1  Douglas D. Yokois, ADC# 240176
   ASPC-Florence/South Unit/0701
2  P.O. Box 8400
   Florence, Arizona 85132
3  Plaintiff: Pro se, In Forma Pauperis

FILED _____ LODGED
RECEIVED _____ COPY

JAN 2 2 2019

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

4

5

6         United States District Court
7             District of Arizona

8

9  Victor Antonio Parsons, et al.,   No. CV-12-0601-PHX-DKD
              Plaintiffs,
10

11                                    EMERGENCY MOTION
12  V.                                FOR AN ORDER OF
13                                    PROTECTION
14

15  Charles L. Ryan, et al.,
              Defendants.
16

17

18      Pursuant to Fed R. Civ. P. 65(b) and the
19  Court's Order filed on July 25, 2017
20  (Document #2209), unnamed plaintiff class
21  member Douglas D. Yokois, appearing in
22  forma Pauperis as a pro se state prisoner
23  litigant, respectfully urges the court
24  grant his Emergency Motion For an Order
25  of Protection. Yokois seeks an emergency
26  order of protection against the Defendant
27  class and their officers, agents, servants,
28  employees, and any and all other persons who

1 are in active concert or participation with them
2 because they have demonstrated a pattern
3 and practice, policy and custom, of
4 disparate treatment against Yokois because
5 he has provided the court and attorneys for
6 the plaintiffs with "information, either
7 via oral testimony or written statements [...
8 [, ]Including] actions which could reasonably be
9 viewed as having a chilling effect on
10 witness testimony by utilizing group
11 punishments, or actions against other prisoners
12 who could in turn blame or target the
13 witness[]." Id., at 4

14

15    This emergency Motion is urged on the
16 grounds that (1) Yokois has documentary
17 evidence that because of his communications
18 with the Parsons court and Attorneys for
19 Plaintiffs; (2) the defendants have and
20 continue to take adverse action against
21 Yokois; (3) because of; (4) his protected
22 conduct, and that such action; (5) chilled
23 Yokois' free exercise of his First Amend-
24 ment Free-speech rights; and (6) the action
25 did not reasonably advance a legitimate
26 correctional goal. See Rhodes v. Robinson, 408
27 F.3d 559, 567-68 (9th Cir. 2005).

28

(2)

1      This emergency Motion is based on the
2 Plaintiff's prior pleadings, motions and other
3 court filings in this case; Yokois' Request
4 For Leave to File an Emergency Motion For an
5 Order of Protection, filed contemporaneously
6 forthwith; the Rulings and Orders of this
7 court in this case; his attached Declaration
8 with exhibits; and his attached Memorandum
9 of Points and Authorities summarizing
10 Yokois' Allegations of Retaliation by
11 Defendants, incorporated herein by this
12 reference. LeBlanc-Sternberg v. Fletcher,
13 143 F.3d 748 (2d Cir. 1998). See also Reno Air
14 Racing Ass'n., Inc. v. McCord, 452 F.3d 1126,
15 1132-33 (9th Cir. 2006).
16
17 MEMORANDUM OF POINTS AND AUTHORITIES
18     IN SUPPORT OF YOKOIS' EMERGENCY
19    MOTION FOR AN ORDER OF PROTECTION
20
21        I. INTRODUCTION.
22
23 1. On July 25, 2017, the court recognized the facts
24 that South Unit Administration officials were
25 retaliating against inmates that cooperated
26 with the Court's investigation into this
27 unit's compliance with the Settlement
28 agreement in the instant case. At that time

(3)

1  the court found good cause to grant plaintiffs of
2  South Unit an Order of Protection against actions
3     taken that harass, intimidate, or otherwise
4     retaliate against the witnesses who have
       provided the Court information, either via oral
5     testimony, or written statements. This
       prohibition includes actions which could
6     reasonably be viewed as having a chilling effect
       on witness testimony by utilizing group
7     punishments, or actions against other prisoners
       who could in turn blame or target the witnesses.
8  Document (Doc.) 2209 at 4. This Court determined:
9  "Cell transfers, loss of property, and spreading
10 potentially damaging information to other inmates
11 are all adverse actions." Id., at 3. Yokois'
12 Inmate Letters, HNRs, Inmate Grievances,
13 letters to Attorneys for the Parsons plaintiffs,
14 and complaints to the U.S. Department of
15 Justice; not to mention his letters and his
16 statements to this court, is "protected conduct
17 by either testifying or submitting written
18 statements to the Court." Ibid. Moreover, "the
19 temporal proximity between their protected
20 conduct and the adverse actions are too close in
21 time to reasonably be viewed as anything other
22 than retaliatory." Ibid., and cases cited. And
23 "Finally, none of the justifications Defendants
24 presented to the Court established a legitimate
25 penological interest." Ibid. Now, once again,
26 ADC administrative officials are retaliating
27 against an inmate at South Unit for cooperating
28 with the Attorneys at Prison Law Office. These

(4)

1 attorneys have been investigating South Unit's
2 compliance with the Parsons Settlement
3 Agreement.
4
5 ## II. ARGUMENT.
6
7 2. Yokois incorporates his attached Declaration
8 with its exhibits herein by this reference
9 hereto, Yokois has been in communication with
10 this court and PLO attorneys since before
11 the Parsons Settlement Agreement was signed.
12 He has maintained his communication with
13 the PLO attorneys since that time, and has
14 been made to suffer many harassments
15 and retaliations, as is described in his Declaration,
16 for his efforts.
17
18 3. Retaliation, The First Amendment to the
19 U.S. Constitution forbids prison officials from
20 retaliating against Yokois for exercising his right
21 of free speech. A retaliation claim consists of
22 5 basic elements:
23    (1) An assertion that a state actor took some
24        adverse action against an inmate;
25    (2) because of;
26    (3) that prisoner's protected conduct; and,
27        that such action;
28    (4) chilled the inmate's exercise of his

(5)

1    First Amendment rights; and,

2    (5) the action did not reasonably advance a

3    legitimate correctional goal.

4  See Rhodes v. Robinson, 408 F.3d 559, 567

5  (9th Cir. 2005).

6

7        First Element

8    Yokois cooperated with the court and

9  attorneys from the PLO on multiple

10  occasions, the last time being on December

11  5 and 6, 2018. Because of his communications

12  with PLO attorneys, his grievances and other

13  writings, he is being harassed and retaliated

14  against by being denied medical treatment,

15  being subjected to false disciplinary

16  charges and guilty findings, in order to

17  move him to a higher custody level unit

18  and deny him access to his legal materials

19  and thereby the courts. These harassments

20  and retaliatory acts perpetrated against him

21  by aforesaid parties have caused Yokois

22  undue pain, suffering and an increased risk

23  of serious and permanent or even fatal injuries

24  as regards his being denied appropriate

25  medical care. And his name being called out

26  over the radio repeatedly by Lieutenant Walker

27  on December 31, 2018, as being responsible for

28  having the yard locked down both constitute

1 the type of adverse actions contemplated
2 by this court in its aforesaid Order,
3 discussed in the foregoing. And, denials or
4 delays in medical treatments alone constitutes
5 an adverse action sufficient to support a
6 retaliation claim. See Davis v. Good, 320
7 F.3d 346, 353 (2d Cir. 2003); Bell v. Johnson,
8 308 F.3d 594, 604 (6th Cir. 2002).

9     Endangerment. Since Yoko's openly spoke
10 with the Parsons attorneys for plaintiffs
11 from the PLO on December 5 and 6, 2018, not
12 only has he been denied post-hospitalization
13 health care for his near-fatal heart attack
14 and diabetic coma, he has been subjected
15 to 5 false disciplinary convictions, the
16 taking of thousands of dollars-worth of
17 personal property without due process,
18 loss of privileges including visits and phone
19 calls, and now is going to be placed in
20 maximum custody (punitive segregation) on
21 or about January 18, 2019. Numerous courts
22 have held that unjustified transfer or
23 transfer to a more dangerous prison constitutes
24 adverse action sufficient to support a
25 retaliation claim. See Morris v. Powell, 449
26 F.3d 682, 687 (5th Cir. 2006); Gomez v. Vernon,
27 255 F.3d 1118, 1127 (9th Cir. 2001).
28

## Second Element

Retaliatory Motive. Retaliatory motive may not be obtainable by direct evidence, especially in a prison setting. Courts have held that "[C]ircumstantial evidence may be sufficient to support a retaliation claim." See Bennett v. Goord, 343 F.3d 133, 138-39 (2d Cir. 2003); Hines v. Gomez, 108 F.3d 265, 268 (9th Cir. 1997).

Courts have held retaliatory motive may be established by:

(1) Proximity in time between protected conduct and adverse action. Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995).

(2) Prior acts of misconduct envince retaliatory motive. See Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 564 (9th Cir. 1990).

(3) Statements by prison officials suggesting retaliatory motive in response to inmates' complaints. Bruce v. Ylst, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

Yokois provides ample retaliatory motive via the evidence shown in his declaration and attached exhibits of aforesaid 3 components.

(8)

## Third Element

1
2 Protected speech. There can be no
3 argument; prisoners providing information to
4 Parsons attorneys for plaintiffs from the
5 PLO who are investigating South Unit's
6 compliance with the Parsons Settlement
7 Agreement, as Yokois is doing, constitutes
8 protected speech.
9

## Fourth Element

11 Defendants' actions are chilling to Yokois'
12 Free Speech rights. The question of whether
13 a particular action would chill a person of
14 ordinary firmness is an objective one and
15 does not depend on how a particular prisoner
16 reacts. See Rizzo v. Dawson, 778 F.2d 527,
17 531-32 (9th Cir. 1985); Siggers-El v. Barlow,
18 412 F.3d 693, 701-02 (6th Cir. 2005);
19 Spruytte v. Hoffner, 181 F. Supp. 2d 736 (W.D.
20 Mich. 2001); Gomez v. Vernon, 255 F.3d 1118,
21 1127, 1130 (9th Cir. 2001).
22

## Fifth Element

24 Legitimate correctional goal. The denial
25 of Yokois' medical treatment, the false
26 disciplinary convictions, the taking of his
27 personal property while he lay in the
28 hospital, the disparate treatment he suffers

(9)

1   due to refusals by ADC officials to
2   reasonably accommodate his disabilities, the
3   seizure of his fundraiser items without due
4   process of law, and now his certain
5   retaliatory transfer to level 5 maximum
6   custody in A.S.P.C.-Eyman's notorious
7   Special Management Unit One, where
8   he was tortured and tormented by
9   ADC officials from April 24, 2014 until he
10   was moved to South Unit on July 21, 2016;
11   or even the threat of transfer, which he
12   has been living under since his arrival here,
13   cannot reasonably advance a legitimate
14   correctional goal.
15
16           Injunction
17     It has been established and may be reasonably
18   inferred that past misconduct by defendants
19   may be used as evidence that future
20   misconduct is likely, which can only be
21   remedied by an injunction. Numerous courts
22   have held there are 4 factors necessary to
23   obtain a preliminary injunction. (1) Irreparable
24   harm; (2) balance of hardships; (3) merits of the
25   case; and, (4) public interest.
26
27         Irreparable Harm
28   A showing that Yokois' Constitutional Rights

1 are likely to be violated, or are currently being
2 violated, is usually enough to meet the
3 irreparable harm requirement, as is being done
4 by the Defendants against Yokois in the
5 instant case. These acts as have been
6 described in the foregoing have and are
7 continuing to cause Yokois irreparable
8 harm. In drawing the inference from past
9 violations that future violations may occur,
10 the court should look at the totality of
11 the circumstances and the seriousness of the
12 injuries. Yokois' foregoing declaration and
13 exhibits demonstrate a pattern and practice
14 of harassment and retaliation that, absent
15 an order enjoining it, will undoubtable
16 continue with impunity.
17
18          Balance of Hardships
19      Yokois need only show that he will
20 suffer more without an injunction than
21 prison officials will suffer if one is
22 granted. In the instant case, the court
23 has already issued its Order enjoining
24 the Defendants from the prohibited behavior
25 If Yokois is moved he will suffer further
26 irreparable injury — this is a certainty.
27 If the Defendants are prohibited from
28 moving Yokois, no harm will be done to
          (11)

them, as they will be able to move him
when the injunction is lifted.

### Merits of the Case

In the instant case, the merits are
long and well-established. As such Yokois
sees no need to rehash the merits of
the Parsons case here.

### Public Interest

The Parsons case is in the public
interest, of course, and so is the courts
Order enjoining prison officials from
acts of harassment and retaliation against
prisoners for their engagement in Constitution-
aly protected speech. Respect for the
Rule of Law, especially by those officials
who are sworn to uphold it, must be held
to be in the public interest, if the public
is expected to have confidence in and
support for our system of government.

### III. CONCLUSION.

Yokois, an unnamed plaintiff in the instant
case, has already suffered irreparable injury
due to the acts of harassment and
retaliation discussed in the foregoing at the

1  hands of the defendants. Yokois,
2  placing his trust and having faith in this
3  court's promise to protect him from
4  harassment and retaliation for speaking
5  to attorneys for the plaintiffs and to
6  this court, asks the court to enforce its
7  Order of Protection of July 25, 2017 (Doc.
8  #2209). Yokois asks this honorable court
9  to waive any rules of the court necessary
10 to hold an emergency hearing on his
11 motion. Absent immediate action by
12 the court, Yokois fears for his continued
13 safety and security at the hands of
14 the Defendants.
15
16        Request for Relief
17
18    Based upon the foregoing and in the
19 interest of justice, Yokois, a plaintiff
20 class member in the instant case, prays
21 this court either:
22    (1) Enforce and enlarge its Order of
23 Protection of July 25, 2017 (Doc. #2209),
24
25              or
26    (2) Grant Yokois an Emergency Order
27 of Protection against all forms of
28 Harassment and Retaliation by the

(13)

1  Defendant class.

2

3      RESPECTFULLY SUBMITTED this 17th

4  day of January, 2019.

5

6

7                    Douglas D. Yokois

8                    Plaintiff Class Member

9                    Pro Se, In Forma Pauperis

10

11            CERTIFICATE OF SERVICE

12

13    I hereby certify that on January    , 2019, I

14  filed an original and two copies of the foregoing

15  document by depositing them in the prison's

16  internal mail system to be delivered by

17  U.S. Mail to the U.S. District court Clerk at:

18  Sandra Day O'Connor U.S. Courthouse

19  401 West Washington St., Suite 130, SPC 1

20  Phoenix, Arizona 85003-2118

21

22    I also certify that on same date and

23  in identical manner as with court I served

24  a copy of the foregoing document to:

25

26  Attorneys for Plaintiffs at:

27  Donald Specter, Esq.

28  Prison Law Office

                    (14)

1   1917 Fifth Street
2   Berkeley, CA 94710
3
4   Attorneys for Defendants at:
5   Daniel Struck, Esq.
6   Struck, Love, Bojanowski & Acedo, PLC
7   3100 W. Ray Road
8   Suite 300
9   Chandler, AZ 85226
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(15)

1 Douglas D. Yokois, ADC# 240176
  ASPC - Florence / South Unit / 0701
2 P.O. Box 8400
  Florence, Arizona 85132
3 Plaintiff: Pro Se, In Forma Pauperis

4

5

6      United States District Court
7          District of Arizona

8

9 Victor Antonio Parsons, et al,    No. CV-12-0601-PHX-DKD
                Plaintiffs,
10

11                                  DECLARATION OF
12 V.                               DOUGLAS D. YOKOIS

13

14 Charles L. Ryan, et al.,
              Defendants.
15

16

17 DECLARATION UNDER PENALTY OF PERJURY

18

19 1. I, DOUGLAS D. YOKOIS, am an unnamed
20 member of the plaintiff class in the
21 above-entitled matter. I am over the
22 age of eighteen (18) years-old. I am
23 competent to testify as to the matters
24 stated herein.

25

26 2. I can show harassment and retaliation
27 for engaging in protected conduct and
28 speech going back to April 2, 2014,

1   when I was maxed out in retaliation for
2   filing inmate grievances about the terrible
3   state of affairs at the Cook and Meadows
4   Medical Units on Eyman Complex. see exhibit
5   1.
6
7   3. During the time I was housed in Eyman
8   Complex's Infamous Special Management One
9   (SMU I), I was subjected to daily conditions
10  that I can only describe as torture. I was
11  housed in many different wings of SMU I
12  from April 24, 2014 until July 21, 2016.
13  During my stay in the SMU I I continued
14  to file complaints and Inmate Grievances
15  about the conditions of my confinement.
16  Altogether I filed approximately 122 of them.
17
18  4. I experienced daily acts of harassment and
19  retaliation by ADC staff. If I were to
20  attach an exhibit and describe each
21  instance, this declaration would reach
22  thousands upon thousands of pages. I can
23  produce these documents if you so order;
24  however, in my effort to keep this as
25  short as possible while preserving as much
26  meaning as I can, I am staying with what
27  I regard as the most important facts.
28

(2)

5. On January 24, 2015, I wrote a letter to the Court expressing my opinions in regard to the fairness of the then proposed settlement agreement. See exhibit 2.

6. Also on January 24, 2015, I wrote a letter to the Prison Law Office to share with the attorneys representing some of the plaintiff class "additional information about the case," and to share my "experience regarding the issues addressed in the case." See exhibit 3.

7. After writing the letters I describe in paragraphs 5 and 6, I was treated much worse by prison officials. I was denied my wheelchair for over a 2-month period. I was denied an ADA-compliant cell, and an ADA-compliant shower, and a shower chair, also for that period. I was denied cleaning tools and disinfectant to clean my cell and my toilet/sink area.

8. I reached out to friends who in turn reached out to Middleground Prison Reform. I filed Inmate Grievances and wrote HNRs about the lack of reasonable accommodation so that I could shower, clean my cell, and

(3)

use my wheelchair in order to gain the necessary
mobility to go to recreation.

9. On February 22, 2016, after winning an
inmate grievance against medical to get
moved to a location in the SMUI with
access to a wheelchair-accessible shower
and an ADA-compliant cell, I was moved to
that new cell; cell 1A37. However, I was
retaliated against by the prison staff who
moved me. These security officers wrote
3 false disciplinary reports against me.
They dumped my legal papers and personal
property items all over the cell I was to
occupy, they stepped on my Holy Bible,
breaking it into 2 pieces. They locked me
into cell 1A37 without giving me my wheelchair,
placing it underneath the stairs where I could
see it but not access it. They refused to
turn on my electricity in my cell or connect my
TV cable. I was without electricity for 3 days
and could not use my CPAP machine. Cell 1A37
was filthy, not having been cleaned after the
prior prisoner had moved out the mattress had
the cover completely torn off, and was wet,
smelling like mold. I took me several days to
restore my papers to order and get the cell
organized. See Exhibit 4

(4)

1 10. On July 21, 2016, I was moved from the
2 SMUI to Florence Complex's South Unit.
3 Upon my arrival here I was informed that
4 I better not file grievances or complain or
5 I would be moved off the unit. I kept my
6 mouth shut, afraid that if I spoke out on
7 any problems here I would be retaliated
8 against.
9
10 11. On July 24, 2016, I requested my sling
11 for my wheelchair be renewed by the medical
12 provider. At that time I also asked permission
13 to have my own wheelchair shipped in at
14 my own expense in compliance with ADC
15 policy. After waiting for 13 months, medical
16 staff issued me a new wheelchair on August
17 13, 2017. Medical refused to allow me to
18 have my own wheelchair shipped in to me.
19 See Exhibit 5.
20
21 12. During the same period I describe in
22 paragraph 11 above, I met prisoner Arnold
23 Geib. I knew prisoner Geib from approximately
24 August 2016 until his untimely death on
25 March 29, 2017. I tried to help Mr. Geib
26 communicate his medical needs to prison
27 staff, as he suffered a Traumatic Brain
28 Injury from a severe aggravated battering

(5)

1  he received from another prisoner in March
2  2016. In retaliation against me for helping
3  prisoner Geib, I was moved to another
4  building and not allowed to assist him.
5  Distraught over this, prisoner Geib died the
6  afternoon after I was moved. See exhibits
7  6 and 7.
8
9  13. On March 14, 2017, $398.00 worth of goods
10 were unlawfully taken from me without due
11 process by ADC officials. I exhausted
12 administrative remedy No. A02-059-017 when
13 my appeal was denied on June 15, 2017.
14
15 14. On July 17, 2017, I was a victim of aggravated
16 assault and battering by Lieutenant Albert
17 Walker, badge No. 3150. Lt. Walker discriminated
18 against me, a prisoner with a disability, by
19 issuing me a false inmate disciplinary report
20 because I could not move my wheelchair the
21 distance he demanded, and told me I could not
22 be housed on South Unit because I was not
23 ambulatory. I exhausted my administrative
24 remedy No. A02-171-017 when my appeal was
25 denied on September 29, 2017, I filed a
26 42 U.S.C. §1983 complaint in Arizona Superior
27 Court on October 16, 2017; Yokois V. Ryan, et al.,
28 CV2017-094513. The case was dismissed for failure

(6)

1. to state a claim on which relief can be granted.
2. The case is currently under appeal in the
3. Arizona Court of Appeals Division One. The
4. case is consolidated. Yokois v. Ryan, et al., Nos.
5. 1 CA-CV 18-0199 and 1 CA-CV-18-0508.
6.
7. 15. On November 20, 2017, My wheelchair
8. broke. I fell into the gravel and was injured.
9. For several days before it broke I had
10. filed HNRs and asked ADC officials for
11. a replacement wheelchair, but my requests
12. were denied. CO II Long refused to replace it,
13. stating that I was "too fat" and that I needed
14. to "lose weight," after I complained on an HNR
15. about his interfering with my medical
16. treatment. I exhausted administrative remedy
17. NO. A02-229-017 when my Emergency Non-
18. Medical Complaint, filed the same day I fell,
19. was not treated as an Emergency, was
20. treated as a medical grievance and denied
21. by AFHA Michael Delgado on November 21,
22. 2017.
23.
24. 16. On January 16, 2018, I used informal means
25. with an ADC official to resolve a problem
26. I was having with Environmental Tobacco
27. Smoke (ETS) inside my dormatory.
28.

(7)

17. On January 19, 2018, I was pushed down onto the ground and battered by another prisoner who is a tobacco smoker. I did nothing to fight back or strike at my assailant. I was given a false Inmate Disciplinary Report (I.D.R.), case no. 18-A02-0045 for fighting by Special Services Unit (SSU) Sergeant D. Thomson, badge #1807.

18. On January 23, 2018, I was moved to dormatory 1C, as retaliation for my complaints about ETS in dorm 8A/B. Dorm 1C is not an ADA-compliant dorm; it does not reasonably accommodate me, a wheelchair-dependant prisoner with a disability. I initiate an inmate grievance about my problem on February 12, 2018, and exhausted my administrative remedies in case no. A02-027-018 on May 7, 2018.

19. On February 6, 2018, I was found guilty in inmate disciplinary case no. 18-A02-0045, by Captain (CPT) T. Curtis, badge #8154. CPT. Curtis changed the charge to disorderly conduct and charged me $7.70 — half of the cost of the tear gas canister that was fired while I was being held down on my back and beaten by my assailant. I appealed, and exhausted my administrative remedy on February 23, 2018.

1 20. On March 21, 2018, COIII Bell, the unit's
2 acting Inmate Grievance Coordinator, retaliated
3 against me by refusing to give me the numbers
4 for grievances I had turned in. I exhausted
5 my administrative remedy in case no. A02-
6 064-018 on May 8, 2018, in this matter.
7
8 21. On July 18, 2018, my medically necessary
9 allergy diet was changed by ADC official
10 Mr. Merriman to a "medical vegan diet" in
11 retaliation for my "winning" my administrative
12 remedy case no. A02-107-018 on July 17, 2018.
13 Vegan diets are only to be approved by the unit
14 chaplain and only for religious reasons.
15
16 22. On July 25, 2018, I submitted an HNR
17 about my being placed on a "medical vegan
18 diet." I never received a written response to
19 my HNR.
20
21 23. On August 30, 2018, I was ordered to
22 wait outside the medical unit in the sun in
23 record-setting heat, by COII Pero, without
24 access to water or misters, after I had
25 already informed her that I take prescription
26 medication that makes me more susceptable
27 to heat injury. As I was forced to sit in
28 the heat in my wheelchair, COII Pero stood

(9)

1 directly under the overhang at the front door
2 of the medical unit smoking a cigarette. I
3 asked COII Pero to contact her supervisor.
4 I few minutes later LT. Mexin, badge #1653
5 arrived. He immediately began to yell and
6 curse at me because I had complained
7 about being made to wait outside and
8 because I had complained about the ETS.
9 After he yelled and cursed at me for
10 a few minutes, he allowed me to return
11 to my dorm amd wait to be called when
12 the nurse was ready to see me. On December
13 12, 2018, I received the inmate grievance appeal
14 response exhausting my administrative remedy
15 in case no. A02-149-018.
16
17 24. Also on August 30, 2018, I began my
18 administrative remedy about the ETS, which
19 violates the smoke-free Arizona act; ARS
20 §36-601.01. I received the inmate grievance
21 appeal response in case no. A02-147-018 on
22 December 12, 2018, exhausting my administrative
23 remedy.
24
25 25. On September 1, 2018, LT. Mexin placed me
26 on an IDR for disorderly conduct. The IDR
27 (18-A02-0538) was changed to a more serious
28 Assault on Staff that Did Not Involve Serious

(10)

1 Injury by SGT. Velazco in concert with COIII
2 Barry Defeo. COIII Defeo was a defendant in
3 <u>Yokois V. Ryan</u>, Ariz. Super Ct. Maricopa Cty., CV2017-
4 094513. On September 18, 2018, CPT. Curtis
5 changed the charge back to disorderly
6 conduct and found me guilty of this false
7 disciplinary charge. The penalties
8 remained the same, but the charge was changed
9 to Attempt to Commit a Class B Violation on my
10 step 1 disciplinary appeal. I exhausted my
11 administrative remedy on November 11, 2018,
12 for inmate disciplinary case no. 18-A02-0538.
13
14 26. On September 1, 2018, I began my administrative
15 remedy regarding the harassment and
16 retaliation I was suffering at the hands
17 of the Trinity (food service) contracted
18 employees and the ADC officials who
19 worked with them, including but not limited
20 to, Mr. Merriman and SGT. Velazco, who
21 informed me that if I complained about my
22 diet anymore that he would write me up
23 for obstructing staff. I exhausted my
24 administrative remedy on December 12, 2018,
25 for A02-148-018.
26
27 27. Also on September 1, 2018, I began my
28 administrative remedy regarding the harassment

(11)

1. and retaliation I suffered for my grievance
2. about ETS in front of medical and for
3. forcing me to sit in the record-setting high
4. temperatures I described above in paragraphs
5. 23 through 25. I exhausted my administrative
6. remedy on November 26, 2018, for A02-153-018
7.
8. 28. On September 1, 2018, one of the front
9. wheels of my wheelchair got stuck in a
10. dangerous spot of concrete immediately in
11. front of the wheelchair ramp at the yard
12. office. My wheel stopped the wheelchair
13. short, nearly throwing me out of said
14. wheelchair. I previously complained to ADC
15. officials about this spot, but the officials
16. refused to have it fixed. I began an
17. administrative remedy on the matter on
18. September 3, 2018, and exhausted it on
19. November 26, 2018. It has not been fixed.
20.
21. 29. I began an inmate grievance procedure
22. because ADC officials refuse to make
23. the necessary modifications to building entrances
24. and doors on South Unit including but not
25. limited to (1) the inmate resource library, (2) the
26. Chaplaincy, (3) the entrance way to my dorm,
27. dorm 7, (4) the Disciplinary [WIPP office, (5)
28. the inmate bathrooms in the medical unit, (6)

(12)

1 the entrances and exits to the unit's strip
2 shack, and (7) the entrance and exit to the
3 yard at the north end by central unit,
4 where inmates must go to get to the
5 central medical unit. When I attempted
6 to use informal means with ADC officials
7 CAPT. Williams, SGT. Konwecski, and COIII Defeo,
8 I was laughed at. I began my administrative
9 remedy on September 5, 2018, it was made
10 unavailable to me by COIII Bell who refused to
11 process my grievance appeal on November 7,
12 2018, exhausting case no. A02-155-018.
13
14 30. On September 23, 2018, I received legal
15 mail from the U.S. Department of Justice
16 Office of Justice Program's Office of
17 Civil Rights "Re: Yokois vs. Az. Dep't of Corrs.,
18 (18-OCR-1557) Litigation Suspension". The
19 letter was opened before I received it,
20 and the enclosed Identity Release Statement
21 was missing from the envelope. I improvised
22 an Identity Release Statement of my own,
23 signed it, and sent it back to the director,
24 Michael L. Alston, via U.S.P.S. 2-Day Express
25 Priority Mail. Two days later it was
26 returned unsent to me. I was informed
27 that I was not permitted to mail any
28 items using 2-Day Express Priority Mail.

1  I had to resend it on September 27, 2018 or
2  September 26, 2018 via U.S.P.S. Priority Mail,
3  but I have not received a receipt with a
4  tracking number or any response from
5  their direction. See exhibit 8.
6
7  31. From October 21, 2018, through October 23, 2018,
8  L.T. Walker, who was a defendant in Yokois V.
9  Ryan, Ariz. Super. Ct. Maricopa Cty. CV2017-094513,
10 committed several deliberate acts of disparate
11 treatment toward me and other non-ambulatory
12 prisoners with disabilities. I personally witnessed
13 him say "No [ADA Aides] will be called to push you
14 or assist you."; "This is a self-care yard."; "[ADA
15 Aides] are a privilege, not a right."; "This is an ambulatory
16 yard: If you aren't ambulatory, then I'll get you
17 moved."; and, "I don't care how long it takes you to
18 get [to the medical unit]. You better get there on your
19 own." He mocked and taunted prisoner Garcia,
20 saying to him; "We don't need to call our attorneys now,
21 do we?" He called another disabled prisoner a
22 jack-off, and ordered another prisoner to push that
23 prisoner up to medical "and leave his crippled ass up
24 there." I filed an administrative remedy on
25 October 24, 2018, I received a response from the
26 deputy warden of South Unit, Lori Stickley, dated
27 November 30, 2018, but as of January 14, 2018,
28 I have not received a response to the appeal I filed

(14)

1 on December 5, 2018; and so I consider my
2 administrative remedy unavailable in this matter,
3 case no. A02-174-018

4

5 32. From 2210 on October 21, 2018 until 0600 on
6 October 22, 2018, COII Lopez repeatedly locked
7 all of the prisoners inside dorm 7, leaving myself
8 and the other disabled, elderly, and frail prisoners
9 with disabilities unattended for several periods
10 exceeding 1 hour each time, failing to ensure our
11 safety. When asked, COII Lopez stated that he
12 did not want to do so, but he had to cover 2 other
13 buildings besides ours, and that his shift supervisor
14 LT. Green had ordered him to do so. I filed my
15 administrative remedy on October 24, 2018, and I
16 received a response from D.W. Stickley dated
17 December 28, 2018. I filed an appeal on January 7,
18 2019, and I await a response to exhaust case no.
19 A02-178-018.

20

21 33. On November 19, 2018, I suffered a nearly
22 fatal diabetic coma. The coma induced
23 dehydration and a heart attack. As I lay
24 in the medical unit fighting for my life, the
25 ADC medical staff sought permission to
26 call 911 to activate emergency services. I had
27 to be cardioverted twice in the ambulance
28 enroute to the hospital emergency room.

(15)

1 While I was hospitalized I was administered
2 a panoply of prescription medication, including
3 powerful opiates and other narcotics. I
4 was discharged in the evening on November
5 21, 2018, and returned to South Unit. Less
6 than 48 hours after my return on November
7 23, 2018, I was targeted to submit a
8 urinalysis which was, of course, positive for
9 opiate metabolites. The urine sample was
10 sealed and sent to a laboratory for
11 confirmation. I was informed that I had
12 nothing to worry about, as my medical
13 record would show I had received opiates
14 in the hospital. But on December 24, 2018,
15 I was informed I was receiving an Inmate
16 Disciplinary Report, case no. 18-A02-0757, for
17 a positive urinalysis. On January 8, 2019, I was
18 found guilty of this charge by CPT. Curtis.
19 My administrative remedy is in process in
20 this matter; but if I can rely on my
21 prior experience in the disciplinary appeal
22 process, I am informed and believe the
23 guilty finding, as with all prior appeals,
24 will be upheld in this matter.
25
26 34. On November 24, 2018, I was called to the
27 medical unit. I was summoned into Nurse
28 Owitis's office. When I left his office,

(16)

1 COII Pero informed me she was placing me
2 on report for disobeying a verbal or written
3 order. On November 27, 2018, COIII Pape
4 found me guilty, but handled the report
5 informally by reprimanding me after he
6 reviewed a video file that exonerated me.

8 35. On November 27, 2018, I discovered that
9 during my hospitalization from November 19
10 through November 21, 2018, ADC officials
11 read through my attorney-work products
12 and my legal papers, mixing them up. I
13 also discovered that 7 legal books worth
14 approximately two thousand dollars were
15 missing, and that several clothing items
16 were also missing, worth approximately
17 one hundred dollars. I am pursuing an
18 administrative remedy for the thefts.

20 36. On November 30, 2018, after waiting
21 9 days for followup medical care from
22 my nearly fatal medical emergency I
23 filed and exhausted an administrative
24 remedy, which was made unavailable
25 to me that same day. See exhibit 9.

27 37. On December 04, 2018, I mailed copies
28 to Florence Complex's Facility Health

1 Administrator (FHA) Adam Perkins, and to
2 ADC Director Charles L. Ryan, via U.S.P.S.
3 Certified Mail with Return Receipt Requested.
4 Mr. Perkins received his copy on December
5 8, 2018; Director Ryan received his on
6 December 10, 2018.
7
8 38. On December 12, 2018, I was summoned
9 to an unscheduled nurse practitioner appointment
10 with Nurse Practitioner Hahn. NP Hahn and COII
11 Johnson told me that I was not to bring up
12 any of my complaints about my medical care
13 or I would be kicked out. NP Hahn proceeded
14 to tell me that she was taking away my
15 wheelchair in 90 days, and that she was
16 not going to renew my ibuprofen prescription
17 which I take twice daily for pain and inflamation.
18 She said she would order me gabapentin
19 to replace the ibuprofen. She said she could
20 get me a walker with a seat to replace
21 my wheelchair. She said she would get my
22 replacement Medical shoes, which have
23 been denied me for over 2 years. I received
24 my initial pair nearly 4 years ago. NP Hahn told
25 me to give her an HNR about these things.
26 I filled out an HNR on the spot and placed it
27 into her hands myself. I have never been
28 given her acknowledged copy of it. See
(18)

exhibit 10 at 12.

39. On January 7, 2019, Nurse P. Raney wrote an Inmate Letter Response to my Inmate Letter I sent to FHA Adamon Perkins on December 4, 2018 ( see paragraph 37 above), wherein I complained to Mr. Perkins that NP Hahn's "knowledge, skills and abilities or experience" was inadequate ( see exhibit 9 at 7). Nurse Raney is NP Hahn's direct supervisor. I attach a copy of Nurse Raney's Inmate Letter Response as exhibit 11.

40. On January 8, 2018, I received a pass to report to the "NP Line" at the Health unit. But when I went there, COII Johnson informed me that I would be rescheduled.

41. On January 9, 2018, I was informed by COII Johnson that NP Hahn was seeing me that morning. At approximately 0740 I was told to wheel myself into her office. As I was trying to get my wheelchair through her door, she asked me how I was doing. When I replied that I was not doing well because I was in severe pain, she snapped "I'm not listening to your bullshit, Yokois. I'm not going to give you anything for pain. I'm

(19)

not giving you your ibuprofen back. I'm not giving you a cane, or shoes, any SNOs, or anything else, and I'm gonna take your wheelchair away from you. You can have nortriptyline or nothing at all. I don't care about your metformin or your simvistatin not being refilled. I don't like what you're ordering from [the inmate] store. I'm gonna see to it that you can't buy any food for awhile. No get out of my office and don't come back." As soon as she said the word "bullshit" and I noticed how angry she was I began to try to leave her office. However, I have a 24-inch wide wheelchair. The width of my wheelchair makes it very hard to get through the doorways, so it took a few moments for me to get out. As soon as I was clear of her office doorway I left medical. At approximately 1016 I was informed by COII Spires, badge #8969, that NP Hahn had written an IDR on me for Threatening or Intimidating her I am awaiting a Disciplinary Hearing on IDR case no. 19-A02-0015.

42. On December 19, 2018, I submitted a $798.95 fundraiser order for Sam's Club Merchandise. Fifty percent, $399.48, of the

(20)

total is donated to the organization funds are
being raised for. These funds were withdrawn
from my Inmate Trust Account on December
27, 2018: Three days after I was informed
I was on report in disciplinary case 18-A02-
0757 (see paragraph 33 above). I was
found guilty on January 8, 2019. On January 10,
2019, as I began my 30 days L.O.P., The Sam's
Club merchandise was being unloaded at
the South Unit Mail/Property Office. It
was delivered the next day on January 11,
2019. But since I started LOP the previous
day, the ADC official in charge of the
fundraisers took my merchandise, and I
lost $400.00 - worth of merchandise, because
instead of being delivered on December 30,
2018, as was promised, it was delayed until
the morning after I went on L.O.P..

43. Since my being found guilty in Inmate
Disciplinary case no. 18-A02-0757 (see paragraph
33 above) my points are now high enough
to send me back to maximum level
custody. I am informed and believe that
as soon as I am found guilty in Inmate
Disciplinary case 19-A02-0012 and 19-A02-
0015 by CPT. Curtis, I am to have a max
custody packet and hearing. I will then

(21)

1  be transferred back to SMUI for at least
2  5 years.
3
4  44. In level 4 (close) or level 5 (maximum)
5  custody, I am not permitted to have any
6  hard cover books. That means I will lose
7  access to important legal resource
8  materials I have purchased at great
9  personal expense. One of these titles is
10  a 4-volume set of Rights of Prisoners.
11  Another is my 72-volume set of Arizona
12  Revised Statutes Annotated. I also have
13  a considerable amount of my own money invested
14  in legal dictionaries that are also hard cover.
15
16  45. On December 5, 2018, we were visited
17  by some of the Attorneys for the Parsons
18  plaintiff class inside dorm 7. As senior
19  ADC administrative officials looked on, Ms.
20  Rita Lomio, Esq. and I discussed the disparate
21  treatment I and other plaintiff class members
22  are suffering as a result of our disabilities here
23  and throughout the ADC, and my not being
24  given replacement medical equipment and
25  supplies in a medically meaningful and
26  timely manner. Ms. Lomio asked me to write
27  her about these problems and I did so.
28  See exhibit 12.

(22)

46. On January 16, 2018, I was informed I will have a maximum custody hearing in 48 hours. On January 18, 2018, I expect to be moved from South Unit to maximum custody housing. When I am moved, I will lose access to all of my witnesses on this unit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of January, 2019.

_____

Douglas D. Yokois
Unnamed Plaintiff and Declarant
Pro Se, In Forma Pauperis

(23)

# Exhibit 1

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Notice of Appeal - Maximum Custody Placement**

| Inmate Name (Last, First M.I.) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| Yokois, Douglas D. | 240176 | Eyman/Meadows/CO4/A103 | 04-01-14 |

I am appealing:

☑ Placement at Maximum Custody Unit.  The Hearing was held on **04 / 01 / 14**.

☐ Continued placement at Maximum Custody Unit.  The Hearing was held on _____/_____/_____.

I understand that I have fifteen (15) work days from the date of placement notice from which to file my appeal.

**Basis for appeal:** (Be specific with the facts and detail the rationale on why you feel the approved placement should be reversed.)

The basis for my appeal of this decision is that I was not afforded adequate due process:

1, I was not given an appeal of maximum custody placement form or informed of the appeal process at my maximum custody hearing.

2, I was not notified in writing that my move to maximum custody had been approved on 04-14-14, Instead I learned of the decision on 04-16-14 from COIII Monaghan. I submitted my appeal to the decision two (2) workdays (WDs) after learning of it.

3, I'm appealing the decision of COIII Wiggin, whose function in this exercise was to serve as a "rubber stamp" for the decisions of D.W, Lao and D.W, Curran. Neither of these two individuals are impartial as they've both been the subject of my grievances.

4, The central point of my appeal is that none of the parties who are involved in rushing me off to maximum custody did so without giving me an opportunity to be heard at a meaningful time and in a meaningful manner.

A, No one reviewed my Maximum Custody Hearing Statement with the nearly 100 pages of supporting documentary evidence of misconduct, deliberate indifference, and conspiracy to thwart my grievance processes by senior prison officials.

B, The terrible state of affairs at Cook and Meadows' Medical units and the security staff at Meadows unit made it necessary for me to file 27 grievances on my own behalf (see attached copies).

C, The problems I stated in 4A above caused me to be sought by other inmates on Meadows Unit for technical assistance in the grievance procedure. As a result, I furnished technical assistance in the submission of 23 grievances for other inmates (see attached copies).

D, As of the date of this appeal, I have not received a decision of the Director on my second appeal of my disciplinary case number 14A440153. I appealed this conviction for due process violations on 04-10-14, a fact which I'm sure is not lost on D.W, Lao.

| Inmate Signature | Receiving Officer Signature/Title/Badge Number | Date |
|---|---|---|
| [signature] | COIII Monaghan, # | 04-18-14 |

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Notice of Hearing and Inmate Rights**
**(Proposed Maximum Custody Placement)**

| Inmate Name (Last, First M.I.) (Please print) | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| YOKOIS, DOUGLAS D. | 240176 | A14 ASPC-E COOK UNIT | 03/20/14 |

**Purpose of Hearing:**   You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution.  The issue being considered is whether your already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution.  In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories:**   Indicate (with a check) which of the following behavioral categories apply to the inmate's proven behavior.

☐ 1.   The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☐ 2.   The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3.   The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4.   The inmate has conspired or attempted to convey, introduce or poses contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☐ 5.   The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6.   The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☑ 7.   The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:**  (Instructions:  provide a detailed factual account of the incident(s) that supports the proposed placement.  In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)

Max Custody due to disciplinary. Inmate scores 63/45 pts.
02/06/14 13-A14-0784 ASSAULT ON INMA GUILTY-MAJ.V

03/20/14 14-A44-0153 DISORDERLY COND GUILTY-MAJ.V

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

Page 1

801-6
2/25/10

Notice of Hearing and Inmate Rights Cont'd

*Yokois  240176*

**Inmate Rights:**   An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of  "guilty" by the Disciplinary Hearing Officer (DHO).  The staff member shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

    ☐ Both the staff member and the inmate agree to waive the inmate's appearance.

    ☒ The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____ / _____ I waive the right to the 48 hour notice of hearing.
*(Inmate Initials)*        *(Date)*

*Received*

| Inmate Signature | Staff Signature / Title | Date |
|---|---|---|
| *A.W.* | *Ford COIII* | 03 /20 /2014 |

Distribution: White - Master Record File
        Canary  - Inmate Copy
        Pink  - Institutional File

801-6
2/25/10

**Maximum Custody Placement Recommendation/Approval Cont'd**

| Evidence relied on to support the recommendation: *(Evidence may Include copies of the Disciplinary Reports)* |
|---|
| 02/06/14 13-A14-0784 ASSAULT ON INMA GUILTY-MAJ.V |
| 03/20/14 14-A44-0153 DISORDERLY COND GUILTY-MAJ.V |

*pts. 63/45*

Was the inmate provided a copy of the Hearing Findings? ☑ Yes ☐ No

Inmate notified of the appeal process? ☑ Yes ☐ No

Inmate ☐ does ☑ does **not** waive their right to an appeal regarding placement in Maximum Custody?

Inmate given a copy of the Notice of Appeal for Maximum Custody Placement? ☐ Yes ☑ No

| Inmate Printed Name | Inmate Signature | Date |
|---|---|---|
| YOKOIS, DOUGLAS D. *240176* | *(signature)* | 01-01-14 |
| Classification Officer Printed Name | Classification Officer Signature | Date |
| ~~D. Ford~~ CO III *B. Monaghan* | *(signature)* | 4-1-14 |

☑ Recommended ☐ Denied

| Deputy Warden Printed Name | Deputy Warden Signature | Date |
|---|---|---|
| *DWf / E-Co* | *DWf* | 4-1-14 |
| Comments *I/M Behvn wrants more struttrd enmmnt* | | |

☑ Approved ☐ Denied

| Warden Printed Name | Warden Signature | Date |
|---|---|---|
| *K. Curran* | *(signature) Dwof* | 04-02-14 |
| Comments *CONCUR W/DW LAC* | | |

☒ Approved ☐ Denied

| Classification Administrator Printed Name | Classification Administrator Signature | Date |
|---|---|---|
| *Phyllis Wiggui CO IV* | *Phyllis Wiggui CO IV* | 04/14/14 |
| Comments *max custody* | | |

Distribution: White - Master Record File
Canary - Inmate Copy
Pink - Institutional File

801-7
2/25/10

RECEIVED

APR 0 9 2014

Offender Services Bureau
ADC

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Notice of Hearing and Inmate Rights**
**(Proposed Maximum Custody Placement)**

| Inmate Name *(Last, First M.I.) (Please print)* | ADC Number | Unit | Hearing Date |
|---|---|---|---|
| YOKOIS, DOUGLAS D. | 240176 | A14 ASPC-E COOK UNIT | 03/02/14 |

**Purpose of Hearing**:    You are being referred for a Classification Review and Hearing to determine whether you should be placed at a maximum custody institution.  The issue being considered is whether your already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The COIII or CO-IV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution.  In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below.

**Behavior Categories**:    Indicate *(with a check)* which of the following behavioral categories apply to the inmate's proven behavior.

- [ ]  1.    The inmate has demonstrated physical or sexually assaultive behavior resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned.  Such demonstrated assaultive behavior may or may not involve the use of a weapon.

- [ ]  2.    The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

- [ ]  3.    The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

- [ ]  4.    The inmate has conspired or attempted to convey, introduce or poses contraband, which posses a threat or danger to the security of the institution.  Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

- [ ]  5.    The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

- [ ]  6.    The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

- [x]  7.    The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:**  *(Instructions:  provide a detailed factual account of the incident(s) that supports the proposed placement.  In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

Max Custody due to disciplinary. Inmate scores 63/45 pts.
02/06/14 13-A14-0784 ASSAULT ON INMA GUILTY-MAJ.V

03/20/14 14-A44-0153 DISORDERLY COND GUILTY-MAJ.V

Distribution:  White  -  Master Record File
                 Canary  -  Inmate Copy
                 Pink  -  Institutional File

801-6
2/25/10

Page 1

5B29

**Notice of Hearing and Inmate Rights Cont'd**

**Inmate Rights:**   An inmate has a right to be present at the hearing and respond to evidence presented.  The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing.  A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded.  A copy of the written statement(s) shall be attached to the Hearing Findings.  The staff member shall insure that such summary statements are based on the inmate's intended meaning.  The inmate shall be asked to read the statement and certify its accuracy when signing the form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings.  Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing.  If such relevancy cannot be clearly established, the witness shall not be authorized.  No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of  "guilty" by the Disciplinary Hearing Officer (DHO).  The staff member shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information.  If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist:

- [ ]   Both the staff member and the inmate agree to waive the inmate's appearance.

- [ ]   The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____ / _____   I waive the right to the 48 hour notice of hearing.
*(Inmate Initials)*     *(Date)*

*Received*

| Inmate Signature | Staff Signature / Title | Date 03/20/2014 |
|---|---|---|

Distribution: White  -  Master Record File
       Canary  -  Inmate Copy
       Pink  -  Institutional File

801-6
2/25/10

Date: 04-01-14

Name: Yokois, Douglas D. ADC# 240176 Location: Eyman/Meadows CDU/A103

To: Custody Hearing Officer, Meadows Unit.

In accordance with Department Order 801, Inmate Classification, subparagraph 10, I hereby give the following statement regarding my maximum custody placement hearing:

1. From the time of my arrest in August 2007 until November 23, 2013, over six (6) years, I was never given a disciplinary hearing or sanction.

2. Regarding my disciplinary case # 13-A14-0184 of 02-06-14, I still maintain that I was forced to defend myself from being called a "punk" by inmate Allen. While I am not attempting to rehash the case, It is important to note that when I was moved back to Cook Unit on 03-14-14, I was in close proximity to and could have easily assaulted inmate Allen if I chose to. However, I instead chose to forgive inmate Allen for his transgressions against me on 11-23-13. Inmate also communicated to me that he regretted his speech and actions of that day.

3. Regarding my disciplinary case #14-A44-0153 of 03-20-14, the case is under appeal. Please refer to my appeal for details.

4. I believe that rather than looking at these individual offenses, that it is of more importance to look at the events in the context of what is currently going on in my life that may shed new light on whether or not I am able to adjust to a lower custody unit.

a. I am currently about to go to Superior Court for the dissolution of my marriage after 22 years, on 04-23-14, I was served with the petition on 02-21-13. It took me 3 months to hire an attorney. In the interim, I had to learn the rules of court for Arizona and learn how to conduct a legal exchange in a family law case, my first experience with law.

b. My first infraction occured on 11-23-13, my twenty-second (22) wedding anniversary, my last one.

c. My second infraction occured on 03-14-14, three (3) days after the final status hearing before our court date.

d. I am being retaliated against for filing grievances. I refer the maximum custody officer to exhibits "A" through "N", with special emphasis on exhibits "C", "E", and "F". Please refer to my disciplinary hearing statement of 03-20-14, paragraph 2, for further details. This information was disallowed by the D.H.O. at my hearing.

5. For the reasons stated in paragraphs 4, 4a, 4b, 4c, and 4d above, I assert that this is new information that has now become known by A.D.C., and therefore constitutes grounds for a Custody Override Decrease, in accordance with D.O. 801.05.1.5

6. I therefore respectfully request that the officer conducting this hearing not recommend that I be placed in maximum custody, but instead that I be granted a custody override decrease to close custody, where I can demonstrate that I am not a threat to staff, the public, or inmates, and that I am capable of functioning in a less secure environment. Then I shall be re-evaluated in 180 days or when new information becomes known.

(End of Statement)

D.W. _____ / 04-01-2014

Douglas D. Yokois / Date signed
ADC# 240176

Page 3 of 3

# Table of Exhibits

| Exhibit | Title and comments |
|---|---|
| A. | Master Grievance Listing as of 03-31-14. |
| B. | "O.P." Master Grievance Listing as of 03-31-14. |
| C. | A44-001-014, "∅sign, ∅store," which was deliberately mishandled and generated exhibits H, I, and J. |
| D. | A44-017-014, "missing property," COIV Perrce-Cerros unduly interfered with investigation. |
| E. | "clear the scanner", D.O.501 and 108 violations. |
| F. | "D.O.109 viols": D.O.109 violations that are about the lack of control of smoking tobacco by staff and inmates. |
| G. | "norm explosion" D.O.501 violations, etc. |
| H. | "∅ conf", confidentiality violation |
| I. | "∅ ext", No written notice of extension |
| J. | "∅ proc". Not processed correctly per D.O.802 |
| K. | "norm misconduct II", D.O.501, Ethics violations |
| L. | "ADW misconduct", D.O.501 violations, retribution |
| M. | "ADW misconduct II", D.O.501 violations, retribution, conspiracy, etc. |
| N. | "Eccles misconduct", D.O.501 violations, retribution, conspiracy, etc. |
| O. | "TBI" Threatened and Intimidated to change dates on grievances, appeals, fraud, conspiracy, retribution. |
| P. | "Security Problem with ADA Inmates" |

Master Grievance Listing

Exhibit "A"

Page 1 of 2

## Master Grievance Procedure Tracking Sheet
### 2013-2014  Yokois #240076  (Not Formed)

| Interviewee Name | Case Number | Step I Begun | Step II Begun | Step III Begun | Step IV Begun | Returned |
|---|---|---|---|---|---|---|
| Interview Name | Case Number | Step I Begun | Step II Begun | Step III Begun | Step IV Begun | Returned |
| 8 Labs° Done | A14-174-013 | 11-07-2013 | 12-13-2013 (cold wing) | 12-13-2013 (cold wing) | | Exhausted 02-04-[04] Rec'd 02-04-14 |
| 8 ID's/advice Done | A14-176-013 | 11-07-2013 | 11-22-2013 (cold wing) | 11-23-2013 (cold wing) | | Rec'd 02-04-14 |
| 8 term referrals Done | A14-176-013 | 11-07-2013 | 11-22-2013 (cold wing) | 12-13-2013 (cold wing) | | Exhausted 02-04-14 Rec'd 02-11-14 |
| 8 vaccination refusals Done | A14-284-013 | 12-10-2013 | 12-16-2013 (cold wing) | 12-13-2013 (cold wing) | 07-15-2014 (cold wing) | Exhausted 02-10-14 Rec'd 03-24-14-20 |
| 8 ID v So # Done | A14-240-013 | 12-10-2013 | 12-17-2013 (cold wing) | | | Rec'd Ple 12-17-20 |
| Sick call wheelchair # Done | A14-001-014 | 12-10-2013 | 12-19-2013 (cold wing) | | | Will take appt. 12-13-2013 |
| Sick 4 point card # Done | A14-017-014 | 01-02-2013 | 01-30-2013 (cold wing) | | | Took wheelchair 12-13-2013 |
| Session for care° Done | P14-029-014 | 01-14-2014 | 01-15-2014 (cold wing) | 03-11-14 (4) | | make appt on 12-13-2013 |
| 8 certification Done | A14-040-014 | 12-05-2013 | 03-30-2014 (cold wing) | 03-11-14 (4) | | Exhausted on 02-03-14 |
| men property # Done | | | | | 03-26-2014 | Exhausted on 03-28-14 |
| men for disroll | | 01-29-2014 02-22-2014 | | | 03-26-2014 04-13-14 | Exhausted on 03-30-14 Rec'd on 03-27-14 |
| N14 illiterate disroll | A14-047-014 | 02-05-2014 | 03-14-2014 (04-09-14) | 03-31-14 (04-09-14) | | |
| 8's predominated or ADA's | | 02-05-2014 | 03-10-14 (03-27-14) | 04-03-14 (05-01-14) | | |
| c. discuss the Sacra. cell | | 02-14-2014 | 03-14-14 (03-27-14) | 04-07-14 (05-01-14) | | |
| c. i. or 8's for disroll or meds | | 02-14-2014 | 03-14-14 (03-27-14) | 04-07-14 (04-23-14) | | |
| c. on 10's hats | | 03-10-2014 | 03-24-14 (03-27-14) | 04-07-14 (04-23-14) | | |
| Ioma expression | | 03-13-2014 (03-06-14) | 03-07-14 (03-27-14) | | | Ret'd on proc. 01-03-2014 |

# Master Grievance Procedure Tracking Sheet
## 2013-2014 Yokois # 240176 (Not for Medical)

| Grievance Name | Case Number | Step I Begun | Step II (Begun) | Step III Begun | Step IV Begun | Return Date | Comments |
|---|---|---|---|---|---|---|---|
| phone - A44-504-014 mendeus | | 03-10-14 (03-26-14) | 04-04-14 (04-24-14) | | | | |
| CRFS - A44-2007-014 mendeus | | 03-10-14 (03-26-14) | 04-04-14 (04-24-14) | | | | |
| proc - A44-0010-014 meadows | | 03-28-14 | 04-04-14 | | | | |
| Admis conduct - A44-0010-014 meadows | | 03-10-14 (03-28-14) | 04-04-14 (04-24-14) | | | | |
| DW misconduct CRM on meadows | | 03-20-14 | | | | | |
| DW misconduct II on meadows | | 03-20-14 | | | | | |
| kites missing on meadows | | 03-31-14 (04-18-14) | | | | | |
| BI on meadows G.C. | | 04-14-14 | | | | | |

O. P. Master Grievance List

# Exhibit "B"

Case 2:12-cv-00601-ROS  Document #116  Filed 01/22/19  Page 54 of 89

# O.P. Master Grievance Procedure Tracking Sheet
## "Mission Medical"
### 2014 — (Not for med)

| Grievance Name | Case Number | Step I begun | Step II begun | Step III begun | Step IV begun | Returned |
|---|---|---|---|---|---|---|
| Intervened @ Pneum, TX Seat Taylor 1607 | A44-009-014 | 01-16-2014 (02-06-14) | | | | Tx Required 1-17 |
| G. Duckworth SDO3 | A44-009-014 | $3-P3 2015 (01-09-14) | 01-13-2014 (02-03-14) | 01-23-2014 (02-28-14) (ⓡ) | 02-28-2014 | Eval by Dr. on |
| Charles Evcns 7614 Emergency | A44-010-014 | 01-16-2014 (02-05-14) | 01-13-2014 (03-10-14) | 03-11-14 (04-10-14) | | Return to Clozapine 01-17-2014 extended |
| Charles Evcns 7614 | A44-033-014 | 01-13-2014 (02-06-14) | 02-17-2014 (03-11-14) | 03-20-2014 (04-10-14) | | Return to Clozapine 01-17-2014 extended |
| Emergency Tom Bedoy 7616 | A44-033-014 | 01-31-2014 (02-00-14) | 01-14-2014 (03-11-14) | 03-20-2014 (04-2-14) | | updated Emergency |
| E. drops Tom Bedoy 7616 | A44-010-014 | 01-21-2014 | 02-24-2014 (03-14) | 02-24-2014 (03-21-2014) | | updated Emergency |
| O.H. Bedoy 7616 Emergency to I.C.U | A44-013-014 | 01-23-2014 | 01-28-2014 | 03-24-2014 (03-31-2014) | | |
| Cassious's Emergency | A44-013-014 | 01-21-2014 | 01-23-2014 | 03-20-2014 | | |
| L. Crittendon to I.C.U | A44-013-014 | 01-30-2014 | 01-27-2014 | 03-20-2014 | | |
| Can't walk Emergency @ | A44-04-014 | 01-37-2014 | 01-27-2014 | 03-00-14 (03-30-14) | | Given walker on 01-23-2014 |
| Charles Ellison 7614 | A44-04-014 | 02-02-2014 | COTE ! | | | |
| Lab Results 2 months emergency @ TED | | 01-15-2014 (02-10-2014) | 03-11-14 (03-31-14) | | | |
| Al. Stippleman 7615 | | 01-18-2014 (03-10-2014) | 03-11-14 (04-03-14) | | | |
| Emergency MRSA P. Newman Recieved EMC | A44-032-014 | 02-31-2014 (02-1-2014) | 03-14-14 (04-13-14) | | | Emergency |
| Lesson Surgery I.M.C. ... | | 02-24-2014 | | | | |
| Diabetic A47390, TC23 ... | | (05-)18-14 02-35-2014 | 03-14-14 (04-03-14) | | | |
| It's not ... 010171.M.C. Fan | | 03-24-2014 (04-03-14) | | | | |
| Frozier 148139, 6A32 | | 03-28-2014 | | | | |
| Tremendous ... | | | | | | |
| Irvin Hill 113172, 7C10 ... | | | | | | |
| w.H. Ellis 171383, 7C06 ... | | | | | | |

Case 2:12-cv-00601-ROS  Document 3118  Filed 01/22/19  Page 55 of 89

# C.P. Master Grievance (Procedure) Tracking Sheet

## 2013-2014

| Grievance Name | Case Number | Step I | Step II (Emc's Start) Begun | Step III Begun | Step IV (Non-Medical) Begun | Return Date/ Comments |
|---|---|---|---|---|---|---|
| Sued-shoes I.M.C. | | 03-10-2014 | | | | |
| Owens, Jack 243930 TC22 | L03-28-14 | | | | | |
| dressings | | 03-10-2014 | | | | |
| Owens, Jack 243930 TC22 | L03-28-14 | | | | | |

"Clear The Scanner"

Exhibit "E"



**U.S. Department of Justice**

Civil Rights Division

---

Disability Rights Section - NYA
950 Pennsylvania Avenue N.W.
Washington, DC 20530

AUG 20 2014

204-08-0

Douglas Yokois #240176
A.S.P.C.-Eyman Unit
P.O. Box 3300
Florence, AZ 85132

     Re: Arizona Department of Corrections

Dear Mr. Yokois:

    This is in response to the complaint that you filed with this office alleging a possible violation of the Americans with Disabilities Act (ADA). After carefully reviewing the information that you provided, we have decided not to take any further action on your complaint. Unfortunately, because the Section receives thousands of ADA complaints each year, we do not have the resources to resolve all of them.

    It is important to note that the Justice Department has made no determination regarding the merits of your complaint or whether it could be redressed under the ADA or another statute. Moreover, our decision not to take further action does not affect your right to pursue your complaint in another manner. You may wish to contact an attorney or legal service provider to determine what remedies may be available.

    In addition, a number of other options are available to you, including consulting state or local authorities or disability rights groups. Enclosed is a list of such organizations serving your area. These listings come from various sources, and our offices cannot guarantee that the listings are current and accurate. We suggest that if you contact any of these organizations, you let them know that you have received this letter from us, so that they will not forward your complaint to our office.

    If you have access to the internet, the text of the ADA, the Department's regulations, and many technical assistance publications are provided on our ADA Home Page at http://www.ada.gov. If you have specific questions about Title II or III of the ADA, or want copies of technical assistance publications sent to you, you may call the ADA Information Line at 800-514-0301 (voice) or 800-514-0383 (TTY).

    We regret that we are unable to further assist you in this matter.

                   Sincerely,

                   *Mellie H. Nelson*

                   Mellie Nelson
                   Supervisory Trial Attorney
                   Disability Rights Section

Enclosures

438844

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Grievance**

Received By: _C...1132_
Title: _CO111_
Badge Number: _1132_    Date: _3-4-14_

Note: You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice.

| Inmate Name (Last, First M.I.) | ADC Number | Date |
|---|---|---|
| Yokois, Douglas D. | 240176 | 03-04-2014 |
| Institution/Facility | Case Number | |
| Eyman/Meadows/TC08 | | |

To: Deputy Warden Lao, Meadows Unit Administration

**Description of Grievance** (To be completed by the inmate)

I did not receive a response to my informal complaint within 15 workdays. My problem is not being addressed; Correctional Officers (C.O.s) on duty at the entrance to the dining hall are forcing inmates who are disabled and need canes, crutches, walkers, and wheelchairs, to set them aside or get out of them and "clear the scanner" by walking through the metal detector unaided, as many times as it takes until he does not set it off. And, if the disabled inmate is not able to do so, refuses to give him a meal ticket to eat. There are no accomodations such as the scanner being wide enough to accomodate a wheelchair or walker or a person using crutches. There are no grab handles or hand or bars or bails available for the disabled inmate to use to steady himself or assist his ambulation through the detector. The C.O.s look on with an amused expression on their faces. They offer no assistance to the disabled inmates. There is, as evidenced by the smirks and inappropriate comments by the C.O.s and inmates who are not disabled waiting in line, ~~that there is~~ an attitude (continued on supplemen

**Proposed Resolution** ( What informal attempts have been made to resolve the problem? What action(s) would resolve the problem?)

I immediately compel Corrections Officers and all staff involved to cease and desist these egregious discriminatory practices, which have been invented solely to harrass, demean, insult, and deride us disabled inmates, who must endure this torture to eat, and also the forcible touching of us disabled inmates by other inmates, as ordered by the C.O.s. There are hand held metal detection wands that are available and that may be used to ascertain whether an inmate has any metallic contraband concealed on his person or not. I saw them used once here at the very beginning of this intensified interest in (continued on supplement)

| Inmate's Signature | Date | Grievance Coordinator's Signature | Date |
|---|---|---|---|
| D.W.Y | 03-04-2014 | | |

**Action taken by** _____ **Documentation of Resolution or Attempts at Resolution.**

RETURNED TO Y/M UNPROCESSED — DI35 DOES NOT SHOW ANY SPECIAL NEEDS (WHEELCHAIRS, CANES, WALKERS). YOU MAY NOT WRITE GRIEVANCE AS A 3RD PARTY. THE ISSUE MUST DIRECTLY EFFECT YOU. PRISON SECURITY IS NOT ALWAYS CONVENIENT.

| Staff Member's Signature | Badge Number | Date |
|---|---|---|
| CHRISTIAN COTE PEREZ 2852 | 1765 | 3/11/14 |

Initial Distribution - White and Canary - Grievance Coordinator; Pink - Inmate
Final Distribution - White - Inmate; Canary - Grievance File

802-1
7/13/09

"clear the scanner"

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Grievance - GF Supplement**

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| Yokois, Douglas D. | 240176 | Eyman/Meadows/TCCB | |

**Description of Grievance (continued):**

of discrimination against us disabled inmates. This has resulted in several disabled inmates not going to the dining hall to eat, as they are not capable of walking unaided and do not wish to be ridiculed by staff and other inmates. These discriminatory actions and behavior by COs are not in compliance with and violate federal and state laws and the A.D.C.'s own D.O.'s. The CO's misconduct is irresponsible, insulting, discriminatory, unprofessional, and egregiously reprehensible. While it is mandated by law that prisoners be fed and given water, there is no legal provision that we must risk serious and irreparable personal injury or endure taunts such as "quit faking, you can walk", snickers, sneers and guffaws and smirks to do even us used enter into the COs and other inmates to get it.

**Proposed Resolution (continued):**

searching disabled inmates. A CO stood by with one and used it to search us disabled inmates. The practice worked very well and did not cause any problems or hinder our access to get our food; so of course it was quickly stopped after that one time. This practice must be immediately resumed and be codified into all Department, Institutional, and Post Orders → Immediately, per D.O. 501, Employee Professionalism, Ethics and Conduct, perform a D.O. 601 investigation into my complaints about this incident, taking immediate and decisive corrective disciplinary action against all parties and those supervising them who ordered this misconduct, including LT. Robles and Capt. Hayes and LT. Swanson. Require the immediate retraining of all parties and supervisory staff that in any way either directly participated in, supervised, ordered, condoned or simply stood by while this disgraceful misconduct was perpetrated on us disabled inmates, as to the contents and meaning of the federal, state and local laws and the A.D.C.'s own D.O.'s on the appropriate treatment of the elderly and especially us inmates with disabilities. Require that COII Cahoon and COII Wellin and LT Robles, who were especially offensive in their participation and their supervision, respectively, of these torturous and demeaning discriminatory acts, be assigned to a duty area where they cannot any longer bully, belittle, harass, threaten or otherwise intimidate or assault elderly or us disabled inmates, such as the sally port or perimeter watch, until they have successfully completed anger management and sensitivity training toward elderly and us disabled inmates, and then only under careful and close supervision to ensure that they remain in compliance at all times with applicable laws and D.O.s. I want them all, to at minimum, receive written reprimands for their misconduct and a copy of this complaint to be attached and filed in their personnel records. They deserve more severe sanctions than this, and if something is not done immediately and this practice is not stopped and investigated as is your sworn duty to do so, or if you ignore this complaint or try to dance around the issues in your response to it, or if you fail to take action as I have described above, you will have proved yourself to unequivocally be a part of the problem, and not part of the solution. As of the date of this formal grievance, you know what my complaints are. From this point onward I shall hold you personally criminally and civilly liable for any and all personal injury that I sustain as a result of this deliberate and discriminatory misconduct by your staff, as you have all the authority that you need to stop it. Please, O. us, many inmates, who have no other choice but to either starve or endure this cruel and unusual punishment every day by deciding whether or not to eat,

| Signature | Date |
|---|---|
| [signature] | 03-04-2014 |

INITIAL DISTRIBUTION - Committee Recommendation - All copies to Grievance Advisory Committee
FINAL DISTRIBUTION - White and Pink - Inmate, Canary - Grievance File

INITIAL DISTRIBUTION - GF Supplement - White and Canary - Grievance Coordinator, Pink - Inmate
FINAL DISTRIBUTION - White - Inmate, Canary - Grievance File

Page 2 of 2.                    "See all grievances!"

802-7
7/13/09

"109 Viols"

Exhibit "F"

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Grievance Appeal**

*(To be completed by staff member initially receiving appeal)*

The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.

| | |
|---|---|
| Received by: | *N U O* |
| Title: | *CO* |
| Badge #: | *2473* |
| Date: | *4-4-14* |

**PLEASE PRINT**

| Inmate's Name *(Last, First, M.I.)* | ADC No. | Date |
|---|---|---|
| Yokois, Douglas D. | 240176 | 04-04-2014 |

| Institution | Case Number |
|---|---|
| Eyman/Meadows CDU/A103 | Unprocessed |

TO: Warden Credio

Eyman Complex Administration

I am appealing the decision of D.W. Lao, Meadows Unit Administration for the following reasons:

I did not receive a response to my formal grievance within 15 workdays. I have waited an additional 5 workdays, and I am now moving forward per D.O.802.01.1.10.1. My problem is not being addressed. Since my arrival at Meadows Unit on 11-23-13, I have observed that neither inmates nor officers or correctional staff comply with federal, state, or local laws and the A.D.C.'s own Department Orders (D.O.'s), Institutional Orders (I.O.'s), or Post Orders (P.O.'s) concerning tobacco smoking. Specifically, I have witnessed the following violations: 1. Smoking occurring in this building, CDU, APOD, and on 7C and 7D runs. This happens mostly at night, immediately prior to or after 2300 count, and early in the morning, before lights on (continued on supplement)

| Inmate's Signature | Date | Grievance Coordinator's Signature | Date |
|---|---|---|---|
| *[signature]* | 04-04-2014 | | |

| Response To Inmate By: | Location |
|---|---|

If this issue personally affected you on 11-23-13 you had 10 work days to file an informal resolution letter to your COIII. There are no attachments of any document to your appeal that indicates that you addressed the issue at any level. I have spoken with you in several ocasions and you have not mention any of the issues you are addressing on this form. Please, adhere to D.O. 802 for processing your complaints.

| Staff Signature | Date |
|---|---|
| COIV Persons 2002 | 4-8-14 |

DISTRIBUTION:
INITIAL:   White & Canary - Grievance Coordinator
           Pink - Inmate
FINAL:     White - Inmate
           Canary - Grievance File

802-3
7/13/09

Page 1 of 5

109 vokis

"Normaxplosion"

Exhibit "G"

ARIZONA DEPARTMENT OF CORRECTIONS

**Inmate Grievance Appeal**

*The inmate may appeal the Warden's, Deputy Warden's or Administrator's decision to the Director by requesting the appeal on this form.*

*(To be completed by staff member initially receiving appeal)*

Received by: B. Monaghan
Title: COIII
Badge #: 2680
Date: 4/7/14

**PLEASE PRINT**

Inmate's Name *(Last, First, M.I.)*
Yokois, Douglas D.

ADC No.
240176

Date
04-07-2014

Institution
Eyman/Meadows CDU/A103

Case Number
Unprocessed.

TO: Charles L. Ryan, Director
1601 West Jefferson, Phoenix, Arizona 85007

I am appealing the decision of **CFHA, Eyman Complex, Administration** for the following reasons:

There was NO response to my Formal Medical Complaint (F.M.C) within 15 workdays. Despite that fact, I have waited an additional 5 workdays, and I am now moving forward per D.O. 802.01.10.1. My problem is being ignored. On 02-07-14 at 1515, CNA Norma C. Sestiaga displayed deliberate and wholly unprofessional misconduct toward me and toward Dr. Subodh Shroff, M.D. Specifically, I had just concluded my scheduled three (3) month chronic care follow up visit with Dr. Shroff. During my visit, he informed me that he was issuing me a Special Needs Order (SNO) for a 20 inch wide wheelchair and a single point-of-contact cane, also called a "stick" cane, as is in use by dozens of inmates on Meadows Unit and hundreds of inmates (continued on supplement)

Inmate's Signature
*D.D. Yokois*

Date
04-07-2014

Grievance Coordinator's Signature

Date

Response To Inmate By:

Location

UNPROCESSED- YOU HAVE FAILED TO SHOW ANY ATTEMPT TO DISCUSS NURSING BEHAVIOR AT THE SUPERVISORY LEVEL OF NURSING SUPERVISOR, OR THE FHA, OR THE CONTRACT MONITOR.
And you have also failed to attach any responses you (may) have received from your assigned COIII

Staff Signature
*COIII Pessieux 7102*

Date
4-8-14

DISTRIBUTION:
INITIAL: White & Canary - Grievance Coordinator
Pink - Inmate
FINAL: White - Inmate
Canary - Grievance File

602-3
7/13/09

*stormexplosion*

# Exhibit 2

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Clerk of the Court
U.S. District Court, District
of Arizona
401 W. Washington St.
Ste 130, SPC 1
Phoenix, AZ 85003-2118

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☑ Agent
                     ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
Bob Stephens                     1/22/15

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:           ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*          ☐ Yes

7002 0860 0006 6277 7693

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

Parsons v. Ryan, CV12-00601-PHX-DVD

Douglas D. Yokois, #ADC 240176
A.S.P.C. Eyman/SMU-1
P.O. Box 4000
Florence, Arizona 85132

January 29, 2015

Prison Law Office
General Delivery
San Quentin, CA 94964

Dear Sir:

I want to share my experiences regarding the issues addressed in the above case with you. I know that yours is a very large and extremely busy law office, and that you have many demands on your valuable time. Therefore, I shall attempt to be as brief and as informal as possible.

I have mixed emotions regarding the proposed settlement of this case. Of course I am grateful to all of the attorneys who worked long and hard on behalf of A.D.C. inmates; I am equally grateful that, due to those efforts, there is some needed and

— 1 —

long overdue changes that I see taking place where I am housed. However, my experience in situations similar to this are proving to be true; that is, that those in positions of power have only an interest in self-preservation and not in improving the quality-of-life or respecting the rights of those in their custody. But, you only "...want additional information about the case, or want [me] to share [my] experience regarding the issues addressed in the case," so I will confine my comments to those areas.

Before I begin, I believe it's instructive that I give you a brief background on me.
— I'm a 54 year-old white male.
— I'm an 11 year veteran of the U.S. Navy.
— I'm a disabled veteran (30%).
— I have "ADA" status in the ADC now.
— I was a Hospital Corpsman First Class (E-6) in the U.S. Navy, so I have a good deal of medical experience in the clinical as well as administrative management of patients in a clinic setting.

— 2 —

as well as in a hospital setting.
— I am a combat veteran, having
served in theater with the U.S.
Marine Corps in the field.

It's important to me that you know
these things about me so that when
you read what I'm about to write on
these pages you'll know that I know
what I'm talking about.

I've seen a lot of sick, dead, and
dying people in my life. I've seen
people with grievous mortal wounds.
I've witnessed first-hand the maddening,
impersonal randomness of life and death
in combat. But I never witnessed
the deliberate indifference to the suffering
and death of a fellow human being that
I have repeatedly been forced to
stand idly by and watch since I became
an inmate of the ADC in March of 2009.

I'm sure that most, if not all of my
fellow inmates, are guilty of some crime
or another. And I'm sure that they
deserve to serve their time locked
away from society—at—large. But
I never realized that they were sentenced

—3—

to treatment that, if it were received
by an animal, would result in criminal
cruelty charges against the perpetrator.
I could give you dozens of tearful
anecdotes. However, I promised you that
I would keep things pithy. And so I
will give you just one.

On 03-11-12, Dr. Thomas Michael Bell, D.O.,
came to Meadows Unit. He discontinued my
chronic G.E.R.D./P.U.D. medication, Omeprazole.
He replaced it with Famotidine without
consulting me. I am unable to tolerate
Famotidine. Dr. Bell not only discontinued
my medication in this fashion, He did the
same to more than one hundred other
inmates on Meadows Unit at that time.
One of those other inmates was a
man named Henry Billings, ADC#218617.
More about Henry later. I submitted
four HNR's followed by a medical grievance,
Case No. M44-130-012, which was denied and
returned to me in January 2013. I also
submitted a grievance in Henry's behalf,
which was upheld. Dr. Bell refused to
see me or any other inmate or change
the medication back for 6 months. During
that time I experienced severe chronic G.E.R.D/

-4-

P.U.D. symptoms, such as not being able to
sleep lying down, a sore throat, cough, and
worst of all, waking up multiple times
during the night choking on a mouthful
of vomit. Dr. Bell was made aware of
this in writing and yet he refused to
do anything. Henry, who was 82 years-
old at that time, was having a more
difficult time than I was. I knew this
because Henry lived in the cubicle
right next to mine, and I slowly watched
him deteriorate. Finally, Dr. Bell
was replaced by a Dr. A. Anikaio, who
finally restored my Omeprazole on 02-22-13.
This didn't happen in time to save Henry.
By the time he had his Omeprazole restored,
Henry had respiratory problems, I watched
these problems slowly progress into
aspiration pneumonia. Aspiration pneumonia
which went untreated due to the
Meadows Unit Medical Staff's deliberate
indifference toward treating him for it.
Henry Billings finally succumbed to
untreated aspiration pneumonia after
lingering for a few more months.
I had to watch him get a little bit
weaker and sicker everyday. What
made it worse for me was that I knew

-5-

what was wrong, what was happening to him and yet I was powerless to help him. He was just one of hundreds of victims that Dr. Bell was allowed to practice medicine on.

I could regale you with stories of George, who I diagnosed with acute appendicitis and raised hell with the guard in Winchester Unit until they finally saved his life with emergency surgery.

Or maybe you'd like to hear about the man with a golf ball-sized hole in his abdomen who walked around without a dressing or antibiotics for several months because Meadows Unit refused to treat his M.R.S.A. infection.

Or, you might prefer the story about the man with shingles that went undiagnosed for several weeks by Dr. Thomas M. Kessler, MD, who, after I correctly diagnosed in about 30 seconds, went back to Dr. Kessler. The Doctor was so embarrassed that he gave the man opioids and begged him not to put forward a complaint about the Doctor's incompetence.

— 6 —

Of course, I followed through with my Formal Grievance, If only for Henry's memory. I lodged a complaint with The Osteopathic Board of Arizona, The Board took nearly 7 months to find that Dr. Bell did not "violate" the laws of Arizona. The Case No. is DO-14-0081A. I'm the author of 19 grievances during my stays at Cook and Meadows Units. I have also helped others to write Medical grievances and appeals. In return for my good deeds in helping my fellow inmates and myself, I was busted on a contrived charge of disorderly conduct and place in maximum custody here at the SMU-1.

In December, I again took up the fight by filing a formal non-medical grievance, because after 8 months, the SMU-1 has not implemented easy, no-cost changes to their business practices that were mandated by Director's Instruction-326-Maximum Custody Population Management, or D.I. 326. This document, promulgated on 03-27-14, was supposed to take effect immediately. It was promulgated to address the issues in Parsons v. Ryan.

— 7 —

Yet my fear is that D.I. 326 is yet more window dressing that is designed to allow the ADC to keep doing business as usual.

As I already wrote, I've authored 19 grievances of substance during my stays on Cook and Meadows Units. I began again on 12-04-14 and wrote another 8 which have all gone through to the formal stage. Thats 27 grievances in 2014. I have another one that will begin the informal stage on 01-28-15.

As far as I'm concerned, the whole grievance process is a risk mitigation tool in the ADC. It nor the PRLA are worth the paper they're printed on. And I'm doubtful that Parsons will have any lasting significance either.

Please contact me if you would like more information about my experiences or grievances. You should be aware, however, that if I can get the ADC into court I won't settle. I want admission of culpability.

Sincerely,

— 8 —

Parsons v. Ryan, CV 12-00601-PHX-DKD

Douglas D. Yokois, ADC#240176

A.S.P.C. Eyman/SMU-1

P.O. Box 4000

Florence, Arizona 85132

January 24, 2015

Clerk of the Court

United States District Court, District of Arizona

401 W. Washington St., Ste 130, SPC 1

Phoenix, Arizona 85003-2118

Your Honor:

1. I'm writing to you to offer my opinions on the fairness of the proposed settlement of Parsons v. Ryan, CV 12-00601-PHX-DKD.

2. I have mixed emotions about this settlement. I'm glad that the parties to this case have been able to work together in order to arrive at this proposal. I'm also grateful that due to their efforts, there is some needed and long overdue changes that I am already seeing take place where I'm housed in the SMU-1. However, my previous experiences in these situations are already proving themselves to be repeated; that is,

-1-

that those in positions of authority, care only about self-preservation and maintaining the status quo. They care little or nothing about respecting the rights of those in their custody or in improving their quality-of-life issues.

3. Before I go any further, I want you to know a little more about me than you will find on the ADC's website:

a. I'm an 11 year, disabled, combat veteran of the U.S. Navy, where I attained the rank of Hospital Corpsman First Class (E-6). I saw combat in the 1991 Persian Gulf War with the 8th Tank Battalion, U.S. Marine Corps, 4th Marine Division in Saudi Arabia and in Kuwait.

b. I've been a Chief Information Officer in Navy Medicine at the U.S. Naval Academy, in Annapolis, Maryland.

c. I have a great deal of clinical and administrative experience with the medical management of patients, both in an inpatient and outpatient setting.

- 2 -

It's important that you know these things about me so that when you'll read the following, you'll know that I know what I'm talking about.

## My Opinions

1. The ADC only has to be 85% compliant with the monitored performance standards after 3 years, meaning that 15% of inmates will not have their serious medical needs or their basic human and civil rights met according to the provisions of the settlement. This outcome is unacceptable to me.

2. The settlement requires that, prior to an inspection of ADC facilities or records, the Plaintiff's attorneys must give a 2-week advance notice to the ADC. There should be a provision for at least 2 unannounced visits per year. The reason for this provision is obvious to any reasonable person.

3. The settlement requires that the Defendants must comply with all of the health care performance standards set

－3－

forth in Exhibit B, and that "[C]linicians who exhibit a pattern and practice of substantially departing from the standard of care shall be subject to corrective action." I fail to see how this is any improvement over the current system. Of all of the medical grievances that I've submitted due to "[c]linicians who... substantially depart[ed] from the standard of care," 100% were denied. I submitted some of those to the various professional boards for investigation. None of them were found to have violated any law. That's just plain ridiculous.

"Sometimes you have to go beyond what is legally required to do what is right." — U.S.A.G. Eric Holder

Storytime
(If you don't want to read this
Skip to the end of Storytime)

1. Right about now, you are probably bored with having to read all of these convict's letters. Let me regale you with a little anecdote which will hopefully wake you up. This is a true story which took place just last month in December 2014.

2. Just last month, a human being named Charles Knight, who was living in 2A19 of SMU-1, contracted a Urinary Tract Infection (UTI). Charlie is 82 years-old, a Korean War-era veteran, and physically frail. Charlie tried to get treatment for his UTI. He submitted an HNR and he waited. His UTI moved up into his bladder. Still he waited. His infection moved from his bladder to his kidneys, just one thin cellular membrane from entering his bloodstream and causing a slow, agonizing death from sepsis. Charlie began to run a fever, yet he trusted the system and he waited.

3. Charlie was in bad shape now. It had been over 2 weeks since he had asked for help from medical. He felt like a mule team had kicked him in his kidneys. One night he fell out of his bunk onto the floor of his cell. In his weakened state, he couldn't get to his feet.

4. Charlie lay on one side on the floor of his cell for 4 days before we could get help for him. During this time, he was so weak that he couldn't even roll

over. Charlie urinated and defecated on himself. He was dehydrated and hungry. He thought he was going to die.

5. Meanwhile, we inmates in pod 3 knew of his suffering. We begged the medication nurse, who came to the pod twice daily to pass meds, to help. We also begged the guards to "do something" to help him. We kept Charlie company the only way we could; we talked to him. We told him that he was going to be okay. We prayed for him to not give up hope that someone would help him.

6. After 4 days we finally got the guards and nurses to pay attention to him. They took Charlie to medical on a gurney. He was given I.V. Fluids and started on antibiotics. Now you might believe that this is the end of the story. It's not.

7. Charlie was brought back to his cell after being literally brought back from the brink of death and dropped off, back on the floor, in his own filth. He was still sick and weak from the fever,

-6-

and in tremendous pain in his kidneys. The clinicians had given him nothing for the fever or the severe pain, not even Tylenol. The antibiotics they gave to him only partially worked. And, when medical discontinued them after 7 days, Charlie's infection came roaring back, this was due to the fact that the clinician violated the "standard of care" by not ordering a Culture and Sensitivity test on the bacteria causing his UTI.

8.   Three days passed. Charlie grew worse. I begged the nurse who passed medications and the guards to "do something" to help him. They finally repeated their past performance. This time giving him Ciproflaxin, a powerful, broad spectrum antibiotic, which killed the infection. After 3 weeks Charlie began to improve. Then suddenly Charlie was moved to another pod. It turned out that this was done because we, his fellow prisoners, had tried to help him. So on 12-23-14, Charlie was moved to cell 2A33 in the SMU-1. We haven't heard from him since.

———— End of Story time ————

—7—

So what can be placed in the settlement so that what happened to Charlie won't happen again? Put another way; How do you legislate human decency and compassion? More importantly, why should we have to? Have we as a race learned nothing except how to be more heartless and cruel to each other in the 21st century? Maybe you can find a way, your honor, to protect us from our captors. You can certainly try.

4. I applaud that the Defendant or contracted vendors are now required to ensure that:

a. All prisoners will be offered an annual influenza vaccination.

b. All prisoners with chronic diseases will be offered the required immunizations as established by the Centers for Disease Control (CDC).

c. All prisoners ages 50-75 will be offered annual colorectal cancer screening.

But hold on. In the cases of 4a and 4b above, when exactly is that vaccination or immunization to be administered? Unless it's given at the beginning of

flu or pneumonia season it does little good. That's what we receive now, if we're lucky. Incidentally, 4a through 4c are merely the minimum standards of care. Instead of the "same 'ol, same 'ol," Why not require that all immunizations and vaccinations be administered in a medically meaningful and timely manner in order to be prophylactically effective?

5. Stating that the "[d]efendants shall request that the Arizona legislature approve a budget to allow [ADC] to implement DI 326 for all eligible prisoners." Is unacceptable. That's like stating that if the ADC is unable to successfully "request that the Arizona legislature approve a budget..." to fund DI 326, or should the Arizona legislature itself fail to approve such a budget, that DI 326 doesn't have to be implemented. That's a huge loophole!

6. The list of chronic diseases in attachment "A" must be expanded. Some examples would be Mental Illnesses, "ADA" or physically disabled inmates, Morbid obesity, sleep apnea, etc.

There is a similar listing contained in ADC Department Order 1101 - Inmate Access to Health Care (D.O. 1101), I believe that a list approved by the CDC or the NCCHC should be a starting point.

7.   Your Honor, in conclusion, I believe that this proposed settlement, in its current form, will do little if anything to change the way that the ADC does business today. This is due to the fact that the ADC doesn't have to admit to any wrong-doing or liability, as described in paragraph I.5 of the Parsons v. Ryan STIPULATION document. "If it ain't broke, don't fix it." Put another way, if there is NO admission of wrong doing, why should there be any reason to change the way that the ADC does business?

"The difference between [other countries and ours] is that we admit and correct our mistakes." — U.S. President Barack Obama

8. If I could have one prayer answered right now, it would be that God would force you and all those in the seats of power to experience through the

— 16 —

senses of the prisoners who are daily, hourly, and even this very minute, suffering deprivations at your hands. And that, if these deprivations were visited on an animal, they would result in the perpetrators being charged with criminal cruelty to animals and arrested. In my 54 years of being a citizen of these United States I never believed that "we the people" could be responsible for such crimes against humanity and call it "justice". Maybe, someday, God willing, the people will awaken to what is being done in their name and in the name of public safety. It is my hope and prayer that on that day, the torture and neglect of prisoners in this, the greatest country in the world, will forever be stopped. Until that day, "[U]nder a government which imprisons any unjustly, the true place for a just [person] is also a prison." – H.D. Thoreau, Civil Disobedience, 1848.

Very Respectfully Submitted,

Douglas D. Yokois



# Exhibit 3

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Prison Law Office
General Delivery
San Quentin, CA 94964

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _AKIRY_    ☑ Agent    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

_AKIRY._    1/27/14

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

7002 0860 0006 6277 7686

PS Form 3811, August 2001         Domestic Return Receipt         102595-02-M-1540

# Exhibit 4

CHSS028B     Other Action/Procedure/Referral

| | | | |
|---|---|---|---|
| Encounter Date: | 04/25/2014 | Time: 12:14:22 PM | Type: Provider - Physical - Periodic |
| Location: | ASPC-E RYNNING MAX [A46] | Staff: Conversion, EOIR838 | |

Category*:    Medical Supplies/Special Equipment

Type*:    WHEELCHAIR

Count*:    1               Sequence Number:    01

Approximate Begin Date:    02/22/2016        Approximate End Date:    02/21/2017

Refer to Staff:    Graham, Stephen

Status:    Treatment Discontinued          As of Date:    02/22/2016      **Status History**

**Specify Comments**

To be available outside IM's cell

**Prepare To Update**      **Prior Page**

Show Last Updated Information

**S. Graham, MD**
**DEA# FG0809078**

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

*Chronic Care*

Date: _____
Time: _____
Initials: _____

| Inmate Name/Nombre *(Last, First M.I.)* *(Apellido, Nombre, Inicial)* | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|
| Yokois, Douglas D. | 240176 | 04-17-16 |

| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
|---|---|---|---|
| 1A37 | SMU-1 | 4000 | Florence |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time).

*[Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez!]*

**AREA OF INTEREST** *(Check only one block below)* / **AREA DE INTERES** *(MARQUE UN ESPACIO SOLAMENTE)* ☒ Medical/Médica ☐ Dental ☐ FHA ☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other *(specify)*/Otros *(especifique)* _____

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

In accordance with D.O.909.02.1.3.3.2, I hereby request that the health care provider "submit documentation supporting the medical need and a (pre-authorization) Duty/Special Needs Order, Form 1101-6O, to the next scheduled complex Medical Review Committee meeting for consideration." So that I may purchase and have my own wheelchair sent in to me

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo *(excluyendo las exenciones otorgadas por la ley)*. Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

| Inmate's Signature/Firma del prisionero | |
|---|---|
| No Charge — 10011 | - Chronic Care |

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX [SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS]**

**REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA** ☒ Medical/Médica ☐ Dental ☐ Pharmacy/Farmacia ☐ FHA ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other/Otros *(specify)* (especifique) _____

Comments/Comentarios

Refer to Nurse Line / Nurse supervisor

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | 4/17/16 | 1104 |

**PLAN OF ACTION/PLAN DE ACCION**

Inmate do not fill out the SNO form, nor submit documentation to committee. That is done by medical staff

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| AI, RN | 5.1.16 | 1300 |

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

This document is a translation from original written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]

1101-10ES
12/19/12