Jonathan C. Bertanelli, No. 47835
ASPC-Lewis / Rast Max 4C5-0 E
P.O. Box 3600
Buckeye, Arizona 85326

FILED LODGED
Jan 25 2019
CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

Plaintiff; appearing in propria persona:

In The United States District Court
For The District Of Arizona

Jonathan Cataldo Bertanelli, Plaintiff, a Member OF The Plaintiff's Class Action Class,

In re The Matter OF:

Victor Parsons, et. al., On behalf of themselves and all others similarly situated and Arizona Center Of Disability Law,
Plaintiff's,

v.

Charles L. Ryan, Arizona Department OF Corrections, et. al.,
Defendant's

No. CV-12-0601-PHX-ROS
Class Action

Plaintiff Bertanelli's Motion For Court Order To Intervene As Plaintiff In Class Action Parsons, et. al v. Ryan, et. al, (Id)
And
Plaintiff's Bertanelli's Motion To Enforce Stipulation As Intervenor Plaintiff In Class Action Parsons, et. al v. Ryan et. al (Id)

The undersigned plaintiff Jonathan Cataldo Bertanelli; appearing in propria persona, a (m)ember of the (N)amed Plaintiff's Class Action class; pursuant to Rule 23 (d), F.R.Civ.P.; and respectfully submits this Motion requesting an Order of the Court which authorizes him to (i)ntervene in this class action, to formally (o)bject to and (p)resent his (c)laim to this Court of the impropriety of class action counsel representives purposefully (n)ot adequately representing the members of the class subjecting them to potential life threatening harm. Due to class counsels collectively acting in an explicit or implict conspiratorial agreement with Defendant Ryan, Director of the Arizona Department of Corrections (ADOC); other ADOC Defendants; together with this ADOC subcontractor Corizon Healthcare providers and all ADOC Defendant's Counsel of Record.

(B)y Class Counsel representives (K)nowingly acquiescing in and (c)overing (u)p (f)rom this Court Defendant's (s)ystemic intentional and (u)nsafe (d)ispensing of inmate (p)otential life threatening perscription medications, 1/ issued by Defendant's Corizon providers to be (c)oncubisively (d)ispensed as (r)estrictive
//

1/ These include (a)ll medications which the Provider has perscribed for the treatment of any medical or mental health condition and (s)pecifically include all medications the Provider medically determines potential life threatening which must be (s)afely individually despensed as Direct Observed Therapy

"(D)irect (O)bserved (T)herapy" (DOT), 2/, (b)ut knowingly being dispensed prohibitly by Corizon nurses as "(N)on DOT restrictive medication" 3/ (Emphases), (d)eliberately permitting the inmates to (r)etain their (u)nauthorized DOT potentially life threatening medications to (f)acilitate their (o)wn perscription medication abuse or to (f)acilitate the inmate's prohibited distribution of thier medication to (o)ther inmates for perscription medication abuse. (Emphasis).

This Motion is based upon this Motion and is supported by Plaintiff Bertanelli's sworn Declaration under the penalty of perjury submitted under a seperal cover in support of his Motion at issue. See eg. (Exhibit. A, hereto attached).

//

(DOT), 2/ medications, which (e)xpressly include all barbituate/sedative based (o)pioid and (n)on-opioid (b)ased (S) and other highly (a)ddictive pain medications, A/ and (a)ll (p)sychotropic barbituate based medications, (Emphases added).

A/ Which generally (e)xclude all over the counter pain medications, such as asprin, motrin, , ect.

2/ Known as (N)urse "Watch Swallow" medications which requires the dispensing nurse to conduct a physical visual check of the inmate mouth to ensure inmate has swallowed the medication.

3/ Known as "Keep On Person" dispensed medication, (KOP). Whereby the dispensing (n)urse (l)eaves the medication with the inmate and (d)oes (n)ot (v)erify whether or not the inmate has taken the medication. These are non DOT restrictive medications.

Wherefore, the plaintiff prays that the Court will issue an Order which:

I. Grants plaintiff Bertanelli, a (m)ember of the Plaintiff's Class Action class; pursuant to Rule 23(d), F.R.Civ.P., authorizing him to intervene in this Class Action to (f)ormally object to and (p)resent his claim to this Court of the substantial impropriety of class counsels representatives purposefully (N)ot adequately representing him and the members of the class subjecting them to potential (L)ife (T)hreatening harm.

II. Grant plaintiff Bertanelli, a (m)ember of the Plaintiff's Class Action class, an (i)ndividual (r)emedial (e)nforcement Order to (e)nforce this Court's Stipulation to assert his (b)estowed (r)ights under the Stipulation, by issuing an Order which (e)ompels compliance of Defendants to "(d)irect and (e)nsure their subcontractor Corizon (d)ispenses his (p)rescribed (L)ife (S)ustaining restricted ADOC DOT N.V. WS Medication in accordance with ADOC DOT N.V. WS (p)rotocol, as (s)pecifically (s)et forth in paragraph 98, inclusive of Plaintiff's Bertanelli's Declaration, [Exhibit 1, Plaintiff's Decl, para 98]; pursuant to governing ADOC DOT policy and procedure, (I)d. under this Courts Stipulation.

III Grant plaintiff Bertanelli such other and further relief as the Court deems just and proper.

Respectfully Submitted this 21st day of January, 2019.

By [signature]

Jonathan C. Bertanelli, No. 47835

P.O. Box 3600

Buckeye, Arizona, 85326

Plaintiff; propria persona

Certificate Of Service

I, Jonathan Cataldo Bertanelli, AE, hereby certify that on this ___ day of __________, 2018, I electronically transmitted the following document entitled, to wit; Declaration of Jonathan C Bertanelli, Re. Plaintiff Bertanelli's Motion to Intervene as Plaintiff In Class Action Parsons et. al. v. Ryan et. al. (Id) using the CF/ECF system to file with the Court and to the CF/ECF participants:

Donald Specter, Esq., 1917 Fifth Street, Berkeley California, 94710

Alison Hardy, Esq., 1917 Fifth Street, Berkeley, California, 94710

Sara Norman, Esq., 1917 Fifth Street, Berkeley, California, 1917

Corene Kendrick, Esq., 1917 Fifth Street, Berkeley, California, 94710

Rita K. Lomio, Esq., 1917 Fifth Street, Berkeley, California, 94710

David C. Fathi, Esq. 915 15th Street, 7th Fl, Washington, DC 20005

Amy Fettig, Esq., 915 15th Street, 7th Fl., Washington, D.C. 20005.

Victoria Lopez, Esq., 915 15th Street, 7th Fl., Washington, D.C. 20005.

Kristen T. Eidenbach, Esq., P.O. Box 91398, Tucson, Arizona

Michael E. Gottfried, Assistant Attorney General (AAG)

1275 W. Washington Street, Phoenix, Arizona 85007-2926
Lucy M. Rand, AAG, 1275 W. Washington Street, Phoenix, Arizona 85007-2926.
Daniel P. Struck, Esq., 400 W. Ray Road, Ste 300, Chandler, Arizona 85226.
Rachel Love, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona 85226
Timothy J. Bojanowski, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona 85226.
Nicholas D. Acedo, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona 85226.
Ashley B. Fletcher, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona, 85226.
Jacob B. Lee, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona, 85226.
Kevin R. Hanger, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona 85226.
Timothy M. Ray, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona 85226.
Richard M. Valenti, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona 85226.
Jamie D. Guzman, Esq., 400 West Ray Road, Ste 300, Chandler, Arizona 85226.
Kathleen E. Brody, Esq., 3707 North 7th Street, Ste 235, Phoenix, Arizona 85013
Sarah Kader, Esq., 5025 East Washington St, Ste 202, Phoenix, Arizona 85034.
Asim Dietrich, Esq., 5025 East Washington St., Ste 202,

Phoenix, Arizona 85034.
Amelia M. Morrow-Gerlacher, Esq. 2901 North Central Avenue, Ste. 2000, Phoenix, Arizona 85012.
Daniel C. Barr, Esq., 2901 North Central Avenue, Ste. 2000, Phoenix, Arizona 85012.
John H. Gray, Esq. 2901 North Central Avenue, Ste. 2000, Phoenix, Arizona 85012.
Caroline N. Mitchell, Esq. 555 California Street, 26 Floor, San Francisco, CA. 94104.
Rose Ann Daly-Rooney, Esq. 177 North Church Avenue, Ste 800, Tucson, Arizona 85701.
Jessica P. Jansepar, Esq. 177 North Church Avenue, Ste. 800, Tucson, Arizona 85701.
Jose de Jesus Rico, Esq. 177 North Church Avenue, Ste. 800, Tucson, Arizona 85701.
Maya S. Abela, Esq. 177 North Church Avenue, Ste. 800, Tucson, Arizona 85701.
John L. Wilkes, Esq., 177 Texas Street, Houston, Texas 77002.
Kathleen L. Wieneke, Esq. 1095 W. Rio Salado Pkwy., Ste. 209, Tempe, Arizona 85281.
Stephen Weeks, Esq. 3839 East Marshalls Gulch Place, Tucson, Arizona 85718.
Joseph E. Deylo, Esq. Arizona Assistant Attorney General 2005 North Central Avenue, Phoenix, Arizona 85004-1592.
Stacy Scheff, Esq., P.O Box 40611, Tucson, Arizona 85717-0611.

Respectfully Submitted this 21st day of January, 2019.

By: [signature]

JONATHAN C BERTANELLI, AE
ASPC-Lewis / Rast Max 4C5-02
P.O Box 3600
Buckeye, Arizona 85326
Plaintiff, a Member Of The Plaintiff's Class action Class,
Plaintiff; propria persona

//

//

//

Exhibit 9

Exhibit 9

Jonathan C. Bertanelli, No 47835
ASPC-Lewis/Rast Max 4C5-07
P.O. Box 3600
Buckeye, Arizona 85326

Plaintiff; appearing in propria persona:

In The United States District Court
For The District OF Arizona

| | |
|---|---|
| Jonathan Cataldo Bertanelli, Plaintiff, a member OF the Plaintiff's Class Action Class, | No. CV-12-0601-PHX-ROS Class Action |
| In re The Matter OF: | Declaration OF Jonathan Cataldo Bertanelli Re: Plaintiff Bertanelli's Motion For Court Order To Intervene As Plaintiff In Class Action Parsons et. al. v. Ryan, et. al. (Id) And Plaintiff Bertanelli's Motion To Enforce Stipulation As Intervenor Plaintiff In Class Action Parsons, et. al. v. Ryan et. al (Id). |
| Victor Parsons, et. al, on behalf of themselves and all others similarly situated and Arizona Center Of Disability Law, Plaintiff's. | |
| v. | |
| Charles L. Ryan, et. al Arizona Department of Corrections, et. al., Defendants | |

I, Jonathan Cataldo Bertanelli, hereby declare under the penalty of perjury the following information is true and correct to my own personal knowledge.

1. I am incarcerated under the jurisdiction of the Arizona Department of Corrections (ADOC) at the Arizona State Prison Complex (ASPC)-Lewis at the Rast Max (Maximum Security) Unit thereof.

2. I am of sound mind and competent to make this declaration.

3. I have not been coerced or threatened in any manner into making this declaration and make this declaration of my own free will.

4. I specifically make this declaration in support of my Motion requesting an Order of this Court which authorizes me to intervene in this Class Action, as class Plaintiff, to formally (o)bject to and (p)resent my claim to the Court of the impropriety of class action Counsel represent[at]ives, 1/ purposefully (n)ot adequately representing me and the members of the class subjecting us to potential life threatening

//

1/ Plaintiff's Class Counsel Representatives are: Specter, Hardy, Norman, Kendrick, Lonio, Fathi, Fetting, Lopez, Edenbach, Broody, Kader, Dietrich, Morrow, Barr, Gray, Morgan, Mitchell, Rooney, Jansepar, Rico, Abela and Wilkes, (hereinafter these Class counsels are (c)ollectively referred (h)erein as, "Plaintiff's class Counsel representives".) (Emphasis).

JR

herein. See: (Plaintiff Bertanelli's Motion, pg. 2, filed under separate cover). Due to Plaintiff's class counsel, 1/ collectively acting in an explicit or implicit conspiratorial agreement with Defendant Ryan, Director of ADOC and other ADOC Defendants, together with their ADOC subcontractor Corizon Healthcare providers and all ADOC Defendant counsels of record. 2/ (Id).

(B) y Plaintiff's Class Counsel representatives, 1/ knowingly acquiescing in and (c)overing (u)p from this Court's Defendants (s)ystemic intentional and (u)nsafe (d)ispensing of inmates (p)otential life threatening prescription medications, issued by Defendants' Corizon providers to (b)e (e)xclusively (d)ispensed as (r)estrictive "(D)irect (O)bserved (T)herapy", (b)ut knowingly being dispensed prohibitedly by Corizon nurses as; "as (N)on DOT restrictive Medication, (d)eliberately permitting the inmates to (r)etain their (u)nauthorized DOT potential life threatening medications, to (f)acilitate their (o)wn perscription medication abuse as to (f)acilitate the inmates prohibited distribution of their medications to other inmates for perscription medication abuse. (Id. at pg. 2-3).

5. I am incarcerated under the jurisdiction of the ADOC at the ASPC-Lewis, Rast Max Unit thereof and an inmate (m)ember

//

2/ Defendants counsel of record are: Gottfried, Rand, Struck, Love, Bojanowski, Aceto, Fletcher, Lee, Hanger, Ray, Valenti and Gazman, (hereinafter these Defendants counsels are (c)ollectively referred herein as "Defendants Counsel of Record"). (Emphasis).

of the Plaintiff's Class Action (c)lass in Parsons et. al. v. Ryan, et. al., (Id) and I have (l)egal (S)tanding to (i)ndependantly petition this Court, over the objection of class Counsels of Record, 2/ and submit this Motion requesting a court Order to (i)ntervene, as Plaintiff in this class action pursuant to Rule 23(d), F.R.Civ.P.

6. In October, 2014, the parties to this class action e.g. Parsons et. al. v. Ryan, et. al., (Id), settled the case and signed a "Stipulation" to end the litigation. The Court approved the settlement and Stipulation after a fairness hearing. (Doc. 1185, Doc. 155). Under the Stipulation, Defendants agreed to provide health care to the class members, as measured by 103 Performance Measures. (Doc. 1185), (Exhibit 1, Stipulation, Parsons et. al. v. Ryan, et. al), (Emphasis added).

7. The Defendants, e.g. The State of Arizona, ex rel. Charles L. Ryan, Director of the ADOC, et. al., has choosen to contract with a third party, to provide Plaintiff's with health care and awarded that approximately $400,000,000.00, (y)early contract to Corizon in 2013. (Doc. 2770 at 61-62, Ex. 99, 103). 3/ Since then, Defendant Ryan has (e)xtended the Corizon

//

3/ It is noteworthy to state that Defendant Ryan has repeatedly made public statements to the Arizona State Legislature and to the Arizona Citizens that contracting with a (t)hird (p)arty to provide health care to ADOC inmates, who (b)id four (4) million less than current ADOC budget would be fiscally conservative and in the best financial interest of both ADOC and the Arizona tax-payer citizens. (Emphasis).

contract to (p)resent (d)ate; (b) it has awarded Corizon a financial (i)ncrease in Corizon's (y)early contract (f)rom the previous approximately four hundred (400) million dollars per year to approximately $410,000,000.00, per year. (Emphasis). 4/ 5/

8. Under the ADOC/Corizon contracts, Defendant Ryan, et. al., The State of Arizona/ADOC, originally incorporated the provision for ADOC to (i)mpose (l)imited (m)onthly "financial sanctions" capped at $90,000.00 per month against Corizon for their non-compliance with this Court's aforesaid 103 Performance Measures under the Stipulation. (Doc. 2740 at 93, 98, 183-184,

//

4/ Upon information and belief, I Jonathan C. Bertanelli, allege that Defendant Ryan has willfully engaged in illegal and prohibited, "insider trading", using official financial information Ryan has obtained on behalf of himself entering the State of Arizona ex rel. ADOC/Corizon contract regarding Corizon stock increased value; based upon this ADOC/Corizon to financially benefit himself by purchasing Corizon stock and by advising other ADOC staff, personal friends, family and business associates to purchase Corizon stock; based upon Corizon stock valuation increase since Corizon has entered this $400,000,000.00 ADOC/Corizon health care contract. (Emphasis)

I further hereby declare that I will support this allegation by sworn declaration at the time of issuance of this Court's subpoena duces tecum issued upon my sworn declaration demonstrating prima facie probable cause therefore. (Emphasis).

Doc. 2769 at 55-56, Ex. 3 at 6). This ADOC "financial sanction cap remained in effect (f)rom October, 2013 through September 2017, five (5) years. Accord. (Exhibit 2, copy of this Court's Slip Opinion, No. 2018 WL 3239691, N. 26).

9. I state based upon my review of this Court's file and it's corresponding judicial opinions and upon my own personal knowledge that since October, 2013, ADOC's subcontractor health care provider Corizon has intentionally engauged in the (c)ontentious and (f)raudulent practice of intentional long term (n)on compliance in their failure and refusal to perform the 103 Performance Measures at all ten (10) ADOC complexes statewide under this Court's Stipulation, (Doc. 1185) Accord. (Exhibit 4, Copy of the Stipulation, hereto attached); and in violation of the State of Arizona and ADOC/Corizon healthcare contract; which (c)ontinues to present to (present)date, 6/, and thereby causing the (c)ontinued systemic (h)arm to the entire class of ADOC inmates, to and including myself as intervenor Plaintiff Bertanelli.

//

5/ Upon information and belief, I, Jonathan C. Bertanelli, alleges that Defendant Ryan, has and is, and he is aware that other ADOC employees as well recieve personal gratious financial benefits from Corizon in (e)xchange for Ryan bestowing upon Corizon the aforesaid ADOC/Corizon hundreds of millions of dollar healthcare contract, (Emphasis added): Accord: Footnote, 4/ inclusive, in conjunction herewith.

6/ As of my filing of this Motion, as intervenor Plaintiff at issue in December of 2018.

See e.g. [Exhibit 2, this Court's Slip Opinion, No. 2018 WL 3239691, Magistrate Duncan, hereto attached]; [Exhibit 3, this Court's Slip Opinion No. 2018 WL 6002515, Senior District Judge Silver, hereto attached].

10. I additionally state based upon my review of this Court's file and it's accompanying judicial opinions and upon my own collaborating personal knowledge that since October, 2013, ADOC Defendant's have purposefully engaged in the (c)ontinuous and (f)raudulent premediated (p)ervasive (p)ractice of willful interminable systemic (n)oncompliance with the performance of the 103 Performance Measures under this Court's Stipulation, (Doc. 1185 ); accord [Exhibit 1, Copy of Stipulation, hereto attached]; (b)y ADOC acquiescing with their subcontractor Corizon's underlying continuous and fraudulent intentional noncompliance in the failure and refusal to perform these 103 Performance Measures; due to ADOC deliberately (n)ot exercising their ADOC supervisory contractual monitoring authority enforcement provision under the ADOC/Corizon contract to (d)emand Corizon fulfill it's contractual obligation to (p)erform these 103 Performance Measures at all ten (10) ADOC complexs in (d)irect violation of their own ADOC/Corizon contract; which (c)ontinues to actively persist to present date as aforesaid. See e.g. [Exhibit 2, this Court's Opinion, No. 2018 WL 3239691]; [Exhibit 3, this Court's Opinion, No. 2018 WL 6002515].

11. As the result of these ADOC Defendant's willful refusal to (d)emand and (e)nsure Corizon fully perform these 103 Performance Measures is the proximate cause of the (c)ontinued systemic (h)arm to the entire class of ADOC inmates and myself, (Emphasis). (Id); Accord: [Exhibit 2, this Court's Slip

opinion, No. 2018WL1323969l, pp. 1-12]; [Exhibit 3, This Court's Slip Opinion No. 2018 WL 6002515, pp. 1-4].

12. I further state based upon my own personal knowledge and upon my review of this court's files and accompanying judicial opinions that in September, 2017, Defendant Ryan had amended it's contract with Corizon and removed the previous cap on performance based (s)anctions based upon Corizon's non-compliance performance with the 103 Performance Measures required to provide healthcare to the class of ADOC inmates, and thereby (b)estowed upon Corizon an "(a)dded performance based (f)inancial (i)ncentive, ("Amendment 14"), 7/ (Doc. 2770 at 73-74, 122, 123, 126, Doc. 2769 at 23-24, Ex. 205), for ADOC to try to compel Corizon to achieve better performance due to their continued willful noncompliance in the refusal to perform these required 103 Performance Measures under the contract. (Doc. 2769 at 104: 23-24). 7/

//

7/ Under Amendment 14, ADOC Defendant-Director Ryan had placed a (c)ap of 3.2 million dollars per year as the added performance based financial (i)ncentive bonus to Corizon. (Id).

The record reflects Defendant Ryan has unjustifiably financially manipulated the Corizon contract; and thereby he has (d)uped the Arizona state legislature and Arizona taxpayer citizens, (b)y unnecessarily imposing this Corizon added 3.2 million dollar tax liability. Instead of Ryan (l)egally compelling Corizon to fullfill it's performance the contract; to show Ryan's unjustifiable (p)ersonal (f)avoritism to Corizon at the (f)raudulent (e)xpense of

13. In November of 2018, this Court held ADOC Defendants in civil contempt for ADOC's continuous interminable noncompliance with the Court's Stipulation upon the finding of widespread and systemic failure of ADOC to perform the 103 healthcare Performance Measures; (S)pecifically including, systemic (i)nadequate (1) staffing and (2) (m)edication (d)ispensing---which persists to present date; continuing to cause healthcare and safty harm to the class; (d)ue to ADOC's continued inadequate and (i)ntentional non contractual supervisory monitoring of ADOC's sub-contractor healthcare provider Corizon; and acquiescing in Corizon's purposefull noncompliance with the failure to perform these required Performance Measures under the contract. See e.g. [Exhibit 3, Contempt Opinion, USDC-AZ, Senior District Judge Silver, No. 2018-WL-6002515(S)]; [Exhibit 2, Contempt Opinion, USDC-AZ, US Magistrate Judge Duncan, No. 2018-WL-3239691]. Accordingly, Application Of this Procedural History to my:

Statement Of The Material Facts To the Consideration Of My Declaration In Support Of My Motion to Intervene as Plaintiff at Issue.

14. Pursuant to this Court's "Settlement," the Defendants agreeded, in pertainent part to "(S)afely" (d)ispense (p)rescribed (m)edications to me, as class member and all other members of the class, as (d)uely (p)rescribed by their (p)rivate

//

of the Arizona state tax payers citizens for the ulterior purpose of (N)ot losing Corizon as the Arizona state privatized ADOC healthcare provider. (Emphasis Added)

subcontractor healthcare provider "Corizon", within the following two (2) categories of medications that (m)ust be (d)ispensed to inmates under the (b)elow criteria, to wit:

(a) Keep-on-person (KOP) (medications), 8/ See e.g. (Exhibit 1, sub. exh. C, Definations).

(b) Direct Observation Therapy, (DOT), (Watch Swallow), 9/ (medication). (Id).

15. Under the Stipulation, the Defendants, by and through their provider Corizon shall in pertinent part, adequately document in both the Medical Administration Record (MAR) and Daily Delivery Manifest the medication dispensed to the inmate whether KOP or DOT, (b)y the nurse dispensing the medication, to wit:

//

8/ KOP medications are prescription medications which the provider has deemed as medically not life threatening and can be (s)afely dispensed KOP. Whereby, the dispensing nurse leaves a (30) day supply of the medication with the inmate and does (n)ot verify if the inmate has taken the medications.

9/ DOT restricted medications are prescription medications which the provider has deemed as medically life threatening and can be "abused" and "unsafely" dispensed. Specifically include all medications the provider medically determines potentially life threatening if "abused" which must be (s)afely individually dispensed as Direct Observation Therapy (DOT), which expressly include all barbiturates / sedative based opioid and (n)on opioid (b)ased (s)ynthetic

(a) Performance Measure (PM) 17, provides in part: "The Medication Administration Record (MAR) will reflect does, frequency, start date and nurse signature. See eg. (Exhibit 1, sub ex. A, Measure 17).

(b). PM. 18, provides in part: "Daily Delivery Manifest will be kept in binders in the medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN. See eg. (Exhibit 1, sub. ex. A, Measure 18).

(c) PM5, provides in pertinent part: " Medical Records shall be accurate...." See eg. (Exhibit 1, sub. ex. A, Measure 5).

16. I assert that this Court; Defendants Ryan and Pratt,

//

and other highly addictive or seditive pain medications / and all (p) sychotropic barbiturate based medication, (Emphasis added).

1/ Which generally excludes all over the counter pain medications, such as asprin, motren, Ibuprofren , ect.

2/ Known as Nurse "Watch Swallow" medications that requires the dispensing nurse to conduct a physical visual check of the inmates mouth to ensure inmates has swallowed the medication.

together with their ADOC Monitoring Bureau staff, to and including all administrative and correctional ADOC staff system-wide; (e) each of Defendant's (1) individually (2) named attorney's for Defendant's, as in footnote, 2/, inclusive; and (e) each of Plaintiff's and Plaintiff's class attorneys, as in footnote, 6/, inclusive; and they all have personal knowledge of the aforementioned ADOC KOP and DOT medication dispensing protocal and that all medical records must be (a) ctually recorded by ADOC through their subcontractor healthcare provider Corizon and it's (n)ursing staff as to medication dispensing to inmates, as set forth in paragraphs 14 and 15, inclusive; based upon a copy of this Court's Stipulation duly served upon them. 10/

17. I, at all times relevant herein, had personal knowledge as class member of (1) ADOC's KOP and DOT medication dispensing protocols, as in paragraph 14, inclusive and (2) of the (r)equirement that ADOC and Corizon (s)hall (a)ctually maintain all medical and medication dispensing records, as in paragraph 15, inclusive; under this Court's "Stipulation". See eg. (Exhibit 1, Stipulation, sub ex. C, Definations and sub ex. A, Measures 17, 18 and 5).

18. I recieve ADOC provided KOP and DOT perscription

//

10/ To and including, all of these individuals knowledge thereof based upon the Court's case file and transcript of this action from 2012 to date, which I hereby incorporate herein as if the same were set forth with particularly therein.

medication which are provided and (d)ispensed by ADOC healthcare provider Corizon and are (r)ecorded in ADOC's Medical Records MAR and Daily Medication Delivery Manifest, (b)y Corizon nurses, (Emphasis) as to (b)oth KOP and DOT dispensed medications.

19. Specifically, (C)orizon providers perscribed me the following KOP medications which which they (d)ispense to me monthly in 30 day supply, to wit: (a) Ecotrin; (b) Metropolol; (c) Lisinopril; (d) Furosemediseand (e) Atorivastation. 8/

20. Corizon additionally perscribed me "Plavix" (major blood thinner), DOT restricted medication which the provider has determined medically unsafe as potentially life threatening if (a)bused and (m)ust be (d)ispensed (d)aily as (r)estricted DOT (W)atch Swallow) medication, 9/ (and see footnote 2/ thereof (Emphasis). 11/

21. For the record, at all times relevant in this declaration, I was aware and complied with the ADOC required restrictive DOT medication dispensing protocol that their Corizon provider nurse (m)ust dispense my aforesaid DOT restricted medication, as in paragraph 20, inclusive, (b)y "the Corizon nurse physically providing me the medication, and the nurse watch me swallow the medication with water; and the nurse (v)isually check the (i)nside of my mouth that I (a)ctually swallowed the medication. I complied therewith from March of 2009 through mid 2016,

//

11/ The Corizon nurse who dispenses my DOT medication (e)ach time (m)ust make an entry into the ADOC Medical Records MAR and Daily Medication Delivery Manifest to record the same.

while I was physically incapacitated and housed in ADOC infirmary units. (Emphasis).

22. For the record, I was fraudulently, 12/ discharged from the ADOC infirmary units on eight (8) occasions between 2014 and 2016, and transferred to the following non medical, general population "Detention Units", (repeatedly for non medical reasons) to: (1) ASPC-Tucson CDU; (2) ASPC-Lewis, (a) Stiner Detention Unit; (b) Morey Detention Unit; (c) Bachman Detention Unit; (d) Buckley Detention Unit; (e) Rast Detention Unit, (prior to being (re)turned (after approx two (2) weeks to the ADOC infirmaries units, due to my physical incapacitated disability state as three quarter quadriplegic. 12/

23. In mid 2016, I was fraudulently discharged for the ninth time from the ADOC Infirmary unit at the ASPC-Lewis 2-11 Unit and transferred (again) to the non medical, general population Stiner Unit (SDU), here at the Lewis Complex. 12/. I remained at SDU for (s)everal months. Thereafter, I was reclassified to Maximum Custody Status.

24. Approximately, early November, 2016, I was transferred from SDU Unit to the non medical, general population, Rast Max, "Closed Custody" Maximum Security Unit here-

//

12/ This is relevant due to it establishes the material fact that I was physically at these Detention Units and that I have personal knowledge of the unauthorized defacto ADOC/Corizon DOT Medications dispensing protocol at these units which is relevant to my herein declaration. The fact that I was fraudulently discharged is Irrelevant to

at the Lewis complex. I am currently housed at the Rast Max Unit until my (s)entence (e)xpiration (d)ate release upon my absolute discharge from ADOC on September 22, 2019. (Emphasis)

25. For the record, I state the following Detention Units at (1) ASPC-Tucson, CDU; (2) ASPC-Lewis; (a) Stiner Detention Unit; (b) Morey Detention Unit; (c) Bachman Detention Unit; (d) Buckley Detention Unit; (e) Rast Detention Unit; (3) ASPC-Eyman, Special Management Unit I and (4) Rast Max Maximum Custody Unit are all "Closed Custody" Units, whereby all inmates are Level 5, Maximum Custody and are single or double housed in a cell and they are under 24 hour lockdown status. (Emphasis)

26. At all times relevant in this declaration, I was previously housed in "Closed Custody" at the aforesaid Detention Units, Special Management Unit and Rast Max Unit, as in paragraph 25, inclusive and I am currently housed in Closed Custody at the Rast Max Unit in a single cell to present date.

27. Based upon my personal knowledge, I state that at each of the foregoing detention units, ASPC-Tucson, CDU; (2) ASPC-Lewis, (a) Stiner Detention Unit; (b) Morey Detention Unit; (c) Bachman Detention Unit; (d) Buckley Detention Unit; (e) Rast Detention Unit and (3) Special Management Unit I, between 2010-2013, I and all other inmates (herein collectively as "our"), actually received all of our ADOC provided (r)estricted DOT Medications (d)ispensed by the (t)hen ADOC and/or previous ADOC healthcare provider Wexford nurses whom (d)ispensed our DOT medications thru the "Security Trap Door" on the lock cell door by (p)hysically providing our medication together with a cup of water physically

watching us swallow the medication and us (r)eturning to the nurse the (e)mpty paper cup of water; and thereafter the nurse had to (v)isually check the (i)nside of inmate's mouth to ensure we actually swallowed the medication, (Emphasis Added), 9/13/. Under the then DOT procedure, an ADOC Correctional Officer had accompied the nurse for personal security reasons and (n)ot to assist nor perform any of the nurse Watch Swallow protocols to ensure the inmate has actually swallowed the medication.

28. I state in late 2013, I first learned that ADOC's then new private healthcare provider Corizon took over that Corizon had refused to comply with nor perform the ADOC required restricted DOT medikation dispensing, "Watch Swallow" procedure, 9/that required Corizon nurses to:

"Dispense restricted DOT medications (b)y physically providing inmate the medication together with a cup of water; watch the inmate swallow the medication and had inmate (r)eturn to the nurse the empty cup of water; and thereafter the nurse shall (v)isually check the (i)nside of the mouth to ensure inmate has actually swallowed the medication."

29. In December of 2013, I was advised by both ADOC and Corizon staff that Corizon had implemented a Corizon corporate unwritten and unauthorized defacto policy, (hereinafter

//

13/ This is the (t)rue and (a)ccurate ADOC DOT Watch Swallow procedure. (Emphasis) Accord. 9/.

"Corizon Policy" which "(S)upperceeds" ADOC's restrictive "DOT medication dispensing protocal that does (N)ot require Corizon nurses to conduct any ADOC required Watch Swallow procedure, 9/ nor verify if the inmate has actually swallowed this DOT medication in all Closed Custody ADOC Detention Units, Special Management Units and Maximum Custody Units, 14/.

30. Pursuant to the Corizon Policy, all Corizon nurses shall dispense ADOC restrictive DOT medications by the nurse (P)re-packaging each inmate's medication in a (R)eusable envelope with the inmates name and cell location thereon; and the nurse "(Q)uickly (S)liding it through the "security trap door" of the locked cell door or through the "door jam" in a (R)apid (F)ashion dispensing all inmates on the teir and then the nurse (Q)uickly goes back and picks up the (E)mpty envelopes (after) inmate has unsecurely removed the medication the envelopes therefrom. 14/

31. Per the Corizon Policy, Corizon has directed all Corizon nurses to (I)nappropriately dispense these ADOC restrictive DOT medications as (N)ot Watch Swallow and dispense them (DOT) as (P)rohibited (N)on-restricted DOT medications as "(D)aily (D)elivered nurse Keep-on-person (KOP) medication deliberately (P)ermitting inmates to (R)etain their (U)nauthorized DOT potential life threatening medications. 14/

32. In addition, under the Corizon Policy, Corizon and all Corizon nurses who are (I)nappropriately dispensing

//

14/ In direct violation of ADOC's required restrictive DOT medication dispensing protocal under this Courts Stipulation, Exhibit 1.

the restricted ADOC DOT medications as not Watch Swallow purposefully permitting the inmate to retain their unauthorized DOT medication has the (p)otential for inmates to facilitate their own perscription medication abuse or facilitate the inmates prohibited distribution of these medications to other inmates for perscription medication abuse. 14/

33. The Corizon Policy requires, that Corizon direct all Corizon nursing staff who (i)nappropriately dispense the restricted ADOC DOT medications as not watch swallow and permit the inmates to retain their unauthorized DOT medications, to (i)naccurately (e)nter into the ADOC MAR and Daily Medication Delivery Manifest that the inmates DOT medications were (f)alsely dispensed as restrictive DOT medication Watch Swallow. 14./

34. Based upon my own personal knowledge, I state that although the Corizon Policy, as in paragraphs 29 to 33, inclusive, is an "unwritten" policy, I have (p)ersonally (s)een here at ADOC Corizon documents that (e)xist which discuss the particulars of Corizon Management and nursing staff compliance with this Corizon Policy at ADOC systemwide. (Emphasis).

35. Upon information and belief, I allege that although the aforesaid Corizon Policy, as in paragraphs 29 to 33, inclusive, is an "unwritten" informal policy, I state that Corizon has (s)ent numerous written correspondances and documents by mail and e-mail to Defendants Ryan and Pratt, including an unspecified number of

of ADOC staff systemwide (n)otifying them of Corizon's intent (n)ot to comply with the (e)xisting ADOC restrictive (DOT) medication dispensing, "Watch Swallow", ADOC protocol at all "Closed Custody" ADOC Detention Units, Special Management Units and Maximum Custody Units systemwide and that Corizon will implement Corizon's own (n)on restrictive DOT medication dispensing protocal whereby Corizon nurses will only (d)aily (d)eliver ADOC DOT medications, as (n)on Watch Swallow and dispense them (DOT) as Keep-on-Person (KOP) medications, (p)ermitting inmates to retain their unauthorized ADOC DOT medications aforesaid Corizon Policy; (b)ased upon Corizon corporation financial reasons to: (1) expidiate Corizon nurses dispensing of these DOT medications and (2) to reduce the number of Corizon nurses staffing to dispense these DOT medications. (B)ased hereupon, I state that these Corizon written correspondances and documents and/or email communications thereof do exist between December, 2013 and present date; and these are on file with Corizon Corporation at an unknown location or subsidiary thereof, and are (s)imilarly on file with ADOC Defendant's Ryan and Pratt, to and including an unspecified number of ADOC staff systemwide; within the same time periods.

36. I further state that (b)ased upon these Corizon written correspondences and documents and/or e-mail communications aforesaid sent to ADOC Defendant's Ryan and Pratt and other ADOC staff systemwide has establihed prima facie evidence that Defendant Ryan and Pratt and on behalf of ADOC has (a)ctual knowledge of the implementation and

enforcement of the aforesaid Corizon Policy at issue. (Emphasis Added).

37. Based upon my own personal knowledge, I state that I know from being transferred to and housed at each of the following "Closed Custody" ADOC units, as in paragraph 25, inclusive; that at each of these units from October, 2013 to present (d)ate, they had and currently have an ADOC Security Video Surveillance (R)ecording System and a consecutive daily practice of automatically (v)ideo (r)ecording, "(t)he date and time of all Corizon nurses (d)ispensing of ADOC restrictive DOT medications to inmates and thereby photo identifies the nurse and the cell number which the nurse dispensed the DOT medication to and video records the exact manner how the nurse dispensed the DOT medication and whether the nurse did or did not dispense the DOT medication "Watch Swallow". (Emphasis). To which ADOC retains an electronically (s)tored copy of these Security Surveillance Video Recordings. 15/

38. I state that the ADOC Security Surveillance Video Recording System (SSVRS) at the ADOC "Closed Custody" ASPC-Lewis

//

15/ ADOC administratively electronically stores these Security Surveillance Video Recordings for an unknown definite number of years for each of these ADOC facilities, to which I do not know.

However, I state from my own personal knowledge that ADOC retains these Security Surveillance Video Recordings for the ASPC-Lewis, Rast Max Unit for 7 years. (Emphasis added).

Rast Max, Pod 4C, for the following dates from November 1, 2016, through March 20, 2017 and from October 27, 2018 through December 31, 2018, for this (p)eriod, (148 days), (and forward to present date), which (a)ffirmatively (s)hows:

(a) That I recieved ADOC restricted, "Watch Swallow" (WS) DOT medications twice daily dispensed by Corizon nurses (for a total of 256 times during this period), and

(b) That (e)ach of these (i)ndividu(a)l (d)ispensing nurses on these dates, had deliberately dispensed my restricted ADOC WS DOT medications inappropriately, as (p)rohibited (N)on WS ADOC KOP, 8/ daily delivered medications, permitting me to retain my unauthorized DOT medications and did (N)ot dispense my DOT medications as required nurse verified DOT WS medications, 9/ for a total of 256 times during this period, on a daily routine basis.

(Id. at SSVRS, Video Tape Recordings for these dates).

39. I further state that these Corizon nurses individually had refused to and continue refuse to comply with Corizon Provider's perscribing DOT WS nurse dispensing order of my aforesaid DOT WS medications, per the Corizon Policy, as in paragraph 32, inclusive.

40. I further state and hereby profer an offer of proof based upon my own personal knowledge that the aforesaid SSVRS, video tape recordings will (p)rove (1) that each of these individual Corizon nurses had actually inappropriately dispensed my restricted ADOC WS DOT medications, as (p)rohibited (N)on

WS ADOC KOP, 8/ medication on 256 (s)eperate occasions, 16/ as in paragraph 38, inclusive and (2) that each of these nurses thereby did (N)ot dispense my DOT medications as required nurse verified WS medications on each of these 256 (s)eperate occasions. (Emphasies added). See e.g. (Id. at SSURS video tape Recording these dates).

41. I additionally state based upon my own personal knowledge that (e)ach of the aforesaid (i)ndividual Corizon nurses had fraudulently (e)ntered the following (i)naccurate and (f)alse information that they, "(d)id dispense my DOT medications as Watch Swallow" (Emphasies), when in fact they did (n)ot dispense my DOT medication Watch Swallow, as (v)erified by the ADOC-SSURS video tape Recordings on their respective individual (d)ates they dispensed my DOT medications, as in paragraph 38, inclusive, in the (1) ADOC Medication Administration Record (MAR); (2) ADOC Daily Medication Delivery Manifest and (3) my ADOC Medical Records, per the Corizon Policy, as in paragraph 33, inclusive.

42. I further state that the aforesaid (V)erified (ADOC) Video Tape Recordings demonstrate that the 256 (s)eperate (i)ncidents of these individual Corizon nurses deliberately and inappropriately dispensing my restricted ADOC WS DOT medications as (p)rohibited (N)on Watch Swallow medications on a routine

//

16/ This calculation is based upon I had actually recieved these DOT medications (s)eperately dispensed 2 times a day for this 148 day period which times 2 daily equals 256 seperate (o)ccasions up to December 31, 2018 and does not include any other incidents of this date.

daily basis at issue establishes prima facie evidence that:

(a). Proves Corizon's implementation and operational enforcement of the Corizon Policy, e.g. Corizon's unauthorized defacto policy which does (N)ot require Corizon nurses to comply with the ADOC DOT Watch Swallow protocol, as in paragraphs 29 through 33, inclusive.

(b). Proves that each of their individual Corizon nurses collectively had deliberately and inappropriately dispensed my restricted ADOC WS DOT Medications as (p)rohibited (N)ot Watch Swallow medications on 256 (s)eperate occasions in their refusal to comply with the Corizon Provider's perscribing DOT WS nurse dispensing order of my DOT medications; constituting 256 (s)eperate violations of (b)oth (1) The Medication Administrative Record (MAR) nurse medication dispensing (d)irective under PM17 and (2) The Daily Delivery Manifest, (DDM), nurse (d)aily DOT medication dispensing manifest.

(1). Therefore, resulting in: (a) 256 (s)eperate incidents of ADOC / Corizon (N)on compliance with PM17, under this Court's Stipulation, (Exhibit 1, Stipulation, sub. exh. A, PM 17) and (b) 256 (s)eperate incidents of ADOC / Corizon noncompliance under this Court's Stipulation. (Id. at Exhibit 1, sub. exh. A, PM18.

(c). Proves that each of these individual Corizon nurses collectively had fraudulently (e)lectronically (e)ntered the (i)naccurate and (f)alse information that they, "did dispense my DOT medications as Watch Swallow" (Emphasis), when in fact they did (N)ot dispense my DOT Medication Watch Swallow on 256

(S)eperate occasions, as (V)erified, in (1) ADOC Medication Administrative Record (MAR); (2) ADOC Daily Medication Delivery Manifest and (3) my ADOC Medical Records; and thus constituting 256 (S)eperate violations of (b)oth: (1) The Medication Administrative Record (MAR), nurse medication dispensing (d)irective under PM17; and (2) The Daily Delivery Manifest, (DDM), nurse daily DOT medication dispensing manifest.

(1) Therefore, resulting in (a) 256 (S)eperate incidents of ADOC/Corizon (N)oncompliance with PM17, under this Court's Stipulation. (Exhibit 1, sub. exh. A, PM17); (b) 256 (S)eperate incidents of ADOC/Corizon (N)oncompliance with PM18, under this Court's Stipulation. (Id, sub. exh. A PM18) and (c) 256 (S)eperate incidents of ADOC/Corizon (N)oncompliance with PM15, under this Court's Stipulation. (Id. sub. exh A, PM15).

III. I state that the (ADOC) SSVRS at the ADOC "closed custody Units at the ASPC-Lewis, (a) Stiner Detention Unit (SDU), (b) Morey Detention Unit (MDU), (c) Buckman Detention Unit (BDU), (d) Buckley Detention Unit (BDU), (e) Rast Detention Unit (RDU) and the ASPC-Eyman Special Management Unit (SMU) I, I was transfered to these Units for a (b)rief periods collectively between 225 and 250 days total and returned to the ADOC infirmary units and said units Video tape Recordings between October, 2013 and November, 2016, when I was housed between these units affirmatively shows:

(a) that I recieved ADOC restricted "Watch Swallow" (WS) DOT medications twice daily dispensed by Corizon nurses (for a total of 250 times during this period), and

(b) That (e)ach of these individual (d)ispensing nurses on these dates, had deliberately dispensed my restricted ADOC WS DOT medications inappropriately, as (p)rohibited (N)on WS DOP, 8 / daily delivered Medications, permitting me to retain my unauthorized DOT medications and did (N)ot dispense my DOT medications as required nurse (V)erified DOT WS Medications, 9 / for a total 150 times during this period, on a daily routine basis.

(Id at SSVRS, Video Tape Recordings for these dates, 17 /).

42. I further state that these Corizon nurses individually had refused to and continue to refuse to comply with Corizon Provider's perscribing DOT WS nurse dispensing order of my aforesaid DOT WS medications, per the Corizon Policy, as in paragraph 32, inclusive.

43. I further state and hereby proffer an offer of proof based upon my own personal knowledge that the aforesaid SSVR'S video tape Recordings will (p)rove (I) that each of these individual Corizon nurses had actually inappropriately dispensed my restricted ADOC WS DOT medications, as (p)rohibited (N)on WS ADOC KOP, 8 / medications on 150 (s)eperate occasions

//

17 / At the present time I do not know the (e)xact (d)ates that I was transfered to and housed at these units. Therefore, I request the Court and all parties hereto to independently contact ADOC to request a "printout" of the ADOC units I was transfered and housed at between October, 2013 and November, 2016.

18/ as in paragraph 41, inclusive and (D)That each of these nurses thereby did (N)ot dispense my DOT medication as required nurse (V)erified WS medications on each of these 250(s) eperate occasions. (Emphasis added). See e.g (Id. at SSVRS, Video Tape Recordings for these dates, 17/).

44. I additionally state based upon my own personal knowledge that (e)ach of the aforesaid (i)ndividual Corizon nurses had fraudulently (e)ntered the following (i)naccurate and (f)alse information that they "did dispense my DOT medications Watch Swallow" (Emphasis), when in fact they did (N)ot dispense my DOT medications Watch Swallow, as (V)erified by the ADOC - SSVRS Video Tape Recordings on their respective individual (d)ates they dispensed my DOT medications, as in paragraph 41, inclusive; in the (1) ADOC Medication Administrative Record (MAR); (2) ADOC, Daily Medication Delivery Manifest and (3) my ADOC Medical Records, per The Corizon Policy, as in paragraph 33, inclusive.

45. I further state that the aforesaid (V)erified (ADOC) Video Tape Recordings demonstrate that the 250(s) eperate (i)ncidents of these individual Corizon nurses deliberately and inappropriately dispensing my restricted ADOC WS DOT medications, as (p)rohibited (N)on Watch Swallow medications on a routine daily bases at issue

//

18/ This calculation is based upon I had actually recieved these DOT medications (S)eperately dispensed 2X times a day for this total 125 day period which times 2 daily equals 250 seperate (o)ccasions from October, 2013 through November 2016.

establishing prima facie evidence that:

(a) Proves Corizon's implementation and systemic operational enforcement of the Corizon Policy, e.g. Corizon's unauthorized defacto policy which does (N)ot require Corizon nurses to comply with ADOC's DOT Watch Swallow protocol, as in paragraphs 27 through 32, inclusive.

(b) Proves that each of these individual Corizon nurses collectively had deliberately and inappropriately dispensed my restricted ADOC WS DOT medications, as (p)rohibited (N)on Watch Swallow medication on 250 (s)eparate occasions in their refusal to comply with the Corizon Provider's perscribing DOT WS nurse dispensing order of my DOT medications; constituting 250 (s)eparate violations of (b)oth: (1) The Medication Administrative Record (MAR), nurse medication dispensing directive under PM 17 and (2) The Daily Delivery Manifest, (DDM), nurse daily DOT medication dispensing manifest.

(1) Therefore, resulting in (a) 250 (s)eparate incidents of ADOC/Corizon (N)oncompliance with PM 17, under this Court's Stipulation. (Exhibit 9, exh A, PM 17, Stipulation) and (b) 250 (s)eperate incidents of ADOC/Corizon noncompliance with PM 18, under this Court's Stipulation. (Id at Exhibit 9, sub exh A, PM 18).

(c). Proves that each of these individual Corizon nurses collectively had fraudulently (e)lectronically (e)ntered the (i)naccurate and (f)alse information that they, "did dispense my DOT medication as Watch Swallow", (Emphasis), when in fact they did (N)ot dispense my DOT medication as Watch Swallow on 250 (s)eparate occasions, as (V)erified, in (1) ADOC Medication Administrative Record, (MAR); (2) ADOC Daily Medication Delivery Manifest

and (3) my ADOC Medical Records; and thus constituting 250 (s)eperate violations of Each: (1) The Medication Administration Record (MAR), nurse medication dispensing (d)irective under PM17; (2) Daily Delivery Manifest, (DDM), nurses daily DOT medication dispensing manifest.

(1) Therefore, resulting in: (A) 250 (s)eperate incidents of ADOC/Corizon (N)oncompliance with PM17, under this Court's Stipulation. (Exhibit 1 Stipulation sub exh A, PM17); (b) 250 (s)eperate incidents of ADOC/Corizon (N)oncompliance with PM18, under this Court's Stipulation. (Id at Exhibit 1, sub exh. A, PM18) and (c) 250 (s)eperate incidents of ADOC/Corizon's (N)oncompliance with PM5, under This Court's Stipulation. (Id at Exhibit 1, sub exh. A PM5).

Systemic Showing Of ADOC/Corizon (D)aily Deliberate Inappropriate Dispensing Of Inmates Restricted ADOC Watch Swallow DOT Medication, As (P)rohibited (N)on-Watch Swallow Medication Permitting Inmates To Physically Retain (U)nauthorized DOT Restricted Potential Life Threatening Medication In (N)on-Compliance With This Court's Stipulation PM's 17, 18 and 5.

46. I further state based upon my own personal knowledge, and based upon my previous and current incarceration at the ASPC-Lewis / Rast Max Unit I have personal knowledge of and personally witness that ADOC/Corizon, had and presently has, a daily routine practice of, "(d)eliberately and

and inappropriately dispensing inmates (a) restricted perscribed ADOC Watch Swallow (WS) medications, "to other unknown inmates, 19/, as (p) rohibited (N) on Watch Swallow medications permitting inmates to physically retain (u) nauthorized DOT restricted potential life threatening medications" (b) ased upon my previous incarceration at this unit from November 1, 2016 through March 20, 2017 and my present incarceration at this unit from October 27, 2018 through December 31, 2018 (and forward).

47. Based thereupon, I state upon my personal knowledge that the continuous Security Surveillance Video Recording System (SSVRS), at the ASPC-Lewis / Rast Max Unit for the following dates from November 1, 2016 through March 20, 2017 and from October 27, 2018 through December 31, 2018, (148 days) 20/ (and forward), which will affirmatively (s) hows:

(a) ADOC / Corizon had and presently is on a (d) aily routine

//

19/ I refer to "other unknown inmates". However, I state that these other unidentified inmates are actually known and are a matter of ADOC and Corizon record. I further state the SSVRS Video Tape Recordings for these specific dates of the Corizon nurses dispensing their DOT medications will "identify the inmates cell number and location", as in paragraph 37, inclusive. Which ADOC or Corizon can "cross reference" and obtain the "inmates actual name and ADOC number. Therefore, these other unidentified inmates are actually known in support of my herein declaration for purposes of relevancy.

20/ Expressly limited to this period I was at this unit to establish my personal knowledge thereof. (Emphasis).

basis deliberately and inappropriately dispensing inmates (r)estricted perscribed ADOC Watch Swallow (WS) medications "to other unidentified inmates," 19/, as (p)rohibited (n)on-Watch Swallow medications permitting inmates to physically retain (u)nauthorized DOT restricted potential life threatening medications".

(b) I submit based upon my personal knowledge that 125 inmates at the Rast Max Unit, 21/ (r)ecieve daily ADOC/restricted "Watch Swallow" (WS) DOT medications dispensed (s)eparately 2 times daily, (for a total of "35,000 times" these DOT medications were dispersed to those inmates within this limited 148 day period), 20/.

(c) that (e)ach of these (i)ndividual dispensing nurses on these (d)ates, had deliberately and inappropriately dis-pensed these 125 inmates restricted ADOC WS Medications

//

21/ I state the Rast Max Unit houses 500 inmates. I state that upon my own personal knowledge I know at "minimum" 125 inmates, (25 percent of the 500 inmates) (a)ctually recieve "(d)aily" restricted ADOC DOT WS medications (s)eparately dispensed 2 times daily. Since I do not have access to the actual ADOC MAR or DOM I do not have the exact number of inmates who recieve (d)aily DOT medications at this unit. But I know at minimum it is at least 125 inmates. Upon information and belief, I allege That realistically it's upward between 125 to 250 (50 percent) who actually recieve restricted DOT WS medications daily so this calculation will substantially increase upon verification.

inappropriately, as (p)rohibited (N)on WS ADOC, KOP, 8/ daily delivered medications permitting these 125 inmates to physically retain their contraband DOT medications and did (N)ot dispense those 125 inmates DOT medications as required nurse (V)erified DOT WS medications, 9/ for a total of 30,000 times during only this limited period, on a daily routine basis.

(Id. at SSVRS, Video Tape Recordings for these dates).

48. I further state that these Corizon nurses individually, had refused to and continues to refuse to comply with the Corizon Providers perscribing DOT WS nurse dispensing Orders of these 125 inmates DOT WS medications, per the Corizon Policy, as in paragraph 3I, inclusive.

48. I further state and hereby proffer an offer of proof, based upon my own personal knowledge that the aforesaid SSVRS Video Tape Recordings will (p)rove (1) that each of these individual Corizon nurses had actually inappropriately dispensed those 125 inmates restricted ADOC WS DOT medications, as (p)rohibited (N)on WS ADOC, KOP, 8/ medications on 30,000 (s)eperate occasions, 21/, as in paragraph 47, inclusive and (2) that each of these nurses thereby did (N)ot dispense these 125 inmates DOT medications as required nurse (V)erified WS medications on (e)ach of these 30,000 (s)eperate occassions. (Emphasis added). See e.g. (Id. at SSVRS Video Tape Recordings for these dates).

49. I additionally state, based upon my own personal knowledge, that (e)ach of the aforesaid individual Corizon nurses

had fraudulently (e)ntered the following (i)naccurate and (f)alse information that they, "did dispense all of these 125 inmates DOT medications as Watch Swallow", (Emphasis), when in fact they did (N)ot dispense those 125 inmates DOT medications Watch Swallow, as (V)erified by the ADOC SSVRS, video tape recordings on their respective individual (d)ates they dispensed these 125 inmates DOT medications, as in paragraph 47, inclusive; in the (1) ADOC Medication Administrative Record (MAR); (2) ADOC Daily Medication Delivery Manifest and (3) my ADOC Medical Records, per the Corizon Policy, as in paragraph 33, inclusive.

49. I further state that the aforesaid (V)erified (ADOC) video tape recordings demonstrate that the 30,000 (s)eperate (i)ncidents of these individual Corizon nurses deliberately and inappropriately dispensing those 125 inmates ADOC DOT WS medications, as (p)rohibited (N)on Watch Swallow medications on a routine (d)aily basis at issue establishes the prima facie evidence that:

(a) Proves Corizon's implementation and operational enforcement of the Corizon Policy, e.g. Corizon's unauthorized and defacto policy which does (N)ot require Corizon nurses to comply with the ADOC DOT Watch Swallow protocol, as in paragraphs 29 through 33, inclusive.

(b) Proves that (e)ach of these individual Corizon nurses collectively, had deliberately and inappropriately dispensed these 125 inmates restricted ADOC WS DOT medications, as (p)rohibited (N)ot Watch Swallow medications on 30,000 (s)eperate occasions, in their refusal to comply with the Corizon Providers prescribing DOT WS nurse dispensing orders of those 125 inmates DOT medications; constituting 30,000 (s)eperate violations of Each: (1) the Medication Administrative

Record, (MAR), nurse medication dispensing (d)irective under PM17. and (2) The Daily Medication Delivery Manifest, (DDM), nurse delivery DOT medication dispensing manifest.

(1) Therefore, resulting in (A) 30,000 (S)eperate incidents of ADOC/Corizon (N)oncompliance with PM17, under this Court's Stipulation. (Exhibit 1, Stipulation sub. exh A, PM17) and (b) 30,000 (S)eprate incidents of ADOC/Corizon (N)oncompliance with PM18, under this Court's Stipulation. (Id at Exhibit 1, sub. exh. A PM18).

(c) Proves that each of these individual Corizon nurses collectively had fraudulently (e)lectronically (e)ntered the (i)naccurate and (f)alse information that they, "did dispense these 125 inmates DOT medications Watch Swallow," (Emphasis); when in fact they did (N)ot dispense those 125 inmates DOT medications watch swallow on 30,000 (S)eperate occasions, as (V)erified, in the: (1) ADOC Medication Administrative Record, (MAR); (2) Daily Medication Delivery Manifest, (DDM) and (3) my ADOC Medical Records; thus constituting 30,000 (S)eperate Violations of Each: (A) The Medication Administrative Record, (MAR), nurse medication dispensing (d)irective under PM17; (b) the Daily Delivery Manifest, (DDM), nurse daily medication DOT dispensing manifest under PM18 and (c) the 125 inmates (S)eperate ADOC Medical Records.

(1) Therefore, resulting in (a) 30,000 (S)eperate incidents of ADOC/Corizon (N)oncompliance with PM17, under this Court's Stipulation. (Id. at Exhibit 1, sub. exh. A PM17); (b) 30,000 (S)eperate incidents of ADOC/Corizon (N)oncompliance with PM18, under this Court's Stipulation, (Id. at Exhibit 1, sub. exh A PM18) and (c) 30,000 (S)eperate incidents of ADOC/Corizon (N)oncompliance

with PMS, under this Court's Stipulation. (Id. at Exhibit 1, seeks with a PMS).

50. Upon information and belief, I allege that Corizon has systemically implemented and is enforcing it's Corizon unauthorized and defacto policy which directs all Corizon nurses to (N)ot comply with governing ADOC's DOT "Watch Swallow" (WS) protocol, as in paragraph 49, inclusive, at all (ADOC) "Closed Custody" Units (a) Complex Detention Units and all inter prison units Detention Units within each complex of the ADOC ten (10) complexes, Douglas, Eyman, Florence, Lewis, Phoenix, Perryville, Sandford, Tucson, Winslow and Yuma and (b) The "Closed Custody" Maximum Custody Units at the Eyman Complex, e.g. (a) Special Management Unit (SMU) I and (b) Browning Unit also known as SMU-II. 22/

51. Upon information and belief, I allege that the (ADOC) SSURS, Video Tape Recordings at each of the aforesaid ADOC "Closed Custody, Complex Detention Units, Institutional Detention Units and Maximum Custody Units within ADOC's ten (10) complexes, as in paragraph 50, inclusive; will (P)rove that Corizon since February of 2015 to present date, has directed all Corizon nurses thereof to (N)ot to comply with governing ADOC DOT WS protocol at all of these ten (10) complexes, (Id). 22/

//

22/ Upon this Court granting my Motion to Intervene as Plaintiff and/or an Evidentiary Hearing, I will move the Court to issue Court ordered subpoena duces tecums to compel the requested documentation and/or SSURS video Tape Recordings in which to support my herein allegations with prima facie relevant evidence.

52. Upon information and belief, I allege that the (ADOC) SSURS, Video Tape Recordings at (e)ach of the aforesaid ADOC "Closed Custody" Complex Detention Units, several institutional Detention Units thereof and Maximum custody Units within ADOC's ten (10) complexes, as in paragraph 50, inclusive; will (p)rove that Corizon nurses system-wide at all ten (10) ADOC complexes, (Id); on a daily routine basis, "deliberately dispenses all inmates (r)estricted ADOC WS DOT medications, inappropriately, as (p)rohibited (o)n Watch Swallow, ADOC KOP, & / medications, per the Corizon Policy, as in paragraph , inclusive; to (s)everal (t)housand inmates, 3 / daily; resulting in approximately 4,200 (s)eperate occurances on a daily routine basis; thus constituting both violations of and noncompliance with the three following PM's 17, 18 and 5, (actually resulting in 12,600 (s)eperate daily occurances 4,200 occurances times three seperate PM violations) under this Court's Stipulation. (Exhibit 4, Stipulation, sub. exh. A, PM's 17, 18 and 5), (Emphasis). 22 / I state this is systemic noncompliance by ADOC / Corizon. 22 /

//

22 / I state that at all of these ADOC "Closed Custody" units system wide there are at minimum 12,600 inmates housed in this custody level and collectively comprise this total population on a daily routine basis. Therefore, I allege upon my own personal knowledge from being within this custody level of ADOC population I state at minimum of 4,200 inmates (33 percent of the 12,600 inmates) actually receive (r)estricted ADOC WS DOT medication dispensed 3 times daily on (s)eperate occasions. (Emphasis).

23/.

53. I state that at all times relevant herein, Defendant-Director Ryan and Defendant Pratt, together with unknown member of ADOC staff, had known since February of 2015 to present (d)ate that the the ADOC systemwide operational enforcement of the (ADOC) SSVRS, videotape recording system at (e)ach of (ADOC) "Closed Custody" Units at (A) Complex Detention Units, all inter prison Detention Units within each complex of the (ADOC) ten (10) complexes, Douglas, Eyman, Florence, Lewis, Phoenix, Perryville, Safford, Tucson, Winslow and Yuma and (b) the "Closed Custody" Maximum Security Units at the Eyman Complex, e.g. (a) Special Management Unit (SMU) I and (b) Browning Unit, also known as SMU II; (d)oes automatically video record on a 24 hour (d)aily basis of the (p)hysical manner and protocol of and identifies the inmate

//

Since, I do not have access to the actual ADOC MAR or DDM I do not have the exact number of inmates who recieve (d)aily DOT medications collectively at all these units. But I know at minimum it is at least 4,200 inmates. Upon information and belief, I allege that realistic all of it's upward from 33 to 50 percent who actually recieve restricted DOT WS medications daily so this calculation will (s)ubstantially increase upon verification. (Emphasis)

23./ To demonstrate the astronomical number of total systemic violations for these three (3) PM's 17, 18 and is 48,330 (s)eparate occurances per month, (30 days) (4,200 violation daily time 3 PM violations daily times 30 days equals 48,330 violations.

cell and location of (a)ll Corizon nurses dispensing of inmates (r)estricted ADOC (r)equired Watch Swallow (WS) DOT medications at there respective Units, (Emphasis). 22/

54. I further state, based upon my own personal knowledge, Defendant-Director Ryan and Defendant Pratt, together with an unknown number of ADOC Staff, since February of 2015 to present date, had known that Corizon was blantently and deliberately (n)on complying with governing ADOC (r)equired WS DOT medication protocol in their dispensing of all inmates (r)estricted DOT WS medication by virtue of Defendants Ryan and Pratt's knowledge of and review of there units SSVR Video Tape Recordings, as in paragraph 50, inclusive.

55. I further state based upon my own personal knowledge that Defendant-Director Ryan and Defendant Pratt, together with an unknown number of ADOC staff, since February of 2015 to present date (4 years), that all Corizon nurses on a routine (d)aily basis had deliberately dispensed all my 2 / and all other inmates (r)estricted ADOC required WS DOT medications, inappropriately, as (N)on WS ADOC KOP, 8/ medications, as described in paragraph 30, inclusive and deliberately not comply with governing ADOC required DOT WS, nurse verification protocol, as (v)erified by Defendants Ryan and Pratt's knowledge of and review of the ADOC SSVRS Video Tape Recordings for the period aforesaid at (e)ach of there "Closed Custody" units, as in paragraph 50, inclusive, (Emphasis). 22/

//

24/ Which (s)pecifically includes the periods I was

56. I further state that Defendant-Director Ryan and Defendant Pratt and other unknown number of ADOC staff, as ADOC Contract Monitors, has not taken any corrective against their subcontractor Corizon to: (1) comply with governing ADOC DOT Watch Swallow (W)erse (V)erified protocol and (2) properly dispense cell inmates (r)estricted ADOC DOT medication Watch Swallow (W)eerse Verification. Since February of 2015, when Defendant Ryan and Pratt and other unknown number of ADOC staff's continuous review of the (ADOC) SSURS videotape recording which verified (1) that Corizon has been continuously not complying with governing ADOC DOT WS procotol, as in paragraph 54, inclusive and (2) that Corizon is continuously to systemically deliberately dispense cell inmates (r)estricted ADOC WS DOT medications, inappropriately as non ADOC Watch Swallow medications for their refusal to comply with governing ADOC DOT WS mere verification protocol, as in paragraph 55, inclusive, to present (d)ate.

22/

57. I further state based upon my own personal knowledge, that at all times relevant herein, Defendant-Director Ryan, Defendant Pratt and unknown numerous ADOC staff systemwide

//

at the aforesaid ADOC Detention units for those interim periods between January 1, 2013 through November 1, 2016, as in paragraph 37, inclusive; the Rast Max Unit from November 1, 2016 through March 20, 2017, as in paragraph 41, inclusive and my present incarceration at the Rast Max Unit from October 27, 2018 through present date, as in paragraph , inclusive.

had known that per ADOC Policy and pursuant to this Court's Stipulation, (Exhibit 7, sub. ex. A), that on (e)ach (o)ccasion when their subcontractor Corizon nurses dispensed my and all other inmates (r)estrictive ADOC required WS DOT medications, they had to (a)ccurately enter into the (ADOC) MAR, DDM and inmates Medical Records they (a)ctually dispensed these DOT restricted medications as verified nurse dispensed Watch Swallow. 22/

58. I further state, at all times relevant in this declaration, Defendant-Director Ryan, Defendant Pratt and other unknown member of ADOC staff, Inmate Health Services and Contract Monitoring Bureau, has not taken any corrective action against their subcontractor Corizon to: (1) comply with governing ADOC Policy and this Court's Stipulation Performance Measures (PM), PM's 17, 18 and 5, (Exhibit 7, sub. ex. A), to direct their Corizon nurses to enter (a)ccurate information as to their nurses dispensing of inmates restricted ADOC required WS DOT medications that they actually (p)hysically nurse verified the inmate actually swallowed these medications, in ADOC's MAR, DDM and inmates Medical Records; and (2) (d)irecting Corizon to "(r)emove" all of their aforesaid Corizon nurses, e.g. "tens of thousands to hundreds of thousands up to one or two million," (s)eparate (i)naccurate and (f)alse entries these nurses had made and are presently making on a (d)aily routine bases in ADOC's MAR, DDM and inmates Medical Records that they (f)alsely stated they "did dispense the inmates DOT medications as Watch Swallow," when they verifiably did not dispense them as physical-visual nurse verified Watch Swallow DOT medications, as in paragraphs 37 through

53, inclusive. Since February of 2015, when Defendants Ryan and Pratt and other unknown member of ADOC Staff as aforesaid upon their (c)ontinuous (r)eview of the (d)aily SSVR video tape recordings which (v)erified that: (1) Corizon nurses has and is presently systemwide purposefully not complying with governing ADOC Policy and this Court's Stipulation PM's 17, 18 and 5 by Corizon nurses (e)ntering inaccurate information as to their Corizon nurses dispensing of inmates restricted ADOC required WS DOT medications that they are (i)naccurately and (f)alsely entering that they actually physically nurse verified the inmate actually swallowed their medications, in ADOC's MAR, DOM and inmates Medical Records, (Id) and (2) that Corizon (r)efuses to (r)emove all of these aforesaid Corizon nurses (s)ystemic (i)naccurate and (f)alse entries they routinely daily enter in the ADOC's MAR, DOM and inmates Medical Records that they (f)alsely stated they, "did dispense the inmates DOT medications as Watch Swallow", when they (v)erifiably did not dispense these DOT medications as physical visual nurse verified Watch Swallow medications, as verified, to (p)resent (d)ate. (Emphasis added). II/

59. Affiant further state, at all times relevant herein my declaration, Defendant-Director Ryan, Defendant Pratt and other unknown member of ADOC staff; since February, 2015 to present (d)ate and forward, has and is (i)mplicitly (a)cquiescing in with their subcontractor health care provider Corizon in Corizon's continued (p)rohibited conduct in violation of their own ADOC policies; The State of Arizona, ex rel. ADOC/Corizon contract and this Court's Order Stipulation, Performance Measures (PM), PM's 17, 18 and 5, (b) e.g. (1)

knowing (p)ermitting Corizon to continue to deliberately (N)ot comply with governing ADOC's required DOT nurse verification watch swallow protocol in their dispensing of (r)estricted ADOC WS DOT potential life threatening medications, as in paragraph 56, inclusive; (2) knowingly (p)ermitting Corizon to continue to systemically dispense inmates restricted ADOC required WS nurse verifications medications, (i)nappropriately, by (p)rohibited non WS ADOC KOP, medications, s/ in violation of governing ADOC required DOT WS medication protocol permitting inmates to retain their unauthorized potential life threatening medications, as in paragraph 57, inclusive and (3) knowingly (p)ermitting Corizon to systemically (p)ermit their Corizon nurses to (i)ntentionally enter (i)naccurate and (f)alse information by their Corizon nurses in ADOC's MAR, DDM and inmates Medical Records, by (f)alsely entering they, "did dispense the inmates restricted ADOC WS DOT medication, as nurse (v)erified WS" per ADOC policy, (Id); when in fact these nurses (d)id (n)ot dispense these restricted DOT WS as nurse verified, in violation of governing ADOC policy, (Id), as verified by ADOC's SSURS system, as in paragraph 58, inclusive, (Emphasis Added). ss/

60. I additionally state, at all times relevant herein, Defendant-Director Ryan, Defendant Pratt and other unknown number of ADOC staff systemwide; since February of 2015 to (p)resent date and (f)orward; has and are (p)urposefully and (p)remediately (r)efusing to take any corrective action against their subcontractor Corizon due to their systemic noncompliance with the aforesaid PM's 17, 18 and 5, as in paragraph , inclusive, to (p)erpetrate

a (c)ontinous (f)raud upon this Court; to falsely document Defendants' ADOC compliance with Performance Measures (PM), PM 17, 18 and 5 of this Court's Stipulation, (Id); which to (f)raudulently assert those (d)ocuments entry calculations in Defendant's monthly Coto Green Amber Red (CGAR) (r)eport to this Court for the purpose to fraudulently (s)how Defendants (ADOC) systemic compliance with PM 17, 18 and 5, (Id), (b)y Defendants aforesaid collectively (i)ntentionally "(c)overing (u)p" their own subcontractor Corizon's (c)ontinual (s)ystemic (n)oncompliance with PM 17, 18 and 5, and (k)nowingly entering Corizon's inaccurate and false entries that:

"Corizon nurses (d)id (d)ispense inmates restricted ADOC required WS nurse verified DOT medications being dispensed by these nurses as nurse verified Watch Swallow DOT medications" under PM 17, 18 and 5;"

to (f)raudulently show this Court Defendants monthly CGAR compliance with PM 17, 18 and 5, to perpetrate this continuous fraud upon this Court since February of 2015 to (p)resent (d)ate and (f)orward; 22/ (Emphasis added).

61. I further state based upon my own personal knowledge that (b)etween January 1, 2015 through November 1, 2016 and from November 1, 2016 through March 20, 2017, as in paragraphs 25, 38 and 41, inclusive; while I was transferred to and housed at these units; I sent the following seventeen (17) (s)eparate correspondences to (1) Defendant-Director Ryan; (2) Defendant Pratt; (3) ADOC Deputy Director Hood; (4) ADOC Division Director of ADOC Operations McWilliams; (5) Warden Morney; (6) Deputy

Part II OF E-Filing Document

Re: Plaintiff Bertanelli Motion to Intervene In Class action Parsons et. al. V. Ryan et. al.
No. CV-12-0601-PHX-ROS

Pages 51 through 100

Warden Moody; (7) ADOC Contract Monitoring Bureau Administrator Headstream and (8) Corizon Vice President of Operations - Arizona Black, 25/, requesting their (E)mergency (I)ntervention to take immediate (c)orrective action against your respective subordinate Corizon nurses. (D)ue to these Corizon nurses are systemically (d)eliberately dispensing my (and all other inmates), (r)estricted ADOC required nurse verified Watch Swallow (SW) DOT (p)otential life threatening (m)edications, 9/ inappropriately and (s)ystemically, as (p)rohibited (N)on ADOC WS, KOP, 8/ medications and in an (u)nsafe manner; which poses an imminent threat to my (h)ealth and (l)ife safty; in violation of governing ADOC policy and under the State of Arizona, u r d ADOC/Corizon health-care contract and the Class Action "Stipulation" settlement decree in Parsons, et. al. v. Ryan, et. al., (Id). 25/ In these correspondances I stated:

(a) that Corizon and their Corizon nurses are deliberately (n)ot complying with governing ADOC required Watch Swallow (WS) (nurse visual mouth inspection to verify inmate has actually swallowed the medication, (hereinafter "nurse verified WS protocol") restricted DOT medications, 9/ policy systemwide and while I was at those unit and while I presently am at the Rast Max unit; (b)y these Corizon nurses on a daily routine basis blanketly (N)ot performing this required ADOC WS nurse verification protocal; and thus (u)nsafely dispensing my and all other inmates restricted WS DOT medications //

25/ Each of these correspondances are verifiable and matter of record.

in violation of governing ADOC required WS DOT medication dispensing policy. (Id) 25/

(b). That Corizon and their Corizon nurses on a (d)aily routine basis, are (d)eliberately and (u)nsafely dispensing my and all other inmates (r)estricted ADOC required nurse verified protocol WS DOT medications, (i)nappropriately and systemically dispensing these (r)estricted ADOC WS DOT medications, as (p)rohibited (N)on WS ADOC KOP medications; (b)y these Corizon nurses (p)repackaging my and other inmates DOT medications in (r)eusable (e)nvelopes and (q)uickly sliding in the cell continously for the (e)ntire (t)ier and then these nurses quickly go back and pick up these (e)mpty envelopes (a)fter I and the other inmates (u)nsecurely removed these restricted DOT medications (w)ithout performing the required ADOC nurse verified WS protocol and (u)nsafely dispensing those restricted DOT medications; as in paragraph 30, inclusive; and in violation of governing ADOC policy aforesaid, as (v)erified by the (ADOC) SSVRS video tape recordings. (Emphasis). (Id at pg. 2).

(c) As the result thereof, I advised (e)ach of them, "that these Corizon nurses on (S)even (7) (S)eperate (O)ccasions throughout this (p)eriod those nurses, due to them dispensing my restricted DOT as non Nurse verified WS pursuant to this defacto and unauthorized Corizon procedure they (nurses) on each of those occasions deliberately and (i)nappropriately (d)ispensed to me "other inmates (p)rescribed restricted DOT Watch Swallow medications". Which I unvoluntarily and unknowingly took under the assumption they were my medications upon which

I suffered (s)evere (a)dverse reaction requiring medical intervention. (Id). 25/

(d) In addition I stated, "that as the result of the Corizon nurses (c)ontinuing to (i)nappropriately dispense these (r)estricted ADOC WS DOT medications per this (p)rohibited Corizon defacto and unauthorized procedure, Corizon is (b)lankly (p)ermitting all inmates to retain their unauthorized and medically determined (u)nsafe WS DOT potentially life threatening medications in violation of the aforesaid governing ADOC policy; and thus poses a potential imminent threat to all inmates health and life safty due to prescription medication abuse. (Id). 25/

(e) I further stated therein," that I hereby request your Emergency intervention to take immediate correction against Corizon and compel them to comply with properly dispensing these restricted DOT medications as nurse verified correctly dispensed DOT medication per the required ADOC nurse verified WS protocal per ADOC policy. I remain in the (d)aily imminent threat of being further irreparably harmed or killed if Corizon is permitted to continue to inappropriatly dispense my DOT medications under this unauthoriy Corizon procedure. I have attempted to resolve this issue through the ADOC greivance but have been precluded by ADOC and therefore I have no available remedy through the ADOC greivance procedure through no fault of my own. (Emphasis)." (Id) 25/

(f). I finally stated that," I hereby request your Emergency supervisory intervention to (i)mmediately (d)irect Corizon to (1) cease dispensing my and all other inmates restricted WS DOT

medication pursuant to this Corizon defacto unauthorized (N)on nurse verified WS procedure and (2) (i)mmediately (d)irect Corizon to comply with governing ADOC policy and properly and safely dispense these restricted DOT medications as (a) nurse verified correctly dispensed medications and nurse verified WS DOT medications in accordance with ADOC policy." (Id). 25/

62. I further state that I did (n)ot receive any response to these seventeen (17) correspondences I sent to Ryan, Pratt, Hood, McWilliams, Morney, Moody, Headstream and Black to my aforesaid request to compel Corizon to comply and properly dispense these (r)estricted ADOC WS DOT medications, as in paragraph 61, inclusive. In addition, I state that Ryan, Pratt, Hood, McWilliams, Morney, Moody, Headstream and Black had deliberately taken no corrective action upon my request and (i)mplicitedly (a)cquienced in (p)ermitting Corizon to continue to inappropriately and unsafely dispense my and all other inmates restricted ADOC WS DOT medications pursuant to this Corizon prohibited defacto and unauthorized (N)on WS DOT medication dispensing procedure contrary to governing ADOC mandatory DOT WS nurse verified WS policy.

63. I further state based upon my own personal knowlege that (b)etween January 1, 2015 through November 1, 2016 and from November 1, 2016 through March 20, 2017, as in paragraphs 25, 38 and 41, inclusive, I sent the following nine (9) (s)eparate correspondances to Defendant's Ryan and Pratt's, Counsel of Record (1) Michael E. Gottfried, Arizona Assistant Attorney General (AAG); Lucy Rand, AAG and (3) The Law Office of Struck, Wieneke and Love, PLC, in Class Action Parsons et. al. V. Ryan

et. al., IS/ In these correspondances, I requested Gottfried, Rand and The Law Office Of Struck, Wieneke and Love, for Emergency intervention, as Counsel of Record for Defendant's Ryan and Pratt in Class action Parsons et. al. v. Ryan et. al; on my behalf and for them to (d)irect their clients Defendants Ryan and Pratt to compel their ADOC sub-contractor Corizon to (p)roperly dispense ADOC restricted Watch Swallow (WS) DOT medication as required under governing ADOC Policy. (D)ue to their clients Defendant's Ryan and Pratt are im-plicitedly (a)cquiescing in with Corizon's nurses are system-ically dispensing my (and all other inmates) (u)restricted ADOC re-quired WS DOT potential life threatening medications in an un-safe manner perimetting inmates to retain their unauthorized restricted DOT medications; which poses an immenent threat to my and all other inmates health and life saftey; in direct vio-lation of your clients Defendants Ryan and Pratt's, "Stipulation" settlement decree in Class action Parsons et. al. v. Ryan et. al; and in violation of governing ADOC policy thereunder and the State of Arizona ex. rel. ADOC/Corizon healthcare contract. IS/

64. I further stated in these correspondances to Gottfried, Rand and the Law Office of Struck, Wieneke and Love, as in paragraph 63, inclusive; that as the result of Defendants Ryan and Pratt deliberately continuing to permit these Corizon nurses to inappro-priately dispense my restricted ADOC WS DOT medications pursuant to this prohibited Corizon defacto and unauthorized non WS pro-cedures those Corizon nurses wrongfully dispensed me other in-mates restricted WS DOT medications which I involuntarily and unknowingly took as my DOT medications causing me to

suffer on repeated (s)eparate occasions (s)evere (a)dverse (r)eaction re-quiring medical intervention; and I requested them to review the ADOC SSVRS Video Tape Recordings at all of the aforesaid ADOC units through-of this period, as in paragraphs 38 and 41, inclusive; which (p)roves these Corizon nurses are systemwide, on a daily routine basis, deliberately dispensing my and all other inmates restricted ADOC WS DOT medications, per this Corizon defacto unauthorized proce-dure. (Id). 25/

45. I further stated in these correspondences to Gottfried, Rand and the Law Office Of Struck, Wieneke and Love that I reiterated the same underlying facts that I previously stated to their clients Defendant's Ryan and Pratt in support of my herein request for these counsels Emergency intervention; and therefore I hereby incorpor-ate the aforesaid material facts, as in paragraph 61, and sub para's (A)-(L), thereof, as if the same were set forth herein with particular-ity, due to the excessive lenght and to prevent unnecessary redund-ancy thereof. (Id). 25/

66. Upon information and belief, I allege that Corizon and assistant attorney General's Gottfried and Rand and the Law Office of Struck, Wieneke and Love, as counsel of record for their clients Defendant's Ryan and Pratt, at all times relevant herein, they individually and collectively, had personally known from their review of the (1) ADOC documents; (2) ADOC SSVRS video tape recordings; (3) ADOC elec-tronically transmitted e mail and text message conversations, and (4) all other documents, including electronically stored data; which are contained in their attorney / client files and records on behalf of Defendant's Ryan and Pratt, In re Parsons et al

vs. Ryan, et. al. which will (s)how:

(1) That Defendant's Ryan and Pratt had known of Corizon's defacto unauthorized (u)on WS DOT medications dispensing of ADOC restricted ADOC (r)equired WS DOT medications.

(2) that (a)fter Defendant's Ryan and Pratt had known of Corizon's (i)nappropriate dispensing of these (r)estricted ADOC required WS DOT medications that Ryan and Pratt (i)mplicitedly continued to (p)ermit Corizon to (i)nappropriately dispense these required ADOC WS DOT medications per Corizon's defacto unauthorized (u)on WS DOT medication dispensing procedure(s) systemwide without Defendant-ADOC Director Ryan's authorization; and will produce (d)ocumentary and (e)lectronically stored data which (s)hows:

(3). That Defendant's Ryan and Pratt's following Counsel of Record, (a) Arizona Attorney General (AG) Brnovich; (b) Assistant Attorney General (AAG) Gottfried; (c) Rand, (AAG); (d) Watanabe, (AAG) and (e) the (e)ntire (a)ttorney staff of Defendant's Counsel of Record of The Law Firm of Struck, Wieneke and Love, individually and collectively, has and are intentionally perpetuating a (c)ontinuous (f)raud upon this Court (b)y knowingly filing (f)raudulent Defendant's Ryan and Pratt's - ADOC (m)onthly (c)ompliance (R)eport to this Court; upon purposefully (e)ntering known ADOC (f)alse information contained in Defendant's Ryan and Pratt's CGAR (r)eports to (f)raudulently show Defendant's - ADOC (s)ystemwide compliance with Performance Measures (PM) 17, 18 and 5 under the Court's "Stipulation, In re Parsons, et. al. v. Ryan, et. al., from

January of 2015 through March of 2017, (b)ased upon the following (f)alse documentation Defendant's Ryan and Pratt through their ADOC subordinate staff on behalf of Ryan and Pratt provided to them:

(1) ADOC documents that Corizon is purposefully (N)ot complying with governing ADOC required WS DOT medication dispensing protocol under this Court's Stipulation PM 17, 18 and 5, (b)y Corizon nurses (d)eliberately (e)ntering (i)naccurate and (f)alse information as to the Corizon nurses dispensing of inmates (r)estricted ADOC WS DOT medications; (b)y these Corizon nurses (s)ystemwide (f)alsely stating that:

"they (d)id dispense the inmates (r)estricted ADOC WS DOT Medications as nurse verified WS (Emphasis), when in (f)act these nurses (v)erifiably did (N)ot dispense the inmates Medications nurse verified WS"

and those nurses then (i)naccurately (e)ntered this (f)alse information (s)ystemically in the (r)equired ADOC MAR, VDM and inmates Medical Records, as in paragraphs 58 and 59, inclusive; and as thereby recorded in ADOC's CGAR, Monitoring Guide under PM 17, 18 and 5.

(2) ADOC documents that Defendant's Ryan and Pratt directed to be prepared, by and through their subordinate ADOC staff; which (f)alsely document their known inaccurate calculations, based upon the false (e)ntries of Corizon that they, "(d)id dispense the inmates (r)estricted ADOC WS DOT medications as nurse verified WS," (Emphasis), when in (f)act those nurses (v)erifiably did (N)ot dispense the inmates medications

nurse verified WS, as in paragraphs 58 and 59, inclusive, entered in the ADOC MAR, DDM and inmate Medical Records, in their ADOC (M)onthly CGAR Grid Report to fraudulently show Defendants' Ryan and Pratts - ADOC systemic compliance with this Court's Stipulation PM 17, 18 and 5, to continue to perpetrate this fraud upon the court.

67. I further state that, I did (N)ot recieve any response to these nine (9) correspondences I sent to Gottfried, Rand; and the Law Office of Struck, Weineke and Love, to my aforesaid request for their Emergency intervention as Defendants' Counsel of Record in this Class action to request that these counsels compel Defendant Ryan to direct Corizon to comply with governing ADOC WS DOT medication nurse verified WS; due to Corizon has implemented a Corizon de facto unauthorized procedure to dispense ADOC required WS DOT medications as non WS DOT medication. As the result I suffered medical harm and remain in the imminent threat of suffering future harm due to this unauthorized procedure. In addition, I state that Gottfried, Rand and the Law Office of Struck Weineke and Love had deliberately took no action upon my request and complicitedly (a)cquiesced in with their ADOC clients Defendants' Ryan and Pratt (p)ermitting Corizon to inappropriately and unsafely dispense my and all other inmates restricted ADOC WS DOT medications pursuant to the Corizon defacto unauthorized (N)on WS DOT dispensing procedure contrary to governing ADOC policy and this Court's Stipulation Decree in Parsons et. al. v. Ryan, et. al. (Emphasis aded).

68. I further state based upon my own personal knowledge that (b) between January of 2015 through November, 2016 through March 10, 2017, as in paragraphs 35, 38 and 41, inclusive, I sent the following thirty (33) (S)eperate correspondances to Plaintiff's Class Action Counsel of Record Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochoda, Broody, Mitchell, Kader, Verma, Brantly, Jaspersen and Welka, in Class Action Parsons et. al v. Ryan et. al. 25/ In these correspondances, I requested Specter, Hardy Norman, Kendrick, Fathi, Fettig, Pochoda, Broody Mitchell, Kader Verma Brantly, Jaspersen and Welkes, for their Emergency intervention, as Plaintiff's Class Action Counsel in Parsons et. al. v. Ryan et. al., to direct and/or obtain a Court Order to direct Defendants Ryan and Pratt to compel their ADOC subcontractor Corizon to (p)roperly dispense ADOC restricted Watch Swallow (WS) DOT medications as required under governing ADOC Policy, (d)ue to Defendant's Ryan and Pratt are implicitedly (a)cquiencing in with Corizon nurses systemically dispensing my (and all other inmates) (r)estricted ADOC required DOT medications (potentially life threatening) in an unsafe manner permitting inmates to retain their unauthorized restricted DOT medications; which are posing an imminent threat to my and all other inmates health and life safty; in direct violation of Defendants Ryan and Pratt's "Stipulation" settlement decree in Class action Parsons et. al v. Ryan et. al; and in violation of governing ADOC policy thereunder and the State of Arizona ex rel. ADOC/ Corizon health care contract. 25/

69. I further state in these correspondences to Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochoda, Broody, Mitchell,

Janespar, Kader, Verma, Brantly and Wilkes, as in paragraph 68, inclusive; that as the result of Defendants Ryan and Pratt deliberately continuing to permit those Corizon nurses to inappropriately dispense my restricted ADOC WS DOT medications pursuant to this prohibited Corizon defacto unauthorized (U) on WS procedure these Corizon nurses wrongfully dispensed me other inmates restricted WS DOT medications which I involuntarily and unknowingly took as my DOT medications causing me to suffer repeated (S)eperate occasions (S)evere (A)dverse (R)eactions requiring medical intervention; and I requested them to review the ADOC SSURS video tape recordings at all of those aforesaid ADOC units throughout this period, as in paragraphs 25, 38 and 41, inclusive; which (p)roves their Corizon nurses are systemwide, on a daily routine basis, deliberately dispensing my and all other inmates restricted ADOC WS DOT medications, per this Corizon defacto unauthorized procedure, (Id). 25/

70. I further stated in these correspondences to Specter, Hardy, Norman, Kendrick, Fathi, Fellig, Pochoda, Broody, Mitchell, Kohler, Verma, Brantly, Janespar and Wilkes that I reiterated the same underlying facts that I previously stated to Defendants Ryan and Pratt in support of my herein request for these Plaintiff's Counsels Emergency intervention; and therefore I hereby incorporate the aforesaid material facts, as in paragraph 61 and sub para's (A) - (J) thereof, as if the same were set forth herein with particularity, due to excessive length and to prevent unnecessary redundancy thereof, (Id). 25/

71. Upon information and belief, I allege that Plaintiff's Class

action Counsels Specter, Hardy, Warman, Kendrick, Fathi, Fettig, Pochoda, Brody, Mitchell, Kader, Verma, Brantly, Jacobsen, and Wilkes; at all times relevant herein, they individually and collectively, had personally known from their review of: (1) all ADOC discovery documents; (2) ADOC SSURS video tape recordings; (3) Medical Administrative Record (MAR); (3) Daily Delivery Manifest (DDM); (4) inmates Medical Records; (5) ADOC Code Green Amber Red (CGAR) Grid Reports; (6) correspondences from inmate class members; (7) Inmate grievance records; (8) ADOC incident reports; (9) inspection of ADOC Detention and Maximum Security Unit records; (10) interview with inmate which are documented; (11) correspondences from inmate family and friends and (12) all other documentation contained in their Plaintiff's case files and records on behalf of Plaintiff's and Class members, In re: Parsons et. al v. Ryan, et. al; which will show:

(A) that Defendant Ryan and Pratt and their subordinate ADOC staff had known of Corizon's defacto unauthorized (N)on WS DOT medication dispensing of ADOC restricted WS DOT medications.

(B) That (a)ll the Defendants Ryan and Pratt had known of Corizon's is (i)nappropriately dispensing of these (r)estricted ADOC required WS DOT medications that Ryan and Pratt (i)mplicitedly continued to (p)ermit Corizon to (i)nappropriately dispense these required ADOC WS DOT medications, per the Corizon defacto unauthorized (N)on WS NOT medication dispensing procedure(s) systemically without ADOC-Director Ryan's authorization; and will produce (d)ocumentary and electronically stored data which shows:

(c) That the following Plaintiff's class action Counsels of Record Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochoda, Broody, Mitchell, Kader, Verma, Berwithy, Jaspersar, and Wilkes, individually and collectively, has and is taking an antagonistic position to me and the interest of the entire class, (b)y impliedly acquiescing in and (N)ot formally objecting with this Court to thier (K)nown, e.g. Defendant's Ryan and Pratt's, Counsels of Record Gottfried, Rand, Watanabe and the Law Office of Strueck, Wieneke and Love; is intentionally perpetrating a (c)ontinuous (f)raud upon this Court (b)y knowing filing (f)raudulent Defendant's Ryan and Pratt's - ADOC (M)onthly (c)ompliance (R)eport with this Court; upon purposefully (e)ntering known (f)alse information contained in Defendant's Ryan and Pratt's CGAR (r)eport to (f)raudulently show Defendant's - ADOC (s)ystemic compliance with required Performance Measures (PM) 17, 18 and 5, under this Court's "Stipulation", In re Parsons et. al. v. Ryan et. al., from January of 2015 through March of 2017, based upon the following (f)alse information:

": that Defendants Ryan and Pratt directed to be prepared, by and through their subordinate ADOC staff; which (f)alsely documents their known inaccurate calculations, based upon the false criteria of Corizon that they, "did dispense the inmates (r)estricted ADOC WS DOT medications as nurse verified WS "(emphasis), when in fact those nurses (v)erifiably did (N)ot dispense the inmates medications nurse verified WS, as in paragraph 59, inclusive; (e)ntered in the ADOC MAR, DDM and

Medical Records, in their ADOC (M)onthly CGAR Report to fraudulently show Defendant's Ryan and Pratt's ADOC systemic compliance with this Court's Stipulation PM 17, 18 and 5, to continue to perpetrate this fraud upon this Court," as in paragraph 66, sub sect. 3 and sub para's (1), (2), thereof.

I state that these case files and records (w)ill (s)how that the aforesaid Plaintiff's class counsels had:

(A) Known that Defendant's Ryan and Pratt knew of and has intentionally (p)ermitted Corizon to inappropriately dispense required ADOC nurse verified WS DOT Medications per the ADOC prohibited Corizon defacto unauthorized procedure systemwide since January 1, 2015 to (p)resent (d)ate.

(B) that these aforesaid Plaintiff's class counsels had and is taken an antagonistic position to me in intrest as class member and to the entire Plaintiff's class in (p)urposefully (n)ot ensuring and not protecting and ensuring Defendant's Ryan and Pratt (p)roperly and (s)afely dispensed ADOC restricted nurse verified WS DOT medications, (b)y (i)ntentionally "(c)overing (u)p" they had known of Defendant's Ryan and Pratt's - ADOC systemic inappropriately dispensing of ADOC required nurse verified WS DOT medications by Corizon inappropriately dispensing there DOT WS medication per Corizon's defacto unauthorized (n)on WS protocol from January 1, 2015 to (p)resent (d)ate.

(C) that these aforesaid Plaintiff's class counsels had and are presently (c)overing (u)p the (m)aterial (f)act that Defendant's Ryan and Pratt by and through their Defendant's counsels

of record had used and (p)resently are using the (f)alse entries of the (i)naccurate (c)alculations in their ADOC-CGAR Grid Record under PM 17, 18 and 5, to (f)raudulently show this Court Defendant's ADOC systemic (c)ompliance with PM 17, 18 and 5, based upon the aforesaid ADOC-Corizon inaccurate calculations as to Corizon falsely dispensing inmates restricted ADOC nurse verified WS DOT Medications, from January 1, 2015 to (p)resent (d)ate.

72. I further state, I did (N)ot recieve any response to these (14) correspondances I sent to Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochoda, Broody, Mitchell, Kader, Verma, Berinthey, Jones par and Wilkes, to my aforesaid request this provision of Emergency intervention as Plaintiff's class counsel representives in this Class Action at issue; consequently these counsels, on my behalf and on behalf of the class informally or formally by filing Motion to Compel Contempt Sanctions in which to compel Defendants Ryan and Pratt to (d)irect and (e)nsure Corizon to comply with governing ADOC nurse verified WS DOT medication dispensing protocol. (D)ue to I have suffered (a)ctual medical harm, as in paragraph 61 (g) inclusive; and remain in the (c)ontinued imminent threat of suffering future potential life threatening health harm as the result of Defendants Ryan and Pratt continuing to permit Corizon to inappropriately dispense my restricted ADOC nurse verified WS DOT medications per the Corizon defacto unauthorized (N)on WS DOT procedure. In addition, I state that (e)ach of these aforesaid (N)amed Plaintiff's class counsel (d)eliberately took no action upon my

request and (i)mplicitedly (a)cquiesced in with ADOC Defendant's Ryan and Pratt (p)ermitting Corizon to inappropriately and (u)n-safely dispense my and all other inmate restricted ADOC WS DOT medications, per the prohibited Corizon defacto unauthorized (n)on-WS DOT medication dispensing procedure; contrary to governing ADOC Policy and (d)irectly in violation of this Courts Stipulation Decree in PM 17, 18 and 5 thereof in Parsons et al. v. Ryan et al. (Emphasis added).

73. Nineteen Months Later. I further state upon my own personal knowledge that (b)etween October 27, 2018 through present date of January 1, 2019, as in paragraph , inclusive; while I am (p)resently housed at the ASPC-Lewis, Rast Max unit (and thereafter forward), I (s)ent thirteen (13) (s)eparate correspondances to: (1) Defendant-Director Ryan; (2) Defendant Pratt; (3) ADOC Deputy Director Hood; (4) ADOC Division Director of Operations McWilliams; (5) Warden Larson; (6) Deputy Warden Rode; (7) ADOC Contract Monitoring Administrator Headstream; (8) Corizon Vice President of Operations-Arizona Maldonado; (9) ADOC Monitoring Bureau Upton, (a)gain requesting their Emergency (i)ntervention to take immediate (c)orrective action against their respective subordinate Corizon nurses (d)ue to these Corizon nurses are systemically (d)eliberately dispensing my (and all other inmates), (r)estricted ADOC required nurse verified WS DOT medications (potentially life threatening), 9/, inappropriately and systemically, as (p)rohibited (n)on ADOC WS DOT, KOP, 8/ (daily delivered) medications and in an (u)nsafe manner; which poses an imminent threat to my health and life safety, in violation of governing ADOC policy

and under the State of Arizona, ex rel ADOC/Corizon heathcare contract and in direct violation of the Class action "Stipulation settlement in Parsons et.al. v. Ryan et.al, (Id). 25/ In these correspondances I stated:

(a) that Corizon and their Corizon nurses are deliberately (N)ot complying with governing ADOC required Watch Swallow (WS) nurse verified mouth inspection to verify inmate has actually swallowed the medication, (hereinafter "nurse verified) WS protocal") restricted DOT Medications, 9/ policy systemwide and which was and (p)resently am at this Rast Max Unit, (b)ey these Corizon nurses, on a daily routine basis "(b)lanketly" (N)ot performing the mandatory ADOC WS nurse verification DOT prolocol; and thus (u)nsafely dispensing my and all other inmates restricted WS DOT medications in violation of governing ADOC required WS DOT medication dispensing policy, (Id), 25/

(b) that Corizon and their nurses, on a daily and routine basis, are (d)eliberately, and (u)nsafely dispensing my (and all other inmates (r)estricted ADOC required nurse verified protocol WS DOT medications, (i)nappropriately and systemwide dispensing these (r)estricted ADOC WS DOT medications, as (p)rohibited (N)on WS ADOC KOP medications, (b)ey these nurses (p)re packaging my and all other inmates DOT medications in (r)eusable (e)nvelopes and quickly sliding them in the cell and (c)ontinously for the (e)ntire tier and then the nurse quickly goes back and picks up the (e)mpty envelopes "(a)fter" the inmate "unsecurely" removed those (r)estricted DOT medications (w)ithout performing the required ADOC nurse verified WS protocol and thus "(u)nsafely" dispensing those

restricted DOT medications; as in paragraph 30, inclusive, and in violation of governing ADOC policy aforesaid, as (v)erified by the ADOC SSVR, video Tape Recordings, (Emphasis), (Id). 25/

(c). As the result thereof, I advised (e)ach of them, "that these Corizon nurses, on three (3) (s)eparate (o)ccasions throughout this (p)eriod these nurses, due to their dispensing my restricted DOT as (w)on nurse visual WS pursuant to this Corizon defacto and unauthorized non WS DOT procedure they (nurses) on (e)ach of these (o)ccasions deliberately and (i)nappropriately (d)ispensed to me "other inmates (p)rescribed restricted DOT WS medications". Which I involuntarily and unknowingly took those medications under the assumption these were mine medications which I suffered (s)evere (a)dverse (r)eactions requiring medical intervention, (Id) 25/ In addition, I advised Corizon provider Ende, N.P, that my Plavix (m)ust be dispensed KOP as my other medications are KOP; and that there is no reason my Plavix cannot be dispensed KOP because it was previously; (d)ue to "I cannot trust your (Corizon) nurses to correctly dispense my medication under Corizon's new defacto unauthorized (w)on WS DOT procedure". Additionally, (a)fter NP Ende deliberately (r)efused to change my DOT plavix to KOP dispensed Plavix, I have knowingly refused my Corizon dispensed daily restricted ADOC WS DOT Plavix medication to date (a)fter on three (3) separate occasions being deliberately dispensed the wrong medication requiring medical intervention to (p)resent (d)ate, (Emphasis Added), (Id). 25/

(d) In addition I stated, "that as the result of Corizon nurses (c)ontinuing to (d)ispense (i)nappropriately these (r)estricted ADOC

ws DOT medications, per this (p)rohibited Corizon defacto unauthorized procedure, Corizon is (b)lantly (p)ermitting all inmates to retain their unauthorized and medically determined (u)nsafe ws DOT potentially life-threatening medications, in violation of the aforesaid governing ADOC policy; and thus poses a potential imminent threat to all inmates health and life safty, due to perscription medication abuse, (Id). 25/

(e) I further stated therein, "that I hereby request your Emergency intervention to take immediate (c)orrective action against Corizon and compel them to actually (c)omply with properly dispensing these (r)estricted DOT medications, as nurse (v)erified ws protocol per ADOC policy. (Emphasis). I additionally stated, that I remain in the (d)aily imminent threat of being further irreparably harmed or killed, if Corizon's (p)ermitted to continue to inappropriately dispense my DOT medications under this (p)rohibited Corizon defacto unauthorized procedure, (Id). 25/ I further stated that I have attempted to resolve this issue through the ADOC grievance procedure but have been (p)recluded by ADOC and therefore, I have (n)o available remedy through the ADOC administrative grievance procedure, through no fault of my own, (Id). 25/

(f). I finally stated that, "I hereby request your Emergency supervisory intervention to (i)mmediately (d)irect Corizon to: (1) (c)ease dispensing my and all other inmates restricted ws DOT medications pursuant to this Corizon defacto unauthorized (n)on ws nurse verification procedure, (Emphasis) and (2) (i)mmediately (d)irect Corizon to (c)omply and ensure Corizon coplies with

governing ADOC policy and thereby (p)roperly and (s)afely dispense these (r)estricted ADOC DOT medications, as "(n)urse (v)erified correctly dispensed medications and (n)urse (v)erified NS DOT medications in (s)trict (a)ccordance with governing ADOC NS policy protocol," (Id), (Emphasis Added). 25/

74. I further stated that I did (n)ot recieve any responses to these ( ) correspondences I sent to Ryan, Pratt, Hood, McWilliams, Lawson, Rode, Headstream, Upton and Maldonado, to my aforesaid requests to compel Corizon to comply and (p)roperly dispense these restricted ADOC NS DOT medications (s)afely, as in paragraph , inclusive. In addition, I stated that Ryan, Pratt, Hood, McWilliams, Larson, Rode, Headstream, Upton and Maldonado, had (d)eliberately taken no corrective action upon my request and (i)mplicitedly (a)cquiesced in (p)ermitting Corizon to continue to inappropriately and (u)nsafely dispense my and all other inmates restricted ADOC NS DOT medications pursuant to this Corizon prohibited defacto unauthorized (n)on NS DOT medication dispensing procedure contrary to governing ADOC mandatory DOT NS nurse verified NS procedures.

75. I further state based upon my own personal knowledge that (b)etween October 27, 2018 throughout January 4, 2019, as in paragraph , inclusive, I sent the following eight (8) (s)eperate correspondences to Defendant's Ryan and Pratt's, Counsels of Record; (1) AAG Gottfried; (2) AAG Rand; (3) AAG Wanamalie and (4) the Law Office of Struck, Bojanowski, and Love, PPL, in class action Parsons et. al. v Ryan, et. al, (Id). 25/.

In these correspondances, I requested Gottfried, Rand, Wanamabe, and The Law Office Of Struck, Bojanowski and Love, for Emergency intervention as Counsel of Record for Defendant's Ryan and Pratt, in Class Action Parsons et. al. v. Ryan, et al, on my behalf and for them to (d)irect their client's Defendant's Ryan and Pratt to compel their ADOC subcontractor Corizon to (p)roperly and (s)afely dispense ADOC (r)estricted ADOC WS DOT medications, as required under governing ADOC Policy, (Id). 25/ (D)ue to these clients Defendant's Ryan and Pratt are (i)mplicitly (a)cquiescing in with Corizon nurses systemic dispensing my (and all other inmates) (r)estricted ADOC required WS DOT potential life threatening medications in an (u)nsafe manner, (p)ermitting inmates to retain their unauthorized (r)estricted DOT medications; which poses an imminent threat to my and all other inmates health and life safety; in (d)irect violation of your clients' Defendant's Ryan and Pratt, "Stipulation" settlement decree in class action, Parsons et. al. v. Ryan, et. al.; and in violation of governing ADOC Policy thereunder and The State of Arizona ex rel. ADOC/Corizon healthcare contract, (Id). 25/

76. I further stated in these correspondances to Gottfried, Rand, Wanamabe and The Law Office Of Struck, Bojanowski and Love, as in paragraph , inclusive; that as the result of Defendant's Ryan and Pratt deliberately continuing to permit their Corizon nurses to inappropriately dispense my (r)estricted ADOC WS DOT medications per this (p)rohibited Corizon defacto unauthorized (N)on WS DOT procedure these Corizon nurses wrongfully dispensed me other inmates restricted WS DOT medications on three (3) separate occasions which I involuntary and unknowing took as my DOT medications causing

me to suffer repeated (5) separate occasions (5) severe (a) diverse (R) reactions requiring medical intervention; and I requested them to review the ADOC SSURS Video Tape Recordings at the Rast Max Unit throughout this period, as in paragraph , Inclusive; which (p)roves there Corizon nurses are systemwide, on a daily routine basis, deliberately dispensing my and all other inmates (r)estricted ADOC WS DOT medications, per this Corizon defacto unauthorized procedure, (Id). 25/

77. I further stated in these correspondences to Gottfried, Rand, Watanabe and the Law Office Of Struck, Bojanowski, and Love, I reiterated the same underlying facts that I personally previously stated to their Client's Defendant's Ryan and Pratt in support of my herein request for their counsels Emergency Intervention; and therefore I hereby incorporate the aforesaid material facts, as in paragraph 73, sub-para C, sub-paras (A)-(I), as if the same were set forth herein with particularity, due to the excessive length and to prevent unnecessary redundancy thereof, (Id). 25/

78. Upon information and belief, I allege that Arizona Assistant Attorney General's Gottfried, Rand and Watanabe and the Law Firm of Struck, Bojanowski and Love, as Counsel of Record for their Client's Defendant's Ryan and Pratt, at all times relevant herein, they individually and collectively had personally known for their review of the (1) ADOC documents; (2) SSURS video tape recordings; (3) ADOC electronically transmitted email and text messages communications; which are contained in their attorney/client file and records. and (4) other electronically stored relevant data therein on behalf

on behalf of Defendant's Ryan and Pratt, in Parsons et. al. v. Ryan, et. al., which (w)ill (s)how:

(1) That Defendant's Ryan and Pratt had known of Corizon's defacto unauthorized (N)on WS DOT medication dispensing of ADOC (r)estricted ADOC (r)equired WS DOT medications.

(2) That (a)fter Defendant's Ryan and Pratt had known of Corizon (i)nappropriately dispensing of these (r)estricted ADOC required WS DOT medications that Ryan and Pratt (i)mplicitedly continued to (p)ermit Corizon to (i)nappropriately dispense these required ADOC WS DOT medications per Corizon's defacto unauthorized (N)on WS DOT medication dispensing procedure (s)ystem wide without Defendant-ADOC Director Ryan's (a)uthorization; and will (p)roduce (d)ocumentary and (e)lectronically stored data which (s)hows:

(3) That Defendant Ryan and Pratt's following counsel of Record (a) Arizona Attorney General Brnovich; (b) Assistant Attorney General (AAG) Gottfried; (c) AAG Rand; (d) AAG Wanamaker and (5) the Law Firm of Struck, Bojanowski, and Love, individually and collectively has and are intentionally (p)erpetrating a (c)ontinuous (f)raud upon this Court; (b) by knowingly filing (f)raudulent Defendant Ryan and Pratt-ADOC (m)onthly (c)ompliance (R)eports to this Court; upon purposefully (e)ntering known ADOC (f)alse information contained in Defendant's Ryan and Pratt's CGAR (r)eports to (f)raudulently shows Defendant's-ADOC (s)ystem wide compliance with Performance Measures (PM) 17, 18 and 5, under the Court's "Stipulation", in re Parsons et. al. v. Ryan, et. al. from October 27, 2018 through January 1, 2019 (and forward), (b) used upon the follow (f)alse documentation Defendant's Ryan and Pratt, by and

through their ADOC subordinate staff on behalf of Ryan and Pratt provided to (T)hem:

(1) ADOC documents that Corizon is purposefully (N)ot complying with governing ADOC required WS DOT medication dispensing protocol under this Court's "Stipulation" PM 17, 18 and 5, (b)y Corizon nurses (d)eliberately (e)ntering (i)naccurate and (f)alse information, as to the Corizon nurses dispensing of inmates (r)estricted ADOC WS DOT medications, (b)y these Corizon nurses (s)ystemwide (f)alsely stating that:

"they (d)id dispense inmates (r)estricted ADOC WS DOT medications as nurse (v)erified WS" (Emphasis)
when in fact these nurses (v)erifiably did (N)ot dispense the inmates medications nurse verified WS"

and those nurses then (i)naccurately (e)ntered this (f)alse information (s)ystemically in their (r)equired ADOC MAR, DOM and inmate Medical Records, as in paragraphs 55 and 59 inclusive; and thereby recorded them in ADOC CGAR used under PM 17, 18 and 5.

(2) ADOC documents that Defendants' Ryan and Pratt (d)irected to be (p)repared, by and through their subordinate ADOC staff; which (f)alsely document their known inaccurate calculations, based upon the (f)alse (e)ntries of Corizon that they, "(d)id dispense the inmates (r)estricted ADOC WS DOT medications as nurse verified WS", (Emphasis); when again in fact those nurses (v)erifiably did (N)ot dispense the inmate medications nurse verified WS, as in paragraphs 58 and 59, inclusive, entered in the ADOC MAR, DOM and inmates Medical Records,

; in their ADOC (m)onthly CGAR Grid Report, to fraudulently show Defendant's Ryan and Pratt's ADOC system wide compliance with this Court's Ordered "Stipulation" PM 17, 18 and 5, to (c)ontinue to (p)erpetrate this (f)raud upon the Court.

79. I further stated, that I did (n)ot recieve any response to there (11) correspondances I sent to Gottfried, Rand and Wanamake and The Law Firm of Struck, Bojanowski and Love, to my aforesaid request for this Emergency Intervention as Defendant's Counsel of Record in this Class Action; to request that there Counsel compel Defendants' Ryan and Pratt to (d)irect Corizon to comply with governing ADOC WS DOT medication nurse verified dispensing protocol. (Id). 25/ Due to Corizon has implemented its Corizon defacto unauthorized procedure to dispense ADOC required WS DOT medications, as (n)on WS DOT medications. (Id) 25/ As the result, I have suffered the aforesaid medical harm and I remain in the imminent threat of suffering future life threatening harm, due to ADOC permitting Corizon to continue to dispense my DOT medications per this prohibited Corizon defacto procedure. (Id) 25/ In addition, I stated to Gottfried, Rand and Wanamake and the Law Office Of Struck, Bojanowski and Love, had (d)eliberately again took no corrective action by continuing to (i)mplicitedly acquiescence in the furtherance of their ADOC clients Defendants Ryan and Pratt (p)ermitting Corizon to (i)nappropriately and "(u)nsafely" dispense my and all other inmates (r)estricted ADOC WS DOT potential life threatening medications per the Corizon defacto unauthorized (n)on WS DOT dispensing medication procedure; contrary to governing ADOC Policy and in (d)irect violation of

this Court's "Stipulation" settlement decree in Parsons et. al. v. Ryan, et. al. (Emphasis Added).

80. I further stated based upon my own personal knowledge that (b)etween October 27, 2018 and January 1, 2019, as in paragraph , inclusive; I had sent the following fourteen (14) (s)eperate correspondences to Plaintiff's Class Action, Counsels of Record: Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochola, Broody, Mitchell, Kader, Verma, Brenthey, Janespar and Wilkes, in Class Action Parsons, et. al. v. Ryan, et. al., (Id). 25/ In these (s)eperate correspondances, I requested Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochola, Broody, Mitchell, Kader, Verma, Bernthey, Janespar and Wilkes, their Emergency Intervention, as Plaintiff's Class Action counsel in Parsons et. al. v. Ryan, et. al., to direct and/or obtain a Court Order which compels Defendants' Ryan and Pratt to compel their subcontractor Corizon to (p)roperly and "(s)afely" dispense ADOC restricted WS DOT potential life threatening medications, as required under governing ADOC Policy; (D)ue to Defendant's Ryan and Pratt are (i)mplicitedly (a)cquiescing with Corizon nurses systemwide dispensing my (and all other inmates) (r)estricted ADOC required WS DOT medications (potentially life threatening in an "unsafe" manner; permitting inmates to retain their unauthorized restricted DOT medications; which are posing an imminent threat to my and all other inmates health and life saftey; in direct violation of Defendant's Ryan and Pratt's "Stipulation" settlement decree in Class Action Parsons et. al. v. Ryan, et. al. and in violation of governing ADOC Policy; and the State of Arizona ex rel ADOC / Corizon

healthcare contract, (Id). 25/

81. I further state in these correspondances to Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochola, Broody, Mitchell, Jansspar, Kader, Verma, Brenthey and Weltes, as in paragraph , inclusive, that as the result of Defendants' Ryan and Pratt's deliberately continuing to permit those Corizon nurses to inappropriately dispense my restricted ADOC WS DOT medications pursuant to this prohibited Corizon defacto unauthorized (U)on WS procedure these Corizon nurses wrongfully and deliberately dispensed me other inmates restricted WS DOT medications which I involuntarily and unknowingly took as my DOT medication causing me to suffer repeated (s)eperat ocaisions(s) severe (a)dverse (r)eaction requiring medical intervention; and I requested them to review the ADOC SSURS, videotape Recordings at the Rast Max Unit, which proves these Corizon nurses are (s)ystemwide, on a daily basis deliberately dispensing my and all other inmates (r)estricted ADOC WS DOT medication, per this prohibited Corizon defacto unauthorized procedure, (Id). 25/

82. I further stated in those correspondances to Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochola, Broody, Mitchel, Kader, Verma, Brenthey, Jansspar and Weltes, that I reiterate the same underlying facts that I previously stated to Defendant's Ryan and Pratt in support of my herein request for their Plaintiff's Counsels Emergency Intervention; and therefore I hereby incorporate the aforesaid material facts, as in paragraph 73, sub para C, (A)-(I), thereof, as if the same were set forth with particularity herein, due to excessive length and to prevent unnecessary

redundancy, (Id). 25/

83. Upon information and belief, I allege that Plaintiff's Class Action counsels Specter, Hardy, Norman, Kendrick, Pochola, Fathi, Fettig, Bernthey, Broody, Mitchell, Kader, Vernace, Janesper and Wilkes, at all times relevant herein, they individually and collectively, had personally known from thier review of: (1) all ADOC discovery documents; (2) ADOC SSURs, Video Tape Recordings; (3) medical Administrative Record (MAR); (4) Daily Delivery Manifest (DDM); (5) inmates Medical Records; (6) ADOC Code Green Amber Red (CGAR) Grid Report; (7) correspondances from inmates class members; (8) inmates grievance records; (9) ADOC incident reports; (10) inspection of ADOC Detention and Maximum Security Units records; (11) interviews with inmates which are documented; (12) correspondances from inmates family and friends and (13) all other documentation contained in thier Plaintiff's case file and records, to and including all electronically stored data, on behalf of Plaintiffs and Plaintiff class members, attorney/client files and records In re Parsons et. al. v. Ryan, et. al.; which will (show:

(a) that Defendant's Ryan and Pratt and thier subordinate staff had known of Corizon's defacto unauthorized (N)on WS DOT medication dispensing of ADOC WS DOT medications.

(b). That (a)fter Defendant's Ryan and Pratt had known of Corizon (i)nappropriately dispensing of these (r)estricted ADOC WS required DOT medications that Ryan and Pratt (i)mplicitedly continued to permit Corizon to (i)nappropriately dispense these required ADOC WS DOT medications, per this Corizon defacto unauthorized (N)on WS DOT medication despensing procedure

(s)ystemically without ADOC Director Ryan's authorization; and will produce (d)ocumentary and (e)lectronically stored data which (s)hows:

(e) That the following Plaintiff's class action Counsels of Record Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Pochoda, Broody, Mitchell, Kader, Verma, Bernthey, Jansparand Welker, individually and collectively, has and is taking an antagonistic position to me, as member of the class and the interest of the entire class, (b)y (i)mplicitedly (a)cquiescing in and (n)ot formally objecting with this Court to their (k)nown, e.g. Defendant's Ryan and Pratt's, Counsel of Record Gottfried, Rand and Wanamaker and the Law Office of Struck, Bojanowski and Love, intentionally perpetrating a (c)onteriorus (f)raud upon this Court (b)y knowing filing (f)raudulent Defendant's Ryan and Pratt's ADOC (M)onthly (c)ompliance (R)eports with this Court; upon purposefully (e)ntering known (f)alse information contained in Defendant's Ryan and Pratt's CGAR (R)eport, to (f)raudulently show Defendant's - ADOC (s)ystemic compliance with required Performance Measures (PM) 17, 18 and 5, under this Court's "Stipulation", based the following (f)alse information:

"That Defendant's Ryan and Pratt (d)irected to be prepared by and through their subordinate ADOC Staff; which (f)alsely documented their known inaccurate calculations based upon the (f)alse (e)nteries of Corizon that they, "(d)id dispense the inmates (r)estricted ADOC, was NOT medications, as verified nurse WS", (Emphasis), when in fact those nurses (r)epeatedly did (n)ot dispense the inmates medications nurse verified WS, as in paragraph 57,

inclusive; (e)ntered in the ADOC MAR, DDM and inmate medical records; in their ADOC (m)onthly CGAR Reports to fraudulently show Defendant's Ryan and Pratt's ADOC systemic compliance with this Court's Stipulation PM 17, 18 and 5; to (c)ontinue to (p)erpetrate this fraud upon this Court," as in paragraph 66, sub sect. 3, and sub para's (1) and (2), thereof.

I state that these care files and records (w)ill (s)how that the aforesaid Plaintiff's class Counsel had:

(a) Known that Defendant's Ryan and Pratt knew of the aforesaid and has intentionally (p)ermitted Corizon to inappropriately dispense required ADOC nurse verified WS DOT medications, per the ADOC prohibited Corizon defacto unauthorized procedure systemwide since October 24, 2018 through January 1, 2019 (and forward) to present (d)ate.

(b) That these aforesaid Plaintiff's class Counsels had and is taken an antagonistic position to my interest as a class member and to the (e)ntire Plaintiff's class in (p)urposefully (n)ot (e)nsuring Defendant's Ryan and Pratt are (p)roperly and "(s)afely" dispensing ADOC restricted nurse verified WS DOT potentially life threatening medications, 9/, (b)y them intentionally "(c)overing (u)p" they had known of Defendant's Ryan and Pratt's ADOC systemic inappropriately dispensing of ADOC required nurse verified WS DOT medications by Corizon inappropriately dispensing these DOT WS medications per Corizon defacto unauthorized (n)on WS protocol from October 24, 2018 to (p)resent (d)ate and forward.

(c) That these aforesaid Plaintiff's class counsels had and are presently (C)overing (U)p the (M)aterial (F)act that Defendants Ryan and Pratt, by and through their Defendants Counsels of record had used and are (p)resently using the (F)alse comtries of the (I)naccurate (C)alculations in their ADOC CGAR Grid Record under PM 17, 18 and 5, to again (F)raudulently show this Court Defendants ADOC systemic (C)ompliance with PM 17, 18 and 5, based upon the aforesaid ADOC-Corizon inaccurate calculations, as to Corizon (F)alsely dispensing inmates (R)estricted ADOC nurse verified WS DOT medications from October 27, 2018 to present (d)ate and continuing forward.

84. I further state, I did (N)ot again recieve any response to these 14 correspondances I sent to Specter, Hardy, Norman, Kendrick, Fathi, Fellig, Parchola, Broody, Mitchell, Kader, Lerma, Brenthey, Jesperson and Wilkes, to my aforesaid request this provision of Emergency Intervention Plaintiff's class counsel representatives in this class action at issue; (R)equesting that these counsels, on my behalf and on the behalf of all other members of the class to informally or formally by filing a Motion to Compel Contempt Sanctions in which to compel Defendants Ryan and Pratt to (d)irect and (e)nsure Corizon to comply with governing ADOC nurse verified WS DOT medication dispensing protocol, (Id) 25/. (D)ue to I have suffered (a)ctual medical harm, as in paragraph 73, inclusive; and I remain in the (c)ontinual imminent threat of suffering future potential life threatening health harm or death, as the result of Defendants Ryan and Pratt continuing to permit

Corizon to inappropriately dispense my restricted ADOC nurse verified WS DOT medications, per this Corizon defacto unauthorized (N)on WS DOT procedure, (Id). 25/ I further stated that (e)ach of these aforesaid (N)amed Plaintiff's class counsels deliberately took no action upon my request and (a)gain (i)mplicitedly (a)cquienced in with ADOC Defendant's Ryan and Pratt (p)ermitting Corizon to inappropriately and "(u)nsafely" dispense my and all other inmates (r)estricted ADOC nurse verified WS DOT medications dispensing protocol; in direct violation of this Courts "Stipulation" settlement decree Performance Measures PM 17, 18 and 5; in violation of governing ADOC Policy thereunder and the State of Arizona, ex rel. ADOC/Corizon health-care contract, (Emphasis Added), (Id). 25/

85. I state that Defendants Ryan and Pratt's, Counsel of Record, Gottfried, Rand, Watanabe, Wieneke and the entire law firm (a)ttorneys of Struck, Bojanowski and Love, respective attorney/client files and records and work product thereof in hardcopy and electronically stored will (p)roduce prima facie relevant (e)vidence they, individually and collectively, have and are (c)ontinuing to (p)erpetrate (f)raud upon this Court; (b)y knowingly filing (f)raudulent Defendant Ryan and Pratt ADOC (m)onthly (c)ompliance (R)eports with this Court; upon purposefully containing known ADOC (f)alse information contained in Defendants Ryan and Pratt's CGAR (r)eports to (f)raudulently show Defendant's ADOC (s)ystemwide compliance with Performance Measures (PM) 17, 19 and 5, under this Courts "Stipulation," as in paragraphs 64 and all sub-paragraphs thereunder and paragraph 78 and all sub-paragraphs thereunder, inclusive.

86. I state that Class Action Counsels of Record, Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Porchola, Broody, Mitchell, Kader, Verma, Brenthey, Janespar, and Wilkes, respective class action Plaintiff's attorney/client files and records and work product thereof in hardcopy and electronically stored; will (p)roduce prima facie (r)elevant (e) evidence they, individually and collectively, have and are (c)ontinuing to perperate a (f)raud upon this Court: (b)y intentionally (c)overing (u)p the (m)aterial (f)acts that Defendant's Counsels of Record has and are continuing to use (f)alse (e)ntries of the (in)accurate (c)alculations in their CGAR Grid Report monthly compliance Report to this Court under PM 17, 18 and 5; to (f)raudulently show this Court Defendant's-ADOC-Corizon inaccurate calculations, as to Corizon (f)alsely dispensing inmates (r)estrictive ADOC nurse verified US DOT medications; as in paragraph 71 and all sub paragraphs thereunder and paragraph 83, and all sub paragraphs thereto, inclusive.

87. In addition, I am aware that, as pro se litigant Intervenor Plaintiff and/or Plaintiff in this action; I am (s)tatutorially (p)recluded from compelling and from receiving disclosure of Defendant Ryan and Pratt's, Counsels of Record, Gottfried, Rand, Wananabe, Wieneke and the (e)ntire law firm (a)ttorneys of Struck, Bojanowski and Love's confidential and privileged legal case files and records of their client Defendant's Ryan and Pratt, based upon the attorney/client privilege and work product doctrine privilege; which to prove my claim these Defendant's Counsels of Record are perperating the aforesaid fraud upon this Court.

88. Additionally, I am similarly aware, as pro se litigant Intervenor Plaintiff and/or Plaintiff in this action; as pro se litigant (c)lass member as well; I am (s)tatutorially (p)recluded from compelling and from

disclosure of Class Action Plaintiff's Counsels of Record, Specter, Hardy, Norman, Kendrick, Fathi, Porchola, Broodey, Mitchell, Kader, Verma, Brenthey, Jamespar, and Wilkes, respective class action confidential and privilege legal case files and records of all named Plaintiff's and of the (e)ntire class members thereof; based upon the attorney/client privilege and work product doctrine privilege; which to prove my claim there Plaintiff's class action Counsels of Record have (i)ntentionally (c)overed (u)p from this Court the aforesaid known Defendant's Counsels of Record are perperating this fraud upon the Court.

89. Upon information and belief, the Plaintiff alleges, there is a (l)egal "(e)xception" to compel (d)isclosure of and (b)reach an (a)ttorney's confidential legal case files and records of a client; which is when a (p)arty to the action, upon Motion to the Court, alleges with (s)pecifity, the attorney(s) has or are perperating a (f)raud upon the (c)ourt and the party requests the Court to (i)ndependantly compel the attorney to produce their case file and records, "(d)irectly to the (c)ourt", 26/ for an "in camera judicial review" thereof, as an exception under the attorney/client privilege and work product doctrine privilege; to (d)etermine a (p)arty's claim that the attorney(s) has and/or are perperating a (f)raud upon the (c)ourt; (p)rior to any (r)elevant disclosure to the party as a matter of law.

90. I hereby submit an "Offer of Proof" that upon the filing of my Motion to Intervene as Plaintiff and/or after this Court certifies me as a named Plaintiff in this action; I will file a Motion with this Court to compel the (d)isclosure of and (b)reach Defendant's Counsels of Re-

//

26/ And (n)ot initially to the party.

Record, Gottfried, Rand, Wananabe, Wieneke and the entire law firm attorneys of Struck, Bojanowski and Love's attorney/client privilege and work product doctrine privilege; alleging with (s)pecifity that these Defendant's counsels, individually and collectively, have and are presently perpetrating a (f)raud upon this (c)ourt; and I will request the Court to (i)ndependently compel those counsels to produce their case files and records of their client Defendant's Ryan and Pratt in this action, "(d)irectly to the (c)ourt, to / for" in camera judicial inspection and review" thereof, as an (e)xception to the attorney / client privilege and work product doctrine privilege; to determine and (p)rove my claim these counsels have and are continuing to perpetrate a (f)raud upon this Court; (p)rior to any (r)elevant disclosures to me, as pro se, intervenor Plaintiff and/or certified name Plaintiff.

91. I further hereby submit an "Offer of Proof" that upon the filing of my Motion to Intervene as Plaintiff and/or after this Court certifies me as named Plaintiff in this action; I will file a Motion with this Court to compel the (d)isclosure of and (b)reach Class Action Plaintiff's Counsels of Record, Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Ponchaka, Brody, Mitchell, Kader, Verma, Brantly, Jamespon and Welker, attorney/client privilege and work product doctrine privilege; alleging with (s)pecifity that these Plaintiff's class counsels, individually and collectively, have and are presently fraudulently (c)overing (u)p their known Defendant Counsels of Record continuous perpetrating a (f)raud upon this (C)ourt; and I will request the Court to (i)ndependently compel those counsels to produce their case files and records of their named Plaintiff's and the entire Plaintiff's class members in this action, "(d)irectly to the (c)ourt to / for an" in camera judicial inspection and review" thereof, as

an (e)xception to the attorney/client privilege and work product doctrine privilege; to determine and (p)rove my claim these counsels have and are continuing to fraudulently (c)over (u)p from this court their known Defendant's counsels cortiosus perperation of a fraud upon this court; (p)rior to any (r)elevant disclosures to me, as pro se intervener Plaintiff and/or certified named Plaintiff.

92. Defendant's Ryan and Pratt, at all times relevant herein and hereinafter, has demonstrated, they were (a)ware of the systemic substantial risk of medical harm to all ADOC inmates in their deliberate failure and refusal to (e)nsure the medically (s)afe dispensing of inmates restricted ADOC NV WS DOT potential life threatening medications systemwide, in violation of (g)overning ADC WS DOT medications dispensing protocol and (b)lanket/(c)omplete (r)eckless (d)isregard for "(m)e" (and all other inmate class members) 27/; (b)y Defendant's Ryan and Pratt, explicitly or implicitly knowingly acting in concert with their ADOC subcontractor healthcare provider Corizon and (p)ermitting their Corizon nurses to (i)nappropriately dispense (m)e, 27/ (r)estrictive ADOC N.V. WS DOT medications, (a)s, (p)rohibited (N)on WS DOT medications, in violation of (g)overning ADOC DOT NV. WS medication dispensing (s)afety protocol policy/procedure, per ADOC (p)rohibited Corizon defacto and unauthorized (N)on WS DOT medication dispensing procedure. 28/ Therefore, I, 27/ remain in the (d)aily imminent threat of ADOC/

//

27/ Including all ADOC inmate class members as well.

28/ Pursuant to Corizon's defacto and unauthorized corporate policy to (f)raudulently (r)educe nursing staffing expenditures to (i)ncrease corporate profits under the ADOC/Corizon Healthcare Contract. (Quote. 4/

Corizon inappropriately (d)ispensing me, 27/ the (w)rong (p)otential (l)ife threatening restricted ADOC N.V. DOT medications; per the aforesaid Corizon defacto and unauthorized (n)on WS DOT medication dispensing protocols (posing an imminent threat to (m)y, 27/ health and life (s)afety or (p)otential (w)rongful (d)eath as the result thereof.

93. Defendants' Ryan and Pratt's counsels of Record, Gottfried, Bond, Wanamaker, Wieneke and the (e)ntire Law Firm (a)ttorneys of Struck, Bojanowski and Love, at all times relevant herein and hereinafter, has demonstrated, they were (a)ware of the ADOC systemic substantial risk of medical harm to all inmates, as the result of their clients Defendants' Ryan and Pratt's (d)eliberate failure and refusal to (e)nsure the medically (s)afe dispensing of inmates (r)estricted ADOC N.V. WS DOT potential life threatening medications systemwide, in violation of (g)overning ADOC WS DOT medications dispensing protocol and in (d)irect "(s)ubstantial (n)on compliance of Defendants' Ryan and Pratt's "Stipulation" settlement agreement of this Court at issue; and in (b)latant / (c)omplete disregard of (m)y 27/ (all other inmate class members), (b)y these Defendants' Counsels of Record, individually and collectively, explicitly and implicitly knowingly (p)ermitting their clients Ryan and Pratt to continue to permit their ADOC subcontractor healthcare provider Corizon to (i)nappropriately dispense (m)y, 27/ (r)estrictive ADOC N.V. WS DOT medications, (a)s, (p)rohibited (N)on WS DOT medications in direct violation of (g)overning ADOC DOT N.V. WS medication dispensing "(s)afety" protocol policy / procedure, per ADOC (p)rohibited Corizon defacto and unauthorized (n)on WS DOT medication dispensing procedure; 28/ 4/ and in (d)irect violation of these Defendants' Class Action Counsels (d)uty under this Court's

Stipulation, (Id) to ensure Defendant's Ryan and Pratt's compliance there-with. (Emphasis). As the result, I, 27/ remain in the (D)aily immi-nent threat of ADOC/ Corizon continuing to inappropriately (D)ispensing me, 27/ the (W)rong (P)otential (L)ife threatening restricted ADOC N.V. WS DOT medications, per the aforesaid Corizon de facto and unauthorized (N)on WS DOT medication dispensing protocol; (P)osing an imminent threat to my, 27/ health and life (S)afty or (P)otential (W)rongful (D)eath, as the result thereof.

94. Plaintiff's Class Counsels Specter, Hardy, Norman, Kendrick, Fathi, Fettig, Porchola, Brody, Mitchel, Kader, Verma, Brenthy, Jamespar, and Wilkes, at all times relevant herein and hereinafter, has demonstrated, they were (A)ware of the ADOC systemic substantial risk of medical harm to all inmate of the class members, as the result of Defendant's Ryan and Pratt's (C)ontinous (D)eliberate failure and refusal to ensure the medically (S)afe dispensing of inmates (R)estricted ADOC N.V. WS DOT potential life threatening medications systemwide, in violation of (G)overning ADOC WS DOT medication dispensing protocol; in (D)irect (S)ubstantial (N)on compliance of Defendant's Ryan and Pratt's, "Stip-ulation" settlement agreement of this Court at issue; and in (B)lanket/ (C)omplete disregard of my, 27/ (all other inmate class members); (B)y there Plaintiff's Class Action Counsels of Record, individually and collectively; explicitly or implicitly, acquiescing in and (F)raudulently (C)overing (U)p (F)rom this Court that Defendant's Ryan and Pratt are de-liberately (P)ermitting their ADOC subcontractor healthcare provider Cori-zon to (I)nappropriately dispense (M)ey, 27/ (R)estrictive ADOC N.V. WS DOT medications; (A)s (P)rohibited (N)on WS medications; in direct violation of (G)overning ADOC DOT WS N.V. medication dispensing "(S)afty"

and in (N)oncompliance under this Court's "Stipulation" PM 17, 18 and 5, 28; and (S)pecifically in direct violation of these Plaintiff's Class action Counsels (D)uties; (b)y those Plaintiff's counsels taking an antagonistic position to my interest, as a member of the class, 27/ in their failure /refusal to adequately represent the class in purposefully (N)ot ensuring Defendant's Ryan and Pratt are (P)roperly dispensing the (R)estricted ADOC NV. WS DOT medications (S)afely systemwide, as (R)equired pursuant to this Court's Stipulation settlement agreement at issue. As the result, I, 27/ remain in the (D)aily imminent threat of ADOC-Corizon continuing to dispense me, 27/ the (W)rong (P)otential (L)ife (T)hreatening restricted ADOC WS N.V. DOT medications, per the aforesaid Corizon defacto and unauthorized (N)on WS DOT medications dispensing protocol; (P)osing and imminent threat to my, 27/ health and (S)afety and (P)otential (W)rongful (D)eath, as the result thereof.

95. Due to the imminent threat of ADOC Corizon inappropriately dispensing me, 27/ the (W)rong potential life threatening DOT WS medications, I was (I)nvoluntarily (F)orced to knowingly, intelligently and (V)oluntarily make the (L)ife (S)ustaining (P)rotective (D)ecision to "(S)elf terminate / refuse my daily (P)rescribed life sustaining cardiac Plavix DOT WS medication, as in paragraph 20, inclusive; as my (O)nly effective means to (S)elf (P)rotect myself from the daily imminent threat of ADOC/ Corizon (C)ontinuing to deliberately dispense me the (W)rong potential life threatening DOT medications and ascertain that I am not (I)nvoluntarily taking this (U)nknown and (W)rong medication, as my own to (P)revent (F)urther life threatening medical harm or potential wrongful death, 29/ as the result of the

aforesaid Corizon defacto and unauthorized DOT (N)on WS medication dispensing procedure.

96. I affirmatively state that I made the "(V)oluntary (d)ecision" to (p)resently (r)efuse to accept my (d)aily perscribed ADOC/Corizon life sustaining (cardiac and anti stroke) DOT WS "(P)lavix" medication; based upon knowing of the (s)ubstantial life threatening risks, due to the imminent threat of ADOC/Corizon (c)ontinuing to (d)eliberately and (i)nappropriately dispense to me the (w)rong potential life threatening DOT WS medication per the ADOC (p)rohibited Corizon defacto and unauthorized DOT "(N)on" WS medication dispensing procedure; "to (p)revent (s)elf (i)nflicted known (p)otential (l)ife (t)hreatening (m)edical (h)arm or potential (w)rongful (d)eath of (m)yself." (Emphasis (A)dded).

97. For the record I am (c)ompliant with taking my aforesaid ADOC/Corizon (p)erscribed restricted ADOC WS N.V. DOT "(P)lavix" medications under (n)ormal circumstances when ADOC/Corizon (p)roperly and (s)afely dispense my DOT WS Plavix medication in accordance with (g)overning ADOC DOT N.V. WS medication dispensing (s)afety protocol.

98. ADOC (g)overning (N)urse "Direct Observation Therapy" (DOT) (r)estricted Watch Swallow medication dispensing (s)afety protocol requires in pertainent part:

"(T)he (N)urse (s)hall dispense restricted DOT medications (b)y:

(1) Nurse (m)ust physically dispense the inmates (I/M) medication from the I/M's (N)amed perscription package and "(V)erify the I/M name on the medication package matches the I/M's ADOC Identification, ID/; and

(2) nurse physically dispense the I/M medication into a small medication clear cup in the I/M's presence; and;

(3) nurse physically provide I/M with small clear plastic cup of water, 30/ and,

(4) nurse then physically provides I/M with the cup of medications and cup of water; and,

(5) nurse visually watches I/M take and swallow the medication; and, and,

(6) the I/M (r)eturns the (e)mpty cup of water to nurse; and

(7) finally the (n)urse (v)isually checks the (i)nside of the I/M (m)outh to (e)nsure the I/M has (a)ctually swallowed the medication. 31/ Accord. Footnote, 27/ (Emphasis). See //

29/ This is a crucial (s)afety (v)erification factor because it (e)nsures I/M is recieving the (c)orrect medication and does (n)ot recieve the (i)ncorrect / wrong potential life threatening DOT medications.

30./ In addition, this is a crucial (s)afety factor of the DOT procedure because it (p)revents I/M from (b)ringing a cup and "(p)retending" they took and swallowed the medication and (d)umping or (s)pitting the medication into the cup to prohibitedly retain I/M's unauthorized potential life threatening DOT ws medications.

Under this procedure, I/M's are expressly prohibited from bring or using a personal cup or container to take DOT ws medications.

Additionally, this procedure provides an (i)mportant departmental (s)afety issue as well; it (p)revents I/M's from retaining DOT medications for self prescription medication (a)buse or unlawfully distributing these prohibited DOT medications for other I/M's prescription medication (a)buse.

Also Footnote 33/.

//

31/ This procedure provides a (l)egitimate departmental health (s)afty component as well, it (p)revents I/M from retaining unauthorized DOT medications for (s)elf prescription medication (a)buse and prevents I/M's from unlawfully distributing these (p)rohibited DOT medications to other inmates for thier prescription medication (a)buse.

32/ I have been incarcerated at ADC from 1980. Based upon my own personal knowledge due to my incarceration at ADC, I state that (t)his "(e)xact" ADC Nurse DOT NUWS procedure has been in (e)ffect since 1980 to (p)resent date (40) years and ADC has not amended nor revised nor made any exception for ADC sub contract healthcare providers, including Corizon (f)rom performing this (a)ctual NUWS DOT procedure to (d)ate. (Emphasis). Accordingly, my declaration herein should also be admitted as Lay Witness Opinion Testimony under Rule 701, FRE.

33/ I further provide this Court the following underlying pertinent relevant factual and evidentiary information for the Court's consideration.

This (a)ctual ADC governing Nurse DOT NUWS procedure, as in paragraph, 98, inclusive, requires the (N)urse to perform specific prerequisite requirements for the (p)roper and (S)afe dispensing of I/M DOT Medications. Therefore, the nurse is required to (s)pend (m)ore (t)ime at (e)ach individual I/M's cell (s)everal (m)inutes to dispense the medications; and thus (r)equires (m)ore (N)ursing (s)taff to dispense these DOT Medications per ADOC unit and complex. (Empasis).

(B)ut Compare: Under the (p)rohibited Corizon defacto and unauthorized DOT (N)on WS procedure, as set forth in paragraph 30, inclusive, at issue Corizon nurses do (n)ot spend several minutes at each individual I/M's cell

My Special Advisal

The Terms And Conditions Under Which "I" Will "Only" Resume Taking My ADOC / Corizon (P)erscribed (R)estricted ADOC N.V. WS DOT "(P)lavix" (Life Sustaining) Medication.

99. I hereby give Notice that I, as Intervenor Plaintiff and as member of the class, wants to (r)esume (t)aking my daily perscribed ADOC / Corizon (L)ife (S)ustaining DOT WS "(P)lavix" Medication, ...... (B)ut "Only" When ADOC (c)ompels subcontractor (C)orizon to "(c)omply" with governing ADOC nurse DOT N.V. WS (S)afety protocol, as in paragraph 98, inclusive and in accordance with this Courts' "Stipulation" agreement, upon "(P)roper" and "(m)edically (S)afe" Corizon dispensing of my DOT N.V. WS "(P)lavix" Medication, (p)er ADOC governing policy, as in paragraph

//

dispensing these DOT medications. To the contrary, Corizon nurses (a)ctually spend "(l)ess than 5 (s)econds" just sticking an (e)nvelope in the I/M's cell door in all relevant cells and then quickly picking up the (e)mpty envelopes after dispensing all medications; and thus under the Corizon procedure of inappropriately dispensing these DOT medications - (r)equires (l)ess Corizon (N)ursing (S)taff to dispense those DOT medications at ADOC Units and complexes, (Emphasis); and (r)educes Corizon corporation nursing staff expenditures.

See eg. The SSURS, tape recordings of Corizon nursing staff inappropriately dispensing these DOT medications per the Corizon de facto DOT (N)on WS procedure, as aforesaid in this (d)eclaration. Accord.

See also: Footnote, 28/ I alleged Corizon has a de facto corporate policy to fraudulently (r)educe nurse staffing expenditures to increase corporate profits under the ADOC / Corizon Healthcare contract as it pertains herein at issue.

98, inclusive; upon the (s)pecific (t)erms and (c)onditions:

(B)y the carryon (d)ispensing nurse (s)hall:

(1) The nurse (m)ust (p)hysically dispense my DOT Plain Medication "(d)irectly" from my (N)amed perscription medication package in (m)y physical presence, (Emphasis) and (V)erify my name on the medication package (m)atches my ADOC identification card. (Note: This can be done by the (N)urse physically bring my medications packets to my cell for dispensing and/or daily calling me to the unit Medical Clinic for dispensing of my medication(s)); 34/; and,

(2) The nurse physically dispensing my medication in a small clear medication cup in my (p)resence; 34/ and,

(3) The nurse physically provide me a cup of water; and,

(4) The nurse physically provide me the medication; and,

(5) The nurse (v)isually watch me take and swallow my medication; and,

(6) I return to the nurse my (e)mpty cup of water; and,

(7) (F)inally, the nurse (v)isually check the inside of my mouth to ensure I actually swallowed the medication.

(Id. at paragraph 98, inclusive); 35./

//

34./ This physical presence of my dispensing of the medication is crucial Verification. Because it (e)nsures the nurse is dispensing me the (c)orrect DOT medication. While simultaneously proving me with verification the nurse has actually dispensed me the (c)orrect DOT Medication and (n)ot the (w)rong potential life threatening DOT medication yet again. (Emphasis).

100. I, as a member of the class have (n)o available remedy through Plaintiff's Class Counsels of Record Specter, Hardy, Norman,

//

35/ I hereby respond to Defendant's Counsels of Record and Plaintiff's Class Counsels of Record (a)nticipated (o)bjection hereto that I, as Intervener Plaintiff and as (m)ember of the (c)lass do (n)ot have legal standing to (d)ictate or (c)ompel the (m)anner in which Defendant's must dispense my restricted ADC DOT N.U. WS medications to me under this Court's "Stipulation" at issue.

To the contrary, I, as prose inmate plaintiff in this class action and as (m)ember of the (c)lass thereof I have (l)egal (s)tanding to assert my rights (b)estowed under this "Stipulation" settlement agreement as a matter of law. See: Glover v. Johnson, 931 F. Supp. 1360, 1371 (E.D. Mich 1996), aff'd 931 F.3d 229 (6th Cir. 1998); Hook v. State of Arizona, Dept. of Cor., 972 F.2d 1012, 1014-15 (9th Cir. 1992).

Pursuant to this Court's Class Action "Stipulation" at issue, (r)equires that Defendant's (s)hall provide all ADC inmate (m)embers of the Class with the medical care (P)rovision of (r)estricted ADC DOT medication (d)ispensing (p)rotocol, as set forth in paragraph 98, inclusive; under that governing ADC DOT policy, (Id), (Emphasis). Accord: [Exhibit 2, Stipulation, sub. exh. A and B thereof].

Accordingly, I as a member of the class I have a "(b)estowed" (r)ight under the Stipulation to (a)ctually (r)eceive my ADC/Canyon (p)rescribed restricted ADC DOT medication(s) (d)ispensed (e)xclusively per the ADC DOT N.U. WS (p)rotocol under the (g)overning ADC DOT policy, as in paragraph 98, inclusive; pursuant to this Court's Stipulation as a matter of law. See e.g. Glover v. Johnson, supra 931 F. Supp at 1371 and Hook v. State of Arizona, Dept of Cor., supra 972 at 1014-15.

Kendrick, Fathi, Fegajig, Porchola, Broody, Mitchel, Kader, Verna, Brenthep, Jameson and Wilkes to compel Defendant's compliance in their (Defendants') (s)ubstantial (l)ife (T)hreatening systemic (n)oncompliance with PM 17, 18 and 5 of this Court's Stipulation; (d)ue to Defendant's are (d)eliberately (p)ermitting thier third party //

Therefore, I as member of the class and Intervener Plaintiff have (l)egal (S)tanding to assert (m)y (b)estowed (l)egal (r)ights under the "Stipulation" to (l)egally (d)ictate and judicially (c)ompel Defendant's (T)o (d)irect their ADOC subcontractor Corizon "correct" only (d)ispense (m)y perscribed ADOC/Corizon DOT N.V. WS "(P)lavix" or other DOT medications to (m)e in (s)trict (c)ompliance with the aforesaid ADC DOT N V WS "(p)rotocol" (by Corizon nurse (p)hysically (p)erforming that N.V. WS protocol), as particularly set forth in paragraph 98, inclusive; and as required pursuant to governing ADC DOT policy, (Id) under this Court's "Stipulation" and in accordance with their (Corizon) State of Arizona ADOC/Corizon contract, 36/ as a matter of law. Glover v. Johnson, supra 931 F. Supp at 1391; and Hook vs. State of Arizona, Dept. of Corr, supra 97 F.2d at 1014-15.

36/ Pursuant to the State of Arizona and ADOC/Corizon health care contract, Corizon (c)ontractually agreed to (s)pecifically provide the provision of Defendant's healthcare to all ADC inmates systemwide per this Court's Class Action Defendant's "Stipulation" settlement agreement in accordance with the 103 Provisions of health care Performance Measures (PM) thereunder and to (s)trictly (c)omply with all pre existing and future governing ADOC departmental health care policies, practices and directives thereunder, (Emphasis), as in paragraph 7, inclusive.

Thus, Corizon has an affirmative nondiscretionary (c)ontractual (d)uty and (m)ust dispense (m)y ADC DOT medications (b)y physically (p)erforming the required ADC DOT NV WS protocol under (g)overning ADOC policy, as in paragraph 98, inclusive.

ADC subcontractor provider Corizon to (i)nappropriately and (u)nsafely dispense my, (and all other inmate members of the class, 2?) restricted ADOC required NV. DOT WS medications, as (p)rohibited (n)on WS DOT medications; thus posing a direct imminent threat to my, 2?/ in direct (s)ubstantial noncompliance with this Stipulation prerequisite requirements under PM 17, 18 and 5. (D)ue to these Plaintiff's class counsels have intentionally taken a (b)lanket (a)ntagonistic position to my interest, as member of the class, (and all other inmate members of the class, 2?) in their purposeful failure and refusal to adequately represent me, 2?/ in (n)ot (c)ompelling remedial corrective (c)ompliance of Defendant's to (P)roperly and (S)afely dispense my, and 2?/ ADOC restricted ADOC DOT WS medications (S)afely in accordance with (g)overning ADOC DOT WS policy and procedure, as in paragraph 98, inclusive under PM 17, 18 and 5 of this Stipulation; (b)y those Plaintiff's counsels fraudulently and (i)mplicitly acquiescing in and (c)overning (e)sp Defendant's systemic substantial (l)ife (t)hreatening (n)on compliance in their inappropriate and unsafe dispensing of my (and all other ADOC DOT (potential life threatening) NV. WS medications; thus in (s)ubstantial (n)on compliance of these Plaintiff's class counsels affirmative duty and responsibilities as to represent me, as member of the class and all other inmate members of the class under this Stipulation.

101. I, as member of the class have (n)o available remedy at law under this Stipulation, (e)xcept by virtue of this Court issuing an (a)ctual (r)emedial (e)nforcement Order which compels compliance of Defendant's to "(d)irect the ADOC subcontractor health care provider Corizon to specifically (p)rovide me with the (a)ctual (P)rovision of medical care under PM 17, 18 and 5, (b)y Defendant's (s)pecifically (d)irecting Corizon to (d)ispense my perscribed (l)ife (s)ustaining restricted ADOC DOT N.V.

WS medication in accordance with ADOC DOT N.V. WS (p)rotocol (by the Corizon nurse (a)ctually (p)hysically dispensing my DOT medications from my perscription medication packages in my (p)hysical (p)resence and (v)isually performing the N.V. WS protocol), as (s)pecifically set forth in paragraph 98, inclusive under (g)overning ADOC DOT policy and procedures, (Id), under this Court's "Stipulation" settlement agreement for:

"(M)e (Bertanelli), as (m)ember of the class to (R)esume Taking (m)y (p)rescribed (l)ife (s)ustaining (d)aily ADOC/Corizon (r)estricted DOT N.V. WS "(P)aim" Medication (S)afely (t)o (p)revent (f)rom (s)uffering (f)urther (i)mminent (t)hreat (o)f (i)rreparable (m)edical (h)arm or (p)otential (w)rongful (d)eath of (m)yself. (Emphasis),

as in paragraph 99, inclusive.

Declarant further sayth naught.

Declaration Under The Penalty Of Perjury

I, Jonathan Cataldo Bertanelli, hereby declare under the penalty of perjury that the foregoing is true and correct to my own personal knowledge pursuant to 28 USC Section 1746.

Executed this 21st day of January, 2019, at Buckeye, Arizona.

By: [signature]

JONATHAN C. BERTANELLI,

Declarant

Exhibit A

Exhibit A

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
Brenna Durkin (Bar No. 027973)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
avarma@azdisabilitylaw.org
bdurkin@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-DJH

**STIPULATION**

Part III OF E-Filing Document

Re: Plaintiff/Bertanelli Motion to Intervene In Class Action Parsons et. al. v. Ryan, et. al.
No. CV-12-0601-PHX-ROS

Pages 101 through 150

Plaintiffs and Defendants (collectively, "the Parties") hereby stipulate as follows:

## I. INTRODUCTION AND PROCEDURAL PROVISIONS

1. Plaintiffs are prisoners in the custody of the Arizona Department of Corrections ("ADC"), an agency of the State of Arizona, who are incarcerated at one of the state facilities located in the State of Arizona, and the Arizona Center for Disability Law ("ACDL").

2. Defendants are Charles Ryan, Director of ADC, and Richard Pratt, Interim Division Director, Division of Health Services of ADC. Both Defendants are sued in their official capacities.

3. The Court has certified this case as a class action. The class is defined as "All prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC." The subclass is defined as "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area."

4. The purpose of this Stipulation to settle the above captioned case. This Stipulation governs or applies to the 10 ADC complexes: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow and Yuma. This Stipulation does not apply to occurrences or incidents that happen to class members while they do not reside at one of the 10 ADC complexes.

5. Defendants deny all the allegations in the Complaint filed in this case. This Stipulation does not constitute and shall not be construed or interpreted as an admission of any wrongdoing or liability by any party.

6. Attached to this Stipulation as Exhibit A is a list of definitions of terms used herein and in the performance measures used to evaluate compliance with the Stipulation.

## II. SUBSTANTIVE PROVISIONS

### A. Health Care.

7. Defendants shall request that the Arizona Legislature approve a budget to allow ADC and its contracted health services vendor to modify the health services contract to increase staffing of medical and mental health positions. This provision shall not be construed as an agreement by Plaintiffs that this budgetary request is sufficient to comply with the terms of this Stipulation.

8. Defendants shall comply with the health care performance measures set forth in Exhibit B. Clinicians who exhibit a pattern and practice of substantially departing from the standard of care shall be subject to corrective action.

9. **Measurement and reporting of performance measures:** Compliance with the performance measures set forth in Exhibit B shall be measured and reported monthly at each of ADC's ten (10) complexes as follows:

a. The performance measures analyzed to determine ADC substantial compliance with the health care provisions of this Stipulation shall be governed by ADC's MGAR format. Current MGAR performance compliance thresholds used to measure contract compliance by the contracted vendor shall be modified pursuant to a contract amendment to reflect the compliance measures and definitions set forth in Exhibit B.

b. The parties shall agree on a protocol to be used for each performance measure, attached as Exhibit C. If the parties cannot agree on a protocol, the matter shall be submitted for mediation or resolution by the District Court.

10. The measurement and reporting process for performance measures, as described in Paragraph 9, will determine (1) whether ADC has complied with particular performance measures at particular complexes, (2) whether the health care provisions of this Stipulation may terminate as to particular performance measures at particular

complexes, as set forth in the following sub-paragraphs.

a. **Determining substantial compliance with a particular performance measure at a particular facility:** Compliance with a particular performance measure identified in Exhibit B at a particular complex shall be defined as follows:

i. For the first twelve months after the effective date of this Stipulation, meeting or exceeding a seventy-five percent (75%) threshold for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9;

ii. For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9;

iii. After the first twenty four months after the effective date of this Stipulation, meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9.

b. **Termination of the duty to measure and report on a particular performance measure:** ADC's duty to measure and report on a particular performance measure, as described in Paragraph 9, terminates if:

i. The particular performance measure that applies to a specific complex is in compliance, as defined in sub-paragraph A of this Paragraph, for eighteen months out of a twenty-four month

period; and

ii. The particular performance measure has not been out of compliance, as defined in sub-paragraph A of this Paragraph, for three or more consecutive months within the past 18- month period.

c. The duty to measure and report on any performance measure for a given complex shall continue for the life of this Stipulation unless terminated pursuant to sub-paragraph B of this Paragraph.

11. Defendants or their contracted vendor(s) will approve or deny all requests for specialty health care services using InterQual or another equivalent industry standard utilization management program. Any override of the recommendation must be documented in the prisoner's health care chart, including the reason for the override.

12. Defendants or their contracted vendor(s) will ensure that:

a. All prisoners will be offered an annual influenza vaccination.

b. All prisoners with chronic diseases will be offered the required immunizations as established by the Centers for Disease Control.

c. All prisoners ages 50 to 75 will be offered annual colorectal cancer screening.

d. All female prisoners age 50 and older will be offered a baseline mammogram screening at age 50, then every 24 months thereafter unless more frequent screening is clinically indicated.

13. Defendants or their contracted vendor(s) will implement a training program taught by Dr. Brian Hanstad, or another dentist if Dr. Hanstad is unavailable, to train dental assistants at ADC facilities about how to triage HNRs into routine or urgent care lines as appropriate and to train dentists to evaluate the accuracy and skill of dental assistants under their supervision.

14. For prisoners who are not fluent in English, language interpretation for healthcare encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service.

15. If a prisoner who is taking psychotropic medication suffers a heat intolerance reaction, all reasonably available steps will be taken to prevent heat injury or illness. If all other steps have failed to abate the heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit.

16. Psychological autopsies shall be provided to the monitoring bureau within thirty (30) days of the prisoner's death and shall be finalized by the monitoring bureau within fourteen (14) days of receipt. When a toxicology report is required, the psychological autopsy shall be provided to the monitoring bureau within thirty (30) days of receipt of the medical examiner's report. Psychological autopsies and mortality reviews shall identify and refer deficiencies to appropriate managers and supervisors including the CQI committee. If deficiencies are identified, corrective action will be taken.

**B. Maximum Custody Prisoners.**

17. Defendants shall request that the Arizona Legislature approve a budget to allow ADC to implement DI 326 for all eligible prisoners. This provision shall not be construed as an agreement by Plaintiffs that this budget request is sufficient to comply with the terms of this Stipulation.

18. Defendants shall comply with the maximum custody performance measures set forth in Exhibit D.

19. **Measurement and reporting of performance measures:** Compliance with the performance measures set forth in Exhibit D shall be measured and reported monthly as follows.

a. The performance measures analyzed to determine ADC substantial compliance with the Maximum Custody provisions of this Stipulation

shall be governed by the protocol used for each performance measure attached as Exhibit E. If the parties cannot agree on a protocol, the matter shall be submitted for mediation or resolution by the District Court.

20. The measurement and reporting process for performance measures, as described in Paragraph 19, will determine (1) whether ADC has complied with particular performance measures at particular units, (2) whether the Maximum Custody provisions of this Stipulation may terminate as to particular performance measures at particular units, as set forth in the following sub-paragraphs.

a. **Determining substantial compliance with a particular performance measure at a particular unit:** Compliance with a particular performance measure identified in Exhibit D at a particular unit shall be defined as follows:

i. For the first twelve months after the effective date of this Stipulation, meeting or exceeding a seventy-five percent (75%) threshold for the particular performance measure that applies to a specific unit, determined under the procedures set forth in Paragraph 19;

ii. For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific unit, determined under the procedures set forth in Paragraph 19;

iii. After the first twenty four months after the effective date of this Stipulation, meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure that

applies to a specific unit, determined under the procedures set forth in Paragraph 19.

b. **Termination of the duty to measure and report on a particular performance measure:** ADC's duty to measure and report on a particular performance measure, as described in Paragraph 19, terminates if:

    i. The particular performance measure that applies to a specific unit is in compliance, as defined in sub-paragraph A of this Paragraph, for eighteen months out of a twenty-four month period; and

    ii. The particular performance measure has not been out of compliance, as defined in sub-paragraph A of this Paragraph, for three or more consecutive months within the past eighteen-month period.

c. The duty to measure and report on any performance measure for a given unit shall continue for the life of this Stipulation unless terminated pursuant to sub-paragraph B of this Paragraph.

21.     Seriously Mentally Ill (SMI) prisoners are defined as those prisoners who have been determined to be seriously mentally ill according to the criteria set forth in the ADC SMI Determination Form (Form 1103-13, 12/19/12), which is attached hereto as Exhibit F and is incorporated by reference as if fully set forth herein.  For purposes of this Stipulation, "intellectual disabilities," as defined by the current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), shall be added to the list of qualifying diagnoses on Form 1103.13.  This definition shall govern this Stipulation notwithstanding any future modification of Form 1103.13 or ADC's definition of "Seriously Mentally Ill."  All prisoners determined to be SMI in the community shall also be designated as SMI by ADC.

22.     ADC maximum custody prisoners housed at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) units, shall be offered out of cell time, incentives, programs and property consistent with DI 326 and the Step Program Matrix, but in no event shall be offered less than 6 hours per week of out-of-cell exercise.  Defendants shall implement DI 326 and the Step Program Matrix for all eligible prisoners and shall maintain them in their current form for the duration of this Stipulation. In the event that Defendants intend to modify DI 326 and the Step Program Matrix they shall provide Plaintiffs' counsel with thirty (30) days' notice. In the event that the parties do not agree on the proposed modifications, the dispute shall be submitted to Magistrate Judge David Duncan who shall determine whether the modifications effectuate the intent of the relevant provisions of the Stipulation.

23.     Prisoners who are MH3 or higher shall not be housed in Florence Central-CB5 or CB7 unless the cell fronts are substantially modified to increase visibility.

24.     All prisoners eligible for participation in DI 326 shall be offered at least 7.5 hours of out-of-cell time per week.  All prisoners at Step II shall be offered at least 8.5 hours of out-of-cell time per week, and all prisoners at Step III shall be offered at least 9.5 hours of out-of-cell time per week.  The out of cell time set forth in this paragraph is inclusive of the six hours of exercise time referenced in Paragraph 22.  Defendants shall ensure that prisoners at Step II and Step III of DI 326 are participating in least one hour of out-of-cell group programming per week.

25.     In addition to the out of cell time, incentives, programs and property offered pursuant to DI 326 and the Step Program Matrix for prisoners housed at maximum custody units specified in ¶ 24 above, ADC maximum custody prisoners designated as SMI pursuant to ¶ 21 above, shall be offered an additional ten hours of unstructured of out of cell time per week; an additional one hour of out-of-cell mental health programming per week; one hour of additional out of cell pyschoeducational programming per week;

and one hour of additional out of cell programming per week. Time spent out of cell for exercise, showers, medical care, classification hearings or visiting shall not count toward the additional ten hours of out of cell time per week specified in this Paragraph. All prisoners received in maximum custody will receive an evaluation for program placement within 72 hours of their transfer into maximum custody, including to properly identify all SMI prisoners.

26. If out of cell time offered pursuant to ¶¶ 24 or 25 above is limited or cancelled for legitimate operational or safety and security reasons such as an unexpected staffing shortage, inclement weather or facility emergency lockdown, Defendants shall make every reasonable effort to ensure that amount of out of cell time shall be made up for those prisoners who missed out of cell time. The out of cell time provided pursuant to paragraph 24 above, may be limited or canceled for an individual prisoner if the Warden, or his/her designee if the Warden is not available, certifies in writing that allowing that prisoner such out of cell time would pose a significant security risk. Such certification shall expire after thirty (30) days unless renewed in writing by the Warden or his/her designee.

27. Defendants shall maintain the following restrictions on the use of pepper spray and other chemical agents on any maximum custody prisoner classified as SMI, and in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU).

a. Chemical agents shall be used only in case of imminent threat. An imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance. A decision to use chemical agents shall be based on

more than passive resistance to placement in restraints or refusal to follow orders. If the inmate has not responded to staff for an extended period of time, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized.

b. All controlled uses of force shall be preceded by a cool down period to allow the inmate an opportunity to comply with custody staff orders. The cool down period shall include clinical intervention (attempts to verbally counsel and persuade the inmate to voluntarily exit the area) by a mental health clinician, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a qualified health care professional (other than a LPN) shall provide such clinical intervention. This cool down period may include similar attempts by custody staff.

c. If it is determined the inmate does not have the ability to understand orders, chemical agents shall not be used without authorization from the Warden, or if the Warden is unavailable, the administrative duty officer.

d. If it is determined an inmate has the ability to understand orders but has difficulty complying due to mental health issues, or when a mental health clinician believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation, a mental health clinician shall propose reasonable strategies to employ in an effort to gain compliance, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a qualified health care professional (other than a LPN) shall propose such reasonable strategies.

e. The cool down period may also include use of other available resources/options such as dialogue via religious leaders, correctional

counselors, correctional officers and other custody and non-custody staff that have established rapport with the inmate.

28.    All maximum custody prisoners shall receive meals equivalent in caloric and nutritional content to the meals received by other ADC prisoners.

## III.    MONITORING AND ENFORCEMENT

29.    Plaintiffs' counsel and their experts shall have reasonable access to the institutions, staff, contractors, prisoners and documents necessary to properly evaluate whether Defendants are complying with the performance measures and other provisions of this Stipulation.  The parties shall cooperate so that plaintiffs' counsel has reasonable access to information reasonably necessary to perform their responsibilities required by this Stipulation without unduly burdening defendants. If the parties fail to agree, either party may submit the dispute for binding resolution by Magistrate Judge David Duncan. Defendants shall also provide, on a monthly basis during the pendency of the Stipulation, copies of a maximum of ten (10) individual Class Members' health care records, and a maximum of five (5) individual Subclass Members' health care and institutional records, such records to be selected by Plaintiffs' counsel.  The health care records shall include: treatment for a twelve (12) month period of time from the date the records are copied. Upon request, Defendants shall provide the health care records for the twelve months before those originally produced.  In addition, Defendants shall provide to Plaintiffs on a monthly basis a copy of all health care records of Class Members who died during their confinement at any state operated facility (whether death takes place at the facility or at a medical facility following transfer), and all mortality reviews and psychological autopsies for such prisoners.  The records provided shall include treatment for a twelve (12) month period prior to the death of the prisoner.  Upon request, Defendants shall provide the health care records for the twelve months before those originally produced.  The parties will meet and confer about the limit on the records that Plaintiffs can request once the ADC electronic medical records system is fully implemented.

30.    In the event that counsel for Plaintiffs alleges that Defendants have failed to substantially comply in some significant respect with this Stipulation, Plaintiffs' counsel shall provide Defendants with a written statement describing the alleged non-compliance ("Notice of Substantial Non-Compliance").  Defendants shall provide a written statement responding to the Notice of Substantial Non-Compliance within thirty (30) calendar days from receipt of the Notice of Substantial Non-Compliance and, within thirty (30) calendar days of receipt of Defendants' written response, counsel for the parties shall meet and confer in a good faith effort to resolve their dispute informally.

31.    In the event that a Notice of Substantial Non-Compliance pursuant to ¶ 30 of this Stipulation cannot be resolved informally, counsel for the parties shall request that Magistrate Judge John Buttrick mediate the dispute.  In the event that Magistrate Judge Buttrick is no longer available to mediate disputes in this case, the parties shall jointly request the assignment of another Magistrate Judge, or if the parties are unable to agree, the District Judge shall appoint a Magistrate Judge. If the dispute has not been resolved through mediation in conformity with this Stipulation within sixty (60) calendar days, either party may file a motion to enforce the Stipulation in the District Court.

32.    Plaintiffs' counsel and their experts shall have the opportunity to conduct no more than twenty (20) tour days per year of ADC prison complexes. A "tour day" is any day on which one or more of plaintiffs' counsel and experts are present at a given complex. A tour day shall last no more than eight hours. No complex will be toured more than once per quarter.  Tours shall be scheduled with at least two weeks' advance notice to defendants.  Defendants shall make reasonable efforts to make available for brief interview ADC employees and any employees of any contractor that have direct or indirect duties related to the requirements of this Stipulation. The interviews shall not unreasonably interfere with the performance of their duties.  Plaintiffs' counsel and their experts shall be able to have confidential, out-of-cell interviews with prisoners during these tours. Plaintiffs' counsel and their experts shall be able to review health and other

records of class members, and records of mental health and other programming, during the tours. Plaintiffs' counsel and their experts shall be able to review any documents that form the basis of the MGAR reports and be able to interview the ADC monitors who prepared those reports.

33. With the agreement of both parties, Plaintiffs may conduct confidential interviews with prisoners, and interviews of ADC employees or employees of ADC's contractors, by telephone.

34. Defendants shall notify the Ninth Circuit Court of Appeals of the settlement of this case and of their intention to withdraw the petition for rehearing en banc in case number 13-16396, upon final approval of the Stipulation by the District Court. Defendants agree not to file a petition for writ of certiorari with the United States Supreme Court seeking review of the Ninth Circuit's judgment in case number 13-16396.

## IV. RESERVATION OF JURISDICTION

35. The parties consent to the reservation and exercise of jurisdiction by the District Court over all disputes between and among the parties arising out of this Stipulation. The parties agree that this Stipulation shall not be construed as a consent decree.

36. Based upon the entire record, the parties stipulate and jointly request that the Court find that this Stipulation satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that it is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right of the Plaintiffs. In the event the Court finds that Defendants have not complied with the Stipulation, it shall in the first instance require Defendants to submit a plan approved by the Court to remedy the deficiencies identified by the Court. In the event the Court subsequently determines that the Defendants' plan did not remedy the deficiencies, the Court shall retain the power to enforce this Stipulation through all remedies provided by law, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a

specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of this Stipulation. In determining the subsequent remedies the Court shall consider whether to require Defendants to submit a revised plan.

## V.    TERMINATION OF THE AGREEMENT.

37.    To allow time for the remedial measures set forth in this Stipulation to be fully implemented, the parties shall not move to terminate this Stipulation for a period of four years from the date of its approval by the Court. Defendants shall not move to decertify the class for the duration of this Stipulation.

## VI.    MISCELLANEOUS PROVISIONS

38.    Information produced pursuant to this Stipulation shall be governed by the Amended Protective Order (Doc. 454).

39.    This Stipulation constitutes the entire agreement among the parties as to all claims raised by Plaintiffs in this action, and supersedes all prior agreements, representations, statements, promises, and understandings, whether oral or written, express or implied, with respect to this Stipulation. Each Party represents, warranties and covenants that it has the full legal authority necessary to enter into this Stipulation and to perform the duties and obligations arising under this Stipulation.

40.    This is an integrated agreement and may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification.

41.    This Stipulation shall be binding on all successors, assignees, employees, agents, and all others working for or on behalf of Defendants and Plaintiffs.

42.    Defendants agree to pay attorneys' fees and costs incurred in the underlying litigation of the subject lawsuit in the total amount of $ 4.9 million. Defendants agree to deliver payment of $ 1 million within 14 days of the effective date of the Stipulation, and $ 3.9 million by July 15, 2015. The parties agree that payment of these fees and costs

represents full satisfaction of all claims for fees and costs incurred through the effective date of the Stipulation.

43. In the event that Plaintiffs move to enforce any aspect of this Stipulation and the Plaintiffs are the prevailing party with respect to the dispute, the Defendants agree that they will pay reasonable attorneys' fees and costs, including expert costs, to be determined by the Court. The parties agree that the hourly rate of attorneys' fees is governed by 42 U.S.C. § 1997e(d).

44. Plaintiffs' counsel shall be compensated for work reasonably performed or costs incurred to monitor or enforce the relief set forth in this Stipulation up to $ 250,000 per calendar year. In exchange for Plaintiffs' agreement to a cap on the amount of fees, Defendants shall not dispute the amount sought unless there is an obvious reason to believe that the work was unreasonable or the bill is incorrect. The amount of $ 250,000 will be prorated for the portion of the calendar year between the effective date of the Stipulation and the start of the next calendar year. Plaintiffs' counsel shall submit an invoice for payment quarterly along with itemized time records and expenses. Defendants shall pay the invoice within thirty (30) days of receipt. This limitation on fees and costs shall not apply to any work performed in mediating disputes before the Magistrate pursuant to paragraphs 22, 29, and 31 above, or to any work performed before the District Court to enforce or defend this Stipulation.

Dated this 9TH day of OCTOBER, 2014.

**APPROVED:**

Charles Ryan,
Director, Arizona Department of Corrections

Date: 10.9.14

Richard Pratt
Interim Division Director, Division of Health Services,
Arizona Department of Corrections

Date: 10/9/14

**PRISON LAW OFFICE**

By: */s Donald Specter*
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Warren E. George (Cal. 53588)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
wgeorge@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@npp-aclu.org
afettig@npp-aclu.org
aquereshi@npp-aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

**STRUCK, WIENEKE, & LOVE, P.L.C.**

By: */s Daniel P. Struck*
Daniel P. Struck (Bar No. 012377)
Kathleen L. Wieneke (Bar No. 011139)
Rachel Love (Bar No. 019881)
Timothy J. Bojanowski (Bar No. 22126)
Nicholas D. Acedo (Bar No. 021644)
Ashlee B. Fletcher (Bar No. 028874)
Anne M. Orcutt (Bar No. 029387)
Jacob B. Lee (Bar No. 030371)
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Email: dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

Arizona Attorney General
Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried
Lucy M. Rand
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Email: Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

*Attorneys for Defendants*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 23966)
Kirstin T. Eidenbach (Bar No. 27341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
keidenbach@perkinscoie.com
jhgray@perkinscoie.com
mdumee@perkinscoie.com
jpeters@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
Dara Levinson (Cal. 274923)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com
aamiri@jonesday.com
daralevinson@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com
tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email: kmamedova@jonesday.com
jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone: (949) 851-3939
Email: kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: */s Sarah Kader*
Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
Brenna Durkin (Bar No. 027973)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
avarma@azdisabilitylaw.org
bdurkin@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email: jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

## CERTIFICATE OF SERVICE

I hereby certify that on ____________________, 2014, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/DRAFT

# EXHIBIT A

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Staffing | 1 | Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week. | Monthly staffing report and Weekly staffing schedule. Any changes to the weekly staffing schedule will be documented and provided to monitors. | Contracted Vendor. |
| Staffing | 2 | Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times. | Monthly staffing report and Weekly staffing schedule. Any changes to the weekly staffing schedule will be documented and provided to monitors. | Contracted Vendor. |
| Staffing | 3 | Dental staffing will be maintained at current contract levels – 30 dentists. | Monthly staffing report and Weekly staffing schedule. | Contracted Vendor. |
| Staffing | 4 | Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries | Monthly staffing report and Weekly staffing schedule. Any changes to the weekly staffing schedule will be documented and provided to monitors. | Contracted Vendor. |
| Medical Records | 5 | Medical Records will be accurate, chronologically maintained, and scanned or filed in the patient's chart within two business days, with all documents filed in their designated location. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nursing and Provider lines from the preceding 30 days. |
| Medical Records | 6 | Provider orders will be noted daily with time, date, and name of person taking the orders off. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Provider lines from the preceding 30 days. |
| Medical Records | 7 | Medical record entries will be legible, and complete with time, name stamp and signature present. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nursing and Provider lines from the preceding 30 days. |

122

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Medical Records | 8 | Nursing protocols/NETS will be utilized by nurses for sick call. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nurse lines from the preceding 30 days. |
| Medical Records | 9 | SOAPE format will be utilized in the medical record for encounters. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Nursing and Provider lines from the preceding 30 days. |
| Medical Records | 10 | Each patient's medical record will include an up-to-date Master Problem list. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Scheduled Provider lines from the preceding 30 days. |
| Pharmacy | 11 | Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Contracted vendor to provide list of NF medications ordered from the preceding 30 days. Follow up and confirmation of receipt of medications will be made through review of MAR's and eOmis. | Contracted vendor to provide list of NF medications ordered from the preceding 30 days, and MAR's and eOmis. |
| Pharmacy | 12 | Medical record will contain documentation of refusals or "no shows." | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | MAR's and eOmis from preceding 30 days. |
| Pharmacy | 13 | Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Contracted vendor Medication Expiration Reports and medication manifests from preceding 30 days will be reviewed, and corresponding MAR's will be reviewed to determine any lapses in medication. | Contracted vendor Medication Expiration Reports and medication manifests from preceding 30 days, and MAR's. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Pharmacy | 14 | Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Contracted vendor HNR logs from preceding 30 days will be reviewed to identify medication refills, and corresponding MAR's will be reviewed to determine any lapses in medication. | Contracted vendor HNR logs from preceding 30 days and MAR's. |
| Pharmacy | 15 | Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | MAR's from preceding 30 days will be reviewed for refusals and no shows, and medical records will be reviewed for follow up counseling. |
| Pharmacy | 16 | Perpetual inventory medication logs will be maintained on each yard. | Review of Perpetual Inventory Logs are to be confirmed in use on each yard. | Perpetual Inventory Logs from the preceding 30 days. |
| Pharmacy | 17 | The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | MAR's from the preceding 30 days. |
| Pharmacy | 18 | Daily delivery manifests will be kept in binders located in medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN. | Review of daily delivery manifests will be reviewed for appropriate signatures on each yard/complex. | Daily manifests from the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Pharmacy | 19 | Perpetual inventory medications will be signed off on the Inmate's individual MAR. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Medications documented in the perpetual inventory lists for individual patient use during the preceding 30 days will be followed up for appropriate documentation in the individual inmate's MAR. | Perpetual Inventory Logs and MAR's from the preceding 30 days. |
| Pharmacy | 20 | Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Any SNO's identified in the Provider's notes will be confirmed as a timely AIMS entry. | Scheduled Provider lines from the preceding 30 days. |
| Pharmacy | 21 | Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor. | At each facility, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. The Released Inmate Medication report from the contracted vendor from the preceding 30 days will be compared to an ADC report with inmate signature documenting receipt of appropriate medications. | The Released Inmate Medication report from the contracted vendor from the preceding 30 days and an ADC report with inmate signature documenting receipt of appropriate medications. |
| Pharmacy | 22 | Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order. | At each facility, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Non-formulary request / tracking log from the preceding 30 days will be provided by the contracted vendor. | Non-formulary request / tracking log from the preceding 30 days. |
| Equipment | 23 | Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff. | At each facility, a monthly physical inspection of all AED's will occur. | All AED's and Checklist Binder. |





| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Equipment | 24 | Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items. | At each facility, a monthly physical inspection of all medical response bags will occur. Contents of bag will match inventory list. | All Emergency response bags. |
| Emergency Response | 25 | A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency. | At each facility, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. SIR's will be reviewed and compared with medical chart documenting the emergency response | Appropriate and pertinent SIR's. |
| Quality Improvement | 26 | Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance. | At each facility, a minimum of 10 grievances per month are randomly selected from the grievance logs. Grievances received during the preceding 30 days will be reviewed for timeliness of responses. | Grievance logs maintained by security staff (COIII-IV) at each yard. |
| Quality Improvement | 27 | Each ASPC facility will conduct monthly CQI meetings, in accordance with NCCHC Standard P-A-06 | Monthly CQI meeting minutes. Monthly CQI minutes will be provided by the contracted vendor. | Monthly CQI minutes. |
| Quality Improvement | 28 | Every medical provider will undergo peer reviews annually with reviews and recommended actions documented. | Annual peer reviews will be documented for every medical provider who has been employed for at least one year. Documentation of required annual peer reviews will be provided by the contracted vendor. | Annual peer review. |
| Quality Improvement | 29 | Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02. | Annual clinical performance reviews will be documented for every nurse who has been employed for at least one year. Documentation of required annual clinical performance reviews will be provided by the contracted vendor. | Annual clinical performance review. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Quality Improvement | 30 | The initial mortality review of an inmate's death will be completed within 10 working days of death. | At each facility, all deaths that occurred in the preceding month are reviewed. Dates of completion of stages in the mortality review will determine compliance. | Mortality reviews for inmate deaths in the preceding month. |
| Quality Improvement | 31 | Mortality reviews will identify and refer deficiencies to appropriate managers and supervisors, including CQI committee, and corrective action will be taken. | At each facility, all mortalities from the preceding month will be identified, and deficiencies identified in any mortalities where the final review has been completed will be documented in the minutes. Monthly CQI minutes will be provided by the contracted vendor. | Monthly CQI minutes. |
| Quality Improvement | 32 | A final independent clinical mortality review will be completed by the Health Services Contract Monitoring Bureau for all mortalities within 10 business days of receipt of the medical examiner's findings. | All final mortality reviews completed in the previous month are reviewed. Dates of completion of stages in the mortality review will determine compliance. | Health Services Contract Monitoring Bureau signed and dated mortality review. |
| Intake facility | 33 | All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility. | Minimum 10 records per month randomly selected per reception center. Records from reception center at ASPC Phoenix (male), ASPC Perryville (female), and if applicable, ASPC Tucson (minor males). | Medical records from inmates received during the preceding 30 days. |
| Intake facility | 34 | A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility. | Minimum 10 records per month randomly selected per reception center. Records from reception center at ASPC Phoenix (male), ASPC Perryville (female), and if applicable, ASPC Tucson (minor males). | Medical records from inmates received during the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Intersystem Transfers | 35 | All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure.  Transfer logs (arrival departure) at each facility, and transfer screening form in the medical record will be reviewed for compliance. | Transfer logs (arrival departure) at each facility, and transfer screening form in the medical record from the preceding 30 days. |
| Access to care | 36 | A LPN or RN will screen HNRs within 24 hours of receipt. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure.  HNR date and time stamps will be reviewed for compliance. | HNR log from the preceding 30 days. |
| Access to care | 37 | Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need). | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line and eOmis from the preceding 30 days. |
| Access to care | 38 | Vital signs, to include weight, will be checked and documented in the medical record each time an inmate is seen during sick call. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. | Nurse line and eOmis from the preceding 30 days. |
| Access to care | 39 | Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |
| Access to care | 40 | Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Access to care | 41 | Emergent provider referrals are seen immediately by a Medical Provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |
| Access to care | 42 | A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Nurse line, Provider line, and eOmis from the preceding 30 days. |
| Access to care | 43 | Inmates returning from an inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Inmates identified in either the field briefing report or the hospital report will be reviewed for documentation upon return from the transport. | Field Briefing Report (ADC), hospital report, and eOmis. |
| Access to care | 44 | Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Inmates identified in either the field briefing report or the hospital report will be reviewed for documentation upon return from the transport. Physician acknowledgement/action will be reviewed for timeliness. | Field Briefing Report (ADC), hospital report, and eOmis. |
| Diagnostic Services | 45 | On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Radiology, vision, lab lines appointments within the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
| --- | --- | --- | --- | --- |
| Diagnostic Services | 46 | A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | Radiology, vision, lab lines appointments within the preceding 30 days and eOmis records. |
| Diagnostic Services | 47 | A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Appropriate HNR's will be tracked for completion. | HNR log from the preceding 30 days, Provider line, eOmis. |
| Specialty care | 48 | Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC and eOmis. |
| Specialty care | 49 | Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Specialty care | 50 | Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |
| Specialty care | 51 | Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |
| Specialty care | 52 | Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. ORC requests are documented in ORC, and will be followed for appropriate handling and documentation. | ORC, eOmis, and provider lines. |
| Chronic care | 53 | Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Chronic care | 54 | Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |
| Chronic care | 55 | Disease management guidelines will be implemented for chronic diseases. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |
| Chronic care | 56 | Inmates with a chronic disease will be provided education about their condition/disease which will be documented in the medical record. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Chronic care logs and forms will be used in the review process. | Chronic care logs and eOmis. |
| Prenatal Services | 57 | A Medical Provider will order prenatal vitamins and diet for a pregnant inmate at the inmate's initial intake physical examination. | This is specific to Perryville intake inmates. At the facility, all pregnant prisoners' files from all intakes in the previous month are reviewed to confirm that vitamins are ordered. | Pregnant inmate list from Perryville within the preceding 30 days, Intake arrival logs and eOmis. |
| Prenatal Services | 58 | Results of an inmate's prenatal screening tests will be documented in the medical record. | This is specific to Perryville intake inmates. At the facility, all pregnant prisoners' files from all intakes in the previous month are reviewed to confirm that the tests were conducted. | Intake arrival logs and eOmis within the preceding 30 days. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Preventative Services | 59 | Inmates will be screened for TB on an annual basis. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Review for PPD history or appropriate signs and symptom follow up will be reviewed to determine timeliness. | eOmis. |
| Preventative Services | 60 | All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended. | This is specific to Perryville. At the facility, 10 records per month are randomly selected from all intakes in the previous month. | eOmis. |
| Preventative Services | 61 | All female inmates ages 21 to 65 will be offered a Pap smear every 36 months after initial intake, unless more frequent screening is clinically recommended. | At each yard, 10 records per month are randomly selected to review the frequency with which subsequent Pap smears have been conducted. Chart review will determine compliance. | Medical records. |
| Preventative Services | 62 | All prisoners are screened for tuberculosis upon intake. | Minimum 10 records per month randomly selected from each reception center. Records from reception center at ASPC Phoenix (male), ASPC Tucson (minor males) and ASPC Perryville (female). Chart review will determine compliance. | Medical records from inmates received at intake during the preceding 30 days. |
| Infirmary Care | 63 | In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 64 | In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Medical Diets | 71 | Inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided the diet, if clinically indicated. When prescribing the special diet, the provider will include the type of diet, duration for which it is to be provided, and any special instructions. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate documentation will be determined upon review. | Diet Roster and eOmis. |
| Medical Diets | 72 | Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a QHCP. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Dietary liaison will advise regarding non-compliance, which will be followed up with nutritional counseling. Appropriate documentation will be determined upon review. | ADC dietary liaison and eOmis. |
| Mental Health | 73 | All MH-3 minor prisoners shall be seen by a licensed mental health clinician a minimum of every 30 days. | An AIMS report will be run monthly by the HSCMB MH staff of all MH-3 minor prisoners. 10 records will be randomly selected from the report for review. | AIMS Report |
| Mental Health | 74 | All female prisoners shall be seen by a licensed mental health clinician within five working days of return from a hospital post-partum. | The HSCMB MH staff will review the hospital reports and review the records of all post-partum women from the previous 30 days. | Hospital Report |
| Mental Health | 75 | A mental health assessment of a prisoner during initial intake shall be completed by mental health staff by the end of the second full day after the prisoner's arrival into ADC. | An AIMS report will be run for the Phoenix and Perryville reception centers, and if applicable, the Tucson minor males reception center. 10 records (if available) will be reviewed from each reception center for compliance with this performance measure. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Infirmary Care | 65 | In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 66 | In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 67 | In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 68 | In an IPC, Inmate health records will include admission orders and documentation of care and treatment given. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 69 | In an IPC, nursing care plans will be reviewed weekly documented with a date and signature. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. | IPC Census and eOmis. |
| Infirmary Care | 70 | All IPC patients have properly working call buttons, and if not, health care staff perform and document 30-minute patient welfare checks. | This is specific to Perryville, Florence, Tucson, and Lewis IPC inmates. At each IPC, 10 records per month are randomly selected for documentation and timeliness. Monitor will walk through IPC once a month to confirm that all call buttons are working, and if the monitor discovers any nonfunctioning call buttons, will also review the medical records of the patient housed in that room.  Patient welfare checks will be shown when required through a separate log. | IPC Census and eOmis. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 76 | If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC. | Of the records reviewed in #74, if any of the initial MH evaluation was not completed by a licensed MH staff, then the record will be re-reviewed in 20 days for compliance with this performance measure. | AIMS Report |
| Mental Health | 77 | Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners. | An AIMS report will be run for all MH-3 and above prisoners at each Complex.  10 records will be reviewed per yard for compliance with the treatment plan time frames. | AIMS Report |
| Mental Health | 78 | All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician. | Each record that is reviewed for treatment plan compliance will also be reviewed for a face-to-face SOAPE note dated the same date. | AIMS Report |
| Mental Health | 79 | If a prisoner's mental health treatment plan includes psychotropic medication, the mental health provider shall indicate in each progress note that he or she has reviewed the treatment plan. | For all records reviewed for inmates on medications, it will be determined if this performance measure was complied with. | AIMS Report |
| Mental Health | 80 | MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician. | An AIMS report will be run for all MH-3A prisoners at each Complex.  10 records (if available) will be reviewed per yard for compliance. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 81 | MH3-A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider. | The records reviewed for performance measure #80 will also be reviewed for compliance if they are on medications. | AIMS Report |
| Mental Health | 82 | MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician. | An AIMS report will be run for all MH-3B prisoners at each Complex.  10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 83 | MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider.  MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days. | The records reviewed for performance measure #82 will also be reviewed for compliance if they are on medications. | AIMS Report |
| Mental Health | 84 | MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider. | An AIMS report will be run for all MH-3C prisoners at each Complex.  10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 85 | MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications. | An AIMS report will be run for all MH-3D prisoners at each Complex.  10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 86 | MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication | The Records reviewed for Performance Measure #85 will also be reviewed for compliance with this performance measure. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 87 | MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days. | An AIMS report will be run for all complexes that have MH-4 prisoners. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 88 | MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days. | The Records reviewed for Performance Measure #87 will also be reviewed for compliance with this performance measure. | AIMS Report |
| Mental Health | 89 | MH-5 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every seven days. | An AIMS report will be run for the Phoenix Complex (MH-5 inmates). 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 90 | MH-5 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 30 days. | The Records reviewed for Performance Measure #89 will also be reviewed for compliance with this performance measure. | AIMS Report |
| Mental Health | 91 | MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily. | The Records reviewed for Performance Measure #89 will also be reviewed for compliance with this performance measure. | AIMS Report |
| Mental Health | 92 | MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days. | An MH-3 report will be run for all maximum custody yards. 10 records (if available) will be reviewed per yard for compliance. | AIMS Report |
| Mental Health | 93 | Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody. | The Records reviewed for Performance Measure #92 will also be reviewed for compliance with this performance measure. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 94 | All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse. | The Contractor will develop and provide to HSCMB MH Staff a log weekly of all inmates currently on watch.  A minimum of 10 records (if available) per Complex will be reviewed, except ASPC Eyman, where 20 records will be reviewed. | Suicide Watch Log |
| Mental Health | 95 | Only licensed mental health staff may remove a prisoner from a suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch. | The Contractor will develop and provide to HSCMB MH Staff a log weekly of all inmates discontinued off watch.  A minimum of 10 records (if available) per Complex will be reviewed, except ASPC Eyman, where 20 records will be reviewed. | Suicide Watch Log |
| Mental Health | 96 | A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above. | An AIMS report will be run for those inmates releasing in the next 30 days.  10 records (if available) per yard will be reviewed. | AIMS Report |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Mental Health | 97 | A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider. | The Contracted Vendor will supply the Appointment Logs for the previous 30 days to the HSCMB MH staff.  10 records (if available) from each yard utilizing telepsychiatry will be reviewed for compliance with this performance measure. | Provider Line Appointment Logs |
| Mental Health | 98 | Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0. | The Contracted Vendor will provide each week an HNR log for each Complex.  10 records (if available) from each yard will be reviewed for compliance with this performance measure. | HNR Log |
| Mental Health | 99 | Peer reviews shall be conducted as set forth in the MHTM (rev. 4/18/14), Chapter 1, Section 3.0. | The Contracted Vendor will provide a report on all required peer reviews for the Psychiatrists, Psychiatric Nurse Practitioners, and Psychologists to the HSCMB. | Contracted vendor report. |
| Dental | 100 | Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Dental HNR's will be reviewed and compared with medical record to identify any conflict or non-compliance. | Dental medical records and Dental HNR's. |

| Category | Measure # | Final Measure | Protocol | Source of Records / Review |
|---|---|---|---|---|
| Dental | 101 | Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. | eOmis. |
| Dental | 102 | Routine dental care wait times will be no more than 90 days from the date the HNR was received. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Dental HNR's will be reviewed and compared with medical record to identify any conflict or non-compliance. | Dental medical records and Dental HNR's. |
| Dental | 103 | Urgent care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received. | At each yard, a minimum 10 records per month are randomly selected, if qualified under this Performance Measure. Appropriate handling and timeliness will be determined upon review. Dental HNR's will be reviewed and compared with medical record to identify any conflict or non-compliance. | Dental medical records and Dental HNR's. |

For any performance measure requiring a review of a minimum of 10 records per month per yard, in the event of an insufficient sample size of less than 10 records, the sample will be drawn from the entire complex.

Monitoring for medical, mental health and dental Outcome Measures specified herein will be conducted by ADC's Monitoring Bureau.



# EXHIBIT B

**HEALTH CARE OUTCOME MEASURES**

| Category | Measure # | Final Measure |
|---|---|---|
| Staffing | 1 | Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week. |
| Staffing | 2 | Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times. |
| Staffing | 3 | Dental staffing will be maintained at current contract levels – 30 dentists. |
| Staffing | 4 | Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries |
| Medical Records | 5 | Medical Records will be accurate, chronologically maintained, and scanned or filed in the patient's chart within two business days, with all documents filed in their designated location. |
| Medical Records | 6 | Provider orders will be noted daily with time, date, and name of person taking the orders off. |
| Medical Records | 7 | Medical record entries will be legible, and complete with time, name stamp and signature present. |
| Medical Records | 8 | Nursing protocols/NETS will be utilized by nurses for sick call. |
| Medical Records | 9 | SOAPE format will be utilized in the medical record for encounters. |
| Medical Records | 10 | Each patient's medical record will include an up-to-date Master Problem list. |
| Pharmacy | 11 | Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT. |
| Pharmacy | 12 | Medical record will contain documentation of refusals or "no shows." |
| Pharmacy | 13 | Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication. |
| Pharmacy | 14 | Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication. |

| Category | Measure # | Final Measure |
|---|---|---|
| Pharmacy | 15 | Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals. |
| Pharmacy | 16 | Perpetual inventory medication logs will be maintained on each yard. |
| Pharmacy | 17 | The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature. |
| Pharmacy | 18 | Daily delivery manifests will be kept in binders located in medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN. |
| Pharmacy | 19 | Perpetual inventory medications will be signed off on the Inmate's individual MAR. |
| Pharmacy | 20 | Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record. |
| Pharmacy | 21 | Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor. |
| Pharmacy | 22 | Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order. |
| Equipment | 23 | Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff. |
| Equipment | 24 | Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items. |
| Emergency Response | 25 | A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency. |
| Quality Improvement | 26 | Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance. |
| Quality Improvement | 27 | Each ASPC facility will conduct monthly CQI meetings, in accordance with NCCHC Standard P-A-06 |
| Quality Improvement | 28 | Every medical provider will undergo peer reviews annually with reviews and recommended actions documented. |
| Quality Improvement | 29 | Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02. |
| Quality Improvement | 30 | The initial mortality review of an inmate's death will be completed within 10 working days of death. |

| Category | Measure # | Final Measure |
|---|---|---|
| Quality Improvement | 31 | Mortality reviews will identify and refer deficiencies to appropriate managers and supervisors, including CQI committee, and corrective action will be taken. |
| Quality Improvement | 32 | A final independent clinical mortality review will be completed by the Health Services Contract Monitoring Bureau for all mortalities within 10 business days of receipt of the medical examiner's findings. |
| Intake facility | 33 | All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility. |
| Intake facility | 34 | A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility. |
| Intersystem Transfers | 35 | All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption. |
| Access to care | 36 | A LPN or RN will screen HNRs within 24 hours of receipt. |
| Access to care | 37 | Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need). |
| Access to care | 38 | Vital signs, to include weight, will be checked and documented in the medical record each time an inmate is seen during sick call. |
| Access to care | 39 | Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointments will be seen within fourteen calendar days of the referral. |
| Access to care | 40 | Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral. |
| Access to care | 41 | Emergent provider referrals are seen immediately by a Medical Provider. |
| Access to care | 42 * | A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider. |
| Access to care | 43 | Inmates returning from an inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there. |

| Category | Measure # | Final Measure |
|---|---|---|
| Access to care | 44 | Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours. |
| Diagnostic Services | 45 | On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine |
| Diagnostic Services | 46 | A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison. |
| Diagnostic Services | 47 | A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request. |
| Specialty care | 48 | Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record. |
| Specialty care | 49 | Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial. |
| Specialty care | 50 | Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider. |
| Specialty care | 51 | Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider. |
| Specialty care | 52 | Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report. |
| Chronic care | 53 | Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease. |
| Chronic care | 54 | Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place. |

| Category | Measure # | Final Measure |
|---|---|---|
| Chronic care | 55 | Disease management guidelines will be implemented for chronic diseases. |
| Chronic care | 56 | Inmates with a chronic disease will be provided education about their condition/disease which will be documented in the medical record. |
| Prenatal Services | 57 | A Medical Provider will order prenatal vitamins and diet for a pregnant inmate at the inmate's initial intake physical examination. |
| Prenatal Services | 58 | Results of an inmate's prenatal screening tests will be documented in the medical record. |
| Preventative Services | 59 | Inmates will be screened for TB on an annual basis. |
| Preventative Services | 60 | All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination. |
| Preventative Services | 61 | All female inmates ages 21 to 65 will be offered a Pap smear , every 36 months after initial intake, unless more frequent screening is clinically recommended. |
| Preventative Services | 62 | All prisoners are screened for tuberculosis upon intake. |
| Infirmary Care | 63 | In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission. |
| Infirmary Care | 64 | In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission. |
| Infirmary Care | 65 | In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission. |
| Infirmary Care | 66 | In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours. |
| Infirmary Care | 67 | In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks. |
| Infirmary Care | 68 | In an IPC, Inmate health records will include admission orders and documentation of care and treatment given. |
| Infirmary Care | 69 | In an IPC, nursing care plans will be reviewed weekly documented with a date and signature. |
| Infirmary Care | 70 | All IPC patients have properly working call buttons, and if not, health care staff perform and document 30-minute patient welfare checks. |

| Category | Measure # | Final Measure |
|---|---|---|
| Medical Diets | 71 | Inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided the diet, if clinically indicated. When prescribing the special diet, the provider will include the type of diet, duration for which it is to be provided, and any special instructions. |
| Medical Diets | 72 | Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a QHCP. |
| Mental Health | 73 | All MH-3 minor prisoners shall be seen by a licensed mental health clinician a minimum of every 30 days. |
| Mental Health | 74 | All female prisoners shall be seen by a licensed mental health clinician within five working days of return from a hospital post-partum. |
| Mental Health | 75 | A mental health assessment of a prisoner during initial intake shall be completed by mental health staff by the end of the second full day after the prisoner's arrival into ADC. |
| Mental Health | 76 | If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC. |
| Mental Health | 77 | Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners. |
| Mental Health | 78 | All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician. |
| Mental Health | 79 | If a prisoner's mental health treatment plan includes psychotropic medication, the mental health provider shall indicate in each progress note that he or she has reviewed the treatment plan. |
| Mental Health | 80 | MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician. |
| Mental Health | 81 | MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider. |
| Mental Health | 82 | MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician. |

| Category | Measure # | Final Measure |
|---|---|---|
| Mental Health | 83 | MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider. MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days. |
| Mental Health | 84 | MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider. |
| Mental Health | 85 | MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications. |
| Mental Health | 86 | MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication. |
| Mental Health | 87 | MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days. |
| Mental Health | 88 | MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days. |
| Mental Health | 89 | MH-5 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every seven days. |
| Mental Health | 90 | MH-5 prisoners who are prescribed psychotropic medications, shall be seen by a mental health provider a minimum of every 30 days. |
| Mental Health | 91 | MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily. |
| Mental Health | 92 | MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days. |
| Mental Health | 93 | Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody. |
| Mental Health | 94 | All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse. |

| Category | Measure # | Final Measure |
|---|---|---|
| Mental Health | 95 | Only licensed mental health staff may remove a prisoner from a suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch. |
| Mental Health | 96 | A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above. |
| Mental Health | 97 | A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider. |
| Mental Health | 98 | Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0. |
| Mental Health | 99 | Peer reviews shall be conducted as set forth in the MHTM (rev. 4/18/14), Chapter 1, Section 3.0. |
| Dental | 100 | Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs. |
| Dental | 101 | Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist. |
| Dental | 102 | Routine dental care wait times will be no more than 90 days from the date the HNR was received. |
| Dental | 103 | Urgent dental care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received. |

Part IV OF E-Filing Document

Re: Plaintiff Bertanelli Motion to Intervene In Class action Parsons et. al. V- Ryan, et. al.
No. CV-12-0601-PHX-ROS

Pages 151 through 200

# EXHIBIT C

| TERM | DEFINITION |
| --- | --- |
| Specialized Medical Housing | Infirmary beds (IPC) |

| TERM | DEFINITION |
|---|---|
| MH-3C (Mental Health 3C) | Inmates who need infrequent intervention and have adequate coping skills to manage their mental illness effectively and independently. These inmates participate in psychiatric interventions only. |
| MH-3D (Mental Health 3D) | Inmates who have been recently taken off of psychotropic medications and require follow up to ensure stability over time. |
| MH-4 (Mental Health 4) | Inmates who are admitted to a specialized mental health program as identified in the Mental Health Technical Manual outside of inpatient treatment areas. |
| MH-5 (Mental Health 5) | Inmates with mental health needs who are admitted to an inpatient psychiatric treatment program (Baker Ward and Flamenco). |
| Prenatal screening tests | GA/Preg, RPR, HIV, HEP, B & C, CBC, CMP (standardized lab panel), Urine, Rubella, ABO RH & Antibody |
| Psychology Associate | A mental health clinician who has a master's or doctoral-level degree in a mental health discipline, but is not a licensed psychologist. |
| Qualified Health Care Professional (QHCP) | Physicians, Physician Assistants, Dentists, nurses, nurse practitioners, dentists, mental health professionals, and others, who by virtue of their education, credentials/license, and experience are permitted by law to evaluate and care for patients. |
| Regular Business Hours | Monday through Friday, 0800 am -1600 pm or similar 8-hour time frame; excluding weekends and holidays. |
| "Seeing a provider"/ seen/ "seen by" | Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting.  With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter |
| SMI | According to a licensed mental health clinician or provider, possessing a qualifying mental health diagnosis as indicated on the SMI Determination Form (#1103.13) as well as a severe functional impairment directly relating to the mental illness. All inmates determined to be SMI in the community shall also be designated as SMI in ADC. All inmates designated SMI (as defined in MHTM Chapter 2, Section 2.0) will be designated a MH-3A, MH-4, or MH-5 based on their current program placement. |
| SNO | Special Needs Order |

| TERM | DEFINITION |
|---|---|
| Effective date of the Stipulation | The date on which the Court grants final approval to the Stipulation. |
| Encounter | Interaction between a patient and a qualified healthcare provider that involves a treatment and/or exchange of confidential information. |
| Healthcare staff | Includes QHCPs as well as administrative and support staff (e.g. health record administrators, lab techs, nursing and medical assistants and clerical workers). |
| HNR | Health Needs Request |
| HSCMB | ADC's Health Services Compliance Monitoring Bureau |
| IPC | Inpatient Component / Infirmary beds |
| IR | Incident Report |
| KOP | Keep-on-person (medications) |
| Licensed | Healthcare staff who hold an active and unrestricted license in the State of Arizona in the relevant professional discipline. |
| MAR | Medication Administration Record |
| Medical Provider | Physician, Dentist, Nurse Practitioner, Physician's Assistant-C. Any health care practitioner who has been duly empowered by the State of Arizona to write prescriptions. |
| Mental Health Clinician | Psychologist, Psychology Associate |
| Mental Health Provider | Psychiatrist, Psychiatry Nurse Practitioner |
| Mental Health Staff | Includes QHCP's who have received instruction and supervision in identifying and interacting with individuals in need of mental health services. |
| MH-1 (Mental Health 1) | Inmates who have no history of mental health issue or treatment |
| MH-2 (Mental Health 2) | Inmates who do not currently have mental health needs and are not currently in treatment but have had treatment in the past |
| MH-3 (Mental Health 3) | Inmates with Mental Health needs, who require current outpatient treatment. Inmates meeting this criterion will be divided into four (4) categories. These categories may change during each interaction with the inmate as their condition warrants. |
| MH-3A (Mental Health 3A) | Inmates in acute distress who may require substantial intervention in order to remain stable. Inmates classified as SMI in ADC and/or the community will remain a Category MH-3A (or MH-4 or MH-5 if in specialized mental health program). |
| MH-3B (Mental Health 3B) | Inmates who may need regular intervention but are generally stable and participate with psychiatric and psychological interventions. |

For purposes of the performance measures, the following definitions will be used:

| TERM | DEFINITION |
|---|---|
| Active labor & delivery | Contractions lasting 45-60 seconds and being 3 to 4 minutes apart |
| ASPC | Arizona State Prison Complex. ASPC- Safford includes Ft Grant. ASPC-Florence includes Globe. ASPC-Winslow includes Apache. |
| ATP | Alternate Treatment Plan |
| Chronic Disease | Chronic diseases include the following:<br>• diabetes<br>• HIV/AIDs<br>• cancer<br>• hypertension<br>• Respiratory disease (for example, COPD / asthma / cystic fibrosis)<br>• Seizure Disorder<br>• heart disease<br>• sickle cell disease<br>• Hepatitis C<br>• Tuberculosis<br>• Neurological disorders (Parkinson's, multiple sclerosis, myasthenia gravis, etc.)<br>• Cocci (Valley Fever)<br>• End-Stage Liver Disease<br>• Hyperlipidemia<br>• Renal Diseases<br>• Blood Diseases (including those on anticoagulants (or long term >six months))<br>• Rheumatological Diseases (including lupus, rheumatoid arthritis)<br>• Hyperthyroidism<br>• Crohn's Disease |
| Contracted Vendor | For purposes of this agreement, contracted vendor refers directly to Corizon Health and its subcontractors, or any successor contractor/subcontractor. |
| CQI | Continuous Quality Improvement |
| Diagnostic Service | Lab draws and specimen collections, X-rays, vision testing, and hearing testing |
| DOT | Direct-observation therapy (watch-swallow) (medications) |

# EXHIBIT D

**MAXIMUM CUSTODY OUTCOME MEASURES**

| Measure # | Outcome Measure |
|---|---|
| 1 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week. Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week. |
| 2 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III. |
| 3 | All out-of-cell time that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation. |
| 4 | All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. |
| 5 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) are offered a minimum of 6 hours of out-of-cell exercise time a week. |
| 6 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy. |
| 7 | No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB 5 or CB-7 unless the cell fronts are substantially modified to increase visibility. |

| Measure # | Outcome Measure |
|---|---|
| 8 | In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:<br>• 10 hours of unstructured out-of-cell time per week<br>• 1 hour of additional out-of-cell mental health programming per week<br>• 1 hour of additional out-of-cell psycho-educational programming per week<br>• 1 hour of additional out-of-cell programming per week |
| 9 | All use of force incidents involving prisoners who are designated SMI or housed in Florence-CB-1 or CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; or Phoenix (Baker, Flamenco, or MTU) conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation. |

# EXHIBIT E

**MAXIMUM CUSTODY OUTCOME MEASURE PROTOCOL**

| Final Measure # | Outcome Measure | Protocol | Source of Records/Review |
|---|---|---|---|
| 1 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week. Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week. | At each designated location, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form |
| 2 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III. | At each designated location, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form |

| | | | |
|---|---|---|---|
| | | At each designated location, DI 326 Programming Attendance/Sign In Sheets for Step II and III are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | Program Attendance/Sign In Sheets (containing prisoner signature) |
| 3 | All out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶26 of the Stipulation. | At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners. | Max Custody Daily Out of Cell Time Tracking Form<br><br>Warden Certification of individual security risk necessitating limitation or cancellation where applicable to randomly selected prisoner |
| 4 | All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. | At each designated location, Monthly Max Custody Prisoner Food Services Menus are selected for each monitored month. | Max Custody Monthly Prisoner Meal Food Services Menu |
| 5 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and | At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week | Max Custody Daily Out of Cell Time Tracking Form |

61

| | | | |
|---|---|---|---|
| | Perryville-Lumley Special Management Area (Yard 30) are offered a minimum of 6 hours of out-of-cell exercise time a week. | for each monitored month, for 10 randomly selected prisoners. | |
| 6 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy. | At each designated location, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners.<br><br>At each designated location, DI 326 Programming Attendance/Sign In Sheets are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners.<br><br>At each designated location, a minimum of 10 Prisoner Property Files are randomly selected and reviewed to identify access to | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form<br><br>Program Attendance/Sign In Sheets (containing prisoner signature)<br><br>Prisoner Property Files |

| | | | |
|---|---|---|---|
| | | allowable property consistent with Step Level under DI 326 for each monitored month. | |
| 7 | No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB 5 or CB-7 unless the cell fronts are substantially modified to increase visibility. | At each designated location, the Housing Assignment Log for maximum custody prisoners with mental health classification of MH3 or higher is reviewed for one randomly selected day of each monitored month and reviewed for: 1) any housing assignments in CB-5 and CB-7; and 2) if so housed, whether prisoner is housed in a cell with modified cell front. | Housing Assignment Log for maximum custody prisoners with mental health classification of MH3 or higher |
| | | | |
| 8 | In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:<br>• 10 hours of unstructured out-of-cell time per week<br>• 1 hour of additional out-of-cell mental health programming per week<br>• 1 hour of additional out-of-cell psycho-educational programming per week<br>• 1 hour of additional out-of-cell | At each maximum custody unit where SMI prisoners are housed, Max Custody Monthly Activity Schedule Calendars are selected for each monitored month.<br><br>At each maximum custody unit where SMI prisoners are housed, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week of each monitored month, for 10 randomly selected prisoners.<br><br>At each maximum custody unit where SMI prisoners are housed, DI 326 Programming | Max Custody Monthly Activity Schedule<br><br>Max Custody Daily Out of Cell Time Tracking Form<br><br>DI 326 Program Attendance/Sign In Sheets (containing prisoner signature) |



# EXHIBIT F

| | | | |
|---|---|---|---|
| | programming per week | Attendance/Sign In Sheets are reviewed for one randomly selected week of each monitored month, for 10 randomly selected prisoners.<br><br>At each maximum custody unit where SMI prisoners are housed, Mental Health Programming Attendance/Sign In Sheets are reviewed for one randomly selected week of each monitored month, for 10 randomly selected prisoners. | Mental Health Program Attendance/Sign In Sheets (containing prisoner signature) |
| 9 | All use of force incidents involving maximum custody prisoners classified as SMI, and in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation. | At each designated location, Use of Force SIRs/Use of Force Review Packets (if applicable) are selected for each monitored month for maximum custody SMI prisoners where force utilized involved chemical agents and incident is reviewed for compliance with the procedures for use of force set forth in ¶ 27 (a)-(e) of the Stipulation | SIR Packet;<br>Use of Force Review Packet (if applicable);<br>incident video (if applicable) |

Monitoring for maximum custody Outcome Measures will be conducted by designated ADC staff at each location specified herein.



# ARIZONA DEPARTMENT OF CORRECTIONS

## Mental Health Seriously Mentally Illness (SMI) Determination

Inmates with a Mental Health Score of 3 or greater will be assessed as clinically indicated to determine if the criteria for SMI is met. To be considered SMI in ADC the inmate must have a qualifying diagnosis [as indicated below] and present with at least one identified level of the severe functional impairment as the result of the mental illness [Reference MHTM 4-5.0].

☐ **Anxiety Disorders**
300.00 Anxiety Disorder NOS; 300.01 Panic Disorder without Agoraphobia; 300.02 Generalized Anxiety Disorder; 300.14 Dissociative Identity Disorder; 300.21 Panic Disorder with Agoraphobia, and 300.22 Agoraphobia without History of Panic Disorder, 300.03 Obsessive Compulsive Disorder; and 309.81 Post -Traumatic Stress Disorder.

☐ **Bipolar Disorder**
296.0x Bipolar 1 Single Manic Episode, 296.4x Bipolar I Most Recent Episode Manic, 296.5x Bipolar I Most Recent Episode Depressed, 296.6x Bipolar I Most Recent Episode Mixed, 296.7 Bipolar I Most Recent Episode Unspecified, 296.80 Bipolar Disorder NOS, and 296.89 Bipolar II Disorder.

☐ **Depressive Disorders**
296.2x Major Depressive Disorder, Single Episode; 296.3x Major Depressive Disorder, Recurrent; 296.90 Mood Disorder NOS; 300.4 Dys

☐ **Psychotic Disorders**
295.10, Schizophrenia Disorganized Type, 295.20 Schizophrenia Catatonic Type, 295.30 Schizophrenia Paranoid Type, 295.60 Schizophrenia Residual Type, 295.90 Schizophrenia Undifferentiated, 295.70 Schizoaffective Disorder, 297.1 Delusional Disorder, and 298.9 Psychotic Disorder NOS.

☐ **Personality Disorders**
301.0 Paranoid Personality Disorder, 302.20 Schizoid Personality Disorder, 301.22 Schizotypal Personality Disorder, 301.4 Obsessive-Compulsive Disorder, 301.50 Histrionic Personality Disorder, 301.6 Dependent Personality Disorder, 301.81 Narcissistic Personality Disorder; 301.82 Avoidant Personality Disorder; 301.83 Borderline Personality Disorder; and 301.9 Personality Disorder NOS.

______ The inmate does not meet any criteria listed above. The inmate is not eligible for SMI status.

The inmate posses a severe functional impairment as evidenced by [check as appropriate]:

☐ A serious and persistent inability to perform developmentally appropriate occupational or school functioning.

☐ Inability to live in General Population without supervision (self-care-basic needs): Impairment in the inmate's ability to function independently including the capacity to provide or arrance for needs such as food, personal hygiene, clothing, medical, dental and mental health care.

☐ Risk of harm to self or others.

☐ Risk of Deterioration: The individual does not currently meet any of the above functional criteria, 1 through 3, but may be expected to deteriorate to such a level without treatment. If the reviewer concurs with this statement, please document the reason below.

- ○ Diagnostic Category I diagnosis with probable chronic, relapsing and remitting course
- ○ Co-morbidities (like mental retardation, substance dependence, personality disorder)
- ○ Persistent or chronic factors such as social isolation, poverty, extreme chronic stressors (life-threatening or debilitating medical illnesses, victimization).
- ○ Other (past psychiatric history; gains in functioning have not solidified or are a result of current compliance only; court-committed; care is complicated; care is complicated and requires multiple providers.)

______ Inmate does not meet any of the criteria for functional impairment. The inmate is not eligible for SMI status.

______ Inmate meets the SMI diagnostic and functional impairment criteria above. The inmate is SMI in ADC.

| Mental Health Staff Name/Stamp | Mental Health Staff Signature | Date |
|---|---|---|

| Inmate Name (*Last, First M.I.*) | ADC Number |
|---|---|
| Date of Birth | Facility/Unit |

1103-13
12/19/12

166

Exhibit L

Exhibit L

KeyCite Blue Flag – Appeal Notification
Appeal Filed by VICTOR PARSONS, ET AL v. CHARLES RYAN, ET AL, 9th Cir., July 31, 2018

2018 WL 3239691
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Victor Antonio PARSONS, et al., Plaintiffs,
v.
Charles L. RYAN, et al., Defendants.

No. CV-12-0601-PHX-DKD
|
Signed 06/22/2018

**Attorneys and Law Firms**

Alison Hardy, Corene T. Kendrick, Donald Specter, Sara Norman, Rita Katherine Lomio, Prison Law Office, Berkeley, CA, Amelia Morrow Gerlicher, Daniel Clayton Barr, John Howard Gray, Perkins Coie LLP, Kathleen E. Brody, ACLU, Sarah Eve Kader, Asim Dietrich, Arizona Center for Disability Law, Phoenix, AZ, Amy B. Fettig, David Cyrus Fathi, Victoria Lopez, Jamelia Natasha Morgan, ACLU, Washington, DC, Caroline N. Mitchell, Jones Day, San Francisco, CA, Kirstin T. Eidenbach, Eidenbach Law PLLC, Rose Ann Daly-Rooney, Jessica Pari Jansepar Ross, Jose de Jesus Rico, Maya Stock Abela, Arizona Center for Disability Law, Tucson, AZ, John Laurens Wilkes, Jones Day, Houston, TX, for Plaintiffs.

Anne Marie Orcutt, Ashlee B. Hesman, Daniel Patrick Struck, Jacob Brady Lee, Nicholas Daniel Acedo, Timothy James Bojanowski, Timothy Michael Ray, Jamie Dennise Guzman, Kevin Richard Hanger, Rachel Love, Richard Michael Valenti, Struck Love Bojanowski & Acedo PLC, Chandler, AZ, Kathleen L. Wieneke, Wieneke Law Group PLC, Tempe, AZ, Lucy Marie Rand, Michael Evan Gottfried, Office of the Attorney General, Phoenix, AZ, for Defendants.

**ORDER AND JUDGMENT OF CIVIL CONTEMPT**

David K. Duncan, United States Magistrate Judge

*1 In October 2014, the parties settled this case and signed a Stipulation to end the litigation. The Court approved the settlement and Stipulation after a fairness hearing in February 2015. (Doc. 1185 at 16; Doc. 1455) Under the Stipulation, Defendants agreed to provide health care to the Class Members as measured by 103 Performance Measures. (Doc. 1185)

In April 2016, after Defendants failed to meet many Performance Measures, Plaintiffs filed their first Motion to Enforce the Stipulation. (Doc. 1555) At the May 2016 Status Conference, the Court ordered Defendants to submit a responsive remediation plan ("First Remediation Plan"). (Docs. 1582, 1583, 1754) The Court thereafter informed Defendants of its concerns about the efficacy of the First Remediation Plan but, in deference to the Stipulation's framework, adopted it nonetheless. (Doc. 1619)

In November 2016, after three months under the First Remediation Plan, the Court " 'determine[d] that the Defendants' [First Remediation] plan did not remedy the deficiencies' for the First Non-Compliant PMs. (Stipulation at ¶ 36)." (Doc. 1754) Citing to the Stipulation's acknowledgment that "[t]he Court has 'the power to enforce this Stipulation through all remedies provided by law,' " the Court ordered Defendants "to use the health care services in the community to ensure compliance with the" Performance Measures covered by the First Remediation Plan." ("Outside Provider Order") (Doc. 1754) The Court noted that "the current data show that Defendants have not been able to meet the Performance Measures by using their current procedures or by adopting the First Remediation Plan." (Doc. 1754) The Court further explained that it had "considered and rejected requiring the Defendants to submit a revised plan because of its concerns, expressed earlier on the record, about Defendants' grasp of the problem at hand, the failure, abject in some cases, of its first remediation plan to deliver compliance, and the health and safety danger posed by continued failures to meet the Performance Measures."

In May 2017, Defendant Pratt testified that he did not know of any instances of compliance with the Outside Provider Order. (Doc. 2071 at 742:1-4)

The Court continued to conduct monthly status conferences with the parties. These monthly status conferences were often lengthy and constituted the Court's efforts to understand the impediments to

compliance and to prompt Defendants to meet their obligations under the Stipulation. The centerpiece of the status conferences, as with the Stipulation, was (and is) Defendants' compliance with the Stipulation as measured by the CGAR (Code Green Amber Red) results. The CGARs are the monthly report card on Defendants' performance under the Stipulation. For many of the PM/locations, particularly PMs addressing critical components of inmates' healthcare, compliance remained unattainable.

On June 14, 2017, the Court informed Defendants that, effective immediately, every single failure to comply with certain performance measures at certain prisons ("OSC PMs") would result in an order to show cause as to why a $1,000 fine should not be imposed. (Doc. 2124) Based on Plaintiffs' suggestion that Defendants should have time to cure their ongoing failure to comply with the Stipulation, the Court held off until October 2017 to enter its Order "that, effective immediately, Defendants shall comply" with specific performance measures at specified prisons "for every class member" ("OSC Order"). (Doc. 2373 at 3) The October 2017 Order required Defendants to "file a list of every instance of non-compliance with this Order during December 2017" by Friday, January 5, 2018. At the November 2017 Status Hearing, the Court added Performance Measure 52 at Eyman. (Doc. 2456) An order to show cause hearing was set for Tuesday, January 9, 2018. (Doc. 2373 at 4)

*2 Defendants requested and received several extensions for submitting the list of every instance of non-compliance (the "OSC List") and for holding the show cause hearing. (Doc. 2456, 2526, 2605, 2620, 2640) As part of these extension requests, Defendants informed the Court—for the first time—that there was no system for collecting real time data on compliance with any performance measure covered by the Stipulation. Defendants submitted a partial OSC List but, without explanation or warning, did not timely comply with the Court's OSC Order for PM 54 at Eyman. (Doc. 2583) Subsequently, Defendants filed multiple revised OSC Lists. (Doc. 2595, 2648, 2662, 2786, 2812)

The Court heard testimony on March 26, March 27, and April 10, 2018, from the following witnesses: Arizona Department of Corrections Director Charles Ryan, Deputy Director Richard Pratt, Division Director Carson McWilliams, Dr. David Robertson, and William Upton.

(Docs. 2689-1 at 5, 2769, 2770, 2724) Mr. Pratt has primary responsibility to ensure compliance with the Stipulation's performance measures. (Doc. 2769 at 48) Mr. McWilliams is in charge of prison operations. (Doc. 2724 at 167) Dr. Robertson works as a physician monitor in ADC's Monitoring Bureau. (Doc. 2671 at 87) Mr. Upton is a member of the Plaintiff class. (Doc. 2671 at 60)

At the conclusion of testimony, Defendants informed the Court that they were re-reviewing the OSC Lists. (Doc. 2782 at 136-139) The parties agreed that Defendants would provide the persons most knowledgeable about the procedure used to compile the OSC Lists. (Doc. 2782 at 148-149) Because counsel did not timely inform the Court about witness availability, Defendants filed declarations instead. (Docs. 2807 at 92-93; 2808; 2809)

## LEGAL STANDARD FOR CIVIL CONTEMPT

The Parties' Stipulation empowered the Court to enforce it "through all remedies provided by law" with two exceptions not relevant here. (Doc. 1185 ¶ 36) Thus the Court's remedial power necessarily includes civil contempt proceedings. *See* 18 U.S.C. § 401(3) ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as [...] [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."); *Spallone v. United States*, 493 U.S. 265, 276 (1990) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt") (quotation marks and citation omitted).

Before finding civil contempt, a court must determine by clear and convincing evidence that: (1) a valid court order exists that is "specific and definite" (*Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) ); (2) the party had knowledge of the order, and notice of and an opportunity to be heard about the alleged noncompliance (*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999) ); and (3) the party failed to take "*all* reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original).

Civil contempt "need not be willful, and there is no good faith exception to the requirement of obedience to

a court order." *In Re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted). Should a party seek to defend against a contempt finding by arguing inability to comply, it must show "categorically and in detail" why it is unable to comply. *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

## FINDINGS OF FACT

***3** To show that they had taken all reasonable measures, Defendants presented testimony about their engagement with the State's prisoner health care provider Corizon and their efforts with Performance Measure 35, the only Performance Measure on the OSC List that ADC has not delegated to Corizon.

### ADC's Oversight of Corizon

#### Written Demands

(1) Defendants have chosen to contract with a third-party to provide Plaintiffs with heath care and awarded that contract to Corizon in 2013. (Doc. 2770 at 61-62, Ex. 99, 103)

(2) Since the OSC Order was issued, ADC sent at least six letters to Corizon about its lack of compliance. (Doc. 2770 at 181-182, 199-201; Exs. 18, 30, 35, 36, 87, 193)

(3) As a result of the OSC Order, ADC's Monitoring Bureau reclassified one staff position from clerical duties to a liaison position. (Doc. 2770 at 155) In addition, ADC sent several letters to Corizon demanding performance. (Doc. 2770 at 108, 114; Exs. 20, 30, 31, 33, 97)

(4) In February or March 2018, ADC began requiring Corizon to provide additional details about staffing efforts because "additional staff were required to fill a current gap." (Doc. 2770 at 112, 208:12-13) Director Ryan testified that he thought Corizon might have flown in additional health care staff but he did not know how many people, what positions, what prison complexes were impacted, when they arrived, how long they stayed, or if they were still here. (Doc. 2769 at 72-73)

(5) Deputy Director Pratt testified that he believed Corizon did bring in staff to assist in Arizona but he did not know how many people came. (Doc. 2770 at 208-209) Corizon did not provide him with any specifics about flying in additional staff. (Doc. 2769 at 158) Mr. Pratt believes that up to a dozen nurses may have come but he does not know when they arrived and there was no testimony about how long they stayed and no written communication about any staffing increases. (Doc. 2770 at 209-210) Corizon may add five additional monitors but have not yet done so. (Doc. 2770 at 153-154)

#### Meetings with Defendant Ryan and Defendant Pratt

(6) In November 2017, Defendants Ryan and Pratt began to meet every other week with Corizon leadership to discuss performance measures, staffing, and compliance with the OSC Order. (Doc. 2770 at 112, 130, 179; Doc. 2769 at 22, 35, 39) In these meetings, ADC had asked Corizon to increase the use of telemedicine because Corizon did not regularly use telemedicine; however, ADC has not made a written demand to Corizon to do so. (Doc. 2671 at 208; Doc. 2769 at 95, 160-163; Doc. 2770 at 49-51, 23-26; Ex. 160) In these meetings, ADC had also asked Corizon to fill the staff positions that were required by the then-current contract but had not asked Corizon to add more staff. (Doc. 2769 at 95)

(7) In November 2017, Corizon informed ADC that it was "prepared with detailed analyses of the root causes of non compliance." (Doc. 33) This analysis consists of flow charts that identify potential fail points for different performance measures. (Doc. 2770 at 113-114, 133, 147-148; 152-153, 223-224; Doc. 2781 at 72-73; Exs. 52-74) There is no evidence that these flow charts address or analyze facility-specific fail points. Further, there is no evidence that these flow charts were based on past performance at Arizona prisons.

***4** (8) Defendant Ryan had conversations with Corizon's CEO "almost on a weekly basis." (Doc. 2769 at 35) But not until January 31, 2018, did Defendants Ryan and Pratt have an ad hoc meeting with Corizon leadership and ADC operations staff about the OSC Order issued in October.