### Meetings with Regional and Site Staff

(9) In November or December 2017, ADC began to conduct daily meetings at each facility to discuss facility-level issues such as inter-facility transportations, missed medical appointments, staffing issues, and nursing lines. (Doc. 2781 at 9-10, 36) These meetings are attended by the warden, facility health administrator, ADC monitor, transportation sergeant, and deputy warden of operations. (Doc. 2781 at 9)

(10) ADC Wardens are expected to have daily meetings with their prison's health administrator to solve problems. (Doc. 2769 at 44) Corizon conducts monthly meetings at each prison to discuss corrective actions plans. These meetings have been expanded to include ADC Monitoring Bureau staff and ADC's outside counsel. (Doc. 2770 at 84, 113, 133-134) Corizon posted training materials for its field staff but there were no classes for staff. (Doc. 2770 at 138-147; Exs. 41-51)

(11) ADC regional operations staff meets every other week with the Corizon team to discuss the performance measures in the OSC Order and staffing levels. (Doc. 2770 at 112; Doc. 2769 at 35-36) Specific performance measures are discussed at this meeting. (Doc. 2770 at 129) As a result of the OSC Order, ADC expanded its weekly meeting with Corizon to include more people. (Doc. 2770 at 112, 128, 129)

### Mortality Reviews

(12) ADC conducts mortality reviews for each inmate who dies in custody. (Doc. 2671 at 95-100) Starting in February or March 2018, an individual from Corizon's Continuous Quality Improvement ("CQI") team started to call into ADC's mortality reviews. (Doc. 2671 at 131:15-16; Doc. 2770 at 7, 28-29) The ADC Mortality Review team has made recommendations to Corizon's CQI representative and those recommendations have received "a mixed response" and have not generated a solution for expediting specialty consults. (Doc. 2770 at 8:25, 9)

(13) These mortality reviews consistently show a failure to properly document the medical care provided to inmates and a failure in written and verbal communication among the health care staff. (Doc. 2671 at 137-138) Of the 18 mortality reviews submitted into evidence during the OSC hearing, ADC checked "yes" 6 times to the question: "Could the patient's death have been prevented or delayed by more timely intervention." (Exs. 30, 35, 36, 37, 40, 47) ADC checked "yes" 8 times to the question: "Is it likely that the patient's death was caused by or affected in a negative manner by health care personnel." (Exs. 30, 33, 35, 36, 37, 40, 46, 47)

### Escalation List

(14) In the summer of 2017, Dr. Robertson was speaking to Dr. FallHowe, Corizon's Western Regional Director, almost daily about obtaining specialty care for specific patients because their consults were languishing and prisoners were not being seen on a timely basis. (Doc. 2671 at 146-147) Dr. Robertson felt "that Utilization Management was being arbitrary." (Doc. 2671 at 147:15-16) Subsequently, Dr. FallHowe "and her team decided to have meetings on every one of the[ ] cancer patients in the Tucson complex." (Doc. 2671 at 147:16-18)

*5  (15) By August 2017, Tucson's Assistant Facility Health Administrator had started circulating a weekly email update to ADC and Corizon staff about high acuity inmates at Tucson with cancer. (Doc. 2671 at 143-144, 148; Ex. 84) These emails were "to make sure the patients that were high acuity that needed care got the care." (Doc. 2671 at 143:21-22) There was a regular meeting about the patients on this email list. (Doc. 2671 at 143-144) There is no evidence in the record whether a similar system was employed to track high acuity patients in other facilities. (Doc. 2671 at 143, 144)

(16) Around December 2017, the meeting about high acuity Tucson cancer patients evolved into a weekly, system-wide meeting between ADC and Corizon staff to discuss high acuity patients who did not seem to be obtaining care ("Escalation Meeting"). (Doc. 2671 at 144, 148-150; Doc. 2770 at 31)

(17) The agenda for the weekly Escalation Meeting is a spreadsheet listing individual patients who have come to the attention of Dr. Robertson ("Escalation List"). (Doc. 2671 at 144, 150-153, 156; Ex. 95 at 2) There are no formal criteria to include someone on the Escalation List. (Doc. 2770 at 13-15, 38) Sometimes an individual

in ADC will advocate for an individual. (Doc. 2671 at 206-207; Ex. 158) Sometimes family members write a letter to Dr. Robertson and he will contact Corizon to bring attention to that individual's case. (Doc. 2770 at 11) The University of Arizona's Cancer Center has contacted Dr. Robertson about an individual who needs expedited care. (Doc. 2770 at 38) Corizon line staff have also contacted Dr. Robertson to complain about delays in specialty care. (Doc. 2770 at 42)

(18) Dr. Robertson testified that when Class Counsel writes to ADC's counsel about individuals, those individuals are added to the Escalation List. (Doc. 2671 at 151) However, it appears that as late as July 2017, Dr. Robertson had not been informed of these letters. (Doc. 2671 at 171)

(19) Dr. Robertson asks the ADC field monitors to track the care provided to the inmates on the Escalation List. (Doc. 2770 at 11-12) Defendants Pratt and Ryan also get involved in individual patient care. (Doc. 2770 at 135-138)

(20) Corizon's Utilization Management ("UM") Team manages the Escalation List and circulates it ahead of the weekly calls. (Doc. 2770 at 35) Dr. Robertson believes that the UM team participates in the weekly meeting but it could be "their clerks or somebody." (Doc. 2671 at 157:5)

(21) Dr. Robertson testified that the system of weekly meetings about the Escalation List is "working" to obtain care for individual inmates but acknowledged that if the system worked as it should then high acuity patients would receive appropriate care as a matter of course and there would be no need for the Escalation List. (Doc. 2671 at 154:19; Doc. 2770 at 40-41)

(22) Dr. Robertson believes Corizon's site and regional medical directors have become more responsive to his calls about individuals. (Doc. 2770 at 32) As of August 2017, Dr. Robertson has noticed an improvement in that "morphine is given on the yards if it's needed. And nursing notes are much more thorough." (Doc. 2671 at 115:2-3)

(23) There is no version of the Escalation List for chronic care patients or patients of a slightly lower acuity to ensure that they receive care before they become high acuity patients. (Doc. 2770 at 39)

### Carrots and Sticks: Fines, Sanctions, and Incentives

(24) Originally, the ADC contract with Corizon was for three years. This Contract included an offset for failing to meet staffing requirements. (Doc. 2770 at 75-77, 121) ADC has assessed this staffing offset penalty every month of the Corizon contract which, at the time of the hearing, had totaled $3,800,000. (Doc. 2770 at 77; Exs. 7, 9, 13, 14, 15, 103, 205)

*6 (25) In May 2015, ADC amended its contract with Corizon to extend the contract to a fourth year, or from March 2016 to March 2017 ("Amendment 10"). (Ex. 201) Amendment 10 increased the amount paid to Corizon to $11.60 per inmate per day. (Ex. 201.3 at ¶ 8)

(26) Amendment 10 included a sanctions provision whereby ADC would sanction Corizon $5,000 for each performance measure at each prison that did not satisfy the Stipulation's requirements but the total for this sanction was capped at $90,000 per month. (Doc. 2770 at 93, 98, 183-184; Doc. 2769 at 55-56; Ex. 201.3 at ¶ 6) Director Ryan testified that it was "a smart business decision." (Doc. 2769 at 70) Deputy Director Pratt also testified that this cap "was an appropriate business decision" and that he thought it was "reasonable" but acknowledged that the $90,000 per month was only "a small percentage" for Corizon. (Doc. 2770 at 197-198) Director Ryan testified that the cap was "part of the negotiation process" and thought that the sanction was likely to have a significant effect on Corizon's behavior. (Doc. 2769 at 57-58)

(27) In Amendment 10, Corizon agreed to extend the contract to a fifth year "if ADC requests 4.0% CPI increases in its annual budget request for contract Years 4 and 5." (Ex. 201.1 at ¶ 2) While negotiating Amendment 10, Corizon indicated that it would cancel the contract if it did not receive the 4.0% increase. (Doc. 2769 at 18) Mr. Pratt testified that this increase was a business decision and reflected increased health care costs. (Doc. 2781 at 52-53) At the time of Amendment 10, Director Ryan was not satisfied with Corizon's performance. (Doc. 2769 at 50, 60)

(28) Amendment 10 includes a revised indemnity provision. (Doc. 2769 at 114; Ex. 201.1-201.2 at ¶ 4) Deputy Director Pratt and Director Ryan understand this

indemnity language to mean that the State would look to Corizon for any monies assessed for contempt from the Court. (Doc. 2770 at 205; Doc. 2769 at 74-75) Director Ryan believes that this was appropriate because Corizon is "the entity or organization [responsible] for the delivery of health care to the inmate population" while ADC "was overseeing Corizon in terms of its accountability in the delivery of health care to the inmate population." (Doc. 2769 at 21)

(29) In September 2015, ADC sent Corizon a letter detailing sanctions for failure to perform between April 1 and June 30, 2015. (Ex. 12)

(30) In June 2016, Director Ryan was not satisfied with Corizon's performance but nevertheless extended Corizon's contract to a fifth year, March 2017 to March 2018, because ADC had received approval for the retroactive application of the 4% increase described in Amendment 10 ("Amendment 11"). (Doc. 2769 at 59-60; Exs. 18, 20, 202) Amendment 11 increased the inmate health care per diem from $11.60 to $12.06. (Doc. 2770 at 183, 185; Ex. 202)

(31) In June 2016, ADC sent Corizon a letter detailing sanctions for failure to perform in April 2016. (Ex. 18) In July 2016, ADC sent Corizon a letter detailing sanctions for failure to perform in May 2016. (Doc. 2769 at 64-65; Ex. 20)

(32) In June 2017, ADC again amended its contract with Corizon to extend the contract from March 2018 through June 2018 and increased Corizon's payment to $12.54 per prisoner per day ("Amendment 13"). (Doc. 2770 at 185-186; Ex. 202) Between March 2016 and June 2017, Corizon paid ADC a total of $1,440,000 in sanctions but would have paid $7,350,000 without the cap. (Doc. 2770 at 199; Ex. 206) Between July and October 2017, the cap on sanctions meant that Corizon paid $1,260,000 less than it would have paid without the cap. (Doc. 2770 at 202) From March 2016 to October 2017, ADC could have offset $6.8 million against Corizon's payment but for the negotiated cap. (Doc. 2770 at 203)

*7 (33) In September 2017, ADC made a business decision to amend its contract with Corizon to remove the previous cap on performance-based sanctions and to add performance-based incentives ("Amendment 14"). (Doc. 2770 at 73-74, 122-123, 125, 126; Doc. 2769 at 23-24; Ex.

205) Amendment 14 does not specify that Corizon has to spend the incentive payments on anything specific. (Doc. 2770 at 196; Doc. 2769 at 70) This amendment was made in anticipation of the Court's OSC Order. (Doc. 2770 at 124-125; Doc. 2769 at 24, 27)

(34) During the first four months of Amendment 14, ADC has paid Corizon $2,550,000 in incentive payments. (Doc. 2770 at 189-90; Doc. 2769 at 92). The incentive payments are capped at $3,500,000. (Doc. 2770 at 127) The incentive payments will be paid in the first part of FY 2018 and then there will be no further funds available to Corizon. (Doc. 2770 at 194-195; Doc. 2769 at 106) Corizon's CEO asked Director Ryan to consider providing Corizon with additional incentive funds and Director Ryan told him that there would not be any. (Doc. 2769 at 108-109)

(35) Director Ryan testified that Amendment 14's incentive money came either from a contingency fund or from vacancy savings accrued from vacant Correctional Officer positions. (Doc. 2769 at 27, 92-93) After his testimony, Defendants submitted a declaration correcting this testimony and stating that the incentive funds came only from funds appropriated for health care. (Doc. 2716)

(36) The disparity between the sanctions and the incentive payments in Amendment 14 was "the negotiated business decision that [ADC] made to try and compel and encourage Corizon to achieve much better performance." (Doc. 2769 at 104:22-24) Director Ryan thinks this decision "was, and still is, a good idea." (Doc. 2769 at 106:9-10)

(37) Director Ryan believes that Amendment 14 worked to increase compliance because the CGAR numbers increased shortly after ADC and Corizon executed Amendment 14. (Doc. 2769 at 24)

(38) For FY2014 to FY2017, ADC assessed $2,071,000 in sanctions against Corizon for Corizon's failure to comply with its contract with the State for the delivery of health care. (Doc. 2770 at 189) Through January 2018 of FY2018, ADC had assessed $945,000 in sanctions against Gorizon. (Doc. 2770 at 189)

(39) Director Ryan testified that Corizon paid ADC's outside counsel's fees and the annual fee to Plaintiffs' counsel that is required by the Stipulation. (Doc. 2769

at 51-53) On re-direct, he testified that he did not know. (Doc. 2769 at 112)

(40) Mr. Pratt assumes that the Amendments' various increases in the inmate health care per diem are used by Corizon to compensate for the increased cost of doing business. (Doc. 2770 at 188-189) But there is no contractual requirement that Corizon use money to increase salaries for health care staff or to hire more staff. (Doc. 2769 at 160) Mr. Pratt understands that Corizon operated at a loss in Arizona during the previous two quarters. (Doc. 2781 at 55)

(41) Mr. Pratt has not been satisfied with Corizon's performance. (Doc. 2770 at 181-185) Mr. Pratt has thought that if ADC pushes Corizon too hard, Corizon will terminate its contract. (Doc. 2781 at 78)

### Performance Measure 35

(42) PM 35 states "All inmate medications (KOP [keep on person] and DOT [direct observation therapy] ) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption." (Doc. 1185-1 at 10)

(43) Compliance with PM 35 is "a true partnership" between ADC and Corizon and requires ADC to follow its own rules. (Doc. 2770 at 162:9-11; Doc. 2769 at 42) ADC transfers 30,000 inmates every year between complexes. (Doc. 2769 at 174)

**8** (44) ADC began collaborating with Corizon on PM 35 in June 2017, because compliance with PM 35 was "a failed process." (Doc. 2769 at 172; Doc. 2770 at 161, 163:18) As a result of that collaboration, during the summer of 2017, ADC conducted a series of meetings and developed an outline of a process to transfer medication with an inmate. (Doc. 2769 at 178; Ex. 1) As part of this process, ADC and Corizon developed a flowchart with possible fail points. (Doc. 2770 at 163-164; Ex. 78)

(45) There was no evidence presented to the Court indicating that ADC understood the fail points at specific prisons.

(46) ADC began to develop DI-361 in August 2017 and adopted it on October 31, 2017. (Doc. 2781 at 28; Ex. 78,

98) DI-361 was submitted to the Court shortly thereafter. (Ex. 2) DI-361 was distributed to ADC employees with an email address. (Doc. 2769 at 191) For ADC employees without an email address, ADC generally distributes new Director's Instructions through electronic briefing boards and through discussions at briefings. (Doc. 2769 at 191-192) There is no evidence that this process was, in fact, completed for DI-326.

(47) If an inmate arrives at the new complex and his medications are not available, DI-361 dictates that Corizon will "obtain the medications from the back-up pharmacy." (Ex. 2 at ¶ 3.5) There have been instances when a local pharmacy was used to obtain medications for a transferring inmate. (Doc. 2769 at 186)

(48) In March 2018, Mr. Pratt wrote to Roland Maldonado, Corizon's Vice President of Operations for Arizona, about Corizon's controlled substance audits and stated that the quarterly controlled substance findings "have been a great concern for years as related to non-adherence to the stated policies." (Ex. 96; Doc. 2769 at 154) ADC has not asked Corizon to stop relying on an out-of-state pharmacy to provide medications to prisoners but it has asked Corizon to increase the stock of pharmaceuticals maintained on site. (Doc. 2769 at 96) Mr. Ryan does not know if this request was made in writing. (Doc. 2769 at 96) Mr. Ryan understands that Corizon is not willing to relocate a pharmacy into Arizona. (Doc. 2769 at 127)

### Real Time Monitoring

(49) ADC cannot monitor health care in real time. (Doc. 2781 at 60) Two weeks after the Court issued its October 2017 OSC Order, ADC leadership asked Corizon leadership to institute real-time data tracking for the performance measures covered by the OSC Order. (Doc. 2769 at 28; Ex. 31) Deputy Director Pratt understood that Corizon would implement such a program in part to find fail points. (Doc. 2770 at 211)

(50) In early November 2017, Mr. Pratt exchanged emails with Corizon's EVP/CAO about real-time reporting on the performance measures covered by the OSC Order. (Doc. 2781 at 58-60; Exs. 105, 106)

(51) In response, Corizon's interim CEO and chair of their Board wrote a letter to Director Ryan that stated Corizon would "not implement any daily real-time monitoring data program." (Doc. 2770 at 211:2-3; Doc. 2769 at 31-32; Ex. 33) Ryan and Pratt co-signed a response letter demanding that Corizon hire additional staff to monitor the OSC Order performance measures. (Doc. 2769 at 34-35; Doc. 2769 at 150; Ex. 34) Mr. Pratt thinks that, as part of complying with the OSC Order, Corizon brought in three or four people to assist with real time data collection. (Doc. 2769 at 150; Doc. 2781 at 81)

(52) In January 2018, Ryan and Pratt co-signed a letter to Mr. Maldonado that concluded there had been 2,481 incidents covered by the OSC Order in December 2017. (Doc. 2769 at 37-38; Ex. 37) In February 2018, they sent a clarification letter stating that they had recalculated the number of incidents to be 668. (Doc. 2769 at 38-39; Ex. 39)

*9 (53) In March 2018, the week before the hearing in this matter, Ryan and Pratt co-signed a letter to Mr. Maldonado about real time reporting. (Doc. 2769 at 82; Ex. 97) This letter noted that, for January 2018, Corizon had compiled the number of incidents and concluded that there were 891 incidents of non-compliance for the PMs covered by the OSC Order. (Ex. 97.002)

(54) In March 2018, Corizon informed ADC that it had implemented real-time reports for some performance measures. Neither Mr. Ryan nor Mr. Pratt know or could remember which performance measures have real-time reports. (Doc. 2770 at 211; Doc. 2769 at 82-83)

(55) There is still no real-time monitoring program for all performance measures. (Doc 2704 at 3:25-26; Doc. 2770 at 108, 210; Ex. 31.002)

(56) In March 2018, ADC made its first written demand to Corizon for a written description of its "efforts taken over the last five months to document Corizon's commitment to comply with the [OSC Order's] performance measures and to fill vacant positions on your rosters." (Doc. 2769 at 85)

(57) Pentaho, a Corizon-owned program, can run reports from eOMIS, Corizon's electronic medical records program. (Doc. 2769 at 147-148) ADC does not have access to Pentaho and has to ask Corizon for any specific Pentaho reports. (Doc. 2769 at 148-149)

(58) ADC had, and has, "serious concerns" with using Pentaho to generate lists of incidents for the OSC Order. (Doc. 2769 at 156; Ex. 38, 97) ADC worked with Corizon to run different Pentaho reports for the OSC Order in an attempt to increase the accuracy of the reports. (Doc. 2769 at 155-156) ADC demanded "significant improvement" in Corizon's next report. (Doc. 2769 at 157:21; Ex. 97) ADC did not disclose its concerns to the Court or to Plaintiffs about the December 2017 real time data until Mr. Pratt's cross-examination as a part of the OSC hearing. (Doc. 2769 at 156-157; Doc. 2781 at 81-82; Ex. 97)

(59) Plaintiffs alleged that ADC had missed 420 instances of non-compliance in the December 2017 OSC List. ADC reviewed Plaintiffs allegations and added 238 names to the December 2017 OSC List. (Doc. 2690 at 21; Doc. 2781 at 62, 68; Docs. 2745, 2755) Plaintiffs made no similar allegation about the January 2018 or February 2018 OSC List.

## CONCLUSIONS OF LAW

(a) Defendants' contract with Corizon does not obviate their non-delegable duty to provide Plaintiffs with health care under state law. Ariz. Rev. Stat. §§ 31-201.01(D); 41-1604(B)(1)(d) (the director may delegate functions or duties "that the director believes can be competently, efficiently and properly performed"); *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (relying on fact that the defendant sheriff was required by state statute to take charge of county jails and was answerable for prisoner's safekeeping). (Doc. 2781 at 89:11) Similarly, Defendants' contract with Corizon does not modify their position as obligors on the Stipulation.

(b) Defendants' management of Corizon does not indicate that they have any real ability to spur Corizon's compliance with the Stipulation. The Demand Letters evince ADC's frustrations with Corizon, frustrations that are similar to the frustration that the Court has expressed to Defendants. Specifically, ADC's communication with Corizon demonstrates a concern about the quality of internal audits, about staffing levels, and about performance.

(c) Obtaining care for high acuity patients depends on committed individuals advocating for the care

that the State has already paid Corizon to provide. Notwithstanding Defendants' use of the Escalation List, Defendants are not entitled to congratulations for developing an extraordinary method, which identifies a subset of high acuity patients, in order to ensure that they receive the care that all high acuity inmates are entitled to receive under the Stipulation. To be clear, these high acuity patients made it to the Escalation List because they had not received the health care to which all inmates are entitled. If the system worked as it should, there would be no need for this Escalation List.

**\*10** (d) Instead, Defendants' "good business decision" was to provide incentive payments to a contractor who had already committed to the State to provide that very service and had repeatedly and consistently failed to meet that obligation. The wisdom of a business decision that so rewards a failing contractor escapes the Court but is, for these purposes, irrelevant.

(e) Of the performance measures covered by the OSC Order, only PM 35 involves ADC operations. When undertaking a remediation plan for PM 35, ADC did not review operations at each prison to determine why PM 35 was, or was not, working. ADC did not begin working on a procedure to address PM 35, DI-361, until after the Court first announced it was contemplating the OSC. This is no evidence before the Court to show that ADC understands why DI-361 did not create compliance in Eyman or Lewis in December 2017, why DI-361 did not create compliance in Florence or Lewis in January 2018, or why Tucson attained compliance in August 2017 without DI-361.

(f) The OSC Order has not resulted in ADC's compliance with the Stipulation, which requires that every single inmate receive the benefit of each Performance Measure. The Stipulation requires 100% compliance with each of its Performance Measures. As this Court has repeatedly stated, the Stipulation's 85% threshold is simply a triggering point for the Court's intervention. And since the OSC Order, the following PM/Locations have remained below the Stipulation's 85% threshold:

- Performance Measure 35 at Eyman in December 2017;

- Performance Measure 35 at Florence in January 2018;

- Performance Measure 35 at Lewis in December 2017 and January 2018;

- Performance Measure 39 at Lewis in January 2018 and March 2018;

- Performance Measure 44 at Eyman in December 2017, January 2018, February 2018, and March 2018;

- Performance Measure 46 at Eyman in December 2017 and February 2018;

- Performance Measure 47 at Eyman in December 2017, January 2018, February 2018, and March 2018;

- Performance Measure 47 Florence in January 2018 and March 2018;

- Performance Measure 47 Lewis in December 2017, January 2018, February 2018, and March 2018;

- Performance Measure 47 Phoenix in December 2017, January 2018, and February 2018;

- Performance Measure 47 Tucson in January 2018 and February 2018;

- Performance Measure 50 at Florence in December 2017 and January 2018;

- Performance Measure 51 at Eyman in January 2017;

- Performance Measure 51 at Florence in December 2018;

- Performance Measure 52 at Florence in December 2017, January 2018, February 2018, and March 2018;

- Performance Measure 54 at Eyman in December 2017;

- Performance Measure 66 at Florence in February 2018 and March 2018; and

- Performance Measure 66 at Tucson in March 2018.

(Docs. 2373, 2801-1)

(g) Defendants did not introduce any evidence to the Court about specific efforts to bring PMs 39, 44, 47, 50, 51, 52, 54, or 66 into compliance. With respect to PM 35, the testimony Defendants presented was generic in nature and not geared toward the specific issues precluding compliance at each facility. This failure alone supports the conclusion that Defendants have not taken "all reasonable steps to comply with the [OSC] order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016).

(h) Because ADC remains noncompliant with these portions of the Stipulation, the Court concludes that civil contempt sanctions against Defendants are warranted here to address Plaintiffs' "injuries resulting from [ADC's] noncompliance." *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983) (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 448-49 (1911) ).

*11 (i) The evidence shows that the mere threat of monetary sanctions was not sufficient to generate ADC's compliance with the Stipulation. More importantly, the evidence presented to the Court indicates that wide-spread and systemic failures remain. In one recent example, Defendants had no information about what could be done to improve compliance for PM 50 at Tucson and failed to even attempt to provide a corrective action plan at the May 2018 Status Conference. (Doc. 2810). In another example, instead of presenting a corrective action plan aimed at trying something new, Defendants informed the Court at the June status hearing that they will continue to use their previous plan even though the CGARs reflect that the previous plan has not obtained consistent compliance for PM 39 at Lewis. (Doc. 2874-1 at 81) That Defendants should exhibit such nonchalance about addressing on-going failures to comply with the Stipulation—even as the sword of sanctions loomed above them   is considerable evidence that a contempt order and monetary sanctions are necessary.

(j) The inescapable conclusion is that Defendants are missing the mark after four years of trying to get it right. Their repeated failed attempts, and too-late efforts, to take their obligation seriously demonstrate a half-hearted commitment that must be braced. The evidence suggests that the States' recalcitrance flows from its fear of losing its contracted healthcare. But even if true, such fear is not a factor that can properly be considered in determining what steps the State must take to meet the health care needs of its inmates. If a private contractor is pushed to the door because it cannot meet the State's obligations, then so be it. Such a result would flow directly from the state's decision to privatize health care to save money. That goal of privatization cannot be achieved at the expense of the health and safety of the sick and acutely ill inmates. Indeed, Arizona for most of its history, and many states, do not privatize their healthcare services. The Court must place a clear and focused light on what is happening here: the State turned to a private contractor which has been

unable to meet the prisoner's health care needs. Rather than push its contractor to meet those needs, the State has instead paid them more and rewarded them with financial incentives while limiting the financial penalties for non-compliance. Accordingly, it appears the Court must do what Defendants will not: compel compliance with the Stipulation.

## CIVIL SANCTIONS

The OSC Order was valid, specific, and definite. Defendants had knowledge of the OSC Order and an extended opportunity to be heard about their non-compliance. As detailed herein, the Court has concluded that Defendants did not take all reasonable steps to comply with the Court's order. As a result, and as previewed in the OSC Order, Defendants shall pay a financial penalty of $1,000 per failed instance for the PM/Locations in the OSC Order that fell below the Stipulation's threshold of 85%. The information provided to the Court by Defendants showed 1,445 such violations:

| December 2017 (Docs. 2600, 2747, 2815) | | | January 2018 (Doc. 2650, 2664, 2675, 2815) | | |
|---|---|---|---|---|---|
| PM Location | CGAR % | # of | PM Location | CGAR % | # of Inste |
| PM 35 at Eyman | 74 | 26 | PM 35 at Florence | 82 | 13 |
| PM 35 at Lewis | 84 | 26 | PM 35 at Lewis | 70 | 44 |
| PM 44 at Eyman | 11 | 9 | PM 39 at Lewis | 81 | 5 |
| PM 46 at Eyman | 84 | 16 | PM 44 at Eyman | 56 | 4 |
| PM 47 at Eyman | 54 | 17 | PM 47 at Eyman | 75 | 9 |
| PM 47 at Lewis | 53 | 11 | PM 47 at Florence | 82 | 8 |
| PM 47 at Phoenix | 50 | 1 | PM 47 at Lewis | 36 | 7 |
| PM 50 at Florence | 60 | 34 | PM 47 at Phoenix | 83 | 1 |
| PM 51 at Florence | 80 | 21 | PM 47 at Tucson | 62 | 9 |
| PM 52 at Florence | 65 | 26 | PM 50 at Florence | 77 | 35 |
| PM 52 at Eyman | 57 | 23 | PM 51 at Eyman | 68 | 17 |
| PM 54 at Eyman | 60 | 54 | PM 52 at Florence | 69 | 21 |
| | Subtotal | 89 | PM 52 at Eyman | 60 | 34 |
| | | | | Subtotal | 207 |

further compliance with the healthcare requirements of the Stipulation. To that end, the parties will submit **February 2018** proposals for use of the funds and the Court will distribute the monies after considering their proposals.

(Doc. 2786-2)

IT IS THEREFORE ORDERED that Defendants are held in civil contempt for failure to comply with the Stipulation as it relates to the Court's Order to Show Cause.

IT IS FURTHER ORDERED that Defendants shall pay $1,445,000 for their December 2017, January 2018, and February 2018 violations of the Court's Order to Show Cause. Within 14 days, Defendants must remit payment to the Clerk of Court in the amount of $1,445,000.

IT IS FURTHER ORDERED that the Clerk of Court must enter judgment against Defendants reflecting contempt fines for December 2017, January 2018, and February 2018 totaling $1,445,000. This total is due and payable into the Registry of the Court, to be kept in the Registry until further order of the Court. This judgment shall bear interest at the federal statutory rate until satisfied.

*12 IT IS FURTHER ORDERED that Defendants shall continue to file monthly reports reflecting every instance of noncompliance for PMs at facilities under the October 10, 2017 Order to Show Cause that are at less than 85% compliance.

IT IS FURTHER ORDERED that, within 30 days of the date of this Order, the parties shall submit their respective proposals regarding the best use of these funds.

| PM/Location | CGAR % |
|---|---|
| PM 44 at Eyman | 43 |
| PM 46 at Eyman | 82 |
| PM 47 at Eyman | 61 |
| PM 47 at Lewis | 61 |
| PM 47 at Phoenix | 67 |
| PM 47 at Perryville | 83 |
| PM 47 at Tucson | 64 |
| PM 52 at Eyman | 58 |
| PM 52 at Florence | 67 |
| PM 66 at Florence | 70 |
| **Subtotal** | **341** |

The Court will impose these sanctions and collect these funds with the understanding that they will be used to

**All Citations**

Slip Copy, 2018 WL 3239691

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 3

Exhibit 3

180

2018 WL 6002515
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Victor Antonio Parsons, et al., Plaintiffs,

v.

Charles L Ryan, et al., Defendants.

No. CV-12-00601-PHX-ROS
|
11/15/2018

Honorable Roslyn O. Silver, Senior United States District
Judge

## ORDER

\*1 Defendants have moved for relief from two of
the Court's earlier Orders under Federal Rule of Civil
Procedure 60(b)(6) and to stay several other Orders.
(Docs. 2931, 2932, 2971). The Court will deny these
motions. The Court will also grant the pending motion
to set a status hearing (Doc. 2999) and set a hearing for
December 6, 2018, at 1:30 p.m.

## BACKGROUND

### A. The Stipulation

In October 2014, after two-and-a-half years of litigation,
the parties signed a Stipulation to settle this matter and
jointly moved to refer the remainder of this case to Judge
Duncan. (Docs. 1185, 1186). After receiving nearly 250
comments from class members, Judge Duncan conducted
a Federal Rule of Civil Procedure 23(e) Fairness Hearing
in February 2015 and granted the parties' Motion to
Approve Stipulation. (Docs. 1208-1463).

Under the Stipulation, Defendants agreed to improve
the healthcare provided to inmates. In particular,
Defendants agreed that over the course of three years,
they would reach a minimum level of compliance
regarding 103 healthcare performance measures (PMs)
based on national standards for correctional healthcare.
Defendants were required to meet or exceed a 75%
compliance score during the first year, 80% during
the second year, and 85% thereafter. Defendants
further agreed to monitor and report on their

progress. The Arizona Department of Corrections' pre-
existing Monitoring Bureau was tasked with monitoring
Defendants' efforts on each PM. Because the Stipulation
only contained high-level definitions for each PM, the
Monitoring Bureau drafted a "Monitoring Guide" for its
employees to use.

As set out in the Monitoring Guide, every month, for each
PM, the Monitoring Bureau reviews a certain number of
healthcare records and, applying the standards applicable
to that PM, determines whether each record is compliant.
As of February 2017, if 85% or more of the records
reviewed are compliant with the criteria in the Monitoring
Guide, ADC is compliant with that PM for that prison for
that month. After ADC generates a compliance number,
it engages in an informal rebuttal process with its private
contractor, Corizon Health, Inc. (Corizon). During that
informal process, Corizon has the opportunity to offer
additional information or context to explain why a
particular PM is actually compliant. At the conclusion
of that rebuttal process, ADC enters the compliance
information into a spreadsheet called the CGAR report.
This CGAR report, generated by the Monitoring Bureau,
determines whether each prison facility is complying with
the Stipulation's PMs.

### B. Efforts to Compel Compliance with the Stipulation

In February 2016—approximately one year after the
Court approved the parties' stipulation—Plaintiffs filed a
motion to compel, seeking production of information they
believed necessary to assess Defendants' compliance with
the Stipulation. (Doc. 1506). In April 2016, Plaintiffs filed
their first Motion to Enforce the Stipulation involving
PMs related to chronic care treatment, inpatient care in
prison infirmaries, medication administration, diagnostic
testing, access to mental health care, monitoring of
psychotropic medications, access to non-medication
treatment, inadequate suicide prevention, and monitoring
confinement in isolation for the mentally ill. (Docs.
1506, 1576). That filing resulted in the Court spending
a tremendous amount of time trying to ascertain why
Defendants were unable to comply with the obligations
they accepted under the Stipulation. The Court held status
conferences in April 2016 and again in May, June, August,
September, October, November, and December. (Docs.
1549, 1559, 1582, 1619, 1645, 1678, 1708, 1780, 1831).
These conferences covered Defendants' remediation plans
for non-compliant PMs, Plaintiffs' access to Defendants'
new electronic medical records system, and interpretations



of key terms in the Stipulation. In the latter half of 2016, the Court also conducted telephonic hearings on discovery disputes, scheduled a prison tour, and addressed allegations of retaliation during the prison tour. (Docs. 1666, 1723, 1734).

**\*2** In late 2016, the parties began presenting disputes for the Court to resolve about how to interpret the data and to assess compliance, including disputes about how to evaluate timing, e.g., whether something done within 30 days means it is done within one month; how to assess compliance when care needs to be provided within a specified number of days; and whether a prisoner is "seen" by a mental health care provider in a group setting or in their cell. (Doc. 1673). The Court also rejected Defendants' use of partial credit to assess compliance and held that if one part of a prisoner's file is deficient, it cannot be counted as compliant. (Doc. 1831).

In 2017, the Court continued to conduct monthly status hearings, emergent telephonic hearings, and evidentiary hearings. (Docs. 1895, 1933, 1964, 2029, 2061, 2124, 2185, 2186, 2205, 2233, 2236, 2245, 2249, 2285, 2313, 2317, 2330, 2403, 2437, 2456, 2474, 2526). The frequent of hearings continued in 2018. (Docs. 2560, 2559, 2586, 2601, 2658, 2659, 2686, 2700, 2720, 2735, 2757, 2764, 2816, 2843, 2844, 2850, 2854, 2860, 2879, 2880, 2882). The Court also sought clarification about the methodologies used to assess compliance and, therefore, held an evidentiary hearing beginning in March 2017 on how data is collected. (Docs. 1964, 1980, 1996). Throughout this time, the motion practice continued apace with the hearings. (Docs. 1583, 1673, 1709, 1727, 1745, 1754, 1762, 1833, 1862, 1907, 1910, 1917, 1918, 1951, 2030, 2117, 2118, 2119, 2147, 2179, 2225, 2235, 2353, 2382, 2483, 2504, 2551, 2604, 2620, 2644, 2789, 2791, 2810, 2833, 2856). In April 2017, the Court informed the parties that it was considering the appointment of a Special Master under Federal Rule of Civil Procedure 53. (Doc. 2029). The Court contemplated that an expert would serve in multiple capacities to oversee the monitoring program and to provide guidance to the Court on what remedial measures would be most effective. Plaintiffs argued that the Court should instead appoint an expert under Federal Rule of Evidence 706. (Docs. 2043, 2083). Defendants argued that such an appointment would violate the Stipulation and that "there is no question that this Court is best suited to oversee the monitoring and enforcement of the Stipulation." (Doc. 2067 at 4:8-9). The Court ordered the parties to meet-and-

confer about possible experts for appointment under Rule 706 and then submit names for the Court's consideration.

At the conclusion of this process, the Court appointed Mr. Millar of The Advisory Group as an expert in October 2017. (Docs. 2133, 2236, 2249, 2437, 2483). The Court recognized that the failure to meaningfully comply with the Stipulation was ultimately a matter of staffing, but the Stipulation precluded the Court from ordering that Defendants hire additional staff. Thus, the Court directed Mr. Millar to identify where Defendants failed to meet their own established staffing levels and to identify the underlying cause of that failure. Mr. Millar submitted his final report in June 2018. (Doc. 2880). The Court thereafter ordered Defendants to "file their plan to implement the recommendations contained in the final Advisory Group report." (Doc. 2904). Defendants submitted a plan and Plaintiffs have challenged that plan as insufficient. (Doc. 2948).

## C. Contempt Proceedings Due to Pervasive Noncompliance with the Stipulation and Errors in the Monitoring Process

At the June 2017 Status Hearing, after Defendants' continued failure to ensure compliance with critical PMs related to delivery of medication, seeing a healthcare provider for routine illness or a specialist, ensuring compliance with emergency room discharge recommendations, acting upon abnormal diagnostic testing, and receiving urgent specialty diagnostic testing, the Court informed the parties that, for certain PMs at certain prisons, "every single failure to comply...will result in an order to show cause hearing as to why a $1,000.00 fine should not be imposed." (Doc. 2124). Following briefing and a hearing, the Court entered findings of fact, conclusions of law, and held Defendants in contempt for December 2017, January 2018, and February 2018 in the amount of $1,445,000. (Doc. 2898). Although some of the PM/locations captured by the contempt proceedings demonstrated improvement, that improvement was neither pervasive nor sustained. (Doc. 2095 at 2).

**\*3** In prior orders, the Court concluded additional expert assistance was needed. In particular, such assistance was needed regarding the monitoring process and for the PMs Defendants repeatedly failed to satisfy. On the monitoring process, evidence—from whistleblower witnesses and internal documents—established that ADC manipulated

the monitoring process so that the CGAR Reports showed compliance even when the goals of providing sufficient and appropriate care had not been met. As detailed in the Court's Order, "the credible evidence before the Court indicates that [Corizon's electronic medical record system] allows providers to create dishonest and untraceable entries in an inmate's medical record, that Corizon has manipulated categories of records to comply with the Stipulation's time frames, and that Corizon has not ensured the integrity of its electronic medical records system." (Doc. 2900 at 8).

Other evidence showed that the Monitoring Bureau reviewed a fluctuating number of records each month and the number of records reviewed may be manipulated to create compliance. Internal emails led to different concerns. One email showed that a member of the monitoring team raised concerns about a specific inmate but did not include him in the CGARs. It seems likely the monitoring team only knew about that particular inmate's record because it was being reviewed in preparing the CGARs and the fact that it was not included raises a concern that inmate records are artificially excluded from CGARs. A different email showed that a different member of the monitoring team raised concerns about a different inmate, but then counted his case as compliant for the CGARs. (Doc. 2900 at 8-9). Further evidence showed that "Corizon [had] re-categorized a category of care in a way that allowed them to take additional time to provide the care and that did not permit an accurate assessment of whether or not there had been compliance with the relevant performance measure." (Doc. 2900 at 11).

This evidence, combined with Defendants' "inexplicably inconsistent filings" and inability to explain the Monitoring Guide's procedures, resulted in the Court concluding that expert assistance is necessary to review Defendants' monitoring process and confirm that it produces accurate, valid, and reliable information about compliance with the Stipulation. (Doc. 2900).

Expert assistance was also necessary because there is a set of PM/locations where the CGAR reports produced by Defendants show long-term non-compliance yet Defendants' remediation plans had stalled. As detailed in the Court's Order, for some PM/locations, Defendants had stopped submitting new ideas and have proposed to "continue to utilize the same corrective action plan as set forth in the [previous] update." (Doc. 2874-1 at

79-80). For other PMs/locations, "Defendants have not even attempted a substantive remedial measure and have simply informed the Court that a new hire will solve the problem" even though the PM/location was already non-compliant when that position had been filled. (Doc. 2905 at 1-2).

The Court ordered the parties to submit names for an outside expert who could develop methods, policies, and procedures for Defendants in the performance measures/ locations where Defendants have demonstrated persistent non-compliance. (Doc. 2905 at 3).

## ANALYSIS

Since this matter was reassigned, the parties have filed multiple motions and other documents required by Judge Duncan. Defendants seek relief under Rule 60 from two of Judge Duncan's June 22, 2018 Orders as well as a stay of other orders pending appeal. As for Plaintiffs, they request the Court hold a status hearing.

### A. Motions for Relief Under Rule 60 and Stay Pending Appeal

Defendants seek relief from the Order denying their Motion to Terminate Monitoring and directing the retention of an expert to evaluate the monitoring process at Defendants' expense and the Order directing Defendants to reinstall Health Needs Request boxes. (Docs. 2931, 2931). Rule 60(b)(6) permits a court to relieve a party from an order "for any other reason that justifies relief" and is used only "sparingly as an equitable remedy to prevent manifest injustice." *U.S. v. Alpine Land & Reservoir Co.,* 984 F.2d 1047, 1049 (9th Cir. 1993). This procedural mechanism is reserved for "extraordinary circumstances" such as a case dismissed because of an attorney's gross negligence. *See, e.g., Lal v. California,* 610 F.3d 518, 524 (9th Cir. 2010). Thus, the moving party must be "able to show both injury and circumstances beyond its control prevented timely action to protect its interest." *Gardner v. Martino,* 563 F.3d 981, 991 (9th Cir. 2009). Here, Defendants' motions for relief rely entirely on arguments that were presented, considered, and rejected. (Docs. 2931, 2932). Rule 60(b)(6) is not a substitute for a motion for reconsideration or an appeal. Similarly, reassignment of this matter with the Court is not an opportunity for a second bite at the apple.

**\*4** Further, the Court will not grant a stay of the Orders entered on June 23, 2018. Whether to grant a stay pending appeal is guided by an analysis of four factors set forth by the Supreme Court in *Nken v. Holder*, 556 U.S. 418, 434 (2009): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken*, 556 U.S. at 434 (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987))).

Defendants fail to meet a single factor. The Stipulation empowers the Court to employ "any remedy provided by law" to compel Defendants to comply with the Stipulation and all of the Court's recent decisions —contempt sanctions, solicitation of an expert, and restoring HNR boxes—are squarely within that authority. More than that, Defendants' interminable noncompliance —which persists to this day—forecloses a finding that a stay of the Court's June 22, 2018 Orders is appropriate because of the continued harm the class experiences. Defendants' Motion to Stay will be denied. (Doc. 2971).

**B. Appointment of Expert**
In light of the costs incurred and the current procedural posture, the Court has concluded that, instead of two separate experts, one consolidated expert is a more appropriate path forward. The Court will conduct a status hearing with the parties to discuss whether Marc Stern, M.D., should be appointed as the Court's Rule 706 expert. A copy of Dr. Stern's curriculum vitae is attached to this Order.

**C. Cost of this Litigation and Path Forward**
Unsurprisingly, this case has cost the State a lot of money. Under the Stipulation, Defendants agreed to pay Plaintiffs up to $250,000 per calendar year for fees and costs for "work reasonably performed" under the Stipulation. (Doc. 1185, ¶ 44). Through June 30, 2017, Defendants had paid Plaintiffs $645,617.58 pursuant to this provision. (Doc. 2402-1).

In November 2017, Plaintiffs informed the Court that Defendants had paid their outside counsel $1,744,543.45 between February 2015 and June 2017. During the first half of 2017, outside counsel invoiced over $100,000/ month. (Doc. 2434). Based on the docket, the Court assumes this level of monthly invoicing continued throughout the latter half of 2017 and into 2018. In June 2018, after Plaintiffs submitted Court-directed revisions, the Court granted Plaintiffs' Motion for Attorneys' Fees and Costs for the amount of $1,259,991.98 for work through June 30, 2017. (Doc. 2902).

This means that, through June 30, 2017, the State had spent over $3.6 million in litigating this matter. Based on billing rates and Plaintiffs' recent submission, a safe assumption is that close to $2 million more has been spent since then. Thus, a conservative estimate is that the State has spent well over $5.5 million in attorneys' fees with most of that being spent in the last three years.

While Defendants are free to utilize the State's resources as they wish, at some point their continued insistence that taxpayer money is better spent on assiduously defending their noncompliance with the Stipulation than on efforts towards remedying the fundamental underlying cause of that noncompliance is likely ill-conceived and ill-advised. The Court is disinclined to grinding down the well-worn path of noncompliance and failed remedial measures. It has been four years since the parties adopted the Stipulation and over six years since this litigation commenced. Defendants' actions raise the distinct miserable possibility that the Stipulation will have to be set aside and the parties instructed to litigate again. *See Delay v. Gordon*, 475 F.3d 1039, 1044 n.11 (2007) (noting "[r]epudiation of a settlement agreement...may justify vacating the court's prior dismissal order [and] return[ing] the parties to the status quo ante"). The parties, but especially Defendants, should carefully contemplate whether they are willing to engage in the good-faith efforts needed to bring Defendants into compliance with the Stipulation.

**\*5** ......

......

......

......

......

......

......

......

......

......

......

......

......

Accordingly,

**IT IS ORDERED** denying Defendants' Motion for Relief from Court Order Re:

Termination of Monitoring (Doc. 2931).

**IT IS FURTHER ORDERED** denying Defendants' Motion for Relief from Court Order Re: HNR Boxes (Doc. 2932).

**IT IS FURTHER ORDERED** denying Defendants' to Stay (Doc. 2971).

**IT IS FURTHER ORDERED** granting Plaintiffs' Motion for Status Hearing. (Doc. 2999). A hearing is set for **December 6, 2018, at 1:30 p.m.**

**IT IS FURTHER ORDERED** granting Defendants' Motion to Modify Order Doc. 2958 (Doc. 3046). Defendants' monthly compliance reports will be due on the 21st day of each month or on the business day thereafter.

**IT IS FURTHER ORDERED** denying Michael Cohn's pro se Motion for Investigation of Fraudulent Schemes (Doc. 3044).

Dated this 15th day of November, 2018.

Honorable Roslyn O. Silver

Editor's Note: Tabular or graphical material not displayable at this time.

Senior United States District Judge

**MARC F. STERN, M.D., M.P.H., F.A.C.P.**

November, 2018

1100 Surrey Trace Drive, SE marcstern@live.com

Tumwater, Washington 98501, USA   +1 (360) 701–6520

**SUMMARY OF EXPERIENCE CORRECTIONAL HEALTH CARE CONSULTANT 2009 – PRESENT**

Consultant in the design, management, and operation of health services in a correctional setting to assist in evaluating, monitoring, or providing evidence-based, cost-effective care consistent with constitutional mandates of quality.

Current activities include:

Advisor to various jails in Washington State on patient safety, health systems, and related health care and custody staff activities and operations, and RFP and contract generation (2014 - ) Consultant to Human Rights Watch to evaluate medical care of immigrants in Homeland Security detention (2016 - ) Consultant to the US Department of Justice, Civil Rights Division, Special Litigation Section. Providing investigative support and expert medical services pursuant to complaints regarding care delivered in any US jail, prison, or detention facility. (2010 - ) (no current open cases)

Consultant to Broward County Sheriff to help develop and evaluate responses to a request for proposals (2017 - ) Physician prescriber/trainer for administration of naloxone by law enforcement officers for the Olympia, Tumwater, Lacey, and Evergreen College Police Departments (2017 - ) Consultant to the Civil Rights Enforcement Section, Office of the Attorney General of California, under SB 29, to review the healthcare-related conditions of confinement of detainees confined by Immigration and Customs Enforcement in California facilities (2017 - )

Previous activities include:

Member of monitoring team (medical expert) pursuant to Consent Agreement between US Department of

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 4

Exhibit 4

1   Kathleen E. Brody (Bar No. 026331)
    **ACLU FOUNDATION OF ARIZONA**
2   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
3   Telephone: (602) 650-1854
    Email: kbrody@acluaz.org
4
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
5   *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
    *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
6   *Desiree Licci, Joseph Hefner, Joshua Polson, and*
    *Charlotte Wells, on behalf of themselves and all others*
7   *similarly situated*

8   **[ADDITIONAL COUNSEL LISTED BELOW]**

9   Sarah Kader (Bar No. 027147)
    Asim Dietrich (Bar No. 027927)
10  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
11  Phoenix, Arizona 85034
    Telephone: (602) 274-6287
12  Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org
13  *Attorneys for Plaintiff Arizona Center for Disability Law*

    **[ADDITIONAL COUNSEL LISTED BELOW]**
14

15              UNITED STATES DISTRICT COURT

16                    DISTRICT OF ARIZONA

17  Victor Parsons; Shawn Jensen; Stephen Swartz;      No. CV 12-00601-PHX-DKD
    Dustin Brislan; Sonia Rodriguez; Christina
18  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph    **DECLARATION OF**
19  Hefner; Joshua Polson; and Charlotte Wells, on     **MEGAN LYNCH**
    behalf of themselves and all others similarly
20  situated; and Arizona Center for Disability Law,

21              Plaintiffs,

22       v.

23  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Division Director,
24  Division of Health Services, Arizona Department of
    Corrections, in their official capacities,
25
                Defendants.
26

27

28

186

1        I, Megan Lynch, hereby declare:

2        1.    I have been employed at the Prison Law Office since May 2013.  Since that date, I was the supervising litigation assistant in my office and was the primary litigation assistant/paralegal assigned to work on *Parsons v. Ryan*.  In July 2016, I was promoted to an Investigator/Monitor position where I monitor prison and jail system's compliance with our office's case settlements and I work on special projects to analyze systemic problems that arise in our cases for further investigation and advocacy.  As part of my monitoring duties, I continue to work on *Parsons*, in both monitoring and paralegal capacities.  If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

2.    I am very familiar with the operations of the Prison Law Office, including the management of all correspondence the office receives from class members in our various cases, their loved ones, and other third parties.  I oversaw all aspects of the creation and implementation of a Salesforce database that went live in May 2017 that the Prison Law Office uses to track all correspondence regarding class members received and sent under our cases.  The database also tracks non-case related self-help correspondence with incarcerated people from across California and the nation who write us seeking assistance and information.

3.    Prior to the implementation of the Salesforce database, I used and oversaw the training of all staff members on the use of a Microsoft Access database our office used to manage and track correspondence regarding class members up until May 2017.  All information contained in the older Access database was imported and fully integrated into the new Salesforce database.

4.    I am knowledgeable and have been trained in the use of Salesforce, Access, and Excel programs to track and analyze data within our operational procedures, and to run reports summarizing the data contained in these various database sources.

5.    We refer to the process used by me and the other litigation assistants and monitors in reviewing correspondence as "triaging" the mail.  In triaging, after sorting

1    physical letters and reviewing the substance to determine if a letter is case related, a copy
2    of all case related letters is electronically scanned to the database. Next, the staff persons
3    triaging the letter read it, and assign the letter to a class member in our system or create a
4    new contact if this is our first time communicating with the class member, and assign the
5    letter to the respective lawsuit, i.e., *Parsons*. Then we enter data from the letter into the
6    database, including summarizing the letter's content and coding the letter.    We next
7    forward the database entry to the attorneys to review and we draft responses to the class
8    member that are also reviewed by the attorneys. This is a uniform practice that we use for
9    every case-related letter our office receives, not just *Parsons*. "Code" refers to the fact
10   that our database is set up to have issue code lists relevant to each case. These are pick
11   lists in our database permitting selection of one or more topics or issues raised by class
12   members in a particular case.

13         6.    In my role in the *Parsons* case, I am responsible, among other tasks, for
14   triaging mail from several Arizona prisons. Throughout 2017, I primarily triaged letters
15   from class members at the Tucson prison, and from multiple yards at the Lewis and
16   Eyman prisons. When litigation assistants and investigators assigned to triage mail from
17   other Arizona prisons are out of the office, I often will triage mail from their assigned
18   prisons, and vice versa when I am out of the office. Therefore, we have a uniform office
19   approach to triaging and managing correspondence. Additionally, the ACLU National
20   Prison Project (ACLU-NPP), the ACLU of Arizona, and the Arizona Center for Disability
21   Law forward to the Prison Law Office all correspondence that they receive in *Parsons* that
22   implicates medical or dental care. (We reciprocally forward all mail or intake the Prison
23   Law Office receives regarding mental health care and conditions in isolation units to the
24   ACLU-NPP.)

25         7.    It has been my observation in reading *Parsons* correspondence that many
26   letters we received from class members, family members, third parties, or forwarded by
27   co-counsel were about pain management, including the discontinuation of pain
28   medication, or the administration of medications inadequate to address class members'

1  chronic pain.  In fact, the number of letters that we received about the topic was so

2  noticeable that at my suggestion, our office created a form letter in March 2017 to send

3  class members who wrote us about the issue, and I created an issue code in the Salesforce

4  database about pain medication so we could more easily track the letters.

5          8.  After the November 21, 2017 telephonic hearing where the issue of

6  Plaintiffs' request for documents regarding the discontinuation of pain medications was

7  discussed, I was asked to run reports in the Salesforce database to quantify and analyze

8  the mail our office has received in *Parsons* since January 1, 2017 about pain management.

9          9.  On December 6, 2017, I ran two reports in our Salesforce database to gather

10  this information.  First, I ran a report searching the database for all letters received in

11  *Parsons* that had the words "pain med" in the Letter Summary field (the database field in

12  which the litigation assistant or investigator summarizes the content of the letter), or that

13  in response our office sent the form letter on pain medications.  I then exported the report

14  into Excel.  Second, I ran a report searching the database for all letters received since

15  January 1, 2017 in *Parsons* to get a baseline number.

16         10.  There was a total of 1,975 letters logged under *Parsons* between January 1

17  and the morning of December 6, 2017.  Of these letters, 253 (or 13% of all mail received

18  in *Parsons* in that time frame) referenced pain management concerns.  Of those 253

19  letters, 165 (or 65% of the pain medication letters, or 8% of all mail received in *Parsons*)

20  mention pain medication discontinuation, including replacement of medications or failure

21  to renew medications.  Of the 165 letters, 27 of them make reference to a blanket

22  discontinuation policy announced by ADC and/or Corizon.

23         11.  I also analyzed the letters by prison.  The 253 letters our office received

24  regarding pain management issues came from eight of the 10 Arizona State Prison

25  Complexes ("ASPC"), as follows:

26               a.  ASPC-Eyman:     54 letters

27               b.  ASPC-Florence:   85 letters

28               c.  ASPC-Lewis:     79 letters

1          d. ASPC-Perryville:    5 letters

2          e. ASPC-Phoenix:     4 letters

3          f. ASPC-Safford:     4 letters

4          g. ASPC-Tucson:      17 letters

5          h. ASPC-Yuma:       5 letters

6      12.     I reviewed the Letter Summary field of the 253 letters. A brief sample of

7 the information our office received regarding a possible system-wide or institution-wide

8 pain medication discontinuation policy is generally described below (I did not include

9 names or identifying details because in some cases we do not have explicit authorization

10 to do so).

11          a. One person reported that a Nurse Practitioner showed him a mass
12              email that said that all prisoners were to be taken off Gabapentin and
Tramadol.

13          b. One class member sent in a grievance response regarding the abrupt
14              discontinuation of pain medication that stated, "[t]he medication you
are requesting is no longer being ordered complex wide."

15          c. Another grievance response we received from a different class
16              member said that "[t]he medica[tion] you are requesting is no longer
being prescribed for long term pain management."

17          d. A different class member reported on an informal grievance that his
18              pain medications were discontinued and replaced with ineffective
medications. The response to his informal grievance states that the
19              medications he requests are no longer offered.

20      13.     In my spreadsheet, I also de-duplicated any multiple entries from the same

21 person so I could get a count of the number of people about whom we were contacted

22 regarding pain management. I found 152 separate individuals who reported that they had

23 problems related to pain management. I reviewed the Letter Summary field from the

24 database to compile the following list of allegations that they reported to us. Again, they

25 are not named, as in many cases as they did not authorize us to share their names or other

26 identifying details.

27          a. A class member who testified on July 14, 2017 regarding the provision of
28              health care and the removal of HNR boxes, has a history of back injuries
and had an untreated hernia. He wrote us in a letter dated August 7, 2017

190

that his Tramadol had been cut in half without explanation. He filed a HNR regarding this abrupt change of his medication, and the Plan of Action in the HNR that was signed by a nurse states that "a mistake was made / scheduled with provider ASAP!" He subsequently contacted our office to report that he was offered Cymbalta instead to treat his chronic pain, a psychotropic medication that was not effective.

b. A class member who has Parkinson's disease reported his Gabapentin was abruptly discontinued without tapering. When this happened, all of his medications, including those for the management of his Parkinson's related tremors, were discontinued for eight days. He alleged that since his pain medications were discontinued, he had been restricted to a wheelchair.

c. A class member who has Multiple Sclerosis (MS) reported his Gabapentin was discontinued with no replacement. Corizon also reportedly reduced his prescription for the muscle relaxant Baclofen for back spasms from three times per day to once a day.

d. Another class member with MS reports he tried many medications to help manage chronic pain caused by the disease, and that none worked except for Gabapentin. However, his prescription was discontinued, and he has been in severe debilitating pain ever since then.

e. A man who suffers chronic neuropathy pain as a result of HIV wrote to report his prescriptions for Gabapentin and Tramadol were discontinued. He was prescribed an alternate medication; however, he reports that the medication does not adequately manage his nerve pain, and it causes his skin to feel like it is burning and itching such that he scratches himself in his sleep until he bleeds or wakes up.

f. A class member who received Gabapentin upon the recommendation of a vascular surgeon, due to the chronic pain he suffers after having veins stripped from his left leg due to blood clots, reported that his pain medication was cut off. In addition, he suffers chronic pain as a result of being stabbed 14 times.

g. A man who had been hit by a car that resulted in a coma state for six days, multiple broken bones, a fractured larynx, and other very serious injuries reported that Corizon's pain management plan consisted of ibuprofen.

h. Another man said he suffered a facial injury which resulted in what he believed was an orbital fracture, drainage, and loss of his senses of taste and smell. He described feeling air come through his eye socket when he drinks. Three weeks after his injury, he reported to us that he had only been seen by nurses and despite severe pain, had not received any pain medications.

i. A class member reported he underwent a complicated surgery that resulted in a bone graft. Despite the invasive nature of the surgery, he reported that Corizon denied any post-operative pain medications.

j. A relatively young man in ADC custody reported that he had metastatic cancer after numerous delays in diagnosis and treatment for testicular cancer. He said that after surgery to remove his cancerous testicle, he was not provided effective pain medications during the recovery from his

1     surgery, and that he was even denied access to ice. Unfortunately his
2     testicular cancer had spread to his lungs, kidneys, and lymph nodes and by the time he wrote us, he reported that he needed immediate cancer treatment, and he still was not prescribed adequate pain medications.

3

4     k. A class member reported the discontinuation of his Gabapentin that he took to manage severe pain up and down his leg. Without the Gabapentin, he reported difficulty sleeping due to the pain ("I can't sleep until exhaustion sets in"), and stated that he wraps a shoelace around his leg to cut off circulation until his leg goes numb so he cannot feel the pain.

5

6

7     l. Another man wrote and reported he has had seven lower back operations, metal brackets placed in his spine, osteoarthritis with tremors, fibromyalgia, and rheumatoid nodules in his hips, knees, and feet. As a result, he reports he is in constant pain; however, his pain medications were discontinued without replacement therapies.

8

9

10     m. We were notified by a third party of a class member who reportedly experiences pain that originates in his neck and back and radiates down his arms. The third party told us that the man's pain had become so great, particularly in his right arm, that he had lost grip strength and could not perform basic activities of daily living, such as gripping a spoon to eat, without intense pain. As a result of his inability to properly feed himself due to weakness and pain, he allegedly had lost approximately 20 pounds.

11

12

13

14     n. A class member with arthritis, degenerative disc disease, and shrinkage between his vertebrae, reports that he was given only ibuprofen to manage his pain.

15

16     o. We were contacted by a class member this summer who fractured his ankle and had two spiral fractures of his fibula. Throughout this time, he reports that he was not provided prescription pain medications.

17

18     p. One class member reported pain so severe that "I want them to give me a writ of execution, instead of living like this."

19     14. I also was asked to review the court docket in Parsons, to review filings or

20 letters sent to the Court by plaintiff class members in 2017. I identified 35 public filings

21 with the Court by class members (through December 6, 2017), and 27 of them related to

22 the provision of health care in Arizona state prisons. Of the 27 health care-related entries

23 from class members on the 2017 docket, thirteen (13, or 48% of all of the health care

24 related docket entries) raise problems with pain management.[1] Some of the concerns

25 regarding pain management that class members directly reported to the Court included:

26

27

28     [1] [See Docs. 2054, 2056, 2059, 2110, 2113, 2169, 2216, 2231, 2261, 2262, 2320, 2391, 2449]

a. On May 8, 2017, Doc. 2054, Julie Pavlich notified the Court that on March 19, 2017 she reported to the morning pill call line and discovered that she was not issued Tramadol. When she questioned the missing medication, she was told she had to wait for the order to be refilled by a provider. She indicates that she was not provided the medication for five days during which time she experienced withdrawal symptoms.[2]

b. On June 13, 2017, Doc. 2110, Michael Mendoza notified the Court that he was issued psychotropic medications to manage his chronic pain associated with degenerative disc disease and nerve damage. He states that the mental health medications were not effective at managing his pain and caused severe side effects. He stated "I personally started having mental psychotic and emotional thoughts. We are all in solitary confinement and administering us psychiatry medication for pain management only compounds our mental state and our emotional life here in solitary confinement." He reports that as of the date of his filing, he also had been without any pain medication for approximately 35 days. He explains "my issue [] went from bad to extreme, now I'm having numbing sensations on my toes on both feet . . . and both of my legs are now full of red blood spots."

c. On June 19, 2017, Doc. 2113, David Klein notified the Court that he has a history of back surgery for which he was not receiving timely follow-up care. He reports that he is in "continuous, immeasurable pain and now is barely physically mobile due to defendants ignored care."

d. On July 11, 2017, Doc. 2169, Larry Prince notified the Court that he tried numerous pain management medications before he was prescribed Gabapentin and Tramadol in 2015. He reported that the treatment plan consisting of Gabapentin and Tramadol greatly improved his quality of life (he was able to ambulate and complete activities of daily living) and that other chronic health conditions also improved when his chronic pain was managed effectively. However, he reports that his treatment plan was discontinued in May 2017, without a taper and that he was later told by a provider that "we no longer have reviews for non-formulary medication." A provider also reportedly stated that a "Ducey order takes your meds." Mr. Prince "suffers in daily identified real pain with blinding headaches, stabbing and burning sensations in his upper spine and neck. The pain burns down into Plaintiff's arms and hands and eventually causes Plaintiff to simply lay on his bunk until he can gather his energy again." He also reports that some of his other chronic conditions, such as high blood pressure, have deteriorated since his pain management plan changed.

e. On July 27, 2017, Doc. 2216, Richard Richards notified the Court that he had untreated cancer. He also reports that he was recommended for a hip replacement and is in severe pain, that he is unable to sit, lie down, walk, or sleep without severe pain.

f. On August 7, 2017, Doc. 2231, Mr. Prince updated the Court with additional information including that after his first filing with the Court, he was seen by medical staff who restarted his gabapentin prescription;

---

[2] The class members' names are included, as they all filed these documents publicly using their names.

1    however the prescription lasted for only a few weeks before it was once
     again discontinued without taper. He was told it was discontinued because
2    he needs surgery. He questions the validity of discontinuation pain
     medication when his condition is severe enough to require surgical
3    intervention.

4    g.   On August 29, 2017, Doc. 2262, Walter Jordan notified the Court of his
          impending death and said that he was terminally ill as a result of delayed
5         cancer treatment. He reported that he was in severe pain from the cancer,
          and gave the names of additional people at Florence-East who are "denied
6         treatment by Corizon . . . and all falling, yelling, screaming of pain."

7    h.   On September 21, 2017, Doc. 2320, Julie Pavlich updated the Court that her
          Gabapentin prescription was discontinued without taper. She also reports
8         that in six of the first seven months of 2017 she suffered lapses of up to 10
          days in distribution of her medications because of delayed orders to refill the
9         medications.

10   i.   On October 19, 2017, Doc. 2391, Clayton Gatlin notified the Court that he
          has been made to try six different and ineffective pain management
11        medications to treat his chronic pain. He reports that he was prescribed
          different medications that were effective and discontinued when Corizon
12        took over the health care contract.

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed December 15, 2017, in Berkeley, California.

3

4                                                    _Megan Lynch_
                                                     Megan Lynch

5

6    **COUNSEL OF RECORD:**              **PRISON LAW OFFICE**
                                         Donald Specter (Cal. 83925)*
7                                        Alison Hardy (Cal. 135966)*
                                         Sara Norman (Cal. 189536)*
8                                        Corene Kendrick (Cal. 226642)*
                                         Rita K. Lomio (Cal. 254501)*
9                                        **PRISON LAW OFFICE**
                                         1917 Fifth Street
10                                       Berkeley, California 94710
                                         Telephone: (510) 280-2621
11                                       Email:    dspecter@prisonlaw.com
                                                   ahardy@prisonlaw.com
12                                                 snorman@prisonlaw.com
                                                   ckendrick@prisonlaw.com
13                                                 rlomio@prisonlaw.com

14                                       *Admitted _pro hac vice_

15                                       David C. Fathi (Wash. 24893)*
                                         Amy Fettig (D.C. 484883)**
16                                       Victoria Lopez (Ill. 6275388)*
                                         **ACLU NATIONAL PRISON**
17                                       **PROJECT**
                                         915 15th Street N.W., 7th Floor
18                                       Washington, D.C. 20005
                                         Telephone: (202) 548-6603
19                                       Email:    dfathi@aclu.org
                                                   afettig@aclu.org
20                                                 vlopez@aclu.org

21                                       *Admitted _pro hac vice_. Not admitted
                                          in DC; practice limited to federal
22                                        courts.
                                         **Admitted _pro hac vice_
23
                                         Kirstin T. Eidenbach (Bar No. 027341)
24                                       **EIDENBACH LAW, PLLC**
                                         P. O. Box 91398
25                                       Tucson, Arizona 85752
                                         Telephone: (520) 477-1475
26                                       Email:   kirstin@eidenbachlaw.com

27

28

195

1   Arizona Attorney General Mark Brnovich
    Office of the Attorney General
2   Michael E. Gottfried, Bar No. 010623
    Lucy M. Rand, Bar No. 026919
3   Assistant Attorneys General
    1275 W. Washington Street
4   Phoenix, Arizona 85007-2926
    Telephone: (602) 542-4951
5   Fax: (602) 542-7670
    Michael.Gottfried@azag.gov
6   Lucy.Rand@azag.gov

7   Daniel P. Struck, Bar No. 012377
    Rachel Love, Bar No. 019881
8   Timothy J. Bojanowski, Bar No. 022126
    Nicholas D. Acedo, Bar No. 021644
9   Ashlee B. Fletcher, Bar No. 028874
    Jacob B. Lee, Bar No. 030371
10  Kevin R. Hanger, Bar No. 027346
    Timothy M. Ray, Bar No. 029191
11  Richard M. Valenti, Bar No. 031533
    Jamie D. Guzman, Bar No. 022095
12  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    3100 West Ray Road, Suite 300
13  Chandler, Arizona 85226
    Telephone: (480) 420-1600
14  Fax: (480) 420-1696
    dstruck@strucklove.com
15  rlove@strucklove.com
    tbojanowski@strucklove.com
16  nacedo@strucklove.com
    afletcher@strucklove.com
17  jlee@strucklove.com
    khanger@strucklove.com
18  tray@strucklove.com
    rvalenti@strucklove.com
19  jguzman@strucklove.com
    *Attorneys for Defendants*

20

21                    **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF ARIZONA**
22

23   Victor Parsons, *et al.*, on behalf of themselves   NO. 2:12-cv-00601-DKD
     and all others similarly situated; and Arizona
     Center for Disability Law,
24                                  Plaintiffs,
                                                          **DECLARATION OF MARK**
25         v.                                             **MOYERS, R. Ph., CCHP**

26   Charles Ryan, Director, Arizona Department
     of Corrections; and Richard Pratt, Interim
     Division Director, Division of Health Services,
27   Arizona Department of Corrections, in their
     official capacities,
28                                  Defendants.

196

1        I, MARK MOYERS, make the following Declaration:

2        1.    I am over the age of 18 years, have personal knowledge of, and am competent

3 to testify to the matters set forth in this Declaration.

4        2.    I am currently the Director of Clinical Pharmacy Services for Corizon Health

5 and have held this position since April 2015. Prior to April 2015, I worked as the Regional

6 Pharmacist Manager for Corizon's contract with the Missouri Department of Corrections.

7 In my current role, I am responsible for directing clinical pharmacy services for Corizon

8 Health and supervise the regional pharmacists in various Corizon contracts, including the

9 contract with the Arizona Department of Corrections ("ADC").

10      3.    On October 24, 2016, Governor Ducey signed an Executive Order limiting

11 the fill of addictive prescription opioids to seven days in cases where the State is the payer.

12 *See* Attachment 1 (Executive Order 2016-06).

13      4.    Gabapentin, although not an opioid, is a pain medication used to treat epilepsy

14 and neuropathy. Because it acts as a sedative, it is highly abused in correctional settings

15 and the community. In March 2017, the State of Kentucky found its abuse potential to be

16 so great that it designated it a controlled substance.

17      5.    Tramadol is an opioid pain medication used to treat moderate to severe pain.

18 As with Gabapentin, it too is highly abused in correctional settings and in the community.

19      6.    As a result of the Governor's October 24, 2016 Executive Order, Corizon

20 undertook a review of narcotic prescriptions in ADC, and revised its practice for prescribing

21 and renewing these medications. For instance, new patients were limited to a seven-day

22 supply for Tramadol. After the initial prescription was completed, they were eligible for a

23 30-day supply.

24      7.    Corizon found that some providers prescribed Gabapentin in cases where the

25 inmate's condition did not justify the medication. For example, while Gabapentin is

26 generally prescribed for certain types of neuropathy and seizures, Corizon found providers

27 were prescribing it to treat other types of pain. In cases where these prescriptions were not

28 warranted, alternative (and often more effective) medications were prescribed. Further,

197

1  Corizon found some providers prescribed Gabapentin upon request from an inmate without

2  proper medical justification.

3      8.    Corizon does not have a policy that prohibits prescriptions for Gabapentin or

4  other narcotics.  Corizon has worked with its providers to ensure that these medications are

5  appropriately prescribed.

6      9.    In 2017, the Corizon Arizona clinical team, along with its Pharmacorr

7  partners, reviewed the utilization of opiates, including Tramadol and Gabapentin.  This

8  review included a comparison of the number of prescriptions for Gabapentin and Tramadol

9  over a 24-month period (January 2016 through December 2017).  Details of this comparison

10  are attached as Attachment 2.

11      10.    Their review revealed that, as a result of the Governor's Executive Order, and

12  the new practices described above, decreases in opioid utilization began in the fourth quarter

13  2016.

14      11.    Pain medications in general, however, increased from 2016 to 2017.  *See*

15  Attachment 3 (Graph evidencing a 1% increase in the number of pain medications

16  prescribed from 2016 – 2017).  Increases in other medication classes indicate that inmates

17  removed from opioid medications were prescribed non-opioid alternatives, such as

18  Cymbalta, Effexor, Elavil, Pamelor, and NSAIDs.  Details regarding the number and type

19  of pain medications prescribed in 2016 and 2017 are attached as Attachment 4.  A chart of

20  pain medications by class is attached as Attachment 5.

21      12.    Importantly, Gabapentin and Tramadol are still available if other therapies are

22  not successful.

23      I declare under penalty of perjury that the foregoing is true and correct.

24      Executed this 16th day of January, 2018.

25

26      *[signature]*
        MARK MOYERS

27

28

ATTACHMENT 1

ATTACHMENT 1

199

GOVERNOR DOUGLAS A. DUCEY

# STATE OF ARIZONA
★
# EXECUTIVE ORDER

### Executive Order 2016-06
### Prescription Opioid; Initial Fill Limitation

WHEREAS, an estimated two million people in the United States have a prescription opioid use disorder; and

WHEREAS, more than 14,000 people died from prescription opioid overdoses in 2014; and

WHEREAS, there has been a 300% increase in opioid prescription sales in the United States in the last fifteen years; and

WHEREAS, Arizona has the ninth highest rate of opioid deaths in the nation; and

WHEREAS, 401 people in Arizona died of prescription opioid overdoses in 2015; and

WHEREAS, in 2013 there were enough prescription pain medications dispensed to medicate every adult in Arizona around the clock for two weeks; and

WHEREAS, the majority of heroin users began by using prescription opioids; and

WHEREAS, addiction can affect people across all sections of society; and

WHEREAS, we must do all we can to not only treat those currently suffering from addiction, but to prevent future addictions; and

WHEREAS, the State of Arizona provides health insurance to hundreds of thousands of people through the State Medicaid and employee health plans.

NOW, THEREFORE, I, Douglas A. Ducey, by virtue of the authority vested in me by the Constitution and Laws of the State of Arizona hereby declare the following:

1. The Directors of the Arizona Health Care Cost Containment System (AHCCCS) and the Arizona Department of Administration (ADOA) shall adopt any necessary policies and rules to limit the initial fill of any prescription opioid to no more than seven days.

200

Part V OF E-Filing Document

Re: Plaintiff Bertaneli Motion to Intervene
In Class Action Parsons et. al. V.
Ryan, et. al.
No. CV-12-0601-PHX-ROS

Pages: 200 through 213 ( End )

Executive Order 2016-06
Page Two

2. The Directors of AHCCCS and ADOA shall adopt any necessary policies and rules to limit all initial and subsequent opioid prescriptions for minors to no more than seven days, except in the case of cancer, other chronic disease, or traumatic injury.



IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the Great Seal of the State of Arizona

GOVERNOR

DONE at the Capitol in Phoenix on this Twenty-fourth day of October in the Year Two Thousand Sixteen and of the independence of the United States of America the Two Hundred and Forty-First.

ATTEST:

Secretary of State

201

**ATTACHMENT 2**

**ATTACHMENT 2**

# Gabapentin and Tramadol Orders 2016-2017

| Drug | 2016 (3rd Qtr) | 2017 (3rd Qtr) |
|---|---|---|
| Gabapentin | 3713 | 2160 |
| Tramadol HCl | 881 | 225 |

| Drug Class | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gabapentin | 1003 | 1090 | 1222 | 1099 | 1213 | 1228 | 1202 | 1314 | 1203 | 1280 | 1206 | 1241 | 1190 | 1029 | 998 | 832 | 850 | 738 | 715 | 738 | 707 | 696 | 630 | 434 |
| Tramadol HCl | 227 | 248 | 275 | 283 | 284 | 274 | 263 | 307 | 311 | 317 | 300 | 337 | 334 | 247 | 188 | 124 | 93 | 92 | 72 | 75 | 78 | 86 | 108 | 96 |



# ATTACHMENT 3

# ATTACHMENT 3

# Annual # of Orders for meds in Pain Med Classes



1% increase in number of orders from 2016 to 2017



**ATTACHMENT 4**

**ATTACHMENT 4**

206

# Utilization by Class

| Drug Class | 2016 | 2017 | Difference | % Change |
|---|---|---|---|---|
| Nonsteroidal Anti-Inflammatory Agents (NSAIDs) | 72,733 | 69,588 | (3,145) | -4% |
| Salicylates | 27,248 | 28,229 | 981 | 4% |
| Anticonvulsants - Misc. | 15,530 | 11,232 | (4,298) | -28% |
| Serotonin-Norepinephrine Reuptake Inhibitors (SNRIs) | 11,691 | 17,124 | 5,433 | 46% |
| APAP-ASA-CAFF | 10,655 | 13,703 | 3,048 | 29% |
| Tricyclic Agents | 6,320 | 8,028 | 1,708 | 27% |
| Opioid Agonists | 5,357 | 3,067 | (2,290) | -43% |
| Codeine Combinations | 4,460 | 3,364 | (1,096) | -25% |
| Analgesics Other | 3,315 | 5,494 | 2,179 | 66% |
| Analgesic Combinations | 2,453 | 858 | (1,595) | -65% |
| Central Muscle Relaxants | 2,056 | 2,536 | 480 | 23% |
| Gout Agents | 1,620 | 1,615 | (5) | 0% |
| Selective Serotonin Agonists 5-HT(1) | 1,309 | 1,531 | 222 | 17% |
| Hydrocodone Combinations | 128 | 26 | -102 | -80% |
| Cyclooxygenase 2 (COX-2) Inhibitors | 46 | 42 | -4 | -9% |
| Analgesics-Sedatives | 38 | 38 | 0 | 0% |
| Uricosurics | 18 | 16 | -2 | -11% |
| Opioid Combinations | 7 | 5 | -2 | -29% |
| Salicylate Combinations | 5 | 6 | 1 | 20% |
| Antihistamine-Analgesics | 4 | 1 | -3 | -75% |
| Gout Agent Combinations | 2 | 13 | 11 | 550% |
| Nonsteroidal Anti-Inflammatory Agent Combinations | 1 | 0 | -1 | -100% |
| Opioid Partial Agonists | 0 | 7 | 7 | |
| Opioid Antagonists | 0 | 10 | 10 | |
| Grand Total | 164,996 | 166,533 | 1,537 | 1% |



# ATTACHMENT 5

# ATTACHMENT 5

208

# Pain Medications by Class

| NARCOTIC | NSAID | APAP-COMBOS | DEPRESSION - 1ST GEN | MOOD STABILIZERS | SEIZURE - 2ND GEN | SSRI / SNRI | Opioid Agonists |
|---|---|---|---|---|---|---|---|
| DURAGESIC | ADVIL | EXCEDRIN MIGRAINE | ELAVIL | CARBATROL | LYRICA | CYMBALTA | ULTRAM (tramadol) |
| FIORICET/CODEINE | CELEBREX | FIORICET | NORPRAMIN | TEGRETOL | TRILEPTAL | EFFEXOR | |
| FIORINAL | CLINORIL | TYLENOL | PAMELOR | TEGRETOL XR | NEURONTIN (gabapentin) | EFFEXOR XR | |
| METHADONE | DISALCID | TYLENOL ES | | | | | |
| METHADONE HCL | INDOCIN | | | | | | |
| MORPHINE SULFATE | MOBIC | | | | | | |
| MORPHINE SULFATE INJ | MOTRIN | | | | | | |
| MS CONTIN | NAPROSYN | | | | | | |
| MSIR | TORADOL | | | | | | |
| NORCO | TORADOL INJ | | | | | | |
| OXYCODONE (IR) | VOLTAREN | | | | | | |
| PERCOCET | | | | | | | |
| ROXANOL | | | | | | | |
| ROXICODONE | | | | | | | |
| SUBOXONE | | | | | | | |
| SUBOXONE SL FILM | | | | | | | |
| SUBUTEX | | | | | | | |
| TYLENOL W/COD #3 | | | | | | | |
| TYLENOL W/COD #4 | | | | | | | |
| TYLENOL/ COD | | | | | | | |
| TYLENOL/COD ELIX | | | | | | | |



# In rare bipartisan act, Arizona lawmakers confront opioid epidemic

Andrew Nicla and Dustin Gardiner, The Republic | azcentral.com   Published 10:30 p.m. MT Jan. 25, 2018 | Updated 8:47 a.m. MT Jan. 26, 2018

opioids to fight the opioid crisis emergency



*(Photo: Patrick Sison, AP)*

In a rare moment of bipartisanship, the Arizona Legislature voted unanimously Thursday night to approve a sweeping plan to combat the state's opioid epidemic (/story/news/politics/arizona/2018/01/19/arizona-opioid-painkiller-law-plan-calls-5-day-prescription-limit-10-million-treatment/1048714001/)that has claimed more than 800 lives since June.

Lawmakers approved the Arizona Opioid Epidemic Act, legislation that would limit initial pain-pill fills to five days for "opioid naive" patients, and impose a maximum dosage limit for many others seeking new prescriptions.

The outcome — the legislation passed 30-0 in the state Senate and 58-0 in the Arizona House of Representatives — was a major victory for Republican Gov. Doug Ducey.

210

Ducey spearheaded the proposal and called lawmakers into a special session this week, urging them to pass it quickly to halt overdose deaths. He was expected to sign the legislation Friday.

"This is a tremendous example of what we can achieve when we work together," he said in a statement Thursday night. "I look forward to signing it."

House Speaker J.D. Mesnard, R-Chandler, said although the bill isn't perfect, it will help save lives. He said patients suffering from chronic-pain conditions will not be hassled (/story/news/local/arizona-health/2018/01/25/arizona-limits-opioids-people-chronic-pain-worry-pain-medication-access/1060283001/)to get prescription refills, as some health-care professionals and critics of the bill fear.

"I'm not generally in favor of more regulation," Mesnard said before casting the final "aye" vote. "But when there's an epidemic, when people are dying, then we have to act."

In addition to capping initial prescription fills, the bill aims to provide more treatment. It includes, at the urging of Democrats, $10 million to provide rehab for people who can't afford treatment because they don't have insurance coverage.

Ducey's plan largely builds off the Arizona Department of Health Services' opioid action plan unveiled last fall after the governor declared a public-health emergency. (/story/money/business/health/2017/06/05/arizona-declares-opioid-crisis-public-health-emergency/371206001/)

## 'Good Samaritan Law'

Pushing the bill through the Legislature in less than a week required a flurry of meetings and hearings. Some lawmakers said the rushed agenda may not have benefited the product. They raised concerns that dosage limits might infringe on the relationship between patients and doctors.

But after hours of intense debate Thursday, lawmakers eventually passed the bill with minor tweaks.



Democrats championed a portion of the bill dubbed the "Good Samaritan Law," which aims to encourage people to call 911 in case of an overdose. It states that a person who reports an overdose won't be prosecuted for a drug-related crime, though law enforcement could confiscate drugs and paraphernalia and charge the individual for non-drug-related crimes.

Rep. Rebecca Rios *(Photo: Special for The Republic)*

Join now for as low as
**$9.99/month**

Subscribe Now (http://fullaccess.azcentral.com/newstart/spe gps-source=BEAZjan&utm_medium=agilityzone&t exchange&utm_campaign=UWEB2017)

House Minority Leader Rep. Rebecca Rios, D-Phoenix, called the negotiations a "true bipartisan effort." She said she's glad to see a handful of the proposals her party offered were accepted, including the $10 million earmark for addiction treatment.

"This is how you get it done," Rios said. "This is a strong first step, but it is only a first step. We need to get back to work."

Much of the debate over the bill occurred in the Republican House and Senate caucus meetings, where a few members took issue with provision to mark opioid prescription bottles with red caps. They also questioned the Good Samaritan provision and potential impacts on patients with chronic pain.

## Concerns about 'unintended consequences'

Two doctors groups, the Arizona Medical Association and the Arizona Osteopathic Medical Association, warned in a December letter to the Department of Health Services about the "unintended consequences" of broadly imposing a five-day limit on fills for new patients.

Sen. Kate Brophy McGee, R-Phoenix, was among those who said the bill could have unintended consequences. She raised concerns about dosage limits, saying a constituent of hers is prescribed more in order to treat chronic pain, so she worries some patients might not have access to the amount of medication they need.

Some medical professional also said they were concerned about limiting opioids to a maximum dosage of 90 morphine milligram equivalents per day for most patients. That's the daily equivalent of about 90 mg of Percoset, 60 mg of oxycodone or 20 mg of methadone, according to the Centers for Disease Control and Prevention.

In their December letter to ADHS, the two doctors groups said they "strongly oppose putting any kind of dose-strength limitation in state law."

Cancer, trauma, burn, hospice, end-of-life care and substance-abuse patients would not be subject to the dosage limits. Doctors also could extend existing prescriptions that exceed the limit.

Lawmakers amended the final bill to state that the 90 morphine milligram equivalents limit does not apply to a patient who is continuing a prior prescription issued within the previous 60 days.

The bill also calls for distributing the overdose-reversal drug naloxone, also known as Narcan, to county health officials and law-enforcement support staff to administer in the event of an overdose.



awstart/specialoffer?

anobar&utm_source=bounce-
ER18)

Narcan, used to reverse opioid overdoses, comes as an injection or an inhaler. (Photo: Jennifer Bowman/jbowman@citizen-times.com)

## E-prescription system

Another concern in both chambers was the implementation of an e-prescription system in doctors offices across the state. Brophy McGee said she and many of her colleagues heard concerns from constituents on the issue and are asking for a delayed implementation or an exception in some cases if costs are too high.

Brophy McGee and other lawmakers worried that some offices in rural and urban areas may not be able to pay for or install software in time to be in compliance with the new requirement, saying that some still prefer written prescriptions.

In rural areas, one concern is that "technology and their practice management sophistication is varied," she said. "So, they would want to have additional time to implement certain parts of the statute, including e-prescribing."

Lawmakers amended the final bill to require the Board of Pharmacy to grant waivers to health-care providers who might struggle to comply with the e-prescription filing requirement due to a lack of broadband internet access or other hardships.

212

## Money for treatment

While the bill allocates $10 million to provide treatment to those without insurance coverage, some lawmakers and health-care providers said they are certain more will be needed.

That $10 million would be distributed through AHCCCS providers for the rest of the year once the bill passes, and once the fund runs out, the Governor's Office and lawmakers would decide if and how much additional funds were needed. AHCCCS, or Arizona Health Care Cost Containment System, is the state's Medicaid program.

Rios said $10 million is a "good start" and enough to put a dent in the problem, but more funding will likely be needed. Once the funds run out and lawmakers see how long it took and what services were used more than others, she said, only then will they have an idea how much money is needed.

Some already see the demand for treatment in massive lines at rehab centers.

Lee Ploske, executive director of the Crossroads, a Valley rehab provider, said there is a line of people out the door every day. Many of them are young and covered under Medicaid, he said.



Lee Ploske *(Photo: Courtesy of Lee Ploske)*

Ploske said he applauds Ducey's efforts to restrict dosage levels and establish stricter refill amounts, but he said there are critical issues the bill does not address. He called the opioid epidemic the "worst health crisis this country has seen in our lifetime."

Some Democratic lawmakers were disappointed the bill didn't include a clean-needle exchange; such programs aim to reduce transmission of blood-borne viruses by discouraging addicts from sharing used syringes.

But the issue could still be revisited during lawmakers' regular session.

Rep. Tony Rivero, R-Peoria, has proposed House Bill 2389, which would allow counties, cities and private organizations to operate clean-needle programs without fear of prosecution.

Lawmakers and Ducey's top health-policy officials said the opioid epidemic differs from other illicit drug use because it largely started with years of bad prescribing of powerful and highly addictive pain medication, such as OxyContin and Percoset.

"I think most people who get addicted didn't intend to get addicted," Maynard said.

| post | bump stock ban | sex harassment | funding increases | tax ph |
|------|----------------|----------------|-------------------|--------|