**EXHIBIT A**

**EXHIBIT A**

Office of the Arizona Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DECLARATION OF CARSON McWILLIAMS IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE MAXIMUM CUSTODY PERFORMANCE MEASURES 1 THROUGH 8** |

I, **CARSON McWILLIAMS**, make the following Declaration:

1. I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2. I currently serve as the Division Director, Offender Operations, for the Arizona Department of Corrections and have held this position since February 2014.

3. I have been employed by ADC since 1978.

4. During my 38 year career with ADC, I have been assigned to five (5) of ten (10) ADC prison complexes and held the following positions: Correctional Officer, Correctional Program Officer I, Correctional Program Officer II, Classification Specialist, Correctional Program Supervisor, Associate Deputy Warden (ASPC-Florence-West Unit), Deputy Warden (ASPC-Florence-East Unit & ASPC-Eyman SMU II), Warden (ASPC-Florence), Southern Regional Operations Director, Interim Deputy Director, Northern Regional Operations Director, and Interim Division Director of Prison Operations.

5. I hold a Bachelor's Degree in Criminology from Indiana State University (1977).

6. Throughout my employment with ADC, I have regularly attended annual training and seminars to keep current in the field of corrections. I also regularly attend seminars and training provided by the American Correctional Association, the National Institute of Corrections, and the North American Association of Wardens & Superintendents.

7. I am a member of the American Correctional Association. The American Correctional Association ("ACA") is the largest and oldest correctional association in the world and provides training and conferences in corrections management as well as corrections standards and certification.

8. The National Institute of Corrections ("NIC") is an agency within the Federal Bureau of Prisons that provides training policy/program development assistance to federal, state, and local corrections agencies. The NIC also provides guidance regarding corrections policies, practices, and operations nationwide.

9. The North American Association of Wardens & Superintendents ("NAAWS") is the only warden's organization with membership throughout the United States and Canada and provides training and conferences in current issues facing and forming modern corrections management.

10. As ADC's Division Director, Offender Operations, I oversee the daily operations of all ADC prison complexes, including staffing, staff accountability, and all security operations.

11. I also monitor the six (6) private correctional facilities with which ADC contracts to incarcerate ADC inmates.

12. Previously, as ADC's Northern Regional Operations Director, I oversaw the daily operations of five (5) ADC prison complexes which include ADC's Eyman Complex, Florence Complex, Lewis Complex, Winslow Complex, and Phoenix Complex. I oversaw staffing, staff accountability, and all security operations.

13. At the time I served as ADC's Northern Regional Operations Director, three complexes that I oversaw operated maximum custody units.

14. In my position as Northern Regional Operations Director, I directly supervised the five wardens assigned to each of the five prison complexes noted above.

15. Currently, as Division Director, Offender Operations, I supervise the ten wardens assigned to each of ADC's ten prison complexes, as well as four Regional Operations Directors who also supervise the operations, staffing, staff accountability, and security operations at ADC's ten prison complexes and contract partner complexes.

16. I am familiar with and directly involved in the defense of the *Parsons v. Ryan* litigation. I have personally participated in assisting in the defense of the litigation pre-settlement, negotiating terms of the Stipulation, providing direction as to operational impacts associated with Stipulation compliance, and monitoring of the Maximum Custody Performance Measures ("MCPMs").

17. I served as ADC's lead point of contact as to defense of the maximum custody conditions of confinement claims asserted in the litigation, prior to settlement.

18. I also personally participated with the parties and counsel in the negotiation of the terms of the Stipulation, with specific emphasis on the maximum custody conditions of confinement terms of the Stipulation.

**<u>Monitoring and Reporting of the Stipulation's Maximum Custody Performance Measures</u>**

19. I am personally aware of the monitoring and reporting of the MCPMs under the Stipulation.

20. Paragraphs 19 and 20 of the Stipulation set forth the measurement and reporting process for the MCPMs. (Doc. 1185 at 5-6).

21. Paragraph 20(a) of the Stipulation sets forth the compliance thresholds that must be met for the PMs to be considered compliant in a given month. For the first twelve months after the effective date of the Stipulation, the compliance threshold was 75%. (Doc. 1185 at 6). For the second twelve months, Defendants were required to meet or exceed 80%, and after the first twenty-four months (currently), Defendants must meet or exceed 85%. (Doc. 1185 at 6-7).

22. In addition to paragraph 20(a), I am also familiar with paragraph 20(b) of the Stipulation, which provides for the termination of ADC's duty to monitor a MCPM that has been compliant for 18 out of the past 24 months and has not been out of compliance for three or more consecutive months within the past 18 months. (Doc. 1185 at 7).

23. The specific requirements and protocols for each of the MCPMs are set forth in Exhibit E to the Stipulation. (Doc. 1185-1 at 40-47).

24. Likewise, the protocols for monitoring and measuring each MCPM are set forth in a Maximum Custody Monitor Guide.

25. The Maximum Custody Monitor Guide was not a document that was required by the Stipulation, but was initiated and created by ADC to provide more detailed written direction to ADC personnel for accurate and consistent monitoring and reporting of the MCPMs.

26. The final terms of the Maximum Custody Monitor Guide also included input and agreement by Plaintiffs' counsel and direction by the Court when the parties reached an impasse as to agreed-upon language.

1    27.    Compliance with the MCPMs is reported in the Compliance Green, Amber,
2 Red ("CGAR") reports on a monthly basis.

3    28.    The monthly CGAR findings are provided to Plaintiffs' counsel and since
4 May of 1017, have also been filed with the Court (starting with March 2017 CGAR
5 reports).

6    29.    The first full month of CGAR reporting following the effective date of the
7 Stipulation was in March 2015.

8    30.    There are a total of nine (9) MCPMs, currently applicable to ASPC-Florence
9 Unit (Kasson Cellblock); ASPC-Eyman (SMU-1 and Browning Units for maximum
10 custody inmates only); and ASPC-Lewis (Rast Unit for maximum custody inmates only).[1]
11 MCPM 9 is not subject to Defendants' Motion to Terminate Monitoring and Reporting as
12 MCPM 9 is subject to a Separate Stipulation entered into in August 2017.

13    31.    MCPMs 1-3, 5-6, & 8 are not applicable to ASPC-Phoenix. However,
14 MCPM 4 is applicable to this location.

15    32.    MCPMs 1-6, & 8 are no longer applicable to ASPC-Perryville and ASPC-
16 Florence-Central Unit (Main Yard) as those locations no longer house maximum custody
17 inmates and therefore are no longer subject to monitoring and reporting. ASPC-Florence/
18 Central Unit (Kasson Cellblock) continues to house maximum custody inmates and
19 therefore continues to monitor and report on the MCPMs at issue.

20    33.    At my direction, maximum custody unit security/programming staff and
21 prison complex leadership have verified the accuracy of the percentage scores reported in
22 the monthly CGAR reports.

23    34.    I review the CGAR reports and MCPM compliance on a monthly basis.

24    35.    As a result of the Stipulation and the Court's approval of the same, and on
25 its own initiative, ADC developed a multi-level monitoring and reporting system for

---

[1] Defendants agreed to add maximum custody inmates housed ASPC-Lewis/Rast Unit (a newly constructed unit) to the terms of Stipulation and began ASPC-Lewis's CGAR reporting in October 2015.

5

MCPMs in order to track and monitor out-of-cell activities and programming offered to maximum custody inmates in conjunction with ADC's DI 326 and compliance with the MCPMs.

36. I personally participated in the creation and oversight of ADC's monitoring and reporting system for MCPMs.

37. Because the MCPMs do not pertain to the delivery of health care, clinical mental health care, or dental care, the MCPMs are not monitored and reported by ADC's Monitoring Bureau, but rather by appropriate complex personnel and operations leadership at the applicable prison complexes.

38. The MCPMs direct certain conditions of confinement for maximum custody inmates and generally direct time out of cell and programming afforded to maximum custody inmates.

39. The MCPMs also track ADC's Director's Instruction 326 ("DI 326") as to out-of-cell activities, programming, and privileges.  DI 326 provides a process that requires maximum custody inmates to work through a program utilizing a step system. The step system is a pro-social behavioral modification system that provides maximum custody inmates the opportunity to participate in out-of-cell activities, programming, and jobs where privileges are increased as the inmates progress through the step system.

40. ADC has developed a multi-level review system to monitor and report on the MCPMs.

41. Specifically, each applicable prison complex has DI 326 designated staff responsible to ensure operational compliance with DI 326 and the MCPMs.  DI 326 staff are also responsible for monitoring the accuracy of the source documents utilized to monitor and report on the MCPMs, and to ensure operational compliance regarding the same.

42. The Stipulation Protocols for the MCPMs require that at each designated location, Maximum Custody Daily Out of Cell Time Tracking Forms ("OOCT Forms")

1  are reviewed for one randomly selected week for each monitored month, for 10 randomly
2  selected inmates.

3      43.    Once the monitored week is randomly selected for a monitored month, DI
4  326 staff gather the OOCT Forms for 10 randomly selected inmates and prepare extensive
5  Maximum Custody Notebooks books containing source documents used to monitor and
6  determine compliance for MCPMs 1-6, & 8.  These Maximum Custody Notebooks
7  usually contain between 200-400 pages of source documents per location.

8      44.    Each prison complex Maximum Custody Notebook goes through four levels
9  of review to ensure accuracy of monitoring and compliance for CGAR reporting.

10      45.    Three of the four levels of review receive cross-complex review.

11      46.    Specifically, at the first three levels of review, the Maximum Custody
12  Notebooks are traded among differing complex DI 326 staff and leadership personnel so
13  that personnel from another prison complex audits the accuracy of monitoring and
14  reporting for the MCPMs.

15      47.    The first level review is conducted by prison complex DI 326 staff,
16  including DI 326 sergeants and lieutenants.

17      48.    The second level review is conducted by Deputy Wardens and Associate
18  Deputy Wardens for the prison complexes housing maximum custody inmates.  During
19  this second level review, the accuracy of calculating time out-of-cell
20  activity/programming and MCPM compliance that was conducted at the first level review
21  is double checked. Any inconsistencies, errors, and/or missing source documentation are
22  noted for additional review and follow up. A highly performing staff member from each
23  complex also participates in the second level review to provide understanding and training
24  to all levels of security and programming staff as to MCPM compliance, monitoring, and
25  reporting.

26      49.    The third level review is conducted by Wardens and Deputy Wardens of
27  Operations for the prison complexes housing maximum custody inmates.  During this
28  third level review, the accuracy of calculating time out-of-cell activity/programming and

7

MCPM compliance that was conducted at the first and second level review is triple checked. Any inconsistencies, errors, and/or missing source documentation are noted for additional review and follow up. A highly performing staff member from each complex also participates in the second level review to provide understanding and training to all levels of security and programming staff as to MCPM compliance, monitoring, and reporting.

50. The third level review is also presided over by the Northern Regional Operations Director, Ernest Trujillo. In his absence, either the Southern Regional Operations Director or I will preside over the review. Direction and training regarding MCPM compliance, monitoring, and reporting is provided by me, the presiding Regional Operations Director and/or and Defendants' counsel.

51. The fourth and final level review is conducted by the Warden of the applicable prison complex – his or her Maximum Custody Notebook having previously been through three levels of cross-prison-complex review. The Warden conducts a final audit of his or her Maximum Custody Notebook and then reports CGAR findings for the MCPMs for his or her complex.

52. On a monthly basis, I review the CGAR findings for the MCPMs.

53. I also regularly meet with Defendant Director Ryan, Defendant Richard Pratt, Deputy Director Joe Profiri, ADC General Counsel Brad Keogh, and Defendants' counsel regarding MCPMs compliance, as well as compliance with the Stipulation as a whole.

54. In addition to the four level review process implemented for monitoring and reporting on the MCPMs, in October of 2016, ADC created the position of Associate Deputy Warden of Compliance, Northern Regional ("ADW of Compliance").

55. The ADW of Compliance directly reports to Ernest Trujillo, Northern Regional Operations Director.

56. The ADW of Compliance position provides monitoring and reporting support to the complexes to which MCPMs 1-6, & 8 apply; leads the first, second, and

1  third level Maximum Custody Book review meetings; assists in compiling Maximum
2  Custody Notebook source documents; randomly audits Maximum Custody Notebooks for
3  accuracy and compliance; assists Defendants' counsel in production review of the
4  Maximum Custody Notebooks; provides direction/training to correctional/programming
5  personnel regarding OOCT Form documentation; conducts unannounced tours of
6  maximum custody units to conduct live-time random audits of out-of-cell activities,
7  comparing them to recorded documentation noted on the OOCT Forms; and identifies
8  whether any cancellations of out-of-cell activities or programming must be made up in the
9  applicable week in order to achieve MCPM compliance.

10   57.   In sum, the monitoring and reporting for the MCPMs is subject to multiple
11  levels of cross-complex review and operational oversite to ensure Stipulation compliance
12  as well as accurate monitoring and reporting.

### **Stipulation Compliance**

14   58.   MCPM 1 provides: All maximum custody prisoners at Eyman-Browning,
15  Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special
16  Management Area (Yard 30) who are eligible for participation in DI 326 are offered a
17  minimum of 7.5 hours out-of-cell time per week.  Those at Step II are offered a minimum
18  of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5
19  hours out-of-cell time per week.[2]  (Doc. 1185-1 at 41).

20   59.   MCPM 2 provides: All maximum custody prisoners at Eyman-Browning,
21  Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special
22  Management Area (Yard 30) who are eligible for participation in DI 326 are offered at
23  least one hour of out-of-cell group programming a week at Step II and Step III. (*See id.*).

---

[2] As stated in Paragraph 32 above, MCPMs 1-6, & 8 are no longer applicable to ASPC-Perryville and ASPC-Florence/Central Unit (Main Yard) as those locations no longer house maximum custody inmates and therefore are no longer subject to monitoring and reporting. ASPC-Florence/Central Unit (Kasson Cellblock) continues to house maximum custody inmates and therefore continues to monitor and report on the MCPMs at issue.

60. MCPM 3 provides: All out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶26 of the Stipulation. (Doc. 1185-1 at 42).

61. MCPM 4 provides: All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. (*See id*.).

62. MCPM 5 provides: All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) are offered a minimum of 6 hours of out-of-cell exercise time a week. (*See id*.).

63. MCPM 6 provides: All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy. (Doc. 1185-1 at 43).

64. MCPM 8 provides: In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive: 10 hours of unstructured out-of-cell time per week, 1 hour of additional out-of-cell mental health programming per week, 1 hour of additional out-of-cell psycho-educational programming per week, hour of additional out-of-cell programming per week. (Doc. 1185-1 at 44).

65. Per agreement of the parties, ADC's duty to monitor/report at ASPC-Florence/Central Unit (Main Yard) for MCPM 7, as related to housing of maximum custody inmates with a mental health classification of MH3 or higher unless the cell fronts are substantially modified to increase visibility, ceased in November 2016.

66. ADC has satisfied paragraph 20 of the Stipulation by complying with the required percentage thresholds from paragraph 20(a) for at least 18 out of 24 months of monitoring, with fewer than three consecutive months of noncompliance within the prior

18 months for MCPMs 1-6 & 8 for all locations still housing maximum security inmates and thus still required to report.

67. For the 24-month time period from November 2016 to October 2018, all five reporting complexes have met or exceeded the current 85% compliance threshold for MCPMs 1-6 & 8 - or are no longer required to monitor/report because the specific location no longer houses maximum custody inmates.[3]

68. For the 24 month time period from November 2016 to October 2018, the five complexes at issue for MCPMs 1-6 & 8 were:[4]

- ASPC-Florence/Central Unit (Main Yard and Kasson Cellblock)[5]
- ASPC-Eyman (SMU-1 and Browning Units)
- ASPC-Lewis (Rast Unit)
- ASPC-Perryville (Lumley Special Management Area (Yard 30))[6].

69. ADC's duty to monitor/report at ASPC-Florence/Central Unit (Main Yard and Kasson Cellblock) terminated as of the end of October 2018 where this location was compliant for MCPMs 1-6 & 8 for at least 18 out of the prior 24 months, and was not out of compliance for three or more consecutive months during the prior 18 months. Moreover, ASPC-Florence/Central Unit (Main Yard) has not housed maximum custody inmates since January 17, 2018, and therefore is no longer subject to monitoring and reporting.[7] The last month monitored and reported for ASPC-Florence/Central Unit (Main

---

[3] While this Motion need only focus on the 24-month time period from November 2016 to October 2018 to demonstrate compliance such that monitoring and reporting ceases per Paragraph 20(b), Defendants' Stipulation compliance for MCPMs 1-6, & 8 exceed this time period.

[4] ASPC-Phoenix is not subject to monitoring of MCPMs 1-6, & 8. *See* Stipulation, Paragraph 3 (Doc. 1185 at 2).

[5] ASPC-Florence/Central Unit (Main Yard) no longer houses maximum custody inmates. ASPC-Florence/Central Unit (Kasson Cellblock) continues to house maximum custody inmates.

[6] ASPC-Perryville no longer houses maximum custody inmates. There are no longer female inmates classified as maximum custody in the ADC system.

[7] ASPC-Florence/Central Unit (Main Yard) last monitored maximum custody in

11

Yard) was December 2017. For the 24-month time period prior to Central Yard ceasing to house maximum custody inmates, this location still achieved compliance for MCPMs 1-6 & 8 for at least 18 out of the prior 24 months, and was not out of compliance for three or more consecutive months during the prior 18 months. (See Attachment 1 hereto – table reflecting historical CGAR data for November 2016 to October 2018; and Attachment 2 hereto – table reflecting historical CGAR data for March 2015 to October 2016.)

70. ADC's duty to monitor/report at ASPC-Eyman (SMU-I and Browning Units) terminated as of the end of October 2018 where these locations were compliant for MCPMs 1-6, & 8 for at least 18 out of the prior 24 months, and was not out of compliance for three or more consecutive months during the prior 18 months. (*See id*.)

71. ADC's duty to monitor/report at ASPC-Lewis (Rast Unit) terminated as of the end of October 2018 where this location was compliant for MCPMs 1-6, & 8 for at least 18 out of the prior 24 months, and was not out of compliance for three or more consecutive months during the prior 18 months. (*See id*.)

72. ADC's duty to monitor/report at ASPC-Perryville Special Management Area (Yard 30) terminated as of December 2016 where, as of December 2016, this complex no longer houses maximum custody inmates.[8] The last month monitored and reported for this location was November 2016. For the 20-month time period prior to ASPC-Perryville ceasing to house maximum custody inmates in December 2016, this complex achieved compliance for MCPMs 1-6, 20/20 months. For this same 20-month time period, this complex achieved compliance for MCPM 8, 14/20 months. (*See id*.; see also Doc. 1995 at 22 acknowledging this location did not reach applicable 75% compliance levels for MCPM 8 for March-July 2015, and January 2016).

---

the December 2017 Maximum Custody Notebook. The last date that the Central Unit housed a maximum custody inmate was January 17, 2018. The randomly selected monitoring week for January 2018 was January 27 through February 2, 2018. Thus, there were no maximum custody inmates housed at the Central Unit during the January 2018 monitored month.

[8] ASPC-Perryville's maximum custody population was not moved elsewhere in the system. There are no female inmates in ADC's system that require a maximum custody classification.

12

73. Finally, ADC's duty to monitor/report at ASPC-Phoenix for MCPM 4 related to caloric and nutritional content for max custody inmates terminated where this complex was compliant for MCPM 4 for at least 18 out of the prior 24 months, and was not out of compliance for three or more consecutive months during the prior 18 months. (*See id.*)

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of January, 2019.

Carson A. McWilliams

13