1  Kathleen E. Brody (Bar No. 026331)
   **ACLU FOUNDATION OF ARIZONA**
2  3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
3  Telephone: (602) 650-1854
   Email: kbrody@acluaz.org

4  *Attorneys for Plaintiffs Shawn Jensen, Stephen*
5  *Swartz, Sonia Rodriguez, Christina Verduzco,*
   *Jackie Thomas, Jeremy Smith, Robert Gamez,*
6  *Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
   *Joshua Polson, and Charlotte Wells, on behalf of*
7  *themselves and all others similarly situated*

8  **[ADDITIONAL COUNSEL LISTED ON**
   **SIGNATURE PAGE]**

9  Asim Dietrich (Bar No. 027927)
   **ARIZONA CENTER FOR DISABILITY LAW**
10 5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
11 Telephone: (602) 274-6287
   Email: adietrich@azdisabilitylaw.org

12 *Attorneys for Plaintiff Arizona Center for Disability*
   *Law*
13
   **[ADDITIONAL COUNSEL LISTED ON**
14 **SIGNATURE PAGE]**

15             UNITED STATES DISTRICT COURT

16                 DISTRICT OF ARIZONA

17 Victor Parsons; Shawn Jensen; Stephen Swartz;      No. CV 12-00601-PHX-ROS
18 Dustin Brislan; Sonia Rodriguez; Christina
   Verduzco; Jackie Thomas; Jeremy Smith; Robert
19 Gamez; Maryanne Chisholm; Desiree Licci;           **PLAINTIFFS' RESPONSE**
   Joseph Hefner; Joshua Polson; and Charlotte        **TO DEFENDANTS'**
20 Wells, on behalf of themselves and all others      **MOTION TO TERMINATE**
   similarly situated; and Arizona Center for         **MONITORING AND**
21 Disability Law,                                     **REPORTING OF**
                                                      **MAXIMUM CUSTODY**
22                         Plaintiffs,                 **PERFORMANCE**
                                                      **MEASURES 1 THROUGH 8**
23           v.                                        **[DOC. 3108]**

24 Charles Ryan, Director, Arizona Department of
   Corrections; and Richard Pratt, Interim Division
25 Director, Division of Health Services, Arizona
   Department of Corrections, in their official
26 capacities,

27                         Defendants.

28

143396206.1

# TABLE OF CONTENTS

**Page**

INTRODUCTION & PROCEDURAL HISTORY ................................................................ 1

I.    DEFENDANTS HAVE THE BURDEN OF PROOF. ................................. 4

II.   DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THEY ARE ENTITLED TO TERMINATION BASED UPON THE FINAL VERSION OF THE MONITORING GUIDE. ............................................... 6

III.  DEFENDANTS' MONITORING METHODOLOGY IS SO UNRELIABLE THAT THEIR SELF-REPORTED FINDINGS OF COMPLIANCE CANNOT SUPPORT TERMINATION OF MONITORING. ............................................................................................ 9

    A.   Defendants' Max Custody Notebooks Demonstrate a Non-Random Selection of Prisoner Records. ................................... 10

    B.   Defendants' Max Custody Notebooks Reveal a Pattern of Non-Compliance with Required Monitoring Methodology. .................... 13

    C.   There is Ample Evidence that ADC is Not Offering Out-of-Cell Time to Prisoners. ............................................................................. 14

IV.   DEFENDANTS IMPROPERLY SEEK TERMINATION FOR MONITORING OF PERFORMANCE MEASURES WHICH ARE THE SUBJECT OF A PENDING PROPOSED ORDER AND MOTION TO ENFORCE AND A PENDING NOTICE OF SUBSTANTIAL NONCOMPLIANCE. ....................................................... 19

V.    IF THE COURT DOES NOT IMMEDIATELY DENY DEFENDANTS' MOTION, IT SHOULD SCHEDULE AN EVIDENTIARY HEARING. ....................................................................... 20

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arvizu v. Medtronic Inc.,*
 41 F. Supp. 3d 783 (D. Ariz. 2014) ............................................................ 12

*Botefur v. City of Eagle Point,*
 7 F.3d 152 (9th Cir. 1993) ......................................................................... 15

*Coleman v. Brown,*
 938 F. Supp. 2d 955 (E.D. Cal. 2013) .......................................................... 4

*Daniels-Hall v. Nat'l Educ. Ass'n,*
 629 F.3d 992 (9th Cir. 2010) ...................................................................... 12

*Gilmore v. Calif.,*
 220 F.3d 987 (9th Cir. 2000) ................................................................. 4, 20

*Graves v. Arpaio,*
 623 F.3d 1043 (9th Cir. 2010) .................................................................... 20

*Hisel v. Upchurch,*
 797 F. Supp. 1509 (D. Ariz. 1992) ............................................................. 15

*Jeff D. v. Andrus,*
 899 F.2d 753 (9th Cir. 1990) ...................................................................... 15

*Jonassen v. Port of Seattle,*
 685 F. App'x 571 (9th Cir. 2017) ................................................................. 5

*Klungvedt v. Unum Grp.,*
 No. 2:12-CV-00651- JWS, 2012 WL 5363002 (D. Ariz. Oct. 31, 2012) ..................... 5

*Lew v. Moss,*
 797 F.2d 747 (9th Cir. 1986) ........................................................................ 4

*Parsons v. Ryan,*
 912 F.3d 486 (9th Cir. 2018) .................................................................. 1, 15

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v.
 California,*
 813 F.3d 1155 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2512 (2016) ........................ 6, 7

*Rawlings v. Apodaca,*
 726 P.2d 565 (Ariz. 1989) (en banc) ........................................................... 15

*Rufo v. Inmates of Suffolk Cty. Jail,*
 502 U.S. 367 (1992) ..................................................................................... 4

*Sharp v. Weston,*
 233 F.3d 1166 (9th Cir. 2000) ...................................................................... 4

# TABLE OF AUTHORITIES
(continued)

Page

**CASES (CONT.)**

*United States v. Goodwin,*
    395 F. App'x 491 (9th Cir. 2010) ..................................................................... 5

1

**INTRODUCTION & PROCEDURAL HISTORY**

2          The settlement agreement in this case (the Stipulation) contains nine Max Custody

3   Performance Measures ("MCPM") that apply to certain enumerated maximum custody

4   housing units and "[a]ll prisoners who are now, or will in the future be, subjected by the

5   [Arizona Department of Corrections] to isolation, defined as confinement in a cell for 22

6   hours or more each day .…" [Doc. 1185 at 2] The MCPM require minimum out-of-cell

7   time for prisoners in isolation, including such activities as exercise time and group

8   programming. [Doc. 1185-1, Ex. E] The purpose of the MCPM is to "reduce the harmful

9   effects of prisoner isolation." *Parsons v. Ryan*, 912 F.3d 486, 493 (9th Cir. 2018).

10         Defendants' motion to terminate seeks to end monitoring and oversight by this

11  Court of MCPM ##1-8 by claiming near 100% compliance with all of the measures.[1]

12  [Doc. 3108] Yet they completely fail to meet their burden to show that they are entitled to

13  termination. Instead, they falsely contend that Plaintiffs have the burden of proof.

14         Plaintiffs strongly dispute Defendants' compliance findings in light of the faulty

15  methodology used for self-monitoring; their failure to implement court-ordered

16  procedures for monitoring; and obvious flaws in the underlying compliance

17  documentation produced. Indeed, Plaintiffs have been raising serious concerns with

18  Defendants' methodology for monitoring compliance with the Stipulation's MCPM, as

19  well as problems with their underlying compliance documentation, the "Max Custody

20  Notebooks," since early 2016. [Doc. 1666; Doc. 1667; Doc. 1795; Doc. 1796-1, Ex. A

21  (under seal); Doc. 1944 at 5-7; Doc. 1889]

22         Plaintiffs previously filed a Motion to Enforce the Stipulation (MCPM ##1-3, 5-6,

23  and 8) which enumerated flaws in the monitoring process which fatally undermined the

24

25

26

27         [1] As Defendants note in their brief, MCPM #9 is subject to a separate agreement by
    the parties. [Doc. 3108 at 1-2] Plaintiffs do not contest the termination of monitoring for
28  MCPM ##4 and 7.

accuracy of the CGAR findings.[2] [Doc. 1944] These flaws included "missing and incomplete documentation" and "systemic problems in the monitoring and implementation of the Stipulation." [*Id.* at 7] This motion also demonstrated various "erroneous compliance findings" and urged that the Court find Defendants non-compliant with the maximum custody performance measures. [*Id.* at 28] It was fully briefed by April 2017. [Doc. 1983; Doc. 2006]

Prior to the filing of Plaintiffs' motion to enforce, the Court had already begun reviewing Defendants' monitoring methodology related to the MCPM. [Doc. 1879; Doc. 1889; Doc. 1915] On January 26, 2017, the Court issued an order directing that specific requirements for monitoring the MCPM be incorporated into a final "Monitoring Guide" used by Defendants to determine compliance with the Stipulation's Performance Measures. [Doc. 1915] In February 2017, the Court also issued an order establishing that the final "Monitoring Guide" would be used to guide any compliance determinations made by the Court. [Doc. 1951] In March and April 2017, the Court held additional hearings on Defendants' monitoring methodology. Throughout the hearings, Plaintiffs revealed profound flaws in Defendants' monitoring methodology. [*See generally* Docs. 2046, 2087] Following these hearings, negotiations between the parties, and discussion with the Court, the "Max Custody Monitor Guide Duties & Responsibilities" ("Monitoring Guide") was finalized in July 2017. [*See* Declaration of A. Fettig ("Fettig, Decl."), filed concurrently herewith, ¶ 4, Ex. 1]

After these case developments, Judge Duncan asked Defendants and Plaintiffs to resubmit proposed orders so that the "refresh button" could be pressed on the max custody enforcement motion. [8/9/17 Tr. at 172:11] On September 30, 2017, the Court dismissed the motion to enforce "without prejudice to refiling when a proposed Order is filed that reflects the current status and request for relief." [Doc. 2353 at 3-4] Plaintiffs

---

[2] The CGARs are the monthly reports submitted by Defendants to demonstrate compliance findings for the Stipulation's health care and maximum custody performance measures.

1  subsequently submitted the requested revised Proposed Order (Doc. 2362) in October

2  2017, and Defendants filed Objections to the same in November 2017. [Doc. 2430] In

3  March 2018, while the Proposed Order for the motion to enforce was still pending before

4  the Court, Plaintiffs informed the Court that the parties had resumed settlement

5  discussions around the MCPM, the pending motion to enforce, and the revised Proposed

6  Order. [Doc. 2680 at 4] Judge Duncan retired from the bench in June 2018, without ruling

7  on or adopting the Proposed Order. In September 2018, Plaintiffs submitted a Request for

8  Status Hearing and Proposed Agenda that informed the Court that Defendants "had

9  withdr[awn] from settlement talks so the 'Motion to Enforce [was] now ripe for

10  decision.'" [Doc 2999 at 3] At the December 6, 2018 status hearing, the Court did not

11  address the matter, (12/6/18 Tr. at 35:9-12), and to date has not ruled on the Proposed

12  Order that has been pending before the Court for more than a year. Defendants' present

13  motion to terminate monitoring of MCPM ##1-8 followed. [Doc. 3108]

14      Below Plaintiffs set forth in detail the profound flaws in the monitoring process for

15  the MCPM during the period November 2016 through October 2018, including a failure to

16  randomly select records for review, and a disregard of the requirements set forth in the

17  court-ordered Monitoring Guide. For example, Plaintiffs' counsel's analysis of the

18  underlying source documents showed that month after month, Defendants reviewed the

19  *exact same* prisoners' files, even though the records are required to be randomly selected

20  each month. Plaintiffs also identify profound flaws in the substance of Defendants'

21  compliance monitoring, illustrated by an inexplicable pattern of refusals of out-of-cell

22  time and group programming across the units and months monitored. These enormous

23  rates of alleged refusals raise serious questions about Defendants' compliance with the

24  Stipulation. Evidence from prisoners and others points to a deliberate effort to undermine

25  participation in the out-of-cell time required by the Stipulation and a failure to

26  meaningfully "offer" the required time.

27      In light of this uncontroverted evidence and Defendants' utter failure to meet their

28  burden of proof for termination under the law and the Stipulation, Plaintiffs ask that the

1  Court deny termination of MCPM ##1-3, 5-6 and 8, or, in the alternative, order an
2  evidentiary hearing to evaluate Defendants' alleged compliance and monitoring
3  methodology.

4  **I.   DEFENDANTS HAVE THE BURDEN OF PROOF.**

5        Defendants bear the burden of proving that they are entitled to the termination of
6  monitoring. *See Gilmore v. Calif.*, 220 F.3d 987, 1007 (9th Cir. 2000) ("[N]othing in the
7  termination provisions [of the Prison Litigation Reform Act] can be said to shift the
8  burden of proof from the party seeking to terminate prospective relief."); *see also Rufo v.*
9  *Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992) ("[A] party seeking modification of
10  a consent decree bears the burden of establishing that a significant change in
11  circumstances warrants revision of the decree."); *Sharp v. Weston*, 233 F.3d 1166, 1170
12  (9th Cir. 2000) ("A party seeking modification or dissolution of an injunction bears the
13  burden of establishing that a significant change in facts or law warrants revision or
14  dissolution of the injunction").[3] "The 'burden' in a civil case involves not one but *two*
15  elements:  the burden of going forward with proof (the burden of 'production') and the
16  burden of persuading the trier of fact (the burden of 'proof')." *Lew v. Moss*, 797 F.2d 747,
17  751 (9th Cir. 1986) (emphasis in original).

18        Despite this well-established case law regarding their burden of proof, Defendants
19  claim that the Stipulation's termination provision at paragraph 20(b) is "self-executing
20  upon presentation of compliant CGAR scores for the applicable MCPMs [maximum
21  custody performance measures]." [Doc. 3108 at 6] But the Court has squarely rejected this
22  argument:

23            Defendants argue that paragraph 10(b) of the Stipulation
              provides for an automatic exit and that Plaintiffs have the
24            burden of proving that a performance measure/location should
              remain covered by the Stipulation. (Docs. 2251, 2407) The
25

26  ───────────────────────

27        [3] Defendants here do not seek termination under the PLRA but rather under the
   terms of the Stipulation. [Doc. 3108 at 1] But nothing in the PLRA or otherwise is
28  inconsistent with "the ordinary rule that the party seeking an order bears the burden of
   proof[.]" *Coleman v. Brown*, 938 F. Supp. 2d 955, 960 (E.D. Cal. 2013).

Court disagrees; the relevant text is silent as to the termination's mechanism and any burden of proof. Reading the Stipulation as a whole, the Court concludes that Defendants may move to terminate if they contend they have the qualifying months, but the Court's oversight function requires the Court to rule on termination based on all of the information before the Court at the time of the ruling. . . .To satisfy this requirement, the Court must know the current conditions . . . and must know that the CGAR data is accurate and reliable.

[Doc. 2900 at 2] Thus, the Court has clearly set forth Defendants' burden for a motion to terminate the Stipulation.[4]

Despite the Court's ruling, the *only* evidence Defendants submit in support of their motion is their self-reported CGAR scores supported by a single unsigned declaration.[5] [*See* Doc. 3108-1] This single declaration is insufficient to meet Defendants' burden here.[6] As explained in detail below, Defendants' mere recitation of facially compliant

---

[4] In this Order, the Court addressed the termination provision under 10(b) which applies to the health care performance measures of the Stipulation. Paragraph 20(b) has identical provisions and language except that it applies to the maximum custody performance measures. [*Compare* Doc. 1185 at 4-5 *with* Doc. 1185 at 8]

[5] Carson McWilliams did not properly execute his declaration. Mr. McWilliams' Declaration filed with the Motion to Terminate is not signed, rather it states: "*Electronically reviewed and telephonically approved on January 11, 2019.*" [Doc. 3108-1 at 14] As Mr. McWilliams is not a registered user on the Court's ECF system, he was required to subscribe his declaration, which then had to be scanned and filed with his signature affixed. *See* ELECTRONIC CASE FILING ADMINISTRATIVE PROCEDURES MANUAL at 6 ("[I]f the original document requires the signature of a non-registered signatory, the filing part must scan and electronically file the original document."), *available at* http://www.azd.uscourts.gov/sites/default/files/documents/adm%20manual.pdf. Unsigned declarations are not evidence. *See United States v. Goodwin*, 395 F. App'x 491, 493 (9th Cir. 2010) ("By submitting only an unsigned declaration to prove his complaints, and not supplementing the record with a substitute, [Defendant] has failed to demonstrate that the favorable evidence exists .…"); *Jonassen v. Port of Seattle*, 685 F. App'x 571, 574 (9th Cir. 2017) (finding the district court properly refused to consider an unsigned declaration for summary judgment purposes as the declaration was not authenticated and therefore not admissible as evidence). Defendants subsequently filed an updated declaration on January 29, 2019 with no justification for their evidentiary default. [Docs. 3126 at 1; 3126-1]

[6] This declaration also included improper legal conclusions regarding the ultimate question before the Court—for example, "ADC's duty to monitor/report at ASPC-Eyman (SMU-I and Browning Units) terminated as of the end of October 2018 .…" [Doc. 3108-1 ¶ 70; *see also* Doc. 3108-1 ¶¶ 69, 71-73] Legal conclusions from a witness are improper and must be disregarded by the Court. *See Klungvedt v. Unum Grp.*, No. 2:12-CV-00651-JWS, 2012 WL 5363002, at *3 (D. Ariz. Oct. 31, 2012) ("Legal opinion evidence such as this is inadmissible: legal conclusions are for the court to make.").

CGAR scores (based upon improper methodology) fails to establish that they are entitled to termination of monitoring. Accordingly, their motion must be denied.

## II. DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT THEY ARE ENTITLED TO TERMINATION BASED UPON THE FINAL VERSION OF THE MONITORING GUIDE.

This Court has ruled as follows:

> Defendants are under no obligation to apply the Final Monitoring Guide's procedures retroactively. However, if Defendants want to persuade the Court that a given Performance Measure[] at a given facility is compliant with the Stipulation, then *Defendants will have to show that this PM/facility was compliant under the Final Monitoring Guide's procedures*. The Court expects that this situation would arise for Defendants in at least three contexts: in response to a Motion to Enforce, when moving to terminate a remediation plan, *and when moving to terminate the Court's oversight*. (Doc. 1185 at ¶¶ 10, 20)

[Doc. 1951 at 1-2 (emphasis added, footnote omitted)] In this ruling, the Court cited to the identical compliance provisions in the Stipulation for the health care performance measures (¶ 10) and the maximum custody performance measures (¶ 20). In its subsequent denial of Defendants' motion to terminate health care performance measures, the Court further reiterated its ruling that Defendants are bound by the Court's "Final Procedures" for monitoring the performance measures under the Stipulation: "Nearly 18 months ago, and consistent with binding precedent, the Court informed Defendants that they did not have to recalculate CGAR data but could not rely on CGAR data calculated under discredited methods. (Doc. 1951)." [Doc. 2900 at 3] The Court further explained:

> Put another way, the 24-month period required by Paragraph 10(b) begins from the first month of data collected under a Final Procedure and so *a performance measure is only eligible for termination under the Stipulation if there are 24 months of accurate and reliable data as measured by a Final Procedure*.

[Doc. 2900 at 3] (emphasis added). As the Court noted, this ruling is compelled by Circuit precedent. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1165 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2512 (2016)

("Once a court has interpreted an ambiguous contract provision that is and has *always been* the correct interpretation from its formation." (emphasis in original)).

For the MCPM, the Court's "Final Procedures" are embodied in the Max Custody Monitor Guide Duties & Responsibilities, July 2017" (the "Monitoring Guide"). [*See* Fettig Decl., Ex. 1] These "Final Procedures" required several changes to the monitoring methodology and are retroactively effective as of the Stipulation's effective date, February 18, 2015. *See Pauma Band*, 813 F.3d at 1165. Despite the clear requirements of the Court's order and binding precedent, Defendants have not made any effort to recalculate the maximum custody performance measures according to the required methodology or demonstrate that their CGAR findings comply with the Court's "Final Procedures."

Defendants in their motion are counting months of alleged compliance from November 2016 to October 2018. [Doc. 3108 at 7-8] The Court's "Final Procedures" in the Monitoring Guide were only completed in July 2017. Any months prior to that which used monitoring methodologies that were not "Final Procedures" cannot be counted toward compliance for termination. As the Court has held "a performance measure is only eligible for termination under the Stipulation if there are 24 months of accurate and reliable data as measured by a Final Procedure." [Doc. 2900 at 3] Accordingly, Defendants' motion is premature, as they cannot possibly demonstrate 24 months of compliance for all MCPMs since July 2017.

Moreover, as a result of recent monitoring visits to ADC prisons, Plaintiffs discovered that Defendants are in clear violation of the requirements of the Court's "Final Procedures" in the Monitoring Guide. [*See* Fettig Decl., Ex. 2, Notice of Substantial Non-Compliance, January 15, 2019 (Florence Kasson and Lewis Rast, MCPM ##1-2, 5-6, and 8); Ex. 3, Notice of Substantial Non-Compliance, February 1, 2019 (Eyman SMU-I and Browning, MCPM ##1-2, 5-6, and 8)] Specifically, the Monitoring Guide requires that:

> When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and the personnel to whom the inmate stated the refusal must

note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same …. Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal.[7]

[*See* Fettig Decl., Ex. 1, Monitoring Guide at 5, 8, 13, 16, and 19 (emphasis added)] This "Final Procedure" under the Monitoring Guide is required for MCPM ##1-2, 5-6 and 8—all of which Defendants have moved to terminate. [*Id*.]

During Plaintiffs' recent site tours of the maximum custody units at multiple prison complexes, it was discovered that each of these units is not following the required procedure and has instead implemented procedures that do not allow for contemporaneous recording of refusals of out-of-cell time or allow for prisoners to sign refusals. [*See* Fettig Decl., Ex. 2 at 1-2; Ex. 3 at 1-2] Defendants' counsel confirmed that this non-compliant methodology has been ongoing "for quite some time." [*See* Fettig. Decl., Ex. 4 at 2 (Letter from T. Bojanowski to C. Kendrick, January 17, 2019)] These non-compliant procedures are not uniform and appear to be individually determined by unit staff. For example, some Florence Kasson staff told Plaintiffs' counsel that an officer enters the housing pods and asks prisoners if they want to participate in out-of-cell time/programming and then later tells a different officer to record the prisoner responses. [*See* Fettig Decl., Ex. 2 at 1-2] Other staff at Kasson claimed that they radio prisoner answers into a central command. [*Id*. at 2] Likewise, during a recent tour of Lewis Rast unit it was observed that no Out-of-Cell Tracking forms were visible in the units as had been the previous practice. [*Id*.] In light of what was later learned during the Florence Kasson tour, Plaintiffs concluded that no contemporaneous documentation of refusals was being done at the facility and raised this issue with Defendants' counsel. [Fettig Decl., Ex. 2 at 2] At Eyman SMU-1 and Browning, staff variously told Plaintiffs' counsel that they are recording information on

---

[7] The usage of the word "contemporaneously" in the Monitoring Guide was agreed to by Defendants and addressed by Court order. [Doc. 1915]

1  the out-of-cell tracking sheets after the fact or calling information into other staff for

2  recording. [*See* Fettig Decl., Ex. 3 at 1-2] None of these monitoring methodologies

3  complies with the Monitoring Guide and the Court's "Final Procedures."[8]

4        Because Defendants have failed to provide evidence of compliance with the

5  Court's "Final Procedures" and because they are, indeed, demonstrably *not* following

6  those procedures, their motion to terminate monitoring must be denied.

7  **III.   DEFENDANTS' MONITORING METHODOLOGY IS SO UNRELIABLE**

8  **THAT THEIR SELF-REPORTED FINDINGS OF COMPLIANCE CANNOT SUPPORT TERMINATION OF MONITORING.**

9        Defendants spend much of their motion to terminate outlining an alleged "multi-

10  level review process for monitoring, reporting, and compliance with the MCPMs."

11  [Doc. 3108 at 3-6] Yet when Plaintiffs' counsel reviewed every single Max Custody

12  Notebook purporting to support the MCPM CGAR findings from November 2016 to

13  October 2018, there was no evidence of *any* level of review beyond some red pen marks

14  on some out-of-cell tracking sheets in some of the Notebooks. [*See* Carns Decl. ¶ 21]

15  Plaintiffs found no indication that any level of review by DI 326 Staff, Deputy Wardens,

16  Associate Deputy Wardens, the Deputy Warden of Operations, or the Warden of any

17  prison complex has been conducted on any of the Notebooks. [*Id.* ¶ 21] In contrast,

18  Plaintiffs' careful review of the documents underlying Defendants' CGAR findings

19  revealed serious, systemic problems with the monitoring methodology and unreliable

20  compliance findings. Plaintiffs' findings and evidence also raise serious questions about

21  the reliability of Defendants' underlying documentation itself. More fundamentally,

22  Defendants' extended discussion of their four levels of review does nothing to verify the

23  reliability of the underlying data that they rely on to make the CGAR findings. [*See*

24

25  _____

26      [8] Defendants' own documentation shows the non-contemporaneous recording of refusals. Plaintiffs found numerous instances where comments on the back of the out-of-

27  cell tracking sheets (where reasons for refusals and signatures are supposed to be noted) were not in chronological order, making it highly unlikely that Defendants are recording refusals in real time. [Declaration of Jessica Carns ("Carns Decl."), filed concurrently

28  herewith, ¶ 12; Ex. 7]

Doc. 3108 at 3-6; Doc. 3108-1 ¶¶ 19-57] If those data are unreliable, the resulting CGAR findings are unreliable as well.[9]

### A.   Defendants' Max Custody Notebooks Demonstrate a Non-Random Selection of Prisoner Records.

The Stipulation requires that the MCPM be monitored "for one randomly selected week for each monitored month, for 10 randomly selected prisoners"—that is, ten prisoners randomly drawn from the seriously mentally ill population (SMI), and ten from the non-SMI population. [Doc. 1185-1, Ex. E at 44-45] As Defendants' expert has correctly stated, "Random sampling techniques ensure that no one file from the universe of files has any higher probability or likelihood of being included in the sample than any other." [Doc. 2465-1 at 3, ¶ 9]

The Monitoring Guide approved by the Court includes the methodology to be used for the random selection of prisoner records, which requires the total number of prisoners to be divided by 10 and the selection of every Nth prisoner until 10 records are drawn.[10] [Fettig Decl., Ex. 1 at 4, 18-19]

Despite the clear requirement that record selection be random, a review of the records selected across facilities and months revealed that Defendants are consistently using the same prisoner records month after month. [Carns Decl. ¶ 3, **Exhibit 1 (under seal)**, "FRE 1006 Summary Exhibit 'Prisoners Chosen For Maximum Custody

_____

[9] Plaintiffs note that despite the multiple levels of review claimed by Defendants, the Maximum Custody Notebooks produced were not complete. For instance, in January 2018, the Notebook produced for Eyman Browning had the records of only seven (rather than the required ten) non-seriously mentally ill (SMI) prisoners and included no records for the SMI population. [Carns Decl. ¶ 18] Similarly, the Max Custody Notebook produced for Florence Central in January of 2018 contained no individual prisoner records, and no Max Custody Notebook for Florence Kasson was ever produced for that month. [*Id.*] Moreover, the compliance documents themselves were often difficult to read and contained so much over-writing and crossed out text that it is difficult to calculate total time out-of-cell accurately. [Carns Decl. ¶ 19, Ex. 12] Other documents were copied so poorly that they are barely legible. [Carns Decl. ¶ 20, Ex. 13]

[10] The specific procedure in the Monitoring Guide requires: "The count sheets for the unit are used to determine the pool of eligible inmates. The total number of inmates eligible for DI 326 is then divided by ten, and every nth inmate is reviewed." [Fettig Decl., Ex. 1 at 4]

Performance Measure Review (January – October 2018)" (including separate charts for each maximum custody unit)] For instance, during the ten month period from January to October 2018, Exhibit 1 demonstrates that 20 prisoners at Eyman Browning were drawn on multiple occasions, several of them for three, four or five months in a row, and one individual was drawn three times at Browning unit and three times at Florence. [*Id*. at Ex. 1] This trend is highlighted by the fact that between July and September 2018, Defendants "randomly" selected the *exact same* five prisoner records for review every single month. [*Id*.] Similarly, for Eyman SMU-1, 22 prisoners were drawn on multiple occasions during the same ten-month period, including prisoners whose records were selected three or more times, often in consecutive months. In August and September 2018, for example, the *exact same* four prisoners were drawn both months. [*Id*.] The same pattern is repeated for Florence Central and Kasson Units, where 38 individuals were selected for more than one month, often across three or more months, and often consecutively. For example, from May to June 2018, the *same* five prisoner records were selected for review. [*Id*.] Four of the prisoners whose records were selected at Florence were also selected for review at the other maximum custody units during this same ten-month period. [*Id*.] Finally, the Lewis-Rast unit demonstrates the same unlikely pattern, with 31 prisoners being drawn more than once during the same ten-month period and often for three or more months consecutively. For example, from August to October 2018, the *same* four prisoners records were selected every month. [*Id*.] At Lewis-Rast, one prisoner was actually selected in *8 out of the 10 months reviewed* and two prisoners' records were selected for review five months in a row. [*Id*.]

The probability of this many records at multiple facilities being "randomly" selected again and again over such a short period of time without deliberate intervention on the part of those doing the selection is vanishingly small.

This is especially the case given the size of the populations from which the samples are drawn—the populations of the maximum custody units.[11] For example, in October 2018, the Eyman complex had 1,243 maximum custody beds; Lewis-Rast had 320 maximum custody beds; and Florence had 150 such beds. Similarly, in October 2017, the Eyman complex had 1,464 maximum custody beds; Lewis-Rast had 320 maximum custody beds; and Florence had 247 such beds.[12] The SMI population is a smaller sub-population within this larger population, but even so, the repeated draws of the same prisoners month after month raise troubling questions about methodology. This is especially the case given some of the count sheets produced by Defendants to reflect the record draws made for the MCPM CGAR findings. These sheets show an irregular pattern of SMI record selection—for example, where several consecutive records on a roster have been selected or where records are selected with no discernible pattern, rather than every Nth record as required by the Monitoring Guide. [Carns Decl. ¶ 4, Ex. 2 (count sheets)]

Instead of the random selection required by the Stipulation, the record draws reveal a repeated use of the same prisoners' records across the ten months reviewed. [*Id.* ¶ 3; Ex. 1] This clear preference for certain records undermines any claim of compliance with the MCPM because it indicates that Defendants can know in advance which prisoner records will be selected and thus ensure that those individuals are given the required

---

[11] The Stipulation requires that the MCPM applicable to non-SMI prisoners be implemented for "DI 326" (Director's Instruction 326) eligible prisoners in the maximum custody units. [Doc. 1185 ¶¶ 22, 24-26] There may be some prisoners housed in a maximum custody unit who are not eligible under "DI 326."

[12] These numbers are posted on the ADC website which includes reports entitled, "ADC Institutional Capacity & Committed Population" that list bed capacity by month, year, and security classification from 2014 forwards. The October 2018 report is here: https://corrections.az.gov/sites/default/files/REPORTS/Monthly_CP/bed_capacity_2018/bed-capacity_oct18.pdf and the October 2017 report is available here: https://corrections.az.gov/sites/default/files/REPORTS/Monthly_CP/bed_capacity_2017/bed-capacity_oct17.pdf. Pursuant to Fed. R. Evid. 201, Plaintiffs request that the Court take judicial notice of this information. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (finding it appropriate to take judicial notice of information made publicly available on government websites where the authenticity of the information was not challenged); *Arvizu v. Medtronic Inc.*, 41 F. Supp. 3d 783, 786 (D. Ariz. 2014) (same).

1    services, while possibly ignoring the Stipulation's requirements for the rest of the
2    population.

### B.   Defendants' Max Custody Notebooks Reveal a Pattern of Non-Compliance with Required Monitoring Methodology.

5          Plaintiffs first documented a troubling and consistent pattern of refusals of out-of-
6    cell time and group programming across the system in the February 2017 motion to
7    enforce. [Doc.1944 at 12-17] Rates of refusal for out-of-cell time were running well over
8    50% in most facilities for most months and were often up to 70 or 90%. [*Id*.] These
9    alarmingly high refusal rates translate into many prisoners being confined for days, weeks
10   and months in their cell, and raise serious questions about the legitimacy of the refusals,
11   the underlying cause of such pervasive refusals, and why Defendants have taken no action
12   to solve the problem.

13         Partially in response to this issue, Plaintiffs advocated certain monitoring
14   requirements that are included in the July 2017 final Monitoring Guide, and approved by
15   the Court, such as the signatures documenting refusals. [Fettig Decl. ¶¶ 2-3, Ex. 1; *see*
16   *also* Doc. 1889; Doc. 1915] Despite these requirements, however, refusal rates for all out-
17   of-cell time among both the SMI and non-SMI prisoners in maximum custody remain
18   between 60-80% for both out-of-cell exercise and group programming for most facilities,
19   most months for the period January 2018 to October 2018. [*See* Carns Decl. ¶¶ 5-7; Ex. 3
20   (FRE 1006 compilation of refusal rates for SMI and Non-SMI Prisoners, January 2018 –
21   October 2018)] These astronomical refusal rates raise significant evidentiary questions
22   which Plaintiffs address below, but the underlying records produced to support these
23   refusals also demonstrate that Defendants are not complying with the required monitoring
24   methodology, the Court's "Final Procedures," set forth in the Monitoring Guide.

25         In particular the Monitoring Guide requires that when a prisoner refuses any out-
26   of-cell time, the officer receiving the refusal must contemporaneously sign that refusal
27   and either the prisoner himself or another officer should co-sign the refusal. [Fettig Decl.,
28   Ex. 1, Monitoring Guide at 5, 8, 13, 16, 19 (applying to MCPM ##1-2, 5-6, and 8)] And

1    yet a review of the Max Custody Notebook documentation from November 2016 to

2    October 2018 demonstrates that Defendants are almost never obtaining a second signature

3    on the alleged refusals, and *no* prisoners are actually signing their own alleged refusals.

4    [Carns Decl. ¶¶ 10-11; Exs. 5, 6] Moreover, when officers record why a prisoner has

5    allegedly refused out-of-cell time, the reasons written down by officers are often the same

6    rote response, word for word.[13] [Carns Decl. ¶¶ 15-17; Exs. 10, 11]

7          The Monitoring Guide also requires that if a prisoner has an "extended pattern of

8    refusals or changed behavior" then a supervisor must have a discussion with the prisoner

9    about the refusals and document the date and nature of the conversation in the

10   "comments" section of the out-of-cell tracking forms. [Fettig Decl., Ex. 1, Monitoring

11   Guide at 5, 8, 13, 16, 19 (applying to MCPM ##1-2, 5-6, and 8)][14] Despite this clear

12   requirement of the Monitoring Guide, when Plaintiffs reviewed the out-of-cell tracking

13   sheets used by Defendants to make compliance findings from November 2016 through

14   October 2018, multiple instances, across all max custody units, were found where

15   Defendants failed to comply with this provision. [Carns Decl. ¶ 14] Indeed, in example

16   after example, where a prisoner refused *all* out-of-cell time in a given week, there was no

17   evidence that any supervisor ever counseled him as required by the Monitoring Guide.

18   [Carns Decl. ¶ 14; Ex. 9]

19

20         **C.    There is Ample Evidence that ADC is Not Offering Out-of-Cell Time to Prisoners.**

21         The Stipulation requires that both SMI and non-SMI prisoners in maximum

22   custody are "offered" certain out-of-cell time. [Doc. 1185-1, Ex. E] This includes such

23   activities as: a minimum amount of out-of-cell time for each prisoner (MCPM #1); one

24   hour of group programming for prisoners depending upon step level (MCPM #2); a

25   _____

26        [13] One officer at Lewis-Rast unit notably used the identical language to explain
     prisoners' reasons for allegedly refusing out-of-cell time approximately 87 times from
27   January to August 2018. [Carns Decl. ¶ 16]
         [14] This requirement was incorporated into the Monitoring Guide by Court order.
28   [Doc. 1915]

minimum of 6 hours of out-of-cell exercise a week (MCPM #5); and every week for SMI prisoners, an additional 10 hours of unstructured time out-of-cell, one hour of additional out-of-cell mental health programming, one hour of additional out-of-cell psycho-education programming, and one hour of additional out-of-cell programming (MCPM #8).[15] [*Id.*]

As discussed above, Defendants are recording extremely high refusal rates for all out-of-cell time allegedly being "offered" to prisoners month after month. *See*, *supra*, § III.B. But Plaintiffs have found evidence that raises serious questions regarding whether or not Defendants are actually "offering" the out-of-cell time required by the Stipulation.

This evidence raises the question whether Defendants are complying with the letter and spirit of the Stipulation. It is well established that federal courts treat settlement agreements as contracts. *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1990). The interpretation and enforcement of a settlement agreement is therefore governed by principles of state contract law. *See Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993); *Hisel v. Upchurch*, 797 F. Supp. 1509, 1517 (D. Ariz. 1992). In Arizona, contract law implies a covenant of good faith and fair dealing in all contracts. *See Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1989) (en banc). "The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement . . . ." *Id.* Based on the evidence discussed below, it appears that Defendants either fail to make out-of-cell time offers as the Stipulation requires, or they structure such "offers" so as to maximize refusals by prisoners. Both these actions impair the right of class members in this case to "receive the benefits which flow from their agreement" with Defendants. *Rawlings*, 726 P.2d at 569.

---

[15] As the Ninth Circuit has noted, the Stipulation here requires Defendants "to offer inmates a minimum amount of out-of-cell time, not compel inmates to take that time." *Parsons*, 912 F.3d at 504. But here, Plaintiffs demonstrate that prisoners in isolation are not genuinely being offered out-of-cell time in compliance with the Stipulation.

1    Out-of-cell time is "offered" only if it can be accepted. Black's Law Dictionary

2    (10th ed. 2014) (defining "offer" as "[t]he act or an instance of presenting something for

3    acceptance"); Am. Heritage Dictionary 912 (1978) (defining "offer" as "[t]o present for

4    acceptance or rejection"). Yet prisoner after prisoner across the various maximum custody

5    units declare, under penalty of perjury, that "offers" of out-of-cell time by Defendants

6    frequently cannot be accepted or simply aren't made. For example, if a prisoner is never

7    asked if he wants to go out to exercise or programming, if he is incapacitated, or given no

8    time to answer before he is marked "refused," then he is not offered (because he cannot

9    accept) the opportunity to leave his cell.[16] Likewise, if a prisoner is not allowed a coat,

10   warm clothing,[17] or proper shoes, or he is subjected to unsanitary and demeaning

11

12

13   [16] [*See, e.g.*, Fettig Decl., Ex. 5, Declaration of Maurice Soto, Jan. 25, 2019, ¶ 3

14   ("At times, ADC staff offer exercise in a whisper so we cannot hear the offer."); Ex. 6, Declaration of William Hartless, Jan. 25, 2019, ¶ 4 ("[C]ustody staff do not ask us to go out to exercise . . . they only ask if we want showers."); Ex. 7, Declaration of Mack

15   Gordnattaz, Jan. 25, 2019, ¶ 9 ("At times, ADC staff does not actually offer us exercise. They just walk by our cells."); Ex. 8, Declaration of Kyle Drattlo, Jan. 25, 2019, ¶ 8 ("At

16   times, when ADC 'offers' us exercise, the staff do not actually ask us if we want to go— they just walk the pod without making an offer."); Ex. 9, Declaration of Vinson Johnson,

17   Jan. 25, 2019, ¶ 2 ("ADC offers exercise in my pod at 6:00 AM when most prisoners are sleeping."); Ex. 10, Declaration of Juan Chavez, Jan. 25, 2019, ¶ 3 ("I have seen people

18   miss their exercise time because they are asleep. Officers do not come to offer exercise cell-front if someone is asleep and didn't hear the announcement."); Ex. 11, Declaration

19   of Victor Lizardi, Jan. 25, 2019, ¶ 3 ("When I ask about my exercise time, officers say I refused because I was asleep."); Ex. 12, Declaration of Jesus Ceja, Jan. 25, 2019, ¶ 3 ("If

20   people do not respond immediately [to an offer of exercise time], officers will move on to the next person."); Ex. 13, Declaration of Yerco Arrvayo, Jan. 25, 2019, ¶ 2 ("Officers

21   expect me to be ready by 6:00 [AM] otherwise you are not let out. I do not get time to wash my face, brush my teeth, or use the toilet.") (*see also* Ex. 14, Declaration of T.

22   Amarillas, dated Jan. 30, 2019, attesting to translation of the Declaration of Y. Arrvayo); Ex. 15, Declaration of Tyler Rangel, Dec. 14, 2018, ¶ 4 ("[O]fficers do not give us enough

23   time to accept out-of-cell opportunities."); *see also* Ex. 16, Declaration of Sergio Rodriguez, Dec. 29, 2018, ¶ 2 ("[O]fficers often offer class at the same time as exercise. I

24   believe they do this to force people to choose one or the other so they can mark on[e] of the offers as 'refused.'").

25   [17] ADC does not appear to provide coats or warm clothing to prisoners in maximum custody during the winter months unless prisoners have funds to purchase those

26   clothes themselves. [Declaration of Pablo Stewart ("Stewart Decl.") ¶ 4] December's average minimum temperatures—such as those one would encounter in the early morning

27   hours when ADC offers exercise time—in Phoenix, Arizona, range from 34° Fahrenheit to 53° Fahrenheit, with an aggregate average of 45° Fahrenheit. *See Climatological Data*

28   *for Phoenix Area, AZ*, NOAA Online Weather Data (Feb. 14, 2019),

1    conditions, he is not offered (because he cannot accept) those opportunities to leave his

2    cell.[18]

3           Particularly disturbing is the evidence that prisoners who are seriously mentally ill

4    (SMI) are not being offered the mental health programming and other out-of-cell time to

5    which they are entitled under the Stipulation. During Dr. Pablo Stewart's recent tour of

6    the Eyman Complex, for example, he interviewed several seriously mentally ill prisoners

7    who informed him that they never receive unstructured out-of-cell time and were not

8    receiving the required hours of group programming. [Stewart Decl. ¶ 2][19] [*See also* Fettig

9    Decl., Ex. 22, Declaration of Marc Fasano, Dec. 14, 2018, ¶ 2 ("I am designated as

10   SMI . . . . [W]e do not receive unstructured time (table time). There is no table for us to go

11   to."); Fettig Decl., Ex. 23, Declaration of Refugio Cruz, Dec. 18, 2018, ¶¶ 2-3 ("I am

12   designated as SMI . . . . ADC [has] stopped offering table time consistently in our pod. At

13   times, we have gone [a] minimum of two weeks without table time.")] Dr. Stewart also

14

15   ───────────────

16   https://w2.weather.gov/climate/xmacis.php?wfo=psr. Plaintiffs request that the Court take
     judicial notice of this information. *See* n.12, *supra*.

17   [18] [*See, e.g.*, Fettig Decl., Ex. 11, Lizardi Decl. ¶ 2 ("At [6:00 AM] in fall and
     winter, it is very cold. I am not provided warm clothes and cannot afford to buy warm
18   clothes on my own."); Ex. 8, Drattlo Decl. ¶ 3 ("ADC does not provide warm clothes
     during winter unless you buy them. This discourages me and others from taking exercise
19   in the cold early morning."); Ex. 17, Declaration of Jesus Guzman, Jan. 25, 2019, ¶5 ("[I]
     do not want to get sick from being in the cold."); Ex. 18, Declaration of Quinton Hollis,
20   Jan. 25, 2019, ¶ 4 ("I have size 17 feet. ADC did not provide me shoes that fit . . . this lack
     of the correct size shoes prevented me from taking exercise or leaving my cell."); Ex. 8,
21   Drattlo Decl. ¶ 7 ("There have been times feces have been left in the SHU recreation area
     for long periods of time. This discourages me from taking exercise."); Ex. 19, Declaration
22   of John Romero, Dec. 23, 2018, ¶ 2 ("I do not take exercise because the outside cages
     strongly smell of urine."); Ex. 15, Rangel Decl. ¶ 3 ("I have refused outdoor exercise
23   because we are not given the opportunity to shower after exercising."); Ex. 8, Drattlo
     Decl. ¶ 4 ("If I get a shower after exercise, I have been stuck in the shower for up to four
24   hours. This discourages me from taking exercise."); Ex. 9, Johnson Decl. ¶ 4 ("[A]fter
     exercise, I have been stuck in the shower for up to three hours. This discourages me from
25   wanting to take [exercise]."); Ex. 20, Declaration of Miguel Berroteran, Jan. 25, 2019,
     ¶ 10 ("If other people are … stuck in the shower before I take exercise, it means I won't
26   get a shower after exercise. This discourages me from taking exercise."); Ex. 21,
     Declaration of Timothy Monk, Dec. 18, 2019, ¶ 3 ("We are also not given the opportunity
27   to shower after exercising.").

     [19] Plaintiffs' expert Pablo Stewart, M.D., is a board-certified psychiatrist. [*See*
28   Stewart Decl., Ex. 1 (updated C.V.)] His background and credentials have also previously
     been provided to the Court. [Doc. 1538-1 at 1-6]

observes that ADC's practice of offering exercise time at 6:00 AM to the SMI population is making it impossible for many individuals to actually accept exercise time. [*See* Stewart Decl. ¶ 3 ("It is wholly inappropriate for SMI individuals to be expected to respond immediately at such an early hour of the morning given their medication schedules and the known sedative side effects of many psychotropic drugs.")][20]

Similarly, if a prisoner is seriously mentally ill and so sick that he cannot respond to requests to leave his cell, he is not offered (because he cannot accept) those opportunities to leave his cell. According to Dr. Stewart, the rates of refusal recorded in ADC's compliance documentation "are stunning in any population, and also undermine any contention that provisions to ameliorate damaging levels of isolation for individuals with SMI are being successfully implemented by ADC." [Stewart Decl. ¶ 7]

Dr. Stewart states that in a clinical setting, occasional refusals from an SMI population are expected, but aggregate rates of refusal for the population above 30% to 40% must be addressed as a clinical failure, as must persistent patterns of refusal in individual patients. [Stewart Decl. ¶ 7] Dr. Stewart notes that in a clinical setting in the community, such high rates of refusal in an SMI population would require an "immediate response by the mental health care staff to reduce the refusal rate" and would be seen as a clinical failure demanding a quality assurance process to determine the factors causing the refusals and plans for corrective action. [Stewart Decl. ¶ 10]

Refusal to adhere to treatment and refusal to socialize or leave one's cell can sometimes be a symptom of disease for SMI individuals who are subjected to isolation. "But it is not acceptable for mentally ill inmates to regularly refuse to leave their cells to participate in care and activities. These are symptoms of uncontrolled, undertreated disease that must be addressed." [Stewart Decl. ¶ 13] Dr. Stewart observes that ADC's

---

[20] While the ability to wake up with an alarm clock is a routine practice outside of prison, for prisoners in maximum custody in the Arizona Department of Corrections, it is not so simple. Such prisoners may be restricted from having such property or unable to purchase an alarm clock because they lack the funds to do so. [*See* Fettig Decl. ¶ 28]

years-long failure to address the enormous rates of refusal recorded for the SMI prisoners to engage in treatment or leave their cells places that entire population at unacceptable risk of harm. [Stewart Decl. ¶ 6] Defendants must take affirmative steps to prevent this harm and solve the clear problems surfaced in the stunningly high refusal rates in the SMI population.

The enormous and unexpected refusal rates found in Defendants' documentation raise the question whether the hundreds of men trapped in these cells for 22 hours or more each day are actually choosing to stay locked down day after day, and if so, why? Are they being "offered" out-of-cell time in a way they can actually accept? The evidence set forth above says "No." Accordingly, Defendants' motion to terminate should be denied.

## IV. DEFENDANTS IMPROPERLY SEEK TERMINATION FOR MONITORING OF PERFORMANCE MEASURES WHICH ARE THE SUBJECT OF A PENDING PROPOSED ORDER AND MOTION TO ENFORCE AND A PENDING NOTICE OF SUBSTANTIAL NONCOMPLIANCE.

Defendants seek to terminate monitoring of performance measures that are currently the subject of Plaintiffs' pending Motion to Enforce MCPM ## 1-3, 5-6, and 8 at Florence Central, Florence Kasson, Lewis Rast, Perryville, Eyman-Browning, and Eyman-SMU I. [Docs. 1944, 1983, 2006, 2362, 2430, 2680, 2999] Defendants also seek to terminate performance measures which are the subject of Plaintiffs' January 15, 2019 Notice of Substantial Noncompliance for Florence Kasson and Lewis Rast related to MCPM ##1-2, 5-6 and 8, and Plaintiffs' February 1, 2019 Notice of Substantial Noncompliance for Eyman SMU-1 and Eyman Browning related to MCPM ##1-2, 5-6 and 8. [*See* Fettig Decl., Exs. 2, 3] Because these Notices and Plaintiffs' Motion to Enforce assert that Defendants are noncompliant with the very Performance Measures Defendants seek to terminate, Defendants' motion must be denied until these claims are resolved.

## V.     IF THE COURT DOES NOT IMMEDIATELY DENY DEFENDANTS' MOTION, IT SHOULD SCHEDULE AN EVIDENTIARY HEARING.

Plaintiffs have presented abundant evidence showing that Defendants are not in compliance with the requirements of the MCPMs. This, without more, compels a conclusion that Defendants have not carried their burden to show that they are entitled to termination of these measures. If, however, the Court concludes that Defendants' motion turns on unresolved factual issues, the Court should schedule an evidentiary hearing to resolve those issues. *See* Doc. 2900 at 2 ("the Court must know the current conditions" before ruling on a motion to terminate monitoring); *Graves v. Arpaio*, 623 F.3d 1043, 1046 (9th Cir. 2010) (district court promptly scheduled evidentiary hearing on defendants' motion to terminate relief in jail conditions case); *Gilmore*, 220 F.3d at 1008 ("[T]he court must inquire into current conditions at a prison before ruling on a motion to terminate.").

## CONCLUSION

For all of the reasons set forth herein, Defendants' Motion to Terminate Monitoring and Reporting should be denied as to MCPM ##1-3, 5-6 and 8 because they have failed to meet their burden under the law and the Stipulation. In the alternative, the Court should order an evidentiary hearing to evaluate whether or not Defendants can meet their burden.

Dated:  February 22, 2019

**ACLU NATIONAL PRISON PROJECT**

By:  s/ Amy Fettig
David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
Ryan Kendall (CA 324714)*
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@aclu.org
              afettig@aclu.org
              vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

-20-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    kbrody@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com
          rlomio@prisonlaw.com

*Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez;
Christina Verduzco; Jackie Thomas;
Jeremy Smith; Robert Gamez; Maryanne
Chisholm; Desiree Licci; Joseph Hefner;
Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others
similarly situated*

**ARIZONA CENTER FOR
DISABILITY LAW**

By:   s/ Maya Abela
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:     adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

-22-

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on February 22, 2019, I electronically transmitted the above

3    document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4    Notice of Electronic Filing to the following CM/ECF registrants:

5

6                            Michael E. Gottfried
                             Lucy M. Rand
7                    Assistant Arizona Attorneys General
                        Michael.Gottfried@azag.gov
8                          Lucy.Rand@azag.gov

9                            Daniel P. Struck
                             Rachel Love
10                       Timothy J. Bojanowski
                          Nicholas D. Acedo
11                         Ashlee B. Hesman
                            Jacob B. Lee
12                         Timothy M. Ray
                          Richard M. Valenti
13                         Jamie D. Guzman
              STRUCK LOVE BOJANOWSKI & ACEDO, PLC
14                      dstruck@strucklove.com
                          rlove@strucklove.com
15                    tbojanowski@strucklove.com
                         nacedo@strucklove.com
16                       ahesman@strucklove.com
                           jlee@strucklove.com
17                         tray@strucklove.com
                         rvalenti@strucklove.com
18                       jguzman@strucklove.com

19                        *Attorneys for Defendants*

20

21                            s/ D. Freouf

22

23

24

25

26

27

28

-23-