Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

[ADDITIONAL COUNSEL LISTED BELOW]

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

[ADDITIONAL COUNSEL LISTED BELOW]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **DECLARATION OF PABLO STEWART, M.D.** |

LEGAL143387369.1

**I, PABLO STEWART, M.D., DECLARE:**

1. I am a physician licensed to practice in California and Hawaii and a board-certified psychiatrist, with a specialty in clinical and forensic psychiatry. My background and experience as relevant to my expert testimony in this proceeding have previously been provided to the Court (*see* Doc. 1538-1 at 3-6) and an updated C.V. is attached hereto as **Exhibit 1**.

2. I toured Eyman, SMU 1 on January 25, 2019. During that tour I was able to confidentially interview several of the prisoners identified by the Arizona Department of Corrections (ADC) as Seriously Mentally Ill (SMI) who reside in the maximum custody housing units at that facility. These individuals consistently reported to me that they were only being offered one or two hours of group programming per week, instead of the three hours required for SMI prisoners under the terms of the Parsons Stipulation. These prisoners also consistently reported the desire for more treatment and group programming but the lack of opportunity to actually participate in such groups. The SMI prisoners I interviewed also unanimously reported that they were rarely being offered the opportunity to participate in unstructured time or "table time" out of their cell on a weekly basis.

3. During my confidential interviews with SMI prisoners at Eyman, SMU-1, the prisoners also told me that they frequently are unable to go to outdoor recreation because it is offered at 6:00 am in the morning and they are not awake when the officers come by, and not given a chance to respond to officers that they wish to go to the exercise pens, especially if they are on powerful psychotropic drugs. Because so many SMI individuals in the ADC are prescribed such drugs, I am not surprised that they are having difficulties responding at such an hour. It is wholly inappropriate for SMI individuals to be expected to respond immediately at such an early hour of the morning given their medication schedules and the known sedative side effects of many psychotropic drugs.

4. During my tour I also spoke with several individuals with obvious mental health problems, who were not identified as SMI by ADC or who had been de-designated recently to a lower mental health status, but who resided in the maximum custody units.

LEGAL143387369.1

1  These prisoners also indicated that they were not able to accept the offer of outside
2  recreation time during the winter because maximum custody prisoners are not allowed to
3  have coats and often they have no other clothing to wear other than a t-shirt—if they are
4  indigent and unable to purchase warmer clothing.  This problem is especially acute
5  because opportunities for recreation are often exclusively given at 6:00 am when it is cold
6  and dark during the winter months.  Many reported that being trapped in their cell for days
7  without the opportunity to interact with others was exacerbating their mental health
8  problems.  This exacerbation of mental health problems was confirmed during clinical
9  interviews.

10  5.  In this litigation I previously submitted a declaration regarding the
11  problematic refusal rates for group programming and recreation required under the
12  Stipulation in the maximum custody units for the period December 2015 to September
13  2016. [Doc. 1939; 1939-1]

14  6.  I have now reviewed the rates of refusal for group programming (for the
15  SMI population this includes 10 hours of unstructured time; and the out-of-cell group
16  programming required under the Stipulation each week), and exercise time for those
17  members of the isolation population in this case who are SMI and non-SMI for the period
18  January 2018 to October 2018.  *See* **Exhibit 2** (a chart of monthly rates of refusal for
19  recreation and programming time for both the SMI and non-SMI max custody population
20  in ADC based on data from compliance documentation provided by Defendants, created
21  by Plaintiffs' counsel, and provided for my review).  The two sets of data I reviewed on
22  refusal rates for this case are markedly similar and cause for tremendous concern.  These
23  refusal rates also indicate a significant risk to individuals with serious mental illness.
24  They are also consistent with the self-reports I heard from Eyman SMU-1 prisoners who
25  indicated that they are not being offered the out-of-cell group programming they are
26  entitled to and often cannot take advantage of outdoor exercise because it is not actually
27  being offered in such a way that they are able to accept it.
28

7. As I've previously stated in this case, in a clinical setting, we expect some occasional refusals from an SMI population, but aggregate rates of refusal for the population above 30% to 40% must be addressed as a clinical failure (indicator of less than adequate clinical care), as must persistent patterns of refusal in individual patients. In the Arizona Department of Corrections (ADC), the extremely high rate of refusals for both programs and out-of-cell time and the pervasiveness of the refusals over time and at multiple facilities raise serious concerns from a clinical perspective. Most facilities for most months are recording refusal rates over 50% and several reach 70% to 80% or greater for out-of-cell exercise refusals. Such refusal rates are stunning in any population, and also undermine any contention that provisions to ameliorate damaging levels of isolation for individuals with SMI are being successfully implemented by ADC.

8. The high rate of refusals across the various activities in the SMI isolation population indicated in Exhibit 1 is a clear clinical red flag. Similarly, these same high rates of refusal in 2015 and 2016 were clinical red flags. Based on the current rates of refusal it appears that nothing has been done to ameliorate the causes of these refusal rates, especially amongst the SMI population.

9. These refusal rates are strong evidence that the SMI population is undertreated and subjected to inadequate mental health care as a whole. The medical literature, often termed "adherence to treatment," supports the fact that sicker patients tend to have the most difficulty with treatment regimes. For psychiatric patients, refusals of treatment tend to be correlated to higher levels of acuity. In other words, the sicker the mental health patient, the more likely s/he is to refuse treatment. Given my first-hand knowledge of ADC's mental health care system developed during the course of this litigation, inspection of facilities, interviews with prisoners and staff, and review of medical records and other documents, I am certain that the acuity of mental health problems in the prisoner population and the lack of adequate mental health treatment is one of the underlying factors leading to the high rates of program and out-of-cell time refusal in the isolation units.

10. As I've also previously stated in this case, if program and socialization activities were refused at the rates recorded for the SMI isolation population in ADC at a comparable clinical setting in the community, there would be an immediate response by the mental health care staff to reduce the refusal rate. Such refusal rates would be seen as a clinical failure (an indicator of less than adequate clinical care) and immediately subject to a quality assurance process to determine the factors causing the refusal rates and proposals for corrective action.

11. In addition to patient acuity and inadequate mental health care, other typical causes for high refusal rates in a correctional mental health setting include the clinical activities occurring in a non-confidential setting; the time of the treatment program interfering with other activities (e.g., commissary, yard time, visiting, etc.); the quality of the programming being poor, including poor skill sets of the clinician; previous attendance in the same group program in the recent past; the group not being pertinent to the inmate's mental illness; the inmate being too disorganized to participate (often indicating a need for a higher level of care); the lack of a positive relationship with the treatment provider; custody staff discouraging people from coming out of their cells; and fear of officers or other inmates and the failure to create a safe environment for the patient. Often, high refusal rates are a combination of clinical and custody staff factors that undermine the participation of individuals with SMI in their own treatment.

12. A key intervention to promote adherence to treatment is to ensure positive relationships with treatment providers. The medical literature establishes that a lack of a positive relationship between patient and clinician is often a key driver of refusals and non-adherence across medical practice. Amongst other issues to consider, ADC should evaluate clinical resources as part of an effort to address the patterns of treatment refusals in the SMI population.

13. For individuals with SMI who are subjected to isolation conditions, refusal to adhere to care and refusal to socialize or leave one's cell is often a symptom of their disease. But it is not acceptable for mentally ill inmates to regularly refuse to leave their

1    cells to participate in care and activities. These are symptoms of uncontrolled,
2    undertreated disease that must be addressed. It is incumbent upon the clinicians, and the
3    staff as a whole, to address the factors undermining the care and treatment of these
4    patients. Failure to work with SMI individuals to ensure they adhere to treatment is
5    unacceptable medical practice in both corrections and the community. Indeed, failure to
6    reduce refusals and establish adherence to treatment creates an unacceptable risk of harm
7    for the SMI population in isolation; their diseases will get worse if they continue to go
8    untreated and undertreated.

9    14.    These stunning refusal rates in the ADC isolation units have persisted since
10   2015. It is still my opinion ADC must take immediate action to reduce the refusal rates
11   substantially in the SMI population in isolation. In order to effectively deal with this
12   clinical failure, ADC should immediately undertake a quality assurance process to identify
13   likely causes of the refusals, including both medical and custody issues. Given the
14   persistence of the refusals over time and the widespread nature of the refusal rates across
15   facilities it is also still my opinion that the system needs outside expert guidance on how
16   to identify the underlying problems and what corrective actions to take to effectively
17   reduce the rates of refusal.

18   15.    Treatment refusals, including medication refusals, are unfortunately
19   observed in the care of psychiatric patients. This is best understood as a consequence of
20   the lack of clinically appropriate treatment. The extremely elevated refusal rates seen in
21   ADC is reflective of the overall poor quality of psychiatric care resulting in severely
22   mentally ill patients being too ill to properly access what little care is available. In
23   addition, the refusal rate is explained by the fact that the treatment offered is not
24   meaningful to the patients.

25   16.    Based on my recent interviews with SMI prisoners in the max
26   custody/isolation units, it is also my opinion that these refusal rates likely do not reflect
27   genuine offers of group programming and out-of-cell exercise to much of the SMI
28   population. The men I interviewed wanted access to out-of-cell time but they were either

not being given those opportunities or were being prevented from actually accessing those opportunities by external factors.

17. An independent review of the operation of the isolation units will be necessary to determine why and how offers of out-of-cell time are being made such that so few individuals are able to fully receive the necessary social and environmental stimulation provided for under the Stipulation to prevent the worst harms of isolated confinement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of February, 2019.

_____
Pablo Stewart, M.D.

**ADDITIONAL COUNSEL:**

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
Ryan Matthew Kendall (Calif. 324714)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@aclu.org
         afettig@aclu.org
         vlopez@aclu.org
         rkendall@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

|   |   |
|---|---|
| 1 | Daniel C. Barr (Bar No. 010149) |
|   | Amelia M. Gerlicher (Bar No. 023966) |
| 2 | John H. Gray (Bar No. 028107) |
|   | **PERKINS COIE LLP** |
| 3 | 2901 N. Central Avenue, Suite 2000 |
|   | Phoenix, Arizona 85012 |
| 4 | Telephone: (602) 351-8000 |
|   | Email:   dbarr@perkinscoie.com |
| 5 |          agerlicher@perkinscoie.com |
|   |          jhgray@perkinscoie.com |

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:  dbarr@perkinscoie.com
        agerlicher@perkinscoie.com
        jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:  kbrody@acluaz.org

Donald Specter (Cal. 83925)\*
Alison Hardy (Cal. 135966)\*
Sara Norman (Cal. 189536)\*
Corene Kendrick (Cal. 226642)\*
Rita K. Lomio (Cal. 254501)\*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:  dspecter@prisonlaw.com
        ahardy@prisonlaw.com
        snorman@prisonlaw.com
        ckendrick@prisonlaw.com
        rlomio@prisonlaw.com

\*Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)\*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:  cnmitchell@jonesday.com

\*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)\*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:  jlwilkes@jonesday.com

\*Admitted *pro hac vice*

LEGAL143387369.1 -7-

| | |
|---|---|
| 1 | *Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated* |

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:   skader@azdisabilitylaw.org
         adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
  rdalyrooney@azdisabilitylaw.org
  jrico@azdisabilitylaw.org
  mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2019, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf