Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

[ADDITIONAL COUNSEL LISTED BELOW]

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

[ADDITIONAL COUNSEL LISTED BELOW]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **DECLARATION OF JESSICA CARNS IN SUPPORT OF PLAINTIFFS' RESPONSE TO MOTION TO TERMINATE MONITORING AND REPORTING OF MAXIMUM CUSTODY PERFORMANCE MEASURES 1 THROUGH 8** |

143390583.1

I, JESSICA CARNS, declare:

1. I am a paralegal employed by the ACLU National Prison Project. As part of my regular duties, I track and review compliance documents produced by Defendants in *Parsons v. Ryan* related to the maximum custody performance measures (MCPMs) set forth in the Stipulation. [Docs. 1185, 1185-1, Exs. D, E] Together with the attorneys and legal fellows, the paralegals before me working on this matter developed protocols and procedures for analyzing these compliance documents with regard to the requirements of the Stipulation, which I have continued to follow. These procedures are explained below where applicable. If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

2. Attached to this declaration are a number of Federal Rule of Evidence (FRE) 1006 summary exhibits created because the underlying data and documents are so voluminous that it cannot be conveniently examined by the Court. All of these summaries are based on true and correct copies of the compliance documents produced by Defendants in this matter and reflect Plaintiffs' reasonable analysis of the contents of these documents. Each FRE 1006 summary is identified as such.

3. I attach hereto as **Exhibit 1 (under seal)**, "FRE 1006 Summary Exhibit 'Prisoners Chosen for Maximum Custody Performance Measure Review (January – October 2018).'" The chart shows by month and facility the frequency at which certain prisoners were chosen for monitoring on a monthly basis. The chart was formulated by reviewing the prisoner out-of-cell tracking sheets produced by Defendants for each facility during each month of monitoring. This information was taken from the Max Custody Notebooks produced by Defendants for each facility for each month. For each facility monitored, nearly every month under review included a prisoner record (out-of-cell tracking sheet) or multiple records that were included in either a month before or a subsequent month in 2018. Review of all Max Custody Notebooks during this time period also revealed that certain prisoners' records were being chosen after moving facilities. This is indicated by an index in yellow highlighting on the chart, which

143390583.1

1  demonstrates that the prisoner was selected in another facility's Max Custody Notebook during the relevant time period.

2  4. Under the Maximum Custody Monitoring Guide, Defendants are supposed to select every nth prisoner based on total population. However, the SMI prisoner selection appears to not follow this methodology in all cases. For example, it is recorded in the max custody documentation for Eyman Browning for August 2018 that every 1st SMI prisoner was selected to be audited for monitoring purposes, but the count sheet itself shows nine (9) prisoners in a row and one (1) prisoner in a separate column being selected. I attach hereto as **Exhibit 2 (under seal)**, true and accurate copies of a few representative samples of these types of count sheets: ADCM1548930; ADCM1540967; ADCM1516755; ADCM1553792.

5. I attach hereto as **Exhibit 3**, "FRE 1006 Summary Exhibit 'Rates of Refusal of Recreation' and 'Rates of Refusal of Programming January – October 2018.'" These two (2) charts demonstrate the rates of refusal for: 1) exercise/recreation; and 2) programming (which includes mental health programming and group programming) for each facility for the months January through October 2018. SMI program unstructured time required under MC PM #8 is not included in this analysis. This exhibit was created by myself and a team of paralegals and law clerks under my supervision. We calculated the rates of refusal for each of the facilities by reviewing the individual out-of-cell tracking sheet for each prisoner for each month and: 1) adding up the total number of recreation periods/programs offered; and 2) adding up the total number of recreation periods/programs marked as "refused" by prisoners. I further broke-down these totals to non-SMI and SMI prisoners and then added the two together to determine the overall refusal rate.

6. When determining the total number of refusals, my colleagues and I included in our calculations any instances where a prisoner refused either an entire recreation period/program or elected to return to their cell early, thereby refusing part of the out-of-cell time offered. Due to variations in the way partial refusals were denoted

across the various facilities, it is possible that some partial refusals may not have been accounted for in these figures.

7. We did not include in our calculations any instances where a prisoner was either offered or refused a visitation period, unstructured out-of-cell time, or other/incentive out-of-cell time. Refusal Rates for Florence-Kasson for January 2018 and for SMI prisoners for Eyman-Browning for January 2018 were not included in the charts as the applicable tracking sheets were missing from Defendants' production.

8. In my review of the documentation produced by Defendants, I found numerous instances in which an entire group programming class of up to approximately ten (10) prisoners would allegedly refuse to participate in out-of-cell-programming. This pattern spans across all facilities and all months for the monitoring period of November 2016 through January 2018. Whenever prisoners would refuse group programming, the corresponding sign-in sheet was never actually signed by the prisoners themselves, but the word "refused" was written in place of the prisoners' signatures. When multiple prisoners refused the same hour of group programming, the same correctional officer would write "refused" on the prisoners' signature lines where they should have been signing to verify their own refusal.

9. I also found instances in which a correctional officer used the same illegible signature to sign for each prisoner. Moreover, I found multiple instances in which the refusal of all prisoners offered a certain program was denoted by a slash across all signature lines, demonstrating that there was no valid attempt on behalf of the correctional officer to receive even a single prisoner's signature on their refusal. Prisoners' refusals of group programming was always denoted by the word "refused" written by a correctional officer, illegible signatures clearly by the same correctional officer, or a slash across all prisoners' signatures lines. I attach hereto as **Exhibit 4 (under seal)** true and accurate copies of a few representative samples of these types of sign-in sheets for programming produced by Defendants: ADCM1518881; ADCM1518698-99; ADCM1538659; ADCM1541173-74; ADCM1501018.

10. In my review of Defendants' Max Custody Notebooks for the period of November 2016 through October 2018, I did not find a single refusal in the comments section on the back of prisoners' out-of-cell tracking sheets in which the prisoners themselves signed, thereby verifying their own refusal. Throughout my review of maximum custody documentation, I found that there was consistently one (1) correctional officer's signature on refusals listed in the comments section of prisoners' out-of-cell tracking sheets, rather than two (2) signatures as required by the Maximum Custody Monitoring Guide. I saw no notation in the documented monitoring that due to safety, security, or operational concerns it was impossible to a get a second signature or a signature from the refusing prisoner. I attach hereto **Exhibit 5 (under seal)** true and accurate copies of a few representative samples of these tracking sheets produced by Defendants: ADCM1553645; ADCM1553630; ADCM1552116; ADCM1549667.

11. In particular, the documentation from Eyman-SMU and Florence-Kasson reflects a consistent pattern of only procuring one (1) correctional officer's signature for prisoners' refusals as recorded on the back of the prisoner's out-of-cell tracking sheet. For the monitoring period of January 2018 through October 2018, the majority of refusals in the comment section on the back of prisoners' out-of-cell tracking sheets for Eyman-SMU and Florence-Kasson only included one (1) signature. This signature was always from a correctional officer and not the prisoners themselves. For example, every refusal in the entire Maximum Custody Notebook for Florence-Kasson for October 2018 has one (1) correctional officer's signature verifying that the alleged refusal actually occurred. I attach hereto **Exhibit 6 (under seal)** true and accurate copies of documents produced by Defendants which are examples of out-of-cell tracking sheets from January to October 2018 for Eyman-SMU and Florence-Kasson: ADCM1535983; ADCM1554571; ADCM1523202; ADCM1516344; ADCM1540094.

12. I also noted numerous instances in which the comments on the back of the out-of-cell tracking sheets (where reasons for refusals and signatures are supposed to be noted) were not in chronological order, making it highly unlikely that Defendants were

taking notes and recording refusals in real time, and therefore, not following the proper procedure of noting the refusal contemporaneously with the instance of the refusal. For example, for Florence for October 2018, the same correctional officer added notes dated earlier in the week to the end of the comments section of multiple prisoners' out-of-cell tracking sheets selected for review that month. I attach hereto **Exhibit 7 (under seal)** true and accurate copies of documents produced by Defendants which are representative examples of out-of-cell tracking sheets demonstrating refusal times that appear to have been entered after-the-fact: ADCM1553930; ADCM1554011; ADCM1522757; ADCM1549520; ADCM1519134.

13.   When reviewing the individual prisoner out-of-cell tracking sheets produced by Defendants, I noted that there were numerous instances when a prisoner would refuse all out-of-cell time offered to them for the entire week. This pattern spans across all facilities and all months for the monitoring period of November 2016 through January 2018. I attach hereto as **Exhibit 8 (under seal)** true and accurate copies of a few representative samples of these types of out-of-cell tracking sheets: ADCM1540069-70; ADCM528893-94; ADCM1517013-14; ADCM1518669-70.

14.   Furthermore, I found multiple instances in which there was no indication that a correctional officer made any attempt to speak to the prisoner about their persistent pattern of refusing out-of-cell time that was allegedly being offered to them for that week. I found this issue to be more prevalent in Eyman-SMU and Florence-Kasson in that there were more instances in which there would be no visible note on a prisoner's out-of-cell tracking sheet when the prisoner exhibited a clear pattern of refusing all offered out-of-cell time for that week. However, this pattern also more generally spans across all facilities and all months for the monitoring period of November 2016 through October 2018. I attach hereto as **Exhibit 9 (under seal)** true and accurate copies of these types of tracking sheets: ADCM1535982-83; ADCM1554473-74; ADCM1554219-20; ADCM1518694-95.

15.     In my review of the max custody documentation, I found that correctional officers sometimes used the exact same quote to indicate that they spoke to each prisoner about their consistent pattern of refusing out-of-cell time being offered that week.  The use of identical quotes from prisoners was most prominent in the Lewis-Rast facility for the monitoring period of November 2016 through October 2018.  For a majority of months during the aforementioned monitoring period, one sergeant recorded an alleged quote from a prisoner and repeated this quote verbatim on multiple prisoners' out-of-cell tracking sheets for that month, thus rendering the entire process of recording instances of refusals unreliable.

16.     For example, for the monitoring period of January 2018 to August 2018, this sergeant, whose name is identified in the attached exhibit under seal, indicated the refusal reason for all prisoners who refused all of the out-of-cell time allegedly offered to them that week was "due to not wanting to go."  This sergeant used the same quote to explain prisoners' refusals approximately 87 times from January to August 2018, as produced by Defendants in the Lewis-Rast out-of-cell tracking forms.  The same sergeant repeated the quote "prisoner said he didn't want table time, rec, or class" approximately 19 times during September and October 2018 for Lewis-Rast.  This sergeant used vague and repetitive quotes to explain prisoners' refusals as far back as November 2016.  I attach hereto **Exhibit 10 (under seal)** true and accurate copies of these problematic tracking sheets produced by Defendants for Lewis-Rast: ADCM1540391; ADCM1519202; ADCM1502158; ADCM1516927.

17.     Although the documentation provided for Lewis-Rast shows a very strong pattern of duplicating quotes from prisoners, I found a broader theme of generic and/or repetitive quotes being used from correctional officers across months and facilities throughout the monitoring period of November 2016 through October 2018.  For example, a correctional officer at Florence-Kasson used similarly vague quotes across multiple months for multiple inmates.  Again in the documentation for Eyman Browning, I noted comparable quotes across multiple months being used by correctional officers to explain

1  prisoners' consistently high rates of refusing out-of-cell recreation and programming. I
2  attach hereto **Exhibit 11 (under seal)** true and accurate samples of these types of tracking
3  sheets produced by Defendants: ADCM1518822; ADCM1523463; ADCM1529629;
4  ADCM1528894.

5      18. Because of incomplete documentation produced by Defendants, it was
6  impossible at times to properly review Maximum Custody Notebooks for each month and
7  facility. For example, Defendants omitted all of the individual out-of-cell tracking forms
8  for both SMI and non-SMI prisoners in Florence-Central's Max Custody Notebook for
9  January 2018 and no Max Custody Notebook was produced for Florence-Kasson for the
10 same month. Additionally, the maximum custody documentation for Eyman-Browning
11 for January 2018 only included individual documents for seven (7) prisoners. The
12 Eyman-Browning Max Custody Notebook for January 2018 was missing all ten (10) SMI
13 prisoners and three (3) prisoners from the general population.

14      19. In some instances, assessing compliance was especially difficult due to
15 disorganization and sloppiness in Defendants' record keeping. For example, the
16 handwritten start and end times on tracking sheets were often difficult to read or illegible.
17 Defendants sometimes crossed out start and end times or wrote over them, making it even
18 more difficult to discern the amount of time offered. I found the same issue of crossing
19 out words or writing over them on the comments section on the back of individual out-of-
20 cell tracking sheets. Without being able to calculate the total amount of out-of-cell time a
21 prisoner was offered, it is extremely difficult to properly determine compliance and
22 consistency with CGAR findings. I attach here to as **Exhibit 12 (under seal)** true and
23 accurate copies of a few representative samples of these types of illegible out-of-cell
24 tracking sheets: ADCM1552827; ADCM1501943; ADCM1549506; ADCM1549143.

25      20. Other documents, attendance sheets in particular, were scanned in at such a
26 low resolution and high contrast that the names and ADC numbers on them were barely
27 legible, if at all. I attach hereto as **Exhibit 13 (under seal)** true and accurate copies of a
28

1  few representative samples of this type of sign-in sheet: ADCM1538656;
2  ADCM1502064; ADCM1549327; ADCM1538477.

3  21. I have reviewed the Declaration of Carson McWilliams (Doc. 3108-1) as supplement to Defendants' Motion to Terminate [Doc. 3108]. Mr. McWilliams describes four (4) separate levels of review occurring among various levels of ADOC prison staff in paragraphs 44-51 in his declaration. Throughout my review of maximum custody notebook documentation for the period November 2016 to October 2018, I saw no discernible evidence of any of the levels of review described in Mr. McWilliams' declaration with DI 326 staff, Deputy Wardens, Associate Deputy Wardens, the Deputy Warden of Operation, or the Warden of any prison complex. In some of the notebooks, I did see the use of red pen to calculate the total time each prisoner spent outside of their cell during the week on out-of-cell tracking sheets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd of February, 2019, in Washington D.C.

*[signature]*
Jessica Carns

**ADDITIONAL COUNSEL:**

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
Ryan Matthew Kendall (Calif. 324714)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:  dfathi@aclu.org
        afettig@aclu.org
        vlopez@aclu.org
        rkendall@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

143390583.1                   -8-

| | |
|---|---|
| 1 | Daniel C. Barr (Bar No. 010149) |
| 2 | Amelia M. Gerlicher (Bar No. 023966)<br>John H. Gray (Bar No. 028107)<br>**PERKINS COIE LLP** |
| 3 | 2901 N. Central Avenue, Suite 2000<br>Phoenix, Arizona 85012 |
| 4 | Telephone: (602) 351-8000<br>Email: dbarr@perkinscoie.com |
| 5 | agerlicher@perkinscoie.com<br>jhgray@perkinscoie.com |

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
rlomio@prisonlaw.com

*Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com

*Admitted *pro hac vice*

143390583.1                                  -9-

| | |
|---|---|
| 1 | *Attorneys for Plaintiffs Shawn Jensen;* |
| 2 | *Stephen Swartz; Sonia Rodriguez;*<br>*Christina Verduzco; Jackie Thomas;* |
| 3 | *Jeremy Smith; Robert Gamez; Maryanne*<br>*Chisholm; Desiree Licci; Joseph Hefner;* |
| 4 | *Joshua Polson; and Charlotte Wells, on*<br>*behalf of themselves and all others*<br>*similarly situated* |

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:  skader@azdisabilitylaw.org
           adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
  rdalyrooney@azdisabilitylaw.org
         jrico@azdisabilitylaw.org
         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2019, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf

143390583.1

-11-