Office of the Arizona Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592
Telephone: (602) 542-1645
Fax: (602) 542-3393
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-ROS <br><br><br> **DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO TERMINATE MONITORING AND REPORTING OF MAXIMUM CUSTODY PERFORMANCE MEASURES 1 THROUGH 8** <br><br> [AMENDED REDACTED] |

Pursuant to Paragraph 20(b) of the Stipulation, Defendants monitoring and reporting obligation for Maximum Custody Performance Measures 1-8 has terminated (Doc. 1185 at 8.)  Defendants have complied with the applicable Stipulation required thresholds for at least 18 out of 24 months of monitoring, with fewer than three consecutive months of noncompliance within the prior 18 months for the time period encompassing November 2016 to October 2018.  Monitoring and reporting obligations for

MCPMs 1-8 at ASPC-Florence, ASPC-Eyman, ASPC-Lewis, and ASPC-Perryville have therefore been completed.

As established by the argument that follows, complete with evidentiary support, Plaintiffs' anecdotal challenges to Defendants' monitoring methodology fails to establish that the data supporting the CGAR reports of MCPM compliance is inaccurate or pervasively unreliable. Defendants have demonstrated success. They have achieved compliance. Fairness and equity prevail to permit Defendants a meritorious release from monitoring and reporting duties for MCPMs 1-8 going forward.

## I.    **INTRODUCTION**

Cut to its core, glaringly absent from Plaintiffs' Response is any evidence establishing that maximum custody inmates eligible for review of MCPMs 1-3, 5-6 & 8 were not actually offered the out-of-cell activities, programming, and incentives required by the Stipulation and applicable MCPMs.[1] Without such evidence, Defendants are entitled to termination of monitoring and reporting pursuant to Stipulation Paragraph 20(b). (Doc. 1185 at 8.)

Plaintiffs' challenge to Defendants' methodology for random selection of inmates for monitoring; location of Out-of-Cell Tracking Forms ("OOCT Forms); and documentation of refusals of out-of-cell time fail where Defendants' methodology is compliant with the Stipulation and Maximum Custody Monitor Guide, and does not violate any Court rulings. Likewise, Plaintiffs' dissatisfaction with out-of-cell activity refusal rates is distraction of no consequence. Neither the Stipulation nor the MCPMs require tracking and evaluation of refusal rates. Nor is any aspect of compliance with the MCPMs based on refusal rates. Thus, inflated and unreliable refusal rates cannot be a basis for denial of termination of monitoring and reporting of MCPMs pursuant to Stipulation Paragraph 20(b).

---

[1] Plaintiffs agree to termination of reporting and monitoring for Maximum Custody Performance Measures ("MCPMs") 4 and 7.

To be sure, Defendants' MCPM performance has never been a calculated focus of the Court's attention. Plaintiffs' Motion to Enforce the Stipulation (MCPM ##1-3, 5-6, and 8), which was filed on February 23, 2017, was denied without prejudice on September 30, 2017. (Doc. 2353 at 3-4.) The Court has never found Defendants in substantial non-compliance for any MCPM. Nor has the Court ruled that any monitoring methodology employed by Defendants was flawed such that Defendants could not move for termination of monitoring and reporting of MCPMs unless the performance measures were recalculated under a new or modified methodology.

Additionally, Plaintiffs never sent Defendants any Notices of Substantial Non-Compliance nor did they file any Motions to Enforce the Stipulation for MCPMs for the monitoring time period at issue – November 2016 to October 2018. Plaintiffs' Notices of Substantial Non-Compliance dated January 15, 2019 and February 1, 2019 for ASPC-Florence, Lewis and Eyman come too late, having been filed after Defendants moved to terminate monitoring and reporting. With that, Plaintiffs' challenges to methodology for location of OOCT Forms and documentation of refusals of out-of-cell time are waived. Plaintiffs also have never challenged Defendants' methodology for random selection of inmates (which has been in place since 2015) and thus waive this challenge too. Lastly, refusal rates are not contemplated by the Stipulation, are not monitored, and thus are not subject to a compliance or methodology challenge at any stage.

Here, Plaintiffs cannot levy concerns with Defendants' monitoring more than two years after it occurred and then force the termination clock to start anew. If the Court indulges Plaintiffs' arguments, this would create an incentive for Plaintiffs to only raise monitoring concerns just before a performance measure terminates so that Defendants would have another full two years before the performance measure terminates. That is not how the Stipulation was designed. Plaintiffs should be estopped from benefiting from their own delay.

Finally, Plaintiffs' disregard of Defendants' demonstrated success along with Plaintiffs' misguided form over substance challenges must come to an end. Under the

terms of the Stipulation agreed upon by Plaintiffs, Defendants are entitled to cease monitoring and reporting of MCPMs 1-3, 5-6 & 8.   Going forward, the focus and resources of the parties and the Court should center on bettering the select few underperforming healthcare performance measures currently at issue. The parties bargained for an achievable end to monitoring and reporting on performance measures that reached Stipulation compliance rates. Defendants have met and exceeded the prescribed compliance rates for November 2016 to October 2018.  The time has come to end monitoring and reporting for MCPMs 1-3, 5-6 & 8.

**II.     DEFENDANTS SATISFIED THEIR INITIAL BURDEN OF SHOWING COMPLIANCE; THE BURDEN THEN SHIFTED TO PLAINTIFFS TO PROVE THAT THE DATE IS INACCURATE OR PERVASIVELY UNRELIABLE**

Plaintiffs correctly recognize that Defendants "do not seek termination under the PLRA but rather under the terms of the Stipulation."[2] (Doc. 3177 at 8 n.3.)  Defendants' Motion is not inconsistent with Magistrate Judge Duncan's prior interpretation of the Stipulation.  In its June 22, 2018 Order, Judge Duncan ruled that "Defendants may move to terminate [measuring and reporting on performance measures] if they contend they have the qualifying months."  (Doc. 2900 at 2.)  That is what Defendants have done: they have moved the Court to issue an order finding that they are no longer required to measure and report on MCPMs 1-8.  (Doc. 3108 at 10.) That Motion is supported by the CGAR reports showing compliance for the requisite number of months and the Declaration of Carson McWilliams.[3] (Doc. 3108-1, 3108-2, 3126-1.)  Defendants maintain that those reports are accurate and reliable.

---

[2] For that reason, Plaintiffs' reliance on cases interpreting the termination provisions of the PLRA are inapposite. (*See* Doc. 3177 at 8 & n.3, citing *Gilmore v. Cal.*, 220 F.3d 987 (9th Cir. 2000); *Coleman v. Brown*, 938 F. Supp. 2d 955, 959 (E.D. Cal. 2013).) So are the cases they cite involving consent decrees and court-ordered injunctions. (*See id.*, citing *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 374-75 (1992); *Sharp v. Weston*, 233 F.3d 1166, 1168 (9th Cir. 2000); *Brown*, 938 F. Supp. 2d at 964.). The Stipulation, a private settlement agreement, is neither. (*See* Doc. 1185, ¶ 35.)

[3] Plaintiffs argue that McWilliams did not properly execute his declaration because the original version was not hand-signed. But as even they recognize, Defendants filed an identical signed version on January 29, 2019. (Doc. 3126-1.) The original version was not signed because McWilliams, ADC's Division Director of Offender Operations, was out of

It is now Plaintiffs' burden to prove that the reports are either inaccurate or unreliable. That, too, is consistent with Judge Duncan's previous ruling: "[B]ut the Court's oversight function requires the Court to rule on termination based on all of the information before the Court at the time of the ruling. … To satisfy this requirement, the Court … must know that the CGAR data is accurate and reliable." (Doc. 2900 at 2.) Indeed, in ruling on a prior motion to terminate measuring and reporting on healthcare performance measures (Doc. 2251), Judge Duncan terminated monitoring on nineteen performance measures based solely on the CGAR reports. (Doc. 2900 at 13). In complying with their obligation to measure and report on these MCPMs, Defendants have provided Plaintiffs more than 33,000 pages of source documents supporting these CGAR reports through production of monthly Maximum Custody Notebooks, each of which is several hundred pages in length containing the necessary source documents to establish MCPM and thus CGAR compliance. (Decl Valenti, Exh. 1 at ¶¶13-16.) Plaintiffs do not challenge the accuracy of that source data, but instead offer anecdotal inmate declarations to challenge their reliability. As discussed below, Plaintiffs' evidence falls woefully short of establishing that the CGAR reports are unreliable.[4]

**III.   FINALIZATION OF THE MAX CUSTODY MONITORING GUIDE IN JULY 2017 DOES NOT DEFEAT TERMINATION OF MONITORING AND REPORTING**

**A.   The Monitor Guide Is Not Part of the Stipulation.**

Plaintiffs argue that because the Maximum Custody Monitor Guide was not finalized until July 2017, Defendants are unable to terminate MCPMS 1-3, 5-6 & 8. Plaintiffs are wrong. The Monitor Guide is not (and has never been) part of the Stipulation. To hold that the finalization date of the Monitor Guide affects Defendants'

---

the state and did not have access to a printer or scanner on the date it was filed. As noted in the original version, however, he had reviewed and approved the Declaration by email/phone. Furthermore, Plaintiffs do not explain, or even assert, any resulting prejudice. The signed declaration was filed *more than a month before* Plaintiffs filed their Response (Doc. 3177).

[4] Of the eighteen inmate declarations Plaintiffs offer, six inmates were among those inmates subject to random monitoring in the produced Maximum Custody Notebooks. Three of those six inmates were subject to random monitoring more than once.

ability to terminate monitoring and reporting on MCPMs under Paragraph 20(b) is to rewrite the Stipulation.  Courts cannot rewrite contracts under the guise of interpretation:

> While the parties to a contract often request the courts, under the guise of interpretation or construction, to give their agreement a meaning which cannot be found in their written understanding . . . the courts properly and steadfastly reiterate the well-established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make.  In other words, the interpretation or construction of a contract does not include its modification or the creation of a new or different agreement; a court is not at liberty to revise, modify, or distort an agreement while professing to interpret or construe it and has no right to make a different contract from that actually made by the parties.

Williston on Contracts, Standards of Interpretation, § 31:5 (May 2017).  The Ninth Circuit agrees: "[I]t is a familiar principle of contract law that unless a contract is voidable, [courts] must enforce it as drafted by the parties, according to the terms employed, and may not make a new contract for the parties or rewrite their contract while purporting to interpret or construe it."  *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1195 (9th Cir. 2007) (citations omitted).

The Stipulation did not call for, much less require, a Monitor Guide, nor is it incorporated.  There is absolutely no reference to a Monitor Guide anywhere in the Stipulation.  In addition, the Stipulation is an integrated contract and can only be modified by an agreement of the parties with a signature of those representative parties to be bound.  The Monitor Guide contains no such required acknowledgement or signature which would modify the terms of the Stipulation and, as such, cannot be incorporated into the Stipulation.  The Stipulation is clear that it is an integrated agreement.  Paragraph 40 of the Stipulation states as follows, "This is an integrated agreement and may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification." (Doc. 1185 at 15.)

Because the parties have not modified the Stipulation in accordance with the integration clause, the Plaintiffs cannot rely upon the content of the Monitor Guide to alter the requirements of the terms contained within the Stipulation.  Further, the reliance by

Plaintiffs upon the monitoring methodology set forth in the Monitor Guide is misplaced as that methodology is not a part of the parties' contract and cannot be used to require action on the part of the Defendants in order to obtain compliance of any particular performance measure.

### B. No Methodology Set Forth in the Monitor Guide Requires Recalculation of Data for MCPMs.

Here, Plaintiffs attempt to defeat termination of monitoring and reporting on MCPMs, arguing that Defendants must recalculate the CGAR data for the MCPMs for November 2016 through July 2017, where the data was calculated under discredited methods. (Doc. 3157 at 10-11.) The only methodology "change" that Plaintiffs point to is the Monitor Guide methodology for documenting inmate refusals of out-of-cell time. Documentation of refusals was addressed by the Court, but no bright line change was made in this regard.   Specifically, Plaintiffs' counsel demanded that Defendants be required to double validate an inmate's refusal of offered out-of-cell time by requiring either a second witnessing officer's signature or the inmate's own signature evidencing the refusal. Defendants could not agree to this operationally burdensome requirement thus, the issue was presented to the Court. After hearing the parties' positions, Defendants' legitimate challenges against a bright line requirement for a second signature to a refusal was accepted by the Court with the Court explaining:

> [W]ith regard to the certification, I guess I'm not so persuaded that there needs to be a signature by more than one guard.  It seems to me that one is sufficient. (Doc. 1836, 12/14/2016 Status Hr., at 79:8-10.)

> We'll require that there be the contemporaneous signature, and we will follow the protocol that Ms. Love has articulated. . . . I am not going to follow the plaintiffs' suggestion of incorporating the requirement of two contemporaneous officers because I think the records available to plaintiffs will be - - will be able to provide you with the additional information that you can provide to the Court . . . .. I think in the first instance, in most instances, the signature of the - - of the officer who hears that from the inmate is sufficient, augmented by the cases under Ms. Love's protocol where it's supported by the supervisor's after-the-fact notation of visiting with the inmate.  (*Id.* at 89:14-22, 90:4-8.)

> And I just think that we'll be more well-informed by what's happening that we need to be concerned about, based upon your reporting that you do on the street level, as opposed to just imposing this requirement of having certain combinations of signatures. So that will be my ruling on that point.

(*Id.* at 94:4-9.) (Doc. 1836, 12/14/2016 Status Hr., at 79:8-10, 89:14-22, 0:4-8, 94:4-9.)

Simply put, a second signature is not required, but encouraged "where feasible considering safety/security/operational concerns . . ." (Doc. 3177-2 at pgs. 15, 18, 23, 26, and 29, Monitor Guide).  Because there was no substantive change to methodology for documentation of refusals, Defendants are not required to re-audit the November 2016-July 2017 data.  Compliance is determined by the number of hours of out-of-cell time offered to inmates, not by whether or not there is a second signature to validate an inmate's refusal of out-of-cell time.

Next, Plaintiffs make a cursory challenge to the ASPC-Florence (Central Unit, Kasson Cellblock) manner of completing OOCT Forms where an officer controlling the cell doors, while another officer restrains/unrestrains an inmate entering or exiting the cell, is the officer who documents refusals or beginning/ending times of out-of-cell time.  This cursory challenge fails to defeat termination of monitoring and reporting.  No re-calculation is required in this regard either.

The Stipulation and MCPMs neither require the use of an OOCT Form nor dictate who fills the Forms out and where it is located.  Moreover, the 2017 Monitor Guide addresses the use of the OOCT Forms but does not require that the OOCT Forms be affixed cell-front. The Monitor Guide also does not dictate which officer documents beginning and end times of out-of-cell activities.  As to refusals of out-of-cell time, the Monitor Guide only requires the officer to whom a refusal as made sign the Comments Section of the OOCT Form, noting the amount of time refused and "contemporaneously sign the same." (Doc. 3177-2 at pgs. 15, 18, 23, 26, and 29, Monitor Guide, at 4(b) -5(b cont.)&(c), 7(b)-8(b cont.)&(c), 12(b cont.)&(c)-13(d), 15(h)-16(h cont.) & (i), 19(c) & (d)). The "contemporaneous" requirement is tied to witnessing officer's duty to log the

8

1   amount of time refused on the comments section and sign his/her name to the same.

2   There is no requirement for contemporaneous documentation of the refusal as it is

3   happening, live-time.[5]

4                    **C.      Defendants Randomly Select the Inmates to be Monitored.[6]**

5          Plaintiffs also challenge Defendants' methodology for monthly random selection of

6   inmates for monitoring MCPMs 1-8.  Plaintiffs state the following: "Plaintiffs' counsel's

7   analysis of the underlying source documents showed that month after month, Defendants

8   reviewed the *exact same* prisoners' files, even though the records are required to be

9   randomly selected each month."  (Doc. 3157 at 6 of 27) (emphasis original).

10         Plaintiffs' grandiose statement claiming that for twenty-four months, Defendants

11  monitored the exact same inmates every month is flagrantly incorrect.  Granted, some

12  inmates were subject to monitoring more than once for the reasons explained below.  But

13  this is due to how the inmates are subject to selection – a methodology never challenged

14  by Plaintiffs until Defendants moved for termination.[7]

15

16

17         [5] The OOCT Forms are just one of many source documents.  Even where an officer
    inadvertently fails to record the amount of out-of-cell time refused by an inmate this
18  documentation oversight does not destroy compliance.  Rather, the reviewer determining
    compliance may compare the OOCT Form to the Activity or Program schedules to
19  determine the amount of time refused.  (Doc. 3177-2 at pg. 15, Monitor Guide at 5(b
    cont.) & (d)).

20         [6] Plaintiffs take issue with the OOCT Forms contained in the monthly Maximum
    Custody Notebooks not indicating on the face of the OOCT Form that it has gone through
21  three levels of review for compliance determination.  Plaintiff's criticism carries no
    weight.  The multi-level review system is ADC's own creation and requirement of itself.
22  (Exh. 2, Decl. of Bendel at ¶ 22-25, 28-36).  Neither the Stipulation, MCPMs, nor the
    Monitor Guide require this process.

23         [7] Plaintiffs also complain that there is no evidence that the Maximum Custody
24  Notebooks go through four levels of review before CGAR compliance is reported.
    Plaintiffs' complaint is of no consequence.  Defendants' initiated their own self-branded
25  manner of review and monitoring of the MCPMs.  Neither the Stipulation, the MCPMs
    nor the Monitor Guide Require the same.  And, the challenge to the absence of any
26  writing on the OOCT Forms to indicate multi-level review is nonsensical.  One must look
    at an OOCT Form and analyze applicability of categories of out-of-cell activity based
27  upon an inmates DI 326 Step Level and SMI status, and calculate hours.  There is no need
    for reviewers to write on the OOCT Form to conduct this analysis other than to write in
28  total numbers of hours into categories if they wish.

Plaintiffs are correct is in their explanation of how from the start, inmates have been randomly selected for review and reporting. The July 2017 Monitor Guide only memorialized the methodology employed since 2015. Per the Monitor Guide and existing practice prior to the Monitor Guide's existence:

> The count sheets for the unit are used to determine the pool of eligible inmates. The total number of inmates eligible for DI 326 is then divided by ten, and every nth inmate is reviewed. If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the inmate either directly above or below the randomly selected inmate who was on the unit for the full seven (7) days is used.

This protocol applies to MCPMs 1, 2, 3, 5, and 6. (Monitor Guide, Doc. 3177-2 at pgs. 14, 17, 19, 20, and 24; Bendel Decl., Exh. 2 at ¶41-42). Substitution memos are provided in the monthly Maximum Custody notebooks to identify inmates who were not subject to review for the above-stated reasons. (Bendel Decl., Exh. 2 at ¶42). The OOCT Forms are reviewed in order to determine compliance with MCPMs 1-3 & 5-6. [8] (*Id.* at ¶42.) Inmates selected for review for MCPMs 1-3 & 5-6 are noted in yellow highlight on the count sheets contained in the monthly Maximum Custody Notebooks (*Id.* at ¶42.)

The Monitor Guide also provides the protocol for choosing the ten maximum custody SMI inmates to be monitored for a facility in a given month for MCPM 8. ("SMI Protocol"):

> At each maximum custody unit where SMI inmates are housed, the count sheets for the unit are used to determine the pool of ten (10) randomly selected records reviewed for this measure. The total number of inmates classified as SMI is then divided by ten, and every *nth* inmate is reviewed. If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the next SMI inmate either directly above or below the randomly selected SMI inmate is selected. If no SMI inmate is listed either directly above or below the randomly selected SMI inmate, then the next SMI inmate listed in the roster who was housed in the unit for the full seven (7) days is used.

---

[8] This category may include both non-SMI and SMI maximum custody inmates, excluding compliance analysis for MCPM 8 which pertains only to SMI inmates.

This protocol applies to Performance Measures 3 and 8. (Doc. 3177-2 at 19-20, 28-29; Bendel Decl., Exh. 2 at ¶43-44.) Random selection of maximum custody inmates for review of MCPMs 1-3 & 5-6 (which may also include SMI inmates) is performed first. (*Id.* at ¶45.)  The names of these selected inmates are noted on the count sheets in yellow highlight.  (*Id.* ¶45.) When selection of SMI inmates is conducted, if the *nth* SMI inmate has already been selected for review of MCPMs 1-2 & 5-6 (and thus has been yellow highlighted), he/she is not reselected for review of MCPMs 1-2, 5-6 & 8 but instead the next following SMI inmate will be selected so that SMI inmates are not double-reviewed. (*Id.* ¶42.)  SMI inmates selected for review are noted in green highlight on the count sheets contained in the monthly Maximum Custody Notebooks.  (*Id.* ¶45)

During the November 2016 to October 2018 monitoring time period at issue, Plaintiffs complain that a total of 111 inmates from ASPC-Eyman, ASPC-Florence, and ASPC-Lewis were selected more than once for monitoring, thus calling into question whether monitoring was indeed random, or rather fixed so that officers would know each month which inmates would be subject to monitoring and reporting.  Plaintiffs' sudden buyers' remorse as to selection methodology that has been in place from the start of monitoring cannot be used to defeat termination of monitoring and reporting five years into the post-Stipulation monitoring phase.

Plaintiffs' "fixed monitoring" theory also fails and is belied by common sense. The random selection of inmates for monthly monitoring is performed by utilizing the count sheets for each maximum custody unit housing inmates eligible for DI 326 participation.  (Bendel Decl., Exh. 2, at ¶38).  ADC's count sheets are organized by housing unit, and within the unit by building, and within the building by cell location. (Bendel Decl, Exh. 2 at ¶39).[9]   The total number of inmates eligible for DI 326 is then divided by 10, and every *nth* inmate is subject to monitoring for that specified month. (*Id.*

_____

[9] SMI inmates are identified with an "M" following their ADC number.

at ¶41).   Substitution scenarios may render an nth counted inmate ineligible for monitoring, thus the next eligible inmate is substituted in.

If a unit's total population numbers stay static and inmates are not reassigned to a different cell or different unit, some inmates may be selected for monitoring multiple times.   This is especially so for the SMI maximum custody inmates where the SMI population constitutes a small subset of the larger maximum custody population. As illustration, on November 1, 2016, ADC housed 2967 maximum custody inmates (combined total for male and female).   (See https://corrections.az.gov/sites/default/files/DAILY_COUNT/Nov2016/11012016_count_sheet.pdf, 11/1/16 summary computation of State Male and Female Maximum Custody Populations at page 2, last visited 4/8/19).  Two years later on October 31, 2018, the total maximum custody population was 1913 male maximum custody inmates.   (See https://corrections.az.gov/sites/default/files/DAILY_COUNT/Oct2018/10312018_count_sheet.pdf, 10/31/18 summary computation of State Male Maximum Custody Populations at page 2, last visited 4/8/19).[10]

Considering November 1, 2016, and October 31, 2018, total maximum custody populations, and averaging the start and stop population numbers for those same dates, 111 inmates being monitored more than once during this two year time period only constitutes 4.5% of the total maximum custody population monitored during the two year monitoring period at issue.   This is not evidence that Defendants were self-selecting inmates for monitoring purposes in order to achieve required Stipulation compliance rates.[11]   More importantly, there is no provision in the Stipulation and its Protocol, MCPMs, or the Monitor Guide that provide that once an inmate is randomly selected for

---

[10] The Court may take judicial notice of official population statistics posted by ADC.  Fed.R.Evid. 201; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010).

[11] Plaintiffs also take issue with several inmates being monitored at two different facility complexes.   (Carns Decl., Doc. 3160 at 2, ¶3).  That this may occur is not surprising where inmates are moved to different complex locations for a variety of reasons to include safety/security concerns, population balancing, and available bed space.

monitoring in a particular month, no matter the location, he/she cannot be randomly selected for monitoring again.

Plaintiffs' purported "non-random selection" chart ("FRE 1006 Summary Exhibit 'Prisoners Chosen for Maximum Custody Performance Measure Review (January – October 2018)'" likewise does not further their cause but instead demonstrates Plaintiffs' misunderstanding of the longstanding and appropriate selection methodology; establishes the absence of foundational evidence to support Plaintiffs' conclusory allegations; and highlights Plaintiffs' cherry picking method of selecting partial documents that do not present the whole story to the Court.   (Doc. 3157 at 14-15).  Indeed, Defendants' review of a sampling of Plaintiffs' examples demonstrates the opposite of Plaintiffs' allegations.[12]  This, notwithstanding that Plaintiffs' entire exercise in this regard should be ignored at the outset where Plaintiffs fail to provide the Court with analysis, data, or available monthly Maximum Custody notebook source documents to demonstrate that the inmates selected for monitoring *were not randomly selected*.  Merely showing in a chart that a low percentage of inmates were monitored two or multiple times, and adding four purported examples of count sheets does not make Plaintiffs' unsupported conspiracy theory fact.

**ASPC-Eyman (Browning Unit)**

Inmate ██████ was a monitored SMI inmate in the April through October 2018 Maximum Custody Notebooks for ASPC-Eyman (Browning Unit). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **April 2018**:  Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated April 27, 2018. These inmates were chosen from an

---

[12] Defendants picked the top four inmates monitored the most times from each applicable unit to demonstrate that the selection process was valid and that Plaintiffs failed to present the Court with the full story and requisite available supporting documents to determine the same.

eligible inmate population totaling 26.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.  The counting of every third SMI inmate began with inmate ███████████; this starting point is identified in red by "SMI start" in the count sheet at Bates No. ADCM1528637. Utilizing the calculation and starting point above, inmate █████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1528637. (Exh. 3, April 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1528615, April 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1528660, and April 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1528625-1528659).

- **May 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated May 25, 2018.  These inmates were chosen from an eligible inmate population totaling 29.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ██████████; this starting point is identified in red by "SMI Start" in the count sheet at Bates No. ADCM1535128.  Utilizing the starting point and calculation above, Inmate ███████████████ would have been selected as the third monitored SMI inmate, but he was placed on Mental Health Watch during the monitored week, necessitating the substitution with inmate █████████████ as the third monitored inmate. ADCM1535155. Inmate █████████████ would have been the fourth monitored SMI inmate, but he too was placed on Mental Health Watch; this necessitated the substitution with inmate ████████████ as the fourth monitored inmate. ADCM1535156. Finally, inmate ████████ would have been the tenth monitored SMI inmate, but because he had already been chosen as the first monitored SMI inmate, inmate ███████ was picked. ADCM1535157.  In sum, utilizing the calculation, starting point, and appropriate substitutions above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1535128. (Exh. 4, May 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1535110, May 2018 Inmate Substitution Memos for Browning Unit at Bates ADCMNo.1535155-1535157, and May 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1535120-1535154).

- **June 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated June 8, 2018.  These inmates were chosen from an eligible inmate population totaling 27.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.  The counting of every third SMI inmate began with inmate ████████; this starting point is identified in black by "SMI Start" in the count sheet at Bates No. ADCM1539186. Utilizing the starting point and calculation above, inmate ████████████ would have been selected as the ninth monitored SMI inmate, but he arrived at the unit during the monitored week, necessitating the substitution with inmate ████████ as the ninth monitored inmate. ADCM1539215. Therefore, utilizing the calculation, starting point, and

appropriate substitution above, inmate ███ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1539186. (Exh. 5, June 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1539170, June 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1539215, and June 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1539180-ADCM1539214).

- **July 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated July 13, 2018. These inmates were chosen from an eligible inmate population totaling 26. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ████████; this starting point is identified in red by "SMI Start" in the count sheet at Bates No. ADCM1540964. Utilizing the starting point and calculation above, inmate ███████████ would have been selected as the third monitored SMI inmate, but he was placed on Mental Health Watch, necessitating the substitution with inmate █████████ as the third monitored inmate. ADCM1540998. Therefore, utilizing the calculation, starting point, and appropriate substitution above, inmate █████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1540967. (Exh. 6, July 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1540954, July 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1540998, and July 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1540964-1540997).

- **August 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated August 17, 2018. These inmates were chosen from an eligible inmate population totaling 14. Inmates were chosen by picking every 1st inmate until 10 inmates were achieved. The counting of every first SMI inmate began with inmate █████████████; this starting point is identified in red by "max/SMI Start" in the count sheet at Bates No. ADCM1548930. Utilizing the starting point and calculation above, inmate █████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1548930. (Exh. 7, August 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1548920 and August 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1548930-1548962).

- **September 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated September 7, 2018. These inmates were chosen from an eligible inmate population totaling 16. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate █████████████; this starting point is identified in red by "SMI Start" in the count sheet at Bates No. ADCM1551634. Utilizing the starting point and calculation above, inmate █████ was correctly counted and chosen from the applicable count sheets, with the inmate's name

highlighted at Bates No. ADCM1551664. (Exh. 8, September 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1551622, September 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1551666, and September 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1551632-1551665).

- **October 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated November 2, 2018. These inmates were chosen from an eligible inmate population totaling 12. Inmates were chosen by picking every 1st inmate until 10 inmates were achieved. The counting of every first SMI inmate began with inmate ▮▮▮▮▮▮▮▮▮▮; this starting point is identified in red by "SMI START" in the count sheet at Bates No. ADCM1553433. Utilizing the starting point and calculation above, inmate ▮▮▮▮▮▮▮▮ would have been selected as the second monitored SMI inmate, but he was placed on Mental Health Watch, necessitating the substitution with inmate ▮▮▮▮▮▮▮▮ as the second monitored inmate. ADCM1553464. Therefore, utilizing the calculation, starting point, and appropriate substitution above, inmate ▮▮▮▮▮ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1553460. (Exh. 9, October 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1553423, October 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1553464, and October 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1553433-ADCM1553463).

▮▮▮▮▮▮▮▮▮▮

Inmate ▮▮▮▮▮ was a monitored SMI inmate in the July, September, and October 2018 Max Custody Notebooks for ASPC-Eyman (Browning Unit). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **July 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated July 13, 2018. These inmates were chosen from an eligible inmate population totaling 26. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ▮▮▮▮▮▮▮▮▮; this starting point is identified in red by "SMI Start" in the count sheet at Bates No. ADCM1540964. Utilizing the starting point and calculation above, inmate ▮▮▮▮▮▮▮▮ would have been selected as the third monitored SMI inmate, but he was placed on Mental Health Watch, necessitating the substitution with inmate ▮▮▮▮▮▮▮▮ as the third monitored inmate. ADCM1540998. Therefore, utilizing the calculation, starting point, and appropriate substitution above, inmate ▮▮▮▮▮ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No.

ADCM1540989. (Exh. 6, July 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1540954, July 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1540998, and July 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1540964-1540997).

- **September 2018:**   Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated September 7, 2018.  These inmates were chosen from an eligible inmate population totaling 16.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved.  The counting of every second SMI inmate began with inmate ███████████████; this starting point is identified in red by "SMI Start" in the count sheet at Bates No. ADCM1551634. Utilizing the starting point and calculation above, inmate ███████████████ would have been selected as the ninth monitored SMI inmate, but because he was already picked as the first monitored SMI inmate, inmate ████████ was substituted as the ninth monitored SMI inmate. Bates No. ADCM1551666.  Therefore, utilizing the calculation, starting point, and appropriate substitution above, inmate ████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1551652. (Exh. 8, September 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1551622, September 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1551666, and September 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1551632-1551665).

- **October 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated November 2, 2018.  These inmates were chosen from an eligible inmate population totaling 12.  Inmates were chosen by picking every 1st inmate until 10 inmates were achieved.   The counting of every first SMI inmate began with inmate ███████████████; this starting point is identified in red by "SMI START" in the count sheet at Bates No. ADCM1553433. Utilizing the starting point and calculation above, inmate ███████████████ would have been selected as the second monitored SMI inmate, but he was placed on Mental Health Watch, necessitating the substitution with inmate ████████ as the second monitored inmate. ADCM1553464. Therefore, utilizing the calculation, starting point, and appropriate substitution above, inmate ████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1553450. (Exh. 9, October 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1553423, October 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1553464, and October 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1553433-1553463).

█████████████ **13**

Inmate ████ was a monitored SMI inmate in the April, May, August, September, and October 2018 Maximum Custody Notebooks for ASPC-Eyman (Browning Unit). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **April 2018**: Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated April 27, 2018. These inmates were chosen from an eligible inmate population totaling 26. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ██████████████; this starting point is identified in red by " SMI start" in the count sheet at Bates No. ADCM1528637. Utilizing the calculation and starting point above, inmate █████████████ would have been selected as the fifth monitored SMI inmate, but he was placed on Mental Health Watch, necessitating the substitution with inmate █████████████ as the fifth monitored inmate. ADCM1528660. Utilizing the calculation, starting point, and appropriate substitution above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1528637. (Exh. 3, April 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1528615, April 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1528660, and April 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1528625-1528659).

**May 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated May 25, 2018. These inmates were chosen from an eligible inmate population totaling 29. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate █████████████ this starting point is identified in red by "SMI Start" in the count sheet at Bates No. ADCM1535128. Utilizing the starting point and calculation above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates ADCM1535128. (Exh. 4, May 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1535110, May 2018 Inmate Substitution Memos for Browning Unit at Bates No. ADCM1535155-1535157, and May 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1535120-1535154).

---

13 Inmate ████ was not a monitored inmate in the July 2018 Maximum Custody Notebook for ASPC-Eyman (Browning Unit) as Plaintiffs assert. (Exh. 6, July 2018 Inmate Selection List for Browning Unit at Bates ADCM1540954 and July 2018 Inmate Count Sheets for Browning Unit at Bates ADCM1540964-ADCM1540997).

- **August 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated August 17, 2018. These inmates were chosen from an eligible inmate population totaling 14. Inmates were chosen by picking every 1st inmate until 10 inmates were achieved. The counting of every first SMI inmate began with inmate ███████████████; this starting point is identified in red by "max/SMI Start" in the count sheet at Bates No. ADCM1548930. Utilizing the starting point and calculation above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1548930. (Exh. 7, August 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1548920 and August 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1548930-1548962).

- **September 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated September 7, 2018. These inmates were chosen from an eligible inmate population totaling 16. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ███████████████; this starting point is identified in red by "SMI Start" in the count sheet at Bates No. ADCM1551634. Utilizing the starting point and calculation above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1551664. (Exh. 8, September 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1551622, September 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1551666, and September 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1551632-1551665).

- **October 2018:** Ten (10) SMI max custody inmates were selected from Browning Unit count sheets dated November 2, 2018. These inmates were chosen from an eligible inmate population totaling 12. Inmates were chosen by picking every 1st inmate until 10 inmates were achieved. The counting of every first SMI inmate began with inmate ███████████; this starting point is identified in red by "SMI START" in the count sheet at Bates No. ADCM1553433. Utilizing the starting point and calculation above, inmate ████████████████ would have been selected as the second monitored SMI inmate, but he was placed on Mental Health Watch, necessitating the substitution with inmate ██████████████ as the second monitored inmate. ADCM1553464. Utilizing the calculation, starting point, and appropriate substitution above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1553460. (Exh. 9, October 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1553423, October 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1553464, and October 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1553433-1553463).

Inmate ████ was a monitored Max Custody inmate in the March and May 2018 Maximum Custody Notebooks for ASPC-Eyman (Browning Unit). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **March 2018**: Ten (10) max custody inmates were selected from Browning Unit count sheets dated March 9, 2018. These inmates were chosen from an eligible inmate population totaling 751. Inmates were chosen by picking every 75th inmate until 10 inmates were achieved. The counting of every seventy-fifth Max Custody inmate began with inmate ████████; this starting point is identified in red by "Max Start" in the count sheet at Bates No. ADCM1522596. Utilizing the calculation and starting point above, Inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1522615. (Exh. 10, March 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1522586, March 2018 Inmate Substitution Memo for Browning Unit at Bates No. ADCM1522631, and March 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1522596-1522630).

- **May 2018:** Ten (10) max custody inmates were selected from Browning Unit count sheets dated May 25, 2018. These inmates were chosen from an eligible inmate population totaling 757. Inmates were chosen by picking every 76th inmate until 10 inmates were achieved. The counting of every seventy-sixth Max Custody inmate began with inmate ████████; this starting point is identified in red by "Max Start" in the count sheet at Bates No. ADCM1535120. Utilizing the calculation and starting point above, Inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1535132. (Exh. 4, May 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1535110, May 2018 Inmate Substitution Memos at Bates No. ADCM1535155-1535157, and May 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1535120-1535154).

**ASPC-Eyman (SMU I)**

Inmate ████ was a monitored SMI inmate in the January, February, March, July, August, and October 2018 Maximum Custody Notebooks for ASPC-Eyman (SMU I). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **January 2018**:  Ten (10) SMI max custody inmates were selected from SMU I count sheets dated February 2, 2018.  These inmates were chosen from an eligible inmate population totaling 50.  Inmates were chosen by picking every 5th inmate until 10 inmates were achieved. The counting of every fifth SMI inmate began with inmate ███████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1516132.  Utilizing the calculation and starting point above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1516135. (Exh. 11, January 2018 Inmate Selection List for SMU I at Bates No. ADCM1516122, January 2018 Substitution Memo for SMU I at Bates No. ADCM1516152, and January 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1516132-1516151).

- **February 2018**:  Ten (10) SMI max custody inmates were selected from SMU I count sheets dated March 2, 2018.  These inmates were chosen from an eligible inmate population totaling 48.  Inmates were chosen by picking every 5th inmate until 10 inmates were achieved. The counting of every fifth SMI inmate began with inmate ███████████; this starting point is identified in red by "Start SMI" in the count sheet at Bates No. ADCM1518444.  Utilizing the calculation and starting point above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1518448. (Exh. 12, February 2018 Inmate Selection List for SMU I at Bates No. ADCM1518423, February 2018 Inmate Substitution Memo for SMU I at Bates No. ADCM1518451, and February 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1518433-1518450).

- **March 2018**: Ten (10) SMI max custody inmates were selected from SMU I count sheets dated March 9, 2018.  These inmates were chosen from an eligible inmate population totaling 46.  Inmates were chosen by picking every 5th inmate until 10 inmates were achieved. The counting of every fifth SMI inmate began with inmate ███████████; this starting point is identified in red by "SMI Start Point" in the count sheet at Bates No. ADCM1522965. Utilizing the calculation and starting point above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1522969. (Exh. 13, March 2018 Inmate Selection List for SMU I at Bates No. ADCM1522944 and March 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1522954-1522971).

- **July 2018**:  Ten (10) SMI max custody inmates were selected from SMU I count sheets dated July 13, 2018.  These inmates were chosen from an eligible inmate population totaling 30.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.  The counting of every third SMI inmate began with inmate ███████████; this starting point is identified in red by "Start Point" in the count sheet at Bates No. ADCM1541343. Utilizing the starting point and

calculation above, inmate ████████████ would have been the first monitored SMI inmate, but he was placed on Mental Health Watch; this necessitated a substitution with inmate ████████████, who became the first monitored inmate. ADCM1541362. Inmate ████████████ would have been the second monitored SMI inmate, but he was housed at Close Custody during the monitored week; this necessitated a substitution with inmate ████████████, who became the second monitored inmate. ADCM1541361. Thus, utilizing the calculation, starting point, and appropriate substitutions above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1541360. (Exh. 14, July 2018 Inmate Selection List for SMU I at Bates No. ADCM1541333, July 2018 Inmate Substitution Memos for SMUI at Bates No. ADCM1541361-1541362, and July 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1541343-1541360).

- **August 2018**: Ten (10) SMI max custody inmates were selected from SMU I count sheets dated August 17, 2018. These inmates were chosen from an eligible inmate population totaling 19. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ████████████; this starting point is identified in black by "start " in the count sheet at Bates No. ADCM1549288. Utilizing the calculation and starting point above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1549291. (Exh. 15, August 2018 Inmate Selection List for SMU I at Bates No. ADCM1549279 and August 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1549288-1549305).

- **October 2018**: Ten (10) SMI max custody inmates were selected from SMU I count sheets dated November 2, 2018. These inmates were chosen from an eligible inmate population totaling 30. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ████████████; this starting point is identified in red by "Start SMI" in the count sheet at Bates No. ADCM1554426. Utilizing the starting point and calculation above, inmate ████████████ would have been the sixth monitored SMI inmate, but he was housed at Florence-Kasson during the monitored week; this necessitated a substitution with inmate ████████████, who became the sixth monitored inmate. ADCM1554441. Inmate ████████████ would have been the ninth monitored inmate, but he was housed at ASPC-Phoenix during the monitored week; this necessitated a substitution with inmate ████, who became the ninth monitored inmate. ADCM1554442. Hence, utilizing the calculation, starting point, and appropriate substitutions above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1554426. (Exh. 16, October 2018 Inmate Selection List for SMU I at Bates No. ADCM1554413, October 2018 Inmate Substitution Memos for SMU I at Bates No. ADCM1554441-1554442, and

October 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1554422-1554440).

Inmate ████ was a monitored Max Custody inmate in the February, March, and October 2018 Maximum Custody Notebooks for ASPC-Eyman (SMU I). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **February 2018**:  Ten (10) max custody inmates were selected from SMU I count sheets dated March 2, 2018.  These inmates were chosen from an eligible inmate population totaling 397.  Inmates were chosen by picking every 40th inmate until 10 inmates were achieved. The counting of every fortieth Max Custody inmate began with inmate ████████; this starting point is identified in red by "Start GP" in the count sheet at Bates No. ADCM1518433. Utilizing the starting point and calculation above, inmate ████████████ would have been the ninth monitored Max Custody inmate, but he was transferred to ASPC-Phoenix during the monitored week; this necessitated a substitution with inmate ████████ who became the ninth monitored inmate. ADCM1518451. Hence, utilizing the calculation, starting point, and appropriate substitution above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1518433. (Exh. 12, February 2018 Inmate Selection List for SMU I at Bates No. ADCM1518423, February 2018 Inmate Substitution Memo for SMU I at Bates No. ADCM1518451 and February 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1518433-1518450).

- **March 2018**:  Ten (10) max custody inmates were selected from SMU I count sheets dated March 9, 2018.  These inmates were chosen from an eligible inmate population totaling 396.  Inmates were chosen by picking every 40th inmate until 10 inmates were achieved.  The counting of every fortieth Max Custody inmate began with inmate ████████; this starting point is identified in red by "Start Point" in the count sheet at Bates No. ADCM1522954.  Utilizing the starting point and calculation above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1522954. (Exh. 13, March 2018 Inmate Selection List for SMU I at Bates No. ADCM1522944 and March 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1522954-1522971).

- **October 2018**: Ten (10) max custody inmates were selected from SMU I count sheets dated November 2, 2018.  These inmates were chosen from an eligible inmate population totaling 458.  Inmates were chosen by picking every 46th inmate until 10 inmates were achieved.  The counting of every forty-sixth Max Custody

inmate began with inmate ███████████; this starting point is identified in red by "Start GP" in the count sheet at Bates No. ADCM1554422. Utilizing the calculation and starting point above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1554431. (Exh. 16, October 2018 Inmate Selection List for SMU I at Bates No. ADCM1554413, October 2018 Inmate Substitution Memos for SMU I at Bates No. ADCM1554441-1554442, and October 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1554422-1554440).

████████████████

Inmate ██████ was a monitored SMI inmate in the March, July, August, September, and October 2018 Maximum Custody Notebooks for ASPC-Eyman (SMU I). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **March 2018**: Ten (10) SMI max custody inmates were selected from SMU I count sheets dated March 9, 2018.  These inmates were chosen from an eligible inmate population totaling 46.  Inmates were chosen by picking every 5th inmate until 10 inmates were achieved.  The counting of every fifth SMI inmate began with inmate ██████████████████; this starting point is identified in red by "SMI Start Point" in the count sheet at Bates No. ADCM1522965. Utilizing the calculation and starting point above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1522969. (Exh. 13, March 2018 Inmate Selection List for SMU I at Bates No. ADCM1522944 and March 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1522954-ADCM1522971).

- **July 2018**:  Ten (10) SMI max custody inmates were selected from SMU I count sheets dated July 13, 2018.  These inmates were chosen from an eligible inmate population totaling 30.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.  The counting of every third SMI inmate began with inmate █████████████████; this starting point is identified in red by "Start Point" in the count sheet at Bates No. ADCM1541343. Utilizing the starting point and calculation above, inmate █████████████ would have been the first monitored SMI inmate, but he was placed on Mental Health Watch; this necessitated a substitution with inmate ██████, who became the first monitored inmate. ADCM1541362. Thus, utilizing the calculation, starting point, and appropriate substitution above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1541343. (Exh. 14, July 2018 Inmate Selection List for SMU I at Bates No. ADCM1541333, July 2018 Inmate Substitution Memos for SMUI at Bates No.

1541361-1541362, and July 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1541343-1541360).

- **August 2018**: Ten (10) SMI max custody inmates were selected from SMU I count sheets dated August 17, 2018. These inmates were chosen from an eligible inmate population totaling 19. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ████████████ ; this starting point is identified in black by "Start" in the count sheet at Bates No. ADCM1549288. Utilizing the calculation and starting point above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1549292. (Exh. 15, August 2018 Inmate Selection List for SMU I at Bates No. ADCM1549279 and August 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1549288-1549305).

- **September 2018**: Ten (10) SMI max custody inmates were selected from SMU I count sheets dated September 7, 2018. These inmates were chosen from an eligible inmate population totaling 21. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ████████████ ; this starting point is identified in red by "Start Both GP + SMI" in the count sheet at Bates No. ADCM1551967. Utilizing the calculation above, Inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1551971. (Exh. 17, September 2018 Inmate Selection List for SMU I at Bates No. ADCM1551958 and September 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1551967-1551984).

- **October 2018**: Ten (10) SMI max custody inmates were selected from SMU I count sheets dated November 2, 2018. These inmates were chosen from an eligible inmate population totaling 30. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ████████████ ; this starting point is identified in red by "Start SMI" in the count sheet at Bates No. ADCM1554426. Utilizing the starting point and calculation above, inmate ██████████ would have been the sixth monitored SMI inmate, but he was housed at Florence-Kasson during the monitored week; this necessitated a substitution with inmate █████ who became the sixth monitored inmate. ADCM1554441. Hence, utilizing the calculation, starting point, and appropriate substitution above, inmate █████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1554422. (Exh. 16, October 2018 Inmate Selection List for SMU I at Bates No. ADCM1554413, October 2018 Inmate Substitution Memos for SMU I at Bates No. ADCM1554441-1554442, and October 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1554422-1554440).

Inmate ▮▮▮ was a monitored Max Custody inmate in the August and September 2018 Maximum Custody Notebooks for ASPC-Eyman (SMU I). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **August 2018**:  Ten (10) max custody inmates were selected from SMU I count sheets dated August 17, 2018.  These inmates were chosen from an eligible inmate population totaling 444.  Inmates were chosen by picking every 44th inmate until 10 inmates were achieved. The counting of every forty-forth Max Custody inmate began with inmate ▮▮▮▮▮▮▮; this starting point is identified in black by "Start" in the count sheet at Bates No. ADCM1549288. Utilizing the calculation and starting point above, Inmate ▮▮▮ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1549289. (Exh. 15, August 2018 Inmate Selection List for SMU I at Bates No. ADCM1549279 and August 2018 Inmate Count Sheets for SMU I at Bates No. ADCM1549288-1549305).

- **September 2018**:  Ten (10) max custody inmates were selected from SMU I count sheets dated September 7, 2018.  These inmates were chosen from an eligible inmate population totaling 445.  Inmates were chosen by picking every 45th inmate until 10 inmates were achieved.  The counting of every forty-fifth Max Custody inmate began with inmate ▮▮▮▮▮▮; this starting point is identified in red by "Start Both GP + SMI" in the count sheet at Bates No. ADCM1551967. Utilizing the calculation and starting point above, Inmate ▮▮▮ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates ADCM1551968. (Exh. 17, September 2018 Inmate Selection List for SMU I at Bates ADCM1551958 and September 2018 Inmate Count Sheets for SMU I at Bates ADCM1551967-1551984).

**ASPC-Florence (Kasson)**

Inmate ▮▮▮ was a monitored Max Custody inmate in the February, March, and April 2018 Maximum Custody Notebooks for ASPC-Florence (Kasson). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **February 2018**:  Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated March 2, 2018.  These inmates were chosen from an eligible inmate population totaling 109.  Inmates were chosen by picking every

26

11th inmate until 10 inmates were achieved.   The counting of every eleventh Max Custody inmate began with inmate ██████████████ this starting point is identified in red by "GP ST" in the count sheet at Bates No. ADCM1518767. Utilizing the starting point and calculation above, Inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1518768. (Exh. 18, February 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1518758, February 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1518769-1518770, and February 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1518767-1518768).

- **March 2018**:  Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated March 9, 2018.  These inmates were chosen from an eligible inmate population totaling 108.  Inmates were chosen by picking every 11th inmate until 10 inmates were achieved.   The counting of every eleventh Max Custody inmate began with inmate ██████████████; this starting point is identified in red by "SP GP" in the count sheet at Bates No. ADCM1523295. Utilizing the starting point and calculation above, Inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1523295. (Exh. 19-, March 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1523286, March 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1523297-1523298, and March 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1523295-1523296).

- **April 2018**: Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated April 27, 2018.  These inmates were chosen from an eligible inmate population totaling 108.  Inmates were chosen by picking every 11th inmate until 10 inmates were achieved. The counting of every eleventh Max Custody inmate began with inmate ██████████████; this starting point is identified in red by "SP GP" in the count sheet at Bates No. ADCM1529429.  Utilizing the starting point and calculation above, inmate ██████████████ would have been the fifth monitored Max Custody inmate but he was on Watch; this necessitated a substitution with inmate ██████████████ who became the fifth monitored inmate. Bates No. ADCM1529435.   Utilizing the calculation, starting point, and appropriate substitution above, Inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1529429. (Exh. 20, April 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1529420, April 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1529431-1529435, and April 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1529429-1529430).

███████████████

Inmate ██████ was a monitored Max Custody inmate in the January, February, and April 2018 Maximum Custody Notebooks for ASPC-Florence (Kasson). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **January 2018**: Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated February 2, 2018.  These inmates were chosen from an eligible inmate population totaling 108.  Inmates were chosen by picking every 11th inmate until 10 inmates were achieved.   The counting of every eleventh Max Custody inmate began with inmate ████████████; this starting point is identified in red by "SP GP" in the count sheet at Bates No. ADCM1516477. Utilizing the starting point and calculation above, Inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1516476. (Exh. 21, January 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1516468, January 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1516479-1516483, and January 2018 Inmate Count Sheets for Kasson Cell Block at Bates ADCM1516477-1516478).

- **February 2018**:  Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated March 2, 2018.  These inmates were chosen from an eligible inmate population totaling 109.  Inmates were chosen by picking every 11th inmate until 10 inmates were achieved. The counting of every eleventh Max Custody inmate began with inmate ████████████; this starting point is identified in red by "GP ST" in the count sheet at Bates No. ADCM1518767. Utilizing the starting point and calculation above, Inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1518767. (Exh. 18, February 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1518758, February 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1518769-1518770, and February 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1518767-1518768).

- **April 2018**: Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated April 27, 2018.  These inmates were chosen from an eligible inmate population totaling 108.  Inmates were chosen by picking every 11th inmate until 10 inmates were achieved. The counting of every eleventh Max Custody inmate began with inmate ████████████; this starting point is identified in red by "SP GP" in the count sheet at Bates No. ADCM1529429.  Utilizing the starting point and calculation above, inmate ████████████ would have been the fifth monitored Max Custody inmate, but he was on Watch; this necessitated a

substitution with inmate ████████████, who became the fifth monitored inmate. ADCM1529435.  Utilizing the calculation, starting point, and appropriate substitution above, ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates ADCM1529430. (Exh. 20, April 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1529420, April 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1529431-1529435, and April 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1529429-1529430).

Inmate ██████ was a monitored SMI inmate in the March, May, and July 2018 Maximum Custody Notebooks for ASPC-Florence (Kasson). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **March 2018**:  Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated March 9, 2018.  These inmates were chosen from an eligible inmate population totaling 39.  Inmates were chosen by picking every 4th inmate until 10 inmates were achieved.  The counting of every forth SMI inmate began with inmate ██████████; this starting point is identified in red by an arrow that is connected to inmate ██████' name, which has "SP SMI" above it in the count sheet at Bates No. ADCM1523296.  Utilizing the calculation and starting point above, Inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1523296. (Exh. 19, March 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1523286, March 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1523297-1523298, and March 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1523295-1523296).

- **May 2018**:  Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated May 25, 2018.  These inmates were chosen from an eligible inmate population totaling 26.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.   The counting of every third SMI inmate began with inmate ██████████; this starting point is identified in red by the "SP SMI" in the count sheet at Bates No. ADCM1535908. Utilizing this calculation and starting point, inmate ██████████ would have been the third monitored SMI inmate, but he had already been picked to be a Max Custody monitored inmate; this necessitated a substitution with inmate ██████████, who became the third monitored inmate. ADCM1535905. Utilizing the calculation, starting point, and appropriate substitution above, Inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1535908. (Exh. 22, May 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1535896, May 2018 Inmate

Substitution Memos for Kasson Cell Block at Bates No. ADCM1535905-1535907, and May 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1535908-1535909).

- **July 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated July 13, 2018.  These inmates were chosen from an eligible inmate population totaling 42.  Inmates were chosen by picking every 4th inmate until 10 inmates were achieved. The counting of every forth SMI inmate began with inmate ███████████; this starting point is identified in blue by the "SP SMI/GP" in the count sheet at Bates No. ADCM1541763.  Utilizing the calculation and starting point above, inmate ████████████ would have been the second monitored SMI inmate, but he had already been picked as a Max Custody monitored inmate; this necessitated a substitution with inmate ██████ ████████, who was the next SMI inmate listed.  ADCM1541764-1541766. However, because inmate ██████ had already been picked as a Max Custody monitored inmate, another substitution was necessary; consequently, inmate ████ ████████ became the second monitored inmate. *Id.* Utilizing the calculation, starting point, and appropriate substitutions above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1541763. (Exh. 23, July 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1541754, July 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1541765-1541774, and July 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1541763-1541764).

██████████████████

Inmate ██████ was a monitored Max Custody inmate in the March, August, and September 2018 Maximum Custody Notebooks for ASPC-Florence (Kasson). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **March 2018**:  Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated March 9, 2018.  These inmates were chosen from an eligible inmate population totaling 108.  Inmates were chosen by picking every 11th inmate until 10 inmates were achieved.  The counting of every eleventh Max Custody inmate began with inmate ███████████ this starting point is identified in red by "SP GP" in the count sheet at Bates No. ADCM1523295. Utilizing the calculation and starting point above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1523296. (Exh. 19, March 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1523286, March 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1523297-1523298,

and March 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1523295-1523296).

- **August 2018**: Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated August 17, 2018. These inmates were chosen from an eligible inmate population totaling 73. Inmates were chosen by picking every 7th inmate until 10 inmates were achieved. The counting of every seventh Max Custody inmate began with inmate ███████████ this starting point is identified in black by "SP GP SMI" above inmate ███████' name in the count sheet at Bates No. ADCM1549633. Utilizing the calculation and starting point above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1549633. (Exh. 24, August 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1549624, August 2018 Inmate Substitution Memo for Kasson Cell Block at Bates No. ADCM1549650, and August 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1549633-1549634).

- **September 2018**: Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated September 7, 2018. These inmates were chosen from an eligible inmate population totaling 73. Inmates were chosen by picking every 7th inmate until 10 inmates were achieved. The counting of every seventh Max Custody inmate began with inmate ███████████; this starting point is identified in red by "SP GP SMI" in the count sheet at Bates No. ADCM1552319. Utilizing the calculation above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1552319. (Exh. 25, September 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1552309, September 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1552321-1552322, and September 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1552319-1552320).

███████████

Inmate ██████ was a monitored Max Custody inmate in the April and May 2018 Maximum Custody Notebooks for ASPC-Florence (Kasson). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **April 2018**: Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated April 27, 2018. These inmates were chosen from an eligible inmate population totaling 108. Inmates were chosen by picking every 11th inmate until 10 inmates were achieved. The counting of every eleventh Max Custody inmate began with inmate ███████████; this starting point is identified in red

31

by "SP GP" in the count sheet at Bates No. ADCM1529429. Utilizing the calculation and starting point above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1529429. (Exh. 20, April 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1529420, April 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1529431-1529435, and April 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1529429-1529430).

- **May 2018**: Ten (10) max custody inmates were selected from Kasson Cell Block count sheets dated May 25, 2018. These inmates were chosen from an eligible inmate population totaling 94. Inmates were chosen by picking every 9th inmate until 10 inmates were achieved. The counting of every ninth Max Custody inmate began with inmate ████████████; this starting point is identified in red by "SP GP" in the count sheet at Bates No. ADCM1535909. Utilizing the calculation and starting point above, inmate ██████████ would have been the third monitored Max Custody SMI inmate, but he was not present for the entire monitor week; this necessitated a substitution with inmate ████████████. ADCM1535906. However, inmate █████ was also not present for the entire monitored week and another substitution was necessary; inmate █████████████████ was the next Max Custody inmate listed on the count sheet and thus became the third monitored Max Custody inmate. ADCM1535907, ADCM1535909. Utilizing the calculation, starting point, and appropriate substitutions above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1535909. (Exh. 22, May 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1535896, May 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1535905-1535907, and May 2018 Inmate Count Sheets for Kasson Cell Block at Bates ADCM1535908-1535909).

████████████████

Inmate █████ was a monitored SMI inmate in the March, April, May, June, and July 2018 Maximum Custody Notebooks for ASPC-Florence (Kasson). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **March 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated March 9, 2018. These inmates were chosen from an eligible inmate population totaling 39. Inmates were chosen by picking every 4th inmate until 10 inmates were achieved. The counting of every forth SMI inmate began with inmate ███████████████; this starting point is identified in red by an arrow that is connected to inmate ████████' name, which has "SP SMI" above

it in the count sheet at Bates No. ADCM1523296.  Utilizing the calculation above, Inmate ███ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1523296. (Exh. 19, March 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1523286, March 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1523297-1523298, and March 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1523295-1523296).

- **April 2018**:  Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated April 27, 2018.  These inmates were chosen from an eligible inmate population totaling 29.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.   The counting of every third SMI inmate began with inmate ███; this starting point is identified in red by "SP SMI" in the count sheet at Bates No. ADCM1529430. Utilizing the calculation and starting point above, inmate ███ would have been the first monitored SMI inmate, but he was on Watch; this necessitated a substitution with inmate ███, who became the first monitored inmate. ADCM1529431. Inmate ███ would have been the third monitored SMI inmate, but he was on a Watch; this necessitated a substitution with inmate ███), who became the third monitored inmate.  ADCM1529432.  Inmate ███ would have been the fifth monitored SMI inmate, but he had already been picked to be a monitored Max Custody inmate; this necessitated a substation with inmate ███, who became the fifth monitored inmate. ADCM 1529433. Utilizing the calculation, starting point, and appropriate substitutions above, inmate ███ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1529430. (Exh. 20, April 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1529420, April 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1529431-1529435, and April 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1529429-1529430).

- **May 2018**:  Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated May 25, 2018.  These inmates were chosen from an eligible inmate population totaling 26.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ███; this starting point is identified in red by the "SP SMI" in the count sheet at Bates No. ADCM1535908. Utilizing this calculation and starting point, inmate ███ would have been the third monitored SMI inmate, but he had already been picked to be a Max Custody monitored inmate; this necessitated a substitution with inmate ███, who became the third monitored inmate. ADCM1535905. Utilizing the calculation, starting point, and appropriate substitution above, inmate ███ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1535908. (Exh. 22, May 2018 Inmate Selection

List for Kasson Cell Block at Bates No. ADCM1535896, May 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1535905-1535907, and May 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1535908-1535909).

- **June 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated June 8, 2018. These inmates were chosen from an eligible inmate population totaling 25. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ███████████; this starting point is identified in red by the "SP SMI" above ██████' name in the count sheet at Bates No. ADCM1539966. Utilizing the calculation and starting point above, inmate ████████████ would have been the first monitored SMI inmate, but had already been picked as a monitored Max Custody inmate; this necessitated a substitution with inmate ███████, who became the first monitored inmate. ADCM1539968. Utilizing the calculation, starting point, and appropriate substitution above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1539966. (Exh. 26, June 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1539956, June 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1539967-1539969, and June 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1539965-1539966).

- **July 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated July 13, 2018. These inmates were chosen from an eligible inmate population totaling 42. Inmates were chosen by picking every 4th inmate until 10 inmates were achieved. The counting of every forth SMI inmate began with inmate █████████████; this starting point is identified in blue by the "SP SMI/GP" in the count sheet at Bates No. ADCM1541763. Utilizing the calculation and starting point above, inmate █████████████ would have been the second monitored SMI inmate, but he had already been picked as a Max Custody monitored inmate; this necessitated a substitution with inmate ████████████, who was the next SMI inmate listed. ADCM1541764-1541766. However, because inmate █████████ had already been picked as a Max Custody monitored inmate, another substitution was necessary; consequently, inmate █████████ became the second monitored inmate. *Id.* Utilizing the calculation, starting point, and appropriate substitutions above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1541763. (Exh. 23, July 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1541754, July 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1541765-1541774, and July 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1541763-1541764).

Inmate ██████████ was a monitored SMI inmate in the February, April, May, July, and August 2018 Maximum Custody Notebooks for ASPC-Florence (Kasson). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **February 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated March 2, 2018. These inmates were chosen from an eligible inmate population totaling 40. Inmates were chosen by picking every 4th inmate until 10 inmates were achieved. The counting of every forth SMI inmate began with inmate ██████████████; this starting point is identified in red by the "SP SMI" in the count sheet at Bates No. ADCM1518767. Utilizing the calculation and starting point above, inmate ████████████ would have been the sixth monitored SMI inmate, but he had already been picked as a monitored Max Custody inmate; this necessitated a substitution with inmate ███████ (██████). ADCM1518769-1518770. Utilizing the calculation, starting point, and appropriate substitution above, inmate ████████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1518767. (Exh. 18, February 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1518758, February 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1518769-1518770, and February 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1518767-15188768).

- **April 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated April 27, 2018. These inmates were chosen from an eligible inmate population totaling 29. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ████████████; this starting point is identified in red by "SP SMI" in the count sheet at Bates No. ADCM1529430. Utilizing the calculation and starting point above, inmate ████████████ would have been the first monitored SMI inmate, but he was on Watch; this necessitated a substitution with inmate █████████ who became the first monitored inmate. ADCM1529431. Inmate ████████████ would have been the third monitored SMI inmate, but he was on a Watch; this necessitated a substitution with inmate ████████████ who became the third monitored inmate. ADCM1529432. Utilizing the calculation, starting point, and appropriate substitutions above, inmate ██████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1529430. (Exh. 20, April 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1529420, April 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1529431-

1529435, and April 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1529429-1529430).

- **May 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated May 25, 2018. These inmates were chosen from an eligible inmate population totaling 26. Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate ███████████; this starting point is identified in red by the "SP SMI" in the count sheet at Bates No. ADCM1535908. Utilizing this calculation and starting point, inmate ███████████ would have been the third monitored SMI inmate, but he had already been picked to be a Max Custody monitored inmate; this necessitated a substitution with inmate ███████████ who became the third monitored inmate. ADCM1535905. Utilizing the calculation, starting point, and appropriate substitution above, inmate ███████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1535908. (Exh. 22, May 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1535896, May 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1535905-1535907, and May 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1535908-1535909).

- **July 2018**: Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated July 13, 2018. These inmates were chosen from an eligible inmate population totaling 42. Inmates were chosen by picking every 4th inmate until 10 inmates were achieved. The counting of every forth SMI inmate began with inmate ███████████ this starting point is identified in blue by the "SP SMI/GP" in the count sheet at Bates No. ADCM1541763. Utilizing the calculation and starting point above, inmate ███████████ would have been the second monitored SMI inmate, but he had already been picked as a Max Custody monitored inmate; this necessitated a substitution with inmate (███████), who was the next SMI inmate listed. ADCM1541764-1541766. However, because inmate ███████ had already been picked as a Max Custody monitored inmate, another substitution was necessary; consequently, inmate ███████████ became the second monitored inmate. *Id.* Inmate ███████████ would have been the sixth monitored SMI inmate, but he had already been picked as the first monitored SMI inmate; this necessitated a substitution with inmate ███████████), who became the sixth monitored inmate. ADCM1541767. Utilizing the calculation, starting point, and appropriate substitutions above, inmate ███████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1541764. (Exh. 23, July 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1541754, July 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1541765-1541774, and July 2018 Inmate Count Sheets Kasson Cell Block at Bates No. ADCM1541763-1541764).

- **August 2018**:  Ten (10) SMI max custody inmates were selected from Kasson Cell Block count sheets dated August 17, 2018.  These inmates were chosen from an eligible inmate population totaling 61.  Inmates were chosen by picking every 6th inmate until 10 inmates were achieved.  The counting of every sixth SMI inmate began with inmate ███████████; this starting point is identified in black by "SP GP SMI" above inmate ███████' name in the count sheet at Bates No. ADCM1549633. Utilizing the calculation and starting point above, inmate ███████ █████████ would have been the first monitored SMI inmate, but he had already been picked to be a monitored Max Custody inmate; this necessitated a substitution with inmate ████████████████, who became the first monitored inmate. Bates No. ADCM1549650. Utilizing the calculation, starting point, and appropriate substitution above, inmate ███████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1549633. (Exh. 24, August 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1549624, August 2018 Inmate Substitution Memo for Kasson Cell Block at Bates No. ADCM1549650, and August 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1549633-1549634).

**ASPC-Lewis (Rast)**

███████████████

Inmate ███ was a monitored SMI inmate in the January, March, April, June, July, August, September, and October 2018 Maximum Custody Notebooks for ASPC-Lewis (Rast). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **January 2018:**  Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated February 2, 2018. These inmates were chosen from an eligible inmate population totaling 27.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.  The counting of every third SMI inmate began with inmate ███████████); this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1516755. Utilizing the calculation and starting point above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1516755. (Exh. 27, January 2018 Inmate Selection List for Rast at Bates No.  ADCM1516749 and January 2018 Inmate Count Sheets for Rast at Bates No. 1516755-1516760).

- **March 2018:**  Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated March 9, 2018. These inmates were chosen from an eligible inmate population totaling 25.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.  The counting of every third SMI inmate began with inmate ████████); this starting point is identified in red by "Start"

in the count sheet at Bates No. ADCM1523573. Utilizing the calculation and starting point above, inmate ███████████ would have been the third monitored SMI inmate, but he had already been picked as a monitored Max Custody inmate; this necessitated a substation with inmate ██████████), who became the third monitored inmate. ADCM1523580. Inmate ██████████ would have been the ninth monitored SMI inmate, but he had already been picked to be the first monitored SMI inmate; this necessitated a substitution with inmate ████████████, who became the ninth monitored inmate. ADCM1523579. Utilizing the calculation, starting point, and appropriate substitutions above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1523575. (Exh. 28, March 2018 Inmate Selection List for Rast at Bates No. ADCM1523567, March 2018 Substitution Memos for Rast at Bates No. ADCM1523579-1523580, and March 2018 Inmate Count Sheets for Rast at Bates No. ADCM1523573-1523578).

- **April 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated April 27, 2018. These inmates were chosen from an eligible inmate population totaling 22. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ███████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1538486. Utilizing the calculation and starting point above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1538490. (Exh. 29, April 2018 Inmate Selection List for Rast at Bates No. ADCM1538480, April 2018 Substitution Memos for Rast at Bates No. ADCM1538492-1538493, and April 2018 Inmate Count Sheets for Rast at Bates No. ADCM1538486-1538491).

- **June 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated June 8, 2018. These inmates were chosen from an eligible inmate population totaling 21. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ███████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1540252. Utilizing the calculation and starting point above, inmate ███████████ would have been the first monitored SMI inmate, but he was not housed at Rast for the entire monitored week; this necessitated a substitution with inmate █████████████ who became the first monitored inmate. ADCM1540258. Utilizing the calculation, starting point, and appropriate substitution above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1540254. (Exh. 30, June 2018 Inmate Selection List for Rast at Bates No. ADCM1540246, June 2018 Substitution Memos for Rast at Bates No.

ADCM1540258-1540260, and June 2018 Inmate Count Sheets for Rast at Bates No. ADCM1540252-1540257).

- **July 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated July 13, 2018. These inmates were chosen from an eligible inmate population totaling 19.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ███████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1542094.  Utilizing the calculation and starting point above, inmate ███████████ would have been the third monitored SMI inmate, but he was not housed at Rast for the entire monitored week; this necessitated a substitution with inmate ███████████, who became the third monitored inmate. ADCM1542101. Utilizing the calculation, starting point, and appropriate substitution above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1542094. (Exh. 31, July 2018 Inmate Selection List for Rast at Bates No. ADCM1542088, July 2018 Substitution Memos for Rast at Bates No. ADCM1542100-1542101, and July 2018 Inmate Count Sheets for Rast at Bates No. ADCM1542094-1542099).

- **August 2018:**  Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated August 17, 2018. These inmates were chosen from an eligible inmate population totaling 17.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ███████████ this starting point is identified in red by "MI tart" in the count sheet at Bates No. ADCM1551283.  Utilizing the calculation and starting point above, inmate ███████████ would have been the second monitored SMI inmate, but he had already been picked as a monitored Max Custody inmate; this necessitated a substitution with inmate ████, who became the second monitored inmate. ADCM1551286. Utilizing the calculation, starting point, and appropriate substitution above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1551283. (Exh. 32, August 2018 Inmate Selection List for Rast at Bates No. ADCM1551274, August 2018 Substitution Memos for Rast at Bates No. ADCM1551286-1551290, and August 2018 Inmate Count Sheets for Rast at Bates No. ADCM1551280-1551285).

- **September 2018:**  Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated September 7, 2018. These inmates were chosen from an eligible inmate population totaling 18.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved.  The counting of every second SMI inmate began with inmate ███████████; this starting point is identified in red by "tart" in the count sheet at Bates No. ADCM1552620. Utilizing the calculation and starting point above, inmate ████ was correctly counted and

chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1552620. (Exh. 33, September 2018 Inmate Selection List for Rast at Bates No. ADCM1552614, September 2018 Substitution Memos for Rast at Bates No. ADCM1552626-1552628, and September 2018 Inmate Count Sheets for Rast at Bates No. ADCM1552620-1552625).

- **October 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated November 2, 2018. These inmates were chosen from an eligible inmate population totaling 20.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved.  The counting of every second SMI inmate began with inmate ███████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1554097.  Utilizing the calculation and starting point above, inmate ███████████████ would have been the second monitored SMI inmate, but he had already been picked as a monitored Max Custody inmate; this necessitated a substitution with inmate ████████████, who became the second monitored inmate. ADCM1554091 and ADCM1554105. Utilizing the calculation, starting point, and appropriate substitution above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates ADCM1554100. (Exh. 34, October 2018 Inmate Selection List for Rast at Bates ADCM1554091, October 2018 Substitution Memos for Rast at Bates ADCM1554103-1554106, and October 2018 Inmate Count Sheets for Rast at Bates ADCM1554097-1554102).

████████████████████

Inmate ███████████ was a monitored Max Custody inmate in the September and October 2018 Maximum Custody Notebooks for ASPC-Lewis (Rast). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **September 2018:** Ten (10) max custody inmates were selected from the Lewis Rast Unit count sheets dated September 7, 2018. These inmates were chosen from an eligible inmate population totaling 280.  Inmates were chosen by picking every 28th inmate until 10 inmates were achieved.   The counting of every twenty-eighth Max Custody inmate began with inmate ███████████████; this starting point is identified in red by "tart" in the count sheet at Bates No. ADCM1552620. Utilizing the calculation and starting point above, inmate ███████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1552624. (Exh. 33, September 2018 Inmate Selection List for Rast at Bates No. ADCM1552614, September 2018 Substitution Memos for Rast at Bates No. ADCM1552626-1552628, and September 2018 Inmate Count Sheets for Rast at Bates No. ADCM1552620-1552625).

- **October 2018:**  Ten (10) max custody inmates were selected from the Lewis Rast Unit count sheets dated November 2, 2018. These inmates were chosen from an eligible inmate population totaling 287.  Inmates were chosen by picking every 29th inmate until 10 inmates were achieved. The counting of every twenty-ninth Max Custody inmate began with inmate ██████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1554097. Utilizing the calculation and starting point above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1554098. (Exh. 34, October 2018 Inmate Selection List for Rast at Bates No. ADCM1554091, October 2018 Substitution Memos for Rast at Bates No. ADCM1554103-1554106, and October 2018 Inmate Count Sheets for Rast at Bates No. ADCM1554097-1554102).

████████████████

Inmate ██████ was a monitored Max Custody inmate in the April and May 2018 Maximum Custody Notebooks for ASPC-Lewis (Rast). The Max Custody inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **April 2018:**  Ten (10) max custody inmates were selected from the Lewis Rast Unit count sheets dated April 27, 2018. These inmates were chosen from an eligible inmate population totaling 286.  Inmates were chosen by picking every 29th inmate until 10 inmates were achieved.  The counting of every second twenty-ninth Max Custody inmate began with inmate ████████████ this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1538486. Utilizing the calculation and starting point above, inmate ██████████ would have been the first monitored Max Custody inmate, but he was not housed at Rast for the entire monitored week; this necessitated a substitution with inmate █████████████, who became the first monitored inmate. ADCM1538492. Utilizing the calculation, starting point, and appropriate substitution above, inmate ████████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1538490. (Exh. 29, April 2018 Inmate Selection List for Rast at Bates No. ADCM1538480, April 2018 Substitution Memos for Rast at Bates No. ADCM1538492-1538493, and April 2018 Inmate Count Sheets for Rast at Bates No. ADCM1538486-1538491).

- **May 2018:**  Ten (10) max custody inmates were selected from the Lewis Rast Unit count sheets dated May 25, 2018. These inmates were chosen from an eligible inmate population totaling 288.  Inmates were chosen by picking every 29th inmate until 10 inmates were achieved. The counting of every second twenty-ninth Max Custody inmate began with inmate ████████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1536191.  Utilizing the

41

calculation and starting point above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1536194. (Exh. 35, May 2018 Inmate Selection List for Rast at Bates No. ADCM1536185 and May 2018 Inmate Count Sheets for Rast at Bates No. ADCM1536191-1536196).

████████████████████

Inmate ███████ was a monitored SMI inmate in the January, February, April, June, July, August, September, and October 2018 Maximum Custody Notebooks for ASPC-Lewis (Rast). The SMI inmate random selection method was followed in selecting this inmate for each of these monitoring months.

- **January 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated February 2, 2018. These inmates were chosen from an eligible inmate population totaling 27.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved.  The counting of every third SMI inmate began with inmate ██████████████); this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1516755. Utilizing the calculation and starting point above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1516755. (Exh. 27, January 2018 Inmate Selection List for Rast at Bates No.  ADCM1516749 and January 2018 Inmate Count Sheets for Rast at Bates No. 1516755-1516760).

- **February 2018:**  Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated March 2, 2018. These inmates were chosen from an eligible inmate population totaling 25.  Inmates were chosen by picking every 3rd inmate until 10 inmates were achieved. The counting of every third SMI inmate began with inmate █████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1519057. Utilizing the calculation and starting point above, Inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1519060. (Exh. 36, February 2018 Inmate Selection List for Rast at Bates No. ADCM1519051, February 2018 Substitution Memos for Rast at Bates No. ADCM1519063-1519064, and February 2018 Inmate Count Sheets for Rast at Bates No. 1519057-1519062).

- **April 2018:**  Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated April 27, 2018. These inmates were chosen from an eligible inmate population totaling 22.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved.   The counting of every second SMI inmate began with inmate ████████████ this starting point is identified in red by

"Start" in the count sheet at Bates No. ADCM1538486. Utilizing the calculation and starting point above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1538490. (Exh. 29, April 2018 Inmate Selection List for Rast at Bates No. ADCM1538480, April 2018 Substitution Memos for Rast at Bates No. ADCM1538492-1538493, and April 2018 Inmate Count Sheets for Rast at Bates No. ADCM1538486-1538491).

- **June 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated June 8, 2018. These inmates were chosen from an eligible inmate population totaling 21. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ███████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1540252. Utilizing the calculation and starting point above, inmate ███████ would have been the first monitored SMI inmate, but he was not housed at Rast for the entire monitored week; this necessitated a substitution with inmate ███████, who became the first monitored inmate. ADCM1540258. Utilizing the calculation, starting point, and appropriate substitution above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1540254. (Exh. 30, June 2018 Inmate Selection List for Rast at Bates No. ADCM1540246, June 2018 Substitution Memos for Rast at Bates No. ADCM1540258-1540260, and June 2018 Inmate Count Sheets for Rast at Bates No. ADCM1540252-1540257).

- **July 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated July 13, 2018. These inmates were chosen from an eligible inmate population totaling 19. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ███████ this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1542094. Utilizing the calculation and starting point above, inmate ███████ would have been the third monitored SMI inmate, but he was not housed at Rast for the entire monitored week; this necessitated a substitution with inmate ███████, who became the third monitored inmate. ADCM1542101. Utilizing the calculation, starting point, and appropriate substitution above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1542094. (Exh. 31, July 2018 Inmate Selection List for Rast at Bates No. ADCM1542088, July 2018 Substitution Memos for Rast at Bates No. ADCM1542100-1542101, and July 2018 Inmate Count Sheets for Rast at Bates No. ADCM1542094-1542099).

- **August 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated August 17, 2018. These inmates were chosen from an

eligible inmate population totaling 17. Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved.  The counting of every second SMI inmate began with inmate ███████████████; this starting point is identified in red by "MI tart" in the count sheet at Bates No. ADCM1551283. Utilizing the calculation and starting point above, inmate ████████████ would have been the second monitored SMI inmate, but he had already been picked as a monitored Max Custody inmate; this necessitated a substitution with inmate ██████████, who became the second monitored inmate. Bates No. ADCM1551286. Inmate ████ ████████ would have been the fourth monitored SMI inmate, but he was not housed at Rast for the entire monitored week; this necessitated a substitution of inmate ██████████, who became the fourth monitored inmate. Bates No. ADCM1551287. Inmate ██████████ would have been the sixth monitored SMI inmate, but he had already been picked as a Max Custody monitored inmate; this necessitated a substitution of inmate ████████), who became the sixth inmate. Bates No. ADCM1551288. Finally, inmate ██████████████) would have been the ninth monitored SMI inmate, but he had already been picked as the first monitored inmate; this necessitated a substitution with inmate █████, who became the ninth monitored inmate. Bates No. ADCM1551289. Utilizing the calculation, starting point, and appropriate substitutions above, inmate ████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1551283. (Exh. 32, August 2018 Inmate Selection List for Rast at Bates No. ADCM1551274, August 2018 Substitution Memos for Rast at Bates No. ADCM1551286-1551290, and August 2018 Inmate Count Sheets for Rast at Bates No. ADCM1551280-1551285).

- **September 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated September 7, 2018. These inmates were chosen from an eligible inmate population totaling 18.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ████████████); this starting point is identified in red by "tart" in the count sheet at Bates No. ADCM1552620. Utilizing the calculation and starting point above, inmate ███████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates No. ADCM1552620. (Exh. 33, September 2018 Inmate Selection List for Rast at Bates No. ADCM1552614, September 2018 Substitution Memos for Rast at Bates No. ADCM1552626-1552628, and September 2018 Inmate Count Sheets for Rast at Bates No. ADCM1552620-1552625).

- **October 2018:** Ten (10) SMI max custody inmates were selected from the Lewis Rast Unit count sheets dated November 2, 2018. These inmates were chosen from an eligible inmate population totaling 20.  Inmates were chosen by picking every 2nd inmate until 10 inmates were achieved. The counting of every second SMI inmate began with inmate ██████████; this starting point is identified in red by "Start" in the count sheet at Bates No. ADCM1554097.  Utilizing the calculation

and starting point above, inmate ████████████ would have been the second monitored SMI inmate, but he had already been picked as a monitored Max Custody inmate; this necessitated a substitution with inmate ████████ ███████, who became the second monitored inmate. Bates No. ADCM1554091 and ADCM1554105. Utilizing the calculation, starting point, and appropriate substitution above, inmate ██████ was correctly counted and chosen from the applicable count sheets, with the inmate's name highlighted at Bates ADCM1554100. (Exh. 34, October 2018 Inmate Selection List for Rast at Bates ADCM1554091, October 2018 Substitution Memos for Rast at Bates ADCM1554103-1554106, and October 2018 Inmate Count Sheets for Rast at Bates ADCM1554097-1554102).

As illustrated in this sampling, the set protocol for random selection of monitored inmates using the unit count sheets was appropriately conducted.

Next, Plaintiffs challenge the random selection of SMI maximum custody inmates. As evidence, Plaintiffs challenge four selections SMI inmates for monitoring of MCPM 8 at ASPC-Eyman (Browning Unit); ASPC-Lewis (Rast Unit); and ASPC-Florence (Central Unit, Kasson Cellblock).   When the full documentation provided in the monthly Maximum Custody Notebooks is analyzed versus a one page snippet, it reveals that Defendants appropriately selected the inmates for review in accordance with the longstanding methodology that is memorialized in the Maximum Custody Monitor Guide.

- **August 2018 – Eyman (Browning Unit):** Plaintiffs challenge the selection of SMI inmates at ASPC-Eyman (Browning Unit) for August 2018.  (Doc. 3157 at 16; Doc. 3160 at 3, ¶8). Specifically, Plaintiffs question why every 1st SMI inmate was selected for monitoring when the count sheet shows nine (9) inmates in a row being selected and one inmate in a separate column also being selected.  Plaintiffs again misunderstand the process and the documentation.

  For the applicable monitored week of August 17, 2018, there were only fourteen (14) SMI maximum custody inmates located at ASPC-Eyman (Browning Unit). SMI inmates are identified with an "M" after their ADC number.  Where there were only fourteen (14) total SMI inmates, simply dividing fourteen (14) by ten (10) determines that the every "nth" inmate (14/10) calculates to picking every first inmate (1.4).  Picking every first inmate with an "M" designation indeed results in the first nine (9) inmates in column one of the count sheet being selected, along with the next (10th) "M" identified inmate in the second column of the first count sheet (the next "first" SMI inmate on the count sheet.  Thus, the ten (10) green highlighted SMI inmates selected out of the eligible pool of fourteen (14) SMI

inmates was properly conducted.  (Exh. 7, August 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1548920 and August 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1548930).[14]

- **July 2018 – Eyman (Browning Unit):**   Plaintiffs next challenge the selection of SMI inmates at ASPC-Eyman (Browning Unit) for July 2018. (Doc. 3157 at 16; Doc. 3160 at 3, ¶4). For the applicable monitored week ending in July 13, 2018, there were only twenty-six (26) SMI maximum custody inmates located at ASPC-Eyman (Browning Unit).[15] ADCM1540954. Where there were only twenty six (26) total SMI inmates, simply dividing twenty-six (26) by ten (10) determines that the every "nth" inmate (26/10) calculates to picking every third inmate (2.6). *Id.* The counting of every third SMI inmate begins with inmate ███████████████ which is identified by the phrase (marked in red) "SMI start" in the count sheet at Bates No. ADCM1540964.

Starting from inmate ████████ (who counts as SMI inmate number one), picking every third inmate with an "M" designation results in ██████████████ being chosen as the first monitored SMI inmate. ADCM1540954 and ADCM1540967. The second is ██████████████. (*Id.*) The third is ██████████████, instead of ██████████████ because Cruz was on a mental health watch during the monitored week and thus ineligible to be monitored. ADCM1540954, ADCM1540967, and ADCM1540998. Following ████ is ██████████████, ██████████████), and ██████████████. ADCM1540954 and ADCM1540967. Inmate ██████████ is next at Bates No. ADCM1540971, followed by (████████) at Bates No. ADCM1540989. *See also* ADCM1540954. The process finishes with ██████████████ followed by ██████████████ at Bates No. ADCM1540967. *See also* ADCM1540954.

Therefore, picking every third inmate with an "M" designation indeed results in seven SMI inmates in column one of the count sheet at Bates No. ADCM1540967 being selected, along with one additional SMI inmate in the second column of that same count sheet. Thus, the ten (10) green highlighted SMI inmates selected out of the eligible pool of twenty-six (26) SMI inmates was properly conducted. (Exh. 6, July 2018 Inmate Selection List for Browning Unit at Bates No. ADCM1540954, July 2018 Inmate Substitution Memo at Bates No. ADCM1540998, and July 2018 Inmate Count Sheets for Browning Unit at Bates No. ADCM1540964-ADCM1540997).[16]

---

[14] Plaintiffs' Exhibit 2 to Carns. Decl. at doc 3162, Bates No. ADCM1548930 fails to attach the entire applicable count sheet as an exhibit.  Defendants provide the Court with the entire count sheet.  (See Exhibit citation supra.)

[15] As mentioned previously, SMI inmates are identified with an "M" after their ADC number.

[16] Plaintiffs' Exhibit 2 to Carns. Decl. at Doc. 3162, Bates No. ADCM1540967

- **January 2018 – Lewis (Rast Unit):** Plaintiffs also cite to the selection of SMI inmates at ASPC-Lewis (Rast Unit) for January 2018. (Doc. 3157 at 16; Doc. 3160 at 3, ¶4). For the applicable monitored week ending in February 2, 2018, there were only twenty-seven (27) SMI maximum custody inmates located at ASPC-Lewis (Rast Unit). ADCM1516749. Where there were only twenty seven (27) total SMI inmates, simply dividing twenty-seven (27) by ten (10) determines that the every "nth" inmate (27/10) calculates to picking every third inmate (2.7). *Id.* The counting of every third SMI inmate begins with inmate ███████████████), which is identified in red by the word "Start" in the count sheet at Bates No. ADCM1516755.

  Starting from inmate ███████ (who counts as SMI inmate number one), picking every third inmate with an "M" designation results in ███████████ being chosen as the first monitored SMI inmate. ADCM1516749 and ADCM1516755. The second is ████████. (*Id.*) The third is ███████████), followed by ███████████), ███████), ███████), ███████), ███████), and finally, ███████), (*Id.*)Therefore, picking every third inmate with an "M" designation indeed results in six SMI inmates in column one, three SMI inmates in column two, and one SMI inmate in column three of the count sheet at Bates No. ADCM1516755 being selected. Thus, the ten (10) green highlighted SMI inmates selected out of the eligible pool of twenty-seven (27) SMI inmates was properly conducted. (Exh. 27, January 2018 Inmate Selection List for Rast Unit at Bates No. ADCM1516749 and January 2018 Inmate Count Sheets for Rast Unit at Bates No. ADCM1516755-1516760).[17]

- **October 2018 – Florence (Central Unit, Kasson Cellblock):** Plaintiffs cite to the selection of SMI inmates at ASPC-Florence (Kasson) for October 2018 as a final example in support of their allegations regarding the SMI selection process. (Doc. 3157 at 16; Doc. 3160 at 3, ¶4). For the applicable monitored week ending in November 2, 2018, there were sixty-three (63) SMI maximum custody inmates located at ASPC-Florence (Kasson). ADCM1553783. Where there were sixty-three (63) total SMI inmates, simply dividing sixty three (63) by ten (10) determines that the every "nth" inmate (63/10) calculates to picking every sixth inmate (6.3). (*Id.*) The counting of every third SMI inmate begins with inmate ███████████); this starting point is identified in green by "SP SMI" in the count sheet at Bates No. ADCM1553792.

---

fails to attach the entire applicable count sheet as an exhibit. Defendants provide the Court with the entire count sheet. (*See* Exhibit citation supra.)

[17] Plaintiffs' Exhibit 2 to Carns. Decl. at Doc. 3162, Bates No. ADCM1516755 fails to attach the entire applicable count sheet as an exhibit. Defendants provide the Court with the entire count sheet. (*See* Exhibit citation supra.)

Starting from inmate ████████ (who counts as SMI inmate number one), picking every third inmate with an "M" designation results in ███████████ being chosen as the first monitored SMI inmate. ADCM1553783 and ADCM1553792. The second is ████████████████ who takes the place of ████████████ ), an inmate who was on a Mental Health Watch and not eligible to be picked. ADCM1553783, ADCM1553792, and ADCM1553794. The third is ███████ ( ████████ ), followed by ████████ ████████ ). ADCM1553783 and ADCM1553792 ███████████ is the fifth monitored inmate, taking the place of ███████████████ ), who was already picked as one of the monitored Max Custody inmates. ADCM1553783, ADCM1553792, and ADCM1553795. The sixth is █████████████████ at Bates No. ADCM1553792, followed by ███████ ██████ ), ████████████ ), and ██████████ ) at Bates No. ADCM1553793. *See also* ADCM1553783.

Therefore, picking every sixth inmate with an "M" designation indeed results in two SMI inmates in column one, two SMI inmates in column two, and two SMI inmates in column three of the count sheet at Bates No. ADCM1553792 being selected. Thus, the ten (10) green highlighted SMI inmates that were selected out of the eligible pool of sixty-three (63) SMI inmates was properly conducted. (Exh. 37, October 2018 Inmate Selection List for Kasson Cell Block at Bates No. ADCM1553783, October 2018 Inmate Substitution Memos for Kasson Cell Block at Bates No. ADCM1553794-1553796, and October 2018 Inmate Count Sheets for Kasson Cell Block at Bates No. ADCM1553792-ADCM1553793).[18]

As demonstrated, Plaintiffs' anecdotal challenges to inmates selected for review and monitoring fall flat. Plaintiffs misunderstand the process and the data. Defendants appropriately and randomly selected inmates for monthly review. Defendants are entitled to termination of monitoring and reporting.

IV. **DEFENDANTS DOCUMENT OFFERED OUT-OF-CELL ACTIVITIES AND INMATE REFUSALS OF THE SAME IN ACCORDANCE WITH ACCEPTED METHODOLOGY**[19]

---

[18] Plaintiffs' Exhibit 2 to Carns. Decl. at Doc. 3162, Bates No. ADCM1553792 fails to attach the entire applicable count sheet as an exhibit. Defendants provide the Court with the entire count sheet. (See Exhibit citation supra.)

[19] In footnote 9 of Doc. 3157, Plaintiffs state that the production of the January 2018 Maximum Custody Notebooks for ASPC-Eyman and Florence-Central were incomplete. Plaintiffs' counsel, however, never notified Defendants' counsel that they detected that the books were obviously incomplete. Defendants' counsel researched the claim made in footnote 9 and determined that due to inadvertent system error, the entirety of the notebooks did not upload. Defendants re-produced these notebooks in full to Plaintiffs' counsel on April 3, 2019.

48

Plaintiffs allege that that Defendants are noncompliant with methodology at ASPC-Florence (Central Unit, Kasson Cellblock), ASPC Lewis (Rast Unit), and Eyman (SMU-1 and Browning Units) for monitoring out-of-cell time offered to maximum custody inmates. (Doc. 3157 at 8). Specifically, Plaintiffs claim that Defendants are not contemporaneously documenting offerings and refusals of out-of-cell activities in violation of required monitoring methodology. Plaintiffs' challenges fail where: (1) OOCT Forms are not required to be affixed cell front; (2) refusals of out-of-cell time are accurately and appropriately documented; and (3) supervisory personnel appropriately address individual inmate patterns of out-of-cell time.

### A.    OOCT Forms Are Not Required to be Affixed Cell Front.

After the November 2018 monitoring tour of ASPC-Florence (Central Unit, Kasson Cellblock), the January 2019 monitoring tour of ASPC-Lewis (Rast Unit), and the January 2019 monitoring tour of ASPC-Eyman (SMU-I and Browning Units), Plaintiffs for the first time questioned the relocation of the OOCT Forms from being affixed cell front to being located in binders either outside of the housing pods or in nearby security offices.

Indeed, before these recent tours, Plaintiffs' counsel who participated in the monitoring tours never questioned why OOCT Forms were no longer cell front at any maximum custody housing location. Had this occurred, an easy explanation would have been provided to counsel. Since the OOCT Form location was adjusted approximately 1 ½ to 2 years ago, Plaintiffs have waived their challenge to the same. (Bendel Decl., Ex. 2 at ¶48; Knight Decl., Ex. 38 at ¶20). This, notwithstanding the fact that there is no substantial non-compliance as to monitoring methodology with respect to location of the OOCT Forms and documentation of refusals in the first place.

OOCT Forms are the leading source documents for review and monitoring. While Exhibit E to the Stipulation sets forth the Maximum Custody Outcome Measure Protocol and the Protocol refers to OOCT Forms as source documents for MCPMs 1-2, 5-6 & 8, the Protocol is silent as to a required location for OOCT Forms. (Doc. 1185-1 at 41-47.)

The same goes for the Monitor Guide.  The MCPMs and the text of the Stipulation do not refer to OOCT Forms at all.

Likewise, neither the Stipulation (and Protocol), MCPMs, nor the Monitor Guide require live-time recording of out-of-cell time on the OOCT Forms.  (Monitor Guide, oc. 3177-2 at 15, 18, 23, 26, 29).   Simply put, the OOCT Forms are just one source document among several by which Defendants may demonstrate that required out-of-cell time was offered to an inmate randomly selected during any particular month for monitoring.

While Defendants do not contest that OOCT Forms were affixed cell front, as the monitoring phase continued, maintaining the OOCT Forms cell front became unworkable. Inmates were able to tear down or tamper with the forms during movement.   Porters working in the pods would remove or alter the forms.   At times, inmates who were provided the forms to sign for refusals would not give the forms back or would destroy them.   Moreover, efforts to have inmates sign the OOCT Forms for their own refusals were either unsuccessful, met with verbal challenges and escalating negative behavior by the inmates such that efforts to obtain the signature ceased to avoid escalating negative behavior by the inmate, or became unduly time consuming such that obtaining inmate signatures interfered with continuing timely and orderly daily operations. (Bendel Decl., Exh. 2 at ¶53; Knight Decl., Exh. 38 at ¶14.)

Most importantly, requiring officers to document at the cell front created legitimate safety and security risks.  By their own crimes and institutional behavior, max custody inmates are of the highest security risk.  Most staff assaults occur in maximum custody units.  Max custody inmates regularly attempt to grab personnel through the cell food ports or throw substances at staff through the ports.  Requiring corrections personnel to document at the cell front diverted attention away from the inmates and provided inmates the opportunity for assault if they were to gain control of their food ports and reach out to assault personnel with either their hands or weapons.  (Bendel Decl., Exh. 2 at ¶57; Knight Decl., Exh. 38 at ¶18).  Defendants are not required to forego basic safety and security to retain OOCT Forms cell front where it is imperative that officer attention be

focused on observation of inmate behavior in-cell, restraint of the inmate, and removal of the inmate from the cell in a safe and controlled manner.

Here, Defendants were reasonably justified in relocating the OOCT Forms to notebook binders located at ASPC-Florence (Central Unit, Kasson Cellblock) at the officers' desk outside the pod or at wing control, and at ASPC-Lewis (Rast Unit) and ASPC-Eyman (SMU-I and Browning Units) either in the security office in the housing cluster or in the rack outside the pod doors.  (Bendel Decl., Exh. 2 at ¶77; Knight Decl., Exh. 38 at ¶20).  Neither the Stipulation, MCPMs, the Monitor Guide, nor any Court rulings required Defendants to notify Plaintiffs' counsel of legitimate operational changes in this regard where proper OOCT Form documentation continues.  Indeed, if Plaintiffs' counsel were concerned, then certainly questions could have been asked during the monitoring tours that have taken place in the last 1 ½ to two years, as it was plain and obvious that the OOCT Forms were no longer located cell front.   As United States Supreme Court precedent cements, courts may not micromanage prison operations, and, certainly here, no provision of the Stipulation, MCPMS, Monitor Guide, or Court ruling prohibited Defendants from adjusting the location of the OOCT Forms for legitimate safety, security, and operational needs.  *See Bell v. Wolfish*, 441 U.S. 520, 546, 547-48 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.)

### B.   Documentation of Offered and Refused Out-of-Cell Time is Reliable.

The following describes operations related to completion of OOCT forms for maximum custody units for November 2016 to October 2018.  Defendants methodology does not violate the Stipulation (or Protocol), MCPMs or the Monitor Guide.

**ASPC-Florence (Central Unit, Kasson Cellblock) Operations**

As was explained and demonstrated to Plaintiffs' counsel during the November 2018 monitoring tour, the physical plant of Kasson Cellblock is unique as compared to the

other max custody locations at other complexes.  Kasson Cellblock is comprised of three Wings - Wings 1, 2, and 3.  Most of the SMI maximum custody population assigned to Kasson is housed on Wings 2 and 3.  It was not until late October 2018 that the mission of the Kasson Cellblock changed to provide a residential program for SMI maximum custody inmates, focusing on a small subset of SMI maximum custody inmates who require more intensive services.  (Decl. Knight, Exh. 38 at ¶25).

Contrary to maximum custody housing locations at ASPC-Eyman (SMU-I and Browning Units) and ASPC-Lewis (Rast Unit), correctional officers at Kasson must manually control the opening and closing of cell doors from mechanisms just outside of the pods, which are small in size because of the smaller number of cells located in each pod.  The officer controlling the unlocking or locking of cell doors stands just outside the housing pod and can see into the pod to visually monitor the officer that is inside the pod at cell front, restraining/unrestraining an inmate for exit or entry into the cell.  Moreover, the officer controlling the cell door from just outside the pod can see and hear what is happening in the pods (radios may or may not be used), and the two officers work as a team to facilitate inmate movement and record on the OOCT Forms the out-of-cell time offered to the inmates. (Decl. Knight, Exh. 38 at ¶28).

The approximate distance from the officer stationed at the manual cell door control to an officer at the farthest cell from the pod entrance is 32 feet.  At closest range, the two officers are approximately 23 feet away from each other.  When out-of-cell time is offered to an inmate, and the inmate is restrained and ready to come out, the pod officer calls out to the officer controlling the cell doors to open the door.  If there is a refusal, the officer at cell front advises the officer controlling the cell doors of the refusal.  In many circumstances, the officer at the controls can also hear the inmate refusing or see body language of the inmate indicating the refusal and thus can second witness a refusal.  Whether an inmate accepts or refuses out-of–cell time is then documented by the officer controlling the cell doors on the OOCT Form, or notes are kept on a notepad or the count sheet and transferred to the OOCT Form soon in time after the movement.  If there is a

refusal, either the officer who was cell front or the officer controlling the cell doors who also witnessed the refusal signs the OOCT Form.  (Decl. Knight, Exh. 38 at ¶37).  Both officers are witnesses to the refusal.

Where staffing levels are increased, an officer may be stationed at a desk at the door to the entrance to the pod.  If such additional staff is available, the officer stationed at the door to the housing pod may record inmate movement on the OOCT Forms, observing by sight, communication, and sound whether an inmate accepts or declines offered out-of-cell time.  Where feasible due to staffing levels, an attempt at an inmate signature is made. However, due to staffing challenges, obtaining an inmate signature is not commonly feasible due to safety, security, and operational concerns.  (Decl. Knight, Exh. 38 at ¶40).

**ASPC-Lewis (Rast Unit) Operations.**

At ASPC-Lewis (Rast Unit), since ceasing the practice of affixing individual inmate OOCT Forms cell front approximately 1½ to 2 years ago, the OOCT Forms have been maintained either in the security office in the cluster or in the rack outside the pod doors.  In preparation for an offer of out-of-cell time, a member of the movement team will use either the pod count sheet or a notepad to note whether an inmate refuses offered out-of-cell time and the time of the refusal.  The officer goes cell to cell in order to ask each inmate whether he will participate in offered out-of-cell time. Moreover, because maximum custody inmates must be restrained for movement, determining whether or not an inmate accepts offered out-of-cell time requires an officer to ask each inmate whether or not the inmate will participate.  (Decl. Bendel, Exh. 2 at ¶80).

If there is a refusal, the refusal that is noted on the count sheet or notepad is then transferred to the OOCT Form and the officer receiving the inmate's refusal signs as a witness for the same, as does another member of the movement team and/or the inmate if feasible.  The OOCT Forms are completed based upon notes made on the count sheet or notepad close in time to the movement.  For those inmates who accept the offered out-of-cell time, a member of the movement team completes the OOCT Forms utilizing the

1    gathered inmate IDs for those participating in the out-of-cell activity and documents the

2    start time for the out-of-cell activity.  (Decl. Bendel, Exh. 2 at ¶63).

3        Offered programs take place in classrooms located outside of the maximum

4    custody housing units requiring movement of the inmates to the program location.  Step

5    Level 1 inmates program by self-study in their cells.  They do not come out of cell for

6    programming (except for SMI Step 1 inmates who come out of cell for mental health &

7    psychoeducational programming and unstructured out-of-cell time). When an inmate

8    attends an offered program, the inmate's time out of cell to participate is documented on

9    the OOCT Form.  (Decl. Bendel, Exh. 2 at ¶66).

10       Refusals of out-of-cell programming time are also noted on the OOCT Forms.

11   While the facilitators of a program also have attendance sheets and obtain a signature

12   from an inmate who attends, if an inmate refuses to attend, there can be no signature from

13   the inmate (nor is there a requirement of the same per the Stipulation, MCPMs, or

14   Monitor Guide) on the sign-in sheet because the inmate is absent.  Where feasible,

15   refusals of offered out-of-cell time are signed by a second witnessing staff member or the

16   inmate. (Decl. Bendel, Exh. 2at ¶69).

17       Due to staffing challenges, it is not commonly feasible to obtain an inmate's

18   signature for a refusal due to movement teams attending to constant movement needs,

19   staffing challenges, and safety/security reasons.  It is also not always feasible to obtain a

20   second witnessing staff member's signature for an inmate refusal of offered out-of-cell

21   time. (Bendel Decl., Exh. 2 at ¶70-71).

22       As illustration, as of February 4, 2019, ASPC-Florence had a 35% COII vacancy

23   rate.  While ASPC-Lewis's COII vacancy rate is not as significant, Lewis faces its own

24   unique staffing challenges.  ASPC-Lewis has high numbers of inmates out to the hospital.

25   This requires the posting of two COIIs per inmate in the hospital, thus affecting staffing

26   levels at all units at Lewis.  Lewis also sees a higher number of inmates on mental health

27   or security watch, which requires increased posting of COIIs in the watch pods.

28   Furthermore, Lewis must address higher numbers of staff callouts and FMLA leave than

other comparable complexes.  All of these factors necessarily impede the ability to obtain an inmate's own signature for a refusal or a second witnessing staff member for the same. (Decl. Bendel, Exh. 2 at ¶75).

**ASPC-Eyman (SMU-I and Browning Units) Operations.**

At ASPC-Eyman, the OOCT Form binders are located in the security office for the corresponding housing area.  At SMU-I, the books are taken out of the office during movement and transported with the movement team on the cart that also carries the restraints and the identification cards for the participating inmates. After movement of the inmates is completed (and recreation/programming starts), the start time for the activity is noted on the OOCT Forms for the participating inmates. The reverse occurs when movement back to cells is completed and thus the activity end time is documented. (Bendel Decl., Exh. 2 at ¶79).

Officers goes cell to cell in order to ask each inmate whether they will participate in offered out-of-cell time.  Moreover, because maximum custody inmates must be restrained for movement, determining whether or not an inmate accepts offered out-of-cell time requires an officer to ask each inmate whether or not the inmate will participate. (Bendel Decl., Exh. 2 at ¶80).

As for out-of-cell time refusals, a movement team officer is tasked with asking the inmates one-by-one whether they will be attending an out-of-cell activity scheduled for that day (in advance of the activity).  The officer notes any refusals (and the time thereof) on either the daily count sheet or the officer's notepad that he/she carries.  The refusal time is then indicated on the OOCT Form with the officer signing the back of the form. (Bendel Decl., Exh. 2 at ¶83).

At Browning Unit, completion of the OOCT Forms takes place in the security offices with the officers transferring their contemporaneous movement notes kept on notepads or count sheets onto the OOCT Forms, in close time to completion of the out-of-cell activity or refusal.  The officer goes cell to cell in order to ask each inmate whether they will participate in offered out-of-cell time.  Moreover, because maximum custody

1  inmates must be restrained for movement, determining whether or not an inmate accepts

2  offered out-of-cell time requires an officer to ask each inmate whether or not the inmate

3  will participate.  (Bendel Decl., Exh. 2 at ¶80).

4        At Browning Unit, completion of OOCT Forms is not done by the movement team

5  while the team is monitoring recreation due to serious assaults that have occurred during

6  recreation thus requiring staff to complete the OOCT Forms during the out-of-cell

7  activity. Like ASPC-Lewis (Rast Unit), offered programs at ASPC-Eyman (SMU-I and

8  Browning Units) also take place in classrooms located outside of the maximum custody

9  housing units thus requiring movement of the inmates to the program location.  (Bendel

10  Decl., Exh. 2 at ¶88).

11        At all locations, it is not commonly feasible to obtain an inmate's signature for a

12  refusal due to movement teams attending to constant inmate movement needs, staffing

13  challenges resulting from correctional officer position vacancies and callouts for sick

14  leave, vacation, etc., and safety/security reasons.   Movement teams are in perpetual

15  motion all day long to recreate and program the inmates, as well as get the inmates moved

16  for medical appointments, visitation, showers, etc.  (Bendel Decl., Exh. 2 at ¶90).

17            **C.    <u>Live Time Documentation on OOCT Forms Is Not Required.</u>**

18        Plaintiffs seem to argue that live time documentation of inmate movement (or

19  refusals) is required to be documented on the OOCT Forms. However, neither the

20  Stipulation (or Protocol), MCPMs, Monitor Guide, or Court rulings require this.

21  Movement and refusals are documented either live time or close in time to movement or

22  refusals addressed by the MCPMs and the Monitor Guide.   To the extent that some

23  officers use count sheets or notepads to record times and then transfer those notes close in

24  time to the OOCT Forms, does not violate any aspect of the Stipulation, MCPMs, Monitor

25  Guide, or Court rulings. It is accepted practice both in corrections and law enforcement

26  for officers to write contemporaneous notes as to facility occurrences and then soon after

27  in time commit the information to official forms, logs, reports, or other required

28  documentation.  (Bendel Decl., Exh. 2 at ¶91.)  Indeed, ADC officers assigned to control

rooms commonly keep crib notes on movement and transfer the information to the official log book close in time to the events occurring.  (*Id.* At ¶92.)

While the Stipulation and MCPMs are silent as to methodology for documenting inmate refusals of out-of-cell time, the Monitor Guide addresses this subject.  The language related to refusals is a product of Court intervention where for legitimate operational reasons, Defendants could not agree to Plaintiffs' position that documentation of refusals should always require a second witnessing staff signature or the inmate's signature. The Court agreed with Defendants' position and, as a result, the Monitor Guide language regarding refusals reads in part:

> When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same.  The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell tracking form). Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form **where feasible considering the safety/security/ operational concerns, to verify the refusal**.

(Monitor Guide, Doc. 3177-2 at pgs. 15, 18, 23, 26, 29 at MCPMs 1-2 at Methodology (c), MCPM 5 at Methodology (d), MCPM 6 at Methodology (i) & MCPM 8 at (d) (emphasis added)).

Here, Defendants are not substantially non-compliant regarding documentation of refusals. The "contemporaneous" requirement that relates to refusals only, prescribes that when the witnessing officer documents a refusal, the officer must note the refusal and the amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same as the officer who witnessed the refusal.  It is not impermissible for an officer at the manual cell door controls at ASPC-Florence (Central Unit, Kasson Cellblock) who is seeing and hearing a refusal of out-of-cell time to be the one documenting the same. Likewise, it is not impermissible for witnessing officers

at ASPC-Lewis (Rast Unit) and ASPC-Eyman (SMU-I and Browning Units) to note a refusal of out-of-cell time on a notepad or count sheet and close in time document the same on the OOCT Form.  These processes are compliant with the Monitor Guide – noting that the Monitor Guide is not part of the Stipulation, not referred to in the Stipulation, not incorporated into the Stipulation, and was a voluntary measure implemented by Defendants at ADC's own suggestion and discretion.

Any concern that out-of-cell time notated on the OOCT Forms as being offered or refused is not actually happening is averted by the number and frequency of supervisory staff that are in the housing units on a daily and weekly basis.  Inmates are not shy about complaining if they feel they are not be afforded what is required.  It cannot be disputed that Plaintiffs' counsel participating in monitoring tours regularly observe the same, as inmates call out to ADC personnel to voice complaints.

Here, Plaintiffs' challenges are form over substance, of no actual consequence to determining compliance with the MCPMs. Defendants appropriately document offers and refusals of out-of-cell time. Fatally absent from Plaintiffs' challenge is any evidence that that maximum custody inmates are not being offered out-of-cell time in accordance with the Stipulation.

### D. <u>Double-Signatures To Witness Inmate Refusals Are Not Mandated</u>.

Plaintiffs next contend that Defendants' recording methodology regarding refusals of out-of-cell time renders Defendants' data inaccurate because "either the prisoner himself or another officer should co-sign the refusal."  (Doc. 3157 at 17.)  Plaintiffs' challenge in this regard fails for two reasons.  First, inmate refusals of out-of-cell time do not affect or drive an MCPM percentage.  The Stipulation and the MCPMs require Defendants to *offer* certain out-of-cell time for recreation, programming, and activities.  Defendants cannot force inmates to participate in out-of-cell time and thus refusals of the same do not affect MCPM compliance whatsoever.  Second, there is no requirement for a

double signature (whether from another witnessing officer or the inmate) to a refusal. Rather, the Monitor Guide provides for the applicable MCPMs:

> Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form **where feasible considering safety/security/operational concerns, to verify the refusal**.

(Monitor Guide, Doc. 3177-2 at pgs. 15, 18, 23, 26, 29 (emphasis added)).

There is no bright line requirement for a second signature, an issue advocated for by the Plaintiffs but denied by the Court.  (Trans. Doc. 1836, 12/14/2016, Status HR, at 79:8-10, 89:14-22, 90:4-8, 94:4-9).  As demonstrated above, it is often difficult to obtain a second witnessing officer or inmate's signature to a refusal of out-of-cell time for legitimate safety, security, operations, and staffing reasons.  Compliance with the MCPMs at issue for termination are in no way compromised by the absence of a second signature. As such, Plaintiffs' challenge cannot defeat termination of monitoring and reporting.

Next, for Plaintiffs to attempt to convince the Court that Defendants never obtain inmate signatures for refusals (Doc. 3157 at ¶18) is careless in the face of production of nearly 2000 OOCT Forms for the monitoring period at issue.  Wildly, Plaintiffs claim that "*no* prisoners are actually signing their own alleged refusals." (Doc. 3157 at 18) (emphasis original).  Plaintiffs are wrong.  An initial review of produced OOCT Forms reveals that at least 100 inmates signed verifying their own refusals.   (Exh. 39). Nevertheless, MCPM compliance is not dictated by whether an inmate signature to a refusal is obtained.  Accordingly, Plaintiffs' meritless challenge fails to defeat termination of monitoring and reporting.

Plaintiffs' allegation that refusals are documented out of chronological order in the Comments section of the OOCT Forms thus establishing the lack of recording refusals in live time also fails to defeat termination.  (Doc. 3157 at 13, fn. 8).  Given that the Comment section is completed by multiple individuals at multiple times on any given day, it should not be surprising that the more detailed entries on the back of the OOCT Form

1    may be made later in time than the beginning time, end time, and refusal notation on the

2    front of the form.

3         Indeed the mere five OOCT Forms upon which Plaintiffs rely at Ex. 7 to Carns

4    Decl. at Doc. 3178 for this proposition show late entries documenting the specifics of the

5    type of activity refused (or even accepted) by the inmate, the time refused, and the

6    witnessing officer signature.  Late entries are not prohibited by the Stipulation, MCPMs,

7    or Monitor Guide and in no way negatively affect MCPM compliance. And a mere offer

8    of five examples neither establishes pervasive unreliability of the supporting CGAR data

9    nor could be construed as driving down compliance levels for any one particular month in

10   the monitoring period at issue even if the same could negatively impact compliance levels.

11        Documentation on OOCT Forms is done by humans in perpetual movement,

12   performing dangerous tasks, whose responsibilities are not limited to stationary, live time,

13   data entry.  That a late entry is made in the Comments section of the form does not mean

14   the event did not occur, it means the officer was dutiful in making a late entry to

15   document events that occurred that evidence compliance Plaintiffs' challenge fails.

16        Next, Plaintiffs further challenge the reliability of Defendants' compliance data,

17   insinuating false reporting by describing one ASPC-Lewis (Rast Unit's) supervisory

18   entries in the Comments section of the OOCT Forms as "often the same rote response,

19   word for word", then in the next paragraph claiming that supervisory staff do not counsel

20   inmates about refusals "as required by the Monitoring Guide." (Doc. 3157 at 18.)  This

21   final challenge fails for three reasons.

22        First, the Monitor Guide does not require Defendants to counsel inmates who

23   refuse all out-of-cell time in a week as Plaintiffs' allege.  Rather, the Guide provides that:

24        In the event of an extended pattern of refusals or changed
             behavior; supervisory personnel shall have a discussion with
25        an inmate regarding refused out-of-cell time and shall
             document the date and nature of the conversation in the
26        comments section on the back of the Maximum Custody Daily
             Out of Cell Tracking Form, including, when provided, inmate
27        comments as to refusal or refusals.

28

1    (Monitor Guide, Doc. 3177-2 at 15, 18, 23, 26, 29).  Plaintiffs asked the Court to require a

2    bright line definition of what constitutes a pattern of refusal.  The Court denied Plaintiffs'

3    request, agreeing with Defendants that supervisory personnel are permitted discretion as

4    to what if anything constitutes a pattern of refusals as the same varies from inmate to

5    inmate.  (Doc. 1836, 12/14/2016 Status Hr., at 79:8-10, 89:14-22, 90:4-8, 94:4-9.)

6           Second, Sgt. Riley from ASPC-Lewis (Rast Unit) did not doctor documentation of

7    discussions with inmates regarding refusals because he used similar language to describe

8    his discussions with inmates.  Sgt. Riley retorts as follows.  As a DI 326 sergeant, Sgt.

9    Riley was charged with reviewing whether maximum custody inmates were exhibiting an

10   extended pattern of refusals of offered out-of-cell time. When such an extended pattern

11   occurred, he was responsible for speaking to the individual inmate about the extended

12   pattern of refusals, encouraging the inmate to participate in offered out-of-cell time, and

13   documenting the nature of the conversation in the comments section on the back of the

14   Out-of-Cell Tracking Forms. Whether or not a particular maximum custody inmate

15   exhibited an extended pattern of refusals of offered out-of-cell time varied, as some

16   inmates regularly refused to participate in offered out-of-cell time, some sporadically

17   refused, and others refused from time to time.  (Riley Decl., Exh. 40 at ¶21).

18          Towards the end of a monitored week, Sgt. Riley would review the OOCT Forms

19   for the maximum custody inmates in 4 Charlie to determine which inmates were refusing

20   all or a majority of offered out-of-cell time and/or programming. Depending on the inmate

21   and his demeanor, personality, security risk, etc., he would either speak to the inmate at

22   cell front or have the inmate escorted to my office to discuss the same in a more private

23   setting. In addition to asking the inmate questions to determine why he was not

24   participating in offered time out-of-cell, he would encourage the inmate to participate in

25   the same, explaining that the offered out-of-cell time promoted and taught positive pro-

26   social behaviors and interactions with others – core skills needed not only to succeed in

27   society upon release from prison, but also core skills necessary to create a more positive

28   experience while incarcerated.  (Riley Decl., Exh. 40 at ¶24).

On June 7, 2018, Sgt. Riley spoke to inmate ███████ about his week of refused offerings of out-of-cell time.  He stated:  "Refused Rec Due Table time class Due to not wanting to go."  This entry was based upon the inmate stating that he did not want to go to recreation, table time, or class.  If the inmate had given Sgt. Riley more information as to why he did not participate, he would have documented that (except for explicative and vulgar language which was not uncommon to hear).  It is not unusual for an inmate to simply state that they did not want to go to offered out-of-cell time and not give further explanation. ADC personnel can encourage, but cannot force, inmates to leave their cell for recreation, programming, or table time. Add to this, Sgt. Riley specifically recalls inmate ███████.  Inmate ███████ regularly refused offered out-of-cell time other than showers due to concerns he had about ████ with regard to interaction with or even proximity to other inmates.  (Riley Decl., Exh. 40 at ¶27-29).

Next, on March 2, 2018, Sgt. Riley spoke to inmate ████ about his week of refused offerings of out-of-cell time.  Sgt. Riley documented: "Refused Rec table time & class Due to not wanting to go."  This entry was based upon the inmate stating that he did not want to go to recreation, table time, or class.  If the inmate had given Sgt. Riley more information as to why, he would have documented that (except for explicative and vulgar language which was not uncommon to hear).  Add to this, Sgt. Riley specifically recalls inmate ████ and his regular refusals to participate in offered out-of-cell time.  With inmate ████, Sgt. Riley would sometimes speak to him about his refusals at cell front and other times in his office.  Sgt. Riley's encouragement of inmate ████ to participate in offered out-of-cell time resulted in sporadic success.  (Riley Decl., Exh. 40 at ¶30-32).

Additionally, Sgt. Riley documented at the end of the Comments section that on December 15, 2017, he spoke to inmate ████ about his refusal of some offerings of out-of-cell time.  Sgt. Riley stated: "Refused Rec Table time, Class Due to not wanting to go."  This entry was based upon the inmate stating that he did not want to go to recreation, table time, or class.  If the inmate had given him more information as to why, he would have documented that (except for explicative and vulgar language which was not

1   uncommon to hear).  And here, inmate ███████ gave Sgt. Riley the same response as he

2   did later on March 2, 2018 (see above).  (Riley Decl., Exh. 40 at ¶33-34).

3       Moreover, Sgt. Riley documented at the end of the Comments section that on

4   February 1, 2018, he spoke to inmate ███████ about his week of refusals of offered out-

5   of-cell time.   Sgt. Riley documented: "Refused Rec Table time & class Due to not

6   wanting to go."  This entry was based upon the inmate stating that he did not want to go to

7   recreation, table time, or class.  If the inmate had given him more information as to why,

8   he would have documented that (except for explicative and vulgar language which was

9   not uncommon to hear).  Sgt. Riley likewise specifically recalls inmate ███████ and his

10   regular refusals to participate in offered out-of-cell time.  Like with the others, Sgt. Riley

11   would sometimes speak to inmate ███████ about his refusals at cell front and other times

12   in my office.   His encouragement of inmate ███████ to participate in offered out-of-cell

13   time also resulted in occasional success, but it was more likely that he would refuse to

14   participate in some or all of the weekly offerings of out-of-cell time.  (Riley Decl., Exh.

15   40 at ¶35-37).

16       In sum, Plaintiffs cannot have it both ways. They cannot allege that supervisors do

17   not counsel inmates who refuse all out-of-cell time offered in a week on one hand, and

18   then criticize sergeants like Sgt. Riley for using common language when they do exactly

19   that – counsel inmates who are refusing all out-of-cell time in a week.  (Riley Decl., Exh.

20   40 at ¶41.)  The source documentation provided by Defendants is replete with examples of

21   sergeants counseling inmates who exhibited patterns of refusals. Documentation of the

22   refusal discussions has no bearing on calculation of MCPM compliance levels.  Thus, this

23   is a red herring argument not capable of defeating termination of monitoring and

24   reporting.

25   **V.**    **ALLEGED "PATTERNS" OF INMATE REFUSALS OF OUT-OF-CELL TIME DO NOT CALL DEFENDANTS' COMPLIANCE INTO QUESTION**

26

27       Plaintiffs unilaterally attempt to rewrite the Stipulation and MCPMs to: (1) require

28   Defendants to study and track rates of inmate refusals of offered out-of-cell activities; and

1    (2) preclude MCPM compliance if alleged refusal rates exceed refusal rates allegedly

2    accepted in the community.  Plaintiffs pontificate that "[t]he astronomical refusal rates

3    raise significant evidentiary questions" as to the accuracy and reliability of the data that

4    support Defendants' CGAR compliance success.  Plaintiffs go on to speculate that the

5    number of refusals of exercise and programming time in the monitored units must be due

6    to failure to meaningfully afford out-of-cell time or falsification of records. Plaintiffs,

7    however, offer absolutely no evidence that any of these theorized "causes" is actually

8    occurring. Plaintiffs also ignore the simplest and most likely reason for the refusals—that

9    the inmates do not actually want the additional exercise and programming time that

10   Plaintiffs' counsel secured for them through the Stipulation.

11          Add to this, Plaintiffs' foundation for their grandiose refusal rate theory is

12   nonexistent.  First, Plaintiffs include in their refusal rate calculation, those inmates who

13   accepted offered time out-of-cell for recreation, programming, or other activity but

14   decided to return early.  This makes no sense.  The offer was accepted, the inmate decided

15   to return early.  Early returns are not refusals and so from the start, Plaintiffs' data is

16   skewed. Second, Plaintiffs rely on an expert declaration to establish that the purported

17   refusal rates are too high.  But by what measurable comparison?  Compared to which

18   similar state department of corrections?  Compared to what similar inmate population?

19   Based upon what empirical studies?  Fueled by what proven and measurable causes?  Cut

20   to its quick, the expert "opinion" is based upon not one scintilla of data.  Thus, the opinion

21   constitutes nothing more than junk conjecture. Third, Plaintiffs' expert compares the

22   purported refusal rate to alleged community refusal rates to conclude a clinical failure.

23   Yet, none of the terms used in the statement are defined and how can one compare out-of-

24   cell time for maximum security inmates to a community clinical setting?  Again, the

25   baseless conjecture carries no weight.

26          Specifically, Dr. Pablo Stewart opines that ADC's 50-80% rate of nonparticipation

27   in out-of-cell activities is unusual, and that a 30-40% rate in a clinical setting would be

28   cause for worry.  He concludes that the rate of nonparticipation is evidence of ADC

failing to offer inmates out-of-cell time.  There is, however, no basis for Dr. Stewart's conclusions. Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993).

"In determining reliability, the court must rule not on the correctness of the expert's conclusions but on the soundness of the methodology, and the analytical connection between the data, the methodology, and the expert's conclusions." *Moussouris v. Microsoft Corp.*, 311 F.Supp.3d 1223, 1234 (W.D. Wash. 2018) (internal citations omitted). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also I.V. v. Wenatchee Sch. Dist. No. 246*, 342 F.Supp.3d 1083, 1092-93 (E.D. Wash. 2018) (finding expert testimony non-admissible when the expert "failed to set down any principles connecting the data to her conclusion").

Dr. Stewart's conclusions regarding the cause of opt-out rates is not reliable scientific evidence because the conclusions simply describes reported opt-out rates and ascribes causation to ADC's actions without identifying and excluding potentially alternative causes or investigating the "mechanism of causation." *Casey v. Ohio Medical Products*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) (declining to allow descriptive epidemiological studies as causative evidence).  Moreover, the comparison he draws between clinical opt-out rates and prison opt-out rates fails to establish why such a comparison is valid, as there are many variables which could cause differences between patients in a clinical setting versus inmates in a maximum security prison setting.

Unlike the clinical setting referenced by Dr. Stewart, "a prison setting is, at best, tense. It is sometimes explosive, and always potentially dangerous." *Madrid v. Gomez*, 889 F. Supp. 1146, 1269 (N.D. Cal. 1995) (quoting *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980)).  Dr. Stewart's failure to provide an explanation as to why a prison

1  setting should be analogous to a clinical setting results in an unreliable comparison that

2  does not assist the Court in ascribing meaning to data.  *See Rogers v. Raymark Industries,*

3  *Inc.*, 922 F.Supp.2d 1426, 1431 (9th Cir. 1991) (finding that an expert's comparison

4  between asbestos dust levels in two different buildings lacked foundation because there

5  was no basis of comparison between the two buildings).   "This Court cannot accept

6  expert opinions without being able to assess the basis behind them."  *Madrigal v.*

7  *Mendoza*, 639 F.Supp.2d 1026, 1031 (D. Ariz. 2009) (citing *Kumho Tire Co., Ltd. v.*

8  *Carmichael*, 526 U.S. 137, 149 (1999)).  Here, the court should not rely on Dr. Stewart's

9  conclusions because he draws faulty comparisons and makes no reliable causative

10  connection between his conclusions and the facts.  *See Whitmire v. Wal-Mart Stores Inc.,*

11  CV-17-08108-PCT-JAT, 2019 WL 479842 at *14 (D. Ariz. February 7, 2019)

12  (disallowing testimony that set forth no basis for conclusion).

13       Finally, and most important to the demise of Plaintiffs' last ditch effort to continue

14  monitoring into perpetuity, is Plaintiffs' inability to connect purported unacceptable

15  refusal rates to any MCPM compliance determinations. Compliance is determined by

16  offered out-of-cell time.  A refusal by its very nature means an offer was made.  If an offer

17  was made, then compliance is achievable. Any ill-guised objection at this stage as to the

18  quality of the programs and activities provided is too little, too late.   Neither the

19  Stipulation nor the MCPMs consider inmate satisfaction with out-of-cell activities the

20  litmus test for achieving compliance.  Accordingly, Plaintiffs' ill-disguised challenge to

21  the inmate satisfaction falls flat and fails to save the MCPMs from termination from

22  monitoring and reporting.

23  **VI.   EIGHTEEN INMATE DECLARATIONS DO NOT ESTABLISH THAT DEFENDANTS DELIBERATELY UNDERMINE INMATE PARTICIPATION IN OFFERED OUT-OF-CELL ACTIVITIES**

24

25       Plaintiffs submit the declarations of eighteen inmates to argue that Defendants

26  deliberately undermine inmate participation in out-of-cell activities such that the required

27

28

out-of-cell time is not actually offered.[20]   Absent from the Stipulation, MCPMs, or Monitor Guide, however, is any requirement that Defendants provide the challenging population of maximum custody inmates with out-of-cell recreation, programs, and activities that yield some percentage rate of inmate satisfaction. Neither do the Stipulation, MCPMs, or the Monitor Guide prescribe or prohibit the time that recreation is offered; the weather conditions for recreation; the location or manner of additional unstructured time out-of-cell for SMI inmates; or the content of offered programs.   Where Plaintiffs' complaints are not prescribed or prohibited by the Stipulation or MCPCs, nor do they affect compliance rates, Plaintiffs cannot defeat termination of monitoring and reporting.

Plaintiffs' inmate declaration complaints fall into several categories:  (1) because inmates do not have alarm clocks, inmates are asleep when out-of-cell time is offered and thus cannot accept or refuse the offers; (2) recreation is offered to early in the morning and inmates do not have time to wash their faces, brush their teeth or go to the bathroom before recreation; (3) inmates do not have jackets and it is too cold to go outside for recreation; (4) there is no water or restrooms outside; and (5) there are no tables at ASPC-Florence (Central Unit, Kasson Cellblock) for unstructured out-of-cell time.

Even if Plaintiffs' complaints that are beyond the scope of the Stipulation and MCPMs could arguably defeat termination of monitoring and reporting, the complaints are without competent evidentiary support and therefore fail to prevent termination.  First, there are legitimate penological justifications for certain conditions of confinement complained of by Plaintiffs.   Second, individual inmate complaints are belied by

---

[20] Dr. Stewart also complains that SMI inmates have reported to him that they get less programming than required to be offered, were rarely offered unstructured out-of-cell time.  (Doc. 3158 at 2).  Dr. Stewart's proclamations should not be considered where he fails to identify which inmates advised of the same such that Defendants and the Court could determine whether the inmates' OOCT Forms revealed the same.  Likewise, Dr. Stewart opines that SMI inmates should not be expected to get up in the morning for recreation because of the medications they take and the corresponding medication schedules.   Dr. Stewart's opinion is without any reference allegedly afflicting medications, description of offending medication schedules and which inmates are allegedly affected.   Dr. Stewart's opinions are not based on any actual evidence whatsoever and must not be considered.

1   documentation of out-of-cell time offered and accepted by complaining inmates. Third,

2   the complaining inmates do not establish that any data contained on their OOCT forms is

3   inaccurate and thus unreliable.  Fourth, submission of a mere eighteen declarations out of

4   a nearly 2000 average maximum custody inmate population fails to establish pervasive

5   inaccuracy and unreliability of the data produced to Plaintiffs in this case to support

6   Defendants' MCPM compliance.  Thus even if the inmates' complaints could be proven

7   true, MCPM compliance rates do not dip below the required thresholds for the six out of

8   eighteen inmates actually monitored.

9          Responding to the inmates' categories of complaints, maximum custody inmates

10   are not permitted alarm clocks for legitimate penological reasons.   (Bendel Decl., Exh. 2

11   at ¶94.) Maximum custody inmates present the highest safety and security risk.  (*Id.* at

12   ¶95.)  Because of this, officers conduct irregular, but frequent safety and security checks

13   of the housing areas.  (*Id.* at ¶96.)  Permitting inmates to have alarm clocks in their cells

14   poses the legitimate risk that inmates may use the alarm clocks to time and alarm officer

15   activity allowing inmates to conspire to engage in prohibited conduct up to and including

16   assault, homicide and/or suicide.  (*Id.* at ¶97.)  Moreover, allowing inmates to control

17   when an alarm sounds on an alarm clock poses the legitimate risk of causing disruption

18   among the inmate population, as disturbing alarm sounds at any time day or night may be

19   used to distract officers and conceal prohibited activity from detection by officers.  (*Id.* at

20   ¶98.)  Maximum custody inmates are not deprived of knowing what time it is, however.

21   Inmates may purchase wrist watches through commissary.  (*Id.* at ¶99.)

22          Second, neither the Stipulation nor the MCPMs prescribe what time of day

23   recreation is offered.  Prison operations are in perpetual motion and recreation must start

24   early in the day to allow rotating populations to use limited recreation areas.  (Bendel

25   Decl., Exh. 2, at ¶90.) In short, the inmates must share time and recreation facilities.  That

26   Plaintiffs complain that inmates cannot hear officers offering recreation is belied by the

27   physical plant of the housing units at issue. The housing pods are relatively small and cells

28   are located side by side.  As recreation is announced and officers go cell-by-cell to restrain

for movement, common sense dictates that there is noise sufficient to cue inmates to wake up and get ready for recreation.  (Knight Decl., Exh. 38, at ¶¶29-32 and Exh. 2; Bendel Decl., at ¶¶58-90.)

Third, neither the Stipulation nor the MCPMs dictate what the weather temperature must be like before maximum custody inmates are offered recreation.  Legitimate legitimate safety and security risks militate against allowing dangerous maximum custody inmates to wear padded jackets.  (Bendel Decl., Exh. 2 at ¶100.)  Maximum custody inmates present the highest safety and security risk to themselves, other inmates, and staff by way of assaultive behavior. (*Id.* at ¶101.)  Allowing maximum custody inmates to possess or use padded jackets poses a legitimate safety and security risk where the padding in jackets defeats the effectiveness of non-lethal munitions such as pepper ball systems, Tasers, and K9s that may be required for use in quelling assaults or disturbances that take place during outdoor recreation.  (*Id.* at ¶102.)  Allowing maximum custody inmates padded jackets also increases an inmate's ability to conceal weapons or other contraband such as drugs.  (*Id.* at ¶103.)  Inmates are not deprived of sufficient clothing for outdoor exercise.  Inmates may purchase sweatshirts for use outdoors.  If indigent, facility personnel may work with the inmate to provide a loaner sweatshirt if requested. (*Id.* at ¶104.)

Fourth, maximum custody inmates are not deprived of water while outside for recreation.  Maximum custody inmates are provided access to water while participating in outdoor recreation.  (Bendel Decl., Exh. 2 at ¶105.)  Specifically, inmates may bring their plastic water containers with them from their cells for use during recreation.  (*Id.* at ¶106.)  Each outdoor recreation area (versus end of the run enclosures) also has water jugs for refills during recreation.  (*Id.* at ¶107.)  Inmates may ask an officer to refill his cup with more water if desired.  (*Id.* at ¶108.)  Moreover, for end of the run enclosures, inmates may ask the officers who are making regular rounds in the housing areas for more water. (*Id.* at ¶109.)  While there are no inmate restrooms on maximum custody outdoor recreation facilities, inmates may ask officers to return to the housing unit to use the

restroom.  (*Id.* at ¶110.)  If there is staff available to return the inmate to recreation after using the restroom, this may occur, but is not always feasible due to staffing levels and perpetual facility operations.  (*Id.*)  Inmates are not permitted to relieve themselves in the outdoor recreation facilities and neither strong urine/feces odors on the outdoor recreation facilities, nor inmate complaints of the same, known or common themes. (*Id.* at ¶111.)

Fifth, an inmate complains that there are no tables at ASPC-Florence (Central Unit, Kasson Cellblock) for him to participate in "table time."  Pursuant to the Stipulation and MCPM 8, SMI maximum custody inmates are offered an additional ten hours of unstructured out-of-cell time a week as compared to non-SMI maximum custody inmates.[21]  (Knight Decl., Exh. --- at ¶41.)  "Table time" is a phrase commonly referred to that describes the ten additional hours of unstructured out-of-cell time for SMI maximum custody inmates.  (*Id.* at ¶42.)   This additional time out of cell is for unstructured pro-social activities but there is no requirement that the inmate be placed at a table as prescribed by the Stipulation or the MCPMs.  (*Id.* at ¶43; Doc. 1185 at 25; Doc. 1185-1 at 41-47.)  Rather, the inmate must be offered an additional ten hours of out-of-cell time that is not programming, recreation, visitation, showers, etc.  (*Id.* at ¶¶44-45; Doc. 1185 at 25; Doc. 1185-1 at 41-47.)

If the additional SMI unstructured out-of-cell time occurs in the pod dayroom areas at tables, the inmates may participate in artwork, crafts, card game, board game, and  pro-social interactions.  (Knight Decl., Exh. 38 at ¶46.)  Pursuant to DI 326, Step Level 1 and 2 inmates who participate in the additional SMI unstructured out-of-cell time at a table in the housing area must be restrained to the table for safety and security purposes.  Step Level 3 inmates are not required to be restrained in this manner. (*Id.* at  ¶46.)

---

[21] This additional unstructured time out-of-cell does not include weekly time out- of- cell for the required six hours of recreation, weekly showers, or any visitation, medical appointments, or classification hearings.  This additional unstructured time also does not include one hour of mental health programming, one hour of psycho educational programming and one hour of additional other out-of-cell time offered to the SMI maximum custody inmates.  Step Level 2 and 3 inmates (whether SMI or not) also receive one hour a week of group programming.  (*Id.*)

At Kasson, Wing 1 Baker tables can accommodate Step Level 3 inmates, but do not have a way to secure restraints for the Step 1 and 2 inmates.  (*Id.* at ¶¶47-50 and 23-24 and Exhs. 1-2 thereto).  Accordingly, Step Level 1 and 2 inmates assigned to this area are offered their ten additional hours of unstructured out-of-cell time in the outdoor 10X10 enclosures or may attend table time in Able High housing areas when those tables (that permit restraints) are available.  (*Id.* at ¶51.)  Facilitating SMI additional ten hours of unstructured time either at tables or outdoors is compliant with the Stipulation and MCPMs.  What is required for compliance achievement is the provision of this additional time out of cell, not a table to sit at.

Finally, Plaintiffs' inmate declarations fail to establish that the inmates are unable or unwilling to participate in the ample out-of-cell time offered to them.  Despite their complaints, the inmates largely participate.  Moreover, their complaints are largely contradicted by the OOCT Forms.  As follows, the inmate declaration lack reliability and furthermore do not render Defendants' CGAR data inaccurate or unreliable.  This is especially so where only six of the eighteen inmates at issue were actually monitored for MCPM compliance.

- ▇▇▇▇▇▇▇▇▇▇

    This unmonitored inmate complains that 6:00 a.m. is too early to go to recreation and thus he does not go out; officers offer recreation in a whisper so that inmates do not actually go to recreation; and he does not get a jacket so he does not go to recreation in the morning when it is cold outside.  (Doc. 3177-2 at Exhibit 5.)  The inmate's OOCT Forms show differently.  Plaintiff goes out to recreation at times other than 6:00 a.m. (after 8:00 a.m., after 9:00 a.m., after 7:00 a.m.) (Exh. 2, Bendel Decl., at Exh. 5 at p. 1, 5, 7, 11, 23, 27.)  Moreover, this inmate refuses morning recreation even in August because it is "too cold."  (*Id.* at 6.)  He also refuses recreation because he prefers to work out in his cell.  (*Id.* at 14, 24.)

- ▇▇▇▇▇▇▇▇▇▇

    This unmonitored inmate complains that 6:00 a.m. is too early to go to recreation; he does not get a jacket so he does not go to recreation in the morning when it is cold outside; recreation is sometimes cancelled; and he gets no other out-of-cell time.  (Doc. 3177-2- at Exhibit 6.)   However, the inmate's OOCT Forms show he also refuses recreation at times other than 6:00 a.m. (9:00 a.m, 7:00 a.m.) (Bendel

Decl. at Exh. 2 at 1, 5.)  He is also offered recreation in the afternoon, in the winter (January 2019), but he still refuses the same.  (*Id.* at 3.) While cancellations of recreation due occur as to staffing shortages and facility safety/security reasons, cancellations are not prohibited by either the Stipulation or the MCPMs.[22]  (*Id.* at Doc. 1185.)    Finally, the inmate is a non-SMI DI 326 Step Level 1 inmate. Accordingly, he programs in cell. (Exh. 2, Bendel. Decl., at Exh. 6 ¶ 116.) Thus, he is not denied out-of-cell time for programming.

- ███████████████████████

This unmonitored inmate complains that recreation is offered at 6:00 a.m. when most inmates are asleep; lack of a jacket discourages him from going to recreation; out-of-cell time is not really offered; and he only goes to one programming class. (Doc. 3177-2 at Exh. 7.) However, the inmate's OOCT Forms show that he regularly is offered and accepts recreation after 6:00 a.m. in the morning and also in the afternoon. (Exh. 2, Bendel. Decl. at Exh. 7, pgs. 1-28.) Despite allegations that inmates are asleep at 6:00 a.m. when recreation is offered, he sometimes goes out for recreation at that time. (*Id.* at 9, 13, 25.).  Finally, the inmate is a non-SMI DI 326 Step Level 2 inmate.  Accordingly, he is entitled to one out-of-cell group program (and he goes). (Exh. 2, Bendel. Decl. at ¶ 117; *Id.* at Exh. 7, at pgs. 1-28.) Thus, he is not denied out-of-cell time for programming.

- ████████████████

This unmonitored inmate complains that officers do not actually offer recreation to inmates, but just walk through the pod; recreation is offered at 6:00 a.m. when most inmates are asleep; lack of a jacket discourages him from going to recreation; and he does not go out-of-cell for a group programming class.  (Doc. 3177-2 at Exh. 8.)  Yet, if the inmate does not want to go out to recreation in the morning because he does not have a jacket and he is cold, why does he also refuse morning recreation in the summer months when it is not cold in the morning?  (Exh. 2, Bendel. Decl. at Exh. 8, pgs. 1-10.) Moreover, when a supervisor sees that he regularly refuses recreation and speaks to him regarding the same, he states that he does not like recreation or simply does not want to go.[23]  He does not complain that it is too cold or he does not hear the officers make their offers of recreation time as he self-servingly avers.  (*Id.* at 2, 4, 6. 8.)  Finally, the inmate is a non-SMI DI 326 Step Level1 inmate.  Accordingly, he is programs in-cell and is not entitled to out-of-cell group programing to which he seems to assert he is entitled to but does not receive.  (Bendel. Decl. at Exh. 2, ¶ 119; *Id.* at Exh. 8, pgs. 1, 3, 5, 7, 9.)  Thus, he is not denied required out-of-cell time for programming.

---

[22] This same position applies to other inmates that complain about cancellations of out-of-cell time.

[23] Plaintiffs argue that supervisors do not look at individual inmate patterns of refusals of out-of-cell time and talk with the inmate regarding the same.  These OOCT Forms establish the opposite.

- ▮▮▮▮▮▮▮▮▮▮▮▮

This unmonitored inmate complains that recreation is offered too early in the morning at 6:00 a.m. before he has used the restroom; lack of a jacket discourages him from going to recreation; and he does not go out-of-cell to a programming class. (Doc. 3177-2- at 9.) This inmate, however, refuses recreation offered after 7:00 a.m. and after 12:00 p.m. (Bendel Dec. at Exh. 9, pgs. 1, 3, 9, 11.) He also complains that it is too cold out to go to morning recreation in July, August, September and October! (*Id.* at 2, 8, 14, 24, 28). Moreover, he makes many excuses as to why he does not participate in offered recreation that contradict his reasons above: he is too sleepy; he is good inside; he is not interested in recreation; he does not need to go; he does not feel like going, and he is fine in here, etc. (*Id.* at 4, 10, 12, 18, 20, 22, 26.) These excuses are made when offered recreation at 6:00ish a.m. (*Id.*) Therefore, his averments that he does not go to recreation in the morning are disingenuous and contrary to what he tells correctional officers. Finally, the inmate is a non-SMI DI 326 Step Level 1 inmate. Accordingly, he is not entitled out-of-cell group programing. (Exh. 2, Bendel Decl. at ¶ 119; *Id.* at Exh. 9generally.) Thus, he is not denied required out-of-cell programming.

- ▮▮▮▮▮▮▮▮▮▮▮▮

This unmonitored inmate generally complains that recreation is offered too early in the morning when it is too cold out, and that he does not go to out-of-cell programming. (Doc. 3177-2 at Exh. 11.) This inmate's complaints are self-serving and contrary to his actual acceptances and refusals of offered out-of-cell time. The inmate regularly goes out to recreation when offered at around 6:00 or 7:00 a.m., thus the offered time is not too early for him and he certainly hears the offer. (Exh. 2, Bendel Decl., Exh. 11, pgs. 2 1, 3. 5, 7, 9, 11, 15, 17, 21, 23, 25.) Moreover, the inmate is a non-SMI DI 326 Step Level 1 inmate. Accordingly, he is not entitled out-of-cell group programing. (Bendel. Decl. at Exh. 2, ¶ 121; *Id.* at Exh. 11, pgs. 1-28.) Thus, he is not denied required out-of-cell programming.

- ▮▮▮▮▮▮▮▮▮▮

This unmonitored inmate complains that if officers make an offer of recreation at 6:00 a.m. and the inmate is asleep, the officers move on and do not re-offer recreation when the inmate is awake. (Doc. 3177-2 at Exh. 12). This complaint, however, is belied by the fact that not only has this inmate attend recreation at 6:55 a.m., he regularly attends recreation offered in the 7:00 a.m., 8:00 a.m., and 9:00 a.m. hours. (Exh. 2, Bendel Decl. at Exh. 12, pgs. 1-24.) Accordingly, he is hearing the offers making the recreation offers and recreation is offered in the morning hours other than the 6:00 a.m. hour.

- ▮▮▮▮▮▮▮▮▮▮

This unmonitored inmate complains that recreation is offered at 6:00 a.m. and he

has no time to wash his face or brush his teeth before going to recreation; he has no jacket to wear when it is cold out; and he gets no out-of-cell programming. (Doc.3177-2 at Exh. 13.)  The inmate's OOCT Forms demonstrate however, that he has gone to recreation at 6:18 a.m. and that he is offered recreation starting later in the morning as well, after 8:00, 9:00, and 10:00 a.m.  (Exh. 2, Bendel Decl. at Exh. 13, pgs. 1-24.)  Moreover, the inmate is a non-SMI DI 326 Step Level 1 inmate.  Accordingly, he is not entitled out-of-cell group programing.    (Exh, 2, Bendel. Decl. ¶ 123; *Id.* at Exh. 13, pgs. 1-24.)  Thus, he is not denied required out-of-cell programming.

- █████████████████

This monitored inmate complains that that he refuses recreation because he does not get a shower after recreation and there is not enough time to decide whether he wants to accept an offer of out-of-cell time before the offering officer moves on. (Doc. 3177-2 at Exh. 15.)  Ample OOCT Forms illustrate, however, that the inmate accepts offers of recreation during the 6:00 a.m., 7:00 a.m., 9:00 a.m., 10:00 a.m. and noon hours.  (Exh. 2, Bendel Decl. at Exh. 14.)  As an SMI Step Level 2 inmate, he also accepts and participates in offered out-of-cell time for programming and unstructured out-of-cell time.  (*Id.*)

- █████████████████

This monitored inmate complains that his programming times sometime conflict with recreation time and thus he is forced to choose between the two activities. (Doc. 3177-2 at Exh. 16).  When this inmate was subject to monitoring at ASPC-Eyman (Browning Unit) in February 2018, he was a non-SMI Step Level 1 inmate. Accordingly, he was not entitled out-of-cell group programing and thus there was no conflict between recreation time and programming time.  (Exh. 2, Bendel. Decl. at ¶ 125; *Id.* at Exh. 15, pgs. 1-24.)  At ASPC-Lewis (Rast Unit) as a non-SMI Step Level 2 inmate, his out-of-cell programming class is schedule on a different day than his recreation days; thus, he not forced to choose between the two.  (Bendel Decl. Exh. at Exh. 161-12.)

- █████████████████

This unmonitored inmate generally complains that recreation is offered at 6:00 or 7:00 a.m. when he is asleep; lack of a jacket discourages his from going out to recreation early in the morning; and he has to choose between participating in recreation or working out-of-cell as a porter.    (Doc. 3177-2-, at Exh. 17.) Plaintiffs' self-serving complaints are contradicted by his OOCT Forms and should not be given any weight.  First, the inmate is offered and attends recreation during a variety of hours to include the 6:00 a.m., 7:00 a.m., 8:00 a.m. and noon hours. (Exh. 2, Bendel. Dec., at Exh. 17, pgs. 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24.) Thus, he is not offered recreation only when he is asleep or early in the morning and he has no jacket.  Additionally, this inmate often works out-of-cell as a porter

but his porter work times do not conflict with recreation.  He either works on different days than he is offered recreation of works before or after recreation.  (*Id.* at 1-26.)

● ███████████████████

This unmonitored inmate complains that he is offered recreation during the 6:00 a.m. hour when most inmates are asleep; lack of a jacket discourages him from participating in recreation when it is cold out, and his feet and big and his uncomfortable shoes discourage him from going to recreation.  (Doc. 3177-2 at Exh. 18.)   The inmate's complaints are contrary to evidence.   He does not participate in recreation whether it is summer or fall and whether recreation is offered during the 6:00 a.m., 7:00 a.m., or 8:00 a.m. hour.  (Exh. 2, Decl. Bendel at Exh. 18, pgs. 1-26.) Moreover, officers document his reasons for refusing recreation and he says nothing about his shoes.  (*Id.*) Rather, he complains that in July and August it is too cold out, he works out in his cell, and it is too early to go to recreation even if the offered time begins during the 7:00 a.m. hour rather than the 6:00 a.m. hour.  (*Id.* at 1-2, 3-4, 7-10, 113-4, 21-22, 25-26.)

● ███████████████████

This monitored inmate complains that he does not go to recreation because it smells like urine, he cannot go to the restroom out on recreation and at ASPC-Lewis (Rast Unit) he does not get group programming.  (Doc. 3177-2 at Exh. 19.)  The inmate's OOCT Forms show differently.  While he generally refuses offered recreation, he has gone.   (Exh. 2, Bendel Decl. Exh. 20 , pgs. 11, 17, 21, 25, and 27.) But he tells officers that he does not go to offered recreation because he does not like recreation, recreation "sucks", recreation is "lame", and he hates recreation.  (Exh. 2, Bendel Decl. at Exh. 20, pgs. 2, 4, 6, 8, 10, 14, 16, 20, 24, 26.)[24]  Moreover, since being transferred to ASPC-Lewis (Rast Unit) as a non-SMI DI 326 Step Level 1 inmate, he is not entitled out-of-cell group programing.   (Exh. 3, Bendel. Decl. at ¶ 130 and Exh. 20 generally.)  Thus, he is not denied required out-of-cell programming as a Step Level 1 inmate.

● ███████████████████

This unmonitored inmate complains that he is offered recreation at 5:30 a.m or 6:00 a.m. when most inmates are asleep; offers of recreation conflict with his porter job; lack of warm clothes discourages him from going to recreation; and he is not offered out-of-cell time beyond recreation, a programming class; and his porter job.  (Doc. 3177-2 at 20.) The OOCT Forms establish however, that the inmate goes either accepts or refuses recreation offered during a variety of hours to include the 7:00 a.m, 8:00 a.m., 10:00 a.m., 11:00 a.m. and noon hours.  (Bendel Decl. Exh. at 1-28.) If the inmate is discouraged to

---

[24] Contrary to Plaintiffs' assertions that supervisors do not follow up with inmates who exhibit a pattern of refusals, these OOCT forms show a supervisor is indeed doing the same.

go out to morning recreation when it is cold because he does not have a jacket, why does he also refuse morning recreation during the summer and early fall? (*Id.*) Moreover, the inmate's time out-of-cell for his porter job does not conflict with offers of recreation where he porters either on days he does not have recreation or a programming class, or at different times of day than these other two activities.  (*Id.*)  Finally, the inmate is correct that his offered times out of cell are for recreation, a programming class, and a porter job. As a non-SMI Step Level 3 inmate, he is not entitled to additional offers of out-of-cell activities such the additional time and programming offered to SMI inmates.

- ████████████████████

This monitored inmate complains that he does not go to recreation because the recreation facilities are dirty and have no restrooms or water available.  (Doc. 3177-2 at Exh. 21.) The inmate, however, does accept offered out-of-cell time and when asked by a sergeant reviewing his pattern of refusals of the same, he does not claim about the recreation facilities, he simply says he does not want to go.  (Exh. 2, Bendel Decl. at Exh. 22 generally; Exh. 23 at pgs. 1-28.)

- ████████████████████

This monitored inmate complains that as an SMI Step Level 2 inmate at ASPC-Florence (Central Unit, Kasson Cellblock), he is not offered an additional ten hours of unstructured out-of-cell time ("table time) and there are no tables for him to go to.  (Doc. 3177-2 at Exh. 22.)  The inmate's monitored OOCT Forms show, however, that the inmate is offered the ten additional hours of unstructured out-of-cell time but generally refuses the same.  (Exh. 2, Bendel Decl. at Exh. 24 generally, and at ADCM1518807-08; ADCM1536103-04;  ADCM1540166-67;  ADCM1541893-94.)    He did, however, participate in the additional ten ours of unstructured out-of-cell time three times during the monitored week of October 27, 2018 to November 2, 2018.  (*Id.* at ADCM1553957-58.) Moreover, as explained above, Step Level 2 inmates are either provided the ten additional hours of unstructured out-of-cell time at an available pod table or outdoors in the 10X10 recreation enclosures.  Thus, the inmate is not being deprived of this SMI additional out-of-cell time.

- ████████████████████

This SMI Step Level 3 monitored inmate complains that at times he goes weeks without an additional ten hours of unstructured out-of-cell time ("table time).  (Doc. 3177-2 at Exh. 23.)  The inmate, however, does not say during which time period he alleges this occurred and thus his statement is without foundation or evidentiary basis.  Moreover, the inmate's OOCT Forms demonstrate that indeed the inmate is offered and participates in the additional ten hours of unstructured out-of-cell time, or is offered but chooses to decline  the  offer. [25]   (Exh. 2, Bendel  Decl.,  at  Exh. 25, ADCM1502338-39;

---

[25] Contrary to Plaintiffs' assertions that supervisors do not follow up with inmates who exhibit a pattern of refusals, these OOCT forms show a supervisor is indeed doing

ADCM1523834-35;   ADCM1538615-16;   ADCM1540419-20;   ADCM1542264-65; ADCM1551433-34;  ADMC1552776-77;  ADCM1554284-85;  Bendel Decl. at Exh., pgs.26 at 1-28.)

In conclusion, the conditions of confinement complaints advanced by Plaintiffs do nothing to lower Defendants' CGAR compliance rates for MCPMs 1-3, 5-6 & 8 or preclude termination of monitoring and reporting.  The operations challenged are not addressed by the Stipulation, measured by the MCPMs, or contemplated by the Monitor Guide.  Add to this, the proffered inmate declarations are self-serving and contradicted by admissible evidence.  Therefore, they must not be considered in any respect to thwart termination of monitoring and reporting for MCPMs 1-3, 5-6 & 8.  *See, e.g., Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1061 (9th Cir. 2002) (finding vague, self-serving testimony alone is insufficient to prove damages); *accord Roth v. Naturally Vitamin Supplements, Inc*., No. CV-04-2135-PHX-FJM, 2007 WL 2020114, *3 (D. Ariz. July 6, 2007) (same).

## VII.   CONCLUSION

For the reasons argued herein as supported by the attached exhibits, and relying upon the arguments and evidence advanced at Docs. 3108, 3208-1 & 3108-2, and considering the Court's entire record herein, Defendants respectfully request this Court terminate Defendants' duty to monitor and report on MCPMs 1-8.  Pursuant to Paragraph 20(b) of the Stipulation, Defendants monitoring and reporting obligation has terminated (Doc. 1185 at 8.)  Defendants have complied with the applicable Stipulation required thresholds for at least 18 out of 24 months of monitoring, with fewer than three consecutive months of noncompliance within the prior 18 months, for the time period of November 2016 to October 2018.  Monitoring and reporting obligations for MCPMs 1-8 at ASPC-Florence, ASPC-Eyman, ASPC-Lewis, and ASPC-Perryville have been completed.

the same.  (Bendel Decl. Exh. 2 at 2, 4, 6, 8, 10, 12, 14, 16, 18, 20, 22, 24, 26, 28).

DATED this 10th day of April, 2019.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Rachel Love
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona  85226

Office of the Arizona Attorney General
Michael E. Gottfried
Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004-1592

*Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on April 10, 2019 I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

4

Alison Hardy:                    ahardy@prisonlaw.com

5

Amelia M. Gerlicher:     agerlicher@perkinscoie.com;docketPHX@perkinscoie.com,

6

kleach@perkinscoie.com

Amy B. Fettig:                 afettig@npp-aclu.org

7

Asim Dietrich:                 adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org;

8

phxadmin@azdisabilitylaw.org

9

Caroline N. Mitchell:     cnmitchell@jonesday.com; mlandsborough@jonesday.com;

10

nbreen@jonesday.com

Corene T. Kendrick:      ckendrick@prisonlaw.com; edegraff@prisonlaw.com

11

Daniel Clayton Barr:     DBarr@perkinscoie.com; docketphx@perkinscoie.com;

12

sneilson@perkinscoie.com

13

David Cyrus Fathi:        dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

14

Donald Specter:             dspecter@prisonlaw.com

15

John Howard Gray:       jhgray@perkinscoie.com; slawson@perkinscoie.com

16

John Laurens Wilkes:    jlwilkes@jonesday.com, dkkerr@jonesday.com

17

Jose de Jesus Rico:       jrico@azdisabilitylaw.org

18

Kathleen E. Brody        kbrody@acluaz.org

19

Maya Abela                    mabela@azdisabilitylaw.org

20

Rose Daly-Rooney:       rdalyrooney@azdisabilitylaw.org

21

Sara Norman:               snorman@prisonlaw.com

22

Rita K. Lomio:             rlomio@prisonlaw.com

23

Victoria Lopez:            vlopez@aclu.org

24

Ryan M. Kendall:        rkendall@aclu.org; ryankendall@ucla.edu

25

/ / /

26

/ / /

27

/ / /

28

/ / /

79

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Rachel Love