**EXHIBIT 2**

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**JERMAINE DOCKERY, et al**                                      **PLAINTIFFS**

**v.**                             Civil Action No. 3:13cv326-WHB-JCG

**RICHARD D. MCCARTY[1], et al**                            **DEFENDANTS**

## AFFIDAVIT OF EMLEE WOODARD NICHOLSON

**STATE OF MISSISSIPPI**
**COUNTY OF HINDS**

       **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for the county and state aforesaid, EMLEE WOODARD NICHOLSON, who having been duly sworn stated on her oath as follows:

       1.     My name is Emlee Woodard Nicholson and I am an adult resident citizen of the state of Mississippi.

       2.     I am over the age of 21 years of age and competent to testify with regard to the matters stated herein. I have personal knowledge of the facts and information contained in this affidavit.

       3.     I earned a BBA in Actuarial Science from Georgia State University where I received the award for excellence in my field. I worked as an actuary for two years before earning my Masters and PhD in mathematics from the University of Mississippi where I received the award for excellence in my field.

---

[1] Pursuant to F.R.C.P. 25(d), Richard D. McCarty, Interim Commissioner, is substituted for Christopher Epps, who resigned as Commissioner on November 5, 2014.

# EXHIBIT B

4. I am currently an Assistant Professor of Mathematics at Millsaps College in Jackson, Mississippi. Over the past 12 years, I have taught statistics many times both at the University of Mississippi and at Millsaps College. My course includes sampling techniques, research bias and how to avoid it, and statistical study design among many other topics in statistics. My current *Curriculum Vitae* is attached to my affidavit.

## INTRODUCTION

5. Bart Abplanalp, Ph.D. was at the East Mississippi Correctional Facility for two days where he reviewed medical records of certain inmates and thereafter he reviewed medical records for other inmates. Based on his observations from his review of these medical records, he made broader conclusions about the overall well-being of the inmates.

6. When selecting medical records to review, Dr. Abplanalp did not employ appropriate sampling techniques that would allow for inferences to be made about any broader population. Furthermore, he shared files with other experts ensuring that their findings would not be independent and that bias would appear in all samples.

7. The methodology employed by Dr. Abplanalp precludes him from making inferences of any sort about the population from which his samples were taken including but not limited to: EMCF as a facility, the population of inmates at EMCF, the population of inmates in isolation at EMCF, the population of inmates receiving mental health services at EMCF, or the population of inmates housed in Units 5 and 6.

8. Based on the samples of medical records no valid conclusions can be drawn about any persons other than the specific cases chosen for study.

9. Dr. Abplanalp's conclusions should not be projected from the sample of inmates

2

to a population of inmates because he did not use mathematics and statistics to standardize the generalization process. Because Dr. Abplanalp did not use this process, there is no way to confirm the trustworthiness of his generalizations. Scientific techniques have been well established for collecting evidence in support of scientific claims to ensure objectivity. Dr. Abplanalp's conclusions were not built upon scientific evidence and cannot be tested by others. Instead, his conclusions are based on his subjective experience and whims.

10. Dr. Abplanalp used biased sampling when he selected the inmates in the subgroup, he did not take care to ensure that the inmates in the sample were representative of the inmate populations so he can make only biased conclusions about the inmate populations.

11. Additionally, Dr. Abplanalp did not use a scientifically recognized method called statistical inference to analyze the information he obtained from the inmate subgroup. Statistical inference is the process of making decisions about a population based on information contained in a sample from that population. Dr. Abplanalp's report contains no evidence that he applied statistical inference. Instead, Dr. Abplanalp's report uses biased samples and anecdotal evidence, but such information is not scientific evidence and should not be used to validate conclusions for the inmate populations.

### STATISTICAL INFERENCE AND HYPOTHESIS TESTING OF A PARAMETER OF A POPULATION

12. Statistical inference is the process of using data from a sample of a population to make conclusions (called inferences) about the same population.

13. Statistical inference requires that certain procedures be followed.

14. Statistical inference in the form of hypothesis testing is used when a scientist seeks evidence for suspected truths about a parameter of a population. One must state

3

hypotheses, collect representative samples, test the information gleaned from those samples, and make appropriate conclusions in context.

15. A parameter is a numerical attribute of the population that describes some aspect of the population. Statistical inference is applicable when the parameter is unknown. A hypothesis test based on sample data should be conducted to test a claim about a parameter of a population.

16. A hypothesis test can be run to seek evidence for a claim about a single parameter of a population or a hypothesis test can be run to compare the same parameter for two or more different populations.

17. A hypothesis test is conducted as follows: First, a researcher must state a measurable claim about a parameter of a population. Second, determine two competing hypotheses for the measurable claim: (1) the null hypothesis and (2) the alternate hypothesis. These hypotheses are the two possibilities. Third, gather data from a representative sample. Fourth, compute the sample statistic that estimates the parameter of the population in the claim. Fifth, determine how probable that statistic would be if the null hypothesis were true. If the observed statistic is determined to be highly unlikely if the null hypothesis were true, that is strong evidence that the null hypothesis is, in fact, not true. If the observed statistic is determined not to be highly unlikely, then the results are not statistically significant and the test was inconclusive.

## RANDOM SAMPLING

18. Statistical inference will produce valid inferences only when the sample of the population is representative of the population.

19. Representative sampling is the foundation of inferential statistics. Random sampling is the most reliable way to collect a representative sample because the random sampling process ensures that every member of the population has an equal chance of being in the sample. A formal random sampling technique must be used.

20. The best and most common way to approach randomness is with technology. There are programs (Microsoft Excel, Minitab, etc.) capable of quickly selecting a random sample from a list of the population or from a list of numbers where each member of the population is represented by a number. This can be done in a few seconds. Generally speaking, prison populations are well suited for random sampling because the inmates are all contained in one location and contacting the members of the sample would not be cost prohibitive. The inmates in the population to be sampled can be given a number and the number is then entered into a program which randomly selects the inmates who are to be in the sample.

21. Dr. Abplanalp did not use any formal random sampling technique to select the medical records he reviewed.

**EXAMPLE OF STATISTICAL INFERENCE**

22. Assume we wanted to know whether inmates on average spend less than 5 hours in the common areas of their cell blocks in a given week. The parameter for the claim is "average amount of time in a given week spent by the inmates in the common areas of their cell block." That parameter is unknown, it is a fixed value that can be expressed in a measurement of time and it represents a characteristic of the inmate population.

23. The null hypothesis would be "the average amount of time spent by the inmates in a given week in the common areas of their cell blocks is greater than or equal to 5 hours." The

alternate hypothesis would be that "the average amount of time spent by the inmates in a given week in the common areas of their cell blocks is less than 5 hours." All inmates in the cell blocks are given a number and a program is used to randomly select 30 inmates from those in the cell blocks. Those 30 inmates are monitored to determine the length of time each of them spends in the common areas in a given week. The average length of time the inmates in the sample spend in the common areas that week is computed from this data. The result for the random sample is an estimate for the average amount of time in a given week all inmates in the population spent in the common areas of their cell block and can be used to test the claim.

## BIASED SAMPLING

24. If a sample is collected in any way that causes meaningful differences between the sample and the population, then the sample is biased. A biased sample can produce misleading results so no inferences can be made about a population from a biased sample. Sampling in a way that introduces bias eliminates the possibility of making any meaningful inference about the population from which the sample was drawn.

25. Haphazardly selecting a sample on one's own will likely produce a biased sample. Dr. Abplanalp's report has findings that are based on this type of biased sampling.

26. Selecting individuals to be in the sample because they are examples of a claim's truth is the most egregious form of sampling bias and is unacceptable in a scientific study. Some of Dr. Abplanalp's findings are based on this type of biased sampling.

## DR. ABPLANALP'S METHODOLOGY AND OPINIONS

27. In the methodology section of his report, Dr Abplanalp explains that "a number" of charts he reviewed were suggested to him by "Dr. Kupers and by Plaintiffs' counsel."

6

(Abplanalp at 3). His report does not say how many "a number" is, but it does show that 22 of the 28 inmates listed in his appendix were also selected and relied upon by at least one of the other medical experts.[2] Dr. Abplanalp also claims to have selected other charts "randomly from lists of admissions to the Observation Unit as well as patients currently residing in segregation and other living units." (Abplanalp at 3). However, this selection was not random in the statistical sense because the report does not show that random sampling, as I explain above, was used to select the inmate medical records for review.

28. By including charts that were recommended by the other experts and Plaintiffs' counsel, the damage has been done to Dr. Abplanalp's sample. Haphazardly selecting a handful of inmate medical records to add to the handpicked ones does not remove the bias. Suppose, for illustrative purposes, that 11 of the 22 shared files were given to Dr. Abplanalp by other experts and the other 11 were actually selected by Dr. Abplanalp and shared with other experts (thereby biasing their samples). In this case, Dr. Abplanalp's sample would contain 11 prisoners who had a 100% chance of being selected, and every other prisoner at EMCF had a 1.4% chance of being in his sample (assuming a population size of 1200 inmates). In a representative sample, every member of the population should have an equal chance of being selected.

29. From this biased sample, Dr. Abplanalp makes six opinions or claims about the entire prison population or EMCF in general. None of these claims are valid for the whole population.

30. His Opinion I states that "prisoners at EMCF lack adequate access to treatment

---

[2] Dr. Terry Kupers Report, Name Key, Exhibit C; Dr. Marc Stern Report, List of Patient Names, Attachment 2; Dr. Bart Abplanalp Report, Name Key, Exhibit B; Ms. LaMarre Report, Appendix A, Patient ID Numbers.

7

for serious mental health needs." (Abplanalp at 3). Opinion I is misleading as he never sampled "prisoners at EMCF" and assessed the access to treatment for serious mental health needs for the individuals in the sample. Furthermore, Dr. Abplanalp has not tested to see if his evidence is significant and applicable to the population. Therefore, this opinion is not supported by scientific evidence.

31. Under Opinion I, Dr. Abplanalp makes many other claims about populations he has not sampled or scientifically studied. He claims "mental health staff deny patients access to care." To support this, Dr. Abplanalp provides anecdotal evidence from three patients. He has no scientific support for a claim about "mental health staff". (Abplanalp at 4-5). Dr. Abplanalp claims: "the lack of confidentiality creates a dangerous barrier to care" citing the noise level in the units as his primary evidence. (Abplanalp at 6-7). The noise level at the moment of Dr. Abplanalp's visit, is not evidence that it is typically noisy as is suggested by this claim. To establish a pattern or typicality, one needs more than one data point.

32. Dr. Aplanalp's Opinion II states that "[t]he mental health care system at EMCF does not provide levels of care that meet inmates' mental health care needs, and it fails to adequately care for patients in psychiatric crisis." (Abplanalp at 10). He has not conducted a scientific study of patients in psychiatric crisis. Dr. Abplanalp relies on his biased sample of inmate medical records and intuition to support this opinion. ("My review of mental health charts led me to the conclusion that prisoners at EMCF do not have meaningful access to any of these levels [of a mental health system] of care." (Abplanalp at 11)).

33. Opinion III states that "EMCF fails to respond to psychiatric emergencies and provide adequate crisis intervention", but this opinion is also based on his biased sample of

8

medical records. (Abplanalp at 12-13). Dr. Abplanalp did not study the rate at which EMCF responds to and provides intervention for psychiatric emergencies. Instead he found one patient whom he concluded was failed by the system. This type of evidence (an example or collection of examples) is called anecdotal and should not be mistaken for scientific support of a claim about the entire mental health staff at EMCF.

34. Opinion IV states that "[t]he Mental Health System at EMCF fails to provide even minimally adequate quality of care" but again he relies on the biased sample of inmate medical records to support this opinion. (Abplanalp at 13-16). From a review of 28 records, a number of which were handpicked because they were problematic, Dr. Abplanalp makes declarations about facets of care being significantly lacking or "practically non-existent" at EMCF. (Abplanalp at 13). The existence of a few files in which a facet of care is absent is not sufficient evidence of that facet of care being "practically non-existent" at the facility. He even makes an assertion about "the vast majority of mental health encounters for prisoners in segregation…" (Abplanalp at 16). To establish a claim about the majority of mental health encounters (much less the "vast" majority), Dr. Abplanalp needs a representative sample and statistical inference. He did not utilize proper scientific techniques to support this claim.

35. Opinion V states "[t]he mental health system at EMCF does not adequately assess risk of self-harm or harm to others and places inmates at grave risk." (Abplanalp at 16-19). Dr. Abplanalp has not even defined what adequate risk assessment would be or conducted a study of the risk assessment at EMCF. He found some examples of charts, but does not say how many, that he deemed to contain inadequate risk assessment. Dr. Abplanalp's claim is imprecise and his evidence is anecdotal.

9

36. Opinion VI states "[m]ental health records are entirely unreliable and incomplete." (Abplanalp at 20-21). Dr. Abplanalp provides no evidence to support a claim about all mental health records. He reviewed a biased sample and projected his opinion about that sample to the population of mental health records. That can only be done with statistical inference. This is exactly as meaningful as finding 28 mental health records that are reliable and complete and declaring the mental health records at EMCF to be complete and entirely reliable.

37. It is invalid to make claims about "inmates" or "prisoners" or "EMCF" which imposes generality where it does not belong. Dr. Abplanalp's sample of patient records was not drawn in a way to represent the population. To support a claim about "inmates", one should take a simple random sample of ALL "inmates" and include no handpicked files that other people suggested. The charts in Dr. Abplanalp's sample should have led to no conclusions about the general population of prisoners or the facility as a whole as those individuals in the sample do not represent the population at EMCF.

38. In Dr. Abplanalp's conclusion to his report he claims that two inmates he identifies as Patient 12 and Patient 13 are representative and are "not at all unusual cases at EMCF." (Abplanalp at 23). These two inmates are examples of anecdotal evidence. Dr. Abplanalp's conclusion is baseless as anecdotal evidence is not scientific. In Dr. Abplanalp's opinion, Patients 12 and 13 may not have been unusual among those he reviewed, but the charts he reviewed were not randomly selected to represent the population of "cases at EMCF."

39. Dr. Abplanalp did not use a formal or scientific procedure at all when making inferences about EMCF and its populations. Instead, he makes these conclusions without the assistance of science. He has used no procedure to support his claims about the populations that

10

can be tested. The mechanisms he used to draw conclusions about the populations at EMCF exist only in his head. His procedure could not be peer reviewed.

40. Dr. Abplanalp employed no reliable principles or methods when making conclusions about the populations. There are reliable principles and methods for supporting the types of conclusions he makes but these are not even mentioned in Dr. Abplanalp's report much less utilized. There is no way to know the potential rate of error but it is reasonable to suspect it is quite high. Dr. Abplanalp took anecdotal evidence and concluded these anecdotes are applicable to the whole population. There are no standards or controls in Dr. Abplanalp's procedure. In fact, he used no formal procedure at all.

41. Dr. Abplanalp's technique is not accepted to any degree in the scientific community. The type of evidence he provides is called anecdotal and is used in the scientific community to mean the opposite of scientific evidence. There are only two ways to demonstrate sufficient scientific evidence exists to support claims about populations. One is to study the entire population. The other is to take a representative sample and apply statistical inference to make conclusions about the population. There is no other accepted technique. Dr. Abplanalp did not study every individual in the populations about which he made conclusions. Nor did he take a representative sample and use statistical inference. Therefore, the conclusions about the populations are not based on sufficient facts or data. Dr. Abplanalp misused anecdotal evidence to validate conclusions that can only be validated with scientific evidence.

And further affiant sayeth not.

_____
EMLEE W. NICHOLSON, Ph.D.

11

SWORN TO AND SUBSCRIBED BEFORE ME, this the 15th day of December, 2014.

*/s/ Mary Lynne Agnew Underwood*
NOTARY PUBLIC

My Commission Expires: _____

[Notary Seal: STATE OF MISSISSIPPI, NOTARY PUBLIC, ID # 25790, MARY LYNNE AGNEW UNDERWOOD, Commission Expires July 31, 2017, RANKIN COUNTY]

12

# Emlee W. Nicholson

*Curriculum Vitae*

email: emlee.nicholson@millsaps.edu

## Education

**University of Mississippi,** University, MS
*Doctor of Philosophy in Mathematics,* May 2007

**University of Mississippi,** University, MS
*Master of Science in Mathematics,* May 2004

**Georgia State University**, Atlanta, GA
*Bachelor of Business Administration in Actuarial Science,* May 2000
Cum Laude

**Mississippi State University**, Starkville, MS
June 1995 - May 1998

## Professional Experience

**Assistant Professor,** Millsaps College, Department of Mathematics, August 2010-present

**Assistant Professor,** Winthrop University, Department of Mathematics, August 2007 - July 2009

**NSF North Mississippi Grades K-8 Fellow and Administrator,** University of Mississippi, June 2006 - May 2007

**NSF NMGK-8 Fellow and Elementary Team Leader,** University of Mississippi, June 2005-June 2006

**NSF NMGK-8 Fellow,** University of Mississippi, June 2004-June 2006

**Graduate Instructor,** University of Mississippi, June 2003- May 2006

**Graduate Teaching Assistant**, University of Mississippi, August 2002-May 2003

**Actuarial Associate,** Acuff & Associates, Nashville, TN, July 2001-July 2002

**Actuarial Associate,** Towers Perrin, Atlanta, GA, June 2000-June 2001

13

## Publications

**Nicholson, E.W.**, & Wei, B. Degree Sum Condition for k-ordered Hamiltonian Connected Graphs. *Graphs and Combinatorics,* 2014, 10.1007/s00373-013-1393-x

**Nicholson, E.W.**, & Wei, B. (2014) Long paths containing k-ordered vertices in graphs. *Ars Combinatoria,* 114, 437-448.

**Nicholson, E.W.**, & Strickland D.M. (2009) Making connections to mathematics beyond high school: An exploration of graph colorings. *The MathMate, 32(3).*

**Nicholson, E.W.**, & Wei, B. (2008). Long cycles containing k-ordered vertices in graphs. *Discrete Mathematics,* 308(9), 1563-1570.

**Nicholson, E.W.** (2008). Making connections to mathematics beyond high school: An exploration of graph connectivity. *The MathMate, 31(2).*

## Presentations

E.W. Nicholson and B. Wei. *Degree conditions for weakly geodesic pancyclic graphs and their exceptions.* MAA/AMS Joint Mathematics Meeting, Baltimore, MD, January, 2014.

E.W. Nicholson and B. Wei. *Degree sum conditions for k-ordered hamiltonian connected graphs.* Invited talk at the American Mathematical Society Southeastern Sectional Meeting, Oxford, MS, March, 2013.

E.W. Nicholson and B. Wei. *Degree sum conditions for k-ordered hamiltonian connected graphs.* Invited talk at the University of Mississippi as one of their series of Combinatorics Seminars, Oxford, MS, April, 2012.

E.W. Nicholson and B. Wei. *Degree sum conditions for k-ordered hamiltonian connected graphs.* Session conducted at the Louisiana/Mississippi Sectional MAA meeting, Oxford, MS, February, 2011.

E.W. Nicholson. *Bringing Higher Mathematics into the High School Classroom: An Introduction to Graph Connectivity.* Session conducted at the Annual Meeting of the South Carolina Council of Teachers of Mathematics, Charleston, SC. October 2008.

B. Wei and E.W. Nicholson. *Long Paths containing k-ordered vertices in Graphs.* Session conducted at the SIAM conference on Discrete Mathematics, Victoria, Canada. June 2006.

E.W. Nicholson and B. Wei. *Long Paths containing k-ordered vertices in Graphs.* Session conducted at the Combinatorics Seminar at The University of Mississippi, University, MS. November 2005.

B. Wei and E.W. Nicholson. *Long Cycles containing k-ordered vertices in Graphs.* Presentation given at the MIGHTY XLI conference at Middle Tennessee State University. Murfreesboro, TN. September 2005.

14

## Awards

W. Charles Sallis Award for distinguished service to Millsaps College, 2014

Graduate Student Achievement Award: M.S. in Mathematics, University of Mississippi, 2004

Eli A. Zubay Award for Excellence in Actuarial Science, Georgia State University, 1999

## Courses Taught

Math 1130 - Elementary Functions

Math 1150 - Elementary Statistics

Math 1220 - Calculus I

Math 2230 - Calculus II

Math 2310 - Introduction to Advanced Math

Math 3620 - Number Theory

Math 3650 - Linear Algebra

Math 4800 - Graph Theory

## Professional Memberships

Mathematical Association of America

Mathematical Association of America Louisiana/Mississippi Section

LA/MS Sectional Project NEXT Fellowship