## Index of Exhibits to Declaration of Corene Kendrick

| Exhibit | Description |
| --- | --- |
| 1 | May 3, 2019 letter from D. Fathi to T. Bojanowski regarding ASPC-Florence mental health encounters **(FILED UNDER SEAL)** |
| 2 | Feb. 6, 2019 letter from C. Kendrick to T. Bojanowski regarding January 2019 tour of ASPC-Tucson **(FILED UNDER SEAL)** |
| 3 | March 11, 2019 letter from T. Bojanowski to C. Kendrick regarding January 2019 tour of ASPC-Tucson **(FILED UNDER SEAL)** |
| 4 | Jan. 29, 2019 letter from D. Fathi to T. Bojanowski re: class members at ASPC-Phoenix with grave mental health concerns **(FILED UNDER SEAL)** |
| 5 | May 14, 2019 letter from D. Fathi to T. Bojanowski regarding ASPC-Phoenix mental health encounters **(FILED UNDER SEAL)** |
| 6 | Feb. 21, 2019 letter from C. Kendrick to T. Bojanowski regarding January 2019 tour of ASPC-Eyman **(FILED UNDER SEAL)** |
| 7 | March 25, 2019 letter from A. Hesman to C. Kendrick regarding January 2019 tour of ASPC-Eyman **(FILED UNDER SEAL)** |
| 8 | May 1, 2019 letter from D. Fathi to T. Bojanowski regarding ASPC-Eyman mental health encounters **(FILED UNDER SEAL)** |
| 9 | April 22, 2019 letter from D. Fathi to T. Bojanowski regarding ASPC-Perryville mental health encounters **(FILED UNDER SEAL)** |
| 10 | May 6, 2019 letter from C. Kendrick to T. Bojanowski regarding April 2019 tour of ASPC-Perryville **(FILED UNDER SEAL)** |
| 11 | Jan. 2, 2019 – Notice of Noncompliance With PMs 23, 24, 40, 44, and 52 |
| 12 | Feb. 4, 2019 – Response to Notice of Noncompliance With PMs 23, 24, 40, 44, and 52 |
| 13 | Jan. 15, 2019 – Notice of Noncompliance With Max Custody PMs 1, 2, 5, 6, and 8 at Florence-Kasson and Lewis-Rast |

| Exhibit | Description |
|---------|-------------|
| 14 | Feb. 14, 2019 – Response to Notice of Noncompliance With Max Custody PMs 1, 2, 5, 6, and 8 at Florence-Kasson and Lewis-Rast |
| 15 | Feb. 2, 2019 – Notice of Noncompliance With Max Custody PMs 1, 2, 5, 6, and 8 at Eyman SMU-I and Eyman-Browning |
| 16 | March 4, 2019 – Response to Notice of Noncompliance With Max Custody PMs 1, 2, 5, 6, and 8 at Eyman SMU-I and Eyman-Browning |
| 17 | Feb. 7, 2019 Notice of Noncompliance With Paragraph 14 of the Stipulation **(FILED UNDER SEAL)** |
| 18 | March 11, 2019 Response to Notice of Noncompliance With Paragraph 14 of the Stipulation **(FILED UNDER SEAL)** |
| 19 | March 5, 2019 – Notice of Noncompliance With PM 2 at Douglas |
| 20 | March 6, 2019 – Notice of Noncompliance With PM 2 at Safford and PM 94 at Florence |
| 21 | April 4, 2019 – Response to Notice of Noncompliance With PM 2 at Douglas and Safford, and PM 94 at Florence |

# Exhibit 1

# (Redacted)

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



May 3, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS

      Re:   *Parsons v. Ryan*
               **Notice of Substantial Noncompliance**

Dear Tim:

Pursuant to Paragraph 30 of the Stipulation, Plaintiffs serve this Notice of
Substantial Noncompliance regarding the following Performance Measures (PMs)
at ASPC-Florence:  PM 80, 81, 82, 83, 84, 85, 86, 87, 88, 92, 94, and 95.

Each of these Performance Measures requires that the patient be "seen" by mental
health staff.  That term is defined in the Stipulation as follows:

> Interaction between a patient and a Medical Provider, Mental
> Health Provider or Mental Health Clinician that involves a
> treatment and/or exchange of information in a confidential
> setting. With respect to Mental Health staff, means an
> encounter that takes place in a confidential setting outside the
> prisoner's cell, unless the prisoner refuses to exit his or her cell
> for the encounter.

Doc. 1185-1 at 5.

Unfortunately, it is clear that many, if not most, encounters with mental health staff
are so brief and perfunctory as to be meaningless.  Our review found an abundance
of encounters that, according to the mental health staff person's note in eOMIS,
lasted 5 minutes or less.  For example:

                                           ████████████████ (4/19/19, 5 minutes; 4/20/19, 5 minutes; 4/21/19,
5 minutes; 4/22/19, 5 minutes; 4/23/19, 5 minutes; 4/28/19, 5 minutes)
████████ (12/8/18, 5 minutes)
████████████████ (2/12/19, 5 minutes; 2/14/19, 2 minutes;
2/16/19, 5 minutes; 2/17/19, 2 minutes; 2/22/19, 5 minutes; 2/23/19, 5
minutes; 2/27/19, 5 minutes; 2/28/19, 5 minutes; 3/2/19, 5 minutes; 3/4/19,
5 minutes; 3/17/19, 5 minutes; 3/19/19, 5 minutes)
████████████████ (11/15/18, 5 minutes; 11/16/18, 5 minutes;
11/18/18, 5 minutes; 11/21/18, 5 minutes; 11/22/18, 5 minutes; 11/23/18, 5

minutes; 11/25/18, 5 minutes; 12/2/18, 5 minutes; 12/3/18, 5 minutes;
12/4/18, 5 minutes; 12/21/18, 5 minutes)
███████████████████████ (1/22/19, 5 minutes)
███████████████████████ (4/21/19, 5 minutes; 5/1/19, 5 minutes; 5/2/19, 5
minutes)
███████████████████████ (11/11/18, 5 minutes)
███████████████████████ (12/14/18, 5 minutes; 12/15/18, 5 minutes;
12/16/18, 5 minutes; 3/27/19, 5 minutes; 3/30/19, 5 minutes; 3/31/19, 5
minutes; 4/17/19, 5 minutes; 4/20/19, 5 minutes; 4/21/19, 5 minutes)
███████████████████████ (11/7/18, 5 minutes; 11/9/18, 5 minutes;
11/10/18, 5 minutes; 11/11/18, 5 minutes)
███████████████████████ (12/2/18, 2 minutes)
███████████████████████ (3/2/19, 4 minutes)
███████████████████████ (4/7/19, 5 minutes)

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

Most disturbing, there were numerous cases in which a patient was moved to a
lower level of suicide watch, or removed from watch entirely, after encounters that
lasted 5 minutes or less.  For example:

███████████████████████ (11/7/18, removed from suicide watch after 5-
minute evaluation)
███████████████████████ (4/18/19, moved from 10-minute to 30-minute
watch after 5-minute evaluation)
███████████████████████ (12/13/18, removed from suicide watch after 5-
minute evaluation)
███████████████████████ (2/15/19, moved from constant to 10-minute
watch after 5-minute evaluation; 3/1/19, moved from constant to 10-minute
watch after 5-minute evaluation; 3/17/19, moved from constant to 10-minute
watch after 5-minute evaluation; 3/18/19, moved from 10-minute to 30-
minute watch after 5-minute evaluation)
███████████████████████ (11/26/18, removed from suicide watch after
5-minute evaluation; 12/6/18, removed from suicide watch after 5-minute
evaluation)
███████████████████████ (4/22/19, moved from constant to 10-minute
watch after 5-minute evaluation; 4/23/19, moved from 10-minute to 30-
minute watch after 5-minute evaluation; 4/30/19, moved from 10-minute to
30-minute watch after 5-minute evaluation)
███████████████████████ (11/10/18, moved from 10-minute to 30-minute
watch after 5-minute evaluation; 11/21/18, removed from suicide watch
after 5-minute evaluation)
███████████████████████ (1/26/19, moved from 10-minute to 30-
minute watch after 5-minute evaluation)
███████████████████████ (12/13/18, moved from 10-minute to 30-minute
watch after 5-minute evaluation; 12/18/18, removed from suicide watch
after 5-minute evaluation; 3/28/19, moved from 10-minute to 30-minute
watch after 5-minute evaluation; 4/18/19, moved from 10-minute to 30-

minute watch after 5-minute evaluation; 4/22/19, removed from suicide watch after 5-minute evaluation)

████████████████████ (11/29/18, removed from suicide watch after 5-minute evaluation; 12/3/18, removed from suicide watch after 5-minute evaluation)

████████████████ (11/8/18, moved from 10-minute to 30-minute watch after 5-minute evaluation; 11/15/18, removed from suicide watch after 5-minute evaluation)

████████████████ (4/6/19, moved from constant to 10-minute watch after 5-minute evaluation)

The relevant eOMIS notes are attached as Exhibit 1.

Five minutes – or two minutes – is not sufficient time in which to provide mental health treatment.  It is certainly not sufficient time in which to make the critically important judgment whether a patient is at risk of killing himself.  See Doc. 2091 at 3 (patient killed himself a few hours after being taken off suicide watch); Exhibit 2 (████████████████████ taken off suicide watch after 3-minute encounter and killed herself four days later).

We look forward to your response within 30 days as required by the Stipulation.

Very truly yours,

David C. Fathi

Enclosures

Cc:    All counsel

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

# Exhibit 2

# (Redacted)



<div align="center">

**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

</div>

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

<div align="center">

February 6, 2019

</div>

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:   Parsons v. Ryan, 2:12-CV-00601
        ASPC-Tucson Tour (January 8-9, 2019)

Dear Tim:

I write regarding Plaintiffs' tour of ASPC-Tucson to inform you of some of the systemic problems and violations of the Stipulation that we identified while touring the facility. Since the tour three weeks ago, we have separately notified you of many class members whom we and our experts spoke with who are in urgent need of medical, mental health, and/or dental care, and we will continue to do so.

## Erratic Medication Administration Times

Multiple people housed at Rincon and Manzanita Units reported that medications they are prescribed to receive every 8 or 12 hours are not provided in these time frames. Rather, they receive medication in a compressed time frame which leads to receiving two (or three) dosages in a very short period during the day, with a long period without medication during the evening, night, and morning.

On January 8, 2019, we observed the "morning medication pass" at Rincon HU-8 that is supposed to occur between 7 and 9 am; instead, it was being done at approximately 11 am. The LPN stated the schedule is supposed to be: "morning meds" between 7 and 9 am; "noon meds" between 11 am and 1 pm; and "evening meds" between 5:30 and 6:30 pm. She confirmed that she was not providing "noon meds" at HU-8, but rather she was finally getting to the morning meds for the building. She stated the reason she was so far behind was due to a lack of staffing – that there was only one LPN (her) who had to administer medications at four units. Medications are prescribed to be taken at particular intervals for a reason, and disregarding the prescriber's

<div align="center">

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

</div>

Mr. Timothy Bojanowski
RE: ASPC-Tucson Tour
February 6, 2019
Page 2

instructions in this manner can create a risk of injury or death to the patient. **Please ensure that patients are provided medication at the times and intervals required by their prescriptions**.

## Use of Infirmary for Mental Health Watch

According to the daily rosters that infirmary staff showed to Dr. Wilcox and Dr. Stewart, there were at least three people with serious mental illnesses who were housed in the infirmary on January 8-9, 2019, for purposes of a watch, and not for treatment of medical conditions:

| Bed | Name | ADC # | Admission | Orders | Notes |
|-----|------|-------|-----------|--------|-------|
| C18 | ▉ | ▉ | 12/3/16 | 30 min. | Paranoid Schizo, HTN, Hep C, Asthma |
| D21 | ▉ | ▉ | 3/21/18 | 30 min | Schizo/SMI/drinks from toilet/ play w/ fecal matter |
| D24 | ▉ | ▉ | 7/21/18 | 30 min. | UTI, bipolar, schizo, mattress on floor |

For example, Mr. ▉'s medical record regarding his admission to the infirmary on 7/21/18 from Rincon HU-8 states that this is "Infirmary Admission for Housing," and "CO is present at the door because pt. is on 30' watch." Mr. ▉ is classified as MH-3A.



Mr. Timothy Bojanowski
RE: ASPC-Tucson Tour
February 6, 2019
Page 3

Similarly, Mr. ▉▉▉▉▉▉ who also is MH-3A, was admitted to the infirmary on 3/21/18 from Rincon HU-8.  According to the nursing note, "Pt was on a 10 minute watch in HU8 and it is to continue here."



**Objective Notes**

Pt is awake and barely alert to self. VSS, respirations even and unlabored, pt's conversation is illogical and on the bizarre side. Pt, in his own way is making conversation but there is no content to his message. This pt was here in IPC before and this behavior is baseline for him.  Pt was on a 10 minute watch in HU8 and it is to continue here.

The watch sheets on these patients' doors confirmed they were on 30 minute watch:

Mr. Timothy Bojanowski
RE: ASPC-Tucson Tour
February 6, 2019
Page 4





On January 10, 2019, Dr. Stewart informed Corizon Regional Psychiatric Director Dr. Leonel Urdaneta of his grave concern regarding these three patients (along with several others) at Tucson who had serious mental illnesses and cognitive disabilities.  [*See also* 1/14/19 Email from D. Fathi to R. Love, "Patients in Tucson IPC"]

We are concerned that these individuals, who are on mental health watch, are not being included in the source documents for measuring compliance with PMs 94 and 95.  **Please confirm that all persons housed in the IPC for watch are included in the source documents used to select the files for review for PMs 94 and 95.**

## Limited Access to HNR forms

Class members in several detention units reported that some officers will not provide blank HNR forms when they are requested.  Due to a fear of retaliation, they did not agree to let us use their names.  **Please remind custody staff at the detention units that prisoners must be provided blank HNR forms immediately upon request**.

## Provider Rounding at the Manzanita SNU

The providers do not make regular rounds of the Manzanita Special Needs Unit, and people must submit HNRs in order to be seen by the provider.  However, there are multiple patients in the SNU who are clearly incapable of filling out HNRs on their own behalf (due to dementia, cognitive impairments, or physical disabilities), and we are concerned that they are unable to access care as needed.  **Please ensure that providers do regular rounds at the SNUs.**

## Lack of ADA-Accessible Equipment at Rincon HU-7

Rincon's Housing Unit 7 has one of its wings reserved for people with physical disabilities, including many full-time wheelchair users.  They reported, and we observed, that there is no ADA-accessible recreation equipment on the small yard that HU-7 and HU-8 share, and as a result these people are unable to use the standard recreational equipment for any upper-body strengthening exercises (which often are recommended by health care staff and physical therapists as critical for them to do in order to have the strength to propel their wheelchairs).  There is ADA-accessible recreational equipment on the small yard in front of HU-6, but the people with disabilities who are housed in HU-7 are not allowed to go over and use that equipment or mix with HU-6's population.

Prisoners have a constitutional right to outdoor exercise.  *See Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (*en banc*); *Keenan v. Hall*, 83 F.3d 1083, 1089-90 (9th Cir. 1996) *as amended* 135 F.3d 1318 (9th Cir. 1998); *Allen v. Sakai*, 48 F.3d 1082, 1088 (9th Cir. 1994); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979).  Both the Americans with Disabilities Act and §504 (Rehabilitation Act) require that an existing facility must "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities," (28 C.F.R. § 35.150(a)), and to do so, must either make structural changes or use other methods that are effective in achieving

Mr. Timothy Bojanowski
RE: ASPC-Tucson Tour
February 6, 2019
Page 6

readily accessible facilities. *Id*. § 35.150(b). When making structural changes, "to the maximum extent feasible" alterations should be made "in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." *Id*. § 35.151(b). Defendants must "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities." *Id*. § 35.133(a). **Defendants must provide people with disabilities housed in Rincon HU-7 access to accessible outdoor recreational equipment, either through installation of accessible equipment, or by allowing them access to other currently available accessible equipment**.

Thank you for your attention to these matters.

Sincerely,

Corene Kendrick, Staff Attorney

cc:     Counsel of Record

# Exhibit 3

# (Redacted)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

March 11, 2019

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

> Re:   **Parsons v. Ryan**
>        ASPC-Tucson Tour (January 8-9, 2019)

Dear Corene:

We are responding to your February 6, 2019 letter regarding Plaintiffs' January 8-9, 2019 Tucson tour.  We again remind you to exercise due diligence by utilizing your eOMIS access to review inmates' medical records before sending correspondence concluding that the care received was improper, needs immediate review, or runs afoul of the Stipulation.  Additionally, sending "inmate in need" correspondence without first reviewing the inmate's record wastes defense counsel, Corizon, and ADC's resources, as we are often forced to conduct an investigation into meritless claims.

Nevertheless, we will address the concerns raised by you in the order you raised them.

**Erratic Medication Administration Times**

Continued education of medical staff and communication efforts with the officers are being made to maintain the best functionality for the administration of medications, even when there are disruptions to the normal routine.  ADC and Corizon recognize the importance for medication passes occurring at the appropriate intervals.

**Use of Infirmary for Mental Health Watch**

All three examples listed in your correspondence have the same inaccuracy.  Neither ██████████ nor █████ weere on a mental health watch at the time of the tour, but were instead on a routine "medical watch" due to being admitted to the IPC.  The "watch sheets on the

Corene Kendrick
March 11, 2019
Page 2

patients' doors" were not "confirm[ation] they were on a 30 minute watch."  All of the photos included in your February 6 correspondence indicate that the reason for observation was "Medical Rounds."

Regarding the source documents for measuring compliance with PMs 94 and 95, please see the below addressing those concerns:

███████████   Mr. ████ was admitted to the IPC on July 21, 2018 and was on a mental health watch at the time he was admitted.  His mental health watch was clearly documented to have been discontinued five days later on July 26.  He has not been on a mental health watch since then.  Therefore, he would not have been on any watch log going forward.

███████████:  Mr. ████ was admitted to the IPC on March 21, 2018, and was on a mental health watch at the time he was admitted.  His mental health watch was clearly documented to have been discontinued on April 4, 2018.  He has not been on a mental health watch since then.  As he was no longer on a watch after April 4, he would not have been on any watch log going forward.

███████████   Mr. ████ was admitted to the IPC in December 2016.  He was placed on a mental health watch on January 25, 2017, which was discontinued on January 27, 2017.  He has been off mental watch since then, but has now been recently placed on watch at Kasson.

In sum, the infirmary is *not* being used for mental health watches as claimed and could have been easily confirmed through a more thorough review of eOMIS.

**Limited Access to HNR forms**

Please identify the detention units or officer names where this is occurring.  In general, we have not identified any issues with inmates accessing HNR forms at the detention units, but have reminded staff to provide inmates HNR forms when requested.

**Provider Rounding at the Manzanita SNU**

We have communicated this concern with Corizon for further follow up and reeducation, if necessary.

Corene Kendrick
March 11, 2019
Page 3

**<u>Lack of ADA-Accessible Equipment at Rincon HU-7</u>**

ADC and Corizon leadership have met to discuss accessible outdoor recreational equipment for HU-7.  ADC has begun to procure some equipment in order to allow those using medical equipment, i.e. wheelchairs, canes, etc., to access equipment.

Regards,

Timothy J. Bojanowski

TMR/TJB/eap
cc:    Counsel of record

# Exhibit 4

# (Redacted)

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



January 29, 2019

**BY EMAIL ONLY**

Tim Bojanowski
Struck Love Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

> Re:   *Parsons v. Ryan*
>       **Patients in urgent need of mental health/medical care**

Dear Tim:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202 393 4930
F/202 393 4931
WWW ACLU ORG

DAVID C  FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS

On January 10, Plaintiffs' counsel conducted a monitoring visit to ASPC-Phoenix. We were accompanied by our psychiatric expert, Pablo Stewart, M.D.  Based upon Dr. Stewart's evaluation of the patients listed below, they are in urgent need of mental health and/or medical care.

1. ▊▊▊▊▊▊▊▊▊▊▊▊ Upon arrival to Baker Unit Dr. Stewart observed Mr. ▊▊▊▊ naked from the waist down, spreading feces in his cell. He was moved to another cell, still half naked, where Dr. Stewart observed him to be on all fours, crawling around his cell, spitting on the ground and then licking up his spit. Dr. Stewart attempted to speak with Mr. ▊▊▊▊▊ and noted he was extremely psychotic, rambling incoherently. Clinical staff informed Dr. Stewart that Mr. ▊▊▊▊▊ had stopped taking his antipsychotic medication last week and that they were in the process of applying for an involuntary medication order. Dr. Stewart pointed out to the clinical director, Dr. Platt, that due to his current condition and behavior Mr. ▊▊▊▊ required an immediate dose of antipsychotic medication given on an emergency basis. Dr. Platt stated that the administration of emergency medication would require Mr. ▊▊▊▊▊ to be placed in restraints and that his current behavior -- feces spreading, half naked, spitting on the floor and licking up his spit -- did not warrant placement in restraints.

2. ▊▊▊▊▊▊▊▊▊▊▊▊▊: Mr. ▊▊▊▊ is a very psychotic individual with a history of enucleating his left eye. Upon examination by Dr. Stewart, he displayed the following psychotic symptoms: thought blocking, ideas of reference, looseness of associations and paranoia. Of note, he had recently been placed in Baker due to his attempting to bite his finger off. Due to his history of serious self-harm and the extremely elevated degree of his current psychotic state, it is Dr. Stewart's opinion that he is at great risk for additional self-harm. His present medication regimen is not addressing his psychotic symptoms and requires immediate reevaluation.

3. ▊▊▊▊▊▊▊▊▊▊▊ Mr. ▊▊▊ is a chronically psychotic individual with a very long history of antipsychotic treatment. Upon examination by Dr. Stewart, he

had a severely contracted left hand that requires immediate physical therapy. This physical therapy is to prevent his having an irreversible contracture and losing the use of his left hand. He also displayed severe, medication-induced tremors in both of his hands. In addition to requiring physical therapy, he needs his medications reviewed.

4. ██████████████████ Mr. ██████ is an exceedingly psychotic individual with a history of serious self-harm, such as slashing his legs and arms as well as pulling off his eyelashes and picking at his face. Upon examination, he presented as irritable and psychotic, refusing to speak with Dr. Stewart regarding his current state of self-harm. He needs to have his medications reviewed.

5. ██████████████████: Ms. ██████ has an exceptionally long and complicated medical and psychiatric history. Of note, she is a self-mutilator who has recently severely injured her abdomen. She is on a complicated medication regimen that requires immediate review given her serious risk of self-harm.

Thank you for your prompt attention to the urgent health care needs of these patients.

Very truly yours,

David C. Fathi

Cc:        All counsel

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

# Exhibit 5

# (Redacted)

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



May 14, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

> Re:   ***Parsons v. Ryan***
>       **Notice of Substantial Noncompliance**

Dear Tim:

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS

Pursuant to Paragraph 30 of the Stipulation, Plaintiffs serve this Notice of
Substantial Noncompliance regarding the following Performance Measures (PMs)
at ASPC-Phoenix:  PM 74, 76, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 94,
and 95.

Each of these Performance Measures requires that the patient be "seen" by mental
health staff.  That term is defined in the Stipulation as follows:

> Interaction between a patient and a Medical Provider, Mental
> Health Provider or Mental Health Clinician that involves a
> treatment and/or exchange of information in a confidential
> setting. With respect to Mental Health staff, means an
> encounter that takes place in a confidential setting outside the
> prisoner's cell, unless the prisoner refuses to exit his or her cell
> for the encounter.

Doc. 1185-1 at 5.

Unfortunately, it is clear that many, if not most, encounters with mental health staff
at ASPC-Phoenix – ADC's dedicated mental health facility -- are so brief and
perfunctory as to be meaningless.  Our review found an abundance of encounters
that, according to the mental health staff person's note in eOMIS, lasted no longer
than 5 minutes.  For example:

████████████████ (11/12/18, 5 minutes; 11/29/18 5 minutes;
4/15/19, 5 minutes)
████████████████ (12/10/18, 5 minutes; 12/21/18, 5 minutes;
12/28/18, 5 minutes)
████████████████ (12/21/18, 5 minutes; 1/4/19, 5 minutes;
2/12/19, 5 minutes)
████████████████ (1/25/19, 5 minutes)
████████████████ (12/28/18, 5 minutes; 1/3/19, 5 minutes;
3/21/19, 5 minutes)

███████████████████ (1/17/19, 5 minutes)
█████████████ (11/13/18, 5 minutes)
████████████ (11/27/18, 5 minutes; 12/27/18, 5 minutes;
2/6/19, 5 minutes; 2/13/19, 5 minutes)
█████████████ (12/5/18, 5 minutes; 12/17/18, 5 minutes;
1/31/19, 5 minutes; 3/11/19, 5 minutes; 3/15/19, 5 minutes)
███████████ (11/27/18, 5 minutes; 1/30/19, 5 minutes; 3/5/19, 5
minutes; 3/26/19, 5 minutes; 4/16/19, 5 minutes)
███████████ (11/8/18, 5 minutes; 11/15/18, 5 minutes;
11/21/18, 5 minutes; 12/12/18, 5 minutes; 1/9/19, 5 minutes; 2/6/19, 5
minutes)
██████████████ (2/28/19, 5 minutes)
█████████████ (12/17/18, 5 minutes; 12/26/18, 5 minutes;
1/2/19, 5 minutes; 1/9/19, 5 minutes; 1/18/19, 5 minutes; 1/20/19, 4-5
minutes)

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

There were numerous cases in which a patient on suicide watch was seen for no
longer than 5 minutes. Most disturbing, there were patients who were moved to a
lower level of suicide watch, or removed from suicide watch entirely, after
encounters that lasted no longer than 5 minutes.  For example:

███████████████ (12/16/18, 5 minutes)
███████████ (11/3/18, 5 minutes; 11/5/18, 5 minutes; 11/6/18,
5 minutes)
█████████████ (1/1/19, 5 minutes)
█████████████ (11/3/18, 5 minutes)
████████████ (11/17/18, 5 minutes)
████████████ (1/4/19, moved from constant to 10-minute watch
after 5 minutes; 1/14/19, removed from suicide watch after 5 minutes;
11/3/18, 5 minutes)
█████████████ (11/16/18, moved from 10-minute to 30-minute
watch after 5 minutes)
██████████████ (12/13/18, 5 minutes; 12/15/18, 5 minutes; 12/16/18,
5 minutes)
███████████████ (11/5/18, 5 minutes; 11/6/18, 5 minutes)
█████████████ (11/2/18, 5 minutes; 11/3/18, 5 minutes;
11/5/18, 5 minutes)

The relevant eOMIS notes are attached as Exhibit 1.

Five minutes is not sufficient time in which to provide mental health treatment.  It is
certainly not sufficient time in which to make the critically important judgment
whether a patient is at risk of killing himself or herself.  See Doc. 2091 at 3 (patient
killed himself a few hours after being taken off suicide watch); Exhibit 2 (█████████
███████████████ taken off suicide watch after 3-minute encounter and
killed herself four days later).

We look forward to your response within 30 days as required by the Stipulation.

Very truly yours,

David C. Fathi

Enclosures

Cc:     All counsel

**AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION**

# Exhibit 6

# (Redacted)



<div align="center">

**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

</div>

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

February 21, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

      RE:    Parsons v. Ryan, 2:12-CV-00601
               Plaintiffs' Monitoring Tour of ASPC-Eyman, Jan. 24-25, 2019

Dear Tim,

     I write regarding several systemic problems we identified during our monitoring visit to Eyman complex on January 24-25, 2019.

## Insufficient Nursing Staff

     Multiple class members we spoke with on the five units reported that nurse's line was frequently cancelled or greatly curtailed due to insufficient numbers of nurses, and insulin lines and pill lines had been delayed or cancelled multiple times.  We were shown copies of the Meadows Unit Newsletter for the past two months, which among other things included the following updates from the DW and CO-IV to the people incarcerated in the unit:

        *1/2/19*          "CO-IV McClellan will look into no nurses for wound care,
        *Newsletter:*   late call PM meds, or regular health provider."

        *12/1/18*      "DW Ping to address Corizon's lack of compliance with plan
        *Newsletter:*   to have a health provider on site each Th, F, S.  Cary Demery
                       is the new FHA."

     Nursing staff we spoke with during the tour also reported that they were frequently working overtime and that there was a shortage of nursing staff.  RN Hunt at Meadows Unit clinic stated that she works up to five 12-hour shifts a week because of the number of vacant positions and that on the day we were there, she was administering medication because there was

<div align="center">

**Board of Directors**

Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

</div>

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 2

not a pill nurse working at the time.  LPN Christie Riley at Rynning Unit reported that "there is no permanent RN" for the yard and that RNs normally assigned to other yards will "float" over to provide nursing line, or RNs will work overtime.  Excessive reliance upon involuntary or semi-voluntary overtime is dangerous to patients, and creates an excessive burden on nursing staff that can lead to exhaustion, burnout, and turnover.

Documentation provided as part of the monthly production and pursuant to the tour confirmed this.  First, the statewide staffing reports showed abysmal levels of staffing for nursing positions, including a decline from October 2018 to January 2019:

| Position | Corizon Contract Positions | Oct. Filled FTEs | Oct % Filled | Nov. Filled FTEs | Nov % Filled | Dec. Filled FTEs | Dec. % Filled | Jan. Filled FTE | Jan % Filled |
|---|---|---|---|---|---|---|---|---|---|
| RN | 20.40 | 10.75 | 53% | 8.23 | 40% | 8.23 | 40% | 8.30 | 41% |
| LPN | 31.00 | 23.2 | 75% | 22.3 | 72% | 21.3 | 69% | 22.3 | 72% |
| Nursing Ass't | 8.6 | 6.5 | 76% | 7.5 | 87% | 6.5 | 76% | 7.5 | 87% |

*See* Attachment A (ADCM1546315, 15550414, 1555107, 1560368)

Clearly, such insufficient numbers of nursing staff, and the resultant delays or cancellation of nurse's line, treatment lines, and medication administration results in untimely delivery of adequate health care, and threatens patient safety.  Given nursing staff's role in triaging all HNRs, inadequate staffing implicates not just the delivery of medical care, but also mental health care, dental care, and timely refill, renewal, and administration of prescription medications.

Indeed, ADC's CGAR reports reflect this, as Eyman was substantially noncompliant with Performance Measure 37 (*Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need)*) with a score of 78% in October 2018, 74% in November 2018, and 54% in December. (ADCM1549992, 1555500, 1560445).[1]

In addition, pursuant to the tour, we requested all Information Reports written by custody staff assigned to the clinics for the time period of October 1 through December 31, 2018. These IRs reflect multiple staffing shortages resulting in the cancellation or delay of nursing care, and

---

[1] The Court found Defendants substantially noncompliant with PM 37 on May 20, 2016. [Doc. 1583 at 2]

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 3

medication administration.  The officers' reports document health care supervisors instructing the few remaining nurses to "prioritize" who they treat, so that they can go to the next yard to provide care there.  For example, this includes but is not limited to the following IRs:

- Oct. 2, 2018 – Meadows Unit – no morning insulin completed (ADCM1556206)

- Oct. 3, 2018 – Meadows Unit – no morning insulin completed (ADCM1556208)[2]

- Oct. 7, 2018 – Meadows Unit – no morning insulin completed (ADCM1556216)

- Oct. 8, 2018 – Meadows Unit – no morning insulin completed (ADCM1556218)

- Oct. 9, 2018 – Meadows Unit – no morning insulin completed (ADCM1556220)

- Oct. 24, 2018 – Cook Unit – "medication and nurses lines started late" (ADCM1556007)

- Oct. 28, 2018 – Cook Unit – "no sick call nurse on site" at 7:30 am; "sick call nurse Shaw arrived at approx. 1400 and saw 3 inmates on Nurse line/sick call" (ADCM1556015)

- Nov. 4, 2018 – Cook Unit – "on 11.4.2018 at 0615 hrs … CRN Box was on site and no other medical staff, at 1050 hrs CRN Shaw cross leveled to Cook Unit from Rynning Unit to assist, as of 1240 hrs no sick call nurse arrived." "Report for information and documentation nurse Shaw arrived at approximately 1240 to assist. At this time no nurse has arrived for nurse's line." (ADCM1556029)

- Nov. 8, 2018 – Cook Unit – CO-II writes, "0600, 11/8/18, no morning or insulins nurses arrived in the health unit," and the lieutenant writes, "On going staffing issue with nurses."

- Nov. 11, 2018 – Browning Unit – "No nurse onsite upon arrival, Corizon on call RN supervisor contacted by phone, RN, at 0715 hours. He advised that Nurse Gallant from Rynning Unit will assist after completion of their lines. Followed up with Nurse Gallant at 1235 hours however she was not aware of assisting Browning unit. I recontacted the On call RN Supervisor again however he did not call me back to give an update. Shift Supervisors notified of situation. At 1243 Shift Supervisor confirmed that RN Hunt will be assisting Browning Unit after 1600 hours. RN Hunt arrived on site at 1609 hours. …The Nurse line began at 1700 hours and was completed at 1800 hours." (ADCM1556498-99)

---

[2] For comparison, the Information Report for Meadows Unit dated October 4, 2018, showed that 41 morning insulins were completed. (ADCM1556210).

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 4

- Nov. 11, 2018 – Cook Unit – CO-II writes, "On 11-11-2018 at 0733 hrs… there was no sick call nurse. …[A]s of 1200 hrs there was still no sick call nurse," and the sergeant writes, "We will be sharing sick call nurse with lockdown.  No ETA on when the nurse will be here." (ADCM1556093)

- Nov. 12, 2018 – SMU-I – "Medical Line Not Completed," "The PM shift did not complete the HNRs, but completed the treatment line.  Report completed due to HNR's not being seen within 24 hr time period." (ADCM1556695)

- Nov. 12, 2018 – Cook Unit – "No insulin nurse (grave yard)," "On the above date and approximate time [0500] there was not a Nurse on site to conduct insulin. …Nurse Saucedo stated that Nurse Lee has been redirected to Browning unit and Nurse Smith is at Meadows Unit but is busy between Meadows and SMU I.  Nurse Saucedo advised me that the day shift nurse will have to conduct the insulins," "All inmates that turned out for insulins have been fed." (ADCM1556095)

- Nov. 12, 2018 – Cook Unit – "No Insulins, No Nurses," "No insulins had been completed. 0600.  No morning nurses had arrived to health unit. At 628 Nurse Box Arrives. …Insulins begins 708."  The lieutenant writes, "On going staffing issues with nurses." (ADCM1556097)

- Nov. 18, 2018 – Cook Unit – "AFHA Smith advised that Rynning/Cook unit will be using the same nurse for nurse line. AFHA Smith also stated that as soon as the nurse was completed in Rynning, they would report to Cook Unit for the nurse line. …At 1330 hours Nurse Shaw came from Browning Unit to conduct nurse line. …Nurses line began at approx. 1430 hours. 8 inmates were seen." (ADCM1556059)

- Nov. 29, 2018 – Cook Unit – CO-II writes, "0600, 11/29/18, ..no medical nurse had arrived in the health unit. Workers medication given 705," and the Associate Deputy Warden reviewing the report writes, "This delays our off-site workers leaving on time for other units." (ADCM1556099-6100).

- Dec. 1, 2018 – SMU-I – "Nurses line saw 03 inmates and did not complete the line during AM shift as Eyman complex had one nurse scheduled. Treatment line was not started during the AM shift." (ADCM1556735)

- Dec. 2, 2018 – SMU-I – "On the above date and time [1800] the Treatment line was not completed due to RN Goff being pulled from SMUI to do Nurse Line at Meadows. She was able to see 6 of the 13 inmates that were on the line." (ADCM1556739)

- Dec. 3, 2018 – Cook Unit – CO-II writes, "On the above time [0600] no medication nurse arrived on post. Nurses Box, Lampshire arrived to Health Unit at 633 AM. Worker medication begins 638," and the lieutenant writes, "Ongoing issue with medical staff."

- Dec. 3, 2018, SMU-I – "On Monday, 12/03/2018 at approximately 0815 hours, I, Officer Olguin was notified by the Med Passes nurses that they had placed a call with D.O.N. Foster letting her know that they needed a nurse to pass in Wing 4. At 1036 hours I asked them if they had gotten anyone to pass Wing 4 meds. They stated that they hadn't gotten a call back from the D.O.N. and had placed a call to the F.A.H. and was waiting for an answer. At 1300 hours no meds had still been passed. I was advised by the Med Pass Nurses that it was too late in the day to pass the AM Meds. At 1730 hours only half of Wing 4 was completed. …At shift change, still waiting for D.O.N. to return calls." (ADCM1556745)

- Dec. 3, 2018, SMU-I – "On the above date and time [1445] the Vacc Line was not completed due to RN Goff being pulled from the line to do med pass down wing 3. She was able to see 2 of the 11 inmates that were on line. Line will be added on 12/4/2018 nurses line." (ADCM1556741).

- Dec. 9, 2018 – SMU-I – "On the above date and time [1800] Nurses Line was not completed. DON Foster called RN Goff at 0645 and advised her that she would need to prioritize the SMU-I list and only see the priorities then she was [to] go to Cook Unit and do the same. She left SMUI at 0930 and arrived back at 1411. SMU was under 2 ICS at her return therefore she didn't restart the line until 1500. (25) inmates seen (12) not seen. Per DON all inmates not seen will be first on 12/10/2018 nurses line." (ADCM1556757)

- Dec. 9, 2018 – Cook Unit – "Nurse line was delayed due to there not being a nurse on site. At approximately 1143 hrs nurse line began when Nurse Goff arrived." (ADCM1556119)

- Dec. 9, 2018 – Rynning Unit – CO-II writes "D.O.N. Foster advised Nurse Tapia that Rynning Unit will not be getting a nurse to provide Nurse Line," lieutenant writes, "Corizon D.O.N. was notified and the Unit was informed that no nurses were to be sent. It was not specified as to [whether] there were none available or they would just not be sent. Medical Lines were slowed to adjust for lack of nurses." (ADCM1555917)

- Dec. 9, 2018 – Browning Unit – "No nurse onsite to conduct today's treatment and nurse line. On-call RN Foster contacted at 0733 hours and was verbally advised that a nurse may show up in the afternoon, only 2 RN onsite for Eyman complex. Shift Supervisor notified." (ADCM1556591)

- Dec. 9, 2018 – Meadows Unit – no morning insulin completed, "Nurse line did not get completed due to no registered nurse on site. 10 inmates were scheduled on the line." (ADCM1556328).

- Dec. 10, 2018 – SMU-I – "On Monday, 12/10/2018 at approximately 0700 hours RN Goff was notified by D.O.N. Foster that she needed to prioritize her nurses line because they were short a med pass nurse. … (6) inmates did not get seen and (0) inmates on the treatment line were seen." (ADCM1556761).

- Dec. 12, 2018 – Cook Unit – "On the above date and approximate time [0600] no nurses for medication pass-out arrived in Health Unit. Stopped Nurse's line." (ADCM1556125)

- Dec. 15, 2018 – Cook Unit – "On the above date and approximate time [1330] there was no nurse in the health unit to conduct nurse line. There were no inmates seen for nurse line between the hours of 0600-1400." (ADCM1556133)

- Dec. 16, 2018 – SMU-I – "On Sunday, 12/16/2018 at approximately 0928 ADON Mays called RN Goff and told her to prioritize her Nurses Line and to only see who she could, that she needed to report to Meadows for Nurses Line. …Due to RN Goff going to Meadows the Treatment Line (total of 8 inmates) will be treated by PM nurses." (ADCM1556777)

- Dec. 17, 2018 – SMU-I – "On the above date and time [1800] Nurses Line was not completed. ADON Mays called RN Goff at 0957 and advised her that she would need to run the Nurses Line at Meadows. She left SMUI at 1130 hours. RN Goff [saw] (3) inmates on the Treatment Line that were priority, leaving (7) inmates not seen. All non-seen treatments will be seen by PM shift tonight."  (ADCM1556781)

- Dec. 22, 2018 – SMU-I – "On the above date and time [1800] SMU 1 was unable to conduct any medical lines due to not having a scheduled Nurse Line nurse." (ADCM1556791).

- Dec. 22, 2018 – Meadows Unit – "No nurse line conducted due to Corizon staff shortage." (ADCM1556354).

- Dec. 23, 2018 – SMU-I – CO-II writes, "Treatment Line was not completed due to inmates not seen on 12/22/2018 nurses line," lieutenant writes, "Nursing staff remains 'understaffed' complexwide." (ADCM1556795).

- Dec. 23, 2018 – Meadows Unit – no AM insulin completed, "nurse line not completed due to Registered Nurse Gallant going to Cook Unit. Only (1) pill call nurse, LPN Egen was on site." (ADCM1556356)

- Dec. 23, 2018 – Cook Unit – "Nurse line was delayed due to there not being a nurse on site. Nurse line began at approximately 1400 hours when Nurse Gallant arrived." (ADCM1556149)

- Dec. 24, 2018 – Browning Unit – "The nurse line was not started until 1415 due to not having a nurse arrive onsite until 1415 hours." (ADCM1556646)

- Dec. 24, 2018 – SMU-I – "On Monday, 12/24/2018 at approximately 1300 hours FHA Demery called RN Goff and asked her to report to Rynning to run the nurse line. Only 1 treatment was seen on the list leaving 7 that will have to be seen by PM shift." (ADCM1556799)

- Dec. 26, 2018 – SMU-I – "On Wednesday, 12/26/2018 at approximately 0630 hours I, COII Olguin was notified by RN Schaffer that her supervisor, Smith notified her that there would not be a nurses line for SMU-I today 12/26/2018 due to low staffing. RN Schaffer was pulled to do med pass in wing 3 here at SMU-I. …Report is for regular tracking of sub-standard staffing levels in Corizon." (ADCM1556803)

- Dec. 27, 2018 – Cook Unit – "On the above date and approximate time [0740] I CO-II Ryan was notified by Sgt. Babue to have one of the medical staff see inmate ███████ 297147.[3]  I spoke with Ms. Sestaga and informed her that the inmate's leg was swollen and the skin was splitting. Ms. Sestaga stated there was no nurse to see him because the two who were there were passing meds. Informed her that if nobody sees him I was going to activate ICS.  Ms. Sestaga stated, 'Activate then.' After that, I activated ICS.  After several minutes of inmate ███████ and I waiting in the nurse's office and no medical staff seeing the inmate, I requested a rapid response nurse be sent from another unit.  After this call was made over the radio, LPN Seddler began her examination of inmate ███████.  After LPN Seddler finished her exam she referred the inmate to Nurse Practitioner Thomas who had been in her office during the entire ICS." (ADCM1556159-61)

- Dec. 30, 2018 – Cook Unit – "Nurse line was not conducted due to there not being a nurse on site." (ADCM1556168)

---

[3] My office notified you of Mr. ███████' urgent need for specialty care for his venous insufficiency.  *See* 2/15/19 Letter to T. Bojanowski from A. Norris and T. Nosewicz.

- Dec. 30, 2018 – Browning Unit – "The nurse line was not started until 1420 hours due to not having a nurse on site until that time." (ADC1556668).

- Dec. 30, 2018 – Cook Unit – no nurse's line or provider line seen. (ADCM1556170)

- Dec. 31, 2018 – Meadows Unit – no AM insulin completed, "only (1) pill call nurse on site." (ADCM1556370).

     **In light of the staggering shortage of nursing staff, we request that you explain what steps ADC and Corizon are taking to recruit and retain FTE nursing staff to fill these positions.  As explained above, forcing the few remaining nursing staff to work massive amounts of overtime is not a safe or sustainable solution to this problem.**

## Insufficient Provider Staff / Turnaways at Clinics

     Multiple prisoners – predominately at Cook and Meadows Units – reported that they frequently will receive a pass telling them to come to the clinic for a provider's appointment, but that when they get to the clinic they are told that they are "not on the list" for the day, and to return to their housing units.  Sometimes they are called back a week or two later, and are able to complete the previously scheduled appointment.  We reviewed numerous medical records and found evidence of this pattern. Class members reported, and their records confirm, that this also happens when they are given a slip to come to the clinic for nurse's line or to have diagnostic procedures such as blood draws, lab tests, and X-rays.

     The October 2018-January 2019 staffing reports show a shortage of providers at Eyman:

| Position | Corizon Contract Positions | Oct. Filled FTEs | Oct % Filled | Nov. Filled FTEs | Nov % Filled | Dec. Filled FTEs | Dec. % Filled | Jan. Filled FTE | Jan. % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Nurse Practitioner | 5.0 | 4.0 | 80% | 3.0 | 60% | 4.0 | 80% | 4.0 | 80% |

*See* Attachment A.

     The Advisory Board's analysis of provider-level recruitment and retention identified Eyman as being compliant with provider staffing requirements only 43% of the reviewed time period, and that there was a turnover rate of 35%.  *See* Doc. 2940-1 at 18, 91-92.  While the Court ordered Defendants to "file their plan to implement the recommendations contained in the final Advisory [Board] report," (Doc. 2904 at 1), Defendants failed to file more than a two page boilerplate statement. [Doc. 2948-1].  Given the more recent staffing numbers at Eyman, it

appears that Defendants and Corizon have ignored the Rule 706 expert's recommendations and failed to take any meaningful steps to improve recruitment and retention.

On the following pages, we offer a few illustrative examples, but we reviewed medical records of many more people and identified similar patterns with those individuals.

████████████████████████, **Cook Unit**, has a golf-ball sized mass on his neck that continues to grow, as shown in the photos taken on January 24, 2019.[4]



He reported that he received a pass two days in a row to go to the clinic in mid-December to see the provider regarding the mass, but both times when he got to the clinic he was turned back and told to return to his housing unit.  Mr. ████████'s medical record confirms that he was scheduled on December 17, 2018 to see the provider for a two week follow up from his December 3, 2018 encounter, but the appointment was cancelled (in violation of PM 42).

It appears that he was rescheduled to see the provider on December 18, 2018, but this is not listed as completed, but rather is still listed scheduled.  Indeed, Mr. ████████ was scheduled for another provider appointment on February 19, 2019, but it too did not occur.  He has not had a provider encounter since December 3, 2018.

---

[4] Our office previously notified you of Mr. ████████'s urgent need for a surgical consult to excise the mass.  *See* 1/24/19 Letter from A. Hardy to T. Bojanowski.

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 10



//

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 11

████████████████ **Meadows Unit,** reported that he has had a chronic bladder infection and UTI from his catheter being infected.[5] He received slips directing him to the clinic for lab tests, nurse's line, and provider's line, and reported that in the fall of 2018, he was repeatedly turned away and told his encounter would be rescheduled.  As seen below, his medical record confirms his account:



████████████████ **Cook Unit**, suffers from multiple chronic medical conditions and reported that he regularly experiences being turned away from the clinic after being told told he no longer was listed on the day's schedule. His medical record documents a plethora of scheduled provider encounters and lab tests that appear to have been postponed to a later date or not completed, as shown on the next two pages.

---

[5] We notified you on January 30, 2019, of Mr. ████'s need for medical attention and correct-sized catheters.  *See* 1/30/19 Letter from A. Norris and T. Nosewicz to T. Bojanowski.

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 12

Health  >  Nurse Favorites  >  Offender Appointments

**OTRS030A - Offender Appointments**

### Offender Appointments (1 - 20 of 186)

| Date/Begin Time | Priority | Type | Facility/Office | Status | Comments |
|---|---|---|---|---|---|
| 01/29/2019  13:04 | | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | skin spots |
| 01/16/2019  07:45 | | Dental - Prosthetics | ASPC-E COOK UNIT | Scheduled | |
| 12/05/2018  06:30 | | Dental - Prosthetics | ASPC-E COOK UNIT | Completed | None |
| 11/26/2018  10:21 | | Lab | ASPC-E COOK UNIT | Completed | |
| 11/23/2018  11:00 | | Provider - Medication Renewal | ASPC-E COOK UNIT | Completed | F/U GABAPENTIN |
| 11/12/2018  07:00 | | Lab | ASPC-E COOK UNIT | Scheduled | |
| 10/31/2018  06:30 | | Dental - Prosthetics | ASPC-E COOK UNIT | Completed | None |
| 10/24/2018  10:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | ATP-F/U |
| 10/05/2018  09:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | C/O OF FORGETNESS,CONFUSION,INCREASED FE... |
| 10/03/2018  06:30 | | Dental - Prosthetics | ASPC-E COOK UNIT | Completed | None |
| 09/07/2018  08:15 | | Provider - Chronic Care | ASPC-E COOK UNIT | Completed | CC-HTN CANCER HLD |
| 09/05/2018  06:30 | | Dental - Routine Treatment | ASPC-E COOK UNIT | Completed | None |

| | | | | | |
|---|---|---|---|---|---|
| 08/24/2018  10:08 | | Lab | ASPC-E COOK UNIT | Completed | |
| 08/16/2018  09:00 | | Lab | ASPC-E COOK UNIT | Scheduled | |
| 08/13/2018  15:41 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | wants to have SNO for hot days over 108-... |
| 08/07/2018  09:20 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | WOUND CULTURE PANEL |
| 08/05/2018  15:14 | | Lab | ASPC-E COOK UNIT | Completed | |
| 07/26/2018  14:00 | | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Completed | Lump to right upper back, no drainage, s... |
| 07/26/2018  06:30 | | Dental - Routine Treatment | ASPC-E COOK UNIT | Completed | |
| 07/25/2018  16:08 | Routine | Nurse - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | |
| 06/21/2018  10:50 | | Lab | ASPC-E COOK UNIT | Completed | |
| 06/21/2018  09:40 | | Lab | ASPC-E COOK UNIT | Completed | |
| 06/18/2018  06:30 | | Dental - Routine Treatment | ASPC-E COOK UNIT | Completed | |
| 06/17/2018  13:30 | | Provider - Optometry | ASPC-E COOK UNIT | Scheduled | NP REFERRAL-V/A |
| 06/14/2018  08:05 | | Lab | ASPC-E COOK UNIT | Scheduled | |
| 06/11/2018  09:00 | | Provider - Chronic Care | ASPC-E COOK UNIT | Completed | CC-HTN CANCER HLD |

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 13

| Date | Type | Provider | Unit | Status | Notes |
|---|---|---|---|---|---|
| 01/29/2018_10:56 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U-FROM ICS-SAT ON CHAIR AND SLID OUT F... |
| 01/29/2018_08:00 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | Inmate had ICS on 1/27-on call HCP wants... |
| 12/28/2017_13:30 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | High blood pressure during BP checks and... |
| 12/20/2017_06:30 | | Dental - Routine Treatment | ASPC-E COOK UNIT | Completed | |
| 12/19/2017_10:10 | | Lab | ASPC-E COOK UNIT | Completed | |
| 12/19/2017_09:10 | | Lab | ASPC-E COOK UNIT | Completed | |
| 12/14/2017_08:00 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Completed | For Chronic pain, wants gabapentin renew... |
| 12/13/2017_06:00 | | Lab | ASPC-E COOK UNIT | Scheduled | |
| 12/09/2017_09:29 | | Provider - Chronic Care | ASPC-E COOK UNIT | Completed | CC-HTN,HDL,BCCA |
| 12/07/2017_14:52 | | X-Ray | ASPC-E COOK UNIT | Completed | This appointment was auto-generated by e... |
| 11/30/2017_16:05 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U-SNO RENEWAL |
| 11/27/2017_08:51 | | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Completed | requests to see HCP for pain management-... |
| 11/09/2017_10:34 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U-FEEL BURNING ON RIGHT SIDE FOR LIKE ... |
| 11/02/2017_10:30 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Scheduled | F/U-CHOKING WHEN EATING |

| Date | Type | Provider | Unit | Status | Notes |
|---|---|---|---|---|---|
| 11/09/2017_10:34 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U-FEEL BURNING ON RIGHT SIDE FOR LIKE ... |
| 11/02/2017_10:30 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Scheduled | F/U-CHOKING WHEN EATING |
| 11/01/2017_08:59 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | Please see pt, adamant for PL for burnin... |
| 10/22/2017_07:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Scheduled | F/U-BOIL ON BACK |
| 10/11/2017_09:02 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Scheduled | F/U-DISCONTINUE MELOXICAM, "ICE IS BETTE... |
| 10/10/2017_07:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Pending | F/U-DISCONTINUE MELOXICAM, "ICE IS BETTE... |
| 10/05/2017_07:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Pending | F/U-DISCONTINUE MELOXICAM-ICE IS BETTER |
| 09/22/2017_16:10 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | Please see pt,  requesting PI to di... |
| 09/14/2017_07:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U-BOIL ON BACK |
| 08/30/2017_06:30 | | Dental - Routine Treatment | ASPC-E COOK UNIT | Completed | |
| 08/27/2017_08:45 | | Lab | ASPC-E COOK UNIT | Completed | |
| 08/27/2017_07:35 | | Lab | ASPC-E COOK UNIT | Completed | |
| 08/21/2017_08:03 | | Lab | ASPC-E COOK UNIT | Completed | |
| 08/21/2017_07:00 | | Lab | ASPC-E COOK UNIT | Scheduled | |

//

//

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 14

██████████, 269335, **Meadows Unit**, reported that he was turned away from the clinic in July and August 2018 after receiving a written notice to come to the clinic for a provider appointment.  His medical record confirms that on May 30, 2018, July 18, 2018, and October 15, 2018, he was scheduled but not seen by the provider for an ordered follow-up appointment, evaluation for orthotics, and for an injured right foot, respectively.



██████████, **Meadows Unit**, reported that on Saturday, January 19, 2019, he received a pass to go to the clinic for Provider's Line regarding a possible broken rib. He reported that he was told when he got to the clinic that he had been taken off the list and that he would be scheduled for follow up on Monday, January 21, 2019, but that did not occur.

Mr. ██████'s medical record confirms the provider appointment did not occur on January 19, 2019, (nor was he actually rescheduled) and shows a similar pattern in November 2018 where he was scheduled to see the provider on November 8, 2018 for shortness of breath but actually was not seen on provider line until November 17, 2018, because "no provider showed."

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 15



ADC #: ▮▮▮▮▮▮   Inmate Name: ▮▮▮▮▮▮▮▮

ENCOUNTER DATE: 11/17/2018   TIME: 09:40:43   DURATION: minutes   TYPE: Provider - Sick Call - Scheduled
LOCATION: ASPC-E MEADOWS MED [A44]   SETTING: Clinic

S   Are interpreter services needed for this inmate: No
NOTES:

TimeStamp: 17 November 2018 09:40:58 --- User: Margaret Salas (SALMA01)
Breathing issues. Was on Provider line on Thurs but no provider showed.
Denies CP N/V/D
c/o SOB

     ▮▮▮▮▮▮▮▮▮▮▮▮ **Cook Unit**, reported that in June, September, and November 2018, he was told to come to the clinic for a provider appointment, but upon arrival was sent back to his housing unit.  His medical record confirmed that he had appointments those months that were scheduled but not completed.  (His record also shows that a lab draw originally scheduled for October 8, 2018, did not occur until October 20, 2018).

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 16



**Cook Unit**, reported that on three separate occasions since the summer of 2018, he was given a slip to come to the clinic, but then upon arrival was told he was not on the list to be seen after all, and that he would be rescheduled.

His medical record confirms his report, and documents violations of PM 42 and PM 52. It shows that he was scheduled to be seen on August 13, 2018 by the provider to follow up on an August 2, 2018 appointment, but this did not occur, in violation of PM 42. He was then scheduled for August 27, 2018 with the provider, but this again is listed as "Scheduled" and not "Completed." Finally, he was scheduled for a follow up to an off-site encounter on December 7, 2018, but he did not see the provider until January 9, 2019, in violation of PM 52.

//

//

//

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 17



**, Cook Unit**, reported a history of pneumonia and COPD and reported that he had not seen a provider since November 2018 for coughing up blood and shortness of breath.[6] As detailed in the February 5, 2019 advocacy letter we sent you regarding his need for a follow up provider encounter, he was not seen for follow-up or sick call provider appointments scheduled for December 7, 2018, January 7, 2019, and February 4, 2019.

It was only on February 8, 2019, after we notified Defendants, that he was finally seen by a provider for his chronic care appointment. Mr. _____' record shows this pattern of scheduled and inexplicably uncompleted encounters also occurred in April, June, and November 2018.

//

---

[6] Our office previously notified you of delays in his care and failure to have follow up appointments. *See* 2/5/19 Letter from A. Norris and T. Nosewicz to T. Bojanowski.

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 18



| | | | | | |
|---|---|---|---|---|---|
| 02/08/2019_07:00 | | Provider - Chronic Care | ASPC-E COOK UNIT | Completed | CC-RESP COCCI |
| 02/04/2019_07:32 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | Shortness of breath |
| 01/07/2019_08:00 | Routine | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | None |
| 01/05/2019_15:30 | Routine | Nurse - Sick Call - Scheduled | ASPC-E COOK UNIT | Completed | |
| 12/07/2018_09:30 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Scheduled | 2 WEEK F/U FOR SOB COUGHING UP BLOOD |
| 12/06/2018_08:00 | | X-Ray | ASPC-E COOK UNIT | Completed | This appointment was auto-generated by e... |
| 11/23/2018_15:12 | | Lab | ASPC-E COOK UNIT | Completed | |
| 11/23/2018_15:02 | | Lab | ASPC-E COOK UNIT | Completed | |
| 11/23/2018_14:02 | | Lab | ASPC-E COOK UNIT | Cancelled | |
| 11/23/2018_08:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | SOB, SPITTING UP BLOOD |
| 11/23/2018_07:00 | | Lab | ASPC-E COOK UNIT | Completed | None |
| 11/13/2018_19:53 | | X-Ray | ASPC-E COOK UNIT | Completed | This appointment was auto-generated by e... |
| 11/12/2018_09:00 | | Lab | ASPC-E COOK UNIT | Scheduled | |
| 11/12/2018_08:00 | | Lab | ASPC-E COOK UNIT | Scheduled | |

| | | | | | |
|---|---|---|---|---|---|
| 07/19/2018_08:30 | | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Completed | renewal of pain meds |
| 07/16/2018_09:27 | Routine | Nurse - Sick Call - Scheduled | ASPC-E COOK UNIT | Completed | |
| 06/19/2018_12:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Scheduled | Inmate requesting biopsy results. |
| 06/18/2018_08:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | BIOPSY RESULTS |
| 06/08/2018_13:15 | | Provider - Chronic Care | ASPC-E COOK UNIT | Completed | CC-COPD |
| 05/14/2018_13:36 | | Lab | ASPC-E COOK UNIT | Completed | wk of 05/14/2018 |
| 04/30/2018_08:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U from return from hospital |
| 04/27/2018_18:30 | | X-Ray | ASPC-E COOK UNIT | Completed | This appointment was auto-generated by e... |
| 04/27/2018_09:00 | Routine | Provider - Follow Up Care | ASPC-E COOK UNIT | Cancelled | SP hospital d/c for Right lung biopsy do... |
| 04/27/2018_08:00 | | Nurse - Sick Call - Scheduled | ASPC-E COOK UNIT | Scheduled | |
| 04/04/2018_07:34 | | Provider - Sick Call - Scheduled | ASPC-E COOK UNIT | Completed | L hip pain |
| 01/31/2018_09:05 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U-RADIOLOGY ORDERED-SHOWS NEOPLASM |
| 01/30/2018_08:00 | | Provider - Follow Up Care | ASPC-E COOK UNIT | Completed | F/U-LAB RESULTS**completed at 1/31 visit |
| 01/27/2018_10:50 | | X-Ray | ASPC-E COOK UNIT | Completed | This appointment was auto-generated by e... |

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 19

Again, this is not an exhaustive list of interviewees whose medical record confirm such problems. If you desire a complete list of people with this problem of uncompleted scheduled encounters, we will be happy to provide it to you.

## Use of Detention and Maximum Custody Units for Medical Isolation

We have previously notified you of our concern when class members are housed in isolation ("transitory") units, maximum custody units, and/or detention units ostensibly for medical reasons, but in conditions that compromise patient safety. It is unclear whether this is a function of Defendants' failure to have an appropriate number of outpatient or skilled nursing units, but it is seen most frequently in the context of people who have their jaws wired shut, or who have scabies. Plaintiffs' counsel and our experts have notified you during recent tours at Lewis and Tucson that this is a dangerous practice, especially since orthodontic wire cutters are not in the units. On this tour, we again met several class members housed at SMU-I because they had broken jaws (for example, ███████████        ██████████████). The officers in the unit reported that people whose jaws are wired shut are in the unit for "medical watch." Our investigator asked the custody officers to show her what equipment they had on hand in case of emergency if these men started to choke, and the wires in their jaws needed to be cut. She was shown the following tools, which were photographed at ADCM1558926:



Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
ASPC-Eyman Tour 1/24-25/2019
February 21, 2019
Page 20

These tools are identical to the tools photographed at ASPC-Tucson after Dr. Todd Wilcox asked to see the orthodontic wirecutters available to staff for emergencies. *See* ADCM1556902. As Dr. Wilcox noted during our visit at Tucson, the pictured tools are not orthodontic wire cutters. This same problem came up during our visit to the Lewis Stiner Detention Unit in November 2018.

**We request that proper orthodontic wire cutters immediately be made available on the unit and any other unit where people on "medical watch" due to a broken jaw may be housed**.

Thank you for your attention to these matters.

Sincerely,

Corene Kendrick, Staff Attorney

cc:     Counsel of Record

# Attachment A

**Arizona Monthly Staffing Report**
**Eyman Region**

**October 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Contract Breakdown | | | | | |
| Medical Director | 1.00 | 1.00 | 100% | 1.00 | - | - | - | 1.00 | 100% |
| Staff Physician | 1.00 | 1.00 | 100% | 0.94 | - | - | - | 0.94 | 94% |
| Nurse Practitioner | 5.00 | 4.00 | 80% | 3.44 | - | 0.14 | - | 3.58 | 72% |
| Facility Health Administrator | 1.00 | 1.00 | 100% | 1.22 | - | - | - | 1.22 | 122% |
| DON | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Asst. DON | 6.20 | 6.00 | 97% | 6.21 | - | - | - | 6.21 | 100% |
| Assistant F.H.A. | 1.00 | 1.00 | 100% | 1.22 | - | - | 0.07 | 1.29 | 129% |
| RN | 20.40 | 10.75 | 53% | 12.78 | - | 1.51 | 0.74 | 15.03 | 74% |
| LPN | 31.00 | 23.20 | 75% | 23.04 | - | 2.92 | 0.07 | 26.04 | 84% |
| Nursing Assistant | 8.60 | 6.50 | 76% | 7.39 | - | 0.66 | - | 8.05 | 94% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.92 | - | 0.05 | - | 0.97 | 97% |
| Lead Inventory Coordinator | 1.00 | 1.00 | 100% | 0.91 | - | 0.01 | - | 0.92 | 92% |
| Inventory Coordinator | 3.00 | 3.00 | 100% | 3.02 | - | 0.14 | - | 3.16 | 105% |
| Secretary / Administrative Assistant | 2.00 | 3.00 | 150% | 1.57 | - | 0.15 | - | 1.72 | 86% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.82 | - | - | - | 0.82 | 82% |
| Med Records Clerk | 4.00 | 4.00 | 100% | 3.79 | - | 0.24 | - | 4.02 | 101% |
| Scheduler | 0.50 | 1.00 | 200% | 0.77 | - | 0.21 | - | 0.99 | 198% |
| Chronic Care Scheduler | 1.00 | 1.00 | 100% | 0.99 | - | 0.19 | - | 1.18 | 118% |
| Clinical Coordinator | 0.50 | 1.00 | 200% | 1.04 | - | 0.75 | - | 1.79 | 358% |
| Dental Director | 1.00 | 1.00 | 100% | - | - | - | - | - | 0% |
| Dentist | 2.25 | 2.50 | 111% | 2.87 | - | - | - | 2.87 | 127% |
| Dental Hygienist | 0.20 | - | 0% | 0.22 | - | - | - | 0.22 | 109% |
| Dental Assistant | 5.00 | 5.00 | 100% | 3.91 | - | - | - | 3.91 | 78% |
| Psychiatric Director | - | | 0% | 0.17 | - | - | - | 0.17 | 0% |
| Psychiatrist | 2.00 | 2.00 | 100% | 1.23 | - | - | - | 1.23 | 61% |
| Lead Psychologist | | | | - | - | - | - | - | 0% |
| Psychologist - Clinical | 3.00 | 3.00 | 100% | 2.51 | - | - | - | 2.51 | 84% |
| MH Director (PH.D) | - | | 0% | - | - | - | - | - | 0% |
| MH Clerk | 1.00 | 1.00 | 100% | 0.92 | - | 0.02 | - | 0.95 | 95% |
| MH Nurse Practitioner | 1.50 | 0.50 | 33% | 1.27 | - | - | - | 1.27 | 85% |
| MH RN | 2.00 | 0.90 | 45% | 2.99 | - | 0.07 | - | 3.05 | 153% |
| Lead Psych Associates | 1.00 | 1.00 | 100% | 0.97 | - | - | - | 0.97 | 97% |
| Psych Associates - Clinical | 11.00 | 10.75 | 98% | 8.59 | - | - | - | 8.59 | 78% |
| Psych Tech | 4.00 | 4.00 | 100% | 3.51 | - | 0.07 | - | 3.58 | 89% |
| Release / Discharge Planner | 1.00 | 1.00 | 100% | 1.00 | - | - | - | 1.00 | 100% |
| Healthcare Delivery Facilitator | 1.00 | - | 0% | 0.23 | - | - | - | 0.23 | 23% |
| Total Contract | 126.15 | 103.10 | 82% | 101.47 | 0.00 | 7.12 | 0.89 | 109.47 | 87% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column   3 of 11

0.00

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

Eyman

ADCM1546315

**Arizona Monthly Staffing Report**

**Eyman Region**

**November 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | 1.00 | 100% | 0.95 | - | - | - | 0.95 | 95% |
| Staff Physician | 1.00 | 1.00 | 100% | 0.88 | - | - | - | 0.88 | 88% |
| Nurse Practitioner | 5.00 | 3.00 | 60% | 4.30 | - | 0.15 | - | 4.45 | 89% |
| Facility Health Administrator | 1.00 | 1.00 | 100% | 0.86 | - | - | - | 0.86 | 86% |
| DON | 1.00 | 1.00 | 100% | 0.78 | - | - | - | 0.78 | 78% |
| Asst. DON | 6.20 | 3.00 | 48% | 3.24 | - | - | - | 3.24 | 52% |
| Assistant F.H.A. | 1.00 | 1.00 | 100% | 1.37 | - | - | - | 1.37 | 137% |
| RN | 20.40 | 8.23 | 40% | 11.46 | - | 1.88 | 0.92 | 14.26 | 70% |
| LPN | 31.00 | 22.30 | 72% | 23.70 | - | 3.10 | - | 26.80 | 86% |
| Nursing Assistant | 8.60 | 7.50 | 87% | 6.68 | - | 0.90 | - | 7.58 | 88% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.69 | - | 0.03 | - | 0.72 | 72% |
| Lead Inventory Coordinator | 1.00 | 1.00 | 100% | 0.95 | - | 0.12 | - | 1.07 | 107% |
| Inventory Coordinator | 3.00 | 3.00 | 100% | 2.67 | - | 0.10 | - | 2.77 | 92% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 1.91 | - | 0.20 | - | 2.12 | 106% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.76 | - | - | - | 0.76 | 76% |
| Med Records Clerk | 4.00 | 4.00 | 100% | 3.51 | - | 0.19 | - | 3.70 | 93% |
| Scheduler | 0.50 | - | 0% | 0.83 | - | 0.10 | - | 0.93 | 185% |
| Chronic Care Scheduler | 1.00 | 1.00 | 100% | 0.78 | - | 0.23 | - | 1.01 | 101% |
| Clinical Coordinator | 0.50 | 1.00 | 200% | 0.91 | - | 0.33 | - | 1.24 | 248% |
| Dental Director | 1.00 | 1.00 | 100% | - | - | - | - | - | 0% |
| Dentist | 2.25 | 2.25 | 100% | 2.78 | - | - | - | 2.78 | 124% |
| Dental Hygienist | 0.20 | - | 0% | 0.18 | - | - | - | 0.18 | 91% |
| Dental Assistant | 5.00 | 5.00 | 100% | 4.13 | - | - | - | 4.13 | 83% |
| Psychiatric Director | - | | 0% | - | - | - | - | - | 0% |
| Psychiatrist | 2.00 | 2.00 | 100% | 1.80 | - | - | - | 1.80 | 90% |
| Lead Psychologist | - | | 0% | - | - | - | - | - | 0% |
| Psychologist - Clinical | 3.00 | 3.00 | 100% | 2.59 | - | - | - | 2.59 | 86% |
| MH Director (PH.D) | - | | 0% | - | - | - | - | - | 0% |
| MH Clerk | 1.00 | 1.00 | 100% | 0.86 | - | 0.04 | - | 0.90 | 90% |
| MH Nurse Practitioner | 1.50 | 0.50 | 33% | 0.57 | - | - | - | 0.57 | 38% |
| MH RN | 2.00 | 1.90 | 95% | 2.62 | - | 0.03 | - | 2.64 | 132% |
| Lead Psych Associates | 1.00 | 1.00 | 100% | 0.95 | - | - | - | 0.95 | 95% |
| Psych Associates - Clinical | 11.00 | 10.00 | 91% | 8.28 | - | - | - | 8.28 | 75% |
| Psych Tech | 4.00 | 4.00 | 100% | 3.43 | - | 0.02 | - | 3.45 | 86% |
| Release / Discharge Planner | 1.00 | 1.00 | 100% | 0.95 | - | - | - | 0.95 | 95% |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 100% | 0.21 | - | - | - | 0.21 | 21% |
| Total Contract | 126.15 | 96.68 | 77% | 96.62 | 0.00 | 7.42 | 0.92 | 104.95 | 83% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

0.00

ADCM1550414

**Arizona Monthly Staffing Report**

**Eyman Region**

**December 2018**

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | 1.00 | 100% | 0.76 | - | - | - | 0.76 | 76% |
| Staff Physician | 1.00 | 1.00 | 100% | 0.76 | - | - | - | 0.76 | 76% |
| Nurse Practitioner | 5.00 | 4.00 | 80% | 5.25 | - | 0.09 | - | 5.34 | 107% |
| Facility Health Administrator | 1.00 | 1.00 | 100% | 1.03 | - | - | - | 1.03 | 103% |
| DON | 1.00 | 1.00 | 100% | 0.76 | - | - | - | 0.76 | 76% |
| Asst. DON | 6.20 | 2.00 | 32% | 1.51 | - | - | - | 1.51 | 24% |
| Assistant F.H.A. | 1.00 | 1.00 | 100% | 1.45 | - | - | - | 1.45 | 145% |
| RN | 20.40 | 8.23 | 40% | 11.48 | - | 1.97 | 1.02 | 14.47 | 71% |
| LPN | 31.00 | 21.30 | 69% | 23.72 | - | 2.81 | - | 26.54 | 86% |
| Nursing Assistant | 8.60 | 6.50 | 76% | 6.17 | - | 0.79 | - | 6.96 | 81% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.85 | - | 0.02 | - | 0.86 | 86% |
| Lead Inventory Coordinator | 1.00 | 1.00 | 100% | 0.83 | - | 0.01 | - | 0.84 | 84% |
| Inventory Coordinator | 3.00 | 3.00 | 100% | 2.32 | - | 0.14 | - | 2.46 | 82% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 1.66 | - | 0.27 | - | 1.93 | 96% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.82 | - | - | - | 0.82 | 82% |
| Med Records Clerk | 4.00 | 4.00 | 100% | 3.39 | - | 0.21 | - | 3.60 | 90% |
| Scheduler | 0.50 | - | 0% | 0.94 | - | 0.26 | - | 1.20 | 240% |
| Chronic Care Scheduler | 1.00 | 1.00 | 100% | 1.01 | - | 0.23 | - | 1.25 | 125% |
| Clinical Coordinator | 0.50 | 2.00 | 400% | 1.07 | - | 0.56 | - | 1.63 | 326% |
| Dental Director | 1.00 | 1.00 | 100% | 0.64 | - | - | - | 0.64 | 64% |
| Dentist | 2.25 | 2.25 | 100% | 1.98 | - | - | - | 1.98 | 88% |
| Dental Hygienist | 0.20 | - | 0% | 0.20 | - | - | - | 0.20 | 100% |
| Dental Assistant | 5.00 | 5.00 | 100% | 3.94 | - | - | - | 3.94 | 79% |
| Psychiatric Director | - | | 0% | - | - | - | - | - | 0% |
| Psychiatrist | 2.00 | 2.00 | 100% | 2.02 | - | - | - | 2.02 | 101% |
| Lead Psychologist | | | | - | - | - | - | - | 0% |
| Psychologist - Clinical | 3.00 | 2.00 | 67% | 2.43 | - | - | - | 2.43 | 81% |
| MH Director (PH.D) | - | | 0% | - | - | - | - | - | 0% |
| MH Clerk | 1.00 | 1.00 | 100% | 0.80 | - | - | - | 0.80 | 80% |
| MH Nurse Practitioner | 1.50 | 0.50 | 33% | 0.89 | - | - | - | 0.89 | 60% |
| MH RN | 2.00 | 1.90 | 95% | 2.88 | - | 0.00 | - | 2.88 | 144% |
| Lead Psych Associates | 1.00 | 1.00 | 100% | 0.67 | - | - | - | 0.67 | 67% |
| Psych Associates - Clinical | 11.00 | 10.00 | 91% | 7.55 | - | - | - | 7.55 | 69% |
| Psych Tech | 4.00 | 4.00 | 100% | 3.10 | - | 0.02 | - | 3.13 | 78% |
| Release / Discharge Planner | 1.00 | 1.00 | 100% | 0.88 | - | - | - | 0.88 | 88% |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 100% | 0.87 | - | - | - | 0.87 | 87% |
| Total Contract | 126.15 | 94.68 | 75% | 94.65 | 0.00 | 7.38 | 1.02 | 103.04 | 82% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

ADCM1555107

**Arizona Monthly Staffing Report**
**Eyman Region**

January 2019

| Position | Corizon Contract SCD | Corizon Filled FTEs | % of Contract Fill Rate | Corizon Employee (Includes PRN) FTEs | Corizon PRN FTEs | Corizon Employee Overtime FTEs | Agency / Locum FTEs | Total FTEs | % of Operating Fill Rate |
|---|---|---|---|---|---|---|---|---|---|
| Medical Director | 1.00 | 1.00 | 100% | 0.96 | - | - | - | 0.96 | 96% |
| Staff Physician | 1.00 | 1.00 | 100% | 0.70 | - | - | - | 0.70 | 70% |
| Nurse Practitioner | 5.00 | 4.00 | 80% | 5.50 | - | 0.06 | - | 5.56 | 111% |
| Facility Health Administrator | 1.00 | 1.00 | 100% | 0.97 | - | - | - | 0.97 | 97% |
| DON | 1.00 | - | 0% | - | - | - | - | - | 0% |
| Asst. DON | 6.20 | 1.00 | 16% | 0.79 | - | - | - | 0.79 | 13% |
| Assistant F.H.A. | 1.00 | 1.00 | 100% | 1.34 | - | - | - | 1.34 | 134% |
| RN | 20.40 | 8.30 | 41% | 14.62 | - | 1.68 | 0.63 | 16.93 | 83% |
| LPN | 31.00 | 22.30 | 72% | 20.93 | - | 2.22 | - | 23.15 | 75% |
| Nursing Assistant | 8.60 | 7.50 | 87% | 7.02 | - | 0.55 | - | 7.57 | 88% |
| X Ray Tech | 1.00 | 1.00 | 100% | 0.85 | - | 0.02 | - | 0.87 | 87% |
| Lead Inventory Coordinator | 1.00 | 2.00 | 200% | 0.99 | - | 0.15 | - | 1.14 | 114% |
| Inventory Coordinator | 3.00 | 3.00 | 100% | 2.85 | - | 0.06 | - | 2.90 | 97% |
| Secretary / Administrative Assistant | 2.00 | 2.00 | 100% | 0.98 | - | 0.07 | - | 1.05 | 52% |
| Med Records Supervisor | 1.00 | 1.00 | 100% | 0.91 | - | - | - | 0.91 | 91% |
| Med Records Clerk | 4.00 | 4.00 | 100% | 3.40 | - | 0.22 | - | 3.62 | 91% |
| Scheduler | 0.50 | - | 0% | 1.03 | - | 0.22 | - | 1.25 | 251% |
| Chronic Care Scheduler | 1.00 | 1.00 | 100% | 0.82 | - | 0.09 | - | 0.91 | 91% |
| Clinical Coordinator | 0.50 | 2.00 | 400% | 1.44 | - | 0.27 | - | 1.71 | 342% |
| Dental Director | 1.00 | 1.00 | 100% | 0.95 | - | - | - | 0.95 | 95% |
| Dentist | 2.25 | 2.25 | 100% | 1.79 | - | - | - | 1.79 | 79% |
| Dental Hygienist | 0.20 | - | 0% | 0.17 | - | - | - | 0.17 | 87% |
| Dental Assistant | 5.00 | 5.00 | 100% | 4.29 | - | - | - | 4.29 | 86% |
| Psychiatric Director | - | | 0% | - | - | - | - | - | 0% |
| Psychiatrist | 2.00 | 2.00 | 100% | 2.07 | - | - | - | 2.07 | 103% |
| Lead Psychologist | | | | - | - | - | - | - | 0% |
| Psychologist - Clinical | 3.00 | 2.00 | 67% | 1.80 | - | - | - | 1.80 | 60% |
| MH Director (PH.D) | - | | 0% | - | - | - | - | - | 0% |
| MH Clerk | 1.00 | 1.00 | 100% | 0.87 | - | 0.04 | - | 0.91 | 91% |
| MH Nurse Practitioner | 1.50 | 1.00 | 67% | 0.77 | - | - | - | 0.77 | 51% |
| MH RN | 2.00 | 2.00 | 100% | 3.11 | - | 0.18 | - | 3.29 | 164% |
| Lead Psych Associates | 1.00 | 1.00 | 100% | 1.04 | - | - | - | 1.04 | 104% |
| Psych Associates - Clinical | 11.00 | 10.00 | 91% | 8.36 | - | - | - | 8.36 | 76% |
| Psych Tech | 4.00 | 4.00 | 100% | 3.52 | - | 0.04 | - | 3.56 | 89% |
| Release / Discharge Planner | 1.00 | 1.00 | 100% | 0.88 | - | - | - | 0.88 | 88% |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 100% | 0.91 | - | - | - | 0.91 | 91% |
| Total Contract | 126.15 | 96.35 | 76% | 96.60 | 0.00 | 5.88 | 0.63 | 103.11 | 82% |

PRN FTEs are included with the Staff FTEs in the Corizon Employee (Includes PRN) FTEs column

0.00

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1560368

# Exhibit 7

# (Redacted)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Ashlee B. Hesman
480.420.1631
ahesman@strucklove.com

March 25, 2019

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

<div style="margin-left:2em">

Re:     ***Parsons v. Ryan***
        **Plaintiffs' Monitoring tour – ASPC-Eyman (01/24 – 01/25/2019)**

</div>

Dear Corene:

We are in receipt of your February 21, 2019 correspondence regarding Plaintiffs' January 24-25, 2019 tour of ASPC-Eyman.

**Nursing Staff**

Both Corizon and ADC have, and will continue to, made every effort to recruit and retain FTE nursing staff to fill positions at ASPC-Eyman. Corizon's efforts include, but are not limited to, the following:

- Expansion of onboarding classes at the regional office to four full days.  This year, 55 nurses have completed the class
- Offering referral bonuses for employees who refer nurses to Corizon
- Discussions with Florence Hospital regarding the possible creation of a co-op of PRN staff
- Meetings with multiple nursing schools to discuss recruitment
- Addition of second clinical recruiter in January
- Utilization of agency nurses.  This has resulted in 25 hires in the last 60 days.
- Mailing of approximately 3,000 recruitment postcards in the Florence area over the last month

Corene Kendrick
March 25, 2019
Page 2

**Individual Inmate Allegations**

████████████████ ):  This inmate was seen on December 3, 2018 and several consults for offsite specialty appointments were submitted:

- December 10, 2018:  urgent general surgery (ATP on December 19, 2018)
- December 20, 2018: urgent general surgery (completed on February 21, 2019)
- January 14, 2019:  urgent ultrasound (completed on February 12, 2019)
- March 4, 2019:  urgent general surgery and Hem/Onc (referred to UM)
- March 6, 2019:  urgent PET/CT scan consult submitted (referred to UM)

Additionally, on February 21, 2019, a fine needle aspiration of the mass was completed.

████████████████ He was seen on February 27, 2019 to discuss his February 19, 2019 urology ATP.  On this same date, a radiology consult for post-residual testing was submitted.

████████████ ):  He was seen on sick call line on August 27, 2018.  He had a chronic care appointment on February 27, 2019.  He was seen by dental on January 16, 2019.

████████████ ):  On September 12, 2018, an ATP was issued for the orthopedic consult for his non-displaced second metatarsal fracture.  He was seen on January 27, 2019 and received repeat x-rays of his right foot which confirmed the fracture had healed and that the alignment remained satisfactory.

████████████████ He was seen on March 9, 2019 and had no complaints.

████████████████ He had a chronic care appointment on June 17, 2018.  On September 17, 2018, a provider reviewed his HNR requesting renewal of medication, and his medication was renewed.  The appointment for his lab results was completed on December 5, 2018.

████████████████ Despite your allegations, his record does not document violations of PMs 42 and 52.  During his August 2, 2018 encounter, the provider advised him to return to clinic as needed.  Because there is no specific follow up ordered, PM 42 is not applicable.  On November 30, 2018, he returned from an offsite ENT appointment with a recommendation for a hearing aid fitting.  An audiology consult was submitted on December 4, 2018.  This complies with PM 52.

████████████████ As you state, he was seen on February 8, 2019.

Corene Kendrick
March 25, 2019
Page 3

**<u>Orthodontic Wire Cutters</u>**

Proper orthodontic wire cutters are available on all units where inmates with a broken jaw may be housed.

Sincerely,

Ashlee B. Hesman

ABF/eap

cc:    Counsel of record

Exhibit 8

(Redacted)

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



May 1, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

Re:   *Parsons v. Ryan*
      **Notice of Substantial Noncompliance**

Dear Tim:

**AMERICAN
CIVIL LIBERTIES
UNION
FOUNDATION**

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW\**

*\*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS*

Pursuant to Paragraph 30 of the Stipulation, Plaintiffs serve this Notice of
Substantial Noncompliance regarding the following Performance Measures (PMs)
at ASPC-Eyman:  PM 73, 76, 80, 81, 82, 83, 84, 85, 86, 87, 88, 92, 94, and 95.

Each of these Performance Measures requires that the patient be "seen" by mental
health staff.  That term is defined in the Stipulation as follows:

> Interaction between a patient and a Medical Provider, Mental
> Health Provider or Mental Health Clinician that involves a
> treatment and/or exchange of information in a confidential
> setting. With respect to Mental Health staff, means an
> encounter that takes place in a confidential setting outside the
> prisoner's cell, unless the prisoner refuses to exit his or her cell
> for the encounter.

Doc. 1185-1 at 5.

Unfortunately, it is clear that many, if not most, encounters with mental health staff
are so brief and perfunctory as to be meaningless.  Our review found an abundance
of encounters that, according to the mental health staff person's note in eOMIS,
lasted 5 minutes or less:

████████████████████ (12/23/18, 5 minutes; 12/25/18, 5 minutes; 12/30/18,
5 minutes)

████████████████ (12/30/18, 5 minutes)

████████████████ (12/23/18, 5 minutes; 12/25/18, 5 minutes; 12/30/18, 5
minutes; 1/6/19, 5 minutes; 1/27/19, 5 minutes)

████████████████ (11/4/18, 5 minutes; 12/16/18, 5 minutes; 12/23/18, 5
minutes; 12/25/18, 5 minutes; 12/30/18, 5 minutes; 1/6/19, 5 minutes; 1/13/19, 5
minutes; 1/20/19, 5 minutes; 1/21/19, 5 minutes; 1/27/19, 5 minutes)

██████████████ (11/4/18, 5 minutes, 11/11/18, 5 minutes; 12/2/18, 5 minutes; 12/16/18, 5 minutes; 12/23/18, 5 minutes; 12/30/18, 5 minutes; 1/6/19, 5 minutes; 1/13/19, 5 minutes; 1/20/19, 5 minutes; 1/21/19, 5 minutes; 1/27/19, 5 minutes; 2/10/19, 5 minutes)

██████████████ (12/2/18, 5 minutes; 12/9/18, 5 minutes; 12/23/18, 5 minutes; 12/30/18, 5 minutes)

██████████████ (11/4/18, 5 minutes; 11/11/18, 5 minutes; 11/18/18, 5 minutes; 11/25/18, 5 minutes; 12/2/18, 5 minutes; 12/9/18, 5 minutes; 12/16/18, 5 minutes; 12/23/18, 5 minutes; 12/25/18, 5 minutes; 12/30/18, 5 minutes; 1/6/19, 5 minutes; 1/13/19, 5 minutes; 1/20/19, 5 minutes; 1/21/19, 5 minutes; 1/27/19, 5 minutes; 2/3/19, 5 minutes; 2/10/19, 5 minutes; 2/17/19, 5 minutes; 2/24/19, 5 minutes)

██████████████ (12/9/18, 5 minutes; 12/23/18, 5 minutes; 12/25/18, 5 minutes; 1/6/19, 5 minutes; 1/20/19, 5 minutes; 1/21/19, 5 minutes)

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

██████████████ (12/30/18, 5 minutes)

██████████████ (11/8/18, 2 minutes; 11/25/18, 5 minutes; 12/2/18, 5 minutes; 12/9/18, 5 minutes; 12/16/18, 5 minutes; 12/23/18, 5 minutes; 12/25/18, 5 minutes; 12/30/18, 5 minutes; 1/6/19, 5 minutes; 1/13/19, 5 minutes; 1/20/19, 5 minutes; 1/21/19, 5 minutes)

██████████████ (2/9/19, 5 minutes; 2/19/19, 3 minutes; 4/29/19, 3 minutes)

██████████████ (12/9/18, 5 minutes; 12/16/18, 5 minutes; 12/23/18, 5 minutes; 12/25/18, 5 minutes; 12/30/18, 5 minutes; 1/6/19, 5 minutes; 1/13/19, 5 minutes; 1/20/19, 5 minutes; 1/21/19, 5 minutes; 1/27/19, 5 minutes; 2/3/19, 5 minutes; 2/10/19, 5 minutes; 2/24/19, 5 minutes; 3/10/19, 5 minutes; 3/16/19, 5 minutes; 3/17/19, 5 minutes; 3/31/19, 5 minutes)

██████████████ (12/30/18, 5 minutes)

██████████████ (12/23/18, 5 minutes; 12/30/18, 5 minutes; 1/27/19, 5 minutes; 2/24/19, 5 minutes; 2/27/19, 5 minutes; 4/6/19, 5 minutes; 4/7/19, 5 minutes; 4/14/19, 5 minutes)

██████████████ (11/4/18, 5 minutes; 11/18/19, 5 minutes; 11/25/18, 5 minutes; 12/2/18, 5 minutes; 12/16/18, 5 minutes; 12/23/18, 5 minutes; 12/30/18, 5 minutes; 1/27/19, 5 minutes; 2/10/19, 5 minutes; 2/17/19, 5 minutes)

Many – although not all – of these brief and perfunctory encounters were the daily contacts with patients on suicide watch required by PM 94.

The relevant eOMIS notes are attached as Exhibit 1.

Five minutes – or three minutes, or two minutes – is not sufficient time in which to provide mental health treatment.  It is certainly not sufficient time in which to make the critically important judgment whether a patient is at risk of killing himself.  *See* Doc. 2091 at 3 (patient killed himself a few hours after being taken off suicide watch); Exhibit 2 (████████████████████████ taken off suicide watch after 3-minute encounter and killed herself four days later).

We look forward to your response within 30 days as required by the Stipulation.

Very truly yours,

David C. Fathi

**AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION**

Enclosures

Cc:     All counsel

3

Exhibit 9

(Redacted)

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



April 22, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS

Re:   *Parsons v. Ryan*
      **Notice of Substantial Noncompliance**

Dear Tim:

Pursuant to Paragraph 30 of the Stipulation, Plaintiffs serve this Notice of Substantial Noncompliance regarding the following Performance Measures (PMs) at ASPC-Perryville:  PM 73, 74, 76, 80, 81, 82, 83, 84, 85, 86, 87, 88, 94, and 95.

Each of these Performance Measures requires that the patient be "seen" by mental health staff.  That term is defined in the Stipulation as follows:

> Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting. With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter.

Doc. 1185-1 at 5.

Unfortunately, it is clear that many, if not most, encounters with mental health staff are so brief and perfunctory as to be meaningless.  Our review found an abundance of encounters that, according to the mental health staff person's note in eOMIS, lasted 5 minutes or less.  For example:

████████████████████ (3/21/19, 5 minutes)
█████████████ (4/2/19, 5 minutes)
███████████████ (3/28/19, 5 minutes)
██████████████ (3/7/19, 5 minutes)
████████████████ (3/27/19, 5 minutes)
███████████████ (3/28/19, 5 minutes)
████████████████ (3/28/19, 2 minutes)
██████████████ (3/2/19, 5 minutes)
███████████████ (3/14/19, 5 minutes)
██████████████ (3/22/19, suicide watch encounter required by
PM 94 lasts 5 minutes)

████████████ (3/26/19, post-suicide watch encounter required by PM 95 lasts 5 minutes) ████████████ (4/19/19, 4 minutes)

Most disturbing, there were numerous cases in which a patient was moved to a lower level of suicide watch, or removed from watch entirely, after encounters that lasted 5 minutes or less, and in many cases were as brief as 2 minutes. On April 2, 2019, while touring Perryville, we observed psych associate Maira Sanchez conduct a cellfront interview with ████████████; the interview lasted 3 minutes and 35 seconds, at the conclusion of which Ms. Sanchez moved Ms. ████ from a 10-minute to a 30-minute watch. Other examples include:

████████████ (4/1/19, removed from suicide watch after 4-minute evaluation)

████████████ (4/1/19, removed from suicide watch after 2-minute evaluation; 4/4/19, removed from suicide watch after 5-minute evaluation)

████████████ (4/1/19, removed from suicide watch after 2-minute evaluation)

████████████ (3/27/19, removed from suicide watch after 4-minute evaluation)

████████████ (4/1/19, moved from 10-minute to 30-minute watch after 2-minute evaluation)

████████████ (4/1/19, moved from 10-minute to 30-minute watch after 2-minute evaluation)

████████████ (3/1/19, moved from 10-minute to 30-minute watch after 3-minute evaluation; 3/4/19, removed from suicide watch after 3-minute evaluation)

████████████ (4/13/19, moved from constant watch to 10-minute watch after 4-minute evaluation; 4/15/19, moved from 10-minute to 30-minute watch after 3-minute evaluation)

████████████ (3/6/19, moved from 10-minute to 30-minute watch after 5-minute evaluation)

████████████ (2/4/19, removed from suicide watch after 2-minute evaluation)

████████████ (3/8/19, moved from 10-minute to 30-minute watch after 4-minute evaluation; 3/11/19, removed from suicide watch after 2-minute evaluation)

████████████ (4/4/19, moved from 10-minute to 30-minute watch after 3-minute evaluation)

████████████ (2/27/19, removed from suicide watch after 3-minute evaluation)

████████████ (3/31/19, moved from 10-minute to 30-minute watch after 2-minute evaluation)

████████████ (4/1/19, moved from 10-minute to 30-minute watch after 2-minute evaluation; 4/3/19, removed from suicide watch after 3-minute evaluation)

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

2

███████████████████ (4/4/19, moved from 10-minute to 30-minute watch after 3-minute evaluation; 4/17/19, moved from 10-minute to 30-minute watch after 3-minute evaluation; 4/18/19, removed from suicide watch after 5-minute evaluation)

The relevant eOMIS notes are attached.

Five minutes – or three minutes, or two minutes – is not sufficient time in which to provide mental health treatment.  It is certainly not sufficient time in which to make the critically important judgment whether a patient is at risk of killing herself.  See Doc. 2091 at 3 (patient killed himself a few hours after being taken off suicide watch).

We look forward to your response within 30 days as required by the Stipulation.

Very truly yours,

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

David C. Fathi

Enclosures

Cc:     All counsel

3

# Exhibit 10

# (Redacted)



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

May 6, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

      RE:   *Parsons v. Ryan*, 2:12-CV-00601
             Tour of ASPC-Perryville (April 2-4, 2019)
             Notice of Noncompliance (Paragraph 8 of Stipulation)

Dear Mr. Bojanowski:

      I write regarding Plaintiffs' tour of ASPC-Perryville to inform you of of systemic problems and violations of the Stipulation that we identified while touring the facility April 2-4, 2019.  Since the tour we separately notified you of many class members with whom we met who are in urgent need of medical, mental health, and/or dental care, and we will continue to do so.

## I.    <u>Prenatal and Postnatal Medical Care</u>

      Prior to our visit, we identified as many women as possible who either are currently pregnant or recently gave birth and who were listed in recent CGARs for the three performance measures associated with prenatal and postnatal care: PM 57 (prenatal vitamins and diets ordered at intake); PM 58 (prenatal screening tests documented in medical record); and PM 74 (encounter with licensed mental health clinician within five working days of return from hospital post-partum).  We also identified all women listed in emergency transport and outside hospitalization logs who were sent out for prenatal care or delivery.

      During the tour, we spoke with approximately 25 women who were pregnant, or had delivered or miscarried in recent months.  All reported that the only additional food pregnant women receive is an extra peanut butter sandwich and carton of milk per day.  They also described an unbalanced diet lacking in vegetables, fruit, or other nutritious foods sources.  The women we interviewed who had miscarried or delivered in recent months reported Corizon did not provide adequate hygiene supplies to address post-partum bleeding, and that at most they were given only the thin panty liners provided to other women.  Finally, they reported that they

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 2

were housed in cells without air conditioning in the reception area at Santa Maria Unit, which in the seasonal heat endangers their health and safety.

We spoke with the following individuals who reported deficient and sometimes dangerous prenatal or postnatal care.  Their medical records document problematic treatment that implicate Paragraph 8 of the Stipulation ("Clinicians who exhibit a pattern and practice of substantially departing from the standard of care shall be subject to corrective action.").  Doc. 1185 ¶ 8.  **We hereby issue this letter as a Notice of Noncompliance with Paragraph 8 with regard to the medical care rendered by Dr. Enciso, and we expect a response within 30 days.**

███████████████   **Lumley Medium**

Ms. ████ reported that she suffered a miscarriage on December 17, 2018 when she was approximately 16-17 weeks pregnant.  The eOMIS record shows she saw OB/GYN Dr. Enciso on November 5, 2018 at Reception, when she was about 10 weeks pregnant.  She told Dr. Enciso, and he documented in her medical record, that she used heroin prior to incarceration. Despite this information, he did not submit any specialty consult for the methadone clinic, which is the ADC/Corizon policy and the medical standard of care for pregnant women who have used heroin. As seen in **Exhibit 1**, and shown below, Dr. Enciso never submitted such a consult request.

| Subjective Notes |
|---|
| f/u w Dr Enciso within 2w for PNC (BL 11/9/2018) |
|  23 years old female, G3 P2, first one vaginal delivery, second by C-section, here for prenatal check up. No complaint offered. Her menstruations were irregular  and she is not sure when her LMP was. No significant medical or surgical problem except for the C-section. She had OB ultrasound done while in jail in October 24, 2018 at 9-10 weeks, was told EDD of May 27, 2019. AG- 11 weeks. She smokes 5 cigarettes a day. She took heroin, meth before coming to prison. |

**Consultation Request** (1 - 5 of 5)

| Request Date | Request Type | Service Type | Procedure Requested | Priority | Request Status |
|---|---|---|---|---|---|
| 12/20/2018 | Off-site Clinic | OB-GYN |  | Urgent | Consult Completed- Practitioner Reviewed |
| 12/19/2018 | Off-site Clinic | Radiology | US Pregnancy After 1st Trimester | Urgent | Cancelled |
| 01/27/2017 | On-site Clinic | Behavioral Health |  | Emergency | Administratively Cleared |
| 01/27/2017 | On-site Clinic | Behavioral Health |  | Urgent | Administratively Cleared |
| 01/27/2017 | On-site Clinic | Behavioral Health |  | Routine | Administratively Cleared |

On December 17, 2019, she saw Dr. Enciso for a check up and QUAD test for fetal abnormalities.  He documented that he could not find a fetal heartbeat ("FHB") with the Doppler,

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 3

but rather than send her to the hospital emergently, his treatment plan was only "[w]ill check FHB at complex with ultrasound if possible," and to have her return to see him in one week:

| | |
|---|---|
| | ENCOUNTER DATE: 12/17/2018  TIME: 09:56:20  DURATION: minutes  TYPE: Provider - OB/GYN<br>LOCATION: ASPC-PV LUMLEY MDM [B62]  SETTING: Clinic |
| S | Are interpreter services needed for this inmate: No<br>NOTES: RTO in 2 weeks.<br>No complaint offered except for heartburn.  Feels flutter of the baby. |
| O | PREV: 09:16:27  TEMP: 96.0  PULSE: 89  RP: 15  BP: 96/62  HT: 5 ft.  2 in.  WT: 154 lb<br>BLOOD SUGAR: NA  WksGest: 0  LMP: 01/01/1000  EDD(Initial): 01/01/1000<br>EDD(Final): 01/01/1000  HT(Fundal): 0  WT(Cml): 0  FHR: 0  PRES:  PROTEIN:  GLUCOSE:<br>NITRITES:  LEUC:  FETAL MOVEMENT:<br>02 SAT: 99.00%  SOURCE: Room Air<br>NOTES: FH- 15 CM? FHB- not heard with Doppler. |
| A | RELATED PROBLEM:  Pre-Medication:  Omeprazole<br>                                 Other Diagnosis:  Other Diagnosis  Heartburn [R12]<br>MEDICAL DIAGNOSIS:  Heartburn [R12]<br>NOTES: Pregnancy, 17 weeks, intrauterine. FHB- not heard this time. Heartburn. |
| P | DRUG PRESCRIPTION: CALCIUM CARB (150) CHEW/500 Mg  VERBAL BY: Enciso, Vicente, MD<br>EFFECTIVE DT: 12/17/2018  RT: PO  DOSE: 1  STRENGTH: 500 Mg  METHOD: Normal Dose<br>FREQ: TID  FOR: 60 DAYS  EXPIRATION DATE: 02/14/2019  REFILLS: 1  STATUS: Order<br>Discontinued at Pharmacy Vendor (DR)<br><br>NOTES: Calcium carbonate- 500 mg. take one capsule 3 times a day X 60 days. Will check FHB with US at complex if possible. RTO in 1 week. |
| E | NOTES: Explained to the patient plan of follow up, |
| H/S | MH Status: Outpatient-Regular MH Contact |
| | STAFF: Enciso, Vicente, MD   Medical Doctor |

It was not until December 19, 2019, that Dr. Enciso submitted a routine – not urgent – request for an OB ultrasound.  Again, he noted that she had used heroin prior to incarceration:

**Subjective Notes**

Entry is generated by need to request for OB ultrasound to verify possible intrauterine fetal demise. Patient is about 17 weeks pregnant be her earlier ultrasound while at county jail. She claims she has been feeling fetal movement. During her last visit in December 17, 2018, no FHB was noted on Doppler examination. There has not been any complaint of abdominal pain or any bleeding. Patient was diagnosed to have chlamydia infection and was treated with Azithromax. She had taken Meth and heroin before she was incarcerated.

Later that day, she had a telepsychiatry appointment.  The psychiatrist noted she was distressed and upset about delays in OB care, and the possibility of her pregnancy ending.  *See* Exhibit 1. That afternoon, officers brought her to the clinic where she complained of abdominal pain and bleeding, and said, "I'm losing my baby."  The nurse documented that officers shackled

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 4

her to the gurney for transport to the emergency room.  *See* Ariz. Rev. Stat. § 31-601(A) and
ADC D.O. 705, §9.36 (prohibiting shackling of pregnant women in transport and delivery).



The evening of December 19, 2018, she returned from the hospital, where hospital staff
confirmed fetal demise.  She spent that night at Perryville, and then returned to the hospital the
next day on December 20 for removal of the deceased fetus.  The medical records show that she
delivered a stillborn fetus the morning of December 21, and the pathology report shows the fetus
was negative for methadone, again confirming that she was never provided the medically
appropriate treatment for a pregnant woman who had used heroin.  *See* Exhibit 1.

**                , San Carlos**
Ms. ▮▮▮ delivered a stillborn baby at 34 weeks gestation on January 4, 2019.  *See*
**Exhibit 2**.  Ms. ▮▮▮ told Plaintiffs' counsel that she came into custody in October 2018, and
requested an ultrasound, but never had one between the time she came into custody and the

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 5

stillbirth.  She reported that shortly before Christmas, she had severe abdominal pain where she was concerned about the viability of her baby, but that health care staff did not address her concerns or send her offsite until after the New Year.[1]

Her medical reports confirm her account. According to eOMIS, she was seen on December 24, 2018 by Dr. Enciso, but the treatment note is incomplete, as it reads in full, "Appears upset. Was treated for yeast infection. Still having problem. Wants to" Dr. Enciso's treatment plan was that he "[r]eassured" the patient, and ordered a follow up return appointment in two weeks.

| | ENCOUNTER DATE: 12/24/2018   TIME: 13:47:48   DURATION: minutes   TYPE: Provider - OB/GYN LOCATION: ASPC-PV SAN CARLOS [B42]   SETTING: Clinic |
|---|---|
| S | Are interpreter services needed for this inmate: No<br>NOTES: PNC FU 2 weeks<br>  Appears upset.  Was treated for yeast infection. Still having problem. Wants to |
| O | PREV: 13:17:00   TEMP: 98.0   PULSE: 96   RP: 16   BP: 92/60   HT: 5 ft.   6 in.   WT: 172 lb<br>BLOOD SUGAR: NA   WksGest: 0   LMP: 01/01/1000   EDD(Initial): 01/01/1000<br>EDD(Final): 01/01/1000   HT(Fundal): 0   WT(Cml): 0   FHR: 0   PRES:   PROTEIN:   GLUCOSE:<br>NITRITES:   LEUC:   FETAL MOVEMENT:<br>02 SAT:  99.00%   SOURCE: Room Air<br>NOTES: FH- 35 cm. FHB- 136/ minute. Presentation- cephalic. |
| A | NOTES: Pregnancy, 33 weeks, cephalic. |
| P | NOTES: Reassured. RTO in 2 weeks. |
| E | NOTES: Patient was informed of her examination findings. |
| H/S | MH Status: No history of MH services |
| | STAFF: Enciso, Vicente, MD   Medical Doctor |

Ms. ▮▮▮▮ told us she "felt a pain I've never felt before" in her abdomen a few days later, and officers called an emergency ICS.  She told us that the nurse searched for a fetal heartbeat, but since it was the weekend there was no provider on-site, and the nurse sent her back to her housing unit with Tylenol.  Ms. ▮▮▮▮ reports that the nurse told her she would see the provider the following week, in the new year.

The medical records confirm Ms. ▮▮▮▮'s account – it shows that on the morning of Saturday, December 29, 2018, nursing staff responded to an ICS where Ms. ▮▮▮▮ was complaining of right side abdominal pain.  Officers brought her to the clinic at 10:09 am, and by

---

[1] *See also* 4/17/17 Tr. at 568:1-9 (22 week pregnant patient had confirmation of no fetal heartbeat and fetal demise on December 29, 2016, but did not see off-site specialist for extraction procedure until January 6, 2017); *see also id.* at 438:12-443:1, 560:11-561:10, 567:2-568:18 (this patient was not included in source documents for PM 74 and therefore not counted in the CGAR report for PM 74).

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 6

10:27 she was sent back to her housing unit with Tylenol.  The provider reviewed the nurse's notes on December 29, 2018, and ordered that Ms. ██████ be placed on the provider line ("PL") for Wednesday, January 2, 2019:

1009 Nurse assessment
1011-FHR: 154
called on call Provider at 1020
orders received
Pt is currently 34 weeks pregnant
Pt with c/o right side pain that is increased with walking
pt also taking methadone during this pregnancy
pt visually crying
states she has been having vaginal discharge due to a yeast infection that she is being treated for
This is pt 3rd baby
Pt is guarding right lower abdomen, states pain increases with walking. Positive rebound tenderness.
1027 stand down. Pt medically clear to return to housing unit

---

**Encounter Orders Review**

|  |  |
|---|---|
| Review Type*:  Practitioner Review | Review Staff:  Davis, Patricia, FNP-C |
| Review Date:  12/29/2018 | Review Time:  14:08:10 |

**Review Notes**

stat cbc, cmp, Tylenol 650 bid x 5d
needs PL wed/Davis
TimeStamp: 29 December 2018 14:09:43 --- User: Patricia Davis (DAVPA01)

---

According to eOMIS, Ms. ██████ saw Dr. Enciso again on December 31, 2018.  He wrote that she said her pain "never came back," but she contradicted what he wrote in her medical record, and reported to us that she was continuing to have abdominal pain during this time period, and critically, that she was not feeling the fetus move and attempted to report this to medical staff.

On January 3, 2019, she saw OB/GYN Dr. Noel Habib, who wrote that she reported "no fetal movement x 2 days," and he assessed her with "no fetal heart tones found, no fetal movement," and ordered her transported to the hospital.  The records indicate that she delivered a full-term stillborn baby girl on January 4, 2019, and returned to Perryville on January 5, 2019.

Ms. ██████'s report to Plaintiffs' counsel that she had never received an ultrasound while in custody is confirmed by her medical record, as shown in the pending consults request and Dr. Enciso's notes:

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 7

| Consultation Request (1 - 1 of 1) | | | | | |
|---|---|---|---|---|---|
| **Request Date** | **Request Type** | **Service Type** | **Procedure Requested** | **Priority** | **Request Status** |
| 10/10/2018 | Off-site Clinic | Pain Clinic | Pain clinic f/u visit | Routine | Consult Completed- Practitioner Reviewed |

| 8-18-WEEK LABS (WHEN INDICATED/ELECTED) | DATE | RESULT | |
|---|---|---|---|
| ULTRASOUND | / / | | |
| MSAFP/MULTIPLE MARKERS | 10/ 10 /18 | *passed window* | MD |
| AMNIO/CVS | / / | | |
| KARYOTYPE | / / | 46, XX OR 46, XY / OTHER _____ | |
| AMNIOTIC FLUID (AFP) | / / | NORMAL _____ ABNORMAL _____ | |
| 24-28-WEEK LABS (WHEN INDICATED) | DATE | RESULT | |
| HCT/HGB | / / | _____ %  _____ g/dl | |
| DIABETES SCREEN | 11 / 20 /18 | 1 HOUR  96 mg/dl | MD |
| GTT (IF SCREEN ABNORMAL) | / / | _____ FBS  _____ 1 HOUR  _____ 2 HOUR  _____ 3 HOUR | |
| D (Rh) ANTIBODY SCREEN | / / | | |
| D IMMUNE GLOBULIN (RHG) GIVEN (28 WKS) | / / | SIGNATURE _____ | |

**Lumley Medium**

Ms. ▮▮▮▮ gave birth to her baby alone in her cell at approximately 3:00 in the morning on January 22, 2019.  This occurred three days after she reported that her water broke, was seen by medical staff, and sent back to her cell.

We discussed Ms. ▮▮▮▮ case at length with Site Medical Director Dr. Ibrahim, who indicated that a contributing factor to what happened was that prior to Ms. ▮▮▮▮ receiving involuntary psychiatric medication, she was refusing prenatal medical treatment prior to giving birth.  However, it is unclear from a review of her medical records how that refusal contributed to health care staff's failure to monitor her wellbeing for three days

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 8

Her records show that she was admitted to ADC on October 26, 2018, when she was approximately seven months pregnant. The mental health assessment documented that she was classified as seriously mentally ill ("SMI") in the community, diagnosed with schizophrenia, and she was assigned a mental health score of MH-3A. *See* **Exhibit 3**. Her medical record shows that it was not until January 2, 2019 – after two months of refusing medical and mental health appointments, and reports by custody staff that Ms. ███████ was engaging in bizarre behaviors such as eating bars of soap, urinating on the ground and her clothes, and refusing to bathe, that mental health staff initiated the Psychotropic Medication Review Board (PMRB) involuntary medication process. On January 9, 2019, the PMRB approved involuntary administration of Haldol, and she received her first shot on January 14, 2019.

On January 19, 2019, nursing staff initiated an ICS after Ms. ███████ reported to staff that her water had broken.[2] The nurse documented that Ms. ███████ sweat pants tested positive with litmus for amniotic fluid, and there was approximately a cup full of fluid. The nurse sent her out to the hospital, but she returned from the hospital a few hours later the same day. According to the medical record from the nurse who processed Ms. ███████ return from offsite, there were no discharge papers sent back with Ms. ███████ to explain why she was sent back to the prison, nor any follow-up instruction. The on-call provider verbally ordered the nurse to send Ms. ███████ back to her housing unit, with no orders for follow up referrals to the provider or OB/GYN.

| | | | |
|---|---|---|---|
| Date*: | 01/19/2019 | Start Time*: | 16:52:50 |
| End Date*: | 01/19/2019 | End Time*: | 16:55:49 |
| Category: | Nursing | | |
| Type*: | Nurse - Return From Offsite | Encounter Close Date: | 01/19/2019 |
| Location*: | ASPC-PV LUMLEY MDM  [B62] | Encounter Close Time: | 17:03:03 |
| Setting*: | Clinic | | |
| Staff Member*: | Dirja, Liliana | | |
| Title: | Registered Nurse | | |
| Form Type: | Return from Off-Site | | |

View Condensed Version     Status History

**Subjective**

Are interpreter services needed for this inmate*:  No
What type of interpreter services were used for the encounter*:

**Related Health Service Requests**    View History

| Request Date | Area of Interest | Request Type | Status |
|---|---|---|---|
| | No Rows Found | | |

**Subjective Notes**

return from Abrazo west

---

[2] *See also* Incident Report No. 19-B0-2-00263, ADCM1565001.

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 9

**Documentation with patient:**

☐ Discharge summary    ☐ Discharge orders

☑ Other:   pt returned wo any docs

---

**Plan Notes**

Vitals
Interview
Assessment
IM cleared to return home
IM aware of POC
No further questions or concerns at this time

---

**Patient Education Notes**

Submit HNR PRN for any new or worsening issues
IM educated on medication non compliance
IM aware of POC and verbalized understanding

---

The provider PA Rodriguez subsequently entered a note later on January 19, 2019 into eOMIS regarding his order to return Ms. ▮▮▮▮ to the yard, while noting "[t]his gravida 4, schizophrenic patient has refused prenatal care, just recently allowed us to get an ultrasound." Under "Plan" he wrote "None." *See* Exhibit 3.  According to her medical record, on January 22, 2019, an ICS was initiated after an officer discovered Ms. ▮▮▮▮ had delivered her baby in her cell.[3]  Ms. ▮▮▮▮ medical record shows no subsequent medical encounters between being sent back to her housing unit and the ICS on January 22, 2019.

| | | | | | |
|---|---|---|---|---|---|
| 01/24/2019 | 16:22 | Nursing | Nurse - Return From Offsite | Moya, Vonda F | ASPC-PV LUMLEY MDM |
| 01/24/2019 | 11:20 | Medical Records | EHR Record Import | Wynne, Brenda | ASPC-PV LUMLEY MDM |
| 01/22/2019 | 10:24 | Mental Health | MH - Non-Clinical Contact Note | Pannella, Lea | ASPC-PV LUMLEY MDM |
| 01/22/2019 | 03:25 | Nursing | Nurse - ICS Response | Smith, Shannon | ASPC-PV LUMLEY MDM |
| 01/19/2019 | 17:35 | Medical Provider | Provider - Review | Rodriguez, Rumaldo | ASPC-PV LUMLEY MDM |
| 01/19/2019 | 17:11 | Nursing | Nurse - Return From Offsite | Moya, Vonda F | ASPC-PV LUMLEY MDM |
| 01/19/2019 | 16:52 | Nursing | Nurse - Return From Offsite | Dirja, Liliana | ASPC-PV LUMLEY MDM |
| 01/19/2019 | 14:20 | Medical Provider | Provider - Review | Rodriguez, Rumaldo | ASPC-PV LUMLEY MDM |
| 01/19/2019 | 14:00 | Nursing | Nurse - ICS Response | McAdams, Amy | ASPC-PV LUMLEY MDM |

Ms. ▮▮▮▮ told Plaintiffs' counsel that she was in her cell alone, as her cellmate works nights, and she felt herself going into labor.  She told us that she started screaming and banging on her cell door, in hopes of getting the night officer's attention, and that other women in cells

---

[3] Despite our request prior to the tour for all Incident Reports from medical clinics, we did not receive the relevant IRs for this event.

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 10

around her started similarly screaming and banging on their doors to help her.  She reported that she felt the baby start to come out, and was in excruciating pain and sat on the toilet, defecated, and delivered the baby into her hands and continued to scream for help.  Both Ms. ██████ as well as other people housed at the time near her, reported to us that it took approximately 10 to 15 minutes from the time she started yelling for help until an officer responded.  The notes by the responding nurse also document that Ms. ██████ similarly reported that it had been about 20 minutes since she gave birth, and she had been knocking on the door for help.

> S   Are interpreter services needed for this inmate: No
>     NOTES: ICS initiated @ 0316 for Pt having delivered her baby in her cell. Pt seen in cell @ 0325. 911 requested by DOC. Pt reports she had the baby "about 20 minutes ago". Pt states she was feeling sick and was knocking on the door for help.

Ms. ██████ was transported by EMS to the hospital, where both she and the baby were found to be healthy.  In our meeting with Dr. Ibrahim, he explained that the corrective action plan arising from this sentinel event is that in the future, if a woman is sent out in labor or because her water broke, and then is returned to the prison from the hospital without delivering, that she would be housed in the special needs unit or infirmary where there is 24/7 nursing presence.

### ██████████████  Lumley Unit

Ms. ██████ delivered her baby on October 1, 2018, via an emergency C-section due to pre-eclampsia.  She reported to us that a week prior to being sent out in maternal and fetal distress, she saw the OB/GYN and her blood pressure was elevated.  She saw Dr. Enciso on September 24, 2018 at 38-39 weeks gestation, and her blood pressure was elevated at 134/93.  Despite the elevated reading, the plan did not include orders for daily or twice-daily blood pressure checks to monitor the possible onset of pre-eclampsia, which is the usual standard of care.  *See* **Exhibit 4** (Treatment Call and Appointments List).  Oddly, eOMIS shows that she was not assessed for pre-eclampsia by Dr. Enciso until November 12, 2018, six weeks *after* she gave birth:



Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 11

Nursing staff initiated an ICS for Ms. ███ on October 1, 2018 at 3:53 am, for contractions 10 minutes apart.  Her blood pressure was elevated at 142/102.  Blood pressure readings over 130/90 for pregnant women are considered high, and Ms. ███ had the known complicating factor of being overweight.  She spent about 45 minutes at the Lumley clinic, and then was moved to the infirmary for monitoring.  Over the next few hours, the medical record shows that her blood pressure continued to be elevated:

| Time | BP |
| --- | --- |
| 03:53 | 142/102 |
| 04:09 | 138/102 |
| 04:17 | 130/88 |
| 04:21 | 142/102 |
| 04:40 | 154/110 |
| 04:58 | 154/110 |
| 05:00 | 154/110 |
| 06:30 | 150/98 |

*See* Exhibit 4 (Nursing Notes from 10/1/18).

The provider, Dr. Habib, saw her in the infirmary on October 1, 2018 at 6:24 am and assessed her as having "incipient preeclampsia," and ordered a treatment plan of testing her blood pressure every hour and transfer her out for induction of labor if the elevation continued.  Her blood pressure subsequent to seeing Dr. Habib was not documented in the medical record, but she was not sent out to the hospital until 10:20 am.  She underwent a Cesarean section within hours of arrival to Abrazo West Hospital.

Ms. ███ also reported to Plaintiffs' counsel that after she returned from the hospital, her C-section incision became infected and opened up about an inch on each side, but she was not sent back to the hospital or to a wound specialist.  She reported that nursing staff packed the open incision with gauze, and taped it shut.  A provider note by Dr. Habib from October 12, 2018, supports her contention.  He noted:

Abdomen--wound open with gauze packing visible through opening of wound on left and right wound defects.  Wound with foul smelling serosanguineous fluid mixed with yellow exudate, irrigated and cleaned with gauze packing and sterile water.  Wound repacked in both open areas.

Wound dehiscence, now cleaned and repacked.  Because of the foul smell of the fluid in the wound, irrigation and dressing changes will need to be

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 12

increased to daily until a good healing base is established.  Nurses on the yard were instructed in wound care and participated in the dressing change.  Increase ibuprofen to 600mg TID.

Pre-eclampsia with continued BP elevation, discovered that labetalol had not been given.  BP today is elevated.  Discussed with nursing, who will ensure that labetalol, 200mg BID, is re-established.

█████████████████, Santa Cruz

Ms. ████████ has a pregnancy complicated by Anti-K antibody.  According to UpToDate, "Kell-sensitized pregnancies are responsible for approximately 10 percent of severe cases of hemolytic disease of the fetus and newborn (HDFN; hemolysis of fetal and neonatal red blood cells [RBCs] by maternal alloantibodies). Compared with other RBC antigens, Kell can cause clinically significant hemolysis at lower titers and earlier in the pregnancy."  The standard of care is that neonatal Doppler monitoring of Kell-positive fetuses with a titer greater than 4 should begin at 18 weeks of gestation.  She also had reported to medical staff repeatedly that her previous pregnancy involved a Kell-positive fetus, and that after giving birth with her previous child, she had hemorrhaged blood, requiring multiple transfusions.

According to her medical records as shown below and in **Exhibit 5**, a prenatal profile screen collected on December 12, 2018, and a report dated December 15, 2018, showed a positive antibody screen result. These abnormal results were reviewed by Dr. James Baird on December 19, 2018, who indicated the results would be reviewed with her at her next chronic care visit.

| Lab Test Results | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Observation Code** | **Result** | **Unit** | **Abnormal Flag** | **Reference** | **Result Status** |
| HCT | 38.0 | | | 31.5-44.8 | Final Results |
| ANTIBODY SCREEN | Positive | | Abnormal | Negative | Final Results |
| HEP. B SURF. Ag | Non-Reactive | | | Non-Reactive | Final Results |
| PLATELET COUNT | 235 | | | 140-425 | Final Results |

| Results Review | |
| --- | --- |
| Reviewed Date: 12/19/2018 | Time:  13:45:03 |
| Review Staff:  Baird, James W | |
| Inmate Notice:  Will Review Results With Patient At Next Chronic Care Visit | |

| Review Notes |
| --- |
| Pos ab screen<br>FU at OB appt<br>TimeStamp: 19 December 2018 13:45:32 --- User: James Baird (BAIJA01) |

She was next seen on January 3, 2019 by the OB/GYN Dr. Habib who noted that no identification had been made as to what the antibody screen was.  However, no further screening

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 13

test was ordered at that time – it was not until February 28, 2019, that a more detailed lab test was ordered, at which point she was 28 weeks pregnant.  The order indicates it is a nonformulary lab test; it is unclear if the two month delay from January 3 to February 28 was due to a delay by Corizon Utilization Management to approve the nonformulary request.



The results came back on March 16, 2019, showing Anti-K titer of 1:8.  Dr. Habib appropriately submitted an urgent request for off-site perinatal specialist for periodic Doppler studies, on March 18, 2019, when she was at 31 weeks gestation.  She saw the off-site specialist for the first time on March 26, 2019, at 32 weeks of gestation, three months later than is clinically indicated.

**████████████████, Lumley Medium**

Ms. █████ had a baby via C-section on December 6, 2018.  She reported, and her medical record confirmed, that she did not see mental health staff after her return on December 6,

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 14

2018, until February 23, 2019. This violation of PM 74 was documented in the December 2018 CGARs. *See* ADCM1560586 (showing 71% compliance with PM 74).[4]

| | | | | | | |
|---|---|---|---|---|---|---|
| 02/23/2019 | 12:36 | Mental Health | MH - Individual Counseling | Mental Health Progress Note | Pustai, Gina | ASPC-PV LUMLEY MDM |
| 02/14/2019 | 09:55 | Medical Provider | Provider - OB/GYN | | Enciso, Vicente | ASPC-PV LUMLEY MDM |
| 02/12/2019 | 12:19 | Dental | Dental - Urgent Care | | Rippley, Connie | ASPC-PV LUMLEY MDM |
| 02/10/2019 | 10:09 | Nursing | Nurse - Sick Call - Scheduled | NET-Ears | White, Jaime | ASPC-PV LUMLEY MDM |
| 02/05/2019 | 08:37 | Medical Provider | Provider - OB/GYN | | Enciso, Vicente | ASPC-PV LUMLEY MDM |
| 01/28/2019 | 08:46 | Medical Provider | Lab Test (Unsolicited) | | Enciso, Vicente | ASPC-PV LUMLEY MDM |
| 01/28/2019 | 08:26 | Medical Provider | Provider - OB/GYN | | Enciso, Vicente | ASPC-PV LUMLEY MDM |
| 12/10/2018 | 15:38 | Nursing | Nurse - Infirmary Return from Offsite | Return from Off-Site | Beacom, Valerie | ASPC-PV LUMLEY MDM |
| 12/10/2018 | 14:33 | Medical Records | EHR Record Import | | Schenkel, Amy | ASPC-PV LUMLEY MDM |
| 12/10/2018 | 08:26 | Medical Provider | Provider - OB/GYN | | Habib, Noel | ASPC-PV LUMLEY MDM |
| 12/06/2018 | 07:24 | Medical Provider | Provider - OB/GYN | | Enciso, Vicente | ASPC-PV LUMLEY MDM |
| 12/06/2018 | 05:20 | Nursing | Nurse - Sick Call - Unscheduled | NET-Pregnancy Related Complaints | Vargas, Casey | ASPC-PV LUMLEY MDM |

██████████████████████  **San Carlos**

Ms. ██████ had a baby via Cesarian section in late January 2019. She returned to Perryville on February 3, 2019, and was seen by the psychologist the same day for her post-partum mental health encounter pursuant to Performance Measure 74. The psychologist noted that this encounter occurred in the presence of another patient. This is a violation of the Stipulation. Doc. 1185-1 at 5 (defining "seen" as meaning "Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or *exchange of information in a confidential setting*. With respect to Mental Health staff, means an *encounter that takes place in a confidential setting* outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter") (emphasis added).

---

[4] According to the CGAR, five out of seven applicable cases were compliant. In the other noncompliant case, ██████████████████, **San Carlos Unit**, returned from offsite on December 21, 2018, and was never seen by mental health staff post-partum before her release on February 13, 2019. See **Exhibit 6**.

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 15

| | |
|---|---|
| Date*: 02/03/2019 | Start Time*: 10:18:25 |
| End Date*: 02/03/2019 | End Time*: 11:23:17 |
| Category: Mental Health | |
| Type*: MH - Individual Counseling | Encounter Close Date: 02/03/2019 |
| Location*: ASPC-PV SPECIAL NEEDS  [B41] | Encounter Close Time: 11:25:15 |
| Setting*: Clinic | |
| Staff Member*: Velez, Glenda | |
| Title: Psychologist | |
| Form Type: Mental Health Progress Note | |

**View Condensed Version**   **Status History**

**Subjective**

Are interpreter services needed for this inmate*:  No
What type of interpreter services were used for the encounter*:

Was the inmate offered the option to speak in a confidential setting*:   Other

**Confidential Setting Comments**

IM seen at the IPC area after having a C-Section; IM was in bed. There was another IM in the area. CO was outside the area. Intervention occurred in Spanish.

Despite the documentation that the mental health encounter was not confidential, the February 2019 CGAR lists it as compliant with PM 74.  *See* ADCM1570290 (listing four out of four reviewed files for PM 74 as compliant, for a score of 100%).  The February 2019 CGAR should have shown 75% compliance with this measure.

████████████████████, **San Carlos**

We sent you an individual advocacy letter on April 23, 2019, regarding Ms. ████████ who was in the 30th week of her pregnancy, and had not received a follow-up ultrasound that the specialist recommended.  *See* **Exhibit 7**.  As of today, this still has not occurred, and no provider has submitted a request for a follow-up ultrasound:

| Consultation Request (1 - 2 of 2) | | | | | |
|---|---|---|---|---|---|
| **Request Date** | **Request Type** | **Service Type** | **Procedure Requested** | **Priority** | **Request Status** |
| 03/19/2019 | Off-site Clinic | Radiology | US Pregnancy After 1st Trimester | Routine | Consult Completed- Practitioner Reviewed |
| 11/30/2018 | On-site Clinic | Optometry | | Routine | Consult Completed- Practitioner Reviewed |

## II.  Lack of Meaningful Mental Health Encounters

As detailed in our April 22, 2019 Notice of Noncompliance, we identified a systemic problem with brief and perfunctory mental health encounters, including for critical encounters such as removing someone from suicide watch, or stepping down the level of watch.

Mr. Tim Bojanowski
RE: *Parsons v. Ryan*
April 2018 Perryville Tour /
Notice of Noncompliance
May 6, 2019
Page 16

We look forward to your response to this Notice within 30 days.

Sincerely,

Corene Kendrick, Staff Attorney

cc:   Dr. Mark Stern

Exhibit 11



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

January 2, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

     RE:    Parsons v. Ryan, 2:12-CV-00601
             Notice of Substantial Noncompliance: PMs 23, 24, 40, 44, 52

Dear Mr. Bojanowski:

     Pursuant to Paragraph 30 of the Stipulation and the Court's Order clarifying the definition of substantial noncompliance (Doc. 2644), we write to inform you that Defendants are in substantial noncompliance with the following performance measures, pursuant to Defendants' CGAR reports.  The exclusion of any other measures from this letter does not waive our right to notify you of noncompliance with respect to them in the future.  We look forward to your response within 30 days and request that you make yourselves available for a meet and confer and mediation as soon as possible after providing your response, or agree to waive mediation.

     **PM 23 (Lewis):** Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff.

| | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct |
|---|---|---|---|---|---|---|---|---|---|---|
| Lewis | 100 | 100 | 67 | 33 | 78 | 89 | 56 | 89 | 67 | 78 |

     **PM 24 (Eyman, Florence, Phoenix, Yuma):** Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items.[1]

---

     [1] The Court found Defendants substantially noncompliant with PM 24 at ASPC-Lewis on October 11, 2017.  (Doc. 2403).

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Timothy Bojanowski
RE: *Parsons v. Ryan*
Notice of Noncompliance
January 2, 2019
Page 2

|  | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct |
|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 100 | 100 | 100 | 40 | 0 | 40 | 60 | 40 | 86 | 40 |
| Florence | 100 | 100 | 83 | 83 | 100 | 67 | 33 | 83 | 100 | 100 |
| Phoenix | 100 | 100 | 100 | 100 | 80 | 80 | 80 | 80 | 100 | 100 |
| Yuma | 100 | 100 | 60 | 80 | 80 | 100 | 80 | 100 | 80 | 100 |

**PM 40 (Florence, Winslow):** Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral.[2]

|  | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Florence | 57 | 80 | 33 | 100 | 75 | 50 | 100 | 60 | 100 | 100 | 50 | N/A |
| Winslow | 50 | 20 | 100 | 67 | 100 | 67 | N/A | 40 | 0 | N/A | N/A | 100 |

**PM 44 (Phoenix, Tucson):** Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours.[3]

|  | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct |
|---|---|---|---|---|---|---|---|---|---|---|
| Phoenix | 38 | 67 | 100 | 85.7 | 50 | 60 | 33 | 0 | 67 | 58 |
| Tucson | 32 | 58 | 79 | 68 | 86 | 89 | 74 | 62 | 69 | 54 |

**PM 52 (Lewis, Yuma):** Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report.[4]

|  | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lewis | 91 | 90 | 90 | 92 | 80 | 94 | 97 | 97 | 97 | 95 | 62 | 74 | 74 | 78 | 58 | 80 |
| Yuma | 71 | 43 | 59 | 74 | 97 | 100 | 90 | 90 | 100 | 98 | 81 | 87 | 76 | 64 | 85.37 | 95 |

---

[2] The Court found Defendants substantially noncompliant with PM 40 at Eyman and Tucson on April 24, 2017.  (Doc. 2030)

[3] The Court found Defendants substantially noncompliant with PM 44 at Eyman, Florence, and Lewis on April 24, 2017.  (Doc. 2030).  The Court's OSC and contempt order included PM 44 at Eyman.  (Docs. 2372; 2898 at 21-23).

[4] The Court found Defendants substantially noncompliant with PM 52 at Florence, Perryville, and Tucson on April 24, 2017, (Doc. 2030), at Eyman on October 11, 2017, (Doc. 2403), and at Phoenix on April 11, 2018. (4/11/18 Tr. at 24:11-19). The Court's OSC and contempt order included PM 52 at Eyman and Florence.  (Docs. 2372, 2456, 2898 at 21-23).

Mr. Timothy Bojanowski
RE: *Parsons v. Ryan*
Notice of Noncompliance
January 2, 2019
Page 3

We look forward to your response.  Thank you for your attention to this matter.

Sincerely,

Corene Kendrick, Staff Attorney

# Exhibit 12



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Ashlee B. Hesman
480.420.1631
ahesman@strucklove.com

February 4, 2019

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

> Re:   *Parsons v. Ryan*
> **Notice of Substantial Noncompliance: PMs 23, 24, 40, 44, 52**

Dear Corene:

We are in receipt of your January 2, 2019 Notice of Substantial Noncompliance regarding Performance Measures ("PMs") 23, 24, 40, 44, and 52.  Defendants' responses are outlined below.

**PM 23 (Lewis):**  *Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff.*

Defendants concede this measure is in substantial non-compliance at Lewis.  Defendants are working to discover the cause of the non-compliance and will develop a remediation plan to fix any deficiencies.  Importantly, Lewis achieved 100% compliance in November 2018.

**PM 24 (Eyman, Florence, Phoenix, Yuma):**  *Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items.*

Defendants concede this measure is in substantial non-compliance at Eyman, Florence, Phoenix, and Yuma.  Defendants are working to discover the cause of the non-compliance and will develop a remediation plan to fix any deficiencies.  Importantly, Phoenix has maintained 100% compliance with this measure since September 2018.  Yuma has maintained 100% compliance since October 2018.

Corene Kendrick
February 4, 2019
Page 2

**PM 40 (Florence, Winslow):**  *Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral.*

Defendants concede this measure is in substantial non-compliance at Florence. Defendants are working to discover the cause of the non-compliance and will develop a remediation plan to fix any deficiencies.  Importantly, Florence has received passing scores since October 2018.

Defendants are not in substantial non-compliance at Winslow because Winslow's performance does not meet the Court's definition of substantial non-compliance.  As such, we ask that you withdraw your notice as to this measure and facility.

**PM 44 (Phoenix, Tucson):**  *Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours.*

Defendants concede this measure is in substantial non-compliance at Phoenix and Tucson. Defendants are working to discover the cause of the non-compliance and will develop a remediation plan to fix any deficiencies.  Importantly, both facilities received passing scores in November 2018.

**PM 52 (Lewis, Yuma):**  *Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report.*

Defendants concede this measure is in substantial non-compliance at Lewis and Yuma. Defendants are working to discover the cause of the non-compliance and will develop a remediation plan to fix any deficiencies.  Importantly, Yuma has maintained a passing score for this measure since September 2018.

Sincerely,

Ashlee B. Hesman

ABF/eap

cc:     Counsel of record

# Exhibit 13

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



January 15, 2019

**BY ELECTRONIC MAIL ONLY**

Rachel Love
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
rlove@strucklove.com

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS

       Re:   *Parsons v. Ryan*
             **Notice of Substantial Non-Compliance**

Dear Counsel:

Pursuant to ¶ 30 of the Stipulation, we hereby serve a Notice of Substantial Non-Compliance with respect to Defendants' noncompliance with the Maximum Custody Performance Measures ("MC PM") ##1-2, 5-6, and 8 at Florence Kasson and at Lewis Rast.

**I.   Noncompliance with Monitoring Methodology for Sub-class Members Housed in Florence Kasson and Lewis Rast.**

Under the final "Max Custody Monitor Guide Duties & Responsibilities" ("Monitoring Guide") approved by the Court there is a required process for recording refusals of out-of-cell time/programming offered under MC PM ##1-2, 5-6, and 8. The Guide specifically states:

> When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and *the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same*….Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal.

Monitoring Guide, July 2017 at 5, 8, 13, 16, and 19 (emphasis added).

During the December 2018 tour of Florence Kasson, we noted that the Out of Cell Tracking forms were no longer being kept on the doors of the cells in any of the Max Custody housing units. We were told by Kasson staff, CO II Knight and others, that the procedures for recording out-of-cell time and programming had changed. Instead of using the required contemporaneous methodology set forth in the Monitoring Guide, Kasson staff are using at least two different methodologies.

Some staff told us that an officer will enter the pod and ask prisoners if they want to participate in out-of-cell time/programming and then later tell the desk officer who sits outside the housing pod who refused out-of-cell time/programming.  That desk officer then makes entries into the Out of Cell Tracking form.  Other officers at Kasson told us that the procedure for offering out-of-cell time/programming is for one officer to enter the housing pod and asks each prisoner if he wants to participate in out-of-cell time and then radio the answers to an officer outside the pod.  That officer makes the entries on the Out of Cell Tracking form.

Both of these procedures are noncompliant with the Monitoring Guide because the offering officer is not contemporaneously noting the refusal or signing the form.  Instead, a third party, who has no personal knowledge of the refusal, is signing the form.  Further, this method is non-compliant with the Monitoring Guide because it prevents both the prisoner from signing the refusal contemporaneously and a second officer with personal knowledge of the refusal from signing. The result of these non-compliant methodologies is alleged refusals that do not meet the standards of proof required by the Monitoring Guide.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

We note that during our November 2018 tour of Lewis-Rast we found that the max custody units had similarly discontinued the practice of keeping the Out of Cell Tracking forms in front of the cell doors.  Given our findings at Kasson we will assume, unless and until it is demonstrated otherwise, that the method of noting refusals at Rast is similarly noncompliant, as set forth above.  We have yet to visit the Eyman complex so the status of the monitoring methodology is unclear at the Browning and SMU-I facilities.

We ask that you inform us of when these new methodologies were implemented at each unit; if the methodology extends to any of the other max custody units beyond Kasson and Rast; and what monitoring methodology is being employed at Eyman SMU-I and Browning.  We also ask that you confirm the date that the monitoring methodology for max custody is corrected in compliance with the Monitoring Guide at each unit.

We look forward to your response as required by ¶ 30 of the Stipulation.

Sincerely,

Amy Fettig

cc:     All counsel

# Exhibit 14



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Rachel Love
480.420.1616
rlove@strucklove.com

February 14, 2019

***VIA EMAIL ONLY***
Amy Fettig
American Civil Liberties Union
Legal Department
NATIONAL PRISON PROJECT
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

Re: **Parsons v. Ryan – Response to Plaintiffs' January 15, 2019 Notice of Substantial Non-Compliance regarding Florence-Kasson and Lewis-Rast Max MCPMs 1-2, 5-6 & 8**

   **Confidential, Subject to Fed.R.Evid. 408, Not for Court Filing**

Dear Amy:

This letter responds to Plaintiffs' January 15, 2019 letter regarding Notice of Substantial Non-Compliance as to Maximum Custody Performance Measures ("MCPMs") 1-2, 5-6, and 8 at Florence-Kasson and Lewis-Rast Max.

Plaintiffs' letter alleges that Defendants are noncompliant with monitoring methods at Florence-Kasson and Lewis-Rast Max as to monitoring out-of-cell time offered to maximum custody inmates. Specifically, Plaintiffs (1) claim that Defendants are noncompliant with the terms of the Stipulation and monitoring methodology because the Out-of-Cell Tracking Forms ('OOCT Forms") are no longer affixed cell front; and (2) claim that Defendants are not properly documenting inmates' refusals of offered out-of-cell time.

As a primary matter, the monthly CGAR reports establish that Defendants consistently meet or exceed the MCPM thresholds required by the Stipulation. The subject Notice of Substantial Non-Compliance was not filed until four days after Defendants filed their Motion to Terminate Monitoring and Reporting of Maximum Custody Performance Measures 1-8 (Doc. 3108).  While the present allegations arise out of the November 2018 monitoring tour of Florence-Kasson and the

Amy Fettig
February 14, 2019
Page 2

January 2019 monitoring tour of Lewis-Rast Max, max custody monitoring has been occurring since March 2015.  Between March 2015 and January 2019, Plaintiffs conducted a total of three monitoring tours of ASPC-Florence (August 2015, June 2018, January 2019). During that same time period, Plaintiffs conducted a total of four monitoring tours of ASPC-Lewis (September 2015, May 2016, January 2017, November 2018).  Yet, it is not until after Defendants filed their Motion to Terminate that these issues were first raised.

Indeed, before the recent Florence-Kasson tour, Plaintiffs' counsel who participated in the monitoring tours never questioned why OOCT Forms were no longer cell front (at any location) and never asked to see them.  Had this occurred at any max custody location, easy explanation would have been provided to counsel just as it was during the November 2018 Florence-Kasson tour. Likewise, during the ASPC-Lewis tour in January 2019, no questions were asked by Plaintiffs' counsel at all as to the location of the OOCT Forms or documentation of refusals.  Since the OOCT Form location was adjusted approximately 1 ½ to 2 years ago, Plaintiffs have waived their challenge to the same.  This, notwithstanding the fact that there is no substantial non-compliance as to monitoring methodology with respect to location of the OOCT Forms and documentation of refusals in the first place.

**Location of the OOCT Forms Is Not Prescribed By the Stipulation, Stipulation Protocols or the Max Custody Monitor Guide.**

Paragraphs 3 and 17-26 of the Stipulation govern max custody monitoring compliance levels and out-of-cell time to be offered to max custody inmates.  (Doc. 1185). These paragraphs are silent as to how Defendants are required to track and monitor the required offer of out-of-cell time.  Neither the OOCT Forms nor their location are addressed in the text of the Stipulation.

Exhibit E to the Stipulation sets forth the Maximum Custody Outcome Measure Protocol. (Doc. 1185-1 at 41-47). While the Protocol refers to OOCT Forms as source documents for MCPMs 1-2, 5-6 & 8 (among others), the Protocol is likewise silent as to a required location for OOCT Forms.

The Max Custody Monitor Guide was finalized in July 2017. The Guide was Defendants' own creation, not required by the Stipulation or Court ruling. Yet, Plaintiffs' counsel participated in agreement to the language contained therein and, where no agreement could be reached, the Court decided the issue.  For MCPMs 1-2, 5-6 & 8, the Guide neither suggests, proscribes, nor prohibits the location of OOCT Forms. Nor does the Guide require contemporaneous recording on the forms. Simply put, the OOCT Forms are just one source document among several by which Defendants may demonstrate that required out-of-cell time was offered to an inmate randomly selected during any particular month for monitoring.

Amy Fettig
February 14, 2019
Page 3

Defendants agree that the original plan was to locate the OOCT Forms cell front. And that occurred. However, as the monitoring phase continued, maintaining the OOCT Forms became unworkable. Inmates were able to tear down the forms during movement. Porters working in the pods would remove the forms, never to be found. Sometimes, inmates who were provided the forms to sign for refusals would not give the forms back or would destroy them. Most importantly, requiring officers to document at the cell front created legitimate safety and security risks. By their own crimes and institutional behavior, max custody inmates are of the highest security risk. Most staff assaults occur in maximum custody units. Max custody inmates regularly attempt to grab personnel through the cell food ports or throw substances at staff through the ports.

Requiring corrections personnel to document at the cell front diverted attention away from the inmates and provided inmates the opportunity for assault if they were to gain control of their food ports and reach out to assault personnel with either their hands or weapons. This scenario is not hypothetical. Indeed, in the past a death row inmate named Jeffrey Landrigan gained control of his food port and launched a self-made spear out of the port at an officer standing near cell front. Had the officer not been alert, focusing on the conduct of the inmate in the cell, and able to move with quick reflex, he would have been seriously injured or killed. Defendants are not required to forego basic safety and security to retain OOCT Forms cell front where it is imperative that officer attention be focused on observation of inmate behavior in-cell, restraint of the inmate, and removal of the inmate from the cell in a safe and controlled manner.

Here, Defendants were reasonably justified in relocating the OOCT Forms to notebook binders, located at Florence-Kasson at the officers' desk outside the pod or at wing control, and at Lewis-Rast either in the security office in the cluster or in the rack outside the pod doors.[1] Neither the Stipulation, the Protocol, the Monitor Guide, nor any Court rulings required Defendants to notify Plaintiffs' counsel of legitimate operational changes in this regard where proper OOCT Form documentation continues. Indeed, if Plaintiffs' counsel were concerned, then certainly questions could have been asked during the monitoring tours that have taken place in the last 1 ½ to two years, as it was plain and obvious that the OOCT Forms were no longer located cell front. As United States Supreme Court precedent cements, courts may not micromanage prison operations, and, certainly here, no provision of the Stipulation, the Protocol, Monitor Guide or Court Ruling prescribed the location of the OOCT Forms or prohibited their relocation when safety, security, and operational concerns justified relocation of the same.

Because neither the Stipulation, Protocol, Monitor Guide or Court rulings require the OOCT Forms be affixed cell front – nor is there a requirement of contemporaneous documentation cell front, Defendants are not substantially non-compliant with the Stipulation. Moreover, to the extent that some officers use count sheets or notepads to record times and then transfer those notes close

---

[1] Indeed OOCT Form binders were located in some pods in the rack outside the pod door at Lewis-Rast Max. While Plaintiffs' counsel and their expert interviewed inmates cell front, I personally reviewed some of the binders.

Amy Fettig
February 14, 2019
Page 4

in time to the OOCT Forms, does not violate any aspect of the Stipulation, the Protocol, Monitor Guide, or Court rulings. It is accepted practice both in corrections and law enforcement for officers to write contemporaneous notes and then soon after in time commit the information to official forms, logs, reports.

**Defendants' Documentation of Inmate Refusals Complies With the Stipulation, Stipulation Protocols, Max Custody Monitor Guide and Court Rulings.**

As is the case with the use of OOCT Forms, Paragraphs 3 and 17-26 of the Stipulation are silent as to how Defendants are to track and monitor inmate refusals of the required offers of out-of-cell time.   Tracking, documenting, and monitoring are not mentioned in the text of the Stipulation. Likewise, the Maximum Custody Outcome Measure Protocol attached as Exhibit E to the Stipulation is silent as to how Defendants are to track and document refusals.  (Doc. 1185-1 at 41-47).

The Max Custody Monitor Guide does address refusals.  The language related to refusals is a product of Court intervention where for legitimate operational reasons, Defendants could not agree to Plaintiffs' position that documentation of refusals should always require a second witnessing staff signature or the inmate's signature. The Court agreed with Defendants' position and, as a result, the Monitor Guide language regarding refusals reads in part:

> When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same.  The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell tracking form). <u>Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering the safety/security/operational concerns, to verify the refusal.</u>

(Monitor Guide at MCPMs 1-2 at Methodology (c), MCPM 5 at Methodology (d), MCPM 6 at Methodology (i) & MCPM 8 at (d) (emphasis added)).

Here, Defendants are not substantially non-compliant regarding documentation of refusals. As Officer Knight explained and demonstrated during the recent Florence-Kasson tour, the physical plant of Kasson is unique as compared to the other max custody locations.  Each wing varies slightly in design.  However, the pods are small and the officers must manually control cell doors from mechanisms just outside of the pod.

Amy Fettig
February 14, 2019
Page 5

The officers controlling the cell doors can see and hear what is happening in the pods (radios may or may not be used). When out-of-cell time is offered to an inmate, and the inmate is restrained and ready to come out, the pod officer calls out to the officer controlling the cell doors to open the door.  If there is a refusal, the officer at cell front advises of the same. In many circumstances, the officer at the controls can also hear the inmate refusing or see body language of the inmate indicating the refusal and thus can second witness a refusal.

Whether an inmate accepts or refuses out-of–cell time is then documented by the officer controlling the cell doors straight onto the OOCT Form or notes are kept on a notepad or the count sheet and transferred to the OOCT Form soon in time after the movement.  If there is a refusal, either the officer who was cell front or the officer controlling the cell doors who also witnessed the refusal signs the form.  It is not impermissible for an officer at the controls who is seeing and hearing that an inmate is either coming out for or refusing out-of-cell time to be the one documenting the same.  Where feasible due to staffing levels, an attempt at an inmate signature is made.  However, due to staffing challenges, obtaining an inmate signature is not commonly feasible due to safety, security, and operational concerns.[2]

As to Lewis-Rat Max, the OOCT Forms are kept in binders, by pod.  Depending on the preference of the movement team and shift, the binders are either kept in the security office in the corresponding cluster or are in the bins located next to the relevant pod doors.  In preparation for an offer of out-of-cell time, a member of the movement team will use either the pod count sheet or a notepad to note whether an inmate refuses offered out-of-cell time.  If there is a refusal, the refusal that is noted on the count sheet or notepad is then transferred to the OOCT Form and the officer receiving the inmate's refusal signs as a witness for the same, as does another member of the movement team.  The OOCT Forms are completed based upon notes made on the count sheet or notepad close in time to the movement.  For those inmates who accept the offered out-of-cell time, a member of the movement team completes the OOCT Forms utilizing the gathered inmate IDs and documents the start time for the out-of-cell activity.[3]  Due to staffing challenges described below, it is not commonly feasible to obtain an inmate's signature for a refusal due to movement teams attending to constant movement needs, staffing challenges, and safety/security reasons.

These processes are compliant with the Monitor Guide – noting that the Monitor Guide is not part of the Stipulation, not referred to in the Stipulation, not incorporated into the Stipulation,

---

[2] For instance, as of February 4th, ASPC-Florence had a 35% COII vacancy rate.  While ASPC-Lewis's vacancy rate is not as significant, Lewis faces its own unique staffing challenges.  First, Lewis has high numbers of inmates out to the hospital.  This requires the posting of two COIIs per inmate in the hospital.  Second, Lewis sees a higher number of inmates on mental health or security watch, which requires increased posting of COIIs in the watch pods. Third, Lewis must address higher numbers of staff call outs and FMLA leave than other comparable complexes.  All of these factors necessarily impede the ability to obtain an inmate's own signature for a refusal.

[3] The binders containing the OOCT Forms follow the movement teams on the carts that also transport the restraints.

Amy Fettig
February 14, 2019
Page 6

and was a voluntary measure implemented by Defendants at ADC's own suggestion and discretion. Any concern that out-of-cell time notated on the OOCT Forms as being offered or refused is not actually happening is averted by the number and frequency of supervisory staff that are in the housing units on a daily and weekly basis. Inmates are not shy about complaining if they feel they are not be afforded what is required. It cannot be disputed that Plaintiffs' counsel participating in monitoring tours regularly observe the same, as inmates call out to ADC personnel to voice complaints. Inmates even ask Plaintiffs' counsel to voice complaints to specific staff on their behalf, which counsel does, and then counsel see the staff members responding to the inmates or advising that they will get with the inmates as soon as they are able.

**Conclusion**

Plaintiffs' allegations are merely meritless challenges to form over substance. Defendants' methodology for documentation on OOCT Forms does not violate the Stipulation, Protocol, Monitor Guide, or Court orders. Defendants appropriately document offers and refusals of out-of-cell time. Plaintiffs cannot demonstrate that max custody inmates are not being offered out-of-cell time in accordance with the Stipulation. And, Defendants' previously filed Motion to Terminate Monitoring and Reporting of Maximum Custody Performance Measures 1-8 (Doc. 3108) demonstrates compliance.

For the reasons set forth herein, Plaintiffs' Notice of Non-Compliance must be withdrawn. Defendants will address Plaintiffs' questions regarding methodology at ASPC-Eyman in conjunction with Plaintiffs' Notice of Substantial Non-Compliance regarding Eyman SMU-1 and Browning dated February 1, 2019.

Sincerely,

Rachel Love

RL/eap

cc:    All counsel of record

# Exhibit 15

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



February 1, 2019

**BY ELECTRONIC MAIL ONLY**

Rachel Love
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
rlove@strucklove.com

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW\**

*\*NOT ADMITTED IN DC:*
*PRACTICE LIMITED TO*
*FEDERAL COURTS*

          Re:    *Parsons v. Ryan*
                   **Notice of Substantial Non-Compliance**

Dear Counsel:

Pursuant to ¶ 30 of the Stipulation, we hereby serve a Notice of Substantial Non-Compliance with respect to Defendants' noncompliance with the Maximum Custody Performance Measures ("MC PM") ##1-2, 5-6, and 8 at Eyman SMU-1 and Browning.

### I. Noncompliance with Monitoring Methodology for Sub-class Members Housed in Eyman SMU-1 and Browning.

Under the final "Max Custody Monitor Guide Duties & Responsibilities" ("Monitoring Guide") approved by the Court there is a required process for recording refusals of out-of-cell time/programming offered under MC PM ##1-2, 5-6, and 8. The Guide specifically states:

> When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and *the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same*….Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal.

Monitoring Guide, July 2017 at 5, 8, 13, 16, and 19 (emphasis added).

During the recent tour of Eyman SMU-1 and Browning on January 24 and 25, 2019, we noted that the Out of Cell Tracking forms were no longer being kept on the doors of the prisoners in any of the Max Custody housing units. We were told by Eyman SMU-1 and Browning staff, Warden Morris, Captain O'Connor, and others, that the procedures for recording out-of-cell time and programming had changed. Instead of using the required contemporaneous methodology set forth in the Monitoring Guide, Eyman SMU-1 and Browning staff are recording information in the tracking sheets after the fact or calling in information to another

officer. Staff who are offering out-of-cell time are not always the staff documenting the information in the tracking sheets.  At SMU-1 officers appear to take binders with tracking sheets out to the recreation yard with them, but this does not appear to be the case at Browning. In both units prisoners are not being asked to sign refusals, instead officers are the only signatories to any alleged refusals.

The new procedures at Browning and SMU-1 are noncompliant with the Monitoring Guide because the offering officer is not contemporaneously making entries or signing refusals.  Instead, a third party, who has no personal knowledge of the refusal, may sign the form, or documentation is done after-the-fact.  Further, this method is non-compliant with the Monitoring Guide because it prevents both the prisoner from signing the refusal contemporaneously or a second officer with personal knowledge of the refusal from signing. The result of these non-compliant methodologies is alleged refusals that do not meet the standards of proof required by the Monitoring Guide.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

We note that the problems found at Eyman SMU-1 and Browning are similar to those found at Lewis Rast and Florence Kasson during earlier tours, which were the subject of our January 15, 2019 Notice of Non-compliance.

We ask that you inform us (1) when these new methodologies were implemented at Browning and SMU-1, and (2) what specific monitoring methodology is being employed at each of the maximum custody units.  We also ask that you confirm the date that the monitoring methodology for max custody is corrected in compliance with the Monitoring Guide at each unit.

We look forward to your response as required by ¶ 30 of the Stipulation.

Sincerely,

Amy Fettig

cc:      All counsel

2

Exhibit 16



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

<div align="right">

Rachel Love
480.420.1616
rlove@strucklove.com

</div>

March 4, 2019

**_VIA EMAIL ONLY_**
Amy Fettig
American Civil Liberties Union
Legal Department
NATIONAL PRISON PROJECT
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

      Re:     **Parsons v. Ryan – Response to Plaintiffs' February 1, 2019 Notice of Substantial Non-Compliance regarding Eyman/Browning and SMU-1 MCPMs 1-2, 5-6 & 8**

               **Confidential, Subject to Fed.R.Evid. 408, Not for Court Filing**

Dear Amy:

      This letter responds to Plaintiffs' February 1, 2019 letter regarding Notice of Substantial Non-Compliance as to Maximum Custody Performance Measures ("MCPMs") 1-2, 5-6, and 8 at Eyman-Browning and SMU-1.

      Plaintiffs' letter alleges that Defendants are noncompliant with monitoring methods at Eyman-Browning and SMU-1 as to monitoring out-of-cell time offered to maximum custody inmates. Specifically, Plaintiffs (1) claim that Defendants are noncompliant with the terms of the Stipulation and monitoring methodology because the Out-of-Cell Tracking Forms ('OOCT Forms") are no longer affixed cell front; and (2) claim that Defendants are not properly documenting inmates' refusals of offered out-of-cell time.

      As a preliminary matter, the monthly CGAR reports establish that Defendants consistently meet or exceed the MCPM thresholds required by the Stipulation. The subject Notice of Substantial Non-Compliance was not filed until four days after Defendants filed their Motion to Terminate Monitoring and Reporting of Maximum Custody Performance Measures 1-8 (Doc. 3108).  While the present allegations arise out of the January 2019 monitoring tour of Eyman-Browning and

Amy Fettig
March 4, 2019
Page 2

SMU-1, max custody monitoring has been occurring since March 2015. Between March 2015 and January 2019, Plaintiffs conducted a total of six monitoring tours of ASPC-Eyman (June 2015, December 2015, November 2016, February 2017, June 2018, and January 2019). Yet, it is not until after Defendants filed their Motion to Terminate that these issues were first raised.

Indeed, before the January 2019 Eyman tour, Plaintiffs' counsel who participated in the monitoring tours never questioned why OOCT Forms were no longer cell front (at any location) and never asked to see them. Had this occurred at any max custody location, the explanation would have been provided to counsel just as it was during the December 5-6, 2018 tour of Florence-Kasson. Since the OOCT Form location was adjusted approximately 1 ½ to 2 years ago, Plaintiffs have waived their challenge to the same. This, notwithstanding the fact that there is no substantial non-compliance as to monitoring methodology with respect to location of the OOCT Forms and documentation of refusals in the first place.

**Location of the OOCT Forms Is Not Prescribed By the Stipulation, Stipulation Protocols or the Max Custody Monitor Guide.**

Paragraphs 3 and 17-26 of the Stipulation govern max custody monitoring compliance levels and out-of-cell time to be offered to max custody inmates. (Doc. 1185). These paragraphs are silent as to how Defendants are required to track and monitor the required offer of out-of-cell time. Neither the OOCT Forms nor their location are addressed in the text of the Stipulation.

Exhibit E to the Stipulation sets forth the Maximum Custody Outcome Measure Protocol. (Doc. 1185-1 at 41-47). While the Protocol refers to OOCT Forms as source documents for MCPMs 1-2, 5-6 & 8 (among others), the Protocol is likewise silent as to a required location for OOCT Forms.

The Max Custody Monitor Guide was finalized in July 2017. The Guide was Defendants' own creation, not required by the Stipulation or Court ruling. Yet, Plaintiffs' counsel participated in agreement to the language contained therein and, where no agreement could be reached, the Court decided the issue. For MCPMs 1-2, 5-6 & 8, the Guide neither suggests, proscribes, nor prohibits the location of OOCT Forms. Nor does the Guide require contemporaneous recording on the forms. Simply put, the OOCT Forms are just one source document among several by which Defendants may demonstrate that required out-of-cell time was offered to an inmate randomly selected during any particular month for monitoring.

Defendants agree that the original plan was to locate the OOCT Forms cell front. And that occurred. However, as the monitoring phase continued, maintaining the OOCT Forms became unworkable. Inmates were able to tear down the forms during movement. Porters working in the pods would remove the forms, never to be found. Sometimes, inmates who were provided the forms to sign for refusals would not give the forms back or would destroy them. Most importantly, requiring officers to document at the cell front created legitimate safety and security risks. By their own crimes and institutional behavior, max custody inmates are of the highest security risk. Most

Amy Fettig
March 4, 2019
Page 3

staff assaults occur in maximum custody units.  Max custody inmates regularly attempt to grab personnel through the cell food ports or throw substances at staff through the ports.

Requiring corrections personnel to document at the cell front diverted attention away from the inmates and provided inmates the opportunity for assault if they were to gain of their food ports and reach out to assault personnel with either their hands or weapons.  This scenario is not hypothetical.  Indeed, in the past a death row inmate named Jeffrey Landrigan gained control of his food port and launched a self-made spear out of the port at an officer standing near cell front.  Had the officer not been alert, focusing on the conduct of the inmate in the cell, and able to move with quick reflex, he would have been seriously injured or killed.  Defendants are not required to forego basic safety and security to retain OOCT Forms cell front where it is imperative that officer attention be focused on observation of inmate behavior in-cell, restraint of the inmate, and removal of the inmate from the cell in a safe and controlled manner.

Here, Defendants acted reasonably in relocating the OOCT Forms to notebook binders.  At ASPC-Eyman, the binders are located in the security office for the corresponding housing area.  At SMU-1, the books are taken out of the office during movement and transported with the movement team on the cart that also carries the restraints and the identification cards for the participating inmates. After movement of the inmates is completed (and recreation/programming starts), the start time for the activity is noted on the OOCT Forms for the participating inmates.  The reverse occurs when movement back to cells is completed.  As for out-of-cell time refusals, a movement team officer is tasked with asking the inmates one-by-one whether they will be attending an out-of-cell activity scheduled for that day (in advance of the activity).  The officer notes any refusals (and the time thereof) on either the daily count sheet or the officer's notepad that he/she carries.  The refusal time is then indicated on the OOCT Form with the officer signing the back of the form. At Browning, completion of the OOCT Forms takes place in the security offices with officer transferring their contemporaneous movement notes kept on notepads or count sheets, onto the OOCT Forms, in close time to completion of the out-of-cell activity or refusal. At Browning, completion of OOCT Forms is not done by the movement team while the team is monitoring recreation due to serious assaults that have occurred during recreation.  The movement team at Browning must concentrate on inmate activity versus completion of the OOCT Forms.

Neither the Stipulation, the Protocol, the Monitor Guide, nor any Court rulings required Defendants to notify Plaintiffs' counsel of legitimate operational changes in this regard where proper OOCT Form documentation continues.  Indeed, if Plaintiffs' counsel were concerned, then certainly questions could have been asked during the monitoring tours that have taken place in the last 1 ½ to 2 years, as it was plain and obvious that the OOCT Forms were no longer located cell front.  As United States Supreme Court precedent dictates, courts may not micromanage prison operations, and, certainly here, no provision of the Stipulation, the Protocol, Monitor Guide or Court Ruling prescribed the location of the OOCT Forms or prohibited their relocation when safety, security, and operational concerns justified relocation of the same.

Amy Fettig
March 4, 2019
Page 4

Because neither the Stipulation, Protocol, Monitor Guide or Court rulings require the OOCT Forms be affixed cell front – nor is there a requirement of contemporaneous documentation at cell front, Defendants are not substantially non-compliant with the Stipulation.  Moreover, to the extent that some officers use count sheets or notepads to record times and then transfer those notes close in time to the OOCT Forms, this does not violate any aspect of the Stipulation, the Protocol, Monitor Guide, or Court rulings. It is accepted practice both in corrections and law enforcement for officers to write contemporaneous notes and then soon after in time commit the information to official forms, logs, reports.

**Defendants' Documentation of Inmate Refusals Complies With the Stipulation, Stipulation Protocols, Max Custody Monitor Guide and Court Rulings.**

As is the case with the use of OOCT Forms, Paragraphs 3 and 17-26 of the Stipulation are silent as to how Defendants are to track and monitor inmate refusals of the required offers of out-of-cell time. Tracking, documenting, and monitoring are not mentioned in the text of the Stipulation. Likewise, the Maximum Custody Outcome Measure Protocol attached as Exhibit E to the Stipulation is silent as to how Defendants are to track and document refusals.  (Doc. 1185-1 at 41-47).

The Max Custody Monitor Guide does address refusals.  The language related to refusals is a product of Court intervention where for legitimate operational reasons, Defendants could not agree to Plaintiffs' position that documentation of refusals should always require a second witnessing staff signature or the inmate's signature. The Court agreed with Defendants' position and, as a result, the Monitor Guide language regarding refusals reads in part:

> When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same.  The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell tracking form).  <u>Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering the safety/security/operational concerns, to verify the refusal.</u>

(Monitor Guide at MCPMs 1-2 at Methodology (c), MCPM 5 at Methodology (d), MCPM 6 at Methodology (i) & MCPM 8 at (d) (emphasis added)).

Here, Defendants are not substantially non-compliant regarding documentation of refusals. As stated above, a member of the movement team will use either the pod count sheet or a notepad to note whether an inmate refuses offered out-of-cell time.  If there is a refusal, information regarding the refusal that is noted on the count sheet or notepad is then transferred to the OOCT Form and the officer receiving the inmate's refusal signs as a witness for the same.  The OOCT

Amy Fettig
March 4, 2019
Page 5

Forms are completed based upon notes made on the count sheet used by the movement officer or on a notepad, close in time to the movement. This process is not dissimilar to common practice in corrections across the country where officers responsible for keeping housing unit journals or control room logs keep contemporaneous notes of events and transfer the data in legible writing to the journal/log close in time to the events being recorded.

Finally, due to staffing challenges for COIIs, it is not always feasible at ASPC-Eyman to obtain either a second officer witness's signature to an out-of-cell time refusal or the inmate's signature. Movement teams are in perpetual motion all day long to recreate and program the inmates as well as get the inmates moved for medical appointments, visitation, showers, etc. The Court found that a second signature should be documented "where feasible due to the safety/security/operational concerns" at play. On February 4, 2019, ASPC-Eyman faced a 39% vacancy rate for COIIs. Vacancy rates for COIIs at ASPC-Eyman regularly reach into the 30th percentile. These vacancy levels create the highest level of safety/security/operational concerns, and obtaining second witness signatures or inmate signatures has not always been operationally feasible at ASPC-Eyman. That said, the importance of attempting to do the same has been re-communicated and re-emphasized to ASPC-Eyman personnel working the max custody housing areas – at every rank and supervisory level from COII to complex Warden. Conversely, allegations by Plaintiffs that ADC officers are documenting refusals with two signatures when two officers actually did not witness the refusal is belied by examples of OOCT Forms showing one officer's signature to a refusal. *See, e.g.,* ADC1549001-02, 10-11, 89-90, 143-144, 162-163, 216-217, 252-253 for August 2018 at Browning for a one-month example. And, allegations that SMU-1 never has a second signature of a witnessing officer for out-of-cell activities is also belied by the OOCT Forms. *See, e.g.,* ADCM1549412-13, 423-24, 451-52, 548-549 for August 2018 at SMU-1 for a one-month example.

Defendants are compliant with the Stipulation, Protocols, and Monitor Guide regarding documentation of refusals – this, noting again that the Monitor Guide is not part of the Stipulation, not referred to in the Stipulation, not incorporated into the Stipulation, and was a voluntary measure implemented by Defendants at ADC's own suggestion and discretion. Any concern that out-of-cell time notated on the OOCT Forms as being offered or refused is not actually happening is averted by the number and frequency of supervisory staff that are in the housing units on a daily and weekly basis. Inmates are not shy about complaining if they feel they are not be afforded what is required.

Amy Fettig
March 4, 2019
Page 6

**Conclusion**

     Plaintiffs' allegations are meritless challenges to form over substance. Defendants' methodology for documentation on OOCT Forms does not violate the Stipulation, Protocol, Monitor Guide, or Court orders. Defendants appropriately document offers and refusals of out-of-cell time. Plaintiffs cannot demonstrate that max custody inmates are not being offered out-of-cell time in accordance with the Stipulation. And, Defendants' previously filed Motion to Terminate Monitoring and Reporting of Maximum Custody Performance Measures 1-8 (Doc. 3108) demonstrates compliance.

     For the reasons set forth herein, Plaintiffs' Notice of Non-Compliance must be withdrawn. Defendants will address Plaintiffs' questions regarding methodology at ASPC-Eyman in conjunction with Plaintiffs' Notice of Substantial Non-Compliance regarding Eyman SMU-1 and Browning dated February 1, 2019.

     Sincerely,

Rachel Love

RL/eap

cc:    All counsel of record

Exhibit 17

(Redacted)



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

February 7, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:    *Parsons v. Ryan*, 2:12-CV-00601
          Notice of Substantial Non-Compliance

Dear Mr. Bojanowski:

Pursuant to Paragraph 30 of the Stipulation, we hereby serve a Notice of Substantial Non-Compliance with respect to Defendants' noncompliance with Paragraph 14, which provides:

> For prisoners who are not fluent in English, language interpretation for healthcare encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service.

## I.      Deaf Class Members

During the tours of ASPC-Tucson and ASPC-Eyman last month, deaf class members whose primary form of communication is American Sign Language (ASL) reported that they are not provided with sign language interpretation during healthcare encounters.[1]    As we

---

[1]    The Arizona Center for Disability Law (ACDL) and National Association for the Deaf separately have raised concerns regarding Defendants' failure to provide sign language interpreters during healthcare encounters and other programs and services.  *See* **Attachment A**, Letter from Rose Daly-Rooney, ACDL, and Howard Rosenblum, National Association for the Deaf, to Charles Ryan, Arizona Department of Corrections 2 (July 18, 2018) ("No inmate that ACDL spoke to has ever been provided a qualified sign language interpreter in *any* state prison for *any* ADC program or service. . . .  This means that there was no effective communication during . . . medical appointments, [or] psychological consults . . . .").

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

previously have explained, "American Sign Language is a language completely distinct from English," and deaf class members are entitled to sign language interpretation services for healthcare encounters under Paragraph 14.  Letter from Corene Kendrick, Plaintiffs' Counsel, to Lucy Rand, Office of the Arizona Attorney General, Notice of Substantial Non-Compliance 3 & n.4 (Oct. 15, 2015); *see E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1105 (9th Cir. 2010) ("ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." (citations omitted)).[2]

A review of the electronic medical record confirms deaf class members' reports.  For example, ▇▇▇▇▇▇▇▇▇▇▇▇ was assessed as "Deaf nonspeaking, not elsewhere classified," on November 8, 2018, and currently is housed at ASPC-Eyman.  **Attachment B**, Select Medical Records of ▇▇▇▇▇▇▇▇▇▇  During a medical encounter on December 12, 2018, the provider noted:  "Communications today buy [sic] writing only.  Patient is able to read sentences."  Written notes, however, are no substitute for a sign language interpreter.  *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1021 (N.D. Cal. 2013) (noting previous finding that "Defendants harm deaf prisoners by forcing them to rely on inadequate and ineffective forms of communication, such as . . . written notes" and "requiring Defendants, for all deaf prisoners whose primary means of communication is sign language, to provide a qualified sign language interpreter during all regularly-scheduled mental health rounds and all other encounters within the definition of the [settlement agreement]"); Irene W. Leigh *et al.*, Deaf Culture 191 (2018) ("It is a well-known fact that many deaf people have low English literacy.  This makes it hard for deaf people to understand English-based health-related

---

[2]  *See also* Matthew S. Moore & Linda Levitan, eds., For Hearing People Only 67 (2016) ("ASL is not a written language.  In everyday usage, it is never written."); John W. Adams & Pamela S. Rohring, Handbook to Service the Deaf and Hard of Hearing: A Bridge to Accessibility 76 (2004) ("ASL's structure is different from that of English, making it a unique and independent language.  It is not a manual representation of English, with individual signs corresponding to English words. . . .  ASL, as a natural language, has its own rules for generating grammatically sound phonological, morphological, and syntactical structures."); *id.* at 125 ("People assume that deaf people are literate in English because the printed word is visually accessible . . . .  What most hearing people do not recognize is that hearing persons are typically fluent in (spoken) English by the time they arrive in kindergarten. . . .  [R]eading and writing become a lifelong struggle for many deaf people.").  ASL has a much smaller vocabulary than English.  English has over 500,000 words, and the average American regularly uses tens of thousands of words.  Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough: Deafness, Language, and Due Process, 2003 Wis. L. Rev. 843, 856 (2003).  By contrast, "[t]he largest commercially available ASL dictionary has approximately 5600 handsigns."  *Id.* at 875.

information . . . .  They may misunderstand instructions for medicine after they see doctors because sign language interpreters were not provided.  They feel doctors or other medical personnel use advanced words that they do not know.  Doctors may not understand them because they do not know ASL and may not have sign language interpreters available and as a result may misdiagnose medical symptoms.  This can lead to ongoing health problems based on lack of understanding."); Anna Middleton, ed., Working with Deaf People:  A Handbook for Healthcare Professionals 59 (2010) ("A busy health professional is also likely to write in a briefer manner in a written note, given the time it takes to write one, than they would be if they were explaining in speech.  This means that a deaf person, particularly a sign language user, is receiving their medical information not only in a language they do not routinely use, but also in a shorter form than their hearing counterpart would receive.  It is not difficult to see that this means a substandard services is being provided.  If a client uses sign language as their first language there is no excuse whatsoever for not booking a sign language interpreter for the healthcare consultation."); Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough: Deafness, Language, and Due Process, 2003 Wis. L. Rev. 843, 854 (2003) ("Thirty percent of deaf students leave school functionally illiterate, i.e., they read at grade level 2.8 or below."); Ira Hrastinski & Ronnie B. Wilbur, Academic Achievement of Deaf and Hard-of-Hearing Students in an ASL/English Bilingual Program, J. of Deaf Studies & Deaf Educ. 156-170 (2016).[3]

In addition, ███████████████ was housed at ASPC-Tucson until his release from prison last month.  According to the electronic medical record, Mr. ███████ was assessed with transient ischemic deafness, bilateral, on May 22, 2017.  *See* **Attachment C**, Select Medical Records of ███████████████  During individual mental health counseling on July 30, 2018, the psychologist wrote, among other things:  "Patient and writer used pen and paper to communicate since patient is deaf," and "Patient appeared frustrated he was unable to use interpreter to communicate."  The Mental Health Treatment Plan entered into the medical record that same day listed the following "Limitations":  "Patient has hearing loss and requires a translator."  The Plan listed the following "intervention":  "provide translating services." Nonetheless, no interpreter was provided for the subsequent individual mental health counseling encounters; Mr. ███████ again communicated with the psychologist only through written notes.

---

[3]     The U.S. Department of Justice, as part of its Barrier-Free Health Care Initiative, has entered into a number of settlement agreements with hospitals requiring provision of sign language interpreters.  *See* U.S. Dep't of Justice, Barrier-Free Health Care Initiative, *available at* https://www.ada.gov/usao-agreements.htm (last visited Feb. 6, 2019).

Mr. Timothy Bojanowski
Re: Notice of Substantial Non-Compliance
February 7, 2019
Page 4

        The problem appears to arise as soon as a deaf person enters the prison system.  Adult
men entering the custody of the Arizona Department of Corrections first are processed at
ASPC-Phoenix, Alhambra Reception.  While there, the person must receive a health screening
(Performance Measure 33); physical examination, including a history (Performance Measure
34); tuberculosis screening (Performance Measure 62); and mental health assessment
(Performance Measure 75).  When we visited ASPC-Phoenix on January 10, 2019, Ms. Acker,
a supervisor at the Alhambra Reception medical building, reported that in the six months she
has been at the prison, she has had one deaf person come through.  She reported that he could
not speak and that medical staff at Alhambra Reception wrote notes with him to communicate.
Ms. Acker said that, if a deaf patient cannot read or write notes, she does not know how she
would communicate with him or what her options for communication would be.  In the last
several months, at least two deaf class members who communicate through sign language have
been processed at ASPC-Phoenix: ██████████████████, and ██████████████████,
██████   According to the electronic medical record, neither class member was provided with a
sign language interpreter for his physical examination, including history, or mental health
assessment.  Indeed, Dr. Lee, who conducted Mr. ████████'s physical examination and history
on November 8, 2018, wrote that Mr. ████████ "is deaf" and that they "communicated through
a word document."  **Attachment B**.  And the psychologist who conducted Mr. ████████'s
mental health assessment on December 10, 2018, noted:  "IP is deaf and we communicated
using paper and pen and being allowed to read the questions on the computer."  **Attachment D**,
Select Medical Records of ██████████████████.

        Section 5.3.3 of Department Order 108:  Americans with Disabilities Act Compliance
(May 9, 2014), makes reference to a provider or Nursing Supervisor completing a "Functional
Assessment, Form 108-1," but it is not clear whether this form contains information regarding
necessary accommodations for effective communication, including sign language
interpretation.  We have not seen the form in the electronic medical record of deaf class
members.  *See Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015) (holding
that "prison officials have an affirmative duty to assess the potential accommodation needs of
inmates with known disabilities who are taken into custody and to provide the accommodations
that are necessary for those inmates to access the prison's programs and services, without
regard to whether or not the disabled individual has made a specific request for accommodation
and without relying solely on the assumptions of prison officials regarding that individual's
needs").

. . . .

. . . .

. . . .

Mr. Timothy Bojanowski
Re: Notice of Substantial Non-Compliance
February 7, 2019
Page 5

On January 17, 2019, we requested the following documents from Defendants:

**RFP 99**      List of all class members who are deaf and their ADC numbers.

**RFP 100**    List of all class members whose primary form of communication is American Sign Language (ASL) or another sign language and their ADC numbers.

**RFP 101**    All documents regarding provision of sign language interpretation during medical, dental, and mental health encounters at all ASPCs, including (1) policies, procedures, and orders regarding the use of sign language interpreters at such encounters; (2) contract(s) for in-person and video remote interpretation; (3) location of computers used for video remote interpretation; [and] (4) . . . log of use of sign language interpretation for the past three years.

We look forward to receiving those documents by February 17, 2019.

## II.    Other Class Members Who Are Not Fluent in English

It also is apparent that Defendants do not reliably provide interpretation services for other class members who are not fluent in English, even when those class members have been identified by prison health care staff as needing interpretation. For example:



████████████████████. At a mental health sick call encounter on February 5, 2019, it was noted that Mr. ███████████ requires language interpretation, and that such interpretation was provided by a member of the health care staff. Mr. ██████████ participated in "MH-Group Counseling" on October 23, 2018; the note for that encounter similarly indicates that interpretation was needed, and was provided by a health care staff member. However, when this patient participated in MH Group Counseling on February 3, 2019, the note indicates that language interpretation was not needed, and there is no indication that interpretation was provided. *See* **Attachment E**, Select Medical Records of ████ ████████████.

████████ At a mental health individual counseling encounter on January 15, 2019, the psychologist noted that interpretation was required, and that such interpretation was provided by a health care staff member. However, when Mr. ██████ participated in MH Group Counseling one week earlier, on January 8, the same psychologist wrote that interpretation was not needed, and there is no indication that it was provided. This patient similarly participated in MH Group Counseling on January 6, 2019, and December 30, 2018; in both cases, the note indicated that no interpretation was needed, and none was provided. *See* **Attachment F**, Select Medical Records of ██████████████.

Mr. Timothy Bojanowski
Re: Notice of Substantial Non-Compliance
February 7, 2019
Page 6

██████████████████████████.   At a mental health individual counseling encounter on January 17, 2019, the psychologist noted that interpretation was required, and that such interpretation was provided by a health care staff member.  Similarly, when Mr. ████████████ participated in MH Group Counseling on July 4, 2018, the note indicated that language interpretation was needed, and that such interpretation was provided via the language line.  But when Mr. ████████████ participated in MH Group Counseling the following day, July 5, 2018, the note indicated that language interpretation was not needed, and there is no indication that interpretation was provided.  *See* **Attachment G**, Select Medical Records of ████████████████████████

Defendants' failure to provide language interpretation to these and similarly situated class members violates both Paragraph 14 of the Stipulation and federal law.  *See Anderson v. County of Kern*, 45 F.3d 1310, 1316-17 (9th Cir. 1995).

\* \* \* \* \*

We have long been concerned with Defendants' failure to accurately document and monitor compliance with Paragraph 14 of the Stipulation.  *See* Letter from Corene Kendrick, Plaintiffs' Counsel, to Lucy Rand, Office of the Arizona Attorney General, Notice of Substantial Non-Compliance 3, 18-19 (Oct. 15, 2015); Letter from Kirstin Eidenbach, Plaintiffs' Counsel, to Lucy Rand, Office of the Arizona Attorney General 4-5 (July 14, 2015).  In our review of the electronic medical record, it is unclear how, if at all, Defendants document whether a class member requires interpretation for healthcare encounters.  The electronic medical record now contains two fields related to interpreter services for specific health care encounters:  "Are interpreter services needed for this inmate," and "What type of interpreter services were used for the encounter."  The first field, however, does not appear to be automatically populated and can be inconsistent between different medical encounters for the same class member.

We look forward to receiving your response to this Notice within 30 days, as required by the Stipulation, and to discussing these important issues with you.

Sincerely yours,

Rita Lomio
Staff Attorney

# ATTACHMENT A

 

July 18, 2018

**Sent Via Electronic Mail and First Class Mail**

Charles Ryan, Director
Arizona Department of Corrections
1601 W. Jefferson Street
Phoenix, AZ 85007
directoroffice@azcorrections.gov

Dear Director Ryan:

The Arizona Center for Disability Law ("ACDL") is the federally designated protection and advocacy agency that represents people with disabilities in Arizona. ACDL advocates for the right of persons with disabilities to be free from discrimination. ACDL currently represents seven deaf individuals who are incarcerated in Arizona State Prison and use sign language. The Arizona Department of Corrections ("ADC") is not providing appropriate auxiliary aids and services, such as qualified sign language interpreters and videophones, to inmates who are deaf or hard of hearing. ACDL asks that ADC take necessary steps, no later than August 15 2018, to ensure effective communication with deaf and hard of hearing inmates in all state prisons and all its programs, services, and activities regardless of whether ADC operates them directly or indirectly through contractual arrangements.

These necessary steps include but are not limited to:

1) stop relying exclusively on TTYs (which are no longer used by most deaf people) for inmate telephone calls and  install videophones, captioned phones, and phones with headsets with amplification in all ADC prisons;

2) stop using inmates to interpret for deaf or hard of hearing inmates in ADC programs, services, and activities and, instead, hire or contract with qualified sign language interpreters that are licensed by the Arizona Commission for the Deaf and Hard of Hearing (ACDHH);

3) ensure that qualified sign language interpreters are provided for all aspects of prison services that require communications including but not limited to: orientation, grievances, disciplinary proceedings, counseling, medical and mental health care, work programs, and parole/probation;

4) arrange to provide extensive training to ADC staff about deafness, sign language and cultural issues, effective communication, and provision of auxiliary aids and services;

5) provide captioning for programming aired on ADC's channel, and ensure that all televisions available to deaf and hard of hearing inmates have captioning turned on for them to be able to see any closed captioning; and

5025 East Washington Street, Suite 202          177 North Church Avenue, Suite 800
Phoenix, Arizona 85034-7439                      Tucson, Arizona  85701-1119
(602) 274-6287                                    (520) 327-9547
(602) 274-6779 (Fax)                              (520) 884-0992 (Fax)
www.azdisabilitylaw.org

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 2

6) provide visual and tactile alerting mechanisms to notify deaf and hard of hearing inmates of meals, fire alarms, and visitors.

**OVERVIEW OF THE PRISONS WITHIN PRISON[1] EXPERIENCED BY DEAF INMATES.**

Many individuals who are deaf grow up using American Sign Language ("ASL") as their primary or only language.[2]  ASL is its own language—not a manual representation of English—with its own vocabulary, syntax, and grammar.  There is not a sign for every English word.[3]  For some individuals who are deaf and whose primary language is ASL, they either use English as a second language or do not use English at all.[4]

No inmate that ACDL spoke to has ever been provided a qualified sign language interpreter in *any* state prison for *any* ADC program or service. No qualified sign language interpreter ever interpreted for deaf or hard of hearing inmates from the day they entered prison and throughout their sentence. This means that there was no effective communication during intake, orientation, Prison Rape Elimination Act ("PREA") training and materials, medical appointments, psychological consults, counseling, education classes, town hall meetings, employment training, reentry programs, and during grievances and disciplinary proceedings.  For example, ADC issued a certificate of completion for a reentry course to a deaf inmate who could only look at written materials at a table outside the classroom while hearing inmates attended the class with an instructor and participated in activities, class discussions and a question and answer session. This happens every day in Arizona State Prisons.  Deaf and hard of hearing inmates that have filed grievances have received inadequate responses, including indefensible statements that it would be an undue burden for ADC to provide a qualified sign language interpreter. The lack of effective communication denies deaf and hard of hearing inmates' equal opportunity to benefit from the programs, services, and activities as other inmates.

TTYs, where available, are often broken. When TTYs are operating, they are not available for use during the same days and hours and in locations accessible to the inmates because, unlike regular telephones, ADC keeps the TTYs locked in Corrections Officer III offices. CO IIIs often do

---

[1] Advocates for deaf or hard of hearing inmates, such as HEARD, commonly refer the isolation experienced as a "prison within a prison." See HEARD Fact Sheet, available at http://www.behearddc.org/images/pdf/deafinprison%20fact%20sheet%20.pdf (last visited June 27, 2018).

[2] *See* Helping Educate to Advance the Rights of the Deaf (HEARD) #DeafInPrison Campaign Fact Sheet ("HEARD Fact Sheet"), available at http://www.behearddc.org/images/pdf/deafinprison%20fact%20sheet%20.pdf (last visited July 2, 2018) at 1.

[3] See HEARD Fact Sheet at 1.

[4] See HEARD Fact Sheet at 1.

---

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 3

not work on weekends or evenings, when many inmates wish to call the friends and families on their approved lists.  Deaf or hard of hearing inmates are deprived of equal opportunities to make personal calls and legal calls. More importantly, TTYs are barely used anymore within the deaf and hard of hearing community, and most deaf and hard of hearing people no longer own TTYs. In Arizona state prisons, deaf and hard of hearing inmates do not have access to videophones that allow them to communicate in their primary language. Given that their family and friends use videophones and no longer have TTYs, deaf and hard of hearing inmates are unable to call them directly until the prisons install videophones.

Collectively, these inmates have been living in "prison within a prison" for over 29 years.

**RELEVANT LAWS**.

ADC, as a state agency, is a public entity as defined by Title II of the Americans with Disabilities Act of 1990 ("ADA"),[5] and thus, subject to Title II and its implementing regulation.[6] As a recipient of federal financial assistance, the ADC must also comply with Section 504 of the Rehabilitation Act.[7] Both laws prohibit the ADC, from directly or indirectly, discriminating against qualified individuals with disabilities, including denying them an equal opportunity to benefit from the "services, programs, or activities of a public entity."[8] ADC is ultimately responsible for meeting Title II's and Section 504's obligations in *all* Arizona State Prisons whether operated by ADC or a private prison and in *all* services, programs, or activities whether conducted by ADC or private contractors.[9]

ADC "[must] take appropriate steps to ensure that communication with [inmates], members of the public, and [visitors] are as effective as communication with others."[10] ADC "[must] furnish appropriate auxiliary aids where necessary to afford qualified individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."[11]  To ensure effective communication, a public entity shall give primary

---

[5] 42 U.S.C. § 12131(1).

[6] 42 U.S.C §§ 12131-12134; 28 C.F.R. Part 35.

[7] Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*

[8] 42 U.S.C. § 12132; *Yeskey v. Pa. Dep't of Corrections*, 524 U.S.  206, 210 (1998) (finding that prison vocational programs are "benefits" of a public entity).

[9] 28 C.F.R. § 35.130 (b)(1); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065–67 (9th Cir. 2010) (holding the California Department of Corrections liable for ADA violations committed by county jails housing state prisoners under contracts); *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 909–10 (9th Cir. 2013) (ruling that ADC could be responsible for any ADA violations committed by Eurofresh, a company that provided paid employment and vocational training to inmates housed in Arizona prisons).

[10] 28 CFR § 35.160(a)(1).

[11] 28 CFR §§ 35.152 and 35.160.

---

5025 East Washington Street, Suite 202          177 North Church Avenue, Suite 800
Phoenix, Arizona 85034-7439                    Tucson, Arizona  85701-1119
(602) 274-6287                                  (520) 327-9547
(602) 274-6779 (Fax)                            (520) 884-0992 (Fax)
www.azdisabilitylaw.org

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 4

consideration to the expressed preference of the individual with a disability when determining what type of auxiliary aid and services are appropriate.[12] Auxiliary aids include, among other aids and services, qualified interpreters, videophones, telephones compatible with hearing aids, amplified telephones, captioning and real-time captioning.[13] A qualified interpreter means an interpreter "who is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary."[14]

ADC is also an agency as defined by the Prison Rape Elimination Act ("PREA"), and thus, is subject to PREA and its implementing regulations.[15] One of the purposes of PREA is to "protect the Eighth Amendment rights of Federal, state and local prisoners," including those with disabilities.[16] PREA requires an agency, such as ADC, to take appropriate steps to provide inmates with disabilities effective communication to ensure they "have an equal opportunity to participate in or benefit from all aspects of the agency's efforts to prevent, detect, and respond to sexual abuse and sexual harassment."[17] Appropriate steps include providing inmates who are deaf or hard of hearing "access to interpreters who can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary."[18]

Arizona Revised Statute (A.R.S.) § 12-242 requires ADC, as a state department, to provide "in any proceeding… in which a deaf person is a principal party of interest or witness… a qualified interpreter to interpret the proceedings to the deaf person and to interpret the deaf person's testimony or statements."[19] This same statutory provision defines "deaf person" to mean "a person whose hearing impairment is so significant that the individual is impaired in processing linguistic information through hearing."[20] This provision also defines "qualified interpreter" as "a person who has a valid license of competency authorized by the commission for the deaf and the hard of hearing."[21]  In any proceeding before an agency, such as discipline, the state agency must use a Legal A interpreter, and if a Legal C interpreter is used it must be on a team of legal interpreters that includes a Legal A interpreter.[22]

---

[12] *Id.*
[13] 28 C.F.R. § 35.104 (auxiliary aids and services definition).
[14] 28 C.F.R. § 35.104 (qualified interpreter definition).
[15] 34 U.S.C. § 30301 et seq.; 28 C.F.R. Part 115.
[16] 34 U.S.C. § 30302(7).
[17] *See* 28 C.F.R. § 115.16(a).
[18] *Id.*
[19] A.R.S. § 12-242(B).
[20] A.R.S. § 12-242(H)(1). Niether NAD or ACDL use the term, "hearing impairment," but it is the term used in the statute.
[21] A.R.S. § 12-242(H)(2).
[22] *See* Arizona Commission for the Deaf and Hard of Hearing (ACDHH) FAQ, available at http://www.acdhh.org/interpreter-services/faq (last visited July 2, 2018); *see also* ACDHH AZ Interpreter Licensure Guideline Chart, available at

5025 East Washington Street, Suite 202
Phoenix, Arizona 85034-7439
(602) 274-6287
(602) 274-6779 (Fax)

177 North Church Avenue, Suite 800
Tucson, Arizona  85701-1119
(520) 327-9547
(520) 884-0992 (Fax)

www.azdisabilitylaw.org

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 5

**STOP RELYING ON TTYS AND ARRANGE FOR THE INSTALLATION OF VIDEOPHONES.**

ADC's exclusive reliance on TTYs – an outdated form of communication[23] – does not comply with federal laws and regulations. TTYs are quickly becoming obsolete[24]. Most deaf and hard of hearing individuals now use videophones for effective communication. Exclusive reliance on TTYs instead of other auxiliary aids, such as videophones, violate an inmate's constitutional right under the First Amendment to communicate with individuals outside of prisons.[25]

Many deaf and hard of hearing individuals cannot effectively communicate with others by using TTYs because they lack the proficiency to read and write English[26] -- a skill that TTY users are required to have because written messages are exchanged in a TTY conversation.[27] Because TTY users must take turns alternating between typing and reading scrolling text, communication via TTY is markedly slower and "takes significantly longer than signed or spoken conversations."[28] Inmate telephone calls are restricted by time limits and a TTY call does not permit the same amount of information to be exchanged within the time allotted. On the other hand, videophones allow deaf or hard of hearing individuals to make calls in real-time and in ASL. Communication via videophone allows the users to see each other and convey important linguistic information such as emotion, tone, or inflection, which can affect meaning and message significantly. Videophone users can also interrupt each other as typical in a natural, free-flowing, conversation.

ADC should also stop relying exclusively on TTYs to provide effective communication because deaf and hard of hearing inmates are not afforded equal access to the courts or an equal opportunity to contact individuals outside of prison, such as friends and family. The primary reason is because ADC's TTYs are not accessible as they are stored in locked offices of appointed staff members who frequently are not around to make them available. In contrast, inmates who are not deaf or hard of hearing are unimpeded from using the telephone to make calls to individuals outside of prison. The ADA prohibits public entities from discriminating, on the basis of disability, by not allowing "equal opportunities to obtain the same result, gain the same benefit, or reach the same level of achievement provided to others."[29]

---

http://www.acdhh.org/media/524145/Licensure-Guideline-Visual-Chart-FINAL.pdf (last visited July 2, 2018).

[23] https://www.ada.gov/florida_doc/florida_doc_comp.html (Last visited June 30, 2018).

[24] *See Heyer v. Boyd*, 849 F3d 202, 207 (4th Cir. 2017).

[25] *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *Turner v. Safley*, 482 U.S. 78 (1987); *Procunier v. Martinez*, 416 U.S. 396 (1974).

[26] *Heyer v. Boyd*, 849 F3d 202, 207 (4th Cir. 2017).

[27] *Id.*

[28] *Id.*

[29] 28 C.F.R. § 35.130.

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 6

Videophones provide meaningful effective communication for those whose primary language is ASL and who use English as a second language or not at all because they provide the real-time communication in their native language that TTY technology cannot deliver. Videophones also provide inmates who are not deaf or hard of hearing meaningful effective communication with family, friends, and others outside of prison who are deaf and hard of hearing.[30]

Videophones allow deaf or hard of hearing inmates to make calls to hearing people outside of prison by automatically connecting to a Video Relay Service ("VRS"). A VRS provides a live qualified sign language interpreter to interpret the call. VRS operators are paid with federal dollars, and their services are not charged to users or prisons. Further, most VRS providers, such as Purple Communications, provide VRS interpretation in English and Spanish.[31]

### I.      Videophones are a safe and accessible option for ADC's facilities

Correctional videophone providers[32] can install a locked-down, wall-mounted all-in-one touch screen PC monitor or kiosks for inmates to use in the general pay phone area. Videophones can also be accessed through IP-Enabled Tablets that are specifically designed for inmate use.[33] Inmates at the Pima County Adult Detention Center ("PCADC") have used these tablets to communicate with family and friends since 2014.[34] Specifications for both types of equipment meet the safety requirement standards for correctional facilities.

Videophones require Internet connectivity, but Internet access is restricted. For example, stationary videophone software for prisons only allows inmates the function to make calls. Many videophone features available to the general public are disabled, including receiving in-bound calls and the ability to see call history. The tablets used at PCADC connect through Wi-Fi on an intranet server. The on-site server allows inmates access only to specific features that have been programmed. Therefore, the current restricted access does not allow inmates the ability to access the Internet for purposes that violate ADC's policies.

### II.     Integrating videophones and VRS into ADC's facilities is a de minimis cost

The only cost for installing videophones is the cost for internet connectivity or WiFi. Companies that provide integrated corrections technology, such as Global Tel* Link ("GTL"), can offset

---

[30] For example, if a Child of a Deaf Adult ("CODA") or another deaf or hard of hearing individual is on an inmate's approved call list or approved visitor list, the caller or visitor would have the opportunity to speak to the inmate in his or her native language.

[31] https://www.purplevrs.com/solutions (last visited 6/28/18).

[32] e.g. Purple Prison Videophones from Purple Communications and Global Tel* Link (GTL)

[33] http://www.gtl.net/gtl-tablet-solutions// (last visited on 6/28/18).

[34] See Pima County Procurement e-contracts by visiting https://econtracts.pima.gov/ and conduct a vendor search for GLOBAL TEL* LINK CORPORATION.

---

5025 East Washington Street, Suite 202          177 North Church Avenue, Suite 800
Phoenix, Arizona 85034-7439                     Tucson, Arizona  85701-1119
(602) 274-6287                                  (520) 327-9547
(602) 274-6779 (Fax)                            (520) 884-0992 (Fax)

www.azdisabilitylaw.org

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 7

hardware and installation costs.[35] Providing VRS would not be a financial hardship for ADC either because the Federal Communications Commission ("FCC") created the Telecommunications Relay Fund to fund the costs of Telecommunication Relay Services ("TRS"). Companies that offer VRS for correctional facilities are paid from the TRS fund to provide free videophone equipment individuals who are deaf or hard of hearing.

**STOP USING INMATES TO INTERPRET AND PROVIDE QUALIFIED SIGN LANGUAGE INTERPRETERS.**

Inmates who are deaf and whose primary language is American Sign Language or another sign language will need a sign language interpreter for effective communication for important, lengthy or complex communications.  The following non-exhaustive list – recognized by the Department of Justice – provides examples of activities, services, and programs, or circumstances at ADC's facilities when qualified interpreters, should be provided to ensure effective communication with inmates who are deaf and whose primary language is sign language.[36] The list includes:

- Critical communication, complex information, lengthy exchanges, or anything involving legal due process, including disciplinary hearings and hearings in which the inmate is a witness;
- Intake;
- Orientation, including orientation regarding PREA;
- Monthly Town Hall Meetings
- Classification;
- Medical care and health programs and services, including physicals, medical screenings and treatment, dental, visual, and/or mental health examinations or treatment, and drug and alcohol recovery services;
- Counseling or psychological services;
- Educational and vocational programming, including reentry classes and any programming required for parole or early-release;
- Classification review interviews;
- Grievance interviews or processes;
- Religious services;

---

[35] PCADC Corrections Captain Sean Stewart stated that the tablets with the video phones did not come from the General Fund or from tax money, but, it instead generates PCADC money. *See* Arizona Public Media, Arizona Week Interview https://www.youtube.com/watch?v=8VA6j6yR4Y4&index=2&list=PL8306C8F702BE72FE at minute 3:48.

[36] This list was adapted from a Department of Justice Settlement Agreement with the South Carolina Department of Corrections. https://www.ada.gov/south_carolina_doc_sa.html (last visited 6/15/18).

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 8

- Non-criminal investigations conducted by the ADC; and
- Pre-release instructions;
- CART Services; and
- Access to a transcript or ASL version of hearing when it is posted on website.

The ADA requires the use of "qualified interpreters."[37] The ADA defines a qualified interpreter as one who, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary."[38]  Arizona established a system for licensing sign language interpreters.  ACDHH recognizes certifications granted by the National Association of the Deaf (NAD), the Registry of Interpreters for the Deaf (RID), and the Board for Evaluation of Interpreters (BEI).  Each certification requires a written and performance exam.  Under Arizona law, all interpreters must meet ACDHH licensure requirements.  As noted above, for certain communications, such as discipline and grievance meetings, an interpreter must be licensed as a legal interpreter.

Moreover, using inmates to interpret places deaf and hard of hearing inmates at great risk.  Putting aside the lack of inmate "interpreter" qualifications, using inmates to interpret for other inmates creates an inherent imbalance of power. In general, it is extremely dangerous for prisoners with disabilities to rely on other prisoners' assistance for basic needs such as medical care. Notably, in the prison economy, this sort of forced reliance on inmate "interpreters" too often leads to predatory behavior including extortion and sexual exploitation of deaf prisoners. Prison officials have a duty to protect prisoners from violence at the hands of other prisoners.[39] Further, PREA prohibits an agency, such as ADC, from using inmates as interpreters because they could compromise an inmate's safety.[40] ADC's internal policies for operational security do not comport with its promotion of inmates as interpreters for inmates who are deaf or hard of hearing because in that role they may go to medical appointments, counseling visits and grievance interviews.[41] Inmates, unlike licensed sign language interpreters, are not bound by ethical responsibilities to keep information confidential and remain neutral during the communication. Deliberate indifference to exposing an inmate to a substantial risk of serious harm is a violation of the Eighth Amendment.[42]

There are over 500 licensed interpreters in Arizona who can travel to and provide ASL services to ADC inmates across the state.  The Arizona Commission for the Deaf and Hard of Hearing

---

[37] 42 U.S.C. § 12141 et seq.
[38] 28 C.F.R. § 35.104.
[39] *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).
[40] *See* C.F.R. § 115.16(c)
[41] Arizona Department of Corrections, Department Order §§ 704.12, .15 and .16
[42] See *Farmer v. Brennan*, 511 US 825, 828 (1994).
[43]http://www.acdhh.org/interpreter-services/list-of-licensed-interpreters (Last visited on 6/29/18).

Charles Ryan, Director
Arizona Department of Corrections
July 18, 2018
Page 9

(ACDHH) provides a list of Arizona's licensed interpreters and a geographical directory to request interpreter services.[43]

Providing qualified interpreters would not be a significant expense to ADC either because relevant factors such as costs of the accommodation and ADC's overall financial resources would be considered.[44] For example, the average rate for an Arizona licensed qualified interpreter is about $60/hour. The annual cost to provide interpreter services would be considered in light of the budget at the ADC facility providing the services, ADC's overall budget, and the budget of the State of Arizona.[45]

ADC should use videophones instead of TTYs to provide effective means of communication and stop using inmates as ASL interpreters. Not allowing inmates with disabilities equal opportunities by providing the appropriate auxiliary aid and services to effectively communicate goes beyond violating Title II of the ADA. It violates inmates' constitutional First Amendment rights to communicate with individuals who are outside of prison. There are numerous resources to assist ADC with implementing these requests.[46] Most importantly, the remedies provided are reasonable and would not create an undue hardship for ADC to implement.

Sincerely,                                                Sincerely,

*Rose Daly-Rooney*

Arizona Center for Disability Law                        National Association for the Deaf
Rose Daly-Rooney                                         Howard Rosenblum, Chief Executive Officer
Legal Director                                           Anna Bitencourt, Staff Attorney


cc: Brad Keogh, General Counsel

---

[44] 42 U.S.C. § 12111(10)(A)-(B) and *Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427 (D. Md. 2016).

[45] ADC's overall budget estimate for FY 2018 is over $1.18 billion dollars and the State of Arizona's overall budget is over $9.8 billion dollars. *See* http://www.ospb.state.az.us/publications2014newweb.aspx (Last visited on 6/30/18).

[46] *See e.g.* Arizona Commission for the Deaf and Hard of Hearing (ADCHH): http://www.acdhh.org/; Pima County Adult Detention Center (PCADC) Tablet contract: Tom Donahue 480-406-8189 or tdonahue@gtl.net and visit www.gtl.net; Purple Prison Videophones: Paul Singleton, Purple VRS Corrections Team, paul.singleton@purple.us, call 240-252-6759 and visit www.purpleVRS.com.

# Exhibit 18

# (Redacted)



# STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

March 11, 2019

*VIA EMAIL ONLY*
Rita Lomio
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

  Re: **Parsons v. Ryan**
    Notice of Substantial Non-Compliance

Dear Rita:

  We are responding to your February 7, 2019 Notice of Non-Compliance regarding Paragraph 14 of the Stipulation.

  As an initial matter, we disagree that Paragraph 14 of the Stipulation was intended to include inmates who utilize sign language as a form of communication. At no time during the parties' extensive negotiations in formulating the Stipulation did Plaintiffs indicate inmates who utilize sign language as a form of communication, but could otherwise read and write English or read lips, were considered sufficiently "not fluent in English" and intended to be encompassed in Paragraph 14. Indeed, the Stipulation has been in place for nearly five years and Plaintiffs have not invoked this provision until now. In the inapposite case you cite, *Armstrong .v Brown*, 939 F.Supp.2d 1012 (2013), the defendants were operating under an *Armstrong* Remedial Plan, which expressly mandated when and under what circumstances sign language interpretative services were required. Had Plaintiffs here intended to include inmates who utilize sign language as a form of communication, but could otherwise read and write English or read lips, in Paragraph 14 of the Stipulation, they would have and should have included express language clearly incorporating them–especially given that Plaintiffs' class counsel here is the same counsel who represented the class members in *Armstrong* and negotiated such express language just one year prior.

  In any event, ADC policy offers reasonable accommodations for persons with disabilities, including sign language interpretation. *See* Department Order 108 (Americans with Disabilities Act Compliance) and Department Order 704.15 (Inmate Regulation). Requests should be made as soon as possible to allow time for the accommodation, however. ADC is also in the process of identifying areas to install kiosks to help inmates communicate with people on the outside. Thirty-eight units have been identified for the kiosks so far. . Inmates know if they need

Rita Lomio
March 11, 2019
Page 2

interpretative services and have the ability to request them in advance. Other inmates with some level of hearing impairment can hear well enough to communicate verbally.

In addition, Corizon has a national contract with LanguageLine, which provides video interpreting, including American Sign Language. All Facility Health Administrators have access to the services provided by Stratus—a web-based program accessible via any computer with internet access. A web cam and speaker are also accommodated. Available laptops and many of the desktops can accommodate this service and are made available on telehealth carts. If a site needs additional equipment, it would be delivered without any significant delay, as it is readily available within the Corizon regional office. Accordingly, hearing impaired inmates are provided reasonable accommodations, including sign language interpretation, at their request.

With respect to inmate ███████ he is noted to be deaf and wore hearing aids that were lost during his arrest. He was sent to audiology for evaluation and fitting for hearing aids, but the evaluation was not able to be completed due to impacted wax and cotton in his ears. Communication during his medical encounters in the interim has been in written form. There is no difficulty in communicating with inmate ██████ noted by the medical providers he encountered, nor is there an HNR request for interpretative services submitted by him. Indeed, inmate ███████ confirmed that he felt he effectively communicated during his encounter on 11/08/2018 by answering "No" to the following question: "Is there anything you forgot to mention or felt uncomfortable bringing up in your intake screening?" *See* Plaintiffs' Attachment B to 02/02/2019 Letter at pg. 37 of 120. Plaintiffs failed to substantiate that writing is not an effective form of communication for inmate ██████ let alone that he is not sufficiently fluent in English. Further, Plaintiffs failed to substantiate that inmate ██████ was denied access to the interpretative services readily available to him upon his request.

Likewise, there is no difficulty in communicating with inmate ████████ noted by the medical providers he encountered, nor is there an HNR request for interpretative services submitted by inmate ██████ He was assessed on 12/08/2018 and also answered "No" to the following question: "Is there anything you forgot to mention or felt uncomfortable bringing up in your intake screening?" *See* Plaintiffs' Attachment B to 02/02/2019 Letter at pg. 91 of 120. Plaintiffs failed to substantiate that writing is not an effective form of communication for inmate ██████ let alone that he is not sufficiently fluent in English. Further, Plaintiffs failed to substantiate that inmate ██████ was denied access to the interpretative services readily available to him upon his request.

Inmate ████████ was released from custody on 01/25/19. He had a cochlear implant placed in 1998, but does not utilize it. Communication during his healthcare encounters was in written form. Inmate ██████ also received his diploma in 2011 from the Mesa Transition Learning Center and passed mandatory literacy testing. Plaintiffs failed to substantiate that writing is not an effective form of communication for inmate ██████ let alone that he is not sufficiently fluent in English. Further, Plaintiffs failed to substantiate that inmate ██████ was denied access to the interpretative services readily available to him upon his request.

Rita Lomio
March 11, 2019
Page 3

Interpretation services are documented in the majority of inmate ███████ ████████████ health services encounters by either LanguageLine or health services staff. HNRs scanned into the record are in both English and Spanish or a combination of the two languages. Plaintiffs failed to substantiate that inmate ████████████ s not sufficiently fluent in English. Further, Plaintiffs failed to substantiate that inmate ████████████ was denied access to the interpretative services readily available to him upon his request.

While inmate ████████████ was provided interpretative services for his individual confidential healthcare encounter on 01/15/2019, no interpretation services were needed for group meetings. The majority of the HNRs he submitted, and that are scanned into the record, are written in English with only one written in Spanish. Plaintiffs failed to substantiate that inmate ████████ is not sufficiently fluent in English. Further, Plaintiffs failed to substantiate that inmate ████████ was denied access to the interpretative services readily available to him upon his request.

The majority of inmate ████████████ healthcare encounters note that interpretative services were not needed. The HNRs scanned into the record are written in both English and Spanish. Plaintiffs failed to substantiate that inmate ████████████ is not sufficiently fluent in English. Further, Plaintiffs failed to substantiate that inmate ████████ was denied access to the interpretative services readily available to him upon his request.

In sum, Defendants are in substantial compliance with the Stipulation.

Finally, Defendants produced responses to RFPs 99-101 (*see* Richie Valenti March 6, 2019 correspondence) and consider this issue closed.

Regards,

Timothy J. Bojanowski

JDG/TJB/eap
cc:      Counsel of record

Exhibit 19



**Prison Law Office**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

March 5, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

      RE:    *Parsons v. Ryan*, 2:12-CV-00601
              Failure to Abide By Court's Order Re: PM 2 Monitoring (Doc. 2474)
              Notice of Noncompliance With PM 2 (Douglas)

Dear Tim:

      On November 21, 2017, the Court ruled that Defendants could not use a "partial credit" method to measure compliance with PMs 1, 2, and 4.  [Doc. 2474 at 1]

      The January 11, 2018 revised version of PM 2 in the Monitoring Guide that your office provided to us incorporated the Court-ordered change to its methodology, and instructed monitors,

> If on each day of the monitored month, one Medical Provider was onsite during regular business hours and on-call at all other times, a score of 100% is given. If for one or more days of the monitored month, one Medical Provider was not onsite during regular business hours and on-call at all other times, a score of 0% is given.

*See* Attachment A.[1]  However, it appears that ADC is not monitoring in accordance with the Court's order and has been awarding partial credit off and on since the January 2018 revision to the Monitoring Guide.  Specifically, for ASPC-Douglas and ASPC-Safford, the monitor awarded the following scores in the monthly CGAR reports as shown on the following pages.

_____

      [1] PM 2 states, "Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times."  Doc. 1185-1 at 8.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Timothy Bojanowski
RE: *Parsons v. Ryan*
Performance Measure 2
March 5, 2019
Page 2

| Facility | Month (2018) | Score | Notes by Monitor | Complies with Doc. 2474? | Bates No. |
|---|---|---|---|---|---|
| Douglas | May | 0% | "This is an all or on none. No onsite Provider 5/29, 5/30, or 5/31/18" | Yes | ADCM1526031 |
| Douglas | June | 0% | "Douglas maintained… one Medical Provider… for 2/30 days in June…" | Yes | ADCM1529765 |
| Douglas | July | 71% | "No onsite provider on 7/2, 7/3, 7/5, 7/6, 7/9, 7/10, 7/11, 7/12, 7/13, 7/20/18" | No | ADCM1534547 |
| Douglas | August | 0% | "No onsite coverage on 8/14, 8/20, and 8/23. This results in a zero." | Yes | ADCM1542883 |
| Douglas | September | 0% | "No onsite Provider on the following days in September – 9/4, 9/5, 9/6, 9/7, 9/10, 9/11, 9/13, 9/14, 9/17, 9/24, 9/25, 9/26, 9/27, and 9/28. …Therefore this scores a 0." | Yes | ADCM1546366 |
| Douglas | October | 35% | "No onsite Provider on the following days in October – 10/1, 10/2, 10/3, 10/4, 10/9, 10/10, 10/11, 10/12, 10/15, 10/16, 10/17, 10/19, 10/22, 10/23, 10/24, 10/25, 10/26, 10/29, 10/30, and 10/31." | No | ADCM1549939 |
| Douglas | November | 40% | "No onsite Provider on the following days in November – 11/5, 11/12, 11/13, 11/14, 11/5 [sic], 11/19, 11/20, 11/21, 11/23, 11/26, 11/27, 11/28, 11/29, and 11/30" | No | ADCM1555447 |
| Douglas | December | 65% | "No onsite Provider on the following days in December- 12/4, 12/5, 12/6, 12/7, 12/8, 12/13, 12/18, 12/19, 12/20, 12/26, and 12/28/18." | No | ADCM1560391 |

Mr. Timothy Bojanowski
RE: *Parsons v. Ryan*
Performance Measure 2
March 5, 2019
Page 3

| Facility | Month (2018) | Score | Notes by Monitor | Complies with Doc. 2474? | Bates No. |
|----------|--------------|-------|------------------|--------------------------|-----------|
| Safford | October | 84% | "No onsite provider on 10/1, 10/8, 10/15, 10/22, and 10/29/18" | No | ADCM1550251 |
| Safford | November | 0% | "No onsite Provider on 11/5, 11/12, 11/19, and 11/26. Though because this is 100% or none, the finding is red." | Yes | ADCM155759 |
| Safford | December | 84% | "No onsite provider on 12/3, 12/10, 12/17, 12/24, and 12/26/18." | No | ADCM1560694 |

*See* Attachment B.

What makes this failure to monitor PM 2 properly even more inexplicable is that it is the same person doing the monitoring for both institutions. *Compare* November 2018 (using "100% or none" at Safford while giving partial credit at Douglas).

**We request that (1) Defendants recalculate the scores for these months and these institutions to reflect the Court's order at Doc. 2474, (2) reissue the CGARs for these months and institutions, and (3) provide updated versions to Plaintiffs' Counsel, the Court's expert, and the Court. We also request that Defendants provide Corrective Action Plan(s) to the Court, Court expert, and Plaintiffs' counsel that address the ongoing noncompliance with these critical measures at the two institutions**.

This letter also serves as a Notice of Noncompliance with PM 2 at ASPC-Douglas. We look forward to your response within 30 days. Thank you for your attention to this matter.

Sincerely,

Corene Kendrick, Staff Attorney

# Attachment A

**P E R F O R M A N C E   M E A S U R E S**

Health Care Performance Measure No. 2
Stipulation Category: Staffing (02)

CGAR Category: Staffing (C) 02

| **Performance Measure:** |
|---|
| Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times. |

| **CGAR Question:** |
|---|
| Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? |

| **Source of Records/Review:** |
|---|
| Contracted Vendor: Provider Staff Schedules for the monitored month; On-Call List. |

**Methodology:**

- Review the reconciled Provider Staff Schedules for each complex for the monitored month for onsite provider coverage during regular business hours.

- Review the On-Call List for the monitored month for on-call provider coverage.

- If, on each day of the monitored month, one Medical Provider was onsite during regular business hours and on-call at all other times, a score of 100% is given.  If, for one or more days of the monitored month, one Medical Provider was not onsite during regular business hours and on-call at all other times, a score of 0% is given.

-

**Formatted:** Font: Garamond, 12 pt

Draft Revised: 12/19/17

# Attachment B

**CGAR Finding for May 2018 DOUGLAS COMPLEX**

| | Staffing  (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **G** | **A** | **R** | **Notifications** | **Level** | **# Compliance** | **# Review** | **% Compliance** |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 6/26/2018 6:47 PM Entered By: Kathy Campbell Number Compliance: 31; Number Review: 31; Percent Compliance: 100.00 % Comments: ASPC-Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 31/31 days in May. | 1 | 31 | 31 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 6/26/2018 6:46 PM Entered By: Kathy Campbell Number Compliance: 0; Number Review: 31; Percent Compliance: 0.00 % Comments: ASPC- Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 28/31 days in May. 0%. This is an all or none. No onsite Provider 5/29, 5/30, or 5/31/18. | 1 | 0 | 31 | 0.00 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 6/26/2018 6:48 PM Entered By: Kathy Campbell Number Compliance: 26; Number Review: 30; Percent Compliance: 86.67 % Comments: PM #3 Statewide dental staffing maintained at 88.2% (26.46/30). | 1 | 26 | 30 | 86.67 |

---

**Corrective Action Plans for PerformanceMeasure: Staffing  (C)**

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 6/26/2018 6:46:25 PM**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1526031

**CGAR Finding for June 2018 DOUGLAS COMPLEX**

| | Staffing  (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **G** | **A** | **R** | **Notifications** | **Level** | **# Compliance** | **# Review** | **% Compliance** |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 7/17/2018 7:54 AM Entered By: Kathy Campbell Number Compliance: 30; Number Review: 30; Percent Compliance: 100.00 % Comments: ASPC-Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 30/30 days in June. | 1 | 30 | 30 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 7/27/2018 1:39 PM Entered By: Kathy Campbell Number Compliance: 0; Number Review: 30; Percent Compliance: 0.00 % Comments: ASPC- Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 2/30 days in June = 6.0%. | 1 | 0 | 30 | 0.00 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 7/17/2018 7:40 AM Entered By: Kathy Campbell Number Compliance: 26; Number Review: 30; Percent Compliance: 86.67 % Comments: Statewide dental staffing maintained at 25.89/30=86.3% | 1 | 26 | 30 | 86.67 |

**Corrective Action Plans for PerformanceMeasure: Staffing  (C)**

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 7/27/2018 1:39:36 PM**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

**ADCM1529765**

## CGAR Finding for July 2018 DOUGLAS COMPLEX

| | Staffing  (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Performance Measure (Description) | G | A | R | Notifications | Level | # Compliance | # Review | % Compliance |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 8/27/2018 6:04 PM Entered By: Kathy Campbell Number Compliance: 31; Number Review: 31; Percent Compliance: 100.00 % Comments: ASPC- Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 31/31days in July. | 1 | 31 | 31 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 8/30/2018 12:37 PM Entered By: Kathy Campbell Number Compliance: 22; Number Review: 31; Percent Compliance: 70.97 % Comments: ASPC-Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 22/31 days in July. No onsite provider on 7/2, 7/3, 7/5, 7/6, 7/9, 7/10, 7/11, 7/12, 7/13, 7/20/18. | 1 | 22 | 31 | 70.97 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 8/27/2018 8:49 AM Entered By: Kathy Campbell Number Compliance: 26; Number Review: 30; Percent Compliance: 86.67 % Comments: Statewide dental staffing maintained at 88.1% (26.43/30) | 1 | 26 | 30 | 86.67 |

### Corrective Action Plans for PerformanceMeasure: Staffing  (C)

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 8/30/2018 12:37:58 PM**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

ADCM1534547

## CGAR Finding for August 2018 DOUGLAS COMPLEX

| | Staffing (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Performance Measure (Description) | G | A | R | Notifications | Level | # Compliance | # Review | % Compliance |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 9/19/2018 7:08 AM Entered By: Kathy Campbell Number Compliance: 31; Number Review: 31; Percent Compliance: 100.00 % Comments: ASPC- Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 31/31days in August. | 1 | 31 | 31 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | X | | X | 9/19/2018 9:52 AM Entered By: Kathy Campbell Number Compliance: 0; Number Review: 31; Percent Compliance: 0.00 % Comments: ASPC- Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 28/31 days in August. No onsite coverage on 8/14, 8/20, and 8/23. This results in a zero. | 1 | 0 | 31 | 0.00 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 9/18/2018 5:57 PM Entered By: Kathy Campbell Number Compliance: 26; Number Review: 30; Percent Compliance: 86.67 % Comments: Statewide dental staffing maintained at 88.6% (26.58/30) | 1 | 26 | 30 | 86.67 |

### Corrective Action Plans for PerformanceMeasure: Staffing (C)

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 9/19/2018 9:52:25 AM**

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

## CGAR Finding for September 2018 DOUGLAS COMPLEX

| | Staffing (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Performance Measure (Description) | G | A | R | Notifications | Level | # Compliance | # Review | % Compliance |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 10/24/2018 11:06 AM Entered By: Kathy Campbell Number Compliance: 30; Number Review: 30; Percent Compliance: 100.00 % Comments: ASPC- Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 30/30 days in September. | 1 | 30 | 30 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 10/28/2018 5:49 PM Entered By: Kathy Campbell Number Compliance: 0; Number Review: 30; Percent Compliance: 0.00 % Comments: ASPC- Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 14/30 days in September. No onsite Provider on the following days in September- 9/4, 9/5, 9/6, 9/7, 9/10, 9/11, 9/13, 9/14, 9/17, 9/24, 9/25, 9/26, 9/27, and 9/28. Provider was available on call and/or via telemedicine on the above dates. Therefore this scores a 0. | 1 | 0 | 30 | 0.00 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 10/23/2018 8:28 AM Entered By: Kathy Campbell Number Compliance: 27; Number Review: 30; Percent Compliance: 90.00 % Comments: Statewide dental staffing maintained at 93.26% (27.98/30). | 1 | 27 | 30 | 90.00 |

**Corrective Action Plans for PerformanceMeasure: Staffing (C)**

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 10/28/2018 5:49:44 PM**

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

**CGAR Finding for October 2018 DOUGLAS COMPLEX**

| | Staffing  (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **G** | **A** | **R** | **Notifications** | **Level** | **# Compliance** | **# Review** | **% Compliance** |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 11/27/2018 8:53 PM Entered By: Kathy Campbell Number Compliance: 31; Number Review: 31; Percent Compliance: 100.00 % Comments: ASPC- Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 31/31 days in October. | 1 | 31 | 31 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | X | | X | 11/27/2018 8:52 PM Entered By: Kathy Campbell Number Compliance: 11; Number Review: 31; Percent Compliance: 35.48 % Comments: ASPC- Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 11/31 days in October. No onsite Provider on the following days in October- 10/1, 10/2, 10/3, 10/4, 10/9, 10/10, 10/11, 10/12, 10/15, 10/16, 1017, 10/19, 10/22, 10/23, 10/24, 10/25, 10/26, 10/29, 10/30, and 10/31. Provider was available on call and/or via telemedicine on all other dates. | 1 | 11 | 31 | 35.48 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 11/27/2018 8:51 PM Entered By: Kathy Campbell Number Compliance: 27; Number Review: 30; Percent Compliance: 93.00 % Comments: Statewide dental staffing maintained at 92.5% (27.76/30). | 1 | 27 | 30 | 93.00 |

**Corrective Action Plans for PerformanceMeasure: Staffing  (C)**

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 11/27/2018 8:52:20 PM**

## CGAR Finding for November 2018 DOUGLAS COMPLEX

| | Staffing  (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Performance Measure (Description) | G | A | R | Notifications | Level | # Compliance | # Review | % Compliance |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 12/17/2018 12:57 PM Entered By: Kathy Campbell Number Compliance: 30; Number Review: 30; Percent Compliance: 100.00 % Comments: ASPC-Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 30/30 days in November. | 1 | 30 | 30 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 12/17/2018 12:59 PM Entered By: Kathy Campbell Number Compliance: 12; Number Review: 30; Percent Compliance: 40.00 % Comments: ASPC- Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 12/30 days in November. No onsite Provider on the following days in November- 11/5, 11/12, 11/13, 11/14, 11/5, 11/19, 11/20, 11/21, 11/23, 11/26, 11/27, 11/28, 11/29, and 11/30. Provider was available on call and/or via telemedicine on the above dates. | 1 | 12 | 30 | 40.00 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 12/17/2018 12:38 PM Entered By: Kathy Campbell Number Compliance: 27; Number Review: 30; Percent Compliance: 90.00 % Comments: Statewide Dental staffing for November- 26.98/30=89.93%. | 1 | 27 | 30 | 90.00 |

## Corrective Action Plans for PerformanceMeasure: Staffing  (C)

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 12/17/2018 12:59:13 PM**

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

## CGAR Finding for  December 2018 DOUGLAS COMPLEX

| | Staffing  (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Performance Measure (Description) | G | A | R | Notifications | Level | # Compliance | # Review | % Compliance |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 1/26/2019 8:15 PM Entered By: Kathy Campbell Number Compliance: 31; Number Review: 31; Percent Compliance: 100.00 % Comments: ASPC- Douglas maintained, at a minimum, one RN onsite 24/7, 7 days/week for 31/31 days in December. | 1 | 31 | 31 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 1/30/2019 9:18 AM Entered By: Kathy Campbell Number Compliance: 20; Number Review: 31; Percent Compliance: 64.52 % Comments: ASPC- Douglas maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 20/31 days in December. No onsite Provider on the following days in December- 12/4, 12/5, 12/6, 12/7 12/8, 12/13, 12/18, 12/19, 12/20, 12/26, and 12/28/18. Provider was available on call and/or via telemedicine on the above dates. | 1 | 20 | 31 | 64.52 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 1/26/2019 8:15 PM Entered By: Kathy Campbell Number Compliance: 27; Number Review: 30; Percent Compliance: 90.00 % Comments: Statewide dental staffing maintained at 26.98/30= 89.93 or 90%. | 1 | 27 | 30 | 90.00 |

**Corrective Action Plans for PerformanceMeasure: Staffing  (C)**

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 1/30/2019 9:19:00 AM**

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

## CGAR Finding for October 2018 SAFFORD COMPLEX

| | Staffing  (C) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **G** | **A** | **R** | **Notifications** | **Level** | **# Compliance** | **# Review** | **% Compliance** |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 11/29/2018 6:30 PM Entered By: Kathy Campbell Number Compliance: 31; Number Review: 31; Percent Compliance: 100.00 % Comments: ASPC- Safford maintained, at a minimum, one RN onsite 24/7, 7 days/week for 31/31 days in October. | 1 | 31 | 31 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 11/29/2018 6:31 PM Entered By: Kathy Campbell Number Compliance: 26; Number Review: 31; Percent Compliance: 83.87 % Comments: ASPC- Safford maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 26/31days in October. No onsite provider on 10/1, 10/8, 10/15, 10/22, and 10/29/18. | 1 | 26 | 31 | 83.87 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 11/29/2018 6:32 PM Entered By: Kathy Campbell Number Compliance: 27; Number Review: 30; Percent Compliance: 93.00 % Comments: Statewide dental staffing maintained at 92.5% (27.76/30). | 1 | 27 | 30 | 93.00 |

---

**Corrective Action Plans for PerformanceMeasure: Staffing  (C)**

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 11/29/2018 6:31:47 PM**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

ADCM1550251

## CGAR Finding for November 2018 SAFFORD COMPLEX

| | **Staffing (C)** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Performance Measure (Description) | G | A | R | Notifications | Level | # Compliance | # Review | % Compliance |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 12/17/2018 12:37 PM Entered By: Kathy Campbell Number Compliance: 30; Number Review: 30; Percent Compliance: 100.00 % Comments: ASPC- Safford maintained, at a minimum, one RN onsite 24/7, 7 days/week for 30/30 days in November. | 1 | 30 | 30 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 12/17/2018 1:06 PM Entered By: Kathy Campbell Number Compliance: 0; Number Review: 30; Percent Compliance: 0.00 % Comments: ASPC- Safford maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 26/30 days in November. No onsite Provider on 11/5, 11/12, 11/19, and 11/26. Though because this is 100% or none, the finding is red. | 1 | 0 | 30 | 0.00 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 12/17/2018 12:40 PM Entered By: Kathy Campbell Number Compliance: 27; Number Review: 30; Percent Compliance: 90.00 % Comments: Statewide Dental staffing for November- 26.98/30=89.93%. | 1 | 27 | 30 | 90.00 |

---

**Corrective Action Plans for PerformanceMeasure: Staffing (C)**

**2 PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 12/17/2018 1:06:28 PM**

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**
**PARSONS v. RYAN, USDC CV 12-00601**

## CGAR Finding for  December 2018 SAFFORD COMPLEX

| | Performance Measure (Description) | G | A | R | Notifications | Level | # Compliance | # Review | % Compliance |
|---|---|---|---|---|---|---|---|---|---|
| | **Staffing  (C)** | | | | | | | | |
| 1 | PM #1 Does each ASPC maintain, at a minimum, one RN onsite 24/7, 7 days/week? | X | | | 1/26/2019 9:06 PM Entered By: Kathy Campbell Number Compliance: 31; Number Review: 31; Percent Compliance: 100.00 % Comments: ASPC- Safford maintained, at a minimum, one RN onsite 24/7, 7 days/week for 31/31 days in December. | 1 | 31 | 31 | 100.00 |
| 2 | PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times? | | | X | 1/26/2019 9:07 PM Entered By: Kathy Campbell Number Compliance: 26; Number Review: 31; Percent Compliance: 83.87 % Comments: ASPC- Safford maintained, at a minimum, one Medical Provider onsite during regular business hours and on-call at all other times for 26/31 days in December. No onsite provider on 12/3, 12/10, 12/17, 12/24, and 12/26/18. | 1 | 26 | 31 | 83.87 |
| 3 | PM #3 Is statewide dental staffing maintained at current contract levels? | X | | | 1/26/2019 8:17 PM Entered By: Kathy Campbell Number Compliance: 27; Number Review: 30; Percent Compliance: 90.00 % Comments: Statewide dental staffing maintained at 26.98/30= 89.93 or 90%. | 1 | 27 | 30 | 90.00 |

**Corrective Action Plans for PerformanceMeasure: Staffing  (C)**

**2  PM #2 Does each ASPC maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hours and on-call at all other times?**
**Level 1 Red User: Kathy Campbell Date: 1/26/2019 9:07:05 PM**

Exhibit 20

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



March 6, 2019

**BY ELECTRONIC MAIL ONLY**

Tim Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
TBojanowski@strucklove.com

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

  Re: *Parsons v. Ryan*
     **Notice of Substantial Noncompliance**

Dear Tim:

Pursuant to Paragraph 30 of the Stipulation, this letter will serve as a notice of substantial noncompliance regarding PM 2 at Safford and PM 94 at Florence.  Both of these PMs have been noncompliant for three consecutive months.  *See* Doc. 2644 at 2 ("*either* a violation of Section [10](b)(i) *or* a violation of Section [10]b(ii) is necessary and sufficient to establish a finding of non-compliance") (emphasis in original).[1]

PM 2 at Safford has had the following compliance scores:

| | |
|---|---|
| October 2018: | 84% |
| November 2018: | 0% |
| December 2018: | 84% |

March 5, 2019 letter from Kendrick to Bojanowski at 3 and Attachment B.[2]

PM 94 at Florence has had the following compliance scores:

| | |
|---|---|
| October 2018: | 0% |
| November 2018: | 7% |
| December 2018: | 67% |

---

[1] PM 2 requires that "Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times."  PM 94 requires that "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse."

[2] As set forth in that letter, the scores for October and December should have been 0%, as there is no partial credit available for this PM.  *See* Doc. 2474 at 1.

Doc. 3153-1 at 314.

We look forward to your response within 30 days, as required by the Stipulation.

Very truly yours,

David C. Fathi

Cc:      All counsel

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

Exhibit 21



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

April 4, 2019

<u>**VIA EMAIL ONLY**</u>
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

David Fathi
Legal Department
National Prison Project
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

> **Re:** **Parsons v. Ryan**
> 20190305-Notice of Noncompliance regarding PM 2 (Douglas); PM 2 Monitoring
> 20190306-Notice of Noncompliance regarding PM 2 (Safford); PM 94 (Florence)

Dear Corene and David:

This letter responds to Corene's March 5 letter regarding PM 2 (Douglas) and monitoring methodology for PM 2 and David's March 6 Notice of Noncompliance regarding PM 2 (Safford) and PM 94 (Florence).

PM 2 performance scores at Douglas and Safford have been adjusted where there is a score of less than 100% as follows:

> Douglas:  July, October, November, and December 2018
> Safford:  October and December 2018

PM 2 at Safford: Defendants concede this measure is in substantial non-compliance at Safford.  Defendants are working to discover the cause of non-compliance and will develop a remedial plan to address any deficiencies.

Corene Kendrick
David Fathi
April 4, 2019
Page 2

  PM 2 at Douglas:  Defendants concede this measure is in substantial non-compliance at Douglas.  Defendants are working to discover the cause of non-compliance and will develop a remedial plan to address any deficiencies.  Douglas, however, achieved 100% compliance in January 2019.

  PM 94 at Florence:  Defendants concede this measure is in substantial non-compliance at Florence.  Defendants are working to discover the cause of non-compliance and will develop a remedial plan to address any deficiencies.  Florence, however, achieved 100% compliance in January 2019.

       Regards,

       Timothy J. Bojanowski

TJB/eap
cc: Counsel of record