**EXHIBIT A**

**EXHIBIT A**

No. 18-16358
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

VICTOR PARSONS, ET AL., ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED; AND ARIZONA CENTER FOR
DISABILITY LAW, Appellees

v.

CHARLES RYAN, DIRECTOR, ARIZONA DEPARTMENT OF
CORRECTIONS; AND RICHARD PRATT, INTERIM DIVISION DIRECTOR,
DIVISION OF HEALTH SERVICES, ARIZONA DEPARTMENT OF
CORRECTIONS, IN THEIR OFFICIAL CAPACITIES, Appellants.
_____

On Appeal From the
United States District Court of Arizona (Phoenix Division)
District Court No. 2:12-cv-00601
_____

## DEFENDANTS-APPELLANTS' OPENING BRIEF
_____

Timothy J. Berg
Todd Kartchner
Courtney R. Beller
Shannon McKeon
Fennemore Craig, P.C.
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016-3429
Telephone: (602) 916-5000

Daniel P. Struck
Rachel Love
Nicholas D. Acedo
Struck, Love, Bojanowski & Acedo, PLC
3100 W. Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS.........................................................................i

TABLE OF AUTHORITIES ..............................................................iv

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ....................................................4

ISSUES PRESENTED FOR REVIEW ...............................................7

STATEMENT OF THE CASE.............................................................7

    A.    The Complaint and Pre-Trial Litigation.............................7

    B.    The Stipulation ...................................................................8

    C.    Fairness Hearing and Order................................................11

    D.    Enforcement of the Stipulation .........................................12

    E.    The District Court's Orders Regarding Contempt Power and Availability of Sanctions....................................................14

    F.    The District Court's Order and Judgment of Civil Contempt.............17

    G.    Prior Appeals in this Matter ...............................................19

STANDARD OF REVIEW ...............................................................20

SUMMARY OF THE ARGUMENT ..................................................21

ARGUMENT ...................................................................................23

I.    THE TRIAL COURT ERRED WHEN IT FOUND THE EXISTENCE OF CONTEMPT POWER.................................................................23

    A.    The Prison Litigation Reform Act (18 U.S.C. § 3626) Governs this Matter....................................................................23

    B.    The Stipulation Is a Private Settlement Agreement. ..........................24

        1.      Characterization of the Agreement ..........................................27

        2.      Retaining Jurisdiction ............................................................27

        3.      Court Approval ......................................................................29

        4.      The Form of Remedy Ordered and Court Ordered
                Compliance ...........................................................................31

    C.  The District Court Did Not Have Contempt Power to Enforce
        the Stipulation........................................................................32

        1.      The Stipulation Cannot Be Enforced Through Contempt. .......33

                a.      The Stipulation Is Not a Court Order Nor Was It
                        Incorporated into One. ....................................................33

                b.      The Stipulation's Language Concerning "Any
                        Available Remedy at Law" Does Not Impart
                        Contempt Powers. ...........................................................36

        2.      The OSC Order Cannot Serve as the Basis for Contempt. .......39

II.  THE CONTEMPT SANCTIONS IMPOSED ARE IMPROPER.................41

    A.  If Contempt Were Appropriate Here, the Sanctions Ordered
        Were Inappropriate................................................................41

        1.      Legal Standard for Contempt and Contempt Sanctions ...........41

        2.      The Sanctions Order Imposes Criminal Sanctions. .................44

        3.      The Court Failed to Afford Defendants Due Process..............48

        4.      Even if the Sanctions Were Civil in Nature, the Amount
                Awarded Is Too High................................................................49

III. THE COURT ACTED OUTSIDE THE SCOPE OF ITS AUTHORITY
     AND IN DIRECT CONTRAVENTION OF THE STIPULATION WHEN
     ENTERING THE SANCTIONS ORDER. .................................................50

A.   Requiring 100% Compliance with the Stipulation Improperly
     Modifies the Stipulation's Compliance Standards. ............................51

B.   Requiring Defendants to Report on Every Instance of
     Non-Compliance Violates the Sampling Procedure in the
     Stipulation. ........................................................................................52

CONCLUSION ...........................................................................................54

STATEMENT OF RELATED CASES ........................................................55

CERTIFICATE OF COMPLIANCE ...........................................................58

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGES**

*Anderson v. Woodcreek Venture, Ltd.*, 351 F.3d 911 (9th Cir. 2003) .......... 55

*Austin v. Hopper,* 15 F. Supp. 2d 1210 (M. D. Ala. 1998) ........................... 24

*Balla v. Idaho State Bd. of Corr.,* 869 F.2d 461 (9th Cir. 1989) ...... 32, 35, 41

*Benjamin v. Jacobson*, 172 F.3d 144 (2d. Cir. 1999) ............................. 23, 24

*Caudill v. N. Am. Media Corp.*, 200 F.3d 914 (6th Cir. 2000) .................... 34

*Christina A. ex rel. Jennifer A. v. Bloomberg*, 315 F.3d 990
    (8th Cir. 2003) ................................................................................... *passim*

*City of Emeryville v. Robinson*, 621 F.3d 1251 (9th Cir. 2010) .................. 25

*Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367
    (10th Cir. 1996) .................................................................................. 34, 35

*D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455 (7th Cir. 1993) ....... 34, 35, 38

*Davis v. Gunter,* 771 F. Supp. 2d 1068 (D. Neb. 2011) .................. 24, 26–27

*Disability Law Ctr. v. Mass. Dep't of Correction,* 960 F. Supp. 2d 271
    (D. Mass 2012) .................................................................................. *passim*

*Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262 (2008) ........ 27

*Falstaff Brewing Corp. v. Miller Brewing Corp.*, 702 F.2d 770
    (9th Cir. 1983) .................................................................................. *passim*

*Gastile v. Virga*, 15-16294, 2016 WL 6520090 (9th Cir. Nov. 3, 2016) ....... 6

*Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418 (1911) ..................... 45

*Goodman v. Newzona Inv. Co.*, 421 P.2d 318 (Ariz. 1966) ................... 52, 53

*Hazen ex rel. LeGear v. Reagen,* 208 F.3d 697 (8th Cir. 2000) .................. 24

*Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624 (1988) ................... 43, 44

*Hook v. Arizona*, 907 F. Supp. 1326 (D. Ariz. 1995) ................................... 43

*In re Nakhuda*, 544 B.R. 886 (9th Cir. B.A.P. 2016) ................................... 40

*In re Phar-Mor, Inc. Sec. Litig.*, 172 F.3d 270 (3d Cir. 1999) ..................... 34

*Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) ............... 25, 30, 37, 40

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
  512 U.S. 821 (1994) .......................................................................... *passim*

*Isaak v. Mass. Indem. Life Ins. Co.*, 623 P.2d 11 (Ariz. 1981) .................... 53

*Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989) ......................................... 25

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ("*Kelly II*") .............. *passim*

*Kelly v. Wengler*, 979 F. Supp. 2d 1237 (D. Idaho 2013) ("*Kelly I*") .... 32, 33

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ... 32, 33, 34

*Lasar v. Ford Motor Co.*, 399 F.3d 1101 (9th Cir. 2005) ........................... 21

*Linney v. Cellular Alaska Partnership*, 151 F.3d 1234 (9th Cir. 1998) . 11–12

*Macias v. N.M. Dep't of Labor*, 300 F.R.D. 529 (D. N. M. 2014) .............. 36

*Miener By & Through Miener v. Mo. Dep't of Mental Health*, 62 F.3d 1126
  (8th Cir. 1995) ........................................................................................ 34

*Morales Feliciano v. Rullan*, 378 F.3d 42 (1st Cir. 2004) .......................... 39

*Nasca v. Peoplesoft*, 160 F.3d 578 (9th Cir. 1998) ...................................... 55

*Olliver/Pilcher Ins., Inc. v. Daniels*, 715 P.2d 1218 (Ariz. 1986) ............... 53

*Parsons v. Ryan*, 912 F.3d 486 (9th Cir. 2018) ..................................... *passim*

*Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865
    (9th Cir. 1992) ............................................................................................... 6

*Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) ..... 34

*Rowe v. Jones,* 483 F.3d 791 (11th Cir. 2007) ............................................... 24

*Shell Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623
    (9th Cir. 2016) ...................................................................................... *passim*

*Shuffler v. Heritage Bank*, 720 F.2d 1141 (9th Cir. 1983) .............. 43, 44, 50

*Sole Survivor Corp. v. Buxbaum*, No. CV 07-3858-GW, 2009 WL 210471
    (C.D. Cal. Jan. 22, 2009) ....................................................................... 39

*Stefano v. City of Long Beach*, 621 Fed. App'x 404 (9th Cir. 2015) ............. 6

*Stone v. City of San Francisco*, 968 F.2d 850 (9th Cir. 1992) ....................... 5

*Tabi v. Ortega*, 649 Fed. App'x 413 (9th Cir. 2016) ...................................... 6

*Thomas, Head & Greisen Emps. Trust v. Buster*, 95 F.3d 1449
    (9th Cir. 1996) ........................................................................................ 21

*United States v. Ayres*, 166 F.3d 991 (9th Cir. 1999) .................................. 47

*United States v. Powers*, 629 F.2d 619 (9th Cir. 1980) .......................... 32, 41

*United States v. Rylander*, 460 U.S. 752 (1983) .......................................... 54

*United States v. Washington,* 761 F.2d 1404 (9th Cir. 1985) ........................ 5

*United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238
    (App. 1983) .............................................................................................. 27

*Van Horn v. Trickey,* 840 F.2d 604 (8th Cir.1988) ...................................... 29

*VanDesande v. United States,* 673 F.3d 1342 (Fed. Cir. 2012) ................... 23

*Wilcox v. Arpaio*, 753 F.3d 872 (9th Cir. 2014) ....................................... 6, 25

## STATUTES

18 U.S.C. § 3626 ...................................................................................*passim*

28 U.S.C. § 636 ............................................................................................ 55

28 U.S.C. § 1291 ......................................................................................... 5, 6

28 U.S.C. § 1331 .............................................................................................. 4

28 U.S.C. § 1343 .............................................................................................. 4

42 U.S.C. § 1983 .............................................................................................. 4

## RULES

Rule 42, Federal Rules of Criminal Procedure ........................... 41, 42, 48, 49

Rule 4(a)(1)(A), Federal Rules of Appellate Procedure ................................. 6

Rule 11, Federal Rules of Civil Procedure .................................................... 40

Rule 23, Federal Rules of Civil Procedure .................................................... 29

## INTRODUCTION

This appeal derives from a class-action lawsuit against the Arizona Department of Corrections ("ADC") by inmates challenging the provision of healthcare. In October 2014, the parties entered into a settlement agreement (the "Stipulation") whereby ADC agreed to comply with certain healthcare performance measures for a specified period of time. During the relevant time period, the Stipulation required 85% compliance for an ADC facility to be deemed in "substantial compliance" with the Stipulation. The Stipulation specifies methods for determining and reporting ADC's compliance with each performance measure. For the majority of the performance measures, ADC reviews a random sampling of inmate medical records applicable to the measure, for each unit at the facility (or specified units and facilities), and determines whether those records comply with the performance measure.

The parties selected Magistrate Judge David K. Duncan (the "District Court") to enforce the Stipulation and resolve disputes concerning compliance. The District Court conducted oversight and enforcement duties for several years. However, beginning in June 2017, the District Court apparently became frustrated with ADC's level of compliance with the performance measures. As a result, the District Court began reaching outside of the "tool box" provided to it by the

Stipulation for additional enforcement measures.[1]  In June 2017, despite that there was no related court order in place, the District Court issued an order to show cause as to why a $1,000 fine should not be imposed for "every single" violation of certain performance measures at certain facilities.  Both Plaintiffs and ADC agreed such an order was an exercise of contempt powers, which would not be appropriate in the situation.[2]  The District Court admitted that it was "not intending to employ [contempt] as [its] mechanism" because it believed the proposed fine was "not within the realm of contempt authority of the Court."  As a result, the District Court sought "some legal power aside from contempt" that would support its proposed $1,000 per violation sanction.

No other legal power exists which would provide support for the proposed fine.  Regardless, the District Court marched on.  In October 2017, the District Court reversed itself and concluded that it did have civil contempt power to enforce the Stipulation and again ordering the $1,000 per violation fine "for every single violation of [certain performance measures], not just those below 85%."  In contravention of the Stipulation's reporting and compliance provisions, ADC was required to file, under seal, "a list of every instance of non-compliance" with the

---

[1]  Several appeals to this Court have arisen from the District Court's orders post-June 2017.  *See* Nos. 17-15302, 17-15352, 18-15989, 18-16368.

[2]  Plaintiffs argued that the proposed $1,000 per violation contempt sanction was appropriate, but that the due process requirements for contempt were not met by the District Court's June 2017 order.

listed performance measures.

The District Court's perturbation with ADC continued to rise until, finally, in June 2018, the District Court issued an Order and Judgment on Civil Contempt (the "Sanctions Order") and Judgment in a Civil Case. The Sanctions Order imposes $1,445,000 in "civil contempt" sanctions against ADC for non-compliance with certain performance measures in December 2017, and January and February 2018. The Sanctions Order requires Defendants to continue filing a monthly list of *every instance* of noncompliance with certain performance measures at certain facilities, and restates the Court's prior determination that "[t]he Stipulation requires 100% compliance with each of its [performance measures]."

The District Court's exasperation with ADC does not furnish it any legal support for the Sanctions Order. Such an exercise of contempt power is plainly contrary to the parties' Stipulation and to established legal standards. The Stipulation is a private settlement agreement, not a court order, and did not contemplate (or grant) contempt powers. As a result, contempt powers were not available to enforce the Stipulation. In addition, even if the District Court did have contempt powers, the Sanctions ordered are clearly punitive and criminal in nature, but Defendants did not receive adequate due process for criminal contempt sanctions. Further, the Sanctions Order and the prior order to show cause directly

contravene the compliance standards and reporting procedures agreed upon by the parties in the Stipulation, and the District Court did not have the power to rewrite the parties' negotiated settlement agreement.

For these reasons, the contempt sanctions cannot stand and Defendants respectfully request that this Court vacate the Sanctions Order and Judgment in a Civil Case.

## JURISDICTIONAL STATEMENT

1.      Plaintiffs-Appellees represent a class of inmates who challenged the provision of health care and the conditions of confinement in the ADC, pursuant to 42 U.S.C. § 1983.  ER 274–350.[3]  The district court had subject matter jurisdiction of this class action lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.  *Id.*  The parties resolved the matter through a Stipulation, whereby ADC agreed to comply with certain performance measures for a conditional period of time.  ER 186–206. The parties further agreed that disputes concerning compliance with the Stipulation would ultimately be submitted to the District Court for resolution.  ER 197.

2.      This appeal is taken from the Sanctions Order and Judgment in a Civil Case.  The Sanctions Order holds Defendants-Appellants[4] in civil contempt and

---

[3]      "Dkt." refers to the district court's docket.  "ER" refers to the Excerpt of Record.

[4]      Defendants-Appellants are Charles Ryan, Director of ADC, and Richard Pratt, Interim Division Director, Division of Health Services of ADC (collectively,

assessing $1,445,000 in contempt sanctions against them. ER 2–25. The Sanctions Order and the Judgment in a Civil Case are "final" decisions and are therefore appealable under 28 U.S.C. § 1291. Although a "final decision" is normally "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," "[it] is sometimes appropriate to give the finality requirement a practical rather than a technical construction." *United States v. Washington,* 761 F.2d 1404, 1406 (9th Cir. 1985) (quoting *Catlin v. U.S.*, 324 U.S. 229, 233–34 (1945)). "This is particularly true when post-judgment orders are involved" because "[t]he policy against and the probability of piecemeal review is not as decisive a consideration after judgment as before judgment since the underlying dispute is already settled." *Id.*; *see also Stone v. City of San Francisco*, 968 F.2d 850, 854 (9th Cir. 1992) (post-judgment contempt order imposing sanctions was final decision for purposes of § 1291).

Though a judgment was never entered in this case, the Stipulation is the functional equivalent because it terminated the underlying merits of the suit. The Stipulation also authorized the District Court to oversee compliance with the Stipulation. ER 197. That will necessarily result—and has resulted here—in post-Stipulation orders interpreting its terms. These orders are final in the sense that there is nothing more for the District Court to do; there is not a subsequent order or

---

"Defendants"). ER 274–350. Defendants were named in their official capacity only. *Id.*

judgment that can be entered that would render it more final. Consequently, an appeal from the Sanctions Order and the Judgment in a Civil Case is the only way Defendants can seek appellate review. *See Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 873 (9th Cir. 1992) ("To constitute an appealable 'final decision' under 28 U.S.C. § 1291, an order 'must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.") (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).

This Court has exercised appellate jurisdiction over similar post-settlement agreement orders under § 1291. *See, e.g., Gastile v. Virga*, 15-16294, 2016 WL 6520090, at *1 (9th Cir. Nov. 3, 2016) (appeal from order granting motion to enforce settlement agreement under § 1983 action); *Tabi v. Ortega*, 649 Fed. App'x 413 (9th Cir. 2016) (appeal from post-settlement agreement order); *Stefano v. City of Long Beach*, 621 Fed. App'x 404 (9th Cir. 2015) (same); *Wilcox v. Arpaio*, 753 F.3d 872, 875 (9th Cir. 2014) (appeal from order granting motion to enforce settlement agreement in § 1983). The Court should similarly do so here.

3.    The District Court entered the Sanctions Order and Judgment in a Civil Case on June 22, 2018. ER 1–25. Defendants filed their notice of appeal on July 21, 2018. ER 37–38. The notice was timely filed pursuant to Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

1.      Did the District Court exceed its authority to enforce the Stipulation by holding Defendants in contempt and assessing contempt sanctions?

2.      Did the District Court deny Defendants due process of law by holding them in criminal contempt without sufficient notice, without full criminal process, without a finding contempt beyond a reasonable doubt, and without finding willful disobedience?

3.      Was $1,445,000 in civil contempt sanctions unduly exorbitant?

4.      Did the District Court exceed its authority in enforcing the Stipulation by holding Defendants to 100% compliance with the Stipulation, rather than the 85% compliance standard outlined in the Stipulation, and by requiring reporting on every instance of noncompliance, rather than a random sampling as provided for in the Stipulation?

## STATEMENT OF THE CASE

### A.    <u>The Complaint and Pre-Trial Litigation</u>

The ADC operates ten prison facilities throughout the State. In March 2012, Plaintiffs filed a class-action lawsuit against Defendants, alleging inadequate healthcare and unlawful conditions of confinement in violation of the Eighth Amendment, and seeking declaratory and injunctive relief. ER 274–350. In March 2013, the District Court certified a class (consisting of all inmates) and a conditions-of-confinement subclass (consisting of all maximum-custody inmates).

Dkt. 372.

## B. The Stipulation

Prior to trial, the parties entered into the Stipulation as allowed under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, whereby ADC agreed to comply, for a limited, specified period of time, with 103 healthcare performance measures ("PMs") and nine measures related to the conditions of confinement for maximum-custody inmates. ER 188, 191, 213–221, 243–245. The PMs at issue here are:

- PM 35: All inmate medications (Keep On Person (KOP) and Direct Observation Therapy (DOT)) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption;

- PM 39: Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral;

- PM 44: Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a Medical Provider within 24 hours;

- PM 46: A Medical Provider will review the diagnostic report including pathology reports, and act upon reports with abnormal values within five

calendar days of receiving the report at the prison;

- PM 47: A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request;

- PM 50: Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider;

- PM 51: Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider;

- PM 52: Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report;

- PM 54: Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer timeframe can be in place;

- PM 66: In an [inpatient component/infirmary bed], a Medical Provider encounters [sic] will occur at a minimum every 72 hours.

*Id.* at 213–21.

The Stipulation provided that Defendants would monitor compliance with the PMs and report compliance scores monthly. *Id.* at 188, 191–92. For most

PMs, ADC compliance monitors review a random sampling of inmate medical records applicable to the measure for each unit at the facility (or specified units and facilities) and determine whether those records comply with the requirements for the measure for the audited month. The percentage of records showing compliance for each PM is tabulated and reported to Plaintiffs' counsel and the District Court each month. Thus, if the PM calls for a sampling of ten medical records and eight indicate compliance, then that unit/facility will receive an 80% for that PM for that month.[5] This measurement and reporting process determines "whether ADC has complied with particular [PMs] at particular complexes." *Id.* at 188–90. The Stipulation also outlines the process for terminating Defendants' duty to monitor and report on a particular PM. *Id.* at 188–90, 192–93.

The Stipulation initially required 75% compliance for an ADC facility to be deemed in "substantial compliance" with the Stipulation. *Id.* After twelve months (October 2015), substantial compliance required 80% compliance with the PMs and, finally, 85% after twenty-four months (October 2016). *Id.* The Stipulation outlines a dispute resolution process if Plaintiffs believe that Defendants are not in "substantial compliance" with the PMs. *Id.* at 198.

Pursuant to the Stipulation and to implement these procedures, the District Court would retain the power to enforce the Stipulation through "all remedies

---

[5]     The Stipulation sets forth the protocol for measuring each PM. ER 188.

provided by law, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of this Stipulation." *Id.* at 199–200. Similarly, the parties consented to the reservation and exercise of jurisdiction by the District Court over all disputes between and among the parties arising out of the Stipulation. *Id.* at 199. The parties selected the District Court (Magistrate Judge David Duncan) to oversee enforcement of the Stipulation. *Id.* at 197.

The Stipulation also outlined that: (1) Defendants denied all the allegations in the Complaint and that the Stipulation did not constitute, and should not be construed or interpreted as, an admission of any wrongdoing or liability by any party; (2) the Stipulation may not be altered or modified, except as expressly agreed to by the Parties; (3) the purpose of the Stipulation's execution was to "settle the [ ] case;" and (4) the "*the parties agree that this Stipulation shall not to be construed as a consent decree*." *Id.* at 187, 199, 200 (emphasis added).

### C.  Fairness Hearing and Order

As a result of the class and subclass certification and the parties' desire to enter into the Stipulation, on February 18, 2015, the Court held a Rule 23 fairness hearing to assess the Stipulation, including assessing whether the Stipulation sufficiently satisfied the factors set forth under *Linney v. Cellular Alaska*

*Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998). Dkt. 1455; ER 180–84. None of those factors required a finding of any constitutional violation or fault on the part of Defendants. ER 180–81.

Subsequently, the District Court entered an order (the "Fairness Order") holding that the Stipulation was fair, reasonable, and adequate, and it closed the case "subject to the Court maintaining jurisdiction to supervise the enforcement of the settlement as provided in the parties' Stipulation." ER 180–84. The Fairness Order included two attachments.[6] The first, titled "Order Re: Settlement," outlined that the Stipulation was narrowly drawn and again stated that "the Court shall retain the power to enforce [the] Stipulation through all remedies provided by law, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of [the] Stipulation." ER 185 (the "Settlement Order"). Neither the Fairness Order nor the Settlement Order attached the Stipulation, outlined the Stipulation's terms, or ordered Defendants to comply with the Stipulation.

### D. **Enforcement of the Stipulation**

As part of their monitoring duties, Defendants file monthly reports with the District Court, which state the compliance score for each facility on each PM, as

---

[6]     The second was an excerpt from the fairness hearing transcript. Dkt. 1458, Attachment 2.

presently applicable. *See, e.g.,* Dkt. 1878, 2031, 2062, 2211, 2246, 2332, 2400, 2467, 2507, 2538, 2571, 2639, 2785, 2842, 2922, 2960, 2989, 3015, 3064, 3102, 3119, 3155, 3193, 3229. In addition, upon insistence by Plaintiffs' counsel, the District Court held monthly status conferences with the parties. The monthly status conferences were opportunities to monitor Defendants' compliance with the PMs, including discussing compliance scores, any impediments to compliance, and issues raised by either party.

On June 14, 2017, the District Court conducted a monthly status conference with the parties. At that conference, via minute entry, the Court issued an order to show cause as to why a $1,000 fine should not be imposed for "every single" violation of certain PMs at certain facilities (the "June 14 Order").[7] ER 168–72.

On July 26, 2017, Plaintiffs filed a Response to the June 14 Order, in which they argued that the $1,000 per violation fine was appropriate but would be an exercise of the District Court's contempt power. ER 132–57. They acknowledged that the due process requirements for contempt were not met by the District

---

[7]      This standard is consistent with the District Court's prior statements that the Stipulation requires 100% compliance and that the 85% compliance metric is only a triggering mechanism for the Court's enforcement of the Stipulation. *See* ER 176 ("the Stipulation requires 100% compliance with the [PMs] and . . . the graduated compliance rates are the trigger for the imposition of a remediation plan").

      Notably, however, this Court has stated that only 85% compliance is required. *See Parsons v. Ryan*, 912 F.3d 486, 500 (9th Cir. 2018). Further, the District Court has also stated that "the [S]tipulation doesn't require 100 percent compliance." ER 106.

Court's June 14 Order. *Id.* Plaintiffs further stated that, if contempt sanctions were ordered, each class member should receive a "nominal amount of $10 in compensatory damages." *Id.* at 153.

On August 7, 2017, Defendants filed a Reply to Plaintiff's Response. *Id.* at 121–31. Defendants reiterated their position that contempt powers are not available to enforce the Stipulation and further argued that the $1,000 per violation fine was a punitive criminal sanction. *Id.*

### E. The District Court's Orders Regarding Contempt Power and Availability of Sanctions

On August 9, 2017, during a monthly status conference, the District Court addressed the briefing relating to the June 14 Order, stating that "both sides think that I'm on a course that I can't take." *Id.* at 94. The District Court requested additional briefing regarding "whether there remains some legal power aside from contempt" that would support its proposed $1,000 sanction. *Id.* at 98. The District Court requested such briefing because it believed the $1,000 per violation fine was "not within the realm of contempt authority of the Court" and it was "not intending to employ [contempt] as [its] mechanism." *Id.* at 94.

In response, Plaintiffs acknowledged that no such alternative legal power existed. *Id.* at 115. Defendants further asserted that not only was there no support for the fine schedule proposed under contract law, but no contempt authority existed because the Stipulation was, by its own terms, not a consent decree and the

- 14 -

PLRA explicitly limited the District Court's enforcement to contractual remedies. *Id.* at 89–92, 108–13.

On October 10, 2017, the District Court issued an order to show cause (the "OSC Order"), which addressed the court's civil contempt power in enforcing the Stipulation. *Id.* at 26–29. The District Court held that it did have contempt power to enforce the Stipulation because "contempt is one of the 'remedies provided by law.'" *Id.* at 24–26. It further stated that if it were to hold Defendants in contempt, the contempt would be coercive, civil contempt because it "would be intended to spur Defendants' compliance with the [PMs] that they have contractually agreed to perform." *Id.* at 26. Lastly, the District Court ordered Defendants to comply with certain PMs at certain facilities, and ordered Defendants to show cause why it should not impose a "civil contempt sanction" for Defendants' noncompliance with the Stipulation. *Id.* at 28–29. In particular, the District Court ordered Defendants to show cause why the proposed $1,000 per violation fine should not be imposed "for every single violation of [those PMs], not just those below 85%." *Id.* at 27. The District Court reiterated its position that the Stipulation requires 100% compliance with the PMs and that the 85% benchmark is a "triggering device" for requiring Defendants to submit a remedial plan. *Id.*

The District Court subsequently required Defendants to file, under seal, "a list of *every instance* of non-compliance" with the listed PMs, including the name

and inmate number of the persons affected, so that it could assess Defendants' compliance.  *Id.* at 29 (emphasis added).

In response, Defendants outlined the extreme burden that compiling lists of every instance of noncompliance would cause.  For example, Defendants explained that, to do so, they would have to conduct a manual review of each and every relevant inmates' medical file.  *Id.* at 52–54 (explaining why manual review is necessary); *id.* at 64 ("Continuous manual auditing and review of each and every healthcare encounter would be required to provide accurate 'real time' instances of noncompliance.").  "[W]ithout manually reviewing each and every eligible medical file for each [PM], there is no way to obtain 100% accuracy . . . ."  *Id.* at 52. Manual review is extremely tedious and time consuming.  To manually review a file, a person must locate and open the file in the electronic medical records system, review the file, and assess the file's compliance with the relevant PMs by utilizing the monitoring methodology currently utilized by Defendants.  *See id.* at 51, 61.  Because of the large number of healthcare encounters, such a monitoring method is realistically impossible.  *See id.* at 65 (measuring instances of noncompliance with only one PM required review of almost 4,500 individual medical files); i*d.* at 62 (review of 420 individual files took three persons more than thirty-seven hours to complete).  For example, to compile the December 2017 noncompliance lists, Defendants reviewed a total of 22,670 health care encounters.

*Id.* at 54; *see also id.* at 55–59 (there were 15,832 eligible healthcare encounters for the February 2018 lists).

As a result of this extreme burden, Defendants requested several extensions to file the noncompliance lists. *See id.* at 83–88 (requesting an extension for the December 2017 lists); *id.* at 76–78 (requesting an extension for the January 2018 lists); *id.* at 73–75 (same). In addition, when Defendants were able to file noncompliance lists, they routinely noted that the lists were "overinclusive" as a result of the need for manual review, that the information was not yet available, or that the list contained "preliminary data only." *See id.* at 67–72, 79–82. Nonetheless, Defendants did comply with the Court's request, albeit over the period of several months rather than in a single month, and filed noncompliance lists for December 2017, and January and February 2018. *Id.* at 41–43, 55–59, 67–72, 79–82.

## F. The District Court's Order and Judgment of Civil Contempt

On June 22, 2018, the District Court issued the Sanctions Order (*id.* at 2–25) and Judgment in a Civil Case (*id.* at 1). The Sanctions Order imposes $1,445,000 in "civil contempt" sanctions (the "Sanctions") against Defendants for violations of the PMs that occurred in December 2017, and January and February 2018. *Id.* at 24. It required that this amount be paid to the Clerk of Court within 14 days. *Id.* The Judgment in a Civil Case orders that judgment be entered against Defendants

for this amount and on these conditions. *Id.* at 1.

The Sanctions Order also requires Defendants to continue filing a monthly list of every instance of noncompliance with the PMs listed in the OSC Order. *Id.* at 25. It also restates the Court's prior determination that "[t]he Stipulation requires 100% compliance with each of its [PMs]." *Id.* at 19.

In imposing the Sanctions, the District Court stated that the Stipulation "empowered the Court to enforce it 'through all remedies provided by law,'" which "necessarily includes civil contempt proceedings" pursuant to 18 U.S.C. § 401(3). *Id.* at 5. In the Sanctions Order, the District Court appears to address Defendants' noncompliance with both the Stipulation and the OSC Order. *Compare id.* at 24 ("Defendants are held in civil contempt for failure to comply with the Stipulation as detailed in the Court's Order to Show Cause") ("[b]ecause ADC remains noncompliant with . . . the Stipulation") *with id.* at 19 ("[t]he OSC Order has not resulted in ADC's compliance with the Stipulation") & *id.* at 21 ("The OSC Order was valid, specific, and definite.").

In addition, the Sanctions Order exclusively addresses civil contempt. *Id.* at 5–6, 21–24. Nowhere does it assess whether the Sanctions are civil or criminal contempt, or the standard for imposing criminal contempt. *See id.* at 2–25. Similarly, Defendants did not have an opportunity for a jury trial relating to the Sanctions.

The District Court further ordered the parties to submit proposals for the best use of the funds, noting it "will distribute the monies after considering their proposals." *Id.* at 24. The parties timely submitted their proposals. *Id.* at 30–36. Plaintiff's counsel proposed 90% of the Sanctions be used to hire court-appointed experts with the other 10% to be paid to the inmates who were identified on the noncompliance lists filed by Defendants.[8] *Id.* at 33–34. Defendants proposed using the funds to improve the quality of healthcare provided to the inmates, including by hiring additional monitors to audit its compliance with the PMs, and improving, modifying, and/or expanding the health units at each facility. *Id.* at 30–31. The intended use of the Sanctions has not been ruled upon by the District Court as of the time of filing this Brief.[9]

### G.   Prior Appeals in this Matter

There have been several other appeals from the District Court's rulings in this matter. In Appeal No. 16-17282, Defendants challenged a prior District Court order on the ground that it effectively required 100% compliance with the PMs. *See Parsons v. Ryan*, 912 F.3d 486, 500 (9th Cir. 2018). The Court did not decide

---

[8]    Notably, Plaintiffs' counsel requested that $100 be deposited in each inmates' prison account. ER 33–34. In prior briefing, Plaintiffs' counsel stated that Plaintiffs' damage as a result of Defendants' noncompliance was only $10 per inmate. *Id.* at 137, 155.

[9]    In June 2018, when Magistrate Judge Duncan retired, District Judge Roslyn Silver took over judicial enforcement of the Stipulation. Dkt. 2911.

whether requiring 100% compliance with the Stipulation would be improper. *Id.* at 500. Instead, the Court merely stated that the District Court's order at issue in that appeal did not modify the threshold for substantial compliance under the Stipulation. *Id.* at 500.

Judge Callahan dissented in part, and concluded that the District Court had effectively required 100% compliance. *See id.* at 508 (Callahan, J., dissenting).

In addition, in Appeal No. 16-17282, the Ninth Circuit stated that the District Court necessarily found a violation of a constitutional right by Defendants. *Id.* at 501. This assertion was implied from a conclusory statement in a District Court order that the Stipulation was "necessary to correct the violations of the Federal right of the Plaintiffs." *Id.* The District Court never made any evidentiary finding that Plaintiffs' constitutional rights were violated. *Id.*

## STANDARD OF REVIEW

Because the question of whether the Stipulation is a settlement agreement or a consent decree is a question of federal law, de novo review applies. *See Kelly v. Wengler*, 822 F.3d 1085, 1094 (9th Cir. 2016) ("*Kelly II*").

Whether the District Court could order contempt relating to the Stipulation is a question of law subject to de novo review. *See Kelly II*, 822 F.3d at 1094 (interpretation of a settlement agreement is reviewed de novo).

Whether the District Court provided sufficient due process relating to the

contempt sanctions is a legal question subject to de novo review. *See Thomas, Head & Greisen Emps. Trust v. Buster*, 95 F.3d 1449, 1458 (9th Cir. 1996); *see also Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109 (9th Cir. 2005).

Interpretation of the scope of the Stipulation is a legal question subject to de novo review. *See Kelly II*, 822 F.3d at 1094.

## SUMMARY OF THE ARGUMENT

The PLRA, which governs civil proceedings arising from prison conditions, allows parties to settle such cases by entering into either (1) a consent decree or (2) a private settlement agreement. 18 U.S.C. § 3626(c). The Stipulation is a "private settlement agreement." Neither the parties nor the courts have characterized the Stipulation as a consent decree, and the Stipulation itself expressly disclaims that it is a consent decree. *See* ER 199. In addition, the findings expressly required by the PLRA related to consent decrees were not expressly made in this matter. *See* 18 U.S.C. § 3626(a)(1)(A). Further, the other factors considered by courts support a finding that the Stipulation is a "private settlement agreement."

Because the Stipulation is a "private settlement agreement," the District Court did not have contempt powers. Contempt is available to enforce a private settlement agreement *only* if the agreement is incorporated into an order by: 1) attaching the settlement agreement as an exhibit to the order; or 2) outlining its terms in the order itself. The Stipulation was not a court order nor was it

incorporated into any court order.  The PLRA makes clear that the *only remedies* available for breach of a "private settlement agreement" is to pursue State law contractual claims or to reinstate the litigation that the agreement settled.   18 U.S.C. § 3626(c)(2).  Therefore, the District Court did not have contempt power to enforce the Stipulation.

Even if the District Court had contempt power, the sanctions ordered were inappropriate, both procedurally and substantively.   To determine whether contempt and related sanctions are civil or criminal, courts look to the character and the purpose of the order awarding them: civil contempt sanctions are imposed for compensatory or coercive purposes; criminal contempt sanctions are imposed for punitive purposes.  Applying this test, the Sanctions Order imposes criminal contempt.  However, Defendants did not receive adequate due process for criminal contempt.

Further, the District Court violated the Stipulation when it entered the Sanctions Order.  First, it held that Defendants must maintain 100% compliance for every PM, rather than the 85% compliance provided in the Stipulation.  ER 19. Second, it required Defendants to report on every instance of noncompliance for each facility and each PM under the OSC Order, rather than a random sampling of inmate medical files as provided for in the Stipulation.  ER 25.  By doing so, the District Court exceeded its authority by rewriting the Stipulation, which only the

parties had the authority to do.  Courts have no license to rewrite private contracts to conform to what the court wishes the parties had agreed.

## ARGUMENT

## I. THE TRIAL COURT ERRED WHEN IT FOUND THE EXISTENCE OF CONTEMPT POWER.

### A. The Prison Litigation Reform Act (18 U.S.C. § 3626) Governs this Matter.

The PLRA governs civil proceedings arising from prison conditions.  The statute specifically outlines the parameters for settling such civil proceedings.  18 U.S.C. § 3626(c).  It allows parties to settle prison-related civil actions by entering into either:  (1) a consent decree; or (2) a private settlement agreement.  *Id.*  The PLRA expressly defines the terms "consent decree" and "private settlement agreement."[10]  *Id.*  A consent decree is "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties ***but does not include private settlements.***"  *Id.* at (g)(1) (emphasis added).  By definition, a consent decree is a form of "relief" subject to the constraints of § 3626(a)(1)(A). *Id.* at (c)(1), (g)(9); *Disability Law Ctr.*, 960 F. Supp. 2d at 283.

A private settlement agreement, on the other hand, is "an agreement entered

---

[10]   Because the PLRA provides express definitions for "consent decree" and "private settlement agreement" in the prison litigation context, authority seeking to define those terms, or outline the elements thereof, in a non-PLRA context are inapposite.  *See VanDesande v. United States,* 673 F.3d 1342, 1348 (Fed. Cir. 2012); *Benjamin v. Jacobson*, 172 F.3d 144, 155 (2d Cir. 1999).

into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled."  18 U.S.C. § 3626(g)(6).  Private settlement agreements are enforceable by reinstating the initial civil action or in State court under State law.  *Id.* at (c)(2).  Unlike a consent decree, a "private settlement agreement" does not constitute "relief" subject to the requirements of § 3626(a)(1)(A).  *Id.* at (g)(9); *Disability Law Ctr.*, 960 F. Supp. 2d at 283 (citing § 3626(c)(2), (g)(9)); *Austin v. Hopper,* 15 F. Supp. 2d 1210, 1218 (M. D. Ala. 1998).

Consent decrees and private settlement agreements are, by definition, distinct and mutually exclusive legal creations.  18 U.S.C. § 3626(c), (g)(1), (g)(6), (g)(9).  Courts commonly acknowledge this principle.  *See*, *e.g.*, *Benjamin v. Jacobson*, 172 F.3d 144, 157 (2d Cir. 1999); *Rowe v. Jones,* 483 F.3d 791, 796 (11th Cir. 2007); *Hazen ex rel. LeGear v. Reagen*, 208 F.3d 697, 698–99 (8th Cir. 2000); *Davis v. Gunter*, 771 F. Supp. 2d 1068, 1070–71 (D. Neb. 2011); *see also Disability Law Ctr.*, 960 F. Supp. 2d at 282–86.

## B.  The Stipulation Is a Private Settlement Agreement.

The Stipulation can be one of two things:  (1) a consent decree; or (2) a private settlement agreement.  It cannot be both, and the District Court's attempt to have it both ways constitutes legal error.

First, Plaintiffs do not argue, and have never argued, that the Stipulation is a

consent decree.  In addition, neither this Court nor the District Court determined that the Stipulation is a consent decree.  In fact, this Court previously referred to the Stipulation as a "settlement agreement," and applied legal principles interpreting and enforcing settlement agreements specifically.  *Parsons*, 912 F.3d at 495, 497–98 (citing *Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989), *City of Emeryville v. Robinson*, 621 F.3d 1251 (9th Cir. 2010), and *Wilcox*, 753 F.3d at 872).[11]

Second, the factors necessary to find the existence of a consent decree have not been met.  Most importantly, the PLRA requires there be a finding that a federal right was violated before a consent decree can be entered.  18 U.S.C. § 3626(a)(1)(A), (c)(1); *see also Disability Law Ctr.*, 960 F. Supp. 2d at 285–86 (finding an agreement was not a consent decree because, in part, "a violation of a federal right by the Department has not been admitted or proven"); *Ingles v. Toro*, 438 F. Supp. 2d 203, 215 (S.D.N.Y. 2006) ("the PLRA seems to provide that a court cannot approve a consent decree unless there is a finding of a violation of a federal civil right . . . most defendants under the PLRA will insist that any settlement take the form of a 'private settlement agreement,' which does not require a finding of a violation").  Here, there was no express finding that a federal right was violated.  In a prior appeal in this matter (No. 16-17282), a panel of this

---

[11]   The Court also cited cases which stated and/or applied general contract principles to other types of private agreements.  *Parsons*, 912 F.3d at 497.

Court stated that the District Court necessarily found a violation of a constitutional right by Defendants. *Parsons*, 912 F.3d at 501. However, this assertion was implied from a conclusory statement in the Settlement Order that the Stipulation was "necessary to correct the violations of the Federal right of the Plaintiffs." *Id.* The District Court never made any evidentiary finding that Plaintiffs' constitutional rights were violated. In fact, the Stipulation expressly recognizes that "Defendants deny all allegations in the Complaint" and states that "[t]his Stipulation does not constitute and shall not be construed or interpreted as an admission of any wrongdoing or liability." ER 187.

Further, the Stipulation was not "entered by the court." *See* 18 U.S.C. § 3626(g)(1) (a consent decree is "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties"). The Stipulation, as a settlement agreement, was entered into between the parties and was merely approved by the District Court pursuant to Rule 23.

When interpreting whether a PLRA settlement agreement is a consent decree or a private settlement agreement, courts also consider: 1) the parties' characterization of the agreement; 2) whether the court retains jurisdiction; 3) whether court approval was required; 4) whether, if the agreement was judicially approved, the court ordered any form of remedy; and 5) whether the court ordered the parties to comply with the agreement in its order. *See Davis*, 771 F. Supp. 2d

at 1071; *Disability Law Ctr.*, 960 F. Supp. 2d at 285. An analysis of these factors confirms that the Stipulation is a private settlement agreement.

### 1. Characterization of the Agreement

Paragraph 35 of the Stipulation expressly states that it is not a "consent decree." ER 199. "In ascertaining the parties' intent, the court will look to the plain meaning of the words as viewed in the context of the contract as a whole." *United Cal. Bank v. Prudential Ins. Co. of Am.*, 140 Ariz. 238, 259 (App. 1983) (internal quotations omitted). "When the provisions of the contract are plain and unambiguous upon their face, they must be applied as written . . . ." *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 267 (2008). There can be no clearer evidence of the parties' intent regarding the private nature of the Stipulation than the inclusion of language expressly rejecting its status as a consent decree. ER 199 ("The parties agree that this Stipulation shall not be construed as a consent decree.").

### 2. Retaining Jurisdiction

The mere fact that a settlement is judicially enforceable does not transform it into a consent decree. *Christina A. ex rel. Jennifer A. v. Bloomberg*, 315 F.3d 990, 993 (8th Cir. 2003); *Disability Law Ctr.*, 960 F. Supp. 2d at 284. To the contrary, the court in *Christina A., 315 F.3d at 990, flatly rejected the idea that ongoing district court enforcement of a PLRA settlement agreement necessarily constituted

a consent decree.

There, parties to a prison-related class action entered into a settlement agreement under the PLRA that provided for ongoing judicial enforcement. *Christina A.*, 315 F.3d at 991. The court considered whether that ongoing judicial enforcement was sufficient to demonstrate the existence not of a private settlement agreement, but rather a consent decree. *Id.* at 992–994. It recognized that the settlement agreement did not strictly adhere to the PLRA's definition of a "private settlement agreement." *Id.* at 993, n. 5 ("the settlement agreement in this case is 'something more' than a private settlement agreement because the district court retained jurisdiction to enforce it"). Nonetheless, the court held that, despite the retention of jurisdiction by the district court, the agreement remained a private settlement agreement for purposes of the PLRA. *Id.* at 993. "[T]he district court's enforcement jurisdiction alone is not enough to establish a judicial 'imprimatur' on the settlement contract." *Id.*

Similarly, *Disability Law Ctr.,* 960 F. Supp. 2d at 271, rejects the idea that judicial enforcement automatically classifies a PLRA settlement agreement as a consent decree. There, litigation brought by a group of inmates was settled after years of negotiations, and the district court retained jurisdiction to enforce the agreement for up to five years. 960 F. Supp. 2d at 276–77. In finding that the settlement agreement was not a consent decree, the court emphasized that retaining

jurisdiction over the settlement agreement was within the court's inherent authority to manage its docket and was not determinative of the agreement's classification. *Id.* at 284.

Here, for the same reasons articulated in *Christina A.* and *Disability Law Ctr.*, the parties' agreement that the District Court would retain jurisdiction to enforce the Stipulation does not evidence that the Stipulation constitutes a consent decree.

### 3. Court Approval

The fact that the Stipulation was approved by the District Court does not change the private nature of the agreement. Although private settlement agreements are not typically approved by the Court, a different rule applies in class actions. Federal Rule of Civil Procedure 23(e) states that "[a] class action shall not be dismissed or compromised without the approval of the court." Fed. R. Civ. P. 23(e). "In approving a class settlement, the district court must consider whether it is 'fair, reasonable, and adequate.'" *Christina A.*, 315 F.3d at 992 (citing *Van Horn*, 840 F.2d at 606). Although Rule 23(e) "requires the district court to approve the class action agreement, it does not require the court to establish the *terms* of the agreement." *Id.* at 992–93 (emphasis in original).

To assert that judicial approval of all class action settlements transforms them into consent decrees is not consistent with the text of the PLRA. Numerous

courts have so held.  *See Christina A.*, 315 F.3d at 993 ("the district court's approval of the settlement agreement does not, by itself, create a consent decree"); *Ingles,* 438 F. Supp. 2d at 214–16; *see also Disability Law Ctr.*, 960 F. Supp. 2d at 275 ("While the review and approval of a settlement agreement and retention of jurisdiction to enforce it are not typical of a private settlement agreement, they are also not incompatible with a private settlement agreement generally or as defined in the PLRA.").

In *Christina A.*, the court analyzed whether the fact that a class action settlement was judicially approved transformed the private agreement into a consent decree.  315 F.3d at 992–93.  Examining the rationale underlying Rule 23 and court approval of class action settlements, the court stated "a class action settlement, like an agreement resolving any other claim, is a *private* contract" and the court's approval is "merely an exercise in compliance with Rule 23(e)."  *Id.* at 992 (emphasis in original).  As a result, the court held that judicial approval under Rule 23 does not convert a private settlement agreement into a consent decree.  *Id.*

In a similar context, *Disability Law Ctr.*, analyzed whether approval of a settlement agreement that was not effective without judicial approval meant that the settlement agreement was a consent decree under PLRA.  960 F. Supp. 2d at 282–86.  The court emphasized that "in this case the court is not evaluating and approving the settlement to determine whether any agreed-upon relief should be

ordered." *Id.* at 284.  In addition, it was not "now ordering any form of remedy" and was only deciding that the agreement "is fair and reasonable" for Rule 23 purposes.  *Id.* at 285.  Thus, the court determined that the settlement agreement was "substantially similar to a private settlement agreement and materially different than a consent decree." *Id.*

The same is true here.  The only reason the District Court approved the Stipulation was to satisfy the requirements of Rule 23.  As such, its character as a private settlement agreement remains unchanged.

### 4. The Form of Remedy Ordered and Court Ordered Compliance

The Court entered two orders concerning the Stipulation: the Fairness Order (evaluating the Stipulation under Rule 23 and closing the case) and the Settlement Order (retaining dispute-resolution jurisdiction over the Stipulation).  Neither the Fairness Order nor the Settlement Order grant any remedy to Plaintiffs nor do they require Defendants' compliance with the Stipulation.  *See generally* ER 180–84. They simply evaluated the Stipulation for purposes of Rule 23 and closed the case but retained jurisdiction over the Stipulation.

Because the parties expressly rejected the idea that the Stipulation was a consent decree, the District Court did not expressly find that a federal right was violated, judicial approval and ongoing enforcement are not dispositive, and the District Court did not order any form of remedy or compliance, the Stipulation is

and was a private settlement agreement under the PLRA.

## C. The District Court Did Not Have Contempt Power to Enforce the Stipulation.

Plaintiffs asserted, and the District Court held, that the Stipulation, standing alone, allows Defendants to be held in contempt. ER 5, 20, 150. Neither the Stipulation nor the District Court's orders flowing from the Stipulation provide a basis for enforcement by contempt.

Contempt is traditionally available to enforce compliance with a court's prior order. As such, to hold a party in contempt, the court must find: (1) a specific and definite *court order*; (2) the contemnor had knowledge of the *order*; and (3) the contemnor disobeyed the *order*. *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989); *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *Kelly II,* 822 F.3d at 1096; *United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980).

Contempt is available to enforce a settlement agreement in *only* one of two circumstances: (1) the agreement is not a private settlement agreement, but rather a consent decree; or (2) the agreement is incorporated into a dismissal order, such as by detailing its terms or attaching it to the order. *Christina A.*, 315 F.3d at 993; *Kelly II*, 822 F.3d at 1094–95; *Kelly v. Wengler*, 979 F. Supp. 2d 1237, 1239–41 (D. Idaho 2013) ("*Kelly I*"); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 US 375, 380–82 (1994). Neither occurred here.

Because the Stipulation is not a consent decree, was not sufficiently incorporated into an order and, standing alone, cannot impart contempt powers, it cannot serve as the basis for contempt.

### 1. The Stipulation Cannot Be Enforced Through Contempt.[12]

#### a. The Stipulation Is Not a Court Order Nor Was It Incorporated into One.

A settlement agreement, on its own, does not constitute a court order. When, however, a court's order dismissing or disposing of a case incorporates the terms of a settlement agreement, the court retains ancillary jurisdiction to enforce the agreement because a breach of the incorporated agreement is also a violation of the dismissal order. *Kelly II*, 822 F.3d at 1094.

Incorporating the terms of a settlement agreement can occur in one of two ways: 1) the settlement agreement can be attached as an exhibit to the dismissal order; or 2) its terms can be expressly outlined in the order itself. *Kelly I*, 979 F. Supp. 2d at 1239–41; *Kokkonen*, 511 US at 380–82.

In *Kelly I*, 979 F. Supp. 2d at 1237, the District of Idaho applied this standard in a prison-related matter. The settlement agreement in *Kelly I* was incorporated into, and attached as an exhibit to, the dismissal order. 979 F. Supp. 2d at 1240. In holding that contempt power was available because the settlement

---

[12]    As discussed in detail above, the Stipulation is not a consent decree and, therefore, does not confer contempt power.

agreement had been incorporated into the dismissal order, the court relied upon the standard described in *Kokkonen*, 511 U.S. at 375. In *Kokkonen*, the Supreme Court analyzed whether a federal court had jurisdiction to enforce a settlement agreement. 511 U.S. at 377. The Supreme Court stated that a district court has ancillary jurisdiction over a settlement agreement if the agreement was "made part of" an order of the court, such as by incorporating the terms of the agreement into the order. 511 U.S. at 381.

Incorporating a settlement agreement "by reference" is not sufficient. *In re Phar-Mor, Inc. Sec. Litig.*, 172 F.3d 270, 274 (3d Cir. 1999) ("the phrase 'pursuant to the terms of the Settlement' in the dismissal order did not confer subject matter jurisdiction over enforcement of the Settlement Agreement because it was insufficient to incorporate the Agreement into the dismissal order"); *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 370–71 (10th Cir. 1996); *Caudill v. N. Am. Media Corp.*, 200 F.3d 914, 917 (6th Cir. 2000); *Miener By & Through Miener v. Mo. Dep't of Mental Health*, 62 F.3d 1126, 1128 (8th Cir. 1995); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 461 (7th Cir. 1993); *see also Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132–33 (9th Cir. 2006) ("we have permitted incorporation by reference in certain limited scenarios, for example, where the referenced document is physically attached to the order itself") (quotations omitted).

Incorporation of a settlement agreement's terms into the dismissal order is particularly important if use of the contempt power is contemplated. As stated above, to find contempt, there must be a "specific and definite" court order. *Balla,* 869 F.2d at 466. Attaching the settlement agreement to, or describing its terms in, a dismissal order provides the specific and definite terms of the dismissal order. *See D. Patrick*, 8 F.3d at 461; *Consumers Gas & Oil*, 84 F.3d at 371.

The Stipulation does not satisfy these standards. It was not incorporated into the Fairness Order or the Settlement Order, nor was it attached to either order. Neither order describes or includes the terms of the Stipulation. The Fairness Order makes only one citation to the Stipulation and does not describe any of its terms. *See generally* ER 180–84. It simply states that the Stipulation is "fair, adequate, and reasonable" as "required by Rule 23(e)(2)" and is therefore approved. *Id.* at 180, 183. Similarly, the Settlement Order merely states that the Court reviewed the Stipulation, found that the relief is appropriate, and will retain the power to enforce the Stipulation. *Id.* at 185. The only term of the Stipulation described in the Settlement Order is a limitation upon the Court's enforcement powers. *Id.* Therefore, the Stipulation, either as a whole or specifically as to the PMs, did not become part of either order and cannot be enforced by contempt power.

As with a consent decree, the means of enforcement for a court order and settlement differ greatly. *Macias v. N.M. Dep't of Labor*, 300 F.R.D. 529, 553 (D. N. M. 2014) ("[V]iolation of a term incorporated into an order is sanctioned using federal contempt of court proceedings; violation of a settlement agreement over which the court has retained jurisdiction is subject to state contract law regarding the prima facie elements, affirmative defenses, and remedies of and for breach of contract."). Because the Stipulation is not a court order, it cannot be enforced through contempt.

> **b.** **The Stipulation's Language Concerning "Any Available Remedy at Law" Does Not Impart Contempt Powers.**

Despite the District Court's own Sanctions Order recognizing that, to hold Defendants in contempt, it was required to find a ***valid court order*** existed that is "specific and definite," (ER 5), the OSC Order nevertheless held that the Stipulation, standing alone, provides a basis for exercise of contempt power. ER 5, 20. The same claim has been made by Plaintiffs. ER 150.

The District Court's misguided belief that the Stipulation carries with it inherent contempt powers appears to be premised on the Stipulation's language that it can be enforced through "any remedy available at law." ER 5. The Sanctions Order cites no authority for the proposition that this language permits an exercise of the court's contempt power when it would not otherwise be available,

and its holding is directly contrary to the plain language of the PLRA.[13]  ER 2–25.

The PLRA distinguishes the remedies available for a consent decree from those relating to a private settlement agreement.  18 U.S.C. § 3626(c)(2); *see also Christina A.*, 315 F.3d at 993 ("Consent decrees are enforceable through the supervising court's exercise of its contempt powers, and private settlements are enforceable only through a new action for breach of contract."); *Ingles*, 438 F. Supp. 2d at 215.

The PLRA makes clear that the ***only remedies*** available for breach of a private settlement agreement is to pursue State law contractual claims or to reinstate the litigation that the agreement settled.  18 U.S.C. § 3626(c)(2); *see also Ingles,* 438 F. Supp. 2d at 215; *Christina A.*, 315 F.3d at 993.  Arizona law only allows contempt for a violation of a court order, not for the enforcement of contracts.  *See Ong Hing v. Thurston*, 101 Ariz. 92, 98 (1966) ("civil contempt is the disobeyance of a court order") (citing *Van Dyke v. Superior Court*, 24 Ariz. 508 (1922)); *Holt v. Hotham ex rel. Cnty. of Maricopa*, 197 Ariz. 614, 616 (App. 2000) ("[c]ivil contempt arises when a party refuses to do an act he lawfully is ordered to do") (citing *Phoenix Newspapers, Inc. v. Superior Court In and For*

---

[13]  Further, to read the Stipulation to provide literally "any remedy," as Plaintiffs propose and as the District Court did, would include an entire spectrum of potentially available remedies, including fines, imprisonment, punitive damages, etc., regardless of whether those remedies are applicable here.  This cannot be a reasonable interpretation of the Stipulation.

*Maricopa County*, 101 Ariz. 257, 258 (1966)).  Thus, the only "remedy available at law" is to sue and seek state law remedies for a breach of contract or for rescission.

Even if the Stipulation did expressly include the right for the District Court to hold Defendants in contempt, that is not enough to overcome the requirement that it must first find an underlying enforceable order or consent decree.  In *D. Patrick*, 8 F.3d at 455, the parties' settlement agreement stated that they "shall be and remain subject to the jurisdiction of this court for purposes of the enforcement of such settlement agreement and ***subject to the contempt powers*** of this court in the event of a violation thereof."  *Id.* at 460–61 (emphasis added).  The court found that even that language, which expressly contemplated the contempt powers of the court, was not sufficient to impart contempt power, because "the court did not set forth any of the provisions of the settlement agreement in its order."  *Id*. at 461.  Stated simply, although "the district court retained jurisdiction to enforce the settlement agreement, that was not sufficient to transform the agreement into a court order enforceable through a contempt proceeding."  *Id*. at 460.  "Standing alone, a settlement agreement is nothing more than a contract; the imprimatur of an injunction is required to render it a consent decree enforceable through contempt."  *Id*.  Absent such an order, which does not exist here, there is no contempt power.

In the court below, Plaintiffs relied on two cases for the proposition that settlement agreements under the PLRA generally provide for the ability to hold

Defendants in contempt.  ER 115.  Neither case supports that proposition.

*Kelly II*, 822 F.3d at 1085, provides no support.  As discussed in detail above, *Kelly II* addresses a settlement agreement that actually was attached to the district court's dismissal order, thereby incorporating it into the order and imparting contempt authority.  822 F.3d at 1094–96.  That narrow set of circumstances is not true here.

*Morales Feliciano v. Rullan*, 378 F.3d 42 (1st Cir. 2004), concerns the use of contempt power to enforce a ***preliminary injunction***, not a private settlement agreement.  378 F.3d at 46.  Because the Stipulation is an agreement between the parties, not an injunction or other court order, *Morales* is inapposite.

### 2.    The OSC Order Cannot Serve as the Basis for Contempt.

The OSC Order is nothing more than a demand that Defendants comply with the Stipulation and a threat that if they fail to do so, they will be held in contempt. It does not itself impose duties on the parties that can be enforced through the Court's contempt powers.   However, the Sanctions Order cites Defendants' purported violations of the OSC Order as its basis for contempt.  ER 19–20.

An order to show cause ("OSC") is merely a vehicle for enforcing a court's prior order.  *See Sole Survivor Corp. v. Buxbaum*, No. CV 07-3858-GW, 2009 WL 210471, at *5 (C.D. Cal. Jan. 22, 2009) ("a party seeking an OSC re [sic] contempt is not seeking new relief, but is simply seeking enforcement of a prior order").  It

is, in effect, its own form of contempt order.  *See In re Nakhuda*, 544 B.R. 886, 900 (9th Cir. B.A.P. 2016); Fed. R. Civ. P. 11, Adv. Comm. Notes, 1993 Amend. ("show cause orders will ordinarily be issued only in situations that are akin to a contempt of court").  However, the District Court did not have contempt authority to issue the OSC Order because, as discussed at length above, the Stipulation is not a court order or a consent decree and thus cannot serve as the basis for, or be enforced through, an OSC.

Further, because an OSC is akin to holding a party in contempt, the District Court must have the ability to hold Defendants in contempt for their conduct before issuing the OSC.  The only conduct giving rise to the OSC Order was Defendants' purported failure to comply with the Stipulation.  *See generally* ER 26–29.  However, the Stipulation, both under contract law as well as the PLRA, does not allow for Defendants to be held in contempt.  The remedies for a breach of the Stipulation are limited to contract remedies or reopening the litigation that led to the Stipulation.  *See* 18 U.S.C. § 3626(c)(2); *see also Ingles,* 438 F. Supp. 2d at 215; *Christina A.*, 315 F.3d at 993.

Because the OSC Order is not premised on the violation of a court order or consent decree, and because the Stipulation cannot serve as the basis for contempt, the OSC Order is void and any purported violation thereof cannot serve as the basis for the Sanctions Order.

## II.    **THE CONTEMPT SANCTIONS IMPOSED ARE IMPROPER.**

### A.    **If Contempt Were Appropriate Here, the Sanctions Ordered Were Inappropriate.**

#### 1.    Legal Standard for Contempt and Contempt Sanctions

A court's contempt power can be broadly divided into two categories:  (1) civil; and (2) criminal.  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016).  The elements for civil and criminal contempt are the same.  *See Balla*, 869 F.2d at 466 (civil contempt); *Bagwell*, 512 U.S. at 827 (same); *Kelly II*, 822 F.3d at 1096 (same); *Powers*, 629 F.2d at 627 (criminal contempt); Fed. R. Crim. Pro. 42 (same).  However, the burden of proof and demands of due process depend upon the nature of the contempt.

To impose civil contempt and sanctions flowing from a civil contempt order, the elements must be proven by clear and convincing evidence.  *Balla*, 869 F.3d at 466.  In addition, the contemnor must simply have notice and an opportunity to be heard.  *Bagwell*, 512 U.S. at 827.

Where the sanctions imposed are coercive and not compensatory, additional requirements must be met.  First, the contemnor must also have an opportunity to purge through compliance.  *Id.* at 829.  Second, where the contempt finding would require elaborate and reliable fact-finding, the civil due process standard is insufficient, and the contemnor is entitled to heightened procedural protections, including proof beyond a reasonable doubt and a jury trial.  *Id.* at 833–34.

To make a finding of criminal contempt and impose criminal contempt sanctions, the elements must be proven beyond a reasonable doubt. *Id.* In addition, the contemnor must be found to have willfully disobeyed the order. *Falstaff Brewing Corp. v. Miller Brewing Corp.*, 702 F.2d 770, 782 (9th Cir. 1983). Further, the contemnor must receive constitutionally adequate due process. *Bagwell*, 512 U.S. at 833. This requires full criminal process, including: (1) notice that the proposed contempt will be criminal; (2) proof beyond a reasonable doubt; and (3) a jury trial. *See* Fed. R. Crim. Pro. 42(a)(1); *Bagwell*, 512 U.S. at 826–27, 833–34.

To determine whether contempt and related sanctions are civil or criminal, courts look to the character and the purpose of the order awarding them. *Shell Offshore*, 815 F.3d at 629; *Falstaff Brewing*, 702 F.2d at 778. The question is "what does the court primarily seek to accomplish by imposing the sanction?" *Shell Offshore*, 815 F.3d at 629. This determination must be made at the time the contempt is **enforced**, rather than when it is imposed. *Id.* at 630. Indeed, what were originally intended as civil contempt sanctions can evolve into criminal contempt sanctions over time. *Id.* at 629.

Civil contempt sanctions are imposed for compensatory or coercive purposes. *Id.*; *Falstaff Brewing*, 702 F.2d at 778. If the civil contempt is intended to be compensatory, the sanction must be based on the complainant's actual losses

sustained. *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983). If the civil contempt is intended to be coercive, the Court must consider the "character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction." *Id*. A coercive sanction cannot be used to punish a past wrong. *Falstaff Brewing*, 702 F.2d at 799. In either instance, the beneficiary of civil contempt is the complainant, who should receive payment of the sanctions. *See Hook v. Arizona*, 907 F. Supp. 1326, 1340 (D. Ariz. 1995); *Hicks on Behalf of Feiock v. Feiock*, 485 U.S. 624, 632 (1988) (a sanction is "remedial when it is paid to the complainant").

In contrast, criminal contempt sanctions are imposed for punitive purposes. *Shell Offshore*, 815 F.3d at 629; *Falstaff Brewing*, 702 F.2d at 778. The beneficiaries of criminal contempt are the Court and the public interest. *Falstaff Brewing*, 702 F.2d at 778. Where the Court takes payment of the contempt sanctions, that is further evidence that the sanctions are criminal, not civil. *Hicks*, 485 U.S. at 632 (a sanction is "punitive when it is paid to the court"); *Shell Offshore*, 815 F.3d at 629 n. 4.

If a contempt order imposes sanctions that have both civil and criminal facets, the criminal character prevails in determining procedure and review. *Falstaff Brewing*, 702 F.2d at 778–79.

### 2. The Sanctions Order Imposes Criminal Sanctions.

The Sanctions here are clearly not civil in nature. It is, for example, undisputed that the $1,000 per violation fine is not compensatory and was never intended to be compensatory. *See* ER 116 ("[t]he proposed fine schedule is not meant to provide individual compensation for specific lapses in medical care"). Nor is the $1,000 per violation amount based on *any* evidence of Plaintiffs' loss. *See Shuffler*, 720 F.2d at 1148 (compensatory sanctions must be based on complainant's actual loss as a result of the noncompliance). By Plaintiffs' own assertion, their damages as a result of Defendants' purported noncompliance were, at most, only $10 per violation. ER 137, 155.

As additional evidence of their criminal nature, the Sanctions were paid to the Court, not Plaintiffs. *See* ER 24–25, 3940. In fact, Plaintiffs' own counsel suggests that 90% of the Sanctions be used to pay for additional court-appointed experts. ER 33. All of this weighs strongly against finding that the sanctions are civil in nature. *See Hicks*, 485 U.S. at 632 (a sanction is "punitive when it is paid to the court"); *Shell Offshore*, 815 F.3d at 629 n. 4.

The only alternative is to assert that the Sanctions are coercive in nature. Indeed, the District Court stated that the Sanctions would be coercive civil contempt because they were "intended to spur Defendants' compliance" with the

Stipulation. ER 26–27.[14]  However, to be coercive, the Sanctions must not be
punitive—i.e. they cannot be intended to punish Defendants for a past wrong. *See
Shell Offshore*, 815 F.3d at 629; *Falstaff Brewing*, 702 F.2d at 799 (citing *Gompers
v. Buck's Stove & Range Co.*, 221 U.S. 418, 442 (1911)) ("a coercive sanction
cannot undo or remedy what has been done") (internal quotations omitted).
Moreover, the retrospective nature of the contempt sanctions underscores that the
intent was to punish for past misdeeds, not to spur future compliance.

The District Court's statements further demonstrate that the true intent was
to punish Defendants for their prior non-compliance with the Stipulation.  For
example, the District Court itself has referred to the per-violation fine as a
"penalty." ER 94.  In addition, the Sanctions Order makes clear that Defendants
are being held in contempt for "missing the mark after four years of trying to get it
right," for "repeated failed attempts[ ] and too-late efforts," and for their "half-
hearted commitment" to compliance.  ER 21; *see also id.* at 162 & 166 (imposing
the per-violation fine because of Defendants' "months and months and months and
months" of non-compliance and their "history of never being compliant"); *id.* at 95
(explaining the decision to impose a per-fine violation because "every other thing
that the defendants have tried and everything that I have tried has either not been

---

[14]    It is worth noting again that the PMs included in the Stipulation are not a
court order.  *See* ER 26–27 (intending to coerce compliance with the measures
"that [Defendants] have **contractually** agreed to perform") (emphasis added).

done, has been appealed, or hasn't produced [ ] favorable results"); *id.* at 104–05 ("if you look at your numbers from June of 2016 and you look at them today, there's essentially no difference").

In addition, the District Court openly admitted that it was "frustrated" with Defendants and their third-party healthcare provider, Corizon. ER 18; *see also id.* at 105 (noting that the Court is "exasperated" by Defendants' noncompliance). Further, during hearings, the Court repeatedly rebuked Defendants for their prior noncompliance. *See id.* at 163 ("[t]he numbers were horrid last time"), 165 (the "Tucson [facility's] track record is not great"), 161 ("this is not the kind of robust trend that gives anybody the idea that you all got your hands on this"), 159 ("it is the kind of mistake that you don't get a pass on"), 102 ("you failed abysmally on this"). The District Court's frustration was further evidenced by his negative statements about Defendants' credibility and motive in other contexts. *See, e.g.*, Dkt. 2516 at 11:5–11 (stating that the District Court was "digging down deep to see how deep this evil goes"); *id.* at 8:12–9:1 ("the people that are lying through their teeth were the people at the Department of Corrections" and "the people that I have thought have lied to me have not been the prisoners, they have been the people working for the prison"); *id.* at 9:2–21 (stating that Defendants' conduct is "just disgusting"); Dkt. 2564 at 17:6–7 (stating that the District Court would be actively "playing a role in checking on the veracity of the monitoring program");

Dkt. 1622 at 4–5 (noting his "disappointment" in Defendants' remedial plan and that Defendants' plan includes statements "ranging from the absurd"). By definition, then, the Sanctions were not coercive, but punitive. Because the Sanctions are not compensatory and were intended to punish Defendants for prior noncompliance, they constitute criminal contempt.

Further, if the Sanctions were to be coercive, Defendants had to be given an opportunity to purge them through compliance with the Sanctions Order. *See Bagwell*, 512 U.S. at 829; *Shell Offshore*, 815 F.3d at 629 ("the ability to purge is perhaps the most definitive characteristic of coercive civil contempt"); *Falstaff Brewing*, 702 F.3d at 778 ("A court's power to impose coercive civil contempt depends upon the ability of the contemnor to comply with the court's coercive order.") (emphasis added); *United States v. Ayres*, 166 F.3d 991, 997 (9th Cir. 1999) ("civil contempt sanctions . . . are only appropriate where the contemnor is able to purge the contempt by his own affirmative act") (emphasis added). No such opportunity to purge was provided here. The Court held Defendants in contempt and awarded sanctions on June 22, 2018; however, the Sanctions were ordered for noncompliance with the Stipulation that occurred in December 2017, January 2018, and February 2018. ER 21–24. Defendants had no ability, in June 2018, to remedy noncompliance from more than four months prior. The fact that the District Court announced the proposed fine schedule before December 2017

does not change this determination.  *See Bagwell*, 512 U.S. at 836 ("the fact that the trial court announced the fines before the contumacy, rather than after the fact, does not in itself justify respondents' conclusion that the fines are civil or meaningfully distinguish these penalties from the ordinary criminal law").  The Sanctions, when imposed, were retrospective and did not allow Defendants an opportunity to purge the contempt or the Sanctions.  Therefore, the Sanctions cannot be deemed coercive and civil in nature.

Finally, even if there was some intent to coerce Defendants' compliance, it is apparent that the Sanctions were at least in part intended as punishment.  Where a contempt order is in part civil and in part criminal, the criminal nature prevails for the purpose of procedure and review.  *Falstaff Brewing*, 702 F.2d at 778–79.  Therefore, for the purpose of this Court's review, the Sanctions must be classified as criminal.

### 3.    The Court Failed to Afford Defendants Due Process.

To impose criminal sanctions on Defendants, the Court had to afford them constitutionally adequate due process, including:  (1) notice that the proposed contempt would be criminal; (2) proof beyond a reasonable doubt; and (3) a jury trial.  *See* Fed. R. Crim. Pro. 42(a)(1); *Bagwell,* 512 U.S. at 826–27, 833–34.  The Court was also required to find, beyond a reasonable doubt, that Defendants had willfully disobeyed the Court's order.  *Falstaff Brewing*, 702 F.2d at 782.

None of these due process requirements were met. First, the briefing in the District Court focused solely on the standards for civil contempt, as did the Sanctions Order and the OSC Order. *See* ER 2–29, 108–13, 132–57; *see also* ER 115. Therefore, no notice of the possibility of criminal contempt sanctions was provided, as required under Federal Rule of Criminal Procedure 42. *See* ER 115 ("the Court should use its *civil* contempt authority") (emphasis added). Second, the District Court expressly refused to analyze whether Defendants were willfully disobedient (ER 5), a required element of criminal contempt (*Falstaff Brewing*, 702 F.2d at 782). Third, Defendants did not receive a jury trial, nor was their noncompliance proven beyond a reasonable doubt. *See Bagwell,* 512 U.S. at 826–27, 833–34 (jury trial and proof beyond a reasonable doubt required for criminal contempt).

Because the Sanctions are criminal in nature and Defendants did not receive adequate due process to impose criminal contempt sanctions, the Court must vacate the Sanctions Order.[15]

### 4.  Even if the Sanctions Were Civil in Nature, the Amount Awarded Is Too High.

Even if the Sanctions Order was civil in nature, and therefore only subject to

---

[15]     Even if this Court finds that the Sanctions Order was civil in nature, a heightened standard of due process was still required because the District Court had to engage in exhaustive and complex fact-finding in order to find Defendants in contempt. *See Bagwell,* 512 U.S. at 833–34; ER 6–17 (the Sanction Order's findings of fact).

clear and convincing evidence, the $1,000 per violation fine is contrary to the standards for compensatory and coercive contempt purposes.

If the Sanctions were intended to be compensatory, they should be no more than $10 per violation. As discussed above, Plaintiffs' own counsel admitted that their harm as a result of Defendants' noncompliance with the Stipulation was, at most, $10. ER 137, 155. A fine of more than $10 per violation is, therefore, not compensatory.

If the Sanctions were intended to be coercive, the District Court was required to articulate that they were proportional to the harm suffered and would be effective to spur Defendants' compliance. *Shuffler*, 720 F.2d at 1148. It made no such findings in the Sanctions Order. *See generally* ER 2–29.

Therefore, to the extent that the Sanctions are found to be civil, this Court should remand for a determination of what amount is appropriate.

## III. THE COURT ACTED OUTSIDE THE SCOPE OF ITS AUTHORITY AND IN DIRECT CONTRAVENTION OF THE STIPULATION WHEN ENTERING THE SANCTIONS ORDER.

In addition to sanctioning Defendants, the Sanctions Order included two additional rulings. First, it held that for each and every PM (not just those at issue in the OSC Order or Sanctions Order), Defendants are held to 100% compliance, rather than the 85% compliance outlined in the Stipulation. ER 19. Second, it required Defendants to report on every instance of noncompliance for each facility

and each PM under the OSC Order, rather than a random sampling of inmate medical files, as provided in the Stipulation. *Id.* at 25.

### A. Requiring 100% Compliance with the Stipulation Improperly Modifies the Stipulation's Compliance Standards.

Defendants addressed whether 100% compliance with the PMs is an incorrect interpretation of the Stipulation in a prior appeal, No. 16-17282. In its recent decision in that appeal, the Court did not decide whether requiring 100% compliance with the Stipulation would be improper; instead, the Court merely stated that the District Court's order at issue there did not require 100% compliance because it did not change the threshold for substantial compliance under the Stipulation. *Parsons*, 912 F.3d at 500. However, that compliance issue is squarely presented here.

Here, the Sanctions Order expressly requires 100% compliance with the Stipulation. ER 19 (stating as a "Conclusion[ ] of Law" that "[t]he Stipulation requires 100% compliance with each of its [PMs]"). This requirement improperly modifies the compliance standards set forth in the Stipulation. The Stipulation expressly defines compliance as "meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure that applies to a specific complex." ER 189. Thus, the plain language of the Stipulation requires only an 85% compliance rate, not a 100% compliance rate. "Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room

for construction or interpretation and a court may not resort thereto." *See Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966). Judge Callahan, in her dissent, recognized that any interpretation of the Stipulation that required 100% compliance would "erroneously modify" it. *Parsons*, 912 F.3d at 508. This Court should adopt Judge Callahan's reasoning and find that the District Court's interpretation requiring 100% compliance was an improper modification of the Stipulation.

## B. Requiring Defendants to Report on Every Instance of Non-Compliance Violates the Sampling Procedure in the Stipulation.

The Stipulation details the process for sampling inmate healthcare records in monitoring compliance with the PMs. ER 188, 222–42 (providing that, for measuring compliance with the majority of the PMs, "10 records will be randomly selected"). It requires that monitors assess a random sampling of inmate medical records applicable to the measure for each unit at the facility (or specified units and facilities), not that they measure every instance of compliance or noncompliance across all inmate medical files. *Id.* This measurement and reporting process determines "whether ADC has complied with particular [PMs] at particular complexes." *Id.* at 188–90. Thus, under the plain language of the Stipulation, Defendants need only measure compliance using randomly sampled records. *See Goodman*, 421 P.2d at 320 ("Where the intent of the parties is expressed in clear

and unambiguous language, there is no need or room for construction or interpretation and a court may not resort thereto.").

The District Court rewrote the Stipulation to eliminate the sampling process expressly agreed upon by the parties. The law, however, prohibits the District Court from doing so. *See Olliver/Pilcher Ins., Inc. v. Daniels*, 715 P.2d 1218, 1221 (Ariz. 1986) ("the court cannot create a new agreement for the parties to uphold the contract"); *Isaak v. Mass. Indem. Life Ins. Co.*, 623 P.2d 11, 14 (Ariz. 1981) ("It is not within the power of this court to revise, modify, alter, extend, or remake a contract to include terms not agreed upon by the parties."); *Goodman*, 421 P.2d at 320 (stating that court's "duty is confined to the construction or interpretation of the [agreement] which the parties have made for themselves").

Further, the District Court, through the Sanctions Order, ordered Defendants to perform an impossible task on threat of further contempt. Compiling *monthly* lists of every instance of noncompliance is not possible—which is why Defendants did not agree to do so. As discussed in detail above, Defendants have to conduct a manual review of every eligible inmate medical file to determine whether the healthcare encounter was compliant. ER 52–54; *see also id.* at 63–66. That manual process is necessary to ensure accuracy, but it is very time consuming. ER 52; *see also id.* at 61. That is compounded by the fact that there are thousands if not tens of thousands of inmate medical files and/or healthcare encounters that

need to be reviewed.  *See* ER 54, 65.  Although a review of those records can be completed, it took months for staff working around the clock to complete the review for a single month's worth of data.

The District Court was prohibited from taking such action.  "Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."  *United States v. Rylander*, 460 U.S. 752, 757 (1983).  It is simply not possible for Defendants to complete such a comprehensive review within the monthly reporting time required by the District Court.  ER 52 (manual review "cannot be done with the current available resources within the deadlines imposed"); *see also* ER 62 (manual review of 420 files took three persons more than thirty-seven hours to complete).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court vacate the District Court's Sanctions Order and Judgment in a Civil Case.

DATED this 8th day of May, 2019.


By:  _s/ Timothy Berg_____
    Timothy Berg (No. 004170)
    Todd Kartchner (No. 021857)
    Courtney R. Beller (No. 029412)
    Shannon McKeon (No. 034429)
    2394 East Camelback Road, Suite 600
    Phoenix, AZ  85016-3429
    Attorneys for Defendants-Appellants

## STATEMENT OF RELATED CASES

Consolidated Appeal Nos. 16-17282, 17-15302, and 17-532 arise from the same underlying matter, are appeals taken from post-Stipulation orders by the District Court, and challenged the District Court's interpretation of the Stipulation. Thus, all three appeals involve the application of contract interpretation and construction principles to the same document with the same litigation history. In addition, Defendants filed a Motion to Dismiss the Consolidated Appeals for lack of appellate jurisdiction, arguing that the parties' selection of Magistrate Judge Duncan violated 28 U.S.C. § 636(c) and the District of Arizona's Local Rules. *See Parsons*, 912 F.3d at 495–96. Because the reassignment did not comply with § 636(c), it was invalid and the District Court never had magistrate jurisdiction to proceed. *Id*. Although a panel of this Court determined that there was magistrate jurisdiction below and declined to rehear that determination *en banc* (*see* No. 16-17282, Doc. 114-1, 119), Defendants will be filing a Petition for Writ of Certiorari, requesting the United States Supreme Court to review the magistrate-jurisdiction question. If the Supreme Court grants the Petition and concludes that there was no magistrate-jurisdiction, the order and judgment at issue here will be void, this appeal will be moot, and this Court will lack appellate jurisdiction. *See also Anderson v. Woodcreek Venture, Ltd.*, 351 F.3d 911, 914 (9th Cir. 2003); *Nasca v. Peoplesoft*, 160 F.3d 578, 580 (9th Cir. 1998).

Appeal No. 18-15989 also arises from the same underlying matter. In Appeal No. 18-15989, Defendants challenge Magistrate Judge Duncan's post-Stipulation order denying their motion to disqualify him as magistrate judge. This Court granted Defendants' Motion to Suspend Briefing Schedule in that appeal on September 24, 2018. The briefing schedule has now been reset and briefing will be completed by July 1, 2019.

Appeal No. 18-16368 also arises from the same underlying matter. In Appeal No. 18-16368, Defendants challenge four post-Stipulation injunctive orders entered by the District Court. These include: (1) an order partially granting and partially denying Defendants' motion to terminate monitoring as to certain PMs at certain facilities; (2) an order requiring Defendants to utilize a certain method for collecting health-needs-requests forms from inmates; (3) an order requiring Defendants to file a plan to implement the recommendations of a staffing advisor appointed by the District Court; and (4) an order identifying eight areas where the court will appoint an expert witness. This Court granted Defendants' Motion to Suspend Briefing Schedule in that appeal on October 19, 2018, pending resolution of the jurisdictional question raised in Appeal No. 16-17282. The briefing schedule has now been reset and briefing will be completed by July 1, 2019.

Appeal Nos. 18-16365 and 18-16424 also arise from the same underlying matter. In Appeal No. 18-16365, Defendants challenge the District Court's grant

of attorneys' fees and costs to Plaintiffs. In Appeal No. 18-16424, Plaintiffs challenge the District Court's reductions on the attorneys' fees and costs requested by Plaintiffs. On October 19, 2018, this Court granted Defendants' Motion to Suspend Briefing Schedule in that appeal. The briefing schedule has now been reset and briefing will be completed by July 24, 2019.

DATED this 8th day of May, 2018.

By: _s/ Timothy Berg_____
Timothy Berg (No. 004170)
Todd Kartchner (No. 021857)
Courtney R. Beller (No. 029412)
Shannon McKeon (No. 034429)
2394 East Camelback Road, Suite 600
Phoenix, AZ 85016-3429
Attorneys for Defendants-Appellants

## CERTIFICATE OF COMPLIANCE

I am one of the attorneys for Appellants.

This brief contains 12,914 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED this 8th day of May, 2018.

> By: *s/ Timothy Berg*
> Timothy Berg (No. 004170)
> Todd Kartchner (No. 021857)
> Courtney R. Beller (No. 029412)
> Shannon McKeon (No. 034429)
> 2394 East Camelback Road, Suite 600
> Phoenix, AZ  85016-3429
> Attorneys for Defendants-Appellants

14258455