# EXHIBIT 1

# (REDACTED)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

February 15, 2019

**VIA EMAIL ONLY**
David C. Fathi
American Civil Liberties Union
Legal Department
NATIONAL PRISON PROJECT
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

     Re:  *Parsons v. Ryan*
           **Patients in urgent need of mental health/medical care**

Dear David:

    We received your January 29, 2019 correspondence regarding inmates █████████, █████████, and ██████ (ASPC-Phoenix).  There are numerous inaccuracies in your letter.  It is clear you sent the correspondence without first conducting a review of these inmates' medical records.  In many instances, a cursory review would have revealed that the treatment they are receiving is appropriate and in accordance with the Stipulation's requirements.  As we have previously informed you, sending "inmate in need" correspondence without first reviewing the inmate's record wastes defense counsel, Corizon, and ADC's resources as we are often forced to conduct an investigation into meritless claims.

    Despite the inaccuracies and lack of due diligence, we will address your concerns for those patients listed in your correspondence.

1.    ████████████:  Dr. Stewart's evaluation that "Mr. ██████ required an immediate dose of antipsychotic medication given on an emergency basis" would have been in violation of policy DO807.09 & DO1103.  Emergency forced medications cannot be administered until other less invasive interventions have been implemented.  A PMRB was held on January 9, 2019, and Mr. ██████ was ultimately restarted on his medications 24 hours later.  The treatment of Mr. ██████ was consistent with policy while also affording him his due process rights.

David C. Fathi
February 15, 2019
Page 2

2.  ███████████████ :  Had Mr. ██████ record been reviewed by either you or Dr. Stewart, you would know that Mr. ██████ was seen by the psychiatric provider four days after the tour and Mr. ██████ indicated he had been taking his medications and was doing well.  In addition, a review of his records would have shown a decrease in injurious behaviors, notwithstanding shifts in his moods.  The mental health team is aware of Mr. ██████████ risks, not only to himself, but to others.  This is evident by him being housed in Baker Ward, which is for those patients with the highest risk of self-harm.  The mental health team is engaged with him and regularly evaluate his treatment plan.

3.  ████████████ :  Similar to the above, had his records been reviewed prior to the sending of this letter, you would have seen a bright green banner with the words, "Unknown – conversion (inactive)."  Mr ████ was released from ADC custody on January 25, 2019, three days before your correspondence.  Thus, there is no need to have his medication reviewed.

4.  ████████████████ :  Mr. ██████ has been seen by mental health, nursing, and Psychiatry on a regular basis.  He has been stabilized and off of watch since November 14, 2018.  He is improving on his current medication and has been attending both individual and group counseling sessions.  His medications are regularly evaluated, and those treating Mr. ██████ are aware of his risks.

5.  █████████████████ :  While Ms. ██████ has a history of self-harm, she has significantly improved since being at George Ward.  Her medications are evaluated on a regular basis.  The clinical guidelines have been followed in this case.

Dr. Stewart's observations, while appreciated, are only a snapshot in time and therefore can only capture a limited aspect of the pathology and progress of each of the patients.  There are inherent regressions and progressions with this population, and they are all closely monitored while admitted to the inpatient program at Phoenix.

Thus, we again request that you exercise due diligence by utilizing your eOMIS access to review inmates' medical records before sending correspondence concluding that the care received was improper, needs immediate review, or runs afoul of the Stipulation.

David C. Fathi
February 15, 2019
Page 3


      Lastly, we hope that patients you or Dr. Stewart identify as needing urgent care are brought to our attention promptly, rather than waiting more than two weeks to inform Defendants of their urgent needs.


      Regards,

Timothy J. Bojanowski


TMR/TJB/eap
cc:     Counsel of Record



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

May 22, 2019

***VIA EMAIL ONLY***
David C. Fathi
American Civil Liberties Union
Legal Department
NATIONAL PRISON PROJECT
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

> Re: ***Parsons v. Ryan - Plaintiffs' Notice of Substantial Noncompliance:***
> **PMs 73, 74, 76, 80-88, 94, 95 – ASPC-Perryville**

Dear David:

We are responding to Plaintiffs' April 22, 2019 Notice of Substantial Noncompliance concerning the following Performance Measures ("PMs") at Perryville:  73-74, 76, 80-88, and 94-95.  Defendants deny Plaintiffs' allegations and affirmatively assert that there is no substantial noncompliance with the settlement Stipulation.  None of the examples in the Notice substantiate any claims to the contrary.

Furthermore, there is no time requirement for an "exchange of information" for a patient to be considered "seen" as defined in the Stipulation, and duration is not a required measurement. Plaintiffs' attempt to supplant mental health professional assessment and care with counsel's unqualified opinion has no good faith basis in the Stipulation, and the Notice should be withdrawn immediately.

**The Performance Scores Plaintiffs Allege are at Issue at Perryville.**

PM 73:      All MH-3 minor prisoners shall be seen by a licensed mental health clinician a minimum of every thirty (30) days.

PM 74:      All female inmates shall be seen by a licensed mental health clinician within five (5) working days of return from a hospital post-partum.

David C. Fathi
May 22, 2019
Page 2

PM 76:     If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within 14 days of his or her arrival into ADC.

PM 80:     MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician.

PM 81:     MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider.

PM 82:     MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician.

PM 83:     MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider.  MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days.

PM 84:     MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider.

PM 85:     MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications.

PM 86:     MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication.

PM 87:     MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days.

PM 88:     MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days.

PM 94:     All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse.

PM 95:     Only licensed mental health staff may remove a prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven (7) and ten (10) days after discontinuation, and between 21 and 24 days after discontinuation of the watch.

David C. Fathi
May 22, 2019
Page 3

**Performance Scores Do Not Support Plaintiffs' Allegations of Substantial Noncompliance.**

As a threshold matter, Defendants are not in substantial noncompliance at Perryville for any of the PMs cited by Plaintiffs because Perryville's performance scores do not meet the Court's definition of substantial noncompliance.[1]  There are no findings by the Monitoring Bureau that Perryville's performance under these measures was noncompliant in number or succession so as to meet the Court's definition of noncompliance.

The following are Perryville's scores over the past two years:

PM 73:   Perryville scored 100% each month this PM was applicable for the past two years.

PM 74:   Perryville scored 100% all months for the past two years except for three in 2017 and two in 2018.  None of these scores meet the Court's definition of substantial noncompliance.

PM 76:   This PM was only applicable in January and May 2017, and Perryville achieved 100% compliance those two months.

PM 80:   Over 90% compliant for the past two years.

PM 81:   Compliant for the past two years.

PM 82:   Compliant for the past two years.

PM 83:   Compliant for the past two years.

PM 84:   Compliant for the past two years.

PM 85:   Compliant for the past two years.

PM 86:   Compliant for the past two years.

PM 87:   Compliant for the past two years.

PM 88:   Compliant for the past two years.

PM 94:   Compliant for the past two years.

PM 95:   Compliant all months for the past two years except June 2017.

None meet the Court's definition of substantial noncompliance and, accordingly, we ask that Plaintiffs withdraw their notice as to all of these measures.

Furthermore, 21 of the 28 files highlighted by Plaintiffs were selected and reviewed for compliance in February and March 2019 and found to be compliant.  The remainder were not selected, reviewed, and measured and, therefore, are irrelevant to compliance.  Plaintiffs have not alleged that the findings by the Monitoring Bureau are inappropriate or inaccurate because they cannot—there is no time requirement in the Stipulation's definition of the term "seen."

---

[1] The Court has concluded that a performance measure is noncompliant when (1) 6 of 24 months are noncompliant; and (2) three consecutive months are noncompliant pursuant to the Stipulation at ¶ 21(b).  Doc. 2030.

David C. Fathi
May 22, 2019
Page 4

**Plaintiffs Erroneously Sweep In Inapplicable PMs.**

In addition to the above, all of the inmate records hand-picked by Plaintiffs as examples of noncompliance were inmates being seen by a mental health clinician in connection with being on, or coming off of, watch, except two – one was evaluated for potential 805 placement and the other was evaluated after an ICS incident at a nurse's request. None were minors in connection with PM 73. None were returning from the hospital post-partum in connection with PM 74. None were on intake status in connection with PM 76. None were scheduled mental health encounters mandated by PMs 80-88 or contacts made by psychiatry providers. Rather, the inmates included in Plaintiffs' letter (except for two) were receiving mental health care by mental health clinicians pursuant to PMs 94 and 95 pertaining to watch and post-watch required encounters.

Plaintiffs' attempt to sweep in PMs that are clearly inapposite to the claims alleged in the Notice is misleading. Plaintiffs have not substantiated or "described the alleged non-compliance" with respect to PMs 73-74, 76, and 80-88 as required by Paragraph 30 of the Stipulation.

There is no Fed. R. Civ. P. 11 good faith basis to support Plaintiffs' claim of substantial noncompliance with respect to these PMs, and we request that you withdraw Plaintiffs' Notice accordingly.

**Plaintiffs' Complaint Concerning the Duration of Encounters is a Disguised Standard of Care Complaint with No Basis in the Stipulation or the PMs.**

Plaintiffs erroneously allege that the mental health encounters cited in their letter were somehow not long enough to satisfy the PMs' requirement that a patient be "seen" by mental health staff as defined in the Stipulation. Again, neither the definition nor the PMs mandate that a certain amount of time be utilized during the encounters. Further, duration is not measured for purposes of determining compliance with the PMs. Therefore, Plaintiffs' claim that the encounters are somehow not long enough to comply with the Stipulation is unfounded.

Moreover, the definition of "seen" in the Stipulation includes "a treatment and/or exchange of information in a confidential setting." Doc. 1185-1 at 5 (emphasis added). The purpose of all of the encounters picked by Plaintiffs (including the excepted two) was crisis intervention treatment services conducted by a mental health clinician to observe behavior, as well as cognitive and emotional state, in order to determine whether the patient's watch or post-watch status was appropriate or needed to be adjusted. Crisis intervention is immediate and short term to protect the patient from self-injury or injury to others. It is intended to stabilize and return the patient to his/her status quo. Counseling or long-term therapy is not appropriate while inmates are on watch. Plaintiffs have a clear misunderstanding of the purpose of these contacts.

David C. Fathi
May 22, 2019
Page 5

Most importantly, however, watch and post-watch contacts are individualized by the patient. While most contacts are short in duration, lasting only a few minutes, the duration is driven by the patient. If a patient needs more time, more time is given. The attached table demonstrates the multiple contacts and varying durations—some encounters take minutes while others last 10, 15, 20 minutes, with one example of a 45-minute encounter. And, a closer look at the specific encounters Plaintiffs attached to their letter reveals that most all of the patients refused a confidential setting and were unwilling to further engage the mental health clinician. The patients themselves dictated the level and duration of those contacts.

Ultimately, the encounters were deemed appropriate by the mental health professionals, and the "exchange of information" was sufficient in their professional opinions to make their assessments and serve the crisis intervention purpose of the encounter within the meaning of PMs 94 and 95. By contrast, Plaintiffs are not qualified to make a determination that the duration of an encounter alone is not sufficient to meet mental health standards of care.

Because there is no time requirement for inmate patients to be deemed "seen" as defined in the Stipulation or set forth in the PMs, Plaintiffs' claim boils down to a disagreement with medical professional opinion and care. The Stipulation does not provide a medium for disagreement with medical opinion; rather, it sets forth objective criteria to be monitored and reported. Had Plaintiffs required a certain time for "the exchange of information" within the meaning of the term "seen", they would have bargained for it and set it forth expressly in the Stipulation. They cannot now after nearly five years of monitoring, and in the wake of Defendants seeking to terminate reporting on certain PMs, seek to attack medical professional discretion that has no basis in the parties' agreement.

Plaintiffs' unqualified claim that the encounters were not long enough to meet mental health standards of care is unsupported.

**<u>Plaintiffs' Examples Do Not Illustrate the Entire Record of Mental Health Contacts and Treatments each Inmate Received.</u>**

Plaintiffs note only one encounter and leave out multiple other contacts that, together, complete the mental health care plan for each inmate patient during the timeframe complained of. The attached table demonstrates the total contacts as well as durations, if noted, for each inmate appearing in Plaintiffs' letter for the February – May 2019 timeframe. Below are some examples:

███████████: Plaintiffs note only one post-watch encounter on 03/21/2019. However, this inmate received a total of 31 total contacts during the relevant timeframe including, a one-on-one counseling session, 14 daily watch encounters, five psychiatry sessions, and six as needed (PRN) encounters, among other visits during these months.

███████████: This inmate arrived on 03/22/2019 and was evaluated for 805 placement. She had a total of five encounters, including two one-on-one counseling sessions and two psychiatry sessions in addition to the segregation encounter.

David C. Fathi
May 22, 2019
Page 6

███████████:  This inmate was contacted a total of 53 times, with two one-on-ones consultations, 29 watch contacts, nine watch follow ups, and four psychiatry sessions, among other contacts.

██████  ████:  This inmate received 16 contacts including seven one-on-one consultations, one segregation contact, five daily watch contacts, two watch follow-up contacts, and one psychiatry session.

████████████:  This inmate received a total of 48 contacts, including 29 watch contacts, six psychiatry sessions, and seven as needed contacts, among other contacts.

██████████:  This inmate received 25 contacts—11 of those were daily watch contacts, seven follow up contacts, and three psychiatry sessions, among other contacts.

████████████:  This inmate received 20 contacts, including, among others, nine one-on-one counseling sessions, three daily watch contacts, five watch follow ups, and three psychiatry sessions.

██████████:  This inmate was seen on 03/02/2019 after an ICS at a nurse's request. She had a one-on-one counseling session as well as one psychiatry session and was released shortly thereafter.

███████████:  This inmate received six encounters, including three one-on-one counseling sessions, two watch follow ups for a watch that preceded Plaintiffs' timeframe, and one psychiatry session.

███████████:  This inmate received 46 encounters, including two one-on-one counseling sessions, two segregation contacts, 29 daily watch contacts, nine follow-up contacts, and four psychiatry sessions.

██████████:  This inmate had eight contacts, including a one-on-one counseling session, five watch contacts, and two post-watch contacts.

███████████:  This inmate received 50 contacts, including three one-on-one contacts, 45 watch contacts, and two psychiatry sessions.

██████████:  This inmate received 44 contacts, including four one-on-one counseling sessions, two segregation contacts, 32 watch and four post-watch contacts, and two psychiatry sessions.

██████████:  This inmate received 84 contacts, including five one-on-one contacts, six segregation contacts, 54 watch and six post-watch contacts, four psychiatry sessions, and nine as needed contacts.

David C. Fathi
May 22, 2019
Page 7

███████████:  This inmate received 45 contacts, including three one-on-one contacts, two segregation contacts, 29 watch and nine post-watch contacts, and two psychiatry sessions.

███████████:  This inmate received 24 contacts, including three one-on-one contacts, 15 watch and five post-watch contacts, and one psychiatry session.

███████████:  This inmate received nine contacts, including a one-on-one contact, one segregation contact, three watch and three post-watch contacts, and one psychiatry session.

███████████:  This inmate received 49 contacts, including a one-on-one counseling session, three segregation contacts, 30 watch and 11 post-watch contacts, three psychiatry sessions, and one as needed contact.

███████████:  This inmate received nine contacts, including two one-on-one counseling sessions, three watch and three post-watch contacts, and one psychiatry session.

███████████:  This inmate received eight contacts, including a one-on-one contact, as well as five watch and two post-watch contacts.

███████████:  This inmate received 21 contacts, including two segregation contacts, 14 watch and four post-watch contacts, and one psychiatry session.

███████████:  This inmate received 14 contacts, including three one-on-one contacts, five watch and four post-watch contacts, and two psychiatry sessions.

███████████:  This inmate received 22 contacts, including two segregation contacts, as well as 13 watch and seven post-watch contacts.

███████████:  This inmate received 26 watch contacts.

███████████:  This inmate received 26 contacts, including three one-on-one contacts, 16 watch and four post-watch contacts, two psychiatry sessions, and one as needed contact.

███████████:  This inmate received 12 contacts, including four one-on-one contacts, as well as five watch and three post-watch contacts.

███████████:  This inmate received 26 contacts, including two one-on-one contacts, as well as 22 watch and two post-watch contacts.

David C. Fathi
May 22, 2019
Page 8

Each of the examples cited by Plaintiffs were extracted out of a wrap-around treatment plan context. The totality of these encounters demonstrates a treatment plan that included crisis intervention encounters by mental health clinicians, as well as follow-up contacts to maintain stability, and follow-up therapy by mental health providers. The wrap-around plan is individualized by each patient to stabilize and maintain mental health, and the encounters are intended to build upon the other. At the end of the day, a summary of each patient encounter is distributed to staff. Staffing is also done at the start of the day where staff are briefed on the status of the patients. Staff know their population. The encounters do not occur in a vacuum and cannot be extracted from one another.

Plaintiffs' letter demonstrates an incomplete picture of the health care that each inmate patient received. A review of the entire record demonstrates that each inmate had multiple other encounters which complete the mental health treatment plan and care needs individualized to each inmate patient.

In addition, Plaintiffs' accusation that medical encounters are not lasting long enough does not state a claim of noncompliance, substantial noncompliance, or demonstrate that the care fell below the standard of care.

**Conclusion**

Plaintiffs have not provided a single example of nor have they "described the alleged non-compliance" with respect to PMs 73-74, 76, and 80-88 as required by Paragraph 30 of the Stipulation. There is no Fed. R. Civ. P. 11 good faith basis to support Plaintiffs' Notice concerning these PMs.

As indicated above, neither the Stipulation nor any of the PMs complained of by Plaintiffs mandate a certain length of time for a patient to be "seen". Plaintiffs are not qualified to conclude that the encounters were somehow not long enough and fell below the standard of care. Plaintiffs' allegations concerning the length of an encounter do not support their claim of noncompliance.

Defendants request that Plaintiffs withdraw their Notice in its entirety.

Regards,

Timothy J. Bojanowski

TJB/eap
cc:     Counsel of Record

| ADC # | 1:1 | Seg. | Daily | WFU | Psych | PRN | Total contacts | Notes |
|---|---|---|---|---|---|---|---|---|
| ■ | 9 | 0 | 3 | 5 | 3 | 0 | 20 | 1:1 mins: 2, 9, 12, 15, 16, 20, 25; Daily mins: 5, 29; WFU mins: 8, 13, 45 |
| ■ | 1 | 0 | 0 | 0 | 1 | 0 | 2 | 1:1 mins: 5, 10, 15; WFU mins: 10, 15 |
| ■ | | 3 | 40 | 9 | 1 | | 53 | 1:1 mins: 5, 15; Seg mins: 3~; Daily mins: 1~, 2, 3, 3, 4, 4, 4, 4, 5, 5, 5~, 5~, 6, 15; WFU mins: 5, 5, 5 |
| ■ | 2 | 2 | 29 | 9 | 4 | | 46 | 1:1 mins: 10; Seg mins: 3~, 7~; Daily mins: 1, 1+, 3, 3, 3, 4, 5, 5, 7, 8, 8; WFU mins: 5, 10, 10 |
| ■ | 2 | | 4 | 2 | 1 | | 9 | 1:1 mins: 10, 16~; Daily mins: 3~, 3~ |
| ■ | | | 26 | | | | 26 | Released 2/27; Daily mins: 3, 3 |
| ■ | 2 | 2 | 11 | 7 | 3 | | 25 | Daily mins: 3, 5, 5, 5; WFU mins: 5, 5, 6 |
| ■ | 1 | 1 | 3 | 3 | 1 | | 9 | 1:1 mins: 10; Seg mins: 15; Daily mins: 2, 5~; WFU mins: 5, 5, 20 |
| ■ | 3 | | 15 | 5 | 1 | | 24 | Released 2/22 and readmit 3/18; 1:1 mins: 10, 26; Daily mins: 3, 3, 4, 4, 5, 5, 15, 19; WFU mins: 7 |
| ■ | 2 | 0 | 22 | 2 | 0 | 0 | 26 | Released 4/22; 1:1 mins: 5, 10; Daily mins: 3, 3, 4, 4, 5, 5, 7, 7, 7, 10, 15 |
| ■ | 3 | 2 | 29 | 9 | 2 | | 45 | 1:1 mins: 10, 10, 11~; Daily mins: 2, 2, 3, 4, 4, 4, 4, 5, 5+~, 8, 8~; WFU mins: 2, 5, 5, 5, 10, 15 |
| ■ | | 2 | 14 | 4 | 1 | | 21 | 1:1 mins: 13; Seg mins: 3~; Dialy mins: 2~, 6~, 6~; WFU mins: 5, 10 |
| ■ | 1 | 1 | 29 | 4 | 6 | 7 | 48 | 1:1 mins: 10; Daily mins: 2+, 3, 3, 3, 4, 5, 5~, 9, 10; WFU mins: 5, 10, 10, 10 |
| ■ | 1 | 1 | 14 | 4 | 5 | 6 | 31 | 1:1 mins: 1; Daily mins: 3, 3, 3, 3, 3+, 5, 6; WFU mins: 3, 5, 5, 5, 5 |
| ■ | 1 | 3 | 30 | 11 | 3 | 1 | 49 | 1:1 mins: 7~; Seg mins: 3, 5, 25; Daily mins: 2, 2, 2, 2~, 3, 3, 3~, 4, 5, 5, 5, 6~, 7, 10; WFU mins: 5, 5, 5, 5 |
| ■ | 7 | 1 | 5 | 2 | 1 | | 16 | 1:1 mins: 3~, 7~, 10, 10, 10; Daily mins: 2~; WFU mins: 5, 10 |
| ■ | 2 | 1 | | | 2 | | 5 | Arrival 3/22 |
| ■ | 4 | 2 | 32 | 4 | 2 | | 44 | 1:1 mins: 4~, 9, 25; Daily mins: 2~, 4~, 5~, 7, 7, 8, 9~, 10, 10, 15, 20; WFU mins: 15 |
| ■ | 5 | 6 | 54 | 6 | 4 | 9 | 84 | 1:1 mins: 1, 30, 30; Seg mins: 4, 5, 14; Daily mins: 2, 3, 3, 3, 3, 3, 3, 3, 4, 5, 5, 5, 6, 6, 6, 7+, 8, 9, 10, 15, 20, 35; WFU mins: 5, 5, 30 |
| ■ | 1 | | 5 | 2 | | | 8 | Daily mins: 3, 3; WFU mins: 10, 10 |
| ■ | 3 | | 45 | | 2 | | 50 | Daily mins: 4, 4, 5, 5, 5, 8, 13, 13, 16, 20 |
| ■ | 3 | | 5 | 4 | 2 | | 14 | 1:1 mins: 10, 20, 20; Daily mins: 2~; WFU mins: 10, 15, 15, 30 |
| ■ | | 2 | 13 | 7 | | | 22 | Seg mins: 3~; Daily mins: 2~, 2~, 3~, 6, 7, 11~; WFU mins: 5, 5, 10, 10 |
| ■ | 4 | 0 | 5 | 3 | 0 | 0 | 12 | 1:1 mins: 2, 5, 15; Daily mins: 2, 3, 10 |
| ■ | 1 | | 3 | 3 | 1 | | 8 | 1:1 mins: 20; Daily mins: 4~; WFU mins: 5, 5, 10 |
| ■ | 3 | | | 2 | 1 | | 6 | 1:1 mins: 5, 10, 15; WFU mins: 10, 15 |
| ■ | 3 | | 16 | 4 | 2 | 1 | 26 | Arrived 2/20; 1:1 mins: 10, 15; Daily mins: 2, 3, 3, 5, 5, 5, 10, 14~; WFU mins: 10, 15, 15, 20 |
| | | | | | | | 729 | |



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

May 31, 2019

**_VIA EMAIL ONLY_**
David C. Fathi
American Civil Liberties Union
Legal Department
NATIONAL PRISON PROJECT
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

   Re: **_Parsons v. Ryan_ - Plaintiffs' Notice of Substantial Noncompliance:**
     **PMs 73, 76, 80-88, 94, 95 – ASPC-Eyman**

Dear David:

  We are responding to Plaintiffs' May 1, 2019 Notice of Substantial Noncompliance concerning the following Performance Measures ("PMs") at Eyman: 73, 76, 80-88, 92, 94-95. Plaintiffs' Notice suffers the same fatal flaws as their April 22, 2019 Notice concerning Perryville:

   (1) Plaintiffs inappropriately sweep-in inapplicable PMs;
   (2) Plaintiffs skip over multiple other mental health encounters and extract hand-picked samples out of the context of the complete mental health care plan that is individualized to the respective inmate patient; and
   (3) Plaintiffs have a fundamental misunderstanding of the purpose of the contacts they extracted out of context in their letter.

  For the same reasons Plaintiffs' Notice of Substantial Noncompliance concerning Perryville is incorrect, their Notice concerning Eyman is incorrect.  Defendants deny the allegations and affirmatively assert that there is no substantial noncompliance with the settlement Stipulation.  None of the examples in the Notice substantiate any claims to the contrary. Furthermore, there is no good faith basis in the Stipulation for Plaintiffs' claims, and the Notice should be withdrawn immediately.

David C. Fathi
May 31, 2019
Page 2

## **The Performance Scores Plaintiffs Allege are at Issue at Eyman.**

PM 73:     All MH-3 minor prisoners shall be seen by a licensed mental health clinician a minimum of every thirty (30) days.

PM 76:     If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within 14 days of his or her arrival into ADC.

PM 80:     MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician.

PM 81:     MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider.

PM 82:     MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician.

PM 83:     MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider.  MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days.

PM 84:     MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider.

PM 85:     MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications.

PM 86:     MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication.

PM 87:     MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days.

PM 88:     MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days.

PM 92:     MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days.

PM 94:     All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse.

David C. Fathi
May 31, 2019
Page 3

PM 95:    Only licensed mental health staff may remove a prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven (7) and ten (10) days after discontinuation, and between 21 and 24 days after discontinuation of the watch.

**Performance Scores Do Not Support Plaintiffs' Allegations of Substantial Noncompliance.**

As a threshold matter, Defendants are not in substantial noncompliance at Eyman for any of the PMs cited by Plaintiffs because Eyman's performance scores do not meet the Court's definition of substantial noncompliance.[1]  There are no findings by the Monitoring Bureau that Eyman's performance under these measures was noncompliant in number or succession so as to meet the Court's definition of noncompliance.

The following are Eyman's scores over the past two years:

PM 73:    This PM concerns minors and has never been applicable and/or measured at Eyman.
PM 76:    This PM has not been applicable at Eyman for the past two years.
PM 80:    Compliant in the 90th to 100th percentile for the past two years.
PM 81:    Compliant in the 90th to 100th percentile for the past two years.
PM 82:    Compliant in the 90th to 100th percentile for the past two years.
PM 83:    Compliant in the 90th to 100th percentile for the past two years.
PM 84:    Compliant in the 90th to 100th percentile for the past two years.
PM 85:    Compliant in the 90th to 100th percentile for the past two years.
PM 86:    Compliant in the 90th to 100th percentile for the past two years.
PM 87:    100 percent compliant for the past two years, when applicable.
PM 88:    100 percent compliant for the past two years, when applicable.
PM 92:    Compliant in the 90th to 100th percentile for the past two years.
PM 94:    Compliant in the 90th to 100th percentile for the past two years.
PM 95:    Compliant in the 90th to 100th percentile for the past two years.

None meet the Court's definition of substantial noncompliance and, accordingly, we ask that Plaintiffs withdraw their notice as to all of these measures.

Furthermore, all of the 15 files highlighted by Plaintiffs were reviewed and scored for compliance in the timeframe selected by Plaintiffs and found to be compliant.  Plaintiffs have not alleged that the findings by the Monitoring Bureau are inappropriate or inaccurate because they cannot—there is no time requirement in the Stipulation's definition of the term "seen."

---

[1] The Court has concluded that a performance measure is noncompliant when (1) 6 of 24 months are non-compliant; and (2) three consecutive months are non-compliant pursuant to the Stipulation at ¶ 21(b).  Doc. 2030.

David C. Fathi
May 31, 2019
Page 4

**Plaintiffs Erroneously Sweep In Inapplicable PMs.**

      In addition to the above, almost all of the inmate records handpicked by Plaintiffs were inmates being seen by a psychiatric nurse on a weekend or holiday in connection with being on watch.  None were minors in connection with PM 73.  Indeed, PM 73 has never been applicable at Eyman and has never been monitored there. None were on intake status in connection with PM 76.  None were scheduled mental health encounters mandated by PMs 80-88 or 92.  Rather, the inmates included in Plaintiffs' letter were receiving mental health care by a psychiatric nurse on weekends and holidays pursuant to PMs 94 and 95 pertaining to watch and post watch encounters.

      Plaintiffs' attempt to sweep in PMs that are clearly inapposite to the claims alleged in the Notice is grossly misleading.  Plaintiffs have not substantiated or "described the alleged non-compliance" with respect to PMs 73, 76, 80-88, and 92 as required by Paragraph 30 of the Stipulation.

      There is no Rule 11 good faith basis to maintain Plaintiffs' claim of substantial noncompliance with respect to these PMs, and we request that you withdraw Plaintiffs' Notice accordingly.

**Plaintiffs' Complaint Concerning the Duration of Encounters is a Disguised Standard of Care Complaint with No Basis in the Stipulation or the PMs.**

      Plaintiffs erroneously allege that the mental health encounters cited in their letter were somehow not long enough to satisfy the PMs' requirement that a patient be "seen" by mental health staff as defined in the Stipulation.  Neither the definition of the term "seen" nor the PMs mandate that a certain amount of time be utilized during the encounters.  Moreover, duration is not measured for purposes of determining compliance with the PMs.  Therefore, Plaintiffs' claim that the encounters are somehow not long enough to comply with the Stipulation is unfounded.

      Further, the definition of "seen" in the Stipulation includes "a treatment <u>and/or exchange of information</u> in a confidential setting."  Doc. 1185-1 at 5 (emphasis added).  The purpose of all the encounters picked by Plaintiffs was crisis intervention treatment services conducted on a weekend or holiday by a psychiatric nurse to observe behavior, as well as cognitive and emotional state, in order to determine the patient's status.  Crisis intervention is immediate and short term to protect the patient from self-injury or injury to others.  It is intended to stabilize and return the patient to his/her status quo.  Counseling or long-term therapy is not appropriate while inmates are on watch.  Plaintiffs have a clear misunderstanding of the purpose of these contacts.

      Most importantly, however, watch and post-watch contacts are individualized by the patient.  While some contacts are short in duration, lasting only a few minutes, the duration is driven by the patient.  If a patient needs more time, more time is given.  The attached table demonstrates the multiple contacts and varying durations—some encounters take minutes while others last 10, 20, and 30 minutes, with one example of a 45-minute encounter.  And, a closer

David C. Fathi
May 31, 2019
Page 5

look at the specific encounters Plaintiffs attached to their letter reveals that most of the patients refused a confidential setting and were unwilling to further engage the nurse. The patients themselves dictated the level and duration of those contacts.

Ultimately, the encounters were deemed appropriate by the mental health professionals, and the "exchange of information" was sufficient in their professional opinions to make their assessments and serve the crisis intervention purpose of the encounter within the meaning of PMs 94 and 95. By contrast, Plaintiffs are not qualified to make a determination that the duration of an encounter alone is not sufficient to meet mental health standards of care. Plaintiffs have not provided expert opinion supporting their position.

Because there is no time requirement for inmate patients to be deemed "seen" as defined in the Stipulation or set forth in the PMs, Plaintiffs' claim boils down to a disagreement with medical professional opinion and care. The Stipulation does not provide a medium for disagreement with medical opinion; rather, it sets forth objective criteria to be monitored and reported. Had Plaintiffs required a certain time for "the exchange of information" within the meaning of the term "seen", they would have bargained for it and set it forth expressly in the Stipulation. They cannot now after nearly five years of monitoring, and in the wake of Defendants seeking to terminate reporting on certain PMs, seek to attack medical professional discretion that has no basis in the parties' agreement.

Plaintiffs' unqualified claim that the encounters were not long enough to meet the Stipulation's requirements is wholly unsupported.

**<u>Plaintiffs' Examples Do Not Demonstrate the Entire Record of Mental Health Contacts and Treatments.</u>**

Plaintiffs handpicked only a few encounters and left out multiple other contacts that, together, complete the mental health care plan for each inmate patient during the timeframe complained of. The attached table demonstrates the total contacts as well as durations, if noted, for each inmate appearing in Plaintiffs' letter for the November 2018 – May 2019 timeframe complained of. For one inmate ▮▮▮▮▮▮, Plaintiffs reach way back to early 2018 watch and post-watch contacts but skip over other contacts he received during that time and to-date. Below explains the totality of mental health encounters for each inmate singled out by Plaintiffs:

▮▮▮▮▮▮▮▮▮: This inmate was "seen" a total of 27 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: release planning, health and welfare rounds, and unscheduled psychiatric nurse visits.

▮▮▮▮▮▮▮▮▮: This inmate was "seen" 18 times. This number does not include the numerous other mental health encounters the inmate received that do not have a "seen" requirement and are in addition to the foregoing: non-clinical mental health, unscheduled psychiatric nurse calls, and mental health ICS responses.

David C. Fathi
May 31, 2019
Page 6



███████████:  This inmate was "seen" 35 times.  This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: health and welfare rounds and unscheduled psychiatric nurse visits.

███████████:  This inmate was "seen" 74 times.  This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: health and welfare rounds and unscheduled psychiatric nurse visits.

███████████:  This inmate was "seen" 98 times.  This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: health and welfare rounds and unscheduled psychiatric nurse visits.

███████████:  This inmate was "seen" 81 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: health and welfare rounds and unscheduled psychiatric nurse visits.

███████████:  This inmate was "seen" 202 times.  This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: group counseling and unscheduled psychiatric nurse visits.

███████████:  This inmate was "seen" 97 times.  This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing:  group counseling, non-clinical mental health, health and welfare rounds, and unscheduled psychiatric nurse visits.

███████████:  This inmate was "seen" 16 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: unscheduled psychiatric nurse visits, non-clinical mental health, and mental health and welfare rounds.

███████████:  This inmate was "seen" 86 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: group counseling, health and welfare rounds, non-clinical mental health, and unscheduled psychiatric nurse visits.

███████████:  This inmate was "seen" 23 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen"

David C. Fathi
May 31, 2019
Page 7

requirement and are in addition to the foregoing: health and welfare rounds, group counseling, and unscheduled segregation visits.

██████████████: This inmate was "seen" 143 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing:  group counseling, unscheduled psychiatric nurse visits, non-clinical mental health, and health and welfare rounds.

██████████████: This inmate was "seen" 15 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: health and welfare rounds and unscheduled and psychiatric nurse visits.

██████████████: This inmate was "seen" 65 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing: health and welfare rounds and unscheduled psychiatric nurse visits.

██████████████: This inmate was "seen" 122 times. This number does not include numerous other mental health encounters that the inmate received which do not have a "seen" requirement and are in addition to the foregoing:  group counseling, health and welfare rounds, non-clinical mental health, and unscheduled psychiatric nurse visits.

Each of the examples cited by Plaintiffs was extracted out of a wrap-around treatment plan context.  The totality of these encounters demonstrates a treatment plan that included crisis intervention encounters by a psychiatric nurse, as well as follow-up contacts to maintain stability, and follow-up therapy by mental health providers.  The wrap-around plan is individualized by each patient to stabilize and maintain mental health, and the encounters are intended to build upon the other.  At the end of the day, a summary of each patient encounter is distributed to staff.  Staffing is also done at the start of the day where staff are briefed on the status of the patients.  Staff know their population.  The encounters do not occur in a vacuum and cannot be extracted from one another.

Plaintiffs' letter demonstrates an incomplete picture of the mental health care that each inmate patient received.  A review of the entire record demonstrates that each inmate had multiple other encounters, including individual counseling sessions, group sessions, mental health sick calls, unscheduled nurse visits, and health and welfare checks—all of which complete the mental health treatment plan and care needs individualized to each inmate patient.

In addition, Plaintiffs' accusation that mental health encounters are not lasting long enough does not state a claim of noncompliance, substantial noncompliance, or demonstrate that the care fell below the standard of care.

David C. Fathi
May 31, 2019
Page 8

**Conclusion**

 Plaintiffs have not provided a single example of nor have they "described the alleged non-compliance" with respect to PMs 73, 76, 80-88, and 92 as required by Paragraph 30 of the Stipulation.  There is no Rule 11 good faith basis to maintain their Notice concerning these PMs.

 As indicated above, neither the Stipulation nor any of the PMs complained of by Plaintiffs mandate a certain length of time for a patient to be "seen".  Plaintiffs are not qualified to conclude that the encounters were somehow not long enough and fell below the standard of care. Plaintiffs' allegations concerning the length of an encounter do not support their claim of non-compliance.

 Defendants request that Plaintiffs withdraw their Notice in its entirety.

     Regards,

     Timothy J. Bojanowski

TJB/eap
cc: Counsel of Record

| | 1:1 | Seg | Daily | WFU | Psychiatry | Psych RN | Total | Notes |
|---|---|---|---|---|---|---|---|---|
| | 2 | 4 | 62 | 5 | 6 | 2 | **81** | Movement: Phoenix-Tucson-Eyman-Phoenix-Released 2/27/19; 1:1 mins: 10,20; Daily mins: 5,5,5,5,5,5 |
| | 9 | 3 | 65 | 6 | 3 | 0 | **86** | Movement: Eyman-Florence; 1:1 mins: 10,10,30; Seg mins: 15; Daily mins: 5(x12),10,10; WFU mins: 2 |
| | 7 | 11 | 59 | 14 | 4 | 2 | **97** | Movement: Eyman-Florence; Seg mins: 5; Daily mins: 2,2,2,5(x24) |
| | 4 | 1 | 7 | 3 | 3 | 0 | **18** | Daily mins: 5 |
| | 2 | 10 | 4 | 3 | 4 | 0 | **23** | Movement: Eyman-Florence; Seg mins: 3 (4/29/18); Daily mins: 5 (2/9/18); WFU mins: 3 (2/19/18) |
| | 6 | 0 | 16 | 4 | 1 | 0 | **27** | Daily mins: 5,5,5 |
| | 4 | 1 | 4 | 4 | 3 | 0 | **16** | Daily mins: 5 |
| | 0 | 7 | 55 | 6 | 6 | 0 | **74** | Released 3/14/19; Daily mins: 5(x10) |
| | 6 | 0 | 6 | 3 | 0 | 0 | **15** | Daily mins: 5 |
| | 4 | 2 | 18 | 6 | 5 | 0 | **35** | Movement: Eyman-Florence-Eyman-Release 4/2/19; Daily mins: 5,5,5,5,5 |
| | 8 | 1 | 76 | 7 | 5 | 1 | **98** | Released 3/12/19; Daily mins: 5(x12) |
| | 10 | 3 | 35 | 11 | 4 | 2 | **65** | Daily mins: 5(x7); WFU mins: 5 |
| | 11 | 1 | 159 | 4 | 7 | 20 | **202** | Movement: Eyman-Phoenix-Tucson-Florence; 1:1 mins: 20; Daily mins: 5(x29),10,30; WFU mins: 20,20,20 |
| | 9 | 3 | 100 | 6 | 4 | 0 | **122** | Movement: Eyman-Florence; Daily mins: 5(x15),10,10,30; WFU mins: 20 |
| | 10 | 9 | 97 | 9 | 9 | 9 | **143** | Movement: Eyman (12/5/18)-Phoenix; 1:1 mins: 15,15,20,30,30; Daily mins: 5(x17),15,15,45 |
| | | | | | | **TOTAL** | **1102** | |



**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

June 3, 2019

<u>***VIA EMAIL ONLY***</u>
David C. Fathi
American Civil Liberties Union
Legal Department
NATIONAL PRISON PROJECT
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

   Re: ***Parsons v. Ryan* - Plaintiffs' Notice of Substantial Noncompliance:**
     **PMs 80-88, 92, 94, 95 – ASPC-Florence**

Dear David:

  We are responding to Plaintiffs' May 3, 2019 Notice of Substantial Noncompliance concerning the following Performance Measures ("PMs") at Florence:  80-88, 92, 94-95. Plaintiffs' now-demonstrated pattern of erroneous Notices continues here, and this one suffers the same fatal flaws as their April 22, 2019 Notice concerning Perryville and their May 1, 2019 Notice concerning Eyman:

  (1) Plaintiffs inappropriately sweep-in inapplicable PMs;
  (2) Plaintiffs skip over multiple other mental health encounters and extract handpicked samples out of the context of the complete mental health care plan that is individualized to the respective inmate patient; and
  (3) Plaintiffs have a fundamental misunderstanding of the purpose of the contacts they extracted out of context in their Notice.

For the same reasons Plaintiffs' Notice of Substantial Noncompliance concerning Perryville and Eyman was incorrect, their Notice concerning Florence is incorrect.

  Defendants concede that Florence was in substantial noncompliance of PM 94 only once in the past two years (August through December 2018) and PM 95 only once in the past two years (August through November 2018).  However, these PMs have been in compliance ever since and, therefore, any need for a corrective action plan is obviated.  These PMs are no longer at issue.

David C. Fathi
June 3, 2019
Page 2

       Notwithstanding, Defendants deny Plaintiffs' claims that the measures were in substantial noncompliance because of the duration of the contacts Plaintiffs singled out and affirmatively assert that there is no substantial noncompliance with the settlement Stipulation as alleged. None of the examples in the Notice substantiate any claims to the contrary. Furthermore, there is no good faith basis in the Stipulation for Plaintiffs' claims, and the Notice as alleged should be withdrawn immediately.

**The Performance Scores Plaintiffs Allege are at Issue at Florence.**

PM 80:      MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician.

PM 81:      MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider.

PM 82:      MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician.

PM 83:      MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider. MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days.

PM 84:      MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider.

PM 85:      MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications.

PM 86:      MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication.

PM 87:      MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days.

PM 88:      MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days.

PM 92:      MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days.

PM 94:      All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse.

David C. Fathi
June 3, 2019
Page 3

PM 95:        Only licensed mental health staff may remove a prisoner from a suicide or mental
              health watch.  Any prisoner discontinued from a suicide or mental health watch
              shall be seen by a mental health provider, mental health clinician, or psychiatric
              registered nurse between 24 and 72 hours after discontinuation, between seven (7)
              and ten (10) days after discontinuation, and between 21 and 24 days after
              discontinuation of the watch.

**<u>Performance Scores Do Not Support Plaintiffs' Allegations of Substantial Noncompliance.</u>**

As a threshold matter, while Defendants concede substantial noncompliance with PMs 94
and 95 as clarified above, Defendants are not currently in substantial noncompliance at Florence
for any of the PMs cited by Plaintiffs because Florence's performance scores do not meet the
Court's definition of substantial noncompliance.[1]  There are no findings by the Monitoring
Bureau that Florence's performance under these measures was noncompliant in number or
succession so as to meet the Court's definition of noncompliance.

The following are Florence's scores over the past two years:

PM 80:    Compliant for the past 24 months
PM 81:    Compliant for the past 24 months
PM 82:    Compliant for the past 24 months
PM 83:    Compliant for the past 24 months
PM 84:    Compliant for the past 24 months
PM 85:    Compliant for the past 24 months
PM 86:    Compliant for the past 24 months
PM 87:    Compliant for the past 24 months, with the exception of June 2017
PM 88:    Compliant for the past 24 months
PM 92:    Compliant for the past 24 months
PM 94:    Compliant for the past 24 months, with the exception of August 2018 through
          December 2018.
PM 95:    Compliant for the past 24 months, with the exception of August 2018 through
          November 2018.

None currently meet the Court's definition of substantial noncompliance and, accordingly, we ask
that Plaintiffs withdraw their notice as to all of these measures.

Furthermore, some of the 24 files highlighted by Plaintiffs were selected and reviewed for
compliance in Plaintiffs' November 2018 through March 2019 timeframe and found to be
compliant. The remainder were not selected, reviewed, and measured and, therefore, are irrelevant
to compliance.  Plaintiffs have not alleged that the findings by the Monitoring Bureau are

---

[1] The Court has concluded that a performance measure is noncompliant when (1) 6 of 24 months are non-compliant;
and (2) three consecutive months are non-compliant pursuant to the Stipulation at ¶ 21(b).  Doc. 2030.

David C. Fathi
June 3, 2019
Page 4

inappropriate or inaccurate because they cannot—there is no time requirement in the Stipulation's definition of the term "seen."

**Plaintiffs Erroneously Sweep In Inapplicable PMs.**

In addition to the above, all of the inmate records handpicked by Plaintiffs were inmates being seen by a psychiatric associate in connection with being on watch.  None were scheduled mental health encounters mandated by PMs 80-88 or 92.  Rather, the inmates included in Plaintiffs' letter were receiving mental health care by a psychiatric associate pursuant to PMs 94 and 95 pertaining to watch and post watch encounters.

Plaintiffs' attempt to sweep in PMs that are clearly inapposite to the claims alleged in the Notice is grossly misleading.  Plaintiffs have not substantiated or "described the alleged noncompliance" with respect to PMs 80-88, and 92 as required by Paragraph 30 of the Stipulation.

There is no Rule 11 good faith basis to maintain Plaintiffs' claim of substantial noncompliance with respect to these PMs, and we request that you withdraw Plaintiffs' Notice accordingly.

**Plaintiffs' Complaint Concerning the Duration of Encounters is a Disguised Standard of Care Complaint with No Basis in the Stipulation or the PMs.**

Plaintiffs erroneously allege that the mental health encounters cited in their letter were somehow not long enough to satisfy the PMs' requirement that a patient be "seen" by mental health staff as defined in the Stipulation.  Again, neither the definition nor the PMs mandate that a certain amount of time be utilized during the encounters.  Further, duration is not measured for purposes of determining compliance with the PMs.  Therefore, Plaintiffs' claim that the encounters are somehow not long enough to comply with the Stipulation is unfounded.

Moreover, the definition of "seen" in the Stipulation includes "a treatment and/or exchange of information in a confidential setting."  Doc. 1185-1 at 5 (emphasis added).  The purpose of all of the encounters picked by Plaintiffs (including the excepted two) was crisis intervention treatment services conducted by a mental health clinician to observe behavior, as well as cognitive and emotional state, in order to determine whether the patient's watch or post-watch status was appropriate or needed to be adjusted.  Crisis intervention is immediate and short term to protect the patient from self-injury or injury to others.  It is intended to stabilize and return the patient to his/her status quo.  Counseling or long-term therapy is not appropriate while inmates are on watch.  Plaintiffs have a clear misunderstanding of the purpose of these contacts.

Most importantly, however, watch and post-watch contacts are individualized by the patient.  While most contacts are short in duration, lasting only a few minutes, the duration is driven by the patient.  If a patient needs more time, more time is given.  The attached table demonstrates the multiple contacts and varying durations—some encounters take minutes while

David C. Fathi
June 3, 2019
Page 5

others last 10, 15, 20 minutes, with one example of a 60-minute encounter. And, a closer look at the specific encounters Plaintiffs attached to their letter reveals that most of the patients refused a confidential setting and were unwilling to further engage the mental health clinician. The patients themselves dictated the level and duration of those contacts.

Ultimately, the encounters were deemed appropriate by the mental health professionals, and the "exchange of information" was sufficient in their professional opinions to make their assessments and serve the crisis intervention purpose of the encounter within the meaning of PMs 94 and 95. By contrast, Plaintiffs are not qualified to make a determination that the duration of an encounter alone is not sufficient to meet mental health standards of care. Plaintiffs have not provided expert opinion supporting their position.

Because there is no time requirement for inmate patients to be deemed "seen" as defined in the Stipulation or set forth in the PMs, Plaintiffs' claim boils down to a disagreement with medical professional opinion and care. The Stipulation does not provide a medium for disagreement with medical opinion; rather, it sets forth objective criteria to be monitored and reported. Had Plaintiffs required a certain time for "the exchange of information" within the meaning of the term "seen", they would have bargained for it and set it forth expressly in the Stipulation. They cannot now after nearly five years of monitoring, and in the wake of Defendants seeking to terminate reporting on certain PMs, seek to attack medical professional discretion that has no basis in the parties' agreement.

Plaintiffs' unqualified claim that the encounters were not long enough to meet mental health standards of care is unsupported.

**Plaintiffs' Examples Do Not Demonstrate the Entire Record of Mental Health Contacts and Treatments each Inmate Reviewed.**

Plaintiffs note only a few encounters and leave out multiple other contacts that, together, complete the mental health care plan for each inmate patient during the timeframe complained of. The attached table demonstrates the total contacts as well as durations, if noted, for each inmate appearing in Plaintiffs' letter for the November 2018 – April 2019 timeframe complain of. Below are some examples:

██████████: This inmate's mental health care was complained of in Plaintiffs' Notice concerning Eyman and repeated here because the inmate moved from Eyman to Florence in Plaintiffs' timeframe. His wrap-around treatment was explained in Defendants' response to the Eyman Notice and is incorporated here.

██████████: This inmate was "seen" a total of 18 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: health and welfare rounds, non-clinical mental health contacts, and unscheduled psychiatric nurse visits.

David C. Fathi
June 3, 2019
Page 6



████████████:  This inmate's mental health care was complained of in Plaintiffs' Notice concerning Eyman and repeated here because the inmate moved from Eyman to Florence in Plaintiffs' timeframe.  His wrap-around treatment was explained in Defendants' response to the Eyman Notice and is incorporated here.

████████████:  This inmate was "seen" a total of 66 times during Plaintiffs' timeframe.  This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: health and welfare rounds, unscheduled psychiatric nurse visits, and non-clinical mental health contacts.

████████████:  This inmate's mental health care was complained of in Plaintiffs' Notice concerning Eyman and repeated here because the inmate moved from Eyman to Florence in Plaintiffs' timeframe.  His wrap-around treatment was explained in Defendants' response to the Eyman Notice and is incorporated here.

████████████: This inmate was "seen" a total of 19 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing:  health and welfare rounds, group counseling, and non-clinical mental health contacts.

████████████: This inmate was "seen" a total of 14 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing:  health and welfare rounds, group counseling, and non-clinical mental health contacts.

████████████: This inmate was "seen" a total of 35 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: health and welfare rounds, group counseling, and non-clinical mental health contact.

████████████: This inmate was "seen" a total of 18 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: health and welfare rounds, group counseling, and non-clinical mental health contacts.

████████████: This inmate was "seen" a total of 28 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: health and welfare rounds and non-clinical mental health contacts.

████████████: This inmate was "seen" a total of 47 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing:  health



David C. Fathi
June 3, 2019
Page 7

and welfare rounds, group counseling, unscheduled psychiatric nurse visits, and non-clinical mental health contacts.

███████████: This inmate's mental health care was complained of in Plaintiffs' Notice concerning Eyman and repeated here because the inmate moved from Eyman to Florence in Plaintiffs' timeframe. His wrap-around treatment was explained in Defendants' response to the Eyman Notice and is incorporated here.

███████████: This inmate was "seen" a total of 8 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: health and welfare rounds.

███████████: This inmate was "seen" a total of 20 times during Plaintiffs' timeframe. This number does not include numerous other mental health encounters the inmate received that do not have a "seen" requirement in the Stipulation and are in addition to the foregoing: group counseling, health and welfare rounds, mental health non-clinical contact, and unscheduled psychiatric nurse visits.

Each of the examples cited by Plaintiffs was extracted out of a wrap-around treatment plan context. The totality of these encounters demonstrates a treatment plan that included crisis intervention encounters by mental health clinicians, as well as follow-up contacts to maintain stability, and follow-up therapy by mental health providers. The wrap-around plan is individualized by each patient to stabilize and maintain mental health, and the encounters are intended to build upon the other. At the end of the day, a summary of each patient encounter is distributed to staff. Staffing is also done at the start of the day where staff are briefed on the status of the patients. Staff know their population. The encounters do not occur in a vacuum and cannot be extracted from one another.

Plaintiffs' letter demonstrates an incomplete picture of the health care that each inmate patient received. A review of the entire record demonstrates that each inmate had multiple other encounters which complete the mental health treatment plan and care needs individualized to each inmate patient.

In addition, Plaintiffs' accusation that medical encounters are not lasting long enough does not state a claim of noncompliance, substantial noncompliance, or demonstrate that the care fell below the standard of care.

<u>**Conclusion**</u>

Plaintiffs have not provided a single example of nor have they "described the alleged non-compliance" with respect to PMs 80-88 and 92 as required by Paragraph 30 of the Stipulation. There is no Rule 11 good faith basis to maintain their Notice concerning these PMs. While Defendants concede that Florence was substantially noncompliant once in the past two years for

David C. Fathi
June 3, 2019
Page 8

PMs 94 and 95, those PMs have been compliant ever since. Further, those measures were not in substantial noncompliance for the reasons stated in Plaintiffs' Notice.

As indicated above, neither the Stipulation nor any of the PMs complained of by Plaintiffs mandate a certain length of time for a patient to be "seen". Plaintiffs are not qualified to conclude that the encounters were somehow not long enough and fell below the standard of care. Plaintiffs' allegations concerning the length of an encounter do not support their claim of noncompliance.

Defendants request that Plaintiffs withdraw their Notice in its entirety.

Regards,

Timothy J. Bojanowski

TJB/eap
cc:      Counsel of Record

| 1:1 | Seg. | Daily | WFU | Psychiatry | Psych RN | Total | Notes | Repeat |
|---|---|---|---|---|---|---|---|---|
| 2 | 5 | 3 | 5 | 5 | 0 | 20 | Daily mins: 5,5 | |
| 1 | 4 | 18 | 9 | 3 | 0 | 35 | Daily mins: 5(x14),10 | |
| 8 | 2 | 64 | 6 | 3 | 0 | 83 | Movement: Eyman-Florence; 1:1 mins: 10,30; Seg mins: 15; Daily mins: 5(x12),10,10; WFU mins: 2 | Eyman |
| 6 | 10 | 61 | 14 | 4 | 2 | 97 | Movement: Eyman-Florence; Seg mins: 5; Daily mins: 2,2,5(x22) | Eyman |
| 4 | 3 | 6 | 3 | 1 | 1 | 18 | Movement: Florence-Eyman-Tucson; Daily mins: 5,5,5 | Eyman |
| 1 | 1 | 3 | 3 | 0 | 0 | 8 | Movement: Florence-Eyman-Released 4/12/19; Daily mins: 5 | |
| 2 | 6 | 8 | 1 | 2 | 0 | 19 | Seg mins: 5; Daily mins: 5,5,5,5,10,10 | |
| 9 | 3 | 21 | 7 | 4 | 3 | 47 | 1:1 mins: 30,60; Seg mins: 15; Daily mins: 4,5,5,5,5,5,5,10,10,10,10,10,10,15; WFU mins: 45 | |
| 2 | 2 | 9 | 4 | 1 | 0 | 18 | Released: 1/20/19; Daily mins: 5,5,5,5,5,5,10 | |
| 3 | 3 | 41 | 14 | 5 | 0 | 66 | Movement: Florence-Eyman; Daily mins: 5(x17), 10,10,10,10 | |
| 1 | 3 | 17 | 5 | 2 | 0 | 28 | Movement: Florence-Eyman; Daily mins: 2,5,5,10,10,10,10,10,10,10,10 | |
| 0 | 0 | 9 | 5 | 0 | 0 | 14 | Released: 1/1/19; Daily mins: 5,5,5,10,10,10,10 | |
| 11 | 1 | 159 | 4 | 7 | 20 | 202 | Movement: Eyman-Phoenix-Tucson-Florence; 1:1 mins: 20; Daily mins: 5(x29),10,30; WFU mins: 20,20,20 | Eyman |
| 9 | 3 | 100 | 6 | 4 | 0 | 122 | Movement: Eyman-Florence; Daily mins: 5(x15),10,10,30; WFU mins: 20 | Eyman |
| | | | | | TOTAL | 777 | | |