# Exhibit C

WO

*(Court Order)* Not to be absolutely subject to absolutely No retaliation, adverse actions.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., <br>     Plaintiffs, <br> v. <br> Charles L Ryan, et al., <br>     Defendants. | No. CV-12-00601-PHX-DKD <br><br> **ORDER** |

At the Court's most recent monthly Status Hearing on July 14, 2017, Plaintiffs presented four inmate witnesses to provide testimony regarding their experience with the open clinic process, removal of HNR (Health Needs Request) boxes from open clinic facilities, and the provision of healthcare at Arizona Department of Corrections prisons. Other inmates provided written statements concerning the same. During each inmate's testimony, the Court addressed the witness' reservations about testifying due to a fear of potential retaliation by prison staff. Each inmate had testified about a fear of retaliation and the Court directed them to inform their counsel if prison officials took retaliatory action. On Thursday July 20, Plaintiffs filed a Notice regarding harassment and retaliation regarding class members. (Doc. 2190) The Notice recounts specific alleged retaliatory allegations including:

- The Deputy Warden at Florence-South Unit telling class member witness Ronald Oyenik that he [Oyenik] "accused me of taking all of your property," when no such allegation had been made. This conversation was

- loud and could be heard by other inmates.
- Mr. Oyenik also reported that inmates in ADA dorms were informed that if they had difficulty ambulating to the open clinic's new location that they would be moved to buildings closer to the clinic, which are not ADA-accessible. Because the majority of inmates did not want to move, presumably because they are not ADA-compliant, the DW and the ADW required them to sign waivers that they accepted their current housing location.
- Mr. Oyenik is concerned that prison staff members, by attempting to forcibly move some inmates, are attempting to cast blame on him for these moves. Mr. Oyenik also is concerned that his medication will not be renewed when it expires in the near future.
- Angela Ashworth also reported events that she felt were retaliatory, including her bunkmate Donna Scheid's transfer to another cell—with an inmate known to be a gang member with violent tendencies and disciplinary infractions—after Ms. Scheid wrote a statement that was admitted as evidence at the July 14 Hearing.
- Ms. Ashworth was also approached by an officer who indicated that he spoke about Ms. Ashworth's June 5, 2017 incident and indicated that "Sergeant Coleman and I have discussed it and we agreed that we saw nothing wrong with Ashworth." Ms. Ashworth interpreted this statement as a decision to "close rank" and would deny the multiple witness reports that, indeed, there was something wrong with Ms. Ashworth and yet no action was taken.
- Ms. Ashworth further reported that a pregnant inmate was moved into her cell after her bunkmate was transferred. The effect of this move is that on particularly hot nights when the pregnant inmate is moved to sleep in an air-conditioned room, Ms. Ashworth is alone. Twice prison officials have

- 2 -

entered her cell at night to "take the temperature" when that had never happened previously. Ms. Ashworth feels vulnerable being left alone in her cell at night and, because her prison job is at night, is concerned that leaving her cell empty on those days exposes her to loss of property or false allegations of possessing contraband.

The Court held an emergency hearing to discuss the allegations on July 21, 2017. In correspondence with Plaintiffs' Counsel and at the hearing, Defendants disputed Mr. Oyenik's conversation with the Deputy Warden and the motives behind staff members' actions. However, Defendants do not deny that Ms. Ashworth's bunkmate was moved, that she is sleeping alone when her pregnant bunkmate is sleeping elsewhere, or that ADA inmates in the Florence South Unit signed waivers of their right to move closer to the open clinic.

All of these developments strongly suggest retaliatory action after the affected inmates provided testimony or written statements at the July 14 Hearing. Cell transfers, loss of property, and spreading potentially damaging information to other inmates are all adverse actions. Moreover, the testifying inmates plainly engaged in protected conduct by either testifying or submitting written statements to the Court.

As discussed at the hearing, the temporal proximity between their protected conduct and the adverse actions are too close in time to reasonably be viewed as anything other than retaliatory. *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) ("timing can properly be considered as circumstantial evidence of retaliatory intent"); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989) (Retaliatory motive can be inferred from the timing and nature of the events); *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 285-86 (1977). The Court further finds that these actions "would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envtl. Center v. Mendocino Co.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

Finally, none of the justifications Defendants presented to the Court established a legitimate penological interest. Indeed, with respect to Ms. Scheid's cell transfer,

Defendants offered no rationale why she was selected to accommodate a third party inmate's need for a cell reassignment.

In short, the Court expressed its belief that no retaliation would flow from the inmates' testimony at the July 14 Hearing. It does not appear that message reached prison staff. The Court will therefore grant Plaintiffs' request for a Court order formally directing that no retaliatory actions take place.

**IT IS THEREFORE ORDERED** directing Defendants and Counsel for Defendants that no actions be taken that harass, intimidate, or otherwise retaliate against the witnesses who have provided the Court information, either via oral testimony or written statements. This prohibition includes actions which could reasonably be viewed as having a chilling effect on witness testimony by utilizing group punishments, or actions against other prisoners who could in turn blame or target the witnesses.

**IT IS FURTHER ORDERED** that Counsel for Defendants provide a written declaration within 7 days of the date of this Order describing all steps they took to communicate the Court's verbal orders of July 14, 2017, regarding retaliation to their clients, and to ensure that witnesses' freedom to communicate with the Court is protected

**IT IS FURTHER OREDERED** that Perryville staff immediately return Ms. Scheid to her previous cell and to not enter Ms. Ashworth's cell at night when she is alone or away working unless it is pursuant to a legitimate correctional objective.

**IT IS FINALLY ORDERED GRANTING** the Defendants' request that the Court set this matter for an evidentiary hearing after the parties confer and present their availability to the Court.

Dated this 25th day of July, 2017.

David K. Duncan
United States Magistrate Judge

# Exhibit D

Friday, May 10th, 2019

Prison Law Office
Sara Norman, Managing Attorney
General Delivery
San Quentin, CA 94964

Re: Parson v. Ryan requested public records request by class member

Dear Mrs. Norman:

Herewith, I respectfully request the following as I have on-going litigation against Corizon Health, LLC and ("ADC") in U.S. District Court, "Pro Se".

1. U.S. Magistrate John Buttrick's order dated November 2016, ordering ADC to bypass Corizon and use community medical providers.

2. U.S. District Judge Roslyn Silver most recent order. The order that mention Corizon, ADC could be forced to pay $50,000 for each (pm) that's not into compliance by July 01, 2019.

I am very grateful that Judge Silver is not allowing Corizon Health or "ADC" to

(2 of 3)

receive a free pass with regards to meeting their contractual obligations, and ADC's monitoring of the contract. Mrs. Norman, I am writing to you because it's indeed a sad situation, a sad day when I the Offender must say that I believe your firm ("Prison Law Office) has lost your focus, and the unusual gravity of how dire the core, grossly inadequate medical care is within these walls. We as Prisoners have a constitutional right to receive adequate health care, and it is unconscionable for us to be left to suffer and die in the face of neglect and deliberate in-difference.

Please, Don't misunderstand what I'm saying. I want absolutely no negativism towards those individuals who can assist myself, but I think by myself affirming my own humanity it will force your firm to see me and acknowledge me.

Why, Because I know my rights and I am worthy of being considered as a person.

I have 90 days until my release and I plan to tell my story,

(3 of 3)

I would like to believe that you and your firm would support me, stand by me in sharing my story. Fox 10, and KPNX News 12, Arizona Republic Newspaper have all reached out to myself. I've declined their request for any interviews until my release.

I trust that you will respond to my letter, and I look forward to receiving the requested documents. Thanking you in advance for your professional courtesy.

Please give me your thoughts on the enclosed (HNR) dated 05/05/19? Where does Corizon get these people from? Can you believe instead of scheduling me to see the provider ⊙ She advise me to submit an Inmate Letter?
Read; Benge v. Corizon, et al., 18-cv-00349-PHX-GMS
I hope that you are well.

Most Sincerely,

Robert J. Benge No. 137719

enclosure



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

May 22, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE: *Parsons v. Ryan*, 2:12-CV-00601
Class Member in Need of Medical Care
Robert Benge, ADC 137719, Florence - East

Dear Mr. Bojanowski:

This is our second letter to you regarding Robert Benge who is in need of medical attention. We last wrote to you regarding Mr. Benge on December 17, 2018.

As we mentioned in our last letter, Mr. Benge is diagnosed with dry eye syndrome and keratoconus, a condition in which the clear tissue on the front of the eye (cornea) bulges outward. To help manage this condition, he is prescribed hard contact lenses. On April 9, 2019, Mr. Benge saw an ophthalmologist who noted,

> his contact lenses are gone and he cannot see, so we ordered some keratoconus contact lenses. As soon as we receive payment for this, then we can order them. We are not allowed to until it is ordered. [...] He should be seen back to pick up the contact lenses when the come in. We will order the contacts for him as soon as possible. For that, he should be seen as soon as the contacts come in and for the plugs he should be seen every three months.

On April 15, 2019, the provider reviewed the specialist's report, and noted, "will schedule pt for review." According to the medical record, Mr. Benge has seen a provider since that time, but eye care has not been discussed nor have any requests for ophthalmology consults been submitted, as seen on the following page.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

Mr. Timothy Bojanowski  
Re: Robert Benge, ADC 137719  
May 22, 2019  
Page 2

**Consultation Request (1 - 88 of 88)**

| Request Date | Request Type | Service Type | Procedure Requested | Priority | Request Status |
|---|---|---|---|---|---|
| 03/15/2019 | Off-site Clinic | Physical Therapy | | Routine | Consult Completed- Practitioner Reviewed |
| 01/30/2019 | Off-site Clinic | Physical Therapy | | Urgent | Consult Completed- Practitioner Reviewed |
| 01/30/2019 | Off-site Clinic | Pain Clinic | | Routine | Alternative Treatment Accepted |
| 01/30/2019 | Off-site Clinic | Ophthalmology | | Routine | Consult Completed- Practitioner Reviewed |
| 01/08/2019 | Off-site Clinic | Neuro Surgery | | Routine | Alternative Treatment Accepted |
| 01/07/2019 | On-site Clinic | Optometry | | Routine | Clinical Coordinator Initiated |
| 09/26/2018 | Off-site Clinic | Pain Clinic | | Routine | Alternative Treatment Accepted |
| 09/19/2018 | Off-site Clinic | Ophthalmology | | Routine | Cancelled |
| 09/13/2018 | Off-site Clinic | Neuro Surgery | | Routine | Alternative Treatment Accepted |
| 06/25/2018 | Off-site Clinic | Ophthalmology | | Routine | Consult Completed- Practitioner Reviewed |
| 06/18/2018 | Off-site Clinic | Optometry | | Routine | Consult Completed- Practitioner Reviewed |
| 05/10/2018 | Off-site Clinic | Neuro Surgery | | Routine | Alternative Treatment Accepted |
| 04/17/2018 | On-site Clinic | Optometry | | Routine | Cancelled |
| 04/09/2018 | Off-site Clinic | Ophthalmology | | Routine | Consult Completed- Practitioner Reviewed |
| 03/20/2018 | Off-site Clinic | Physical Therapy | | Routine | Alternative Treatment Accepted |
| 01/03/2018 | On-site Clinic | Optometry | | Routine | Consult Completed- Practitioner Reviewed |

We request that Mr. Benge immediately receive the prescribed contact lenses, that he see the ophthalmologist as recommended, and that he timely receive all appropriate follow-up care as recommended by the specialist.

Thank you for your prompt attention to this matter.

Sincerely,

*[signature]*

Amber Norris  
Investigator

*[signature]*

Thomas Nosewicz  
Staff Attorney

cc:    Mr. Benge

# ARIZONA DEPARTMENT OF CORRECTIONS
## Health Needs Request (HNR)

Att: Dr. Stewart & D. Igwe NP "completely outrageous!!!"

Date: _____
Time: MAY 05 2019 07:50
Initials: SK

### SECTION/SECCIÓN I

INMATE NAME/NOMBRE: Kenge, Robert J.
ADC NUMBER: 137719
DATE/FECHA: 05/05/2019
CELL/BED NUMBER: A-6-11
UNIT/UNIDAD: East
BOX/APARTADO POSTAL: 5000
INSTITUTION: ADC Florence

### SECTION/SECCIÓN II

AREA OF INTEREST: ☒ Medical/Médico

PLEASE PRINT:
I need to see HCP D. Igwe, NP / Dr. Stewart via Complex. I have a spinal cord injury with daily extreme pain and suffering. There is evidence of past improper action, resulting injury, the injuries are clearly documented in my MRs, As well as countless HNR's complaints. My pain management has been virtually nonexistent due to D. Igwe's "flagrant disregard"

INMATE SIGNATURE: [signed]

### SECTION III/SECCION III

STAFF SIGNATURE STAMP: [signed] Smith
DATE: MAY 05 2019 07:50

### SECTION/SECCIÓN IV

PLAN OF ACTION: Please submit an inmate letter.

STAFF SIGNATURE STAMP: [signed]
DATE: MAY 05 2019 07:50

1101-10ES
12/13/16

SECTION 4, HNR

Exhibit E

CORRECTIONAL FACILITIES CRISIS

# ARIZONA PRISONS UNDER-STAFFED



Florence Prison Correctional Officer Wilfredo Maisonet watches inmates in a recreational yard. NICK OZA/THE REPUBLIC

## Pay freeze leads to turnover, dangerous conditions

**More online**
To see a video, go to azcentral.com.

**Dustin Gardiner** Arizona Republic | USA TODAY NETWORK

Corrections officer Delfina Reza has guarded inmates in Arizona's state-run prisons for 20 years, but she's never felt more outnumbered.

On a typical day, the amount of officers on duty at her workplace, the East Unit of the Arizona State Prison Complex-Florence, is far below where it should be to ensure her safety, as well as that of the inmates.

There are often as few as 11 guards to 680 prisoners at the mid-level security facility, according to the state. That's a ratio of 61:1.

"You'll see me and a bunch of orange," Reza said as she looked toward the prison's office, several football fields away across an

See PRISONS, Page 6A

April 29, 2019  Arizona Republic (1 of 3)

Case 2:12-cv-00601-ROS   Document 3275-1   Filed 06/03/19   Page 15 of 16

# Prisons

Continued from Page 1A

open-air yard filled with inmate dorms. "Being back here all by ourselves, it's pretty far up to the front."

At full staffing, there should be roughly twice as many officers on duty at the East Unit, where about 50 percent of the officer jobs are currently vacant.

Arizona's prisons face an under-staffing crisis in the wake of a 13-year freeze on officer pay. Corrections officials say the freeze has exacerbated already high turnover in a physically and mentally grueling job.

Corrections officers are among the lowest paid law-enforcement officers in the state, with a starting salary of about $32,000 per year.

### More assaults and suicide attempts

According to the Department of Corrections, about a fifth of all officer positions are now vacant across the state's 10 prison complexes. That's a shortage of roughly 1,150 officers.

And officers must work frequent overtime hours just to keep prisons in operation.

Gov. Doug Ducey has proposed to address the crisis by giving officers their first across-the-board raise since the recession. But his budget plan has hit an impasse at the state Capitol.

Meanwhile, the under-staffing crisis has made prisons more dangerous for officers and inmates alike, public records show.

"Staff are spread very thin, to the point where it could get dangerous," said Kevin Curran, warden at the Florence prison complex. "It just keeps snowballing and getting worse because other agencies are hiring, are paying more money."

Department of Corrections data shows prisons have gotten more violent:

❚ **Assaults on officers:** Inmate attacks on officers and prison staff have increased by roughly 52 percent over a decade. There were 466 assaults last year, compared with 307 in the 2009 budget year. Assaults peaked in 2017, with 560 attacks.

❚ **Inmate-on-inmate violence:** Assaults and fights among inmates also have increased in recent years. There were 2,000 reported last year, up 32 percent from the 1,510 reported in the 2012 budget year.

❚ **Inmate self-harm:** Prisoners are also trying to injure or kill themselves at higher rates. There were 708 inmate self-harm attempts last year, compared with 379 in the 2014 budget year. However, more inmates have not been successful in taking their lives.

Meanwhile, the under-staffing problem could get worse as more people are incarcerated.

Arizona's prison population is expected to grow at an estimated rate of 360 inmates per year through 2022, according a planning forecast from the department.

The population has surged the past 20 years. There are currently 42,000 people behind bars. That's about 12,500 more than there were in 2000, even with a slight dip in inmate numbers the past two years.

Arizona's incarceration rate — with 877 inmates per every 100,000 people — is among the highest in the nation.



Correctional Officer Delfina Reza stands guard at Florence Prison. NICK OZA/THE REPUBLIC

The national benchmark is 698 inmates, according to the non-partisan Prison Policy Initiative.

### Why are inmates more violent?

Officers and prison administrators said assault have increased as a lack of staffing has forced them t scale back programs and activities at times.

When a prison is short on officers for the day, th state often responds to by cutting things like behavior al classes, reentry programs, and outside recreatio time because there aren't enough officers to run them

Inmates end up spending more time in their cell and take out their frustration on officers and each other.

"It becomes more negative because they feel lik they're getting the short end of something," said Car son McWilliams, prison operations division director a the Department of Corrections. "Anytime you cut corner, something bad happens."

Those frustrations were apparent on a Friday morn ing in March as McWilliams took reporters on a tour o the Eyman and Florence prison complexes.

Both facilities were operating with bare bones staff ing given many officers had declined to work overtim shifts because their children were home from schoo on spring break. Many inmates lost recreation time a a result.

One maximum custody prisoner at the Eyman com plex bickered with McWilliams as he passed his cell saying the inmates were getting bilked out of recrea tion time.

McWilliams said the decision to cut programs is tough call, but driven by security needs or incidences He said the agency faces a troublesome cycle becaus it needs to focus on programs that prepare inmates t reenter society.

"You can't put inmates into a system where the en vironment is not safe and expect them to get some thing positive out of it to change their lives," McWil liams said.

### Road to officer raises is unclear

Ducey's proposed budget aims to reduce turnove among officers with a 10 percent raise, starting in July He also hopes to give them an additional 5 percen raise the following year.

The increase would boost an average level-two offi cer's salary from $37,002 to $40,703, according to Du

April 29, 2019  Arizona Republic (2 of 3)

> "Folks do truly feel as though it's overwhelmingly understaffed. I do think there is a fear within those communities that somebody's mom or dad or somebody's husband or wife could get hurt in there."
>
> Rep. T.J. Shope
> R-Coolidge



cey's budget.

New officers still receive step-pay increases early in their careers, but they haven't received an across-the-board raise since before the recession.

Ducey's proposed pay hike would cost about $36 million in the first year; Arizona has a roughly $1 billion surplus.

His proposal came a relief to officers like Reza, who said it would motivate her to stay in the job even though she's retirement-eligible this year and could start drawing a pension and work elsewhere.

"I had my mind set to retire," she said. "They started talking about the pay raise. That's going to keep me."

But hopes for an increase have been in limbo given the budget impasse between Ducey and lawmakers in both parties.

Legislators' demands include a tax cut and more spending for schools.

While nobody has publicly opposed a raise for corrections officers, some fear the issue could get lost in the budget fight.

Rep. T.J. Shope, R-Coolidge, has been one of the most vocal advocates for the officers. He represents a Pinal County district where prisons are the major employer, including the state's Florence, Globe and Eyman complexes.

Shope said because most of the state doesn't see or hear about the conditions inside its prisons, other priorities like roads and schools always take precedent.

"Folks do truly feel as though it's overwhelmingly understaffed," he said. "I do think there is a fear within those communities that somebody's mom or dad or somebody's husband or wife could get hurt in there."

*Reach the reporter at dustin.gardiner@arizonarepublic.com or 602-444-2471. Follow him on Twitter: @dustingardiner.*





April 29, 2019 Arizona Republic (3 of 3)