**EXHIBIT B**

**[REDACTED]**



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

June 5, 2019

***VIA EMAIL ONLY***
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

Re:     **Parsons v. Ryan**
        Tour of ASPC-Perryville (April 2-4, 2019)
        Notice of Noncompliance (Paragraph 8 of the Stipulation)

Dear Corene:

This letter responds to your May 6, 2019 Notice of Noncompliance regarding Paragraph 8 of the Stipulation concerning the medical care provided by Dr. Enciso. Defendants deny Plaintiffs' allegations and affirmatively assert that there is no noncompliance with Paragraph 8 of the Stipulation.

Specifically, we respond to the concerns raised for the individual inmates in your letter as follows:

████████████████

There was no clinical indication that Ms.████ needed to be placed on methadone upon her arrival to Perryville. Ms.████ was booked into the County jail on October 16, 2018 and was started on prenatal vitamins only; no other medications. She was transferred to Perryville on October 25, 2018, at least nine days after her last illicit drug use and possibly longer depending on when her last dose was prior to booking. Any withdrawal would have occurred prior to her arrival at Perryville. She did not exhibit any signs or symptoms of withdrawal when she was evaluated by Dr. Enciso. Thus, beginning methadone was not appropriate and was not required under policy.

There was no urgent need to send Ms.████ to the hospital on December 17. Ms.████ reported no complaints, except heartburn, despite Dr. Enciso being unable to hear the fetal heartbeat. Importantly, she reported feeling the flutter of the baby. Furthermore, your statement that the OB ultrasound request by Dr. Enciso on December 19 was "routine" is false. He submitted an urgent

Corene Kendrick
June 5, 2019
Page 2

request.  *See* Exhibit 1.   Your comment to KJZZ that "medical notes show the woman being transported off-site to deliver her stillborn fetus while shackled" is also false.   Ms. ███ was transported to the hospital on December 19 because of complaints of abdominal pain and bleeding.   *See* Exhibit 2.   She was not being transported to deliver her stillborn fetus.   That occurred a few days later as your letter acknowledges.

Thus, Ms. ███ (17 weeks pregnant) was properly restrained and transported to the hospital in accordance with D.O. 705, §9.4.3, "During the second trimester of pregnancy, inmates shall be transported in caged vehicles, handcuffed in front."  Ariz. Rev. Stat. § 31-601(A) and D.O. 705, § 9.36 only prohibit restraining pregnant inmates who are being transported for delivery or during labor, not every pregnant inmate being transported.   We demand that you withdraw your statement to KJZZ that "medical notes show the woman being transported off-site to deliver her stillborn fetus while shackled."  This is a clear misrepresentation.

███████████

There is no indication in Ms. ███'s record that she requested an ultrasound.  Nevertheless, Dr. Enciso's treatment was appropriate.  Ms. ███ had a 20-week ultrasound on September 27, 2018 while in jail.  She reported no complaints to Dr. Enciso during her October 15, 2018 encounter.  While she experienced pregnancy related discomfort, there is no indication an ultrasound was medically necessary.  She was treated for a yeast infection, and her other pregnancy pains were appropriately addressed.  She was evaluated by RN Valenzuela on December 29, 2019 (Saturday) in response to the ICS for complaints of abdominal pain on the right side.  RN Valenzuela consulted with the on-call provider, and Ms. ███ was prescribed Tylenol.  RN Valenzuela instructed Ms. ███ to return to medical ASAP if the symptoms worsened or if there was sudden relief and to monitor fetal movement.  Ms. ███ was referred to Dr. Enciso and was seen within 48 hours.

Ms. ███ was evaluated by Dr. Enciso on December 31, 2018.  Ms. Angal reported that the pain she had experienced only lasted ten minutes and never came back.  She also reported good fetal movement.  Dr. Enciso diagnosed her right lower quadrant pain she had been feeling as a "round ligament spasm."  Dr. Habib evaluated Ms. ███ three days later.  At that time, she complained that she had not felt any fetal movement for two days. This complaint is an indication for an OB ultrasound and she was appropriately sent out for testing.  The care she received from Dr. Enciso was appropriate.

███████████

Ms. ███' medical records show that she refused prenatal care on numerous occasions and refused to be seen by Drs. Enciso and Habib.  She finally agreed to an OB ultrasound on December 5, 2018, which revealed a viable pregnancy.  On January 19, 2019, an ICS was initiated, as Ms. ███ complained that her "water broke."  The Litmus test came back positive, and she was appropriately sent to Abrazo West Valley Hospital for delivery.  Several hours later, the hospital discharged her.  Ms. ███ reported to medical staff at Perryville that the hospital told her she was not in labor.  There was no rupture of the membranes.  There were no reported signs of distress upon her return from Abrazo, so it was appropriate to return her to her unit.  Ms. ███ was instructed to submit a HNR as needed for any new or worsening symptoms.  Between

Corene Kendrick
June 5, 2019
Page 3

her return to Perryville on January 19, 2019 and the ICS on January 22, 2019, there was no clinical indication that continuous monitoring was necessary, as she was not in labor and had no other complaints.

Your statement that Ms. ████ delivered her baby via an "emergency C-section due to pre-eclampsia" is false.  The Abrazo hospital record indicates the reason for the emergency C-section was due to fetal intolerance to labor.  *See* Exhibit 3.  Furthermore, the elevated blood pressure on September 24, 2018 would not have warranted daily or twice-daily blood pressure checks, as there were no symptoms prior to September 24 that indicated pre-eclampsia.  Pre-eclampsia is diagnosed when the patient exhibits both elevated blood pressure reading and significant proteinuria.  Ms. ████ was treated for hypertension and had trace (mild) proteinuria.  Ms. ████ was at risk for developing pre-eclampsia, and she was appropriately referred to the hospital for induction of labor, as her blood pressure readings remained elevated and her risk of pre-eclampsia persisted.

Ms. ████ wound was treated appropriately onsite without complications.  There were no signs of infection.  A referral back to the hospital to see a wound specialist is not medically necessary as this is a common condition that is successfully treated by OB/GYN physicians.

Ms. ████'s prenatal screening test was ordered on December 18, 2018 and drawn on December 24, 2018.  The results were received on January 3, 2019 demonstrating "antibody positive."  There are 32 different antibodies that this prenatal screening test identifies.  Dr. Habib documented during an encounter with Ms. ████ that the screening was positive, but the particular antibody which flagged a positive value at this point could not be identified. The lab was contacted and they stated that the identification of the antibody occurs automatically and an additional lab order is not necessary.

Ms. ████ was seen again on January 30, 2019, and at that time the antibody was identified as a Kell antibody.  At this encounter, Dr. Enciso documented that after her 4th pregnancy the patient had received a blood transfusion due to excessive bleeding.  She had never had a positive Kell with any pregnancy prior to her transfusion.  Dr. Enciso clinically assessed the current presence of the antibody as the result of her blood transfusion. This process is known as alloimmunization ("AI").  The next step in making the AI determination is to determine the paternal genotype. Dr. Enciso attempted to make this determination. Unknown to Dr. Enciso at the time was that the father of Ms. ████'s baby was and still is incarcerated at the Florence complex. After several attempts at paternal genotyping, the plan was abandoned, as it was determined to be impossible due to the father's current incarceration. The antibody screen was then re-ordered on February 28, 2019 and was found to be stable and unchanged. A subsequent antibody screen in March 2019 demonstrated the Kell antibody titer rising, and Ms. ████ was sent to perinatology for fetal Doppler monitoring, although the rest of her pregnancy remained uneventful.  Importantly, there was no adverse effect to her or the baby.

Corene Kendrick
June 5, 2019
Page 4

███████████████

The specialist did not request a repeat ultrasound.  There was no evidence of abnormalities, even though the anatomic survey was incomplete due to fetal positioning.  The original fetal survey ultrasound was read by Dr. Frank Tranisi from SimonMed.  Dr. ██████ called SimonMed on the physician line to discuss the ultrasound results.  Dr. Tranisi was not available, but he was able to speak with Dr. Adam Kupper, who is licensed and lives in Arizona.  The decision not to repeat the ultrasound was done in consultation with Dr. Kupper.  They collaboratively determined that enough normal fetal anatomy was identified during the initial ultrasound. They also concluded that another ultrasound was not necessary, as the likelihood of abnormalities was infinitesimally small.

███████████████

This was appropriately marked non-complaint in the December 2018 CGARS.  The notification process once an inmate gives birth and returns to the facility has been updated and improved.[1]

███████████

Ms. ██████ was seen by a psychologist, Dr. Velez, in the (old) IPC following C-section pursuant to PM 74. There was another inmate in the bay during the encounter as documented, but Ms. ██████ was approximately 30 feet away from the other inmate in the bay.  Dr. Velez spoke in a low voice to maintain confidentiality and spoke in Spanish.  There is no evidence that the other inmate could hear or understand their conversation.   When Dr. Stern toured Perryville, he recommended that, in the future, Dr. Velez should ask patients to step outside to maintain confidentiality.  Dr. Velez responded that she did not have authority to remove a patient from the IPC, as she is not a physician, and it would not have been appropriate to have Ms. ██████ get up and walk as, she was still having post-procedural pain.  Dr. Velez said it was also not appropriate to remove the other inmate, as she was receiving IV antibiotic therapy.  Therefore, this encounter allowed for a confidential exchange of information; and was not in violation of PM 74.

Regards,

*[signature: Timothy J. Bojanowski]*

Timothy J. Bojanowski

TJB/TMR/eap
cc:   Counsel of record

---

[1] This explanation also applies to Brandi Christensen.

3100 West Ray Road | Suite 300 | Chandler, AZ 85226
480.420.1600 | STRUCKLOVE.COM

# EXHIBIT 1

# (FILED UNDER SEAL)

# EXHIBIT 2

# (FILED UNDER SEAL)

# EXHIBIT 3

# (FILED UNDER SEAL)