Michael J. Cohn, #288721
ASPC Tucson/ Manzanita 1B19
P.O. Box 24401, 10002 S. Wilmot
Tucson, AZ 85734-4401

FILED ___ LODGED
___ RECEIVED ___ COPY
AUG 15 2019
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

UNITED STATES DISTRICT COURT, ARIZONA

| Parsons, et al. | 2:12 CV 601-ROS |
|---|---|
| v. | Motion to compel petition by counsel for Plaintiffs |
| Ryan, et al | Hon. Roslyn O. Silver |

Per FedRCivP 23(d), which authorizes the court to allow class plaintiffs to intervene or otherwise enter/come into the case, I, Michael J. Cohn assert the following:

1) I am a class plaintiff/advocate in the above named case.

2) A subclass of plaintiffs, those diagnosed/undiagnosed with Hepatitis "C" exists. ADC admits to 16% of the prisoner population having hepatitis "C." (attached). This translates to roughly 6500 prisoners. This is the 7th highest % of states responding, (39).

3) According to Nurse Practitioner Lawrence Ende, ADC discontinued screening inmates for Hepatitis "C" when the percentage reached 50%. This translates to roughly 20,000 inmates. My conversation with Ende was sometime between 2015 and the end of 2018.

4) There appears to be no mechanism in the stipulation for updates or amendments as new information becomes available.

5) Monitoring the progression of the disease may indicate the provider's "deliberate indifference," (Abu-Jamal v. Wetzel) US.DC. (M.D. Penn) (Case No. 3:16-CV-02000-RDM; 2017 US DIST. LEXIS 368.

6) Treatment must/should be provided at any stage of the disease (In my opinion, this includes the diagnosis of the virus' presence in the host.)

1

7) "Current standards from the American Association for the Study of Liver Disease (AASLD) upon which the Hepatitis "C" policy allegedly is based, explicitly supports treating active drug users." Therefore Centurion's anticipated argument that ADC prisoners could recontact the disease/virus while in prison from improper administration of illicit drugs is moot. Corris v. Koenigsmann, U.S.D.C. (N.D.N.Y.) Case No. 9:15cv-01205-GTS-TWD. (see attached).

### Remedy

PER MCPC E.R. 1.3 diligence, counsel for plaintiffs overlooked this issue when agreeing to the stipulations. Given the numbers involved, this should not have been overlooked. Therefore, I request the following:

1) That the court order counsel for plaintiffs to submit a motion for the immediate screening of all inmates for Hepatitis "C."
2) That the motion include the assertion/remedy that those carrying the virus be treated immediately with the current or recent generation of Hepatitis "C" treatments.
3) Other, as the court deems appropriate.
4) Cost cannot be used as an excuse to deny treatment.
5) Monitoring cannot be used as a reason for delaying/denying treatment.

### Stakes

The stakes in this matter for the inmates are potentially quality of life or life and death. The stakes for ADC/Centurion are business as usual. The stakes favor the plaintiffs in terms of the risk of future harm (Helling v. McKinney 509 US at 33 (1993).

2

For the reasons stated herein and inter alia the court should grant this request in all its respects.

Respectfully submitted,                    Date: 8/12/19

*Michael J. Cohn, Ed.D.*

Dr. Michael J. Cohn, Pro Se
(Advocacy/Coaching/Education) Expert Witness

### Declaration

I declare, under penalty of perjury, that the contents herein are true and correct to the best of my knowledge and understanding.

*Michael J. Cohn, Ed.D.*    8/12/19

### Service

Original mailed to:    on: 8/13/19
Clerk of the U.S. Dist. Ct.
401 W. Washington
Phoenix, AZ 85003

Copies to:    on: 8/13/19
Michael E. Gottfried, A.AG.
2005 N. Central
Phoenix, AZ 85004


Corene Kendrick, Esq.
Prison Law Ofc.
General Delivery
San Quentin, CA 94964

## Rate of hepatitis C among state prison inmates by state, 2015

| STATE | SHARE OF INMATES WITH HEP C | OPT-OUT TESTING? |
|---|---|---|
| New Mexico | 40% | ✓ |
| New Hampshire | 33 | |
| Alaska | 30 | |
| Montana | 25 | ✓ |
| Indiana | 20 | ✓ |
| Washington | 18 | ✓ |
| Arizona | (16) = approx. 6700 inmates (underreported) per Ende, IOP | |
| Wisconsin | 16 | |
| Missouri | 15 | |
| Tennessee | 15 | |
| Pennsylvania | 14 | ✓ |
| North Dakota | 14 | ✓ |
| Utah | 14 | |
| Massachusetts | 14 | |
| Wyoming | 13 | |
| Kentucky | 13 | |
| Colorado | 13 | ✓ |
| Oregon | 13 | ✓ |
| Vermont | 12 | |
| West Virginia | 12 | |
| Louisiana | 11 | |
| Texas | 11 | |
| Iowa | 10 | ✓ |
| Alabama | 10 | |
| Illinois | 10 | ✓ |
| Michigan | 10 | ✓ |
| Nebraska | 10 | ✓ |
| Arkansas | 10 | ✓ |
| Delaware | 9 | ✓ |
| Maryland | 9 | |

| Oklahoma | 8 | |
|---|---|---|
| Ohio | 8 | |
| Rhode Island | 8 | ✓ |
| Kansas | 8 | |
| New York | 8 | |
| New Jersey | 7 | |
| Florida | 6 | |
| South Carolina | 3 | |
| Mississippi | 1 | |
| North Carolina | 1 | |

Opt-out states screen all inmates unless they choose not to be tested (though they may have different methods for screening). Other states use various criteria to determine who will be tested. Ten states either didn't respond to the survey or did not provide a rate.

SOURCE: HEALTH AFFAIRS

There are some significant caveats to these numbers, because states track the virus differently. Some states screen everyone who comes into prison, and others simply ask inmates whether they've ever been told they have hepatitis C. Some don't keep track at all. Still, it's the first time in 15 years that a study has tried to show the number of people getting treatment in each state system.

## State prisons pay very different prices for the same drugs

| | COST FOR COURSE OF TREATMENT WITH DRUG | |
|---|---|---|
| STATE | HARVONI | SOVALDI |
| Michigan | $94,500 | $84,000 |
| Idaho | 93,000 | 82,000 |
| Oklahoma | 89,777 | 80,600 |
| Rhode Island | 64,260 | 77,280 |
| Delaware | 64,260 | 77,280 |
| Florida | 64,161 | 76,869 |
| Colorado | 63,510 | 76,089 |
| New York | 63,510 | 76,089 |
| Iowa | 63,507 | 76,086 |

| | | |
|---|---|---|
| South Dakota | 92,064 | 76,083 |
| Minnesota | 62,844 | 75,580 |
| Tennessee | 62,245 | 74,573 |
| Washington | 89,451 | 73,106 |
| Louisiana | 52,284 | 68,781 |
| Virginia | 47,250 | 62,160 |
| Nevada | 44,421 | 58,422 |
| Alabama | 62,975 | 56,000 |
| Connecticut | 45,856 | 43,419 |

Data as of September 2015

SOURCE: HEALTH AFFAIRS

In September 2015, Michigan was paying more for a course of treatment than any other state that answered the Yale survey. It treated roughly 100 inmates at the full list price for the first two drugs that hit the market, $84,000 per course of Sovaldi and $94,500 for Harvoni, according to Chris Gautz, a spokesperson for the Michigan Department of Corrections. The state has since negotiated discounts of 60 percent to 65 percent off.

It's not easy for state prisons to negotiate drug prices. Three programs regulate how much the federal government pays for drugs, guaranteeing that it receives discounts for Medicaid, Medicare and the Veterans Health Administration. Federal prisons are entitled to discounted prices, but state prisons are excluded from many of the programs. In theory, there are ways for states to hook up with other health care providers to buy drugs at lower prices through a discount program known as 340B, but in practice, it's a complicated process that isn't easy to navigate. At the time of the first survey, just 16 states were working on getting discounts through 340B. Twenty-nine said they were trying to negotiate directly with the pharmaceutical companies (and some were doing both).

"The broader issue is that the U.S. has an incredible patchwork of drug pricing regulation, and [state] prisons are left out of it," said Sean Dickson, a senior manager at the National Alliance of State and Territorial AIDS Directors who previously worked

for a law firm that helped a major pharmaceutical company report its drug pricing data.

The Michigan DOC estimates that 10 percent of its inmates — about 4,400 people — have hepatitis C and has taken an aggressive stance on treatment in the past year. The department wants to set its own standards for who can get treatment before a lawsuit decides the standard for it, Gautz said. While some other states aren't providing the new and expensive drugs to *any* inmates, the Michigan DOC decided to cover people who could in theory get the drugs from Medicaid if they weren't incarcerated, which includes anyone with serious liver scarring.[3] To date, they've treated roughly 400 people at a cost of $26 million, Gautz said. One-time funding from the state legislature is helping to treat the inmates who are currently eligible, about 600 people, but the Michigan DOC estimates that it will need about $7 million a year going forward to treat new inmates and current inmates with the disease whose health deteriorates.

Michigan says it isn't treating everyone because not everyone with the hepatitis C virus will get sick from it. While 75 percent to 85 percent will develop a chronic infection, only 5 percent to 20 percent will develop severe liver damage, and 1 percent to 5 percent will ultimately die of liver failure or cancer, according to the Centers for Disease Control and Prevention.

Despite the huge price tag, treating nearly everyone with the virus has been deemed cost-effective and is what's recommended by the American Association for the Study of Liver Diseases. That's partly because it's the best way to prevent others from being infected in the future, and, as I wrote last year, providing treatment in prisons is the only way to eliminate or drastically reduce the number of people with hepatitis C because it's where many of the cases are concentrated. However, it would cost $33 billion just to treat all U.S. *inmates* with the virus, according to a 2014 estimate. That's a lot of money that corrections departments don't have. The study "gets to a moral societal question," said Adam Beckman, lead author of the Yale paper. "What do we do when something is cost-effective, but we'd have to break our budget to spend on it?"

That question is particularly poignant in New Mexico, where the Corrections Department reported that 40 percent of its inmates had hepatitis C, the highest

percentage of any state. Alex Sanchez, the deputy secretary of administration, points to the state's long history with heroin addiction as the main cause. To date, the state has treated about 75 people, Sanchez said, and there has been a 100 percent cure rate. But by the Corrections Department's estimates, it spends about $80,000 *per week* to treat an inmate. That cost includes much more than the drugs — things such as additional security, special meals and treatment for other underlying medical conditions — but from a budgetary standpoint, Sanchez says, those help make up the real cost to cure.

Like in Michigan, officials in New Mexico started treating prisoners before a court told them they had to, so they could do it on their terms. "Our goal is to treat people who need to be treated, but we have to be cognizant that this is taxpayer money. We don't want to land ourselves in some kind of court decree that leaves taxpayers paying through the nose," Sanchez said. "We have something like a 50 percent recidivism rate," she said. "The likelihood that we're going to treat everyone and be done with it? This is going to go on for a long time here."

Yeh says the Pennsylvania class-action lawsuit is in the discovery phase until next month. After that, she will swap information with the Pennsylvania DOC, including data on how many inmates have the hepatitis C virus. Even without that information, it's fairly clear that if Chimenti wins, the state will be on the hook for hundreds of millions of dollars.

---

## Footnotes

1. This refers to inmates with the hepatitis C virus. Not everyone who has the virus will present with disease, which can be either acute or chronic. Statistics presented throughout refer to people with the virus, not necessarily disease.
2. In the first survey, 41 states reported data on the number of inmates with hepatitis C infections and the number receiving treatment. While Nevada included the number of its inmates estimated to have hepatitis C, the authors did not include the percentage of inmates that represented, so only 40 states are included in the table below. Thirty-one states completed the second survey, but several did not disclose the prices they paid for drugs and are not included in the tallies here. The researchers also surveyed two smaller systems, Los Angeles County jails and the Philadelphia Prison System.

3. Eligibility is restricted to people with advanced liver disease, F3 and F4 on the Metavir scale.

# Pennsylvania DOC Ordered to Evaluate Mumia Abu-Jamal for Hep C Treatment

*by Derek Gilna*

PENNSYLVANIA STATE PRISONER Mumia Abu-Jamal, serving a life sentence for murder and diagnosed with hepatitis C, sued the state's Department of Corrections (DOC) in federal court when he was refused treatment for that life-threatening disease.

On January 3, 2017, U.S. District Court Judge Robert D. Marian granted Abu-Jamal's motion for a preliminary injunction, ordering the DOC to let a doctor examine him within 14 days regarding his suitability for hep C treatment – an order which, given his diagnosis, effectively guarantees he will eventually receive medical care. Abu-Jamal, a well-known political prisoner who was successful in having his death sentence overturned, is a *Prison Legal News* columnist.

Incarcerated since 1981, Abu-Jamal filed suit in September 2016 seeking medical care after he began to exhibit symptoms of hepatitis C; however, the DOC maintained that he did not qualify for treatment. The latest generation hep C drugs cost around $84,000 to $90,000 per patient. Most medical experts agree that these drugs, including Harvoni and Solvaldi, are over 90% effective at curing hepatitis C. [See: *PLN*, Aug. 2015, p.22; July 2014, p.20]. Also named as a defendant in the lawsuit is the DOC's private medical services provider, Correct Care Solutions.

According to Judge Marian's order, which relied heavily upon the testimony of Dr. Jay Cowan and other medical experts, "the Plaintiff has shown that Defendants have deliberately denied providing treatment to inmates with a serious medical condition and chosen a course of monitoring instead. They have done so with the knowledge that (1) the standard of care is to administer [hepatitis C] medications regardless of the disease's stage, (2) inmates would likely suffer from hepatitis C complications and disease progress without treatment, and (3) the delay in receiving ... medications reduces their efficacy."

The DOC had argued that "monitoring" prisoners with hep C rather than providing them with treatment did not violate the Eighth Amendment, but the court rejected that defense. Although medical negligence or malpractice does not constitute an Eighth Amendment violation, "medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference," the district court wrote, quoting *McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009) [*PLN*, June 2011, p.46].

The court further noted that Abu-Jamal had a serious medical condition and would continue to suffer if he were not treated, and that "[h]is liver will continue to scar and its functioning will continue to deteriorate." In granting the motion for a preliminary injunction, Judge Marian observed that the "realities of civil litigation make it likely that waiting for resolution at trial will prolong Plaintiff's suffering for a significant period of time and result in an overall deterioration of his health."

The defendants appealed the ruling on January 12, 2017. Abu-Jamal is represented by Bret D. Grote with the Abolitionist Law Center and attorney Robert J. Boyle. See: *Abu-Jamal v. Wetzel*, U.S.D.C. (M.D. Penn.), Case No. 3:16-cv-02000-RDM; 2017 U.S. Dist. LEXIS 368.

Apparently, by denying hep C treatment to Abu-Jamal and appealing the preliminary injunction, DOC officials are trying to accomplish what they failed to achieve when Abu-Jamal won his appeal and was removed from death row.

Additional source: *www.philly.com*

**NEW BOOKS AVAILABLE**

**LIFE WITH A RECORD: REENTER SOCIETY, FINISH SUPERVISION AND LIVE SUCCESSFULLY**
Make sense of the major challenges facing ex-offenders today. Ten hard hitting chapters outline the purpose of making a Strategic Reentry Plan and making peace with supervisors, family, your community and your future, its pages give a quick, easy to follow, full spectrum of instruction on the whole reentry process. Softcover, 8x10", B&W, 360 pgs... $25.99 plus $7 s/h

**S.T.O.P. START THINKING OUTSIDE PRISON**
Thinking is very critical to one's success, failure, survival and every decision requires thinking. If not, many actions will be done on impulse and impulsive behavior tends to bring about situations one needs to be rescued. S.T.O.P. was written to help promote a greater thinking process to slow down the recidivism rate. Softcover, 6x9", B&W, 70 pgs... $13.99 plus $5 s/h

**GIFT LOOK BOOK**
With Every Book Receive a $15 Voucher. We carry hundreds of high quality gifts for every occasion to fit every budget. Our gifts are made in America! Gift Baskets, Flowers, Chocolates & Candies, Personalized Gifts, Perfumes, Singing Plush Gifts and more. Softcover, 8x10", FULL COLOR, 110 pgs... $15 (Free s/h)

NO ORDER FORM NEEDED PRINT ON PAPER WITH PAYMENT TO
**Freebird Publishers**
Box 541, North Dighton, MA 02764
WWW.FREEBIRDPUBLISHERS.COM & AMAZON

---

## National *Federal* Legal Services

- **Federal Appellate Representation all Circuits and Supreme Court**
  - Admitted to all Federal Circuits and Supreme Court
  - Over 150 Appeals Filed and represented

- **Federal 2255 Habeas Petitions**
  - Representation
  - Pro Se review and Assistance
  - Over 200 Habeas filed and Represented

**We do not do prison law suits or state cases.**

Helping you successfully navigate the federal criminal justice system in the United States for over 24 years.

www.federalappealslawyer.com
2392 N. Decatur Rd, Decatur, GA 30033
Voice: 404-633-3797

# NY State Prisoner Settles Case Over DOC's Denial of Hepatitis C Treatment

*by Derek Gilna*

ADAM CORRIS, INCARCERATED AT THE Gouverneur Correctional Facility in New York, filed a federal civil rights lawsuit in 2015 claiming that he had been diagnosed with hepatitis C but prison staff wrongfully refused to treat him. In May 2016, New York corrections officials agreed to change their policy to treat Corris, as well as pay his legal fees and a modest monetary settlement.

New York State Department of Corrections and Community Supervision (DOCCS) policy stated that prison health officials need not treat prisoners with hepatitis C if there is evidence they had used drugs or alcohol in the past six months. Prior to filing suit, Corris' attorneys had repeatedly contacted staff at Gouverneur seeking treatment for their client, to no avail.

Corris alleged in his complaint that due to the lack of treatment he experienced "physical symptoms which include profuse sweating, body pains and aches, lethargy, trouble sleeping, fatigue, weakness, lack of appetite, changes in body temperature, throat pains and aches, headaches, diarrhea, shaking, dizziness, black outs, and a fear of requiring a liver transplant, a fear of liver cancer, and a fear of death." Additionally, the suit stated that "current standards from the American Association for the Study of Liver Disease (AASLD), upon which the Hepatitis C Policy allegedly is based, explicitly supports treating active drug users."

Corris put even more pressure on DOCCS officials by filing a petition for a preliminary injunction, which alleged that "[u]ntreated Hepatitis C can lead to severe internal organ damage or failure, including chronic liver disease, cirrhosis, liver cancer, and death. *Hilton v. Wright*, 928 F.Supp.2d 530, 538 (N.D. NY 2013) ... [and] DOCCS' own policy states that Hepatitis C is the most common cause of end stage liver disease and hepatocellular cancer, and is responsible for up to 13,000 deaths per year."

The settlement provided, in addition to the requested hepatitis C treatment, that the defendants would pay $19,144.82 "in full settlement of all claims," of which $5,000 was to be placed in Corris' prison commissary account.

Prison medical staff have generally been reluctant to provide treatment for hepatitis C due to the cost – particularly for the latest generation of hep C drugs, which have cure rates of over 90% at a cost of around $80,000. Thus, lawsuits are often required to ensure prisoners receive treatment; class-action suits over the provision of hep C drugs are pending in at least four states. *PLN* has previously covered the new hepatitis C drugs and the difficulties that prisoners often experience in receiving them. [See: *PLN*, Aug. 2015, p.22; July 2014, p.20].

Corris was represented by Alissa R. Hull with Prisoners' Legal Services of New York – who previously served as a staff attorney for the Human Rights Defense Center, *PLN*'s parent organization. See: *Corris v. Koenigsmann*, U.S.D.C. (N.D. NY), Case No. 9:15-cv-01205-GTS-TWD.

# Arkansas Judge Charged with Trading Leniency for Sexual Favors

FEDERAL AUTHORITIES HAVE INDICTED an Arkansas judge on charges of – among other things – trading sexual favors for leniency in sentencing.

Former Cross County District Court Judge Joseph Boeckmann, Jr. was indicted in October 2016 by federal prosecutors, following investigations conducted by the FBI and the Arkansas Judicial Discipline & Disability Commission (JDDC). In the face of those investigations, the judge had resigned in May 2016.

According to the indictment, Boeckmann abused his position in order to "obtain personal services, sexual contact, and the opportunity to view and to photograph in compromising positions persons who appeared before him in traffic and misdemeanor criminal cases in exchange for dismissing the cases."

Such "compromising positions" included situations where the judge would paddle the buttocks of young men, then photograph the results. [See: *PLN*, July 2016, p.35].

The indictment included multiple counts of wire fraud, witness tampering and bribery, spanning a nearly 30-year period in which prosecutors said Boeckmann abused his authority as both a municipal prosecutor and judge in order to gratify his own sexual desires.

Some of the more substantial charges against Boeckmann – witness tampering and wire fraud – carry potential 20-year sentences and up to $250,000 in fines.

With respect to the witness tampering allegations, the indictment described interactions with at least two witnesses in which a person, allegedly acting on behalf of the judge, threatened to make a witness "disappear" or otherwise made threats for the purpose of curtailing witness cooperation with investigators.

During his October 2016 arraignment, Boeckmann, 70, pleaded not guilty to the charges. Prosecutors argued that given the judge's history of alleged witness tampering, he should be held without bond to await trial in federal custody. While the federal district court initially agreed and ordered Boeckmann to be detained, that decision was later reversed and he was released to the custody of his family.

Boeckmann, a former prosecutor in Wynn, Arkansas, had served as a judge since January 1, 2009. His troubles began when the JDDC launched an investigation into allegations of impropriety that involved claims he had a longstanding personal relationship with a young man named Anthony Avellino.

Boeckmann previously had been admonished on March 18, 2011 for conduct involving members of the Avellino family. Anthony Avellino was his former client and employee.

The federal indictment against Boeckmann cited an individual, identified only as "A.A.," who maintained a long-term inti-