1 | Martin Lieberman (Bar No. 007442)
2 | Molly Brizgys (Bar No. 029216)
  | **ACLU FOUNDATION OF ARIZONA**
  | 3707 North 7th Street, Suite 235
3 | Phoenix, Arizona 85013
  | Telephone: (602) 650-1854
4 | Email: mlieberman@acluaz.org
  |         mbrizgys@acluaz.org
5 |
  | *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6 | *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
  | *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7 | *Desiree Licci, Joseph Hefner, Joshua Polson, and*
  | *Charlotte Wells, on behalf of themselves and all others*
8 | *similarly situated*
  | **[ADDITIONAL COUNSEL LISTED ON**
9 | **SIGNATURE PAGE]**
10 | Asim Dietrich (Bar No. 027927)
   | **ARIZONA CENTER FOR DISABILITY LAW**
11 | 5025 East Washington Street, Suite 202
   | Phoenix, Arizona 85034
12 | Telephone: (602) 274-6287
   | Email: adietrich@azdisabilitylaw.org
13 |
   | *Attorneys for Plaintiff Arizona Center for Disability Law*
14 | **[ADDITIONAL COUNSEL LISTED ON**
   | **SIGNATURE PAGE]**
15 |

16 | UNITED STATES DISTRICT COURT

17 | DISTRICT OF ARIZONA

|   |   |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-ROS |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO** |
| v. | **(1) DEFENDANTS' NOTICE OF COMPLIANCE WITH COURT ORDER (DOC. 3235)** |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Assistant Director, Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, | **[Doc. 3335]** |
|  | **AND** |
| Defendants. | **(2) DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE (DKT. 3235)** |
|  | **[Doc. 3339]** |

18
19
20
21
22
23
24
25
26
27
28

1

## INTRODUCTION

2      Defendants' own monitoring reports show substantial noncompliance in June 2019

3   with 24 of the 34 health care performance measures ("PMs") and facilities listed in the

4   May 5, 2019 Order to Show Cause (Doc. 3235) (hereinafter "OSC").  [Doc. 3335 at 2-6]

5   Rather than meet the legal requirements to describe "categorically and in detail" why they

6   were unable to comply with the OSC, (*N.L.R.B. v. Trans Ocean Export Packing, Inc*., 473

7   F.2d 612, 616 (9th Cir. 1973)), and to show that they took "*all* reasonable steps to comply

8   with the order," (*Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in

9   original)), Defendants argue that their change from one for-profit health care vendor

10  (Corizon), to another (Centurion), excuses their failure to comply with the OSC in June.

11  [Doc. 3339 at 7-8]

12     The Court should not countenance such an excuse, as it is yet another attempt by

13  Defendants to blame their chosen vendor(s) for their own failure to abide by their

14  constitutionally and statutorily-mandated responsibilities to the more than 34,000 people

15  in state prisons who are completely dependent upon the State for health care, and for their

16  failure to live up to the promises that they made to those people almost five years ago in

17  the Stipulation.  Defendants utterly fail to prove that they took all reasonable steps to

18  comply with the OSC.  Instead of describing what they did to provide the promised health

19  care, such as hire more staff, Defendants fill the record with the same tired excuses that

20  they have used for the last five years. [*See* Doc. 3057 at 9 ("While Defendants are free to

21  utilize the State's resources as they wish, at some point their continued insistence that

22  taxpayer money is better spent on assiduously defending their noncompliance with the

23  Stipulation than on efforts towards remedying the fundamental underlying cause of that

24  noncompliance is likely ill-conceived and ill-advised.")]

25     Defendants also yet again argue that the Court lacks any power to enforce the

26  Stipulation via its inherent Article III contempt power, and that any finding of contempt

27  would be criminal, and not civil, because the fines would be imposed only after the data

28  showing their noncompliance became available.  [Doc. 3339 at 3-6]  The Court should

reject Defendants' arguments, find them in contempt of the OSC, and fine them $1.2 million for their 24 noncompliant PMs / complexes.  [*See* Doc.  3235 at 7 ("Defendants shall show cause as to why the Court should not impose a civil contempt sanction of $50,000 per Performance Measure per complex")]

Furthermore, it appears that the past contempt fine of more than $1.4 million, this prospective fine, and Plaintiffs' request for daily fines of $10,000 for Defendants' continuing refusal to comply with the Court's June 22, 2018 contempt order (Doc. 2898 at 24), and with a Ninth Circuit order (Doc. 3276), (*see* Docs. 3301, 3323), have all had zero effect on Defendants' behavior.  In light of their ongoing intractable and contumacious behavior, the time has come for this Court to take additional actions.  Plaintiffs ask that in addition to the monetary fine, the Court enter an injunctive order pursuant to Rule 66 of the Federal Rules of Civil Procedure, appointing a receiver to manage ADC's delivery of health care services to class members. [*See, e.g., Plata v. Schwarzenegger*, No. C01-1351TEH, 2005 WL 2932253 at *1, *19 (N.D. Cal. Oct. 3, 2005) ("the Court imposes the drastic but necessary remedy of a Receivership in anticipation that a Receiver can reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards. . . . The Court has attempted to move defendants toward meeting constitutional standards by issuing a series of court orders with detailed objectives and measures.  Unfortunately, defendants have repeatedly delayed their progress and ultimately failed to achieve even a semblance of compliance."); *see also Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998) ("After years of attempting to get D.C. to voluntarily comply, and appointing a Special Master to coordinate with D.C. in an attempt to alleviate conditions, the district court ordered that the jail's medical and mental health services be placed in receivership in 1995")]

## I.  The Court Has the Legal Authority to Hold Defendants in Contempt.

This Court has the power to enforce compliance with its orders through civil contempt.  18 U.S.C. § 401(3); *Spallone v. United States*, 493 U.S. 265, 276 (1990) ("[C]ourts have inherent power to enforce compliance with their lawful orders through

civil contempt") (quotation marks omitted); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (district court has "wide latitude" to determine if a party defied an order and is in contempt) (citations omitted).  This power is heightened when—as here—a court has overseen litigation and noncompliance with injunctive relief by a governmental institution for a long period of time.  The Supreme Court has held that "[a] court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Brown v. Plata*, 563 U.S. 493, 542 (2011); *see also Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014) ("The ongoing, intractable nature of this litigation affords the district court considerable discretion in fashioning relief").

Defendants ignore the Stipulation's clear language that "the Court shall retain the power to enforce this Stipulation through all remedies provided by law, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff . . . ."  Doc. 1185 ¶ 36.  They also ignore the holding of the Ninth Circuit in this case. *See Parsons v. Ryan*, 912 F.3d 486, 494-95, 497-98 (9th Cir. 2018) (describing the scope of this Court's authority, and holding that "the Stipulation is clear on the limits of the district court's authority to enforce the Stipulation," citing to the only two exceptions in Paragraph 36, and that otherwise the district court can rely upon "all remedies provided by law.").[1]

Thus, this Court has the authority and power to hold Defendants in civil contempt.

//

//

---

[1] Defendants disregard the abundant caselaw, including the Ninth Circuit's 2018 opinion in this very case, and continue to insist that the "Stipulation is a private settlement agreement, not a court order or a consent decree." Doc. 3339 at 4.  They also ignore the "law of the case doctrine" under which "a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *United States v. Smith*, 389 F.3d 944, 948-49 (9th Cir. 2004) (citations and quotation marks omitted).

## II. The Proposed Contempt Finding is Civil, Not Criminal

### A.  Legal Framework for Civil Contempt

Prior to holding a party in civil contempt, a court must find by clear and convincing evidence that:

(1)     a "specific and definite" court order exists, (*Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 465 (9th Cir. 1989));

(2)     the party had knowledge of the order, and notice of and an opportunity to be heard about the alleged contempt, (*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) ("*Bagwell*"); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999)); and,

(3)     the party failed to take "*all* reasonable steps to comply with the order." *Kelly*, 822 F.3d at 1096 (emphasis in original).

The contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order."  *In Re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted).  Should a party seek to defend against a contempt finding by arguing inability to comply, it must show "categorically and in detail" why it is unable to comply.  *Trans Ocean Export Packing*, 473 F.2d at 616.[2]  And impossibility is not a valid defense if the party is "responsible for the inability to comply." *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980) (quotation marks and citation omitted); s*ee also F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (same).[3]

---

[2]    Throughout the life of this case, Defendants repeatedly have argued that Plaintiffs bear the burden to detail "all additional steps Defendants were required to take" to avoid contempt of the Court's orders.  *See, e.g.*, Doc. 3315 at 6.  Defendants are wrong. The burden is on them to show cause why they should not be found in contempt, not upon the Plaintiffs to come up with all the different ways Defendants could have complied with the OSC.  *Trans Ocean Export Packing*, 473 F.2d at 616; *Kelly*, 822 F.3d at 1096.

[3]    To the extent Defendants shift the blame for noncompliance on their outgoing vendor, Corizon, such excuses are unavailing.  Corizon, as Defendants' contractor, was their agent, and thus any failure by Corizon is attributable to Defendants.  *Salyers v. Metro. Life Ins. Co.*, 817 F.3d 934, 939 (9th Cir. 2017) ("The legal consequences of an agent's actions may be attributable to a principal when the agent is acting within its authority") (*citing* RESTATEMENT (THIRD) OF AGENCY § 2 intro. note (2006)).

Once a court finds a party in contempt, it has "broad equitable power to order appropriate relief . . ."  *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).  When considering a sanction, the court should look at "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947) ("*United Mine Workers*").

**B.  Defendants Are In Civil Contempt of the Court's Orders.**

Here, the factual record amply supports a finding of civil contempt.

**1.  The OSC and the Stipulation Are Specific and Definite as to Defendants' Responsibilities.**

The Stipulation states that "Defendants shall comply with the health care performance measures set forth in Exhibit B."  Doc. 1185 ¶ 8.  The PMs in Exhibit B are simple, unambiguous, and declarative sentences.  [Doc. 1185-1 at 8-15]  The OSC clearly sets out precisely which Arizona state prison complexes and PMs needed to be at substantial compliance in June 2019.  [Doc. 3235 at 6-7]  By no stretch of the imagination could Defendants argue that the Stipulation or the OSC are not specific and definite.

**2.  Defendants Have Notice of the OSC, and Have Been Heard on Their Efforts to Comply.**

Defendants had notice of the order when it was issued on May 5, 2019.  The Court warned them that if they did not achieve substantial compliance with the relevant PMs at the specific facilities during June 2019, they could be found in contempt of court.  They have been provided the opportunity to be heard, (*see* Doc. 3339), and will have the opportunity to provide additional final briefing on their noncompliance.  [*See* Doc. 3306 at 2 ("Defendants may file a reply no later than Friday, September 20, 2019")]

Defendants argue that the Court's proposed sanction "is criminal in nature" because the OSC relied upon Defendants' past failures to comply with the Stipulation when identifying the particular PMs and facilities to include in the OSC.  Doc. 3339 at 5. Defendants cite no legal authority—as none exists—for their position that the proposed sanction is criminal because the Court relied on their previous failures to comply with the

1    Stipulation and court orders in issuing the OSC.

2        Defendants also argue that they have been provided no opportunity to purge the

3    contempt because the briefing on the matter will not be done until September 20, 2019,

4    and some time will pass before a final contempt order issues.  Doc. 3339 at 5-6.  But this

5    ignores the fact that the order setting out the potential for fines was prospective and

6    conditional—the Court issued it on May 5, 2019, and placed Defendants on notice that

7    they could be fined for future noncompliance with specific performance measures at

8    specific prisons in the future month of June 2019.  Doc. 3235 at 5-7.  "[C]oercive civil

9    sanctions, intended to deter, generally take the form of conditional fines."  *Shell Offshore*

10    *Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016); *id*. at 630 (holding that

11    "[f]urther accrual of the conditional fines could have been avoided by Greenpeace at any

12    time, should it have chosen to recall the activists and comply with the injunction"); *see*

13    *also Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1117 n.27 (D. Idaho 2013) (holding that a

14    prospective fine schedule is not punitive because "the amount of fine, if it succeeds in

15    making them comply, should prevent the fine from reaching millions because Defendants

16    will fix their behavior and begin living up to their promise in the Settlement Agreement.

17    If a prospective fine leads to $2.4 million in penalties, [Defendant] has no one to blame

18    but itself."), *aff'd*, 822 F.3d 1085 (9th Cir. 2016).  Here, Defendants did avail themselves

19    of the opportunity to purge, as there were ten PMs / facilities in the OSC for which they

20    achieved at least 85% compliance in June; and thus, judicial involvement was not

21    triggered, and Defendants will not be fined for them.  [Doc. 3339 at 2]

22        Defendants' argument that the passage of time necessary to document their

23    performance on the PMs and present the information to the Court renders the contempt

24    finding criminal also fails, because under this construction, Defendants could never be

25    held in civil contempt, no matter how flagrant and willful their noncompliance, because

26    the evidence of their noncompliance is not instantaneously apparent. In *Shell Offshore*, the

27    contumacious behavior of the Greenpeace protestors continuing to hang off of St. John's

28    Bridge in Portland was readily and immediately visible and measureable, as they

disregarded the court's order that continuing to do so would result in daily, and then hourly, fines. 815 F.3d at 630.  Here, by contrast, Defendants' compliance (or lack thereof) with the Stipulation is not instantaneously visible or measurable for several reasons, but the fines are still conditional and prospective.

First, the plain language of the Stipulation measures substantial compliance by month, not by day or hour.  *See* Doc. 1185 at ¶ 9 ("Compliance with the performance measures set forth in Exhibit B shall be measured and reported monthly at each of ADC's ten (10) complexes . . .").  Therefore, compliance cannot be determined until the month is completed.  Second, the lag time in getting the compliance numbers to the Court is of Defendants' own making, as they insist that they need up to 45 days after the end of the relevant month to make a final determination of compliance.  *See* Doc. 3261-1 (Defendant Pratt stating "[t]he data is collected in a retrospective manner, allowing for monitoring periods to be consistent and complete"), Doc. 3315 ("Corizon did not provide any additional 'real time' data" regarding noncompliance).  Defendants cannot use their failure to use real-time data to insulate themselves from a finding of civil contempt.[4]

Finally, the fact that any potential fine would be deposited and held in escrow in the Registry of the Court pending any appeal or future orders as to the disbursement of the money does not transform the contempt from civil to criminal.  It cannot be that this Court is transformed into the "beneficiary" of contempt fines merely because the money is being held in escrow pending final review.

### 3. Defendants Have Not Shown They Took All Reasonable Steps to Comply With the OSC

Defendants must show "categorically and in detail" that they took all reasonable steps to comply with the OSC, *Trans Ocean Export Packing*, 473 F.2d at 616.  They have failed to do so.

---

[4] Defendants sought, and were granted, a delay in the court-imposed deadline to report the June compliance scores and in the briefing schedule (*see* Doc. 3306) – and now use that delay to argue that the Court cannot hold them in civil contempt.  *See* Doc. 3339 at 5 ("briefing … will not be completed until September 20, 2019").

Defendants are silent as to what efforts—if any—they took to comply with ten PMs/facilities, including, **PM 11 at Eyman** (82%); **PM 39 at Eyman** (72%); **PM 40 at Eyman** (69%); **PM 42 at Eyman** (76%) and **PM 42 at Florence** (80%); **PM 47 at Eyman** (57%) and **PM 47 at Lewis** (72%); **PM 49 at Eyman** (58%); **PM 52 at Eyman** (82%) and **PM 52 at Florence** (62%).[5]  [Doc. 3335 at 2-5]  Accordingly, they should be found in contempt of the OSC for these ten PMs / facilities.[6]

Defendants offer nothing but excuses for the rest of the PMs/facilities that the Court listed in its Order to Show Cause.  Many, if not all, of these excuses have in one form or another been used before to justify their noncompliance.  But, to avoid a finding of contempt, Defendants must do more than present well-worn excuses; they must satisfy the Court that they took all reasonable steps to comply.  This means that Defendants must present evidence that they explored or tried every reasonable alternative to provide the necessary services.  Because they failed to do so, the Court should hold them in contempt.

---

[5] These measures are:
- PM 11: "Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT."
- PM 39: "Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral."
- PM 40: "Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral."
- PM 42: "A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider."
- PM 47: "A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request."
- PM 49: "Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial."
- PM 52: "Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report."

[6] Defendants ask that they not be found in contempt with seven PMs/facilities in the OSC, (PM 39 at Eyman, PM 42 at Eyman and Florence, PM 47 at Lewis, PM 50 at Florence, PM 52 at Eyman, and PM 66 at Tucson), because they are "nearing substantial compliance." Doc. 3339 at 10.  "Nearly" or "close" may count in horseshoes, but under the Stipulation substantial compliance is binary; there is no support for Defendants' argument that "nearing substantial compliance" is equal to "substantial compliance" to meet the threshold to avoid judicial involvement. Doc. 1185 ¶ 10(a)(iii).

And as described below, even their meager excuses fall flat. Defendants have been substantially noncompliant with these measures for months—if not years—and therefore it is implausible to argue that their ongoing noncompliance in June had anything to do with the transition.

With regard to Defendants' explanation for individual PMs / facilities, Plaintiffs respond below:

**PM 12 at Eyman** (54%).[7] [Doc. 3335 at 2] Defendants assert they were unable to comply with this measure that requires documentation of class members' refusal of prescribed medication, because "as a result of the transition, there were significant delays in scanning the documentation needed." Doc. 3339 at 7. They do not explain what the change in vendor on July 1, 2019 has to do with nursing staff's failure to scan refusal forms to patients' medical records in June. In any event, in their monthly corrective action plans filed five days later, they offered the Court a different explanation for the noncompliance with this PM at Eyman in June, namely that "[n]ursing was not updating the scheduled appointment date with the date the refusal occurred[,] resulting in failing scores." Doc. 3342-1 at 7. The Court should find Defendants in contempt of the OSC for this PM/facility.

**PM 14 at Eyman** (0%).[8] [Doc. 3335 at 2] Defendants state that to audit this measure regarding timely refills of prescription medication, they "review a manual log created by the health care contractor, but Corizon, the healthcare contractor for June, was unable to create the log due to the then-completed transition." Doc. 3339 at 7. This makes no sense, and Defendants provide no explanation of what efforts they made to direct their contractor to prepare the monthly report that they knew they would need for monitoring purposes. This also contradicts the avowals made by Defendant Pratt under penalty of

---

[7] PM 12: "Medical record will contain documentation of refusals or 'no shows' for prescribed medications."

[8] PM 14: "Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication."

1   perjury, when asking the Court for more time to provide data on June noncompliance, that

2   "[b]y the fifth day of each month, Corizon is to provide the HSCMB [Health Services

3   Contract Monitoring Bureau] with source documents containing all records applicable to

4   each HCPM" and "[t]hus, for June 2019 compliance scores, source document data will be

5   collected and provided to HSCMB during the month of July 2019." Doc. 3261-1 at ¶¶ 13,

6   19. The Court should find Defendants in contempt of the OSC for this PM/facility. [9]

7       **PM 24 at Lewis** (63%).[10]  [Doc. 3335 at 3]  Defendants assert that they were

8   unable to comply because the "scanned copies of inventory logs [] were misplaced." Doc.

9   3339 at 7.  They do not describe if they made any efforts to find the "misplaced" scanned

10  copies, nor explain how a log scanned to a computer system could not be recovered.  The

11  Court should find Defendants in contempt of the OSC for this PM/facility.

12      **PM 15 at Lewis** (54%), **PM 19 at Lewis** (67%), **PM 37 at Eyman** (14%), **PM 37**

13  **at Lewis** (49%), **PM 66 at Florence** (10%), **PM 66 at Tucson** (80%), **PM 67 at Tucson**

14  (10%).[11] [Doc. 3335 at 2-3, 6] Defendants offer a blanket explanation and blame their

15  noncompliance in June 2019 with these measures on the "transition between healthcare

16  contractors" resulting in Corizon having "difficulty staffing open positions and

17

---

18      [9] It is not as if Corizon rode off into the waning moon at 12:01 am on July 1, 2019.
19  Defendant Pratt told the Court that there would be ongoing interactions between ADC and
    Corizon in the months after the end of the contract.  *See* Doc. 3261-1 at ¶¶ 23-24
20  ("Preliminary results for the monitored month of June 2019 will be presented to Corizon
    throughout the month of July 2019 as the results are completed by the HSCMB. . . .
21  Corizon is allowed the first ten business days of August 2019 to rebut or dispute any
    preliminary findings for the month of June 2019. . .")
22      [10] PM 24 requires "Emergency medical response bags are checked daily,
    inventoried monthly, and contain all required essential items."
23      [11] These measures are:
    - PM 15: "Inmates who refuse prescribed medication (or no show) will be
24      counseled by a QHCP after three consecutive refusals."
    - PM 19: "Perpetual inventory medications will be signed off on the Inmate's
25      individual MAR."
    - PM 37: "Sick call inmates will be seen by an RN within 24 hours after an HNR
26      is received (or immediately if identified with an emergent need, or on the same
    day if identified as having an urgent need)."
27  - PM 66: "In an IPC, a Medical Provider encounters will occur at a minimum
    every 72 hours."
28  - PM 67: "In an IPC, Registered nurses will conduct and document an assessment
    at least once every shift. Graveyard shift assessments can be welfare checks."

1   maintaining existing staff at Defendants' facilities." Doc. 3342-1 at 7-8.

2          This justification falls flat and is contradicted by Defendants' staffing reports: for

3   example, while the June 2019 staffing reports shows a shortage of nursing staff at **Eyman**,

4   with only 6.4 of 20.4 Registered Nurse ("RN") Full Time Equivalent ("FTE") positions

5   staffed (31% filled), and 18.0 of 31.0 Licensed Practical Nurse ("LPN") FTEs filled

6   (58%), (*see* Declaration of Corene Kendrick, filed herewith ("Kendrick Decl.") Ex. 1 at

7   ADCM1578387), this is not a new problem that suddenly occurred in June or that can be

8   blamed on a change of health care vendors. [*See* Kendrick Decl. Ex. 2 at ADCM1575436

9   (May 2019 staffing report showing 31% of RN FTEs and 58% of LPN FTEs at Eyman

10  filled); Doc. 3185-1 at 28 (January 2019 staffing report showing 41% of RN FTEs and

11  72% of LPN FTEs at Eyman filled); *id.* at 4 (November 2018 staffing report showing 40%

12  of RN FTEs and 72% of LPN FTEs at Eyman filled); *see also* Doc. 3255-1 Ex. 6 (Eyman

13  tour report detailing shortages of nurses in November and December 2018)][12]

14         Similarly, while the June 2019 staffing report shows that at **Tucson** only 0.75 of

15  2.0 FTE staff physician positions are filled (38%) and 5.0 of 7.0 FTE nurse practitioner

16  positions are filled (71%), (*see* Kendrick Dec. Ex. 1 at ADCM1578393), this is actually an

17  improvement from a few months ago.  [*See* Doc. 3280-1 at 10 and 34 (November 2018

18  and January 2019 reports showing 25% fill rate for staff physician and 71% fill rate for

19  nurse practitioner positions at Tucson)]  Likewise, the vacancies at Lewis and Florence

20  also are not new developments that just happened in June, as seen in the lack of variation

21  between the December 2018 and June 2019 reports, and in some cases, an improvement in

22  June 2019:

23  //

24  //

25  //

26  //

27  _____

28      [12] The July 2019 staffing reports also show vacancies continue under Centurion.
    *See generally* Kendrick Decl. Ex. 3.

**Florence:**

| Position | Corizon Contract Positions | Dec. 2018 Filled FTEs | Dec. 2018 % Filled | June 2019 Filled FTEs | June 2019 % Filled |
|---|---|---|---|---|---|
| Medical Director | 1.0 | 0.0 | 0% | 0.0 | 0% |
| Staff Physician | 2.0 | 2.0 | 100% | 1.0 | 50% |
| Nurse Practitioner | 4.2 | 4.0 | 95% | 5.5 | 131% |
| Director of Nursing | 1.0 | 1.0 | 100% | 1.0 | 100% |
| Ass't DON | 7.2 | 7.0 | 92% | 6.9 | 96% |
| RN | 32.0 | 30.7 | 96% | 26.0 | 81% |
| LPN | 27.05 | 17.4 | 64% | 16.5 | 61% |

**Lewis:**

| Position | Corizon Contract Positions | Dec. 2018 Filled FTEs | Dec. 2018 % Filled | June 2019 Filled FTEs | June 2019 % Filled |
|---|---|---|---|---|---|
| Staff Physician | 2.0 | 0.0 | 0% | 0.0 | 0% |
| Nurse Practitioner | 6.0 | 5.0 | 83% | 6.0 | 100% |
| Director of Nursing | 1.0 | 1.0 | 100% | 0.0 | 0% |
| Ass't DON | 7.0 | 4.0 | 57% | 5.0 | 71% |
| RN | 30.0 | 20.6 | 69% | 22.0 | 73% |
| LPN | 35.0 | 20.1 | 57% | 18.1 | 52% |

[Kendrick Dec. Ex. 1 at ADCM1578388-89; Doc. 3185-1 at 17-18]

Additionally, Defendants assert that "the pending transition of healthcare contractors presented unexpected and atypical difficulties" for these PMs, without articulating what these "difficulties" were, and that "[t]hese issues were entirely outside of Defendants' (or their health care contractor's control)." Doc. 3339 at 8. But in March, they argued that they were not obligated "to form a transition plan," (Doc. 3187 at 4), and that the Court should not require a transition plan because "Centurion has successfully transitioned Corizon contracts in Tennessee, Minnesota, Florida, and New Mexico and it

'recognizes the importance of collaborating with the incumbent healthcare contractor in order to ensure a smooth transition for current employees and continuous, uninterrupted quality care for patients.'" Doc. 3187 at 3.   Defendants do not explain what the "unexpected and atypical difficulties" were that prevented a successful transition in Arizona, despite their previous assurances to the Court that everything would go smoothly.[13]   Accordingly, they should be found in contempt of the OSC for these seven PMs / facilities.

**PM 50 at Florence** (82%), **PM 51 at Eyman** (40%), **PM 51 at Florence** (72%), **PM 51 at Tucson** (79%).[14]   [Doc. 3335 at 5]   Defendants excuse their substantial noncompliance with these four measures related to the timely completion of specialty referrals on the basis that "as a result of the pending transition, several outside healthcare providers ended their relationships with Corizon . . . there were less [sic] available providers for specialty consults . . ." Doc. 3339 at 8.   This does not align with the reasons offered for noncompliance in Defendants' monthly report of compliance scores and corrective action plans, including the statement that pending requests for specialty care were not processed at the request of Corizon:

**PM 50 at Florence:**

- June 21, 2019: "The Clinical Coordinator and scheduler positions have had a high turnover rate resulting in delays in scheduling appointments."

- July 16, 2019: "The Eyman Clinical Coordinator and scheduler had been completing both the Florence and Eyman facility consults. Due to the large volume of consults at both facilities compliance was not achieved."

- August 8, 2019: "There was a backlog of referrals that carried over through the transition. In addition, there are providers that provided services prior to

---

[13] The Court correctly foresaw that "[t]his is a substantial transition that requires advance coordination to ensure ADC's 33,000 prisoners receive continuity of care, particularly concerning provision of prescription medication, specialty consultations, diagnostic testing, and necessary emergency treatment" and ordered Defendants to develop and produce a transition plan.  Doc. 3234 at 1.

[14] PM 50 requires "Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider," and PM 51 requires "Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider"

the transition who will no longer provide services to the inmate population without a contract in place."

Doc. 3342-1 at 265.

**PM 51 at Eyman:**

- June 21, 2019: "The Clinical Coordinator and scheduler positions have had a high turnover rate resulting in delays in scheduling appointments."

- July 16, 2019: "The Eyman Clinical Coordinator and scheduler had been completing both the Florence and Eyman facility consults. Due to the large volume of consults at both facilities compliance was not achieved."

- August 8, 2019: "Due to the transition, ***there was a period of time that routine referrals could not be processed at the request of the outgoing contractor***.  In addition, there are providers that provided services prior to the transition who will no longer provide services to the inmate population without an executed contract in place."

Doc. 3342-1 at 276 (emphasis added).

**PM 51 at Florence:**

- June 21, 2019: "The Clinical Coordinator and scheduler positions have had a high turnover rate resulting in delays in scheduling appointments."

- July 16, 2019: "The Eyman Clinical Coordinator and scheduler had been completing both the Florence and Eyman facility consults. Due to the large volume of consults at both facilities compliance was not achieved."

- August 8, 2019: "Due to the transition, ***there was a period of time that routine referrals could not be processed at the request of the outgoing contractor***.  In addition, there are providers that provided services prior to the transition who will no longer provide services to the inmate population without an executed contract in place."

Doc. 3342-1 at 280-81 (emphasis added).

**PM 51 at Tucson:**

- July 16, 2019: "The regular Clinical Coordinator was off during this audit cycle and the assigned staff member that filled in was unable to properly track this measure to ensure it completion [sic] within time frame."

- August 8, 2019: "Key community specialists were unable to receive scheduled appointments within the timeframes required for compliance."

Doc. 3342-1 at 285.

Additionally, it is unclear why—if specialists subcontracted with Corizon stopped seeing patients in June, as Defendants assert—other prison facilities were able to achieve substantial compliance with these PMs in June.  [*See* Doc. 3342-1 at 266 (Perryville PM

-14-

50 at 89%); *id.* at 270 (Douglas PM 51 at 100%); *id.* at 282 (Perryville PM 51 at 97%); *id.* at 287 (Yuma PM 51 at 94%)]  Therefore, the Court should find Defendants substantially noncompliant with these four PMs / facilities.

## C. Defendants' Noncompliance and Contempt Harm Class Members.

While there is no legal requirement that there be a showing of harm in order to find a party in contempt, Defendants' noncompliance with the PMs in the OSC placed class members at serious risk of substantial harm.  This Court has recognized "the continued harm the class experiences" due to "Defendants' interminable noncompliance" with the Stipulation.  Doc. 3057 at 8.

Plaintiffs have previously detailed examples of class members suffering from Defendants' failure to comply with their obligations under the Stipulation and the Constitution.  [*See* Doc. 2292 at 20-21; Doc. 2293-1 Exs. 5-9; Doc. 3071-1 Ex. 15; Doc. 3255-1 Exs. 1-10, 17]  As part of their ethical duties as class counsel, Plaintiffs' counsel regularly alert Defendants to individual class members who are at serious risk of harm and are in need of medical, dental, or mental health care.  [*See, e.g.,* Doc. 2898 at 9 ("Dr. Robertson testified that when Class Counsel writes to ADC's counsel about individuals, those individuals are added to the Escalation List.")]  In recent months, Plaintiffs' counsel alerted Defendants to class members at risk of harm due to noncompliance with many of these very same PMs at the specific institutions, including but not limited to:

- A 23-year-old class member at Eyman's Browning Unit was not seen in a timely manner by nursing and provider staff in response to numerous health needs requests ("HNRs") regarding excruciatingly painful lumps on his back and along his spine, in violation of PMs 37, 39, and 40.  On one occasion, he was seen by a psychology associate in response to his lumps on his spine.  The lumps went untreated for months, he ultimately was sent to the hospital where he underwent emergency surgery for multiple infected abscesses on his back, and was diagnosed with disseminated coccidioidomycosis (commonly known as "Valley Fever" or "cocci"), osteomyelitis, and acute kidney failure.  Kendrick Decl. Ex. 4.

- A different class member also at Eyman's Browning Unit experienced delays in receiving treatment for cancer, and was not seen in a timely manner in response to HNRs or as ordered by the provider, in violation of PMs 37, 39, and 42.  He was not sent out for cancer treatment in a timely manner, in violation of PM 50.  *Id.* Ex. 5.

- A 31-year-old class member at Eyman's SMU-I submitted multiple HNRs regarding a broken hand, and was not seen in a timely manner by the nurse or provider, in violation of PMs 37 and 40. His broken hand was still untreated three months after his injury. *Id*. Ex. 6.

- A class member at the Morey Unit in Lewis with a history of hospitalization for brain injuries and polyneuropathy submitted a HNR in June complaining of severe headaches, nausea, and dizziness, and was not seen by nursing staff in accordance with PM 37 and 39. The provider's urgent request for a neurosurgery consult had not occurred, in violation of PM 50. *Id*. Ex. 7.

- A class member at Lewis-Rast Unit submitted multiple HNRs reporting stomach pains and bloody diarrhea, but was not seen by nursing staff or for sick call follow-ups in accordance with PMs 37 and 42. There also were multiple delays in ordering lab and diagnostic tests, and then in the provider reviewing them and conveying the results to the patient, in violation of PMs 45, 46, and 47. *Id*. Ex. 8.

- A class member at Florence's North Unit has a family history of heart attacks and is repeatedly experiencing chest pains and sinus bradycardia with sinus arrhythmia, had not seen his cardiologist more than two months after the urgent specialty request was submitted, in violation of PM 50. *Id*. Ex. 9.

- A class member at Tucson's Catalina Unit has acute prostatitis and cystitis with hematuria had not seen a urologist more than 80 days after the provider requested the consult, in violation of PM 51. *Id*. Ex. 10.

## CONCLUSION

For the foregoing reasons, the Court should find Defendants in contempt of the OSC with regard to the 24 PMs / facilities that were below the 85% threshold for substantial compliance and that therefore triggered further judicial involvement, and fine them $1.2 million. Any fines assessed against the State should be deposited with the Court for disbursement as it sees fit to benefit the Plaintiff class. Furthermore, the Court should enter an injunctive order appointing a receiver to manage ADC's delivery of health care services to class members.

//

//

//

//

//

//

1    Respectfully submitted,

2    Dated:  September 6, 2019                **PRISON LAW OFFICE**

3                                             By:   s/ Corene T. Kendrick
4                                                  Donald Specter (Cal. 83925)*
                                                   Alison Hardy (Cal. 135966)*
                                                   Sara Norman (Cal. 189536)*
5                                                  Corene T. Kendrick (Cal. 226642)*
                                                   Rita K. Lomio (Cal. 254501)*
6                                                  **PRISON LAW OFFICE**
                                                   1917 Fifth Street
7                                                  Berkeley, California 94710
                                                   Telephone:  (510) 280-2621
8                                                  Email:    dspecter@prisonlaw.com
                                                             ahardy@prisonlaw.com
9                                                            snorman@prisonlaw.com
                                                             ckendrick@prisonlaw.com
10                                                           rlomio@prisonlaw.com

11                                                 *Admitted *pro hac vice*

12                                                 David C. Fathi (Wash. 24893)*
                                                   Amy Fettig (D.C. 484883)**
13                                                 Ryan Kendall (Cal. 324714)*
                                                   **ACLU NATIONAL PRISON PROJECT**
14                                                 915 15th Street N.W., 7th Floor
                                                   Washington, D.C. 20005
15                                                 Telephone:  (202) 548-6603
                                                   Email:    dfathi@aclu.org
16                                                           afettig@aclu.org
                                                             rkendall@aclu.org
17
                                                   *Admitted *pro hac vice*. Not admitted in DC;
18                                                   practice limited to federal courts.
                                                   **Admitted *pro hac vice*
19
                                                   Martin Lieberman (Bar No. 007442)
20                                                 Molly Brizgys (Bar No. 029216)
                                                   **ACLU FOUNDATION OF ARIZONA**
21                                                 3707 North 7th Street, Suite 235
                                                   Phoenix, Arizona 85013
22                                                 Telephone:  (602) 650-1854
                                                   Email:    mlieberman@acluaz.org
23                                                           mbrizgys@acluaz.org

24                                                 Daniel C. Barr (Bar No. 010149)
                                                   Amelia M. Gerlicher (Bar No. 023966)
25                                                 John H. Gray (Bar No. 028107)
                                                   **PERKINS COIE LLP**
26                                                 2901 N. Central Avenue, Suite 2000
                                                   Phoenix, Arizona 85012
27                                                 Telephone:  (602) 351-8000
                                                   Email:    dbarr@perkinscoie.com
28                                                           agerlicher@perkinscoie.com

1

jhgray@perkinscoie.com

2

*Attorneys for Plaintiffs Shawn Jensen; Stephen*

3

*Swartz; Sonia Rodriguez; Christina Verduzco;*
*Jackie Thomas; Jeremy Smith; Robert Gamez;*
*Maryanne Chisholm; Desiree Licci; Joseph*

4

*Hefner; Joshua Polson; and Charlotte Wells, on*
*behalf of themselves and all others similarly*

5

*situated*

6

7

**ARIZONA CENTER FOR DISABILITY LAW**

8

By:   s/ Maya Abela

Rose A. Daly-Rooney (Bar No. 015690)

9

J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)

10

**ARIZONA CENTER FOR DISABILITY**
**LAW**

11

177 North Church Avenue, Suite 800
Tucson, Arizona 85701

12

Telephone:  (520) 327-9547
Email:    rdalyrooney@azdisabilitylaw.org

13

jrico@azdisabilitylaw.org
mabela@azdisabilitylaw.org

14

Asim Dietrich (Bar No. 027927)

15

5025 East Washington St., Ste. 202
Phoenix, Arizona 85034

16

Telephone: (602) 274-6287
Email:    adietrich@azdisabilitylaw.com

17

*Attorneys for Arizona Center for Disability Law*

18

19

20

21

22

23

24

25

26

27

28

-18-

1   **CERTIFICATE OF SERVICE**

2       I hereby certify that on September 6, 2019, I electronically transmitted the above

3   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4   Notice of Electronic Filing to the following CM/ECF registrants:

5

6                          Michael E. Gottfried
                           Lucy M. Rand
7              Assistant Arizona Attorneys General
                       Michael.Gottfried@azag.gov
8                        Lucy.Rand@azag.gov

9                          Daniel P. Struck
                           Rachel Love
10                      Timothy J. Bojanowski
                          Nicholas D. Acedo
11                        Ashlee B. Hesman
                            Jacob B. Lee
12                        Timothy M. Ray
                          Richard M. Valenti
13                        Jamie D. Guzman
          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
14                    dstruck@strucklove.com
                       rlove@strucklove.com
15                   tbojanowski@strucklove.com
                      nacedo@strucklove.com
16                    ahesman@strucklove.com
                        jlee@strucklove.com
17                       tray@strucklove.com
                      rvalenti@strucklove.com
18                    jguzman@strucklove.com

19                    *Attorneys for Defendants*

20

21                                            s/ C. Kendrick

22

23

24

25

26

27

28

                                -19-