# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Victor Antonio Parsons, et al.,

Plaintiffs,

v.

Charles L Ryan, et al.,

Defendants.

No. CV-12-00601-PHX-ROS

**ORDER**

Defendants filed their second motion to terminate their obligation to monitor certain Performance Measures (Doc. 3108). The current motion relates to the Maximum Custody Performance Measures (MCPMs), which apply to a subclass in this action and primarily mandate a minimum amount of out-of-cell time for prisoners confined in maximum custody units. As part of the Stipulation, the parties agreed Defendants would abide by nine MCPMs. Defendants seek to terminate monitoring of eight MCPMs; Plaintiffs largely oppose the motion. The parties agree two MCPMs can be terminated and agree one will continue. Thus, there are six MCPMs where the parties disagree on whether monitoring should continue. As to those challenged MCPMs, there are monitoring deficiencies and factual uncertainties about whether Defendants are complying with the Stipulation's requirements. The motion to terminate will therefore be granted in part and denied in part.

## Background of MCPMs

In addition to the Stipulation's 103 Health Care Performance Measures, the parties also agreed to nine MCPMs to settle the claims brought by the Maximum Custody

Subclass, which includes "[a]ll prisoner[s] who are now, or will in the future be, subjected by the [ADC] to isolation, defined as confinement in a cell for 22 hours or more each day." (Doc. 1185 at 2.)

The nine MCPMs are as follows:

| Measure | |
|---|---|
| 1 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326[1] are offered a minimum of 7.5 hours out-of-cell time per week. Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week. |
| 2 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III. |
| 3 | All out-of-cell time that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation. |
| 4 | All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. |

---

[1] DI 326 is a Director's Instruction issued by the Director of the Arizona Department of Corrections. It implements "a program utilizing a step system providing the opportunity [for maximum custody inmates] to participate in jobs, programs and other out of cell activities."

| | |
|---|---|
| 5 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) are offered a minimum of 6 hours of out-of cell exercise time a week. |
| 6 | All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy. |
| 7 | No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB 5 or CB-7 unless the cell fronts are substantially modified to increase visibility. |
| 8 | In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:<br>• 10 hours of unstructured out-of-cell time per week;<br>• 1 hour of additional out-of-cell mental health programming per week;<br>• 1 hour of additional out-of-cell psycho-educational programming per week; and<br>• 1 hour of additional out-of-cell programming per week. |
| 9 | All use of force incidents involving prisoners who are designated SMI or housed in Florence-CB-1 or CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; or Phoenix (Baker, Flamenco, or MTU) conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation. |

Because of the preeminence of the deficiencies in providing health care, the parties have spent considerably less time litigating issues related to the MCPMs. Indeed, although Plaintiffs filed a motion seeking enforcement of the MCPMs in early 2017, the Court denied the motion without prejudice. Thereafter, Plaintiffs filed a proposed order to enforce the MCPMs but the parties began settlement discussions to resolve all their pending disputes, so the Court did not rule on the proposed order.

**MCPMs the Parties Agree to Terminate and Units that No Longer House Maximum Custody Prisoners**

The parties agree Defendants may terminate monitoring MCPMs 4 and 7.[2] Therefore, those MCPMs will be terminated for all locations. Further, Plaintiffs do not dispute that ASPC-Florence-Central Unit (Main Yard) and ASPC-Perryville no longer house maximum custody prisoners. The Court will therefore grant Defendants' motion as to MCPMs 1-3, 5-6, and 8 as to ASPC-Florence-Central Unit (Main Yard) and ASPC-Perryville.

**Challenged MCPMs**

As to MCPMs 1, 2, 3, 5, 6, and 8, Defendants argue they have complied with the Stipulation's requirements and, as a result, their duty to monitor terminated automatically. In contrast, Plaintiffs challenge both the monitoring methodology and substantive compliance with the MCPMs. According to Plaintiffs, monitoring must continue for all the remaining MCPMs. The Court will address the general and specific challenges to the monitoring process in turn.

**Standard for Termination**

Paragraph 20(b) of the Stipulation provides that after twenty-four months of monitoring, Defendants' duty to monitor MCPMs terminates if they are in substantial compliance. (Doc. 1185 at 6-7.) In other words, if an MCPM at a specific unit is compliant (85% or higher) for eighteen out of twenty-four months and has not been non-compliant

---

[2] MCPM 9 is subject to a separate agreement and Defendants do not seek to terminate monitoring at this time.

for three or more consecutive months within the past eighteen-month period, Defendants' duty to monitor will terminate.

In their motion, Defendants construe the Stipulation as automatically terminating their obligations under the Stipulation after they report eighteen months of compliance with the MCPMs. Judge Duncan rejected this interpretation in his June 22, 2018 Order, noting that the Stipulation does not discuss automatic termination or which party bears the burden of proof that a particular performance measure should continue to be monitored (Doc. 2900). Judge Duncan determined that, in congruity with the Prison Litigation Reform Act, the Court must review any request to terminate monitoring and "prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation." *Id.* at 2 (quoting 18 U.S.C. § 3626(b)(3)). There is no basis to depart from this standard and the Court adopts it. Further, consistent with *Gilmore v. California*, 220 F.3d 987, 1007 (9th Cir. 2000), Defendants have the burden of proof that termination is appropriate.

**Alleged Monitoring Deficiencies as to all Max Custody PMs**

The protocol for assessing compliance with each MCPM is detailed in an exhibit to the Stipulation (Doc. 1185, Ex. E). For example, for MCPM 1, the protocol requires that

> At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly selected prisoners.

This is a generic description of what is required but the procedure is spelled out in more detail in the Max Custody Monitor Guide Duties & Responsibilities (as an example, the methodology for MCPM 1 is nearly three pages long (Doc. 3177-2, Ex. 1 at 13-16)). The methodologies for evaluating compliance have been revised over the past three years as the parties presented disputes to the Court about the appropriate monitoring methodology for certain PMs. This turned the Monitoring Guide into a living document that went through substantial revisions. When the parties—with the Court's assistance— eventually agreed on a final version of the Monitoring Guide, the Court forewarned

Defendants that "they did not have to recalculate CGAR data but could not rely on CGAR data calculated under discredited methods." (Docs. 1951, 2900 at 3.) The Monitoring Guide was not finalized until July 2017. Defendants' current snapshot of compliance is from November 2016 until October 2018, meaning some of the information substantially predates the final version of the Monitoring Guide. Plaintiffs therefore argue that the compliance numbers from prior to July 2017 do not reflect assessment pursuant to the Monitoring Guide and should not be accepted as valid.

In addition to pointing out that some of the monitoring predates the final version of the Monitoring Guide, Plaintiffs challenge the process by which out-of-cell refusals are documented. The Monitoring Guide requires that the "personnel to whom the inmate stated the refusal must note the refusal and amount of time refused . . . and contemporaneously sign the same." (Doc. 3177, Ex. 1 at 5, 8, 13, 16, 19.) Plaintiffs maintain that Defendants do not follow this process; rather, an officer will ask prisoners if they would like out-of-cell time and the results are reported to another officer, who tracks the information at a later time. Plaintiffs also assert that the Out-of-Cell Tracking Forms are not displayed conspicuously as they were in the past, thereby inhibiting contemporaneous documentation of out-of-cell refusals.

Defendants respond that the Monitoring Guide is not part of the Stipulation because the parties have not "modified the Stipulation in accordance with the integration clause." (Doc. 3216 at 6.) As a result, Defendants claim the Monitoring Guide that the parties agreed to, or which the Court mandated, cannot be used to challenge Defendants' compliance. In Defendants' view, the fact that the Monitoring Guide was not in place until July 2017 is irrelevant because Defendants never had to follow the Monitoring Guide in the first place. This argument makes little sense. The Monitoring Guide is primarily Defendants' own interpretations of the MCPMs and how compliance with the MCPMs will be measured. If there were no explanation on how to assess compliance, there would be no way to measure it.

It is true that Judge Duncan informed the parties that compliance numbers must be

1 calculated under the Monitoring Guide. But in reviewing his rulings in context, Judge Duncan was referring to disputes that forced Defendants to change whether a particular file of a selected prisoner was deemed compliant or not. For example, when discussing Defendants' prior practice of awarding partial credit to selected prisoner files, Judge Duncan prohibited partial credit, which meant that certain files were determined to be completely noncompliant. In contrast, the challenge here to the way Defendants record out-of-cell refusals does not necessarily bear on whether a particular file is compliant. Importantly, there is no persuasive argument that Defendants' minor deviations from the documentation requirements of the Monitoring Guide has rendered the underlying data incorrect. Without such a challenge, the motion to terminate cannot be denied on this basis.

The parties' briefing did, however, reveal a fundamental problem underlying Defendants' monitoring—the randomization method. The Stipulation requires Defendants review files "for 10 randomly selected prisoners" at "each designated location" from the seriously mentally ill (SMI) and non-SMI populations. (Doc. 1185, Ex. E at 41-45.) The Monitoring Guide explains that for each unit, the count sheets[3] are used as the primary document to identify the pool of eligible prisoners for each location. The total number of prisoners is divided by ten and then that number is the skip-interval between selected prisoners. When Plaintiffs reviewed the compliance data, however, they discovered that the same prisoners' files were frequently "randomly" selected for multiple months. And after reviewing Defendants' Reply,[4] Plaintiffs' expert Dr. Craig Haney describes Defendants' sampling methodology. Dr. Haney determined that Defendants began their sampling with the first name on the count sheet and then used the skip-interval. Because Defendants do not use a random starting point, this process does not, in fact, represent random selection. Instead, it renders certain individuals much more likely to be selected.

The parties agree that "[r]andom selection techniques ensure that no one file from

---

[3] Count sheets are the lists of prisoners for each housing unit in order according to their bed assignments. Thus, if a prisoner is housed at a particular unit in a particular bed and does not move, his placement on the count sheet will not change from month to month.
[4] Dr. Haney's Declaration indicates he reviewed Doc. 3126 at 9-49, but it appears he intended to refer to Doc. 3216.

the universe of files has any higher probability or likelihood of being included in the sample than any other." (Doc. 2465-1 at 3 ¶ 9; Doc. 3237 at 3 ¶10.) But because Defendants do not use a random starting point, certain records—those closest to the skip-interval—have a much higher likelihood of being selected while other records—those further from the skip-interval—have a much lower chance of being selected. Cut to its core, this is not random sampling. But the harm depends on whether the pool of eligible prisoners is large or small. If there are under 50 prisoners in a particular pool, like the SMI pools of prisoners (*see* Doc. 3216 at 13-19), there is a skip-interval of less than five, and likely no harm results from failing to use a random starting point.

But when randomly selecting prisoners from the non-SMI populations, the remaining units have hundreds of prisoners. For example, in the Browning Unit the records show a population of approximately 750 non-SMI prisoners. Thus, the skip-interval is usually around 75, which means that the prisoners at 1-70 on the count sheet had virtually no chance of being selected. This is unequivocally not random selection and reflects a critical flaw in Defendants' monitoring process for non-SMI max custody units. Plaintiffs also present evidence why this failure is significant. Because prisoners may be grouped together for varying reasons (*i.e.*, the same prisoners might be in the 1-70 interval month after month), there may be latent biases in how the count sheets are organized. By precluding large groups of prisoners from being selected, this could eliminate necessary review of their files.

In short, Defendants have not utilized a sufficiently random sampling technique. Because Defendants missed the critical and necessary first step of the monitoring process of ensuring random selection of prisoners, the remainder of their arguments regarding the outcome of the monitoring must be viewed with a heavy dose of skepticism.

**Whether an Offer for Out-of-Cell Time Satisfies the Stipulation**

The other challenge to Defendants' compliance numbers is whether prisoners are, in fact, able to take advantage of an offer for out-of-cell time. Plaintiffs amassed evidence that:

- Alternatively, staff members do not actually ask prisoners if they would like exercise, offer exercise in a whisper so that prisoners cannot hear the offers, or offer exercise while prisoners are sleeping (Doc. 3177-2 at 47, Declaration of Maurice Soto at ¶¶ 2-3; *id.* at 51, Declaration of William Hartless ¶¶ 3-4; *id.* at 55, Declaration of Mack Gordnattaz ¶¶ 4, 9; *id.* at 59, Declaration of Kyle Drattlo ¶¶ 3, 8; *id.* at 63, Declaration of Vinson Johnson ¶ 2; *id.* at 67, Declaration of Juan Chavez ¶ 3; *id.* at 71, Declaration of Victor Lizardi ¶ 3; *id.* at 75, Declaration of Jesus Leja ¶ 3; *id.* at 92, Declaration of Jesus Guzman ¶ 4; *id.* at 96, Declaration of Quinton Hollis ¶ 2; and *id.* at 103, Declaration of Miguel Berroteran ¶ 3).
- Prisoners are not provided adequate clothing or footwear and are not able to go outside on early cold mornings (Doc. 3177-2 at 47, Declaration of Maurice Soto at ¶ 4; *id.* at 51, Declaration of William Hartless ¶ 6; *id.* at 55, Declaration of Mack Gordnattaz ¶ 5; *id.* at 59, Declaration of Kyle Drattlo ¶ 3; *id.* at 63, Declaration of Vinson Johnson ¶ 5; *id.* at 71, Declaration of Victor Lizardi ¶ 2; *id.* at 79, Declaration of Yerco Arrvayo ¶ 3; *id.* at 92, Declaration of Jesus Guzman ¶ 5; *id.* at 96, Declaration of Quinton Hollis ¶ 3; and *id.* at 103, Declaration of Miguel Berroteran ¶ 8).
- Because of staffing shortages, prisoners are left in the showers for hours after recreation, which discourages them from taking exercise (Doc. 3177-2 at 51, Declaration of William Hartless ¶ 5; *id.* at 55, Declaration of Mack Gordnattaz ¶ 6; *id.* at 59, Declaration of Kyle Drattlo ¶ 4; *id.* at 63, Declaration of Vinson Johnson ¶ 4; *id.* at 92, Declaration of Jesus Guzman ¶ 7; and *id.* at 103, Declaration of Miguel Berroteran ¶ 10).
- The outside recreation cages contain feces or the smell of urine, which inhibit prisoners from taking exercise (Doc. 3177-2 at 59, Declaration of Kyle Drattlo ¶ 7; and *id.* at 100, Declaration of John Romero ¶ 2).
- Staff shortages result in recreation being frequently cancelled (Doc. 3177-2

at 51, Declaration of William Hartless ¶ 9; *id.* at 55, Declaration of Mack Gordnattaz ¶ 8; *id.* at 59, Declaration of Kyle Drattlo ¶ 3; *id.* at 71, Declaration of Victor Lizardi ¶ 5; *id.* at 75, Declaration of Jesus Leja ¶ 2; *id.* at 79, Declaration of Yerco Arrvayo ¶ 5; and *id.* at 103, Declaration of Miguel Berroteran ¶ 5).

The issue of how to evaluate offers of out-of-cell time does not arise on a clean slate. Judge Duncan previously concluded close custody prisoners were not leaving their cells such that they should be part of the maximum custody subclass. (Docs. 1833, 1918.) When Defendants appealed that ruling, the Ninth Circuit focused on whether prisoners have control over leaving their cells. In the Ninth Circuit's view, "an inmate given an opportunity to participate in out-of-cell activities cannot be considered 'confined' in a cell during that time even if the inmate may theoretically decide not to take advantage of the opportunity." *Parsons v. Ryan*, 912 F.3d 486, 504 (9th Cir. 2019). In other words, provided an inmate is "offered" out-of-cell time, it does not matter if he fails to take advantage of that offer.

While the crux of the Ninth Circuit's decision was that offers to spend out-of-cell time count if prisoners are given the choice, the Court of Appeals did not have occasion to consider the ramifications of unreasonable and unattainable offers. For example, routinely offering outdoor exercise to *sleeping* prisoners during typical sleeping hours does not provide prisoners the type of choice contemplated by the Stipulation and MCPMs. Additionally, prisoners' knowledge that accepting recreation will lead to four hours confined in the shower or that they will not be provided sufficient clothing when it is cold outside, mean the offers are not reasonable.

Defendants try to rebut this evidence by showing that the prisoner declarants also refuse recreation at different times of the day—not just the morning when they are apparently sleeping or when it is too cold out—but this cannot conclusively resolve the myriad disputes of fact. This argument by Defendants was presented in their reply, leaving the prisoner declarants no meaningful opportunity to respond. In sum, the evidence cited

above creates significant factual uncertainty regarding the reasonableness of the offers for prisoners to leave their cells. In fact, Defendants do not deny that they offer recreation when prisoners are sleeping or that there are times when recreation is not offered because of staffing shortages. On this record, the Court cannot conclude Defendants have carried their burden of showing prisoners are receiving sufficiently reasonable offers to comply with the out-of-cell requirements.

For these reasons, the Court will grant in part and deny in part Defendants' motion to terminate. For MCPMs 1-3, 5, 6, and 8, the Court will require the parties to mediate their ongoing disputes with Judge Fine. After narrowing their issues, Plaintiffs may file a renewed motion to enforce the Stipulation.

**IT IS THEREFORE ORDERED** that Defendants' motion to terminate (Doc. 3108) is granted in part and denied in part. It is **GRANTED** as to Maximum Custody Performance Measures 4 and 7 and as to ASPC-Florence-Central Unit (Main Yard) and ASPC-Perryville. The motion is **DENIED** as to MCPMs 1-3, 5, 6, 8 at Eyman-Browning, Eyman-SMU I, and Florence-Kasson.

**IT IS FURTHER ORDERED** that the parties must schedule a mediation session with Judge Fine to narrow their disputes concerning MCPMs 1-3, 5, 6, and 8. The parties must contact Judge Fine's chambers within 14 days to schedule this mediation. After their mediation, Plaintiffs may file a renewed motion to enforce the Stipulation as to the remaining MCPM disputes.

Dated this 16th day of September, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge