**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| Charles L Ryan, et al., | |
| Defendants. | |

The conclusion of Dr. Marc Stern's analysis and the receipt of his report requires determining how this case will proceed. As set out below, the history of Defendants' behavior after a settlement agreement was reached means the parties will be required to select from three options regarding the future course of this case.[1]

---

[1] The history of similar suits in Idaho and California illustrate what the Court is attempting to avoid. In Idaho, inmates filed a class action in 1981 challenging, among other things, the medical care provided to inmates. Those inmates obtained a permanent injunction against state officials. *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558 (D. Idaho 1984); *Balla v. Idaho*, 677 F.3d 910, 911 (9th Cir. 2012). Over the following decades, that injunction was repeatedly modified but Idaho's noncompliance with the injunction led to extensive proceedings, including awards of attorneys' fees and monetary sanctions. *Id.* (attorneys' fees); *Balla v. Idaho State Bd. of Correction*, 119 F. Supp. 3d 1271 (D. Idaho 2015) (sanctions). Idaho recently moved to terminate all remaining prospective relief but that request will not be heard until January 2020. Thus, even if the injunction is lifted sometime in 2020, the injunction will have been in place for close to forty years. In California, inmates filed a lawsuit in 2001 alleging inadequate medical care. *Brown v. Plata*, 563 U.S. 493, 507 (2011). California "stipulated to a remedial injunction" but did not comply with the injunction. *Id.* That prompted the court to appoint a receiver to administer the inmate healthcare system. The receiver reported ongoing problems and in 2009, a three-judge court concluded the only way to remedy the constitutional deficiencies was to enter an inmate release order. *Coleman v. Schwarzenegger*, No. C01-1351 TEH, 2010 WL 99000, at *1 (E.D. Cal. Jan. 12, 2010). In 2013, the Associated Press calculated the litigation had cost California taxpayers $182 million dollars in payments to inmates' attorneys and court-appointed attorneys. If the calculation included California's own legal

# BACKGROUND

In October 2014, the parties, apparently in good faith, entered into a stipulation to settle this litigation. (Doc. 1185). That stipulation required Defendants "comply with the health care performance measures" the parties agreed upon. (Doc. 1185 at 3). The stipulation did not contemplate perfect compliance with each performance measure but it did require that, as of two years after the stipulation's effective date, Defendants would comply with every performance measure at least 85% of the time. Now, approaching the five-year anniversary of the stipulation's acceptance, Defendants are in violation of that agreement because they are not complying with every performance measure 85% of the time. And crucially, the failing performance measures relate to the core aspects of health care delivery: provision of medication, access to specialty care, and ensuring adherence to outside providers' recommendations.

Based on Defendants' continued non-compliance with the stipulation and questions regarding the accuracy of the compliance numbers themselves, the Court appointed Dr. Stern to assess the manner in which Defendants were monitoring their compliance and to assess Defendants' "substantial noncompliance with critical aspects of health care delivery." (Docs. 3079, 3089). On October 2, 2019, Dr. Stern provided his report. His report confirms the Court's long-held belief that pervasive issues have precluded accurate monitoring of certain performance measures and that even the low compliance levels reported in some instances may be worse. The report sets forth recommendations to ensure accurate monitoring of performance measures as well as recommendations that certain performance measures be retired and others be altered to more realistically capture whether required health care is being provided to prisoners. The report also describes in detail how Defendants' behavior creates a significant risk of serious harm to prisoners' health and concluded that additional funding would be necessary to provide required healthcare. The

---

costs, the total would be more than $200 million. *See* https://sacramento.cbslocal.com/2013/02/11/ap-calif-paid-182m-over-last-15-years-for-inmates-attorneys/. While the longevity and cost of the class actions in Idaho and California exceed the present case, the Court will not adopt a wait-and-see approach that would allow this case to linger for anything close to those time periods.

Before delving into the specifics of Dr. Stern's report, it is imperative that the Court determine whether to continue down the path of trying to bring Defendants into compliance or, with the parties' agreement, switch to an alternate path.[2]

## ANALYSIS

Dr. Stern's report raises serious questions whether it is realistic or appropriate to expect that Defendants will perform the obligations they accepted years ago. And given that Defendants' continued failure to comply with crucial performance measures appears to pose a significant risk of serious harm to plaintiffs, the Court cannot delay any longer. (Doc. 3379 at 72). The Court sees three possible options.

### A. Enforcement of Stipulation

The first is for Defendants to reaffirm that they wish to comply in good faith with the stipulation such that the Court should pursue enforcement efforts to bring Defendants into compliance. This option would require the Court go through Dr. Stern's recommendations with immense care and decide which of those recommendations should be adopted and which rejected. This option would also require the Court become much more active in ensuring Defendants perform their obligations. In particular, the Court would have to determine what to do when Defendants do not perform their obligations.

In the past, the Court concluded monetary fines in the form of contempt sanctions might convince Defendants to come into compliance. Defendants did not agree the Court had the power to pursue contempt fines and Defendants are presently appealing that issue. But while Defendants continue to argue contempt fines cannot be imposed, Defendants have never identified another realistic enforcement mechanism the Court should invoke. It is foolish to believe the parties meant for the Court to have no enforcement mechanisms. The stipulation itself states the Court shall have "the power to enforce [the] Stipulation through all remedies provided by law, except that the Court shall not have the authority to

---

[2] On October 7, 2019, Defendants filed a chart that Dr. Stern deleted from his report shortly before the report's submission. Plaintiffs believe it was improper for Defendants to file that chart and request the Court not consider it. The Court will not consider the version of the chart submitted by Defendants. In the event the Court concludes such a chart would be helpful, the Court will direct Dr. Stern to confer with the parties and prepare a complete and accurate version.

order Defendants to construct a new prison or to hire a specific number or type of staff."
(Doc. 1185 at 14-15). Thus, if Defendants wish to continue down the path of attempting
to come into compliance with the stipulation, they will first have to outline the parameters
of their view of "all remedies provided by law." That is, Defendants will be required to
outline each and every enforcement mechanism that is authorized by the stipulation and
general principles of law. Plaintiffs will be required to do the same.

In considering whether to select this option, the parties should carefully review Dr.
Stern's observations that the performance measures poorly reflect the adequacy of care
being provided. In other words, Dr. Stern believes that even if Defendants were complying
with all the performance measures, prisoners would still not be receiving the required level
of care. If compliance with the performance measures would not, in fact, provide the level
of care Defendants are obligated to provide under the Constitution, Defendants would be
susceptible to massive lawsuits based on the actual provision of care.

**B. New Settlement**

The second option is for the parties to negotiate a new settlement, perhaps with the
assistance of Magistrate Judge Fine who is involved in this case and will soon have under
consideration the parties' maximum custody disputes. As noted earlier, Dr. Stern identified
numerous performance measures that should be eliminated and proposed revisions to other
performance measures. Dr. Stern's recommendations appear to be a solid basis on which
the parties could craft a supplemental settlement agreement. Such an agreement would
result in a much more focused effort aimed at ensuring the delivery of required health care.
Importantly, a supplemental agreement could include automatic enforcement mechanisms
in the event of noncompliance.

It is noteworthy that this option offers the immense benefit of possibly resolving the
entire controversy, including all matters before this Court and the Ninth Circuit.[3]

_____

[3] At present, there are five separate appeals pending. Four of them have been consolidated
and those concern Defendants' appeals from the Court's June 2018 Contempt Order; the
order awarding Plaintiffs' attorneys fees (and Plaintiffs' cross-appeal denying certain fees);
and miscellaneous orders denying Defendants' motion to terminate monitoring, requiring
Defendants to allow prisoners to submit Health Needs Requests in multiple ways, requiring
Defendants to implement the Advisory Group's recommendations, and finding that expert

Significantly, the window for resolving this matter by settlement will not be extensive.

## C. Trial

The third and final option is for the Court to hold that Defendants' inability or refusal to come into compliance with all their obligations under the stipulation merits setting aside the stipulation and proceeding to a trial on the merits. Previously, the Court was hesitant to pursue this time consuming, highly expensive, and potentially harsh course. But at a recent oral argument before the Ninth Circuit, Defendants' counsel specifically identified setting aside the stipulation as a plausible path forward. Counsel's remark was made in response to Judge Callahan questioning Defendants' position that the Court lacked the authority to enforce the stipulation through its contempt powers.

> **Judge Callahan**: So the stipulation then just basically means nothing? I mean it's just this is what we agree to and if it doesn't work out then that's it. The court can't do anything?
>
> **Defendants' Counsel**: No. The court definitely has enforcement ability. First of all, if the court concludes that the parties aren't dealing with the . . . complying with the stipulation, it can vacate the stipulation and we can go back and litigate the case.

Thus, Defendants apparently believe the Court should consider setting aside the stipulation. And if Defendants continue to argue the Court lacks meaningful authority to coerce them into complying with the stipulation, setting aside the stipulation likely is the only solution. If this is the preferred course for Defendants, and Plaintiffs do not object, the Court is willing to schedule a trial in the immediate future, which will be costly to the taxpayers of Arizona.

## D. Parties' Preference

The Court does not have a preference between the three options outlined above. The Court notes, however, that Dr. Stern concluded the "severe level of underfunding of health care services . . . is the single most significant barrier to compliance with the [performance measures] in this case." (Doc. 3379 at 94). Whether or not that is accurate, as mentioned

assistance was necessary for certain noncompliant performance measures. Recently, Defendants filed the fifth pending appeal challenging another award of attorneys' fees to Plaintiffs.

in a prior Order, Defendants have spent millions of dollars on the present litigation and Defendants appear determined to spend millions more in the future. (Doc. 3057 at 8-9). Defendants are free, of course, to spend their funds as they wish and believe necessary to protect their interests. But it makes very little sense for Defendants to expend public funds paying attorneys to defend their *undisputed* breaches of the agreed upon stipulation.

Finally, the Court reiterates that Defendants' past behavior of not providing required health care will not be allowed to continue. The Court has spent substantial time and effort trying to get Defendants to do what they agreed to do years ago. Once the Court receives the parties' positions, the Court will take *immediate* steps to enforce Defendants' compliance with the stipulation, send the parties for settlement negotiations, or set the case for trial.

Accordingly,

**IT IS ORDERED** no later than **October 16, 2019**, the parties shall confer and inform the opposing side which of the three options they plan to pursue.

**IT IS FURTHER ORDERED** no later than **October 23, 2019**, each side shall file a statement outlining how that side wishes to proceed. That statement shall address the following:

1. Whether the Court should 1) pursue continued enforcement of the stipulation, 2) send the parties for settlement negotiations, or 3) set aside the stipulation and set the case for trial. The parties' statements must clearly identify which of these three options they believe appropriate.

2. If either side believes continued enforcement of the stipulation is appropriate, that side must set forth each and every coercive tool the Court may use in bringing Defendants into compliance.

…

…

…

…

1    3.  If either side believes the stipulation should be set aside, that side must set forth

2        authority supporting that position as well as the expected length of trial.

3        Dated this 11th day of October, 2019.

       _____
       Honorable Roslyn O. Silver
       Senior United States District Judge