## Index of Exhibits to Declaration of Corene Kendrick

| Exhibit | Description |
|---|---|
| 1 | **UNDER SEAL** – Letters sent by Plaintiffs' counsel to Defendants' counsel between May 17, 2019 and October 30, 2019, regarding class members in need of immediate medical, dental, and/or mental health care |
| 2 | **UNDER SEAL** – May 17, 2019 letter from D. Fathi to T. Bojanowski regarding ASPC-Lewis mental health encounters |
| 3 | **UNDER SEAL** – May 31, 2019 letter from D. Fathi to T. Bojanowski regarding ASPC-Yuma mental health encounters |
| 4 | September 4, 2019 letter from D. Fathi to T. Bojanowski regarding Paragraph 15 of the Stipulation |

# Exhibit 1

# FILED UNDER SEAL



LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

May 17, 2019

**BY ELECTRONIC MAIL ONLY**

Tim Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

Re:     *Parsons v. Ryan*
        **Class Member Suicide**

Dear Tim:

**AMERICAN
CIVIL
LIBERTIES UNION
FOUNDATION**

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

We write regarding the recent suicide of *Parsons* class member ▮▮▮▮▮,
ADC No. ▮▮▮.

Mr. ▮▮▮ died by hanging at ▮▮▮▮▮ on ▮▮▮▮▮.  He was classified
as MH-3A and Seriously Mentally Ill, with a diagnosis of schizophrenia.  The
▮▮▮▮ nurse's note provides no detail beyond "ICS hanging."  Nevertheless,
several facts surrounding Mr. ▮▮▮▮ death indicate violations of the Stipulation in
areas where both the Court and Plaintiffs' counsel have repeatedly warned
Defendants that the health care services provided at Eyman are so inadequate that
they could cause serious harm to incarcerated class members.

First, Mr. ▮▮▮▮ was prescribed Geodon.  However, when he was transferred from
Meadows to SMU I on 4/26/19, his medication did not accompany him.  See
4/30/19 note by MH Midlevel Brett Leifson ("Pt reports has not been administered
Geodon dosing since being on watch as was left at Meadows unit").  A 5/6/19 note
similarly states that "Inmate arrived without medication."  On 5/14/19, Mr. ▮▮▮▮
once again advised mental health staff (Nicole Rasche) that his medication was not
transferred with him.  This is a violation of PM 35 ("All inmate medications (KOP
and DOT) will be transferred with and provided to the inmate or otherwise provided
at the receiving prison without interruption").  There is no indication that this
problem had been addressed at the time of Mr. ▮▮▮▮ suicide.[1]

---

[1] The Court's June 22, 2018 contempt order found Defendants in contempt
for ongoing noncompliance with PM 35 at Eyman.  *See* Doc. 2898 at 18.  Judge
Silver's May 6, 2019 Order to Show Cause includes PM 35 at Eyman, noting that
"performance generally at the Eyman Complex is woefully deficient and reflects a
wholesale breakdown in the medical unit's operations."  *See* Doc. 3235 at 4.  We
recently brought to your attention the widespread shortage of nursing and provider
staff at Eyman (*see* 2/21/19 letter from C. Kendrick to T. Bojanowski), and the brief
and perfunctory encounters with mental health staff at Eyman.  *See* 5/1/19 letter
from D. Fathi to T. Bojanowski.

Second, it appears that Mr. ███ may have been seen while on suicide watch by unlicensed clinicians, in violation of PM 94 ("All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse") and PM 95 ("Only licensed mental health staff may remove a prisoner from a suicide or mental health watch").

On 4/26/19, he was seen while on 10-minute watch by Erin Abel, who is listed in the note as "Psych Associate Licensed." However, the note states that "Pt was informed [this writer] is currently receiving clinical supervision." It is unclear why Ms. Abel would be receiving clinical supervision if she were licensed. A search of the Arizona Board of Psychologist Examiners (https://elicense.az.gov/ARDC_LicenseSearch) does not return anyone with this name as a psychologist, behavior analyst, or temporary licensure. She noted that Mr. ███ "was delayed with responses and mumbling at various points during assessment" and "appeared to be responding to some internal stimuli, potentially AH, although denied when asked during assessment." Despite these signs of active psychosis, she moved him from a 10-minute to a 30-minute watch.

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

On 4/29/19, Mr. ███ was seen while on 30-minute watch by Wesley Luffman, who is identified in the note as "Psych Associate Licensed." However, Mr. Luffman wrote "Pt advised that [this writer] is supervised by a licensed clinician." Again, it is unclear why Mr. Luffman would write that he "is supervised by a licensed clinician" if he himself were a licensed clinician. A search of the Arizona Board of Psychologist Examiners (https://elicense.az.gov/ARDC_LicenseSearch) does not return anyone with this name as a psychologist, behavior analyst, or temporary licensure. At the conclusion of this encounter, Mr. Luffman removed Mr. ███ from watch.

**Please state whether Mr. Luffman and Ms. Abel were licensed mental health clinicians at the time of the encounters set forth above. If so, please provide their license type and number.**

Third, Mr. ███ received the kind of brief, perfunctory mental health encounter that we have previously brought to your attention as a violation of the Stipulation (see 5/1/19 Notice of Substantial Noncompliance). On 4/28/19, Mr. ███ was seen while on 30-minute watch by Lea Ann Hayes, Mental Health RN. Ms. Hayes noted "Pt starring at distant cell wall, does not make eye contact, does not engage in conversation, refuses to answer other questions;" her assessment was "risk for self harm." Despite these troubling observations and her recognition that Mr. ███ was at risk for self-harm, Ms. Hayes spent no more than 5 minutes with him. There is no indication that she notified other mental health staff or took any other action to address this risk.

Finally, in the last weeks of his life Mr. ███ displayed multiple signs that he was at risk of self-harm or suicide, none of which were meaningfully acted upon by mental health staff. In addition to signs of active psychosis and his repeated notifications to mental health staff that he had not received his antipsychotic

medication, on 4/29/19, an LPN noted that Mr. ███ refused to house at Meadows; "IM refusing to transfer to meadows stating that they are planning to "rape."" A prisoner who is facing transfer to a facility where he fears rape or other assault is at high risk of self-harm or suicide.

A 5/9/19 nursing note reads "inmate submitted HNR reporting tele med 4/10 new medication as Haldol caused T.D or neck twitching. Dr. Rastogi said check back in 3 weeks. we are late. please scheduled." The nurse indicated that Mr. ███ was "at risk for alteration in comfort [and] at risk for decompensating."

On 5/15/19, a mental health clerk noted "This Patient was scheduled for Psychiatry line today and was not seen due to being moved another yard. This Patient will be rescheduled for the next Psychiatry line."

Despite these multiple danger signs, mental health staff displayed no awareness of the risk to Mr. ███ Indeed, on 5/14/19 – two days before his suicide – Dr. Tenrreiro concluded "He seems to be at low risk for self-harm or further harming others at this time. No need for urgent MH intervention."

The relevant eOMIS notes are attached as Exhibit 1.

We look forward to your prompt response regarding the licensure status of Ms. Abel and Mr. Luffman. We also request that ADC and Corizon prepare and submit to Plaintiffs' counsel a corrective action plan for this sentinel event.

Very truly yours,

David C. Fathi

Cc:      All counsel

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION



LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

July 3, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

Re:     Parsons v. Ryan
        **Class member in urgent need of adequate mental health care**
        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ASPC-L Rast Max

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Dear Mr. Bojanowski,

Plaintiffs write regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who is a
Seriously Mentally Ill class member in urgent need of adequate mental health
care.  Plaintiffs previously wrote regarding Mr. ▮▮▮▮▮▮ on May 3, 2019,
detailing Mr. ▮▮▮▮▮▮▮ uncontrolled auditory hallucinations, suicidal ideation,
and self-harm incidents.  In that letter, Plaintiffs also expressed concern with
Mr. ▮▮▮▮▮▮▮ removal from Clozaril; we write today to renew our concerns.
Plaintiffs note that Mr. ▮▮▮▮▮▮▮ symptoms persist and that ADC has yet to
effectively treat Mr. ▮▮▮▮▮▮

On April 2, 2019, a Corizon psychiatrist, Dr. Kamal Rastogi, reviewed Mr.
▮▮▮▮▮▮▮s lab results, indicating there were no issues with his blood work and
opining "**This patient should continue Clozaril treatment**."[1]  See eOMIS
note, attached hereto (emphasis added).  However, two days later a nurse
practitioner, Karen Lahr, discontinued Mr. ▮▮▮▮▮'s Clozaril because it is a
non-formulary medication.  See April 4, 2019 eOMIS note, attached hereto.
This action by the nurse practitioner directly conflicts with Dr. Rastogi's
assessment a mere two days prior.  It is inappropriate for a nurse practitioner to
override the medical judgment of a psychiatrist—and it is particularly egregious
when done for a non-medical reason.

Since ADC discontinued Mr. ▮▮▮▮▮▮s Clozaril treatment, his symptoms
have persisted and worsened.  Mr. ▮▮▮▮▮▮ has repeatedly raised the issue of
his medication with ADC staff, pleading to be put back on Clozaril to no avail.
On June 20, 2019, Mr. ▮▮▮▮▮▮ requested to be put back on Clozaril, stating
that "he has been having anger issues and getting into a lot of trouble . . . [and

---

[1] Mr. ▮▮▮▮▮ also raised the issue of his blood work when advocating for
himself to be placed back on Clozaril, stating that he did not understand why
Clozaril was discontinued given that his blood work was normal.  *See* April 17,
2019 eOMIS note, attached hereto.

that the] voices and paranoia are getting worse." *See* eOMIS note, attached
hereto.  On June 15, 2019, an eOMIS note, attached hereto, states:

> Pt was seen in a confidential setting for a MH f/u requested by
> security.  Pt informed writer he has not been the same since
> being taken off his antipsychotic medication.  Pt stated he should
> not have been taken off of his medication because it keeps him
> stable and helps him to regulate his behavior.  Pt reported he has
> lost his job and received several tickets due to the increase in his
> voices which make him irritable, angry, and paranoid which
> causes him to act out. . . . Pt requested to see the provider to be
> placed back on Clozapine.[2]  Pt stated his anxiety and depression
> are high and endorsed both at 10/10. . . . Pt reported that
> everyone is out to get him.  Pt reported his appetite and sleep are
> also off due to not having the antipsychotic.

Plaintiffs are concerned at Defendants' deliberate indifference to Mr.
████████ mental health needs, as evidenced by a nurse practitioner overriding
the medical judgment of a psychiatrist to remove Mr. ████████ from an
effective medication for a non-medical reason.  Defendants' deliberate
indifference is further evidenced by the fact that Mr. ████████ repeated pleas
to be placed back on Clozaril fall on deaf ears.

In evaluating Mr. ████████ mental health records for this letter, Plaintiffs
requested our mental health expert, Dr. Pablo Stewart, review Mr. ████████
medical record and opine on the adequacy of his care.  Dr. Stewart's findings
are as follows:

1) Mr. ████████ suffers from a very severe relapsing mood disorder
   associated with auditory hallucinations, which at times command him to
   hurt himself.
2) His symptoms have not responded to several adequate trials of
   antipsychotic and antidepressant medications.
3) His symptoms have only responded to treatment with Wellbutrin and
   Clozaril.
4) Clozaril treatment requires episodic blood work to monitor a patient's
   white blood cell count.
5) He was being treated with both Wellbutrin and Clozaril on April 2,
   2019, when he had routine blood work obtained.
6) The results of this blood work were normal.  In particular, Mr.
   ████████ white blood cell count was 5.55 (normal range 3.66-10.60).
   In addition, a secondary test to measure the absolute percentage was
   69.2 (normal range 34.9-75.3).

---

[2] Clozapine is another name for Clozaril.

7) A progress note dated April 2, 2019, reported his white blood cell count as "unremarkable."

8) Without any medical explanation, his Clozaril was discontinued on April 4, 2019.

9) It is my firm opinion that Mr. ████████ should immediately be restarted on his Clozaril treatment.

Dr. Stewart agrees with Dr. Rastogi that Mr. ████████ should continue on Clozaril. Plaintiffs are concerned that without being provided this effective medication, Mr. ████████ will further decompensate. Plaintiffs are concerned that the severity and lethality of his self-harm incidents will increase if he continues to be denied this vital medication.

**Plaintiffs request that Mr. ████████ be placed back on Clozaril. We also request that ADC investigate NP Karen Lahr's inappropriate override of Dr. Rastogi's medical judgment and report the results of that investigation to Plaintiffs. Furthermore, Plaintiffs request that Defendants ensure the medical judgments of psychiatrists are not overridden by lower-level mental health staff, especially for non-medical reasons.**

Respectfully,

**/s/Ryan M. Kendall**

Enclosure

CC:   All counsel

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



July 8, 2019

**BY ELECTRONIC MAIL ONLY**

Tim Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
TBojanowski@strucklove.com

> Re:   ***Parsons v. Ryan***
> **Suicide by hanging of** ████████████████

AMERICAN
CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS

Dear Tim:

We write regarding the ████████ suicide by hanging of ████████████ ████████████████.

Ms. ████████ was classified as MH-3B, with diagnoses including chronic recurrent major depressive disorder and bipolar disorder.  On Friday, June 28, she was so agitated that a CO brought her to Santa Cruz medical hub after hours, and asked that she be allowed to see the psych associate (PA).  Although the medical officer inexplicably stated that the PA was unavailable, the officer insisted on taking Ms. ████████ to see the PA, saying "she needs to talk to somebody."

PA Samantha Francis noted that Ms. ████████ was "visibly agitated," saying "I can't cope anymore I lost someone in April and I don't know what to do."  Ms. ████████ reported compliance with her medications but said they were not helping her; she also reported a history of self-harm.  Ms. Francis "educated [Ms. ████████ on further coping skills such as utilizing rubber bands and ice cubes."  It is not apparent how rubber bands and ice cubes were expected to prevent Ms. ████████ from harming or killing herself.

On Monday, July 1, PA Francis again saw Ms. ████████  PA Francis noted in eOMIS that Ms. ████████ was "stable" with "no distress noted," and "no evidence of [suicidal ideation]." ████████████████████ hanged herself. [1]

---

[1] Ms. Francis is identified in the June 28 and July 1 eOMIS notes as a "Psych Associate Licensed."  In a November 29, 2018 note in the record of ████████ ████████████, Ms. Francis is similarly identified in the heading as a "Psych Associate Licensed," but she writes in the body of that note that "IM was informed this PA is unlicensed."  *See* Exhibit 1.

Ms. ██████ s suicide follows the ████ 2019 suicide of ██████ ██████████. Mr. ████ hanged himself two days after Dr. Tenrreiro concluded "He seems to be at low risk for self-harm or further harming others at this time. No need for urgent MH intervention." *See* my letter of May 17, 2019.

There are other tragic examples of such poor judgment by ADC clinicians. On ████ ██████████████████████, hanged himself just hours after PA Amos Abplanalp determined that he "did not present as [danger to self]" and removed him from suicide watch. *See* Doc. 2091, ¶ 6. And on ██████████ ██████████████████████ hanged herself four days after PA Naimah Hassan -- in a three-minute encounter – found her to be "stable and with euthymic mood" and removed her from suicide watch.

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

It is by now painfully apparent that ADC mental health staff are unable to determine with any reliability when a patient is at risk of suicide. This inability has already contributed to the deaths of the four patients mentioned above. We request that ADC and Centurion urgently prepare and submit to Plaintiffs' counsel a plan to remedy this serious deficiency in ADC's suicide prevention program.

Very truly yours,

David C. Fathi

Cc:     All counsel

2

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



July 29, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

Re:   ***Parsons v. Ryan***
       **Suicide of** ██████████████████████

Dear Mr. Bojanowski,

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW\**

*\*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS*

We write regarding the ████████ suicide of ████████████████
████████████.  Our review of Mr. ████████ medical records shows
several serious lapses in care, some of which may have contributed to his
suicide.

At the time of his suicide, Mr. ████ was classified MH-3B, with a diagnosis
of adjustment disorder with depressed mood.  Mr. ████ also had several
serious medical problems, including Stage IV throat cancer and Hepatitis C (he
was classified as M-4), which put him at increased risk of suicide.  *See* Doc.
2091 at 4 (Decl. of Pablo Stewart, M.D.) (stating that "[c]hronic medical
problems are a known risk factor for suicide").

Even though Mr. ████ experienced severe, chronic pain, his pain medication
was discontinued because staff claimed he was pocketing his medication.  *See*
June 18, 2019 HNR, attached hereto.  The abrupt and complete discontinuation
of Mr. ████'s pain medication was highly inappropriate and may have
contributed to his suicide.  Even assuming that Mr. ████ was pocketing his
medication, Defendants had the obvious alternative of providing his medication
in liquid form, but chose not to do so, perhaps because of the chronic shortage
of nursing staff and/or due to the wholly inadequate formulary used by Corizon.
*See* Doc. 2496 at ¶ 17 (Decl. of Todd Wilcox, M.D., characterizing provider's
choice to use wholly inadequate pain medication for cancer treatment as
"willful ignorance of the lack of efficacy for their patients in favor of adhering
to an unreasonable formulary and institutional pressures").  Instead, Defendants
completely discontinued Mr. ████ s pain medication, leaving him to suffer.
This is not the first time Defendants have failed to provide medically
appropriate pain control for a cancer patient.  *See id.* at ¶ 5 (describing Walter
Jordan's "excruciating needless pain from cancer that was not appropriately
managed in the months prior to his death").

On July 3, 2019, and July 6, 2019, Mr. ████ submitted HNRs requesting to
speak with mental health and start back on medication.  *See* July 3, 2019 HNR,

attached hereto ("I'm requesting to speak to someone regarding possibly starting back on meds to help on problems I'm having in my life and health (<u>mentally</u>)"); July 6, 2019 HNR, attached hereto ("I'm requesting to see/speak to the psychiatrist and/or psychologist seeking some help with problems I'm having at this time of life for me").

On July 10, 2018, Mr. ███ had an unscheduled mental health sick call encounter.  During this encounter, the mental health clinician noted that Mr. ███ had Stage IV throat cancer, but that his pain medication had been removed by the medical provider.  The clinician wrote:

> "I had meds when I came in but they don't do them here.  I have racing thoughts that keep me up.  No, I really don't need counseling about my cancer, I am dealing with it.  I will not release before the cancer gets me."  Pt. denied SI/HI/AVH/low mood.  His appearance was subdued, psychomotor and speech slowed.

*See* July 10, 2019, MH – Sick Call Unscheduled note, attached hereto.

On July 16, 2019, Mr. ███ was seen by video for a telepsychiatry appointment with MH Midlevel Karen Lahr, a nurse practitioner.  During that encounter, Mr. ███ requested to be put back on his previously discontinued pain medication.  *See* eOMIS note, attached hereto ("I want Elavil.").  During that encounter, Ms. Lahr noted that Mr. ███ had previously been on morphine, which was discontinued, and then placed on Elavil, which was also discontinued.

Ms. Lahr also noted that Mr. ███ reported depression and anxiety.  She noted his mood to be dysphoric, and found him to exhibit poor judgment and poor impulse control.  Despite these multiple warning signs, Ms. Lahr judged Mr. ███ to be at "minimal" risk of self-harm.  She prescribed venlafaxine (Effexor) and wrote that Mr. ███ should return in three months.  Mr. ███ hanged himself ██ days later.

Also during the July 16, 2019 telepsychiatry encounter, Ms. Lahr noted that Mr. ███ was hypotensive and ordered that "B/P and pulse should be taken daily until IM remains normotensive."  *Id.*  Between July 16 and his suicide ███, the ordered daily blood pressure and pulse checks were done only once, on July 20.  The failure of nursing staff to comply with this order is a serious lapse in care.[1]

---

[1] A July 17 note by Rebecca Rynders, Mental Health RN, states "entry of treatment order per Dr. [sic] Lahr only; no contact with pt at this time."  Ms. Lahr is not a physician or doctoral-level psychologist; she is a nurse practitioner.

* * *

On July 8, 2019, we wrote to you about four *Parsons* class members who killed themselves shortly after ADC mental health staff concluded that they posed little or no risk of self-harm.  Mr. ████'s suicide ██ days after NP Lahr found him to be at "minimal" risk of self-harm adds to the tragic death toll from the inability of ADC mental health staff to determine with any reliability when a patient is at risk of suicide.

The death of Mr. ████ is at least the sixth suicide of an ADC prisoner in 2019; if present trends continue, Defendants are on track for a record number of suicides this calendar year.  ADC's failure to implement an effective suicide prevention program poses a substantial risk of serious harm to *Parsons* class members, and creates significant liability for ADC.  We reiterate our request, previously stated in our letter of July 8, 2019, that ADC and Centurion urgently prepare and submit to Plaintiffs' counsel a plan to implement an effective suicide prevention program.

Very truly yours,

David C. Fathi

Enclosures

CC:     All counsel

**AMERICAN CIVIL
LIBERTIES UNION FOUNDATION**



## PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

August 1, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:      *Parsons v. Ryan*, 2:12-CV-00601
         Class Member in Need of Medical Care
         ████████████████████, Eyman - Browning

Dear Mr. Bojanowski:

We write regarding ████████ a 23-year-old class member who is in need of urgent medical attention.

On March 3, 2019, Mr. █████ submitted a Health Needs Request (HNR) stating,

> something is completely wrong with my back and there is a huge bump on it that hurts extremely. please see me ASAP.

The March 6, 2019, HNR response states, "nurse line for assessment," in violation of Performance Measure 37. On March 7, 2019, Mr. █████ saw the nurse who referred Mr. █████ to the provider and noted,

> Pt. has palpable mass on the lower back  that pt. says he found recently and c/o of pain when palpated mas is movable and soft.

On March 23, Mr. █████ submitted another HNR regarding his back pain, which was not received until two days later, on March 25, 2019, in violation of Performance Measure 36. The March 31, 2019, HNR response states, "You were seen by the provider on 3/26/19 re back issue." Indeed, Mr. █████ saw the provider on March 26, 2019, in violation of Performance Measure 39. At that time, the provider noted,

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah



Mr. Timothy Bojanowski

Re: ███████████

July 31, 2019

Page 2

Back: Normal curvature, no spinal point tenderness, no SI joint tenderness, LIMITED ROM, symmetric. TENDERNESS NOTED TO LUMP NOTED ON RIGHT PARASPINAL AREA NEAR LOWER THORACIC SPINE.

The provider noted the plan of care as follows:

1. IBUPROFEN 600MG PO BID PRN
2. THROACIC X-RAY, 2-VIEW
3. HEP EXERCISES FOR BACK GIVEN AND DISCUSSED WITH PATIENT; INSTRUCTED TO NOT STRT FOR AT LEAST 1 WEEK AND WHEN PAIN IS UNDER CONTROL
4. PATIENT INSTRUCTED TO NO LIFT HEAVY OBJECT/ BEND FORWARD FOR 1 WEEK
5. PROVIDER FOLLOW UP AS NEEDED

The provider's order for the X-ray was cancelled the following day with no note indicating the reason for the cancellation, as seen below.



The electronic medical record includes a refusal form for the X-ray that is dated March 27, 2019, and is only signed by staff and not by Mr. ███████ as seen on the following page.

| SERVICE BEING REFUSED | RELATED TO DIAGNOSIS OR PROCEDURE |
|---|---|
| ☐ Medication* | Thoracic Spine X-Ray |
| ☐ Diet** | |
| ☐ Lab | |
| ☑ Imaging Study | |
| ☐ Medical treatment/assessment | |
| ☐ Mental Health treatment/assessment | |
| ☐ Dental treatment/assessment | |
| ☐ Other (Describe) | |

I have been informed and understand that the consequences of my refusal, if any, could lead to increased pain, worsening of my condition, or other consequences, up to and including death. I assume full responsibility for the risks and consequences of this refusal and release the State of Arizona, the Arizona Department of Corrections, and all of its employees from any and all liability for these risks and consequences.

I also understand that this refusal does not prevent me from seeking the above treatment of services in the future.

| INMATE SIGNATURE | INITIALS | TIME | DATE (mm/dd/yyyy) |
|---|---|---|---|
| HEALTH STAFF NAME (Last, First M.I.) (Please print/Stamp) | TITLE | | |
| SIGNATURE | TIME | | DATE (mm/dd/yyyy) |

I hereby acknowledge that the above-named inmate refused the treatment/assessment/medication checked above in my presence and refused to sign this form.

| HEALTH STAFF NAME (Last, First M.I.) (Please print/Stamp) Robert Brule | TITLE Rad Tech | |
|---|---|---|
| SIGNATURE | TIME 0650 | DATE (mm/dd/yyyy) 3/27/19 |
| WITNESS NAME (Last, First M.I.) (Please print/Stamp) Archer | TIME 0650 | DATE (mm/dd/yyyy) 3-27-19 |
| SIGNATURE (Health or Custody staff) | TIME 0650 | DATE (mm/dd/yyyy) 3-27-19 |

*AFTER THREE CONSECUTIVE DOSES OF ANY SPECIFIC MEDICATION ARE REFUSED, QHCP EDUCATION IS REQUIRED.
** AFTER A PRESCRIBED DIET IS REFUSED FOR THREE CONSECUTIVE DAYS, QHCP EDUCATION IS REQUIRED.

QHCP: Physicians, Physician Assistants, Dentists, Nurses, Nurse Practitioners, Mental Health Professionals, and others, who by virtue of their education, credentials/license, and experience are permitted by law to evaluate and care for patients.

SECTION 3, CONSENTS/REFUSALS

1101-4Draft
10/29/18

Mr. Timothy Bojanowski

Re: ███████████

July 31, 2019

Page 4

On March 29, 2019, Mr. ███████ submitted an HNR requesting the ordered X-ray. The HNR was received two days later, on March 31, 2019, in violation of Performance Measure 36. The April 8, 2019, HNR response states, "scheduled on nurse line," in violation of Performance Measure 37. Mr. ███████ did not see a nurse in response to this HNR until April 26, 2019, when the nurse noted,

> Patient wants to understand why nothing has happen with his back follow up. Patient advised that he was to have an xray done on 3/27/2019 and he refused the xray patient states he did not refuse and states that an officer said there was an ICS and he would come back and never came back. Patient denies refusing. [...]Patient becomes visibly upset and shaking his head that he didn't refuse and later calms down.

The nurse referred Mr. ███████ to the provider. We note that prior to this encounter, two ICS were activated because of Mr. ███████ back pain, once on April 11 and again on April 12. On April 11, the nurse noted, "Repositions self slowly using all extremities, needs assist x1 to stand, ambulate due to pain," and noted the plan to include "to see provider as soon as possible." On April 25, 2019, Mr. ███████ submitted an HNR regarding his back pain, stating,

> "I've been putting in to get my back looked at and I haven't been seen at all. Weeks ago I was suppose to be seen by the CO said an ICS happen and he would be back, he never came back. I'm begging and pleading to please be seen my back hurts bad."

Mr. ███████ finally saw a provider on May 2, 2019, at which time the provider noted,

> Back: Normal curvature, no spinal point tenderness, no SI joint tenderness, LIMITED ROM, symmetric. TENDERNESS NOTED TO LUMP NOTED ON RIGHT PARASPINAL AREA NEAR LOWER THORACIC SPINE. LUMP PALPATED ON THORACIC SPINE AS WELL; THIS WAS NOT NOTED ON PREVIOUS EXAM. Skin: Warm, dry, and intact, no rashes or lesions. LUMP NOTED ABOVE WITHOUT ERYTHEMA, EDEMA, TENDER TO PALAPATION.

The provider noted the plan of care to include:

> 1. X-RAY L-SPINE
> 2. X-RAY T-SPINE
> 3. NAPROXEN 500MG PO BID PRN
> 4. PROVIDER FOLLOW UP AS NEEDED

Mr. Timothy Bojanowski

Re: 

July 31, 2019

Page 5

On May 5, 2019, Mr. ███████ received the ordered X-rays, which were normal. On May 20, 2019, Mr. ███████ again saw a provider whose observations were nearly identical to those noted during the previous exam:

> Back: Normal curvature, no spinal point tenderness, no SI joint tenderness, LIMITED ROM, symmetric. TENDERNESS NOTED TO LUMP NOTED ON RIGHT PARASPINAL AREA NEAR LOWER THORACIC SPINE. LUMP PALPATED ON THORACIC SPINE AS WELL; THIS WAS NOT NOTED ON PREVIOUS EXAM. Skin: Warm, dry, and intact, no rashes or lesions. LUMP NOTED ABOVE WITHOUT ERYTHEMA, EDEMA, OR TENDERNESS TO PALAPATION.

The provider noted the plan of care to include, "1 .CONTINUE CURRENT MEDICAL MANAGEMENT 2. PROVIDER FOLLOW UP AS NEEDED"

On June 16, 2019, Mr. ███████ submitted an HNR regarding his back pain, stating it was urgent. He was seen the following day for a sick call encounter by a psych associate. Mr. ███████ reported his pain to be "100 out of 10." The psych associate noted,

> IM BACK EXAMINED TO REVEAL LARGE INFLAMMED AREA TO RIGHT SIDE OF THE BACK. PAIN TO PALPATION, WARMTH AND REDNESS NOTED TO BACK . IM ALSO HAS SECOND LUMP TO BACK NOTED AT THE LEFT SIDE BASE OF BACK. SLIGHT DISCOLORATION NOTED TO BACK ." plan: "REFER TO PROVIDER FOR FURTHER CARE AND EVALUATION

The associate urgently referred Mr. ███████ to the provider who in turn noted, "WILL SEE ON LINE ASAP FOR FURTHER WORK UP AND DX."

However, it does not appear that a provider saw Mr. ███████ until June 24, 2019, after an ICS was again activated, in violation of Performance Measure 40. During that ICS, the nurse noted,

> ICS called at 1023 due to pt non-responsive, falling off toilet, when pt arrived to HU, responsive and communicating pt reports severe pain 10 on movement, and 2 when lying on stomach, since 11/2018, pt reports been seen by medical several times for issue with no dx, pt given Naproxen for pain with little relief pt denies issues with BM, urination, nausea/vomiting, SOB

//

Mr. Timothy Bojanowski
Re: ███████
July 31, 2019
Page 6

Mr. ███████ saw a medical doctor the same day who noted,

> HE APPARENTLY HAS LUMPS SINCE NOV. OF LAST YEAR.   THE
> PATIENT STATES THAT HE HAS HAD LUMPS PRESENT ON HIS BACK
> BUT THEY HAVE GROWN IN SIZE AND HAVE BECOME PAINFUL.  THE
> PATIENT STATES HE IS HAVING DIFFICULTY IN GETTING OUT OF HIS
> BED DUE TO THE PAIN THROUGHOUT HIS BACK AND HE CANNOT
> SLEEP ON HIS BACK. HE HAS NOT HAD N/V.  HE IS UNABLE TO
> DETERMINE IF HE HAS HAD A FEVER." O: BACK   MULTIPLE FIRM
> LUMP LIKE SWELLINGS THAT ARE TENDER AND DIFFICULT TO
> EXAMINE DUE TO PAIN.   (PATIENT WILL NOT ALLOW)   THERE IS
> OTHER SWELLING THAT EXTENDS FROM THE LUMPS.   THERE IS
> ERYTHEMA AND WARMTH OVER THESE AREAS.   LEFT LOWER BACK
> LUMP HAS A RASH THAT APPEARS EXCORIATED

The provider noted the plan of care to include "LABS   DP2, ESR, CRP, LYME TITER, COCCI
TITER, ANA DS DNA, CH50." Two days later, on June 26, 2019 an ICS was again activated
regarding Mr. ███████ back pain:

> Inmate brought to HU, states he woke up with sheets wet. Inmate has
> draining pustule on L lumbar area. Report given to NP Avant Ortiz,
> orders for wound culture and inmate to stay at HU for assessment by
> NP Ortiz. [...] pt arrived to HU on gurney with inability to move lower
> limbs due to severe back pain [...] with help from security pt was
> slowly moved to a standing position, grimacing and  intense breathing
> heard from pt. pt ask to walk to ER gurney, pt unable to move lower
> limbs, gurney moved to pt, security helped low pt to ER gurney.
> localized swelling visible to (1) thoracic are R. of spine, (2) below (1)
> R. of spine, (3) gluteal (red) L. of spine. L. Gluteal higher than R.
> Gluteal, not symmetrical. no issues with upper body, FROM to arms,
> neck, head. unable to move lower limbs, ADLS impaired.

The same day, Mr. ███████ saw the provider who noted,

> Back: Normal curvature, no spinal point tenderness, no SI joint
> tenderness, LIMITED ROM, symmetric. TENDERNESS, erythemaotus
> lump with yellow purulent drainage NOTED ON RIGHT PARASPINAL
> AREA NEAR LOWER THORACIC SPINE. LUMP PALPATED ON THORACIC
> SPINE AS WELL Skin: Warm, dry, and intact, no rashes or lesions.
> LUMP NOTED ABOVE WITHOUT ERYTHEMA, EDEMA, OR TENDERNESS
> TO PALAPATION.

The provider noted the plan of care to include:

1. rocephin 1 gram im x 1 dose now
2. bactrim 1 tab po bid x 10 days
3. other labs as ordered per Dr. Stewart ASAP
4. provider follow up in 1 week

Although not included in the provider's plan of care or noted in the medical record (in violation of Performance Measure 5), it appears that Mr. ███████ was sent to the hospital that day, where he underwent surgery for multiple abscesses on his back, and was diagnosed with disseminated coccidioidomycosis, osteomyelitis, and acute kidney failure.

On June 30, 2019 — while Mr. ███████ was in the hospital — a mental health clinician improperly noted that she observed Mr. ███████ in his cell:

> **ADOC1103-52 (MH Tech/Aide Note)**
>
> Subjective Notes:
>
> Patient was seen in 3H at approximately 0652 for the purpose of MH health and welfare checks. Patient was asleep upon arrival but showed signs of life by responding when his name was called out. No MH concerns.
>
> Rev #: 684

The same clinician later noted that the note was made in error, and Mr. ███████ was not, in fact, in his cell at the time of the welfare check:

> **Prior Addendums**
>
> 07/08/2019 10:32:13 Zion, Victoria
> CHARTING ERROR
> Patient was not in his cell in 3H at approximately 0652 for the purpose of MH health and welfare checks.

//

Mr. Timothy Bojanowski

Re: █████████████

July 31, 2019

Page 8

Mr. ██████ returned to the prison on July 13, 2019, and saw the provider two days later, at which time the provider ordered twice-daily wound care, which does not appear to have occurred, as seen below.



| Category*: | Treatments | | |
| Type*: | Wound Care | | |
| Frequency*: | Twice a day | for*: | 90 days |
| Count*: | 180 | Sequence Number: | 01 |
| Approximate Begin Date: | 07/15/2019 | Approximate End Date: | 10/13/2019 |
| Refer to Staff: | Unknown | | |
| Status: | Active | As of Date: | 07/15/2019   Status History |

**Specify Comments**

1. CLEANSE WITH NORMAL SALINE 2. APPLY WET-TO-DRY DRESSING 3. COVER WITH DRY STERILE GAUZE 4. TAPE WITH PAPER TAPE PREFERABLY

| Treatment Date | Treatment Time | Treatment By | Comments | Status |
|---|---|---|---|---|
| 07/27/2019 | 15:46:55 | Wischhusen, Daphnie | | Treatment Performed |
| 07/27/2019 | 09:16:16 | Wischhusen, Daphnie | | Treatment Performed |
| 07/26/2019 | 06:54:38 | Wischhusen, Daphnie | | Treatment Performed |
| 07/25/2019 | 17:32:13 | Wischhusen, Daphnie | | Treatment Performed |
| 07/25/2019 | 10:44:10 | Wischhusen, Daphnie | | Treatment Performed |
| 07/20/2019 | 15:19:56 | Wischhusen, Daphnie | | Treatment Performed |
| 07/20/2019 | 07:34:26 | Wischhusen, Daphnie | Wounds are beefy red in color, scant amount of drainage, not actively bleeding,  no sign of infection noted at this time | Treatment Performed |
| 07/19/2019 | 16:49:06 | Wischhusen, Daphnie | | Treatment Performed |
| 07/19/2019 | 16:46:52 | Wischhusen, Daphnie | | Treatment Performed |
| 07/17/2019 | 07:21:05 | Jones, Lin, RN | | Treatment Performed |
| 07/15/2019 | 22:30:00 | Quintana, Rosaura, LPN | | Treatment Performed |

On July 22, 2019, the provider submitted a routine request for general surgery, noting,

FOLLOW UP WITH DR. TAHIR (GENERAL SURGERY) IN 2 WEEKS [...] PRESENTS AS RFO FROM GENERAL SURGERY FOR EVALUATION OF POST-SURGICAL OPEN WOUNDS ON BACK. PATIENT STATES DRESSINGS WERE CHENED THIS MORNING BY SURGERY AND WAS INFORMED BY SURGEON TO INFORM NURSING TO INCREASE PACKING IN LEFT LOWER BACK INCISION. SURGEON NOTED "GOOD GRANULATION TISSUE. OVERALL SIZE HAS IMPROVED/DRESSED SINCE SEEN IN HOSPITAL

//

Mr. Timothy Bojanowski
Re: ████████████████
July 31, 2019
Page 9

Considering the recommendation that the follow-up appointment occur by July 27, 2019, the provider should have submitted the consult urgently. The status of the consult remains "Referred to UM Team for Review," as seen below.

| Consultation Request (1 - 3 of 3) | | | | | |
|---|---|---|---|---|---|
| **Request Date** | **Request Type** | **Service Type** | **Procedure Requested** | **Priority** | **Request Status** |
| 07/22/2019 | Off-site Clinic | General Surgery | | Routine | Referred to UM Team for Review |
| 07/15/2019 | Off-site Clinic | Infectious Disease Specialty | | Urgent | Consult Completed -Results Received |
| 07/15/2019 | Off-site Clinic | General Surgery | | Urgent | Consult Completed- Practitioner Reviewed |

We request that Mr. ██████ immediately see the surgeon for the follow-up appointment. We request that Mr. ██████ receive wound care as ordered. Thank you for your prompt attention to this matter.

Sincerely,

Amber Norris
Investigator

Thomas Nosewicz
Staff Attorney

cc:   Mr. ██████

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



August 8, 2019

**BY ELECTRONIC MAIL ONLY**

Tim Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

    Re: ***Parsons v. Ryan***
       **Patient attempting suicide while on constant watch**
       ████████████████████ **ASPC-Lewis Rast MHW**

Dear Tim:

We write regarding Mr. ██████ a patient who was able to secrete a week's worth of watch-swallow medication and attempt suicide by overdose, all while ostensibly on a constant watch.  Mr. ██████ also has serious medical needs for which he is not receiving appropriate care, which aggravates his suicidal tendencies.

**Attempted suicide while on constant watch**

Mr. ██████ is classified MH-3B.  He has frequently reported command hallucinations telling him to harm himself, and ADC mental health staff have concluded that his condition is aggravated by the extreme isolation to which ADC has subjected him.  *See* July 3, 2019 note by John Keck, MH Midlevel ("I feel that his symptoms are the result of sensory deprivation and will improve once the pt is moved back to previous unit").

On July 2, 2019, while Mr. ██████ was housed in the Stiner CDU, Psych Associate Angelina Rose concluded that he "appeared future oriented, to have support on the yard, and was able to identify positive coping skills," and discontinued his 30-minute watch.  The following day, on July 3, he attempted suicide by hanging.  He was transferred to Rast MHW, where he has remained on watch for more than a month.  On July 19, he was noted to be banging his head on the cell door, and was placed on a constant watch.

On August 2, while on a constant watch, Mr. ██████ attempted suicide by overdose, swallowing "7 days worth of horded [sic] Cogentin, olanzapine, and fluoxetine pills."  The note indicates that "Security officers deny any visualization of actual pills or ingestion of pills."

It is extremely concerning that Mr. ██████ was able to hoard seven days' worth of medications while on constant watch, when those medications were prescribed as

watch-swallow.  It is equally concerning that Mr. ███████ was able to attempt suicide while on constant watch, and that this suicide attempt was missed by the observing officers.

This is not the first time a *Parsons* class member has been able to attempt suicide while on a constant watch.  *See* Fischer 051 (attached) (Psych Associate Angela Fischer reports that "just last week we had an inmate … hang himself while he was on constant watch").  We are particularly troubled by the signs we saw posted in Rast MHW last week, indicating that a "constant" watch is in fact not constant at all, but can be satisfied by observing the patient once every four minutes.

These serious flaws in ADC's medication delivery and suicide prevention programs create a significant risk of serious harm to *Parsons* class members, and a significant risk of liability for ADC.

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

The follow-up to Mr. ███████ August 2 suicide attempt was also deficient.  Despite his suicide attempt the previous day, and his statement that he was "still feeling suicidal," his August 3 contact with mental health staff lasted a mere 5 minutes.  Similarly, on August 6, Mr. ██████ stated that he continued to have suicidal ideation; once again, his contact with mental health staff lasted only 5 minutes.  In addition, this contact was conducted by Russell Prause, "Psych Associate Unlicensed," in violation of PM 94 ("All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse") (see attached notes).[1]

## Denial of Adequate Care for Ostomy

Mr. ██████ uses an ostomy bag, a condition documented in his medical record.  When we interviewed him in November 2018 and again when we interviewed him in Rast MHW on July 30, 2019, he informed us he is not receiving the correct size ostomy bag, which results in the bag falling off.  On July 30 he reported that this has happened numerous times.  *See, e.g.*, 7/27/19 note ("IM was angry for not being able to replace his colostomy bag"); 2/28/19 note ("Supply CNA spoke with the FHA about the supplies for the ostomy being late").  I personally observed Mr. ██████'s bag and confirmed that it was not the correct size.  ADC's failure to provide him adequate ostomy supplies results in an unpleasant smell; other prisoners harass Mr. ██████ because of this, which aggravates his suicidal ideation.

On July 30, in your presence, Corene Kendrick brought this problem to the attention of Centurion Regional Medical Director Wendy Orm, who replied, "I can't do

---

[1] eOMIS contains two apparently identical notes by Mr. Prause on August 6, one at 9:12 and one at 13:07.

anything about that right now."  You asked Centurion to take note of this problem, and Centurion's counsel Sarah Barnes appeared to make a written note.  However, as the attached screenshot shows, there is no indication that Mr. ███████ has been provided the needed ostomy supplies.

We urge that Mr. ██████ be provided adequate ostomy supplies without further delay.  We further urge that Mr. ██████ and all other patients on watch, are adequately monitored so that they are not able to attempt suicide.  Finally, because Mr. ██████ has now been on watch at Rast MHW for more than a month, and because he manifestly cannot be kept safe in that setting – even while on constant watch – we ask that he be immediately transferred to the mental health facility at ASPC-Phoenix.

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Very truly yours,

David C. Fathi

Enclosures

Cc:     All counsel

3



LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

August 15, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

Re:     Parsons v. Ryan
        **Class member in urgent need of adequate mental health care**
        ██████████████████████████  **ASPC-L Rast MHW**

Dear Mr. Bojanowski,

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Plaintiffs write with concern regarding ██████████████████ who is
a class member in urgent need of adequate mental health care.  Mr. ████
carries a mental health score of MH3A and is designated as seriously mentally
ill (SMI).  Mr. ██████ who is grievously ill, has been on mental health watch
regularly for more than a year and nearly continuously since 03/17/19    nearly
five months ago.

Mr. ██████ experiences severe suicidal ideation, regularly engages in self-
harm, and has documented paranoid delusions.  On 08/12/19, Mr. ██████ had
two ICS responses for self-harm and suicide attempts.  *See* 08/12/19 eOMIS
ICS Response note, attached hereto (self-harm by biting right forearm);
08/12/19 eOMIS ICS Response note, attached hereto (attempted hanging).  The
day before, he had another ICS Response for attempted hanging.  *See* 08/11/19
eOMIS ICS Response note.  In fact, Mr. ██████ engages in self-harm with such
frequency and regularity that he has had **296 ICS Responses**, many for self-
harm or suicide attempts, since 11/26/2014.  Despite this, ADC has failed to
provide Mr. ██████ with adequate mental health care.

Mr. ██████ paranoid ideation is so severe that ADC sought and received
approval to forcibly medicate him.  *See* 08/01/19 eOMIS note, attached hereto.
In that note, the mental health provider noted that Mr. ██████ is "acutely
psychotic and delusional and refusing medication and not eating (lost
significant amount of weight, paranoid [that he is] being poisoned) and potential
[self] harm."  *Id.*

Even with forced medication, Mr. ██████ continues to engage in self-harm and
display paranoia.  *See* 08/12/19 eOMIS ICS Response note, attached hereto
("I'm feeling suicidal and committing self-harm. I tried to hang myself 3 times
since yesterday."); 08/12/19 eOMIS ICS Response note, attached hereto ("They
keep messing with my food.").  To date, ADC has failed to provide Mr. ██████
adequate mental health care to control his severe symptoms.  Instead, ADC has

1

held Mr. ▆▆▆ on a near-continuous mental health watch, which is plainly ineffective at controlling Mr. ▆▆▆ symptoms.  Just this morning, Mr. ▆▆▆ had his 296th ICS Response.  During that encounter, Mr. ▆▆▆ was noted to have "fabricat[ed] a rope during constant watch, he says he will use to choke self to death.  [H]e states he will not give rope to security unless they spray him.  He says the pepper spray will cause him to stop thinking very bad thoughts."  *See* 08/15/19 eOMIS ICS Response note, attached hereto.

During Plaintiffs' recent tour of Lewis from 07/30/19 to 08/01/19, we spoke with Mr. ▆▆▆ and noticed blood smeared on the inside window of his cell door.  *See* ADCM1579958 (inline below).

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION



In addition, mental health staff recently noted that Mr. ▆▆▆ cell "smelled of feces."  *See* 08/03/19 eOMIS note, attached hereto.

**Plaintiffs request Mr. ▆▆▆ be transferred on an emergency basis to an inpatient mental health unit where his grave mental illness can be treated effectively.**

Respectfully,

**/s/Ryan M. Kendall**

Enclosure

CC:    All counsel

2



## PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

August 15, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:   *Parsons v. Ryan*, 2:12-CV-00601
       Class Member in Need of Medical Care
       ████████████████████████, Lewis - Stiner

Dear Mr. Bojanowski:

We write on behalf of Mr. ██████ a 41-year-old class member with a left hand contracture and broken dental plate.  Co-counsel met with Mr. ██████ during our recent visit to ASPC-Lewis.

<u>Occupational Injury and Chronic Contractures</u>

On December 5, 2018, Mr. ██████ left hand was crushed at his ADC work assignment.

**Subjective Notes**

ARRIVED TO COMPLEX MEDICAL HUB AFTER OCCUPATIONAL INJURY TO LEFT HAND. IM STATES HIS HAND GOT CAUGHT BETWEEN A METAL ROLLER AND CONVEYER BELT, THAT HAD AROUND 500-1000PSI.

**NET-Musculoskeletal - Subjective**

**Chief complaint:** LACERATION LEFT HAND AND POSSIBLE CRUSH INJURY
**Onset Date:**      12/5/18

He was taken to the hospital that same day.

**Chief Complaint:**
LEFT HAND TRAUMATIS INJURY.

HISTORY OF PRESENTING COMPLAINT:
The patient is a 40-year-old  Caucasian male with no medical history who presented with chief complaint of left hand traumatic injury.
The patient stated that chief complaint presented acutely today.
Stated that his hand accidentally got caught in a cutting machine at work. No other complaint.

On presentation to Abrazo West Central Campus Emergency Room, The ER physician consulted on call hand surgeon ,Dr. Yang who advise patient be transfer to Abrazo Central for surgical evaluation in am.

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski

Re: ███████████

August 15, 2019

Page 2

On May 13, 2019, over five months after the accident, Mr. ██████ received surgery in an attempt to release chronic contractures of three fingers.

**Indications:**
40 y.o. male incarcerated male who had a farm accident with conveyor belt accident to his left small, ring, middle finger with contractures of all three fingers. His injury was in December, so this is a chronic contracture. Presents for attempted contracture release, flexor tenolysis.

The surgeon noted that Mr. ██████ "may require a couple of surgery [sic] to straighten hand" and requested to see Mr. ██████ again in one week.

Dr. Kruger spoke to patient about surgery and that he may require a couple of surgery to straighten hand. Patient voided 400 cc of clear yellow urine. Pre/post-op teaching done with patient.

It does not appear, however, that Mr. ██████ was seen by the surgeon again until June 21, 2019, 39 days later.  At that time, the surgeon wrote that he would not recommend surgery to straighten the hand unless Mr. ██████ had access to "a comprehensive hand protocol."  The surgeon also wrote that Mr. ██████ would discuss the treatment plan "with legal counsel & warden."



Mr. ██████ reported that the surgeon's mention of lack of "a comprehensive hand protocol" is a reference to Defendants' denial of what the surgeon deemed to be a sufficient number of physical therapy sessions.  In particular, on May 29, 2019, a provider submitted a request for "PT 2-4x per week for 6 weeks."  Utilization Management denied the request on June 5, with only a conclusory statement about medical necessity, and instead directed the provider to "[c]onsider" four physical therapy sessions (as opposed to the requested 12-24) and then "re- evaluate."

**Action Taken Comments**

See ATP below. Please advise if you accept or reject this ATP by 06/07/2019.

ATP:
Based on information provided, medical necessity not demonstrated at this time.

Consider 4 PT formal therapies with HEP education and re- evaluate.

TimeStamp: 5 June 2019 14:25:54 --- User: Erica Johnson (Ericaj)

Mr. Timothy Bojanowski

Re: ████████

August 15, 2019

Page 3

Mr. ██████ subsequently received only four physical therapy sessions, which concluded on July 5, 2019.  In response to the final physical therapy report, the provider noted that Mr. ████ "CONTINUES WITH DEC ROM, STRENGHT [sic], ADL'S SECONDARY TO LEFT HAND INJURY."  Nonetheless, the provider stated only that the session was the "LAST VISIT" allowed by Utilization Management and indicated that the only remaining treatment plan is for Mr. ██████ to "CONT WITH SELF STRETCH."  The provider did not appear to "re- evaluate" the need for additional sessions, as directed by Utilization Management in the previous Alternative Treatment Plan.

**Action Taken Comments**

PT SESSION #4 REPORT REVIEWED
CONTINUES WITH DEC ROM, STRENGHT, ADL'S SECONDARY TO LEFT HAND INJURY
TX--MH, MOB, MS, THEREX, ICE P TX
PER AUTH LAST VISIT
IM ADVISED TO CONT WITH SELF STRETCH
TimeStamp: 8 July 2019 16:51:22 --- User: Cassidy Morales (MORCA01)

Mr. ██████ however, continues to suffer from serious contractures and reports that even though he cannot use his hand, he has been disciplined for refusing work.  During the recent tour of ASPC-Lewis, class counsel photographed Mr. ██████ left hand extended as wide as he is able to open it.



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601                                    ADCM1679992

We request that Defendants immediately implement a comprehensive hand protocol so that Mr. ██████ may be eligible for corrective surgery and that he return to the surgeon for re-evaluation. We also request that Defendants review any disciplinary action taken against Mr. ██████ for refusal to work since his serious work-related injury and Defendants' apparent failure to provide adequate and timely medical care left him incapacitated.

Mr. Timothy Bojanowski

Re: ███████████

August 15, 2019

Page 4

### Broken Upper Dental Plate

Mr. █████ also reported that his upper dental plate broke in half and no longer stays in his mouth, which makes it difficult to eat.  (During a dental intake exam in September 2017, the dentist noted that Mr. █████ had "8 teeth present; 24 missing teeth as charted.")  Mr. █████ submitted an HNR on July 5, 2019, which explained that the broken denture "pinches me and causes bleeding."

| AREA OF INTEREST (Check only one block below)/AREA DE INTERES (Marque Un Espacio Solamente) | ☐ Medical/Médico | ☒ Dental | ☐ FHA |
| --- | --- | --- | --- |
| ☐ Pharmacy/Farmacia    ☐ Mental Health/Salud Mental    ☐ Eyes/Ojos    ☐ Other (specify)/Otros (especifique) | | | |

PLEASE PRINT!  Describe your medical/dental treatment issue need in the space below.  Be clear and specific.  NO ADDED PAGES. [POR FAVOR, ESCRIBA EN IMPRENTA!  Describa su tratamiento o necesidad médica/dental en el espacio de abajo.  Describa claramente y sea específico.  ¡NO USE MAS HOJAS!]

*my upper Denture cracked right in the middle of the front teeth and would like to be seen ASAP before it gets worse and comes apart Completely. It Pinches me and causes bleeding   Thank you*

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Services fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting.  I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo *(excluyendo las exenciones otorgadas por la ley)*. Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

The response to the HNR is a stamp that says, "You Are On The Routine Care List."

SECTION/SECCIÓN IV

PLAN OF ACTION/PLAN DE ACCION

*You Are On The Routine Care List*

STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO

M. Bermudez DAII

DATE/FECHA (mm/dd/yyyy) 07/05/19   TIME/HORA 1257 pm

It does not appear from the electronic medical record, however, that Mr. █████ has any pending dental appointments—in fact, he does not appear to have any pending medical appointments of any kind.

| Offender Appointments (1 - 20 of 46) | | | | | |
| --- | --- | --- | --- | --- | --- |
| Date/Begin Time | Priority | Type | Facility/Office | Status | Comments |
| 08/21/2019  14:43 | | Lab | ASPC-L STINER UNIT I | Cancelled | |
| 06/17/2019  07:00 | Routine | Provider - Follow Up Care | ASPC-L STINER UNIT I | Completed | Discuss PT ATP. TimeStamp: 10 June 2019... |

Mr. Timothy Bojanowski

Re: ███████████████

August 15, 2019

Page 5

We request that Mr. ████████ be seen by a dentist as soon as possible.

Thank you for your prompt attention to this matter.

Sincerely yours,

Tania Amarillas
Investigator

Rita Lomio
Staff Attorney

cc:    Mr. ████████



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

August 26, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:  *Parsons v. Ryan*, 2:12-CV-00601
Class Member in Need of Medical Care
███████████████████, Lewis - Stiner

Dear Mr. Bojanowski:

We are contacting you again on behalf of Mr. ██████ (please see our 2/1/2019, 7/24/2018, 4/27/2018, and 3/12/2018 letters regarding his care). Mr. ██████ is a 38-year-old Type 2 Diabetic with a history of diabetic ketoacidosis resulting in hospitalization, who is housed at the Lewis-Stiner Unit.

According to his medical record, Mr. ██████ has a prescription for insulin glargine to be administered as his second daily dosage 12 hours following his first dosage. He also has a prescription for Novolin to be administered twice daily.  As of 3/4/19 he is also prescribed Metformin for his diabetes.

Mr. ██████ reports, and his medical record confirms, that his insulin administration has inconsistent and at very erratic times. This is true for both his AM and PM dosage.

Recently, he missed his insulin glargine doses in the morning on 8/1/19 and 8/14/19 . He missed his evening insulin glargine doses on 8/3/19.  His insulin glargine is very rarely administered on the 12-hour time table that it should be, as shown on the next pages.

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski

Re: ▮▮▮▮▮▮▮▮▮▮

August 26, 2019

Page 2

| Active Orders | Allergies | Appointments | Consults | Current Health Status | Dental | Encounters | HSR |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Vitals | X-Ray Orders | Other... | | | | | |

| | | | | |
| --- | --- | --- | --- | --- |
| 08/19/2019 | 09:18 | 44.00 | Patient Specific | Administered |
| 08/18/2019 | 15:32 | 44.00 | Patient Specific | Administered |
| 08/18/2019 | 10:38 | 44.00 | Patient Specific | Administered |
| 08/17/2019 | 15:29 | 44.00 | Patient Specific | Administered |
| 08/17/2019 | 09:03 | 44.00 | Patient Specific | Administered |
| 08/16/2019 | 14:19 | 44.00 | Patient Specific | Administered |
| 08/16/2019 | 07:38 | 44.00 | Patient Specific | Administered |
| 08/15/2019 | 17:03 | 44.00 | Patient Specific | Administered |
| 08/15/2019 | 11:26 | 44.00 | Patient Specific | Administered |
| 08/14/2019 | 17:21 | 44.00 | Patient Specific | Administered |
| 08/13/2019 | 17:00 | 44.00 | Patient Specific | Administered |
| 08/13/2019 | 10:05 | 44.00 | Patient Specific | Administered |
| 08/12/2019 | 16:53 | 44.00 | Patient Specific | Administered |
| 08/12/2019 | 10:55 | 44.00 | Patient Specific | Administered |
| 08/11/2019 | 17:27 | 44.00 | Patient Specific | Administered |
| 08/11/2019 | 11:16 | 44.00 | Patient Specific | Administered |
| 08/10/2019 | 13:48 | 44.00 | Patient Specific | Administered |
| 08/10/2019 | 11:02 | 44.00 | Patient Specific | Administered |
| 08/09/2019 | 17:38 | 44.00 | Patient Specific | Administered |
| 08/09/2019 | 09:48 | 44.00 | Patient Specific | Administered |
| 08/08/2019 | 16:24 | 44.00 | Patient Specific | Administered |
| 08/08/2019 | 10:46 | 44.00 | Patient Specific | Administered |
| 08/07/2019 | 17:39 | 44.00 | Patient Specific | Administered |
| 08/07/2019 | 13:53 | 44.00 | Patient Specific | Administered |

powered by eOMIS v5 © Co

| Active Orders | Allergies | Appointments | Consults | Current Health Status | Dental | Encounters | HSR |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Vitals | X-Ray Orders | Other... | | | | | |

| | | | | |
| --- | --- | --- | --- | --- |
| 08/08/2019 | 16:24 | 44.00 | Patient Specific | Administered |
| 08/08/2019 | 10:46 | 44.00 | Patient Specific | Administered |
| 08/07/2019 | 17:39 | 44.00 | Patient Specific | Administered |
| 08/07/2019 | 13:53 | 44.00 | Patient Specific | Administered |
| 08/06/2019 | 18:05 | 44.00 | Patient Specific | Administered |
| 08/06/2019 | 12:07 | 44.00 | Patient Specific | Administered |
| 08/05/2019 | 16:33 | 44.00 | Patient Specific | Administered |
| 08/05/2019 | 10:26 | 44.00 | Patient Specific | Administered |
| 08/04/2019 | 17:59 | 44.00 | Patient Specific | Administered |
| 08/04/2019 | 11:07 | 44.00 | Patient Specific | Administered |
| 08/03/2019 | 11:35 | 44.00 | Patient Specific | Administered |
| 08/02/2019 | 15:50 | 44.00 | Patient Specific | Administered |
| 08/02/2019 | 09:37 | 44.00 | Clinic Stock | Administered |
| 08/01/2019 | 19:36 | 44.00 | Patient Specific | Administered |
| 07/31/2019 | 16:01 | 44.00 | Patient Specific | Administered |
| 07/31/2019 | 09:22 | 44.00 | Patient Specific | Administered |
| 07/30/2019 | 17:02 | 44.00 | Patient Specific | Administered |
| 07/30/2019 | 10:28 | 44.00 | Patient Specific | Administered |
| 07/29/2019 | 15:05 | 44.00 | Patient Specific | Administered |
| 07/29/2019 | 08:46 | 44.00 | Patient Specific | Administered |
| 07/28/2019 | 15:54 | 44.00 | Patient Specific | Administered |
| 07/28/2019 | 11:49 | 44.00 | Patient Specific | Administered |
| 07/27/2019 | 18:34 | 44.00 | Patient Specific | Administered |

powered by eOMIS v5 © Co

Equally worrisome is the fact that Mr. ▮▮▮▮▮ often receives his morning insulin long after breakfast. In the last month, his morning insulin was administered past 10:30 AM on the

Mr. Timothy Bojanowski

Re: █████████████████

August 26, 2019

Page 3

following days: 7/23/19 (11:49 AM); 7/26/19 (12:29 PM); 7/27/19 (12:29 PM); 7/28/19 (11:49 AM); 8/3/19 (11:35 AM); 8/4/19 (11:07 AM); 8/6/19 (12:06 PM); 8/7/19 (1:53 PM); 8/8/19 (10:46 AM) 8/11/19 (11:02 AM) ; 8/12/19 (10:55 AM); 8/15/19 (11:26 AM); and on 8/18/19 (10:38 AM).

To make matters worse, his afternoon insulin is often administered only a few hours later, leaving Mr. ████████ without any insulin for up to 15 hours as he waits for the next day's morning insulin administration.  Finally, Mr. ████████ did not receive at least one of his Metformin tablets on the following days:  8/3/19, 8/2/19, and 8/1/19.

| Active Orders | Allergies | Appointments | Consults | Current Health Status | Dental | Encounters | HSR | Health Problems |
|---|---|---|---|---|---|---|---|---|
| Vitals | X-Ray Orders | Other... | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 08/09/2019 | 17:38 | 1.00 | | Patient Specific | Administered |
| 08/09/2019 | 09:48 | 1.00 | | Patient Specific | Administered |
| 08/08/2019 | 16:24 | 1.00 | | Patient Specific | Administered |
| 08/08/2019 | 10:46 | 1.00 | | Patient Specific | Administered |
| 08/07/2019 | 17:39 | 1.00 | | Patient Specific | Administered |
| 08/07/2019 | 13:53 | 1.00 | | Patient Specific | Administered |
| 08/06/2019 | 18:05 | 1.00 | | Patient Specific | Administered |
| 08/06/2019 | 12:07 | 1.00 | | Patient Specific | Administered |
| 08/05/2019 | 16:33 | 1.00 | | Patient Specific | Administered |
| 08/05/2019 | 10:26 | 1.00 | | Patient Specific | Administered |
| 08/04/2019 | 17:59 | 1.00 | | Patient Specific | Administered |
| 08/04/2019 | 11:07 | 1.00 | | Patient Specific | Administered |
| 08/03/2019 | 11:35 | 1.00 | | Patient Specific | Administered |
| 08/02/2019 | 09:37 | 1.00 | | Clinic Stock | Administered |
| 08/01/2019 | 19:36 | 1.00 | | Patient Specific | Administered |
| 07/31/2019 | 16:01 | 1.00 | | Patient Specific | Administered |
| 07/31/2019 | 09:22 | 1.00 | | Patient Specific | Administered |
| 07/30/2019 | 17:02 | 1.00 | | Patient Specific | Administered |
| 07/30/2019 | 10:28 | 1.00 | | Patient Specific | Administered |
| 07/29/2019 | 15:05 | 1.00 | | Patient Specific | Administered |
| 07/29/2019 | 08:46 | 1.00 | | Patient Specific | Administered |
| 07/28/2019 | 15:54 | 1.00 | | Patient Specific | Administered |
| 07/28/2019 | 11:49 | 1.00 | | Patient Specific | Administered |

powered by eOMIS v5 © Copyright 2000-2019.

It is important for insulin medication to be taken close to the same time every day and with timely dosing. Inadequate insulin therapy can result in the triggering of diabetic ketoacidosis, and Mr. ████████ has a history of diabetic ketoacidosis that resulted in hospitalization.

We ask that careful attention be paid to the time and consistency of administration of Mr. ████████ AM and PM insulin dosages and Novolin prescription. We ask that Mr. ████████ daily insulin doses be administered at approximately the same time every day every 12 hours, as erratic dosing for a Insulin-Dependent Diabetic with a history of diabetic ketoacidosis is cause for concern. We also ask that there be consistency in the administration of his Novolin prescription and no further lapses on the administration of his Metformin tablets.

//

Mr. Timothy Bojanowski
Re: █████████
August 26, 2019
Page 4

Thank you for your prompt attention to this matter.

Sincerely,

*Ilian Meza*

Ilian Meza-Peña
Litigation Assistant

*Kendrick*

Corene Kendrick
Staff Attorney

cc:   Mr. ██████



## PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

August 30, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:     *Parsons v. Ryan*, 2:12-CV-00601
        Class Member in Need of Medical Care
        ██████████████████, Lewis - Barchey

Dear Mr. Bojanowski:

We write on behalf of Mr. ██████ a class member with high-grade dysplasia adenocarcinoma and lesions on his lower legs. Plaintiffs' counsel met with Mr. ██████ during our visit to ASPC-Lewis.

On July 17, 2019, NP Coronado submitted requests for an abdomen and chest/thorax CT scans. Both CT scans were scheduled on August 9, 2019, then rescheduled on August 26, 2019, for early September. A request for a "repeat endoscopy EGD with repeat biopsies from Barrett's esophagus area" was also ordered on July 17, 2019, and authorized by UM on August 22, 2019 in violation of PM 48, but does not appear to be scheduled yet.

| 07/17/2019 | Off-site Clinic | Diag:Radiology-MRI,UltrSnd,CAT | CT Abdomen | Routine | Scheduled |
|---|---|---|---|---|---|

**Action Taken** (1 - 5 of 5)

| Date | Time | Type | Reason | By Staff | Forward To Staff |
|---|---|---|---|---|---|
| 08/26/2019 | 12:08:05 | External Consult Scheduled | Scheduled | Johnson, Erica | |
| 08/09/2019 | 13:40:17 | External Consult Scheduled | Scheduled | Johnson, Erica | |
| 08/06/2019 | 07:09:01 | Discussed with RMD | Clinical Findings | Thiel, Lisa | Johnson, Erica |
| 08/05/2019 | 15:29:49 | Consult Under Review | Clinical Findings | Thiel, Lisa | |
| 07/18/2019 | 07:55:47 | Referred to UM Team for Review | See Comments | Price, Tearra, LPN | |

| 07/17/2019 | Off-site Clinic | Diag:Radiology-MRI,UltrSnd,CAT | CT Chest/Thorax | Routine | Scheduled |
|---|---|---|---|---|---|

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski

Re: ██████████

August 30, 2019

Page 2

| Action Taken (1 - 5 of 5) | | | | | |
|---|---|---|---|---|---|
| Date | Time | Type | Reason | By Staff | Forward To Staff |
| 08/26/2019 | 12:08:29 | External Consult Scheduled | Scheduled | Johnson, Erica | |
| 08/09/2019 | 13:40:43 | External Consult Scheduled | Scheduled | Johnson, Erica | |
| 08/06/2019 | 07:07:37 | Discussed with RMD | Clinical Findings | Thiel, Lisa | Johnson, Erica |
| 08/05/2019 | 15:30:41 | Consult Under Review | Clinical Findings | Thiel, Lisa | |
| 07/18/2019 | 07:55:29 | Referred to UM Team for Review | See Comments | Price, Tearra, LPN | |

| 07/17/2019 | Off-site Clinic | Gastroenterology | | Routine | Authorization Obtained |
|---|---|---|---|---|---|

| Action Taken (1 - 4 of 4) | | | | | |
|---|---|---|---|---|---|
| Date | Time | Type | Reason | By Staff | Forward To Staff |
| 08/22/2019 | 11:09:23 | Authorization Obtained | See Comments | Johnson, Erica | |
| 08/06/2019 | 10:53:12 | Discussed with RMD | Clinical Findings | Thiel, Lisa | Johnson, Erica |
| 08/05/2019 | 15:46:16 | Consult Under Review | Clinical Findings | Thiel, Lisa | |
| 07/18/2019 | 07:54:52 | Referred to UM Team for Review | See Comments | Price, Tearra, LPN | |

Mr. ██████ unaware of the status of his cancer treatment plan, submitted HNRs on August 17 and August 25 (scanned August 18 and August 26, respectively), requesting to see a doctor about his cancer and reporting he is having trouble swallowing. Nursing staff responded to both HNR's by noting that Mr. ██████ would be scheduled to be seen on the Nurses' Line. However, Mr. ██████ was not seen on either occasion by nursing staff.  Both appointments are still listed as pending.

| 08/26/2019 | 11:36 | Nursing | Routine | NEED TO SEE DR ON MY CANCER IN MY ESOPHIGUS CT SCAN WAS CANCELLED DON'T KNOW WHY | Schedule Appointment |
|---|---|---|---|---|---|
| 08/18/2019 | 10:34 | Nursing | Routine | I NEED TO SEE DR ABOUT CANCER OF ESPHOGUS IM HAVING PROBLEMS SWALLOWING | Schedule Appointment |

| 08/29/2019_08:35 | | Nurse - Sick Call - Scheduled | ASPC-L BARCHEY MED PS | Scheduled | I NEED TO SEE DR ABOUT CANCER OF ESPHOGU... |
|---|---|---|---|---|---|
| 08/27/2019_08:30 | | Nurse - Sick Call - Scheduled | ASPC-L BARCHEY MED PS | Scheduled | NEED TO SEE DR ON MY CANCER IN MY ESOPHI... |

Mr. ██████ was last seen on August 6, 2019, by NP Ende to discuss the lesions on his legs. The photos below were taken during Plaintiffs' counsel tour of ASPC-Lewis, shortly before Mr. ██████ saw his provider.

Mr. Timothy Bojanowski
Re: █████████████
August 30, 2019
Page 3



ADCM1580021



ADCM1580022

Mr. Timothy Bojanowski

Re: ████████████

August 30, 2019

Page 4

NP Ende initiated a wound care program for Mr. █████ that same day. Yet, there is no indication that this wound care program was in fact implemented, and there is no documentation in his record that he is receiving regular wound care.

We request that Mr. █████ be seen for his CT scans and endoscopy EGD with repeat biopsies within the time frames set by PM 51. We further request that Mr. █████'s wound care program be implemented immediately and that he be seen by the proper specialist to diagnose and treat his skin condition.

Thank you for your prompt attention to this matter.

Sincerely,

Tania Amarillas
Investigator

Corene Kendrick
Staff Attorney

cc:    Mr. █████



**Director:**
Donald Specter

**Managing Attorney:**
Sara Norman

**Staff Attorneys:**
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

October 11, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:     *Parsons v. Ryan*, 2:12-CV-00601
        Class Member in Need of Medical Care
        ███████████████████████ Yuma - Cocopah

Dear Mr. Bojanowski:

 We write regarding Mr. ████████████ a 70 year-old class member with lung cancer in need of urgent medical attention.

 Mr. █████ saw an oncologist on August 29, 2019 and was diagnosed with lung cancer. The oncologist recommended a PET scan and a CT scan of the brain. The provider consequently submitted routine consult requests for both the PET scan and the CT scan on August 31, 2019, as seen below.

**Procedure Requested Comments**

Oncology consult reviewed, Oncologist request, Pet scan, and a CT of the Brain. This consult is for the Pet scan.

TimeStamp: 31 August 2019 12:22:26 --- User: Daniel Delp (DELDA01)

**Procedure Requested Comments**

Oncology consult reviewed, Oncologist request, Pet scan, and a CT of the Brain. This consult is for the Brain CT
TimeStamp: 31 August 2019 12:22:26 --- User: Daniel Delp (DELDA01)

 The PET scan was completed on September 26, 2019. There were two major findings: "(1) Prominently metabolic right lower lung mass, consistent with the known malignancy. (2) Metabolic adenopathy consistent with metastases involving the right hilium subcarinal region and right prevascular mediastinum." The PET scan further revealed that the mass in Mr. █████'s lung had a size of 3.0 cm x 3.5 cm.

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski
Re: ███████
October 11, 2019
Page 2

Despite the urgency of Mr. ███████'s diagnosis, the provider submitted a routine consult request for an oncology appointment on September 28, 2019 for treatment of the lung cancer, but then wrote, "please schedule ASAP."

| Procedure Requested Comments |
|---|
| Known HX RT lobe Lung CA with recent abnormal PET scan. please schedule ASAP with Oncology. TimeStamp: 28 September 2019 07:16:28 --- User: Daniel Delp (DELDA01) |

As of October 11, 2019 the referral is still listed as Pending Utilization Management Team Review. If there is no response from the UM team by the end of the day, this will be a violation of Performance Measure 48.

| Action Taken (1 - 1 of 1) | | | | | |
|---|---|---|---|---|---|
| Date | Time | Type | Reason | By Staff | Forward To Staff |
| 09/30/2019 | 11:20:22 | Referred to UM Team for Review | See Comments | Hofer, Brin | |

Given the severity and time-sensitive nature of Mr. ███████'s condition, we request that Mr. ███████'s oncology appointment be approved and scheduled without further delay.

Thank you for your prompt attention to this matter.

Sincerely,

*Ilian Meza*

Ilian Meza-Peña
Litigation Assistant

*Corene Kendrick*

Corene Kendrick
Staff Attorney

cc:    Mr. ███████



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas M. Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

October 22, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

     RE:   *Parsons v. Ryan*, 2:12-CV-00601
            Class Member in Need of Medical Care
            ███████████████████████ Yuma - La Paz

Dear Mr. Bojanowski:

We write on behalf of ████████████ a class member with the autoimmune disorder epidermolysis bullosa. Mr. ██████ is in need of urgent specialty medical care for inappropriately managed symptoms of epidermolysis bullosa.

Plaintiffs' counsel spoke to Mr. ██████ during our recent tour of ASPC-Yuma. When we spoke to him on October 16, 2019, Mr. ██████ had multiple open lesions across his hands and legs. We took photographs of these lesions. Mr. ██████ reported that his condition causes his skin to break easily and often, resulting in many open wounds.

Medical staff's recent interactions with Mr. ██████ show a failure to provide appropriate care for him. On 9/11/2019, RN Barnett ordered daily wound care for Mr. ██████ for 10 days for his left knee and ankle, after Mr. ██████ presented to medical as a walk-in with blisters and wounds on his left knee and ankle. According to the electronic medical record, this treatment was only performed on 9/15/2019 and 9/16/2019. On 9/18/2019, RN Young left the following comment on the treatment record as seen in the screenshot below: "There is no documented treatment for epidermolysis bullosa. Articles reviewed deal with prevention, pain control, and surgical options. Wound care does not tell me what to do specifically. I need a provider's direct order for the wound care."

| Treatment Date | Treatment Time | Treatment By | Comments | Status |
|---|---|---|---|---|
| 09/18/2019 | 13:23:36 | Young, Howard, RN | There is no documented treatment for epidermolysis bullosa. Articles reviewed deal with prevention, pain control, and surgical options. Wound care does not tell me what to do specifically. I need a provider's direct order for the wound care. | Treatment Performed |

On this same day (9/18/2019), RN Young saw Mr. ██████ for treatment and entered a new special needs order (SNO) for wound care every Monday, Wednesday and Friday for 21 days. RN Young's objective notes describe multiple open area wounds on Mr. ██████ lower left extremities and his assessment notes

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski
Re: ██████████
October 22, 2019
Page 2

state that Mr. ████ is at risk of skin integrity, amputation and infection. The order specified how the wound care was to be performed:

**Specify Comments**

Cleanse open areas with wound wash and allow to air dry. DO NOT RUB TO DRY. Place a liberal amount of hydrogel onto all open spaces. Cover with a telfa pad. Hold in place using an ace wrap, loosely wrap from lower to upper. Change every M/W/F and prn if soiled.

**Treatments (1 – 1 of 1)**

| Treatment Date | Treatment Time | Treatment By | Comments | Status |
|---|---|---|---|---|
| 09/19/2019 | 23:56:33 | Richards, Barbara, RN | | Treatment Performed |

As seen in the above screenshot, the wound care treatment was only performed on 9/19/2019.

RN Young also wrote the following Plan Notes during this 9/18 Treatment Call, noting that Mr. ████ needed to be seen by a provider for a specific diagnosis and orders, to address the pain and wounds caused by his autoimmune disorder.

**Plan Notes**

Needs to be seen by provider for specific Dx and orders.
Should be taken off ibuprofen as an NSAID will stall wound healing at the inflammatory stage.
This is a autoimmune disorder involving up to 16 chromosomes. There is no cure and the injuries are going to be reoccurring for inmates lifetime.
Pain needs to be addressed.
Clothing, sheets, blankets, mattress all will cause outbreaks R/T type and coarseness.

On 9/27/19, NP Joseph reviewed RN Young's notations and stated that Mr. ████ was experiencing a medical skin disorder, not a wound care problem, and that Mr. ████ needed a dermatology consult, as well as stronger pain control:

**Encounter Orders Review**

Review Type*: Practitioner Review          Review Staff: Joseph, Adlene, NP
Review Date: 09/27/2019                    Review Time: 16:03:39

**Review Notes**

This is not a wound care problem but a medical skin disorder. Inmate needs a dermatology consult. Needs stronger pain control. NSADs will impeded any wound healing at the inflammatory stage so ibuprofen and Tylenol are not appropriate. Inmate will have outbreaks of blisters all the time as his own body is attacking his skin integrity. NIH was my source for this information.
TimeStamp: 27 September 2019 16:05:43 --- User: Adlene Joseph (JOSAD01)

On 09/23/2019, NP Young conducted a chart review and documented the multiple open wounds that Mr. ████ had. NP Young also noted that the wounds' "[s]urrounding tissue shows evidence of previous scarring. Is paper thin in texture and pink-purple in color." Mr. ████ according to NP Young's notes, also had scarring on his right and left hands: "All fingers are contracted by scar tissue. Little finger, both hands are folded up and locked in place by scar tissue." And NP Young noted that, "[l]ateral malleolus of both LEs have evidence of scarring. Paper thin tissue. Area around Malleolus is pink-purple in color." The subjective notes from this entry indicate that Mr. ████ "still has pain 6/10 during the day and then increases at night to 9/10 with muscle contractions of legs, arms, gluteus,  small of back. ¶ Has pain in both hands R/T contracted fingers. If he leaves arm in a dependant position the pain will increase. if he holds arms up at 90 degress at elbow the arm will fatigue and pain will move uo the muscles of the arm causing contractions of the muscles."

Mr. Timothy Bojanowski

Re: █████████████

October 22, 2019

Page 3

NP Young made the following relevant Assessment Notes:

> *Recommended treatment is: have the patient wear shorts that are midthigh in length. Wear soft slippers, preferably made of sheep skin. Sleep on a soft mattress with non abrading sheets and covers. Use soft pads under patient to absorb drainage if they have open wounds. Change pads With each turn cycle.  Do not dress the open wounds as this will cause the body to attack the area of adhesion or pressure. NSAIDs are not an option for pain control.*

NP Young also made these Plan Notes: "Refer to provider. Need specific treatment orders. ¶ Recommend inmate be sent to either a dermatologist knowledgeable in this condition, or be sent to an IPC unit where his care can be daily."

On 9/26/2019, NP Joseph ordered wound care every Monday, Wednesday and Friday for 60 days. As seen in the below screenshot, NP Joseph specified the following treatment:

| | | | | |
|---|---|---|---|---|
| Status:  Treatment Discontinued | | | As of Date:  10/18/2019 | Status History |

**Specify Comments**

Please apply zinc to skin to promote healing. No dressing necessary
Treatment Order discontinued per Joseph, NP

**Treatments** (1 - 1 of 1)

| Treatment Date | Treatment Time | Treatment By | Comments | Status |
|---|---|---|---|---|
| 10/11/2019 | 12:56:17 | Leon, David | | Treatment Performed |

LPN Rhonda Rae reviewed these notes on 09/27/2019 and confirmed the three-times-a-week wound care. As the above screenshot shows, this treatment was only performed on 10/11/2019 and discontinued on 10/18/2019.

//

//

//

//

Mr. Timothy Bojanowski

Re: ████████

October 22, 2019

Page 4

On 10/01/2019, Dr. Jordan ordered daily wound care for Mr. ████ for 30 days. (Note that this encounter is misclassified as "Provider - Prenatal - Follow Up.") He specified the following treatment:

| Status: Treatment Discontinued | | As of Date: 10/18/2019 | Status History |
|---|---|---|---|

**Specify Comments**

place telfa daily with Aquaphor. wrap gently with ace. please document wounds progress daily in notes.
Treatment Order discontinued per Joseph, NP

**Treatments (1 - 1 of 1)**

| Treatment Date | Treatment Time | Treatment By | Comments | Status |
|---|---|---|---|---|
| 10/07/2019 | 13:47:05 | Young, Howard, RN | | Treatment Performed |

As the above screenshot shows, this treatment was only performed on 10/07/2019 and discontinued on 10/18/2019.

Mr. ████ last saw a provider on 10/18/2019, when he saw NP Joseph for follow-up care. NP Joseph's subjective notes document the following:

> *Patient is a 34 y/o male who presents for epidermolysis bullosa. He was diagnosed at age 5 with this rare skin condition which is characterized by blister formation due to mechanical trauma. The blisters are no time -limited, they will often reoccur.*
> *He complains of unmanaged symptoms due to blisters increasing in size without appropriate drainage. He states that his skin is aggravated by the firm mattress, clothing and provided medical shoes. He is currently on the treatment line for wound care along with surveillance for infection. Patient complains that he often refuses treatment for his skin due to lack of knowledge regarding his skin condition. Prior to his incarceration, he had an appointment Sandford university. Today, he is seeking measures to prevent skin breakdown, i.e mattress topper and moccasin shoes.*

In the objective notes, NP Joseph notes that Mr. ████ has, "open healing lesions on right ankle, left knee and shin." NP Joseph ordered the following daily wound care treatment for Mr. ████ on 10/18:

**Specify Comments**

Please monitor skin for blisters/ infection/open wounds- once blisters are notated, please put patient on the provider line for drainage which will prevent them from increasing in size/ reduce pain, Skin may be cleansed with NS. Patient can continue to do self care with Aquafor provided. Medical may give kerlix rolls to patient.

**Treatments**

| Treatment Date | Treatment Time | Treatment By | Comments | Status |
|---|---|---|---|---|
| | | No Rows Found | | |

As the screenshot shows, there is no documentation in the electronic medical record that this wound care has been provided to Mr. ████

Even though NP Young twice noted it was a proper course of treatment (on 09/23/2019 and 09/27/2019), a consult request for a dermatologist for Mr. ████ has not been submitted. He has not been seen by a

Mr. Timothy Bojanowski
Re: █████████
October 22, 2019
Page 5

dermatologist since re-entering ADC custody on December 19, 2018, despite having experienced multiple symptoms of improperly-managed epidermolysis bullosa throughout his incarceration.

We request that Mr. ████████ providers submit urgent requests for a dermatology consult with a dermatologist familiar with his condition and for a consult with a wound care specialist, given the severity of his wounds and the failure of medical staff at Yuma to provide adequate wound care. We request that Mr. ██████ receive this specialty care as soon as possible. We further request that he be evaluated for transfer to a facility closer to a metropolitan area where specialists capable of managing his condition are available.

Thank you for your prompt attention to this matter.

Sincerely,

Thomas Nosewicz
Staff Attorney

Gabriela Pelsinger
Litigation Assistant

cc:     Mr. ██████



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah

VIA EMAIL ONLY

October 23, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:      *Parsons v. Ryan*, 2:12-CV-00601
         Class Member in Need of Medical Care
         ████████████████████ Eyman - Meadows

Dear Mr. Bojanowski:

We write regarding ████████████ a 51-year-old class member who is in need of medical attention.

Mr. ██████ entered ADC custody in March 2014. On May 6, 2014, a provider submitted a routine request for an ophthalmology consult. It does not appear, however, that the appointment occurred. On May 27, 2015, the provider submitted an urgent request for an ophthalmology consult, noting:

> *A-Scan/Cataract removal blind in both eyes for the last three years, and he was told by the optometrist on-site on 5/5/14 that he has bilateral hyper mature cataracts, his vision was very bad, in the left eye light perception only, and in the right eye finger counting only. In ophthalmology consultation was ordered, but somehow he didn't see the ophthalmologist. Patient says he had no problem with his vision three years ago, when he was diagnosed with cataracts. He is legally blind, uses a cane and need the support of a person to walk with him to prevent falls. We'll placed the ophthalmology consult as urgent.*

Mr. ██████ finally saw an ophthalmologist on July 10, 2015, in violation of Performance Measure 50. The ophthalmologist noted that his vision could improve with surgery on the cataracts in both eyes. In August 2015, Mr. ██████ received the cataracts surgery on his right eye, although it appears that he did not receive the one-week follow-up appointment recommended by the ophthalmologist.

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski

Re: ███████████

October 23, 2019

Page 2

On December 2, 2016, the provider submitted a routine request for cataract surgery on Mr. ████████s left eye, but Utilization Management denied the request:

*Criteria not met based on information provided*
*1. obtain visual acuity while wearing glasses*
*2. on site optom visit*
*Note: best corrected visual acuity (BCVA) must be 20/50 or worse in right and in left eye*

As we have noted previously, Utilization Management appears to have a "one good eye" policy whereby it will only approve surgical removal or repair for one eye, even when both are indicated for repair. The Ninth Circuit has definitively found that such a "one good eye" policy by corrections departments and their contractors violates the Eighth Amendment. *See Colwell v. Bannister*, 763 F.3d 1060 (9th Cir. 2014).

On January 11, 2017, the provider submitted another routine request for the surgery:

*Left eye cataract: Advanced*
*As requested (ORC 261988)*
*Corrected visual acuity obtained OD 20/50 OS Unable to see chart.*

Mr. ████████ saw the ophthalmologist on January 17, 2017, at which time the specialist recommended cataract surgery in Mr. ████████'s left eye to improve his vision. The provider did not review the specialist's report until February 7, 2017, in violation of Performance Measure 52. The provider made no comments regarding the report.

On June 6, 2019, the provider submitted a routine request for an on-site optometry consult, noting, "Requesting consult for pt with cataracts that is reporting eye discomfort; last opto f/u was >2yrs." The status of the request remains "Clinical Coordinator Initiated," as seen below and in violation of Performance Measures 48 and 51.

**Consultation Request** (1 - 8 of 8)

| Request Date | Request Type | Service Type | Procedure Requested | Priority | Request Status |
|---|---|---|---|---|---|
| 08/13/2019 | Off-site Clinic | Ophthalmology | | Routine | Consult Completed -Results Received |
| 06/06/2019 | On-site Clinic | Optometry | | Routine | Clinical Coordinator Initiated |
| 01/11/2017 | Off-site Clinic | Ophthalmology | Cataract Extraction | Routine | Consult Completed- Practitioner Reviewed |
| 12/02/2016 | Off-site Clinic | Cardiology | | Urgent | Alternative Treatment Accepted |
| 12/02/2016 | Off-site Clinic | Ophthalmology | | Routine | Alternative Treatment Accepted |
| 05/27/2015 | Off-site Clinic | Ophthalmology | | Urgent | Consult Completed- Practitioner Reviewed |
| 05/27/2015 | Off-site Clinic | Other | | Routine | Scheduled |
| 05/06/2014 | Off-site Clinic | Other | | Routine | Scheduled |

Mr. Timothy Bojanowski
Re: ████████████████
October 23, 2019
Page 3

The prison therefore did not appear to follow the Corrective Action Plan that reportedly had been put in place in September 2018 as follows:

> *A new process was implemented that will improve the tracking and monitoring of optometry consults to meet the timeframe and complete the process by scanning documentation that the consult occurred. The process requires that the patient request optometry through an HNR after which the patient is seen by a nurse and a Snellen is performed. Then, the nurse enters a consult into eOMIS, and the optometry consult is entered and completed through eOMIS.*

*See* Defendants' Notice of Filing Performance Measure Charts Regarding April 2019 Compliance Pursuant to Court Order, Doc. 3292-1 at 259-260.

On October 8, 2019, Mr. ████████ finally saw an ophthalmologist who did not recommend cataract surgery because Mr. ████████'s retina has now detached. The ophthalmologist recommended that Mr. ████████ return for a follow-up visit in three months—that is, by January 8, 2020. However, when the provider reviewed the specialist's report, she noted:

> *Scheduled onsite provider March 2020 for consult for ophthalmology follow up as suggested. According to notes written, patient has mature cataract left eye as well and retinal detachment left eye. The ophthalmalogist does not feel at this time cataract removal is warranted, it will not improve vision, however, if the patient develops glaucoma left eye, then [cataract] surgery would be warranted to improve vision.*

It is unclear why the provider recommended that Mr. ████████ see a provider for follow-up in March 2020.

On October 10, 2019, Mr. ████████ submitted a Health Needs Request (HNR) reporting that he had a black spot on his right eye that was hindering his vision. The October 15, 2019, response states, "you are sched w/ the provider." It does not appear that Mr. ████████ has seen a provider, as seen below.

| Health Services Encounters (1 - 20 of 217) | | | | | | |
|---|---|---|---|---|---|---|
| Date | Time | Category | Type | Embedded Form | Staff | Location |
| 10/14/2019 | 07:53 | Medical Provider | Provider - Review | | Gay, Maureen | ASPC-E MEADOWS MED |
| 10/07/2019 | 12:55 | Mental Health | MH - Individual Counseling | | Stein, Steven M | ASPC-E MEADOWS MED |
| 09/09/2019 | 14:45 | Mental Health | MH - Chart Review | | Masters, Katie | ASPC-E MEADOWS MED |
| 08/13/2019 | 14:33 | Nursing | Nurse - Immunizations | | Hunt, Jennie | ASPC-E MEADOWS MED |

An appointment was scheduled for October 18, 2019, but apparently never took place.

Mr. Timothy Bojanowski

Re: ███████

October 23, 2019

Page 4

| Offender Appointments (1 - 20 of 79) | | | | | |
|---|---|---|---|---|---|
| **Date/Begin Time** | **Priority** | **Type** | **Facility/Office** | **Status** | **Comments** |
| 10/28/2019  13:52 | | Lab | ASPC-E MEADOWS MED | Scheduled | |
| 10/18/2019  08:00 | Routine | Provider - Sick Call - Scheduled | ASPC-E MEADOWS MED | Scheduled | please schedule onsite provider follow u... |
| 08/13/2019  08:55 | | Provider - Medication Renewal | ASPC-E MEADOWS MED | Completed | SNO renewals Limited duty/ no climbing l... |

Confusingly, on October 14, 2019, the provider reviewed Mr. ███████'s chart and noted:

*please schedule onsite provider follow up for consult so he could return to ophthalmology as suggested, Please schedule onsite provider follow up visit March 2, 2020*

We request that Mr. ███████ see an ophthalmologist for a follow-up appointment no later than January 8, 2020, as recommended by the specialist. We request that a provider evaluate the symptoms in Mr. ███████ right eye and develop a treatment plan accordingly. Thank you for your prompt attention to this matter.

Sincerely yours,

Amber Norris
Investigator

Rita Lomio
Staff Attorney

cc:    Mr. ███████



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

October 29, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:  *Parsons v. Ryan*, 2:12-CV-00601
Class Member in Need of Medical Care
████████████████████ Yuma - La Paz

Dear Mr. Bojanowski:

I write with an urgent medical concern for Mr. ██████ a class member currently incarcerated at ASP-Yuma (La Paz). Mr. ██████ requires an urgent referral to a urologist to remove a ureteral stent that has been in place for almost five months.

Mr. ██████ was sent to the hospital on 6/7/2019, where he was diagnosed with a kidney stone. He was given oral antibiotics and underwent ureteral stent placement.  The hospital instructed that he "follow-up as outpatient for stent removal in the next month or so with stone extraction also being required."

According to UptoDate, "[p]rolonged stent indwelling times can lead to serious complications including encrustation, urinary tract infection, or urinary obstruction and potential loss of kidney function." UptoDate recommends removing the stent "one week after initial placement to minimize the potential for infectious complications."

Mr. ██████ returned to ASP-Yuma on 6/10/2019.  A provider reviewed the hospital's report and ordered a consult with a urologist on 6/10/2019.  The consult was ordered on a "routine" basis.

On 9/5/2019, Mr. ██████ still had not seen the urologist, in violation of Performance Measure 51, and was in significant pain from both the kidney stone and the ureteral stent.  Again according to UptoDate, "[n]egative symptoms affecting quality of life and interfering with the ability to work are experienced by approximately 80 percent of stented patients."

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. ████████ submitted a health needs request on September 5, 2019, stating:

*I would like to see a doctor to follow up with an ongoing medial issue. On June 7, 2019 I was brought to the hospital in an emergency ambulance. In the hospital they found a kidney stone. Then they did surgery and put a "stint" [sic] inside me. After the surgery the doctor told me that the "stint" [sic] should not be inside me for more than 90 days because it can cause an infection. It has now been 90 days, and the "stint" [sic] has not been removed. I am not starting to experience sharp, stinging pains in my bladder and penis area. The pain is getting worse and worse. It also burns, and feels enflamed. I think I'm getting an infection. Please help me before it gets worse!! I need to see a doctor now please.*

He saw the nurse on 9/6/2019.  The nurse noted that he was at "risk for infection," and his urine dipstick was "Abnormal," and referred him to see provider within 14 days.  As shown below, he has not seen a provider, in violation of PM 39:

| Active Orders | Allergies | Appointments | Consults | Current Health Status | Dental | Encounters | HSR | Health Problems | Labs | Medications |
|---|---|---|---|---|---|---|---|---|---|---|
| Precautions | Special Needs | Transfer Holds | Vitals | X-Ray Orders | Other... | | | | | |

**Health Services Encounters (1 - 20 of 80)**

| Date | Time | Category | Type | Embedded Form | Staff | Location |
|---|---|---|---|---|---|---|
| 09/24/2019 | 20:40 | Nursing | Nurse - Return From Offsite | Return from Off-Site | Young, Howard | ASPC-Y YUMA LA PAZ |
| 09/18/2019 | 16:16 | Nursing | Nurse - Verbal/Telephone Orders | | Barnett, Barbara | ASPC-Y YUMA LA PAZ |
| 09/18/2019 | 14:30 | Nursing | Nurse - Sick Call - Unscheduled | NET-Genitourinary | Barnett, Barbara | ASPC-Y YUMA LA PAZ |
| 09/16/2019 | 03:00 | Nursing | Nurse - PPD Administration | | Gomez, Nathalie | ASPC-Y YUMA LA PAZ |
| 09/06/2019 | 13:48 | Nursing | Nurse - Verbal/Telephone Orders | | Barnett, Barbara | ASPC-Y YUMA LA PAZ |
| 09/06/2019 | 13:05 | Nursing | Nurse - Sick Call - Unscheduled | NET-Genitourinary | Barnett, Barbara | ASPC-Y YUMA LA PAZ |
| 08/19/2019 | 07:37 | Mental Health | MH - Chart Review | | Martinez, Elga | ASPC-Y YUMA LA PAZ |

On 9/15/2019, having still not seen a urologist or a provider, he submitted another HNR, stating: "I need to see a doctor or anyone who can medically excuse me from working due to an ongoing medical issue that started on 6/7/19 when I was hospitalized for a kidney stone that I still have inside me today. I also have a possible infection, and suffer from pain and inflammation. Also need a SNO."

He saw the nurse on 9/18/2019, in violation of PM 37.  The nurse again noted he was at risk for infection, and that his urine disptick was again "ABNORMAL."  The nurse contacted a provider, who prescribed five days of pain medications. Those medications ran out on 9/22/2019.

Mr. Timothy Bojanowski

Re: <span>█████████</span>

October 29, 2019

Page 3

Mr. <span>████</span> finally saw the urologist on 9/24/2019.  The urologist's report notes:

*He apparently was seen initially 3 months ago in another hospital for right flank pain and after a CT which conformed a uretral stone a right JJ stent was placed for the patient. He is here today for further evaluation. He complains of on and off dysuria and right lower abdominal pain. He has not passed any stone and this is the first time he experiences stone disease.*

Under "Assesment and Plan," the urologist stated that the plan was "to schedule for right ureteroscopy with laser lithotripsy and stent removal."

On 10/3/2019, a provider at ASP-Yuma reviewed the report, and apparently missed the "assessment and plan" that was clearly indicated on the specialist's report, in violation of PM 52. The provider wrote: "Urology consult reviewed, There was no plan or F/U indicated on the consult? please clarify and advise onsite medical provider or place on provider line ASAP."

It does not appear that anyone has followed up on this.  No appointments have been ordered, and Mr. <span>████</span> still has a painful kidney stone and ureteral stent in place almost five months after it was inserted.

We request that medical staff schedule Mr. <span>████</span> for urgent follow-up with the urologist, for ureteroscopy and stent removal. We also request that staff immediately provide Mr. <span>████</span> with appropriate pain medications pending this consult.

Thank you for your prompt attention to this matter.

Sincerely,

Corene Kendrick
Staff Attorney

cc:   Mr. <span>████</span>



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

October 29, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:    *Parsons v. Ryan*, 2:12-CV-00601
       Class Member in Need of Medical Care
       ████████████████████ Yuma - CDU

Dear Mr. Bojanowski:

    We write regarding ████████, a 34-year-old class member who is in need of medical attention. Mr. ████ underwent a skin graft on his leg following a car accident in 2012 for which he is prescribed Absorbase ointment. On October 17, 2019, Plaintiffs' counsel met with Mr. ████ whose leg was significantly swollen, as seen in the below photograph (ADC1588694).



**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk



Mr. Timothy Bojanowski

Re: █████████████

October 29, 2019

Page 2

On October 18, 2019, Mr. ██████ saw the provider at Mr. Fathi's request. The provider noted,

> *Pt was placed in CDU and has gone 5 days without his absorbase and 10/17/19 requested medical evaluation for his LT calf graft. pt. not sure if he sustained injury to graft during altercation.*

The provider renewed the Absorbase ointment prescription and noted the treatment plan to include daily wound care for 14 days, as seen below. However, it appears that Mr. ██████ has not received the Absorbase ointment, as seen below and in violation of Performance Measure 11.



//

Mr. Timothy Bojanowski
Re: ███████
October 29, 2019
Page 3

In addition, according to the electronic medical record, nursing staff evaluated Mr. ███████ leg only on October 19 and 20, 2019, contrary to the provider's order that his leg be evaluated daily, as seen below.

| Encounter Date: 10/18/2019 | | Time: 09:36:10 | | Type: Provider - Follow Up Care |
|---|---|---|---|---|
| Location: ASPC-Y YUMA CDU [Y10] | | Staff: Delp, Daniel, PA | | |

| Category*: Treatments | | | | |
|---|---|---|---|---|
| Type*: Wound Care | | | | |
| Frequency*: Daily (as specified by the Practitioner) | | for*: 14 days | | |
| Count*: 14 | | Sequence Number: 01 | | |
| Approximate Begin Date: 10/18/2019 | | Approximate End Date: 11/01/2019 | | |
| Refer to Staff: | | | | |
| Status: Active | | As of Date: 10/18/2019 | Status History | |

**Specify Comments**

Please evaluate for any breakdown of graft apply nonadhesive dressing qd. as needed.

**Treatments**

| Treatment Date | Treatment Time | Treatment By | Comments | Status |
|---|---|---|---|---|
| | | No Rows Found | | |

On October 23, 2019, Mr. █████ again saw the provider who noted the treatment plan to include using Absorbase two to three times daily

We request that Mr. █████ receive all prescribed medications without further delay and that staff provide wound care as ordered. Thank you for your prompt attention to this matter.

Sincerely,

Amber Norris
Investigator

Corene Kendrick
Staff Attorney

cc:   Mr. █████



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

October 30, 2019

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:     *Parsons v. Ryan*, 2:12-CV-00601
        Class Member in Need of Medical Care
        ███████████████████ Perryville - San Pedro

Dear Mr. Bojanowski:

This is our third letter to you regarding ████████ a 53-year old class member who remains in need of medical attention. We wrote to you regarding Ms. ████ on August 14, 2019, and August 6, 2018, when we detailed delays in care for uterine and bladder prolapse, as well as several ovarian cysts. Ms. ████ continues to experience delays in care.

On September 6, 2019, the provider submitted a routine request for a consult with an offsite obstetrician gynecologist, noting, "with h/o vaginal surgery with subsequent mesh erosion, surgery for revision of the mesh recommended." The status of the request remains "Authorization Obtained," as seen below. The surgery must occur by November 6, 2019, to comply with Performance Measure 51.

| Consultation Request (1 - 16 of 16) | | | | | |
|---|---|---|---|---|---|
| **Request Date** | **Request Type** | **Service Type** | **Procedure Requested** | **Priority** | **Request Status** |
| 09/06/2019 | Off-site Clinic | OB-GYN | | Routine | Authorization Obtained |
| 07/23/2019 | Off-site Clinic | OB-GYN | | Routine | Consult Completed- Practitioner Reviewed |
| 07/02/2018 | Off-site Clinic | OB-GYN | | Routine | Consult Completed- Practitioner Reviewed |
| 05/24/2018 | Off-site Clinic | OB-GYN | | Routine | Consult Completed- Practitioner Reviewed |
| 05/03/2018 | Off-site Clinic | Radiology | US Pelvic, non-OB Complete | Routine | Consult Completed- Practitioner Reviewed |
| 04/19/2018 | Off-site Clinic | Radiology | US Pelvic, non-OB Complete | Routine | Alternative Treatment Accepted |
| 02/19/2018 | On-site Clinic | OB-GYN | | Routine | Consult Occurred |
| 01/25/2018 | Off-site Clinic | OB-GYN | | Routine | Alternative Treatment Accepted |

In addition, on August 16, 2019, the provider wrote a Special Needs Order (SNO) indicating that Ms. ████ weekly receive wipes for three weeks. According to the electronic medical record, she received wipes only once, on August 22, 2019. On September 3, 2019, the

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski
Re: █████████████
October 30, 2019
Page 2

provider wrote another SNO indicating that Ms. ████ weekly receive wipes. There is no indication that Ms. ████ received wipes in the electronic medical record. We note that Ms. ████ submitted Health Needs Requests asking for the wipes on September 16 and October 29, 2019.

We request that Ms. ████ receive the recommended surgery in compliance with Performance Measure 51. We request that Ms. ████ receive wipes and supplies as prescribed. Thank you for your prompt attention to this matter.

Sincerely,

Amber Norris
Investigator

Corene Kendrick
Staff Attorney

cc:    Ms. ████

Exhibit 2

FILED UNDER SEAL

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



May 17, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

<div style="text-align:center"></div>

Re: *Parsons v. Ryan*
   **Notice of Substantial Noncompliance**

Dear Tim:

Pursuant to Paragraph 30 of the Stipulation, Plaintiffs serve this Notice of
Substantial Noncompliance regarding the following Performance Measures (PMs)
at ASPC-Lewis:  PM 80, 81, 82, 83, 84, 85, 86, 87, 88, 92, 94, and 95.

Each of these Performance Measures requires that the patient be "seen" by mental
health staff.  That term is defined in the Stipulation as follows:

> Interaction between a patient and a Medical Provider, Mental
> Health Provider or Mental Health Clinician that involves a
> treatment and/or exchange of information in a confidential
> setting. With respect to Mental Health staff, means an
> encounter that takes place in a confidential setting outside the
> prisoner's cell, unless the prisoner refuses to exit his or her cell
> for the encounter.

Doc. 1185-1 at 5.

Unfortunately, it is clear that many, if not most, encounters with mental health staff
are so brief and perfunctory as to be meaningless.  Our review found an abundance
of encounters that, according to the mental health staff person's note in eOMIS,
lasted 5 minutes or less; some were as brief as 2 minutes.  For example:

<div style="margin-left:2em">

███████████████████ (4/2/19, 5 minutes)
█████████████████████████ (1/31/19, 5 minutes)
███████████████████ (5/8/19, 5 minutes)
█████████████████████ (1/23/19, 2 minutes; 4/6/19, 5 minutes; 5/1/19,
5 minutes)
███████████████████ (2/17/19, 5 minutes)
███████████████████ (2/20/19, 5 minutes; 3/7/19, 5 minutes; 3/22/19,
5 minutes; 3/29/19, 5 minutes; 5/14/19, 5 minutes)

</div>

Most disturbing, there were numerous cases in which a patient on suicide watch
was seen for 5 minutes or less, and in some cases for as little as 2 minutes.  Many of

**AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION**

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW**

**NOT ADMITTED IN DC:*
*PRACTICE LIMITED TO*
*FEDERAL COURTS*

these patients were moved to a lower level of suicide watch, or removed from watch entirely, after encounters that lasted 5 minutes or less.  For example:

███████████████████ (12/1/18, 5 minutes; 12/2/18, 5 minutes; 12/12/18, moved from constant to 10-minute watch after 5 minutes; 12/16/18, 5 minutes)

████████████████ (1/23/19, moved from 10-minute to 30-minute watch after 5 minutes; 1/22/19, 5 minutes; 4/2/19, moved from 10-minute to 30-minute watch after 5 minutes)

███████████████ (11/2/18, 5 minutes; 11/3/18, 5 minutes; 11/5/18, moved from 10-minute to 30-minute watch after 5 minutes; 11/6/18, removed from suicide watch after 5 minutes; 12/1/18, 5 minutes; 12/2/18, moved from 10-minute to 30-minute watch after 5 minutes; 12/8/18, 5 minutes; 12/9/18, 5 minutes; 12/11/18, 5 minutes; 12/12/18, moved from 10-minute to 30-minute watch after 5 minutes; 12/14/18, 5 minutes; 12/15/18, 5 minutes; 12/16/18, 5 minutes; 12/18/18, 5 minutes; 12/19/18, 5 minutes; 12/23/18, moved from 10-minute to 30-minute watch after 5 minutes; 3/7/19, 5 minutes; 3/8/19, moved from 10-minute to 30-minute watch after 5 minutes; 3/9/19, 5 minutes; 3/10/19, 2 minutes; 3/11/19, removed from suicide watch after 5 minutes; 3/13/19, 5 minutes; 3/14/19, 5 minutes; 4/17/19, 5 minutes; 4/19/19, 5 minutes; 4/22/19, 5 minutes; 4/23/19, 5 minutes; 4/26/19, 5 minutes; 5/8/19, 3 minutes; 5/9/19, 5 minutes; 5/11/19, 5 minutes; 5/12/19, 5 minutes; 5/14/19, 5 minutes)

███████████████ (2/17/19, moved from 10-minute to 30-minute watch after 5 minutes; 2/18/19, removed from suicide watch after 5 minutes; 2/23/19, 5 minutes; 3/1/19, moved from 10-minute to 30-minute watch after 5 minutes)

██████████████ (11/10/18, 5 minutes; 11/11/18, 5 minutes; 11/24/18, 5 minutes; 11/25/18, moved from 10-minute to 30-minute watch after 5 minutes; 11/27/18, removed from suicide watch after 5 minutes)

██████████████ (1/11/19, 5 minutes; 1/12/19, moved from 10-minute to 30-minute watch after 5 minutes; 1/15/19, 5 minutes; 1/16/19, removed from suicide watch after 5 minutes; 2/8/19, removed from suicide watch after 5 minutes; 2/23/19, moved from 10-minute to 30-minute watch after 5 minutes; 3/28/19, 5 minutes; 3/29/19, moved from 10-minute to 30-minute watch after 5 minutes; 4/7/19, 5 minutes; 4/9/19, 5 minutes; 4/10/19, removed from suicide watch after 5 minutes; 4/11/19, 5 minutes; 4/12/19, 5 minutes; 4/13/19, 5 minutes; 4/14/19, 5 minutes; 4/16/19, 5 minutes; 4/17/19, moved from 10-minute to 30-minute watch after 5 minutes; 4/19/19, 5 minutes; 4/20/19, 5 minutes; 4/23/19, moved from 10-minute to 30-minute watch after 5 minutes; 4/25/19, 5 minutes; 4/27/19, 5 minutes)

█████████████ (2/2/19, 5 minutes; 2/3/19, moved from 10-minute to 30-minute watch after 5 minutes; 2/14/19, moved from constant to 10-minute watch after 5 minutes; 2/23/19, moved from 10-minute to 30-

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

minute watch after 5 minutes; 3/6/19, moved from 10-minute to 30-minute watch after 5 minutes; 3/12/19, moved from 10-minute to 30-minute watch after 5 minutes; 3/13/19, removed from suicide watch after 5 minutes; 4/26/19, 5 minutes; 4/27/19, moved from 10-minute to 30-minute watch after 5 minutes)

███████████████████ (12/22/18, moved from constant to 10-minute watch after 5 minutes; 12/23/18, 5 minutes; 12/25/18, 5 minutes; 12/26/18, removed from suicide watch after 5 minutes; 2/8/19, 5 minutes; 2/9/19, 5 minutes; 2/10/19, 5 minutes; 2/14/19, removed from suicide watch after 5 minutes)

██████████████████ (11/6/18, removed from suicide watch after 5 minutes; 11/10/18, 5 minutes; 11/11/18, moved from 10-minute to 30-minute watch after 5 minutes; 1/19/19, 5 minutes; 1/20/19 moved from 10-minute to 30-minute watch after 5 minutes; 1/22/19, removed from suicide watch after 5 minutes; 2/6/19, moved from 10-minute to 30-minute watch after 5 minutes; 2/8/19, 5 minutes; 2/9/19, 5 minutes; 2/10/19, 5 minutes; 3/17/19, 5 minutes; 3/19/19, removed from suicide watch after 5 minutes; 5/3/19, 5 minutes)

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

The relevant eOMIS notes are attached as Exhibit 1.

Five minutes – or 3 minutes, or 2 minutes – is not sufficient time in which to provide mental health treatment.  It is certainly not sufficient time in which to make the critically important judgment whether a patient is at risk of killing himself.  See Doc. 2091 at 3 (patient killed himself a few hours after being taken off suicide watch); Exhibit 2 ██████████████████████ taken off suicide watch after 3-minute encounter and killed herself four days later).

We look forward to your response within 30 days as required by the Stipulation.

Very truly yours,

*[signature: David C. Fathi]*

David C. Fathi

Enclosures

Cc:     All counsel

3

Exhibit 3

FILED UNDER SEAL

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



May 31, 2019

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

Re:   ***Parsons v. Ryan***
      **Notice of Substantial Noncompliance**

Dear Tim:

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC:
PRACTICE LIMITED TO
FEDERAL COURTS

Pursuant to Paragraph 30 of the Stipulation, Plaintiffs serve this Notice of
Substantial Noncompliance regarding the following Performance Measures (PMs)
at ASPC-Yuma:  PM 80, 81, 82, 83, 84, 85, 86, 94, and 95.

Each of these Performance Measures requires that the patient be "seen" by mental
health staff.  That term is defined in the Stipulation as follows:

> Interaction between a patient and a Medical Provider, Mental
> Health Provider or Mental Health Clinician that involves a
> treatment and/or exchange of information in a confidential
> setting. With respect to Mental Health staff, means an
> encounter that takes place in a confidential setting outside the
> prisoner's cell, unless the prisoner refuses to exit his or her cell
> for the encounter.

Doc. 1185-1 at 5.

Unfortunately, it is clear that many, if not most, encounters with mental health staff
are so brief and perfunctory as to be meaningless.  Our review found an abundance
of encounters that, according to the mental health staff person's note in eOMIS,
lasted no more than 5 minutes.  For example:

(5/29/19, 5 minutes)
(1/31/19, 5 minutes; 2/27/19, 5 minutes)
(5/22/19, 5 minutes)
(4/1/19, 5 minutes)
(11/5/18, 5 minutes)
(5/24/19, 5 minutes)
(1/9/19, 5 minutes)
(5/6/19, 5 minutes)
(2/26/19, 5 minutes)
(2/25/19, 5 minutes)
(3/19/19, 5 minutes)

███████████████ (2/6/19, 5 minutes; 3/6/19, 5 minutes)
████████████████████ (5/7/19, 5 minutes)
███████████████████████ (5/13/19, 5 minutes)
██████████████████████ (4/17/19, 5 minutes)
██████████████████████████ (5/13/19, 5 minutes)
████████████ (3/12/19, 5 minutes)
██████████████████████████ (5/1/19, 5 minutes)
████████████████████████ (5/13/19, 5 minutes)
█████████████████████ (3/1/19, 5 minutes)
██████████████████████ (5/29/19, 5 minutes)
████████████████ (1/31/19, 5 minutes; 2/27/19, 5 minutes; 3/26/19, 5 minutes; 4/23/19, 5 minutes; 5/22/19, 5 minutes)

Most disturbing, there were cases in which a patient on suicide watch was seen for no more than 5 minutes.  For example:

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

████████████████ (2/9/19, 5 minutes)
█████████████████ (5/18/19, 5 minutes; 5/28/19, 5 minutes)
███████████████████ (5/28/19, 5 minutes)

The relevant eOMIS notes are attached as Exhibit 1.

Five minutes is not sufficient time in which to provide mental health treatment.  It is certainly not sufficient time in which to make the critically important judgment whether a patient is at risk of killing himself.  *See* Doc. 2091 at 3 (patient killed himself a few hours after being taken off suicide watch); Exhibit 2 (████████ ███████████████████ taken off suicide watch after 3-minute encounter and killed herself four days later).

We look forward to your response within 30 days as required by the Stipulation.

Very truly yours,

David C. Fathi

Enclosures

Cc:     All counsel

2

Exhibit 4

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



September 4, 2019

**BY ELECTRONIC MAIL ONLY**

Tim Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

> Re:   *Parsons v. Ryan*
> **Risk of injury or death from extreme heat**

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW\**

*\*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS*

Dear Tim:

As you know, the National Weather Service has issued an Excessive Heat Warning covering much of southern Arizona, including the Phoenix metropolitan area, Yuma, and other areas where ADC prisons are located, with some areas experiencing heat that is "rare, dangerous, and deadly."  Exhibit 1.  An Excessive Heat Warning means that "a period of very hot temperatures, even by local standards, will occur," and there is "very high heat risk."  Exhibit 2.  People are advised to "stay indoors and seek air-conditioned buildings."  *Id.*

Given that ADC prisons are, with very limited exceptions, not air conditioned, these temperatures pose a potentially lethal risk to *Parsons* class members.  *See* Exhibit 3, at 4 (heat-related deaths in Maricopa County reached an all-time high in 2018, with almost three times as many deaths as in 2014).  Those taking psychotropic medications are particularly at risk.  *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("The district court found that air temperatures above 85° F greatly increase the risk of heat-related illnesses for individuals who take psychotropic medications").

For these reasons, Paragraph 15 of the *Parsons* Stipulation provides as follows:

> 15.  If a prisoner who is taking psychotropic medication suffers a heat intolerance reaction, all reasonably available steps will be taken to prevent heat injury or illness.  If all other steps have failed to abate the heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit.

Doc. 1185 at 6.  Despite years of record heat and mounting heat deaths, Defendants maintain that since February 2015, *not one single Parsons class member* has ever

required transfer to an area where the temperature does not exceed 85 degrees – a highly implausible contention.

Plaintiffs request that Defendants and Centurion immediately prepare and file with the Court a plan to ensure compliance with Paragraph 15 and to protect *Parsons* class members from heat injury and death.

Very truly yours,

David C. Fathi

Cc:      All counsel

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION

# EXHIBIT 1



**NWS Forecast Office Phoenix, AZ**
Weather.gov > NWS Phoenix

**NWS Phoenix**
Weather Forecast Office

Current Hazards   Current Conditions   Radar   Forecasts   Rivers and Lakes   Climate and Past Weather   Local Programs

| Dangerous Heat | Monsoon Index - East | Monsoon Index - West |
|---|---|---|



# Dangerous Heat
## Wednesday, September 4th

## What To Do

- Drink before you're thirsty
- Reduce time in the sun
- Avoid strenuous activity; postpone outdoor afternoon activities
- Seek air-conditioned buildings
- Check on elderly & neighbors
- Help kids & pets stay cool
- Close blinds during day



**Wednesday's Heat Risk**
Valid: September 04, 2019

Very Low
Low
Moderate
High
Very High

### Orange Means...
Heat like this happens many times a year. It will be relatively easy to take simple precautions to keep safe.

### Red Means...
Heat of this magnitude happens a few times each year. Impacts are likely, even for the general population, if precautions are not taken.

### Magenta Means...
Heat of this magnitude is rare, dangerous, and deadly.

Show Caption

**Click a location below for detailed forecast.**



Watches, Warnings & Advisories

Excessive Heat Warning
Heat Advisory
Hazardous Weather Outlook

Last Map Update: Wed, Sep. 4, 2019 at 7:58:43 am MST

# EXHIBIT 2

# National Weather Service

# Watches, Warnings & Advisories

## Excessive Heat Warning

URGENT - WEATHER MESSAGE
National Weather Service Phoenix AZ
332 AM MST Wed Sep 4 2019

AZZ534-537-540>544-546-548-550-551-553-555-042300-
/O.CON.KPSR.EH.W.0011.190904T1700Z-190905T0300Z/
Aguila Valley-Northwest Valley-Buckeye/Avondale-
Cave Creek/New River-Deer Valley-Central Phoenix-
North Phoenix/Glendale-Scottsdale/Paradise Valley-East Valley-
South Mountain/Ahwatukee-Southeast Valley/Queen Creek-
Northwest Pinal County-Apache Junction/Gold Canyon-
Including the cities of Aguila, Gladden, Wickenburg, Circle City,
Surprise, Wittmann, Beardsley, Sun City West, Avondale, Cashion,
Goodyear, Liberty, Scottsdale, Peoria, Phoenix, Paradise Valley,
Mesa, Chandler, Tempe, Gilbert, Sun Lakes, Queen Creek,
Casa Grande, Florence, Coolidge, and Apache Junction
332 AM MST Wed Sep 4 2019

...EXCESSIVE HEAT WARNING REMAINS IN EFFECT FROM 10 AM THIS
MORNING TO 8 PM MST THIS EVENING...

* WHERE...Portions of south central Arizona including the Phoenix
  metropolitan area.

* IMPACTS...Increase in heat related illnesses, including heat
  cramps, heat exhaustion, and heat stroke. Heat stroke can lead
  to death.

* THREAT...Very High HeatRisk. Afternoon temperatures 107 to 112.

PRECAUTIONARY/PREPAREDNESS ACTIONS...

An Excessive Heat Warning means that a period of very hot
temperatures, even by local standards, will occur. Actions should
be taken to lessen the impact of the extreme heat.

Stay indoors and seek air-conditioned buildings. Drink water,
more than usual, and avoid dehydrating alcoholic, sugary, or
caffeinated drinks. Dress for the heat - lightweight and light-
colored clothing. Eat small meals and eat more often. Monitor
those with a higher vulnerability to heat, including small
children. Check in on family, friends, and neighbors, especially
the elderly. If engaging in outdoor activity, take longer and
more frequent breaks and avoid the hottest parts of the day.
Never leave kids or pets unattended in cars.

Public cooling shelters are available in some areas. Consult

county officials for more details.

Recognize the signs and symptoms of heat-related illness. Early
signs include thirst and muscle cramps. Heat exhaustion may
include: cool, moist, pale skin; headache; dizziness; weakness or
exhaustion; nausea. The most serious illness is heat stroke,
which may include: vomiting; confusion; throbbing headache;
decreased alertness or loss of consciousness; high body
temperature (above 105F); hot, dry skin; rapid, weak pulse;
rapid, shallow breathing; seizures.

Heat stroke can be DEADLY. Treat as an emergency and call 9 1 1.

Continue to monitor NWS forecasts, broadcast outlets, and local
government for updates.

&&

$$
---

URGENT - WEATHER MESSAGE
National Weather Service Phoenix AZ
332 AM MST Wed Sep 4 2019

AZZ530-CAZ569-570-042300-
/O.CON.KPSR.EH.W.0011.190904T1700Z-190905T0300Z/
Parker Valley-Palo Verde Valley-Chuckwalla Valley-
Including the cities of Parker, Ehrenberg, Martinez Lake, Blythe,
Palo Verde, Ripley, and Midland
332 AM MST Wed Sep 4 2019 /332 AM PDT Wed Sep 4 2019/

...EXCESSIVE HEAT WARNING REMAINS IN EFFECT FROM 10 AM MST /10 AM
PDT/ THIS MORNING TO 8 PM MST /8 PM PDT/ THIS EVENING...

* WHERE...In Arizona, Parker Valley. In California, Palo Verde
  Valley and Chuckwalla Valley.

* IMPACTS...Overexposure can cause heat cramps and heat
  exhaustion to develop and, without intervention, can lead to
  heat stroke.

* THREAT...High HeatRisk. Afternoon temperatures 108 to 114.

PRECAUTIONARY/PREPAREDNESS ACTIONS...

An Excessive Heat Warning means that a period of very hot
temperatures, even by local standards, will occur. Actions should
be taken to lessen the impact of the extreme heat.

Stay indoors and seek air-conditioned buildings. Drink water,
more than usual, and avoid dehydrating alcoholic, sugary, or
caffeinated drinks. Dress for the heat - lightweight and light-
colored clothing. Eat small meals and eat more often. Monitor
those with a higher vulnerability to heat, including small
children. Check in on family, friends, and neighbors, especially
the elderly. If engaging in outdoor activity, take longer and
more frequent breaks and avoid the hottest parts of the day.

Never leave kids or pets unattended in cars.

Public cooling shelters are available in some areas. Consult
county officials for more details.

Recognize the signs and symptoms of heat-related illness. Early
signs include thirst and muscle cramps. Heat exhaustion may
include: cool, moist, pale skin; headache; dizziness; weakness or
exhaustion; nausea. The most serious illness is heat stroke,
which may include: vomiting; confusion; throbbing headache;
decreased alertness or loss of consciousness; high body
temperature (above 105F); hot, dry skin; rapid, weak pulse;
rapid, shallow breathing; seizures.

Heat stroke can be DEADLY. Treat as an emergency and call 9 1 1.

Continue to monitor NWS forecasts, broadcast outlets, and local
government for updates.

&&

$$

---

URGENT - WEATHER MESSAGE
National Weather Service Phoenix AZ
332 AM MST Wed Sep 4 2019

AZZ532-536-CAZ567-042300-
/O.CON.KPSR.EH.W.0011.190904T1700Z-190905T0300Z/
Yuma-Gila River Valley-Imperial Valley-
Including the cities of Yuma, Fortuna Foothills, Ligurta,
El Centro, Calexico, Alamorio, and Brawley
332 AM MST Wed Sep 4 2019 /332 AM PDT Wed Sep 4 2019/

...EXCESSIVE HEAT WARNING REMAINS IN EFFECT FROM 10 AM MST /10 AM
PDT/ THIS MORNING TO 8 PM MST /8 PM PDT/ THIS EVENING...

* WHERE...In Arizona, Gila River Valley and Yuma. In California,
  Imperial Valley.

* IMPACTS...Overexposure can cause heat cramps and heat
  exhaustion to develop and, without intervention, can lead to
  heat stroke.

* THREAT...High HeatRisk. Afternoon temperatures 108 to 117.

PRECAUTIONARY/PREPAREDNESS ACTIONS...

An Excessive Heat Warning means that a period of very hot
temperatures, even by local standards, will occur. Actions should
be taken to lessen the impact of the extreme heat.

Stay indoors and seek air-conditioned buildings. Drink water,
more than usual, and avoid dehydrating alcoholic, sugary, or
caffeinated drinks. Dress for the heat - lightweight and light-
colored clothing. Eat small meals and eat more often. Monitor
those with a higher vulnerability to heat, including small

children. Check in on family, friends, and neighbors, especially
the elderly. If engaging in outdoor activity, take longer and
more frequent breaks and avoid the hottest parts of the day.
Never leave kids or pets unattended in cars.

Public cooling shelters are available in some areas. Consult
county officials for more details.

Recognize the signs and symptoms of heat-related illness. Early
signs include thirst and muscle cramps. Heat exhaustion may
include: cool, moist, pale skin; headache; dizziness; weakness or
exhaustion; nausea. The most serious illness is heat stroke,
which may include: vomiting; confusion; throbbing headache;
decreased alertness or loss of consciousness; high body
temperature (above 105F); hot, dry skin; rapid, weak pulse;
rapid, shallow breathing; seizures.

Heat stroke can be DEADLY. Treat as an emergency and call 9 1 1.

Continue to monitor NWS forecasts, broadcast outlets, and local
government for updates.

&&

$$
_____

URGENT - WEATHER MESSAGE
National Weather Service Phoenix AZ
332 AM MST Wed Sep 4 2019

AZZ556-042300-
/O.CON.KPSR.EH.W.0011.190904T1700Z-190905T0300Z/
Tonto Basin-
Including the city of Punkin Center
332 AM MST Wed Sep 4 2019

...EXCESSIVE HEAT WARNING REMAINS IN EFFECT FROM 10 AM THIS
MORNING TO 8 PM MST THIS EVENING...

* WHERE...Tonto Basin.

* IMPACTS...Increase in heat related illnesses, including heat
  cramps, heat exhaustion, and heat stroke. Heat stroke can lead
  to death.

* THREAT...Very High HeatRisk. Afternoon temperatures 104 to 109.

PRECAUTIONARY/PREPAREDNESS ACTIONS...

An Excessive Heat Warning means that a period of very hot
temperatures, even by local standards, will occur. Actions should
be taken to lessen the impact of the extreme heat.

Stay indoors and seek air-conditioned buildings. Drink water,
more than usual, and avoid dehydrating alcoholic, sugary, or
caffeinated drinks. Dress for the heat - lightweight and light-
colored clothing. Eat small meals and eat more often. Monitor

EXHIBIT 3



# Heat-Associated Deaths in Maricopa County, AZ
# Final Report for 2018

Photograph by Dan Sorensen.
http://www.dansorensenphotography.com/



**Maricopa County**
**Public Health**
WeArePublicHealth.org

ACKNOWLEDGEMENTS ................................................................................................ 2

INTRODUCTION ...................................................................................................... 3

RESULTS ............................................................................................................... 4

Heat-Associated Deaths by Year ................................................................................. 4

Heat-Associated Deaths by Month ............................................................................... 5

Heat-Associated Deaths and Temperatures ................................................................... 6

Heat-Associated Deaths by Residency .......................................................................... 7

HEAT-ASSOCIATED DEATHS BY TIME RESIDING IN ARIZONA* ........................................... 7

Demographic Characteristics of Heat-Associated Deaths ................................................. 8

Heat-Associated Death Rates* .................................................................................. 10

Heat-Associated Deaths by Place of Injury .................................................................. 12

Air Conditioning Use for Indoor Deaths* ..................................................................... 14

Substance Use among Heat-Associated Deaths ............................................................. 15

Living Situation among Heat-Associated Deaths ........................................................... 17

CONCLUSIONS ...................................................................................................... 18

APPENDIX ............................................................................................................. 19

Background ........................................................................................................... 19

Methodology ......................................................................................................... 19

Tables .................................................................................................................. 21

# Acknowledgements

The Maricopa County Department of Public Health (MCDPH), Office of Epidemiology would like to thank the following agencies for their contributions to this report:

- ➢ Maricopa County Office of the Medical Examiner (OME)

- ➢ Maricopa County Office of Vital Registration (OVR)

- ➢ Arizona Department of Health Services (ADHS), Office of Vital Registration

- ➢ National Weather Service (NWS)

- ➢ Maricopa Association of Governments (MAG)

- ➢ Local hospitals (infection preventionists, emergency departments, social worker staff)

- ➢ City of Phoenix Heat Relief Network

# Introduction

Mortality from environmental heat is a significant public health problem in Maricopa County, especially because it is largely preventable. Maricopa County has conducted heat surveillance since 2006. Each year, the enhanced heat surveillance season usually begins in May and ends in October. The main goals of heat surveillance are to identify the demographic characteristics of heat-associated deaths (e.g., age and gender) and the risk factors for mortality (e.g., homelessness). Sharing this information helps community stakeholders to design interventions in an effort to prevent heat-associated deaths among vulnerable populations.

The two main sources of data for heat surveillance are: preliminary reports of death (PRODs) from the Office of the Medical Examiner (OME) and death certificates from the MCDPH Office of Vital Registration.

Heat-associated deaths are classified as heat caused or heat related. Heat caused deaths are those in which environmental heat was directly involved in the sequence of conditions causing deaths. Heat related deaths are those in which environmental heat contributed to the deaths but was not in the sequence of conditions causing these deaths.  For more information on how heat-associated deaths are classified, see the definitions in Appendix.  For more information on MCDPH's surveillance system, see Background and Methodology.

# Results

## Heat-Associated Deaths by Year

Graph 1. There were 182 heat-associated deaths reported in 2018.



**Data Sources: Maricopa County, Office of Vital Registration and Office of Medical Examiner; Arizona Department of Health Services, Office of Vital Registration**

> ➤ See Methodology in the Appendix for more information about the number of confirmed, ruled-out, and pending cases by year.

## Heat-Associated Deaths by Month

Graph 2. Fifty-nine percent of heat-associated deaths since 2006 have been classified as heat-caused.



Graph 3. Eighty-six percent of all heat-associated deaths occurred in the months of July, August, and September (N=156).



## Heat-Associated Deaths and Temperatures

> ➤ The National Weather Service issued seven excessive heat warnings for a total of thirteen days in 2018.
>
> ➤ The highest daily maximum temperature in 2018 was 116°F and occurred on July 24th and 25th.

Graph 4. Twenty-three percent of heat-associated deaths occurred on days for which an excessive heat warning has been issued. (N=41)



*Two deaths which occurred outside of the MCDPH enhanced heat surveillance season (May 1 – September 30) excluded from graph.

## Heat-Associated Deaths by Residency

Graph 5. Maricopa County residents accounted for eighty-eight percent of all heat-associated deaths with known county of residence.



† Non-Maricopa County Arizona Resident cases include residents from Apache, Gila, Navajo, Pima, and Pinal, Counties and one case with unknown county of residency.

‡ Non-Arizona Resident cases include residents of California, Illinois, Iowa, Missouri, New Jersey, and Ohio.

## Heat-Associated Deaths by Time Residing in Arizona*

Graph 6. Sixty-four percent of heat-associated deaths with known residency history had lived in Arizona for 20 or more years at time of death.



*Fifty cases for which time spent in Arizona was unknown were excluded from analysis.

## Demographic Characteristics of Heat-Associated Deaths

Graph 7. The majority of heat-associated deaths occurred among males.



Graph 8. The largest proportion of deaths in males occurred in thoe under 65, while the largest proportion of deaths in females occurred in those over 65.



* Indicates suppressed value of ≤ 5.

Graph 9.  Seventy-three percent of heat-associated deaths were among those 50 and older. (N=132)



Graph 10. Fifty-nine percent of heat-associated deaths for which race and ethnicity are known occurred among whites. (N=107)



## Heat-Associated Death Rates*

*Death rate graphs below include rates per 100,000 residents. Non-Maricopa County residents were excluded. Rates calculated using census population estimates for 2017.

Graph 11. The heat-associated death rate for males was more than three times greater than the rate for females.



Graph 12. For both male and female residents, the heat-associated death rate was highest in those over the age of 65.



Graph 13. The heat-associated death rate increases with age.



Graph 14. African Americans and Native Americans had the highest rates of heat-associated deaths per 100,000 residents.



## Heat-Associated Deaths by Place of Injury

Graph 15. A lower proportion of deaths occurred indoors than in previous years.



| Year | Outdoor | Indoor |
|------|---------|--------|
| 2011 | Outdoor 46% | Indoor 54% |
| 2012 | 58% | 42% |
| 2013 | 59% | 41% |
| 2014 | 72% | 28% |
| 2015 | 61% | 39% |
| 2016 | 61% | 39% |
| 2017 | 60% | 40% |
| 2018 | 72% | 28% |

Graph 16. A higher proportion of male deaths than female deaths occurred outdoors.



Males — Indoor 24%, Outdoor 76%

Females — Indoor 43%, Outdoor 58%

Graph 17. Sixty percent of outdoor deaths with a known location of injury occurred in an urban area.



* Indicates suppressed value of ≤ 5.

Graph 18. Seventy-three percent of indoor deaths occurred in a house or apartment.



* Indicates suppressed value of ≤ 5.

Graph 19.  Sixty-three percent of indoor deaths were discovered during a welfare check, compared to just seven percent of outdoor deaths.*



*Excludes forty cases for which welfare check status was not reported and one case for which place of injury is unknown.

## Air Conditioning Use for Indoor Deaths*

*Evaporative coolers were not considered as A/C units as their ability to cool becomes inadequate in extreme Maricopa County temperatures.

Graph 20. Eighty-two percent of indoor deaths had an air conditioning unit present at time of death. (N=42)



Graph 21.  Among deaths where an A/C unit was present, a non-functioning A/C unit was the most common reason for not having a cooled environment at the time of death.



## Substance Use among Heat-Associated Deaths

Graph 22.  Half of all cases involved substance use as a cause of death or a contributing factor. (N=91)



Graph 23. In thirty-seven percent of cases, drug use was listed as either cause of death or a contributing factor. (N=68)



Graph 24. The proportion of heat-associated deaths involving drug use increased seventeen percent from the previous year.*



*Cases involving both drug and alcohol use are represented uniquely on each line.

## Living Situation among Heat-Associated Deaths

Graph 25. Thirty-four percent of cases were homeless at time of death.



Graph 26. More heat-associated deaths occurred among homeless individuals than any previous year on record.



* Indicates suppressed value of ≤ 5.

# Conclusions

➢ There was only a 1% increase in heat-associated deaths between 2017 and 2018.

➢ Seven excessive heat warnings were issued in 2018, and ranged in duration from 1 to 3 days. On those days, 23% of all heat-associated deaths occurred.

➢ For the first time on record, more heat deaths occurred in September than in June.

➢ There were more heat-caused deaths than heat-related deaths.

➢ The majority of cases were residents of Maricopa County. Furthermore, most cases had lived in Arizona for 20 years or more.

➢ Overall, there were much fewer deaths among females than among males

➢ Among Maricopa County residents, the rate of heat-associated deaths was the highest for males, African Americans, Native Americans, and those 65 years of age or older.

➢ The majority of cases were injured outdoors. The most common place of injury for the outdoor deaths was an urban area. The most common place of injury for indoor deaths was at a private residence.

➢ While 82% of indoor deaths had an A/C unit present at the time of death, in all cases the environment was not being adequately cooled. Reasons for lack of cooling in the presence of an A/C unit include a malfunctioning unit, a lack of electricity, the unit being turned off due to cost, forgetfulness, or other reasons, and the unit being set to a high temperature. A total of 18% of indoor cases did not have an A/C unit present.

➢ Drugs or alcohol were mentioned on the death certificate in half of all cases.

➢ Individuals experiencing homelessness accounted for 34% of heat-associated deaths.

➢ The average years of life lost for those with heat-related deaths was 23 years, with a median age at death of 60 years.

# Appendix

## Background

In July 2005, Maricopa County (MC) experienced exceptionally high temperatures that contributed to 45 deaths, of which 35 occurred over nine consecutive days.  Temperatures reached 116° F and three excessive heat warnings were issued during this month. After this event, the Maricopa County Department of Public Health (MCDPH) created a novel and effective approach for surveillance of heat-associated deaths in 2006 and has continued to use this system annually.

## Methodology

Surveillance data is obtained from the following sources:

1. The Maricopa County Office of the Medical Examiner (OME) forwards suspected heat-related deaths to MCDPH and provides data including demographics, preliminary information regarding how the death occurred, and the circumstances of death. In the past, this information came solely as a weekly line list with limited information for each case. However, in February of 2012, MCDPH started receiving all preliminary reports of death (PRODs) from the OME. These reports provide expanded information on a daily basis and have changed the screening methods used by MCDPH staff to ensure that all potential heat-related deaths are documented.

2. The MCDPH Office of Vital Registration registers all Maricopa County death certificates in the Arizona Department of Health Services vital records database. The MCDPH Office of Epidemiology searches this database looking for causes of death associated with environmental heat.   A Statistical Analysis Software (SAS) program looks for the key phrases and International Classification of Disease-10 (ICD-10) codes listed below.

| Key Phrases |
|---|
| HEAT EXPOSURE |
| ENVIRON |
| EXHAUSTION |
| SUN |
| HEAT STRESS |
| HEAT STROKE |
| HYPERTHERMIA |

| ICD 10 Code | Corresponding Definition |
|---|---|
| X30 | Exposure to excessive natural heat |
| T67.X | Effects of heat and light |
| P810 | Environmental hyperthermia of newborn |

3.  Hospital and media reports can sometimes initiate a heat death investigation, for example, if a child is reportedly left in a hot car.

Once data are received, analysis of the information is required to identify only those deaths caused as a result of environmental heat.  Environmental heat is heat generated by the climate (sun, humidity, etc.) rather than heat from man-made sources such as ovens or manufacturing equipment.  Heat-associated deaths are categorized based on the classification criteria listed below:

> **Heat-caused (HC) deaths** are those in which environmental heat was <u>directly</u> involved in the sequence of conditions causing deaths.  These are deaths where environmental heat terms were indicated in ***Part I*[1]** of the death certificate causes of death (diseases or conditions in the direct sequence causing death), for cause of death variables (*cod_a, cod_b, cod_c, or cod_d).* County of death: Maricopa.

> **Heat-related (HR) deaths** are those in which environmental heat contributed to the deaths but was not in the sequence of conditions causing these deaths. These are cases where environmental heat terms were mentioned in ***Part II*[2]** of the death certificate causes of death (diseases and conditions contributing but not directly resulting in the death sequence), but not in any of the Part I death variables (*cod_a, cod_b, cod_c, or cod_d*). County of death: Maricopa.

For the purposes of this report, heat-caused and heat-related deaths are combined and referred to as "heat-associated deaths." Please note that most jurisdictions report only heat-caused deaths. This should be considered when comparing Maricopa County data with data from other locations.

Death certificate data, in combination with the OME notes, are used to produce the information that is contained in this report. Total case count, demographics, residency, drug/alcohol use, and years lived in Arizona are directly retrieved from death certificate data. Place of death location, indoor/outdoor occurrence, air conditioning use, and homelessness are retrieved based on explicit notations made in the death certificate and/or OME notes. For the purposes of this report, reasons for not having a cooled environment at the time of death in indoor cases where an A/C unit was present were grouped into three categories: non-functioning, functioning but turned off, and no electricity. "Non-functioning" is defined as an A/C unit that was not operating properly, was broken, or could not be turned on despite the presence of electricity. Cases categorized as having a "functioning but turned off" A/C unit indicate that the unit worked properly but was the A/C was turned off for some reason at the time of the OME scene inspection. In cases where the unit could not be turned on due to a lack of electricity, regardless of whether it was functioning or non-functioning, were counted in the "no electricity" category.

Homelessness is defined as having an address on the death certificate that matches a homeless shelter, government agency, business, or an intersection. Cases are also classified as homeless if there is an indication on the death certificate.  If the address is listed as unknown on the death certificate then an examination of the medical examiner's notes is made to determine if there is a reference to an address - if none, then the person is classified as homeless.  If the address is listed as out of jurisdiction then time spent in Arizona, as provided by the death certificate, is taken into consideration.

Once classification is completed, the data are summarized for the production and dissemination of reports. Reports are generated weekly during the season and posted to the MCDPH website which can be found at: http://www.maricopa.gov/publichealth/Services/EPI/Reports/heat.aspx

[1] **Part I of the death certificate:** cod a – is the immediate cause (final disease or condition resulting in death) cod b, cod c, cod d – are sequentially listed conditions leading to the cause listed on cod a.

[2] **Part II of the death certificate:** Other significant conditions contributing to death but not resulting in the underlying cause given in Part I.

## Tables

Table A. Heat-Associated Deaths Reported by Investigation Status, Maricopa County, 2006-2018

| YEAR | TOTAL CASES REPORTED | CONFIRMED CASES (%) | RULED-OUT CASES (%) | PENDING CASES (%) |
|------|------|------|------|------|
| **2006** | 104 | 85 (82%) | 19 (18%) | 0 (0%) |
| **2007** | 131 | 51 (39%) | 80 (61%) | 0 (0%) |
| **2008** | 97 | 49 (51%) | 48 (49%) | 0 (0%) |
| **2009** | 114 | 74 (65%) | 40 (35%) | 0 (0%) |
| **2010** | 142 | 82 (58%) | 60 (42%) | 0 (0%) |
| **2011** | 144 | 106 (74%) | 38 (26%) | 0 (0%) |
| **2012** | 173 | 110 (64%) | 63 (36%) | 0 (0%) |
| **2013** | 145 | 75 (52%) | 70 (48%) | 0 (0%) |
| **2014** | 115 | 61 (53%) | 54 (47%) | 0 (0%) |
| **2015** | 144 | 84 (58%) | 59 (42%) | 0 (0%) |
| **2016** | 240 | 154 (64%) | 86 (36%) | 0 (0%) |
| **2017** | 264 | 179 (68%) | 85 (32%) | 0 (0%) |
| **2018** | 242 | 182 (75%) | 60 (25%) | 0 (0%) |
| **TOTAL** | **1,549** | **931 (60%)** | **617 (40%)** | **0 (0%)** |

Table B. Heat-Associated Deaths by Gender and Age Group, Maricopa County, 2018

| AGE GROUP | MALE CASES (%) | FEMALE CASES (%) | TOTAL CASES (%) |
|:---:|:---:|:---:|:---:|
| **0-4** | 0 (0%) | 0 (0%) | 0 (0%) |
| **5-19** | 0 (0%) | 0 (0%) | 0 (0%) |
| **20-34** | 17 (9%) | * | * |
| **35-49** | 27 (15%) | * | * |
| **50-64** | 56 (31%) | 10 (5%) | 66 (36%) |
| **65-74** | 27 (15%) | 14 (8%) | 41 (23%) |
| **75+** | 14 (8%) | 11 (6%) | 25 (14%) |
| **TOTAL** | **141 (100%)** | **41 (100%)** | **182 (100%)** |

* Indicates suppressed value of ≤ 5 or a value that would facilitate calculation of a suppressed value.

Table C. Heat-Associated Deaths Rates per 100,000 Residents** by Gender and Age Group, Maricopa County, 2018

| AGE GROUP | MALE RATE (N) | FEMALE RATE (N) | TOTAL RATE (N) |
|:---:|:---:|:---:|:---:|
| **0-4** | 0.0 (0) | 0.0 (0) | 0.0 (0) |
| **5-19** | 0.0 (0) | 0.0 (0) | 0.0 (0) |
| **20-34** | 2.7 (13) | 0.0 (0) | 1.4 (13) |
| **35-49** | 4.0 (17) | 1.2 (*) | 2.6 (*) |
| **50-64** | 9.8 (37) | 1.7 (7) | 5.7 (44) |
| **65-74** | 13.4 (24) | 5.7 (12) | 9.3 (36) |
| **75+** | 10.6 (13) | 5.7 (9) | 7.8 (22) |
| **TOTAL** | **4.8 (104)** | **1.5 (*)** | **3.1 (137)** |

* Indicates suppressed value of ≤ 5 or a value that would facilitate calculation of a suppressed value.

**Based on 2018 census population estimates for Maricopa County. Forty-five cases that were not Maricopa County residents or had an unknown county of residence excluded.

Table D. Heat-Associated Deaths Rates per 100,000 Residents** by Age Group and Race/Ethnicity, Maricopa County, 2018

| RACE/ETHNICITY | AGE GROUP RATE (N) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-19 | 20-34 | 35-49 | 50-64 | 65-74 | 75+ | TOTAL |
| **WHITE** | 0.0 (0) | 0.0 (0) | 0.7 (*) | 3.7 (17) | 5.6 (29) | 7.9 (24) | 7.2 (17) | 3.7 (90) |
| **HISPANIC** | 0.0 (0) | 0.0 (0) | 1.5 (*) | 1.1 (*) | 4.7 (8) | 10.0 (*) | 7.5 (*) | 1.7 (23) |
| **BLACK** | 0.0 (0) | 0.0 (0) | 5.0 (*) | 4.1 (*) | 12.9 (*) | 21.3 (*) | 13.5 (*) | 5.8 (14) |
| **ASIAN/PACIFIC ISLANDER** | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) | 13.0 (*) | 0.5 (1) |
| **NATIVE AMERICAN** | 0.0 (0) | 0.0 (0) | 9.5 (*) | 0.0 (0) | 9.9 (*) | 31.3 (*) | 0.0 (0) | 5.4 (*) |
| **MULTIPLE** | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) | 0.0 (0) |
| **TOTAL** | **0.0 (0)** | **0.0 (0)** | **1.4 (13)** | **2.6 (22)** | **5.7 (44)** | **9.3 (36)** | **7.8 (22)** | **3.1 (137)** |

* Indicates suppressed value of ≤ 5 or a value that would facilitate calculation of a suppressed value.

**Based on 2018 census population estimates for Maricopa County. Forty-five cases that were not Maricopa County residents or had an unknown county of residence excluded. Total includes five cases with unknown race/ethnicity.

Table E. Heat-Associated Deaths Rates per 100,000 Residents** by Gender and Race/Ethnicity, Maricopa County, 2018

| RACE/ETHNICITY | MALE RATE (N) | FEMALE RATE (N) | TOTAL RATE (N) |
|---|---|---|---|
| **White** | 5.4 (64) | 2.1 (26) | 3.7 (90) |
| **Hispanic** | 3.0 (21) | 0.3 (*) | 1.7 (23) |
| **Black** | 4.9 (6) | 2.5 (*) | 3.7 (9) |
| **Asian/Pacific Islander** | 1.1 (*) | 0.0 (0) | 0.5 (*) |
| **Native American** | 23.1 (8) | 0.0 (0) | 10.9 (8) |
| **Multiple** | 4.2 (*) | 0.0 (0) | 2.1 (*) |
| **TOTAL** | **4.8 (104)** | **1.5 (33)** | **3.1 (137)** |

* Indicates suppressed value of ≤ 5 or a value that would facilitate calculation of a suppressed value.

*Based on 2018 census population estimates for Maricopa County. Forty-five cases that were not Maricopa County residents or had an unknown county of residence excluded. Total includes five cases with unknown race/ethnicity.

Table F. Indoor Heat-Associated Deaths* by Place of Injury and Age Group, Maricopa County, 2018

### PLACE OF INJURY TYPE

| AGE GROUP | HOUSE | APARTMENT | TRAILER/RV/ MOBILE HOME | BUSINESS | CARE FACILITY | TOTAL |
|---|---|---|---|---|---|---|
| **0-4** | 0% | 0% | 0% | 0% | 0% | 0% |
| **5-19** | 0% | 0% | 0% | 0% | 0% | 0% |
| **20-34** | 0% | 4% | 2% | 0% | 0% | 6% |
| **35-49** | 0% | 2% | 2% | 0% | 0% | 4% |
| **50-64** | 16% | 4% | 8% | 0% | 0% | 27% |
| **65-74** | 27% | 8% | 8% | 2% | 2% | 47% |
| **75+** | 10% | 2% | 4% | 0% | 0% | 16% |
| **TOTAL** | **53%** | **20%** | **24%** | **2%** | **2%** | **100%** |

Table G. Outdoor Heat-Associated Deaths* by Place of Injury and Age Group, Maricopa County, 2018

### PLACE OF INJURY TYPE

| AGE GROUP | CAR | DESERT AREA | RESIDENCE | URBAN AREA | CARE FACILITY | TOTAL |
|---|---|---|---|---|---|---|
| **0-4** | 0% | 0% | 0% | 0% | 0% | 0% |
| **5-19** | 0% | 0% | 0% | 0% | 0% | 0% |
| **20-34** | 1% | 4% | 2% | 6% | 0% | 12% |
| **35-49** | 2% | 5% | 2% | 15% | 0% | 23% |
| **50-64** | 0% | 4% | 2% | 33% | 0% | 39% |
| **65-74** | 2% | 1% | 5% | 6% | 0% | 13% |
| **75+** | 2% | 2% | 9% | 0% | 1% | 13% |
| **TOTAL** | **6%** | **15%** | **19%** | **60%** | **1%** | **100%** |

*Two cases with unknown place of injury excluded from analysis. Outdoor total excludes two outdoor cases with unknown location type.

Table H.  Heat-Associated Deaths* by Place of Injury, Age Group, and Gender, Maricopa County, 2018

| AGE GROUP | INDOOR | | | OUTDOOR | | |
|---|---|---|---|---|---|---|
| | MALE | FEMALE | TOTAL | MALE | FEMALE | TOTAL |
| 0-4 | 0% | 0% | 0% | 0% | 0% | 0% |
| 5-19 | 0% | 0% | 0% | 0% | 0% | 0% |
| 20-34 | 6% | 0% | 6% | 11% | <1% | 12% |
| 35-49 | 4% | 0% | 4% | 19% | 3% | 22% |
| 50-64 | 20% | 8% | 27% | 35% | 5% | 40% |
| 65-74 | 29% | 18% | 47% | 9% | 4% | 13% |
| 75+ | 8% | 8% | 16% | 8% | 5% | 13% |
| TOTAL | 67% | 33% | 100% | 82% | 18% | 100% |

*Total excludes two cases with unknown place of injury.


Table I.  Indoor Heat-Associated Deaths by Presence of an Air Conditioning (A/C) Unit and Age Group, Maricopa County, 2018

| AGE GROUP | AC UNIT PRESENT (%) | AC UNIT NOT PRESENT OR UNKNOWN (%) | TOTAL |
|---|---|---|---|
| 0-4 | 0% | 0% | 0% |
| 5-19 | 0% | 0% | 0% |
| 20-34 | 4% | 2% | 6% |
| 35-49 | 4% | 0% | 4% |
| 50-64 | 22% | 6% | 27% |
| 65-74 | 39% | 8% | 47% |
| 75+ | 14% | 2% | 16% |
| TOTAL | 82% | 18% | 100% |

Table J. Indoor Heat-Associated Deaths with AC Unit Present by Air Conditioning (A/C) Status and Age Group, Maricopa County, 2018

## A/C STATUS (%)

| AGE GROUP | NO ELECTRICITY | NON-FUNCTIONING | NOT IN USE | OTHER | UNKNOWN | TOTAL |
|-----------|----------------|-----------------|------------|-------|---------|-------|
| 0-4 | 0% | 0% | 0% | 0% | 0% | 0% |
| 5-19 | 0% | 0% | 0% | 0% | 0% | 0% |
| 20-34 | 0% | 4% | 2% | 0% | 0% | 7% |
| 35-49 | 0% | 4% | 0% | 0% | 0% | 4% |
| 50-64 | 2% | 17% | 2% | 0% | 2% | 24% |
| 65-74 | 7% | 35% | 4% | 0% | 2% | 48% |
| 75+ | 0% | 11% | 2% | 2% | 2% | 17% |
| TOTAL | 9% | 72% | 11% | 2% | 7% | 100% |

Table K. Heat-Associated Deaths by Substance Use at Time of Death, Maricopa County, 2018

## SUBSTANCE USE (%)

| AGE GROUP | ALCOHOL | DRUG | BOTH | NEITHER | TOTAL |
|-----------|---------|------|------|---------|-------|
| 0-4 | 0% | 0% | 0% | 0% | 0% |
| 5-19 | 0% | 0% | 0% | 0% | 0% |
| 20-34 | 2% | 5% | 2% | 1% | 10% |
| 35-49 | 3% | 11% | <1% | 3% | 18% |
| 50-64 | 5% | 16% | <1% | 15% | 36% |
| 65-74 | 2% | 2% | <1% | 18% | 23% |
| 75+ | 1% | 0% | 0% | 13% | 14% |
| TOTAL | 13% | 34% | 4% | 50% | 100% |

Table L. Heat-Associated Deaths among Homeless Individuals, Maricopa County, 2018

| AGE GROUP | MALE | FEMALE | TOTAL |
|-----------|------|--------|-------|
| 0-4 | 0% | 0% | 0% |
| 5-19 | 0% | 0% | 0% |
| 20-34 | 8% | 2% | 10% |
| 35-49 | 25% | 5% | 30% |
| 50-64 | 43% | 7% | 49% |
| 65-74 | 11% | 0% | 11% |
| 75+ | 0% | 0% | 0% |
| TOTAL | 87% | 13% | 61% |

Table M. Heat-Associated Deaths by Education Level, Maricopa County, 2018

| EDUCATION | CASES (%) |
|-----------|-----------|
| 8th grade or less | 12 (7%) |
| 9th through 12th grade; no diploma | 18 (10%) |
| High school graduate or GED completed | 51 (28%) |
| Some college credit, but no degree | 24 (13%) |
| Associate degree (e.g.AA,AS) | 15 (8%) |
| Bachelor's degree (e.g.BA,BS) | 17 (9%) |
| Master's degree (e.g.MA,MS,MEng,MEd,MSW,MBA) | 6 (3%) |
| Doctorate (e.g.PhD,EdD) or Professional degree (e.g.MD,DDS,DVM,LLB,JD) | 0 (0%) |
| Unknown | 39 (21%) |
| TOTAL | 182 (100%) |