1    Martin Lieberman (Bar No. 007442)
     Molly Brizgys (Bar No. 029216)
2    **ACLU FOUNDATION OF ARIZONA**
     3707 North 7th Street, Suite 235
3    Phoenix, Arizona 85013
     Telephone:  (602) 650-1854
4    Email: mlieberman@acluaz.org
              mbrizgys@acluaz.org
5
     *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6    *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
     *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7    *Desiree Licci, Joseph Hefner, Joshua Polson, and*
     *Charlotte Wells, on behalf of themselves and all others*
8    *similarly situated*

9    **[ADDITIONAL COUNSEL LISTED ON
     SIGNATURE PAGE]**

10   Asim Dietrich (Bar No. 027927)
     **ARIZONA CENTER FOR DISABILITY LAW**
11   5025 East Washington Street, Suite 202
     Phoenix, Arizona 85034
12   Telephone:  (602) 274-6287
     Email: adietrich@azdisabilitylaw.org
13
     *Attorneys for Plaintiff Arizona Center for Disability Law*
14
     **[ADDITIONAL COUNSEL LISTED ON
15   SIGNATURE PAGE]**

16                UNITED STATES DISTRICT COURT

17                     DISTRICT OF ARIZONA

18   Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-ROS
     Dustin Brislan; Sonia Rodriguez; Christina
19   Verduzco; Jackie Thomas; Jeremy Smith; Robert
     Gamez; Maryanne Chisholm; Desiree Licci; Joseph      **PLAINTIFFS' RESPONSE**
20   Hefner; Joshua Polson; and Charlotte Wells, on       **TO COURT ORDER**
     behalf of themselves and all others similarly        **(DOC. 3416)**
21   situated; and Arizona Center for Disability Law,
                                                          **(STATUS HEARING**
22                  Plaintiffs,                           **REQUESTED)**

23        v.

24   David Shinn, Director, Arizona Department of
     Corrections; and Richard Pratt, Division Director,
25   Division of Health Services Contract Monitoring
     Bureau, Arizona Department of Corrections, in their
26   official capacities,

27                  Defendants.

28

1

**INTRODUCTION**

2      As discussed below, the Court has a number of alternative methods to achieve the

3  Stipulation's goal to provide the 34,000 people in Arizona's prisons with constitutionally

4  adequate health care and to prevent them from suffering cruel and unusual punishment

5  while in isolation units.  These enforcement mechanisms stem from the Court's inherent

6  authority to compel compliance with its orders and from the Stipulation itself, which

7  provides that "the Court shall retain the power to enforce this Stipulation through all

8  remedies provided by law, except that the Court shall not have the authority to order

9  Defendants to construct a new prison or to hire a specific number or type of staff . . . ."

10  [Doc. 1185 ¶ 36]  The Ninth Circuit ruled that ***this Court, in this case,*** can rely upon "all

11  remedies provided by law" subject to Paragraph 36's two exceptions.  *Parsons v. Ryan*,

12  912 F.3d 486, 497-98 (9th Cir. 2018), *cert denied sub nom. Ryan v. Jensen*, 589 U.S. __

13  (Oct. 7, 2019).[1]  This Court therefore retains all powers inherent in an Article III court,

14  and those authorized by case law, statute, and the Federal Rules.  *See Roadway Exp., Inc.*

15  *v. Piper*, 447 U.S. 752, 764 (1980) (holding that "[t]he inherent powers of federal courts

16  are those which 'are necessary to the exercise of all others.'") (quoting *United States v.*

17  *Hudson*, 7 Cranch 32, 34 (1812)).[2]

18

19      [1] With regard to the staffing exception, the Ninth Circuit held that "Paragraph 36
does not, by its plain language, preclude the district court from ordering Defendants to
20  develop and implement a plan to increase staff in general."  *Parsons*, 912 F.3d at 498.
Therefore, "the district court may, in future proceedings, consider whether a general
21  staffing order that does not require Defendants to hire a specific number or type of staff is
an appropriate remedy for Defendants' non-compliance."  *Id*. at 499.
22      [2] That David Shinn replaced Charles Ryan as ADC Director does not affect the
Court's power to issue any remedy described in the brief, as Mr. Ryan was sued in his
23  official capacity for injunctive relief.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985)
("As long as the government entity receives notice and an opportunity to respond, an
24  official-capacity suit is, in all respects other than name, to be treated as a suit against the
entity.  It is *not* a suit against the official personally, for the real party in interest is the
25  entity") (emphasis in original) (citation omitted).  Mr. Shinn is bound by the Stipulation
that Mr. Ryan signed.  Fed. R. Civ. P. 25(d); *see Morales-Feliciano v. Rullan*, 303 F.3d 1,
26  7-8 (1st Cir. 2002) (holding that "a government official, sued in his representative
capacity, cannot freely repudiate stipulations entered into by his predecessor in office" in
27  a correctional health care case); *see also Barcia v. Sitkin*, 367 F.3d 87, 90 n.1 (2d Cir.
2004) (same); *Shakman v. Democratic Org. of Cook Cty*., 919 F.2d 455, 456-57 (7th Cir.
28  1990) (successor to official capacity defendant "automatically became a party to the . . .

1    Pursuant to the Court's direction to file a brief detailing all mechanisms available

2    to it to enforce the Stipulation, Plaintiffs set forth below all of the powers the Court has to

3    enforce compliance.   [Doc. 3416 at 2][3]   In the past five years, this Court has found

4    Defendants in contempt, levied a fine of $1.4 million, appointed two Rule 706 experts and

5    issued numerous other enforcement orders, none of which have been successful in

6    motivating Defendants to come into full compliance with the Stipulation and thereby

7    provide constitutional conditions for the plaintiff class.   In light of this appalling situation,

8    Plaintiffs have previously recommended that the Stipulation be terminated and the case set

9    for trial on an expedited basis to allow the Court to hear the depth of the suffering and

10   death that is pervasive in ADC and to fashion appropriate relief to address the ongoing

11   constitutional violations.   Plaintiffs continue to believe that the Court should adopt this

12   course of action.   If, however, the Court decides not to set the case for trial, Plaintiffs

13   strongly recommend that the Court employ compliance mechanisms that have the

14   potential to be more successful than those already used.

15   Specifically, as detailed below, Plaintiffs recommend that the Court focus its

16   efforts on what Judge Duncan found was the root of many of the problems—inadequate

17   clinical staffing.   Thus the Court should order an independent entity or person, such as

18   Dr. Stern, to complete a general staffing analysis and require Defendants to hire clinical

19   staff accordingly.   Plaintiffs also believe that the Court should conduct proceedings aimed

20   at determining whether to modify the Stipulation.   Dr. Stern found that the Stipulation's

21   absence of qualitative measures prevents an accurate assessment of whether patients

22   receive adequate care, and that even facial compliance with the Stipulation's provisions

23   does not ensure that health care meets minimum standards.   Finally, Plaintiffs believe the

24   Court should appoint a Receiver to operate ADC's health care system.   That ADC has

25   failed to come close to providing constitutionally adequate care over the last five years,

26

27   consent decree"); 7C FED. PRAC. & PROC. CIV. § 1961 (3d ed.) ("The manipulation of
     names is merely a technicality that should not interfere with substantial rights.").
          [3] All citations to the docket are to the page number assigned by the Court's
28   Electronic Case Filing system.

1   while under close Court supervision, demonstrates that the state is incapable of providing

2   the resources and expertise needed to remedy the persistent constitutional violations.

3              **I.       The Court Can Issue Further Enforcement Orders.**

4        A federal court has the power to issue further enforcement orders and injunctive

5   relief to effectuate the purpose of a decree, settlement agreement, injunction, or past

6   orders. *Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to

7   approving consent decrees and hoping for compliance.  Once entered, a consent decree

8   may be enforced."); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 (1984)

9   (courts may enter further orders by exercising "the equitable powers of courts of law over

10   their own process, to prevent abuses, oppression, and injustices") (quoting *Int'l Prods.*

11   *Corp. v. Koons*, 325 F.2d 403, 407-08 (2d Cir. 1963)); *Armstrong v. Brown*, 768 F.3d 975,

12   986 (9th Cir. 2014) ("The ongoing, intractable nature of this litigation affords the district

13   court considerable discretion in fashioning relief").  The All Writs Act provides that

14   federal courts "may issue all writs necessary or appropriate in aid of their respective

15   jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a); *see*

16   *also United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 ("This Court has repeatedly

17   recognized the power of a federal court to issue such commands under the All Writs Act

18   as may be necessary or appropriate to effectuate and prevent the frustration of orders it

19   has previously issued in its exercise of jurisdiction otherwise obtained . . . ."); *Nat'l Org.*

20   *for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544 (9th Cir. 1987) ("One of

21   the recognized applications of the All Writs Act is the issuance of orders necessary to

22   ensure the integrity of orders previously issued.").[4]

23

24

_____

25        [4] This power to issue further orders is not limited to parties before the court in the underlying litigation.  *N.Y. Tel. Co.*, 434 U.S. at 174 (the power to issue orders "extends,

26   under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court

27   order or the proper administration of justice, [. . .] and encompasses even those who have not taken any affirmative action to hinder justice") (citations omitted).  Therefore, the

28   Court has the power to issue orders directing Defendants' contractors, agents, and/or employees to take, or refrain from, specified actions.

1   While Defendants may argue that the Prison Litigation Reform Act ("PLRA")
2   constrains the Court's ability to issue enforcement orders, that argument was rejected by
3   the Ninth Circuit in this case.  *See Parsons*, 912 F.3d at 501 ("[T]he district court was not
4   required to make new findings of a constitutional violation before enforcing the
5   Stipulation with the [enforcement order]").

6   There are a multitude of enforcement orders this Court could issue.  As an initial
7   matter, it can do what the Ninth Circuit said is within its authority as "an appropriate
8   remedy for Defendants' noncompliance" and issue "a general staffing order that does not
9   require Defendants to hire a specific number or type of staff," (*id.* at 499), by ordering
10  Defendants to immediately implement Dr. Stern's recommendation that a correctional
11  health care expert "conduct a staffing analysis and then implement staffing changes
12  accordingly." [Doc. 3379 at 98]  Dr. Stern explained,

13      The analysis uses a combination of the four approaches above along with
14      other techniques, including time-motion studies, interviews with managers
        and front line workers, observation of work flow, and, most importantly, a
15      review of key tasks that are being done poorly and/or with unacceptable
        delays to calculate the marginal increase in staffing required to correct the
16      deficiencies.

17  [*Id.*]

18  As detailed below, the Court has the power to appoint an independent expert.  That
19  said, Plaintiffs do not believe that a staffing study, standing alone, is sufficient to
20  ameliorate the problems that the Court noted that Dr. Stern's report revealed:

21      His report confirms the Court's long-held belief that pervasive issues have
        precluded accurate monitoring of certain performance measures and that
22      even the low compliance levels reported in some instances may be worse.
        . . . The report also describes in detail how Defendants' behavior creates a
23      significant risk of serious harm to prisoners' health and concluded that
        additional funding would be necessary to provide required healthcare.
24      [. . .] Dr. Stern's report raises serious questions whether it is realistic or
        appropriate to expect that Defendants will perform the obligations they
25      accepted years ago.

26  [Doc. 3385 at 2-3]

27  Additionally, Dr. Stern recommended that the privatization of correctional health
28  care in Arizona be rescinded or overridden because it poses a barrier to compliance with

-4-

the Stipulation.  [Doc. 3379 at 104-08]  He also recommended that the Legislature's instruction to ADC to cap payment to community specialists at the Medicaid (AHCCCS) reimbursement rate be rescinded or overridden.  [*Id*. at 102]  This Court can issue orders rescinding or overriding these statutes, upon a finding that such orders are necessary to correct a violation of federal rights.  *See* 18 U.S.C. § 3626(a)(1)(B).

## II.    The Court Can Appoint a Rule 706 Expert to Evaluate and Monitor ADC's Delivery of Health Care.

"Courts have broad discretion to appoint expert witnesses" under Rule 706 of the Federal Rules of Evidence, *Sanders v. York*, 446 F. App'x 40, 43 (9th Cir. 2011), in order to provide "an independent source of evidence" to the court and to assist it in its decision-making process, *F.T.C. v. Enforma Nat. Prods. Inc*., 362 F.3d 1204, 1213 (9th Cir. 2004). The Court can appoint Rule 706 experts to provide it with reports and recommendations, and to monitor compliance with past orders and stipulations.  *See Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1116 (D. Idaho 2013) (appointing independent monitor to evaluate compliance with settlement in prison conditions case), *aff'd*, 822 F.3d 1085 (9th Cir. 2016).  Dr. Stern's recent report did *not* provide a systemic analysis of the adequacy of the health care provided to class members:

> I was not charged by the court to evaluate, did not design my methodology to, and therefore with rare exception do not offer an opinion on, whether, overall, the systems of care in place to deliver health care at the ADC pose a significant risk of serious harm to its residents.

[Doc. 3379 at 4; *see also id*. at 113]  The Court should explicitly order him to undertake such a system-wide evaluation, using qualitative evaluation metrics instead of the Stipulation's existing methodology of timeframes and box-checking.  [*See id*. at 113][5]

---

[5] As noted in Plaintiffs' November 4, 2019 filing, the last sample of inadequate health care provided to the Court constituted less than 5% of the almost 300 individual letters Plaintiffs' counsel sent to Defendants from May 17 through November 1, 2019, regarding class members in need of immediate medical, mental health, and/or dental care, after reviewing class members' medical records.  [Doc. 3404 ¶ 3]  Between November 4 and November 27, 2019, Plaintiffs' counsel sent Defendants 49 notifications of individual class members in need of immediate health care, a sample of which are filed with this brief along with a report summarizing findings of their October 2019 monitoring tour of

1     If Dr. Stern's analysis were to conclude that the Stipulation's methodology does

2  not accurately reflect the quality of care on a systemic basis, as he already has concluded

3  on a case-by-case basis, (*see generally* Doc. 3379, Part IV), then the Court could appoint

4  him, or another expert, to monitor the delivery of care using qualitative metrics and

5  clinical judgment rather than the Stipulation's quantitative performance measures.[6]  If the

6  Court were to appoint an expert to take on a qualitative monitoring role, this would

7  involve modifying the Stipulation, which is discussed next.[7]

8     **III.    The Court Can Modify the Stipulation.**

9     If enforcement orders do not address Defendants' substantial noncompliance or

10  improve the adequacy of care, the Court can modify the Stipulation under Rule 60(b)(5)

11  of the Federal Rules of Civil Procedure.  The Supreme Court has held that a court

12        retains the authority, and the responsibility, to make further amendments to
          the existing order or any modified decree it may enter as warranted by the
13        exercise of its sound discretion.  The power of a court of equity to modify a
          decree of injunctive relief is long-established, broad, and flexible.  A court
14        that invokes equity's power to remedy a constitutional violation by an
          injunction mandating systemic changes to an institution has the continuing
15

16  ASPC-Yuma.  [Declaration of Corene Kendrick ("Kendrick Decl.") ¶¶ 2, 6; Exs. 1-5]
    This is hardly the "false narrative" that Defendants characterize it to be.  [*See, e.g.*,
17  Doc. 3410 at 4 n.2]  In any event, if Defendants are confident that they and their latest
    vendor are providing constitutionally adequate care on a systemic basis, then they should
18  welcome, rather than object to, the Court directing Dr. Stern or another independent
    expert to embark upon a systemic review of the health care services.
19     [6] Plaintiffs continue to raise concerns regarding the accuracy of information
    maintained by Centurion and ADC, including in class member medical records, which
20  form the basis for evaluating compliance with performance measures.  For example,
    Plaintiffs' counsel recently notified Defendants that a mental health staff member had
21  made false entries of "mental health checks" on a class member in a max custody unit,
    when in fact the class member was at an outside hospital.  [*See* Kendrick Decl. Ex. 5]  At
22  a different prison, a psych associate was cutting-and-pasting identical notes for different
    patients on different dates.  [*See id.* Exs. 3-4]  Plaintiffs' counsel also notified Defendants
23  that a Centurion report purporting to list all pregnant women in ADC custody was
    woefully incomplete.  [*Id.* Ex. 2]  To date, Defendants have not responded to any of these
24  notifications.  [*Id.* ¶¶ 3-5]
       [7] In 2017, Plaintiffs explained why a Rule 706 court expert is superior to the
25  appointment of a Special Master under Rule 53 of the Federal Rules of Civil Procedure.
    [Doc. 2043]  In a nutshell, the strict limitations the PLRA places on the appointment of a
26  special master in a prison conditions case limit the Court's ability to ensure the special
    master can effectuate improvements in an efficient or timely manner.  [*See id.* at 3; *see
27  also* Declaration of Donald Specter ("Specter Decl."), filed herewith, ¶¶ 4, 7 (describing
    limitations of Rule 53 Special Master in litigation regarding mental health care in
28  California's prisons)]

1
2
3
4

> duty and responsibility to assess the efficacy and consequences of its order. Experience may teach the necessity for modification or amendment of an earlier decree. To that end, the [district] court must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection.

5   *Brown v. Plata*, 563 U.S. 493, 542-43 (2011) (citations and quotation marks omitted).  As

6   prospective relief "is drafted in light of what the court believes will be the future course of

7   events, . . . a court must never ignore significant changes in the law or circumstances

8   underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar*

9   *v. Buono*, 559 U.S. 700, 714-15 (2010) (citations and quotation marks omitted).[8]

10         Courts may modify any injunction or order where there has been "a significant

11   change either in factual conditions or in law," which can be shown by either (1) changed

12   factual conditions that make compliance substantially more onerous; (2) the injunction or

13   decree "proves to be unworkable because of unforeseen obstacles;" or (3) enforcement

14   "without modification would be detrimental to the public interest." *Rufo v. Inmates of*

15   *Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992) (citations omitted).  While only one of these

16   *Rufo* findings need to be met in order to modify a stipulation, all three are amply met here.

17         First, a party's failure to comply with a court order *is* an unforeseen circumstance

18   that justifies modification.  *See Labor/Cmty. Strategy Ctr. v. L.A. Cty. Metro. Transp.*

19   *Auth.*, 564 F.3d 1115, 1120-21 (9th Cir. 2009) ("The failure of substantial compliance

20   with the terms of a consent decree can qualify as a significant change in

21   circumstances. . .");  *see also Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016)

22

23   _____

[8] To the extent Defendants continue to cling to their unpersuasive argument that the Stipulation is unenforceable because it is not entitled "Consent Decree," the law is clear that the Court's equitable power to modify applies to *all* orders and judgments with prospective application, including not only consent decrees but also court-ordered and stipulated injunctions.  *See Armstrong*, 768 F.3d at 986 (modification of a stipulated remedial plan); *Valdivia v. Schwarzenegger*, 599 F.3d 984, 986, 994 (9th Cir. 2010) (discussing *Rufo*'s application to motion to modify stipulated injunction); *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1255 (9th Cir. 1999) (holding that "*Rufo* sets forth a general, flexible standard for all petitions brought under the equity provision of Rule 60(b)(5)" and applying *Rufo* to court-ordered injunction in a private commercial case); *see also Plata*, 563 U.S. at 514-15, 542 (modifying a stipulated injunction).

("[S]ubstantial violation of a court order constitutes a significant change in factual circumstances."). More than five years of Defendants' half-hearted and inadequate responses to the Court's findings of substantial noncompliance and orders to comply with the Stipulation also are a basis to justify modifying the Stipulation. *See Armstrong*, 768 F.3d at 978-79 (detailing the district court's modifications to the stipulated remedial plan due to prison officials' years of weak or nonexistent attempts to comply); *Ball v. Rodgers*, No. CV 00–67–TUC–EHC, 2010 WL 797146, at *8 (D. Ariz. Mar. 8, 2010) (modifying injunction when the state failed to provide adequate in-home and community-based services under the Medicaid Act).

Second, when entering into the Stipulation, Plaintiffs assumed Defendants intended to comply with it. *Cf. Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014), *cert. denied sub nom. Rosebrock v. Hoffman*, 135 S. Ct. 1893 (2015) ("We presume that a government entity is acting in good faith when it changes its policy . . . ."); *see also Fisher v. United States*, Nos. CV 74-90 TUC DCB, CV 74-204 TUC DCB, 2007 WL 2410351, at *4 (D. Ariz. Aug. 21, 2007) (when determining whether to dissolve a settlement agreement the court must analyze whether the government entity has shown "good faith compliance and a good faith commitment to the future operation [of the agency], which can be shown through specific policies, decisions, and courses of action that extend into the future.").[9] In hindsight, this assumption may have been misplaced, as Plaintiffs did not anticipate the scope, degree, or duration of Defendants' noncompliance. Nor could Plaintiffs—or the Court, for that matter—have predicted Defendants' stubborn refusal to recognize the Court's authority, or that they would argue for years on multiple trips to the Ninth Circuit that the Stipulation that they signed is unenforceable and that they are

---

[9] Likewise, the parties assumed Defendants would devote the necessary resources to comply. Doc. 1185 ¶ 7 ("Defendants shall request that the Arizona Legislature approve a budget to allow ADC and its contracted health services vendor to modify the health services contract to increase staffing of medical and mental health positions. *This provision shall not be construed as an agreement by Plaintiffs that this budgetary request is sufficient to comply with the terms of this Stipulation*.") (emphasis added); s*ee Rufo*, 502 U.S. at 392 ("[f]inancial constraints may not be used to justify the creation or perpetuation of constitutional violations").

1    unaccountable for their noncompliance.   [*See, e.g.*, Doc. 3411; *see also* Doc. 3385 at 3

2    (this Court noting that "[i]t is foolish to believe the parties meant for the Court to have no

3    enforcement mechanisms.")][10]

4          Finally, the Court may consider the Stipulation's purpose and the public interest in

5    deciding whether modification is appropriate to effectuate its purpose.  *Rufo*, 502 U.S. at

6    384 (holding that modification is appropriate "when enforcement of the decree without

7    modification would be detrimental to the public interest"); *Thompson v. Enomoto*, 915

8    F.2d 1383, 1388 (9th Cir. 1990) (holding that a court has the power to modify "if

9    experience with the administration of the decree shows the need for modification in order

10   to accomplish the primary goals of the decree.").  It is clearly in the public interest for the

11   State of Arizona's prisons to provide constitutionally adequate health care and conditions

12   of confinement.  "[I]t is always in the public interest to prevent the violation of a party's

13   constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citations

14   and internal quotation marks omitted).  As to incarcerated persons' right to minimally

15   adequate health care, "the public interest lies in obviating the ongoing constitutional

16   violations in the mental and medical health care systems in [the state's] prisons[.]"

17   *Coleman v. Brown*, 960 F. Supp. 2d 1057, 1073 (E.D. Cal. 2013) (Three Judge Panel); *see*

18   *also Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009) ("The public has a strong

19   interest in the provision of constitutionally-adequate health care to prisoners[.]"); *cf.*

20   *Plata*, 563 U.S. at 510-11 ("Just as a prisoner may starve if not fed, he or she may suffer

21   or die if not provided adequate medical care.  A prison that deprives prisoners of basic

22   sustenance, including adequate medical care, is incompatible with the concept of human

23   dignity and has no place in civilized society."); *Armstrong v. Brown*, 939 F. Supp. 2d

24

25   ────────────────

26        [10] If Defendants argue that the Court and Plaintiffs should have anticipated their recalcitrance and noncompliance, this is an admission that Defendants foresaw their

27   inability to comply with the Stipulation and entered into it anyway.  *See, e.g.*, *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 829 (4th Cir. 2005) (". . . Defendants

28   would not have subjected themselves to the district court's contempt powers by agreeing to do something they knew they would not be able to do.").

1   1012, 1022 (N.D. Cal. 2013) (holding that "the Court need not wait until a death to require

2   compliance with its orders").

3        The Court could modify the Stipulation to incorporate the changes Dr. Stern

4   recommended throughout his report.  [*See* Doc. 3379 at 8-52, 89-112]  The Court could

5   modify the Stipulation to align it with Dr. Stern's recommendation that qualitative

6   measurements evaluating actual clinical care be used to determine adequacy of health

7   care, rather than a focus on box-checking.  The Court also could modify the Stipulation to

8   eliminate Paragraph 36's limitation on its power to order Defendants to hire a specific

9   number or type of staff.

10  **IV.    The Court Can Reinstate the Proceedings and Set the Matter For Trial.**

11       As detailed in Plaintiffs' recent filing, Plaintiffs' preference is to set the matter for

12  trial.  [*See generally* Doc. 3402]  If the Court finds constitutional violations at trial, the

13  result will be court-ordered injunctive relief, whose enforceability Defendants will

14  presumably not incessantly challenge.

15       Related to the Court's power to modify the Stipulation under Rule 60(b)(5) of the

16  Federal Rules of Civil Procedure, the Court can reinstate the proceedings on the grounds

17  that applying the Stipulation "prospectively is no longer equitable" or for "any other

18  reason that justifies relief."  Fed. R. Civ. P. 60(b)(5) and (b)(6); *Keeling v. Sheet Metal*

19  *Workers Int'l Ass'n, Local Union 162*, 937 F.2d 408, 410-11 (9th Cir. 1991) (district court

20  facing "consistent noncompliance" or "bad faith noncompliance" with settlement

21  agreement can restore a dismissed case to the civil active list); *see also Lehman v. United*

22  *States*, 154 F.3d 1010, 1017 (9th Cir. 1998) (suggesting that a district court could re-open

23  a dismissed case if the settlement agreement were breached); *Grand Canyon West Ranch,*

24  *LLC  v. Kempthorne*, No. CV-03-02496-PCT-NVW, 2013 WL 12364963, at *5 (D. Ariz.

25  July 1, 2013) (district court amended dismissal order to give court continuing jurisdiction

26  to enforce the settlement after finding that the principle of finality was not implicated and

27  the interest of equity was served "by giving effect to the intentions and expectations of the

28  parties as far as the enforceability of the settlement agreement.").  And here, unlike in the

cases just cited, the case is not dismissed and under the plain language of the Stipulation the Court retains jurisdiction, which is all the more support for the Court's power to schedule a trial.

If the Court goes down this path, it should not terminate the current Stipulation until it issues a judgment subsequent to trial, because until then, Plaintiffs still need and are entitled to the Stipulation's protections. [*See* Doc. 3402 at 4-5 and cases cited therein] And when the Court issues a further judgment, the Court should then *terminate*, rather than *vacate*, the existing Stipulation. [*See id.* at 5 n.4]

## V.    The Court Can Find Defendants in Civil or Criminal Contempt.

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quotation marks omitted); *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 856 (9th Cir. 1992) (district court has "wide latitude" to determine if a party has not complied with a court order and is in contempt). The Court has the power to find Defendants in criminal or civil contempt, or both. 28 U.S.C. § 1826; 18 U.S.C. §§ 401(3), 402; Fed. R. Crim. P. 42; *see United States v. United Mine Workers of Amer.*, 330 U.S. 258, 298-99 (1947) ("Common sense would recognize that conduct can amount to both civil and criminal contempt"); *United States v. Rose*, 806 F.2d 931, 933 (9th Cir. 1986) (holding that "[t]he same conduct may result in both civil and criminal contempt charges") (citations omitted). A finding of civil contempt can be the basis for orders of coercive imprisonment, conditional fines, modification of a settlement agreement, or other enforcement orders. The Supreme Court has held that

> The paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command . . . . Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies. In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket.

*Int'l Union, United Mine Workers of Amer., v. Bagwell*, 512 U.S. 821, 828 (1994) (internal citations and quotation marks omitted); *see Shell Offshore Inc. v. Greenpeace,*

1   *Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (holding that "coercive civil sanctions, intended to

2   deter, generally take the form of conditional fines"); *Kelly*, 822 F.3d at 1097 (holding that

3   extending a settlement agreement by two years was an appropriate compensatory civil

4   contempt sanction).

5          The Court currently has before it fully briefed responses to its Order to Show

6   Cause, (Docs. 3235, 3339, 3352, 3363), as well as Plaintiffs' motion for contempt for

7   Defendants' refusal to comply with the Court's June 22, 2018 contempt order (Doc. 2898

8   at 24) and with a Ninth Circuit order (Doc. 3276).   [Docs. 3301, 3315, 3323]   These

9   filings more fully set out the parties' positions with regard to the Court's contempt power.

10   **VI.    The Court Can Appoint a Receiver to Oversee Health Care Services.**

11          This Court has the power to enter an injunctive order under Rule 66 of the Federal

12   Rules of Civil Procedure to appoint a receiver to manage ADC's delivery of health care

13   services.   While courts historically and most often have appointed receivers to care for

14   property and assets, their use expanded during the civil rights era.  *See, e.g.*, *Morgan v.*

15   *McDonough*, 540 F.2d 527, 533 (1st Cir. 1976) (affirming appointment of court receiver

16   to implement school desegregation orders); *Turner v. Goolsby*, 255 F. Supp. 724, 730

17   (S.D. Ga. 1965) (appointing receiver for county school system).

18          Courts have appointed receivers to enforce orders related to prisons and jails,

19   including in relation to the delivery of health care to incarcerated people.  *See, e.g.*, *Plata*,

20   563 U.S. at 507-08 (detailing the circumstances that led to the district court's appointment

21   of a receiver for medical care services in California state prisons); *Plata v.*

22   *Schwarzenegger*, 603 F.3d 1088, 1093 (9th Cir. 2010) (holding that "[c]ertainly nothing in

23   the PLRA expressly prohibits the appointment of a receiver.  Receiverships were far from

24   unknown in prison litigation before the enactment of the PLRA . . . ."); *Plata v.*

25   *Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932253, at *1 (N.D. Cal. Oct. 3, 2005)

26   (appointing a receiver to "reverse the entrenched paralysis and dysfunction and bring the

27   delivery of health care in California prisons up to constitutional standards."); *see also*

28   *Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998) (describing how

the district court had ordered the jail's medical and mental health services be placed in receivership); *Shaw v. Allen*, 771 F. Supp. 760, 763 (S.D. W.Va. 1990) (appointing receiver for county jail after ongoing noncompliance with a settlement agreement regarding the conditions in the jail); *Newman v. State of Ala.*, 466 F. Supp. 628, 635 (M.D. Ala. 1979) (appointing receiver for Alabama state prison system because "[t]he Court can no longer brook non-compliance with the clear command of the Constitution, represented by the orders of the Court in this case."); *Wayne County Jail Inmates v. Wayne County Chief Exec. Off.*, 444 N.W.2d 549, 556 (Mich. Ct. App. 1989) (affirming lower court's appointment of a receiver due to jail's noncompliance with orders regarding conditions of confinement and the delivery of health care services).

Plaintiffs are mindful that receivership is an extraordinary remedy, and the Court has indicated to date that it does not want to appoint a receiver.  But the fact remains that it is a tool in the Court's toolbox, and the experience in California with a receiver overseeing prison medical care is that under the receiver there have been significant improvements in the quality of care; more than half of the prisons' medical operations have been returned to the state's control; and the receiver has been so effective and efficient that *defendant state officials* requested in a parallel class action that the receiver's office take over certain activities related to mental health care that the prison system is unable to accomplish on its own.  [*See* Specter Decl. ¶¶ 3-7][11]  And there is a "distinct miserable possibility" (Doc. 3057 at 9), that at some point the ongoing deficiencies in health care, Defendants' noncompliance with the Stipulation, their intransigent refusal to recognize this Court's authority, and their argument that the Stipulation they signed is unenforceable, will leave the Court with no other choice.

---

[11]  Plaintiffs request that the Court take judicial notice, under Rule 201(c)(2) of the Federal Rules of Evidence, of documents from the matter of *Coleman v. Newsom*, E.D. Cal. No. 2:90-cv-00520 KJM-DB, and *Plata v. Newsom*, N.D. Cal. No. 4:01-cv-01351-JST, and attached as Exhibits 1-5 of the Specter Declaration.

1

**CONCLUSION**

2      This Court has an array of options at its disposal to ensure that Defendants provide

3 constitutionally adequate medical, mental health, and dental care and conditions of

4 confinement to the 34,000 men, women, and children incarcerated in Arizona's prisons.

5 Plaintiffs respectfully request that the Court avail itself of these options and exercise its

6 power without any further delay to ensure that Plaintiffs finally receive the benefit of the

7 promises made by Defendants in October 2014.   Plaintiffs also request that the Court

8 schedule this matter for a status hearing as soon as practicable.

9      Respectfully submitted this 2nd day of December.

10                            **PRISON LAW OFFICE**

11                    By:   s/ Corene T. Kendrick
                          Donald Specter (Cal. 83925)*
12                        Alison Hardy (Cal. 135966)*
                          Sara Norman (Cal. 189536)*
13                        Corene T. Kendrick (Cal. 226642)*
                          Rita K. Lomio (Cal. 254501)*
14                        1917 Fifth Street
                          Berkeley, California 94710
15                        Telephone:  (510) 280-2621
                          Email:    dspecter@prisonlaw.com
16                                  ahardy@prisonlaw.com
                                    snorman@prisonlaw.com
17                                  ckendrick@prisonlaw.com
                                    rlomio@prisonlaw.com
18
                          *Admitted *pro hac vice*
19
                          David C. Fathi (Wash. 24893)*
20                        Amy Fettig (D.C. 484883)**
                          Eunice Hyunhye Cho (Wash. 53711)*
21                        **ACLU NATIONAL PRISON PROJECT**
                          915 15th Street N.W., 7th Floor
22                        Washington, D.C. 20005
                          Telephone:  (202) 548-6603
23                        Email:    dfathi@aclu.org
                                    afettig@aclu.org
24                                  echo@aclu.org

25                        *Admitted *pro hac vice*. Not admitted in DC;
                           practice limited to federal courts.
26                        **Admitted *pro hac vice*

27

28

-14-

Martin Lieberman (Bar No. 007442)
Molly Brizgys (Bar No. 029216)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    mlieberman@acluaz.org
              mbrizgys@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:    s/ Maya Abela
       Rose A. Daly-Rooney (Bar No. 015690)
       J.J. Rico (Bar No. 021292)
       Maya Abela (Bar No. 027232)
       177 North Church Avenue, Suite 800
       Tucson, Arizona 85701
       Telephone:  (520) 327-9547
       Email:    rdalyrooney@azdisabilitylaw.org
                 jrico@azdisabilitylaw.org
                 mabela@azdisabilitylaw.org

       Asim Dietrich (Bar No. 027927)
       5025 East Washington St., Ste. 202
       Phoenix, Arizona 85034
       Telephone: (602) 274-6287
       Email:    adietrich@azdisabilitylaw.com

*Attorneys for Arizona Center for Disability Law*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 2, 2019 I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf