Exhibits to the Declaration of Donald Specter

| Exhibit | Description |
|---|---|
| 1 | *Plata v. Newsom*, No. C01-1351-JST, Receiver's Forty-Second Tri-Annual Report, (N.D. Cal. 10/1/19), Docket 3157. |
| 2 | *Plata v Brown*, No. C01-1351-TEH, Special Report: Improvements in the Quality of California's Prison Medical Care System, (N.D. Cal. 3/10/15), Docket 2840-1. |
| 3 | *Plata v. Newsom*, No. C0-1351-JST, Joint Case Management Conference Statement, (N.D. Cal. 10/29/19), Docket 3163. |
| 4 | *Coleman v. Newsom*, No. 90-cv-00520 KJM-DB, Defendants' Response to the Court's August 14, 2019 Order, (E.D. Cal. 8/29/19), Docket 6257. |
| 5 | *Coleman v. Newsom*, No. 90-cv-00520 KJM-DB, Defendants' Response Regarding Proposed Remedies Following Evidentiary Hearing, (E.D. Cal. 11/13/19), Docket 6388. |

# Exhibit 1

1  FUTTERMAN DUPREE DODD CROLEY MAIER LLP
   MARTIN H. DODD (104363)
2  601 Montgomery Street, Suite 333
   San Francisco, California 94111
3  Telephone:  (415) 399-3840
   Facsimile:   (415) 399-3838
4  Email:  mdodd@fddcm.com

5  Attorneys for Receiver
   J. Clark Kelso
6

7

8                  **UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10          **AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11 | MARCIANO PLATA, et al.,          | Case No. C01-1351-JST
12 |        *Plaintiffs*,
13 |        v.
14 | GAVIN NEWSOM, et al.,
15 |        *Defendants*.
16 | RALPH COLEMAN, et al.,           | Case No. CIV-S-90-0520-KJM-DB
17 |        *Plaintiffs*,
18 |        v.
19 | GAVIN NEWSOM, et al.,
20 |        *Defendants*.
21 | JOHN ARMSTRONG, et al.,          | Case No. C94-2307-CW
22 |        *Plaintiffs*,
23 |        v.
24 | GAVIN NEWSOM, et al.,
25 |        *Defendants*.
26              **NOTICE OF FILING OF RECEIVER'S**
                **FORTY-SECOND TRI-ANNUAL REPORT**
27

28 ///

                              1

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

NOTICE OF FILING OF RECEIVER'S FORTY-SECOND TRI-ANNUAL REPORT
U.S.D.C. N. DIST. CASE NO. C01-1351-JST, C94-2307-CW;  E. DIST. CASE NO. CIV-S-90-0520-KJM-DB

1       PLEASE TAKE NOTICE that Receiver J. Clark Kelso has filed herewith his Forty-

2 Second Tri-Annual Report in *Plata, et al. v. Newsom., et al.*, Case No. C01-1351-JST; *Coleman,*

3 *et al. v. Newsom, et al.* Case No. CIV-S-90-0520-KJM-DB; and *Armstrong, et al. v. Newsom, et*

4 *al.* Case No. C94-2307-CW.

5

6 Dated: October 1, 2019                FUTTERMAN DUPREE DODD CROLEY
                                          MAIER LLP

7

8                                       By:_____/s/ Martin H. Dodd_____

9                                           Martin H. Dodd
                              Attorneys for Receiver J. Clark Kelso

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FUTTERMAN DUPREE
DODD CROLEY
MAIER LLP

NOTICE OF FILING OF RECEIVER'S FORTY-SECOND TRI-ANNUAL REPORT
U.S.D.C. N. DIST. CASE NO. C01-1351-JST, C94-2307-CW;  E. DIST. CASE NO. CIV-S-90-0520-KJM-DB



# Achieving a Constitutional Level of Medical Care in California's Prisons

## Forty-second Tri-Annual Report of the Federal Receiver For May 1 – August 31, 2019

**October 1, 2019**

# California Correctional Health Care Receivership

**Vision:**

As soon as practicable, provide constitutionally adequate medical care to patients of the California Department of Corrections and Rehabilitation within a delivery system the State can successfully manage and sustain.

**Mission:**

Reduce avoidable morbidity and mortality and protect public health by providing patients timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1. **Status and Progress Concerning Remaining Statewide Gaps**……………………………… **1**

    A.   Reporting Requirements and Reporting Format……………………………………… 1

    B.   Progress during this Reporting Period…………………………………………… 2

    C.   Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals……………………………………… 5

2. **Other Matters Deemed Appropriate for Judicial Review** ……………………………… **8**

    A.   California Health Care Facility – Level of Care Delivered………………………… 8

    B.   Statewide Medical Staff Recruitment and Retention…………………………… 9

    C.   CCHCS Data Quality………………………………………………………………… 10

    D.   Coordination with Other Lawsuits………………………………………………… 11

    E.   Master Contract Waiver Reporting…………………………………………………… 11

    F.   Consultant Staff Engaged by the Receiver……………………………………… 12

    G.   Accounting of Expenditures………………………………………………………… 12

## Section 1: Status and Progress Concerning Remaining Statewide Gaps

### A.  Reporting Requirements and Reporting Format

This is the forty-second report filed by the Receivership, and the thirty-sixth submitted by Receiver J. Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006, calls for the Receiver to file status reports with the *Plata* Court concerning the following issues:

1.  All tasks and metrics contained in the Turnaround Plan of Action (Plan) and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
2.  Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
3.  Particular success achieved by the Receiver.
4.  An accounting of expenditures for the reporting period.
5.  Other matters deemed appropriate for judicial review.

(Reference pages 2–3 of the Appointing Order at https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/2006-02-14_Order_Appointing_Receiver.pdf)

The Court's March 27, 2014, Order Re: Receiver's Tri-Annual Report directs the Receiver to summarize in each Tri-Annual Report the level of care being delivered at California Health Care Facility (CHCF); difficulties with recruiting and retaining medical staff statewide; sustainability of the reforms the Receiver has achieved and plans to achieve; updates on the development of an independent system for evaluating the quality of care; and the degree, if any, to which custodial interference with the delivery of care remains a problem.

The Receiver filed a report on March 10, 2015, entitled Receiver's Special Report: Improvements in the Quality of California's Prison Medical Care System wherein he outlined the significant progress in improving the delivery of medical care in California's prisons and also the remaining significant gaps and failures that must still be addressed.  The identified gaps are availability and usability of health information; scheduling and access to care; care management; and health care infrastructure at facilities.

To assist the reader, this Report provides two forms of supporting data:

- *Appendices*: This Report references documents in the Appendices of this Report.
- *Website References*: Website references are provided whenever possible.

In support of the coordination efforts by the three federal courts responsible for the major health care class actions pending against California Department of Corrections and Rehabilitation (CDCR), the Receiver files the Tri-Annual Report in three different federal court class action cases: *Armstrong, Coleman,* and *Plata*.  An overview of the Receiver's enhanced reporting responsibilities related to these cases and to other *Plata* orders filed after the Appointing Order

can be found in the Receiver's Eleventh Tri-Annual Report on pages 15 and 16. (https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/T11_20090601_11thTriAnnualReport.pdf)

Court coordination activities include: facilities and construction; telemedicine and information technology; pharmacy; recruitment and hiring; credentialing and privileging; and space coordination.

## B. Progress during this Reporting Period

Progress towards improving the quality of health care in California's prisons continues for the reporting period of May 1 through August 31, 2019, and includes the following:

(i)   Office of the Inspector General
As of the filing of this report, the Office of the Inspector General has initiated Cycle 6 medical inspections at Ironwood State Prison (ISP); Valley State Prison; California State Prison, Los Angeles County (LAC); Wasco State Prison; California Correctional Center (CCC); and California State Prison, Solano (SOL).

(ii)   Delegations
As of the filing of this report, the Receiver has delegated to CDCR authority for the medical operations at 19 institutions.  No additional delegations were made during this reporting period.

(iii)   *Armstrong*
A new contract with Interpreters Unlimited Group was implemented July 1, 2019.  The contract provides California Correctional Health Care Services (CCHCS) staff with Video Remote Interpretation services for patients requiring a Sign Language Interpreter.   Additional enhancements include audio and video acuity, increased bandwidth, and increased availability of interpreters.

Durable Medical Equipment (DME) reconciliation efforts continue.  As of July 1, 2019, Priority 1 discrepancies, which include class members with missing DME, were 96 percent complete. Institutions are completing the remaining Priority 1 discrepancies.  The remaining Priority 2 discrepancies consist of documentation errors reflected within the Strategic Offender Management System (SOMS) and the Electronic Health Records System (EHRS) as well as errors comporting information between the SOMS and EHRS systems.  Field Operations and Information Technology staff are working together to develop an on-demand report that will allow institution staff to self-audit and correct DME documentation discrepancies continuously.

(iv)   Electronic Health Records System
The EHRS was successfully implemented at all institutions statewide as of November 2017.  The remaining functionality includes solutions which will reduce paper processes and simplify the delivery of medical information.   As of August 30, 2019, six institutions implemented Cerner Direct.  This functionality provides CCHCS the ability to utilize Health Insurance Portability and Accountability Act compliant secure electronic communication to send and receive patient data

from the EHRS.  Staff will select documents from the patient's chart, including the transition of care referral summary, to send to external providers who utilize the Cerner Direct messaging solution.

    (v)    <u>Integrated Substance Use Disorder Treatment</u>

Effective July 1, 2019, the California Legislature approved funding for implementation of the Integrated Substance Use Disorder Treatment (ISUDT) Program described in the forty-first Tri-Annual Report.  The project begins fiscal year (FY) 2019-20 and allocates 280.2 positions and $71.3 million from the General Fund with an additional 150.8 positions and a total of $161.9 million from the General Fund in FY 2020-21.

On July 17, 2019, the Receiver and CDCR Secretary Ralph Diaz issued a joint memorandum to all departmental staff announcing the ISUDT Program as a critical, departmental initiative. The joint memorandum requires coordination and active involvement from nearly all business areas within CDCR and CCHCS to provide timely, effective, and evidence-based treatment and transitions to incarcerated individuals with SUD.

ISUDT Project Management Planning and Implementation (P&I) efforts encompass Business Team Sponsors and Leads at the directorate level overseeing seven business areas including the following:

- Human Resources and Employee Wellness;
- Staff Training and Development;
- Programming and Supportive Housing Space;
- Cognitive Behavioral Therapy Services;
- Clinical Services;
- Transition Services; and
- Communication and Change Management.

The ISUDT Program has assigned a Project Executive to provide day-to-day project oversight, ensuring involvement and coordination among all stakeholders to achieve project goals on time, within scope, and to lead the P&I weekly workgroup.  The project has established an Executive Steering Committee that meets monthly to serve in an advisory role, providing direction on policy and resource allocations, and is co-chaired by Secretary Diaz and the Receiver.

In the first two years, the project scope encompasses establishment of the necessary infrastructure and resources to successfully implement ISUDT including the following:

- Hiring and training staff;
- Contracting with sufficient numbers of qualified counselors;
- Using standardized evidence-based curricula for behavioral group therapy;
- Obtaining adequate supportive correctional housing arrangements;
- Ensuring adequate clinical and programming space;
- Delivering Medication Assisted Treatment (MAT); and
- Providing comprehensive transition services.

Once fully developed, the ISUDT Program is expected to result in the following:
- Reductions in both SUD-related morbidity and mortality;
- Rehabilitative environments that improve safety for patients and staff;
- Reduction in overall recidivism;
- Successful reintegration of individuals into their community at the time of release; and
- Improved public safety, promoting healthy families and communities.

Elements of the plan have already begun to enroll patients and statewide implementation of the ISUDT Program will begin on January 1, 2020, with plans to screen and risk stratify patients who are at higher clinical risk for SUD related harm, including: patients entering CDCR who are currently prescribed MAT; patients already in CDCR who have one or more events indicative of high-risk behavior; and inmates preparing to leave CDCR within 15-18 months.

### (vi)    CDCR Heart Healthy Diet and Menu

The Division of Adult Institutions (DAI), in partnership with CCHCS, reviewed the current CDCR Heart Healthy standardized menu with the goal of achieving dietary requirements while also providing healthy choices for inmates with diabetes mellitus and obesity.  To achieve this goal, DAI and CCHCS collaboratively developed the FY 2019-20 Heart Healthy standardized menu using the current healthy eating pattern as recommended by the 2015–2020 Dietary Guidelines for Americans effective July 1, 2019.  This allows DAI to continue providing the general population inmates, as well as inmates living with diabetes mellitus and obesity, the ability to identify carbohydrates in their diet and make educated food choices.  The four-week menu cycle allows for appropriate forecasting, reduction of food waste, and improvement in the variety to the inmate population.  Other factors considered in the menu development include, but are not limited to: inmate meal preferences, plate waste and food acceptability, increased focus on added fruits and vegetables, and identification of carbohydrate exchanges to enhance portion control for inmates living with diabetes.  To date, the new menu has received favorable reviews from inmates, and medical staff have begun to report better control for inmates with diabetes.

### (vii)    Health Care Department Operations Manual and Medical Care Regulations

On July 1, 2019, the Health Care Department Operations Manual (HCDOM) was published and released statewide to all CDCR and CCHCS staff.  The HCDOM combines the policies and procedures previously contained within the Inmate Medical Services Policies and Procedures and the Inmate Dental Services Program Policies and Procedures and mirrors the format of the Department Operations Manual (DOM).  The Mental Health Services Delivery System Program Guide remains in place.

Also on July 1, 2019, emergency regulations related to medical care were filed with the Secretary of State and became effective statewide.  The medical care regulations, which are published in the California Code of Regulations, Title 15, contain regulatory elements of the HCDOM. Adoption of the emergency medical care regulations established comprehensive health care regulations for the provision of care to patients, aligned regulatory language with current department processes, and repealed obsolete and outdated regulations related to medical care.

CCHCS is currently in the process of completing a regular Administrative Procedure Act rulemaking action to permanently adopt the emergency regulations.

**C. Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals**

(i)     In-State and Out-of-State Contracting for Community Correctional Facilities

As of August 31, 2019, the population count at the six in-state contracted modified community correctional facilities (MCCF) and the one in-state female correctional re-entry facility (FCRF) was 3,721, with a budgeted capacity of 4,115.  McFarland FCRF was closed to intake in November 2018 due to an inadequate audit result.  Based on improvements since that time, it was reopened to limited intake in February 2019.  In July 2019, intake resumed after significant physician performance improvements were noted and is currently at 95 percent of capacity.   On August 12, 2019, CDCR officially announced Central Valley MCCF will close on September 30, 2019.

The last of the out-of-state facilities, La Palma Correctional Center, closed on June 26, 2019. Approximately thirteen years after the issuance of the Governor's emergency proclamation to relieve prison overcrowding in October 2006, CDCR no longer houses inmates out-of-state.

During the reporting period, the last three of the seven on-site annual audits for 2019 were conducted and all seven audit reports were published.  Below is a summary of each facility's annual audit rating.

**2019 Annual Overall Audit Rating by Facility**

| *Private Facilities* | | *Public Facilities* | |
|---|---|---|---|
| Central Valley MCCF | **Inadequate** | Delano MCCF | **Proficient** |
| Desert View MCCF | **Inadequate** | Shafter MCCF | **Adequate** |
| Golden State MCCF | **Inadequate** | Taft MCCF | **Adequate** |
| McFarland FCRF | **Inadequate** | | |

The inadequate components contributing to each facility's compliance rating are illustrated below.  Specific areas of non-compliance are related to the facility's policies and procedures, training, health care grievance process, emergency medical response and/or drill incident packages, and physician case review.

**Average Facility Score by Component**

Administrative Components

| | | |
|---|---|---|
| 1 | Administrative Operations | **75.5%** |
| 2 | Internal Monitoring and Quality Management | **73.8%** |
| 3 | Health Care Staffing | **63.4%** |

Medical Components

| | | |
|---|---|---|
| 4 | Access to Care | **85.4%** |
| 5 | Diagnostic and Specialty Services | **86.4%** |
| 6 | Health Care Transfer | **89.3%** |
| 7 | Medication Management | **80.4%** |
| 8 | Preventive Services | **80.4%** |
| 9 | Emergency Medical Response | **74.0%** |
| 10 | Clinical Environment | **92.8%** |
| 11 | Quality of Nursing Performance | **90.8%** |
| 12 | Quality of Provider Performance | **75.5%** |

In July 2019, the process to re-examine each facility's failing component(s) began with the Taft MCCF audit.  These audits will conclude in December 2019.

(ii)     Transportation Vehicles

As reported in the forty-first Tri-Annual Report, health care vehicles yet to be received from the Fleet Acquisition Plan for FY 2016-17 included two ambulances for Sierra Conservation Center (SCC) and CCC, which were delivered for retrofitting on June 11, 2019, and June 24, 2019, respectively.  Additionally, one paratransit bus expected to be received by August 30, 2019, has been delayed by the vendor until October 16, 2019.  As of August 31, 2019, there are a total of 30 vehicles requiring inspection by the Department of General Services prior to delivery to CDCR for retrofitting at SOL.

(iii)     Health Care Infrastructure at Facilities

Several sub-projects were activated during this reporting period.  The more notable activations include the new E yard primary care clinic at California Correctional Institution (CCI); renovation of B yard medication distribution room at Correctional Training Facility (CTF); renovated central health services specialty and staff support at Deuel Vocational Institution (DVI); renovation of Building 5 medication distribution room at Folsom State Prison; new Administrative Segregation Unit primary care clinic at Kern Valley State Prison; new D yard primary care clinic at North Kern State Prison; new pharmacy, renovation, and addition of D yard primary care clinic, and renovation of the Triage and Treatment Area at Richard J. Donovan Correctional Facility (RJD); and renovation and addition of C yard primary care clinic at SCC.

The following chart indicates the original baseline completion date, the previously reported revised completion date, and the further revised completion date as of August 31, 2019.  Three projects, CCI, CTF, and SCC, are ahead of schedule.  Three projects, ISP, Chuckawalla Valley State Prison, and Centinela State Prison, have not delayed since the previous reporting period for construction completion.  All other projects are showing a delay from the previous reporting

period for construction completion with the greatest delay at Pleasant Valley State Prison of 281 days. DVI completed construction on March 27, 2019, and the final sub-project activated on September 16, 2019.

| | Baseline Construction Completion Date | April 30, 2019 Revised Construction Completion Date | August 31, 2019 Revised Construction Completion Date |
|---|---|---|---|
| VSP | January 27, 2016 | January 14, 2020 | May 1, 2020 |
| SAC | November 7, 2016 | December 31, 2019 | June 26, 2020 |
| CMF | February 10, 2017 | January 8, 2020 | April 7, 2020 |
| HDSP | April 17, 2017 | February 18, 2020 | June 28, 2020 |
| CCI | May 1, 2017 | April 16, 2020 | March 31, 2020 |
| RJD | May 26, 2017 | May 30, 2019 | July 19, 2019 |
| WSP | June 19, 2017 | June 2, 2020 | September 2, 2020 |
| NKSP | July 4, 2017 | January 3, 2020 | May 4, 2020 |
| SATF | July 28, 2017 | November 8, 2019 | February 6, 2020 |
| COR | July 31, 2017 | July 6, 2020 | September 23, 2020 |
| CTF | September 18, 2017 | November 30, 2021 | August 16, 2021 |
| SVSP | September 20, 2017 | May 31, 2019 | August 1, 2019 |
| CIM | September 26, 2017 | January 31, 2021 | March 3, 2021 |
| CCC | October 16, 2017 | January 31, 2021 | November 1, 2021 |
| SOL | November 6, 2017 | October 20, 2020 | April 22, 2021 |
| SCC | December 14, 2017 | October 31, 2021 | June 14, 2021 |
| FSP | December 21, 2017 | June 16, 2020 | July 15, 2020 |
| CMC | December 22, 2017 | June 23, 2020 | December 29, 2020 |
| KVSP | January 13, 2018 | February 14, 2020 | May 21, 2020 |
| CCWF | February 16, 2018 | May 19, 2020 | October 20, 2020 |
| PVSP | March 30, 2018 | June 30, 2020 | April 7, 2021 |
| PBSP | August 9, 2018 | August 28, 2020 | February 25, 2021 |
| ISP | February 19, 2019 | October 28, 2020 | October 28, 2020 |
| CVSP | February 28, 2019 | January 14, 2021 | January 13, 2021 |
| CAL | June 15, 2019 | November 19, 2020 | June 2, 2021 |
| CEN | September 1, 2019 | December 16, 2020 | December 16, 2020 |

   (iv)   <u>Scheduling and Ducating</u>

Subsequent to the Scheduling and Ducating Program Review that was conducted at California State Prison, Sacramento, in the last reporting period, thorough evaluations of access to health care programs have been completed at the following institutions:

   1) California State Prison, Corcoran (COR)
   2) LAC
   3) Salinas Valley State Prison (SVSP)
   4) RJD
   5) Mule Creek State Prison

One month prior to the Special Reviews of these institutions, the Wardens and Chief Executive Officers received a "lessons learned" document provided by Corrections Services, with direction that the institutions take immediate steps to be compliant with the HCDOM and Health Care

Access Unit standards.  The goal of providing the Special Review information in advance was to provide the institutions an opportunity to self-correct prior to the on-site review.

During the subsequent reviews, the following universal issues of concern were identified at COR, LAC, SVSP, and RJD:
1) Scheduling
   - Enhanced communication is required.
   - Formalized training is necessary.
   - Scheduling and provider availability needs to be more consistent.
2) Ducating
   - Supervisory monitoring of the ducat process is required to ensure compliance with policy.
   - Provider adherence to ducat times and the Master Pass list requires improvement.
   - More consistency in generating Rules Violation Reports (inmate disciplinary write-up) for health care service refusals is necessary.
3) Operations
   - Provider and patient confidentiality during health care encounters (e.g., doors are propped open or discussions through holding cells) requires improvement.
   - Staff compliance with policy and procedure needs to be more consistent.
   - Application of security precautions requires greater utilization.
   - Staff access to personal safety devices needs improvement.
   - Operational hours need to be more consistent with staff reporting hours.
   - Staff completion of formalized training requires improvement.
   - Development of DOM supplements and/or Local Operating Procedures is required.
4) Technical Applications
   - Increased access to required computer applications (e.g., SOMS) is necessary.
5) Real-time utilization of the SOMS Health Care Access (HCA) application needs to occur.

Issues identified during the Special Reviews will continue to be monitored by Field Operations to include the following:
1) Expanded and detailed Access Quality Report analysis using data from the SOMS HCA application;
2) New and revised questions in the Operational Monitoring Audits Guide to better identify and monitor issues discovered during the Special Reviews; and
3) Access to care training will be implemented by the Office of Training and Professional Development in annual institutional off-post training for the upcoming year.

## Section 2: Other Matters Deemed Appropriate for Judicial Review

### A.  California Health Care Facility – Level of Care Delivered
CHCF's health care leadership remains focused on ensuring the delivery of quality health care services to its patient population.  CHCF opened a 30-bed Palliative Care Services Unit in July 2018

and a 30-bed Memory Care Unit in February 2019.  As of August 2019, CHCF is just under 95 percent capacity (2,792 current population; 2,951 capacity) and as of July 31, 2019, 33.5 of the 36 budgeted provider positions at CHCF are filled as follows:
- Physician and Surgeon (P&S): 32 positions, 29.5 filled, 2.5 vacant
- Nurse Practitioners: 1 position, 1 filled, 0 vacant
- Physician Assistants: 3 positions, 3 filled, 0 vacant

As reflected in the September 2, 2019, Primary Care Provider Vacancy/Coverage Report (Refer to Appendix 1), civil service telemedicine providers and contract registry providers are utilized to deliver care at CHCF, which increases the coverage to just over 101 percent for providers.

**B.  Statewide Medical Staff Recruitment and Retention**

CCHCS has made significant progress and substantially resolved the challenges present at the beginning of the Receivership, which were outlined in the March 10, 2015, *Special Report: Improvements in the Quality of California's Prison Medical Care System*.  Since that time, CCHCS has developed strategies to adapt and respond to new challenges.  Through frequent assessment of staffing ratios, health care delivery models, and retention strategies, CCHCS has implemented a series of flexible and continuously evolving solutions to ensure the delivery of quality health care services to patients in a timely manner through a stable provider workforce.  The following summarizes the continuous recruitment efforts during this reporting period:
- The expanded media outreach combined with a CCHCS streamlined hiring process has produced positive results.  Since January 2019, CCHCS has hired 46 new physicians, with 12 hired into the Telemedicine Program, 1 hired at headquarters, and 33 hired at institutions.  Two new Advanced Practice Providers were hired.
- The Telemedicine Program is experiencing continued recruitment and health care delivery success.  The program has expanded to 56 primary care provider (PCP) positions.  As of August 31, 2019, the current telemedicine provider workforce is 95.7 percent filled, with one hire pending.
- The 15 percent pay differential strategy was broadly implemented in July 2017 for 13 institutions with historically hard-to-recruit missions or locations.  Since that time, 56 external hires have been made, an increase of 14.3 percent since the last report.  As of August 31, 2019, 6 of the 13 institutions are staffed above 90 percent with civil service providers, 5 are staffed between 80 and 89 percent, and only 2 institutions are staffed below 80 percent.  Additionally, all 13 institutions have experienced an increase in fill rates since July 2017 with minimal fluctuations.  While initial interest consisted primarily of current CCHCS physicians, the majority of hires now consist of externally-recruited physicians.
- In an effort to highlight statewide physician opportunities and further increase the streamlined hiring experience for PCP candidates, CCHCS is developing recruiting landing pages for the CCHCS website.  These new landing pages will allow candidates to easily access recruiter's contact information and highlight salary/benefits of working with CCHCS.

- To provide additional support to continue the success of CCHCS' PCP hiring efforts, CCHCS has contracted with Merritt Hawkins, a nationwide recruitment firm.  This contract will provide CCHCS assistance with recruiting PCP candidates for its most difficult-to-recruit locations and help to ensure a continuous candidate pipeline for all CCHCS PCP vacancies.
- CCHCS is contracting with an external marketing firm to redesign its PCP recruitment marketing campaigns.  The firm will develop new marketing and branding concepts based on current best practice for PCP recruitment efforts with the ultimate goal of delivering a strategic marketing campaign that supports CCHCS' image as a modern and current health care provider.
- CCHCS' relocation assistance program for PCP hires relocating from outside of California has shown initial signs of success.  Research was recently conducted to ensure the maximum repayment amount remains consistent and competitive with the private sector.  As a result of that research, CCHCS will be requesting an increase in the maximum repayment amount for which it has delegated authority.
- To remain competitive as PCP recruiters, CCHCS is securing membership for recruiters with the Association for Advancing Physician and Provider Recruitment (AAPR).  In addition to membership, recruiters will be enrolled in AAPR's Fellowship Program designed to elevate their recruiting skills.

As of July 31, 2019, 31 percent of institutions (11 institutions) have achieved the goal of filling 90 percent or higher of their civil service provider positions; 46 percent (16 institutions) have filled between 75 and 89 percent of their civil service provider positions; and 23 percent (8 institutions) have filled less than 75 percent of their civil service provider positions.  However, when on-site civil service, telemedicine, and contract registry providers are utilized to deliver care statewide, coverage at 25 institutions is at or above 90 percent (refer to Appendix 1).

## C.  CCHCS Data Quality

The Receiver continues to assess the impact of the EHRS implementation on the integrity of data presented in CCHCS performance reports and operational tools.  As referred to in the thirty-ninth Tri-Annual Report, effective June 15, 2018, the Receiver engaged the firm of Manatt, Phelps & Phillips, LLP (MPP) to analyze data collection and validation processes at CCHCS that are used to compile health care delivery performance statistics published on the CCHCS Health Care Services Dashboard.  MPP worked with information technology and software experts from Intueor Consulting, Inc. (Intueor) to evaluate the accuracy of 16 Dashboard measures with suspected data integrity issues, which include seven clinician access metrics, five DME access metrics, two workload metrics, a disease management metric, and a health information management metric.

Applying techniques consistent with international standards, Intueor experts evaluated the systems and processes that load patient data into CCHCS-hosted databases ("data capture" operations) and transfer and extract data from state repositories to CCHCS databases ("data transfer" operations).  In addition, Intueor conducted a detailed software code review and software engineering analysis for each data processing step included in a specific measure, which involved "a detailed assessment of the software logic used to derive results in the Public

Dashboard." Intueor compared CCHCS-defined business rules, exceptions, and filters as described in the Dashboard Glossary with the actual code generating data. To assess accuracy, Intueor independently recalculated results using the same data set that was the basis for the June 2018 Public Dashboard (the most recently published Public Dashboard at the time Intueor began this analysis).

On August 27, 2019, MPP produced a 23-page final report with findings and recommendations, concluding that Dashboard reporting for these 16 measures is highly accurate. Independent coding of the same metrics by Intueor yielded the same results or results within 1 percent of what the Dashboard published for all 16 measures investigated. MPP identified minor flaws in Dashboard reporting in the following two categories:

1) Minor errors in Glossary specifications when compared to actual code logic: For 7 of the 16 measures, business rules depicted in the glossary accurately aligned with code construction; for 9 measures, there were technical disparities between the stated business rules and the way the code functioned, such as citing a data source in the Glossary that has since been decommissioned. MPP recommended addressing those minor discrepancies in glossary documentation.
2) Software discrepancies: Intueor found that 3 measures dropped data for the last day of the reporting month, a problem that has since been remedied. Also, some patient data did not correctly link with the correct care team for some measures, particularly in instances when a patient moved around the time of a health care event. The care team linking issue did not impact Public Dashboard reporting because the Public Dashboard provides performance at the statewide and institution levels only.

MPP opined that all of these identified issues could be handled with "modest corrective action," bringing these 16 measures, which are 99 percent accurate, to higher levels of reliability. CCHCS has been making changes to improve performance per Intueor's findings over the course of the past year and will take action on all recommendations in this report by the end of 2019.

**D. Coordination with Other Lawsuits**

Meetings between the three federal courts, *Plata, Coleman,* and *Armstrong* (Coordination Group) class actions have occurred periodically. The Coordination Group met on June 10, 2019, and August 30, 2019.

**E. Master Contract Waiver Reporting**

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007, Order and in addition to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures, and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report

and are fully articulated in the Court's Orders, and therefore, the Receiver will not reiterate those details here.

The Receiver did not use the substitute contracting process during this period.

**F. Consultant Staff Engaged by the Receiver**

The Receiver did not engage any new consultant staff during this reporting period.

**G. Accounting of Expenditures**

   (i)      Expenses

The total net operating and capital expenses of the Office of the Receiver for the FY ending June 30, 2019, was $2,644,556 and $0.00, respectively.  A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 2.

For the two months ending August 31, 2019, the net operating and capital expenses were $398,358 and $0.00, respectively.

   (ii)     Revenues

For the months of May and June 2019, the Receiver requested transfers of $800,000 from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the Receiver.  Total year to date funding for the FY 2018-19 to the CPR from the State of California is $2,625,000.

For the months of July and August 2019, the Receiver requested transfers of $400,000 from the State to the CPR to replenish the operating fund of the office of the Receiver.

All funds were received in a timely manner.

# Exhibit 2

# Special Report:

# Improvements in

# the Quality of California's Prison

# Medical Care System

## By

## J. Clark Kelso

## Receiver

## March 10, 2015

# Table of Contents

**Section I. Executive Summary** ..................................................................................... 1

**Section II. Background** ................................................................................................. 5

  A.    The Legal Standard for Assessing Quality of Care ................................................. 5

    1.    The Eighth Amendment's "Deliberate Indifference" Standard ............................. 5

      a.    "Serious Medical Needs" .................................................................................. 5

      b.    "Deliberate Indifference" ................................................................................ 5

    2.    Individual and Systemic Claims .......................................................................... 6

      a.    Individual Claims ............................................................................................. 6

      b.    Systemic Claims .............................................................................................. 7

    3.    Constitutionality in a Systemic Claims Case ....................................................... 7

  B.    The District Court's October 3, 2005, Opinion re Appointment of Receiver ............... 8

  C.    The *Turnaround Plan of Action* ............................................................................ 9

  D.    First Three Rounds of OIG Inspections ................................................................. 9

  E.    Court Expert Reports ......................................................................................... 11

  F.    Fourth Round of OIG Assessments ...................................................................... 12

  G.    Summary of Improvements to Prison Medical Care ............................................... 13

  H.    Remaining Gaps ................................................................................................ 15

**Section III. Assessment of the Prison Medical Care System** ....................................... 17

  A.    Structure ........................................................................................................... 18

    1.    Organizational Structure and Leadership ............................................................ 18

      a.    State Structure and Leadership ....................................................................... 19

      b.    Regional Structure and Leadership ................................................................. 20

      c.    Institution Structure and Leadership ............................................................... 20

    2.    Facilities ........................................................................................................... 21

      a.    Construction at San Quentin ........................................................................... 22

      b.    Construction at Avenal State Prison ................................................................ 23

      c.    Construction at California Health Care Facility ................................................ 23

      d.    The Health Care Facilities Improvement Program ............................................ 25

      e.    Sanitation Program ........................................................................................ 26

    3.    Equipment ......................................................................................................... 26

    4.    Budget and Fiscal .............................................................................................. 27

    5.    Acquisitions and Medical Contracting ................................................................ 28

    6.    Human Resources .............................................................................................. 30

    7.    Information Technology ..................................................................................... 32

  B.    Process ............................................................................................................. 35

    1.    Access to Providers & Services .......................................................................... 35

      a.    Access to Medical Services ............................................................................. 36

      b.    Access to Dental Services ............................................................................... 36

      c.    Access to Mental Health Services .................................................................... 36

      d.    Appointments Cancelled Due to Custody ......................................................... 37

e.   Appointments Seen as Scheduled ........................................................ 38
f.   Effective Communication Provided ...................................................... 38
2.   Continuity of Providers .......................................................................... 38
a.   Continuity of Medical Providers ......................................................... 38
b.   Continuity of Mental Health Primary Clinician ................................. 39
c.   Continuity of Psychiatrists ................................................................... 39
3.   Medication Management ......................................................................... 39
a.   Medication Continuity-Transfer .......................................................... 41
b.   Medication Non-Adherence Counseling .............................................. 41
c.   Medication Administration ................................................................... 42
d.   Non-Formulary by Psychiatrists .......................................................... 42
e.   Non-Formulary by Medical Providers ................................................. 42
4.   Nursing .................................................................................................... 43
5.   Providers ................................................................................................. 43
a.   Staffing .................................................................................................. 46
b.   Quality of Providers ............................................................................. 46
c.   Peer Review ........................................................................................... 48
6.   Quality Improvement .............................................................................. 49
7.   Care Management ................................................................................... 51
a.   Appropriate Placement of High Risk Patients ................................... 51
b.   Specialty Services ................................................................................. 51
c.   30-Day Community Hospital Readmission .......................................... 52
d.   Potentially Avoidable Hospitalizations ............................................... 53
e.   30-Day MHCB or DSH Readmission .................................................. 53
8.   Health Care Information Management .................................................... 53
a.   Non-Dictated Documents ...................................................................... 54
b.   Dictated Documents .............................................................................. 55
c.   Specialty Notes ..................................................................................... 55
d.   Community Hospital Records ............................................................... 55
e.   Scanning Accuracy ............................................................................... 55
f.   Implementation of an Electronic Medical Record .............................. 56
9.   Mortality Review .................................................................................... 56
C.   Outcomes ...................................................................................................... 59
1.   Death Reports ......................................................................................... 59
2.   Population Health Management .............................................................. 60
a.   Asthma Care .......................................................................................... 61
b.   Therapeutic Anticoagulation ............................................................... 61
c.   Diabetes Care ........................................................................................ 62
d.   End Stage Liver Disease Care .............................................................. 62
e.   Utilization Specialty Services .............................................................. 62
f.   Colon Cancer Screening ....................................................................... 63
g.   Breast Cancer Screening ...................................................................... 63
h.   Diagnostic Monitoring .......................................................................... 63
3.   HEDIS Comparisons .............................................................................. 63

## Section I. Executive Summary

The quality of health care in California's prisons has substantially improved from the inception of the Receivership in 2006 to the present. At the system-wide level, there remain a number of improvement efforts initiated by the Receiver that must be completed. At the institution level, there is still wide variability in performance and, at some institutions, only partial implementation of system-level changes. While there have been improvements at all institutions, some institutions are much further ahead than others.

In 2005, the United States District Court in *Plata v. Schwarzenegger* described in detail substantial deficiencies in the system of prison medical care, deficiencies that cut across the entire spectrum of care. *2005 Opinion re Appointment of Receiver*, 2005 Westlaw 2932253 (N.D. Cal. Oct. 3, 2005). At that time, the prison mental health system had been under federal court scrutiny in the *Coleman* case for 14 years, and the State was still far from compliance. *See Coleman v. Schwarzenegger*, 922 F.Supp.2d 882, 897-98 (E.D. Cal. 2009). The dental health system was similarly deficient, resulting in the settlement of the *Perez* case, and for many of the same type of systemic reasons as found in *Plata* (i.e., an absence of qualified providers and clinicians, inadequate and deficient facilities, and inadequate and poorly implemented policies). *See Perez v. Schwarzenegger*, No. 3:05-cv-05241-JSW (N.D. Cal., August 21, 2006) (amended stipulation and order).

The Receiver's *Turnaround Plan of Action* (http://www.cphcs.ca.gov/receiver_tpa.aspx), approved by the Court on June 16, 2008, set the stage for improvements in the quality of prison medical health care, with ancillary improvements in mental health and dental care. Under the leadership of Diana Toche, D.D.S., who now serves as the Undersecretary for Healthcare Services, improvements in dental care – including improved access to dental care, increases in staffing, and facility improvements – were sufficient to end the *Perez* case in 2012. *Coleman* and *Plata* remain to be resolved.

Overcrowding of California's prisons was determined by a three-judge panel in 2009 to be a significant cause of the inability to provide a constitutional level of care in *Plata* and *Coleman*. *Brown v. Plata*, 131 S.Ct. 1910 (2011). After years of appeals and further litigation, the State agreed in early 2014 to reduce prison population to 137.5% of design capacity by February, 2016. Current institution population is slightly below 137.5% of design capacity, down from a high of approximately 200% of design capacity in 2006.

There is general agreement among the parties to the *Plata* litigation that the Receivership has made significant progress in improving the delivery of medical care in California's prisons. However, disagreements persist among the parties regarding the extent of the improvements and the appropriate timing of the next steps in the case.

Given the progress that has been made, the Receiver determined that it is now appropriate to summarize the achievements made to date and to report broadly on the quality of medical care in California's prisons. Such a report, combined with upcoming institutional assessments by the Office of the Inspector General, will help us (1) identify any remaining systemic deficiencies in our medical care system that need to be remedied; (2) set a new baseline for assessing quality on an ongoing basis; and (3) provide important guidance to the parties, the Court and the Legislature regarding future progress in the *Plata* litigation.

Although there remains significant variability in the quality of care at the institution level, at a system-wide level, there have been significant improvements in the *structure* of the prison medical system, the implementation of *processes* to guide the delivery of medical services, and the health *outcomes* actually achieved:

### Structure

With respect to the structural elements of the system, we now have in place competent, experienced leadership and staff at headquarters, in four regional offices, and in all of the institutions. These leaders and front-line staff are supported by competent, hard-working administrative support units in budgeting, human resources, labor, contracting, and policy and risk-management. There is a simple organizational structure and a direct line of authority from the top at headquarters to the individual Chief Executive Officers for Healthcare at the institutions. There is an Undersecretary for Healthcare Services who reports directly to Secretary Jeff Beard and is responsible for the mental health and dental programs (while the Receiver has responsibility for the medical program and for portions of the nursing, pharmaceutical and ancillary services programs that support mental health and dental).

### Process

With respect to process implementation, areas of significant improvement, where we consistently meet or are within 5% of meeting statewide goals, include the following:

- Scheduling & Access to Care
  - Access to Medical Services
  - Appointments Cancelled Due to Custody
  - Effective Communication
- Population Health Management
  - Asthma Care
  - Therapeutic Anticoagulation
  - Colon Cancer Screening
  - Breast Cancer Screening
  - Utilization Specialty Services
- Care Management
  - Appropriate Placement of High Risk Patients
- Continuity of Clinicians & Services
  - Primary Care Providers

- Medication Management
  - o Medication Continuity – Transfer
  - o Medication Administration
  - o Non-Formulary by Medical Providers
- Resource Management
  - o Claims Processed
  - o Specialty Teleservices

There have also been significant improvements in recruiting board-certified and appropriately credentialed and privileged providers. The providers' quality of work is evaluated through a number of different venues, including regular evaluations by chief physicians & surgeons at the institution, evaluations triggered by sentinel event reporting or by death reviews, ordinary peer review reporting, and assessments by the Court Experts and OIG.

### Outcomes

With respect to outcomes, there has been a significant reduction in definitely preventable deaths and a similar reduction in possibly preventable deaths. In addition, our population health measures indicate that our outcomes, on a population basis, are better than outcomes achieved in Medi-Cal, Medicaid and national HMO populations for a number of important health measures.

### Work to be Done

Notwithstanding this progress, there remain a number of significant gaps and failures that must still be addressed, including the following areas:

- **Availability and Usability of Health Information** – We are not meeting our goals for making health records information available on a timely basis. The existing electronic unit health record, which was built to help bring some small measure of order to what had been an utterly broken and chaotic records process, is no longer able to keep pace with ease of usability. Although a clear improvement over the paper-based processes it replaced, the electronic unit health record is now beginning to crumble under the sheer weight of digital documents, including non-dictated medical documents, CDCR inpatient documents, medical dictated documents and specialty dictated documents with little to no summarization of key clinical information. Even with the electronic unit health record, we still experience difficulty in properly documenting medication administration records.

- **Scheduling & Access to Care** – Although we no longer have significant interference in patients making health care appointments, we now have far too many appointments that are being rescheduled for a variety of reasons. The appointment churn is resulting in our providers' schedules becoming overloaded which then creates backlogs and delays in seeing patients. It appears many of these scheduled appointments may not be necessary and that we are scheduling the wrong patients for provider appointments.

- **Care Management** – Our rates of 30-day community hospital readmissions and potentially avoidable hospitalizations are too high. These high rates indicate likely shortcomings with chronic care, infection control, health information management and continuity of care, among other things.

- **Facilities** – Most facilities are still grossly insufficient for providing appropriate medical care to patients. Treatment rooms are too small, poorly configured, lack basic equipment and fixtures, are not appropriately sanitized, and are disorderly.

We also face the reality that the implementation of statewide improvements at the institution level has been uneven. A few leading institutions – "early adopters" – have substantially embraced the organizational changes required to improve and sustain a higher quality of care; a second group of institutions are following behind the leading institutions, learning from the best practices that have been successful at the early adopters; and, a third group of institutions still lag significantly behind. One of our greatest challenges will be reducing the variation that we currently see across the institutions. Standardizing facilities through HCFIP, adopting a standard electronic health record, standardizing scheduling processes and improving care management will each play a role in reducing variation. However, the most significant and difficult work will undoubtedly have to take place at the institution level where statewide plans for change and change management confront the reality and inertia of decades of sub-standard care.

## Section II. Background

This report is written in the context of longstanding litigation between the parties where the Receivership is an integral part of a court-ordered remedy for a constitutionally deficient prison medical system. Given this legal context, it is appropriate to begin with the Receiver's understanding of the applicable legal principles against which the medical system should be assessed. To be clear, neither the parties nor the Court have approved the legal analysis which follows in this section. Notwithstanding, it seemed incumbent on the Receiver to express his own views on these legal matters so the parties and the Court, as well as other readers, will have an understanding of the legal context for this report and the standards that govern the provision of care.

### A. The Legal Standard for Assessing Quality of Care

#### 1. The Eighth Amendment's "Deliberate Indifference" Standard

A prison official violates the Eighth Amendment when he or she acts with "deliberate indifference" to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). *See Estelle v. Gamble,* 429 U.S. 97 (1976). There are two components to this standard. First, the deliberate indifference must be with respect to the *serious medical needs* of one or more inmates. Second, liability attaches only if a prison official has been *deliberately indifferent* to those serious medical needs.

##### a. "Serious Medical Needs"

A "serious medical need" exists when the failure to treat an inmate's physical condition may result in further significant injury or the unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992) overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997).

##### b. "Deliberate Indifference"

"Deliberate indifference" is shown by an act or failure to act done with the purpose of denying an inmate medical care that would address an inmate's serious medical needs (*McGuckin*, 974 F.2d at 1096), or where the actor "knows of and disregards an excessive risk to inmate health and safety" (*Estelle*, 429 U.S. at 106). In other words, to show deliberate indifference, an inmate must show that the course of action chosen was "medically unacceptable under the circumstances" and that the prison official "chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996).

Liability under the constitutional deliberate indifference standard is limited when compared with civil liability in an ordinary tort action for medical malpractice. In particular, "an *inadvertent* failure to provide adequate medical care does not, by itself, state a deliberate indifference claim for § 1983 purposes. *McGuckin,* 974 F.2d at 1060 (internal quotation marks omitted); *see also Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ('[A] complaint that a physician has been negligent in *diagnosing or treating* a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.' (emphasis added))." *Wilhelm v. Rotman,* 680 F.3d 1113, 1122 (9th Cir. 2012). Because of this limitation, "a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." *Id.*

## 2.   Individual and Systemic Claims

There are two very different types of cases alleging deliberate indifference with respect to inmate medical care. The first type of case – an individual case – is typically brought by a single inmate alleging that the medical care given to that inmate violates the Eighth Amendment deliberate indifference standard. The second type of case – a systemic case – alleges that one or more elements of the system of inmate medical care is so deficient that it deprives a class of inmates (often defined as inmates with serious medical needs) of constitutionally adequate care. There are also significant differences between cases seeking damages for harm that has already occurred and cases involving prospective injunctive relief.

### a.   Individual Claims

In individual cases, the complaint will often allege specific decisions or actions to deny, delay or intentionally interfere with the delivery of medically necessary care. For example, a complaint might allege that a specific type of surgery or treatment is medically necessary for that inmate and that the prison has refused to authorize that surgery or treatment. Or, a complaint might allege that a prison has failed to make medically necessary drugs available to the plaintiff to treat a particular condition.

The application of the Eighth Amendment's standards to these types of individual complaints is relatively straightforward. For purposes of a complaint seeking damages, the plaintiff must establish both the medical necessity of the surgery or other treatment that was denied as well as a sufficiently culpable state of mind which entails more than mere negligence (at a minimum, the plaintiff must show that the prison officials had actual knowledge of an excessive risk to inmate health or safety and disregarded that risk). For purposes of a complaint seeking prospective injunctive relief, the plaintiff must show that the requested surgery or treatment is medically necessary and that failure to provide the surgery or treatment would create an excessive risk to the inmate's health. If those showings are made, the defendant's further refusal to provide the requested surgery or treatment would necessarily satisfy the heightened culpability required for deliberate indifference.

Other complaints by individual plaintiffs may involve allegations that medical care was delivered to the plaintiff, but that the care delivered was constitutionally deficient, perhaps because of one or more errors committed by the treating physician(s). These cases require the court to distinguish merely bad care from care that is so bad that it violates the Eighth Amendment. The distinction is important because, as noted above, mere negligence or medical malpractice, without more, generally does not violate the Eighth Amendment. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) overruled, in part, on other grounds by *Peralta v. Dillard*, 2014 U.S. App. LEXIS 4226 (9th Cir. Mar. 6, 2014). In such cases, even if a prison doctor's performance falls below a community or national standard of care, that will ordinarily not be enough to constitute an Eighth Amendment violation. Put another way, isolated instances of medical malpractice do not, by themselves, violate the Eighth Amendment.

### b.  Systemic Claims

The analysis is fundamentally different and more complex when a case involves broad claims that an entire prison system of medical care violates the Eighth Amendment. The constitutional challenge in these cases is to the system of care itself, not to the care delivered to any particular plaintiff. Of course, there clearly is a relationship between the system of care and the care delivered to individual patients. In particular, if one or more elements of the system of care are absent or significantly deficient, it is highly likely that care is not appropriately being delivered to a significant number, or perhaps even all, patients, thereby creating a risk of serious harm to patients. For example, if the system of care is so grossly understaffed that it cannot see patients in a timely manner as required by their medical needs, then there would be a significant risk that the understaffing would result in serious risks of harm to inmates, significantly increasing the risk of morbidity and mortality. Well-functioning systems are what help ensure that adequate care is actually being delivered. For purposes of prospective injunctive relief, once prison officials are aware that understaffing is creating these risks, the constitutional violation has been established. As the Ninth Circuit recently noted in *Parsons v. Ryan*, 754 F. 3d 657, 2014 Westlaw 2523682 (June 5, 2014), "we have repeatedly recognized that prison officials are constitutionally prohibited from being deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm." (*Id.*, at *12).

Although there is a relationship between the system of care and the care actually delivered to individual patients, it is important to remember that the primary remedial focus in a case alleging systemic violations is on the critical elements of the health care system, not on individual-level care. Stated another way, the remedial goal is to improve the critical systems that support appropriate medical care delivery, and when those systems have been improved to a level of adequacy and are actually being implemented routinely and reliably, that should be sufficient to satisfy the Eighth Amendment's requirements in a case challenging the system of care.

### 3.  Constitutionality in a Systemic Claims Case

The legal discussion above frames the practical question of how to go about determining whether California's prison medical system has reached the level of constitutional adequacy. The overarching factual issues in a systemic claims case are: (1) whether, as a matter of pattern or

regular practice, inadequacies in the medical system expose inmates to a serious risk of harm, and (2) to the extent it does, whether the state or responsible state officials are deliberately indifferent to any such system deficiencies. Once an Eighth Amendment violation has been found (i.e., once there have been findings under both (1) and (2)), the remedial focus shifts to the first element of the test since, at that point, any deficiencies that are allowed to persist will readily support a finding of deliberate indifference in fixing those deficiencies.

In determining whether there are deficiencies in the medical system or with respect to care at the individual provider-patient level, deficiencies that expose inmates to a serious risk of harm, we will be guided by the standard of care set by the medical community. The community standard of care refers to the level of skill, knowledge and care in diagnosis and treatment that a reasonably competent and skilled healthcare professional, with a similar background and in the same medical community, would have provided under similar circumstances. Due consideration will be given to the correctional setting, California Code of Regulations (CCR), Title 15, and the policies and procedures promulgated by the federal receiver pursuant to *Plata v. Brown*.

### B. The District Court's October 3, 2005, Opinion re Appointment of Receiver

The District Court issued "Findings of Fact and Conclusions of Law Re Appointment of Receiver" on October 3, 2005. *2005 Opinion re Appointment of Receiver*, 2005 Westlaw 2932253 (N.D. Cal. Oct. 3, 2005). Based primarily upon essentially uncontested reports from the Court's medical experts, the opinion chronicled serious deficiencies in the system of medical care encompassing the following elements:

- Lack of Medical Leadership
- Lack of Qualified Medical Staff
  - Medical Administrators
  - Physicians
    - Death Reviews
    - Morbidity
  - Nurses
- Lack of Medical Supervision
- Failure to Engage in Meaningful Peer Review
- Defendants Lack the Capacity to Recruit Qualified Personnel for Key Medical Positions
- Intake Screening and Treatment
- Patients' Access to Medical Care
- Medical Records
- Medical Facilities
- Interference by Custodial Staff with Medical Care
- Medication Administration
- Chronic Care
- Specialty Services
- Medical Investigations
- Other Obstacles to Providing Adequate Medical Care

8

- o  Civil Service Obligations
- o  The Dills Act
- o  Procurement, Contracting and Budgeting Rules

**C.  The *Turnaround Plan of Action***

Within the first 90 days of his appointment in January 2008, Receiver J. Clark Kelso had produced a draft *Turnaround Plan of Action* to remedy the constitutional deficiencies. The Court approved the plan on June 16, 2008.

The *Turnaround Plan of Action* set forth 6 goals:

- Ensure Timely Access to Health Care Services
- Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services
- Recruit, Train and Retain a Professional Quality Medical Workforce
- Implement a Quality Assurance and Continuous Improvement Program
- Establish Medical Support Infrastructure
- Provide for Necessary Clinical, Administrative and Housing Facilities

Progress on the *Turnaround Plan of Action* has been reported in tri-annual reports filed with the Court, the most recent of which was filed on January 31, 2015.

**D.  First Three Rounds of OIG Inspections**

At the request of the Court and the first Receiver, and as authorized by California Penal Code Section 6126, in 2007 the Office of the Inspector General (OIG) developed a comprehensive inspection program in cooperation with key stakeholders to periodically review delivery of medical care at each state prison and measure compliance with health care policies and procedures. The first cycle of inspections began in November 2009, and the third cycle of inspections concluded in May 2013.

The average scores from these inspections steadily improved at each institution, year-over-year, as shown in Figure 1, which plots the scores for each institution in the three inspection cycles.



Figure 1. Institution OIG Scores Cycles 1, 2 & 3

The rate of improvement is also shown in Figure 2, which displays the individual scores in chronological order over all three cycles.



Figure 2. Institution OIG Scores Chronologically

The system-wide average scores for the three cycles were as follows:
- Cycle 1: 72.0%
- Cycle 2: 79.6%
- Cycle 3: 87.0%

For a detailed review of these inspections, see the OIG's "Comparative Summary and Analysis of the First, Second, and Third Medical Inspection Cycles of California's 33 Adult Institutions" (available on the OIG's website at www.oig.ca.gov).

Although overall scores steadily increased and by the third cycle showed high adherence with medical policies and procedures, the scoring methodology actually concealed certain critical weaknesses in our medical systems because low scores in some areas were counterbalanced by high scores in other areas. Moreover, certain medical processes were simply excluded from the scope of the audit instrument (e.g., quality of care in CTCs). These weaknesses ultimately prevented the parties from coming to agreement about the meaning of the scores for purposes of the litigation.

**E. Court Expert Reports**

In an effort to determine how well the OIG methodology and reports captured the quality of the medical care system, the Court ordered its three medical experts – Dr. Michael Puisis, Dr. Joe Goldenson, and Madie LaMarre FNP-BC – to conduct a number of institution assessments during 2013. The Court order stipulated that Court Experts would review institutions that had attained an OIG score of 85% or greater.  The Court also directed that Court Experts could review institutions  that have received overall OIG scores of between 75% and 85% in any round of the OIG inspections at the Receiver's and experts' discretion.

By January 2014, the experts had evaluated and published reports for ten institutions, finding that the medical care at four institutions was mostly acceptable and that the medical care at six institutions was unacceptable. The Court Experts also evaluated another institution in late 2014 for purposes of comparison with an OIG evaluation.  That facility was also unacceptable.

The Court Experts identified a number of significant, common failures that reflected serious gaps in the medical care system. Some of these could, in retrospect, be seen in the OIG inspections by drilling down into individual items that had low scores. Other gaps discovered by the Court Experts were not revealed in the OIG reports. The gaps fell into the following broad categories:

- **Capital Improvements** – Nearly every institution was significantly deficient when it came to healthcare treatment and clinic space and space for the delivery of services and medications. Spaces were too small, poorly equipped and lacked order.

- **Cleanliness** – Nearly every institution had serious problems in maintaining the cleanliness and sanitation of healthcare areas.

- **Inter- and Intra-System Transfers** – Nearly every institution did a poor job of return from outside care (including scheduling follow-ups or other required actions and making sure medications are provided). Gaps in the management of transfers exposed patients to significant and serious risks of increased morbidity and mortality.

- **Medical Records** – Nearly every institution had serious gaps and delays in scanning and updating patient medical records, including medication administration records. These gaps result in significant and serious risks to patients.

- **Clinical Quality of Care** –In all unacceptable institutions, Court Experts found quality of care problems significant enough to place inmate-patients at risk of harm.  The reasons for the quality of care issues were different at each institution; some were related to staff quality or performance and others were related to systemic issues.  Notably, the OIG instrument failed to identify these issues.

- **Peer Review** – In 2008 the Court issued an order on physician competency outlining procedures to be followed with respect to peer review.   This order has not been incorporated into CCHCS policy or procedure.  At several institutions, Court Experts identified failure to perform effective peer review, in part due to lack of adequate procedure and in part due to an ineffective peer review process.

- **Disciplinary Process** – The CDCR through the Office of Internal Affairs conducts hearings on serious disciplinary matters of CCHCS employees.  This resulted in lay custody staff conducting investigations of CCHCS employees on clinical matters. Court Experts recommended that CCHCS conduct its own disciplinary hearings and investigations.

- **Quality Management –** Court Experts found a variety of process problems at institutions.  The quality management programs at the institutions were ineffective at identifying these systemic problems and developing effective strategies to address the problems.

- **Mortality Reviews –** At several institutions, Court Experts reviewed deaths and had findings in disagreement on several cases with the CCHCS mortality review committee, particularly with respect to preventability.

### F.  Fourth Round of OIG Assessments

During 2014, the Court Experts met frequently with OIG staff to improve upon and expand the OIG's audit instrument and processes. OIG sponsored several meetings with all of the parties and stakeholders to review the instrument and methodology, and invite further comments for improvement. Although the parties did not reach an agreement upon all details of the OIG instrument and methodology or upon how the OIG's reports and conclusions should be used by

the Court, a consensus developed that the OIG should begin its fourth round of inspections. Although the Court Experts have expressed continuing concern about a number of methodological issues, the Court Experts indicated that the OIG's evaluations were likely to adequate for at least those institutions where medical care was clearly acceptable and for those institutions where medical care was clearly unacceptable, but that the instrument may not be sufficiently discerning with respect to those institutions in the middle.

The OIG began its fourth round of inspections during the last week in January at Folsom State Prison. OIG has scheduled the following inspection visits to begin its fourth round:

- CTF (2/16/2015)
- CFC (3/9/2015)
- CCC (3/30/2015)
- NKSP (4/20/2015)
- CVSP (5/18/2015)
- KVSP (6/29/2015)
- CCI (7/13/2015)
- PBSP (8/3/2015)
- VSP (8/24/2015)
- CEN (9/7/2015)

**G.  Summary of Improvements to Prison Medical Care**

Most of the data reflected in this report has been collected by our Performance Measurement System and is reported on a monthly basis on the Healthcare Services Dashboard (see http://www.cphcs.ca.gov/dashboard.aspx). The *Turnaround Plan of Action* called for the development of the Performance Measurement System to provide the feedback loops necessary to assess the effectiveness of different improvement strategies and to monitor overall health care system performance. The initial core set of performance indicators encompassed critical health care processes, such as medication management and scheduling, and covering key domains of quality recognized by organizations such as the Joint Commission, including timeliness, appropriateness, continuity, cost-effectiveness and quality of care.

In 2009, we contracted with the RAND Corporation to review the initial list of indicators and provide recommendations for additional performance measures in an effort to bring our measurement system into alignment with comprehensive measurements systems found in other health care organizations. RAND convened a panel of experts who recommended that we supplement existing measures with a subset of clinical quality and patient outcome measures relevant for our patient population, consistent with those used by free-world health plans. The experts further recommended using standardized, well-documented methodologies promulgated by standard-setting organizations such as the National Committee for Quality Assurance, the National Quality Forum, and the federal Agency for Healthcare Research and Quality. We adopted these recommendations, selecting a subset of patient outcome measures determined to

be impactful in improving patient outcomes and feasible to calculate using readily available, primarily electronic data sources.

Since then, more indicators have been added as new data sources and technologies became available, capturing more and more of the essential health care processes described in our primary care model. As our analytic capabilities matured, intrinsic patient and system characteristics were added that most impacted patient outcomes and process reliability in a correctional setting. The current Performance Measurement System contains more than 100 performance indicators and focuses on two major functions: (1) System Surveillance; and (2) Performance Improvement.

Drawing primarily upon data collected through our Performance Measurement System, the remainder of this report documents significant improvements in the *structure* of the prison medical system, the implementation of *processes* to guide the delivery of medical services, and the health *outcomes* actually achieved.

With respect to the *structural* elements of the system, we now have in place competent, experienced leadership and staff at headquarters, in four regional offices, and in all of the institutions. These leaders and front-line staff are supported by competent, hard-working administrative support units in budgeting, human resources, labor, contracting, and policy and risk-management. There is a simple organizational structure and a direct line of authority from the top at headquarters to the individual Chief Executive Officers for Healthcare at the institutions. There is an Undersecretary for Healthcare Services, responsible for mental health and dental care, who reports directly to Secretary Jeff Beard. Healthcare now receives significant executive attention throughout the organization.

With respect to *process* implementation, areas of significant improvement, where we consistently meet or are within 5% of meeting statewide goals, include the following:

- Scheduling & Access to Care
    - Access to Medical Services
    - Appointments Cancelled Due to Custody
    - Effective Communication
- Population Health Management
    - Asthma Care
    - Therapeutic Anticoagulation
    - Colon Cancer Screening
    - Breast Cancer Screening
    - Utilization Specialty Services
- Care Management
    - Appropriate Placement of High Risk Patients
- Continuity of Clinicians & Services
    - Primary Care Providers
- Medication Management
    - Medication Continuity – Transfer

14

      ○ Medication Administration
      ○ Non-Formulary by Medical Providers
- Resource Management
      ○ Claims Processed
      ○ Specialty Teleservices

There have also been significant improvements in recruiting board-certified and appropriately credentialed and privileged providers. The providers' quality of work is evaluated through a number of different venues, including regular evaluations by Chief Physicians & Surgeons at the institution, evaluations triggered by sentinel event reporting or by death reviews, ordinary peer review reporting, and assessments by the Court Experts and OIG.

With respect to *outcomes*, there has been a significant and apparently permanent reduction in definitely preventable deaths and similar reduction in possibly preventable deaths. In addition, our population health measures indicate that our outcomes, on a population basis, are better than outcomes achieved in Medi-Cal, Medicaid and national HMO populations for a number of important health measures.

## H. Remaining Gaps

Notwithstanding this progress, there remain a number of significant gaps and system ineffectiveness that must be addressed, including the following areas:

- **Availability and Usability of Health Information** – We are not meeting our goals for making health records information available on a timely basis. The existing electronic unit health record, which was built to help bring some small measure of order to what had been an utterly broken and chaotic records process, is no longer able to keep pace with ease of usability. Although a clear improvement over the paper-based processes it replaced, the electronic unit health record is now beginning to crumble under the sheer weight of digital documents, including non-dictated medical documents, CDCR inpatient documents, medical dictated documents and specialty dictated documents with little to no summarization of key clinical information. Even with the electronic unit health record, we still experience difficulty in properly documenting medication administration records.

- **Scheduling & Access to Care** – Although we no longer have significant interference in patients making health care appointments, we now have far too many appointments that are being rescheduled for a variety of reasons. The appointment churn is resulting in our providers' schedules becoming overloaded which then creates backlogs and delays in seeing patients. It appears many of these scheduled appointments may not be necessary and that we are scheduling the wrong patients for provider appointments.

- **Care Management** – Our rates of 30-day community hospital readmissions and potentially avoidable hospitalizations are too high. These high rates indicate likely shortcomings with chronic care, infection control, health information management and continuity of care, among other things.

- **Facilities** – Most facilities are still grossly insufficient for providing appropriate medical care to patients. Treatment rooms are too small, poorly configured, lack basic equipment and fixtures, are not appropriately sanitized, and are disorderly.

Each of these problems is being actively addressed as follows:

- **Availability of Health Information** -- Cerner Corporation has been selected to provide a commercial "off-the-shelf" electronic health record system (EHRS) for our prison health care system. This system will provide us with demonstrable and sustained benefits to patient safety, medication administration, quality and efficiency of care, and staff efficiencies and satisfaction. The project is currently in the Design/Testing phase. Initial implementation is scheduled to begin in October 2015.

- **Scheduling & Access to Care** – The second phase of a statewide Scheduling Process Improvement initiative will conclude during 2015. The initiative is designed to provide institutions with better tools and a structured process to improve scheduling efficiency and effectiveness.

- **Care Management** – The Population Care Management Coordination Committee, established during the summer of 2014, is working to develop policies, manuals, guides and other tools to guide nursing staff in the proper management of our patients. These policies should improve our ability to manage primary care, preventive clinical services, outpatient specialty services, chronic care disease management, and continuity of care, among other things. Improved care should result in lower rates of avoidable hospitalizations and 30-day returns.

- **Facilities** – CDCR is responsible for completing facilities improvements in the HCFIP program (described below). The Receiver has contracted with Prison Industries Authority to provide sanitation services at all institutions.

We also face the reality that the implementation of statewide improvements at the institution level has been uneven. A few leading institutions – "early adopters" – have substantially embraced the organizational changes required to improve and sustain a higher quality of care; a second group of institutions are following behind the leading institutions, learning from the best practices that have been successful at the early adopters; and, a third group of institutions still lag significantly behind. One of our greatest challenges will be reducing the variation that we currently see across the institutions. Standardizing facilities through HCFIP, adopting a standard electronic health record, standardizing scheduling processes and improving care management will each play a role in reducing variation. However, the most significant and difficult work will undoubtedly have to take place at the institution level where statewide plans for change and change management confront the reality and inertia of decades of sub-standard care.

## Section III. Assessment of the Prison Medical Care System

Within the health care field system-wide, there is no one best or agreed upon methodology for assessing the quality of care in large health care systems. Instead, there are multiple approaches used by different entities, often for different purposes depending upon whether the primary focus is accreditation, quality improvement, or government oversight and regulation.

Although there are a number of different approaches to assessing quality, all of the approaches trace back, in one way or another, to foundational work on quality assessment published by Dr. Avedis Donabedian in the early 1980s and 1990s. Donabedian recognized that all health care systems consisted of three organizational domains -- Structure, Processes and Outcomes – each of which could be assessed for quality.

- **Structure** includes all the factors that affect the context in which care is delivered. This includes the physical facility, equipment, and human resources, as well as organizational characteristics such as staff training and payment methods. These factors control how providers and patients in a healthcare system act and are measures of the average quality of care within a facility or system. Structure is often easy to observe and measure and it may be the upstream cause of problems identified in process.

- **Process** is the sum of all actions that make up healthcare. These commonly include diagnosis, treatment, preventive care, and patient education but may be expanded to include actions taken by the patients or their families. Processes can be further classified as technical processes, how care is delivered, or interpersonal processes, which all encompass the manner in which care is delivered. According to Donabedian, the measurement of process is nearly equivalent to the measurement of quality of care because process contains all acts of healthcare delivery. Information about process can be obtained from medical records, interviews with patients and practitioners, or direct observations of healthcare visits.

- **Outcomes** contain all the effects of healthcare on patients or populations, including changes to health status, behavior, or knowledge as well as patient satisfaction and health-related quality of life. Outcomes are sometimes seen as the most important indicators of quality because improving patient health status is the primary goal of healthcare. However, accurately measuring outcomes that can be attributed exclusively to healthcare is very difficult. Drawing connections between process and outcomes often requires large sample populations, adjustments by case mix, and long-term follow ups as outcomes may take considerable time to become observable.

The remainder of this report follows the analytic approach suggested by Dr. Donabedian. This report assesses quality of care metrics at the system-wide level. We know from the OIG's inspections, the reviews by the Court Experts, and our own internal data that there is very significant variability between institutions. Some institutions have a history of high compliance with policies and procedures and appear to be providing acceptable care; other institutions have a

17

history of poor compliance combined with other difficulties that interfere with the ability to provide acceptable care. It is partly because of this variability that institution-level assessments by the OIG are so important to get a more precise picture regarding quality of care. At the same time, in a class action challenging the entire system of medical care, it is appropriate to review improvements in the quality of care at the system-wide level, as well as at the institution level.

## A. Structure

### 1. Organizational Structure and Leadership

A flawed organizational structure can undermine or even totally frustrate an organization's ability to meet its goals. Organizational structure formally identifies lines of leadership and accountability for organizational performance. Absent leadership and accountability, organizational goals are likely to drift and efforts to reach those goals will fail.

As of 2006, CDCR's organizational structure with respect to healthcare was seriously flawed. The following bullet points are taken from the court experts' *2006 Status Report* (pp. 8-9):

*Ten years ago . . .*

- Historically, the leadership of the Health Care Services Division (HCSD) has been not been [sic] adequately positioned within the CDCR organizational structure to provide a voice for the serious health care issues facing the agency. Health care is effectively treated as just another program that CDCR is required to provide to inmates. This underscores a lack of understanding of the enormity of the mission that faces CDCR and commitment to developing an adequate health care program.

- The Health Care Services Division organizational structure is complex and lacks clear lines of authority and accountability. There are insufficient numbers of qualified health care professionals to plan, develop, implement, and monitor the health care program. As a result, staff often does not perform the roles that they were hired to perform (e.g., Regional Medical Directors, QMAT nurses and physicians) and are involved only in crisis management activities.

- There has never been executive nursing leadership with meaningful authority, responsibility, or accountability for nursing services in the CDCR Health Care Services Division. This has resulted in a complete vacuum of professional direction and development for over 2,400 nurses in CDCR. It has contributed greatly to the lack of recruitment and retention, and to the unsuccessful implementation of the health care policies and procedures.

- There are not enough regional medical, nurse, and administrator positions (and ancillary support) to provide meaningful onsite presence, training, supervision, and monitoring to the institutions. There are 33 prisons with over 165,000 inmates divided into three

regions. The number, size, and geographical distribution of the facilities make it virtually impossible for three regional medical and nursing directors to provide adequate oversight. It is, therefore, not surprising that institutional staff reported during our site tours that they rarely see the regional medical directors and administrators. The HCSD regional nursing director positions remain unfilled.

- At headquarters and in the institutions, custody staff with no health care training or experience occupies health care management positions (on an acting or permanent basis). Examples of this include correctional Lieutenants being hired into Health Care services Administrator positions, Associate Wardens appointed as Health Care Managers, and correctional Captains appointed as Regional Medical Administrators. While many of these employees are dedicated and hard working, the majority do not have the qualifications and experience needed to effectively assess, plan, develop, implement, and monitor a health care program.

See *2005 Opinion re Appointment of Receiver*, 2005 Westlaw 2932253, *3-5 (Oct. 3, 2005) (hereinafter referred to as *2005 Opinion re Appointment of Receiver*).

All of these deficiencies have now been addressed at the State, Regional and Institutional levels.

### a.  State Structure and Leadership

The State has established an undersecretary position for healthcare leadership which reports directly to the CDCR Secretary. With CDCR's concurrence, the Receiver has established a healthcare executive team and organizational structure. That structure includes both a healthcare operations and services component and a policy and administrative management component. The structure is simple and has clear lines of authority and accountability for basic healthcare functions encompassing Nursing, Medical, Mental Health, Dental, Quality Management and Regional Executives. The Deputy Director for Nursing has authority and accountability for statewide nursing functions.

On the administrative side, the structure includes information technology, budget and resource management, business services, labor relations and staff development, and policy and risk management. It is clear to the Receiver that we never would have been able to implement or maintain the improvements called for by the *Turnaround Plan of Action* without control over and support from these administrative services units, all of which operate independently from CDCR's administrative services functions. After the termination of the Receivership, the issue will inevitably arise (and, in fact, has already been discussed) about the possible consolidation of these health care administrative services into CDCR's administrative organization. The Receiver is convinced that this consolidation would be a mistake and would substantially interfere with the ability to maintain the improvements that have been achieved. Business and administrative services that support health care are not at all comparable to business and administrative services that support CDCR's custody function. Consolidation would ultimately lead to poorer services

for health care as the specialized knowledge and expertise required to support health care becomes diluted and health care becomes subordinated

### b.  Regional Structure and Leadership

In January 2014, four geographically focused regional healthcare teams were established. Built along the organizational lines of, and incorporating the existing regional mental health and dental teams, each region is headed by a Regional Health Care Executive, drawn from experienced institutional chief executive officers, together with regional medical, nursing, mental health and dental executives.

These teams have a strong physical presence within their geographically grouped institutions, identify cross institutional issues, support and consult with the local institutional leadership, leverage statewide HQ support resources and foster bidirectional communication between institutions and Headquarters. Over the last 12 months the regional teams have incorporated themselves into the policy and operational processes of CCHCS/DHCS, developed strong headquarters relationships, and begun to foster rapid change and improvement at the institutional level.

Given the importance and focus on quality improvement and durable processes at the institutional level, the Governor's 2015-16 budget calls for expanding the regional analytic and quality teams to support these key missions at the regional level. It is expected that these teams will provide needed "span of influence" and continued focus to best support health care delivery in a sustainable manner at both the statewide and institutional levels.

### c.  Institution Structure and Leadership

The Court found institutional leadership and supervision to be lacking:

*Ten years ago . . . .*

"The Court finds that the lack of supervision in the prisons is a major contributor to the crisis in CDCR medical delivery.

"At the institutional level, there are very few managers and supervisors that are competent. Thus, it is difficult to carry out central office directives. Just five or six prisons have an adequate Chief Physician and Surgeon, and only one-third of the prisons have an adequate Health Care Manager. For example, the Experts report that San Quentin is 'a completely broken system bereft of local medical leadership.'

"A large part of the problem is simply a lack of personnel and a chronic high vacancy rate. Many line-staff, including both physicians and nurses, work without any supervision whatsoever.

"This lack of leadership and supervision has resulted in a failure to correct the myriad problems within the CDCR medical clinics. Such unaddressed problems have made the provision of adequate medical care impossible and clearly have resulted in patient deaths.

"A further result of this non-supervision is that doctors responsible for patient death and morbidity receive little if any discipline from supervising physicians. Beyond the obvious problem of condoning malpractice and allowing incompetent doctors to remain on staff, the leadership vacuum and lack of discipline also fosters a culture of non-accountability and non-professionalism whereby 'the acceptance of degrading and humiliating conditions [becomes] routine and permissible.' No organization can function for long when such a culture festers within it, and it has become increasingly clear to the Court that this is a major factor in the current crisis." *2005 Opinion re Appointment of Receiver*, at *9-10 (citations omitted throughout).

The Receiver addressed the problem of institutional leadership and supervision by completing initiatives in four domains: First, as described below (see Section II(B)(4) & (5)), we replaced incompetent providers and nurses with competent personnel. We filled supervisorial positions. Within nursing, for example, 93% of SRN III's are filled, and 97% of SRN II's are filled. Third, we established a functioning peer review system for providers (see Section II(B)(5)) and discipline system for nurses (see Section II(B)(4)). Fourth, the Receiver established a "health CEO" position and filled those positions by recruiting from outside State service for health care managers with significant experience leading large healthcare systems. Before, there was no line of accountability from line-staff upwards; today, there are clear lines of accountability, and systems of review and discipline are functioning.

### 2. Facilities

CDCR's facilities were not originally designed and constructed to provide adequate health care services, and the facilities have generally been poorly maintained. The court experts' *2006 Status Report* described the problems as follows (p. 10):\

*Ten years ago . . .*

- **Clinic Space –** At virtually every facility we visited there was inadequate space for clinical, administrative, and ancillary support functions. Moreover, the existing space is often in disrepair and unsanitary. In most facilities, the clinic and office furniture was old and falling apart.

- **Medical Housing / Bedspace –** There is [sic] insufficient numbers and types of medical housing and beds to match the health care needs of the patient population. The CDCR has four General Acute Care Hospitals (GACH) occupied by patients who are not acutely ill, but require long-term skilled nursing care. A significant proportion of Correctional Treatment Centers (CTC) and Outpatient Housing Unit (OHU) beds are occupied by mental health patients. Most of the remaining beds are occupied by long term care

patients. Therefore, if beds are full, medical patients who do not require hospitalization are sent to an outside hospital simply for lack of a bed. In some cases, patients who should be monitored in a CTC bed are sent back to their housing unit, subsequently deteriorate, and must be urgently sent to an outside hospital. The CDCR does not have a medical bed space management system that ensures the appropriate and best use of medical beds.

These findings echoed the District Court's *2005 opinion Re Appointment of Receiver*, where the Court described the deficiencies in facilities as follows:

*Ten years ago . . .*

"The physical conditions in many CDCR clinics are completely inadequate for the provision of medical care. Many clinics do not meet basic sanitation standards. Exam tables and counter tops, where prisoners with infections such as Methicillin-Resistant Staph Aureus (MRSA) and other communicable diseases are treated, are not routinely disinfected or sanitized. Many medical facilities require fundamental repairs, installation of adequate lighting and such basic sanitary facilities as sinks for hand-washing. In fact, lack of adequate hygiene has forced the closure of some operating rooms. . . .

"The Court observed first-hand at San Quentin that even the most simple and basic elements of a minimally adequate medical system were obviously lacking. For example, the main medical examining room lacked any means of sanitation – there was no sink and no alcohol gel – where roughly one hundred men per day undergo medical screening, and the Court observed that the dentist neither washed his hands nor changed his gloves after treating patients into whose mouths he had placed his hands." *2005 Opinion re Appointment of Receiver*, at *15 (citations omitted throughout).

As of this writing, major improvements have been completed at San Quentin and Avenal State Prison, a new healthcare facility in Stockton for the neediest medical and mental health patients is in the process of activation, and clinic and treatment room improvements for all other prisons are now beginning to be constructed. In addition, a recently authorized sanitation program run by Prison Industry Authority and using inmate labor is making substantial progress in establishing and maintaining sanitary conditions.

### a. Construction at San Quentin

Construction at San Quentin was completed by the end of 2009. The construction program included a medical warehouse, east and west rotunda clinics, personnel offices, the triage and treatment area, a clinic heat project, and replacement parking spaces. The most significant construction was the Central Health Services Building which is the primary home for medical, mental health and dental treatment at San Quentin.

The Central Health Services Building (CHSB), commonly referred to as Building 22, at San Quentin State Prison (SQ) is a five-story, 116,885 gross square foot medical building for medical, dental and mental health care services. Construction of this building, which is inside the secure perimeter, began in November 2007 and was completed in November 2009. The project was completed at a final cost of $128.3 million, which was $17.8 million under the original budget amount of $146.1 million authorized by Senate Bill 99. The building includes outpatient clinical services, specialty clinical services, radiology, dialysis, inpatient (licensed Correctional Treatment Center) and outpatient housing care, emergency trauma care, a pharmacy, housing of medical records, receiving and release, dental operatories, and the library. There are a total of 38 medical exam rooms in the CHSB. The fourth floor Nursing Unit was originally constructed with 50 inpatient beds, consisting of 17 Mental Health Crisis Beds and 33 medical beds. Pursuant to an agreement with CDCR needed to comply with a *Coleman* court order relative to the condemned population, this configuration has recently been redistributed to now include 40 Mental Health beds and 10 medical beds.

### b.  Construction at Avenal State Prison

Construction at Avenal State Prison concluded in early 2010. The construction projects included three yard clinics to provide medical and mental health treatment space, an administrative-segregation clinic, and a healthcare administration building to provide support for healthcare access and administration.

### c.  Construction at California Health Care Facility

The California Health Care Facility (CHCF), in Stockton, California, is a 1.5 million square foot complex built to provide intermediate-level medical and mental health care for patients in the California Department of Corrections and Rehabilitation (CDCR) prison system. It was designed and constructed to consolidate facilities and services for long-term medical and acute and intermediate mental health patients for more efficient and cost-effective delivery of services.

The CHCF was constructed in two phases. The first phase is a 1.264 million square foot facility on the site of the former Karl Holton Youth Facility. The construction of this facility was through the design-build delivery method and the first inmate-patient was received in July 2013. The facility is comprised of 54 buildings; 23 of those are for housing patients with medical and/or mental health treatment needs and one houses inmate workers. Of the total patient capacity of 1,818 beds, 1,010 are for medical patients, 612 are for mental health patients, and 196 are for a permanent inmate work crew.

Due to the acuity level of the patients, the majority of treatment services, programs, and support are based in the housing units and support clusters. Most of these patients are bedridden or have limitations on their ability to walk to any out-of-housing treatment programs. Many of the high custody, acute, and crisis level mental health patients will receive services in the housing unit due to behavior and safety concerns.

For the lower acuity patients, extensive diagnostic and treatment programs, education, and/or support programs are centralized to achieve a more efficient and cost effective model of providing services. A 144,000 square foot shared services building is at the center of the facility and contains elements typical of a central health services building including a laboratory, pharmacy, exam and treatment rooms, diagnostic imaging, dental clinic, dialysis clinic, triage and treatment clinic, and therapy rooms. The CHCF was completed in August 2013 and cost $840 million.

The second phase of the CHCF was the construction of the 1,133-bed DeWitt Nelson Correctional Annex (DNCA), which is adjacent to the first phase of the CHCF. Upon full occupancy, this facility will house 425 patients with Enhanced Outpatient Program (EOP) level of mental health needs, 528 Specialized Outpatient Program (SOP) inmate-patients that require frequent medical appointments and treatment services at the medical facilities within CHCF, and 180 Permanent Work Crew (PWC) inmates that have work assignments within the total facility.

The DNCA totals approximately 283,000 square feet and involved the design and construction of new buildings for the EOP patients and extensively remodeled buildings for the SOP patients and PWC. The facility cost $173 million and the PWC occupancy began in April 2014. Patient occupancy of SOPs began in May 2014.

Following the initial activation of the CHCF in July 2013, numerous problems were identified, which in February 2014 ultimately led to the Receiver temporarily halting additional intake until the problems could be rectified. The most persistent and fundamental failure was the inability to provide basic medical and personal hygiene supplies to the housing units. In addition, problems with management of the kitchen, health records, inadequate nursing clinical and custody staff, and failures to provide appropriate accommodations for *Armstrong* class lawsuit members were identified.

To remedy these significant issues, many prompt and aggressive steps were taken. California Correctional Health Care Services (CCHCS) installed a new permanent healthcare leadership team including the Chief Executive Officer, Chief Support Executive, Chief Medical Executive, Chief Nurse Executive, and Chief of Mental Health. CDCR also assigned a new Warden at CHCF. Together, this team completed a thorough evaluation of the deficiencies and completed a "reboot" of processes and policies where needed. In addition, significant increases in nursing, clinical, and custody positions have been authorized. In July, CHCF reopened to medical intake on a measured and controlled basis.

The planned clinical staffing for CHCF – particularly housing-level nursing staffing – was intended to take advantage of modern principles of "lean management," a management design approach that attempts to eliminate non-value producing elements of a manufacturing or service process. Unfortunately, the lean management approach left CHCF significantly understaffed to deal with its patient load. The Receiver personally endorsed the lean management design approach as well as the original proposed staffing for CHCF. That endorsement was a mistake.

Lean management principles -- at least the way we implemented them – do not appear to work in a healthcare, skilled-nursing facility context.

Last year, the Receiver commissioned a comprehensive analysis of the staffing issue by CPS HR Consulting. Their report confirmed that the facility was severely short-staffed at the housing unit level. Based on this report and our own reassessment internally, we worked with the Department of Finance to prepare a request for additional staffing which was made part of the Governor's budget and is now before the Legislature for consideration.

### d. The Health Care Facility Improvement Program

It is the goal of the Health Care Facility Improvement Program (HCFIP) to provide facilities improvements in all other CDCR institutions that will support timely, competent, and effective health care delivery with appropriate health care diagnostics and treatment, medication distribution, and access to care for individuals incarcerated within CDCR.

Facilities assessments have been performed at each of the CDCR's adult institutions to determine the infrastructure deficiencies that exist within the prison system requiring correction.  The existing conditions and capabilities of the health care facilities were evaluated for conformance to the health care components established by California Correctional Health Care Services.

The existing health care facilities constructed between the years of 1852 and the 1990s are deficient in that they do not meet current health care standards, public health requirements, and current building codes.  In addition, the facilities serve a population that is greater in number and much older than when they were originally built, which has increased CDCR's need for health care space.

An initial scope of a facility improvement program developed by the Receiver proposed uniform medical care improvements at all existing prisons at a cost of approximately $2 billion.  The implementation of the Medical Classification System (MCS), identifying inmates requiring more intensive or frequent medical care, along with the designation of those prisons near metropolitan areas that possess local specialty and hospitalization services, allows the clustering of these inmates at designated prisons.  This has resulted in a reduction in the scope of improvements proposed in HCFIP that allows for implementation of this program within the funding resources provided through Assembly Bill 900 (Chapter 7, Statutes of 2007).

Implementation of the HCFIP will provide appropriate and adequate health care diagnostic and treatment facilities to the entire CDCR inmate population housed in existing adult institutions, including health care processing and intake screening facilities (medical, mental health and dental) at the Reception Center (RC) institutions. Currently, 7 institutions are at the preliminary plan phase, 5 institutions at the working drawing phase, 9 institutions are at the state fire marshal approval phase, and 11 institutions have started or are ready for construction. The HCFIP program is scheduled for completion during 2017.

### e. Sanitation Program

Health care delivery and work locations such as pharmacies, laboratories, examination rooms, standby emergency rooms, and nursing stations must be properly maintained, disinfected, and sanitized. The ability to provide health care clinic space that is clean, sanitized, and well maintained is not and has never been a core competency of CDCR.  Even before the Receivership, medical experts consistently found prison health care clinic space failed to meet even the minimum standards required for a health care environment.  Wardens have long been instructed to ensure the health care clinics, infirmaries, and other inpatient areas are maintained in a clean and orderly fashion.  While there may have been some individual attempts at isolated locations, the problem appears to have been virtually intractable.

More recently, unacceptable standards of health care cleanliness and sanitation were a consistent theme in the eight inspections and reports by the Court's three medical experts during their institution visits in 2013.  The cleanliness and sanitation deficiencies found at many institutions are so serious the experts determined these issues must be permanently addressed as a prerequisite to the transition of medical care back to the State.

The sanitation model previously employed at the institutions used inmate porters supervised by custody staff. It is clear that this model has been unsuccessful. In order for the institutions to have the necessary tools to ensure the medical areas are clean, sanitary and disinfected—essential for a health care environment—much higher standards must be met. These standards include those promulgated under California Code of Regulations, Title 22, standards outlined by the Association for the Health Care Environment, OSHA Safety Requirements, and other standards outlined by the Environmental Protection Agency, the Department of Toxic Substance Control, and the Center for Disease Control.

The Receiver decided to enter into a contract with the California Prison Industry to provide sanitation services to health care areas. The contract entered into between California Correctional Health Care Services and the California Prison Industry provides sufficient resources to provide cleaning for all of the licensed health care areas statewide and complies with the cleanliness and sanitation standards required under Title 22 standards. So far, the implementation of this contract has been a clear success. Health care areas that formerly were not cleaned properly for years have been thoroughly cleaned and are being routinely maintained. The program will have rolled out to all but 8 institutions by June 2015, and will finish its initial roll-out during 2015-2016.

### 3. Equipment

In addition to having deficient facilities, CDCR did not properly equip its facilities to perform routine medical services. The Court described the situation in its *2005 Opinion re Appointment of Receiver* as follows:

*Ten years ago . . .*

> "In addition, many of the facilities lack the necessary medical equipment to conduct routine examinations and to respond to emergencies. Clinics lack examination tables and physicians often have to examine patients who must sit in chairs or stand in cages.

26

"The Court observed first-hand at San Quentin that even the most simple and basic elements of a minimally adequate medical system were obviously lacking. For example, the main medical examining room lacked any means of sanitation – there was no sink and no alcohol gel – where roughly one hundred men per day undergo medical screening, and the Court observed that the dentist neither washed his hands nor changed his gloves after treating patients into whose mouths he had placed his hands." *2005 Opinion re Appointment of Receiver*, at \*15.

The deficiencies in medical equipment and fixtures were addressed in the *Turnaround Plan* as follows: First, Objective 2.3 was devoted to improving the emergency response system, improvements which included conducting an inventory of, assessing and standardizing equipment to support emergency medical responses. As noted in the *Turnaround Plan*, "emergency medical equipment . . . is not uniformly available at CDCR institutions" (Action 2.3.3, p. 10).

As documented in the *11th Tri-Annual Report*, the deficiencies in emergency medical equipment were cured in early 2009 when we completed the six following elements of Action 2.3.3 of the *Turnaround Plan*:

- Element I – Identify critical emergency medical equipment;
- Element II – Inventory and deploy emergency medical treatment bags;
- Element III – Survey other EMR equipment needs;
- Element IV – Develop procurement methods;
- Element V – Procure and deploy EMR equipment; and,
- Element VI – Develop program sustainability.

With respect to Element VI, we developed an EMR Standard Equipment Catalogue which was provided to our procurement staff, institution CEOs and directors of nursing, and regional offices. At that time, a four-year standardization and expansion budget plan was developed.

The second deficiency – basic gaps in treatment room facilities and equipment – will be addressed in the facility improvements that are being implemented in the HCFIP program, as described above. Through that program, we will improve the level of standardization of clinic and treatment room equipment and supplies.

### 4.  Budget and Fiscal

Implementing the changes necessary to bring medical care within CDCR up to constitutional standards has required a new and higher level of expenditures than was previously allocated to prison medical care. Even before the Receivership was established, from FY 1994-95 to FY 2005-06, total prison health care expenditures increased 252% from $368 million to $1.296 billion (with $620 million of that increase after FY 2000-01 when the *Plata* case commenced). Yet these expenditures did not materially improve the quality of care, as found by the Court in its *2005 Order re Appointment of Receiver*.

When the current Receiver was appointed in January 2008, he found a budget for prison health care that was headed towards $2.4 billion. As part of the *Turnaround Plan of Action*, the Receiver embarked upon a series of cost reduction strategies that cut $400 million annually from the medical care budget. Combined with other changes and reforms, beginning in FY 2010-11, the budget for prison medical care stabilized at around $1.6 billion. Expenditures for FY 2014-15 are expected to jump substantially because of costs associated with the Cocci testing program, additional PYs for CHCF and very high costs for new drugs to treat Hep C.

The Court concluded in its *2005 Order re Appointment of Receiver* that the State's lengthy budget process itself interfered with implementation of court-ordered changes:

***Ten years ago . . .***

> "The State budgetary process similarly hinders defendants from instituting medical reforms. There is a lengthy process for obtaining resources for personnel, equipment or facilities. It generally takes between 14 months to two years for a budget concept to result in an appropriation of funds. An even lengthier capital outlay process must be used when the CDCR seeks to build a new building or make significant changes to an existing structure." *2005 Order re Appointment of Receiver*, at *18 (citations omitted).

During the current Receiver's first three years, there were substantial discrepancies between what the Receiver knew he would be spending and what was reflected in official State budget documents. The Receiver and his staff have worked diligently with the Department of Finance, the Legislative Analyst's Office and the budget committees in the Legislature to reach a new baseline budget for prison medical care that incorporates all ongoing operational expenses, removes those discrepancies and bases funding for direct medical care on inmate medical acuity. Only by reaching this agreement on a new baseline budget can the Court have some degree of confidence that the improvements we have achieved will continue to be funded.

The Receiver has not asked the State permanently to modify its ordinary budget processes for the prison medical care program. Those processes reflect a policy of careful analysis and deliberation within the Executive Branch and democratic controls as the budget works through the Legislature. The Receiver believes that with a new baseline established for prison medical care, normal budget processes can adequately handle the year-to-year changes that are likely to occur in prison medical care spending.

### 5. Acquisitions and Medical Contracting

The Court noted in its *2005 Order re Appointment of Receiver* that the State's lengthy procurement process was one of the bureaucratic obstacles to reforming CDCR's medical care system. The Court explained as follows:

*Ten years ago . . .*

> "In general, the California Department of General Services must approve all State contracts, including contracts for personal services and contracts for information technology goods and services. Deputy Secretary for Information Technology for CDCR, Jeff Baldo, testified that the entire contracting process, from the initial stage of determining the need for goods or services for information technology to awarding a contract, can take up to two years." *2005 Order re Appointment of Receiver*, at *18 (citations omitted).

There is no question that the State's procurement processes are lengthy. The Receiver served as Acting Director of the Department of General Services during the Davis Administration and subsequently served as the State's Chief Information Officer, a role which frequently involved planning and monitoring complex information technology procurements. Because of his experience, the Receiver was able to recruit from the Department of General Services and other departments some of the best procurement personnel in the State. Even with this talent, it has been necessary and advantageous on certain large procurements, particularly large information technology procurements, to employ special contracting authority provided by the Court based on waivers of State procurement law (it should be noted that these waivers will not be available to CDCR after the Receivership has concluded). This authority facilitated quicker contracting than is usually possible using the State's processes.

The Receiver discovered an acquisitions function that was chaotic and dysfunctional. There was no strategic approach at all to contracting. For example, there were literally hundreds of contracts with individual hospitals and outside providers to provide services. The terms of these contracts were not standardized, and in many cases, contracts with providers had expired and had not been renewed. With many hospitals, there was no contract at all, and bills were simply paid as invoiced (at unreasonably high rates, in some cases).

In addition to professionalizing the acquisitions staff, the Receiver moved decisively towards a more strategic approach to contracting. Instead of hundreds of unmanageable contracts with individual hospitals and provider groups, the Receiver ordered staff to conduct a strategic procurement to acquire a statewide network of providers. The number of separate registry contracts has been reduced for similar reasons. Contracting for basic medical supplies has been improved by establishing a formulary. These and other contracting changes have significantly improved our ability to contract for goods and services.

As part of the transition of prison medical care back to State control, we will be seeking a few changes to State procurement law with respect to prison health care. The changes would allow for the extension of specified existing contracts for up to two years without a new bid process, incorporate negotiation as part of the procurement process to ensure the State is receiving best value or most cost-efficient services (instead of only lowest bid), and allow for payment of invoices for health care services even in the absence of a written contract.

The Receiver believes that the combination of better staff along with a more strategic approach to contracting will be a durable solution to the contracting problems identified in the Court's *2005 Opinion*.

### 6. Human Resources

The success or failure of a health care services organization ultimately depends upon its ability to recruit and maintain a quality workforce. The *2005 Opinion re Appointment of Receiver* explained serious deficiencies in CDCR's human resources systems:

*10 years ago . . .*

> "The CDCR also suffers from a significant vacancy rate in critical positions within the medical care line-staff. . . . The vacancy problem also plagues the Department in all other areas of health care staffing. Vacancy rates at some institutions are as high as 80% for Registered Nurses (RNs) and 70% for Medical Technical Assistants (MTAs).

> "The CDCR has made some efforts to recruit and retain qualified supervisors, doctors, nurses and MTAs. However, these efforts have paled in the face of the enormity of need. The CDCR's efforts also have been stymied to large degree by the state bureaucracy, as discussed below.

> "The reality facing the CDCR is that its efforts to recruit qualified medical staff into the current system have been ill-fated from the start. For example, compensation levels for CDCR medical staff are simply too low. According to a CDCR commissioned study, compensation for CDCR staff registered nurses is 20-40% lower than for RNs in the private sector, and up to 57% lower for some supervising nurses. Yet the State has failed to pay heed to the study and the nurse staffing crisis continues unabated.

> "The difficulty in recruiting qualified medical staff is compounded by the poor working conditions offered. In one instance, the triage nurse at San Quentin had to walk through the men's shower room, while it was in use, in order to get to her 'clinic' in which she had no sink, exam table or medical equipment. Many competent professionals simply will not work, at least not for long, under such conditions.

> "In addition, the long and bureaucratic hiring process at CDCR increases the difficulty of retaining competent doctors and nurses. The testimony at the hearing makes it clear that the State bureaucracy is simply incapable of recognizing and acting upon the crisis in which the CDCR finds itself." *2005 Order re Appointment of Receiver*, at *11-12 (citations omitted throughout).

The Receivership addressed most of the difficulties in hiring by establishing a well-staffed, highly proficient human resources division at headquarters to lead and assist in keeping vacancy rates at appropriate levels (compensation levels for providers and nurses were increased to

market levels which made a huge difference in our ability to recruit). In effect, the Receivership took over the critical bureaucratic steps in administering an effective HR process, and we have been successful in maintaining staffing in all but a few difficult-to-recruit areas of the State. Even in these areas, however, we have taken steps to ensure adequate staffing (such as by using telemedicine services or registry contracts to fill in the gaps). In order to insure we have a robust recruitment and retention process that will be sustainable in the future, the Receiver is seeking a modest increase in HR staffing, which will be considered by the Legislature in upcoming budget negotiations.

The Human Resources division is responsible for the following functions:

- **Payroll Transactions and Benefits** – administers the employee pay and benefit program for all CCHCS and Division of Health Care Services (DHCS) headquarters and regional employees, ensuring employees are paid appropriately and timely.

- **Position Control** – prepares, processes and maintains the changes to established positions (establish, redirect, reclassify, and abolish positions).

- **Classification and Pay**- ensures CCHCS/DHCS positions are allocated appropriately for the duties assigned to the position, this includes reviewing and approving duty statements, working with control agencies for approval of special allocations, California Department of Human Resources (CalHR) Board Items, and reviewing hiring packages and appointments to ensure they are legal.

- **Equal Employment Opportunity (EEO)** – responds to complaints from employees regarding discrimination, sexual harassment, and retaliation issues; works with management to ensure all staff are aware of and adhere to the State's and CCHCS's EEO policies and procedures.

- **Disability Management Unit** – responsible for Return-To-Work and Reasonable Accommodation functions, which include managing employees on extended sick leave and/or who have disabilities which impact their ability to perform essential functions.

- **Examination Services Section (ESS)** – is responsible for the creation, administration, and maintenance of a legally-defensible examination program in support of the state of California's Civil Service Selection Process. ESS develops and administers over 150 job-related examination processes for the Department's clinical and administrative classifications, in addition to providing job analytic documentation in support of professional best practices.

- **Headquarters Certification Unit** – provides assistance to Northern Region institutions and headquarters programs for the Department's 200+ civil service classifications. It is responsible for processing all requests to fill vacant positions for Northern Region institutions and headquarters and is a critical component in ensuring the legality of hires in accordance with State regulations.

- **Executive Recruitment** – responsible for examination, recruitment, selection, hiring, compensation, and on boarding services for all headquarters and institutional executive and Career Executive Assignment (CEA) positions.

- **Workforce Development Unit** – provides nationwide and statewide recruitment services for CCHCS/DHCS through the use of print and digital media and conference and job fair attendance.   It is responsible for recruiting all Executive, Information Technology, Administrative, and Clinical classifications at headquarters, regional offices, and institutions. Additionally, the Unit provides support for the Department's Federal Loan Repayment Program, Education Program, and Visa Program.

- **Regional Personnel Offices** – Responsible for recruitment, certification process, selection and hiring for all health care positions in institutions.  Prepares, processes and maintains the changes to established positions (establish, redirect, reclassify, and abolish positions).  Provide consultative services to institution health care management on human resources issues.

- **Seniority Placement Unit** – Responsible for placement services and conducts layoff activities.

### 7. Information Technology

The Court noted in the *2005 Order re Appointment of Receiver,* that many of the problems identified by the Court could be traced back to a total absence of information systems within the CDCR. The lack of information systems created a management nightmare where basic information about any health care process was simply not available in a timely manner. In this environment, quality management and improvement was impossible, and providers lacked basic information about their patients.

*10 years ago . . .*

> "[C]entral office staff do not have the tools they need to handle the vast quantity of information necessary to manage a billion dollar, 164,000 inmate system. Data management, which is essential to managing a large health care system safely and efficiently, is practically non-existent. The CDCR's system for managing appointments and tracking follow-up does not work. These data management failures meant that central office staff cannot find and fix systemic failures or inefficiencies. As just one of innumerable examples, there are patients in the general population who need specialized housing, but the CDCR does not track them and headquarters staff is unaware of how

many specialized beds are needed." *2005 Order re Appointment of Receiver*, at \*6 (citations omitted throughout).

Effective, efficient and secure information management lies at the core of any large healthcare organization. The Receivership built from scratch an Information Technology Services Division (ITSD) that has successfully deployed and currently maintains hundreds of millions of dollars of information technology systems that enable our clinical staff to provide better care and give us the data infrastructure to make quality management and improvement an organizational reality. ITSD has 280 staff and is comprised of four areas:

- **Operations/Infrastructure:**
  - o  Data Center, Network, Security Operations, Disaster Recovery, Regional IT Support, Telemedicine/Telepsych Support, Service Desk

- **Clinical Information Technology Systems:**
  - o  Application and Data Base Development and Maintenance

- **Information Technology Management and Analysis:**
  - o  Asset Management, Enterprise Architecture, Contracts/Procurement, HR Services, Project Oversight and Governance, Project Integration

- **Office of Information Security**
  - o  Policy, Audits, Incident Response

Collectively, each area provides the technologies, tools and high quality services that support the healthcare mission, including the following sets of systems:

- **Network**

  CCHCS maintains a high-speed medical-grade network at all 35 institutions and 6 headquarter sites. This includes managing backup power and satellite back-up data connections as well as Wi-Fi access enabling mobility for clinicians and medical devices.

- **Service Desk**

  The CCHCS Service Desk (Call Center and Desktop Support) supports approximately 13,000 users. The call center receives 4,000 calls per month. The average time calls are in queue is 17 seconds with the average time per phone call at 3 minutes and 33 seconds. 10,000 incident and service request tickets are processed per month with 60% of the tickets being submitted through the customer self service portal.

- **Electronic Health Record System (EHRS)**

  CCHCS has undertaken a new Electronic Health Record Project. EHRS is a commercial off-the-shelf software solution which provides electronic processing

33

for integrated health service components such as order management and patient access management, pharmacy with medication management, and laboratory information systems.

- **Clinical Information Technology Systems**
  - Internal Custom Systems – In-house development using Microsoft products such as:
    - Dental Scheduling and Tracking System (DSTS)
    - Mental Health Tracking System (MHTS)
    - Medical Classification Chrono (MCC)
    - Quality Management Databases including CDR Lab Results (QM Registries), Clark Report, First Data Bank Load, Internal Inmate Locator.
    - Cocci Tracking System
    - Preliminary Outbreak Reporting System (PORS)
    - MedSATS
    - Web Census and Discharge Data Information System (WebCADDIS)
  - Internal COTS Systems – Licensed for use by vendors who share maintenance responsibility such as:
    - MS Dynamics Customer Relationship Management (CRM);
    - MS SharePoint;
    - EMC Documentum;
    - EMC Captiva;
    - Adobe® LiveCycle®;
    - Medicor MiPACS Storage Server;
    - Fujifilm Synapse® PACS/RIS;
    - Crescendo Medrite-XL;
    - McKesson InterQual®;
    - Cornerstone Automation System Inc. (CASI) Central Fill; and
    - Omnicell Medication Management Cabinets.
  - Externally Hosted Systems – Owned, managed, and operated by vendors such as:
    - CDCR Strategic Offender Management System (SOMS) Project Electronic Offender Management Information System (eOMIS™);
    - Maxor GuardianRx;
    - Quest Care360 Laboratory Information System (LIS);
    - Electronic Unit Health Record (eUHR);
    - Health Information Management (HIM) System; and
    - Advanced Technology Group (ATG), LLC Food Service Management System (FSMS)

We could never have accomplished the improvements anticipated by the *Turnaround Plan of Action* without the extraordinary efforts of our information technology services division.

### B. Process

#### 1. Access to Providers & Services

Inmate access to providers and other medical services was a serious problem that significantly contributed to the Court's conclusion that the medical system was constitutionally deficient. The Court explained the situation in its *2005 Opinion re Appointment of Receiver* as follows:

*10 years ago . . .*

"As a matter of medical policy, the CDCR requires that within one business day of the submission of a prisoner request for medical care, an RN shall triage the request using an in-person interview and standardized protocols. Unfortunately, this policy lives more on paper than in reality. The CDCR has left several basic nursing policy requirements only partially implemented and at some prisons face-to-face triage is nonfunctional. As a result, patients do not receive timely access to care and suffer a serious risk of harm and even death as a result.

"In addition, inmates do not have timely access to physicians. Appointments with physicians often do not take place within the time frame established by CDCR policy. A number of prisons experience 'serious backlogs in patients receiving medical care.'" *2005 Opinion re Appointment of Receiver*, at *13 (citations omitted throughout).

Access to care is a complex, multi-faceted function. Patients who need access to care must be properly identified (sometimes by the patient him or herself, sometimes by nurses who triage service requests, sometimes by CDCR physicians who must make decisions about tests and outside referrals, and sometimes by external physicians), appointments must be properly scheduled within timelines set either by policy or by physician orders, and patients must be escorted to those appointments as scheduled. There are multiple opportunities for system failure, and the system was plainly nonfunctional when the Receivership began.

The Healthcare Services Dashboard reports on six measures related to scheduling and access to care as follows: (a) access to medical services; (b) access to dental services; (c) access to mental health services; (d) appointments cancelled due to custody; (e) appointments seen as scheduled; and (f) effective communication provided.

The *Turnaround Plan of Action* addressed access to care as the primary focus of its first goal, which was to "Ensure Timely Access to Health Care Services." There were four objectives under the first goal: (1) Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release; (2) Establish Staffing and Processes for Ensuring Health Care Access at Each Institution; (3) Establish Health Care Scheduling and Patient-Inmate Tracking System; and (4) Establish A Standardized Utilization Management System. *Turnaround Plan*, pp. 5-7. All objectives were completed by early 2014. *Twenty-sixth Triannual Report*, pp. 5-7 (June 2, 2014).

### a.  Access to Medical Services

Using data provided by our medical scheduling and tracking systems, we report on a monthly basis a composite measure of our performance on access to medical care and services. The composite includes nine medical access measure percentages: (1) face-to-face triage of health care services requests completed within 1 business day; (2) urgent referral to a physician seen within 1 calendar day; (3) routine referral to a physician seen within 14 calendar days; (4) chronic care evaluation within the timeframe specified at the last chronic care encounter; (5) high priority specialty referrals seen within 14 calendar days; (6) routine specialty referrals seen within 90 calendar days; (7) patients discharged from a community hospital or CDCR inpatient unit who were seen by a primary care provider within 5 calendar days; (8) laboratory appointments completed per provider's order; and (9) radiology appointments completed per provider's order. We set a performance target of 85% or more of patients who require care receive timely access to clinicians and diagnostic services.

As of November 2014, the Healthcare Services Dashboard reports 89% compliance with access to medical services. This percentage has been consistently above 85% since March 2014.

### b.  Access to Dental Services

We report on access to dental services by a composite measure that includes five dental access measure percentages: (1) dental treatments prompted by a Health Care Services Request that was completed within 3 days or 10 days (depending on urgency of symptoms), (2) dental treatments provided within timeframes based on the acuity of the diagnosed condition, (3) Reception Center dental screenings provided within 60 days of the patient's arrival at the institution, (4) patient-requeted comprehensive examinations provided within 90 days, and (5) patients eligible for a periodic comprehensive dental examination (over 50 or diagnosed with diabetes, HIV, seizure disorder or pregnancy) who were notified at least 60 days prior to their anniversary month. There is a performance target of 85% or more of patients who require care receive timely access to dental services.

As of November 2014, the Healthcare Services Dashboard reports 93% compliance with access to dental services. This percentage has been consistently above 85% since January 2014.

### c.  Access to Mental Health Services

We report on access to mental health services by a composite measure that includes three mental health access measure percentages: (1) Enhanced Outpatient Program patients offered 10 or more hours of structured treatment during the measurement month; (2) emergency, urgent, and routine mental health referrals completed within required timeframes; and (3) timely mental health contacts, including psychiatrist, primary clinician and interdisciplinary treatment team contacts. There is a performance target of 85% or more of patients who require care receive timely access to mental health services.

As of November 2014, the Healthcare Services Dashboard reports 89% compliance with access

to mental health services. This percentage has been consistently above 85% since June 2014.

### d.  Appointments Cancelled Due to Custody

In its *2005 Opinion re Appointment of Receiver*, the Court took special notice that access to medical care was often blocked by custody staff. The Court explained as follows:

*10 years ago . . .*

> "A major problem stemming from a lack of leadership and a prison culture that devalues the lives of its wards is that custody staff present a determined and persistent impediment to the delivery of even the most basic aspects of medical care. Too frequently medical care decisions are preempted by custodial staff who have been given improper managerial responsibility over medical decision-making.

> "Correctional officers often are not available to take prisoners to medical appointments or to enable the physicians to do examinations. In medical units that lack call buttons for prisoners to contact doctors, custody staff routinely fail to make rounds and check on patients.

> "All in all, there is a common lack of respect by custody staff for medical staff, and custody staff far too often actively interfere with the provision of medical care, often for reasons that appear to have little or nothing to do with legitimate custody concerns. This exacerbates the problem of physician retention, and the evidence reflects that a number of competent physicians have left CDCR specifically due to conflicts with custodial staff." *2005 Opinion re Appointment of Receiver*, at *15 (citations omitted throughout).

The Receivership addressed this problem on several fronts, most significantly by establishing properly staffed and trained Health Care Access Units that are accountable for facilitating inmate access to health care. It is now exceedingly rare that we receive any reports that individual custody officers are interfering with access to health care.

As for the health care access system, we report on the prevalence of interference with scheduled appointments due to custody factors by a composite measure that includes the percentage of all health care appointments cancelled due to custody factors such as lockdown or modified program, lack of officers or transportation, fog recall, or lack of holding space. The performance target is that less than 1% of health care appointments are cancelled due to custody reasons.

As of November 2014, the Healthcare Services Dashboard reports that 2.8% of health care appointments were cancelled due to custody. This measure has been between 1.6% and 3.3% during 2014.

### e. Appointments Seen as Scheduled

Another important measure of access to care – and particularly the efficiency of the access to care system – is whether scheduled appointments are actually seen as scheduled. We report monthly on the percentage of dental, medical, and mental health appointments seen as scheduled (i.e., without being rescheduled). This figure excludes appointments not seen as scheduled due to patient refusal or similar patient-controlled factors; scheduling error; patient transfer; lay-in; out to court/medical; pending or "to be scheduled" appointments; walk-ins; and appointments scheduled to be seen during the reporting period but not yet closed. The performance target is 85% or more of health care appointments occur as scheduled.

As of November 2014, the Healthcare Services Dashboard reports that 85% of appointments are seen as scheduled. This percentage has never been below 82% during 2014, and has been 85% or higher since August 2014.

### f. Effective Communication Provided

Finally, an important aspect of access to care is the ability of the patient to communicate with his or her clinician. In prison, patients may require assistance in facilitating effective communication. We report monthly on whether effective communication has been provided by a composite measure that includes the percentage of dental, medical, and mental health appointments during the reporting month where the patient required reasonable accommodations to achieve effective communication, and effective communication was provided. This includes patients who require reasonable accommodations due to developmental disability; hearing, vision, and/or speech impairment; and low educational level (score of 4 or lower on the Test of Adult Basic Education). The performance target for this measure is 90% or more of appointments where the patient required reasonable accommodations to achieve effective communication, and effective communication was provided.

As of November 2014, the Healthcare Services Dashboard reports that 95% of appointments requiring accommodations were actually provided effective communication. This measure started the year at only 63%, but because of program changes made during the Spring, the measure rapidly rose to above 90% beginning in June, and has remained above 90% since then.

### 2. Continuity of Providers

An important element of a good medical system of care is maintenance of continuity in primary care providers. A patient who never sees the same physician twice and is handed off from doctor to doctor is likely to be a risk for missed diagnoses and episodic, fragmented care. Accordingly, we have been working for several years to establish a primary care provider system that expands continuity of providers.

### a. Continuity of Medical Providers

We report monthly on the percentage of primary care encounters each medium or high risk

38

patient had over the past 6 months that occurred with the two providers who saw the patient the most often. This measure is based on a rolling six months of data. The performance target is that high and medium risk patients will have 85% or more of their encounters with the same one or two providers within the past six months.

As of November 2014, the Healthcare Services Dashboard reported 86% compliance for continuity of primary care providers. This measure has been above 85% for all of 2014.

### b.   Continuity of Mental Health Primary Clinician

We report monthly on the percentage of each enhanced outpatient program patient's encounters that occurred with a single Mental Health Primary Clinician during the past 6 months. This measure is based on a rolling six months of data. The performance target is that enhanced outpatient program patients will have 85% or more of their encounters with one mental health primary clinician within the past six months.

As of November 2014, the Healthcare Services Dashboard reported 84% compliance for continuity of mental health primary clinicians. This measure has been above 78% for all of 2014 and above 80% since June 2014.

### c.   Continuity of Psychiatrists

We report monthly on the percentage of each enhanced outpatient program patient's encounters that occurred with a single psychiatrist during the past 6 months. This measure is based on a rolling six months of data. The performance target is that enhanced outpatient program patients will have 85% or more of their encounters with one primary psychiatrist within the past six months.

As of November 2014, the Healthcare Services Dashboard reported 84% compliance for continuity of psychiatrists. This measure has been above 78% for all of 2014 and above 80% since June of 2014.

### 3.   Medication Management

Medication management is a critical component of any health care system and presents special challenges in a prison setting where patients are generally not able to acquire prescribed medications themselves and where there are well-founded concerns about hoarding of medications. The pharmacy and medication management systems were seriously deficient which the Court explained in its *2005 Opinion re Appointment of Receiver* as follows:

*10 years ago . . .*

"The Court concurs with Dr. Puisis that management of the prison pharmacy operation is 'unbelievably poor.' There is no statewide coordination between pharmacies and there is no statewide pharmacist. At the individual institutions, the administration of medications is in various states of disarray.

"The CDCR has failed to adequately implement the Inmate Medical Policies and Procedures that require each prison to develop local procedures for medication management.

"There are serious, long-standing problems with dispensing medication, renewing prescriptions, and tracking expired prescriptions. Chronically ill patients are not able to refill their prescriptions in a timely manner.

"The Court observed the pharmacy at San Quentin first-hand. As discussed in the Order to Show Cause, the pharmacy was in almost complete disarray. Additionally, there is no system to identify expiring prescriptions for critical medications and patients wait two to three weeks for refills, which places many inmates at unnecessarily increased risk.

"To ensure continuity of treatment, the policies require that prescriptions continue to be filled when a prisoner transfers to another prison. In practice, however, the prisons do not consistently transfer prescriptions along with the inmates, resulting in large quantities of medication being thrown out rather than administered. On the other end, the receiving prisons routinely disregard prescriptions from sending prisons." *2005 Opinion re Appointment of Receiver*, at *16 (citations omitted throughout).

The *Turnaround Plan of Action* addressed problems with the pharmacy system in Objective 5.1, which sought to establish a comprehensive, safe and efficient pharmacy program. The elements of that objective included developing a functioning drug formulary to improve consistency in prescribing practices and reduce cost, improve pharmacy policies and practices at each institution and introduce a pharmacy information technology system, and establish a central-fill pharmacy to serve the institutions. These goals were completed by the end of 2011. *Nineteenth Tri-Annual Report*, p. 16 (Jan. 13, 2012).

The *Turnaround Plan of Action* did not address all aspects of medication management. The formulary, institution pharmacy practices, and a central-fill pharmacy are important components of a properly functioning medical management system. However, there remains the challenge of actually distributing prescribed medications to patients in a timely manner. In a prison, where many of the medications must be personally delivered so that a clinician can directly observe the patient taking the medication, accurate and timely distribution is a complex endeavor. At any one time, more than half of the inmate population has one or more prescriptions, and on any one day, tens of thousands of drugs must be delivered.

In retrospect, in part because the *Turnaround Plan of Action* did not directly address this distribution challenge, medication management has trailed other elements of the health care system in making sustainable improvements. The medication management scores during the first three rounds of OIG inspections were consistently lower than other elements of the medical system. To improve medication management, we are in the process of acquiring a commercially-available electronic medical record system that, if properly implemented, will facilitate improved

practices of medication distribution and record-keeping. When fully implemented, we anticipate a substantial jump in the performance of our medication management system.

Using data provided by the Medication Administration Process Improvement Program, we report monthly on five medication management measures: (a) Medication Continuity-Transfer; (b) Medication Non-Adherence Counseling; (c) Medication Administration; (d) Non-Formulary by Psychiatrists; and (e) Non-Formulary by Medical Providers. Institutions are also beginning to report medication errors using the Patient Safety Health Incident Reporting system.

### a.   Medication Continuity-Transfer

As noted above, maintaining continuity of medication orders as patients are transferred from one area of a prison to another has been a challenge. We report on a monthly basis medication continuity-transfer by calculating a composite of the following seven percentages from the Medication Administration Process Improvement Program audit tool related to patients who received their medications timely upon: (1) initial CDCR arrival at a Reception Center; (2) inter-institutional transfer; (3) intra-institutional transfer for medications that are nurse administered or directly observed therapy; (4) discharge from a mental health crisis bed; (5) transfer to an administrative segregation unit, security housing unit, or psychiatric services unit; (6) discharge from a community hospital, or Department of State Hospital-run facility; and (7) paroling or otherwise transferring to the community. The performance target is 90% or more of patients who arrived at a reception center or transfer across health care settings will continue to receive their medications in a timely manner.

As of November 2014, the Healthcare Services Dashboard reported 82% compliance for medication continuity-transfer. This measure has been in the low 80's for all of 2014.

### b.   Medication Non-Adherence Counseling

If one or more doses of medication are missed, a properly functioning medication management system will ensure that the missed doses are documented and that the patient is counseled on the missed doses and any consequences. We report on a monthly basis medication non-adherence counseling by calculating a composite score based on the average of the following four percentages from the Medication Administration Process Improvement Program audit tool related to timely referral, counseling, and documentation for patients who: (1) missed doses of medication prescribed by a mental health provider; (2) were subject to an involuntary medication order per Penal Code Section 2602; (3) missed doses of medication prescribed by a primary care provider; and (4) missed doses of insulin, Clozaril or HIV medication. The performance target is 90% or more of patients not compliant with medication orders will be appropriately referred to a clinician.

As of November 2014, the Healthcare Services Dashboard reported 81% compliance for medication non-adherence counseling. This measure has been in the mid- to high-70's for most of 2014, and moved above 80% beginning in October.

41

### c.  Medication Administration

The core activities in medication administration involve ensuring that patients receive their medications in a timely manner. We report on a monthly basis medication administration by calculating a composite score based on the average of the following five percentages from the Medication Administration Process Improvement Program audit tool related to patients receiving their medications timely who were: (1) taking psychiatrist prescribed, nurse administered, or directly observed therapy chronic care medication; (2) prescribed Keep On Person medication by a medical provider; (3) prescribed a new medication by a psychiatrist; (4) had a new medication prescribed by a medical provider; and (5) prescribed TB medication. The performance target is 90% or more of chronic care patients will receive all essential medications, including psychotropic medications, in a timely manner.

As of November 2014, the Healthcare Services Dashboard reported 89% compliance for medication administration. This measure was at 91% for January and February of 2014, and has been just below 90% for the remainder of 2014.

### d.  Non-Formulary by Psychiatrists

Maintenance and use of a drug formulary helps ensure both quality and efficiency in prescription practices. We report on a monthly basis non-formulary use by psychiatrists by calculating the percentage of medications prescribed by psychiatrists that are non-formulary. The performance target is 3% or less of medications prescribed by psychiatrists will be non-formulary.

As of November 2014, the Healthcare Services Dashboard reported non-formulary by psychiatrists at 3.3%. This measure has been below 4% for all of 2014, and below 3.5% for most of 2014.

### e.  Non-Formulary by Medical Providers

We report on a monthly basis non-formulary use by medical providers by calculating the percentage of medications prescribed by primary care providers that are non-formulary. The performance target is 3% or less of medications prescribed by medical providers will be non-formulary.

As of November 2014, the Healthcare Services Dashboard reported non-formulary by medical providers at 3.8%. For most of 2014, this measure was between 5-6%, dropping below 4% in September 2014.

#### 4. Nursing

Approximately 85% of our clinical staff, some 5,195 positions, are nurses (SRN III, SRN II, RN, LVN, CNA and Psych Techs). Needless to say, having a quality nursing staff is critical to the delivery of care. The Court's review of nursing indicated serious gaps in the nursing program:

*10 years ago . . .*

> "The evidence establishes beyond a doubt that the CDCR fails to provide competent nurses to fill the needs of the prison medical care system. According to the Court's nursing Expert, Madie LaMarre, CDCR nurses often fail to perform basic functions and refuse to carry out specific physician's orders. She also found that a number of nurses were not even certified in basic CPR. At certain prisons, nurses often fail to identify urgent medical issues that require immediate referral to a physician. Even where face-to-face triage is implemented, nurses often fail to take vital signs or conduct examinations. Nurses then often fail to adequately assess patients and dispense appropriate over-the-counter medications for problems.

> "Additional, the evidence shows that those nurses who fail to perform basic duties over an extended period of time are not disciplined." *2005 Opinion re Appointment of Receiver*, at *9 (citations omitted throughout).

The *Turnaround Plan of Action* sought to remedy these deficiencies through a sustained recruiting program (see Objective 3.1.1), establishing appropriate nursing leadership and supervision at the institutions (see Objective 3.2.1) and creating professional-quality training programs for providers and nurses (see Object 3.3).

The Healthcare Services Dashboard reports monthly on the percentage of authorized positions that are filled for nurses by displaying three numbers: (1) the actual number of full-time equivalent (FTE) nursing positions used during the reporting month, taking into account hours worked by civil service staff, registry staff, and staff serving overtime, covering more than 20 classification types; (2) the authorized number of FTEs in these positions under the current budget; and (3) the percent of authorized filled. The performance target is 90% of authorized positions being filled.

As of November 2014, the Healthcare Services Dashboard reported 5,742 nursing FTEs actually used and 5,354 FTEs authorized resulting in 107% of authorized FTEs being used. As explained above (Section III(A)(1)(c)), over 90% of our supervising nursing positions are filled.

We have made available to our nurses nationally recognized training programs through HealthStream and AACN ENMO.

#### 5. Providers

The Court's *2005 Opinion re Appointment of Receiver* highlighted inadequacies both in the number and quality of CDCR physicians as follows:

*10 years ago . . .*

"The CDCR also suffers from a significant vacancy rate in critical positions within the medical care line-staff. The vacancy rate for physician positions is over 15%, and this does not account for the additional significant percentage of incompetent doctors who need to be replaced. The rates differ from institution to institution, depending partly on the desirability of the location and the culture of the prison. At one institution, there are only two doctors responsible for approximately 7,000 prisoners.

"The Court finds, based on estimates by the Court Experts and CDCR's consultant, that the CDCR must hire approximately 150 competent physicians to fill vacancies and replace inadequate physicians throughout the system." *2005 Opinion re Appointment of Receiver*, at *11.

***

"The CDCR sorely lacks sufficient qualified physicians to provide adequate patient care to prisoners. While there certainly are some competent and dedicated doctors working within the system, they are unable to service even a fraction of the entire prisoner population. Many other CDCR physicians are inadequately trained and poorly qualified as, for many years, CDCR did not have appropriate criteria for selecting and hiring doctors. Dr. Shansky testified that historically the CDCR would hire any doctor who had 'a license, a pulse and a pair of shoes.' According to Dr. Puisis, 20-50% of physicians at the prisons provide poor quality of care. Many of the CDCR physicians have prior criminal charges, have had privileges revoked from hospitals, or have mental health related problems. An August 2004 survey by CDCR's Health Care Services Division showed that approximately 20 percent of the CDCR physicians had a record of an adverse report on the National Practitioner Databank, had a malpractice settlement, had their license restricted, or had been put on probation by the Medical Board of California. The Court Experts testified that the care provided by such doctors repeatedly harms prisoner patients. The Court finds that the incompetence and indifference of these CDCR physicians has directly resulted in an unacceptably high rate of patient death and morbidity.

"Inadequate medical care in CDCR is due not merely to incompetence but, at times, to unprecedented gross negligence. Indeed, the evidence from multiple sources establishes that medical care too often sinks below gross negligence to outright cruelty.

"The Court will give just a few representative examples from the testimonial and documentary evidence. In one instance, a prisoner reported a two to three week history of fever and chills and requested care. The prisoner repeatedly visited medical staff with an increasingly serious heart condition but was consistently sent back to his housing unit. Eventually, the patient received a correct diagnosis of endocarditis, a potentially fatal heart condition treatable with antibiotics, but did not get appropriate medication. Finally,

the prisoner went to the prison emergency room with very low blood pressure, a high fever and cyanotic (blue) fingertips, indications of seriously deficient blood flow and probable shock. Despite the objections of a nurse who recognized the severity of the prisoner's condition, the physician attempted to return the patient to his housing unit without treatment. Rather than being sent to a community hospital emergency room for immediate treatment, as would have been appropriate, the patient was sent to the prison's Outpatient Housing Unit for observation. He died shortly thereafter from cardiac arrest. Dr. Goldenson found that this course of treatment was 'the most reckless and grossly negligent behavior [he had] ever seen by a physician.'

"In another example, a prisoner repeatedly requested to see a doctor regarding acute abdominal and chest pains; the triage nurse canceled the medical appointment, thinking the prisoner was faking illness. When the prisoner requested transfer to another prison for treatment, his doctor refused the request without conducting an examination. A doctor did see the prisoner a few weeks later but refused to examine him because the prisoner had arrived with a self-diagnosis and the doctor found this unacceptable. The prisoner died two weeks later. Sixty-two grievances had been filed against that same physician, but when interviewed by the Court Expert, the physician advised that most of the prisoners she examined had no medical problems and were simply trying to take advantage of the medical care system.

"In a further example, in 2004 a San Quentin prisoner with hypertension, diabetes and renal failure was prescribed two different medications that actually served to exacerbate his renal failure. An optometrist noted the patient's retinal bleeding due to very high blood pressure and referred him for immediate evaluation, but this evaluation never took place. It was not until a year later that the patient's renal failure was recognized, at which point he was referred to a nephrologist on an urgent basis; he should have been seen by the specialist within 14 days but the consultation never happened and the patient died three months later. Dr. Puisis testified that 'it was like watching the natural history of high blood pressure turn into chronic renal failure somewhat similar to the Tuskegee experiment.'

"Defendants have made some efforts to identify and remove from patient care those practitioners believed to be providing substandard care; in 2004, twelve such doctors were removed. The Quality In Corrections Medical ('QICM') program, developed in conjunction with the Court Experts, Dr. Kanan, Dr. Shansky, and the University of California at San Diego seeks to evaluate the work of identified CDCR physicians in order to improve and assure physician quality. However, QICM has encountered considerable obstacles to implementation and as of yet has not satisfactorily addressed the problems of incompetence and indifference." *2005 Opinion re Appointment of Receiver*, at \*6-7 (citations omitted throughout).

### a. Staffing

The *Turnaround Plan of Action* addressed physician recruitment in Objective 3.1 which set a target of filling 90% of physician positions with qualified medical personnel. To ensure better quality in the recruitment process, the job description was changed to require that all applicants be board certified in family or internal medicine.

The Healthcare Services Dashboard reports monthly on the percentage of authorized positions that are filled for medical personnel, pharmacy, dental clinical, and mental health clinical. For each of these positions, the measure displays three numbers: (1) the actual number of full-time equivalent (FTE) medical provider positions used during the reporting month, taking into account hours worked by civil service staff, registry staff, and staff serving overtime; (2) the authorized number of FTEs in these positions under the current budget; and (3) the percent of authorized filled. The performance target for all of these positions is 90% of authorized positions being filled.

As of November 2014, the Healthcare Services Dashboard reported the following staffing:

|  | Actual | Authority | % of Authority |
|---|---|---|---|
| Medical FTE | 434 | 463 | 94% |
| Pharmacy FTE | 531 | 488 | 109% |
| Dental Clinical FTE | 798 | 825 | 97% |
| Mental Health Clinical FTE | 2767 | 3275 | 84% |

### b. Quality of Providers

A key aspect of recruiting and maintaining a quality provider workforce is a functioning credentialing, licensing and certification program. As the Court noted in its *2005 Opinion*, these important programs were not functional:

*10 years ago . . .*

"The CDCR's high number of incompetent or unqualified doctors is due in part to defendants' failure to track physician credentials and to remain cognizant of the areas of practice in which their board-certified doctors are certified. The Patient Care Order required CDCR to establish a policy of credentialing and privileging physicians as a critical step to preventing harm to prisoners.

"Defendants were allowed five and a half months to institute a credentialing policy. Credentialing is widely used in the health care industry, and the policies are 'not that complicated.' Instead of developing this policy in house, the CDCR contracted out the task, waiting nine months to even sign a contract with the firm performing the work.

46

"At the beginning of 2005, the CDCR implemented a policy that forbade hiring independent contractors and primary care physicians who were not board-certified or board-eligible in internal medicine or family practice. The central office now investigates each new CDCR physician by doing a broad search of practitioner databases to ascertain whether other health care entities have reported adverse credentialing actions regarding them or malpractice settlements on their behalf that are indicative of problems with their patient care. However, the CDCR has not formally adopted this or any other credentialing policy, which is evidence of a lack of will (or at a minimum a lack of competence) for systemic reform in this area. Due to the lack of a credentialing policy, many CDCR doctors are not qualified to practice the type of medicine required by their position and practice outside their area of medical expertise. For example, within the CDCR, one OBGYN manages HIV patients and an incompetent neurosurgeon practices internal medicine." *2005 Opinion re Appointment of Receiver*, at \*21 (citations omitted throughout).

The problems identified by the Court with credentialing, licensing and certification have been solved. As a result, over the course of the Receivership, there has been a complete transformation of our providers so that today, we can confidently assert a quantum improvement in the quality of our medical providers.

To begin, there has been an 82% turnover in medical providers pre- and post-Receivership, consisting of an 80% turnover in physician & surgeons, a 100% turnover in physician assistants, and an 80% turnover in nurse practitioners. Sixty-two percent of these providers graduated from U.S. medical schools, and thirty-eight percent graduated from foreign medical schools. Our top 10 feeder U.S. medical schools, accounting for just over 100 of our 436 providers, are as follows:

- Western University of Health Sciences College of Osteopathic Medicine
- University of California, Davis
- University of California, San Francisco
- Loma Linda University School of Medicine
- California State University, Fresno
- Keck School of Medicine of the University of Southern California
- University of California, Los Angeles
- Stanford University School of Medicine
- University of California, Irvine
- Charles R. Drew University of Medicine and Science

One important consequence of the turnover and recruitment of new providers using new hiring standards is that 92% of our physicians and surgeons are board certified (the greatest number being board certified in family medicine / family practice or internal medicine).

### c. Peer Review

Maintaining and improving a quality medical workforce is done, in part, through peer review systems. Those systems were not functional prior to the Receivership, as explained in the *2005 Opinion re Appointment of Receiver*:

*10 years ago . . .*

> "Peer review is the periodic review of work by similarly qualified professionals. For quality control and the identification of bad practitioners, peer review is performed universally by health care organizations. But in the CDCR, peer review 'is either bogus or it's not done at all.'
>
> "The peer review process sometimes fails because there is a paucity of qualified staff to engage in the process. Doctors with internal medicine qualifications are needed to review medical decisions, correct mistakes and provide training, but such doctors are rarely present at the institutions. At some prisons, the doctors who engage in the peer review process are incompetent. As a result, 'untrained physicians who make mistakes will continue to make them because there is no one to identify and correct their mistakes.'" *2005 Opinion re Appointment of Receiver*, at *10 (citations omitted throughout).*

We developed a peer review process – approved by the Court in its July 9, 2008, "Order Approving, With Modifications, Proposed Policies Regarding Physician Clinical Competency" – that ensures that assessments of clinical competency and quality are determined by active clinicians in the same discipline as the provider, clinicians who can provide an unbiased assessment of clinical care rendered. *See* "*Plata* Physician Professional Clinical Practice Review, Hearing and Privileging Procedures" (Sept. 4, 2008). Peer review occurs in a number of contexts, including both routine reviews of each provider on an annual basis as well as focused reviews that are triggered by certain events, such as a patient death, a sentinel event, potential concerns raised by patterns of practice, utilization, or supervisory observations of care delivered. Peer review occurs at all levels of the organization, local, regional and statewide depending on the individual circumstances of the case. The function of a peer review committee is only to determine whether standards of care were met and that care was appropriate. Because of the tight integration of peer review into daily process, all CCHCS clinicians undergo review at least yearly. Decisions of appropriate remediation, if other than appropriate care delivery was determined by the peer review process, are made by other committees within CCHCS and complement the peer review process.

The most serious peer review sanctions – e.g., termination or suspension or revocation of privileges – trigger a statutory filing with the Board of Medicine pursuant to Bus. & Prof. Code Section 805. From 2009 through most of 2014, our peer review processes resulted in 71 providers whose privileges were suspended or revoked, 20 providers who were terminated, retired or resigned in the face of further proceedings, and 55 Section 805 filings.

### 6. Quality Improvement

The *Turnaround Plan of Action* recognized that a constitutionally adequate health care delivery system would not be sustainable into the future unless supported by a strong quality management and performance evaluation and improvement system, and that the incorporation of performance and outcome measurements for improvement and accountability is required for health care transformation. Given the absence of any meaningful quality improvement program in 2008, the *Turnaround Plan of Action* emphasized that development of a quality improvement system "requires not only new policies and procedures, but a fundamental cultural change and the development of skills for clinicians, clinical units, institutions and the entire system to self-assess and self-correct" (p. 15).

When we began in 2008, there was no basic information technology or data infrastructure to support a quality improvement program. There was no statewide network for data sharing and no technical expertise for program development. Accordingly, the first several years were spent building that basic infrastructure.

The Quality Management division was formally established in 2012. Its primary initial charge was to establish data reporting and analytic tools to support creation of a Healthcare Services Dashboard that would report on key performance measures. The Healthcare Services Dashboard was first released in April 2012.

At present, the Quality Management division supports full implementation of Quality Management and the Patient Safety Program through the following activities:

- **Improvement Planning and Management of Statewide Improvement Initiatives**
  - o Formulation of a statewide Performance Improvement Plan at least every two years that lists priority areas for improvement, specific performance objectives, and overarching strategies used to achieve performance objectives.
  - o Providing tools, training, and direct facilitation to assist institutions in developing annual improvement plans customized to local quality concerns.
  - o Remedial planning for a subset of institutions with poor performance, under the direction of the QM Committee.
  - o Establishment of annual Patient Safety Goals and a Patient Safety Work Plan.
  - o Staff support for the statewide QM and Patient Safety Committees, which includes design, implementation, and implementation of statewide improvement / patient safety initiatives, such as the recent Scheduling Process Improvement Initiative and Patient Safety Survey.

- **Improvement Tools and Training**
  - o Creation of tool kits and staff development programs to help health care staff apply classic quality improvement techniques (Example:  RCA Tool Kit).
  - o Establishment of a quarterly QM Academy (two-day basic orientation to QM and patient safety topics) for Institution Quality Management Support Units (QMSU) members and other local quality champions (the current demand requires

49

monthly QM Academy sessions, but it's not possible at this time).

o Development of continuing education presentations and decision support tools covering clinical topics from the Performance Improvement Plan.

o Maintenance of a database of current improvement initiatives at the institution level as a reference resource (PIWP Database).

o Maintenance of a SharePoint site hosting all improvement tools, patient registries, and performance reports released to date.

- **Performance Evaluation**

   o Production of a monthly Health Care Services Dashboard, consolidating nearly 200 performance metrics across all major program areas into one organizational performance report.

   o Production of monthly "candy cane" reports showing relative performance across institutions on important health care measures; these reports are used to identify and intervene at institutions that show consistently poor performance.

   o Development and maintenance of an automated risk classification system, which uses evidence-based predictive models and screening of thousands of data points to assign each CCHCS patient a risk level, updated daily.

   o Maintenance of more than 25 patient registries, drawing together information from multiple complex clinical and administrative databases to list patients with particular chronic conditions and flag patients at risk for poor outcomes or in need of services.

   o Creation of new patient registries for high-priority conditions, as necessary.

   o Compilation of daily reports to support health care and custody efforts to identify and appropriately place at-risk patients (Cocci Movement Report and Risk-Level Change Report, among others).

   o Production of ad hoc analytics at the request of CCHCS executives to support policy decisions or investigate potential quality problems. Recent examples include identification of mental health patients whose clinical history might make them appropriate for placement at a Minimum Support Facility and a study of the correlation between staffing levels and access to care.

   o Executive performance reports detailing progress on objectives in the statewide Performance Improvement Plan.

   o Design of data collection tools and sampling methodologies and pre-population of audit tools to ensure statistically valid measurement.

   o Routine validation of statewide databases and data feeds.

- **Patient Safety**

   o Managing the Health Care Incident Reporting System, including maintenance of a reporting platform and daily staff support to a group of executives that screen and triage health incident reports.

   o Development and maintenance of an adverse/sentinel event tracking system.

   o Facilitation of root cause analyses (RCAs) at individual institutions.

   o Coordination and facilitation of aggregate root cause analyses as assigned by the Adverse/Sentinel Event Committee, including completion of the final root cause

analyses report.
- o   Annual reporting of root cause analysis and health care incident reporting findings.
- o   Quarterly reports (Patient Safety Stories) identifying and disseminating best practices in patient safety.

In recognition of the workload described above and the need to expand Quality Management at the regional and institution levels, CCHCS redirected a net of eight additional positions to the Quality Management division last year and is requesting an additional 30 positions from the Legislature in this year's budget to begin building quality management at the regional offices and institutions (10 for headquarters and 5 each for the 4 regional offices).

### 7.  Care Management

#### a.  Appropriate Placement of High Risk Patients

We have designated certain prisons that are located near substantial community-based medical resources as "intermediate institutions" where we can cluster a greater percentage of high risk patients and deliver care more efficiently. We report monthly the percentage of all high risk patients statewide appropriately housed at an intermediate institution (high risk patient who are newly incarcerated or soon-to-be paroled are excluded from the measure). The performance target is 90% or more of high risk patients will reside at an appropriate institution.

As of November 2014, the Healthcare Services Dashboard reported 75% compliance for appropriate placement of high risk patients. This measure has been above 70% for all of 2014.

#### b.  Specialty Services

In its *2005 Opinion re Appointment of Receiver,* the Court highlighted the failure to provide appropriate specialty services to patients as follows:

*10 years ago . . .*

"Defendants have failed to provide patients with necessary specialty services. Patients with very serious medical problems often wait extended periods of time before they are able to see a specialist due to unnecessary and preventable delays. At Pleasant Valley State Prison ('PVSP') for example, it may take over a year to see certain specialists; as of May 2005, patients with consultation referrals from early 2004 had yet to be seen. In one instance a patient with a colonoscopy referral had to wait ten months before his appointment; by the time he was seen the mass in his colon was so large that the colonoscope could not pass through. Even when patients do see a specialty consultant,

medical staff often do not follow-up on the specialist's recommendations." *2005 Opinion re Appointment of Receiver*, at *16.

There are several aspects to appropriate and timely use of specialty referrals. The *Turnaround Plan of Action* established a standardized utilization management system to ensure appropriate access to specialty services, infirmary beds and hospitalization. *Turnaround Plan of Action*, Objective 1.4, p. 7. Timely access to specialty services was also addressed by the *Turnaround Plan's* objectives establishing health care access units and improvements to the scheduling and tracking system.

Compliance with policy timelines for access to specialty care are part of the composite measures discussed above dealing with timely access to care. We report on a monthly basis compliance with policy timelines for access to high priority specialty referrals and routine specialty referrals. The performance target for these measures is 90%.

Between June and November 2014, the Healthcare Services Dashboard reported that compliance for routine specialty referrals ranged from 93% to 94%. Compliance for high priority specialty referrals ranged from 75% to 78%.

With respect to the quality of specialty referrals, we report monthly on the percentage of specialty referrals that were submitted and approved that met utilization management approval criteria under the InterQual Utilization Management System. The performance target is 90% or more of approved specialty referrals that have evidence-based criteria available to guide referral decisions are consistent with the criteria.

As of November 2014, the Healthcare Services Dashboard reported utilization specialty services compliance at 91%. This measure has been above 90% for all of 2014.

During 2015, a new measure will be added to the Healthcare Services Dashboard showing how many high risk patients have a written interdisciplinary care plan. This will be a further measure of the quality of planned care for our high risk patients.

### c.  30-Day Community Hospital Readmission

We report monthly on the percentage of community hospitalizations during the reporting period that were linked to a previous hospitalization for the same patient, with no more than 30 days between the two episodes of care (excluding hospitalizations for scheduled aftercare, such as chemotherapy, and readmissions on the same day or next day as the initial hospitalization). This measure is based on a rolling six months of data. The performance target is 5% or less of all hospitalizations results in a readmission within 30 days.

As of November 2014, the Healthcare Services Dashboard reported 7.8% for 30-day community hospital readmissions. This measure has been below 10% for all of 2014.

### d. Potentially Avoidable Hospitalizations

The federal Agency for Healthcare Research and Quality has identified a subset of diagnoses that qualify a hospitalization as potentially avoidable, and these are applied at healthcare organizations nationwide. The list includes conditions such as cellulitis, pneumonia, diabetes, asthma, chronic obstructive pulmonary disease, seizure disorders, urinary tract infections, dehydration, angina, congestive heart failure, and perforated appendix. We also include end stage liver disease complications, self-injury, and medication-related events. Based on a rolling six months of data, we report monthly on the rate of potentially avoidable hospitalizations per 1,000 patients per year. The performance target is that the rate of avoidable hospitalizations will be less than 10 per 1,000 inmates per year.

As of November 2014, the Healthcare Services Dashboard reported a rate of 11.3 potentially avoidable hospitalizations. This measure has been below 11.9 for all of 2014.

### e. 30-Day MHCB or DSH Readmission

We report monthly on the percentage of discharges from a mental health crisis bed or Department of State Hospitals-run program that resulted in an admission to the same mental health bed type within 30 days. The performance target is 5% or less of patients who return from mental health crisis bed or Department of State Hospitals will be readmitted within 30 days.

As of November 2014, the Healthcare Services Dashboard reported 29% 30-day mental health crisis bed or Department of State Hospitals readmission. This measure has fluctuated between 23% and 31% during 2014.

### 8. Health Care Information Management

For obvious reasons, adequately maintained medical records are a critical component of every health care system. The *2005 Order re Appointment of Receiver* described a medical records system that was essentially broken:

*10 years ago . . .*

"The medical records in most CDCR prisons are either in a shambles or non-existent. This makes even mediocre medical care impossible. Medical records are an essential component of providing adequate patient care and should contain comprehensive information about a patient that can assist a physician in determining the patient's history and future treatment.

"The amount of unfiled, disorganized, and literally unusable medical records paperwork at some prisons is staggering. At CIM, the records were kept in a 30 foot long trailer with no light except for a small hole cut into the roof and were arranged into piles without any apparent order. Conditions are similar at other prisons as well. At some prisons medical records are completely lost or are unavailable in emergency situations.

"At CIM, the use of temporary medical records creates a confusing and dangerous situation for practicing physicians who often have access only to little or none of a patient's history. The Court observed first-hand at CIM that doctors were forced to continually open new files on patients simply because the doctors could not get access to the permanent files. As a result, the risk of misdiagnosis, mistreatment, and at a minimum, wasted time, increase unnecessary.

"The Court concurs with Dr. Puisis's testimony that the CDCR medical records system is 'broken' and results in dangerous mistakes, delay in patient care, and severe harm." *2005 Order re Appointment of Receiver*, at *14.

The *Turnaround Plan of Action* did not propose a specific solution to the medical records problem. Instead, it recognized that the first step in fixing the problem was to create a roadmap for achieving an effective management system that ensures standardized health records practice for all institutions. *Turnaround Plan of Action*, Objective 5.2.1, p. 22. At the time the *Turnaround Plan of Action* was adopted, planning was already underway for implementing a computerized patient information system for all inmates.

During the first years of the Receivership, an electronic Unit Health Record ("eUHR") system was built. The eUHR was a substantial improvement over the paper-based system. It introduced substantial standardization of medical records, significant reduced the backlog of unfiled documents, and made the medical record much more accessible to clinicians. However, the eUHR has not been adequate for our clinicians. The eUHR is only a document filing system where paper records are scanned into digital, PDF files. As more and more documents are entered into each patient's file, the eUHR becomes more and more difficult to use as an efficient medical record. As a result, performance of the eUHR system has degraded over the years.

The Healthcare Services Dashboard reports on five elements of health information availability: (1) non-dictated documents; (2) dictated documents; (3) specialty notes; (4) community hospital records; and (5) scanning accuracy.

### a. Non-Dictated Documents

We report on a monthly basis the timely availability of health information in non-dictated documents by calculating a composite of the average of five measures which report the percentage of documents available in the eUHR within 3 calendar days of a patient encounter for: (1) onsite medical services; (2) onsite mental health services; (3) onsite dental services; (4) CDCR inpatient services; and (5) other miscellaneous documents. These measures compare the document scan date to the patient encounter date, and they exclude documents related to specialty, hospital, diagnostic imaging, medication administration records, laboratory, and dictated documents. The performance target is 85% or more of non-dictated records generated by clinicians are available in the chart within 3 calendar days from the date of the patient encounter.

As of November 2014, the Healthcare Services Dashboard reported the availability of non-dictated documents at 59%. This measure has been between 50% and 60% from July through November 2014.

### b.  Dictated Documents

We report on a monthly basis the timely availability of health information in dictated documents by calculating a composite of the average of three measures which report the percentage of dictated documents available in the eUHR within 5 calendar days of the patient encounter for: (1) medical services; (2) mental health services; and (3) specialty services. The performance target is 85% or more of dictated records generated by clinicians are available in the chart within 5 calendar days from the date of the patient encounter.

As of November 2014, the Healthcare Services Dashboard reported the availability of dictated documents at 29%. This measure has been below 50% for all of 2014.

### c.  Specialty Notes

We report on a monthly basis the timely availability of specialty notes by calculating the percentage of specialty consultation documents available in the eUHR within 5 calendar days of the patient encounter. The performance target is 85% or more of specialty documents will be available in the chart within 5 calendar days after services are performed.

As of November 2014, the Healthcare Services Dashboard reported the availability of specialty notes at 66%. This measure has been climbing upward to its current level from the low 30%'s in January 2014.

### d.  Community Hospital Records

We report on a monthly basis the timely availability of health information from community hospital records by calculating the percentage of hospital discharge documents available in the eUHR within 3 calendar days of a community hospital discharge. The performance target is 85% or more of hospital discharge records will be available in the chart within 3 calendar days after the patient is discharged.

As of November 2014, the Healthcare Services Dashboard reported the availability of community hospital records at 65%. This measure has been between 50% and 65% throughout 2014.

### e.  Scanning Accuracy

We report on a monthly basis the accuracy of the scanning process by calculating from a sample of pages sent to the Health Record Center for audit the percentage of documents scanned into the

eUHR that are scanned accurately. The performance target is 95% or more of documents will be scanned accurately into the chart.

As of November 2014, the Healthcare Services Dashboard reported scanning accuracy at 97%. This measure has been above 95% since July 2014 (the measure was not separately reported previously).

### f.   Implementation of an Electronic Medical Record

A few years ago, when it became clear that the eUHR would become inadequate for our health care system, we decided to acquire a commercially available electronic medical record system. We are now in the middle of a project to implement Cerner's medical record system. System configuration and build has largely been completed, and we have begun system testing. The first institution to go-live should occur in October 2015 with implementation at all institutions completed during 2016. Successful implementation of this system – along with substantial modification of our clinicians' work practices – should solve the problem of timely access to medical record information.

### 9.   Mortality Review

Large health care systems generally have processes to review deaths to determine whether lapses in care contributed to a death. The death review process at CDCR was broken. The *2005 Order re Appointment of Receiver* explained as follows:

*10 years ago . . .*

> "Death reviews provide a mechanism for medical delivery systems to identify and correct problems. These reviews should determine whether there has been a gross deviation from the adequate provision of care and whether the death was preventable. These reviews should be conducted even when death is expected, such as with a terminal condition, to determine if appropriate care has been provided.

> "Expert review of prisoner deaths in the CDCR shows repeated gross departures from even minimal standards of care. In 2004, the Court Experts and Dr. Shansky reviewed approximately 193 deaths, the majority from August 2003 to August 2004. These death reviews were the result of an Order of this Court after CDCR failed to perform the death reviews independently. These were only a portion of the backlogged death review cases.

> "The Court Experts concluded, and the Court finds, that thirty-four of the deaths were serious and probably preventable. CDCR sent these thirty-four cases to physicians at UCSD for review. In twenty cases, the UCSD physicians found serious errors that contributed to death. The conclusions of the UCSD physicians confirmed that the medical care provided by the prison medical staff prior to the inmates' deaths was well below even minimal standards of care. The reviewing physicians used the following language to

describe some of their conclusions: 'a gross" departure from the standard of care; 'standard of care definitely not met'; 'a number of deviations' and 'a severe systemic problem'; 'a gross departure' and 'treatment . . . far below the standard'; 'the corrections medical system failed the patient' and the inmate 'died of what quite likely was a preventable process'; 'an egregious deviation'; 'a fatal omission' and 'a gross deviation'; 'multiple gross deviations'. A Court Expert also testified: 'You would not expect one death like this in a relatively large-sized facility for years. As an example, if I took one of the most problematic deaths that we reviewed, I don't think I saw one of these in my entire 20 years' experience in managing prison facilities.

"The Court will provide just one of many examples to illustrate the problems revealed by the death reviews. An inmate arrived at 4:30 a.m. at the prison infirmary due to complaints of shortness of breath and tiredness. About a week prior, the inmate had reportedly been swollen all over with a blood pressure of 150/126 and a heart rate of 100. The night before his death the inmate had been brought to the infirmary for very similar complaints. The following morning at 6:00 a.m., the nurse and physician determined that further care was unnecessary at that time and released the inmate from the infirmary. On his return to the transport van, the inmate began staggering, went down on his hands and knees and went prone. As the inmate was helped into the van, a medical provider told a correctional officer that the inmate 'was fine and just needed sleep.' When he inmate arrived at his housing unit fifteen minutes later, he stumbled out of the van, went down on his hands and knees, then went prone and became unresponsive. By 6:30 a.m., the inmate had no vital signs, and at 7:02 a.m. he was pronounced dead. The UCSD physicians determined that there were 'multiple gross deviations from the standard of care' in this case, including an inadequate monitoring of the inmate's diabetes and hypertension in the years before his death, a lack of concern for high blood pressure readings in the days and weeks before his death, the lack of a personal physician's evaluation of the inmate when he came to the infirmary, and the failure to diagnose or treat the congestive heart failure from which the inmate presumably died.

"The Court Experts have made even further findings based on their review of additional death records beyond those sent to UCSD. In March 2005, a Court Expert reviewed the death files of ten prisoners at SATF prison and determined that a least seven deaths were preventable, and two more might have been preventable. The Court Expert concluded that the care provided in most of the cases constituted medical incompetence.

"In February 2005, the Courts Experts made similar conclusions regarding the review of ten deaths at San Quentin; most of the deaths had been preventable. The Court adopts these uncontested expert findings regarding preventable deaths.

"All of this information led Dr. Puisis to the uncontested conclusion, as referenced in the Introduction, that on average, every six to seven days one prisoner dies unnecessarily." *2005 Order re Appointment of Receiver*, at *7-8 (citations omitted throughout).

\*\*\*

> "As discussed above, the Stipulated Order required defendants to formulate 'a minimally adequate death review process.' Although defendants have had over three years to comply, they have failed to establish an adequate death review system, and many of the unreviewed deaths present serious problems, including neglect and cruelty. The CDCR has a backlog of over 300 deaths that have not been reviewed. In addition, almost all the deaths that occurred (at an approximate rate of one per day) in March, April and May of this year have not been reviewed." *2005 Opinion re Appointment of Receiver*, at \*20 (citations omitted throughout).

The Receivership has cured these deficiencies by establishing a fully-functioning, appropriately staffed death review process. There are no backlogs of unreviewed deaths.

Annual reports on inmate deaths contain significant information on medical outcomes and quality improvement. Rigorous peer review of all prison deaths identifies serious lapses in care and records numbers of preventable deaths. The death review has been used to find opportunities for systemic improvement and to identify, counsel and sanction any unsafe providers.

The death review reporting and review policy and procedure is described in the Receiver's Quality Management Policy and Procedural Manual (Volume 3, Chapter 7). Each inmate death is reviewed by a trained Clinical Support Unit (CSU) physician and by a registered nurse consultant. Findings are recorded on a standardized death review template. Reviewers summarize the decedent's healthcare record, focusing primarily on all of the clinical encounters that took place during the last six months of the patient's life.

The quality of patient triage and evaluation, the timeliness of access to primary care and specialty referral, the quality of all clinical evaluations, and results of and responses to all laboratory and diagnostic imaging studies are noted. The quality of care for any identified chronic medical condition is evaluated and reviewed for adherence to standardized and evidence based guidelines for care. All visits to specialty care, emergency departments and inpatient hospital facilities are reviewed. The quality of end of life care for terminal conditions is evaluated. The timing and quality of the responses to emergency "man down" situations are reviewed for compliance with emergency procedural guidelines.

In the past four years, reviewers have also determined whether there was an identifiable primary care physician involved in the patient's care.

In each case, the cause of death is determined, using autopsy findings when available. All lapses in care are noted, even if lapses did not contribute to the death. The reviewer then makes a judgment as to whether the death was preventable or not preventable.

Completed death reviews are presented by the reviewer to the Death Review Committee (DRC), an interdisciplinary group appointed by the Statewide Chief Medical and Nursing Executives.

The eight-member DRC, chaired by a physician and a nurse executive, includes three physicians, three nurses, one (nonvoting) mental health representative and one custody representative. The DRC is charged with reevaluating the care provided to the decedent including an evaluation as to the preventability of death. A vote is taken by the committee to achieve concurrence as to whether the death was Not Preventable, Possibly Preventable, or Definitely Preventable. Other functions of the DRC are to identify opportunities for improvement in the health care system, to make recommendations for changes in Clinical Care Guidelines, to recommend statewide training or continuing medical education programs on specific issues, to identify and refer local issues to institution leadership, systemic issues to Statewide leadership, and to identify and refer deficiencies in clinical care to the appropriate Peer Review bodies.

The results of our death review process are summarized in an annual report. Items requiring provider improvement are referred to the peer review process, and the annual reports are used by the Quality Management division in its annual Patient Safety Report.

### C. Outcomes

#### 1. Death Reports

Annual reports on inmate deaths contain significant information on medical outcomes and quality improvement. Rigorous peer review of all prison deaths identifies serious lapses in care and records numbers of preventable deaths. The death review has been used to find opportunities for systemic improvement and to identify, counsel and sanction any unsafe providers. The death review process is described above. In this section, we will describe the outcomes as reported in the annual death reports, the most recent of which is the "Analysis of 2013 Inmate Death Reviews in the California Correctional Healthcare System" (Kent Imai, MD, Oct. 27, 2014).

During the time of the Receivership, there has been a significant reduction in the number of "likely preventable deaths" as follows:

- 2006: 18 likely preventable deaths
- 2007: 3 likely preventable deaths
- 2008: 5 likely preventable deaths
- 2009: 3 likely preventable deaths
- 2010: 5 likely preventable deaths
- 2011: 2 likely preventable deaths
- 2012: 1 likely preventable death
- 2013: 0 likely preventable deaths

During these same years, while there was an initial increase in the number of "possibly preventable deaths," the overall trend has been a reduction in "possibly preventable deaths" as follows:

- 2006: 48 possibly preventable deaths

- 2007: 65 possibly preventable deaths
- 2008: 61 possibly preventable deaths
- 2009: 43 possibly preventable deaths
- 2010: 47 possibly preventable deaths
- 2011: 41 possibly preventable deaths
- 2012: 42 possibly preventable deaths
- 2013: 35 possibly preventable deaths

Combining the rates for likely preventable deaths and possibly preventable deaths, Figure 3 shows a clear downward trend in preventable deaths.



Figure 3. Preventable Death Rates 2006-2013

Figure 3 shows a 32% reduction in likely and possibly preventable deaths from the inception of the Receivership.

### 2. Population Health Management

Many of the items reported on the Healthcare Services Dashboard are "process" measures that only indirectly are indicators of quality of care. These measures are important because they do indicate whether the process systems are working properly and because the court orders in *Plata* direct compliance with Policies & Procedures that are, by and large, process oriented. When considering implications of population based health outcomes, 100% is not an achievable goal. This is due to the variability of the disease process, interactions between multiple conditions, patient non-compliance and the underlying environmental factors that contribute to the response to therapy. When comparing to other reference groups, consideration must be given to the similarities and differences in the demographics of the comparator populations.

Early on, the Receiver directed the Quality Management division to begin developing "outcome" measures that would more directly assess the health of our patients and the extent to which health care services actually improved the quality of our patients' health. At present, the Healthcare Services Dashboard reports monthly on the following eight "Population Health Management" measures:

- Asthma Care
- Therapeutic Anticoagulation
- Diabetes Care
- End Stage Liver Disease Care
- Utilization Specialty Services
- Colon Cancer Screening
- Breast Cancer Screening
- Diagnostic Monitoring

A ninth measure – Polypharmacy Medication Review – is being added this year.

Five of these measures – Asthma Care, Therapeutic Anticoagulation, Diabetes Care, Colon Cancer Screening and Breast Cancer Screening – have been reported since 2011, and as detailed below, the four-year trend data for each of these measures shows substantial improvements.

### a. Asthma Care

Rather incredibly, the death report for 2006 indicated that there were 6 deaths from asthma. In 2008, the Receiver ordered an emergency statewide focus on asthma care so that this result would not be repeated. Now, on a monthly basis, we report on the average of two asthma care measures: (1) percentage of persistent asthmatics 18-64 years of age who were prescribed an inhaled corticosteroid (ICS) during the past 12 months; and (2) percentage of patients with asthma who received 2 or fewer short-acting beta agonist inhalers in the past 6 months. The performance target is 85% or more of asthma patients will be in good control based on the use of inhaled corticosteroids (ICS) and short acting beta agonists (SABA).

As of November 2014, the Healthcare Services Dashboard reported 81% compliance for asthma care. This measure has been above 80% for all of 2014. There have been no deaths from the failure to treat asthma since 2008. When initially reported in 2011, there was 75% compliance for asthma care.

### b. Therapeutic Anticoagulation

We report monthly the percentage of patients on anticoagulation therapy whose most recent international normalizing ratio (INR) within the last 30 days was between 2 and 3.5 (excluding patients who have been prescribed Warfarin for less than 4 months). The performance target is 90% or more of all patients on Warfarin will have their most recent INR result within the last 30 days at therapeutic levels.

As of November 2014, the Healthcare Services Dashboard reported 79% compliance for therapeutic anticoagulation. This measure has been above 70% for all of 2014. When initially reported in 2011, there was 47% compliance for therapeutic anticoagulation.

### c.   Diabetes Care

We report monthly a composite score on diabetes care calculated by the average of the following four measures: (1) percentage of diabetic patients whose most recent hemoglobin A1C result is less than 8%; (2) percentage of diabetic patients whose most recent low-density lipid result is less than 100 mg/dL; (3) percentage of diabetic patients whose most recent blood pressure is less than 190/90 mm Hg; and (4) percentage of diabetic patients screened or treated for nephropathy. The performance target is 90% or more of diabetic patients will be in good control based on the following indicators: hemoglobin A1C, cholesterol, and blood pressure levels in good control, and screened or treated for nephropathy.

As of November 2014, the Healthcare Services Dashboard reported 81% compliance for diabetes care. This measure has been above 75% for all of 2014. When initially reported in 2011, there was 62% compliance for diabetes care.

### d.   End Stage Liver Disease Care

Beginning with the October 2014 dashboard, we report monthly a composite score on end stage liver disease care by calculating the average of the following four measures: (1) percentage of ESLD patients receiving an EGD within 36 months; (2) percentage of ESLD patients receiving a HCC screening ultrasound within 12 months; (3) percentage of ESLD patients not receiving a NSAID medication >= 30 days within the previous 60 days; and (4) percentage of ESLD patients receiving appropriate medication per ESLD related diagnosis. The performance target is 90% or more of end stage liver disease patients will be receiving care consistent with the CCHCS end stage liver disease care guide.

As of November 2014, the Healthcare Services Dashboard reported 74% compliance for end stage liver disease care.

### e.   Utilization Specialty Services

We report monthly on the quality of utilization specialty services by calculating the percentage of specialty referrals that were submitted and approved in the past month that met utilization management approval criteria. The performance target is 90% or more of approved specialty referrals that have evidence-based criteria available to guide referral decisions are consistent with the criteria.

As of November 2014, the Healthcare Services Dashboard reported 91% compliance for utilization specialty services. This measure has been above 90% for all of 2014.

### f.   Colon Cancer Screening

We report monthly on the extent of colon cancer screening by calculating the percentage of patients 50 through 75 years of age who were offered colorectal cancer screening (in the form of a fecal occult blood test, fecal immunochemical test, sigmoidoscopy, or colonoscopy) within the appropriate timeframe (excluding patients who have had a diagnosis of colon cancer or total colectomy). The performance target is 90% or more of eligible patients will be offered colon cancer screening as recommended by the U.S. Preventive Task Force.

As of November 2014, the Healthcare Services Dashboard reported 94% compliance for colon cancer screening. This measure has been above 87% for all of 2014. When initially reported in 2011, there was 55% compliance for colon cancer screening.

### g.   Breast Cancer Screening

We report monthly on breast cancer screening by calculating the percentage of female patients 50 through 74 years of age who were offered a mammogram during the last 24 months (excluding patients who have had a bilateral mastectomy). The performance target is 90% or more of eligible female patients will be offered a mammogram as recommended by the U.S. Preventive Task Force.

As of November 2014, the Healthcare Services Dashboard reported 94% compliance for breast cancer screening. This measure has been above 90% since March 2014 and above 87% for January and February of 2014. When initially reported in 2011, there was 69% compliance for breast cancer screening.

### h.   Diagnostic Monitoring

We report monthly on diagnostic monitoring as a composite score of 29 measures by calculating the percentage of patients prescribed select high risk medications who received appropriate diagnostic monitoring consistent with clinical guidelines. The performance target is 90% or more of patients prescribed select high risk medications will have appropriate diagnostic monitoring.

As of November 2014, the Healthcare Services Dashboard reported 80% compliance for diagnostic monitoring. This measure has been above 70% for all of 2014.

### 3.   HEDIS Comparisons

More than 90 percent of America's health plans participate in the Healthcare Effectiveness Data and Information Set (HEDIS), submitting data annually on a core set of performance metrics. The 2012 HEDIS database included data on more than 40 percent of the U.S. population. The National Committee on Quality Assurance (NCQA) issues an annual report that rolls up HEDIS scores from various organizations into three broad comparison categories:

- Commercial HMO and PPO plans;
- Medicaid plans; and,

- Medicare plans.

NCQA reports scores at the 10th, 25th, 75th and 90th percentiles. Medi-Cal sets the "Minimum Performance Level" for its contracted managed care plans at the national 25th percentile.

CCHCS currently uses "HEDIS-like" methodologies for a number of our Healthcare Services Dashboard measures. For most of these measures, there are no significant differences between the HEDIS standards for data collection and reporting and the standards we use for our Performance Dashboard. The few differences in methodology are unlikely to materially affect our results or our ability to compare our results with national HEDIS results. However, CCHCS is in the process of partnering with UC Davis and NCQA to expand and validate our use of HEDIS methodologies so that any lingering concerns about our data may be addressed.

Currently, we collect data on 13 items, six of which are items that are part of a measure of comprehensive diabetes care. Systemwide, we are above the 25th percentile for all 13 items. For 11 of those items, we are above the 75th percentile. In other words, based on our HEDIS-like data, our outcomes are better than outcomes for patients in Medi-Cal, Medicaid and National Commercial HMO and PPO plans. The following table contains the details.

| HEDIS Measures | HCS 2014 Dashboard or Other Data As of June 2014 | HEDIS 75th Percentile | HEDIS 25th Percentile | National Medicaid HEDIS 2014 Overall | National Commercial HMO HEDIS 2014 Overall | Medi-Cal Managed Care HEDIS 2013 |
|---|---|---|---|---|---|---|
| Persistent Asthma ICS Treatment | 81% | 87% | 81% | 84% | 91% | --- |
| Colorectal Cancer Screening | 95% | 69% | 56% | --- | 63% | --- |
| Breast Cancer Screening | 83% | 65% | 51% | 58% | 74% | --- |
| 30 Day All-cause Readmissions | 8.2% | --- | --- | --- | 8.5% | 14.4% |
| Flu Shots for Adults (50-64) | 59% | 54% | 44% | --- | 50% | --- |
| Cervical Cancer Screening | 82% | 73% | 62% | --- | --- | 62% |
| Mental health Follow-up Visits in 7 Days | 86% | 58% | 33% | 42% | 55% | --- |
| Diabetes Care – HbA1c Control (<8%) | 78% | 56^ | 42% | 46% | 59% | 49% |
| Diabetes Care – LDL-C Control (<100 mg/dL) | 74% | 41% | 29% | 34% | 47% | 38% |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Diabetes Care – Blood Pressure Control (<140/90)** | 84% | 64% | 48% | 60% | 65% | 63% |
| **Diabetes Care – Medical Attention for Nephropathy** | 91% | 83% | 73% | 79% | 85% | 82% |
| **Diabetes Care – HbA1c Testing** | 96% | 87% | 79% | 84% | 90% | 83% |
| **Diabetes Care – Poor HbA1c Control (>9.0%)** | 12% | 34% | 51% | 46% | 31% | 40% |

# Exhibit 3

XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN - SBN 209508
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:    November 5, 2019<br>Time:    2:00 p.m.<br>Crtrm.:  6, 2nd Floor<br>Judge:   Hon. Jon S. Tigar |

1    The parties submit the following joint statement in advance of the November 5,

2  2019 Case Management Conference.

3    Defendants' Statement:  Defendants note that Plaintiffs identify 10 issues in this

4  Case Management Conference statement that were previously raised with the Receiver or

5  CDCR.  In addition, several joint issues discussed in this CMC statement are merely

6  updates to prior statements.  Defendants, therefore, believe that it would be more efficient

7  for the parties to meet with the Receiver in advance of the preparation of future CMC

8  statements to limit those statements to issues that require the Court's attention.

9    Plaintiffs' Position:  Plaintiffs are happy to meet with the Receiver at any time.  We

10  include issues in this Statement that we believe are important for the Court to know,

11  including matters related to the advancement of the remedy.

12  **I.    Institution-Specific Issues**

13    **A.    California Health Care Facility (CHCF)**

14      **1.    Legionnaire's**

15    In March, a CHCF patient died after contracting Legionnaire's disease (a type of

16  potentially deadly pneumonia caused by inhalation of small droplets of water containing

17  *legionella* bacteria, or aspiration of water containing the bacteria), and then a second

18  patient tested positive for the disease (he recovered).  In mid-April, preliminary test results

19  determined that *legionella* bacteria were widespread in biofilm throughout the prison's

20  plumbing.  Based on public health recommendations, CHCF then imposed water

21  restrictions, including using bottled water for drinking and above-the-neck hygiene and

22  showering via portable units or in-building showers with nozzles equipped with *legionella*

23  filters.  CDCR also undertook efforts to control the bacteria in the plumbing, including a

24  course of hyper-chlorination, and testing to determine if the bacteria was sufficiently

25  controlled.  In addition, medical staff increased surveillance of patients.  CCHCS has said

26  it would inform the parties of any further Legionnaire's disease diagnoses at the prison; to

27  date, no further cases have been reported.

28

1    Test results received since approximately late July showed *legionella* bacteria levels

2    sufficiently controlled such that full use of water has been resumed in some buildings.  As

3    of October 11, 2019, eight of CHCF's 29 patient housing units had no water restrictions.

4    In the 21 other housing units, bottled water continues to be provided for drinking and

5    above-the-neck hygiene.  Further, all housing units showers have been equipped with in-

6    line *legionella* filters so that all showers can be safely used.  For that reason, all portable

7    showers have been removed.  In addition, efforts to control *legionella* bacteria continue in

8    all areas and housing units, including those without restrictions, and include (1) periodic

9    thermal disinfection of certain water valves in the plumbing and (2) the flushing of water

10   through each building's pipes; most are done monthly, about a third are done weekly, and

11   three buildings require daily flushing.  The water flushing process is labor intensive;

12   CHCF has utilized staff overtime.  These control efforts will continue even if subsequent

13   test results show all buildings have *legionella* bacteria sufficiently controlled (the

14   frequency of pipe-flushing may be adjusted depending on test results).

15   Testing of water for the presence of *legionella* bacteria also continues in all

16   buildings.  In early October, one area of CHCF, which includes its emergency treatment

17   and patient receiving and release areas, was placed back on water restrictions after having

18   such restrictions lifted in August, because more recent test results indicated that *legionella*

19   again was not sufficiently controlled.

20   A long-term water safety management plan for CHCF is necessary, but the plan has

21   not yet been developed given the current efforts to sufficiently control *legionella* bacteria.

22   The plan likely will include continued thermal disinfection of plumbing valves and

23   periodic flushing of the pipes.  CDCR continues to evaluate whether CHCF should install a

24   chlorine dioxide water treatment unit between its water storage tank and water distribution

25   mains, which was included as one of many potential recommendations from a consultant.

26   *Legionella* bacteria was also recently discovered in a cooling tower at San Quentin

27   during routine testing.  Subsequent testing confirmed non-detectable results on October 25,

28

15971294.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   2019, and the cooling tower is back in service.  No diagnoses of Legionnaire's disease

2   have been reported.

3       Plaintiffs' Position:  CHCF plumbing and the control of *legionella* bacteria are

4   CDCR's responsibility, but there has been a substantial impact on medical staff, including

5   because of the two infections and increased surveillance of patients.  Plaintiffs continue to

6   monitor the situation, and appreciate that Defendants have provided and presumably will

7   continue to provide documents and periodic conference calls with its staff regarding the

8   matter.

9       More generally, the Receiver at the July Case Management Conference stated that

10  CDCR needs a water safety management plan for each of its prisons.  In Plaintiffs' view,

11  such plans are necessary to reduce the risk of serious medical harm and death to

12  incarcerated people, and attendant medical care delivery system needs, given, among other

13  things, the Legionnaire's disease diagnoses at CHCF and previously at San Quentin.  The

14  Receiver should report early next year on the status of these prison-specific water safety

15  plans.

16      Defendants' Position: Defendants will evaluate the need for water safety plans on

17  an institution-by-institution basis in consultation with environmental specialists and public

18  health agencies.  Defendants deny that there has been a substantial impact on medical staff.

19  Further, Defendants do not believe that the status of *legionella* bacteria should continue to

20  be reported in this case, as there have been no reports of legionella-related illnesses in

21  recent months.

22      **2.  Other Matters**

23      Plaintiffs' Position:  Plaintiffs continue to have serious concerns about care at

24  CHCF.  These include the inability to provide many patients with timely specialty services

25  (see discussion in Part III.B.).

26      Plaintiffs in the July Case Management Statement expressed concern, and we

27  remain concerned, about the shocking series of events related to a patient's death in late

28

Case No. 01-1351 JST

15971294.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   2018.  First, a doctor did not document any response to a nurse's notification that a patient

2   had passed blood per rectum nine times.  Then, after the patient was hospitalized the next

3   day, doctors there diagnosed esophageal bleeding.  Due to the risk of further bleeding,

4   doctors at the hospital stopped (and recommended the prison stop upon on discharge back

5   to CHCF) an anti-coagulant medication the patient had been taking.  However, upon the

6   patient's return a CHCF doctor re-ordered the medication, and it was administered the next

7   day.  Several hours later, a Registered Nurse (RN) messaged and phoned CHCF's

8   emergency services doctor, reporting the patient defecated a large volume of bloody stool.

9   Third, the CHCF doctor twice contacted by the RN, in the words of the death review,

10  "deflected the concern to another provider who could not be reached.  One and one half

11  hours later . . . the patient was found in the shower, vomiting a large amount of blood" and

12  was finally sent to a community hospital, where he subsequently died due to hemorrhagic

13  shock secondary to another esophageal bleeding episode.

14      In response to Plaintiffs' query about this matter, prison medical officials in late

15  July stated a Root Cause Analysis (RCA) was being completed regarding the above-

16  described circumstances, and that a plan of action to mitigate risk to future patients would

17  be implemented.  Plaintiffs have asked for a copy of the RCA so as to determine whether

18  there was adequate assessment of what happened, what was found to underlie, this

19  shocking case.  We anticipate CCHCS will not provide the RCA, and, as discussed in Part

20  I.D. below, will request a meet-and-confer.

21      Defendants' Position:  Defendants agree with the Receiver that RCA documentation

22  should not be provided to Plaintiffs "given the privileged peer review nature of the RCA

23  process and chilling effect that disclosure of information provided during the RCA process

24  would likely have on the sharing of information during future RCAs."  (*See*, *e.g.*, CCHCS

25  10/25/19 Memorandum to S. Fama Re: Non-Paragraph 7 Concern Relating to Root Cause

26  Analysis Reports Concerning Salinas Valley State Prison's Correctional Treatment Center

27  Cases.)

28

1

**B.      Mule Creek State Prison (MCSP)**

2      Plaintiffs' Position:  MCSP has serious problems with ducats for medical

3  appointments.  In March, Plaintiffs reported that staff at the prison sometimes failed to

4  distribute health care ducats as required and instead relied on incarcerated people to do that

5  work; patients were sometimes told to sign refusals even when they did not receive a ducat

6  for an appointment or were late because they were not timely released by custody

7  officers; and in at least one case, staff may have forged a patient's refusal form.  In

8  response, CCHCS in April said prison staff would be retrained and a local operating

9  procedure (LOP) for scheduling and access to care, including ducats, would be developed,

10  with further training thereafter.  In mid-July, the warden, after hearing that the court

11  experts had identified problems with medical ducats, told the experts he would ensure that

12  all ducat processes were followed.  In early September, CCHCS said the LOP regarding

13  ducats had not been approved by the unions.  Plaintiffs' counsel also visited the prison in

14  September, and subsequently reported that the previously identified problems

15  continued.  On September 19, 2019, Plaintiffs requested that the Receiver and the MCSP

16  Warden create a comprehensive corrective action plan to address the ducating problems

17  and a copy of the LOP when approved.  To date, Plaintiffs have not received a response.

18      Defendants' Position:  MCSP, in consultation with CCHCS, is in the process of

19  formulating a response to Plaintiffs' concerns and anticipates a response will be provided

20  within the coming weeks.

21

**C.      California State Prison-Sacramento (SAC)**

22      The Court Experts recently visited SAC.  In a briefing to the parties, the experts

23  reported serious concerns with the medical care system at that prison.  The experts

24  reported that the overriding problem at SAC is the level of violence, and said the level of

25  staff assaults and use of force are the highest among the state's prisons.  The experts also

26  noted that the prison houses the highest number of mentally ill patients.  In the experts'

27  view, this has a direct impact on medical care: because of the violent and unstable culture,

28

15971294.2      JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   there are both greater demands on the healthcare system, and an unstable medical

2   workforce because of turnover and high rates of employees using leave.  Given the

3   particular challenges at SAC, the experts recommended CCHCS allocate additional

4   medical staff to the institution.

5        Plaintiffs' Position:  Plaintiffs request an update on CDCR's response to the Court

6   Experts' findings.

7        **D.**    **Salinas Valley State Prison (SVSP)**

8        In early 2019, the Receiver and CDCR closed SVSP's inpatient Correctional

9   Treatment Center (CTC) due to problems with care coordination and treatment.

10   Healthcare staff, including from headquarters, then initiated RCAs regarding two cases,

11   including one in which a patient died, to determine appropriate improvements before the

12   CTC is reopened.  (See ECF No. 3096 at 8.)  CDCR has stated the CTC will re-open to

13   medical patients in early November.  In late October, CCHCS denied Plaintiffs request for

14   copies of the RCAs, based on what it believes is the privileged peer review nature of the

15   RCA process and the discouraging effect it believes disclosure would likely have on staff

16   sharing information during future RCAs.

17        Plaintiffs' position:  The Receiver should address the re-opening of the CTC.  In

18   addition, Plaintiffs cannot adequately monitor medical care and the system's ability to

19   identify and correct problems when findings regarding the most serious cases in which

20   patients were harmed (or faced a risk of harm) are secret.  There are protective orders in

21   this case that prohibit public disclosure of confidential information by Plaintiffs.  We will

22   request a meet-and-confer with the Receiver regarding RCAs.  If necessary thereafter we

23   will ask the Court to resolve this issue.

24        Defendants' Position: As stated above, Defendants agree with the Receiver that

25   RCA documentation should not be provided to Plaintiffs "given the privileged peer review

26   nature of the RCA process and chilling effect that disclosure of information provided

27   during the RCA process would likely have on the sharing of information during future

28

15971294.2

1   RCAs." (*See*, *e.g.*, CCHCS 10/25/19 Memorandum to S. Fama Re: Non-Paragraph 7

2   Concern Relating to Root Cause Analysis Reports Concerning Salinas Valley State

3   Prison's Correctional Treatment Center Cases.)

4        **E.    California Rehabilitation Center (CRC)**

5        In October 2018, the Receiver reported that a modular medical clinic would be

6   placed at CRC.  (ECF No. 3076 at 5.)   This is now referred to as the Mobile Medical

7   Clinic.  Prison medical officials say that it is currently being constructed and estimate that

8   it will be ready for patients in early 2020.

9        The modular will not address all medical space needs at CRC.  Prison medical

10  officials say that existing healthcare space at the prison can be renovated to meet patient

11  needs.  Defendants are exploring options for renovations with a potential start date in

12  Fiscal Year 2020-21; there is currently no scheduled completion date for this construction.

13       With regard to CRC in general, the State continues its project to paint and replace or

14  repair flooring, electrical service, toilets, and showers in some of the old barracks-style

15  dormitory units at the prison, which it intends to complete by 2023.  To date, twenty dorms

16  in Facilities A, B, and C have been renovated.  The painting in Facilities B and C still

17  needs be to be completed.  The painting in Facility A has been completed.  CRC continues

18  working on the renovations of Facility D.

19       Plaintiffs' Position:  With regard to renovation of existing healthcare space, prison

20  medical officials have stated that a Budget Change Proposal has been submitted to obtain

21  funding.

22       **F.    Recent Work of Court Experts**

23       The experts have conducted site visits and other work related to medical care at

24  seven prisons so far this year, including since the mid-July Case Management Conference

25  at MCSP, High Desert State Prison (HDSP), and Avenal State Prison (ASP).  Earlier this

26  month, the experts provided a telephonic briefing to the Receiver and parties regarding

27  their MCSP and HDSP work.

28

1      <u>Plaintiffs' Position:</u>  Plaintiffs request the Court advise whether the Court

2   anticipates assigning additional projects to the experts in the near future.  Plaintiffs

3   recommend the experts visit and review care at CHCF and the California Medical Facility

4   (CMF).

5      <u>Defendants' Position:</u>  Defendants defer to the Receiver and the Court as to the need

6   for the court experts' further involvement, as is contemplated by the Court's March 10,

7   2015 Order.  (*See* Mar. 10, 2015 Order at 5:6-9.)

8   **II.    Statewide Developments and Updates**

9        **A.    Medical Staffing**

10             **1.    New Positions**

11      The Fiscal Year 2019-20 Budget, in accord with a proposal recognizing that

12   CDCR's "population has grown older and sicker" and that "[c]urrent staffing ratios are

13   insufficient to meet these needs," included funding to increase medical staffing, including

14   for approximately 25 staff Primary Care Providers (PCPs).[1]  Earlier this year, UCSF

15   produced a report on primary care provider (PCP) recruitment.  The Report states that a

16   related report on PCP retention and professional practice evaluation processes will be

17   forthcoming later this year.

18      <u>Plaintiffs' Position:</u> We very much appreciate the increased medical staffing,

19   particularly the additional PCP positions and especially the approximately 4.0 PCP

20   positions added at the Central California Woman's Facility (CCWF).  The additional PCPs

21   at CCWF are based on, among other things, a "female factor" that finally has been adopted

22   as part of the acuity-based medical staffing model.  Plaintiffs five years ago first raised

23   concerns about the shortcomings of the acuity-based staffing model as applied to CCWF,

24   based on the failure to factor in women's higher rates of accessing medical service.

25             **2.    Elimination of the Medical Technical Assistant (MTA) Positions**

26

27   [1]      The parties in the July Case Management Statement stated that 13 new PCP
     positions had been authorized by the 2019-20 budget; the corrected figure in the text above
28   is based on information received from recent PCP vacancy reports.

1   MTAs are hybrid positions requiring both peace officer status and certain nursing

2   licensure that in years past were widely used in CDCR.  The first Receiver eliminated the

3   MTA classification within CDCR more than a decade ago, but the MTA classification still

4   existed within the Department of State Hospitals (DSH), and a few hundred such positions

5   remained in use at the DSH-run psychiatric inpatient programs (PIPs) for CDCR patients

6   located at CMF and SVSP.  On July 1, 2017, CDCR and CCHCS assumed responsibility

7   for management and oversight of the formerly DSH-run PIPs located in the state prisons,

8   including at CMF and SVSP.  Beginning no sooner than January 2020, the MTA

9   classification will no longer be utilized at CCHCS because it is inconsistent with CCHCS'

10  health care model.

11   The Receiver in July informed the parties that meetings with the affected unions

12  and other steps to eliminate and replace the MTA positions had begun.

13      **B.   Specialty Services**

14   For many months, the Dashboard has shown that a significant percentage of

15  specialty services appointments are untimely—particularly those ordered as "high" (14

16  calendar days) or "medium" (45 calendar days) priority.  While percentages of timely

17  appointments have improved somewhat over the last six months, per the August 2019

18  Dashboard only approximately 80% of high and medium priority specialty appointments

19  statewide occurred within the ordered timeframe, and fewer than 50% of high priority

20  specialty appointments were timely provided at CHCF, RJD, and the Substance Abuse

21  Treatment Facility and State Prison, Corcoran (SATF).  More generally, that Dashboard

22  showed that 18 prisons failed to meet the 85% threshold for timely high priority specialty

23  appointments, and 19 failed to meet it for timely medium priority specialty appointments.

24   The Receiver has scheduled a November 21, 2019, three hour meeting with the

25  parties—informally called a "mini-summit"—to present ideas and discuss problems and

26  solutions in specialty services scheduling.

27   <u>Plaintiffs' Position</u>:  Plaintiffs' look forward to the Receiver's mini-summit.

28

-10-

Case No. 01-1351 JST

1   Following discussion with the Receiver after the July Case Management Conference,

2   Plaintiffs sent the Receiver documents showing that prison medical officials had stated that

3   they had been unable to obtain telemedicine specialists requested from the company that

4   provides them.  Plaintiffs believe the lack of sufficient telemedicine specialists creates

5   challenges for timely care at certain prisons.  We also believe the Receiver should explore

6   hiring in-house specialists to ensure timely care at those prisons—such as CHCF—that for

7   years have been unable to provide timely specialty services.

8        Defendants' Position:  Defendants look forward to learning more about this issue

9   and working with the Receiver on an informed solution.  Defendants believe the

10   Receiver's mini-summit is a good step in this regard.

11        **C.    Work to Improve Medical and other Scheduling Processes**

12        After remedial efforts at SAC, multi-disciplinary staff recently conducted special

13   reviews at five additional prisons—SVSP; MCSP; California State Prison-Corcoran

14   (COR); California State Prison-Lancaster (LAC); and Richard J. Donovan Correctional

15   Facility (RJD)—regarding medical scheduling, ducating, clinic operations, and related

16   access to care practices.  *See* ECF No. 3156 at 12.

17        In his recent Tri-Annual Report, the Receiver reported that several universal issues

18   were identified at COR, LAC, SVSP, and RJD.  ECF No. 3157 at 13.  Specifically, the

19   Receiver reported that, in regards to scheduling appointments, enhanced communication

20   and formalized training is necessary, and that scheduling and provider availability needs to

21   be more consistent.  In regards to ducating, the Receiver said among other things that the

22   prisons require greater supervisory monitoring of the ducat process, PCPs need to better

23   follow appointment schedules, scheduled appointment times, patient confidentiality during

24   appointments needs improvement, and development of policy supplements and/or Local

25   Operating Procedures is required.  Regarding technical barriers, he determined that staff

26   required greater access to required computer applications (*e.g.*, SOMS).  Finally, the

27   Receiver noted that real-time utilization of the SOMS Health Care Access (HCA)

28

15971294.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  application needs to occur.  ECF No. 3157 at 13.

2      The Receiver stated that these issues would continue to be monitored, including

3  through (1) expanded and detailed Access Quality Report analysis using data from SOMS,

4  and (2) new and revised questions in the Operational Monitoring Audits Guide.  He further

5  reported that access to care training would be implemented by the Office of Training and

6  Professional Development.  ECF No. 3157 at 13.

7      **D.      Dashboard**

8          **1.      Reliability**

9      As previously reported, the Receiver contracted with a firm and consultant to test

10 whether the software that extracts data from EHRS and converts it to Dashboard results

11 performs as it should.  The firm issued a report on August 27, 2019, which found that there

12 were no major problems with data extraction and conversion.  ECF No. 3157 at 10-11.

13     Plaintiffs' Position:  The consultant's findings, while necessary, do not address all

14 concerns regarding Dashboard accuracy and reliability.  As Plaintiffs have previously

15 raised, there are many other ways in which Dashboard data can be inaccurate or unreliable.

16 See ECF No. 3080 at 7-8.  For example, Dashboard results can be unreliable if compliance

17 is measured only for appointments ordered using a specific computer command, but staff

18 do not use it; if orders are canceled or compliance dates are modified to eliminate overdue

19 appointments; or if the definition of what is tested does not include or capture all

20 appointments.  In mid-September and early October, Plaintiffs asked CCHCS about certain

21 Dashboard accuracy and reliability concerns.  In late October, CCHCS responded to

22 certain of the questions and concerns.  Plaintiffs intend to ask for a meeting with CCHCS

23 staff to discuss some of the information provided.

24     Defendants' Position:  The consultant's report indicated the Dashboard is accurate

25 within a 1% degree of error.  The parties were subsequently invited to a meeting to discuss

26 the report, and counsel for both sides participated.  Plaintiffs did not raise any questions or

27 comments to the report during the meeting.  Defendants defer to the Receiver to comment

28

1   on whether all of Plaintiffs' concerns with the Dashboard's accuracy have already been

2   addressed and potentially been demonstrated to be unfounded.

3           **2.      New Measures**

4           CCHCS has stated that a new measure regarding timeliness of Primary Care

5   Provider (PCP) appointments for the approximately 1,600 patients in Specialized Medical

6   Beds (e.g., Correctional Treatment Centers and Outpatient Housing Units) will be added to

7   the Dashboard in October 2019.  The new measure will be called "Timely Medical

8   Inpatient Access to Care," and it will combine two sub-measures: "Timely Medical

9   History & Physical," which will measure the percentage of patient admissions into

10  Specialized Health Care Housing with a History and Physical completed within one

11  calendar day of admission, and "Timely Medical Rounds," which will measure the

12  percentage of PCP appointments that had timely rounding documentation completed

13  within specified rounding intervals.

14          **E.      Electronic Health Record System (EHRS)**

15          Currently, all orders relating to care of patients transferring from one prison to

16  another, and between different levels of care, must be re-ordered in EHRS at the new

17  location.  CCHCS has a complex process for this, known as reconciliation.  Depending on

18  the type of order, this can involve central pharmacy and various local prison staff, and

19  there are variations in practices at the prisons, all of which creates risks for patients.  In

20  response, CCHCS is developing what it calls an "automated Cross Encounter

21  Reconciliation process" which it says will result in all orders being electronically

22  transmitted when a patient changes prisons or level of care.  This currently is estimated to

23  be completed in June 2020.

24          **F.      Hepatitis C**

25          In late September, CCHCS informed the parties that its previously reported Fiscal

26  Year 2018-19 data regarding patients newly started on medication for HCV, which the

27  parties had relayed to the Court in Case Management Conference statements, had

28

15971294.2       JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  overstated the number of patients newly started on treatment by approximately 10%,

2  because the data source did not account for certain duplicate medication orders.  CCHCS

3  has corrected its methodology, and reports that for the Fiscal Year 2018-19, 7,622 patients

4  were newly started on HCV medication.  This total exceeded CCHCS' goal of 6,000 such

5  patients for the fiscal year.

6       In the first three months of the current Fiscal Year (*i.e.*, since July 1, 2019), CCHCS

7  has reported starting an average of approximately 950 patients per month on HCV

8  treatment.  As of October 3, 2019, CCHCS report that approximately 7,250 patients with

9  HCV were eligible under current criteria and remain to be offered treatment.

10      Plaintiffs' Position: We again applaud the efforts of the Receiver and medical staff

11  with regard to HCV care, and appreciate the transparency regarding the correction of

12  previously reported data.  We continue to monitor data regarding new HCV treatment

13  starts, particularly at those prisons that have the largest numbers of patients remaining to

14  be offered treatment.

15      **G.    Substance Use Disorder Treatment / Medication Assisted Treatment**

16         **(MAT)**

17      As reported in the last Case Management Conference Statement, the State has

18  funded a comprehensive substance abuse treatment program for all 35 prisons.  When fully

19  implemented in Fiscal Year 2020-21, the program will result in 431 new positions,

20  including approximately 125 correctional officers and approximately 50 additional

21  licensed mental health staff.  The program will target people who (1) were receiving MAT

22  prior to entering prison; (2) have high substance use disorder risk factors (such as a recent

23  overdose); or (3) are scheduled for release within 15 to 18 months and have a high need for

24  substance use disorder services.  The Receiver recently reported that some patients are

25  being treated and "statewide implementation of the ISUDT Program will begin on January

26  1, 2020."  *See* ECF No. 3157.

27      In late July, the Receiver and CDCR Secretary issued a joint memorandum

28

15971294.2    JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   announcing the Integrated Substance Use Disorder Treatment Program (ISUDTP), which

2   they said will be a "top initiative" for the next few years.  An executive director is in place,

3   and in late August prison medical officials said an ISUDTP management plan would be

4   finalized this fall, and that medical policies, procedures, care guides, and Dashboard

5   measures were being developed.  CCHCS staff also indicated that a statewide survey was

6   being conducted to identify short and long-term ISUDTP space needs.

7       Plaintiffs' Position:  Plaintiffs look forward to statewide implementation of the

8   medically necessary ISUDTP program, and look forward to reviewing the management

9   plan, Dashboard, relevant policies, and space survey, when completed.

10      **H.    Provision of Naloxone (Narcan) at Parole**

11      CCHCS has stated that it intends to provide Narcan to certain patients when they

12  parole, at least with regard to those who parole from an institution that has a pharmacy (as

13  opposed to a community-based transitional housing unit).  The parties understand that

14  policies and procedures for this process will be developed and presented along with the

15  MAT policies and procedures.

16      **I.    Emergency Medical Response Improvement Project**

17      CCHCS launched its Emergency Medical Response Improvement Project in March

18  2019.  The project involves new policies, procedures, processes, equipment, and training

19  (40 hours of the latter for nurses), and is being rolled out serially to all prisons. All prisons

20  are currently scheduled to have the training by October 2020.  As of October 29, 2019, it

21  appears 13 prisons have completed the training.

22      Plaintiffs' Position: Plaintiffs understand the project has been well received by staff,

23  and hope it will address serious emergency response deficiencies identified in recent years,

24  including untimely initiation of 9-1-1 in many cases.  We have recently asked prison

25  medical officials if and how regional and headquarters staff are monitoring the local

26  prisons' implementation of new emergency medical response and response review

27  processes.

28

15971294.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

**J.      Mortality Review Process**

In October 2018, the Receiver directed CCHCS to implement certain recommendations made by the UCSF consultant regarding the Mortality Review Process. In early February 2019, CCHCS said revisions to written policy to reflect the Receiver's directives would be completed by this past Spring.  On July 1, it said that revisions would be completed in "late Summer."  In late October, CCHCS staff responsible for the reviews stated they had implemented the Receiver's directives and now had a goal to complete policy revisions in the early part of 2020.

Plaintiffs' Position: It is increasingly concerning that formal policy remains unrevised a year after the Receiver's directives.  Without a policy, requirements remain unclear and accountability is difficult.  During a late October phone briefing, CCHCS managers and staff responsible for mortality reviews explained current practices, and Plaintiffs expressed concerns, including regarding what happens when opportunities for patient care improvements are identified.  In addition, it is not yet known how the revised Mortality Review Process will be monitored, including determining whether it adequately identifies opportunities for improvement, tracks remedial efforts, and works to reduce the risk of harm to patients in the future.

**K.      Patient Safety Program**

UCSF earlier this year completed an evaluation of and provided recommendations regarding the CCHCS Patient Safety Program.  Among other things, the Report agreed there were concerns about the quality of RCAs, which are undertaken in the most serious cases in which a patient or patients have been harmed or put at risk of harm, and which result in a report and recommendations for quality improvement.  The UCSF report recommended training of staff to improve RCA quality.  Subsequently, the Receiver has directed his staff to "continue evolving" the Patient Safety Program taking into consideration certain of UCSF's recommendations, including regarding RCA training.

Plaintiffs' Position:  Plaintiffs remain concerned about efforts to improve RCA

-16-                                    Case No. 01-1351 JST

1   quality, and what will be done to assess whether adequate RCAs are being done.  In

2   response to Plaintiffs' query about improvement and monitoring plans for RCAs, the

3   Receiver's office in late October stated that a Budget Change Proposal (BCP) regarding

4   the Patient Safety Program is pending and as a result no further information can be

5   presently provided.  We hope the BCP will comprehensively address these matters.

6        **L.    Medical Inpatient Beds and Related Housing Needs**

7        In September 2018, UCSF provided the Receiver a report assessing medical bed use

8   in CDCR's women's prisons.  In response to the Report, CCHCS established a transitional

9   care unit (TCU) at CCWF.  Plaintiffs have scheduled a site visit to CCWF in November,

10  including to see how care and support are provided to patients in this new unit.  In mid-

11  July, the Receiver stated that CCHCS was considering establishing a TCU-type unit at the

12  California Institution for Women (CIW).  More recently, prison medical officials have

13  stated that a TCU is not necessary at CIW.  Plaintiffs have asked for further information

14  regarding this matter.

15       With regard to men, the Court experts recently pointed out that some prisons do

16  not have sufficient number of medical inpatient beds on site, and also suggested the aging

17  population warrants a study, of the kind done for the women's prisons, regarding the need

18  for and availability of medical and related beds at the men's prisons.

19       Plaintiffs' Position: The Receiver should address the expert's suggestion that a

20  study be done of medical bed availability and needs at the men's prisons, as was done for

21  the women's facilities.

22       **M.    Office of Inspector General (OIG) Medical Inspections and Reports**

23       In late July, the OIG issued its first Cycle 6 medical inspection report, regarding

24  Ironwood State Prison (ISP), in draft form, but has said that it will redo that report. The

25  OIG says that its inspection team nurses and physicians have completed site visits at other

26  prisons, and that it is currently working on a report for one of those.

27       In January 2018, the Receiver contracted with UCSF medical consultants to review,

28

1  assess, and report on the OIG's medical inspection program, including whether it is

2  sufficient to measure the quality of care.  The UCSF consultants have begun their review.

3       Plaintiffs' Position:  The OIG's medical inspections are an important part of a

4  durable remedy in this action, as they provide an independent assessment of the medical

5  care delivery processes and care at the prisons.  The UCSF consultant report should

6  provide useful information regarding the inspection process and reports, including possibly

7  regarding improvements that would benefit all parties as well as the OIG.

8       Defendants' Position:  On August 26, 2019, Defendants wrote to the OIG to raise

9  their concerns with the OIG's Cycle 6 inspection protocol generally, and with the draft

10 report for Ironwood State Prison specifically.  The OIG responded that it "will take

11 [Defendants' input] into consideration …"  Subsequently, the OIG notified CCHCS that

12 the ISP report will not be published and it will be re-inspected later in the Cycle 6

13 schedule.  Defendants look forward to receiving the UCSF report and to working with the

14 OIG to develop a more objective, clinically-appropriate, and metric-oriented inspection

15 protocol, as contemplated by California Penal Code § 6126.

16      **N.    Health Care Facility Improvement Program (HCFIP)**

17      The HCFIP is a key part of the Receiver's plan to provide adequate medical care;

18 authority over it was delegated to CDCR in 2012. As the Receiver has reported, HCFIP

19 projects have had significant delays and other problems, which have become a barrier to

20 patient care at certain prisons.  ECF No. 3076 at 5-6.  The Receiver hired a consultant,

21 Sixth Dimension, "to examine reasons for the continuing project delays in HCFIP and to

22 make recommendations for solutions to reduce further delays."  ECF No. 3096 at 13, 18.

23 On October 23, 2019, the Receiver released the Sixth Dimension report, entitled Review of

24 the Healthcare Facility Improvement Program & Recommendations.  CDCR responded to

25 the Sixth Dimension report with its plans to address the recommendations included within

26 the report.

27      Plaintiffs' Position: The report says the HCFIP is currently scheduled to be

28

15971294.2

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  completed at most prisons next year and at one in 2021 (a delay from the original 2017

2  date that is characterized as "unusually, and significantly, large" as well as "exceptional"),

3  but forecasts an additional two years of delay unless CDCR implements substantial

4  changes.[1]  The report cites numerous factors that contributed to and continue to cause

5  delays, including CDCR managers' "discernible lack of energy and enthusiasm to come up

6  with ideas to change the dynamics of the program, at least partially based on the belief that

7  certain factors are set and are unchangeable."  The report makes eight general

8  recommendations, six recommendations, some with sub-parts, specific to the Inmate Ward

9  Labor (IWL) program responsible for 80% of remaining work, and one recommendation

10 for general contractor-managed projects.  In its response, CDCR says it "plans to address"

11 the report's "major" recommendations, and describes what is being or will be done.

12 However, no timeline for implementation of changes is provided.  Also, CDCR without

13 explanation rejects certain recommendations, including the call to eliminate the six to nine

14 month limit on the tenure of free-world union labor who perform "critical functions" for

15 IWL projects.  The Receiver should address the report's findings and recommendations

16 and CDCR's response, including the failure to provide an implementation timeline and

17 apparent rejection of certain recommendations.  The Receiver should also address the

18 timing of further reports from the consultant.

19     **O.     Roof Maintenance**

20         The most recent three fiscal year budgets, including the current year's, have

21 included funding for what the state describes as a broad, multiyear plan to replace aging

22 and deteriorating roofs across the prison system (currently, the State says 18 prisons are

23 scheduled for roof replacement and repair projects over the next seven years).   Certain

24 information regarding the status of some roof replacement projects, provided by CDCR, is

25

26 _____

27 [1].  The report does not address projected completion dates for new HCFIP projects funded
   for more than a dozen prisons in the State's Fiscal Year 2019-20 budget.  The initial
   projected completion dates for those projects extend into 2023.

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

available to Plaintiffs quarterly.  Currently, and pursuant to court order, the Facility A dining hall at SATF is closed due to conditions caused by a roofing leak, and CDCR has voluntary closed general population intake at Pleasant Valley State Prison (PVSP) during roof construction, so as to reduce the prison's population during that construction.

Plaintiffs' Position:  Plaintiffs acknowledge the funding approved for roof repair and related work, the quarterly updates defendants provide, and a water intrusion survey they provided in August.  However, until roofs are repaired, some class members are subjected to squalid and unhealthy living conditions, which impacts medical care and medical care delivery processes.

CDCR should identify all cells, housing units and other areas, including medical delivery service areas, that should be closed and/or subject to other restrictions, because of a risk of harm due to leaking roofs, as has been done at the General Population units at PVSP and/or the dining halls in SATF.

Defendants' Position:  As reported in the previous joint statement, in Spring 2018, all institutions identified repairs needed at each facility due to water intrusion.  Roof repairs and replacements are ongoing.  In addition, the warden and the warden's leadership team at each prison regularly evaluate the adequacy of the living conditions and may request repairs to water intrusion damage as the need arises.

**P.     Infrastructure Reports**

In January 2017, CDCR entered into a contract with Kitchell CEM to evaluate the infrastructure of each prison constructed prior to 1980 and recommend renovations or replacements necessary to maintain the current level of operations.  ECF No. 3125-1 at 5, 32.  The study will cover the 12 oldest prisons: CMF; CIW; CIM; CRC; San Quentin State Prison (SQ); Folsom State Prison (FSP); Correctional Training Facility (CTF); Deuel Vocational Institution (DVI); California Correctional Institution (CCI); California Men's Colony (CMC); California Correctional Center (CCC); and Sierra Conservation Center (SCC).  *Id.* at 32.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1        In July 2019, Defendants produced two sections of this report (one pertaining to

2   CMF, the other providing an overview of the study) to Plaintiffs.  ECF No. 3139 ¶¶ 2-4.

3   The CMF section recommended $763,495,000 in repairs and renovations.  ECF No. 3139-

4   1 at 19.  This includes completely replacing four housing units, and conducting significant

5   repairs of the other housing units (including replacing failing roofs, installing new wiring,

6   repairing failing HVAC and plumbing systems, and removing hazardous materials from

7   the housing units).  *Id.* at 69-112.  The report also recommends repairs for the medical

8   inpatient wing, including replacing failing roofs that are "still leaking despite multiple

9   repairs," replacing HVAC equipment that "is in poor condition or is not operational," and

10   replacing the corroded pipes that frequently leak.  *Id.* at 87-88, 91-93.  During the repairs,

11   "[a]ll medical functions served by these buildings will have to be moved off-site to another

12   facility."  *Id.* at 99.  The report also recommends urgent interim repairs for some units, to

13   avoid "costs of potential shutdowns associated with disrepair."  *Id.* at 82-83, 101, 112.

14        Defendants agreed to produce the final report once completed, and stated that it

15   "will be completed by the fall of 2019."  ECF No. 3124 ¶ 8.  Plaintiffs have not received

16   any additional sections of the report since the last Case Management Conference.  On

17   September 12, 2019, this Court denied Plaintiffs' request for draft sections of the report.

18   ECF No. 3155.  The Court instructed the parties to meet and confer if Defendants had not

19   produced the final report in its entirety by December 31, 2019.  *Id.* at 4.

20        <u>Plaintiffs' Position</u>:  We continue to believe that the failing infrastructure at these

21   12 prisons impacts both demands for healthcare and, in certain respects, Defendants'

22   ability to provide care in a safe and secure setting—including in the inpatient medical beds

23   at these prisons.  Because the section of the Kitchell Report assessing CMF recommended

24   more than $760 million in repairs and renovations, we believe it is likely that the final cost

25   to repair the 12 oldest prisons will be close to $8 billion.  It will also likely require

26   relocation of healthcare services and patients during construction.  *See* ECF No. 3139-1 at

27   80, 99, 110.  We are unaware of any efforts to secure that funding or plan for the massive

28

1  relocation of people and services in the affected buildings.

2       Defendants' statement below implies they will not produce the entire report by the

3  end of the fall, as they had previously stated in a declaration filed with the Court.  *See* ECF

4  Nos. 3124 ¶ 8; 3155 at 4.  Given this development—and because the CMF section raises

5  concerns that that failing infrastructure at the 11 other prisons may have significant

6  impacts on healthcare services—we request to discuss this issue at the Case Management

7  Conference.

8       Defendants' Position: Defendants anticipate being able to provide Plaintiffs with

9  another final report in the near future.  Defendants continue to work with their consultant

10  to finalize the reports in the most expedient manner possible.

11

12  DATED:  October 29, 2019              XAVIER BECERRA

13                                       Attorney General of California

14

15                               By:      /s/

16                                       DAMON MCCLAIN
                                         Supervising Deputy Attorney General
17                                       NASSTARAN RUHPARWAR
                                         Deputy Attorney General
18                                       Attorneys for Defendants

19

20  DATED:  October 29, 2019              HANSON BRIDGETT LLP

21

22

23                               By:      /s/

24                                       PAUL B. MELLO
                                         SAMANTHA D. WOLFF
25                                       Attorneys for Defendants

26

27

28

-22-                                               Case No. 01-1351 JST

15971294.2   JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   DATED:  October 29, 2019                    PRISON LAW OFFICE

2

3                                                By:        /s/

4                                                    STEVEN FAMA
                                                     Attorneys for Plaintiffs
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-23-                                    Case No. 01-1351 JST
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

Exhibit 4

1    XAVIER BECERRA, State Bar No. 118517
     Attorney General of California
2    ADRIANO HRVATIN, State Bar No. 220909
     Supervising Deputy Attorney General
3    ELISE OWENS THORN, State Bar No. 145931
     TYLER V. HEATH, State Bar No. 271478
4    ROBERT W. HENKELS, State Bar No. 255410
     Deputy Attorney General
5     1300 I Street, Suite 125
      P.O. Box 944255
6     Sacramento, CA 94244-2550
      Telephone:  (916) 210-7325
7     Fax:  (916) 324-5205
      E-mail:  Tyler.Heath@doj.ca.gov
8    Attorneys for Defendants

     ROMAN M. SILBERFELD, State Bar No. 62783
     GLENN A. DANAS, State Bar No. 270317
     ROBINS KAPLAN LLP
      2049 Century Park East, Suite 3400
      Los Angeles, CA 90067-3208
      Telephone:  (310) 552-0130
      Fax:  (310) 229-5800
      E-mail:  RSilberfeld@RobinsKaplan.com
     Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO THE COURT'S AUGUST 14, 2019 ORDER**<br><br>Judge:          The Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................... 1

Defendants' Additional Stipulations and Concessions on Issues B, E, and F ............................. 2

Defendants' Commitment to Transparency ........................................................... 8

Witnesses for Any Focused and Narrow Evidentiary Hearing ................................... 13

     I. The persons most knowledgeable on Issues E and F. ................................. 13

     II. The August 14, 2019 Order limited the need for other witnesses. ................. 14

Defendants' Position on Rei Onishi's Anticipated Testimony ................................... 16

    I.     Counsel from the Governor's Office, Rei Onishi, should not be called as a witness because he has little or no personal knowledge, and any testimony he could provide would be protected by various privileges .............................. 16

          A.    Mr. Onishi has little or no personal knowledge of the specific data-reporting issues identified by the court's august 14, 2019 order as subjects for live testimony. ............................................................ 16

          B.    The attorney-client privilege is sacrosanct, and covers Mr. Onishi's testimony on the lone issue as to which he could conceivably have personal knowledge. ..................................................................... 18

          C.    Mr. Onishi's testimony is protected by work-product immunity. ............ 21

          D.    Mr. Onishi's testimony is also protected by the deliberative process privilege. ................................................................................... 22

    II.    Defendants' proposed alternative processes strike the appropriate balance between honoring the privileges that protect Mr. Onishi's testimony and helping the court obtain information. ................................................... 23

          A.    The court should choose to elicit any information from Mr. Onishi by written interrogatory. ............................................................... 23

          B.    in the alternative, the court should choose to interview Mr. Onishi in camera. ................................................................................... 23

Defendants' Commitment to Amending the Record ............................................ 24

Defendants' Proposal for New Pre-Hearing Deadlines ......................................... 27

Conclusion .................................................................................................. 28

**INTRODUCTION**

On August 14, 2019, the Court issued an order confirming and clarifying matters addressed during the Court's August 8 status conference concerning the evidentiary hearing set to address five issues identified in the Neutral Expert Report.  Defendants agree with the Court that the primary goal of this case must be to provide constitutional care to the Plaintiff class.  Defendants have not lost sight of their fundamental responsibility and remain committed to providing greater than constitutional care to all of their patients and working constructively with the Court, Special Master, and Plaintiffs in this critical endeavor.

The Court's order also addressed the scope of the anticipated evidentiary hearing.  Specifically, it referred two of the issues—counting all encounters as evaluations and medication noncompliance—to the Special Master for additional work by the parties and outlined the specific questions it intends to address at the evidentiary hearing on the other three issues—redefining "monthly," reporting of scheduled and missed appointments, and psychiatric supervisors acting as line staff.  The Court also asked the parties to meet and confer to determine if they could reach any additional stipulations and asked Defendants to inform the Court whether they are prepared to make additional commitments to transparency in their data generation and production.  The Court ordered the parties to file responses to the order within fourteen days.

Defendants welcome the opportunity in this filing to provide the Court additional stipulations (both joint and individual) aimed at addressing the Court's continuing questions on the three issues currently set for the evidentiary hearing.  Defendants also appreciate the opportunity to respond to the Court's ruling on each of the five issues and provide additional commitments regarding transparency.  Through the provision of this information, Defendants hope to communicate to the Court that it understands the problems with the manner in which it provided or did not provide certain data to the Court and Special Master and to reassure the Court of its commitment to a number of important reforms and to setting a new course.  Below, CDCR provides a comprehensive list of remedies and commitments to transparency it believes would remedy any past mistakes or erosion of trust, and would provide additional transparency in this case.  Defendants also agree with the Court that any evidentiary hearing that takes place should

1

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

not become an open-ended detour.  To that end, Defendants do not object to the Court's order denying discovery, referring issues D and G to the Special Master for additional work, and proposal to address the matters implicated by footnote 19 of the Neutral Expert Report.

**DEFENDANTS' ADDITIONAL STIPULATIONS AND CONCESSIONS ON ISSUES B, E, AND F**

On August 26, 2019, Defendants sent Plaintiffs proposed additional stipulations to further address the Court's questions and potentially obviate the need for an evidentiary hearing. Defendants also requested that Plaintiffs reconsider Defendants' previously proposed stipulations that Plaintiffs rejected in July—Defendants submit that those stipulations provide important context and address the Court's questions.  The parties appear to have agreement on the following additional stipulations on issues B and E:

**Issue B:  Redefining "Monthly"**

- Nonetheless, because the change in the definition in the business rule impacted the way compliance for timeliness of psychiatry appointments was measured, the Chief Psychiatrist should have been consulted prior to the creation and implementation of the rule change.

- CDCR acknowledges that it must notify the Special Master and Plaintiffs regarding business rule changes that materially alter the way compliance with Program Guide requirements is measured before such rule changes are implemented.  CDCR will work with the Special Master and Plaintiffs to determine the best way to keep them informed of relevant updates to the Performance Report.

- After meeting and conferring with the Special Master and Plaintiffs, CDCR will also issue internal guidance to all CDCR mental health administrators further clarifying which business rule changes must be provided to the Special Master and Plaintiffs before implementation.

**Issue E:  Reporting of Scheduled and Missed Appointments**

- CDCR acknowledges that additional quality control measures must be taken to

2

1   ensure that indicators and definitions are developed with appropriate consultation and

2   quality control in the future.

3   Defendants will work with Plaintiffs to prepare and file a joint document reflecting these

4   additional stipulations in compliance with the Eastern District Local Rules.

5   Given that the Court directed the parties to address its August 14 order within fourteen

6   days and because Defendants were not able to provide additional proposed stipulations to

7   Plaintiffs until August 26, the time to meet and confer with Plaintiffs was limited.  However, it

8   appears the parties were able to reach agreement on several stipulations, as stated above, and

9   Defendants welcome the opportunity to continue to meet and confer regarding their proposed

10   stipulations in the coming weeks if Plaintiffs agree that the parties may be able to reach additional

11   stipulations to further narrow any evidentiary hearing or eliminate the need for an evidentiary

12   hearing, as contemplated by the Court's August 14 order.

13   The Court's August 14 order suggested that Defendants could have simply offered up

14   certain acknowledgements even without reaching a stipulation with Plaintiffs.  (ECF No. 6242 at

15   3.)  To that end, CDCR provides the Court with their newly proposed stipulations (labeled Newly

16   Proposed Stipulation), which were offered before the August 28 response deadline, but upon

17   which the parties could not reach agreement, as well as Defendants' prior individual stipulations

18   (labeled "Defendants' Prior Individual Stipulation from July 22, 2019 Joint Status Report"),

19   which Plaintiffs rejected in connection with the parties' joint July 22, 2019 joint submission.

20   Defendants offer these new and prior individual stipulations responsive to issues B, E, and F as

21   concessions and acknowledgements.  Defendants offer all of the stipulated facts together, by

22   issue, so that the Court may consider them in context.

23   **Issue B:  Redefining "Monthly"**

24   •      Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:

25   Redefining the term "monthly" when measuring compliance with timely psychiatry
     contacts was first raised on November 2, 2015 by a medication administrator at the

26   California Health Care Facility at the request of two CDCR psychiatrists.  (Neutral Expert
     Report, ECF No. 6147 at 45.[1])  When the psychiatrists attended a webinar hosted by Dr.

27   ───────────────

28   [1] Defendants cite to the page numbers automatically generated by the Court's Electronic

3

Leidner to discuss the issue, he instructed them to raise the issue with Dr. Golding. (*Id.*) On February 25, 2016, the psychiatrists e-mailed Dr. Golding and asked to substitute the 30-day rule with a "monthly" rule to "help ease psychiatrists' tracking issues, reduce staffing needs, help psychiatrists manage their own outpatient caseloads and other issues." (*Id.* at 46.)

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** The medication administrator at the California Health Care Facility raised the issue again in November and December of 2016. (*Id.*)

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** On December 5, 2016, the medication administrator submitted a request on behalf of psychiatry that CDCR's data quality management team for the Statewide Mental Health Program change the definition of the term "monthly" in the business rule for the Performance Report indicator measuring timely compliance with EOP routine psychiatric appointments from 30 days to once every calendar month, to never exceed 45 days between appointments. (*Id.* at 45-46.)

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** Under the revised rule, timely compliance continued to require at least one appointment every calendar month, without exception. (*Id.* at 43, 45-46.)

- **Newly Proposed Stipulation:** Because Dr. Ceballos believed that the methodology was consistent with the Program Guide rule requiring "monthly" psychiatry contacts for EOP patients, she did not believe that the rule change was a change in policy.

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** There was no release note for the change since release notes were not being issued at that time. (*Id.* at 46.)

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** In December 2016, when CDCR changed the definition in the business rule, there was no established process or practice in place to notify the Chief Psychiatrist before a business rule was changed.

- **Newly Proposed Stipulation:** Instead, the rule change was announced at two statewide Management Reporting webinars, one on December 7, 2016 and one on December 8, 2016, and also appeared in the Compliance Rules Report for the entire time it was in effect. The Compliance Rules Report was viewable both directly and through links from the Performance Report to any staff who had access to the Performance Report.

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** The change in the definition of the term "monthly" in the business rule for the Performance Report indicator measuring timely compliance with EOP routine psychiatric appointments was not reported to the Special Master or the Court because CDCR mental

Case Filing system that appear in the header of each page of the Neutral Expert Report, ECF No. 6147.

4

health administrators believed the business rule change was consistent with the Program Guide's requirement that each EOP inmate-patient be evaluated "at least monthly to address psychiatric medication issues." (*Id.* at 45.)

• Newly Proposed Stipulation: The decision to implement the business rule change without notifying the Special Master resulted in part from the lack of any criteria for determining what types of business rule changes should be provided to the Special Master; and the lack of a regular process for providing business rule changes to the Special Master.

• Newly Proposed Stipulation: These steps reflect CDCR's commitment to ensure that processes and practices are in place to prevent what happened in December 2016 from happening again and rebuild the parties' trust.

**Issue E:  Reporting of Scheduled and Missed Appointments**

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The "Appointments Seen as Scheduled" indicator was developed by CDCR's data quality management team for the Statewide Mental Health Program independent of the Program Guide to measure and track whether inmate-patients housed at CDCR's institutions statewide were being seen by a psychiatrist based on scheduled appointments. (Neutral Expert Report, ECF No. 6147 at 73.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The "Treatment Refused" and "Treatment Cancelled" indicators do not reflect or capture any Program Guide requirements. (*Id.* at 75.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The cutoffs used to calculate the "Treatment Refused" and "Treatment Cancelled" indicators reflect CDCR's chosen methodology for achieving a meaningful data set that can be utilized to enhance care within the institutions. (*Id.*)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: Defendants have not provided data from the "Treatment Refused" or "Treatment Cancelled" indicators to the Court or the Special Master. (*Id.*)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: Defendants did not rely on data from the "Treatment Refused" Performance Report indicator to support their proposal to reduce the number of CCCMS patients on psychiatrists' caseloads as part of Defendants' 2018 Staffing Proposals, which were provided to the Special Master, Plaintiffs, and the Court. (ECF No. 5841-3 at 2; ECF No. at 5922 at 14.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: During monitoring, the Special Master conducts interviews of staff to determine whether the institutions are offering the required number of hours and did not find any major issues with compliance data. (Neutral Expert Report, ECF No. 6147 at 71.)

5

- • Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: This change was made as a part of its effort to examine whether the mental health system's management of patients was causing patients to miss appointments. (*Id.* at 75.)

- • Newly Proposed Stipulation: The methodology was changed to bring CDCR in line with the methodology and definition used by California Correctional Health Care Services (CCHCS), and came at a time when CDCR was aligning its performance improvement work plans and reports with those at CCHCS.

- • Newly Proposed Stipulation: The "Appointments Seen as Scheduled" indicator includes group, IDTT, and individual contacts provided by mental health staff, across all levels of care. The majority of appointments included in the "Appointments Seen as Scheduled" indicator are not psychiatry contacts and the measure is not directly related to the provision of psychiatric care.

- • Newly Proposed Stipulation: At the time of the change in 2016, Dr. Ceballos did not inform the Chief Psychiatrist about every methodology change. Instead, she only consulted with the subject matter expert for the affected discipline.

- • Newly Proposed Stipulation: In April 2017, CDCR implemented a Mental Health Management Change Committee to ensure that all stakeholders, including the Chief Psychiatrist, are informed of requests for Performance Report modifications, and to ensure that CDCR's psychiatrists are made aware of psychiatry indicator-related requests and have an opportunity to opine on the appropriateness of proposed changes. (*Id.* at 49.) The work of that committee was paused when Dr. Golding issued his allegations.

- • Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The "Appointments Seen as Scheduled" indicator does include appointments not seen due to scheduling errors in the denominator.

- • Newly Proposed Stipulation: If a provider sees a patient after an appointment is scheduled, but simply checks the patient in and out in EHRS when the patient is seen without requesting that the appointment be rescheduled, only one appointment will be recorded and it will be included in the Appointments Seen As Scheduled indicator as a seen appointment.[2]

- • Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: CDCR first learned that the indicator's definition did not reflect the change in the methodology when Dr. Golding submitted his allegations to the Plata Receiver on October 3, 2018. (*Id.* at 75.)

- • Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The reporting of the "Appointments Seen as Scheduled" data without updating the

---

[2] In the July 22, 2019 Joint Status Report, Defendants included a slightly different version of this proposed stipulated fact. (ECF No. 6226 at 18.)

definition was an inadvertent oversight and not intended to mislead the Court or the Special Master.

• Newly Proposed Stipulation:  CDCR is committed to taking additional steps to ensure that this problem does not occur again. One important step is reviewing the definition of each indicator and ensuring that it corresponds to the data measured.

**Issue F:  Supervisors Acting as Line Staff**

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: Plaintiffs and the Special Master were aware that supervising psychiatrists were occasionally seeing patients.  (*See* Neutral Expert Report, ECF No. 6147 at 77.) Defendants' representation in their 2018 Staffing Proposal that patients were being seen by psychiatrists necessarily included some treatment by supervising psychiatrists.  As a result, Defendants believed that the Special Master and Plaintiffs were aware that the data included contacts completed by supervising psychiatrists, and they did not tell the Special Master or Plaintiffs that the data included contacts completed by supervising psychiatrists. (*Id.*)

• Newly Offered Stipulation:  When gathering data for the 2018 Staffing Proposal, CDCR relied upon the contact data from the EHRS system, which did not specify whether the provider was a supervisor or a line psychiatrist.  CDCR thus did not consider, let alone evaluate, the degree to which different institutions relied upon supervisory patient contacts to satisfy patient contact requirements.

• Newly Offered Stipulation:  Defendants included data on the frequency and timeliness of patient contacts in their 2018 Staffing Proposal to illustrate to the Special Master that certain staffing assumptions from 2009 were outdated or unreasonable from a systemic perspective.  Defendants were not trying to use this data to make a statement regarding the adequacy of care at thinly staffed institutions where supervisors may have had to perform the functions of line staff.  Defendants acknowledged at the time, and continue to acknowledge, that they need to fill the vacant positions at those institutions to ensure that patients receive adequate mental health care.

• Newly Offered Stipulation:  While CDCR made no representation to the Court or the Special Master that all patient contacts are seen only by line psychiatrists (*see* Neutral Expert Report, ECF No. 6147 at 77), its failure to further assess the extent to which supervisory psychiatrists, as opposed to line psychiatrists, were providing care meant that its data on the timeliness of patient contacts, as presented in the 2018 Staffing Proposal, was not by itself sufficient to justify revising the 2009 staffing assumptions.[3]

---

[3] The Neutral Expert Report noted that "the Special Master did not primarily rely on current staffing ratio data in evaluation the 2018 Staffing Proposal" and "[t]he focus of CDCR's proposal, and of the Special Master's evaluation of it, was on staffing cuts that could be justified by changes since the original 2009 Staffing Plan, such as the changes in CDCR patient-inmate populations, changes in the number of CCCMS inmates on medications, and the existence of unfilled FTEs relating to unused functions contemplated in the original plan."  (ECF No. 6147 at 74.)

7

- • Newly Offered Stipulation: CDCR's Associate Director of Statewide Planning and Policy, Angela Ponciano, conducted a review of the data in response to Dr. Golding's allegations by manually searching the system for appointments associated with the name of each supervisor and chief. Her review of the data reflected that a very small portion of appointments statewide were conducted by supervisors. This suggests that the inclusion of supervisory patient contacts may have had little, if any, material effect on Defendants' statewide numbers. (*Id*. at 80-81.)

- • Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: Since February 2018, Defendants have filed monthly psychiatry vacancy reports with the Court that report only on vacancies for line staff psychiatrists. This is consistent with the court's order requiring only reporting of vacancies for line staff and the subsequent report template negotiated with the Plaintiffs and Special Master.

To the extent that the Court determines that an evidentiary hearing is still necessary, Defendants proffer that the witnesses they identified as persons most knowledgeable will testify consistent with Defendants' newly proposed stipulations and the proposed individual stipulations that Plaintiffs previously rejected in July. For the Court's convenience, Defendants attach as Exhibit A a list of the stipulations that the parties previously agreed on, Defendants' proposed stipulations that Plaintiffs rejected in July, the new stipulations to which the parties agreed, and Defendants' newly proposed stipulations that Plaintiffs rejected so that the Court has in a single document the key facts that Defendants believe would be presented at any evidentiary proceeding.

## DEFENDANTS' COMMITMENT TO TRANSPARENCY

The Court's August 14 order invited Defendants "to let the court know if [they] are prepared to make additional commitments to transparency in their data generation and production so as to further narrow the scope of the hearing, if not obviate the need for it entirely." (ECF No. 6242 at 4-5.) Defendants appreciate this opportunity to make additional commitments that will expand on existing practices that grant the Special Master and Plaintiffs access to CDCR's mental health care system, along with the proposals made in Defendants' portion of the July 22, 2019 joint status report.

Before Dr. Golding published his allegations, there were already a number of transparency practices in place. The order of reference grants the Special Master access to CDCR's

8

documents, facilities, and employees, and CDCR complies with that order.  (*See* ECF No. 640 at 5-7.)  Moreover, the Special Master and Plaintiffs have real-time access to CDCR's electronic health records system and regularly tour CDCR's facilities.  And CDCR regularly participates in workgroups with the Special Master and Plaintiffs and responds to countless questions.  The Special Master and Plaintiffs have always had the ability to question Defendants about their performance report indicators and underlying methodologies and CDCR will continue to answer those questions to the extent possible.

However, Defendants also represented in the July 22, 2019 joint status report that CDCR is responsible for a number of unintentional and inadvertent errors related to the collection and reporting of data and the use of that data in negotiations with Plaintiffs and the Special Master and in filings with the Court.  CDCR recognizes that certain steps are necessary to prevent these types of errors from occurring in the future.  To that end, Defendants' joint statement (ECF No. 6226 28-32) offered the following remedies, to which CDCR remains committed:

1. To avoid issues with the tracking and reporting of data and the mischaracterization of methodologies, CDCR will meet and confer with Plaintiffs, under the guidance of the Special Master, to review the definitions and methodologies CDCR uses to report data related to Program Guide requirements or the Continuous Quality Improvement Tool.

2. The parties will meet and confer under the guidance of the Special Master to discuss discrepancies in policy and data collection methodology, as the Court envisioned.  (Tr. at 23:13 – 24:18, Dec. 14, 2018, ECF No. 6054.)

3. Defendants will meet with Plaintiffs and the Special Master to explain CDCR's processes for analyzing change requests to their compliance tracking systems.  These processes include those already in place like the Mental Health Change Management Committee, designed to ensure all stakeholders, such as the psychiatry team, are notified of proposed methodological changes to psychiatric appointment metrics and requests for Performance Report modifications.

4. CDCR will issue a memo to the field reminding psychiatrists of their duty to report the confidentiality of patient encounters appropriately, what default settings are used in Electronic Health Records System (EHRS) related to timely contacts, and how to use drop-down menus.

9

5. The parties should review with the Special Master the issue of how to track non-confidential encounters initiated by psychiatrists and whether those contacts should be, under appropriate clinical circumstances, counted towards compliance.

6. Defendants have processes in place to ensure data system accuracy. Report users who identify an error or discrepancy are encouraged to report that error using CDCR's "Solution Center" system. (*See* Leidner Decl., Nov. 20, 2018, ECF No. 6012-3 at 5.) Should an error be identified with the "Appointments Seen as Scheduled" indicator, or any other indicator, the error will be reported to the appropriate data systems staff. To ensure staff are aware of the obligation and process for reporting such errors, CDCR will issue a memorandum to the field re-educating staff regarding the "Solution Center" system.

7. In connection with continuing discussions related to the Staffing Proposal, CDCR will provide Plaintiffs and the Special Master with any additional data (including the methodology used to calculate the data) they request that is available to satisfy their concerns with the proposal, including data on supervisor workload in outpatient programs.

8. The parties will discuss the methodology for CDCR's medication nonadherence indicator to eliminate, to the extent possible, ambiguities or misunderstandings as to what is being measured and what data is included in the measurement.

CDCR also remains committed to its self-certification proposal providing that for all performance report data referred to in future Court filings, a person most knowledgeable (who may or may not be CDCR's Chief Psychiatrist) will certify that the source of the data, the methodology used to calculate the data, and the reference to the data is an accurate representation of the underlying reported data. (ECF No. 6226 at 34.) Defendants believe this proposal will ensure that the parties, Court, and Special Master understand precisely what Defendants' data is reporting. Defendants request that the Court approve this proposal.

In response to the Court's August 14 order, CDCR makes the following additional proposals to improve transparency and restore trust:

1. The Court ordered Defendants "to take all steps necessary to ensure that their EHRS allows staff to record data that accurately reflects whether a clinical evaluation was confidential

10

or non-confidential, without allowing electronic auto defaults to contribute to the generation of misleading data." (ECF No. 6242 at 8.)  In addition to CDCR's prior commitment to instruct the field on their duty to accurately record the confidentiality of an appointment and to review with the Special Master how to track non-confidential encounters, CDCR is in the process of eliminating the default confidentiality setting for psychiatry and primary clinician contacts in EHRS.  Instead of defaulting, this field will be mandatory and will require the provider to select whether the encounter was confidential or non-confidential.  CDCR is currently drafting a memo to the field regarding this change and will present that draft to the Special Master and Plaintiffs.

2. The Court also stated its intention to take testimony regarding "what steps Defendants plan to take to ensure indicators and definitions are developed with appropriate consultation and quality control in the future." (ECF No. 6242 at 9.)  CDCR submits that it is in the process of working with the California Correctional Health Care services (CCHCS) to create a data governance policy, the intent of which is to manage the availability, usability, reliability, integrity, and security of the data.  Once that policy is complete, CDCR will create its own change management and data governance policy specifically for Mental Health.  That will allow CDCR Mental Health to restart its Mental Health Change Management Committee, which started in April 2017 to ensure all stakeholders were informed of Performance Report modifications, and will continue to address any changes required or proposed regarding the Performance Report or any other indicators.[4]  The data governance policies will also allow CDCR to begin an ongoing review of each indicator and corresponding methodology, business rules, and definitions to make sure they are accurate.  Through this process, CDCR will confirm that each indicator corresponds to the data measured.

3. It has also become apparent to CDCR through this process that there was a lack of communication with the Special Master regarding when he expected to be informed of changes to CDCR's quality improvement performance report business rules and methodologies.  This, in turn, resulted in a failure of CDCR to set those expectations for its staff members responsible for

---

[4] Since Dr. Golding published his allegations in October 2018, the committee has been suspended pending development of policies to govern the process.

11

creating CDCR's quality improvement systems, including the performance report.  As recognized

in the tentatively agreed stipulations above, CDCR acknowledges that it must notify the Special

Master and Plaintiffs regarding business rule changes that materially alter the way compliance

with Program Guide requirements is measured before such rule changes are implemented.  CDCR

will work with the Special Master and Plaintiffs to determine the best way to keep them informed

of relevant updates to the Performance Report.  And, after meeting and conferring with the

Special Master and Plaintiffs, CDCR will also issue internal guidance to all CDCR mental health

administrators further clarifying which business rule changes must be provided to the Special

Master and Plaintiffs before implementation.

4. On August 28, 2019, the parties met with the Special Master and the *Plata* Receiver to

discuss Defendants' proposal to improve data management, integrity, transparency, and analytics

by integrating mental health care data into the data system used for all other health care data at

CDCR.  Currently, the CCHCS Quality Management Section provides patient quality, quality

management, and data analytics functions for all of CDCR's health care programs except mental

health.  The data that it generates is widely trusted and recognized for its integrity.  Defendants

believe that using this existing system not only would better integrate the care teams and

providers who serve patients, thereby improving mental health outcomes, but also help restore the

parties' trust in the integrity and reliability of CDCR's mental health data.  Defendants intend to

pursue further discussions with the Special Master and Plaintiffs to advance this proposal.

Defendants' proposed remedies represent a comprehensive approach to correcting past

errors related to data reporting, with the short- and long-term objectives of improving trust and

understanding among the parties.

## WITNESSES FOR ANY FOCUSED AND NARROW EVIDENTIARY HEARING

### I.     THE PERSON'S MOST KNOWLEDGEABLE ON ISSUES E AND F.

The Court's August 14 order stated the Court's intention to ask focused questions on

issues B, E, and F at the evidentiary hearing, if one is necessary.  On issue B—redefining

monthly—the Court identified Dr. Leidner, Dr. Ceballos, and former Deputy Director Katherine

12

1   Tebrock as the individuals the Court expected to question.  (ECF No. 6242 at 6.)[5]  CDCR

2   believes that Drs. Leidner and Ceballos can appropriately address the specific areas of inquiry for

3   issue B identified by the Court, and do not believe that former Deputy Director Tebrock is

4   necessary.

5        With respect to issue E—reporting of scheduled and missed appointments—the Court

6   ordered the parties to identify the persons most knowledgeable about "why and how the

7   Appointments Seen as Scheduled indicator was developed incorrectly and in the absence of

8   consultation with Dr. Golding or other quality control measures, and what steps defendants plan

9   to take to ensure indicators and definitions are developed with appropriate consultation and

10  quality control in the future."  (ECF No. 6242 at 9.)  Defendants identify Drs. Ceballos and

11  Leidner as the persons most knowledgeable.

12       On issue F, the Court ordered the parties to identify the person most knowledgeable

13  regarding "(1) why defendants did not disclose in their 2018 Staffing Proposal whether, and to

14  what extent, the reporting of data related to average frequency of patient contacts did not disclose

15  the use of supervisory psychiatrists to complete caseload contacts with patients; and (2) to what

16  extent defendants knowingly relied on active participation of supervisory psychiatrists in

17  performing the duties of line psychiatrists both in defendants' 2018 Staffing Proposal and in

18  supporting their representation that, if adopted, the 2018 Staffing Proposal would bring

19  defendants into compliance with the October 2017 staffing order."  (ECF No. 6242 at 10.)

20  Defendants identify Assistant Deputy Director Angela Ponciano as the person most

21  knowledgeable on this issue.

22       During the meet-and-confer process, Plaintiffs stated they believe that Katherine Tebrock,

23  John Rekart, Kevin Kuich, and Eureka Daye are additional persons most knowledgeable on issue

24  E, and Katherine Tebrock, Brittany Brizendine, Laura Ceballos, and Kevin Kuich as additional

25  persons most knowledgeable on issue F.  At this time, CDCR does not believe that these

26  individuals are the persons most knowledgeable to respond to the narrow issues identified by the

27

28       [5] If their testimony is necessary, Dr. Leidner, Dr. Ceballos, and former Deputy Director
    Tebrock will not require additional service to appear at the evidentiary hearing.

1    Court.  And Plaintiffs' inclusion of these individuals is contrary to the Court's direction that

2    "[h]owever necessary the court's focused evidentiary hearing is at this time to purge and cleanse

3    the court's docket now and for the future, the hearing must not become an open-ended detour."

4    (ECF No. 6242 at 4.)  Plaintiffs' contention that several of these individuals are persons most

5    knowledgeable lacks foundation.  For example, Eureka Day was only recently made the acting

6    Deputy Director of Mental Health—long after Dr. Golding made his allegations.  Because

7    Plaintiffs did not explain why these individuals are persons most knowledgeable until the day of

8    this filing, Defendants were unable to fully address Plaintiffs' proposal.  Accordingly, Defendants

9    reserve their right to raise additional objections.  In the interim, the Court should reject Plaintiffs'

10   additional persons most knowledgeable.

11   **II.     THE AUGUST 14, 2019 ORDER LIMITED THE NEED FOR OTHER WITNESSES.**

12          Defendants appreciate the Court's willingness to hear from several of their original

13   proposed witnesses, but now that the Court has referred two issues to the Special Master and

14   parties for resolution and narrowed the scope of the evidentiary hearing with regards to the three

15   other issues, several of those witnesses are no longer necessary.  Specifically, the testimony of

16   Ms. Julie Kirkman, Dr. Shama Chaiken, and Dr. John Rekart is no longer required.  Below,

17   Defendants also address the Court's determination that "it may have a focused few questions for

18   Deputy Legal Affairs Secretary Onishi as a witness."  (ECF No. 6242 at 12.)

19          Defendants expected Ms. Kirkman to testify concerning the request she made to CDCR

20   headquarters to change the business rule that measures compliance with the Program Guide's

21   requirement that '[a] psychiatrist shall evaluate each EOP inmate-patient at least monthly to

22   address psychiatric medication issues."  (ECF No. 6226 at 53.)  Defendants expected Dr. Chaikin

23   to provide background testimony regarding the development and implementation of the Program

24   Guide's requirement of monthly psychiatry evaluation of EOP patients.  (*Id.* at 53.)  However, the

25   Court's August 14 order clarified the questions it intends to ask with regards to issue B, and

26   Defendants no longer believe their testimony is necessary.

27          Defendants anticipated calling Dr. Rekart to provide testimony regarding issue D—

28   counting all encounters as evaluations.  Similarly, Plaintiffs noted that the Neutral Expert cited

14

1  Dr. Rekart's opinions and testimony with regards to issues A, D, and G.  (ECF No. 6226 at 48.)

2  Following the Court's August 14 order, none of these three issues are part of the proposed

3  evidentiary hearing.  (ECF No. 6242 at 8, 10.)  To the extent Plaintiffs insist on the Court calling

4  Dr. Rekart at the proposed hearing, Defendants request the Court require them to make a specific

5  offer of proof showing the relevant information they expect him to provide in response to the

6  narrowed issues for the evidentiary hearing.

7          Although Defendants did not list Dr. Kuich as a potential witness for the evidentiary

8  hearing, Defendants do not think he is a necessary witness now that the Court has narrowed the

9  issues for the hearing.  Defendants initially objected to his inclusion as a witness because their

10  designation of extensive additional represented an intent to open the evidentiary hearing to any

11  and all factual and policy issues raised by Dr. Golding and the Court's expert and this objection

12  remains applicable.  (ECF No. 6226 at 54.)  Defendants do not believe Dr. Kuich would provide

13  testimony relevant to the three issues identified for the evidentiary hearing and do not believe he

14  is a person-most-knowledgeable concerning those issues.  Removing Dr. Kuich as a witness for

15  the proposed hearing would be consistent with the Court's plan to conduct a narrow and focused

16  hearing on only three issues.  However, if Plaintiffs believe that Dr. Kuich should still be called to

17  testify, the Court should require them to make an offer of proof showing the relevant information

18  they expect him to provide on the three issues.

19          Defendants previously informed the Court that Drs. Rekart and Kuich no longer work for

20  CDCR or any other state agency.  To the extent the Court determines it will call Drs. Rekart and

21  Kuich for testimony, CDCR is informed and believes that Dr. Rekart has agreed to appear without

22  any additional service.  CDCR is informed that Dr. Kuich accepted a new position in Hawaii—

23  CDCR has not discussed with him whether he would agree to appear without additional service.

24          Plaintiffs informed Defendants that they learned Dr. Kuich would not be available the

25  week of October 15 and will request his deposition in lieu of trial testimony.  Defendants object

26  to this request.  As stated, Defendants do not believe that Dr. Kuich's testimony is necessary for

27  the narrowed evidentiary hearing envisioned by the Court.  Requiring a deposition in lieu of

28  testimony for an unnecessary witness is contrary to the Court's desire to conduct a narrow and

15

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

focused hearing.  The Court should reject Plaintiffs' open-ended deposition request.

### DEFENDANTS' POSITION ON REI ONISHI'S ANTICIPATED TESTIMONY

The Court has indicated that it expects one of the Governor's attorneys, Deputy Legal Affairs Secretary Rei Onishi, to testify at the upcoming evidentiary hearing.  (ECF No. 6242 at 12:26-28.)  Defendants request the Court to reconsider that possibility.  While Mr. Onishi has advised two gubernatorial administrations on *Plata*,[6] this litigation, and the related Three-Judge Panel proceedings, Mr. Onishi has little or no personal knowledge of the specific data-reporting issues on which this Court will hear testimony at the evidentiary hearing.  Moreover, even if Mr. Onishi could provide relevant testimony, it would be protected by the attorney-client, work-product, and deliberative process privileges.  For these reasons, the Court should not call Mr. Onishi as a witness in court at the evidentiary hearing and instead either submit written questions to Mr. Onishi, to be answered in writing, or question Mr. Onishi *in camera*, outside the presence of Plaintiffs and their counsel.  Both alternatives are discussed further below.

### I.   COUNSEL FROM THE GOVERNOR'S OFFICE, REI ONISHI, SHOULD NOT BE CALLED AS A WITNESS BECAUSE HE HAS LITTLE OR NO PERSONAL KNOWLEDGE, AND ANY TESTIMONY HE COULD PROVIDE WOULD BE PROTECTED BY VARIOUS PRIVILEGES.

#### A.   Mr. Onishi Has Little or No Personal Knowledge of the Specific Data-Reporting Issues Identified by the Court's August 14, 2019 Order as Subjects for Live Testimony.

As this Court has made clear, the evidentiary hearing is not a "free for all."  (ECF No. 6185 at 26:6-8.)  The Court's expert has already conducted a wide-ranging four-month investigation (ECF No. 6147 at 7), and issued an exhaustive report, which the Court accepted.  (ECF No. 6187 at 2:1-3.)  The Court scheduled the evidentiary hearing to take evidence identified by the expert to determine whether misleading data had been presented to the Court in relation to five specified issues, if so, how and why, and what to do about it.  (*Id.* at 2:5-18.)  In the Court's more recent August 14, 2019 order, the Court narrowed the topics to be covered further, specifically identifying three subjects that it intends to explore at the evidentiary hearing through live witness testimony: (1) why CDCR mental health administrators did not inform Dr. Golding or the Special

---

[6] *Plata v. Newsom*, 3:01-cv-01351 (N.D. Cal.).

16

1  Master when they changed the definition of "monthly"; (2) why the internal "Appointments Seen

2  as Scheduled" indicator was developed incorrectly and in the absence of consultation with Dr.

3  Golding or other quality control measures; and (3) why Defendants did not disclose in their 2018

4  Staffing Proposal whether, and to what extent, the reporting of data related to average frequency

5  of patient contacts did not disclose the use of supervisory psychiatrists to complete caseload

6  contacts with patients, and to what extent Defendants knowingly relied on that data in the 2018

7  Staffing Proposal.  (ECF No. 6242 at 6:10-18; 9:22-26; 10:19-26.)

8       In connection with these issues, the Court has informed the parties that it may have a

9  "focused few questions" of Mr. Onishi.  (ECF No. 6242 at 12:26.)  The Court should reconsider

10  calling Mr. Onishi as a witness.  Mr. Onishi does not have personal knowledge as to the first and

11  second of these issues, and he thus would not be a helpful witness for the Court.  (*See* Onishi

12  Decl. ¶¶ 4-7.)  The first and second issues specified by the Court concern internal policies

13  developed and enacted by CDCR.  Mr. Onishi, however, was not involved in any of the policy

14  decisions related either to the change of the business rule or the Appointments Seen as Scheduled

15  indicator.  (*Id.* at ¶¶ 4-7.)  He thus lacks personal knowledge regarding whether, or how, data

16  relevant to issues one and two were generated and who was consulted (or not), and his testimony

17  would be unhelpful as to those matters.  Furthermore, while Mr. Onishi has some knowledge

18  about the data used in Defendants' 2018 Staffing Proposal, he has very limited personal

19  knowledge relevant to issue three.  In any case, any limited testimony Mr. Onishi could

20  conceivably provide on issue three falls under several applicable privileges as to which the

21  procedure for overcoming them has not been followed.

22       **B.    The Attorney-Client Privilege Is Sacrosanct, and Covers Mr. Onishi's
              Testimony on the Lone Issue as to Which He Could Conceivably Have
23            Personal Knowledge.**

24       In addition to lacking personal knowledge, the very limited testimony that Mr. Onishi could

25  conceivably provide is protected from disclosure by the attorney-client privilege.  Federal

26  common law recognizes a privilege for communications between a client and attorney for the

27  purpose of obtaining legal advice.  *Gomez v. Vernon,* 255 F.3d 1118, 1131-32 (9th Cir. 2001).

28  "The attorney-client privilege is the oldest and arguably most fundamental of the common law

privileges recognized under Federal Rule of Evidence 501." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), abrogated on other grounds by *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). And as the Supreme Court has explicitly stated, this privilege applies equally to government clients. *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 169-70 (2011). Accordingly, the government may invoke the attorney-client privilege in civil litigation to protect confidential communications between government officials and government attorneys. *Id.* Mr. Onishi is an attorney who, as the Deputy Legal Affairs Secretary, represents and advises the Governor's Office for the State of California, including on the matters at issue in this lawsuit and with respect to the strategy and details of the litigation itself. (Onishi Decl. at ¶¶ 2-3.) As such, the attorney-client privilege applies, and protects any confidential communications between himself and other government officials. *See In re Grand Jury Subpoena*, 909 F.3d 26, 32 (1st Cir. 2018) (providing that state attorneys are entitled to invoke attorney-client privilege to shield privileged information from federal subpoena).

One exception to the inviolability of privileged communications is the so-called crime-fraud exception, under which otherwise privileged communications made to further an illegal scheme are not protected from disclosure. *See United States v. Zolin*, 491 U.S. 554, 556 (1989). Before the privilege may be breached, the party asserting the privilege is owed procedural and evidentiary safeguards. *See id.* at 572 (setting forth the process and evidentiary standard before in camera review of potentially privileged information); *In re Napster*, 497 F.3d at 1092-95 (setting forth the process and evidentiary standard before disclosure of potentially privileged information). The Court may not review information subject to a claim of privilege, even *in camera*, absent a threshold showing that the privilege does not apply. *See Zolin*, 491 U.S. at 572 (there must be a "factual basis adequate to support a good faith belief by a reasonable person [] that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."). A court's authority to conduct in camera review of privileged materials does not "authoriz[e] . . . indiscriminate judicial scrutiny of attorney client relationships." *Fed. Sav. & Loan Ins. Corp. v. Ferm*, 909 F.2d 372, 375 (9th Cir. 1990).

18

1    There has been no such threshold showing in this case.  Nor has the Court indicated that it

2    thinks such a threshold showing has been made in connection with Mr. Onishi or that it believes

3    the crime-fraud exception applies in any way to Mr. Onishi.  Indeed, in the same order calling Mr.

4    Onishi to be a witness, the Court stated that "it will not delve further into the possibility of fraud

5    on the court at this time."  (ECF No. 6242 at 2 n.1.)  And while the Court's order states that it will

6    only have a "focused few questions" that will be "designed to not invade any privilege" (ECF No.

7    6242 at 12:26-28), this reverses the required inquiry by foregoing the State's right to procedural

8    and evidentiary safeguards to ensure that the privilege is not wrongfully invaded.  Under the

9    Supreme Court's *Zolin* decision, the Court may not even intrude upon the privilege *in camera* –

10   much less in a hearing in open court – without a threshold evidentiary showing that "the

11   attorney's services were used to further an ongoing criminal scheme."  *In re Grand Jury*

12   *Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996).  Again, here there has been no such showing and

13   the Court itself has specifically indicated it is not "delv[ing] further" into the factual prerequisites

14   for the finding required under *Zolin*.

15        Invading the privilege under these circumstances would have harmful consequences in the

16   form of a chilling effect on clients—here, the Governor of the State of California—being able to

17   seek and rely on counsel for advice.  Plaintiffs earlier argued that Mr. Onishi's testimony is

18   necessary to evaluate the Governor's Office's "state of mind" with respect Dr. Golding's

19   allegations.  (ECF No. 6226 at 46.)  However, the purpose of the attorney-client privilege is to

20   encourage clients to make full disclosure to their attorneys, recognizing that sound advice

21   depends upon lawyers' being fully informed by the client.  *Upjohn Co. v. United States,* 449 U.S.

22   383, 389 (1981).  And it therefore protects not only the giving of professional advice to those who

23   can act on it, but also the giving of information *to the lawyer.  Id.* at 390.  Accordingly, to the

24   extent that Mr. Onishi can provide any information regarding the Governor's Office's "state of

25   mind," that information lies at the core of what is protected by the attorney-client privilege.  *See*

26   *United States v. Chen,* 99 F.3d 1495, 1500 (9th Cir. 1996) ("This valuable social service of

27   counseling clients and bringing them into compliance with the law cannot be performed

28

19

1  effectively if clients are scared to tell their lawyers what they are doing, for fear their lawyers will

2  be turned into government informants.").

3       It should be emphasized that Mr. Onishi has played a key role in this litigation, and

4  provided legal advice to the Governor, members of the Governor's staff, as well as the co-

5  Defendant agencies.  Perhaps most importantly, the Governor and members of the Governor's

6  staff rely on their ability to seek and obtain candid legal advice from Mr. Onishi in performing

7  their duties.  Thus, the harm that would follow from improperly invading the attorney-client

8  privilege here is not merely theoretical or abstract; in this case, the ability of the Governor himself

9  to engage in candid and open communications with his attorneys while managing the executive

10  branch of the nation's largest state would be irreparably impaired if his conversations—and the

11  legal advice received—were subject to compelled disclosure.

12       Finally, the fact that Mr. Onishi is a member of the Governor's staff does not destroy the

13  protections of the attorney-client privilege.  The attorney-client privilege applies to

14  communications between lawyers and their clients when the lawyers act in a counseling and

15  planning role, as well as when the lawyers represent their clients in litigation.  *Chen,* 99 F.3d at

16  1501.  And individuals do not forfeit the protections of the attorney-client privilege merely

17  because their attorney is a permanent member of their staff.  *See FTV v. Boehringer Ingelheim*

18  *Pharmaceuticals, Inc.,* 892 F.3d 1264, 1267 (D.C. Cir. 2018) (the "privilege applies to

19  communications between corporate employees and a corporation's counsel made for the purpose

20  of obtaining or providing legal advice…regardless of whether the attorney is in-house counsel or

21  outside counsel").

22  / /

23  / /

24  **C.    Mr. Onishi's Testimony Is Protected by Work-Product Immunity.**

25       To the extent the Court may also question Mr. Onishi regarding the contents of privileged

26  documents relating to the 2018 Staffing Proposal, any such testimony that would consist of Mr.

27  Onishi's "mental impressions, conclusions, opinions, or legal theories" are protected by the work-

28  product doctrine.  The attorney work-product privilege protects from discovery in litigation

20

1   "mental impressions, conclusions, opinions, or legal theories of a party's attorney" that were

2   "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(B). The privilege was

3   first recognized in *Hickman v. Taylor*, 329 U.S. 495 (1947), and is codified in Federal Rule of

4   Civil Procedure 26(b)(3). As *Hickman* recognized, shielding from discovery materials prepared

5   "with an eye toward the anticipated litigation" protects the integrity of adversarial proceedings by

6   allowing attorneys to prepare their thoughts and impressions about a case freely and without

7   reservation." 329 U.S. at 498, 510-11. To qualify for work-product protection, documents must:

8   "(1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another

9   party or by or for that other party's representative.'" *United States v. Richey*, 632 F.3d 559, 567

10  (9th Cir. 2011) (quoting *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004)).

11        As with respect to the attorney-client privilege, the inviolability of the work-product

12  doctrine is subject to the so-called crime-fraud exception, under which otherwise privileged

13  communications made to further an illegal scheme are not protected from disclosure. *In re*

14  *Richard Roe, Inc.*, 68 F.3d 38, 40 n.2 (2d Cir. 1995) ("Where, as here, the attorney-client

15  privilege and the work product immunity substantially overlap, we see no reason to apply a

16  different standard for attorney work product.") (citing *In re Grand Jury Proceedings*, 604 F.2d

17  798, 803 (3d Cir. 1979)). However, before the work-product doctrine may be dispensed with, the

18  court must find that an initial evidentiary showing has been satisfied justifying *in camera* review,

19  and then, after the *in camera* review, must find that the evidence supports application of the

20  crime-fraud exception. *Zolin*, 491 U.S. at 572; *In re Grand Jury Investigation*, 974 F.2d 1068,

21  1072 (9th Cir. 1992).

22        Here, Defendants have produced for the Court's *in camera* review privileged documents

23  relating to the 2018 Staffing Proposal. These documents were created within the course of this

24  litigation, and to the extent they contain Mr. Onishi's "mental impressions, conclusions, opinions,

25  or legal theories," they are protected from further invasion by the Court during the upcoming

26  hearing. If the Court believes that the crime-fraud exception applies, it must make specific

27  findings to that effect. At this point, however, the Court has made no such findings and may

28  therefore not invade the attorney-client privilege or work-product doctrine by questioning Mr.

21

1  Onishi about his "impressions, conclusions, opinions or legal theories" in connection with the

2  privileged documents produced for the Court's review on June 19, 2019.  (ECF No. 6201.)  As

3  such, these subjects are off-limits to questioning and are absolutely privileged.

4      **D.    Mr. Onishi's Testimony Is Also Protected by the Deliberative Process
            Privilege.**

5

6      Any testimony Mr. Onishi could provide would be irrelevant and protected by the attorney-

7  client privilege and the work-product doctrine.  But to the extent he could provide any

8  information regarding current policies, such testimony would also be protected by the deliberative

9  process privilege.

10     The deliberative process privilege exempts from discovery information reflecting advisory

11 opinions, recommendations, and deliberations comprising part of a process by which government

12 decisions and policies are formulated.  *FTC v. Warner Communications, Inc.*, 742 F.2d 1156,

13 1161 (9th Cir. 1984).  The privilege is designed to allow agencies to freely explore possibilities,

14 engage in internal debates, or play devil's advocate without fear of public scrutiny.  *Assembly of*

15 *California v. United States Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992).  And the key

16 inquiry in determining whether particular information is "deliberative" is whether disclosure of

17 the information would expose the decision-making process in such a way as to discourage candid

18 discussion within the agency and thereby undermine the agency's ability to perform its functions.

19 *Carter v. United States DOC,* 307 F.3d 1084, 1090 (9th Cir. 2002).

20     Here, any Court questions to Mr. Onishi regarding the three main subjects the Court has

21 flagged for exploration at the evidentiary hearing would fall under the deliberative process

22 privilege.  How Mr. Onishi and Defendants approached, for instance, the 2018 Staffing Proposal,

23 lies at the core of the process of "internal debate" within the government agencies at issue that is

24 protected from public scrutiny.

25

26

27

28

**II.   DEFENDANTS' PROPOSED ALTERNATIVE PROCESSES STRIKE THE APPROPRIATE BALANCE BETWEEN HONORING THE PRIVILEGES THAT PROTECT MR. ONISHI'S TESTIMONY AND HELPING THE COURT OBTAIN INFORMATION.**

**A.   The Court Should Choose to Elicit Any Information from Mr. Onishi by Written Interrogatory.**

In light of the potential challenges posed by the Court's plan to hear live testimony from Mr. Onishi on any of the three general issues identified by the Court in its August 14, 2019 order, a preferable alternative would be if the Court were to issue written interrogatories to which Mr. Onishi may respond in writing under oath. This would have the advantage of allowing for the "procedural and evidentiary safeguards" that the Supreme Court's *Zolin* decision requires. As explained above, the Court would be required to make affirmative findings that the crime-fraud (or some other) exception to the attorney-client privilege and work-product doctrine applies *before* infringing on those evidentiary privileges. No such findings have been made, and the Court has further stated "it will not delve further into the possibility of fraud on the court at this time," (ECF No. 6242 at 2 n.1), thus closing the door on applying *Zolin*. If the Court believes that its questions will not invade any privileges at all, and thus no exception to the privileges need be established, eliciting testimony by written interrogatories would allow for Mr. Onishi to assert any specific, relevant privilege(s) and for the Court to make its findings in an orderly fashion. *Cf. Halkin v. Helms (Halkin I)*, 598 F.2d 1, 6 (D.C. Cir. 1978) (discussing the district court's procedure of propounding its own interrogatories to the Secretary of Defense).

**B.   In the Alternative, the Court Should Choose to Interview Mr. Onishi *In Camera*.**

If the Court is disinclined to put its questions to Mr. Onishi via written interrogatories, just as it reviewed the attorney-client documents *In camera*, the Court should, at a minimum, conduct its questioning of Mr. Onishi *in camera*, outside the presence of Plaintiffs' counsel and the rest of the Court. It is well settled that *in camera* proceedings are an appropriate means to resolve disputed issues of privilege. *See, e.g., Kerr v. United States District Court*, 426 U.S. 394, 405-06, (1976) (in suit against the California prison system, upholding requirement that district court individually assess, *in camera*, Adult Authority files for various privileges, before determining

23

whether each should nonetheless be produced); *Kasza v. Browner*, 133 F.3d 1159, 1169 (9th Cir. 1998) ("Elaborating the basis for the claim of privilege through *in camera* submissions is unexceptionable."); *Olam v. Congress Mortg. Co.*, 68 F. Supp. 2d 1110, 1128 (N.D. Cal. 1999) (taking testimony from the mediator in closed proceedings, under seal, to protect mediation privilege). This includes questioning of a witness *in camera*, outside of the presence of opposing counsel, where considerations of confidentiality are paramount. *Halkin I*, 598 F.2d at 9 (privilege invoked by Secretary of Defense, supported by *in camera* testimony of Deputy Director of NSA, regarding applicability of state secrets privilege). The potential damage that might be done to the Governor's Office, Defendants, and this litigation by improperly invading the privileges that apply to Mr. Onishi's testimony would be substantially mitigated by conducting the questioning in this way, rather than in open court and with opposing counsel.

In short, Mr. Onishi has little or no personal knowledge over the information that the Court has identified for the upcoming evidentiary hearing, and as to the narrow issue that Mr. Onishi could conceivably possess any personal knowledge, the attorney-client privilege, the work-product doctrine, and the deliberative process privilege shield disclosure. Instead of having Mr. Onishi testify in court, the Court should instead use well-established procedures invoked in analogous situations, of either posing written interrogatories to Mr. Onishi or, in the alternative, questioning Mr. Onishi *in camera*, outside the presence of other parties.

## DEFENDANTS' COMMITMENT TO AMENDING THE RECORD

The Court's August 14 order requires Defendants to make specific corrections or clarifications to documents in the record and provided to the Special Master, as well as providing the Court with dates certain by when Defendants will complete these tasks. Defendants do not object to the Court's order in this respect and provide the timeframes for doing so below. However, as discussed below, some of the data may be impossible to correct. For that data, Defendants offer an alternative for the Court's consideration.

The Court ordered Defendants to re-run the performance reports affected by the change of the EOP monthly business rule from every 30 days to "at least every calendar month and not to exceed 45-days," and amend two filings which relied on the changed business rule. (ECF No.

1    6242 at 5.)  Defendants offered to do this in the July 22, 2019 status report, and will do so within

2    thirty days.

3           The Court also ordered Defendants to amend five monthly Administrative Segregation

4    Unit EOP Hub Certification letters provided to the Special Master that used the alternative

5    business rule for routine EOP monthly psychiatry contacts.  (ECF No. 6242 at 6.)  CDCR

6    previously reported that they would need to correct five ASU EOP Hub Certification letters

7    submitted during the time the business rule for monthly was changed.  (ECF No. 6226 at 5.)

8    After reviewing the specific data included in those five letters, CDCR submits that timely

9    psychiatry evaluation data was based on the thirty-day rule.  The Program Guide requires that

10   EOP patients in an ASU EOP Hub be "evaluat[ed] by the psychiatrist at least every 30 days."

11   (Program Guide at 12-7-10.)  In this instance, the Program Guide prescribed a precise thirty-day

12   timeline, and CDCR did not modify the business rule timely psychiatry contacts conducted for

13   patients in the ASU EOP Hub program.  Accordingly, CDCR no longer needs to resubmit the five

14   ASU EOP Hub certification letters.

15          The Court ordered Defendants to provide a date certain by which they will amend and

16   refile their 2018 Staffing Proposal to modify its reference to the incorrectly defined Appointments

17   Seen as Scheduled indicator, as well as provide a date certain when they would review and

18   correct the relevant definitions and methodologies for the indicator.  (ECF No. 6242 at 9.)  As set

19   forth in Defendants' November 20, 2018 response, Defendants corrected the definition of the

20   Appointments Seen As Scheduled indicator on October 8, 2018, as soon as it was brought to

21   CDCR's attention.  (ECF No. 6012 at 18.)  Defendants' 2018 Staffing Plan was included as an

22   exhibit to Joint Status Report Re: June 28, 2018 Status Conference.  (ECF No. 5841-2.)

23   Defendants can file corrected versions of that exhibit within thirty days.

24          The Court ordered CDCR to correct the record regarding their inclusion of confidential

25   and non-confidential encounters for their timely psychiatry performance report indicator.

26   However, due to the nature of this data, CDCR submits that it is impossible to correct the record

27   as envisioned by the Court.  CDCR acknowledged to the Court that it provided data based on the

28   "timely psychiatry contacts" quality management indicator to the Special Master and the Court on

25

1  several occasions that included both confidential and non-confidential encounters.[7]  (ECF No.

2  6226 at 9-10.)  In its August 14 order, the Court interpreted the Program Guide to require that

3  psychiatric evaluations be conducted confidentially, "unless an inmate-patient refuses."  (ECF

4  No. 6242 at 8.)  The Court directed CDCR to "propose a date certain by which corrected

5  documents will be provided to the Special Master and filed with the court as necessary to correct

6  the record" and exclude non-confidential contacts that do not count as evaluations.  (*Id.*)  CDCR

7  submits that it has discussed with its quality management staff its ability to modify the data in the

8  manner contemplated by the Court and does not believe it is possible to accurately do so for two

9  reasons.

10        First, the allegation that non-confidential appointments are being coded as confidential

11  because psychiatrists are unaware of how to change the confidentiality drop down at checkout

12  suggests that CDCR may never be able to fully correct any erroneous data.  For CDCR to remove

13  the erroneously coded appointments and reclassify them properly as non-confidential, CDCR

14  submits that it would need to review each appointment by seeking out a collateral source of

15  evidence to determine if the appointment was properly coded as confidential.  However, it is

16  unlikely that a collateral source exists for all appointments in which the psychiatrist recorded the

17  setting of the appointment.  This process could not be automated and would require months, if not

18  years, of work to individually review patient files dating back to 2014.[8]

19        Second, the Court's order directs Defendants to count only confidential appointments, or

20  those non-confidential appointments following a refusal, as compliant encounters.  However,

21  CDCR's ability to determine which recorded non-confidential appointments follow a refusal is

22        [7] Data for each institution visited during the 26th round; data for each institution visited
23  during the 27th round; data shared in connection with Defendants' Continuous Quality
   Improvement (CQI) monitoring tours and in Defendants' draft CQI reports provided to the
24  Special Master and Plaintiffs; any monthly Administrative Segregation Unit  or Psychiatric
   Services Unit hub certification letters; Exhibit I—HDSP Performance Report to Defendants' June
25  5, 2018 Clustering Proposal; CDCR's 2018 Staffing Proposals (ECF No. 5741-2 at 9-10; ECF
   No. 5841-2 at 4 n.5, 9, 14, 16, 31-33; ECF No. 5841-3 at 2; ECF No. 5922 at 15, 21);
26  Defendants' objection to Telepsychiatry policy (ECF Nos. 5879 at 17 and 5879-4 at 4); and
   Defendants' 2017 filings, including in a declaration by Deputy Director Tebrock, in response to
27  the Special Master's report on CDCR's staffing plan (ECF Nos. 5591 at 14, 5591-2 at ¶¶ 8, 10,
   5591-2 at 9, and 5601 at 8-9).
28        [8] Data produced for the 26th Round of Monitoring included timeliness data backdated to
   2014.

26

1   limited by individual psychiatrists' data entry practices. CDCR would need to remove every non-

2   confidential appointment that is also not coded as a refusal in the EHRS. Additionally, CDCR

3   believes other exceptions may exist for cell-front visits to be counted as compliant, such as when

4   a patient is too ill to exit their cell or when the unit is small, such as an inpatient unit, and where a

5   cell-front visit could be conducted confidentially. The Court referred this issue to the workgroup

6   to "develop protocols to ensure 30 and 90 day psychiatric evaluations required by the Program

7   Guide are confidential unless an inmate-patient refuses to be seen in a confidential setting." (ECF

8   No. 6242 at 8.) Until the development of those protocols are complete and the exceptions are

9   clearly defined, CDCR will not be able to identify those non-confidential appointments that

10   should count as evaluations. CDCR believes that it may be possible to design an automated filter,

11   based only on how the psychiatrists record the appointment, but it may not be possible to apply

12   the filter to all appointments included in the data provided to the court or Special Master. CDCR

13   provided data on timeliness as far back as 2014 and retrieving that older data, much of which was

14   generated using the predecessor to the EHRS, may not be possible.

15       Because CDCR represents it is unable to reliably retrieve, review, and provide corrected

16   data in the manner requested by the Court, CDCR proposes refiling or resupplying the data to the

17   Court and Special Master with the inclusion of the data's methodology at the time and any

18   relevant limitations. For instance, in addition to the Performance Report methodology, CDCR

19   could file a statement noting that the data counts all recorded psychiatric contacts, regardless of

20   whether they were confidential or not, that the data is only as accurate as it was inputted by the

21   psychiatrist, and that, for data entered after the implementation of the EHRS in 2017, the

22   confidentiality field defaulted to "confidential," although it could be changed by the provider.

23   ### DEFENDANTS' PROPOSAL FOR NEW PRE-HEARING DEADLINES

24       On August 23, 2019, the Court vacated the pre-hearing deadlines set forth in its July 11,

25   2019 order, and ordered the parties to meet and confer and propose new deadlines "in their next

26   set of filings related to the evidentiary hearing." (ECF No. 6252 at 3.) During the meet-and-

27   confer process, Defendants informed Plaintiffs that they believe it may be premature to designate

28   precise dates until the Court confirms an evidentiary-hearing date and identifies the issues upon

27

1   which it intends to take testimony, including from which witnesses.  Without the Court's

2   guidance, the parties do not know the precise date of the hearing or the scope of the hearing on

3   each issue and what testimony and exhibits would be relevant.  Accordingly, Defendants

4   proposed that the Court allow the parties to propose dates once the Court confirms the date and

5   scope of any evidentiary hearing.

6        Plaintiffs proposed the following new dates:

7        •       September 24, 2019:  Last day for parties to exchange evidentiary exhibits they intend

8   to offer at the hearing.

9        •       October 1, 2019:  Last day for parties to exchange any demonstrative exhibits they

10  intend to offer at the hearing.

11       •       October 8, 2019:  Last day for parties to file a joint list of exhibits to be presented at

12  the hearing.

13  While Defendants do not oppose these dates, subject to the parties' ability to modify them at a

14  later date as necessary, they do believe, as previously stated, that it is premature at this time to set

15  precise dates for an evidentiary hearing that the Court has yet to confirm.

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

1

**CONCLUSION**

2

Defendants appreciate this further opportunity to meet the Court's objective of restoring

3

trust among the parties and resolving these important data issues so the parties can return their

4

focus to the threshold goal of providing constitutional levels of mental health care to the Plaintiff

5

class.  This further submission, with additional stipulations and commitments to transparency,

6

reflects Defendants' ongoing commitment to that critical effort.

7

Dated:  August 28, 2019                    Respectfully submitted,

8

                                           XAVIER BECERRA
                                           Attorney General of California

9                                          ADRIANO HRVATIN
                                           Supervising Deputy Attorney General

10

                                           /s/ Tyler V. Heath

11

                                           TYLER V. HEATH

12                                         Deputy Attorney General
                                           *Attorneys for Defendants*

13

14

Dated:  August 2, 2019                     ROBINS KAPLAN LLP

15

                                           /s/ Glenn A. Danas

16

                                           ROMAN M. SILBERFELD

17                                         GLENN A. DANAS
                                           *Special Counsel for Defendants*

18

19

CF1997CS0003 / 14058110

20

21

22

23

24

25

26

27

28

29

Exhibit 5

1   XAVIER BECERRA, State Bar No. 118517          ROMAN M. SILBERFELD, State Bar No. 62783
    Attorney General of California                GLENN A. DANAS, State Bar No. 270317
2   ADRIANO HRVATIN, State Bar No. 220909         ROBINS KAPLAN LLP
    Supervising Deputy Attorney General            2049 Century Park East, Suite 3400
3   KYLE A. LEWIS, State Bar No. 201041            Los Angeles, CA  90067-3208
    ELISE OWENS THORN, State Bar No. 145931        Telephone: (310) 552-0130
4   TYLER V. HEATH, State Bar No. 271478           Facsimile:  (310) 229-5800
     ROBERT W. HENKELS, State Bar No. 255410        E-mail: RSilberfeld@RobinsKaplan.com
5   Deputy Attorneys General                      *Special Counsel for Defendants*
     1300 I Street, Suite 125
6   P.O. Box 944255
    Sacramento, CA 94244-2550
7   Telephone:  (916) 210-73258
    Facsimile:  (916) 324-5205f
8   E-mail:  Tyler.Heath@doj.ca.gov
    *Attorneys for Defendants*

9

10                    **IN THE UNITED STATES DISTRICT COURT**

11                  **FOR EASTERN DISTRICT OF CALIFORNIA**

12                            **SACRAMENTO DIVISION**

13

14   **RALPH COLEMAN, et al.,**              Case No.  2:90-cv-00520 KJM-DB (PC)

15                  Plaintiffs,              **DEFENDANTS' RESPONSE REGARDING
                                             PROPOSED REMEDIES FOLLOWING
16   v.                                      EVIDENTIARY HEARING**

17   **GAVIN NEWSOM, et al.,**               Judge: The Hon. Kimberly J. Mueller

18                  Defendants.

19

20                            **INTRODUCTION**

21        Defendants are committed to furthering data accuracy and transparency, acknowledging

22   their mistakes, and correcting the record wherever necessary in order to restore trust in their

23   reporting of information on which the Court, the Special Master and Plaintiffs' counsel rely.

24        Defendants' proposed remedies, as set forth in both past filings and this brief, seek to rebuild

25   trust by addressing past reporting errors and inconsistencies among the data processes and business

26   rules of the California Department of Corrections and Rehabilitation (CDCR), promoting future

27   reporting accuracy, and focusing on improving the Special Master and Plaintiffs' understanding of

28

*ROBINS KAPLAN LLP*
*ATTORNEYS AT LAW*
*LOS ANGELES*

CDCR's tracking and reporting systems.  Defendants address as well Plaintiffs' brief on remedies and agree with their suggestions where appropriate.  Defendants also point out those areas where the Plaintiffs' suggested remedies either do not achieve a beneficial purpose or unintentionally impede the delivery of mental health services to the patient population.

**<u>REMEDIAL ACTIONS IDENTIFIED BY THE COURT</u>**

On October 23, 2019, the Court identified several topics it believed may be helpful in remediating some of the issues addressed during the Golding hearing, including:

1. A compendium of court orders

2. Enhanced training of Coleman specific requirements

3. A system with check and balances to catch errors

4. Correction of any filings that contain errors

5. Resumption of committee work within CDCR

6. Coordination between Mental Health Quality Management and  CCHCS's Health Care Quality Management

7. Meaningful inclusion of Psychiatry in policy and decision making

8. Modification of the Electronic Health Record System (EHRS) to ensure data relevant to treatment is captured (directed to Special Master)

9. Clarification of psychiatric supervisor's role in direct patient care beyond 2009 staffing plan requirements

10. List of all committees (a request directed to Special Master)

11. Release note process

12. Better documentation of CDCR's webinars

13. Certification of filings

14. Coordination between Special Master and Receiver (this was directed to Special Master and Court)

Defendants are committed to taking action on these issues, and have begun do to so already. Indeed, as described below, Defendants have already taken concrete steps to implement the Court's recommendations, and are diligently working to create functional and durable solutions to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    implement the remainder.

2    **I.    DEFENDANTS' REMEDIAL PROPOSALS AND OTHER ACTIONS TO**
3    **ADDRESS THE COURT'S STATEMENTS AND FINDINGS.**

4    CDCR is eager to continue actions to further foster transparency in data operations and
5    restore trust in its reporting.  There are specific programs that CDCR would like to immediately
6    restart to improve its data management and reporting.  Mental health program reporting and its
7    supporting methodologies will be transparent to not only the Court, the Special Master, and
8    Plaintiffs, but also to all clinicians and mental health leadership.

9    **A.    Remedial actions that CDCR has already taken regarding data and**
10   **methodology issues.**

11   Some of these actions have been previously reported to the Court in past filings, in open
12   court or through the testimony of witnesses at the Golding hearing.  They are listed here once again
13   for the sake of completeness:

14   • **Re-start of the Mental Health Change Committee**
15   The draft policy and procedure was submitted to Dr. Diana Toche, Undersecretary, Health Care
16   Services for review on November 7, 2019.  Once the draft is finalized and approved, the Defendants
17   will seek endorsement from the Special Master and next from the Plaintiffs.  The committee will
18   then begin meeting on a regular monthly basis.

19   • **Explaining the process for mental health staff's change requests for CDCR's data**
20   **and reporting systems to Plaintiffs and the Special Master**
21   CDCR's Mental Health leadership team will be prepared to explain the process once the policy and
22   procedure are approved.

23   • **Memo to the field regarding reporting confidential encounters appropriately**
24   A draft of this memorandum is routing internally within CDCR and to the Special Masters' team
25   at CDCR headquarters and includes clarification about clinical encounters and confidentiality.

26   • **Changing the drop down box in EHRS regarding confidential/non-confidential**
27   **contacts**
28   This item is on the November 18, 2019 agenda with the Clinical Leadership Advisory Committee

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

(CLAC).  It is expected be ready to go live December 2, 2019 which is when the memo is expected to be distributed. A draft memo is routing internally and has not yet been presented formally to the Special Master and Plaintiffs, however it has been approved by headquarters monitors.

- **Memo regarding what constitutes a compliant psychiatry contact**

Part of the EHRS drop-down box project, this memo is about clinical encounters and ensuring confidentiality. CDCR plans to finalize and circulate a draft of this memo in November 2019.

- **Memo re-educating the field on the use of the Solution Center system**

A draft has been finalized and is in the process of being vetted internally prior to a review by the Special Master's team.  Once the draft is finalized, it will be disseminated to the field.

- **Data Governance Meeting**

California Correctional Healthcare Services has developed a workgroup to discuss data governance policies. The purpose of the workgroup is to implement a data governance decision structure and to ensure the overall management of the availability, usability, reliability, integrity, and security of data.  The members of this group will act as a governing body or steering committee, and will write a Charter outlining and defining the obligations and responsibilities of the committee. There have been three meetings thus far.

- **Process for review of performance report indicators to ensure methodologies, business rules, and definitions correspond with the data being gathered**

Defendants are committed to reviewing the indicators and their underlying methodologies and business rules with the Special Master and Plaintiffs.

- **Improved communication with the Special Master and his team**

The Deputy Director and headquarters mental health leadership team communicate regularly with the Coleman monitors and Coleman subject matter experts while at headquarters.  Dr. Toche is also frequently in discussion with the Special Master and is organizing a formal process of communicating via scheduled calls with the Special Master to include an agenda for each call.  The Deputy Director may periodically be invited on to these calls.

- **Greater Inclusion of Psychiatry in Decision Making**

Defendants are in the process of modifying their reporting structure to ensure that the chief

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   psychiatrist at each institution with Mental Health Crisis Beds (MHCB) reports to that institution's

2   Chief Executive Officer (CEO) instead of Chief of Mental Health. Thus, for institutions with a chief

3   psychiatrist, the chief psychiatrist will become a  key member of the executive leadership team.

4   Duty statements for the chief psychiatrist are being aligned with this new reporting structure to

5   include new responsibilities as key members of the executive leadership team. Changes will also

6   be made to the duty statements of the Chief of Mental Health with a crosswalk to the Program

7   Guide to address this new reporting structure. Institutions without MHCB and which do not have a

8   chief psychiatrist will have the highest ranking psychiatrist in the institution report to the CEO,

9   even if a senior psychiatrist. If there are no seniors or chiefs at the institution, then the staff

10   psychiatrist will report to the CEO. The Special Master endorsed this plan on November 4, 2019

11   and the Plaintiffs were informed of the impending changes during the Coleman Mission Change

12   meeting on November 5, 2019.

13      Defendants also issued a policy memorandum requiring that both psychiatrists and primary

14   clinicians to sign the treatment planning form following an Interdisciplinary Treatment Team

15   meeting.   This memo was issued on September 24, 2019, and an EHRS change occurred

16   simultaneously to implement this process.

17      • **Initial Psychiatry Contact timeframes**

18   By November 30, 2019, Defendants will finalize a draft memorandum requiring an initial

19   psychiatry evaluation for all mentally ill patients who newly arrive to a prison or mental health

20   program.  By performing a psychiatry evaluation shortly after their arrival, CDCR will ensure

21   patients are seen promptly upon transfer.

22      • **Enhanced Outpatient Program (EOP) Patients Not on Meds**

23   A  memo was issued to the field requiring that all EOP patients, not just those on medication, are

24   seen by their psychiatrist at least once every 30 days.

25      B.   **CDCR'S additional proposed remedial actions.**

26      1.   Proposed Integration of Mental Health Quality Management Data into California

27   Correctional Healthcare System (CCHCS) Quality Management Data System.

28      Defendants propose merging CCHCS's and CDCR's Quality Management divisions in

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

1   order to provide transparency and trust in the data that forms the bases of CDCR's mental health

2   reports.  This is an important remedy to show that reports are accurate and generated from reliable

3   data points.

4         CDCR will provide a greater explanation of how this will work, though the process is still

5   being developed.

6         This has been the subject of coordination meetings among judges, the Plata Receiver and

7   Special Master.  Their discussions are continuing to ensure that Coleman requirements are met.

8         2.  Review CDCR's current mental health data system with the Special Master and

9   Plaintiffs.

10        CDCR will work with the Special Master to convene a workgroup to review the sources of

11  all data, and the business rules and methodologies used to report the data.

12        This remedy will ensure that all stakeholders have the same base of knowledge of CDCR's

13  data methodologies, and is the first step in restoring trust in CDCR's reporting. The workgroup will

14  produce a master list of business rules and methodologies used to generate the various reports that

15  are identified in Defendants' Data Certification Proposals.

16        3.  Business Rule Change Management Committee and Business Rule Prioritization

17  Committee.

18        CDCR is finalizing policies and procedures to restart its change management and rule

19  prioritization committees.

20        Defendants will present policies that provide the functions of each committee to the Special

21  Master and Plaintiffs followed by a discussion to confirm that they understand the value and

22  purpose of the committees.  The goal of this remedy is to restore trust in CDCR's reporting

23  practices, and provide accountability for future business rule changes.

24        4.  Proposed Steps for Defendants to Certify the Data Utilized in Reporting.

25        Defendants' certification proposals filed on November 5, 2019, ECF no. 6384, contains

26  Defendants' best assessment to date of the remedial steps on this subject.

27        5.  Improved integration and communication among CDCR mental health leadership and

28  field staff.

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Defendants want to promote greater interaction between staff involved in administrative

2    and clinical functions and provide a greater cross-functional understanding of department goals and

3    Coleman court ordered requirements. To accomplish this goal, CDCR will involve clinical

4    leadership in operational matters, and rebuild relationships with the mental health program

5    leadership, enhance executive training for mental health leadership, and ensure that clinical

6    leadership is included in committee memberships in high-level headquarters meetings that occur

7    monthly as well as the leadership flash meetings that occur three times a week.

8         6.   Continuing commitment to correct the record where needed.

9         The Court has specifically required that any data mistakes (or misrepresentations) in the

10    record are corrected.

11        To date, defendants have taken the following steps to correct the record. Errata were filed

12    on October 1, 2019, to correct Defendants March 2017 filings, ECF Nos. 5591, 5591-2, and 5601.

13    (ECF No. 6302.)  That Errata also corrected an erroneous footnote about the desert institutions in

14    a version of Defendants 2018 Staffing Proposal filed as an attachment at ECF Nos. 5841 and 5841-

15    2. (*Id.*)  Finally, by letter dated October 10, 2019, from Nicholas Weber, Defendants corrected five

16    ASU EOP Hub and PSU certifications made to the Special Master between January and May 2017.

17    (ECF No. 6330.)

18    **II.   ANALYSIS OF PLAINTIFFS' PROPOSED REMEDIAL MEASURES.**

19         **A.   Plaintiffs' Proposed Remedial Actions With Which Defendants Agree.**

20    *Plaintiffs' Proposal A.*  Moving Mental Health Care Data From Mental Health Headquarters

21    to CCHCS's Quality Management Section.

22        The Court should proceed with Defendants' solution of moving mental health data to the

23    California Correctional Health Care System's (CCHCS) Quality Management Section. Defendants

24    agree that Mental Health Quality Management Data should be integrated into the CCHCS Health

25    Care Quality Management unit. The exact scope of the integration and the operational details

26    thereof should be referred to the Special Master with directions to work with the parties and issue

27    a report by December 2019.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

1      *Plaintiffs' Proposal B*.  Continued Central Monitoring of Mental Health Headquarters By

2  The Special Master Team.

3      Defendants do not oppose continued monitoring at CDCR Headquarters by the Special

4  Master's team.  His team's monitoring has fostered greater interaction with the Special Master's

5  team and promoted greater mutual understanding and the transparency that all parties seek.

6      *Plaintiffs' Proposal D*.  Revisiting the ASU EOP Hub and PSU Certification Process.

7      The Court should refer the issue of discussing the Administrative Segregation Unit (ASU)

8  EOP Hub certification process to the All-Parties report on the effectiveness of the negotiated ASU

9  EOP hub certification process.  The parties should meet, under the guidance of the Special Master,

10  to discuss any misunderstandings about the process Plaintiffs may have.  Defendants have

11  submitted monthly certifications under the process developed and implemented in 2014 and 2015,

12  and disagree that wholesale restructuring is necessary.

13      The ASU EOP hub certification process was borne out of this court's April 10, 2014, order

14  to "forthwith provide to the court and the Special Master monthly reports on whether each EOP

15  ASU hub meets Program Guide requirements for an EOP ASU level of care."  (ECF no. 5131 at

16  73.)

17      On August 1, 2014, following extensive meet and confer between the Defendants, the

18  Special Master, and the Plaintiffs, Defendants filed their "Plans and Policies Submitted in Response

19  to April 10, 2014, and May 13, 2014 Orders."  (ECF no. 5190.)  The parties agreed that before

20  submitting any monthly report, Defendants would first conduct baseline assessments of each ASU

21  EOP Hub via in-depth on site evaluations.  That process began on July 29, 2014, when a team of

22  regional administrators toured each hub monthly for at least two months using the Continuous

23  Quality Improvement Tool to conduct the audit.  (*Id*. at 18-19.)

24      After the baseline audit was completed, Defendants began issuing monthly certifications.

25  The monthly certifications are completed by the Deputy Director (formerly Dr. Belavich, then

26  Katherine Tebrock, and now Dr. Daye) by reviewing the completed institutional reports from each

27  ASU EOP hub institution as well as by reviewing a snapshot of monthly data.

28      According to Plaintiffs' October 21, 2019, objection to Defendants' Response to Paragraph

*Left margin:* ROBINS KAPLAN LLP  ATTORNEYS AT LAW  LOS ANGELES

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

5 of the court's September 17, 2019, order, Plaintiffs believe that CDCR must be ninety percent compliant with twenty-three indicators, including timely psychiatry contacts, in order to certify an ASU EOP Hub.  (See ECF no. 6360 at 3, and Decl. of Cara Trapani In Support of Plaintiffs' Objection, ECF no. 6360-1 at 2, 11.)  Plaintiffs attach an email from Nicholas Weber to the Special Master and Plaintiffs, dated July 29, 2014, providing a document, the ASU EOP Hub Certification Audit Instructions, that states that each ASU EOP hub "program must meet a threshold of 90% in each area" in order to certify.  (*Id.* at 11.)

Defendants dispute this interpretation of the hub certification process and believe Plaintiffs' reliance on a document provided in advance of the baseline audits is misplaced.  Defendants have openly discussed the current monthly certification process with the Plaintiffs and the Special Master – a process which has been consistent since late 2014.  Defendants are willing to discuss the process with the Plaintiffs again, but plaintiffs have been well aware from policy meetings in 2015 and 2016 that the certification process was revised to require 90% compliance with only five of the performance report indicators.

Finally, with respect to the Psychiatric Services Unit (PSU) certification process, Defendants would note that the process is not court ordered.  Defendants voluntarily began that process to align, in part, with the ASU EOP Hub certification process in 2017.  Defendants are willing to discuss this process as part of the workgroup as well, but the court's April 10, 2014 order only required certification of the ASU EOP hubs, not the PSUs.

Defendants welcome the opportunity to make the certification process more transparent and trustworthy and defendants believe their proposals above regarding business rule review/validation and data management practices positively affect the Hub certification process.

### B. <u>Plaintiffs' Proposals that are Unworkable, Overbroad, or Not Responsive to a Court Finding or Identified Concern.</u>

*Plaintiffs' Proposal C.*  Increasing Plaintiffs' and The Special Master's Access to Data And Improving Transparency of Defendants' Provision of Mental Health Care.

Defendants agree that Plaintiffs and the Special Master should understand what data is measured by Defendant's performance report system and how the data is generated.  This proposed

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

1   remedy is addressed by Defendants commitment to meet and confer with the Plaintiffs and Special

2   Master and to transfer control of CDCR's mental health Quality Management division to CCHCS.

3   Accordingly, the Court should formally order the parties to engage in a process to improve

4   transparency and increase Plaintiffs' and the Special Master's access to data including the

5   requirement to merge CDCR and CCHS's Quality Management divisions.

6        To the extent that Plaintiffs request access to the performance report mental health data

7   systems, Defendants believe that such an expansion is untimely because it should necessarily

8   follow the merger of CDCR and CCHCS's Quality Management divisions.  Post-merger, the

9   system will be under CCHCS's control, and Defendants would defer to CCHCS to determine the

10   best way to provide transparent and meaningful data to the Plaintiffs.

11        Defendants oppose Plaintiffs' request to conduct more direct monitoring of Defendants

12   compliance with the court's orders.  As the court has previously stated, the Plaintiffs should file

13   formal motion to make such a request.  In either event, such monitoring is inconsistent with the

14   direction this court has taken – that is it is the duty of the Special Master to assess compliance.

15   If there are areas the Court believes require monitoring, the solution is not to add a separate set of

16   monitors, but to use the ones the Court already has appointed for that purpose. Should the Court

17   require additional items to be monitored, the Court should order its Special Master to monitor and

18   report back timely on his findings and recommendations.

19        The Special Master has the power to access and review CDCR's data and information and

20   to observe and report on EHRS workflows and how staff interacts with data systems.  CDCR will

21   cooperate with any request by the Special Master to monitor workflows and staff interaction with

22   the EHRS.  In addition, CDCR has already granted the Special Master access to their performance

23   report system for monitoring purposes.  The Special Master is invited to monitor the system and

24   has been invited to monitor it since he was provided access to the system years ago.

25        In addition, access to monitoring tours has always been the responsibility of the Special

26   Master.  Plaintiffs' request to attend more tours should be directed to the Special Master and any

27   approval to expand Plaintiffs' observations of the Special Master's work, as has occured in the past,

28   should be discussed with Defendants after they have an opportunity to provide input.    But this

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    proposed remedy goes beyond what is contemplated by the court to address data integrity.  Access

2    to more tours goes far beyond curing data analytics issues.

3           Plaintiffs also request a list of all class members by level of care and location each month.

4    Defendants provide roster data to plaintiffs anytime they request it, but this marks the first instance

5    that Plaintiffs have requested such an expansive list.

6           Additionally, Plaintiffs request for access to CDCR's custody data systems are not

7    reasonably related to the court's identified remedial areas.  Plaintiffs' counsel seek access to

8    custody data systems that are not implicated by the Golding report. These custody data systems,

9    ERMS and SOMS, involve the security and safety of inmates and the institution as they contain

10   sensitive bed movement and location information.  For these reasons, and a host of others,

11   Defendants object to such access for the following practical, policy and legal reasons.

12          SOMS and ERMS are the heart of CDCR's inmate tracking and security system.  Access to

13   SOMS or ERMS provides not just the institution where the inmate is housed, but the housing unit,

14   cell number, and bed number.  SOMS and ERMS provide detailed inmate movement data,

15   including daily schedules of each inmate, appointments, and work assignments.  Defendants have

16   serious concerns about the disclosure of this type of security data on this magnitude to Plaintiffs'

17   counsel.  SOMS and ERMS access also has the potential to provide the user with access to

18   confidential inmate information, including lists of enemies or potential enemies, and known

19   associates and security threat groups within CDCR.  Some of the data available in SOMS or ERMS

20   includes comprehensive risk assessments, information on sex crimes, names of victims, court

21   documents, probation reports, and third party names or addresses.  Misuse of this information, even

22   inadvertently, can lead to harm, or even death, to staff and other inmates.

23          Additionally, the system is far more complex that an electronic medical record viewed as

24   an auditor.  SOMS is a live system with many functions that requires technical expertise to

25   understand and navigate.  SOMS access is restricted.  In the rare case that non-CDCR employees

26   have access, they are also state employees or contractors who access it for legitimate security

27   reasons.  Finally, the information contained in SOMS and ERMS goes far beyond that needed for

28   Coleman.  Users of SOMS and ERMS could access inmate information on non-class members.

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   *Plaintiffs' Proposal E.*   Posting Notice of The Court's Remedial Order And Requiring

2   Training to Ensure Defendants And Their Counsel Are Aware of Their Remedial Obligations.

3       Defendants agree that they ought to be aware of the court's orders, generally, however, the

4   scope of Plaintiffs' particular proposal is unclear. Defendants are aware of their remedial

5   obligations, and do not require training concerning it. As part of its proposed review of all business

6   rules, field staff will be further trained regarding the rules and any future changes.

7                            **OTHER MATTER AND FINAL OBSERVATIONS**

8       Plaintiffs' Section III, "The Court Should Refer Additional Issues to The Workgroup."

9       Plaintiffs' are concerned by (1) evidence in the Neutral Expert Report that CDCR

10   excludes from compliance metrics all data points relating to EOP patients in "overflow" housing,

11   and (2) evidence from Dr. Golding's Report that CDCR measures compliance with its Medication

12   Administration Process Improvement Program ("MAPIP") in misleading ways that have yet to be

13   corrected.

14       Defendants have stated they are "open and willing to address the issues raised in

15   Plaintiffs' July 3, 2019 letter with Plaintiffs, the Special Master, and if appropriate, the Court."

16   Joint Status Report, ECF no. 6226 at 60 (July 23, 2019).

17       B. Final Observations

18       Plaintiffs overstate in their brief the extent to which the Court found that defendants

19   provided misleading information to the court and/or the Special Master. Tr at 464:9-10.  (ECF no.

20   6374 at Page 11:24-27.)

21       Plaintiffs argue that CDCR must develop methodologies to measure and track compliance

22   for all Program Guide requirements.  Yet, there has never been a requirement that defendants

23   develop methodologies and reports that cover every Program Guide requirement. That has never

24   been up to defendants, but is in instead within the purview of the Special Master who monitors and

25   reports on Defendants' compliance.   "The Special Master's task is to measure the State's

26   compliance with any remedial plan that this court may order."  (Order of Reference, Dkt. 640 at 4.)

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

## <u>CONCLUSION</u>

Defendants again underscore their deep commitment to furthering transparency, acknowledging their mistakes, correcting the record, and restoring trust in reporting. Their proposed remedial measures demonstrate that commitment.

Defendants welcome the opportunity to demonstrate CDCR's data management practices and improvements as the case moves forward. CDCR and counsel are committed to considering any other ideas from the court, OSM or plaintiffs to further improve data accuracy.

DATED:  November 13, 2019                    ROBINS KAPLAN LLP


                                             By:  /s/  *Roman M. Silberfeld*
                                                  ROMAN M. SILBERFELD
                                                  *Special Counsel for Defendants*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING