Molly Brizgys (Bar No. 029216)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: mbrizgys@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen,*
*Stephen Swartz, Sonia Rodriguez, Christina*
*Verduzco, Jackie Thomas, Jeremy Smith,*
*Robert Gamez, Maryanne Chisholm, Desiree*
*Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and*
*all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-ROS |
| Plaintiffs, | **PLAINTIFFS' MOTION TO MODIFY STIPULATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(5)** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

LEGAL146719182.1

1

## INTRODUCTION

2    This case was settled five years ago. At that time, the parties agreed that the
3  Stipulation would remain in effect for at least four years. [Doc. 1185 ¶ 37] And Plaintiffs'
4  counsel agreed that they would receive no more than $250,000 a year for monitoring
5  Defendants' compliance with the Stipulation. [Doc. 1185 ¶ 44]

6    Four years was a vast underestimate of how long it would take Defendants to
7  comply with the Stipulation. Five years later, Defendants—because of their stubborn
8  refusal to comply—are nowhere close to satisfying the Stipulation. They have already
9  been held in contempt once for failing to provide adequate medical care to people in
10  Arizona's prisons. [Doc. 2898] And this Court is considering whether to do so again.
11  [Doc. 3235] Defendants' refusal to do what they agreed to in the Stipulation has required
12  intensive monitoring efforts from Plaintiffs' counsel—monitoring costs that fall heavily
13  on Plaintiffs' counsel despite being caused by Defendants' actions.

14    These years of Defendants' stubborn noncompliance and escalating costs to
15  Plaintiffs' counsel are an unexpected development in this case. As a result, the Stipulation
16  should be modified by removing the cap on monitoring fees. This would incentivize
17  Defendants' compliance with the Stipulation by requiring them to fully bear the costs of
18  their refusal to comply.

19

## BACKGROUND

20    Plaintiffs filed this class action in March 2012 on behalf of over 33,000 men and
21  women housed in Arizona state prisons. Two and a half years later, the parties reached a
22  settlement that included over one hundred health care Performance Measures that
23  specified Defendants' obligations at their ten state-run prisons. [Doc. 1185-1 at 8–15;
24  Doc. 1185 ¶¶ 4, 8–9] The parties agreed that the Stipulation would remain in effect for at
25  least four years. [Doc. 1185 ¶ 37] It was approved by this Court on February 25, 2015.
26  [Doc. 1458 Attachment 1]

27    The Stipulation explained how Plaintiffs' counsel would monitor Defendants'
28  compliance, including limiting tours of prisons to twenty days a year. [Doc. 1185 ¶¶ 29–

34] But no matter how much monitoring work Plaintiffs' counsel completed, compensation was capped at $250,000 a year. [Doc. 1185 ¶ 44] And "[i]n exchange for Plaintiffs' agreement to a cap on the amount of fees, Defendants shall not dispute the amount sought unless there is an obvious reason to believe that the work was unreasonable or the bill is incorrect." [Doc. 1185 ¶ 44]

Another section of the Stipulation set the hourly rate that Plaintiffs' counsel could recover "to enforce any aspect of this Stipulation." [Doc. 1185 ¶ 43] This rate was taken from the Prison Litigation Reform Act (Doc. 1185 ¶ 43), which currently sets a maximum hourly rate of $223.50 an hour.[1] In other words, the $250,000 annual cap on monitoring fees would cover about 1,110 hours a year—roughly one attorney working half-time on the monitoring aspects of this massive, complex, and grueling case.

As the Court knows, Defendants have refused to comply with the Stipulation. Just over a year ago, this Court reflected on Defendants' defiance: "While Defendants are free to utilize the State's resources as they wish, at some point their continued insistence that taxpayer money is better spent on assiduously defending their noncompliance with the Stipulation than on efforts towards remedying the fundamental underlying cause of that noncompliance is likely ill-conceived and ill-advised." [Doc. 3057 at 9] The Court further noted that "Defendants' actions raise the distinct miserable possibility that the Stipulation will have to be set aside and the parties instructed to litigate again." [*Id.*]

This Court was not writing on a blank slate. In June 2018, the Court found Defendants in contempt because of "[t]he inescapable conclusion [] that Defendants are missing the mark after four years of trying to get it right. Their repeated failed attempts, and too-late efforts, to take their obligation seriously demonstrate a half-hearted

---

[1] The maximum rate under the PLRA is determined by multiplying by 150% the amount "authorized by the Judicial Conference pursuant to the Civil Justice Reform Act, 18 U.S.C. § 3006A" to pay court-appointed defense counsel in federal court. *Webb v. Ada County*, 285 F.3d 829, 838 (9th Cir. 2002). The Judicial Conference's most recent authorized rate is $149 an hour. *See* Administrative Office of the U.S. Courts, The Judiciary Fiscal Year 2020 Congressional Budget Summary, February 2019, ii, available at www.uscourts.gov/sites/default/files/fy_2020_congressional_budget_summary_0.pdf

1    commitment that must be braced." [Doc. 2898 at 20] The Court also found that

2    Defendants "turned to a private contractor [Corizon] which has been unable to meet the

3    prisoner's health care needs. Rather than push its contractor to meet those needs, the State

4    has instead paid them more and rewarded them with financial incentives while limiting

5    the financial penalties for non-compliance." [*Id.*]

6        Despite this strong rebuke from the Court, Defendants are facing contempt yet

7    again. [Doc. 3235 at 1 ("Defendants' continued excuses for noncompliance do not reflect

8    the seriousness of their prolonged breach of the Stipulation or the ramifications of their

9    failure to meet their obligations in the affected fundamental aspects of health care

10   delivery.")] The Court is also considering taking other measures, including terminating

11   the Stipulation entirely and setting the case for trial. [Doc. 3385 at 5]

12                                      **ARGUMENT**

13   **I.   THE CAP ON MONITORING FEES SHOULD BE REMOVED SO THAT
         DEFENDANTS BEAR THE FULL COST OF THEIR STUBBORN
14       REFUSAL TO COMPLY WITH THE STIPULATION.**

15       **A.    The Court's power to modify the stipulation.**

16       This Court "retains the authority, and the responsibility, to make further

17   amendments to [an] existing order or any modified decree it may enter as warranted by

18   the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011). *See also*

19   *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("Courts have long had inherent

20   power to modify court orders in changed circumstances."). Specifically, under Federal

21   Rule of Civil Procedure 60(b)(5), this Court may modify "a final judgment, order, or

22   proceeding" if "applying it prospectively is no longer equitable."[2] As prospective relief "is

23   drafted in light of what the court believes will be the future course of events, . . . a court

24   must never ignore significant changes in the law or circumstances underlying an

25

26

27

28       [2] The Court also has power to modify the order pursuant to Federal Rule of Civil
     Procedure 60(b)(6).

injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714-15 (2010) (citations and quotation marks omitted).

A party seeking this equitable modification must show that "a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992).[3] Though the moving party must show that something has changed, a court should apply a "flexible approach," *id.* at 381, and not expect the parties to have "anticipate[d] every exigency that could conceivably arise during the life of a consent decree." *Id.* at 385.

A "flexible approach" is particularly important in institutional reform cases like this one because these cases "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Id.* at 381 (citations omitted). In such cases, the "ability of a district court to modify a decree in response to changed circumstances [is] all the more important . . . [b]ecause such decrees

---

[3] Defendants are likely to argue, as they have in the past (Doc. 1842 at 6–9; Doc. 3456 at 4), that this Court has no power to modify the Stipulation because it states that it "shall not be construed as a consent decree." [Doc. 1185 ¶ 35] But that language does not nullify this Court's power. Rule 60(b)(5) applies to *all* orders and judgments with prospective application—not just consent decrees but also court-ordered and stipulated injunctions. *See Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014) (upholding the modification of a stipulated injunction, and holding that "[t]he ongoing, intractable nature of this litigation affords the district court considerable discretion in fashioning relief"); *Bellevue Manor Assocs. v. United States,* 165 F.3d 1249, 1255 (9th Cir. 1999) (holding that "*Rufo* sets forth a general, flexible standard for all petitions brought under the equity provision of Rule 60(b)(5)" and applying *Rufo* to court-ordered injunction in a private commercial case); *Valdivia v. Schwarzenegger*, 599 F.3d 984, 986, 994 (9th Cir. 2010) (discussing *Rufo*'s application to motion to modify injunction arising out of parties' stipulation); *see also Plata*, 563 U.S. at 514-15, 542 (modifying a stipulated injunction).

Defendants have repeatedly and incorrectly argued that *Plata* is irrelevant because it concerned a consent decree. [Doc. 1842 at 15 n.10; Doc. 3456 at 4 n.4] Although there was a consent decree in that matter, the injunction at issue was styled as a stipulation for injunctive relief. *Plata*, 563 U.S. at 514-15. Plaintiffs respectfully request that the Court take judicial notice of the stipulated injunction pursuant to Federal Rule of Evidence 201. *See Plata v. Davis*, No. C-01-1351-TEH (N.D. Cal. June 13, 2002) [Doc. 68], *available at* https://www.clearinghouse.net/chDocs/public/PC-CA-0018-0005.pdf.

The Court has the power to modify the Stipulation because it is a settlement between the parties that provided prospective relief to the Plaintiffs, was approved by this Court after a fairness hearing, and was memorialized by the Court's signing of a joint proposed Order. [Doc. 1458, Attachment 1]

1    often remain in place for extended periods of time, [and] the likelihood of significant

2    changes occurring during the life of the decree is increased." *Id.* at 380–81.

3

4    **B.    Defendants are not currently responsible for the full cost of their refusal to abide by the Stipulation.**

5        A party's failure to comply with a court order *is* an unforeseen circumstance that

6    justifies modification. *See Labor/Cmty. Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*,

7    564 F.3d 1115, 1120-21 (9th Cir. 2009) ("The failure of substantial compliance with the

8    terms of a consent decree can qualify as a significant change in circumstances. . ."); *see*

9    *also Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("[S]ubstantial violation of a

10   court order constitutes a significant change in factual circumstances."); *see also Holland*

11   *v. New Jersey Dep't of Corr.*, 246 F.3d 267, 270 (3d Cir. 2001) (noting that "it is settled

12   that a court does have inherent power to enforce a consent decree in response to a party's

13   non-compliance, and to modify a decree in response to changed conditions," and

14   remanding to district court for fact finding as to whether extension of decree was

15   warranted); *David C. v. Leavitt*, 242 F.3d 1206, 1212 (10th Cir. 2001) (approving district

16   court's conclusion that substantial noncompliance after four years of enforcement was an

17   "unforeseen circumstance[] [which] provide[s] an objective basis for equitable

18   intervention by this court to rescue, if necessary, the purposes of the agreement"

19   (quotation marks omitted)); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013,

20   1020 (6th Cir. 1994) (finding noncompliance with performance goal is a "significant

21   change in circumstances which warrants revision of the consent decree").

22        Defendants' extended noncompliance justifies modifying the Stipulation. Nearly

23   five years since the Stipulation, this case is nowhere close to winding down: last summer,

24   Defendants were held in contempt and ordered to pay more than a million dollars.

25   [Doc. 2898] And this Court is considering whether to hold them in contempt again.

26   [Doc. 3235] In December 2018, the Court appointed an expert to investigate two issues:

27   "irregularities and errors in the monitoring process that produces the compliance numbers

28   for the Stipulation's 103 health care Performance Measures and undermine confidence in

their validity" and "substantial noncompliance with critical aspects of health care delivery." [Doc. 3089 at 1] The need for such an expert showed that Defendants' compliance with the Stipulation is not imminent, as does Defendants' resistance to working with such an expert. [*See, e.g.*, Doc. 3127 at 1 (the Court notes that "Defendants wish to artificially limit the scope of [the expert's] work both in substance and by preventing him from speaking with personnel involved in providing care. Such limitations are not appropriate.")] And the expert has recently opined that "failure to fix the problems identified by the Court and identified in this report stems from a lack of will, rather than a lack of know-how on the part of the health care vendor." [Doc. 3379 at 89]

Defendants—though energetically resisting every order this Court has made to enforce the Stipulation, not to mention arguing that this Court has no power to enforce the Stipulation—have tacitly admitted to their epic problems in complying with the Stipulation: they changed the contractor that provides health care services required under the Stipulation. This switch-over took effect in July 2019 and has apparently only made things worse. [*See* Doc. 3339-1 (Declaration of William Carr, Vice President of Operations of Corizon Health) ¶ 13 ("Due to the pending transition, Corizon had difficultly staffing open positions and maintaining existing staff at Defendants' facilities."); *id.* ¶ 15 ("Also as a result of the pending transition, several outside healthcare providers ended their relationships with Corizon, upon which Corizon relied to provide specialty care to inmates."); Doc. 3364-1 at 289 (as of August 8, 2019, "Due to the transition, there was a period of time [at Eyman] that routine referrals [to specialists] could not be processed at the request of the outgoing contractor. In addition, there are providers that were used prior to the transition who will not provide services to the inmate population without an executed contract in place.")]

The dismal situation in Defendants' prisons has required extensive monitoring by Plaintiffs' counsel. These efforts include a steady stream of letters to Defendants cataloging failures to provide medical care in specific cases and requesting assistance. More than 650 of these letters have been sent by the Prison Law Office in 2019 alone.

[*See* Declaration of Donald Specter, filed concurrently ("Specter Decl."), ¶ 2 (additionally noting that 124 letters were sent by the Prison Law Office in 2015, 118 in 2016, 142 in 2017, and 280 in 2018)] These letters often concern serious and life-threatening problems. [*See*, *e.g.*, Doc. 3353-1 at 40–48 (months of delay in treatment of infected abscesses in back that ultimately required emergency surgery), 50–52 (delays in polycythemia vera blood cancer treatment); Doc. 2993-1 at 24–26 (failure to treat rash covering entire body of 81 year old man), 30–32 (failure to treat "total body rash" of 85 year old man); Doc. 3071-2 at 64–65 (failure to monitor large hernia), 77–78 (weeks of delay to see dental about "loose mouth wires"); *see also* Doc. 3431-1 at 30-31 (pointing out falsified entries in patient's medical record)]

Plaintiffs' counsel has also toured Defendants' prisons more than 30 times since June 2015, and uncovered widespread violations of the Stipulation. [*See* Specter Decl. ¶ 3 (listing tours); Doc. 3255-1 at 8–13 (January 2019 tour of Tucson), 26–50 (January 2019 Eyman tour), 64-79 (April 2019 tour of Perryville); Doc. 3071-1 at 109–13 (description of "Defendants' counsel and Lewis officials repeatedly l[ying] and misle[ading] Plaintiffs' experts in an attempt to thwart their fact-finding and monitoring of compliance with the Stipulation" during November 2018 tour); Doc. 3071-2 at 2–34 (November 2018 Lewis tour); Doc. 2865-1 at 6–22 (April 2018 Yuma tour), 24–36 (May 2018 Phoenix tour)] This monitoring has helped create the factual record relied upon by the Court in issuing orders for enforcement and contempt.

The resources spent on monitoring have far outstripped the amount allocated in the Stipulation. For example, using the current PLRA rate of $223.50 an hour, in 2015, counsel for the Plaintiff class spent approximately $517,081 in billable time and costs on monitoring activity. In 2016, that amount was $413,047; in 2017, $495,422; in 2018, $662,112. And as of December 15, 2019, Plaintiffs' counsel have spent $967,232 in 2019. [*See* Specter Decl. ¶¶ 5–7] Thus, class counsel have incurred a total of $3,158,700 in monitoring fees and expenses during the life of the Stipulation. However, because of the cap on monitoring fees and expenses, counsel have been reimbursed for only $1,217,124

1  of that amount, less than 40% of the amount incurred by the 501(c)(3) organizations and

2  their solo practitioner contractor. [*Id.* ¶¶ 4, 8][4]

3      Defendants have bitterly contested Plaintiffs' counsel's requests for monitoring

4  fees. Though the Stipulation directs that "Defendants shall not dispute the amount sought

5  unless there is an obvious reason to believe that the work was unreasonable or the bill is

6  incorrect," (Doc. 1185 ¶ 44), Defendants have ignored this. Instead, they have fought

7  about petty and irrelevant billing issues such as disputing increments of billed time as

8  little as 12 minutes that they speculated were double-billing (Specter Decl., Ex. 1 at 2),

9  and obvious typos. [*Id.*, Ex. 1 at 2 ("revise" instead of "review")] They have demanded

10  granular (and privileged) details about each letter from a class member with whom

11  Plaintiffs' counsel corresponded. [*See id.*, Ex. 2 at 2, 4; Ex. 3 at 2, 5]

12      Though the cap on monitoring fees was meant to avoid such petty disputes,

13  Defendants have nonetheless dragged Plaintiffs' counsel into them. Defendants' death-by-

14  a-thousand-papercuts strategy was the exact dynamic the fee cap was designed to avoid,

15  but Defendants have shown they are incapable of adhering to it—or even paying on time

16  until this Court intervenes. [*See* Doc. 3245 at 3–4 (ordering Defendants to pay overdue

17  monitoring fees (with interest) and rejecting their "objections that can generously be

18  described as distractions")][5]

19      The people in Arizona's prisons and the Court are now faced with years of

20  recalcitrance that show no sign of ending. Five years of bad faith by Defendants in what

21  this Court has called "the seemingly unending march toward compliance," (Doc. 3245

22

23

---

24      [4] In contrast, Defendants' private counsel has apparently earned approximately
    $6 million during this same time. [*See* Specter Decl., Ex. 4 (chart of "*Parsons v. Ryan*

25  Legal Costs" provided by ADC showing costs paid to outside counsel)]
        [5] Defendants have similarly fought this Court's two orders awarding fees to

26  Plaintiffs' counsel for work done to enforce the Stipulation. [Doc. 2902; Doc. 3245 at 2
    ("Most critically, Defendants do not meaningfully object to Plaintiffs' specific bills and

27  only lodge wholesale objections that were not credited in the Court's first order and are no
    more persuasive now.")] To date, Defendants have not paid Plaintiffs' counsel any of

28  these attorneys' fees and costs, which now (excluding interest) total $2,893,113.78.

at 2), could not and should not have been anticipated. *See Kelly*, *supra*, 822 F.3d at 1098; *Labor/Cmty. Strategy Ctr., supra*, 564 F.3d at 1120–21.

## C. Removing the monitoring fees cap will incentivize Defendants' compliance.

Modifying the Stipulation by removing the fees cap is a suitably tailored response to Defendants' years of intransigence. *See Rufo*, 502 U.S. at 383 (once moving party shows changed circumstances, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance"). Removing the cap would not change any substantive actions Defendants must take to comply with Stipulation—it would merely shift the full burden of monitoring from Plaintiffs' counsel to Defendants. If faced with the actual cost of monitoring their continued refusal to comply with the Stipulation, Defendants may actually comply with it. *See United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty., New York*, No. 06 CIV. 2860 (DLC), 2017 WL 728702, *5 (S.D.N.Y. Feb. 23, 2017) (lifting cap on monitoring fees and noting that "[t]he seven-year history of the County's noncompliance and the Monitor's fees and expenses demonstrates that a presumption of $175,000 in annual fees and expenses is unrealistic and counter-productive. Removing the cap will add to the County's incentives to work cooperatively and speedily to comply with its outstanding obligations and bring the Consent Decree to an end").[6]

As this Court has said, Defendants appear more interested in "assiduously defending their noncompliance with the Stipulation" than complying. [Doc. 3057 at 9] Health care appears to be getting worse, not better. The time has come to stop insulating Defendants from the full costs of their actions.[7]

---

[6] Removing the monitoring fees cap will not result in excessive fees to Plaintiffs' counsel. Any requests for fees could require court approval, *see Westchester Cty.*, 2017 WL 728702 at *5, and monitoring costs and expenses are necessarily constrained by the Stipulation, which allows only "twenty (20) tour days per year of ADC prison complexes." [Doc. 1185 ¶ 32]
[7] Attempts to resolve this issue without Court intervention were ignored by Defendants. [*See* Specter Decl. ¶ 10]

1

**CONCLUSION**

2        For these reasons, this Court should modify the Stipulation to remove the cap on

3   monitoring fees beginning in calendar year 2019.

4        Respectfully submitted,

5   Dated: December 24, 2019          **PRISON LAW OFFICE**

6                                     By:  s/ Donald Specter
                                      Donald Specter (Cal. 83925)*
7                                     Alison Hardy (Cal. 135966)*
                                      Sara Norman (Cal. 189536)*
8                                     Corene T. Kendrick (Cal. 226642)*
                                      Rita K. Lomio (Cal. 254501)*
9                                     1917 Fifth Street
                                      Berkeley, California 94710
10                                    Telephone:  (510) 280-2621
                                      Email:    dspecter@prisonlaw.com
11                                              ahardy@prisonlaw.com
                                                snorman@prisonlaw.com
12                                              ckendrick@prisonlaw.com
                                                rlomio@prisonlaw.com
13
                                      *Admitted *pro hac vice*
14
                                      David C. Fathi (Wash. 24893)*
15                                    Amy Fettig (D.C. 484883)**
                                      Eunice Hyunhye Cho (Wash. 53711)*
16                                    **ACLU NATIONAL PRISON PROJECT**
                                      915 15th Street N.W., 7th Floor
17                                    Washington, D.C. 20005
                                      Telephone:  (202) 548-6603
18                                    Email:    dfathi@aclu.org
                                                afettig@aclu.org
19                                              echo@aclu.org

20                                    *Admitted *pro hac vice*. Not admitted in DC;
                                      practice limited to federal courts.
21                                    **Admitted *pro hac vice*

22                                    Molly Brizgys (Bar No. 029216)
                                      **ACLU FOUNDATION OF ARIZONA**
23                                    3707 North 7th Street, Suite 235
                                      Phoenix, Arizona 85013
24                                    Telephone:  (602) 650-1854
                                      Email:    mbrizgys@acluaz.org
25

26

27

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:    dbarr@perkinscoie.com
            agerlicher@perkinscoie.com
            jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen
Swartz; Sonia Rodriguez; Christina Verduzco;
Jackie Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others similarly
situated*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 24, 2019, I electronically transmitted the above

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:


Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com

*Attorneys for Defendants*

Asim Dietrich
Rose A. Daly-Rooney
J.J. Rico
Maya Abela
ARIZONA CENTER FOR DISABILITY LAW
adietrich@azdisabilitylaw.org
rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
mabela@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

s/ D. Freouf