**Index of Exhibits to Declaration**
**of David C. Fathi**

**Exhibit 1**   True and correct copy of the transcript of the deposition of Leonel Urdaneta, M.D., taken in this matter on December 10, 2019

**Exhibit 2**   True and correct copy of Exhibit 1 to the Urdaneta deposition (**FILED UNDER SEAL**)

**Exhibit 3**   True and correct copy of Exhibit 2 to the Urdaneta deposition

**Exhibit 4**   True and correct copy of Exhibit 3 to the Urdaneta deposition

**Exhibit 5**   True and correct copy of Exhibit 4 to the Urdaneta deposition (**FILED UNDER SEAL**)

# EXHIBIT 1

# In The Matter Of:

*Parsons vs.*
*Shinn*

---

*Leonel A. Urdaneta, M.D.*
*December 10, 2019*

---

*Glennie Reporting Services, LLC*
*1555 East Orangewood Avenue*
*Phoenix, Arizona  85020*
*602.266.6535 Office     877.266.6535 Toll Free*
*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 121019 REV -LU.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Victor Parsons, et al.,           )
                                  )
              Plaintiffs,         )
                                  )
    v.                            )  No. 2:12-cv-00601-ROS
                                  )
David Shinn, et al.,              )
                                  )
              Defendants.         )
_____)


DEPOSITION OF LEONEL A. URDANETA, M.D.

Phoenix, Arizona
December 10, 2019
9:15 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona  85020-5130
                                    Prepared by:
602.266.6535                        Janet Hauck, RPR
www.glennie-reporting.com           Arizona CR No. 50522

2

1                              I N D E X

2

3   Witness                                        Page

4   LEONEL A. URDANETA, M.D.

5        Examination by Mr. Fathi:                   5

6        Examination by Ms. Hesman:                 129

7

8

9                       INDEX TO EXHIBITS

10  Description                                     Page

11  Exhibit 1   ADC Patients Who Died by Suicide -    8
                CONFIDENTIAL

12
    Exhibit 2   E-mail from Leonel Urdaneta to       30
13              David Fathi, 10/27/19

14  Exhibit 3   Subpoena to Produce Documents,      123
                Information, or Objects or to Permit
15              Inspection of Premises in a Civil
                Action
16
    Exhibit 4   Handwritten list - CONFIDENTIAL    148
17

18

19

20

21

22

23

24

25

3

1              DEPOSITION OF LEONEL A. URDANETA, M.D., was

2     taken on December 10, 2019, commencing at 9:15 a.m., at

3     Perkins Coie, LLP, 2901 North Central Avenue, Suite 2000,

4     Phoenix, Arizona, before JANET HAUCK, RPR, a Certified

5     Reporter, Certificate No. 50522, for the State of Arizona.

6

7     APPEARANCES:

8     For Plaintiffs:

9              AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                 David C. Fathi, Esq.
10               915 15th Street, NW
                 Washington, DC  20005
11

12    For Defendants:

13               STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                 Ashlee B. Hesman, Esq.
14               3100 West Ray Road, Suite 300
                 Chandler, Arizona  85226
15

16    For Corizon:

17               FENNEMORE CRAIG
                 Todd Kartchner, Esq.
18               2394 East Camelback Road, Suite 600
                 Phoenix, Arizona  85016
19

20    Also present:

21               Maya S. Abela, Arizona Center for Disability Law

22               Sey In, Arizona Center for Disability Law

23               Molly Brizgys, ACLU Arizona

24

25

1              MS. HESMAN:  I just want to put on the

2      record that we're going to designate the deposition as

3      confidential pursuant to the protective order.

4              MR. FATHI:  And we disagree with that

5      because there will be no confidential information

6      discussed in the deposition.

7              MS. HESMAN:  How do you know that?

8              MR. FATHI:  Because we are going to use

9      numbers rather than patient names.  Obviously, if

10     inadvertently there's some confidential information that's

11     disclosed, that can be handled with redaction, but we are

12     not agreeing that the deposition, as a whole, would be

13     confidential.

14             MS. HESMAN:  Okay.  I think we can talk

15     about portions if you want to de-designate at that time

16     after the transcript is out.  Certainly, it's not an

17     argument we had today, but I just want to put our position

18     on the record.

19             MR. FATHI:  Okay.

20             (Next page, please.)

21

22

23

24

25

5

1                    LEONEL A. URDANETA, M.D.,

2    called as a witness herein having been first duly sworn by

3    the Certified Reporter to tell the whole truth and nothing

4    but the truth, was examined and testified as follows:

5

6                         EXAMINATION

7    BY MR. FATHI:

8         Q.    Good morning, Doctor.

9         A.    Hi.  Good morning.

10        Q.    Would you please state your full name.

11        A.    Leonel Urdaneta.

12        Q.    Would you spell that for the reporter.

13        A.    L-E-O-N-E-L, U-R-D-A-N-E-T-A.

14        Q.    Doctor, have you ever had your deposition taken

15   before?

16        A.    Yes, and, as always, nervous about it.

17        Q.    About how many times?

18        A.    Oh, man.  Quite a few times.  20 plus, 30 plus

19   maybe.

20        Q.    Has your deposition ever been taken in

21   connection with your employment with Corizon here in

22   Arizona?

23        A.    No.

24        Q.    Well, it sounds like you may be familiar with

25   the process, but let me just go over a few of the basic

```
 1  ground rules.

 2       A.    Okay.

 3       Q.    Obviously, the reporter is trying to write down

 4  every word that's said, and that means that I need you to

 5  answer audibly and verbally.  So no nods of the head or

 6  shakes of the head.  Please remember to answer with words.

 7            Similarly, the reporter can't take down two

 8  people talking at once.  So even if you think you know

 9  what my question is, please wait for me to finish my

10  question, and I will wait for you to finish your answer.

11            I try to ask clear questions, but I don't

12  always succeed.  So if you don't understand my question,

13  please ask me, and I will clarify it.

14       A.    Okay.

15       Q.    One of the other lawyers may state an

16  objection.  Those objections are just for the record, and

17  you still need to answer the question.

18            We can take a break at any time.  If you

19  need to use the restroom, get a drink of water, or just

20  need a break, just let us know and we'll take one.

21            Finally, the most important reminder is

22  that you are testifying under oath under penalty of

23  perjury just as if you were testifying in court, okay?

24       A.    Okay.

25       Q.    Any questions?
```

1      A.    No.

2      Q.    Is there any reason why you can't give complete

3  and truthful testimony today?

4      A.    In terms of the complete part, I had to make

5  sure that the confidentiality issue is cleared to see how

6  far I can go with names or information that might be

7  confidential.

8      Q.    And how did you go about that?

9      A.    I don't have any idea.  I think one thought

10  would be perhaps that you, and Corizon's, particularly,

11  legal counsel guide me to what might be proper or not to

12  do at any particular time.

13          MS. HESMAN:  And I think this is reason to

14  designate the deposition as confidential.  And I think to

15  the extent that you disagree and you would like to

16  de-designate after the transcript comes out -- and that's

17  a conversation we can have, but the deposition clearly

18  needs to be designated as confidential, and I think the

19  witness agrees with that.

20          MR. FATHI:  I think that you're

21  mischaracterizing the witness' statement.  You've stated

22  your position.  Our position is that, except for

23  personally-identifiable medical information, which we are

24  going to attempt to avoid by using pseudonyms, patient 1,

25  patient 2, there is going to be nothing in this deposition

8

1    that is confidential.  So we disagree with the preemptive

2    and complete designation of it as confidential.  And as

3    you said, we can discuss that later.

4                 MS. HESMAN:  I just want to be clear that

5    before you disclose any contents of the deposition,

6    because we have designated it as confidential under the

7    protective order, that you do need to clear it with us,

8    and we're objecting to you disclosing anything without

9    running it by us.

10                MR. FATHI:  I note your objection.  I do

11   not agree with it.

12                MS. HESMAN:  Thank you.

13       Q.   BY MR. FATHI:  Sorry, Doctor.

14                In connection with what you said, we may

15   talk about specific patients today, but as I just said, we

16   are going to not use names or numbers.  We will use

17   designations like patient 1, patient 2.  So if you could

18   remember that, please not to state a patient name on the

19   record, okay?

20       A.   Okay.

21                MR. FATHI:  Let's mark this as Exhibit 1.

22                (Exhibit 1 identified for the record.)

23       Q.   BY MR. FATHI:  Doctor, showing you what's been

24   marked Exhibit 1, this is a list of some ADC patients who

25   died by suicide about the time that you were working with

Leonel A. Urdaneta, M.D. - 12/10/2019

9

1   Corizon at ADC.  And this exhibit, obviously, will need to

2   be designated as confidential.  So if, in the course of

3   this discussion, Doctor, you want to mention any of these

4   people, please don't use their name.  Please use their

5   designation as patient 1 or patient 2, okay?

6      A.   Okay.

7           MS. HESMAN:  And I'll just object to the

8   use of this exhibit as I'm unclear of who prepared it.

9   There's no Bates number.  I've never seen it.  It's never

10   been disclosed, and I have no idea if it's authentic or

11   accurate in any way.

12           MR. FATHI:  Your objection is noted.

13           MS. HESMAN:  Thank you.

14      Q.   BY MR. FATHI:  Doctor, did you bring any

15   documents with you today?

16      A.   I apologize.  I have had some documents,

17   particularly clinical notes that I took during my time

18   working with Corizon.  I had not been able to find those

19   notebooks due to the fact that I just moved and everything

20   had been packed.  But in regards to that, I was advised,

21   too, that -- and I didn't know it at the time, but I was

22   advised that those notes actually are Corizon's property

23   rather than mine.  So that's another area of possible

24   conflict.

25      Q.   And who advised you of that?

1      A.    Corizon's counsel.

2      Q.    Is that Mr. Kartchner?

3      A.    I believe, yeah.

4            MR. KARTCHNER:  Yeah, and let me just state

5    for the record that it actually is not entirely accurate.

6    The position, I think, is actually that it's ADC's

7    property, but that's something that can be --

8            MR. FATHI:  Well, regardless of whose

9    property they are, that doesn't affect their ability to be

10   subpoenaed in a case in federal court.

11     Q.    BY MR. FATHI:  But what I understand you to be

12   saying, Doctor, is that, in any event, you don't have

13   those notes or at least you can't find them; is that

14   correct?

15     A.    At this particular point.

16     Q.    And you didn't bring any other documents with

17   you today?

18     A.    No, I did not.

19     Q.    Doctor, what is your occupation?

20     A.    I am a psychiatrist.

21     Q.    Are you licensed in Arizona?

22     A.    Yes, I am.

23     Q.    Are you currently employed?

24     A.    Yes, I am.

25     Q.    And who is your employer?

Leonel A. Urdaneta, M.D. - 12/10/2019

11

1     A.     District Medical Group.

2     Q.     And what do you do for them?

3     A.     I am an attending at one of their hospitals

4  where I see psychiatric patients.

5     Q.     And which hospital is that?

6     A.     That's the Maryvale -- I'm sorry.  That was

7  just a few months ago.  That's the Valleywide Mesa

8  Hospital.

9     Q.     Okay.  And since when have you had that

10  position?

11     A.     With that particular hospital since October the

12  15th of this year.

13     Q.     What did you do before October 15th?

14     A.     I was with the same group but at the Maryvale

15  hospital doing the same sort of work.  And I did that

16  since May of this year until October the 15th when I

17  transferred to the current hospital.

18     Q.     I see.  So is this an agency that places

19  physicians at different hospitals?

20     A.     This is a group of medical practitioners that

21  has the contract with the Maricopa County health system

22  for the treatment of psychiatric patients as well as

23  medical patients.  So they provide all of the medical and

24  psychiatric care for patients who have particular

25  insurances.

12

1        Q.    I see.  And you have been employed by them

2    continuously since May?

3        A.    Yes.

4        Q.    Where did you graduate from medical school?

5        A.    At the Stritch School of Medicine, Loyola

6    University in Chicago.

7        Q.    Of what year?

8        A.    1969.

9        Q.    Did you complete a residency?

10        A.    Yes, I did.

11        Q.    And where was that?

12        A.    At the Medical School of Psychiatry.

13        Q.    And what year was that?

14        A.    From -- let's see.  I did the internship from

15    '69 to '70.  Then from '70 to '74 was the residency

16    training.

17        Q.    Are you board certified?

18        A.    Yes, I am.

19        Q.    In what?

20        A.    In adult psychiatry.

21        Q.    Since when have you been board certified?

22        A.    1979.

23        Q.    Have you been continuously board certified

24    since then?

25        A.    I am -- I have been grandfathered into the

Leonel A. Urdaneta, M.D. - 12/10/2019

13

1   certification system.

2        Q.    So as we sit here today, are you board

3   certified?

4        A.    Yes, I am.

5        Q.    Have you ever worked in the field of

6   correctional mental health?

7        A.    Yes, I have.

8        Q.    Could you give us a brief overview of your

9   experience in that field?

10       A.    Surely.  I started during my residency training

11  at the Medical School of Psychiatry taking a elective in

12  correctional psychiatry.  And I continued doing that after

13  finishing my residency, which was 1973 until 1974.  Then I

14  left the country, came back in '79, and went back either

15  full-time or part-time to correctional psychiatry until my

16  retirement from the Kansas correctional system.

17       Q.    Let me stop you there if I could, Doctor.

18       A.    Surely.

19       Q.    So you started in 1979 working with the Kansas

20  correctional system?

21       A.    Yes.

22       Q.    And you did that until what year?

23       A.    Until I retired, and that was 29 years later.

24  I think that was 2007.

25       Q.    So between approximately 1979 and 2007 you were

14

1   employed in the Kansas Department of Corrections?

2        A.    Correct.

3        Q.    As a psychiatrist?

4        A.    It was initially as a psychiatrist, and

5   eventually, I became the -- several titles for it.  The

6   monitor, the penal physician, the director of the

7   Department of Psychiatry.

8        Q.    Can you tell us what your job duties were in

9   those various positions?

10       A.    Initially, it was the examination and the

11  program coordination of patients under psychiatric care.

12  As time went on, then it was monitoring the work that was

13  being done by contract agencies that were taking direct

14  care of patients.

15       Q.    And for that entire 29-year period were you

16  providing care yourself or were there periods when you

17  were not providing care?

18       A.    There were periods where I did not provide

19  direct care, but just monitor the care being provided.

20       Q.    And since your retirement from the Kansas

21  Department of Corrections in approximately 2007, have you

22  worked in corrections since then?

23       A.    Yes.

24       Q.    Tell us about that.

25       A.    I then retired from the Department of

15

1    Corrections in Kansas.  I came to New Mexico, and I was

2    the director of psychiatry at the MCC [sic], the

3    Metropolitan -- I forgot -- Metropolitan jail system there

4    in Albuquerque.  Two years after that I then became the

5    director of psychiatry for the New Mexico Corizon

6    contract.

7         Q.    Okay.  So from 2007 to about 2000 --

8         A.    Maybe '9.

9         Q.    -- you worked at the MCC?

10        A.    Yes.

11        Q.    And was that a federal facility or --

12        A.    No, that was a county facility.  That was a

13   county jail.

14        Q.    And then in about 2009 you were director of

15   psychiatry for the Corizon contract in New Mexico?

16        A.    That's right.

17        Q.    And how long did you keep that position?

18        A.    I think we were there maybe four to five years

19   until the contract was terminated.

20              By the way, let me correct.  It's not MCC.

21   It's MDC.  And so that was -- maybe it was 2013, maybe.

22   Well, anyhow, the year -- I might be a little off in the

23   year.  I think it was until 2017, then Corizon lost the

24   contract with the New Mexico Department of Corrections.

25        Q.    Okay.  And at some point did you go to work for

16

1  Corizon here in Arizona?

2        A.    Yes.  And then in 2017 I came here to Arizona

3  to be the director of psychiatry for Corizon here with the

4  Department of Corrections in Arizona.

5        Q.    And when did you leave that position?

6        A.    I left it in May of this year.

7        Q.    Do you remember what was your last day working

8  at Corizon?

9        A.    It might have been somewhere maybe the 1st of

10  May, I believe.

11        Q.    And what were the circumstances of your

12  departure?

13        A.    Well, first Corizon had lost the contract.

14  Second, I did not want to continue really working within a

15  system that I think was failing in many ways.  Third, the

16  new company that came to replace Corizon really never

17  reached out to me, and I suppose I believe that the

18  Department of Corrections had something to do with that

19  since it's the same company that had replaced Corizon in

20  New Mexico, and in New Mexico they had reached out to me.

21  I knew some people working with the new company and so on

22  and that relationship was good and so on.

23             So I always believed that there were some

24  conversations that went along those lines.  But I think

25  the main reason after the whole thing was said here is

 1    that I found the Arizona system very onerous, difficult to

 2    work with, misguided, and jaded.

 3        Q.    Was your departure voluntary?  Did you resign?

 4        A.    Yes, it was.

 5        Q.    You were not terminated?

 6        A.    No, I was not.

 7        Q.    While you worked for Corizon here in Arizona,

 8    what were your duties?

 9        A.    I was the supervisor for the Department of

10    Corrections of what the psychiatrists and the nurse

11    practitioners in the areas were doing.  I was monitoring

12    that.  I was also in charge of my own care of patients

13    that came about, one, because we had a lot of shortages,

14    and two, there were patients that were referred directly

15    to my care.  I was also in charge of doing reviews as the

16    need arose of the patient care of some patients.  I had

17    also to coordinate and work together with other

18    disciplines within the overall mental health psychiatric

19    system.

20        Q.    So you supervised the psychiatrists and the

21    mental health and nurse practitioners?

22        A.    Exactly.

23        Q.    And you also provided direct patient care?

24        A.    Correct.

25        Q.    About what portion of your time over your two

18

```
 1    years with Corizon would you say you spent on providing
 2    patient care as opposed to management and supervision?
 3         A.    I would say it probably was a good 50/50.
 4         Q.    Did you treat patients at all ten Arizona
 5    prisons?
 6         A.    I treated mostly patients at the Phoenix
 7    facility, and this was another area of conflict that
 8    eventually came to surface.  However, within my concept of
 9    treating patients I push for continuity of care all
10    around, okay.  I wasn't able to make that principle part
11    of the overall functioning and delivery of care within the
12    system, but I did it for myself.  That also came to be a
13    point of contention at some point coming from the way that
14    the Department of Corrections here saw the delivery of
15    care, and I was even reported for continuing to see my
16    patients via tele when they were discharged from the
17    inpatient level of care where my bulk of work was being
18    done.
19         Q.    Do you recall if you saw patients at any other
20    facility other than Phoenix?
21         A.    Yes.  I also saw patients at the women's
22    facility, and I also saw patients at the Florence complex,
23    or Eyman.  And then via tele I saw also patients from the
24    Tucson area, also from Lewis for as long as I did not find
25    interference.  Some, as I said, coming from the Department
```

19

1   of Corrections and some coming from within.

2        Q.    By within, you mean within Corizon?

3        A.    Yes.

4        Q.    Tell me about the interference that you

5   encountered.

6        A.    From the Department of Corrections was, again,

7   the ill-conceived notion that patients' continuity of care

8   was apparently not of prime importance for them.  From the

9   Corizon itself it was because of conflicts between my

10  position as director of psychiatry and mental health

11  counselors and the director of the mental health -- called

12  then the vice president of mental health.

13       Q.    Who communicated this position from the Arizona

14  Department of Corrections?

15       A.    It was communicated through e-mail from

16  Dr. Taylor to, I suppose, the vice president of mental

17  health, who then -- the e-mail was also sent to the

18  director of psychiatry for Corizon, and then through the

19  director of psychiatry it came to me.

20       Q.    And what did the e-mail say?

21       A.    That particular e-mail, I think, had two areas

22  of concerns.  One, questioning the use of some medications

23  in my practice, and two, the practice of continuing to see

24  patients that had been discharged from the inpatient level

25  of care from other facilities now that they went through

Leonel A. Urdaneta, M.D. - 12/10/2019

20

 1  by the process of telepsychiatry.

 2      Q.    And the message was that you were not to

 3  continue to see your patients?

 4      A.    Correct.

 5            MS. HESMAN:  Form.

 6      Q.    BY MR. FATHI:  Who was your direct supervisor

 7  when you were in this position with Corizon?

 8      A.    The director of psychiatry, Dr. Pastor, Joe

 9  Pastor.

10      Q.    Was he your supervisor the entire time you were

11  here?

12      A.    Correct.

13      Q.    Now, you said a few minutes ago that one of the

14  reasons you left was because the system was failing in

15  many ways.  What did you mean by that?

16      A.    Overall, there was an obsessiveness with

17  quantity only within the department within the psychiatric

18  mental health field, obsessiveness with reaching some

19  benchmarks with the indicators that the system had been

20  working with.  Those indicators were, for the most part,

21  quantitative.  There was very little concern with the

22  quality of it all.

23            My general message was these are human

24  beings.  These are patients.  They cannot be treated

25  simply on a conveyor belt as just goods.  They are human

21

1    beings that need to be understood.  This is not what

2    mental health and psychiatry are all about.

3                    So this created some conflicts.  The

4    pursuit, no matter what, continued to be, let's reach

5    those benchmark numbers so we don't fail the quantity, but

6    in the meanwhile, quality was being sacrificed all around,

7    in my opinion.

8        Q.    And who in the Department of Corrections was

9    conveying this message about quantity and reaching the

10   benchmarks?

11       A.    Well, within psychiatry and mental health it

12   was all under Dr. Taylor, and I think the radar at Corizon

13   picked that up very well.  And then the point was reached

14   in which I think the relationship between the vice

15   president of mental health, whose position was contested

16   during my time there by psychiatry itself, the point then

17   became when Dr. Taylor and the vice president of mental

18   health became -- I call it an unholy alliance in which,

19   again, the care of patients was being sacrificed in the

20   pursuit of policies and procedures that had mostly to do

21   with the obtaining of benchmark numbers to satisfy the

22   indicators that we had to go by.

23       Q.    And just so the record is clear, you're talking

24   about Dr. Nicole Taylor of the Department of Corrections?

25       A.    That is correct.

22

1      Q.      Did you come to know a Dr. Lynn Calcote?

2      A.      Yes.

3      Q.      And who is Dr. Calcote?

4      A.      Dr. Calcote was a Ph.D. in psychology who had

5    the title of vice president of mental health.

6      Q.      And did you supervise him, or did he supervise

7    you, or were you in different chains of command?

8      A.      Well, that's another blurred area that was a

9    great point of dissatisfaction.  When I came to work for

10   Corizon the idea is that psychiatry -- and the psychiatry

11   was the ultimate leader, teacher, organizer of the

12   psychiatric mental health field.  However, in reality, it

13   was never so.

14              So there was always blurred boundaries.  I

15   tried to clarify that, just as other disciplines had tried

16   to do and other professional psychiatrists and medical

17   doctors had wanted to do, but it was always a continuous

18   fight and conflict.

19              We got to the point then when the director

20   of psychiatry for Corizon clearly told Dr. Calcote in a

21   conversation that the system here was going to follow the

22   system -- the national Corizon system in which the

23   director of psychiatry was responsible for the overall

24   psychiatric mental health care.  And that mental health,

25   in all of its disciplines, were going to report to the

1  psychiatry.  He made it clear to him.

2            Dr. Calcote immediately said, I resign.

3  Dr. Pastor told him, well, that's your decision.  However,

4  he never did.  Instead, he reached out to Dr. Taylor, and

5  Dr. Taylor then sent him an e-mail which he sent around

6  indicating that it was him that was responsible for the

7  overall mental health care of patients.

8            So that became another point of contention

9  on one side.  And I saw a conflict that could not be

10 resolved.  And that was, again, part of why I thought the

11 system was failing, and my decision was I cannot continue

12 to work here, besides the other two points I mentioned.

13     Q.    Did that conflict or lack of clarity between

14 psychology and psychiatry have an effect on patient care?

15     A.    Oh, totally, yes, yes.

16     Q.    Please explain.

17     A.    In terms of that one we can look at, A, the

18 provision of care in the Phoenix prison.  The Phoenix

19 prison is a licensed mental health psychiatric hospital as

20 a fact, okay.  Well, admissions, discharges, everyday care

21 was totally under the supervision, the monitoring, the

22 direction of the mental health department rather than

23 psychiatric one.  And in terms of the way they did it,

24 even the nursing discipline became just an accolade for

25 them so that patient care, again, became a matter of

24

1   quantity.  Let's see what we do, first of all.  Second, it

2   became a beach ball sort of thing.  Let's see where we

3   send them now.  Let's see where we can send them to Tucson

4   or Lewis and so on, without consideration whatsoever for

5   the condition of the patient, without consideration for

6   the clinical progress or lack of it of the patient.

7              I made my efforts to correct some of that,

8   and I think it was a mixture of success and failure.

9   Success in the main acute area, for instance, in

10  establishing regular team meetings with all disciplines,

11  but then in the other ones never was able to get mental

12  health to agree to have team meetings where everybody

13  participated in making the decisions about care of

14  patients.  Nursing was left on the side.  Over and over I

15  was told, yeah, we met.  I would go to nursing and they'd

16  say, no, they haven't talked to us.

17     Q.    Why are team meetings important for patient

18  care?

19     A.    Well, because it's a multidisciplinary

20  approach.  We all bring to the whole care different aspect

21  of what we do, and that's essential then to develop

22  clinically significant treatment plans, including, okay,

23  who is really ready to go to the next level of care,

24  rather than looking at do we have too many patients.  You

25  know, is Tucson waiting for a discharge, rather than

1   having decisions that nobody had participated in except

2   mental health practitioners and the affirmation from

3   security on the administrative part.

4        Q.   Are you saying that patients would sometimes be

5   inappropriately discharged from the Phoenix facility based

6   on nonmedical factors like bed space at another prison?

7             MS. HESMAN:  Form.

8             THE WITNESS:  Yes.

9        Q.   BY MR. FATHI:  Did you observe that to happen?

10             MS. HESMAN:  Some objections.

11             THE WITNESS:  Yes.  I'm also saying that

12   patients who needed to come in were not allowed to come in

13   because of the interference from mental health.  And

14   patients who really needed it and patients who, in spite

15   of direct order from a physician, at times me, at times

16   other physicians, did not come to the acute level of care

17   where they should have been treated.

18        Q.   BY MR. FATHI:  And did that create a risk of

19   harm to the patient?

20             MS. HESMAN:  Form.

21             THE WITNESS:  Oh, yes.

22        Q.   BY MR. FATHI:  Did it result in actual harm to

23   the patient?

24             MS. HESMAN:  Same objection.

25             THE WITNESS:  Yes.

1        Q.     BY MR. FATHI:  About how many times, in your

2    recollection, did that occur, that a patient who had been

3    ordered transferred to Phoenix was not transferred because

4    of interference by mental health?

5        A.     I remember at least three very significant

6    cases, okay, and not because I have a poor memory.  What I

7    remember, though, is factual, but there are a lot of

8    things that I don't remember, but there were more than

9    three.  At least, you know, factually, yeah, I remember

10   three cases in which our order for admissions to these

11   facilities in Phoenix wasn't followed through, was

12   interfered with, particularly by Dr. Calcote and the

13   mental health people, and I suppose Dr. Taylor and the

14   administration.

15       Q.     Do you remember the names of those patients?

16       A.     I remember some.

17       Q.     All right.  Would you write them down on that

18   piece of paper in front of you?

19       A.     The fourth one, I just can't remember the name.

20       Q.     So, Doctor, because we're already using 1, 2,

21   and 3, could you make that A, B, and C?

22       A.     Oh, sure.  See, my D comes into play.

23       Q.     Okay.  So your testimony is that these patients

24   you've indicated as A, B, and C, were rejected for

25   transfer to the Phoenix facility?

Leonel A. Urdaneta, M.D. - 12/10/2019

27

 1      A.     Correct.

 2                    MS. HESMAN:  Form.  Can we also have that

 3      passed around so we can see who the names are?

 4                    MR. FATHI:  Please.

 5                    MS. HESMAN:  I'm having a difficult time

 6      reading these.  He's going to have to tell me what they

 7      are.  I mean, A looks like it's the same as B.

 8                    THE WITNESS:  Well, it's cursive.

 9                    MS. HESMAN:  I know.  It's difficult to

10      read.  This is why, David, I'm not understanding your

11      objection to designating this as confidential.  It seems

12      it is a lot easier for him to simply refer to the patients

13      by their names so we all are on the same page as to who he

14      is talking about.  Otherwise, we're going to have to pass

15      this paper around each time he refers to a patient, which

16      doesn't seem to make sense at all.

17                    MR. FATHI:  You've said that four times

18      now, and we continue to disagree, and I would ask you to

19      stop repeating your position.

20                    MS. HESMAN:  So now we're at a point where

21      it's becoming unreasonable to pass around a piece of paper

22      with names.  Perhaps if you can explain what your

23      hesitation is to mark it as confidential, I can better

24      understand your position.

25                    MR. FATHI:  There's no reason to mark a

28

1  document as confidential that doesn't contain confidential

2  information.  Would you return it to the doctor and we'll

3  ask him to print?

4       Q.    BY MR. FATHI:  Could you print rather than

5  cursive so Ms. Hesman can read it?

6       A.    My print is terrible.

7       Q.    And we will, of course, make this document an

8  exhibit so everyone will have a copy.

9            MS. HESMAN:  Okay.  It looks like there's

10 two names, and then one says, don't remember; is that

11 correct?

12            THE WITNESS:  Yes.  I'm trying to bring it

13 up.  That's the number, second.  The second one is a

14 patient who was several times referred by the primary care

15 doctor, and I think it was at Lewis, over and over again

16 with a clear indication of why she, this primary care

17 doctor, wanted the patient to be seen.  I had been the

18 psychiatrist to see him.  The psychiatrist, I believe,

19 agreed that this patient needed psychiatric care.  I

20 looked at the whole thing, I read the history, I say, this

21 patient has such-and-such diagnosis, even though I have

22 not seen it.  This patient needs to be seen or else he

23 continue to injure himself at the inpatient level of care.

24            That went nowhere.  Instead I get a call

25 from a mental health practitioner that was then the

29

1   director of mental health at the Phoenix -- what made you

2   think of that diagnosis?  Well, if you're going to

3   question it, look at the records.  Do you have an

4   alternative diagnosis?  Oh, it's manipulation.  Baloney.

5              Tell me, what is the psychiatric meaning of

6   manipulation?  You don't use those terms.  Manipulation

7   has a psychological meaning.  Tell me what it is.  What is

8   it in this guy that is there to manipulate when he goes

9   repeatedly to the emergency room and he injures himself?

10  I mean, if you're going to believe in manipulation, then,

11  ipso facto, then this patient has to be crazy, at least,

12  to injure himself just to manipulate others.

13       Q.   BY MR. FATHI:  Doctor, to your knowledge, was

14  that patient ever admitted to inpatient care at Phoenix?

15       A.   Not to my knowledge up to the time I left.  You

16  know, I left, and still the problem was unresolved, I

17  believe.  As I said, this patient had been referred by the

18  medical provider.  That's what I can't remember, the name.

19  Yeah, but it took several weeks, and this doctor kept at

20  it, the medical doctor.  You haven't done anything.  You

21  haven't done anything.  Not to me, you know.  In terms of

22  getting the patient into the level of care, he could not

23  come into the patient level of care unless the vice

24  president of mental health said, yes, let's move him.

25              MR. FATHI:  Let's mark this next in order.

1              (Exhibit 2 identified for the record.)

2      Q.     BY MR. FATHI:  Doctor, I'm showing you an

3  e-mail from you to me dated October 27, 2019.  Did you

4  send that e-mail on or about that date?

5      A.     Yes.

6      Q.     I'm going to ask you some more specific

7  questions, but first you refer in the second paragraph,

8  you say, quote, those dysfunctions cause tremendous harm

9  to patients, including suicides and severe self-injurious

10  damage, end of quote.  What were you talking about there?

11      A.     I was talking about in terms of suicide cases

12  in which procedures and policies, according to what the

13  Department of Corrections has, were perhaps followed, but

14  again, the quality of care, the continuity of care, the

15  delivery of care, as it should be, was not up to par.

16              The understanding of suicidal attempts,

17  suicidal thoughts, the mental and psychological state of

18  patients who get to this point was treated -- a time when

19  it was treated by putting the patient on a one-on-one in a

20  cell by himself or herself and having a mental health

21  practitioner coming by daily, but he could be one today

22  and another one tomorrow and another one tomorrow

23  totally -- the patient complained to them, by the way, and

24  say, you know, yesterday I saw somebody, but today I saw

25  somebody else, you know.  There was no therapeutic

31

1   alliance, which is basic.  I mean, that's primordial for

2   the care of human beings, okay.  There was nothing there,

3   okay.  So these patients were left only to the management

4   of officers that took care of them, looked at them for 24

5   hours, and then they were moved to maybe a higher status

6   being seen every other day and so on.

7                   Again, there was kind of a mental health

8   practitioner coming by to see them without ever realizing

9   there is something here that is human, that is

10  psychological, that is mental.  This is not manipulative.

11  This is not this, this, and that, okay.  There were

12  occurrences then in which this failed.  And the sickest

13  people, the sickest patients then become casualties.

14                  The other one that's, let's say, straddling

15  the fence between life and death, maybe some of them will

16  go all by himself by tincture of time into, okay, I'm

17  going to change my mind.  I'm going to kill myself.  But

18  in that process, if it is not well done, many are going to

19  fall on the other side, okay.

20                  There is a side dedicated totally to the

21  care of self-injurious patients.  You can do that.  A

22  patient will tell me, I see somebody else doing it.  I'm

23  going to do it, too, because I have the same problem,

24  okay.  Even from the concept from the Department of

25  Corrections of having a unit assigned to a patient who

Leonel A. Urdaneta, M.D. - 12/10/2019

32

1   self-injures themselves, that's unheard of.  You can't do

2   that.

3                    There were many cases like that over and

4   over again.  And the patients then end up in the emergency

5   room over and over and over.  Sometimes the same patient

6   eight, nine, ten times within a very short period of time,

7   okay.  You look at that.  You say, you cannot do that.

8   Doesn't matter.  That's what the department wants.  That's

9   what the department has developed.

10       Q.    Let me ask you some follow-up questions.

11                    Do the practices that you just described

12   affect the quality of patient care?

13       A.    You bet.  Surely, yes.

14       Q.    Do the practices that you've just described

15   create a risk of injury or death to patients?

16       A.    It creates risk, major risk.

17       Q.    During your time with Corizon in Arizona, were

18   you generally familiar with how the mental health

19   operation was staffed?

20                    MS. HESMAN:  Form.

21                    THE WITNESS:  Clarify that for me.  In

22   terms of -- you mean numbers or --

23       Q.    BY MR. FATHI:  Numbers and qualifications.

24   Were you generally aware of how many psychiatrists there

25   were, how many psychologists, how many nurse

 1    practitioners?

 2         A.    I was aware directly of the number of

 3    psychiatrists, how they practice and so on, and the nurse

 4    practitioner.  Not so aware of the mental health area.  I

 5    know, for a fact, that the numbers were low.  We need them

 6    more.  And that was sometimes the pushback I got when I

 7    would indicate, yeah, but you cannot do, for instance,

 8    this treatment of patients who are suicidal in special

 9    observations, putting one counselor today, another one

10    tomorrow, another one tomorrow.  And they would say, we

11    don't have more.  You know, that's all we got.

12         Q.    Let me ask a follow-up question.

13               Did you at any point develop any concerns

14    about the adequacy of mental health staffing for patients

15    in ADC?

16               MS. HESMAN:  Form; foundation.

17               THE WITNESS:  Yes, in terms of numbers and

18    also in terms of quality.

19         Q.    BY MR. FATHI:  Okay.  Let's talk about numbers

20    first.  What were the concerns you had about numbers?

21         A.    There were not enough.  I cannot tell you,

22    okay, we needed so many more specifically, but there were

23    not enough of them to take care of the very sick

24    population.

25         Q.    And did you ever communicate those concerns to

Leonel A. Urdaneta, M.D. - 12/10/2019

34

```
1    anyone in ADC?
2         A.    No, I did not.
3         Q.    Did you ever communicate those concerns to
4    anyone in Corizon?
5         A.    It was a two-way street.  They communicated
6    that to me, and I communicated also to them.
7         Q.    And them was who?
8         A.    Particularly, Dr. Calcote.
9         Q.    Did the numbers of staffing improve at all by
10   the time you left Corizon?
11                   MS. HESMAN:  Form; foundation.
12                   THE WITNESS:  I don't know, but I don't
13   think so.  I've always heard the same sort of complaint
14   that we don't have enough people.
15        Q.    BY MR. FATHI:  Does the staffing shortage that
16   you describe affect patient care?
17        A.    Oh, totally, yes.
18        Q.    Does the staffing shortage that you described
19   pose a risk of harm to patients?
20        A.    Absolutely.
21        Q.    You also said that you had some concerns about
22   the quality of the mental health staff; is that right?
23        A.    Yes.
24        Q.    What were those concerns?
25        A.    Lack of knowledge, lack of empathy, lack of
```

1    experience in a population that is difficult to treat.

2    But also, let me add there that, you know, there is a

3    parallel process going on there because those were also

4    concerns that I had about the Department of Psychiatry

5    itself.  You know, they had somebody who is a psychologist

6    and plus a few others in charge of everything.  They did

7    not have a psychiatrist, which is -- you know, it's almost

8    hard to believe.  You almost do it -- many times the

9    Department of Psychiatry, it's for them to save money, I

10   suppose, also, because, again, there is a lack of

11   knowledge about what these different departments do.

12        Q.    So I'm sorry.  I was --

13        A.    What is it that we psychiatrists can do?  What

14   is it that counselors and Ph.D.s do?

15              In terms of the quality, I would be told

16   sometimes, well, the patient is receiving CBT or some

17   other sort of manual therapy and so on, but then you ask,

18   okay, what is the training with this particular counselor

19   in this particular area?  Well, I don't think she had been

20   trained in this.  So how can you provide that if you

21   haven't been trained, if you don't have enough knowledge

22   with that which you are saying you are practicing.

23        Q.    So were you concerned that some mental health

24   staff didn't have the necessary training to provide

25   treatment?

36

1           MS. HESMAN:  Form; foundation.

2           THE WITNESS:  Correct.

3     Q.    BY MR. FATHI:  And does that lack of training

4  affect the quality of patient care?

5           MS. HESMAN:  Foundation.

6           THE WITNESS:  Absolutely.

7     Q.    BY MR. FATHI:  Does it create a risk of harm to

8  patients?

9           MS. HESMAN:  Same.

10           THE WITNESS:  Absolutely.

11     Q.    BY MR. FATHI:  Can you give me an example, if

12  you remember, of one or more mental health staff people

13  who you thought were not qualified, trained, or competent

14  to carry out their jobs?

15     A.    You mean name-wise?

16     Q.    A name would be better.  If you don't want to

17  give a name, you can just describe the situation.

18     A.    Well, one situation, for instance, was the

19  person in charge of the mental health of the Phoenix

20  facility that, I don't think, had enough knowledge or

21  interest in human beings and ability to connect and

22  understand what they were saying.  The person in charge of

23  the Tucson facility was an officer in disguise, not that

24  officers are anything negative, but it is negative if

25  you're a psychologist and then you are behaving more like

1    an officer.

2         Q.    What do you mean by that?

3         A.    Well, what I mean by that, people who treat

4    human beings, again, as if they were just felons.  They

5    are more concerned about satisfying the administrative

6    part of the correctional department rather than satisfying

7    the treatment and caring of patients as you're supposed to

8    be.  That was a particular case.

9              For instance, I had a patient that I

10   believed to be transferred to the Tucson facility and I

11   wanted to follow him.  Actually, there were more than one.

12   There were two or three that ended up there.  I was able

13   to follow one of them for one or two extra visits, gave

14   him an appointment for the next visit.  He obstructed on

15   it all the way, all the way.  Never allowed me to see the

16   patient.

17        Q.    I'm sorry.  Who obstructed it?

18        A.    This particular psychologist from Tucson.

19        Q.    So I want to make sure I understand your

20   testimony.

21              This was someone who had been your patient

22   in Phoenix, you wanted to follow him clinically after his

23   transfer to Tucson, and this psychologist at Tucson

24   obstructed that; is that correct?

25        A.    Correct.

38

1     Q.    And does that affect the quality of patient

2  care?

3     A.    Absolutely.

4     Q.    Does that pose a risk of harm to the patient?

5     A.    Absolutely.

6     Q.    About how many times did that happen that your

7  attempts to follow a patient after transfer were

8  obstructed?

9     A.    Well, in this particular area in Tucson -- oh,

10  during -- I believe probably during all of my time there

11  for the two years, five, six, seven times, repeated

12  e-mails to this, then I went to Dr. Calcote.  Oh, yeah,

13  we'll tell him.  Never got anywhere.

14     Q.    What was the name of this person at Tucson?

15     A.    Dr. -- it's a Hispanic name.

16     Q.    Is it Dr. Sanchez?

17     A.    Yes.

18     Q.    You mentioned that you conveyed your concerns

19  about this to Dr. Calcote; is that right?

20     A.    Correct.

21     Q.    Did you convey your concerns about this to

22  anyone else either in ADC or in Corizon?

23     A.    Within Corizon, yeah, to my supervisor.  To the

24  Department of Corrections, no.  I have no access to them.

25     Q.    And your supervisor was Dr. Pastor?

Leonel A. Urdaneta, M.D. - 12/10/2019

39

1        A.     Pastor, yes.

2        Q.     Are you aware of any documents, either written

3   by you or by someone else, that discussed either the

4   adequacy of numbers of mental health staff or the

5   competence and qualifications of mental health staff?

6        A.     You know, I'm not aware right off the bat.

7        Q.     Did you send e-mails about those issues?

8        A.     I don't believe I did.  I think it was mostly

9   conversations.

10        Q.     One of the things that psychiatrists do is

11   prescribe medications, correct?

12        A.     Yes.

13        Q.     During your employment with Corizon were you

14   familiar with the prescription of medications for mental

15   health purposes?

16        A.     Yes.

17        Q.     Did you ever have any concerns about the

18   availability of appropriate medication for patients with

19   mental illness in ADC?

20               MS. HESMAN:  Form.

21               THE WITNESS:  You know, I did not.  You

22   know, there was a process for the availability of

23   medications and so on that we follow.  I was satisfied

24   that the process was working then.

25               Now, the medication field is a slippery

1   field.  I think it can be confusing, and also it can be

2   used perhaps in inappropriate ways, meaning I think that

3   there is a lack of knowledge about the power, the need,

4   the indication for medications, and on the other hand,

5   absolute lack of knowledge about the power, the need and

6   the benefits of talking therapy.  I think these days part

7   of what is making treatment in psychiatry so difficult is

8   that sometimes we forget about the second and put too much

9   emphasis about the first.

10              So one of the things I kept emphasizing

11  was, yes, let's not let pharma obscure our thinking.

12  Medications are not a panacea for this and that.

13  Sometimes old medications are as good as new ones, and new

14  and old medications are not going to do the whole trick.

15              In a nutshell, with that philosophy and

16  that sort of thinking in mind, I don't think I really had

17  concern with availability of medications.

18      Q.    BY MR. FATHI:  Did you ever have concerns about

19  the availability of talk therapy?

20      A.    That, I did.

21      Q.    Tell me about that.

22      A.    There was not talk therapy even within the

23  inpatient level of care.

24      Q.    Are there patients for whom talk therapy is an

25  important treatment modality?

1      A.    Absolutely, absolutely.

2      Q.    And did you observe patients who you believe

3   needed talk therapy who weren't receiving it?

4      A.    Absolutely, yes.

5      Q.    Did that happen just once or more than once?

6      A.    No, that happened innumerable times.

7      Q.    And why were they not receiving talk therapy?

8      A.    One, because the quantity, and that quantity

9   has two sides to it.  One, there were not enough

10   therapists, counselors, well prepared to do therapy.  Two,

11   the main concern was, again, the quantity in terms of, did

12   we reach the benchmarks.

13           Then we mentioned that, also, the quality.

14   There's is no, first of all, understanding that that is

15   pretty much needed and that we can probably do better for

16   patients than just throwing medications at them.  And

17   there were those who said, hey, he is receiving CBT.  Go

18   in and see them, okay, show me.  Where is the CBT?  They

19   didn't find that.

20           There were a few counselors, let me tell

21   you, that were darn good -- I'm not denying that -- here

22   and there, and they had the care of patients and so on in

23   mind.  They were very empathic.  Not everybody was, you

24   know, like I described in the first group.  There were a

25   few that were very good.  But, again, talking to some of

Leonel A. Urdaneta, M.D. - 12/10/2019

42

1  those, they tell me, I'm overwhelmed.  They also decried

2  the fact that the system as a whole was not supporting

3  what they wanted to do with these human beings.

4       Q.    Can the failure to provide talk therapy affect

5  the quality of mental health care?

6       A.    Oh, absolutely.

7       Q.    Can the failure to provide talk therapy create

8  a risk of harm to the patient?

9       A.    Absolutely, yes.

10      Q.    You've used a term a couple of times, CBT?

11      A.    Mm-hmm.

12      Q.    Could you define that?

13      A.    Cognitive behavioral therapy.

14      Q.    And what is that?

15      A.    That's a special sort of therapy that is mostly

16  manual driven that you need special skills on in order to

17  help patients with behavioral issues.  Together with that

18  there is another one that is called dialectic behavioral

19  therapy that is specially designed, and it was developed

20  to treat what we call borderline patients.  And there are

21  quite a few patients there that had borderline

22  characteristics.  Again, it would appear, well, he's

23  receiving dialectic behavioral therapy, but you go and

24  look at what is being done, and he's not.  First of all,

25  there was not the quantity of patients, there was not the

43

1    quality that you would expect from that.

2                    Another type of therapy is -- I mentioned

3    CBT, cognitive behavioral therapy, and dialectic

4    behavioral therapy, at least those three.  And they are

5    used in talk therapy, but you had to be fairly prepared

6    for that.

7         Q.    Is it your testimony that some of the mental

8    health staff who were purporting to provide those kinds of

9    therapy were, in fact, not qualified to do so?

10                   MS. HESMAN:  Form; foundation.

11                   THE WITNESS:  Correct.

12        Q.    BY MR. FATHI:  On how many occasions did you

13   observe that?

14        A.    Oh, many occasions.

15        Q.    I believe you also mentioned that you believe

16   there just weren't enough staff to provide talk therapy?

17        A.    Correct.

18                   MS. HESMAN:  Form and foundation.

19        Q.    BY MR. FATHI:  And how did you come to that

20   conclusion?

21        A.    I heard it and I saw it.  I would refer

22   patients for cognitive behavioral therapy or other similar

23   sort of therapy.  There was none.  I would ask my

24   patients.  There was none.  I haven't seen anyone.  By the

25   way, this shortage not only was within the mental health

44

1   area.   There was also shortage of qualified psychiatrists

2   and nurse practitioners.

3                  So you read notes and the notes were most

4   of the times administrative sort of notes, but not really

5   process notes, as we call them, in which a process of

6   treatment is being put in writing.

7                  So those were my observations generally.

8   But mostly, you know, the patient you saw, no, I'm not

9   getting anything.

10       Q.     So these were patients for whom a specific kind

11  of therapy had been ordered but they weren't receiving it?

12       A.     Correct.

13       Q.     And did you observe that once or more than

14  once?

15       A.     Oh, I think several times.

16       Q.     Does that create a risk of harm to the patient?

17       A.     Yes.

18       Q.     During your time with Corizon here in Arizona

19  did you have any familiarity with the mental health

20  evaluation process when a patient comes into the system?

21  Sometimes we call that the intake process.  Were you

22  familiar with that?

23       A.     Up to a point.

24       Q.     Did you ever have any concerns about the mental

25  health evaluation and treatment that was provided to

1    patients upon their intake into the system?

2        A.    I had concerns in two areas there.  One, many

3    of these patients were not seen by a psychiatric

4    practitioner within a reasonable time.

5              I had particular problems in that aspect

6    with the many patients who came from jails with a

7    combination of medications, or medications that did not

8    make any sense, or medications that maybe made sense but,

9    therefore, needed to be followed up much sooner than what

10   the department wanted or required.  I think it was too

11   lax.  I think it was 42 days to see any patient, you know,

12   that came in.

13             There were some issues that came up in

14   terms of that one, because I would say I cannot put my

15   name -- for instance, if I was the doctor that was going

16   to order this medication, I cannot put my name on that.

17       Q.    Let's break this down.  So you first said that

18   there were patients who were not seen by the psychiatrist

19   in a reasonable period of time?

20             MS. HESMAN:  Form.

21             THE WITNESS:  A clinically reasonable

22   period of time.

23       Q.    BY MR. FATHI:  Tell us more about that.

24       A.    One, the lack of psychiatrists or psychiatric

25   practitioners, okay.  Two, there is a policy whereby,

1    unless the patient is referred by the mental health
2    practitioner to be seen in an acute way, these patients
3    had 42 days to be seen, and we followed that, 42 days.
4    And these patients probably needed to be seen much sooner
5    than that.  So we pushed back on that and we got nowhere.
6    We pushed back on -- listen, I'm not going to put my name
7    on this medication combination that the patients come up
8    with.  Again, we got nowhere.
9              Again -- and I think the interference was
10   for the Department of Corrections, particularly from
11   Dr. Taylor, following blindly some policy created probably
12   without input of, you know, a psychiatrist.
13        Q.    Dr. Taylor is not a psychiatrist, correct?
14        A.    No, she's a psychologist.
15        Q.    So what is your basis for saying this
16   interference came from Dr. Taylor?
17        A.    Well, I started changing medications according
18   to what I thought.  And I mean, my thoughts were right.  I
19   mean, it was some combination of medications that the
20   patient got from jail that nowhere in this country of ours
21   were going to be seen as kosher medications, you know.
22             The pushback was such that then it was
23   reported to corporate that this was not acceptable, that
24   in order to change the medication and so on the patient
25   had to be seen, which I felt needs to be seen, I agree

Leonel A. Urdaneta, M.D. - 12/10/2019

47

1  with you, but then provide the number of providers that we

2  can have the patients seen when they need to be seen.  You

3  know, I don't know of any system in which patients come in

4  with medications and they can wait for 42 days.

5       Q.   And do you believe that is clinically

6  inappropriate?

7       A.   Oh, sure, yes, totally clinically

8  inappropriate.  It's not a community standard.  And in the

9  system that I had been to, no.  You know, if the patient

10 seems to be all right, yeah, maximum, maybe two weeks, ten

11 days, two weeks.

12      Q.   Were there enough psychiatric providers in the

13 Arizona Department of Corrections to see all incoming

14 patients within ten days or two weeks?

15           MS. HESMAN:  Foundation.

16           THE WITNESS:  No.

17      Q.   BY MR. FATHI:  Does not being timely seen by a

18 psychiatric provider on intake create a risk of harm to

19 the patient?

20      A.   Absolutely.

21      Q.   Did you communicate these concerns that we've

22 been discussing to anyone?

23      A.   Yes.

24           MS. HESMAN:  Form.

25      Q.   BY MR. FATHI:  To whom did you communicate?

48

```
 1        A.    I discussed that with my supervisor,

 2   Dr. Pastor, who acted and communicated with the Department

 3   of Corrections, and eventually some sort of compromise was

 4   reached.

 5               Again, we had, at the Department of

 6   Corrections, somebody who is a psychologist who doesn't

 7   understand that part of psychiatry.  We did not have

 8   somebody that we could go to who was a psychiatrist at the

 9   central office to discuss these matters.  So policies were

10   policies even if they were blighted.

11        Q.    And you're referring to Dr. Nicole Taylor?

12        A.    You bet, yes.

13        Q.    And you're saying there was no psychiatrist at

14   ADC you could speak with?

15        A.    Correct.

16        Q.    Doctor, during your time in Arizona did you

17   become familiar with the Psychotropic Medication Review

18   Board, or PMRB, process?

19        A.    (No response.)

20        Q.    It's the process by which a patient can be

21   involuntarily medicated.

22        A.    Oh, I see.  Okay, yes, I became very familiar

23   with that.

24        Q.    Did you ever have any concerns about the way

25   this process worked to approve patients for involuntary
```

Leonel A. Urdaneta, M.D. - 12/10/2019

49

```
 1   medication?

 2        A.    Oh, yes.

 3        Q.    What were those concerns?

 4        A.    First of all, the representation of the patient

 5   wasn't there.

 6        Q.    The representation?

 7        A.    Yeah.  You know, the representation of somebody

 8   advocating for the patient wasn't there.

 9        Q.    And why is that a problem?

10        A.    I think there was a misunderstanding all

11   around, particularly, again, coming from mental health

12   because they were generally the ones nominated then to be

13   the advocate for the patient.  Never saw it.  At least in

14   those that I presided, never saw it.  So the interest all

15   around was in having the patient then committed for

16   treatment one way or the other.

17              Second, we had conflict as of late,

18   particularly within the Phoenix area, whereby the patients

19   were asked to leave the room when the decision was being

20   made and so on, again, which I think is a violation of the

21   civil rights to hear from, you know, whoever is presiding

22   on the board what the decision has been.  No, we can't do

23   that.  This particular -- again, coming from mental

24   health.  They would say, no, we can't do it.  So the cards

25   were stacked against the patient all around.
```

1          There was also misunderstanding of what are

2     the bases that can be used to request a court-ordered

3     evaluation or a court-ordered treatment.  What is it

4     required.  And that was from both parties.  I think it was

5     from the psychiatric service as well as the mental health

6     service.  However, I place more responsibility on the

7     mental health service because, as they said and as

8     Dr. Taylor had said in a memo, they are in total control,

9     monitor, supervision, and responsibility, of the care of

10    patients.  And I think that sort of mentality and attitude

11    eventually filtered down to some of the direct psychiatric

12    providers.  Some of them complained to me, you know, what

13    is this.

14         Q.    I'm sorry.  I just want to make sure I'm

15    understanding.  Tell me about this memo.

16         A.    Well, the memo was, I think I mentioned it

17    earlier, when Dr. Calcote was told that he was going to

18    report to the chief of psychiatry, and the chief of

19    psychiatry was to report to the chief medical director,

20    okay, and he says, I resign.  He didn't, but then he goes

21    around internal policies and so on, reaches out to

22    Dr. Taylor, who then affirms in a memo that mental health

23    is to be -- they weren't responsible for delivery of

24    everything that is mental health, and obviously,

25    psychiatry is part of that, too.

51

1            So the effect then was demoralizing for the

2    psychiatric provider who felt that they were, again, sort

3    of satellites to whatever mental health counselor and

4    practitioners, direct ones, wanted them to do, et cetera.

5    And in terms of the psychotropic review board, they had no

6    thoughts about utilizing their own thinking, their own

7    reasoning, but instead to go by what mental health wanted

8    them to do.

9        Q.    And, Doctor, I want to make sure I understand

10   the terminology you're using.  When you say mental health,

11   you mean the sort of psychology counseling side of things

12   as distinguished from the psychiatry side of things; is

13   that correct?

14       A.    That is correct, and I'm glad that you asked

15   the question, because, again, that was part of -- from the

16   beginning I had problems with.  I think it's an artificial

17   separation.  I said we had to change.  There is no mental

18   health here and psychiatry here.  You know, everything

19   comes together.  We are part of mental health, but within

20   part of mental health, traditionally and in community

21   standards, indicate that the medically trained, the

22   clinical-trained psychiatrist is, at the end, the one

23   responsibility for all care.

24       Q.    And was that ever the case in the Department of

25   Corrections?

Leonel A. Urdaneta, M.D. - 12/10/2019

52

1      A.    Absolutely not.

2      Q.    About how many PMRB proceedings did you

3  personally participate in?

4      A.    Oh, man.  Maybe, I don't know, 20 or 30 maybe.

5      Q.    Did it ever occur that there was what you

6  consider to be an excessive delay in convening a PMRB for

7  a patient who you thought needed one?

8                  MS. HESMAN:  Form; foundation.

9                  THE WITNESS:  Yes.  There were occasions in

10  which that occurred.

11      Q.    BY MR. FATHI:  And when there's a excessive

12  delay in convening a PMRB, does that create a risk of harm

13  to the patient?

14      A.    Yes.

15      Q.    What was the cause of the delay in the cases

16  that you remember?

17                  MS. HESMAN:  Form; foundation.

18                  THE WITNESS:  Well, I think, again, a

19  confusion about the process; second, the lack of enough

20  professionals to man the process.

21      Q.    BY MR. FATHI:  So were there cases when a PMRB

22  was delayed because there was not a psychiatrist

23  available?

24                  MS. HESMAN:  Form; foundation.

25                  THE WITNESS:  Yes.

53

1      Q.    BY MR. FATHI:  About how many times did that

2  happen?

3                  MS. HESMAN:  Same objections.

4                  THE WITNESS:  You know, I really cannot

5  give you a number, but the one that I was aware of, you

6  know, one is one too many, but probably in the tens that I

7  was aware of.

8      Q.    BY MR. FATHI:  During your time in the Arizona

9  Department of Corrections did you become familiar with the

10  role of custody staff in facilitating the provision of

11  mental health care by things like escorting patients,

12  monitoring patients?

13                  MS. HESMAN:  Form.

14                  THE WITNESS:  Yeah, I became familiar with

15  what they did.

16      Q.    BY MR. FATHI:  Did you ever have any concerns

17  that the unavailability of custody staff or inappropriate

18  behavior by custody staff was interfering with treatment

19  of patients with mental illness?

20                  MS. HESMAN:  Form; foundation.

21                  THE WITNESS:  No, I don't think I ventured

22  into that.

23      Q.    BY MR. FATHI:  Were there any cases where a

24  patient couldn't receive treatment because there was no

25  officer to bring him up to the clinic?

54

1              MS. HESMAN:  Form; foundation.

2              THE WITNESS:  There were many cases

3    reported to me from the psychiatric practitioners that

4    they had been unable to see the patient because of the

5    lack of escort or similar sort of issue, and those were

6    fairly common.

7        Q.   BY MR. FATHI:  And when a patient can't be seen

8    by the provider because there's no custody escort, does

9    that create a risk of harm to the patient?

10             MS. HESMAN:  Form; foundation.

11             THE WITNESS:  Absolutely.

12       Q.   BY MR. FATHI:  Were you ever aware of either a

13   nurse's line, mental health line being canceled because

14   there weren't custody staff available?

15             MS. HESMAN:  Form; foundation.

16             THE WITNESS:  Yeah, I think there were

17   times in which that happened.

18       Q.   BY MR. FATHI:  Are you aware of it happening

19   just once or more than once?

20             MS. HESMAN:  Same objection.

21             THE WITNESS:  It happened sporadically here

22   and there in which the whole thing had to be canceled.

23       Q.   BY MR. FATHI:  Had to be canceled because of

24   unavailability of custody staff?

25             MS. HESMAN:  Same objections.

55

1                    THE WITNESS:  Correct.

2        Q.    BY MR. FATHI:  Are you ever aware of custody

3   staff sleeping on the job?

4                    MS. HESMAN:  Same objections.

5                    THE WITNESS:  No, I don't have evidence of

6   that.

7        Q.    BY MR. FATHI:  Were you aware of custody staff

8   not adequately monitoring patients who were on suicide

9   watch or other kind of watch?

10                    MS. HESMAN:  Same objections.

11                    THE WITNESS:  I'm not aware of that.

12        Q.    BY MR. FATHI:  Were you ever aware of custody

13   staff behaving inappropriately in their interactions with

14   patients with mental illness?

15                    MS. HESMAN:  Same objections.

16                    THE WITNESS:  Yeah.  There were a few

17   instances in which their response left a lot to be

18   desired, particularly considering the fact that many of

19   these patients had some degree of this or that mental

20   illness.  I had some of my patients who had been in

21   conflicts of this sort.

22        Q.    BY MR. FATHI:  Can you give me an example?

23                    MS. HESMAN:  Form.

24                    THE WITNESS:  Well, I had, for instance, a

25   patient with Tourette's.  So it is typical of Tourette's

56

1   sometimes to make remarks that come out with ticks and

2   mannerism of their own that were then misunderstood and

3   for which then they suffered the consequences of

4   administrative repercussions.

5       Q.   BY MR. FATHI:  So are you saying that the

6   patient in that example you just gave was disciplined?

7       A.   Yes.

8           MS. HESMAN:  Form; foundation.

9       Q.   BY MR. FATHI:  Do you know what discipline he

10  received?

11      A.   I don't remember exactly what was the

12  discipline, you know, status where he was put on 24-hour

13  administrative exclusion or something of this sort, but,

14  again, one, I remember now talking about this, his visits

15  were canceled, which was important to him.

16           So, yeah, there were events of this sort in

17  which a consideration of the patient's mental health

18  issues were set aside.

19      Q.   Did you ever have concerns that custody

20  officers weren't adequately or appropriately trained to

21  interact with patients with mental illness?

22           MS. HESMAN:  Form; foundation.

23           THE WITNESS:  Yes.

24      Q.   BY MR. FATHI:  And what was the basis for those

25  concerns?

1              MS. HESMAN:  Same objections.

2              THE WITNESS:  Well, what I thought was the

3    lack of, again, understanding that these people with

4    mental problems were not just felons that needed to be

5    punished one way or the other, but that there was a

6    humanness in them, and that even their behaviors, when

7    negative and inadequate, were not necessarily because they

8    were bad.  So there was, again, a lack of recognition of

9    the humanness of human beings, which is not -- you know, I

10   would tell myself, well, it's not peculiar to the

11   department.  It's kind of a pervasive sort of problem.

12              I remember when in Kansas I proposed we

13   used what we call attitude therapy in the training of

14   officers to teach them, you know, about what the meaning

15   of behaviors are.  We did some of that, also, on the MDC

16   and so on.  Never tried here.

17        Q.    BY MR. FATHI:  To your knowledge, did officers

18   in Arizona ever receive that kind of training?

19              MS. HESMAN:  Form and foundation.

20              THE WITNESS:  I think they do receive some

21   type of training.  Again, as a chief of psychiatry, I was

22   never part of that, invited for that.  It was -- all of

23   it, I think, again -- under the mental health umbrella.

24        Q.    BY MR. FATHI:  During your time in Arizona did

25   you become familiar with the procedures for placing a

1    patient on suicide watch or mental health watch?

2         A.    Yes.

3         Q.    Did you ever have any concerns about the

4    adequacy of those procedures for placing or maintaining a

5    patient on suicide watch?

6                    MS. HESMAN:   Form.

7                    THE WITNESS:   My main concern, again, was

8    that everybody was almost seen the same way.   The work

9    that was being done was not driven by the need to know

10   what was driving the suicide thoughts and so on of the

11   patient.   There was a propensity more to look at the

12   superficial sort of reasoning, or she wants to be next to

13   her lover because her lover now is on a suicidal watch.

14   So she wants to be next to her, and that's bad.   That's

15   not so.   I will say, well, no, that's abandonment.

16                    There is a humanness there that you have to

17   understand.   You have to work with the patient.   Say,

18   okay, this behavior has this meaning, and he's not just

19   manipulating to be next to her and be lovers, you know.

20   Never got anywhere.

21                    So in the process, again, there was a total

22   lack of understanding of the humanness of human beings who

23   are going through this sort of a thing.

24        Q.    BY MR. FATHI:   And that lack of understanding

25   was on the part of the mental health staff?

```
 1                   MS. HESMAN:  Form; foundation.

 2                   THE WITNESS:  Yes.

 3       Q.    BY MR. FATHI:  Did you ever have a concern

 4    about the number of interactions between mental health

 5    staff and patients on watch that occur at cell-front with

 6    the patient locked in the cell and the mental health

 7    person standing outside the cell?

 8                   MS. HESMAN:  Form; foundation.

 9                   THE WITNESS:  Yes.

10       Q.    BY MR. FATHI:  What were your concerns about

11    that?

12                   MS. HESMAN:  Same objections.

13                   THE WITNESS:  One, confidentiality issues.

14    Two, about the setting, the way of doing things, not being

15    optimal for the establishment of rapport and a

16    relationship.  Three, the superficial way of assessing

17    these patients when they are at the most critical point

18    and then coming out with superficial explanations.  Again,

19    you know, he's playing games, or he's attention seeking,

20    or he's this and he's that.  Those are very basic stuff,

21    you know.

22                   I mean, these are the patients who are, as

23    I said, in the most critical part of their life.  And

24    they're not being allowed even to have the opportunity to

25    engage with another person that might listen and
```

60

1    understand their plight.  You know, it's distressing.

2    This was the typical way of doing things.

3         Q.    BY MR. FATHI:  Why was that the typical way of

4    doing things?

5              MS. HESMAN:  Form; foundation.

6              THE WITNESS:  Well, one, is the mental

7    health worker being in a rush, having too much to do, and

8    the other side of that lacking enough help.  Two, the

9    facility themself not having enough physical rooms and

10   offices and so on to be able to do this.

11             I think the main thing was just to get the

12   job done and that's it, according to the policy, and this

13   is what I was indicating earlier, that there are a lot of

14   policies that were being followed that way, but the

15   quality of it wasn't there.

16        Q.    BY MR. FATHI:  Can excessive reliance on the

17   cell-front encounters for someone who is on suicide watch

18   create a risk of harm to the patient?

19             MS. HESMAN:  Form; foundation.

20             THE WITNESS:  Absolutely.

21        Q.    BY MR. FATHI:  Did you ever express your

22   concern about the extent to which cell-front encounters

23   were being used?

24        A.    I did in a general way.

25        Q.    And to whom?

Leonel A. Urdaneta, M.D. - 12/10/2019

61

```
 1      A.    Meaning, again, to the director of the vice
 2   president of mental health.
 3      Q.    And that person is --
 4      A.    Dr. Calcote.
 5      Q.    Dr. Calcote.  And did that ever result in any
 6   change that you could tell?
 7                MS. HESMAN:  Foundation.
 8                THE WITNESS:  Not really.
 9      Q.    BY MR. FATHI:  Did you ever discuss this with
10   Dr. Nicole Taylor?
11      A.    No, I did not.
12      Q.    Did you ever become concerned about the
13   brevity, the short duration of some interactions between
14   mental health staff and patients on suicide watch?
15                MS. HESMAN:  Form; foundation.
16                THE WITNESS:  Yes.
17      Q.    BY MR. FATHI:  Tell me about that.
18      A.    All their interest was you have thoughts of
19   suicide today and, again, done at the cell level without
20   any exploration of the circumstances, the internal
21   conflict that the patient was in, in order to form an idea
22   of why this is happening.  And I think that was kind of
23   rampant.  Again, I don't want to paint a picture that this
24   was everybody.  There were a few mental health counselors
25   that did a great job, but I think, in general, that was
```

62

1    the exception.

2         Q.    Do you think the problem was the individual

3    mental health counselors?  Do you think the problem was a

4    structural problem of not enough staff?  Or do you think

5    it was both?

6              MS. HESMAN:  Form and foundation.

7              THE WITNESS:  I think most of it was the

8    general lack of appreciation, the general lack of passion

9    for working with human beings.  And, you know, I cannot

10   say this was a particular person because sometimes we are

11   at the mercy of the policy and at the mercy of whatever is

12   being told.  But I think I placed more responsibility for

13   this on the people who were supposed to be guiding the

14   whole system.

15        Q.    BY MR. FATHI:  And who were those?

16        A.    And I think it's, again, the Department of

17   Corrections, through their representative, Nicole Taylor,

18   and the vice president of mental health, Dr. Calcote.  I

19   think they needed to set the tone and it wasn't there.

20   And I heard this, by the way, from -- some of those that I

21   mentioned were very good, very good at caring for human

22   beings, very good, you know.  I learned some from them.  I

23   hope they learned from me.  We had conversations, but I

24   also would hear their lack of enjoyment out of what they

25   were doing, that they wanted to do, because of the general

1    sense of the department that indicated we are here, just

2    fill up numbers.

3              In terms of that one, you know, one of -- I

4    recall -- I don't want to make this sound like it was -- I

5    don't doubt it that I made mistakes.  You know, I don't

6    doubt that I needed to hear also from some people

7    sometimes, hey, you know, look at this, and I did.  But I

8    remember a conversation I had with this vice president of

9    mental health.

10    Q.    Dr. Calcote?

11    A.    Dr. Calcote.  And I told him, no, you know, you

12    cannot continue this and that and that, you know.  And I

13    said, but you know, sometimes I ask myself, and I am

14    right, do I have to adapt to what I see.  And the response

15    was, well, I think we need to hear from people like you.

16              So we are aware of the bad things we are

17    doing.  But then months after I asked myself, had that

18    gotten anywhere.  I don't think it ever got anywhere.  The

19    things continued the same, and actually they got worse,

20    particularly once we found out that a new company was

21    coming in, and, therefore, what Corizon had wanted to do

22    and so on was out of the picture now.

23              So in another conversation talking about

24    those sort of things, and particularly talking about

25    talking therapy and medications and the treatment that the

64

1  patient was receiving, okay, and the idea was, well, you

2  cannot treat patients here the way you treat them at

3  Miningers.

4       Q.    Who told you that?

5       A.    Dr. Calcote.  And I said, well, do not -- to a

6  certain degree you might be right, in my mind.  And I

7  started thinking of it and then initially say, well, I had

8  to be realistic.  We don't have here the means, the tools

9  that we have with Miningers on the one hand, but then I

10  change my mind.  I said, no, that's not true.

11            You have to have a system that supports

12  treatment, and that's what's lacking.  And then we can do

13  here, too, what they do at Miningers or at the

14  Massachusetts general hospital or anywhere else.  You had

15  the basic tools in order to be able to be empathic,

16  establish a therapeutic relationship, and care for human

17  beings.  And I think that's what lacks.

18       Q.    Do you think that inadequate staffing also

19  played a role in the use of or the occurrence of very

20  short encounters?

21            MS. HESMAN:  Form and foundation.

22            THE WITNESS:  Oh, absolutely.  Patients

23  sometimes -- those that I had under my care, sometimes

24  they would complain about that, and that went for both the

25  psychiatric service as well as the mental health.

Leonel A. Urdaneta, M.D. - 12/10/2019

65

1      Q.    BY MR. FATHI:  So you're saying there were

2   staffing shortages on both sides?

3      A.    Oh, yes.

4            MS. HESMAN:  Form and foundation.

5            THE WITNESS:  And some patients would tell

6   me, I don't want to see somebody on television there five

7   minutes and now you go and say, take this or take that.

8      Q.    BY MR. FATHI:  We'll get to that in a minute.

9   You also mentioned earlier that patients on suicide watch

10  would often be seen by a different staff person every day.

11  Did I hear that?

12     A.    Yes.

13     Q.    Were you concerned about that?

14     A.    Absolutely.

15     Q.    And why were you concerned about that?

16     A.    Again, that deprives the patient of developing

17  rapport with another person.  They would tell you, I don't

18  have to repeat the same thing from one day to the other,

19  you know.  They should have known from yesterday that I

20  did A, B, and C, and now they're asking me whatever that

21  they should have known.  So patients complain about that.

22     Q.    Does that lack of continuity or consistency

23  affect the quality of patient care?

24     A.    Absolutely.

25     Q.    Can it create a risk of harm to the patient?

Leonel A. Urdaneta, M.D. - 12/10/2019

66

1        A.      Absolutely, yes.

2        Q.      In your opinion, is it possible to adequately

3   assess a patient's suicide risk in a five-minute

4   cell-front encounter?

5        A.      It's not.

6        Q.      Is it possible to adequately assess a patient's

7   suicide risk in a three-minute cell-front encounter?

8        A.      Even less.

9        Q.      Is it possible to adequately assess a patient's

10  suicide risk in a two-minute cell-front encounter?

11              MS. HESMAN:  Form for the whole line of

12  questioning.

13              THE WITNESS:  Absolutely not.

14              (Recess from 11:29 a.m. to 11:48 a.m.)

15       Q.      BY MR. FATHI:  Doctor, before the break we were

16  talking about suicide prevention.  While you were at

17  Corizon in Arizona was a written suicide risk assessment

18  instrument always used with patients on watch?

19              MS. HESMAN:  Form; foundation.

20              THE WITNESS:  It was used.  I don't know

21  that it was always -- you know, to have direct observation

22  of that.

23       Q.      BY MR. FATHI:  Is it preferable to use a

24  written suicide risk assessment instrument?

25              MS. HESMAN:  Form; foundation.

1          THE WITNESS:  It's helpful.  However, it
2  should not be the end of it.
3      Q.    BY MR. FATHI:  What do you mean by that?
4      A.    Well, I think more important than a written
5  assessment is a talking assessment.  The assessment --
6  reached out once you have met with the patient and
7  discussed matters and understand the patient.
8      Q.    Okay.  Would you turn to Exhibit 1, please, the
9  list of patients.  Doctor, Exhibit 1 is a list of 16
10 patients who died by suicide in the Arizona Department of
11 Corrections in the approximate time that you were there.
12 Were any of these suicides, in your opinion, preventable?
13          MS. HESMAN:  Form; foundation.
14          THE WITNESS:  I'm sorry.  I cannot tell you
15 specifically because I don't know.  I would have to review
16 the cases again.  So I cannot give you an absolute answer
17 to that.
18     Q.    BY MR. FATHI:  Okay.  Are there any of these
19 suicides that you believed resulted in whole or in part
20 from inadequate mental health care?
21          MS. HESMAN:  Form; foundation.
22          THE WITNESS:  Again, I think this would
23 need to be looked at.  And I suppose many of these, during
24 my time there, were cases that I might have examined and
25 gone over, and I suppose that maybe policies and

68

1   procedures were followed to a certain degree.  But my

2   general concern in many of these cases was that, again,

3   policies and procedures do not reflect quality and that

4   there might have been issues in the quality that brought

5   about the final outcome.

6        Q.    BY MR. FATHI:  Were any of these patients

7   people who you treated personally?

8        A.    Let's see.  Number 11, I knew of him.  He was

9   not under my care at the time.  Number 6, also knew of the

10  patient.  That's about the extent I can go this time with

11  this.

12       Q.    Okay.  Just so I understand your testimony, you

13  believe that you treated patient 11 at some point?

14       A.    Correct.

15       Q.    And I believe you were still working in ADC at

16  the time of his suicide; is that right?

17       A.    Correct.

18       Q.    Were you treating him at the time of his

19  suicide?

20       A.    I was not.

21       Q.    Same questions about patient 6, you treated her

22  at some point?

23       A.    I believe I treated her at some point, yes.

24       Q.    And you were employed in ADC at the time of her

25  suicide, correct?

69

```
 1        A.     Correct.
 2        Q.     Were you treating her at the time of her
 3   suicide?
 4        A.     No, I was not.
 5        Q.     Okay.  So your testimony is that, without more
 6   information, you're just not able to say whether any of
 7   these suicides were preventable?
 8                    MS. HESMAN:  Form.
 9                    THE WITNESS:  Correct.
10        Q.     BY MR. FATHI:  And you're not able to say
11   whether any of them resulted, in whole or in part, from
12   inadequate mental health care?
13                    MS. HESMAN:  Form.
14                    THE WITNESS:  Correct.
15        Q.     BY MR. FATHI:  Okay.  Doctor, are you familiar
16   with the mortality reviews and psychological autopsies
17   that are performed when a patient dies by suicide?
18        A.     Yes, I am.
19        Q.     Were you involved in the process of preparing
20   those documents?
21        A.     No, I was not.
22        Q.     Why would you not be involved in that process?
23                    MS. HESMAN:  Form; foundation.
24                    THE WITNESS:  It wasn't part of the policy.
25   And, yeah, I don't recall even a single case in which the
```

```
 1   chief of psychiatry would be an essential part of the
 2   process and procedures and policies.
 3        Q.    BY MR. FATHI:  Do you think it would have made
 4   sense to have the chief of psychiatry to be involved in
 5   mortality reviews and psychological autopsies?
 6                   MS. HESMAN:  Form; foundation.
 7                   THE WITNESS:  Absolutely.
 8        Q.    BY MR. FATHI:  And what would be the benefits
 9   of that?
10                   MS. HESMAN:  Same objections.
11                   THE WITNESS:  Looking at it from the
12   medical psychiatric point of view and see what happened.
13        Q.    BY MR. FATHI:  As I understand your testimony,
14   you simply had no role in the process?
15                   MS. HESMAN:  Form.
16                   THE WITNESS:  Correct.
17        Q.    BY MR. FATHI:  Would you see the completed
18   mortality review or psychological autopsy at some point?
19                   MS. HESMAN:  Form.
20                   THE WITNESS:  I was not privy to that.  I
21   was told sometimes, okay, what they had found.
22        Q.    BY MR. FATHI:  But it's not something that
23   would be given to you in the ordinary course of things?
24        A.    Correct.
25        Q.    Did you ever express the view maybe the chief
```

```
 1   psychiatrist should be involved in mortality reviews for
 2   people who died by suicide?
 3                  MS. HESMAN:  Form.
 4                  THE WITNESS:  Yeah, I did.
 5        Q.    BY MR. FATHI:  To whom did you express that?
 6        A.    To Dr. Calcote.
 7        Q.    And what was his response?
 8        A.    Well, we'll see.  It never got anywhere.  I
 9   don't recall specifically what he said, but, as usual, the
10   answer was, okay, we have some hope here, but the hope
11   didn't materialize.
12        Q.    With the understanding that you weren't
13   involved in the process, did you have any concerns about
14   the process by which mortality reviews and psychological
15   autopsies were done of patients who died by suicide?
16                  MS. HESMAN:  Form; foundation.
17                  THE WITNESS:  Absolutely.
18        Q.    BY MR. FATHI:  And what were those concerns?
19        A.    Again, the total examination of the
20   psychological reason leading to the event.
21        Q.    Tell me what you mean by that.
22        A.    Well, understanding what was within the patient
23   that led to that particular outcome, and from there you
24   had a lot of possibilities that not only showed within
25   sentinel events of this sort, but even showed in other
```

1    areas, ordinary areas of concerns.  You know, there were

2    times when a difficult patient -- I remember specifically

3    one that Eyman transferred them to Florence in which the

4    whole system was so perverted against the fellow, and he

5    was so hard looking for a way out of his misery.  I

6    requested time to be able to go and have the team to

7    gather and explain the mechanism by which this was

8    happening, that the teams themselves, or the lack of them,

9    anyway, that the several disciplines had interest in,

10   okay, or that the several disciplines following the

11   delivery of care were missing points, but it never got

12   anywhere.

13                  So if you're going to have a sentinel event

14   that is of more gravity than an ordinary sort of a

15   difficult case, then it makes sense to have all of the

16   disciplines participating so we can contribute our part of

17   the knowledge of what happened, and it was not happening.

18   I think the way I saw it, it became more of an

19   administrative sort of exercise.

20       Q.    The patient you were just discussing, did he

21   die by suicide?

22       A.    No, I hope he hasn't.

23       Q.    When you say it became an administrative

24   exercise, what do you mean by that?

25       A.    Well, it became then, let's get together to see

Leonel A. Urdaneta, M.D. - 12/10/2019

73

1    what policies were followed or not followed.  That's it.

2    There was not a psychological understanding of what

3    happened.  And when it was mentioned in the few that I was

4    made aware of, then the understanding was a little bit,

5    you know, jaded or perverted, you know, the usual sort of

6    thing.  Manipulative or he was borderline or she was

7    borderline, whatever that meant, but there was no more

8    than that.

9         Q.    Is one of the purposes of doing a mortality

10   review or a psychological autopsy to learn lessons and do

11   things better in the future?

12                   MS. HESMAN:  Form; foundation.

13                   THE WITNESS:  Absolutely.

14        Q.    BY MR. FATHI:  Did it ever occur, while you

15   were in ADC, that someone said, okay, as a result of this

16   mortality review, we're now going to do this thing

17   differently?

18                   MS. HESMAN:  Form; foundation.

19                   THE WITNESS:  I don't remember.  I don't

20   remember specifically in that sense.

21                   MR. FATHI:  Well, let me ask it a different

22   way.

23                   Can you recall any change in policy or

24   practice that you were ever told about that occurred

25   because of a mortality review or a psychological autopsy?

1          MS. HESMAN:  Form; foundation.

2          THE WITNESS:  I do not.

3     Q.    BY MR. FATHI:  We were talking a little bit

4  earlier about the Phoenix facility and the licensed unit

5  there.  Is that Baker Ward?

6     A.    Well, Baker is the acute.  All the facilities

7  there are licensed.  You know, there's subacute, and then

8  there is a residential sort of setting, but that is all

9  within the same license.

10    Q.    Okay.  Are there some patients with mental

11 illness who need an inpatient or hospital level of care?

12    A.    Absolutely, yes.

13    Q.    Are there some patients in the Arizona

14 Department of Corrections who need a hospital or inpatient

15 level of care?

16    A.    Yes.

17    Q.    During your time with ADC did you ever develop

18 any concerns about ADC's ability to provide a hospital or

19 inpatient level of care?

20         MS. HESMAN:  Form; foundation.

21         THE WITNESS:  Yes.

22    Q.    BY MR. FATHI:  And what were those concerns?

23    A.    The lack of enough space, dedicated teams for

24 the provision of care for the mentally ill.

25    Q.    So let's break that down.  Tell me about the

75

1   lack of enough space.

2        A.    The facilities that they have now are

3   inadequate to deal with the many severely mentally ill

4   patients that we have spread throughout the whole system.

5   Many patients are suffering in other facilities because

6   there is not room, not space in the Baker unit, for

7   instance.

8                I think they need, also, the other subacute

9   and the rehabilitative, they call it, area within the

10  Phoenix facility.  They also need more dedicated staff and

11  more space to do their job adequately.

12       Q.    I believe you just said that there are patients

13  who clinically should be at Phoenix but who are instead at

14  other facilities; is that right?

15               MS. HESMAN:  Form.

16               THE WITNESS:  That is correct.

17       Q.    BY MR. FATHI:  And if a patient should be at

18  Phoenix but is, in fact, at a different facility, does

19  that create a risk of harm to the patient?

20               MS. HESMAN:  Form.

21               THE WITNESS:  Absolutely.

22       Q.    BY MR. FATHI:  You also talked about, I think

23  you said, a lack of dedicated teams?

24       A.    Yes.

25       Q.    Tell us about that.

1        A.    Well, lack of psychiatrists, mental health,

2    nursing, officers, different form of therapists, fully

3    dedicated to the acute level of care, to the other one, to

4    the subacute, the residential care.  They were all the

5    time rotated.  They were short here and then they would

6    put somebody else there.  This was particularly troubling

7    in the very acute Baker unit where you couldn't count on

8    that you were going to have the same people today that you

9    had tomorrow.  Nursing probably was the best one doing

10   their job this way in that unit.

11       Q.    During your time with ADC did Baker unit have

12   adequate numbers of qualified mental health staff to care

13   for the patients?

14             MS. HESMAN:  Form and foundation.

15             THE WITNESS:  Absolutely, no, they didn't.

16       Q.    BY MR. FATHI:  Did you have concerns about the

17   physical plant at Baker unit?  By that I just mean the

18   design of the building.

19       A.    Yes.  Patient, for instance, at times had to be

20   put in areas where they had very limited space and all

21   behind bars.  They could barely lay there to sleep, let

22   alone to do any other activities.  There were insufficient

23   cells for many of these patients.

24       Q.    Let me just follow up on that.  You talked

25   about a construction of the cells so that the patient had

77

1  very little space?

2      A.    Yes.

3      Q.    Is that sort of setting appropriate for a

4  patient who needs a hospital level of care?

5      A.    Oh, absolutely not.  You won't find that

6  anywhere.

7      Q.    Does that sort of physical setting create a

8  risk of harm to the patient?

9              MS. HESMAN:  Form.

10             THE WITNESS:  Yes.

11     Q.    BY MR. FATHI:  Are you familiar with a patient

12  at Phoenix -- he was at Phoenix at one time -- who was

13  required to wear mittens and a plastic brace that looked

14  kind of like a turtle shell?

15     A.    Yes, I think I know.

16     Q.    Do you know who I'm talking about?

17     A.    I think so.

18     Q.    Do you know his name?

19     A.    I think so.

20     Q.    Would you write down his name as next in order?

21  This will be number D.

22     A.    I think it is there.

23     Q.    Oh, it is there?  What number is it?

24     A.    A.

25     Q.    It's now A.  Okay.  But you have that patient

1   in mind?

2       A.    Yes.  Somebody else, too, with similar

3   characteristics, but that one was what I had in mind.

4       Q.    Was this a patient that you personally took

5   care of?

6       A.    Yes.

7       Q.    Was that patient able to receive adequate

8   mental health care in the Arizona Department of

9   Corrections?

10              MS. HESMAN:  Form; foundation.

11              THE WITNESS:  No.

12      Q.    BY MR. FATHI:  And why not?

13      A.    He was eventually transferred to the inpatient

14  area of care as to innumerable self-inflicted injuries

15  after in that particular unit where there were many

16  self-injurious patients.  And he had ended up in the

17  emergency room or in the hospital several times.

18              I made a specific trip to that facility to

19  discuss the case, and it was obvious that nursing -- the

20  medical director there was asking that this patient be

21  transferred to the inpatient level of care, which I

22  supported.  I said we had to do it.  It wasn't done.  By

23  the time it was done he was in the condition that you

24  described.

25      Q.    Do you know who blocked the transfer when you

1    advocated for it?

2        A.    I think it was Dr. Calcote.

3        Q.    Which facility was this patient at when you

4    were trying to get him transferred to Baker?

5        A.    Eyman.

6        Q.    And you said there are a lot of patients there

7    who self-injure?

8              MS. HESMAN:  Form; foundation.

9              THE WITNESS:  Oh, yes.  They have a unit

10   specifically designed where they put them all together.

11       Q.    BY MR. FATHI:  They put patients who

12   self-injure together?

13       A.    Yes.

14       Q.    Do you know what the name of that unit is?

15       A.    I have forgotten.

16       Q.    The patient that we're speaking of, was he

17   receiving adequate mental health treatment at Eyman?

18             MS. HESMAN:  Form; foundation.

19             THE WITNESS:  I do not think so.

20       Q.    BY MR. FATHI:  And you said he was eventually

21   transferred to the Baker unit, correct?

22       A.    Correct.

23       Q.    Doctor, my next few questions are about

24   telepsychiatry and telepsychology, and I am going to

25   define that as the provision of mental health services via

Leonel A. Urdaneta, M.D. - 12/10/2019

80

1    a video screen by mental health person who is not

2    physically in the same place as the patient.  Do you

3    understand my definition?

4         A.    Yes.

5         Q.    Okay.  Did you at some point become familiar

6    with the way telepsychiatry and telepsychology were used

7    in the Arizona Department of Corrections?

8         A.    With the telepsychiatry, yes.

9         Q.    But not a telepsychology?

10        A.    Not the telepsychology part.

11        Q.    Okay.  Well, let's stick with telepsychiatry

12   then.  Did you have any concerns about the way

13   telepsychiatry was used in the Arizona Department of

14   Corrections?

15        A.    Yes.

16              MS. HESMAN:  Form.

17              THE WITNESS:  Put it this way:  I had

18   universal concerns, meaning the practice of psychiatry

19   this way.  However, as time went on I realized that, given

20   the circumstances, the shortages, and so on and so on,

21   that it was an adequate compromise if it was well done.

22        Q.    BY MR. FATHI:  Okay.  Well, let's go through

23   those different steps.  You first said you had universal

24   concerns.  What did you mean by that?

25        A.    I mean by that, how can you establish rapport

81

1   with patients when they cannot see you, you cannot see

2   them.  However, those concerns, little by little, as I

3   became more acquainted with different practitioners, I

4   think they went away.  I think what mattered was the

5   provider being able to transmit that rapport, that

6   interest in patients, across the TV set.  So I said, okay,

7   it's a good compromise.

8       Q.   When you say compromise, what do you mean by

9   that?

10      A.   Compromise between the traditional way of doing

11  things, you know, face-to-face, and on the other hand, the

12  lack of enough psychiatric providers to do the work.

13      Q.   So are you saying that face-to-face psychiatry

14  would be better, but telepsychiatry is better than

15  nothing?

16      A.   Nothing at all, yes.

17              MS. HESMAN:  Form.

18      Q.   BY MR. FATHI:  Okay.  So it sounds like you

19  believe that it was appropriate, at least in some cases,

20  for ADC to use telepsychiatry?

21      A.   Yeah.  I believe it's better than nothing.

22      Q.   Is it as good as face-to-face psychiatry?

23      A.   I do not think so.

24      Q.   And are there some patients for whom

25  telepsychiatry is not appropriate?

Leonel A. Urdaneta, M.D. - 12/10/2019

82

1     A.    Yes.

2     Q.    Tell me about those.

3     A.    There are some patients that are delusional,

4  for instance, who are not going to trust whoever is at the

5  other side, you know, the provider, without including in

6  their delusions all of these tools and so on that are

7  being used.  Are you plotting something, you know, is

8  somebody else there, and so on.  There's some patients, by

9  the nature of their own psychiatric disorder, this is not

10 an adequate tool for.

11    Q.    Did you ever become concerned about, in the

12 Arizona Department of Corrections, telepsychiatry was

13 being used with some patients for whom it wasn't

14 appropriate?

15               MS. HESMAN:  Form.

16               THE WITNESS:  Yeah.  I think I had

17 opportunity to hear from one, two, three patients that,

18 you know, I don't feel comfortable with it.  Absolutely,

19 yes.

20    Q.    BY MR. FATHI:  What was done in those cases?

21 Were those patients then allowed to see a psychiatrist

22 face-to-face?

23               MS. HESMAN:  Form; foundation.

24               THE WITNESS:  Not necessarily, no.  Many of

25 the places don't have anybody face-to-face.

Leonel A. Urdaneta, M.D. - 12/10/2019

83

1       Q.    BY MR. FATHI:  If telepsychiatry is not
2    clinically appropriate for a given patient but there's no
3    face-to-face psychiatrist available, does that create a
4    risk of harm for the patient?
5       A.    Yes.
6                   MS. HESMAN:  Form.
7       Q.    BY MR. FATHI:  Did you ever become concerned
8    that the telepsychiatry provider didn't have adequate
9    information about the patient that he or she was treating?
10                   MS. HESMAN:  Form; foundation.
11                   THE WITNESS:  I think the presence of
12   electronic medical records allowed, you know, for a good
13   source of information all around.  My main concern was
14   that the communication among the disciplines providing
15   care was not as robust as they should be, and therefore,
16   this psychiatric provider might not have access to what
17   the nursing discipline had to say, which was very often
18   the case.
19                   All of this, again, was organized in such a
20   way that mental health had their hands in it.  Mental
21   health had the organization of it.  Mental health
22   scheduled them and so on.  And I think there was then a
23   pervasive demoralization of the other disciplines,
24   including the psychiatric providers themselves.
25                   So the effect of it was not necessarily

84

1    because of the nature of telepsychiatry with all of its

2    disadvantages that we mentioned, but also the moral effect

3    that it had in the teams as a whole, okay, that it further

4    punctuated the hijacking, I would call it, or the delivery

5    of care by a single discipline that thought of itself as

6    having in their hands the final say of anything with the

7    exclusion of other disciplines like nursing and even the

8    psychiatric provider.

9              So what I saw then in the psychiatric

10   provider was the same.  So I come in here, listen for five

11   minutes, throw medications, and that's it.  And they were

12   not a participant, therefore, in the provision of care

13   within a team concept.

14        Q.   BY MR. FATHI:  Is it harder to have an

15   effective team with a telepsychiatrist than with an

16   on-site psychiatrist?

17              MS. HESMAN:  Form.

18              THE WITNESS:  It is harder, but it can be

19   done.

20        Q.   BY MR. FATHI:  Did you ever have any concerns

21   that some information is lost through telepsychiatries?

22   For example, that it may be more difficult to notice

23   abnormal movements?  Is that a concern that you have?

24              MS. HESMAN:  Form.

25              THE WITNESS:  Yes.  There is a particular

Leonel A. Urdaneta, M.D. - 12/10/2019

85

1    exam that we need to periodically do on patients.  It's

2    called the AIMS.  Most of the ones that were present were

3    done by the tele, and you can't do that.  You know, you

4    have to actually touch the patient and, you know, have

5    them move and so on.  So we looked into ways of changing

6    that and actually maybe having a nurse train for this, but

7    again, there were barriers between one and the other

8    discipline, most of them due to we don't have the

9    personnel.  We are very short of nurses.  We are very

10   short of everything.  So how can we take one just to do

11   those exams when there are other, more priority, larger

12   priorities with the nursing discipline.  So we understood

13   that.

14                    But yes, certainly telepsychiatry won't be

15   a good medium to do the AIMS, movement disorders,

16   particularly.

17        Q.    BY MR. FATHI:  What is the AIMS exam trying to

18   detect?

19        A.    Abnormal involuntary movements due to

20   antipsychotic use.

21        Q.    And those involuntary movements, if not

22   detected and treated, can become permanent, correct?

23                    MS. HESMAN:  Form.

24                    THE WITNESS:  Correct, yes.

25        Q.    BY MR. FATHI:  You also mentioned -- I think

1   you alluded to the duration of the telepsych appointments.

2   Did you have any concern that those appointments were too

3   brief to be clinically effective?

4                   MS. HESMAN:  Form.

5                   THE WITNESS:  Yes.

6        Q.   BY MR. FATHI:  Tell me about that.

7        A.   I had patients themselves where all I had to do

8   was to listen to complaining five minutes and, you know,

9   I'm being told this medication change for this and so on.

10  And sometimes the changes were not adequate enough, you

11  know.  You need time to assess these sort of situations.

12                   The sad thing was that the psychiatric

13  providers said, well, we're going to rely on what we might

14  hear from the mental health counselors or from the nursing

15  department about a particular patient I am seeing.  But

16  then, on the other hand, there was the statement that

17  mental health particularly was usurping their role.  So it

18  was a no-win situation.  It needed to be understood and

19  needed to be solved, but the system was already in so much

20  of a hole that it was going to be immobile without the

21  collaboration of all the disciplines.

22       Q.   In your opinion, is a five-minute

23  telepsychiatry session adequate to make an appropriate

24  assessment of the patient?

25                   MS. HESMAN:  Form.

87

1                    THE WITNESS:  I don't think so.

2          Q.    BY MR. FATHI:  Doctor, my next questions are

3    about isolated confinement.  And I'm going to define that

4    as the state of being confined to a cell, either alone or

5    with another prisoner, for all but 14 hours a week or

6    less.  So all but two hours a day or less you're in the

7    cell.  And I'm using the term isolated confinement,

8    regardless of what other terms ADC might use for it, like

9    max custody, or detention, or restrictive housing, or

10   anything else.  Do you understand my definition?

11         A.    Yes.

12         Q.    When you were at ADC did you become familiar

13   with the circumstances under which some prisoners are held

14   in isolated confinement?

15                    MS. HESMAN:  Form; foundation.

16                    THE WITNESS:  To some extent.

17         Q.    BY MR. FATHI:  Did you ever develop any

18   concerns about the use of isolated confinement in ADC?

19                    MS. HESMAN:  Form; foundation.

20                    THE WITNESS:  Yes.

21         Q.    BY MR. FATHI:  And what were those concerns?

22         A.    One, the lack of adequate assessment of the

23   circumstances from the patient perspective as well as from

24   the external aspect that had led to the isolation of the

25   patient.  Two, the consequences of isolation.  I had a

1    patient who had developed psychotic symptoms, many of them

2    coming from isolation.  I remember one particularly that

3    developed, for instance, voices because there was no one

4    for this amount of time that he could talk to.  He was

5    totally isolated.  So rather than going totally bizarre,

6    he developed these voices that he heard through vents and

7    so on that he had some sort of contact with.

8                      So, you know, the effect of isolations are

9    very, very damaging to the human mind even when they are

10   just for a short amount of time rather than being provided

11   some sort of human contact.

12       Q.    Did you encounter patients in ADC who you

13   believe had been damaged by isolated confinement?

14       A.    Yes.

15       Q.    About how many such patients did you encounter?

16       A.    Well, you know, I had a limited amount of

17   patients in my -- let's call it caseload, for lack of

18   other words.  But in those limited amount, yes, I had

19   several ones.  One of those, C over here comes to mind.

20       Q.    As a patient whose mental illness was

21   aggravated by isolated confinement?

22       A.    Yes.

23                   MS. HESMAN:  Belated objection to form.

24       Q.    BY MR. FATHI:  Did you have any concern that

25   isolated confinement and the restrictions on those

```
 1   patients makes it more difficult to provide effective
 2   mental health care?
 3               MS. HESMAN:  Form; foundation.
 4               THE WITNESS:  Absolutely.
 5        Q.    BY MR. FATHI:  Tell us about that.
 6        A.    First of all, the effect of the whole caring
 7   system.  These patients become, in a way, forgotten.  They
 8   become labeled then.  So I think this has a very quiet
 9   sort of influence in them, a moral aspect of the whole
10   system.  We become demoralized.  We see them as bad and so
11   on.
12               Second, once you are in isolation you're
13   going to have a label, and there is no way that it's going
14   to be taken off of you by anyone.  Those being seen as
15   troubling, misbehaving, and always needing a strong hand
16   to handle you, they become forgotten.  There's no way that
17   anybody is going to be feeling comfortable handling your
18   case and getting to the base of it all.
19               You know, I cannot talk for the officers
20   themselves, but I think it also has a very damaging effect
21   on the way officers look at these patients.
22        Q.    And are you aware of a requirement that, with
23   certain patients in isolation, mental health staff have to
24   wear a helmet with a visor?
25               MS. HESMAN:  Form.
```

90

1              THE WITNESS:  Yes.

2        Q.    BY MR. FATHI:  In your opinion, is that

3    requirement conducive to effective mental health care?

4              MS. HESMAN:  Form; foundation.

5              THE WITNESS:  Absolutely not.

6        Q.    BY MR. FATHI:  Can you explain why that is?

7        A.    It's sending the message, again, to the patient

8    that you are now one of us.  That at the least damaging

9    level, you know, you're so far off or whatever that we had

10   to protect ourself from you as if you were some sort of a

11   very sick, contagious sort of animal.  At a higher level

12   it might worsen psychotic components of the patient's

13   condition.

14              MR. FATHI:  Why don't we take a lunch

15   break.

16              (Recess from 12:20 p.m. to 1:43 p.m.)

17       Q.    BY MR. FATHI:  Before we move on to a new

18   topic, there's just a couple of things I wanted to clean

19   up from before lunch.

20              You testified that at one point the

21   telepsych psychiatrists were essentially doing the AIMS

22   test via video; is that correct?

23              MS. HESMAN:  Form.

24              THE WITNESS:  Correct.

25       Q.    BY MR. FATHI:  Did that change at any point

  1  before you left Corizon?

  2              MS. HESMAN:  Form; foundation.

  3              THE WITNESS:  I do not believe it did.

  4      Q.   BY MR. FATHI:  Okay.  You also testified that

  5  you as chief psychiatrist were not involved in the psych

  6  autopsy or mortality review process; is that right?

  7      A.   Correct.

  8      Q.   Is there anyone involved in that process who's

  9  qualified to evaluate the medication side of the patient's

 10  care?

 11              MS. HESMAN:  Form; foundation.

 12              THE WITNESS:  Not from what I know.  I

 13  don't believe there was anyone there.

 14      Q.   BY MR. FATHI:  Would that need to be a

 15  psychiatrist or a psychiatric nurse practitioner?

 16              MS. HESMAN:  Form; foundation.

 17              THE WITNESS:  It needs to be a

 18  psychiatrist.

 19      Q.   BY MR. FATHI:  We talked a little bit before

 20  lunch about the gentleman who was required to wear mitts

 21  and a sort of turtle shell thing.  Do you remember him?

 22      A.   Yes.

 23      Q.   Why do you remember him?

 24              MS. HESMAN:  Form.

 25              THE WITNESS:  Because this was one of the

1  examples that it was so obvious in which the vice

2  president of mental health interfered with this patient

3  being transferred to a higher level of care.  By the time

4  he got into Phoenix he was in a very critical situation

5  already.

6      Q.    BY MR. FATHI:  Was this patient harmed by that

7  delay?

8              MS. HESMAN:  Form; foundation.

9              THE WITNESS:  Yes.

10     Q.    BY MR. FATHI:  At any point during your time

11  with Corizon in Arizona did you come to have any concerns

12  about the provision of group mental health therapy in ADC?

13              MS. HESMAN:  Form; foundation.

14              THE WITNESS:  No, I don't remember that I

15  did.  There were various sorts of group therapy being

16  provided for patients, but I never really looked closer

17  than what was happening with those.  Actually, I was happy

18  that at least this was being provided for patients often

19  in lieu of individual therapy.

20     Q.    BY MR. FATHI:  Did you know the content of the

21  group therapy that was being provided?

22              MS. HESMAN:  Form; foundation.

23              THE WITNESS:  Not altogether.

24     Q.    BY MR. FATHI:  Did you know the qualifications

25  of the mental health staff providing this group therapy?

Leonel A. Urdaneta, M.D. - 12/10/2019

93

1       A.      Not precisely, no.

2       Q.      I would like to talk now about mental health

3   treatment plans.

4               Did you become familiar with the mental

5   health treatment plans that were developed for patients in

6   ADC?

7               MS. HESMAN:  Form.

8               THE WITNESS:  Yes.

9       Q.      BY MR. FATHI:  Did you ever have any concerns

10   about the adequacy of those mental health treatment plans?

11               MS. HESMAN:  Form; foundation.

12               THE WITNESS:  Yes.

13       Q.      BY MR. FATHI:  And what were those concerns?

14               MS. HESMAN:  Same objections.

15               THE WITNESS:  The lack of cohesive teams

16   developing those treatment plans.  Second, the lack of

17   timely updating the adherence to just the policies'

18   markers and indicators rather than providing a more

19   comprehensive assessment of what was happening with

20   patients.  So my feeling was that they had become just

21   business as usual administrative tools.

22       Q.      BY MR. FATHI:  Did you ever have a concern that

23   the treatment plans lacked an appropriate level of detail?

24               MS. HESMAN:  Form; foundation.

25               THE WITNESS:  Yes, in depth.

Leonel A. Urdaneta, M.D. - 12/10/2019

94

1           Q.     BY MR. FATHI:  Did you ever develop a concern

2    that the treatment plans failed to address the patients'

3    symptoms in an individualized way?

4                      MS. HESMAN:  Same objections.

5                      THE WITNESS:  Correct.

6           Q.     BY MR. FATHI:  Did it ever come to your

7    attention that parts of the treatment plan were simply cut

8    and pasted from one patient to another?

9                      MS. HESMAN:  Same objections.

10                     THE WITNESS:  I don't have evidence and

11   recollection that that was necessarily being done.

12          Q.     BY MR. FATHI:  Did you have a concern that the

13   treatment plans weren't being meaningfully updated and

14   revised in light of changes in the patient's conditions?

15                     MS. HESMAN:  Same objections.

16                     THE WITNESS:  Correct, yes.

17          Q.     BY MR. FATHI:  Does an inadequate treatment

18   plan affect the quality of mental health care that's

19   provided to the patients?

20                     MS. HESMAN:  Same objection.

21                     THE WITNESS:  Yes, it does.

22          Q.     BY MR. FATHI:  Could you explain that?

23          A.     They provide guidelines of intervention for the

24   treatment of patients.  But if they become just routine

25   administrative sort of exercises, then, again, you know,

Leonel A. Urdaneta, M.D. - 12/10/2019

95

1   you are throwing into the mix an element of not caring.

2   It's business as usual.  This is a conveyor belt sort of

3   approach to things.

4       Q.   Can an inadequate treatment plan create a risk

5   of harm to the patient?

6              MS. HESMAN:  Form; foundation.

7              THE WITNESS:  Yes.

8       Q.   BY MR. FATHI:  The electronic medical record

9   used in the Arizona Department of Corrections is called

10  eOMIS, right?

11      A.   Yes.

12      Q.   Did you, during your time with ADC, become

13  familiar with the documentation of mental health diagnosis

14  and treatment in eOMIS?

15      A.   Yes.

16      Q.   Did you use eOMIS yourself?

17      A.   Yes.

18      Q.   Did you ever develop any concern about the

19  adequacy or the accuracy of documentation of mental health

20  diagnosis and treatment in eOMIS?

21              MS. HESMAN:  Form; foundation.

22              THE WITNESS:  Yes.

23      Q.   BY MR. FATHI:  And what were those concerns?

24              MS. HESMAN:  Same objections.

25              THE WITNESS:  They were superficial, they

Leonel A. Urdaneta, M.D. - 12/10/2019

96

1    were cumbersome, on the one hand.  They were labor

2    intensive on the other hand.  They were not significant in

3    the terms of providing an understanding of the patient.

4    So they were not clinically oriented -- and

5    time-consuming.  They just did not work too well

6    altogether.

7         Q.    BY MR. FATHI:  And does that have any effect on

8    the quality of treatment?

9                   MS. HESMAN:  Form; foundation.

10                  THE WITNESS:  Certainly so.  It's

11   demoralizing, again, for the professionals that are using

12   it because they have to spend more time in documentation

13   than in really assessing patients and dealing with

14   patients and doing treatments.

15        Q.    BY MR. FATHI:  Is it fair to say that, in a

16   setting like a prison where a patient is treated by a lot

17   of different people, the record is an important

18   communication device?

19        A.    It is, certainly, if it is well done.

20        Q.    If the record is not well done, does that

21   affect the quality of care that can be rendered?

22                  MS. HESMAN:  Form; foundation.

23                  THE WITNESS:  Certainly, there is a great

24   deal of confusion and you read what somebody had in there

25   today, but tomorrow it might be somebody different, and

1    there is no appreciation then for that continuity that is

2    so necessary and important.

3        Q.    BY MR. FATHI:  Can that lack of continuity

4    create a risk of harm to the patient?

5                    MS. HESMAN:  Same objection.

6                    THE WITNESS:  Absolutely.

7        Q.    BY MR. FATHI:  Did you ever have a concern that

8    the information in eOMIS was insufficiently detailed or

9    not complete or that important information was missing?

10                   MS. HESMAN:  Same objections.

11                   THE WITNESS:  It was detail-ish where

12   perhaps it shouldn't be, on the one hand, and it was too

13   superficial what perhaps should be detail-ish.  It was

14   inadequate altogether.

15       Q.    BY MR. FATHI:  And this is something that you

16   personally observed looking at records in eOMIS?

17       A.    Yes, yes.

18       Q.    Did you ever have concerns that information in

19   the record was inaccurate?

20                   MS. HESMAN:  Same objections.

21                   THE WITNESS:  I don't recall specifically

22   about that particular aspect.

23       Q.    BY MR. FATHI:  So it was more a question of

24   inadequate information, a lack of detail, rather than

25   incorrect information?

```
 1              MS. HESMAN:  Form.
 2              THE WITNESS:  Correct.
 3      Q.   BY MR. FATHI:  Did you ever have a concern that
 4   information in the record had been deliberately falsified?
 5              MS. HESMAN:  Form; foundation.
 6              THE WITNESS:  I don't have any examples of
 7   experiences with that.
 8      Q.   BY MR. FATHI:  Did it ever come to your
 9   attention that mental health staff were simply cutting and
10   pasting notes from one patient's record to another?
11              MS. HESMAN:  Same objections; asked and
12   answered.
13              THE WITNESS:  I do not recall that I ever
14   became aware of that.
15      Q.   BY MR. FATHI:  Doctor, my next few questions
16   are about the monitors, and by the monitors I mean those
17   ADC employees who were monitoring Corizon's compliance
18   with the requirements of the stipulation in the Parsons
19   versus Ryan case.  Are you familiar with the Parsons case?
20              MS. HESMAN:  Form; foundation.
21              THE WITNESS:  Yes.
22      Q.   BY MR. FATHI:  Do you understand my definition
23   of the monitors?
24      A.   Yes.
25      Q.   So I gather that you became familiar with the
```

Leonel A. Urdaneta, M.D. - 12/10/2019

99

1    fact that these ADC employees were monitoring Corizon's

2    compliance with the Parsons settlement, correct?

3        A.    Yes.

4        Q.    During your employment by Corizon, did you ever

5    come to have any concerns about the accuracy or

6    reliability of the information that was being provided to

7    the monitors?

8                    MS. HESMAN:  Form; foundation.

9                    THE WITNESS:  You know, I don't recall that

10   I ever had those questions.

11       Q.    BY MR. FATHI:  Okay.  Doctor, can high

12   temperatures, extreme heat have a harmful effect on some

13   patients who are taking psychotropic medications?

14                   MS. HESMAN:  Form; foundation.

15                   THE WITNESS:  Oh, absolutely, yes.

16       Q.    BY MR. FATHI:  Can you explain a little bit

17   about that?

18       A.    There are many medications that interfere with

19   the natural mechanism for the body to cool down and to

20   cool off.  I had examples of those patients that I had

21   examined and had suffered because of the combination of

22   high temperature and medications; also, some concerns

23   about patients in the isolation exclusion areas or on a

24   suicidal watch within settings that were very difficult to

25   maintain on a cool temperature.  And the patients

1   themselves complained of that, and they were certainly at

2   risk of developing serious consequences of that

3   combination.

4              I think, as a whole, internally from the

5   Corizon perspective, I think the practitioner had become

6   very much aware of that, but very often the physical

7   structures and the part that pertained more to the

8   internal administrative management of the prisons were not

9   so much so.  Inpatients, yeah, were at risk of developing

10  serious consequences from that.

11      Q.   What can happen if a patient on psychotropic

12  medication is exposed to high temperatures?

13      A.   They can develop neuroleptic malignant

14  syndrome.  They can develop heat strokes.  They can

15  develop psycho-neurological problems of great importance

16  and danger.

17      Q.   Can it be fatal?

18      A.   Oh, yes.

19      Q.   Whether pertaining to the actions of staff of

20  the physical plant, did you ever have concerns about the

21  risk of harm to patients taking psychotropic medication

22  that was posed by high temperatures?

23              MS. HESMAN:  Form; foundation.

24              THE WITNESS:  Yes.

25      Q.   BY MR. FATHI:  Did you ever have a concern that

```
 1   effective steps weren't being taken to protect those
 2   patients from heat injury?
 3              MS. HESMAN:  Same objections.
 4              THE WITNESS:  Not that I can recollect
 5   precisely in the case.
 6       Q.   BY MR. FATHI:  You said you did have some
 7   patients who suffered a heat reaction because of their
 8   psychotropic medication?
 9       A.   Yeah, particularly I remember one clearly who
10   had come from jail on psychotropic medications and he
11   developed a bad reaction to that, but the nursing staff
12   was able to catch it on time.  We went and saw him, the
13   medical counterpart also saw the patient, and a possible
14   very bad outcome was prevented.
15       Q.   About how many times would you say that you
16   observed or became aware of a patient having an adverse
17   heat reaction because of psychotropic medication?
18       A.   You know, that's hard to quantify for me, but I
19   think, as a whole, we all were very concerned, and I think
20   preventive measures and steps were taken to not get to a
21   risky sort of situation, but I cannot tell you of any
22   other case precisely that I had become aware of.
23       Q.   We don't need to make this an exhibit.
24              Doctor, I'm showing you what's titled the
25   stipulation.  This is the settlement agreement in the
```

102

```
 1    Parsons versus Ryan case.  Have you seen this document
 2    before?
 3         A.    I don't think so.
 4               MR. FATHI:  Okay.  And for the record, this
 5    is document 1185 filed in this case.
 6         Q.    BY MR. FATHI:  Doctor, would you turn to page
 7    5, please.  And we're going to be looking at paragraph 15.
 8    Do you see it?
 9         A.    Yes.
10               MS. HESMAN:  You're referring to the
11    document numbers or --
12         Q.    BY MR. FATHI:  I'm sorry.  I'm using the page
13    numbers at the bottom of the page, page 5, paragraph 15.
14         A.    Yes.
15         Q.    Okay.  Paragraph 15 reads as follows, quote, if
16    a prisoner who is taking psychotropic medication suffers a
17    heat intolerance reaction, all reasonably available steps
18    will be taken to prevent heat injury or illness.  If all
19    other steps have failed to abate the heat intolerance
20    reaction, the prisoner will be transferred to a housing
21    area where the cell temperature does not exceed 85 degrees
22    Farenheit, end of quote.  Do you see that language,
23    Doctor?
24         A.    Yes.
25         Q.    Were you aware of this provision in the Parsons
```

1    settlement?

2         A.    Yes.

3         Q.    To your knowledge, was this provision

4    consistently complied with while you were in ADC?

5               MS. HESMAN:  Form; foundation.

6               THE WITNESS:  I believe it was.

7         Q.    BY MR. FATHI:  So you're not aware of any

8    instance where this provision was not complied with?

9               MS. HESMAN:  Same objection.

10              THE WITNESS:  Correct.

11        Q.    BY MR. FATHI:  Are you aware of any instance

12   where a prisoner suffering from a heat reaction was

13   transferred to a housing area where the temperature did

14   not exceed 85 degrees?

15              MS. HESMAN:  Same objections.

16              THE WITNESS:  Yes.

17        Q.    BY MR. FATHI:  You're aware of that happening?

18        A.    Yeah, I am aware of some of these cases

19   happening.

20        Q.    About how many times did that happen, to your

21   knowledge?

22              MS. HESMAN:  Same objections.

23              THE WITNESS:  Maybe a dozen times when,

24   particularly in the Phoenix area, that would happen.

25        Q.    BY MR. FATHI:  The prisoner would actually be

Leonel A. Urdaneta, M.D. - 12/10/2019

104

1   transferred to a different housing area?

2        A.    Yeah, to a different area where the temperature

3   was livable.

4        Q.    You also mentioned the risk of heat to people

5   in isolation or seclusion.  Tell me about that.

6              MS. HESMAN:  Form.

7              THE WITNESS:  Well, particularly when they

8   are in isolation and seclusion, their monitoring is not as

9   strong as it should be.  Generally, those areas are not as

10  well provided for and supervised and so on as some other

11  areas.  So that was my concern with some of these people.

12  And they were spread all over the department prisons and

13  so on.  Some of those I'm not familiar with, et cetera.

14  So the concern was we wonder what's happening in those

15  areas, you know.  So that was essentially my concern with

16  those patients.

17       Q.    BY MR. FATHI:  Are you specifically aware of

18  any patients who were either in isolation or some sort of

19  watch status who had a heat intolerance reaction?

20             MS. HESMAN:  Form; foundation.

21             THE WITNESS:  No, I'm not aware of that.

22       Q.    BY MR. FATHI:  Doctor, when you were working in

23  ADC did you become familiar with how health care staff

24  interacted with patients who either were deaf or who are

25  not fluent in English?

105

1              MS. HESMAN:  Form; foundation.

2              THE WITNESS:  I'm not aware of any specific

3    cases meeting those characteristics.

4         Q.   BY MR. FATHI:  Let me ask it a different way.

5              Are you aware of any instance in which a

6    patient who was deaf was interacting with health care

7    staff?

8              MS. HESMAN:  Form; foundation.

9              THE WITNESS:  I am not.

10        Q.   BY MR. FATHI:  Are you aware of any instance in

11   which a patient who was not fluent in English was

12   interacting with health care staff?

13             MS. HESMAN:  Same objections.

14             THE WITNESS:  I'm not aware of those cases

15   either.

16        Q.   BY MR. FATHI:  That's surprising, because there

17   are a number of monolingual Spanish speakers in the

18   Arizona Department of Corrections.

19        A.   Yes.

20        Q.   But you're not aware of any of them ever

21   interacting with health care staff?

22             MS. HESMAN:  Same objections; asked and

23   answered.

24             THE WITNESS:  No, I'm not aware.  And I was

25   thinking, okay, maybe the issue here is not becoming aware

1   of such, but it was lack of the flow of information that

2   would get to me because, certainly, it would stand to

3   reason that having so many, particularly Spanish speaking,

4   that issue may not have come up, but I don't recall that

5   it ever came up, at least with me.

6       Q.   BY MR. FATHI:  I understand that you are a

7   native speaker of Spanish, correct?

8       A.   Correct.

9       Q.   So you are able to treat monolingual Spanish

10  speakers by speaking Spanish?

11      A.   Correct.

12      Q.   Did you ever become aware of any case in which

13  language interpretation in a health care encounter was

14  provided by a member of the custody staff?

15              MS. HESMAN:  Same objections.

16              THE WITNESS:  I think that happened.  And

17  to the best of my memory, it occurred more often than not.

18  Precisely when and which patients and so on, I can't tell.

19  I don't have those specifics.

20      Q.   BY MR. FATHI:  But you remember it happened?

21      A.   Yes, but I remember the whole issue happening.

22      Q.   Are you aware of any cases in which

23  interpretation in a health care encounter was provided by

24  another prisoner?

25              MS. HESMAN:  Same objections.

1              THE WITNESS:  No, I'm not.

2        Q.    BY MR. FATHI:  Are you aware of any cases in

3    which interpretation in a health care encounter was

4    provided by a health care staff person who wasn't actually

5    fluent in the patient's language?

6                  MS. HESMAN:  Same objections.

7                  THE WITNESS:  I'm not aware of specifically

8    anything like that.

9        Q.    BY MR. FATHI:  Are you aware of any cases in

10   which a deaf patient was asked to communicate by writing

11   notes?

12                 MS. HESMAN:  Same objections.

13                 THE WITNESS:  No.

14       Q.    BY MR. FATHI:  Are you aware of any cases in

15   which a deaf patient was asked to communicate by reading

16   lips?

17                 MS. HESMAN:  Same objections.

18                 THE WITNESS:  No.

19       Q.    BY MR. FATHI:  If you would pick up the

20   settlement document again, back to page 5, paragraph 14 on

21   page 5 provides, quote, for prisoners who are not fluent

22   in English, language interpretation for health care

23   encounters shall be provided by a qualified health care

24   practitioner who is proficient in the prisoner's language

25   or by a LanguageLine interpretation service, end of quote.

108

1              Were you familiar with this or aware of

2    this provision, Doctor?

3       A.    Yes.

4       Q.    Are you aware of the LanguageLine

5    interpretation service ever being used?

6              MS. HESMAN:  Form; foundation.

7              THE WITNESS:  No, I'm not.

8       Q.    BY MR. FATHI:  Doctor, before the lunch break

9    we discussed the issue of cell-front encounters,

10   specifically in the context of patients who are on watch.

11   Do you recall that discussion?

12      A.    Yes.

13      Q.    Did you ever have concerns about the use of

14   cell-front encounters in other kinds of mental health

15   context?

16              MS. HESMAN:  Form; foundation.

17              THE WITNESS:  I did.  Anytime that a mental

18   health encounter was provided in such a way, no matter

19   what the status of the patient was at any particular time,

20   was of concern.

21              One concern was not only confidentiality,

22   but that, again, there was no engagement.  I got the

23   feeling that these encounters were, again -- I don't want

24   to repeat the phrase again -- was a conveyor belt,

25   depersonalizing the patient altogether.  So it remains

Leonel A. Urdaneta, M.D. - 12/10/2019

109

1  certainly a point of concern.

2      Q.   BY MR. FATHI:  Doctor, at the very beginning

3  when we started this morning you said that one of the

4  reasons you left in May of this year was because you had

5  found the Arizona Department of Corrections very difficult

6  to work with.  Do you remember that?

7                MS. HESMAN:  Form.

8                THE WITNESS:  Yes.

9      Q.   BY MR. FATHI:  Other than what we've already

10  talked about, is there anything else that you meant by

11  that phrase?

12      A.   The lack of understanding about what

13  professional disciplines do and what is their area of

14  expertise.  I come back to the same idea that for them

15  having a few mental health counselors directed by somebody

16  that had sold his soul to them, that that was enough.

17                A concern that there was -- philosophically

18  we can call it like that -- approach to patients looking

19  at them as the felonious sort of individuals, the total

20  ignorance about human nature and the handling of patients

21  more like -- no matter what, you know, like cattle.  The

22  lack of respect, due to the organization that they had

23  contracted with, was obvious, was very difficult.  The

24  creation of an adversarial relationship rather than a

25  cooperative one that was intimidating.  And that I think

110

1    took away, from the company I was working for, some of the

2    wind that they could have put more in their sail.

3              They had to walk in such a thin line

4    between sticking to principles that they held high and

5    then not creating a conflict with the Department of

6    Corrections.  The Department of Corrections, I think we

7    all knew, was not interested in anything but in providing

8    some numbers so that they would get the ACLU and everybody

9    else off of their back so they could save money and do

10   things that they wanted to.

11             So that was very, very disturbing.  The

12   lack of education and the sense of ignorance among the

13   directors and so on that I had the opportunity to be with,

14   sometimes listen to and discuss things with.  The

15   Department of Corrections also lacked proper monitoring of

16   things.  And what they had were very one-sided and were

17   done in such a way that, as I said, they became

18   oppositional.

19             You know, in a system like that you cannot

20   create relationships like that.  And I think that sort of

21   relationship was parallel, then, in the relationship that

22   the lower people in the totem pole, that is patients, had

23   to suffer from everybody else above.

24        Q.   You said a lot there, Doctor, so I want to go

25   back and break it down a little bit.

1              When you were talking about an attitude on

2    the part of the Department of Corrections, were you

3    referring to Dr. Nicole Taylor?

4         A.    I think I was referring to her, but I also was

5    referring to the general attitude of the whole department.

6    I participated in monthly meetings that Corizon had with

7    the Department of Corrections, and that was the only time

8    in which us, as psychiatry, had access to them.  However,

9    there was nothing psychiatric to discuss.  General issues

10   and mostly matters of purely medical nature, but not a

11   psychiatric one.  So their cross-ignorance about this

12   particular aspect was quite disturbing.

13        Q.    Whose ignorance?

14        A.    I think the whole department.  The fact that,

15   again, you didn't have the psychiatrist himself, a

16   well-trained psychiatrist that you could discuss matters

17   with and establish a relationship with for the benefit of

18   patients is already a great indication that they didn't

19   know what we were about, what we were doing, et cetera,

20   you know.

21        Q.    And you also said, I think, the ignorance of

22   the directors?

23        A.    Yes.

24        Q.    Which directors were we talking about?

25        A.    Well, I put them all in the same bag.  And

1    we're talking about the directors at the center office

2    level as well as the directors in the individual prisons

3    level.

4              In my experience, I think I had two that,

5    you know, you felt that their interests were in the right

6    place and they were able to relate to the medical and

7    clinical staff in a cooperative way and with the right

8    things in mind.  Care.

9              I think for the most part, though, what I

10   observed was people who were not interested in those

11   matters and who were just there to incarcerate people.

12       Q.    Now, are these people you're talking about,

13   these directors, ADC employees or Corizon employees?

14       A.    ADC employees.

15       Q.    Who specifically are we talking about here?

16       A.    Most of the ones I had the opportunity to see

17   and to relate to were at the Phoenix facility.  Eventually

18   that fellow left, or he was pushed out or whatever he was,

19   but he was quite harmful for the whole system in the

20   delivery of care there.

21       Q.    What was his name?

22       A.    Gosh, I forgot.

23       Q.    He was the medical director at --

24       A.    Oh, no, no.  He was the director of the

25   administrator, the warden.

1        Q.      Any other people who exemplified this attitude
2    you were discussing?
3        A.      The ones at Eyman, the -- what I recall -- and
4    I don't remember their names.  This whole thing is a joke.
5    What we are discussing about caring for a patient is just
6    a joke.  People are bad, these people are whatever.
7        Q.      Somebody said that?
8        A.      Yeah.
9        Q.      The warden at Eyman said that?
10       A.      The warden at Eyman, yes.  On the other hand, I
11   had the opportunity to meet with the warden at the women's
12   facility then.  I don't remember her name.  She was a good
13   example of how things could be.
14       Q.      And then you also said that ADC lacked proper
15   monitoring.  What did you mean by that?
16       A.      Well, particularly within the mental health
17   psychiatric part, I meant not having somebody there that
18   was versed on psychiatric provision of care.  They had to
19   rely mostly on Dr. Nicole Taylor, who is not a
20   psychiatrist, who had limited clinical experience, and
21   whatever came their way.  But they did not have more the
22   quantitative measures and indicators to see what is being
23   done and how we can improve.
24       Q.      Is Dr. Nicole Taylor competent to evaluate the
25   provision of psychiatric care?

114

1                MS. HESMAN:  Form; foundation.

2                THE WITNESS:  No, she's not.

3      Q.    BY MR. FATHI:  Going back to Exhibit 2, I

4  believe, the e-mail.

5      A.    Yes.

6      Q.    Doctor, why did you decide to get in contact

7  with me?

8      A.    Well, that was a long process in which

9  conscience played a role at least at the end.  I had to

10 piece out what were negative feelings on my part and

11 perhaps aggressive feelings in the sense that -- not that

12 I was going to be aggressive physically with anyone, but

13 that I could get people mentioned in a negative way, and I

14 had to struggle with that.  You know, you don't want to

15 hurt anybody.

16                Then I came to the conclusion, no, but, you

17 know, these people are not evil.  These people are not

18 bad.  But in my own approach to human beings, I always

19 understand that we have two parts, you know.  As the Sioux

20 saying says, we all have two dogs, and which dog is going

21 to win is the one that you feed the most.  Therefore, I

22 said, okay, we have to do whatever we can to make sure

23 that the good Labrador is the one being fed.  And then at

24 that point I said, okay, I had to put aside my other

25 concerns and be a voice for the good Labrador in all of

1   us, and that's how the decision was reached.

2                    MR. FATHI:  Okay.  Let me take a short

3   break, but I think we may be nearing the end.

4                    (Recess from 2:25 p.m. to 2:28 p.m.)

5        Q.    BY MR. FATHI:  Doctor, I don't think you told

6   us about patient B and why he was significant to you.  Can

7   you describe his situation?

8        A.    Oh, yeah.  I think I mentioned the fact that --

9                    MS. HESMAN:  I just want to clarify

10   something.  I have patient B as the unknown patient.  So

11   are we talking about patient C, David, is that --

12                    THE WITNESS:  I'm sorry.  I did not hear

13   you.

14                    MS. HESMAN:  In your notes you had a name

15   for patient 1.  Patient B was an unknown.  And then there

16   was a patient C.  So I just want to make sure we're

17   talking about the same person.

18                    THE WITNESS:  Correct.  So which one?

19        Q.    BY MR. FATHI:  I'm asking about patient B, like

20   Bravo.

21        A.    B, okay.  That's a patient that I indicated was

22   referred initially by the primary care provider, the

23   family care specialty there.  It was a lady doctor.  And

24   this patient had been going to the emergency room

25   repeatedly, some because of inserting tools and stuff into

1   part of him.  And then in the emergency room he would give

2   information that he was diabetic, medical information that

3   was inaccurate.

4           So this happened several times.  The same

5   thing goes on.  The doctor then realizes that something is

6   going on, referred the patient to mental health.  I don't

7   recall what mental health did specifically, but again, he

8   wasn't referring the patient to anyone else.  The patient

9   then is viewed as just manipulating to get out of prison

10  and go into a hospital where he can get a hot meal or, you

11  know, have plenty of nurses around or whatever he wanted

12  manipulation for, but that's the way the thinking goes.

13          So the doctor realized that this can be

14  very dangerous.  If the emergency room physician said,

15  okay, the patient is diabetic and they go and give you

16  some medication that the patient really doesn't need

17  because he's not a diabetic, then he is going to have a

18  bad reaction.  So the doctor persists.  Please assess this

19  patient.

20          So that's when then I asked a doctor, a

21  tele-psychiatrist, to assess the patient.  The assessment

22  came back with a diagnosis that I think it was applicable,

23  but it was not applicable to what was happening, you know.

24  You can have a borderline personality disorder, but you

25  have to have a dynamic, as I call it, a diagnosis of why

Leonel A. Urdaneta, M.D. - 12/10/2019

117

1    at this particular time this borderline patient is doing

2    what he's doing, and it's not because he's manipulating.

3    That's crazy.  Manipulating by putting stuff, you know, up

4    your whatever, it doesn't make sense.

5              So I look at the records, look around, and

6    say, you know, what's happening to this patient is that he

7    had what we call a dissociative identity disorder, a

8    condition that is very difficult to diagnose, but it's a

9    rampant condition, too, very common.

10             So I say, this patient needs to come to the

11   Phoenix facility where we can continue with the assessment

12   and treat him dynamically, okay.  Well, that goes to

13   Dr. Calcote.  He just drags his feet and drags his feet.

14   The primary care physician at Lewis facility continues to

15   send e-mails, and e-mails, and he continues to drag his

16   feet and saying this, saying that, and saying that, you

17   know.  And the patient continues there suffering with this

18   condition.  Finally, eventually, I say we had to bring him

19   in.  And I sent the memo to the person in charge of the

20   admission at Phoenix, and then I get a memo e-mail back

21   questioning the reasoning for this.

22             Come on, you haven't looked at the record.

23   You don't have the experiences to say yes or nay.  And

24   third, looking at what is happening to the patient.  If

25   you want to question my clinical assessment, then see the

1   patient, let's talk about it.  Well, as far as I know, it

2   never happened.  By then I was leaving my service there,

3   and I don't know what happened to the patient.  But he had

4   been several times that he ended up in the emergency room.

5        Q.    So to your knowledge, that patient was not

6   transferred to Phoenix by the time you left?

7        A.    By the time I left, yes.

8        Q.    And was that patient harmed by the failure to

9   transfer into Phoenix?

10                  MS. HESMAN:  Form; foundation.

11                  THE WITNESS:  I don't know what came up of

12   it -- the final outcome was, he was already harmed.  I

13   mean, he was harming himself repeatedly.

14        Q.    BY MR. FATHI:  So was he harmed by the delay in

15   being transferred?

16        A.    Oh, absolutely.

17                  MS. HESMAN:  Same objections.

18        Q.    BY MR. FATHI:  Doctor, we've covered a lot of

19   territory, and I appreciate your patience.  I just want to

20   ask, other than what we've already discussed, did you have

21   any other concerns about the treatment of patients with

22   mental illness during your time working in the Arizona

23   Department of Corrections?

24                  MS. HESMAN:  Form; foundation.

25

119

1              THE WITNESS:  I have grave concerns perhaps
2    mitigated in a way by the fact that they might appear to
3    be impressionistic, or they might appear to be coming from
4    a fellow who values his service to patients.  You know,
5    that's my background, that's the way I was trained, and
6    that's my vocation.
7              So if we take that away I still, though,
8    have concerns that the quality of care is not up to par
9    and that there are several players in this whole thing
10   that interfere with such, starting with the lack of
11   appreciation for what human beings are about, the lack of
12   understanding of why we humans do things the way we do,
13   and instead by treating everybody as if they were bad,
14   they were felons, they were people that we are going to
15   incarcerate because all the time they are trying to pull
16   the wool over our eyes.  That attitude comes from higher
17   up from the department itself.  I think it has a negative
18   pervasive effect on any other company that we had a
19   contract with at the Arizona Department of Corrections.
20              I used to say, hey, I was in New Mexico, I
21   was in Kansas.  I never felt this same degree of
22   callousness of concern in any of those other places.  And
23   even though, you know, they were not exemplary, certainly,
24   they had greater dedication of treating patients and doing
25   the best for them.  I think the Arizona Department of

120

```
 1   Corrections that I knew then was cruel, dated,
 2   insensitive, and inhumane.
 3       Q.    BY MR. FATHI:  And is that attitude conducive
 4   to the provision of adequate mental health treatment?
 5                 MS. HESMAN:  Form.
 6                 THE WITNESS:  Certainly not.
 7       Q.    BY MR. FATHI:  Other than the ones we've
 8   already discussed, Doctor, are there any patients who
 9   particularly stand out in your memory as having been
10   harmed by the deficiencies that we've discussed?
11       A.    Yes.  I'm here trying to recall their names so
12   I can see their faces.  This practice, for instance, of
13   moving patients around and discharging from the Phoenix
14   facility, very often, as I mentioned earlier, without the
15   consent and the knowledge of the psychiatric provider, let
16   alone the nursing staff, is dangerous and it has produced
17   risky events.
18                 At least three patients that I recall that
19   were transferred from my care to the Tucson facility for
20   instance, they underwent a very bad time there, and
21   particularly at a time when they were turning the right
22   way, you know, at a very critical time when they're
23   realizing, hey, I got to change.  I am becoming now aware
24   of my good part.  And, you know, with oblivion to this
25   sort of thing these patients are just pushed away and sent
```

1    somewhere else where they become, again, conveyor-belt

2    goods is dangerous.  You just forget about the progress

3    and they go back.

4              At least I recall three patients.  One I

5    think is intelligent.  I hope he's doing well.  The other

6    two did not do so well.  One went back to injuring

7    himself.  The other one became -- by the time that I had

8    left was very depressed and had, again, started doing some

9    misbehaviors and so on, you know.

10             So when you treat patients like this and

11   move them around without concern for what's going on in

12   their clinical progress, you're doing a great disservice

13   to them and you're damaging their possibilities of getting

14   better, okay.

15             The other great concern I have is in

16   management of the Phoenix facility, because those are the

17   most critical, the most vulnerable patients we have in the

18   system.  From the one hand, it was difficult to get them

19   admitted there for the right reasons.  On the other hand,

20   it was so easy for just one discipline to take them out of

21   the process of treatment and send them somewhere else, I

22   think in a great part being influenced by the Department

23   of Corrections' need to move them around or not to have

24   them in any particular place for a long time.  I don't

25   know what the fears are with that.  Just move them out,

```
 1    just keep them moving.  That's it.
 2                   So this is of great concern because the
 3    patients who need it don't come, and those who are taken
 4    are leaving too early.  So you get it from both sides.
 5    The third concern in all of that is that there is no team
 6    participation in decision-making and in the care of
 7    patients.
 8         Q.    The three patients you just spoke about, were
 9    they harmed by being transferred out of the Phoenix
10    facility without the consent of their treating
11    psychiatrist?
12                   MS. HESMAN:  Form; foundation.
13                   THE WITNESS:  They were harmed.
14         Q.    BY MR. FATHI:  Do you remember the names of any
15    of those people?
16         A.    I remember them.  I had just to bring them to
17    my tongue, but I do remember them.
18         Q.    Are you able to write their names down, or do
19    you not recall?
20         A.    Yeah.
21         Q.    Why don't you write them down as numbers D, E,
22    and F.
23         A.    The first name, I forgot.  How can I forget it?
24         Q.    That's okay.  But you remembered one?
25         A.    One, I did.
```

1      Q.    And you wrote that down as D?

2      A.    Yes.

3      Q.    Okay.  Would you pass it to counsel so they can

4  see?

5            And, Doctor, the three patients that we've

6  been talking about who were transferred away from Phoenix,

7  did they all go to Tucson?

8      A.    (No oral response.)

9      Q.    All three of them went to Tucson?

10     A.    (No oral response.)

11     Q.    Is that a yes?

12     A.    I'm sorry, yes.

13     Q.    Okay.  Thank you.  All right.  I just want to

14  ask you a few questions about documents.

15            MR. FATHI:  Let's mark this next in order.

16            (Exhibit 3 identified for the record.)

17     Q.    BY MR. FATHI:  Doctor, I'm showing you what's

18  been marked as Exhibit 3.  This is a subpoena that was

19  served on you on, I believe, November 18th.  Do you recall

20  receiving --

21     A.    This one?

22     Q.    Yes.  If you look at the second page you'll see

23  your name.  Do you recall being served with this document?

24     A.    Yes.

25     Q.    All right.  And was it on or about November

124

```
 1   18th?
 2       A.    Correct.
 3       Q.    Now, if you look at the last two pages, pages 5
 4   and 6, using the numbers at the bottom of the page, it
 5   lists ten categories of documents.  Do you see that
 6   document?
 7       A.    Yes.
 8       Q.    And I'm going to ask you about documents that
 9   are in your possession or your custody or control.  And by
10   that I mean documents that are at your home, in your
11   office, in your safe deposit box, any place where you have
12   the ability to gain access to them.  Do you understand my
13   definition?
14       A.    Yes.
15       Q.    So with that definition, my question is:  Do
16   you have any of these ten categories of documents in your
17   possession or custody or control?
18       A.    I had in my possession notebooks in which I
19   would write the content of my dealing with patients, what
20   we had talked about, et cetera, et cetera.  It was
21   clinical process notes describing the issues, the
22   problems, and so on.
23             There might also be within those notebooks
24   administrative annotations of perhaps some cases that I
25   had to call for or deal with.
```

125

1    Q.    Are those the clinical notes that you were

2  talking about earlier that you now can't find?

3    A.    That's correct.

4    Q.    Okay.  Other than those documents, do you have

5  in your possession, custody, or control any other

6  documents that fall into any of those ten categories?

7    A.    I do not believe so.

8    Q.    Okay.  Now, Doctor, since you sent me that

9  e-mail on October 27th, has anyone communicated with you

10  in any way about your contact with me or your testimony

11  today, this deposition, anything like that?

12    A.    Yes.  (Pager alerts.)

13    Q.    Do you need to take that?

14    A.    May I?

15         (Recess from 2:48 p.m. to 2:53 p.m.)

16    Q.    BY MR. FATHI:  Before the break I was asking

17  if, since you sent me that e-mail on October 27th, has

18  anyone at all communicated with you about your contact

19  with me or about this deposition?

20    A.    Yes.

21    Q.    And who has contacted you about that?

22    A.    Corizon's legal counsel.

23    Q.    Okay.  And who is that?

24    A.    Jennifer did.

25         MR. KARTCHNER:  Jennifer Finger.

Leonel A. Urdaneta, M.D. - 12/10/2019

126

1              THE WITNESS:  Jennifer Finger.

2        Q.    BY MR. FATHI:  On how many occasions did you

3    speak with Jennifer Finger?

4        A.    Once.

5        Q.    And when was that?

6        A.    I think it was last Thursday.

7        Q.    Okay.  And about for how long?

8        A.    20 to 30 minutes.

9        Q.    Okay.  Was anybody else on the call?

10       A.    No.

11       Q.    Okay.  Is that the only time you've spoken to

12   Corizon's legal counsel since you sent me that e-mail?

13       A.    Yes.

14       Q.    Okay.  And what was said on that call?

15       A.    What was said?

16       Q.    Yes.

17       A.    One question was what had prompted me to reach

18   out to you, clarification of confidentiality issues, the

19   nature of my notebooks, and the information there, part

20   not belonging to me.  I think that was iterations of that.

21   That was the extent of it.

22       Q.    What did Ms. Finger tell you about

23   confidentiality?

24       A.    That it was improper to mention specific names

25   of patients.  I didn't give identifiable information here.

1      Q.    Did she mention the possibility of any legal
2   action against you by Corizon?
3      A.    No.
4      Q.    So she told you not to identify specific
5   patients?
6                  MS. HESMAN:  Form.
7                  THE WITNESS:  She told me, in general,
8   there was the statement that that would break
9   confidentiality if specific patients were identified.
10      Q.    BY MR. FATHI:  Did she say anything else about
11   what information you should or should not disclose?
12      A.    Not that I can recall.
13      Q.    And there was no mention of a possible lawsuit
14   against you or any other legal action by you against
15   Corizon -- I'm sorry -- by Corizon against you?
16      A.    Against me?  Though that's a concern, no, it
17   wasn't mentioned.
18      Q.    Did you ever speak with Mr. Kartchner here?
19      A.    Just on that particular occasion.
20      Q.    Oh, Mr. Kartchner was on the same call?
21      A.    Yeah.
22      Q.    Was anyone else on the call?
23      A.    No.
24      Q.    Okay.  Have you spoken with Mr. Kartchner on
25   any other occasion?

1      A.    No.

2      Q.    Have you spoken with anyone from Corizon,

3  again, since you sent me that e-mail on October 27th?

4      A.    No, I have not.

5      Q.    Have there been any e-mail or other written

6  communications between you and Corizon or you and

7  Corizon's counsel?

8      A.    No.

9      Q.    Have you had any contact with Ms. Hesman or

10  anyone from her law firm?

11      A.    No.

12      Q.    Since you sent me that e-mail, have you had any

13  contact with anyone from the Arizona Department of

14  Corrections?

15      A.    No, I have not.

16      Q.    Other than what we've already discussed, has

17  anyone tried to influence your testimony here in any way?

18      A.    No.

19      Q.    Has anyone tried to dissuade you from

20  testifying fully and truthfully here today?

21      A.    No.

22              MR. FATHI:   All right.   I believe that's

23  all I have.   Thank you very much, Doctor.   I don't know if

24  the other attorneys have some questions for you.

25              (Next page, please.)

1                          EXAMINATION

2    BY MS. HESMAN:

3        Q.    I just have some brief questions, Dr. Urdaneta.

4    My name is Ashlee Hesman and I represent the defendants in

5    this action.

6        A.    You represent what?

7        Q.    I represent the defendants in this litigation,

8    Parsons versus Ryan.

9        A.    I see.  Okay.

10       Q.    I want to direct your attention back to Exhibit

11   Number 2, which is the e-mail correspondence that you sent

12   to David Fathi on October 27th.  Do you have that in front

13   of you?

14       A.    Yes.

15       Q.    And in the first sentence you say that Angela

16   Fischer referred you to Mr. Fathi.  Do you see that?

17       A.    Yes.

18       Q.    Who is Angela Fischer?

19       A.    She is a mental health counselor who worked for

20   Corizon and whom I met there when I came to work for

21   Corizon and she worked at the Phoenix facility.

22       Q.    And tell me about the conversation you had with

23   Ms. Fischer.

24       A.    Well, the conversation had centered around a

25   personal matter, where she's working, how she's doing,

1    et cetera, et cetera.  Besides that, concerning the

2    referral here, I also talked to her about what I was

3    dealing with within myself in terms of the load of the

4    things I had seen and wanted to get off of my chest.  And

5    then that's when she referred me to David and indicated

6    that maybe I should write him a piece of communication to

7    see how we could talk.

8         Q.    Why did she refer you to David?

9         A.    Because I was dealing with issues of delivery

10   of care.  And if I remember well, she had had similar

11   concern when she had left Corizon and then had gone her

12   own way.

13        Q.    And based on that conversation you had with

14   her, is it your understanding that she brought her

15   concerns to David's attention as well?

16        A.    I don't know that she did.  She just referred

17   me to talk to David.

18        Q.    Did she tell you how she knew of David?

19        A.    Yes.

20        Q.    How so?

21        A.    She had worked with David when she had left

22   Corizon and had similar concerns in terms of how the

23   patient care was being delivered, and particularly with

24   serious concern about the mental health part.

25        Q.    When did you have that conversation with

1   Ms. Fischer?

2       A.   That, I cannot tell you specifically, but that

3   must have been -- let me see.  That must have been between

4   June and October sometime.  So it might have been in those

5   months there.  Specifically, I don't know.  I don't

6   recall.

7       Q.   Did she give a reason as to why speaking with

8   David was important?

9       A.   Yes.

10      Q.   What was that reason?

11      A.   The reason was that he would help in the

12  concern I had about working for delivering better care for

13  patients.  (Pager alerts.)

14      Q.   Do you need to get that?

15      A.   No.  I can answer that later.  Thank you.

16      Q.   Have you ever held yourself out to be a voice

17  and advocate of the incarcerated population, not just in

18  Arizona, but those who are incarcerated nationally?

19      A.   Not at the national level.  I consider what I

20  do with patients is sacred to me and, therefore, I am an

21  advocate for my patients.

22      Q.   And you used the word sacred.  Did I hear that

23  correctly?

24      A.   Yes.

25      Q.   Have you ever informed anyone that you have a

1  patron saint that has told you to advocate in this

2  fashion?

3              MR. FATHI:  Objection.  Dr. Urdaneta's

4  religious beliefs are irrelevant.

5              THE WITNESS:  And the saint I have has

6  nothing to do with religion.

7      Q.    BY MS. HESMAN:  I'll just note that relevance

8  objections are improper in a deposition.  So you still

9  need to answer the question.

10     A.    Well, it's not religious, although, if it were

11 purely religious I would not deny that at this particular

12 point.  You know, we learn from everybody, and I think I

13 have made statements of that sort.

14              I had made a statement that my saint is

15 called Phillipe Pinel.  He was a psychiatrist, medical

16 doctor during the French Revolution.  He initiated

17 actually the correctional system for mentally ill

18 patients.  And during the French Revolution mentally ill

19 patients, as well as ordinary persons with felonies, were

20 all living in Paris jails.  He managed somehow to separate

21 one from the other.  He was then instrumental in opening

22 the doors of prisons and jails for mentally ill patients.

23 And there is a famous painting -- I forgot the name of the

24 painter -- of where you see him with all of these patients

25 coming behind him.  So this is western culture, and this

1    is the way I approach my work.

2         Q.    Is it true that you believe another revolution

3    and liberation is necessary?

4         A.    I believe so.

5                    MR. FATHI:  Objection.  What's the

6    relevance of this?

7                    MS. HESMAN:  Relevance objections aren't

8    proper in a deposition.

9                    MR. FATHI:  Yes, but a deposition that's

10   being conducted in a manner so as to harass and annoy the

11   deponent is --

12                   MS. HESMAN:  I'm not harassing or annoying

13   him in any way.  And if he feels that way he's certainly

14   welcome to tell me, but I let you ask many questions that

15   I did not feel were relevant in the scope that you

16   designated this deposition for.  I think you went beyond

17   that, but I let you have your time.  So please let me have

18   my time.

19                   MR. FATHI:  Okay.  Let's take a break.

20                   MS. HESMAN:  I'm not willing to go off the

21   record.

22                   MR. FATHI:  Well, no, we are going to go

23   off the record.

24                   MS. HESMAN:  There's no need to go off the

25   record.  If there's something you want to be said, you can

134

1    put it on the record.  I'll continue with my questions.

2                        MR. FATHI:  This is being conducted in way

3    so as to harass or annoy Dr. Urdaneta.

4                        MS. HESMAN:  Are you his attorney?

5                        MR. FATHI:  I am an attorney at this

6    deposition.

7                        MS. HESMAN:  Are you his attorney?

8                        MR. FATHI:  I am not his attorney.

9                        MS. HESMAN:  Okay.  So then you cannot

10   advocate on his behalf.  If at any time he feels like I'm

11   harassing him, which I have not done so far, he's more

12   than welcome to let me know that.  I'm wrapping up this

13   line of questioning very quickly, but you are not his

14   attorney, so you cannot advocate on his behalf.

15                        MR. FATHI:  I can present a motion to

16   terminate the deposition because it's being --

17                        MS. HESMAN:  Is that what you want to do?

18                        MR. FATHI:  Will you stop interrupting me,

19   please?

20                        MS. HESMAN:  I'm asking if that's what you

21   want to do.

22                        MR. FATHI:  You interrupted me.  Whether or

23   not I'm his attorney, I can present a motion to terminate

24   the deposition on the grounds that it's being conducted in

25   a way so as to harass and annoy the deponent pursuant to

 1  Rule 30(e)3.

 2              MS. HESMAN:  Are you finished?

 3              MR. FATHI:  I'm finished for now.

 4              MS. HESMAN:  Is that what you wish to do?

 5              MR. FATHI:  I am considering my options.

 6       Q.   BY MS. HESMAN:  Going back to my questions,

 7  Doctor, that's something that you feel is necessary at

 8  this point, correct, going back to the revolution and

 9  liberation; is that correct?

10       A.   That is partially correct.  The content of such

11  a statement has many sides to it, including the meaning of

12  revolution, which can be understood in many ways.  Yes,

13  there has to be a revolution so that professionals who are

14  delivering care for human beings come to the realization

15  that their actions and their purposes in treatment are

16  very important for the patient they are treating and that

17  the patients, whether it be within the correctional system

18  or not, are to be treated with respect, with

19  understanding, and with the purpose in mind to help them

20  change.  And I think that's a revolution, a revolution

21  that should come particularly to mainly the Department of

22  Corrections.  And it's not a revolution that I'm

23  advocating here that we should open all the doors from

24  prisons and jails so everyone becomes free.

25       Q.   Just to clarify, that is the position you are

136

1  advocating for or is not?  I just didn't hear.

2      A.   No, that's not a position.  That's crazy that I

3  would advocate for something like that.  Anybody who

4  misunderstands that, as you said, is trying to misguide

5  and confuse the issue.  Even if it were that, I'd rather

6  be taken for somebody who cares about human beings than

7  for somebody who doesn't give a whatever about it.

8      Q.   Have you advised that you think there needs to

9  be a resurrection of the human soul within correctional

10  systems?

11      A.   Yes.

12      Q.   Not just in Arizona, but -- I think you said

13  not nationally.  Are you speaking on a global level?

14      A.   Well, I don't want it to become Mossianic here,

15  and Messianic, but I think, yeah, there needs to be a

16  revolution whereby we learn how to resurrect the good

17  parts in human beings rather than everybody being

18  manipulative, a no-good liar, who -- you know, the same

19  goes, do you know how people in prison, do you know when

20  they lie?  When they're opening their mouth.  I mean,

21  that's as demeaning as you can get.  And that's much

22  worse, even if my message were taken in such Messianic and

23  Mossianic stuff, which is not.  Somebody is perverting

24  that for their own purposes.

25      Q.   Going back to your communications with David,

1    is the only communication you've had with him that

2    October 27th e-mail communication?

3        A.    Yes.

4        Q.    Have you ever spoken to him on the phone?

5        A.    No.

6        Q.    Did he respond to your October 27 e-mail

7    communication?

8        A.    Yes.

9        Q.    When did he respond?

10       A.    I don't know.  My initial one was in October,

11   sometime in November, I think it might have been.

12       Q.    What did his November response say?

13       A.    Yeah, we would like to talk to you, and before

14   that I would have to get permission from -- or clarify

15   whatever the term was used with Corizon legal department.

16       Q.    Did you respond to his e-mail?

17       A.    No, I did not respond to that.

18       Q.    And other than those e-mail communications that

19   we spoke about, you had no other communication with him?

20       A.    That is correct.

21       Q.    Have you reached out to or communicated with

22   any other attorney in this litigation?

23       A.    No, I have not.

24       Q.    Any other attorney at the ACLU?

25       A.    No, I have not.

 1      Q.    The Prison Law Office?

 2      A.    Who?

 3      Q.    The Prison Law Office, have you tried to

 4   communicate with them?

 5      A.    I don't know who they are.

 6      Q.    They're a law firm that represents the

 7   plaintiff class in this litigation.

 8      A.    To the best of my memory, I have not reached

 9   out to anyone.

10      Q.    So it's accurate to say that you reached out to

11   David Fathi because Angela Fischer recommended that you

12   reach out to him; is that correct?

13      A.    Yes.

14      Q.    You spoke about some notes -- or I think you

15   later referred to them as journals that you had taken --

16      A.    Notebooks.

17      Q.    -- notebooks that you had with you after you

18   left Corizon?

19      A.    Mm-hmm.

20      Q.    And I believe you testified that the contents

21   of those notebooks contained clinical notes?

22      A.    Correct.

23      Q.    Clinical notes regarding patient care?

24      A.    Correct.

25      Q.    Would you agree that clinical notes regarding

 1   patient care should have been input into the eOMIS system?

 2        A.    They were.

 3        Q.    I believe you said they were.  And so I want to

 4   understand if the notes in your notebooks --

 5        A.    I'm sorry.  (Cell phone alerts.)

 6        Q.    That's okay.

 7              (Witness answers cell phone.)

 8        Q.    BY MS. HESMAN:  To clarify, is it accurate to

 9   say that all the notes in your notebooks are also

10   contained in the eOMIS system, or is there additional

11   information contained in your notebooks that would not be

12   in eOMIS?

13        A.    There might be because the notebooks were more

14   comprehensive perhaps.  So in the eOMIS translation were

15   desklets of what had been transcribed during the meeting

16   with the patient.  They were parts of -- when I put them

17   in the eOMIS I tried to get out of the notes what was

18   significant for clinical purposes.

19        Q.    Okay.  So if I'm understanding correctly, was

20   it your practice to handwrite notes in your notebooks, and

21   then at a later time transcribe them into eOMIS?

22        A.    That is correct.

23        Q.    Sometimes the entire content of the written

24   note would be transferred to eOMIS, other times only

25   portions; is that correct?

140

1      A.    Yes.  And other times eOMIS contained more of

2   what I had written.

3      Q.    So it would just depend?

4      A.    So it could go either way.

5      Q.    I understand.  But there were situations in

6   which the notebooks that you took with you after you left

7   Corizon were more comprehensive than what was in eOMIS; is

8   that right?

9      A.    There might be those cases in which it was more

10  clinically comprehensive.

11     Q.    Do you recall a line of questioning by

12  Mr. Fathi where he asked you the importance of keeping

13  complete and well-done eOMIS records?  Do you recall that?

14     A.    Yes.

15     Q.    And you agreed with him that that's important

16  to keep complete and well-done eOMIS records?

17     A.    Yes.

18     Q.    But that was not all of the case if you had

19  handwritten notes that were not later transcribed in the

20  eOMIS.  You would agree with that, right?

21     A.    Not necessarily.

22     Q.    Why not?

23     A.    Because sometimes when you write in the

24  notebook a little clinical relevance to the point that you

25  were making, when you're talking to a patient there's

1    going to be a lot of statements and sayings and so on and

2    so on that are distracting.  And what you want to do is to

3    convey in the clinical note what makes clinical

4    significance, what the intent was, what the content is of

5    perhaps a meaning, but not necessarily that the patient

6    came in and said, you know, hey, good morning, the weather

7    is this and that outside.  So they are not verbatim,

8    per se, what you see in eOMIS and what you see in the

9    clinical notes.

10        Q.    You testified at length that one of your

11   concerns was the lack of team work among different

12   disciplines, for example, between mental health and

13   psychiatry.  Do you recall that?

14        A.    Yes.

15        Q.    You would agree with me that clinical notes in

16   notebooks that other disciplines can't -- that it poses a

17   problem, and other disciplines cannot see those notes

18   because they're in your handwritten notebooks as opposed

19   to a centralized eOMIS database, correct?

20        A.    Not necessarily.  Again, it might be

21   distractions if you're going to transcribe everything that

22   happened and was said and so on.  It might be distracting

23   and might actually obscure the essence of what the

24   particular meeting was about.

25        Q.    But you felt that whatever you put in your

```
 1   notebooks was significant to you, correct?
 2        A.    Not necessarily.
 3        Q.    Then why did you include it?
 4        A.    So I can put it all together and then go
 5   through the process of understanding what was being said.
 6        Q.    Is it accurate to say that the majority of your
 7   practice during your tenure at Corizon was at the Phoenix
 8   facility?
 9        A.    Yes.
10        Q.    And you're not a psychologist, correct?
11        A.    No.
12        Q.    You're a psychiatrist?
13        A.    Correct.
14        Q.    There's a difference?
15        A.    Yes.
16        Q.    Have you ever practiced psychology?
17        A.    It depends on what you call psychology.  I
18   practice psychology all the time when I see patients.
19   There are, you know, so many varieties of psychologies and
20   so on, but the two go together.
21        Q.    But you distinguished the two by -- and I
22   believe Mr. Fathi clarified that when you were talking
23   about mental health, that's psychology, which is different
24   than psychiatry, correct?
25        A.    Operationally, it might be, but no more than
```

143

1    that.  For me to practice good psychiatry I have to have

2    an understanding of a lot of psychological principles.

3         Q.    It seems to me, and correct me if I'm wrong,

4    that, based on your testimony, they were separate at the

5    department.  You defined mental health to be psychology,

6    and psychiatry was different?

7         A.    That was the artificial separation that I

8    alluded to, yes.

9         Q.    In fact, during your testimony you admitted

10   that you did not have knowledge of some psychology

11   practices.  For example, telepsych you knew nothing about,

12   but telepsyhiatry you did have knowledge on?

13        A.    I had knowledge of the structural part of it.

14   I didn't have knowledge that telepsychology was being

15   practiced.

16        Q.    There were a series of questions regarding

17   staffing.  Do you recall those questions?

18        A.    Staffing?

19        Q.    Staffing.

20        A.    Mm-hmm.

21        Q.    You would agree you're not qualified to

22   formulate any sort of staffing analysis or pattern, right?

23        A.    No, that's too broad of a statement.  I think I

24   am qualified to provide some number, for instance, of how

25   many psychiatrists does it take to change a lightbulb or

Leonel A. Urdaneta, M.D. - 12/10/2019

144

1    how many psychiatrists does it take to treat patients

2    within a correctional facility.  There are guidelines.

3    There are national guidelines for that, the American

4    Psychiatric Association, and so on.  So it depends.

5              In terms of mental health, you infer from

6    what you see that staffing might be less than what is

7    necessary because of what you see and because of what you

8    hear.  And what you hear is we don't have the time, and

9    what you see is that, indeed, mental health practitioners

10   are being moved from A to B and from B to C, and then you

11   have the shell game, and it is because they don't have

12   enough people.

13       Q.    Have you ever seen ADC or Corizon's staffing

14   pattern or staffing analysis?  Have you ever seen any of

15   those documents?

16       A.    Yeah, I have seen them.

17       Q.    What have you seen with respect to staffing?

18       A.    Well, I saw the number of the different

19   disciplines before the RFP came out, and then I saw the

20   changing numbers during the RFP negotiations that went

21   back and forth.

22       Q.    Have you ever developed a staffing pattern for

23   any correctional institution or medical contractor who

24   contracts with correctional institutions?

25       A.    I put my input in some of them, and then during

1    also the RFP of New Mexico.

2              MR. FATHI:  Could we take a five-minute

3    break at some point in time soon?

4              MS. HESMAN:  Sure.  I'm just wrapping up.

5    So yeah, certainly.

6        Q.    BY MS. HESMAN:  And all of the opinions that

7    you spoke about today, Dr. Urdaneta, are opinions you had

8    under Corizon's tenure, correct?

9        A.    Not all of them.

10       Q.    Let me rephrase.

11             It's fair to say that you don't have any

12   experience under Centurion's leadership?

13       A.    Under what?

14       Q.    Centurion is the contractor who took over for

15   Corizon.

16       A.    Correct.

17       Q.    You don't have any experience under Centurion's

18   leadership is what I'm trying to establish.

19       A.    I don't have any experience on how they manage

20   things, correct.

21       Q.    Toward the end of Mr. Fathi's questioning you

22   spoke about a conversation you had with the warden at

23   Eyman.  Do you recall that?

24       A.    Well, that was a group conversation, yeah.

25       Q.    Where he told you, this is a joke, they are bad

Leonel A. Urdaneta, M.D. - 12/10/2019

146

```
 1   people?
 2        A.    Yes.  Well, he didn't tell me.  He told us.
 3        Q.    When did that statement take place?
 4        A.    Date specifically, it must have been 2018, most
 5   likely, and it was at the time that I went there to
 6   facilitate a change in the approach to this particular
 7   patient that had been in the emergency room many times.
 8        Q.    So it was a conversation regarding a specific
 9   patient?
10        A.    Yes.
11        Q.    Who else was present for the statement that he
12   made?
13        A.    The chief nurse, the medical director.
14        Q.    Sorry to interrupt.  What was the chief nurse's
15   name?
16        A.    Her name, I can't remember.
17        Q.    And you said a medical director?
18        A.    The medical director whose name, again, I can't
19   remember.  And there were several mental health
20   practitioners there, too.
21        Q.    Do you recall any of their names?
22        A.    No.  And there was a psychiatric nurse
23   practitioner whose name I still don't remember.
24        Q.    And you don't recall the name of the warden; is
25   that correct?
```

 1       A.     Oh, no.

 2                    MS. HESMAN:  Now is a good time.

 3                    (Recess from 3:27 p.m. to 3:30 p.m.)

 4       Q.     BY MS. HESMAN:  And, Dr. Urdaneta, just one

 5   more question for clarification.

 6                    Regarding the notebooks that we spoke

 7   about, I believe you said that you couldn't locate them?

 8       A.     Right now I can't.

 9       Q.     And I believe you said it's because you just

10   moved recently?

11       A.     Mm-hmm.

12       Q.     What efforts have you made to locate them, if

13   any?

14       A.     The effort of moving boxes and opening them.  I

15   hope some of you have some experience with that.  They are

16   back breaking and everything else.  So those are after I

17   have tried to identify the boxes that belong to the move

18   within Phoenix from the boxes that I still have to open

19   from my move from Albuquerque to here.  So it has been

20   quite a task.

21       Q.     I understand.  But it's possible that they're

22   in a box somewhere in your new home?

23       A.     I think it is very likely.

24       Q.     And to the extent you find those, would you

25   please forward them to me?  Not necessarily originals, but

148

1   copies.

2        A.    Sure.

3                  MS. HESMAN:  That's all I have.  Thank you.

4                  THE WITNESS:  If that's proper.

5                  MR. FATHI:  I think it would be appropriate

6   to notify all counsel if you do that.

7                  THE WITNESS:  Okay.

8                  MR. FATHI:  Anything further?

9                  We need to make Dr. Urdaneta's handwritten

10  list Exhibit 4.

11                  (Exhibit 4 identified for the record.)

12                  MR. FATHI:  Plaintiffs agree that Exhibits

13  1 and 4 are confidential.  We do not agree that the

14  remainder of the deposition or exhibits are confidential.

15                  MS. HESMAN:  I think I've already put my

16  position on the record that, to the extent you wish to use

17  any portion of the deposition, because marked as

18  confidential, that you please reach out to us before

19  submitting it.

20                  MR. FATHI:  Doctor, you have the option of

21  reading the transcript and making any corrections that you

22  would like.  Would you like to do that?

23                  THE WITNESS:  Yes, please.

24                  (The deposition adjourned at 3:32 p.m.)

25

149

1                         SIGNATURE PAGE

2              I, LEONEL A. URDANETA, M.D., a deponent
   exercising my right to read and sign my deposition taken
3  on December 10, 2019, place my signature hereon and make
   the following changes on this ____ day of _____,
4  2019.

5              (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

                    _____
7                   LEONEL A. URDANETA, M.D.

8  PAGE    LINE    READS              CHANGE TO          REASON

9  _____   _____   _____    _____    _____

10 _____   _____   _____    _____    _____

11 _____   _____   _____    _____    _____

12 _____   _____   _____    _____    _____

13 _____   _____   _____    _____    _____

14 _____   _____   _____    _____    _____

15 _____   _____   _____    _____    _____

16 _____   _____   _____    _____    _____

17 _____   _____   _____    _____    _____

18 _____   _____   _____    _____    _____

19 _____   _____   _____    _____    _____

20 _____   _____   _____    _____    _____

21 _____   _____   _____    _____    _____

22 _____   _____   _____    _____    _____

23 _____   _____   _____    _____    _____

24 _____   _____   _____    _____    _____

25 _____   _____   _____    _____    _____

150

1   STATE OF ARIZONA      )
                          )
2   COUNTY OF MARICOPA    )

3           BE IT KNOWN that I took the foregoing deposition
    pursuant to Notice; that the witness was duly sworn by
4   me; and that said transcript is a full, true, and
    accurate record of the proceedings; that the proceedings
5   were taken down by me in shorthand and thereafter reduced
    to print under my direction; that I have acted in
6   compliance with ACJA 7-206.

7           I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in the
8   outcome hereof.

9           Pursuant to request, notification was provided
    that the deposition is available for review and
10  signature.

11          Dated this 30th day of December, 2019.

12                              _Janet Hauck_

13

14                              _____
                                Janet Hauck, RPR
                                Certified Reporter
15                              Arizona CR No. 50522

16

17          I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
    has complied with the ethical obligations set forth in
18  ACJA 7-206.

19

20                  _Lisa L. Glennie_

21

22
    _____
23  GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
24  Arizona RRF No. R1035

25

# EXHIBIT 2


# FILED UNDER SEAL

# EXHIBIT 3

**David Fathi**

| | |
|---|---|
| **From:** | leonel urdaneta < > |
| **Sent:** | Sunday, October 27, 2019 3:23 PM |
| **To:** | David Fathi |
| **Subject:** | AZ Correctional Practices |

Hello, Mr. Fathi,

Ms. Angela Fischer referred me to you. I am a psychiatrist who has worked in the correctional field for 30 years plus. My last job was as Director of Psychiatry for the AZ-Corizon contract.

My reason for reaching out to you is my interests in bringing to light the dysfunctions I was witness to during my two years as head of the Psychiatric Service for the contract, dysfunctions that were part to AZ Correctional Department and of Corizon itself. Those dysfunctions caused tremendous harm to patients, including suicides and severe self-injurious damage.

I am for that asking for your help to become a voice for the improvement of care for patients in the correctional system in Arizona.

Thank you for you attention and time,

Leonel A. Urdaneta, MD

1

EXHIBIT 2
Usdaneta
12/10/19

# EXHIBIT 4

# EXHIBIT 1

CONFIDENTIAL



AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### District of Arizona

| | | |
|---|---|---|
| Victor Parsons, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  2:12-cv-00601-ROS |
| David Shinn, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                   Leonel Urdaneta, M.D.

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  See Attachment A

| Place: Perkins Coie LLP | Date and Time: |
|---|---|
| 2901 N. Central Avenue, Suite 2000 Phoenix, Arizona 85012 | 12/02/2019 10:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

   The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/13/2019

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| | | s/ David C. Fathi |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Prisoner Plaintiffs
, who issues or requests this subpoena, are:

David C. Fathi, ACLU National Prison Project, 915 15th St. N.W., 7th Floor, Washington, DC 20005; dfathi@aclu.org; 202-548-6603

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   2:12-cv-00601-ROS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

1                                       **ATTACHMENT A**

2

3                                          **DEFINITIONS**

4       For the purposes of this request the following definitions shall apply:

5       1.     "ADC" means the Arizona Department of Corrections, including all its

6 subdivisions, agents, employees, contractors, and attorneys.

7       2.     "COMMUNICATIONS" means any transmittal of information from one

8 person or entity to another by any means, including letters, correspondence, notes,

9 memoranda, records, reports, papers, facsimiles, electronic mail (whether to, from, copied

10 or blind copied), electronic mail generated from a hand held personal device including a

11 Blackberry or iPhone, instant messaging, electronic mail generated from business or

12 personal email accounts, internet relay chat, news group, group or collaboration servers,

13 electronic bulletin boards, electronic discussion boards, dictation tapes, video recordings,

14 audio recordings, digital recordings, memoranda, telegrams, telecopies and telexes,

15 teleconference, collaboration servers (including share point servers), web-based or

16 software virtual meetings including Web-X and any other meeting software and share

17 point servers, and oral contact such as face-to-face discussions or meetings, telephone

18 conversations, and voice mail messages.

19       3.     "CORIZON" means Corizon, Inc.

20       4.     "DOCUMENT" and "DOCUMENTS" have the same scope used in

21 Rule 34(a)(1) of the Federal Rules of Civil Procedure and shall encompass every writing

22 or record of every type and description and every tangible thing that is or has been in

23 YOUR possession, custody, or control, to which YOU have access, or of which YOU

24 have knowledge, including, but not limited to, newspaper articles, magazine articles, news

25 articles, correspondence, letters, contracts, files, electronic mail, memoranda, stenographic

26 notes, handwritten notes, drafts, studies, publications, books, pamphlets, catalogs,

27 purchase orders, receipts, advertisements, direct mail solicitations, point-of-sale and point-

28 of-purchase materials, notebooks, diaries, models, devices, pictures, photographs, films,

146311359.1

1    audiotapes, videotapes, computer records, voice recordings, maps, reports, surveys,

2    MINUTES, data compilations, and statistical compilations, regardless of whether a

3    particular DOCUMENT is privileged or confidential, and regardless of the form of

4    storage (including, but not limited to, paper, microfiche, magnetic tape, magnetic disk

5    (hard disk or floppy disk), CD-ROM, DVD, optical disk, or electronic storage device).

6         5.    "HEALTH CARE" means the provision of care, including adequate diet, to

7    address the mental health, medical, or dental needs of a PATIENT whether those needs

8    arise as a result of injury, illness, disease, or other trauma, or care provided for diagnostic

9    or preventive purposes.

10        6.    "PATIENT" means a person incarcerated by the ADC.

11        7.    "REGARDING" or "REGARDED" to any given subject matter means,

12   without limitation, anything that, in whole or in part, analyzes, comments upon,

13   comprises, concerns, constitutes, contains, describes, discusses, embodies, evidences,

14   explains, identifies, manifests, mentions, pertains directly or indirectly to, reflects, refers

15   to, relates to, responds to, states, summarizes, or is in any way relevant to the particular

16   subject matter identified.

17        8.    "YOU," "YOUR," and "YOURSELF" means Leonel Urdaneta, M.D., his

18   agents, representatives, contractors, and employees.

19

20

21

22

23

24

25

26

27

28

146311359.1                                -2-

## **INSTRUCTIONS**

1. YOU are required to furnish all DOCUMENTS in YOUR possession, custody, or control, including those DOCUMENTS that are in YOUR possession, custody, or control in the normal course of YOUR employment obligations, and those in the possession, custody or control of your (1) employer; (2) consultants; (3) attorneys; (4) representatives; (5) agents; or (6) any other person acting or purporting to act on YOUR behalf or at YOUR direction, whether doing so directly or at the direction of YOUR subordinates. Possession, custody, or control includes DOCUMENTS stored in electronic form by third party service providers but accessible to you, including but not limited to email accounts, FTP servers, portable storage media such as USB drives, cloud storage services such as Dropbox or SharePoint, and online workspaces such as WebEx.

2. Each request herein constitutes a request for DOCUMENTS in their entirety, with all enclosures and attachments, and without abbreviation, redaction, or expurgation.

3. YOU shall produce any and all drafts and copies of each DOCUMENT that are responsive to any request, including but not limited to copies containing handwritten notes, markings, stamps, or interlineations.

4. YOU shall produce all responsive DOCUMENTS as they have been kept in the ordinary course of business.

5. Responsive DOCUMENTS should be produced in a form consistent with the Federal Rules of Civil Procedure, including producing the DOCUMENTS in a form or forms in which they are ordinarily maintained or in a reasonable usable form or forms.

6. If YOU object to a portion or an aspect of a request, state the grounds for your objection with specificity and respond to the remainder of the DOCUMENT request. If any DOCUMENTS, or portion thereof, are withheld because YOU claim that such information is protected under the attorney-client privilege, work product doctrine, or other privilege or doctrine, YOU are required to provide a privilege log setting forth the

1    specific basis for the claim of privilege or protection and for each DOCUMENT provide

2    the following:

3             a.       the subject matter of the DOCUMENT;

4             b.       the title, heading or caption of the DOCUMENT, if any;

5             c.       the date appearing on the DOCUMENT or, if no date appears

6                      thereon, the date or approximate date on which the DOCUMENT

7                      was prepared;

8             d.       the type of the DOCUMENT (e.g., whether it is a letter,

9                      memorandum, MINUTES of meeting, etc.) and the number of pages

10                     of which it consists;

11            e.       the identity of the person who signed the DOCUMENT or, if it was

12                     not signed, the person who prepared it;

13            f.       the identity of each person to whom the DOCUMENT was addressed

14                     and the identity of each person to whom a copy thereof was sent; and

15            g.       the identity of each person who has custody of a copy of each such

16                     DOCUMENT.

17            7.       If YOU claim that a portion of a DOCUMENT is protected from disclosure

18    for any reason, produce such DOCUMENT with redaction of only the portion claimed to

19    be protected.  When such redactions for privilege or protection are made, YOU shall place

20    a legend similar to "REDACTION – PRIVILEGE" on the copy of the DOCUMENT

21    produced.   All redactions shall also be included on the privilege log described in

22    Instruction #6.

23            8.       If any DOCUMENT called for by these requests has been destroyed, lost,

24    discarded, or is otherwise no longer in your possession, custody, or control, identify such

25    DOCUMENT as completely as possible, and specify the date of disposal of the

26    DOCUMENT, the manner of disposal, the reason for disposal, the person authorizing

27    disposal, and the person disposing of the DOCUMENT.

28

146311359.1                                    -4-

## **DOCUMENTS REQUESTED**

1.      All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the adequacy of mental health staffing levels in the Arizona Department of Corrections.

2.      All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the adequacy of individual and group mental health treatment provided to patients in the Arizona Department of Corrections, including but not limited to the practice of "cellfront" encounters during which the patient remains in his or her cell while speaking to mental health staff.

3.      All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the mental health treatment provided to patients who are on suicide watch or mental health watch, or who have recently been removed from suicide watch or mental health watch, in the Arizona Department of Corrections, including but not limited to the "STAR process."

4.      All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the adequacy of measures taken by mental health staff and custody staff to prevent suicide or self-harm by patients in the Arizona Department of Corrections.

5.      All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the adequacy of mental health treatment plans for patients in the Arizona Department of Corrections.

6.      All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the availability of appropriate medications to treat the mental illnesses of patients in the Arizona Department of Corrections, including but not limited to any limitations imposed by Corizon or ADC on the psychotropic medications that can be prescribed for patients, and/or the discontinuation of non-formulary medications that community or jail mental health staff had prescribed for patients prior to their incarceration in ADC custody.

1       7.     All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the Psychotropic Medication Review Board ("PMRB") process to approve patients for involuntary medication.

       8.     All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the risk posed by high temperatures to patients taking psychotropic medications.

       9.     All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the appropriateness of the use of "telemedicine" to provide mental health services to patients in the Arizona Department of Corrections.

      10.    All documents and communications exchanged between you and Corizon employees, or between you and ADC employees, regarding the accuracy of monitoring of ADC's compliance with the mental health requirements of the Stipulation in *Parsons v. Ryan*.

# EXHIBIT 5


# FILED UNDER SEAL