Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO MODIFY STIPULATION**<br>**(Dkt. 3461)** |

For years, Plaintiffs have tried to re-characterize the Stipulation as a court order, either to unilaterally modify what they originally bargained for or to expand the Court's enforcement authority beyond its terms to punish Defendants for non-compliance. (*See*, *e.g.*, Dkt. 1790, 1819, 2214, 3402.)  Not once has this Court agreed that the Stipulation is a court order.  And for good reason.  The Stipulation is a voluntary settlement agreement.

Plaintiffs' most recent Motion to Modify the Stipulation (Dkt. 3461) seeks to do it again. They ask the Court to remove the Stipulation's attorneys' fees provision capping Plaintiffs' counsels' annual monitoring compensation so that they can request and recover unlimited fees.  But like all their past attempts, this request fails because Rule 60 can only be used to modify a court order, and the Stipulation is not a court order.

Even if Rule 60 did apply, Plaintiffs fail to demonstrate that their proposed modification is warranted. Instead of affirmatively demonstrating that removing the monitoring-fees cap is "suitably tailored" to resolve a "significant change" in circumstances, they simply assert that they should be paid more because Defendants are not in full compliance with the Stipulation. This perfunctory demand falls woefully short of meeting their heavy burden to justify the substantial modification they seek. The Court should deny the Motion.

**I.  Background.**

The parties entered into the Stipulation just 12 days before trial was set to begin. (Dkt. 1075, 1185.) In the preceding two months, the Court noted that Defendants had "presented some discrete matters about which there may be no conflicting evidence" (Dkt. 1065 at 12); denied Plaintiffs' motion to present expert testimony by declaration, finding that process to be "ill-suited for a complex case of this magnitude" (Dkt. 1107 at 11); granted Defendants' motion to exclude Plaintiffs' deposition designations for 21 witnesses (Dkt. 1167); and ruled that Plaintiffs had failed to timely provide copies of their trial exhibits (Dkt. 1126).[1] Understanding that a complete litigation victory was not a "sure thing" for either side (Dkt. 1458 at 2–3), Plaintiffs and Defendants decided to "settle" the matter (Dkt. 1185, ¶ 4) before any finding of constitutional or unconstitutional conduct.

The form of that agreement was a point of considerable contention during negotiations. Plaintiffs' counsel wanted a court-ordered agreement, like the stipulated injunction entered in *Plata v. Davis*, No. C-01-1351 THE (N.D. Cal.).[2] (Dkt. 1857, ¶ 4.) Defendants steadfastly refused to enter into anything even remotely similar to a consent decree or any other agreement that would allow subsequent judicial modifications. (Dkt.

---

[1] Despite Plaintiffs' violation of the final-pretrial-order deadline to exchange trial exhibits, the Court allowed Plaintiffs an opportunity to cure it (Dkt. 1126 at 2), which they also failed to do (Dkt. 1161, 1174, 1179). Before the Court ruled on Defendants' request to exclude all of Plaintiffs' proposed trial exhibits (Dkt. 1161), the parties entered into the Stipulation, rendering the issue moot (Dkt. 1191).

[2] Plaintiffs' counsel Donald Specter was counsel for the plaintiffs in *Plata* and brokered that stipulated injunction. (Dkt. 1450-1 at 19.)

1842-2, ¶¶ 10, 12; Dkt. 1842-3, ¶¶ 13, 15; Dkt. 1857, ¶¶ 4–8.) Defendants never would have agreed to that arrangement. (*Id*.) And they did not. They entered into a voluntary settlement agreement. (Dkt. 1185.) Whereas the stipulated injunction in *Plata* was ordered and signed by the district court judge (Dkt. 1450-1 at 20 ["THE COURT SO FINDS AND IT IS SO ORDERED"]), the Stipulation in this case was signed only by the parties (Dkt. 1185 at 16–21). The Stipulation further states that it "shall not be construed as a consent decree," codifying the parties' intent that it is a voluntary settlement agreement. (*Id*., ¶ 35.) To ensure that its terms remained as they were originally agreed upon, the parties agreed that only *they* could jointly modify it: "This is an integrated agreement and may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification." (*Id*., ¶ 40.)

Also unlike the stipulated injunction in *Plata*—which required the State of California to implement policies and practices designed to "meet or exceed the minimum level of care necessary to fulfill the defendants' obligation to plaintiffs under the Eighth Amendment" (Dkt. 1450-1, ¶¶ 4, 28)—the Stipulation does not measure constitutional compliance. Rather, it requires compliance with 112 performance measures ("PMs") at most facilities. (Dkt. 1185, ¶¶ 8, 18; Dkt. 1185-1, Ex. B & D.) Defendants are required to measure and report on their compliance each month. (Dkt. 1185, ¶¶ 9–10, 19–20.) This largely involves ADC monitors/staff reviewing a random sample of files and recording the percentage that complies with the particular measure for the audited month. (Dkt. 1185-1, Ex. C & E; Dkt. 1842-3, ¶¶ 17-21; Dkt. 3108-1, ¶¶ 37–57.) Compliance percentages are tabulated in the CGAR reporting tool and sent to Plaintiffs' counsel and the Court each month. (Dkt. 1842-3, ¶¶ 16-19; Dkt. 3108-1, ¶¶ 27–28.) The CGARs dictate Defendants' compliance with the Stipulation. (Dkt. 1185, ¶¶ 9.a, 20.a.) A particular PM is substantially non-compliant if, according to the CGARs, either (a) it is not in compliance for 18 out of 24-four months, or (b) it has been non-compliant for three or more consecutive months in an 18-month period. (Dkt. 2644.)

Although Plaintiffs' counsel have a role in the monitoring of Defendants' compliance with the Stipulation, Section III—titled, "Monitoring and Enforcement"—limits their role:

> Plaintiffs' counsel shall have reasonable access to the institutions, staff, contractors, prisoners and documents necessary <u>to properly evaluate whether Defendants are complying with the performance measures and other provisions of this Stipulation</u>.

(Dkt. 1185, ¶ 29, emphasis added.) To that end, each month, Plaintiffs' counsel are entitled to: (1) health care records of no more than 10 Class members; (2) health care and institutional records of no more than five Subclass members; and (3) health care records of all Class members who died. (*Id*.) Plaintiffs' counsel and their experts are also allowed to conduct prison-complex tours "no more than twenty (20) days per year," where they can interview ADC and contractor employees, conduct confidential, out-of-cell interviews with inmates, review health care and other inmate records, and review monitoring-related documents.[3] (*Id*., ¶ 32.) Since the Stipulation was approved, Plaintiffs have taken 32 monitoring tours—six in 2015, five in 2016, and seven in 2017, 2018, and 2019 (Dkt. 3462, ¶ 3)—and Defendants have produced to Plaintiffs' counsel approximately 1,601,339 pages of documents. The Court has also granted Plaintiffs' counsel unlimited access to ADC's electronic health records database (eOMIS).

If Plaintiffs' counsel believe a performance measure is not in substantial compliance with the Stipulation, they must provide Defendants a notice of substantial non-compliance. (Dkt. 1185, ¶ 30.) The parties are then required to informally meet and confer to try and resolve the dispute. (*Id*.) If they cannot resolve the dispute informally, the parties are required to mediate the dispute before a magistrate judge. (*Id*., ¶ 31.) If the dispute is not resolved in mediation, Plaintiffs may file a motion to enforce the Stipulation with the Court, and the Court resolves the dispute. (*Id*.)

---

[3] Plaintiffs' counsel typically request, and Defendants provide, a host of documents in advance of each tour. (*See*, *e.g.*, Ex. 1.)

4

Plaintiffs' counsel are paid for their efforts. Upon entering the Stipulation, they were paid a lump sum in the amount of $4,900,000.00. (Dkt. 1185, ¶ 42.) In addition to that lump sum, the Stipulation authorizes—and limits—fees in two circumstances. Under Paragraph 43, Plaintiffs are entitled to recover their "reasonable attorneys' fees and costs, including expert costs" "[i]n the event that [they] move to enforce any aspect of this Stipulation and [they] are the prevailing party with respect to the dispute." (*Id.*, ¶ 43.) Since the Stipulation began, Plaintiffs' counsel have been awarded $2,893,113.78 in fees and costs pursuant to that Paragraph (Dkt. 2902, 3245), and an additional request in the amount of $386,858.61 is still pending (Dkt. 3401).[4] Paragraph 44 states that "Plaintiffs' counsel shall be compensated for work reasonably performed or costs incurred to monitor or enforce the relief set forth in this Stipulation up to $250,000 per calendar year." (Dkt. 1185, ¶ 44, emphasis added.) Plaintiffs' counsel have been paid more than $1,200,00.00 in monitoring fees to date. (Dkt. 3461 at 8.) Plaintiffs' Motion to Modify concerns the monitoring-fees cap in Paragraph 44.

## II.   The Court Cannot and Should Not Remove the Monitoring-Fees Cap From the Stipulation.

### A.   Rule 60 Does Not Authorize the Court to Modify the Parties' Settlement Agreement.

Plaintiffs once again argue that Rule 60(b)(5) gives the Court the power to modify the Stipulation. (Dkt. 3461 at 4–5.) It does not. "'Rule 60(b)(5) represents a codification of preexisting law, recognizing the inherent power of a court sitting in equity to modify its decrees prospectively to achieve equity.'" *S.E.C. v. Worthen*, 98 F.3d 480, 482 (9th Cir. 1996) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 911 F.2d 363, 365 (9th Cir. 1990), *abrogated on other grounds*, *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367 (1992)) (emphasis added). Thus, a court's equitable power—and therefore Rule 60(b)(5)—

---

[4] The Court has previously ruled that Paragraph 43 authorizes fees for activities that "are driven by Plaintiffs' attempts to enforce the Stipulation." (Dkt. 2902 at 2.) The Ninth Circuit is currently reviewing the scope of fees authorized by this provision, as well as the applicable hourly rates. *See Parsons v. Ryan*, No. 18-16365. Defendants dispute the rates asserted in Plaintiffs' Motion.

extends only to modifications of its *own orders*. *See Horne v. Flores*, 557 U.S. 433, 441 (2009); *Flores v. Huppenthal*, 789 F.3d 994, 998 (9th Cir. 2015); *Seychelles Organics, Inc. v. Rose*, CV-11-1746-PHX-FJM, 2014 WL 3339640, at *3 (D. Ariz. July 8, 2014).

All of the cases cited by Plaintiffs confirm this; each one involved the modification of a preexisting *court order*. *See Brown v. Plata*, 563 U.S. 493, 514, 542–43 (2011) (noting that a court "retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion") (emphasis added); *Kelly v. Wengler*, 822 F.3d 1085, 1095 (9th Cir. 2016) (involving the modification of a "dismissal order" that "explicitly incorporated" the parties' stipulation for dismissal, which "explicitly incorporated the parties' settlement agreement and attached the agreement as an exhibit") (emphasis added); *Armstrong v. Brown*, , 978 (9th Cir. 2014) (involving a proposed modification where "the district court [had] entered a permanent injunction" and "issued another injunction") (emphasis added, internal citations omitted); *Bellevue Manor Associates v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999) (involving the proposed modification of a "declaratory judgment and injunction" that "had been entered against" the defendant) (emphasis added); *Valdivia v. Schwarzenegger*, 548 F. Supp. 2d 852, 854 (E.D. Cal. 2008), *aff'd*, 599 F.3d 984 (9th Cir. 2010) ("This Court entered a Stipulated Order for Permanent Injunctive Relief in this action[.]") (emphasis added).

As discussed above, the Stipulation is not a court order—it expressly states that it shall not be construed as a consent decree, *and* it was not ordered, entered, or signed by the Court. *See Escalanti v. Superior Court*, 799 P.2d 5, 8 (Ariz. App. 1990) (holding that where the "[p]lain language [of an agreement] reveals the intended meaning," it "allows no room for interpretation"). It is a negotiated settlement agreement voluntarily entered into by the parties. Thus, the Court does not have the authority to unilaterally modify it.[5] *See Isaak v.*

---

[5] The Ninth Circuit has referred to the Stipulation as a "settlement agreement," and in a prior appeal applied legal principles interpreting and enforcing settlement agreements specifically. *See Parsons v. Ryan*, 912 F.3d 486, 495, 497–98 (9th Cir. 2018) (citing *Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989), *City of Emeryville v. Robinson*, 621 F.3d 1251 (9th

*Mass. Indem. Life Ins. Co.*, 623 P.2d 11, 14 (Ariz. 1981) ("It is not within the power of this court to revise, modify, alter, extend, or remake a contract to include terms not agreed upon by the parties."). Indeed, Plaintiffs admitted this much when they urged the Court to approve the Stipulation:

> Additionally, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness," and the Court cannot "delete, modify or substitute certain provisions. The settlement must stand or fall in its entirety." *Hanlon*, 150 F.3d at 1026 (citations omitted); *see also Jeff D. v. Andrus*, 899 F.2d 753, 758 (9th Cir. 1989) ("[C]ourts are not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties.").

(Dkt. 1449 at 10, emphasis added.) They cannot now take an inconsistent position when they are apparently not satisfied with the agreement that they bargained for.

Plaintiffs state (in a footnote) that *Plata* supports their argument because it involved a "stipulation for injunctive relief." (Dkt. 3461 at 5 n.3.) But the stipulated injunction in that case, regardless of how the parties labeled it, was still a court order—it was ordered and signed by the judge. (*See* Dkt. 1450-1 at 20 ["THE COURT SO FINDS AND IT IS SO ORDERED"].) Plaintiffs also state (in a footnote) that the Court has the power to modify the Stipulation because it was "approved by this Court after a fairness hearing, and was memorialized by the Court's signing of a joint proposed Order." (Dkt. 3461 at 5 n.3.) But neither the Fairness Order nor the Order Re: Settlement converted the Stipulation into a court order. The Fairness Order merely found that the terms of the Stipulation were fair, adequate, and reasonable, as required by Rule 23(e) for all class action settlement agreements. (Dkt. 1458 at 1–5.) *See Christina A. ex rel. Jennifer A. v. Bloomberg*, 315 F.3d 990, 992–93 (8th Cir. 2003) (holding that judicial approval of a class action settlement agreement does not convert it into a consent decree); *Disability Law Ctr. v. Mass. Dep't of Correction*, 960 F. Supp. 2d 271, 284–85 (D. Mass. 2012) (holding that, in approving a class action settlement agreement, "the court is not evaluating and approving the settlement

---

Cir. 2010), and *Wilcox v. Arpaio*, 753 F.3d 872 (9th Cir. 2014)).

1  to determine whether any agreed-upon relief should be ordered," nor was it "now ordering
2  any form of remedy" but was deciding only whether it was fair and reasonable); *see also*
3  *Jeff D.*, 899 F.2d at 758 ("The court's power to approve or reject settlements does not permit
4  it to modify the terms of a negotiated settlement.").[6]

5        Furthermore, neither Order incorporated the terms of the Stipulation; granted any
6  remedy or entered any relief; or required Defendants' compliance with the Stipulation.
7  (Dkt. 1458 at 1–6.) The mere fact that the Court acknowledged the Stipulation in the Order
8  Re: Settlement, including its authority to enforce its terms, did not transform it into a
9  consent decree. *See Christina A.*, 315 F.3d at 993 ("[T]he district court's enforcement
10 jurisdiction alone is not enough to establish a judicial 'imprimatur' on the settlement
11 contract."); *Disability Law*, 960 F. Supp. at 284 (holding that retaining jurisdiction over a
12 settlement agreement was within the court's inherent authority to manage its docket and
13 was not determinative of the agreement's classification); *see also Kokkonen v. Guardian*
14 *Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (in case involving a Rule 41 dismissal order
15 following a settlement agreement, the court held that "[t]he judge's mere awareness and
16 approval of the terms of the settlement agreement do not suffice to make them part of his
17 order"). Thus, Rule 60(b)(5) cannot be invoked to modify it.[7]

18       For such a significant request for relief, Plaintiffs hardly support it with anything
19 persuasive. Their one-page argument (Dkt. 3461 at 4–5), consisting primarily of a footnote,
20 presents nothing new, despite knowing Defendants' position and arguments from past
21 pleadings. The Court should rule once and for all that the Stipulation is not a court order,

---

[6] Notably, the fairness order approving the stipulated injunction in *Plata* went beyond simply finding the agreement to be fair and reasonable. The district court expressly "adopt[ed] the stipulation as the order of this Court." *See Plata v. Davis*, No. C-01-1351 THE (N.D. Cal.), Dkt. 69 [Order entered June 6, 2002] at 3, attached as Ex. 2. The Fairness Order in this case does not include that express adoption and conversion. (Dkt. 1458 at 1–5.)

[7] In a pending appeal, the Ninth Circuit is considering whether the Court has the authority to hold Defendants in contempt for failing to comply with the Stipulation, which could shed additional light on this issue. *See Parsons v. Ryan*, No. 18-16358, Doc. 36, 50.

and therefore Rule 60(b)(5) does not apply.[8]

### B.      Plaintiffs Have Failed to Establish That Their Proposed Modification Is Warranted Under the Circumstances.

Even assuming that Rule 60(b)(5) applies, Plaintiffs have failed to meet their "heavy burden" of justifying their proposed modification. *Seychelles Organics*, 2014 WL 3339640, at *3. To modify a court order, the moving party must:

> [First] establish that a "significant change either in factual conditions or in the law" occurred after execution of the decree. Second, it must demonstrate that the change was not "anticipated at the time it entered into the decree." Third, it must show that the changed factual circumstance makes "compliance with the consent decree more onerous, unworkable, or detrimental to the public interest." Finally, the proposed [modification] must be "suitably tailored to resolve the problems created by the changed conditions."

*Labor/Cmty. Strategy Ctr. v. Los Angeles County Metro. Transp. Auth.*, 564 F.3d 1115, 1120 (9th Cir. 2009) (quoting *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005)) (internal citations omitted).

Although a court should generally exercise "flexibility" in considering a request for modification in certain cases, the Supreme Court has cautioned that "it does not follow that a modification will be warranted in all circumstances." *Id.* For example, a modification is inappropriate simply where "it is no longer convenient to live with the terms." *Id.* Moreover, even less of a basis to modify exists where, as here, the parties agreed to the original terms. *See Bellevue Manor*, 165 F.3d at 1253 n.4 ("It might be argued with some force that there is even less of a basis to disrupt a consent decree to which all parties agreed (which thus truly partakes in part of the nature of a contract) than a court-issued final judgment that had been contested by at least one party."); *Rhino Sports, Inc. v. Sport Court, Inc.*, CV021815 PHX JAT(L), 2007 WL 1302745, at *6 (D. Ariz. May 2, 2007) ("Here, the

---

[8] In a footnote, Plaintiffs state: "The Court also has power to modify the order pursuant to Federal Rule of Civil Procedure 60(b)(6)." (Dkt. 3461 at 4 n.2, emphasis added.) This conclusory statement can hardly be considered an affirmative request to modify the Stipulation on that alternative ground, but, even if it was, Plaintiffs fail to provide any argument to support it. The Court should find it waived and not entertain it. Nonetheless, like Rule 60(b)(5), Rule 60(b)(6) applies only to court orders. *See*, *e.g.*, *Rufo*, 502 U.S. at 372; *Hook v. State of Ariz., Dep't of Corr.*, 972 F.2d 1012, 1016 (9th Cir. 1992).

parties stipulated to the permanent injunction; therefore, even less basis exists to disrupt such an order to which all parties agreed.").

### 1. There has not been a "significant change" in circumstances.

Plaintiffs argue that the failure to comply with a court order constitutes a "significant change" in circumstances that warrants any modification of its terms. (Dkt. 3461 at 6.) But all of the cases they cite to support that proposition involved a very specific proposed modification: extending the *duration* of a consent decree. *See Labor/Cmty. Strategy*, 564 F.3d at 1120–21 ("The failure of substantial compliance with the terms of a consent decree can qualify as a significant change in circumstances that would justify the decree's temporal extension.") (emphasis added); *see also Kelly*, 822 F.3d at 1093 (involving a 2-year extension of a court order); *Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 270 (3d Cir. 2001) (involving a 10-month extension of a consent decree); *David C. v. Leavitt*, 242 F.3d 1206, 1208 (10th Cir. 2001) (seeking an extension of a four-year consent decree); *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1016 (6th Cir. 1994) (involving a two-year extension of a consent decree). Plaintiffs have not cited any case holding that noncompliance with a court order is a basis for a plaintiff to modify a substantive, agreed-upon term capping the amount of fees that a plaintiff is entitled to. For that reason alone, Plaintiffs' proposed modification should be rejected.[9]

Plaintiffs have also made no effort to establish that there has been "substantial" non-compliance with the Stipulation. *Kelly*, 822 F.3d at 1098; *Labor/Cmty. Strategy*, 564 F.3d at 1120–21. In place of that necessary showing (and heavy burden), they conclusively assert, "Nearly five years since the Stipulation, this case is nowhere close to winding down." (Dkt. 3461 at 6; *see also id*. at 7 [fleetingly referencing "epic problems"]; *id*. at 10 ["Health care appears to be getting worse, not better."].) Simply making such statements does not come close to *actually demonstrating* a significant change in circumstances.

---

[9] The fees cap in *United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester County, New York*, 06 CIV. 2860 (DLC), 2017 WL 728702, at *1 (S.D.N.Y. Feb. 23, 2017), involved a cap of the amount to pay a *court-ordered monitor*, not attorneys' fees.

10

Plaintiffs' failure to even attempt to show substantial non-compliance is likely because they cannot make that showing. In determining whether substantial non-compliance exists, the Court must take "a holistic view of all the available information" and determine whether Defendants' "compliance with the [Stipulation] overall was substantial, notwithstanding some minimal level of noncompliance." *Labor/Cmty. Strategy*, 564 F.3d at 1122. Of the original 1,030 healthcare PMs, the Court has terminated 140. (Dkt. 2900.) Indeed, the great majority of the remaining healthcare PMs should now be terminated in light of Dr. Stern's report, which did not find systemic unreliability or inaccuracy in the reporting numbers establishing compliance.[10] (*See* Dkt. 3379 at 9–48 [finding issues regarding the accuracy of compliance data for only 11 specific PMs]; *see also id.* at 9 ["It is my firm conclusion that ADC monitors conduct their work as fiduciaries for patients incarcerated at ADC. Their first and only consideration is whether patients are safe, as measured by the PMs they review. If anything, I found their audit decisions, at times, to be less forgiving of the vendor's actions than I might have been myself."].)

Historically, Defendants have been in compliance with the majority of healthcare PMs. For example, in July 2019, six of the 10 ADC facilities were compliant with at least 90% of the PMs and nine out of 10 facilities were compliant with at least 85% of the PMs, with an overall passage rate of 89% (Dkt. 3375); in August 2019, six of the 10 ADC facilities were compliant with at least 90% of the PMs and eight out of 10 facilities were compliant with at least 85% of the PMs, with an overall passage rate of 89% (Dkt. 3397); in September 2019, seven of the 10 ADC facilities were compliant with at least 90% of the PMs and all 10 facilities were compliant with at least 85% of the PMs, with an overall passage rate of 92% (Dkt. 3443); in October 2019, nine of the 10 ADC facilities were compliant with at least 90% of the PMs and nine out of 10 facilities were compliant with at least 85% of the PMs, with an overall passage rate of 94% (Dkt. 3459); and in November

---

[10] In fact, Dr. Stern believes 536 healthcare PMs should be terminated or retired and that an additional 113 are no longer applicable to the particular complex. (Dkt. 3379 at 37–38, 44, 53–56, 89–90; Dkt. 3382-1 at 9–10.)

11

2019, eight of the 10 ADC facilities were compliant with at least 95% of the PMs and nine out of 10 facilities were compliant with at least 85% of the PMs, with an overall passage rate of 94% (Dkt. 3473).[11] The same is true of the maximum custody PMs. As early as August 2015, Defendants achieved and exceeded compliance for all nine maximum custody PMs.[12] (*See* Dkt. 3108.)

Furthermore, only 47 healthcare PMs (out of the original 1,030) have been included in an order to show cause for chronic non-compliance (Dkt. 2372, 3235), and the Court has held Defendants in contempt for failing to comply with only 19 healthcare PMs (Dkt. 2898), just 2% of the total number originally required to be monitored (Dkt. 1185-1, Exhibit B). Defendants have never been ordered to show cause—or held in contempt—for non-compliance with any maximum custody PM. Thus, it cannot be said that Defendants are in substantial non-compliance with the Stipulation overall. *Cf. David C.*, 242 F.3d at 1212–13 (finding that 80% non-compliance with the provisions of a consent decree constituted a "change of circumstances" warranting modification); *see also Labor/Cmty. Strategy*, 564 F.3d at 1123 ("We note that the de minimis level of noncompliance here is nowhere close to the near total noncompliance in cases in which courts concluded that extensions of the consent decrees were warranted. In *Thompson*, 404 F.3d at 834, there was a 'near total failure' of some defendants to comply with their obligations. Those defendants failed to do 'almost anything that they were required to do under the Decree.' In contrast, aside from the imperfect compliance with the load factor targets, MTA complied fully with its

---

[11] Centurion began providing healthcare on July 1, 2019, and these percentages reflect compliance since that time. Plaintiffs' assertion that the "switch-over" to Centurion "only made things worse" is baseless. (*See* Dkt. 3461 at 7.)

[12] As the Court is aware, it recently terminated two of the nine PMs (at all facilities) and all PMs at ASPC-Florence-Central Unit (Main Yard) and ASPC-Perryville, but denied Defendants' request to terminate six PMs at the remaining facilities because it found the random sampling technique used to monitor them was inadequate and Defendants failed to establish that inmates were in fact offered out-of-cell time. (Dkt. 3359.) These rulings are currently on appeal. *See Jensen v. Ryan*, No. 19-17072. Defendants also note that maximum custody PM 9 regarding the use of chemical agents on seriously mentally ill maximum security inmates is subject to a Separate Agreement Regarding Modification of Stipulation Para. 27(a)–(c). (Dkt. 3108 at 1–2 & n.1.) Notwithstanding this Separate Agreement, Defendants long since achieved, and remain, compliant with that PM.

numerous obligations under the decree.") (internal citations omitted). Therefore, Plaintiffs have not established a "significant change" in circumstances warranting any modification of the Stipulation.[13]

### 2. Allowing unlimited monitoring fees is not suitably tailored to the purported change in circumstances.

Plaintiffs have also failed to establish that their proposed modification—removing the monitoring-fees cap—is suitably tailored to the purported change in circumstances. If "a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Rufo*, 502 U.S. at 391–92. Courts must also "remain attentive to the fact that 'federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation.' 'If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law,' it may 'improperly deprive future officials of their designated legislative and executive powers.'" *Horne*, 557 U.S. at 450 (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977), and *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

Plaintiffs have failed to make this showing for several reasons. First, because their purported change in circumstances is non-compliance with the Stipulation and the Stipulation does not measure constitutional compliance, any modification to cure that

---

[13] Plaintiffs belabor the point that the Stipulation was approved in February 2015, and yet Defendants are still not in *full* compliance with every PM five years later. (Dkt. 3461 at 2.) Unlike many consent decrees, the Stipulation does not have an expiration date, and, in fact, Defendants were precluded from moving to terminate the Stipulation "for a period of four years from the date of [the Court's] approval in February 2015. (Dkt. 1185, ¶ 37.) Defendants were also precluded from moving to terminate monitoring/reporting of specific PMs until they acquired at least two years' worth of data. (Dkt. 2644.) Only after Defendants moved to terminate a majority of the PMs did Plaintiffs challenge the reliability of the underlying compliance data with the Court, wasting years of monitoring. (Dkt. 2344, 3177.) Furthermore, at the time they negotiated the monitoring fees cap, Plaintiffs' counsel knew, based on their experience in other class-action lawsuits, that monitoring could last for many years. *See, e.g.*, *Armstrong*, 768 F.3d at 978; *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1072 (E.D. Cal. 2014).

1  change necessarily exceeds the Court's authority. *Horne*, 557 U.S. at 450. Second, Plaintiffs do not explain how removing the monitoring-fees cap and paying them more fees will result in additional compliance with the Stipulation. They generally contend that it "will incentivize Defendants' compliance," but even they admit that this contention is pure speculation. (*See* Dkt. 3461 at 10 ["If faced with the actual cost of monitoring their continued refusal to comply with the Stipulation, Defendants may actually comply with it."], emphasis added.) Though disguised as an "incentive," the justification is really a punishment. (*See id*. at 2–3, 7, 9 [repeatedly suggesting Defendants' non-compliance is intentional].) *See Rufo*, 502 U.S. at 392–93 ("Financial constraints … are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification.").

At bottom, Plaintiffs' Motion is simply a plea for more fees, claiming they have had to engage in "extensive monitoring," resulting in fees far exceeding the $250,000 annual cap. (Dkt. 3461 at 7–9.) Their plea does not warrant modifying the Stipulation. As a threshold matter, the amount in "monitoring fees and expenses" Plaintiffs' counsel allege they have actually incurred is supported only by avowals stating the amounts. (Dkt. 3461 at 8; Dkt. 3462, ¶¶ 5–7.) They do not provide any documentation supporting those amounts, and therefore neither Defendants nor the Court can verify (1) whether they in fact involved a "monitoring activity," (2) the number of hours expended on those monitoring activities, or (3) whether the work performed was unreasonable. Thus, Plaintiffs' counsel have not even established that their demand for unlimited fees is necessary or equitable.

More importantly, Plaintiffs' counsel have not justified any increase in fees. They argue that they have sent Defendants a "steady stream of letters," including 650 letters in 2019 (coincidentally, more than *five times* the number of letters sent in prior years, Dkt. 3462, ¶ 2), "cataloging failures to provide medical care in specific cases and requesting assistance." (Dkt. 3461 at 7, emphasis added.) But preparing these letters go far beyond what is necessary "to properly evaluate whether Defendants are complying with the performance measures and other provisions of this Stipulation." (Dkt. 1185, ¶ 29.) The

PMs do not require the provision or adequacy of individual inmate care. (Dkt. 1185-1, Ex. B–E.) Indeed, Plaintiffs (and Dr. Stern) have acknowledged that the PMs do not measure the adequacy of care provided to individual inmates (Dkt. 3402 at 2, citing Dkt. 3379), and this Court has repeatedly refused to entertain individual inmate healthcare grievances filed in this case. Thus, advocating on behalf of individual inmates falls outside the scope of the Stipulation and Plaintiffs' counsels' monitoring duties.[14]

Plaintiffs also contend that they have conducted more than 30 prison tours in five years. (Dkt. 3461.) Although these tours are permitted for monitoring purposes, Plaintiffs' counsel asked to conduct 20 tours *each* year and still agreed to the $250,000 monitoring-fees cap. Based on their extensive experience monitoring other class action lawsuits, they were well-situated to know the costs entailed.[15]

Plaintiffs last complain that Defendants have, in the past, contested their monitoring fees invoices, referring to them as "petty disputes" and a "death-by-a-thousand-papercuts strategy." (Dkt. 3461 at 9.) This allegation does not justify *removing* the monitoring-fees cap altogether. Nonetheless, (1) the Stipulation allows Defendants to dispute the amount if "there is an obvious reason to believe that the work was unreasonable or the bill is incorrect" (Dkt. 1185, ¶ 44); (2) Plaintiffs' counsel received the full $250,000 in 2017, 2018, and 2019; and (3) Plaintiffs' counsel did not raise any issue with the Court regarding payments made in 2015 or 2016.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion to Modify Stipulation.

---

[14] Each inmate letter is forwarded to numerous Centurion and ADC employees for review, analysis, and investigation. Often times, the claim is unsubstantiated because the inmate has refused the care or treatment Plaintiffs demand, or because the allegations are inaccurate. For example, within the last approximately five week period, Plaintiffs sent four letters demanding treatment which the inmate had refused or subsequently refused. Moreover, some inquiries are trivial (request for Oakley brand glasses), (Ex. 3), or unrelated to the Stipulation or provision of healthcare (advocating that an inmates' medical bills be paid without further delay) (Ex. 4).

[15] Defendants responded to each one of Plaintiffs' counsel's various post-tour letters alleging violations of the Stipulation and rebutted their allegations. (Ex. 5.)

DATED this 24th day of January, 2020.

                              STRUCK LOVE BOJANOWSKI & ACEDO, PLC


                              By /s/Daniel P. Struck
                                  Daniel P. Struck
                                  Rachel Love
                                  Timothy J. Bojanowski
                                  Nicholas D. Acedo
                                  3100 West Ray Road, Suite 300
                                  Chandler, Arizona 85226

                                  *Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com; docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Amy B. Fettig: | afettig@npp-aclu.org |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Casey Arellano | carellano@acluaz.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Daniel P. Struck