# EXHIBIT 5

# (REDACTED)



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

March 11, 2019

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

   Re: **Parsons v. Ryan**
     ASPC-Tucson Tour (January 8-9, 2019)

Dear Corene:

  We are responding to your February 6, 2019 letter regarding Plaintiffs' January 8-9, 2019 Tucson tour.  We again remind you to exercise due diligence by utilizing your eOMIS access to review inmates' medical records before sending correspondence concluding that the care received was improper, needs immediate review, or runs afoul of the Stipulation.  Additionally, sending "inmate in need" correspondence without first reviewing the inmate's record wastes defense counsel, Corizon, and ADC's resources, as we are often forced to conduct an investigation into meritless claims.

  Nevertheless, we will address the concerns raised by you in the order you raised them.

**Erratic Medication Administration Times**

  Continued education of medical staff and communication efforts with the officers are being made to maintain the best functionality for the administration of medications, even when there are disruptions to the normal routine.  ADC and Corizon recognize the importance for medication passes occurring at the appropriate intervals.

**Use of Infirmary for Mental Health Watch**

  All three examples listed in your correspondence have the same inaccuracy.  Neither ██████████ nor █████ weere on a mental health watch at the time of the tour, but were instead on a routine "medical watch" due to being admitted to the IPC.  The "watch sheets on the

Corene Kendrick
March 11, 2019
Page 2

patients' doors" were not "confirm[ation] they were on a 30 minute watch."  All of the photos included in your February 6 correspondence indicate that the reason for observation was "Medical Rounds."

Regarding the source documents for measuring compliance with PMs 94 and 95, please see the below addressing those concerns:

███████, #██████:  Mr. █████ was admitted to the IPC on July 21, 2018 and was on a mental health watch at the time he was admitted.  His mental health watch was clearly documented to have been discontinued five days later on July 26.  He has not been on a mental health watch since then.  Therefore, he would not have been on any watch log going forward.

███████, #██████:  Mr. █████ was admitted to the IPC on March 21, 2018, and was on a mental health watch at the time he was admitted.  His mental health watch was clearly documented to have been discontinued on April 4, 2018.  He has not been on a mental health watch since then.  As he was no longer on a watch after April 4, he would not have been on any watch log going forward.

███████, #██████:  Mr. █████ was admitted to the IPC in December 2016.  He was placed on a mental health watch on January 25, 2017, which was discontinued on January 27, 2017.  He has been off mental watch since then, but has now been recently placed on watch at Kasson.

In sum, the infirmary is *not* being used for mental health watches as claimed and could have been easily confirmed through a more thorough review of eOMIS.

**Limited Access to HNR forms**

Please identify the detention units or officer names where this is occurring.  In general, we have not identified any issues with inmates accessing HNR forms at the detention units, but have reminded staff to provide inmates HNR forms when requested.

**Provider Rounding at the Manzanita SNU**

We have communicated this concern with Corizon for further follow up and reeducation, if necessary.

Corene Kendrick
March 11, 2019
Page 3

**<u>Lack of ADA-Accessible Equipment at Rincon HU-7</u>**

ADC and Corizon leadership have met to discuss accessible outdoor recreational equipment for HU-7.  ADC has begun to procure some equipment in order to allow those using medical equipment, i.e. wheelchairs, canes, etc., to access equipment.

Regards,

Timothy J. Bojanowski

TMR/TJB/eap
cc:    Counsel of record



**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**

Ashlee B. Hesman
480.420.1631
ahesman@strucklove.com

March 25, 2019

<u>**VIA EMAIL ONLY**</u>
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

   Re: *Parsons v. Ryan*
     **Plaintiffs' Monitoring tour – ASPC-Eyman (01/24 – 01/25/2019)**

Dear Corene:

  We are in receipt of your February 21, 2019 correspondence regarding Plaintiffs' January 24-25, 2019 tour of ASPC-Eyman.

**<u>Nursing Staff</u>**

  Both Corizon and ADC have, and will continue to, made every effort to recruit and retain FTE nursing staff to fill positions at ASPC-Eyman. Corizon's efforts include, but are not limited to, the following:

- Expansion of onboarding classes at the regional office to four full days.  This year, 55 nurses have completed the class
- Offering referral bonuses for employees who refer nurses to Corizon
- Discussions with Florence Hospital regarding the possible creation of a co-op of PRN staff
- Meetings with multiple nursing schools to discuss recruitment
- Addition of second clinical recruiter in January
- Utilization of agency nurses.  This has resulted in 25 hires in the last 60 days.
- Mailing of approximately 3,000 recruitment postcards in the Florence area over the last month

Corene Kendrick
March 25, 2019
Page 2

## Individual Inmate Allegations

 ):  This inmate was seen on December 3, 2018 and several consults for offsite specialty appointments were submitted:

- December 10, 2018:  urgent general surgery (ATP on December 19, 2018)
- December 20, 2018: urgent general surgery (completed on February 21, 2019)
- January 14, 2019:  urgent ultrasound (completed on February 12, 2019)
- March 4, 2019:  urgent general surgery and Hem/Onc (referred to UM)
- March 6, 2019:  urgent PET/CT scan consult submitted (referred to UM)

Additionally, on February 21, 2019, a fine needle aspiration of the mass was completed.

 ):  He was seen on February 27, 2019 to discuss his February 19, 2019 urology ATP.  On this same date, a radiology consult for post-residual testing was submitted.

):  He was seen on sick call line on August 27, 2018.  He had a chronic care appointment on February 27, 2019.  He was seen by dental on January 16, 2019.

):  On September 12, 2018, an ATP was issued for the orthopedic consult for his non-displaced second metatarsal fracture.  He was seen on January 27, 2019 and received repeat x-rays of his right foot which confirmed the fracture had healed and that the alignment remained satisfactory.

):  He was seen on March 9, 2019 and had no complaints.

):  He had a chronic care appointment on June 17, 2018.  On September 17, 2018, a provider reviewed his HNR requesting renewal of medication, and his medication was renewed.  The appointment for his lab results was completed on December 5, 2018.

):  Despite your allegations, his record does not document violations of PMs 42 and 52.  During his August 2, 2018 encounter, the provider advised him to return to clinic as needed.  Because there is no specific follow up ordered, PM 42 is not applicable.  On November 30, 2018, he returned from an offsite ENT appointment with a recommendation for a hearing aid fitting.  An audiology consult was submitted on December 4, 2018.  This complies with PM 52.

):  As you state, he was seen on February 8, 2019.

Corene Kendrick
March 25, 2019
Page 3

## **Orthodontic Wire Cutters**

Proper orthodontic wire cutters are available on all units where inmates with a broken jaw may be housed.

Sincerely,

Ashlee B. Hesman

ABF/eap

cc:     Counsel of record

3100 West Ray Road | Suite 300 | Chandler, AZ 85226
480.420.1600 | STRUCKLOVE.COM



# STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

June 5, 2019

***VIA EMAIL ONLY***
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

    Re:     **Parsons v. Ryan**
            Tour of ASPC-Perryville (April 2-4, 2019)
            Notice of Noncompliance (Paragraph 8 of the Stipulation)

Dear Corene:

This letter responds to your May 6, 2019 Notice of Noncompliance regarding Paragraph 8 of the Stipulation concerning the medical care provided by Dr. Enciso. Defendants deny Plaintiffs' allegations and affirmatively assert that there is no noncompliance with Paragraph 8 of the Stipulation.

Specifically, we respond to the concerns raised for the individual inmates in your letter as follows:



██████████ (#██████)

There was no clinical indication that Ms. ████ needed to be placed on methadone upon her arrival to Perryville. Ms. ████ was booked into the County jail on October 16, 2018 and was started on prenatal vitamins only; no other medications. She was transferred to Perryville on October 25, 2018, at least nine days after her last illicit drug use and possibly longer depending on when her last dose was prior to booking. Any withdrawal would have occurred prior to her arrival at Perryville. She did not exhibit any signs or symptoms of withdrawal when she was evaluated by Dr. Enciso. Thus, beginning methadone was not appropriate and was not required under policy.

There was no urgent need to send Ms. ████ to the hospital on December 17. Ms. ████ reported no complaints, except heartburn, despite Dr. Enciso being unable to hear the fetal heartbeat. Importantly, she reported feeling the flutter of the baby. Furthermore, your statement that the OB ultrasound request by Dr. Enciso on December 19 was "routine" is false. He submitted an urgent

Corene Kendrick
June 5, 2019
Page 2

request.  *See* Exhibit 1.   Your comment to KJZZ that "medical notes show the woman being transported off-site to deliver her stillborn fetus while shackled" is also false.   Ms. ███ was transported to the hospital on December 19 because of complaints of abdominal pain and bleeding.   *See* Exhibit 2.   She was not being transported to deliver her stillborn fetus.   That occurred a few days later as your letter acknowledges.

Thus, Ms. ████ (17 weeks pregnant) was properly restrained and transported to the hospital in accordance with D.O. 705, §9.4.3, "During the second trimester of pregnancy, inmates shall be transported in caged vehicles, handcuffed in front."  Ariz. Rev. Stat. § 31-601(A) and D.O. 705, § 9.36 only prohibit restraining pregnant inmates who are being transported for delivery or during labor, not every pregnant inmate being transported.   We demand that you withdraw your statement to KJZZ that "medical notes show the woman being transported off-site to deliver her stillborn fetus while shackled."  This is a clear misrepresentation.



████████  (# ██████)

There is no indication in Ms. ████'s record that she requested an ultrasound.   Nevertheless, Dr. Enciso's treatment was appropriate.   Ms. ████ had a 20-week ultrasound on September 27, 2018 while in jail.   She reported no complaints to Dr. Enciso during her October 15, 2018 encounter.   While she experienced pregnancy related discomfort, there is no indication an ultrasound was medically necessary.   She was treated for a yeast infection, and her other pregnancy pains were appropriately addressed.   She was evaluated by RN Valenzuela on December 29, 2019 (Saturday) in response to the ICS for complaints of abdominal pain on the right side.   RN Valenzuela consulted with the on-call provider, and Ms. ████ was prescribed Tylenol.   RN Valenzuela instructed Ms. ████ to return to medical ASAP if the symptoms worsened or if there was sudden relief and to monitor fetal movement.   Ms. ████ was referred to Dr. Enciso and was seen within 48 hours.

Ms. ████ was evaluated by Dr. Enciso on December 31, 2018.   Ms. ████ reported that the pain she had experienced only lasted ten minutes and never came back.   She also reported good fetal movement.   Dr. Enciso diagnosed her right lower quadrant pain she had been feeling as a "round ligament spasm."  Dr. Habib evaluated Ms. ████ three days later.   At that time, she complained that she had not felt any fetal movement for two days. This complaint is an indication for an OB ultrasound and she was appropriately sent out for testing.   The care she received from Dr. Enciso was appropriate.

████████  (# ██████)

Ms. ████' medical records show that she refused prenatal care on numerous occasions and refused to be seen by Drs. Enciso and Habib.   She finally agreed to an OB ultrasound on December 5, 2018, which revealed a viable pregnancy.   On January 19, 2019, an ICS was initiated, as Ms. ████ complained that her "water broke."  The Litmus test came back positive, and she was appropriately sent to Abrazo West Valley Hospital for delivery.   Several hours later, the hospital discharged her.   Ms. ████ reported to medical staff at Perryville that the hospital told her she was not in labor.   There was no rupture of the membranes.   There were no reported signs of distress upon her return from Abrazo, so it was appropriate to return her to her unit.   Ms. ████ was instructed to submit a HNR as needed for any new or worsening symptoms.   Between

Corene Kendrick
June 5, 2019
Page 3

her return to Perryville on January 19, 2019 and the ICS on January 22, 2019, there was no clinical indication that continuous monitoring was necessary, as she was not in labor and had no other complaints.

███████ (# ██████)

Your statement that Ms. ████ delivered her baby via an "emergency C-section due to pre-eclampsia" is false. The Abrazo hospital record indicates the reason for the emergency C-section was due to fetal intolerance to labor. *See* Exhibit 3. Furthermore, the elevated blood pressure on September 24, 2018 would not have warranted daily or twice-daily blood pressure checks, as there were no symptoms prior to September 24 that indicated pre-eclampsia. Pre-eclampsia is diagnosed when the patient exhibits both elevated blood pressure reading and significant proteinuria. Ms. ████ was treated for hypertension and had trace (mild) proteinuria. Ms. ████ was at risk for developing pre-eclampsia, and she was appropriately referred to the hospital for induction of labor, as her blood pressure readings remained elevated and her risk of pre-eclampsia persisted.

Ms. ████'s wound was treated appropriately onsite without complications. There were no signs of infection. A referral back to the hospital to see a wound specialist is not medically necessary as this is a common condition that is successfully treated by OB/GYN physicians.

███████ (# ██████)

Ms. ██████'s prenatal screening test was ordered on December 18, 2018 and drawn on December 24, 2018. The results were received on January 3, 2019 demonstrating "antibody positive." There are 32 different antibodies that this prenatal screening test identifies. Dr. Habib documented during an encounter with Ms. ██████ that the screening was positive, but the particular antibody which flagged a positive value at this point could not be identified. The lab was contacted and they stated that the identification of the antibody occurs automatically and an additional lab order is not necessary.

Ms. ██████ was seen again on January 30, 2019, and at that time the antibody was identified as a Kell antibody. At this encounter, Dr. Enciso documented that after her 4th pregnancy the patient had received a blood transfusion due to excessive bleeding. She had never had a positive Kell with any pregnancy prior to her transfusion. Dr. Enciso clinically assessed the current presence of the antibody as the result of her blood transfusion. This process is known as alloimmunization ("AI"). The next step in making the AI determination is to determine the paternal genotype. Dr. Enciso attempted to make this determination. Unknown to Dr. Enciso at the time was that the father of Ms. ██████'s baby was and still is incarcerated at the Florence complex. After several attempts at paternal genotyping, the plan was abandoned, as it was determined to be impossible due to the father's current incarceration. The antibody screen was then re-ordered on February 28, 2019 and was found to be stable and unchanged. A subsequent antibody screen in March 2019 demonstrated the Kell antibody titer rising, and Ms. ██████ was sent to perinatology for fetal Doppler monitoring, although the rest of her pregnancy remained uneventful. Importantly, there was no adverse effect to her or the baby.

Corene Kendrick
June 5, 2019
Page 4

 (# )

The specialist did not request a repeat ultrasound.  There was no evidence of abnormalities, even though the anatomic survey was incomplete due to fetal positioning.  The original fetal survey ultrasound was read by Dr. Frank Tranisi from SimonMed.  Dr. Enciso called SimonMed on the physician line to discuss the ultrasound results.  Dr. Tranisi was not available, but he was able to speak with Dr. ▇▇▇ Kupper, who is licensed and lives in Arizona.  The decision not to repeat the ultrasound was done in consultation with Dr. Kupper.  They collaboratively determined that enough normal fetal anatomy was identified during the initial ultrasound. They also concluded that another ultrasound was not necessary, as the likelihood of abnormalities was infinitesimally small.

 (# )

This was appropriately marked non-complaint in the December 2018 CGARS.  The notification process once an inmate gives birth and returns to the facility has been updated and improved.[1]

 (# )

Ms. ▇▇▇ was seen by a psychologist, Dr. Velez, in the (old) IPC following C-section pursuant to PM 74. There was another inmate in the bay during the encounter as documented, but Ms. ▇▇▇ was approximately 30 feet away from the other inmate in the bay.  Dr. Velez spoke in a low voice to maintain confidentiality and spoke in Spanish.  There is no evidence that the other inmate could hear or understand their conversation.   When Dr. Stern toured Perryville, he recommended that, in the future, Dr. Velez should ask patients to step outside to maintain confidentiality.  Dr. Velez responded that she did not have authority to remove a patient from the IPC, as she is not a physician, and it would not have been appropriate to have Ms. ▇▇▇ get up and walk as, she was still having post-procedural pain.  Dr. Velez said it was also not appropriate to remove the other inmate, as she was receiving IV antibiotic therapy.  Therefore, this encounter allowed for a confidential exchange of information; and was not in violation of PM 74.

Regards,

Timothy J. Bojanowski

TJB/TMR/eap
cc:   Counsel of record

---

[1] This explanation also applies to ▇▇▇▇ .



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Rachel Love
480.420.1616
rlove@strucklove.com

January 7, 2019

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA  94964
ckendrick@prisonlaw.com

   Re: **Parsons v. Ryan**
      **ASPC-Lewis Tour; Request for Expert Compensation**

Dear Corene:

  This letter is in response to your November 16, 2018 letter regarding the monitoring tour of ASPC-Lewis conducted on November 13-15, 2018.  Your allegations that Defendants' counsel and ADC personnel "repeatedly lied and misled Plaintiffs' experts in an attempt to thwart their fact-finding and monitoring of compliance with the Stipulation" are incorrect and without merit. Neither Defendants' counsel nor Defendants will tolerate such allegations which constitute libel, slander, and defamation of character. A retraction of your meritless allegations, which are also now on the docket and thus public, is demanded for the second time.  See first demand by letter from Rachel Love to Corene Kendrick dated December 4, 2018.

  Defendants' responses to your meritless allegations follow.

**Dr. Pablo Stewart**

  You allege that Plaintiffs' mental health expert, Dr. Pablo Stewart, repeatedly asked me, Warden Larson, and DW Rode on Tuesday, November 13, and Wednesday, November 14, 2018 "whether there was a unit or pod for seriously mentally ill (SMI) prisoners within Rast, because he wanted to speak to all of the class members housed in such areas."  You further refer to Plaintiffs' 10/17/18 tour set-up letter from K. Eidenbach to T. Bojanowski and T. Kartchner at 4 ("Dr. Stewart will need to visit [. . .] all housing units designated for prisoners with mental illness or with a specified MH score; all max custody housing units and all detention units.") as apparent support for your inaccurate and misguided allegations.

Corene Kendrick
January 7, 2019
Page 2

First, there were no "repeated" requests by Dr. Stewart as to whether there was a unit or pod for SMI inmates at the Rast Unit or at Lewis Complex generally.  Rather, on Day 1 of the tour you advised Tim Bojanowski that your group, which included Dr. Stewart, would be spending the day at "Rast Max to interview/tour the maximum custody side of the Rast Unit."  Soon after we were at Rast and in a maximum custody portion of the unit, either you or Dr. Stewart (or together is my recollection) asked if there was a SMI pod for max custody.  It was specifically explained to you that ***Rast Max*** does not have an SMI pod and that SMI maximum custody inmates are spread throughout Rast Max.  The location of the Watch Pod for Rast Max inmates was pointed out to you, and you toured that pod and conducted cell front interviews of the max custody inmates on watch in 3-A-6.

We understood your inquiry to be as to Rast Max inmates, since you told Tim Bojanowski you wanted to spend the day at "Rast max".  We were in the maximum custody portion of the Rast Unit when you asked the question and, in responding to your inquiry, you were told by ADC personnel present that there was no "SMI pod" for max custody inmates – with max custody specified.  Thus, the response to your one-time inquiry was accurate.  Neither you nor Dr. Stewart "repeatedly" asked if there were any locations where SMI inmates were physically clustered on the Rast close custody side of the Rast Unit where your counterparts were touring that first day.  Moreover, no one in your tour group ever asked if there were any "SMI pods" for the Rast Unit in general, or the Lewis Complex in general.[1]  Furthermore, as is explained below, ASPC-Lewis does not run any SMI residential mental health programs like those run at ASPC-Phoenix, ASPC-Florence-Kasson or ASPC-Tucson-Rincon, which is what we understood your inquiry to be about.  Furthermore, your characterization of the entire Rast Unit as a maximum custody unit is in error.  Referring to the Unit as "Rast Max" became antiquated with the addition of close custody inmates in August 2017.  The ADC Daily Count Sheets that are available on the ADC website likewise delineate Rast Unit by custody level as follows:

|       | ASPC-Lewis      |     |
|-------|-----------------|-----|
| CLOSE | Rast            | PC  |
| CLOSE | Rast II         | PC  |
| CLOSE | Rast III        | PC  |
| MAX   | Rast PC         | PC  |
| CLOSE | Rast Close Mgt. | PC  |

[1] Of note, on Day 3 after lunch we toured Bachman Unit's detention cells.  At approximately 2:50 p m., upon your direction, we joined Ms. Eidenbach's group at Rast close 3-A-6 pod.  Both groups conducted cell-front interviews of the close custody inmates.  Your letter at page 2 designates 3-A-6 pod as "Rast Max."  This is inaccurate.  3-A-6 is a close custody pod, not max custody.  This was clearly evidenced by the fact that all the cell doors were unsecured and the inmates were out and about in the pod, speaking to Plaintiffs' counsel.  While Ms. Eidenbach's group left to go to another unit, your group remained in 3-A-6 to conduct inmate interviews.  Of note, you elected to end your interviews of the inmates at approximately 4:09 p.m., at least ten minutes before the end of the tour day.

Corene Kendrick
January 7, 2019
Page 3

At very best, this whole situation is an unfortunate miscommunication reasonably based upon your inquiry as to maximum custody inmates, failure to understand the breadth of the custody levels housed at the Rast Unit, and non-existence of a residential SMI mental health program operating at ASPC-Lewis.  Your allegations of deliberate lying are wrong and require retraction.

Second, you cite to Ms. Eidenbach's 10/17/18 tour set-up letter and Dr. Stewart's intended areas of touring to buttress your position, apparently, that we should have known what you were talking about when you stood in the max custody unit and asked if there was a "SMI pod".  The requested areas for Dr. Stewart's tour are specific to max custody housing units, detention units and "prisoners with mental illness or with specified MH score[s]."  But as has been the case from the start of the post-settlement monitoring tours, you tell us where you want to go and we go.  We do not set up or otherwise dictate where you tour.

Third, Plaintiffs' counsel requested, and Defendants provided, the ASPC-Lewis Mental Health Inmate Count sheets on November 6, 2018 – a week before the tour.  *See* ADCM1542822-2860. You indeed were carrying around the Count Sheets and flipping through them at the beginning of Day 1 of the tour while we were at the Rast max side of the Unit.  Inmates with a mental health score who are designated as SMI are identified by a "Y" in the "SMI" column of the sheets.  The inmates are further identified by locator code which correlates to a specific unit.  Pod and cell locations are also provided. At no time during the three days of the tour did you ask me, or any Lewis personnel that I am aware of, how to read the Count Sheets to determine the locations of SMI inmates (no matter the custody level) such that Dr. Stewart could interview them.[2]  You were in possession of the Count Sheets for the complex and therefore could easily locate where SMI inmates were housed, no matter the custody level.  It is unexplainable to us why, if Dr. Stewart wanted to interview all SMI inmates at ASPC-Lewis, Plaintiffs' counsel did not review the Count Sheets for the locations of SMI inmates no matter the custody level, go to their locations over the three-day tour, and interview them.

Fourth, Ms. Eidenbach's group toured the Rast Unit close custody housing locations and interviewed inmates[3] on both days 1 and 3 of the tour. Ms. Eidenbach had the Count Sheets available to her as well.  Because I was not in that tour group, I do not know whether Ms. Eidenbach (who toured with Plaintiffs' medical expert, Dr. Wilcox) inquired as to whether there were any pods where close custody SMI inmates were clustered by operations as to physical location.  At any rate, Rast Close Custody 3-B-6[4] is a location where close custody SMI inmates are physically clustered location-wise by operations. Rast close custody 3-A-6 is not a residential mental health program.  Rather, it as a housing location where close custody SMI inmates may simply be clustered location-wise as a security operations management tool.  There is no directive or request by the mental health team to house these inmates together and no specialized mental health residential program is being run in this location – although the inmates receive mental health services commensurate with their mental health diagnosis/designation.  To be clear, clustering is a term of art utilized by operations,

[2] The Count Sheets for max custody reveal 20 easily identifiable max custody SMI inmates housed at Rast Max.
[3] At least 13 close custody inmates were interviewed by Ms. Eidenbach's group in a confidential setting versus ongoing cell-front interviews.
[4] You inaccurately refer to the close custody location at issue as 3-A-6.  The correct location is 3-B-6.

Corene Kendrick
January 7, 2019
Page 4

not mental health, to sometimes concentrate certain types of inmates in a particular housing area. Clustering of SMI inmates does not require that every single close custody SMI inmate must be housed in this area. Nor is there a prohibition on non-SMI close custody inmates living in a location. Indeed, a simple review of SMI inmates assigned to Location "Loc" 42, Building "Bldg" HUB3, Bed ("cell") 6—shows that 5 inmates living in this location were not SMI. *See* ADCM1542856-58. Thus, 3-B-6 is not considered an "SMI pod" by either operations or mental health.

Fifth, you allege that when interviewing Dr. Calcote (Corizon) and Dr. Taylor (ADC) regarding mental health care, they told Dr. Stewart that there were not any SMI pods or units at ASPC-Lewis. As support, you rely upon notes taken "by multiple representatives from Plaintiffs' counsel." I too rely upon my recollection, my notes, and the recollection of Dr. Taylor. You state in your letter that Dr. Taylor said that "ADC had residential mental health programs only at ASPC-Florence max custody, ASPC-Tucson close custody, ASPC-Phoenix medium custody, and at ASPC-Eyman's Behavioral Management Unit." This information is accurate (but inadvertently left out the newly employed ASPC-Tucson-Rincon program). Rast close custody 3-B-6 is not a SMI residential mental health program. Neither Dr. Calcote nor Dr. Taylor lied to you or misled you. If you were not inquiring about SMI-specific residential programs, but were instead asking for mere housing locations as to where SMI inmates were assigned, you did not make this clear. We all understood your inquiry to be whether mental health was running any residential mental health programs for SMI inmates at ASPC-Lewis. Again, at best, this is another instance of unintended miscommunication based upon the nature in which the questions were posed.

Sixth, you allege that every single inmate in 3-B-6 reported to you that they were only allowed out of their cells for two hours in the morning and two hours in the afternoon; that they can only go to rec at 5:00 a.m.; and they are not provided any DI326 programming. The inmates in 3-B-6 are close custody inmates – which should have been obvious to you since they were all permitted out in the dayroom area walking around unrestrained, talking to you. DI326 governs programming provided to max custody inmates, not close custody inmates. Therefore, DI326 does not apply to these close custody inmates. Per appropriate close custody programming needs, the inmates in this location are offered group programming one hour per week (out of cell). In short, the inmates in 3-B-6 are not max custody inmates to which the Stipulation's max custody out-of-cell time and programming requirements are applicable.

The purported inmate allegations as to deprivation of pod time and recreation are completely inaccurate. The close custody inmates in 3-B-6 are indeed provided pod dayroom time (as you observed), but not for four hours a day. Rather, this location of close custody inmates are permitted out-of-cell pod dayroom time seven days a week (not withstanding emergencies and lockdowns) from approximately 7:00 a.m. to 10:45 a.m.; noon (following clearing of count) to 3:45 p.m.; and 5:00 p.m. (following clearing of count) to 8:00 p.m. In addition, they are provided eighteen (18) hours of rec a week – and not at 5:00 a.m. Recreation is conducted Saturday through Thursday on a rotating schedule where, on alternating days, recreation is provided from 0730-0930, and the next day from 1230-1430. The close custody time out-of-cell time far exceeds the requirements of the Stipulation for max custody inmates.

Corene Kendrick
January 7, 2019
Page 5

Seventh, you allege that the close custody inmates at this location "do not receive any mental health programs or services other than walk-through visits by psych associates but often the only contact they have with anyone from the mental health team is upon request." You report what the inmates told you, but did you take action to verify the accuracy of these allegations through eOMIS? You have access to your clients' medical and mental health records and should confirm the accuracy of the statements before launching inaccurate allegations. The reports by the inmates are false.

Eighth, you allege, based upon inmate report only, that the two psych associates assigned to Rast do not have SMI specific training. Please advise as to how unidentified inmates could possibly know the education and training background of mental health personnel who provide services to inmates at Rast – whether max custody or close custody? Please refrain from launching allegations based solely on inmate reports where you have taken no action verify those reports. Such conduct is inappropriate and lacks any due diligence whatsoever. Contrary to the inmates' allegations, there are two full-time and one half-time Master's level clinicians that provide mental health services to the approximately 250 MH3 inmates (max or close) assigned to Rast. The designation of SMI does not require "specialized training" to provide services.

### Dr. Todd Wilcox

First, as to the tour group that included Ms. Eidenbach, Dr. Wilcox, and Tim Bojanowski, you allege that inmates at Barchey Unit were threatened with retaliation for speaking with the ACLU and were intentionally misled as to who the ACLU was and the purpose of the interviews. Specifically, you allege (through Ms. Eidenbach) that inmates called to visitation for confidential interviews were told by an officer on the yard that they had to meet for a meeting about DO 704 violations. You allege, as a result, several class members refused to come to the visitation unit for an interview or did not bring medical paperwork with them. Which personnel allegedly threatened or intimidated class members? When, at what location, what is the physical description of the personnel, and who are the inmates making these allegations? Without more, your allegations cannot be investigated. As to allegations that some inmates did not come for their interview or did not bring paperwork, you were in possession of Count Sheets for the complex and were free to conduct follow-up interviews of the inmates at cell front or in their units.

Second, you allege that you were not able to observe insulin administration at the Barchey Unit the afternoon of Wednesday, November 14, 2018, at around 2:00 p.m. as planned. What occurred is that when the tour group arrived at the Red Side of Barchey Unit, pill call was underway. While awaiting completion of pill call, with insulin administration next up, a fight broke out and a legitimate security lockdown ensued. Ms. Eidenbach was advised that staff needed to do security inspections to identify the inmates involved in the fight and, per the Deputy Warden, the lockdown would be lifted approximately fifteen (15) minutes after the identifications were made. After that, the yard would then re-open to continue medical services.

Because of the lockdown, Ms. Eidenbach asked to observe insulin administration on the Blue Side of the Unit which was not on lockdown. During the lockdown, the FHA and Deputy Warden attempted to bring inmates from the Blue Side over to the Red Side for insulin. However,

Corene Kendrick
January 7, 2019
Page 6

they were informed that medical personnel were already over on the Blue Side administering insulin and that only two more administrations needed to occur, one which was already in progress. Ms. Eidenbach was advised that there was not enough time to get over to the Blue Side to observe the last administration. Rather than waiting for the inspections of inmates on the Red Side and for the lockdown to be terminated, Ms. Eidenbach announced she was ready to leave the Unit. In sum, no one prevented observation of insulin administration at Barchey that day. Security and medical operations are paramount and will not be impeded or delayed by a tour. A lockdown of the Red Side of the Unit was necessary, and insulin administration on the Blue Side could not be delayed just so the tour group could observe. There were no actions taken by Defendants' counsel or ASPC-Lewis personnel to prevent observation of insulin administration at the Barchey Unit.

Third, you allege that while touring the Rast Unit on the third day of the tour, Ms. Eidenbach requested to see the clinic/treatment room that Judge Duncan observed in 2017. Ms. Eidenbach alleges that the FHA and DW Diaz stated that the room did not exist, feigned ignorance of the location of the room, and upon location of the room, advised that the room is not used anymore because there is no longer any open clinic. At the outset, "DW Diaz" is not a deputy warden. Ms. Diaz regularly participates in monitoring tours, and it is well known that Tara Diaz is a Regional Operations Director for ADC. She was not, however, on the tour in 2017 when Judge Duncan visited. Moreover, Ms. Eidenbach was not clear in her request when she asked to see the room and did not clarify that the room she was referring to was on the close custody side (or Blue Side) of the Rast Unit. The tour group had entered the Rast Unit on the max custody side (or Red Side), and DW Rode accurately advised that inmates are escorted to medical to be seen. Later, when Ms. Eidenbach clarified the location of the treatment room she wanted to see, she was escorted there and accurately advised that the room was no longer in use because the Open Clinic concept is no longer employed (this due to Plaintiffs' unwarranted complaints about the Open Clinic concept and the Court's unfortunate rulings regarding the same). The fact that the room remains outfitted with equipment does not mean it "clearly was still in use." Plaintiffs' counsel's conclusion that just because the room remains equipped means it is in use is speculation and constitutes an unnecessary and inconsequential blame game.

For the reasons set forth herein, and as stated previously in my email correspondence to you dated November 21, 2018, Defendants do not agree to a re-do monitoring tour of ASPC-Lewis and/or attorney/expert costs and fees associated therewith. As to requests for additional interviews of SMI inmates by Dr. Stewart, reasonable alternatives exist. You may set up telephone calls with your clients or conduct individual visits.

Sincerely,

Rachel Love

RL/eap
cc:     Counsel of Record



## STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

January 17, 2019

***VIA EMAIL ONLY***
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

Re:   **Parsons v. Ryan**
ASPC-Lewis Tour (November 13-15, 2018)

Dear Corene:

We are responding to your November 30, 2018 letter regarding Plaintiffs' November 13-15, 2018 Lewis tour.

In your letter, you repeat, as a "threshold matter", allegations of retaliation that were raised in your November 16, 2018 letter, but add nothing new to your claims. We responded to that letter separately—the claims are unfounded. No additional response is warranted here.

**Mental Health Encounters:**  You allege receiving multiple reports that some mental health encounters held in-unit have not been confidential. You fail, however, to identify key information needed to investigate the claims. Neither we nor ADC can address bare allegations. Please provide specific information, including the inmate name/number, time, location, and nature of the encounter so that any such allegations can be investigated and addressed, if necessary.

In any event, all complexes are instructed on a continuing basis that providers must ensure their contacts are confidential when the inmate agrees to leave the cell for the same. When review of records by the monitors indicates that a confidential setting was not indeed confidential, that encounter is not given credit and the situation is addressed in out-briefs. Mental health staff are allowed to have security (and other staff) present during their interactions so long as they have not indicated these contacts are confidential 1:1 contacts. The expected practice is that confidential contacts do not include an officer in the room. Any deviation is addressed immediately. Indeed, Dr. Calcote distributed a memo after the Lewis tour

Corene Kendrick
January 17, 2019
Page 2

reinforcing this expectation. Dr. Taylor confirmed that, for monitoring purposes, patient encounters in which an officer is present or within earshot are not counted as satisfying the Stipulation's requirement that the patient be "seen by mental health staff" in a confidential setting unless they are being seen cell front due to their refusal to be seen in a confidential setting. Doc. 1185-1 at 5.

**Mental Health Watch:**  You allege receiving reports from unidentified inmates at Rast and Stiner that officers are not appropriately conducting checks required by watch orders, and self-harm has occurred.  However, you do not tie any such allegations to actual incidents.  Nor do you tie the allegations to a performance measure.  Accordingly, no response to these allegations is warranted.  Notwithstanding, self-harm occurring while on a continuous watch is not indicative of inappropriate checks. Mentally ill inmates intent on harming themselves find ways at times to execute self-harm out of view of officers conducting checks, e.g., under blankets, smocks, or other allowed materials, which can obscure visibility.  ADC is continually looking at ways to improve observation and visibility for inmates on watch, independently of and unrelated to your allegations.

Regarding unidentified inmates' allegations of refusals to provide HNR forms upon request, again, you fail to provide sufficient information to investigate and address any such claims.  Contrary to your allegations, the Lewis HNR log documents for the last six months show that for inmates on watch, the number of HNR submissions per month was consistently one to two HNRs.  Moreover, the eight HNRs submitted by inmates on watch in the last six months were appropriately triaged and the inmates were seen on time.  Defendants are unaware of any reports of staff refusing to provide HNR forms. Inmates may utilize the grievance process to address any such alleged actions of staff pursuant to DO 802.01.  In sum, the allegations of inmate reports of staff refusals are unsubstantiated by your letter, as well as the information available to us.

You also requested any policies concerning transport of inmates on watch. DO 807 addresses transferring inmates on watch to the hospital as well as for offsite appointments. You further referenced a cancellation of a specialty appointment documented in ADCM1542392-93, but have not alleged substantial non-compliance with any applicable performance measure in connection with the IR.  There is no policy permitting transportation officers to cancel specialty appointments.  They may, however, cancel transportation upon approval from mental health.

**Max Custody PM 1 and 2:**  You complain that out-of-cell tracking forms were not posted on cell fronts in the Rast Max housing locations.  As has been the case at other max custody housing locations for quite some time, the forms are no longer maintained on cell fronts because inmates take and/or destroy them.  They are now kept in a binder on the unit.  The notebooks are easily accessible to movement staff, and out-of-cell activity is contemporaneously recorded. Indeed, Rachel Love herself accessed and went through the notebooks while on tour with your group, while you were interviewing inmates.  At no time during the tour did you or anyone in your group ask about the location of the out-of-cell tracking forms. If such inquiry had been made, Rachel would have shown you the books – as she herself picked books up and reviewed them herself while on tour.

Corene Kendrick
January 17, 2019
Page 3

You also allege receiving reports from inmates of programming cancellations and/or conflicts with recreation time requiring inmates to choose between rec time and programming. Cancellations and refusals are documented on out-of-cell tracking forms and are subject to monitoring. If a cancellation was not appropriately made up or justification was not provided as to any inability to make up a cancellation, monitoring and reporting of the same would show non-compliant. Likewise, if an inmate is not offered the required out-of-cell time for programming and recreation, monitoring and reporting would show non-compliant. The monthly Max Custody Notebooks produced to Plaintiffs show that actual operations are contrary to the allegations you receive from your clients.

**Prison Conditions:**  Your letter goes on for several pages alleging various conditions of confinement that were purportedly reported to you by inmates. Notwithstanding the fact that Defendants disagree with the allegations, the conditions of confinement complained about are not subject to the terms of the Stipulation and thus are outside the scope of monitoring and reporting pursuant to the Stipulation and its performance measures.  If inmates have concerns about conditions of confinement, they may utilize the inmate administrative grievance procedure to address the same.

Regards,

Timothy J. Bojanowski

TJB/eap
cc:   Counsel of record



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Rachel Love
480.420.1616
rlove@strucklove.com

June 15, 2018

**_VIA EMAIL ONLY_**

Corene Kendrick
Prison Law Office
1917 Fifth Street
Berkeley, CA  94710

      Re:    **_Parsons v. Ryan_ – Plaintiffs' May 1, 2018 letter concerning Yuma Monitoring Tour**

Dear Corene:

Your May 1, 2018, letter regarding the Yuma Tour sets forth, in large part, complaints and allegations regarding ADC's response to the March 1, 2018, disturbance at the Cheyenne unit and makes several demands for records and information concerning the same.  As you are aware, several inmates kicked off a major disturbance on that day by spontaneously attacking corrections officers who were escorting a non-compliant and assaultive inmate off the yard.  Numerous crimes were committed by the participating inmates during the disturbance, including vicious assaults on officers and other inmates, as well as destructive conduct that resulted in hundreds of thousands of dollars of property damage.  Following the disturbance, top priority was given to ensure safe, secure, and orderly operations, as well as preserving evidence for on-going administrative and criminal investigations.  Accordingly, some inmates from the unit were transferred to alternate housing while other inmates, those who were involved in the disturbance, remained secured on the yard until the facility was secure and the housing units were restored to allow occupation.  All inmates were appropriately provided for and cared for during this period of exigent circumstances.

The Stipulation and its attendant Performance Measures do not require Defendants to respond to information requests, explain, or justify security-based operational responses to inmate disturbances.  The Max Custody Performance measures are inapplicable to ASPC-Yuma.  Accordingly, Defendants will not be providing documents or information related to the underlying incident, the disturbance, or the security-based operational response.  Notwithstanding this position, information concerning the disturbance is available to Plaintiffs on ADC's website at https://corrections.az.gov/article/final-reports-yuma-disturbance-released, including the Disturbance Assessment Report and Operational Report with exhibits.

Corene Kendrick
June 15, 2018
Page 2

As to the eleven specific allegations made related to medical/mental healthcare for certain inmates, in accordance with the Court's Order yesterday concerning Plaintiffs' monitoring tour letters, we will supplement this response regarding the allegations advanced on behalf of inmates ██████████████████████████████████████████████ , and ██████ .

Sincerely,

Rachel Love

RL/eap
cc:      Counsel of Record



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Ashlee B. Hesman
480.420.1631
ahesman@strucklove.com

July 16, 2018

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

Re:     *Parsons v. Ryan*
        **Supplemental Response to 05-01-2018 Letter Re:**
        **ASPC-Yuma tour (April 26-27, 2018)**

Dear Corene:

As discussed in Ms. Love's June 15, 2018 response to your May 1, 2018 correspondence regarding the March 1, 2018 disturbance at ASPC-Yuma, Defendants' response to the 11 specific inmate healthcare allegations is contained below:

███████████████  Inmate ██████'s KOP medications were provided to him upon his return to the housing unit.  He did not submit any HNRs requesting a Prozac refill.

████████████████  These allegations were addressed in Defendants' Response to Plaintiffs' June 8, 2018 correspondence.

████████████:  There is no documentation to support your allegations regarding a heat reaction. A nebulizer treatment was provided to the inmate for audible wheezing.

████████████████  While inmate ███████████'s medical record indicates an ICS was called for "inmate down on rec filed", there is no evidence he fell from a transport trailer as you allege. He received x-rays on March 9, 2018, which revealed a grade two right shoulder separation.  He was provided a brace, and IBU was prescribed for pain.  He was seen again on March 21, 2018 where he exhibited improvement in his range of motion and decreased pain.

Corene Kendrick
July 16, 2018
Page 2

███████████████   On March 21, 2018, after complaining of eye discomfort, he was evaluated by the eye clinic.  On March 26, 2018, he was issued an eye patch.  His retinal detachment was repaired on April 19, 2018.  On April 20, 2018, he received an ophthalmology follow-up where he reported he was doing well.  He was evaluated at Southwest Eye Center on June 20, 2018.

████████████████   Inmate ███████ was fitted for and issued new hearing aids on April 13, 2018.

████████████████   Inmate █████ has not been prescribed psychotropic medications since June 1, 2014.  On November 30, 2017, he denied hearing voices and on March 27, 2018 he stated it had been four months since he had any auditory hallucinations.

███████████████   Your claim that inmate ███████ "is diagnosed with bipolar disorder" is incorrect.  On March 5, 2018, he reported to the clinician that he was placed on watch because he was dehydrated and passed out, not because he was suicidal.

██████████████   It is unclear what your allegations are with respect to this inmate's healthcare as it relates to the Stipulation.

██████████████   Inmate ███████ has not submitted any HNR requesting a medical evaluation for a "tingling feeling" in his hands.  There is no documentation to support your allegations.

██████████████   On March 4, 2018, inmate █████ was seen on nurse's line where his contact lenses were removed and his eyes were rinsed. His contact lenses were placed into a sterile container with saline.  He was seen again on March 5, 2018 to re-insert his contacts, however, was advised to leave them out due to being temporarily housed on the recreation yard.

As we have previously advised, in the future, please check the records first before requesting an explanation from Defendants that is based solely upon verbal allegations of inmates whom you have interviewed.

Sincerely,

*Ashlee Hesman*

Ashlee B. Hesman

ABF/eap
cc:     Counsel of record



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Ashlee B. Hesman
480.420.1631
ahesman@strucklove.com

July 16, 2018

**<u>VIA EMAIL ONLY</u>**
Kirstin T. Eidenbach
Eidenbach Law, P.L.L.C.
P.O. Box 91398
Tucson, AZ  85752

  Re: *Parsons v. Ryan*
    **ASPC-Yuma tour (April 26-27, 2018)**

Dear Kirstin:

  We are in receipt of your June 8, 2018 correspondence regarding Plaintiffs' April 26 – 27, 2018 tours of ASPC-Yuma.

**<u>Plaintiffs' Alleged Systemic Issues at ASPC-Yuma</u>**

  Your correspondence contains various conclusory allegations regarding alleged systemic issues at ASPC-Yuma, but is devoid of sufficient information to allow Defendants to investigate your claims.

**Dental Policy and Practice:**  You claim "dentists joke in front of patients about how many teeth they have pulled and have contests to see who has pulled the most teeth in a given day or a given week", but you do not identify which dentists on which yards or identify the inmate(s) who informed you of this alleged behavior.  Corizon staff deny these allegations.  Indeed, there have been no grievances filed regarding unprofessional behavior by Yuma dental staff and no formal or informal complaints filed regarding this alleged behavior.  You also claim you received reports that there is an extraction only policy in place, but fail to identify who the reports were made by or provide citations to any documentation to support this conclusion.  As we have previously informed you, there is not an "extraction only" policy.  Indeed, in May 2018 there were 149 restorations and only 96 extractions.

**Assistive Medical Devices:**  You claim "numerous class members" reported trouble obtaining assistive devises, but you do not provide any names or inmate numbers.  It is Corizon's practice to

Kirstin T. Eidenbach
July 16, 2018
Page 2

keep patients out of wheelchairs and up and walking for as long as their condition will allow. This allows inmates to keep autonomy, which boosts self-esteem and increases their quality of life. ASPC-Yuma has approximately twenty-five inmates using wheelchairs regularly.

**Outside Specialty Consults:**  Similarly, you allege "[c]lass members" reported difficulties in getting outside specialty consults scheduled, but you do not provide any names or inmate numbers, nor do you specify which type of specialty consults were reportedly difficult to schedule. Moreover, you admit that many of the class members who made these reports had been scheduled and/or were seen as of the date of your correspondence. Outside specialty consults are scheduled as quickly and efficiently as the off-site provider will allow. This area of patient care is monitored closely by UM teams, site leaders, ADC, and monitors to ensure quick and appropriate care is delivered to patients.

**Overall Sanitation and Cleanliness:**  One of the inmate porters' assigned duties is to clean and sanitize showers and restrooms. Sanitation supplies are issued daily to inmate porters. Each day, correctional staff on all three shifts conduct sanitary inspections to ensure these areas are clean. On July 12, 2018, Deputy Warden Hernandez inspected the restrooms and showers in the Cheyenne Unit. All were clean and sanitary. *See* Attachment One (Photographs of Cheyenne Unit restrooms and showers).

**Telepsychiatry not Confidential:**  The Yuma Mental Health Lead reported that the treatment door room has always been closed when he has observed telepsych lines running. The FHA was reminded that appointments are to be confidential.

**Open Clinic:**  Again, your correspondence contains vague allegations that "several class members" reported waiting "close to five hours" for open clinic. You do not state who these inmates are, when they had to allegedly wait close to five hours, what yard they were on at the time, or what medical issue they were being seen for. Moreover, while you allege inmates are not seen the same day, PM 37 only requires they be seen within twenty-four hours. Open sick call is held seven days a week to ensure all HNRS are seen and addressed within twenty-four hours.

## Individual Inmate Healthcare Allegations

█████████████     Mr. ███████'s A1C level is currently too high to undergo orthopedic surgery. Providers are working to lower his A1C level to below 7.5%. A rheumatology consult was submitted on June 14, 2018.

█████████████     Inmate ███████ has not submitted any HNRs regarding his hemorrhoids. He requested a colorectal screening and was issued guaiac cards.

█████████████     On January 18, 2018, inmate ██████ received an esophagogastroduodenoscopy. He received a small bowel study on January 31, 2018. On July 9, 2018, a gastroenterology consult for a colonoscopy was approved and is currently being scheduled.

Kirstin T. Eidenbach
July 16, 2018
Page 3

███████         With respect to your allegations regarding inmate ███'s mental health care, in February 2017, inmate ███ requested that psychiatry discontinue all of his medications. During his follow-up appointment in March 2017, he stated he still experienced some symptoms, but that these symptoms had improved since his medications were discontinued. He requested to remain off medications. He was seen by a clinician in May, August, and November 2017. During his November encounter, he requested to have his mental health score decreased to MH-2 because he was stable and his "medications weren't very effective." He has not submitted any HNRs to mental health since his request to be lowered to an MH-2. With respect to inmate ███'s medical allegations, he received an orthopedic consult on February 26, 2018. On April 16, 2018, he was issued a brace and orthopedic shoes.

███████████         On April 5, 2018, inmate ████ was seen by a gastroenterologist and received an esophagogastroduodenoscopy and biopsy. The gastroenterologist recommended inmate ███ continue Pantoprazole 40mg each morning and Ranitidine 300mg each evening. It was also recommended that he receive an esophagogastroduodenoscopy in one year. On June 16, 2018, inmate ████ was compliant with his medications and reported he was feeling well. He has not submitted an HNR since May 20, 2018. He is scheduled to see a provider on August 13, 2018.

███████████         Inmate ██████ is not due for a follow-up CT until August 2018. He will be seen at that time. He also receives routine lab testing. On June 28, 2018, a consult was submitted for a PET scan. It was approved and has been scheduled.

██████████         There is no documentation to support your allegations. Inmate ████ has not submitted any HNRs regarding this issue. Despite this, medical will issue him an eye patch.

███████████         Inmate ██████ arrived at ADC on October 17, 2017. On May 2, 2018, he submitted an HNR requesting hearing aids. He received a hearing test on May 7, 2018. He was seen by Dr. Jordan on May 14, 2018. An audiology consult was submitted on July 5, 2018. On July 9, 2018, an alternative treatment plan was implemented to clean his left external canal. On July 13, 2018, inmate ██████ received ear drops. He is scheduled for ear lavage on July 17, 2018.

██████████         On April 24, 2018, it was noted that inmate ██████ had not fallen since his medication was discontinued on April 9, 2018. A review of his records supports that he has not fallen since that time. His chronic care conditions have been reviewed and followed pursuant to the Stipulation.

██████████         There is no documentation in inmate ███████'s medical records to support your allegations. On April 3, 2018, he submitted an HNR for finger pain, but when he was brought to medical, he refused treatment. He received x-rays on April 11, 2018, which confirmed no fracture, dislocation or lesions. He was issued ace wraps on April 11, 2018 and knee braces on April 13, 2018. On April 25, 2018, he submitted an HNR and was brought to nurse line, but again refused treatment. On July 9, 2018, he was evaluated for back pain. During that encounter it was noted that he had equal hand grips without swelling, bruising, or visible deformities.

Kirstin T. Eidenbach
July 16, 2018
Page 4

████████████   The emergency room physician increased inmate ██████'s Dilantin dosage and, as a result, his seizure activity has decreased (he had one seizure in April and one in May). He was seen on February 26, April 28, and June 8, 2018. He did not report any side effects related to his medications and requested they remain the same. At this time, a neurology consult is not clinically indicated.

████████████   There is no evidence to support your allegations. Inmate ██████' pacemaker check was completed on December 19, 2017, and he received a cardiology follow-up on December 20, 2017. He has not submitted an HNR regarding his pacemaker since April 30, 2016. His last chronic care appointment was on May 30, 2018 and his blood pressure was well controlled at that time.

████████████   Inmate ██████ was seen by neurology on August 7, 2017. While the report recommended an MRI, no definitive timeframe was given. Despite your allegations, there was no recommendation that he been seen by neurology every three months. On September 28, 2017, he received a brain MRI, which was completed without acute findings. No recommendations were made on the report. He receives chronic care follow-ups every three months.

████████████   On January 11, 2018, inmate ██████ was seen by a provider, however, there is no evidence to support your allegation that he was informed that his "lumps" may be cancer. He was educated on lipomas and advised to follow up as needed. He has not submitted any HNRs regarding his "lumps" since that time.

████████████   On May 17, 2018, inmate ██████'s cardiac encounter was completed. The April 17, 2018 retroactive authorization was for a separate office visit that occurred prior to the May 17, 2018 encounter.

████████████   He is scheduled to be seen on July 17, 2018 by the on-site provider for an evaluation of his hand.

████████████   Inmate ██████ received a copy of the MRI report on May 9, 2018. He is scheduled to been seen by the pain clinic on July 17, 2018.

████████████   On June 13, 2017, inmate ██████ refused debrox medication to clean out his ears. He has not submitted any HNRs for ear pain since June 13, 2017. He was seen on December 12, 2017, but did not complain of ear pain.

████████████   On March 9, 2018, inmate ██████ submitted an HNR for a new walker, which was provided to him on April 18, 2018. He has not requested a walker with a seat. The MRI request received an alternative treatment plan, which recommended a detailed musculoskeletal exam, and, if neurologically intact, physical therapy. He completed physical therapy sessions on July 5 and 9, 2018.

████████████   Your allegations pertaining to confidentiality of telepsychiatry are discussed above. The "guarded w/information" notation in inmate ██████'s record related to questions

Kirstin T. Eidenbach
July 16, 2018
Page 5

regarding his previous suicide attempts.  Inmate ███ does not have a back brace.  On February 8, 2018, his back belt was evaluated in response to an HNR.  It was found to be intact and functional.  He has not submitted any HNRs since that time.  Inmate ███ is scheduled to be released today.

███████████ Inmate ███'s records do not contain any recommendation that he be seen every three months by neurology.  He is scheduled to be seen on July 18, 2018 for reevaluation of his Parkinson's and his knee issues.

███████████ Inmate ███'s medical record notes that an increase in his medication has decreased his seizure activity.  His chronic care appointment has been moved up to evaluate the need for neurology.

███████████ Inmate ████ has not reported hallucinations during his many mental health encounters.  He has reported he is managing well without medications.  Psychiatry attempted to see him on June 30, 2018, but he refused to attend the appointment. A request for his records has been made to the Alameda County Jail.  With respect to his bed bug allegations, there is no documentation in his medical records to support this.  Indeed, he has not submitted any HNRs, nor made any verbal reports during his frequent health visits.

███████████ Inmate ███'s medical records actually evidence that he has *gained*, not lost weight.  At intake, on December 19, 2016, inmate ████ weighed 150 pounds.  On December 8, 2017, he weighed 150 pounds, and on June 28, 2018, he weighed 162 pounds.  He was seen by GI on June 21, 2018, where medication and diet changes were recommended.  Because lab testing was required before his medication can be administered, his labs were collected on July 12, 2018. He was transferred to ASPC-Lewis for infusion therapy that same day.

███████████ Inmate ████ is scheduled for an orthotics evaluation on July 17, 2018.

███████████ A pain clinic consult was submitted on July 3, 2018.  It received an alternative treatment plan to consider restarting opioid medication.  An urgent oncology consult was submitted on July 12, 2018.

███████████ A February 18, 2018 optometry report recommended that inmate ████ receive a follow-up in two years.  Inmate ████ currently has prescription glasses. There is no evidence in his medical record to support your allegation of an untreated leg fracture. On June 5, 2018, he was diagnosed with lymphedema.  He was issued compression stockings, and a follow-up appointment will be scheduled.  With respect to your allegations regarding inmate ████'s accessibility, he is assigned a wheelchair pusher, and his provider notes he is able to wheel himself without distress.

███████████ On May 30, 2018, a consult was submitted for a holter monitor, which was approved and is currently scheduled.  On June 28, 2018, inmate ████'s consult for the echo TTE procedure was approved and is pending scheduling.

Kirstin T. Eidenbach
July 16, 2018
Page 6

██████████   Inmate ████ was seen on May 9, 2018 where his Gabapentin dose was increased. He was seen again on June 15, 2018 for non-pain issues.  He was scheduled on June 29, 2018 for an x-ray follow-up, but he refused.

It is clear that Plaintiffs' counsel could have checked on these allegations themselves due to the court-ordered access to eOMIS.  In the future, please check the records first before requesting an explanation from Defendants that is based solely upon verbal allegations of Plaintiffs whom you have interviewed.

Sincerely,

Ashlee B. Hesman

ABH/eap

cc:    Counsel of record