**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| David Shinn, et al., | |
| Defendants. | |

The Court's October 11, 2019, Order laid out the options to proceed in this case: (1) robust efforts to coerce compliance with the Stipulation, (2) a new settlement based in part on Dr. Stern's recommendations, or (3) concluding the Stipulation to be irretrievably breached by Defendants and proceeding to trial. (Doc. 3385). The parties agreed to engage in settlement negotiations (on certain conditions), and the Court granted the parties sixty days to attempt to reach a new agreement. Settlement did not occur. The Court must therefore pursue additional efforts to enforce the Stipulation or conclude the Stipulation should be rescinded such that Plaintiffs' claims are reinstated and litigation resumes. A close review of the record supports a finding of rescission. But given the tremendous resources the parties and the Court have devoted to enforcing the Stipulation, as well as the Ninth Circuit's recent conclusion that this Court may impose contempt sanctions to coerce performance, *see Parsons v. Ryan*, No. 18-16358, 2020 WL 466709, at *17-19 (9th Cir. Jan. 29, 2020), one more, but final, attempt at coercive sanctions is the most prudent course. As reflected in the January 31, 2020 Order, Defendants must come into compliance with

every Performance Measure identified in that Order or pay $100,000 for each instance of non-compliance (Doc. 3490). If further monetary sanctions do not result in Defendants' compliance with their contractual obligations as of the compliance numbers for July 2020, the Court will set the case for trial.

To prepare for future enforcement of the Stipulation and to ensure compliance numbers reflect actual care being provided in the Arizona Department of Corrections, the Court will address Dr. Stern's recommendations as follows.

**A. Dr. Stern's Recommendations Regarding PM Monitoring Issues**

Part of the impetus for Dr. Stern's appointment was a concern that Defendants' monitoring process was not producing accurate information. (Doc. 3089). The first section of Dr. Stern's report addresses this concern and identifies areas where he believed the monitoring process is flawed and potentially results in unreliable data. Dr. Stern provided thirty-two recommendations regarding the monitoring process.

### 1. Recommendation 1 (Doc. 3379 at 10)

Dr. Stern found "the Rebuttal Process employed by ADC to be fair, statistically sound, and well documented." (Doc. 3379 at 10.) Therefore, he did not recommend changes. Defendants concur but Plaintiffs believe they are entitled to additional materials regarding the rebuttal process and have a "standing request" for those materials, but have not received any since August 2017.

If Plaintiffs believe they remain entitled to documents they have requested, they may file a discovery dispute with the Court as outlined in the discovery dispute procedures available on the Court's website.

### 2. Recommendation 2 (Doc. 3379 at 12)

Dr. Stern recommends that, going forward, "ADC should use (or continue to use) the event as the [unit of analysis] for PMs (unless otherwise specified)." This recommendation would require the Court to reverse a previous order requiring use of the prisoner as the unit of analysis. (Doc. 2185). Nevertheless, the parties agree with this recommendation, so it will be adopted.

### 3. Recommendation 3 (Doc. 3379 at 12)

Dr. Stern determined some encounters between prisoners and nurses were being labeled as between prisoners and psychiatrists. After reviewing the evidence, Dr. Stern believes the "mislabeling of mental health encounters is not a material concern." (Doc. 3379 at 12). Therefore, he makes no recommendation regarding this issue. The Court agrees no action is necessary.

### 4. Recommendation 4 (Doc. 3379 at 13)

The ADC's Monitoring Bureau employs over 20 different monitors to audit the 103 medical PMs. During Dr. Stern's analysis of the monitoring process, he discovered that monitors were assigned to complexes instead of by PM. That resulted in inconsistencies in how each PM is monitored. Because ADC has shifted to electronic health records, Dr. Stern recommends that monitors be assigned according to PM and not complex, except for PMs that require on-site observations. The parties agree with this recommendation and it will be adopted.

### 5. Recommendations 5, 6, and 7 (Doc. 3379 at 16-18)

In evaluating the monitoring process Dr. Stern identified errors in calculating compliance with five PMs addressing requests for specialty services, such as offsite imaging or specialist provider consultations. For example, PM 50 requires "urgent specialty consultations . . . be scheduled and completed within 30 calendar days of the consultation being requested." In measuring compliance with some of these PMs, in particular PM 48, PM 50, and PM 51, Defendants were using a Source Document taken from a list of specialty requests that were already completed or resolved. This method excluded the possibility of choosing requests that were cancelled early in the process. Dr. Stern opines that this artificially inflates compliance because those cancelled specialty requests could have been clinically necessary but cancelled to attempt to remain compliant with the PMs.

Dr. Stern therefore recommends, and the parties agree, that PM 48, PM 50, and PM 51 must be re-audited using new protocols if Defendants wish to rely on those past results.

The Court agrees.  Defendants must also utilize the new protocols going forward.

### 6.  Recommendations 8, 9, 10, and 58 (Doc. 3379 at 21)

Many of the PMs require Defendants take an action within a specific period of time after receiving a Health Needs Request ("HNR") form.  For example, PM 36 requires that HNRs be screened within 24 hours of receipt.  Previously, Defendants calculated when HNRs were received based upon the date stamp affixed by Corizon staff.  Dr. Stern concluded that the date stamp does not always reflect the date the HNR was actually received and, as a result, would result in inaccurate compliance measurements.  He makes Recommendations 8, 9, and 10 to address that discrete issue.  But he also offers a more significant recommendation about Defendants' use of the "Open Clinic" model for providing healthcare that significantly affects HNR processing and must be addressed first.

The Ninth Circuit in the very recent opinion provided the relevant background of the Open-Clinic dispute:

> When the Stipulation was entered into, healthcare was provided through an "HNR-Box" system, where prisoners placed health needs request forms into designated boxes, nursing staff triaged the forms, and prisoners were provided care based on the requests.  After entering the Stipulation, ADC discontinued the HNR-Box system and transitioned to an "Open-Clinic" system, where prisoners would bring completed health needs request forms to a health unit and be seen on a first-come, first-served basis.

*Parsons v. Ryan*, No. 18-16358, 2020 WL 466709, at *18 (9th Cir. Jan. 29, 2020). Plaintiffs believed the Open Clinic system was impermissible under the Stipulation because it restricted the number of HNRs submitted for measurement and so it could not replace the HNR Boxes for purposes of measuring compliance with the Stipulation. Eventually, Magistrate Judge Duncan "ordered Defendants to reinstall HNR boxes in the same number and approximate locations as before the HNR-Box system was discontinued."  *Id.*  That order allowed Defendants to continue to operate the Open Clinic system, but Defendants chose not to do so because they did not wish to maintain the two systems simultaneously.

Dr. Stern now recommends Defendants be permitted to operate a revised Open Clinic system.  Dr. Stern has outlined five elements that, if followed, would "address actual

- 4 -

or potential weaknesses" in the previous attempt to institute the Open Clinic system. (Doc. 3379 at 109). Under Dr. Stern's recommendation, only certain prisoners would be allowed to submit HNRs (e.g., prisoners in maximum custody or on mental health watch). All others would be required to appear at the Open Clinic location to request care but all prisoners who appear at the Open Clinic would be logged, whether or not they are eventually seen.

Defendants agree with Dr. Stern's recommendation and Plaintiffs do not entirely oppose the recommendation. Rather, Plaintiffs believe the Open Clinic system and the HNR system should be allowed to co-exist. Dr. Stern believes such a "dual system" may not be practical. Deciding whether to allow Defendants to switch to the principally Open Clinic system presents a difficult issue that highlights weaknesses in the Stipulation as well as the unreasonableness of Defendants' approach to performing under the Stipulation.

As noted by the Ninth Circuit, "the Stipulation does not specifically define the way health-needs request forms must be collected." *Id.* at *19. But "the HNR-Box system was a mutually understood assumption on which the contract was based." *Id.* Despite that "mutually understood assumption," Defendants previously determined they were free to unilaterally undercut the Stipulation by abandoning the HNR-Box system and manipulating their compliance by only assessing HNRs from prisoners who were seen by a health care provider and not counting attempts by prisoners who were unable to visit the Open Clinic due to illness or scheduling conflicts with their prison jobs.[1]

At this juncture, the Court does not have sufficient information to determine if Defendants should be allowed to institute their revised Open Clinic system. If Defendants wish to implement the Open Clinic system, they must confer with Plaintiffs and then the

---

[1] History has shown that Defendants appear to believe they are empowered to modify the Stipulation to accommodate their own preferences about the best way to provide care. But where Plaintiffs request any sort of modification of the Stipulation, Defendants have refused to agree to such a modification and argue they need only perform precisely and expressly as required by the Stipulation. Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable.

parties must file a joint report indicating their agreement on the exact terms by which the Open Clinic will operate. For present purposes, however, the Court will not adopt Dr. Stern's Recommendation 58 to allow for the Open Clinic system.

Because the HNR Box system will continue for the immediate future, the Court must evaluate Recommendations 8, 9, and 10. As noted earlier, multiple PMs impose deadlines for Defendants to act after receiving an HNR. Under the current HNR-Box system, compliance with the deadlines is measured based on the "the date stamp placed on the HNR by Corizon staff." Dr. Stern believes that practice was creating inaccuracies in measuring Defendants' compliance. Dr. Stern established the stamped date and the date written by a prisoner often differed by a significant amount. Dr. Stern believes it would be more accurate to use "the date written by the patient, not the stamped date, as the date received" for purposes of calculating compliance with the deadlines in the PMs. (Doc. 3379 at 21).

Defendants object to this recommendation, claiming the dates written by the prisoners are not accurate. But Dr. Stern's analysis establishes the dates written by prisoners are accurate and there are simply "delays in processing HNRs." Therefore, the Court will adopt Dr. Stern's recommendations and Defendants' compliance levels must be measured using the dates written on the HNRs by the prisoners. Because this is a change from how Defendants previously calculated compliance, they must re-audit previous results if they wish to rely on previous results when seeking termination.

**7. Recommendation 11, 12, 13, 14, and 15 (Doc. 3379 at 26)**

Dr. Stern discovered errors in the way compliance levels were being measured for six PMs again involving HNRs or physician referrals. To measure compliance with PM 36 and PM 37, Defendants were using a document known as the "Nursing HNR Log." To measure compliance with PM 39, PM 40, and PM 41, Defendants were using a document known as the "Nursing Line Log." And to measure compliance with PM 98, Defendants were using a document known as the "Mental Health HNR Log." All three of these documents are "manual logs" requiring staff to manually enter data into them. They are

also all "free-standing," meaning they are maintained separately from the underlying medical records. Dr. Stern determined these three documents were not complete and, because these documents were being used to measure compliance, the incompleteness resulted in inaccurate compliance numbers. To illustrate by example: the Nursing HNR Log allegedly includes "all HNRs (medical, dental, mental health) the nurses handle during the month." (Doc. 3379 at 23). Dr. Stern looked to the underlying medical records to determine if the Nursing HNR Log did, in fact, include all the HNRs submitted in a particular month. Dr. Stern discovered the Nursing HNR Log did not include all the HNRs it should have contained and the omissions of HNRs artificially inflated the compliance levels.

Based on the inaccuracies he discovered, Dr. Stern recommends re-auditing past results using new protocols if Defendants wish to rely on those past results. Defendants object and claim it would be burdensome to do so. But Defendants do not attempt to identify any flaw in Dr. Stern's analysis. Thus, Defendants effectively concede their past compliance levels were inaccurate but argue it would be too burdensome to generate accurate numbers. Defendants' position is borderline frivolous. Therefore, Defendants must re-audit any past results they plan on relying on to justify termination and, going forward should utilize this methodology to calculate compliance with PM 39, PM 40, PM 41, and PM 98. Thus, the Court adopts Dr. Stern's Recommendations 11, 12, 13, 14 and 15.

### 8. Recommendation 16 (Doc. 3379 at 33)

This recommendation addresses a common feature of multiple PMs requiring certain prisoners be "seen" by a mental health professional. (Doc. 3379 at 28). For example, PM 73 requires certain prisoners be "seen by a licensed mental health clinician a minimum of every 30 days." The Stipulation defines "seen by" as "an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter." (Doc. 1185-1 at 5). Magistrate Judge Duncan previously ruled "cell-front visits (unless the patient refuses to exit his or her cell) and group therapy

do not count as 'seen'" for purposes of the PMs. (Doc. 3379 at 28). During his work, Dr. Stern determined the parties disagree on whether "very short mental health visits (some as short as 5, 3, or 2 minutes)" should qualify as "seen" for purposes of assessing compliance with the PMs.

Dr. Stern offers a thoughtful analysis that the PMs requiring prisoners be "seen" according to a universal schedule are nonsensical. By imposing a universal schedule, Dr. Stern believes the PMs "forc[e] visits to be scheduled, even when they are not needed." (Doc. 3379 at 30). In addition, because the PMs do not specify a minimum length of time for a visit, the PMs can, in theory, be satisfied by markedly short interactions. After reviewing medical records, Dr. Stern concluded "some of the short visits are too short to be clinically effective, and in the context of the cases, place patients at significant risk of substantial harm." (Doc. 3379 at 31).

Analyzing this issue, however, led Dr. Stern to conclude that there is "an unfortunate and glaring deficiency" in the PMs. Specifically, because the parties apparently intended to agree to "objective" measures, "documentation of a visit with a signed progress note is sufficient evidence that a patient was 'seen,' regardless of the length of the visit." (Doc. 3379 at 33). But given the "*significant risk of serious harm*" posed by such an interpretation, Dr. Stern believed there should be a qualitative assessment of the effectiveness of very short visits.

The Court rejects the notion that a visit of *any* length, no matter how short, is contemplated by these PMs. While the Stipulation does not mandate the length of visits, it is not plausible the parties intended these PMs to be satisfied by visits lasting five or ten seconds. The only rational reading of the Stipulation is that to be "seen" requires a meaningful interaction between the prisoner and the mental health professional. It would, of course, make more sense to allow clinical judgment to guide the assessment of particular visits. That is, if a mental health professional believed a visit of only one minute was clinically appropriate given the unique circumstances (e.g., a highly agitated prisoner on watch), such a visit would comply with the PMs.

Defendants have always been adamant that the Stipulation was not intended to allow for any qualitative measures of care. But in the context of a mental health encounter with a health care provider, the term "seen" is not equivalent to a drive-by sighting through binoculars. The Court must interpret what "seen" requires giving effect to the parties' intent. At present, there is no plausible basis to conclude Plaintiffs and Defendants intended to allow for mental health encounters lasting only 1-2 minutes. But to avoid the imposition of a bright line rule that may result in unintended consequences, the parties will be required to confer and submit a joint statement outlining their proposals for future monitoring of PMs requiring that prisoners be "seen" at a particular interval.

### 9. Recommendation 17 (Doc. 3379 at 36)

This recommendation involves the PMs requiring prisoners receive visits with a health care professional at an identified interval. Using PM 73 as an example again, that requires certain prisoners be seen "a minimum of every 30 days." The Court has previously discussed how this "every 'X' day" issue should be handled. Dr. Stern determined there was "anecdotal evidence" that Corizon had "engaged in . . . manipulation" to meet these PMs by "scheduling a patient for two back-to-back appointments (e.g. one day and the next day)." (Doc. 3379 at 34). After conducting his analysis, Dr. Stern concluded "manipulation does happen" but "the PM performance levels, as reported, are accurate." (Doc. 3379 at 36). In Dr. Stern's views, however, these PMs should be revised because they are not providing substantive insight into the quality of care provided to prisoners.

Defendants are happy to accept Dr. Stern's finding that the reported performance levels are accurate. Plaintiffs, in contrast, argue the compliance levels are not reliable because some of the visits being measured were for less than five minutes. (Doc. 3379 at 36). In other words, Plaintiffs believe the current compliance levels reflect Defendants' inappropriate conclusion that a visit of any length is sufficient. If the visits must be of some minimum length, then Defendants' compliance levels are not accurate. As discussed above, the Court agrees that no reasonable person would interpret the Stipulation to allow visits of a meaningless length to satisfy its requirements.

Some of the PMs at issue in Recommendation 17—PM 54, PM 61, PM 66, PM 73, PM 77, PM 80, PM 81, PM 82, PM 83, PM 84, PM 87, PM 88, PM 89, PM 90, and PM 92—are subject to the time limit interpretation explained above. Having concluded the Stipulation requires encounters of *some* minimum length, Defendants' past performance levels are not accurate. Again, the Court recognizes that enforcing a different minimum length requirement at this late date will cause difficulties for Defendants. Defendants are free to enter into a supplemental agreement with Plaintiffs to avoid this difficulty. But Defendants' rigid insistence that the Stipulation be enforced robotically guarantees that Defendants will sometimes be gored by their own approach. Once the parties address, and the Court resolves, the appropriate minimum length, the relevant PMs must be re-audited if Defendants plan on relying on past performance levels.

### 10. Recommendations 18 and 19 (Doc. 3379 at 36, 38)

Recommendations 18 and 19 involve difficulties in assessing Defendants' performance of PM 25, which requires that "[a] first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency." (Doc. 1185-1 at 21). The parties disagree on what this PM requires, how it should be measured, and whether Defendants' prior compliance levels were accurate.

This PM is, in effect, impossible to monitor in the manner Defendants would prefer. First, the parties disagree on what should qualify as an "emergency." According to Defendants, the type of events that qualify as "emergencies" under this PM are very rare. In their view, an "emergency" exists only when a prisoner "needs CPR or [is] bleeding." (Doc. 3379 at 37). Under that definition, there were only eleven such events in the entire state during December 2018. Plaintiffs counter that many more events should qualify as "emergencies." Plaintiffs point to the "dozens of [Incident Command Systems] events at each prison each month," apparently arguing those events should qualify for monitoring under PM 25. (Doc. 3379 at 37).

Even if the Court were to craft an appropriate definition of "emergency" for PM 25, the difficulty in assessing the "adequacy" of the response would still exist. Dr. Stern

explains some monitors have attempted to arrive at a subjective evaluation of how the first responder behaved while another monitor simply assessed whether a first responder arrived within three minutes. Given that PM 25 explicitly requires the first responder "adequately provide[] care," it should be obvious that focusing solely on the time it takes for a first responder to appear on scene is inappropriate.

Given the difficulties of monitoring PM 25 in a coherent way, Dr. Stern recommends it be retired. Defendants agree with that approach. Plaintiffs disagree, however, and claim PM 25 should "be modified to actually evaluate the adequacy and timeliness of emergency responses." The parties will be required to confer and submit a joint statement outlining their proposals for the proper interpretation and monitoring of PM 25.

### 11.  Recommendations 20 and 21 (Doc. 3379 at 39, 41)

PM 44 states:

> Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours.

(Doc. 1185-1 at 24). Dr. Stern reviewed the monitoring of this PM and concluded because the variations in monitoring methods were so vast, the compliance numbers were not accurate and "should not be relied upon." (Doc. 3379 at 39). Dr. Stern provided two alternative options to accurately monitor this PM. The first option does not require an exercise of "clinical judgment" so Defendants' disagreement with that option has no merit. Therefore, Defendants should adopt the first option, using that option prospectively and retrospectively to the extent Defendants wish to seek termination of PM 44.

### 12.  Recommendations 22, 23, and 24 (Doc. 3379 at 42)

PM 46 states:

> A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison.

(Doc. 1185-1 at 25). Dr. Stern concluded the reported compliance numbers were not accurate because the random sample included "a large number of diagnostic reports which reside within the same patient." (Doc. 3379 at 41). In other words, the sample for December 2018 included four tests for a single patient. Doing so rendered the statistics unreliable. Therefore, Dr. Stern recommends that monitoring PM 46 require ten diagnostic tests from ten different prisoners. Plaintiffs agree but Defendants argue past results were reliable despite Dr. Stern's concerns. Defendants did not, however, provide any explanation why Dr. Stern's analysis was incorrect. With no reason to doubt Dr. Stern's analysis, Recommendation 22 will be adopted. Going forward, Defendants must monitor PM 46 in the manner Dr. Stern proposes and must re-audit PM 46 if they wish to rely on past numbers in seeking termination.

### 13. Recommendations 25 and 26 (Doc. 3379 at 44-45)

PM 54 states:

> Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place.

PM 55 states:

> Disease management guidelines will be implemented for chronic diseases.

(Doc. 1185-1 at 27). Dr. Stern recommends PM 54 be terminated and PM 55 be monitored according to a new protocol that encompasses the objective of PM 54. The parties agree PM 54 should be terminated but they disagree regarding a new monitoring protocol for PM 55. Part of that new protocol will require a determination whether a future visit was scheduled. If no future visit was scheduled, Dr. Stern recommends the case be found noncompliant. Defendants argue "Noncompliance cannot be determined based upon a future visit, because the visit has not yet taken place. Just because a visit has not been scheduled, does not mean that it will not be scheduled." (Doc. 3379 at 44). Defendants' objection has no merit. As explained by Dr. Stern, "part of the purpose of a chronic care

visit is to plan future care." And Defendants offer no reason why a visit that was not scheduled is likely to become scheduled. Moreover, it will not burden Defendants to schedule future visits. Recommendations 25 and 26 are therefore adopted, meaning Defendants must use Dr. Stern's protocol prospectively and perform a re-audit if they wish to seek termination based on prior compliance numbers.

### 14.  Recommendations 27, 28, and 29 (Doc. 3379 at 47-48)

Dr. Stern proposes a new protocol for monitoring PM 85 which requires certain prisoners "be seen by a mental health provider within 30 days of discontinuing medications." The parties agree with Dr. Stern's recommendation, but Plaintiffs point out that this PM is dependent on resolution of the "seen" dispute involving exceptionally short visits. That is correct and, once the "seen" dispute is resolved, the new approach must be applied to past and future performance.

### 15.  Recommendations 30, 31, and 32 (Doc. 3379 at 49-51)

PM 86 requires certain prisoners "be seen a minimum of every 90 days." (Doc. 1185-1 at 32). Dr. Stern proposes one protocol for re-auditing PM 86 and a different protocol for prospective monitoring. Plaintiffs agree with the protocols; Defendants do not. But because Dr. Stern's protocols are well-designed, and Defendants do not offer any reason for their disagreement, both protocols will be adopted.

Finally, this PM is dependent on the resolution of the "seen" dispute. Once the "seen" dispute is resolved, the new approach must be applied to past and future performance.

## B.  Dr. Stern's Recommendations Regarding Retirement, Collapse, or Modification of PMs

Dr. Stern recommends the "retirement, collapse, or modification of PMs." (Doc. 3379 at 53).

### 1.  Stipulated Termination of PMs – Recommendations 33, 35, 36, 37, and 38 (Doc. 3379 at 54-56)

The parties agree the following PMs should be "retired": PM 12, PM 16, PM 18,

PM 19, PM 20. Based on that agreement, those PMs are terminated for all locations. Because the Order issued on January 31, 2020, included PM 12, PM 19, and PM 20, Defendants need not show compliance with those PMs by June 2020.

### 2. Modification or Collapse of PMs

Dr. Stern also provided analysis of numerous PMs that should be modified or collapsed to streamline the monitoring process.

#### a. Recommendation 34 (Doc. 3379 at 54-55)

This recommendation involves PM 15 which states

> Inmates who refuse prescribed medication (or no show) will be counselled by a QHCP after three consecutive refusals.

(Doc. 1185-1 at 19). Dr. Stern believes this PM "endorses a staff action which is dangerous or wasteful." For some medications, a single missed dose is dangerous while for others, missing three or more poses "little risk." Thus, applying a blanket rule of "three consecutive refusals" is not appropriate. Dr. Stern recommends the PM be "replaced (or reworded) to require that patients who refuse prescribed medications . . . be counselled by a QHCP in accordance with policy." This would allow Defendants to identify those medications where a single missed dose is cause for concern and those medications where even three missed doses does not merit counselling. Plaintiffs agree that PM 15 should be reworded while Defendants argue it would be too "difficult to identify and agree upon classes of medications [and] an acceptable algorithm for a missing dosage pattern." Defendants also argue it would be difficult to have their systems identify missed doses based on the type of medication at issue.

The Court agrees that PM 15 is both over- and underinclusive. But, as written, there is no ambiguity in this particular PM and so, absent a clear agreement from the parties, the Court will enforce it as written. Therefore, Dr. Stern's Recommendation 34 is not adopted.

#### b. Recommendation 39 (Doc. 3379 at 56-58)

This recommendation involves PM 32 which states:

> A final independent clinical mortality review will be completed by the Health Services Contract Monitoring Bureau

for all mortalities within 10 business days of receipt of the medical examiner's findings.

(Doc. 1185-1 at 22). Dr. Stern points out the purpose of a "clinical mortality review" is to identify deficiencies so that medical providers can, if necessary, take immediate action to prevent deficiencies that resulted in death from recurring. Accordingly, it is crucial that the "clinical mortality review" take place as soon as possible. The way PM 32 is written, however, the review need not take place until after receiving the medical examiner's findings. Those findings are often delayed for many months. For example, the medical examiner's findings for a prisoner death in May 2017 were not received until January 2019. Dr. Stern recommends the PM be modified to require a clinical mortality review within one month of a prisoner's death.

Plaintiffs agree with Dr. Stern's recommendation. Defendants concede it would be far better to "conduct a mortality review within a month of the death." But Defendants, without explanation, state they "do not wish to change the wording of the PM." (Doc. 3379 at 57).

Clearly, the parties should not have agreed to PM 32. But they did. And because there is no ambiguity in the PM's express wording, the Court will enforce it as written. Therefore, Dr. Stern's Recommendation 39 is not adopted.

### c. Recommendation 40 (Doc. 3379 at 58-59)

This recommendation involves PM 35 which states

All inmate medication (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption.

(Doc. 1185-1 at 23). Dr. Stern points out this PM "is dependent on the health care staff at both the sending and receiving complexes doing their jobs." But the way this PM is being implemented "measures and penalizes" only the receiving complex. Dr. Stern therefore recommends the monitoring of this PM be modified so that "the sample for PM 35 for a given month at all complexes should either be drawn from patients transferring *into* each complex with the resultant score attributed to the receiving complex (i.e. as is currently

being done) or drawn from patients transferring *from* each complex, with the resultant score attributed to the sending complex." (Doc. 3379 at 58). Plaintiffs agree but Defendants believe the responsibility should remain with the receiving facility.

Dr. Stern's recommendation does not alter PM 35 but merely provides a way to accomplish the purpose by more accurately measuring compliance. Therefore, going forward, Defendants must follow Dr. Stern's recommendation for monitoring PM 35.

### d. Recommendation 41 (Doc. 3379 at 59)

This recommendation involves PM 42 which states

> A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider.

(Doc. 1185-1 at 24). Dr. Stern explains this PM is "difficult to monitor due to the paucity of events which meet the parameters of the PM." Because monitoring takes place on a monthly basis, monitors often encounter follow-up encounters that were ordered for a future month, leaving no way to assess compliance. The monitors then must skip that case and randomly select another to determine whether the ordered follow-up occurred during the monitoring month. Dr. Stern believes PM 42 should be reworded to include scheduled appointments, not merely appointments that have occurred. Plaintiffs agree but Defendants argue that would require a change to the Stipulation which they will not agree to.

It is not clear why Defendants will not agree to this recommendation as it would result in an easier monitoring process for this PM. But because it is not ambiguous, Defendants are free to insist on strict compliance with the original PM. Therefore, Recommendation 41 is not adopted.

### e. Recommendation 42 (Doc. 3379 at 59-60)

This recommendation involves PM 64 and 65. PM 64 states:

> In an IPC [Inpatient Component/Infirmary beds], a Medical Provider evaluation and plan will occur within the next business day after admission.

And PM 65 states:

> In an IPC, a written history and physical examination will be

completed by a medical provider within 72 hours of admission.

(Doc. 1185-1 at 28-29). Dr. Stern believes there is no meaningful difference between the "evaluation and plan" required by PM 64 and the "written history and physical examination" required by PM 65. He believes the PMs are duplicative and PM 65 should be "collapsed into PM 64." Plaintiffs agree but Defendants claim they want these two PMs to remain separate because any change would be a material change to the Stipulation. (Doc. 3379 at 60).

Again, it is unclear why Defendants oppose the effective elimination of PM 65. Defendants must be drawing a distinction between "evaluation and plan" versus "history and physical examination" but the Court is left to guess at what the distinction could be. Based on the present record, the simplest path would be to terminate PM 65 and focus on PM 64. But Defendants are free to adopt positions that create additional work for them. Therefore, Recommendation 42 is not adopted.

### f. Recommendation 43 (Doc. 3379 at 60-61)

This recommendation involves PM 66 which states:

> In an IPC, a Medical Provider encounters [sic] will occur at a minimum every 72 hours.

(Doc. 1185-1 at 29). Dr. Stern believes PM 66 "is potentially too lenient or too strict." (Doc. 3379 at 60). Some prisoners need more frequent visits while others do not. Dr. Stern recommends this PM be modified to allow for clinically appropriate lengths of time between medical provider encounters. Plaintiffs agree but Defendants insist on the original Stipulation's language. PM Recommendation 43 will not be adopted.

### g. Recommendation 44 (Doc. 3379 at 61)

This recommendation involves PM 67 which states:

> In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks.

(Doc. 1185-1 at 29). Dr. Stern believes PM 67 allows for nurses to see prisoners at

"inappropriate intervals." He provides an example of a seriously ill prisoner who "went almost a full day (22 hours) without any evaluation." Dr. Stern recommends PM 67 be modified to provide for clinically appropriate time intervals between assessments. Plaintiffs agree but Defendants insist on the original Stipulation's language. Defendants' insistence is unreasonable; it is unfathomable that the parties intended to agree to permit assessments of seriously ill prisoners to occur nearly a full day apart. The parties will be required to confer and submit a joint statement outlining their proposals for future monitoring of PM 67.

### h. Recommendation 45 (Doc. 3379 at 62)

This recommendation involves PM 72 which states:

> Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a qualified health care provider.

(Doc. 1185-1 at 29). Dr. Stern's analysis of this PM revealed that none of the failures to provide timely counseling resulted in a significant risk of harm. He therefore recommends that the sample for PM 72 should be drawn from only those prisoners who received a medical diet for a metabolic disease (e.g. heart disease or diabetes). He further suggests that a prisoner who has been counseled within the past year for the same diet should be considered compliant. Finally, he recommends that the PM specify that the counseling occur within two weeks of the third consecutive denial of refused meals. The parties agree with the recommendation and it will be adopted.

### i. Recommendation 46 (Doc. 3379 at 63-64)

This recommendation involves PM 73, PM 77, PM 80, PM 82, and PM 87. All five of the identified PMs require one-to-one counseling as part of their mental health treatment. Indeed, Magistrate Judge Duncan previously determined that group therapy may not count as compliant for a PM that requires individual counseling (Doc. 1673 at 5). Dr. Stern's analysis and opinion, however, is that group therapy is clinically indicated for many prisoners and requiring individual counseling sessions impairs clinicians' ability to maximize use of their time when an individual session is not indicated. Dr. Stern therefore

recommends that the MH-3 and MH-4 portions of PM 73, PM 77, PM 80, PM 82, and PM 87 should be collapsed into a single PM that empowers the clinician to determine whether individual counseling or group therapy is appropriate and the frequency that is needed. Plaintiffs agree with this change in principle but point to deficiencies in care that Dr. Stern has outlined in his report. Defendants agree with permitting group therapy but oppose any change to the protocol.

Because the PMs at issue are not ambiguous, Defendants are free to insist on strict compliance with the original Stipulation. But that strict compliance also precludes group therapy. Therefore, Recommendation 46 will not be adopted.

**j. Recommendation 47 (Doc. 3379 at 64-66)**

This recommendation involves PM 73, PM 77, PM 80, PM 81, PM 82, PM 83, PM 84, PM 87, PM 88, PM 89, PM 90, and PM 92. The common feature of these PM is they require a visit with a clinician or provider on a recurring basis. In a prior dispute, Magistrate Judge Duncan addressed the difficulty in monitoring compliance with this PM. For example, if a file reflecting that a visit must occur within three months is audited during month 2, the file could not be found noncompliant. If the file is excluded from review, however, a file where the visit takes place early unfairly penalizes Defendants for early performance. To remedy these concerns, Dr. Stern recommends vacating Magistrate Judge Duncan's prior order (Doc. 2225) and adopting a methodology where the review determines whether the prisoner was "safe" during the entirety of the monitored month.

Like Recommendation 46, because the PMs at issue are not ambiguous, the Court will not adopt Dr. Stern's recommendation.

**k. Recommendation 50 (Doc. 3379 at 66)**

Previously, the Court ruled that when no data is available for a PM at a particular location, that month could not be used to either establish noncompliance or to seek termination. Dr. Stern believes that is no longer practical because, for some PMs, termination would never be possible because insufficient relevant events occur at certain locations. Dr. Stern sets forth a proposed protocol for assessing situations when there is

very little data.  Plaintiffs agree with the proposed protocol but Defendants do not.  The Court is unable to understand Defendants' opposition and Dr. Stern's suggested protocol would not automatically preclude termination of PMs with little data.  Therefore, Recommendation 50 will be accepted and used in the event Defendants seek termination of PMs involving months where no data is available.

**C. Dr. Stern's General Recommendations**

In the penultimate section of his report, Dr. Stern persuasively identifies core deficiencies in Arizona's provision of health care to prisoners and offers several broad recommendations he believes necessary to ensure the provision of appropriate care.  Many of those recommendations would improve care but, at present, it is not clear whether the Court should pursue the adoption of any of these recommendations.  The specific recommendations are as follows:

- **Recommendation 51 (Doc. 3379 at 90-95)** – "[T]he severe level of underfunding of health care services at the ADC is the single most significant barrier to compliance with the PMs in this case.  At a minimum, the gap between what it costs to take care of this population according to AHCCCS rates and what ADC spends, is at least $74 million dollars."

- **Recommendation 52 (Doc. 3379 at 95-98)** – ADC should conduct a staffing analysis and then implement staffing changes accordingly.  While a staffing analysis is conducted, ADC should adjust (increase) the number of physicians at the Lewis Complex and mental health professionals at Perryville.

- **Recommendation 53 (Doc. 3379 at 98-100)** – ADC should increase RNs relative to LPNs, physicians relative to mid-level providers, and licensed relative to unlicensed mental health professionals.

- **Recommendation 54 (Doc. 3379 at 100-101)** – ADC should seek the authority to create an alternative salary plan, suspend the operative salary plan, and devise a new salary plan based on professional judgment.

- **Recommendation 55 (Doc. 3379 at 101-102)** – Dr. Stern recommends rescission of the Arizona Legislature's instruction to ADC to cap payment to community specialists at the level adopted by AHCCCS.

- **Recommendation 56 (Doc. 3379 at 102-104)** – Dr. Stern identified inefficiencies and flaws in eOMIS (electronic medical records) that waste resources and are potentially dangerous to prisoners. He recommends that the program be updated with input from users.

- **Recommendation 57 (Doc. 3379 at 104-108)** – Dr. Stern believes the Arizona Legislature's decision to privatize prison healthcare is a barrier to providing adequate care. As a result, he recommends that the ADC return to self-operating health care services.

- **Recommendation 59 (Doc. 3379 at 109-110)** – Dr. Stern also recommends that ADC modify its contract with its private healthcare provider to penalize vacant positions in such a way that the penalty for a vacant position is more than the salary.

- **Recommendation 60 (Doc. 3379 at 110-112)** – Dr. Stern proposes that the process by which referrals for specialist services be completed inside eOMIS instead of in a different program.

The Court will require Defendants to file a statement indicating whether they will attempt to implement any of these recommendations. Defendants must specifically identify and respond as to each recommendation.

**D.     Pending Motions**

In July of last year, Plaintiffs sought to compel Defendants to comply with Magistrate Judge Duncan's previous order requiring that "Defendants shall continue to file monthly reports reflecting every instance of noncompliance for PMs at facilities under the October 10, 2017 Order to Show Cause [Doc. 2373 at 3-4] that are at less than 85% compliance." These reports formed the basis for the June 2018 contempt judgment. While Defendants unsuccessfully sought a stay of the Court's June 2018 Orders in this Court and

in the court of appeals, Defendants did not file another report that listed each instance of noncompliance with the performance measures in the first Order to Show Cause. Defendants argued that they were not subject to a current threat of contempt and, further, that "the reports are difficult to produce and prone to errors."

The Court must remain singularly focused on coercing Defendants' compliance with the Stipulation and, if that fails, setting this case for trial. On the present record, Defendants' failure to comply with their prior reporting requirement was unjustified. To the extent Defendants believed it would be unduly burdensome to comply with Magistrate Judge Duncan's order, they were required to seek relief from the Court. Defendants certainly were not free simply to ignore the Order. But the Court must keep its eye on the ball. Due in part to Defendants' concerns regarding the burden in preparing the reports required by Magistrate Judge Duncan, the Court recently shifted the potential for future contempt sanctions from individual instances to failing to meet a PM at individual locations. Thus, while Defendants' behavior was inappropriate—and obviously so— Plaintiffs' motion will be denied. The Court trusts, however, Defendants' disobedience to a valid order will not recur.

Plaintiffs also filed a new motion for attorneys' fees for their work performed enforcing the health care performance measures between July 1, 2018 and June 30, 2019. The Ninth Circuit recently affirmed an award of attorneys' fees to Plaintiffs for their work through June 30, 2017 (Doc. 2276). The Ninth Circuit's decision may impact the proper resolution of Plaintiffs' pending motion for fees. But because the Ninth Circuit's decision is not yet final, the Court will deny Plaintiffs' motion for fees without prejudice to refiling when the mandate is issued.

Plaintiffs also filed a motion to modify the stipulation under Rule 60(b) to allow them to collect monitoring fees in excess of the Stipulation's express cap of $250,000 per year. The Court will deny this motion and declines to modify the Stipulation at this time.[2]

**E. Termination of PMs**

_____
[2] Plaintiffs have not yet filed their reply in support of this motion but the present briefing is sufficient to establish a modification of the Stipulation is not appropriate at this time.

To ensure the parties and the Court are focused on the PMs still at issue, they will be required to prepare a document similar to one prepared by Dr. Stern. (Doc. 3382-1). That document should be a spreadsheet listing each PM and location and then an indication whether that PM has already been terminated at each location or should now be terminated at a particular location.

**IT IS THEREFORE ORDERED:**

1. The parties must confer and submit a joint statement regarding Defendants operating an "Open Clinic" no later than **February 28, 2020**.

2. The parties must confer and submit a joint statement as described herein as to Recommendations 16, 18, 19, and 44 no later than **February 28, 2020**.

3. Defendants must file a statement as to whether they will attempt to implement Recommendations 51, 52, 53, 54, 55, 56, 57, 59, or 60 no later than **February 28, 2020**.

4. The remainder of Dr. Stern's Recommendations are accepted or not adopted as discussed herein.

5. The parties must confer and submit a document regarding the status of PMs by location no later than **February 28, 2020**.

The following motions are addressed:

- o Plaintiffs' Motion to Compel Compliance (Doc. 3301) is **denied**.
- o Plaintiffs' Motion for Attorneys' Fees (Doc. 3401) is **denied** without prejudice to refiling after issuance of the Ninth Circuit's mandate in 18-16358.
- o Defendants' Motions to Stay Enforcement of the Court's May 8, 2019 Attorney Fees' Order and Briefing on Plaintiffs' pending motion (Doc. 3413, 3415) are **denied as moot**.
- o Plaintiffs' Motion to Modify the Stipulation (Doc. 3461) is **denied**.
- o Defendants' Motion to Seal (Doc. 3483) is **granted**.

…

o   Class Member Richard Johnson's Motion to Enforce the Stipulation (Doc. 3488) is **denied**.

Dated this 12th day of February, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge