1  Jared Keenan (Bar No. 027068)
   Casey Arellano (Bar No. 031242)
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone: (602) 650-1854
4  Email: jkeenan@acluaz.org
          carellano@acluaz.org
5
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6  *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
   *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7  *Desiree Licci, Joseph Hefner, Joshua Polson, and*
   *Charlotte Wells, on behalf of themselves and all others*
8  *similarly situated*

   **[ADDITIONAL COUNSEL LISTED ON**
9  **SIGNATURE PAGE]**

10 Asim Dietrich (Bar No. 027927)
   **ARIZONA CENTER FOR DISABILITY LAW**
11 5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
12 Telephone: (602) 274-6287
   Email: adietrich@azdisabilitylaw.org
13
   *Attorneys for Plaintiff Arizona Center for Disability Law*
14 **[ADDITIONAL COUNSEL LISTED ON**
   **SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br>Plaintiffs, <br><br>v. <br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, <br><br>Defendants. | No. CV 12-00601-PHX-ROS <br><br>**JOINT RESPONSE TO COURT ORDER (DOC. 3495)** |

Pursuant to the Court's February 12, 2020 Order (Doc. 3495), the parties jointly file the following response. The parties met-and-conferred on February 25, 2020. [Declaration of Corene Kendrick, ("Kendrick Decl."), filed herewith, ¶ 2]

**Statements Regarding Recommendation 58 (The Operation of an Open Clinic)**

The Court asked the parties to submit their positions regarding Dr. Stern's Recommendation 58 that Defendants be permitted to operate a revised open clinic system, in accordance with certain elements to safeguard that all requests for health care are recorded and tracked. [Doc. 3495 at 23; *see also* Doc. 3379 at 109 (Recommendation 58)]

*Plaintiffs' Statement*

As noted in Dr. Stern's report, Plaintiffs do not oppose restarting the open clinics, but believe that "HNR boxes should still be on the yards as an alternate way to seek care," (Doc. 3379 at 109), because, as the Court previously noted, "[a]t least a dozen of the Stipulation's performance measures require Defendants to act within certain time frames and it is the submission of an HNR which starts the clock for assessing compliance with them." Doc. 2901 at 1.

Plaintiffs agree with Dr. Stern that the five elements of an open clinic system that he outlined (Doc. 3379 at 109) must be part of any open clinic system, but also continue to believe that class members must be able to request care via HNRs or some other system. (Of note, Defendants have indicated that the open clinic system would not be re-implemented on maximum custody, close custody, detention, or watch units, or any other areas where people are not allowed to freely move about to go to a clinic).

When the parties met-and-conferred on February 25, 2020, Defendants asserted that it is too burdensome for health care staff to physically collect paper HNRs from boxes on a daily basis while simultaneously running an open clinic.[1] Defendants stated that at some point in the future class members will be able to submit HNRs electronically via handheld tablets that are being distributed to all people incarcerated at the ten state-

---

[1] Plaintiffs believe that any such burden is rooted in the fact that Defendants and their vendors have insufficient numbers of health care staff. *See* Doc. 3379 at 95-100.

operated prisons, and that this would ameliorate the administrative burden of having staff physically empty the box or boxes on any given yard, as the HNRs would be transmitted electronically to a central intake system. But Defendants also indicated that such a capability to submit HNRs electronically does not currently exist, and that tablets have to date been distributed only at the Tucson and Florence prisons. It is unclear if the class member would retain some sort of record of their electronic request, in order to demonstrate that they had sought care. It also is unclear whether or not tablets would be taken away from some class members for disciplinary purposes, or because they are housed in a max custody, detention, or watch units. If these class members are not allowed to have tablets, then they must have access to paper forms.

Once an ADA-compliant electronic system is fully implemented and working at all ten ASPC institutions, Plaintiffs are amenable to this system of requesting care electronically, as an adjunct to the open clinic system.[2] But until this occurs, Plaintiffs believe that Defendants should continue to make paper HNR forms available to all class members and have HNR boxes on the yards, even at prison units that are running the open clinic, and that the Court should order Defendants to have the HNR boxes in place until the parties agree that the electronic system is in place and operational at a given prison institution or unit, and that tablets are accessible to all class members.

Finally, Plaintiffs agree with the Court that Defendants "previously determined they were free to unilaterally undercut the Stipulation by abandoning the HNR-Box system and manipulating their compliance," that "[h]istory has shown that Defendants appear to believe they are empowered to modify the Stipulation to accommodate their own preferences," and that "Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable." Doc. 3495 at 5 and n.1. Therefore, Plaintiffs request that if the Court adopts Dr. Stern's Recommendation 58, that it also order Defendants to work collaboratively with Plaintiffs and Dr. Stern in restarting the open clinic system pursuant

---

[2] During the parties' meet and confer, Plaintiffs had questions regarding the accessibility of these tablets to people with disabilities.

to Recommendation 58, to consider the input of Plaintiffs and Dr. Stern, and to provide regular updates to Plaintiffs and Dr. Stern that show how Recommendation 58 is being fully implemented.

*Defendants' Statement*

By November 2020, inmates will be able to submit digital HNRs using personal tablets provided to them by ADCRR.[3]  A detailed description of the tablet program (including images of the digital HNR interface) is outlined in the Declaration of Richard Pratt ("Pratt Decl."), filed hereto as Exhibit 6 to the Kendrick Declaration.

As Defendants have advised Plaintiffs, the digital HNRs accessible to inmates via their tablets is an enhancement (not a replacement) to the paper HNR system. (*Id*. at ¶17.) Both systems will operate simultaneously, allowing inmates to choose which system to utilize in requesting healthcare. (*Id.* at ¶18.)  Thus, inmates who are unable to utilize a tablet due to a disability, medical condition, or custody level/disciplinary status, will have access to paper forms in the same manner currently in place. (*Id*. at ¶28.)

Tablets are currently deployed at Tucson and Florence. (*Id*. at ¶26.)  The target date for implementation at all facilities is November 2020. (*Id*. at ¶27.)  Until that time, and as discussed above, even after the deployment of digital HNRs, the paper HNR system will remain in place.  Providing inmates with the ability to submit paper and/or digital HNRs resolves the issues outlined in Dr. Stern's Report and addresses Plaintiffs' concerns identified above. (Dkt. 3379 at 108 –109.)  As such, Defendants do not intend to re-implement the open-clinic concept at this time.   (Pratt Decl. at ¶19.)

**Statements Regarding Certain Recommendations of Dr. Stern**

The Court ordered the parties to confer and submit a joint statement regarding Dr. Stern's Recommendations 16, 18, 19, and 44. [Doc. 3495 at 7-8, 10-11, 17-18, 23; *see also* Doc. 3379 at 33-34 (Recommendation 16); *id*. at 36, 38 (Recommendations 18 and

---

[3] For various reasons (custody level, disciplinary status, disability, medical reason, etc.) certain inmates may not be able to utilize a tablet.  But, as discussed below, will still have access to paper HNR forms.

19); *id.* at 61 (Recommendation 44)]

**Recommendation 16**

Recommendation 16 pertains to the requirement in a number of Performance Measures that a patient be "seen" by mental health staff. [Doc. 3379 at 33-34]

*Plaintiffs' Statement*

ADC mental health staff routinely spend as little as five, three, or two minutes with their patients – including patients who are on suicide watch. [*See* Doc. 3255-1 at 4-6, 22-24, 56-58, and 60-62; *and* Doc. 3404-1 at 61-66 (setting forth numerous examples of such extremely brief sessions)]  After reviewing some of these sessions, Dr. Stern concluded that "some of the short visits are too short to be clinically effective, and in the context of the cases, place patients at significant risk of substantial harm."  Doc. 3379 at 31.  He further concluded that "care delivered during many of these short visits was not safe." Doc. 3379 at 32 n. 24.  Dr. Leonel Urdaneta, Corizon's Director of Psychiatry for the ADC contract from 2017 to 2019, has testified that it is not possible to adequately assess a patient's suicide risk in a cell-front encounter lasting five, three, or two minutes. [Doc. 3476-1 at 18:25-19:6, 69:2-13; *see also* Declaration of Pablo Stewart, M.D., ("Stewart Decl."), filed herewith, ¶ 7 ("It is simply not possible to assess a patient and determine his or her risk of self-harm or suicide in an encounter lasting five, three, or two minutes").

After consultation with their psychiatric expert, Pablo Stewart, M.D., Plaintiffs submit the following proposal for the future monitoring of mental health PMs requiring that patients be "seen."

1. For PM 91, 94, and 95, the minimum session length should be ten minutes. *See* Stewart Decl., ¶¶ 7-8. Dr. Stewart notes that in the Illinois Department of Corrections, daily mental health sessions for patients on watch are required to last "at least 15-20 minutes." *Id.*, ¶ 9 and Ex. 2.

2. For PM 73, 74, 76, 78, 80-90, and 92, the minimum session length should be 30 minutes. *See* Stewart Decl., ¶¶ 10-11; *see also* Doc. 3379 at 32 n. 25 (Dr. Stern opines

-4-

1 that "I would expect encounters in the non-acute setting when chronic care is being
2 provided to generally be longer (in the range of 30 to 60 minutes) than those in the acute
3 watch-related setting when very narrowly focused care is being provided").

4       3.     Under extraordinary circumstances (for example, the patient adamantly
5 refuses to speak with the clinician or is highly agitated), a session lasting less than ten
6 minutes (for PM 91, 94, and 95) or less than 30 minutes (for PM 73, 74, 76, 78, 80-90,
7 and 92) may be counted as compliant only if the clinician (1) makes and documents
8 repeated attempts to engage with the patient; (2) conducts and documents a detailed
9 assessment of the patient, including risk of self-harm or suicide; and (3) documents the
10 length of the session, including the reasons why the session was shorter than required.
11 *See* Stewart Decl., ¶¶ 12-13.

12       4.     ADC should be required to track and report (by clinician and by location)
13 the number of encounters that fall short of the required durations set forth above, to
14 identify facilities or clinicians that are frequently not complying with these minimum
15 durations and facilitate corrective action. *See id.*, ¶ 14.

16       5.     ADC should be required to adopt Dr. Stern's recommendation to implement
17 a plan to reduce the number of mental health encounters with patients on watch that are
18 conducted at cell-front to no more than 10% of the total number of such encounters. *See*
19 *id.*, ¶¶ 15-16.

20       Once the Court determines the minimum length of mental health encounters for
21 PMs requiring that patients be "seen," Plaintiffs request an opportunity to be heard on the
22 method by which Defendants' results for those PMs will be re-audited. *See* Doc. 3495 at
23 10 ("Once the parties address, and the Court resolves, the appropriate minimum length,
24 the relevant PMs must be re-audited if Defendants plan on relying on past performance
25 levels").

26     ***Defendants' Statement***

27       As the Court noted, Dr. Stern's "thoughtful analysis" concluded that requiring
28 inmates be "seen" according to a universal schedule is nonsensical. (Dkt. 3495 at 8.) Yet,

Plaintiffs propose it anyway.

> As Dr. Stern opines:
>
>> In most of the cases, when viewed in the context of the patient's overall care for the acute problem, **the fact that the visit was short was not, *in and of itself*, problematic.** (Dkt. 3379 at 29)
>>
>> For example, if a patient has been determined to be improved and stable over several days of constant watch and can appropriately be advanced to 10-minute watches if the improvement has been sustained, **a short visit can conceivably be adequate for determining that sustained improvement. Short visits may also be appropriate when the visit is conducted at cell-front** (i.e., the patient declines to be taken to an examination room) because this is a non-confidential setting and in-depth conversations either risk violating the patient's right to privacy, or engender stilted or less-than-frank information from the patient. (*Id.* at 29–30)
>>
>> Finally, **longer visits may be contraindicated in patients on watch because if they are agitated and uncooperative** – a not-uncommon situation in this acute setting – pressuring the patient to participate in a longer engagement may cause their agitation to escalate. (*Id.* at 30)
>>
>> With regard to the non-watch-related PMs, the Stipulation itself has created an aberrancy in mental health care (see further discussion in Part IA of this report). **The good intentions of these PMs to set a minimal visit frequency in a variety of situations, has had the unintended consequence of forcing visits to be scheduled, even when they are not needed.** Indeed, in the typical clinical setting, the frequency of mental health visits is determined on a case-by-case basis that flows from the clinician's clinical assessment, informed by input from the patient. A number of mental health professionals at ADC informed me of unnecessary visits that they would not have scheduled but for the requirements of the Stipulation. It is not surprising – nor inappropriate – if those visits are exceedingly short. (*Id.*)
>>
>> **Setting a minimally acceptable length of time for visits would likely cause an [sic] negative unintended consequence.** For situations when a short visit is clinically appropriate, professionals would feel obligated to lengthen the visit to satisfy the PMs. **At best this would unnecessarily waste resources; at worst it could agitate a patient who wanted to be left alone.** (Id.)

(bold emphasis added).[4]

---

[4] While Dr. Stern did conclude that some visits may be too short, he noted such visits were not perfunctory or disingenuous and that he did not believe they violated the

Because "there is no minimum time requirement in the community, the National Commission on Correctional health Care, or the American Corrections Association," Dr. Stern's opinions are consistent with the standard of care. (Dkt. 3379 at 34.) Defendants' mental health expert, Joseph V. Penn, MD CCHP FAPA, agrees. Declaration of Joseph Penn, M.D. ("Penn Decl.") filed herewith.

To avoid the bright line rule Plaintiffs' request, and to instead ensure "clinical judgment" and "meaningful interaction" guide the assessment, as suggested by the Court (Dkt. 3495 at 8), Defendants and Dr. Penn suggest the following procedure for monitoring PMs which require inmates be "seen":

 1. There is no mandated minimum amount of time to see a patient. If the contact is documented to have occurred for more than ten minutes, the objective measuring methods currently in place apply.

 2. If, however, a contact is documented to have been less than ten minutes, a mental health clinician[5] shall exercise clinical judgment to determine if the length was meaningful and appropriate in the context of the patient's overall care.

 3. If the mental health clinician determines the contact was not clinically appropriate, the contact is marked non-compliant. If the mental health clinician determines the patient's contact was clinically appropriate, the contact is marked compliant.

(Pen Decl., ¶¶48 –51.)

Finally, Defendants will agree to re-audit these measures utilizing the two-step protocol recommended by Dr. Stern. (Dkt. 3379 at 33).

**Recommendations 18 and 19**

Dr. Stern's Recommendations and 18 and 19 related to Performance Measure 25, which requires that "[a] first responder trained in Basic Life Support responds and

---

spirit of "seeing" patients. (Dkt. 3379 at 31.)
[5] Mental health clinician is defined as a psychologist or psychology associate. (Dkt 1185-1 at 4.)

-7-

1   adequately provides care within three minutes of an emergency." Doc. 1185-1 at 21.

*Plaintiffs' Statement*

As noted in Dr. Stern's report, Plaintiffs' position is that the Defendants ignore the portion of PM 25 that requires that a responder "adequately provide[] care," and/or the monitors idiosyncratically interpret how to evaluate the adequacy of a response. Most of the time, the review focuses solely on the timeframe for responding, and does not evaluate adequacy. Plaintiffs have raised their concerns with Defendants regarding problematic emergency responses and the difficulties involved with monitoring this PM since October 2015. [*See* Doc. 1561-2 at 12-14]

Dr. Stern noted in his description of an inadequate emergency response, "neither PM 25 nor any other PM would accurately reflect the adequacy" of the elements of an emergency response. [Doc. 3379 at 125]  Unfortunately, the shortcomings continue – in Plaintiffs' January 22, 2020 report regarding their December 2019 monitoring visit to Eyman, they described a sentinel event review done in September by facility health care staff regarding a patient who suffered a fractured thoracic spine due to custody staff administering CPR incorrectly – yet despite the shortcomings identified in the sentinel event review, this encounter was marked as "compliant" in the relevant month's CGAR report for PM 25. [*See* Kendrick Decl., Ex. 1 at 23-24 (1/22/20 Eyman tour report)]

Plaintiffs are concerned that Dr. Stern's recommendation that the PM be "retired" and that emergency responses no longer be reviewed or monitored is shortsighted. How ADC and health care staff respond to medical emergencies (known in ADC vernacular as an ICS, which stands for Incident Command System) is literally a life or death matter that implicates the quality of both health care and correctional staff, and is a critical component of any functional prison. Plaintiffs believe that the parties should, with the assistance and input of Dr. Stern, revise this PM so that it includes, but is not limited to: (1) a sample of a minimum of ten (or if less than ten, all) medical ICSes in a given month at each unit within a prison complex, so that review is not limited solely to events where bleeding needed to be stopped or CPR administered, as is currently the case; and (2) a

-8-

qualitative analysis of the response by custody and/or health care staff that is done collaboratively by ADC staff with the requisite training and experience, with Centurion (or subsequent vendor) health care staff.

As Dr. Stern notes, there are multiple "components to an emergency response including the subsequent care provided by medical staff, joint care provided by medical and custody staff, coordination of the care with community resources, and, as with all other health care, documentation of the event." Doc. 3379 at 125. He proposed that the metric to use for evaluating emergency response focus on whether it is "clinically appropriate." *Id*. at 126. Plaintiffs have proposed that such an evaluation be modeled upon the system used by the California Correctional Health Care Services ("CCHCS") to evaluate emergency responses. A copy of the CCHCS policy (Policy 3.7.4) on the post-event review process, which is based upon the National Commission on Correctional Health Care Standards, is attached as Exhibit 2 to the Kendrick Declaration.[6] The treatment guidelines for emergency responses by which custodial and health care staff are evaluated (CCHCS Emergency Medical Response System, Section 3.7.1-1), are attached as Exhibit 3 to the Kendrick Declaration.[7] A copy of the CCHCS checklist used by auditors to evaluate each medical emergency response is Exhibit 4 to the Kendrick Declaration.

***Defendants' Statement***

Due to the significant challenges (and in some instances, impossibility) in monitoring compliance with PM 25, Defendants agree with Dr. Stern's recommendation that PM 25 be retired.[8] Specifically, Dr. Stern opines this measure should be retired because: (1) the "adequacy" component is subjective and results in monitors employing

---

[6] The policy is publicly available at https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-ch03-art7.4.pdf).
[7] The policy is publicly available at https://cchcs.ca.gov/wp-content/uploads/sites/60/HC/HCDOM-ch03-art7.1-1.pdf.
[8] Importantly, as Dr. Stern notes, PM 25 was written in response to *a single* event that occurred years ago, where first responders did not timely summon health care staff or provide basic first aid to stop an inmate from bleeding. (Dkt. 3379 at 36.)

-9-

varied monitoring techniques; (2) it is difficult to determine compliance as not all incidents are video recorded, and when they are, they are usually of poor quality without sound; and (3) given the infrequency of emergency responses, the results are not statistically meaningful. (Dkt. 3379 at 37.) For example, some monitors inaccurately monitor the adequacy of the nurse's response, although a CO was the first responder. (*Id.* at 36.) As a result, according to Dr. Stern, files are erroneously marked noncompliant, which results in unreliable CGAR data.[9] (*Id.*)

Rejecting both of Dr. Stern's recommendations, Plaintiffs argue that the monitoring of PM 25 be revised to require the review of a twenty-five point checklist. (Exhibit 4 to Kendrick Declaration). Their checklist includes reviewing items that do not apply to all emergencies (CPR, mandown bag, EMS called, etc.) and injects additional subjective and ambiguous terms (which is currently why PM 25 does not result in reliable data) such as "unnecessary delay," "timely," and "communicated." (Exhibit 4 to Kendrick Declaration). Plaintiffs' proposal does not resolve any of the issues identified by Dr. Stern, and only further complicates how PM 25 is measured. Similarly, Plaintiffs urge the Court to add additional records (all medical ICSs) to the universe of files used to monitor PM 25. Because not every ICS is an emergency[10] (and certainly not "literally a life or death matter" as Plaintiffs claim), this does not resolve the problem. For these reasons, and because Plaintiffs' suggestions are exceptionally broad and require extreme departures from the original intent of this measure, the Court should decline to adopt them and instead should defer to Dr. Stern's recommendation that PM 25 retired.

Alternatively, if the Court does not retire PM 25 as Dr. Stern recommends, Defendants propose that its language be modified as follows: "A first responder trained in Basic Life Support responds and provides appropriate care within three minutes of an

---

[9] If the Court does not retire PM 25, Defendants request it adopt Dr. Stern's Recommendation 18 that performance levels for Lewis on PM 25 for December 2017, April 2018, and June 2018 be changed to "compliant." (Dkt. 3379 at 36.)

[10] Indeed, an ICS is often initiated for minor injuries associated with inmate-on-inmate assaults, broken bones, or dehydration. Such instances are not life or death matters as Plaintiffs claim.

emergency." Defendants propose that "appropriate care" refers solely to whether the first responder performed or did not perform CPR, and in cases where an inmate is bleeding, "appropriate care" refers solely to whether the first responder contained the wound. This language provides clarity on how PM 25 should be monitored, respects the parties' original intent, and avoids a more robust definition that, according to Dr. Stern, "is subject to the same challenges" discussed in his recommendations concerning PM 25.[11]

**Recommendation 44**

Dr. Stern's Recommendation 44 was that PM 67 be modified to provide for clinically appropriate time intervals between assessments by nursing staff of patients in infirmaries (referred to as IPCs). [Doc. 3379 at 61-62] Plaintiffs concurred with Dr. Stern's recommendation. [*See id.* at 62] Defendants concur with his recommendation. [*Id.*]

**Defendants' Statement Regarding Implementation of Dr. Stern's General Recommendations**

The Court ordered Defendants to "file a statement as to whether they will attempt to implement Recommendations 51, 52, 53, 54, 55, 56, 57, 59, or 60." Doc. 3495 at 23. Defendants will file their statement on this issue separately from this joint filing. In addition to these Recommendations, and based upon the Court's Order regarding same, Defendants advise that they will adopt Recommendations 41 and 42. [Doc. 3495 at 16-17]

**Statements Regarding the Termination of Some Performance Measures**

The Court asked the parties to prepare "a spreadsheet listing each PM and location and whether that PM has already been terminated at each location or should now be terminated at a particular location." Doc. 3495 at 23. Exhibit 5 to the Kendrick Declaration is a spreadsheet created by Defendants' counsel.

*Plaintiffs' Statement*

Plaintiffs do not agree with the characterizations made in Defendants' spreadsheet.

---

[11] Dr. Stern's comment concerning a "more robust definition" was in reference to Plaintiffs' recommendation that a "more robust definition of adequate first aid", borrowed from the California prison system, apply. (*Id*. at 38.)

-11-

Following the submission of Dr. Stern's report, Defendants filed with the Court a chart from a working draft of his report, which he had chosen to not include in his final report. [Doc. 3382-1] Plaintiffs objected to Defendants' filing as improper, and the Court stated it "will not consider the version of the chart submitted by Defendants."  Doc. 3385 at 3 n.2. Despite this admonishment, and in defiance of the Court's order, Defendants have repeatedly cited this chart in their filings, most recently in their filing today. [*See also* Doc. 3482 at 11 n.10; Doc. 3399 at 1 (citing chart in violation of the Court's order)]  It is improper for Defendants to impute any opinion to Dr. Stern in their chart, to wit:

- Entries Defendants shaded orange are characterized by them as "Dr. Stern recommends termination/retiring. Dkt. 3382-1 at 9-10)." [Kendrick Decl. Ex. 5 at 4] However, Defendants cite to the working draft of his report, and to nothing in his final report and recommendations to the Court.

- Entries Defendants shaded blue are characterized by them as "Dr. Stern contends are N/A to the complex" without citation to any source, including from Dr. Stern. [Kendrick Decl. Ex. 5 at 4]  Instead, Dr. Stern's Recommendation 50 proposed how to handle PMs/institutions where there is a dearth of data for the complex, ***but he did not indicate to which PMs/institutions this applied***. [*See* Doc. 3379 at 70-71]  Plaintiffs concurred with his proposed solution, (*id*. at 71), but Defendants disagreed with Recommendation 50. [*Id.*] The Court noted in its Order that the recommendation "will be accepted and used in the event Defendants seek termination of PMs involving months where no data is available." Doc. 3495 at 20.  To the extent Defendants seek to have these PMs/institutions terminated, they need to actually abide by the protocol recommended by Dr. Stern and adopted by the Court.  They have not done so.

- Entries that Defendants shaded green are described as measures for which Plaintiffs agreed to terminate monitoring and reporting. As detailed below, that is correct. However, their footnote stating that "Many of these are measures [Dr.] Stern previously recommended be terminated," is incorrect, (Kendrick Decl. Ex. 5

at 4), because, as noted above, there was no such final recommendation made in his report to the court.

As a threshold matter, Plaintiffs believe that none of the performance measures identified in Dr. Stern's report as needing recalculation can be terminated unless and until recalculation occurs in accordance with his recommendations, and this includes PMs/institutions that were in his working draft chart. Additionally, Plaintiffs believe that none of the PMs/institutions in the Court's Order to Show Cause (Doc. 3490) should be terminated, nor the noncompliant PMs/institutions in Plaintiffs' pending Motion to Enforce the Stipulation. [Doc. 3492] In addition, none of the PMs requiring that a patient be "seen" can be terminated until the Court decides the appropriate minimum length of these encounters, and Defendants re-audit those PMs in accordance with the Court's order. [Doc. 3495 at 10]

In addition to the 54 PMs/institutions that Plaintiffs previously agreed could be terminated in response to Dr. Stern's report, (*see* Doc. 3495 at 13-14 (termination of PMs 12, 16, 18, 19, 20), *id.* at 16-17 (Plaintiffs agree with Dr. Stern's Recommendation 42 to terminate PM 65 and collapse it into PM 64 with regard to infirmary care at four facilities), Plaintiffs agree that monitoring of the 102 following PMs/institutions can terminate:[12]

- **PM 6:** Provider orders will be noted daily with time, date, and name of person taking the orders off. – All ten Arizona State Prison Complexes
- **PM 9:** SOAPE format will be utilized in the medical record for encounters. – All ten Arizona State Prison Complexes.
- **PM 10:** Each patient's medical record will include an up-to-date Master Problem

---

[12] Plaintiffs previously agreed to and the Court terminated monitoring of the following 158 PMs/institutions on June 22, 2018: PM 7 (all 10 facilities); PMs 33, 34, 62, 75, 76 (at the 6 non-intake facilities: Douglas, Florence, Lewis, Safford, Winslow, and Yuma); PM 38 (all 10 facilities); PM 56 (all 10 facilities); PMs 57, 58, 60, 61, 74 (at the 8 facilities incarcerating men); PMs 63-70 (six facilities that do not have infirmaries: Douglas, Eyman, Phoenix, Safford, Winslow, and Yuma); PM 71 (all 10 facilities). [Doc. 2900 at 12-13]

-13-

list. – All ten Arizona State Prison Complexes

- **PM 17:** The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature. – All ten Arizona State Prison Complexes

- **PM 28:** Every medical provider will undergo peer reviews annually with reviews and recommended actions documented. – All ten Arizona State Prison Complexes

- **PM 29:** Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02. – All ten Arizona State Prison Complexes

- **PM 61:** All female inmates ages 21 to 65 will be offered a Pap smear every 36 months after initial intake, unless more frequent screening is clinically recommended. –ASPC-Perryville and ASPC-Phoenix (until recently, women were housed in one unit at ASPC-Phoenix).

- **PM 79:** If a prisoner's mental health treatment plan includes psychotropic medication, the mental health provider shall indicate in each progress note that he or she has reviewed the treatment plan. – All ten Arizona State Prison Complexes

- **PM 96:** A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above. – All ten Arizona State Prison Complexes

- **PM 99:** Peer reviews shall be conducted as set forth in the MHTM (rev. 4/18/14), Chapter 1, Section 3.0. – All ten Arizona State Prison Complexes

- **PM 101:** Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist. – All ten Arizona State Prison Complexes

***Defendants' Statement***

Pursuant to the Court's February 12, 2020 Order, attached as Exhibit 5 is a color-coded chart[13] indicating which measures should be terminated, and why. Red indicates

---

[13] While Plaintiffs criticize Defendants for submitting this chart, Defendants do so in accordance with the Court's Order requiring the parties to "prepare a document similar

-14-

the measure has already been terminated by the Court (Dkt. 2900 at 12–13; Dkt. 3495 at 13–14); orange indicates Dr. Stern recommended the measure be terminated and Plaintiffs concurred[14]; blue indicates Dr. Stern found the measure is not applicable to the facility[15]; green indicates Plaintiffs agreed to terminate after the February 25, 2020 meet and confer[16]; and yellow indicates the measure should be terminated because there is either insufficient data to support continuation of monitoring or because the measure does not apply to the facility (e.g., intake measures at a facility that do not accept intakes).

Yellow entries should be terminated because no auditable events occurred at the respective complexes for many months. (Dkt. 3379 at 69.) While the Court ordered that N/A entries cannot count either for or against termination, as Dr. Stern opined, this impractically results in some measures that "might never accumulate the requisite data to settle the case" which "deserves reconsideration" of that Order. (*Id.*) As such, Defendants request the Court terminate these measures as outlined in Exhibit 5.

PM 40, PM 41, and PM 54 are all measures the Court ordered Defendants to re-audit. (Dkt. 3495 at 7, 10.) These measures, however, should be terminated. With respect to PM 40 and PM 41, Dr. Stern concluded he was "not able to draw any conclusion about the completeness of the Source Documents ADC uses to measures PM 40 and 41 and therefore unable [sic] to draw any conclusions as to the accuracy of performance levels for these two PMs." (Dkt. 3379 at 26.) In fact, he recommended these measures be terminated at several facilities—PM 40 (Lewis, Perryville, Phoenix, Tucson, Winslow, Yuma; PM 41 (all facilities). (Dkt. 3382-1 at 9.) PM 40 and PM 41 should therefore be terminated. PM 54 should also be terminated because Dr. Stern recommends

---

to one prepared by Dr. Stern." (Dkt. 3495 at 23.)

[14] Measures the parties agreed to terminate are reflected in Dr. Stern's chart by a box with a checkmark. (Dkt. 3382-1 at 9.) To the extent the Court has required Defendants to re-audit one of these measures, Defendants removed it from Exhibit 1 and are not requesting it be terminated.

[15] See Dr. Stern's chart at Dkt. 3382-1 at 9, which indicates these measures do not apply at the respective facilities.

[16] Many of the measures Plaintiffs agreed to terminate were measures that Dr. Stern already recommended be terminated. (Dkt. 3382-1 at 9–10.)

-15-

it and notes the parties agreed to it. (Dkt. 3379 at 44.) Indeed, the Court's Order references both this recommendation by Dr. Stern and the parties' agreement. (Dkt. 3495 at 12.)

As such, Defendants request the Court terminate the 531 measures listed in Exhibit 5.[17]

Respectfully submitted,

Dated: February 28, 2020

| **STRUCK, LOVE, BOJANOWSKI, & ACEDO, PLC** | **PRISON LAW OFFICE** |
|---|---|
| By: s/ (with permission)<br>      Rachel Love<br>Daniel P. Struck<br>Rachel Love<br>Timothy J. Bojanowski<br>Nicholas D. Acedo<br>**STRUCK, LOVE, BOJANOWSKI, & ACEDO, PLC**<br>3100 West Ray Road, Suite 300<br>Chandler, Arizona 85226<br>Telephone: (480) 420-1600<br>Email: dstruck@strucklove.com<br>        rlove@strucklove.com<br>        tbojanowski@strucklove.com<br>        nacedo@strucklove.com<br><br>*Attorneys for Defendants* | By:  s/ Corene T. Kendrick<br>Donald Specter (Cal. 83925)*<br>Alison Hardy (Cal. 135966)*<br>Sara Norman (Cal. 189536)*<br>Corene T. Kendrick (Cal. 226642)*<br>Rita K. Lomio (Cal. 254501)*<br>**PRISON LAW OFFICE**<br>1917 Fifth Street<br>Berkeley, California 94710<br>Telephone:  (510) 280-2621<br>Email:   dspecter@prisonlaw.com<br>            ahardy@prisonlaw.com<br>            snorman@prisonlaw.com<br>            ckendrick@prisonlaw.com<br>            rlomio@prisonlaw.com<br><br>*Admitted pro hac vice<br><br>David C. Fathi (Wash. 24893)*<br>Amy Fettig (D.C. 484883)**<br>Eunice Hyunhye Cho (Wash. 53711)*<br>**ACLU NATIONAL PRISON PROJECT**<br>915 15th Street N.W., 7th Floor<br>Washington, D.C. 20005<br>Telephone:  (202) 548-6603<br>Email:   dfathi@aclu.org<br>            afettig@aclu.org<br>            echo@aclu.org<br><br>*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.<br>**Admitted *pro hac vice* |

---

[17] This number does not include measures that have already been terminated (highlighted in red) in Exhibit 5.

Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:  jkeenan@acluaz.org
           carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:  dbarr@perkinscoie.com
           agerlicher@perkinscoie.com
           jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Maya Abela
Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:  rdalyrooney@azdisabilitylaw.org
           jrico@azdisabilitylaw.org
           mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington St., Ste. 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
 Email:   adietrich@azdisabilitylaw.com

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com

*Attorneys for Defendants*

s/ C. Kendrick