Exhibits to the Declaration of Corene Kendrick

**Exhibit**   **Description**
1             **FILED UNDER SEAL**
              1/22/20 Letter and Report from C. Kendrick to T. Bojanowski regarding
              December 2019 Monitoring Tour of ASPC-Eyman

2             California Correctional Health Care Services ("CCHCS") Policy 3.7.4

3             CCHCS Policy 3.7.1-1

4             CCHCS Emergency Response Checklist

5             Spreadsheet created by Defendants' counsel

6             Declaration of Defendant Richard Pratt

7             Declaration of Defendants' Expert Joseph Penn, M.D.

# Exhibit 1

# (Redacted)



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah

VIA EMAIL ONLY

January 22, 2020

Mr. Timothy Bojanowski
Struck, Love, Bojanowski, & Acedo, PLC
3100 W. Ray Rd., Ste. 300
Chandler, AZ 85226
tbojanowski@strucklove.com

     RE:    *Parsons v. Shinn*
            ASPC-Eyman December 11-12, 2019 Tour Report

Dear Tim:

     Please see the enclosed report from Plaintiffs' counsel regarding our recent monitoring visit to ASPC-Eyman on December 11-12, 2019. We thank custody and health care staff for their assistance in facilitating the visit.

     We look forward to your prompt and substantive response to the report.

          Sincerely yours,

          Corene Kendrick
          Staff Attorney

cc:    Counsel of Record
       Dr. Marc Stern

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah

**ASPC-Eyman**
***Parsons* Monitoring Tour Report**
**December 11-12, 2019**

Introduction ........................................................................................................ 1

I.    Systemic Problems in the Provision of Health Care ................................. 1

      A.   Insufficient Numbers of Nursing Staff ........................................... 1

           1.   Browning Unit ......................................................................... 6

           2.   Cook Unit ................................................................................. 9

           3.   Meadows Unit ........................................................................ 13

           4.   Rynning Unit .......................................................................... 15

           5.   SMU-I ..................................................................................... 18

      B.   Insufficient Numbers of Other Health Care Staff ......................... 21

      C.   Deficient Emergency Responses Not Reflected in PM 25 ............. 22

      D.   Insufficient Network of Specialists and Delays in Specialty Care .... 24

      E.   Wheelchair and Walker Repairs .................................................... 27

      F.   Other Issues Related to the Delivery of Health Care .................... 27

           1.   Toileting Supplies .................................................................. 27

           2.   Influenza Vaccinations / Failure to Abide by Paragraph 12 ...... 28

II.   Systemic Problems in Prison Operations ................................................ 30

      A.   Shortages of Custody Officers Impacts Compliance with the Stipulation ...... 30

III.  Systemic Problems in Restricted Housing Units .................................... 32

      A.   Failure to Comply With Max Custody PMs and DI 326 / DO 812 ..... 32

      B.   Living Conditions in Browning and SMU-I .................................. 35

           1.   Browning Unit ........................................................................ 35

           2.   SMU-I ..................................................................................... 37

      C.   Retaliation Against Class Members for Speaking With Plaintiffs' Counsel .... 42

## Introduction

Plaintiffs' counsel conducted a monitoring tour of ASPC-Eyman on December 11-12, 2019, in order to evaluate the prison's compliance with the *Parsons* Stipulation. The information in this report is based on interviews and correspondence with class members, interviews with health care and custody staff, a review of medical records and other documents, and observations made while visiting the prison.

Eyman has a total capacity of 6,249 (3,984 rated beds; 1,793 temporary beds; 240 detention beds). The population on December 11, 2019 was 5,588.[1] It has five geographically separate units with a mixture of security levels – Browning (max), Cook (medium), Meadows (medium/close), Rynning (close), and SMU-I (max/close) – each with their own medical clinics, and no central medical facility. Class members who need infirmary level of care are usually transferred to ASPC-Florence Central Unit. SMU-I has 384 beds used as detention units, and Rynning has a stand-alone 80 bed detention unit. SMU-I has a 24-bed mental health watch unit, and Browning has 10 beds designated for mental health watch.

This report details systemic issues identified on our visit to the prison. Between the tour on December 11, 2019, and through January 21, 2020, we separately notified Counsel for Defendants regarding 105 individuals at Eyman with serious medical, mental health, and/or dental needs who are in need of health care.

### I.   Systemic Problems in the Provision of Health Care

### A.  Insufficient Numbers of Nursing Staff

After we previously visited Eyman in January 2019, we detailed the profoundly inadequate number of nursing staff that contributed to widespread cancellation and/or delays of medication administration and nursing line. (*See* 2/21/19 letter from C. Kendrick to T. Bojanowski at pp. 1-8). In response, Defendants asserted that "[b]oth Corizon and ADC have, and will continue to, made every effort to recruit and retain FTE nursing staff" at Eyman. (*See* 3/25/19 letter from A. Hesman to C. Kendrick at p. 1).

Unfortunately, these efforts have fallen woefully short, and the situation has not improved under Centurion, as detailed in Defendants' own documents.

---

[1] ADC Institutional Capacity Committed Population, Dec. 11, 2019, *available at* https://corrections.az.gov/sites/default/files/DAILY_COUNT/Dec2019/12112019_count_sheet.pdf (last checked 1/6/20).

The Court first found Defendants substantially noncompliant with Performance Measure 37 ("Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need)") in May 2016.  Doc. 1583 at 2.  Defendants have been substantially noncompliant with PM 37 at Eyman each month since June 2018.[2]

Defendants' most recent filing of the performance measure charts and corrective action plans ("CAPs") shows this trend continuing, with compliance with PM 37 falling to a shocking 4% in October 2019:



Doc. 3458-1 at 116.

Each month since August 29, 2018, the CAP for PM 37 at Eyman included a plan by Corizon (and now Centurion) to recruit, hire, and retain nursing staff.  *Id*. at 116-22.

_____

[2] The Court's May 6, 2019 Order to Show Cause stated that "performance generally at the Eyman Complex is woefully deficient and reflects a wholesale breakdown in the medical unit's operations," and included PM 37 as one of the measures that Defendants needed to bring into substantial compliance no later than July 1, 2019 or face a civil contempt sanction of $50,000 for noncompliance with the measure. Doc. 3235 at 4, 6-7.  Defendants were unable to bring PM 37 in to substantial compliance in June 2019.  Doc. 3335 at 3 (showing 14% compliance).

But staffing reports for September to November 2019 show abysmal levels of nursing staff, echoing the shortages observed during our last tour:

| Position | Centurion Contract FTEs | Sept. Filled FTE | Sept % Filled | Oct. Filled FTE | Oct. % Filled | Nov. Filled FTE | Nov. % Filled |
|---|---|---|---|---|---|---|---|
| ADON | 6.0 | 2.0 | 33% | 3.0 | 50% | 3.0 | 50% |
| RN | 20.0 | 10.4 | 52% | 10.3 | 52% | 9.5 | 48% |
| LPN | 30.0 | 17.6 | 59% | 14.9 | 50% | 16.8 | 56% |

Source: ADCM1584897 (9/5/19); 1595661 (10/21/19); 1595683 (11/26/19).[3]

When we met with the facility health leadership on December 12, 2019, and reviewed the November 26, 2019 staffing report with them, Centurion's Regional Director of Nursing Corliss (who was acting as the facility Director of Nursing position pending a permanent DON) said that in the past two weeks, the facility brought on two new FTE Registered Nurses that would bring the total count to 12 FTE RNs.[4]

---

[3] Our February 21, 2019 letter detailed October 2018 to January 2019 vacancies:

| Position | Corizon Contract Positions | Oct. Filled FTEs | Oct % Filled | Nov. Filled FTEs | Nov % Filled | Dec. Filled FTEs | Dec. % Filled | Jan. Filled FTE | Jan % Filled |
|---|---|---|---|---|---|---|---|---|---|
| RN | 20.40 | 10.75 | 53% | 8.23 | 40% | 8.23 | 40% | 8.30 | 41% |
| LPN | 31.00 | 23.2 | 75% | 22.3 | 72% | 21.3 | 69% | 22.3 | 72% |

[4] We received the January 2, 2020 staffing report days before the completion of this tour report. It showed 5.0/6.0 ADON positions filled (83%), 10.5/20.0 RN positions filled (53%), and 20.8/30.0 LPN positions filled (69%). ADCM1600192.

Ms. Corliss also indicated that she had been at Eyman as the acting DON for about a week, and that the other Regional DON, Sarah Cartwright, had been at the prison for several weeks before that as the Acting DON. The September 2019 CQI meeting minutes state that Eyman DON was moving to Florence, and that "[i]n the interim RDON Sarah Cartwright will be on site and will step into the role while we source for a new DON." ADCM1589624. The 10/21/19 staffing report accurately shows the DON position as vacant, *see* ADCM1595661, but the 11/26/19 staffing report shows the DON position filled, *see* ADCM1595683, which it clearly was not since Ms. Corliss and Ms. Cartwright were serving in that position part-time while also working at the regional Centurion office. The 11/26/19 staffing report shows 2.0 FTE Regional Directors of Nursing, presumably these two people, *see* ADCM1595682, so it is unclear if Centurion is double-counting the same person in two separate FTE positions.

Ms. Corliss stated that the facility is relying upon part-time temporary registry nurses as well as overtime by Centurion nurses to attempt to fill the shortfalls. However, a reliance upon part-time temporary staff who have not gone through the same orientation process/training or relying upon overtime, is not sustainable and puts patients at risk of harm. *See* Reports of Dr. Todd Wilcox, 9/2/16, Doc. 1670 at ¶ 8 ("[H]eaping more duties and arbitrary productivity quotas on existing staff is virtually guaranteed to create additional systemic issues…") and ¶ 10 ("staff that are devoting all of their time putting out fires, as appears to be the case in Arizona, cannot simultaneously build a functional and sustainable health care delivery system); 4/11/15, Doc. 1539 at ¶ 35 ("staffing shortages endanger patients … they lead to excessive delays in access to care…, healthcare staff acting outside the scope of their licenses…, the failure to carry out providers' orders…, and the failure to review and file diagnostic test results… .")

Corizon's and Centurion's monthly Continuous Quality Improvement ("CQI") meeting minutes for 2019 similarly indicate that a lack of health care staffing at Eyman is a root cause of substantial noncompliance with many requirements of the *Parsons* Stipulation. Examples include, but are not limited to:

- "Insulin times and adjustments have been an ongoing issue during the month of July. It has been a combination of security not having officers available and Centurion not having the nursing staff available at the time the insulins need to happen." This was the "biggest issue" at SMU-I. (ADCM1584179).

- "Due to staffing on night shift, we currently do not have a night nurse available to do morning insulins. It has fallen on day shift to manage insulins. Cook and Meadows are starting insulin at 0600." (*Id.*)

- "[O]ur NL [nurse's line] backlog is at 921. When we started addressing this, we were at over 2300." (September 2019 meeting, August data, ADCM1589616).[5]

- Regarding noncompliance with PM 59 (annual tuberculosis screening): "Per DON Brown, we are still sourcing nurses to do OT to come in weekly to catch us up. It is difficult with our staffing issues and backlog of HNRs." (*Id.*)

---

[5] At the December 12, 2019 meeting with facility health administration, FHA Smith first denied that there was a nurse's line backlog. After a five minute philosophical debate about how to define what is a "backlog," and Plaintiffs' counsel referencing these minutes, she admitted that a nurse's line backlog still existed. She estimated that it was currently about 180 people, the majority of whom are at SMU-I and Meadows, and would be cleared "by the end of December." She said SMU-I's backlog is due in part to security precautions that at least two officers must transport each patient to and from the clinic, and at Meadows it is due to the higher acuity level of the patients on the yard.

- "When a [mental health] provider requests a day off, staffing becomes a struggle." (ADCM1589617).

- "Currently sourcing for telehealth providers to step in a run nurse lines.  Two Med Pass nurses called off, forcing us to cancel nurse line." (ADCM1589624)

- "Cook DW identified issues with insulins not starting on time."  (*Id*.)

We were especially concerned to see that with regard to noncompliance with PM 36 and 37, Centurion's solution was to "administratively close" all untriaged/unaddressed HNRs that were more than nine months old.[6]  "Regional Director of Operations Vicki Smith has been in communication with the EHR [electronic health records] team at Corporate and has asked that they administratively close everything that is still open prior to November 2018.  It will give Eyman as well as the whole state a fresh start." (September 2019 meeting, August data, ADCM1589616).  **This act of administratively closing hundreds or thousands of unaddressed and untriaged HNRs – not just at Eyman, but statewide – will artificially inflate Defendants' scores on the six Performance Measures that are timed off of the receipt and processing of a HNR.** *See* Report of Dr. Stern, Doc. 3379, at 19-28 (discussing the timing of HNR triaging and its impact on other PMs).  Closing out untriaged/unaddressed HNRs is reminiscent of the practice, exposed by Dr. Jan Watson, of simply cancelling specialty consult requests if they are about to exceed the timeframes set by PMs 50 and 51.  Even putting aside the requirements of the Stipulation, this practice of administratively closing unaddressed requests for care will paint a deceptively rosy picture to anyone conducting an evaluation of the ADC health care system or attempting to determine how many staff are needed.

---

[6] While the Court has not yet made an official finding of noncompliance at Eyman with PM 36 ("A LPN or RN will screen HNRs within 24 hours of receipt"), 2019 CGAR reports show the prison meets the definition of substantial noncompliance:

| Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. |
|------|------|------|------|-----|------|------|------|-------|------|
| 50% | 88% | 18% | 54% | 54% | 18% | 34% | 52% | 58% | 40% |

But these levels likely overstate compliance.  *See* Report of Dr. Stern, Doc. 3379 at 19-20 ("Based on my review, there are, at times, large enough gaps between the date the HNR was written by the patient and the date it was stamped by Corizon staff, to question the accuracy of the assumption that the stamped date is, in fact, the date received") and at 20-21 (his review of Eyman's December 2018 HNR logs showed that the stamped date on an HNR "does not always accurately reflect the date an HNR was received" and "the inaccuracy occurs frequently enough  … that it could materially affect the calculated performance level for PM 36 or PM 98.").

Prior to the tour, we requested all Information Reports ("IRs") written by custody staff for the period of August 15-November 15, 2019. The IRs – as was the case with the IRs reviewed before the January 2019 tour – documented a multitude of days when the daily nurse's line ("NL") did not occur, delayed insulin/medication administration, and/or a failure to provide all patients their Keep on Person ("KOP") meds on scheduled pick-up dates. The IRs also showed multiple dates when the weekday provider's line ("PL") did not occur.

Since the custody staff assigned to the clinic are required to write daily IRs documenting all activity that occurs at the clinic to which they are assigned pursuant to Department Order 105, we surmise that the days for which Defendants did not provide us with IRs indicates that no IR exists, and thus the clinic was closed. **If IRs were written for the dates indicated but were not produced to us, we ask that you provide them immediately.** As shown on the calendars on the following pages, the IRs documented multiple occasions when no nurse's line occurred or when no provider's line occurred during weekdays, or when medication administration was delayed or did not occur. We have indicated on the calendar all dates for which the IRs documented problems in the delivery of care. ***The blank entries on the calendars are the dates for which nurse's line, provider's line, and medication administration occurred as required***.

Finally, the nursing staff we spoke with at each clinic confirmed that there was a shortage of RNs and LPNs.

**1. Browning Unit**

Plaintiffs' counsel toured Browning's clinic on December 11, 2019. FHA Smith answered all questions from counsel, rather than a charge nurse assigned to the clinic. She confirmed the reports of class members at Browning that HNR forms are only distributed by custody staff during the graveyard shift. She reported that the triage process was that in the morning, nursing staff pick up and review the HNRs. Anyone with an emergent need is seen that afternoon, and it is treated as an ICS emergency. Non-emergent HNRs are scheduled to be seen the afternoon following the triage. FHA Smith reported that influenza vaccines only arrived at the facility the previous weekend (Dec. 7-8, 2019), and that it would be disbursed in a two-phase process: first, obtain refusal/consent from class members with chronic conditions; and second, administer the vaccines to all consenting class members.[7] She indicated that the clinic had just started administering the vaccine to consenting class members.

As Browning is a maximum custody unit, all medication administration is done cell-front. According to the report Defendants provided prior to the tour listing all

---

[7] See pages 28-30 below regarding the delays in administering flu vaccines.

insulin-dependent diabetics (ADCM1595207-11), there are six (6) people with diabetes who rely upon insulin at Browning Unit.  FHA Smith reported that insulin is provided twice a day to people with diabetes at cell-front: at 3:40 am when breakfast is distributed, and around 3:45 pm during the PM medication pass.

Prior to the tour, Defendants produced all IRs written by custody staff assigned to work at Browning's clinic, for August 15-November 15, 2019.  ADCM1594312-563.  These reports documented numerous days on which no nurse's line or provider's line occurred, but there were many days for which we received no IR for Browning.  Given DO 105's requirements, we interpret the absence of an IR to mean that no officer was present at the clinic, which by extension means that no clinic occurred.  (Browning is a maximum custody unit, it is inconceivable that health care staff would see patients without officers present).  **If IRs were written for these days but not provided, we request that you provide them without delay.**

| Browning Unit - August 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | | | 15 *No IRs provided* | 16 *No IRs provided* | 17 *No IRs provided* |
| 18 *No IRs provided* | 19 *No IRs provided* | 20 No NL, late PM meds | 21 | 22 | 23 No PL | 24 *No IRs provided* |
| 25 *No IRs provided* | 26 *No IRs provided* | 27 *No IRs provided* | 28 NL via telenurse | 29 | 30 No PL | 31 *No IRs provided* |

| Browning Unit - September 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| 1 *No IRs provided* | 2 No NL | 3 No NL | 4 No NL, PL not finished due to computer problems | 5 NL, PL, and MH line not finished due to staff shortages | 6 PM med times not listed | 7 *No IRs provided* |
| 8 *No IRs provided* | 9 *No IRs provided* | 10 *No IRs provided* | 11 *No IRs provided* | 12 *No IRs provided* | 13 *No IRs provided* | 14 *No IRs provided* |

| Browning Unit - September 2019 | | | | | | |
|---|---|---|---|---|---|---|
| 15<br>*No IRs provided* | 16<br>*No IRs provided* | 17<br>*No IRs provided* | 18<br>*No IRs provided* | 19<br>*No IRs provided* | 20<br>*No IRs provided* | 21<br>*No IRs provided* |
| 22<br>*No IRs provided* | 23<br>*No IRs provided* | 24<br>*No IRs provided* | 25<br>*No IRs provided* | 26<br>*No IRs provided* | 27<br>*No IRs provided* | 28<br>*No IRs provided* |
| 29<br>*No IRs provided* | 30<br>*No IRs provided* | | | | | |

| Browning Unit - October 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | 1<br>No NL | 2<br>No NL | 3<br>No NL | 4<br>No NL | 5<br>No NL |
| 6<br>*No IRs provided* | 7<br>No NL, No PL, Late PM med pass, dental incomplete | 8<br>NL not completed | 9<br>No NL, Late PM med pass | 10<br>No NL | 11<br>No NL, No PL | 12<br>*No IRs provided* |
| 13<br>*No IRs provided* | 14<br>No NL, Late PM med pass | 15<br>No NL, Late PM med pass | 16<br>No NL | 17<br>No NL | 18<br>No NL, No PL | 19<br>*No IRs provided* |
| 20<br>*No IRs provided* | 21<br>*No IRs provided* | 22<br>*No IRs provided* | 23<br>*No IRs provided* | 24<br>No NL | 25<br>No NL, No PL | 26<br>No NL |
| 27 | 28<br>No NL | 29<br>No NL, Late PM med pass | 30 | 31<br>No NL | | |

| Browning Unit - November 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | | | | 1<br>No NL | 2<br>*No IRs provided* |

| Browning Unit - November 2019 | | | | | | |
|---|---|---|---|---|---|---|
| 3<br>*No IRs provided* | 4<br>No NL, No PL | 5<br>NL via telenurse | 6<br>No NL | 7<br>No NL | 8<br>NL not finished due to "high volume" & discovery of scabies | 9 |
| 10 | 11<br>No NL, No PL | 12<br>No NL | 13<br>No NL | 14<br>No NL, No PL | 15<br>No NL, No PL | |

### 2. Cook Unit

On the morning Plaintiffs' counsel visited Cook Unit's clinic (Dec. 12, 2019), FHA Smith was working in the clinic administering influenza vaccines.  When Plaintiffs' counsel asked her when the vaccines arrived to Cook Unit or ASPC-Eyman, she said she did not know the "exact date," despite the day before telling a different group of Plaintiffs' counsel at Browning Unit that the vaccines had only arrived the weekend prior to the tour.  (*See* p. 6 above).  When we asked her to give her best estimate of the date the vaccines arrived at Cook or Eyman, she said "maybe Thanksgiving."

When we asked to speak to the Cook Unit charge nurse or ADON, FHA Smith told us that the Cook ADON was the acting DON for the entire complex.[8]  Correctional staff and FHA Smith told us that RN Veronica Renna was that day's charge nurse on the unit.  Ms. Renna told us she could tell us nothing about Cook Unit's policies and procedures because she normally works as a RN at Browning Unit, but had been reassigned to Cook Unit to triage Cook's unreviewed HNRs.  She and FHA Smith confirmed that the practice at Browning and Cook is that any HNRs raising mental health needs are put on the nurse's line schedule.  They stated that any HNRs raising dental needs are given to dental staff, if dental staff are present that day, and if dental staff are not present, then the patient is placed on the nurse's line schedule.  This is problematic, as the widespread documented failure to hold nurse's line impacts not just patients seeking medical care, but also those seeking mental health and dental care.

We also spoke with Nurse Lee, who described herself as a "rapid response nurse" who worked PRN (as needed) at Cook Unit as a medication nurse.  She confirmed that there are numerous chronic care patients on the yard who are on multiple medications, and she estimated the number of insulin-dependent diabetics (IDDMs) at around 50.

---

[8] This contradicts the statement made several hours later by Regional DON Corliss that she was the Acting DON for ASPC-Eyman.  *See* p. 3, n.4 above.

(According to the report Defendants provided prior to the tour listing all insulin-dependent diabetics (ADCM1595207-11), there are 48 people with diabetes who rely upon insulin at Cook Unit.)

Nurse Lee described how medication administration should occur when the clinic is fully staffed.  Morning insulin is supposed to start around 6 am, and takes about two hours to complete with one nurse testing blood sugar levels and administering the insulin.  Two other nurses are supposed to start the morning pill call for Direct Observed Therapy (DOT) at 7 am, and this runs until 10 am.  The people who have received notification to pick up their Keep on Person (KOP) medications come to the clinic around 10 am, until the yard closes for count at 11 am.  At noon, there are about five IDDM patients who need insulin, about 30 people with DOT medications, and then any remaining KOP pick-ups.  The evening pill call starts at 2 pm and staff try to finish before the yard closes at 4 pm for count.  Evening insulin is administered beginning at 5 pm, after count.  She emphasized that this is how it should run when fully staffed, but when there are not enough medication nurses, or if the medication nurses have to provide an emergency response to an ICS, that the pill line is delayed or shut down for some period of time during the day.

Prior to the tour, Defendants produced all IRs written by custody staff assigned to work at Cook Unit's clinic, for August 15-November 15, 2019.  ADCM1594564-766.  The IRs document a frequent failure to hold nurse's line, and a delay and/or cancellation of morning insulin.  The failure to provide people with diabetes puts these patients at substantial risk of harm, as foregoing insulin on the regular schedule is potentially lethal.  The IRs also showed that on many days only a fraction of class members were able to pick up their KOP medications.

| Cook Unit - August 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | | | 15<br>No NL, No AM insulin, 23 of 56 patients got KOP meds | 16<br>No NL | 17<br>*No IRs provided* |
| 18<br>*No IRs provided* | 19<br>No NL, 3 of 67 patients got KOP meds | 20<br>No NL, 29 of 71 patients got KOP meds | 21<br>No AM insulin, 25 of 100 patients got KOP meds | 22 | 23<br>No NL, no KOP meds given to 35 people | 24<br>No NL, no KOP meds given to 51 people |

| Cook Unit - August 2019 | | | | | | |
|---|---|---|---|---|---|---|
| 25<br>No NL | 26<br>NL – 2 patients, 10 of 26 patients got KOP meds | 27<br>No NL, Late AM insulin | 28<br>No PL | 29<br>No NL, Late AM insulin | 30<br>No NL, Late AM insulin | 31<br>*No IRs provided* |

| Cook Unit - September 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| 1<br>*No IRs provided* | 2<br>Late AM insulin, 29 of 69 patients got KOP meds | 3<br>No NL, 68 of 122 patients got KOP meds | 4<br>16 of 50 patients seen on NL, no KOP meds for 135 people, PM meds late | 5<br>No NL, Late AM insulin, 137 of 214 patients got KOP meds | 6<br>Late AM insulin, 22 of 51 patients got KOP meds | 7<br>No NL |
| 8<br>*No IRs provided* | 9<br>No NL, late AM insulin, 37 of 67 patients got KOP meds | 10<br>No NL, late AM insulin, 38 of 131 patients got KOP meds | 11<br>Late AM insulin, 4 patients seen on NL | 12<br>No NL | 13<br>No NL | 14<br>No NL, no KOP meds given to 36 people |
| 15<br>No NL, 31 of 45 patients got KOP meds | 16<br>No NL, late AM insulin | 17<br>No NL, no KOP meds given to 208 people | 18 | 19<br>Late AM insulin | 20<br>No NL, late AM insulin, no KOP meds given to 29 people | 21<br>No KOP meds given to 50 people |
| 22<br>*No IRs provided* | 23<br>No NL, 102 of 161 patients got KOP meds | 24<br>No NL, no KOP meds given to 115 people | 25<br>No AM insulin, 5 patients seen on NL, no KOP meds given to 32 people | 26<br>No AM insulin, no KOP meds given to 75 people | 27<br>No NL, 6 of 33 patients got KOP meds | 28<br>No NL |
| 29<br>*No IRs provided* | 30<br>*No IRs provided* | | | | | |

| Cook Unit - October 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
|  |  | 1<br>No NL,<br>59 of 129 patients got KOP meds | 2<br>No NL, late PM meds, no KOP meds given to 137 people | 3<br>No NL, late PM meds, 78 of 90 patients got KOP meds | 4<br>*No IRs provided* | 5<br>*No IRs provided* |
| 6<br>*No IRs provided* | 7<br>2 patients seen on NL | 8<br>No NL, No AM insulin, No KOP meds given to 134 people | 9<br>No NL, No AM insulin, 82 of 96 patients got KOP meds | 10<br>No NL, 14 of 123 patients got KOP meds | 11<br>No NL, 24 of 56 patients got KOP meds | 12<br>No NL, 25 of 45 patients got KOP meds |
| 13<br>No NL | 14 | 15<br>11 of 135 patients got KOP meds | 16<br>No NL, 3 of 18 patients seen on PL, 16 of 54 patients got KOP meds | 17<br>No NL, 41 of 124 patients got KOP meds | 18<br>No NL, Late AM insulin | 19<br>No NL, 40 of 65 patients got KOP meds |
| 20<br>*No IRs provided* | 21<br>No NL | 22<br>No NL | 23<br>No NL, Late AM insulin, 12 of 242 patients got KOP meds | 24<br>No NL, 31 of 37 patients got KOP meds | 25<br>No NL, No KOP meds given to 163 people | 26<br>3 patients seen on NL |
| 27<br>*No IRs provided* | 28<br>No NL, 11 of 25 patients got KOP meds | 29<br>NL via telenurse, 76 of 100 patients got KOP meds | 30<br>No NL, 22 of 52 patients got KOP meds | 31<br>NL via telenurse, no KOP meds given to 103 people |  |  |

| Cook Unit - November 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
|  |  |  |  |  | 1<br>NL via telenurse, 30 of 86 patients got KOP meds | 2<br>No NL, 35 of 80 patients got KOP meds |
| 3<br>*No IRs provided* | 4<br>No NL, no KOP meds given to 113 people | 5<br>No NL, 9 of 114 patients got KOP meds | 6<br>No NL, No AM insulin, 49 of 87 patients got KOP meds | 7<br>NL via telenurse | 8<br>31 of 111 patients got KOP meds | 9<br>*No IRs provided* |
| 10<br>*No IRs provided* | 11<br>*No IRs provided* | 12<br>*No IRs provided* | 13<br>No NL, insulin line not finished, 13 of 50 patients got KOP meds | 14<br>56 of 72 patients got KOP meds | 15<br>No NL, late AM insulin, 96 people did not get KOP meds |  |

### 3.  Meadows Unit

Plaintiffs' counsel visited Meadows Unit clinic on December 11, 2019.  Plaintiffs' counsel first spoke with RN Muse, who reported she had been working for only six weeks at the unit.

According to the report Defendants provided prior to the tour listing all insulin-dependent diabetics (ADCM1595207-11), there are 30 people with diabetes who rely upon insulin at Meadows Unit.  RN Muse stated that insulin starts between 6:30 and 6:45 am and ends around 7:30 or 8 am, even though breakfast also starts at 6:30.  A few people receive insulin again at noon, and the evening insulin administration begins at 4:30 pm after count ends. The morning pill call runs from 7 am through 8:15 or 8:30 am, and evening pill call starts at 2 pm until 3 or 3:30 pm.  FHA Smith told Plaintiffs' counsel that Meadows was in the process of providing flu vaccines to people on the yard, and that it was the first unit to provide vaccinations because of the high number of vulnerable patients with chronic health care conditions.

Prior to the tour, Defendants produced all IRs written by custody staff assigned to work at Meadows's clinic, for August 15-November 15, 2019.  ADCM1594767-5000. The IRs show frequent late starts for insulin, and no nurse's line on multiple dates.

| Meadows Unit - August 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
|  |  |  |  | 15<br>No NL | 16<br>Late AM insulin | 17<br>NL – 2 patients |
| 18 | 19<br>No NL, Late AM insulin | 20<br>No NL, Late AM insulin | 21<br>No NL, Late AM insulin | 22<br>No NL, No PL, Late AM insulin | 23<br>No NL, No PL, Late AM insulin | 24 |
| 25 | 26<br>Late AM insulin | 27<br>No PL, Late AM insulin | 28<br>No NL, no PL, Late AM insulin | 29<br>NL – 1 patient, Late AM insulin, No PL | 30<br>No PL, Late AM insulin | 31<br>Not all patients got AM insulin |

| Meadows Unit - September 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| 1<br>No NL | 2<br>Late AM insulin | 3<br>No PL, Late AM insulin | 4<br>Late AM insulin | 5<br>No PL, Late AM insulin | 6<br>Late AM insulin | 7<br>*No IRs provided* |
| 8<br>*No IRs provided* | 9<br>No NL, No PL | 10 | 11<br>No PL, Late AM insulin | 12<br>No NL, No PL | 13<br>No NL, no PL | 14 |
| 15<br>No NL | 16<br>No NL, No PL | 17<br>No NL | 18<br>No NL | 19<br>No NL, PL – 4 patients | 20<br>No NL, PL – 1 patient | 21<br>NL – 2 patients |
| 22 | 23<br>No NL, PL – 3 patients | 24<br>No NL | 25<br>No NL | 26<br>No NL | 27<br>No PL | 28 |
| 29<br>No NL | 30<br>No NL, PL – 3 patients |  |  |  |  |  |

| Meadows Unit - October 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
|  |  | 1<br>No NL | 2 | 3<br>No NL, No PL | 4<br>No PL | 5 |

| Meadows Unit - October 2019 | | | | | | |
|---|---|---|---|---|---|---|
| 6<br>*No IRs provided* | 7<br>No NL, No PL | 8<br>No NL, No PL | 9<br>NL – 1 patient | 10 | 11<br>No NL | 12<br>No NL |
| 13<br>No NL | 14<br>No NL, No PL | 15<br>No PL | 16 | 17 | 18<br>No NL | 19<br>No NL |
| 20<br>No NL | 21<br>No NL, No PL | 22<br>No NL, No PL | 23<br>No NL | 24<br>No NL | 25<br>No NL | 26<br>No NL |
| 27 | 28<br>No NL | 29 | 30<br>No PL | 31 | | |

| Meadows Unit - November 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | | | | 1<br>No NL | 2<br>No NL |
| 3<br>No NL | 4<br>No NL | 5<br>No NL | 6<br>No NL | 7<br>4 of 19 seen on telenurse (machine broke) | 8 | 9<br>No NL |
| 10 | 11<br>No NL, No PL | 12<br>No NL, No PL | 13<br>Late NL, 6 patients | 14<br>Late NL | 15<br>Late NL, No PL | |

## 4. Rynning Unit

Plaintiffs' counsel visited the Rynning clinic on December 12, 2019 around 1:15 pm.  When we arrived, the staff present told us that no charge nurse or RN had been on-site that day, because the RN was reassigned to work at Meadows Unit.  There were two LPNs present who were preparing medication for the evening pill pass, which they said would run from 2:00-3:00 pm.  We spoke with LPN Tapia, who said that the RN splits her time between Rynning and Meadows Unit, and that nurse's line is done either via telemedicine, or Dr. Johnson adds those patients to his provider's line, which normally is Monday-Thursday.  (Although it was Thursday, Dr. Johnson was not there because he was out sick, according to staff.)  LPN Tapia indicated that the telenurse lines had only started in the two to three weeks prior to the tour.

According to the report Defendants provided prior to the tour listing all insulin-dependent diabetics (ADCM1595207-11), there are two (2) people with diabetes who rely upon insulin at Rynning Unit, which is what LPN Tapia reported. She stated that the morning insulin is supposed to start at 5:45 am, before breakfast, and then the morning pill call starts at 6:00 am. Once the LPNs finish the morning pills, they go to the Rynning Detention Unit to provide AM medications cell-front. Only one of the two people with diabetes requires insulin at noon, and the evening insulin is provided whenever the 4 pm count ends, normally between 4:30 and 5:00 pm. LPN Tapia confirmed that after the LPNs finish the PM pill line around 3 pm, they go to the Detention Unit to administer evening medications cellfront.

We requested all IRs written by custody staff who work at Rynning's clinic, for August 15-November 15, 2019. ADCM1594891-5036. They again show a widespread failure to have nurse's line. We were not provided IRs for much of September.

| Rynning Unit - August 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | | | 15<br>No PL | 16<br>Late AM insulin | 17<br>*No IRs provided* |
| 18<br>*No IRs provided* | 19<br>*No IRs provided* | 20<br>No NL, No PL | 21<br>No NL | 22<br>No NL, No PL | 23<br>No NL | 24<br>No NL |
| 25<br>*No IRs provided* | 26<br>No NL, No PL | 27<br>*No IRs provided* | 28<br>No NL, Late AM insulin | 29<br>No NL | 30<br>*No IRs provided* | 31<br>*No IRs provided* |

| Rynning Unit - September 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| 1<br>*No IRs provided* | 2<br>*No IRs provided* | 3<br>No NL | 4<br>No NL | 5<br>*No IRs provided* | 6<br>No NL, no PL | 7<br>*No IRs provided* |
| 8<br>*No IRs provided* | 9<br>*No IRs provided* | 10<br>No NL | 11<br>*No IRs provided* | 12<br>*No IRs provided* | 13<br>*No IRs provided* | 14<br>*No IRs provided* |
| 15<br>*No IRs provided* | 16<br>*No IRs provided* | 17<br>*No IRs provided* | 18<br>No NL, late AM insulin | 19<br>*No IRs provided* | 20<br>*No IRs provided* | 21<br>*No IRs provided* |

*Parsons* Monitoring Tour Report
ASPC-Eyman, Dec. 11-12, 2019
Page 17

| Rynning Unit - September 2019 | | | | | | |
|---|---|---|---|---|---|---|
| 22 | 23<br>No NL, late<br>AM insulin | 24<br>*No IRs*<br>*provided* | 25<br>*No IRs*<br>*provided* | 26 | 27<br>*No IRs*<br>*provided* | 28<br>*No IRs*<br>*provided* |
| 29<br>*No IRs*<br>*provided* | 30<br>*No IRs*<br>*provided* | | | | | |

| Rynning Unit - October 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | 1<br>*No IRs*<br>*provided* | 2<br>No NL | 3<br>No IRs<br>provided | 4<br>No NL, No<br>PL | 5<br>*No IRs*<br>*provided* |
| 6<br>No NL, Late<br>AM insulin | 7<br>No NL | 8 | 9<br>No NL | 10<br>No NL | 11<br>*No IRs*<br>*provided* | 12<br>*No IRs*<br>*provided* |
| 13<br>No NL | 14<br>No PL | 15<br>No NL, no<br>PL | 16<br>No NL | 17<br>No IRs<br>provided | 18<br>No NL | 19<br>*No IRs*<br>*provided* |
| 20<br>No NL | 21<br>*No IRs*<br>*provided* | 22<br>*No IRs*<br>*provided* | 23<br>No NL | 24<br>No NL | 25<br>No NL, No<br>PL | 26<br>*No IRs*<br>*provided* |
| 27<br>No NL | 28<br>No NL | 29<br>No NL, no<br>PL | 30<br>Late AM<br>insulin,<br>No NL | 31<br>No NL | | |

| Rynning Unit - November 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | | | | 1<br>*No IRs*<br>*provided* | 2<br>*No IRs*<br>*provided* |
| 3<br>Late AM<br>insulin | 4<br>No NL, Late<br>AM insulin | 5<br>No NL, Late<br>AM insulin | 6<br>NL via<br>telenurse | 7<br>No NL | 8 | 9 |
| 10<br>No NL | 11<br>No NL, No<br>PL, Late<br>AM insulin | 12<br>No NL, Late<br>AM insulin | 13<br>No NL, No<br>PL | 14 | 15<br>No PL | |

## 5. SMU-I

When Plaintiffs' counsel visited the SMU-I clinic the afternoon of December 11, 2019, we were initially told by custody and health care staff at the clinic that there was no ADON or charge nurse present.  ADC Program Monitor Kathy Campbell told us that the ADON was working elsewhere that day, but LPNs preparing the afternoon medications contradicted her and said that the ADON position had been vacant for some period of time, and that a new ADON was supposedly starting the following week.  Ms. Campbell also said the unit had been running "telenurse" lines for at least three months.  Again, the LPNs, when asked, contradicted this assertion, and stated that the telenurse line had started only a few weeks earlier, in mid-to-late November.[9]  The clinic staff also reported that Nurse Practitioner Ortiz is present most weekdays to conduct provider's line, and that she sometimes sees patients who would otherwise have been seen on nurse's line.

After some delay, a nurse was located at the clinic, RN Whistler. She reported that she had been working at Eyman for two weeks, and it was her first day of nurse's line. She said in the coming weeks she would be the "night ADON" for Eyman.  She reported that there was a backlog of approximately 80 to 90 people who needed to be seen on nurse's line at SMU-I, and stated "we are trying to get organized here."

The LPNs preparing the medications reported that SMU-I did not receive flu vaccines until the first week of December, and that the LPNs were trying to add the administration of the vaccines in with their normal duties administering medications.  RN Whistler stated that the people on the chronic care caseload were being called up first to be offered the flu shot, and that when they finished with the people with chronic medical conditions, any other prisoner who wanted a flu shot could submit a HNR requesting a vaccination.  She and the LPNs indicated that they were still working their way through the chronic care list, and did not have an idea of how much longer it would take.

The pill nurses reported that they start the morning cellfront medication pass and insulin administration before 6 am, and start the evening medication pass around 2:30 - 3:00 pm in the afternoon.  They stated the night nurse is supposed to administer the evening insulin.  They estimated there are approximately 20 insulin-dependent diabetics in SMU-I.

As noted on page 4, the August 2019 CQI meeting minutes stated that in July, insulin times were an "ongoing issue" due to a "combination of security not having

_____

[9] We observed a telemedicine/telenursing session that was occurring in an adjacent room at the SMU-I clinic, and saw that a custody officer was standing directly behind the seated, shackled, patient who was attempting to communicate with health care staff over the television, in violation of the patient's right to medical privacy. We did not observe any health care staff in the room.

officers available and Centurion not having the nursing staff available," and was the "biggest issue" at SMU-I.  ADCM 1584179.  Defendants produced all IRs written by custody staff assigned to work at SMU-I Unit's clinic, for August 15-November 15, 2019.  ADCM1595037-206.  Based on the IRs, it appears patients with diabetes did not receive insulin as needed in subsequent months.  According to the report provided prior to the tour listing all insulin-dependent diabetics (ADCM1595207-11), there are 17 people with diabetes who rely upon insulin at SMU-I.

| SMU-I - August 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
|  |  |  |  | 15<br>*No IRs provided* | 16<br>*No IRs provided* | 17<br>*No IRs provided* |
| 18<br>No NL, only noon insulin documented | 19<br>No NL | 20<br>*No IRs provided* | 21<br>No NL, No noon insulin | 22<br>No PM insulin documented | 23<br>NL – 2 patients seen, No PL | 24<br>*No IRs provided* |
| 25 | 26<br>No NL, no noon insulin | 27<br>No IRs provided | 28 | 29<br>No NL, no noon insulin | 30<br>PL delayed, No NL, no noon insulin | 31<br>*No IRs provided* |

| SMU-I - September 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| 1<br>No NL | 2<br>No NL | 3<br>No NL | 4<br>No NL | 5<br>No NL | 6<br>No NL | 7<br>*No IRs provided* |
| 8<br>No NL | 9<br>No NL, No PM meds distributed | 10<br>No NL | 11<br>No NL, Late and incomplete AM insulin | 12<br>No NL | 13<br>No PL, Noon & PM insulin not documented | 14<br>*No IRs provided* |
| 15<br>No NL | 16<br>*No IRs provided* | 17<br>*No IRs provided* | 18<br>*No IRs provided* | 19<br>*No IRs provided* | 20<br>No NL | 21 |
| 22<br>NL done by M.D. | 23<br>No NL | 24<br>No NL | 25 | 26 | 27<br>No NL | 28 |
| 29<br>No NL | 30<br>No NL |  |  |  |  |  |

| SMU-I - October 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | 1<br>No NL | 2<br>*No IRs provided* | 3<br>No NL | 4<br>No NL | 5<br>*No IRs provided* |
| 6<br>No NL | 7<br>No NL | 8<br>No NL | 9<br>No NL | 10<br>No NL | 11<br>No NL | 12<br>*No IRs provided* |
| 13<br>NL rescheduled | 14 | 15 | 16<br>No NL | 17<br>No NL | 18<br>No NL | 19<br>*No IRs provided* |
| 20<br>NL via telenurse | 21<br>No NL | 22<br>*No IRs provided* | 23<br>No NL | 24<br>No NL | 25<br>No NL, No PL | 26<br>*No IRs provided* |
| 27<br>No NL | 28<br>NL via telenurse | 29<br>NL and PL not finished | 30<br>*No IRs provided* | 31<br>No NL | | |

| SMU-I - November 2019 | | | | | | |
|---|---|---|---|---|---|---|
| Sun | Mon | Tues | Wed | Thurs | Fri | Sat |
| | | | | | 1<br>No NL, No PL | 2<br>*No IRs provided* |
| 3<br>*No IRs provided* | 4<br>*No IRs provided* | 5<br>NL via telenurse, delayed & not finished | 6<br>NL via telenurse | 7<br>No NL | 8<br>PL via telemed not finished | 9 |
| 10<br>No NL | 11<br>No NL, No PL | 12<br>No NL | 13<br>No NL, No PL | 14<br>No NL | 15<br>No NL, No PL | |

\* \* \* \*

Given the nurse's line is a class member's first point of access to medical, mental health, and/or dental care, Eyman's staggering failure to provide such a basic component of correctional health care creates a substantial risk of harm to patients. The assertions of FHA Smith and ADC Monitor Campbell that "telenurse" services had been used for several months to provide nurse's line are contradicted by contemporaneous IR records made by correctional officers, and statements made by health care staff at the units.

     **In light of the overwhelming shortage of nursing staff, the failure to respond to HNRs in a timely manner pursuant to Performance Measure 37, and the widespread failure to hold nurse's line, we request that you explain what steps ADC and Centurion are taking to recruit and retain FTE nursing staff to fill these positions, and when it is anticipated that those additional nursing staff will be in place.**  Forcing the few remaining nursing staff to work massive amounts of overtime is not a safe or sustainable solution to this problem, nor is forcing providers to take on the duties of the nurses.

### B.  Insufficient Numbers of Other Health Care Staff

     While the shortages in nursing staff are the most acute and sustained, Centurion's staffing reports document that the prison also suffers from a shortage of other key medical and mental health staff.

| Position | Centurion Contract FTEs | Sept. Filled FTE | Sept % Filled | Oct. Filled FTE | Oct. % Filled | Nov. Filled FTE | Nov. % Filled |
|---|---|---|---|---|---|---|---|
| Midlevel Medical Providers | 5.0 (Sept) 5.5 (Oct, Nov) | 3.0 | 60% | 4.0 | 73% | 5.0 | 91% |
| Midlevel MH Providers | 3.0 (Sept) 3.5 (Oct, Nov) | 1.0 | 33% | 2.0 | 57% | 2.0 | 57% |
| Psych Associates (Clinicians) | 13.0 | 10.0 | 77% | 9.0 | 69% | 8.0 | 62% |

(Source: ADCM1584897 (9/5/19); 1595661 (10/21/19); 1595683 (11/26/19).)

     During our meeting with facility health leadership, we were told that Medical Director Dr. Stewart also sees patients, and there is one staff physician position at the facility.  However, Dr. Stewart has numerous administrative duties, and serves as the Site Medical Director at both Florence and Eyman.  (Nevertheless, the staffing reports cited above show the Site Medical Director position at each prison as filled with 1.0 FTE, which is not possible unless Dr. Stewart is working at least 80 hours a week).

     Mental Health Lead Laird stated two new psych associates would start in the next week or two.  She confirmed that the 1.0 psychiatrist position for the prison is filled via telemedicine, and that there is no psychiatrist physically on-site at the prison.  In the days prior to this report, we received the January 2, 2020 staffing report that showed 8.75/13.0 FTE (67%) psych associates filled.  ADCM1600192.

## C. Deficient Emergency Responses Not Reflected in PM 25

The CQI meeting minutes from 2019 describe multiple problematic emergency / ICS responses, but these deficiencies were not reflected in the CGAR scores for PM 25 ("A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency").  This underscores Dr. Stern's analysis that PM 25 does not meaningfully measure or analyze emergency responses by first responders. *See* Doc. 3379 at 37-38.

Most significantly, there are multiple sentinel event reviews that describe delays in providing emergency medical care, because correctional officers moved the patient to the clinic, either because there was no health care staff responding to the scene, or custody staff interfered with nursing staff's ability to respond to emergencies. For example:

- The May 2019 meeting minutes included a discussion of the ICS critique of the response to the medical emergency of Mr. ███████ Meadows Unit, who died in November 2018. "During ICS, CPR was interrupted and patient was moved to the Health Unit by Operations, despite Nursing staff insisting to the contrary. Corizon continues to provide education for Operations on Medical ICS protocol."  ADCM1575369.  The November 2018 CGARs marked this emergency response as compliant with PM 25.  ADCM1555496.

- The June 2019 meeting minutes included an ICS critique of the emergency response on May 10, 2019 to Mr. ███████, who was on the Cook Unit and was having trouble breathing. The comments noted that "Due to nature of medical issue, medical staff should have gone to patient, patient should not have been transported to the Health Unit." ADCM1578035.[10]  This emergency response was not reviewed in the May 2019 CGARs for PM 25.  ADCM1579505.

- The July 2019 meeting minutes included an ICS critique of the emergency response on June 2, 2019 on the Meadows Unit to Mr. ███████.  "[T]he CQI team proposed ideas to ensure that moving forward, DOC staff does not move inmate from the scene of the ICS.  Visual aids on unit, and/or postings suggested. DON Brown suggested that Nursing would respond via radio as soon as ICS activated and request DOC staff not to move the patient until Nursing is there to assess the situation.  DON to send training to Nursing staff regarding responding

---

[10] Plaintiffs' counsel contacted Defendants on September 13, 2019 regarding Centurion's failure to provide Mr. ████ with treatment of his metastasized cancer or a palliative pain management treatment plan.  He died in December 2019.

via radio when ICS is activated." ADCM1580596. This emergency response was not reviewed in the June 2019 CGARs for PM 25. ADCM1580137.

- The August 2019 meeting minutes included the following discussion of custody staff interfering with a nurse's ability to trigger an emergency response. "We had a patient with a BS of 45 during PM insulin. Nurse immediately wanted to bring him to medical in a wheelchair and was told he would have to walk up to medical. Nurse then wanted to call ICS and was told DOC would not call ICS. The inmate walked up to medical but DOC would not provide him with a snack to improve his blood sugar. Nurse was educated that she does not need security's permission to call ICS." ADCM1584179.[11]

- The August 2019 minutes also included an ICS critique of an emergency response to Mr. ███████████ who died in July 2019 at Meadows after complaining of shortness of breath. "IM was complaining of SOB in housing at approximately 0545. He went to use bathroom while waiting for a wheelchair, collapsed while on toilet, and hit his head. IM was unconscious. Brought to HU [health unit] on gurney, placed on floor, and CPR was started by officers. Dental nurse arrived shortly thereafter and assisted… Time of death declared at 0620." "Per DON Brown, many things went wrong with this ICS. The first of which is the ICS was called. They [custody staff] stated there was no rush. …Additionally, the inmate should have never been moved. This is an ongoing issue and nurses have all been re-educated on ICS protocol and responding via radio for patient not to be moved from the scene until a nurse assesses the situation. Especially after having hit his head, he should have never been paced [sic] on a gurney and transported to the health unit. Precious time was wasted when CPR should have been started at the scene. …Education will continue as DOC has a high staff turnover." ADCM1584184. This emergency response was not reviewed in the July 2019 CGARs for PM 25. ADCM1583686.

- The September 2019 minutes also included an ICS review of a sentinel event on August 4, 2019, involving Mr. ███████████, Meadows Unit. "CPR was done appropriately but did result in fractures of his T-Spine. He was in a medically induced coma for a while and is now heavily sedated."[12] ADCM1589621. The

---

[11] The minutes do not indicate at which unit this occurred, nor the identity of the insulin-dependent patient.

[12] According to his medical record, the ICS response and send out to the ER was August 4, 2019, after officers performed CPR on him. He returned from the hospital on October 30, 2019, after treatment of a heart attack and surgical repair of his T7 and T8 vertebrae fractured when he received CPR. There is no indication if any retraining of staff occurred on how to administer CPR without breaking peoples' thoracic spines.

August 2019 CGARs marked this emergency response as compliant with PM 25. ADCM1589136.

**We request an update on the status of the "education" provided to nursing and custody staff regarding moving patients during an ICS, including copies of any visual aids/postings, see ADCM1580137, and/or any written instructions or memos sent to custody and health care staff.**

### D. Insufficient Network of Specialists and Delays in Specialty Care

Plaintiffs' counsel repeatedly has raised concerns about the shortage of outside specialists willing to treat class members. Dr. Stern's report noted the shortage of outside specialists "contributes to delays ADC has witnessed in patients receiving specialty services, as measured by PMs 50 and 51." Doc. 3379 at 101. Plaintiffs' counsel have documented how Corizon's apparent failure or delay in paying specialists resulted in these specialists refusing to see class members.

Centurion's offer in response to Defendants' RFP for health care services touted their specialty network. Centurion noted that their parent company, Centene, provides health care services across the state under Medicare and Medicaid, and boasted that "Centene has nearly 47,000 Arizona providers, including primary care providers, specialists, and hospitals and clinics in its network in Arizona. No other company responding to this procurement can match Centurion's depth of relationships within the medical community throughout Arizona stemming from Centurion's parent companies." *See* Centurion Offer in Response to RFP ADOC18-000008264, at p. 18. "Centurion's Network Development Department, under the direction of Lisa Rossics, will have responsibility for establishing and maintaining a comprehensive provider network for the ADC contract and for managing all contractual agreements. **We commit that we will have sufficient numbers and types of contracted providers, hospitals, and other healthcare professionals to meet the needs of inmates at any of the ASPCs**. […] Centurion will respond to any inquiries raised by the Department concerning any aspect of network inadequacies within two business days of receipt." *Id*. at 152 (emphasis added).

Centurion's promises to tap into a network of 47,000 Arizona providers to address specialty care needs have not been met, unfortunately. Facility health administrative staff reported a backlog of delayed consults, and identified urology, nephrology, and cardiology as specialties that are especially difficult to secure. They stated that a limit on the transportation network, including limitations on mixing security levels and custody status, and a shortage of transport officers contributed to delays. Staff also reported that on-site optometry consults were insufficient to meet the need, and National Eye Care

came to each yard one Sunday a month, but in November and December, to address the backlog, the optometrist was coming to each yard two Sundays a month.

The specialist shortage is described in documents we reviewed. For example, according to the August 2019 CQI meeting minutes, "[o]ff-site provider network is severely limited. Banner and MIHS have been accommodating; but this can cause a delay in care when waiting for next available appointment." ADCM1584176-77. They noted "[n]o GI specialist is available to see patients for procedures only. Started reaching out to Banner and MIHS for those GI consults that are written for evaluation only. 63 total GI pending, 34 of those are EGDs. Most are not from July. They are still pending." *Id*. Of special concern is the precipitous drop in scheduled off-site appointments from August to September 2019:  In August, Eyman had 121 off-site specialty appointments scheduled and Florence had 174, ADCM1589618, and in September Eyman had 52 scheduled off-site appointments and Florence had 60.  ADCM1589692.

CGAR reports document an ongoing failure to provide timely specialty care.  The Court found Defendants noncompliant with PM 51 ("Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider") on April 24, 2017.  Doc. 2030 at 2. The Court held Defendants in contempt for the failure to comply with PM 51 at Eyman in January 2018.  Doc. 2898 at 21.  Defendants' reports show ongoing noncompliance:



Doc. 3458-1 at 299.[13]

The reasons offered since August 2019 as the basis for noncompliance with PM 51 at Eyman have included:

- "Due to the transition, there was a period of time that routine referrals could not be processed at the request of the outgoing contractor.  In addition, there are providers that were used prior to the transition who will not provide services to the inmate population without an executed contract in place," (Aug. 8, 2019, Doc. 3458-1 at 304);

- "There was a backlog of referrals that has carried over since the transition," (Sept. 19, 2019, Doc. 3458-1 at 305);

- "The available resources has outpaced the demand. Multiple outside providers are pending seeing patients until a contract is signed with the new vendor. … Some specialty providers will not see the inmates until an executed contract is in place.  This is being addressed and inmates are being scheduled, as the transportation schedule will allow," (Oct. 15, 2019, Doc. 3458-1 at 305);

- "Inadequately staffed to schedule all required appointments in timeframe. Appointments with offsite specialty care providers have been difficult to procure. …Additional staff will be assigned to assist in finding offsite vendors to schedule within timeframes," (Nov. 17, 2019, Doc. 3458-1 at 305);

- "Inadequately staffed to schedule all required appointments in timeframe. Appointments with offsite specialty care providers have been difficult to procure. … Eyman continues to have a shortage in outside providers. Providers have been instructed to utilize the Rubicon program to ensure all consults are necessary," (Dec. 19, 2019, Doc. 3458-1 at 306).[14]

---

[13] While the Court has not yet made an official finding of noncompliance at Eyman with PM 50 ("Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider"), the 2019 CGAR reports show the prison meets the definition of substantial noncompliance:

| Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. |
|------|------|------|------|-----|------|------|------|-------|------|
| 69% | 62% | 55% | 67% | 80% | 86% | 56% | 69% | 51% | 60% |

[14] The Corrective Action Plan does not explain what the "Rubicon program" is.

### E. Wheelchair and Walker Repairs

FHA Smith confirmed that Centurion has a contract with McKesson to provide durable medical devices and equipment, including wheelchairs and walkers. However, Centurion does not have a contract **to repair** durable medical equipment, nor any sort of on-site repair system, so all wheelchairs and walkers that need repair must be replaced, even if they just need oil, or a bolt tightened or replaced. This a waste of money and equipment to replace repairable assistive devices, when repairing them could be much cheaper.

**We request an update on Centurion securing a contract with McKesson or another vendor to provide repairs to durable medical equipment**.[15]

### F. Other Issues Related to the Delivery of Health Care

#### 1. Toileting Supplies

We spoke with class members who require toileting supplies such as ostomy bags, catheters, diapers, and/or wipes, especially on Cook and Meadows Units where there is a population of elderly people and people with lower body paralysis or other neuro-muscular problems that require them to need toileting supplies. They reported that they did not always receive their toileting supplies as needed, because the supplies are distributed at the same time as KOP medications, and the window of time for pick-up was very short. *See* pages 10-15 above. Others reported that the clinic sometimes did not have toileting supplies of the correct size (i.e. catheters), or that were latex-free, for people with latex allergies. Significantly, class members who in the past had received sanitizing wipes for use when changing their diapers, catheters, or ostomy bags, reported that beginning in July, they received a limited number or no sanitizing wipes. Some people reported that they also were no longer receiving small plastic trash bags for dirty/used supplies. These class members said that they were trying to use toilet paper to clean their bodies and ostomy bags and/or catheters, but they are provided a limited amount of toilet paper. (Several class members at SMU-I reported that they were provided one roll of toilet paper on the 10th, 20th, and 30th of each month). In any event, toilet paper does not clean as well or provide the sanitizing benefits of wipes.

The class members were under the impression that the discontinuation of wipes and trash bags was due to the change in vendors and that Centurion was not providing the wipes, but it appears that ADC made the policy change. The August 2019 CQI meeting

---

[15] When Judge Wake certified the case as a class action, he certified the class as to multiple policies and practices, including but not limited to a "[f]ailure to provide necessary medication **and medical devices**." Doc. 372 at 22 (emphasis added).

discussed the 124 grievances filed in July, including four that related to ostomy supplies, specifically wipes. The minutes noted,

> Our current challenge with wipes is that DOC is asking we not use wipes because of the damage of the sewer system. DOC has also had a decrease in supplies as far as toilet paper allotment. As a result we have seen an increase in the request for wipes. We are trying to ensure that the patients receive wipes, receive them at the appropriate time frames and do have the justified diagnosis to support that additional medical cost.

ADCM1584180.

The failure to provide basic hygiene supplies puts people (and others in their living units) at a serious risk of harm due to infection and unsanitary conditions. **We request that all persons who previously received wipes to assist in toileting be provided an adequate supply in the future. To the extent that operations staff are concerned that people are flushing wipes down the toilet, class members who need them for toileting should be provided plastic trash bags.**

### 2. Influenza Vaccinations / Failure to Abide by Paragraph 12

As detailed above, health care staff reported that the various clinics did not receive influenza vaccinations until late November to early December. To reiterate, we were told the following:

- Browning: FHA Smith reported on Dec. 11, 2019 that influenza vaccines only arrived at the facility the previous weekend (Dec. 7-8, 2019), and that it would be disbursed in a two-phase process: first, obtain refusal/consent from class members; and second, administer the vaccines to all consenting class members.

- Cook: FHA Smith stated that she was administering flu vaccines on Dec. 12, 2019 to class members at Cook Unit, but that she did not know when the vaccines arrived to the facility, estimating it to be "around Thanksgiving."

- Meadows: FHA Smith told Plaintiffs' counsel on Dec. 11, 2019, that Meadows was in the process of providing flu vaccines to people on the yard, and that it was the first unit of the five Eyman units to provide vaccinations because of the high number of vulnerable patients with chronic health care conditions.

- SMU-I: LPNs reported on Dec. 11, 2019 that SMU-I had not received flu vaccines until the first week of the month, and they were trying to add the administration of flu vaccines in with their normal duties administering medications.

Paragraph 12, subsection (a) of the Stipulation requires that "All prisoners will be offered an annual influenza vaccination."  Doc. 1185 ¶ 12(a).  Similar to our Yuma tour, class members – including those with multiple chronic medical conditions – reported that they had not yet been offered the flu vaccine.  The U.S. Centers for Disease Control ("CDC") indicates that persons with the following chronic medical conditions are at higher risk of getting serious complications from the flu:

- Asthma
- Neurologic and neurodevelopment conditions
- Blood disorders (such as sickle cell disease)
- Chronic lung disease (such as chronic obstructive pulmonary disease [COPD] and cystic fibrosis)
- Endocrine disorders (such as diabetes mellitus)
- Heart disease (such as congenital heart disease, congestive heart failure and coronary artery disease)
- Kidney disorders
- Liver disorders
- Metabolic disorders (such as inherited metabolic disorders and mitochondrial disorders)
- People who are obese with a body mass index [BMI] of 40 or higher
- People younger than 19 years of age on long-term aspirin- or salicylate-containing medications.
- People with a weakened immune system due to disease (such as people with HIV or AIDS, or some cancers such as leukemia) or medications (such as those receiving chemotherapy or radiation treatment for cancer, or persons with chronic conditions requiring chronic corticosteroids or other drugs that suppress the immune system)

Other people at higher risk from the flu are:

- Adults 65 years and older
- American Indians and Alaska Natives

*See* Ctrs. for Disease Control & Prevention, "People at High Risk for Flu Complications," https://www.cdc.gov/flu/highrisk/index.htm (last visited 1/8/20).  According to the CDC's recommendations to health care providers for the 2019-2020 flu season, "it is recommended that vaccination should be offered ***by the end of October***." Ctrs. For Disease Control & Prevention, Morbidity & Mortality Weekly Report, "Prevention and Control of Seasonal Influenza with Vaccines: Recommendations of the Advisory Committee on Immunization Practices – United States, 2019-20 Influenza Season," Aug. 23, 2019, https://www.cdc.gov/mmwr/volumes/68/rr/rr6803a1.htm?s_cid=rr6803a1_w (last visited 1/8/20) (emphasis added).

**We request an update as to whether the flu vaccine is now available on all yards at ASPC-Eyman, and the date that it was made available. We ask that you report how many and what percentage of the institution's chronic care patients have received the vaccination, and to the extent that the chronic care population was prioritized before the general population, when staff completed administration to the chronic care population. Please indicate how many units were sent to Eyman, and what steps health care staff have taken to ensure that *all prisoners* are offered an annual flu vaccine, as required by the Stipulation**.

## II.     Systemic Problems in Prison Operations

### A. Shortages of Custody Officers Impacts Compliance with the Stipulation

As Defendants recently reported to the Legislature, the department is suffering from a statewide shortage of custody officers, with the problem most acute at Eyman, with a correctional officer vacancy rate of 38.5%. *See* Jt. Legis. Budget Comm., 54th Legis., Second Quarter Officer Staffing Report (Dec. 11, 2019), available at https://www.azleg.gov/jlbc/jlbcag121119rev2.pdf.

This shortage of custody staff adversely affects ASPC-Eyman's ability to comply with the Stipulation's requirements for both the class as a whole, and as detailed in Part III, with regard to providing the required programming and out of cell time for the subclass members incarcerated in SMU-I and Browning Units.

With regard to health care, it appears that the shortage of correctional officers adversely impacts patients' abilities to access care both on-site and off-site. As noted above at pages 6-20, there were numerous days for which we received no Information Reports from the clinics. It is unclear if the apparent failure to have an IR, or the clinic open, was due to a complete lack of health care staff or custody staff, but operationally speaking, the clinics – even on medium security yards – cannot operate without the presence of custody officers. With regard to the clinics at the two max custody units, every patient who comes to the clinic must be escorted by two officers, and there is enhanced correctional officer staffing at those clinics. FHA Smith told us in our meeting with her and other facility health care administrators that the HNR backlog at SMU-I was due in part to these heightened custody staffing requirements.

Class members at SMU-I and Browning reported their units often had no HNR forms, and forms were only distributed by officers during graveyard shift. Health care staff at Browning confirmed that HNRs were distributed only during graveyard shift.

Other examples of how the shortage of custody staff puts class members at risk of harm include, but are not limited to, the following:

- New medication carts were received for use in the max custody units, but "security has shared that they have some concerns with being able to provide the escorts and ensure we have the appropriate support for those medication carts going into the lockdown unit." (August 2019 CQI Minutes, ADCM1584178).

- "Insulin times and adjustments have been an ongoing issue during the month of July. It has been a combination of security not having officers available and Centurion not having the nursing staff available at the time the insulins need to happen." This was the "biggest issue" at SMU-I. (*Id.*, ADCM1484179)

- "Although DOC agreed to the time change for insulins, and they also agreed, at the time, to the times for sack lunches, they have reverted back to giving the inmates sack lunches at 0330. We are seeing spikes in blood sugars during morning Insulins because they are eating prior." (*Id.*)

- With regard to Eyman's ongoing noncompliance with PM 50 (see Part I.D. above), it was noted in September that "[t]hey [ADC] have no more transportation to offer us. We met with the Warden regarding this issue and he is willing to reach out to other complexes for their transport teams to do OT by coming in to help transport." (September 2019 CQI Minute, ADCM1589616).

- Mental health staff reported that "[custody] [e]scorts are another issue we are having. We use security staff as much as we can but they are busy and short-staffed and it is really hard to get patients pulled out to be seen." (*Id.*, ADCM1589617).

- With regard to medication administration and delivery of Keep On Person medications, "Per DON Brown, nurses are getting pushback from security on Cook and Meadows. They state they do not have time to assist with KOPs for PM 11." (*Id.*, ADCM1589624)

As discussed further below (see Part III.A), these staffing shortages also have an impact on conditions of confinement in the "restricted housing" units and also affect compliance with the Maximum Custody Performance Measures (MCPMs) due to frequent cancellations of the required out-of-cell time. In order to comply with the MCPMs, Defendants must either increase their custody staffing to appropriate and necessary levels or reduce the number of prisoners held in the restrictive housing units.

Governor Ducey recently announced on January 13, 2020, that his administration plans to close ASPC-Florence and transfer custody staff to ASPC-Eyman to address the shortage of custody staff at Eyman.  However, Gov. Ducey's aides indicated to reporters that the closure of Florence would take "possibly up to two years."[16]  Therefore, any planned closure of Florence is not going to address the violations of the Stipulation that currently exist due to a lack of custody staff.  **We request that Defendants indicate what steps have been taken to increase the number of filled correctional positions, to ensure that the Stipulation's health care and maximum custody performance measures are met.**

### III.   Systemic Problems in Restricted Housing Units

#### A.  Failure to Comply With Max Custody PMs and DI 326 / DO 812

The pertinent MCPMs at issue in Eyman Browning and SMU-1 that surfaced during this tour include the following:

- MC PM #1 requires that maximum custody prisoners receiving a minimum amount of out-of-cell time per week: Step I (7.5 hours); Step II (8.5 hours); and Step III (9.5 hours);

- MC PM #2 incorporates DI 326's incentive system and requires that all Step II and III prisoners are mandated to be offered at least one hour of out-of-cell group programming a week;

- MC PM #3 requires that if out-of-cell time mandated by MC PM #1, 2, and 8 is limited or cancelled it must be properly documented and justified as required by the Stipulation;

- MC PM #5 requires that all maximum custody prisoners are offered a minimum of 6 hours of out-of-cell exercise a week;

---

[16] *See* Maria Polletta, *Florence prison closure left some in Arizona 'startled' and 'concerned.' Here's what we know*, Ariz. Repub., 1/15/20, *available at* https://www.azcentral.com/story/news/politics/arizona/2020/01/15/gov-doug-ducey-said-arizona-florence-prison-close-what-we-know/4461553002/.

- MC PM #6 requires that all prisoners eligible for participation in DI 326 be offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing;

Plaintiffs' counsel spent two days conducting interviews of people incarcerated in the restrictive housing units at Eyman Browning and SMU-1. These interviews were largely randomly selected cell-fronts in randomly chosen housing pods across both units. The uniformity of reporting by the men incarcerated across these units is striking. Subclass members reported frequent cancellations of out-of-cell time, especially outdoor exercise. The reason for these cancellations is a shortage of custody staff. Indeed, these same problems are reflected in Defendants' own documentation. For example, in the Max Custody Notebook for SMU-I in July 2019, out-of-cell tracking forms for one week reflected the following cancellations and the reasons listed for the cancellation:

1.  7/13 inside recreation (staff shortage)
2.  7/15 inside recreation for wing #1 (staff shortage)
3.  7/15 outside recreation for wing #4 (staff shortage)
4.  7/15 Responsible Thinking class (staff shortage)
5.  7/15 Communication Skills class (staff shortage)
6.  7/17 Peer Relationships class (staff shortage)
7.  7/17 Communication Skills class (staff shortage)
8.  7/18 Family Ties class (staff shortage)
9.  7/18 Communication Skills class (staff shortage)
10. 7/19 outside recreation for wing #1 (staff shortage)

Despite the number of cancellations during this one week, there was no documentation indicating that cancellations were made up. Moreover, although MCPM #3 allows for "unexpected staffing shortage[s]" to justify cancellations or limitation on out-of-cell time, the type of systemic, persistent staffing shortages within ADC are in no way "unexpected" and therefore cannot be used to justify non-compliance with the Stipulation. *See, e.g.,* J. Legis. Budget Comm., 54th Legis., Second Quarter Officer Staffing Rep. (Dec. 11, 2019) (Reporting a department-wide staff vacancy rate of nearly 20%, with the Eyman facility that houses much of the subclass having a custody staff vacancy rate of 38.5%).

Consistent with earlier reports at Eyman and at other restrictive housing units in ADC, the men incarcerated in SMU-1 and Browning also reported practices by ADC staff that do no amount to genuine "offers" of out-of-cell time. The subclass members consistently reported only being "offered" recreation early in the morning while asleep so that they could not accept their out-of-cell time. They also reported that officers either do not actually offer out-of-cell time or engage in behavior that dissuades or prevents prisoners from taking advantage of out-of-cell time, such as failing to acknowledge when

a request for out-of-cell time is made or more systemically failing to provide adequate shoes and clothing to individuals in restrictive housing during the winter months. "The officers often don't offer us rec. We have to ask for it. This morning, for example, no rec was offered even though it was scheduled."  Indeed, a review of the out of cell tracking forms during the tour confirmed recent cancellations.



    Problems with the implementation of DI 326/DO 812 were also consistently identified.  Numerous people indicated that they are spending months and months on Step 1 status, with no ability to move up to Step 2 and therefore qualify for more out-of-cell time.  Some indicated that they have been told that they are "Step 2 eligible" but there are no program slots available, so they must wait to move to the higher level.  Others indicated that they were told they are on a "waiting list" for Step 2.  Long stays in the deprived, isolating environment of Step 1 undermines the efficacy of the entire step program and the functioning of the Stipulation's chief purpose, which is to ameliorate the harmful impacts of isolation and solitary confinement on human beings.

    People incarcerated at Browning overwhelmingly reported that recreation, showers, and other out-of-cell time, such as programming, are frequently cancelled due to custody staffing shortages and never made up. "Due to cancellations, I have gone as long as two weeks without being offered the opportunity to shower."  People incarcerated at

SMU-I also universally reported that recreation, showers, and other out-of-cell time are frequently cancelled due to custody staffing shortages.

As discussed above in § II.A, the chief driver of non-compliance appears to be custody staff shortages – from the inability to staff outdoor exercise to the lack of available programming to ensure that the DI 326/DO 812 Step Program can actually function properly. **In order to comply with the MCPMs, Defendants must either increase their custody staffing to appropriate and necessary levels or reduce the number of prisoners held in the restrictive housing units. Furthermore, Defendants must revise DI 326 to include presumptive time limits for each step, with automatic advancement to the next step level, barring some documented reason for the subclass member to not advance.**

## B. Living Conditions in Browning and SMU-I

### 1. Browning Unit

At every housing pod we inspected in Browning Unit, the men living there indicated that they rarely or never use the showers because they are not offered showers as frequently as is the policy, but also because the showers are filthy and not cleaned often. Subclass members also reported that when they do use the shower, they will be left in the shower for hours dripping wet and cold as custody staff routinely leave the units after placing a person in the shower, and fail to return for hours at a time. They attributed this dereliction of duty to ongoing staffing shortages. The uniformity of men indicating that they only take "bird baths" in the small sinks in their cells is striking and exceeds any reporting of this practice received by Plaintiffs' counsel throughout this litigation.

Individuals with mobility impairments living in these units also identified accessibility issues as a reason why they cannot use the showers. In particular, the showers cannot accommodate a wheelchair, the pitch on the cement ramp is difficult to navigate, the bars are not placed at the height or location needed for adequate gripping to negotiate the shower and its controls, and there is no shower chair or bench. As seen on the next two pages, Plaintiffs' counsel viewed these showers in Browning's 1-Able pod and photographed them – confirming the problems with accessibility identified by the incarcerated men.







Source: ADCM1597288-90.

### 2. SMU-I

People we spoke to at multiple pods within SMU-I reported that the units were not kept clean, which we personally observed.  The units we visited were filthy; people at 1-Baker and 4-Alpha reported that they were not provided any cleaning supplies for their cells and they had to use hygiene products such as bars of soap or shampoo to clean their cells. People who previously worked as porters reported that they recently lost their jobs because there are no custody staff to supervise them as they clean the units.

Since people on mental health watch have limited or no hygiene supplies, those cells were especially filthy.  We observed on December 11, 2019 that several of the cells (in particular, 1-Baker, cells 2, 4, and 8 on the upper tier) had trash and food strewn everywhere, with rust, pools of water, and pervasive stenches.  The toilets in cells 2 and 4 were overflowing with feces, and the sinks were clogged.

### 1-Baker, cell 2.

We previously notified you of this class member's need for inpatient mental health care.  *See* 12/17/19 letter from D. Fathi to T. Bojanowski, re: Patient in urgent need of mental health treatment.  This class member would not agree to get off of the bed and exit

the cell so that we could photograph it, so we were only able to take the following photograph of his toilet filled with feces by taking it through the food trap door.



(Source: ADCM1597264).

**1-Baker, cell 4:**

We previously notified you of this class member's need for inpatient mental health care. *See* 1/3/19 letter from D. Fathi to T. Bojanowski, re: Patient in urgent need of mental health treatment. The cell had blood smeared on the wall inside the cell next to the door, and the plastic door had feces and blood smeared all over it. The class member had piles of food and garbage everywhere, he said it was because the people on watch are not given cleaning supplies or garbage bags and there are no porters to collect the garbage. He also reported that his toilet was broken, as was the toilet of his neighbor in cell 2. He agreed to exit his cell so that we could take photographs of it. When custody staff came up to the upper tier to take photographs of the cells, Plaintiffs' counsel asked the officer if the toilets were broken and if a work order had been submitted to repair the toilets. He shrugged his shoulders and said, "They don't flush them."

The following photos were taken of his cell at Plaintiffs' counsel's direction (ADCM1597265-69).





Blood smeared on wall and cell door:





The class member told Plaintiffs' counsel that the paper item floating in the toilet is the eating utensil given to people on watch, and that he had tried to clean the toilet using it. The following picture shows what the paper utensil looks like:



We observed the following instruction sign for staff, adjacent to the watch unit's shower (ADCM1597270):



The handwritten graffiti saying "Don't go suicidal This place sucks Please help me" was written on the wall at the entrance to the pod (ADCM1597271):



## C.  Retaliation Against Class Members for Speaking With Plaintiffs' Counsel

Plaintiffs' counsel notified Defendants on January 8, 2020, about class members interviewed by Plaintiffs' counsel at SMU-I, 1-Baker-Pod 6, who reported that since our visit they have been threatened by custody officers and officials as being "fucking snitches" for speaking with attorneys from the ACLU of Arizona and the Prison Law Office on December 11, 2019.  See 1/8/20 Ltr. from C. Kendrick to T. Bojanowski.  To date, we have not received any response to this letter, including our request that Eyman staff be instructed that retaliatory actions are improper and that they be provided a copy of the Court's past orders regarding retaliation (Doc. 1734 and 2209).

* * *

We look forward to your prompt response to the matters raised in this report.

Exhibit 2



### Emergency Medical Response Program

Health Care Department Operations Manual (HCDOM), Section 3.7.1-1, Emergency Medical Response System (revised July 2019), is effective only at the institutions that have been fully trained according to the implementation schedule listed below[*]. Institutions that have not completed training shall follow HCDOM, Sections 3.7.1 through 3.7.5, Emergency Medical Response System policies and procedures (revised July 2012).

**Training Schedule: Phase 1**

| **Dates** | **Institution** |
| --- | --- |
| March 4-22, 2019 | California State Prison, Solano |
| April 8-26, 2019 | Pleasant Valley State Prison |
| April 8-26, 2019 | California State Prison, Sacramento |
| April 29-May 17, 2019 | Mule Creek State Prison |
| April 29-May 17, 2019 | Folsom State Prison |
| June 3-21, 2019 | California Medical Facility |
| July 8-26, 2019 | San Quentin State Prison |
| July 8-26, 2019 | California Correctional Center |
| September 9-27, 2019 | Pelican Bay State Prison |
| September 9-27, 2019 | High Desert State Prison |

**Training Schedule: Phase 2**

| **Dates** | **Institution** |
| --- | --- |
| October 7-25, 2019 | Sierra Conservation Center |
| October 7-25, 2019 | Deuel Vocational Institution |
| November 4-22, 2019 | Substance Abuse Treatment Facility |
| November 4-22, 2019 | California State Prison, Corcoran |
| January 6-24, 2020 | California State Prison, Calipatria |
| January 6-24, 2020 | California State Prison, Centinela |
| January 27-February 14, 2020 | California Men's Colony |
| January 27-February 14, 2020 | Avenal State Prison |
| February 24-March 13, 2020 | California State Prison, Los Angeles County |
| February 24-March 13, 2020 | California Correctional Institution |
| March 23-April 17, 2020 | Chuckawalla Valley State Prison |
| March 23-April 17, 2020 | Ironwood State Prison |

---

[*] Schedule is subject to change. The most current version is posted on Lifeline and the CCHCS internet.

 

**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**

**Training Schedule: Phase 3**

| Dates | Institution |
|---|---|
| April 27-May 15, 2020 | Central California Women's Facility |
| April 27-May 15, 2020 | Valley State Prison |
| June 1-19, 2020 | North Kern State Prison |
| June 1-19, 2020 | Wasco State Prison |
| June 29-July 17, 2020 | California Institution for Men |
| June 29-July 17, 2020 | Richard J. Donovan Correctional Facility |
| August 10-28, 2020 | Correctional Training Facility |
| August 10-28, 2020 | Salinas Valley State Prison |
| September 14-October 2, 2020 | California City Correctional Facility |
| September 14-October 2, 2020 | Kern Valley State Prison |
| October 12-30, 2020 | California Rehabilitation Center |
| October 12-30, 2020 | California Institution for Women |
| January 11-29, 2021 | California Health Care Facility |

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

### 3.7.1-1, Emergency Medical Response System Definitions

**9-1-1 Community Emergency Medical Services Activation:** The community Emergency Medical Services (EMS) activation number utilized for all emergent ambulance transportation and community EMS transportation requests.

**Advanced Cardiac Life Support:** Emergency care consisting of Basic Life Support procedures and definitive therapy including the use of invasive procedures, medications, and manual defibrillation.

**Advanced Practice Provider:** Nurse Practitioner and Physician Assistant staff who are authorized to provide health care and dispense controlled substances by the state in which they practice.

**Allied Health Care Staff:** Respiratory Therapists, Physical Therapists, Occupational Therapists, Radiology Technicians, Laboratory Technologists/Technicians and Phlebotomists, and registered dieticians.

**Basic Life Support:** Emergency care performed to sustain life that includes cardiopulmonary resuscitation, automated external defibrillation, control of bleeding, treatment of shock, and stabilization of injuries and wounds.

**Disaster:** An internal or external occurrence disrupting the normal operating conditions and causing a level of dysfunction that exceeds the institution's capacity of adjustment and ability to manage using its own resources.

**Emergency:** A state in which normal procedures are suspended and extraordinary measures are taken in order to avert a disaster.

**Emergency Medical Response and Review Committee:** The committee designated to provide systematic assessment, risk stratification, and monitoring of the effectiveness of the Emergency Medical Response System and coordination at the regional and statewide levels.

**Emergency Medical Response System:** The organized pattern of readiness and response services within California Department of Corrections and Rehabilitation and California Correctional Health Care Services.

**Emergency Medical Response Vehicle:** A vehicle used to respond to medical emergencies.

**Emergent Transport:** Immediate transportation to a higher level of care for the purpose of treating an emergent medical condition.

**First Aid:** Care administered to an injured or sick patient before health care staff is available.

First Responder: The first staff member certified in BLS on the scene of a medical emergency.

**Health Care First Responder:** The first health care staff member certified in BLS to arrive at the scene of a medical emergency.

**Health Care Provider:** A Medical Doctor, Doctor of Osteopathy, Doctor of Podiatric Medicine, Clinical Psychologist, Dentist, Clinical Social Worker, Nurse Practitioner, or Physician Assistant.

**Health Care Staff:** Physicians, Dentists, Registered Nurses, PAs, NPs, Licensed Vocational Nurses, Certified Nursing Assistants, Psychiatrists, Psychologists, Licensed Clinical Social Workers, Licensed Psychiatric Technicians, Medical Assistants, Pharmacists, Pharmacy Technicians, Registered Dental Assistants, and Registered Dental Hygienists.

**Licensed Independent Practitioner:** An individual, as permitted by law and regulation, and also by the organization, to provide care and services without direction or supervision within the scope of the individual's license and consistent with the privileges granted by the organization.

**Medical Emergency:** Any medical, mental health, or dental condition as determined by health care staff for which immediate evaluation and treatment are necessary to prevent death, severe or permanent disability, or to alleviate disabling pain. A medical emergency exists when there is a sudden, marked change in an individual's medical condition so that action is immediately necessary for the preservation of life, alleviation of severe pain, or the prevention of serious bodily harm to the patient or others.

**Primary Care Provider:** A Physician, NP, or PA designated to have primary responsibility for the patient's health care or, in the absence of a designation or if the designated Physician is not reasonably available or declines to act as primary Physician, a Physician who undertakes the responsibility.

**Urgent Condition:** Any medical condition that would not result in further disability or death if not treated immediately, but requires professional attention and has the potential to develop such a threat if treatment is not provided within four hours.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

## Chapter 3 – Health Care Operations
### Article 7 – Emergency Medical Response

**3.7.1-1        Emergency Medical Response System**
**(a) Policy**

California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS) shall ensure that an emergency medical response system (EMRS) is maintained at each institution to deliver emergency medical treatment to patients, employees, contractors, volunteers, and visitors 24 hours per day, 7 days per week.

(1) This system shall ensure rapid identification, early intervention, and Basic Life Support (BLS) treatment of all medical emergencies that may include the 9-1-1 community emergency medical services (EMS) activation and appropriate transportation within the institution and/or community. Emergency care includes, but is not limited to, initial survey and assessment, interventions, stabilization for transfers, and transportation.

(2) CDCR and CCHCS shall maintain a statewide standardized emergency medical response (EMR) training curriculum, including, but not limited to, BLS, cardiopulmonary resuscitation (CPR), competencies, training exercises, and drills. CDCR and CCHCS shall ensure administrative, correctional, and clinical systems are in place to support the EMRS, including, but not limited to, a standardized formulary of EMRS equipment and supplies.

(A) Community EMS response times differ per county; accordingly, institutions shall be prepared to provide ongoing necessary treatment and interventions pending EMS arrival, provide an appropriate handoff, and be prepared for immediate transport with necessary documentation upon EMS arrival.

(B) Institutions shall implement and maintain a system to ensure care is delivered according to the community 9-1-1 EMS response times (refer to Community EMS Dispatch County Status and 9-1-1 Response Times located on the Lifeline Nursing Services EMRP tab).

(C) Institutions shall establish and maintain a working relationship with community EMS agencies to ascertain appropriate resources, access, and transportation for all 9-1-1 community EMS activations.

(3) CDCR and CCHCS shall identify key indicators, essential functions, and metrics to benchmark and monitor effectiveness and ensure that the EMRS is organized with an established pattern of response (i.e., access to care, alarm responses, transportation, and quality of clinical intervention). This shall include ongoing evaluation through After Action Reviews and other established forums to identify immediate corrective action and improvement opportunities. Statewide and institutional-level committees shall be identified to be responsible for monitoring EMR requirements, identifying trends, initiating and directing improvement activities, and responding to changes in technology and evidence based practice.

**(b) Responsibility**
**(1) Statewide**

It is the responsibility of CDCR and CCHCS departmental leadership at all levels of the organization, within the scope of their authority, to plan, implement, and evaluate the EMRS. The designated committee shall monitor EMRS performance metrics statewide to review and provide feedback on identified issues that present an increased level of risk to patients and the organization. These trends shall be referred to the regional executive teams, headquarters, and the institution's Emergency Medical Response and Review Committee (EMRRC) for quality improvement activities.

**(2) Regional**

Regional Health Care Executives are responsible for implementation of this policy and shall provide oversight and support at the subset of institutions within an assigned region. Each region shall ensure a regional forum is established to review the institutional trends related to the quality, timeliness, and efficacy of all EMRs, as well as direct process improvements through the institutions' performance improvement work plans and quality structure. The regional forum shall meet no less than quarterly to review and provide feedback to the institution for continuous quality improvement and sustainability of the EMRS.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

**(3) Institutional**

The Chief Executive Officer (CEO), health care, and the Warden have overall responsibility for implementation and ongoing oversight of the EMRS at the institutional level. Under the EMRS, the CEO, health care, and Warden shall delegate decision making authority to designated institutional health care staff and correctional executives.

(A) The CEO, health care, and Warden shall:
1. Ensure that the equipment is maintained with sufficient supplies in approved locations to meet the needs of the institution.
2. Implement the standardized EMR training, including, but not limited to, BLS, CPR, and drills with competencies for all staff and ensure that a tracking system is in place.
3. Implement an After Action Review process for immediate evaluation and necessary corrective action of emergency events.
4. Ensure that sufficient staff are available to respond to emergencies 24 hours per day, 7 days per week, and that all staff have the means to activate the EMRS including the 9-1-1 community EMS.
5. Ensure that all staff are appropriately trained and maintain current applicable licenses and certifications.
6. Ensure that appropriate transportation is available to transport patients in emergency situations.
7. Establish an EMRRC to:
   a. Review EMR incidents.
   b. Review the quality, timeliness, and efficacy of all EMRs.
   c. Analyze local trends and outliers.
   d. Provide systematic assessment, risk stratification, and monitoring of all identified groups of patients to ensure the effectiveness of the EMRS.
   e. Develop corrective action measures to ensure continuous process improvement.
   f. Report on Section (b)(3)7.a-e. to the Institution Quality Management Committee.
8. Ensure a local operating procedure is developed that outlines the institution's specific activities or requirements as indicated in Section (d).

(B) The CEO, health care, and Warden have joint, overall responsibility for oversight of the EMRRC at their institution. Identified issues that present an increased level of risk to patients and the organization shall be referred to the institution's EMRRC.

**(c) Procedure Overview**

This procedure describes the EMRS and processes which CDCR and CCHCS staff shall utilize to deliver emergency medical treatment to patients, employees, contractors, volunteers, and visitors 24 hours per day, 7 days per week. EMRS preparedness includes, but is not limited to:
(1) Competencies.
(2) Ongoing training programs.
(3) Standardized equipment inventories.
(4) Maintenance standards.
(5) Disaster response.
(6) Mass casualty response.
(7) Ongoing multidisciplinary EMRS drills.
(8) After Action Reviews.
(9) Access to transportation.
(10) Local Operating Procedures (LOP).
(11) Fostering professional relationships with community Emergency Medical Services (EMS) agencies.

**(d) Local Operating Procedure Requirements**

Each institution shall develop an LOP to ensure the following minimum EMRS requirements are met:
(1) A detailed process for all staff in 9-1-1 community EMS activation and transporting patients to a higher level of care.
(2) 9-1-1 community EMS activation shall not be delayed solely due to waiting for the provider-on-call (POC) consultation or custody response.
(3) Direct, in-person contact with the patient by licensed health care staff is provided for patients requiring urgent/emergent medical attention.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(4) In the event that the Health Care First Responder (HCFR) contacting the patient is of a lower licensure than a Registered Nurse (RN), a health care provider or RN shall be contacted for final disposition prior to releasing the patient back to their housing unit.

(5) A system is in place to document EMRS incidents including persons involved, actions taken, and timelines within the institution, and that copies of all documentation are provided to the EMRRC for quality assurance purposes.

(6) Designation of HCFR's assigned to respond to medical emergencies to ensure institution-wide coverage, 24 hours per day, 7 days per week.

(7) A multidisciplinary approach to disaster response via ongoing training based on tools set forth in this procedure, such as mock drills and skills training.

(8) Availability of a fully stocked EMR bag for each designated HCFR's use during EMRS events including, but not limited to, Triage and Treatment Areas (TTA), clinics, and medication rooms.

(9) A disaster response bag is stocked in each location designated in the institution's LOP. The location of the disaster response bag shall be clearly marked by signage and readily available to responding health care staff during an institution-wide incident response.

(10) Stock a treatment cart in each location identified as a TTA or licensed inpatient area. The location of the treatment cart shall be readily visible to be accessed by licensed health care staff for individuals and patients in need of urgent/emergent care. Other equipment and supplies shall be located in the locked drawers, boxes or cabinets and identified by appropriate signage. Medications stored in treatment carts used for Advanced Cardiac Life Support (ACLS) shall be independently secured and accessed only by a Licensed Independent Practitioner (LIP) pursuant to Health Care Department Operations Manual (HCDOM), Section 3.5.6, Emergency Drug Supplies.

(11) Designate an internal and external transportation plan designed to transport patients, in a medically appropriate manner, to a higher level of care, as needed, to ensure the rapid treatment of the patient's medical condition.

(12) Emergency equipment and supplies, EMR bags, disaster bags, emergency medical response vehicles (EMRV) and contents, treatment carts, oxygen delivery systems, Automated External Defibrillators (AED), and other required equipment and supplies are maintained as required in Section (i).

(13) Required equipment and supplies are readily accessible in the institution at all times to health care staff in the TTA, clinical areas, EMRVs, and other areas as deemed appropriate by the CEO, health care, and the Warden.

(14) A process is in place to document that required inventories and maintenance have been performed. Procedures shall ensure that the required documentation is retained for one year, audited monthly, and reviewed as part of the institution's EMRS quality improvement process.

(15) A preventative maintenance plan is in place for training equipment as specified in the manufacturer's recommendations/guidelines.

(16) Staff who utilize and access equipment supplies and medications have demonstrated competency in their use, purpose, application, and proper handling and maintenance.

**(e) Emergency Medical Response System Organization and Management**
**(1) First Responder**
(A) Patients may request medical attention for an urgent or emergent health care need from any CDCR or CCHCS employee. In all instances the employee shall notify health care staff without delay.

(B) If notified of a possible emergency by any individual, the First Responder shall be at the patient's side within four minutes of notification.

(C) Upon notification or discovery of a health care emergency, the First Responder shall activate local EMRS via radio, personal alarm, whistle, or institutional EMR number; notify the designated clinical area; provide a brief report; request health care staff response; and activate 9-1-1 community EMS if indicated.

(D) Custody staff shall isolate, contain, and control the scene of the emergency and significant security threats to self or others including any circumstances causing harm to the involved patient. Custody staff requirements shall not unreasonably delay medical care during a medical emergency unless the safety of staff, patient, or the general public would be compromised.

(E) All staff shall utilize Personal Protective Equipment when responding to emergencies.

(F) The First Responder shall evaluate the situation and the patient to include the presence of pulse and spontaneous respirations, and initiate appropriate First Aid and/or BLS measures including establishing circulation, airway,

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

breathing, controlling bleeding, and administering CPR until health care staff arrives to continue life support measures.

(G) The First Responder shall provide a brief description of the nature of the emergency to health care staff.

(H) First Responders shall document on the CDCR 837, Crime/Incident Report, the decisions made regarding immediate First Aid and/or BLS and actions taken or not taken including cases where First Aid and/or BLS is not initiated consistent with training, and/or situations that posed a significant threat to the First Responder or others.

**(2) HCFRs shall:**

(A) Respond as quickly as conditions permit to the scene of the medical emergency with an EMR bag and AED.

(B) Arrive at the scene within eight minutes of the initial notification of emergency.

(C) Initiate, or continue/assist with, necessary BLS measures including CPR as indicated.

(D) Take control of the medical response at the scene, continue appropriate treatment as clinically indicated, and determine subsequent action including, but not limited to:

   1. Notifying the TTA of the need for transportation.
   2. Transferring the patient to the TTA.
   3. Administration of Naloxone per policy, as clinically indicated.
   4. 9-1-1 community EMS activation, if not already activated by the First Responder.
   5. Transferring the patient directly to a higher level of care as the patient's conditions dictate.
   6. Continuing medical treatment until community EMS responders arrive, assume care, and transport the patient.
   7. Directing the transportation of the patient to the nearest site equipped and staffed for continuation of appropriate care in a setting such as a hospital emergency department under the care of a physician.
   8. Notifying the TTA immediately of the patient's disposition if the patient is sent to a higher level of care.
   9. Notifying the Medical Officer of the Day or POC of the patient's disposition if the patient is sent to a higher level of care.
   10. Licensed clinical staff clearly documenting the encounter including the disposition and the rationale for the disposition decision in the health record.
   11. Obtaining vital signs, other clinical data, and performing interventions within their scope of practice, as directed by RNs, physicians, or Advanced Practice Providers.
   12. Dispositions for urgent conditions shall be made at the RN level of licensure or higher.

**(3) Documentation of Emergency Medical Response System Events**

(A) The HCFR shall document his/her findings and interventions at the scene as needed. Following the EMR, input the information into the health record.

(B) The use of an AED shall be documented by health care staff.

(C) The HCFR shall, if required by the local EMS authority, file a "Notice of Discharge of an AED" with the EMS authority utilizing the forms provided by that entity per the local EMS authority timeframes.

(D) The HCFR shall have documentation relating to each EMRS event available to the designated Supervising Registered Nurse (SRN) II. The SRN II shall complete a CDCR 7186-1, Emergency Medical Response and Unscheduled Transport Event Checklist, before the end of the shift on which the EMR occurred. Documentation that shall be available includes, but is not limited to:

   1. TTA documentation.
   2. First Responder Form.
   3. Other pertinent clinical information.

**(4) Transportation Requirements**

(A) Designated health care staff are responsible for determining the appropriate method of transportation based on the patient's clinical condition, distance to nearest the treatment facility capable of addressing the patient's health care, and other considerations (e.g., weather).

(B) Emergency transportation shall be arranged via 9-1-1 community EMS activation and not by contacting the local EMS non-emergency number.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(C) Emergent or urgent unscheduled transportation of a patient via 9-1-1 community EMS activation shall not be delayed in order to complete the CDCR 7252, Request for Authorization of Temporary Removal for Medical Treatment, or to obtain other approvals from custody staff.

(D) The CDCR 7252, shall be initiated by designated health care staff and given to the designated custody representative for final completion and approval.

(E) Community EMS personnel will transport the patient to a community emergency facility according to local EMS agency policies and procedures.

(F) Custody and health care staff shall ensure proper documentation of incident timelines via a designated local process, which shall be provided to EMRRC at the institution. Sally port officers shall maintain a standardized log of emergency vehicle traffic entrances and exits, including times. The log shall be provided to the EMRRC for review.

(G) In the case of an unscheduled urgent/emergent transfer to a higher level of care facility, the Primary Care Provider (PCP) and/or RN shall communicate pertinent health care data to the receiving health care facility.

1. Urgent/emergent unscheduled transfers to higher level of care facilities requires an accepting physician at the receiving facility. This shall be communicated to the responding community EMS transfer provider.

2. Pertinent documentation shall be sent to the receiving facility with the patient pursuant to HCDOM, Section 3.1.9, Health Care Transfer.

3. Communications to outside facilities regarding the patient's condition shall be documented in the health record.

(H) Custody and health care staff shall use clear language and avoid specialized terminology (i.e., jargon, acronyms) when requesting 9-1-1 community EMS activation.

(I) Appropriate language within the institution and outside agencies shall include urgent and emergent designations when describing the urgency of the response and transport. Code 1, Code 2, and Code 3 language shall not be used to describe health care emergencies or transportation.

**(5) Cardiopulmonary Resuscitation**

(A) Once CPR is initiated, it shall be continued until one of the following occurs:

1. Resuscitative efforts are transferred to a rescuer of equal or higher level of training.

2. The patient is determined by a physician or Advanced Practice Provider to be deceased. Pronouncement of death is also possible by community EMS personnel utilizing local agency's protocol for determination of death in the field.

3. Effective spontaneous circulation and ventilation have been restored.

4. Emergency responders are unable to continue because of exhaustion or safety and security of the rescuer or others is jeopardized.

5. A written, valid Do Not Resuscitate (DNR) order is presented. If there is any suspicion that a patient's cardiopulmonary arrest is not part of a natural or expected death (e.g., the patient's condition is a result of an attempted suicide) resuscitation efforts shall be continued regardless of the existence of a DNR, Physician's Orders for Life Sustaining Treatment, or Advance Directive to the contrary, and resuscitative efforts shall be commenced and continued until other indications to cease are present.

6. An RN determines that clear signs of death, outlined in Section (e)(5)(B)2., are present and directs that CPR be discontinued.

(B) Cessation of Cardiopulmonary Resuscitation

1. The decision to terminate CPR shall be made by a physician, an Advanced Practice Provider, or community EMS personnel in the event that they determine that the patient is unable to be resuscitated.

2. The decision to terminate CPR may also be made by an RN if CPR was initiated for a patient who exhibits clear signs of death as described below:

   a. Rigor mortis
   b. Dependent lividity
   c. Tissue decomposition
   d. Decapitation
   e. Incineration

   The RN shall still contact a physician or Advanced Practice Provider to declare a time of death.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(C) Determination of Death

A physician or Advanced Practice Provider shall pronounce the patient deceased after an in-person evaluation, including the exception of the RN's determination of the presence of the clinical findings listed in Section (e)(5)(B)2. Community EMS personnel may also pronounce a patient deceased utilizing local EMS Agency protocol for determination of death in the field.

(D) CDCR 7462, Cardiopulmonary Resuscitation Record

1. A detailed CDCR 7462 that includes all resuscitative measures and drugs administered by the LIP shall be scanned in to the health record by an RN, or designee, during following a respiratory and/or cardiac arrest event.
2. Drugs administered by the LIP during the respiratory and/or cardiac arrest event shall be documented by the recorder on the CDCR 7462, at the time of administration.
3. The names of the staff involved in the CPR event shall be documented on the CDCR 7462 and in the health record.

**(f) Staffing**

(1) Health care staff shall provide emergency care consistent with their licensure/certification, training, competency, and legal scope of practice.
(2) Licensed Vocational Nurses (LVNs) and Psychiatric Technicians (PTs), based on their level of licensure and training, and when under the guidance of an RN shall provide emergency care as directed by the RN based on clinical indications. The patient-specific orders shall be given verbally or telephonically.
(3) Naloxone may be administered independently by LVNs and PTs pursuant to the regulatory board, clinical decision support, and the institution's Naloxone Emergency Medical Response LOP.
(4) At least one RN shall be available onsite at each institution 24 hours per day, 7 days per week for emergency care. When a physician is not onsite, the highest priority for the RN shall be emergency care.
(5) A provider shall be onsite during business hours.
(6) A POC shall be available after hours, weekends, and holidays to provide consultation and onsite care as necessary. The POC shall be readily available to provide telephone consultation and shall respond within 15 minutes of the initial attempt to contact by institutional staff.
(7) TTAs and clinical areas shall be properly staffed and equipped.
(8) RN staff, based on their level of licensure, training, and demonstration of competency, shall provide emergency care based upon clinical indications and utilizing patient-specific individual orders or nursing standardized procedures. The patient-specific orders may be given verbally or telephonically when the provider is not present.

**(g) Emergency Medical Response System Training/Certification**

(1) Basic Life Support Certification Requirement

(A) BLS proof of certification or recertification shall be provided to institutional management and maintained pursuant to the HCDOM, Section 1.4.6, Licensed Medical Provider Credentialing and Privileging, for the following health care staff:

1. Medical staff.
2. Nursing staff.
3. Psychiatrists.
4. Psychologists who belong to the organized medical staff at their institutions and who have admitting privileges.
5. Dentists, dental hygienists, dental assistants.

(B) BLS certification is recommended but not required for the following health care staff:

1. Allied health care staff who have direct patient contact.
2. Licensed Clinical Social Worker.
3. Psychologists who do not have admitting privileges.

(2) Correctional peace officers shall, within the previous two years, have successfully completed a CPR course provided or approved by the Warden, or designee.

(A) The Warden, or designee, shall maintain a system to manage and track correctional peace officers' CPR requirements.
(B) Correctional peace officers shall carry a personal CPR mouth shield at all times.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(3) Advanced Cardiovascular Life Support Certification Requirement
    (A) PCPs shall maintain current ACLS certification provided or approved by the American Heart Association. Proof of certification or recertification shall be submitted to institutional management and the headquarters Credentialing and Privileging Support Unit pursuant to HCDOM, Section 1.4.6, Licensed Medical Provider Credentialing and Privileging.
    (B) Contract specialty providers who can perform procedures requiring procedural sedation at CDCR institutions shall, within the previous two years, have successfully completed a course in ACLS that is provided or approved by the American Heart Association. Proof of certification or recertification shall be received by the institutional CEO, health care, and the headquarters Credentialing and Privileging Support Unit prior to the contract specialist's start date and/or prior to the expiration of the contract specialist's ACLS certification.

(4) Emergency Medical Response System Minimum Training and Training Exercise Requirements – Health Care Staff
    (A) Each institution under the control of CDCR/CCHCS shall ensure minimum training requirements are met and tracked.
    (B) The Chief Medical Executive (CME), Chief Nurse Executive (CNE), Chief of Mental Health, and Supervising Dentist, or their designees, shall ensure that EMRS skills trainings are scheduled on the education calendar and health care staff have the opportunity to participate in the skills and competency training appropriate to their licensure and classification. Emergency health care skills, in-service training, forms, materials, and documentation shall be maintained and tracked by designated health care staff.
    (C) General skills training shall be conducted annually to ensure competency for health care staff based on their licensure and scope of practice. General skills training shall be conducted more frequently if EMRS deficiencies and remedial training needs are identified by the EMRRC.
    (D) EMRS skills training and/or remedial training shall be documented in the employee's proof of practice (training) file or other approved location (e.g., the CCHCS Learning Management System).
    (E) Joint EMRS training drills, that include custody, health care, and other institutional staff, shall be conducted in compliance with the requirements as defined in Section (h) below.

**(h) Joint Emergency Medical Response System Training and Training Exercises**
(1) Institutional leadership shall:
    (A) Determine the location, time, and scenario to be used for each drill.
    (B) Coordinate and conduct drills between disciplines and departments.
    (C) Ensure that staff participate in scheduled training and drills.
    (D) Ensure institutional staff respond immediately to EMRS drills within their designated area.
    (E) Determine responsibility for setting up and maintaining control of the CPR mannequins and/or other necessary EMRS equipment at the designated drill location.

(2) Institutional fire departments shall respond immediately to EMRS drills within their designated institutions as specified in the institution's EMRS plan.

(3) The CEO, health care, and the Warden shall conduct periodic EMRS training drills and exercises and shall provide access to skills training on an ongoing basis as outlined below.
    (A) One drill shall be conducted in each lock-up unit (e.g., Administrative Segregation Unit, Long Term Restricted Housing, Short Term Restricted Housing, Psychiatric Services Unit, Security Housing Unit), Correctional Treatment Center, and Enhanced Outpatient Program building on each watch, each month.
    (B) In addition to the above, all other yards shall conduct at least one EMRS training drill each month, on each watch, on a rotating basis (i.e., Month 1 - A Facility 2nd watch, B Facility 3rd watch, and C Facility 1st watch). Monthly drills shall be didactic in nature.
    (C) Each drill shall address responses to medical emergencies in all areas of the institution and include participation of health care staff, custody staff, and other institutional staff as appropriate for the scenario being utilized.
    (D) Institutions shall conduct live, hands-on simulation drills at least quarterly. The quarterly drill may suffice as the monthly drill described in Section (h)(3)(A)-(B). (i.e., a separate monthly drill does not have to be conducted for the month in which the quarterly drill was conducted). These drills shall include institution-wide scenario based training and shall be conducted on each shift. Programming shall be paused and/or modified during quarterly drills.
    (E) The participants shall respond to the scenario as if they are responding to an actual emergency.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(F) An institution-wide live, hands-on simulation incident training shall be conducted at least annually. Monthly and/or quarterly drills do not need to be performed during the same month as an annual drill. Every effort should be made to coordinate with, and to include community EMS in the annual incident drill. Programming shall be paused and/or modified during annual incident drills.

(G) Each dental clinic shall conduct at least one EMRS drill annually. The drill shall include participation by dental and all other EMRS program staff (i.e., nursing and custody staff). Programming shall be paused and/or modified during annual drills.

(H) The drills may or may not be pre-announced, shall be conducted under varied conditions, and shall address a variety of potential scenarios to test processes and competencies.

(I) Once the drill is initiated and staff is gathered, the Drill Coordinator shall read the drill scenario to the staff participants. The drill scenario shall be read from and documented on the Emergency Medical Response System Mock Code Template (located on the Lifeline Nursing Services EMRP tab).

(J) Staff shall complete documentation that would be required in an actual emergency during the drill scenario.

(K) Immediately following the drill, the Drill Coordinator shall conduct a debriefing to allow the participants to evaluate their performance, incorporate lessons learned, and discuss additional steps or components necessary to remedy identified deficiencies.

(L) The Drill Coordinator shall submit a report to the EMRRC for all drills that includes, but is not limited to, the following:
1. CDCR 7186-1.
2. Emergency Medical Response System Mock Code Template (located on the Lifeline Nursing Services EMRP tab).
3. Areas identified as positive or appropriate interventions.
4. Recommendations on areas needing improvement or training.
5. Development of a Corrective Action Plan (CAP).

(M) Copies of documentation and After Action Reviews shall be reviewed and signed by the EMRRC, and the results shall be reported to the institution Quality Management Committee (QMC) as described below.

**(i) Emergency Medical Response System Preparedness and Equipment**
   **(1) Emergency Medical Response and Disaster Response Bags**
   (A) EMR and disaster response bags shall be stocked and maintained in accordance with CDCR 7188-1, Emergency Medical Response Bag Checklist, and CDCR 7185-1, Disaster Response Bag Checklist.
   (B) Designated health care staff shall inspect the EMR and disaster response bags at the beginning of each shift to ensure that the bags are complete, seals are intact, and that the bags and the contents do not appear to be damaged.
   (C) Designated zippered compartments of each EMR bag shall be sealed (compartment zippers together) with a numbered plastic seal.
      1. The number of the seal shall be indicated on the appropriate checklist.
      2. The institution shall coordinate with their local Pharmacy Services to ensure that seals do not duplicate the color of those used to seal emergency drug supplies.
   (D) If seals are broken, the contents of the bags shall be inventoried, fully restocked, and new seals affixed to the compartments. Each item within the bag shall be inspected prior to the new seals being placed to ensure that it has not reached its expiration date.
      1. Items within 30 calendar days of expiration or the next scheduled monthly inspection shall be replaced prior to resealing the bag.
      2. Items without a specific expiration date (e.g., mm/dd/yyyy) shall be considered to expire at 23:59 on the last day of the month indicated (e.g., mm/yyyy).
   (E) An inventory of sealed compartments shall be completed monthly if the seal on a bag has not been broken and an inventory of that compartment has not been completed in the previous 30 calendar days. This inventory is standardized and shall be completed in compliance with the appropriate inventory checklist (refer to CDCR 7188-1 and 7185-1).
   (F) Designated supervisory staff shall conduct random inspections, no less than once per month, of each EMR bag, disaster response bag, and the associated logs.

(G) All inspections (i.e., shift, monthly, supervisory) shall be documented and recorded on the appropriate checklist (refer to CDCR 7188-1 and 7185-1).

(H) Completed inventory checklists shall be collected by the SRN II when they are completed, no less than monthly, and retained for a period of no less than one year. Compliance with the requirements of this paragraph shall be reviewed as part of the institution's EMRRC and Quality Assurance (QA) Program.

**(2) Treatment Carts and Supplies**

(A) The RN shall secure treatment carts with numbered seals. The number and integrity of the seal shall be checked during each shift and documented on CDCR 7544-1, Treatment Cart Daily Check Sheet. If the seal is not intact, the RN shall:

   1. Immediately notify the SRN responsible for the area and document the SRN notified on the CDCR 7544-1.

   2. If the medication drawer seal is not intact and/or needs restocking, immediately notify a Pharmacist and document the Pharmacist notified on the CDCR 7544-1 pursuant to HCDOM, Section 3.5.6, Emergency Drug Supplies.

   3. Complete the CDCR 7547-1, Treatment Cart Inventory Report, and document completion on the CDCR 7544-1.

   4. Secure the treatment cart with a yellow seal.

   5. Complete sections of the CDCR 7544-1, corresponding to date, time, printed name, and signature of the staff member completing the form.

(B) The RN shall replace missing equipment as indicated on the CDCR 7547-1.

(C) Treatment carts without complete equipment supplies shall be secured with a yellow seal by the RN until completely restocked (indicated by a red seal).

   1. Where quantity levels for replacement equipment are not prescribed, each institution's EMRRC shall evaluate usage and set local quantity requirements.

   2. Missing and non-functional equipment shall be replaced immediately to ensure continued availability for patient care.

   3. If equipment cannot be replaced immediately, the SRN II responsible for the area shall be notified. If the equipment is not immediately replaced, the SRN II shall notify the CNE.

(D) ACLS medications shall:

   1. Be available and accessible only to a LIP.

   2. Be controlled by the pharmacy pursuant to HCDOM, Section 3.5.6, Emergency Drug Supplies.

   3. Placed in locations in the designated treatment cart, or designated locked cabinet and clearly labeled and sealed with numbered seals provided by the pharmacy.

(E) LIPs shall access the medication supply and administer the medication or direct the administration only by RNs holding current certification in ACLS. The LIP shall be onsite and shall remain onsite with the patient until the patient has been transferred to a higher level of care.

(F) A defibrillator performance check shall be completed by the designated nursing staff at the beginning of every shift in accordance with manufacturer's instructions with the defibrillator unplugged and documented on the CDCR 7548-1, Defibrillator Performance Test.

(G) On the first business day of each month, the RN shall inventory treatment carts and document on the CDCR 7547-1.

   1. Equipment shall be restocked as necessary to maintain  quantity requirements.

   2. Sterile items shall be checked for package integrity and expiration dates. Equipment, including sterile items, expiring within 60 calendar days shall be ordered for restocking during the next treatment cart inventory.

   3. Items within 30 calendar days of expiration or the next scheduled monthly inspection shall be replaced prior to resealing the cart. Items without a specific expiration date (e.g., mm/dd/yyyy) shall be considered to expire at 23:59 on the last day of the month indicated (e.g., mm/yyyy).

(H) The RN shall check laryngoscope function prior to placement in the treatment cart on a monthly basis.

(I) The RN shall replace oxygen cylinders with less than 1000 psi.

(J) Designated nursing supervisory staff shall conduct random inspections, no less than once per month, of each treatment cart and the associated logs.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(K) The CDCR 7544-1, 7547-1, and 7548-1 shall be completed by the RN on duty no less than monthly and collected and retained for a period of no less than one year. Compliance with the requirements of this paragraph shall be reviewed as part of the institution's QA Program.

(3) **Emergency Medical Response Vehicles**

Institutions in possession of an EMRV shall implement the following procedure to ensure standardization and readiness:

(A) EMRVs are exclusively for the response to and transportation of patients within the grounds of the institution. At no time shall an EMRV be used to transport patients outside of the institution for community medical services.

(B) The Warden, or designee, shall ensure EMRVs are maintained and inspected daily for functionality and safety.

(C) Designated custody staff shall drive EMRVs to the scene within an institution.

(D) EMRVs shall be stocked in accordance with the CDCR 7187-1, Emergency Medical Response Vehicle Inventory Checklist.

(E) At the beginning of each shift, designated health care staff shall perform a complete inventory of the EMRV and designated custody staff shall check functionality of the EMRV. The inspections shall be recorded on the CDCR 7187-1.

(F) Designated nursing supervisory staff shall conduct random inspections, no less than once per month, of each EMRV and the associated logs. This inspection shall be recorded on the CDCR 7187-1.

(G) Completed CDCR 7187-1s shall be collected no less than monthly and retained by the EMRRC for a period of no less than one year.

(H) Compliance with the requirements of this paragraph shall be reviewed as part of the institution's QA Program.

**(j) Emergency Medical Response and Review Committee**

(1) Each institution shall maintain a multidisciplinary EMRRC that is designated to review and analyze all EMRs and EMRS drills. The committee shall meet no less than monthly.

(2) The EMRRC shall record minutes at each meeting. The minutes shall describe the cases and drills reviewed, recommendations and actions taken, referrals made, and any completed and/or outstanding action items. The minutes shall be reviewed and approved by committee members prior to signature by the Warden and the CEO, health care, and submitted to the institution QMC.

(3) Clinical Review (Initial Event Review)

(A) Each business day the CME, or designee, and the CNE, or designee, shall review the documentation and the clinical care delivered during each EMRS incident for suicide attempts, deaths, and all unscheduled transfers out of the institution which have occurred since the prior review.

(B) When indicated, the CME, or designee, and/or the CNE, or designee, shall take immediate, appropriate action to prevent repeat events and to protect the safety and security of patients, employees, contractors, volunteers and visitors including, but not limited to:

1. Referral to the CEO, health care, Warden, and/or the committee designated to review sentinel events in the institution.

2. Gathering information, identifying system and process gaps, and training needs.

3. Developing and implementing CAPs or opportunities for improvement.

4. Communicating with the CME, CNE, relevant Primary Care Teams, TTA staff, and on-call providers regarding departures from the standard of care or policy.

5. Identification of sentinel events and reporting via the Health Care Incident Reporting System.

(C) The CME and CNE shall maintain a log of each review conducted, recorded on the CDCR 7189-1, Emergency Medical Response and Review Committee Agenda Template and Minutes. At a minimum, the log shall contain the following information:

1. Patient name and CDCR number.

2. The date and time of the incident.

3. Brief pertinent clinical details of the case and identified opportunities for improvement.

(D) For reviews where immediate action is indicated, or in cases which are sentinel events, a more detailed report may be indicated. It may be necessary to appoint a clinical staff member to further evaluate and prepare detailed reports of those cases for presentation to executive leadership or committees (refer to Section (j)(4) below).

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(4) Process Review (EMRRC QA Review)
    (A) The following institutional staff shall be voting members of the EMRRC:
        1. Warden, or designee.
        2. CEO, health care.
        3. CME, or designee.
        4. Chief Physician and Surgeon (CP&S) - The CP&S shall serve as the EMRRC chairperson.
        5. CNE, or designee.
        6. Chief Psychiatrist, or designee (Senior Psychiatrist, Supervisor, or designee for institutions that do not have a Chief Psychiatrist).
        7. Supervising Dentist.
        8. Emergency Medical Response Coordinator (EMRC).
        9. Nurse Instructor.
    (B) The following staff may be assigned to the EMRRC as necessary to support the operation of the committee:
        1. Administrative support staff.
        2. Community EMS response representatives, when applicable.
        3. Fire Chief, or designee.
        4. Other personnel as deemed necessary.
    (C) The EMRRC shall designate in writing an EMRC who shall be at least at the level of an SRN II. The EMRRC shall ensure that the EMRC is supported by administrative staff from the institution's Quality Management Support Unit and the Health Care Access Unit.
    (D) The EMRC shall:
        1. Assist the CME and CNE in identifying and documenting the daily clinical review of EMRs.
        2. Determine the documentation needed for the daily clinical review and for the monthly EMRS review meeting, and ensure the documentation is produced.
        3. Ensure completion of and collect Emergency Medical Response Event Checklists.
        4. Ensure completion of the initial report for presentation to the committee designated to review EMRs at the next scheduled meeting.
        5. Coordinate with the EMRRC chairperson to ensure that cases are reviewed by the committee at the next meeting after the event occurred. Events shall be reviewed within 30 calendar days of their occurrence.
(5) The EMRRC shall review as applicable, the following documentation. Other relevant documentation shall be reviewed as the circumstances of the event requires.
    (A) The health record.
    (B) CDCR 837, Crime/Incident Reports, including each applicable supplemental report and attachments.
    (C) CDCR 7229-A, Inmate Death Report.
    (D) CDCR 7229-B, Inmate Death Report/Suicide, when available.
    (E) CDCR 7463, First Medical Responder – Data Collection Tool.
    (F) CDCR 7186-1.
    (G) Coroner's Report of Autopsy, when available.
    (H) Community Emergency Medical Services Field Report (Patient Care Record [PCR]). The EMRC shall forward a copy of the PCR to Health Information Management for inclusion in the health record.
    (I) Any other reports as necessary to determine if the emergency response and care provided was appropriate or necessary to evaluate systems, processes, or procedures that need improvement.
(6) Emergency Medical Response and Review Committee Quality Management Reporting
    (A) The EMRRC shall submit monthly, quarterly, and annual reports to the institution QMC that analyzes, aggregates, and trends EMRS incidents for the reporting period.
    (B) The report shall be focused on processes and systems including, but not limited to:
        1. Performance scorecards of drills and audits.
        2. Monthly analysis and benchmarking of the EMR performance indicators including coordination of activity, timeliness of responders, and clinical outcomes.
        3. Total number of EMRS cases evaluated by the EMRC and clinical management.
        4. Number of EMRS sentinel events.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

5. Summary report of CAPs.
6. Total number of unscheduled send outs with breakdowns by ambulance, air transportation, or state vehicle.
7. Total number of naloxone utilization cases, with a breakdown based on the provider level, and reported responses.
8. Total number of suicide attempts.
9. Total number of 9-1-1 community EMS activations.
10. Total number of direct dialed requests for urgent and emergent transports.
11. Analysis of the percentage of patients returned to institutions within 24 hours of send out or urgent and emergent transportation requests.
12. Actions taken at Population Management Working Sessions and by care teams in response to patients being sent to a higher level of care.

**References**

- *Plata* v. *Newsom*, U.S. District Court of the Northern District of California, Case No. C01-1351 JST
- California Penal Code, Part 3, Title 7, Chapter 2, Section 5054
- California Penal Code, Part 3, Title 7, Chapter 2, Section 5058
- California Code of Regulations, Title 15, Division 3, Chapter 1, Subchapter 4, Article 8, Section 3354(f)(1)
- California Code of Regulations, Title 15, Division 3, Chapter 2, Subchapter 2, Article 2, Section, 3999.210(a)
- California Code of Regulations, Title 16, Division 10, Chapter 1, Article 4, Section 1016
- California Code of Regulations, Title 22, Division 5, Chapter 1, Article 3, Section 70263, Pharmaceutical Service General Requirements
- California Code of Regulations, Title 22, Division 5, Chapter 3, Article 3, Section 72377, Pharmaceutical Service - Equipment and Supplies
- California Code of Regulations, Title 22, Division 5, Chapter 4, Article 3, Section 73375, Pharmaceutical Service - Equipment and Supplies
- California Code of Regulations, Title 22, Division 5, Chapter 12, Article 3, Section 79671, Pharmaceutical Service - Equipment and Supplies
- California Code of Regulations, Title 22, Division 5, Chapter 12, Article 5, Section 79817, Equipment Supplies
- California Correctional Health Care Services, Health Care Department Operations Manual, Chapter 1, Article 4, Section 1.4.6, Licensed Medical Provider Credentialing and Privileging
- California Correctional Health Care Services, Health Care Department Operations Manual, Chapter 3, Article 1, Section 3.1.9, Health Care Transfer
- California Correctional Health Care Services, Health Care Department Operations Manual, Chapter 3, Article 5, Section 3.5.6, Emergency Drug Supplies
- California Department of Corrections and Rehabilitation, Mental Health Services Delivery System Program Guide, 2009 Revision, Chapter 10, Suicide Prevention and Response
- American Heart Association, Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care
- National Commission on Correctional Health Care Standard P-A-10, Procedure in the Event of an Inmate Death, 2008

**Revision History**
Effective: 08/2008
Revision: 07/2019

Exhibit 3

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

**3.7.4        Emergency Medical Response: Post-Event Review**

**(a) Policy**

California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Services shall maintain a formal review mechanism to review each emergency medical response incident or drill in the institutions.

**(b) Purpose**

To ensure that institutions review emergency medical responses on a regular basis to promote continuous quality improvement related to performance and coordination of emergency medical response activities.

**(c) Responsibility**

The Chief Executive Officer (CEO) and the Warden are responsible for implementation of this policy.

**(d) Procedure Overview**

Implementation of this procedure shall ensure that emergency medical response incidents are appropriately audited, evaluated, and reported.

**(e) General Instructions**

(1) The institution's committee designated to analyze emergency medical responses shall review the emergency medical response reports at its regular monthly meeting.  The following staff should attend the emergency medical response section of the committee meeting:

(A) Warden or designee (Associate Warden for Health Care or Chief Deputy Warden).

(B) CEO.

(C) Chief Medical Executive (CME) and/or Chief Physician and Surgeon (CP&S).

(D) Supervising Dentist.

(E) Chief Nurse Executive/Director of Nursing (CNE/DON).

(F) Chief of Mental Health, as appropriate.

(G) Emergency Medical Response Coordinator.

(H) Fire Chief or designee.

(I)  Other personnel as deemed necessary.

(2) Confidential documents relevant to the review shall be available to committee members if needed for reference during the meeting.

(3) Minutes shall be recorded at each meeting, reviewed, and approved by committee members prior to signature by the Warden and the CEO.

**(f) Procedure**

**(1) Institution Emergency Medical Response Review Process**

(A) Clinical Review: Each business day the CME, or designee, and the CNE/DON, or designee, shall review the documentation and the clinical care delivered during each emergency medical response incident for suicide attempts, deaths, and all unscheduled transfers out of the institution which have occurred since the prior review.

1. Whenever necessary the CME, or designee, and the CNE/DON, or designee, shall take appropriate action to prevent repeat events and to protect the safety and security of patients and staff including but not limited to:

a. Referral to the CEO, the Warden, and/or the committee designated to review sentinel events in the institution.

b. Gathering information and referring for investigation.

c. Implementing Corrective Action Plans (CAPs).

d. Communicating with the CME, CNE/DON, relevant Primary Care Teams, Triage Treatment Area staff, and on-call providers regarding departures from the standard of care or policy.

2. The CME and CNE/DON are responsible for maintaining a log of reviews to include patient name, date, and brief pertinent clinical details of each case.  In some cases in which actions are taken or in cases which are sentinel events, a more detailed report may be indicated.  It may be necessary to appoint a clinical staff member to further evaluate and prepare detailed reports of those cases for presentation to executive leadership or committees.

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES
Health Care Department Operations Manual

(B) Process Review:  Each institution shall adapt its existing emergency medical response Local Operating Procedure to implement this procedure including assigning a staff member to the role of Emergency Medical Response Coordinator.

1. The Emergency Medical Response Coordinator shall:
   a. Assist the CP&S and Supervising Registered Nurse II in identifying and documenting the daily clinical review of all emergency medical responses.
   b. Gather all documentation needed for the daily clinical review and for the monthly emergency medical response review meeting.
   c. Complete the Emergency Medical Response Event Checklist.
   d. Ensure completion of the initial report for presentation to the committee designated to review emergency medical responses at the next scheduled meeting.
   e. Provide clerical support for monthly meetings of the committee which reviews the emergency medical response report.

2. When evaluating each emergency medical response incident the following documents may be utilized:
   a. CDCR 837, Crime/Incident Reports (including each applicable supplemental report and attachments).
   b. CDCR 7219, Medical Report of Injury or Unusual Occurrence.
   c. CDCR 7229-A, Inmate Death Report.
   d. CDCR 7229-B, Inmate Death Report/Suicide, when available.
   e. CDCR 7462, Cardiopulmonary Resuscitation Record.
   f. CDCR 7463, First Medical Responder – Data Collection Tool.
   g. CDCR 7464, Triage and Treatment Services Flow Sheet.
   h. The health record relevant to the patient's health condition and treatment prior to the incident under review.  It may be necessary to review up to 3-6 months of medical history prior to the incident.
   i. Coroner's Report of Autopsy, when available.
   j. Community Emergency Medical Services Field Report.
   k. Any other reports as necessary.

**(2) Quality Management Committee Reporting**

The Emergency Medical Response Coordinator shall submit monthly, quarterly, and annual reports to the Quality Management Committee that analyzes, aggregates, and trends all the emergency medical response incidents for the reporting period.  This report is focused on processes and systems including:

(A) Performance scorecards of drills and audits.

(B) Monthly analysis and benchmarking of the emergency medical response performance indicators including coordination of activity, timeliness of responders, and clinical outcomes.

(C) Total number of emergency medical response cases evaluated by the Emergency Medical Response Coordinator and clinical management.

(D) Number of emergency medical response sentinel events referred to the designated review committee.

(E) Summary report of CAPs.

**References**
- National Commission on Correctional Health Care Standard P-A-10, Procedure in the Event of an Inmate Death, 2008

**Revision History**
Effective: 08/2008
Revised: 07/2012

# Exhibit 4

**Emergency Medical Response Review**

| Type of Event: | Drill ☐ | Emergency Care ☐ | Urgent Care ☐ |
|---|---|---|---|

| CDCR#: | Name: |
|---|---|

| Date of Event: | Time of Event: |
|---|---|

**Location of Event:**

**Initial reviewer / staff conducting drill:**

| | | Time | Yes | No | Not Applicable | OIG Indicator # |
|---|---|---|---|---|---|---|
| 1 | Alarm sounded by discovering staff (note actual time)? | | | | | 8.183, 15.24 |
| 2 | General nature of emergency communicated to medical staff? | | | | | 15.284, 15.24 |
| 3 | First Aid including CPR initiated by first responder (note actual time)? | | | | | 8.241, 15.257, 15.258, 8.185, 15.285 |
| 4 | Medical staff responded with equipped man down bag (note actual time of arrival)? | | | | | 8.185,  15.234 |
| 5 | Patient moved prior to arrival of health care staff?    If yes why? | | | | | |
| 6 | First Responder Data Collection Tool completed? | | | | | |
| 7 | RN or provider has contact with patient  or communicates with first responder at scene within 8 minutes of alarm (note actual time)? | | | | | 8.184, 15.282 |
| 8 | Additional health care staff requested? | | | | | |
| 9 | Transporting of inmate was timely? Method of transportation? _____ Transported to? ☐ TTA   ☐ EMS   ☐ _____ | | | | | 15.287, 8.242 |
| 10 | TTA staff given report by medical responder (note actual time)? | | | | | 21.275 |
| 11 | Assessment completed in TTA (note actual time)? | | | | | 21.275, 21.276 |
| 12 | Provider notified  (note actual time)? | | | | | |
| 13 | Provider responded (note actual time)? | | | | | |
| 14 | Documentation complete? | | | | | |
| 15 | EMS called without unnecessary delay? | | | | | 8.242, 15.287 |
| 16 | Transportation team ready when EMS arrives? | | | | | 8.187, |
| 17 | Written or verbal report given to EMS / ER? | | | | | 21.275 |
| 18 | EMS arrives to patient location without delay (note actual time) | | | | | 8.187 |
| 19 | EMS leaves the final sally port without delay (note actual time) | | | | | |
| | **Clinical Review:** | | | **Date:** | | |
| 1 | RN or provider disposition decision appropriate | | | | | 8.185, 8.242, 15.287 |
| 2 | Policies and procedures followed | | | | | 8.241, 8.185, 8.242, 15.285, 15.287 |
| 3 | Method of transporting of inmate was appropriate | | | | | 8.185 |
| 4 | Adherence to RN Protocol | | | | | 21.275, 21.276 |
| 5 | TTA equipment and supplies present | | | | | 13.141, 13.253 |
| 6 | Adherence to policies and procedures in the TTA | | | | | 21.276 |

**Summary of Event (include discussion of system or process errors or departures from above indicators from the standard of care)  Continue on additional pages if necessary.**

Exhibit 5

| | Douglas | Eyman | Florence | Lewis | Perry | Phoenix | Safford | Tucson | Winslow | Yuma |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | orange | white | orange | orange | orange | orange | orange | orange | orange | orange |
| 2 | white | orange | orange | orange | orange | orange | white | orange | white | orange |
| 3 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 4 | blue | blue | white | orange | orange | blue | orange | orange | blue | blue |
| 5 | orange | orange | orange | white | orange | white | orange | orange | orange | white |
| 6 | green | green | green | green | green | green | green | green | green | green |
| 7 | red | red | red | red | red | red | red | red | red | red |
| 8 | white | white | white | white | white | white | white | white | white | white |
| 9 | green | green | green | green | green | green | green | green | green | green |
| 10 | green | green | green | green | green | green | green | green | green | green |
| 11 | orange | white | orange | white | orange | orange | orange | orange | orange | orange |
| 12 | red | red | red | red | red | red | red | red | red | red |
| 13 | white | white | white | white | white | white | white | white | white | white |
| 14 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 15 | orange | white | orange | white | orange | orange | white | orange | orange | orange |
| 16 | red | red | red | red | red | red | red | red | red | red |
| 17 | green | green | green | green | green | green | green | green | green | green |
| 18 | red | red | red | red | red | red | red | red | red | red |
| 19 | red | red | red | red | red | red | red | red | red | red |
| 20 | red | red | red | red | red | red | red | red | red | red |
| 21 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 22 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 23 | orange | white | orange | white | orange | orange | orange | orange | orange | orange |
| 24 | orange | orange | orange | orange | orange | white | orange | white | orange | orange |
| 25 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 26 | yellow | orange | white | white | orange | orange | orange | white | yellow | orange |
| 27 | orange | orange | white | orange | orange | orange | orange | orange | orange | white |
| 28 | green | green | green | green | green | green | green | green | green | green |
| 29 | green | green | green | green | green | green | green | green | green | green |
| 30 | yellow | orange | orange | orange | white | yellow | yellow | orange | yellow | white |
| 31 | yellow | white | white | orange | orange | white | yellow | orange | white | white |
| 32 | white | white | white | white | white | white | white | white | white | white |
| 33 | red | yellow | red | red | orange | orange | red | orange | red | red |
| 34 | red | yellow | red | red | orange | orange | red | orange | red | red |
| 35 | orange | white | white | orange | orange | orange | orange | white | orange | white |
| 36 | white | white | white | white | white | white | white | white | white | white |
| 37 | white | white | white | white | white | white | white | white | white | white |
| 38 | red | red | red | red | red | red | red | red | red | red |
| 39 | white | white | white | white | white | white | white | white | white | white |
| 40 | yellow | white | white | orange | orange | orange | yellow | orange | orange | orange |
| 41 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 42 | orange | white | orange | white | orange | orange | orange | orange | white | orange |
| 43 | orange | orange | orange | orange | orange | white | orange | orange | orange | orange |
| 44 | white | white | white | white | white | white | white | white | white | white |
| 45 | orange | white | orange | orange | orange | orange | orange | orange | orange | orange |

| | Douglas | Eyman | Florence | Lewis | Perry | Phoenix | Safford | Tucson | Winslow | Yuma |
|---|---|---|---|---|---|---|---|---|---|---|
| 46 | | | | | | | | | | |
| 47 | | | | | | | | | orange | |
| 48 | | | | | | | | | | |
| 49 | orange | | | orange | | | orange | | orange | |
| 50 | | | | | | | | | | |
| 51 | | | | | | | | | | |
| 52 | orange | | | | orange | | orange | | orange | |
| 53 | orange | | orange | | orange | | | | | orange |
| 54 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 55 | | | | | | | | | | |
| 56 | red | red | red | red | red | red | red | red | red | red |
| 57 | red | red | red | red | orange | blue | red | red | red | red |
| 58 | red | red | red | red | orange | blue | red | red | red | red |
| 59 | red | | red | | orange | orange | orange | orange | orange | orange |
| 60 | red | red | red | red | red | blue | red | red | red | red |
| 61 | red | red | red | red | green | green | red | red | red | red |
| 62 | red | yellow | red | red | orange | orange | red | orange | red | red |
| 63 | red | red | orange | orange | orange | red | red | orange | red | red |
| 64 | red | red | red | red | red | red | red | red | red | red |
| 65 | red | red | red | red | red | red | red | red | red | red |
| 66 | blue | blue | | | | blue | blue | | blue | blue |
| 67 | blue | blue | | | orange | blue | | | blue | blue |
| 68 | red | red | orange | | red | red | red | orange | red | red |
| 69 | blue | blue | | orange | | blue | blue | orange | blue | blue |
| 70 | red | red | orange | orange | red | red | red | orange | red | red |
| 71 | red | red | red | red | red | red | red | red | red | red |
| 72 | | | | orange | | | | orange | | orange |
| 73 | blue | blue | blue | blue | | blue | blue | | blue | blue |
| 74 | red | red | red | red | | blue | red | | red | red |
| 75 | red | red | red | blue | orange | | red | orange | red | red |
| 76 | red | red | red | blue | yellow | yellow | red | red | red | red |
| 77 | blue | | | | | | blue | | | orange |
| 78 | | | | | | | | | | |
| 79 | green | green | green | green | green | green | green | green | green | green |
| 80 | blue | | | | | | blue | | blue | |
| 81 | blue | | | | | | blue | | blue | |
| 82 | blue | | | | | | blue | | blue | |
| 83 | blue | | | | | yellow | blue | | blue | |
| 84 | blue | | | | | yellow | blue | | blue | |
| 85 | blue | | | | | | blue | | blue | |
| 86 | blue | | | | | | blue | | blue | |
| 87 | blue | | | blue | | | blue | | blue | blue |
| 88 | blue | | | blue | | | blue | | blue | blue |
| 89 | blue | blue | blue | blue | blue | | blue | blue | blue | blue |
| 90 | blue | blue | blue | blue | blue | | blue | blue | blue | blue |

| | Douglas | Eyman | Florence | Lewis | Perry | Phoenix | Safford | Tucson | Winslow | Yuma |
|---|---|---|---|---|---|---|---|---|---|---|
| 91 | blue | | blue | blue | blue | | blue | blue | blue | blue |
| 92 | blue | | | | | | blue | | blue | blue |
| 93 | blue | orange | orange | orange | | orange | blue | | blue | blue |
| 94 | | | | | | | | | | |
| 95 | | | | | | | | | | |
| 96 | green | green | green | green | green | green | green | green | green | green |
| 97 | | orange | orange | orange | orange | orange | | orange | | orange |
| 98 | | | | | | | | | | |
| 99 | green | green | green | green | green | green | green | green | green | green |
| 100 | | orange | green | green | green | green | green | green | green | orange |
| 101 | green | green | green | green | green | green | green | green | green | green |
| 102 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |
| 103 | orange | orange | orange | orange | orange | orange | orange | orange | orange | orange |

🟥 = Court Terminated. (Dkt. 2900 at 12–13; Dkt. 3495 at 13–14.)

🟧 = Dr. Stern recommends termination/retiring. (Dkt. 3382-1 at 9 –10.)

🟦 = Dr. Stern contends are N/A to the complex.

🟩 = Measures Plaintiffs agreed to terminate after February 25, 2020 meet and confer.[1]

🟨 = Measures that should be terminated as there is insufficient data at the respective facility.

---

[1] Many of these are measures Stern previously recommended be terminated.

Exhibit 6

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DECLARATION OF RICHARD PRATT** |

I, **RICHARD PRATT**, make the following Declaration:

1.   I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.   I have been working with the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR")[1] since July 2000, not including from October 2009 to July 2011, when I was employed elsewhere.

3.   In July 2011, I was appointed ASO IV / Regional Health Administrator of ADCRR Health Services Bureau.

---

[1]ADCRR was formerly known as the Arizona Department of Corrections ("ADC"), and will be referred to by its current name for purposes of this Declaration. ADC has been referred to as ADCRR since January 2020.

1     4.     In February 2012, I was appointed Interim Assistant Director of ADCRR
2  Health Services Bureau following Dr. Michael Adu-Tutu's retirement.

3     5.     July 1, 2012, Health Services was privatized.  My title was adjusted to be
4  the Interim Assistant Director of ADCRR's Health Services Contract Monitoring Bureau
5  (HSCMB).

6     6.     In October, 2012, Arthur Gross was hired to be the Assistant Director of the
7  HSCMB, and my position changed to Program Evaluation Administrator, HSCMB.

8     7.     In March, 2014, Arthur Gross retired, and I was placed under a temporary
9  special assignment as the Interim Assistant Director, HSCMB.

10     8.     In August, 2014, I was named Assistant Director, HSCMB.

11     9.     As Assistant Director, I was responsible for providing managerial oversight
12  and direction to the HSCMB to monitor the contracted vendor's compliance with all
13  aspects of the health services contract.  I was also responsible for reviewing and
14  responding to internal and external inquiries pertaining to compliance issues, contract
15  specifications, reports, inspections, staffing levels, and legal mandates of inmate
16  healthcare, mental health care, and dental care services.

17     10.    In December, 2019, I was assigned as a Bureau Administrator in Operations,
18  to oversee 9 FTEs (Program Evaluation Specialists) who act as liaisons between the
19  contracted healthcare vendor and the Wardens at the state operated prison facilities.

20     11.    I am familiar with ADCRR's policies and practices pertaining to healthcare,
21  including medical care, dental care, and mental health care, the privatization of ADCRR's
22  healthcare, ADCR's contract with the healthcare vendor, the healthcare vendor's
23  responsibilities under that contract, and the HSCMB monitoring of the healthcare
24  vendor's care to ADC inmates.

25     12.    I am familiar with ADCRR's policies and practices pertaining to healthcare,
26  including medical care, dental care, and mental health care, the privatization of ADCRR
27  healthcare, ADCRR's contract with the healthcare vendor, the healthcare vendor's

28

2

1   responsibilities under that contract, and the HSCMB monitoring of the healthcare
2   vendor's care to ADCRR inmates.

3       13.   I am familiar with ADCRR's policies and practices pertaining to healthcare,
4   including medical care, dental care, and mental health care, the privatization of ADCRR
5   healthcare, ADCRR's contract with Centurion, Centurion responsibilities under that
6   contract, and the HSCMB's monitoring of Centurion's care to ADCRR inmates.

7       **Inmate Access to Medical Care**

8       14.   Currently, ADCRR inmates may request healthcare services by completing
9   and submitting a Health Needs Request ("HNR") form. Inmates submit completed HNRs
10  by depositing HNRs into the appropriately labeled box ("HNR Box"). Healthcare
11  personnel gather the HNRs from the HNR Box, administratively triage the HNRs, and
12  schedule the inmate for an appointment.

13      15.   Additionally, ADCRR is in the process of providing each inmate (with the
14  exception of certain custody levels and inmates on watch) with a tablet.

15      16.   Among other capabilities (games, media, inmate account access), inmates
16  will be able to access and submit digital HNRs.

17      17.   The digital HNR system available on the inmates' tablets will serve as an
18  enhancement to the paper HNR system.

19      18.   They will operate simultaneously and allow each inmate to choose whether
20  to submit a paper or digital HNR.

21      19.   Thus, because the digital HNR enhancement resolves the issues identified in
22  Dr. Stern's Report (Dkt. 3379 at 108–109), Defendants do not intend to re-implement an
23  Open Clinic system at this time.

24      20.   A detailed description of the program and current interface design, and
25  examples of the tablet's various screens and views, are contained in the ADCRR Tablet
26  Program PowerPoint Presentation, which is attached as Exhibit A.

27      21.   The current digital HNR interface allows inmates to submit a digital HNR as
28  follows: "Start a New Communication" within the interface, select "Health Needs

3

1  Request" in the "Form," identify the "subject" of their request, identify a description of
2  their request, and then write the details of their request.

3      22.    Inmates can select a specific nurse line in the "subjects" section, such as
4  medical, dental, FHA, pharmacy, mental health, eyes, and other.  The categories ensure
5  that the HNR is digitally routed to the appropriate nurse line.

6      23.    The Communications Center inbox provides a reference number, and
7  advises the inmate of the HNR submission status.

8      24.    Specifically, the Communications Center inbox will show the HNR's
9  reference number, the date the HNR was created, the form, the description of the form, the
10  "current status" of the HNR, and the time left.  The "current status" informs the inmate
11  whether the digital HNR is under review, action is required, is on appeal, or is closed.

12      25.    The digital HNR submitted via tablet is timestamped with the date the
13  inmate submits the HNR.

14      26.    Currently, the tablets are deployed at Florence and Tucson.  Because the
15  final product, including the digital HNR submission interface is currently under
16  development, inmates cannot yet submit digital HNRs.

17      27.    Defendants intend to complete deployment of the tablets and digital HNR
18  system at all facilities by November 2020.

19      28.    Any inmate who is unable to utilize the digital HNR system for whatever
20  reason (certain ADA inmates, inmates on suicide watch, inmates of certain custody levels)
21  will be able to submit paper HNRs in the same manner currently in place.

22      **ICS Response**

23      29.    In the event of an emergency, an Incident Command System ("ICS") is
24  initiated.

25      30.    A Correctional Officer ("CO") or nurse trained in Basic Life Support
26  ("BSL") will respond within three minutes of an emergency.

27      31.    Indeed, an ICS is often initiated for minor injuries associated with inmate-
28  on-inmate assaults, broken bones, or dehydration.

4

1        I declare under penalty of perjury that the foregoing is true and correct.

2    Executed this  *28ᵀᴴ*  day of February 2020.

3

4                                          RICHARD PRATT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

**EXHIBIT A**

**EXHIBIT A**

# ADC TABLET PROGRAM

## DEPLOYMENT STATUS EXECUTIVE BRIEFING FEBRUARY 21, 2020





Arizona Department of Corrections
Rehabilitation and Reentry

# PROGRAM HISTORY

- Initial Contract Execution with JPAY in October 2018
- Highlights of capabilities
  - Contractor absorbs all costs of installation, recapture of installations recovered through program commissions.
  - Wi-Fi infrastructure installation at all 10 state operated prison complexes as well as all contract bed locations.
  - Wi-Fi Coverage established in all inmate living, programs, recreation, and visitation areas.
  - Wi-Fi coverage signal strength not to exceed -70db in areas noted above
  - Tablet issuance at a 1:1 ratio for each inmate in an adult institution.



# PROGRAM HISTORY (Con't)

- ADC agreement with JPAY includes, a managed platform of 100% wireless
  - New technology replaces the kiosk/tablet security mode.
- The tablet infrastructure does not connect to the internet and is a closed system
  - Infrastructure includes a designated portion of the network for ADC use



Arizona Department of Corrections
Rehabilitation and Reentry

3

# Security

- Tablet does not access the outside internet.
- Each complex has at least one content server for the tablet to request a media item
  - This creates an "Air Gap", to prevent unauthorized access to the internet
- Tablets are dependent upon the JPAY infrastructure to connect
  - JP5 tablet must authenticate back to a kiosk to avoid mortality lock
  - JP6 is a live appliance and is subject to management 24 hours per day.
- A tablet will not function outside of the JPAY system.



# Security

- Inmate tablets are pin-locked devices
- Applications must share the same unique SSL certificate.



# Phase Levels/Access

| Custody Management | Phase I | Phase II | Phase III |
|---|---|---|---|
| Minimum, Medium, Close, Death Row Close, Max, Death Row Max[6] | • Basic Services[1]<br>• Secure Mail[5]<br>• E-book<br>• Media/Music (Access to purchased content only)[4]<br>• Games (Access to purchased content only)[4]<br>• News Feeds<br>• AM FM Radio | • Basic Services[1]<br>• Secure Mail[5]<br>• Video gram<br>• Media/Music Purchase<br>• Games/Purchase<br>• EBooks<br>• News Feeds<br>• AM FM Radio | • Basic Services[1]<br>• Secure Mail[5]<br>• Video gram<br>• Media/Music Purchase<br>• Movie Rental<br>• Video Visitation[2][3]<br>• Games/Purchase<br>• EBooks<br>• News Feeds<br>• AM FM Radio<br>• Video Visitation |



# Phase Levels/Access

| Custody Management | Phase/Step I | Phase/Step II | Phase/Step III |
|---|---|---|---|
| Restrictive Housing/Enhanced /Close Management (A73, A51, and A71) | • No Tablet Issued | • Basic Services[1]<br>• Secure Mail[5]<br>• E-book<br>• Media/Music (Access to purchased content only)[4]<br>• Games (Access to purchased content only)[4]<br>• News Feeds<br>• AM FM Radio | • Basic Services[1]<br>• Secure Mail[5]<br>• Video gram<br>• Media/Music Purchase<br>• Games/Purchase<br>• EBooks<br>• News Feeds<br>• AM FM Radio |



# Technology Update

- JP5 is the current tablet in use at Florence, Tucson, Perryville, and Lewis
  - The JP5 will be replaced with the JP6 late summer 2020.  Kiosks in these locations will be removed.
- All remaining ADC sites are scheduled to receive the JP6.
  - 100% wireless management
  - Compatible with secure JPAY streaming services



Arizona Department of Corrections
Rehabilitation and Reentry

8

# Installation/Deployment

- From start to finish, 60 to 90 days for electrical contractors to complete installation.
- Installation must meet national electrical code standards
- Installation includes bench-marks during the project to determine operational readiness.
- Each prison complex requires a JPAY (JPAY Provided) site administrator:
  - Reset passwords for staff
  - Maintain 10% for tablet replacement
  - On-site repairs of tablet/kiosk.
- At 45 days from tablet deployment, and operational workshop for ADC staff and JPAY personnel assemble to finalize tablet distribution, assignment.
- At 20 days from tablet issuance, site training is finalized, JPAY personnel are required to be on site at all facilities during tablet issuance.



Arizona Department of Corrections
Rehabilitation and Reentry

9



# Current Price

| Electronic Messaging (All Tablet Models) | |
|---|---|
| Written Electronic Message | $ 0.25 |
| Written Electronic Message with photo attachment | $ 0.50 |
| Written Electronic Message with video attachment | $ 1.00 |

| Downloads for Purchase (All Tablet Models) | |
|---|---|
| Music | $ 0.99 |
| Games | $ 4.59 |
| Ebook | $ 0.99 |
| Movies | $ 4.99 |
| FM Radio | Free |
| TV Audio | Free |
| Podcasts | Free |
| Translation Services | Free |

| *Subscriptions Model (Available JP6 Tablet Only) | |
|---|---|
| **Thirty-Day Subscriptions** | |
| Music | $ 19.99 |
| Games | $ 9.99 |
| Ebook | $ 4.99 |
| FM Radio | Free |
| TV Audio | Free |
| Podcasts | Free |
| Translation Services | Free |
| Movies | $ 19.99 |
| **Fourteen-Day Subscriptions** | |
| Music | $ 9.99 |
| Games | $ 4.99 |
| Ebook | $ 2.49 |
| FM Radio | Free |
| TV Audio | Free |
| Podcasts | Free |
| Translation Services | Free |
| Movies | $ 9.99 |
| **Seven-Day Subscriptions** | |
| Music | $ 4.99 |
| Games | $ 2.49 |
| Ebook | $ 1.75 |
| FM Radio | Free |
| TV Audio | Free |
| Podcasts | Free |
| Translation Services | Free |
| Movies | $ 4.99 |

Subscription model pricing not available until the Tablet JP6 model becomes available. A date for the JP6 release is not available.



Arizona Department of Corrections
Rehabilitation and Reentry

11

# APPLICATIONS CURRENTLY DEPLOYED

| Application | Use |
|---|---|
| **Email Access**<br>• Email<br>• Photo Attachment "Snap n Send" *(Incoming from friends and family only)*<br>• Videogram *(Incoming from friends and family only)* | Email access occurs to and from the inmate through a secure messaging platform. Inmates and their friends and family may exchange messages with or without a picture and/or 30-second video attachments. |
| E-Cards | A digital version of a greeting card, utilized for the exchange between friends and family, and the inmate. |
| Media Purchase:<br>• Music Titles<br>• Movie Titles | Tablet use enables the inmate to browse for music and movie titles.<br><br>*All titles are subject to publication review |



# APPLICATIONS CURRENTLY DEPLOYED

| Application | Use |
|---|---|
| Games | Access games<br><br>*All titles are subject to publication review |
| E-books | Access to electronic books and publications.<br><br>*All titles are subject to publication review |
| FM Radio | Over the air broadcasts of FM radio signals delivered by the tablet's built-in FM receiver. |
| Religious Materials | Religious publication materials |
| JPAY   Lantern   Learning Management Services (LMS) | The LMS system permits the agency to develop programs and education content to the inmate population.  This service is similar to Blackboard or Canvas systems. |



# APPLICATIONS CURRENTLY DEPLOYED

| Application | Use |
|---|---|
| Kahn Academy Light | Access to learning materials offered to enhance the learning opportunity. |
| Communications Module | This module enables inmates and staff to communicate electronically to enable resolution of concerns or needs.<br>*Health Needs Module to be released during March 2020. |
| Inmate Banking Information | The banking balance module enables inmates to review the inmate trust account balances. |

| | |
|---|---|
| Legal Resources | Access to the same legal resources offered currently by ADC through the resource centers. |
| Job View | An application utilized to capture a view of jobs potentially available upon an inmate's release into the community. |



# APPLICATIONS PENDING DEPLOYMENT

| Application | Use |
|---|---|
| Email Access (Application Enhancement)<br>• Email<br>• Photo Attachment "Snap n Send" *(incoming and outgoing)*<br>• Videogram *(incoming and outgoing)* | Email access occurs to and from the inmate through a secure messaging platform. Inmates and their friends and family may exchange messages with or without a picture and/or 30-second video attachments. |
| High School Diploma and GED Preparation such as A+, GED Academy, and Reading Horizons | This application permits the agency to deliver the curriculum for students who are preparing to complete their high school education or GED. |



# Application Future

- For those applications not developed by JPAY, a pass-through application may be utilized to deliver content.
  - The Keefe commissary application is an example of a future pass-through application.



# APPLICATIONS PENDING DEPLOYMENT

| Application | Use |
| --- | --- |
| Inmate Commissary | The commissary module enables inmates to securely place commissary orders electronically. |
| Video Visitation | This service enables the inmate to visit with friends and family via secure visitation kiosk or docking station.  Friends and family will have the ability to visit the inmate through their use of a smartphone. |



# JPAY INMATE MAIL



© 2002- 2020 JPay Inc. - All Rights Reserved



Rehabilitation and Reentry

18

# JPAY INMATE MAIL

## Jpay

**Facility System**

Admin          Money          Communications          Mail          Intel          Sign Out

Welcome rloe2
Last Login: 02/13/2020 2:59PM EST

<<Back | Main | Requires Approval | Photo Approval | Pending | Printed | Security | Returned | Censored | Released

### Mail

Letter Delivery

Search

Word/Phrase Watch List

Mail Reports

Mail Graphical Reports

Restricted Domains

Inbound Mail Operational Report

Mail Operational Report

Stamp Usage Report

Inactive Locations

In Mail Discarded Material

Out Mail Discarded Material

Recover Deleted Letters

Suspend Videogram Inmate

Restricted Videogram Customers

**Requires Approval**
Letters that require approval for the past 1 months
**View Letters From All Locations**

| Location | # of Letters | View |
|----------|--------------|------|
| A02 | 54 | View |
| A03 | 29 | View |
| A04 | 113 | View |
| A72 | 1 | View |
| C37 | 2 | View |

© 2002- 2020 **JPay** Inc. - All Rights Reserved



Arizona Department of Corrections
Rehabilitation and Reentry

19

# Email Screening





# Snap n Send



Arizona Department of Corrections
Rehabilitation and Reentry



21

# Communications Inbox





Arizona Department of Corrections
Rehabilitation and Reentry

22

# Case Details





Arizona Department of Corrections
Rehabilitation and Reentry

23

# Case Details (Cont.)



Leave a comment, question or standardized response to the inmate.

☐ **Require Inmate Response**


SEND



Arizona Department of Corrections
Rehabilitation and Reentry

24

# Case Details (Cont.)



### Ref# AZA020000021026
← Back

| Inmate Name: | JUDD, ROBIN G. | Form Type: | Inmate Letter |
|---|---|---|---|
| Inmate ID#: | 045470 | Time Left: | 20 Day(s) - 03/09/2020 |
| Loc./Housing: | A02 DRM8A01L | Curr. Status: | Pending |
| Kiosk ID#: | AZFM-082 | Assigned to: | - |
| Created On: | 02/18/2020   1:50 PM | Last Modified: | 02/18/2020 1:50:7 PM |

**Case Details**   **Perform Actions**   Attachments (0)   **Admin Notes (0)**   **Case Logs**   **Inmate History**

BROWSE FILE        The maximum file size for upload is 10 MB.        ATTACH FILE

| *File Name* | *User* | *Uploaded* | *Options* |
|---|---|---|---|
| No Files Attached | | | |

© 2002- 2020 **JPay** Inc. – All Rights Reserved



Arizona Department of Corrections
Rehabilitation and Reentry

25

# Case Details (Cont.)

## Ref# AZA020000021026

 ← Back

| | | | |
|---|---|---|---|
| Inmate Name: | JUDD, ROBIN G. | Form Type: | **Inmate Letter** |
| Inmate ID#: | 045470 | Time Left: | **20 Day(s) - 03/09/2020** |
| Loc./Housing: | A02 DRM8A01L | Curr. Status: | **Pending** |
| Kiosk ID#: | AZFM-082 | Assigned to: | - |
| Created On: | 02/18/2020   1:50 PM | Last Modified: | **02/18/2020 1:50:7 PM** |

Case Details | Perform Actions | Attachments (0) | Admin Notes (0) | Case Logs | Inmate History

| User | Date | Time | Details |
|---|---|---|---|
| rlee2 | 2/18/2020 | 1:50 PM | Form was viewed by Ronald Lee and the status was changed to Pending. |
| 045470 | 2/18/2020 | 1:50 PM | Form has been submitted |



Rehabilitation and Reentry

26

# INMATE KIOSK VIEW





# INMATE KIOSK VIEW





Arizona Department of Corrections
Rehabilitation and Reentry

28

# INMATE KIOSK VIEW





29

# INMATE KIOSK VIEW





30

# INMATE KIOSK VIEW





31

# TABLET SECURITY





Arizona Department of Corrections
Rehabilitation and Reentry

# TABLET SECURITY





# DEVICE MENU PAGE





# DEVICE MENU PAGE





Arizona Department of Corrections
Rehabilitation and Reentry

35

# Medial Library





Arizona Department of Corrections
Rehabilitation and Reentry

36

# MEDIA BALANCE



# DEPLOYMENT ORDER

| Phase | Location | Hardware Installation Begin Date | Hardware Installation Completion Date | Tablet Issuance Begin Date |
|---|---|---|---|---|
| [1]Phase 1 | ASPC Florence (Does not Include Globe Unit) | April 01, 2019 | June 10, 2019 | July 11, 2019 |
| Phase 2 | ASPC-Tucson | July 29, 2019 | December 06, 2019 | December 09, 2019 |
| Phase 3 | ASPC-Perryville | August 01, 2019 | November 01, 2019 | November 04, 2019 |
| Phase 4 | ASPC-Lewis | August 05, 2019 | December 13, 2019 | December 16, 2019 |
| *Phase 9 | ASPC-Eyman | March 01, 2020 | June 05, 2020 | June 02, 2020 |
| Phase 5 | ASPC-Douglas | November 18, 2019 | January 10, 2020 | January 13, 2020 |
| Phase 6 | ASPC-Safford | December 09, 2019 | January 24, 2020 | January 27, 2020 |
| Phase 7 | ASPC-Winslow | January 13, 2020 | February 10, 2020 | February 13, 2020 |
| Phase 7 | ASPC-Florence Globe | January 27, 2020 | March 27, 2020 | March 31, 2020 |
| Phase 8 | ASP-Florence West | January 27, 2020 | March 27, 2020 | April 01, 2020 |
| Phase 8 | ASP-Kingman | December 16 2019 | March 06, 2020 | March 10, 2020 |
| Phase 9 | ASPC-Eyman | February 17, 2020 | May 29, 2020 | June 02, 2020 |
| Phase 9 | ASP-CACF ASP-Red Rock ASP Marana MTC | January 27, 2020 | March 27, 2020 | April 01, 2020 April 03, 2020 April 05, 2020 |
| Phase 10 | ASPC-Yuma | March 09, 2020 | May 29, 2020 | June 02, 2020 |
| Phase 11 | ASPC-Phoenix | December 16, 2019 | March 06, 2020 | March 10, 2020 |

• Denotes change in schedule per Director Shinn
• Shaded areas denote completed deployments



Arizona Department of Corrections
Rehabilitation and Reentry

38

# Video Visitation

- Training workshop for staff begin at the Florence and Tucson locations in March 2020
- Video visit is 30 minutes
- Video visits must conform to ADC policy



Arizona Department of Corrections
Rehabilitation and Reentry

39

# Currently Deployed Locations

- Florence
    - North Unit
    - South Unit
    - Central Unit
    - East Unit

- Tucson
    - Catalina
    - Winchester
    - Rincon
        - Rincon Minor's *
    - Manzanita
    - Santa Rita
    - Whetstone



Arizona Department of Corrections
Rehabilitation and Reentry

40

Exhibit 7

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                             Plaintiffs,<br><br>          v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                             Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DECLARATION OF JOSEPH V. PENN, MD CCHP FAPA** |

1.      I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.      I am a psychiatric physician based in Conroe, Texas.  I am triple board-certified in forensic psychiatry, general psychiatry, and child and adolescent psychiatry.  All of these boards are under the American Board of Psychiatry and Neurology (ABPN); this is a member board of the American Board of Medical Specialties (ABMS) that grants board certification for psychiatrists and neurologists in the United States.  I am fully licensed to practice medicine in Texas.

3.      I attended medical school at the University of Texas Medical Branch (UTMB), Galveston, Texas, graduating in 1992.  I completed three residency and fellowship training programs for a total of seven years of specialty/subspecialty residency

1    training – four years of general psychiatry in 1996 at Brown University, Providence, Rhode

2    Island; two years of child and adolescent psychiatry in 1998 at Brown University,

3    Providence, Rhode Island; and one year of forensic psychiatry at Yale University, New

4    Haven, Connecticut, in 1999.

5        4.    Since 1998, I have focused my clinical, administrative, and forensic work

6    within adult and juvenile correctional settings, including jails, prisons, and juvenile

7    detention facilities.   I remain current in the evaluation, diagnosis, and treatment of

8    individuals within both correctional and non-correctional settings as demonstrated by my

9    national board re-certification and maintenance of certification within general, child and

10   adolescent, and forensic psychiatry. I remain knowledgeable in clinical and administrative

11   psychiatry and systems of care issues within non-correctional settings through my

12   leadership work at the national and state level within the American Academy of Psychiatry

13   and the Law (AAPL), American Psychiatric Association (APA), Texas Society of

14   Psychiatric Physicians (TSPP), the state district branch of the APA, and through other

15   medical and psychiatric organizations.

16       5.    Aside from my full-time work which is corrections based, I have achieved

17   and maintained specialized certification as a Certified Correctional Health Professional

18   (CCHP) by the National Commission on Correctional Health Care (NCCHC).  This requires

19   passing a written national examination, demonstration of proficiency in national

20   correctional health standards, annual attestation of continuing medical education credits,

21   full medical licensure without restrictions, and annual re-certification.

22       6.    I have extensive past experience in evaluating and treating individuals in both

23   correctional and non-correctional settings.  I have spent the majority of my professional

24   career providing direct clinical care and/or administrative oversight and consultation

25   regarding psychiatric, mental health, and other services to incarcerated adults and juveniles

26   across a variety of jails, prisons, juvenile settings, and other correctional settings.

27       7.    Since 2008, I have served as the Director of Mental Health Services for

28   UTMB Correctional Managed Care (CMC). In this capacity, I oversee the provision of

2

1    psychiatric, psychological, and mental health services to approximately 80%

2    (approximately 110,000 adult offenders) of the entire Texas state jail and state adult prison

3    population housed within the Texas Department of Criminal Justice (TDCJ) facilities

4    statewide. I also oversee the delivery of psychiatric services to approximately 9,000 youths

5    housed statewide within state juvenile correctional institutional facilities (referred to as state

6    schools) and halfway houses within the Texas Juvenile Justice Department (TJJD). I also

7    oversee the delivery of psychiatric services to several county jails and short term detention

8    facilities in Texas (this is described in more detail below).

9         8.     In my administrative role, I oversee approximately 315 mental health staff,

10   including psychiatrists, psychologists, mental health managers and clinicians, case

11   managers, psychiatric nurse practitioners, psychiatric physician assistants, and other mental

12   health professionals and student trainees across the state. I have 12 years of clinical and

13   administrative experience in the provision of psychiatric services and psychotropic

14   medication treatment within county jails, short-term Substance Abuse Felony Punishment

15   treatment programs (SAFPs) and short-term Intermediate Sanction Facilities (ISFs) in

16   Texas. I also previously oversaw the psychiatric services that UTMB CMC previously

17   provided to four federal prison units in Beaumont, Texas.

18        9.     I am involved in the oversight of disease management guidelines (DMGs),

19   clinical protocols, decision-making regarding psychotropic medications and treatment

20   protocols, formulary and non-formulary approval of psychotropic medications, and

21   psychiatric evaluation and treatment of individuals with serious mental illness (such as

22   schizophrenia and other psychotic disorders), depressive disorders, and PTSD and anxiety

23   disorders. In particular, I maintain clinical knowledge of the unique mental health needs of

24   individuals with psychotic disorders (e.g., schizophrenia, schizoaffective disorder and other

25   psychotic disorders) and those with co-occurring substance disorders in detention and

26   correctional settings. In my clinical role, I perform both on-site and telepsychiatric

27   evaluations of high profile and more complicated patient offenders within our juvenile and

28   adult correctional systems statewide.

10.     I also have extensive experience in the operation, administration, management, and supervision of the functioning and operations of psychiatric and mental health care and treatment, and other healthcare services within jails, prisons, and juvenile correctional facilities. I serve on the Executive Operations Council of UTMB CMC, the Pharmacy and Therapeutics Committee (I am the immediate past Chair), other joint UTMB CMC and TDCJ and joint UTMB CMC and TJJD committees, and various other local, state, and national committees that are detailed in my CV.

11.     I have published extensively in scientific journals and other peer reviewed publications in the areas of correctional psychiatry and mental health, continuity of care for offenders with mental health and substance abuse, and suicide prevention. Some recent publications specifically in the area of correctional mental health include Psychiatric Services in Correctional Facilities: A Work Group Report of the American Psychiatric Association (APA), the chapter, "Standards and Accreditation for Jails, Prisons, and Juvenile Facilities," in the Oxford Textbook of Correctional Psychiatry, and the chapter, "Correctional Psychiatry" in the most current edition of the Kaplan and Sadock's Comprehensive Textbook on Psychiatry. I was a lead author in the AAPL "Resource Document for Prescribing in Corrections."

12.     I have presented in state, nationally, and internationally and have consulted nationally on correctional and non-correctional mental health care delivery and standards of care. Some recent examples include: the Office of the California Attorney General regarding the California Department of Corrections and Rehabilitations (CDCR); Technical Assistance Project Consultant, U.S. Department of Justice, National Institute of Corrections (NIC); Technical Assistance to New York County Jails, Valhalla, New York; Consultant to the State of Vermont Department of Corrections; and Consultant, National Institute of Mental Health (NIMH), regarding ICE detainees (other examples are listed in my CV).

13.     I have served as a physician surveyor for the NCCHC, a national organization that provides healthcare accreditation to jails and short term detention facilities, prisons, juvenile facilities, and opioid treatment programs in correctional facilities. I have surveyed

4

1   several major metropolitan county jails and short term detention facilities [e.g., US

2   Immigration and Customs Enforcement (ICE) facilities] nationally (these are listed in my

3   CV). I am the past chair of the NCCHC Accreditation Committee, and continue to serve as

4   a member of the NCCHC Accreditation Committee.  I am the Chair Elect of the NCCHC

5   Board of Directors.  I have served on several NCCHC standards revision task force groups

6   to revise the NCCHC healthcare standards: NCCHC Standards for Health Services in Jails

7   and Prisons, NCCHC Standards for Mental Health Services in Correctional Facilities, and

8   the NCCHC Juvenile Health Standards.  This demonstrates my current knowledge and

9   direct clinical and administrative involvement in the provision of psychiatric and mental

10  health care to detained/incarcerated juvenile and adult offender populations.

11       14.    I am actively involved at a national role within several psychiatric

12  organizations. These include the American Psychiatric Association (APA).  I am the

13  immediate past chair of the APA Council on Children, Adolescents and their Families.  I

14  previously served on the APA Council of Psychiatry and the Law.  I have also been active

15  within the American Academy of Psychiatry and the Law (AAPL), the national organization

16  for correctional and forensic psychiatrists, and I was recently appointed as an AAPL

17  Councilor.  I was the past chair of the AAPL Suicidology Committee, a committee focused

18  on suicide phenomenology and suicide assessment and prevention.  I also serve on the

19  American Academy of Child and Adolescent Psychiatry (AACAP) (Children and the Law

20  Committee, formerly known as the Rights and Legal Matters Committee). I was previously

21  the AACAP's representative to the NCCHC Board of Directors, and am now the AAPL

22  representative.

23       15.    I have guided the development of correctional psychiatry resource

24  documents, publications, policy, best practices, and position statements within the APA, the

25  AAPL, the AACAP, and the Texas Society of Psychiatric Physicians at a state, national,

26  and international level.  I am the immediate past president of the Texas Society of

27  Psychiatric Physicians (TSPP), the Texas statewide branch of the APA. I am involved at a

28  state and national level, and have testified at the Texas State Capital and the US Capital on

1   a variety of correctional and non-correctional psychiatric and mental health issues. I was

2   recently invited by the International Association for Correctional and Forensic Psychology

3   to participate in a one-day International Correctional Mental Health Leadership Network

4   meeting in Boston, Massachusetts.    Only 14 national and international correctional

5   psychology practitioner leaders were invited from eight countries. I was one of two US

6   psychiatrists invited, and I was asked to provide an overview of the United States criminal

7   justice systems and treatment of the mentally ill.

8        16.   I serve in a leadership role within several national correctional organizations,

9   the NCCHC (this is described above), and on the behavioral health committee and the health

10   care committee of the American Correctional Association (ACA), (the ACA also provides

11   accreditation to correctional facilities nationally). I am a past board member of the

12   American College of Correctional Physicians (formerly known as the Society of

13   Correctional Physicians).

14        17.   I am a Clinical Professor in the Department of Psychiatry and Behavioral

15   Sciences, UTMB, Galveston, Texas. I was previously Clinical Associate Professor in the

16   Department of Psychiatry and Human Behavior at Brown University and the Warren Alpert

17   Medical School, Providence, Rhode Island. I provide clinical supervision to several general

18   and child psychiatrists, psychiatric nurse practitioners, physician assistants (PAs), and

19   medical student and PA student trainees. I provide lectures and trainings on a variety of

20   correctional psychiatry topics to local medical school faculty, psychiatry residents and other

21   trainees, and other organizations and treatment programs.

22        18.   I attend state and national meetings and have completed continuing medical

23   education (CME) and maintenance of certification requirements to become and maintain

24   my status as a triple board certified psychiatrist – board certified in forensic psychiatry,

25   general adult psychiatry, and child and adolescent psychiatry. I previously served as a board

26   examiner for the ABPN in the areas of general adult psychiatry and child and adolescent

27   psychiatry, on the general psychiatry recertification committee, and on the forensic

28

1   psychiatry committee.   I was recently appointed to the Forensic Psychiatry Article
2   Assessment Continuing Certification Pilot Committee of the ABPN.

3       19.   I have been qualified as an expert witness in various state and federal courts,
4   in the field of forensic, child and adolescent, and correctional psychiatry (1998-present),
5   and have given expert opinion in several areas, including the use of psychotropic
6   medications, psychic harm, PTSD, suicide, suicide prevention, suicide risk assessment,
7   seclusion and restraint, evaluation and treatment of gender dysphoria, and other mental
8   health and psychiatry content areas.

9       20.   My state medical and federal Drug Enforcement Agency (DEA) licenses are
10  on file with the proper authorities.   I hold a full and unrestricted medical license to practice
11  in the State of Texas.   I previously held full and unrestricted medical licenses in Rhode
12  Island, Massachusetts, and Connecticut (they remain in lapsed and/or inactive status
13  because I live and practice correctional and forensic psychiatry exclusively in Texas).

14      21.   Based upon my many years of study and practice and ongoing requirements
15  in order to achieve and maintain board certification in the areas of general adult psychiatry,
16  child and adolescent psychiatry, and forensic psychiatry, combined with my years of work
17  providing direct patient care, as well as administering mental health care delivery systems
18  in the correctional and non-correctional setting, it is my opinion that I am amply qualified
19  to render opinions on the standard of care as it relates to the psychiatric and mental health
20  evaluation, care, and treatment provided to state prisoners in the Arizona Department of
21  Corrections, Rehabilitation & Reentry (ADCRR).   It is my further opinion, based on my
22  many years of experience as a CCHP and forensic and correctional psychiatrist involved at
23  the national level in studying, reviewing, and promulgating national standards for mental
24  health delivery in the jail/detention, prison, and juvenile correctional settings, I am qualified
25  to render opinions on the adequacy of the policies, procedures, and overall system of mental
26  health care delivery and services rendered by the contracted mental health care staff of the
27  ADCRR.

28

22.     I was asked by Timothy Bojanowski with the law firm of Struck Love Bojanowski & Acedo to review Plaintiffs' notices of "substantial noncompliance" regarding mental health performance measures (MHPMs) at ASPC-Phoenix, Eyman, Lewis, Perryville, Yuma, and Florence, respectively, and Defendants' responses to those notices. I have also reviewed the medical records of the ADCRR inmates identified in the notices. I reviewed Plaintiffs' allegations and analyzed the medical records to determine whether the amount of time the inmates were seen during mental health "contacts" fell below the standard of care and/or were clinically appropriate. The Plaintiffs allege that "no treatment" is being rendered during these contacts and, thus, these mental health staff contacts fell below the standard of care. In addition, I reviewed portions of Dr. Stern's report (Doc. 3379) concerning being "seen" and portions of the Court's Order (Doc. 3495) concerning the issue of being seen by a mental health clinician.

23.     All opinions stated in this declaration are based upon my years of training and experience and my review of the records, and are to a reasonable degree of medical and psychiatric certainty/probability.

I reviewed the following materials:

1)   Plaintiffs' 04/22/19 Notice of Substantial Noncompliance re MHPMs (mental health performance measures) at ASPC Perryville and associated exhibits/records;

2)   Plaintiffs' 05/01/19 Notice of Substantial Noncompliance re MHPMs at ASPC-Eyman and associated exhibits/records;

3)   Plaintiffs' 05/03/19 Notice of Substantial Noncompliance re MHPMs at ASPC-Florence (Eyman) and associated exhibits/records;

4)   Plaintiffs' 05/14/19 Notice of Substantial Noncompliance re MHPMs at ASPC-Phoenix and associated exhibits/records;

5)   Plaintiffs' 05/17/19 Notice of Substantial Noncompliance re MHPMs at ASPC-Lewis and associated exhibits/records;

6)   Defendants' 05/22/19 Response re: Notice of Substantial Noncompliance re MHPMs at ASPC Perryville and associated exhibits/records;

7)   Defendants' 05/31/19 Response re: Notice of Substantial Noncompliance re: MHPMs at ASPC-Eyman and associated exhibits/records;

8)  Plaintiffs' 05/31/19 Notice of Substantial Noncompliance re MHPMs at ASPC-Yuma and associated exhibits/records;

9)  Defendants' 06/13/19 Response re: Notice of Substantial Noncompliance re MHPMs at ASPC Phoenix and associated exhibits/records;

10) Defendants' 06/17/19 Response re: Notice of Substantial Noncompliance re MHPMs at ASPC Lewis and associated exhibits/records;

11) Defendants' 07/01/19 Response re: Notice of Substantial Noncompliance re: MHPMs at ASPC-Yuma and associated exhibits/records;

12) Document 2091 identified in the last paragraph of Plaintiffs' Notices of Noncompliance regarding mental health performance measures (Declaration of Pablo Stewart, M.D., dated 06/02/17);

13) Illinois Department of Corrections Procedural Bulletin, Office of Mental Health, No. 2018-03;

14) Portions of Report of Marc Stern (Doc. 3379; and

15) Portions of Court Order (Doc. 3495).

24. In addition, the following scientific literature was utilized in the formation of this evaluator's opinions contained in this declaration, including, but not limited to, the following articles and publications:

1.  Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2018;

2.  Handbook of Correctional Mental Health, (2010) Second Edition, Edited by Charles L Scott, American Psychiatric Publishing, Inc., Washington, DC;

3.  Trestman, RL (Chair), Penn JV, et al. Psychiatric Services in Correctional Facilities: Third Edition A Work Group Report of the American Psychiatric Association. American Psychiatric Publishing. 2015;

4.  Penn JV. Standards and Accreditation for Jails, Prisons, and Juvenile Facilities, In Oxford Textbook of Correctional Psychiatry. Edited by Trestman R, Appelbaum K, and Metzner J. Oxford University Press, New York, NY, 2015, pp 359-365;

5.  Penn JV, Weinstein HC. Correctional Psychiatry, In Kaplan & Sadock's Comprehensive Textbook of Psychiatry 10th edition. Edited by Sadock BJ, Sadock VA and Ruiz P, Lippincott Williams & Wilkins, Philadelphia, PA (2017).

25. I have conducted a review of Plaintiffs' notices of substantial noncompliance regarding mental health performance measures at ASPC- Phoenix, Eyman, Florence, Lewis,

9

1   Perryville, and Yuma, respectively, together with Defendants' responses and the medical
2   records of the inmates identified in the notices. I have reviewed Plaintiffs' allegations and
3   have analyzed the medical records to determine whether the amount of time the inmates
4   were seen during mental health contacts fell below the standard of care. I also reviewed
5   Plaintiffs' allegation that "no treatment" is being rendered during these contacts and, thus,
6   this does not meet the CGAR requirements as being "seen," and therefore fell below the
7   standard of care.

8          26.    After careful review of the above facts and data, and based on my training,
9   experience, attendance at national correctional health conferences, correctional health
10  committee work nationally, discussion with correctional professionals nationally, my
11  current active practice and full-time work within correctional settings, and approximately
12  20 years of direct experience in correctional settings, I have sufficient basis and information
13  to form my professional opinion to a reasonable degree of medical/psychiatric and scientific
14  certainty regarding the duration and appropriateness of the mental health contacts.

15         27.    Per my review of the above, it is my professional opinion that the mental
16  health contacts with incarcerated state prisoners utilized by the contracted mental health
17  staff of the ADCRR meet generally accepted standards for state prisons.

18         28.    The CGAR definition of being "seen", as agreed to by the parties to the
19  Stipulation, is as follows: "Interaction between a patient and a Medical Provider, Mental
20  Health Provider or Mental Health Clinician that involves a treatment and/or exchange of
21  information in a confidential setting. With respect to Mental Health staff, means an
22  encounter that takes place in a confidential setting outside the prisoner's cell, unless the
23  prisoner refuses to exit his or her cell for the encounter." It is my professional opinion that
24  the contacts made comply with the CGAR requirements as being "seen."

25         29.    It is my professional opinion that the duration of the mental health care
26  encounters reviewed in the materials referenced in this report was clinically appropriate to
27  the specific individual patient-related clinical task, i.e., seeing a state prisoner who is
28  currently on a current suicide watch or, similarly, re-assessing a prisoner after removal from

watch status.   These state prisoners are being evaluated by qualified mental health professionals specifically to assess their immediate clinical functioning and status, and to assess in particular any immediate safety or other clinical issues.   These mental health contacts are not meant to be intensive and lengthy individual psychotherapy sessions or diagnostic evaluations, but instead are meant to be focused, brief, and concise mental health follow-ups.  These contacts are clinically appropriate and are sufficient to meet correctional and community mental health standards of care.

30.     There is no national correctional health standard of care that establishes or defines an expected duration, timeframe, or range of expected duration of time for a mental health professional to conduct any type of a mental health or psychiatric interaction or encounter with a patient prisoner/offender.

31.     There is no national definition, standard for health services in prisons, licensing board (e.g., medical board for psychiatrists, psychology board for psychologists, and the like) requirements, established correctional clinical practices or national position statements or clinical guidelines, or any other nationally promulgated expectations regarding any defined time frame or expected duration for any particular type of a mental health screening, evaluation, contact, or any type of treatment services within correctional settings.

32.     Regardless of the location, setting, or type of mental health encounter (e.g., a segregation visit, watch and post-watch encounters, crisis intervention treatment services, suicide risk assessment, individual counseling session), there is no defined or expected duration of time for any mental health professional within a correctional setting.   The duration of each mental health encounter is based on the professional's clinical judgment, background, training, and professional community and correctional experience, and an individualized determination of each prisoner's current clinical status and evaluation and individual treatment needs.

33.     Similarly, there is no nationally defined time duration requirement to conduct any type of mental health interaction or evaluation of a prisoner prior to, while on, or

1    subsequent to removal from a suicide watch/suicide precautions.  According to the most

2    current NCCHC Standards for Health Services in Prisons, 2018 (and the similar standards

3    for Jails and Juvenile Health Standards), the Standard for Suicide Prevention and

4    Intervention is defined, "Suicides are prevented when possible by implementing prevention

5    efforts and intervention."  There is no language in this NCCHC standard's compliance

6    indicators, definitions, or discussion section that mandates or promulgates a minimum or

7    certain amount of time or time range be utilized during any of these encounters.

8        34.    I also conducted two series of onsite tours on January 2-3, 2019, and February

9    19-21, 2019 to a majority of the listed Arizona state prison facilities, series of interviews

10   with correctional, nursing, and mental health staff, and also my review of inmate records

11   and policies and procedures, and suicide prevention educational and training materials.

12   Based on the above, in addition to my previously detailed education, background, and

13   experience, I have sufficient basis and information to form my professional opinion to a

14   reasonable degree of medical/psychiatric and scientific certainty regarding the duration and

15   appropriateness of suicide prevention efforts utilized within the ADCRR:

16       35.    It is my professional opinion that the ADCRR's suicide prevention policies

17   and practices such as placing identified at risk inmates on suicide watch precautions by

18   healthcare staff with routine mental health staff assessment and reassessment status post

19   removal from suicide watch precautions, and other educational and training methods to

20   avoid suicide and self-injurious behaviors are within generally accepted standards.

21       36.    In my professional opinion, the ADCRR has suicide prevention policies and

22   procedures that comport with correctional national health care standards.  The ADCRR's

23   correctional administrators and staff, in partnership with its healthcare vendor, Centurion

24   of Arizona (formerly Corizon Healthcare), have implemented a suicide prevention program

25   for identifying and responding to each potentially suicidal state prisoner.  Offenders receive

26   direct or other types of continued monitoring and repeated assessment for emotional or

27   behavioral problems during confinement.  Available records demonstrate an effective and

28   successful   suicide   prevention   program   via   properly   trained   staff   and   ongoing

1  communication between direct-care correctional personnel and clinical staff.   The
2  correctional, nursing, and mental health records clearly document a pattern of continued
3  observation and re-assessment for state prisoners placed on suicide precautions.  This is
4  particularly important in the prevention of suicide for incarcerated offenders.

5        37.   Based on my review of materials, two series of tours, and interviews with
6  ADCRR custody and mental health care leadership, in addition to interviews with medical,
7  mental health, nursing, and other health care staff, and observation of suicide prevention
8  monitoring by custody staff and mental health staff's activities with prisoners on suicide
9  watch (I am prohibited from speaking with Arizona state prisoners), it is my professional
10  opinion that ADCRR offenders who are designated as potentially suicidal or self-harming
11  are provided with adequate mental health evaluation, treatment, and suicide prevention
12  practices that include mental health assessments during suicide watches and post-watch
13  assessments.

14        38.   It is my professional opinion that there exist clinically appropriate suicide risk
15  assessment referral processes; that watch and post-watch assessments are performed by
16  mental health care staff; and there are additional suicide prevention protocols and
17  procedures in place.  There exist opportunities for continuous quality improvement, and
18  there are adequate qualified and trained mental health staff to perform suicide risk
19  assessments and clinical reassessments of offenders on suicide watch precautions.

20        39.   It is my professional opinion that the policies, procedures, and standards
21  utilized by the ADCRR regarding mental healthcare, medical record organization, suicide
22  prevention, and mental health service delivery are within accepted correctional standards of
23  care.  In my professional opinion, the following do not cause an undue risk of harm to state
24  prisoners incarcerated at different facilities and are in keeping with national correctional
25  health standards of care: Clinical referrals; evaluations;  assessment and reassessment, and
26  monitoring of prisoners who require suicide precautions regardless of whether they have a
27  serious mental illness, whether they are or are not prescribed psychotropic medication(s),
28  are or are not compliant with prescribed psychotropic medications (prescribed by

13

1   psychiatrists and other psychiatric providers such as nurse practitioners); monitoring and
2   management of psychotropic medication therapeutic levels and side effects; access to
3   medical and mental health care; mental health programming; treatment plans; suicide
4   prevention; the use of telepsychiatry; monitoring and oversight; and the overall access to
5   mental health services, regardless of the correctional housing setting -- even those alleged
6   to constitute isolation or segregation by Plaintiffs.

7       40.   It is my professional opinion that the suicide prevention policies, procedures,
8   and standards utilized by the ADCRR meet the generally accepted practices for incarcerated
9   state prisoners with and without mental illness.  The policies, procedures, and standards,
10  and the implementation of those policies, procedures, and standards by both the correctional
11  personnel at the ADCRR's state prison facilities and ADCRR's previous contracted medical
12  and mental health vendor, Corizon Health, as well as ADCRR's current vendor, Centurion
13  of Arizona, are performed within generally accepted national, state, and county practices,
14  including accepted suicide prevention practices.

15      41.   It is my opinion that the interactions of clinicians and inmates were
16  "meaningful" and met the standard of care.  The contacts, although two minutes long, still
17  provided vital information to the mental health clinician, and were utilized in evaluating the
18  condition of the patient.  These contacts are part of an overall treatment plan.

19      42.   In my review of the medical records, I did not find evidence that the length of
20  mental health contacts were meaningless or were only a few seconds as a clinician was
21  walking by the front of the cell, looking in without interaction with the inmate.  There were
22  no files that involved a situation where being "seen" amounted to a "drive by sighting
23  through binoculars".  All of the contacts involved some level of contact with the inmate to
24  assess that inmate's current functioning.

25      43.   Given the nature of mental health and psychiatric evaluation and treatment,
26  there can be no bright line rule setting a minimum or maximum amount of time to see,
27  evaluate, or treat a patient.  Clinical judgment controls the length of time a patient needs to
28  be seen within any correctional or non-correctional health care setting, regardless of

14

whether in a medical, psychiatric, mental health, specialty, or other health care setting.  In many instances, the amount of time needed to assess a patient is no more than two minutes, based upon the type of contact involved.  Even though the contacts are short, they are clinically appropriate.

44.     In order to evaluate the issue of being "seen" for Performance Measures 73, 74, 76, 78, 80-91, 94, and 95, I agree with Dr. Stern that an objective approach is favored. (Doc. 3379 at 33.)  I also agree that if a re-audit occurs, any visit recorded as ten minutes or more is compliant and any visit with no time recorded is compliant.  (Doc. 3379 at 33.) Dr. Stern's re-audit methodology is also acceptable as to visits which are less than ten minutes involving a clinical review of the visit in the context of the patient's overall management to determine if the visit length was appropriate (Doc. 3379 at 33), said review to be performed by a mental health clinician.

45.     It is my opinion that the State of Illinois policy concerning the amount of time required to provide "treatment" to inmates on "crisis watch" to be overly rigid and prescriptive.  The policy does not provide for independent decision-making and there is an over reliance on the use of psychiatrists.  Overall, the policy does not comport with the national standard of care and requires treatment times far in excess to what may be needed under the circumstances.  This is the exact scenario Dr. Stern warned about.  Dr. Stern stated that "longer visits may be contraindicated in patients on watch because if they are agitated and uncooperative – a not uncommon situation in this acute setting – pressuring the patient to participate in a longer engagement may cause their agitation to escalate." (Doc. 3379 at 30.)  I agree that a set amount of time to be "seen" for patients on watch is not appropriate, does not comport with the standard of care, and should not be adopted by the Court.

46.     Based upon my review of available records, it is my opinion within a reasonable degree of medical certainty, that Patient 41's (Doc. 3379 at 121-123) reported suicide was unpredictable, unpreventable, and was not the result of any breach of the standard of care, violation of state prison correctional or suicide prevention protocols, or deliberate indifference to her medical or mental health needs.  The practices utilized, and

the protocols put in place, by the ADC's custody and Corizon mental health and psychiatric staff was appropriate, and Patient 41's act of reported suicide was the result of her own doing and her misleading mental health and correctional staff that she was not suicidal. Patient 41 was afforded individual mental health and psychiatric care all within a reasonable and timely manner and all within the community and correctional standard of health care. Patient 41 also demonstrated an ability to communicate her medical and mental health care needs and concerns and received appropriate initial and follow-up mental health evaluations.  Patient 41 was seen promptly and underwent clinically appropriate mental health evaluations by qualified mental health staff.  It is my professional opinion that the mental health staff acted appropriately and did not engage in negligence, medical malpractice or deliberate indifference to her mental health needs.  It is also my professional opinion that ADC custody and Corizon psychiatric and mental health care staff in this case adhered to the NCCHC Standards for Health Services in Prisons (2014 and 2018 editions) and, in particular, the following prison standards: P-E-2 Receiving Screening, P-E-05 Mental Health Screening and Evaluation, P-E-12 Continuity and Coordination of Care During Incarceration, P-G-02 Patients with Special Health Needs, and P-G-04 Basic Mental Health Services.

47.    During her incarceration, Patient 41 was appropriately screened, assessed, and reassessed for suicide risk. The day of her reported suicide attempt she did not verbally report current suicidal ideation, intent, plan or other current mental health complaints to custody or health care staff.  She did not submit any health need requests (HNRs) of a mental health nature.  She did not demonstrate signs or symptoms suggestive of schizophrenia, a psychotic disorder, any other serious medical needs such as a serious mental illness/disorder, or that she was potentially suicidal or that she faced a substantial risk of serious harm.  Although she had access to custody staff while they were making security checks, she did not utilize them at any time.  She did not demonstrate symptoms or evidence of more severe psychiatric target symptoms such as dissociative experiences, objective psychotic symptoms, such as disorganized thinking or behavior, delusions (fixed

false beliefs), or behavior suggesting that she was internally preoccupied or attending to or distracted by auditory or visual hallucinations. At no time is there any mention of any concerns that she demonstrated any impairments in her activities of daily living (ADLs), loss of weight, refusal to bathe/groom herself, refusal to eat due to paranoia or suspiciousness, oddities in her behavior, disorganized or bizarre behaviors, any signs or symptoms suggestive of imminent suicide risk, or any impairment in her ability to function within her state prison setting.

48.    It is my opinion that there should be no mandated minimum amount of time for mental health professionals to see a patient, but that any contact which is documented to be less than ten minutes in length should be guided by the independent clinical judgment of the mental health professional.

49.    It is my opinion that the Health Services Contract Monitoring Bureau ("Monitoring Bureau") should follow the two-step protocol set forth in Dr. Stern's report to re-audit past performance (Doc. 3379 at 33).

50.    For future auditing purposes, it is my opinion that the Monitoring Bureau should conduct an audit of any mental health patient contact which is documented to be less than ten minutes in length to determine if the duration of the patient contact was clinically appropriate under the individual patient's clinical circumstances and in the context of the patient's overall care, and that such review be performed by a qualified mental health clinician.

51.    If the qualified mental health clinician finds that the patient contact was not clinically appropriate, then the contact is not compliant.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of February 2020.

_____
JOSEPH V. PENN MD CCHP FAPA