Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
          carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **DECLARATION OF PABLO STEWART, M.D.** |

LEGAL23774493.1

I, PABLO STEWART, M.D., DECLARE:

1. I am a physician licensed to practice in California and Hawaii and a board certified psychiatrist, with a specialty in clinical and forensic psychiatry. My background and experience as relevant to my expert testimony in this proceeding have previously been provided to the Court (see Doc. 1538-1 at 3-6) and an updated curriculum vitae is attached hereto as **Exhibit 1**.

2. I have been asked by Plaintiffs' counsel to express an opinion in response to the Court's order that "the parties will be required to confer and submit a joint statement outlining their proposals for future monitoring of PMs requiring that prisoners be 'seen' at a particular interval." Doc. 3495 at p. 9, lines 7-9.

3. I have reviewed the following documents:
    a. The Court's order of February 12, 2020 (Doc. 3495).
    b. Letters from Plaintiffs' counsel to Defendants' counsel regarding very brief mental health encounters (redacted versions of these letters are filed at Doc. 3255-1 at pp. 4-6, 22-24, 56-58, and 60-62, and Doc. 3404-1 at pp. 61-66).
    c. Report of Marc Stern, M.D., M.P.H. (Doc. 3379).
    d. Deposition of Leonel Urdaneta, M.D., December 10, 2019 (Doc. 3476-1).
    e. Entries in patients' ADC medical records reflecting the very brief mental health encounters set forth in Plaintiffs' letters (see 3.b. above).

4. Having reviewed a number of the mental health encounters identified by Plaintiffs that lasted five minutes, or three minutes, or two minutes, I agree with Dr. Stern's conclusion that "some of the short visits are too short to be clinically effective, and in the context of the cases, place patients at significant risk of substantial harm." Doc. 3379 at 31. I further agree with his conclusion that "care delivered during many of these short visits was not safe." Doc. 3379 at 32 n. 24.

5. Mental health professionals interact with their patients for a variety of purposes. But one indispensable task that the mental health professional must carry out in *every* encounter is a meaningful assessment of the patient's condition and prognosis, including

any risk of harm to the patient. This is particularly critical when the patient has already been identified as a person who is at risk of self-harm or suicide.

6. As Dr. Stern notes (Doc. 3379 at 29), PM 91, 94, and 95 "deal[] with management of patients during or after placement on watch (due to acute psychotic or suicidal states)." Thus, I will conservatively assume that the primary purpose of the encounters required by these three PMs is to assess the patient and determine his or her risk of self-harm or suicide, rather than to provide extended treatment.

7. It is simply not possible to assess a patient and determine his or her risk of self-harm or suicide in an encounter lasting five, three, or two minutes. Such an assessment requires more than literally "seeing" the patient; it first requires establishing a therapeutic relationship. Only after this relationship is established is a mental health clinician able to effectively assess the patient. This is especially important when a mental health clinician is responsible for evaluating a patient's risk of self-harm or suicide. Establishing a therapeutic relationship is particularly important when, as is the case in ADC, there is little continuity, and the patient is seen by different mental health staff from day to day. See, for example, PM 94, Doc. 1185-1 at 14 (providing that patients on watch are seen on weekdays by a licensed mental health clinician, but may be seen on weekends or holidays by a registered nurse).

8. Dr. Stern used "10 minutes or more as an acceptable visit length" for PMs 91, 94, and 95. Doc. 3379 at 32. It is my opinion that the absolute minimum permissible length of an encounter to determine a patient's risk of self-harm or suicide is **ten minutes**. This is an extremely conservative estimate, and in many cases more time will be needed to conduct a minimally adequate assessment. When a patient is placed on suicide watch in a mental health facility in the community, such visits are typically approximately 45 minutes in length.

9. I currently serve as the Monitor in the case of *Rasho v. Baldwin*, No. 1:07-cv-01298-MMM (C.D. Ill.). This case involves the provision of constitutionally-compliant

1 mental health care to people with mental illness incarcerated in the Illinois Department of
2 Corrections (IDOC). IDOC policy requires as follows:

> A patient placed on crisis watch must be seen by a Mental Health Professional (MHP) every working day. **Each daily contact by the mental health professional shall be at least 15-20 minutes in length per person. The total patient time must be properly reflected on the completed progress note.**

(Emphasis in original). See **Exhibit 2** attached hereto, at p. 1. These visits occur daily, with the mental health clinician providing work sheets that the patients complete prior to the subsequent daily visit.

10. As Dr. Stern notes, the remaining PMs requiring that a patient be "seen" by mental health staff (PM 73, 74, 76, 78, 80-90, and 92) "deal[] with patients in non-acute chronic care." Doc. 3379 at 29. Therefore, I assume that the purpose of these visits is both to assess the patient and determine his or her condition, prognosis, and risk, and to provide treatment. The first step in conducting this type of comprehensive evaluation is similarly establishing a therapeutic relationship.

11. Dr. Stern writes that "I would expect encounters in the non-acute setting when chronic care is being provided to generally be longer (in the range of 30 to 60 minutes) than those in the acute watch-related setting when very narrowly focused care is being provided." Doc. 3379 at 32 n. 25. I agree with Dr. Stern. Meaningful mental health treatment requires establishing a therapeutic relationship, evaluating the patient including assessing their risk for self-harm, arriving at a diagnostic assessment, assessing the effectiveness of previous treatment strategies, and providing the most efficacious treatment possible. It is difficult, if not impossible, to accomplish these goals in less than 30 minutes. Accordingly, it is my opinion that **30 minutes** is the minimum acceptable duration for the mental health encounters required by PM 73, 74, 76, 78, 80-90, and 92.

12. There are exceptional situations, however, where a shorter clinical encounter with the patient may be appropriate. These may include times, for example, when a patient is adamantly refusing to meet with the mental health clinician or is extremely agitated. Under these circumstances a shorter period of observation may be acceptable. However,

these exceptions should be rare. The clinician should make repeated efforts to engage with the patient and encourage him or her to talk. And even if the patient refuses to talk, the clinician is still required to assess him or her, including evaluating the patient's risk for self-harm or suicide. This can be accomplished in a variety of ways. The clinician should first observe the patient's hygiene. That is, is their personal appearance including clothing relatively neat or are they dirty, disheveled and malodorous? The cleanliness of the suicide watch cell is also important to note. Again, is it relatively clean or are there food wrappers and other trash items strewn about the cell? Is the toilet flushed or is it backed up with feces, urine or trash? Next the clinician should carefully observe the patient to determine if he/she is displaying any overt signs of mental illness such as responding to internal stimuli. If after the clinician has performed this comprehensive observation and has repeatedly attempted to engage the patient in conversation and they still cannot determine the patient's degree of suicidality, then the patient should be maintained on constant suicide watch status.

13. If the clinician spends less than ten minutes (with a patient on suicide watch or in a post-watch follow-up encounter) or less than thirty minutes (with a patient receiving treatment), the clinician must still document the length of the encounter; the reasons why the session was shorter than required; and a detailed assessment of the patient, including risk of self-harm. A cursory note to the effect that "patient was agitated" or "patient waved me away" falls far below the standard of care and is not acceptable.

14. In addition, ADC and its health care vendors should be required to track and report the number of encounters that fall short of the required duration. This will permit identification of any facilities or clinicians that are frequently not complying with these minimum durations, which will facilitate corrective action.

15. Finally, there is a related issue that must be addressed: the very frequent use of cell-front encounters by mental health staff. Dr. Stern concludes that "Cell-front visits during watch are, unfortunately, very common at ADC." Doc. 3379 at 29 n. 20. He explains:

> [C]onducting [mental health] encounters in a confidential space is of paramount importance for patients on watch because it helps ensure that the patients share complete and accurate information with the clinician, information which is key to assessing risk. Unfortunately, a very high percentage of the watch-related encounters I reviewed were conducted at the cell-front (i.e. non-confidentially).
>
> * * *
>
> Inadequate assessments can result in one or more of the following errors: (1) inappropriate initial assignment to a particular level of watch (i.e., constant observation, 10-minute checks, 30-minute checks); (2) inappropriate promotion to a less intense level of watch; (3) failure to provide adequate treatment or resolution of factors which contributed to the need to be placed in watch.

Doc. 3379 at 121. Dr. Stern then cites a case in which the repeated use of cell-front encounters with a patient on suicide watch contributed to the patient being placed "at a significant risk of serious harm." Doc. 3379 at 121-22.

16. Dr. Stern recommends that ADC take steps to reduce the number of cell-front mental health encounters; he proposes 10% as a possible target. He recommends reconsideration of the current ADC policy requiring all patients on suicide watch to be shackled if they wish to be removed from their cells for a confidential mental health encounter:

> [T]he policy of shackling patients when taking them from their cells to private rooms to meet with the mental health clinician merits scrutiny. Currently patients on watch are housed in living units designated as high level of custody. Many, if not most, of these patients do not meet the criteria of high custody. However, they are still subjected to the requirements of high custody (notably shackling before removal from the cell). It is likely that the prospect of having to be shackled serves as a deterrent to agreeing to be taken out of their cell.

Doc. 3379 at 123. I agree with Dr. Stern's recommendations in this regard.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27TH day of February, 2020 at Honolulu, Hawaii.

*/s/ Pablo Stewart*

PABLO STEWART, M.D.

| | | |
|---|---|---|
| 1 | **ADDITIONAL COUNSEL:** | Donald Specter (Cal. 83925)* |
| 2 | | Alison Hardy (Cal. 135966)* |
| | | Sara Norman (Cal. 189536)* |
| 3 | | Corene T. Kendrick (Cal. 226642)* |
| | | Rita K. Lomio (Cal. 254501)* |

ADDITIONAL COUNSEL:

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene T. Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         ckendrick@prisonlaw.com
         rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@aclu.org
         afettig@aclu.org
         echo@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:   jkeenan@acluaz.org
         carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
         agerlicher@perkinscoie.com
         jhgray@perkinscoie.com

|   |   |
|---|---|
| 1 | *Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated* |

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:   rdalyrooney@azdisabilitylaw.org
              jrico@azdisabilitylaw.org
              mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington St., Ste. 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
 Email:   adietrich@azdisabilitylaw.com

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
Jamie D. Guzman
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com
jguzman@strucklove.com

*Attorneys for Defendants*

s/ Corene Kendrick