Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE TO FEBRUARY 12, 2020 ORDER RE: DR. STERN'S RECOMMENDATIONS**<br>**(Doc. 3495)** |

In accordance with the Court's February 12, 2020 Order, Defendants state their position regarding Dr. Stern's Recommendation Nos. 51, 52, 53, 54, 55, 56, 57, 59, and 60. (Doc. 3495 at 20-21, 23; Doc. 3379 at 90-112.)

## **INTRODUCTION**

On October 3, 2019, Dr. Stern submitted his Report opining on the reliability of Defendants' monitoring system and the primary causes for their substantial noncompliance with certain healthcare performance measures ("HCPMs"). (Doc. 3379.) Section III of the Report identifies nine recommendations that Dr. Stern believes may cure that noncompliance. Those recommendations, however, were based nearly exclusively on compliance data from Corizon's tenure as the contract healthcare vendor. (Doc. 3379 at 89 n.62.) Centurion assumed the provision of healthcare on July 1, 2019. Dr. Stern

1

acknowledged this change in circumstance, but maintained that his recommendations remained relevant.  (*Id*.)

The new partnership between the Arizona Department of Corrections Rehabilitation and Reentry ("ADCRR") and Centurion has improved the delivery of healthcare to the Plaintiff class members.  Their combined efforts and improvements, which predate the Court's January 31, 2020 Contempt Order and February 12, 2020 Recommendations Order, demonstrate a strong commitment to achieving and sustaining compliance with all HCPMs. Dr. Stern's recommendations, and Defendants' position, must be considered with these positive changes in mind.

Centurion provides healthcare services for governmental agencies in correctional facilities, state hospitals, courts, juvenile facilities, and community clinics.  It operates in 16 states, at 300 locations, and with an employment base of 7,000 employees.  Serving 11 state correctional agencies, Centurion is the dominant provider for medical and behavioral health services to state correctional systems in the country. *See* https://www.centurionmanagedcare.com/about-us.html. Centurion is committed to achieving 100% compliance with the Stipulation, and developing and fostering a highly skilled and dedicated group of medical professionals.  (Exh. 1, Decl. of A. Diamantis, at ¶ 40.) Centurion is also committed to continuing its successful recruitment and retention efforts to ensure that the ADCRR population has access to quality and constitutional healthcare. (*Id*.)

ADCRR has also recently undergone a change in leadership.  David Shinn was appointed Director of ADCRR in late October 2019.  (Exh. 2, Decl. of D. Shinn, at ¶ 2.) Prior to his appointment, Director Shinn served for more than 32 years in uniformed and civil service for the United States Government.  (*Id*. at ¶ 3.)  A veteran of the U.S. Marine Corps, he began his career with the Federal Bureau of Prisons in 1991 as a correctional officer, and served for more than 28 years, rising to the position of Assistant Director for the Program Review Division, in Washington, D.C. (*Id*. at ¶ 4.)

As a member of the Executive Leadership for the Federal Bureau of Prisons, which is the nation's largest correctional system with 122 institutions, 39,000 employees, and an inmate population of more than 240,000, Director Shinn served as the internal audit authority, where he was responsible for the development of comprehensive audit guidelines and led a division of professional auditors in the continuous assessment and evaluation of the agency's operations comprised of 17 specialized disciplines.  (*Id*. at ¶ 5.)  He served as the agency coordinator for all external audit activities conducted by the Department of Justice Inspector General's Office and Government Accounting Office and was responsible for resolving audit findings by managing the policy and procedural changes necessary to demonstrate compliance and prevent recurrence.  (*Id*. at ¶ 6.)  Additionally, he led agency training efforts and managed the accreditation process to achieve and maintain certification from the American Correctional Association, the Joint Commission for Accreditation of Healthcare Organizations, and later the National Commission on Correctional Healthcare.  (*Id*. at ¶ 7.)

In addition to considering the following positions, Defendants respectfully request this Court set a hearing to give Director Shinn and members of Centurion's state and national leadership the opportunity to personally provide further in-depth explanation regarding their combined commitment to providing inmate healthcare that is both constitutionally sufficient and in compliance with the Stipulation's HCPMs, and to answer any questions this Court may have.

## IMPROVEMENTS IN THE DELIVERY OF INMATE HEALTHCARE SINCE JULY 2019

In December 2019, Defendants were in compliance with nearly 93% of the remaining 852 Stipulation Performance Measures (which includes the 36 maximum custody measures).  (Exh. 2, Decl. of D. Shinn at ¶¶ 8, 12.)  By comparison, the compliance rate at the time of transition to the Centurion partnership in July 2019 was 89%.  (*Id*. ¶ 3.)  Centurion's November 2019 compliance rate in excess of 94% was the highest Healthcare

Performance Measure ("HCPM") compliance score achieved since the Stipulation became effective in October 2014. (*Id.* at ¶ 14; Exh. 3, Decl. of W. Orm at ¶ 3.) The following figure represents overall Stipulation Performance Measure compliance (which includes maximum custody measures) from January 2019 to December 2019.



(Docs. 3193, 3225, 3264, 3294, 3331, 3346, 3375, 3397, 3443, 3459, 3473, 3503.)

**Furthermore, of the 135 remaining "sanctionable measures" under the Court's January 31, 2020 Order (as modified on February 12, 2020), 81 of those measures have always been in compliance during Centurion's tenure; eighteen measures were non-compliant for only one month of Centurion's tenure; and 11 were non-compliant for only two months. (Exh. 3, Decl. of W. Orm at ¶ 4.) Moreover, of those 135 sanctionable measures, Dr. Stern has recommended 44 of them for termination (considered on a per-complex basis), all of which have been substantially compliant for twenty-four months.[1]** (Compare Docs. 3490 & 3495 with 3382-1, and December 2017-November 2019 CGAR Reports.)

_____

[1] These 44 HCPMs are:

As to the magnitude of care provided by Centurion, in December 2019 alone, there were 39,769 nursing encounters and 13,129 medical provider encounters (not including dental or mental health encounters).  (Exh. 3, Decl. of W. Orm at ¶ 6.)  From July 2019 to December 2019, average monthly consultations for specialty care have increased 41%. (*Id.* at ¶ 21).  Moreover, when Centurion began providing healthcare, it inherited a backlog of over 2,830 uncompleted and past-due Nurse Line encounters.  (*Id.* at ¶ 7.)  However, within seven months, Centurion has reduced that backlog by more than 98.72%, and had only 36 backlogged nursing encounters at the end of January 2020.  (*Id.*)  Similarly, prior to Centurion taking over, there was a backlog of uncompleted and past-due Chronic Care appointments.  (*Id.* at ¶ 8.)  In addition to seeing those Chronic Care Clinic patients normally scheduled, Centurion providers were able to reduce the backlog by more than 93%, and there are currently only 12 past due Chronic Care Clinic appointments statewide.  (*Id.*)

Centurion and ADCRR continue to take proactive steps to improve the quality of constitutionally sufficient medical care already provided to the inmate population. Highlighted efforts include:

- While building its staffing force, Centurion used its existing resources to clear the existing backlog of HNRs.  Nursing staff were offered mileage reimbursement and

PM 11:  Florence, Tucson Winslow, Yuma
PM 13:  Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma
PM 14:  Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma
PM 15:  Florence
PM 35:  Phoenix
PM 40:  Tucson
PM 42:  Perryville
PM 45:  Lewis
PM 47:  Winslow
PM 49:  Douglas, Perryville, Phoenix
PM 51:  Perryville
PM 52:  Perryville
PM 54:  Perryville, Phoenix, Tucson, Yuma
PM 66:  Lewis
PM 80:  Lewis, Tucson
PM 91:  Phoenix
PM 92:  Eyman, Florence, Lewis, Tucson
PM 93:  Eyman, Florence, Lewis
PM 94:  Eyman, Perryville, Phoenix, Tucson
PM 97:  Phoenix

lodging accommodations to travel to remote sites that were in need of coverage. These nursing "blitzes" have occurred twice at Lewis and three times at Eyman (most recently in November 2019 and January 2020, respectively) to clear the backlog of HNRs. (Exh. 1, Decl. of A. Diamantis, at ¶ 31.)

- Centurion currently has six providers who will provide additional coverage throughout the state, including providing weekend coverage where needed. Centurion will continue to reallocate resources to any facility with need to ensure appropriate care. (*Id*. at ¶ 32.)

- Centurion maintains a network of agency nurses who can fill in where necessary. There are currently over 300 agency nurses cleared to present to Arizona facilities. Moreover, Centurion's use of agency nurses has declined in favor of onsite nursing staff and telemedicine nurses who are better trained in the requirements of the Performance Measures. (*Id*. at ¶¶ 33-34.)

- Centurion is in the process of developing an internal traveling nurse program. This program will consist of RNs and LPNs who are available to travel anywhere in the state to fill critical openings. This program will drastically reduce reliance on agency nurses, and will decrease the cost of overtime. (*Id*. at ¶ 35.)

- Medical staff, including specialists, from other states are also being deployed to provide care through telemedicine. This number is expected to increase as out-of-state providers gain Arizona licenses. (*Id*. at ¶ 36.)

- Centurion is working with Arizona governmental agencies and regulators to develop initiatives to speed up the process for Arizona licensure of out-of-state providers. (*Id*. at ¶ 37.)

- Centurion's on-boarding process has been adapted to fulfill the needs of the Stipulation. All new staff must go through extensive training on the requirements of the Stipulation, including all Performance Measures, at Centurion's Tempe regional office. This training lasts between one and a half and three days, depending on the position. This centralization ensures that all staff receive consistent training. This approach promotes consistency throughout Centurion's network and increases compliance with the Performance Measures. Further, a centralized approach to training ensures that employees feel included in the onboarding process and a part of a larger team. This leads to greater staff retention and less turnover. (*Id*. at ¶ 38.)

- For the first time in Centurion nationwide operations, Centurion has created an Arizona operations position whereby a Centurion employee is tasked with calling upon community providers to recruit and retain outside specialty providers. (Exh. 3, Decl. of W. Orm at ¶ 23.)

- In addition to a robust Utilization Management process, Centurion offers its ADRRC providers access to RubiconMD. RubiconMD is an eConsult platform which permits primary care providers to consult with a specialist for answers to questions, treatment suggestions, and also to confirm, if an outside specialty consultation is required, what diagnostic test the specialist will need to have completed before seeing that patient. ADRRC providers do not need any specific authorization to utilize RubiconMD and are free to use it as they deem appropriate for any patient. However, the opportunity to consult and verify what specialty is most likely to best address a condition, or what the specialist needs to have done before seeing the patient, will eliminate historical problems of a patient being referred to the wrong specialist (i.e., neurology vs. neuro-surgery), or being scheduled for an appointment with a specialist, only to learn that

an essential diagnostic test was not completed and provided to the specialist (i.e., an MRI). (*Id*. at ¶¶ 10-11.)

- Unlike the prior health services provider, upon beginning service to ADRRC inmates in July 2019, Centurion implemented a uniform evidence-based process for, where Utilization Management decision making control is left to local Arizona staff. Centurion's process occurs within the eOMIS electronic medical record system, and thereby eliminates both the delay and potential for error resulting from duplicate data entry, which was experienced by the previous health care provider. (*Id*. at ¶ 12.)

- Centurion's Utilization Management Department is a team of Arizona-based nurses and a dedicated Arizona-based physician, with full access to eOMIS to review and process requests for outside specialty care appointments for ADC inmates. This physician position was created and staffed in excess of the staffing matrix to accelerate the decision process and improve patients' access to specialty care. (*Id*. at ¶ 13.)

- Centurion is dedicated to improving infectious disease control measures as a preventative measure to avoid the outbreak of an infectious disease which may spread among the inmate population or facility staff. Centurion has hired an Infection Control RN, who is responsible for managing Infection Control programs across all facilities. This professional is tasked with making sure that most current recommended protocols are in place, to coordinate with applicable public health authorities, and to provide site-based teams with proactive steps necessary to reduce the possibility for the spread of an infectious disease. (*Id*. at ¶ 36.)

- In addition to controlling the spread of infections, Centurion recognizes that many inmate patients may have infectious diseases, such as HIV, Hepatitis C, or latent-TB. Centurion is ramping up to the community standard of care to detect, triage and treat these conditions. In particular, Centurion recognizes that upon release patients with these conditions, absent intervention, have significant risk factors which may lead to reinfection or transmission of the disease to the larger public population. In addition, to providing detection, triage and medically appropriate treatment of patients with these conditions, Centurion is also working to develop further education and treatment methods to reduce the likelihood that inmate patients will engage in risky behaviors following release. (*Id*. at ¶ 37.)

- In recognition of the nationwide opioid crisis, where illicit use is often accompanied by the risk of infection from sharing needles, Centurion's Arizona providers are all seeking "X-Waivers" under the Drug Addiction Treatment Act of 2000, which would permit them to prescribe medical interventions to reduce opioid dependence, under a Medication Assisted Treatment program. (*Id*. at ¶ 38.)

- Since July 2019, telemedicine has played an important role in decreasing the backlog of HNRs that Centurion inherited. To alleviate the HNR backlog at Eyman, Centurion instituted a dedicated telehealth physician, and an RN program. In conjunction with the nursing "blitzes" that utilized nursing staff from across the state, these efforts have helped to drastically reduce the HNR backlog. (*Id*. at ¶ 27.)

- Centurion's increase in onsite nursing staff has decreased the demand for nursing telemedicine services. But clearing the HNR backlogs has led to an increase in the need for provider and specialist visits. Thus, Centurion is investing in developing a robust provider and specialist telemedicine network. (*Id*. at ¶ 28.)

- The telemedicine program in Arizona is already the largest in the Company. Centurion's in state-of-the-art telemedicine equipment has been deployed at all major facilities. This equipment complies with health privacy laws. It is also more advanced that traditional telemedicine services because the equipment includes high definition cameras, heart monitors, pulse oximeters, and mechanisms which allow providers to conduct skin analyses. This technology allows providers to perform a wide variety of services remotely. (*Id*. at ¶ 29.)

- Centurion currently has two dedicated full-time telemedicine providers. In addition, Centurion's network of providers and specialists continues to grow. Professionals from outside of the state are joining the network as they obtain Arizona licenses. As the rules regarding licensure continue to change, even more providers and specialists will be able to join the network. (*Id*. at ¶ 30.)

- Telemedicine specialists are filling the gap by providing specialty services that are in short supply in Arizona. Further, patients can receive care faster without the complication of coordinating external inmate movement. Telemedicine specialists are already helping Centurion to provide patients access to specialty services within the timeframes established by the Performance Measures. (*Id*. at ¶ 31.)

- As an additional method of increasing efficiency in the provision of medical care, ADCRR is currently rolling out a tablet system whereby inmates in most every classifications will be provided tablets that provide for entertainment and communication opportunities. The tablets were issued at ASPC-Florence in October 2019 and the complex was completed in November 2019. The tablets were issued at ASPC-Tucson in December 2019 and the complex is currently projected to be completed by March 2020. Tablets are currently projected to be issued at ASPC-Eyman in June 2020 and the complex is currently projected to be completed by July 2020. Design/implementation efforts are also currently being made to further equip the tablets with technology capability for submission of Health Needs Requests and medical care refusal forms directly from the tablet to Centurion medical personnel. This capability will increase the efficiency and timeliness of processing inmate HNRs and medical care refusals. (Exh. 2, Decl. of D. Shinn, at ¶ 19.)

- ADCRR and Centurion leadership continue to meet bi-weekly to discuss HCPM compliance and to collaboratively address efforts to achieve complete Stipulation compliance. Likewise, ADCRR complex-level security operations and medical leadership meet daily to discuss HCPM compliance, identify and resolve issues that compromise compliance, collaborate to achieve complete Stipulation compliance, and advise on the medical and mental health status of inmates who may require additional security supervision. (*Id*. at ¶ 15; *see also,* Exh. 3, Decl. of W. Orm at ¶¶ 40-41.)

- ADCRR has realigned its Monitoring Bureau monitor assignments such that monitors will be responsible for monitoring an assignment of specific HCPMs on a statewide basis versus monitoring HCPMs only at one specified prison complex location. This realignment will ensure consistency in monitoring methodology and scoring, and will aid in identification and resolution of barriers that impede the achievement of compliance. (Exh. 2, Decl. of D. Shinn at ¶ 17.)

- In 2019, ADCRR added ten medical program liaison positions to assist in achieving HCPM compliance. The current liaisons have been reassigned effective January 2020 to now report to prison operations leadership as opposed to ADCRR's Monitoring Bureau. A liaison is assigned to each of the ten state-operated prison complexes. Liaison duties include review and confirmation of daily HCPM

compliance, identifying and aiding in the resolution of barriers that impede the achievement of compliance, serving as liaisons between complex medical personnel and security prison operations, and investigating and appropriately referring and responding to complaints pertaining to the provision of healthcare to individual inmates.  (*Id*. at ¶ 19.)

- ADCRR is adding HCPM performance to Complex Wardens' annual performance review criteria in order to ensure that Complex Wardens engage in successful partnership with Centurion personnel in order to achieve and maintain HCPM compliance.  (*Id*.  at ¶ 20.)

- ADCRR will collaborate with and assist Centurion in devising a training component of Centurion's onboarding program that will provide detailed training regarding HCPM requirements, monitoring methodology and compliance expectations. Additional training in this regard will increase new employees' understanding of the HCPMS which will in turn increase   compliance and improve the delivery of quality healthcare.  (*Id*. at ¶ 21.)

- ADCRR will work with Arizona governmental agencies and regulators to develop initiatives to streamline the process for Arizona licensure of Centurion's out-of-state providers.  (*Id*. at ¶ 22.)

As illustrated, ADCRR and Centurion are committed to engaging in successful, collaborative efforts to achieve full compliance with the Stipulation and to improve the delivery and quality of healthcare to ADCRR's inmate population.  (*Id*. at ¶ 23.)

## DEFENDANTS' RESPONSES TO DR. STERN'S NINE RECOMMENDATIONS

- **Recommendation 51 (Doc. 3379 at 90-95) – "[T]he severe level of underfunding of health care services at the ADC is the single most significant barrier to compliance with the PMs in this case.  At a minimum, the gap between what it costs to take care of this population according to AHCCCS rates and what ADC spends, is at least $74 million dollars."  (Doc. 3495 at 20.)**

In light of the fact that Centurion was compliant with more than 92% of the HCPMs within six months of taking over the provision of healthcare (and more than 94% in November 2019) (*See* Exh. 3, Decl. of W. Orm at ¶ 3), Defendants disagree that ADCRR's inmate healthcare system requires an additional $74 million per year.[2]  Moreover, Defendants cannot unilaterally increase ADCRR's budget by tens of millions of dollars per year.  Budgetary increases require Arizona legislative approval.

---

[2] Defendants' disagreement with Dr. Stern's opinion that an increase in rates paid for inmate healthcare to exceed AHCCCS rates is addressed below in response to Recommendation 55.

Nonetheless, Defendants will be conducting both a root cause analysis for non-performing HCPMs as well as a system-wide staffing analysis. These analyses may result in acceptable recommendations to support a proposed increase in budgeting for inmate healthcare. If agreeable, Defendants are prepared to request necessary budget increases to fund specific action items. However, until an analysis is completed to consider the present state of operations of Centurion (as opposed to Corizon), Defendants cannot commit to any specified proposed budget increase, particularly one such as suggested by Dr. Stern, which is not tethered to specific line-item expenditures.[3] Defendants suggest that any determination as to budgeting increases in the health care services budget must wait until these analyses are completed and analyzed.

Since the Court issued its Order (Doc. 3495), ADCRR has investigated nationally recognized correctional medicine organization candidates that can identify and provide modification recommendations related to: (1) root causes that impede CGAR compliance; (2) revision/modification of certain HCPMs to ensure that the measures are outcome-based and qualitatively measure the actual delivery of healthcare; and (3) a complex-specific staffing analysis that accounts for unique hiring and retention factors, physical plant, and security staffing requirements that must be contemplated at each unique prison complex location. Centurion supports Defendants' efforts in this regard. (Exh. 2, Decl. of D. Shinn at ¶ 24.) ADCRR will acquire the services of such a nationally recognized correctional medicine organization to perform the analyses listed above in accordance with all applicable law and all deliberate speed. (*Id*. at ¶ 25.)

It is important to consult with a nationally recognized correctional medicine organization to perform the root cause, HCPM revision/modification, and staffing analyses so as to ensure that the study takes into account the unique challenges of corrections medicine—challenges that exceed baseline delivery of care and must also address

---

[3] Defendants request that before the Court issues an order approving any of Dr. Stern's recommendations to which either the Plaintiffs or Defendants are not in agreement regarding information, the Court should set an evidentiary hearing to allow the Court and the parties to question Dr. Stern regarding his findings pursuant to Fed. R. Evid. 706(b).

geographical location, site-specific facility plant design, and overlapping security staffing needs in order to facilitate the delivery of healthcare.  (*Id*. at ¶ 26.)  Defendants anticipate that the selected organization will also consult with Dr. Stern in performing its analysis, considering the tremendous amount of work that Dr. Stern has already conducted in this regard.  (*Id*. at ¶ 27.)   Defendants also anticipate that the selected organization will be familiar to Dr. Stern, either as a member, a consultant, or an award recipient.  (*Id*. at ¶ 28.)

As to any increased budget proposal, great consideration must be given to the fact that ADCRR will be closing ASPC- Florence.  (*Id*. at ¶ 30.)  This closure will reduce approximately 10% percent of ADCRR's in-state inmate population, as a corresponding number of inmates must be reassigned to alternative custody placements with either Arizona county jails or third party vendors. (*Id*. at ¶ 31.)   Solicitations for Intergovernmental Agreements with Arizona county jails are in progress. (*Id*. at ¶ 32.)  The closing of ASPC-Florence will additionally free up substantial funding, medical staffing, and security staffing resources that will be redistributed to ASPC-Eyman and to other state-run prison complexes.  (*Id*. at ¶ 33.)  Defendants will provide supplemental reports regarding the ASPC-Florence closure as the process proceeds.

The closing of ASPC-Florence has also resulted in ADCRR initiating a statewide bed allocation analysis to focus on potential re-distribution of the inmate population to locate those inmates with chronic or complex medical conditions in the geographical location that best serves their medical needs.  (*Id*. at ¶ 34.)  Defendants will provide supplemental reports regarding this analysis which will also necessarily play a role in both the root cause and staffing analyses. In the interim, Defendants and Centurion have agreed to implement a utilization review procedure whereby, on a weekly basis, a multi-disciplinary team, including facility operations (the Warden), will meet to discuss possible alternative housing assignments for inmates who require medical services that may not be optimally available at the prison complex to which the inmate is assigned.  (*Id*. at ¶ 35.) Recommendations for alternative placement made at the complex level will then be elevated to ADCRR operations leadership and Centurion leadership for ultimate determination.  (*Id*.

at ¶ 36.)  ADCRR and Centurion leadership will also meet weekly to review alternative placement recommendations made at the complex level. (*Id*. at ¶ 37.)

Because retaining a nationally recognized correctional medicine consulting group to perform these analyses will require a significant outlay of funding not currently present in ADCRR's authorized budget, Defendants respectfully request to use the $1.445 million in prior sanctions that was deposited with the Court, as well as any forthcoming non-compliance sanctions associated with the Court's May 6, 2019 and January 31, 2020 Sanctions Orders, to fund them.  (Docs.2898, 3235, 3490.)

- **Recommendation 52 (Doc. 3379 at 95-98) – ADC should conduct a staffing analysis and then implement staffing changes accordingly. While a staffing analysis is conducted, ADC should adjust (increase) the number of physicians at the Lewis Complex and mental health professionals at Perryville. (Doc. 3495 at 20.)**

While Defendants believe that Centurion's contracted-for staffing levels are sufficient to achieve Stipulation compliance when fully filled, Defendants nevertheless agree to conduct a staffing analysis as discussed in their response to Recommendation 51. Defendants also agree to strongly consider recommendations resulting from the staffing analysis and, if appropriate, implement them.  However, any increased staffing commitment must take into consideration inherent market place challenges that may restrict Defendants and Centurion from filling recommended positions (i.e., unavailable or small employment pool, lack of interest in working in a prison, geographic proximity challenges, etc.). Thus, if Defendants and/or Centurion engage in reasonable recruiting and hiring efforts, the inability to fill positions which offer market or above-market salaries and incentives should not be considered non-compliance.

Dr. Stern also recommended that ASPC-Lewis hire an additional physician while a staffing analysis was completed.  Centurion continues to make significant efforts to recruit and hire an additional physician for ASPC-Lewis.  Accordingly, Defendants agree to continue those efforts.

As to ASPC-Perryville mental health staffing, Dr. Stern recommended essentially quadrupling mental health staffing to reduce provider caseloads.  However, Dr. Stern did

not detail how staffing should be increased as to positions and numbers.  While Defendants disagree that a quadruple staffing increase is required to achieve compliance, Centurion has already increased ASPC-Perryville's mental health staffing by eight professionals, which is a 50% increase in staffing, since Dr. Stern issued his report.  Specifically, ASPC-Perryville's current mental health staffing is as follows:

- 2 Psychologists  (both hired since October 2019);
- 3 Behavioral Health Technicians (two hired since October 2019);
- 7 Psychology Associates (four hired since October 2019, recruiting for three additional positions, and pending five interviews to fill the same);
- 1 Mental Health Lead (position filled prior to October 2019);
- 5.2 Mental Health RNs (all positions filled prior to October 2019);
- 1 Psychiatrist (position filled prior to October 2019);
- 3.5 Psychiatric NPs (three positions filled prior to October 2019; part-time position filled since October 2019[4]);
- 1 Mental Health Clerk (position filled prior to October 2019);
- 1 Release Planner (position filled prior to October 2019).

(Exh. 1, Decl. of A. Diamantis at ¶ 25.)  Defendants therefore believe that they have adequately addressed Dr. Stern's recommendation.

- **Recommendation 53 (Doc. 3379 at 98-100) – ADC should increase RNs relative to LPNs, physicians relative to mid-level providers, and licensed relative to unlicensed mental health professionals.  (Doc. 3495 at 20.)**

Defendants agree to this recommendation as described in their responses to Recommendations 51 and 52 above to the extent a staffing analysis reasonably supports it and marketplace challenges do not impede the recruitment and hiring of qualified medical personnel.

- **Recommendation 54 (Doc. 3379 at 100-101) – ADC should seek the authority to create an alternative salary plan based on professional judgment.  (*Id*.)**

Defendants agree to consider alternative salary plans to the extent that a staffing analysis reasonably supports it.  Because inherent marketplace factors and increased salaries may not result in successful hiring and retention of qualified employees for reasons beyond Defendants' and Centurion's control, the inability to fill positions which offer market or

---

[4] The half-time Psychiatric Nurse Practitioner is actually a full-time employee who also works half-time at ASPC-Lewis.

above-market salaries and incentives should not be considered non-compliance.  See also, Response to Recommendations 51-53, above.   Notwithstanding, Centurion has already complied with this recommendation by implementing alternative salary and incentive plans with demonstrated success.[5]

Centurion's recruitment and retention strategies have also resulted in hiring and retention successes:

- In order to attract and retain qualified health care staff, Centurion offers salaries that are competitive with both private and public medical employers in each unique geographic region in Arizona.  To determine the appropriate salaries for its workforce, Centurion completed a geographical market salary analysis which identified major employers by region and analyzed their salary and bonus structures. Based on this information, Centurion raised salaries to meet or exceed the market rate for both providers and non-providers. (*Id*. at ¶¶ 4-6.)

- In September 2019, Centurion also began offering sign-on bonuses for hard-to-fill positions and remote regions.  To increase retention, part of the bonus is paid upon signing, while the rest is paid out after a certain number of months of service.  (*Id*. at ¶ 7.)

- Certain candidates for hard-to-fill positions are also being offered reimbursement for relocation expenses. To ensure that patients have access to adequate care, Centurion hired a number of providers and dentists at salaries that are over-budget in order to ensure that positions at remote sites are filled.  (*Id*. at ¶¶ 8-9.)

- Centurion will continue to conduct salary surveys and regularly engage with its workforce to ensure that it remains a competitive employer.  (*Id*. at ¶ 10.)

- A majority of sites also qualify for the Health Resources and Services Administration (HRSA) loan repayment program.  This federal program repays student loans for providers who practice in shortage areas.  (*Id*. at ¶ 11.)

- In addition to offering competitive salaries and sign-on bonuses, Centurion is engaging in aggressive recruitment efforts to attract new hires.  Candidates are thoroughly interviewed and screened to ensure that they are highly qualified for their positions and have a passion for corrections healthcare.  (*Id*. at ¶ 12.)

- Centurion has hosted dinners for providers in Yuma and Tucson to provide information about and encourage interest in available positions.  (*Id*. at ¶ 13.)

- In 2019, Centurion attended twenty-five events at educational institutions to recruit non-providers.  An additional six events are planned for the first quarter of 2020. Events that Centurion staff have attended include:

---

[5] Moreover, Centurion's retention rate is average to above average for the corrections healthcare industry.  The contract turnover rate for July 1, 2019 through January 31, 2020 was 15.56%.  Contract turnover with status change was 23.87%.  (Exh. 1, Decl. of A. Diamantis, at ¶ 39.)

- University of Arizona Nursing School Networking Event;
- Pima Community College Nursing Career Fair for LPNs;
- National Student Nurses Association Annual Conference in Salt Lake City, UT;
- Pima Medical Institute Advisory Council Meeting;
- Pima Community College Career Fair for CNAs;
- Carrington College Career Fair;
- Northland Pioneer College Nursing Career Fair in Winslow and Holbrook, AZ; and,
- Coolidge Career Fair.

(*Id*. at ¶¶ 14-15.)

- Centurion also frequently advertises on over twenty online job boards. These include the websites for the:
  - American Nurses Association;
  - Association for Professionals in Infection Control and Epidemiology;
  - Arizona Nurses Association; and,
  - Arizona Psychological Association.

(*Id*. at ¶ 16.)

- Centurion staff conducts daily searches of online resume databases to identify potential candidates. (*Id*. at ¶ 17.)

- In addition to online advertising, Centurion also advertises positions in traditional print media. These sources target licensed candidates in hard-to-fill areas, and include the:
  - Arizona Nurse Newspaper;
  - Arizona Regulatory Journal, which is sent to approximately 89,000 nurses;
  - Casa Grande Dispatch;
  - Copper Era Newspaper;
  - East Valley Tribune;
  - Explora/Marana Publications;
  - Florence Reminder newspaper;
  - Gilbert Sun News;
  - Glendale Star;
  - Imperial Valley Press;
  - National Association of Social Workers monthly newsletter;
  - Navajo Hopi Observer;
  - Peoria Times;
  - Sierra Vista Herald;
  - Tucson Weekly; and,
  - West Valley View newspaper.

(*Id*. at ¶ 18.)

- Centurion also engages in direct advertising to potential employees. Between May 2019 and January 2020, Centurion sent a total of 20 email blasts which reached over 130,000 prospective candidates. (*Id*. at ¶ 19.)

- A total of three direct mail events occurred in July 2019. This included postcard mailers sent to thousands of LPNs and RNs in or near Tucson, Buckeye, Lewis, Eyman, and Florence. (*Id*. at ¶ 20.)

- In July 2019, Centurion also began using text campaigns. These text campaigns specifically target individuals who hold health care licenses and live within a certain number of miles of prisons in need of employees. Between July 2019 and January

2020, Centurion engaged in a total of 20 text campaigns, sending job advertisements to over 6,000 RNs and 1,900 LPNs across the state.  (*Id*. at ¶ 21.)

As a result of these efforts, Arizona facilities have gone from an average 80% fill rate in July 2019 to 87% in January 2020.  (*Id*. at ¶ 22.)  The most notable staffing differences can be seen in hard-to-fill facilities such as Douglas and Safford.  (*Id*. at ¶ 23.) The fill rate for Douglas improved from 59% in July 2019 to 97% in January 2020.  Safford increased from 71% to 97% in the same timeframe.  (*Id*.)  Provider staffing has also seen a dramatic increase. (*Id*. at ¶ 24.) One hundred percent of Nurse Practitioner positions, including Psychiatric NP positions, are filled; 100% of Psychiatry positions are filled; and 97% of all Dentist positions are filled.  (*Id*.) PRN staff fills in if a Dentist is needed to achieve 100% of contractually required hours. (*Id*.)  Mental health care staffing has also increased with special attention given to increase mental health staffing at Perryville since October 2019 (see Response to Recommendation No. 52, above).  Furthermore, Centurion successfully hired new full-time Site Medical Directors for both the Florence Complex and the Winslow Complex.  (*Id*. at ¶ 26.)  In addition, two providers were hired at the Yuma Complex.  (*Id*.)  Douglas, Safford, and Tucson are 100% staffed for midlevel providers for the first time in years. (*Id*. at ¶ 27.)

Non-provider staffing has also increased since July 2019.  Centurion has hired 55 new CNAs; 25 new Directors of Nursing/Assistant Directors of Nursing; 70 new LPNs; 14 new Medical Assistants; and 115 new RNs.  (*Id*. at ¶ 28.)  In sum, there have been a total of 366 new non-provider hires from July 1, 2019 through January 31, 2020. (*Id*. at ¶ 29.) Finally, Centurion has added positions in excess of what is required by the contractual matrix.  For example, two OB/GYNs were hired over the staffing matrix.  Also hired over the matrix were 5 TeleHealth RNs; 5 TeleHealth CNAs; 4 onsite Physical Therapists; a second Regional Director of Nursing; and 2 full-time Floater Providers.  (*Id*. at ¶ 30.)

Based upon the foregoing, Defendants believe they have complied with Dr. Stern's recommendation to reassess salaries and incentives.  Centurion's robust recruitment efforts have significantly increased staffing.

- **Recommendation 55 (Doc. 3379 at 101-102) – Dr. Stern recommends rescission of the Arizona Legislature's instruction to ADC to cap payment to community specialists at the level adopted by AHCCCS. (Doc. 3495 at 21.)**

Defendants do not agree that rescission of the statutory requirement to pay AHCCCS rates would materially improve the quality of healthcare. ACHCCS rates are not the root cause of challenges faced in securing outside specialists. Rather, lack of available specialists and a reluctance by specialists to serve the inmate population drives the specialty provider dilemma.

Specialists often shy away from serving the inmate population due to safety/security concerns for the provider's staff and community clientele, as well as the negative reaction community patients may have when their provider simultaneously serves the inmate population. Specialists are also often already booked far in advance by their community patients, which further complicates Defendants' ability to comply with Stipulation timeframes. Despite these challenges, Centurion is targeting efforts to alleviate the strain on procuring a willing offsite network of specialty providers.

While Centurion's Utilization Management efficiencies have increased the volume of specialist appointments, that has put additional stress on Centurion's existing offsite network. (Exh. 3, Decl. of W. Orm, at ¶ 22.) One key challenge impacting the community standard of care, as well as correctional healthcare, is a short supply of available specialty appointments, particularly since most community specialty care providers are already booked months ahead of time for all patients, including the general public seeking specialty healthcare. (*Id*.) To combat this, Centurion has created positions in excess of the staffing matrix to provide patients with increased access to care, as well as looking to non-traditional methods to increase access to specialty care services. (*Id*.)

Where feasible to expedite the delivery of services, Centurion is working to provide more on-site specialty care. (*Id*. at ¶ 24.) While audiology and optometry specialties have long been provided on-site at ADCRR facilities, Centurion has already brought physical therapists on-site to Eyman, Florence, Tucson and Yuma, as well as making mobile

Mammography services available at Perryville and on-site ultrasound services available statewide. (*Id*.) Bringing these services on-site provides a dedicated window when services can be regularly scheduled exclusively for ADCRR patients and makes transport resources more available for other inmates. (*Id*.) Centurion is also currently assessing demand and looking to identify opportunities to further expand this program by adding other specialties or ADCRR facilities. (*Id*. at ¶ 25.) Moreover, Centurion is considering exclusive employment of other outside specialty care providers, whose sole practice would be to serve correctional healthcare patients. (*Id*. at ¶ 26.)

Centurion's telemedicine programs are also addressing the market shortage of available specialists. Centurion's network of providers and specialists continues to grow. (*Id*. at ¶ 30.) Professionals from outside of the State are joining the network as they obtain Arizona licenses. (*Id*.) As the Arizona rules regarding licensure continue to change, even more providers and specialists will be able to join the network. (*Id*.)

Perhaps the greatest opportunity for advancement through telemedicine is the ability to see a wide variety of specialists remotely. (*Id*. at ¶ 31.) These telemedicine specialists are filling the gap by providing specialty services that are in short supply in Arizona. (*Id*.) Further, patients can receive care faster without the complication of coordinating external inmate movement. (*Id*.) Telemedicine specialists are already helping Centurion to provide patients access to specialty services within the timeframes established by the Performance Measures. (*Id*.)

Presently, Centurion is actively negotiating a contract with CareClix. (*Id*. at ¶ 32.) This partnership will provide ADCRR patients access to remote orthopedists, cardiologists, nephrologists, ENTs, and rheumatologists. (*Id*.) These are some of the specialties which are in the shortest supply in Arizona. (*Id*.) Providers are currently analyzing pending specialty appointment requests to determine which cases are the most appropriate for telemedicine. (*Id*.) Treating these cases through telemedicine will allow Centurion to address the short supply of in-person appointments with outside specialty care providers by prioritizing and scheduling those inmates who require in-person off-site specialty services,

and also expedite specialty consults for those who are most likely to benefit from a remote consult.  (*Id*.)

Telemedicine can also connect ADRRC inmates with the specialty services offered through research institutions.  (*Id*. at ¶ 33.)  For example, Centurion has worked locally with the University of Arizona Banner-Tucson telemedicine program to provide inmates with access to the University's Infectious Diseases telemedicine program. (*Id*.)  Centurion is currently negotiating with potential vendors in hopes of further expanding its external telemedicine network.  (*Id*. at ¶ 34.)  Though not a replacement for on-site and community medical care, telemedicine is a useful tool that will continue to be developed. (*Id*.)  It offers an innovative solution for the unique problems faced by correctional health providers.  (*Id*.)

Repealing the statutory cap for rates paid to outside providers for inmate healthcare services will not directly impact the scarcity of specialists willing to serve the inmate population.  Moreover, changing or eliminating the statutory cap requires legislative action which Defendants cannot compel.

- **Recommendation 56 (Doc. 3379 at 102-104) – Dr. Stern identified inefficiencies and flaws in eOMIS (electronic medical records) that waste resources and are potentially dangerous to prisoners.  He recommends that the program be updated with input from users. (Doc. 3495 at 21.)**

Defendants, through Centurion, have already implemented recommendations to update and improve the eOMIS system based upon input from eOMIS users and Dr. Stern. Defendants agree to continue to update and improve eOMIS.  The following describes Centurion's improvement actions taken to date, as well as Centurion's process for continual improvement assessment and implementation.

- Centurion has devoted significant time and resources to understanding the current Information Technology capabilities of the ADCRR facilities, as well as the needs and growth opportunities to provide more efficient data entry and access.  (Exh. 4, Decl. of C. Bourque, at ¶ 3.)

- Between July 1, 2019 and January 28, 2020, thirty-tine (39) updates were installed into the eOMIS system and have been implemented at the ADCRR facilities.  While some of these updates were requested by ADCRR and provided by Centurion as part of the contract process, other updates were made to incorporate and address suggestions by providers and nurses located at the ADCRR facilities.  (*Id*. at ¶ 4.)

19

- One initial change implemented by Centurion almost immediately is to automatically record a non-editable system date on all forms in the eOMIS system at the times the form is opened and saved.  To the extent a medical professional is charting late, he or she is trained and instructed to explain the reason for the late entry in the narrative portion of the document.  (*Id*. at ¶ 5.)

- Providers, nursing staff or other professionals at ADCRR are encouraged to submit suggestions to improve their eOMIS workflow through their Facility Health Administrator.  Those requests are submitted to and considered by Centurion's Regional Office Change Committee to determine if the change is locally needed.  (*Id*. at ¶ 6.)

- Approved requests are also submitted for approval by clinical operations as well as ADCRR prior to implementation.  Clinical operations' approval is necessary to ensure that a change requested by one person will be consistent with the work flow of multiple providers.  Sometimes, a suggested change will make it apparent that additional training, rather than a change to the system, is the appropriate solution.  (*Id*. at ¶ 7.)

- Once approval is obtained at all levels, Centurion's Electronic Health Record team works with the eOMIS vendor, Marquis, to develop the change.  It is then tested first by Marquis, and then by Centurion, to ensure it works as designed prior to being released.  (*Id*. at ¶ 8.)

- Once approval has been obtained, the development of a new feature or form typically requires a week to a month of programming time, depending on the complexity of the change, before it is implemented.  (*Id*. at ¶ 9.)

- As to Dr. Stern's specific criticisms of the eOMIS system, the critiques do not reflect the current state of the eOMIS system.  (*Id*. at ¶ 10.)  For example, when scanned documents are added to eOMIS, the date field for the scanned document is editable by the Medical Records Clerk entering the record.  While the current date and time is suggested, that field can be edited to reflect the date of the event addressed in the document by the Medical Records Clerk, without any additional change to the eOMIS design. (*Id*. at ¶ 11.)

- While Dr. Stern may have had concern about viewing or only a limited set of 20-scanned documents from the "Scanned Documents/Photos" control in eOMIS, this is not the method of viewing scanned documents that Centurion trains its employees or providers to use.  Rather, Centurion trains and instructs the ADCRR healthcare professionals to use the "Scanned Document Index" option instead.  This button then opens up a filtered list, divided by category of scanned documents (such as Health Needs Request, Intake Data, Release of Information, Consults, Dental, Refusals, Mental Health, Lab Tests, etc.), from which a user can view either all of the scanned documents for a patient, or all of a sub-set of documents based upon category, without seeing a limited set of most recent results.  (*Id*. at ¶ 12.)

- Moreover, while sound medical records and information technology practices require that only one patient encounter be opened at a time in order to maintain an accurate audit trail, prior to Centurion providing services to ADCRR, eOMIS users have been able to view from the open active encounter other portions of the records relating to a patient's Medication Administration Record, Current Medications, Orders, Laboratory Results, Imaging Results, Consultations, Follow-up, Other Procedures, Scanned Documents, and Vital Signs.  (*Id*. at ¶ 13.)

- Additionally, prior to Centurion providing services to ADCRR, an eOMIS option was put into production, where a user can select multiple laboratory tests under laboratory results, and then click a button to generate a graphical display and values of laboratory results over time, to quickly see relevant trends. (*Id*. at ¶ 14.)

- At all times since Centurion began providing services to ADCRR, eOMIS has permitted users to filter, rather than simply sort, encounter records by general type of encounter (i.e., Dental, Provider, Medical Records, Mental Health, Nursing), and then provides the user the further option of whether or not to sort by subtype. This eliminates the challenge for any healthcare professional, to be confronted with a long list of encounters which are not relevant to their treatment of the patient and affords the user the discretion to view all encounters or only a subset of desired encounter types. (*Id*. at ¶ 15.)

- To increase efficiency in the delivery of healthcare, Centurion has acquired electronic signature pads, which have been delivered to all ADCRR facilities, to reduce the need for scanned documents requiring a patient's signature to be included in the record. Rather, the patient can sign the form digitally on the signature pad, and the image of the signature, along with the date and time it was signed, will be appended to the record. (*Id*. at ¶ 17.)

- Moreover, at ASPC-Lewis, Centurion will be piloting a program to give medical staff handheld tablets, so they may enter information into eOMIS in real time, while they are moving throughout the units at that facility. (*Id*. at ¶ 18.)

- Centurion is also supporting ADCRR in rolling eOMIS out to the privately operated facilities. This will provide more consistent records and enhance the continuity of care for patients transferred between state and privately operated facilities. (*Id*. at ¶ 20.)

- Finally, currently, Centurion has more than 15 open requests for changes to the eOMIS system requested by ADCRR facility personnel in various stages of completion. (*Id*. at ¶ 20.)

Defendants and Centurion remain committed to supporting Centurion's medical professionals in the delivery of quality patient care and will continue to consider user suggestions for improvements to eOMIS, advocating for necessary changes, and partnering with Marquis to quickly develop, test, and release an effective update.

- **Recommendation 57 (Doc. 3379 at 104-108) – Dr. Stern believes the Arizona Legislature's decision to privatize prison healthcare is a barrier to providing adequate care. As a result, he recommends that the ADC return to self-operating health care services. (Doc. 3495 at 21.)**

Defendant do not agree that a return to self-operation of inmate healthcare services would materially increase Stipulation compliance or improve the quality of healthcare.[6]

_____

[6] When Plaintiffs filed suit, inmate healthcare was self-operated. And no empirical evidence exists that demonstrates that ADCRR presently could deliver medical care that

Initially, returning to self-operation requires legislative action which Defendants cannot compel. Furthermore, self-operation would not change those individuals—existing personnel and the potential employment pool— who are actually delivering healthcare. A substantial portion of Centurion's current healthcare personnel are the same personnel that were employed by the State at the inception of this case, and later by Wexford and Corizon. The crossover of personnel in this regard is not unique due the market challenges discussed herein that are present in staffing for corrections healthcare. Together with Centurion's leadership, these existing healthcare professionals have combined to steadily increase compliance rates over compliance rates achieved by the prior provider. Finally, as discussed herein, Centurion's hiring, retention, and training efforts translate to a demonstrated increase in compliance rates that have recently reached record high levels.

- **Recommendation 59 (Doc. 3379 at 109-110) – Dr. Stern also recommends that ADC modify its contract with its private healthcare provider to penalize vacant positions in such a way that the penalty for a vacant position is more than the salary. (Doc. 3495 at 21.)**

Defendants' contract with Centurion did increase sanctions from those imposed on the prior healthcare provider. (Exh. 2, Decl. D. Shinn at ¶ 38.) Therefore, Defendants believe they have addressed this issue, albeit not in the particular format that Dr. Stern recommended.

Dr. Stern's sanction model punishes vacancy rates versus HCPM performance deficiencies where the two factors may not tie together. For instance, under Dr. Stern's scenario, Centurion may be penalized at a monetary amount that exceeds a psychiatric nurse practitioner's annual salary for one particular month just because the position is vacant. However, the prison complex may be achieving HCPM compliance on all mental health measures. In this scenario, the vacancy did not affect compliance. Accordingly, the sanction would not track actual non-compliance, which is what the sanctions are designed to deter. Such a purely vacancy-targeted sanction would also fail to take into account uncontrollable

_____

exceeds Centurion's HCPM compliance rates.

marketplace challenges that could reasonably impede Centurion's ability to fill certain positions no matter the circumstance.

For example, Centurion may reasonably be unable to fill a psychiatric nurse practitioner position in Yuma even if above market salary is offered if there are only three such professionals living in the Yuma area and under no circumstances do any of the three want to work in a prison.   Dr. Stern's recommended sanction system also does little to address root causes of non-compliance if the focus is on filling vacant positions versus addressing the root cause of the non-compliance which easily could be systems or operations related versus staffing related.  In short, throwing more staff at a problem does not guarantee resolution of a problem.

In comparison, Defendants' available performance sanctions are reasonable and demonstrate ADCRR's ever increasing demand for compliance. (*Id*. at ¶¶ 38, 42, Exh. 2.) Specifically, Defendants may impose contract performance measure offsets against Centurion on a monthly basis for each HCPM that falls below the 85% compliance rate at each of the applicable ten prison complexes, at a rate of $500.00 per compliance failure. (*Id*. at 39.)  Further sanctions may be imposed on an increasing scale where compliance failures result in an extension of the twenty-four (24) month rolling compliance time period. (*Id*. at 40.)   In this circumstance, monthly sanctions escalate from $2,500 per sanction for the first nine (9) HCPMs that extend the twenty-four (24) month rolling compliance time period to $20,000 per sanction for 50+ measures that extend the compliance period.  (*Id*. at 41.)   Defendants' escalating sanctions deter non-compliance and encourage problem-solving focus on the root cause of non-compliance versus artificial focus on merely filling positions with any person Centurion could find to take the job.  (*Id*. at 42.)  Defendants' sanctions system does not unfairly punish circumstances that may not be the cause of non-compliance.

Here, Centurion is committed to achieving Stipulation compliance and has made great strides in doing so in the short time period that it has partnered with ADCRR. Additional increased sanctions at this juncture are not warranted. Compliance is increasing,

not decreasing.  And any change at this juncture would require a contract modification which would correspondingly result in an unwarranted increase in contract price.  Should Centurion change course and embark upon a path of substantial decrease in compliance, Defendants are willing to reconsider this position and explore alternate sanctions methods designed to encourage both compliance as well as investigation and remedy of actual root causes of declining compliance.

- **Recommendation 60 (Doc. 3379 at 110-112) – Dr. Stern proposes that the process by which referrals for specialist services be completed inside eOMIS instead of in a different program. (Doc. 3495 at 21.)**

Dr. Stern's eOMIS change recommendation stems from criticism of Corizon's Utilization Management ("UM") process, whereby different software systems were utilized to complete the Utilization Management process and the two systems did not interface. Of particular concern was that under Corizon's UM process, UM decision makers did not have access to eOMIS to personally review the patient's medical record.  As such, if the decision maker needed answers to questions to inform a response to the specialty request, the decision maker had to pose the question to the provider, a clerk had to paste the question into eOMIS for the provider to see, and then the provider had to answer the question which required the clerk to paste the information into the UM system for the decision maker to see. This process resulted in delays.

Centurion's Utilization Management process runs differently. The entire specialty request process is run through eOMIS and the UM decision makers have access to eOMIS such that they do not have to rely on a question or answer process that deprives the decision maker of the ability to review records personally.  (*See* Exh. 3, Decl. of W. Orm, at ¶ 12.) Specifically, Centurion's processes for specialty referral requests are completed within eOMIS as follows:

- A Centurion facility provider enters a request for an outside specialty consult into eOMIS. Utilization Management Department members review the request in eOMIS and have the entire patient's medical record available for further review while they evaluate the request.  This permits the Utilization Management Department to understand the full background of the patient's history. (*Id*. at ¶ 14.)

- The Utilization Management team uses the TrueCare system—which houses all of the McKesson InterQual clinical criteria—to ensure that decisions are made uniformly and consistently with the community standard of care. These are the same criteria used in Utilization Management decisions on behalf of Medicare, Medicaid and many private insurers. (*Id*. at ¶ 15.)

- Centurion's Utilization Management rules allow nursing staff to approve many requests without physician consultation, which not only speeds up the process, but allows the Utilization Management Physician to focus on more complex cases. (*Id*. at ¶ 16.)

- All actions pertaining to outside consultation approval are entered and tracked in real time in the eOMIS system, including but not limited to: (1) when a provider requested a consultation request; (2) when the Utilization Management Department viewed the request; (3) the decision of the Utilization Management Department and when it was issued; (4) who is assigned to schedule the consult after approval; (5) the date and time of the scheduled appointment; (6) the recommendations of the outside specialist; and, (7) the follow-up actions of the facility provider based upon the specialist's recommendations. Only when all steps have been completed, is the request marked complete in eOMIS. (*Id*. at ¶ 17.)

- In the event that the Utilization Management Department requests more information or suggests an Alternative Treatment Plan ("ATP"), such requests are made directly in eOMIS and the provider is notified of the request or ATP in real-time. (*Id*. at ¶ 18.)

Because Centurion's UM process is completed inside of eOMIS, Dr. Stern's recommendation has already been implemented.

## **CONCLUSION**

Based upon the foregoing, Defendants agree, conditionally agree, or a have already addressed Dr. Stern's recommendations as set forth herein. Since the inception of the ADCRR–Centurion partnership, Defendants and Centurion have demonstrated their combined commitment to achieving complete Stipulation compliance. This is evidenced by Centurion's November and December 2019 compliance rates. Defendants request the opportunity for Director Shinn and Centurion leadership to address the Court to answer any questions and further detail their commitment to reaching and sustaining full compliance with the Stipulation.

DATED this 28th day of February, 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/Rachel Love
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on February 28, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

3

4

Alison Hardy:          ahardy@prisonlaw.com

5

Amelia M. Gerlicher:   agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

6

7

Amy B. Fettig:         afettig@npp-aclu.org

Asim Dietrich:         adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

8

9

Corene T. Kendrick:    ckendrick@prisonlaw.com; edegraff@prisonlaw.com

10

Daniel Clayton Barr:   DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

11

12

David Cyrus Fathi:     dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:        dspecter@prisonlaw.com

13

John Howard Gray:      jhgray@perkinscoie.com; slawson@perkinscoie.com

14

Jose de Jesus Rico:    jrico@azdisabilitylaw.org

15

Maya Abela            mabela@azdisabilitylaw.org

16

Rose Daly-Rooney:      rdalyrooney@azdisabilitylaw.org

17

Sara Norman:           snorman@prisonlaw.com

18

Rita K. Lomio:         rlomio@prisonlaw.com

19

Eunice Cho             ECho@aclu.org

20

Jared G. Keenan        jkeenan@acluaz.org

21

Casey Arellano         carellano@acluaz.org

22

23

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

24

25

N/A

26

/s/Rachel Love

27

28

27