**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| David Shinn, et al., | |
| Defendants. | |

As required by the Court's February 12, 2020, Order, the parties have submitted a joint statement regarding several issues. (Doc. 3507). Defendants have also submitted a separate statement outlining their positions on Dr. Stern's systemic recommendations. (Doc. 3512).

**I. Establishment of Open Clinic**

The parties were asked to provide their positions regarding the reimplementation of an open clinic model for providing healthcare. Plaintiffs believe an open clinic model could be implemented provided certain safeguards were put in place. Defendants, however, "do not intend to re-implement the open-clinic concept at this time." (Doc. 3507 at 4). Because Defendants are not interested in pursuing the open clinic model, there is no need for further Court involvement on this issue. If in the future Defendants wish to implement an open clinic model, they must first inform Plaintiffs and seek Court authorization.

**II. Performance Measures Requiring Prisoners be "Seen"**

A number of the PMs require prisoners be "seen" by a mental health professional at specified intervals. For example, PM 73 requires that inmates with mental health needs who require outpatient treatment be "seen by a licensed mental health clinician a minimum of every 30 days." (Doc. 1185-1 at 30). The Stipulation contains three PMs (91, 94, and 95) dealing "with management of patients during or after placement on watch (due to acute psychotic or suicidal states)." (Doc. 3379 at 29). Those PMs will be referred to as the "watch-related PMs." The Stipulation also contains fifteen PMs (73, 74, 76, 78, and 80-90) that deal "with patients in non-acute chronic care." (Doc. 3379 at 29). Those PMs will be referred to as the "non-watch-related PMs."

Defendants previously interpreted the "seen" requirement as permitting visits of *any* length. Thus, "very short mental health visits (some as short as 5, 3, or 2 minutes)" were being conducted and counted as compliant with the PMs. (Doc. 3379 at 28). After evaluating the monitoring process and extensive mental health records, Dr. Stern opined that "the quality of care delivered during *short visits did, in some cases, pose a significant risk of serious harm*," and he proposed a revised two-step protocol to assess compliance going forward.

> In the first step, monitors would apply a 10-minute cutoff: any visit with no visit time recorded, or a visit time of 10 minutes or greater is compliant with regard to "seen." Any visit with a recorded time of less than 10 minutes would then be subjected to a second step: a clinical review of the visit in the context of the patient's overall management to determine if the visit length were appropriate.

In proposing this 10-minute cutoff, Dr. Stern noted Defendants had argued there should be a "shorter cutoff than 10 minutes for watch-related" PMs. (Doc. 3379 at 32 n.25). Dr. Stern believed there was "some merit" to Defendants' position but concluded the 10-minute cutoff was an appropriate "conservative" approach for watch-related PMs. (Doc. 3379 at 32 n.25). Dr. Stern also noted, however, that he "would expect encounters in the non-acute setting when chronic care is being provided to generally be longer (in the range of 30 to 60 minutes)." (Doc. 3379 at 32 n.25). In other words, Dr. Stern believed the non-

1    watch-related PMs might merit a longer cutoff than 10 minutes.

2    Defendants responded to Dr. Stern's proposed two-step protocol by arguing *any* time limit would be unfair. (Doc. 3379 at 34). As for Plaintiffs, they seemed to agree with the proposed 10-minute cutoff but objected to any visit without a recorded duration being counted as compliant. (Doc. 3379 at 33 n.27). In the February 12, 2020, Order, the Court "reject[ed] the notion that a visit of *any* length, no matter how short, is contemplated by these PMs." (Doc. 3495 at 8). The Court concluded "[t]he only rational reading of the Stipulation is that to be 'seen' requires a meaningful interaction between the prisoner and the mental health professional." (Doc. 3495 at 8). The parties were directed to confer and submit proposals for the correct interpretation of "seen." The parties were unable to agree on an interpretation and they have submitted competing proposals.

    Plaintiffs believe the Court should interpret "seen" as imposing a 10-minute minimum for watch-related PMs and a 30-minute minimum for non-watch-related PMs. (Doc. 3507 at 5). Plaintiffs further propose that only "extraordinary circumstances" would justify visits of shorter duration. Plaintiffs request any visits shorter than the presumptive minimums be documented and explained. As for Defendants, they have abandoned their position that visits of any length are automatically sufficient. Instead, Defendants propose a single protocol for both watch-related and non-watch-related PMs. Defendants propose any visit that is "documented to have occurred for more than ten minutes" be deemed compliant. (Doc. 3507 at 8). If a visit is "less than ten minutes, a mental health clinician shall exercise clinical judgment to determine if the length was meaningful and appropriate in the context of the patient's overall care." (Doc. 3507 at 8).

    Despite their purported disagreement, the parties actually agree that for the watch-related PMs, there should be a 10-minute minimum. Thus, for those PMs, the parties must comply with Dr. Stern's proposed 10-minute protocol. The Court rejects Plaintiffs' request to go beyond Dr. Stern's recommendations and require shorter visits be deemed acceptable only under "extraordinary circumstances."

    The Court also rejects Plaintiffs' request that Defendants "track and report" visits

that are less than the minimum and that Defendants be required "to implement a plan to reduce the number of mental health encounters with patients on watch that are conducted at cell-front to no more than 10% of the total number of such encounters." (Doc. 3507 at 6). While such reduction likely would be preferable, there is no requirement in the Stipulation for such action.

As for the non-watch-related PMs, the dispute is whether the same 10-minute minimum should be utilized or if the Court should impose a 30-minute minimum. As noted previously, Dr. Stern stated that he would expect the length of visits for these PMs to be "in the range of 30 to 60 minutes." (Doc. 3379 at 32 n.25). In connection with their supplemental statement, the parties submitted competing expert opinions on this issue. (Doc. 3511 at 4) (Plaintiffs' expert believes for non-watch-related PMs "30 minutes is the minimum acceptable duration"); (Doc. 3508-1 at 134-35) (Defendants' expert believes there can be "no bright line rule setting a minimum or maximum amount of time" and "[i]n many instances, the amount of time needed to assess a patient is no more than two minutes").

The Court agrees with Dr. Stern that, for the non-watch PMs, visits should generally be longer than 10 minutes. This conclusion is informed by the extended lengths of time between visits in many of the non-watch-related PMs. For example, PM 81 requires certain prisoners be "seen" every 90 days. For those prisoners, the Court is skeptical that a 10-minute visit every three months is what the parties intended for prisoners who are prescribed psychotropic medications. Therefore, the Court will impose a 30-minute minimum for the non-watch-related PMs. In doing so, it is important to stress that the 30-minute minimum does not prohibit shorter visits. Rather, it merely requires that visits of less than 30 minutes be evaluated by a mental health clinician to determine whether "the length was meaningful and appropriate in the context of the patient's overall care."[1] Thus, if Defendants' expert is correct that a two-minute visit every 90 days is clinically appropriate for a particular prisoner, that visit can be deemed compliant.

---

[1] The mental health clinician who evaluates these visits but not be the same individual who conducted the visits.

For purposes of re-auditing past results, the parties should comply with Dr. Stern's recommended protocol, using a 10- or 30-minute minimum as appropriate. Retrospectively, visits where no length was recorded may be counted as compliant with the appropriate minimum. In the future, however, visits without a length recorded should be deemed non-compliant with the minimum length requirement and proceed to the clinical evaluation step.

**III. Performance Measure 25**

PM 25 requires "[a] first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency." As previously explained by the Court, Dr. Stern recommended this PM be retired because the parties could not agree on what would qualify as an "emergency" and how the adequacy of a response should be measured. The Court directed the parties to confer, believing they could reach some agreement regarding the proper interpretation. They were unable to do so.

Plaintiffs now propose the Court require the parties to work with Dr. Stern to craft guidelines for monitoring this PM. Defendants counter that PM 25 should be "retired" because of the "significant challenges (and in some instances, impossibility) in monitoring compliance." (Doc. 3507 at 10). Alternatively, Defendants propose PM 25 be "modified" to include different language, focusing solely on determining whether CPR was performed or if a bleeding wound was "contained." (Doc. 3507 at 12).

The Court is at a loss to understand the basis for Defendants' position. For years Defendants have insisted that the Court must remain focused on the precise language of the Stipulation and can only enforce that specific language, even when it is antithetical to the purpose of the Stipulation. (*See, e.g.*, Doc. 3495 at 15) (discussing PM 32 that allows for mortality review years after a death but, pursuant to Defendants' request, refusing to modify it to make it useful to prevent future deaths). Now, however, Defendants propose the Court either "retire" an inconvenient PM or unilaterally alter the language of the PM to better suit Defendants' current practices. Unless Defendants wish to concede that the Court has the power to modify the Stipulation to better align with a perceived reality, the Court

simply lacks the authority to do what they request.

Accepting that PM 25 cannot be "retired" or modified for Defendants' benefit, the Court must employ its own interpretation. Therefore, for purposes of PM 25, the term "emergency" includes every Incident Command System alert where medical attention was provided or should have been provided. And "adequately provides care" requires a qualitative analysis of the actions taken by the responding staff. Each incident selected for monitoring must be reviewed by a "Qualified Health Care Professional" ("QHCP") as defined in the Stipulation who was not involved in the initial response. The QHCP must evaluate the actions taken by the responding staff and determine whether those actions were medically appropriate.

**IV. Performance Measure 44**

The Court also instructed the parties to confer regarding appropriate monitoring of PM 67 (involving monitoring of prisoners in the infirmary). Defendants now agree with Dr. Stern's original recommendation. Therefore, PM 67 must be monitored using the methodology recommended by Dr. Stern. (Doc. 3379 at 61).

**V. Spreadsheet of Remaining PMs**

Hoping to focus on the PMs still at issue, the Court directed the parties to prepare a spreadsheet indicating which PMs had been terminated and which remain pending. The parties were unable to produce a fully agreed-upon spreadsheet. (Doc. 3508-1 at 69). But they did produce a spreadsheet that shows the parties agree to the termination of additional PMs. Pursuant to the parties' agreement, the Court will terminate monitoring for PM 6, PM 9, PM 10, PM 17, PM 28, PM 29, PM 79, PM 96, PM 99, and PM 101 at all ten ADC Complexes. The Court will also terminate monitoring for PM 61 at Perryville and Phoenix. (Doc. 3507 at 14-15). The parties will be required to update and file a revised spreadsheet reflecting *only* the PMs that have been terminated and those that have not.

**VI. Defendants' Positions Regarding Systemic Recommendations**

As required, Defendants have addressed Dr. Stern's systemic recommendations. (Doc. 3512). Plaintiffs will be given the opportunity to respond to Defendants' positions.

Plaintiffs response should address whichever portions they wish but Plaintiffs must address, in particular, the following two items.

- Defendants request the Court use the $1.445 million in prior sanctions, as well as any future monetary sanctions, to fund "a root cause analysis for non-performing HCPMs as well as a system-wide staffing analysis." (Doc. 3512 at 10). Would that be a proper use of the monetary sanctions?
- An overarching theme in recent filings by Defendants is their position that recent numbers show they have been "in compliance with nearly 93% of the remaining 852 Stipulation Performance Measures." (Doc. 3512 at 3). Defendants seem to believe a 93% compliance rate means their performance is acceptable. Could the Court conclude the Stipulation should be rescinded if the 93% compliance rate is accurate?

Accordingly,

**IT IS ORDERED** Defendants shall monitor Performance Measures 73, 74, 76, 78, 80-90, 91, 94, and 95 using the protocols set forth above.

**IT IS FURTHER ORDERED** Defendants shall monitor Performance Measure 25 using the protocol set forth above.

**IT IS FURTHER ORDERED** Performance Measure 67 must be monitored using the methodology recommended by Dr. Stern.

**IT IS FURTHER ORDERED** no later than **March 27, 2020**, the parties shall file an updated version of the spreadsheet reflecting the PMs that have been terminated and those that remain pending.

**IT IS FURTHER ORDERED** no later than **March 27, 2020**, Plaintiffs shall respond to Defendants' position statement as directed herein (Doc. 3512). Defendants may file a reply no later than **April 3, 2020**.

Dated this 11th day of March, 2020.

Honorable Roslyn O. Silver
Senior United States District Judge