Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
       carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **PLAINTIFFS' EMERGENCY MOTION REGARDING DEFENDANTS' PREVENTION, MANAGEMENT, AND TREATMENT OF COVID-19** <br><br> **(Expedited Briefing and Telephonic Status Hearing Requested)** |

Plaintiffs respectfully request that the Court order Defendants to collaborate with Dr. Marc Stern, the Court's expert, to immediately develop and implement a plan for the prevention and management of COVID-19 in the State's prisons. Plaintiffs ask that the Court expedite the deadline for responsive briefing, if any, from Defendants, and that the Court set this matter for a telephonic status hearing as soon as practicable, in accord with Paragraph 5 of General Order 20-10, *Court Operations Under the Exigent Circumstances Created by Coronavirus Disease (COVID-19).*[1] A proposed order is attached.

**Factual Background**

"On March 11, 2020, the World Health Organization announced that the COVID-19 outbreak can be characterized as a pandemic, as the rates of infection continue to rise in many locations around the world and across the United States." Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ ("Proclamation on Declaring a National Emergency"). Also on March 11, Arizona Governor Doug Ducey declared a statewide state of emergency, under Ariz. Rev. Stats. § 26-303(D) and § 26-301(15). [*See* "Declaration of Emergency," *available at* https://azgovernor.gov/sites/default/files/declaraton_0.pdf] In his declaration, Governor Ducey noted that "COVID-19 poses a serious public health threat for infectious disease spread to Arizona residents and visitors if proper precautions recommended by public health are not followed;" "the spread of COVID-19 can lead to severe respiratory illness, disease complications, and death for Arizona residents, particularly those with underlying medical conditions or the elderly," and "it is necessary and appropriate to take action to ensure the spread of COVID-19 is controlled and that the residents of Arizona remain safe and healthy." *Id.* The same day, he issued an executive order stating that "it is important to institute enhanced protections at facilities that treat and house populations most at risk

---

[1] *See* http://www.azd.uscourts.gov/sites/default/files/general-orders/20-10.pdf.

if they contract COVID-19." *See* Exec. Order 2020-07, "Proactive Measures to Protect Against COVID-19," https://azgovernor.gov/sites/default/files/eo_2020-07.pdf. Two days later, President Trump declared a national emergency, noting that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's healthcare systems." Proclamation on Declaring a National Emergency.

Plaintiffs' counsel visited Arizona State Prison Complex ("ASPC")-Florence on March 11 and 12, 2020, for a previously scheduled monitoring visit. The visit confirmed that current conditions in Arizona's prisons, and Defendants' inadequate planning, will foster the spread of the virus. Plaintiffs' counsel met with Defendant Pratt, counsel for Defendants and Centurion, and facility health administration at ASPC-Florence on March 12, and discussed COVID-19 and the facility's (and department's) planned response. [*See* Declaration of Corene Kendrick ("Kendrick Decl."), ¶¶ 11-15, filed herewith; Declaration of Rita Lomio ("Lomio Decl."), ¶¶ 17-24, filed herewith]. ADC and its health care contractor Centurion had no articulable plan for managing and preventing the spread of the virus. [Kendrick Decl. ¶¶ 11-12, 15; Lomio Decl. ¶¶ 17-24] On March 14, 2020, Plaintiffs' counsel notified Defendants by letter of ADC's failure to plan for COVID-19. Kendrick Decl., Ex. 1. The letter indicated that Plaintiffs would seek the Court's assistance and an order, and noted:

> **We are extremely concerned that ADC and Centurion were unable to describe any plans to address the pandemic or to protect and treat the many elderly and ill patients in the prison beyond stating that they planned to come up with a plan.** The tens of thousands of people in ADC custody are highly vulnerable to outbreaks of contagious illnesses, and the risk here is only heightened by the unsanitary conditions in the prisons, failure to take strong and sensible precautionary measures, and the already inadequate medical staffing and treatment. We are deeply concerned that when COVID-19 enters the Arizona prison system, our clients will suffer unnecessary pain and death. **Failure to address COVID-19 in the state's prisons also threatens the community at large, as thousands of correctional, health care, and other staff interact with the incarcerated population every day, and then return to their homes and communities.**

*Id*. at 1 (emphasis in original). The letter attached a five-page memorandum that Dr. Stern provided to the Washington Association of Sheriffs and Police Chiefs with his suggestions on how to manage COVID-19 in the state's jails, based on current recommendations of

the Centers for Disease Control ("CDC").  *See id*. at Ex. A to Ex. 1.

Plaintiffs' counsel requested that Defendants create and implement an "appropriate, evidence-based, substantive, and detailed plan [that] can help prevent an outbreak, minimize its impact if an outbreak does occur, and contribute to broader efforts in the state and the country to 'flatten the curve' of the outbreak." Kendrick Decl., Ex. 1 at 2.[2] Plaintiffs' counsel indicated that components of such a plan include but are not limited to:

- Patient education;
- Screening, testing, treatment, and housing of class members;
- Provision of hygiene and cleaning supplies;
- Health care and custody staffing plans; and
- Coordination with community hospitals and among the ten prison institutions.

*Id*., Ex. 1 at 3-11.  As of the time of the filing of this motion, Plaintiffs' counsel has not received a response to this letter.  Kendrick Decl., ¶ 18.

Among other things, the letter detailed the following:

- ASPC-Florence facility health administration and Defendant Pratt indicated that they had not yet developed a plan to address COVID-19.  Defendant Pratt – who is the highest ranking official at ADC with job duties related to the provision of health care to incarcerated people – stated that he not yet seen any information or guidance from the Arizona Department of Health Services regarding outreach to incarcerated people and staff regarding the management and prevention of COVID-19. [Kendrick Decl., Ex. 1 at 1-2; *see also id*. ¶ 15;

---

[2] *See also* Jennifer Gonnerman, *How Prisons and Jails Can Respond to the Coronavirus*, THE NEW YORKER, March 14, 2020, *available at* https://www.newyorker.com/news/q-and-a/how-prisons-and-jails-can-respond-to-the-coronavirus (hereinafter "Dr. Venters interview") (Q&A with Dr. Homer Venters, epidemiologist and former chief medical director at Rikers Island jail: "All of the new terms of art that everybody has learned in the last two weeks, like 'social distancing' and 'self-quarantine' and 'flattening the curve' of the epidemic—all of these things are impossible in jails and prisons, or are made worse by the way jails and prisons are operated. Everything about incarceration is going to make that curve go more steeply up. [. . .] To the extent that we don't do a good job in jails and prisons, we will certainly prolong the life of this outbreak.").

1  Lomio Decl., ¶ 19]

2  • The Florence site medical director – who started in this position in December
3  2019, and said he had not previously worked for Centurion or in a prison setting
4  – offered a series of uninformed, flippant, and implausible comments about
5  COVID-19 and medically fragile patients' use of hygiene supplies, including
6  that these severely disabled patients had hidden "contraband" soap, towels, and
7  washcloths in the housing unit's ceiling panels. [Kendrick Decl. Ex. 1 at 2, 8
8  ("They say this thing will die by itself," "We have people with dengue and we
9  don't treat that," and "The first case was not in China, it was in Germany."); *see*
10  Lomio Decl. ¶¶ 20, 22; Kendrick Decl. ¶¶ 13-14]

11 • Plaintiffs' counsel observed dirty and unventilated dorms, tents, and Quonset
12  huts that housed elderly and/or medically frail people with chronic health
13  conditions and multiple disabilities. [Kendrick Decl., Ex. 1 at 2; *id.* at ¶¶ 3-4,
14  8-9, 16; (describing conditions inside Central Unit's infirmary, HU-8, HU-10,
15  and East Unit's Quonset huts); Lomio Decl., ¶ 6 (describing conditions at South
16  Unit's dormitories); Declaration of Maya Abela ("Abela Decl."), ¶¶ 9-10, 12-14
17  (observing no soap dispensers or soap in North Unit bathrooms in the housing
18  units and squalid conditions in tents with leaking roofs); Declaration of Amy
19  Fettig ("Fettig Decl."), ¶ 4 (describing the filthy cells of seriously mentally ill
20  people in Kasson Unit's mental health unit)][3]

21 • Inadequate and incomplete education materials for incarcerated people and
22  staff, with class members reporting that the only knowledge they had of
23  COVID-19 was courtesy of television or word-of-mouth rumors on the prison
24  yard. [Kendrick Decl. Ex. 1 at 3; *id.* at ¶¶ 5-6, 8-10, 16-17; Lomio Decl. ¶ 3;
25  Abela Decl. ¶¶ 3, 15; Fettig Decl. ¶ 6][4]

---

[3] At Plaintiffs' counsel's request, photos were taken of these conditions by Defendants' staff, but have not yet been provided to Plaintiffs' counsel.

[4] *See also* Dr. Venters interview ("People still are going to be watching T.V. So they watch T.V., and they hear about the importance of hand-washing, but there is no soap

-4-

- The senior Assistant Director of Nursing ("ADON") reported that she and other health care staff had not yet received training on how or when to use the screening instrument, but the FHA stated it would be used starting Monday, March 16, 2020. [Kendrick Decl. Ex. 1 at 5; Abela Decl. ¶ 4; Lomio Decl. ¶¶ 8, 10, 18] Plaintiffs' counsel requested a copy of the screening instrument while on-site and have not yet received it. [Lomio Decl. ¶ 8]

- Incarcerated people reported that they were not provided any disinfectant cleaning supplies to clean their cells or personal bed space, but rather were told to use their personal supplies of shampoo or soap to clean hard surfaces. [Kendrick Decl. Ex. 1 at 5; *id.* ¶¶ 6, 8, 10, 16; Abela Decl. ¶¶ 9-10; Fettig Decl. ¶ 5][5] All class members, including indigent people, must pay for soap and basic hygiene supplies, pursuant to an order issued by Defendant Shinn in October 2019 that all supplies provided to indigent class members will be charged to their inmate trust accounts. [Kendrick Decl. Ex. 1, at 5-7; *see also id.*, Ex. C of Ex. 1] Such a policy predictably results in class members declining to order basic hygiene supplies as simple—and as critical to public safety—as a bar of soap. Incarcerated people in Arizona's prisons – if they are lucky enough to have a job – are paid pennies an hour (before mandatory deductions are taken out of their pay).[6] Plaintiffs' counsel requested that the department suspend this policy change. [Kendrick Decl. Ex. 1 at 8]

---

for them. They hear about the importance of going to the hospital or the doctor when you have certain symptoms, but that is not available to them. That level of hypocrisy or double standard is really fodder for serious chaos behind bars.").

[5] This is not the first time that class members have reported to counsel that they are reduced to using their personal supplies of shampoo and soap to clean their cells or bed area in dorms. *See, e.g.,* Doc. 3508-1 at 41 (report from December 2019 monitoring visit to ASPC-Eyman) ("[P]eople at 1-Baker and 4-Alpha reported that they were not provided any cleaning supplies for their cells and they had to use hygiene products such as bars of soap or shampoo to clean their cells.").

[6] In the Arizona prison system, someone designated as "functionally illiterate" can make only 10 cents per hour. *See* Ariz. Dep't of Corr., Department Order 903: Inmate Work Activities § 903.2.5.1 (rev. Feb. 24, 2018), https://corrections.az.gov/sites/default/files/policies/900/0903_032519.pdf.

-5-

- Class members at a medical housing unit at Florence-Central reported that the night before Plaintiffs' counsel visit, their housing unit was aggressively searched and all soap, towels, and washcloths deemed to be "in excess of what you need" were confiscated by ADC officers, even when those items had been provided by medical staff, which class members interpreted to be a threatening / retaliatory action for speaking with Plaintiffs' counsel the following day. [Kendrick Decl. Ex. 1 at 7; *id*. ¶ 3].[7]

- ADC has designated as contraband any hand sanitizer that contains ethyl alcohol, and historically has prohibited staff and visitors from possessing or bringing alcohol-based hand sanitizer into the prisons. [Kendrick Decl. ¶ 2][8] Plaintiffs' counsel observed on March 11, 2020 (and had photographs taken, which have not yet been provided by Defendants, of) a hand sanitizer station in the North Unit clinic, that was clearly labeled with a Post-It note on it stating "Out." [Lomio Decl. ¶ 12; Abela Decl. ¶ 7] The Assistant Director of Nursing said she thought that was the only sanitizer station in the clinic. [Lomio Decl. ¶ 12] This clearly endangers the well-being of health care staff, custody staff, and patients in the clinic. At ASPC-Douglas, Defendants admit that there has been intermittent access to running water in recent months, because the well

---

[7] These threatening actions are paradigmatic examples of the Court's past concern that Defendants' employees' actions threatened and/or chilled class members' abilities to communicate with class counsel and / or the Court. [*See, e.g*. Doc. 1734 and 2209]

[8] The Centers for Disease Control advises that

[I]f soap and water are not available, using a hand sanitizer with at least 60% alcohol can help you avoid getting sick and spreading germs to others. [. . .] Many studies have found that sanitizers with an alcohol concentration between 60–95% are more effective at killing germs than those with a lower alcohol concentration or non-alcohol-based hand sanitizers. Hand sanitizers without 60-95% alcohol 1) may not work equally well for many types of germs; and 2) merely reduce the growth of germs rather than kill them outright.

Centers for Disease Control, *Show Me the Science – When & How to Use Hand Sanitizer in Community Settings*, available at https://www.cdc.gov/handwashing/show-me-the-science-hand-sanitizer.html.

that supplies water to most of the prison was contaminated. [Kendrick Decl. Exs. 3-4 (Feb. 13, 2020 letter from Plaintiffs' counsel to ADC attorneys and Mar. 9, 2020 response)][9]

- Class members also reported to Plaintiffs' counsel during the ASPC-Florence monitoring visit that the mandatory $4 co-pay charged to them every time they seek health care via a Health Needs Request ("HNR") was a major disincentive to seeking care. [Kendrick Decl. ¶ 17 and Ex. 1 at 5]  If someone is being paid 10 cents an hour, a $4.00 copay is the equivalent of 40 hours' worth of work.[10]  Plaintiffs' counsel requested in their March 14, 2020 letter that ADC follow the lead of other states and discontinue all or some co-pays. [*See* Kendrick Decl. Ex. 1 at 5 (As of Mar. 13, 2020, "Alabama, Maine, and Connecticut are temporarily suspending all medical co-pays. Minnesota, Florida, Pennsylvania, and Georgia are suspending copays for flu and COVID-19–related symptoms. California ended all copays in 2019, which was subsequently codified in state statute.")][11]

- Plaintiffs' counsel requested Defendants' COVID-19 plan address how prison operations and health care services will continue to operate, when staff stay home because they are sick, in self-quarantine, or caring for family members.

---

[9] The Ninth Circuit has held that an adequate supply of clean water is essential for the basic human needs of incarcerated people. *See Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000) (lack of drinking water contributed to Eighth Amendment violation).

[10] "Inmates are almost always in an 'indigent' mode.  They seldom have outside resources and most have no source of income while incarcerated.  They most often rely on a spouse, mother, or other family member to provide funds they can use for toiletries, over-the-counter medications like analgesics and antacids, telephone calls, writing paper and pens, sanitary napkins, candy, etc.  These 'extras' become extremely important to one who is locked up 24 hours per day.  The inmate may well choose to forgo treatment of a medical problem in order to be able to buy the shampoo or toothpaste." Nat'l Comm'n on Corr. Health Care, Charging Inmates a Fee for Health Care Services (Oct. 2012), http://www.ncchc.org/charging-inmates-a-fee-for-health-care-services.

[11] Under Ariz. Rev. Stat. § 26-307(A), "a state agency, when designated by the Governor, may make, amend and rescind orders, rules and regulations necessary for emergency functions."  March 11, 2020 Declaration of Emergency, *available at* https://azgovernor.gov/sites/default/files/declaraton_0.pdf.

-7-

[Kendrick Decl. Ex. 1 at 9][12] This is of the gravest importance, and is only exacerbated by the fact that Defendants and their contractor are already profoundly understaffed. Defendants recently reported to the Legislature that the department is suffering from a statewide shortage of custody officers, with a statewide vacancy rate of 19.9% of officers, including a vacancy rate of 38.5% at ASPC-Eyman and 32.3% at ASPC-Florence. [*See* Jt. Legis. Budget Comm., 54th Legis., Second Quarter Officer Staffing Report (Dec. 11, 2019) at 2, https://www.azleg.gov/jlbc/jlbcag121119rev2.pdf]

- Defendants and their contractor likewise suffer from widespread shortages of health care staff at multiple prisons across the state. [Kendrick Decl. Ex. 2 (ADCM1600190-1600200, Jan. 3, 2020 staffing report)] This is the most recent version Defendants have provided. [*Id*. ¶ 19]
    - At ASPC-Douglas, there is no medical director. [Kendrick Decl. Ex. 2, at ADCM1600191]
    - At ASPC-Eyman, there are 30 vacant health care positions prison-wide, with only half of the Full Time Equivalent ("FTE") Registered Nurse ("RN") positions filled. [*Id*. at ADCM1600192; *see also* Doc. 3508-1 at 5-25 (December 2019 monitoring report detailing the staggering impact of health care staff shortages on ASPC-Eyman's ability to run basic functions such as nurse's line, insulin administration, provider's line, medication distribution, and response to emergencies)].
    - At ASPC-Florence, the Facility Health Administrator reported to

---

[12] On March 15, 2020, Gov. Ducey ordered closed all K-12 schools in the State from March 16-27, 2020. *See* Open Letter to Arizona Families, Educators, School Leaders, and Education Community from Gov. Doug Ducey and State School Superintendent Kathy Hoffman, *available at* https://azgovernor.gov/governor/blog/2020/03/open-letter-arizona-families-educators-school-leaders-and-education-community ("The safest place for children during this time is at home. They should not be cared for by elderly adults or those with underlying health conditions, including grandparents and other family members. [. . .] We understand many parents have questions about childcare options. It is the recommendation of public health officials that kids who are not at school remain at home to the greatest extent possible.")

Plaintiffs' counsel on March 12, 2020 that there are 10 vacant RN FTEs (which translates to 26 of 36 FTEs, or 72%, filled), and about 11 vacant Licensed Practical Nurse ("LPN") FTE positions (or 19 of 30 FTEs, or 63% filled). [Kendrick Decl. ¶ 11; Ex. 1 at 9-10]

- At ASPC-Lewis, only 111.6 of 150.0 contracted FTE staff positions, or 74%, are filled complex-wide, including 0.75 of 2.0 physician FTEs filled (37.5% filled), 17.0 of 30.0 RN FTEs filled (57% filled), 20.2 of 34.0 LPN FTEs filled (59% filled), 1.0 of 3.0 psychologist FTEs filled (33% filled), and 7.0 of 12.0 psychology associate FTEs filled (58% filled). [Kendrick Decl. Ex. 2 at ADCM1600194].

- At ASPC-Perryville, the women's prison, only 3.0 of 10.0 psychology associate FTE positions are filled (30% filled); 0.5 of 1.2 physician FTEs are filled (42% filled); 21.9 of 30.0 RN FTEs are filled (73% filled). [*Id.*, at ADCM1600195]

- ASPC-Phoenix is the main intake unit for all men committed to ADC custody, and has mental health units for the most seriously mentally ill patients. Only 7.0 of 11.0 psychology associate FTEs are filled (64%), 2.0 of 5.75 Nursing Assistant FTEs are filled (35%), and 1.0 of 3.0 Assistant Director of Nursing FTE positions are filled (33%). [*Id.*, at ADCM1600196]

- ASPC-Safford has only 2.0 of 6.0 LPN positions filled (33%). [*Id.*, at ADCM1600197]

- ASPC-Tucson has a large infirmary and specialized medical and mental health housing units. The report shows 5.0 of 8.0 Assistant Director of Nursing FTE positions filled (63%), 25.7 of 36.0 FTE RN positions filled (71%), 33.1 of 40.0 LPN FTEs filled (83%), and 6.0 / 8.0 medical midlevel practitioner FTEs filled (75%). [*Id.*, at ADCM1600198]

- ASPC-Yuma's sole staff physician position is vacant, and only 68% of

the LPN FTE positions are filled. [*Id.*, at ADCM1600200]

- Defendants' COVID-19 plan also must include close coordination across the state's ten prisons, as well as with community hospitals. It appears that as of March 12, 2020, such planning had not yet occurred. [Kendrick Decl. Ex. 1 at 11; *id.*, ¶ 12; Lomio Decl. ¶ 24] ADC has limited infirmary and medical isolation units, and in the past the department's approach to treating infectious disease outbreaks is to send incarcerated people to the harsh conditions of maximum custody units. [*See, e.g.*, Doc. 2993-1 at 24-26 and 30-32 (scabies outbreak at ASPC-Florence in the summer of 2018 resulted in an 81-year-old man and 85-year-old man with dementia who uses a wheelchair being sent to suicide watch cells in ASPC-Eyman)][13]

- Finally, in their letter, Plaintiffs' counsel requested that Defendants and Governor Ducey consider exercising his power to order the release of elderly people, persons convicted of nonviolent offenses, and rehabilitated individuals who present little or no risk to public safety, with a priority on the people who are most vulnerable and at highest risk due to age, medical condition, or disability. [Kendrick Decl. Ex. 1 at 12]

### **Argument**

"The Court need not wait until a death to require compliance with its orders." *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1022 (N.D. Cal. 2013); *see also Brown v. Plata*, 563 U.S. 493, 531-32 (2011) ("all prisoners in California are at risk so long as the State continues to provide inadequate care… in no sense are they remote bystanders in California's medical care system. They are that system's next potential victims");

---

[13] Dr. Stern recommended to Washington county sheriffs and jail administrators that they should ensure that anybody put into medical quarantine not be subjected to the harsh and punitive conditions of most administrative segregation / solitary confinement units, because "you want to do everything possible to encourage inmates to notify medical staff as early as possible if they experience symptoms of infection. Fear of being placed in an overly-restrictive cell may delay their notification, which is counterproductive." Kendrick Decl. Ex. 1, Ex. A at 5.

The Constitution is violated by conditions that pose an unreasonable *risk* of future harm, even if that harm has not yet come to pass.

> That the Eighth Amendment protects against future harm to inmates is not a novel proposition. The Amendment, as we have said, requires that inmates be furnished with the basic human needs, one of which is "reasonable safety." *DeShaney, supra,* 489 U.S., at 200, 109 S.Ct., at 1005. … It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.

*Helling v. McKinney*, 509 U.S. 25, 33–34 (1993). The Court in *Helling* specifically recognized that communicable disease could constitute such an "unsafe, life-threatening condition:"

> In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. … ***Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms***.

*Id.* at 33 (emphasis added); *see also id.* at 34 (citing with approval *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974), which held that prisoners were entitled to relief under the Eighth Amendment when they showed, *inter alia*, "the mingling of inmates with serious contagious diseases with other prison inmates").

COVID-19 has the potential to cause significant and life-threatening barriers to medical care and to Defendants' ability to comply with the Stipulation. As detailed above, Arizona's ten state-run prisons already are significantly understaffed both in terms of custody staff and health care staff. [*See supra* at 7-9] Should staff be exposed either in prison or in the community and show symptoms, they must be quarantined and/or treated, further reducing available staff to provide medical care or to facilitate such care by, for example, providing security and transportation services. [*See* Ariz. Dep't of Health Services, Coronavirus Disease 2019 (COVID-19), Healthcare Providers, Facilities, and Partners, https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-

disease-epidemiology/index.php#novel-coronavirus-healthcare-providers (last visited Mar. 15, 2020) ("If an exposed HCW [healthcare worker] develops symptoms of COVID-19, they should be restricted from patient care")] And Defendants' ability to rely on agency and as-needed medical staff may decrease as community demand for those services increases. For the same reason, the availability of community healthcare services, including for hospitalization and specialty appointments, may be substantially curtailed. [Doc. 1754 at 3-4 (ordering "Defendants to use the health care services in the community to ensure compliance with" performance measures), *aff'd*, *Parsons v. Ryan*, 912 F.3d 486 (9th Cir. 2018)] When COVID-19 arrives in the prison system, demands on healthcare services generally—including medical and custody staff—will only increase as more patients require screening, isolation, testing, and clinical management.

Adequate staffing is critical to compliance with the Stipulation. The Court appointed Dr. Stern as an expert under Federal Rule of Evidence 706, and directed him, among other things, to "evaluate causes of noncompliance and the barriers to compliance and propose written recommendations to alleviate them." [Doc. 3089 at 2] Dr. Stern concluded that, to comply with the Stipulation, "[s]taffing levels need to be increased," and noted that at least one prison was "dangerously understaffed." [Doc. 3379 at 95, 97; *see also id.* at 90 ("By far the most critical barrier to ADC's compliance with the PMs in this case is **insufficient funding** of health care services." (emphasis in original))]

That is unsurprising. Plaintiffs' experts have long explained that adequate staffing is a necessary prerequisite to compliance with the Stipulation and provision of constitutional medical and mental health care.[14] Several performance measures explicitly

---

[14] *See, e.g.*, Doc. 1539 at 5 ¶ 9 (Declaration of Todd R. Wilcox) (concluding that patients continued to be at an "unreasonable risk of harm" as a result of inadequate staffing, and some "suffer preventable deaths"); *id.* at 29 ¶ 68 ("When fragile infirmary level patients are not seen sufficiently often, many will suffer harm, and some may die."); Doc. 1104-1 at 22 ¶ 53 (Confidential Report of Robert L. Cohen, M.D.) ("Very predictably, inadequate staffing drives appointment backlogs and treatment delays."); *id.* at 16 ¶ 33 ("where corners are cut in providing medical care by having too few professional staff and an inadequate budget, patients will suffer, and sometimes die, because of systemic neglect"); Doc. 1104-2 at 12 (Expert Report of Pablo Stewart, M.D.) ("the chronic shortage of mental health staff, delays in providing or outright failure to

set staffing minimums.[15] Others address the frequency of patient encounters with medical and mental health staff.[16] Others relate to provider review of diagnostic reports, acting upon those reports, and communicating the results to patients.[17] And still others relate to nursing staff triaging and responding to Health Needs Requests ("HNRs"), which are requests for health care, and referring patients to see providers.[18] Finally, some relate to

---

provide mental health treatment, the gross inadequacies in the provision of psychiatric medications, and the other deficiencies identified in this report are statewide systemic problems, and prisoners who need mental health care have already experienced, and will experience, a serious risk of injury to their health if these problems are not addressed"); Doc. 1538-1 at 73, 80 (Third Supplemental Expert Report of Pablo Stewart, M.D.) (discussing staffing shortages that "result in needed services not being provided," including nurse's line and noting "failure of mental health treatment" that "are attributable, in whole or in part, to inadequate staffing," including "improper and dangerous practices" where "some prisoners (including those with SMI) have had their psychotropic medications simply expire with no psychiatric follow-up; others have had their medications renewed without being seen by a psychiatrist"); *id.* at 83 ("Many patients, including those with serious mental illness (SMI), have experienced extraordinarily long delays in seeing a psychiatrist, during which they were in extreme distress and/or at serious risk of suicide."); *id.* at 10 ¶ 22 ("ADC records . . . acknowledge chronic shortages of mental health staff, and explicitly link these shortages with ADC's failure to comply with the mental health Performance Measures.").

[15] **PM 1** ("Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week."); **PM 2** (Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour[s] and on-call at all other times."); **PM 3** ("Dental staffing will be maintained at current contract levels—30 dentists."); **PM 4** ("Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries.").

[16] *See, e.g.*, **PM 54** ("Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place."); **PM 66** ("In an IPC, a Medical Provider encounters [sic] will occur at a minimum every 72 hours."); **PM 80** ("MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician."); **PM 85** ("MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications."); **PM 92** ("MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days."); **PM 93** ("Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody."); **PM 94** ("All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse.").

[17] *See, e.g.*, **PM 46** ("A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison."); **PM 47** ("A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request.").

[18] *See, e.g.*, **PM 37** ("Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same

-13-

the timely provision and renewal of medication.[19]

This Court previously has ordered Defendants to produce a plan when there was a potential disruption in provision of healthcare services—namely, when Centurion of Arizona, LLC, replaced Corizon, Inc., as the correctional healthcare service provider. [Doc. 3234 at 1 ("This is a substantial transition that requires advance coordination to ensure ADC's 33,000 prisoners receive continuity of care, particularly concerning provision of prescription medication, specialty consultations, diagnostic testing, and necessary emergency treatment. . . . The Court agrees that planning is necessary to ensure that health care and compliance with the Stipulation is continued unabated.")] Nonetheless, by Defendants' own admission, the transition resulted in an inability to comply with the terms of the Stipulation.[20] COVID-19 poses a threat of far greater magnitude. Therefore, the Court expert should review Defendants' plan and ensure that it is appropriate.

## **Conclusion and Prayer for Relief**

There is a real and immediate risk that class members incarcerated in Arizona prisons will die or suffer serious medical injuries due to Defendants' failure to prepare for the COVID-19 pandemic. ADC and Centurion to date have exhibited no interest in

---

day if identified as having an urgent need)."); **PM 39** ("Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointments [sic] will be seen within fourteen calendar days of the referral."); **PM 98** ("Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0.").

[19] *See, e.g.*, **PM 11** ("Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT."); **PM 13** ("Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication."); **PM 14** ("Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication.").

[20] *See, e.g.*, Doc. 3501 at 275 ("**Basis for Noncompliance**: . . . [T]here are providers that provided services prior to the transition who will no longer provide services to the inmate population without a contract in place."); *id.* at 291 (same); *id.* at 298 (same); *id.* at 290 ("**Basis for Noncompliance**: Due to the transition, there was a period of time that routine referrals could not be processed at the request of the outgoing contractor."); *id.* at 299 ("**Basis for Non-Compliance:** Due to the transition, the demand outpaced available resources in processing consult referrals and finding offsite specialists to see the inmates.").

preparing for the tsunami that already is in the community and may soon crash through the prison gates (if it is not there already), swamping the department and its contractor's ability to respond and protect the lives of those in its custody.

The Court should order Defendants to take this problem seriously and take all appropriate actions to protect class members. In particular, the Court should order Defendants to collaborate with Dr. Stern, a correctional healthcare expert, to immediately develop and implement a plan for the prevention and management of COVID-19 in the State's prisons. Specifically, the plan should include the following components:

1. Patient education;
2. Screening, testing, treatment, and housing of class members;
3. Provision of hygiene and cleaning supplies;
4. Health care and custody staffing plans;
5. Coordination with community hospitals and among the ten prisons; and
6. Reduction in the density of the population for class members who are high risk according to the standards set forth by the CDC.

Plaintiffs ask that the Court order Defendants to file this plan with the Court no later than March 20, 2020, and order Dr. Stern to submit a statement on March 23, 2020, setting forth his opinion of whether Defendants' plan is adequate to address the issues raised by COVID-19.

Additionally, Plaintiffs request that the Court immediately order Defendants to suspend all Department orders, policies, and/or regulations that:

1. Charge class members for hygiene supplies including soap;
2. Charge class members $4.00 for submitting a Health Needs Request seeking medical care;
3. Designate ethyl-alcohol based hand sanitizer as contraband.

Such suspension of these financial charges and restrictions on sanitizers should be immediately communicated to class members via public address announcements in all housing units and yards and visible postings in English and Spanish in all housing units,

medical clinics, dining and programming spaces. Class members incarcerated in maximum custody, detention, and watch units should be provided individual written and verbal notification in English and Spanish.[21] Defendants should submit an affidavit no later than March 27, 2020, certifying that such notification occurred at all ten prisons.

A proposed order is attached.

Respectfully submitted,

Dated: March 16, 2020

**PRISON LAW OFFICE**

By: s/ Corene T. Kendrick
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene T. Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
afettig@aclu.org
echo@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

---

[21] Persons who do not speak English or Spanish fluently should have the notification in their primary language. This should include deaf persons who rely upon American Sign Language.

Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:   jkeenan@acluaz.org
             carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
             agerlicher@perkinscoie.com
             jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: __s/ Maya Abela__
Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:   rdalyrooney@azdisabilitylaw.org
             jrico@azdisabilitylaw.org
             mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington St., Ste. 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
 Email:   adietrich@azdisabilitylaw.com

*Attorneys for Arizona Center for Disability Law*

-17-

**CERTIFICATE OF SERVICE**

I hereby certify that on March 16, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com

*Attorneys for Defendants*

s/ C. Kendrick