Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and
Arizona Center for Disability Law,

Plaintiffs,

v.

David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-ROS

**DECLARATION OF CORENE T. KENDRICK**

I, Corene T. Kendrick, declare:

1. I am an attorney licensed to practice before the courts of the State of California, and admitted to this Court *pro hac vice*. I am a staff attorney at the Prison Law Office ("PLO"), and an attorney of record to the plaintiff class in this litigation.

2. On March 11-12, 2020, I participated in a monitoring tour of Arizona State Prison Complex ("ASPC")-Florence, along with other attorneys and investigators employed by PLO, the Arizona Center for Disability Law ("ACDL"), the ACLU of Arizona, and the ACLU National Prison Project. Since the Court's 2015 approval of the settlement of this case, I have participated in all but two of the Plaintiffs' counsel monitoring visits, and have visited eight of the ten Arizona state prisons. In my past experience visiting Arizona prisons, visitors and staff may not bring in any alcohol based hand sanitizers such as Purell. Once, early in the tour process, I had Purell with me during a tour, and had it confiscated by prison staff. We are only permitted to bring non-alcohol based sanitizer.

**<u>Central Unit (March 11, 2020)</u>**

3. On March 11, 2020, I first visited Central Unit's Housing Unit-10, which is an outpatient medical housing unit for people with special medical needs. There are approximately 20 people who live in one giant room, dormitory style. I was joined by PLO investigator Tania Amarillas and ACDL attorney Sey In. The building was very stuffy, and staff had propped the doors at opposite sides of the room open to capture a cross-breeze. Patients said that the doors were normally closed, and that they were being opened for our benefit and for the benefit of the random Centurion and ADC staff who were following around my team. The air was stale in the building, and in various locations there was a strong smell of feces. Multiple patients reported to us that on the evening of March 10, a sergeant and a team of custody officers went through the housing unit and aggressively searched each patient's personal property (which the incarcerated people refer to as "tossing" their belongings), and confiscated any soap, towels, or washcloths in excess of one per person. Several people said that they would be willing to

make declarations attesting to this search, and everyone I spoke with said that they viewed this "tossing" as a threatening warning in anticipation of our visit. (Many of them knew of our impending visit, because either my office had written and notified them, or their private counsel had told them we were visiting). Several men seemed resigned that they would probably be subjected to additional intrusive searches after speaking with us.

4. I spoke with one patient who is undergoing cancer treatment who had a terrible case of pinkeye, which I asked custody staff to photograph. Defendants have not yet provided these photos. He told me that the pinkeye developed the previous week, and a nurse had given him a stack of washcloths, and instructed him to soak them in hot water and to apply to his eye as a compress to relieve the pain and swelling. He said that all of these washcloths were taken by the custody officers. I spoke with another man who reported that he had more than one bar of soap, but he had purchased these bars from the commissary, and they were taken from him as "excessive." The people I spoke with all denied having any sort of contraband or illegal materials in their living spaces. There were at least six men in HU-10 who were bed-ridden, including one man who appeared to be asleep or unconscious, and others said that he rarely if ever was awake. Another man was in a bed that had a tent-like system above and around him that zipped shut; he was on oxygen and IVs, and the men living on each side of him said that he was never awake and unable to eat, speak, or move. I spoke with a bedridden man who told me that he could not move in or out of bed by himself due to crippling arthritis, and that he is incontinent with both his bowels and urine. He gave off a rank smell of feces and urine, and his face did not appear to have been recently washed. Another patient Ms. Amarillas and I spoke with was a young man with debilitating terminal multiple sclerosis for whom my office has repeatedly contacted Counsel for Defendants in the past two years regarding deficiencies in his care. His wrists were tied to the sides of his bed, apparently because his involuntary tremors are so bad that he could injure himself, and he was unable to move his hands or arms, let alone get up out of bed.

5. I asked every patient who I was able to communicate with in HU-10 what, if

anything, they had been told about COVID-19 by prison or health care staff, or if they had been given educational information. They uniformly said that the only information they had about the virus was from television, or word-of-mouth from other incarcerated people or staff. One man said that a nurse told him last month to "stay away from everyone who is sick." A different man said he hoped that when COVID-19 came to the unit, that it would kill him quickly because "I don't want to live like this."

6. I spoke to the porter who works in HU-10, and he said he had not received any additional cleaning supplies or instructions on disinfecting this unit in response to COVID-19. Patients who are somewhat mobile said that they are responsible for cleaning hard surfaces around their beds and dressers, and that some staff will allow them to use disinfectant products, but other staff would not unlock the cleaning supplies, and tell them to use their soap and towels that they used for bathing to clean their living spaces.

7. After visiting HU-10, Ms. Amarillas, Mr. In, and I proceeded to the infirmary, referred to as the IPC. Facility Health Administrator ("FHA") Spencer Sego escorted us to the gate behind which there were approximately eight to ten hospital beds in one room. I asked if we needed to wear masks, because when I visited the ASPC-Tucson IPC a few weeks prior, the Tucson site medical director and nursing staff insisted that all visitors wear masks so that we did not transmit any illnesses to their infirmary patients. FHA Sego instructed the nurse on duty to find masks for us, which took a couple minutes. While we waited, I observed a half-full container of hand sanitizer in the nurses' station, which I used, and I instructed Ms. Amarillas and Mr. In to use it to sanitize their hands. I did not see any of the attorneys, custody, or health care staff, who were following us use the sanitizer. As we waited for masks, FHA Sego asked me if I had medical concerns that I might contract an illness from one of the patients in the infirmary. While I felt it was inappropriate to share my medical history, or that of my loved ones with him, I told him that while I am generally healthy, I was concerned that I or one of my colleagues might inadvertently transmit an illness to one of the sick patients, and thus I felt it was responsible for us to wear masks. Ms. Amarillas, Mr. In, and I put on

protective masks before going in the IPC. I did not see any of the facility staff, attorneys for Centurion and ADC, or the other people following us put on a mask. Nor were any of the health care staff in the IPC who I encountered while within it wearing a mask.

8. While in the infirmary, we were told that there were three cells designated as "neutropenic" isolation rooms. I asked if these were negative pressure rooms, such as those needed to isolate people with tuberculosis, and FHA Sego said they were not negative pressure rooms. He indicated that these are the only medical isolation cells within the infirmary and/or prison. I spoke to one class member in one of the three cells, who has leukemia, just finished chemotherapy, and is profoundly immunocompromised. He gave me permission to share his story with this Court, and is willing to provide a sworn declaration, if necessary. He reported that no porters come into his isolation cell, and he cleans his cell using warm/hot water from his sink, soap, and his bathing towels. He has been housed in this cell for over a year due to his leukemia. The patient reported that he was hospitalized in the community in January 2020 for cancer treatment, and when he returned to the IPC, nursing staff told him that custody officers had isolated and housed a person with suspected scabies in his cell. Despite his post-cancer treatment weakened condition, he cleaned his cell on his own, and would not have done so but for the nurses who warned him of the potential infectious disease. This patient also said that he has not been provided any education from staff about COVID-19, that his only source of information is television news and family. He expressed to me his concerns and fears that after years of fighting cancer, he would be killed by this viral infection. He also expressed concern that he would face retaliation for speaking with me or allowing me to use his story, but decided that in the end it was worth it.

9. I also visited HU-8 with Ms. Amarillas and Mr. In. Similar to HU-10, this is another outpatient medical housing unit for seriously ill patients. This unit is best compared to a temporary portable building one might see at an elementary school, with a main entrance in the middle, and to the left and the right is a large room, each one housing about 14 to 16 patients, with a bathroom and showers beyond the living space. Again, I

spoke to multiple medically fragile people, and similar to HU-10, observed profoundly ill and elderly people confined to their beds. I spoke with several immunocompromised people undergoing cancer treatment who stated that they were resigned to dying from COVID-19. One patient with stage IV liver cirrhosis due to untreated Hepatitis C that he contracted in 1989 while in custody, told me, "If the coronavirus comes in here, we're all dead." Another class member with uncontrolled diabetes who relies upon an oxygen tank told me he was more worried about his neighbor living in an adjacent bed, who is blind and 99-years-old, has advanced dementia, and according to the class member "is allowed to sit in his poop and is cranky so they don't make him shower." I was unable to communicate with the elderly man, and counsel for Defendants Timothy Bojanowski came over to warn Mr. In within my hearing that we needed to "stay away" from this class member, because he was so senile that he lashed out at people who approached him. I then observed his deaf neighbor -- who was also wearing a diaper -- escort the 99-year-old man to the toilets after there was a smell of feces in the air. None of the men I spoke to in this housing unit knew anything about COVID-19, other than to express their resignation, and in some cases, hope, that they would be dead soon.

10. The afternoon of March 11, 2020, I visited Central Unit's Housing Unit 5, the Death Row unit that houses most of the men condemned to execution. While this unit is relatively clean and the class members have more free movement, again, I heard from multiple class members that they had not received any education or screening about COVID-19, and that the only way to clean their cells was using their own hygiene products such as shampoo and soap.

**<u>Meeting With Facility Health Staff</u>**

11. The morning of March 12, 2020, I met with facility health staff and counsel for Defendants and Centurion. Rita Lomio, another PLO attorney, and Mr. In were present with me at this meeting. We met with Defendant Richard Pratt; FHA Sego; Dr. V. Gilreath, D.O., the site medical director; Erin Abel, the mental health program lead at the ASPC-Florence Kasson Unit's Behavior Management Unit, and Michelle Diaz, the

Senior Assistant Director of Nursing. Also present were Timothy Bojanowski, counsel for ADC, and Sarah Barnes, Counsel for Centurion. Ms. Lomio, Mr. In, and I all took contemporaneous notes during this meeting. I had met FHA Sego and Ms. Abel during past visits to other prisons, but had never met Dr. Gilreath. He stated that he had come to the institution as the site medical director in December 2019, and when I asked if he had ever worked for Centurion or a prison before, he said, "Never," and explained that he previously was running a drug treatment / methadone clinic in the community. At the meeting, I reviewed a January 3, 2020 staffing report with Mr. Sego and Ms. Diaz. Mr. Sego stated that currently there was a shortage of ten (10) full-time equivalent ("FTE") Registered Nurses, and 11 FTE Licensed Practical Nurse positions.

12. During this meeting, we discussed at length the COVID-19 outbreak, and what steps ASPC-Florence and ADC were taking to address the pandemic. I had brought with me a draft of a memo that Dr. Marc Stern had sent to Washington jail administrators the week before, along with other correctional medical care guidelines for addressing COVID-19.[1] These documents included, among other things, recommendations that COVID-19 plans focus on staff and prisoner education; health care and custody staffing plans; staffing plans for services performed by incarcerated people; provision of hygiene and disinfectant cleaning supplies; screening, testing, treatment, and housing of people exposed to or positive for the virus; interfacing with community hospitals; and precautions for vulnerable populations such as older people and people with chronic medical conditions. Ms. Lomio and I asked about these components of a COVID-19 plan, and it was clear that there was very little, if any of this, in place at the prison. When I asked flatly whether there was *any* operational COVID-19 plan in place, FHA Sego stated that he would be meeting later that day with the ASPC-Florence warden and deputy wardens to develop an institutional plan to respond to COVID-19, and regarding how Florence would interface with other ADC prisons and community hospitals. (It should be noted that

[1] An updated version of Dr. Stern's memo was attached to a letter that I sent to Defendants on March 14, 2020; that letter is attached as Exhibit 1 to this declaration.

ASPC-Florence warden Jeff VanWinkle accompanied me everywhere I went the rest of the day, from approximately 9:00 am until 4:30 pm).

13. Dr. Gilreath made several statements during this discussion of COVID-19 that I found to be contrary to everything that I had heard to date from public health and correctional health experts. When we asked about a one-page document that Ms. Lomio reviewed the previous day that was going to be used to screen incoming transfers from other prisons or jails, she and I noted that one of the questions was if the person had been in China in the previous 21 days, and that we thought this question didn't seem relevant to incarcerated people in Arizona. Dr. Gilreath didn't say anything at the time, but minutes later, apropos of nothing when we were still talking about COVID-19, he said "the first case was not in China, it was in Germany." When we discussed the treatment modalities of people who test positive for COVID-19, he responded, "We have people here with dengue and we don't treat that." Later in our discussion, he piped up, unprompted, that "They say this thing will die by itself." He did not elucidate who "they" might be.

14. I relayed to the Centurion and ADC staff (and attorneys) that the previous day, class members reported that they had been the subject of an intrusive search "tossing" their personal property and confiscating soap, towels, and washcloths, and that I viewed this as incredibly unproductive and shortsighted, given the need to mitigate the spread of infectious disease. [*See* ¶¶ 3-4 above][2] Dr. Gilreath said that this search was done at his direction, stating that the patients in HU-10 were hiding contraband in the ceilings of the medical unit, and that in his opinion, "we should get rid of ceilings. I made them [ADC] aware of it." I found this justification to strain credulity, given the number of people who were bedridden, very sick, or seriously disabled and could barely walk, let alone climb up and hide contraband in ceiling tiles eight feet off the ground.

15. We asked Mr. Pratt what instructions or guidance ADC had received from

[2] I also reminded Counsel of the past actions by ADC staff that had been interpreted by class members as retaliatory, and the Court's past orders regarding retaliatory behavior.

the Arizona Department of Health Services regarding COVID-19. He said, "I haven't seen anything yet."

**East Unit**

16. After my meeting described above, I toured ASPC-Florence East Unit with Mr. In from ACDL, and again with several ADC staff and Mr. Bojanowski. The East unit consists of numerous World War II-era Quonset huts that have been modified to house about 12 people per hut. These huts were uniformly stuffy, dimly lit, and numerous elderly men who have serious medical concerns or physical disabilities, are incarcerated in these units. Mr. In and I visited at least nine of these Quonset huts, and again, the class members housed within them reported that they had to use their personal supplies of soap and shampoo to attempt to disinfect their living areas. Again, they had received no education or information about COVID-19, including the symptoms or how to prevent transmission of the disease. Several men asked me, "isn't this all a big hoax?"

**Central Unit (March 12, 2020)**

17. That afternoon, I visited several close custody cell blocks in Central Unit with Ms. Lomio. Again, class members reported that they only could clean their cells using soap and shampoo. I spoke to at least three people who said they had been feeling sick, having fevers, or coughing, but they had not filed an HNR because they could not afford the $4 co-pay. Again, one man confidently informed me that "coronavirus is a hoax." None of the men who I spoke with reported that they had been provided any educational information by ADC or Centurion about COVID-19, how to reduce the probability of transmitting the virus, or the symptoms of the virus.

**Exhibits**

18. Attached as **Exhibit 1** is a true and correct copy of a letter that I emailed to Counsel for Defendants on March 14, 2020 at 12:01 pm Arizona Standard Time / Pacific Daylight Time regarding COVID-19, and information that we had learned during the ASPC-Florence tour. As of the time of the filing this declaration, we have not received a response to this letter, nor even an acknowledgment that it was received.

19. Attached as **Exhibit 2** is a true and correct copy of a health care staffing report provided by Defendants that purported to show all contracted and filled positions as of January 3, 2020, and that Defendants' counsel Bates-stamped as ADCM1600190-1600200. We have a recurrent monthly request for the staffing report, but this is the most current version that Defendants' counsel has provided to Plaintiffs' counsel.

20. Attached as **Exhibit 3** is at true and correct copy of a letter that I sent to Defendants' counsel on February 13, 2020, regarding the compromised water supply at ASPC-Douglas. Attached as **Exhibit 4** is a true and correct copy of a letter that Defendants' counsel Timothy Bojanowski sent me on March 9, 2020 regarding the water supply at ASPC-Douglas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 16, 2020, in San Francisco, California.

/s/ Corene T. Kendrick
Corene T. Kendrick

**ADDITIONAL COUNSEL OF RECORD:**

By: s/ Corene T. Kendrick

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene T. Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
afettig@aclu.org
echo@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**


By: s/ Maya Abela

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email: rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington St., Ste. 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.com


*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 16, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com

*Attorneys for Defendants*

s/ C. Kendrick