**Exhibits to Declaration of Corene Kendrick**

**Exhibit**

**1**    March 14, 2020 letter from C. Kendrick and R. Lomio to
       T. Bojanowski re: COVID-19

**2**    January 3, 2020 Health Care Staffing Variance Report
       (ADCM1600190-1600200)

**3**    February 13, 2020 letter from C. Kendrick to T. Bojanowski
       re: ASPC-Douglas water supply

**4**    March 9, 2020 letter from T. Bojanowski to C. Kendrick
       re: ASPC-Douglas water supply

# Exhibit 1



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

VIA EMAIL ONLY

March 14, 2020

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

> RE:  *Parsons v. Shinn*, 2:12-CV-00601
> ADC and Centurion Plans for COVID-19 Management

Dear Mr. Bojanowski:

We write to follow up on our visit this week to ASPC-Florence, and in particular on our discussion on March 12, 2020, with you, Mr. Pratt, and facility health administration staff regarding ADC and Centurion's response to COVID-19. **We are extremely concerned that ADC and Centurion were unable to describe any plans to address the pandemic or to protect and treat the many elderly and ill patients in the prison beyond stating that they planned to come up with a plan.** The tens of thousands of people in ADC custody are highly vulnerable to outbreaks of contagious illnesses, and the risk here is only heightened by the unsanitary conditions in the prisons, failure to take strong and sensible precautionary measures, and the already inadequate medical staffing and treatment. We are deeply concerned that when COVID-19 enters the Arizona prison system, our clients will suffer unnecessary pain and death. **Failure to address COVID-19 in the state's prisons also threatens the community at large, as thousands of correctional, health care, and other staff interact with the incarcerated population every day, and then return to their homes and communities.**

**We request that Defendants immediately provide Plaintiffs' counsel and the Court all plans that they and their health care contractor Centurion have prepared for the prevention and management of COVID-19 in the Arizona prison system**. We plan to ask Judge Silver to order Defendants to implement a plan for the prevention and management of COVID-19, with the input and feedback of Dr. Marc Stern, the Court expert, including provisions outlined in the following pages. We are dealing with an urgent, life and death situation for tens of thousands of people (including incarcerated people, prison staff, and others in the community), and this is the time for bold and comprehensive action.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
ADC Response to COVID-19
March 14, 2020
Page 2

We would like to work collaboratively with Defendants on these issues, as we are doing in other jurisdictions.  An appropriate, evidence-based, substantive, and detailed plan can help prevent an outbreak, minimize its impact if an outbreak does occur, and contribute to broader efforts in the state and the country to "flatten the curve" of the outbreak.

We note at the outset that the fact that ADC and Centurion have not documented any COVID-19 positive staff or patients at this time does not ameliorate the urgent need to have a concrete, actionable plan in place.  There is a profound shortage of test kits in the United States, so the fact that no incarcerated persons or staff have yet tested positive is not dispositive; nor does it excuse a failure to take affirmative steps (in fact, we are not aware of any incarcerated people being tested, and it is doubtful that many – if any – ADC or health care staff have been tested).[1]

In the case of COVID-19, particularly vulnerable populations include people over the age of 60, pregnant women, people with chronic illnesses, and people with compromised immune systems or disabilities.  During our visit to ASPC-Florence, we saw crowded, filthy, unventilated dorms, tents, and Quonset huts housing elderly, frail men with chronic health conditions and multiple disabilities.

During our March 12, 2020 meeting, Facility Health Administrator ("FHA") Spencer Sego stated that he and Site Medical Director Dr. Gilbreath, who said that he started working in the prison a few months ago and who apparently has no prior correctional experience, would be meeting later that day with the warden and deputy wardens to develop an institutional plan to address the concerns we raised during our meeting.  Mr. Pratt indicated that he had not yet seen any plans, or received any information or guidance from the Arizona Department of Health Services regarding management and prevention of COVID-19.[2]  We were particularly concerned by Dr. Gilbreath's seemingly flippant and uninformed comments about COVID-19, including:  "They say this thing will die by itself," "We have people with dengue and we don't treat that," and "The first case was not in China, it was in Germany."

---

[1] According to the Arizona Department of Health Services, as of 9:01 AM today, 183 people had been tested statewide.  *See* https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/index.php#novel-coronavirus-home.

[2] The Arizona Department of Health Services' guidance to health care providers is available at https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/index.php#novel-coronavirus-healthcare-providers.

If Defendants and Centurion have not yet developed a plan, we request that the Department immediately contact and consult with Dr. Stern.  **Exhibit A** to this letter is a memorandum that Dr. Stern has provided to the Washington Association of Sheriffs and Police Chiefs with his suggestions on how to manage COVID-19 in the state's jails, based on current recommendations of the Centers for Disease Control ("CDC").

Critical issues that must be addressed in your plan include:

**Patient Education**

People housed in the prisons need to be informed about the virus and the measures they can take to minimize their risk of contracting or spreading the virus, to explain what symptoms they should watch out for and what to do if they experience them, and to address any fears and concerns.  They must be educated on the importance and method of proper handwashing, coughing into their elbows, and social distancing to the extent they can. Information about the spread of the virus, the risks associated with it, and prevention and treatment measures must be based on the best available science.  During our meeting, we asked whether there had been any education of staff or the incarcerated population. Mr. Pratt responded, "I haven't seen anything yet."

In fact, it appears that education of the incarcerated population so far consists of, at most, posting several CDC informational sheets on a wall of the medical clinics.  None of the class members we spoke to had seen or read those informational sheets, and the small print makes them inaccessible to blind and low-vision class members.  The informational sheets, at least in the two yards we saw them, were not posted in multiple languages. Unsurprisingly, to the extent class members knew anything about COVID-19, it was from television or word-of-mouth from other incarcerated people.  Some asked us if it was true it was a "hoax," as they had seen people on television saying that.

As an example of the type of patient education Defendants should provide, attached as **Exhibit B** are the written materials that the California Correctional Health Care Services ("CCHCS") prepared to go to the more than 112,000 people held in California's 34 state prisons.  CCHCS is taking a multi-pronged approach to patient education, with the written materials and posters being distributed in multiple languages, and in an accessible format for people with disabilities.  CCHCS is also playing the videos listed on the next page from the CDC to increase awareness on COVID-19.  The content is playing twice in a four-hour cycle, six times a day (12 times in total) every day.  CCHCS is also in the process of creating a video specific to the incarcerated population, which we understand will be ready for distribution this weekend.

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
ADC Response to COVID-19
March 14, 2020
Page 4

- COVID-19: Should I wear a facemask? -
  https://www.youtube.com/watch?v=pgbp5gvGxyA&list=PLvrp9iOILTQaJa78zFQ0
  QgvShQ2HEwHxP&index=10&t=0s

- COVID-19 Stop the Spread of Germs -
  https://www.youtube.com/watch?v=7-
  lW0s2yJA0&list=PLvrp9iOILTQaJa78zFQ0QgvShQ2HEwHxP&index=13&t=0s

- COVID-19: What is my risk? -
  https://www.youtube.com/watch?v=aFXb3yiYA2E&list=PLvrp9iOILTQaJa78zFQ0
  QgvShQ2HEwHxP&index=14&t=0s

- COVID-19: What is novel coronavirus? -
  https://www.youtube.com/watch?v=3AozUnFbYJs&list=PLvrp9iOILTQaJa78zFQ0
  QgvShQ2HEwHxP&index=16&t=0s

- COVID-19: How to protect against novel coronavirus? -
  https://www.youtube.com/watch?v=ANvNCk6546M&list=PLvrp9iOILTQaJa78zFQ
  0QgvShQ2HEwHxP&index=15&t=0s

- COVID-19 Detenga la propagación de los microbios (Spanish) -
  https://www.youtube.com/watch?v=JDK2iKtZ_tg&list=PLvrp9iOILTQaJa78zFQ0Q
  gvShQ2HEwHxP&index=19&t=0s

- How does COVID-19 spread? -
  https://www.youtube.com/watch?v=VPBT2oLQv3k&list=PLvrp9iOILTQaJa78zFQ0
  QgvShQ2HEwHxP&index=21&t=0s

- What can I do to protect myself from COVID-19? -
  https://www.youtube.com/watch?v=3Cx1b6H0H0E&list=PLvrp9iOILTQaJa78zFQ0
  QgvShQ2HEwHxP&index=22&t=0s

- Lo que necesitas saber acerca del lavado de manos (Spanish) -
  https://www.youtube.com/watch?v=d6GqqqSC4Zw&t=0s

- What you need to know about handwashing?
  https://www.youtube.com/watch?v=d914EnpU4Fo

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
ADC Response to COVID-19
March 14, 2020
Page 5

**Screening and Testing of the People in ADC Custody**
The plan must include guidance, based on the best science available, on how and when to screen and test people in your facilities for the virus.  On March 11, while at the South Unit clinic, Senior ADON Diaz showed us the short screening instrument that reportedly would be used with incarcerated people starting on March 16.  Ms. Diaz reported that she had not yet received instructions or training on how or when to use the instrument. The instrument included the question whether, in the past 21 days, someone had been to China – hardly relevant to a prison population.  FHA Sego indicated at our March 12 meeting that the screening instrument already was in place for people transferring into the facility from other ADC or private prisons, or from county jails, but that no decision had been made whether the instrument would be used every day when off-site workers returned to the prison or in other contexts.  **We request a copy of the screening instrument.**

Furthermore, as part of access to care, we are concerned that the $4 co-pay charged to patients every time they seek health care via a Health Needs Request will create barriers and disincentives to people reporting symptoms of COVID-19 and requesting care, thus delaying diagnosis, treatment, and appropriate housing of patients with COVID-19.  During the Florence tour, we spoke with multiple class members who stated that they had been having flu-like symptoms, but had not reported them via a HNR because they could not afford the $4 charge for medical care.  Multiple prison systems across the United States have permanently or temporarily discontinued all or some medical co-pays, precisely so that there are no barriers to people seeking care.  For example, as of Friday evening, Alabama, Maine, and Connecticut are temporarily suspending all medical co-pays.  Minnesota, Florida, Pennsylvania, and Georgia are suspending copays for flu and COVID-19 –related symptoms.  California ended all copays in 2019, which was subsequently codified in state statute.  **We request that pursuant to Governor Doug Ducey's proclamation of a state of emergency, ADC immediately suspend all ADC policies that require co-pays or, at a minimum, co-pays for any HNR that reports flu, cold, and/or COVID-19 type symptoms, and that this suspension be promptly communicated to the incarcerated population.[3]**

. . . .
. . . .
. . . .
. . . .

---

[3] Nat'l Comm'n on Corr. Health Care, Charging Inmates a Fee for Health Care Services (Oct. 2012), http://www.ncchc.org/charging-inmates-a-fee-for-health-care-services. ("No charges should be made for . . . diagnosis and treatment of contagious disease").

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
ADC Response to COVID-19
March 14, 2020
Page 6

**Provision of Hygiene and Cleaning Supplies**

The most basic aspect of infection control is hygiene.  There must be ready access to warm or hot water, soap, and adequate hygiene and cleaning supplies, both for handwashing and for cleaning living units.  Soap and cleaning supplies should be provided free of charge.  Defendants' plan must include detailed information regarding frequent environmental cleaning of all common areas in housing units, food preparation areas, classrooms and programming space, and clinical/infirmary space.  The plan must include information as to how disinfectants will be provided to people to clean their personal living spaces.  As Dr. Stern notes, "[f]or infection control (and to help reduce fears among inmates), adopt a liberal approach to inmates who want to disinfect their houses."  Ex. A at 3.

We have repeatedly reported and documented the unhygienic and filthy conditions in ADC's prisons, which are a breeding ground for infectious disease.  For example, in our recent report regarding our December 2019 tour of ASPC-Eyman, we documented widespread filth in multiple units.  *See* Doc. 3508-1 at 39-45.

This monitoring visit was no different.  Class members at ASPC-Florence, as at other prisons, reported that they are not provided basic disinfecting cleaning solutions.  Many reported that the only way they had to clean their cells or their bed area in a dorm was to use their personal supply of soap and shampoo, neither of which is effective in disinfecting hard surfaces.[4]  (CDC reports indicate that COVID-19 can survive up to four hours on hard surfaces.)  We observed, and documented in photographs that we have not yet received, filthy conditions in housing areas and communal bathrooms and an empty sanitization station in the North Unit clinic.

People must have access to adequate hygiene supplies.  Dr. Stern notes that "[a]s simple as it sounds, hand washing is the most important protection," and that correctional institutions should "[m]ake adherence to good hygiene easy for staff and inmates," and "[k]eep supplies, such as soap and paper towel dispensers and hand sanitizer full and available."  Ex. A at 3.

Currently, incarcerated people in ADC have to pay for soap; none is provided for free.  Class members reported that they are limited to only two bars of soap at a time and that they are allowed to place an order for soap once a week.  They reported that any excess

---

[4] *See also* Doc. 3508-1 at 41 (report from December 2019 monitoring visit to ASPC-Eyman) ("[P]eople at 1-Baker and 4-Alpha reported that they were not provided any cleaning supplies for their cells and they had to use hygiene products such as bars of soap or shampoo to clean their cells.").

Case 2:12-cv-00601-ROS   Document 3521-1   Filed 03/16/20   Page 9 of 53

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
ADC Response to COVID-19
March 14, 2020
Page 7

soap will be confiscated.  Class members reported that it can be difficult to afford soap when they do not have a job.[5]  Class members on South Unit reported that there is a hand sanitizer dispenser in the visitation room, but it is usually empty.  (When we visited, the visitation room was being used for staff training and the sanitizer dispenser was not empty.  The restroom for incarcerated people, however, did not have soap or hand sanitizer.)  They reported there is no dispenser in the dining hall.  Porters working on multiple yards, including the porter working in the special medical housing units at Central, reported that they had not received any instruction on how or what to clean in light of COVID-19 concerns, and class members – echoing class members at other prisons we visited in the past – reported that cleaning supplies are heavily diluted and watered down.

On October 31, 2019, Defendant Shinn issued Inmate Notification # 19-27, regarding revisions to Department Order 905, Inmate Trust Account / Money System.  *See* **Exhibit C**.  In this memorandum, Mr. Shinn stated that effective December 2, 2019, indigent people would be charged for indigent supplies.  These include basic items such as a small piece of soap, a small container of shampoo, and toothpaste.[6]  Previously, indigent persons were provided basic hygiene supplies on a monthly basis free of charge; Defendant Shinn's memorandum ended that practice.  The charge for indigent supplies, including hygiene products, are now placed on a person's trust account as a debit, and stays on the account as due to the Department for one year.  If the person received any sort of deposit on their trust account in the subsequent year, they would not receive the money but instead it would go to pay for the hygiene supplies previously received.  We spoke with multiple indigent class members who said that subsequent to this memorandum, they have curtailed the quantity of

---

[5] In the Arizona prison system, someone designated as "functionally illiterate" can make only 10 cents per hour.  *See* Ariz. Dep't of Corr., Department Order 903: Inmate Work Activities § 903.2.5.1 (rev. Feb. 24, 2018), https://corrections.az.gov/sites/default/files/policies/900/0903-effective_102216.pdf.  "Inmates are almost always in an 'indigent' mode.  They seldom have outside resources and most have no source of income while incarcerated.  They most often rely on a spouse, mother, or other family member to provide funds they can use for toiletries, over-the-counter medications like analgesics and antacids, telephone calls, writing paper and pens, sanitary napkins, candy, etc.  These 'extras' become extremely important to one who is locked up 24 hours per day.  The inmate may well choose to forgo treatment of a medical problem in order to be able to buy the shampoo or toothpaste."  Nat'l Comm'n on Corr. Health Care, Charging Inmates a Fee for Health Care Services (Oct. 2012), http://www.ncchc.org/charging-inmates-a-fee-for-health-care-services.

[6] *See also* Doc. 3508-1 at 41 (picture at ASPC-Eyman SMU-I's suicide watch unit stating, "DO NOT Give full bars of soap to watchpod inmates break into 4-6 pcs the soap not the inmate").

basic hygiene supplies that they request, and that this new policy is a disincentive to requesting something as basic – and as critical to public health – as soap.  **We request that Director Shinn's memorandum regarding charges to indigent people for hygiene supplies be suspended until further notice, and that the suspension be promptly communicated to the people in the prisons**.

Additionally, multiple people living in Central HU-10, one of the special needs health units, reported that on the night of March 10, 2020, the sergeant (we were alternately told his last name is Peterman, Peterson, or Peterfield) and officers "tossed" and searched every patient's living area, and confiscated soap, towels, and washcloths that were deemed to be "in excess of what you need."  While the class members reported that they interpreted this search/toss as a retaliatory/threatening gesture prior to our monitoring visit, which was scheduled for March 11 – which is in and of itself highly problematic (*see, e.g.*, Docs. 1734 and 2209) (court orders that retaliatory actions are improper) – this also is alarming for purposes of managing an infectious disease outbreak.  The confiscation of soap, towels, and washcloths as a pandemic spreads across the state and country is staggeringly shortsighted.  When we raised our concerns with the confiscation of hygiene supplies on March 12, Dr. Gilbreath responded that contraband is hidden in ceilings and continued:  "I said we should get rid of ceilings.  I made them [ADC] aware of it. . . .  And if they go in there and confiscated stuff, there's usually a reason for it."

Dr. Gilbreath's justification for the search and confiscation is disingenuous at best, given that the vast majority of patients in this medical housing unit were unconscious, seriously disabled, medically fragile, and/or unable to walk, making Dr. Gilbreath's claim that they were hiding contraband in the ceilings frankly not credible.  Furthermore, the very ill patients incarcerated at HU-10 insisted that they had not hidden soap, washcloths, or towels in the ceiling tiles of the clinic, as Dr. Gilbreath alleged, and that they had been given these items by the medical staff working in the building.[7]

. . . .
. . . .
. . . .

---

[7] For example, one class member we spoke with in the building had pinkeye, which he said he had had for over a week (and which we photographed).  He reported that he had not been provided antibiotics until the prior day, but that when the infection first appeared, nursing staff gave him a stack of washcloths and instructed him to soak them in hot water and apply to his eye to provide some relief.  He stated that all of these washcloths were taken Tuesday night by the officers who searched the unit.

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
ADC Response to COVID-19
March 14, 2020
Page 9

Finally, ADC's ban on hand sanitizer (on the basis that it contains ethyl alcohol) cannot be justified in the midst of this public health emergency. **We request that hand sanitizer be made available to both staff and incarcerated people, as is being done in Ohio state prisons in response to the COVID-19 pandemic.**

### Staffing Plans for Services Provided by Incarcerated People

Many tasks in Arizona prisons, such as food preparation and basic sanitation, are performed by incarcerated people. We spoke with one kitchen worker who reported that the hand sanitizer dispenser in his work area sometimes is empty and not refilled for days at a time, even when custody staff is notified. **The COVID-19 plans must also address how necessary tasks currently performed by incarcerated people will continue, if large numbers of them are ill or quarantined. In addition, all efforts should be made to ensure they have clean work areas and ready access to soap, water, and hand sanitizer.**

### Health Care and Custody Staffing Plans

Regardless of how many staff are staying at home because they are sick, are in quarantine due to possible exposure, and/or are caring for family members, the prisons and health care services inside them must continue to operate. **Therefore, the Department's COVID-19 plan must indicate how necessary functions and services will continue if large numbers of health care and custody staff are not reporting to work.**

Unfortunately, ASPC-Florence already has widespread vacancies in custody officers and nurses, who are the backbone of the entire prison health care system.

The most recent monthly Centurion staffing report that you have provided to us was dated January 3, 2020, and shows significant vacancies in nursing staff:

| Position | Contracted FTE | Filled FTE | % Filled |
|---|---|---|---|
| Registered Nurse | 36.0 | 22.8 | 63.3% |
| Licensed Practical Nurse | 30.0 | 17.3 | 57.7% |
| Nursing Assistant | 20.0 | 15.6 | 78.0% |

(Source: ADCM1600193)

On March 12, 2020, FHA Sego confirmed that currently there are still 10 vacant RN positions (which would mean 26/36, or 72% filled) and "just under 11" vacant LPN

positions (which presumably would mean 19/30, or 63% filled).  He said that all of the Nursing Assistant positions have been filled.

FHA Sego told us that there is a pool of 30 as-needed nurses (referred to as "PRN") that had gone through Centurion and DOC training, and could be contacted as needed to see if they would pick up shifts.  He and Senior ADON Diaz were unable to tell us a breakdown of how many of these PRNs are Registered Nurses versus Licensed Practical Nurses.  He admitted that other prisons could also draw from this pool of 30 PRN nurses if necessary.  In addition to the 30 PRN nurses, there is a temporary staffing agency providing 11 nurses.

We have previously noted our concerns with the reliance upon temporary and agency health care staff.  *See, e.g.*, Doc. 3508-1  at 5- 25 (ASPC-Eyman December 2019 tour report).  These temporary and as-needed nurses work not only for the prisons, but also serve as supplemental health care staff to community hospitals and clinics.  If COVID-19 arrives in the prison and health care staff is exposed (or if they are exposed in the community), Defendants need to be able to fill those positions so the provision of health care can continue uninterrupted.  It does not appear that Defendants have a plan for that eventuality.

With regard to custody staff, Defendants recently reported to the Legislature that the department is suffering from a statewide shortage of custody officers, with a vacancy rate of 32.3% of officers at ASPC-Florence, the second highest vacancy rate statewide.  *See* Jt. Legis. Budget Comm., 54th Legis., Second Quarter Officer Staffing Report (Dec. 11, 2019) at 2, available at https://www.azleg.gov/jlbc/jlbcag121119rev2.pdf at 17:

Table 2

**Correctional Officer Staffing Levels by Location**
(As of October 28, 2019)

|  | Filled CO Positions | Vacant CO Positions | Officers in Training | Vacancy Rate (%) |
|---|---|---|---|---|
| Eyman | 642 | 411 | 15 | 38.5 |
| Florence | 505 | 250 | 19 | 32.3 |
| Perryville | 515 | 100 | 34 | 15.4 |
| Lewis | 786 | 234 | 24 | 22.4 |
| Phoenix | 207 | 16 | 18 | 6.6 |
| Tucson | 883 | 141 | 52 | 13.1 |
| Douglas | 348 | 52 | 12 | 12.6 |
| Safford | 219 | 34 | 23 | 12.3 |
| Winslow | 249 | 77 | 13 | 22.7 |
| Yuma | 720 | 8 | 16 | 1.1 |
| Maricopa Re-Entry | 17 | 0 | 0 | 0.0 |
| Pima Re-Entry | 15 | 0 | 0 | 0.0 |
| **Total** | **5,106** | **1,323** | **226** | **19.9** |

**Housing of Persons Exposed to the Virus**

The plan must describe how and where people in the prison system will be housed if they are exposed to the virus, are at high risk of serious illness if they become infected, or become infected. This should not result in prolonged, widespread lock-downs with no out-of-cell time. Any lock-downs or interruptions in regular activities, such as exercise or visits and phone calls with families or attorneys, should be based solely on the best science available and should be as limited as possible in scope and duration. As Dr. Stern notes in his memo to Washington's county sheriffs and jail administrators:

> You should also do what you can to not make placement in isolation feel punitive. Inmates in isolation should have ample access to comfort, entertainment, and activity-related materials allowed by their custody level. An important reason for this suggestion is that you want to do everything possible to encourage inmates to notify medical staff as early as possible if they experience symptoms of infection. Fear of being placed in an overly-restrictive cell may delay their notification, which is counterproductive.

Ex. A at 5.

**Defendants' plan must include close coordination with community hospitals and other prisons to isolate any patients who meet the CDC's guidelines for isolation. This coordination must occur now, rather than waiting until the prison is dealing with patients exhibiting COVID-19 symptoms**. During our March 12, 2020 meeting, FHA Sego again indicated that later that day he would be meeting with the warden and ADC Regional Operations Director Kevin Curran, to discuss the placement of people within health care spaces at ASPC-Florence, other prisons, and community hospitals. As FHA Sego acknowledged, if there is an outbreak in the community, hospitals will be crowded, and community members likely will be prioritized over incarcerated people.

We are deeply concerned that ADC does not have enough appropriate spaces in its prison system to provide medical care during an outbreak of COVID-19. In fact, FHA Sego and Dr. Gilbreath confirmed that the prison has only three isolation / quarantine rooms available, all located in the infirmary, which are currently filled with patients who need that protected housing. (At least one of those patients spoke with Ms. Kendrick; that patient is profoundly immunocompromised due to treatment for leukemia.) In the past, we have noted that the prison's approach to treating infectious disease outbreaks is to send incarcerated people – including elderly patients in their 70s and 80s – to the harsh conditions of ASPC-Eyman's supermax unit. *See, e.g.*, Doc. 2993-1 at 24-26 and 30-32 (scabies outbreak at

ASPC-Florence in the summer of 2018 resulted in an 81-year-old man and 85-year-old man with dementia who uses a wheelchair being sent to suicide watch cells in ASPC-Eyman).

That is certainly insufficient in the event of a COVID-19 outbreak. In order to provide appropriate clinical spaces for an outbreak, and to allow social distancing to be meaningfully implemented in the prisons, **we ask that Governor Ducey consider executing his power to immediately order the release of elderly people, persons convicted of nonviolent offenses, and others who present little or no risk to public safety.** These releases should prioritize those who, because of age or medical condition, are at particularly high risk of severe illness or death if they become infected with COVID-19.

\* \* \* \* \*

Thank you for your prompt attention to this matter. We look forward to working with you on these critical public safety efforts.

Sincerely yours,

Corene Kendrick
Staff Attorney

Rita Lomio
Staff Attorney

cc:   Counsel of Record
      Dr. Marc Stern

# Exhibit A



**Washington Association of**
# SHERIFFS &
# POLICE CHIEFS

3060 Willamette Drive NE
Lacey, WA 98516
360-486-2380 (Phone)
360-486-2381 (Fax)
www.waspc.org

**President**
Sheriff John Snaza
Thurston County

**President-Elect**
Chief Craig Meidl
City of Spokane

**Vice President**
Sheriff Rick Scott
Grays Harbor County

**Past President**
Chief Ken Thomas
City of Des Moines

**Treasurer**
Chief Brett Vance
City of Montesano

**Executive Board**

Chief John Batiste
Washington State Patrol

Sheriff Bill Benedict
Clallam County

Chief Rod Covey
Port of Seattle

Chief Steve Crown
City of Wenatchee

Raymond P. Duda, SAC
FBI—Seattle

Chief Gary Jenkins
City of Pullman

Sheriff Mitzi Johanknecht
King County

Sheriff James Raymond
Franklin County

Director David Trujillo
Washington State
Gambling Commission

Steven D. Strachan
Executive Director

## Washington State Jails Coronavirus Management Suggestions in 3 "Buckets"

Publication date:
March 13, 2020

Written by:
Marc F. Stern, MD, MPH
Affiliate Assistant Professor, School of Public Health, University of Washington, Seattle mfstern@uw.edu

Acknowledgments:
I would like to express my gratitude to the following professionals for their invaluable (and rapid!) input: Lara Strick, MD, MS, Chief of Infectious Diseases at the Washington State Department of Corrections; Dr. Benjamin Sanders, MD, MPH, Medical Director at the King County Jail, Seattle; Rachel Wood, MD, MPH, Health Officer for Lewis County, WA; and John McGrath, Jail Services Liaison, WASPC.

The following ideas are provided as suggestions to jails for managing the impacts of COVID-19. It is VERY important to note that they are not standards or rules and also that many of these suggestions are based on *current* CDC recommendations. Therefore, jail administrators should heed the following three cautions. First, CDC recommendations regarding COVID-19 are changing constantly as more is learned about the virus, its spread, and its management. So check the CDC website (https://www.cdc.gov/coronavirus/2019-nCoV/summary.html) on a regular basis for changes. Second, local public health departments – the WA DOH (https://www.doh.wa.gov/Emergencies/Coronavirus), but especially county, city, and tribal health departments – are excellent sources of information. They may also make recommendations that differ from, or go beyond, CDC recommendations, based on local conditions and local resources. In addition, local public health departments are vested with certain legal authorities that may help you "make things happen." So you should be in close contact with your local public health department. Third, your jail medical director has ultimate clinical responsibility for the health of inmates in your custody and may recommend different or additional steps based on your particular jail's needs.

An additional resource that has been developed specifically for corrections is a slide set produced by Dr. Anne Spaulding at Emory University under a CDC grant. The current slide set will be sent with this document. However, it is being updated on a regular basis, so it's best to check for the latest version at: https://accpmed.org/online_learning.php.

*Serving the Law Enforcement Community and the Citizens of Washington*

**Bucket 1: Dealing with the effects of COVID-19 in the community**

1. Disaster plan

Review, update, and start working with your disaster preparedness plan.

2. Supply chain

Among other things in the disaster plan, think about what are all the materials, supplies, equipment upon which you are dependent (i.e. items that would be affected by disruptions in your supply chain), and what are alternative sources. An important – if not most important – supply is food.

3. Screening staff

Consider screening staff reporting to work. For the moment those guidelines are: check for fever over 100 degrees, cough, shortness of breath, recent travel to a high-risk country, exposure to someone who is symptomatic and under surveillance for COVID-19. If 2 out of 3 are present, send them home. (You'll want a simple form or log. You'll also need a thermometer.) However, these guidelines may change as we learn more, so check the current CDC guidelines (https://www.cdc.gov/coronavirus/2019-nCoV/summary.html), but more importantly, be sure you're getting the most recent guidelines from your local health department.

4. Screening arrestees

See the suggestions above for staff screening, with the obvious modification that someone who has a positive screen will not be sent home. Instead, first have the individual place a surgical mask on themselves and place them in isolation (a single room with a closed door in Booking, for example). Then the jail's medical authority should be contacted for further management instructions.

5. Discouraging "presenteeism"

While we worry about absenteeism among staff, another concern is the opposite: presenteeism, which is staff coming to work despite being ill. They pose a risk to other staff and inmates. Explain the risk to staff and encourage them to stay home if they are ill. Depending on your own particular staff and staffing situation, you MAY want to consider an untested approach: for staff who have no sick or vacation days left, consider allowing staff to stay home penalty-free. On the flip side, to encourage healthy employees to continue to come to work, you might also consider liberalizing restrictions on overtime.

6. Non-contact visitation.

If you don't already have non-contact visitation, consider how you might do this, using either non-contact rooms or video conferencing. Phone visitation is another option.

This following two issues apply both to Bucket #1 (preventing infection from the community) Bucket #3 (containing infection in the jail). There are many types of out-trips. I will focus on the two most common: medical and court.

6a. Contact between inmates and the community during out-trips: Medical

To the extent that medical out trips can be safely postponed, that is optimal. This should only be done after a provider documents an order in the patient's medical record justifying the clinical appropriateness of the delay. Telemedicine is an excellent alternative to out-trips. There are federal regulations governing the types of telemedicine software to be sure they are HIPAA compliant. These programs usually are not free and require contracts, software set-up, etc. There is theoretically a risk of compromising patient confidentiality using non-HIPAA-complaint software. However, in my opinion, it is low. And these are special times when risks and benefits need to be weighed. While I would never advise someone to break the law, jails may want to discuss with their legal counsels the risks and

benefits of using readily available non-HIPAA-complaint software (e.g. FaceTime) and then make the best decision for your jail and your community's health.

6b. Contact between inmates and the community during out-trips: Court
Transporting inmates for court appearances places staff and inmates in (sometimes close) contact with the members of the community. There is a risk of bringing infection back into the facility. And if the inmate is ill, the reverse risk is true. Consider reaching out now to the courts with which you interact to have a plan for both situations. As with medical trips, video appearances are a useful tool.

7. Stay connected with the Health Department
Both we in jails, as well as public health officials, sometimes forget that county, city, and tribal jails are key parts of public health. Contact your local public health officer and ask that a jail representative be "at the table" both for planning meetings as well as when information is being shared with hospitals, nursing homes, and other parts of the public health system. Even though CDC is issuing up-to-date scientific guidance, it is the responsibility of the local health officer to interpret and implement that guidance. This officer, or delegate, is the person, for example, who would suggest/direct an at-risk staff member to self-quarantine.

8. Perform routine environmental cleaning
See the CDC website above for more detail, but in brief, continue to perform routine cleaning of all frequently touched surfaces. The normal disinfectants that you use are adequate. For infection control (and to help reduce fears among inmates), adopt a liberal approach to inmates who want to disinfect their houses.

9. Routine steps to prevent spread of respiratory infections
Aside from environmental cleaning, follow CDC and any local health department recommendations for the usual personal steps to avoid spread of respiratory droplet-borne infections, including hand washing (a good short video from CDC: https://youtu.be/eZw4Ga3jg3E), sneezing or coughing into one's elbow, not touching one's eyes, nose or mouth with unwashed hands, and discarding tissues after using and washing hands. As simple as it sounds, hand washing is the most important protection. And wearing gloves does not eliminate the need to wash your hands. Make adherence to good hygiene easy for staff and inmates. Keep supplies, such as soap and paper towel dispensers and hand sanitizer full and available. Allow staff to carry personal-sized containers of hand sanitizer. It is appropriate to wear masks in certain situations (see below), but they are not recommended for routine use (and may actually increase risk). Remove barriers to good infection control for inmates. For example, inmates should have an ample supply of soap. You will certainly reduce the transfer of inmates from one unit to another if and when there is an infection in the jail. But consider reducing unnecessary movement even now because you hope, but can't be sure, that no one has undiagnosed infection.

10. Communication
It can be helpful to be very generous with your communication with staff and inmates. In addition to briefings with each shift of staff, consider daily – if not twice daily – briefings of inmates, explaining what you're doing and why you're doing it. People are much more tolerant of adversity if they know what's going on.

**Bucket 2: Dealing with the effects of COVID-19 among staff**
1. Downsizing
Talk with prosecutors and judges ahead of time to develop a plan if you need to downsize.
> a. Are there people you can release on their own recognizance? Do you have a priority list (who do you release if you need to downsize by 5%? 10%? etc.)? In addition to public safety

considerations (e.g. alleged crime), prioritization of this list should also take into consideration medical factors: the elderly and people with other underlying health problems are at greatest risk from COVID-19. (There is no data yet on the risks to pregnant women, but until there is, it would not be unreasonable to add them to the prioritization list.)

b. Are there alternatives to arrest for certain crimes, or, in dire situations, are there crimes for which your patrol division will not arrest?

2. Supplemental staff
Think about where you might get supplementary staff. Retirees? Patrol?

3. Inmate activities and movement
What activities/programs can you curtail or cut?

4. Influenza
In the present environment, it's hard to imagine this, but the flu remains a greater threat to community (and jail) health today than COVID-19. As of the week ending February 22, CDC lists Washington State (and 38 other states) as having flu activity in the highest of the high category. So far this season, in our state alone, there have been 74 deaths from the flu (and 18,000 deaths nation-wide). And flu vaccination is very safe and very effective in preventing or attenuating the current strains of influenza virus going around. Staff who have not yet been vaccinated against the flu should be encouraged to do so. The better protected your staff is, the less likely you are to have absences from at least one infection, and it will help avoid confusion and panic that someone has COVID-19 infection. If it will help encourage vaccination, consider arranging with a local pharmacy to offer the vaccine on-site at no charge (actually, if employees have insurance, it may very well be covered).

**Bucket 3: Dealing with infection, or possible infection, among inmates**
1. Influenza
Offer and administer flu vaccine to all eligible inmates who have not been vaccinated. No, flu vaccine does NOT protect against Coronavirus. However, it still makes sense to vaccinate inmates for the same reasons that staff should be vaccinated. Also, given the high risk of influenza, vaccinating inmates will decrease the possibility of overloading your jail health care system with severe respiratory illness from a highly preventable cause.

2. Inmates who want to go to medical
When a patient requests to see a medical professional for a respiratory complaint, before bringing them to the medical unit, the deputy should have the patient put on a mask. A simple surgical mask is adequate.

3. Masks
For the moment CDC recommends simple surgical masks for symptomatic patients, and higher efficiency masks for health care workers who are working in close proximity (within 6 feet) of a patient with possible COVID-19. Because, in jails, custody staff working with persons with possible COVID-19 infection share many of the same tasks and exposures as health care workers in the community, it would make sense for custody staff to use the same personal protection as jail medical staff who are working in close proximity of patients. For the moment, this recommendation is to use N-95 masks. In case you have trouble getting N-95 masks, you can use any mask with an N, P, or R letter designation and a 95 or 100 number designation. And if none of these masks is available, use simple surgical masks. As an example of adjusting to shortages of N-95s, King County Jail is moving towards only allocating these masks to health care workers who have close contact (e.g. physical examination, obtaining

laboratory samples) with patients with possible COVID-19 infection.

4. Other Personal Protective Equipment (PPE)

For the same reasons as described above, it would be wise for custody staff to follow the same general guidelines for PPE as jail medical staff. You should review the recommendations on the CDC website. There is more detail there than we can provide here…and it may change. The recommended PPE also depends on the patient and the task your staff is performing. For example, at one end of the extreme, if staff are going to be in a "hands-on" situation with a person who has obvious secretions, more protection will be needed, while at the other end of spectrum, if the patient is cooperative, with no secretions, and the contact will be brief and at a distance of over 6 feet, less protection will be needed. Generally, in addition to a mask with eye protection, CDC is recommending staff use Standard Precautions, including gloves.

5. Isolation

For patients who meet the CDC's current recommended criteria for isolation, CDC also currently recommends they be placed in negative pressure rooms. This will be a tall order for many jails. And even for jails equipped with negative pressure rooms, demand may exceed supply. Therefore this is one of the many topics you should be discussing with your local public health authority ahead of time, to seek their advice and their help in developing a plan in coordination with community resources (especially the hospitals). They may recommend alternative solutions, such as keeping certain patients isolated in their own cell with the door closed. You should also do what you can to not make placement in isolation feel punitive. Inmates in isolation should have ample access to comfort, entertainment, and activity-related materials allowed by their custody level. An important reason for this suggestion is that you want to do everything possible to encourage inmates to notify medical staff as early as possible if they experience symptoms of infection. Fear of being placed in an overly-restrictive cell may delay their notification, which is counterproductive.

6. Upon Release

What do you do when releasing someone back to the community? It depends on their condition. Most people do not need to be hospitalized – if they were that sick, you would already have sent them there. However, for jails with higher level infirmaries, you may have someone in the infirmary who wasn't ill enough to need a hospital, but who is not able to care for themselves at home. If hospitalization is the only option, your medical staff should call ahead to the hospital and, with their agreement, make a well-coordinated transfer. A second group of individuals are those who are either in isolation (mildly ill) or in quarantine (without symptoms). These people will likely go home (if they have a home), but your medical staff should contact your local health department prior to discharge for any special instructions and to be sure they are aware of the discharge. You can give the releasee a copy of an excellent one page handout about home care from the CDC (https://www.cdc.gov/coronavirus/2019-ncov/about/steps-when-sick.html). If they don't have a home to release to, again, contact your local health department for assistance; some health departments are working on plans to find special temporary housing for such individuals. A third group of individuals is all the rest: those who are healthy and not thought to have been exposed to the virus. They would release as usual. You can provide them with basic information about prevention, such as this one-page handout from the CDC (https://www.cdc.gov/coronavirus/2019-ncov/downloads/stop-the-spread-of-germs.pdf).

# Exhibit B

# CORONAVIRUS/COVID-19 FACTS AND FAQS

**What is a coronavirus and what is COVID-19?**

Coronaviruses are a large family of viruses that cause illnesses ranging from the common cold to more severe diseases including Severe Acute Respiratory Syndrome (SARS) and Middle East Respiratory Syndrome (MERS). COVID-19 is the infectious disease caused by the most recently discovered coronavirus. This new virus and disease were unknown before the outbreak began in Wuhan, China, in December 2019.

**How did this virus get its name?**

On Feb. 11, 2020, the World Health Organization announced the official name for the new coronavirus virus would be COVID-19. "CO" stands for "corona," "VI" stands for "virus," D stands for "disease" and 19 indicates the year the virus was first discovered. Before this, the virus was referred to as the "2019 novel coronavirus," which means it was a new strain not previously identified in humans.

**Where did COVID-19 come from?**

The World Health Organization states that coronaviruses are zoonotic, which means they are transmitted from animals to people. A specific animal source of COVID-19 has not been identified, but the virus has been linked to a large seafood and live animal market.

**What are the symptoms of COVID-19?**

According to the Center for Disease Control (CDC), individuals diagnosed with this coronavirus experience a mild to severe respiratory illness. Symptoms include fever, cough and shortness of breath. Individuals with severe complications from the virus often develop pneumonia in both lungs.

**How does the virus spread?**

The virus is spread person-to-person. According to the CDC, spread is happening mainly between people who are in close contact (within 6 feet) of each other via respiratory droplets produced when an infected person coughs or sneezes. The droplets land on the noses and mouths of other people, who then inhale them. The CDC says it may be possible for the virus to spread by touching a surface or object with the virus and then a person touching their mouth, nose or eyes, but this is not thought to be the main method of spread. As the virus was discovered just a few months ago, more research is required to learn more about the spread pattern of the virus. The incubation period ranges from 2 to 14 days after exposure (most cases occurring at approximately 5 days.) People are thought to be most contagious when they are most symptomatic (the sickest.) Some spread might be possible before people show symptoms.

**Do I need to wear a protective mask?**

There is no need for healthy individuals to wear surgical masks to guard against coronavirus. Individuals should only wear a mask if they are ill or if it is recommended by a health care professional. Masks must be used and disposed of properly to be effective.

**Is there a cure for the virus?**

There is no specific medication to treat COVID-19; supportive care is provided to treat symptoms. There is currently no vaccine to protect against COVID-19. Individuals should take care to avoid being exposed to the virus through hygiene and sanitary practices. Please seek immediate medical care to relieve symptoms if infected with the virus.

**How do I protect myself and others?**

There is currently no vaccine to prevent COVID-19 or medication to directly treat COVID-19. The best way to protect yourself is to avoid being exposed to the virus that causes COVID-19. The CDC recommends maintaining personal preventative actions such as:

- Avoiding close contact with those who are sick
- Not touching your eyes, mouth or nose, especially with unwashed hands
- Washing your hands often with soap and warm water for last least 20 seconds
- Clean objects and surfaces that are frequently touched
- Limit your exposure to others if you are sick
- Cover your coughs and sneezes with a tissue
- Do not share food, drinks, utensils, or toothbrushes

**What should I do if I think I have COVID-19?**

Avoid direct contact with other people and immediately request to be seen by health care if you feel sick with a fever, cough or difficulty breathing. Make sure to give your provider details of any symptoms and potential contact with individuals who may have recently traveled.

**Will I be tested for COVID-19?**

You will be tested if your provider suspects you have COVID-19.

**What is CDCR/CCHCS doing to prepare for a potential outbreak?**

CDCR and CCHCS are dedicated to the safety of everyone who lives, works, and visits our state prisons. We have longstanding emergency response plans in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, as well as coronavirus. Based on guidance from the CDC, and to ensure we are as prepared as possible to respond to any exposure to COVID-19 specifically, we are building upon the robust influenza infection control guidelines already in place at each institution. These guidelines clearly define procedures for prevention of transmission, management of suspected and confirmed cases including isolation and quarantine protocols, surveillance of patients, and routine cleaning and disinfection procedures.

If there is a suspected case of COVID-19, we will follow the policies and procedures already in place for modified programming for any affected housing units and areas. We will continue to update guidelines for COVID-19 response based on CDC recommendations and will maintain cooperation with local and state health departments and the law enforcement community.

COVID-19 is new, but the most important aspect of preparedness is remaining calm. Don't panic. We understand staff, families, and those who visit state prisons as program providers or volunteers may have concerns and anxiety about COVID-19, but please be assured that there is no need for alarm. All should follow the precautions recommended by CDC, which expand upon precautions advised during cold and flu season. The spread of COVID-19 can be significantly reduced with proper infection control measures and good individual hygiene practices.








**Wet** your hands with clean, running water (warm or cold), turn off the tap, and apply soap.

**Lather** your hands by rubbing them together with the soap. Be sure to lather the backs of your hands, between your fingers, and under your nails.

**Scrub** your hands for at least 20 seconds. Need a timer? Hum the "Happy Birthday" song from beginning to end twice.

**Rinse** hands well under clean, running water.

**Dry** hands using a clean towel or air dry them.

**WASH YOUR HANDS FREQUENTLY**



# SYMPTOMS OF CORONAVIRUS DISEASE 2019

**Patients with COVID-19 have experienced mild to severe respiratory illness.**



**Symptoms* can include**

**FEVER**

**COUGH**

*Symptoms may appear 2-14 days after exposure.

**SHORTNESS OF BREATH**

Seek medical advice if you develop symptoms, and have been in close contact with a person known to have COVID-19 or if you live in or have recently been in an area with ongoing spread of COVID-19.

# If you have symptoms of COVID-19, please complete a form 7362 and let someone know immediately.

# PREVENT THE SPREAD OF ILLNESS

**Good health habits like covering your cough and washing your hands often can help stop the spread of germs and prevent respiratory illnesses. Protect yourself and others from viral illnesses and help stop the spread of germs.**

## Avoid close contact

*Avoid close contact with people who are sick. When you are sick, keep your distance from others to protect them from getting sick too.*

## Keep your germs to yourself

*As much as possible, stay in your housing area away from others when you are sick. This will help prevent spreading your illness to others.*

## Cover your nose and mouth

*Cover your mouth and nose with a tissue when coughing or sneezing. It may prevent those around you from getting sick. Flu and other serious respiratory illnesse are spread by cough, sneezing, or unclean hands.*

## Handwashing: clean hands save lives!

*Washing your hands is easy, and it's one of the most effective ways to prevent the spread of germs. Clean hands can stop germs from spreading from one person to another and throughout an entire community. If soap and water are not available, use hand sanitizer.*

## Avoid touching your eyes, nose or mouth

*Germs are often spread when a person touches something that is contaminated with germs and then touches his or her eyes, nose, or mouth.*

## Practice other good health habits

*Clean frequently touched surfaces especially when you or someone you share space with is ill. Get plenty of sleep, be physically active, manage your stress, drink plenty of fluids, and eat nutritious food.*



# Lo que necesita saber sobre la enfermedad del coronavirus 2019 (COVID-19)

## ¿Qué es la enfermedad del coronavirus 2019 (COVID-19)?

La enfermedad del coronavirus 2019 (COVID-19) es una afección respiratoria que se puede propagar de persona a persona. El virus que causa el COVID-19 es un nuevo coronavirus que se identificó por primera vez durante la investigación de un brote en Wuhan, China.

## ¿Pueden las personas en los EE. UU. contraer el COVID-19?

Sí. El COVID-19 se está propagando de persona a persona en partes de los Estados Unidos. El riesgo de infección con COVID-19 es mayor en las personas que son contactos cercanos de alguien que se sepa que tiene el COVID-19, por ejemplo, trabajadores del sector de la salud o miembros del hogar. Otras personas con un riesgo mayor de infección son las que viven o han estado recientemente en un área con propagación en curso del COVID-19.

## ¿Ha habido casos de COVID-19 en los EE. UU.?

Sí. El primer caso de COVID-19 en los Estados Unidos se notificó el 21 de enero del 2020.

## ¿Cómo se propaga el COVID-19?

Es probable que el virus que causa el COVID-19 haya surgido de una fuente animal, pero ahora se está propagando de persona a persona. Se cree que el virus se propaga principalmente entre las personas que están en contacto cercano unas con otras (dentro de 6 pies de distancia), a través de las gotitas respiratorias que se producen cuando una persona infectada tose o estornuda. También podría ser posible que una persona contraiga el COVID-19 al tocar una superficie u objeto que tenga el virus y luego se toque la boca, la nariz o posiblemente los ojos, aunque no se cree que esta sea la principal forma en que se propaga el virus.

## ¿Cuáles son los síntomas del COVID-19?

Los pacientes con COVID-19 han tenido enfermedad respiratoria de leve a grave con los siguientes síntomas:

- fiebre
- tos
- dificultad para respirar

## ¿Cuáles son las complicaciones graves provocadas por este virus?

Algunos pacientes presentan neumonía en ambos pulmones, insuficiencia de múltiples órganos y algunos han muerto.

## ¿Qué puedo hacer para ayudar a protegerme?

Las personas se pueden proteger de las enfermedades respiratorias tomando medidas preventivas cotidianas.

- Evite el contacto cercano con personas enfermas.
- Evite tocarse los ojos, la nariz y la boca con las manos sin lavar.
- Lávese frecuentemente las manos con agua y jabón por al menos 20 segundos. Use un desinfectante de manos que contenga al menos un 60 % de alcohol si no hay agua y jabón disponibles.

## Si está enfermo, para prevenir la propagación de la enfermedad respiratoria a los demás, debería hacer lo siguiente:

- Quedarse en casa si está enfermo.
- Cubrirse la nariz o la boca con un pañuelo desechable al toser o estornudar y luego botarlo a la basura.
- Limpiar y desinfectar los objetos y las superficies que se tocan frecuentemente.

## ¿Qué debo hacer si he regresado recientemente de un viaje a un área con propagación en curso del COVID-19?

Si ha llegado de viaje proveniente de un área afectada, podrían indicarle que no salga de casa por hasta 2 semanas. Si presenta síntomas durante ese periodo (fiebre, tos, dificultad para respirar), consulte a un médico. Llame al consultorio de su proveedor de atención médica antes de ir y dígales sobre su viaje y sus síntomas. Ellos le darán instrucciones sobre cómo conseguir atención médica sin exponer a los demás a su enfermedad. Mientras esté enfermo, evite el contacto con otras personas, no salga y postergue cualquier viaje para reducir la posibilidad de propagar la enfermedad a los demás.

## ¿Hay alguna vacuna?

En la actualidad no existe una vacuna que proteja contra el COVID-19. La mejor manera de prevenir infecciones es tomar medidas preventivas cotidianas, como evitar el contacto cercano con personas enfermas y lavarse las manos con frecuencia.

## ¿Existe un tratamiento?

No hay un tratamiento antiviral específico para el COVID-19. Las personas con el COVID-19 pueden buscar atención médica para ayudar a aliviar los síntomas.



Evite el contacto cercano con las personas enfermas.

Limpie y desinfecte los objetos y las superficies que se tocan frecuentemente.

# DETENGA LA PROPAGACIÓN DE LOS MICROBIOS

Ayude a prevenir la propagación de virus respiratorios como el nuevo COVID-19.



Cúbrase la nariz y la boca con un pañuelo desechable al toser o estornudar y luego bótelo a la basura.



Lávese las manos frecuentemente con agua y jabón por al menos 20 segundos.



Evite tocarse los ojos, la nariz y la boca.

# Exhibit C



# Arizona Department of Corrections
# Inmate Notification

| SUBJECT | ISSUED | NOTIFICATION NUMBER |
|---------|--------|---------------------|
| 905, Inmate Trust Account/Money System | October 31, 2019 | 19-27 |

This information is to be posted for **a minimum of 30** days in areas accessible to inmates and shall be made available to inmates who do not have access to posted copies.

## NOTICE

Department Order #905, Inmate Trust Account/Money System, will be revised and will be effective **December 2, 2019**. Significant revisions include:

- The new banking software, associated with AIMS2, will automatically determine indigent inmate status over a period of 30 days by verifying daily spendable balances. If the spendable balance on each day is less than $8, the inmate will be eligible for indigent status. Other criterion that is a factor will be the monthly spending, not including deductions, which cannot exceed $31.99 to be eligible for indigent status.

- In the new system, the inmates will no longer be required to fill out Form 905-2 Application for Health and Welfare Indigent Status.

- The new spendable balance threshold to qualify as indigent will change from $12 to $8.

- All indigent inmates will be charged for indigent supplies. The charges will remain as a debt on their account until paid in full or partially. After one calendar year, the debt balance will be retired.

- The new system will restrict indigent purchasing to only supplies needed.

**Current process: The inmate fills out Form 905-2 for approval by CO III or a case manager. Upon approval, the form is submitted to Inmate Banking for determination of indigent eligibility based on spendable balances within the last 30 days. If the inmate had less than $12 available in spendable account within the last 30 days, they are approved and the status is recorded in AIMS. The balance file submitted to Keefe Commissary will have indigent flags included and allow them to shop from the indigent supplies list.**

**New System process: The banking System will determine inmate indigent status on a daily basis and allow the inmate to purchase health and welfare items from the indigent commissary list. All indigent items will be charged to their spendable account. The charges will remain as debt (for up to one year) unless future spendable funds become available.**

David Shinn
Director

# Exhibit 2

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **AZ Regional Office** | | | |
| Associate Regional Mental Health Director | 1.00 | **1.00** | 0.00 |
| Associate VPO | 1.00 | **1.00** | 0.00 |
| Business Analyst | 1.00 | **1.00** | 0.00 |
| Director Operations | 1.00 | **1.00** | 0.00 |
| Education Coordinator | 1.00 | **2.00** | 1.00 |
| Lead Outpatient UM Reviewer | 1.00 | **1.00** | 0.00 |
| Office Manager | 1.00 | **1.00** | 0.00 |
| Recruiter | 1.00 | **1.00** | 0.00 |
| Regional Behavioral Health Tech | 1.00 | **1.00** | 0.00 |
| Regional Clinical Pharmacy Director | 1.00 | **1.00** | 0.00 |
| Regional Dental Director | 1.00 | **1.00** | 0.00 |
| Regional Director CQI | 1.00 | **1.00** | 0.00 |
| Regional Director of Nursing | 1.00 | **2.00** | 1.00 |
| Regional Grievance Coordinator | 1.00 | **1.00** | 0.00 |
| Regional Infection Control Nurse | 1.00 | **0.00** | **-1.00** |
| Regional Lead Psychology Associate | 1.00 | **1.00** | 0.00 |
| Regional Medical Director | 1.00 | **1.00** | 0.00 |
| Regional Mental Health Director | 1.00 | **1.00** | 0.00 |
| Regional Psychiatric Director | 1.00 | **1.00** | 0.00 |
| Release / Discharge Planner | 1.00 | **1.00** | 0.00 |
| Service Desk Analyst | 1.00 | **1.00** | 0.00 |
| Telehealth Coordinator | 1.00 | **1.00** | 0.00 |
| Training & Development Mgr | 1.00 | **1.00** | 0.00 |
| Utilization Review RN | 3.00 | **3.00** | 0.00 |
| VP of Operations | 1.00 | **1.00** | 0.00 |
| Associate Regional Medical Director | 0.00 | **1.00** | 1.00 |
| Medical Records Clerk | 0.00 | **1.00** | 1.00 |
| QA Director | 0.00 | **1.00** | 1.00 |
| | 27.00 | **31.00** | **-1.00** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600190

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **Douglas Complex** | | | |
| **Administrative Assistant** | 1.00 | **1.00** | 0.00 |
| **Assistant Director of Nursing** | 1.00 | **1.00** | 0.00 |
| **Clinical Coordinator** | 0.50 | **1.00** | 0.50 |
| **Dental Assistant** | 2.00 | **3.00** | 1.00 |
| **Dental Director** | 1.00 | **0.00** | **-1.00** |
| **Dentist** | 1.00 | **1.55** | 0.55 |
| **Director of Nursing** | 1.00 | **1.00** | 0.00 |
| **Facility Health Administrator** | 1.00 | **1.00** | 0.00 |
| **Healthcare Delivery Facilitator** | 1.00 | **1.00** | 0.00 |
| **Inventory Coordinator** | 1.00 | **1.00** | 0.00 |
| **Lead Inventory Coordinator** | 1.00 | **1.00** | 0.00 |
| **LPN/MA** | 4.00 | **4.00** | 0.00 |
| **Medical Director** | 1.00 | **0.00** | **-1.00** |
| **Medical Records Clerk** | 1.00 | **1.00** | 0.00 |
| **Medical Records Supervisor** | 1.00 | **0.00** | **-1.00** |
| **Midlevel Practitioner** | 1.50 | **1.00** | **-0.50** |
| **Nursing Assistant / PCT** | 4.00 | **3.00** | **-1.00** |
| **Psychology Associate (CLINICIAN)** | 1.00 | **1.00** | 0.00 |
| **RN** | 8.00 | **8.40** | 0.40 |
| **Scheduler** | 0.50 | **0.00** | **-0.50** |
| **X-Ray Technician** | 0.25 | **0.25** | 0.00 |
| | 33.75 | 31.20 | **-5.00** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600191

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| Eyman Complex | | | |
| Administrative Assistant | 2.00 | 2.00 | 0.00 |
| Assistant Director of Nursing | 6.00 | 5.00 | -1.00 |
| Assistant Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Behavioral Health Tech | 4.00 | 4.00 | 0.00 |
| Clinical Coordinator | 1.50 | 0.00 | -1.50 |
| Dental Assistant | 6.00 | 5.00 | -1.00 |
| Dental Director | 1.00 | 1.00 | 0.00 |
| Dentist | 3.00 | 3.25 | 0.25 |
| Director of Nursing | 1.00 | 1.00 | 0.00 |
| Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 0.00 |
| Inventory Coordinator | 3.00 | 4.00 | 1.00 |
| Lead Inventory Coordinator | 1.00 | 0.00 | -1.00 |
| MH Lead | 1.00 | 1.00 | 0.00 |
| LPN/MA | 30.00 | 20.80 | -9.20 |
| Medical Director | 1.00 | 1.00 | 0.00 |
| Medical Records Clerk | 4.00 | 4.00 | 0.00 |
| Medical Records Supervisor | 1.00 | 1.00 | 0.00 |
| Mental Health Clerk | 1.00 | 1.00 | 0.00 |
| Mental Health Midlevel (NP / PA) (PROVIDER) | 3.50 | 3.00 | -0.50 |
| Mental Health RN | 2.00 | 1.90 | -0.10 |
| Midlevel Practitioner | 5.50 | 5.00 | -0.50 |
| Nursing Assistant / PCT | 9.00 | 7.90 | -1.10 |
| Psychiatrist (PROVIDER) | 1.00 | 2.00 | 1.00 |
| Psychologist (CLINICIAN) | 3.00 | 3.00 | 0.00 |
| Psychology Associate (CLINICIAN] | 13.00 | 8.75 | -4.25 |
| Release / Discharge Planner | 1.00 | 1.00 | 0.00 |
| RN | 20.00 | 10.50 | -9.50 |
| Scheduler | 3.00 | 2.00 | -1.00 |
| Staff Physician | 1.00 | 1.00 | 0.00 |
| X-Ray Technician | 1.00 | 1.00 | 0.00 |
| | 132.50 | 104.10 | -30.65 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600192

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **Florence Complex** | | | |
| Administrative Assistant | 2.00 | 4.00 | 2.00 |
| Assistant Director of Nursing | 6.00 | 6.00 | 0.00 |
| Assistant Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Behavioral Health Tech | 4.00 | 4.00 | 0.00 |
| Dental Assistant | 6.00 | 5.00 | -1.00 |
| Dental Director | 1.00 | 1.00 | 0.00 |
| Dentist | 3.00 | 3.00 | 0.00 |
| Director of Nursing | 1.00 | 1.00 | 0.00 |
| Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 0.00 |
| Inventory Coordinator | 3.00 | 4.00 | 1.00 |
| Lab Technician | 0.50 | 1.00 | 0.50 |
| Lead Inventory Coordinator | 1.00 | 0.80 | -0.20 |
| MH Lead | 1.00 | 1.00 | 0.00 |
| LPN/MA | 30.00 | 17.30 | -12.70 |
| Medical Director | 1.00 | 1.00 | 0.00 |
| Medical Records Clerk | 5.00 | 3.00 | -2.00 |
| Medical Records Supervisor | 1.00 | 1.00 | 0.00 |
| Mental Health Clerk | 1.00 | 0.00 | -1.00 |
| Mental Health Midlevel (NP / PA) (PROVIDER) | 3.50 | 2.00 | -1.50 |
| Mental Health RN | 1.00 | 0.90 | -0.10 |
| Midlevel Practitioner | 6.00 | 5.25 | -0.75 |
| Nursing Assistant / PCT | 20.00 | 15.60 | -4.40 |
| Psychiatrist (PROVIDER) | 1.00 | 0.00 | -1.00 |
| Psychologist (CLINICIAN) | 3.00 | 0.90 | -2.10 |
| Psychology Associate (CLINICIAN) | 8.00 | 8.00 | 0.00 |
| Release / Discharge Planner | 1.00 | 1.00 | 0.00 |
| RN | 36.00 | 22.80 | -13.20 |
| Staff Physician | 2.00 | 2.00 | 0.00 |
| X-Ray Technician | 1.00 | 1.00 | 0.00 |
| | 152.00 | 115.55 | -39.95 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600193

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| Lewis Complex | | | |
| Administrative Assistant | 2.00 | 2.00 | 0.00 |
| Assistant Director of Nursing | 6.00 | 5.00 | -1.00 |
| Assistant Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Behavioral Health Tech | 4.00 | 3.00 | -1.00 |
| Clinical Coordinator | 1.00 | 1.00 | 0.00 |
| Dental Assistant | 6.00 | 6.65 | 0.65 |
| Dental Director | 1.00 | 1.00 | 0.00 |
| Dentist | 3.00 | 2.75 | -0.25 |
| Director of Nursing | 1.00 | 1.00 | 0.00 |
| Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | 0.00 | -1.00 |
| Inventory Coordinator | 4.00 | 4.00 | 0.00 |
| Lead Inventory Coordinator | 1.00 | 1.00 | 0.00 |
| MH Lead | 1.00 | 1.00 | 0.00 |
| LPN/MA | 34.00 | 20.20 | -13.80 |
| Medical Director | 1.00 | 1.00 | 0.00 |
| Medical Records Clerk | 3.00 | 2.00 | -1.00 |
| Medical Records Supervisor | 1.00 | 1.00 | 0.00 |
| Mental Health Clerk | 1.00 | 1.00 | 0.00 |
| Mental Health Midlevel (NP / PA) (PROVIDER) | 3.50 | 2.75 | -0.75 |
| Mental Health RN | 2.00 | 1.90 | -0.10 |
| Midlevel Practitioner | 6.00 | 7.00 | 1.00 |
| Nursing Assistant / PCT | 14.00 | 15.60 | 1.60 |
| Psychiatrist (PROVIDER) | 1.00 | 1.00 | 0.00 |
| Psychologist (CLINICIAN) | 3.00 | 1.00 | -2.00 |
| Psychology Associate (CLINICIAN) | 12.00 | 7.00 | -5.00 |
| Release / Discharge Planner | 1.00 | 1.00 | 0.00 |
| RN | 30.00 | 17.00 | -13.00 |
| Scheduler | 1.50 | 0.00 | -1.50 |
| Staff Physician | 2.00 | 0.75 | -1.25 |
| X-Ray Technician | 1.00 | 1.00 | 0.00 |
| Dental Hygienist | 0.00 | 0.00 | 0.00 |
| | 150.00 | 111.60 | -41.65 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600194

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| Perryville Complex | | | |
| Administrative Assistant | 2.00 | 2.00 | 0.00 |
| Assistant Director of Nursing | 6.00 | 6.00 | 0.00 |
| Assistant Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Behavioral Health Tech | 3.00 | 3.00 | 0.00 |
| Clinical Coordinator | 1.00 | 1.00 | 0.00 |
| Dental Assistant | 6.00 | 8.00 | 2.00 |
| Dental Director | 1.00 | 1.00 | 0.00 |
| Dentist | 4.00 | 2.75 | -1.25 |
| Director of Nursing | 1.00 | 1.00 | 0.00 |
| Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 0.00 |
| Inventory Coordinator | 2.00 | 2.00 | 0.00 |
| Lab Technician | 0.50 | 2.00 | 1.50 |
| Lead Inventory Coordinator | 1.00 | 1.00 | 0.00 |
| MH Lead | 1.00 | 1.00 | 0.00 |
| LPN/MA | 24.00 | 20.40 | -3.60 |
| Medical Director | 0.80 | 1.00 | 0.20 |
| Medical Records Clerk | 4.00 | 4.00 | 0.00 |
| Medical Records Supervisor | 1.00 | 1.00 | 0.00 |
| Mental Health Clerk | 1.00 | 0.00 | -1.00 |
| Mental Health Midlevel (NP / PA) (PROVIDER) | 3.50 | 4.20 | 0.70 |
| Mental Health RN | 5.20 | 3.80 | -1.40 |
| Midlevel Practitioner | 5.00 | 5.55 | 0.55 |
| Nursing Assistant / PCT | 14.00 | 12.00 | -2.00 |
| Psychiatrist (PROVIDER) | 1.00 | 2.00 | 1.00 |
| Psychologist (CLINICIAN) | 2.00 | 1.00 | -1.00 |
| Psychology Associate (CLINICIAN] | 10.00 | 3.00 | -7.00 |
| Release / Discharge Planner | 1.00 | 1.00 | 0.00 |
| RN | 30.00 | 21.90 | -8.10 |
| Scheduler | 1.00 | 1.00 | 0.00 |
| Staff Physician | 1.20 | 0.50 | -0.70 |
| X-Ray Technician | 0.50 | 1.00 | 0.50 |
| Dental Hygienist | 0.00 | 0.00 | 0.00 |
| | 136.70 | 117.10 | -26.05 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600195

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| Phoenix Complex | | | |
| Administrative Assistant | 1.00 | 1.00 | 0.00 |
| Assistant Director of Nursing | 3.00 | 1.00 | -2.00 |
| Behavioral Health Tech | 5.00 | 5.90 | 0.90 |
| Clinical Director (Ph.D) | 1.00 | 1.00 | 0.00 |
| Dental Assistant | 3.00 | 2.80 | -0.20 |
| Dental Director | 1.00 | 1.00 | 0.00 |
| Director of Nursing | 1.00 | 1.00 | 0.00 |
| Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 0.00 |
| Inventory Coordinator | 1.00 | 2.00 | 1.00 |
| Lab Technician | 0.50 | 1.00 | 0.50 |
| Lead Inventory Coordinator | 1.00 | 0.00 | -1.00 |
| LPN/MA | 3.00 | 4.00 | 1.00 |
| Medical Director | 1.00 | 0.00 | -1.00 |
| Medical Records Clerk | 3.00 | 4.00 | 1.00 |
| Medical Records Supervisor | 1.00 | 1.00 | 0.00 |
| Mental Health Midlevel (NP / PA) (PROVIDER) | 3.50 | 3.00 | -0.50 |
| Mental Health RN | 15.80 | 17.30 | 1.50 |
| MH RN Charge | 1.00 | 1.00 | 0.00 |
| Midlevel Practitioner | 4.00 | 6.00 | 2.00 |
| Nursing Assistant / PCT | 5.75 | 2.00 | -3.75 |
| Psychiatrist (PROVIDER) | 1.00 | 1.00 | 0.00 |
| Psychologist (CLINICIAN) | 4.00 | 4.00 | 0.00 |
| Psychology Associate (CLINICIAN) | 11.00 | 7.00 | -4.00 |
| RN | 12.00 | 10.40 | -1.60 |
| Scheduler | 0.50 | 0.00 | -0.50 |
| Staff Physician | 1.00 | 2.00 | 1.00 |
| X-Ray Technician | 1.00 | 1.00 | 0.00 |
| | 88.05 | 82.40 | -14.55 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600196

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **Safford Complex** | | | |
| Administrative Assistant | 1.00 | **1.00** | 0.00 |
| Assistant Director of Nursing | 2.00 | **2.00** | 0.00 |
| Dental Assistant | 2.00 | **2.00** | 0.00 |
| Dental Director | 1.00 | **1.00** | 0.00 |
| Director of Nursing | 1.00 | **1.00** | 0.00 |
| Facility Health Administrator | 1.00 | **1.00** | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | **1.00** | 0.00 |
| Inventory Coordinator | 1.00 | **1.00** | 0.00 |
| Lead Inventory Coordinator | 1.00 | **1.00** | 0.00 |
| LPN/MA | 6.00 | **2.00** | **-4.00** |
| Medical Director | 1.00 | **1.00** | 0.00 |
| Medical Records Clerk | 1.00 | **1.00** | 0.00 |
| Medical Records Supervisor | 1.00 | **1.00** | 0.00 |
| Midlevel Practitioner | 1.00 | **2.00** | 1.00 |
| Nursing Assistant / PCT | 4.00 | **3.75** | **-0.25** |
| Psychology Associate (CLINICIAN) | 1.00 | **1.00** | 0.00 |
| RN | 8.00 | **9.30** | 1.30 |
| Scheduler | 0.50 | **0.75** | 0.25 |
| X-Ray Technician | 0.25 | **0.25** | 0.00 |
| | 34.75 | **33.05** | **-4.25** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600197

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **Tucson Complex** | | | |
| Administrative Assistant | 2.00 | **2.00** | 0.00 |
| Assistant Director of Nursing | 8.00 | **5.00** | -3.00 |
| Assistant Facility Health Administrator | 1.00 | **1.00** | 0.00 |
| Behavioral Health Tech | 6.00 | **6.00** | 0.00 |
| Clinical Coordinator | 1.00 | **1.00** | 0.00 |
| Dental Assistant | 6.00 | **6.20** | 0.20 |
| Dental Director | 1.00 | **1.00** | 0.00 |
| Dentist | 3.00 | **2.00** | -1.00 |
| Director of Nursing | 1.00 | **1.00** | 0.00 |
| Facility Health Administrator | 1.00 | **1.00** | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | **1.00** | 0.00 |
| Inventory Coordinator | 3.00 | **4.00** | 1.00 |
| Lab Technician | 2.00 | **2.00** | 0.00 |
| Lead Inventory Coordinator | 1.00 | **1.00** | 0.00 |
| MH Lead | 1.00 | **1.00** | 0.00 |
| LPN/MA | 40.00 | **33.10** | -6.90 |
| Medical Director | 1.00 | **1.00** | 0.00 |
| Medical Records Clerk | 6.00 | **6.00** | 0.00 |
| Medical Records Supervisor | 1.00 | **1.00** | 0.00 |
| Mental Health Clerk | 1.00 | **1.00** | 0.00 |
| Mental Health Midlevel (NP / PA) (PROVIDER) | 3.50 | **4.00** | 0.50 |
| Mental Health RN | 2.00 | **2.00** | 0.00 |
| Midlevel Practitioner | 8.00 | **6.00** | -2.00 |
| Nursing Assistant / PCT | 19.00 | **22.90** | 3.90 |
| Psychiatrist (PROVIDER) | 1.00 | **2.00** | 1.00 |
| Psychologist (CLINICIAN) | 4.00 | **3.00** | -1.00 |
| Psychology Associate (CLINICIAN) | 14.00 | **12.00** | -2.00 |
| Release / Discharge Planner | 2.00 | **2.00** | 0.00 |
| RN | 36.00 | **25.70** | -10.30 |
| Scheduler | 1.00 | **2.00** | 1.00 |
| Staff Physician | 2.00 | **0.75** | -1.25 |
| X-Ray Technician | 1.00 | **1.00** | 0.00 |
| Dental Hygienist | 0.00 | **0.00** | 0.00 |
| | 180.50 | **160.65** | **-27.45** |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600198

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| Winslow Complex | | | |
| Administrative Assistant | 1.00 | 2.00 | 1.00 |
| Assistant Director of Nursing | 2.00 | 2.00 | 0.00 |
| Dental Assistant | 2.00 | 2.00 | 0.00 |
| Dental Director | 1.00 | 1.00 | 0.00 |
| Director of Nursing | 1.00 | 1.00 | 0.00 |
| Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 0.00 |
| Inventory Coordinator | 1.00 | 0.00 | -1.00 |
| Lead Inventory Coordinator | 1.00 | 1.00 | 0.00 |
| LPN/MA | 4.00 | 1.90 | -2.10 |
| Medical Director | 1.00 | 1.00 | 0.00 |
| Medical Records Clerk | 1.00 | 0.00 | -1.00 |
| Medical Records Supervisor | 1.00 | 1.00 | 0.00 |
| Midlevel Practitioner | 2.00 | 2.00 | 0.00 |
| Nursing Assistant / PCT | 3.00 | 4.00 | 1.00 |
| Psychology Associate (CLINICIAN) | 1.00 | 1.00 | 0.00 |
| RN | 6.00 | 13.00 | 7.00 |
| Scheduler | 0.50 | 1.00 | 0.50 |
| X-Ray Technician | 0.50 | 0.50 | 0.00 |
| | 31.00 | 36.40 | -4.10 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600199

Staffing Variances - Hired FTE vs Contract FTE

| POSITION | CONTRACT FTE | HIRED FTE | FTE VARIANCE |
|---|---|---|---|
| **Yuma Complex** | | | |
| Administrative Assistant | 2.00 | 3.00 | 1.00 |
| Assistant Director of Nursing | 5.00 | 5.00 | 0.00 |
| Assistant Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Behavioral Health Tech | 3.00 | 1.00 | -2.00 |
| Clinical Coordinator | 1.00 | 1.00 | 0.00 |
| Dental Assistant | 4.00 | 5.00 | 1.00 |
| Dental Director | 1.00 | 0.00 | -1.00 |
| Dentist | 2.00 | 1.05 | -0.95 |
| Director of Nursing | 1.00 | 1.00 | 0.00 |
| Facility Health Administrator | 1.00 | 1.00 | 0.00 |
| Healthcare Delivery Facilitator | 1.00 | 1.00 | 0.00 |
| Inventory Coordinator | 2.00 | 2.00 | 0.00 |
| Lab Technician | 2.00 | 0.00 | -2.00 |
| Lead Inventory Coordinator | 1.00 | 1.00 | 0.00 |
| MH Lead | 1.00 | 1.00 | 0.00 |
| LPN/MA | 10.00 | 6.75 | -3.25 |
| Medical Director | 1.00 | 1.00 | 0.00 |
| Medical Records Clerk | 3.00 | 4.00 | 1.00 |
| Medical Records Supervisor | 1.00 | 1.00 | 0.00 |
| Mental Health Clerk | 1.00 | 1.00 | 0.00 |
| Mental Health Midlevel (NP / PA) (PROVIDER) | 3.00 | 3.00 | 0.00 |
| Mental Health RN | 1.00 | 1.00 | 0.00 |
| Midlevel Practitioner | 4.00 | 4.90 | 0.90 |
| Nursing Assistant / PCT | 6.00 | 12.50 | 6.50 |
| Psychiatrist (PROVIDER) | 1.00 | 0.00 | -1.00 |
| Psychologist (CLINICIAN) | 1.00 | 0.00 | -1.00 |
| Psychology Associate (CLINICIAN) | 9.00 | 7.35 | -1.65 |
| Release / Discharge Planner | 1.00 | 1.00 | 0.00 |
| RN | 14.00 | 12.55 | -1.45 |
| Scheduler | 0.50 | 1.00 | 0.50 |
| Staff Physician | 1.00 | 0.00 | -1.00 |
| X-Ray Technician | 1.00 | 1.00 | 0.00 |
| | 86.50 | 82.10 | -15.30 |
| **TOTAL FTE VARIANCE** | 1052.75 | 905.15 | 147.60 |
| **TOTAL NEGATIVE VARIANCE** | | | -209.95 |
| | | | |
| **TOTAL FTE VARIANCE:** | | | |
| DIFFERENCE BETWEEN **TOTAL** NUMBERS OF FTE STAFF REQUIRED UNDER THE CONTRACT (1052.75) AND **TOTAL** NUMBER OF FTE STAFF CURRENTLY EMPLOYED | | | |
| **TOTAL NEGATIVE VARIANCE:** | | | |
| NUMBER OF SPECIFIC FTE POSITIONS REQUIRED UNDER THE CONTRACT (1052.75) THAT ARE UNFILLED BY FACILITY AND POSITION | | | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1600200

Exhibit 3



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964

Telephone (510) 280-2621 • Fax (510) 280-2704

www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Shira Tevah

VIA EMAIL ONLY

February 13, 2020

Mr. Timothy Bojanowski
Struck, Love, Bojanowski, & Acedo, PLC
3100 W. Ray Rd., Ste. 300
Chandler, AZ 85226
tbojanowski@strucklove.com

     RE:   *Parsons v. Shinn*
            ASPC-Douglas Water Supply

Dear Tim:

     Recently it has come to our attention from class members incarcerated at Douglas prison and their loved ones that the drinking water supply at the institution has tasted and smelled like motor oil or diesel fuel since mid-January.  According to ADC's Institutional Capacity Daily Count sheet, there are currently 1,987 people incarcerated at ASPC-Douglas: Gila Unit (774 people); Mohave Unit (928 people); Mohave Detention Unit (79 people); Eggers Unit (236 people); Papago Unit (49 people).[1]

     According to a recent media report from the Douglas *Dispatch*, this is the second time in less than a year that the water supply to the Douglas prison has been compromised.[2] The public information officer for the Arizona Department of Environmental Quality ("ADEQ") told the *Dispatch* that the water supply was tested the previous week, and that bottled water was being provided to the staff and incarcerated people at the prison.[3]

     However, class members are reporting that they are suffering symptoms including diarrhea, rashes, and nausea, from having to brush their teeth in this water, bathe in it, and/or consume food prepared with this water.  They cannot launder or wash their clothing

---

     [1] See https://corrections.az.gov/sites/default/files/DAILY_COUNT/Feb2020/ 02132020_count_sheet.pdf.   Papago Unit is designated for women.

     [2] Bruce Whetten, ADEQ testing water at Douglas prison, Douglas *Dispatch*, Feb. 5, 2020, available at https://www.douglasdispatch.com/news/adeq-testing-water-at-douglas-prison/article_132b4488-46c2-11ea-8d0c-ab8f06d3dd29.html

     [3] *Id.*

**Board of Directors**

Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah

or bedding in the contaminated water.  They also report that they are provided only intermittent access to bottled water, and that portable water tanks and Igloos on the prison yards appear to be filled with hoses from the tap water, and not from outside sources.  Some reports indicate that incarcerated people are threatened with disciplinary tickets if they file grievances or Health Needs Requests reporting problems with the water.

In June 2019, when there was no running water for four days at ASPC-Douglas, family members reported that access to bottled water was a "free-for-all," that there were only four portable toilets for more than 800 people at Mohave Unit, and that at two units, "prison personnel are filing trash cans with water for people to clean themselves," and at Eggers Unit, "the trash cans filled with water had been placed 'in the middle of the yard [] like the Hunger Games.'"[4]

A November 12, 2019 inspection report by ADEQ of the prison's drinking water supply (attached to this letter) states that

> In October 2019, ADEQ received complaints from families of inmates about the water at the Arizona State Prison Complex (ASPC) in Douglas smelling like diesel fuel and being discolored. ASPC-Douglas gets its water from Bisbee Douglas International Airport (AZ0402061). The water system had put a new approved well online (55-229594) in September 2019. According to the system, the new well was causing the issue and was taken offline over the Oct. 19-20 weekend.  System sampled for Volatile Organic Compounds, diesel, oil and gas at both of its wells.  All samples were below acceptable limits.[5]

The report also noted that Well 1 was the new well put into production in September 2019 to serve the prison.  According to news reports, it was used after other wells suffered intermittent shortages in June 2019, and went off-line after the November inspection, and a

---

[4] Meg O'Connor and Elizabeth Whitman, *4 Toilets, 830 People: Douglas Prison's Water Crisis Was Years in the Making*, Phoenix New Times, June 10, 2019, available at https://www.phoenixnewtimes.com/news/douglas-prisons-water-crisis-was-years-in-the-making-11310513

[5] Ariz. Dep't of Env. Quality, *Water Complaint Inspection Report: Bisbee Douglas International Airport, Complaint No. 16434, Inspection 33732*, Nov. 12, 2019,("ADEQ Inspection Report" available at https://azsdwis.azdeq.gov/DWW_EXT/JSP/WaterSystemDetail.jsp?tinwsys_is_number=220&tinwsys_st_code=AZ&wsnumber=AZ0402061

different well, Well 7, is now being used.[6]  The ADEQ inspectors identified six problems with Well 1, and six different problems with Well 7, and noted that the "[s]ystem reportedly has a problem with oil from the pump oiler seeping into the water at well 1," and offered recommendations to avoid "potential contamination" and "chemical reactions," and to "determine sources of possible contamination."[7]

In an October 8, 2019 letter from Acting ADC Director Joe Profiri to Cochise County Administrator Edward T. Gilligan (see attached), Mr. Profiri detailed six separate incidents in a three month period from June 7, 2019, to September 7, 2019, in which the water supply to ASPC-Douglas was disrupted.  Mr. Profiri noted in his letter, "when the water services are compromised, not only do we lose the ability to draw water for human essential needs, but there is no fire protection for the prison complex.  This truly is a life, safety issue that should be treated as an urgent matter."[8]

Mr. Profiri is correct that an adequate supply of clean water is essential for human needs.  *See Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000) (lack of drinking water contributed to Eighth Amendment violation).  Given the history of problems with the water supply at Douglas, we are also concerned that the department's emergency response to the compromised water supply apparently consists only of providing bottled water.  We are extremely concerned that class members are being exposed to water that is causing sickness and rashes.  We are also concerned about the reports that there is not an adequate supply of bottled water for incarcerated people, and that class members are still being forced to shower, bathe, and brush their teeth in compromised water, and eat food that has been prepared with compromised water.  Finally, a lack of uncontaminated water for handwashing (by both patients and health care personnel) and for cleaning of health care equipment poses a significant danger to patient health and safety.

We request that ADC provide us within two weeks (by Feb. 27, 2020) copies of the emergency response plan for the water supply, and information about what steps the

---

[6] *See* Douglas *Dispatch*; *see also* Jimmy Jenkins, *Families of Incarcerated People Fear Water at Douglas, Arizona, Prison Is Contaminated Again*, KJZZ, Jan. 30, 2020, available at https://kjzz.org/content/1419971/families-incarcerated-people-fear-water-douglas-arizona-prison-contaminated-again.

[7] ADEQ Inspection Report at 2-3.

[8] Letter from J. Profiri, Acting Director, Arizona Department of Corrections, to Edward T. Gilligan, Cochise County Administrator, Oct. 8, 2019, available at https://kjzz.org/content/1320051/arizona-department-environmental-quality-investigating-water-contamination-douglas.

Mr. Timothy Bojanowski
RE: Parsons v. Shinn
RE: ASPC-Douglas Water Supply
Feb. 13, 2020
Page 4

department is taking to provide uncontaminated water for bathing and cooking for the long term; for example, bringing in trailers with portable showers, or establishing an alternate system for meal preparation.  We also request information as to what steps the department is taking to potentially move class members to other facilities for their safety and well-being. We further request Defendants' assurance that class members will suffer no retaliation or other adverse consequences for submitting HNRs, grievances, or other requests or complaints regarding problems with the water supply

      Thank you for your attention to this matter.

Sincerely yours,

Corene Kendrick
Staff Attorney



# ARIZONA DEPARTMENT
## OF
# ENVIRONMENTAL QUALITY



Douglas A. Ducey
Governor

Misael Cabrera
Director

## Water Quality Complaint Inspection Report

| | |
|---|---|
| **Facility Name and PWS ID:** Bisbee Douglas International Airport | **Complaint No:** 16434 |
| **Physical Location:** 6940 N Air Terminal Blvd.<br>**City, State, Zip:** Douglas, AZ 85607 | **Inspection No.:** 337232 |
| **County:** Cochise | **Arrival Date and Time:** 11/12/2019 8:40 AM |
| **Mailing Address:** 1415 W Melody Ln., Attn: Dan Coxworth<br>**City, State, Zip:** Bisbee, AZ 85603-3037 | **Inspector(s):** Reshet Gebremariam |
| **Owner/Responsible Party:**<br>Cochise County, Attn: Dan Coxworth | **Inspector Phone:** 602-771-4220<br>**Inspector Email:** gebremariam.reshet@azdeq.gov |
| **Onsite Contact Person(s)/Facility Operator(s):**<br>Fred Nixon<br>Elberto Acosta | **Was Inspection Announced?**<br>☒ Yes   ☐No |
| **Classification:** Community Water System<br>**System Grade:** D2<br>**Service Connections:** 14  **Population:** 2600<br>**Changes/Updates:**  ☐ Yes | **Weather:** Windy |
| **Operator/ID:** Elberto M Acosta / OP010922<br>**Phone:** 520-368-8064<br>**Email:** elberto.acosta@douglasaz.gov | **Op. Cert. Grade/Expiration:** D3 / 30-Nov-2021<br>**Add/Remove/Update Operator:** ☐ Yes |
| **Results of Inspection:**<br>☐ No deficiencies were noted during the course of the inspection. No ADEQ action will result from this inspection.<br>☒ Potential deficiencies were noted during the course of the inspection. Additional correspondence regarding this inspection may be forthcoming. | |
| **Inspection Report Issued:**   Via email from ADEQ office        **Facility Initial:**        **ADEQ Initial:** RG | |
| **ADEQ Compliance Assistance Coordinator:** Jane Kim, 602-771-4609, kim.jane@azdeq.gov<br><br><br>**Attachments:**<br>Attachment A – Notice of Inspection Rights | |
| **PHOTOGRAPHS TAKEN DURING INSPECTIONS ARE AVAILABLE ON REQUEST** | |

| Description of the Complaint | In October 2019, ADEQ received complaints from families of inmates about the water at the Arizona State Prison Complex (ASPC) in Douglas smelling like diesel fuel and being discolored. ASPC-Douglas gets its water from Bisbee Douglas International Airport (AZ0402061). The water system had put a new approved well online (55-229594) in September 2019. According to the system, the new well was causing the issue and was taken offline over the Oct. 19-20 weekend.<br><br>System sampled for Volatile Organic Compounds, diesel, oil and gas at both of its wells. All samples were below acceptable limits. |
|---|---|
| **Observations:** | **Sources:**<br>Three inactive wells: Well 4 (55-606410), Well 6 (55-606411), and Well 8 (55-516373).<br>Two active wells: Well 7 (55-606412) and Well 1 (55-229594)<br>Well 1 is the new well put into production in September 2019. It is currently offline (note: well 1 is referred to as well 9 in ATC/AOC engineering files but is registered as 55-229594).<br><br>**System flow:**<br>Well 7 (55-606412) → Chlorine gas → Storage tank 1 (200,000 gallons) → EPDS001 → Distribution System<br><br>Well 1 (55-229594) → Sodium Hypochlorite → Storage tank 1 (200,000 gallons) → EPDS001 → Distribution System<br><br>System is currently sampling at two Entry Points to the Distribution System (EPDSs). However, the system only has one EPDS located after the storage tank (i.e. EPDS001). EPDS001 is tagged.<br><br>**Observations:**<br>**Well 1:**<br>1. Well 1's pump does not directly sit on a slab/pedestal. The pump sits on elevated casing. Well 1 did not have a sanitary seal between the water pump base and casing.<br>2. Well 1 doesn't have an air vent. The well has a check valve type air vent on well discharge line. Well 1 has a sounding tube opening that is capped.<br>3. Well 1 has a pump to waste line that goes into a percolation pond. The pipe is inside the pond and is not air gapped. The percolation pond's capacity is 5,000 gallons. System is planning to expand its percolation pond.<br>4. The suction line for the chlorine feed system was not sealed (well 1 site).<br>5. The pump lubricant oil used at well 1 and well 7 is food grade.<br>6. The system has a generator with fuel tank at the well 1 site. The generator and the sodium hypochlorite containers are stored in the same room. |

| | **Well 7:** |
|---|---|
| | 1. Well 7's pump sits directly on ~6 inch pedestal and is not bolted down. |
| | 2. Well 7's air vent is not screened. |
| | 3. Well 7's sounding tube opening is not capped. |
| | 4. Well 7 is not secured/fenced in. The system is working on expanding the building housing the well discharge line to encompass the well. |
| | 5. There is a stand pipe at the well 7 site that is not being used. |
| | 6. According to the system, there is an old gas station less than 300 feet from the well 1 site. |
| **Comments and Potential Deficiencies:** | **Recommendations:** |
| | 1. To avoid potential contamination from backflow, the well 1's pump to waste line should be air gapped. The air gap distance shall be at least twice the diameter of the pipe. |
| | 2. To avoid any chemical reactions, at the well 1 site, store sodium hypochlorite containers in a different room or building from the generator. |
| | 3. Install a sanitary seal for well 1. |
| | 4. Seal chlorine container on the chlorine feed system (well 1 site). |
| | 5. Install a concrete pedestal on well 1 to have pump sit directly on concrete pedestal. |
| | 6. System reportedly has a problem with oil from the pump oiler seeping into the water at well 1. The system should verify that the solenoid and the control valve for the oilers are working properly at both wells. |
| | 7. Install a screen on well 7's air vent. |
| | 8. Cap sounding screen opening at well 7. |
| | 9. Disconnect stand pipe. |
| | 10. Bolt down well 7 to concrete slab. |
| | 11. System should conduct additional well sampling and work with ADEQ's waste program to determine source of possible contamination. |



# Arizona Department of Corrections

**1601 WEST JEFFERSON**
**PHOENIX, ARIZONA 85007**
**(602) 542-5497**
**www.azcorrections.gov**



DOUGLAS A. DUCEY
GOVERNOR

JOE PROFIRI
ACTING DIRECTOR

October 8, 2019

Mr. Edward T. Gilligan
County Administrator, Cochise County
1415 Melody Lane, Building G
Bisbee, AZ 85603

Dear Mr. Gilligan:

I was made aware of on-going issues with the County being unable to consistently supply water to Arizona State Prison Complex (ASPC)-Douglas from Arizona Department of Corrections (ADC) Warden Lee. Over the past four months beginning June 7, 2019 the City of Douglas has encountered several water outages that spanned several days. There have been continued intermittent issues surrounding the stability of ASPC-Douglas' water service. This basic service is contained in our lease with Cochise County that has existed since 1983. As I am sure you understand, with the vital public safety mission ADC serves, we must be able to count on the County to consistently provide the services promised, and to treat interruptions in that service with the utmost urgency.

The following are detailed events that are noteworthy.

| Date | Description | Notes |
|------|-------------|-------|
| 6/7/2019 | Low Water Pressure, Outage, Kick-Off Event | Initial Incident ICS 3-day outage. |
| 7/28/2019 | Low Water Pressure, Loss of water to partial areas of the complex. | A power issue at the site, causes the well to mal-function. |
| 8/4/2019 | Utility Outage | Power issue caused a pump failure--circuit was reset and resolved the issue, water disruption occurs, loss of water for several hours. |
| 8/23/2019 | Utility failure, power outage | Power outage caused the pump to fail to cause loss of water pressure later that night.  Backup generator did not start; water was not restored to full capability until preferred power was restored. |
| 8/24/2019 | Loss of Water Pressure | Following the incident on 8/23/2019, water to the complex was again lost due to electrical issues at the well. |
| 9/7/2019 | Inclement Weather | Loss of preferred power, well off-line, emergency generator at well-site not operational.  Rental brought in later that night.  No total loss of water occurred. |

Periodically during the times above, Warden Lee has been reassured week after week that Well #1, which has been under repair, would be up and operational.  The well is still not supplying water to the complex.

Edward T. Gilligan
October 8, 2019
Page Two

I fully understand and support the cooperative effort of our two government entities.  However, when the water services are compromised, not only do we lose the ability to draw water for human essential needs, but there is no fire protection for the prison complex.  This truly is a life, safety issue that should be treated as an urgent matter.

I respectfully request a response from you by October 15, 2019 that details how this problem will be solved by the County, and what measures are or will be in place to avoid these issues in the future. Furthermore, I request a specific escalation path to quickly resolve any future matters.

If you have any questions, please feel free to contact me directly at 602-542-5225.

Sincerely,

Joe Profiri
Acting Director

MPK/KS/cv

cc:     Tom Borer, Chairman, Cochise County Board of Supervisors
        Ann English, Vice-Chairman, Cochise County Board of Supervisors
        Peggy Judd, Supervisor, Cochise County Board of Supervisors
        Michael P. Kearns, Division Director, ADC Administrative Services
        Tara Diaz, Division Director, ADC Prison Operations
        Ron Credio, Southern Region Operations Director, ADC Prison Operations
        Ronald Lee, Warden, Arizona State Prison Complex-Douglas
        Kenneth Sanchez, Chief Procurement Officer, ADC Procurement Services
        Michael Landry, Administrator, ADC Engineering & Facilities

# Exhibit 4



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

March 9, 2020

<u>**VIA EMAIL ONLY**</u>
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

  Re: **Parsons v. Shinn**
    **ASPC-Douglas Water Supply**

Dear Corene:

  This letter responds to your February 13, 2020 correspondence concerning the water supply at ASPC-Douglas.  Issues involving the potential contamination of water are taken seriously and when ADC is made aware of potential contamination, it ensures that all inmates have a safe supply of drinking water.

  As one example, in January, ADC was made aware that the water had an odor.  ADC contacted the Cochise County officials in an effort to address the concern.  Even though the officials reported the water was safe to drink, out of an abundance of caution, bottled water was purchased and ADC staff distributed bottled water to all areas of the Douglas Complex.  During this time, ADC had the water supply independently tested.  The tests showed the water met safe drinking water standards.  In addition to bottled water, potable water and ice were purchased for use in all kitchens on the main complex for food preparation (Papago Unit is located in the City of Douglas, and it receives water from a different system than the main complex).

  At no point during the water quality concerns was the water deemed unusable to shower, launder, or use for cleaning purposes. Water quality tests were taken, and the results were within acceptable ranges for safe drinking water.  Moreover, during all instances where running water was not available, water was provided for drinking and food preparation.

Corene Kendrick
March 9, 2020
Page 2

Please let us know if you have any further questions.

Regards,

Timothy J. Bojanowski

TJB/TMR/eap
cc:   Counsel of record

3100 West Ray Road | Suite 300 | Chandler, AZ 85226
480.420.1600 | STRUCKLOVE.COM