Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' EMERGENCY MOTION REGARDING DEFENDANTS' PREVENTION, MANAGEMENT, AND TREATMENT OF COVID-19** |

The COVID-19 pandemic is rapidly evolving, and the recommendations and guidelines issued by global, national, and local health authorities and leaders change daily, if not hourly. The Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR"), in partnership with its inmate healthcare vendor, Centurion, has been monitoring the progress of the disease and adapting its prevention and response plan as necessary to protect its staff and all inmates statewide.  ADCRR's prevention and response plan is guided by CDC recommendations, subject matter expert recommendations, and recommendations/orders of the State of Arizona Department of Health Services and federal

government officials. The plan also aligns with the Federal Bureau of Prisons' response plan.

Plaintiffs' Emergency Motion assumes no plan is in place, accuses ADCRR – without a single shred of evidence - of not taking this issue seriously, and requests an order requiring ADCRR to implement a plan developed by Dr. Stern. As a preliminary matter, such an order (and request) is beyond the scope of the Court's enforcement jurisdiction.[1] More importantly, ADCRR already has a robust and detailed plan in place, one that coincidentally mirrors Dr. Stern's recommendations in both Washington and Mississippi.[2] Plaintiffs' Motion should be denied in its entirety because it requests the Court to order ADCRR to do what it has already done.

## I. ADCRR Is, and Has Been, Appropriately Responding to COVID-19.

The World Health Organization declared COVID-19 to be a pandemic on March 11, 2020, and, within days, ADCRR assessed and implemented appropriate COVID-19 prevention and response action plans to mitigate the potential spread of COVID-19 within its prisons and its impact on staff and inmates, as well as to ensure the continued effective

---

[1] The Court only retains jurisdiction over "disputes between and among the parties arising out of this Stipulation." (Doc. 1185, ¶ 35, emphasis added.) And even then, its enforcement authority is limited to remedying Defendants' noncompliance with the Stipulation. If Defendants have "not complied with the Stipulation," the Court has the authority to "enforce this Stipulation" in order to "remedy the deficiencies." (Doc. 1185, ¶ 36.) *See Parsons v. Ryan*, 949 F.3d 443, 454-55 (9th Cir. 2020) ("*Parsons II*") (recognizing that "the district court's enforcement authority is limited by the terms of the Stipulation," and that any injunction must be limited to curing noncompliance with the Stipulation); *Parsons v. Ryan*, 912 F.3d 486, 497 (9th Cir. 2018) ("*Parsons I*") ("[T]he Stipulation is clear on the limits of the district court's authority to enforce the Stipulation."); *id.* at 500-01 (affirming outside-provider order in part because it was necessary to redress noncompliance with the Stipulation). Here, the Stipulation does not require the implementation of a pandemic response plan, nor have Plaintiffs shown that Defendants are not in compliance with the Stipulation because of an inadequate COVID-19 response plan. Plaintiffs cannot use this existing litigation as a catch-all grievance forum.

[2] Plaintiffs' counsel sent their March 14 Letter to Defendants' counsel this past Saturday at 12:01 p.m. MST. Then, without any follow up, Plaintiffs filed their Emergency Motion at 9:31 a.m. MST on Monday—less than 48 hours *and only 1.5 business hours* after sending their Letter. Had they simply called Defendants' counsel on Monday morning before filing, they could have saved both parties and the Court valuable time and resources and avoided emergency briefing during a time when efforts should be focused elsewhere.

operation of the state correctional system in the service of public safety. (Ex. 1, Dec. of Director D. Shinn, ¶¶ 2-4.)

ADCRR has and is implementing the following measures to defend against the spread of the COVID-19 virus:

- Effective March 13, 2020, ADCRR suspended general and legal visitation for a period of 30 days, after which time the suspension will be re-evaluated. The suspension of visitation includes non-contact visits and applies to facilities operated by the Department as well as third-party operated facilities. ADCRR's policies for phone calls and written letters remain in effect.
- Effective March 16, 2020, ADCRR's phone and internet provider (CenturyLink) began offering inmates two 15-minute phone calls per week at no charge, in addition to the existing phone call and written letter privileges. Thus far, CenturyLink has reported that on the first day 13,721 free calls totaling 174,743 minutes have been made on the system. ADCRR is exploring potential video visitation options so that inmates may remain in close contact with family members.
- Effective March 17, 2020, all inmate classes provided by local community colleges were suspended.
- Effective March 18, 2020, a $4-copay that inmates pay for health care services is being waived for those who are experiencing flu or cold-like symptoms.
- ADCRR has restricted all routine internal movement of inmates across all Arizona prison complexes to control exposure. Specialty needs for inmate movements will be evaluated on a case-by-case basis. External medical needs will continue based on provider availability.
- Effective this week, Wardens at each Arizona prison complex are initiating a weekly deep cleaning of all facilities. Wardens are also taking part in regular ongoing meetings with ADCRR leadership to ensure robust availability of

         soap, paper towels, hygiene items, and cleaning agents for both inmates and staff.

- Until such time as the COVID-19 Emergency Declaration has expired, ADCRR is providing free hand soap to all inmates upon request. As recommended by ADHS, frequent handwashing remains the preferred method of virus prevention.
- ADCRR is requiring all employees entering Arizona prison complexes to undergo an Infectious Disease Symptoms Check that includes a series of health questions.
- In partnership with ADCRR's inmate healthcare vendor, ADCRR staff will be checked for symptoms of COVID-19 continuously as they enter each facility.
- Inmate work crews are likewise being evaluated for COVID-19 exposure risk factors and symptoms as they depart and re-enter all prison complex facilities.
- ADCRR and Centurion are communicating with staff and inmates about how they can reduce the risk of contracting COVID-19, including washing hands, sanitizing surfaces, covering coughs and sneezes and encouraging employees to stay home if they are sick. Bulletins advising of the same are posted in inmate housing units, medical departments, and high activity locations. Inmate bulletins are also broadcast on ADCRR's inmate CCTV-system.

(*Id*. at ¶ 5.)

As of this date, ADCRR currently has no known confirmed cases of the COVID-19 virus. (*Id*. at ¶ 6.) ADCRR's leadership is in frequent communication with Centurion, its inmate health care vendor, to assess and respond to evolving risks, threats, and coordinated responses. (*Id*.) In the event that quarantine measures become necessary, ADCRR has identified dedicated housing locations to facilitate a quarantine. (*Id*. at ¶ 5.) As to new admissions, ADCRR has initiated discussions to develop an inmate management system for

new inmate admissions from other jurisdictions. (*Id*. at ¶ 8.) Any new admissions are being evaluated for COVID-19 exposure risk factors and symptoms by Centurion. (*Id*.)

To address possible staffing deficiencies, Arizona prison complex Wardens have devised twelve-hour security staffing rosters for implementation should staffing deficiencies related to COVID-19 staff-call outs require them. (*Id*. at ¶ 9.) As of this date, implementation of twelve-hour security staffing plans has not been required. (*Id*.)

Until such time as the COVID-19 Emergency Declaration has expired, ADCRR will permit staff to carry personal alcohol-based hand sanitizer (alcohol-free based hand sanitizer is already permitted) as long as the employee can account for possession and control of the item at time of entry and egress into a facility. (*Id*. at ¶ 10.) Because ADCRR currently permits inmate smoking at designated prison complex locations, inmates are restricted from access to alcohol-based hand sanitizer to prevent associated misuse and fire-setting risks. (*Id*.) ADCRR is also working with its vendors to ensure that prison operations supply chains remain open. (*Id*. at ¶ 11.)

ADCRR will continue to assess and update COVID-19 measures being taken to protect the safety and well-being of its staff, the inmate population, and the public. (*Id*. at ¶ 12.) ADCRR's top priority is to ensure the safety and well-being of all of the agency's employees, inmates, and those that visit ADCRR's ten Arizona State Prison Complexes. (*Id*. at ¶ 13.) Indeed ADCRR is uniquely positioned to prevent and respond to health care risks associated with the spread of communicable diseases in accordance with accepted corrections industry standards where communicable disease prevention in the prison setting is always of paramount priority. (*Id*. at ¶ 14.) For decades, ADCRR has developed and implemented plans to manage incidents of infectious disease in a correctional environment involving inmates who are often medically fragile. (*Id*. at ¶ 15.) ADCRR's robust infectious disease protocols are continuously tested with new inmate admissions involving tuberculosis or symptoms associated with the common flu, scabies, chicken pox, or other droplet or airborne spread infectious disease. (*Id*. at ¶ 16.) ADCRR is one of the only non-

hospital settings with negative pressure rooms to treat and isolate those with airborne infectious diseases. (*Id*. at ¶ 17.)

ADCRR also continues to coordinate closely with Arizona's public health officials as this situation evolves and communicate measures taken to protect the health of our community members. (*Id*. at ¶ 18.) ADCRR's prevention and response plan is guided by CDC recommendations, subject matter expert recommendations, and recommendations/orders of the State of Arizona Department of Health Services and federal government officials. (*Id*. at ¶ 19.) ADCRR's prevention and response plan is likewise aligned with the Federal Bureau of Prisons' response plan. (*Id*. at ¶ 20.) New and changing recommendations are continuously monitored, assessed, and implemented where applicable and advisable. (*Id*. at ¶ 21.) Finally, ADCRR's Emergency Operations Center is in operation in conjunction and cooperation with state and federal officials as well as the nation's National Incident Management System (NIMS) to manage healthcare, security, administration and finance needs associated with response to the COVID-19 virus. (*Id*. at ¶ 22.) NIMS provides a nationwide approach to enable communities to work together to manage threats and hazards. (*Id*.)

In sum, notwithstanding Plaintiffs' unsubstantiated allegations to the contrary, ADCRR and Centurion have been closely monitoring the progress of COVID-19 and have already implemented a prevention and response plan to protect all staff and inmates statewide. ADCRR and Centurion will continue to implement existing Communicable Disease and Infection Control protocols and adjust them, if necessary, as the situation evolves. (*Id*. at ¶ 23.)

**II.     Centurion Is, and Has Been, Adequately Responding to COVID-19.**

Even prior to the identification of COVID-19 in December 2019, Centurion had a Pandemic Preparedness and Emergency Response Plan in place that was intended to be tailored to new pandemics as they arise. (Ex. 2, Dec. of John May, M.D., ¶ 4; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 4.) As the current COVID-19 pandemic has developed, Centurion

has continued to develop and refine its plans and procedures for dealing with the virus. (Ex. 2, Dec. of John May, M.D., ¶ 5; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 5.)

In January 2020, Centurion began adding information from the CDC to its Employee Portal and regularly updating it as CDC updated its information. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 6.) That same month, Centurion also developed an inmate screening tool for use at all facilities in which it provides health care services. (Ex. 2, Dec. of John May, M.D., ¶ 6; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 7.) The inmate screening tool was placed on the front page of the Centurion employee portal in January 2020. (Ex. 2, Dec. of John May, M.D., ¶ 6; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 7.) It was also announced during conference calls to facility medical directors beginning in January 2020. (Ex. 2, Dec. of John May, M.D., ¶ 6; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 7.) During the conference calls, each statewide medical director was asked to consider the best method to implement it. (Ex. 2, Dec. of John May, M.D., ¶ 6; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 7.) Plaintiffs' counsel were informed on March 12, 2020 that ASPC-Florence was screening inmates as they entered the facility. (Ex. 4, Dec. of D. Spencer Sego, ¶¶ 6-12.)

In late February 2020, even though there was no evidence of community spread in Arizona at the time (and still is not based on current information from the CDC), Centurion began coordinating with ADCRR regarding preparations to respond to COVID-19, including methods of screening inmates and visitors, isolation of inmates suspected of having the virus, and precautions for security staff. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 8.) In early March 2020, Centurion began internal discussions regarding potential impacts to the pharmaceutical supply chain and ways to ensure an ongoing supply of medications for ADCRR inmates, revised the inmate screening tool, and distributed it and the Pandemic Preparedness and Emergency Response Plan to ADCRR. (Ex. 3, Dec. of Wendy Orm, M.D., ¶¶ 9-10.)

On or about March 4, 2020, Centurion sent a communication to all employees regarding social distancing, sick time allowance, and tactical matters related to expectations and communication during the pandemic. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 11.) On

March 6, 2020, Centurion staff met with ADCRR to discuss, among other topics, COVID-19. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 12.) During the meeting, Centurion provided ADCRR with a copy of Centurion's inmate screening tool to pass along to the 15 Arizona county sheriffs for use in their jails. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 12.) On March 8, 2020, Centurion revised and finalized its Pandemic Preparedness and Emergency Response Plan, which is intended to be universal, and to be adapted by each state and site as necessary to accommodate specific contracts and local needs, to specifically include COVID-19. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 13.) Likewise, on March 10, 2020, the Arizona Department of Health Services recommended to Centurion that it check the temperature of inmates returning to the facilities from daily work crew assignments in the community. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 14.) On March 11, 2020, after Governor Ducey declared a state of emergency in Arizona, Centurion engaged in additional discussions with ADCRR regarding procedures to assess inmates returning from work details, intrasystem transfers, and new inmates, with the goal of implementing the new procedures by March 16, 2020. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 15.)

On March 15, 2020, Centurion finalized Clinical Guidelines for COVID-19. (Ex. 2, Dec. of John May, M.D., ¶ 7; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 16.) On March 16, 2020, Centurion sent a memorandum titled Coronavirus Awareness: Medical Precautions to all employees. (Ex. 2, Dec. of John May, M.D., ¶ 8.) On that same date, Dr. Orm sent an email to medical staff at the various sites regarding protocols for any inmates who presented with symptoms of a febrile respiratory illness, including the following:

- mask and isolate the inmate, preferably on-site (Centurion continues to work with ADCRR to identify space for quarantine and isolation overflow);
- perform a full symptom check and vitals check and escalate the inmate to the provider for a full history and physical evaluation;
- notify me and Wendy Larson regarding any inmates who will be isolated and observed (name, location, and inmate number);
- rule out influenza if test kits are available (Wendy Larson continues to work

8

- order CBC and CMP labs and chest x-rays depending on the severity of the symptoms and clinical suspicion;
- check vital signs every shift and document them in the chart;
- send the inmate to the emergency room only if they are immunocompromised, hypoxic, suspected of being septic, or if the exam and/or chest x-rays shows signs of pneumonia;
- notify the county public health department of the inmate's status and let them dictate (1) what information they need, and (2) what additional updates they need; and
- administer prophylactic Tamiflu as indicated to at-risk patients, including the elderly, those with emphysema, the immunosuppressed, etc. who become ill with a febrile respiratory illness.

(Ex. 3, Dec. of Wendy Orm, M.D., ¶ 17.)  Also on March 16, 2020, Centurion identified a population of approximately 6,600 vulnerable inmates based on their age (>60), health status, and diagnoses and sent it to ADCRR for weekly welfare checks and education urging the inmates to report any symptoms that may be associated with COVID-19.  (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 18.)

On or about March 16-17, 2020, Centurion finalized a Staff Screening Tool and Staff Screening Flowsheet, as well as informational handouts for correctional health care staff, security staff, and inmates.[3]  (Ex. 2, Dec. of John May, M.D., ¶¶ 9-10; Ex. 3, Dec. of Wendy Orm, M.D., ¶ 19.)  On March 17, 2020, Centurion also finalized signage regarding COVID-19 as a suggestion for posting at facility entrances.  (Ex. 2, Dec. of John May, M.D., ¶ 11.)  On that same date, Centurion suspended all non-emergent dental procedures pursuant to recommendations of the American Dental Association.  (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 20.)  On March 18, 2020, Centurion suspended all non-essential services and traffic at all

---

[3] The informational handout for inmates is available in English and Spanish.  (Ex. 2, Dec. of John May, M.D., ¶ 10.)

9

(also, at the top of the first visible lines: "to acquire more rapid influenza test kits and distribute them to the sites);")

sites, including routine optometry and audiology services. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 22.) On that same date, Centurion received instructions from ADCRR regarding the use of the Staff Screening Tool at all points of entry at ADCRR facilities. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 21.) Centurion continues to evaluate the COVID-19 pandemic and develop and refine its procedures as necessary on a daily basis. (Ex. 3, Dec. of Wendy Orm, M.D., ¶ 23.)

As demonstrated, both ADCRR's and Centurion's advanced and continuing response to COVID-19 is robust, in alignment with CDC recommendations, and well within the corrections healthcare standard of care for response protocols to combat infectious diseases.[4]

### III. Plaintiffs Misrepresent the Events of the March 11-12, 2020 Tour at ASPC-Florence.

First, Plaintiffs misconstrue purported statements made by Richard Pratt and Dr. Gilreath during the ASPC-Florence monitoring tour in an attempt to accuse ADCRR of not having any COVID-19 prevention plan at all, and not even caring enough to develop one. (Doc. 3520 at 3-4.) Plaintiffs' tactic should be summarily rejected by the Court.

---

[4] There is no need for Dr. Stern to "collaborate with [Defendants] to immediately develop and implement a plan for the prevention and management of COVID-19 in the State's prisons." As demonstrated above, ADCRR and Centurion are already actively engaged in developing and implementing plans to prevent and manage COVID-19 in ADCRR's facilities. The measures they are implementing meet the community standard of care for dealing with COVID-19 (Ex. 5, Dec. of Owen Murray, M.D., ¶ 10) and are in line with Dr. Stern's recent recommendations to the Washington Association of Sheriffs & Police Chiefs (Doc. 3521-1, pp. 16-20) and the United States District Court for the Northern District of Mississippi (No. 4:20-cv-00007-DMB-JMV, N.D. Miss., Doc. 59-6). In fact, they are nearly identical to the measures Dr. Stern recommended to the Northern District of Mississippi and the Mississippi Department of Corrections. (Id.) There is little, if anything, Dr. Stern could add at this point in the process.

Moreover, collaborating with Defendants to develop and implement COVID-19 plans goes beyond the scope of work the Court appointed Dr. Stern to perform. (Doc. 3127.) "The Court appointed Dr. Stern to conduct analysis [regarding] the irregularities and errors in the monitoring process and Defendants' substantial noncompliance with critical aspects of health care delivery." (Doc. 3127, internal quotations omitted.) Dr. Stern was not appointed to help develop and implement COVID-19 plans. Indeed, he could not have been, as the COVID-19 pandemic was unforeseen by governments and public health agencies worldwide at the time of his appointment. And Plaintiffs have not cited to single provision of the Stipulation or aspect of the monitoring process that is directly implicated by COVID-19.

1  As to Defendant Pratt, he was present during a meeting between the Plaintiffs' attorneys and counsel for ADCRR, counsel for Centurion, and facility healthcare staff. (Ex. 6, Dec. of R. Pratt at ¶¶ 4-5.) When asked what instructions or guidance ADCRR had received from the Arizona Department of Health Services regarding COVID-19, he responded, "I haven't seen anything yet." (*Id*. at ¶ 5.) Any interpretation of that statement as meaning that ADCRR had made no plans to address COVID-19 in its facilities as of March 12, 2020 is false and misrepresents both Mr. Pratt's statements and the conversation in general. (*Id*. at ¶ 6.) Likewise, during the same March 12 meeting, counsel asked several general questions about how ASPC-Florence was addressing COVID-19. In response to their questions, Mr. Pratt stated that he had not yet seen anything from ADCRR leadership, but that he was aware that meetings and discussions regarding ADCRR's response to COVID-19 were taking place they were speaking – which means ADCRR was planning its response to COVID-19. (*Id*. at ¶ 7.) In his current position as a Bureau Administrator in Operations, Mr. Pratt is not involved in leadership meetings and discussions, and would not be aware of official plans until such plans were finalized and released to staff generally. (*Id*. at ¶ 8.) Mr. Pratt's statements are not proof that Defendants were doing nothing as of March 12, 2020, to address COVID-19.

Likewise, Plaintiffs' attempt to paint Dr. Gilreath as having no background in correctional medicine and having a flippant attitude to COVID-19 is incorrect, unfair and unacceptable. At the outset, to allege that Dr. Gilreath admitted he has never worked in corrections medicine is incorrect. Dr. Gilreath has been practicing medicine for over forty years. (Ex. 7, Dec. of Dr. V. Gilreath at ¶ 2.) Before his employment with Centurion, he was previously employed as a correctional facility physician by CoreCivic, Inc. at its Saguaro Correctional Center from January 2016 to January 2018, and at its Central Arizona Florence Correctional Complex from January 2018 to August 2018. (*Id*. at ¶ 2.) Plaintiffs' Counsel did not ask about Dr. Gilreath's prior experience in correctional medicine such that he would deny his own career history, and he certainly has never run a methadone clinic as Plaintiffs assert. (*Id*. at ¶¶ 5-7.)

Moreover, in discussing COVID-19 generally, Dr. Gilreath stated that it was his understanding that the first confirmed case of COVID-19 *outside* of China was in Germany. (*Id*. at ¶¶ 8-9.) He also observed that other, more widespread diseases with higher mortality rates, such as dengue fever, did not generate the kind of global concern that currently exists for COVID-19, and that globally people are not taking the kind of action being taken to stop the spread of COVID-19 to stop dengue fever. (*Id*. at ¶9.) He further expressed an opinion, based on his personal medical education, experience, and training, as well as discussions with other medical professionals and reports about COVID-19, that COVID-19 would likely run its course within a few weeks. (*Id*.) Dr. Gilreath made these statements in a general sense, and was not referring specifically to measures being developed or implemented at ASPC-Florence. (*Id*. at ¶10.) Dr. Gilreath takes the health and safety of all of his patients, including medical precautions intended to protect their health and safety, very seriously. (*Id*.). Plaintiffs' recitation of conversation with Dr. Gilreath is incorrect and not evidence that Defendants are doing nothing to address COVID-19.

Second, as to facility conditions, Plaintiffs characterized ASPC-Florence to be "squalid" and "filthy" in order to accuse Defendants of failing to prepare for and respond to COVID-19.[5] (Doc. 3520 at 4-5.) Plaintiffs' incorrect anecdotal observations are without merit and do not demonstrate that Defendants are ill-equipped to address COVID-19.

---

[5] Plaintiffs also insinuate that medical supplies were taken from inmates in advance of the tour for retaliatory purposes. This is categorically false. Rather, on March 10, 2020, at approximately 7:30 p.m., Sergeant J. Peterman conducted routine quarterly searches in Housing Unit 10, which is a medical housing unit. All areas of the unit are searched quarterly. (Ex. 9, Dec. of Warden J. Van Winkle at ¶ 9.) While conducting the search, Sgt. Peterman found nuisance contraband and documented his findings in Information Report 20-A58-1534. (*Id*. at ¶ 10.) The Information Report documents the nuisance contraband found in the area, which included undocumented medical supplies and two trash bags full of blankets, sheets, pillow cases, and towels. (*Id*.) After further investigation, the medical supplies included medical tape, extra bandages, extra wipes, extra catheters, and a bag full of bandages and alcohol wipes. (*Id*.) These items were returned to medical, and the following day, after confirming the possession was authorized, almost everything was returned to the inmates except the medical tape. (*Id*. at ¶¶ 11, 12-15.) The March 10, 2020 search was not a pre-emptory retaliation against any inmate for potentially speaking with Plaintiffs' counsel on March 11, 2020 or March 12, 2020. (*Id*. at ¶¶ 16-17.) Moreover, the

1         Appropriate sanitation levels are maintained throughout ASPC-Florence, and the areas are not filthy as Plaintiffs claim. All inmates are provided access to hand soap at no charge. (Ex. 1, Dec. of Director D. Shinn at ¶ 5.) All inmates, including indigent inmates are also provided sufficient hygiene items, including soap and shampoo on a monthly basis. (Ex. 8, Dec. of Lt. J. King at ¶¶ 11- 12, 19-20.) Where appropriate, supplemental hygiene items are available upon request, with approval by a supervisor. (*Id.* at ¶ 12.)

        As to general housing unit sanitation, inmate pod porters clean housing unit common areas and showers daily, and inmates are provided access to cleaning supplies to clean their own cells. (*Id.* at ¶¶ 17-18.) ASPC-Florence's Kasson Unit houses a specialty population of Seriously Mentally Ill inmates. (*Id.* at ¶ 5.) Inmates at Kasson are offered showers three days a week, but have the right to refuse. (*Id.* at ¶ 9.) Security staff will not use force on an inmate to require that the inmate shower unless the inmate has, for instance, covered himself in feces. In other circumstances, if medical personnel determine that an inmate's hygiene might negatively affect his health and safety and the inmate still refuses to shower, security staff may assist in requiring the inmate to shower. (*Id.* at ¶ 10.)

        The SMI inmate population at Kasson Unit (as is the case in any other location) may play a role in their own cell cleanliness. For example, some inmates are known to hoard items or be messier than others. (*Id.* at ¶ 13.) Security staff will not use force on an inmate to pick up trash in their cell. (*Id.* at ¶ 14.) Rather, personal responsibility for cell sanitation is addressed by the normal disciplinary process and security staff may clean an unhygienic inmate's cell when the inmate leaves his cell for showering or to participate in recreation or programs, etc., (where there is staff available to do so). (*Id.* at ¶¶ 16, 15.)

        Finally, Plaintiffs' allegation that a cell in the Kasson Unit contained feces and blood is incorrect. (*Id.* at ¶¶ 6-8.) The brown material was ground coffee and red material was red ink (and the ground coffee and red ink were in two different cells). (*Id.* at ¶ 8.) Ground

---

search was not done at the direction of Dr. Gilreath. (Ex.7, Dec. of Dr. V. Gilreath at ¶¶ 11-12.)

coffee, red ink, or paper trash on the ground present no known current risk to an inmate's health. (*Id*.). This is especially so where both cells were vacant. (*Id*.; *see also* Ex. 10, monitoring tour photos directed to be taken by Plaintiffs' counsel.)

In sum, Plaintiffs' complaints regarding housing or cell conditions are neither evidence of a Stipulation violation nor conditions that expose class members to COVID-19. Accordingly, Plaintiffs' allegations are irrelevant to both Stipulation enforcement and the appropriateness of Defendants' response to COVID-19.[6]

**IV.     Conclusion.**

For the foregoing reasons, this Court should deny Plaintiffs' Emergency Motion in its entirety.

DATED this 18th day of March, 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Rachel Love
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Defendants*

---

[6] If Plaintiffs' counsel are concerned with the spread of COVID-19 into ADCRR facilities, they should consider immediately halting all prison monitoring tours. Flying in from San Francisco/Oakland and Washington, D.C. to conduct these tours, as they just did last week, poses the very risk they claim exists. Indeed, the ACLU National Prison Project's office has closed to reduce the risk of COVID-19 spreading.  And just two days ago, "[s]ix Bay Area counties announced 'shelter in place' orders for all residents on Monday — the strictest measure of its kind yet in the continental United States — directing everyone to stay inside their homes and away from others as much as possible for the next three weeks in a desperate move to curb the rapid spread of coronavirus across the region." (*See* https://www.sfchronicle.com/local-politics/article/Bay-Area-must-shelter-in-place-Only-15135014.php, last accessed March 18, 2020.)

# CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com; docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Amy B. Fettig: | afettig@npp-aclu.org |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Casey Arellano | carellano@acluaz.org |
| Maria V. Morris | mmorris@aclu.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Rachel Love