**Exhibits to Defendants' Response to Plaintiffs' Emergency Motion Regarding Defendants' Prevention, Management, and Treatment of COVID-19 (Dkt. 3520)**

Exhibit 1     Declaration of D. Shinn

Exhibit 2     Declaration of J. May, MD, FACP

Exhibit 3     Declaration of W. Orm, MD

Exhibit 4     Declaration of D. Sego

Exhibit 5     Declaration of O. Murray, D.O., MBA

Exhibit 6     Declaration of R. Pratt

Exhibit 7     Declaration of V. Gilreath

Exhibit 8     Declaration of J. King

Exhibit 9     Declaration of J. Van Winkle

Exhibit 10    ASPC-Florence Monitoring Tour Photographs

**EXHIBIT 1**

**EXHIBIT 1**

1   Daniel P. Struck, Bar No. 012377
    Rachel Love, Bar No. 019881
2   Timothy J. Bojanowski, Bar No. 022126
    Nicholas D. Acedo, Bar No. 021644
3   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    3100 West Ray Road, Suite 300
4   Chandler, Arizona  85226
    Telephone:  (480) 420-1600
5   Fax:  (480) 420-1696
    dstruck@strucklove.com
6   rlove@strucklove.com
    tbojanowski@strucklove.com
7   nacedo@strucklove.com

8   *Attorneys for Defendants*

9               **UNITED STATES DISTRICT COURT**

10                   **DISTRICT OF ARIZONA**

11  Victor Parsons, *et al.*, on behalf of themselves       NO. 2:12-cv-00601-ROS
    and all others similarly situated; and Arizona
12  Center for Disability Law,

13                                    Plaintiffs,          **DECLARATION OF DAVID
                                                           SHINN**
            v.
14
    David Shinn, Director, Arizona Department of
15  Corrections; and Richard Pratt, Interim
    Division Director, Division of Health Services,
16  Arizona Department of Corrections, in their
    official capacities,
17
                                    Defendants.

18
            I, David Shinn, make the following Declaration:
19
            1.      I am the Director of the Arizona Department of Corrections, Rehabilitation
20
    and Reentry ("ADCRR") and have served as Director since October 21, 2019.
21
            2.      I am aware that Plaintiffs' Counsel in the *Parsons v. Ryan* litigation filed an
22
    Emergency Motion Regarding Defendants' Prevention, Management, and Treatment of
23
    COVID-19 on Monday, March 16, 2020, alleging that ADCRR has no plan (or
24
    insufficient plans) to address the threat of COVID-19 in ADCRR's inmate population.
25
            3.      Plaintiffs' allegation is false.
26
            4.      The World Health Organization declared COVID-19 to be a pandemic on
27
    March 11, 2020, and, within days, ADCRR assessed and implemented appropriate
28

COVID-19 prevention and response action plans to mitigate the potential spread of COVID-19 within its prisons and its impact on staff and inmates, as well as to ensure the continued effective operation of the state correctional system in the service of public safety.

5.      ADCRR has implemented and is implementing the following measures to defend against the spread of the COVID-19 virus:

- Effective March 13, 2020, ADCRR suspended general and legal visitation for a period of 30 days, after which time the suspension will be re-evaluated. The suspension of visitation includes non-contact visits and applies to facilities operated by the Department as well as third-party operated facilities. ADCRR's policies for phone calls and written letters remain in effect.

- Effective March 16, 2020, ADCRR's phone and internet provider (CenturyLink) began offering inmates two 15-minute phone calls per week at no charge, in addition to the existing phone call and written letter privileges. Thus far, CenturyLink has reported that on the first day 13,721 free calls totaling 174,743 minutes have been made on the system. ADCRR is exploring potential video visitation options so that inmates may remain in close contact with family members.

- Effective March 17, 2020, all inmate classes provided by local community colleges were suspended.

- Effective March 18, 2020, a $4-copay that inmates pay for health care services is being waived for those who are experiencing flu or cold-like symptoms.

- ADCRR has restricted all routine internal movement of inmates across all Arizona prison complexes to control exposure. Specialty needs for inmate movements will be evaluated on a case-by-case basis. External medical needs will continue based on provider availability.

- Effective this week, Wardens at each Arizona prison complex are initiating a weekly deep cleaning of all facilities. Wardens are also taking part in regular ongoing meetings with ADCRR leadership to ensure robust availability of soap, paper towels, hygiene items, and cleaning agents for both inmates and staff.

- Until such time as the COVID-19 Emergency Declaration has expired, ADCRR is providing free hand soap to all inmates upon request. As recommended by ADHS, frequent handwashing remains the preferred method of virus prevention.

- ADCRR is requiring all employees entering Arizona prison complexes to undergo an Infectious Disease Symptoms Check that includes a series of health questions.

- In partnership with ADCRR's inmate healthcare vendor, ADCRR staff will be checked for symptoms of COVID-19 continuously as they enter each facility.

- Inmate work crews are likewise being evaluated for COVID-19 exposure risk factors and symptoms as they depart and re-enter all prison complex facilities.

- ADCRR and Centurion are communicating with staff and inmates about how they can reduce the risk of contracting COVID-19, including washing hands, sanitizing surfaces, covering coughs and sneezes and encouraging employees to stay home if they are sick. Bulletins advising of the same are posted in inmate housing units, medical departments, and high activity locations.  Inmate bulletins are also broadcast on ADCRR's inmate CCTV-system.

6.    As of this date, ADCRR currently has no known confirmed cases of the COVID-19 virus.  ADCRR's leadership is in frequent communication with its inmate

health care vendor to assess and respond to evolving risks, threats, and coordinated responses.

7. In the event that quarantine measures become necessary, ADCRR has identified dedicated housing locations to facilitate the same.

8. As to new admissions, ADCRR has initiated discussions to develop an inmate management system for new inmate admissions from other jurisdictions. Any new admissions are being evaluated for COVID-19 exposure risk factors and symptoms by ADCRR's inmate health care vendor.

9. To address possible staffing deficiencies, Arizona prison complex Wardens have devised twelve-hour security staffing rosters for implementation should staffing deficiencies related to COVID-19 staff-call outs necessitate the same. As of this date, implementation of twelve-hour security staffing plans has not been required.

10. Until such time as the COVID-19 Emergency Declaration has expired, ADCRR will permit staff to carry personal alcohol-based hand sanitizer (alcohol-free based hand sanitizer is already permitted) as long as the employee can account for possession and control of the item at time of entry and egress into a facility. Because ADCRR currently permits inmate smoking at designated prison complex locations, inmates are restricted from access to alcohol-based hand sanitizer to prevent associated misuse and fire-setting risks.

11. ADCRR is also working with its vendors to ensure that prison operations supply chains remain open.

12. ADCRR will continue to assess and update COVID-19 measures being taken to protect the safety and well-being of its staff, the inmate population, and the public.

13. ADCRR's top priority is to ensure the safety and well-being of all of the agency's employees, inmates, and those that visit ADCRR's ten Arizona State Prison Complexes.

4

14.     Indeed ADCRR is uniquely positioned to prevent and respond to health care risks associated with the spread of communicable diseases in accordance with accepted corrections industry standards where communicable disease prevention in the prison setting is always of paramount priority.

15.     For decades, ADCRR has developed and implemented plans to manage incidents of infectious disease in a correctional environment involving inmates who are often medically fragile.

16.     ADCRR's robust infectious disease protocols are continuously tested with new inmate admissions involving tuberculosis or symptoms associated with the common flu, scabies, chicken pox, or other droplet or airborne spread infectious disease.

17.     ADCRR is one of the only non-hospital settings with negative pressure rooms to treat and isolate those with airborne infectious diseases.

18.     ADCRR also continues to coordinate closely with Arizona's public health officials as this situation evolves and communicate measures taken to protect the health of our community members.

19.     ADCRR's prevention and response plan is guided by CDC recommendations, subject matter expert recommendations, and recommendations/orders of the State of Arizona Department of Health Services and federal government officials.

20.     ADCRR's prevention and response plan is likewise aligned with the Federal Bureau of Prisons' response to the same.

21.     New and changing recommendations are continuously monitored, assessed, and implemented where applicable and advisable.

22.     ADCRR's Emergency Operations Center is in operation in conjunction and cooperation with state and federal officials as well as the nation's National Incident Management System (NIMS) to manage healthcare, security, administration and finance needs associated with response to the COVID-19 virus.  NIMS provides a nationwide approach to enable communities to work together to manage threats and hazards.

1          23.    ADCRR and its inmate healthcare vendor (Centurion) continue to

2     implement existing Communicable Disease and Infection Control protocols and adjust the

3     same as recommendations and protocols evolve.

4          I declare under penalty of perjury that the foregoing is true and correct.

5          Executed this 18 day of March, 2020.

6

7     _____

8          David Shinn

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 2**

**EXHIBIT 2**

1  Daniel P. Struck, Bar No. 012377
   Rachel Love, Bar No. 019881
2  Timothy J. Bojanowski, Bar No. 022126
   Nicholas D. Acedo, Bar No. 021644
3  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   3100 West Ray Road, Suite 300
4  Chandler, Arizona 85226
   Telephone: (480) 420-1600
5  Fax: (480) 420-1696
   dstruck@strucklove.com
6  rlove@strucklove.com
   tbojanowski@strucklove.com
7  nacedo@strucklove.com

8  *Attorneys for Defendants*

9              **UNITED STATES DISTRICT COURT**
10                  **DISTRICT OF ARIZONA**

11  Victor Parsons, *et al.*, on behalf of themselves      NO. 2:12-cv-00601-ROS
    and all others similarly situated; and Arizona
12  Center for Disability Law,

13                                    Plaintiffs,          **DECLARATION OF JOHN P.**
                                                           **MAY, MD, FACP**
14            v.

    David Shinn, Director, Arizona Department of
15  Corrections; and Richard Pratt, Interim
    Division Director, Division of Health Services,
16  Arizona Department of Corrections, in their
    official capacities,
17
                                    Defendants.
18

        I, John P. May, MD, FACP, make the following Declaration:

        1.    I am over the age of 18 years and have personal knowledge of and am

competent to testify to the matters set forth in this Declaration.

        2.    I have worked as the Chief Medical Officer on behalf of Centurion of Arizona,

LLC ("Centurion") since Centurion began providing contractually specified healthcare

services to inmates incarcerated in the Arizona Department of Corrections Rehabilitation

and Reentry ("ADCRR") pursuant to a contract with the ADCRR, commencing July 1,

2019. I have been practicing medicine for approximately 28 years. I am currently licensed

to practice medicine in 21 states, including Arizona, and have been board-certified in

internal medicine since 1993.

3.      I am aware of the *Parsons* litigation, including Plaintiffs' Emergency Motion Regarding Defendants' Prevention, Management and Treatment of COVID-19, filed on March 16, 2020.

4.      Even prior to the identification of COVID-19 in December 2019, Centurion had a Pandemic Preparedness and Emergency Response Plan in place that was intended to be tailored to new pandemics as they arise. A true and correct copy of the plan is attached as Attachment A.

5.      As the current COVID-19 pandemic has developed, Centurion has continued to develop and refine its plans and procedures for dealing with the virus.

6.      In January 2020, Centurion developed an inmate screening tool for use at all facilities in which it provides health care services. A true and correct copy of the most current version, in English and Spanish, is attached as Attachment B. The inmate screening tool was announced during conference calls to facility medical directors beginning in January 2020. It was also placed on the front page of the Centurion employee portal in January 2020. During the conference calls, each statewide medical director was asked to consider the best method to implement it.

7.      On March 15, 2020, Centurion finalized Clinical Guidelines for COVID-19. A true and correct copy of the guidelines is attached as Attachment C.

8.      On March 16, 2020, Centurion sent a memorandum titled Coronavirus Awareness: Medical Precautions to all employees. A true and correct copy of the memorandum is attached as Attachment D.

9.      On March 17, 2020, Centurion finalized a Staff Screening Tool and Staff Screening Flowsheet. True and correct copies of the screening tool and flowsheet are attached as Attachments E and F, respectively.

2

10.     On March 17, 2020, Centurion also finalized informational handouts for correctional health care staff, security staff, and inmates[1]. True and correct copies of the handouts are attached as Attachments G, H, and I, respectively.

11.     On March 17, 2020, Centurion also finalized signage regarding COVID-19 as a suggestion for posting at facility entrances. A true and correct copy of the signage is attached as Attachment J.

I declare under penalty of perjury under the laws of the United States of America and the State of Arizona that the foregoing is true and correct.

Executed this ___18___ day of March, 2020.

_____
John P. May, MD, FACP

---

[1] The informational handout for inmates is available in English and Spanish. Both versions are included in Attachment I.

3

**ATTACHMENT A**

**ATTACHMENT A**



# Centurion Pandemic Preparedness and Emergency Response Plan

### Purpose

Centurion will work with the Department of Corrections to provide an infectious communicable disease pandemic preparedness and response plan.

With emerging and reemerging infectious diseases, it is import to be prepared to respond to outbreaks, epidemics and pandemic. Pandemics are unpredictable. While history offers useful benchmarks, there is no way to know the characteristics of a pandemic before it emerges. Nevertheless, we must make assumptions to facilitate planning efforts. The event can be caused from different types of infections and can spread rapidly as the world has experienced in the past.  This policy outlines the steps in preparing for a communicable disease or infection pandemic, and an emergency response to a pandemic event.  This is a model outlining the steps and will be part of the overall facility procedure for a pandemic event.  The plan incorporates current disaster preparedness plans already in place by the facility and agencies, and provides additional measures needed for a pandemic response.  Centurion will collaborate and cooperate with the facility, agency, state, local and federal entities that may include local community / sheriff's offices,  Department of Corrections, Department of Health, Office of Homeland Security, CDC in providing a response for safe response to staff and community members if a pandemic is declared.

### Definitions

1. Pandemic: A global outbreak. A pandemic occurs when a communicable disease emerges for which there is little or no immunity in the human population, begins to cause serious illness and then spreads easily from person to person
2. Viral Infections: A disease/condition characterized by fever, headache, myalgia (muscle pain), prostration (exhaustion), coryza (symptoms of a head cold), sore throat and cough.
3. Bacterial Infections: A disease/condition characterized by fever, headache, myalgia (muscle pain), prostration (exhaustion), coryza (symptoms of a head cold), sore throat and cough.
4. Bioterrorism agent: An intentional release of a virus or bacteria with intent of harm or death to unsuspecting persons for purpose of biological attack that can be transmitted to multiple persons.
5. Initial Commander: The Shift Commander will assume this role. This person is responsible for the entire facility and the emergency until relieved by Interim Commander or Ultimate Commander.
6. Interim Commander: The Interim Commander is the next person in the chain of command set by the facility or Facility / DOC Policy and Procedure. This person will assume the Commander's position in the event the Ultimate Commander is more than one (1) hour away from the facility.
7. Isolation: Separation and restriction of movement or activities of persons who are too ill but who have a contagious disease, for the purpose of preventing transmission to others.
8. Morbidity:  A state of being diseased; or the relative incidence of disease.

9. Mortality:  The state of being diseased: or the relative incidence of death.
10. Personal Protective Equipment (PPE): Equipment used by any person to prevent the acquisition or transmission of disease between persons. Examples of personal protective items include, but are not limited to gloves, masks, gowns, and etc.
11. Quarantine: The separation and restriction of movement or activities of ill infected persons who are believed to have been exposed to infection, for the purpose of preventing the transmission of disease. Individuals may be quarantined at home or in designated facilities, healthcare providers and other workers may be subject to quarantine when they are off duty.
12. Segregation/Social distancing:  Housing exposed or infected persons away from other population at a distance to decrease or prevent the transmission of disease.
13. Infodemic: The distribution of accurate, inaccurate, and rumored information. The purpose for the recognition of this is to provide accurate, timely information from reliable sources to make appropriate decisions related to any outbreak
14. Ultimate Commander: This role will be assumed by the Warden/designee to have full authority during an emergency.

**Procedures**

1. The infection prevention and control program, policies and procedures, and clinical guidelines provide written protocols give disease/condition specific guidelines of the diagnosis, treatment, and management of conditions recognized as prevalent in the state or local area.

2. These include procedures for infection prevention, education, identification, surveillance, immunization (as applicable), treatment, follow-up, isolation (as indicated), and reporting requirements to applicable local, state, and federal agencies.  A multidisciplinary team that includes clinical, security, environmental, maintenance, and administrative representative meets at least yearly to review and discuss communicable diseases and infection control activities.
   a. At minimum disease specific protocols will include:
      i. Prevention to include immunizations, when applicable
      ii. Surveillance (identification and monitoring)
      iii. Offenders education and staffing
      iv. Treatment to include medical isolation, when indicated,
      v. Follow-up care
      vi. Reporting requirements to applicable, local, state, and federal agencies
      vii. Confidentiality/protected health information
      viii. Monitoring current community/state/national trends

      ix. Appropriate safeguards for inmates and all staff
      x. Education and training on PPE
      xi. Maintain par levels of PPE
      xii. Post-exposure management protocols particularly for HIV and viral hepatitis

3. Review of all Emergency plans is an essential element of personnel training and retraining programs. All employees are to be familiar with all emergency plans prior to their permanent work assignments.

**Preparedness**

1. Cases (large outbreak outside United States
   a. Monitor reliable information on outbreak and transmission
   b. Type of infection/disease
   c. Evaluate outbreak plan, and emergency preparedness and response plan
   d. Specific screening tool available (risk factors & symptoms)

2. Case diagnosed in United States (not in your state)
   a. Monitor and provide reliable medical information on current situation
   b. Update Clinical guidance as recommended by Department of Health and CDC
   c. Disseminate information to healthcare providers
   d. Evaluate current par levels of PPE
   e. Routine communication with public health

3. Single Case diagnosed in your state
   a. Evaluate current local situation
   b. Reinforce Infection control measures
   c. Update information for healthcare providers
   d. Focus on disease surveillance
   e. Increase public health communication

4. Cluster linked to cases in your state
   a. Continue monitor of local situation
   b. Implement screening tool as indicated
   c. Continue public health communication
   d. Update information for healthcare providers

5. Multiple unlinked cases in your state
   a. Increase surveillance
   b. Implement screening tool
   c. Continue public health communication (emergency operation indicated)
   d. Update information for healthcare providers
   e. Strict infection control prevention
   f. Monitor PPE supplies

6. Multiple linked cases in your state
   a. Increase surveillance
   b. Implement screening tool
   c. Continue public health communication (emergency operation indicated)
   d. Update information for healthcare providers
   e. Strict infection control prevention
   f. Monitor PPE supplies
   g. Follow quarantine recommendations
   h. Limit access to facility

Security

1. The facility will maintain health and safety standards at the highest level possible during a pandemic communicable emergency. Once a pandemic outbreak is confirmed, the community immediately surrounding the institution is also affected. As a result, available resources and external assistance may become limited. This guide should be used in coordination and conjunction with Facility / DOC Policy and Procedure.

Locate and Verify

1. The County Public Health Office and/or the State Health Department will verify a pandemic outbreak within the community or at the facility and notify the FHA/designee.
2. This notification will then be passed to the Regional Office.

Isolate and Contain

1. Upon notification, isolation of confirmed cases is required. The Commander will initiate the Disease Specific Checklist.  The Commander may initiate an emergency lockdown in accordance with the Facility / DOC Operational Procedures

2. On duty staff will be expected to remain on site until relieved. Exceptions will be determined by facility authorities on a case by case basis.

3. Inmates affected with the illness will be quarantined in the infirmary and/or detention cells.  In the event  of a mass epidemic, housing units will be evacuated and utilized to quarantine infected  inmates based  on the  number  of  infected  inmates, and suspected exposures and the custody levels of all involved inmates.

4. The Facility Health Administrator (FHA) will coordinate with the Warden/designee to ensure that standard PPE is available to all staff regardless of assignment.

Notifications

1. The following listing is supplement to the established facility disaster and emergency preparedness procedure, and is intended to include ancillary staff that is essential to the implementation and success of the pandemic plan.
   a. Warden/Deputy Warden
   b. Facility Duty Officer
   c. Food Service Manager and staff
   d. Facility Health Administrator
   e. Maintenance staff
   f. Facility TSU Team Leaders
   g. Facility Captain
   h. Off duty staff
   i. County Coroner
   j. Local Area Hospitals and EMS providers
   k. Local law enforcement agencies (PD and SO)
   l. Inmate population

Command Post

1. Activation of the facility Critical Incident Command Posts will occur in accordance with established procedure. The Commander shall ensure that staff is assigned to all essential Posts. Staff assignments will consist of both on duty staff and off duty staff called into the institution. In the event of staff shortages, likely resulting from staff becoming infected and the inability of off duty staff to return to the institution, assistance from other FACILITY / DOC sites may be requested. Essential Posts shall include:
   a. Security Posts necessary to maintain order and provide for controlled treatment of inmates from housing areas to necessary locations.
   b. Food Service Staffing. Staff shortages or the threat of the spread of disease may necessitate feeding inmates in cells or housing units. The Commander may initiate an Emergency Food Service Plan at this time. Food service staff will provide contingency meal planning and services for effected and non-effected areas including meals and services for staff.
   c. Food service will maintain a food and water supply of a minimum of three (3) days, on site.
   d. Medical Staffing.
   e. Centurion staff will:
      i. Initiate their disease specific protocol and will provide services contained in the contract, including diagnosis and treatment for affected staff and inmates inside the facility.
      ii. Contact local area hospitals giving a briefing on the facility communicable diseases status and request that they accept any critically ill inmate patients if deemed necessary.
      iii. Shall continue to monitor and treat confirmed or suspected cases.  All new cases shall be reported to the Command Post as well as the department of health as required.
   f. Maintenance Staff. Maintenance supervisors will ensure that sanitation is maintained and that all contaminated waste is disposed of properly. They will also validate operation functions and temperatures of laundry equipment to ensure laundry is properly sanitized.
   g. Support staff needed to maintain and update inmate records, to provide Chaplain Services, and to complete any other necessary tasks.  Any service or programs not deemed necessary to the operation of the institution shall be suspended during the duration of the pandemic status.

Deaths

1. Any deaths will be reported in accordance with facility /FACILITY / DOC Policy and Procedure.
2. Inmate deaths will only be released to the public in accordance with FACILITY / DOC Policy and Procedure.
3. Employee death will only be released to the public in accordance with FACILITY / DOC Policy and Procedures.

Portable Sanitation

1. Portable sanitation facilities such as portable toilets may be needed and should be considered where plumbing and availability of water may become an issue.

2. Classification and Housing Assignments: Classification and housing assignments may be impacted in the event of a pandemic, and consideration may be given to housing various custody levels together should isolation of ill inmates and/or quarantine of those not affected be deemed necessary.

On-Site Bivouac

3. Should it be necessary for staff to remain on site to ensure shift coverage or to control spread of disease, Centurion and the Facility / DOC will utilize a designated large area within the complex.

Facility Medical Response

1. The FHA shall be responsible for:
   a. Provision of updates on the number of infected individuals and their state;
   b. Any deaths believed to be related to the pandemic;
   c. Any other information requested by the Facility / DOC related to the event
   d. Required reporting to the Department of Health, or other agency, numbers of cases either suspected or confirmed.
   e. Necessary staff and resources to provide medical evaluation and treatment of routine health issues as well as pandemic related health care in all areas of the facility, including those designated as quarantined and non-quarantined. Examples of such services include, but are not limited to:
      i. Sick call
      ii. Medication management and delivery
      iii. Nursing services
      iv. Health assessments
      v. Mental health services
      vi. Pharmacy services

2. The Centurion staff shall be prepared to distribute PPE to all staff and inmates in the institution during a pandemic outbreak.

3. In the event that a pandemic is declared, inmates placed in medical quarantine or suspected of being infected shall utilize PPE to prevent spread of the disease.

4. In addition, all staff working in and around isolation areas, medical clinics and conducting inmate patient care without exception shall use PPE in accordance with recommendations set forth by the Center for Disease Control (CDC), US Department of Health and Human Services (HHS) and the State Department of Health.

Pharmaceuticals

1. Vaccines (if available), and/or antiviral/antibacterial drugs will be made available to all institutional staff first. Vaccines (If available) and or antiviral drugs will be made available to inmates based on availability and in accordance with CDC and HHS

recommended priority populations. Although information may change based on the particular strain and virulence of the causative pandemic, the following represents the current information and priority for inmate populations:

    a. Inmates over 65 with 1 or more high risk condition
    b. Inmates under 65 with 2 or more high risk conditions
    c. Inmates with history of hospitalization for pneumonia, flu, or symptoms of disease
    d. Dormitory contacts of immune-compromised inmates who would not be vaccinated due to likely poor response to vaccine (transplant recipients, AIDS, cancer)
    e. Healthy inmates 65 and older
    f. Inmates under 65 with I high risk condition
    g. Healthy inmates

   2. Centurion will provide the available vaccine for inmates and staff.

In general, Centurion will establish a plan in conjunction with the v Facility / DOC for pandemic outbreaks and emergencies to include surveillance, quarantine and treatment, and resolution.

1. Each Centurion site will have specific areas and staff assignments based on facility location and any Facility / DOC emergency response plans.

2. Below are general statements that apply to medical services in general and apply to all sites. Centurion disease specific plans will be on file with the Warden at the respective facility.

Authority

    The FHA (Facility Health Administrator (FHA) at the facility, at the direction of the Warden or their designee will be in charge of initiating and coordinating the medical portion of the response. In the absence of the FHA, the senior nurse on duty will be in charge of coordinating the medical services.

Implementation of the Procedure

    Notification of pandemic status will be provided by the Facility Health Administrator who will have received it from the State Department of Health. Centurion staff will be notified by the FHA or designee.

Isolate and Contain

    The first priority upon receiving notification of a pandemic will be to isolate anyone who has been exposed to the disease and contain the spread of the illness. If deemed necessary and appropriate, the medical staff will screen all staff reporting for duty for signs and symptoms of the disease. Entry can be denied based on display symptoms until such time as the staff member has been cleared by a physician to return to work. Inmate housing assignments may be temporarily altered to accommodate situations as they arise. This will be done in collaboration with the Warden/designee. Medical staff will work with the Facility / DOC to plan methods to clean and disinfect the treatment areas and rooms.

Staffing

The FHA will develop a staffing plan that takes into consideration staffing where possible with separate staff, those areas know to house inmates infected with the virus and those not affected to reduce the possible spread of the disease with the Warden should it become necessary to isolate and/or quarantine in place.

Resource Storage and Supplies

1. An assessment of necessary resources, including volume, storage requirements, availability, and utilization procedures will include the following, and be coordinated with Warden/designee:
   a. Medical Supplies:
   b. Disease specific medications (enough to cover all staff and inmates);
   c. PPE (masks, gloves, gowns, goggles, sanitizers, paper products);
   d. Medications and medical supplies (i.e., insulin, cardiac, respiratory, anti-viral medications, vaccines (pneumococcal, influenza, and new vaccines developed during pandemic), analgesic and antipyretic meds, I.V. solutions and I.V. supplies, blood collections tubes, vacutainers, specimen cups);
   e. Other supplies and equipment necessary to maintain medical operations for a period of forty-five (45) days. (Chemical disinfectants, syringes, needles, alcohol wipes);
   f. Disposable equipment (urinals, bedpans, wash basins, emesis basins, disposable instruments, biohazard waste bags [large and small).
   g. Paper products (plates, silverware, toilet paper, paper towels, etc.)
   h. Centurion will maintain sufficient PPE supplies to include the Facility / DOC staff;
   i. Soaps, rinse free hand sanitizers, rinse free soaps;
   j. Items will be stored in the facility warehouse and medical unit.

Coordination with Community Resources

Centurion shall maintain contact with local health authorities and service providers to coordinate any assistance should outside services be necessary. This will include off site local pharmacies in order to obtain medications should routine delivery methods be disrupted (i.e., UPS, FedEx etc.), use of local emergency rooms, off-site private provider clinics, and ancillary services such as radiology. All off-site provider agreements will be updated to include mention of possible assistance during a pandemic situation. Centurion maintain a relationship with local public health nursing offices to further coordination efforts in the event of a pandemic outbreak in the community where the facility is located.

Facility/Site Specific Plans

FHA at each the Facility / DOC will provide the Warden a copy of any site specific alterations to this pandemic plan.  Adherence to this plan will vary based on type of service provided, availability to bivouac medical staff on site, use of water and consumables, and inmate population. These addendums will become attachments to this policy and procedure.

Updates and Revisions

As additional information becomes available through the CDC or other recognized health authority, the plans will be updated and/or modified to reflect the most current data and processes.

Education

Centurion will work with facility staff to prepare and provide appropriate education for both staff and inmates on proper identification and control of infectious diseases, to include benefits of appropriate vaccines, hand washing techniques, universal precautions, and wellness in general.

Reporting and Testing

Centurion will complete any reports and testing as required by the Department of Health, the CDC, HHS, or other health authority, as well as specific forms required by the facility or the Facility / DOC (yet to be determined) related to a pandemic.

Mortuary Services

1. Mortuary services in the event of a pandemic resulting in deaths that exceed community resources may require the institution to provide a temporary morgue.
2. In the event that outside temperatures are below zero (0), the industry bays will be utilized as a temporary morgue.

3. If outside temperatures do not support the use of the delivery corridor, then a maintenance bay shall be utilized with air conditioning and ice.

4. In the event that morgue services are needed for an extended period of time and appropriate refrigeration is unavailable, the practice of a mass burial will be implemented. Equipment will be utilized to dig a deep opening in the ground in the designated facility parking lots. The deceased will be tagged and placed in body bags taken to the burial site and covered with ice to maintain the integrity of the bodies. This process will operate in coordination with Centurion staff. Both medical aspects associated with storing a body, as well as the psychological impact on staff and inmates have been considered. The Coroner shall be notified immediately once a death occurs. The morgue shall remain in operation until attendant legal obligations are satisfied and the bodies may be removed.

Provided at time of Pandemic:
1. Condition Specific Screening Tool
2. Condition Specific Self-Triaging Algorithm
3. Actions Checklist-Yellow/Orange Alert Level
4. Actions Checklist-Red Alert

**ATTACHMENT B**

**ATTACHMENT B**

# COVID-19 (coronavirus) Screening

**English**

| Date: | Time: | | | |
|---|---|---|---|---|
| State: | Facility: | | | |

| **Symptoms (check all that apply)** | **Yes** | **No** | **Start date** |
|---|---|---|---|
| Fever/chills  (if on medications that lower temp, may not have fever) | | | |
| Cough | | | |
| Describe | | | |
| Shortness of breath or trouble breathing | | | |
| Describe | | | |
| Other: | | | |

**Vital Signs**

B/P                P                R                pSO2                Temp*

*\* Patients with immune compromised conditions or taking fever reducing  medications may not have a fever*

| | **In the past 14 days** | **Yes** | **No** | **Note** |
|---|---|---|---|---|
| 1 | Have you traveled to or been in any outbreak areas in United States, or traveled internationally*?   Many countries have out breaks, and large outbreaks in C*hina, Italy, Iran, South Korea.* | | | |
| | If yes: Where            When | | | |
| 2 | Have you or any family or friends with whom you live been in such areas? | | | |
| | If yes: Where:            When | | | |
| 3 | Have you had close contact with anyone who has tested positive to COVID-19 or experiencing fever or cough? | | | |
| | If yes:  When | | | |
| | If yes to any symptoms **and yes to** any questions 1, 2, 3:  Have patient don surgical/procedural mask, educate patient, and consult provider | | | |
| | Or if a person has a fever($\geq$100.4°), cough, shortness of breath, and lower respiratory infection, with unknown source of infection contact practitioner | | | |

Practitioner Notified(date/time)                    Practitioner Name:

Department of Health Notified (Name):

Comments

Nurse Signature:

☐ Patient accepted   ☐ Patient Quarantined   ☐ Patient Isolated   ☐ Patient Referred to Hospital

☐ Patient Tested for COVID-19    Date:          Results:

| Patient Name | DOB | ID # |
|---|---|---|
| | | |

*\*Risk Area=Outbreak areas include  United States , major airports, globally.*

# COVID-19 (coronavirus) Screening

## Spanish

| Date: | Time: | | | |
|---|---|---|---|---|
| State: | Facility: | | | |
| **Síntomas (marque todos los que correspondan)** | | **Yes** | **No** | **Start date** |
| Fiebre / escalofríos | | | | |
| Tos | | | | |
| Describir | | | | |
| Falta de aliento/ Dificultad para respirar | | | | |
| Describir | | | | |
| Other: | | | | |

|  |
|---|

| **Vital Signs** | | | | | |
|---|---|---|---|---|---|
| B/P | P | R | pSO2 | Temp* | |
| *\* Patients with immune compromised conditions or taking fever reducing medications may not have a fever* | | | | | |

| | **En los últimos 14 días** | **Yes** | **No** | **Note** |
|---|---|---|---|---|
| 1 | ¿Ha viajado o ha estado en áreas de brotes en los Estados Unidos, o ha viajado internacionalmente *? Muchos países tienen brotes y grandes brotes en China, Italia, Irán, Corea del Sur. | | | |
| | | | | |
| 2 | ¿Usted o alguna familia o amigo con quien vive ha estado en esas áreas? | | | |
| | | | | |
| 3 | ¿Has tenido contacto cercano con alguien que haya dado positivo a COVID-19 o que tenga fiebre o tos? | | | |
| | Si sí, cuándo | | | |
| | If yes to any symptoms **and yes to** any questions 1, 2, 3:  Have patient don surgical/procedural mask, educate patient, and consult provider | | | |
| | Or if a person has a fever(>100.4°), cough, shortness of breath, and lower respiratory infection, with unknown source of infection consult provider | | | |

|  |
|---|

| Provider Notified(date/time) | Provider Name: | |
|---|---|---|
| Department of Health Notified (Name) | | |
| Comments: | | |
| | | |
| | | |
| Nurse Signature: | | |

☐ Patient accepted    ☐ Patient Quarantined    ☐ Patient Isolated    ☐ Patient Referred to Hospital

☐ Patient Tested for COVID-19    Date:            Results:

| Patient Name | DOB | ID # |
|---|---|---|
| | | |

*\*Risk Area=Outbreak areas include  United States , major airports, globally.*

ATTACHMENT C

ATTACHMENT C

Centurion Clinical Guidelines
COVID-19
March 15, 2020

# Centurion Clinical Guidelines

## COVID-19 (Novel Coronavirus)

Treatment guidelines do not apply to all patients. Use your clinical judgment.
When these guidelines do not apply, document the clinical rationale for your treatment decision.
Centurion Clinical Guidelines can be used by clients to develop contract-specific guidelines

**Introduction:**

Early detection, prevention, and control of novel coronavirus (COVID-19) in correctional facilities is important to protect the health of incarcerated persons, staff and the community.

On March 11, 2020, the World Health Organization declared COVID-19 as a pandemic.  Details and information change frequently, and the latest situation summary updates are available on CDC's web page  https://www.cdc.gov/coronavirus/2019-ncov/index.html .  Local and state health departments provide frequent updates and guidance about the emerging situation. Facility and medical leadership is to be in contact with the local health department and exchange contact information, even if no transmission is ongoing in the immediate community.

**Definitions:**

*Isolation*—the procedure of separating a person who is already sick from others who are not ill in order to prevent the spread of disease. The term isolation is distinct from the term quarantine.

*Incubation period*—the length of time between an exposure to an ill person and the development of symptoms in another person. The incubation period of the Coronavirus is 2 to 14 days; mean of 5 days.

*Non-Pharmocologic Measures*– Actions taken to prevent the spread of virus within a facility that include handwashing, environmental cleaning, and social distancing between well and unwell individuals.

*Person Under Investigation (PUI)*—person with symptoms and epidemiological risk factors for being infected with COVID-19 from whom a sample has been obtained, though the results are pending.

*Personal Protective Equipment (PPE).* Used upon entry into patient space (< 6 feet) or exam room. Includes impermeable gown and gloves, a N95 mask or Powered Air Purifying Respirator (PAPR), and eye protection.

*Quarantine*—the procedure of separating and restricting the movement of persons who are not sick yet, but who were exposed. This allows rapid identification of those who will become sick.



Centurion Clinical Guidelines
COVID-19
March 15, 2020

**Healthy Workforce:**

Incarceration involves the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, correctional facilities may facilitate transmission of respiratory viruses from person-to-person through exposure to respiratory droplets or contact with contaminated surfaces. To reduce spread of respiratory infections including COVID-19, staff are not to come to work when sick. (See Centurion Workforce Policy and Employee Benefits guidance of March 13, 2020.) Return to work requires evidence of a negative COVID-19 test.

Consider screening staff reporting to work utilizing a form or log (see Centurion Staff Screening log):

1) Have you traveled to international or domestic areas with ongoing transmission such as China, Iran, Italy, Japan, South Korea in past 14 days?
2) Do you have a fever?
3) Do you have a cough?
4) Are you short of breath?
5) Have you been in close contact (less than 6 feet) of someone exhibiting these symptoms or confirmed case of COVID-19 ?
6) Take and record temperature.

If NO to the above, enter facility and duty.
If YES to any of the above, or temperature >100.4, do not enter facility. Follow local health department guidance or 14 day home quarantine.

**Intake and Transfer Screening:**

Prompt identification and isolation of persons who might have COVID-19 infection is essential for disease control. Justice-involved persons entering the prison from county jail, community or transfer from another facility are screened immediately (Centurion form ICP-042 or local state/county-issued screening form):

1) Have you traveled to international or domestic areas with ongoing transmission such as China, Iran, Italy, Japan, South Korea in past 14 days?
2) Do you have a fever?
3) Do you have a cough?
4) Are you short of breath?
5) Have you been in close contact (less than 6 feet) of someone exhibiting these symptoms or confirmed case of COVID-19 ?
6) Take and record temperature.

If NO to the above, proceed with processing, assessment and disposition.

If YES to any of the above, or temperature >100.4, patient is designated as Person Under Investigation (PUI), and the following happens:
• Put a simple surgical mask on the patient
• Place the patient in a separate, closed room and close the door. Ideally, this is an airborne infection isolation room (AIIR) with negative pressure.

- Healthcare and custody staff wear Personal Protective Equipment (N-95 mask, eye shield, gown, gloves) when entering room or escorting patient.
- Assess the stability of the patient.  For example, is patient short of breath or hypotensive?  Does patient need transfer to hospital?
- Contact facility practitioner.  Obtain and document a plan for monitoring, treatment or transfer.
- If transfer to Emergency Department, call ahead to notify them prior to moving the patient that COVID-19 is suspected.  Notify transport officers and EMS (if activated) that COVID-19 is suspected.
- Notify security and medical administration and local health department of PUI.
- Testing to be done per local protocols and availability.  Test for seasonal influenza.

Remember the basics—vital signs, chief complaint, history and physical. For respiratory symptoms, what was onset of upper respiratory symptoms, such as rhinorrhea and cough? Is cough productive? Is there fever, subjective or was it measured? Is there shortness of breath? Any diarrhea? Any other symptoms, including ones not typical for COVID-19? Relevant history? Known contacts? Travel by patient or contacts to hot spots?

Wash hands with soap and water before and after touching a patient. Regarding PPE, healthcare workers and security wear N95 masks during direct patient encounters, when entering room of a PUI or when escorting or transporting a patient.  Personnel use a facemask (eye protection in addition to N95), gowns and gloves.  Hand washing for at least 20 seconds occurs after removing and discarding gloves, gown and mask.

After patient is relocated, if coronavirus was deemed a possibility, perform terminal cleaning of room with hospital grade disinfectant Environmental Protection Agency (EPA) registered for disinfectant effective on human coronavirus.

Screening also occurs prior to transfer or release from a facility.  Persons screening positive are to have transfer cancelled.  If person is a end of sentence, coordinate with local health department (see section below on Discharge Planning).

**Isolation:** Stable patients with mild symptoms or influenza-like illness may be moved to a room separate from general population (either room with door, or when capacity for private infirmary rooms exceeded, dedicated cell block.) Supply tissues. Provide soap/water.  Obtain monitoring and treatment orders from practitioner to include at least twice daily assessments. They are not in contact with incarcerated persons without symptoms. PPE is required for contact.

**Quarantine:** For those who are asymptomatic, but a credible history of exposure to COVID-19 or hot spots, patient is placed in a single room or dedicated cell block as quarantine.  Follow the local health department's current protocol for PUI.  The incubation period is believed to be 2-14 days, with an average of 5 days.  Quarantine lasts for 14 days.

Health staff complete a daily face-to-face assessment of all persons housed in designated quarantine units to include temperature checks. In the event of a full lockdown of the facilities,

the health care staff to round in all areas at least once in a three-day period. The health care staff maintain written documentation of all completed rounds.

**Education for Staff and Incarcerated Persons:**

- Maintain good health with healthy diet, exercise, reduce stress and stop smoking

- Practice social distancing as much as possible (avoid large groups, keep distance of >6 feet from most persons).  Wear PPE interviewing, escorting, or providing other assistance to sick persons.

- Inform a medical practitioner immediately if develop a fever (>100.4°F), begin to feel feverish, or develop other signs or symptoms of sickness.
- Use respiratory, cough, and hand hygiene
  - o Advise incarcerated persons and staff of the importance of covering coughs and sneezes with a tissue. Dispose used tissues immediately in a disposable container (e.g., plastic bag) or a washable trash can.
  - o Remind incarcerated persons to wash their hands often with soap and water, especially after coughing or sneezing. **Correctional facilities are to make soap widely available and without charge for all incarcerated persons during this pandemic. For persons with nasal discharge, cough or both, tissue is supplied.**
  - o If soap and water are not available in a work station for staff, authorization can be sought to use a hand sanitizer containing 60%-95% alcohol.
  - o Depending on correctional regulations and security classification level, a facility may decide to provide hand sanitizer containing 60%-95% alcohol to incarcerated persons. This is a decision that medical services needs to make in conjunction with custody leadership.
- Centurion healthcare staff access company portal for updated materials, resources and information on the pandemic.

Recognize that complications or poor outcomes from COVID-19 are most common in older persons (age >65 years) and those with chronic medical conditions (e.g. COPD, CVD, Autoimmune Disease, etc.).   Increase attention to protection from exposure, monitoring and consideration for alternatives to incarceration.

Do not forget influenza is currently more common in USA than coronavirus. Until the current flu season ends, vaccinate those who have not been vaccinated.

See Centurion documents (Coronavirus Awareness – Medical Precautions; Coronavirus Information for Security Staff; Coronavirus Information for Correctional Healthcare Staff; Coronavirus Information for Incarcerated Persons).



**Facility Considerations:**

Close facility to visitations and outside, non-essential staff or volunteers (such as education, vocational and religious services).   Offer video visitation.  (See sample signage for posting at entrances.)  Recognize importance of person in isolation or quarantine to have communication with family members, including those who might have concern for the health and safety of their family members in the community.

Facilitate legal visits through non-contact mechanisms.

For persons under observation after COVID-19 exposure, and especially those with symptoms, the jurisdiction makes every attempt for Court to be held via teleconferencing.

Review sick leave polices for employees and vendors and communicate them to employees. The correctional system ensures that contract companies have policies that prohibit sick employees from reporting to work.

Establish staffing plans if workforce were to have large vacancies due to illness.

Staff who self-report or appear to have fever or acute respiratory symptoms (such as cough or shortness of breath) are to seek medical attention promptly from their usual providers and health care facility.

Incarcerated persons are encouraged to report any symptoms of fever, cough and shortness of breath.  Consider elimination of co-pay for evaluation of such symptoms.

Continue opportunities for entertainment or exercise as possible within isolation or quarantine areas so that persons are not discouraged from revealing symptoms.

Continue access and availability of behavioral health services.

Ensure adequate access to soap and water for hand washing, or supply alcohol-based hand-sanitizer in all areas of facility.

In addition to routine cleaning and disinfection strategies, consider more frequent cleaning of commonly touched surfaces such as tabletops, countertops and doors.

Use disinfectant products against COVID-19 with EPA-approved emerging viral pathogens claims or label claims against human coronaviruses.  Diluted household bleach solutions can also be used if appropriate for the surface. Follow manufacturer's instructions for application and proper ventilation (and no not mix household bleach with ammonia or any other cleanser). Allow 2 hours to pass before entering a room used to house a person with COVID-19 to allow time for droplets to settle.

Review plan for adequate food supplies, preparation and distribution.



Meals are delivered to housing areas when possible instead of movements of individuals throughout facility.  Incarcerated persons are fed in their cells or on their beds in dorms. Small contingents of identifiably healthy persons are used to deliver food and maintain kitchen operations. Such persons are provided masks to deliver meals in housing areas where infected persons are housed.  Consider disposable plates, cups, utensils for persons with active COVID-19 infection.

Medication distribution is provided at the housing units or single cells when possible to avoid movements.  Expansion of KOP medications is encouraged.

Conduct an assessment of necessary resources, including volume, storage requirements, availability, and utilization procedures include the following, and be coordinated with Warden/designee:

 a. PPE (masks, gloves, gowns, goggles, sanitizers, paper products) sufficient to supply healthcare and facility staff;
 b. Medications; i.e., insulin, cardiac, respiratory, anti-viral medications, vaccines (pneumococcal, influenza, and new vaccines developed during pandemic), analgesic and antipyretic meds, iv solutions and iv supplies, blood collections tubes, vacutainers, specimen cups, viral testing kits;
 c. Medical supplies, other supplies and equipment necessary to maintain medical operations for a period of forty-five (45) days. (Chemical disinfectants, syringes, needles, alcohol wipes);
 d. Disposable equipment (urinals, bedpans, wash basins, emesis basins, disposable instruments, biohazard waste bags [large and small].
 e. Paper products (plates, silverware, toilet paper, paper towels, etc.) advised for persons with COVID-19 infection.
 f. Soaps, rinse free hand sanitizers, rinse free soaps;
 g. Identify storage areas in the facility warehouse and medical unit.

Explore means to obtain release from prison facility for elderly persons and those with complicated medical conditions for which exposure and infection of COVID-19 is likely to have worse outcome.  Although the impact on pregnancy is uncertain, pregnant women are also included.

Work with Courts, arresting agencies and probation departments to rely less on prison and promote community corrections or alternatives to incarceration (pre-arrest programs; diversionary courts pre-adjudication, at-home electronic monitoring, early parole, etc.).  Expand opportunities for medical furlough or compassionate release.

For persons under observation after COVID-19 exposure, and especially those with symptoms, the jurisdiction should make every attempt to court be held via teleconferencing.



**Discharge Planning:**

Before discharging incarcerated or detained persons suspected of having COVID-19, medical staff and telemedicine providers discuss the release of the patients with the state and local health departments to ensure safe transport and continued shelter and care of the patient and medical transportation of the patient upon arrival. Persons are not released to homeless shelters without notifying the shelter's staff so they can make preparation to

**Coordination with Community Resources:**

Centurion maintains contact with local health authorities, hospitals and service providers to coordinate any assistance should outside services be necessary. This includes off site local pharmacies in order to obtain medications should routine delivery methods be disrupted (i.e., UPS, FedEx etc.), use of local emergency rooms, off-site private provider clinics, and ancillary services such as radiology. All off-site provider agreements are updated to include mention of possible assistance during a pandemic situation. Centurion maintains a relationship with local public health nursing offices to further coordination efforts in the event of a pandemic outbreak in the community where the facility is located.

**Updates and Revisions**

As additional information becomes available through the CDC or other recognized health authority, the plan is updated and/or modified to reflect the most current data and processes.

**Reporting and Testing**

Centurion completes any reports and testing as required by the Department of Health, the CDC, Health and Human Services or other health authority, as well as specific forms required by the facility or the Facility / DOC related to a pandemic.

1. The Health Services Administrator/Facility Health Administrator is responsible for:
    a. Provision of updates on the number of infected individuals and their state;
    b. Any deaths believed to be related to the pandemic;
    c. Any other information requested by the Facility / DOC related to the event
    d. Required reporting to the Department of Health, or other agency, numbers of cases either suspected or confirmed.
    e. Tracking number of staff who callout or identified as COVID-19 exposure doing self-quarantine and number of staff who call out or identified as positive infection in the area.
    f. Necessary staff and resources to provide medical evaluation and treatment of routine health issues as well as pandemic related health care in all areas of the facility, including those designated as quarantined and non-quarantined. Examples of such services include, but are not limited to:
        i. Sick call
        ii. Medication management and delivery



   iii.  Nursing services
   iv.  Health assessments
   v.  Mental health services

**RESOURCES:**

**Center for Disease Control and Prevention**

https://www.cdc.gov/coronavirus/2019-ncov/index.html;
https://wwwnc.cdc.gov/travel/notices/alert/novel-coronavirus-china;
https://www.cdc.gov/coronavirus/2019-nCoV/clinical-criteria.html;
https://www.cdc.gov/coronavirus/2019-ncov/summary.html

**World Heath Organization**;
https://www.who.int/csr/sars/en/;
https://www.who-2019-nCoV-IPC-v2020.1-eng.pdf;
https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200122-sitrep-2-2019-ncov.pdf

**Map** https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

**ATTACHMENT D**

**ATTACHMENT D**



# Coronavirus Awareness

## Medical Precautions

**Reminder:**

- There is a designated place for updates and announcements on Centurion's Portal located at portal.mhm-services.com. Click on the banner titled "Coronavirus Updates." This is where our employees can access the most recent news, formal announcements and resources pertaining to COVID-19.



- Centurion has provided, and will continue to make available, webinars, conference calls and materials including links and references. Staff have access to these resources on the Portal.
- A facility specific screening tool has been developed for jail and prison admissions, transfers, and other trips in/out of facilities.  Please check with your supervisors before implementing this guidance as your facility may use other screening tools.
- Do not enter a facility if you:
  - Are experiencing symptoms (fever, cough, and/or difficulty breathing)
  - Had recent travel to a high risk area within the past 14 days
  - Have been advised that you have been exposed to a confirmed case
- Centurion has developed and distributed an outline of a pandemic clinical guideline which can be found on the Portal banner link;
- Teleconferencing and telemedicine capacity has been expanded. Whenever possible, if delivery of care can be done via telehealth technology for primary care, specialty care, nursing care, and mental health, please utilize these resources.  Your supervisor will provide guidance as to the availability of these alternatives at your specific facility.

## Recommendations:

Below we provide a listing of program-level and site-level recommendations by corporate senior medical leadership. If necessary, a point person is listed for applicable instructions.

- Identify contacts at your nearest local health department for reporting of suspect cases and request testing kits. *(Facility infection control nurse; alternate: DON and HSA/FHA)*
- Identify areas for single cell isolation for symptomatic patients. *(HSA/FHA, DON, site medical director)*
- Identify air circulation patterns in dormitories in case they are to be used for quarantine. *(HSA, DON, site medical director)*
- Cancel visitations or limit external vendors and personnel. Instead use videoconferencing and telephonic communications.
- Be sure to use appropriate personal protective equipment (N95 mask, eye/face shield, gown, gloves) for Movement and Transport Officers. We recommend tracking appropriate levels of PPE, medications, equipment, and supplies as there is potential for supply chain disruption. *(Program Manager/Vice President of Operations or HSA)*
- Review inventory of supplies and medications which might be in short supply. *(DON or charge nurse)*
- Provide a symptom screening for all persons being transferred or released using the Centurion screening tools or other screening tools that are consistent with CDC recommendations for all intakes, transfers in/out, and returns from outside trips such as court, offsite medical trips, and work details. If the screening is positive, there needs to be a determination whether or not it is appropriate to proceed with the planned movement.
- Encourage patients who have not taken the influenza vaccination to reconsider.
- If allowed by Clients, Centurion is drafting an informational FAQ sheet to healthcare and correctional staff and our patients.
- We recommend mock drills for a possible outbreak scenario that incorporates cooperation between custody, health services, and other ancillary staff to become familiar with protocols and have lessons learned to improve the response if such an incident does arise.
- We recommend that Centurion regional/site clinical leadership is involved in any task force or committee meetings/discussions relating to COVID-19.
- We recommend making available sufficient handwashing with soap access. *(HSA)*
- We recommend programs create educational videos for any in-facility video programming. Keeping not just staff but patients informed is critical to preventing riots and other safety concerns.
- We recommend custody staff have ample hospital-grade disinfectants and routinely clean areas. If inmates are to be utilized for cleaning duties, be sure that they have proper training and are handling of materials with appropriate safety equipment.
- We recommend that our Clients not to limit soap, tissues, toilet paper, and other hygiene products during this time period.
- We encourage our Clients to consider meals/dining be done in the units to limit mass movement and gatherings.
- Centurion program leadership should draft and implement a plan for emergency staffing in the event that employees are absent either due to infection or self-quarantine. The plan must ensure adequately licensed and trained staff perform the essential tasks and services under our contract. Further, the plan should address what to do if custody becomes short staffed, such as, by way of example, cell-side encounters and alternative medication administration.
- Consider recommending medical release of incarcerated persons who are aged or medically compromised and increase monitoring of those at highest risk.

**ATTACHMENT E**

**ATTACHMENT E**

Centurion™

# CORONAVIRUS DISEASE 2019 (COVID-19)

## STAFF SCREENING TOOL

| **1.  Assess the Risk Of Exposure** | |
|---|---|
| ⊔ Yes   ⊔ No | Traveled from, or through, any of the locations identified by the CDC as increasing epidemiologic risk within the last 14 days? |
| | Describe: |
| ⊔ Yes   ⊔ No | Had close contact with anyone diagnosed with the COVID-19 illness within the last 14 days? |
| ⊔ Yes   ⊔ No | Deployed for COVID-19 response and back from deployment within the last 14 days? |

***If the answer to ALL the above risk of exposure questions is NO, then STOP here.***
***If the answer to ANY of the above risk of exposure questions is YES, then assess symptoms in step 2 and proceed to step 3.***

| **2.  Assess Symptoms** | | **Date of Onset:** |
|---|---|---|
| ⊔ Yes      ⊔ No | **Fever** (*Fever may not be present in some patients, such as elderly, immunosuppressed, or taking certain medications. Fever may be subjective or objective).* | |
| ⊔ Yes      ⊔ No | **Cough** | |
| ⊔ Yes      ⊔ No | **Shortness of Breath (SOB)** | |
| TEMPERATURE: | | |

| ***3.  Contact Central Office*** |
|---|
| If the staff member answers **Yes** to **either question in section 1** (exposure risk), **Yes** to **any question in symptoms**; or **Temperature >100.4F**, contact: |


_____    _____    _____
**STAFF NAME (Last, First)**                           **BADGE #**                    **DOB**


_____        _____
**INTERVIEWED BY**                                        **DATE/TIME:**


IPC- 043
COVID-19 STAFF SCREENING  03/17/2020

**ATTACHMENT F**

**ATTACHMENT F**

# COVID-19 Staff Screening

**Date:**                          **Facility:**                 **State:**

| Time | Employee# or name | If using ID#, please write initials | Do you have a fever? | TEMP | Do you have a cough? | Are you short of breath? | Traveled to an area with COVID-19 outbreak? | Have you been in close contact (less than 6ft) with someone who displays these symptoms? |
|---|---|---|---|---|---|---|---|---|
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |
| | | | Y / N | | Y / N | Y / N | Y / N | Y / N |

**ATTACHMENT G**

**ATTACHMENT G**



**Coronavirus COVID-19**
# Information for Correctional Healthcare Staff

## Personal Safety

Maintain healthy habits and be prepared.  Always wash hands with soap and water after contact with persons and public objects.   Utilize personal protective equipment (PPE) in interactions with patients who might be infected. Recognize that droplets can remain active on surfaces and clothing for several hours. Take everyday actions to stay healthy.

## Facility Safety

Do not to enter facilities if you are:

- Experiencing symptoms (fever, cough, and/or difficulty breathing).
- Traveled within the past 14 days to a high risk area.
- Have been exposed to a confirmed case.

If someone in your household has been exposed to a contact, seek guidance from your local health department. Refer to Centurion policy for leave during the COVID-19 epidemic.

## Facility Procedures

All patients entering and leaving the facility are to be screened with the following questions or actions:

- Have you traveled to any area with an outbreak of COVID-19 or to international areas with sustained (ongoing) transmission such as China, Iran, Italy, Japan, South Korea?
- Do you have a fever?
- Do you have a cough?
- Are you short of breath?
- Have you been in close contact (less than six feet) of someone exhibiting these symptoms or confirmed case of COVID-19?
- Take and record temperature.

> If **NO** to the above screening items, proceed as normal.
>
> If **YES** to any the above, or temperature >100.0 F, proceed as follows.

If exposure or symptoms or fever:

- → Put a simply surgical/procedure mask on the patient.
- → Place the patient in a separate, closed room and close the door.  Ideally, this is an airborne infection isolation room (AIIR) with negative pressure.
- → Healthcare and custody staff wear Personal Protective Equipment (N-95 mask, eye shield, gown, gloves) when entering room or escorting patient.





**Coronavirus COVID-19**
# Information for Correctional Healthcare Staff

→ Rapid test for influenza.
→ Assess stability of the patient.  Short of breath?  Need transfer to hospital?
→ Contact your facility practitioner.
→ Contact local health department or Emergency Department prior to moving patient.
→ Notify security and EMS transport patient with respiratory illness.
→ Testing to be done per local protocols and availability.

## Quarantine

If a person is identified with COVID-19, determination is made for those who had potential exposure.  Those persons are placed in quarantine for a period of 14 days.  This is coordinated with security.

## Supplies

Maintain adequate stock of essential supplies, including medications and cleaning equipment.

## Minimize Your Risks

**Stay healthy:**  Strict hand washing, social distancing (>6 feet or ~2 arms lengths), and smoking cessation.



**ATTACHMENT H**

**ATTACHMENT H**



**Coronavirus COVID-19**
# Information for Security Staff

COVID-19 is a virus similar to other viruses that cause respiratory illness:  It is transmitted person to person through cough, sneeze or other respiratory droplets.  The virus remains active on surfaces such as doorknobs, table tops or clothing for several hours.

Fortunately, 80% of people that are infected will have mild to moderate symptoms.

The time from exposure to display of symptoms is 2-14 days with an average around day 5.  People are most contagious when they are symptomatic but transmission can occur without symptoms.

**The symptoms are very similar to the flu and can be mild, moderate, or severe:**

⚠ Fever of 100.4°F (a person might not have a fever if you taking Tylenol or other pain/fever reducing medications)

⚠ Dry cough

⚠ Shortness of breath/difficulty breathing

## How to Protect Yourself and Others

- Take everyday actions to stay healthy.
- Protect your immune system with exercise, healthy eating, and rest.
- Wash hands frequently with soap and water:
  - ⟶ Before eating
  - ⟶ After going to the bathroom
  - ⟶ When dirty
  - ⟶ Handling or touching possible contaminated surfaces
  - ⟶ After sneezing and coughing
- Avoid touching your eyes, nose, and mouth.
- Keep your distance or avoid close contact with people who are sick (fever, coughing).
- Cover your cough or sneeze.
  - ⟶ Use tissue, then throw the tissue in the trash, then wash your hands.
  - ⟶ If tissue is not available cough or sneeze into your arm not your hand.
- Monitor environmental cleaning and disinfect frequently touched objects and surfaces using the disinfectant provided by the facility.
- If you are sick or have been exposed to a confirmed case COVID-19, it is recommended you do not come to work. Follow your facility's and health professional's recommendation.

## Safe Facility

- If you identify or note an inmate who is ill, coughing, short of breath or febrile, notify medical and separate the person from others.





**Coronavirus COVID-19**
# Information for Security Staff

## Safe Facility *(Continued)*

- Staff are to wear Personal Protective Equipment (N-95 mask, eye shield, gown and gloves) when escorting or transporting or entering the room of a person suspected of COVID-19 infection.

- Special vigilance is appropriate for older persons and those with medical problems such as emphysema who are more likely to be severely affected by the infection.

- If moving a person suspected of COVID-19, the receiving facility (such as a hospital) should be notified in advance.

- Persons who are exposed to an active case of COVID-19 are generally placed in quarantine for 14 days. This means they are restricted from interacting with persons or places that have not been exposed.

- Do not come to work if you are sick (fever, cough).  Follow your facility's directive.



**ATTACHMENT I**

**ATTACHMENT I**



**Coronavirus COVID-19**

# Information for Incarcerated Persons

Coronavirus is spread like a cold or flu.  If a sick person coughs or sneezes near you, or touches surfaces with contaminated hands, you could get sick.  Washing your hands and cleaning surfaces is your best protection from germs.

Most people (about 80%) who have coronavirus only have mild to moderate symptoms.

## The symptoms are like the flu and can be mild, moderate, and severe:

⚠ Fever of 100.4°F (a person might not have a fever if you taking Tylenol or other pain / fever reducing medications)

⚠ Dry cough

⚠ Shortness of breath / difficulty breathing

If you have a dry cough, trouble breathing, or a fever, please tell medical staff. If anyone in your housing unit has these symptoms, please notify medical staff.

## Stay healthy! How to Protect Yourself and Others

- Eat healthy, exercise, and reduce stress to keep your immune system strong
- Wash hands often with soap and water:
  - → Before eating
  - → After going to the bathroom
  - → When dirty
  - → Touching possible contaminated surfaces or items
  - → After sneezing and coughing
- Do not touch your eyes, nose, and mouth
- Do not share food
- Stay away from people who are sick, with a fever, and coughing. Tell sick visitors not to come until they are healthy.
- Cover your cough or sneeze:
  - → Cough or sneeze into your arm, not your hand
  - → Use a tissue, then throw the tissue in the trash then wash your hands
- Clean objects and surfaces using disinfectant.

## Do not be afraid

- ***We are prepared.*** ✔
- We are following directions from the Centers for Disease Control and Prevention and health departments.
- Ask questions if you are worried.
- Tell medical staff if you are sick.



## LOWER YOUR RISKS

**Stay healthy:  Wash hands, social distancing** (at least 6 feet or 2 arm lengths)**, and stop smoking** (COVID-19 is a respiratory disease)





## Coronavirus COVID-19
# Información para personas encarceladas

El coronavirus se propaga como un catarro o la gripe. Si una persona enferma tose o estornuda cerca de usted, o toca superficies con manos contaminadas y luego las toca usted, se puede enfermar. El lavar las manos y limpiar las superficies es su mejor protección frente a los gérmenes.

La mayoría (alrededor del 80%) de las personas que tienen coronavirus solo tienen síntomas que van de leves a moderados.

### Los síntomas son como los de la gripe y pueden ser ligeros, moderados y graves:

⚠ Fiebre de 100.4°F (la persona enferma puede que no tenga fiebre si toma Tylenol u otro medicamento para reducir el dolor o la fiebre)

⚠ Tos seca

⚠ Falta de aliento/dificultad para respirar

Si tiene tos seca, problemas para respirar o fiebre, dígaselo al personal médico. Si alguien en su unidad de vivienda tiene estos síntomas, notifique al personal médico.

### ¡Manténgase saludable! Cómo protegerse y proteger a los demás

- Coma saludablemente, haga ejercicio y reduzca su estrés para mantener su sistema inmunitario fuerte.
- Lávese las manos a menudo con agua y jabón:
  - ➡ Antes de comer
  - ➡ Después de ir al baño
  - ➡ Cuando estén sucias
  - ➡ Si ha tocado superficies u objetos que estaban posiblemente contaminados
  - ➡ Después de estornudar y toser
- No se toque los ojos, nariz o boca
- No comparta comida
- Manténgase alejado de las personas que están enfermas, tienen fiebre o tosen. Dígales a los visitantes que estén enfermos que no vengan hasta que estén saludables
- Cubra su tos o estornudo:
  - ➡ Tosa o estornude en su brazo, no en su mano
  - ➡ Use un pañuelo, después tire el pañuelo a la basura y lávese las manos
- Limpie los objetos y superficies usando desinfectante.



### No tenga miedo

- ***Estamos preparados*** ✔
- Estamos siguiendo las instrucciones de los Centros para el Control y la Prevención de Enfermedades y del Departamento de Salud.
- Haga preguntas si está preocupado.
- Si está enfermo, dígaselo al personal médico.



# DISMINUYA SUS RIESGOS

**Manténgase saludable:** Lávese las manos, practique **aislamiento social** (mantenga una distancia de al menos 6 pies o de 2 brazos)**, y deje de fumar** (COVID-19 es una enfermedad de las vías respiratorias)

*Emitido el 3/17/2020*





**ATTACHMENT J**

**ATTACHMENT J**

# CORONAVIRUS (COVID-19) PRECAUTIONS

**In order to protect our staff and inmates, we ask the you DO NOT enter the facility during this time if you have the following active symptoms:**

**STOP**

- *Fever*
- *Cough/Sneezing Cold Symptoms*
- *Difficulty breathing*

**In order to keep our facility free of COVID-19 we ask that you abide by this. Anyone with "active"signs of this virus should stay home, avoid contact with the public, and see their Doctor as soon as possible.**

# THANK YOU FOR YOUR COOPERATION AND UNDERSTANDING

**EXHIBIT 3**

**EXHIBIT 3**

1   Daniel P. Struck, Bar No. 012377
    Rachel Love, Bar No. 019881
2   Timothy J. Bojanowski, Bar No. 022126
    Nicholas D. Acedo, Bar No. 021644
3   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    3100 West Ray Road, Suite 300
4   Chandler, Arizona 85226
    Telephone: (480) 420-1600
5   Fax: (480) 420-1696
    dstruck@strucklove.com
6   rlove@strucklove.com
    tbojanowski@strucklove.com
7   nacedo@strucklove.com

8   *Attorneys for Defendants*

9               **UNITED STATES DISTRICT COURT**
10                   **DISTRICT OF ARIZONA**

11   Victor Parsons, *et al.*, on behalf of themselves      NO. 2:12-cv-00601-ROS
     and all others similarly situated; and Arizona
12   Center for Disability Law,

13                              Plaintiffs,     **DECLARATION OF WENDY**
                     v.                         **ORM, M.D.**
14
     David Shinn, Director, Arizona Department of
15   Corrections; and Richard Pratt, Interim
     Division Director, Division of Health Services,
16   Arizona Department of Corrections, in their
     official capacities,
17
                              Defendants.
18
          I, Wendy Orm, M.D., make the following Declaration:
19
          1.    I am over the age of 18 years and have personal knowledge of and am
20
     competent to testify to the matters set forth in this Declaration.
21
          2.    I am the Arizona Statewide Medical Director for Centurion of Arizona, LLC
22
     ("Centurion"), and have been since May 2019. I am licensed to practice medicine in
23
     Arizona, and have been doing so for approximately 23 years. I am board-certified in
24
     family medicine.
25
          3.    I am aware of the *Parsons* litigation, including Plaintiffs' Emergency
26
     Motion Regarding Defendants' Prevention, Management and Treatment of COVID-19,
27
     filed on March 16, 2020.
28

4. Even prior to the identification of COVID-19 in December 2019, Centurion had a Pandemic Preparedness and Emergency Response Plan in place that was intended to be tailored to new pandemics as they arise.

5. As the current COVID-19 pandemic has developed, Centurion has continued to develop and refine its plans and procedures for dealing with the virus.

6. In January 2020, Centurion began adding information from the CDC to its Employee Portal and regularly updating it as CDC updated its information.

7. Also in January 2020, Centurion developed an inmate screening tool for use at all facilities in which it provides health care services. The inmate screening tool was announced during conference calls to facility medical directors beginning in January 2020. It was also placed on the front page of the Centurion employee portal in January 2020. During the conference calls, each statewide medical director was asked to consider the best method to implement it.

8. In late February 2020, even though there was no evidence of community spread in Arizona at the time (and still is not based on current information from the CDC), I began coordinating with the Arizona Department of Corrections Rehabilitation and Reentry ("ADCRR") regarding preparations to respond to COVID-19, including methods of screening inmates and visitors, isolation of inmates suspected of having the virus, and precautions for security staff.

9. In early March 2020, Centurion began internal discussions regarding potential impacts to the pharmaceutical supply chain and ways to ensure an ongoing supply of medications for ADCRR inmates.

10. Also in early March 2020, Centurion revised the inmate screening tool and distributed it and the Pandemic Preparedness and Emergency Response Plan to ADCRR.

11. On or about March 4, 2020, Centurion sent a communication to all employees regarding social distancing, sick time allowance, and tactical matters related to expectations and communication during the pandemic.

2

12.     On March 6, 2020, I and other Centurion staff met with ADCRR Director Shinn and other ADCRR staff to discuss, among other topics, COVID-19. During the meeting, I provided Director Shinn with a copy of Centurion's inmate screening tool to pass along to the 15 Arizona county sheriffs for use in their jails.

13.     On March 8, 2020, Centurion revised and finalized its Pandemic Preparedness and Emergency Response Plan to specifically include COVID-19. The Plan is intended to be universal, to be adapted by each state and site as necessary to accommodate specific contracts and local needs.

14.     On March 10, 2020, the Arizona Department of Health Services ("ADHS") recommended to Centurion that it check the temperature of each inmate returning to the facilities from daily work crew assignments in the community. Centurion began coordinating with the various Facility Health Administrators as well as ADCRR to procure sufficient thermometers and develop written plans for distribution to inmates and ADHS.

15.     On March 11, 2020, after Governor Ducey declared a state of emergency in Arizona, Centurion engaged in additional discussions with ADCRR regarding procedures to screen inmates returning from work details, intrasystem transfers, and new inmates, with the goal of implementing the new procedures by March 16, 2020.

16.     On March 15, 2020, Centurion finalized its Clinical Guidelines for COVID-19 and posted them to the Employee Portal.

17.     On March 16, 2020, I sent an email to medical staff at the various sites regarding protocols for any inmates who presented with symptoms of a febrile respiratory illness, including the following:

a. mask and isolate the inmate, preferably on-site (Centurion continues to work with ADCRR to identify space for quarantine and isolation overflow);

b. perform a full symptom screen and vitals check and escalate the inmate to the provider for a full history and physical evaluation;

c. notify me and Wendy Larson regarding any inmates who will be isolated and observed (name, location, and inmate number);

d. rule out influenza if test kits are available (Wendy Larson continues to work to acquire more rapid influenza test kits and distribute them to the sites);

e. order CBC and CMP labs and chest x-rays depending on the severity of the symptoms and clinical suspicion;

f. check vital signs every shift and document them in the chart;

g. send the inmate to the emergency room only if they are immunocompromised, hypoxic, suspected of being septic, or if the exam and/or chest x-rays shows signs of pneumonia;

h. notify the county public health department of the inmate's status and let them dictate (1) what information they need, and (2) what additional updates they need; and

i. administer prophylactic Tamiflu as indicated to at-risk patients, including the elderly, those with emphysema, the immunosuppressed, etc. who become ill with a febrile respiratory illness.

18.     Also on March 16, 2020, Centurion identified a population of approximately 6,600 vulnerable inmates based on their age (>60), health status, and diagnoses and sent it to ADCRR for weekly welfare checks and education urging the inmates to report any symptoms that may be associated with COVID-19.

4

19.     On or about March 16-17, 2020, Centurion finalized informational handouts and postings for correctional health care staff, security staff, and inmates and disseminated them to ADCRR.

20.     On March 17, 2020, Centurion suspended all non-emergent dental procedures pursuant to recommendations of the American Dental Association.

21.     On March 18, 2020, Centurion received instructions from ADCRR regarding the use of the Staff Screening Tool at all points of entry at ADCRR facilities.

22.     Also on March 18, 2020, Centurion suspended all non-essential services and traffic at all sites, including routine optometry and audiology services.

23.     Centurion continues to evaluate the COVID-19 pandemic and develop and refine its procedures as necessary on a daily basis.

I declare under penalty of perjury under the laws of the United States of America and the State of Arizona that the foregoing is true and correct.

Executed this _18th_ day of March, 2020.

Wendy Orm, M.D.

**EXHIBIT 4**

**EXHIBIT 4**

1  Daniel P. Struck, Bar No. 012377
   Rachel Love, Bar No. 019881
2  Timothy J. Bojanowski, Bar No. 022126
   Nicholas D. Acedo, Bar No. 021644
3  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   3100 West Ray Road, Suite 300
4  Chandler, Arizona 85226
   Telephone: (480) 420-1600
5  Fax: (480) 420-1696
   dstruck@strucklove.com
6  rlove@strucklove.com
   tbojanowski@strucklove.com
7  nacedo@strucklove.com

8  *Attorneys for Defendants*

9              **UNITED STATES DISTRICT COURT**
10                **DISTRICT OF ARIZONA**

11 Victor Parsons, *et al.*, on behalf of themselves      NO. 2:12-cv-00601-ROS
   and all others similarly situated; and Arizona
12 Center for Disability Law,

13                                    Plaintiffs,    **DECLARATION OF D. SPENCER**
                                                      **SEGO, LPN, CCHP**
              v.
14
   David Shinn, Director, Arizona Department of
15 Corrections; and Richard Pratt, Interim
   Division Director, Division of Health Services,
16 Arizona Department of Corrections, in their
   official capacities,
17
                                   Defendants.
18
          I, D. Spencer Sego, LPN, CCHP, make the following Declaration:
19
          1.     I am over the age of 18 years and have personal knowledge of and am
20
   competent to testify to the matters set forth in this Declaration.
21
          2.     I have been a licensed practical nurse since 2007. I have been employed as
22
   the Facility Health Administrator ("FHA") at the Arizona Department of Corrections
23
   Rehabilitation & Reentry's ("ADCRR") Arizona State Prison Complex – Florence
24
   ("ASPC-Florence") since 2018, first with Corizon and now with Centurion. I have been a
25
   FHA/Health Services Administrator ("HSA") since 2015, including at ASPC-Eyman and
26
   ASPC-Lewis.
27

28

3.     I am generally aware of the *Parsons* litigation, including the Declarations of Corene Kendrick and Rita Lomio, who are attorneys representing the *Parsons* Plaintiffs, that were filed on March 16, 2020. On March 11-12, 2020, I participated in a monitoring tour of ASPC-Florence along with Ms. Kendrick, Ms. Lomio, and other attorneys representing the Plaintiffs in this matter.

4.     At one point during the tour, we visited ASPC-Florence's Inpatient Care Center ("IPC").[1] As we approached the IPC, Ms. Kendrick asked me if they needed to wear masks. It is my understanding that Ms. Kendrick and her colleagues were required to wear masks at a similar tour of ASPC-Tucson the week before due to a cold one of them had at the time. There was no discussion about COVID-19 at that time in regard to Ms. Kendrick's question.

5.     Ms. Kendrick asserts that she did not see me or any of the other health care or security staff use the available hand sanitizer or wear masks before entering the IPC, but this is misleading. Only Ms. Kendrick and two of her colleagues actually entered the IPC. The remainder of the group, myself included, remained outside the IPC while Ms. Kendrick and her colleagues spoke with the inmates in the IPC.

6.     Ms. Kendrick also asserts that while we were in the medical unit (which also contained the IPC unit), she asked whether the medical isolation rooms were negative pressure rooms. This conversation, however, occurred during a meeting with Ms. Kendrick and her colleagues, counsel for ADCRR, counsel for Centurion, and facility healthcare staff on March 12, 2020. Ms. Kendrick asked whether we had any negative pressure rooms at ASPC-Florence. I informed her that we had three medical isolation rooms, but that they were not negative pressure rooms. When an inmate requires a negative pressure room, we send them to ASPC-Tucson or ASPC-Lewis.

---

[1] Although the IPC has three units, Ms. Kendrick and her colleagues only asked to visit the main unit.

2

7.     Ms. Kendrick asserts that during the meeting, we discussed the January 3, 2020 staffing report, which showed that there was a shortage of staff in excess of the 10 full-time equivalent ("FTE") registered nurse and 11 FTE licensed practical nurse positions referenced in her Declaration. Ms. Kendrick's statement is incomplete, as Ms. Kendrick and I also discussed that there was a continuing improvement of adding additional staff not reflected on the prior reports, a fact not mentioned in her Declaration.

8.     Ms. Kendrick asserts that during the meeting, we also discussed "at length the COVID-19 outbreak." This statement is false and/or misleading in two ways. First, there is no COVID-19 outbreak at ASPC-Florence—no staff member or inmate at ASPC-Florence has been diagnosed with the disease to date. Second, the discussion was a five-minute general discussion, most of which was spent by Ms. Kendrick and Ms. Lomio lecturing us on the dangers of COVID-19 and advising us of procedures they thought should be implemented.

9.     I never indicated there were no plans in existence to deal with COVID-19. In fact, there were plans in place to address COVID-19 before the tour. Any assertion or suggestion by Ms. Kendrick, Ms. Lomio, or anyone else that there were no plans in place is false.

10.    In response to Ms. Kendrick and Ms. Lomio's general questions about what we were doing to protect staff and inmates from COVID-19, I informed them that ASPC-Florence was already screening inmates as they entered the facility, whether as (1) new intakes, (2) returning from hospital visits, court appearances, or work details, or (3) parole violators. Ms. Kendrick's Declaration omits my statements to her about these screening procedures.

11.    Indeed, Ms. Lomio admits that, on March 11, 2020, ASPC-Florence Assistant Director of Nursing ("ADON") Michelle Diaz showed her a copy of the inmate screening form that was set to go into effect starting March 16, 2020.

12.    Ms. Kendrick questions the relevance of one of the questions on that form regarding visits to China or other countries with identified outbreaks of COVID-19 in the

past 14 days. This question is absolutely relevant, as a new inmate or a parole violator potentially could have been in China or one of these other countries in the 14 days prior to arriving at ASPC-Florence (or any other ADCRR facility). If staff did not ask that question, the facility would potentially be housing an inmate who had been exposed to the virus without any precautions in place.

13.     I also told Ms. Kendrick that I would be meeting later that day with Warden Van Winkle to discuss further plans to deal with COVID-19. She asserts in her Declaration that Warden Van Winkle "accompanied [her] everywhere [she] went the rest of the day, from approximately 9:00 am [sic] until 4:00 pm [sic]," as if to suggest that I lied to her about my plans to meet with Warden Van Winkle, or at least that I never met with him.

14.     I did in fact meet with Warden Van Winkle while Ms. Kendrick and her colleagues broke for lunch. During that meeting, we discussed procedures for additional inmate screenings and potential places to house inmates who require isolation. Any suggestion by Ms. Kendrick that I did not meet with Warden Van Winkle, as I said I planned to, is false and misleading.

I declare under penalty of perjury under the laws of the United States of America and the State of Arizona that the foregoing is true and correct.

Executed this  18th  day of March, 2020.


*D. Spencer Sego*
D. Spencer Sego, LPN, CCHP

4

**EXHIBIT 5**

**EXHIBIT 5**

1  Daniel P. Struck, Bar No. 012377
   Rachel Love, Bar No. 019881
2  Timothy J. Bojanowski, Bar No. 022126
   Nicholas D. Acedo, Bar No. 021644
3  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   3100 West Ray Road, Suite 300
4  Chandler, Arizona  85226
   Telephone:  (480) 420-1600
5  Fax:  (480) 420-1696
   dstruck@strucklove.com
6  rlove@strucklove.com
   tbojanowski@strucklove.com
7  nacedo@strucklove.com

8  *Attorneys for Defendants*

9           **UNITED STATES DISTRICT COURT**
10                **DISTRICT OF ARIZONA**

11  Victor Parsons, *et al.*, on behalf of themselves      NO. 2:12-cv-00601-ROS
    and all others similarly situated; and Arizona
12  Center for Disability Law,

13                                      Plaintiffs,        **DECLARATION OF OWEN J.**
                                                           **MURRAY, D.O., MBA**
          v.
14
    David Shinn, Director, Arizona Department of
15  Corrections; and Richard Pratt, Interim
    Division Director, Division of Health Services,
16  Arizona Department of Corrections, in their
    official capacities,
17
                                      Defendants.

18       I, **OWEN MURRAY**, make the following Declaration:

19       1.     I am over the age of 18 years and have personal knowledge of and am

20  competent to testify to the matters set forth in this Declaration.

21       2.     I am a board-certified Doctor of Osteopathy specializing in correctional

22  healthcare and licensed to practice medicine in Texas.

23       3.     I attended medical school at the Chicago College of Osteopathic Medicine,

24  Chicago, Illinois, graduating in 1988. I completed a one-year internship at the Chicago

25  Osteopathic Hospital in Chicago, Illinois, and a two-year residency in Family Practice at

26  Michigan State University Kalamazoo Center for Medical Studies.

27

28

4.      Since 1995, I have been responsible for ensuring the provision of all medical, mental, and dental healthcare services for approximately 120,000 offenders in the Texas Department of Criminal Justice, serving as Medical Director for ten years, Executive Director for Clinical Services for four years, and Vice President of Offender Health Services for twelve years. In addition, I have served as a physician and medical director at the Cook County Jail and two Illinois Department of Corrections facilities.

5.      I have published and lectured extensively on correctional health care and have served as a healthcare consultant for a number of correctional systems, including the California, North Carolina, Illinois, and Vermont Department of Corrections.

6.      Attached as Attachment 1 to this Declaration is a true and correct copy of my Curriculum Vitae detailing my education and experience.

7.      I reviewed the March 13, 2020 memorandum prepared by Marc F. Stern, MD listing suggestions for addressing potential exposure to the COVID-19 virus in the jails and prisons located in the State of Washington.

8.      I reviewed the following Centurion plans and documents implemented at the Arizona Department of Corrections Rehabilitation & Reentry ("ADCRR") facilities:

A.      Pandemic Preparedness and Emergency Response Plan

B.      IPC-42 Inmate Screening Tool

C.      COVID-19 Clinical Guideline Centurion MAR 16 2020

D.      Coronavirus-Medical Info and Recommendations - Centurion MAR 13 2020

E.      IPC-043 COVID-19 Staff Screening Tool MAR 17 2020

F.      COVID-19 Staff Screening Flowsheet MAR 2020

G.      Coronavirus – Healthcare Staff FINAL

H.      Coronavirus – Security FINAL

I.      Coronavirus – Inmates FINAL

J.      Coronavirus Signage

K.      March 16, 2020 Email re: COVID-19 Protocols

1

L. Timeline of Centurion COVID-19-Related Activities

M. Declaration of Wendy Orm, M.D. dated March 18, 2020

9. I am aware of the following operational changes at ADCRR at all of its facilities:

A. Suspend all contact and noncontact visits system-wide

B. Wave the $4.00 fee for medical care concerning COVID-19 related issues

C. Distribute free hand soap to all inmates

D. Halt all routine movement of inmates between institutions

E. Halt all inmate classes conducted outside the facility

F. A facility-wide deep clean will be conducted each week at every facility

G. Intake screening for all staff entering the facility

H. CenturyLink is providing two free 15-minute phone calls for each inmate system wide

I. Currently evaluating plan to halt movement of new inmates into the system from county jails

J. Designated a housing unit in Safford, Arizona for purposes of quarantine

10. It is my professional opinion that the COVID-19 plans, protocols, clinical guidelines, and ADCRR operational plans implemented at its facilities comport with the CDC Guidelines dealing with COVID-19, are consistent with the best practices for pandemic illness management in a correctional setting, and are consistent with management strategies in the community.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed this 18th day of March 2020.

3

4    OWEN J. MURRAY

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

**ATTACHMENT 1**

**ATTACHMENT 1**

Date: January 2020

## CURRICULUM VITAE

**NAME: Owen J. Murray, D.O., MBA**

**PRESENT POSITION AND ADDRESS:**

| | |
|---|---|
| 07/2009 - Present | Vice President, Offender Health Services |
| | Correctional Managed Care |
| | University of Texas Medical Branch at Galveston |
| | 301 University Boulevard |
| | Galveston, Texas 77555-1008 |

**BIOGRAPHICAL:**

Office Phone: 936-494-4170
Cell Phone: 936-436-2046
Email: ojmurray@utmb.edu

**EDUCATION:**

| | |
|---|---|
| 9/1979 – 5/1983 | B.S. (Biology), Boston College, Chestnut Hill, Massachusetts |
| 8/1984 – 6/1988 | D.O., Chicago College of Osteopathic Medicine, Chicago, Illinois |
| 7/1988 – 6/1989 | Internship (Osteopathy), Chicago Osteopathic Hospital, Chicago, Illinois |
| 7/1989 – 6/1991 | Residency (Family Practice), Borgess Medical Center, Michigan State University Kalamazoo Center for Medical Studies, Kalamazoo, Michigan |
| 8/1997 – 8/1999 | MBA, University of Houston–Clear Lake, Houston, Texas |

**BOARD CERTIFICATION:**

American Board of Family Medicine, July 12, 1991–present

Certified Correctional Health Professional (National Commission on Correctional Health Care), 1996–present

**LICENSURE INFORMATION:**

Texas Medical Board: License no. J8070 (Expiration date: 08/31/2020)

**PROFESSIONAL WORK HISTORY AND TEACHING EXPERIENCE:**

| | |
|---|---|
| 1983–1984 | Postgraduate Research Assistant (Molecular Biology)<br>Northwestern University, Chicago, Illinois |
| 1989–1991 | Emergency Department Physician<br>Pipp Community Hospital, Plainwell, Michigan |
| 1989–1991 | Coverage Physician<br>Kalamazoo Neuro Imaging, Kalamazoo, Michigan |
| 1991–1992 | Medical Director<br>Cook County Department of Corrections, Chicago, Illinois |
| 1992–1993 | Medical Director<br>Pontiac Correctional Center, Illinois Department of Corrections, Pontiac, Illinois |
| 1991–1995 | Staff Physician<br>Western Illinois Correctional Center, Illinois Department of Corrections, Mt. Sterling, Illinois |
| 1993–1994 | Medical Director<br>Robinson Correctional Center, Illinois Department of Corrections, Robinson, Illinois |
| 1995–2005 | Medical Director<br>Correctional Managed Care, University of Texas Medical Branch at Galveston |
| 1996–2001 | Instructor in Institutional and Correctional Health<br>Department of Preventive Medicine and Community Health<br>University of Texas Medical Branch at Galveston |
| 2001–present | Assistant Professor (N-T Trk Clin)<br>Department of Preventive Medicine and Community Health<br>University of Texas Medical Branch at Galveston |
| 2005–2009 | Executive Director for Clinical Services & Chief Physician Executive, Correctional Managed Care<br>University of Texas Medical Branch at Galveston |
| 2009–present | Vice President, Offender Health Services<br>Correctional Managed Care, University of Texas Medical Branch at Galveston |

**RESEARCH ACTIVITIES:**

    **A. Major Research Interests**

- Medical and psychiatric disorders in the correctional setting
- Correctional health care utilization and delivery

    **B. Extramural Funding**

| | |
|---|---|
| 2006 | Genzyme. CMC Operations. "SYNVISC Joint Injection Teaching." Project Director. |
| 2012–2013 | Texas Department of State Health Services/HRSA Subcontract. CMC Operations. "Texas DSHS Contract for Discharge Planning." Project Director, $120,000.00/1yr. |

**COMMITTEE RESPONSIBILITIES:**

| | |
|---|---|
| 1996 | Committee to Revise Standards, National Commission on Correctional Health Care |
| 1996–2001 | UTMB-CMC Utilization Review Committee |
| 1996–1998 | Chairman, UTMB-CMC Pharmacy & Therapeutics Committee |
| 1996–2008 | Chairman, UTMB-CMC Physician Peer Review Committee |
| 1997–1999 | UTMB Telemedicine Committee |
| 1997–1998 | Work Group on HIV/AIDS Education Programs (UTMB) |
| 2002–2005 2009–2011 | Chairman, UTMB-CMC System Leadership Council |
| 2010–present | UTMB Strategic Executive Council |
| 2014–2015 | UTMB 340B Compliance Committee |
| 2015–2017 | Steering Committee, UTMB Training Council |

**OTHER PROFESSIONAL ACTIVITIES:**

Consultant, Cermak Health Services of Cook County Survey, National Commission on Correctional Health Care, Chicago, IL, January 1997.

Member, Focus Group on Prison Health Care, National Institute of Corrections, U.S. Department of Justice, Washington, DC, August 1997.

Consultant, HIV Education Behind Bars, Meeting the Challenges in the Year 2000. World Health Direct, November 1999

Course Director and Moderator, Managing HIV in the Correctional Setting [Series of CME-Accredited Conference Calls], World Health Direct, Ft. Lauderdale, FL, November 1999.

Consultant, J Allen Correctional Healthcare Management, LLC, 2013–present.

Elected to seat on American Correctional Association Commission on Accreditation for Corrections (Health Care) 2017–2021

**MEMBERSHIP IN SCIENTIFIC SOCIETIES/PROFESSIONAL ORGANIZATIONS**:

American Academy of Family Physicians

American Correctional Association

Texas Osteopathic Medical Association

**HONORS:**

Chief Resident, Family Practice Residency, Michigan State University Kalamazoo Center for Medical Studies, Borgess Medical Center (1990–1991)

Resident Director of Recruiting, Family Practice Residency, Michigan State University Kalamazoo Center for Medical Studies, Borgess Medical Center (1989–1991)

Illinois Department of Public Health Medical Student Scholarship, Chicago College of Osteopathic Medicine (1986–1989)

**PUBLISHED:**

**A.   Articles in Peer-Reviewed Journals**

1.   Baillargeon J, Contreras S, Grady JJ, Black SA, **Murray O**. Compliance with antidepressant medication among prison inmates with depressive disorders. *Psychiatric Services* 51:1444–1446; 2000.

2.   Baillargeon J, Ducate S, Pulvino J, Bradshaw P, **Murray O**, Olvera R. The association of psychiatric disorders and HIV infection in the correctional setting. *Annals of Epidemiology* 13:606–612; 2003.

3.   Baillargeon J, Black SA, Leach CT, Jenson H, Pulvino J, Bradshaw P, **Murray O**. The infectious disease profile of Texas prison inmates. *Preventive Medicine* 38:607–612; 2004.

4. Baillargeon J, Soloway RD, Paar D, Giordano TP, **Murray O**, Grady J, Williams B, Pulvino JS, Raimer BG. End-stage liver disease in a state prison population. *Annals of Epidemiology* 17:808–813; 2007.

5. Baillargeon J, Paar DP, Wu ZH, Giordano TP, **Murray OJ**, Raimer BG, Avery EN, Diamond PM, Pulvino JS. Psychiatric disorders, HIV infection, and HIV/hepatitis co-infection in the correctional setting. *AIDS Care* 20:124–129; 2008.

6. Baillargeon J, Thomas CR, Williams B, Begley CE, Sharma S, Pollock BH, **Murray OJ**, Pulvino JS, Raimer B. Medical emergency department utilization patterns among uninsured patients with psychiatric disorders. *Psychiatric Services* 59:808–811; 2008.

7. **Murray OJ**. Assessing demand for wheelchair use. *Virtual Mentor* 10:84–87; 2008.

8. Harzke AJ, Baillargeon J, Paar DP, Pulvino J, **Murray OJ**. Chronic liver disease mortality among male prison inmates in Texas, 1989–2003. *American Journal of Gastroenterology* 104:1414–1419; 2009.

9. Baillargeon J, Penn JV, Thomas CR, Temple JR, Baillargeon G, **Murray OJ**. Psychiatric disorders and suicide in the nation's largest state prison system. *Journal of the American Academy of Psychiatry and the Law* 37:188–193; 2009.

10. Baillargeon J, Binswanger IA, Penn JV, Williams BA, **Murray OJ**. Psychiatric disorders and repeat incarcerations: The revolving prison door. *American Journal of Psychiatry* 166:103–109; 2009.

11. Raimer BG, **Murray OJ**, Pulvino JS. Health care in the Texas prison system: A looming fiscal crisis. *Texas Public Health Journal* 62(4):12–17; 2010.

12. Schneider BC, Harzke AJ, Ivanitskaya L, **Murray OJ**. Prioritization of inpatient hospital services to prisoners: A method for justifying care and costs. *Journal of Health Care for the Poor and Underserved* 25:863–876; 2014

B. **Other Publications**

1. **Murray OJ**. Hurricane Rita leaves lessons in its wake [Guest Editorial]. *CorrectCare* 20(1):3; 2006.

2. **Murray OJ**, Pulvino J, Baillargeon J, Paar D, Raimer BG. Managing hepatitis C in our prisons: Promises and challenges. *CorrectCare* 21(2):1, 16–17; 2007.

3. **Murray OJ,** Pulvino J, Baillargeon J, Paar D, Raimer BG. Treating all prisoners with hepatitis C may not be feasible. In: Langwith J, ed. *Hepatitis: Perspectives on Diseases and Disorders*. Farmington Hills, MI: Greenhaven Press; 2009: pp. 74–81.

C. **Abstracts**

1. Li H, Dang M, Johnson CW, Appel DJ, Pulvino JS, **Murray OJ**, Johnson L, Chao GC, Calhoun JH, Clements LM, Raimer BG. Evaluation of preferences and attitudes toward telemedicine evaluation of diabetic retinopathy. *Telemedicine Journal and e-Health* 7(2):147; 2001.

2.   Li HK, Dang M, Uwaydat S, Horna J, Appel DJ, Pulvino JS, **Murray OJ**, Johnson L, Chao GC, Clements LM, Raimer BG. Operational challenges and outcomes of store-and-forward telemedicine evaluation of diabetic retinopathy in a prison health care system. *Telemedicine Journal and e-Health* 7(2):182; 2001.

3.   Baillargeon J, **Murray O**, Pulvino J. Applying epidemiologic methods to the study of Texas prison inmates. Abstracts of the National Symposium on Correctional Health Care, Houston, Texas, September 2002.

4.   Baillargeon J, Ducate S, **Murray O**, Pulvino, J. The association of HIV infection and psychiatric disorders among Texas prison inmates. Abstracts of the National Symposium on Correctional Health Care, Houston, Texas, September 2002.

5.   Garza−Gutierrez G, Sharma G, Cardenas V, Baillargeon G, **Murray O**, Williams B, Baillargeon J. Use of intensive care at the end of life among a state prison population. *American Journal of Respiratory and Critical Care Medicine* 179:2009; A5226.

6.   Raimer B, **Murray O**. Health care in the Texas prison system: A looming fiscal crisis. Proceedings of the 4th Academic and Health Policy Conference on Correctional Health, Boston, Massachusetts, March 10–11, 2011.

7.   Tong EK, Zepeda SD, Gonzalez J, Sandmann RM, Fisher DR, **Murray O**, Khan J. Effectiveness of switching virologically suppressed HIV-infected patients from emtricitabine and emtricitabine-containing products to lamivudine. Presented at the Alcalde XXVII Southwestern Leadership Conference, San Marcos, Texas, April 24–25, 2013.

**INVITED PRESENTATIONS:**

Comprehensive correctional pharmaceutical program. 1st Annual Health Care Education Program for Pharmaceutical Companies, Houston, Texas, November 1995

Correctional managed health care. 19th National Conference on Correctional Health Care, Washington, DC, November 13–15, 1995.

Fast food mentality in a managed care world. American Correctional Health Services Association Multidisciplinary Training Conference, Houston, Texas, February 1996.

Correctional managed health care. 21st National Conference on Correctional Health Care, San Antonio, Texas, November 10–12, 1997.

Primary approach to managing depression in a correctional environment. Prime Works Symposium, Houston, Texas, January 1998.

Correctional managed health care. 22nd National Conference on Correctional Health Care, Long Beach, California, November 2–4, 1998.

Improving care and lowering cost in a correctional medical facility. American Correctional Association Winter Conference, San Antonio, Texas, January 19–21, 1998.

CyberCare: The virtual physician's office. The National Healthcare Congress, Miami, Florida, November 6, 1999.

CyberCare: The correctional medical delivery systems of the future. 23rd National Conference on Correctional Health Care, Fort Lauderdale, Florida, November 8–10, 1999.

HIV care in the Texas Department of Criminal Justice. Texas/Oklahoma AIDS Education and Training Center (AETC) HIV Conference, Austin, Texas, October 2003.

Chronic care/disease case management. American Correctional Health Services Association Multidisciplinary Training Conference, Houston, Texas, March 25–28, 2004.

HIV care in the Texas Department of Criminal Justice. Texas Department of State Health Services 14th Texas HIV-STD Conference, Austin, Texas, December 13–17, 2004.

Addressing end stage liver disease. Hepatitis Summit (Sponsors: Texas Board of Criminal Justice & Correctional Managed Health Care Committee), Houston, Texas, September 7, 2006.

Texas Department of Criminal Justice healthcare and HIV programs. Department of State Health Services HIV/STD Program 15th Texas HIV-STD Conference, Austin, Texas, December 11–15, 2006.

Correctional health: Disaster management preparedness [moderator & speaker]. American Correctional Association 2007 Winter Conference, Tampa, Florida, January 20–24, 2007.

Developing a critical incident medical plan - from the healthcare administrator's perspective [moderator]. American Correctional Association 2007 Winter Conference, Tampa, Florida, January 20–24, 2007.

*In omnia paratus*—"Ready for anything" [moderator]. American Correctional Association 2007 Summer Conference, Kansas City, Missouri, August 11–15, 2007.

Cracks: Finding and fixing unintended and unfortunate places our patients fall. National Conference on Correctional Health Care. Chicago, Illinois, October 18–22, 2008.

Telemedicine: Not just a subspecialty tool [with Stephen R. Smock and Glenn Hammack]. National Commission on Correctional Health Care Updates in Correctional Health Care Conference, San Antonio, TX, May 19–22, 2012.

Life in the big house: A look at medicine behind bars. UTMB Healthy Health Policy Lunch & Lecture Series, Galveston, TX, November 28, 2012.

Cost savings and care innovations for prisoner health [with Matt McKillop and Aaron Edwards]. National Conference of State Legislatures Webinar, November 1, 2013.

Telehealth innovations–Transforming medical practice models [panel discussion with Kirk Gillis and Monica Fernandez]. American Osteopathic Association of Medical Informatics Conference, Seattle, WA, October 26, 2014.

Tele-Health: Pioneering new models for care [moderator]. American Correctional Association 146th Congress of Correction, Boston, MA, August 6, 2016.

## INVITED TESTIMONY

UTMB Correctional Managed Care [joint presentation with William R. Elger]. Texas Senate Committee on Finance, Austin, TX, February 21, 2011.

House Bill 25, correctional health care cost containment. Texas House of Representatives Corrections Committee, Austin, TX, June 7, 2011.

UTMB Correctional Managed Care update. Texas Senate Committee on Finance, Austin, TX, July 9, 2012.

Correctional Managed Health Care system. Texas House of Representatives Appropriations Subcommittee on Articles I, IV & V. Austin, TX, August 24, 2012.

House Bill 512, relating to the eligibility of certain inmates for release on medically recommended intensive supervision. Texas House Corrections Committee, Austin, TX, March 13, 2013.

Correctional Managed Health Care population and cost trends. Texas House of Representatives Appropriations Subcommittee on Articles I, IV & V and House Corrections Committee Joint Hearing, Austin, TX, May 29, 2014.

Telemedicine in Correctional Managed Care & the UT System Virtual Health Network. Senate Committee on Health & Human Services, Austin, TX, June 16, 2016.

**EXHIBIT 6**

**EXHIBIT 6**

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-ROS <br><br> **DECLARATION OF RICHARD PRATT** |

I, Richard Pratt, make the following Declaration:

1.      I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.      I have been working with the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR") since July 2000, not including from October 2009 to July 2011, when I was employed elsewhere. During my time with ADCRR, I have held various positions related to oversight and monitoring of health services.

3.      In December 2019, I was assigned as a Bureau Administrator in Operations, where I oversee nine Program Evaluation Specialists who act as liaisons between the contracted healthcare vendor and the wardens at ADCRR's state-operated prison facilities.

4.      On March 12, 2020, I participated in a monitoring tour of Arizona State Prison Complex – Florence ("ASPC-Florence") along with Corene Kendrick and other attorneys representing the Plaintiffs in this matter. On that date, I was present during a meeting between the Plaintiffs' attorneys and counsel for ADCRR, counsel for Centurion, and facility healthcare staff.

5.      I am aware of the Declaration of Corene Kendrick filed on March 16, 2020, including Ms. Kendrick's allegation that, when asked what instructions or guidance ADCRR had received from the Arizona Department of Health Services regarding COVID-19, I responded, "I haven't seen anything yet."

6.      Any interpretation of that statement as meaning that ADCRR had made no plans to address COVID-19 in its facilities as of March 12, 2020 is false and misrepresents both my statements and the conversation in general.

7.      During the meeting, counsel asked several general questions about how ASPC-Florence was addressing COVID-19. In response to their questions, I stated that I had not yet seen anything from ADCRR leadership, but that I was aware that meetings and discussions regarding ADCRR's response to COVID-19 were taking place as we were speaking.

8.      In my current position, I am not involved in such meetings and discussions, and would not see any official plans until they were finalized and released to staff generally. The fact that I had not yet seen anything official did not mean that nothing was being done, and I made no statements to that effect to Ms. Kendrick or anyone else at that meeting.

I declare under penalty of perjury under the laws of the United States of America and the State of Arizona that the foregoing is true and correct.

Executed this _18th_ day of March, 2020.

_____
Richard Pratt

2

**EXHIBIT 7**

**EXHIBIT 7**

1  Daniel P. Struck, Bar No. 012377
   Rachel Love, Bar No. 019881
2  Timothy J. Bojanowski, Bar No. 022126
   Nicholas D. Acedo, Bar No. 021644
3  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   3100 West Ray Road, Suite 300
4  Chandler, Arizona  85226
   Telephone:  (480) 420-1600
5  Fax:  (480) 420-1696
   dstruck@strucklove.com
6  rlove@strucklove.com
   tbojanowski@strucklove.com
7  nacedo@strucklove.com

8  *Attorneys for Defendants*

9                    **UNITED STATES DISTRICT COURT**
10                        **DISTRICT OF ARIZONA**

11  Victor Parsons, *et al.*, on behalf of themselves       NO. 2:12-cv-00601-ROS
    and all others similarly situated; and Arizona
12  Center for Disability Law,

13                                         Plaintiffs,      **DECLARATION OF VALERIE
                                                            GILREATH, D.O.**
14                    v.

15  David Shinn, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim
16  Division Director, Division of Health Services,
    Arizona Department of Corrections, in their
    official capacities,
17
                                        Defendants.

18          I, Valerie Gilreath, D.O., make the following Declaration:

19          1.      I am over the age of 18 years and have personal knowledge of and am
20
    competent to testify to the matters set forth in this Declaration.
21
            2.      I am currently licensed to practice medicine in Arizona and have been
22
    employed as a physician by Centurion of Arizona, LLC ("Centurion") since December
23
    2019, when I started as the Medical Director at the Arizona Department of Corrections
24
    Rehabilitation & Reentry's ("ADCRR") Arizona State Prison Complex – Florence
25
    ("ASPC-Florence"). I was previously employed as a prison physician by CoreCivic, Inc.
26
    at its Saguaro Correctional Center from January 2016 to January 2018, and at its Central
27
    Arizona Florence Correctional Complex from January 2018 to August 2018.
28

3.      I have been practicing medicine for over 40 years.  I am currently board-certified in family practice/family medicine, and have a retired certification in Neurological Surgery.

4.      I am generally aware of the *Parsons* litigation. On March 12, 2020, I met with various attorneys representing the *Parsons* Plaintiffs, including Corene Kendrick, and other individuals, including counsel for ADCRR, counsel for Centurion, and other facility healthcare staff.

5.      I am aware of the Declaration of Corene Kendrick filed on March 16, 2020, including various allegations Ms. Kendrick made in her Declaration about statements she claims I made during our March 12 meeting. These statements are misrepresentations and/or taken out of context, as described below.

6.       First, Ms. Kendrick claims she asked me whether I had ever worked for either Centurion or a prison before, and that I responded "Never," and told her that I was previously running a drug treatment/methadone clinic in the community.

7.      These statements are false. Ms. Kendrick asked me when I started in my position as Medical Director at ASPC-Florence, and I responded that I started in December 2019. I have no recollection of Ms. Kendrick asking me about my previous experience in correctional medicine, or my employment before coming to ASPC-Florence. If she had, I would not have responded that I had never worked in correctional medicine, as I have several years of experience in correctional medicine, as detailed above. I have also never run a methadone clinic, and did not make any statements during the March 12 meeting about my involvement in any community drug clinics.

8.      Second, Ms. Kendrick claims I made several statements about COVID-19, including that: (1) I gave an unsolicited opinion that the first case of COVID-19 was not in China, but in Germany; (2) I told her that ADCRR has people at ASPC-Florence with dengue fever but was not treating them for it; and (3) I gave an unsolicited opinion that COVID-19 would "die by itself."

2

9.      These statements are false and/or taken out of context. Ms. Kendrick asked a general question about what "we" were doing about COVID-19. In the course of that conversation, which included discussion of COVID-19 generally, I stated that it was my understanding that the first confirmed case of COVID-19 outside of China was in Germany. I also observed that other, more widespread diseases with higher mortality rates, such as dengue fever, did not generate the kind of global concern that currently exists for COVID-19, and that globally people are not taking the kind of action being taken to stop the spread of COVID-19 to stop dengue fever. I also expressed an opinion, based on my medical education, experience, and training, as well as discussions with other medical professionals and reports about COVID-19, that COVID-19 would likely run its course within a few weeks.

10.      I made these statements in a general sense, and was not referring specifically to measures being developed or implemented at ASPC-Florence. In fact, I made no comments specific to COVID-19 at ASPC-Florence during that conversation. I take the health and safety of all of my patients, including medical precautions intended to protect their health and safety, as well as that of myself and other medical and security staff at ASPC-Florence, very seriously.

11.      Third, Ms. Kendrick claims I stated that the March 10, 2020 search of the patient cells/beds in HU-10 was done at my direction due to the patients hiding contraband in the ceilings.

12.      This statement is false. I did not direct the search of HU-10 that occurred on March 10, 2020, and did not state that I had. I have no authority to "direct" security staff to search any part of the facility. Nor did I request that security staff search HU-10. In fact, I did not become aware of the search of HU-10 until after it had occurred, at which time I was told that staff found various drugs hidden in the ceiling tiles. Any statements I made during the meeting with Ms. Kendrick about drugs and ceiling tiles were made in reference to this after-the-fact knowledge.

3

1        I declare under penalty of perjury under the laws of the United States of America

2    and the State of Arizona that the foregoing is true and correct.

3        Executed this _17_ day of March, 2020.

4

5                                                  

6                            Valerie Gilreath, D.O.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 8**

**EXHIBIT 8**

1    Daniel P. Struck, Bar No. 012377
     Rachel Love, Bar No. 019881
2    Timothy J. Bojanowski, Bar No. 022126
     Nicholas D. Acedo, Bar No. 021644
3    STRUCK LOVE BOJANOWSKI & ACEDO, PLC
     3100 West Ray Road, Suite 300
4    Chandler, Arizona 85226
     Telephone: (480) 420-1600
5    Fax: (480) 420-1696
     dstruck@strucklove.com
6    rlove@strucklove.com
     tbojanowski@strucklove.com
7    nacedo@strucklove.com

8    *Attorneys for Defendants*

9                  UNITED STATES DISTRICT COURT
10                      DISTRICT OF ARIZONA

11   Victor Parsons, *et al.*, on behalf of themselves      NO. 2:12-cv-00601-ROS
     and all others similarly situated; and Arizona
12   Center for Disability Law,

13                              Plaintiffs,    **DECLARATION OF JOSHUA
                                               KING**
             v.
14
     David Shinn, Director, Arizona Department of
15   Corrections; and Richard Pratt, Interim
     Division Director, Division of Health Services,
16   Arizona Department of Corrections, in their
     official capacities,
17
                              Defendants.
18
          I, Joshua King, make the following Declaration:

19        1.    I am over the age of 18 years and have personal knowledge of and am

20   competent to testify to the matters set forth in this Declaration.

21        2.    I have been employed with the Arizona Department of Corrections,

22   Rehabilitation and Reentry ("ADCRR") since 2007.

23        3.    I am currently the Lieutenant for Kasson Unit at Arizona State Prison

24   Complex – Florence ("ASPC-Florence") and have been so assigned for the past eleven

25   months.

26

27

28

4.      On March 11 and 12, 2020, I participated in the monitoring tour of ASPC-Florence, Kasson Unit, along with Amy Fettig and other attorneys representing the Plaintiffs' class.

5.      Kasson Unit is a single bed unit that houses inmates who are designated by mental health as Seriously Mentally Ill ("SMI").

6.      I am aware of the Declaration of Amy Fettig filed on March 16, 2020 and her claims contained therein.

7.      As to the claim that a cell looked like it had been smeared with feces and possibly blood, I can personally confirm based on inspection that there was no feces or blood.

8.      The brown material was ground coffee and red material was red ink.  To clarify, the ground coffee and red ink were in two different cells.  Ground coffee, red ink, or trash on the ground present no known current risk to an inmate's health as both cells are vacant.

9.      Inmates at Kasson are offered showers three days a week, but have the right to refuse.

10.     Security staff will not use force on an inmate to take a shower unless the inmate has, for instance, covered himself in feces.  In other circumstances, if medical personnel determine that an inmate's hygiene might negatively affect his health and safety and the inmate still refuses to shower, security staff may assist in requiring the inmate to shower.

11.     Appropriate hygiene items are provided to all inmates, whether indigent or not.

12.     Those inmates who are considered indigent are given sufficient hygiene supplies, i.e. soap, shampoo, etc. for use in the shower.  Hygiene items are provided to indigent inmates once a month.  If needed, indigent inmates may obtain additional hygiene supplies by making a request to any staff member, and upon approval of a supervisor, additional hygiene supplies may be provided where appropriate.

13.     The SMI inmate population at Kasson may play a role in their own cell cleanliness.  For example, some inmates are known to hoard items or be messier than others.

14.     Security staff will not use force on an inmate to pick up trash in their cell.

15.     Nonetheless, inmates whose cells fall below the standards set forth in Department Order 704 may be subject to discipline for failure to meet those standards.

16.     Moreover, security staff may clean an unhygienic inmate's cell when the inmate leaves his cell for showering or to participate in recreation or programs, etc., where there is staff available to do so.

17.     As to general housing unit cleanliness, inmate pod porters and shower porters wipe the railings, mop the floors, and clean the showers on a daily basis. Sufficient cleaning supplies are provided to the porters.  For security reasons, however, the porters do not enter the cells to clean.

18.     Further, cleaning supplies are provided to inmates to clean their own cells at least three times a week.

19.     Based upon my experience and training, the sanitation level of the Kasson Unit is appropriate.  Individual instances of sanitation/hygiene challenges are addressed with the particular inmate.

20.     I am not personally aware of security or medical staff allowing cell or personal hygiene levels to compromise the health and safety of an individual inmate or the inmate population.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⅛ day of March, 2020.

Joshua King

3

**EXHIBIT 9**

**EXHIBIT 9**

1  Daniel P. Struck, Bar No. 012377
   Rachel Love, Bar No. 019881
2  Timothy J. Bojanowski, Bar No. 022126
   Nicholas D. Acedo, Bar No. 021644
3  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   3100 West Ray Road, Suite 300
4  Chandler, Arizona  85226
   Telephone:  (480) 420-1600
5  Fax:  (480) 420-1696
   dstruck@strucklove.com
6  rlove@strucklove.com
   tbojanowski@strucklove.com
7  nacedo@strucklove.com

8  *Attorneys for Defendants*

9            **UNITED STATES DISTRICT COURT**
10               **DISTRICT OF ARIZONA**

11 Victor Parsons, *et al.*, on behalf of themselves     NO. 2:12-cv-00601-ROS
   and all others similarly situated; and Arizona
12 Center for Disability Law,

13                            Plaintiffs,     **DECLARATION OF JEFFREY**
                                              **VAN WINKLE**
                    v.
14
   David Shinn, Director, Arizona Department of
15 Corrections; and Richard Pratt, Interim
   Division Director, Division of Health Services,
16 Arizona Department of Corrections, in their
   official capacities,
17
                            Defendants.

18        I, Jeffrey Van Winkle, make the following Declaration:

19        1.      I am over the age of 18 years and have personal knowledge of and am

20 competent to testify to the matters set forth in this Declaration.

21        2.      I am the Warden at the Arizona Department of Corrections, Rehabilitation

22 and Reentry ("ADCRR"), Arizona State Prison Complex – Florence ("ASPC-Florence"),

23 and have served as Warden since August 2019.

24        3.      Prior to my appointment as Warden, I served as the Deputy Warden of

25 Operations at ASPC-Florence for approximately three years.

26        4.      I have participated in prior monitoring tours at the facilities I have worked at

27 since they began.

28

5.     I participated in the monitoring tour of ASPC-Florence on March 11 and 12, 2020, along with Plaintiffs' counsel.

6.     I am aware of the Declaration of Corene Kendrick filed on March 16, 2020 and her claims contained therein regarding facility cleanliness and searches.

7.     ASPC-Florence's Central Unit, East Unit, and CB-Kasson are single bed housing units and have no double bunks. South Unit and North Unit have double bunks located in certain housing areas within each unit, however, these units are not considered crowded.

8.     Appropriate sanitation levels are maintained throughout ASPC-Florence, and the areas are not filthy as Plaintiffs' counsel asserts.  Any inmates with hygiene issues that fall below the standards set forth in Department Order 704 are addressed through disciplinary tickets for their failure to meet the standards.

9.     On March 10, 2020, at approximately 1930 hours (7:30 p.m.), Sergeant J. Peterman conducted routine quarterly searches in Housing Unit 10, which is a medical housing unit.  All areas of the unit are to be searched quarterly.

10.     While conducting the search, Sgt. Peterman found nuisance contraband and documented his findings in Information Report 20-A58-1534.  *See* Attachment 1. The Information Report documents the nuisance contraband found in the area, which included undocumented medical supplies and two trash bags full of blankets, sheets, pillow cases, and towels.

11.     After further investigation, the medical supplies included medical tape, extra bandages, extra wipes, extra catheters, and a bag full of bandages and alcohol wipes. These were returned to medical.  The following day, almost everything was returned to the inmates except the medical tape.

12.     Department Order 909 establishes property items that inmates are allowed to have in their possession.  This includes washcloths, towels, blankets, pillow cases, and bed sheets.

13.     Nuisance contraband are items in an inmate's possession that are over and above the total amount allowed.  Allowing an inmate to have nuisance contraband may encourage trading, lending, bartering, or selling property, which is prohibited by policy.

14.     If medical determines that an inmate needs extra property, clearance must be obtained from security staff.  If clearance is obtained, documentation is then provided to the inmate confirming the inmate is allowed to have extra property.

15.     If during a search an officer finds extra property, the extra will be removed, unless the inmate provides documentation confirming the allowance of extra property.  If documentation is not provided, but it is later determined the inmate was allowed extra property, the extra property would be returned.

16.     The March 10, 2020 search was not a pre-emptory retaliation against any inmate for potentially speaking with Plaintiffs' counsel on March 11, 2020 or March 12, 2020.

17.     Neither I nor staff were told which units Plaintiffs' counsel planned to tour. The units Plaintiffs' counsel planned to tour on March 11, 2020 were only provided by Plaintiffs' counsel minutes before the tour began.  This is also true for the second day of the tour.  This is the pattern Plaintiffs' counsel has followed since I began participating in tours.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __18TH__ day of March, 2020.



Jeffrey Van Winkle

3

# ATTACHMENT 1

# [REDACTED]

# ATTACHMENT 1

# [REDACTED]



# ARIZONA DEPARTMENT OF CORRECTIONS

## Information Report

| | | |
|---|---|---|
| Report Number | | 20-A58-1534 |
| Report Date | | 3-10-2020 |
| Page | | 1 of 2 |

| To | Title | Unit |
|---|---|---|
| Gonzalez, Martin | Lt. | Central |

| From | Title | Unit |
|---|---|---|
| Peterman, Jeremy | Sgt. | Central |

| Subject | | |
|---|---|---|
| Searches in Health Unit 10 | | |

### Staff Involved

| Employee Name *(Last, First M.I)* | Title | Badge Number |
|---|---|---|
| Sgt. Peterman, Jeremy | Sgt. | 9611 |
| Employee Name *(Last, First M.I)* | Title | Badge Number |
| | | |

### Intel

| Intelligence Category 1 | | Intelligence Category 2 | |
|---|---|---|---|
| Source Type | | Source's Last Name | Source's ADC Number |

### Inmates Involved

| Inmate Name *(Last, First M.I)* | ADC Number | Unit | HU/BED | Involved As |
|---|---|---|---|---|
| | | | | |
| Inmate Name *(Last, First M.I)* | ADC Number | Unit | HU/BED | Involved As |
| | | | | |

| Time | Date | Location |
|---|---|---|
| 1930 | 3-10-2020 | Health Unit 10 |

### Summary

| Summary |
|---|
| On the above date and approximately 1930 hours I Sgt. Peterman started quarterly searches in health unit 10.  Searches started at bed 1 Inmate ▮▮▮▮▮ at 1930 hours; search completed at 1936 nuisance contraband found.  At 1937 hours, searches were put on hold due to an ICS in CB2.  Searches resume at 2030 hours, with bed 2 Inmate ▮▮▮▮▮  At 2035 hours, search was completed with nuisance contraband found.  At 2038 hours, a search of Bed 3 Inmate ▮▮▮▮▮ was conducted, search completed at 2048 hours with nuisance contraband found.  At 2049 hours, a search of Bed 4 Inmate ▮▮▮▮▮was conducted, search completed at 2057 hours with nuisance contraband found.  At 2105 hours, a search of Bed 5 Inmate ▮▮▮▮▮ ▮▮▮▮▮was conducted, search completed at 2114 hours with nuisance contraband found. |

| Employee's Signature | Title |
|---|---|
| *[signature]* | Sgt. |

### Action Taken

| Comments/Action Taken |
|---|
| QUARTERLY SEARCHES COMPLETED, LOGGED IN K DRIVE. COPY OF SEARCH PACKET PLACED IN SEARCH LOG BOOK.  CONTRABAND WAS REMOVED, EXCESS LINEN WAS RECYCLED. |

| Employee's Signature | Title |
|---|---|
| *[signature]* | LT. |

| Distribution *(Check all that apply)* | Entered into Database |
|---|---|
| ☒ (+ W.O.) | By |
| ☐ | Date |
| ☐ | |

105-2(e)
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

| | To be used as a continuation for all reports. *Indicate sections being continued.* |
|---|---|

**Continuation Sheet**

| Date | Report Number |
|---|---|
| 03/10/2020 | 20-A58-1534 |

At 2115 hours, a search of Bed 6 Inmate ████████ was conducted, search completed at 2122 hours with nuisance contraband found. At 2124 hours, a search of Bed 7 Inmate ████████ was conducted, search completed at 2127 hours with nuisance contraband found. At 2128 hours, a search of Bed 8 Inmate ████████ was conducted, search completed at 2136 hours with nuisance contraband found. At 2137 hours, a search of Bed 9 Inmate ████████ was conducted, search completed at 2145 hours with nuisance contraband found. At 2146 hours, a search of Bed 10 Inmate ████████ was conducted, search completed at 2155 hours with nuisance contraband found. At 2157 hours, a search of Bed 11 Inmate ████████ was conducted, search completed at 2202 hours with nuisance contraband found. At 2203 hours, a search of Bed 12 Inmate ████████ was conducted, search completed at 2208 hours with nuisance contraband found. At 2209 hours, a search of Bed 13 Inmate ████████ was conducted, search completed at 2214 hours with nuisance contraband found. At 2215 hours, a search of Bed 14 Inmate ████████ was conducted, search completed at 2221 hours with nuisance contraband found. At 2222 hours, a search of Bed 15 Inmate ████████ was conducted, search completed at 2228 hours with nuisance contraband found. At 2228 hours, a search of Bed 16 Inmate ████████ was conducted, search completed at 2233 hours with nuisance contraband found. At 2234 hours, a search of Bed 17 Inmate ████████ was conducted, search completed at 2239 hours with nuisance contraband found. At 2240 hours, a search of Bed 18 Inmate ████████ was conducted, search completed at 2245 hours with nuisance contraband found. At 2246 hours, a search of Bed 19 Inmate ████████ was conducted, search completed at 2251 hours with nuisance contraband found. At 2252 hours, a search of Bed 20 Inmate ████████ was conducted, search completed at 2258 hours with nuisance contraband found. All searches were completed at 2258 hours with only nuisance contraband found. All medical supplies that were found were returned to medical along with two trash bags full of blankets, Sheets, pillow cases and towels.

| Employee Name *(Last, First M.I.)* | Employee Signature and Badge Number | Date |
|---|---|---|
| Peterman, Jeremy | #9611 | 3/10/2020 |

105-5(e)
8/6/09

Page ___ of ___

Arizona State Prison/Central Unit Search Log

# RANDOM PATS AND STRIPS          # MONTH:

| DATE / TIME | I/M NAME | I/M # | HOUSING | IR# | I/M present Y/N if no why | NEGATIVE/ POSITIVE | STAFF  (2 officers needed when I/M not present) | | PAT/STRIP/CELL |
|---|---|---|---|---|---|---|---|---|---|
| 3/10/20 1930 | | | HU10/1 | 20-858-1534 | yes | Nuisance Contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2030 | | | HU10/2 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2038 | | | HU10/3 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2049 | | | HU10/4 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2105 | | | HU10/5 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2115 | | | HU10/6 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2124 | | | HU10/7 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2128 | | | HU10/8 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2137 | | | HU10/9 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2146 | | | HU10/10 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2157 | | | HU10/11 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2203 | | | HU10/12 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2209 | | | HU10/13 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |

## Arizona State Prison/Central Unit Search Log

# RANDOM PATS AND STRIPS

# MONTH:

| DATE / TIME | I/M NAME | I/M # | HOUSING | IR# | I/M present Y/N if no why | NEGATIVE/ POSITIVE | STAFF (2 officers needed when I/M not present) | | PAT/STRIP/CELL |
|---|---|---|---|---|---|---|---|---|---|
| 3/10/20 2215 | ■ | | HUNO/ 14 | 20-858-1534 | yes | Nuisance Contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2222 | ■ | | HUNO/ 15 | 20-858-1534 | yes | Nuisance Contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2228 | ■ | | HUNO/ 16 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2234 | ■ | | HUNO/ 17 | 20-858-1534 | yes | Nuisance contra | #1 Peterman | #2 | Cell |
| 3/10/20 2240 | ■ | | HUNO/ 18 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2254 | ■ | | HUNO/ 19 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| 3/10/20 2252 | ■ | | HUNO/ 20 | 20-858-1534 | yes | Nuisance contraband | #1 Peterman | #2 | Cell |
| | | | | | | | #1 | #2 | |
| | | | | | | | #1 | #2 | |
| | | | | | | | #1 | #2 | |
| | | | | | | | #1 | #2 | |
| | | | | | | | #1 | #2 | |
| | | | | | | | #1 | #2 | |

**EXHIBIT 10**

**EXHIBIT 10**



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1603678



03/11/2020

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS v. RYAN, USDC CV 12-00601

ADCM1603681