Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
          carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION REGARDING DEFENDANTS' PREVENTION, MANAGEMENT, AND TREATMENT OF COVID-19 (Doc. 3520)** <br><br> **(Telephonic Status Hearing Requested)** |

**INTRODUCTION**

There is no dispute that both the staff who work for and the people in the custody of ADC face an extreme risk of harm from the COVID-19 pandemic. Nor is there any dispute that many class members are particularly vulnerable because of their age and/or their medical condition. What is disputed is whether ADC is doing all that is reasonably possible to protect class members. Fortunately, the Court has already appointed a physician with expertise in correctional healthcare and appropriate responses to the pandemic who is qualified to resolve these disputes. Because time is of the essence, the quickest and most reliable method of resolving these disputes is for the Court to charge Dr. Stern with the task of determining whether ADC's policies are adequate and whether adequate policies are being implemented. After having witnessed all of ADC's failures to comply with the Stipulation over the last several years and holding Defendants in contempt for some of those failures, there cannot be any reasonable doubt that ADC and its contractor are not competent to manage this crisis without court supervision, and the advice and recommendations of Dr. Stern. But in the event that the five years of post-settlement history is insufficient to justify such a charge to Dr. Stern, Plaintiffs set forth below more examples of how Defendants' response to this crisis is wholly inadequate.

Most if not all the actions Defendants' response describes ADC as taking occurred after March 11, 2020, the day Governor Ducey declared a state of emergency and the World Health Organization warned that infection rates would escalate. [Doc. 3520 at 2; Doc. 3527 at 3].[1] Others date from March 16, 2020, the day Plaintiffs filed their emergency Motion, and March 18, the day Defendants filed their response, or are phrased in the future or subjunctive, or offer no specific dates or details. [*Id*. Doc. 3527 at 3-5]. Defendants have failed to adopt and properly implement protocols to protect people in

---

[1] That Centurion corporate leaders began working on general COVID-19 recommendations for all its customers (not just ADC) earlier is what one would hope and expect, given that it provides health care to tens of thousands of incarcerated persons across the country. But that misses the mark when it comes to ***Defendants'*** obligations to class members, and whether and how Defendants chose to implement their contractor's recommendations

their custody from COVID-19 and to revise court-mandated corrective action plans to account for present circumstances.[2]

Defendants' argument that "the Stipulation does not require the implementation of a pandemic response plan, nor have Plaintiffs shown that Defendants are not in compliance with the Stipulation because of an inadequate COVID-19 response plan" is ludicrous. [Doc. 3527 at 2 n.1][3] Over the past four years, the Court has found Defendants substantially noncompliant with more than 150 performance measures / institutions, with more pending, and ordered corrective action plans (*see* Docs. 1583, 1709, 2030, 2403, 2526, 2764, 3020, 3492); found them in contempt and fined them more than $1.4 million in sanctions (Doc. 2898); and issued two Orders to Show Cause regarding contempt. [Docs. 3235, 3490] Defendants remain incapable of executing even basic health care tasks. *See, e.g*. Doc. 3508-1 at 5-25 (ASPC-Eyman December 2019 tour report describing Defendants' own reports showing Centurion and ADC staff's inability to

---

[2] The assertion that Defendant Pratt – the highest-ranking person in ADC with a responsibility related to health care services – "is not involved in leadership meetings and discussions, and would not be aware of official plans until such plans were finalized and released to staff generally" (Doc. 3527 at 11), and thus had no information to share with Plaintiffs' counsel during the parties' meeting, is, ***if true***, a staggering admission of the Department's incompetent mismanagement. If all of this planning was going on between ADC and Centurion for months before the virus hit, why would the person who is tasked with monitoring compliance with the more than $200 million a year Centurion contract not be privy to these discussions and the decisions being made?

In any event, on March 19, 2020, Defendants produced an agenda for the February 7, 2020 monthly "Director's Meeting" between Defendant Shinn and Centurion, and COVID-19 is not listed. *See* Declaration of Corene Kendrick ("Kendrick Decl."), Ex. 1. Similarly, January and February 2020 minutes from monthly meetings of custody and health care staff held at each of the ten Arizona prisons contain no mention of COVID-19 except one reference at ASPC-Winslow in February, (*id*. ¶ 7) – debunking Defendants' claim that they have been preparing for months.

[3] That there are no confirmed cases of COVID-19 among class members (Doc. 3527 at 4), is irrelevant. The serious risk of harm is well-documented, necessitating certain, swift, and comprehensive preventive measures. *Cf. Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."). And it is unlikely that any incarcerated person has been tested. *See* Amanda Morris, *Using robots to speed up testing, ASU hopes to open drive-thru coronavirus testing*, Ariz. Repub. (Mar. 19, 2020), available at https://www.azcentral.com/story/news/local/arizona-health/2020/03/19/asu-drive-thru-coronavirus-testing-screen-covid-19-arizona/2866138001/ (noting that "only 265 people [have been] tested by the state lab as of Wednesday afternoon.").

1   provide insulin, medication, or nurse's line on a timely basis).

2   It is entirely reasonable—and indeed necessary—for the Court to ensure corrective
3   action for noncompliance is based on current realities, and not wait for disaster to strike
4   and Defendants' inevitable *post hoc* excuses. *Parsons v. Ryan*, 949 F.3d 443, 459
5   (9th Cir. 2020) ("the Stipulation also authorizes the district court to remedy 'deficiencies'
6   via 'all remedies provided by law' (with a few exceptions that do not apply here)"); *see*
7   *also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not
8   reduced to approving consent decrees and hoping for compliance."). The risk of harm is
9   too great. *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts nevertheless must not
10  shrink from their obligation to enforce the constitutional rights of all persons, including
11  prisoners." (internal quotation marks and citation omitted)). Put frankly, this Court cannot
12  wait until months from now when disastrous performance measure scores come out – and
13  dozens, if not more, class members are dead – to take action.

14  We have been down this road before. The Court previously ordered Defendants to
15  produce a plan for the transition of healthcare services between contract providers. [Doc.
16  3234] Then, like now, Defendants produced a token plan on paper, but failed to
17  meaningfully implement it. And Defendants now blame their continued substantial
18  noncompliance on the transition – something that was entirely foreseeable. [*See* Doc.
19  3520 at 15 n.20; page 9 n.13, *infra*] To avoid re-treading this path, this Court should
20  order Defendants to immediately work with Dr. Stern to develop and implement a
21  comprehensive and specific plan for how they will address persistent noncompliance with
22  the Stipulation in light of the COVID-19 pandemic, which must include concrete
23  deliverables and identify responsible parties.[4]

---

[4] Plaintiffs also asked the Court to order Defendants to stop charging for hygiene supplies, including soap; to stop charging $4.00 for submitting a Health Needs Request seeking medical care; and to no longer designate ethyl-alcohol based hand sanitizer as contraband. Doc. 3520 at 16. While Defendants assert that they voluntarily changed their policies as of March 18, 2020 (the date of their Response) to provide "free hand soap to all inmates *upon request*," to waive the $4.00 copay for persons "experiencing flu or cold-like symptoms," and to permit staff to carry personal alcohol based sanitizer (Doc. 3527 at 3-5 (emphasis added)), the Court should still include Plaintiffs' requested elements in its

### I. Defendants' Plan Filed With the Court Lacks Detail and Offers No Indication Who Will Be Responsible for Implementing The Plans.

Defendants repeatedly proclaim their COVID-19 plan to be "robust" and "detailed" (Doc. 3527 at 3, 5, 10), but it is nothing of the sort. Other than boilerplate platitudes, most of which were cut-and-pasted from a press release posted on ADC's website the same day,[5] Defendants offer little to no substantive details as to exactly how their vague plans will be implemented and executed on the ground. For example, Defendants assure the Court that they "have identified dedicated housing locations to facilitate a quarantine" without specifying whether these locations are at all ten state prison complexes or only a few, where these housing locations are, how many people they can accommodate, and how social distancing will be accomplished. [Doc. 3572 at 4][6]

Defendants similarly assert that "[e]ffective this week, Wardens at each Arizona prison complex are initiating a weekly deep cleaning of all facilities" (Doc. 3527 at 3), without actually detailing what this cleaning will involve or the dates it will begin, let alone be completed, in already cramped and unsanitary prison conditions. And initial reports from correctional officers and families of class members raise serious concerns.

---

order so that class members' health and safety are not at the mercy of Defendants' whims and in light of widespread reports that notwithstanding the policy on paper, soap currently is, in fact, not being distributed for free when requested. *Cf. Knox v. Serv. Emps. Int'l Union Local 1000*, 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.") (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)); *see also* n. __ *infra*.

[5] Ariz. Dep't of Corrs., Rehabilitation and Reentry, *Media Advisory: COVID-19 Management Strategy Update* (Mar. 18, 2020), available at https://corrections.az.gov/sites/default/files/notifications/adcrr_covid-19_management_strategy_update_3-18-2020.pdf

[6] Defendants tout the existence of negative pressure rooms in their prisons as evidence of their competence or ability to address a pandemic. [Doc. 3527 at 5-6] They conspicuously fail to mention how many of these specialized health care rooms actually exist to serve the more than 34,000 class members in the ten state prison complexes. The ASPC-Florence Facility Health Administrator confirmed last week that there are *no* negative pressure rooms at that prison's infirmary (Doc. 3521 at ¶ 8), and during Plaintiffs' counsel's February 2020 tour of ASPC-Tucson's infirmary, the site medical director said that there were only *two* negative pressure rooms there, both of which were occupied. [Kendrick Decl. ¶ 2] The only other two prisons that have infirmaries are ASPC-Lewis and ASPC-Perryville, neither of which had negative pressure rooms during Plaintiffs' counsel's previous visits in 2019. [Id. ¶¶ 3-5] Defendants offer no evidence there are additional rooms at ASPC-Lewis, ASPC-Perryville, or any other ADC facility.

-4-

The union leader has stated that custody staff "lacks enough cleaning supplies and basic medical protection equipment," while "[m]any families have contacted ABC15 in recent days reporting that there is no free soap available for inmates and that personal hygiene and cleaning supplies are scarce."[7] Meanwhile, correctional officers have come forward to report that ADC is selling prison toilet paper – *intended for class members* – to employees at ASPC-Eyman and ASPC-Lewis who are facing shortages in community grocery stores.[8] This was allegedly done with the knowledge of ADC administration with one ADC employee stating, "Admin wanted to do something to help the staff. The request was elevated to central office and authorization to do this for staff was obtained."

Photos taken last week at ASPC-Florence at the direction of Plaintiffs' counsel show the crowded conditions in the dormitories and tents:

 

*See* Declaration of Rita Lomio, Ex. 2, filed herewith (South Unit dorms); Declaration of Maya Abela, Ex. 2, filed herewith (North Unit tents).

Defendants also fail to show any consideration of how they will manage the daily ebb and flow of incarcerated people sent off-site to work in the community, other than to say they have "the ***goal*** of implementing the new procedures by March 16, 2020" for health care staff to take the workers' temperatures every day when they depart and return

---

[7] ABC15 Arizona, *Union leaders, advocates criticize DOC plan for preventing COVID-19 in prisons* (Mar. 19, 2020), available at https://www.abc15.com/news/state/union-leaders-advocates-criticize-doc-plan-for-preventing-coronavirus-in-prisons.

[8] KJZZ, *Arizona Department of Corrections Sells Prison Toilet Paper to Employees at Cost During Pandemic* (Mar. 20, 2020), available at https://kjzz.org/content/1494941/arizona-department-corrections-sells-prison-toilet-paper-employees-cost-during.

to the prisons, an activity that may eventually divert short-staffed nurses from their regular duties. Doc. 3527 at 4, 10 (emphasis added).[9]

### A. Defendants Do Not Explain How Current and Future Health Care and Custody Staffing Shortages Will Be Addressed.

Centurion's COVID-19 guidelines, filed by Defendants, acknowledge the reality that additional staffing shortages will occur during the outbreak of the virus:

> Incarceration involves the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, correctional facilities may facilitate transmission of respiratory viruses from person-to-person through exposure to respiratory droplets or contact with contaminated surfaces. To reduce spread of respiratory infections including COVID-19, ***staff are not to come to work when sick***. (See Centurion Workforce Policy and Employee Benefits guidance of March 13, 2020.) ***Return to work requires evidence of a negative COVID-19 test***.

Doc. 3527-1 at 28 (emphasis added). They also note that at each contracted location,

> Centurion program leadership should draft and implement a plan for emergency staffing in the event that employees are absent either due to infection or self-quarantine. The plan must ensure adequately licensed and trained staff perform the essential tasks and services under our contract. Further, the plan should address what to do if custody becomes short staffed, such as, by way of example, cell-side encounters and alternative medication administration.

*Id*. at 37. Defendants submitted no such emergency staffing plan to the Court. Indeed, other than saying that prison wardens have "devised twelve-hour security staffing rosters for implementation should staffing deficiencies related to COVID-19 staff-call outs," (Doc. 3527 at 5), Defendants offer no explanation of how they will address the very real and forthcoming problem of custody and/or health care staff availability, especially in light of the dangerous and pre-existing health care and custody staffing shortages. [*See* Doc. 3520 at 8-10; Doc. 3521-1 at Ex. 2; *see also* Doc. 3508-1 at 5-25][10]

If Defendants are unable or unwilling to fill the numerous vacant custody officer and health care staff positions, and are unable to improve living conditions, then their

---

[9] It is unclear why a document filed on March 18, 2020, uses the future tense to refer to a goal to begin a task on March 16, 2020.

[10] On March 19, 2020, Defendants provided a more recent health care staffing report dated February 2, 2020, which shows additional *decreases* in the number of filled health care staff positions. [Kendrick Decl. Ex. 2 (ADCM1607096-1607105)]

COVID-19 plan must include a "[r]eduction in the density of the population for class members who are high risk according to the standards set forth by the CDC."  Doc. 3520 at 16.  Centurion's COVID-19 guidelines recognize this need:

> Explore means to obtain release from prison facility for elderly persons and those with complicated medical conditions for which exposure and infection of COVID-19 is likely to have worse outcome. Although the impact on pregnancy is uncertain, pregnant women are also included.
>
> Work with Courts, arresting agencies and probation departments to rely less on prison and promote community corrections or alternatives to incarceration (pre-arrest programs; diversionary courts pre-adjudication, at-home electronic monitoring, early parole, etc.). Expand opportunities for medical furlough or compassionate release.

Doc. 3527-1 at 32.  The Court should order Defendants to incorporate a plan to reduce population density as a component of their plan to manage and mitigate COVID-19.[11]

Defendants state that, four days ago (and five days *after* Governor Ducey declared a state of emergency), "Centurion identified a population of approximately 6,600 vulnerable inmates based on their age (>60), health status, and diagnoses and sent it to ADCRR for weekly welfare checks and education urging the inmates to report any symptoms that may be associated with COVID-19."  [Doc. 3527 at 9]  They do not specify the health status or diagnosis of these patients, nor do they explain who is conducting 'weekly welfare checks and education," or what those persons' qualification might be to conduct health education.  And the number identified by Defendants seems low; there are a high number of people in prison with serious chronic health conditions.[12]

---

[11] Reducing population density does not mean throwing the prison gates open for all people incarcerated in the prisons.  First, the population of people most at risk for COVID-19 complications – the elderly and the chronically ill – tend to be of the lowest risk for recidivism or injury to public well-being.  Secondly, the density of the population can be reduced by measures such as electronic monitoring, temporary furloughs, accelerated time credits, identifying resources in the community (for example, empty motels or shuttered military bases) that could house vulnerable populations in locations where they are not cheek-and-jowl with one another.  *See* Lomio Decl., Ex. 2 (photo of dorm).  In addition, Defendants must ensure that there is appropriate continuity of care and cannot simply set the sickest outside the prison gates.

[12] *See* https://corrections.az.gov/sites/default/files/REPORTS/CAG/2020/cagfeb-20.pdf (ADC February 2020 Corrections at a Glance report: 7,136 people in custody with Hepatitis C and 282 are HIV-positive); *see also* Kendrick Dec. Ex. 3 at ¶ 5 (March 16, 2020 Declaration of Dr. Marc Stern in *Dawson v. Asher*, 2:20-cv-00409-JLR-MAT (W.D. Wash.)) ("Vulnerable people include people over the age of 50, and those of any age with

**B. Defendants' Plan Fails to Address the Impacts on Specialty Care of At-Risk Class Members.**

The Stipulation includes performance measures related to the provision of specialty care. *See, e.g.*, PM 50 ("Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider."); PM 51 ("Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider."); Doc. 3379 at 110 (Dr. Stern: "Performance on these two measures was quite poor."). This Court already has found Defendants substantially noncompliant with those provisions, ordered corrective action plans, and directed the court expert to identify causes of noncompliance. [Doc. 3490 at 2; Doc. 3379 at 89-90 (Dr. Stern noting that "reduced willingness of community specialists to see prison patients [is a] specific barrier[] to performance")]

Nonetheless, there continue to be serious delays in provision of specialty care. At ASPC-Florence alone, Defendants have hundreds of pending specialty appointments, many of which already are untimely. [Declaration of Tania Amarillas Diaz, ¶ 4-6, filed herewith] Plaintiffs' counsel last week met with some of the patients there who are currently experiencing serious delays in specialty care, including, to provide only a few examples, a terminally ill, 36-year-old patient in need of a follow-up oncology appointment and an evaluation for a thyroidectomy (*id.*, Ex. 5); a 76-year-old cancer patient with already-delayed gastroenterology, urology, and oncology appointments (*id.*, Ex. 3); and a 79-year-old patient with suspected lung cancer with already-delayed oncology and bronchoscopy appointments needed "to determine treatment" (*id.*, Ex. 4).

---

underlying health problems such as – but not limited to – weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy." (Declaration of Dr. Marc Stern)); Kimberly A. Skarupski *et al.*, The Health of America's Aging Prison Population, 40 Epidemiologic Reviews 157-165, 158 (2018) ("One of the challenges in assessing and understanding aging in prison is determining the appropriate cutoff to define 'old age.' Although 65 years is the conventional cutoff used to define older age in the general US population, unhealthy lifestyles and inadequate health care often accelerate the onset and progression of many chronic conditions associated with aging; thus, old age in prison typically commences at ages 50 or 55 years").

In their Motion, Plaintiffs raised concerns that noncompliance with specialty care provisions would only increase as "the availability of community healthcare services . . . may be substantially curtailed" due to the pandemic. [Doc. 3520 at 13]  Indeed, the Facility Health Administrator for ASPC-Florence acknowledged that the "community will take care of community first, and then us [the prison] second." [Doc. 3522 at 6-7, ¶ 24] Defendants provide no substantive response to this concern, and instead state only: "External medical needs will continue *based on provider availability*." [Doc. 3527 at 3 (emphasis added)]  That is insufficient.  It makes no mention of how Defendants intend to address patients' medical needs if local providers under existing contracts are unavailable.

Defendants already have been found substantially noncompliant in the provision of specialty care and, for years, have asserted a number of shifting reasons for such noncompliance.[13]  The Court should order Defendants to update their corrective action

---

[13] For example, Defendants' latest CGAR data for PM 50 at ASPC-Florence, for December 2019, shows a compliance score of **38%**.  Over the past two years, Defendants have offered ever-changing excuses for chronic non-compliance:  **December 15, 2017**: "Corizon is experiencing difficulties in terms of identifying and procuring specialty providers for delivering urgent consultations and urgent specialty diagnostic services within the required timeframe. A significant number of specialty providers that have been contacted either do not have the capacity to take on new patients at this time, do not want inmates in their facilities, or will not accept AHCCCS rates."  **January 8, 2018**: "Corizon is experiencing difficulties in procuring specialty providers for specialty diagnostic services within the required timeframe, such as urology, neurology, and gastroenterology. Some of this difficulty has been compounded by limited provider availability during the Thanksgiving holiday. There has also been a problem with patients receiving oncology services because the oncology provider that had been used, AON, filed for bankruptcy."  **August 29, 2018**: "The Clinical Coordinator left on June 22, 2018, leading to diminished oversight."  **December 21, 2018**:  "This facility is transitioning to a new Clinical Coordinator and scheduler, who are still learning their roles."  **March 21, 2019**:  "The Clinical Coordinator and scheduler positions have had a high turnover rate resulting in delays in scheduling appointments."  **July 16, 2019**:  "The Eyman Clinical Coordinator and scheduler had been completing both the Florence and Eyman facility consults. Due to the large volume of consults at both facilities compliance was not achieved."  **August 8, 2019**:  "There was a backlog of referrals that carried over through the transition. In addition, there are providers that provided services prior to the transition who will no longer provide services to the inmate population without a contract in place."  **September 19, 2019**:  "A large number of consults have been approved and getting outside providers to see all of them has proved to be a challenge. Now that a large number of inmates are also being scheduled, transportation has become an issue."  **October 15, 2019**:  "The available resources has outpaced the demand. Multiple outside providers are pending seeing patients until a contract is signed with the new vendor."  **January 17, 2020**: "The Clinical Coordinator resigned in November 2019, making the department short staffed. Urgent consultations were not scheduled within 30 calendar days of the consultation due

plans to address the COVID-19 pandemic and mitigate, to the extent possible, continued noncompliance with specialty care performance measures and harm to patients.

## II. The Court Should Ask Dr. Marc Stern to Work With Defendants to Ensure That Their COVID-19 Plan Is Comprehensive and Includes All Necessary Elements.

Because time is of the essence, and in light of Dr. Stern's familiarity with the Stipulation's requirements, Defendants' healthcare system, and key administrators, the Court should ask Dr. Stern to work with Defendants in developing protocols to address compliance with the Stipulation in light of the COVID-19 pandemic.

Defendants suggest that such consultation is not necessary because their plan "mirrors Dr. Stern's recommendations in both Washington and Mississippi." Doc. 3527 at 2. This is false. For example, in Washington, Dr. Stern identified "downsizing" – that is, release of people who are particularly vulnerable to the virus – as an element of a COVID-19 response plan. [Doc. 3521-1 at 18-19] In a declaration filed March 16, 2020, in *Dawson v. Asher*, 2:20-cv-00409-JLR-MAT (W.D. Wash.), Dr. Stern elaborated:[14]

> The effects of COVID-19 are very serious, especially for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as –but not limited to – weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy.
>
> Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs. Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support. An outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure.

Kendrick Decl., Ex. 3 at ¶¶ 5-6.[15]

> For detainees who are at high risk of serious illness or death should they contract the COVID-19 virus, release from detention is a critically important way to meaningfully mitigate that risk. Additionally, the release of detainees

---

to demand outpacing available resources occurring with transportation issues and offsite provider availability." [Doc. 3501-1 at 269-277]

[14] *Dawson* involves the health and safety of immigration detainees at the Northwest Detention Center in Tacoma, Washington. The ACLU National Prison Project is co-counsel for the plaintiffs in that case.

[15] Defendants' response does not indicate how many, if any, ventilators and respirators they have in their infirmaries.

> who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility. Combined, this has a number of valuable effects on public health and public safety: it allows for greater social distancing, which reduces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees.

*Id.*, ¶ 9. Dr. Stern concludes:

> As a correctional public health expert, I recommend release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19.

*Id.*, ¶ 11.

Defendants' plan is entirely silent on this issue. The Court should order Defendants to collaborate with Dr. Stern on a plan that includes reduction of the population density at ADC facilities, as well as other essential measures to protect the health, safety, and lives of incarcerated people and staff.

## **CONCLUSION**

The threat to health and life from the COVID-19 global pandemic is not fake news or a partisan hoax. It is real, and the more than 34,000 men, women, and children in ADC custody are helpless and utterly dependent upon Defendants and their contractor to work together to prevent, manage, and treat the pandemic when – not if – it spreads into the prison system. There is a real and immediate risk that class members incarcerated in Arizona prisons will die or suffer serious medical injuries due to Defendants' inadequate preparation for the COVID-19 pandemic. For the reasons set forth in their Motion and supporting documentation (Docs. 3520-3524), and above and in supporting documentation filed herewith, Plaintiffs respectfully request that the Court grant their Motion and enter their proposed order without further delay.

//
//
//

Respectfully submitted,

Dated: March 20, 2020

**PRISON LAW OFFICE**

By: s/ Corene T. Kendrick
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene T. Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
afettig@aclu.org
echo@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Maya Abela
    Rose A. Daly-Rooney (Bar No. 015690)
    J.J. Rico (Bar No. 021292)
    Maya Abela (Bar No. 027232)
    **ARIZONA CENTER FOR DISABILITY LAW**
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone:  (520) 327-9547
    Email:   rdalyrooney@azdisabilitylaw.org
            jrico@azdisabilitylaw.org
            mabela@azdisabilitylaw.org

    Asim Dietrich (Bar No. 027927)
    5025 East Washington St., Ste. 202
    Phoenix, Arizona 85034
    Telephone: (602) 274-6287
    Email:   adietrich@azdisabilitylaw.com

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Richard M. Valenti
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
rvalenti@strucklove.com

*Attorneys for Defendants*

s/ C. Kendrick

-14-