**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| David Shinn, et al., | |
| Defendants. | |

Plaintiffs request the Court find Defendants substantially noncompliant with a total of eleven Performance Measures ("PMs") at various complexes. (Doc. 3492).  Defendants agree that one PM is substantially noncompliant but argue the other ten should not be found substantially noncompliant at this time.  It is undisputed that most of the ten PMs have, in the past, met the long-established criteria to be deemed substantially noncompliant.  It is also undisputed, however, that many of those PMs have been compliant in recent months.  Given those recent performance levels, Defendants argue Plaintiffs should be required to pursue informal dispute resolution steps again before the Court deems the ten PMs substantially noncompliant.  The Stipulation, however, does not require repetitive attempts at informal resolution.  Therefore, the ten PMs will be declared substantially noncompliant.  Defendants will be required to submit remediation plans for any of those PMs that were not compliant in the most recent data and will be required to submit remediation plans for any currently compliant PMs that, in the future, become noncompliant.

A.     **Background**

1        As of 2018, the Stipulation required Defendants to achieve an 85% compliance rate

2  for every PM at every complex.  (Doc. 1185 at 4).  The Stipulation sets forth a multistep

3  process for the parties to follow in the event Defendants "fail to substantially comply in

4  some significant respect with [the] Stipulation." (Doc. 1185 at 13).  If Plaintiffs believe

5  Defendants have not "substantially compl[ied]," Plaintiffs must first provide Defendants a

6  "written statement describing the alleged non-compliance." (Doc. 1185 at 13).  Defendants

7  must then provide a written response, after which the parties are required to "meet and

8  confer in a good faith effort to resolve their dispute informally."  If they are unable to

9  resolve their dispute, the parties must proceed to mediation before a Magistrate Judge.  If

10  that mediation fails, Plaintiffs can file a motion with the Court.  Assuming the Court agrees

11  that Defendants have not "substantially compl[ied]," the Court must "require Defendants

12  to submit a plan approved by the Court to remedy the deficiencies identified by the Court."

13  (Doc. 1185 at 14).   Then, if Defendants' remediation plan "did not remedy the

14  deficiencies," the Court gains the power to enforce the Stipulation "through all remedies

15  provided by law." (Doc. 1185 at 14).

16        After the Stipulation went into effect, the parties could not agree on what would

17  qualify as "substantial noncompliance" to trigger the enforcement process.  In February

18  2018, Magistrate Judge Duncan ruled Defendants will be "substantially non-compliant"

19  with the Stipulation whenever a PM falls below 85% for more than six months within any

20  24-month period or if a PM falls below 85% for three consecutive months.  (Doc. 2644).

21  In establishing these parameters, Magistrate Judge Duncan recognized "that there will be

22  PM/locations where the more recent history has been consistently compliant and so a

23  finding of noncompliance may not require the immediate imposition of a remediation

24  plan." (Doc. 2644 at 2).  In other words, given the very lengthy process necessary for the

25  Court to even be in the position to require a remediation plan, it is possible a particular PM

26  will have improved such that, by the time the Court is empowered to take action, a

27  remediation plan is not immediately necessary based on the most recent numbers.

28        In February 2020, Plaintiffs filed a motion to enforce the Stipulation.  (Doc. 3492).

1   That motion claims the parties have completed the multi-step process regarding eleven

2   PMs such that the Court should now order Defendants to produce a remediation plan

3   regarding those PMs.[1]   The eleven PMs can be divided into three groups based on their

4   history and the arguments the parties make.

5        **B.       PMs 23, 24, 40, 44, and 52**

6             **1.      History**

7        On January 2, 2019, Plaintiffs sent Defendants a written notice stating Defendants

8   were substantially noncompliant regarding, among others, the following PMs and

9   locations:

10            PM 23: Lewis;

11            PM 24: Eyman, Florence, Phoenix, Yuma;

12            PM 40: Florence;

13            PM 44: Phoenix, Tucson;

14            PM 52: Lewis.

15   (Doc. 3493-1 at 3).   Defendants' response to that statement conceded they were

16   substantially noncompliant with these PMs.   (Doc. 3493-1 at 7).   The parties then

17   proceeded to mediation before a Magistrate Judge in August 2019.   That mediation failed.

18        Plaintiffs now seek a finding of substantial noncompliance regarding these nine

19   PMs.   Defendants concede that PM 40 at Florence is substantially noncompliant and

20   Defendants state they "will identify the deficiencies and develop a remedial plan to correct

21   them."   (Doc. 3515 at 4).   But Defendants argue the remaining eight PMs have become

22   compliant.   Thus, Defendants believe there is no need to find those eight PMs substantially

23   noncompliant and require submission of a remediation plan.

24             **2.      Analysis**

25        The informal process that must precede any motion to enforce the Stipulation is

26   lengthy.   That process begins with monitoring data compiled by Defendants that, by the

27

28   _____

[1] The motion originally identified twelve PMs but Plaintiffs have conceded PM 19 at Tucson is no longer at issue.

- 3 -

1    time the data is produced, is two months old.  Once the data is produced, Plaintiffs must

2    send written notice to Defendants of noncompliance and Defendants have thirty days to

3    respond.  Then, the parties have to confer within 30 days.  (Doc. 1185 at 13).  If they cannot

4    reach an agreement, they must pursue mediation, which the Stipulation anticipates taking

5    as long as sixty days.  Only if mediation fails can Plaintiffs seek a finding of substantial

6    noncompliance from the Court.  In other words, if Defendants became substantially

7    noncompliant with a particular PM in December 2018, that fact would first be reflected in

8    data produced in February 2019.  If Plaintiffs immediately sent written notice, Defendants

9    would have until March 2019 to respond and the parties would have until April 2019 to

10   confer.  If they could not reach an agreement, the parties would have until June 2019 to

11   pursue mediation.  And only after that mediation failed could Plaintiffs seek a finding of

12   substantial noncompliance.  Thus, noncompliance in December 2018 could not be raised

13   with the Court until July 2019, at least seven months later.

14          Given the lengthy dispute resolution process required by the Stipulation, a finding

15   of substantial noncompliance will always be premised on old data.  Moreover, it is entirely

16   possible that by the time Plaintiffs seek a finding of substantial noncompliance Defendants

17   will have identified and remedied a particular failure such that the more recent data shows

18   Defendants are no longer noncompliant.

19          According to Defendants, if the noncompliance was too long ago, the Court cannot

20   make a finding of substantial noncompliance.  Alternatively, Defendants argue that if they

21   have become compliant by the time Plaintiffs file their motion, the Court should not make

22   a finding of substantial noncompliance.  Nothing in the Stipulation supports the theory that

23   stale data should prevent a finding of substantial noncompliance or that the noncompliance

24   must exist at the moment Plaintiffs seek relief from the Court.  Indeed, the Stipulation is

25   complicated enough without introducing additional concerns such as the age of data or

26   requiring that, if Defendants' compliance rates are currently sufficient, the parties must

27   await another dip in performance before Plaintiffs can seek relief from the Court.

28          Under basic principles of contract interpretation, the Court will not "add something

1    to the contract which the parties have not put there." *Employers Mut. Cas. Co. v. DGG &*

2    *CAR, Inc.*, 183 P.3d 513, 518 (Ariz. 2008).  And based on the terms of the Stipulation, the

3    parties are required to pursue the informal dispute resolution process regarding a particular

4    PM at a particular location only once.  Therefore, once the parties have completed the

5    dispute resolution process in its entirety a single time regarding a particular PM at a

6    particular location, there is no requirement that Plaintiffs pursue the process again.  To hold

7    otherwise, and adopt Defendants' approach, would doom the parties to potentially

8    perpetual rounds of dispute resolution.  It is better to simply enforce the Stipulation which

9    requires only a single trip through the months-long process.

10   Based on the underlying data, the following PMs have been substantially

11   noncompliant: PM 23 at Lewis; PM 24 at Eyman, Florence, Phoenix, and Yuma; PM 44 at

12   Phoenix and Tucson; and PM 52 at Lewis.  But as recognized by Magistrate Judge Duncan

13   years ago, even if Defendants were noncompliant in the past, recent data might show

14   Defendants are meeting their obligations.  In such circumstances, "a finding of

15   noncompliance may not require the immediate imposition of a remediation plan."  (Doc.

16   2644 at 2).  The Court will not, therefore, require immediate submission of remediation

17   plans for each of these PMs.  But neither will the Court require further proceedings that

18   might inject additional delay in the event Defendants stop performing their obligations.

19   Thus, Defendants will not be required to submit a remediation plan regarding any of these

20   PMs that were compliant in the most recent data.  But for any of these PMs that were

21   compliant in the most recent data, Defendants will be required to *automatically* submit a

22   remediation plan if a PM dips below 85% for even a single month.  That remediation plan

23   will be due on the later date of fifteen days of the date of this Order (if the most recent data

24   shows noncompliance) or fifteen days of the submission of data indicating Defendants have

25   again become noncompliant.

26   **C.    PM 74 (Perryville)**

27   **1.    History**

28   On May 20, 2019, Plaintiffs sent Defendants a written statement arguing that PM

74 at Perryville was substantially noncompliant as it had been noncompliant for three consecutive months. Understanding Plaintiffs' position requires a detailed explanation of what PM 74 requires and the numbers reported by Defendants.

PM 74 states:

> All female prisoners shall be seen by a licensed mental health clinician within five working days of return from a hospital post-partum.

Based on other terms of the Stipulation, this PM requires that the interaction between the prisoner and the mental health clinician take place in a "confidential setting." (Doc. 1185-1 at 5). According to Plaintiffs, PM 74 fell below the 85% compliance rate during the months of December 2018, January 2019, and February 2019. Defendants concede December 2018 and January 2019 were below the 85% compliance rate. As for February 2019, however, Defendants reported a 100% compliance rate but Plaintiffs dispute its accuracy.

The 100% compliance rate for PM 74 in February 2019 was calculated based on four encounters. Plaintiffs reviewed the medical records underlying the monitoring score and discovered an encounter they believed was improperly counted as compliant. According to Plaintiffs, that encounter was not compliant because it did not occur in a confidential setting. That is, the prisoner and the mental health clinician spoke in the same room as another prisoner. If that particular encounter is deemed noncompliant, the compliance rate for February 2019 drops to 75% and PM 74 can be found "substantially noncompliant" based on February 2019 being the third consecutive noncompliant month.

After Plaintiffs sent Defendant their written position regarding PM 74's February 2019 score at Perryville, Defendants responded and argued the February 2019 score had been calculated correctly. The parties could not agree, and they proceeded to an unsuccessful mediation in August 2019. Plaintiffs now seek a ruling that PM 74 became substantially noncompliant in February 2019 because of the encounter that took place in a nonconfidential setting. Defendants respond that the relevant encounter took place in a close-to-confidential setting such that the February 2019 score was accurate.

**2.      Analysis**

In support of their position that the relevant consultation occurred in a confidential setting, Defendants submitted an affidavit from Dr. Nicole Taylor.  That affidavit attempts to recount the circumstances of the encounter, but it is undisputed Dr. Taylor was not present during that encounter. (Doc. 3515-1 at 7-8).  Instead, Dr. Taylor's affidavit is based on "discussions with individuals who interviewed the psychologist" who had conducted the consultation.  In other words, Dr. Taylor's information is thirdhand.  This flimsy affidavit does not comport with Federal Rule of Evidence 602 and the Court cannot credit it.  As a result, the only reliable evidence in the record is that the consultation happened with another prisoner "in the area." (Doc. 3255-1 at 78).  This does not constitute a confidential encounter and, thus, that encounter did not satisfy PM 74.

Because PM 74 at Perryville in February 2019 was not, in fact, compliant, there were three consecutive months of noncompliance, which triggers a finding of substantial noncompliance.  Recent data indicates PM 74 at Perryville has been compliant; thus, no remediation plan must be submitted at this time.  In the event PM 74 at Perryville falls below 85% in any future month, Defendants must file a remediation plan within fourteen days.

**D.      PM 67 (Florence)**

**1.      History**

The parties have a long history regarding Defendants' performance on PM 67.  That PM states

> In an [in patient care setting], Registered Nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks.

For Florence, Defendants have failed to comply with this PM from the very beginning. Thus, in 2017 Plaintiffs sent Defendants a written notice of noncompliance, Defendants responded, and the parties attended an unsuccessful mediation in late 2017.  (Doc. 2520). In January 2018, Plaintiffs filed a motion to enforce the Stipulation, requesting a finding of substantial noncompliance.  (Doc. 2520).  That motion was fully briefed, and Magistrate

1   Judge Duncan subsequently conducted numerous status conferences where the motion to

2   enforce and PM performance were discussed.  Eventually, in September 2018, the motion

3   was denied as to PM 67 at Florence.  (Doc. 3020).

4            Since September 2018, PM 67 at Florence has been noncompliant five times.[2]  There

5   were three consecutive months of noncompliance in September, October, and November

6   2018.  Based on those months, Plaintiffs believe the Court should deem PM 67 at Florence

7   substantially noncompliant.   As for Defendants, they argue the Stipulation requires

8   Plaintiffs begin the multi-step process again.  That is, Defendants assert Plaintiffs' request

9   is based on informal dispute resolution attempts and a mediation that occurred more than

10  two years ago.  Defendants believe the extensive delay means Plaintiffs must start the entire

11  dispute resolution process anew with an initial notice of noncompliance.  Defendants argue

12  that basing a finding of substantial noncompliance on such old data would "run afoul of

13  the Stipulation's intent."  (Doc. 3515 at 6).

14            **2.       Analysis**

15           As discussed above, the parties are required to pursue the informal dispute

16  resolution process regarding a particular PM at a particular location only once.  Because

17  there is no dispute that PM 67 at Florence was noncompliant for three consecutive months

18  in late 2018, that PM is substantially noncompliant.  But because its most recent

19  performance has been compliant, Defendants need only submit a remediation plan within

20  fourteen days of the PM dipping below 85%.

21            **E.       Amendment to or Issuance of Order to Show Cause and Status Reports**

22           Plaintiffs request the Court amend its pending Order to Show Cause (Doc. 3490) or

23  issue another Order to Show Cause that includes the PMs discussed in this Order.  It

24  appears Plaintiffs believe the PMs at issue in this Order are subject to immediate contempt

25  enforcement by the Court.  That is incorrect.  The Stipulation first requires that Defendants

26  submit a remediation plan and that plan must fail before the Court gains authority to enforce

27  the Stipulation by additional means (Doc. 1185 at 14).

28  _____
[2] The five months were September, October, and November 2018 as well as March and August 2019.  (Doc. 3492 at 6).

1    Finally, Magistrate Judge Duncan required Defendants file monthly status reports

2    regarding the PMs that had been found substantially noncompliant.  (Doc. 1678).  Having

3    found the PMs in this Order substantially noncompliant, Defendants must, going forward,

4    include these PMs in the monthly status reports filed with the Court.

5    Accordingly,

6    **IT IS ORDERED** the Motion to Enforce the Stipulation (Doc. 3492) is **GRANTED**

7    **IN PART**.

8    **IT IS FURTHER ORDERED** that PM 23 at Lewis; PM 24 at Eyman, Florence,

9    Phoenix, and Yuma; PM 40 at Florence; PM 44 at Phoenix and Tucson; PM 52 at Lewis;

10   PM 67 at Florence; and PM 74 at Perryville are substantially noncompliant.

11   **IT IS FURTHER ORDERED** no later than fourteen days from this Order

12   Defendants shall submit a remediation plan for any of the listed PMs that were

13   noncompliant in the most recent data.

14   **IT IS FURTHER ORDERED** for the listed PMs that were compliant in the most

15   recent data, no later than fourteen days of the filing of data indicating one of the listed PMs

16   again becomes noncompliant, Defendants shall file a remediation plan for that PM.

17   **IT IS FURTHER ORDERED** the monthly status reports and charts filed pursuant

18   to Doc. 1678 must include the PMs identified in this Order.

19   Dated this 23rd day of April, 2020.

20

21

22
     Honorable Roslyn O. Silver
23   Senior United States District Judge

24

25

26

27

28