**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| VICTOR ANTONIO PARSONS; SHAWN JENSEN; STEPHEN SWARTZ; SONIA RODRIGUEZ; CHRISTINA VERDUZCO; JACKIE THOMAS; JEREMY SMITH; ROBERT CARRASCO GAMEZ, JR.; MARYANNE CHISHOLM; DESIREE LICCI; JOSEPH HEFNER; JOSHUA POLSON; ARIZONA CENTER FOR DISABILITY LAW; CHARLOTTE WELLS, on behalf of themselves and all others similarly situated, | No. 18-16358 |
| | D.C. No. 2:12-cv-00601-ROS |
| *Plaintiffs-Appellees*, | |
| v. | |
| CHARLES L. RYAN, Director, Arizona Department of Corrections; RICHARD PRATT, Interim Division Director, Division of Health Services, Arizona Department of Corrections, | |
| *Defendants-Appellants.* | |

VICTOR ANTONIO PARSONS; SHAWN
JENSEN; STEPHEN SWARTZ; SONIA
RODRIGUEZ; CHRISTINA VERDUZCO;
JACKIE THOMAS; JEREMY SMITH;
ROBERT CARRASCO GAMEZ, JR.;
MARYANNE CHISHOLM; DESIREE
LICCI; JOSEPH HEFNER; JOSHUA
POLSON; CHARLOTTE WELLS, on
behalf of themselves and all others
similarly situated; ARIZONA CENTER
FOR DISABILITY LAW,
                        *Plaintiffs-Appellees*,

                    v.

CHARLES L. RYAN, Director, Arizona
Department of Corrections; RICHARD
PRATT, Interim Division Director,
Division of Health Services, Arizona
Department of Corrections,
                        *Defendants-Appellants.*

Nos. 18-16365
      18-16368

D.C. No.
2:12-cv-00601-
ROS

| | |
|---|---|
| VICTOR ANTONIO PARSONS; SHAWN JENSEN; STEPHEN SWARTZ; SONIA RODRIGUEZ; CHRISTINA VERDUZCO; JACKIE THOMAS; JEREMY SMITH; ROBERT CARRASCO GAMEZ, JR.; MARYANNE CHISHOLM; DESIREE LICCI; JOSEPH HEFNER; JOSHUA POLSON; CHARLOTTE WELLS, on behalf of themselves and all others similarly situated, | No. 18-16424<br><br>D.C. No.<br>2:12-cv-00601-ROS<br><br>OPINION |

                    *Plaintiffs-Appellants*,

                    and

ARIZONA CENTER FOR DISABILITY
LAW,
                         *Plaintiff*,

                    v.

CHARLES L. RYAN, Director, Arizona
Department of Corrections; RICHARD
PRATT, Interim Division Director,
Division of Health Services, Arizona
Department of Corrections,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Arizona
Roslyn Silver, District Judge, and David K. Duncan,
Magistrate Judge, Presiding[*]

Argued and Submitted September 24, 2019
San Francisco, California

Filed January 29, 2020

Before: Sidney R. Thomas, Chief Judge, and J. Clifford
Wallace and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Wallace

---

[*] Magistrate Judge Duncan retired on June 22, 2018, and the case
was reassigned to District Court Judge Roslyn O. Silver.

## SUMMARY**

### Prisoner Class Action

The panel affirmed in part, reversed in part, and dismissed in part, in consolidated appeals in a comeback case involving eleven district court orders, arising from a class action by Arizona state prisoners against Defendant Arizona Department of Corrections (ADC) senior officials, challenging the ADC's provision of healthcare.

The parties entered into a Stipulation in which Defendants agreed to comply with Performance Measures designed to improve the healthcare system at ten ADC-operated prisons. The Stipulation provided the process by which the parties must resolve disputes over compliance.

The panel affirmed the district court's order holding the Defendants in contempt; affirmed in part and reversed in part the order awarding Plaintiffs' attorneys' fees for work performed post-stipulation; affirmed the order partially granting and partially denying Defendants' motion to terminate the monitoring of certain Performance Measures; affirmed the order requiring Defendants to reinstall Health Needs Request boxes for prisoners to submit forms requesting medical assistance; and dismissed the remainder of the medical needs appeal for lack of jurisdiction.

Concerning the contempt order, the panel rejected Defendants' contention that the district court lacked the

---

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

power to hold them in contempt; and held that the district court acted within its authority in issuing the order to show cause, and thus Defendants' noncompliance with that order properly served as the basis for the contempt order. The panel further held that because the contempt order was coercive and compensatory, it was civil in nature, and thus Defendants were not entitled to criminal due process protections. As a result, Defendants did not establish that the district court deprived them of due process. The panel also held that the contempt order was sufficiently detailed to justify the $1,000 sanction per violation, and therefore remand was not required. The panel also held that any error committed by the district court in interpreting the Stipulation to require 100% compliance had no impact on the contempt order, and would therefore not be grounds for reversing that order. Finally, the panel rejected Defendants' contention that the district court improperly modified the Stipulation.

Concerning the parties' cross-appeals from the attorneys' fees order, the panel held that Plaintiffs' time entries were sufficient for the district court to make a reasonable attorneys' fees award, and thus the district court did not abuse its discretion in relying on them. The panel also held that the district court erroneously set Plaintiffs' attorneys' base hourly rate higher than the rate permitted by the Stipulation, but disagreed with the alternative rate proposed by Defendants. Specifically, the panel held that the hourly rate under 42 U.S.C. § 1997e(d)(3) was the amount the Judicial Conference of the United States authorized and requested from Congress, and the district court did not err in consulting the Congressional Budget Summary to derive the rate. The panel vacated the attorneys' fees order, and remanded to the district court to recalculate the fee award by determining the correct rates for each year and applying these rates to Plaintiffs' time-entries.

The panel rejected Defendants' argument that the district court erred in applying San Francisco Bay Area and Washington, D.C. paralegal market rates instead of the market rate in Phoenix. The panel held that the district court did not err in applying the Prison Litigation Reform Act ("PLRA") maximum rate to the paralegal work performed in the San Francisco Bay Area, but the correct maximum rate was the amount the Judicial Conference authorized and requested from Congress.  The panel reversed and remanded with instructions for the district court to re-calculate the fees awarded for paralegal work in light of the correct rates. Finally, the panel rejected Defendants' contentions that the Stipulation did not allow for a multiplier  and the PLRA did not allow for a multiplier, but agreed that the district court abused its discretion by concluding a multiplier was appropriate here.  The panel vacated the attorneys' fees order, and remanded for the district court to reweigh whether an enhancement was appropriate.

Concerning Plaintiffs' contention on cross-appeal that the district court misinterpreted the law by denying Plaintiffs compensation for law clerk time, the panel held that compensation for unpaid law clerks was permissible under 42 U.S.C. § 1988.  The panel held, however, that Plaintiffs incorrectly assumed that the district court ruled that it could not award compensation for unpaid law clerk time, when it actually ruled that it would not.  The panel denied Plaintiffs' cross-appeal.

Concerning the medical needs appeal, the panel affirmed the district court's termination order, which denied Defendants' request to terminate certain Performance Measures.  The panel rejected Defendants' argument that the district court erred in finding that ADC's monitoring system was unreliable.   The panel also rejected Defendants'

challenge to the district court's legal interpretation of the Stipulation, and Defendants' argument that the district court exceeded its authority in appointing a doctor to investigate ADC's monitoring program.  The panel affirmed the district court's HNR-Box order, in which it ordered Defendants to reinstall HNR boxes in the same number and approximate locations as before the HNR-Box system was discontinued. The panel rejected Defendants' three arguments challenging the HNR-Box order.   The panel held that it lacked jurisdiction over the district court's seven expert orders because they were neither final orders nor appealable collateral orders.   The panel dismissed the appeal to the extent it concerned those orders.

## COUNSEL

Timothy J. Berg (argued), Todd Kartchner, Courtney R. Beller, and Shannon McKeon, Fennemore Craig P.C., Phoenix, Arizona; Nicholas D. Acedo (argued), Daniel P. Struck, and Rachel Love, Struck Love Bojanowski & Acedo PLC, Chandler, Arizona; for Defendants-Appellants/Cross-Appellees.

Corene T. Kendrick (argued), Donald Specter, and Rita K. Lomio, Prison Law Office, Berkeley, California; David C. Fathi, Amy Fettig, and Jennifer Wedekind, ACLU National Prison Project, Washington, D.C.; Maya S. Abela and Rose A. Daly-Rooney, Arizona Center for Disability Law, Tucson, Arizona; for Plaintiffs-Appellees/Cross-Appellants.

**OPINION**

WALLACE, Circuit Judge:

The consolidated appeals in this comeback case arise from a class-action by prisoners in the custody of the Arizona Department of Corrections (ADC) against senior ADC officials (Defendants), in which certain prisoners (Plaintiffs) challenged ADC's provision of healthcare. Defendants appeal from eleven district court orders imposing contempt sanctions, awarding attorneys' fees to Plaintiffs, appointing expert witnesses, and otherwise enforcing obligations under a settlement agreement Defendants entered into with Plaintiffs. Plaintiffs cross-appeal from the attorneys' fees order. We affirm in part, reverse in part, dismiss in part, and remand.

I.

In 2012, Plaintiffs brought a class action alleging, in relevant part, that Defendants were deliberately indifferent to the substantial risk of serious harm that ADC's healthcare delivery policies and practices posed to Plaintiffs. On the eve of trial, the parties settled and entered into an agreement (the Stipulation), in which Defendants agreed to comply with 103 "Performance Measures" designed to improve the healthcare system at ten ADC-operated prisons.

The Stipulation provides the process by which the parties must resolve disputes over compliance. In the event Plaintiffs believe Defendants are in non-compliance with one or more of the Performance Measures, the Stipulation requires Plaintiffs to first provide Defendants a written statement describing the alleged non-compliance, to which Defendants must provide a written response. Plaintiffs and Defendants must then meet and confer in an attempt to

resolve the dispute informally and, if informal efforts fail, participate in formal mediation. If the dispute is not resolved through formal mediation, either party may file a motion to enforce the Stipulation in the district court. If the district court "finds that Defendants have not complied with the Stipulation, it shall in the first instance require Defendants to submit a plan approved by the Court to remedy the deficiencies identified by the Court."

If "the Court subsequently determines that the Defendants' plan did not remedy the deficiencies, the Court shall retain the power to enforce the Stipulation through all remedies provided by law." However, "the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of this Stipulation." The Stipulation also provides for attorneys' fees and costs for Plaintiffs' successful enforcement efforts.

Since executing the Stipulation, the parties have engaged in multiple disputes stemming from Defendants' alleged non-compliance with some of the Performance Measures. We addressed a number of these disputes in our prior decision, *Parsons v. Ryan*, 912 F.3d 486 (9th Cir. 2018) (*Parsons I*). Because the facts and procedural history of this case were detailed in that decision, we discuss them here only as necessary to explain our decision in the consolidated appeals currently before us.

On October 10, 2017, the district court issued an order (the Order to Show Cause), in which it explained that, although Defendants had been given "wide latitude to revise their remediation plans over the last two years," for "a subset of performance measures, these remediation plans have failed." The district court ordered that "effective

immediately, Defendants shall comply with" eleven specified Performance Measures "for every class member" at specified prisons. The district court also ordered Defendants to "file a list of every instance of non-compliance with this Order during December 2017," and ordered Defendants to "show cause why the Court should not impose a civil contempt sanction of $1,000 per incident of non-compliance commencing the month of December 2017."

Following hearings on Defendants' compliance with the Order to Show Cause, the district court determined that Defendants had not taken all reasonable steps to comply with the Order to Show Cause and their compliance remained below 85% for certain of the Performance Measures listed in that order.

Accordingly, on June 22, 2018, the district court issued an order holding Defendants in contempt (the Contempt Order). The district court imposed "a financial penalty of $1,000 per failed instance" for each Performance Measure listed in the Order to Show Cause "that fell below the Stipulation's threshold of 85%." Cataloguing 1,445 such violations, the district court ordered Defendants to pay $1,445,000 "to be kept in the Registry until further order of the Court." The district court entered final judgment against Defendants the same day.

Also on that same day the district court issued the following orders: an order awarding Plaintiffs attorneys' fees for work performed post-Stipulation in the amount of $1,259,991.98 (the Attorneys' Fees Order); an order partially granting and partially denying Defendants' motion to terminate the monitoring of certain Performance Measures (the Termination Order); an order requiring Defendants to reinstall Health Needs Request boxes (HNR-

boxes) for prisoners to submit forms requesting medical assistance (the HNR-Box Order); an order requiring Defendants to file a plan to implement the recommendations made by BJ Millar of Advisory Board Consulting (the Millar-Plan Order);[1] and an order requiring the parties to submit proposed experts to analyze "why deficiencies persist and to opine as to the policies and procedures necessary to compel compliance with the Stipulation" (the Compliance-Expert Order).

On December 11, 2018, the district court appointed Dr. Marc Stern as a Rule 706 expert to provide remediation plans and to review ADC's monitoring process, and it ordered the parties to confer regarding the scope of Dr. Stern's engagement (Stern-Appointment Order). On January 31, 2019, the district court issued an order accepting Dr. Stern's engagement as agreed to by the parties in a joint submission, and resolved some disputes regarding the scope of Dr. Stern's engagement (Stern-Terms of Engagement Order). On April 30, 2019, upon a request from Dr. Stern, the district court again clarified the scope of Dr. Stern's work (Stern-Standard of Care Order). On May 30, 2019, the district court—in response to an additional issue raised by Dr. Stern concerning his ability to assess mental health delivery—appointed Dr. Bart Abplanalp as a Rule 706 expert (Abplanalp-Appointment Order) focusing on mental health.

In this opinion, we address four consolidated appeals. First, Defendants appeal from the Contempt Order (the Contempt Appeal, No. 18-16358). Second, Defendants and

---

[1] The district court previously appointed Mr. Millar as a Rule 706 expert to make recommendations regarding enforcement of the Stipulation (the Millar-Appointment Order).

Plaintiffs cross-appeal from the Attorneys' Fees Order (the Attorneys' Fees Appeals, Nos. 18-16365 & 18-16424). Finally, Defendants appeal from the following orders related to the ongoing enforcement of the Stipulation (the Medical Needs Appeal, No. 18-16368): the Termination Order, the HNR-Box Order, the Millar-Plan Order, the Millar-Appointment Order, the Compliance-Expert Order, the Stern-Appointment Order, the Stern-Terms of Engagement Order, the Stern-Standard of Care Order, and the Abplanalp-Appointment Order.

For the reasons set forth below, we affirm the Contempt Order, affirm in part and reverse and remand in part the Attorneys' Fees Order, affirm the Termination Order and the HNR-Box Order, and dismiss the remainder of the Medical Needs Appeal for lack of jurisdiction.

II.

We review the district court's enforcement of a settlement agreement for an abuse of discretion. *Wilcox v. Arpaio*, 753 F.3d 872, 875 (9th Cir. 2014). Therefore, we will reverse only if the district court made an error of law or reached a result that was illogical, implausible, or without support in the record. *See United States v. Hinkson*, 585 F.3d 1247, 1261–63 (9th Cir. 2009). "[W]e defer to any factual findings made by the district court in interpreting the settlement agreement unless they are clearly erroneous." *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010). However, we review de novo the district court's interpretation of a stipulation of settlement. *See Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989).

"An appellate court reviews an award of attorney's fees and costs for an abuse of discretion." *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (citations omitted). "A

district court abuses its discretion if its fee award is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Id.*

## III.

Defendants challenge the Contempt Order on the grounds that (A) the district court lacked the power to hold them in contempt; (B) the district court imposed criminal contempt sanctions without affording them adequate due process; (C) the amount of the sanctions was excessive; (D) the district court improperly modified the Stipulation to require 100% compliance; and (E) the district court improperly modified the Stipulation by requiring reporting on all instances of non-compliance. We address these arguments in turn.

## A.

We begin with Defendants' argument that the district court lacked the power to hold them in contempt. Defendants provide two reasons why the district court supposedly lacked this power.

First, Defendants argue that the Stipulation is a private settlement agreement, and as such, it is not enforceable via the district court's contempt powers. Defendants are correct, as a legal matter, that contempt is only available when the district court finds by clear and convincing evidence that a party "violated a specific and definite order of the court." *Stone v. City and Cty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992).

However, this principle is unhelpful to Defendants because the Contempt Order was not based on violations of the Stipulation—but rather, it was explicitly based on

violations of the Order to Show Cause. The Contempt Order requires Defendants to pay a "financial penalty" as "a result" of their failure to "take all reasonable steps to comply with the Court's [Order to Show Cause]," in light of Defendants' "knowledge" of the Order to Show Cause and the fact that Defendants had an "opportunity to be heard about their non-compliance." Moreover, the Contempt Order exclusively imposed penalties for Defendants' failure to comply with some of the 11 Performance Measures outlined in the Order to Show Cause—not for a failure to comply with any of the other 92 Performance Measures outlined in the Stipulation. *Compare* Order to Show Cause (ordering Defendants to comply with Performance Measures 11, 35, 39, 44, 46, 47, 50, 51, 52, 54, 66), *with* Contempt Order (holding Defendants in contempt for violating Performance Measures 35, 44, 46, 47, 50, 51, 52, 54, 66).

Second, Defendants argue that their noncompliance with the Order to Show Cause cannot be the basis for the Contempt Order because the Order to Show Cause is, itself, void. According to Defendants, an order to show cause is "merely a vehicle for enforcing a court's prior order"—not for enforcing a private agreement like the Stipulation. While Defendants are correct that the Order to Show Cause did not assert that any past violation of the district court's orders had occurred, we disagree that it is void.

The Stipulation provides the district court the authority to "enforce this Stipulation through all remedies provided by law," subject to a few limitations. Ordering Defendants to comply with a specific subset of the Performance Measures they agreed to in the Stipulation is one such "remed[y] provided by law," namely, an injunction requiring specific performance. We have previously upheld the district court's power to issue such injunctions to enforce the Stipulation in

this case. *See Parsons I*, 912 F.3d at 499–501 (upholding the Outside Provider Order, which required Defendants to "use all available community healthcare services" to ensure compliance with certain Performance Measures).

Moreover, "the Stipulation is clear on the limits of the district court's authority to enforce the Stipulation." *Parsons I*, 912 F.3d at 497. One of those limitations deprives the district court of "the authority to order Defendants to construct a new prison or to hire a specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of this Stipulation." This limitation would be superfluous if the district court lacked injunctive powers generally. "It is a cardinal rule of the construction of contracts that some effect is to be given, if possible, to every part thereof." *Aldous v. Intermountain Bldg. & Loan Ass'n of Ariz.*, 284 P. 353, 355 (Ariz. 1930). Although the district court's enforcement authority is limited by the terms of the Stipulation, Defendants have not shown that the Order to Show Cause exceeds those limitations or is otherwise inconsistent with other terms of the Stipulation. *Cf., e.g.*, *Parsons I*, 912 F.3d at 503 ("The parties set the benchmark for inclusion in the subclass at 14 hours; the district court cannot unilaterally move that benchmark to 15.5 hours").

We conclude that the district court acted within its authority in issuing the Order to Show Cause, and thus Defendants' noncompliance with that order may properly serve as the basis for the Contempt Order. *See Spallone v. United States*, 493 U.S. 265, 276 (1990) (explaining that federal courts have inherent power to enforce their lawful orders through contempt).

### B.

Defendants next argue that the Contempt Order must be vacated because it imposed criminal sanctions on Defendants without affording them due process.[2] Plaintiffs concede that criminal due process protections (such as a jury trial) were not observed, but contend that the Contempt Order was civil in nature. Thus, the relevant question is whether the Contempt Order was criminal or civil.

To determine whether contempt sanctions are civil or criminal, we examine "the character of the relief itself." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828 (1994). A "sanction generally is civil if it coerces compliance with a court order or is a remedial sanction meant to compensate the complainant for actual losses." *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013), *citing Bagwell*, 512 U.S. at 829. "A criminal sanction, in contrast, generally seeks to punish a 'completed act of disobedience.'" *Id.*, *quoting Bagwell*, 512 U.S. at 829.

Here, the "character" of the sanction was primarily coercive. The district court explicitly stated that the purpose of holding Defendants in contempt was to "compel compliance" because the "mere threat of monetary sanctions" in the Order to Show Cause was "not sufficient." Moreover, the district court utilized the paradigmatic coercive contempt sanction of prospective, conditional fines

---

[2] Defendants argue in a footnote that, "[e]ven if this Court finds that the Sanctions Order was civil in nature, a heightened standard of due process was still required." Defendants do not elaborate on what this heightened standard is or how the district court failed to provide it. This argument is therefore forfeited due to inadequate briefing. *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

outlined in the Order to Show Cause and ordered Defendants to continue filing monthly reports regarding their compliance. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) ("coercive civil sanctions, intended to deter, generally take the form of conditional fines").

The sanction was also compensatory. The district court concluded that "civil contempt sanctions against Defendants" were warranted "to address Plaintiffs' injuries resulting from [Defendants'] noncompliance." To that end, the district court ruled that it would use the funds for the benefit of the class "to further compliance with the healthcare requirements of the Stipulation," and it ordered the parties to provide proposals for how best to do so. *Cf. Shell Offshore*, 815 F.3d at 629 n.4 ("Whether fines are payable to the opposing party or to the court may also be a factor in deciding whether they are coercive or compensatory"). Furthermore, Defendants could not purge the fines after the violations occurred, which indicates that the harm suffered by Plaintiffs in those months needed to be redressed. *See id.* at 629 ("Because civil compensatory sanctions are remedial, they typically take the form of unconditional monetary sanctions").

Although the "line between civil and criminal contempt" can become "blurred" in cases where "noncompensatory sanctions" are predicated on "out-of-court disobedience to complex injunctions," no such blurriness exists here because, as explained above, the sanction in the Contempt Order was also compensatory. *Ahearn*, 721 F.3d at 1129. The Supreme Court's decision in *Bagwell* "leaves unaltered the longstanding authority of judges . . . to enter broad compensatory awards for all contempts through civil proceedings." *Id.* at 1130, *citing Bagwell*, 512 U.S. at 838.

Finally, nothing in the record suggests that the sanctions were punitive. Prospective, conditional fine schedules do not bear any of the hallmarks of punitive contempt, such as retroactivity and determinacy. *See Bagwell*, 512 U.S. at 828–30. The fact that Defendants had no purge option after December 2017 does not necessarily reflect that the sanctions were imposed as punishment because Defendants were able to avoid the sanctions by complying with the October 2017 Order to Show Cause before the December 2017 reporting period. *See CBS v. FilmOn.com, Inc.*, 814 F.3d 91, 102 (2d Cir. 2016) ("[A] court's sanction does not become criminal even if the court does not afford the party an additional opportunity to purge because the sanctions were prompted by the party's previous failure to purge"). Defendants' complaints about the district court's oral remarks alluding to punishment do not alter our conclusion because subjective intent is not the applicable standard for determining whether contempt is criminal. *See Bagwell*, 512 U.S. at 828; *see also Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 926 F.3d 534 (9th Cir. 2019) (rejecting the "misguided" argument that sanctions "must be deemed criminal in nature because the district court stated that it was imposing the sanctions in part to deter future violations of the preliminary injunction").

Because the Contempt Order was coercive and compensatory, we hold that it was civil in nature, and thus, Defendants were not entitled to criminal due process protections. As a result, Defendants have not established that the district court deprived them of due process.

## C.

Defendants next argue that remand of the Contempt Order is required because the district court failed to make the requisite findings to justify a $1,000 sanction per violation.

Defendants' sole authority for this point is *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983).

As we explained above, the Contempt Order here was coercive and compensatory. Coercive sanctions may only be imposed "after a reasoned consideration" of "the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Shuffler*, 720 F.2d at 1148. Similarly, compensatory fines "must be based on" the "actual losses sustained as a result of contumacy." *Id.*

The instant case is distinguishable from *Shuffler*. In that case, we vacated contempt sanctions because the district court made "no written statement of the purpose or purposes underlying its imposition of a $500 daily fine" and the appellee "ha[d] not pointed to any portion of the record demonstrating that the district court imposed the fine after a reasoned consideration of these criteria." *Id.* at 1147–48. Here, by contrast, the district court explained why it was holding Defendants in contempt and why it selected the prospective fine schedule. For example, in the Order to Show Cause, when establishing a prospective and conditional fine schedule, the district court wrote:

> Any exercise of the Court's contempt authority in this matter would be intended to spur Defendants' compliance with the performance measures that they have contractually agreed to perform. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (describing coercive civil contempt). When Defendants provide the health care required by the Stipulation, the contempt will purge. *Int'l Union, UMWA*

> *v. Bagwell*, 512 U.S. 821, 829 (1994). The
> power of economic carrots and sticks is
> clearly understood by Defendants. (Doc.
> 2295; Doc. 2330 at 195–197) Accordingly,
> the Court expects this to be an effective and
> short-lived tool that creates compliance with
> the Stipulation.

This reasoning demonstrates that the district court gave "reasoned consideration" to "the probable effectiveness of any suggested sanction in bringing about the result desired." *Shuffler*, 720 F.2d at 1148.

Similarly, in the Contempt Order, the district court extensively documented Defendants' failures to comply with the district court's Performance Measures and explained that the sanctions were warranted to "address Plaintiffs' injuries resulting from [Defendants'] noncompliance." This explanation demonstrates that the district court gave "reasoned consideration" to "the character and magnitude of the harm" and to "actual losses sustained as a result of contumacy." *Shuffler*, 720 F.2d at 1148.

Based on the reasoning in the district court's orders, we conclude that such orders were sufficiently detailed and therefore remand is not required.

## D.

We turn now to Defendants' argument that the district court improperly modified the Stipulation by requiring 100% compliance with the Performance Measures. The Stipulation defines "substantial compliance" during the

relevant timeframe[3] as "meeting or exceeding an eighty-five percent (85%) threshold for the particular Performance Measure that applies to a specific complex." In the Contempt Order, the district court interpreted the Stipulation's 85% threshold as "simply a triggering point for the Court's intervention," and stated that the "Stipulation requires 100% compliance with each of its Performance Measures." Defendants argue that the district court improperly modified the Stipulation by requiring 100% compliance with the Performance Measures.

We have already rejected an analogous argument from Defendants concerning the Outside Provider Order (OPO) in *Parsons I*, 912 F.3d at 500. The OPO required Defendants to use outside medical providers to treat prisoners whom Defendants had failed to treat within the time-frame detailed in Performance Measures "immediately after the expiration" of that time-frame. *Id.* at 499–500. Defendants objected to the OPO on the grounds that it "effectively re-writes the Stipulation to require 100 percent compliance with the performance measures, rather than 80 percent." *Id.*

In rejecting this argument, we held that "[a]lthough the OPO requires Defendants to use outside providers if Defendants cannot otherwise treat inmates within the prescribed time frame, it does not, in fact change the threshold for substantial compliance," which was 80% at that time. *Id.* at 500. As we explained:

---

[3] The Contempt Order was based on Defendants' noncompliance in December 2017. The Stipulation provides an 85% threshold for substantial compliance "[a]fter the first twenty four months after the effective date of this Stipulation," which was February 25, 2015.

> [T]he OPO is simply a remedy to address Defendants' non-compliance, it does not change what constitutes compliance for purposes of avoiding judicial enforcement. So long as Defendants meet or exceed the 80 percent benchmark provided in the Stipulation, the OPO has no effect. Therefore, we disagree with the notion that the OPO effectively requires 100 percent compliance.

*Parsons I*, 912 F.3d at 500.

The same reasoning applies here. The district court determined that the Stipulation requires 100% compliance once a Performance Measure falls below the 85% threshold, which serves as a "triggering point for the Court's intervention." The district court imposed sanctions only for Performance Measures that "have remained below the Stipulation's 85% threshold." Thus, as with the OPO, "the [contempt order] is simply a remedy to address Defendants' non-compliance, it does not change what constitutes compliance for purposes of avoiding judicial enforcement." *Parsons I*, 912 F.3d at 500. "So long as Defendants meet or exceed the [85] percent benchmark provided in the Stipulation, the [Contempt Order] has no effect." *Id.*

Simply put, the district court did not exercise its discretion to impose contempt sanctions based on its legal conclusion that "[t]he Stipulation requires 100% compliance with each of its Performance Measures." Therefore, any error committed by the district court in interpreting the Stipulation to require 100% compliance had no impact on the Contempt Order, and would therefore not be grounds for reversing that order.

E.

Finally, Defendants seek reversal of the Contempt Order on the grounds that the district court purportedly modified the Stipulation by ordering Defendants to "file monthly reports reflecting every instance of noncompliance" for certain Performance Measures "that are at less than 85% compliance." As Defendants point out, compliance under the Stipulation "shall be measured and reported monthly at each of ADC's ten (10) complexes [based on] . . . a protocol to be used for each performance measure, attached as Exhibit C." Exhibit C establishes the measuring protocol for each Performance Measure, and the most common method is through a random sampling of 10 records each month. Defendants contend that, because the Stipulation sets forth a random sampling process for measuring compliance, the Stipulation prohibits the district court from ordering comprehensive reporting.

We start with the premise that the district court "cannot unilaterally" alter the terms of the Stipulation. *Parsons I*, 912 F.3d at 503; *see also Isaak v. Mass. Indem. Life Ins. Co.*, 623 P.2d 11, 14 (Ariz. 1981) ("It is not within the power of [a] court to 'revise, modify, alter, extend, or remake' a contract to include terms not agreed upon by the parties"). However, this principle does not resolve the dispute here because the Stipulation also authorizes the district court to remedy "deficiencies" via "all remedies provided by law" (with a few exceptions that do not apply here), and Defendants do not argue that ordering monthly reports to

ascertain compliance with a court-approved plan is not a remedy at law.[4]

Instead, Defendants appear to conflate the fact that the Stipulation requires a random sampling to *measure* compliance with the fact that the Contempt Order requires comprehensive *reporting*. However, the two requirements are distinct and not necessarily inconsistent. While ordering comprehensive *reporting* of noncompliance falls within the district court's authority under the Stipulation pursuant to the "all remedies provided by law" clause, the district court may not *measure* noncompliance using comprehensive monthly reporting because the Stipulation expressly sets forth random sampling protocols for measuring compliance. *Cf. Parsons I*, 912 F.3d at 503 ("The parties set the benchmark for inclusion in the subclass at 14 hours; the district court cannot unilaterally move that benchmark to 15.5 hours").

Although somewhat unclear, the record suggests the district court measured compliance pursuant to the random sampling protocols set forth in the Stipulation. In the Contempt Order, the district court determined that certain Performance Measures were below the 85% substantial compliance threshold by reviewing Defendants' Notice Relating to Performance Measures for the May 9, 2018 Status Hearing (Dist. Dkt. No. 2801-1). That document, unfortunately, does not indicate how Defendants measured compliance. However, given Defendants' litigation position in this case—namely that comprehensive manual reporting is an "impossible task" which contravenes the agreed-upon

---

[4] Nor could they; district courts routinely issue such orders. *See, e.g., Coleman v. Brown*, No. CIV. S-90-520 LKK, 2014 WL 1091864, at *3 (E.D. Cal. Mar. 18, 2014) (ordering "monthly reports as to whether the project has been or can be accelerated").

method in the Stipulation—it seems almost certain that
Defendants calculated their substantial compliance based on
the Stipulation's random sampling protocols. Defendants'
failure to argue otherwise in their briefs further suggests that
they measured compliance pursuant to the random sampling
method provided by the Stipulation. On this record, we do
not conclude that the district court based its Contempt Order
on comprehensive measurements, and thus there was no
reversible error.

In sum, we conclude the district court did not abuse its
discretion in issuing the Contempt Order.

## IV.

We turn now to the parties' cross-appeals from the
Attorneys' Fees Order, in which the district court awarded
fees pursuant to Paragraph 43 of the Stipulation. That
paragraph provides for attorneys' fees and costs as follows:

> In the event that Plaintiffs move to enforce
> any aspect of this Stipulation and the
> Plaintiffs are the prevailing party with respect
> to the dispute, the Defendants agree that they
> will pay reasonable attorneys' fees and costs,
> including expert costs, to be determined by
> the Court. The parties agree that the hourly
> rate of attorneys' fees is governed by
> 42 U.S.C. § 1997e(d).

In the Attorneys' Fees Order, the district court awarded
Plaintiffs attorneys' fees for work performed post-

Stipulation,[5] holding that such fees were compensable under the Stipulation because that work was "driven by Plaintiffs' attempts to enforce the Stipulation." The district court set the hourly rate for each year at Plaintiffs' suggested base rate, and applied a 2X fee enhancement. The district court also granted Plaintiffs copying costs but denied them unpaid law clerk time. The district court calculated the award at $1,259,991.98 and subsequently entered judgment against Defendants for that amount.

## A.

Defendants argue that the Attorneys' Fees Order should be reversed because the district court erroneously (1) awarded fees and costs in excess of the fees authorized by the Stipulation; (2) set the base hourly rate too high; (3) set the paralegal based hourly rate based on the wrong geographic market; and (4) improperly enhanced the fee award by a 2X multiplier. We address these arguments in turn.

## 1.

Defendants contend that Paragraph 43 only permits an award of fees and costs for work that was directly related to a successful motion to enforce a provision in the Stipulation that "expressly requires Defendants to do some act." The district court rejected this interpretation as "inappropriately narrow" because activities other than motion practice were also "driven by Plaintiffs' attempts to enforce the stipulation." Defendants argue that the district court's

---

[5] Attorneys' fees prior to the Stipulation were negotiated separately and are not at issue here.

interpretation of the Stipulation is erroneous in light of the "move to enforce" language in Paragraph 43.

Reviewing the district court's legal interpretation de novo,[6] *Andrus*, 899 F.2d at 759, we agree with the district court. We reject Defendants' contention that Paragraph 43 only applies to time spent related to documents bearing the title "Motion to Enforce." While Paragraph 43 does contain the phrase "move to enforce," we decline to interpret the Stipulation as only providing fees and costs for work pertaining to motions.

The term "move" is somewhat ambiguous because it "may be susceptible to multiple interpretations," *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993). Considering "the plain meaning of the words as viewed in the context of the contract as a whole," *Earle Invs., LLC v. S. Desert Med. Ctr. Partners*, 394 P.3d 1089, 1092 (Ariz. Ct. App. 2017), we construe the term to mean "to prompt or rouse to the doing of something"—which, in this case, refers to the process the Stipulation requires Plaintiffs to engage in to "prompt" Defendants or the Court to enforce the Stipulation. *See Move*, Merriam-Webster Dictionary (11th ed. 2019), https://www.merriam-webster.com/dictionary/move; *see also id.* (defining "move" as "a step taken especially to gain an objective"). This interpretation is compelling when viewing the Stipulation

---

[6] Plaintiffs argue that we should give deference to the district court's interpretation of the Stipulation in light of the district court's extensive oversight of the enforcement process. However, Plaintiffs' cited authority only supports the proposition that a court of appeals may give deference to a district court's interpretation of a consent decree. Because we affirm without providing such deference, we do not reach the question of whether such deference extends to the district court's interpretation of the Stipulation.

"as a whole" because the Stipulation expressly requires that Plaintiffs' enforcement efforts begin with providing Defendants written notice of non-compliance, followed by meeting and conferring with Defendants to resolve disputes informally, which, if necessary, is followed by mediation, and finally—if all of those steps do not "prompt" Defendants to change course—Plaintiff may file a motion before the district court. Thus, any enforcement motions filed in court are merely the proverbial tip of the iceberg for the enforcement process required by the Stipulation. In light of these requirements, we conclude it would be unreasonable and defy the expectations of the parties to limit reimbursements only to work related to documents bearing the moniker "motion to enforce." *See Bryceland v. Northey*, 772 P.2d 36, 39 (Ariz. Ct. App. 1989) ("We will interpret a contract in a manner which gives a reasonable meaning to the manifested intent of the parties rather than an interpretation that would render the contract unreasonable").

We also reject Defendants' contention that Paragraph 43 only applies to the enforcement of "provision[s] in the Stipulation that expressly require[] Defendants to do some act." The plain language of the Stipulation supports an award of fees for enforcement of "*any aspect*" of the Stipulation in which Plaintiffs "are the prevailing party with respect to the dispute." Plaintiffs have repeatedly prevailed in disputes to enforce aspects of the Stipulation separate and apart from provisions directly requiring Defendants to act. For example, despite the fact that the Stipulation defined being "seen" by a mental health professional as "an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter," Defendants unilaterally implemented a new definition of being "seen" to include non-confidential group and cell-front encounters (where the prisoner is not allowed

to leave the cell). Had Plaintiffs not successfully enforced the definition of being "seen," Defendants' interpretation would have inflated Defendants' compliance scores for various Performance Measures pertaining to mental health, and effectively stifled the enforcement of the Stipulation. Denying Plaintiffs fees and costs for work relating to this interpretative dispute merely because it did not directly enforce a provision that "expressly requires Defendants to do some act" contravenes the plain language of Paragraph 43, which provides an award of fees for enforcement of "*any aspect*" of the Stipulation.

Finally, Defendants argue that Plaintiffs' time entries failed to establish their entitlement to fees and costs under Paragraph 43 because those entries did not contain sufficient details identifying a specific successful motion to enforce. The district court concluded that "[a]ll of these matters are before the Court because Defendants have not satisfied their obligations under the Stipulation thereby requiring Plaintiffs to move to enforce it." We review the district court's award for abuse of discretion, under which a "district court abuses its discretion if its fee award is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Barjon*, 132 F.3d at 500.

Defendants fail to establish that the district court based its award on an inaccurate view of the law: as we explained above, the Stipulation does not limit reimbursements to time-entries relating to a successful motion to enforce. Moreover, attorneys "need only 'keep records in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed.'" *United Steelworkers of Am. v. Retirement Income Plan for Hourly-Rated Emps. of ASARCO, Inc.*, 512 F.3d 555, 565 (9th Cir. 2008) (citations

omitted). A review of the billing entries flagged by Defendants does not suggest that the court committed legal error under this standard.[7]

We evaluate under the "clearly erroneous" standard the district court's factual finding that the activities for which Plaintiffs sought compensation were eligible enforcement activities. *Barjon*, 132 F.3d at 500. In doing so, we are mindful that the determination of fees "should not result in a second major litigation," and "trial courts need not, and indeed should not, become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Rather, the "essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Id.* "So trial courts may take into account their overall sense of [an action], and may use estimates in calculating and allocating an attorney's time" and "appellate courts must give substantial deference to these determinations, in light of the district court's superior understanding of the litigation." *Id.* As the Supreme Court declared, "[w]e can hardly think of a sphere of judicial decision-making in which appellate micromanagement has less to recommend it." *Id.*

The parties agree that the district court erroneously awarded fees for certain activities that the district court had

---

[7] In fact, some of the entries flagged by Defendants appear to meet even the more demanding standard Defendants proffered. For example, two entries at the end of March 2016 provide that one attorney "restructured and drafted Motion to Enforce" and another "[e]dit[ed] motion to enforce." A review of the docket leads to the reasonable conclusion that these entries pertain to the motion to enforce filed on April 11, 2016.

previously ruled were prohibited.**8** However, apart from these entries, Defendants fail to establish that the district court's factual findings were "clearly erroneous," *Barjon*, 132 F.3d at 500. By lodging blanket objections against nearly all of Plaintiffs' entries, Defendants invite the exact type of "appellate micromanagement" the Supreme Court cautioned against in *Fox*. We conclude that Plaintiffs' time entries were sufficient for the district court to make a reasonable attorneys' fees award, and thus the district court did not abuse its discretion in relying on them.

2.

Defendants next argue that that the district court erroneously set Plaintiffs' attorneys' base hourly rate higher than the rate permitted by the Stipulation. For the reasons set forth below, we agree that the district court erroneously set the rate higher than permitted under the Stipulation, but disagree with the alternative rate proposed by Defendants.

The Stipulation provides that "the hourly rate of attorneys' fees is governed by 42 U.S.C. § 1997e(d)." Section 1997e(d) provides: "No award of attorney's fees . . . shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel." *See* 42 U.S.C. § 1997e(d)(3). Section 3006A, which codifies the Criminal Justice Act (CJA), requires that the Judicial Conference of the United States "develop guidelines for determining the

---

**8** As outlined in the parties' briefs, these hours include: 2.9 hours related to correspondence with the media and appellate matters and 8.1 hours for maximum-custody Performance Measures. As explained below, we remand the Attorneys' Fees Order for other reasons. On remand, the district court should modify its order to exclude these entries from any fees award.

maximum hourly rates for each circuit" and authorizes the Judicial Conference of the United States to "raise the maximum hourly rates . . . at intervals of not less than 1 year each," subject to certain limits not relevant here. *See* 18 U.S.C. § 3006A(d)(1).

The district court determined that the Judicial Conference set this rate at $146 an hour for 2017 based on a document prepared by the Administrative Office of the U.S. Courts called the "Judiciary Fiscal Year 2017 Congressional Budget Summary" ("Congressional Budget Summary"). It then multiplied this $146 rate by 150% and arrived at the rate of $219 per hour for fiscal year 2017. The district court appears to have undertaken the same analysis in setting Plaintiffs' rates at $216 per hour for work performed in 2016, and at $213 per hour for work performed in 2015.

While Plaintiffs essentially defend the district court's decision,[9] Defendants argue that the district court erred in two ways. First, Defendants argue that the district court erred by consulting the Congressional Budget Summary in order to derive the base hourly rate. Instead, according to Defendants, the district court should have derived the rate from Volume 7 of the Guide to Judiciary Policy (the Guide). Second, Defendants contend that the $146 figure that the district court derived from the Congressional Budget Summary does not reflect the amount that the Judicial Conference set, and instead, that rate merely represents the

---

[9] Plaintiffs also argue that Defendants forfeited this argument by failing to raise it to the district court. We disagree. Defendants raised this argument clearly and distinctly in their objection to Plaintiffs' second request for attorneys' fees. While the district court appears to have disregarded this filing, the argument was nonetheless made and the issue was preserved for appeal.

"maximum rate authorized in statute" according to the Congressional Budget Summary's own description.

We review the district court's interpretation of the Stipulation and the relevant statutes de novo. *See P.N. v. Seattle Sch. Dist. No. 1*, 474 F.3d 1165, 1168 (9th Cir. 2007) ("any elements of legal analysis and statutory interpretation underlying the district court's attorneys' fees decision are reviewed de novo"). While we disagree with Defendants that the district court erred by consulting the Congressional Budget Summary, we hold that the district court erred by relying on the $146 figure in the Congressional Budget Summary.

As stated above, the Stipulation provides that "the hourly rate of attorneys' fees is governed by 42 U.S.C. § 1997e(d)." We begin by examining the plain language of that statute, which is a component of the Prison Litigation Reform Act (PLRA). *See Republic of Ecuador v. Mackay*, 742 F.3d 860, 864 (9th Cir. 2014). Section 1997e(d) provides: "No award of attorney's fees . . . shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel." 42 U.S.C. § 1997e(d)(3). In other words, Section 1997e(d) provides the district court the "authority to award attorney's fees up to 150 percent of the hourly rate for counsel established in the Criminal Justice Act, 18 U.S.C. § 3006A." *Perez v. Cate*, 632 F.3d 553, 555 (9th Cir. 2011).

Section 3006A, in turn, requires that the Judicial Conference "develop guidelines for determining the maximum hourly rates for each circuit" and authorizes the Judicial Conference of the United States to "raise the maximum hourly rates . . . at intervals of not less than 1 year each," subject to certain limits not relevant here. *See* 18 U.S.C. § 3006A(d)(1). Thus, the relevant question is

what source definitively reflects the "raise[s]" authorized by the Judicial Conference.

Defendants assert that we must consult the Guide because it constitutes the "guidelines of the Judicial Conference of the United States for the administration and operation of the Criminal Justice Act,"[10] and because it explicitly sets forth maximum hourly rates.[11] Defendants also cite four cases from district courts in the Eastern District of California and Northern District of California applying the rates set forth in the Guide.

However, we previously rejected this argument. *See Perez*, 632 F.3d at 558. In rejecting other prison officials' emphasis on the "direction in 18 U.S.C. § 3006A to develop guidelines for determining the maximum hourly rates for attorney's fees," we explicitly held that these "guidelines are not binding on a court tasked with determining the maximum allowable hourly rate under the PLRA, because such guidelines do not themselves constitute the Judicial Conference's determination of the rate that is justified for a circuit or district." *Id.* We concluded that the "calculation required by the PLRA is not limited by the hourly rates

---

[10] Defendants quote the website hosting the Criminal Justice Act (CJA) Guidelines, https://www.uscourts.gov/rules-policies/judiciary-policies/criminal-justice-act-cja-guidelines (last visited Jan. 14, 2020).

[11] *See* Guide to Judiciary Policy, Vol 7 Defender Services, Part A Guidelines for Administering the CJA and Related Statutes, Chapter 2: Appointment and Payment of Counsel § 230.16(a), https://www.uscourts.gov/rules-policies/judiciary-policies/cja-guidelines/chapter-2-ss-230-compensation-and-expenses#a230_16 (last visited Jan. 14, 2020) ("Except in federal capital prosecutions and in death penalty federal habeas corpus proceedings, compensation paid to appointed counsel for time expended in court or out of court or before a U.S. magistrate judge may not exceed the rates in the following table").

suggested by the Judicial Conference" in the Guide. *Id.* at 557–58.

Instead, in order to determine the maximum hourly rates set by the Judicial Conference, we reviewed the Congressional Budget Summary, which revealed that the Judicial Conference's budgetary request to Congress incorporated a $113 rate. *Id.* at 555–56, *citing* Admin. Office of the U.S. Courts, *Fiscal Year 2002 Congressional Budget Summary* 6.13 (Feb. 2001). We also cited the Report of the Proceedings of the Judicial Conference of the United States, which explained that the Judicial Conference ratified the Defender Services Committees' recommended rate of $113 and modified its budget request accordingly. *Id.* at 556 n.1, *citing Report of the Proceedings of the Judicial Conference of the United States* (Sept. 19, 2000) at 44–45, https://www.uscourts.gov/sites/default/files/2000-09.pdf (last visited Jan. 14, 2020).

Therefore, *Perez* instructs us that the relevant rate under Section 3006A is the one that the Judicial Conference authorized and requested as evidenced by the Congressional Budget Summary and the Report of the Proceedings of the Judicial Conference of the United States—not what Congress ultimately allocated as evidenced by the Guide. This instruction is consistent with our conclusion in *Webb v. Ada County* that "the amount actually paid to CJA counsel" due to "lack of congressional funding" is irrelevant to the rate determination under Section 3006A. 285 F.3d 829, 839 (9th Cir. 2002). It is also consistent with the conclusion of our sister circuit that, because Section 3006A "contains no reference to congressional appropriations," the "language of the statute indicates that Congress intended the PLRA rate to be determined by the Judicial Conference" alone. *Hadix v. Johnson*, 398 F.3d 863, 867–68 (6th Cir. 2005); *see also id.*

("the maximum allowable attorney fees under the PLRA should be based on the amount authorized by the Judicial Conference, not the amount actually paid to court-appointed counsel under the CJA").

In light of this precedent, we hold that the "hourly rate established under section 3006A" within the meaning of 42 U.S.C. § 1997e(d)(3) is the amount the Judicial Conference authorized and requested from Congress. We further hold that the district court did not err in consulting the Congressional Budget Summary to derive this rate.[12]

However, the district court's selection of $146 as the relevant rate within the Congressional Budget Summary merits further scrutiny. The Congressional Budget Summary for Fiscal Year 2017 provides:

> The requested funding supports a $6 hourly rate increase above inflation from $131 to $137 per hour for non-capital cases in FY 2017 (the maximum rate authorized in statute is $146 per hour). The judiciary assumes that there will be a $2 cost-of living adjustment in FY 2017, raising the CJA base rate from $129 per hour to $131 per hour for FY 2017. The $6 rate increase is needed to ensure that courts retain and recruit qualified and experienced criminal defense practitioners

---

[12] The other source we consulted in *Perez*—the Report of the Proceedings of the Judicial Conference of the United States—is silent as to what rate the Judicial Conference authorized and requested for Fiscal Year 2017. *See* R*eport of the Proceedings of the Judicial Conference of the United States* (Sept. 17, 2015), https://www.uscourts.gov/sites/default/files/2015-09-17_0.pdf.

for their CJA panels. The annualized cost of
this increase is $15.1 million.

Following *Perez*, we conclude that the $146 base rate
employed by the district court is incorrect because it merely
represents the "maximum rate authorized in statute"—not
the amount authorized and requested by the Judicial
Conference. Instead, the correct CJA panel rate here is $137
per hour for Fiscal Year 2017, 150% of which is $205.50 per
hour.

We vacate the Attorneys' Fees Order and remand to the
district court with instructions to recalculate the fee award
consistent with this Opinion by determining the correct rates
for each year and applying these rates to Plaintiffs' time-
entries. As we explained above, however, the district court
should exclude from any fee award the 11 hours erroneously
included, *see* fn. 8, *supra*. Finally, we agree with the parties
that the district court should modify the costs award down
by $1,285.79 in light of the district court's failure to reflect
the downward adjustments in its prior order.

3.

Defendants next argue that the district court erred by
setting the paralegal rate at $219 per hour (the amount the
district court determined to be the maximum rate under the
PLRA) for paralegal work performed in the San Francisco
Bay Area, and at $160 per hour for paralegal work
performed in Washington, D.C. According to Defendants,
the district court should have applied a $125 rate—the rate
for paralegal work in Phoenix, Arizona—for all paralegal
work even though Plaintiffs' paralegals actually worked in
the San Francisco Bay Area and Washington D.C.

We reject Defendants' argument that the district court erred in applying Bay Area and D.C. paralegal market rates and instead of the market rate in Phoenix. "[R]ates, other than those of the forum, may be employed if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992). Plaintiffs have submitted uncontroverted evidence regarding the unavailability of local counsel to handle complicated and low-paying prison cases such as this one. There is thus a factual and legal basis for the district court to award fees based on rates outside Phoenix.[13]

We also reject Defendants' challenge to the district court's assignment of the PLRA maximum rate to the paralegal work performed in the San Francisco Bay Area. As we explained in *Perez*, paralegals are entitled to the PLRA's maximum hourly rate if the paralegal market rate exceeds that cap. 632 F.3d at 557. Defendants do not contest Plaintiffs' evidence indicating that the prevailing market rate for paralegal work was $250 per hour in the San Francisco Bay Area—which exceeds the PLRA rate. Accordingly, district court did not err in applying the PLRA maximum rate to the paralegal work performed in the San Francisco Bay Area.

However, as we explained above, the correct maximum rate is the amount the Judicial Conference authorized and

---

[13] Defendants assert that local counsel *must* have been available because local law firms are co-counsel for Plaintiffs. However, the availability of local counsel to handle ancillary matters like meeting with clients and touring prisons does not imply that such counsel could have handled the case in its entirety. *See Gates*, 987 F.2d at 1405.

requested from Congress, which can be found in the
Congressional Budget Summary. *See* Section IV.A.2, *supra*.
The 2017 maximum rate is $205.50 per hour, *id.*—not $219.
Accordingly, we reverse and remand with instructions for
the district court to re-calculate the fees awarded for
paralegal work in light of the correct rates.

4.

Finally, Defendants argue that the district court erred by
enhancing the fee award with a double multiplier.
Defendants contend that the Stipulation does not allow for a
multiplier, the PLRA does not allow for a multiplier, and,
even if a multiplier were permissible, the district court
abused its discretion by concluding one was appropriate
here. We reject Defendants' first two contentions, but agree
with the last.

The Stipulation explicitly incorporates the PLRA's rules
for determining "reasonable attorneys' fees and costs,"
because it provides that the hourly rate is "governed by
42 U.S.C. § 1997e(d)"—which codifies the PLRA. The
PLRA, in turn, authorizes multipliers to the base hourly rate
above the cap set by 42 U.S.C. § 1997e(d)(1). *See Kelly v.
Wengler*, 822 F.3d 1085, 1100 (9th Cir. 2016).[14]

---

[14] Defendants argue that we should overrule *Kelly* because it is
inconsistent with intervening Supreme Court decision *Murphy v. Smith*,
138 S. Ct. 784 (2018). Under the law of this circuit, panel decisions are
binding on future panels unless the Supreme Court (or our en banc court)
has "undercut the theory or reasoning underlying the prior circuit
precedent in such a way that the cases are clearly irreconcilable." *Miller
v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). That is not the
case here. *Murphy* concerned only the interpretation of 42 U.S.C.
§ 1997e(d)(2), and it did not disapprove the lodestar method or fee

However, the district court abused its discretion by enhancing the fee award. "A strong presumption exists that the lodestar figure represents a reasonable fee," and the district court must "decide whether to enhance or reduce the lodestar figure based on an evaluation" of the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975), "that are not already subsumed in the initial lodestar calculation." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 & n.4 (9th Cir. 2000) (citations and internal quotation marks omitted). "[A]ny reliance on factors that have been held to be subsumed in the lodestar determination will be considered an abuse of the trial court's discretion." *Cunningham v. Cty. of Los Angeles*, 879 F.2d 481, 487 (9th Cir. 1988).

The district court violated this rule when it decided to "evaluate the applicability of all the *Kerr* factors to determine whether an enhancement is appropriate." The district court reasoned that it could do so because "there is no true lodestar analysis here" in light of the fact that the "Stipulation set the hourly rate . . . ." This was error because the Stipulation applies the PLRA rate, which already "subsumes the [*Kerr*] factors relevant to the determination of a reasonable attorney's fee, including the novelty and complexity of the case and the quality of the attorney's performance." *Kelly*, 822 F.3d at 1103. Accordingly, the district court's reliance on several of the *Kerr* factors to justify an enhancement effectively double-counted certain factors and constituted an abuse of discretion. *See Cunningham*, 879 F.2d at 487.

---

enhancements in any way, despite explicitly discussing both the overall "surrounding statutory structure of § 1997e(d)" and the lodestar method in particular. *See* 138 S. Ct. at 789–90.

We therefore vacate the Attorneys' Fees Order and remand for the district court to reweigh whether an enhancement was appropriate.

B.

Plaintiffs' sole argument on cross-appeal is that the district court misinterpreted the law by denying Plaintiffs compensation for law clerk time, which, Plaintiffs assert, is reimbursable.

As a legal matter, Plaintiffs are correct that compensation for unpaid law clerks is permissible under 42 U.S.C. § 1988. *See Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274, 286 (1989) (rejecting argument that award "should be based on cost" and instead should be "calculated according to the prevailing market rates" (internal quotation marks and citations omitted)); *see also, e.g.*, *Rosenfeld v. U.S. Dep't of Justice*, 904 F. Supp. 2d 988, 1006 (N.D. Cal. 2012) ("That those law students and interns worked without pay is of no consequence so long as the rates for which their work was billed is 'consistent with market rates and practices.'" (quoting *Jenkins*, 491 U.S. at 286)). Plaintiffs are also correct that Section 1988 is applicable here because the Stipulation provides that "the hourly rate of attorneys' fees is governed by 42 U.S.C. § 1997e(d)," and that statute, in turn, authorizes fees under Section 1988. *See* 42 U.S.C. § 1997e(d)(1).

However, Plaintiffs incorrectly assume that the district court ruled that it *could* not award compensation for unpaid law clerk time, when it actually ruled that it *would* not. The relevant language from the district court's decision provides: "The Court will not authorize reimbursement for a cost without any evidence that a cost was, in fact, incurred." Although Plaintiffs assume that this language reflects legal

error, the better interpretation of the district court's order is that the district court believed it was unreasonable to award fees for law clerk time when Plaintiffs' law clerks were not paid. Plaintiffs have not provided any arguments for why this determination was so unreasonable as to be an abuse of discretion. *Cf. Blackburn v. Goettel-Blanton*, 898 F.2d 95, 97 (9th Cir. 1990) ("We review the reasonableness of the district court's award of fees for abuse of discretion"). We therefore consider the argument waived. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) ("[W]e ordinarily will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief" (alteration in original) (citation omitted)). Accordingly, Plaintiffs' cross-appeal is denied.

V.

We turn now to the Medical Needs Appeal, in which Defendants appeal from (A) the Termination Order, (B) the HNR-Box Order, and (C) seven orders concerning court-appointed experts tasked with assisting the district court in enforcing the Stipulation (collectively, the Expert Orders).[15] For the reasons set forth below, we affirm the Termination Order and the HNR-Box Order, and dismiss the Expert Orders for lack of jurisdiction.

A.

The Stipulation provides, in relevant part, that Defendants' "duty to measure and report on a particular performance measure . . . terminates if" two conditions are

---

[15] The Expert Orders are comprised of the Millar-Plan Order, the Millar-Appointment Order, the Compliance-Expert Order, the Stern-Appointment Order, the Stern-Terms of Engagement Order, the Stern-Standard of Care Order, and the Abplanalp-Appointment Order.

satisfied. First, the "particular performance measure that applies to a specific complex" must be "in compliance" for "eighteen months out of a twenty-four month period." Second, the "particular performance measure" to be terminated must not have "been out of compliance" for "three or more consecutive months within the past 18-month period." Otherwise, Defendants' "duty to measure and report on any performance measure for a given complex shall continue for the life of this Stipulation . . . ."

On August 25, 2017, Defendants filed a motion to terminate the monitoring of certain Performance Measures. On June 22, 2018 the district court issued the Termination Order, in which it granted Defendants' motion in part, and ordered the parties to submit names of proposed Rule 706 experts to review the monitoring process.

The district court denied Defendants' request to terminate certain Performance Measures on two independent grounds. First, the district court interpreted the Stipulation to require compliance—as measured by specific reporting procedures it previously ordered—in 18 of the 24 months preceding Defendants' motion to terminate. The district court determined that some of the Performance Measures failed under these criteria.

Second, the district court determined that Defendants' monitoring system was unreliable and held that it could not terminate monitoring of Performance Measures "without confirmation that a compliant CGAR[16] is a valid, reliable, and accurate indicator that Defendants have provided Class

---

[16] "CGAR" (short for "Compliance Green Amber Red") is used to evaluate and report Defendants' monthly performance on the Performance Measures in the Stipulation.

Members the care required by the Stipulation." The district court evaluated Defendants' data integrity and determined that it "cannot be confident that the CGARs demonstrate compliance with the Stipulation" because "there are profound and systemic concerns with the monitoring process at every stage of the process."

Defendants argue that the Termination Order should be vacated for three reasons.[17] We discuss each argument in turn.

### 1.

We begin with Defendants' argument that the district court erred by finding that ADC's monitoring system was unreliable. Defendants argue that the district court erred in finding system-wide unreliability based on supposedly isolated incidents by challenging several of the district court's inferences from the testimony presented in evidentiary hearings and citing additional evidence that the district court declined to credit.[18]

---

[17] Additionally, in their opening brief, Defendants originally argued that no termination motion was required, but abandoned that argument in their reply.

[18] Defendants also cursorily argue that Plaintiffs should have been estopped from raising their challenges about Defendants' monitoring when they did before the district court. However, Defendants provide no analysis of why Plaintiffs should have been estopped or what type of estoppel should have applied, nor did they do so in the district court. This argument is therefore forfeited. *See Greenwood*, 28 F.3d at 977 ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review").

Because Defendants challenge the factual findings of the district court, to which we defer unless they are clearly erroneous, *Parsons I*, 912 F.3d at 495, Defendants must show that the findings are "illogical, implausible, or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). Defendants have failed to meet this heavy burden.

Defendants list several instances where they disagree with the inferences the district court drew from the examples it provided. However, Defendants do not argue that any of the examples cited by the district court did not factually occur. "Where more than one inference can be drawn from the evidence presented, the inference relied upon by the district court will not be set aside unless unreasonable as a matter of law." *Fenton v. Freedman*, 748 F.2d 1358, 1361 (9th Cir. 1984). Because Defendants failed to establish that the district court's inferences that Defendants failed to demonstrate the integrity of its CGAR scores were illogical, implausible, or without support, we conclude that those findings are not clearly erroneous.

2.

Defendants also challenge the district court's legal interpretation of the Stipulation, arguing that, contrary to the district court's decision, the Stipulation does not require compliance in 18 of the 24 months preceding Defendants' motion to terminate and does not require monitoring to comply with the "Final Monitoring Guide."

Even if these interpretations were erroneous, however, such error would have been harmless because both of these supposed errors only related to the first of the two independently-sufficient grounds for the district court's

decision to deny the termination of the Performance
Measures. As we explained above, the district court's second
ground adequately supports its decision not to terminate
monitoring. As such, these alleged interpretive errors do not
justify vacating the Termination Order.

3.

Defendants also argue that the district court exceeded its
authority in appointing Dr. Stern to investigate ADC's
monitoring program. This argument is factually challenged:
at the time of the Termination Order Dr. Stern had not been
appointed; the district court only ordered the parties to
submit the names of proposed experts. Simply put, there is
no basis for reversing the Termination Order—which dealt
almost exclusively with interpreting the Stipulation and
making findings of fact about the reliability of ADC's
monitoring—based on the appointment of an expert five
months later. Accordingly, we reject Defendants' last
argument and affirm the Termination Order.

B.

When the Stipulation was entered into, healthcare was
provided through an "HNR-Box" system, where prisoners
placed health needs request forms into designated boxes,
nursing staff triaged the forms, and prisoners were provided
care based on the requests. After entering the Stipulation,
ADC discontinued the HNR-Box system and transitioned to
an "Open-Clinic" system, where prisoners would bring
completed health needs request forms to a health unit and be
seen on a first-come, first-served basis. After ADC notified
Plaintiffs' counsel about this change, Plaintiffs objected to
ADC's discontinuation of the HNR-Box System.

Ultimately, the district court issued the HNR-Box Order, in which it ordered Defendants to reinstall HNR boxes in the same number and approximate locations as before the HNR-Box system was discontinued. The district court ruled that, "[b]ecause the parties identified the HNR boxes as the triggering event with some of the performance measures, this practice cannot be abandoned without proof that it would have no effect on the measurement of Defendants' compliance with the Stipulation." The district court found that "HNRs are now only tracked when an inmate sees a health care provider" and that ADC "does not have any mechanism to track inmates who attempted to attend an open clinic and does not log when inmates arrived at the open clinic." Accordingly, the district court concluded that the Open-Clinic system could "impermissibly constrict the numbers of HNRs submitted for measurement and so [ADC] cannot replace the HNR Boxes for purposes of measuring compliance with the Stipulation." The district court permitted ADC to continue using the Open-Clinic process in tandem with the HNR-Box System, if it wished.

Defendants argue that the district court erred by ordering them to resume the HNR-Box System for three reasons.

### 1.

Defendants first argue that the district court exceeded its remedial authority under the Stipulation by ordering ADC to resume the HNR-Box system because the Stipulation does not require Defendants to collect health needs request forms in any particular manner. We disagree.

The Stipulation grants the district court the power to enforce non-compliance through "all remedies provided by law." To come within this enforcement authority, the district court's order must be (1) a remedy recognized by the law,

and (2) consistent with the remainder of the Stipulation. *Parsons I*, 912 F.3d at 497–98. Both requirements are met here. First, the HNR-Box Order is a recognized remedy—an injunction. We have previously upheld the power of the district court to issue injunctions in this case. *See Parsons I*, 912 F.3d at 499–501 (upholding the OPO, which required Defendants to "use all available community healthcare services" to ensure compliance with certain Performance Measures). Second, the HNR-Box Order is consistent with the remainder of the Stipulation.

Although the Stipulation does not specifically define the way health-needs request forms must be collected, the only fair reading of the Stipulation is that the HNR-Box system was a mutually understood assumption on which the contract was based. *See, e.g.*, Stip. ¶ 13 ("Defendants . . . will . . . train dental assistants at ADC facilities about how to triage HNRs into routine or urgent care lines"); Exh. B, Performance Measure #36 ("A LPN or RN will screen HNRs within 24 hours of receipt"); Exh. B, Performance Measure #37 ("Sick call inmates will be seen by an RN within 24 hours after an HNR is received"); Exh. B, Performance Measure # 98 ("Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual"); Exh. B, Performance Measure #102 ("Routine dental health care wait times will be no more than 90 days from the date the HNR was received"); Exh. B, Performance Measure #103 ("Urgent dental care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received").

We conclude the district court did not err by determining it could enforce the Stipulation to comply with that mutual understanding. *See Bryceland*, 772 P.2d 36, 39 ("We will interpret a contract in a manner which gives a reasonable

meaning to the manifested intent of the parties rather than an interpretation that would render the contract unreasonable").[19]

2.

Defendants next argue that the district court improperly placed the burden of proof on Defendants to show that the Open-Clinic system did not affect compliance-monitoring. Defendants contend that the Stipulation places the burden of proving non-compliance on Plaintiffs, and thus Defendants should not have been forced to prove their own compliance. Plaintiffs argue that it was reasonable to place the burden on Defendants because they changed the status quo by eliminating the HNR-Box system, and that if there was error, it was harmless in light of the district court's findings.

We agree that the district court erred by placing the burden of proof on Defendants. The Stipulation contemplates the activation of the district court's remedial powers only after a motion to enforce, and in this case, Plaintiffs were the ones who sought to enforce the Stipulation by moving the court for the HNR-Box Order. Plaintiffs have not provided a persuasive reason why we should deviate from the general axiom that "the burden of proof rests with the moving party," *McDonald v. Harding*, 57 F.2d 119, 124 (9th Cir. 1932). Thus, we hold that the burden of proof properly rested with Plaintiffs as the party seeking to demonstrate Defendants' non-compliance.

---

[19] We also reject Defendants' arguments concerning deference to prison administrators: the district court afforded any deference due when it enabled ADC to continue the "open-clinic" system alongside the HNR-Box system (which ADC had previously employed for years).

Nevertheless, we conclude that the district court's legal error was harmless. As we discussed in the previous section, the issue here is whether the district court could order Defendants to resume the HNR-Box system. The district court correctly determined that it could so order "[b]ecause the parties identified the HNR boxes as the triggering event with some of the performance measures." The district court then supported that determination by finding that "the modified open clinic HNR process may impermissibly constrict the numbers of HNRs submitted for measurement." That factual finding is unchallenged by Defendants on appeal and is sufficient to support the district court's order regardless of which party had the burden of proof regarding compliance.

3.

Finally, Defendants take issue with a portion of the HNR-Box Order, in which the district court found "it is likely that some class members would not be able to brave the gauntlet of making it to a nurse at the open clinic." Defendants contend that this factual finding is clearly erroneous.

However, even assuming that this statement was clearly erroneous, such error was harmless. The complete sentence reads: "*Not only* have Defendants failed to meet this burden of proof but the Court is satisfied that it is likely that some class members would not be able to brave the gauntlet of making it to a nurse at the open clinic." We conclude that this statement was an aside in the HNR-Box Order and did not factor into the legal issue of whether the Stipulation permitted Defendants to abandon the HNR-Box system.

Accordingly, we reject Defendants' last argument and affirm the HNR-Box Order.

## C.

We now turn to Defendants' appeals from the seven Expert Orders. For the reasons below, we conclude that we lack jurisdiction over the Expert Orders and dismiss the Medical Needs Appeal to the extent it pertains to those orders.

We generally have jurisdiction only over final decisions of the district courts. *See* 28 U.S.C. § 1291. A "final decision" is typically "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *United States v. Washington*, 761 F.2d 1404, 1406 (9th Cir. 1985) (citation omitted). In this post-settlement case, there is no final judgment from which to appeal. However, this panel previously held that it had jurisdiction to review the certain enforcement orders pursuant to 28 U.S.C. § 1291 under the collateral order doctrine. *Parsons I*, 912 F.3d at 502–03.

As we explained in *Parsons I*, an "order that does not strictly end the litigation may nonetheless be considered sufficiently final when it is 'too important to be denied review and too independent of the merits of the case to require deferral of review.'" 912 F.3d at 502, *quoting Plata v. Brown*, 754 F.3d 1070, 1075 (9th Cir. 2014). "To warrant review under the collateral order doctrine, the order must '(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment.'" *Id.* at 502. None of the Expert Orders satisfy these criteria.

In five of the Expert Orders—the Millar-Appointment Order, the Stern-Appointment Order, the Abplanalp-Appointment Order, the Stern-Standard of Care Order, and

the Stern-Terms of Engagement Order—the district court merely appointed experts and clarified the scope of those experts' duties. The issues presented in appointing, and assigning duties to, experts are not "effectively unreviewable," *id.*, because Defendants will be able to raise any issues regarding their findings, testimony, or recommendations in an appeal from a subsequent order relying on those findings or implementing those recommendations (if and when such an order is issued). Accordingly, these orders are neither final orders nor appealable collateral orders.

In the Compliance-Expert Order, the district court required the parties to submit briefing regarding what procedures were necessary to compel compliance with the Stipulation. Similarly, in the Millar-Plan Order, the district court required Defendants to file a plan to implement the recommendations made by an expert.

We lack jurisdiction under 28 U.S.C. § 1291 over these orders because they do not qualify as either a final order or an appealable collateral order. An order requiring a prison to submit a plan is not a final order under § 1291. *See Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 464–65 (9th Cir. 1989) (joining other courts of appeals in holding that orders requiring the "submission of detailed plans are not final orders appealable under 28 U.S.C. § 1291"). Moreover, Defendants will be able to raise any issues regarding any operational modifications in an appeal from the district court's implementation order (if and when one is issued). Thus, the issues raised here are not "effectively unreviewable," and the collateral order doctrine does not apply. *See Parsons I*, 912 F.3d at 502.

We also lack jurisdiction under 28 U.S.C. § 1292 because an "order requiring submission of a remedial plan is

generally not an injunction reviewable interlocutorily under § 1292(a)(1)." *Armstrong v. Wilson*, 124 F.3d 1019, 1021–22 (9th Cir. 1997). There is a narrow exception for timely appeals that pose a "purely legal question," such as when "the order sufficiently specifies the content of the plan to be submitted," or when "the exact specifications of the plan would not alter in a material manner the issues that would be presented to the court of appeals." *Id.* (internal quotation marks and citations omitted).

Here, however, neither order "specifies the content of the plan to be submitted" such that the "content and scope of the remedial scheme" is "sufficiently clear to enable appellate review" concerning the issues Defendants raise. *Id.* at 1022. The district court has not yet ordered the appointment of a specific type and number of staff, nor did it order Defendants to submit a plan that adopts verbatim an expert's specific staffing recommendations. Without knowing how, or whether, the district court will do so in the future, "important issues regarding the nature and extent of the relief still remain to be resolved and are dependent on the particular circumstances of the case as it w[ill] develop in the proceedings subsequent to the entry of the order." *Id.* (alteration and citation omitted). Accordingly, Defendants' appeal of these orders is premature and we lack jurisdiction over it.

Consistent with our "strong policy against piecemeal appeals," we conclude that we lack jurisdiction over Defendants' Medical Needs Appeal to the extent it concerns the Expert Orders. *See Citibank, N.A. v. Oxford Properties & Fin. Ltd.*, 688 F.2d 1259, 1261 (9th Cir. 1982). Accordingly, we cannot address the merits of Defendants' arguments concerning propriety of any of these orders at this

juncture and must dismiss the appeal to the extent it concerns those orders.

## VI.

For the foregoing reasons, we affirm the Contempt Order, the Termination Order, and the HNR-Box Order; we vacate the Attorneys' Fees Order and Judgement, and remand with instructions to (a) recalculate the fee award by determining the correct hourly rates for each year consistent with the process outlined in this Opinion, (b) exclude from any fee award the 11 hours erroneously included; (c) modify the costs award down by $1,285.79 in light of the district court's failure to reflect the downward adjustments in its prior order; and (d) reweigh whether a fee enhancement was appropriate without double-counting the *Kerr* factors. The remainder of the Medical Needs Appeal is dismissed for lack of jurisdiction.

The parties shall bear their own costs on appeal. Any pending motions are **DENIED.**

**AFFIRMED in part, REVERSED in part, DISMISSED in part, and REMANDED.**