Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **MOTION TO ENFORCE THE STIPULATION AND FOR CONTEMPT OF THE MAY 2019 OSC (DOC. 3235) REGARDING PERFORMANCE MEASURE 50 AT ASPC-FLORENCE (URGENT SPECIALTY CARE)** |

**INTRODUCTION**

Performance Measure ("PM") 50 requires that "[u]rgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider." Doc. 1185-1 at 26. Timely access to urgent specialty care is of paramount importance because it is an indication that the prison medical provider treating the patient has determined, using their medical judgment and training, that the patient's condition requires it. All requests made by a provider for specialty consults are separately reviewed and approved by medical professionals in Centurion's Utilization Management team, before they are scheduled. Urgent requests for specialty care are also often submitted as part of a patient's ongoing treatment, for example, chemotherapy, or follow-up treatment after surgery. [See, e.g., Doc. 1539 at ¶¶ 80-96 (4/11/16 Expert Report of Dr. Todd Wilcox detailing the importance of timely specialty care and the observed delays in specialty referrals); Doc. 2103 at ¶¶ 46-56 (6/9/17 Expert Report of Dr. Todd Wilcox detailing Defendants' noncompliance with specialty care performance measures and the inadequacy of Defendants' proposed remedial plans); Doc. 2496 at ¶¶ 7-14, 23 (12/18/17 Expert Report of Dr. Todd Wilcox detailing failures of specialty care resulting in death of class member at Arizona State Prison Complex ("ASPC")-Florence)]

Defendants have been unable, in the three years since the Court found them in substantial noncompliance with PM 50 at ASPC-Florence, to address the problems. [*See* Doc. 3542-1 at 270 (18% in January 2020); Doc. 3569-1 at 270 (57% in February 2020)] ASPC-Florence has an infirmary with 15 beds, and two additional special medical needs units (Housing Unit 8 and Housing Unit 10), each with approximately 20 beds.[1] It houses a large number of class members who are older than average, have disabilities, or who require specialty care. It also is the site of the largest outbreak of COVID-19 in the state

---

[1] *See* ADC Institutional Capacity Committed Population, (May 5, 2020) at 1 at https://corrections.az.gov/sites/default/files/DAILY_COUNT/May2020/05052020_count_sheet.pdf.

prison system, with 47 out of the 94 Florence patients who have been tested (50%) being found positive for the virus, and at least four class members who, as of May 5, 2020, appear to have died due to complications COVID-19.[2]

| Location | Inmates Tested | Inmates Negative | Inmates Confirmed | Inmates Pending | Inmates Recovered | Daily Total Population | Inmates Confirmed Deaths | Inmates Potential Deaths |
|---|---|---|---|---|---|---|---|---|
| Florence | 94 | 47 | 48 | 20 | 0 | 3564 | 0 | 4 |
| Tucson | 71 | 31 | 1 | 43 | 0 | 4925 | 0 | 1 |
| Eyman | 22 | 16 | 5 | 1 | 0 | 5639 | 0 | 0 |
| Marana* | 14 | 5 | 9 | 0 | 6 | 426 | 0 | 0 |
| Red Rock* | 12 | 12 | 0 | 0 | 0 | 1987 | 0 | 0 |
| Phoenix | 9 | 9 | 0 | 0 | 0 | 778 | 0 | 0 |
| Kingman* | 8 | 8 | 0 | 0 | 0 | 3127 | 0 | 0 |
| Yuma | 7 | 7 | 0 | 0 | 0 | 4897 | 0 | 0 |
| CACF* | 6 | 6 | 0 | 0 | 0 | 1268 | 0 | 0 |
| Lewis | 4 | 4 | 0 | 0 | 0 | 4536 | 0 | 0 |
| Douglas | 4 | 4 | 0 | 0 | 0 | 2139 | 0 | 0 |
| Perryville | 2 | 0 | 1 | 0 | 0 | 4069 | 0 | 0 |
| Winslow | 2 | 2 | 0 | 0 | 0 | 1334 | 0 | 0 |
| Safford | 2 | 1 | 0 | 1 | 0 | 1628 | 0 | 0 |
| Florence West* | 1 | 1 | 0 | 0 | 0 | 640 | 0 | 0 |
| Phoenix West* | 1 | 1 | 0 | 0 | 0 | 467 | 0 | 0 |
| MRC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PRC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

# BACKGROUND

**A. Noncompliance Finding in April 2017, Subsequent Noncompliance, and October 2017 Order to Show Cause**

On April 24, 2017, this Court found Defendants substantially noncompliant with PM 50 at ASPC-Florence. [Doc. 2030 at 2] In the subsequent months, Defendants submitted general excuses to explain their noncompliance, and as their corrective action

---

[2] *See* https://corrections.az.gov/adcrr-covid-19-dashboard (last checked and screenshot taken on May 6, 2020 at 9:45 a.m. MST).

plans. [Doc. 1977 at 8-11; Doc. 2051 at 6-8] For example, Plaintiffs' medical expert Dr. Wilcox noted at the time that

> Defendants' remedial plans refer to "challenges in establishing long-term relationships with community-based specialty service providers." [Doc. 2051 at 6] That is an understatement. In 2009, reimbursement rates for specialists contracted with ADC were capped so as to be no higher than those paid by the State's Medicaid program, the Arizona Health Care Cost Containment System. [Doc. 1, ¶ 63]; Ariz. Rev. Stat. § 41-1608 (2009). Unsurprisingly, at the time this went into effect, the number of specialists willing to accept ADC prisoners plummeted.
>
> This restriction on how much community specialists are paid is, in my opinion, the single biggest cause for the failures in complying with PMs 50 and 51. (According to Defendants' own data, there are more institutions with failing scores than the ones the Court found noncompliant, according to Doc. 2041 at 50-51.) With certain specialties, Corizon will be lucky to find one or two doctors in the entire state willing to accept Medicaid rates. Unless and until ADC (or its contractor) can pay higher rates to subcontracted specialists in the community, they will continue to face serious problems in recruiting and retaining specialists. A basic first step to address this failure is to enlist the State's publicly-funded medical schools and their affiliated practice groups to provide their expertise and assistance, including delivery of specialty care, to persons who are wards of the State.
>
> The constant turnover in subcontracted specialists also leads to fragmented and delayed treatment for serious medical conditions, as I recently observed in relation to the delays in treatment of the recurrence of prostate cancer for named plaintiff Shawn Jensen. [Doc. 1958-1 at 3-6]

[Doc. 2103 ¶¶ 51-53][3]

None of the plans addressed the problem. The Court took additional action in the form of its October 2017 Order to Show Cause. [Doc. 2373 at 3 (a fine of $1,000 would issue for each violation of PM 50 at Florence beginning December 2017)] Defendants submitted a series of shifting, cursory, and false statements as their corrective action plans in the months that followed:

---

[3] Notably, in October 2019, the Court's expert came to the same conclusion as Dr. Wilcox regarding the barrier to compliance with specialty care performance measures, and similarly recommended that the restriction on what specialists are paid be lifted. *See* Doc. 3379 at 101-02 ("[I]t is my opinion that this markedly lower payment rate is a major factor in reducing the number of specialists available to see ADC patients. This, in turn, contributes to delays ADC has witnessed in patients receiving specialty services, as measured by PMs 50 and 51. [. . .] I recommend that the Legislature's instruction to ADC to cap payment to community specialists . . . be rescinded or overridden. ADC should be allowed to pay community specialists at the rate necessary, based on market forces, so that it can provide medically necessary care to its patients and provide that care in a timely manner.").

**Supplemental Information as of October 6, 2017:** It is too early to see the effects of the new procedure referenced in the above Corrective Action Plan given that it was implemented in mid-August 2017.

**Supplemental Information as of December 15, 2017:**
**Basis for Non-compliance:** Corizon is experiencing difficulties in terms of identifying and procuring specialty providers for delivering urgent consultations and urgent specialty diagnostic services within the required timeframe. A significant number of specialty providers that have been contacted either do not have the capacity to take on new patients at this time, do not want inmates in their facilities, or will not accept AHCCCS rates.
**Corrective Action Plan:** Corizon is currently receiving additional assistance from its corporate office in terms of trying to identify and procure necessary specialty providers to provide urgent consultations and diagnostic services. The corporate office is reaching out to additional specialty providers within Arizona and those also residing in neighboring states, including through telemed and in-person patient care at the Florence facility. This action measure was implemented in mid-November 2017.

**Update as of January 8, 2018:**
**Basis for Noncompliance:**
Corizon is experiencing difficulties in procuring specialty providers for specialty diagnostic services within the required timeframe, such as urology, neurology, and gastroenterology. Some of this difficulty has been compounded by limited provider availability during the Thanksgiving holiday. There has also been a problem with patients receiving oncology services because the oncology provider that had been used, AON, filed for bankruptcy. Corizon was only given one week's notice of this closure. Accordingly, oncology patients had to be transferred to a new provider. Due to these issues, even where specialty providers have been procured for an inmate, many of the appointments are not until February, outside of the compliance time period.[4]
**Corrective Action Plan:** Corizon has contracted with an additional oncology provider. Additionally, Corizon's corporate office is arranging single-case agreements with additional specialty providers who do not have long-term contracts with Corizon or ADC to facilitate faster access to these specialty services. Finally, Dr. Robertson and ADC have utilized their contacts to identify additional specialty providers across the state who could be willing to accept inmates as patients.

---

[4] Defendants' statement to the Court blaming their noncompliance with PM 50 at ASPC-Florence on the oncology subcontractor's bankruptcy with only one week's notice was later proven to be completely false, as it was contradicted by the sworn declaration under oath of the oncologist in question. *See* Doc. 2635 at ¶¶ 8-10 (2/23/18 Declaration of Dr. Manntej S. Sra, M.D.) ("AON has not declared bankruptcy, and there are no plans for bankruptcy. AON made the business decision to close the AON clinic as of December 1, 2017. My staff at AON had been communicating with Corizon for at least two to three months about closing our clinic . . .")]

-4-

**Update as of February 14, 2018:** Transportation has significantly improved, which is helping with getting inmates to the specialty provider. As of this week of January 29, 2018, there is a zero backlog for routines.[5]
**Corrective Action Plan:** For any provider that expresses an interest, local Corizon staff will set meetings with provider to attempt to get new contracts to provide specialty care. Corizon is working to have additional specialty providers come to the site to provide services. Dermatology, urology, physical therapy, ultrasound, orthotics are some examples of doctors that can come on site to provide care. ADC Operations will provide new space to accommodate the provision of specialty care on site.[6]

[Doc. 3569-1 at 270, 272-73]

### B. Contempt Finding in June 2018, and Continued Noncompliance

Again, none of the plans addressed the problem with PM 50 at ASPC-Florence. Noncompliance continued. Thus, in June 2018, the Court found Defendants in contempt; the applicable amount of the $ 1.4 million overall fine attributable to failures with PM 50 at ASPC-Florence was $ 69,000. [Doc. 2898 at 18, 21 (34 instances of noncompliance in December 2017); and at 22 (35 instances of noncompliance in January 2018)] The Ninth Circuit upheld this contempt finding and fine. *Parsons v. Ryan*, ("*Parsons III*") 949 F.3d 443, 455 (9th Cir. 2020).

Despite the finding of contempt and fine in June 2018, Defendants continued to be profoundly noncompliant with this critical measure at ASPC-Florence. Again, Defendants justified their substantial noncompliance with a series of cursory statements—this time blaming ongoing and foreseeable administrative staffing changes.

**Update as of August 29, 2018:**
**Basis for Non-Compliance:** The Clinical Coordinator left on June 22, 2018, leading to diminished oversight.
**Corrective Action Plan:** A new Clinical Coordinator started July 23, 2018 and was trained by staff from Perryville that week.

**Update as of September 25, 2018:**
**Basis for Noncompliance:** Turnover in the Clinical Coordinator position caused issues with this measure. The previous Clinical Coordinator's last day was June 22, 2018. A new Clinical Coordinator started July 23, 2018 and was trained by staff from Perryville that week. Similarly, the recently assigned scheduler has been training at the Perryville facility during the third week of September 2018.

---

[5] Apparently "routines" refers to routine specialty appointments, which is covered by a different measure, PM 51.
[6] This onsite specialty care never occurred.

In addition, conversations continue with the Eyman facility on ways to increase compliance with this performance measure by making additional adjustments and increasing coordination between the two facilities in regard to getting patients to offsite medical consultations in a timely manner. Now that the training for the Clinical Coordinator and scheduler positions is completing, compliance with this performance measure is expected to increase.

**Update as of October 24, 2018:**
**Basis of Non-Compliance:** A new scheduler was hired and started training in the third week of September. Thus, the impact of the increased staffing is not reflected in the August numbers.
**Corrective Action Plan:** Corizon will continue with the current corrective action.

**Update as of November 21, 2018:**
The compliance rates for this performance measure are on a significant upward trajectory and are nearing compliance. Accordingly, Corizon will continue to utilize the existing corrective action plan.

**Update as of December 21, 2018:**
**Basis for Non-Compliance:** This facility is transitioning to a new Clinical Coordinator and scheduler, who are still learning their roles.
**Corrective Action Plan:**
The Clinical Coordinator is scheduled to complete a full day of additional training on December 21, 2018.

**Update as of January 21, 2019:**
**Basis for Noncompliance:** The prior corrective action plan for this performance measure included training that occurred on December 21, 2018. As such, the November numbers do not fully reflect the impact of the corrective actions. Additionally, there were ongoing issues with the previous Clinical Coordinator completing the necessary tasks of the job. The replacement Clinical Coordinator needed time to catch up on the backlog.
**Corrective Action Plan:** The Clinical Coordinator was able to catch up with the backlog caused by the prior Clinical Coordinator. ***The replacement Clinical Coordinator has now departed and a new LPN will be starting as the Clinical Coordinator on January 20, 2019***. [emphasis added] Until that occurs, the Clinical Coordinator out of Eyman is providing coverage for this facility. Corizon expects that this performance measure will be compliant for the month of December.

**Update as of March 21, 2019:**
**Basis for Noncompliance:** The Clinical Coordinator and scheduler positions have had a high turnover rate resulting in delays in scheduling appointments.
**Corrective Action Plan:** A new Clinical Coordinator was hired and started the second week of January. Onboarding and training for this position included this measure's requirements and the process was completed by February 1, 2019. Four clinical coordinators from other facilities have been assigned to assist during this transition period.

//

//

>  **Update as of April 21, 2019:**
>  **Basis for Noncompliance:** The Clinical Coordinator and scheduler positions have had a high turnover rate resulting in delays in scheduling appointments.
>  **Corrective Action Plan:** Continue with the current CAP (see above) as this measure has a longer timeframe and the improvement is not reflected in the February audit.

Doc. 3569-1 at 273-75.

### C. May 2019 Order to Show Cause and Continued Noncompliance

On May 6, 2019, this Court issued an Order to Show Cause ("May 2019 OSC") regarding "unacceptable levels of noncompliance" with provisions of the Stipulation. Doc. 3235 at 1. PM 50 at ASPC-Florence was again one of the PMs listed in this OSC, at 76% in January 2019 and 69% in February 2019, (*id*. at 2), and the Court indicated that Defendants had to bring that PM (along with other PMs / institutions) "into substantial compliance no later than July 1, 2019," or be sanctioned $ 50,000 for each noncompliant PM / institution. [*Id*. at 6, 7] Defendants reported on August 9, 2019, in their "Notice of Compliance with Court Order" that they were noncompliant in June 2019 with PM 50 at ASPC-Florence, with a compliance score of 82%, (Doc. 3335 at 5), but blamed their overall noncompliance with the May 2019 OSC on high staffing turnover, plus the transition from their second health care contractor, Corizon, to their third health care contractor, Centurion. [Doc. 3339 at 8 ("as a result of the pending transition, several outside healthcare providers ended their relationships with Corizon . . . there were less [sic] available providers for specialty consults . . ."); *see also* Doc. 3542-1 (Aug. 8, 2019 update: "There was a backlog of referrals that carried over through the transition. In addition, there are providers who will no longer provide services to the inmate population without a contract in place.")][7]

---

[7] Despite Defendants' opposition to Plaintiffs' request that the Court order Defendants to create a detailed transition plan, *see* Doc. 3187 at 3 (Defs' Opp.) ("The plan details . . . specialty care . . .), this Court correctly foresaw that "[t]his is a substantial transition that requires advance coordination to ensure ADC's 33,000 prisoners receive continuity of care, particularly concerning . . . specialty consultations," and ordered Defendants to develop and produce a detailed transition plan well in advance of the changeover. Doc. 3234 at 1.

At that point, the Court could have assessed a $ 50,000 monetary fine against Defendants for their failure to reach substantial compliance with PM 50 at ASPC-Florence starting in June 2019, and could do so each month thereafter, to motivate Defendants to achieve compliance. And in each month from June 2019 through January 2020, ASPC-Florence was below the 85% substantial compliance threshold; Defendants therefore failed to purge themselves of contempt and avoid the monthly $ 50,000 fine threatened in the May 2019 OSC. [*See* Doc. 3235 at 2, 6, 7]

Long after the transition to their third contractor, Defendants continued to state the blindingly obvious as the basis for noncompliance, and recycle the same tired excuses and flimsy remedial plans that they trotted out in 2017.

> **Update as of September 19, 2019:**
> **Basis for Noncompliance:** A large number of consults have been approved and getting outside providers to see all of them has proved to be a challenge. Now that a large number of inmates are also being scheduled, transportation has become an issue.
> **Corrective Action Plan:** Florence clinical coordinator and scheduler will continue to schedule inmates in effort to reduce the backlog and become current. The FHA is working with the Warden in regards to possibly adding additional transport staff to assist with the backlog of inmates now scheduled. Centurion is working on getting specialist providers to go to the facility to provide services. Audiology and ultra-sound radiology have already started, while physical therapy and others are being discussed.
>
> **Update as of October 15, 2019:**
> **Basis for Non-Compliance:** The available resources has outpaced the demand. Multiple outside providers are pending seeing patients until a contract is signed with the new vendor.
> **Corrective Action Plan:** The Clinical Coordinator office is diligently working to schedule the consults within the timeframes. Some specialty providers will not see the inmates until an executed contract is in place. This is being addressed and inmates are being scheduled, as the transportation schedule will allow.
>
> **Update as of November 17, 2019:**
> **Basis for Non-Compliance:** An increase in the volume of referrals has caused delays for appointments.
> **Corrective Action Plan:** The Clinical Coordinator office is diligently working to schedule the consults within the timeframes. Corporate staff are assisting with finding offsite providers who will see inmates. Audiology and ultrasounds our now available on site to expedite appointments for these services. Centurion is contacting physical therapy companies that may be able to provide services to the patients on site. The ability to provide services on site allows these services to be completed in an expedited

manner and frees up transportation availability for other services not available on site.

**Update as of December 19, 2019:**
**Basis for Non-Compliance:** An increase in the volume of referrals has caused delays for appointments.
**Corrective Action Plan:** Continue with the current CAP as the score has increased by 6%. The Clinical Coordinator office is diligently working to schedule the consults within the timeframes. Corporate staff are assisting with finding offsite providers who will see inmates. Audiology and ultrasounds our now available on site to expedite appointments for these services. Centurion is contacting physical therapy companies that may be able to provide services to the patients on site. The ability to provide services on site allows these services to be completed in an expedited manner and frees up transportation availability for other services not available on site.

**Update as of January 17, 2020:**
**Basis for Non-Compliance:** The Clinical Coordinator resigned in November 2019, making the department short staffed. Urgent consultations were not scheduled within 30 calendar days of the consultation due to demand outpacing available resources occurring with transportation issues and offsite provider availability.
**Corrective Action Plan:** The demand is outpacing available resources in processing consult referrals and finding offsite specialists to see the inmates. Corporate staff are assisting with finding offsite specialists who will see inmates. Audiology and ultrasounds are now being completed onsite, and physical therapy is being looked at to be done onsite starting mid-January 2020.

[Doc. 3569-1 at 277-78]

### D. January 2020 Order to Show Cause and Continued Noncompliance

The Court issued another Order to Show Cause on January 31, 2020, ("January 2020 OSC"), ratcheting up the noncompliance fine from $ 50,000 to $ 100,000 for each PM / institution, starting with February 2020. [Doc. 3490] Again, PM 50 at ASPC-Florence was among the listed institutions in the January 2020 OSC. [*Id.* at 2] Defendants were unable to purge themselves of contempt in February 2020, achieving only 57% compliance with PM 50 at Florence. [Doc. 3569-1 at 270]

**Update as of February 18, 2020:**
**Basis for Non-Compliance:** The amount of consults submitted monthly has increased significantly. Specialists have limited availability and at times are scheduled out in advance for three months. An increase in limited availability occurred over the December holiday season.
**Corrective Action Plan:** A new Clinical Coordinator was hired for Florence starting January 6, 2020. Corporate staff are assisting with finding offsite specialists who will see inmates. Centurion is also recruiting a provider liaison to facilitate specialty development networks. Audiology and

ultrasounds are now being completed onsite, as well as a physical therapist, starting onsite PT mid-February 2020. A new SMD is providing coaching and education to the providers with the highest volume of requested consults. Providers received instruction on 1/21/2020 to start using RubiconMD to enable primary care clinicians to easily and quickly discuss their eConsults with top specialists, so they can provide better care– improving the patient experience. Two additional UM nurses and a UM clerk are being hired to expedite the UM process.

**Updated as of March 16, 2020:**
**Basis for Non-Compliance:** Certain specialties have been difficult to obtain. A large volume of consults has been generated recently causing some delays in appointment scheduling for the clinical coordinating team.
**Corrective Action Plan:** More focus was needed to ensure all avenues were attempted to obtain compliance. The UM team has continued to source for specialties that have been difficult to schedule. The scheduler has also been given additional help to ensure timely calls to offsite clinics.

*Update as of April 17, 2020:*
*Basis for Non-Compliance: Urgent consultations not scheduled within 30 calendar days of the consultation due to demand outpacing available resources for offsite provider availability.*
*Corrective Action Plan: A physical therapist is completing onsite PT. Care Clix was added in April to cover specialties of Orthopedics, Nephrology, Cardiology and Urology. Providers are continuously being encouraged to use RubiconMD, which enables primary care clinicians to easily and quickly discuss their eConsults with top specialists, so they can provide better care improving the patient experience.*

[Doc. 3569-1 at 277-79 (bold and italics in original)]

Again, Defendants' self-created corrective actions have failed to appreciate the severity of the situation or meaningfully and durably address the problem. Defendants' April 21, 2020 report to the Court, show a compliance level of only **18%** with PM 50 at ASPC-Florence in January 2020, and substantial noncompliance for eleven consecutive months between April 2019 and February 2020, as shown below. [Doc. 3569-1 at 270]



**ARGUMENT**

Defendants have been persistently unwilling or unable to comply with the Stipulation and the repeated Orders to Show Cause with respect to this critical performance measure at a prison housing numerous class members with serious medical conditions. [*See* Doc. 3537 ¶¶ 4, 6, and Ex. 2 (85 out of 188 pending specialty requests submitted between November 1, 2019 and February 15, 2020 at ASPC-Florence were out of compliance with PM 50 and 51 timeframes); *see also* Doc. 3537-1 at 31-47 (Advocacy letters sent to Defendants in March 2020 regarding noncompliance with PM 50 at ASPC-Florence in multiple individual cases)] And that was during normal times; we are not now in normal times. As the Court has recognized, "Defendants' past performance, coupled with an unprecedented public health crisis, does not inspire confidence in their ability to meet this moment." Doc. 3540 at 2.

Defendants are liable for their failure to cure noncompliance with PM 50 at ASPC-Florence. The Court should hold them in contempt of the May 2019 OSC, and fine them $400,000 ($50,000 per month for eight months) for their failure to purge the contempt fine for the months of June 2019 – January 2020.[8] [*See Parsons III*, 949 F.3d at 455-57 (upholding this court's authority to issue a similar compensatory and coercive contempt sanction for noncompliance with the Stipulation)]

Additionally, it is clear from the history outlined above that contempt fines alone are not sufficient to motivate Defendants to address longstanding noncompliance with urgent specialty care at ASPC-Florence, and that they are unable to identify and address the problems on their own and require expert guidance. As a result, pursuant to its power under the Stipulation, the Court should also order Defendants to consult with Dr. Stern

---

[8] The January 2020 OSC orders Defendants to respond no later than June 15, 2020, as to why the Court should not impose a $100,000 fine for each failure to purge noncompliance with PMs / institutions starting in February 2020. [Doc. 3490 at 4] Accordingly, this Motion does not include a request for an assessment of coercive fines for Defendants' failure to purge contempt in February 2020. Plaintiffs also do not waive their right to seek further contempt orders regarding Defendants' failure to comply with the May 2019 OSC for other PMs / institutions during June 2019-January 2020.

regarding their chronic failure to comply with this measure, and to implement the recommendations that he has previously made to the Court with regard to access to timely specialty care, including but not limited to his recommendation that the cap on specialty reimbursement rates be rescinded. [*See supra* n.3, quoting Doc. 3379 at 101-02] It is well within the Court's power to issue such a further enforcement order. [*See* Doc. 1185 ¶ 36 ("In the event the Court subsequently determines that the Defendants' plan did not remedy the deficiencies, the Court shall retain the power to enforce this Stipulation through all remedies provided by law . . ."); *see also Parsons III*, 949 F.3d at 454 ("We have previously upheld the district court's power to issue such injunctions to enforce the Stipulation in this case") (citing *Parsons v. Ryan*, 912 F.3d 486, (9th Cir. 2018))]

Respectfully submitted,

Dated: May 6, 2020 **PRISON LAW OFFICE**

By: s/ Corene T. Kendrick
    Donald Specter (Cal. 83925)*
    Alison Hardy (Cal. 135966)*
    Sara Norman (Cal. 189536)*
    Corene T. Kendrick (Cal. 226642)*
    Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com
           rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@aclu.org
           afettig@aclu.org
           echo@aclu.org
           mmorris@aclu.org

\*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
\*\*Admitted *pro hac vice*

Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: s/ Maya Abela
Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email: rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington St., Ste. 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.com

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

                                                    s/ C. Kendrick