Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:  jkeenan@acluaz.org
          carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
*Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
*similarly situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-ROS |
| Plaintiffs, | **PLAINTIFFS' MOTION TO ENFORCE THE STIPULATION (MAXIMUM CUSTODY PERFORMANCE MEASURES 1-3, 5-6, AND 8)** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

Plaintiffs, by and through their undersigned counsel, hereby move this Court to exercise its inherent powers and those outlined in the Stipulation (Doc. 1185 ¶¶ 35-36) to enforce the terms of the Stipulation by finding Defendants substantially non-compliant with Maximum Custody Performance Measures 1-3, 5-6, and 8, for the period of November 2016 to August 2019 in all maximum custody units, and order Defendants to take immediate and substantial action to implement the terms of the Stipulation required to end the extreme conditions of solitary confinement and isolation in the subclass units, as well as the mental health and other out-of-cell group programming designed to counteract the devastating impact of isolation on prisoners with serious mental illness.

## INTRODUCTION

This motion arises from continued flaws in the monitoring process for the Maximum Custody Performance Measures ("MCPMs") at Eyman-Browning, Lewis-Rast, Eyman SMU-I, and Florence-Kasson from November 2016 to August 2019, the most recent month for which Defendants have produced Max Custody Notebooks supporting their compliance findings. Stretching as far back as March 2015, and notwithstanding the Defendants' repeated self-reports of nearly 100% compliance across the board for the MCPMs, Defendants' methodology for monitoring their compliance with the MCPMs as well as their underlying administration of out-of-cell time, incentives, and group programming for the subclass members in isolation have been marked by deep methodological errors, inconsistencies, and the lack of good faith. Despite Plaintiffs' numerous notices of non-compliance, Plaintiffs' previous motion to enforce the MCPMs, and Defendants' failed motion to terminate the MCPMs, Defendants continue to violate the MCPMs, undermining the operation of the Stipulation.

Defendants have also continued to violate the 2017 Max Custody Monitoring Guide and the Stipulation in calculating their compliance with the MCPMs. Specifically, Defendants have failed to audit their compliance using the files of randomly selected sub-class members. Defendants have also failed to follow the Monitoring Guide's required procedures when documenting refusals of out-of-cell time. These failures bring the validity

1    of Defendants' self-reported compliance rates into question.

2         Likewise, Plaintiffs have amassed evidence that Defendants' offers of out-of-cell

3    time are often unreasonable or unattainable such that isolation sub-class members are

4    unable to take advantage of those offers. As they have done before, Defendants consistently

5    structure their communication of opportunities for out-cell-time in ways that maximize

6    refusals by the sub-class members. And crucially, the conditions regularly encountered by

7    sub-class members during out-of-cell time are so unreasonable that they have discouraged

8    class members from taking full advantage of out-of-cell opportunities. The result of these

9    conditions and practices has been extremely high refusal rates for out-of-cell time that do

10   not reflect the sub-class members' actual desire for out-of-cell opportunities.

11        Defendants' sustained, intractable non-compliance has resulted in significant harm

12   to the subclass members by perpetuating the devastating impact of extreme conditions of

13   solitary confinement and isolation, particularly as it relates to those with serious mental

14   illness. As such, Plaintiffs ask that the Court find non-compliance with MCPMs #1-3, 5-6,

15   and 8 at Eyman-Browning, Lewis-Rast, Eyman SMU-I, and Florence-Kasson and order a

16   remedial plan to correct that non-compliance.[1]

17   _____

18   [1] Under the Stipulation, the MCPMs require the following:
       • MCPM #1 requires that maximum custody prisoners receiving a minimum
19         amount of out-of-cell time per week: Step I (7.5 hours); Step II (8.5 hours);
           and Step III (9.5 hours);
20     • MCPM #2 incorporates DI 326's incentive system and requires that all Step
           II and III prisoners are mandated to be offered at least one hour of out-of-cell
21         group programming a week;
       • MCPM #3 requires that if out-of-cell time mandated by MC PM #1, 2, and 8
22         is limited or cancelled it must be properly documented and justified as
           required by the Stipulation;
23     • MCPM #5 requires that all maximum custody prisoners are offered a
           minimum of 6 hours of out-of-cell exercise a week;
24     • MCPM #6 requires that all prisoners eligible for participation in DI 326 be
           offered out-of-cell time, incentives, programs and property consistent with
25         their Step Level and housing;
       • MCPM #8, requires that prisoners with serious mental illness be offered all
26         of the privileges and incentives under DI 326 and additional out-of-cell time
           per week, including ten hours of unstructured time; one hour of additional
27         mental health programming; one hour of pscyho-educational programming;
           and one hour of additional out-of-cell programming.

28   [Doc. 1185-1, Ex. E]

## PROCEDURAL HISTORY

On September 16, 2019, the Court denied Defendants' motion to terminate MCPMs #1-3, 5, 6, and 8 at the Eyman-Browning, Lewis-Rast, Eyman-SMU I, and Florence-Kasson facilities based on alleged compliance from November 2016 to October 2018. [Doc. 3359, Order at 11] The Court found that Defendants' monitoring process "missed the critical and necessary first step [of a sufficiently random sampling technique]" and therefore must be "viewed with a heavy dose of skepticism." [*Id*. at 8] The Court further ordered the parties to mediate their ongoing disputes so as to narrow their disputes concerning the MCPMs. [*Id* at 11.] Upon narrowing the issues at a mediation, the Court held that Plaintiffs may file a renewed motion to enforce the Stipulation as to the remaining MCPM disputes. [*Id.*]

The parties' scheduled mediation took place before Judge Fine in chambers on October 30, 2019. [Doc. 3396 ("Settlement discussions took place. The parties had productive discussions; all parties participated fully and in good faith.")] Post-mediation, the core compliance issues for MCPMs #1-3, 5, 6, and 8 at Eyman-Browning, Lewis-Rast, Eyman-SMU I, and Florence-Kasson remain unresolved.

## STATEMENT OF FACTS

### I.   DEFENDANTS' MAX CUSTODY NOTEBOOKS DEMONSTRATE A NON-RANDOM SELECTION OF PRISONER RECORDS

The Stipulation requires that the MCPMs be monitored "for one randomly selected week of each monitored month, for 10 randomly selected prisoners"—that is, ten prisoners randomly drawn from the seriously mentally ill population (SMI), and ten from the non-SMI population. [Doc. 1185-1, Ex. E at 44-45] This random selection of just 20 prisoner records each month to monitor the conditions of thousands of people is fundamental to the integrity of the monitoring of the MCPMs. As Defendants' own expert has correctly stated, "Random sampling techniques ensure that no one file from the universe of files has any higher probability or likelihood of being included in the sample than any other." [Doc.

2465-1, Declaration of J. Baillargeon at 3, ¶ 9] In the absence of random sampling, according to Plaintiffs' expert, Dr. Craig Haney, there is a stronger possibility that "the sample would not faithfully represent that larger universe of cases to which researchers (or, in this instance, auditors) want to generalize." [Doc. 3237, Declaration of Dr. Craig Haney at 3, ¶ 7]

Here, the parties have agreed to conduct what is termed "interval sampling." Interval sampling is a "method of random sampling in which, after a **random start**, every Nth sample is selected from a sampling frame containing all possible cases from which to sample records." [*Id.* at ¶ 8 (emphasis added)] As the 2017 Monitoring Guide further explains, this is the chosen method for monitoring the MCPMs. The count sheets are used as the primary document to identify the pool of eligible prisoners for each location. The total number of prisoners is divided by ten and then that number is the skip-interval between selected prisoners. [Doc. 3359, Order at 7] However, a non-random initial selection destroys the randomness of the sampling technique, making the process non-random and potentially biased. [Doc. 3237, Haney Decl. at 4, ¶¶ 10-11]

In its ruling on the Defendants' Motion to Terminate MCPMs #1-3, 5, 6, and 8, the Court found that the Defendants did not use a random starting point in its selection process during the period of November 2016 to October 2018, and instead began their sampling with the first name on the count sheet and then used the skip-interval, an error that violated "the basic, critical principle of random sampling." [*Id.* at 5, ¶ 14] For the monitoring period of November 2016-October 2018, Plaintiffs conducted an exhaustive review of the count sheets from the Eyman-Browning, Lewis-Rast, Eyman-SMU I, Lewis, and Florence facilities Defendants used as their sampling pool. In 136 instances out of 192 total instances, Defendants began their sampling with the first name listed on the count sheet, or with the first SMI prisoner listed. [*See* Doc. 3238 at ¶ 5] In the remaining 56 instances, Defendants began at a different start point not demonstrated to be randomly selected.[2] [*Id.*]

---

[2] Even if Defendants arbitrarily selected a starting position in these instances, the starting point would not have been **randomly** selected. [*See* Doc. 3237 at 3, ¶ 5 ("A random

1    Because Defendants regularly started their sampling with the first name listed on the count

2    sheet or at a location not demonstrated to be randomly selected, their methodology does not

3    qualify as random sampling.

4         Due to this error, the Court found that "certain records—those closest to the skip-

5    interval—[had] a much higher likelihood of being selected while other records—those

6    further from the skip-interval—[had] a much lower chance of being selected." [Doc. 3359,

7    Order at 8] The Court emphasized the significance of this error in its ruling on the motion

8    to terminate. The Court found that Defendants' errors, depending on the size of the sampling

9    pool, would have the effect of "precluding large groups of prisoners from being selected,"

10   thus compromising the necessary review of files for compliance assessment purposes. [*Id.*]

11   According to the Court, when Defendants have failed to ensure the random selection of sub-

12   class members' files for review, "the remainder of their arguments regarding the outcome

13   of the monitoring must be viewed with a heavy dose of skepticism." [*Id.*] Put another way,

14   the use of random selection techniques is a foundational requirement for monitoring in

15   accordance with the Stipulation, and its absence is a fatal flaw which invalidates the

16   compliance findings for each MCPM.

17        Plaintiffs' review of the Max Custody Notebooks subsequent to the period pertinent

18   to the Court's ruling on Defendants' Motion to Terminate revealed that their erroneous

19   practice continues, invalidating Defendants' most recent compliance findings. During the

20   latest monitoring period, from November 2018 – August 2019, Plaintiffs found numerous

21   instances in which Defendants clearly failed to begin each prisoner selection process with

22   a random starting point, as evidenced by the repeated selection of certain sub-class

23   members' records during the latest 10 month monitoring period from November 2018 –

24   August 2019.[3] At Eyman-Browning, 6 sub-class members were selected at least 5 times,

25   _____

26   sample is not a sample that is selected in an arbitrary, haphazard, or idiosyncratic fashion.")]
     [3] Even where starting points appear to vary in Defendants' selection methodology,

27   they are not random. For example, at Florence-Kasson, the starting point for counting to
     determine record selection was found to vary inexplicably month by month with no clear

28   notation as to why or how the starting point is determined.  By way of illustration, in the
     Florence max custody notebook for April 2019, the counting started at the top of the first

with 4 of those sub-class members having been picked for at least 7 consecutive months. [Declaration of Jessica Carns, dated May 7, 2020, Ex. 1] At Florence-Kasson, 8 sub-class members were selected 4 times. [*Id.*] At Eyman-SMU I, 1 sub-class member was selected for 5 consecutive months. [*Id.*] And, at Lewis-Rast, 7 sub-class members were selected at least 5 times and for at least 5 consecutive months. [*Id.*] These statistically unlikely outcomes are a natural byproduct of Defendants' flawed selection process, and fatally compromise the veracity of the subsequent reviews.[4]

These non-compliant practices, which were previously identified in Plaintiffs' opposition to Defendants' Motion to Terminate MCPMs #1-3, 5, 6, and 8 and invalidated by the Court, undermine the operation of what is, ironically, "Defendants' own interpretations of the MCPMs and how compliance with the MCPMs will be measured." [Doc. 3359, Order at 6] By continuing to contravene the required practices of the mandatory random selection for record review as identified by the parties as well as the Court, Defendants have invalidated their compliance findings for the MCPMs at Eyman-Browning, Lewis-Rast, Eyman SMU-I, and Florence-Kasson during the entire period of compliance from November 2016 to August 2019.

## II.    THERE IS AMPLE EVIDENCE THAT DEFENDANTS ARE NOT SATISFYING OUT-OF-CELL REQUIREMENTS

Plaintiffs first documented a troubling and consistent pattern of refusals of out-of-cell time and group programming across the system in their February 2017 Motion to

---

page of the count sheets, while for May 2019, the counting started in the middle of the page. Sometimes there was no indication of a starting point at all, which makes it impossible to determine Defendants' methodology and whether they are utilizing their designated skip interval chosen for that month.  Despite the apparent chaotic selection methodology, **the same** prisoner records are repeatedly selected across months. *See* Carns Decl. ¶6, Exs.1, 4.

[4] The large population belies Defendants' repeated selection of the same prisoner records. For example, In November 2018, Eyman-Browning held a total max custody population of 754 and in August 2019 had a total max custody population of 728; while Florence-Kasson, the smallest unit, had a total max custody population of 142 in February 2019 and 158 in July 2019.  *See* Carns Decl., Ex. 3.  The SMI population, while smaller, is still substantial, especially at Florence-Kasson, for example, in March 2019 the SMI population was 123 and in August 2019 it was 127.  *Id.*

Enforce. [Doc.1944 at 12-17] Rates of refusal for out-of-cell time were running well over 50% in most facilities for most months and were often up to 70% or 90%. [*Id.*] These alarmingly high refusal rates translate into many prisoners being confined for days, weeks, and months in their cell, and raise serious questions about the legitimacy of the refusals, the underlying cause of such pervasive refusals, and why Defendants have taken no action to solve the problem. Partially in response to this issue, Plaintiffs advocated certain monitoring requirements that are included in the July 2017 final Monitoring Guide, and were approved by the Court, such as the signatures documenting refusals. [Doc. 3177-2 ¶¶ 2-3, Ex. 1; *see also* Doc. 1889; Doc. 1915] Despite these requirements, however, refusal rates for all out-of-cell time among both the SMI and non-SMI prisoners in maximum custody remained between 60-80% for both out-of-cell exercise and group programming for most facilities, most months for the period of November 2016 to August 2018. [*See* Doc. 3177-3 at 3-4, ¶¶5-7; Ex. 3 (FRE 1006 compilation of refusal rates for SMI and Non-SMI Prisoners, January 2018 – October 2018)] These same refusal rates have persisted through the most recent monitoring documents up to August 2019 at Eyman-Browning, Eyman-SMU I, Florence-Kasson, and Lewis-Rast. For exercise/recreation opportunities, the out-of-cell refusal rates were between 65–85% for most facilities, most months from November 2018 – August 2019 [Carns Decl., Ex. 5] For mental health and group programming, the refusal rates were between 40-60% for most facilities, most months from November 2018 – August 2019. [*Id.*] And, when considering particular out-of-cell opportunities, such as recreation in the small, concrete chute enclosure, refusal rates skyrocketed even further, to as high as 95% at Eyman-SMU I in May 2019. [*Id.*]

While these astronomical refusal rates raise significant evidentiary questions, which Plaintiffs address below, the underlying records produced to support these refusals also demonstrate that Defendants are not complying with the required monitoring methodology, the Court's "Final Procedures," set forth in the Monitoring Guide.

### A. Defendants' Offers for Out-of-Cell Time Do Not Satisfy the Stipulation

The Stipulation requires that both SMI and non-SMI prisoners in maximum custody

are "offered" certain out-of-cell time. [Doc. 1185-1, Ex. E] This includes such activities as: a minimum amount of out-of-cell time for each prisoner (MCPM #1); one hour of group programming for prisoners depending upon step level (MCPM #2); a minimum of 6 hours of out-of-cell exercise a week (MCPM #5); and every week for SMI prisoners, an additional 10 hours of unstructured time out-of-cell, one hour of additional out-of-cell mental health programming, one hour of additional out-of-cell psychoeducation programming, and one hour of additional out-of-cell programming (MCPM #8). [*Id.*]

As discussed above, Defendants are recording extremely high refusal rates for all out-of-cell time allegedly being "offered" to prisoners month after month, year after year. But Plaintiffs have found evidence that raises serious questions regarding whether or not Defendants are actually "offering" the out-of-cell time required by the Stipulation. At the crux of this issue is the question of whether the spirit as well as the letter of the Stipulation is being complied with or undermined. That is, it is not enough for an officer to simply "offer" an opportunity for out-of-cell time to a sub-class member, that offer must be sufficiently reasonable and attainable such that the sub-class member can both meaningfully respond and take advantage of the out-of-cell opportunity. As the Court stated, "routinely offering outdoor exercise to sleeping prisoners during typical sleeping hours does not provide prisoners the type of choice contemplated by the Stipulation and MCPMs. Additionally, prisoners' knowledge that accepting recreation will lead to four hours confined in the shower or that they will not be provided sufficient clothing when it is cold outside, mean the offers are not reasonable." [Doc. 3359, Order at 10] In rejecting Defendants' Motion to Terminate the MCPMs, the court further noted that the record demonstrated "significant factual uncertainty regarding the reasonableness of the offers for prisoners to leave their cells" and that the Defendants "do not deny that they offer recreation when prisoners are sleeping or that there are times when recreation is not offered because of staffing shortages." [*Id.* at 11]

In finding that Defendants' had not carried the burden of showing that sub-class members were receiving sufficiently reasonable offers to comply with out-of-cell

requirements, the Court relied on Plaintiffs' evidence of the following practices: "[S]taff members do not actually ask prisoners if they would like exercise, offer exercise in a whisper so that prisoners cannot hear the offers, or offer exercise while prisoners are sleeping;"[5] "Prisoners are not provided adequate clothing or footwear and are not able to go outside on early cold mornings;"[6] "[P]risoners are left in the showers for hours after recreation, which discourages them from taking exercise;"[7] "The outside recreation cages contain feces or the smell of urine, which inhibit prisoners from taking exercise."[8] [*Id.* at 9]

Since the Court's denial of Defendants' motion to terminate, Plaintiffs have continued to amass evidence that Defendants' "offers" for out-of-cell time fall short of the Stipulation's requirements, if they are even made at all. In response to Plaintiffs' recent site inspections of the maximum custody units at Eyman-Browning and Florence-Kasson, sub-class members consistently reported that officers still maximize refusals by offering recreation early in the morning or in whispers. [Declaration of Curtis Harris, dated May 8, 2020, Ex. 1, Declaration of Adrian Montoya, dated December 12, 2019, ¶ 8 ("Some officers will offer us outdoor rec. but others make us ask. Some officers will come to our pod early in the morning and if you're not awake or ready to go, you [lose] your rec. time."); Ex. 2, Declaration of Daniel Carpio, dated March 12, 2020 ¶ 6 ("Offers for recreation and showers are often made early in the morning, sometimes as early as 5:30 am. Because of this,

---

[5] [*See*, e.g.,Doc. 3177-2 at 47, Declaration of Maurice Soto at ¶¶ 2-3; *id.* at 51, Declaration of William Hartless ¶¶ 3-4; *id.* at 55, Declaration of Mack Gordnattaz ¶¶ 4, 9; *id.* at 59, Declaration of Kyle Drattlo ¶¶ 3, 8; *id.* at 63, Declaration of Vinson Johnson ¶ 2; *id.* at 67, Declaration of Juan Chavez ¶ 3; *id.* at 71, Declaration of Victor Lizardi ¶ 3; *id.* at 75, Declaration of Jesus Leja ¶ 3; *id.* at 92, Declaration of Jesus Guzman ¶ 4; *id.* at 96, Declaration of Quinton Hollis ¶ 2; and *id.* at 103, Declaration of Miguel Berroteran ¶ 3]

[6] [*See*, e.g., Doc. 3177-2 at 47, Declaration of Maurice Soto at ¶ 4; *id.* at 51, Declaration of William Hartless ¶ 6; *id.* at 55, Declaration of Mack Gordnattaz ¶ 5; *id.* at 59, Declaration of Kyle Drattlo ¶ 3; *id.* at 63, Declaration of Vinson Johnson ¶ 5; *id.* at 71, Declaration of Victor Lizardi ¶ 2; *id.* at 79, Declaration of Yerco Arrvayo ¶ 3; *id.* at 92, Declaration of Jesus Guzman ¶ 5; *id.* at 96, Declaration of Quinton Hollis ¶ 3; and *id.* at 103, Declaration of Miguel Berroteran ¶ 8]

[7] [*See*, e.g., Doc. 3177-2 at 51, Declaration of William Hartless ¶ 5; *id.* at 55, Declaration of Mack Gordnattaz ¶ 6; *id.* at 59, Declaration of Kyle Drattlo ¶ 4; *id.* at 63, Declaration of Vinson Johnson ¶ 4; *id.* at 92, Declaration of Jesus Guzman ¶ 7; and *id.* at 103, Declaration of Miguel Berroteran ¶ 10]

[8] [*See*, e.g., Doc. 3177-2 at 59, Declaration of Kyle Drattlo ¶ 7; and *id.* at 100, Declaration of John Romero ¶ 2]

individuals whose psychotropic medications make it difficult in the morning are unable to accept these offers. One such individual in my pod has gone 8 months without leaving his cell"); Ex. 3, Declaration of Stephen Dionne, dated December 12, 2019, ¶ 7[9] ("I've frequently been asleep when COs allegedly offer rec in the early morning, like 6am. Because I've been asleep, COs won't allow me to go to rec."); Ex. 4, Declaration of Jesse Cañez, dated March 12, 2020, ¶ 2 ("Offers for recreation and showers are made early in the morning, sometimes as early as 6:00 am. My psychotropic medications make it difficult for me to wake up in time to respond to these offers; because of this, I'm consistently marked down as having refused recreation and showers."); Ex. 5, Declaration of Thomas Hernandez, dated March 12, 2020, ¶ 7 ("Showers are offered in the early morning. Showers are offered but not cell-by-cell. I do not believe officers make an effort to meaningfully offer showers."); Ex. 6, Declaration of Abraham Zavala, dated March 12, 2020, ¶ 4 ("When I was housed in Pod 3B, officers would regularly announce if anyone would like to go to recreation at 5:30 am or 6:00 am. However, officers would just make the announcement in a normal conversational volume when everyone was asleep. Because I was asleep at that time, I would be marked as refusing even though I was interested in going to recreation.")].[10]

Likewise, sub-class members report that the conditions they experienced during out-of-cell opportunities are often so unsanitary and inhumane that they are discouraged from taking advantage of out-of-cell opportunities. For instance, sub-class members are often left in the rarely cleaned showers for hours before being let out, with many having resorted to "bird bathing", where one washes himself with water from the small sink attached to his toilet, in lieu of actual showers. [Harris Decl., Ex. 7, Declaration of Roberto Ramirez, dated December 12, 2019, ¶ 9 ("Inmates often urinate in the showers since they have no other

---

[9] The Declaration of Stephen Dionne mistakenly contains two paragraphs that are labeled as "7". The forgoing citation refers to the second paragraph 7 in the declaration.

[10] While the ability to wake up with an alarm clock is a routine practice outside of prison, for prisoners in maximum custody in the Arizona Department of Corrections, it is not so simple. Such prisoners may be restricted from having such property or unable to purchase an alarm clock because they lack the funds to do so. *See* Harris Decl. ¶ 3

way to use the bathroom while they're stuck, and the showers aren't cleaned often which means that they're filthy most of the time. As a result, I only take showers twice per month and bird bath in my cell at all other times"); Ex. 8, Declaration of Philip M. Chambers, dated December 12, 2019, ¶ 5 ("The last time I went to the shower I was left there for over an hour and the light was off so I was trapped in the dark. Because of these shower conditions I mostly try to bathe in my cell with the in-cell sink. It's degrading but the only way to keep clean"); Ex. 9, Declaration of David Gonzales, dated March 12, 2020, ¶ 4 ("The showers are filthy with black mold and are rarely cleaned, which discourages some inmates in my pod from taking advantage of opportunities to shower. I have observed certain inmates in my pod go for months without showering as a result.")].

### B. Defendants' Non-compliance with the Monitoring Guide's Documentation Requirements Casts Doubt on the Veracity of Their Reported Refusal Rates

Further casting doubt upon Defendants' self-reported refusal rates is their unwillingness to adhere to the Monitoring Guide's documentation requirements for out-of-cell time refusals. The Monitoring Guide requires that when a prisoner refuses any out-of-cell time, the officer receiving the refusal must contemporaneously sign that refusal and either the prisoner himself or another officer should co-sign the refusal. [Doc 3177-2, Ex. 1, Monitoring Guide at 13, 18, 23, 26, 29 (applying to MCPMs ##1-2, 5-6, and 8)] As well, the Monitoring Guide requires that if a sub-class member has an "extended pattern of refusals or changed behavior" then a supervisor must have a discussion with the prisoner about the refusals and document the date and nature of the conversation in the "comments" section of the out-of-cell tracking forms. [*Id.*]

Despite these clear requirements of the Monitoring Guide, when Plaintiffs reviewed the out-of-cell tracking sheets used by Defendants to make compliance findings from November 2016 to October 2018, multiple instances, across all max custody units, were found where Defendants failed to comply with these provisions. The review demonstrated that Defendants are almost never obtaining a second signature on the alleged refusals, and no prisoners are actually signing their own alleged refusals. [Doc. 3177-3 at 4, ¶¶10-11;

Exs. 5, 6] Moreover, when officers record why a prisoner has allegedly refused out-of-cell time, the reasons written down by officers are often the same rote response, word for word.[11] [Id. at 7-8, ¶¶15-17; Exs. 10, 11]

Plaintiffs also found that Defendants routinely failed to have the required follow-ups with sub-class members who had extended patterns of refusals. [Id. at 6, ¶14] Indeed, in example after example, where a prisoner refused *all* out-of-cell time in a given week, there was no evidence that any supervisor ever counseled him as required by the Monitoring Guide. [Id.; Ex. 9] This pattern of noncompliance is especially concerning as Plaintiffs argued for the inclusion of this provision in the Monitoring Guide in order to help identify prisoners in isolation experiencing crisis or mental health decompensation.

Since the Court's ruling on Defendants' Motion to Terminate, Plaintiffs have continued to amass evidence that Defendants have not complied with the Monitoring Guide's documentation requirements for refusals.  From November 2018 to August 2019, the same pattern emerged, despite the lack of safety, security, or operational concerns that would make it impossible to comply with the monitoring requirements. [Carns Decl., ¶ 11 ("I saw no notation in the documented monitoring that due to safety, security, or operational concerns it was impossible to a get a second signature or a signature from the refusing prisoner.")] During this latest monitoring period, Defendants consistently failed to obtain a second signature to verify refusals of out-of-cell time. And, as with the November 2016 – October 2018 monitoring period, there was not a single refusal in which the comments section contained a sub-class member's signature as verification of the refusal. [Id. ("Consistent with my findings described in my declaration for the monitoring period of November 2016 through October 2018, I did not find a single refusal in the comments

---

[11] "Although the documentation provided for Lewis-Rast shows a very strong pattern of duplicating quotes from prisoners, I found a broader theme of generic and/or repetitive quotes being used from correctional officers across months and facilities throughout the monitoring period of November 2016 through October 2018.  For example, a correctional officer at Florence-Kasson used similarly vague quotes across multiple months for multiple inmates.  Again in the documentation for Eyman Browning, I noted comparable quotes across multiple months being used by correctional officers to explain prisoners' consistently high rates of refusing out-of-cell recreation and programming." [Doc. 3177-3 at 7-8, ¶17]

section on the back of prisoners' out-of-cell tracking sheets in which the prisoners themselves signed, thereby verifying their own refusal, through August 2019.")][12]

During the period November 2018 to August 2019, Defendants also failed to comply with the mandates of the Monitoring Guide by not enforcing the provision that staff must counsel prisoners who exhibit a pattern of refusals to engage in out-of-cell activities. [Carns Decl. ¶ 13].  This pattern of noncompliance was especially notable at Eyman-SMU I where there were repeated instances in which there would be no visible note on a prisoner's out-of-cell tracking sheet when prisoners exhibited a clear pattern of refusing out-of-cell time during a monitored week.  But while notable at Eyman-SMU I, this pattern generally spans all facilities and all months for the monitoring period of November 2018 through August 2019.  [Id.] Although there were numerous instances where prisoners refused all out-of-cell-time opportunities offered to them during a monitored week were generally verified by only one correctional officer's signature, and there was no note indicating that the prisoner

---

[12] Similarly, Defendants' documentation frequently showed instances in which an entire group programming class of up to approximately ten (10) prisoners would allegedly refuse to participate in out-of-cell-programming.  This pattern spans all facilities and all months for the monitoring period of November 2018 through August 2019. [Carns Decl. ¶ 9].  But when prisoners refuse group programming, the corresponding sign-in sheets are not signed by the prisoners themselves, instead, the word "refused" was written in place of the prisoners' signatures.  When multiple prisoners refused the same hour of group programming, the same correctional officer generally writes "refused" on the prisoners' signature lines where they should have been signing to verify their own refusal.  [Id.]  In addition, there are numerous instances where "group programming" only consisted of one or two prisoners on the sign-in sheets.  More often than not, these one to two prisoner "groups" would be recorded as refused by all participants.  [Id.] A similarly questionable pattern in Defendants' monitoring documentation is the high incidences of correctional officers using the same illegible signature to "sign" for each prisoner, particularly for the blanket refusals of group programming. [Id. at ¶ 10] For example, Plaintiffs found multiple instances in the monitoring documents in which the refusal of all prisoners offered a certain program was denoted by a slash across all signature lines, demonstrating that there was no valid attempt on behalf of the correctional officer to receive even a single prisoner's signature on their refusal. Instead, individuals' alleged refusals of group programming are denoted by the word "refused" written by a correctional officer, illegible signatures clearly by the same correctional officer, or a slash across all prisoners' signatures lines. [Id. at ¶ 10; Ex. 8]

was counseled in any way, even where there was a notation in the documentation, it was a perfunctory and generic quote supposedly taken from the prisoner refusing. [*Id.* ¶ 14, Ex. 9] For example, such phrases as the "inmate said he didn't want table time rec or class" or "he just doesn't want to go," were repeatedly found in Defendants' documentation. [*Id.* ¶ 15, Ex. 10]

Defendants' consistent pattern of ignoring and promoting refusals of out-of-cell time and programming across months, years and facilities undermines their compliance findings and the central purpose of the Stipulation itself.  As a result they should be found non-compliant for the entire period, November 2016 through August 2019.

## III.    DEFENDANTS' FLAWED ADMINISTRATION OF THE STEP INCENTIVE PROGRAM VIOLATES THE STIPULATION

Defendants' Max Custody Step Incentive Program, which was most recently operationalized in Department Order ("DO") #812, is a cornerstone of MCPMs #1, 3, and 5-6, given that the program is a key determinant of the type and amount of out-of-cell time a sub-class member is entitled to.[13] As an example, MCPM #2 requires that "[a]ll maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III." [Doc. 1185-1, Ex. E]

Participants in Department Order ("DO") #812's incentive program progress through three "step levels" before graduating out of the program into less restrictive housing with Step 1 being the most restrictive and Step 3 being the least restrictive level with the most privileges and incentives. Sub-class members at Step 2 and 3 have access to larger exercise enclosures and greater socialization during exercise periods in addition to group programming classes. For example, a Step 2 sub-class member at Eyman-Browning must be offered "[t]hree, 2.5-hour blocks per week, one of which can be in the 10x10 interactive

---

[13]   DO #812 replaces Director's Instruction ("DI") 326, which previously operationalized the Max Custody Step Incentive Program.

enclosure." [Harris Decl., Ex. 18 at 12] At Eyman-SMU I, a Step 3 class member must be offered "[t]hree, 2.5 hour blocks per week to include one-time per month in 10x10 enclosure (two inmates)," "[o]ne, 2.5-hour block per month in 20x40 basketball enclosure (up to eight inmates)," and "[o]ne, 2.5-hour block per month in 50x90 (up to 32 inmates)." [*Id.* at 14] At Florence-Kasson, Step III sub-class members must be offered "[t]hree, 3-hour blocks per week in a combination of 20x20 and 40x40." [*Id.* at 17] At Lewis-Rast, Step II sub-class members must be offered "[t]hree, 2.5 hour blocks per week 10x10 enclosure (two inmates)," and "[o]ne, 2.5-hour block per month in 20x40 basketball enclosure (up to eight inmates)." [*Id.* at 14]

Despite the centrality of the DO #812 incentive program in satisfying the MCPM requirements, Plaintiffs have found that the program has been haphazardly executed, particularly as it relates to step level progression. This has resulted in a significant impact to many sub-class members' access to out-of-cell opportunities that they would otherwise be entitled to, and further exacerbates excessively high refusal rates for out-of-cell time, given the often-cited undesirability of recreation opportunities taking place in environments generally reserved for the lower step levels, such as the concrete chute enclosure and the 10x10 recreation cages. [*See* Carns Decl., Ex. 6 (compare photos of the concrete chute rec (ADC153355-57) and 10x10 cages (ADCM1603696- 97) with the exercise yards Step 2 and 3 prisoners are supposed to be provided (ADCM1558869-71; ADC153375; ADC15362)); Harris Decl., Ex. 10, Declaration of Conrad Alvarez, dated March 12, 2020, ¶ 8 ("The 10x10 cages are terrible, they are only concrete and metal with no exercise equipment. They are worse than being in our cells. At least in our cells we have water and a tv or radio or book.")]  In May 2019 alone at Eyman-SMU I, recreation opportunities at the chute enclosure were refused 95% of the time. [Carns Decl., Ex. 5] Due to Defendants' failure to implement the Step Program incentive program as required by the Stipulation's MCPMs #1, 3, and 5-6, these measures should be found non-compliant for the period November 2016 to August 2019.

Plaintiffs have also amassed evidence that subclass members at Step 2 and 3 have

been consistently denied out-of-cell exercise opportunities as required by the Stipulation/DO 812 at the larger recreation enclosures in accordance with their step levels. Instead, class members at Step 2 and 3 are often restricted to recreation opportunities in the smaller, concrete "chute" recreation enclosures or small recreation cages measured at 10 feet by 10 feet. Recreation opportunities held in these enclosures are undesirable inasmuch as they don't represent out-of-cell opportunities or opportunities for socialization in a meaningful sense; the "chute" is a small, four-walled concrete enclosure with minimal sunlight, and the small recreation cages are no larger than a cell and often filthy with urine and feces because there is no bathroom access during recreation, and the cages are rarely cleaned. [Harris Decl., Ex. 7, Ramirez Decl., ¶ 8 ("We don't have access to bathrooms in the recreation areas. If we go back to our cells to use the bathroom, we are told that we can't go back to recreation. Due to this, inmates often urinate in the recreation areas, which makes them filthy and leaves a lingering smell of urine.")]   During recent facility inspections at Eyman-Browning and Florence-Kasson, sub-class members consistently reported that they have refused recreation opportunities because officers often exclusively offer recreation in the chute enclosures or small cages regardless of Step level. [Harris Decl., Ex. 11, Declaration of Damasso Aguilar, dated March 12, 2020, ¶ 4 ("When I was a Step 2, officers would come up with excuses to cancel Saturday recreation or switch us to small cage recreation because they were short staffed."); Ex. 10, Alvarez Decl., ¶ 8 ("Even though I am a Step 3, Phase 3, I am frequently only offered outdoor exercise in the 10x10 cages instead of the larger enclosures that I'm entitled to as a Step 3…I believe the officers do this on a weekly basis because they know the 10x10 cages are considered punishment and therefore the prisoners will refuse to go out."); Ex. 12, Declaration of Tyson Anderson, dated March 12, 2020, ¶ 7 ("I'm Step III so I should be allowed to go to the big recreation yards, but nearly every Tuesday we're taken to the 10'x10' cages because they say they are short staffed."); Ex. 15, Declaration of Jason Johnson, dated March 12, 2020, ¶ 6 ("When outside exercise is cancelled it's usually the Step 2 and 3 exercise enclosures that people want to go to. Instead the 10x10 cages will be offered which most people don't like."); Ex.

3, Dionne Decl., ¶¶ 2, 7 ("I'm a Step 3, Phase 3...[w]e're not offered rec in the larger enclosures ever.")]

Plaintiffs have also amassed evidence that sub-class members have been deprived of the opportunity to meaningfully participate in the step program. During a recent facility inspection at Eyman-Browning, sub-class members reported being kept at the same step level for years at a time without any progression out of solitary confinement, despite participating in the required programming and otherwise meeting the requirements for step progression. [Harris Decl., Ex. 13, Declaration of Leonard Medina, dated December 12, 2019, ¶ 2 ("I am currently at Step level 3 under DO #812 and have been at this level for 5 years, during which time I have not received any disciplinary tickets or infractions"); Ex. 1, Montoya Decl., ¶ 2 ("I'm a Step 3 and I've been a Step 3 for 3 years. I've been discipline free for the past 3 years too.")] Sub-class members also reported being demoted to a lower step level despite adhering to the step program requirements, losing valuable access to group programming and superior exercise opportunities. [Harris Decl., Ex. 14, Declaration of Zach Eggers, dated December 12, 2019, ¶ 3 ("And, despite the fact that I didn't receive any disciplinary tickets or infractions as a Step 3, I was demoted to Step level 1 with no explanation on September 31 [sic], 2019.")]

These issues occur with little to no explanation or indication of a feasible path forward to (re)gaining access to higher incentives and, eventually, less restrictive housing. [Harris Decl., Ex. 19, Declaration of Stonney Biddings, dated December 12, 2019, ¶ 3 ("I inquired about my Step 2 because I've completed the requirements in the policy and I was told I am not eligible, 'continue to wait.' I wasn't told why.")] This information gap particularly impacts those sub-class members who are classified as SMI, who may be unable to navigate such an uncertain process. During a facility inspection on March 11-12, 2020 at Florence-Kasson, which has a large SMI population, sub-class members reported that lower functioning SMI sub-class members were unable to understand the Step Program process and never participated in the program as a result. [Harris Decl., Ex. 15, Johnson Decl., ¶ 8 ("If you are pretty high functioning you can manage the Kasson program. But many people

here are too low functioning and need a higher level of help. There are guys on my pod who never leave their cells and live in filth."); Ex. 16, Declaration of Jonathon Gonzalez, dated March 12, 2020, ¶ 2-3 ("I am seriously mentally ill/SMI and have been diagnosed with bipolar disorder…[r]ight now I'm a Step 1. Previously, I was a Step 3. It's very hard to remain a Step 3 because it lasts so long and any mistakes set us back and there's no support and flexibility from staff despite the fact that we're all SMI. There's no mercy here.")] These lower functioning sub-class members instead were decompensating in their cells in nearly complete isolation for months on end with no assistance or intervention by staff. [Harris Decl., Ex. 17, Declaration of Jesus Murrieta, dated March 12, 2020, ¶ 4 ("Other than for the purpose of preparing this declaration, I have never left my cell for the entire time that I have been housed at this unit.")]

There is ample evidence that Defendants' implementation of the Step Program under DO 812 and its predecessor, DI 326, fails to provide the out-of-cell time and incentives required under those policies and fails to move people out of solitary confinement so that the sub-class is trapped in an endless cycle of isolation without a meaningful path back to general population. This violates both the spirit and letter of the Stipulation. [*See, e.g.*, [Doc. 1185-1, Ex. E, MCPM #6 (requiring that sub-class members be given the incentives and out-of-cell time set forth in DI 326/DO 812)]

## IV. DEFENDANTS' CANCELLATIONS OF OUT-OF-CELL OPPORTUNITIES ARE NOT JUSTIFIED IN ACCORDANCE WITH THE STIPULATION

MCPM #3 requires that all out-of-cell time that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation. In detailing the required protocol for cancelled out-of-cell time, the Stipulation establishes that cancellations are justified when they are for "legitimate operational or safety and security reasons such as an *unexpected* [emphasis added] staffing shortage". [Doc. 1185 ¶ 26] The Stipulation provides that "Defendants shall make every reasonable effort to ensure that amount of out of cell time shall be made up for those prisoners who missed out of cell time" in the event of a cancellation. [*Id.*] The court-approved Monitoring Guide further establishes

that the reasons for cancellations must be documented in Information Reports, and that cancellations that are not made up must be accompanied by a Warden's Certification authored by the complex warden, or designee, documenting that "allowing such an inmate out-of-cell time would pose a significant security risk." [Doc 3177-2, Ex. 1, Monitoring Guide at 20]

Plaintiffs have amassed evidence that, in addition to cancellations due to staff shortages being routine and not *unexpected* as required by the Stipulation, Defendants have not made reasonable efforts to ensure that cancelled out-of-cell opportunities have been made up – indeed staff shortages appear to be a routine justification for non-compliance. This is demonstrated by the fact that cancellations of recreation and programming during this period were almost always due to staff shortage.  For example, this was the case in 24 documented cancellations of recreation sessions and 20 cancellations of programming sessions, which resulted in approximately 119 total recorded instances of cancelled out-of-cell time in the weeks selected for monitoring alone. [Carns Decl. ¶ 16].  Unfortunately, the required make-ups for these recreation and programming hours rarely occur and non-compliance with this aspect of the Stipulation is similarly justified due to staff shortages. [*Id.*; Ex. 11]  For example, in August 2019, there were three (3) recreation periods and four (4) programs cancelled in one week at Eyman-SMU I due to staff shortages, none of which were rescheduled – and lack of staffing was the sole excuse used to justify non-compliance. [*Id.*] Additionally, in Defendants' documentation there was frequently no written indication of any attempt to reschedule the cancelled recreation or programs.  [*Id.*]

ADC's chronic and unaddressed staffing shortages undermine the operation of the MCPMs and both the intent and letter of the Stipulation.  For example, according to a recent internal staffing report, Eyman-Browning and Eyman SMU-I have staffing shortages of 52.17% and 50.00%, respectively.[14]  And, despite asserting to the Arizona Joint Committee

---

[14]*See* Jimmy Jenkins, *Internal Report Shows Arizona Prison Is Critically Understaffed*, KJZZ (April 29, 2020), https://kjzz.org/content/1549136/internal-report-shows-arizona-prison-critically-understaffed.

on Capital Review on April 29, 2020 that, "[w]e have no problem hiring folks," ADC Director David Shinn later admitted during the same hearing that, "[w]e do have a staffing problem, *we've had one for multiple years at this point* [emphasis added]. There's no question. In terms of overtime we still have 1,164 correctional officer vacancies throughout the entire system."[15] A staffing shortage that has existed "for multiple years" is not an "unexpected staffing shortage" that can justify Defendants' failure to comply with this requirement. Failing to address this longstanding deficiency perpetuates the devastating impact of isolation on the sub-class, thus undermining the MCPMs and the Stipulation.

## ARGUMENT

Given the overwhelming evidence set forth above, this Court should find that Defendants are non-compliant with Maximum Custody Performance Measures ##1-3, 5-6, and 8 at Eyman-Browning, Lewis-Rast, Eyman-SMU I, and Florence-Kasson from November 2016 to August 2019.

The Court has the authority to issue any relief "provided by law." [Doc. 1185 ¶ 36] The Stipulation also provides that when the Court finds non-compliance it must first order Defendants to submit a plan to be approved by the Court to remedy the deficiencies. [*Id.*] When ordering a party to develop a remedial plan to come into compliance with a settlement or past court orders, "the court is entitled to give some guidance … and set some deadlines for compliance." *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir. 2001). With the inclusion of instructions as to what elements need to be in a remedial plan "the … district judge [does] not attempt to 'micro manage' the [party's] activities, but rather to set clear objectives for it to attempt to attain, and, in most circumstances, general methods whereby it would attain them." *Id.* The U.S. Supreme Court has also held, in a prison conditions case, that a court's inherent power to order a non-compliant party to develop remedial plans to achieve compliance includes the court's ability to direct the party to include certain tasks and

---

[15] *See Review of Revised Scope of Lewis and Yuma Lock and HVAC Projects: Hearing Before the J. Comm. on Capital Review,* 54th Ariz. Leg. at 24:26, 39:25 (April 29, 2020) (Statement of David Shinn), http://azleg.granicus.com/MediaPlayer.php?clip_id=24384&autostart=0.

deadline in the plan, because the court "retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011).

### RELIEF REQUESTED

Plaintiffs request that the Court issue an order that:

1) Finds Defendants non-compliant with MCPMs ##1-3, 5-6, and 8 from November 2016 to August 2019 at Eyman-SMU I, Eyman-Browning, Florence-Kasson, and Lewis-Rast due to the overwhelming deficiencies with Defendants' compliance findings, Defendants' monitoring methodology, and the documentation that allegedly supports Defendants' findings

2) Finds Defendants non-compliant with MCPMs ##1-3, 5-6, and 8 from November 2016 to August 2019 at Eyman-SMU I, Eyman-Browning, Florence-Kasson, and Lewis-Rast due to the failure to randomly select prisoner records for review, as required by these Performance Measures.

3) Orders Defendants to submit a plan, including retaining an outside expert for technical assistance, within 30 days detailing how they plan to remedy the overwhelming pattern of refusals in programming and all other out-of-cell time for the SMI and non-SMI prisoners at Eyman-SMU I, Eyman-Browning, Florence-Kasson, and Lewis-Rast.

4) Orders Defendants to submit a plan within 30 days detailing how they will ensure that the monitors use the methods and procedures necessary to accurately monitor compliance with MCPMs ##1-3, 5-6, and 8 of the Stipulation as set forth in the 2017 Monitoring Guide.

5) Orders Defendants to report monthly on their compliance with MCPMs ##1-3, 5-6, and 8 at Eyman-SMU I, Eyman-Browning, Florence-Kasson, and Lewis-Rast, including the underlying documents upon which their compliance findings are based.

. . .

. . .

# CONCLUSION

While Defendants' failure to utilize random selection techniques and other required monitoring methodologies is on its own sufficient grounds for a finding of non-compliance, in light of that failure, along with Defendants' flawed administration of the Max Custody Step Incentive Program, unreasonable offers for out-of-cell time, and cancellations due to chronic and unaddressed staffing shortages, Plaintiffs respectfully request that the Court find Defendants substantially noncompliant with MCPMs #1-3, 5-6, and 8 at Eyman-Browning, Eyman SMU-I, Lewis-Rast, and Florence-Kasson, for the period November 2016 through August 2019. Plaintiffs additionally request that the Court order Defendants to promptly submit a remedial plan for each noncompliant measure and to report monthly to the Court on their compliance levels.

Dated: May 8, 2020

**ACLU NATIONAL PRISON PROJECT**

By:   s/ Amy Fettig
David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
               afettig@aclu.org
               echo@aclu.org
               mmorris@aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
               agerlicher@perkinscoie.com
               jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     jkeenan@acluaz.org
               carellano@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
               ahardy@prisonlaw.com
               snorman@prisonlaw.com
               ckendrick@prisonlaw.com
               rlomio@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez;
Christina Verduzco; Jackie Thomas;
Jeremy Smith; Robert Gamez; Maryanne
Chisholm; Desiree Licci; Joseph Hefner;
Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others
similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**


By:   s/ Maya Abela
      Rose A. Daly-Rooney (Bar No. 015690)
      J.J. Rico (Bar No. 021292)
      Maya Abela (Bar No. 027232)
      177 North Church Avenue, Suite 800
      Tucson, Arizona 85701
      Telephone:  (520) 327-9547
      Email:
          rdalyrooney@azdisabilitylaw.org
               jrico@azdisabilitylaw.org
               mabela@azdisabilitylaw.org

      Asim Dietrich (Bar No. 027927)
      **ARIZONA CENTER FOR DISABILITY LAW**
      5025 East Washington Street, Suite 202
      Phoenix, Arizona 85034
      Telephone:  (602) 274-6287
      Email:     adietrich@azdisabilitylaw.org

      *Attorneys for Arizona Center for Disability Law*

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on May 8, 2020, I electronically transmitted the above document

3   to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

4   Electronic Filing to the following CM/ECF registrants:

5

6                         Michael E. Gottfried
                          Lucy M. Rand
7              Assistant Arizona Attorneys General
                    Michael.Gottfried@azag.gov
8                     Lucy.Rand@azag.gov

9                         Daniel P. Struck
                          Rachel Love
10                    Timothy J. Bojanowski
                       Nicholas D. Acedo
11                     Ashlee B. Hesman
                         Jacob B. Lee
12                     Timothy M. Ray
            STRUCK LOVE BOJANOWSKI & ACEDO, PLC
13                   dstruck@strucklove.com
                      rlove@strucklove.com
14               tbojanowski@strucklove.com
                     nacedo@strucklove.com
15                   ahesman@strucklove.com
                       jlee@strucklove.com
16                    tray@strucklove.com

17                     *Attorneys for Defendants*

18

19                                          s/ Jessica Carns

20

21

22

23

24

25

26

27

28

LEGAL23774493.1                                  -25-