Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-ROS

**DECLARATION OF JESSICA CARNS IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE STIPULATION (MAXIMUM CUSTODY PERFORMANCE MEASURES 1-3, 5-6, AND 8)**

I, JESSICA CARNS, declare:

1. I am a paralegal employed by the ACLU National Prison Project. As part of my regular duties, I track and review compliance documents produced by Defendants in *Parsons v. Shinn* related to the maximum custody performance measures (MCPMs) set forth in the Stipulation. [Docs. 1185, 1185-1, Exs. D, E] Together with the attorneys and legal fellows, the paralegals before me working on this matter developed protocols and procedures for analyzing these compliance documents with regard to the requirements of the Stipulation, which I have continued to follow. These procedures are explained below where applicable. If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

2. I wrote a declaration in support of Plaintiffs' Response to Defendants' Motion to Terminate Monitoring of Maximum Custody Performance Measure 1 Through 8 [Doc. 3160], which was filed with the Court in this case on February 22, 2019. Many, if not all, of my findings explained in my 2019 declaration remain accurate for the latest months of documentation that I have reviewed as provided by Defendants.

3. Attached to this declaration are a number of Federal Rule of Evidence (FRE) 1006 summary exhibits created because the underlying data and documents are so voluminous that they cannot be conveniently examined by the Court. All of these summaries are based on true and correct copies of the compliance documents produced by Defendants in this matter and reflect Plaintiffs' reasonable analysis of the contents of these documents. Each FRE 1006 summary exhibit is identified as such.

4. I attach hereto as **Exhibit 1 (under seal)**, "FRE 1006 Summary Exhibit 'Prisoners Chosen for Maximum Custody Performance Measure Review (November 2018 – August 2019).'" The chart shows by month and facility the frequency at which certain prisoners were chosen for monitoring on a monthly basis. The chart was formulated by reviewing the prisoner out-of-cell tracking sheets produced by Defendants for each facility during each month of monitoring. The information was taken from the Max Custody Notebooks produced by Defendants for each facility for each month. For each facility

monitored, every month under review included a prisoner record (out-of-cell tracking sheet) or multiple records that were included in either a month before or a subsequent month during the monitoring period.

5. Under the Maximum Custody Monitoring Guide, Defendants are supposed to select every nth prisoner based on total population. Because the nth prisoner interval is determined the exact same way each month – by dividing the total population of the facility by 10 – the same interval is repeatedly used across months. Therefore, the same prisoners are often chosen for review consecutively across months. For example, there are four Substitution Memos for the month of August 2019 at Florence-Kasson demonstrating that four separate prisoners were chosen for both the max custody and SMI drawing because the skip intervals for each group were numerically so close together. I attach hereto **Exhibit 2 (under seal)**, these four (4) substitution memos from the Florence-Kasson max custody notebook for August 2019. I also created a chart that shows the total population size for both general population and the SMI population, and the intervals at which prisoners were selected for review; attached hereto as **Exhibit 3**, "FRE 1006 Summary Exhibit 'Skip Intervals Used to Select Prisoners for Maximum Custody Performance Measure Review (November 2018 – August 2019).'"

6. I found many inconsistencies in the starting points on the count sheets. Particularly at Florence-Kasson, the starting point tends to vary inexplicably month by month with no clear notation as to why or how the starting point is determined. For example, in the Florence max custody notebook for April 2019, the counting starts at the top of the first page of the count sheets, while for May 2019, the counting starts in the middle of the page. Sometimes there was no indication of a starting point at all, which makes it impossible to determine Defendants' methodology and whether they are utilizing the designated skip interval chosen for that month. Even so, the same prisoners are repeatedly selected across months. I attach hereto as **Exhibit 4 (under seal)**, true and accurate copies of a few representative samples of these types of count sheets: ADCM1562964; ADCM1569475; ADCM1578825: ADCM1582774; ADCM1579168.

7. I attach hereto as **Exhibit 5**, "FRE 1006 Summary Exhibit 'Rates of Refusal of Recreation and Programming (November 2018 – August 2019) and Sampled Rates of Refusal of Chute Recreation (November 2016 – August 2019).'" These three (3) charts demonstrate the rates of refusal for: 1) exercise/recreation; 2) programming (which includes mental health programming and group programming) for each facility for the months November 2018 through August 2019; and 3) the rates of refusal for chute recreation for a sample of months chosen from the entire monitoring period. SMI program unstructured time required under MC PM #8 is not included in this analysis. This exhibit was created by myself and a team of paralegals under my supervision. We calculated the rates of refusal for each of the facilities by reviewing the individual out-of-cell tracking sheet for each prisoner for each month and: 1) adding up the total number of recreation periods/programs offered; and 2) adding up the total number of recreation periods/programs marked as "refused" by prisoners. I further broke-down these totals to non-SMI and SMI prisoners and then added the two together to determine the overall refusal rate. We followed the same procedure for chute recreation specifically, which demonstrates the excessively high refusal rates when prisoners are offered recreation indoors in the smallest area available for recreation. I attach hereto as **Exhibit 6 (under seal)**, photographs which juxtapose the chute recreation area, the 10x10 enclosures, and the larger basketball court enclosures.

8. When determining the total number of refusals, my colleagues and I included in our calculations any instances where a prisoner either refused an entire recreation period/program or elected to return to their cell early, thereby refusing part of the out-of-cell time offered. We did not include in our calculations any instances where a prisoner was either offered or refused a visitation period, unstructured out-of-cell time, or other/incentive out-of-cell time. Due to variations in the way partial refusals were denoted across the various facilities, it is possible that some partial refusals may not have been accounted for in these figures. For example, there were various instances where a prisoner's programming would not last a full hour, however, there would be no corresponding note from a correctional officer confirming that they returned early. I attached hereto **Exhibit 7**

**(under seal)**, true and accurate copies of a couple representative samples of these types of out-of-cell tracking sheets: ADCM1579048-49; ADCM1579074-75.

9. In my review of the documentation produced by Defendants, I found numerous instances in which an entire group programming class of up to approximately ten (10) prisoners would allegedly refuse to participate in out-of-cell-programming. This pattern spans across all facilities and all months for the monitoring period of November 2018 through August 2019. Whenever prisoners would refuse group programming, the corresponding sign-in sheet was never actually signed by the prisoners themselves, but the word “refused” was written in place of the prisoners’ signatures. When multiple prisoners refused the same hour of group programming, the same correctional officer would write “refused” on the prisoners’ signature lines where they should have been signing to verify their own refusal. There are numerous instances where “group programming” actually only consisted of one or two prisoners on the sign-in sheets. More often than not, these one to two prisoners would be recorded as refusals for their group programming.

10. I found instances in which a correctional officer used the same illegible signature to sign for each prisoner, particularly for the blanket refusals of group programming. Moreover, I found multiple instances in which the refusal of all prisoners offered a certain program was denoted by a slash across all signature lines, demonstrating that there was no valid attempt on behalf of the correctional officer to receive even a single prisoner’s signature on their refusal. Prisoners’ refusals of group programming was always denoted by the word “refused” written by a correctional officer, illegible signatures clearly by the same correctional officer, or a slash across all prisoners’ signatures lines. I attach hereto as **Exhibit 8 (under seal)**, true and accurate copies of a few representative samples of these types of sign-in sheets for programming produced by Defendants: ADCM1582751-52; ADCM1565684-85; ADCM1574673; ADCM1582493; ADCM1592795-96; ADCM1586513.

11. Consistent with my findings described in my declaration for the monitoring period of November 2016 through October 2018, I did not find a single refusal in the

comments section on the back of prisoners' out-of-cell tracking sheets in which the prisoners themselves signed, thereby verifying their own refusal, from November 2018 through August 2019. Throughout my review of maximum custody documentation, I found that there was consistently one (1) correctional officer's signature on refusals listed in the comments section of prisoners' out-of-cell tracking sheets, rather than two (2) signatures as required by the Maximum Custody Monitoring Guide. I saw no notation in the documented monitoring that due to safety, security, or operational concerns it was impossible to a get a second signature or a signature from the refusing prisoner. Moreover, nearly every single refusal documented at Florence-Kasson and Eyman-SMU for the monitoring period of November 2018 through August 2019 was accompanied by just one correctional officer's signature instead of two.

12. When reviewing the individual prisoner out-of-cell tracking sheets produced by Defendants, I noted that there were numerous instances when a prisoner would refuse all out-of-cell time offered to them for the entire week, many of which also had only one correctional officer's signature. Again, this is consistent with my findings described in my 2019 declaration. This pattern spans across all facilities and all months for the monitoring period of November 2018 through August 2019.

13. Even more troubling, I found multiple instances in which there was no indication that a correctional officer made any attempt to speak to the prisoner about their persistent pattern of allegedly refusing the out-of-cell time that was being offered to them for that week. I found this issue to be more prevalent at Eyman-SMU I in that there were more instances in which there would be no visible note on a prisoner's out-of-cell tracking sheet when the prisoner exhibited a clear pattern of refusing out-of-cell time for that week. However, this pattern generally spans across all facilities and all months for the monitoring period of November 2018 through August 2019.

14. I found numerous instances in which a prisoner refused all, or nearly all, out-of-cell-time opportunities offered to them that week, all of which were verified by only one correctional officer's signature, and there was no note indicating that the prisoner was

counseled in any way. Sometimes, there was a note, but it was a perfunctory and generic quote supposedly taken from the prisoner refusing. I attach hereto as **Exhibit 9 (under seal)**, true and accurate copies of these types of tracking sheets: ADCM1562551-52; ADCM1569846-47; ADCM1565801-02; ADCM1600751-52; ADCM1574393-94; ADCM1600818-19; ADCM1600298-99.

15. Furthermore, I found that correctional officers sometimes used the same, or similar, quote to indicate that they spoke to each prisoner about their consistent pattern of refusing out-of-cell time. I found a broad theme of generic and/or repetitive quotes being used from correctional officers across months and facilities throughout the monitoring period of November 2018 to August 2019. For example, for the monitoring week chosen in November 2018, correctional officers at Lewis-Rast indicated the reason for nine (9) different prisoners refusing all out-of-cell time offered to them was that the "inmate said he didn't want table time rec or class." At Florence-Kasson in December 2018, correctional officers used the phrase "he just doesn't want to go" to explain six (6) different prisoners' patterns of refusal. If not verbatim, there were many similar quotes used to explain high refusal rates. I attach hereto **Exhibit 10 (under seal)**, true and accurate copies of representative examples of these problematic tracking sheets produced by Defendants: ADCM1569543; ADCM1579320; ADCM1587031; ADCM1586929; ADCM1593179; ADCM1566422; ADCM1566572; ADCM1563529; ADCM1563543; ADCM1574176.

16. Throughout the monitoring period of November 2018 through August 2019, I noticed a trend of cancellations of recreation and programming due to staff shortage. For the aforementioned monitoring period, there were 24 instances of cancelled recreation and 20 cancellations of programming, resulting in approximately 119 total recorded instances on the out-of-cell tracking sheets provided by Defendants in which a prisoner was denied the out-of-cell time that they are owed. Due to variations in the way cancellations were reported across facilities, it is possible that some cancellations may not have been accounted for in these figures. Unfortunately, the make-ups for these recreation and programming hours rarely occurred also due to staff shortage. For example, in August 2019, there were

three (3) recreation periods and four (4) programs cancelled in one week at Eyman-SMU I due to staff shortage, none of which were rescheduled also due to lack of staffing. Sometimes there was no written indication of any attempt to reschedule the cancelled recreation or programs. I attach hereto **Exhibit 11 (under seal)**, true and accurate copies of a few representative samples of cancellation memos produced by Defendants: ADCM1600528; ADCM1592408; ADCM1600250; ADCM1600529-31; ADCM1569492; ADCM1592579.

17. In some instances, assessing compliance was especially difficult due to sloppiness in Defendants' record keeping. For example, the handwritten start and end times on tracking sheets were sometimes difficult to read or illegible. Defendants sometimes crossed out start and end times or wrote over them, making it even more difficult to discern the amount of time offered. I found the same issue of crossing out words or writing over them on the comments section on the back of individual out-of-cell tracking sheets. Sometimes, the documents were scanned in at such a low resolution and high contrast that the text was barely legible. Without being able to calculate the total amount of out-of-cell time a prisoner was offered, it is extremely difficult to properly determine compliance and consistency with CGAR findings. I attach hereto as **Exhibit 12 (under seal)**, true and accurate copies of a few representative samples of these types of illegible out-of-cell tracking sheets: ADCM1592689; ADCM1569798; ADCM1574713; ADCM1600548.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th of May 2020, in Washington D.C.

Jessica Carns

**ADDITIONAL COUNSEL:**

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
afettig@aclu.org
echo@aclu.org
mmorris@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
carellano@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         ckendrick@prisonlaw.com
         rlomio@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
  rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:   adietrich@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ Jessica Carns