1 | Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
2 | **ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
3 | Phoenix, Arizona 85013
Telephone:  (602) 650-1854
4 | Email:  jkeenan@acluaz.org
           carellano@acluaz.org
5
*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6 | *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7 | *Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
8 | *similarly situated*
**[ADDITIONAL COUNSEL LISTED ON**
9 | **SIGNATURE PAGE]**

10 | Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
11 | 5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
12 | Telephone:  (602) 274-6287
Email: adietrich@azdisabilitylaw.org
13
*Attorneys for Plaintiff Arizona Center for Disability Law*
14 | **[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**
15

16 | UNITED STATES DISTRICT COURT

17 | DISTRICT OF ARIZONA

18 | Victor Parsons; Shawn Jensen; Stephen Swartz; | No. CV 12-00601-PHX-ROS
Dustin Brislan; Sonia Rodriguez; Christina
19 | Verduzco; Jackie Thomas; Jeremy Smith; Robert
Gamez; Maryanne Chisholm; Desiree Licci; Joseph | **DECLARATION OF**
20 | Hefner; Joshua Polson; and Charlotte Wells, on | **DR. TODD R. WILCOX,**
behalf of themselves and all others similarly | **M.D., M.B.A.**
21 | situated; and Arizona Center for Disability Law,

22 | Plaintiffs,

v.
23
David Shinn, Director, Arizona Department of
24 | Corrections; and Richard Pratt, Division Director,
Division of Health Services Contract Monitoring
25 | Bureau, Arizona Department of Corrections, in their
official capacities,
26
Defendants.

27

28

I, Todd Randall Wilcox, declare:

1.    I have personal knowledge of the matters set forth herein. If called as a witness, I could and would testify competently to the facts stated herein.

2.    I have worked as a physician in jail and prison environments for more than 25 years. I am the Medical Director of the Salt Lake County Jail System.  I am licensed to practice medicine in the States of Arizona and Utah, and am Board Certified in Urgent Care Medicine.  I submitted my curriculum vitae on September 2, 2016. [Doc. 1670-1]

3.    I have reviewed Defendants' proposal that they use the sanction fines, assessed against Defendants by the Court in 2018, for Defendants to hire NCCHC Resources, Inc., to perform a staffing analysis of their contractor Centurion's current staffing levels and mix of staff, and to do a "root cause" analysis of ongoing noncompliance.  [Doc. 3595]

4.    This proposal is problematic for several reasons.  First, Defendants do not disclose the inherent conflict of interest in hiring the National Commission on Correctional Health Care ("NCCHC") to do this analysis of Centurion's staffing and performance – namely, that Centurion is a prominent financial supporter of NCCHC, including underwriting and sponsoring its many trainings and conferences held throughout the year, and frequently advertising in NCCHC's publications.  For example, attached as Exhibit 1 is the Spring 2020 issue of "Correct Care," NCCHC's magazine, including a full-page ad at page 27 for Centurion.[1] This financial underwriting relationship calls into question how aggressive and objective NCCHC would be in making its determinations and judgments about Centurion's staffing in the Arizona prisons.

5.    Second, there is another inherent conflict of interest that arises with this recommendation. Facilities within ADC are accredited by NCCHC, but despite that accreditation, the Court has found ADC is not delivering sufficient care in many areas outlined by the performance measures.  Given that discrepancy, how critical will NCCHC

---

[1] *See* https://www.ncchc.org/filebin/CorrectCare/34_2_Spring_2020.pdf.

1    be of a health care system that it has repeatedly found to meet NCCHC standards?

2           6.     Third, NCCHC Resources is a consulting group that NCCHC started to

3    facilitate and encourage accreditation by the NCCHC.  In my experience with the work

4    that NCCHC Resources has done in other jurisdictions, their consulting is centered on

5    compliance with the aspirational NCCHC standards, which are focused on a paper review

6    of written policies and procedures and an audit of healthcare system administrative

7    practices, rather than getting into the nitty-gritty operational details of how care is

8    delivered.  NCCHC's focus on form over function calls into question whether their

9    staffing analysis or a "root cause analysis" would provide the Court with the information

10   it actually needs to address the ongoing inadequate health care and chronic noncompliance

11   with critical performance measures that is putting class members at risk of serious harm.  I

12   am not aware of anyone working with NCCHC Resources who has the experience

13   necessary to perform a true work-load based staffing study.

14          7.     As I noted in past declarations regarding staffing analyses, these are very

15   quantitative endeavors requiring rigorous methodology, and they must focus on the unique

16   circumstances of each prison and each unit within it. I wrote in April 2016 that:

17          [E]stimates and ratios alone and in a vacuum simply do not work in a
18          correctional healthcare staffing analysis.  What is required is to evaluate the
            setting in which the care is delivered (segregation vs. open yard), the actual
19          demand load for the system (number of sick call requests, number of pills
            administered, number of intakes done per day), and then apply reasonable
20          healthcare metrics to the equation of meeting the demand in each individual
            setting with adequate clinical resources. For example, we know that the
21          actual face-to-face time for a patient to be with a provider in a routine
            appointment should take about 15 minutes. It doesn't matter whether they
22          are a segregated patient or a minimum security patient, it takes 15 minutes.
            What changes, however, is the impact of the security component on the
23          entire patient care experience. It may take an hour in a high security setting
            to secure and transport a patient each way and other prisoner movement is
24          restricted during that time.  So the 15 minute appointment becomes 1:15 for
            that setting.

25   [Doc. 1539 ¶¶ 10, 11]

26          8.     In my opinion, the Court (not Defendants, as explained below), should

27   retain an expert for the staffing analysis who has no actual or apparent conflict or

28   pecuniary interest in the outcome. Given the excellent and detailed report provided to

Judge Duncan in 2018 by Rule 706 expert B.J. Millar from the Advisory Board about recruitment and retention of health care staff in Arizona's prisons (Doc. 2940-1, Ex. 1), and his team's knowledge of the ADC system, it seems that he would be the obvious person for the Court to appoint to do a staffing analysis.  In addition, Mr. Millar has actual experience overseeing a state-wide prison staffing study and performing the data analysis necessary to complete a study of this size.  He was the primary consultant to the Special Master for the mental health staffing study ordered by the court in the California litigation (*Coleman* case). As a result, not only does he know how to do a study of this complexity, but he also has the mathematical models necessary to perform the analysis already built, which will save a huge amount of money than hiring a consultant to do it from scratch.

9.     The same problems of conflict of interest arise with regard to NCCHC performing any "root cause" analysis of Defendants' substantial noncompliance. Plaintiffs' proposal that the Court ask Dr. Stern to do a systemic analysis of the adequacy of the health care provided to class members makes sense, as he is independent from ADC and their contractor and is very familiar with ADC's health care system.  [Doc. 3564 at 3]

10.     Finally, based upon my experience as a Court-appointed expert, an expert for jail/prison systems, and as an expert for incarcerated people regarding correctional medical care; it is always best if the Court is the "client" to whom the expert reports.  This ensures a higher level of transparency between the expert and the parties on both sides, and the Court has more assurance that the situation will not devolve into an endless "Battle of the Experts."

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 28, 2020, in Salt Lake City, Utah.

  /s/  Todd R. Wilcox, M.D.
Todd R. Wilcox, M.D.

**PRISON LAW OFFICE**

By:  s/ Corene T. Kendrick

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene T. Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              ckendrick@prisonlaw.com
              rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
              afettig@aclu.org
              echo@aclu.org

*Admitted *pro hac vice*. Not admitted in DC;
  practice limited to federal courts.
**Admitted *pro hac vice*

Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    jkeenan@acluaz.org
              carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

1

2

3

4

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

5

6 **ARIZONA CENTER FOR DISABILITY LAW**

By: ___s/ Maya Abela___

7        Rose A. Daly-Rooney (Bar No. 015690)
         J.J. Rico (Bar No. 021292)

8        Maya Abela (Bar No. 027232)
         **ARIZONA CENTER FOR DISABILITY**

9        **LAW**
         177 North Church Avenue, Suite 800

10       Tucson, Arizona 85701
         Telephone:  (520) 327-9547

11       Email:    rdalyrooney@azdisabilitylaw.org
                   jrico@azdisabilitylaw.org

12                 mabela@azdisabilitylaw.org

13       Asim Dietrich (Bar No. 027927)
         5025 East Washington St., Ste. 202

14       Phoenix, Arizona 85034
         Telephone: (602) 274-6287

15       Email:    adietrich@azdisabilitylaw.com

16 *Attorneys for Arizona Center for Disability Law*

17

18

19

20

21

22

23

24

25

26

27

28

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on May 28, 2020, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Michael E. Gottfried
Lucy M. Rand

7

Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov

8

Lucy.Rand@azag.gov

9

Daniel P. Struck
Rachel Love

10

Timothy J. Bojanowski
Nicholas D. Acedo

11

Ashlee B. Hesman
Jacob B. Lee

12

Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC

13

dstruck@strucklove.com
rlove@strucklove.com

14

tbojanowski@strucklove.com
nacedo@strucklove.com

15

ahesman@strucklove.com
jlee@strucklove.com

16

tray@strucklove.com

17

*Attorneys for Defendants*

18

19

20

s/ C. Kendrick

21

22

23

24

25

26

27

28

# Exhibit 1

Spring 2020 | Volume **34** | Issue 2

# CorrectCare

® ™

NCCHC

The magazine of the National Commission on Correctional Health Care

# PANDEMIC

## Prepare, Prevent, Respond, Repeat

*Drugs of Abuse: What Correctional Nurses Need to Know (Part 2)*

*Vaping and Juveniles: A Primer*

*Knee Surgery, Informed Consent, and Deliberate Indifference*

National Commission on Correctional Health Care
1145 W. Diversey Parkway, Chicago, IL 60614

# Medi-Dose® EPS®

# THE VERDICT IS IN

## *Still #1 for tamper-evident unit dose in correctional care pharmacies*

**Unit Dose, Bar Coding, Pharmacy & Nursing Supply Experts!**

## Medi-Dose®

## TampAlerT®



*Simple. Safe. Secure. Since 1971, the Medi-Dose® and TampAlerT® unit dose packaging systems have continued to meet the specific needs of correctional care pharmacies.*

Medi-Dose® is the economical answer for packaging and dispensing your solid oral medication. Available in 13 styles, with 6 or 12-month beyond-use dating options, it's moisture and light resistant. No in-service training is required and it's barcode ready. Medi-Dose® uses no metal, glass or machinery…so it's safe to use for both your staff and patient population.

TampAlerT® is the ideal tamper-evident solution for liquids or powders. It's stocked from 15 to 120 mL, in natural or UV inhibitor polyethylene, with regular or child-resistant screw caps. The TampAlerT® seal goes on automatically when you twist on the container cap.

***Call or visit our website for samples and more information.***

# 800.523.8966

# MediDose.com

*CorrectCare*® is published quarterly by the National Commission on Correctional Health Care, a nonprofit organization whose mission is to improve the quality of health care in our nation's jails, prisons, and juvenile confinement facilities. NCCHC is supported by the leading national organizations representing the fields of health, mental health, law, and corrections.



Spring 2020 | Volume 34 | Issue 2

# contents



**8**

## Features

**6**  Legal Affairs: Knee Surgery and Informed Consent

**8**  Pandemic: Prepare, Prevent, Respond, Repeat

**12**  Drugs of Abuse: What Correctional Nurses Need to Know (Part 2)

**16**  Vaping 101: E-Cigarettes and Juveniles

## Departments

**2**  NCCHC News

**3**  Chair Notes: How Bias Can Undermine Diagnosis and Treatment

**5**  Guest Editorial: When the Going Gets Tough, the Tough Turn to the Standards

**19**  Journal Preview: Drug and Alcohol Deaths Are Likely Undercounted, Study Shows

**21**  CCHP Page: CCHP-MHs Feel the Love

**22**  Exhibitor Opportunity

**23**  Classified Ads and Ad Index

**24**  Standards Q&A

*Cover design by Jill Cooper; cover image © Lightspring/Shutterstock*

## Our Independence Matters

The National Commission on Correctional Health Care has no membership or dues. NCCHC does not require any affiliation to be considered for accreditation, certification, or employment as a consultant or surveyor, or to serve on committees or the board of directors. NCCHC staff and spouses are not allowed to accept gifts or consulting fees from those we accredit or certify. NCCHC is impartial, unbiased, expert, and dedicated only to recognizing and fostering improvements in the field of correctional health care.

### BOARD OF DIRECTORS

**Robert E. Morris, MD, CCHP-P (Chair)**
Society for Adolescent Health and Medicine

**Joseph V. Penn, MD, CCHP-MH (Chair-Elect)**
American Academy of Psychiatry and the Law

**Thomas J. Fagan, PhD, CCHP-MH (Immediate Past Chair)**
American Psychological Association

**Nancy B. White, MA, LPC (Treasurer)**
American Counseling Association

**Carolyn Sufrin, MD, PhD (Secretary)**
American College of Obstetricians and Gynecologists

**Jeffrey J. Alvarez, MD, CCHP-P, CCHP-A**
American Academy of Family Physicians

**Oscar Aviles, CJM, CCE, CCHP**
American Jail Association

**Patricia Blair, JD, PhD, CCHP-RN, CCHP-A**
American Bar Association

**Paula Braverman, MD**
American Academy of Pediatrics

**Carol Cramer Brooks, MPA**
National Partnership for Juvenile Services

**Jennifer Clifton, DNP, FNP-BC, CCHP**
American Association of Nurse Practitioners

**Eileen Couture, DO, RN, CCHP-P**
American College of Emergency Physicians

**Wendi R. Wills El-Amin, MD**
National Medical Association

**Kevin Fiscella, MD, MPH, CCHP**
American Society of Addiction Medicine

**Robert L. Hilton, RPh, CCHP**
American Pharmacists Association

**Alison O. Jordan, MSW, LCSW**
American Public Health Association

**Ilse R. Levin, DO, MPH, CCHP-P**
American Medical Association

**Elizabeth A. Lowenhaupt, MD, CCHP**
American Academy of Child and Adolescent Psychiatry

**Nicholas S. Makrides, DMD, MPH**
American Dental Association

**Pauline Marcussen, DHA, RHIA, CCHP**
American Health Information Management Association

**Edwin I. Megargee, PhD, CCHP-MH**
International Association for Correctional and Forensic Psychology

**Mary Muse, MSN, RN, CCHP-RN, CCHP-A**
American Nurses Association

**Peter C. Ober, JD, PA-C, CCHP**
American Academy of PAs

**Debra Pinals, MD**
American Psychiatric Association

**George J. Pramstaller, DO, CCHP**
American Osteopathic Association

**Sheriff B. J. Roberts**
National Sheriffs' Association

**Christopher T. Rodgers, MPA, MBA**
National Association of Counties

**Jayne Russell, MEd, CCHP-A**
Academy of Correctional Health Professionals

**Steven Shelton, MD, CCHP-P, CCHP-A**
American College of Correctional Physicians

**Samuel Soltis, PhD, MHA, CCHP**
American College of Healthcare Executives

**Sylvie R. Stacy, MD, MPH, CCHP**
American College of Preventive Medicine

**Barbara A. Wakeen, MA, RDN, CCHP**
Academy of Nutrition and Dietetics

**Melvin H. Wilson, MBA, LCSW**
National Association of Social Workers

**Liaison Pending**
American College of Physicians

Copyright 2020 National Commission on Correctional Health Care. Statements of fact and opinion are the responsibility of the authors alone and do not necessarily reflect the opinions of this publication, NCCHC or its supporting organizations. NCCHC assumes no responsibility for products or services advertised. We invite letters of support or criticism or correction of facts, which will be printed as space allows. Articles without designated authorship may be reprinted in whole or in part provided attribution is given to NCCHC.

Send correspondence to Barbara Granner, CCHP, Editor
NCCHC, 1145 W. Diversey Pkwy., Chicago, IL 60614
Phone 773-880-1460; Fax 773-880-2424
info@ncchc.org; www.ncchc.org
For advertising, contact sales@ncchc.org.

# NCCHCnews

# Harvard Researchers Join NCCHC to Study New Coronavirus in Corrections

**A**cademic researchers from Harvard University have partnered with NCCHC to assess the impact of the pandemic on correctional facilities in the United States. An initial survey and follow-up questionnaire were developed in late March and made available to jails, prisons, and juvenile detention facilities via NCCHC.

Results from the study provide unique insights into the spread of the virus and incidence of COVID-19 in the highly vulnerable incarcerated population.

Nearly 400 facilities, representing thousands of incarcerated individuals, health staff, and custody staff, have responded. The data are primarily drawn from jails (70%) with prisons accounting for 20% and juvenile detention and other facilities representing the remainder of the sample.

As of May 4, the most recent data available, a high percentage of facilities report screening new intakes (96%), while only 49% screen current inmates.

See "Pandemic" on page 8 for more details.



The 2019 Annual Report highlights the many ways in which NCCHC and its partners are making an impact on correctional health care, the people who work in the field, and the individuals for whom they provide care.

**ncchc.org/annual-report-2019**

## NCCHC Welcomes Two New Staff Members

Jennifer Riskind has joined the organization as director of the new NCCHC Correctional Health Foundation. She brings more than 20 years of nonprofit management, development, and fundraising experience to the role, most recently as director of development for the Accelerate Institute in Chicago.



Amy Turner-Panagopoulos, MBA, BSN, RN, NCCHC's new vice president of accreditation, has deep experience in health care quality, standards, and accreditation, having held leadership positions with the Joint Commission's division of health care quality evaluation.





**COVID-19 Resources and Guidance**

Visit the NCCHC website for informational materials and videos, Q&As, tips from the field, recordings of a webinar series held in partnership with the Major County Sheriffs of America, details about the NCCHC–Harvard study, and links to important resources.

**ncchc.org/covid-resources**

## Calendar of events

| | |
|---|---|
| July 18 | CCHP exams, Denver |
| July 19-20 | Correctional Mental Health Care Conference, Denver |
| August 26 | CCHP exams, Galveston, TX |
| August 29 | CCHP exams, Phoenix, AZ |
| Sept. 29 | CCHP exams, Alexandria, MN |
| Oct. 3 | CCHP exams, Boise, ID |
| Oct. 31-Nov. 4 | National Conference on Correctional Health Care, Las Vegas |
| Nov. 1 | CCHP exams, Las Vegas |

## Spring Conference Is a Virtual Success!

Nearly 500 people participated in the first-ever virtual NCCHC conference, held May 4 and 5 on computer screens across the country. Participants tuned in to 32 educational sessions and three preconference webinars, electronically chatted with speakers, and enjoyed the same excellent learning experience found at all NCCHC conferences.

"Although certainly not ideal, the circumstances presented an opportunity to try new learning formats for sharing critical information," says CEO Deborah Ross, CCHP. "While hoping for a swift return to in-person gatherings, it's good to know the correctional health care community remains flexible and is still eager for quality education."

The sessions were recorded and are available to participants through August 3, for up to 35 CE credits. If you did not register to participate but would like access to the prerecorded webinars and accompanying CE, contact info@ncchc.org. Cost is $325.

# **Chair**notes

# Shortcuts: How Bias Can Undermine Diagnosis and Treatment

by Robert E. Morris, MD, CCHP-P



The concept of "bias" is often misunderstood as simply meaning prejudice against a person, group, or thing. In fact, biases involve an array of brain processes – shortcuts – that can lead to erroneous health care decisions and affect diagnosis and treatment. Generally, biases are unconscious, which makes them more potentially damaging.

Unconscious bias takes many forms. One of those, confirmation bias, has a particularly insidious effect on diagnostic accuracy. Confirmation bias occurs when we reach conclusions based on what we expect to find by selectively accepting some information and ignoring other information that does not fit our expectations. It's a shortcut in thinking that can lead to disaster. Availability bias fuels confirmation bias by accepting an idea – in this case, a diagnosis – based on how "available" it is, or how easily it comes to mind. To make matters worse, if an "expert" makes a diagnosis, the rest of us tend to accept it without question, a phenomenon called expert certainty.

Corrections is especially ripe for mistakes due to bias. Many of our patients misuse alcohol and drugs; some exaggerate pain, malinger, and scheme. Unfortunately, we can come to believe this applies to all our patients.

There is a relatively new technology that can amplify the persistence or "stickiness" of an erroneous diagnosis: the electronic health record. Once a diagnosis appears in the record it tends to stay there, whether or not it is correct, and mislead the next clinician if the patient is not reevaluated.

## The Case of the 'Depressed' Teenager

A young man in clinic carried the diagnosis of depression and, much to the consternation of the staff, refused referrals for depression. I was asked to talk to him and convince him to go to therapy. As we talked, he said, "I'm not depressed. I'm angry and I want help with that. But everyone ignores my request." He lived in a dangerous neighborhood and had suffered multiple attacks at school and on the street. He was anxious and angry, and engaged in body building so he would be ready to attack anyone he perceived as a threat.

Despite that information, the resident physician continued to record in his notes that the patient was depressed and refused treatment. That was what was in the chart, so it "must be correct," despite my request that it be removed.

I did succeed in getting "anger issues" added to the problem list. After we worked with him to get his high school degree and enrolled in a college outside his neighborhood, his "depression" – his anger and anxiety – subsided.

Several types of bias are illustrated in that example. The previous diagnostician had diagnosed depression and, rather than listen to the patient who contradicted that diagnosis, the resident continued it (expert certainty). "Everyone" knows depression is common in young people (availability bias). The resident ignored information offered by the patient, relying instead on what was in the chart (confirmation bias).

## More Complexity Can Mean More Harm

More complex presentations offer a greater opportunity for bias to lead to a misdiagnosis. A 17-year-old boy in detention complained of back pain and leg weakness. His initial neurologic exam was normal, although it was difficult to perform because he was on the floor of his room. He said he couldn't move, and he was too heavy to lift. A back X-ray was also normal. The fact that he didn't appear to be stressed by his ailment added to a conclusion that he was looking for secondary gain. After a few weeks without improvement he was seen by the facility neurologist, who proclaimed that he was faking, despite the fact that he was now leaking urine. Staff members also reported that they had seen him standing and walking, so he was surely faking.

Several weeks later he was sent to the ER that served the facility, where an MRI revealed that an aneurysmal bone cyst in a vertebral body had eroded the posterior wall and was pressing intermittently on his spinal cord, leading to the waxing and waning of symptoms. Surgery removed the cyst and over several months his symptoms resolved. He later told us that he hadn't been worried because he knew we were in control. His apparent lack of concern about his condition revealed expert certainty on his part!

In *How Doctors Think*, Jerome Groopman, MD, reminds us to beware of expert opinion when common sense would indicate that something else is going on. He suggests:

- Make a list of alternative explanations.
- Throw out previous conclusions and readdress the case.
- Be ready to get another opinion.
- Finally, beware that biases of all types can unconsciously creep into our daily clinical work.

*Robert E. Morris, MD, CCHP-P, is the 2020 chair of NCCHC's board of directors and board liaison of the Society for Adolescent Health and Medicine.*

# NCCHC
# STANDARDS

For authoritative guidance on correctional health care, turn to the organization that "wrote the books."



With five *Standards* manuals, we've got you covered!

| JAIL | PRISON | OPIOID TREATMENT | JUVENILE | MENTAL HEALTH |



NCCHC *Standards* are widely recognized as the most rigorous and highly respected guidelines for quality, efficiency and safety. Continually updated, they reflect the evolution of health care, mental health, corrections and the law.

National Commission on Correctional Health Care

Order yours at **ncchc.org/standards**.

# Guest editorial

# When the Going Gets Tough, the Tough Turn to the Standards

by Jim Martin, MPSA, CCHP

*"Success occurs when opportunity meets preparation."
– Zig Ziglar, American motivational speaker*

**N**ever has this truth resonated more than now, during the historic pandemic we are experiencing at home and abroad. It seems like the COVID-19 virus consumes every second of every day.

I have taken many questions from our accredited facilities asking if NCCHC would allow them to suspend some of their normally accepted practices because of COVID-19. Can they stop having their monthly meetings? Stop studying problems for CQIs? Stop triaging the sick call process?

I understand all of this. I, too, worked in a facility when the unthinkable happened, and all you want to do is address the emergency at hand.

But my answer to these questions is, "No!" Now is the time when your preparation meets opportunity.

For years, facilities have used the NCCHC *Standards for Health Services* for jails, prisons, and juvenile facilities as a road map to effective and efficient health care. That is your preparation. And now is the time for you to embrace the standards like never before. They are the best guidance for dealing with the pandemic and its many challenges. In fact, I have also heard from facilities that have not used the standards as a tool, gone through the accreditation process, or analyzed their own systems, and are now sorry that they haven't. They are now … turning to the standards.

## Sweating the Survey

Another question I hear is, "Jim, how is this going to affect our next survey?"

When assessing compliance, our survey teams look for trends. If the trend shows an upward curve of compliance, generally, the committee will accept the actions being taken. If you miss an occasional meeting due to extenuating circumstances, don't panic. Do the best you can and make sure that action, or inaction, is an exception, not the norm. Remember, we are looking for trends.

NCCHC surveyors are health care professionals themselves. Of course, they will review your entire situation. They understand what you are going through and will be compassionate. The most important thing is not to cut corners on items that affect patient care, and be sure that your responses and actions are well-documented.

So dust off that standards manual and ask yourself, "How can this get me through what is happening?" I know the situation is scary and challenging, but you are ready. I know how much you have prepared, and I know that COVID-19 is giving you and your teams the opportunity to put that preparation into action.

All of us at NCCHC are here to support you and be the resource you need us to be. Together, we will get through this, just like we always have.

*Jim Martin, MPSA, CCHP, is NCCHC's vice president of program development.*





# Legalaffairs

# Knee Surgery and Informed Consent

by Fred Cohen, LLM

**K**night v. Grossman (7th Cir. 2019) is an important, nuanced – and lengthy – decision that deserves more than a quick read. In the interest of time, I will do what I can to describe and explore the case, but it will not be enough to provide the fullness of the six-page decision.

## What Happened?

Inmate Knight was confined at Wisconsin's Waupun Prison when he sought treatment for a painful left knee, which he had injured while playing basketball. Prison officials made a referral to Dr. Grossman, an experienced orthopedic surgeon who contracted with the Wisconsin Department of Corrections for his medical services. Dr. Grossman diagnosed an ACL tear and performed successful reconstructive surgery.

Years later, Knight reinjured the same knee and returned to Dr. Grossman, who examined Knight and ordered X-rays but not an MRI. Nonetheless, he went ahead with torn ACL revision surgery based on a diagnosis of torn ACL revision.

Dr. Grossman did explain that the surgery was elective and not strictly necessary, that it involved specified risks, and that there was no certainty that Knight's pain would be resolved. Knight agreed knowing that the surgery involved opening both knees, the right one to obtain needed transplant tissue. On the day of the surgery, Knight signed a consent form authorizing a "revision left anterior cruciate reconstruction with donor site from right knee." The form also specified that if "unforeseen conditions" arose during the surgery which, in Dr. Grossman's judgment, required additional or different procedures, he had Knight's consent to take any further steps "deemed necessary and advisable."

The plot now thickens. Upon opening Knight's left knee, Dr. Grossman was met with a different condition than the one he anticipated: Knight's left ACL was intact and functional, not torn. But Dr. Grossman observed other issues with the knee, including surface damage to the cartilage, narrowing of the space between the two bumps at the end of the thigh bone (dense stenosis on the lateral side on the intercondylar notch, with a small bone fragment) and bony overgrowths on the kneecap (patellar osteophytosis). Dr. Grossman determined that what he was seeing was consistent with degenerative joint disease, or arthritis, which would explain why Knight was experiencing renewed pain and discomfort in that left knee.

The doctor knew what to do – a chondroplasty to smooth the damaged cartilage and lessen friction in the joint. With Knight still unconscious on the operating table, Dr. Grossman had a choice: he could end the surgery, or he could perform the alternative procedures. He elected to do what he considered the right thing for his patient – the alternative surgery – because he was confident in the revised diagnosis, the proper procedure, and the anticipated result.

When Knight woke from surgery he was aware that his right knee was untouched, but no one told him about the mid-operation change in diagnosis and procedure. The doctor's operative note said that Knight could stand when he was able tolerate the pain – bad advice, because it impaired needed healing time for the new cartilage. It was not until three months later, during an appointment with the doctor, that he learned of the change in surgery.

Meanwhile, Knight's knee had gotten worse. He sued under the Eighth Amendment (cruel and unusual punishment) and 14th Amendment due process clause. The district court granted Dr. Grossman summary judgment – that is, ruled for the defendant without the need for a further trial – on both claims.

## Cruel and Unusual Punishment?

The Seventh Circuit Court finds no deliberate indifference here and upholds the lower court. Knight ingeniously argues that Grossman was deliberately indifferent to his right to informed consent. But the court indicates that that is the wrong path for the consent claim. Knight's claim is there was deliberate indifference for the care itself, not the consent. No reasonable jury, we are told, would find Grossman deliberately indifferent. Any minimally competent professional would have performed the surgery as he did.

continued on page 18



"Insight into the most significant issues in correctional health."

# Correctional Health Care
## Practice, Administration & Law
### Edited by Fred Cohen, LL.M., LL.B.

**W**e live in an era of unprecedented promise and uncertainty in health care—nowhere more so than in America's prisons and jails. New drugs and devices for treating infectious and chronic conditions are revolutionizing care, but often at very high costs. Courts are mandating better levels of service, while the resources available to correctional agencies are increasingly subject to severe budget constraints. The work can be incredibly rewarding—yet burnout is a constant threat to the well-being of caregivers and patients alike.

Written to help professionals meet these challenges, this contributed volume brings together the insights and experiences of thirty of the nation's top experts to provide a comprehensive working guide designed to benefit every correctional health care provider, from specialist physicians to GPs, PAs, nurses, and the correctional administrators who are responsible for the overall well-being and care of their residents.

CORRECTIONAL HEALTH CARE
PRACTICE, ADMINISTRATION, AND LAW

Edited by
Fred Cohen

Format: Casebound Book
Leather, Gold Foil Stamp
© MMXVII  416  pp.
ISBN 978-1-939083-07-4
List Price: $135.95
Title Code: CHCPAL
http://www.civicresearchinstitute.com/chcpal.html

 Civic Research Institute

P.O. Box 585 • Kingston, NJ 08528
Tel: 609-683-4450 • Fax: 609-683-7291



Working together to achieve the best quality care is what has propelled Wexford Health to become one of the largest correctional health care companies in the nation. We partner with health care professionals in their mission to innovate industry care—both for our patients, and our employees. We know that collectively, as a multidisciplinary team of dedicated specialists, we can achieve progress.

Join us on our mission to serve the underserved, and be rewarded with competitive compensation, comprehensive benefits, and flexible schedules. Learn about careers at Wexford Health at **jobs.wexfordhealth.com,** or call us at **1-800-903-3616**.





# PANDEMIC
## Prepare, Prevent, Respond, Repeat

by Anne Spaulding, MD, MPH, CCHP-P, and
Barbara Granner, CCHP

The coronavirus pandemic brought unprecedented attention to the provision of health care in correctional facilities. Seemingly overnight, the news is full of commentary about the potential spread of infection among incarcerated populations, with alarming headlines using words like "incubator," "tinderbox," and "epicenter."

Fortunately, the possibility of an emergency like this was not news to many of the country's correctional leaders, for whom disaster preparedness is part of the job. Accustomed to planning for weather emergencies, fires, riots, and other disasters, jails and prisons are among the best-prepared institutions in any emergency. Nevertheless, the rapid spread and severity of the novel coronavirus presents a serious threat within such a closed environment.

According to an ongoing study of the novel coronavirus in correctional facilities conducted by NCCHC and researchers from Harvard University, at the time this magazine went to print there were 529 reported COVID-19 cases among inmates, 467 reported cases among correctional officers, and 87 among health staff, with 378 facilities reporting (May 4 data). At the same time, the Federal Bureau of Prisons reported 2,100 federal inmates and 35 BOP staff with confirmed cases and 30 federal inmate deaths (May 6 data). Those numbers will almost certainly go up as the virus continues to spread.

Correctional facilities are challenging places in which to manage an infectious disease outbreak. Any environment in which individuals live and work in close proximity, sleep in close quarters, eat together, and recreate in small spaces – cruise ships, nursing homes, jails, and prisons – is ripe for

transmission. The daily influx of large numbers of people creates opportunities for the virus to be introduced; the movement of large numbers of people in corrections' closed and semi-closed settings creates opportunities for it to spread.

Although nationwide social distancing and shelter-in-place efforts seem to have been effective in "flattening the curve," experts believe that until there is a vaccine, the novel coronavirus will continue to cause disease in the population. Whatever the country as a whole, and your facility in particular, is currently experiencing, it is always a good time to assess and adjust your response. With planning, flexibility, and resourcefulness, these guidelines can be adopted even for small jails with limited health care staff. "There are few blanket solutions," says NCCHC's chief health officer, Brent Gibson, MD, MPH, CCHP-P. "But don't let the perfect be the enemy of the good. Do your best to care for the sick and limit the spread."

## Prepare

As the virus continues to spread, it's likely to show up in your jail or prison, if it hasn't already. Planning ahead now can prevent a crisis later. Involving a multidisciplinary team in planning is essential. Now more than ever, health care and custody staff, along with executive leadership, need to work together for the good of everyone.

Coordination with your local or state public health department is also critical, even if no transmission is evident in your community or facility. Contact the health department to make sure correctional health services are being considered in regional planning. Establish a point of contact and exchange contact information.

If you have not already done so, set up a meeting at your facility to discuss preparedness. If your facility has an

infection control committee, be sure it is convened and present. A representative of facility administration should be there, as well as someone from the public health department and the hospital where you will send your sickest patients. Share with your local health department the role of your facility in prevention, identification, and management of COVID-19 and all infectious disease, and stress how movement of people in and out of the facility impacts the health of the public and community.

More important preparatory steps:

- To protect staff and inmates from possible infection, explore alternatives to face-to-face triage and visits. Start planning locations and procedures for isolating ill patients, quarantining exposed but asymptomatic people, and cohorting groups of people as necessary.
- Instruct staff in the proper use, storage, and disposal of personal protective equipment. Conduct medical clearance and mandatory fit testing for N95 masks. Wrong use or handling of PPE can increase the spread of the virus.
- Be sure to review the latest federal Occupational Safety and Health Administration guidelines on use of PPE and related matters, as the occupational health situation is dynamic.
- Consider that a continued epidemic may disrupt distribution of medications and medical supplies. Make sure your stocks are as full as possible, but also remember that you are part of the broader community. Hoarding is not appropriate.
- Prepare for potential shortages of personal protective equipment. While the number of respondents in the NCCHC–Harvard study who report not having "adequate PPE" has declined, many still say their supplies are inadequate. Plan to optimize your facility's PPE supply in the event of shortages.

Standard C-04 Health Training for Correctional Officers requires that COs, often the front line of surveillance, are trained to recognize the need to refer an inmate to a qualified health care professional. The standard specifically requires that officers are trained on precautions and procedures with respect to infectious and communicable diseases.

If you have a pandemic plan or exposure control plan, adapt it to COVID-19 and readapt as more is learned. If you don't have one, now is the time!

**Prevent**

The goal of prevention is to minimize opportunities for introduction of the virus into your facility and to protect staff and inmates from infection – while continuing to provide the appropriate level of health care to all patients.

While social distancing has proven effective in the community setting, it may be less feasible in many correctional environments, especially for health care providers and custody staff. The NCCHC–Harvard study found that while the number of cases among inmates, correctional officers, and health care all increased over time, the fastest rise was among officers.

Hand-washing, of course, is another highly effective measure, as every health care professional knows. It is imperative that the people incarcerated in your facility have access to soap (or hand sanitizer containing 60% to 95% alcohol, if allowed).

Masks, increasingly viewed by U.S. health authorities as very important preventive measures, are currently in short supply, especially N95 masks that are most effective at protecting health care professionals from the virus. If N95 masks are not available, a standard surgical face mask is preferable to no mask.

It is also worth noting that staff members should not come

---

**"The standards provide a blueprint upon which you can rely for guidance when the seas around you are tumultuous. This is a time to lean into them, not away."**

Sheriff Peter Koutoujian, Middlesex County (MA)

---

- Plan for staff shortages. Consider what will happen if health care workers are themselves sick and need to stay home.
- Be aware of ongoing clinical updates and guidelines from the Centers for Disease Control and Prevention, local authorities, or your corporate vendor.
- Review the NCCHC standards. They are an important resource and set a framework for providing care, especially during this pandemic.

Standard B-02 Infectious Disease Prevention and Control, in particular, provides information on what should be included in a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease, and Standard D-07 Emergency Services and Response Plan spells out how planning for emergency health care ensures that all staff are prepared to respond effectively during emergencies.

to work if they feel ill. Staff must be instructed that if they have a cough, fever, and/or shortness of breath, they must not report to work until further investigation is complete.

An abundance of caution at intake is crucial to minimize introduction of the virus to the facility. Anyone entering from the street, court, or another correctional facility should be asked about typical symptoms and have their temperature taken, ideally with an infrared no-touch thermometer. Either custody or health care staff can perform this screening. The CDC recommends conducting intake screening in the sally port.

If possible, designate a room near the intake area to evaluate new entrants who are flagged by the intake screening process for symptoms or case contact, before they move to other parts of the facility.

*continued on page 10*

### Respond

The incubation period for the COVID-19 infection is believed to be between 2 and 14 days. When evaluating patients with fever or acute respiratory illness, health staff should obtain a detailed movement and exposure history. Clinical presentation and underlying medical conditions are also essential factors in assessing who may need further medical evaluation and treatment.

While testing is the only definitive way to diagnose COVID-19, the availability of testing kits is not consistent across the country. According to the NCCHC–Harvard study, of those facilities reporting access to laboratory tests also note long turnaround times for results. Check with your laboratory vendor or corporate infection control coordinator about availability, supply, and turnaround.

If your facility does not have sufficient AIIRs to meet demand, check with your partner hospital about availability there and develop transfer procedures and protocols.

The CDC recommends a cautious approach to interacting with any suspected or confirmed COVID-19 case. Whenever possible:
- Wear an N95 or surgical mask, and have the patient wear a surgical mask.
- Use standard precautions, contact precautions, and airborne precautions when entering the person's room.
- Maintain a distance of 6 feet.
- Keep interactions as brief as possible.
- Limit the number of people who interact with a sick person. To the extent possible, have a single staff person give care and meals to the patient.

**"On a daily basis we're adjusting to whatever new information is available and new ideas we have. We're learning we are even more flexible than we thought."**

Julia Wilson, MD, medical director, Fulton County (GA) Jail



If possible, identify a room near each housing unit to evaluate individuals with symptoms, rather than having them walk through the facility to the medical unit. If that is not feasible, consider staggering sick call, and have patients wear face masks any time they leave their room or interact with others.

The goal is to minimize contact between well individuals, those who know they have been exposed to the virus through close contact with someone with a confirmed case, and those who are suspected of having COVID-19 based on symptoms.

Those who have been exposed, those who are sick but not confirmed, and those who have a confirmed case all need to be housed away from general population. Exposed but asymptomatic individuals should be quarantined for 14 days with twice daily monitoring for symptoms. That allows for rapid identification of those who become sick. Ill patients need to be isolated from others who are not ill.

In an ideal world with unlimited resources, each quarantined and medically isolated individual would be housed in a single airborne infection isolation room. Follow-up care and evaluations would be conducted there.

In the real world, however, this may not be possible, and a workable alternative will need to be found. Some authorities recommend that AIIRs be reserved for patients undergoing aerosol generating procedures.

Some facilities are cohorting groups – keeping "like with like." That could mean cohorting ill patients or those who have been exposed; in that case, the 14-day quarantine clock must restart any time someone develops symptoms and is moved into medical isolation. Another option is to quarantine all new intakes, but that presents a serious logistical challenge.

On an ongoing basis, any incarcerated person with known or suspected COVID-19 should be reported to the local/state health department, especially if the expected length of stay is shorter than the likely duration of the illness.

When determining if a patient needs to be transferred to a hospital, call ahead to check on bed availability and wait time in the emergency department. Some hospitals are accepting only those inmates who need serious attention.

Decisions to discontinue isolation should be made on a case-by-case basis based on health professionals' clinical judgment and CDC guidelines in consultation with the community's health department.

Before discharging anyone with a suspected or confirmed case of COVID-19, discuss that person's release with the state or local health department to ensure safe transport and continued shelter and care for the patient. Do not release anyone to a homeless shelter without notifying shelter staff so they can make preparations to continue isolation.

### Review

It's impossible to predict what will have changed by the time this article is published. Hopefully, supplies will be more available, testing will be readily available, and the situation will have improved. One thing is certain: Everyone at the front lines of this crisis, as well as those behind the scenes, will have learned invaluable lessons about dealing with a pandemic in extraordinarily difficult circumstances. Like all good lessons, they will almost certainly have been painful. But the insights gained will make everyone better prepared for the next emergency.

A future issue of *CorrectCare* will take a look back at those lessons learned.

*Anne Spaulding, MD, MPH, CCHP-P, is associate professor at Emory University; Barbara Granner, CCHP, is editor of CorrectCare.*



# Put an End to Medication Waste.

## Efficient Dispensing is Within Site.

The InSite® In-Facility Medication Packaging and Dispensing System simplifies medication administration and reduces avoidable drug spend.

## Wasted medications cost corrections facilities hundreds of thousands of dollars each year.

Forward-thinking facilities are taking back control of their pharmacy inventory by packaging and dispensing medications on-demand.

**With the InSite system, you will experience:**

— **Accountability** – Get down-to-the-dose traceability of medications to reduce waste and minimize diversion

— **Control** – Easily suspend an inmate's medication while they are off-site or in-transit through a direct interface to the inmate tracking system

— **Accuracy** – Minimize the risk of legal action due to medication errors with on-demand, automated, patient-specific packaging

### Discover your path to efficient dispensing.

**Visit:**
swisslog-healthcare.com/AvoidMedicationWaste

**Swisslog Healthcare**

800.764.0300 | healthcare.us@swisslog.com | swisslog-healthcare.com/corrections

InSite is a registered trademark of Swisslog AG.



# Drugs of Abuse: What Correctional Nurses Need to Know (Part 2)

by Ranee' M. Wright, MSN, RN, CCHP-RN, and
Lana J. Winter, CSAC

In Part 1 of Drugs of Abuse: What Correctional Nurses Need to Know, we discussed how correctional facilities have become mental health providers and medically assisted withdrawal and treatment facilities for many underserved, incarcerated individuals. Part 1 also provided a brief overview of addiction and a review of heroin, marijuana, designer drugs, club drugs, and synthetic cathinones such as bath salts. In Part 2, we will complete our discussion with information about stimulants, benzodiazepines, and hallucinogens.

## Stimulants: Cocaine, Meth, and Other 'Uppers'

Stimulants are substances that stimulate the central nervous system. They boost mood, energy and alertness while also raising blood pressure and heart rate dangerously. Stimulants were first marketed in the 1930s as an over-the-counter nasal congestion remedy called Benzedrine. Today they are prescribed to treat narcolepsy, attention deficit hyperactivity disorder, traumatic brain injury, and chronic fatigue syndrome.

Substances in the stimulant category include illegal street drugs like cocaine and methamphetamine, as well as prescription drugs that can be abused, such as common ADHD medications Ritalin and Adderall. Caffeine and nicotine are also considered stimulants.

### Cocaine

- A DEA schedule II drug (dangerous, with high potential for abuse)
- Slang names include coke, flake, snow, blow
- Physical dependence: possible
- Psychological dependence: high
- Tolerance: yes
- Duration: 1-2 hours
- Usually sniffed, snorted, injected, or smoked (as crack)

Cocaine is one of the most addictive of all drugs. It causes a dopamine surge in the brain's reward system and, over time, will damage the brain's pleasure receptors. The user will need more of the drug in order to feel normal. Teenagers' developing brains make them especially susceptible to the surge in the brain's reward chemical that cocaine triggers.

To break a cocaine addiction, the user must go through unpleasant withdrawal effects and strong cravings while not reusing the drug. This is difficult to accomplish without a cocaine-free environment and professional support. Side note: Crack is a version of cocaine that is cooked into a rock-like form and smoked.

**Nursing Implications:** Possible effects of cocaine include increased alertness, excitation, euphoria, increased pulse rate and blood pressure, insomnia, and loss of appetite. Withdrawal symptoms include apathy, long periods of sleep, irritability, depression, and disorientation.

**Overdose Concerns:** Symptoms include agitation, increased body temperature, hallucinations, convulsions/seizures, and possible death. If you suspect that someone may be experiencing a cocaine overdose, call 911 right away. There is no official antidote to cocaine overdose.

**Corrections-Specific Tips:** If a patient is having a cocaine-suspected seizure, make sure there is nothing nearby that they can hurt themselves on. Apply a cold compress to help keep the body temperature down. Stay with the patient until medical help arrives. Decreasing the blood pressure and pulse is essential.

### Methamphetamine

- A DEA schedule II drug (dangerous, with high potential for abuse)
- Other names are meth, ice, speed, glass, or crank
- Very rarely prescribed for ADHD, narcolepsy, weight control
- Physical dependence: possible
- Psychological dependence: yes
- Tolerance: yes
- Usually snorted, smoked, or injected

Methamphetamine, often called meth, is a powerful, highly addictive central nervous system stimulant also known as meth, speed, or crank. The drug causes a surge in the brain chemical dopamine that can last anywhere from six to 24 hours. The user feels a "rush" of energy and euphoria. Due to the large underground market for methamphetamine, it are often illegally manufactured by clandestine chemists, trafficked and sold on the black market.

Meth is generally a white, yellow, or pinkish powder, with any color impurities caused by a filler. Crystal meth, made famous in the TV show "Breaking Bad," is solid chunks that can be smoked or crushed into powder for injecting or snorting. Sometimes called ice or glass, crystal meth is

---

### Correctional Nurse Tip
#### Prevent Diversion of Stimulants

Stimulant medications that are prescribed in a correctional setting have high potential for abuse. Diversion of such medications can be prevented by crushing them into a powder or mixing them in water for ingestion. (Extended- and controlled-release forms of medications, however, should never be crushed.) Proper mouth checks can also prevent diversion.

---

very highly addictive and associated with serious health conditions, including memory loss, aggression, psychotic behavior, potential heart and brain damage, bruxism (teeth grinding), and tooth decay caused by a reduction in saliva that allows bacteria to grow in the mouth – the infamous "meth mouth."

Yaba, called "the madness drug," is a mixture of meth and caffeine that originated in Thailand. It often comes in red pills or brightly colored tablets that look and taste like candy.

**Nursing Implications:** Effects of taking meth include excitability, anxiety, tremors, involuntary muscular movements, dry mouth, dizziness, chest pain, teeth grinding, dilated pupils, tooth decay, anxiety, paranoia, hallucinations, delusions, increased blood pressure, insomnia (awake for days at a time, followed by crashing and sleeping for days), excessive itching, sores on body (from scratching or picking at imaginary "meth bugs"), lack of appetite, extreme weight loss, irritability, high body temperature, extreme depression, and repetitive or compulsive behaviors. Withdrawal symptoms include apathy, long periods of sleep, irritability, depression, and disorientation.

**Overdose Concerns:** Symptoms of overdose include agitation, increased body temperature, hallucinations, convulsions, and possible death. There is no known overdose antidote.

**Corrections-Specific Tips:** Recovering from meth addiction is very difficult, though possible. There are no medications approved to treat addiction to meth. One popular approach is a combination of education and support groups, individual and family counseling, and drug testing.

---

### Ritalin

- A DEA schedule II drug (high potential for abuse)
- Generic name: Methylphenidate
- Prescribed for ADHD, narcolepsy
- Abused as "study drug"
- High level of psychological dependence
- Duration: 2-4 hours

---

Ritalin is commonly prescribed for attention deficit hyperactivity disorder but can also be misused.

**Nursing Implications:** Possible effects include heightened alertness, excitation, euphoria, increased pulse and blood pressure, insomnia, and loss of appetite. Extremely negative long-term effects include cardiovascular disease, psychosis, and inability to experience pleasure. Withdrawal symptoms include apathy, long periods of sleep, irritability, depression, and disorientation.

**Overdose Concerns:** Symptoms of overdose include agitation, increased body temperature, hallucinations, convulsions, and possible death. Overdose intervention usually involves managing psychosis, agitation, and irregular heartbeat. Beta blockers are helpful in lowering blood pressure. Antipsychotics and benzodiazepines are the best course of action to control agitation and psychosis.

## Benzos: What Goes Up Must Come Down

---

### Benzodiazepines

- Some brand names and their generics are Ativan (lorazepam), Xanax (alprazolam), Klonopin (clonazepam), Valium (diazepam) Dalmane (flurazepam), Librium (chlordiazepoxide ), Serax (oxazepam), Versed (midazolam), Restoril (temazepam)
- Sometimes called benzos or tranks (tranqs)
- Medical uses: antianxiety, sedative, anticonvulsant, hypnotic
- Physical dependence: high
- Psychological dependence: high
- Tolerance: yes
- Duration: 4-8 hours
- Usually taken orally, injected, or crushed and snorted

---

Benzodiazepines are central nervous system depressants most often used to treat anxiety disorders. They are a type of depressant, a category that also includes antipsychotics like Haldol and barbiturates or sedatives.

When taken alone, benzos have a similar effect to other depressants, such as opiates. When combined with other CNS depressants, however, the tranquilizing effect is amplified and can result in blackouts, during which the user is often reported to exhibit strange behaviors. Withdrawal from benzodiazepines is very dangerous and can be life-threatening. If users are able to taper off, they should do so under medical care.

**Nursing Implications:** Symptoms of benzodiazepine use include slurred speech, disorientation, and drunken behavior without odor of alcohol. Withdrawal can result in insomnia, tremors, delirium, convulsions and possible death.

**Overdose Concerns:** Symptoms include shallow respirations, clammy skin, dilated pupils, weak and rapid pulse, and coma. Users who combine benzos with other substances, especially alcohol or opioids, are at significantly higher risk of overdosing. Those substances have the greatest effect on the CNS and when combined intensify the depression of the heart and respiratory system.

An antidote for benzodiazepine toxicity is flumazenil. This specific benzodiazepine antagonist is useful in reversing the sedation and respiratory depression that often occur.

**Corrections-Specific Tips:** Any benzodiazepine prescribed in a correctional setting is a high risk for abuse and misuse. Consider crushing the medication prior to administration. Proper mouth checks can help prevent diversion. If you suspect someone is overly intoxicated or overdosing, call 911. It is often unknown if someone has combined a benzo with another substance.

*continued on page 14*

## Hallucinogens

Hallucinogens are drugs that change the way a person perceives reality. Some are man-made like LSD and PCP, and some occur naturally in things like cacti and "magic mushrooms." Ecstasy and salvia can also produce hallucinogenic effects at times. True hallucinogenic drugs produce the effect every time.

> ### LSD
> - A DEA schedule drug, with no medical uses in the United States and a high potential for abuse
> - Also known as acid, microdot
> - Physical dependence: none
> - Psychological dependence: unknown
> - Tolerance: yes
> - Duration: 8-12 hours
> - Taken orally

When under the influence of LSD, the user may have a sense of detachment from surroundings, hallucinations, fixed eyes, blank stare, anxiety, panic, distorted reality, and slurred or blocked speech. The experience is usually called a "trip." Trips generally last from between a few hours up to 12 hours. They can be pleasant, terrifying, or a little of both. The user may become psychotic and hurt themselves or others. Some users have been left with severe mental illnesses that last long after the drug has worn off. It is unknown if the drug creates the mental illness or if it simply unmasks it in a susceptible person.

**Nursing Implications:** In addition to hallucinations, the user may experience increased body temperature, sweating, dry mouth, dilated pupils, numbness, dizziness, loss of appetite, tremors, increased blood pressure and heart rate, mood swings, distorted thinking, impulsiveness, and impaired judgment.

**Overdose Concerns:** Symptoms include dilated pupils, dangerously elevated blood pressure, tachycardia, muscle shakes or tremors, extreme drowsiness, nausea, diarrhea, excessive sweating, flushing, tingling or prickling sensations, and goose bumps. A severe LSD overdose might result in irregular heartbeat, bleeding inside the skull, cessation of breathing, vomiting, dangerously high body temperature, blood clotting malfunctions, and a breakdown of muscle tissue, which may lead to kidney failure, seizures, and coma.

> ### Correctional Nurse Tip
> **Round-the-Clock Chemicals: Polydrug Use**
>
> Polydrug use refers to using more than one drug at a time, either in combination or one taken to counteract the effects of another. Some people use both depressants and stimulants for 24-hour mood regulation. For example, cocaine users might take a depressant to come down from a cocaine high, short-circuiting the usual sadness that comes when the high ends. This puts the body in abnormal chemical swings. Another common extremely dangerous polydrug combo is taking benzodiazepines with alcohol to magnify the effects.
>
> The possibility of polydrug use is something to keep in mind if a patient's complaints, requests for medications, and assessments just aren't adding up.

There is no known antidote to counteract the effects of the hallucinogens, although medications can be used to ease the symptoms.

> ### "Angel Dust" (Phencyclidine)
> - Schedule: I, II
> - Other names: angel dust, PCP, TCP, PCPE hog, loveboat
> - Medical use: none
> - Physical dependence: unknown
> - Psychological dependence: high
> - Tolerance: yes
> - Durations: days
> - Usual method: oral, smoked

Phencyclidine is an animal anesthetic known by the street name "angel dust." It can be found as a powder, liquid, or tablet. It also can be dipped or sprinkled on marijuana joints. The drug appears to induce a temporary state of mental illness, and the "trips" are usually negative compared to LSD. Users believe they are powerful and capable of great feats such as flying or breaking through walls. The user may feel paranoid and get angry or violent toward others.

**Nursing Implications:** Possible effects include delusions, hallucinations, and altered perception of time and distance. At low doses PCP will raise blood pressure and heart rate, but larger doses will do the opposite and reduce blood pressure, heart rate, and even breathing.

**Overdose Concerns:** An overdose causes a longer, more intense "trip" episode, psychosis, seizures, catatonia, and possible death. While there is no known antidote, medications can be used to ease the symptoms.

**Corrections-Specific Tips:** If you suspect someone is under the influence of PCP, contact 911 immediately. The person will need to be stabilized and may need to be restrained due to violent and/or suicidal tendencies.

## Keep Learning

Dealing with a patient's drug use and abuse is a part of everyday life for correctional nurses, whether it is individuals entering the facility under the influence, undergoing withdrawal, or requiring medication-assisted treatment, or the consequences of contraband drugs brought into the facility. The two-part series was intended as an introduction to some of the more common drugs of abuse.

For more information, see NCCHC Standard F-04 Medically Supervised Withdrawal and Treatment.

*Ranee' M. Wright, MSN, RN, CCHP-RN, is a nurse clinician at the Wisconsin Resource Center, Winnebago, WI. Lana J. Winter, CSAC, is a substance abuse counselor at Sokaogon Chippewa Health Clinic, Crandon, WI.*

# CALIFORNIA
## CAREERS | LOCATIONS | LIFESTYLES



# As a correctional health care professional,

you're already well-versed in the skills needed to provide care for this diverse and unique patient population.  Now imagine taking your skills to the California State Prison System!

Together, the California Department of Corrections and Rehabilitation (CDCR) and California Correctional Health Care Services (CCHCS) provide medical, dental, and mental health care to patients in our State-operated correctional facilities.  Here, you'll find robust multidisciplinary teams with like-minded professionals dedicated to providing patient-centered primary care.  And with locations throughout California, you're sure to find your perfect fit.

You'll also experience more of the California lifestyle with the positive work-life balance found with CDCR/CCHCS.  This lifestyle is supported by great State of California benefits, including:

· Generous yearly paid time off and holiday schedule
· Robust 401(k) and 457 retirement plans – tax defer up to $39k-$52k per year
· Comprehensive medical, dental, and vision insurance plans
· Secure State of California retirement that vests in five years
· And much more

**Chief Medical Executives:**
Nicole Herrera at (916) 691-3893 or Nicole.Herrera@cdcr.ca.gov

**Physicians:**
Danny Richardson at (916) 691-3155 or CentralizedHiringUnit@cdcr.ca.gov

**Psychiatrists:**
LaTreese Phillips at (916) 691-4818 or CentralizedHiringUnit@cdcr.ca.gov

**Psychologists and Nurses:**
Danielle Sawtelle at (916) 691-3036 or MedCareers@cdcr.ca.gov



CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

To apply online, please visit **www.cchcs.ca.gov**

## Executive

**Chief Medical Executives**
$333,048 - $501,744
(Depending on assignment)

California State Prison, LA County – Lancaster
Chuckawalla Valley State Prison – Blythe

## Mental Health

**Psychiatrists**
$266,844 - $320,640
(Board Certified)

$260,004 - $311,592
(Board Eligible)

**Senior Psychologists**
$129,996 - $139,164

## Primary Care

**Physicians**
$282,216 - $296,328
(Time-Limited Board Certified)

**Physicians**
$268,080 – $281,496
(Lifetime Board Certified)

**Supervising Registered Nurses II**
$113,256 - $141,780
(Non-Bay Area)

**Supervising Registered Nurses II**
$124,848 - $156,264
(Bay Area: Correctional Training Facility, Salinas Valley State Prison, and San Quentin State Prison)

**Primary Care Physicians at select institutions receive additional 15%**

*California Poppy – Eschscholzia californica – State Flower*



f in EOE



# Vaping 101: E-Cigarettes and Juveniles

By Jennifer M. Clifton, DNP, FNP-BC, CCHP, and Madeline Hansen, BSN, RN

**V**aping has become increasingly popular since electronic cigarettes were introduced to the U. S. market in 2003. Vape shops have popped up in towns and cities all over the country. "Vape" was the Oxford Dictionary's 2014 Word of the Year, defined as either a noun meaning "an electronic cigarette or similar device" or a verb meaning to "inhale and exhale the vapor produced by an electronic cigarette or similar device."

Vape products are especially popular among adolescents and young adults for a number of reasons, including their sweet and fruity flavors. But despite claims to the contrary, vaping is not harmless, and it is addictive. Anyone working with juveniles needs to understand the what, why, and wherefore of vaping.

### Vape Basics

The technical term for these smoking devices is electronic nicotine delivery systems, or ENDS. They are available in a



variety of shapes and sizes. Some look like regular cigarettes, cigars, or pipes; others look like USB flash drives, pens, and other everyday items, making them easy to disguise and hide from unsuspecting parents, teachers, or counselors.

Rather than a match or lighter, the classic ENDS design uses a compact lithium-ion battery to heat a solvent – known as e-liquid, vape juice, e-juice, or vape liquid – in a vaporization chamber. The solvent evaporates and rapidly cools, creating not smoke but an aerosol or vapor that the user inhales – thus the term vaping. While most don't contain tobacco, vape products do contain nicotine, the addictive ingredient in traditional combustible cigarettes. The nicotine in traditional tobacco products is derived from the tobacco plant; the nicotine in vape products is often manufactured synthetically.

E-liquid, the substance that is converted into aerosol, has been found to include at least 60 chemical compounds. Heavy metals such as tin, nickel, and lead may also be present in e-liquid. Still more compounds are found in the aerosol produced, which is typically a mix of water, food-grade flavoring, propylene glycol or vegetable glycerin, and nicotine. (THC, the primary psychoactive constituent in cannabis, can also be vaped.)

There are several generations of ENDS. First-generation designs closely resemble the classic cigarette and deliver lower levels of nicotine than second-, third-, and fourth-generation models, which contain larger reusable e-liquid cartridges called pods and higher-powered batteries, enhancing the concentration of nicotine consumed.

### Youthful Appeal

ENDS are the most commonly used tobacco product among young people. According to the Centers for Disease

*Vaping devices come in all sorts of shapes and sizes.*
*© Shutterstock/Alexandr III; Aliaksandr Barouski (above)*

Control and Prevention in 2018, 3.6 million middle school and high school students reported using a vape product in the past 30 days. In a 2019 study, more than 5.3 million middle school and high school youth reported having used e-cigarettes, with 1 million reporting daily use. After adolescents, young adults aged 18-24 have the second highest rate of vaping.

There are several reasons for this popularity among youth. Vape products tend to be less expensive than traditional cigarettes, and they are more easily available to young people, sold at gas stations, convenience stores, and vape shops everywhere and, until recently, without the 21-or-over laws that govern tobacco purchases. Young users tend to like the flavorings that are added to e-juice, such as mint, candy, and fruit flavors. Manufacturers (which include "Big Tobacco" cigarette manufacturers like Philip Morris and Reynolds) targeted much of their early marketing to minors and helped perpetuate the idea that vaping is a harmless way to "smoke." Many adult users report taking up vaping in an attempt to quit smoking cigarettes – despite the fact that most vape products include nicotine, which is reported to be as addictive as heroin or cocaine.

## Nicotine Addiction and Other Health Hazards

Nicotine causes stimulation in the brain, inducing feelings of reward and decreasing stress and anxiety. It also acts as a stimulant, speeding up response time and enhancing attention and focus. Adolescents and young adults (until age 25) are particularly vulnerable to the effects of nicotine due to ongoing brain development during this time. The use of nicotine during adolescence can harm the parts of the brain that control attention, learning, mood, and impulse control. Some ENDS devices, including Juul, the most popular vape product among adolescents, use nicotine salts, which allow particularly high levels of nicotine to be inhaled easily and with less throat irritation.

Nicotine poses a number of health risks beyond being highly addictive. It is toxic to developing fetuses and increases risk for cardiovascular, respiratory, and gastrointestinal disorders. Other, long-term health consequences are often overlooked or unknown by those using vape products. That lack of knowledge may be due to advertising touting them as a safer alternative to conventional tobacco products. While it is true that they are not as likely to cause cancer as conventional cigarettes, other significant long-term health risks include increased risk of cardiovascular disease and lung disease.

The inhaled aerosol contains biologically active ultrafine particles that increase oxidative stress and trigger inflammatory processes. These particles directly increase risk for CVD and acute cardiac events, including heart attack, stroke, hypertension, heart rhythm abnormalities, and chest pain.

There is also strong and consistent evidence that vape aerosol adversely affects lung function and inhibits the immune system, increasing the risk of developing acute infections (i.e., pneumonias) and chronic lung diseases. In 2019, vaping became associated with a dangerous new disease; see sidebar on the next page for more information.)

Recent regulations have been adopted in an attempt to curb adolescent vaping. In December 2019, it became illegal in all states for people under 21 years of age to purchase ENDS. In January 2020, the U.S. Food and Drug Administration issued a partial and temporary ban on flavored varieties of e-liquid. Companies are no longer allowed to sell cartridges that contain flavored e-liquid, with the exception of tobacco and menthol flavors. Newer disposable vape pens, however, exploit a loophole in the ban by not using an e-liquid cartridge, so their manufacturers are able to continue to offer a wide array of flavors.

## Vaping Cessation in Juvenile Facilities

It is very difficult for many people to quit using e-cigarette or vape products, just like traditional cigarettes and other tobacco products. When users stop their intake of nicotine, they experience negative mood changes and begin feeling withdrawal symptoms, including irritability, increased appetite, tremors, depression, anxiety, difficulty concentrating, insomnia, and difficulty feeling pleasure. Those negative withdrawal symptoms are relieved almost instantly when nicotine is inhaled;  it only takes the nicotine six to 10 seconds to reach its receptors.

A variety of quit-smoking medications is available, including nicotine replacement therapy like nicotine gum and patches, varenicline (Chantix), and bupropion (Zyban). All of those therapies help decrease symptoms of nicotine withdrawal, increasing the likelihood of successfully quitting. To our knowledge, no research has been conducted on the best medications or dosages to help people quit vaping; recommendations are currently based on the guidelines for tobacco cessation. And those medications are only available to people over the age of 17.

Justice-involved youth suffer a disproportionately high number of mental health and substance abuse disorders, including nicotine dependency. When an adult is detained, continued use of ENDS may be an option. In fact, some are marketed specifically for the incarcerated adult population. But youth who are detained in the juvenile justice system are typically banned from obtaining vaping devices or other forms of nicotine. They are forced to quit "cold turkey." Since no pharmacologic options are approved for smoking or vaping cessation in the juvenile population, many will experience nicotine withdrawal.

Those symptoms typically peak about one to two days after quitting and then slowly decrease over the following weeks. Many youth are detained past this three-day mark, giving them a great start to permanent cessation. If not convinced of the personal benefits of quitting, however, it is unlikely the forced cessation while in detention will continue once released. This is where education and behavioral counseling can play a critical role.

Health care and mental health professionals who work with juveniles have a unique opportunity to discuss with them the serious consequences of vaping – which they may not understand – and help with developing quit plans.

*continued on page 18*

The World Health Organization provides a useful resource titled the Toolkit for Delivering the 5As and 5Rs: Brief Tobacco Interventions in Primary Care. Though the guide was intended for tobacco cessation, it is applicable for quitting any kind of nicotine product. It uses a motivational interviewing approach to help patients identify personal risks for continuing use, benefits of cessation, potential barriers and ways to overcome them, and development of wa quit plan. The toolkit may be particularly useful for adolescents, who typically respond positively to motivational interviewing. That is just one example of the abundance of helpful information available.

*The authors are affiliated with the University of Utah College of Nursing. Jennifer Clifton, DNP, FNP-BC, CCHP, is a clinical director and associate professor. Madeline Hansen, BSN, RN, is a graduate assistant and candidate for the doctorate in nursing practice.*

## Vaping-Related Lung Disease

In August 2019, the CDC identified an acute and sometimes fatal lung disease linked to vaping, termed E-cigarette or Vaping Product Use-Associated Lung Injury. Symptoms of EVALI include:

- Shortness of breath
- Cough
- Chest pain
- Fever and chills
- Diarrhea, nausea, and vomiting
- Tachycardia (rapid heartbeat)
- Tachypnea (rapid and shallow breathing)

Many otherwise healthy individuals began presenting with serious and acute lung infections. The commonality among those cases was the recent use of e-cigarettes or vape products. As of early January 2020, the CDC had identified more than 2,600 cases of patients hospitalized with EVALI in all 50 states, with 57 confirmed deaths.

Vapes containing THC and vitamin E are highly associated with the development of EVALI. Because the exact cause of the disease is unknown, the CDC affirms that the only way to ensure safety is to refrain from all e-cigarette and vaping products, especially products containing THC or vitamin E.

---

**Knee Surgery,** *continued from page 6*

None of the alleged errors (including the recovery error) amounts to knowing a risk and proceeding in the face of it, the court ruled.

### Due Process

No doubt, a competent person has a constitutional right to refuse unwanted medical care. The right to refuse, then, provides the need for informed consent.

The Seventh Circuit, until now, had not adopted the view that incarcerated individuals have a due process right to receive the elements of informed consent; it does so in this opinion.

In doing so, the court reviews and adopts the views expressed in *Pabon v. Wright* (2d Cir. 2019). To claim violation of his right to informed consent, the patient must first establish that his right to informed consent was violated. He must prove that (1) he was deprived of information that a reasonable person would deem necessary to make an informed decision about his medical treatment, (2) the defendant acted with deliberate indifference to the patient's right to refuse treatment, and (3) if the patient had received the information, he would have refused the treatment.

If the patient establishes that his right to informed consent has been violated, the final step of balancing the right to informed consent against countervailing state interests is taken. Liability arises only if, in the end, the patient's right outweighs the state's interests.

Dr. Grossman knew immediately upon opening the knee how to treat Knight. He could continue operating by using the two small incisions that had already been made to Knight's left knee to perform a series of arthroscopic surgical procedures: a chondroplasty to remove the damaged tissue, a notchplasty to enlarge the narrowed gap, and an abrasion arthroscopy – a procedure that required (in simplified terms) shaving the bone to a degree that stimulated the bone marrow to generate new cartilage.

He chose to keep operating because he felt it was in the patient's best interests. Knight fails to show that if he had had the new information, he would have refused the procedure.

Again, summary judgment is upheld.

### Comment

The result here seems fair as the inmate received a more than decent level of care. The "would have refused" factor is a bit too tough for the inmate. "Would likely have refused" is a more accurate measure, should the issue arise elsewhere.

Finally, the inmate-patient's presurgery consent form included an "unforeseen conditions" clause, which allowed a change in procedure should the new condition indicate the desirability or need for such a change. That is what occurred in this case. It's difficult to fault the surgeon. Although there was no explicit consent, the presurgery, unforeseen circumstance agreement – and the facts – protect him.

*Fred Cohen, LLM, is editor of the* Correctional Law Reporter. *This article is reprinted (with minor modifications) from CLR with permission of the publisher. All rights reserved.*

*For subscription information, contact the Civic Research Institute, 4478 U.S. Route 27, P.O. Box 585, Kingston, NJ 08528; 609-683-4450; civicresearchinstitute.com.*

# **Journal**preview

# Drug and Alcohol Deaths in Jails Are Likely Undercounted, Study Finds

Intoxication by drugs and alcohol is the third leading cause of death in jails in the United States, killing more than 1,000 people from 2000 to 2014, according to the Bureau of Justice Statistics. BJS collects this data in its Deaths in Custody Reporting Program, but relatively little is known about these deaths. Kevin Fiscella and colleagues drilled down into the data; their findings appear in the April issue of the *Journal of Correctional Health Care*.

The study notes two concerns with the DCRP: deaths associated with drugs and with alcohol are grouped together and cannot be analyzed independently, and deaths associated with withdrawal are typically categorized as "illness" or "other," lacking their own category.

The study had three purposes:
- To disaggregate deaths associated with drugs from those associated with alcohol using unstructured text data
- To assess cause of deaths among persons who died within 7 days of arrest for driving while intoxicated or "under the influence"
- To assess deaths associated with either drug or alcohol withdrawal using text searches

The study analyzed 2000-2013 DCRP data, available from the National Archive of Criminal Justice Data. The coding of de-identified data combined existing codes in the data set with newly created codes. The data sets include text fields that may provide information on the primary cause of death, details about intoxication, or notes from the autopsy.

Using an iterative two-phase approach that used word searches followed by physician review of the candidate cases, the researchers identified 1,442 deaths associated with drugs and alcohol. These cases were coded as intoxication, withdrawal, and "could not be distinguished." Further coding identified the substance associated with the death: alcohol, cocaine, opioid, amphetamine/methamphetamine, other drugs, and "could not be distinguished."

## What the Data Show

In 45% of cases, drug and alcohol deaths could not be distinguished; 36% were associated with drugs and 20% with alcohol. In terms of demographics, those dying in association with alcohol tended to be older, more often male, White, convicted, more often died within 7 days, charged with DWI/DUI or violent offense, and coded as death from illness. Among drug-associated deaths, the largest drug category, 44%, was "other"—a wide range of nonopioid medications—followed by stimulants (36%) and opioids (20%).

More than 103 deaths were associated with withdrawal: 66 involved alcohol, 21 involved drugs (primarily opioids), and for 16 the substance was not noted.

The authors conclude that drugs and alcohol likely contribute to more deaths in jails than has been recognized, and that most of those deaths likely involve drug intoxication. Alcohol and opioid withdrawal represent a small but underappreciated contributor to jail deaths.

## JCHC Vol. 26, Issue 2: April 2020

• Clinical Pharmacist Services on Admission to a Large Correctional Center – *Ashwin Bhat, Mary Gunther, Tammy J. Bungard, Stewart MacLennan, Kim Taube & Peter Macek*

• Physical Health, Medical Care Access, and Medical Insurance Coverage of Youth Returning Home After Incarceration: A Systematic Review – *Elizabeth Barnert, Ava Sun, Laura S. Abrams & Paul J. Chung*

• Physical Health and Disability Among U.S. Adults Recently on Community Supervision – *Tyler N. A. Winkelman, Michelle Phelps, Kelly Mitchell, Latasha Jennings & Rebecca J. Shlafer*

• Prisoner Parenting: Parenting from a Federal Jail – *Kimberly Collica-Cox & Gennifer Furst*

• Management and Complications of Non-Thumb Metacarpal Fractures in the Incarcerated Population – *Neil M. Vranis, Safi Ali-Khan, Kelly Hu, David Daar, Karl Bruckman & Jacques Hacquebord*

• Development of a Dementia Education Workshop for Prison Staff, Prisoners, and Health and Social Care Professionals to Enable Them to Support Prisoners With Dementia – *Joanne Brooke & Monika Rybacka*

• Drug- and Alcohol-Associated Deaths in U.S. Jails – *Kevin Fiscella, Margaret Noonan, Susan H. Leonard, Subrina Farah, Mechelle Sanders, Sarah E. Wakeman & Jukka Savolainen*

• Identification, Referral, and Services for Individuals With Serious Mental Illness Across Multiple Jails – *Sheryl Kubiak, Erin B. Comartin, Julie Hanna & Leonard Swanson*

Academy of Correctional Health Professionals members receive JCHC as a member benefit and Certified Correctional Health Professionals receive a complimentary online subscription.

**https://journals.sagepub.com/home/jcx**

# CCHP-MH

## Specialty Certification for

## Correctional Mental Health Professionals





- Validation of correctional mental health professionals' expertise in correctional health care
- Recognition of mastery over national standards for quality mental health care
- A next step in the most prestigious correctional health care certification program

CCHP-MH specialty certification provides validation of one's dedication to continuing competence and quality service delivery to incarcerated patients. A CCHP-MH has shown mastery of specialized content developed by mental health experts in the field of correctional health care.

### THE BEST CCHP-MH EXAM PREPARATION, HANDS DOWN!

Attend an In-Depth Review of NCCHC's *Standards for Mental Health Services* before you take the CCHP-MH exam at the Correctional Mental Health Care Conference!

**Application deadline: June 12**

More information is available at **ncchc.org/mental-health-conference**.



For more information or to obtain an application, visit **ncchc.org/cchp-mh**.
Or contact us at **cchp@ncchc.org** or **773-880-1460**.

# CCHPpage

# CCHP-MHs Feel the Love

For CCHP-MHs, the specialty certification in mental health brings them a personal sense of pride and helps lend credibility to the challenging profession they love. Ask some of them what they like about the work they do, and their passion for it is evident.

"I like almost everything about my job," says Hilary Van Patten, LSCSW, CCHP-MH, behavioral health director at a state prison in Kansas. "Every day is different. I have been able to learn and grow as a clinician in ways that I do not believe would have been possible in any other setting."

"I love that I get to know the kids as more than what they've done," says Ivory McMillian, PsyD, CCHP-MH, health service program manager with the DC Department of Youth Rehabilitation Services. "I see what happened to them, their struggles, their history."

Walter Campbell, PhD, CCHP-MH, chief psychologist with the Idaho Department of Correction, likens his work to that of a sculptor working with large tools to make initial broad-stroke changes without a clear picture of what or who will begin to emerge, as opposed to the fine filigree work of a jeweler. He says, "I've always enjoyed working with people who would probably never take themselves to see a therapist. I like the challenge of diagnosing and treatment planning for people with so many competing concerns, a whole lifetime of problems that need to be teased out."

Diane Kearns, MS, LPC, CCHP-MH, enjoys the managerial aspects of her role as clinical operations specialist – mental health for Centurion. "I like supporting those who choose to do a job that most wouldn't. I enjoy the challenges of finding ways to bring people together to collaborate and overcome obstacles in order to provide care for those who need it. And I value being part of something that ultimately impacts all of society."

## Standards-Bearers

Passing the CCHP-MH exam requires a comprehensive understanding of NCCHC's *Standards for Mental Health Services in Correctional Facilities*. Having learned the value of the standards through studying for their exams, most CCHP-MHs come to rely on them heavily. "I keep my *Standards* book no more than one arm's length away at all times," says Melissa Caldwell, PhD, CCHP-MH, vice president - mental health services, Advanced Correctional Healthcare. On the other hand, McMillian reports that her manuals are "borrowed" repeatedly: "We have three copies and I still can never find mine."

When it comes to making policy changes or other decisions, the standards are an invaluable resource. Campbell,

who says that his "brown book is battered and dog-eared," turns to that book for the principles upon which to base decisions. "I always say, 'Let's see what the standards say.' The standards lend credibility to any decision you make. And in a legal challenge, courts see them as the gold standard."

Van Patten, who claims to have most of the standards memorized, agrees: "For policy changes or new concerns that come up, the NCCHC manual is the first resource I check."

"People frequently look to me for guidance in ensuring compliance with the standards," says Kearns. "I find it valuable to continually review the standards, especially as there are updates, to ensure I am current and knowledgeable."

## Pride and Competence

Like all CCHPs, those with the mental health certification feel a deep personal pride in their accomplishment. "I'm proud to include my certifications in my email signature," says Campbell. "I see them as a formalization of all my hard work." Caldwell agrees: "My CCHP and CCHP-MH certifications are badges of honor of which I am really proud," she says.

McMillian's facility provides on-site testing for all interested staff members, organizes study groups, and pays the application fees. Why? "Certification solidifies the quality of the work we do," she says. "CCHP certification is evidence of a commitment to exceptional care," says Van Patten.

Being a correctional mental health professional takes a special kind of person. For those who love their work, it is equally challenging and rewarding. Kearns explains it this way: "We get the opportunity to walk alongside individuals who are at their lowest, and often to watch these same individuals grow into healthy, prosocial individuals. Some of my clients have been written off by everyone in their lives, often because of their own actions; many of them find that forming a therapeutic relationship with someone who believes in their potential can be life-altering and motivate them to work toward a more positive future."

### Take the Exam This Summer!
The CCHP-MH exam will be held on July 18, in conjunction with the Correctional Mental Health Care Conference. Exam applications are due June 12. Qualified mental health professionals who are CCHPs may be eligible to take the exam. Find all eligibility requirements and exam details online. **mental-health-conference.ncchc.org**.

*Exhibitor Opportunity*



# CORRECTIONAL MENTAL HEALTH CARE CONFERENCE

NCCHC

LEADING THE WAY

JULY 19-20, 2020 • HYATT REGENCY DENVER

Exhibit at NCCHC's Correctional Mental Health Care Conference and connect with mental health professionals from across the country. You'll gain visibility and exposure to the largest annual gathering of correctional mental health care providers, who come together to share insights, find solutions, and identify best practices. Connect with more decision makers than you can in months of sales calls.

## 2019 Attendee Profile

| | |
|---|---|
| Mental health services staff | 39% |
| Mental health directors | 13% |
| Department managers/supervisors | 7% |
| Health services staff | 7% |
| Custody | 5% |
| Other | 17% |

## Categories of Interest

- Education and training
- Mental health care staffing
- Mental health services
- Pharmaceuticals
- Screening and assessment
- Suicide prevention
- Treatment programs

## Exhibitor Benefits

NCCHC will conduct a comprehensive marketing campaign that includes email broadcasts, direct mail, social media, online banners, and direct outreach.

For $1,000, exhibitors receive:

- Skirted table and two chairs
- FREE company listing with 25-word description in the official printed final program and website
- One FREE full conference registration, including up to 15 continuing education credits
- One full conference registration for an additional staff member at 50% off
- Preshow and postshow attendee mailing lists
- Exclusive opportunity to become a sponsor or advertise in preshow and on-site materials

**Also available:**
Full-page, 4-color ad in the conference final program.
Only $990!

### For Extra Impact

Gain added exposure through sponsorships that support and enhance the conference. Recognition is given through additional signage, sponsor ribbons, and listings in the final program! Download the prospectus at ncchc.org, or contact exhibits and advertising manager Stana Manojlovic at sales@ncchc.org or 773-880-1460. Ask about advertising, too!



NCCHC mailing lists

# WHERE WILL YOU FIND YOUR NEXT GREAT HIRE?

Find your next lead with the **National Commission on Correctional Health Care mailing list**, a proven tool to reach over 40,000 physicians, nurses, mental health care providers, medical directors, nurses and other allied health professionals and administrators. Pinpoint your audience by job title, work setting and demographics. No other marketing channel allows you such a targeted marketing opportunity.

**www.InfocusLists.com/Datacard/NCCHC**

INFOCUS

**Contact *INFOCUS* Today!**
Kerry Tranfa
ktranfa@infocuslists.com
800.708.LIST (5478), ext 3247

**www.InfocusLists.com**

## Become an Exhibitor Today!

Contact exhibits and advertising manager Stana Manojlovic at sales@ncchc.org or 773-880-1460.

# Classfiedads

## EMPLOYMENT

**Registered Nurse, Denver Sheriff City & County Jails**

*Are you looking for a new career opportunity in correctional care treatment?* Denver Health supports the Denver Sheriff Department City and County Jail's treatment centers and we are looking for RNs with the energy, motivation and passion to deliver high quality treatment for patients. Working with a team you will help drive and execute treatment plans for all patients. We offer competitive compensation and a full suite of benefits.

To apply go to hcm-denverhealth-prd.inforcloudsuite.com/hcm/xmlhttp/shorturl.do?key=FLR. Contact Stewart Douglass at stewart.douglass@dhha.org or Diane Grierson at diane.grierson@dhha.org with any questions.

**Academy Career Center**

*Looking for a job?* Post your resume online and showcase your skills and experience to prospective employers to find the best job opportunities.

*Hiring?* Receive member discounts on job postings and access the most qualified talent pool to fulfill your staffing needs.

Hosted by the Academy of Correctional Health Professionals. For information or to access listings, visit **careers.correctionalhealth.org.**

---

## About CorrectCare®

*CorrectCare* is the quarterly magazine of the National Commission on Correctional Health Care. Its mission is to publish news, articles, and commentary of relevance to professionals in the field of correctional health care.

**Subscriptions:** *CorrectCare* is mailed free of charge to Certified Correctional Health Professionals, key personnel at accredited facilities, members of the Academy of Correctional Health Professionals, and other recipients at our discretion. To see if you qualify for a subscription, create an account at ncchc.org or email us at info@ncchc.org. The magazine is also posted at ncchc.org.

**Change of Address:** Send notification four weeks in advance, including both old and new addresses and, if possible, the mailing label from the most recent issue. See page 1 for contact information.

**Editorial Submissions:** Submitted articles may be published at our discretion. Manuscripts must be original and unpublished elsewhere. For guidelines, email editor@ncchc.org or call 773-880-1460. We also invite letters or correction of facts, which will be printed as space allows.

**Advertising:** Contact us at sales@ncchc.org or call 773-880-1460, ext. 298.

---

## HearingLife

### Correctional Audiology & Hearing Aid Services

• On Site • On Time • In Compliance

**Professional Licensed Services Performed**

**At your location on a regular schedule**

• Experienced • Dependable • In Budget

• Eliminate Transport • Cut Admin Expense

**For a no cost utilization and cost analysis contact:**

Mark Nystrom / Program Director

**mnys@hearinglife.com | 719-322-6575**

---

## ADVERTISER INDEX

California Correctional Health Care Services ................... 15

Centurion .................................................. Inside back cover

Certified Correctional Health Professionals (CCHP) ...... 20

Correctional Health Care: Practice, Administration & Law ... 6

Correctional Mental Health Care Conference ....... Back cover

Hearing Life ..................................................... 23

InFocus Mail Lists ............................................. 22

Medi-Dose EPS ................................... Inside front cover

Medi-Dose Tamper Evident Products ........................ 5

Medi-Dose Tamper Evident Syringe Bags ................. 24

NCCHC Standards ............................................. 4

Swisslog Healthcare .......................................... 11

Wexford Health Sources ...................................... 7

# Standards Q & A

# Expert Advice on NCCHC Standards

by Jim Martin, MPSA, CCHP

## Access to Care in the Time of COVID-19

**Q** *We have a question about compliance with standard A-01 Access to Care during the coronavirus emergency or any similar pandemic in the future. Patients' ability to access health care services in a timely manner is central to compliance with the standards. However, with the COVID-19 situation, we are finding it necessary to change the way we provide health care in order to respond appropriately to the more vulnerable populations' needs while also actively working to reduce potential exposure to the virus. What is NCCHC's stance on the situation with regard to access to care? We don't want this new reality to affect our accreditation status.*

**A** Given the increased challenges of the coronavirus pandemic, and during any emergency like this, triaging is always the top priority. You need to direct your staff accordingly. This is truly a mass disaster scenario. NCCHC surveyors are health care professionals who know what you are going through: many have been through similar crises themselves. They will consider the unusual circumstances you are facing and the adjustments you are having to make. That said, be sure that your technical response to the crisis is thoughtful, and document, document, document.

## Are Routine Physicals Still Routine?

**Q** *The medical team at our juvenile detention center is looking for guidance about continuing to do routine physical exams on youth admitted to our facility. Should we still perform initial health assessments within one week of admission per NCCHC standards? Or should we hold off on routine physicals until the coronavirus crisis has passed?*

**A** Because these are new patients, it's important to get an assessment of their health status. That being said, your local medical authority should determine the details of this assessment according to the level of risk for COVID-19 or other disease transmission to and among you and your patients. Always follow recommended levels of personal protective equipment and high-quality infection control procedures, and please see Standard Y-B-01 Infection Prevention and Control Program as a reference.

## DNRs and Advance Directives

**Q** *Which of the standards for health services in jails and prisons speak to advance directives and do not resuscitate orders?*

**A** Advance directives and do not resuscitate orders are addressed in standard F-07 Care for the Terminally Ill. The standard states: "The facility addresses the needs of terminally ill inmates, including protecting their rights regarding end-of-life decisions." One of the compliance indicators is that "advance directives, health care proxies, and DNR orders are available when medically appropriate."

Those options are often overlooked for our patient population. Those approaching the end of life may face many profound issues. This NCCHC standard states that they have the right to receive life-sustaining treatments, if desired, or not to have the dying process prolonged, if that is their wish.

*Jim Martin, MPSA, CCHP, is NCCHC's vice president of development. If you have a question about the standards, write to accreditation@ncchc.org or call 773-880-1460.*

*For an archive of Q&A topics as well as the Spotlight on the Standards column, visit ncchc.org/standards-explained.*

# Medi-Dose® EPS®

## Tamper Evident Syringe Bags

Unit Dose, Bar Coding, Pharmacy & Nursing Supply Experts!

Scan Me!

- Durable 3 Mil Plastic with Tamper-Evident Closure
- 2" x 8" or 3" x 12" Bags Fit Virtually All Syringe Sizes
- Clear or Amber Ultraviolet Inhibitant

**MediDose.com · 800.523.8966**



# Real managed care makes a *real difference*.

**Correctional healthcare is public healthcare.** At Centurion, we believe the healthcare services we provide to inmates are an essential part of rehabilitation and the health of the community at large. Our innovative model delivers real managed care services by combining evidence-based, integrated healthcare services with modern managed care practices that ensure quality and efficiency. We engage inmates in their personal health and work towards a seamless connection to resources in the community so they re-enter society with a better chance of long-term success.



CenturionManagedCare.com



National Commission on
Correctional Health Care

# VIRTUAL

## CORRECTIONAL
## MENTAL HEALTH CARE
## CONFERENCE

— JULY 20-21 —

**Join expert speakers and like-minded colleagues for inspiring viewpoints and fresh perspectives during this virtual two-day event.**

**NEW**
Preconference Webinar on NCCHC's Standards for Mental Health Services

## Session Topics

- Coping with COVID-19
- Ethics
- Human trafficking
- Medication-assisted treatment
- Personality disorders
- PTSD
- Recidivism
- Sexual offenders
- Suicide risk and prevention

*Continuing education hours available for psychologists, social workers, nurses, physicians, and CCHPs.*





**Registration includes educational sessions on every aspect of correctional mental health care, real-time Q & A with presenters, and the opportunity to earn additional CE, all from the socially distant safety of your home or office.**

## REGISTER BEFORE JUNE 19 AND SAVE!

Visit **NCCHC.org/mental-health-conference**

For more information, contact info@ncchc.org or call 773-880-1460.