Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: jkeenan@acluaz.org
          carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,
Sonia Rodriguez, Christina Verduzco, Jackie Thomas,
Jeremy Smith, Robert Gamez, Maryanne Chisholm,
Desiree Licci, Joseph Hefner, Joshua Polson, and
Charlotte Wells, on behalf of themselves and all others
similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED BELOW]**

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, Plaintiffs, v. David Shinn, Director, Arizona Department of Corrections; and Larry Gann, Division Director, Health Care Services Monitoring Bureau, Arizona Department of Corrections, in their official capacities, Defendants. | No. CV 12-00601-PHX-ROS  **PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 14 OF THE STIPULATION** |

LEGAL148518651.1

# TABLE OF CONTENTS

**Page**

PROCEDURAL HISTORY ................................................................................................ 1

ARGUMENT.................................................................................................................... 4

    I.       PARAGRAPH 14 APPLIES TO ALL CLASS MEMBERS NOT FLUENT IN ENGLISH, INCLUDING THOSE WHO USE SIGN LANGUAGE. ............................................................................................. 4

    II.      DEFENDANTS DO NOT HAVE A SYSTEM IN PLACE TO ACCURATELY DEMONSTRATE COMPLIANCE WITH PARAGRAPH 14. .......................................................................................... 7

        A.      Defendants Do Not Accurately Document Whether Someone Requires Interpreter Services. ........................................... 7

            1.      Medical Records Improperly State That Class Members Who Are Not Fluent in English Do Not Need an Interpreter. ............................................................................ 7

            2.      Medical Records for the Same Patient Are Contradictory, Sometimes Stating That Interpreter Services Are Needed, and Sometimes Saying That They Are Not. ......................................................................... 10

        B.      Defendants Do Not Assess or Document Whether Qualified Healthcare Practitioners Are Proficient in Any Non-English Language. ........................................................................................ 13

    III.     RELIEF REQUESTED ................................................................. 14

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Armstrong v. Brown*,
    939 F. Supp. 2d 1012 (N.D. Cal. 2013) ................................................................ 6

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001), *abrogated on other grounds by Johnson v.*
    *California*, 543 U.S. 499 (2005) ....................................................................... 14

*Brown v. Plata*,
    563 U.S. 493 (2011) .......................................................................................... 15

*Jones v. Gusman*,
    296 F.R.D. 416 (E.D. La. 2013) ................................................................... 15, 16

*Pierce v. District of Columbia*,
    128 F. Supp. 3d 250 (D.D.C. 2015) .................................................................. 15

*U.S. E.E.O.C. v. UPS Supply Chain Sol'ns*,
    620 F.3d 1103 (9th Cir. 2010) ............................................................................ 4

*United States v. Maricopa County*,
    915 F. Supp. 2d 1073 (D. Ariz. 2012) ............................................................... 16


**OTHER AUTHORITIES**

Anna Middleton, ed., Working with Deaf People:  A Handbook for
    Healthcare Professionals (2010) ........................................................................ 5

Irene W. Leigh *et al.*, Deaf Culture (2018) ........................................................... 6

Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough: Deafness,
    Language, and Due Process, 2003 Wis. L. Rev. 843 (2003) ............................... 6

U.S. Dep't of Justice, Guidance to Federal Financial Assistance Recipients
    Regarding Title VI Prohibition Against National Origin Discrimination
    Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455
    (June 18, 2002) .......................................................................................... 11, 15, 16

1    Plaintiffs hereby move the Court to exercise its inherent powers and those outlined

2  in the Stipulation to enforce the terms of the Stipulation and order Defendants to take

3  immediate and substantial action to remedy their failure to provide interpretation during

4  the healthcare encounters of class members who are not fluent in English, including

5  D/deaf class members who communicate using sign language and monolingual Spanish

6  speakers.[1]  All too often, patients are forced to pantomime or simply not participate in or

7  fully understand critical healthcare encounters involving, among other things, mental

8  health counseling, review and prescription of psychiatric medications, and chronic care

9  appointments.

10                              **PROCEDURAL HISTORY**

11    Paragraph 14 of the Stipulation provides:

12            For prisoners who are not fluent in English, language
              interpretation for healthcare encounters shall be provided by a
13            qualified health care practitioner who is proficient in the
              prisoner's language, or by a language line interpretation
14            service.

15  [Doc. 1185 at 6 ¶ 14]

16    On July 12, 2016, Plaintiffs moved to enforce the Stipulation, noting, among other

17  things, that Defendants refused "to monitor and document compliance" with

18  Paragraph 14.  [Doc. 1625 at 8-9]  In response, Defendants contended that they were "not

19  required to monitor" Paragraph 14.  [Doc. 1644 (capitalization omitted) at 3]  The Court

20  disagreed and, on September 6, 2016, granted Plaintiffs' motion in part.  [Doc. 1673 at 1-

21  2, 8]  The Court held that "Plaintiffs are entitled to timely data demonstrating Defendants'

22  compliance" and ordered Defendants to "propose a reporting procedure to demonstrate

23  compliance" within thirty days.  [*Id.* at 2, 8]

24

25

26

---

27    [1] Use of the lowercase "deaf" generally is used when referring to the audiological
    condition of not hearing, whereas the uppercase "Deaf" is used when referring to
28  individuals who self-identify as culturally Deaf, meaning they share the use of American
    Sign Language and other practices as a culture.

On October 6, 2016, Defendants proposed the following:

> To demonstrate compliance with [Paragraph 14], Defendants propose that a 'hard-stop' feature be added to eOMIS. Specifically, when a health care provider opens a new note to begin a health care encounter with an inmate, the provider will be prompted to answer the following questions before being allowed to complete the remainder of the note:
>
> 1. Are interpreter services needed for this inmate?
>
> 2. If so, what type of interpreter services were used for the encounter?
>
>    a) Language line
>
>    b) Healthcare staff was available for interpretive services
>
>    c) Inmate refused interpreter services.

[Doc. 1703 at 3]  Defendants stated that "a report of all inmates who required interpreter services to be seen and the type of interpretation that was used" would "be produced to Plaintiffs on a monthly basis."  [*Id.*]

Plaintiffs responded that they were satisfied with this proposal, but noted that Defendants offered no information as to when the changes would be implemented. [Doc. 1755 at 21-22]  The Court thereafter ordered Defendants to report whether they could make the changes within thirty days.  [Doc. 1831 at 3]  On February 9, 2017, Defendants reported that "[a] 'hard-stop' feature has been added to eOMIS, which requires a provider answer several questions regarding interpreter services each time a SOAPE note is opened."[2]  [Doc. 1927 at 2]  Defendants, however, never produced the promised monthly compliance reports.  [*See* Declaration of Corene T. Kendrick ("Kendrick Decl.") ¶ 8]

On February 7, 2019, Plaintiffs sent Defendants a Notice of Substantial Non-Compliance.  [Doc. 3255-1 at 108-113]  Plaintiffs noted that, during visits to ASPC-

---

[2] "eOMIS" refers to the electronic medical record system used by Defendants. "SOAPE" note refers to the "Subjective, Objective, Assessment, Plan, and Education" sections that are a standard part of documenting every healthcare encounter. The fields for a SOAPE note are generated whenever a new encounter is opened in eOMIS.

1    Tucson and ASPC-Eyman in 2019, "deaf class members whose primary form of

2    communication is American Sign Language (ASL) reported that they are not provided

3    with sign language interpretation during healthcare encounters." [*Id.* at 108]  Plaintiffs

4    noted that "[a] review of the electronic medical record confirms deaf class members'

5    reports," and listed several examples where sign language interpretation was not provided

6    for healthcare encounters, including for intake assessments and mental health counseling.

7    [*Id.* at 109-111]  Plaintiffs further noted that the "hard-stop" feature that had been

8    proposed by Defendants to demonstrate compliance was not in fact accurately identifying

9    instances of noncompliance and was yielding internally inconsistent results:

> The electronic medical record now contains two fields related
> to interpreter services for specific health care encounters:
> "Are interpreter services needed for this inmate," and "What
> type of interpreter services were used for the encounters." The
> first field, however, does not appear to be automatically
> populated and can be inconsistent between different medical
> encounters for the same class members.

14   [*Id.* at 113]

15   This also was true for Spanish-speaking class members.   In one case, "the

16   psychologist noted that interpretation was required" during an individual counseling

17   encounter on January 15, 2019, and "that such interpretation was provided by a health

18   care staff member." [Doc. 3255-1 at 112]  "However, when [the patient] participated in

19   MH Group Counseling one week earlier, on January 8, the same psychologist wrote that

20   interpretation was not needed, and there is no indication that it was provided." [*Id.*]

21   Defendants responded to the Notice of Substantial Non-Compliance on March 11,

22   2019.   [Doc. 3255-1 at 125-27]   Defendants first stated that they "disagree that

23   Paragraph 14 of the Stipulation was intended to include inmates who utilize sign language

24   as a form of communication." [*Id.* at 125]  Defendants then stated that their contractor

25   "has a national contract with LanguageLine, which provides video interpreting, including

26   American Sign Language." [*Id.* at 126]  As to the specific examples of noncompliance

27   provided by Plaintiffs, Defendants stated only that "Plaintiffs failed to substantiate that

28

[the] inmate[s] . . . [are] not sufficiently fluent in English." [*Id.* at 126-27]  Defendants concluded their letter by stating that they "consider this issue closed." [*Id.* at 127]

On March 20, 2019, Defendants responded to Plaintiffs' request for "[a]ll documents related to Defendants' monitoring of compliance with Paragraph 14 . . . at all ASPCs, including instructions to monitoring staff and compliance reports." [Kendrick Decl., Ex. 3 at 6]  Defendants asserted, "[w]ithout waiving any objections, there are no responsive documents." [*Id.*]

The parties met-and-conferred and later mediated the dispute before Magistrate Judge Deborah M. Fine on August 28, 2019.  [Doc. 3348]  The parties were unable to resolve the dispute through mediation, and have been unable to resolve it since that time.

## ARGUMENT

## I.   PARAGRAPH 14 APPLIES TO ALL CLASS MEMBERS NOT FLUENT IN ENGLISH, INCLUDING THOSE WHO USE SIGN LANGUAGE.

As an initial matter, Defendants simply are wrong when they assert "that Paragraph 14 of the Stipulation was [not] intended to include inmates who utilize sign language as a form of communication." [Doc. 3255-1 at 125]  Paragraph 14 is broadly worded and covers all class members "who are not fluent in English." [Doc. 1185 at 6 ¶ 14]  This includes class members who use a sign language, including American Sign Language ("ASL"), to communicate.  "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages.  In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language."  *U.S. E.E.O.C. v. UPS Supply Chain Sol'ns*, 620 F.3d 1103, 1105 (9th Cir. 2010) (internal citations omitted).

D/deaf class members uniformly report that a sign language interpreter was not provided for healthcare encounters.[3]  From review of the medical record, it appears that

---

[3] [*See* Declaration of Amber Norris ("Norris Decl."), Ex. 1, Declaration of W.D. ("W.D. Decl.") ¶ 8 ("The only ASL interpreters I have had in medical appointments at ADC has been other prisoners who knew some fingerspelling in ASL."); *id.*, Ex. 62, Declaration of J.H. ("J.H. Decl.") ¶ 10 ("While at ADC, I was not provided a certified

staff instead often attempted to communicate through notes written in English.[4]  [*See, e.g.*, Norris Decl. ¶¶ 27, 58, 70, 93, 97, 116, 122, 126, 128, 132, 134, 142, 147, 149, 157, 165, 167, 175, 192, 196, 200, 202, 204, 211, 281, 283]  This includes perfunctory questions written by mental health staff ("Homicidal?  Kill others?"), and an attempt to counsel a class member after the suicide of his brother ("greif [sic] is like a fart if you force it, it just might be shit").  [*Id.*, Ex. 99 at 10]  As Dr. Pablo Stewart, a board-certified psychiatrist and correctional health expert, explained, such notes are "an unnecessarily awkward, stilted, and slow way to communicate and do[] not provide an appropriate or adequate medium to engage the patient in discussion of sensitive and important mental health matters."[5]  [Declaration of Dr. Pablo Stewart ("Stewart Decl.") ¶ 25]  Indeed, one psychologist wrote that an "evaluation proceed[ed] with written questions that [the

ASL interpreter during important medical and mental health encounters, including medical appointments, psychiatric consults, psychologist/therapy meetings, dental procedures, and intake."); *id.*, Ex. 20, Declaration of F.L.H. ("F.L.H. Decl.") ¶ 9 (same); *id.*, Ex. 52, Declaration of G.M. ("G.M. Decl.") ¶ 25 (same); *id.*, Ex. 83, Declaration of K.P. ("K.P. Decl.") ¶¶ 15-16 ("I have never been provided an ASL interpreter for any of my healthcare encounters at ADC.  During healthcare encounters at ADC, ADC has either attempted to use an unqualified fellow incarcerated person to interpret, used written English notes, or simply ignored that I could not hear and talked to me.")]  The class member declarations cited in this motion were drafted with the assistance of Spanish language interpreters, a person fluent in Spanish, and sign language interpreters, as appropriate, and read to the class member in his or her language to ensure accuracy.  [*See id.*, Exs. 2, 49, 53, 63, 84, 102, 126, 139, 145, 158 at 3, 165 at 4]

    [4]  In other cases, there is no indication in the record how, if at all, effective communication was achieved.  [*See, e.g.*, Norris Decl. ¶¶ 17, 36, 38, 40, 42, 44, 48, 64, 66, 99, 101, 114, 130, 136, 138, 140, 151, 155, 171, 182, 206, 219]

    [5]  *See also* Anna Middleton, ed., Working with Deaf People:  A Handbook for Healthcare Professionals 59 (2010) ("A busy health professional is also likely to write in a briefer manner in a written note, given the time it takes to write one, than they would be if they were explaining in speech.  This means that a deaf person, particularly a sign language user, is receiving their medical information not only in a language they do not routinely use, but also in a shorter form than their hearing counterpart would receive.  It is not difficult to see that this means a substandard service is being provided.") (citation omitted); G.M. Decl. ¶ 20 ("I find that often when using notes to communicate in healthcare visits, [staff] provide less information than they would provide if they could say it.  The notes are short.  It takes a lot less time to tell me information than to write it down.  The healthcare professionals are, at times, impatient, if I need to follow up on information in the note or if I write that I do not understand."); Norris Decl., Ex. 48, Declaration of C.P. ¶ 20 ("I receive less information when it needs to be written because it takes longer to write than to speak/translate information in sign language, and the healthcare providers are in a hurry.  If I do not understand a concept or a medical term in the note, the healthcare provider often does not provide a sufficient explanation for the same reasons.").

patient] answers with written one-word responses," something that even the psychologist acknowledged in the medical record did not allow her to assess "[t]hought processes." [Norris Decl. ¶ 281]

And many D/deaf people are not fluent in English—verbal or written.[6]  In fact, D/deaf class members reported that they did not understand English notes written by healthcare staff.  [*See, e.g.*, W.D. Decl. ¶ 10 ("The provider showed me a list of medicines on the computer screen and wrote down information on a piece of paper and showed it to me, but I did not understand what the provider wrote."); *id.* ¶ 11 ("The nurse tried to communicate with me by typing on the computer and showing me what she had typed, but I did not understand what the nurse was trying to communicate."); Norris Decl., Ex. 101, Declaration of F.L. ("F.L. Decl.") ¶ 8 ("There are certain medical terms that after reading them in English, I have no idea what they mean."); K.P. Decl. ¶¶ 14, 22 ("I did not understand a lot of the vocabulary in the medical questionnaire when I read it and had to guess. . . .  In some encounters, healthcare staff wrote notes to attempt to communicate with me.  Handwritten notes are not an effective way for me to communicate with medical staff because I am not fluent in reading and writing in English."); F.L.H. Decl. ¶ 8 ("[O]ut of several pages of notes the doctors write, I can usually understand just a few words.")]

It thus is critical that sign language interpretation be provided when required by Paragraph 14.  *Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1021 (N.D. Cal. 2013) (noting "Defendants harm deaf prisoners by forcing them to rely on inadequate and ineffective forms of communication, such as . . . written notes" and "requiring Defendants, for all deaf prisoners whose primary means of communication is sign language, to provide a

---

[6] *See, e.g.*, Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough: Deafness, Language, and Due Process, 2003 Wis. L. Rev. 843, 854 (2003) ("Thirty percent of deaf students leave school functionally illiterate, i.e., they read at grade level 2.8 or below."); Irene W. Leigh *et al.*, Deaf Culture 191 (2018) ("It is a well-known fact that many deaf people have low English literacy. . . .  They may misunderstand instructions for medicine after they see doctors because sign language interpreters were not provided. . . .  Doctors may not understand them because they do not know ASL and may not have sign language interpreters available and as a result may misdiagnose medical symptoms.  This can lead to ongoing health problems based on lack of understanding.").

qualified sign language interpreter during all regularly-scheduled mental health rounds and all other encounters within the definition of the [settlement agreement]").

## II.     DEFENDANTS DO NOT HAVE A SYSTEM IN PLACE TO ACCURATELY DEMONSTRATE COMPLIANCE WITH PARAGRAPH 14.

Defendants do not have a system in place to accurately demonstrate compliance with Paragraph 14.  First, Defendants do not accurately document whether a class member is not fluent in English and therefore requires an interpreter for healthcare encounters. Second, Defendants do not maintain a list of the healthcare practitioners who are proficient in languages other than English.

### A.     Defendants Do Not Accurately Document Whether Someone Requires Interpreter Services.

Defendants have conceded that they do not have a "[l]ist of all class members who are not fluent in English and their ADC numbers and primary language."  [*See* Kendrick Decl., Ex. 3 at 5]  Instead, for each individual healthcare encounter, medical staff enters a response to the "hard-stop" question: "Are interpreter services needed for this inmate." This has not proven to be a reliable method for documenting or determining if a person in fact requires interpreter services.  In some cases, medical staff improperly state that a class member who is not fluent in English does *not* need an interpreter for a specific encounter. And a single class member can have inconsistent entries; some encounters state that the class member needs an interpreter, and other encounters state that the same class member does not need an interpreter (and, even more confusingly, some encounters state both that an interpreter is needed and that an interpreter is not needed).

#### 1.     Medical Records Improperly State That Class Members Who Are Not Fluent in English Do Not Need an Interpreter.

The medical record sometimes states that no interpreter services are needed when the class member is not fluent in English and does in fact require such services.  For example, D.M. reported that he is a native Spanish speaker, has not had any formal education in English, and has a limited English vocabulary.  [Norris Decl., Ex. 144,

Declaration of D.M. ("D.M. Decl.") ¶ 2]   He "cannot speak, write, or read English fluently."   [*Id.*]   He reported that he has been provided Spanish interpreter services only once during a healthcare encounter—in 2012.   [*Id.* ¶ 9]   He reported that he could not communicate with the Nurse Practitioner during a chronic care appointment on September 18, 2019, because she spoke only in English, and he did not understand what was said at that appointment.   [*Id.* ¶ 5]   Nonetheless, the medical record states that interpreter services were not needed for the encounter.  [Norris Decl. ¶ 272; *id.*, Ex. 149]

The same is true for an encounter with a psychiatrist on August 5, 2019, to discuss psychiatric medications; D.M. was not provided with an interpreter, and the medical record says one was not needed.   [Norris Decl. ¶ 266; *id.*, Ex. 146]   In order to communicate his concerns, D.M. "had another prisoner write down what [he] needed to say in English and practiced it before going to [the] appointment."  [D.M. Decl. ¶ 8]  The psychiatrist noted the following in the medical record:

> Today he says that he would like to get back on his zyprexa, that loxapine is not working, reports that, "I am having mood swings, I am happy, sad, angry, worrying, thinking, depressed, feel angry too much, and too much problem for sleep, I feeling bad, I put 2 HNR to other psychiatrist, I eat my fingers, I eat my nails, I bang the wall because I feel angry too much, I need help please, I am not crazy but I feeling bad, I am having too much problem, I don't want to do something wrong, I don't want to hurt someone, I need help please."

[Norris Decl., Ex. 146 at 1]   "The verbatim quotation to what the patient was saying shows that the patient was rattling off what was written down in a staccato manner and clearly isn't fluent in English ('I feeling bad')."  [Stewart Decl. ¶ 16 ("I lack the adjectives to describe how problematic this encounter is.")]

The following month, D.M. had a mental health counseling appointment, where the psychologist again spoke to D.M. only in English.  [D.M. Decl. ¶ 6]  As D.M. explained, "I have learned a few words like 'happy,' 'sad,' 'angry,' and 'depressed' from other prisoners, but I cannot elaborate further in English.  I cannot explain to the psychologist in English why I feel those emotions, and I cannot understand anything the psychologist says that might be able to help me feel better."  [*Id.*]  Again, the medical record, which quotes

D.M. as saying his mood "goes happy, sad, angry, depressed . . . too much angry," states that interpreter services were not needed.  [Norris Decl., Ex. 148]

Other monolingual Spanish speaking class members are incorrectly listed as not requiring interpreter services for healthcare encounters.  For example:

- C.L., a native Spanish speaker with limited English language abilities, requested an interpreter for a chronic care appointment to discuss diabetes, lung problems, and high blood pressure.  "The provider got another prisoner who was a porter in the health unit to serve as the Spanish interpreter for this appointment."  [Norris Decl., Ex. 138, Declaration of C.L. ¶¶ 4-6, 11]  The medical record states that interpreter services were not needed, and makes no reference to another incarcerated person being present or providing interpreter services.  [*Id.*, Ex. 141 at 1]

- F.A.H., a native Spanish speaker who does "not speak English at all," requested an interpreter for a mental health encounter, but was not given one: "Communicating with the psychiatrist in this appointment was difficult.  He seemed to understand when I said 'medicina' that I was talking about my medication but then I ended up having to 'act out' what I was experiencing with my medication—that it wasn't helping, that I still couldn't sleep well.  I never understood what the psychologist told me in that appointment, and I wonder whether he understood what I was trying to communicate through gestures and acting out what was happening to me.  I also wanted to be able to ask about whether the medication I am taking might cause any potential long-term harm to my liver.  However, because without a Spanish interpreter I was communicating mostly by gestures in this appointment, I did not know how to ask the questions.  I still do not know about any of the long-term risks of the medication I am taking, if there are any."  [Norris Decl., Ex. 125, Declaration of F.A.H. ("F.A.H. Decl.") ¶¶ 8, 13; *see also id.*, Ex. 133 at 1 (medical record entry stating no interpreter services needed)]

- C.M., a native Spanish speaker with "a very limited English vocabulary," reported that she was not able to fully participate in her individual counseling session: "Ms. Contreras [Psych Associate] speaks some Spanish but is very limited in her vocabulary. I did not have an interpreter for this appointment.  Ms. Contreras is aware that I speak very little English and require an interpreter.  I tried to express to Ms. Contreras how I was feeling in Spanish and let her know that I had a lot of anxiety following an assault that occurred in April 2018 while I was housed in ASPC-Lewis.  Following that incident, I attempted to take my own life.  I did not feel that I was able to fully communicate my feelings to Ms. Contreras because of our language barrier."  [Norris Decl., Ex. 165, Declaration of C.M. ¶¶ 4, 7; *see also id.*, Ex. 166 at 1 (medical record entry stating no interpreter services needed)]

Defendants' failure to comply with the requirements of Paragraph 14 is not limited to monolingual Spanish speakers.  As noted above, D/deaf class members who are not fluent in English and who use sign language to communicate uniformly report that an interpreter was not provided for healthcare encounters, even when they asked for one.  [*See, e.g.*, J.H. Decl. ¶ 13 (during intake process), ¶ 16 (during encounter with psych associate), ¶¶ 17-18 (after being assaulted by an incarcerated person, which resulted in

blood loss, dizziness, and his jaw being wired shut), ¶ 22 (during mental health counseling appointment), ¶ 24 (during encounter with nurse regarding flu symptoms); W.D. Decl. ¶ 8 ("I have repeatedly requested ASL interpreters for medical appointments and have been repeatedly told 'no.'"); F.L. Decl. ¶ 17 ("I was experiencing problems with my lower back relating to kidney stones.  I tried to gesture [to] indicate the area that was bothering me, but I later found out that the provider misunderstood me and thought that I was experiencing pain in the middle of my back."); K.P. Decl. ¶ 40 ("Without an ASL interpreter, I could not really explain my feelings of loneliness and isolation and what it is like to be deprived constantly of language."); F.L.H. Decl. ¶ 21 ("On the Living Will form I just picked the last choice without understanding the choice or what it meant.")]  In those cases, the related medical record entry says that no interpreter was needed.  [*See* Norris Decl. ¶¶ 6-32 (W.D.), 56-57 (F.L.H.), 106-143 (J.H.), 163-64 (K.P.), 200-01 (F.L.)]

### 2.   Medical Records for the Same Patient Are Contradictory, Sometimes Stating That Interpreter Services Are Needed, and Sometimes Saying That They Are Not.

The medical record for individual patients also is internally contradictory.  In some cases, medical staff state that no interpreter is needed in response to the "hard-stop" question: "Are interpreter services needed for this inmate."  But, in the same medical record for the same encounter, the same medical staff note that the patient was deaf and no sign language interpreter was available.  For example, one Deaf patient was assaulted in July 2017 by another incarcerated person.  "The punch was so severe that it dislocated [his] jaw, [his] jaw had to be wired shut, and [he] had to have surgery."  [J.H. Decl. ¶ 17]  He was seen by a psych associate "to assess for suicidality following [the] assault." [Norris Decl. ¶ 122; *id.*, Ex. 72]  The psych associate entered "No" in response to the hard-stop question "Are interpreter services needed for this inmate," but also wrote: "as IM is deaf and **no interpreter was available**, interview was conducted with paper and pen."  [*Id.* (emphasis added); *see* J.H. Decl. ¶ 18 (stating he could not express himself in writing)]

─Subjective──────────────────────────────────────────────

Are interpreter services needed for this inmate*:   No
What type of interpreter services were used for the encounter*:

...

**Subjective Notes**

IM was seen in confidential setting for 27 minutes to assess for suicidality following an assault; as IM is deaf and no interpreter was available, interview was conducted with paper and pen.

The same Deaf patient had an individual mental health counseling appointment in May 2017.  The psych associate entered "No" in response to the hard-stop question "Are interpreter services needed for this inmate," but also wrote: "IM was seen for 15 minutes in confidential setting to update tx [treatment] plan; as he is hearing-impaired and **no sign language interpreter was available**, session was conducted mostly in writing."  [Norris Decl. ¶ 116 (emphasis added); *id.*, Ex. 69 at 7]  The psych associate noted the patient's limitations as "hearing loss, **requires a translator**," and interventions as "**provide translating services**; 1:1 counseling; HNR as needed."  [*Id.*, Ex. 69 at 4 (emphasis added)]  Nonetheless, interpreter services were never provided to the Deaf patient between May 2017 and January 2019, when he was released from prison.  [J.H. Decl. ¶¶ 10, 22]

The records of other D/deaf patients show similar inconsistencies.  For example:

- W.D. saw a nurse in September 2018.  The nurse entered "No" in response to the question "Are interpreter services needed for this inmate," but also wrote: "**Patient needs sign language to communicate** . . .  A&Ox3, cannot speak, uses a sign language inmate to communicate." [Norris Decl. ¶ 21 (emphasis added); *id.*, Ex. 14 at 1, 2]  W.D. reported, of this encounter: "[D]uring this appointment I went to medical with a friend of mine, another prisoner who knew some ASL fingerspelling.  The nurse would only allow me in the room at first, but after the nurse and I tried to communicate and could not understand each other, the nurse eventually let my friend come in to help us communicate."[7]  [W.D. Decl. ¶ 12]

---

[7] Other D/deaf class members reported being forced to rely on incarcerated people not fluent in ASL to try to facilitate communication during healthcare encounters.  [*See, e.g.*, J.H. Decl. ¶ 14; K.P. Decl. ¶¶ 17-21, 26-29]  That does not comply with the Stipulation.  *See also* U.S. Dep't of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455, 41,462 (June 18, 2002) (noting that people "may feel uncomfortable revealing or describing sensitive,

- F.L. saw an RN in November 2019, in response to a Health Needs Request asking for a sign language interpreter for a dental appointment. [Norris Decl., Ex. 113 at 1] The RN entered "No" to the question "Are interpreter services needed for this inmate," but also wrote, "DEAF **REQUIRES SIGN LANGUAGE INTREPRETER** [sic]; NO TTY MACHINE AVAILABLE AT THIS TIME. ABLE TO COMMUNICATE VIA WRITTEN NOTES AND PER IM DEPUTY WARREN ASSIGNED IM FLORES TO INTREPRET [sic] FOR THIS PATIENT," and "IM IS DEAF REQUIRES LANGUAGE INTREPRETER [sic]." [*Id.* ¶ 202 (emphasis added); *id.*, Ex. 113 at 3]

And medical records also are inconsistent between different healthcare encounters for the same class member. For example, medical staff wrote on February 20, 2018, that interpreter services were needed for G.M., noting that "Patient uses sign language to communicate." [Norris Decl. ¶ 95; *id.*, Ex. 58 at 1] But medical staff wrote that no interpreter services were needed for encounters with G.M. on February 22, 2018; May 17, 2018; January 10, 2019; and June 5, 2019. [*Id.* ¶¶ 97-102; *id.*, Exs. 59 at 1, 60 at 1, 61 at 1] And K.P., another Deaf class member, had healthcare encounters on February 8, 2020; February 27, 2020; March 5, 2020 (twice); and March 7, 2020, with confusing and inconsistent entries in the medical record:

|  | Are interpreter services needed for this inmate*: | What type of interpreter services were used for the encounter*: | Subjective Notes (excerpt): |
| --- | --- | --- | --- |
| February 8 (Nurse - Sick Call - Scheduled) | No | -- | IM is deaf, uses sign language, communicated with IM through writing on pieces of paper back and fourth [sic]. |
| February 27 (Nurse - Sick Call - Scheduled) | Yes | Inmate Refused Interpreter Services | IM IS DEAF. UNABLE TO PULL UP ASL INTERPRETER, IM REQUESTED TO JUST WRITE ON PAPER TO COMMUNICATE |
| March 5 (MH - Non-Clinical Contact Note) | No | -- | Inmate communicated with COII Jones and he denied wanting to talk with mental health. He was informed that his brother hanged himself on graveyard shift Wednesday morning. |
| March 5 (Nurse - Treatment Call) | No | -- | ASL Interpreter 356204 Lynette |
| March 7 (Nurse - Treatment Call) | Yes | Language Line | ASL interpreter Tina 248645 |

confidential, or potentially embarrassing medical . . . information to" friends and community members); Stewart Decl. ¶¶ 18-19 (same).

[Norris Decl. ¶¶ 165-174; *id.*, Exs. 94 at 1, 95 at 1, 96 at 1, 97 at 1, 98 at 1][8]

### B.   Defendants Do Not Assess or Document Whether Qualified Healthcare Practitioners Are Proficient in Any Non-English Language.

Under the Stipulation, if a healthcare practitioner provides interpreter services for a specific healthcare encounter, that practitioner must be "proficient in the prisoner's language." [Doc. 1185 at 6 ¶ 14]   Defendants do not have a system in place to demonstrate compliance with that requirement.

First, Defendants do not record the name of the healthcare practitioner providing interpreter services during a specific healthcare encounter. [*See, e.g.*, Norris Decl. ¶¶ 15 (W.D.), 19 (W.D.), 54 (F.L.H.), 62 (F.L.H.), 95 (G.M.), 112 (J.H.), 151 (K.P.)][9] Therefore, it is impossible to check whether a specific practitioner in fact is proficient in the relevant language.   Second, even if the identity of the practitioner providing interpreter services was known, there is no way to determine whether he or she in fact was qualified to provide such services under the standard set forth in Paragraph 14.   This is because Defendants, by their own admission, do not maintain a "[l]ist of all qualified health care practitioners who are proficient in any non-English language." [*See* Kendrick Decl., Ex. 3, Letter from Richard M. Valenti to Corene Kendrick, Plaintiffs' Supplemental Document Requests 82, 98, 99, 101, and 103-111 at 2-3 (Mar. 20, 2019); Kendrick Decl., Ex. 4, Letter from Richard M. Valenti to Corene Kendrick, Plaintiffs' Supplemental Document Requests 101, 104, 105, and 112 at 1-2 (Apr. 19, 2019)]

This is a significant problem.   Spanish-speaking class members report that practitioners sometimes try to communicate with them in Spanish, but the staff member is

---

[8] References to "pull[ing] up" an interpreter and the listing of ASL interpreter numbers suggest that Defendants may now be providing video remote interpretation for some encounters.   If that is true, it is a welcome and overdue development.   But, as seen in the table above, interpretation is not consistently provided and the medical record remains unreliable, making it impossible to accurately evaluate compliance with Paragraph 14.

[9] Although the medical record states that "Healthcare Staff Used for Interpreter Services" for these encounters, the class members report that no interpretation in fact was provided by staff or anyone else. [*See* W.D. Decl. ¶¶ 13, 15; F.L.H. Decl. ¶¶ 16, 19; G.M. Decl. ¶ 25; J.H. Decl. ¶ 10]

not proficient in the language and therefore neither the patient nor healthcare staff is able to fully understand what is going on.  For example:[10]

- "On September 4, 2019, I had a mental health counseling appointment. . . .  I asked the psychologist if we could use the telephonic Spanish interpreter because my English skills are not good.  The psychologist told me she could understand me in Spanish, and while it did seem like she understood what I was saying during the appointment, she only spoke English back to me and I didn't understand what she was saying.  I didn't understand what was going on during the appointment, and I was frustrated that I was unable to ask questions I had about my medication for depression and insomnia.  I wanted to ask her whether these medications might be bad for my liver, because I already have Hepatitis C.  Because I was not able to understand the psychologist or communicate well in the appointment due to the lack of a Spanish interpreter, I was not able to resolve these questions concerning my healthcare."  [F.A.H. Decl. ¶ 12]

- "On April 23, 2019, I saw Nurse Practitioner (NP) Clarisse Ngueha-nana, who claimed to be able to conduct my appointment in Spanish.  Yet, NP Ngueha-nana spoke to me in mostly English and limited Spanish during this encounter.  Because I do not know English, I was only able to speak with NP Ngueha-nana in Spanish. It became apparent that NP Ngueha-nana did not speak Spanish well and was not understanding the questions I was asking.  For example, I asked NP Ngueha-nana why she was prescribing me medication for hemorrhoids when it was my stomach that was the problem.  She was not able to respond to my question."  [Norris Decl., Ex. 158, Declaration of J.F.B. ¶ 11]

## III.   RELIEF REQUESTED

Because Defendants do not have an accurate system in place to demonstrate compliance with Paragraph 14 of the Stipulation, the Court should order them to develop such a system.  [Doc. 1185 at 14-15 ¶ 36 ("In the event the Court subsequently determines that the Defendants' plan did not remedy the deficiencies, the Court shall retain the power to enforce this Stipulation through all remedies provided by law" and "shall consider whether to require Defendants to submit a revised plan")]  The system should include the three components listed below.  *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005) (holding that "the court is entitled to give some guidance to the [defendant]," including by "set[ing] clear objectives for it to attempt to attain, and, in most circumstances, general methods

---

[10] In these examples, the medical record states that interpreter services were *not* needed and there is no reference to the fact that staff attempted to communicate in Spanish.  [Norris Decl. ¶¶ 244 (F.A.H.), 297 (J.F.B); *id.*, Exs. 134 (F.A.H) and 161 (J.F.B.)]

whereby it would attain them"); *Brown v. Plata*, 563 U.S. 493, 542-43 (2011) (noting that a court "retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion" and that "[e]xperience may teach the necessity for modification or amendment of an earlier decree").

**First**, Defendants must develop a process to promptly identify all class members "who are not fluent in English" (Doc. 1185 at 6 ¶ 14) and their primary language.[11]  This first should be assessed during intake, as is "standard practice in functional correctional health care systems."[12]   Stewart Decl. ¶ 20; *see also* U.S. Dep't of Justice, Appendix A, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455, 41,469 (June 18, 2002) ("U.S. Dep't of Justice Guidance") ("Intake/Orientation plays a critical role . . . in the system's identification of LEP prisoners"); Declaration of Rita K. Lomio ("Lomio Decl."), Ex. 2, U.S. Dep't of Justice, Planning Tool:   Considerations for Creation of a Language Assistance Policy and Implementation Plan for Addressing Limited English Proficiency in a Department of Corrections 10-11 (Mar. 2006) ("U.S. Dep't of Justice Planning Tool") (discussing

---

[11] This includes people who are deaf and communicate through sign language. *See Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015) (holding that "prison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs").

[12] *See, e.g.*, *Jones v. Gusman*, 296 F.R.D. 416, 454 (E.D. La. 2013) (finding that Defendant "does not keep a record, whether through intake classification or through some other process, of inmates that do not speak English" and approving settlement that required identification at intake of people who had limited English proficiency and what language(s) they speak); Declaration of Rita K. Lomio, Ex. 1, Consent Judgment § IV.F.1.a(3), *Jones v. Gusman*, No. 12-CV-859 (E.D. La. June 6, 2013) (requiring Orleans Parish Prison to, "[a]t intake and classification, identify and assess demographic data, specifically including the number of LEP [limited English proficiency] individuals at OPP on a monthly basis, and the language(s) they speak").

assessment and evaluation of language on intake).[13]  There also should be a mechanism to identify at a later time class members who are not fluent in English, including if they state that they are not able to fully understand what is being said, or are not able to fully respond in English, during a healthcare encounter.  [Stewart Decl. ¶ 20]  Whether a class member is not fluent in English, and their primary language, should be documented and made readily available to healthcare staff through eOMIS.  *See* U.S. Dep't of Justice Guidance at 41,469 ("Each prisoner's LEP status, and the language he or she speaks, should be placed in his or her file.").  Class members should be informed how to request interpreter services, and healthcare staff should be trained on their obligations in securing and documenting in the medical record interpreter services.

**Second**, Defendants must develop a process to identify, evaluate, and train "qualified health care practitioner[s] who [are] proficient" in languages other than English.   [Doc. 1185 at 6 ¶ 14]   This will allow the parties to determine whether interpreter services are being provided by *qualified* healthcare practitioners.  *See* U.S. Dep't of Justice Planning Tool at 9 (recommending "[a]ssessment and training for bilingual direct service staff"); *Jones v. Gusman*, 296 F.R.D. 416, 454 (E.D. La. 2013) (finding that Orleans Parish Prison "does not keep a record or otherwise identify staff members who are bilingual" and approving settlement that required assessment of bilingual staff and a list of such staff); Lomio Decl., Ex. 1, Consent Judgment § IV.F.1.a(5)-(6), *Jones v. Gusman*, No. 12-CV-859 (E.D. La. June 6, 2013) (requiring Orleans Parish Prison to "[r]egularly assess the proficiency and qualifications of bilingual

---

[13] Paragraph 14 overlaps with Defendants' responsibilities to people with limited English proficiency under Title VI.  *United States v. Maricopa County*, 915 F. Supp. 2d 1073, 1079 (D. Ariz. 2012) ("[L]ongstanding case law, federal regulations and agency interpretation . . . hold language-based discrimination constitutes a form of national origin discrimination under Title VI"); U.S. Dep't of Justice Guidance at 41,466 ("The requirements of the Title VI regulations, as clarified by this Guidance, supplement, but do not supplant, constitutional and other statutory or regulatory provisions that may require LEP services.").  For that reason, Defendants should take advantage of the free language access technical assistance provided to prison administrators by the U.S. Department of Justice.  [*See* Lomio Decl. ¶ 3]

staff to become an [Orleans Parish Prison] Authorized Interpreter ('OPPAI')" and "[c]reate and maintain an OPPAI list").

**Third**, Defendants must develop an automated process to evaluate whether, for each month, "language interpretation for healthcare encounters [for all class members not fluent in English] [was] provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service."  [Doc. 1185 at 6 ¶ 14]  This requires running reports of all healthcare encounters for class members who are not fluent in English and determining whether appropriate interpretation in fact was provided.  Defendants should report the overall compliance numbers, by prison and yard, on a monthly basis, and also provide Plaintiffs with the underlying reports, including the ADC numbers of the relevant class members and all encounters marked either compliant or noncompliant in a given month.

## CONCLUSION

The Court should order Defendants to develop an accurate system to demonstrate compliance with Paragraph 14 of the Stipulation.

Respectfully submitted this 12th day of June 2020.

**PRISON LAW OFFICE**

By:   s/ Rita K. Lomio
   Donald Specter (Cal. 83925)*
   Alison Hardy (Cal. 135966)*
   Sara Norman (Cal. 189536)*
   Corene T. Kendrick (Cal. 226642)*
   Rita K. Lomio (Cal. 254501)*
   1917 Fifth Street
   Berkeley, California 94710
   Telephone:  (510) 280-2621
   Email: dspecter@prisonlaw.com
      ahardy@prisonlaw.com
      snorman@prisonlaw.com
      ckendrick@prisonlaw.com
      rlomio@prisonlaw.com

   *Admitted *pro hac vice*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
              afettig@aclu.org
              echo@aclu.org
              mmorris@aclu.org

*Admitted *pro hac vice*. Not admitted in DC;
 practice limited to federal courts.
**Admitted *pro hac vice*

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    jkeenan@acluaz.org
              carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen
Swartz; Sonia Rodriguez; Christina Verduzco;
Jackie Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others similarly
situated*

1
2

**ARIZONA CENTER FOR DISABILITY LAW**

3

By:   s/ Maya Abela

4

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)

5

Maya Abela (Bar No. 027232)
177 North Church Avenue, Suite 800

6

Tucson, Arizona 85701
Telephone:  (520) 327-9547

7

Email:     rdalyrooney@azdisabilitylaw.org
               jrico@azdisabilitylaw.org

8

               mabela@azdisabilitylaw.org

9

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY**

10

**LAW**
5025 East Washington St., Ste. 202

11

Phoenix, Arizona 85034
Telephone: (602) 274-6287

12

 Email:    adietrich@azdisabilitylaw.com

13

*Attorneys for Arizona Center for Disability Law*

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1                                  **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 12, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

                                          s/ D. Freouf