Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
         carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections; and Larry Gann, Division Director, Health Care Services Monitoring Bureau, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **EXPERT DECLARATION OF PABLO STEWART, M.D.** |

1    I, PABLO STEWART, M.D., do hereby declare:

2    1. I am a physician licensed to practice in California and Hawai'i, and a board-
certified psychiatrist, with a specialty in clinical and forensic psychiatry. My background
and experience as relevant to my expert testimony in this proceeding have previously been
provided to the Court (*see* Doc. 1538-1 at 3-6), and my current CV is attached as
**Exhibit 1**. I submit this declaration in support of Plaintiffs' Motion to Enforce Paragraph
14 of the Stipulation. I am competent to testify to the matters set forth in this declaration
and if called to do so, would and could so testify.

2. I have been retained by plaintiffs' attorneys in the *Parsons* case as an expert
on prison psychiatry and the provision of mental health services. Plaintiffs asked me to
analyze ADC's policies and practices regarding provision of interpreters in group mental
health care and in other health care encounters. Prior to rendering this opinion, I reviewed
class members' medical records, their declarations, and reports cited herein.

## OPINIONS

### Effective Communication in Health Care Encounters

3. The Stipulation requires that "[f]or prisoners who are not fluent in English,
language interpretation for healthcare encounters shall be provided by a qualified health
care practitioner who is proficient in the prisoner's language, or by a language line
interpretation service." Doc. 1185 ¶ 14. In the past, I described the problems with ADC
not having interpretation for mental health encounters, or using correctional officers to
translate during mental health treatment. I noted in my November 2013 report,

> Accurate mental health diagnosis and effective mental health treatment
> require accurate communication between the patient and the provider. The
> patient must be able to describe his or her emotional or cognitive state, and
> the provider must be able to observe often subtle cues in the patient's
> speech. It goes without saying that such communication requires a common
> language.
>
> [. . .] I am concerned that ADC has no system for providing effective,
> qualified, confidential interpretation for mental health diagnosis and
> treatment.
>
> [. . .] [A] mental health provider must make very subtle assessments, such as
> whether a patient is paranoid or attending to internal stimuli, and whether

> his or her thoughts are tangential.  This requires an interpreter who not only is fluent in both languages, but is also specifically trained in interpretation, including specialized psychiatric vocabulary.

See 11/8/13 Report at 49-51 (filed under seal at Doc. 947-1 and 956).

4. I am familiar with the current provision of mental health services within ADC, as within the past 18 months I have joined Plaintiffs' counsel in touring Arizona State Prison Complex (ASPC)-Eyman, ASPC-Tucson, ASPC-Lewis, and ASPC-Phoenix. On each of these tours, I visited most or all of the key mental health programs in the institution, visited all mental health/suicide watch units, visited segregated units including maximum custody and detention units, interviewed key staff members and clinical leadership, and interviewed class members participating in various mental health programs.  On each tour, we also requested documents and information relevant to the operations of the mental health programs at that institution.

5. In conducting my interviews of mentally ill class members, often housed in special housing units or watch units, I found many people displaying severe and disabling mental health conditions.  While at each prison, I encountered class members who were so profoundly mentally ill or psychotic that pursuant to my ethical obligation as a physician, I brought them to the immediate attention of ADC officials, Defendants' counsel, and health care staff and officials at the institutions.  [*See, e.g.*, Doc. 3255-1 at 19-20 (1/29/19 letter from Plaintiffs' counsel to Defendants describing patients at ASPC-Phoenix who I had identified as being in urgent need of mental health care)]

6. I stress the severity of the mental illnesses I observed, as well as the fragility of the mentally ill prisoners I encountered on these tours, because their precarious mental health conditions highlight the high stakes when they are seen by mental health staff on daily or weekly encounters.  For better or worse, ADC has been entrusted with the care of many or most of the most profoundly mentally ill people in the State of Arizona, people who struggle with debilitating chronic mental health conditions who in an earlier era might have been confined to state mental hospitals.  These people with mental illness are

particularly vulnerable to the harsh, stressful, chaotic, and violent conditions that prevail in ADC today, and are most at risk of self-harm and suicide.

7. I am fluent in Spanish; I have spoken it from childhood. When I visit prisons and tour mental health units and watch areas, I affirmatively seek out monolingual Spanish speakers. To a person, they will report suicidal thoughts or auditory or visual hallucinations, but when I review their medical records, there is nothing recorded that reflects that. That is of significant concern. It may be that they were not able to express their thoughts to mental health staff in a language (Spanish) that they understood. Indeed, these class members often report to me that to the extent health care staff speak Spanish, it's "tourist Spanish," and to the extent that the patients speak any English, it's "street English" or "prison English." As I detail below, effective communication is critical to establishing a durable provider-patient relationship, and it is impossible to establish such a relationship when there is a breakdown in language and nuance.

8. One of the first things mental health staff should do before commencing any encounter is ensure that they are able to effectively communicate with their patient. If they cannot do so, the encounter is largely meaningless. This is a fundamental component of providing care, and the burden should be on the staff to ensure that they are communicating fully and effectively with the patient.

9. It is an understatement to say that I am concerned when ADC admits that, more than six years after my 2013 report detailed why not providing interpretation for mental health services was deeply problematic, the Department continues not to have a reliable system in place to identify and track the class members who require an interpreter in health care encounters, nor does it have a way of tracking which staff are bilingual, as also was true in November 2013. That is simply unacceptable.

10. It is a bedrock principle of medicine that effective communication between health care staff and patients is essential to safe, quality care. A good summary of why this is the case is available in a recent white paper by the Joint Commission International, which sets evidence-based guidelines and standards for safety and quality of care in health

care services.  *See* Joint Commission Int'l, *Communicating Clearly and Effectively to Patients: How to Overcome Common Communication Challenges in Health Care*, 2018, available at https://www.jointcommissioninternational.org/assets/3/7/JCI-WP-Communicating-Clearly-FINAL_%281%29.PDF, and attached hereto as **Exhibit 2**.  This report describes a study that the Joint Commission conducted comparing outcomes of patients with limited English proficiency in U.S. hospitals, versus patients who were fluent in English.  *Id*. at 6.  The study found that almost 50% of the patients with limited English proficiency suffered some degree of physical harm, but less than 30% of the patients fluent in English suffered such harm.  *Id*.  "The rate at which patients with limited English proficiency suffered permanent or severe harm or death was 3.7%, compared with 1.4% of the patients who spoke English well."  *Id.*, citing Divi, Koss, Schmaltz, Loeb, *Language proficiency and adverse events in US hospitals: A pilot study*, Int'l J. of Quality Health Care, April 2007;19(2):60-7.

11.    It is important not only for the patient to provide information, but for the patient to receive information, and the parties can't do this in a superficial manner.  When a provider (whether it be a medical or mental health provider) is trying to provide patient education, or the diagnoses and treatment modalities and options to the patient, the provider cannot engage the patient in the treatment process if the parties cannot fully and effectively communicate in a common language.

12.    With regard to mental health care in particular, a recent study published in *Clinical Psychological Science* found clear and consistent differences in the use of language by those with depression, anxiety, and suicidal ideation.  *See* Al-Mosaiwi and Johnstone, *In an Absolute State: Elevated Use of Absolutist Words Is a Marker Specific to Anxiety, Depression, and Suicidal Ideation*, Clinical Psychological Science, 2018, 6(4), 529–542, at https://journals.sagepub.com/doi/pdf/10.1177/2167702617747074 and attached as **Exhibit 3**.  Scientists, psychologists, and psychiatrists have long observed that major depression changes the way people speak and write (sometimes referred to as "the language of depression"), most past studies of this relied upon mental health encounter

-4-

notes, while this study used computerized textual analysis of thousands of posts on 64 different online mental health fora/support groups. The computerized analysis was able to spot linguistic features including classes of words, lexical diversity, lengths of sentences, and grammatical patterns. The study confirmed what those of us who regularly see people with these conditions recognize: that there are differences in the use of language, both in terms of content and style. With regard to content, people with depression, anxiety, and suicidal thoughts are much more likely to use negative adjectives and adverbs, and first person pronouns (*e.g.*, "I," "me," "myself") instead of third-person or collective pronouns (*e.g.* "we," "us," "they"). In terms of style (how people express themselves), the use of absolutist words (conveying absolute magnitudes, *e.g.*, "always," "nothing," or "completely") was found to occur quite frequently in people with depression, given their tendency to have a more rigid, black and white view of the world. The study found that the prevalence of absolutist words (compared to control fora) was 50% greater for people with anxiety or depression, and 80% higher for people experiencing suicidal ideation.

13. The practical implication of this is clear when the primary language of the health care provider and the patient are different. A mental health provider needs to evaluate the severity of the symptoms, especially for those patients with suicidal or homicidal thoughts, or people experiencing auditory or visual hallucinations. Using as an example a patient whose primary language is Spanish and a provider whose primary language is English, even patients with some ability to converse in English will not be able to articulate and express the nuances of their current mental state the way they could if they were speaking in their native tongue of Spanish. Similarly, a provider who may speak some Spanish is not going to understand or know the nuances and phrasing by Spanish-speaking patients that may signal the degree of mental health distress, or be able to pick up on the subtleties of the Spanish language's adjectives and verb tenses.

14. One example of this that I saw was a Spanish-speaking patient who had a mental health counseling appointment, where the psychologist spoke to the patient only in English. Declaration of Amber Norris, Ex. 144, ¶ 6. As the patient explained in his

-5-

1  declaration, "I have learned a few words like 'happy,' 'sad,' 'angry,' and 'depressed' from
2  other prisoners, but I cannot elaborate further in English. I cannot explain to the
3  psychologist in English why I feel those emotions, and I cannot understand anything the
4  psychologist says that might be able to help me feel better." *Id.* But the electronic
5  medical record for an encounter states that interpreter services were not needed for the
6  encounter, even though the psychologist directly quotes the patient as saying his mood as
7  "goes happy, sad, angry, depressed...too much angry," (*id.*, Ex. 148 at 1), which on the
8  face of that quote shows the patient's limited range of ability to fully articulate his
9  emotions in English, and the lack of nuance in the encounter.

10  15. This same class member also reported that a month earlier, he "had another
11  prisoner write down what [he] needed to say in English and practiced it before going to
12  [the] appointment." *Id*. Ex. 144, at ¶ 8. The psychiatrist noted the following in the
13  electronic medical record:

> Today he says that he would like to get back on his zyprexa, that loxapine is not working, reports that, "I am having mood swings, I am happy, sad, angry, worrying, thinking, depressed, feel angry too much, and too much problem for sleep, I feeling bad, I put 2 HNR to other psychiatrist, I eat my fingers, I eat my nails, I bang the wall because I feel angry too much, I need help please, I am not crazy but I feeling bad, I am having too much problem, I don't want to do something wrong, I don't want to hurt someone, I need help please."

19  *Id*., Ex. 146 at 1.

20  16. The verbatim quotation to what the patient was saying shows that the patient
21  was rattling off what was written down in a staccato manner and clearly isn't fluent in
22  English ("I feeling bad"). I lack the adjectives to describe how problematic this encounter
23  is. It is beyond comprehension that this could be seen as a nuanced exchange of
24  information that would allow the psychiatrist to make an accurate diagnosis and treatment
25  plan. The obligation of the psychiatrist when he or she heard the patient saying these
26  things was to immediately pause the encounter, and secure a Spanish language interpreter
27  to make sure they were really understanding each other. What the patient is describing ("I
28  eat my fingers," "I bang the wall," "I don't want to hurt someone") are very serious

symptoms that needed to be thoroughly explored in a therapeutic milieu.  Does "eat my fingers" mean that the patient is anxiously biting their nails, or that they are in fact chewing off parts of their fingers?  Without a common language, it is impossible to know.

17. It appears that the only steps ADC and its contractors have taken to address interpretation problems in health care encounters since this case was settled, is to add a field to eOMIS that requires health care staff to answer a question regarding the need for interpreter services for a particular patient when the staff open a SOAPE note in the electronic health record system.  However, I reviewed health care records for class members that showed internally inconsistent results, including staff indicating "No" in response to the question "Are interpreter services needed for this inmate," and then in the text of the medical record entry noting that the individual did in fact require an interpreter.  Other examples included encounters on different days between the health care staff and the same patient, with one day's entry indicating the patient needed interpreter services, and a different day's entry indicating, without explanation, that no interpreter services were needed.  These failures and discrepancies in documentation do not serve the critical goal of Paragraph 14, which is to ensure effective communication in health care encounters.

18. In another case, mental health care staff documented that an interpreter was not needed, but later quoted the patient as saying "everything is more better" and that "[s]taff used to translate briefly to clarify with him. He does speak English but with a heavy accent." *Id.*, Ex. 152 at 7.  The quoted language alone suggests that the issue is not one of accent but one of lack of proficiency in the language in which the encounter is being conducted.  It also is not clear what staff was asked to help "clarify" matters, as the staff person's identity does not appear to be recorded in the health care record.  Paragraph 14 properly disallows custody staff from providing interpretation services during health care encounters.  The use of corrections officers as interpreters in health care encounters in prison and jail settings is highly inappropriate for a number of reasons. As a threshold matter, using custody staff necessarily results in inappropriate disclosure of confidential

1  patient health information.  The presence of custody staff may cause patients to self-
2  censor or alter their communications with the provider, depriving the provider of critically
3  important information.  For example, if a patient is bothered by intrusive flashbacks to
4  past trauma or the facts of their commitment offense, they may be unlikely to disclose that
5  to the mental health provider in the presence of a corrections officer for fear that the
6  information could get out or be used against them. Or if a patient has a medical condition
7  that, if widely known, could subject them to physical or psychological abuse (for example,
8  HIV positive), he is unlikely to want to discuss it in the presence of an officer.

9       19.    Similarly, using other incarcerated people as interpreters introduces these
10 same concerns regarding patient confidentiality and safety.

11      20.    It is my opinion that ADC and its contractor must develop a process to
12 promptly identify all people for whom English is not their first language, and identify
13 their primary language.  This should include people who are deaf and who communicate
14 through sign language.  Such identification should occur at intake to ADC custody.  This
15 is a standard practice in functional correctional health care systems.  ADC and its
16 contractor also must create a system by which patients can later report to health care staff
17 that they need interpreters, so that this information is available when scheduling
18 appointments.  This is relevant for when patients who may speak and understand some
19 English, but when confronted with a complicated health care encounter where they are
20 trying to understand complex medical language, or who are attempting to articulate their
21 emotional state, they realize that they need an interpreter to fully communicate with the
22 health care providers so that they can express themselves in their primary language.

23 **The Failure to Provide Sign Language Interpretation in Health Care Encounters**

24      21.    I was very concerned when I learned of ADC's practice not to provide sign
25 language interpreters ("SLIs") to deaf prisoners whose primary language is American
26 Sign Language (or other sign languages such as Pigdin Signed English or Signed Exact
27 English) for any health care encounter, including and not limited to mental health
28 encounters.  ADC's failure to ensure effective communication for deaf people is contrary

-8-

not only to Paragraph 14, but also to basic standards of effective communication in the provision of health care as detailed above. Defendants' failure to provide sign language interpretation to deaf people unnecessarily places these class members with disabilities at a significantly higher risk of serious and permanent injury than hearing class members who can communicate freely with health care staff, including mental health staff. Finally, it is well-understood by health care providers, hospitals, and clinics in the community that under the Americans with Disabilities Act, they must utilize SLIs to communicate with deaf patients.

22. I am aware that class members who are deaf and use sign language as their primary form of communication report that instead of having SLIs available for health care encounters, they are forced to attempt to communicate with health care staff by using other incarcerated people who may know a few signs as a go-between, by written notes in English, pantomiming, or lip-reading. A head-shake, "thumbs up," "thumbs down," or finger-spelling simply is not adequate to assess if a person is suicidal. With regard to written notes, given the fact that English is not the first language of most deaf people, and many if not most have limited reading / writing skills in English, this is patently inadequate for a provider to determine if patients exhibit possible signs and symptoms of a serious mental or medical condition and to provide patient education to a patient. Furthermore, research has shown that when health care providers have to rely upon written notes to communicate with deaf patients, the health care staff often write terser versions of what they would normally tell a patient, or use health care jargon. *See* Anna Middleton, ed., <u>Working with Deaf People: A Handbook for Healthcare Professionals</u> 59 (2010) ("A busy health professional is also likely to write in a briefer manner in a written note, given the time it takes to write one, than they would be if they were explaining in speech. This means that a deaf person, particularly a sign language user, is receiving their medical information not only in a language they do not routinely use, but also in a shorter form than their hearing counterpart would receive. It is not difficult to see that this means a substandard service is being provided."). Finally, "[l]ip-reading is difficult to do clearly,

1  as identical lip-patterns are often used with words which incorporate different sounds
2  from the throat; these may be invisible to the viewer." *Id*. at 53.

3      23.    I find it profoundly disturbing that health care leadership at ADC and their
4  previous and current vendors are so cavalier about effective communication in health care
5  encounters with deaf patients, a particularly isolated and vulnerable population in prison,
6  especially when monitoring the stability and mental health of people with serious mental
7  illness, who are incarcerated in segregated housing, and/or on suicide watch.

8      24.    I reviewed documents from the medical records of several deaf or hearing
9  impaired class members, as well as the declarations of deaf class members.  Norris Dec.
10 Exs. 1, 20, 52, 62, 83, 101.  The documents show how deaf class members have gone for
11 months – if not years – unable to communicate in a meaningful manner with health care
12 staff without a sign language interpreter present.  For example, one deaf class member
13 reported that when he met with mental health staff, and had to use notes, "[w]ithout an
14 ASL interpreter, I could not really explain my feelings of loneliness and isolation and
15 what it is like to be deprived constantly of language." Norris Dec., Ex. 83 ¶ 40.  I was
16 appalled to see the written exchange between a psych associate and this patient when he
17 was placed on watch after he passed out and a day after his brother committed suicide:

> Homicidal? kill others? NO
> Hallucinations NO
> eating ok   OK
> sleeping ok  ok
> feeling Anxious. NO
> Depressed NO
> How are you dealing w/ your loss
>
> greif is like a fart if you force it, it just might be shit. meaning dont rush through the grieving process ok. I Get it I really want come back CATALINA

27 *Id*. Ex. 99 at 10.

28

-10-

25. Holding aside the substance of the encounter ("greif [sic] is like a fart"), this illustrates the concerns described in Paragraph 22 that the health care staff often write terser versions of what they would normally verbalize to a hearing patient. It also is an unnecessarily awkward, stilted, and slow way to communicate and does not provide an appropriate or adequate medium to engage the patient in discussion of sensitive and important mental health matters.

26. Another deaf class member reported that without an SLI in a mental health encounter, "I wanted to discuss my anxiety but I had a hard time discussing it with just pen and paper." Norris Dec. Ex. 62 ¶ 16. These patients are trying to report significant mental health issues, that if unaddressed can lead to an increased risk of self-harm or suicide. Asking a deaf person experiencing mental health issues to write down in a language they are not fluent in is unreliable and totally puts the burden of achieving effective communication on the patient. These deaf people are already burdened enough by being incarcerated, and by being in a setting where they are completely isolated from meaningful human interaction due to their disability, and it is absurd to expect that they will be able to meaningfully engage with treatment staff.

27. I was deeply alarmed to review the medical records for another patient described by medical staff in the medical record as "deaf/mute." Norris Decl., Exs. 154-155. In an individual counseling session on February 18, 2020, the mental health practitioner wrote that "Pt. responds with head shakes, head nods, or in writing." *Id.* Ex. 154 at 1. I cannot fathom how a meaningful mental health counseling encounter can be conducted in such a manner. That same deaf patient also had an individual counseling session on June 3, 2019. The psychologist wrote: "Pt. is mute and therefore the evaluation proceed with written questions that he answers with written one-word responses," and "Thought processes cannot be assessed due to pt. being mute but his written responses suggest he is logical in his thought processes." *Id.* at 153 at 1. The fact that the psychologist admitted that she could not assess "[t]hought processes" due to the manner of communication is telling. In that case, the psychologist should immediately

-11-

have obtained interpretation services and, if one was not available, rescheduled the encounter for a time when one was available. One-word responses simply are not appropriate for this type of encounter, which is meant to evaluate the patient's well-being and to provide talk therapy.

28.     These barriers to effective communication by deaf class members are not limited to mental health encounters. The examples detailed in the medical records and declarations of deaf class members filed with Plaintiffs' motion confirm that deaf patients seeking care for medical concerns are similarly stymied in their ability to communicate with health care staff, which puts these people with disabilities at disproportionate risk of serious harm. Norris Dec. Exs. 1, 20, 48, 52, 62, 83, 101. These cases are clear examples of the need for SLIs to allow deaf class members who sign the opportunity for meaningful communication with health care staff. Without these interpreters, deaf people cannot communicate effectively, and their risk of physical or psychological harm is significantly greater than prisoners who can communicate verbally.

**Failure to Provide Spanish Interpretation in Group Mental Health Encounters**

29.     As noted above in paragraph 3, I have discussed in past reports to the Court, the serious risk of harm to Spanish-speaking persons with serious mental health conditions who did not have Spanish interpretation services in one-on-one mental health encounters, or while on suicide watch. It also has come to my attention that group mental health programming provided to people in certain designated mental health units fail to provide language interpretation for people who are not fluent in English, primarily Spanish speakers.[1]

30.     The people who are participating in ADC's mental health groups are doing so because they have been designated as seriously mentally ill, and live in special mental

---

[1] One class member has reported that in February 2020, a bilingual mental health aide began a support group for Spanish speaking patients at ASPC-Tucson Rincon Mental Health Unit, but was suspended in April 2020. Norris Dec. Ex. 165 ¶ 11. This is an excellent development, and one that I recommend below, but it needs to be implemented at all prisons, and not be dependent upon one staff person

-12-

health housing units, for example at Tucson-Rincon Mental Health Unit, Phoenix-Baker Unit and Phoenix-Flamenco Unit, or Florence-Kasson Mental Health Unit.

31. Group mental health care programs are an important component of the treatment modality for these populations. They are an incredibly effective tool because it is not just a one-on-one therapy session, but rather the individual has a whole group of other people who give feedback and point things out, and the patient can hear about others' experiences and not feel so isolated or alone. It is powerful for people to get feedback from their peers. It is frustrating and a waste of peoples' time if they are sitting in a group where they don't understand the language. In fact, it is counterproductive as they likely will feel only further isolated, frustrated, dismissed, marginalized, and alone.

32. By way of background, for many years I oversaw individual and group mental health services provided at a 12-bed psychiatric ward located at San Francisco General Hospital and as a liaison with the Jail Psychiatric Services of the City and County of San Francisco,[2] and for decades while a clinical professor of psychiatry at University of California, San Francisco School of Medicine, I supervised fourth-year medical students who led mental health group services to dually diagnosed patients at the Haight-Ashbury Free Clinic.

33. There are several ways mental health staff can ensure that non-English speakers are able to participate in a meaningful manner in group mental health sessions. As a threshold matter, ADC should track which patients assigned to group mental health sessions are not fluent in English. One approach to ensuring effective communication during these group sessions would be to have separate sessions for all of the Spanish speakers, led by mental health clinical staff who are appropriately trained, and fluent in Spanish. One advantage of this approach is that it could lead to more culturally-sensitive and appropriate care, given the dynamics and background of the group.[3]

---

[2] At the time, mental health care in the San Francisco jails was subject to a consent decree in *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992).

[3] Likewise, if Defendants would track all deaf and hard of hearing class members who use sign language to communicate, ADC could theoretically incarcerate them

-13-

34. If there are not enough Spanish speakers at the unit to warrant a separate Spanish-language group, then simultaneous interpretation services should be provided during the group session. Simultaneous interpretation could be done unobtrusively in one of two ways. The first method would be to have a Spanish interpreter sitting near the one class member to interpret what others are saying in English, and anything the class member might want to say to the group. The other approach would be what I have done when facilitating group sessions with participants who do not all speak the same language – say a sentence or two in English, pause, and then either the provider (if fluent) or the interpreter repeats the same sentence in Spanish, and translates what the participants are saying in a similar fashion. While it may slow down the flow of the conversation, this approach allows everyone to participate, and actually by going slower, gives everyone more time to reflect upon what others are saying.

I declare under penalty of perjury that the foregoing is true and correct.

Executed June 10 2020, in Honolulu, Hawai'i.

_____
Pablo Stewart, M.D.

---

together to the extent possible, and hold separate group mental health sessions for the deaf people, led with the assistance of an in-person SLI. At the very least, either a live SLI or remote interpreter (via video remote interpretation) must be provided to ensure effective communication and participation in group sessions.

-14-

| | | |
|---|---|---|
| 1 | **ADDITIONAL COUNSEL:** | Donald Specter (Cal. 83925)* |
| 2 | | Alison Hardy (Cal. 135966)* |
| | | Sara Norman (Cal. 189536)* |
| 3 | | Corene Kendrick (Cal. 226642)* |
| | | Rita K. Lomio (Cal. 254501)* |
| 4 | | **PRISON LAW OFFICE** |
| | | 1917 Fifth Street |
| 5 | | Berkeley, California 94710 |
| | | Telephone: (510) 280-2621 |
| 6 | | Email: dspecter@prisonlaw.com |
| | | ahardy@prisonlaw.com |
| 7 | | snorman@prisonlaw.com |
| | | ckendrick@prisonlaw.com |
| 8 | | rlomio@prisonlaw.com |

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:  dfathi@aclu.org
 afettig@aclu.org
 echo@aclu.org
 mmorris@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:  dbarr@perkinscoie.com
 agerlicher@perkinscoie.com
 jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
   rdalyrooney@azdisabilitylaw.org
   jrico@azdisabilitylaw.org
   mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf