Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br><br>**DECLARATION OF DAVID SHINN** |

I, David Shinn, make the following Declaration:

1.     I am the Director of the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") and have served as Director since October 21, 2019.

2.     Prior to my appointment as ADCRR's Director, I served for more than 32 years in uniformed and civil service for the United States Government.

3.     I am a veteran of the U.S. Marine Corps, began my career with the Federal Bureau of Prisons in 1991 as a correctional officer, and served for more than 28 years, rising to the position of Assistant Director for the Program Review Division, in Washington, D.C.

4.      As a member of the Executive Leadership for the Federal Bureau of Prisons, which is the nation's largest correctional system with 122 institutions, 39,000 employees, and an inmate population of more than 240,000, I served as the internal audit authority, where I was responsible for the development of comprehensive audit guidelines and led a division of professional auditors in the continuous assessment and evaluation of the agency's operations comprised of 17 specialized disciplines.

5.      I served as the agency coordinator for all external audit activities conducted by the Department of Justice Inspector General's Office and Government Accounting Office and was responsible for resolving audit findings by managing the policy and procedural changes necessary to demonstrate compliance and prevent recurrence.

6.      Additionally, I led agency training efforts and managed the accreditation process to achieve and maintain certification from the American Correctional Association, the Joint Commission for Accreditation of Healthcare Organizations, and later the National Commission on Correctional Healthcare.

7.      Upon my appointment as Director of ADCRR, I was briefed on the history of the *Parsons v. Ryan* litigation.

8.      As Director of ADCRR, I am committed to partnering with Centurion of Arizona ("Centurion") to lead this agency to full compliance with the Stipulation Health Care Performance Measures ("HCPMs") and overall Stipulation compliance.

9.      To that end, I have explored and analyzed the important interplay between prison security operations and the provision of inmate healthcare to identify challenges that may require redirection, improvement, or change in order to achieve both ADCRR and Centurion's common goal of providing quality and Stipulation-compliant healthcare to the inmate population while also maintaining the safety and security of the public, the inmate population, and staff.

10.     It is my understanding that the overall compliance rate at the time of transition to the Centurion partnership in July 2019 with the commencement of Centurion's contract was 89%.

11.     Excluding the Maximum Custody and "N/A" HCPMs, the Medical Services Contract Monitoring Bureau ("MSCMB") audited 746 HCPMs in June 2019; 741 in February 2020; 732 in March 2020; and 731 in April 2020. When the Maximum Custody and "N/A" HCPMs are excluded from both the numerator and denominator of the equation, the adjusted compliance rate for those time periods, respectively, are:

- 89.01% in June 2019 (as performed by ADCRR's <u>prior</u> contract healthcare provider, Corizon);

- 94.74% in February 2020 (achieved by ADCRR's <u>current</u> contract healthcare provider, Centurion);

- 96.17% in March 2020 (by Centurion); and

- 96.17% in April 2020 (by Centurion).

As such, since the Court's January 31, 2020 OSC Order, ADCRR and Centurion have partnered to achieve HCPM Stipulation overall compliance nearing 100%.

12.     HCPM performance statistics are not yet available for May through July 2020.

### January 31, 2020 Order to Show Cause and Demands to Centurion

13.     I am aware of the Court's January 31, 2020 OSC Order which was communicated to me in short order upon issuance.

14.     In response to this Order, I not only continued already existing efforts to achieve Stipulation compliance above and beyond steadily increasing overall compliance rates already achieved, but I took further proactive measures to achieve compliance with all HCPMs.

15.     The reasonable and proactive measures that I have taken since my appointment as well as in response to the Court's OSC Order include the following.

16.     Since the start of my Directorship, I have participated in ADCRR and Centurion bi-weekly leadership meetings to specifically address Stipulation HCPMs performance and to collaboratively address efforts to achieve and maintain complete Stipulation compliance.

17.     On February 14, 2020, I formally demanded Centurion contractually meet their obligation to achieve Stipulation compliance with the HCPMs at issue in the Court's OSC Order which required 85% compliance in February 2020 or ADCRR would face $100,000 in sanctions per HCPM, per location for:

- Performance Measure 6:  Eyman;

- Performance Measure 11: Eyman, Florence, Lewis, Tucson, Winslow, Yuma;

- Performance Measure 12:  Eyman, Florence;

- Performance Measure 13:   Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma;

- Performance Measure 14:   Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma;

- Performance Measure 15:  Eyman, Florence, Lewis;

- Performance Measure 19:  Eyman, Lewis, Phoenix;

- Performance Measure 20:   Eyman, Florence, Lewis, Perryville, Phoenix, Tucson;

- Performance Measure 24:  Lewis;

- Performance Measure 35:  Eyman, Florence, Lewis, Phoenix, Tucson;

- Performance Measure 37:   Eyman, Florence, Lewis, Tucson, Winslow, Yuma;

- Performance Measure 39:   Eyman, Florence, Lewis, Perryville, Tucson, Yuma;

- Performance Measure 40:  Eyman, Tucson;

- Performance Measure 42:  Eyman, Florence, Lewis, Perryville;

- Performance Measure 44:  Eyman, Florence, Lewis, Winslow;

- Performance Measure 45:  Lewis, Tucson;

4

- Performance Measure 46:   Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma;

- Performance Measure 47:   Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma;

- Performance Measure 49:  Douglas, Eyman, Florence, Perryville, Phoenix, Tucson;

- Performance Measure 50:  Florence, Perryville, Tucson;

- Performance Measure 51:  Douglas, Eyman, Florence, Perryville, Tucson, Yuma;

- Performance Measure 52:  Eyman, Florence, Perryville, Phoenix, Tucson;

- Performance Measure 54:   Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma;

- Performance Measure 55:  Eyman;

- Performance Measure 66:  Florence, Lewis, Tucson;

- Performance Measure 67:  Lewis, Tucson;

- Performance Measure 72:  Eyman;

- Performance Measure 80:  Lewis, Tucson;

- Performance Measure 85:   Eyman, Florence, Lewis, Perryville, Tucson, Yuma;

- Performance Measure 91:  Phoenix;

- Performance Measure 92:  Eyman, Florence, Lewis, Perryville, Tucson;

- Performance Measure 93:  Eyman, Florence, Lewis, Tucson;

- Performance Measure 94:  Eyman, Florence, Perryville, Phoenix, Tucson;

- Performance Measure 97:  Phoenix; and

- Performance Measure 98:  Douglas, Eyman, Florence, Lewis, Winslow.

(Letter from Director Shinn to Centurion Chief Executive Officer dated 2/14/2020 at Attachment A.)

18.     In so advising Centurion of the Court's OSC Order, relevant HCPMs, and sanctions, I demanded that Centurion immediately commit all necessary resources to not only maintain, but also achieve where necessary, compliance on every HCPM at every location at issue in the OSC Order.  Likewise, I demanded all necessary resources to be committed to achieving and maintaining overall HCPM Stipulation compliance.  (*Id.* at 2.)

19.     My compliance demands were not general.   Indeed, I specified that Centurion must immediately take all reasonable steps including but not limited to:

- Reallocate existing Arizona healthcare personnel to locations that face challenges in achieving compliance;

- Temporarily transfer Centurion healthcare personnel from other states to assist in achieving compliance;

- Increase the use of telemedicine;

- Increase the use of overtime to provide supplemental health care resources;

- Continue daily facility-level meetings with ADCRR leadership to report on compliance and discuss strategies to improve/achieve compliance;

- Increase the existing bi-weekly Centurion-ADCRR leadership meetings to weekly to report on compliance and discuss strategies to improve/achieve compliance;

- Take all reasonable efforts to fill current FTE vacancies to improve/achieve compliance in the continuing months;

- Provide written details/reports regarding staffing efforts to fill vacant FTEs;

- Seriously consider whether increased staffing beyond the current vacant FTEs is warranted in an effort to achieve Performance Measure compliance;

- Determine, report on, and devise remedial plans for root causes that hinder compliance by location; and

-  Ensure that in addition to meeting HCPM compliance threshholds, that the inmate population receives appropriate medical care.

(*Id.* at 3-4.)

20.     I advised Centurion that failure to take all reasonable steps to comply with the OSC Order or Centurion's contractual obligations would necessitate ADCRR to impose all available contractual sanctions and indemnification remedies as against Centurion.  (*Id.* at 4.)

21.     Centurion timely responded to ADCRR's demand with a commitment to take all reasonable steps to maintain/achieve Stipulation compliance to include action plans to address ADCRR's performance requirements.

22.     Yet, even prior to the Court's OSC Order, Centurion was executing on ADCRR's demands to take all reasonable action to achieve Stipulation compliance by engaging in:

- Reallocation of statewide staff to conduct nursing line blitzes at ASPC-Eyman and Lewis;

- Reallocation of providers to provide statewide weekend coverage where needed;

- Utilization of two dedicated out-of-state telehealth physicians and recruitment for more;

- Implementation of dedicated physician and nursing telehealth programs;

- Investment into wireless technology at ASPC-Lewis to pilot an expansion of electronic health record capability;

- Increased hiring of on-site providers as of October 2019 which subsequently decreased telemedicine needs;

- Increased use of overtime to provide supplemental health care resources to supplement vacant positions;

- Continued participation in daily facility-level meeting to discuss complex compliance;

- Continued participation in weekly meetings with ADCRR's Monitoring Bureau and Director of Offender Operations;

- Completed an initial geographical market salary analysis and increasing salaries, sign-on bonuses and statewide recruitment efforts;

- Hired historically hard-to-fill staffing vacancies to include the Winslow and Florence Site Medical Direct positions (which had been open for years prior to Centurion's assumption of the contract); filled mid-level provider positions to 100% at Douglas, Safford and Tucson for the first time in years; hired two OBGYNs over the current staffing matrix; and fully staffed all complexes with psychiatric nurse practitioners and psychiatrists.

- Approved the hiring of medical assistants and certified nursing assistants to support housing unit medical clinics; and

- Approved hiring of facility level administrative and support staff to assist with HCPM administrative tasks.

23.     Following the Court's OSC Order, ADCRR and Centurion leadership increased the existing bi-weekly meetings to weekly meetings to track and discuss HCPM compliance, and to collaboratively address efforts to achieve complete Stipulation compliance and address non-performing HCPMs.

24.     Likewise, ADCRR complex-level security operations and medical leadership meet daily to discuss HCPM compliance, identify and resolve issues that compromise compliance, collaborate to achieve complete Stipulation compliance, and advise on the medical and mental health status of inmates who may require additional security supervision.

**ADCRR Leadership Changes to Promote Stipulation Compliance**

25.     Over the course of my first three months as Director, I realigned the leadership of ADCRR at the Deputy Director level.

26.     Specifically, in January 2020, I added a second Deputy Director position to ADCRR's top leadership ranks.  Deputy Director Joseph Profiri, who held this position prior to my appointment, was appointed Deputy Director of Administration, which also includes leadership of ADCRR's Medical Services Contract Monitoring Bureau ("MSCMB"). I appointed Frank Strada as Deputy Director of Operations to lead state-wide security facility operations.

27.     Deputy Director Profiri brings over three decades of ADCRR prison operations oversight, investigations, and administration experience to ADCRR's

8

1    leadership. Deputy Director Strada brings over three decades of Federal Bureau of Prisons
2    and private corrections provider experience in prison operations oversight, and policy
3    implementation to ADCRR's leadership.

4         28.    The ADCRR Assistant Directors for Financial Services, Contract
5    Compliance, and Medical Services, among others, now report directly Deputy Director
6    Profiri.  The ADCRR Assistant Directors for Inmate Programs and Reentry, ACI, and
7    Prison Operations report directly to Deputy Director Strada.

8         29.    The purpose of my appointment of two Deputy Directors was to increase
9    oversight focus on the daily operations of the specified divisions that each Deputy
10   Director leads and to facilitate collaboration between the two Deputy Directors in a
11   culture committed to proactive advancement of the mission of ADCRR. The Deputy
12   Director restructure also included increased accountability over the MSCMB with direct
13   reporting to and leadership oversight by Deputy Director Profiri.

14        30.    In April 2020, I also advanced the leadership of the MSCMB with the
15   appointment of Larry Gann as the Assistant Director of the Medical Services Contract
16   Monitoring Bureau.

17        31.    Assistant Director Gann brings formidable corrections healthcare
18   administration and direct facility healthcare management experience to ADCRR,
19   including achievement of compliance with corrections healthcare consent decrees for the
20   Maricopa County jail system and Baltimore City Detention Center.

21        32.    To add a layer of oversight and accountability over ADCRR's MSCMB,
22   Deputy Director Profiri meets with Assistant Director Gann at least once a week, but
23   typically the two engage daily on Centurion's performance, operations of the MSCMB,
24   observations and guidance relating to overall contract and Stipulation compliance,
25   expectations for the MSCMB, and to assist in re-setting healthcare contractor relations
26   and expectations.

27
28

33.     The appointment of Assistant Director Gann, working in daily collaboration with Deputy Director Profiri, has precipitated a culture shift, not only within the MSCMB, but in the relationship between ADCRR and Centurion.

34.     It has been communicated to Centurion that Assistant Director Gann serves as the voice of ADCRR as to the delivery of inmate healthcare services.  If an issue needs to be escalated, first Deputy Director Profiri, and then I become involved to reach resolution.

35.     This structure provides a much more agile and efficient method by which ADCRR's concerns can be made known to Centurion and resolved.  In one recent example, an issue arose relating to medication administration procedures.  Upon escalation to Deputy Director Profiri, he worked together with Deputy Director Strada, Assistant Director Gann, and Centurion regional and site leadership to communicate a single set of expectations and resolve the concern.  We communicated that ADCRR is not a passive observer, and that despite having two separate chains of command—one for facility operations and one for the MSCMB—ADCRR has one unified voice, and would work cooperatively to ensure higher compliance.

36.     Assistant Director Gann oversees the MSCMB, and one of his responsibilities is to ensure that ADCRR's healthcare vendor is complying with all aspects of its contract with ADCRR as well as the Stipulation.

37.     Per my direction, Assistant Director Gann is also responsible for ensuring that Centurion provides ADCRR's inmate population with a quality system of healthcare. Through subordinate managers and specialty monitors, it is Assistant Director Gann's responsibility to ensure that Centurion (and other contracted private prison operators) provide medical, mental health, and dental services in accordance with all applicable laws, rules, and regulations; the American Correctional Association; the National Commission on Correctional Health Care; and ADCRR policies and procedures. Additional responsibilities, as directed by me, include:

- Provide managerial oversight and direction to the Contract Compliance Administrator and the Quality/Clinical Management Administrator to ensure the Contractor complies with all aspects of the health services contract;

- Review and respond to internal and external inquiries pertaining to compliance issues, contract specifications, reports, inspections, staffing levels and legal mandates of inmate health, mental health and dental services;

- Prepare correspondence, reports, analysis, and recommendations related to contracted services;

- Authorize and impose sanctions and ensures notices, as required;

- Oversee the development of policies and procedures pertaining to quality assurance and utilization review processes; ensure policies, processes, procedures and protocols are implemented, maintained and enforced; complete special projects and assignments within given time frames; attend meetings, tour facilities and conduct scheduled and unscheduled inspections;

- Supervise subordinate employees, including reviews of work product and approval of leave; and

- Conduct interviews of incoming staff and issue discipline as appropriate.

38.     While the MSCMB has a reactive role in imposing sanctions to enforce compliance with the term of the contract, it also has a significant role in proactively assessing and evaluating compliance issues in real-time to reduce the risk of prospective noncompliance, which can negatively impact patient care.

39.     Also, under my leadership and to comply with the February 12, 2020 Order in this litigation, monitors transitioned to statewide monitoring.  The transition was completed by March 1, 2020, and the February data was audited under this statewide approach.

40.     Prior to this transition, MSCMB monitors were assigned to audit all applicable HCPMs for a specific facility.  This realignment ensures consistency in monitoring methodology and scoring, and aids in the identification and resolution of barriers that impede the achievement of compliance.

41.     Prior to my Directorship and in June 2018, ADCRR added ten medical liaison positions to assist in achieving HCPM compliance. These medical liaisons, who are Licensed Practical Nurses ("LPN") and Registered Nurses ("RN") in some instances were embedded into each of the 10 state-operated prison complexes and served as contact points between facility operations, Centurion, and the MSCMB.  They also identified and assisted with solving facility-specific issues, and addressed non-performance by both ADCRR and Centurion staff.

42.     In January 2020, the liaisons were reassigned to report to prison operations leadership as opposed to MSCMB. Liaison duties included reviewing and confirming daily HCPM compliance, identifying and aiding in the resolution of barriers that impede the achievement of compliance, serving as liaisons between complex medical personnel and security prison operations, and investigating and appropriately referring and responding to complaints pertaining to the provision of healthcare to individual inmates. This change to direct reporting refocused the liaisons to facilitate daily collaboration between ADCRR facility operations and Centurion staff in order to address impediments in Stipulation compliance in real time.

43.     As for MSCMB continuing measures to achieve Stipulation compliance, and upon my directives, in his short tenure Assistant Director Gann has achieved the following:

- Creation of a Bureau Administrator position. The Bureau Administrator will be responsible for managing the medical liaisons, and, with them, identifying and resolving compliance issues.  The Program Evaluation Administrators will be responsible for the day-to-day monitoring of Performance Measure compliance. The monitors will report directly to them.  Program Evaluation Administrators discuss issues with the monitors and myself on a daily basis.

- If monitors identify a barrier to noncompliance with a Performance Measure, they will forward the issue to the Bureau Administrator and the medical liaison team.  These new delegations of responsibilities will better allow the MSCMB to not only monitor Centurion's compliance with the HCPMs, but also achieve compliance with a newfound sense of urgency. This new organizational structure will increase the pace of ADCRR's ability to enact positive change.

The Bureau Administrator will also be responsible for the creation of a real-time corrective action plan format that will allow all team members to see each identified barrier's cure status in an up-to-date format. This information will then be shared with the Director on a monthly basis during his Business Review Meetings and his Strategic Plan Initiative. Accountability will replace speculation.

- Beginning September 1, 2020, the medical liaisons will be relocated to MSCMB's Central Office and will work under the direction and supervision of the Bureau Administrator. They are currently embedded in their assigned facilities and receiving direction from the leadership within the MSCMB. Instead of addressing facility-specific issues, the liaisons will be tasked with identifying and solving problem-specific issues, beginning with HCPMs that have been chronically noncompliant. This reassignment will allow for additional oversight, direction, and training on CGAR compliance. It will also shift focus from quantitative performance monitoring toward qualitative care enhancement. The goal is to develop clinically trained correctional health care teams with critical-thought-problem-solving ability. Liaisons will include individuals who are not only LPNs and RNs but who have also worked in a correctional health care setting and have experience in staffing development, pharmaceutical regulations, and patient education. They will be responsible for recognizing and providing solutions to the barriers of noncompliance and patient care. Although the liaisons will be stationed out of Central Office, they will be traveling to and working in the facilities at least three days a week so that they can identify problems firsthand and work with facility and Centurion staff to solve them. Each day, they will review processes to identify where breakdowns in compliance and patient care are occurring and why; troubleshoot the problems; and follow-up with facility and Centurion staff to ensure that corrective action has been taken. The liaisons will continue to participate in ADCRR and Centurion on-site leadership meetings and will assist Centurion staff to apply practical problem-solving initiatives at the facility level.

- To lead the medical liaisons, two Operational Team Leader positions will be created and filled. Each Team Leader will have a team of four or five liaisons.

- Every Monday, Assistant Director Gann, the Bureau Administrator, the Program Evaluation Administrators, and the medical liaisons meet to discuss compliance and healthcare issues, and meet again every Friday to ensure that any plan of action was implemented and followed through. The formation of these liaison teams will generate improved, uniform communication to ADCRR and Centurion staff.

- The MSCMB has also developed and implemented a Computer Based Training for Centurion staff to aid with compliance relating to nurse line encounters,

13

provider line encounters, referrals, HNRs, and pharmacy. The training is required for all existing and new staff, and will help them understand what exactly is required by the HCPMs and how to properly and fully do what is required.

- Nearly every Thursday, Assistant Director Gann and the MSCMB Program Evaluation Administrators will tour facilities in order to uncover noncompliance issues and assist in troubleshooting measures.  For example, they will observe med pass and sick call, speak with providers, and monitor scheduling. They will also formally participate in the creation of Corrective Action Plans by Centurion when operational barriers are identified.  If they recognize a potential issue, they devise a real-time corrective action plan with the inclusion of our Centurion counterparts.

44.     I am confident that Assistant Director Gann's demonstrated leadership will quickly advance ADCRR's ultimate goal of full Stipulation compliance.

### Centurion Contract Incentives to Promote Compliance

45.     I am aware of the Court's prior findings and concerns that the financial structure of the contract for correctional health care with the prior contractor, Corizon, Inc., did not contain sufficiently large "sticks" to ensure compliance with the Stipulation.

46.     I am further aware that the Court was critical of Amendment 10 of the Corizon contract, which provided a $5,000-per-month sanction for noncompliant HCPMs, but also included a $90,000-per-month cap on the total amount of those noncompliance sanctions.

47.     I am further aware that the Court recognized that Amendment 14 of the Corizon contract removed the $90,000 sanctions cap, but remained critical of the provision of "disparate" incentive payments to the contractor, which, in certain months, more than offset the amount of sanctions and resulted in payments that were disparately large relative to the amount of sanctions assessed.

48.     On June 1, 2018, Request for Proposal No. ADOC18-00008264 ("RFP") for comprehensive correctional health services to inmates housing at the state-operated Arizona State Prison Complexes ("ASPC") was released.

49.     Both this RFP and the final contract awarded to Centurion addressed and resolved the Court's concerns.  Significantly, there is no longer a cap on the amount of noncompliance sanctions, and there also is no "incentive payment" for compliance.

50.     Rather, the contract has a three-tier system of sanctions designed to promote compliance with the contract, as well as with the Stipulation. Those sanctions are imposed as offsets on amounts due by the State to Centurion. Each separately monitored noncompliant HCPM counts as a separate instance of noncompliance under this sanction scheme.

51.     The contract includes a first-tier of performance sanctions to ensure that Centurion strives to comply with the HCPMs. For each HCPM monitored by the MSCMB, even if a compliance failure does not result in the extension of the twenty-four month rolling period of the Stipulation (and even for those measures which have been retired by the Court), Centurion's failure to meet the 85% compliance threshold at any complex during any audited month will result in a fixed-rate performance offset of $500.00 per measure, per month, per facility.   In contrast, performance sanctions imposed on Corizon were limited only to instances of noncompliance that extended the twenty-four month rolling period.

52.     In addition, the contract also includes a second-tier of performance sanctions, which is a graduated-scale performance offset which applies only to HCPMs where noncompliance at a particular complex or month will result in the extension of the twenty-four month rolling period of the Stipulation.

53.     These graduated-scale offsets necessarily apply to all HCPMs set forth in the Court's January 1, 2020 OSC (with the exception of HCPMs 12, 19 and 20, which were subsequently terminated on February 12, 2020), as any further instance of noncompliance would extend the time period before the measure was eligible for termination.

54.     Under the graduated-scale offset, the lowest amount of the sanction is $2,500.00 for each noncompliant Performance Measure where a month of noncompliance

results in an extension of the Stipulation.  The amount of the offset increases based upon the amount of those compliance failures which occur in a particular month, as follows:

| Number of Non-Compliant Measures | Offset Amount per Instance |
|---|---|
| 1-9 | $2,500.00 |
| 10-19 | $5,000.00 |
| 20-29 | $7,500.00 |
| 30-39 | $10,000.00 |
| 40-49 | $15,000.00 |
| 50+ | $20,000.00 |

55.    For example, in a hypothetical month where MSCMB monitors found that Centurion did not meet the 85% compliance threshold for 40 HCPMs, and those failures extended the term of the Stipulation, the total amount of the offset would be $262,500.00 (9 measures x $2,500.00) + (10 measures x $5,000.00) + (10 measures x $7,500.00) + (10 measures x $10,000.00) + (1 measure x $15,000.00). Once this system was developed for the RFP, the graduated-scale offset system was also imposed by Amendment during the remaining term of the Corizon contract.

56.    Third, the contract provides for staffing offsets/paybacks for hours of service if the actual number of hours worked by personnel in contract job descriptions in a month falls below the level of hours to be worked by a full-time equivalent ("FTE") employee identified in the staffing matrix at the regional office or at a facility.  Where positions are under-filled in a particular month, the contractor is subject to an offset based upon the average hourly rate for that provision for each hour that was uncovered.  To avoid these offsets, Centurion may use more qualified staff to cover the hours (for

example an RN may be used to complete the work of an LPN, or a physician may work to cover the hours for a mid-level provider listed in the staffing plan).

57.     The staffing offset is designed to eliminate any financial incentive if the contractor decides that it may be economically advantageous to leave a position on the staffing plan unfilled, even where there is a sanction for noncompliance.  If a position on the staffing plan is not actually worked in the month, the amount of the payment due to the contractor is offset by the wage or salary due to that particular position for each vacancy.

58.     The staffing sanctions are imposed based upon hours worked by hired staff up to one FTE per Centurion employee.  Hours worked by Centurion employees as overtime, as well as hours worked by locums, agency staff, or independent contractors, do not reduce the staff sanction imposed in a given month.

**Offsets Imposed Since July 1, 2019**

59.     For July 2019, Centurion was found noncompliant with 50 HCPMs, which resulted in an extension of the Stipulation.  Accordingly, ADCRR imposed a graduated-scale offset of $417,500.00.  Centurion was also found noncompliant with 40 additional HCPMs (which did not extend the Stipulation), which resulted in an additional fixed-rate offset of $20,000.00.  Centurion did not dispute ADCRR's HCPM offset calculation, and the offsets were applied in October 2019.

60.     Centurion was also assessed an additional staffing offset in the amount of $1,171,788.19 for the month of July 2019.

61.     For August 2019, Centurion was initially found noncompliant with 49 HCPMs, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale offset of $418,500.00.  Centurion was also found noncompliant with 42 additional HCPM (which did not extend the Stipulation), and an additional fixed-rate offset of $21,000 was imposed.  Centurion did not dispute ADCRR's HCPM offset calculation, and the offsets were applied in November 2019. Subsequent review in September 2019 identified an error in the source documents used in determining five instances of

1    noncompliance, and retroactive credits were applied in September 2019.  After revision

2    for August 2019, Centurion was assessed a total performance sanction of $358,000.00, of

3    which $337,500.00 was for noncompliance with 44 HCPMs that extended the length of

4    the Stipulation; and of which $20,500.00 was for noncompliance with 41 HCPMs that did

5    not extend the length of the Stipulation.

6         62.    Centurion was also assessed an additional $1,060,451.40 staffing offset for

7    the month of August 2019.

8         63.    For September 2019, Centurion was found noncompliant with 41 HCPMs,

9    which resulted in an extension of the Stipulation. ADCRR imposed a graduated-scale

10   offset of $277,500.00.   Centurion was also found noncompliant with 21 additional

11   HCPMs (which did extend the Stipulation), and an additional fixed-rate offset of

12   $10,500.00 was imposed.   While Centurion did not dispute ADCRR's HCPM offset

13   calculation, due to an error in the source documents for August 2019, a $65,000 credit was

14   applied, and the net September 2019 HCPM combined sanction of $227,500.00 was

15   imposed in November 2019.

16        64.    Centurion was also assessed an additional $839,650.97 staffing offset for the

17   month of September 2019.

18        65.    For October 2019, Centurion was found noncompliant with 35 HCPMs,

19   which resulted in an extension of the Stipulation. ADCRR imposed a graduated-scale

20   offset of $207,500.00.   Centurion was also found noncompliant with 16 additional

21   HCPMs (which did extend the Stipulation), and an additional fixed-rate offset of

22   $8,000.00 was imposed. Centurion did not dispute ADCRR's HCPM offset calculation,

23   and the offsets were applied in December 2019.

24        66.    Centurion was also assessed an additional $898,325.56 staffing offset for the

25   month of October 2019.

26        67.    For November 2019, Centurion was found noncompliant with 31 HCPMs,

27   which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale

28   offset of $167,500.00.   Centurion was also found noncompliant with 14 additional

HCPMs (which did extend the Stipulation), and an additional fixed-rate offset of $7,000.00 was imposed. Centurion did not dispute ADCRR's HCPM offset calculation, and the offsets were applied in February 2019.

68.     Centurion was also assessed an additional $554,211.77 staffing offset for the month of November 2019.

69.     For December 2019, Centurion was found noncompliant with 31 HCPMs, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale offset of $167,500.00.  Centurion was also found noncompliant with 31 additional HCPMs (which did extend the Stipulation), and an additional fixed-rate offset of $15,500.00 was imposed. Centurion did not dispute ADCRR's HCPM offset calculation, and the offsets were applied in March 2020.

70.     Centurion was also assessed an additional $508,265.72 staffing offset for the month of December 2019.

71.     For January 2020, Centurion was found noncompliant with 37 HCPMs, which resulted in an extension of the Stipulation. ADCRR imposed a graduated-scale offset of $277,500.00. Centurion was also found noncompliant with 29 additional HCPMs (which did extend the Stipulation), and an additional fixed-rate offset of $14,500.00 was imposed. Centurion did not dispute ADCRR's HCPM offset calculation, and the offsets were applied in March 2020.

72.     Centurion was also assessed an additional $510,559.25 staffing offset for the month of January 2020.

73.     For February 2020, Centurion was found noncompliant with 22 HCPMs, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale offset of $95,000.00. Centurion was also found noncompliant with 17 additional HCPMs (which did extend the Stipulation), and an additional fixed-rate offset of $8,500.00 was imposed. Centurion did not dispute the Department's HCPM offset calculation, and the offsets were applied in May 2020.

74.     Centurion was also assessed an additional $388,368.15 staffing offset for the month of February 2020.

75.     For March 2020, Centurion was found noncompliant with 17 HCPMs, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale offset of $62,500.00. Centurion was also found noncompliant with 11 additional HCPMs (which did extend the Stipulation), and an additional fixed-rate offset of $5,500.00 was imposed. Centurion did not dispute ADCRR's HCPM offset calculation, and the offsets were applied in June 2020.

76.     Centurion was also assessed an additional $360,419.13 staffing offset for the month of March 2020.

77.     In the first nine months of contract performance, total offsets of $8,362,040.14 were imposed.  This graph illustrates the total amount imposed each month.  The dark-blue on the bottom shows the graduated-scale offset;  pink is the fixed-



1   rate offset; and the light-blue is the amount of the staffing offset imposed each month.

2       78.    It is notable that the sanctions imposed upon Centurion began to be applied

3   in the first month of contract performance.  This is a significant change from the initial

4   Corizon contract which did not include any performance offsets for noncompliant

5   measures in the initial contract period, and then included caps on performance sanctions.

6       79.    By imposing immediate and substantial sanctions, ADCRR clearly and

7   unequivocally communicated the importance and necessity for Centurion to ensure

8   compliance with the terms of the contract and the HCPMs contained in the Stipulation.

9       80.    While Centurion initially experienced some relatively substantial sanctions

10  under the three-part offset system, it appears that these sanctions resulted in higher

11  performance compliance.

12      81.    Since September 2019, Centurion has been found compliant with more than

13  90% of the HCPMs, and that rate has continued to improve as new record highs for

14  HCPM compliance were reached in February 2020 and again in March 2020.

15      82.    The three-part sanction scheme, involving the combination of fixed-rate

16  performance offsets, graduated-rate performance offsets, and staffing offsets, has served,

17  and continues to provide a significant impact and incentive for Centurion to ensure

18  adequate performance and compliance.

19                    **Engagement of NCCHC Resources, Inc.**

20      83.    In response to the Court's OSC Order and to increase and maintain

21  Stipulation HCPM compliance, ADCRR has investigated nationally recognized

22  correctional medicine organization candidates that can identify and provide modification

23  recommendations related to: (1) root causes that impede HCPM compliance; (2)

24  revision/modification of certain HCPMs to ensure that the measures  are outcome-based

25  and qualitatively measure the actual delivery of healthcare; and (3) a complex-specific

26  staffing analysis that accounts for unique hiring and retention factors, physical plant, and

27  security staffing requirements that must be contemplated at each unique prison complex

28  location.

84.     ADCRR has petitioned the Court to allow it to utilize prior sanctions already paid to fund a system-wide medical personnel staffing study and root cause analysis for underperforming HCPMs to be conducted by NCCHC (National Commission on Correctional Health Care) Resources, Inc.

85.     Specifically, ADCRR obtained a written proposal from NCCHC Resources, Inc. in February 2020.  The proposal sets forth a robust statement of work to include a staffing analysis, on-site assessment of delivery of health care associated with the HCPMs to identify root causes of performance issues, and detailed recommendation and implementation plans.  Based upon the "Confidential and Proprietary" designation of the proposal by NCCHC Resources, Inc. as to its statement of work, identification/qualification of the proposed subject matter team members, terms, and cost, through counsel ADCRR has requested permission to submit the Proposal to the Court for *in camera* review.

86.     It is vital that ADCRR be permitted to utilize prior sanctions already paid to specifically retain NCCHC Resource, Inc. to perform the above noted studies and provide implementation recommendations and processes. Judicial permission to do so will directly benefit the inmate class of plaintiffs, who would be the beneficiaries of this analytical work.

87.     NCCHC Resources, Inc.'s subject matter expert teams are uniquely positioned to traverse the panoply of issues at play in analyzing staffing needs, identifying HCPM root cause challenges, and devising recommended remedies for ten distinct prison complexes located throughout the state. Each complex presents its own unique prison security operations, facility plant design, staffing challenges, staffing market availability, and level of inmate healthcare needs.  NCCHC Resources, Inc.'s team of subject matter experts is uniquely equipped to accomplish this sophisticated task.

88.     NCCHC Resources, Inc. provides customized technical and consulting services for policy development and solution identification.  Consulting services include staffing studies as well as review and recommendations for delivery of health care

services, along with health system assessments, and performance improvement and technical assistance. NCCHC Resources Inc.'s clients include Delaware Department of Corrections, Idaho Department of Corrections, Illinois Department of Corrections, and Department of Youth Rehabilitation Services (Washington, D.C.), along with jail systems across the United States.

89. The consulting teams are made up of subject matter experts in the field of corrections healthcare and address specified categories of delivery of healthcare to focus on, but not be limited to, nursing, mental health, clinical operations, provider operations, etc., which are all specific areas of expertise that must be considered in both a staffing study and root cause analysis.

90. It is important to consult with a nationally recognized correctional medicine organization such as NCCHC Resources, Inc. to perform the root cause analyses, HCPM revision/modification reviews, and staffing analyses to ensure that the study accounts for the unique challenges of corrections medicine  which exceed baseline delivery of care and must also address geographical location, site-specific facility plant design, and overlapping security staffing needs in order to facilitate the delivery of healthcare.

91. ADCCR anticipates that the selected organization will also consult with Dr. Marc Stern in performing its analysis, considering the substantial amount of work that Dr. Stern has already conducted in this regard.

92. I understand that Plaintiffs' counsel opposes this request due to alleged conflicts of interest and their purported lack of confidence in results because Centurion supports NCCHC (at large) and ADCRR is already accredited by NCCHC.

93. I disagree with the alleged conflict of interest and lack of confidence as alleged by Plaintiffs through their retained expert, Dr. Wilcox. NCCHC Resources, Inc.'s consulting and technical services are provided separate from its accreditation services. Moreover, ADCRR would retain NCCHC Resources, Inc., not Centurion, and thus NCCHC Resources, Inc.'s obligations would be directly to ADCRR, not Centurion. Moreover, corrections agencies all over the country recognize NCCHC as the leader in

1    correctional health whose mission is to improve the quality of healthcare in prison
2    systems. Plaintiffs' purported lack of confidence in the NCCHC organization contradicts
3    Plaintiffs' request for the Court to further appoint Dr. Marc Stern to conduct root cause
4    and staffing studies because Dr. Stern has a longstanding affiliation with NCCHC.
5    Indeed, Dr. Stern's pedigree includes co-developing and teaching for NCCHC's Medical
6    Director's Leadership and contributing to NCCHC's 2014 editions of Standards for
7    Health Services. Dr. Stern has likewise provided lectures and workshops for NCCHC
8    educational events, and is the recipient of NCCHC's 2019 B. Jaye Anno Award of
9    Excellence in Communication. Dr. Stern's CV has long highlighted his historical
10   involvement with NCCHC as an instructor, a co-contributor for NCCHC Jail and Prison
11   Standards, and participation as a clinical expert on an NCCHC comprehensive assessment
12   team

13        94.    It is self-evident and makes correctional industry common sense to retain
14   the subject matter leader to assess and determine how to improve ADCRR's inmate
15   healthcare system and to achieve final Stipulation compliance.

16        95.    I also disagree with Dr. Wilcox's opinion that the Advisory Board
17   Consultants who were appointed by the Court in 2018 to report on generalized staffing
18   recruitment and retention should be tasked with performing HCPM root cause and staffing
19   studies. This group has no experience in the very unique niche specialty of corrections
20   medicine which necessarily entails unique comprehension of the attendant safety and
21   security needs inherent in the delivery of inmate healthcare as well as the unique nature of
22   inmate patients who not only present safety/security risks but also traditionally present
23   complicated previously unattended to or treated medical conditions. This is all critical
24   experience forming a bedrock foundation toward the specialized understanding of the
25   challenges and complications of the delivery of inmate healthcare. This group lacks this
26   critical experience and is not qualified to effectively analyze root causes for
27   underperforming HCPMS and staffing needs.

28

1

**Deactivation of ASPC-Florence**

2      96.      In response to the Court's OSC Order and to increase and maintain

3   Stipulation HCPM compliance, ADCRR moved forward with deactivating ASPC-

4   Florence.  The first phase of closure of the North Unit will commence in July 2020 and is

5   projected for completion this new fiscal year.

6      97.      This initial phase will begin to relocate a portion of ADCRR's inmate

7   population to placements in existing ADCRR bed space.

8      98.      The phased deactivation of ASPC-Florence will permit redeployment of

9   medical staffing and security staffing resources to ASPC-Eyman and to other state-run

10   prison complexes.

11      99.      This has also resulted in ADCRR initiating a state-wide bed allocation

12   analysis to focus on potential re-distribution of the inmate population to locate those

13   inmates with chronic or complex medical conditions in geographical locations that best

14   serves the population's relevant medical needs.

15      100.     In the interim, ADCRR and Centurion have implemented a utilization

16   review procedure whereby on a weekly basis, a multi-disciplinary team, including facility

17   operations (the Warden), meet to discuss possible alternative housing assignments for

18   inmates who require medical services that may not be optimally available at the prison

19   complex to which the inmate is assigned.  Recommendations for alternative placement

20   made at the complex-level are elevated to ADCRR operations leadership and Centurion

21   leadership for ultimate determination. ADCRR and Centurion leadership also meet

22   weekly to review alternative placement recommendations made at the complex level.

23

**OCI Analysis and Operational Recommendations**

24      101.     In response to the Court's OSC Order and to increase and maintain

25   Stipulation HCPM compliance, I tasked ADCRR's Office of Continuous Improvement

26   ("OCI") to provide support to Centurion to (1) analyze backlogs for outside specialty

27   consultations and (2) provide recommendations to improve/eliminate the same with a

28   focus on reducing  operational barriers to the delivery of healthcare so that compliance

with HCPMs related to the timeliness of completion of outside specialty consultations could be maintained and/or achieved.

102.    The mission of OCI is to deploy and embed the Arizona Management System across ADCRR.  The Arizona Management System is an intentional, results-driven approach that enables every employee, at every level, to reflect daily on how they did, find the waste, and decide how to do better going forward with sustainable progress.

103.    The OCI team tasked with analyzing outside specialty consultation backlogs and providing operations-based improvement recommendations includes three ADCRR retired complex wardens with combined prison operations experience exceeding seven decades.  Armed with extensive operational insight, the team has provided recommendations to Assistant Director Gann that focus in part on reassessment of statewide housing plans to position inmates in locations to provide optimal access to necessary outside specialists based upon medical condition and geographic availability of necessary specialists. Recommendations also include engagement of specialists willing to provide all-day or weekend bookings to maximize appointment availability and coordination of attendant security transport needs.

104.    In conjunction with existing data/analysis as well as OCI's study and recommendations, Centurion has expanded its telemedicine specialty groups; hired a service provider representative to develop additional provider networks; expanded its Utilization Management team; implemented use of Care-Clix Telehealth Specialty Providers; increased on-site specialty services for physical therapy, audiology, nephrology, orthopedics and mammograms; and increased frequency of specialty clinics and nurse lines.

**Warden Performance Reviews Consider HCPM Compliance**

105.    In response to the Court's OSC Order and to increase and maintain Stipulation HCPM compliance, ADCRR added HCPM compliance performance to Complex Wardens' annual performance review criteria in order to ensure that Complex

1  Wardens engage in successful partnership with Centurion personnel in order to achieve

2  and maintain HCPM compliance.

3  **Tablet System Rollout**

4      106.    As an additional method of increasing efficiency in the provision of medical

5  care, ADCRR continues to roll out a tablet system whereby inmates in most every

6  classification will be provided tablets that provide for entertainment and communication

7  opportunities.

8      107.    Since October 2019, tablets have been issued to the eligible inmate

9  population at ASPC-Florence (with the exception of the Globe unit), Tucson, Perryville,

10  and Lewis.  Hardware installation for the tablet systems is nearly complete at ASPC-

11  Eyman and Yuma, but unfortunately delayed because of access restrictions due to the

12  COVID-19 pandemic.

13      108.    Design/implementation efforts are also currently being made to further

14  equip the tablets with technology capability for submission of Health Needs Requests and

15  medical care refusal forms directly from the tablet to Centurion medical personnel.  This

16  capability will increase the efficiency and timeliness of processing inmate HNRs and

17  medical care refusals.

18      109.    Under my leadership, ADCRR is committed to achieving comprehensive

19  Stipulation compliance and the partnership efforts of ADCRR and Centurion have made

20  great strides in doing so with respect to HCPM compliance in the short time period that

21  Centurion has partnered with ADCRR.

22  / / /

23

24  / / /

25

26  / / /

27

28

110.    ADCRR continues to take all reasonable steps to comply with the Court's OSC Order and to achieve Stipulation compliance so as to terminate Court oversight of this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of July, 2020 in Phoenix, Arizona.

David Shinn

**ATTACHMENT A**

**ATTACHMENT A**





# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov

**DOUGLAS A. DUCEY**
GOVERNOR

**DAVID SHINN**
DIRECTOR

February 14, 2020

<u>VIA EMAIL</u>

Steven H. Wheeler
Chief Executive Officer
Centurion
1593 Spring Hill Road
Suite 600
Vienna, Virginia 22182

Re:   <u>Demand for Full Compliance</u>

Dear Mr. Wheeler:

As you know from communications between ADCRR's *Parsons* litigation defense counsel and Centurion's counsel, on Friday, January 31, 2020 (5:18 p.m.), the Court issued a Contempt Order requiring Defendants to comply with specified *Parsons* Stipulation healthcare Performance Measures at specified locations, or face monetary sanctions pursuant to the Court's civil contempt authority. (See Order, attached, Doc. 3490.) The Performance Measures at issue are those that ADCRR agreed to meet pursuant to the *Parsons* Stipulation and to which Centurion is contractually obligated to meet.

The Performance Measures at issue in the Order are:

- Performance Measure 6: Eyman

- Performance Measure 11: Eyman, Florence, Lewis, Tucson, Winslow, Yuma

- Performance Measure 12: Eyman, Florence

- Performance Measure 13: Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma

- Performance Measure 14: Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma

- Performance Measure 15: Eyman, Florence, Lewis

- Performance Measure 19: Eyman, Lewis, Phoenix

Steven H. Wheeler
February 14, 2020
Page 2

- Performance Measure 20: Eyman, Florence, Lewis, Perryville, Phoenix, Tucson

- Performance Measure 24: Lewis

- Performance Measure 35: Eyman, Florence, Lewis, Phoenix, Tucson

- Performance Measure 37: Eyman, Florence, Lewis, Tucson, Winslow, Yuma

- Performance Measure 39: Eyman, Florence, Lewis, Perryville, Tucson, Yuma

- Performance Measure 40: Eyman, Tucson

- Performance Measure 42: Eyman, Florence, Lewis, Perryville

- Performance Measure 44: Eyman, Florence, Lewis, Winslow

- Performance Measure 45: Lewis, Tucson

- Performance Measure 46: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma

- Performance Measure 47: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma

- Performance Measure 49: Douglas, Eyman, Florence, Perryville, Phoenix, Tucson

- Performance Measure 50: Florence, Perryville, Tucson

- Performance Measure 51: Douglas, Eyman, Florence, Perryville, Tucson, Yuma

- Performance Measure 52: Eyman, Florence, Perryville, Phoenix, Tucson

- Performance Measure 54: Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma

- Performance Measure 55: Eyman

- Performance Measure 66: Florence, Lewis, Tucson

- Performance Measure 67: Lewis, Tucson

- Performance Measure 72: Eyman

- Performance Measure 80: Lewis, Tucson

- Performance Measure 85: Eyman, Florence, Lewis, Perryville, Tucson, Yuma

Steven H. Wheeler
February 14, 2020
Page 3


- Performance Measure 91: Phoenix

- Performance Measure 92: Eyman, Florence, Lewis, Perryville, Tucson

- Performance Measure 93: Eyman, Florence, Lewis, Tucson

- Performance Measure 94: Eyman, Florence, Perryville, Phoenix, Tucson

- Performance Measure 97: Phoenix

- Performance Measure 98: Douglas, Eyman, Florence, Lewis, Winslow

The Order specifies that sanctions in the amount of $100,000 will be levied if either the 85% compliance threshold is not achieved for the monitored month of February 2020, or previously compliant scores fall below the current 85% compliance threshold **"unless** Defendants can establish they took all reasonable steps to achieve compliance but still fell short." (Order at 3, emphasis added.)   While some of the specified Performance Measures/locations will likely maintain or achieve compliance, the Court's Order imposes a potential monthly sanction of nearly $14.6 million. The Court warns that contempt sanctions will recur on a monthly basis until the Performance Measures, by complex, are brought into and remain in compliance. (Order at 3.)

ADCRR expects and demands Centurion to immediately commit all necessary resources to achieve and maintain compliance on every Performance Measure at every specified location addressed in the Order. The Court's Order also further reinforces ADCRR's continuing demand that Centurion improve performance not only for those Performance Measures specifically identified in the Court's Order, but for every Performance Measure that is not in current compliance with the Stipulation's 85% compliance threshold.

Specifically, ADCRR demands that Centurion immediately take all reasonable steps to substantially comply with the Court's Order, including but not limited to: (1) reallocate existing Arizona healthcare personnel to locations that face challenges in achieving compliance; (2) temporarily transfer Centurion healthcare personnel from other states to assist in achieving compliance; (3) increase the use of telemedicine; (4) increase the use of overtime to provide supplemental health care resources; (5) continue daily facility-level meetings with ADC leadership to report on compliance and discuss strategies to improve/achieve compliance;  (6) increase the existing bi-weekly Centurion-ADCRR leadership meetings to weekly to report on compliance and discuss strategies to improve/achieve compliance; (7) take all reasonable efforts to fill current FTE vacancies to improve/achieve compliance in the continuing months; (8) provide written details/reports regarding staffing efforts to fill vacant FTEs; (9) seriously consider whether increased staffing beyond the current vacant FTEs is warranted in an effort to achieve Performance Measure compliance; and (10) determine, report on, and devise remedial plans for root causes that hinder compliance by location.  Centurion must also ensure that in addition to meeting healthcare Performance Measure compliance thresholds, that the inmate

Steven H. Wheeler
February 14, 2020
Page 4

population affected by the Performance Measures receives appropriate medical care that Centurion is contractually obligated to provide.

Failure or refusal to take all reasonable steps to comply with the Court's Order exposes ADCRR, the State and I to civil contempt sanctions. If the Court ultimately imposes any sanctions against us, Centurion will be contractually responsible for comprehensive indemnification pursuant to Paragraph 3.22, 3.22.2 & 3.22.3 of the Contract. ADCRR will also continue to hold Centurion accountable for contract compliance and performance in accordance all applicable Contract provisions. This letter therefore constitutes ADCRR's formal demand for full indemnification as well as compliance with the Court's January 31 Order. As named defendant in the lawsuit, I likewise formally demand full indemnification as well as compliance with the Court's Order.

ADCRR recognizes that Centurion has demonstrated improvement for many compliance scores over the last several months and remains committed to working with Centurion to achieve full compliance with the Stipulation and will continue to assist Centurion in achieving the same. It is my expectation that Centurion will fully perform to the agreed upon contractual obligations.

Please review the January 31 Order and within five calendar days provide a detailed written plan as to all immediate efforts being taken by Centurion to achieve compliance with the Order, for not only the monitored month of February 2020, but for the term of the Contract, so as to avoid the imposition of contempt sanctions.

Sincerely,

David Shinn
Director


cc:    Joe Profiri, Deputy Director
       Frank Strada, Deputy Director
       Brad Keogh, General Counsel
       Vanessa Headstream, Assistant Director of Health Services

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| David Shinn, et al., | |
| Defendants. | |

Defendants remain substantially noncompliant with a significant number of Performance Measures at multiple locations. This noncompliance must be addressed while the Court considers Dr. Stern's report and decides on a path forward. Based upon the Ninth Circuit's recent conclusion that this Court may impose contempt sanctions to coerce performance, further sanctions are appropriate. Defendants will therefore be required to come into compliance with every Performance Measure that the Court has found substantially noncompliant and Defendants have attempted to remedy with a remediation plan.

The following Performance Measures have completed the process required by paragraph 36 of the Stipulation:

- Performance Measure 11: Eyman, Florence, Lewis, Tucson, Winslow, Yuma.
- Performance Measure 12: Eyman, Florence.
- Performance Measure 13: Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma.

- Performance Measure 14: Douglas, Eyman, Florence, Lewis, Perryville, Tucson, Yuma.
- Performance Measure 15: Eyman, Florence, Lewis.
- Performance Measure 19: Eyman, Lewis, Phoenix.
- Performance Measure 20: Eyman, Florence, Lewis, Perryville, Phoenix, Tucson.
- Performance Measure 24: Lewis.
- Performance Measure 35: Eyman, Florence, Lewis, Phoenix, Tucson.
- Performance Measure 37: Eyman, Florence, Lewis, Tucson, Winslow, Yuma.
- Performance Measure 39: Eyman, Florence, Lewis, Perryville, Tucson, Yuma.
- Performance Measure 40: Eyman, Tucson.
- Performance Measure 42: Eyman, Florence, Lewis, Perryville.
- Performance Measure 44: Eyman, Florence, Lewis, Winslow.
- Performance Measure 45: Lewis, Tucson.
- Performance Measure 46: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma.
- Performance Measure 47: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, Yuma.
- Performance Measure 49: Douglas, Eyman, Florence, Perryville, Phoenix, Tucson.
- Performance Measure 50: Florence, Perryville, Tucson.
- Performance Measure 51: Douglas, Eyman, Florence, Perryville, Tucson, Yuma.
- Performance Measure 52: Eyman, Florence, Perryville, Phoenix, Tucson.
- Performance Measure 54: Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma.
- Performance Measure 55: Eyman.
- Performance Measure 66: Florence, Lewis, Tucson.
- Performance Measure 67: Lewis, Tucson.
- Performance Measure 72: Eyman.
- Performance Measure 80: Lewis, Tucson.

- Performance Measure 85: Eyman, Florence, Lewis, Perryville, Tucson, Yuma.

- Performance Measure 91: Phoenix.

- Performance Measure 92: Eyman, Florence, Lewis, Perryville, Tucson.

- Performance Measure 93: Eyman, Florence, Lewis, Tucson.

- Performance Measure 94: Eyman, Florence, Perryville, Phoenix, Tucson.

- Performance Measure 97: Phoenix.

- Performance Measure 98: Douglas, Eyman, Florence, Lewis, Winslow.

(Doc. 3472).[1]

Defendants must bring every Performance Measure identified above into immediate compliance. Defendants will be required to pay $100,000 for each instance of future non-compliance with this Order. For the Performance Measures identified above that were compliant in the most recent numbers, Defendants must ensure those Performance Measures remain compliant. If Defendants do not bring every Performance Measure into compliance, or if Defendants allow any previously-compliant Performance Measure to become non-compliant, the Court will impose contempt sanctions unless Defendants can establish they took all reasonable steps to achieve compliance but still fell short. If Defendants are found in contempt, the Court will impose a fine of $100,000 per Performance Measure per location to coerce compliance with this Order. The fines will recur on a monthly basis until Defendants bring each Performance Measure and location into compliance. For example, if Defendants do not bring Performance Measure 6 at Eyman into compliance by March 1, 2020, Defendants will be held in contempt and will be required to deposit $100,000 with the Clerk of Court absent a showing that Defendants took all reasonable steps to come into compliance. Defendants will then be required to deposit an additional $100,000 if Performance Measure 6 at Eyman is not brought into compliance by April 1, 2020.[2]

---

[1] These Performance Measures are those listed in Defendants' most recent status report. Those status reports are filed pursuant to an order by Magistrate Judge Duncan requiring Defendants to "report to the Court on a monthly basis . . . the current percentage compliance rates of the Performance Measures before this Court (i.e. Performance Measures that are before this Court following unsuccessful mediation)." (Doc. 1678 at 2).
[2] The amount of fines, if any, that should be imposed pursuant to the Court's May 6, 2019,

1    Accordingly,

2    **IT IS ORDERED** Defendants shall come into compliance regarding every

3    Performance Measure and location identified above no later than **March 1, 2020**.

4    **IT IS FURTHER ORDERED** that no later than **June 15, 2020**, Defendants shall

5    show cause as to why the Court should not impose a civil contempt sanction of $100,000

6    per Performance Measure per complex.

7    Dated this 31st day of January, 2020.

8

9

10

11   Honorable Roslyn O. Silver
     Senior United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
_____
Order to Show Cause will be addressed in a subsequent order.

- 4 -