1    Daniel P. Struck, Bar No. 012377
     Rachel Love, Bar No. 019881
2    Timothy J. Bojanowski, Bar No. 022126
     Nicholas D. Acedo, Bar No. 021644
3    STRUCK LOVE BOJANOWSKI & ACEDO, PLC
     3100 West Ray Road, Suite 300
4    Chandler, Arizona  85226
     Telephone:  (480) 420-1600
5    Fax:  (480) 420-1695
     dstruck@strucklove.com
6    rlove@strucklove.com
     tbojanowski@strucklove.com
7    nacedo@strucklove.com

8    *Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-ROS |
| Plaintiffs, | **DECLARATION OF LARRY GANN** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

I, Larry Gann, Jr., make the following Declaration:

1.     I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

**Background**

2.     My academic degrees include a Master of Science in Nursing, a Master of Science in Healthcare Management, a Bachelor in Business Administration, and an Associate Degree in Nursing.

3.     I have been a Registered Nurse ("RN") since 2005, and am licensed or have been licensed as an RN in Alabama, Arizona, Nevada, Oregon, California, Ohio, Texas, and Florida.  I am also a Certified Correctional Health Professional.

4.      From July 2005 to July 2006, I was an RN in the Emergency Department at Union Hospital in Dover, Ohio.

5.      From July 2006 to July 2015, I worked for NaphCare Inc., a privately owned correctional health care company that partners with city, county, state, and federal correctional facilities nationwide to provide proactive, patient-focused healthcare.

6.      From July 2006 to March 2008, I was the Health Services Administrator and Director of Nursing at the Clark County Detention Center in Las Vegas, Nevada.  In that role, I provided direct supervision of all healthcare delivery operations (medical, mental health, dental) and was responsible for a multidisciplinary team of 178 healthcare professionals who cared for an average daily population of 3,800 patients.

7.      From May 2008 to January 2010, I was NaphCare's Chief Nursing Officer, and from January 2010 to July 2015, I was NaphCare's Vice President of Operations.  In these roles, I was directly responsible for the Standards of Nursing Practice throughout all my assigned facilities throughout the United States.  I was focused on the operational effectiveness of the company's clients, as well as the creation of their Electronic Medical Record System, *TechCare*.  I directly managed 18 facilities and more than 800 health care professionals to ensure that nursing services were provided in compliance with all applicable standards and requirements of the National Commission on Correctional Health Care ("NCCHC"), the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), the American Correctional Association ("ACA"), and the regulatory State Boards of Nursing.  In my final two years with NaphCare, I was focused and directly responsible for NaphCare's Western States expansion based out of Las Vegas, Nevada.  I oversaw the transition teams for services within correctional facilities throughout Nevada, California, and Oregon.

8.      From October 2009 through April 2012, I was an RN at the Veteran's Administration / Birmingham Regional Medical Center.

9.      From August 2015 to February 2019, I was the Director of Nursing ("DON") for Maricopa County Correctional Health Services ("MCCHS").  Prior to taking this

position, I had become familiar with this organization as my team, and I implemented my prior employer's TechCare programming (EMR) at Maricopa County.  This laid the foundation and the ability to restructure a system of care within the Maricopa County Jail System.  As MCCHS DON, I realigned the correctional health care system while managing more than 300 health care professionals and a patient population of over 8,000 Maricopa County detainees.  When I began my tenure at MCCHS, the Maricopa County jail system had been subject to a 1977 consent decree relating to the provision of healthcare, *Graves v. Penzone*, No. 77-cv-00479-PHX-NVW.  My efforts and leadership helped MCCHS finally come into compliance with that consent decree, which the Court ultimately terminated just a few months after my departure.  On September 19, 2019, the final order in the case terminated the Fourth Amended Judgment and denied the ACLU's requested modification of that Judgment.

10.    From January 2017 to February 2019, I was an adjunct nursing professor at Carrington College.  I mentored Registered Nursing students nearing graduation at clinical facilities throughout the Phoenix valley.  I regularly introduced correctional nursing to these students as we included rotations within the Maricopa County Jail System.

11.    From February 2019 to April 2020, I was the Assistant Vice President of Operations for Corizon Health in Baltimore, Maryland. Corizon was responsible for providing healthcare to the State of Maryland's detainee and inmate patient population.  I was recruited to help cure noncompliance with a consent decree dating back to 1978, involving the provision of healthcare at the Baltimore City Detention Center, *Duvall v. Hogan*, No. ELH-94-2541.   The executive review from the latest *Duvall* Settlement Agreement Report dated March 2, 2020 (see Attachment 1) states the following:

- "Since the new vendor has assumed responsibility for provision of health care, Defendant[s'] report[s] have been more straightforward and based on understandable data. This has allowed the program to understand its deficiencies and attempt corrective actions."

- "There were six items in substantial compliance; 18 items in partial compliance and 14 items in noncompliance."

3

12.     This compliance occurred in a twelve month period with the former vendor achieving no compliance within any substantial compliance area throughout their tenure. Prior to assuming this responsibility, some of these noncompliance areas were not even measurable in statistical terms.

13.     On April 20, 2020, I was appointed to be the Assistant Director of the Medical Services Contract Monitoring Bureau for the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR").

14.     As the Assistant Director, I oversee the Medical Services Contract Monitoring Bureau ("MSCMB"), and one of my responsibilities is to ensure that ADCRR's healthcare vendor—currently Centurion of Arizona—is complying with all aspects of its Contract with ADCRR.  I am also responsible for ensuring that Centurion provides ADCRR's inmate population with a quality system of healthcare. Through subordinate managers and specialty monitors, it is my responsibility to ensure that Centurion (and other contracted private prison operators) provide medical, mental health, and dental services in accordance with all applicable laws, rules, and regulations; the American Correctional Association; the National Commission on Correctional Health Care; and ADCRR policies and procedures. Additional responsibilities include:

- Provide managerial oversight and direction to the Contract Compliance Administrator and the Quality/Clinical Management Administrator to ensure the Contractor complies with all aspects of the health services contract.

- Review and respond to internal and external inquiries pertaining to compliance issues, contract specifications, reports, inspections, staffing levels and legal mandates of inmate health, mental health and dental services.

- Prepare correspondence, reports, analysis, and recommendations related to contracted services.

- Authorize and impose sanctions and ensures notices, as required.

- Oversee the development of policies and procedures pertaining to quality assurance and utilization review processes; ensure policies, processes, procedures and protocols are implemented, maintained and enforced; complete special projects and assignments within

4

given time frames; attends meetings, tours facilities and conducts scheduled and unscheduled inspections.

- Supervise subordinate employees, including reviews of work product and approval of leave.

- Conduct interviews of oncoming staff and issue discipline as appropriate.

15.     I am generally familiar with the relevant orders in this proceeding, including the Court's June 22, 2018 Order and Judgment of Civil Contempt, and the January 31, 2020 Order to Show Cause.

## ADCRR Reorganization and Oversight

16.     Prior to January 2020, the Assistant Director of Medical Services reported directly to the Director.  In January 2020, ADCRR split the responsibilities of the Deputy Director into two separate positions.  I, along with the Assistant Directors for Financial Services and Contract Compliance, report to one Deputy Director.  The ADCRR Assistant Directors for Inmate Programs and Reentry, Arizona Correctional Industries, and Prison Operations report directly to the other Deputy Director.

17.     I meet with the Deputy Director for a formal meeting at least once a week, although I have multiple engagements with him on a daily basis.  Our meetings consist of comprehensive interpretation of statistical and analytical data which assists us in focusing the MSCMB's efforts.  A great deal of this data is quantitative material, but we hone in on the details to ensure that qualitative measures are being addressed by Centurion.  For instance, instead of focusing solely on whether medication was passed out to the patients, we focus on whether the medications were administered correctly.

## MSCMB Monitoring Practices and Centurion Contract Results

18.     The MSCMB monitors Centurion's compliance with the Health Care Performance Measures required under the Stipulation in this litigation.  This monitoring serves two related purposes:  (1) monitoring compliance with the Stipulation; and (2) monitoring health care contractor performance, since the Health Care Performance Measures are incorporated in the terms of the contract.

19.    Under the contract, Centurion must comply with all 103 Health Care Performance Measures required under the original language of the Stipulation, regardless of whether the Court has terminated or retired a Performance Measure.  There is only one exception.    Following the Court's February 12, 2020 Order collapsing Performance Measure 54 into Performance Measure 55, Centurion is no longer required to comply with Performance Measure 54, effective March 2020.  The reason for this is to avoid double-penalizing any duplicative instances of noncompliance, given the way by which these were monitored.

20.    Each month, the MSCMB audits Centurion's compliance with the Health Care Performance Measures.  This generally involves reviewing a random sample of inmate medical records—selected upon criteria set forth in the Monitoring Guide—from each unit in each complex, and determining whether those records reflect compliance with the particular Performance Measure for that month.  For each measure, each complex is given a compliance score, depending on the number of records audited and the number of compliant audited records.  For example, if 50 total medical records are reviewed at ASPC-Eyman and 42 of those files reflect compliance with a Performance Measure, ASPC-Eyman will receive an 84% compliance score for that Performance Measure in the monitored month.  These compliance scores are tabulated using the Compliance Green Amber Red ("CGAR") reporting tool and reported to Plaintiffs' counsel and the District Court each month.

21.    Certain complexes will not be audited for specific Performance Measures in a particular month, and therefore will not receive a compliance score for that month.  This occurs because a particular complex does not house a particular inmate population (e.g., female inmates or MH-5 inmates) or have the facilities (e.g., intake or IPC) that the Performance Measure is designed to cover.  For example, Performance Measure 61— requiring all female inmates ages 21 to 65 to be offered a pap smear every 36 months after initial intake—cannot apply to any complex that does not house female inmates.  Performance Measure 62—requiring all inmates to be screened for tuberculosis upon

intake—cannot apply to any complexes that are not in-take facilities.  Performance Measure 89—requiring all MH-5 inmates to be seen by a mental health clinician for a 1:1 session a minimum of every seven days—cannot apply to complexes that do not house MH-5 inmates.  For these (and similar) Performance Measures, medical services staff cannot provide the care required, because there is (and there is not expected to be) any inmate at the complex who could receive the care.  For those reasons, these measures are "deactivated" in the CGAR reporting tool, and do not come up for monitoring.  The monthly CGAR reports provided to the Court do not mention these deactivated measures.  If an operational change in population or facility occurs at a complex where a deactivated measure may be applicable, like the recent transfer of female inmates to ASPC-Douglas, these "deactivated" Performance Measures will be activated, and Centurion must provide the care required, and the MSCMB will monitor Centurion's compliance and tabulate a compliance score.

22.    In addition, there are certain Performance Measures where, although it is possible that an inmate at a complex may qualify under the Monitoring Guide for his or her record to be audited, there are no qualifying records to audit in a particular month.  In those instances, the monitor notes that there are no records, and does not enter a compliance score.  These Performance Measures are frequently considered to be the "N/A" findings, because there were no applicable qualifying inmates to monitor in a particular month at a particular complex.  While there is no performance score given, these instances are reported in the CGAR reports and given a "Green" score on the audit tool, since there is no basis to conclude that the healthcare contractor failed to provide adequate care relating to that measure.

23.    When ADCRR reports the "overall" or "systemwide" compliance rate, it is reporting that percentage based upon the formula of:

$$\frac{\text{\# activated measures - \# noncompliant activated measures}}{\text{\# activated measures}} \times 100$$

The "activated measures" in this formula include the Maximum Custody Outcome Measures, the "N/A" Measures, and Measures that have been terminated or retired by the Court (with the exception of PM 54, effective March 2020). Additional rates can be calculated from the underlying data contained in the CGAR reports.

24. Excluding the Maximum Custody and N/A Measures, the MSCMB audited 746 Health Care Performance Measures in June 2019; 741 in February 2020; 732 in March 2020; and 731 in April 2020. If the Maximum Custody and N/A measures are excluded from both the numerator and denominator of the equation, the adjusted compliance rate for those time periods, respectively, are: 89.01% in June 2019; 94.74% in February 2020; 96.17% in March 2020; and 96.17% in April 2020.

**<u>Centurion Contract Incentives to Promote Compliance</u>**

25. I am aware of the Court's prior findings and concerns that the financial structure of the contract for correctional health care with the prior contractor, Corizon, Inc., did not contain sufficiently large "sticks" to ensure compliance with the Stipulation.

26. I am further aware that the Court was critical of Amendment 10 of the Corizon contract, which provided a $5,000-per-month sanction for noncompliant Performance Measures, but also included a $90,000-per-month cap on the total amount of those noncompliance sanctions.

27. I am further aware that the Court recognized that Amendment 14 of the Corizon contract removed the $90,000 sanctions cap, but remained critical of the provision of "disparate" incentive payments to the contractor, which, in certain months, more than offset the amount of sanctions and resulted in payments that were disparately large relative to the amount of sanctions assessed.

28. On June 1, 2018, Request for Proposal No. ADOC18-00008264 ("RFP") for comprehensive correctional health services to inmates housing the state-operated Arizona State Prison Complexes ("ASPC") was released.

29.     Neither this RFP nor the final contract awarded to Centurion contain the prior infirmities noted by the Court.  Significantly, there is no longer a cap on the amount of noncompliance sanctions, and there also is no "incentive payment" for compliance.

30.     Rather, the contract has a three-tier system of sanctions designed to promote compliance with the contract, as well as with the Stipulation.  Those sanctions are imposed as offsets on amounts due by the State to Centurion.  Each separately monitored noncompliant Performance Measures counts as a separate instance of noncompliance under this sanction scheme.

31.     The contract includes a first-tier of performance sanctions, to ensure that Centurion strives to comply with the Performance Measures.  For each Performance Measure monitored by the MSCMB, even if a compliance failure does not result in the extension of the twenty-four month rolling period of the Stipulation (and even for those measures which have been retired by the Court), Centurion's failure to meet the 85% compliance threshold at any complex during any audited month will result in a fixed-rate performance offset of $500.00 per measure, per month, per facility.  In contrast, performance sanctions imposed on Corizon were limited only to instances of noncompliance that extended the twenty-four month rolling period.

32.     In addition, the contract also includes a second-tier of performance sanctions, which is a graduated-scale performance offset which applies only to Performance Measures where noncompliance at a particular complex or month will result in the extension of the twenty-four month rolling period of the Stipulation.

33.     These graduated-scale offsets necessarily apply to all Performance Measures set forth in the Court's January 1, 2020 Order to Show Cause (with the exception of Health Care Performance Measures 12, 19 and 20, which were subsequently terminated on February 12, 2020), as any further instance of noncompliance would extend the time period before the measure was eligible for termination.

34.     Under the graduated-scale offset, the lowest amount of the sanction is $2,500.00 for each noncompliant Performance Measure where a month of noncompliance

results in an extension of the Stipulation.  The amount of the offset increases based upon the amount of those compliance failures which occur in a particular month, as follows:

| Number of Non-Compliant Measures | Offset Amount per Instance |
|---|---|
| 1-9 | $2,500.00 |
| 10-19 | $5,000.00 |
| 20-29 | $7,500.00 |
| 30-39 | $10,000.00 |
| 40-49 | $15,000.00 |
| 50+ | $20,000.00 |

35.     For example, in a hypothetical month where MSCMB monitors found that Centurion did not meet the 85% compliance threshold for 40 Performance Measures, and those failures extended the term of the Stipulation, the total amount of the offset would be $262,500.00 (9 measures x $2,500.00) + (10 measures x $5,000.00) + (10 measures x $7,500.00) + (10 measures x $10,000.00) + (1 measure x $15,000.00). Once this system was developed for the RFP, the graduated-scale offset system was also imposed by Amendment during the remaining term of the Corizon contract.

36.     Third, the contract provides for staffing offsets/paybacks for hours of service if the actual number of hours worked by personnel in contract job descriptions in a month falls below the level of hours to be worked by a full-time equivalent ("FTE") employee identified in the staffing matrix at the regional office or at a facility.  Where positions are under-filled in a particular month, the contractor is subject to an offset based upon the average hourly rate for that provision for each hour that was uncovered.  To avoid these offsets, Centurion may use more qualified staff to cover the hours (for example an RN may be used to complete the work of an LPN, or a physician may work to cover the hours for a mid-level provider listed in the staffing plan).

37.     The staffing offset is designed to eliminate any perverse financial incentive if the contractor decides that it may be economically advantageous to leave a position on the staffing plan unfilled, even where there is a sanction for noncompliance.  If a position on the staffing plan is not actually worked in the month, the amount of the payment due to the contractor is offset by the wage or salary due to that particular position for each vacancy.

38.     The staffing sanctions are imposed based upon hours worked by hired staff up to one FTE per Centurion employee.  Hours worked by Centurion employees as overtime, as well as hours worked by locums, agency staff, or independent contractors, do not reduce the staff sanction imposed in a given month.

**Offsets Imposed Since July 1, 2019**

39.     For July 2019, Centurion was found noncompliant with 50 Performance Measures, which resulted in an extension of the Stipulation.  Accordingly, ADCRR imposed a graduated-scale offset of $417,500.00.  Centurion was also found noncompliant with 40 additional Performance Measures (which did not extend the Stipulation), which resulted in an additional fixed-rate offset of $20,000.00.  Attachment 2 is a true and correct copy of ADCRR's September 20, 2019 letter notifying Centurion of the combined performance offset of $437,500.00 for July 2019.  Centurion did not dispute ADCRR's Performance Measure offset calculation, and the offsets were applied in October 2019.  (*See* Attachment 3, October 3, 2019 letter confirming application of July 2019 Performance Measure offsets.)

40.     Centurion was also assessed an additional staffing offset in the amount of $1,171,788.19 for the month of July 2019.

41.     For August 2019, Centurion was initially found noncompliant with 49 Performance Measures, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale offset of $418,500.00.  Centurion was also found noncompliant with 42 additional Performance Measures (which did not extend the Stipulation), and an additional fixed-rate offset of $21,000.00 was imposed.  Attachment 4 is a true and correct copy of ADCRR's October 18, 2019 letter notifying Centurion of the combined performance offset

11

of $418,500.00 for August 2019.  Centurion did not dispute ADCRR's Performance Measure offset calculation, and the offsets were applied in November 2019. (*See* Attachment 5, November 4, 2019 letter confirming application of August 2019 Performance Measure offsets.)  Subsequent review in September 2019 identified an error in the source documents used in determining five instances of noncompliance, and retroactive credits were applied in September 2019.  (*See id.* at 3.)  After revision for August 2019, Centurion was assessed a total performance sanction of $358,000.00, of which $337,500.00 was for noncompliance with 44 Performance Measures that extended the length of the Stipulation; and of which $20,500.00 was for noncompliance with 41 Performance Measures that did not extend the length of the Stipulation.

42.     Centurion was also assessed an additional $1,060,451.40 staffing offset for the month of August 2019.

43.     For September 2019, Centurion was found noncompliant with 41 Performance Measures, which resulted in an extension of the Stipulation. ADCRR imposed a graduated-scale offset of $277,500.00.  Centurion was also found noncompliant with 21 additional Performance Measures (which did extend the Stipulation), and an additional fixed-rate offset of $10,500.00 was imposed.  Attachment 6 is a true and correct copy of ADCRR's November 19, 2019 letter notifying Centurion of the combined performance offset of $288,000.00 for September 2019.  While Centurion did not dispute ADCRR's Performance Measure offset calculation, due to an error in the source documents for August 2019, a $65,000 credit was applied, and the net September 2019 Performance Measure combined sanction of $227,500.00 was imposed in November 2019.  (*See* Attachment 7, November 29, 2019 confirming application of September 2019 Performance Measure offsets and credit for error in August 2019 source documents.)

44.     Centurion was also assessed an additional $839,650.97 staffing offset for the month of September 2019.

45.     For October 2019, Centurion was found noncompliant with 35 Performance Measures, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-

scale offset of $207,500.00.  Centurion was also found noncompliant with 16 additional Performance Measures (which did extend the Stipulation), and an additional fixed-rate offset of $8,000.00 was imposed.  Attachment 8 is a true and correct copy of ADCRR's December 18, 2019 letter notifying Centurion of the combined performance offset of $215,500.00.  Centurion did not dispute ADCRR's Performance Measure offset calculation, and the offsets were applied in December 2019.  (*See* Attachment 9, December 31, 2019 letter confirming application of October 2019 Performance Measure offsets.)

46.    Centurion was also assessed an additional $898,325.56 staffing offset for the month of October 2019.

47.    For November 2019, Centurion was found noncompliant with 31 Performance Measures, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale offset of $167,500.00.  Centurion was also found noncompliant with 14 additional Performance Measures (which did extend the Stipulation), and an additional fixed-rate offset of $7,000.00 was imposed.  Attachment 10 is a true and correct copy of ADCRR's February 5, 2020 corrected letter notifying Centurion of the combined performance offset of $174,500.00.  Centurion did not dispute ADCRR's Performance Measure offset calculation, and the offsets were applied in February 2019.  (*See* Attachment 11, February 7, 2020 letter confirming application of November 2019 Performance Measure offsets.)

48.    Centurion was also assessed an additional $554,211.77 staffing offset for the month of November 2019.

49.    For December 2019, Centurion was found noncompliant with 31 Performance Measures, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-scale offset of $167,500.00.  Centurion was also found noncompliant with 31 additional Performance Measures (which did extend the Stipulation), and an additional fixed-rate offset of $15,500.00 was imposed. Attachment 12 is a true and correct copy of ADCRR's February 21, 2020 letter notifying Centurion of the combined performance offset of $183,000.00.  Centurion did not dispute ADCRR's Performance Measure offset calculation,

1   and the offsets were applied in March 2020.  (*See* Attachment 13, March 3, 2020 letter

2   confirming application of December 2019 Performance Measure offsets.)

3        50.     Centurion was also assessed an additional $508,265.72 staffing offset for the

4   month of December 2019.

5        51.     For January 2020, Centurion was found noncompliant with 37 Performance

6   Measures, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-

7   scale offset of $277,500.00.  Centurion was also found noncompliant with 29 additional

8   Performance Measures (which did extend the Stipulation), and an additional fixed-rate

9   offset of $14,500.00 was imposed. Attachment 14 is a true and correct copy of ADCRR's

10   March 18, 2020 letter notifying Centurion of the combined performance offset of

11   $242,000.00.  Centurion did not dispute ADCRR's Performance Measure offset calculation,

12   and the offsets were applied in March 2020.  (*See* Attachment 15, March 30, 2020 letter

13   confirming application of January 2020 Performance Measure offsets.)

14        52.     Centurion was also assessed an additional $510,559.25 staffing offset for the

15   month of January 2020.

16        53.     For February 2020, Centurion was found noncompliant with 22 Performance

17   Measures, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-

18   scale offset of $95,000.00.  Centurion was also found noncompliant with 17 additional

19   Performance Measures (which did extend the Stipulation), and an additional fixed-rate

20   offset of $8,500.00 was imposed. Attachment 16 is a true and correct copy of ADCRR's

21   April 20, 2020 letter notifying Centurion of the combined performance offset of

22   $103,500.00.  Centurion did not dispute the Department's performance measure offset

23   calculation, and the offsets were applied in May 2020.  (*See* Attachment 17, May 6, 2020

24   letter confirming application of February 2020 Performance Measure offsets.)

25        54.     Centurion was also assessed an additional $388,368.15 staffing offset for the

26   month of February 2020.

27        55.     For March 2020, Centurion was found noncompliant with 17 Performance

28   Measures, which resulted in an extension of the Stipulation.  ADCRR imposed a graduated-

scale offset of $62,500.00.  Centurion was also found noncompliant with 11 additional Performance Measures (which did extend the Stipulation), and an additional fixed-rate offset of $5,500.00 was imposed. Attachment 18 is a true and correct copy of ADCRR's May 19, 2020 letter notifying Centurion of the combined performance offset of $68,000.00. Centurion did not dispute ADCRR's Performance Measure offset calculation, and the offsets were applied in June 2020.  (*See* Attachment 19, June 8, 2020 letter confirming application of March 2020 Performance Measure offsets.)

56.     Centurion was also assessed an additional $360,419.13 staffing offset for the month of March 2020.

57.     In the first nine months of contract performance, total offsets of $8,362,040.14 were imposed.



This graphic illustrates the total amount imposed each month. The dark-blue on the bottom shows the graduated-scale offset; the pink is the fixed-rate offset; and the light-blue is the amount of the staffing offset imposed each month.

58. It is notable that the sanctions imposed upon Centurion began to be applied in the first month of contract performance. This is a significant change from the initial Corizon contract which did not include any performance offsets for noncompliant measures in the initial contract period, and then included caps on performance sanctions.

59. By imposing immediate and substantial sanctions, ADCRR clearly and unequivocally communicated the importance and necessity for Centurion to ensure compliance with the terms of the contract and the Performance Measures contained in the Stipulation.

60. While Centurion initially experienced some large sanctions under the three-part offset system, it appears that those large sanctions resulted in higher performance compliance.

61. Since September 2019, Centurion has been found compliant with more than 90% of the Health Care Performance Measures, and that rate has continued to improve as new record highs for Performance Measure compliance were reached in February 2020 and again in March 2020.

62. The three-part sanction scheme, involving the combination of fixed-rate performance offsets, graduated-rate performance offsets, and staffing offsets have served, and continue to provide a significant impact and incentive for Centurion to ensure adequate performance and compliance.

## **MSCMB Organizational Changes to Promote Compliance**

63. Prior to my appointment as Assistant Director, MSCMB monitors were assigned to audit all applicable Performance Measures for a specific facility. To comply with the February 12, 2020 order in this litigation, monitors transitioned to statewide monitoring. Monitors are now responsible for auditing a Performance Measure at all

1    applicable facilities.  The transition was completed by March 1, 2020, and the February data

2    was audited under this statewide approach.

3          64.    In June 2018, ADCRR created 10 medical liaison positions.  These medical

4    liaisons, who are Licensed Practical Nurses ("LPN") and Registered Nurses ("RN") in some

5    instances, were embedded into each of the 10 state-operated facilities and served as contact

6    points between facility operations, Centurion, and the MSCMB.  They also identified and

7    assisted with solving facility-specific issues, and addressed non-performance by both

8    ADCRR and Centurion staff.  Liaisons primarily reported to the facility Warden and

9    operations staff.

10         65.    Although my tenure thus far as Assistant Director has been relatively short, I

11   am aware of the *Parsons* litigation and the historical noncompliance (chronically, in some

12   instances) with certain Performance Measures.  My primary goal is to cure this

13   noncompliance and achieve full compliance with every Performance Measure as quickly as

14   possible.  Given my experience and the results I helped achieve in the *Graves* and *Duvall*

15   matters, I believe I am uniquely qualified to undertake this task and will successfully

16   accomplish that goal.  I have the full support of ADCRR and Director David Shinn.  My

17   vision is to hire and train "Change Agents," who will travel as teams of troubleshooters.

18   They will focus on the barriers to care identified by their monitoring counterparts.  As

19   teams, they will support one another and utilize each team-member's unique strength to

20   solve these issues and ensure the delivery of quality care.

21         66.    I have restructured the MSCMB with this goal in mind: the construction of a

22   more efficient and cohesive team of experts that not only monitors Centurion's compliance

23   with Performance Measures, but identifies compliance barriers and breaks them down.

24         67.    For example, I have created a Bureau Administrator position. The Bureau

25   Administrator will be responsible for managing the medical liaisons, and, with them,

26   identifying and resolving compliance issues.  The Program Evaluation Administrators will

27   be responsible for the day-to-day monitoring of Performance Measure compliance. The

28

                                        17

1    monitors will report directly to them.  Program Evaluation Administrators discuss issues
2    with the monitors and myself on a daily basis.

3          68.    If monitors identify a barrier to compliance with a Performance Measure, they
4    will forward the issue to the Bureau Administrator and the medical liaison team.  These new
5    delegations of responsibilities will better allow the MSCMB to not only monitor
6    Centurion's compliance with the Performance Measures, but also achieve compliance with
7    a new found sense of urgency.  This new organization layout will quicken the pace of
8    ADCRR's ability to enact change. The Bureau Administrator will also be responsible for
9    the creation of a real-time corrective action plan format that will allow all team members
10   the ability to see each identified barrier's cure status in an up-to-date format. This
11   information will then be shared with the Director on a monthly basis during his Business
12   Review Meetings and his Strategic Plan Initiative.  Accountability will replace speculation.

13         69.    Beginning September 1, 2020, the medical liaisons will be relocated to
14   MSCMB's Central Office and work under the direction and supervision of the Bureau
15   Administrator.  They are currently embedded in their assigned facilities and receiving
16   direction from the leadership within the MSCMB.  Instead of addressing facility-specific
17   issues, the liaisons will be tasked with identifying and solving problem-specific issues,
18   beginning with Performance Measures that have been chronically noncompliant.  This
19   reassignment will allow for additional oversight, direction, and training on CGAR
20   compliance.  It will also shift focus from quantitative performance monitoring toward
21   qualitative care enhancement.  The goal is to develop clinically trained correctional health
22   care teams with critical-thought-problem solving ability.  Liaisons will include individuals
23   who are not only LPNs and RNs but who have worked in a correctional health care setting
24   and have experience in staffing development, pharmaceutical regulations, and patient
25   education.  They will be responsible for recognizing and providing solutions to the barriers
26   of noncompliance and patient care.  Although the liaisons will be stationed out of Central
27   Office, they will be traveling to and working in the facilities at least three days a week so
28   that they can identify problems firsthand and work with facility and Centurion staff to solve

them.  Each day, they will review processes to identify where breakdowns in compliance and patient care are occurring and why; troubleshoot the problems; and follow-up with facility and Centurion staff to ensure that corrective action has been taken.  The liaisons will continue to participate in ADCRR and Centurion on-site leadership meetings, and assist Centurion staff and apply practical problem solving initiatives at the facility level.

70.    To lead the medical liaisons, I have created and approved for hiring two Operational Team Leader positions.  Each Team Leader will have a team of four or five liaisons. Every Monday, myself, the Bureau Administrator, the Program Evaluation Administrators, and the medical liaisons meet to discuss compliance and healthcare issues, and we meet again every Friday to ensure that any plan of action was implemented and followed through.  The formation of these liaison teams will generate improved, uniform communication to ADCRR and Centurion staff.

71.    The MSCMB has also developed and implemented a Computer Based Training for Centurion staff to aid with compliance relating to nurse line encounters, provider line encounters, referrals, HNRs, and pharmacy.  The training is required for all existing and new staff, and will help them understand what exactly is required by the Performance Measures and how to properly and fully do what is required.  (See Attachment 20.)

72.    Every Thursday (barring certain circumstances), myself and the MSCMB Program Evaluation Administrators tour facilities to try to uncover noncompliance issues and assist in troubleshooting measures.   For example, we will observe med pass and sick call, speak with providers, and monitor scheduling.  We will formally participate in the creation of Corrective Action Plans by Centurion when operational barriers are identified.  If we recognize a potential issue, we devise a real-time corrective action plan with the inclusion of our Centurion counterparts.

///

///

19

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of July, 2020.

_____
Larry Gann

**ATTACHMENT 1**

**ATTACHMENT 1**

# DUVALL SETTLEMENT AGREEMENT REPORT

## March 2, 2020

### MICHAEL PUISIS, DO

## OVERVIEW

The responsibilities of the medical monitor for this agreement does not include a report except when the Commissioner has asserted substantial compliance in an applicable provision of the Settlement Agreement.  However, Plaintiffs' counsel requested that I provide an ongoing report irrespective of the status of compliance.  Believing that production of reports would assist Defendants to organize their efforts, I agreed to do this. It was delayed due to my awaiting word from the State's counsel that the reports would be protected from subpoena.

The report will include a brief executive summary.  Each provision of the report will be stated verbatim in italics as a Settlement Agreement Statement.  Following that I will give a compliance rating for that item.  Although the Settlement Agreement does not define compliance ratings, including substantial compliance, I will use the compliance rating to give Parties a context for my impression of the existing status of Defendants with respect to that individual provision.  I define substantial compliance as a degree of compliance sufficient to not require any oversight or monitoring.  I will define non-compliance as being significantly remote from compliance with considerable work needed to attain compliance. Partial compliance will be defined as between non-compliance and substantial compliance with reasonable efforts ongoing to achieve compliance.

## EXECUTIVE SUMMARY

Since the new vendor has assumed responsibility for provision of health care, Defendant report have been more straightforward and based on understandable data.  This has allowed the program to understand its deficiencies and attempt corrective actions.

There were six items in substantial compliance; 18 items in partial compliance and 14 items in noncompliance.

A major recurring theme is failure of availability of medical record information to providers or nurses in performance of their responsibilities.  Interfaces between the laboratory and pharmacy and the electronic medical record are defective.  The electronic medical record has no electronic medication administration record which account for several areas of noncompliance or makes it difficult to achieve compliance.  Orders for supplies and administration of those supplies can't be tracked on the record and paper audits are currently inadequate.  A new medical record is needed.

Intake facilities are inadequate and continue, in my opinion, to contribute to mistakes in intake screening.  In several areas, specialized medical housing space is lacking.  This would make tracking of diabetic care and tracking of vital signs for persons undergoing detoxification very easy and would facilitate improvement in item 19.g. which is currently in non-compliance.

## INTAKE AND INITIATION OF MEDICATION

**Settlement Agreement Statement:** 17.a. *The Commissioner shall promulgate and implement policy and procedure to provide adequate medical and mental health intake screening to all plaintiffs accepted for admission at BCBIC. Such policy shall provide that initial medical and mental health screening, including rejection or acceptance of admission of the plaintiff, is performed by a RN within four hours of arrival at BCBIC, provided the plaintiff is present for all four of those hours. If the plaintiff is rejected for admission and later returns to BCBIC, a new four-hour period within which the initial medical and mental health screening must be performed shall commence.*

**Compliance Rating:** Partial Compliance

**Findings:** For the six month (July, 2019 to December 2019) period related to this reporting period there were 11,015 bookings. In their biennial report, Department of Public Safety and Correctional Services (DPSCS) asserts that an unreliable data feed from the custody database to the electronic medical record makes data unreliable, with data being lost, deleted, or formulated with errors. Apparently, for that reason, DPSCS sampled 390 of the 11,015 (3.5%) bookings and produced the data below as evidence of their performance.

Table 1

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| IMMS is completed within 2 hours of scan-in time | 89% | 100% | 95% | 95% | 97% | 98% | **97%** |
| IMMS migrated to the EPHR within 4 hours of scan-in time | 72% | 83% | 71% | 80% | 72% | 69% | **75%** |
| IMMS completed by an RN or higher | 100% | 100% | 100% | 100% | 100% | 100% | **100%** |
| *Score Summary for SA 17A (Accept)* | *87%* | *94%* | *89%* | *92%* | *90%* | *89%* | *90%* |

These data show that 97% of inmates who are booked have intake screening within two hours of booking. This apparently is data obtained from OCMS the correctional database. Based on this sample, of the 11,015 inmates booked during this time period, approximately 330 inmates did not have intake screening within two hours of booking. The data does not show how many inmates missed intake screening entirely. This would be useful to know because 330 inmates either missed intake screening or had it later than two hours. 330 inmates would be an unacceptable number to have missed intake screening. But would be more acceptable if their intake screening were only delayed.

For this audit sample 162 of the 390 audit sample were persons who were initially rejected at booking and were sent to the hospital for clearance.  Of that 162 portion of the sample, the following data were obtained.

Table 2

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| IMMS migrated to EPHR within 4 hrs of scan-in time upon return to the facility for rejects | 39% | 80% | 87% | 69% | 73% | 60% | **68%** |
| IMMS is completed by an RN or higher | 96% | 100% | 100% | 100% | 100% | 100% | **99%** |
| Provider encounter note in EPHR following ER return | 83% | 64% | 88% | 80% | 95% | 100% | **85%** |
| *Score Summary for SA 17A (Reject):* | **73%** | **81%** | **92%** | **83%** | **89%** | **87%** | **84%** |

The effort to demonstrate compliance is improved but still needs work.  The issue in provision 17a is whether nurses complete intake screening within 4 hours of booking. Tables 1 and 2 above do not assess whether this occurs.  Table 1, apparently using data from OCMS, identifies that intake screening is completed within 2 hours for 97% of the sample.  Instead, this data should include the percent of intake screenings that are completed within 4 hours which is likely to result in a higher percent.

The data shows that transmission of the intake screening (IMMS) into the EPHR is still flawed and deficient which is a significant problem.  DPSCS, over several reporting periods, has not been able to eradicate these flaws in data transfers.  DPSCS also states it was unable to accurately reconcile electronic data with manual logs.  DPSCS is attempting to develop a method to reconcile manual logs and the electronic data they have available. I would encourage expeditious roll out of a satisfactory electronic record that will accurately record these data.

Lastly, for this provisional item DPSCS needs to validate whether the quality of nursing intake screenings are of adequate quality.  DPSCS reports on the quality of nurse intake screenings in item 17d & 17e.  It should be reported in this provisional item.

For clinical quality of nurse intake screening, a sample of 10 records of a single nurse was evaluated each month.  Each month a sample for a unique nurse was used so that over a six month period six separate nurses were evaluated.  The samples selected were adequate in my opinion.  Record selection was targeted with persons referred to providers based on an urgent need or from those initially rejected at booking who were returning from the hospital.  I also agree with this targeted selection criteria.

The data provided in the DPSCS report, shown below in Table 5, shows that there is still opportunity for improvement.  I would stress, though, that though these data show need for

==improvement, it is very encouraging that such an audit is actually occurring.==  For this I give the Commissioner and the new vendor much credit.

Table 5

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| Intake Screening form is completed in its entirety with no blanks | 78% | 95% | 90% | 73% | 70% | 83% | *82%* |
| Vital signs and peak flow (respiratory problems) and/or random finger stick glucose (diabetics) were documented | 59% | 87% | 58% | 63% | 73% | 83% | *71%* |
| Point of Care Testing is documented on the IMMS in the comments section | 59% | 51% | 50% | 42% | 70% | 61% | *56%* |
| Baseline CIWA or COWS scores are documented on the IMMS for all individuals who reports drug or alcohol use | 76% | 75% | 32% | 71% | 39% | 45% | *56%* |
| The individual was triaged and referred appropriated based on the nursing assessment and IMMS responses | 70% | 67% | 95% | 88% | 70% | 61% | *75%* |
| *Score Summary for SA 17 Qualitative:* | *68%* | *75%* | *65%* | *67%* | *64%* | *66%* | *68%* |

It is critical that supervisory nurses, in a collegial manner, give feedback to staff nurses on these results.  Also, my first impression in seeing these numbers is to reflect on the conditions of the intake area.  The DPSCS report focuses on possible failures of staff to complete their assignments as the cause of these results.  ==However, based on my tours of the intake area lead me to believe that the physical constraints in the intake space and the pressure to move people through the intake process are, in my opinion, a significant contributor to these results==.  It may be useful to perform a root cause analysis on why these results were obtained.  A discussion with staff in intake may help to elucidate whether space or time-pressure conditions contribute to these results.  ==This may not be a problem of lack of staff training and dedication but a cramped, overcrowded, and time-pressured intake area that makes it difficult to impossible for staff to complete their assignments==.

**Recommendations:**

1. Obtain an electronic medical record as soon as possible.  Use the electronic record to validate your progress on the timeframe part of this provision.
2. Develop a method to assess quality of intake evaluations as part of your validation of this provision item.
3. ==Perform a root cause analysis of the intake process to include interviews with intake nurses to establish whether time-pressures or space conditions contribute to the poor quality of care of nursing intake evaluations.==

**Settlement Agreement Statement:** 17.b. *The Commissioner shall ensure that any plaintiff who reports during intake screening that he or she is currently prescribed medication for a medical condition, or who presents with an urgent medical need, shall receive a physical*

*assessment by a Clinician within 24 hours of the intake screening, or sooner if clinically indicated*

**Compliance Rating:** <mark>Partial Compliance</mark>

**Findings:** It isn't clear in the DPSCS report if data for this item includes an audit of all inmates who are booked or a sample of inmates. The only data verifying this item is in Table 3 below which is from the DPSCS report.Table 3

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| There is documentation on the IMMS of an urgent medical and/or mental health referral | 92% | 85% | 91% | 95% | 93% | 89% | *91%* |
| There is documentation of same arrestee's name as an urgent referral on the IMMS Referral Log, same date as IMMS | 100% | 100% | 100% | 100% | 100% | 95% | *91%* |
| Medical Provider encounter for urgent referral completed within 24 hours of intake screening, or sooner if clinically indicated | 90% | 92% | 91% | 98% | 96% | 96% | *94%* |
| *Score Summary for SA 17B:* | *94%* | *92%* | *94%* | *98*% | *96*% | *93*% | *95%* |

It is not clear whether documentation on the IMMS of an urgent referral equates to the number who actually need a referral. For example, do all persons with an urgent medical need and all persons on medication get referred for a provider evaluation to occur within 24 hours? This data doesn't show that.

Only 94% of persons referred urgently for evaluation are actually seen by a provider. This number can't be pro-rated to the entire population of booked persons because the number of persons booked who are on medication or in need of urgent evaluation is unknown. Based on my experience, about 50% of persons coming into the jail would have need to see a provider based on the Settlement Agreement language. This would be 5,507 individuals. <mark>If 94% of these are seen, then 330 individuals would not have been seen timely. This is about 55 individuals a month who fail to be evaluated for need of a medication or for an urgent need. This is not a good outcome for this provision item.</mark>

Lastly, the presentation fails to address the quality of the provider evaluations that were audited.

**Recommendations:**

1. Include record reviews of provider quality of intake assessments.

**Settlement Agreement Statement:** 17.c. *The Commissioner shall ensure that any plaintiff who is identified during intake screening as currently prescribed psychotropic medication*

*(unless he or she receives a bridge order as provided in paragraph 25.b.) or as having an urgent mental health need, including a suicide risk, shall receive a mental health evaluation by a Mental Health Practitioner within 24 hours of the intake screening, or sooner if clinically indicated.*

**Compliance Rating:** This is a mental health issue not evaluated by the Medical Monitor.

**Findings:** None

**Recommendations:** None

**Settlement Agreement Statement:** 17.d. *To address the needs of plaintiffs who, prior to being taken into custody, were prescribed medication that, if interrupted, would pose a risk of adversely affecting health, the Commissioner shall promulgate and implement policy and procedure to ensure that such plaintiffs receive such medications within 24 hours of the intake screening or subsequent encounter at which the plaintiff first reports such medications to a Medical Professional or Mental Health Professional, or sooner if clinically indicated, unless: (i) a Clinician determines that such continuation is not medically appropriate, including without limitation a determination that continuation is not medically appropriate pending verification of the reported prescription, provided that appropriate verification efforts shall be promptly undertaken; or (ii) despite reasonable efforts consistent with the gravity of the need for the medication, DPDS is unable to timely obtain the medication. The Commissioner shall promulgate and implement policy and procedure requiring reasonable efforts, consistent with the gravity of the need for the medication, to ensure that such plaintiffs are timely provided with the medication or a pharmaceutical equivalent.*

**Settlement Agreement Statement:** 17.e. *The intake screening, any physical or mental health assessment, and any decision regarding the continuation or non-continuation of reported prescription medication shall be documented in the plaintiff's medical record. If a medication is not continued, the clinical justification for that decision shall be documented in the plaintiff's medical record.*

**Compliance Rating:** Noncompliance

**Findings:** DPSCS has reported 17d & 17e together, so this report will do likewise. A sample population was utilized but the sample size was not provided. Nevertheless, audit results are not good. Data in the DPSCS report is provided below.

Table 4

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| There is medication order documented for any chronic care or acute medications identified/reported at IMMS or alternative medications ordered | 88% | 100% | 96% | 95% | 97% | 100% | ***96%*** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| There is a MAR generated documenting chronic or acute medications identified during the intake receiving process (IMMS) or alternative medications ordered | 77% | 32% | 52% | 51% | 79% | 77% | *61%* |
| First dose medications reported as IMMS or alternative medication ordered were administered within 24hs of the IMMS in OCMS | 59% | 32% | 35% | 21% | 59% | 52% | *43%* |
| There is explanation in EPHR for non-ordered medications listed as current by the arrestee | 87% | 100% | 100% | 100% | 100% | 86% | *95%* |
| *Score Summary for SA 17D & SA 17E:* | *78%* | *66%* | *71%* | *67%* | *84%* | *79%* | *74%* |

The data show that only 96% of persons in need of medication had an order for that medication. Typically, about 50% of incoming inmates in a jail will be in need of medication of some sort. If these data are pro-rated to the 11,015 inmates who were booked in this time period about 5,507 inmates will need medication and about 220 individuals over a 6 month period will not have an order for medication.

Evidence for receipt of medication is considerably worse with only 43% of individuals having receipt of medication documented as given in the IMMS. Medication administration records documenting receipt of medication were found in only 61% of individuals who had orders. ==These data describe significant process issues==. In my opinion, some of these issues may be resolved with introduction of an electronic medication administration process. However, even when an electronic medication administration system is put into place, there may be underlying process problems. For this reason, I encourage the DPSCS to continue to attempt to identify those process issues that may be leading to these poor results.

 **Recommendations:**

1. Perform a root cause analysis to determine why medication orders are not resulting in a medication administration record.

## MEDICAL PLAN OF CARE

**Settlement Agreement Statement:** 18.a. *For purposes of this Settlement Agreement, a "Plan of Care" is a combined summary, evidenced by Clinician documentation in the medical record that includes: (a) a summary listing of major medical problems; and (b) a plan for treatment of such identified major medical problems, including, as applicable, medications, testing, records of past periodic chronic care appointments and access to orders for future periodic chronic care appointments, and access to orders for specialist referral. The Plan of Care shall be documented in the EMR. In the EMR existing as of the Effective Date, the Plan of Care shall be documented utilizing the Chart Summary template.*

**Settlement Agreement Statement:** 18.b. *For purposes of this Settlement Agreement, an "Ongoing Condition" is a condition that requires ongoing care and that: (i) will not be resolved within a 30-day period; or (ii) constitutes a serious acute injury or illness that will require repeated follow-up (aside from routine medication administration) or has*

*lasting significance for the plaintiff's future health care treatment. For those plaintiffs with one or more Ongoing Conditions, a Plan of Care shall be developed by one or more Clinicians, as appropriate, based on physical examination and the documented medical history of the plaintiff, as provided herein.*

**Settlement Agreement Statement:** 18.c. *The Commissioner shall promulgate and implement policy and procedure to ensure that initial diagnosis and identification of Ongoing Conditions, along with any elements of a Plan of Care that do not require development at chronic care clinics or through specialist referral, shall be conducted and entered into the EMR within seven days of the plaintiff's admission, or sooner if clinically indicated.*

**Settlement Agreement Statement:** 18.d. *During this initial diagnosis and identification process, a Clinician shall order that the plaintiff be enrolled in any chronic care clinics that are clinically indicated and recommend any specialty care that is clinically indicated. Any elements of the Plan of Care developed as a result of enrollment in chronic care clinics or specialty care shall be entered promptly in the EMR.*

**Settlement Agreement Statement:** 18.e. *If an Ongoing Condition is diagnosed and identified after the initial diagnosis and identification, the Plan of Care shall be promptly updated or created, as appropriate, to reflect such new diagnosis and identification.*

**Settlement Agreement Statement:** 18.f. *The Plan of Care shall be accessible to any Medical Professional or Mental Health Professional who is providing treatment, including diagnostic services, to a plaintiff, unless the need for emergency treatment precludes access at the plaintiff's location.*

**Compliance Rating:** <mark>Partial Compliance</mark>

**Findings:** DPSCS reported on all provision 18 items in one section. I will report in the same manner. For purposes of verification of item 18, DPSCS utilizes medical record reviews, which I agree with. I have had several calls with DPSCS staff who have been working on developing a methodology for record review. DPSCS has hired Dr. Abebe and Dr. Gibbons as consultants to work on this project. Record reviews are performed by Dr. Abebe and Dr. Tessema, the Medical Director at the jail. The vendor corporate Medical Director, Dr. Ganns, has been fully cooperative with this process.

Record reviews consist of a triggered selection process in which records of medically complex patients are chosen to review. The list is selected from hospital discharge diagnoses based on potentially preventable diagnoses. According to the DPSCS report the reviews, "cover a time span adequate to evaluate the problem being reviewed" thus including intake screening, the first provider assessment, follow up chronic care visits, and intervening nursing assessments. Opportunities for improvement are identified for each episode of care and are coded based on an error type. These are collated and reviewed. The concept is that identified systemic problems area referred to the quality improvement committee to address corrective action by performing root cause analysis.

During the recent reporting time period from July 2019 to December 2019, DPSCS staff have reviewed 19 records. ==This is approximately three records a month. This should be increased==. DPSCS sent me several records that they had reviewed. I reviewed their work and we discussed our common results. In their February CQI meeting, provisional item 18 was discussed including:

- The chart review process
- The intention to review 6 records a month
- A summary of their analysis
- Identification of opportunities for improvement
- A listing of identified problems including:
  - Problems with diagnostic work ups
  - Problems with assessments
  - Problems with appropriate treatment plans
  - Issues with hypertension management

Key findings in record reviews included lapses in formulating a clinical plan that was attributed to either lapse in judgment or clinical knowledge. A second key finding was that there were lapses in execution or delays in care. ==The formulation of root cause for these clinical deficiencies was not well developed==. The DPSCS 6 month report focuses on documentation of providers as a major problem. Likewise==, based on corrective actions for record reviews, the deficiencies appeared to be attributed to individual provider performance but did not include systemic issues such as scheduling problems, electronic record deficiencies, information availability on laboratory and medication status, the space and operational problems with the intake area, and support services for chronic illness==. Corrective action plans included counseling with providers, disease management training, and improving the standard of care for medication. Poor documentation was attributed to a defective EPHR. ==The CQI presentation acknowledged that after a corrective action was initiated (e.g. training), the group had yet to develop an evaluation methodology to document improvement==.

Identification of systemic issues based on record reviews and audits is still a work in progress. I reviewed the record reviews of the DPSCS auditors. I identified 42 problems that were mostly also identified by the reviewers. My categorization of root causes were somewhat different than DPSCS. Six issues that I repeatedly found included:

1. Use of stat doses of clonidine for minimally elevated blood pressure.
2. Not knowing what medication the patient was on or evaluating whether the patient was receiving their medication.
3. Failure to send the patient to higher level medical housing when indicated.
4. Defects in the EPHR that resulted in lost documents.
5. Failures to identify all medical conditions or medications in intake.
6. A variety of clinical management issues.

==Also, eight (20%) of deficiencies were related to intake evaluations by providers.== While clinical management issues were evident in items 1 and 6, all other items were reflective of systemic deficiencies that appeared not solely related to provider performance including:

- Item 2 above reflecting inability to have medication records available at clinic visits and inability of the electronic record to accurately reflect what medications the patient was on or to accurately reflect administration of medication.
- Item 3 above which has uncertain cause but appears to reflect a lack of medical protective housing for persons with severe chronic illness.
- Item 4 above which reflects a significantly defective medical record software.
- Item 5 above which identifies defective intake screening which may result from multiple causes.
- 20% of deficiencies were related to intake. Root cause analysis of the intake process is needed. This does not appear to be only a provider problem but appears to represent a problem with the operational issues in intake.

It would be useful to expand root cause analysis of deficiencies to ensure systemic corrective action when indicated. For example, there were 9 observations of a provider missing a problem when developing a therapeutic plan and 16 episodes of inadequate provider identification. ==In my own observations and in record reviews, I was struck by the lack of an adequate problem list in the electronic record.== This can be attributed to a lack of a standardized procedure for entering problems, allowing any staff including nurses to enter problems, and medical record software that mixes nursing and physician diagnoses into the problem lists. These systemic problems contribute to a problem list that is not used because it does not accurately describe a true picture of the patient's problems. ==While the root cause of missing problems is being attributed to physician performance, in my opinion, a substantial contributor to this problem is the lack of an adequate procedure to enter problems into the problem list and a defective medical record that contains a useless problem list mostly created by nurses who list nursing diagnoses as problems.== I would encourage the CQI committee to expand its root cause analysis to include systemic factors into the evaluation. This should involve more probing into why a particular deficiency occurs.

As well as record reviews, DPSCS has initiated compliance audits of records performed by nursing CQI staff to augment record reviews. DPSCS has chosen nine audit questions summarized in Table 6 below as compliance indicators for provision 18 of the Settlement Agreement.

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | Totals |
|---|---|---|---|---|---|---|---|
| Do the CC Encounters address the specific problems identified at the 7 day Intake Exam (excluding those issue that are resolved/inactive)? | 100% | 60% | 100% | 86% | 100% | 100% | 91% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Are needs for disease-specific lab test monitoring evaluated, reviewed, or ordered? | 100% | 57% | 71% | 100% | 83% | 80% | *82%* |
| Is compliance with chronic medications and or diets assessed as part of the Plan of Care? | 100% | 0% | 80% | 83% | 60% | 75% | *66%* |
| Is there indication that the chart summary and the hard copy medical record was reviewed? | 71% | 57% | 88% | 100% | 78% | 100% | *82%* |
| Have episodic recurrent non serious medical problems been assessed with a plan of care? | 67% | 100% | 100% | 100% | 100% | 100% | *95%* |
| Do Intake Screening encounters reflect appropriate CC registration status (with updating or enrollment where applicable) and scheduling for CC encounter(s)? | 78% | 100% | 89% | 60% | 100% | 88% | *86%* |
| Are newly identified CC conditions updated to the Problems List? | 57% | 100% | 50% | 71% | 75% | 80% | *72%* |
| Is the disease activity and control clearly indicated in the Plan of Care? | 100% | 100% | 100% | 100% | 100% | 100% | *100%* |
| Is review of external specialty care and hospital or Infirmary summary /reports and recommendations clearly documented? | 40% | 50% | 67% | 67% | 71% | 60% | *59%* |
| *Score Summary for SA 18:* | *79%* | *69%* | *83%* | *85%* | *85%* | *87%* | *81%* |

These audit questions are performed by nurses.  I have expressed concern to DPSCS whether nurses can evaluate some of these questions.  For example, can a nurse determine if a physician ordered appropriate tests, whether the physician evaluated all medical conditions, or whether disease activity is appropriately assessed?  A compliance audit would be a useful contribution to verification of item 18 but, in my opinion, I would modify the audit questions.  Instead of asking whether disease specific lab testing was ordered I would ask whether physician-ordered laboratory tests, imaging studies, and other testing were completed timely as ordered and whether the lab review process works as designed. Instead of asking whether compliance with medications were assessed, I would ask whether the patient received ordered medication and whether ordered and administered medication information is available to the provider at each clinic visit.  Instead of asking whether a physician adequately assessed problems, I would ask whether all scheduled provider appointments occurred as scheduled.  Instead of asking whether a physician appropriately reviewed hospital and specialty consultant reports and recommendations, I would ask whether the provider specialty referrals occurred as ordered.  Most of the questions on the nursing audits are questions that need to be addressed in record reviews because they require a physician judgment.  The audit questions need to focus on compliance issues that do not require a physician judgment yet answer questions about support structures for the chronic care program.

**Recommendations:**

1. Perform a greater number of record reviews than are now currently being done.
2. Include root cause analyses of systemic issues identified from record reviews which should be part of quality improvement activity.

3. Ensure that the new electronic medical record has ability to create a problem list and has electronic medication administration documentation capability so that it is accessible to practicing providers.

## MEDICATION MANAGEMENT AND TESTING

**Settlement Agreement Statement:** 19.a. *The Commissioner shall promulgate and implement policy and procedure to ensure that, unless clinically contra-indicated, medications not intended only for short-term use shall be renewed without interruption. Such policy shall ensure that a plaintiff prescribed such medication is seen by a Clinician in sufficient time before renewal would be required for the Clinician to determine whether such medication should be renewed. Nothing in this Settlement Agreement is intended to, or shall, interfere with the exercise of appropriate clinical judgment by a Clinician to prescribe, or not prescribe, any medication.*

**Compliance Rating:** <mark>Non-compliance</mark>

**Findings:** To verify this provision, DPSCS has structured an audit to determine if a patient is regularly seen in chronic clinic and whether those visits translated in orders for medications which demonstrate uninterrupted medication administration as evidenced on medication administration records.

This audit could be automatically produced for 100% of patients if a reasonable electronic medication administration record were available. Since the electronic record is still unavailable, this audit was constructed. The sample size was not given in the DPSCS report; this should be provided. This audit is a significant effort. The vendor CQI team was largely responsible for this study and I give them much credit. Their data, as provided in the DPSCS report is provided in Table 7 below.

Table 7

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| Compliance with chronic care policy as shown by order in EPHR for this patient to be seen in Chronic Care Clinic for his/her previously diagnosed chronic health condition | 82% | 74% | 92% | 55% | 92% | 97% | *82%* |
| Compliance with chronic care policy for the first appointment within 30 days or as clinically ordered as shown by EPHR review calculated as time between order date and chronic care appointment | 77% | 57% | 71% | 41% | 62% | 74% | *64%* |
| Ongoing compliance with chronic care clinics within 90 days or as clinically ordered shown by EPHR review calculated as time between the last chronic care encounters | 67% | 38% | 60% | 16% | 33% | 55% | *45%* |
| Chronic medications ordered for 120 days as shown by the start and stop dates on the order in EPHR | 66% | 42% | 66% | 34% | 60% | 65% | *56%* |
| Start and stop dates accurately transcribed on MARs | 43% | 40% | 44% | 25% | 49% | 62% | *44%* |

| A review of the MAR shows continuity of medications without interruption | 41% | 32% | 90% | 60% | 74% | 82% | *63%* |
|---|---|---|---|---|---|---|---|
| *Score Summary for SA 19A:* | *63%* | *47%* | *71%* | *39%* | *62%* | *72%* | *60%* |

These data do not reflect a good system.  DPSCS attributes these medication related problems to excessive provider appointments with failure to consistently monitor medications and failures of physicians to prescribe medications for a duration conforming to chronic clinic intervals.  <mark>Based on my own record reviews and these data, the major problem in this area is not physician centered.</mark>  A medication support system must be able to provide accurate medication lists, accurate administration rates, a stop order system that notifies physicians when medications are expiring, a reasonably efficient and time-saving way to safely renew medications, and an electronic record or paper system that provides information related to medication ordering, administration and compliance.  The root cause of failure of continuity of medications does not, in my opinion, reflect a problem with physicians.  <mark>The root cause of this failure resides in failure of the pharmacy to integrate with the electronic record and failure of this system to provide physicians information about medication ordering, medication expiration, medication administration, and medication compliance which is critical for their ability to care for patients.</mark>

**Recommendations:**

**Settlement Agreement Statement:** 19.b. *Medication Administration Records ("MARS") shall be completed by RNs or LPNs.  If medication is not administered to the intended plaintiff on a particular occasion, the MARS shall allow a determination whether the medication was refused by the plaintiff or whether some other specified cause prevented administration.  Any Medical Professional who makes entries in MARS shall document his or her entries as required by policy, including legibly signing entries, and noting the applicable professional licensure.*

**Compliance Rating:** <mark>Non-compliance</mark>

**Findings:** This item also is one that should be able to be performed automatically for 100% of patients *if* an electronic medication administration record were available.  Lacking such a system, the Corizon CQI team performed a paper audit of medication administration records.  The sample size and methodology were not provided.  Their data is provided below in Table 8.

Table 8

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| Medication administered by LPN or higher (confirmed by signature and licensure documented on the back of the MAR – LPN, RN, PA, NP) | 11% | 12% | 46% | 20% | 38% | 46% | *29%* |
| Medications administered as ordered (no holes/blanks) – "N" for any hole or blank | 83% | 35% | 92% | 55% | 57% | 85% | *68%* |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Missed medication documented using approved codes | 71% | 52% | 61% | 30% | 51% | 63% | *55%* |
| Number of blanks or holes in the MAR (number of missed doses with no explanation) | 127 | 173 | 6 | 38 | 103 | 26 | *79* |
| Legible name of nurses administering medications whose initials appeared on the MAR with applicable professional licensure documented at the back of each MAR | 90% | 80% | 95% | 65% | 91% | 95% | *86%* |
| *Score Summary for SA 19B:* | *64%* | *45%* | *74%* | *43%* | *59%* | *72%* | *57%* |

The DPSCS report identifies the two biggest problems identified as:

1. Inability to locate paper medication administration records. This implied that either a medication record was not initiated or it was lost.
2. Failure to document administration of medication on a medication administration record.

One comment on this audit is that there were significant numbers of blanks on the medication records (audit question 4) but this numerator needs a denominator. How often are there missed doses without explanation?

Based on the opportunities for improvement section of this provision, it appears that DPSCS attributes these poor results to accountability of nursing staff in documentation of medication administration. Similar to attributing difficulties on provision 18 to physician performance and documentation, difficulties on item 19.b. are attributed to performance issues with nurses.

My own observations is different. For example, I have found on record reviews that patient movement is considerable and when patients move, the medication administration record and the medication do not move with the patient and nursing staff is unable to identify that a patient is on medication. As a result, these patients may miss their medication, sometimes for extended periods of time. The knowledge that a patient in a new location is on medication and the availability of that patient's paper medication records is a significant problem. When a patient moves to a new location, the pharmacy is unaware of where the new location is and multiple nurses have told me that medications are often sent by pharmacy to the wrong location causing missed medication. How can nurses reliably be expected to perform when the process of managing medication is defective? There are multiple areas of medication administration that must be considered in the root cause analysis with respect to this item. They include:

- Pharmacy issues with respect to delivery of medication to the right location.
- Pharmacy issues with respect to accuracy of the medication administration record.
- Ensuring that nurses have an accurate and reliable medication administration record in the location where the patient is housed.

- Improvement of the electronic record to include an electronic medication administration record that simplifies documentation and accuracy of medication administration.

**Recommendations:**

1. Obtain a new electronic medical record with electronic medication administration record capacity.
2. Perform a root cause analysis as to why patient movement results in missing medication.

**Settlement Agreement Statement:** 19.c. *The Commissioner shall promulgate and implement policy and procedure to ensure that, when a Clinician orders that vital signs or blood sugar results be documented, the documentation occurs as ordered and that these records are reviewed by a Clinician according to appropriate policy.*

**Compliance Rating:** Non-compliance

**Findings:** This provision was verified by an audit. The sample size of the audit should be included. This is a straightforward audit that examines a sample drawn from patients who had orders in the EPHR for blood glucose testing or vital sign testing. The results of the audit are provided in Table 9 below.

Table 9

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| Vital signs completed and documented as ordered in EPHR | 8% | 4% | 18% | 7% | 8% | 0% | *8%* |
| Blood sugar tests completed and documented in EPHR as ordered | 100% | 13% | 0% | 0% | 0% | 29% | *24%* |
| Vital signs results documented as reviewed by clinician during patient encounter | 6% | 8% | 10% | 20% | 5% | 11% | *10%* |
| Blood sugar tests documented as reviewed by clinician during patient encounter | n/a | 86% | 75% | n/a | 17% | 86% | *66%* |
| *Score Summary for SA 19C:* | *38%* | *27%* | *26%* | *9%* | *7%* | *31%* | *23%* |

The DPSCS discussion of these results in the opportunities for improvement section implies that the electronic record ordering template may be producing inaccurate reports regarding orders and may be resulting in physician orders that are not performed because staff don't know there is an order. If this is an accurate description of the process it is dangerous.

Also, DPSCS discusses that documentation of results of these orders is inconsistent mostly because the manner of documenting review of these results by providers does not result in clear documentation in the EPHR that a review has occurred. This implies that DPSCS does not know if providers are not reviewing lab and vital sign results or if malfunctions

==highlight== in the EPHR are making it appear that providers are not reviewing these results.  The corrective action DPSCS recommends for this problem is to create a performance expectation of where physicians should be documenting their review.  This unfortunately should be something the EPHR should perform automatically. ==highlight==

**Recommendations:**

1.  Obtain a new electronic medical record and reassess.

**Settlement Agreement Statement:** 19.d. *The Commissioner may require plaintiffs who are prescribed medication that they are permitted to keep on their persons to initiate the process for refill of a prescription medication without having to first see a Medical Professional; provided, however, that DPDS shall have a process for expedited refills of keep-on-person medications that are prescribed for potentially urgent needs, such as rescue inhalers.*

**Compliance Rating:** Non-compliance

**Findings:** DPSCS verifies this provision with two audits.  One audit consists of evaluating a sample of patients who have keep-on-person (KOP) medication ordered, submitted a sick call slip for a medication refill, and appear on a 30-day medication expiration report.  The summary of these audit findings is in Table 10 below.

Table 10

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| KOP medication receipt by patient documented on MAR for each KOP refill request for the most recent sick call request for review | 40% | 42% | 14% | 9% | 0% | 17% | *20%* |
| No lapse in medication between dates refills were received by patient measured as the number of doses from last fill to the current fill | 45% | 38% | 50% | 14% | 61% | 86% | *49%* |
| *Score Summary for SA 19D:* | *43%* | *40%* | *32%* | *12%* | *31%* | *51%* | *35%* |

A second audit addresses the last phrase in this provision which requires a process for expedited refills of KOP medications for potentially urgent needs.  The results of these data is provided in Table 11 below.  ==highlight== This audit does not verify that inmates in need of an urgent refill of a KOP but only that the medication is kept on stock.  For that reason this audit does not satisfy the Settlement Agreement requirements. ==highlight==

Table 11

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| Stock medication supply (presence of medication) | No data | No data | 95% | 90% | 94% | 96% | *94%* |

Based on the discussion in the opportunities for improvement section, it appears that auditors could not determine in the EPHR whether medication was directly observed therapy (DOT) or KOP. The analysis also asserted that nurses should use a KOP stamp on the medication administration record to designate whether the patient was to receive KOP or DOT. In functional medication systems, the pharmacy produces medication administration records as needed that indicate whether medication is to be DOT or KOP. That DPSCS expects nurses to reconcile medication records and ensure they are accurate is a pharmacy and medication management failure.

**Recommendations:**

1. Obtain a new electronic medical record and reassess.

**Settlement Agreement Statement:** 19.e. *The Commissioner shall promulgate and implement policy and procedure requiring a Clinician to respond to and document in a plaintiff's medical record the results of any ordered tests. Such policy and procedure shall require that a Clinician:*

> a. *document review of critical or other serious abnormal values, and any actions taken as a result of that review, within 24 hours of the testing results becoming available, or sooner if clinically indicated, provided that review may be documented by a RN based on telephonic consultation with a Clinician;*

> b. *document review of all other ordered testing results within a reasonable timeframe.*

**Settlement Agreement Statement:** 19.f. *The Commissioner shall promulgate and implement policy and procedure to ensure that orders for laboratory testing, including but not limited to cultures of potential Methicillin-Resistant Staphylococcus aureus ("MRSA") infections, are executed within timeframes consistent with the urgency of the test and the capacity of appropriately functioning laboratories to conduct such tests.*

**Compliance Rating:** Non-compliance

**Findings:** DPSCS combined 19.e and 19.f and this report will do the same. To verify compliance with this item an audit was performed to test whether the lab log was completed, that the test was completed within the timeframe requested, that stat labs were completed within four hours, that critically abnormal results resulted in provider

notification within 15 minutes, that there was evidence of review of labs within two days, that the patient was notified of results and that a hard copy of the results were found in the EPHR within two days.

These results were said to include tests for Methicillin-Resistant Staphylococcus aureus (MRSA) but the number of these tests was not specified. The number of MRSA tests should be included. It is not clear why the audit included whether a hard copy of the lab is uploaded to the EPHR within 2 days. Typically, laboratories interface with electronic records and all test results are uploaded to the electronic record within minutes of being completed by the lab. If this is not done, it is a serious problem with the electronic record. If this interface exists, why include this question?

This audit is a reasonable methodology to measure compliance with this Settlement Agreement provision. Audit results are shown below in Table 11.

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| Lab requests are listed on the facility Lab Log? (Date of order, Date test drawn/completed, Date results received, Date results reviewed by provider, Date results shared with patients, and Date review was documented in health record)? | 0% | 0% | 0% | 0% | 0% | 0% | *0%* |
| There is evidence that the lab test was completed within the timeframe specified in the provider's orders? | 13% | 67% | 91% | 77% | 46% | 48% | *57%* |
| Stat labs results were received within (4) hours of the draw by a nurse or higher? (exception for tests that cannot be completed within timeframe, e.g. cultures) | n/a | n/a | n/a | n/a | n/a | 0% | *0%* |
| If critical / abnormal results were noted, the provider was notified of the lab results? (Critical= Immediately (within 15 minutes of receipt), Abnormal= within same day received or within (4) hours) | 7% | 50% | 30% | 67% | 27% | 60% | *40%* |
| There is evidence that the lab result was Reviewed, Signed, and Dated by provider within 48 hours after receipt of test results? | 13% | 75% | 60% | 55% | 46% | 42% | *49%* |
| There is evidence that reviewed labs have written provider follow-up on lab values or test results? (within 24 hours of receipt for critical and abnormal results, 48 hours of receipt for normal results) | 10% | 100% | 60% | 33% | 38% | 32% | *46%* |
| There is documentation the patient was notified of normal /abnormal lab results? (Routine= 7 business days, Abnormal= 24 hours of receipt of results). | 9% | 50% | 22% | 25% | 0% | 21% | *21%* |
| The hard copy lab test result was uploaded into EPHR within 48 hours of the provider's date and signature? | 0% | 0% | 0% | 0% | 46% | 53% | *17%* |
| *Score Summary for SA 19E and SA 19F:* | *10%* | *68%* | *53%* | *51%* | *40%* | *41%* | *44%* |

These results are not good. Any facility I have ever monitored that has an electronic medical record has never had a problem with timely referring laboratory results to physicians or having physicians review those results. DPSCS, in the opportunities for improvement section, describes problems with the bi-directional interface between the laboratory vendor and the EPHR. The poor results are attributed to interface issues with the lab and EPHR. However, in my experience, even when a correctional facility utilizes a paper record, these results would be considered extremely poor results. If the electronic record will be delayed, DPSCS must develop a reliable, timely, and safe system of

returning of laboratory results to physicians and ensuring their timely entry into the medical record.

**Recommendations:**

1.  Fix the bidirectional interface between the laboratory and the electronic medical record.

**Settlement Agreement Statement:** 19.g. *The Commissioner shall promulgate and implement policy and procedure that defines those blood sugar and vital sign readings that are sufficiently abnormal to require notification of the plaintiff's Clinician; ensure that such policy and procedure for notification is implemented in practice; and further ensure that Medical Professionals notified of such readings take appropriate medical measures in response.*

**Compliance Rating:** Non-compliance

**Findings:** DPSCS verifies this provision using an audit that has pertinent questions. The sample size is not described in the DPSCS report. The results of this audit are shown below in Table 12.

Table 12

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| There is an order for blood sugar or vital signs monitoring in EPHR by the provider with parameters in the audit period | 26% | 17% | 34% | 10% | 6% | 12% | *18%* |
| There is documentation in the EPHR that the vital signs and /or blood sugars were taken according to the provider orders during the audit period | 12% | 13% | 2% | 2% | 3% | 2% | *7%* |
| Abnormal results for vital signs and /or blood sugar have documentation in EPHR with nursing referral to the clinician during the audit period | 24% | 22% | 35% | 83% | 0% | 13% | *30%* |
| There is documentation of the review and disposition by the clinician in EPHR for abnormal readings of vital signs or accucheck as a result of that nursing referral during the audit period | 13% | 14% | 24% | 50% | 0% | 0% | *17%* |
| Blood sugar tests reported in the lab contractor blood sugar report documented as reviewed in EPHR by clinician during patient encounter during the audit period | 23% | 21% | 76% | 50% | 100% | 40% | *52%* |
| There is abnormal A1C >9 result for the audit period during the audit period | 45% | 7% | 60% | 100% | 0% | 100% | *52%* |
| *Score Summary for SA 19G:* | *24%* | *15%* | *39%* | *49%* | *18%* | *28%* | *29%* |

That only 17% of abnormal results are documented as reviewed by a physician is a very poor result. This is not unexpected insofar as only 30% of abnormal results have evidence of a nurse referral to a physician. In this regard approximately 56% of abnormal tests actually referred by nurses are documented as reviewed.

I would note that the audit does not describe the degree of abnormality which is considered reportable; this should be done. The level of abnormality should be standardized and defined in policy not arbitrarily determined. The auditors for DPSCS assert that each individual physician order should describe parameters for when notification is to occur and that individual nurse judgement, in the absence of provider instructions, should determine when notification is made. This would be extremely cumbersome and practically is never done in my experience. Levels of CBG that require notification are typically standardized and described in policy and DPSCS should do the same. If DPSCS uses nurse judgment as a criteria for when an abnormal test needs to be reported, it would be impossible to audit because each nurse may conceivably use a separate personal standard as a threshold for reporting.

In their discussion of these results, DPSCS asserts that process issues with an ordering template in the EPHR contribute to these poor results. The DPSCS corrective action is to create a system of accountability of providers in ordering these tests. This, in my opinion, is not an accountability problem of providers but a system design issue with how abnormal test results are addressed. DPSCS needs to establish standardized thresholds for which a nurse needs to notify a physician. In many systems, when such a threshold is reached, a nurse obtaining the abnormal value calls a physician on call and asks for guidance. The nurse documents that conversation with any orders or directions in the medical record. DPSCS should review this process and determine if there is a more efficient procedure.

**Recommendations:**

1. Standardize reportable laboratory results.
2. Fix medical record issues so that reportable results are queued to the responsible physician.

## INTERACTION BETWEEN MEDICAL AND CUSTODY

**Settlement Agreement Statement:** 20.a. *The Commissioner shall promulgate and implement policy and procedure for coordination between custody and medical staff to ensure that custody staff transport plaintiffs to emergency and scheduled internal and off-site appointments with Medical Professionals and Mental Health Professionals, for other specialty appointments, and for medical tests. Such policy and procedures shall also be promulgated and implemented ensuring timely rescheduling of missed appointments.*

**Compliance Rating:** Non-compliance

**Findings:** An audit was performed using a sample population of patients scheduled for on-site and off-site specialty or diagnostic care and emergency room care. The audit asks five questions. The data for this provision is given in Table 13 below.

Table 13

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | Totals |
|---|---|---|---|---|---|---|---|
| There is a medical order for the test, consultation service or ER visit | 100% | 98% | 88% | 100% | 88% | 94% | 95% |
| There is documentation of the completed consultation or medical test in EPHR with clinician's review and disposition | 50% | 52% | 36% | 48% | 41% | 26% | 42% |
| There is documentation in EPHR of review of the ER report by the clinician following return of the detainee to the facility | 0% | 50% | 100% | 67% | 100% | 100% | 70% |
| If there was a missed appointment, there was a documented reason for the missed appointment in EPHR | 7% | 11% | 24% | 33% | 0% | 38% | 19% |
| If there was a missed appointment, there is documentation of rescheduled and completed appointment in EPHR | 23% | 0% | 0% | 0% | 0% | 50% | 12% |
| Score Summary for SA 20A: | 36% | 42% | 50% | 50% | 46% | 62% | 48% |

These data show poor results, especially for information about missed appointments. However, the data do not address the central question of this provision which is whether internal scheduled appointments and off-site scheduled appointments occur as scheduled. I have been told during multiple site visits that custody leadership maintains a tracking log of all scheduled appointments, both on-site and off-site appointments. I was told that all appointments are tracked including I have recommended previously that this tracking data be summarized in a spreadsheet and presented as data for this item. This tracking data should separate internal onsite appointments and external offsite appointments. The information maintained on the tracking logs needs to include the referral or order date; the appointment date; whether the patient was seen or not; if not seen the reason for the no-show; a rescheduled date for appointments not kept; and whether the rescheduled appointment takes place; and if not then why the patient was a no-show. This should be repeated until a completed appointment occurs.

The data that was provided does not inform how many offsite appointments actually are seen. However, when there is a missed appointment there is no evidence in the record that the patient missed the appointment and was rescheduled. The opportunities for improvement section mentions that lack of custody personnel to transport patients for scheduled offsite appointments was noted throughout the study period. A table demonstrating the data from tracking logs indicated in the paragraph above would quantify this problem.

I note that the August 2019 Interagency Agreement between Pre-trial Detention and Services and Corizon includes in item number 14 a requirement to maintain a tracking log.

If a referral date would be added to this information it could be used for purpose of verifying the sick call portion of this item.

**Recommendations:**

1.  Maintain a tracking log of appointments to include:
    a.  Referral date,
    b.  Appointment date of referral or scheduled onsite activity,
    c.  Whether the patient shows up and is seen for the appointment, and
    d.  If the patient doesn't show up why the patient didn't show up.

**Settlement Agreement Statement:** 20.b. *The Commissioner shall promulgate and implement policy and procedure to ensure that when Medical Professionals or Mental Health Professionals direct medical accommodations (such as bottom bunk placement, access to a cane or crutches, specialized housing for medical or mental health purposes, or for purposes of protection from exposure to excessive heat), custody staff follow such directives. In the event that custody staff have concerns about the security implications of a particular medical accommodation, a mechanism shall exist to resolve such concerns promptly in a manner that does not threaten the health or safety of the plaintiff whose accommodation is at issue.*

**Compliance Rating:** Non-compliance

**Findings:** This provision was audited using a sample population of persons who had orders for a specific accommodation. Data for this provision is shown in Table 14 below.

Table 14

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| There is an order in EPHR for cane, crutches, wheelchair, bottom bunk, and any other disability (visual impairment, seizure, orthopedic restrictions, hearing impairment) | 44% | 68% | 63% | 63% | 63% | 85% | *64%* |
| There is a copy of a completed transfer of housing form in the medical record | 100% | 95% | 93% | 100% | 100% | 100% | *98%* |
| There is a signed receipt of durable medical equipment in the medical record for each detainee | 55% | 55% | 61% | 83% | 100% | 54% | *68%* |
| Detainees are housed in the designated areas for ADA housing (confirmed during joint custody/medical ADA rounds for patients that require ADA accommodations, and on the Inmate Traffic History in OCMS for patients that required bottom bunk who did not require an ADA accommodation) | 81% | 74% | 70% | 59% | 59% | 60% | *67%* |
| *Score Summary for SA 20B:* | *70%* | *73%* | *72%* | *76%* | *80%* | *75%* | *74%* |

The data show that in the sample studied, only 64% of individuals had an order in the EPHR for the accommodation. What is unclear is how was it determined that an accommodation was necessary if there was no order in the EPHR? The DPSCS report states that DPSCS does not have a comprehensive listing of patients who are ordered a low

bunk.  Obtaining information on orders for accommodations was not able to be obtained from the custody database or the EPHR.  This may be able to be resolved with an improved electronic record.

**Recommendations:**

1. Fix the order system in the electronic record so that orders for accommodation can be obtained.  Also arrange that deliver of the ordered accommodation to the inmate is tracked in the electronic record so that this data is obtainable in an audit.

**Settlement Agreement Statement:** 20.c. *The Commissioner shall ensure that Medical Professionals and Mental Health Professionals have access to current plaintiff location information for all plaintiffs on at least a daily basis.*

**Compliance Rating:** Substantial Compliance

**Findings:**  This provision was verified at my last visit. Paper lists of all inmates with their current housing data were available in health care areas.  DPSCS was in process of training all staff to have access to the custody database (OCMS) so that they could look up a current location.  I questioned multiple staff who were able to demonstrate how to do this.

**Recommendations:**

1. None

**Settlement Agreement Statement:** 20.d. *The Commissioner shall promulgate and implement policy and procedure to ensure coordination between custody staff and Medical Professionals when scheduling sick call and medication administration.*

**Compliance Rating:** Patial Compliance

**Findings:** On August 27, 2019 DPSCS emailed me two interagency agreements.  Both were agreements between Corizon and Division of Pre-trial Detention.  One was an agreement regarding medication management and the second was an agreement regarding sick call.  Both agreements were adequate.

Data to verify this provision with respect to sick call is provided with provision 23. b, c, and d.  However, I would ask that verification of the implementation of the medication administration policy would include observation of medication administration. Verification of sick call procedures would include evaluation of sick call tracking logs showing substantial show rates for onsite clinics.

**Recommendations:**

1. Verify that the interagency agreement procedures are being followed.

**Settlement Agreement Statement:** 20.e. *The Commissioner shall promulgate and implement policy and procedure to ensure that plaintiffs classified as H1 are housed in temperature-controlled housing, to the extent sufficient temperature controlled housing is available, from May 1 through September 30. Temperature-controlled housing includes those housing units of BCBIC, WDC, JI Dorms 600 and 700, and such other facilities as the parties agree constitute temperature-controlled housing because such units reliably control temperature to less than 88° Fahrenheit.*

**Compliance Rating:** <mark>Substantial Compliance</mark>

**Findings:** All parts of the jail are now air conditioned and therefore this provision is no longer pertinent to current conditions.

**Recommendations:**

1. None

**Settlement Agreement Statement:** 20.f. *In the event that the temperature control system of a housing unit used for H1 plaintiffs fails to maintain the temperature below 88° Fahrenheit, the Commissioner shall, to the extent possible and safe, transfer such H1 plaintiffs to other H1 housing. If insufficient H1 housing is available, appropriate Clinicians shall determine which HI plaintiffs are priorities for transfer to the available H1 housing. Respite in air-conditioned areas shall be provided for such plaintiffs, as well as other plaintiffs as required pursuant to Maryland Division of Pretrial Services, Directive 185.008 (2009).*

**Compliance Rating:** <mark>Substantial Compliance</mark>

**Findings:** All parts of the jail are now air conditioned and therefore this provision is no longer pertinent to current conditions

**Recommendations:**

**Settlement Agreement Statement:** 20.g. *In the event that any housing unit designated as temperature controlled fails to reliably control temperature to less than 88° Fahrenheit while plaintiffs designated as H1 are housed there, such housing unit shall no longer be considered temperature-controlled housing for purposes of this Settlement Agreement until the Commissioner provides evidence that such housing can now be expected to reliably control temperature to less than 88° Fahrenheit under comparable conditions in the future.*

**Compliance Rating:** <mark>Substantial Compliance</mark>

**Findings:** All parts of the jail are now air conditioned and therefore this provision is no longer pertinent to current conditions

**Recommendations:**

## ACCOMMODATION FOR PLAINTIFFS WITH DISABILITIES

**Settlement Agreement Statement:** 21.a. *The Commissioner shall promulgate and implement policy and procedure ensuring the timely delivery of necessary medical supplies to plaintiffs with disabilities. The Commissioner shall promulgate and implement policy and procedure to ensure that plaintiffs with disabilities that require special accommodations are housed in locations that provide those accommodations, including, as applicable, toilets that can be used without staff assistance, accessible showers, and areas providing appropriate privacy and sanitation for bowel disimpaction.*

**Compliance Rating:** Non Compliance

**Findings:** DPSCS verifies this provision with an audit. The sample size is not provided. The audit traces whether there is an order for supplies and whether the patient received the ordered supplies. Data for this audit is provided in Table 15 below.

Table 15

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| There is an order in EPHR for the specific medical supplies (for example colostomy bags, urinary catheter, etc.) for each detainee detailing the type and quantity | 86% | 67% | 88% | 40% | 71% | 88% | *73%* |
| There is a copy of the completed disability assessment form in the medical record. | 100% | 89% | 100% | 100% | 71% | 100% | *93%* |
| There is a copy of signed receipt for medical supplies that is consistent with order for the detainee (type and quantity) | 86% | 100% | 100% | 100% | 43% | 93% | *87%* |
| Initial medical supplies were provided within 12 to 24 hours of the order (timeliness of initiation of order) | 64% | 44% | 33% | 60% | 0% | 64% | *44%* |
| Subsequent supplies were provided consistent with the established protocol | 67% | 50% | 83% | 60% | 0% | 50% | *52%* |
| There is a copy of a completed transfer of housing form in the medical record | 100% | 100% | 100% | 100% | 100% | 94% | *99%* |
| Detainees listed on the ADA log are housed in the designated areas for ADA housing (confirmed during joint custody/medical ADA rounds) | 71% | 78% | 88% | 50% | 86% | 69% | *74%* |
| *Score Summary for SA 21A:* | *82%* | *75%* | *85%* | *73%* | *53%* | *80%* | *75%* |

These data show that inmates are receiving supplies only 50% of the time which is not good. This data should be able to be obtained from the electronic record but the existing EPHR is unable to provide this information. Regardless, 100% of patients were included

in the sample.  DPSCS acknowledges that ADA needs are not consistently identified at intake.  This failure should be included in the quality evaluation of intake assessments by providers in item 18.  Documentation of receipt of medical supplies was frequently unable to be located in the EPHR.  These are paper documents which are not timely filed into the paper medical record.  This is another instance in which paper documents are used because of a defective medical record.

**Recommendations:**

1. Fix the electronic record so it can document receipt of ordered supplies or develop a paper system that tracks this information based on orders in the electronic medical record.

**Settlement Agreement Statement:** 21.b. *A staff member with appropriate training shall be designated to address concerns of plaintiffs with disabilities regarding accommodations for their disabilities and to assist in the resolution of any security issues that may threaten provision of necessary accommodations.*

**Compliance Rating:** Substantial Compliance

**Findings:**  A custody officer has been assigned as the ADA officer.  This officer has training and experience as a nurse aide who worked as a home health staff person who cared for persons with disabilities.  This officer tracks non-clinical issues for every patient who is housed on one of the disability units.  Non-clinical issues are unrelated to nursing care but are necessary for accommodation of the patient's needs.  This person maintains a log of her work.  I examined the log which verifies consistent tracking of issues for disabled inmates.

The vendor also has a RN assigned to track disabled patients.  The nurse tracks only clinical issues.

**Recommendations:**

1. None

**Settlement Agreement Statement:** 21.c. *Plaintiffs with disabilities shall be provided with access to specialized medical services, such as dentists, mental health treatment, and offsite medical specialist treatment, on the same basis as plaintiffs without disabilities.*

**Compliance Rating:** Non Compliance

**Findings:** 100% of ADA patient appointments were audited.  Findings are found below in Table 16 below.

Table 16

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| There is documentation of encounter in EPHR for each detainee scheduled for a clinic appointment | 65% | 76% | 85% | 80% | 82% | 100% | *81%* |
| There is documentation of encounter in EPHR for all rescheduled appointments | 38% | 14% | 25% | 0% | 20% | 100% | *33%* |
| *Score Summary for SA 21C:* | *51%* | *45%* | *55%* | *40%* | *51%* | *100%* | *57%* |

This data shows that 19% of scheduled appointments for disabled patients didn't occur and that for those that don't occur only 33% are rescheduled. This is not good. In their report DPSCS states that offsite and onsite specialty appointments are particularly problematic without explanation.

In addition, access to care for a disabled patient includes having an appropriate examination table that accommodates disabled persons. The facility does not have proper table yet.

**Recommendations:**

1. Perform a root cause analysis regarding why ADA patients fail to show for appointments and only a third are rescheduled.

**Settlement Agreement Statement:** 21.d. *The Commissioner shall promulgate and implement policy and procedure to use a vehicle with adaptations to make it suitable for the safe transportation of persons with mobility-related disabilities to transport plaintiffs with such disabilities, unless such vehicle is not available in an emergency situation.*

**Compliance Rating:** Substantial Compliance

**Findings:** The Department has an adequate policy describing use of vehicles for the disabled. There are two vehicles with adaptations suitable for disabled inmates. Each has a ramp allowing for entry of a person in a wheelchair. A wheelchair can be safely secured in the van. Or, the patient can be secured in a seat. In all situations, patients are secured with a seat belt. I have previously observed an officer wheel a mock patient into the van and secure the patient. This vehicle appeared adequate.

**Recommendations:**

1. None

**SPECIALTY CARE/CONSULTATION**

**Settlement Agreement Statement:** 22.a. *The Commissioner shall promulgate and implement policy and procedure to ensure timely review of requests for routine, urgent and emergency specialty care.*

**Settlement Agreement Statement:** 22.b. *Such policy and procedure shall provide that plaintiffs are referred to specialists as medically necessary and that the process for review and approval of specialty consultations does not take more than 48 hours for urgent care and five business days for routine care.*

**Settlement Agreement Statement:** 22.c. *The Commissioner shall promulgate and implement policy and procedure to maintain a log documenting the date a Clinician requests approval of a specialist referral; the date utilization management takes action on the request; the outcome of the request; and whether the referral is to a specialist for the purpose of treatment or for the purpose of evaluation only. Clinicians shall be given training regarding the documentation necessary to support a specialty request.*

**Settlement Agreement Statement:** 22.d. *The Commissioner shall promulgate and implement policy and procedure to ensure that, if applicable, each plaintiff's medical record contains documentation of requests for outside specialty care, including the date of the request, the date and nature of the response, the date any consultation is scheduled, the date of any consultation, and appropriate information, if any, regarding follow-up care.*

**Settlement Agreement Statement:** 22.e. *For the purpose of this Settlement Agreement, referrals for mental health services that are provided onsite at BCDC or BCBIC do not constitute specialist referrals.*

**Compliance Rating:** Partial compliance

**Findings:** Provisions 22. a, b, c, d, and e, are combined in the DPSCS report. Provision 22.b requires that patient are referred as medically necessary yet this statement was not evaluated in the data provided. My suggestion is to evaluate this item with record reviews using chronic conditions that typically call for specialty referral as a trigger for chart selection. Provision 22.c requires that a log be maintained that documents all referrals which wasn't included in this report. If this log is electronic it should be submitted as an Excel spreadsheet appendix on the thumb drive containing the report. If this log is a paper log, it should be scanned and sent as a PDF attachment. My preference is an electronic log. Provision 22.d is not addressed in the data presented.

For purpose of verification an audit was provided. The sample of cases was based on offsite, onsite, and emergency room visits. Onsite specialty care should be tracked with other onsite appointments as described in 20.d. "ER visits" are not all emergency specialty

visits so sample selection should be modified accordingly.  The data for this audit was obtained from the Corizon company specialty care database.  The report asserts that a manual log is maintained at the jail and that regular "reconciliation" occurs to ensure that requests on the log have been processed.  The data for this provision should be obtained from the onsite log not the company log.  Also, the sample used for this audit did not include denials of care.  All referrals for care need to be included in the log tracking specialty care.  If specialty care is denied, the denial needs to be noted and any alternate treatment plans need to be documented in the log as well as in the medical record.  It is also not clear how referrals are documented.  Referrals should be based on orders related to a plan of care that can be verified in the medical record. The data obtained for verification of this item is given in Table 17 below.

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | Totals |
|---|---|---|---|---|---|---|---|
| The Consultation Request form is completed in its entirety, with no missing pertinent information; at a minimum the following fields need completed on the Chm_consultation template in EPHR: Select off-site, onsite clinic, or telemedicine. Select urgent, routine, or Retro Request. Specialty Service Requested, Provider, Initial Visit or F/U, and Site Medical Provider? | 26% | 31% | 43% | 38% | 38% | 41% | **36%** |
| The referral processed in a timely manner? (i.e. routine referral 5 business days; urgent referral 1-2 business days; emergent referral same day; and documented in EPHR) | 97% | 96% | 93% | 90% | 93% | 95% | **94%** |
| There is evidence in the UM Log that the off-site appointment was scheduled timely after the authorization number was provided to the site (decision date on UM Log). Specialty consultation within 60 days of the authorization or within 90-120 days for less available specialties). | 90% | 93% | 96% | 96% | 92% | 97% | **94%** |
| If an ATP was received and accepted by the provider, were the ATP recommendations noted and followed up by the provider within 48 hours? | n/a | n/a | n/a | n/a | n/a | n/a | **n/a** |
| The site provider review the Consultation Report/Clinical Summary, provide follow-up care and document in EPHR within 48 hours | 60% | 63% | 76% | 70% | 69% | 74% | **69%** |
| The consultation report, ER discharge instructions, or hospital discharge report were signed and dated by the reviewing provider and uploaded into EPHR within 48 hours of the review date. | 12% | 25% | 34% | 15% | 31% | 48% | **28%** |
| *Score Summary for SA 22:* | *57%* | *62%* | *68%* | *62%* | *65%* | *71%* | *64%* |

Some questions arise based on data in this table.  If forms are completely filled out only 36% of the time, how is it clear that the urgency of the appointment is known?  If the urgency request is not known, how can one be sure that the referral occurred timely?  This should be clarified when presenting this data.  Also unless the log is present it may not be possible to determine whether the timeliness of the referral was appropriate.  This will be difficult for a nurse to determine as this is mostly a physician judgment.

**Recommendations:**

1. Standardize tracking of offsite specialty logs.  The log used should be the onsite DPSCS log and not the company log.
2. Denials of care need to be included on the log.  All referrals should be on the log with their disposition.

## SICK CALL

**Settlement Agreement Statement:** 23.a. *Plaintiffs shall daily have the opportunity to request health care. Nursing staff shall make daily rounds to collect sick call requests from plaintiffs who have no access to a sick call box.*

**Compliance Rating:**  Partial Compliance

**Findings:** This provision needs to consist of a tour to identify that every housing unit has a secure sick call box into which inmates can confidentially place a health request.  This presumes that every housing unit has sick call slips available.  There needs to be evidence that health care staff pick up slips on a daily basis.  The report merely asserts that there is a locked box on every housing unit.  There is no assessment regarding availability of health requests.  There is no data with respect to picking up health requests daily.

Monthly rounds on the housing units can be a method of verifying that all housing units have a sick call box and health requests.  A method to verify this is having a paper log in the sick call box on which the person picking up slips documents, dates, and initials how many slips were picked up that day.  These slips can be tallied monthly and these tallies can be used to verify this provision.

**Recommendations:**

1. Track pick up of sick call slips on a daily basis and provide monthly aggregate report to the quality improvement committee.

**Settlement Agreement Statement:** 23.b. *Requests for health care shall be triaged by RNs within 24 hours of receipt, with receipt measured from the time that the requests arrive at the site of triage following daily collection of sick call slips.*

**Settlement Agreement Statement:** 23.c. *Plaintiffs whose requests include reports of clinical symptoms shall have a face-to-face (in person or via video conference, if clinically appropriate) encounter with a Medical Professional (not including an LPN) or Mental Health Professional within 48 hours (72 hours on weekends) of the receipt of the request by nursing staff at the site of triage, or sooner if clinically indicated.*

**Settlement Agreement Statement:** 23.d. *Care at sick call and at subsequent follow-up appointments shall be as determined by appropriate Medical Professionals and/or Mental Health Professionals, in the exercise of appropriate clinical judgment, to meet the plaintiffs' medical and mental health needs.*

**Compliance Rating:** Partial Compliance

**Findings:** Provisions 23. b, c, and d are combined in the DPSCS report.  An audit was performed using a sample of sick call slips for symptomatic medical complaints.  The sample size was not provided.  The data of this audit is provided below in Table 18.

Table 18

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| Sick call slip was stamped with date and time received | 65% | 85% | 85% | 85% | 73% | 87% | *80%* |
| Sick call slip was stamped with date and time of triage | 63% | 77% | 82% | 80% | 77% | 82% | *77%* |
| The sick call slip was triaged by an RN or higher | 52% | 82% | 87% | 72% | 77% | 87% | *76%* |
| There is documentation of sick call encounter corresponding to the sick call slip complaint dated for the audit period | 59% | 78% | 93% | 95% | 97% | 88% | *85%* |
| Sick call encounter occurred within 48 hours to 72 hours (if on a weekend or holiday) | 50% | 50% | 81% | 90% | 93% | 79% | *74%* |
| If sick call appointment was missed, there is documentation of reason for missed appointment in EPHR | 7% | 29% | 56% | 57% | 100% | 40% | *48%* |
| There is documentation of an encounter in EPHR demonstrating completion of the re-scheduled/missed sick call appointment | 15% | 33% | 33% | 50% | 40% | 73% | *41%* |
| There is documentation within the encounter that identifies a physical assessment and plan that addressed the specific sick call slip complaint | 37% | 67% | 67% | 76% | 81% | 82% | *68%* |
| There is a disposition specific to the complaint identified on the sick call slip as part of the encounter note | 52% | 69% | 77% | 79% | 89% | 89% | *76%* |
| *Score Summary for SA 20D, SA 23B, SA 23C and SA 23D:* | *44%* | *63%* | *73%* | *76%* | *81%* | *78%* | *69%* |

These data show that almost every audit indicator needs improvement.  Typically, in correctional facilities, a log of health requests is maintained to include the date of request, the date of triage, the reason for the request, the date of the face-to-face nursing visit when indicated, and the date of referral to provider when indicated. Rescheduled appointments should be included.  This type of log should be used in BCBIC.  All data should be summarized in a table month to month and sent to the QI committee.  It is best if this can be maintained electronically on a spreadsheet.  This data can be used for verification of this item.

This provision also requires that sick call evaluations are of adequate quality.  For this purpose, every week 10 patient records for patients evaluated in sick call are audited.  This audit is appropriate for this purpose with one exception.  I ask that the nursing note

documents an appropriate history for the complaint.   The data for this audit is listed in Table 19 below.

Table 19

| Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|
| The correct OTC protocol has been selected for the complaint described on the sick call request | 83% | 100% | 91% | 88% | 100% | 96% | *94%* |
| Applicable vital signs (pulse ox, FSBG, PEFR), including a weight, are documented with action taken for abnormal findings (including provider notification) | 57% | 88% | 84% | 90% | 94% | 88% | *84%* |
| The nursing sick call encounter is documented in SOAP format | 83% | 40% | 38% | 38% | 58% | 74% | *55%* |
| Patient is referred appropriately to the next level provider, when indicated | 90% | 92% | 94% | 88% | 89% | 91% | *91%* |
| Patient education is documented | 30% | 45% | 37% | 30% | 46% | 45% | *39%* |
| Phone or verbal consultation with a provider is documented, as applicable | n/a | 100% | 100% | 0% | n/a | n/a | *67%* |
| *Score Summary for SA 23 (Quality):* | *69%* | *78%* | *74%* | *56%* | *77%* | *80%* | *72%* |

I would include in this process feedback to the nurse who is being audited.  I would also maintain data on individual nurses and whether there is improvement audit to audit.  I note that selection of the correct OTC protocol does not ensure that the nurse takes an adequate history of the patient's complaint.  Therefore some assessment of the nurse history needs to occur.

**Recommendations:**

1. Perform root cause analysis as to why these results occurred and attempt corrective action.

**MEDICAL RECORDS**

**Settlement Agreement Statement:** 24.a. *The Commissioner shall promulgate and implement policy and procedure to ensure that the medical records of plaintiffs are available at sick call and other encounters with Medical Professionals and Mental Health Professionals.  An on-site Medical Professional or Mental Health Professional who is providing treatment, including diagnostic services, to a plaintiff shall have access to both the EMR and any non-electronic portion of the medical record, unless the need for emergency treatment precludes access at the plaintiff's location.*

**Compliance Rating:** Non Compliance

**Findings:** A sample of patient scheduled for a variety of clinics was audited to ensure that a paper record was available to the clinician when the patient was seen and that the clinician seeing the patient documented that the record was available and reviewed.

Data for this item is presented in Table 20 below.

Table 20

| | Audit Indicator | Jul | Aug | Sept | Oct | Nov | Dec | *Totals* |
|---|---|---|---|---|---|---|---|---|
| **SA 24** | There is a check mark against the name of the patients on the clinic schedule indicating the hard copy health record was pulled for all patients scheduled for that clinic | 90% | 90% | 55% | 69% | 88% | 73% | ***78%*** |
| | There is documentation of the encounter in the EPHR noting that the hard copy records were available and were reviewed during the specific healthcare encounter | 80% | 84% | 39% | 47% | 52% | 55% | ***60%*** |
| | *Score Summary for SA 24:* | *85%* | *93%* | *47%* | *58%* | *70%* | *64%* | *69%* |

This audit is incomplete insofar that the paper record does not contain all medical record documents that are supposed to be in the paper record.  This is especially true of medication administration records.  In that respect, clinicians do not consistently have information related to compliance with medication available to them when they see patients.  Also, the electronic record still has problems with availability of laboratory test results, intake screening information, and the current pharmacy medication profile for the patient.  These deficiencies are unlikely to be corrected until an effective revised electronic record is available.

**Recommendations:**

1.  Obtain a new electronic medical record.

**ATTACHMENT 2**

**ATTACHMENT 2**




# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov

DOUGLAS A. DUCEY
GOVERNOR

JOE PROFIRI
ACTING DIRECTOR

September 20, 2019

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ  85281

RE:     Contract No. ADOC18-216360
        July 2019
        Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the ARIZONA DEPARTMENT OF CORRECTIONS (ADC) has reviewed the CGAR findings for the contractually sanctionable month of July, 2019.

There are several Performance Measures that Corizon had failed to bring into compliance in the past, in spite of continuing demands to do so.  An unsatisfactory result for any Performance Measure continues to be unacceptable. We anticipate continued improvement in the scores attained by Centurion as we progress in the new contract, and will work closely with you to reach those goals. Centurion will be expected to meet and sustain satisfactory levels of performance on each of the current 852 measures.

This is the first scheduled monthly review and subsequent sanction under the contract.

Particular focus has been requested in the past with regard to 34 individual Performance Measures at specific facilities which have been identified by the Court's most recent Order to Show Contempt (OSC), and Judge Silver's focus. Corizon's scores and the most recent Centurion scores for those specific measures are provided as a separate attachment to this correspondence. Each Performance Measure is individually shown.

In July, 2019, it was determined that 90 total Performance Measures failed to attain a passing score of 85%. ADC has further identified **50 of the 90** Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Douglas | Eyman | Florence | Lewis | Phoenix | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|
| 2 | X | | | | | | | 1 |
| 11 | | X | | | | | | 1 |
| 12 | | X | | | | | | 1 |
| 15 | | X | | | | | | 1 |
| 19 | | | | X | | | | 1 |
| 23 | | X | | X | | X | | 3 |
| 24 | | X | | X | | X | X | 4 |
| 29 | | | | | X | | | 1 |
| 31 | | X | | X | | | | 2 |
| 35 | | X | | X | | | | 2 |
| 36 | | X | | | | | | 1 |
| 37 | | X | | X | | X | | 3 |
| 39 | | X | | | | | | 1 |
| 40 | | X | X | | | | | 2 |
| 42 | | X | X | | | | X | 3 |
| 44 | | X | | | | X | | 2 |
| 45 | | | | | X | X | | 2 |
| 47 | | X | | X | | | | 2 |
| 49 | | X | X | | | | | 2 |
| 50 | | | X | X | | | X | 3 |
| 51 | | X | X | | | | | 2 |
| 52 | | X | X | | | | | 2 |
| 53 | | | | | X | | | 1 |
| 54 | | X | | X | | | | 2 |
| 55 | | X | | X | | | | 2 |
| 59 | | X | | X | | | | 2 |
| 67 | | | | | | X | | 1 |
| Total | 1 | 20 | 6 | 11 | 3 | 6 | 3 | 50 |

Please review the 50 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures.  If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 10 | $75,000.00 |
| 30-39 | $10,000.00 | 10 | $100,000.00 |
| 40-49 | $15,000.00 | 10 | $150,000.00 |
| 50+ | $20,000.00 | 1 | $20,000.00 |
| TOTAL | | 50 | $417,500.00 |

The remaining **40 of the 90** individual performance measures are sanctioned @ $500.00 per measure. 40 X $500.00 = $20,000.00.

The total sanction for the month of July, 2019:

$$\$417,500.00 + \$20,000.00 = \$437,500.00$$

The total offset amount is calculated to be $437,500.00.

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer.  If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.

Sincerely,

Richard Pratt
Assistant Director
Health Services Contract Monitoring Bureau

Enclosure

cc:    Joseph Profiri, Acting Director, ADC
       Keith Lueking, COO, Centurion
       Mike Kearns, Division Director, Administrative Services Division, ADC
       Brad Keogh, General Counsel, ADC
       Deana Johnson, VP & General Counsel, Centurion
       Ken Sanchez, Chief Procurement Officer, ADC
       Jacob Gable, Bureau Administrator, Planning, Budget & Research Bureau

**ATTACHMENT 3**

**ATTACHMENT 3**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

JOE PROFIRI
ACTING DIRECTOR

October 3, 2019

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:   Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
of July, 2019

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated September 20, 2019 of the penalties determined
appropriate for the reporting period from the calendar month of July, 2019. The deadline for any "meet and
confer" requests regarding this sanctionable period was required to be scheduled to take place no later than
September 30, 2019.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 90 performance measures. The final
sanctionable amount is $437,500 for the month.

To effect the payment of the sanction, the Department will offset $437,500 against payments due to Centurion
on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at
(602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:   Keith Lueking, COO, Centurion
Joseph Profiri Acting Director, Arizona Department of Corrections
Richard Pratt, Assistant Director, Health Services Contract Monitoring Bureau
Brad Keogh, General Counsel, Legal Services

**ATTACHMENT 4**

**ATTACHMENT 4**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

JOE PROFIRI
ACTING DIRECTOR

October 18, 2019

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ  85281

RE:    Contract No. ADOC18-216360
       August 2019
       Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the ARIZONA DEPARTMENT OF CORRECTIONS (ADC) has reviewed the CGAR findings for the contractually sanctionable month of August, 2019.

This is the second scheduled monthly review and subsequent sanction under the contract.

Particular focus will continue to be requested with regard to 34 individual Performance Measures at specific facilities which have been identified by the Court's most recent Order to Show Contempt (OSC), and Judge Silver's focus. Corizon's scores and the most recent Centurion scores for those specific measures are provided as a separate attachment to this correspondence. Each Performance Measure is individually shown.

In August, 2019, it was determined that 91 total Performance Measures failed to attain a passing score of 85%. ADC has further identified 49 of the 91 Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Douglas | Eyman | Florence | Lewis | Phoenix | Tucson | Winslow | Yuma | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2 | X | | | | | | | | 1 |
| 6 | | | | X | | | | | 1 |
| 12 | | X | | | | | | | 1 |
| 15 | | X | | | | | | | 1 |
| 16 | | | | | | | | X | 1 |
| 19 | | | | X | | | | | 1 |
| 23 | | | | X | | X | | X | 3 |
| 24 | | X | X | X | | X | | X | 5 |
| 31 | | | X | X | | | | | 2 |
| 35 | | X | | X | | | | | 2 |
| 36 | | X | | | | | | | 1 |
| 37 | | X | | X | | X | | | 3 |
| 40 | | X | X | | | | X | | 3 |
| 42 | | X | | X | | | | | 2 |
| 44 | | | | | | X | | | 1 |
| 45 | | X | | | | X | | | 2 |
| 47 | | X | | X | X | | | | 3 |
| 49 | | | X | | | | | | 1 |
| 50 | | X | X | X | | | | X | 4 |
| 51 | | X | X | | | X | | | 3 |
| 53 | | | | X | X | | | | 2 |
| 54 | | X | | | | | | | 1 |
| 55 | | X | | X | | | | | 2 |
| 59 | | X | | X | | | | | 2 |
| 67 | | | | | | X | | | 1 |
| Total | 1 | 15 | 6 | 13 | 2 | 7 | 1 | 4 | 49 |

Please review the 49 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures.  If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 10 | $75,000.00 |
| 30-39 | $10,000.00 | 10 | $100,000.00 |
| 40-49 | $15,000.00 | 10 | $150,000.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 49 | $397,500.00 |

The remaining 42 of the 91 individual performance measures are sanctioned @ $500.00 per measure.  42 X $500.00 = $21,000.00.

The total sanction for the month of August, 2019:
$397,500.00 + $21,000.00 = $418,500.00

The total offset amount is calculated to be $418,500.00.

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer.  If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.

Sincerely,

Richard Pratt
Assistant Director
Health Services Contract Monitoring Bureau

Enclosure

cc:    Joseph Profiri, Acting Director, ADC
       Keith Lueking, COO, Centurion
       Mike Kearns, Division Director, Administrative Services Division, ADC
       Brad Keogh, General Counsel, ADC
       Deana Johnson, VP & General Counsel, Centurion
       Ken Sanchez, Chief Procurement Officer, ADC
       Jacob Gable, Bureau Administrator, Planning, Budget & Research Bureau

**ATTACHMENT 5**

**ATTACHMENT 5**



# Arizona Department of Corrections



1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov

DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

November 4, 2019

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:     Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
        of August, 2019

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated October 18, 2019 of the penalties determined
appropriate for the reporting period from the calendar month of August, 2019.  The deadline for any "meet and
confer" requests regarding this sanctionable period was required to be scheduled to take place no later than
October 28, 2019.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 91 performance measures. The final
sanctionable amount is $418,500 for the month.

To effect the payment of the sanction, the Department will offset $418,500 against payments due to Centurion
on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at
(602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:     Keith Lueking, COO, Centurion
        David Shinn, Director, Arizona Department of Corrections
        Richard Pratt, Assistant Director, Health Services Contract Monitoring Bureau
        Brad Keogh, General Counsel, Legal Services

**ATTACHMENT 6**

**ATTACHMENT 6**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.corrections.az.gov



DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

November 19, 2019

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ 85281

RE:   Contract No. ADOC18-216360
      September 2019
      Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the ARIZONA DEPARTMENT OF CORRECTIONS (ADC) has reviewed the CGAR findings for the contractually sanctionable month of September, 2019.

This is the third scheduled monthly review and subsequent sanction under the contract.

Particular focus will continue to be requested with regard to 34 individual Performance Measures at specific facilities which have been identified by the Court's most recent Order to Show Contempt (OSC), and Judge Silver's focus. Corizon's scores and the most recent Centurion scores for those specific measures are provided as a separate attachment to this correspondence. Each Performance Measure is individually shown.

In September, 2019, it was determined that 62 total Performance Measures failed to attain a passing score of 85%. ADC has further identified 41 of the 62 Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

**Page 1 of 4**

| FAILED PERFORMANCE MEASURE | Douglas | Eyman | Florence | Lewis | Phoenix | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|
| 2 | X | | | | | | | 1 |
| 12 | | | | X | | | | 1 |
| 15 | | X | | | | | | 1 |
| 16 | | | | | | | X | 1 |
| 19 | | X | | X | | X | | 3 |
| 23 | | | | X | X | X | | 3 |
| 24 | | | X | X | X | X | | 4 |
| 31 | | | X | X | | | | 2 |
| 35 | | X | | X | | | | 2 |
| 36 | | X | | | | | | 1 |
| 37 | | X | | X | | X | | 3 |
| 39 | | X | | | | | | 1 |
| 40 | | X | | | | | | 1 |
| 42 | | | X | X | | | | 2 |
| 49 | | X | X | | | | | 2 |
| 50 | | X | X | X | | X | X | 5 |
| 51 | | X | X | | | | | 2 |
| 55 | | | | X | | X | | 2 |
| 59 | | X | | X | | | | 2 |
| 67 | | | | | | X | | 1 |
| 73 | | | | | | X | | 1 |
| Total | 1 | 11 | 6 | 11 | 2 | 8 | 2 | 41 |

Please review the 41 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures. If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 10 | $75,000.00 |
| 30-39 | $10,000.00 | 10 | $100,000.00 |
| 40-49 | $15,000.00 | 2 | $30,000.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 41 | $277,500.00 |

The remaining 21 of the 62 individual performance measures are sanctioned @ $500.00 per measure. 21 X $500.00 = $10,500.00.

The total sanction for the month of September, 2019:

$277,500.00 + $10,500.00 = $288,000.00

The total offset amount is for the month of September 2019 is calculated to be $288,000.00.

In addition to the sanctions listed above, the following chronic care performance measures for August 2019 (monitored in September) have been re-reviewed due to an error in the source document that included records that should not have been identified as chronic conditions subject to audit. As a result of this review, the following scores have been retroactively adjusted.

PM #55 at Eyman from 82% to 90%
PM #54 at Eyman from 84% to 86%
PM #53 at Lewis from 78.38% to 88.37%
PM #53 at Perryville from 83.87% to 96.55%
PM #53 at Phoenix from 72.72% to 88.89%

Based upon this information, in August, 2019, there were 86 Performance measures that failed to attain a passing score of 85%, and 45 of those measures resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement.

This end result will result in a credit back to Centurion in the amount of $60,500.00 for the monitored month of August, 2019.

FINAL EXPECTED OFFSET:

|  |  |
|---|---|
| September | $288,000.00 |
| August | ($60,500.00) |

NET TOTAL   $227,500.00

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer.  If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.

Sincerely,

Richard Pratt
Assistant Director
Health Services Contract Monitoring Bureau

Enclosures

cc:     David Shinn, Director, ADC
        Keith Lueking, COO, Centurion
        Mike Kearns, Division Director, Administrative Services Division, ADC
        Brad Keogh, General Counsel, ADC
        Deana Johnson, VP & General Counsel, Centurion
        Ken Sanchez, Chief Procurement Officer, ADC
        Jacob Gable, Bureau Administrator, Planning, Budget & Research Bureau

**ATTACHMENT 7**

**ATTACHMENT 7**




# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov

DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

November 29, 2019

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:     Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
        of September, 2019

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated November 19, 2019 of the penalties determined appropriate for the reporting period from the calendar month of September, 2019. The deadline for any "meet and confer" requests regarding this sanctionable period was required to be scheduled to take place no later than November 29, 2019.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 62 performance measures. The sanctionable amount is $288,000 for the month less $60,500 (credit back to Centurion, due to error identified in the source document for the month of August). The net total offset shall be $227,500.

To effect the payment of the sanction, the Department will offset $227,500 against payments due to Centurion on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at (602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:     Keith Lueking, COO, Centurion
        David Shinn, Director, Arizona Department of Corrections
        Richard Pratt, Assistant Director, Health Services Contract Monitoring Bureau
        Brad Keogh, General Counsel, Legal Services

**ATTACHMENT 8**

**ATTACHMENT 8**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.corrections.az.gov



**DOUGLAS A. DUCEY**
**GOVERNOR**

**DAVID SHINN**
**DIRECTOR**

December 18, 2019

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ  85281

RE:     Contract No. ADOC18-216360
        October 2019
        Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the ARIZONA DEPARTMENT OF CORRECTIONS (ADC) has reviewed the CGAR findings for the contractually sanctionable month of October, 2019.

This is the fourth scheduled monthly review and subsequent sanction under the contract.

Particular focus will continue to be requested with regard to 34 individual Performance Measures at specific facilities which have been identified by the Court's most recent Order to Show Contempt (OSC), and Judge Silver's focus. Corizon's scores and the most recent Centurion scores for those specific measures are provided as a separate attachment to this correspondence. Each Performance Measure is individually shown.

In October, 2019, it was determined that 51 total Performance Measures failed to attain a passing score of 85%. ADC has further identified **35 of the 51** Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Douglas | Eyman | Florence | Lewis | Perryville | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|
| 2 | X | | | | | | | 1 |
| 11 | | X | | | | | | 1 |
| 12 | | X | | X | | | | 2 |
| 15 | | X | | | | | | 1 |
| 19 | | X | | | | X | | 2 |
| 24 | | X | | | | | | 1 |
| 31 | | X | X | | | | | 2 |
| 35 | | X | | X | | | | 2 |
| 36 | | X | | | | | | 1 |
| 37 | | X | | X | X | | | 3 |
| 39 | | X | | | | | | 1 |
| 40 | | X | X | | | | | 2 |
| 44 | | | X | | | | | 1 |
| 47 | | X | | | | | | 1 |
| 49 | | | | | | X | X | 2 |
| 50 | | X | X | X | | X | X | 5 |
| 51 | | X | X | | | X | | 3 |
| 55 | | | | X | | | | 1 |
| 59 | | X | | X | | | | 2 |
| 67 | | | | | | X | | 1 |
| Total | 1 | 15 | 5 | 6 | 1 | 5 | 2 | 35 |

Please review the 35 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures. If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 10 | $75,000.00 |
| 30-39 | $10,000.00 | 6 | $60,000.00 |
| 40-49 | $15,000.00 | 0 | $0.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 41 | $207,500.00 |

The remaining **16 of the 51** individual performance measures are sanctioned @ $500.00 per measure. 16 X $500.00 = $8,000.00.

The total sanction for the month of October, 2019:

$$207,500.00 + \$8,000.00 = \$215,500.00$$

The total offset amount is for the month of October, 2019 is calculated to be $215,500.00.

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer. If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.

Sincerely,

Richard Pratt
Assistant Director
Health Services Contract Monitoring Bureau

Enclosure

cc:     David Shinn, Director, ADC
        Keith Lueking, COO, Centurion
        Mike Kearns, Division Director, Administrative Services Division, ADC
        Brad Keogh, General Counsel, ADC
        Deana Johnson, VP & General Counsel, Centurion
        Ken Sanchez, Chief Procurement Officer, ADC
        Jacob Gable, Bureau Administrator, Planning, Budget & Research Bureau

**ATTACHMENT 9**

**ATTACHMENT 9**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

December 31, 2019

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:   Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
      of October, 2019

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated December 18, 2019 of the penalties determined
appropriate for the reporting period from the calendar month of October, 2019.  The deadline for any "meet
and confer" requests regarding this sanctionable period was required to be scheduled to take place no later than
December 28, 2019.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 51 performance measures. The sanctionable
amount is $215,500 for the month.

To effect the payment of the sanction, the Department will offset $215,500 against payments due to Centurion
on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at
(602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:   Keith Lueking, COO, Centurion
      David Shinn, Director, Arizona Department of Corrections
      Richard Pratt, Assistant Director, Health Services Contract Monitoring Bureau
      Brad Keogh, General Counsel, Legal Services

**ATTACHMENT 10**

**ATTACHMENT 10**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

February 5, 2020

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ  85281

RE:     Revised Sanction Letter
        Contract No. ADOC18-216360
        November 2019
        Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the sanction letter dated January 14, 2020 has been revised due to the correction to remove a $500.00 sanction for PM 112, a Maximum Custody measure based on Operation's actions.  The measure remains non-compliant but the vendor is not sanctioned for the non-compliance.   Please see page 3 for the revised sanctioned amount. There will not be any additional time frames given for additional review as the original review period has expired.

This is the fifth scheduled monthly review and subsequent sanction under the contract.

Particular focus will continue to be requested with regard to 34 individual Performance Measures at specific facilities which have been identified by the Court's most recent Order to Show Contempt (OSC), and Judge Silver's focus. Corizon's scores and the most recent Centurion scores for those specific measures are provided as a separate attachment to this correspondence. Each Performance Measure is individually shown.

In November, 2019, it was determined that 46 total Performance Measures failed to attain a passing score of 85%. ADC has further identified **31 of the 46** Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Douglas | Eyman | Florence | Lewis | Safford | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|
| 2 | X | | | | | | | 1 |
| 11 | | X | | | | | | 1 |
| 12 | | X | | | | | | 1 |
| 15 | | | | X | | | | 1 |
| 19 | | | | X | | | | 1 |
| 31 | | X | | | | | | 1 |
| 35 | | | | X | | | | 1 |
| 36 | | X | | | | | | 1 |
| 37 | | X | | X | | | X | 3 |
| 39 | | X | | | | | | 1 |
| 40 | | X | X | | | | | 2 |
| 44 | | X | | | X | | | 2 |
| 47 | | X | | | | | | 1 |
| 49 | | X | | | | | | 1 |
| 50 | | X | X | X | | X | X | 5 |
| 51 | | X | X | | | X | | 3 |
| 52 | | X | | | | | | 1 |
| 55 | | | | X | | | | 1 |
| 59 | | X | | X | | | | 2 |
| 66 | | | X | | | | | 1 |
| Total | 1 | 14 | 4 | 7 | 1 | 2 | 2 | 31 |

Please review the 31 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures.  If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 10 | $75,000.00 |
| 30-39 | $10,000.00 | 2 | $20,000.00 |
| 40-49 | $15,000.00 | 0 | $0.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 31 | $167,500.00 |

The remaining **14 of the 46** individual performance measures are sanctioned @ $500.00 per measure.  14 X $500.00 = $7,000.00.

The total sanction for the month of November, 2019:

$$\$167,500.00 + \$7,000.00 = \$174,500.00$$

The total offset amount is for the month of November, 2019 is calculated to be $174,500.00.

Sincerely,

Vanessa Headstream
Acting Assistant Director
Health Services Contract Monitoring Bureau

Enclosure

cc:   David Shinn, Director, ADC
      Keith Lueking, COO, Centurion
      Mike Kearns, Division Director, Administrative Services Division, ADC
      Brad Keogh, General Counsel, ADC
      Deana Johnson, VP & General Counsel, Centurion
      Ken Sanchez, Chief Procurement Officer, ADC
      Richard Evitch, Bureau Administrator, Planning, Budget & Research Bureau

**ATTACHMENT 11**

**ATTACHMENT 11**



# Arizona Department of Corrections



1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov

DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

February 7, 2020

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:   Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
      of November, 2019 - Revised

Dear Mr. Dolan:

Centurion was advised in the enclosed revised sanction letter dated February 5, 2020 of the penalties
determined appropriate for the reporting period from the calendar month of November, 2019.

The Department is proceeding with the sanction/offset based on 45 performance measures. The sanctionable
amount is revised to $174,500 for the month.

To effect the payment of the sanction, the Department will offset $174,500 against payments due to Centurion
on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at
(602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:   Keith Lueking, COO, Centurion
      David Shinn, Director, Arizona Department of Corrections
      Richard Pratt, Assistant Director, Health Services Contract Monitoring Bureau
      Brad Keogh, General Counsel, Legal Services

**ATTACHMENT 12**

**ATTACHMENT 12**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



**DOUGLAS A. DUCEY**
GOVERNOR

**DAVID SHINN**
DIRECTOR

February 21, 2020

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ  85281

RE:     Contract No. ADOC18-216360
        December 2019
        Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the ARIZONA DEPARTMENT OF CORRECTIONS (ADC) has reviewed the CGAR findings for the contractually sanctionable month of December, 2019.

This is the sixth scheduled monthly review and subsequent sanction under the contract.

All Performance Measures are important. However, particular attention is immediately necessary with regard to 146 individual Performance Measures at specific facilities which have been identified by the Court's most recent Order (3490), and Judge Silver's focus. Tracking for these measures will be a major focus at each of the facilities identified in the document (attached).

In December, 2019, it was determined that 62 total Performance Measures failed to attain a passing score of 85%. ADC has further identified **31 of the 62** Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Eyman | Florence | Lewis | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|
| 12 | X | | | | | 1 |
| 15 | | | X | | | 1 |
| 16 | | | | | X | 1 |
| 19 | | | X | | | 1 |
| 23 | X | | | | | 1 |
| 35 | X | | | | | 1 |
| 36 | X | | | | | 1 |
| 37 | X | | X | X | X | 4 |
| 39 | X | | | | | 1 |
| 40 | X | X | | | | 2 |
| 42 | X | | X | | | 2 |
| 45 | X | | | | | 1 |
| 47 | X | | | | | 1 |
| 49 | X | | | | | 1 |
| 50 | X | X | X | X | X | 5 |
| 51 | X | X | | X | | 3 |
| 52 | | | | X | | 1 |
| 59 | X | | X | | | 2 |
| 67 | | | | X | | 1 |
| Total | 14 | 3 | 6 | 5 | 3 | 31 |

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 10 | $75,000.00 |
| 30-39 | $10,000.00 | 2 | $20,000.00 |
| 40-49 | $15,000.00 | 0 | $0.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 31 | $167,500.00 |

The other remaining **31 of the 62** individual performance measures are sanctioned @ $500.00 per measure.  31 X $500.00 = $15,500.00.

The total sanction for the month of December, 2019:

$$\$167,500.00 + \$15,500.00 = \$183,000.00$$

The total offset amount is for the month of December, 2019 is calculated to be $183,000.00.

Please review the total 62 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures.  If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer.  If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.

Sincerely,

Vanessa Headstream

Vanessa Headstream
Acting Assistant Director
Health Services Contract Monitoring Bureau

Enclosure

cc:   David Shinn, Director, ADC
       Keith Lueking, COO, Centurion
       Mike Kearns, Division Director, Administrative Services Division, ADC
       Brad Keogh, General Counsel, ADC
       Deana Johnson, VP & General Counsel, Centurion
       Ken Sanchez, Chief Procurement Officer, ADC
       Richard Evitch, Bureau Administrator, Planning, Budget & Research Bureau

**ATTACHMENT 13**

**ATTACHMENT 13**



# Arizona Department of Corrections
# Rehabilitation & Reentry

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

March 3, 2020

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:     Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
of December, 2019

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated February 21, 2020 of the penalties determined
appropriate for the reporting period from the calendar month of December, 2019.  The deadline for any "meet
and confer" requests regarding this sanctionable period was required to be scheduled to take place no later than
March 2, 2020.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 62 performance measures. The sanctionable
amount is $183,000 for the month.

To effect the payment of the sanction, the Department will offset $183,000 against payments due to Centurion
on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at
(602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:     Keith Lueking, COO, Centurion
David Shinn, Director, Arizona Department of Corrections, Rehabilitation & Reentry
Richard Pratt, Bureau Administrator, Arizona Department of Corrections, Rehabilitation & Reentry
Brad Keogh, General Counsel, Legal Services
Vanessa Headstream, Acting Assistant Director, Health Services Contract Monitoring Bureau

**ATTACHMENT 14**

**ATTACHMENT 14**



# Arizona Department of Corrections
# Rehabilitation & Reentry

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

March 18, 2020

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ 85281

RE:    Contract No. ADOC18-216360
       JANUARY, 2020
       Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the Arizona Department of Corrections Rehabilitation & Reentry (ADCRR) has reviewed the CGAR findings for the contractually sanctionable month of January, 2020.

This is the seventh scheduled monthly review and subsequent sanction under the contract.

All Performance Measures are important. However, particular attention is immediately necessary with regard to 146 individual Performance Measures at specific facilities which have been identified by one of the Court's most recent Order (3490), and Judge Silver's focus. Tracking for these measures will be a major focus at each of the facilities identified in the document (enclosed).

In January, 2020 it was determined that 66 total Performance Measures failed to attain a passing score of 85%. ADCRR has further identified 37 of the 66 Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Douglas | Eyman | Florence | Lewis | Perryville | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|---|
| 2 | X | | | | | | | 1 |
| 11 | | X | | | | | | 1 |
| 12 | | X | | X | | | | 2 |
| 14 | | X | | | | | | 1 |
| 15 | | | | X | | | | 1 |
| 19 | | | | X | | | | 1 |
| 35 | | X | | X | | | | 2 |
| 36 | | X | | | | | | 1 |
| 37 | | X | | X | | X | X | 4 |
| 40 | | X | X | | X | | | 3 |
| 42 | | X | | | | | X | 2 |
| 44 | | | | | | X | | 1 |
| 45 | | X | | | | | | 1 |
| 49 | | X | | | | X | | 2 |
| 50 | | X | X | X | | X | X | 5 |
| 51 | | X | X | X | | X | | 4 |
| 55 | | | | | | | X | 1 |
| 59 | | X | | X | | | | 2 |
| 66 | | | X | | | | | 1 |
| 67 | | | | | | X | | 1 |
| Total | 1 | 13 | 4 | 8 | 1 | 6 | 4 | 37 |

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 10 | $75,000.00 |
| 30-39 | $10,000.00 | 8 | $80,000.00 |
| 40-49 | $15,000.00 | 0 | $0.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 37 | $227,500.00 |

Page **2** of 3

The other remaining 29 of the 66 individual performance measures are sanctioned @ $500.00 per measure.  29 X $500.00 = $14,500.00.

The total sanction for the month of January, 2020:

$$\$227,500.00 + \$14,500.00 = \$242,000.00$$

The total offset amount is for the month of January, 2020 is calculated to be $242,000.00.

Please review the total 66 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures.  If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer.  If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.


Sincerely,

Vanessa Headstream
Interim Assistant Director
Health Services Contract Monitoring Bureau

Enclosure

cc:    David Shinn, Director, ADCRR
       Keith Lueking, COO, Centurion
       Mike Kearns, Division Director, Administrative Services Division, ADCRR
       Brad Keogh, General Counsel, ADCRR
       Deana Johnson, VP & General Counsel, Centurion
       Ken Sanchez, Chief Procurement Officer, ADCRR
       Richard Evitch, Bureau Administrator, Planning, Budget & Research Bureau, ADCRR

**ATTACHMENT 15**

**ATTACHMENT 15**



# Arizona Department of Corrections
# Rehabilitation & Reentry

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



**DOUGLAS A. DUCEY**
**GOVERNOR**

**DAVID SHINN**
**DIRECTOR**

March 30, 2020

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:     Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
        of January, 2020

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated March 18, 2020 of the penalties determined
appropriate for the reporting period from the calendar month of January, 2020.  The deadline for any "meet
and confer" requests regarding this sanctionable period was required to be scheduled to take place no later than
March 28, 2020.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 66 performance measures. The sanctionable
amount is $242,000 for the month.

To effect the payment of the sanction, the Department will offset $242,000 against payments due to Centurion
on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at
(602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:     Keith Lueking, COO, Centurion
        David Shinn, Director, Arizona Department of Corrections, Rehabilitation & Reentry
        Richard Pratt, Bureau Administrator, Arizona Department of Corrections, Rehabilitation & Reentry
        Brad Keogh, General Counsel, Legal Services
        Vanessa Headstream, Acting Assistant Director, Health Services Contract Monitoring Bureau

**ATTACHMENT 16**

**ATTACHMENT 16**



# Arizona Department of Corrections
# Rehabilitation & Reentry

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



**DOUGLAS A. DUCEY**
**GOVERNOR**

**DAVID SHINN**
**DIRECTOR**

April 20, 2020

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ 85281

RE:   Contract No. ADOC18-216360
      FEBRUARY, 2020
      Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION & REENTRY (ADCRR) has reviewed the CGAR findings for the contractually sanctionable month of February, 2020.

This is the eighth scheduled monthly review and subsequent sanction under the contract.

All Performance Measures are important. However, particular attention is immediately necessary with regard to 146 individual Performance Measures at specific facilities which have been identified by one of the Court's most recent Order (3490), and Judge Silver's focus. Tracking for these measures will be a major focus at each of the facilities identified in the document (attached).

In February, 2020 it was determined that 39 total Performance Measures failed to attain a passing score of 85%. ADCRR has further identified **22 of the 39** Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Douglas | Eyman | Florence | Lewis | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|---|
| 16 | | | | | | X | 1 |
| 37 | | | | X | X | | 2 |
| 43 | | X | | | | | 1 |
| 44 | | X | X | X | X | | 4 |
| 45 | | X | | | | | 1 |
| 47 | X | | | | | | 1 |
| 49 | | X | | | | | 1 |
| 50 | | X | X | X | X | X | 5 |
| 51 | | X | X | X | X | | 4 |
| 52 | | | | | X | | 1 |
| 59 | | | | X | | | 1 |
| Total | 1 | 6 | 3 | 5 | 5 | 2 | 22 |

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 10 | $50,000.00 |
| 20-29 | $7,500.00 | 3 | $22,500.00 |
| 30-39 | $10,000.00 | 0 | $0.00 |
| 40-49 | $15,000.00 | 0 | $0.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 22 | $95,000.00 |

The other remaining 17 of the 39 individual performance measures are sanctioned @ $500.00 per measure. 17 X $500.00 = $8,500.00.

The total sanction for the month of February, 2020 is:

$$\$95,000.00 + \$8,500.00 = \$103,500.00$$

The total offset amount for the month of February, 2020 is calculated to be $103,500.00.

Please review the total 39 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures. If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer.

If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.


Sincerely,

Vanessa Headstream

Vanessa Headstream
Interim Assistant Director
Medical Services Division

Enclosure

cc:    David Shinn, Director, ADCRR
       Joseph Profiri, Deputy Director, ADCRR
       Keith Lueking, COO, Centurion
       Richard Evitch, Assistant Director, Financial Services Division, ADCRR
       Brad Keogh, General Counsel, ADCRR
       Deana Johnson, VP & General Counsel, Centurion
       Ken Sanchez, Chief Procurement Officer, ADCRR

**ATTACHMENT 17**

**ATTACHMENT 17**



# Arizona Department of Corrections
# Rehabilitation & Reentry

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



**DOUGLAS A. DUCEY**
**GOVERNOR**

**DAVID SHINN**
**DIRECTOR**

May 6, 2020

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:    Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
       of February, 2020

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated April 20, 2020 of the penalties determined appropriate for the reporting period from the calendar month of February, 2020.  The deadline for any "meet and confer" requests regarding this sanctionable period was required to be scheduled to take place no later than April 30, 2020.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 39 performance measures. The sanctionable amount is $103,500 for the month.

To effect the payment of the sanction, the Department will offset $103,500 against payments due to Centurion on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at (602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:    Keith Lucking, COO, Centurion
       David Shinn, Director, Arizona Department of Corrections, Rehabilitation & Reentry
       Richard Pratt, Bureau Administrator, Arizona Department of Corrections, Rehabilitation & Reentry
       Brad Keogh, General Counsel, Legal Services
       Vanessa Headstream, Acting Assistant Director, Health Services Contract Monitoring Bureau

**ATTACHMENT 18**

**ATTACHMENT 18**



# Arizona Department of Corrections
# Rehabilitation & Reentry

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

May 19, 2020

Tom Dolan
Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, AZ 85281

RE:     Contract No. ADOC18-216360
        MARCH, 2020
        Contract Sanctions

Dear Mr. Dolan:

This letter is to advise you that the ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION & REENTRY (ADCRR) has reviewed the CGAR findings for the contractually sanctionable month of March, 2020.

This is the ninth scheduled monthly review and subsequent sanction under the contract.

All Performance Measures are important. However, particular attention is immediately necessary with regard to 139 individual Performance Measures at specific facilities which have been identified by one of the Court's most recent Order (3490), and Judge Silver's focus. Tracking for these measures will be a major focus at each of the facilities identified in the document (attached).

In March, 2020 it was determined that 28 total Performance Measures failed to attain a passing score of 85%. ADCRR has further identified 17 of the 28 Performance Measures that resulted in an extension of the Stipulation based upon the rules of the Stipulation Agreement. The list of those Performance Measures follows on page 2.

| FAILED PERFORMANCE MEASURE | Eyman | Florence | Lewis | Tucson | Yuma | Total |
|---|---|---|---|---|---|---|
| 11 | X | | | | | 1 |
| 40 | | | | X | | 1 |
| 44 | X | X | | X | X | 4 |
| 50 | X | X | X | X | | 4 |
| 51 | X | X | X | X | | 4 |
| 52 | X | X | | | | 2 |
| 59 | | | X | | | 1 |
| Total | 5 | 4 | 3 | 4 | 1 | 17 |

| MEASURE SCALE | SANCTION AMOUNT | # SANCTIONABLE MEASURES | TOTAL SANCTIONS |
|---|---|---|---|
| 1-9 | $2,500.00 | 9 | $22,500.00 |
| 10-19 | $5,000.00 | 8 | $40,000.00 |
| 20-29 | $7,500.00 | 0 | $0.00 |
| 30-39 | $10,000.00 | 0 | $0.00 |
| 40-49 | $15,000.00 | 0 | $0.00 |
| 50+ | $20,000.00 | 0 | $0.00 |
| TOTAL | | 17 | $62,500.00 |

The other remaining 11 of the 28 individual performance measures are sanctioned @ $500.00 per measure.  11 X $500.00 = $5,500.00.

The total sanction for the month of March, 2020:

$$\$62,500.00 + \$5,500.00 = \$68,000.00$$

The total offset amount for the month of March, 2020 is calculated to be $68,000.00.

Please review the total 28 items and respond within 10 calendar days of this letter with any questions you may have regarding the Performance Measures.  If you disagree with the results for any of the measures, we will meet and confer on those issues in accordance with the administrative remedy process set forth in the contract.

Any necessary administrative remedy process shall be completed within five (5) calendar days of any meet and confer. The matter will then be referred to the Chief Procurement Officer. If you are in agreement with the above, please provide that response as well within the ten (10) calendar days of the date of this letter so that this matter can be immediately referred to the Chief Procurement Officer for further action.

Sincerely,

Larry Gann
Assistant Director
Medical Services Contract Monitoring Bureau

Enclosure

cc:     David Shinn, Director, ADCRR
        Joseph Profiri, Deputy Director, ADCRR
        Keith Lueking, COO, Centurion
        Richard Evitch, Assistant Director, Financial Services Division, ADCRR
        Brad Keogh, General Counsel, ADCRR
        Deana Johnson, VP & General Counsel, Centurion
        Ken Sanchez, Chief Procurement Officer, ADCRR

**ATTACHMENT 19**

**ATTACHMENT 19**



# Arizona Department of Corrections
# Rehabilitation & Reentry

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

DAVID SHINN
DIRECTOR

June 8, 2020

Tom Dolan, Vice President of Operations
Centurion, Arizona Regional Office
1850 W. Rio Salado Pkwy, Suite 209
Tempe, Arizona 85281
Via Email: tdolan@teamcenturion.com

Re:    Contract No. CTR041835/ADOC18-216360 – Inmate Correctional Healthcare / Sanctionable Month
       of March, 2020

Dear Mr. Dolan:

Centurion was advised in the enclosed sanction letter dated May 19, 2020 of the penalties determined
appropriate for the reporting period from the calendar month of March, 2020. The deadline for any "meet and
confer" requests regarding this sanctionable period was required to be scheduled to take place no later than
May 30, 2020.

No response has been received from Centurion regarding rebuttal or clarification of the proposed sanction.

The Department is proceeding with the sanction/offset based on 28 performance measures. The sanctionable
amount is $68,000 for the month.

To effect the payment of the sanction, the Department will offset $68,000 against payments due to Centurion
on the next payment.

If you have any questions, please contact Rocky Advani, Procurement Manager at (602) 364-3792 or me at
(602) 542-1172.

Sincerely,

Kenneth P. Sanchez
Chief Procurement Officer

KS/ra

Enclosure

cc:    Keith Lueking, COO, Centurion
       David Shinn, Director, Arizona Department of Corrections, Rehabilitation & Reentry
       Brad Keogh, General Counsel, Legal Services
       Larry Gann, Assistant Director, Health Services Contract Monitoring Bureau

**ATTACHMENT 20**

**ATTACHMENT 20**





# What is a Nurse Line Encounter?

The Nurse Line encounter is usually either Scheduled (ex. submission of a HNR) or Unscheduled (ex. unanticipated addition to the NL usually originating from vendor administration or security personnel)





# NL Encounter Need to Know

The RN should **ALWAYS** use a Nurse Encounter Tool (NET) or Nursing Assessment Protocol (NAP).



When seeing patients on Nurse Line (NL), avoid using Symptoms Review forms, Chart Notes, and Chart Reviews

**ALWAYS** get a complete set of vital signs including weight. If a vital sign is unable to be obtained, make sure the reason is documented.





## Restrictions

Review if the patient has active prescriptions for medications, take a brief look at the MAR and history of compliance

If any doses are missing or have been refused, perform medication education counseling and **DOCUMENT** it

If the patient has an active diet order, always perform diet counseling and **DOCUMENT** it

# Nurse Line Video













# Provider Line Encounter Video











# No Referral

This refers to exactly what it means.  You were able to treat this inmate and no additional medical appointments or treatment is needed.



# Routine Referral

The patient's health condition is stable, but requires a higher level of care from a provider.  This can come in the form of a Chart Review or an in-person provider visit.





*Helpful hint: routine referral timeframe can range from 2-14 days.*

# Urgent Referral

The patient MUST BE SEEN by a provider within 24 hour window that starts when the NL visit has concluded. Typical documentation may include statements such as (1) "Patient will be seen later today," (2) "Patient will be seen tomorrow," or (3) "Patient will be seen by the provide in the AM."

# Emergent Referral

The patient MUST BE SEEN immediately by the onsite provide and/or the patient is sent offsite to a hospital.

# Referral Video









# CGAR & PM

 Many medical staff find the CGAR and its associated Performance Measures (PM) to be overwhelming, negative, and ever-changing.

 Many of these thoughts actually arise because each individual PM is commonly looked at independently.

 Each PM has been assigned a numeric number, but each PM falls into the process that already exists at each complex.

 It is important to understand that the CGAR PMs are intertwined and linked much like the engine of a car.  All CGAR PMs must co-exist and function together in order to propel the car in one desired direction.





# HNR Submitted

Inmates submit HNR's in various ways.  They can deposited in labeled boxes within the complex or be given directly to medical staff.

# Time Stamp and Initial

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

'20 MAR 17 5:14

Date : _____

Time: _____

Initials: _AL_

**SECTION/SECCIÓN I**

| INMATE NAME/NOMBRE (Last, First M.I.) (Apellido, Nombre, Inicial) | | ADC NUMBER/NÚMERO DE ADC | DATE/FECHA (mm/dd/yyyy) |
|---|---|---|---|
| Smith, Joe D | | 000000 | 3-19-2020 |
| CELL/BED NUMBER/CELDA/ NÚMERO DE CAMA | UNIT/UNIDAD | P.O. BOX/APARTADO POSTAL | INSTITUTION/INSTALACIÓN: ADC |
| 4 L 5 9 | Browning | 3400 | Eyman |

You are required to be truthful.  Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action.  [Se le exige diga la verdad.  La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar  la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria.]

Once the document is received in the medical unit, the form gets time stamped (see upper right hand red box) and initialed by the staff member that received the document.

It then awaits triage by either a RN or LPN.

# HNR Triaged RN/LPN

**SECTION III/SECCION III**

REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA    ☒ Medical/Médico    ☐ Dental    ☐ Pharmacy/Farmacia    ☐ FHA

☐ Pharmacy/Farmacia    ☐ Mental Health/Salud Mental    ☐ Eyes/Ojos    ☐ Other *(specify)/Otros (especifique)* _____

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA *(mm/dd/yyyy)* | TIME/HORA |
|---|---|---|
| RN Smith | 3-21-2020 | 1200 AM |

**SECTION/SECCIÓN IV**

**PLAN OF ACTION/PLAN DE ACCION**

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA *(mm/dd/yyyy)* | TIME/HORA |
|---|---|---|
| | | |

*This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision*

Section III of the HNR:  Within 24 hours, the HNR should be triaged by a RN or LPN.  Once the appropriate department is determined, the RN or LPN should (1.) stamp/print his/her name, date the form, and document the time of triage.

# Triaged

**SECTION III/SECCION III**

**1** REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA     ☒ Medical/Médico     ☐ Dental     ☐ Pharmacy/Farmacia     ☐ FHA
☐ Pharmacy/Farmacia     ☐ Mental Health/Salud Mental     ☐ Eyes/Ojos     ☐ Other (specify)/Otros (especifique) _____

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| RN Smith | 3-21-2020 | 1200 AM |

**SECTION/SECCIÓN IV**

**PLAN OF ACTION/PLAN DE ACCION**

**2.**   Referred to provider for evaluation of possible broken hand

| STAFF SIGNATURE STAMP/FIRMA DEL EMPLEADO | DATE/FECHA (mm/dd/yyyy) | TIME/HORA |
|---|---|---|
| **3** RN Smith | 3-21-2020 | 1200 AM |

This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision

Section IV (Plan of Action):  This section will be filled in after the completion of the initial action or encounter.  So, if the patient was seen on Nurse Line (NL) and is being referred to the provider, this would be noted in #2 and the staff member would close out this HNR by (1.) stamp/printing his/her name, (2) current date, and (3.) current time.

# Referrals Video

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

Date: _____
Time: _____
Initials: _____

| Inmate Name/Nombre *(Last, First M.I.) (Apellido, Nombre, Inicial)* | | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|---|
| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). *[Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez!]*

**AREA OF INTEREST**(*Check only one block below)/***AREA DE INTERES** *(MARQUE UN ESPACIO SOLAMENTE)* ☐ Medical/Médica ☐ Dental ☐ FHA ☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other *(specify)/*Otros *(especifique)* _____
PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

SECTION/SECCION I

N/SECCION II



# Pharmacy

Presented by Arizona Department of Corrections









# Review

How many days do you have to administer a
medication from the prescribed day?



○ 1

○ 5

○ 2

○ 4



# Pharmacy Video
# Inmate Refuses Medication

CHSS037B - Drug Prescription Order

| Active Orders | Allergies | Appointments | Consults | Current Health Status | Dental | Encounters | HSR | Health Problems | Labs | Medications | Precautions |

**Medication Administration Record** (1 - 118 of 118)

| Date | Time | Quantity Dispensed | Source | Outcome | |
|------|------|--------------------|--------|---------|--|
| 01/20/2019 | 16:59 | 0.00 | Patient Specific | Patient Refused | |
| 01/19/2019 | 18:06 | 2.00 | Patient Specific | Administered | |
| 01/18/2019 | 14:18 | 0.00 | Patient Specific | Patient Refused | |
| 01/17/2019 | 17:05 | 0.00 | Patient Specific | Patient Refused | |
| 01/16/2019 | 16:06 | 0.00 | Patient Specific | Patient Refused | |
| 01/15/2019 | 15:31 | 2.00 | Patient Specific | Administered | |
| 01/13/2019 | 16:47 | 0.00 | Patient Specific | Patient Refused | |
| 01/12/2019 | 14:22 | 2.00 | Patient Specific | Administered | |
| 01/11/2019 | 13:33 | 0.00 | Patient Specific | Patient Refused | |
| 01/10/2019 | 16:57 | 0.00 | Patient Specific | Patient Refused | |
| 01/09/2019 | 16:58 | 0.00 | Patient Specific | Patient Refused | |
| 01/08/2019 | 13:09 | 0.00 | Patient Specific | Patient Refused | |
| 01/07/2019 | 16:42 | 0.00 | Patient Specific | Patient Refused | |
| 01/06/2019 | 12:51 | 2.00 | Patient Specific | Administered | |
| 01/05/2019 | 19:10 | 0.00 | Patient Specific | Patient Refused | |
| 01/04/2019 | 17:08 | 0.00 | Patient Specific | Patient Refused | |
| 01/03/2019 | 17:12 | 0.00 | Patient Specific | Patient Refused | |
| 01/02/2019 | 12:29 | 0.00 | Patient Specific | Patient Refused | |

# Review

How many consecutive refusals are required before you much educate the inmate?

○ 2 consecutive refusals

○ 4 consecutive refusals

○ 1 consecutive refusal

○ 3 consecutive refusals

