Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-ROS |
| Plaintiffs, | **DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE** |
| v. | **(Dkt. 3490)** |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | [REDACTED] |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...........................................................................................i

I.    Background ..................................................................................................1

    A.    ADCRR Changes Its Healthcare Vendor, Appoints a New Director and Assistant Director, and Restructures the Department ..........................1

        1.    ADCRR Begins a new partnership with Centurion .........................1

        2.    Centurion takes over and substantially improves compliance. .....................................................................................5

        3.    ADCRR appoints a new Director and restructures the Department ...................................................................................15

        4.    ADCRR appoints a new Assistant Director and reorganizes the Monitoring Bureau.................................................16

    B.    The Order to Show Cause and ADCRR's Response .................................20

    C.    Compliance in February 2020 ..................................................................24

II.    The Court Should Not Hold Defendants in Civil Contempt of the OSC.........25

    A.    General Legal Principles ..........................................................................25

    B.    ADCRR and Centurion Took All Reasonable Steps to Comply with the OSC and Substantially Complied with It .....................................26

    C.    At a Minimum, the Court Should Reduce the $100,000-per-Noncompliance Sanction...........................................................................47

    D.    Defendants Request an Evidentiary Hearing ...........................................49

III.    Conclusion ..................................................................................................49

For the many reasons that follow, the Court should not hold Defendants in contempt of the January 31, 2020 Order to Show Cause ("OSC").  Defendants employed all reasonable measures within their power to comply with the OSC, and they have substantially complied with it.  The extraordinary efforts they have taken—over the past year—have resulted in near total compliance with the Stipulation.  The measures taken in recent months are closing the gap.  The Court should refrain from imposing any sanctions and allow this trending compliance to continue to fruition.  At a minimum, the Court should reduce the amount of the sanction.

## I.    Background.

The OSC listed 35 Health Care Performance Measures ("PM") at certain facilities, a total of 146 Performance Measures/facilities.  (Dkt. 3490.)  The Court included these PMs because they had been found to be substantially noncompliant in the past.  (Dkt. 3490 at 3 & n.1; *see also* Dkt. 1678, 2535, 2647, 2682, 2751, 2801, 2874, 2958.)  They have already resulted in two previous orders to show cause, one finding of civil contempt, and a $1,445,000.00 sanction.  (Dkt. 2373, 2898, 3235.)  All of this occurred during Corizon's tenure as the healthcare vendor.  (Dkt. 344.)  A lot has changed since then.

### A.    ADCRR Changes Its Healthcare Vendor, Appoints a New Director and Assistant Director, and Restructures the Department.

#### 1.    ADCRR begins a new partnership with Centurion.

On July 1, 2019, the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") changed healthcare vendors from Corizon to Centurion of Arizona ("Centurion").  (Declaration of Larry Gann, ¶ 28; Declaration of Tom Dolan, ¶ 7.) Centurion is a national leader in providing medical and behavioral health services to state prison systems, serving 12 state correctional agencies.  (Dolan Decl., ¶ 2.)  Mindful of the Court's concerns that ADCRR's contract with Corizon did not contain sufficiently large "sticks" to ensure compliance, capped the total amount of monthly sanctions for PM noncompliance, and offered "disparate" incentive payments, which in some months offset the amount of monthly sanctions, ADCRR's contract with Centurion is fundamentally

different.  (Gann Decl., ¶¶ 25–29.)  The Centurion contract does not include a cap on the amount of noncompliance sanctions and provides no "incentive payment" for compliance. (*Id*., ¶ 29.)  Instead, the contract has a three-tier system of sanctions designed to promote compliance with the contract and the Stipulation.  (*Id*., ¶ 30.)  Those sanctions are imposed as offsets on amounts due to Centurion.  (*Id*.)

The first tier of performance sanctions ensures that Centurion strives to comply with all PMs in the Stipulation.  (*Id*., ¶ 31.)  Even if a noncompliant finding does not result in the extension of the 24-month-rolling period of the Stipulation, Centurion's failure to meet the 85% compliance benchmark at any complex for any month will result in a fixed-rate performance offset of $500.00 per measure, per month, per facility. (*Id*.) In contrast, performance sanctions imposed on Corizon were limited only to instances of noncompliance that extended the 24-month-rolling period.  (*Id*.)

The second tier is a graduated-scale performance offset which applies only to PMs where noncompliance at a particular complex in a month will result in the extension of the 24-month-rolling period of the Stipulation.  (*Id*., ¶ 32.) These graduated-scale offsets necessarily apply to all PMs in the OSC, as any further instance of noncompliance would extend the time period before the measure was eligible for termination.  (*Id*., ¶ 33.)  The sanction amount starts at $2,500.00 for each noncompliant PM.  (*Id*., ¶ 34.)  The amount of the offset increases based upon the number of compliance failures in a particular month:

| Number of Noncompliant Measures | Offset Amount per Instance |
|---|---|
| 1–9 | $2,500.00 |
| 10–19 | $5,000.00 |
| 20–29 | $7,500.00 |
| 30–39 | $10,000.00 |
| 40–49 | $15,000.00 |
| 50+ | $20,000.00 |

(*Id*., ¶¶ 33–34.)

The third tier provides for staffing offsets/paybacks for hours of service if the actual number of hours worked by personnel in contract-job descriptions in a month falls below the level of hours to be worked by a full-time equivalent ("FTE") employee. (*Id*., ¶ 36.) Where positions are under-filled in a particular month, Centurion is subject to an offset based upon the average hourly rate for that provision for each hour that was uncovered. (*Id*.) To avoid these offsets, Centurion may use more qualified staff to cover the hours; for example, a Registered Nurse ("RN") may be used to complete the work of a Licensed Practical Nurse ("LPN"), or a physician may work to cover the hours for a mid-level provider listed in the staffing plan. (*Id*.) The staffing offset is intended to eliminate any financial incentive for the contractor to conclude that it may be economically advantageous to leave a position on the staffing plan unfilled, even where there is a sanction for noncompliance. (*Id*., ¶ 37.) If a position on the staffing plan is not worked in the month, the amount of the payment due to the contractor is offset by the wage or salary due to that particular position for each vacancy. (*Id*.) The staffing sanctions are imposed based upon hours worked by hired staff up to one FTE per Centurion employee. (*Id*., ¶ 38.) Hours worked by employees as overtime, as well as hours worked by agency (locum) staff, or independent contractors, do not reduce the staff sanction imposed in a given month. (*Id*.)

///

///

3

In the first nine months of Centurion's performance, ADCRR imposed $8,362,040.14 in offsets/sanctions. (*Id.*, ¶ 57.) Figure 1 graphically illustrates the total amount imposed each month:[1]



(*Id.*, Figure 1.) Unlike the Corizon contract, the Centurion contract requires the immediate imposition of sanctions. (*Id.*, ¶ 58.) By imposing immediate and substantial sanctions, ADCRR unequivocally communicated the importance of and necessity for Centurion to ensure compliance with the contract and the PMs in the Stipulation. (*Id.*, ¶ 59.) This three-tier sanction scheme, involving a combination of fixed-rate performance offsets, graduated-rate performance offsets, and staffing offsets, has served, and continues to provide, a

---

[1] Dark blue is the graduated-scale offset; pink is the fixed-rate offset; and light blue is the staffing offset. (Gann Decl., ¶ 57.)

significant incentive for Centurion to achieve compliance.  (*Id.*, ¶ 62.)  These sanctions have resulted in higher compliance rates. (*Id.*, ¶¶ 60–61.)

### 2. Centurion takes over the provision of healthcare and substantially improves compliance.

Since assuming the contract in July 2019, Centurion has taken many proactive steps to improve not only inmate-patient access to care but the quality of care they receive. (Dolan Decl., ¶ 6.)

### Staffing

Centurion has emphasized hiring and retaining qualified health care staff.  (*Id.*, ¶ 8.) Since Centurion assumed the contract in July 2019, the "hired fill rate" and "worked fill rate" have increased dramatically.[2]  (*Id.*)  The fill rates for all contracted positions increased from 70.06% (hired) / 85.30% (worked) to 93.36% (hired) / 102.54% (worked):



---

[2] The "hired fill rate" is the percentage of the contractually required FTE that is filled by hired employees. (Dolan Decl., ¶ 8.) The "worked fill rate" is the percentage of the FTE that is filled by not only hired employees but also overtime by non-salaried employees, coverage pay by salaried employees, and work by agency staff. (*Id.*) Worked FTE is a better reflection of the hours that go into providing and supporting direct patient care. (*Id.*)

(*Id.*, ¶ 9.)  The contract requires 10.2 FTE for physicians and 43 FTE for mid-level providers (NPs and Physician Assistants ("PA")).  In September 2019, hired physicians totaled 6.0 FTE, and hired mid-level providers totaled 38.8 FTE.  (*Id.*, ¶ 10.)  In October 2019, hired physicians increased to 7.0 FTE (a 17% increase), and three pro re nata ("PRN") physicians (i.e., as needed physicians) were hired, bringing the hired total to 13 physicians.  (*Id.*)  Hired mid-level providers also increased in October 2019 to 40.7 FTE (a 5% increase).  (*Id.*)  In April 2020, hired mid-level providers increased significantly, reaching 49.65 FTE—a 115.47% hired fill rate and 126.60% worked fill rate:

| Provider | Contract | 20-Apr | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Hired FTE | Hired Staff # | Hired % | Hours Worked | Worked FTE | Worked % |
| Mid-Level | 43 | 49.65 | 70 | 115.47% | 9,581.08 | 54.44 | 126.60% |
| Physician | 10.2 | 7 | 16 | 68.63% | 1,396.80 | 7.94 | 77.81% |

(*Id.*)  In May 2020, hired mid-level providers either met or exceeded contract FTE requirements at all complexes.  (*Id.*, ¶ 11.)  Statewide, Centurion exceeded contract requirements for mid-level provider positions by 8.40 FTE, 19.5% more than the contract requires.  (*Id.*)

Centurion filled critical positions, including the ASPC-Florence Site Medical Director (on November 11, 2019); the ASPC-Winslow Site Medical Director (on November 23, 2019), and the ASPC-Douglas Site Medical Director (on June 29, 2020).  (*Id.*, ¶ 12.)  Centurion also hired two OB-GYNs at ASPC-Perryville (on July 1, 2019, and April 27, 2020), exceeding the current staffing matrix.  (*Id.*)  In May 2020, the combined hired fill rate for Psychiatrists and Psychiatric Nurse Practitioners was 90%.  (*Id.*)

In November 2019, Centurion approved the hiring of additional Medical Assistants and Certified Nursing Assistants to support the clinics in each of the housing units as needed.  (*Id.*, ¶ 13.)  These staff members are utilized to improve scheduling for appointments and referrals, which improves compliance with PMs 39, 40, and 42.  (*Id.*)  They also assist with administrative tasks, distributing diagnostic results to patients (which improves compliance with PM 47), and facilitating telehealth services (which improves compliance with PMs 37, 39, 40, 42, 53, and 55).  (*Id.*) Centurion also recently hired an

additional (over contract requirements) 18.8 FTE Medical Assistants/Certified Nursing Assistants to help support clinics.  (*Id*.)

In November 2019, Centurion approved the hiring of additional Administrative Assistants (currently 5.75 FTE over contract requirements) to assist with supporting, tracking, and monitoring PMs.  (*Id*., ¶ 14.)  These additional positions assist the healthcare delivery facilitators in tracking and monitoring more measures, which improves compliance.  (*Id*.)  The following facilities exceed contract requirements for hired Administrative Assistants: ASPC-Eyman (two extra), ASPC-Florence (one extra), ASPC-Lewis (one extra), ASPC-Tucson (one extra), ASPC-Winslow (one extra).  (*Id*.)

To ensure the availability of temporary staff if needed, Centurion utilizes supplemental staffing through several agencies.  (*Id*., ¶ 15.)  Centurion has contracted with three provider agencies (Maxim Healthcare Services, Alumni Healthcare Staffing, and Consilium Staffing) and five nursing agencies (AB Staffing Solutions, Accountable Healthcare Staffing, Maxim Healthcare Services, Supplemental Health Care, and MobileX).  (*Id*.)  Centurion began working with MobileX, Supplemental Health Care, Maxim Healthcare Services, and Alumni Healthcare Staffing during the July 2019 contract transition.  (*Id*.)  Consilium Staffing began assisting in September 2019, Accountable Healthcare Staffing began assisting in November 2019, and AB Staffing began assisting in January 2020.  (*Id*.)  Centurion supplemented staff with approximately 71 agency staff in the first quarter of 2020.  (*Id*.)  There were 83 agency staff in June, and currently there are 64 agency staff.  (*Id*.)  In April 2020, 12 new agency nurses were added, and in May 2020, 16 new agency nurses were added.  (*Id*.)

### Recruitment and Retention

Centurion has aggressively recruited through marketing and online postings, social media and text messaging campaigns, job fairs, and nursing school visits. (*Id*., ¶ 16.) Provider recruiting efforts started in March 2019, non-provider recruiting efforts started in May 2019, and both continue to date.  (*Id*.)  Centurion has attended 23 academic events; advertised with 11 professional associations; joined and posted employment opportunities

within several social media groups on Facebook and LinkedIn; sent 29 text campaigns resulting in over 10,000 individual connections with nurses in Arizona; published and distributed six direct mail campaigns to nearly 40,000 nurses and completed 22 email campaigns targeted to 34,000 Arizona nurses; placed print and display advertisements in 15 Arizona newspapers; and created an online presence by advertising through a variety of employment websites, including Indeed, Zip Recruiter, and Monster.  (*Id.*)  Due to the COVID-19 pandemic, many additional events in March, April, May, and July had to be canceled. (*Id.*)  Centurion has spent $179,310.32 in these recruitment efforts.  (*Id.*, ¶ 17.) Since February 2020, Centurion has spent $80,956.36.  (*Id.*)

Centurion has doubled the retention bonus for Assistant Directors of Nursing ("ADON"), RNs, LPNs, and Psychology Associates at certain understaffed facilities.  (*Id.*, ¶ 18.)  Beginning September 16, 2019, full-time RNs and LPNs hired at ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Perryville, and ASPC-Yuma received a $3,000 retention bonus paid over the first year. (*Id.*) Beginning February 12, 2020, full-time ADONs, RNs, and LPNs hired at ASPC-Eyman, ASPC-Florence, ASPC-Lewis, and ASPC-Yuma received a $6,000 retention bonus paid over the first year; full-time night shift RNs at ASPC-Perryville received a $4,000 retention bonus paid over the first year; fulltime Psychology Associates hired at ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Perryville, and ASPC-Yuma received a $2,500 retention bonus paid over the first year; and full-time ADONs, RNs and LPNs hired at ASPC-Tucson received a $2,500 retention bonus paid over the first year.  (*Id.*)  These retention bonuses were effective until June 30, 2020. Twenty-four ADONs, 16 Psychology Associates, 117 RNs, and 41 LPNs were hired during these times frames and eligible to receive retention bonuses, totaling a potential pay-out of $1,002,500.00.  (*Id.*)

Beginning October 1, 2019, Centurion offered a retention bonus for all newly hired Site Medical Directors in the amount of $20,000, with 50% paid after 30 days and the remainder paid at the one-year anniversary.  (*Id.*, ¶ 19.)  Beginning March 1, 2020, Centurion offered the same bonus for all primary care physician vacancies, except at ASPC-

Tucson.  (*Id*.)  Beginning November 29, 2019, Centurion offered an additional bonus, ranging from $5,000 to $10,000, to mid-level providers to assist with licensure and/or relocation expenses.  (*Id*., ¶ 20.)  Beginning July 1, 2020, full-time Psychology Associates hired at ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Perryville, and ASPC-Yuma receive a $2,500 retention bonus paid over the first year.  (*Id*., ¶ 18.)

### Compensation

In February 2020, Centurion increased salaries for RNs and LPNs at ASPC-Eyman, ASPC-Florence, ASPC-Lewis, and ASCP-Yuma.  (*Id*., ¶ 21.)  These increases were determined by using various resources, such as the Economic Research Institute Salary Assessor, a paid subscription-based compensation research platform, and by researching information on the compensation analysis portals of websites, e.g., salary.com, payscale.com, etc.  (*Id*.)  Centurion also researched online job boards to see what other comparable employers in the area are paying and surveyed contacts, healthcare professionals, and candidates in the area to gather information regarding market rates.  (*Id*.)  The increases placed these salaries in at least the 90th percentile.  (*Id*.)

Centurion also authorizes overtime pay (for non-salaried employees) and coverage pay (for salaried employees).  (*Id*., ¶ 22.)  Centurion has paid the following hours of overtime and coverage pay since October 2019:

| Overtime Pay Hours | | | | | | |
|---|---|---|---|---|---|---|
| Oct. 2019 | Nov. 2019 | Dec. 2019 | Jan. 2020 | Feb. 2020 | Mar. 2020 | Apr. 2020 |
| 3924.57 | 5129.75 | 4237.75 | 4439.28 | 3917.62 | 7729.48 | 5890.68 |

| Coverage Pay Hours | | | | | | |
|---|---|---|---|---|---|---|
| Oct. 2019 | Nov. 2019 | Dec. 2019 | Jan. 2020 | Feb. 2020 | Mar. 2020 | Apr. 2020 |
| 733.00 | 1106.50 | 798.85 | 761.03 | 556.25 | 543.88 | 397.10 |

(*Id*.)  Since the Court issued the OSC, 13 mid-level providers have consistently worked above their hired FTE status required by the contract.  (*Id*., ¶ 24.)  In February 2020, mid-level providers worked 270 hours above their hired FTE; in March 2012, mid-level providers worked 276.75 above their hired FTE; and in May 2020, mid-level providers worked 380.5 hours above their hired FTE.  (*Id*.)

In addition to overtime and coverage pay, Centurion offers shift bonuses, which is a set amount offered to staff who agree to fill shifts.  (*Id*., ¶ 24.)  These bonuses start at $40 for LPNs and $60 for RNs, and have gone up to as much as $150 to cover an open shift.  (*Id*.)  Since September 2019, Centurion has paid $132,586.85 in shift bonuses.  (*Id*.)

**General Compliance Efforts**

Telehealth Equipment & Program.  Centurion invested in state-of-the-art telehealth equipment statewide and developed an Arizona TeleHealth Program.  (*Id*., ¶ 25.)  The TeleHealth Program increases access to medical providers, on and off-site Specialists, Psychiatrists, and RNs, which helps improve compliance with PMs 37, 39, 40, 42, 44, 53, 55, 81–88, 90, 95, and 97.  (*Id*.)  The Arizona Telehealth Program went live on July 1, 2019, and became Centurion's largest telehealth program after just six months of operation.  (*Id*.)

Specialty Consultations.  Before assuming the contract, specialty-care PMs 49, 50, 51, and 52 at certain facilities were substantially noncompliant at certain complexes.  (*Id*., ¶ 26.)  In its first six months, Centurion increased the average number of monthly specialty consultations submitted (processed) by onsite providers by 41%.  (*Id*.)  In other words, there was a 41% increase in the average for the months July 2019 through December 2019 from the average for the months of January 2019 through June 2019 under the prior vendor:





(*Id.*)  This increase was the result of streamlining the offsite consultation approval process by decreasing the steps and time from when a consultation is written to when the Utilization Management team (both regional and corporate staff) reviews and approves it.  (*Id.*, ¶ 27.) Patient records now visibly track the status of consultations, which allow for close oversight and scrupulous follow-ups. (*Id.*) The Utilization Team also works closely with local hospitals and are able to retrieve hospital records and discharge recommendations more expediently. (*Id.*) This allows for discharge recommendations to be reviewed by the provider within 24 hours, as required by PM 44.  (*Id.*)  In 2020, the number of specialty consultations submitted (processed) in January (3,538), February (3,489), and March (3,494) held steady, and only dipped in April (2,583) because of the Governor's COVID-19 Executive Orders.  (*Id.*, ¶ 28.)

As a result, PM 44 achieved compliance in December 2019 and January 2020 at ASPC–Eyman, ASPC-Florence, and ASPC-Lewis. (*Id.*, ¶ 29.) PM 49 exceeded the compliance threshold in February, March, and April 2020 at ASPC-Florence, APSC-Perryville, and ASPC-Tucson; in February and March 2020 at ASPC-Douglas; in February 2020 at ASPC-Phoenix; and in March and April 2020 at ASPC-Eyman.  (*Id.*)  PM 50 exceeded the compliance threshold in February, March, and April at ASPC-Perryville; and in April 2020 at ASPC-Florence and ASPC-Tucson. (*Id.*)  PM 51 exceeded the compliance

threshold in February, March, and April at ASPC-Douglas and ASPC-Yuma; and in April 2020 at ASPC-Eyman, ASPC-Florence, ASPC-Perryville, and ASPC-Tucson. (*Id*.) And PM 52 exceeded the compliance threshold in January, February, and April 2020 at ASPC-Eyman, ASPC-Florence, ASPC-Perryville, and ASPC-Phoenix; in March 2020 at ASPC-Phoenix; and in January, March, and April 2020 at ASPC-Tucson. (*Id*.)

Telehealth Nurse Program. In September 2019, Centurion developed and implemented a TeleHealth Registered Nurse Program to provide telenursing sick call. (*Id*., ¶ 30.) This Program was developed and implemented to improve compliance with several PMs, including PM 37. (*Id*.) The telenursing RNs are used mainly at ASPC-Lewis, ASPC-Tucson, ASPC-Eyman, and ASPC-Yuma. (*Id*.) Those facilities processed, on average, 200 encounters in February, March, and April 2020.[3] (*Id*.)

Nurse Line Blitzes. Prior to Centurion assuming the contract, PM 37 (which requires Sick Call inmates to be seen by an RN within 24 hours of receiving a health needs request ("HNR")) at ASPC-Eyman and ASPC-Lewis had been substantially noncompliant for approximately one year. (*Id*., ¶ 31.) When that noncompliance continued under Centurion, it took action. Centurion brought in additional staff to conduct nurse line "blitzes" to eliminate the backlogs at these facilities. (*Id*.) Nurses were rotated to these facilities to double or triple the number of nurse lines in operation during the shifts. (*Id*.) Blitzes took place at ASPC-Lewis from November 16–18, 2019. (*Id*.) On November 15, ASPC-Lewis had a nurse line backlog of 483. (*Id*.) That backlog was reduced to zero by November 20. (*Id*.) Compliance with PM 37 at ASPC-Lewis improved from 59% in December 2019 to 82% in February 2020 and has exceeded the compliance threshold since March 2020. (*Id*.) ASPC-Eyman completed two nurse line blitzes in November 2019 and one in January 2020. (*Id*.) The November blitzes occurred from November 8–10 and November 16–18. (*Id*.) On November 8, the nurse line backlog was 680. (*Id*.) On November 19, the backlog was only 296. (*Id*.) The third blitz occurred from January 24–26, 2020. (*Id*.) On January 24,

_____

[3] If there is a need, Centurion has the ability to complete Telehealth Nurse Sick Call RN visits in all of the complexes. (Dolan Decl., ¶ 30.)

2020, the nurse line backlog was 196.  (*Id*.)  On January 27, the backlog was zero.  (*Id*.)  There have been no significant backlogs at ASPC-Eyman since.  (*Id*.)  ASPC-Eyman achieved 92% compliance with PM 37 in February 2020, and maintained compliance in March 2020 and April 2020, after 20 consecutive months of noncompliance.  (*Id*.)

Nurse Line Telehealth.  In addition to the nurse line blitzes at ASPC-Eyman, beginning in November 2019, Centurion assigned telehealth physicians and a tele-nurse to assist with the nurse line backlog at ASPC-Eyman.  (*Id*., ¶ 32.)  There were as many as six telehealth physicians assigned; currently there are two.  (*Id*.)  This effort helped increase compliance with not only PM 37, but also PMs 39 and 40, and allowed other providers flexibility to focus on other PMs.  (*Id*.)

Physicians Coverage.  After the Court issued the OSC, and to improve compliance with PMs 39, 40, 42, and 55 at facilities that were not in compliance, Centurion made six physicians available to provide additional coverage at those facilities as needed, including on weekends.  (*Id*., ¶ 33.)  Additionally, Centurion hired two in-State telehealth physicians (on January 5, 2020 and April 6, 2020), for a total of 10 dedicated telehealth physicians.  (*Id*.)  Another out-of-State telehealth physician (licensed in Arizona) started in May 2020.  (*Id*.)  PM 39 exceeded compliance at all relevant facilities in February, March, and April 2020.  (*Id*.)  PM 40 exceeded compliance in February, March, and April 2020 at ASPC-Eyman; and in April 2020 at ASPC-Tucson.  (*Id*.)  PM 42 exceeded compliance at all relevant facilities in February, March, and April 2020.  (*Id*.)  PM 55 at ASPC-Eyman exceeded compliance in August, September, November, and December 2019, and in January, March, and April 2020.  (*Id*.)

Wireless Technology.  Beginning in November 2019, Centurion invested in a wireless technology pilot program to enhance real-time nurse and provider documentation in facilities with connectivity issues.  (*Id*., ¶ 34.)  Real-time documentation improves compliance with PMs that require an event or action by a certain time.  (*Id*.)  The project was fully operational and implemented at APSC-Lewis, Rast Unit, on May 5, 2020.  (*Id*.)  Centurion is identifying additional connectivity needs for other complexes.  (*Id*.)

    <u>CareClix Contract</u>.  To help improve access to care, particularly during the COVID-19 pandemic, Centurion contracted with CareClix in March 2020.  (*Id*., ¶ 35.)  CareClix is a virtual healthcare platform that provides specialty telehealth services, including cardiology, endocrinology, Ear, Nose and Throat, rheumatology, orthopedics, urology, nephrology, and infectious disease.  (*Id*.)  The first CareClix consult occurred on April 4, 2020.  (*Id*.)

    <u>Specialty Consultation Review</u>.  In February and March 2020, Centurion's Chief Medical Officers helped review specialty-consultation requests to determine which specialty consultations were appropriate for telehealth services.  (*Id*., ¶ 36.)  These reviews were completed proactively so that any patients not yet seen could be scheduled for telehealth services once they became available.  (*Id*.)  Since February 2020, Centurion has contracted directly with an endocrinologist and a nephrologist.  (*Id*.)

    <u>Daily Healthcare</u>.  In February 2020, qualified health care professionals (LPNs, Mental Health RNs, Nursing Director, Nursing Supervisor) had 85,848 encounters with ADCRR inmates; health care practitioners (physicians, NPs, PAs) had 26,729 encounters with ADCRR inmates; Centurion filled 74,594 prescriptions, processed 22,793 HNRs, ordered 3,580 specialty consultations, scheduled 1,550 specialty consultations, and completed 1,089 specialty consultations; and Defendants completed 618 outside transports for specialty consultations.  (*Id*., ¶ 38.)  Nearly all of these numbers increased in March and April 2020.  (*Id*.)

**Resulting Compliance Scores**

    When Centurion assumed the contract on July 1, 2019, Corizon's overall compliance with the PMs in the Stipulation was 89%.  (Declaration of David Shinn, ¶¶ 10–11; Dolan Decl., ¶ 7; Gann Decl., ¶¶ 19–24.)  Of the 746 audited PMs, only 664 were compliant (85% or higher).  (*Id*.)  As of May 1, 2020, Centurion raised the overall compliance percentage of PMs in the Stipulation to 96%—703 compliant PMs out of 731 audited PMs in April 2020, the last audited month.  (*Id*.)  The overall compliance percentage in February 2020 was 95%, and the overall compliance percentage in March 2020 was 96%.  (*Id*.)  This

14

significant improvement was the result of the many efforts taken by ADCRR and Centurion since their partnership began.  (*Id*.)

### 3.    ADCRR appoints a new Director and restructures the Department.

On October 21, 2019, David Shinn began his tenure as the Director of ADCRR.[4] (Shinn Decl., ¶ 1.)  A Marine veteran, Director Shinn has more than 32 years' experience in uniformed and civil service for the United States Government, including more than 28 years with the Federal Bureau of Prisons, first as a correctional officer and rising to the position of Assistant Director for the Program Review Division, in Washington, D.C.  (*Id*., ¶¶ 2–3.)  As a member of the Executive Leadership for the Federal Bureau of Prisons, which is the nation's largest correctional system with 122 institutions, 39,000 employees, and an inmate population of more than 240,000, Director Shinn served as the internal audit authority, where he was responsible for the development of comprehensive audit guidelines and led a division of professional auditors in the continuous assessment and evaluation of the agency's operations.  (*Id*., ¶ 4.)  He also served as the agency coordinator for all external audit activities conducted by the Department of Justice Inspector General's Office and Government Accounting Office, and was responsible for resolving audit findings.  (*Id*., ¶ 5.)  Additionally, he led agency training efforts and managed the accreditation process for certification from the American Correctional Association, the Joint Commission for Accreditation of Healthcare Organizations, and the National Commission on Correctional Healthcare.  (*Id*., ¶ 6.)

Upon his appointment, Director Shinn was briefed on the history of this litigation. (*Id*., ¶ 7.) In partnership with Centurion, he is committed to leading ADCRR to full compliance with the Stipulation.  (*Id*., ¶¶ 8, 109.)

### Identifying Operational Barriers

Director Shinn immediately began analyzing the important interplay between security operations and the provision of inmate healthcare to identify challenges that may

---

[4] Charles Ryan retired on September 13, 2019.

1   require improvement or change to achieve both ADCRR's and Centurion's common goal

2   of providing quality and Stipulation-compliant healthcare.  (*Id.*, ¶ 9.)  That started with

3   participating in bi-weekly leadership meetings with ADCRR and Centurion to discuss how

4   to achieve and maintain complete PM performance.  (*Id.*, ¶ 16.)

5                  **Leadership Realignment & Accountability**

6          Director Shinn also realigned ADCRR's leadership command.  (*Id.*, ¶ 25.)   In

7   January 2020, he added a second Deputy Director position.  (*Id.*, ¶ 26.)  One Deputy

8   Director is now responsible for leading the Assistant Directors for Financial Services,

9   Contract Compliance, and Medical Services.  (*Id.*, ¶ 28.)  The second is responsible for

10  leading the Assistant Directors of Prison Operations, Inmate Programs and Reentry, and

11  Arizona Correctional Industries.  (*Id.*)  By splitting these leadership roles, there is increased

12  oversight of the daily operations of the specified Divisions that each Deputy Director leads.

13  (*Id.*, ¶ 29.)  There is also increased accountability over the Medical Services Contract

14  Monitoring Bureau ("MSCMB") with direct reporting to and leadership oversight by one

15  Deputy Director.  (*Id.*)  The Deputy Director and Assistant Director of the MSCMB meet

16  at least once a week, but typically the two engage daily regarding Centurion's performance,

17  operations of and expectations for the MSCMB, and observations and guidance relating to

18  overall contract and Stipulation compliance.  (*Id.*, ¶ 32.)  This daily collaboration between

19  the Deputy Director and the MSCMB Assistant Director has precipitated a positive culture

20  shift not only within the MSCMB but also in the relationship between ADCRR and

21  Centurion.  (*Id.*, ¶ 33.)

22          **4.     ADCRR appoints a new Assistant Director and reorganizes the**
            **Monitoring Bureau.**

23

24          The MSCMB monitors Centurion's compliance with the PMs.  (Gann Decl., ¶ 18.)

25  At the outset of this litigation, the MSCMB was known as the Health Services Contract

26  Monitoring Bureau (or HSCMB).  (Dkt. 3508-1, ¶ 5.)  Richard Pratt was the Interim

27  Assistant Director of the HSCMB and, in August 2014, he was named the Assistant Director

28  of the HSCMB.  (*Id.*, ¶¶ 5, 8.)  He managed the HSCMB.  (*Id.*, ¶ 9.)  HSCMB monitors

were assigned to audit all applicable PMs for a specific facility.  (Shinn Decl., ¶ 40; Gann Decl., ¶ 63.)  In December 2019, Mr. Pratt was reassigned to be a bureau administrator on the operations side of ADCRR.  (Dkt. 3508-1, ¶ 10.)  In that role, his responsibilities were limited to overseeing medical liaisons (LPNs and RNs) who were embedded into each facility and served as contact points between facility operations, Centurion, and the HSCMB.[5]  (Dkt. 3508-1, ¶ 10; Shinn Decl., ¶ 41; Gann Decl., ¶ 64.)

As noted above, in January 2020, Director Shinn realigned the chain of command for the MSCMB.  In February 2020, the MSCMB transitioned to statewide monitoring; monitors are now responsible for auditing a PM at all applicable facilities.  (Shinn Decl., ¶ 39; Gann Decl., ¶ 63.)  On April 20, 2020, Director Shinn further advanced the leadership of the MSCMB by appointing Larry Gann as the Assistant Director.  (Shinn Decl., ¶ 30; Gann Decl., ¶ 30.)  As the Assistant Director, Mr. Gann oversees the MSCMB, and one of his responsibilities is to ensure that Centurion is complying with all aspects of the contract and providing a quality system of healthcare.  (Shinn Decl., ¶ 36; Gann Decl., ¶ 14.)  It has been communicated to Centurion that Assistant Director Gann serves as the voice of ADCRR for purposes of inmate healthcare services.  (Shinn Decl., ¶ 34.)  If an issue needs to be escalated, first the Deputy Director, and then Director Shinn becomes involved to reach a resolution.  (*Id.*)  This structure provides a more agile and efficient method by which ADCRR's concerns are communicated to Centurion and resolved.  (*Id.*, ¶ 35.)

Assistant Director Gann brings formidable corrections health care administration and direct facility health care management experience to ADCRR. (*Id.*, ¶ 31.)   He previously worked for NaphCare, Inc., a privately owned correctional health care company that provides healthcare to federal, state, and local correctional facilities, as Health Services Administrator, Director of Nursing, Chief Nursing Officer, and Vice President of Operations. (Gann Decl., ¶¶ 5–7.) He was also the former Director of Nursing for Maricopa County Correctional Health Services, where he was instrumental in terminating the 40-year

---

[5] Mr. Pratt retired from ADCRR on March 26, 2020.

1   consent decree in *Graves v. Penzone*, No. 77-cv-00479-PHX-NVW.  (*Id.*, ¶ 9.)  And he was

2   the former Assistant Vice President of Operations for Corizon in Baltimore, Maryland,

3   where he successfully narrowed the scope of the 40-year consent decree in *Duvall v. Hogan*,

4   No. ELH-94-2541.  (*Id.*, ¶¶ 11–12.)

5          Assistant Director Gann's primary goal is to achieve full compliance with every PM

6   as quickly as possible.  (*Id.*, ¶ 65.)  His vision is to hire and train "Change Agents" and form

7   efficient and cohesive teams of subject-matter experts who not only monitor Centurion's

8   compliance with PMs, but who will identify compliance barriers and remove them.  (*Id.*)

9   In other words, the MSCMB will not only retain its reactive role in imposing sanctions to

10  enforce compliance with the terms of the contract but it will also have a much larger role in

11  proactively assessing and evaluating compliance issues in real-time, which will positively

12  impact patient care.  (Shinn Decl., ¶ 38.)

13                            **Reorganizing Responsibilities**

14         In the past two months, Director Shinn and Assistant Director Gann have already

15  taken significant action.  (Shinn Decl., ¶ 43.)  For example, they have created a Bureau

16  Administrator position in the MSCMB, which will be responsible for managing the medical

17  liaisons, and, with them, identifying and resolving compliance issues.  (Gann Decl., ¶ 67.)

18  The monitors and Program Evaluation Administrators will be responsible for the day-to-

19  day monitoring of PM compliance.  (*Id.*)  If the monitors identify a barrier to compliance

20  with a PM, they will forward the issue to the Bureau Administrator and the medical liaison

21  team.  (*Id.*, ¶ 68.)  These new delegations of responsibilities will enable the MSCMB to not

22  only monitor Centurion's compliance with the PMs but also achieve compliance with a new

23  found sense of urgency, and quicken the pace of ADCRR's ability to enact positive change.

24  (*Id.*)  The Bureau Administrator will also be responsible for the creation of a real-time

25  corrective action plan format that will allow all team members to see each identified

26  barrier's cure status in an up-to-date format.  (*Id.*)  This information will then be shared

27  with Director Shinn on a monthly basis during his Business Review Meetings and his

28  Strategic Plan Initiative.  (*Id.*)  Accountability will replace speculation.  (*Id.*)

**Deploying Liaisons to Troubleshoot Issues**

Beginning September 1, 2020, the medical liaisons will be relocated to MSCMB's Central Office and will work under the direction and supervision of the Bureau Administrator. (*Id*., ¶ 69.)  Instead of addressing facility-specific issues, the liaisons will be tasked with identifying and solving problem-specific issues, beginning with any PMs that may be chronically noncompliant. (*Id*.)  This reassignment will allow for additional oversight, direction, and training on CGAR compliance. (*Id*.)  It will also shift focus from quantitative performance monitoring toward qualitative care enhancement. (*Id*.)  The goal is to develop clinically trained correctional health care teams with critical-thought-problem-solving ability. (*Id*.)  Liaisons will be responsible for recognizing and providing solutions to the barriers of noncompliance affecting patient care. (*Id*.)  Although they will be stationed out of Central Office, they will be traveling to and working in the facilities at least three days a week so that they can identify problems firsthand and work with facility and Centurion staff to solve them. (*Id*.)  Each day, they will review processes to identify where breakdowns in compliance and patient care are occurring and why; troubleshoot the problems; and follow-up with facility and Centurion staff to ensure that corrective action has been taken. (*Id*.)  The liaisons will also continue to participate in ADCRR and Centurion on-site leadership meetings, and assist Centurion staff and apply practical problem-solving initiatives at the complex level. (*Id*.)

**Cohesive Teams**

To lead the medical liaisons, Director Shinn and Assistant Director Gann have created and approved for hiring two Operational Team Leader positions. (*Id*., ¶ 70.)  Each Team Leader will have a team of four or five liaisons. (*Id*.)  Every Monday, Assistant Director Gann, the Bureau Administrator, the Program Evaluation Administrators, and the medical liaisons meet to discuss compliance and healthcare issues, and they meet again every Friday to ensure that any plan of action was implemented and followed through. (*Id*.)  The formation of these liaison teams will generate improved, uniform communication to ADCRR and Centurion staff. (*Id*.)

1

**Compliance Training**

2    The MSCMB has also developed and implemented a Computer Based Training for

3 Centurion staff to aid with compliance relating to nurse line encounters, provider line

4 encounters, referrals, HNRs, and pharmacy. (*Id*., ¶ 71.) The training is required for all

5 existing and new staff, and will help them understand what exactly is required by the PMs

6 and how to properly and fully do what is required. (*Id*.)

7    **Onsite Inspections & Real-Time Corrective Actions**

8    Nearly every Thursday, Assistant Director Gann and the MSCMB Program

9 Evaluation Administrators tour facilities to uncover noncompliance issues and assist in

10 troubleshooting measures. (*Id*., ¶ 72.) For example, they will observe med pass and sick

11 call, speak with providers, and monitor scheduling. (*Id*.) They will also formally participate

12 in the creation of corrective action plans with Centurion when operational barriers are

13 identified. (*Id*.) If Assistant Director Gann and his team recognize a potential issue, they

14 devise a real-time corrective action plan. (*Id*.)

15    **B.    The Order to Show Cause and ADCRR's Response.**

16    On January 31, 2020, the Court issued the OSC. (Dkt. 3490.) The OSC required

17 Defendants to bring into compliance 35 PMs at certain facilities, for a total of 146 PMs, no

18 later than March 1, 2020. (*Id*.) It further ordered Defendants to show cause why it should

19 not impose a civil contempt sanction of $100,000 for each PM that is not brought into

20 compliance by that date. (*Id*.)

21    ADCRR immediately sent the OSC to Centurion's regional and site leadership,

22 which conferenced to determine how to retain and attain substantial compliance with the

23 affected PMs. (Dolan Decl., ¶ 37; Declaration of Jennine Gahris, ¶ 6.) Centurion leadership

24 and staff discussed potential site-specific issues, and staff was advised to track the PMs

25 listed and to immediately advise Arizona's Regional Director of Compliance ("RDOC") of

26 any potential barriers to compliance.[6] (Gahris Decl., ¶ 6.)

27    _____

28        [6] Centurion's Regional Director of Compliance manages a team of 10 Healthcare
Delivery Facilitators ("HDFs") and two Business Data Analysts ("BDAs"). (Gahris Decl.,

On February 14, 2020, Director Shinn followed-up with a formal letter to Centurion, demanding that it commit all necessary resources to maintain and/or achieve compliance with all the PMs listed in the OSC.  (Shinn Decl., ¶¶ 17–18.)  Specifically, Director Shinn demanded Centurion take the following action:

- Reallocate existing Arizona healthcare personnel to locations that face challenges in achieving compliance;

- Temporarily transfer Centurion healthcare personnel from other states to assist in achieving compliance;

- Increase the use of telemedicine;

- Increase the use of overtime to provide supplemental health care resources;

- Continue daily facility-level meetings with ADCRR leadership to report on compliance and discuss strategies to improve/achieve compliance;

- Increase the existing bi-weekly Centurion-ADCRR leadership meetings to weekly meetings to report on compliance and discuss strategies to improve/achieve compliance;

- Take all reasonable efforts to fill current FTE vacancies to improve/achieve compliance in the continuing months;

- Provide written details/reports regarding staffing efforts to fill vacant FTEs;

- Seriously consider whether increased staffing beyond the current vacant FTEs is warranted in an effort to achieve PM compliance;

- Determine, report on, and devise remedial plans for root causes that hinder compliance by location; and

- Ensure that, in addition to meeting PM compliance thresholds, the inmate population receives appropriate medical care.

---

¶ 4.) Each HDF is assigned to a facility. (*Id*.) Their job is to review underperforming PMs at their assigned facility, run reports and trackers to assist in achieving compliance with those PMs, and follow up with medical staff to ensure inmates are receiving the care or information required by the PMs. (*Id*.) They report their findings and progress to the RDOC on a daily basis. (*Id*.)

(*Id*., ¶ 19.)  Director Shinn further cautioned Centurion that he would impose all available contractual sanctions and indemnification remedies as necessary.  (*Id*., ¶ 20.)  Centurion committed to take all reasonable steps to maintain/achieve compliance.  (*Id*., ¶ 21.)

Following the OSC, Director Shinn took many proactive measures to achieve compliance with all PMs.  (Shinn Decl., ¶ 14.)

**Increased Communication**

ADCRR and Centurion leadership increased their existing bi-weekly meetings to weekly meetings to track and discuss PM compliance, and to collaboratively address efforts to achieve complete compliance and address any noncompliance.  (*Id*., ¶ 23.)  ADCRR complex-level security operations and medical leadership also meet daily to discuss PM compliance, identify and resolve issues that compromise compliance, collaborate to achieve complete Stipulation compliance, and advise on the medical and mental health status of inmates who may require additional security supervision.  (*Id*., ¶ 24.)

**Staffing & Root Cause Analysis**

ADCRR investigated nationally recognized correctional medicine organization candidates that can identify and provide modification recommendations related to: (1) root causes that impede PM compliance; (2) revision/modification of certain PMs to ensure that the measures are outcome-based and qualitatively measure the actual delivery of healthcare; and (3) a complex-specific staffing analysis that accounts for unique hiring and retention factors, physical plant, and security staffing requirements that must be contemplated at each unique prison complex location.  (*Id*., ¶ 83.)  In February 2020, ADCRR obtained a written proposal from National Commission on Correctional Health Care Resources, Inc. ("NCCHCR").  (*Id*., ¶ 85.)  NCCHCR provides customized technical and consulting services for policy development and solution identification, including staffing studies, recommendations for delivery of health care services, health system assessments, and performance improvement and technical assistance.  (*Id*., ¶¶ 88–90.)  The proposal sets forth a robust statement of work to include a staffing analysis, on-site assessment of delivery of healthcare associated with the PMs to identify root causes of performance issues, and

1  detailed recommendation plans. (*Id*.)  Based upon the "Confidential and Proprietary"

2  designation of the proposal by NCCHCR as to its statement of work and identification and

3  qualification of the team members, terms, and cost, ADCRR requested permission to submit

4  the proposal to the Court for *in camera* review.[7]  (*Id*.)

5  **Backlog Support**

6  Director Shinn tasked ADCRR's Office of Continuous Improvement ("OCI") to

7  provide support to Centurion to (1) analyze backlogs for outside specialty consultations,

8  and (2) provide recommendations to improve/eliminate any backlogs.  (*Id*., ¶¶ 101–102.)

9  This OCI Team has made recommendations to Assistant Director Gann that focus in part

10  on reassessing statewide housing plans to place inmates in locations with optimal access to

11  necessary outside specialists based on their medical condition and geographic availability

12  of specialists. (*Id*., ¶ 103.) In conjunction with these recommendations, Centurion has

13  expanded its telemedicine specialty groups, hired a service provider representative to

14  develop additional provider networks, expanded its Utilization Management team,

15  implemented CareClix Telehealth Specialty Providers, increased on-site specialty services

16  for physical therapy, audiology, nephrology, orthopedics and mammograms, and increased

17  frequency of specialty clinics and nurse lines.  (*Id*., ¶ 104.)

18  **Performance Reviews**

19  Director Shinn added PM compliance to Complex Wardens' annual performance

20  review criteria to ensure they engage in successful partnership with Centurion personnel

21  and achieve and maintain PM compliance.  (*Id*., ¶ 105.)

22  **Tablet Technology**

23  ADCRR continued to roll out its Tablet System (which began in October 2019), and

24  efforts are being made to equip the tablets with technology that enables inmates to submit

25  HNRs and medical-care refusal forms directly to Centurion medical staff.  (*Id*., ¶¶ 107–

26

27  [7] Defendants have asked the Court to use the already paid sanctions monies to fund this analysis. Defendants anticipate that NCCHCR will also consult with Dr. Stern. (Shinn

28  Decl., ¶ 91.)

1  108.)  This capability will increase efficiency and processing timeliness.  (*Id.*)

2  **Population and Resource Reallocation**

3  Director Shinn directed the deactivation of ASPC-Florence.  (*Id.*, ¶ 96.)  The first

4  phase will commence in July 2020, and the deactivation is expected to be complete by the

5  end of this new fiscal year.  (*Id.*)  This phased deactivation will begin to relocate a portion

6  of ADCRR's inmate population to placements in existing ADCRR bed spaces, which will

7  permit redeployment of medical staffing resources to ASPC-Eyman and other state-

8  operated complexes.  (*Id.*, ¶ 98.)  ADCRR has also initiated a state-wide bed allocation

9  analysis to focus on potential redistribution of the inmate population to locate those inmates

10  with chronic or complex medical conditions in geographical locations that best serve the

11  population's relevant medical needs.  (*Id.*, ¶ 99.)  In the interim, ADCRR and Centurion

12  have implemented a utilization review procedure, whereby, on a weekly basis, a multi-

13  disciplinary team, including facility operations, meet to discuss possible alternative housing

14  assignments for inmates who require medical services that may not be optimally available

15  at their destination complex.  (*Id.*, ¶ 100.)

16  **C.  Compliance in February 2020.**

17  Of the 146 PMs listed in the Order to Show Cause, 126 were compliant in February

18  2020.[8]  (Dkt. 3571.)  Of the 20 PMs that were noncompliant in February, only eight were

19  noncompliant in March.  (Dkt. 3605.)  And of the eight PMs that were noncompliant in

20  March, only two were noncompliant in April.[9]  (Dkt. 3637.)[10]

21

22  [8] In its February 12, 2020 Order, the Court terminated 11 PMs: PM 12 at ASPC-
   Eyman and Florence, PM 19 at ASPC-Eyman, Lewis, and Phoenix, and PM 20 at ASPC-
23  Eyman, Florence, Lewis, Perryville, Phoenix, and Tucson. (Dkt. 3490 at 1–2; Dkt. 3495 at
   13–45.) All 11 PMs, however, were compliant in February.  (Dkt. 3571.)

24  [9] The recurring noncompliant PMs in March were PM 40 at ASPC-Tucson, PM 44
   at ASPC-Eyman and Florence, PM 50 at ASPC-Florence and Tucson, and PM 51 at ASPC-
25  Eyman, Florence, and Tucson. (Dkt. 3571, 3605.) The recurring noncompliant PMs in April
   were PM 44 at ASPC-Eyman and Florence. (Dkt. 3357, 3605, 3637.)

26
27  [10] Defendants interpret the OSC as requiring them to show cause as to why sanctions
   should not be imposed for noncompliance in February 2020. If ordered by the Court, they
   can and will show cause why sanctions should not be imposed for any noncompliance in
28  subsequent months.

1  **II.    The Court Should Not Hold Defendants in Civil Contempt of the OSC.**

2      **A.    General Legal Principles.**

3      A party may be held in civil contempt if it fails to comply with "a specific and

4  definite order of the court." *Parsons v. Ryan*, 949 F.3d 443, 454 (9th Cir. 2020) (quoting

5  *Stone v. City and Cty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).  "The proof

6  for civil contempt must be clear and convincing—a higher standard than the preponderance

7  of the evidence standard[.]"  *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir.

8  1989); *accord Parsons*, 949 F.3d at 454.

9      A "[f]ailure to comply consists of not taking 'all the reasonable steps within [one's]

10  power to insure compliance with the order [].'"  *Balla*, 869 F.2d at 466 (quoting

11  *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976)) (alterations in original).

12  This does not require a contemnor to employ "every option that the court could conceive."

13  *Stone*, 968 F.2d at 857.  Rather, "[a] contemnor fails to take all reasonable steps where there

14  is 'little conscientious effort on the part of the [contemnors] to comply....'"  *Herb Reed*

15  *Enters., Inc. v. Monroe Powell's Platters, LLC*, 2014 WL 3894069, at *6 (D. Nev. Aug. 8,

16  2014) (quoting *Stone*, 968 F.2d at 857).  Moreover, "technical or inadvertant violations of

17  the order will not support a finding of civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*,

18  787 F.2d 1376, 1379 (9th Cir. 1986).

19      In addition, "[s]ubstantial compliance with a court order is a defense to an action for

20  civil contempt," *Balla*, 869 F.2d at 466 (citing *Donallco*, 787 F.2d at 1379), which "is not

21  vitiated by 'a few technical violations' where every reasonable effort has been made to

22  comply," *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th

23  Cir. 1993) (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891

24  (9th Cir. 1982)).  Indeed, the Supreme Court has cautioned that "civil contempt 'should not

25  be resorted to where there is [a] fair ground of doubt as to the wrongfulness of the

26  defendant's conduct.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting *Calif.*

27  *Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.     ADCRR and Centurion Took All Reasonable Steps to Comply with the OSC and Substantially Complied with It.**

As the Court is aware, meaningful changes in the provision of correctional healthcare do not happen overnight.  Structural, operational, and even bureaucratic obstacles may slow progress.  ADCRR's goal—indeed, its contractual obligation—has always been to achieve 100% compliance with every PM in the Stipulation.  Although universal compliance has not yet been achieved, it is readily apparent that the measures ADCRR and Centurion have taken over the past 12 months have been momentous.  Because the OSC is merely a subset of the Stipulation, those measures necessarily were taken to comply with not only the Stipulation but the OSC as well.

The measures recounted in Section I.A. are significant.  ADCRR changed healthcare vendors and included in the contract a three-tier sanction scheme to spur better compliance. ADCRR appointed a new Director, Director Shinn, who has taken ownership of Stipulation noncompliance/compliance and has immediately ordered changes to improve compliance. He realigned leadership command to increase oversight and accountability.  He appointed a new Assistant Director to lead the MSCMB.  Together, Director Shinn and Assistant Director Gann have reorganized the MSCMB to proactively identify compliance barriers and break those barriers down.  Medical liaison teams are deployed to troubleshoot issues. Centurion staff is better trained to understand what is necessary to comply with the PMs. The MSCMB conducts inspections to identify compliance barriers and implement real-time corrective action plans.

The new vendor, Centurion, has also made great strides toward full compliance.  It has dramatically increased staffing.  The hired fill rate has increased 23%; the worked fill rate is 102.54% of the contract requirement; mid-level providers meet or exceed contract requirements at all complexes; critical Site Medical Doctor positions have been filled; hired fill rates for Psychiatrists and Psychiatric Nurse Practitioners are at 90%; Medical Assistants and Certified Nursing Assistants exceed contract requirements; and Administrative Assistants exceed contract requirements at five complexes.  Centurion has actively recruited

new employees and has undertaken substantial efforts to retain qualified employees by offering, and even doubling, retention bonuses. It has increased salaries for RNs and LPNs who work at facilities with lower compliance rates. It has authorized and paid overtime pay, coverage pay, and shift bonuses. It has also taken measures to increase compliance with nonperforming PMs. It invested and employed a Telehealth Program; streamlined specialty consultation approvals; developed and implemented a Telehealth Nurse Program; deployed nurse line blitzes and nurse line telehealth to erase backlogs; made physicians available to help cover certain complexes; invested in and launched wireless technology; and contracted with CareClix to provide specialty telehealth services and queued up specialty consultation requests. Most of these measures continued after the OSC.

When the Court issued the OSC, ADCRR and Centurion did even more. ADCRR obtained a written proposal from NCCHCR to conduct a staffing and root-cause (of noncompliance) analysis. Director Shinn mobilized the OCI to provide support to Centurion; added PM compliance to the performance review criteria for Complex Wardens; devoted efforts to enable tablets to submit HNRs and medical-care refusal forms; and moved forward with the deactivation of ASPC-Florence to permit redeployment of resources and assign inmates with particular medical needs to complexes that can better accommodate them.

These measures collectively resulted in a 95% overall compliance rate in February, and a 96% overall compliance rate in March and April. (Shinn Decl., ¶¶ 10–11; Dolan Decl., ¶ 7; Gann Decl., ¶¶ 19–24.) With respect to the 146 PMs in the OSC, Defendants were compliant with 86% (126 PMs) in February. (Dkt. 3490, 3571.) That compliance rate increased to 90% in March (132 compliant PMs) and 95% in April (139 compliant PMs).[11] (Dkt. 3490, 3605, 3637.) And of the 20 OSC PMs that were noncompliant in February, only eight were noncompliant in March; and, of those eight, only two were noncompliant

---

[11] These compliance percentages do not change when you remove from the calculation the PMs the Court subsequently withdrew from the OSC (PMs 12, 19, 20), which received compliant scores in February, March, and April.

in April.  (Dkt. 3571, 3605, 3637.)  This reflects substantial compliance with the OSC. Defendants should not be held in civil contempt, nor should they be sanctioned for any technical noncompliance in February 2020.

A finding of contempt is even less warranted when considering the circumstances surrounding the noncompliant PMs.  Many fell short of compliance by just a few inmate files.  Many were beyond Defendants' control.  And while certain files were technically noncompliant (due to a documentation or verbiage error), many inmates actually received the care required by the PM in the timeframe the PM prescribed.

| PM 11 | Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT. |
|---|---|

ASPC-Tucson:  82%

Although noncompliant in February 2020, PM 11 was compliant at ASPC-Tucson in 23 of the previous 24 months.  (Gahris Decl., ¶ 9.) Therefore, it meets the definition of substantial compliance (compliant for 18 of the previous 24 months and not out of compliance for three or more consecutive months within the past 18-month period) and is eligible for termination.  (*Id.*)  Because of its sustained success, upon receipt of the OSC, Centurion continued with the same process and procedures that had historically resulted in compliant scores.  (*Id.*)

In February 2020, 97 files were audited.  (*Id.*, ¶ 10.)  Because 80 files were compliant, this PM received an 82%, just three files short of the 85% benchmark.  (*Id.*)  In February 2020, 3,623 new medications were prescribed to inmates at ASPC-Tucson.  (*Id.*, ¶ 14.)  Of those, only 60 were administered outside PM 11's 48-hour timeframe, yielding a 98% compliance rate.  (*Id.*) ASPC-Tucson's noncompliance in February 2020 was largely the result of a newly assigned RN who did not administer recommended vaccines (booster shots) to seven inmates at the Minors Unit within 48 hours of the time they were prescribed.

(*Id.*, ¶ 11.)  Although the vaccines were not administered within 48 hours, each of the seven inmates still received their booster shots by the vaccine's effective date.  (*Id.*)  To address the issue, the Director of Nursing ("DON"), Assistant Facility Health Administrator ("AFHA"), and the Facility Health Administrator ("FHA") met with the RN and educated her on the requirement that vaccines (as with any other prescription) must be administered within 48 hours of being ordered.  (*Id.*, ¶ 12.)

This corrective action was successful, as evidenced by ASPC-Tucson's compliance with PM 11 in March (95%) and April (88%).  (*Id.*)  ASPC-Tucson's noncompliance in February 2020 was an anomaly and not representative of the facility's overall sustained compliance with PM 11 or the quality of care provided to ADCRR inmates.  (*Id.*, ¶ 13.) This is especially so where the noncompliance was the result of one RN at one unit failing to timely provide booster shots to seven inmates, and where the seven inmates all still received them within the vaccine's effective date.

| PM 15 | Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals. |
| --- | --- |

<u>Eyman:</u>  70%

Before the OSC, ASPC-Eyman had maintained compliance with PM 15 for three consecutive months:  November (90%); December (92%); and January (90%).  (*Id.*, ¶ 15.) To ensure compliance with the OSC in February 2020, the AFHA began pulling no-show reports three times a week.  (*Id.*, ¶ 16.)  By doing this, she is able to quickly identify inmates with consecutive refusals and timely schedule counseling services before the inmate refuses a fourth time.  (*Id.*)  Once the inmates are identified, the AFHA provides their names to the DON, Mental Health RNs, and facility Psychiatrist, who refer them to a Qualified Health Care Professional ("QHCP") for counseling. (*Id.*) The DON then follows up to ensure counseling was completed, and educates the QHCP if it was not timely done.  (*Id.*)

In February 2020, 47 files were audited. (*Id.*, ¶ 17.) Fourteen files were noncompliant, resulting in a compliance score of 70%. (*Id.*) Centurion performed an internal review of the audited files to identify the cause of noncompliance and determined that one of the audited files should not have been audited, as the medication was to be given as needed (#███████). (*Id.*, ¶ 18.) Seven other files were marked noncompliant simply because the required verbiage (name of medication and indication that inmate was educated or counseled or that medication compliance was discussed) was not included in the chart (███████; #███████; #███████; #███████; #███████; #███████; #███████). (*Id.*, ¶ 19.) While these specific words were not used, the inmates still actually received timely counseling and changes were implemented to their medications. (*Id.*, ¶ 20.) Had the non-applicable file not been audited, and had these seven files been marked compliant, ASPC-Eyman would have received an 87% compliance score in February 2020. (*Id.*, ¶ 23.)

Once the cause of noncompliance was identified, all ASPC-Eyman providers were educated by the Site Medical Director ("SMD") and FHA on the verbiage required in order for a chart to be compliant with PM 15. (*Id.*, ¶ 21.) These corrective actions were successful, as evidenced by ASPC-Eyman's compliance with PM 15 in March (98%) and April (95%). (*Id.*, ¶ 22.) With the exception of February 2020, since November 2019, ASPC-Eyman has maintained scores above 90% for PM 15.

ASPC-Eyman was noncompliant with PM 15 in February 2020, not because inmates did not receive the care that PM 15 requires, but only because the requisite language was not used and because a non-applicable file was audited. Had these files been marked compliant, and had the non-applicable file been removed, ASPC-Eyman would have complied in February 2020.

///

///

| PM 37 | Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need). |
|---|---|

Lewis:  82%

Upon receipt of the OSC, in February 2020, Centurion hired two agency LPNs and three agency RNs, which resulted in a 26.32% increase in agency contracts at ASPC-Lewis. (*Id.*, ¶ 29.)  In March 2020, Centurion hired six agency LPNs and two agency RNs, which resulted in a 20.83% agency contract increase at ASPC-Lewis.[12]  (*Id.*, ¶ 30.)  It takes approximately two months to see an increase in PM compliance as a result of newly hired staff.  (*Id.*, ¶ 32.)  The fruits of Centurion's staffing labors are showing.  (*Id.*)  ASPC-Lewis was compliant with PM 37 in March (90%) and April (93%).  (*Id.*)

In February 2020, ASPC-Lewis received an 82% compliance score.  (*Id.*, ¶ 33.)  Because 68 files (out of 83) were compliant, this PM fell just three files short of the 85% benchmark.  (*Id.*)  This is the first time, however, that PM 37 has scored above 80% since June 2018 and is a significant improvement from the previous month's score of 37%.  (*Id.*)  As discussed above, Centurion's commitment to increasing RN staffing at ASPC-Lewis and its aggressive recruiting efforts, are working.  (*Id.*)

Tucson:  79%

ASPC-Tucson received a 79% compliance score in February 2020 for PM 37.  (*Id.*, ¶ 37.)  Because 68 files (out of 86) were compliant, this PM fell just five files short of the 85% benchmark.  (*Id.*)   However, Centurion's aggressive recruiting efforts have successfully resulted in compliance with PM 37 at ASPC-Tucson in March (85%) and April (91%).  (*Id.*)

---

[12] Each agency nurse contract is a 13-week assignment. (Gahris Decl., ¶ 31.) At the conclusion of the assignment, agency nurses are often offered permanent positions with Centurion. (*Id.*)

31

| PM 40 | Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral. |
|-------|-----|

Tucson: 78%

For approximately one year before the OSC (February 2019 through December 2019), ASPC-Tucson had only one instance of noncompliance with PM 40 (October 2019). (*Id*., ¶ 38.) Centurion continued to employ the successful practices and procedures that had been in place in February 2020. (*Id*.) To ensure continued compliance with PM 40 at ASPC-Tucson, the HDF began running daily reports (Monday through Friday) of all urgent and emergent provider referrals. (*Id*., ¶ 39.) The HDF reviews the report and alerts the providers to any inmate who was referred the previous day but not yet seen. (*Id*.) If the HDF determines nursing staff did not complete the referral-type section, nursing staff receive additional education on the requirement to do so. (*Id*.) Additionally, on February 29, 2020, a telehealth provider began seeing urgent and emergency referrals on the weekends. (*Id*.) Beginning in March 2020, the HDF began running the referral reports on weekends. (*Id*.)

In February 2020, ASPC-Tucson received a 78% compliance score for PM 40. (*Id*., ¶ 40.) Twenty seven files were audited, but because 21 files were compliant, this PM fell just two files short of the 85% benchmark. (*Id*.) Upon investigating the reason for noncompliance, Centurion discovered that two of the noncompliant files (#███████ & #███████) were marked routine and therefore should not have been audited for PM 40. (*Id*., ¶ 41.) In two other noncompliant files (#███████ & #███████), the inmates had their health needs addressed by a provider, but the files were marked noncompliant because the provider did not personally see them. (*Id*., ¶ 42.) Neither file, however, required a physical encounter with a provider. (*Id*.) Two other noncompliant files (#███████ & #███████) were seen within 29 hours, just shy of the 24-hour requirement. (*Id*., ¶ 43.) Had the non-applicable routine files been excluded, and had the two files which did not require a physical encounter been marked compliant, ASPC-Tucson would have received a 92% compliance score. (*Id*., ¶ 44.)

32

In April 2020, after ASPC-Tucson missed the compliance threshold for three consecutive months—an unusual pattern because PM 40 was compliant in 19 of the previous 23 months—Centurion further investigated the cause of noncompliance.  (*Id*., ¶ 45.)  It determined that nurses were inadvertently selecting "urgent" instead of "routine" (or vice versa) when referring an inmate to a provider, as these selections are next to each other in eOMIS.  (*Id*.)  This resulted in referrals that should have been routine (which requires an inmate be seen within 14 days) being incorrectly marked as subject to the 24-hour timeframe, and thus noncompliant. (*Id*.) It was also determined that nurses were closing charts before selecting a referral type.  (*Id*.)  Without a selection, the monitor must determine whether the nurse intended for the referral to be emergent, urgent, or routine. (*Id*.)  This subjectively allowed files to be reviewed under timeframes the nurse did not intend.  (*Id*.)  To remedy this, beginning April 15, 2020, any nurse who fails to select a referral type is required to complete an online training program, taught by Centurion's Regional Nurse Educators, regarding provider referrals.  (*Id*., ¶ 46.)  These corrective actions have been successful.  (*Id*., ¶ 47.)  In April 2020, ASPC-Tucson received a 100% compliance score for PM 40.[13]  (*Id*.)

| PM 44 | Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours. |
|---|---|

<u>Eyman:  46%</u>

When Centurion assumed the contract in July 2019, ASPC-Eyman had met the compliance threshold for PM 44 only one time since November 2017. (*Id*., ¶ 49.)

---

[13] Centurion also requested that the eOMIS Change Committee program a "hardstop" into eOMIS to force nurses to make (and confirm) a referral selection before being permitted to continue in the chart.  (Gahris Decl., ¶ 48.)  This prevents nurses from closing a chart without making a selection and forces them to double-check their selection before moving forward. (*Id*.) The "hardstop" went into effect on June 25, 2020. (*Id*.)

33

Centurion immediately implemented procedures to increase compliance, including requiring the HDF to conduct daily tracking of inmates who returned from an inpatient hospital stay or emergency transport, and reviewing provider notes to ensure all discharge recommendations had been reviewed and acted upon.  (*Id.*)  These changes were successful.  In August 2019, PM 44 at ASPC-Eyman scored an 89%.  (*Id.*, ¶ 50.)  From July 2019 through January 2020, PM 44 missed compliance only twice—July 2019 (79%) and November 2019 (82%).  (*Id.*)

On February 12, 2020, the Court adopted Dr. Stern's recommendation to change PM 44's methodology.  (*Id.*, ¶ 51.)  February files were therefore monitored pursuant to the new methodology.  (*Id.*)  Under the prior methodology, if the inmate's file indicated that discharge recommendations were reviewed and implemented by a medical provider, the file was marked compliant.  (*Id.*)  For example, if an inmate returned from a hospital stay with a recommendation that a medication be prescribed for 30 days (twice a day), the file was marked compliant if the provider reviewed the recommendation and prescribed the inmate the medication within 24 hours.  (*Id.*)  As a result of the Court's Order, the methodology changed to include an additional inquiry:  did the patient receive the prescribed treatment?  (*Id.*)  In the above example, to be compliant, the inmate must receive the medication each day, twice a day, for 30 days.  (*Id.*)  If one morning or evening is missed (even for one day), the file is noncompliant.  (*Id.*)  Thus, this PM became an "all or nothing" measure, as the score can only be 0% or 100%.  (*Id.*)

In February 2020, 13 files were audited at ASPC-Eyman.  (*Id.*, ¶ 52.)  Because six files were compliant, this PM received a 46% compliance score, five files short of the 85% compliance benchmark.  (*Id.*)  Centurion completed an internal review of the noncompliant files and found that noncompliance was caused by the change in methodology.  (*Id.*, ¶ 53.)  Indeed, in January 2020, the month before the change, ASPC-Eyman received a 92% compliance score (88% in December 2019).  (*Id.*)  Five of the noncompliant files in February 2020 would have been compliant under the original methodology, because all of the inmates' discharge instructions were reviewed and acted upon (#█████, #█████,

34

#████, #████, #████). (*Id.*) But for the change in methodology, ASPC-Eyman would have scored an 85% in February. (*Id.*)

In March 2020, Centurion implemented tracking procedures to monitor inmates who are prescribed medications after a hospital stay or emergency transport. (*Id.*, ¶ 54.) Each day, the HDF reviews all inmates who returned from an inpatient hospital stay or emergency transport and notifies the ADON at each inmate's unit. (*Id.*) The ADON then tracks their inmates' prescriptions and ensures they are received and administered as ordered. (*Id.*) Additionally, the SMD began reviewing returns and ensuring providers act upon all recommendations, document any deviations, and enter any consults deemed medically appropriate. (*Id.*) Centurion believes these additional corrective actions will spur compliance under the new monitoring methodology. (*Id.*)

Florence: 56%

Before the OSC, with the exception of one month (October 2019), ASPC-Florence had maintained compliance with PM 44 for nine of the previous 10 months. (*Id.*, ¶ 55.) Because of its sustained success, upon receipt of the OSC, Centurion continued with the same process and procedures that had historically resulted in compliant scores. (*Id.*)

In February 2020, 27 files were audited. (*Id.*, ¶ 56.) Because 15 files were compliant, this PM received a 56%, eight files short of the 85% compliance benchmark. (*Id.*) Centurion completed an internal review of the noncompliant files and found that noncompliance was caused by the change in methodology. (*Id.*, ¶ 57.) Indeed, in January 2020, the month before the change, APSC-Florence received a 92% compliance score. (*Id.*) Eight of the noncompliant files would have been compliant under the original methodology because all inmates' discharge instructions were reviewed and acted upon (#████, #████, #████, #████, #████, #████, #████, #████). (*Id.*) But for the change in methodology, ASPC-Florence would have scored an 85% for PM 44 in February. (*Id.*) The same daily tracking implemented at ASPC-Eyman (discussed above) in response to the new monitoring methodology was also implemented at ASPC-Florence. (*Id.*, ¶ 58.)

1

<u>Lewis:</u>  76%

2      Before the OSC, ASPC-Lewis had maintained compliance with PM 44 since May

3  2019, nine consecutive months.  (*Id.*, ¶ 59.)  From August 2019 to January 2020, PM 44

4  scored a 91% or higher, six consecutive months.  (*Id.*)  Because of its sustained success,

5  upon receipt of the OSC, Centurion continued with the same process and procedures that

6  had historically resulted in compliant scores.  (*Id.*)

7      In February 2020, 38 files were audited.  (*Id.*, ¶ 60.)  Because 29 files were compliant,

8  this PM received a 76% compliance score, just four files short of the 85% compliance

9  benchmark.  (*Id.*)  Centurion completed an internal review of the noncompliant files and

10  found that noncompliance was caused by the change in methodology.  (*Id.*, ¶ 61.)  Indeed,

11  prior to the change, ASPC-Lewis had been compliant with PM 44 for nine consecutive

12  months.  (*Id.*)  Six of the noncompliant files would have been compliant under the original

13  methodology.  (*Id.*)  But for the change in methodology, ASPC-Lewis would have scored a

14  92% for PM 44 in February.  (*Id.*)  The same daily tracking implemented at ASPC-Eyman

15  and ASPC-Florence (discussed above) in response to the new monitoring methodology was

16  also implemented at ASPC-Lewis.  (*Id.*, ¶ 62.)

17

| PM 47 | A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request. |
|-------|-------|

18

19

20

21

<u>Douglas:</u>  80%

22      Before the OSC, with the exception of July 2019, ASPC-Douglas had maintained

23  compliance with PM 47 for approximately one year.  (*Id.*, ¶ 63.)  In fact, ASPC-Douglas

24  was 100% compliant with PM 47 for six consecutive months prior to February 2020.  (*Id.*)

25  Because of its sustained success, upon receipt of the OSC, Centurion continued with the

26  same process and procedures that had historically resulted in compliant scores.  (*Id.*)  Each

27  day, the HDF reviews all HNRs, identifies the inmates who requested diagnostic results,

28

1   and places them on the nursing line.  (*Id*.)  The HDF subsequently reviews the inmates'

2   charts to confirm that results were provided.  (*Id*.)

3       In February 2020, only five files were eligible to be audited.  (*Id*., ¶ 64.)  Because

4   just *one* file was *non*compliant, ASPC-Douglas received an 80% compliance score.  (*Id*.)

5   When the sample size is six or less files, a facility can only be 100% compliant or

6   noncompliant.  (*Id*.)  Centurion completed an internal review of the noncompliant file.  (*Id*.,

7   ¶ 65.)  The inmate (# ███████) requested lab results on February 23, 2020, and was seen the

8   same day.  (*Id*.)  In reviewing his records, the nurse did not see the results, which were

9   received on February 21, 2020, and informed him they were not yet available.  (*Id*.)  In

10  response, the FHA and DON educated the nurse on all areas of the record where diagnostic

11  results may be found, and instructed her to exhaust these avenues before determining

12  whether diagnostic results were available.  (*Id*., ¶ 66.)  The corrective action of educating

13  this nurse was effective.  (*Id*., ¶ 67.)  ASPC-Douglas received an 87% compliance score in

14  March 2020 and a 100% compliance score in April 2020.  (*Id*.)

15                                    Phoenix:  50%

16      Before the OSC, ASPC-Phoenix had maintained compliance with PM 47 since

17  September 2019.  (*Id*., ¶ 68.)  Because of its sustained success, upon receipt of the OSC,

18  Centurion continued with the same process and procedures that had historically resulted in

19  compliant scores.  (*Id*.)

20      In February 2020, only two files were eligible to be audited.  (*Id*., ¶ 69.)  Because

21  just *one* file was *non*compliant, ASPC-Phoenix received a 50% compliance score.  (*Id*.)

22  Centurion completed an internal review of the noncompliant file.  (*Id*., ¶ 70.)  While the

23  inmate's chart noted that the provider discussed the results with the inmate and answered

24  his questions regarding the results, and that the inmate was satisfied with the information

25  he received, the file was marked noncompliant because the provider did not document this

26  encounter (the nurse did) and the nurse did not print the results and hand them to the inmate.

27  (*Id*.)  Had this been documented, ASPC-Phoenix would have received a 100% compliance

28  score in February 2020.  (*Id*.)

To remedy the noncompliance, once an inmate has been seen, the HDF verifies that the charting was completed (noting that the results were printed and handed to the inmate) and notifies the nurse if a chart is missing the requisite language. (*Id*., ¶ 71.) Additionally, the HDF sent training materials to the DON regarding the specific language to comply with PM 47's requirements. (*Id*., ¶ 72.) The DON distributed these materials to all nursing staff at ASPC-Phoenix on March 12, 2020. (*Id*.) Throughout March 2020, the FHA also provided training to all ASPC-Phoenix nurses regarding the action and documentation required (printing results and handing them to the inmate) to be entered in an inmate's chart after the diagnostic results are discussed. (*Id*.)

| PM 49 | Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial. |
|---|---|

Eyman: 75%

Upon receipt of the OSC, Centurion's Business Data Analyst began preparing reports of all inmates who received Alternative Treatment Plans. (*Id*., ¶ 73.) Each week, the RDOC distributes these reports to each facility. (*Id*.) At ASPC-Eyman, the Clinical Coordinator and AFHA review the report and verify that inmates are scheduled and seen by a specialty provider within the 30-day timeframe. (*Id*.)

In February 2020, 12 files were audited. (*Id*., ¶74.) Because nine files were compliant, this PM received a 75% compliance score, just two files short of substantial compliance. (*Id*.) In response, beginning March 18, 2020, regional leadership (VP of Operations, Regional Medical Director, Regional Director of Nursing, Lead Utilization Management RN, Provider Representative, Regional CQI Director, Director of Operations, TeleHealth Coordinator) began meeting with the clinical coordinators and site leadership

weekly.  (*Id.*, ¶ 75.)  During these meetings, expectations of the clinical coordinators are discussed.  (*Id.*)  The meetings allow for an open forum to discuss any barriers and challenges that have the potential to impact patient care and compliance.  (*Id.*)

Because PM 49 covers a 30-day time period and audits are completed in arrears, corrective action measures often take longer to see results.  (*Id.*, ¶ 76.)  The corrective actions discussed above, however, have already been effective.  (*Id.*, ¶ 77.)  ASPC-Eyman received a 100% compliance score in both March and April 2020.  (*Id.*)

| PM 50 | Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider. |
|---|---|

&

| PM 51 | Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider. |
|---|---|

To spur compliance with PMs 50 and 51, beginning in July 2019, Centurion began paying over 100% of the AHCCCS rates to the following specialty services:

  a.  Acute care and rehab (7/1/2019);

  b.  Oncology (7/1/2019);

  c.  Gastroenterology (to be finalized 7/26/2020);

  d.  Neurosurgery & Spine (2/10/2020); and

  e.  Endocrinology & Diabetes (5/8/2020).

(*Id.*, ¶ 78.)  Centurion also negotiated rates for cancellation and no-show fees with specialty providers, as inmates sometimes refuse to go to their appointments.  (*Id.*, ¶ 79.)

On February 28, 2020, Centurion participated in the first 2020 Quarterly Leadership Meeting.  (*Id.*, ¶ 81.)  Attendees included Regional Department Leaders, FHAs, SMDs, and DONs.  During the meeting, new services and processes to improve compliance were discussed (e.g., addition of UM nurses and clerks, continuing education to site providers,

increased onsite specialty services, staffing of correctional officers at hospitals, and availability of Up-to-Date and Medical Library for literature searches).  (*Id*.)  The RDOC presented to the Regional Department Leaders, FHAs, SMDs, and DONs on Specialty Care Services, covering trends of specialty frequency and utilization by complex.  (*Id*., ¶ 83.)  The presentation included a discussion regarding Centurion's partnership with RubiconMD/eConsult.  (*Id*.)  RubiconMD/eConsult is a specialty consult software program where providers input patient symptoms and history into the software and receive suggested specialist recommendations.  (*Id*., ¶ 82.)  The software also advises when specialty consults are unnecessary, which reduces the amount of consults being submitted and allows for other consults to be addressed in a timely manner.  (*Id*.)  The goal is to have 100% provider utilization with RubiconMD. (*Id*., ¶ 83.) The utilization rate increased from 11% in September 2019 to 40% in February 2020.  (*Id*.)

To provide additional scheduling opportunities to complete consults within the stipulated timeframes, upon receipt of the OSC in February 2020, Centurion began recruiting, in excess of contract requirements, a Provider Services Representative ("PSR").  (*Id*., ¶ 84.)  PSRs are responsible for building and sustaining positive working relationships with Arizona community providers as well as assisting with a full range of provider relations and service interactions, including claim management and contract negotiation.  (*Id*.)  PSRs support, develop, and maintain service relationships with all participants (physicians, providers, and administrators) of a provider network and the 10 ADCRR complexes.  (*Id*.)  PSRs negotiate the contracts with community healthcare professionals (including hospitals, surgery clinics, and dental providers) that provide services to inmates.  (*Id*.)  Additionally, PSRs review and revise all contracts and letters of agreement to ensure the documentation is complete and compliant with the ADCRR contract.  (*Id*.)  The RDOC trains PSRs on the Centurion portal, handling claim issues, and making recommendations to executive leadership regarding provider contracts.  (*Id*.)  Centurion filled the PSR position on March 16, 2020.  (*Id*., ¶ 85.)  Within the first 90 days of employment, the PSR finalized five new contracts for the following specialty services: Endocrinology,

1   Dermatology, Dermatopathology, and Neurodiagnostic.  (*Id*.)  On July 1, 2020, Centurion

2   finalized a contract for urology services.  (*Id*., ¶ 80.)  A contract for gastroenterology

3   services is scheduled to be finalized on July 26, 2020.  (*Id*.)  Four additional contracts for

4   Oral Surgery, Specialty Surgery, Gastroenterology, and Rehabilitation are in the process of

5   being finalized.  (*Id*., ¶ 85.)

6          In January and February 2020, three Physical Therapists were hired, above contract

7   requirements, to provide specialty care at ASPC-Eyman, ASPC-Florence, and ASPC-

8   Lewis.  (*Id*., ¶ 86.)  Completing physical therapy on site eliminates the need for the

9   utilization management ("UM") review process.  (*Id*.)  Eliminating this step expedites care,

10  increases the number of consults completed, and reduces the burden on the UM department.

11  (*Id*.)  The first two Physical Therapists were hired in January 2020, and the third on February

12  10, 2020.  (*Id*.)  As a result, the physical therapy backlogs at ASPC-Eyman, ASPC-Lewis,

13  and ASPC-Tucson were cleared by the end of February 2020.  (*Id*.)

14         Additionally, in February 2020, Centurion began recruiting two additional UM

15  nurses as well as a UM clerk.  (*Id*., ¶ 87.)  These additional positions exceeded the contract

16  requirement.  (*Id*.)  These additional UM positions will expedite the rate at which consult

17  requests are approved, which will increase the number of days the facilities have to schedule

18  the outside appointment.  (*Id*.)  This should spur compliance.  (*Id*.)  The UM Clerk was

19  hired on April 6, 2020, and both additional UM Nurses were hired on May 5, 2020.  (*Id*.)

20  As a result of these hires, the contract fill rate is 166.67% for UM nurses.  (*Id*.)  Because

21  the UM Clerk position is not required by contract, there is no contract fill rate associated

22  with this position.  (*Id*.)

23         In February 2020, the RDOC began working with Centurion of Arizona's VP of

24  Utilization Management to identify opportunities to increase the UM review turnaround

25  time for routine and urgent consults.  (*Id*., ¶ 88.)  They meet at least once a week via

26  telephone and twice a week via email.  (*Id*.)  Risks, process improvement, and outside

27  specialty services are topics of discussion.  (*Id*.)  These meetings have been beneficial in

28  resolving and improving consult issues.  (*Id*.)

1    Additional clerical staff was also provided to assist the Clinical Coordinator teams
2    at ASPC-Eyman, ASPC-Tucson, and ASPC-Florence. (*Id.*, ¶ 89.) Two additional
3    employees were assigned to both ASPC-Tucson and ASPC-Florence at the end of February
4    2020 to assist with scheduling onsite services. (*Id.*) At the state level, approximately four
5    weeks of overtime was approved for the UM team (regional and corporate) to process
6    "consults to be approved" backlog in February and March 2020. (*Id.*, ¶ 90.) As a result,
7    the backlog was eliminated. (*Id.*) The Regional Medical Director and SMDs continue to
8    provide education to site providers related to consults. (*Id.*, ¶ 91.)

9    The most significant issue that affected ASPC-Eyman, ASPC-Florence, and ASPC-
10   Tucson's compliance with PMs 50 and 51 in February 2020 was the increase in
11   consultations scheduled that month due to the limited availability of specialists over the
12   December 2019 and January 2020 holiday season. (*Id.*, ¶ 92.)

13                            Florence:  57% & 40%

14   ASPC-Florence has continued to face challenges with PMs 50 and 51 because it has
15   a large inpatient facility, which generates a larger volume of urgent consults, and shares a
16   transportation team with ASPC-Eyman for outside specialty services. (*Id.*, ¶ 95.)
17   Additionally, the facility has experienced high turnover rates in the clinical coordinator and
18   scheduler roles, the availability of outside specialists is limited due to multiple factors such
19   as holidays and vacations, and difficulty identifying outside specialists that are willing to
20   treat the inmate population. (*Id.*)

21   For PM 50 in February 2020, there were a total of 46 audited files; 20 files were
22   noncompliant, resulting in a compliance score of 57%. (*Id.*, ¶ 96.) For PM 51 in February
23   2020, there were a total of 52 audited files; 31 files were noncompliant, resulting in a
24   compliance score of 40%. (*Id.*, ¶ 97.) The corrective actions described above, however,
25   are helping. In April 2020, ASPC-Florence achieved 100% compliance with PM 50 and
26   96% compliance with PM 51. (*Id.*, ¶ 98.) This is the first time ASPC-Florence has met the
27   compliance threshold with PMs 50 and 51 since March 2019 and December 2018,
28   respectively. (*Id.*)

Tucson:  60% & 65%

For PM 50 in February 2020, there were a total of 67 audited files; 27 files were noncompliant, resulting in a compliance score of 60%.  (*Id.*, ¶ 99.)  For PM 51 in February 2020, there were a total of 82 audited files, 29 files were noncompliant, resulting in a compliance score of 65%.  (*Id.*, ¶ 100.)  Centurion's corrective actions, however, are helping.  In April 2020, ASPC-Tucson achieved 100% compliance with PM 50 and 96% with PM 51.  (*Id.*, ¶ 101.)

Eyman: 38%

For PM 51 in February 2020, there were a total of 50 audited files; 31 files were noncompliant, resulting in a 38% compliance score.  (*Id.*, ¶ 93.)  The above corrective actions, however, are working, as ASPC-Eyman's compliance rate in April 2020 for PM 51 was 92%.  (*Id.*, ¶ 94.)

Defendants and Centurion undertook substantial efforts to develop and sustain relationships with numerous specialty care providers to comply with PMs 50 and 51 at ASPC-Eyman, ASPC-Florence, and ASPC-Tucson in February 2020.  Centurion paid providers more than AHCCCS rates, negotiated cancelation and no-show rates, purchased software to streamline the referral process, and recruited and hired over contract requirements, and Defendants continuously engaged in productive conversations with Centurion leadership regarding all these efforts to meet the compliance threshold.  Despite their best efforts, and due to the difficulties associated with securing outside consults for the inmate population (hurdles that are beyond Defendants' control), they did not meet the compliance threshold for these PMs in February 2020.  But because they took all reasonable steps, they should not be held in contempt.

///

///

43

| | |
|---|---|
| PM 52 | Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report. |

Tucson:  82%

Before the OSC (with the exception of December 2019), ASPC-Tucson had maintained compliance with PM 52 since December 2018, 12 consecutive months.  (*Id*., ¶ 102.)  Because of its sustained success, upon receipt of the OSC, Centurion continued with the same process and procedures that had historically resulted in compliant scores.  (*Id*.)  This included requiring the SMD's assistant to send daily reports to the providers of reviews to be completed.  (*Id*.)  Any reviews not completed within four days are escalated to the SMD.  (*Id*.)  This process has been in place since Centurion assumed the contract in July 2019.  (*Id*.)

In February 2020, ASPC-Tucson received an 82% compliance score.  (*Id*., ¶ 103.) Eighty four files were audited, but because 69 files were compliant, ASPC-Tucson fell short of the 85% benchmark by just three files.  (*Id*.)  Centurion performed an internal review and identified two issues that caused this noncompliance: (1) reviews were completed outside of the allotted seven days; and (2) providers were not acting upon all recommendations. (*Id*., ¶ 104.)  In response, on March 10, 2020, the SMD met with all ASPC-Tucson providers and provided additional training and education regarding best practices for reviewing consultation notes.  (*Id*., ¶ 105.)  They discussed the timeframe for reviews to be completed, the requisite verbiage to be used, and entering recommendations upon completion of the review.  (*Id*.)  The provider meeting and daily notifications proved successful, as ASPC-Tucson was in compliance with PM 52 in both March (85%) and April (91%) 2020.  (*Id*., ¶ 106.)

///

///

44

| PM 55 | Disease management guidelines will be implemented for chronic diseases. |
|-------|---------------------------------------------------------------------------|

Eyman: 76%

Before February 2020, ASPC-Eyman had maintained compliance with PM 55 for 19 of the previous 24 months. (*Id.*, ¶ 107.) Therefore, it met the definition of substantial compliance and is eligible for termination. (*Id.*) Because of its sustained success, upon receipt of the OSC, Centurion continued with the same process and procedures that had historically resulted in compliant scores. (*Id.*)

In February 2020, 50 files were audited. (*Id.*, ¶ 108.) Because 38 files were compliant, ASPC-Eyman received a score of 76%, just five files short of the 85% benchmark. (*Id.*) Centurion performed an internal review and discovered that, in February 2020, ASPC-Eyman experienced a significant increase in the number of chronic care appointments. (*Id.*, ¶ 108.) For example, in December 2019, there were 2,884 chronic care patients. (*Id.*) By March 2020, as a result of the new requirements for Hepatitis C patients, the number increased by approximately 200. (*Id.*) Due to this unexpected increase, ASPC-Eyman's Chronic Care Nurse was unable to manage the volume and timely schedule the appointments. (*Id.*) To remedy this, on March 3, 2020, a Medical Assistant was hired to assist the Chronic Care Nurse in scheduling chronic care appointments. (*Id.*) The Medical Assistant also alerts nursing assistants and ADONs when appointments are scheduled to ensure they occur. (*Id.*) These corrective actions have been successful, as evidenced by ASPC-Eyman's compliance with PM 55 in March (86%) and April (86%).

| PM 98 | Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0. |
|-------|----------------------------------------------------------------------------------------------------------------------------------------------------------------|

Lewis: 81%

Upon receipt of the OSC, the Regional Director of Mental Health and Regional Director of Psychiatry were alerted that PM 98 at ASPC-Lewis and ASPC-Winslow were

included.  (*Id*., ¶ 111.)  PM 98 is the only mental health measure subject to the OSC.  (*Id*.)
Before February 2020, ASPC-Lewis had been compliant with PM 98 since January 2017.
(*Id*., ¶ 112.)  Therefore, it meets the definition of substantial compliance and is eligible for
termination. (*Id*.) Because of its sustained success, upon receipt of the OSC, Centurion
continued with the same process and procedures that had historically resulted in compliant
scores.  (*Id*.)

In February 2020, 59 files were audited.  (*Id*., ¶ 113.)  Because 48 files were
compliant, ASPC-Lewis received a compliance score of 81%, just two files short of the
85% benchmark.  (*Id*.)  This was the first time ASPC-Lewis had not been compliant in 36
months.  (*Id*.)  In response, ASPC-Lewis educated mental health and nursing on how the
HNR reviews are sent to mental health.  (*Id*., ¶ 115.)  Additionally, the facility added daily
monitoring, which consists of the HDF sending a report of all HNRs every morning to the
mental health lead to review and act upon when needed.  (*Id*.)  These corrective actions
were successful.   (*Id*., ¶ 116.)  ASPC-Lewis received a 98% compliance score in March
and 93% compliance score in April.  (*Id*.)

Winslow:  70%

ASPC-Winslow's noncompliance with PM 98 in February 2020 is an anomaly.
Before February 2020, ASPC-Winslow had only been out of compliance once (January
2019) in the nearly three-year period since May 2017.  (*Id*., ¶ 117.)  Therefore, it meets the
definition of substantial compliance and is eligible for termination.  (*Id*.)  Because of its
sustained success, upon receipt of the OSC, Centurion continued with the same process and
procedures that had historically resulted in compliant scores.  (*Id*.)

In February 2020, 10 files were audited.  (*Id*., ¶ 118.)  Because three files were
noncompliant, ASPC-Winslow received a compliance score of 70%, just two files short of
the 85% benchmark. (*Id*.)   Centurion performed an internal review of the three
noncompliant files and identified that the patients were not referred to psychiatry to further
discuss medications.  (*Id*., ¶ 119.)  To remedy the noncompliance, the FHA and the MH
clinician implemented a process by which all inmates who submit an HNR regarding

46

psychiatric medications are seen by the psychiatrist.  (*Id*., ¶ 120.)  This corrective action was successful.  ASPC-Winslow received a 100% compliance score in March and a 91% compliance score in April.  (*Id*., ¶ 121.)

***

Against the backdrop of significant measures taken by ADCRR and Centurion to achieve full compliance, both before and after the OSC, the circumstances surrounding each of the noncompliant PMs in February 2020 demonstrate that a finding of civil contempt is not appropriate.  *See Taggart*, 139 S. Ct. at 1801 ("[C]ivil contempt 'should not be resorted to where there is [a] fair ground of doubt as to the wrongfulness of the defendant's conduct.'") (citation omitted); *In re Dual-Deck*, 10 F.3d at 695 (substantial compliance "is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply") (citation omitted); *Donallco*, 787 F.2d at 1379 ("[T]echnical or inadvertent violations of the order will not support a finding of civil contempt.").  Moreover, the corrective measures currently in place are achieving compliance and inching closer to full compliance.

### C.    At a Minimum, the Court Should Reduce the $100,000-per-Noncompliance Sanction.

The  "$100,000  per  Performance  Measure  per  complex"  sanction  is disproportionately severe, especially given that Defendants have substantially complied with the PMs (both in the Stipulation and in the OSC).  Imposing them would also unfairly elevate  form  over  substance  because  the  noncompliant  PMs  are  mostly  due  to technical/inadvertent  errors  and/or  other  reasons  beyond  their  control.  Although "[s]anctions may be imposed to coerce the contemnor to comply with the court's order, [they] may not be so excessive as to be punitive in nature." *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991).  "Coercive sanctions may only be imposed 'after a reasoned consideration' of 'the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Parsons*, 949 F.3d at 456 (quoting *Shuffler*

1    *v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983)).  Furthermore, although the absence

2    of willfulness will not ordinarily insulate a party from civil liability, a party's good faith is

3    relevant in determining an appropriate sanction.  *Taggart*, 139 S. Ct. at 1802; *see also In re*

4    *Dual-Deck*, 10 F.3d at 695 (quoting *Vertex*, 689 F.2d at 889) ("[A] person should not be

5    held in contempt if his action "'appears to be based on a good faith and reasonable

6    interpretation of the [court's order].'").

7          Under the OSC, Defendants are subject to a $2,000,000.00 sanction for failing to

8    comply with the 20 PMs in February (out of 147 PMs).  That is harsh and excessive

9    considering the many reasonable measures taken; the technical or inadvertent reasons many

10    of these PMs were noncompliant in February; and the historical compliance—both before

11    and after February—for many of these PMs.

12         • Four PMs had been substantially compliant and, therefore, eligible for

13             termination (PM 11: APSC-Tucson; PM 55: ASPC-Eyman; PM 98: ASPC-

14             Lewis; PM 98: ASPC-Winslow).

15         • Six PMs had been consistently/consecutively compliant in the previous nine

16             months (PM 40: ASPC-Tucson; PM 44: ASPC-Florence and Lewis; PM 47:

17             ASPC-Douglas and Phoenix; PM 52: ASPC-Tucson; PM 55: ASPC-Eyman).

18         • Nine PMs missed compliance by three or less files, (PM 11: ASPC-Tucson;

19             PM 37: ASPC-Lewis; PM 40: ASPC-Tucson; PM 47: ASPC-Douglas and

20             Phoenix; PM 49: ASPC-Eyman; PM 52: ASPC-Tucson; PM 98: ASPC-Lewis

21             and Winslow).

22         • Four PMs were noncompliant because of technical errors (PM 15: ASPC-

23             Eyman; PM 40: ASPC-Tucson; PM 47: ASPC-Douglas and Phoenix).

24         • Four PMs were noncompliant for reasons beyond Defendants' control (PM

25             44: ASPC-Eyman, Florence, and Lewis; PM 55: ASPC-Eyman).

26    Because Defendants have already put in place comprehensive measures to correct the

27    noncompliant PMs, such an excessive amount will not serve any legitimate deterrent

28    purpose.  It would be punitive, not coercive.  *See Watkins*, 943 F.2d at 1304.

1    The steep amount of the proposed sanction—and any finding of contempt—should

2    also be reconsidered in light of the fact that Defendants were given notice of the potential

3    sanction (on January 31) just hours before the care that was to be measured and potentially

4    sanctioned began (February 1).  Additional measures could not be implemented before that

5    patient care started and was documented.  Thus, the opportunity to purge was difficult, if

6    not impossible.  *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821,

7    829 (1994) ("Where a fine is not compensatory, it is civil only if the contemnor is afforded

8    an opportunity to purge."); *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th

9    Cir. 2016) ("[T]he ability to purge is perhaps the most definitive characteristic of coercive

10   civil contempt"); *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir.

11   1983) ("A court's power to impose coercive civil contempt depends upon the ability of the

12   contemnor to comply with the court's coercive order.").  The sharp increase in compliance

13   with the OSC PMs in March and April demonstrates that the additional measures that were

14   taken in February spurred additional compliance.

15                **D.    Defendants Request an Evidentiary Hearing.**

16   Because a finding of civil contempt is a "severe remedy," *Taggart*, 139 S. Ct. at

17   1802, Defendants should be afforded every opportunity to defend against it.  *See Bagwell*,

18   512 U.S. at 827 ("[C]ivil contempt sanctions … may be imposed in an ordinary civil

19   proceeding upon notice and an opportunity to be heard."); *Watkins*, 943 F.2d at 1304 ("Due

20   process requires that the court … provide a hearing in which the alleged contemnor may

21   explain why the court should not make a contempt finding.").  If the Court is inclined to

22   hold Defendants in contempt, they respectfully request an evidentiary hearing to further

23   elaborate on the measures taken to achieve full compliance. The Court would benefit from

24   hearing directly from Director Shinn, Assistant Director Gann, or any Centurion personnel

25   who have devoted their jobs to that goal.

26   **III.    Conclusion.**

27   For these reasons, the Court should not find Defendants in civil contempt or impose

28   any sanctions.

DATED this 13th day of July, 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Daniel P. Struck
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

    *Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on July 13, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

3

4

| Alison Hardy: | ahardy@prisonlaw.com |

5

| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com |

6

7

| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |

8

| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |

9

| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |

10

11

| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |

12

| Donald Specter: | dspecter@prisonlaw.com |

| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |

13

| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |

14

| Maya Abela | mabela@azdisabilitylaw.org |

15

| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |

16

| Sara Norman: | snorman@prisonlaw.com |

17

| Rita K. Lomio: | rlomio@prisonlaw.com |

18

| Eunice Cho | ECho@aclu.org |

19

| Jared G. Keenan | jkeenan@acluaz.org |

20

| Casey Arellano | carellano@acluaz.org |

21

| Maria V. Morris | mmorris@aclu.org |

22

23

    I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

24

25

    N/A

26

                    /s/Daniel P. Struck

27

28