Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE THE STIPULATION (MAXIMUM CUSTODY PERFORMANCE MEASURES 1-3, 5-6, AND 8) (Doc. 3599)** |

Defendants respond in opposition to Plaintiffs' Motion to Enforce the Stipulation (Maximum Custody Performance Measures 1-3, 5-6, and 8.  (Doc. 3599.)  This Court should deny Plaintiffs' Motion because Defendants' inmate monitoring selection process does not render CGAR compliance scores invalid.  Defendants offer reasonable and attainable out-of-cell time as prescribed by the Stipulation and Maximum Custody Performance Measures ("MCPMs"). Moreover, Plaintiffs' submission of a mere handful of inmate declarations for only two of Arizona Department of Corrections, Rehabilitation and Reentry's ("ADCRR") four maximum custody units is woefully insufficient to demonstrate that Defendants systemically deprive maximum custody inmates of reasonable and

attainable offered out-of-cell time, particularly in light of years of compliance data that has been provided to Plaintiffs.  For these reasons, Plaintiffs' Motion should be denied.

This Response is supported by the following Memorandum of Points and Authorities, attached exhibits, simultaneously filed request to submit non-electronic exhibits to provide this Court with monthly Maximum Custody Monitoring Notebook source documents for November 2016 – August 2019, and the Court's entire record herein.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     FACTUAL BACKGROUND

#### A. Max Custody Monitoring System.

ADCRR developed a robust, multi-level monitoring and reporting system for MCPMs in order to track and monitor out-of-cell activities and programming offered to maximum custody inmates in conjunction with the MCPMs and DI 326/DO.  (Exh. 1, Decl. J. King, ¶ 6; Exh. 2, Decl. C. Jackson, ¶ 6.)  Each applicable prison complex that houses maximum custody inmates has DI 326/DO 812-designated staff responsible to ensure operational compliance with DI 326/DO 812 and the MCPMs.  (Id. at ¶ 7.)  DI 326/DO 812-designated staff is also responsible for monitoring the accuracy of the source documents utilized to monitor and report on the MCPMs.  (Id.)

The Stipulation protocols for the MCPMs require that at each designated location, Out-of-Cell Tracking Forms ("OOCT Forms") are reviewed for one randomly selected week for each monitored month, for 10 randomly selected complex location maximum custody inmates and 10 randomly selected SMI maximum custody inmates. (Id. at ¶ 7.) Once the monitored week is randomly selected for a monitored month, DI 326/DO 812-designated staff gathers the OOCT Forms for the two 10 randomly selected inmate groups and prepare extensive Maximum Custody Notebooks containing source documents used to monitor and determine compliance for MCPMs. (Id. at ¶ 17.)

2

The Maximum Custody Notebooks contain between 200-400 pages of source documents per location.  (Id. at ¶ 10.)[1]  The Maximum Custody Notebooks for each prison complex go through four levels of review to ensure accuracy of monitoring and compliance for CGAR reporting.  Three of the four levels of review receive cross-unit review, with the final level of review conducted by the complex warden.  (Id. at ¶¶ 11- 16.)

**B. Max Custody Monitoring Selection Process.**

The random selection of inmates subject to monthly monitoring is performed utilizing the count sheets for each maximum custody unit housing inmates eligible for DI 326/ DO 812 participation.  (Id. at ¶ 18.)  ADCRR's count sheets are organized by housing unit, and within the unit by building, and within the building by cell location.  (Id. at ¶ 19.)  SMI inmates are identified on the count sheets and the OOCT Forms by an "M" following the inmate's ADCRR identification number. (Id. at ¶ 20.)

To randomly select maximum custody inmates for monitoring MCPMs 1-2 & 5-6, the total number of inmates eligible for DI 326/DO 812 is divided by 10, and every nth inmate is subject to monitoring for that specified month.  (Id. at ¶ 21.)   If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week (Saturday to Friday), then that inmate's records are not reviewed and the inmate listed either directly above or below the randomly selected inmate who was on the unit for the full seven (7) monitored days is selected for monitoring.  (Id. at ¶ 22.)  Substitution memos are provided in the monthly Maximum Custody notebooks to identify inmates who were not subject to review for the above-stated reasons.  (Id.)  The OOCT Forms are reviewed in order to determine compliance with MCPMs 1-2 & 5-6.[2]  (Id.)  Inmates selected for review

---

[1] By separate motion filed this same date, Defendants seek leave to provide the Court with non-electronic exhibits that comprise monthly Maximum Custody Notebooks for the time period encompassing November 2016 to August 2019 for all four maximum custody unit locations, to be incorporated herein as Exh. 9.

[2] This category may include both non-SMI and SMI maximum custody inmates, excluding compliance analysis for MCPM 8 which pertains only to SMI inmates.

for MCPMs 1-2 & 5-6 are noted in yellow highlight on the count sheets contained in the monthly Maximum Custody Notebooks.  (Id.)

Next, ten SMI maximum custody inmates from each unit are randomly selected for monitoring for MCPM 8.  (Id. at ¶ 23.)  The selection process noted above is also used for the SMI inmate selection process utilizing the total number of inmates classified as SMI at a particular unit, dividing this total number by ten, and every nth inmate is reviewed.  (Id.)  If a randomly selected SMI inmate was not present in the unit for the full seven (7) days of the monitoring week, then that inmate's records are not reviewed and the next SMI inmate listed either directly above or below the randomly selected SMI inmate is selected.  (Id. at ¶ 24.)  If no SMI inmate is listed either directly above or below the randomly selected SMI inmate, then the next SMI inmate listed in the roster who was housed in the unit for the full seven (7) days is used.  (Id.)  The OOCT Forms for the group of ten SMI inmates are reviewed to determine compliance with MCPMs 1-2, 5-6 & 8.  (Id.)

Random selection of maximum custody inmates for review of MCPMs 1-2 & 5-6 (which may also include SMI inmates) is performed first.  (Id. at ¶ 25.)  The names of these selected inmates are noted on the count sheets in yellow highlight.  (Id.) When selection of SMI inmates is conducted, if the nth SMI inmate has already been selected for review of MCPMs 1-2 & 5-6 (and thus has been yellow highlighted), he/she is not reselected for review of MCPMs 1-2, 5-6 & 8 but instead the next following SMI inmate will be selected so that SMI inmates are not double-reviewed.  (Id.) SMI inmates selected for review are noted in green highlight on the count sheets contained in the monthly Maximum Custody Notebooks. (Id.)

Based upon unique population characteristics and numbers at each maximum custody location, count sheet start selection points may vary, none of which serve to intentionally reselect inmates for monitoring.  For instance, Kasson Unit utilizes the master unit count sheet as the starting point for both the monitoring selection groups. (Exh. 1, Decl. King, ¶ 26.)  Because Kasson SMI maximum custody inmates often go on watch status thus rendering those inmates ineligible for monitoring for any week in which they were on watch

4

1   status, the selection process allows for monthly variance drawn for monitoring. (Id.) Small

2   numbers of repeat selections also occur because in total, 20 Kasson inmates are selected for

3   monitoring each month out of small population numbers of 130 to 150 inmates. (Id.)

4       At Browning Unit, after the monitoring week is chosen, a different cluster count

5   sheet than was used in the prior few months is chosen as the selection starting point. (Exh.

6   2, Decl. Jackson, ¶ 26.)   Due to population changes, internal housing movement, and

7   cluster/cell assignments changes, it does not necessarily follow that the same inmates would

8   be chosen again for monitoring even if cluster count sheet starting points were repeated in

9   a several month period of time.  (Id.)

10              **C. Inmate Recreation.**

11      Plaintiffs submit only eighteen (18) inmate declarations from only Kasson and

12  Browning Units in an attempt to argue that offers of recreation at all four maximum custody

13  locations for the time period of November 2016 to August 2019 somehow were

14  "unreasonable or unattainable", allegedly because the inmates were asleep when recreation

15  offers were made, water and restrooms were unavailable, it was too cold to go to recreation,

16  and being left in a shower after recreation makes inmates not want to go to recreation.

17  Plaintiffs submit no declarations from the ASPC-Eyman SMU-I or ASPC-Lewis Rast

18  maximum custody locations.  And, the inmate declarations are generally non-specific as to

19  time period and thus fail to actually cover the entirety of the time period at issue.

20      Plaintiffs' handful of inmate declarations purporting to show overall unattainable

21  out-of-cell time pales in comparison to an average maximum custody population of 2,184

22  inmates for the November 2016 to August 2019 time period – thus representing less than

23  1% of the population.[3]  (*See* https://corrections.az.gov/capacity-custody-level, last visited

24  7/21/2020).  Contrary to Plaintiffs' narrative, in reality, movement for inmate recreation

25  opportunities at Kasson and Browning begins when first shift officers complete their first

26

27      [3] Average population number was calculated utilizing the average of the ADCRR
    total maximum custody count number for the first day of each month of the November 2016
28  to August 2019 time period.

5

cell-to-cell safety/security check between 0600 and 0630 hours. (Exh. 1, Decl. King, ¶¶ 26-28, Exh. 2, Decl. Jackson, ¶¶ 26-28.) In order to complete a safety/security check, the officer must stop and look into every cell and observe that the inmate is living and breathing. (Id. at ¶ 29.) While doing so, officers ask the inmates scheduled for recreation if the inmate wants to go to recreation and awaits a response. (Id. at ¶ 30.) The offer is not made in a whisper, but in a voice loud enough to elicit a response from the inmate. (Id. at ¶ 31.) After the first safety/security checks are completed by first shift officers, movement teams begin the recreation movement process to outdoor recreation. (Id. at ¶ 33.)

Contrary to Plaintiffs' allegations, the offer of recreation made during the first shift officers' first security walk is not the first housing activity of the day. Indeed, breakfast is served in-cell by approximately 0500 to 0530 hours. (Id. at ¶ 34.) As a result, most inmates are awake when recreation is offered.

As to conditions associated with outdoor recreation, water is available to all inmates participating in outdoor recreation. (Id. at ¶ 36.) Inmates may bring a cup or sports bottle filled with water to outdoor recreation. Water jugs are available for refills. (Id.) At Kasson, upon request, Kasson SMI max custody inmates are provided a loaner jacket for outdoor recreation. (Exh. 1, Decl. King, ¶ 37.) At Browning, inmates are provided sweatshirts but are not provided jackets for legitimate safety/security reasons attendant to the Browning population. (Exh. 2, Dec. Jackson, ¶¶ 37.) At both locations, recreation enclosures are cleaned daily by inmate porters. (Exh. 1, Decl. King, ¶ 38, Exh. 2, Decl. Jackson, ¶ 38.) Likewise, if an inmate participating in recreation needs to use the restroom during his recreation period, he merely has to advise the recreation officer of the same and will be escorted back to his housing location to use the restroom. (Id. at ¶ 39.) If the inmate would then like to return to recreation, he may do so. (Id.)

Recreation may be cancelled if staffing that particular day does not allow sufficient recreation staff to supervise outdoor recreation. (Id. at ¶ 40.) Attempts are made to make up cancelled recreation opportunities during the monitoring week. (Id. at ¶ 41.) Moreover, efforts are also made, where feasible, to allow recreation with adjustment to the type of

recreation enclosures used.  (Id. at ¶ 42.)  For instance, if staff is unavailable to safely conduct recreation in the large group enclosures, recreation may still be offered to the inmates in the 10x10 enclosures (or chute recreation at Browning) as staffing required to operate the same is less staff intensive and provides the opportunity to still recreate the inmates, albeit in an alternative location.  (Id.)  At Browning because of the substantially larger population numbers (less than 200 maximum custody inmates at Kasson versus nearly 700 or more at Browning), recreation cancellations are partial and may not affect all locations, with efforts made to rotate locations of partial cancellations.  (Id.)

**D. Documentation of Recreation and Programming Refusals.**

Plaintiffs complain that OOCT Form documentation does not contain detailed explanations as to why inmates do not want to come out of their cells.  It is not uncommon, however, for maximum custody inmates to regularly choose not to participate in recreation, programming, or unstructured out-of-cell time.  (Exh. 1, Decl. King, ¶ 44; Exh. 2, Decl. Jackson, ¶ 44.)  Moreover, it is not unusual, when asked by correctional officers and/or supervisors why a particular inmate does not want to recreate/program/etc. that the response from the inmate is "I don't want to", "I don't want to go" etc., without further explanation. (Id.) Documentation of refusals often includes these general descriptors as to why an inmate is refusing offered out-of-cell time because staff does not want to push inmates to further explain themselves so as not to agitate the inmate, leading to inmate behavior that may require an activation of an ICS emergency response and use of force.  (Id.)  Moreover, Defendants dispute that it is necessary to include detailed reasons why an inmate wants to refuse an opportunity for out-of-cell time.  (Exh. 3, Maximum Custody Monitor Guide (2017) at 5 (c)).  The Stipulation requires that out-of-cell time be offered, not that Defendants continuously track detailed reasons for rejecting the offer

Plaintiffs also criticize the accuracy of Defendants' reporting of inmate refusals to participate in programming by taking issue with programming class sign-in sheets not having inmate signatures for inmates who refuse to participate in the class.   But the sheets are sign-in sheets. If the inmate is not present, he cannot sign his name; thus staff indicates

on the sheet that the inmate refused the offered program. Specifically, DI 326/DO 812 and SMI programming activities occur in classrooms outside of the housing locations, which require inmate movement to those locations. (Id. at ¶ 45.) If an inmate refuses to participate in out-of-cell programming opportunities, then the refusal is documented on the inmate's OOCT Form, but the inmate does not leave his cell, so he cannot sign-in (or sign a refusal) at the classroom location. (Id. at ¶¶ 46-48.) Plaintiffs' criticism of the absence of a signed refusal is nothing more than a weak attempt to re-litigate an argument that the Court has already rejected. Defendants are not required to obtain a signed refusal for an inmate who refuses to leave his cell. (Trans. Doc. 1836, 12/14/2016, Status HR, at 79:8-10, 89:14-22, 90:4-8, 94:4-9.)

### E.  Inmate Showers.

Inmates at both Kasson and Browning are offered showers three days a week, but have the right to refuse the same. (Id. at ¶ 49.) Showers are cleaned by inmate cleaning crews daily and are not "mold invested." (Id. at ¶ 50) The showers are illuminated so that officers can monitor inmate conduct and welfare – thus no inmates are left in "dark" showers. (Exh. 1, Decl. King, ¶ 55; Exh. 2, Decl. Jackson, ¶ 53.) Moreover, inmates have regular contact with and access to correctional officers who perform their security walks at irregular intervals as close to 30 minutes as possible but not to exceed 59 minutes. (Id.) Inmates are not left secured in the shower for hours on end, the exception being an emergency facility lockdown situation requiring that all movement cease; or the inmate refuses to exit the shower and an ICS is activated requiring a cool-down period wherein correctional and mental health/medical personnel engage in de-escalation methods to attempt to gain compliance without use of force.[4] (Exh. 1, Decl. King, ¶ 52; Exh. 2, Decl. Jackson, ¶ 51.)

---

[4] At Kasson, Step Level 2 and 3 inmates walk unrestrained to the shower and are not secured in the shower. Thus, they cannot be secured in the shower, unattended to, for hours. (Id. at ¶¶ 52-53.)

Neither the Stipulation, the MCPMs, nor the Max Custody Monitor Guide address inmate showers, at all.  (Doc. 1185; 1185 at 40-45; Exh. 3, Maximum Custody Monitor Guide (July 2017).)  Moreover, contrary to Plaintiffs' argument, bare allegations of being "left in a shower" do not render out-of-cell time "unreasonable or unattainable." (Doc. 3599 at 3.)

## II.    LEGAL ARGUMENT

The Stipulation is a private settlement agreement to which contract law applies as to interpretation and enforcement. Plaintiffs bear the burden of proof by a preponderance of the evidence to establish that Defendants have breached the terms of the settlement agreement and thus are substantially non-compliant with the Stipulation and the MCPMs. *See, e.g., Am. Pepper Supply Co. v. Fed. Ins. Co*., 208 Ariz. 307, 310 (2004) (clarifying that plaintiff must prove the existence of the contract, its breach, and the resulting damages by a preponderance of the evidence to prevail on a breach of contract claim).

Defendants' employment of an inmate monitoring selection process does not violate any provision of the Stipulation, MCPMs or the Max Custody Monitor Guide.  As a result, Defendants are in substantial compliance with the MCPMs.  This is especially so where Plaintiffs fail to establish that inmates actually monitored during the November 2016 to August 2019 time period were not provided out-of-cell time/programming as required by the Stipulation and MCPMs such that Defendants' compliance scores are inaccurate. Tellingly, the accuracy of Defendants' reporting remains unchallenged by Plaintiffs.

Next, Plaintiffs' submission of a few declarations from only two max custody locations is woefully insufficient to demonstrate that "Defendants' offers of out-of-cell time are often unreasonable or unattainable such that isolation sub-class members are unable to take advantage of those offers," and utterly fails to prove by a preponderance of the evidence that compliance scores for 2,720[5] instances of monitoring for November 2016 to August

---

[5] During the November 2016 to August 2019 time period of 34 months, 20 inmates were monitored each month at each of the 4 maximum custody locations, totaling 2,720 monitoring instances used to determine MCPM compliance.

2019 are invalid.  This is especially true where the declarations largely lack foundation, are incapable of verification due to lack of time period specificity as to claims made, are based upon hearsay and lack of personal knowledge, and lack reliability upon review of the inmates' own OOCT Forms.  (*Compare* Doc. 3600-1 and 3600-2 Exhibits 1-17, 19 ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Id., ¶¶ 3-8) *with* Exh. 4, Fed.R.Evid. 1006 Summary Chart of comparison of Plaintiffs' Doc. 3600-1 and 3600-2 (Exhibits 1-17, 19) and corresponding Declarant OOCT Forms); *see also* Fed. R. Civ. P. 56 (c)(4); Fed. R. Evid. 801–802; Fed. R. Evid. 601–602; Fed. R. Evid. 701; *see also Wang v. Chinese Daily News, Inc.*, 231F.R.D. 602, 615 (C.D. Cal. 2005) (sustaining hearsay objection to declaration statement); *Bank Melli v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995) (a declaration not made on personal knowledge is entitled to no weight); *Self-Ins. Inst. of Am., Inc. v. Software and Info. Ind. Ass'n*, 208 F. Supp. 2d 1058, 1063–64 (C.D. Cal. 2000) (affirming defendants' objections over (1) a declarant's statements about third persons being "confused" for lack of personal knowledge and (2) statements about "calls to myself and to my staff" from clients because the statements in these calls are inadmissible hearsay); *Wells v. Jeffery*, No. 03-cv-228, 2006 WL 696057, at *3 n.7 (D.D.C. Mar. 20, 2006) ("The affidavit or declaration cannot contain hearsay evidence, as such evidence would not be admissible at trial.").

**A. Defendants' Monitoring Inmate Selection Process Does Not Invalidate Defendants' November 2016 to the Present Compliant CGAR Scores.**

Stipulation Paragraphs 30-31 requires the parties to mediate formally noticed issues of substantial non-compliance before filing a motion to enforce the Stipulation by the District Court.  (Doc. 1185, ¶¶ 30-31.)  In ruling on Defendants' Motion to Terminate

1    Monitoring and Reporting of Maximum Custody Performance Measures 1 through 8, (Doc.

2    3108), this Court ordered the parties to mediate Plaintiffs' disputes regarding in part,

3    Defendants' inmate monitoring selection process, before Plaintiffs could proceed on a

4    procedurally compliant motion to enforce the Stipulation.  (Doc. 3359 at 11.)  Plaintiffs

5    failed to serve Defendants with any Notices of Substantial Noncompliance or mediate

6    before seeking enforcement relief in responding to Defendants' motion to terminate.  (Id.;

7    Doc. (Reply) at 3.)

8         Plaintiffs' criticism of the selection methodology should be rejected because the

9    inmate selection process is not prohibited by either the maximum custody provisions of the

10   Stipulation, MCPMs, or the Maximum Custody Monitor Guide.  (Doc. 1185, ¶¶ 17-28; Doc.

11   1185-1 at 41-45; Exh. 3, Maximum Custody Monitor Guide (2017).)  Plaintiffs fail to

12   present any actual evidence as to how many repetitive selections in a 24 month period are

13   statistically permissible in order to justify their desire for judicial invalidation of more than

14   five years of compliance scores. That some repetition in selection is inevitable cannot be

15   disputed.  And, Plaintiffs cannot reasonably explain why they waited four years to challenge

16   selection methodology, knowing full well from the start of production of monthly

17   Maximum Custody Notebooks the methodology of how inmates were selected.  As a result,

18   if nothing else other than in the interest of fairness, Plaintiffs should be estopped from ever

19   making this argument again.

20        Moreover, the Court has already ruled that "[i]f there are under 50 prisoners in a

21   particular pool, like the SMI pools of prisoners (see Doc. 3216 at 13-19), there is a skip-

22   interval of less than five, and likely no harm results from failing to use a random starting

23   point." (Doc. 3359 at 8.)  For the time period of November 2018 to August 2019, which is

24   the contracted time period upon which Plaintiffs base their faulty selection repetition

25   arguments, the SMI maximum custody inmate populations ranged from:

26        • 5 to 15 SMI inmates at ASPC-Eyman Browning;

27        • 1 to 29 at SMI inmates at ASPC-Eyman SMU I;

28        • 57 to 131 at SMI inmates at ASPC-Florence Kasson; and

- 6 to 23 SMI inmates at ASPC-Lewis Rast.

(Exh. 5, Fed.R.Evid. 1006 Summary Chart of Total SMI and Non-SMI Maximum Custody Populations at ASPC-Eyman Browning; ASPC-Eyman SMU I, ASPC-Lewis Rast and ASPC-Florence Kasson for November 2018 to August 2019 with supporting Maximum Custody Notebook Source Documents.) Because the SMI inmate populations at Browning, SMU I and Rast never even approached the 50 inmate mark during the time period challenged by Plaintiffs, Defendants inmate selection methodology was not compromised and Defendants' passing Stipulation compliance scores for MCPM 8 stand.

Because the SMI population at Kasson never exceeded 131 inmates, reasonable repetition selection should be permitted. During the November 2018 to August 2019 selection period challenged by Plaintiffs, only 2 inmates were selected four times; 6 inmates were selected three times; and 11 inmates were selected twice. These low repetition rates are simply insufficient to render monitoring results unreliable, particularly so where as explained above, Kasson's fluid population of eligible inmates because of frequent watch status changes and low population numbers makes repetition in monitoring reasonable, unintentional, and unavoidable.[6] (Exh. 6, Fed.R.Evid. 1006 Summary Chart of Inmates Chosen for MCPM Review by Maximum Custody Unit Location for November 2018 to August 2019 with supporting Maximum Custody Notebook Count Sheet Source Documents.)

Finally, Plaintiffs' form-over-substance criticism should be rejected as to inmate monitoring selections for MCPMs 1-3 and 5-6 for all maximum custody locations. Plaintiffs' attempt to paint a picture of excessive reselection is fatally flawed. Indeed, when extracting the non-SMI inmate draws at each location from Plaintiffs' tables at Doc. 3601-

---

[6] Should the Court find that Plaintiffs have proven with actual evidence what magic number of reselection at each complex location based upon specified population parameters is "too much", Defendants should be permitted to re-select that certain number of disqualified inmates and recalculate compliance scores. To throw out the entirety of Defendants' monitoring and reporting for the last five years based upon a minute number of reselections is patently unfair and prejudicial to Defendants.

1 (Exh. 1 filed under seal) and comparing it to Defendants' summary tables which remove non-SMI inmates selected for monitoring, there are very few repetitions:

- ASPC-Eyman Browning:  7 inmates were selected twice for review.
- ASPC-Eyman SMU I:  8 inmates were selected twice for review.
- ASPC-Florence Kasson[7]:  1 inmate was selected four times for review; 3 inmates were chosen three times for review; and 14 inmates were selected twice for review.
- ASPC- Lewis Rast:  11 inmates were selected twice for review.

(Exh. 6.)

In total, 44 inmates were re-selected during the time period at issue across four prison complexes.  Forty out of 44 inmates were selected only twice for review, with the highest incident of re-selection being one inmate selected four times at Kasson, which has a significantly lower population pool to begin with. (Exh. 6.)  Compared to 2,720 instances of monitoring that occurred from November 2016 to August 2019, these scant repetitions do not even suggest, let alone prove, an intentional re-selection process calculated to skew compliance rates.  Plaintiffs have failed to prove that Defendants' selection methodology is unreliable.

**B. Plaintiffs' Challenge To Documentation Of Refusals of Out-Of-Cell Time or Refusal Rates Fails.**

Plaintiffs attack Defendants' long standing MCPM compliance rates by arguing that Defendants are required to obtain a second signature (either another officer or the inmate) to validate an inmate's offer of out-of-cell time on both OOCT Forms and programming sign-in sheets.  Plaintiffs are wrong.  Plaintiffs' challenge fails for three reasons.

---

[7] Kasson's maximum custody population numbers represent less than 10% of the ADCRR's current total maximum custody population. (Exh. 7, 7/20/2020 Daily Population Count.)

First, there is no requirement for two signatures (whether from another witnessing officer or the inmate) to evidence refusals on the OOCT Forms.  Rather, the Maximum Custody Monitor Guide provides for the applicable MCPMs:

> Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form **where feasible considering safety/security/operational concerns, to verify the refusal**.

(Exh. 3 at 15, 18, 23, 26, 29 at MCPMs 1-2 at Methodology (c), MCPM 5 at Methodology (d), MCPM 6 at Methodology (i) & MCPM 8 at (d)  (emphasis added)).  There is no bright line requirement for a second signature, an issue advocated for by the Plaintiffs but denied by the Court. (Trans. Doc. 1836, 12/14/2016, Status HR, at 79:8-10, 89:14-22, 90:4-8, 94:4-9.)  MCPM compliance is not compromised by the absence of a second signature on the OOCT Forms.  Nor is there any requirement that a second signature be obtained to denote refusals on sign-in sheets for programming classes.  (Exh. 3 at 15, 18, 23, 26, 29 at MCPMs 1-2 at Methodology (c), MCPM 5 at Methodology (d), MCPM 6 at Methodology (i) & MCPM 8 at (d)  (emphasis added)).  And, such a requirement is nonsensical.  Programming takes place in classrooms, outside of the housing location.  An inmate who refuses to come to class cannot sign his name on the sign-in sheet confirming he did not come to class.[8]

Second, the Court already rejected Plaintiffs' challenge to OOCT Forms not containing either a second officer signature or inmate signature confirming a refusal of out-of-cell time, finding the absence of the same does not render compliance data unreliable. (Doc. 3359 at 7.)  Moreover, two signatures are just not required.  (Trans. Doc. 1836, 12/14/2016, Status HR, at 79:8-10, 89:14-22, 90:4-8, 94:4-9.)

---

[8] Plaintiffs challenge to commonplace documentation that inmates refuse out-of-cell time because they just do not want to go is likewise unavailing.  The explanation is common place and does not call into question the accuracy of Defendants' documentation of the same.  Neither the Stipulation, MCPMs or the Maximum Custody Monitor Guide require either inmates to give detailed explanations for their choice not to accept offered out-of-cell time or security staff to document any explanations provided with some benchmark level of detail.

1    Third, refusals of out-of-cell time are not a monitored component of the Stipulation

2    or MCPMs.  (Doc. 1185; Doc. 1185 at 40-45).  Accordingly, Plaintiffs' pattern of refusal

3    rates arguments fails to establish substantial noncompliance with the Stipulation or

4    MCPMs.  Plaintiffs include in their refusal rate calculation those inmates who accepted

5    offered time out-of-cell for recreation, programming, or other activity but decided to return

6    early. (Doc. 3601 at 4-5.) This makes no sense.  The offer was accepted, the inmate decided

7    to return early.  Early returns are not refusals.  As a result, Plaintiffs' data is flawed.

8    Additionally, Plaintiffs' continued reliance on an expert declaration to establish that the

9    purported refusal rates are "too high" is without necessary foundation.  (Doc. 3599 at 7-8.)

10   Their expert fails to mention any measureable comparison to support his opinion that the

11   rates are "too high."  He failed to point to any other department of corrections analysis or

12   empirical study which would support his conclusions. The "opinion" is not based on

13   measurable data and constitutes nothing more than conjecture.  Moreover, Plaintiffs' expert

14   fails to define critical terms or explain how comparison of out-of-cell time for maximum

15   security inmates to a community clinical setting makes any sense.

16       This baseless conjecture fails to establish substantial non-compliance where refusal

17   rates are not a basis for determining Stipulation and MCPM compliance.  *Daubert v. Merrell*

18   *Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993); *Moussouris v. Microsoft Corp.*, 311

19   F.Supp.3d 1223, 1234 (W.D. Wash. 2018) ("In determining reliability, the court must rule

20   not on the correctness of the expert's conclusions but on the soundness of the methodology,

21   and the analytical connection between the data, the methodology, and the expert's

22   conclusions."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either

23   *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence

24   that is connected to existing data only by the ipse dixit of the expert. A court may conclude

25   that there is simply too great an analytical gap between the data and the opinion proffered.");

26   *see also I.V. v. Wenatchee Sch. Dist. No. 246*, 342 F.Supp.3d 1083, 1092-93 (E.D. Wash.

27   2018) (finding expert testimony non-admissible when the expert "failed to set down any

28

principles connecting the data to her conclusion"). For these reasons, Plaintiffs' challenge to documentation of refusals and refusal rates fails.

**C. Plaintiffs Have Not Amassed Evidence That Defendants Out-Of-Cell Time Offers Are Unreasonable Such That Offered Out-Of-Cell Time Is Unattainable.**

Plaintiffs submit declarations of a handful of inmates to argue that Defendants deliberately undermine inmate participation in out-of-cell activities such that the required out-of-cell time is not meaningfully offered. Plaintiffs' submission fails to show Defendants are substantially noncompliant with the Stipulation and MCPMs.

First, neither the Stipulation, MCPMs, nor Monitor Guide, require Defendants to provide maximum custody inmates with out-of-cell recreation, programs, and activities that yield some percentage rate of inmate satisfaction and participation. Neither do the Stipulation, MCPMs, or the Monitor Guide prescribe or prohibit the time that recreation is offered; the weather or restroom conditions for recreation; or inmate satisfaction with recreation or programming opportunities. Where Plaintiffs' complaints are not prescribed or prohibited by the Stipulation or MCPCs, Defendants cannot be found in substantial non-compliance with its longstanding compliance reporting. (Docs. 2116, 2213, 2247, 2333, 2399, 2648, 2508, 2570, 2626, 2711, 2783, 2836, 2921, 2953, 2987, 3008, 3053, 3063, 3099, 3113, 3154, 3192, 3225, 3264, 3294, 3331, 3346, 3375, 3397.)

Even if Plaintiffs' complaints regarding the manner in which out-of-cell time (recreation is the main complaint) is delivered could come into play in determining compliance, submission of a mere 18 inmates' declarations is woefully insufficient to demonstrate systemic noncompliance with the MCPMs where from November 2016 to August 2019 there were 2,720 instances of monitoring supported by unchallenged source documents. (*See, e.g.,* Maximum Custody Notebooks for November 2016 to August 2019 to be submitted to the Court as non-electronic exhibits upon Court approval of the same as Exh. 9.) Further, ADCRR's July 20, 2020 maximum custody population was 1,899 inmates. Plaintiffs' submission of declarations from a few of ADCRR's total maximum custody population cannot be considered sufficient proof by a preponderance of the evidence that

16

1  Defendants do not offer maximum custody inmates reasonable or attainable out-of-cell

2  time. (Exh. 7.)

3      Moreover, even if Plaintiffs' complaints, which are beyond the scope of the

4  Stipulation and MCPMs, could arguably defeat termination of monitoring and reporting,

5  they are without competent evidentiary support and therefore fail to prove substantial non-

6  compliance. As illustrated in the handful of inmate declarations upon which they rely,

7  Plaintiffs' overarching claims are that they cannot go to recreation because it is too early in

8  the morning and they either do not hear the offer or cannot get up because of medications

9  is belied by a sampling of the inmates' OOCT Forms that show differently.  (Exh. 4.)

10  Plaintiffs furthermore do not submit any expert medical evidence to support their claims

11  that psychotropic medications render specified inmates unable to hear the recreation offers

12  or get up in time for morning recreation. Plaintiffs' claims that they are rarely offered

13  recreation in the group enclosures are likewise countered by the inmate declarants' own

14  OOCT Forms as well as mountains of source documents contained in Defendants' Monthly

15  Maximum Custody Notebooks for November 2016 to August 2019.  (Maximum Custody

16  Notebooks for November 2016 to August 2019 to be submitted to the Court as non-

17  electronic exhibits upon Court approval of the same as Exh. 9.)

18      Finally, recreation offers are not made in "whispers" and neither the Stipulation nor

19  the MCPMs prescribe the time of day recreation is to be offered. Starting recreation at 0600

20  am on a rotating schedule is not unreasonable in corrections and Plaintiffs have no contrary

21  evidence. Water and restroom opportunities are provided during recreation.  Recreation

22  enclosures are cleaned daily and inmates are provided sufficient clothing for winter

23  recreation – recreation that rotates scheduling so that inmates are afforded morning and

24  afternoon opportunities. And, allegations of being left in showers for extended periods of

25  time have nothing to do with inmates going outside for recreation.[9]  If Defendants were

26  _____

27  [9] The showers are cleaned daily by inmate work crews.  Officers perform security
   walks at irregular intervals and thus inmates are not "forgotten" in the shower. The showers

28  are illuminated and thus inmates are not "left in the dark".  At Kasson, Step Level 2 and 3
   inmates walk unrestrained to the shower and are not secured in the shower stalls; thus they

17

really not offering meaningful opportunities for recreation, then certainly, after more than five years of monitoring, Plaintiffs would have gathered far more than a few declarations from all four maximum custody units, and they would have presented this Court specified date/time evidence that could actually be investigated by Defendants and evaluated by this Court.  Plaintiffs' reliance upon a few unreliable inmate declarations utterly fails to prove that Defendants are substantially noncompliant in offering out-of-cell time prescribed by the Stipulation and MCPMs

### D. Plaintiffs' Challenge To Maximum Custody/Step Level Lengths Of Stays And Maximum Custody Vacancies Exceeds The Bounds Of The Stipulation And MCPM Requirements.

In a belated attempt to defeat Defendants' demonstration of compliance with MCPMs and entitlement to termination of monitoring and reporting, Plaintiffs now suddenly complain about the average length of time inmates are classified as maximum custody and the average length of time inmates stay at each  DI 326/DO812 Step Level. Requirements for progression through Step Levels are prescribed by DO 812 and are based upon individual inmate behavior – issues not governed by the Stipulation or monitored by the MCPMs. Assessment of Defendants' MCPM compliance based upon individual or average length of stays in maximum custody or at a particular Step Level was never contemplated by the parties.  Nor do the MCPMs remotely address the issue.  Plaintiffs' misguided attempt to expand the Stipulation should be summarily rejected by this Court.

Next, Plaintiffs argue that security staffing challenges at the maximum custody units place Defendants in substantial noncompliance with the Stipulation and MCPMs because staffing shortages lead to cancellations of out-of-cell time. Cancellations due to unexpected staffing shortages however, do not defeat compliance per Paragraph 26 of the Stipulation. (Doc. 1185.)

Moreover, Plaintiffs' mischaracterization of cancellations as constant, based always on staffing, and without attempts made for makeup is incorrect.  Here, for the monitored

could not be locked in the showers for hours.

weeks for November 2018 to August 2019, ASPC-Eyman-Browning had 4 one-day cancellations of recreation and/or programming during monitored weeks; ASPC Eyman-SMU I had 19 instances; ASPC-Florence-Kasson had 3 instances, and ASPC-Lewis had 3 instances.  (Exh. 8, Cancellation Memos and Accompanying Reports for November 2018 to August 2019.)  The cancellations were often only partial or affected only one category of out-of-cell-time, some were due to security incidents requiring lock down due to security issues unrelated to staffing, and many times cancellation make-ups occurred within the same monitoring week.  (Exh. 8.)  Based upon these factors, Plaintiffs cannot prove a systemic pattern of unjustified out-of-cell time cancellations sufficient to find Defendants in substantial noncompliance.

In sum, Plaintiffs' attempt to wildly expand the Stipulation to dictate classification determinations and staffing is unsupported by any theory of basic contract law or Defendants' Stipulation performance.  The Stipulation expressly prohibits this Court from ordering Defendants to hire a specific number or type of staff and so Plaintiffs are not entitled to enforcement relief in this regard.  (Doc. 1185 at ¶ 36.).  Likewise, neither the staffing allegation nor the challenge to average maximum custody and Step Levels has never been the subject of a Notice of Noncompliance or pre-motion to enforce mediation.  As such, Plaintiffs' request for a judicial determination of substantial noncompliance and attendant enforcement relief on these grounds flagrantly violates Paragraphs 30-31 of the Stipulation and must be denied.  (Doc. 1185).

## III.   CONCLUSION

Plaintiffs have not proven by a preponderance of the evidence that Defendants have breached the terms of the Stipulation and MCPMs or that Defendants are substantially noncompliant with the same.  Plaintiffs' attempt to summarily render over five years of monitoring data unreliable and inaccurate is meritless.  For these reasons, Defendants respectfully request this Court deny Plaintiffs' Motion to Enforce.

DATED this 21st day of July, 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Rachel Love
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:               ahardy@prisonlaw.com

Amelia M. Gerlicher:        agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

Asim Dietrich:              adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Corene T. Kendrick:         ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:        DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:          dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:             dspecter@prisonlaw.com

John Howard Gray:           jhgray@perkinscoie.com; slawson@perkinscoie.com

Jose de Jesus Rico:         jrico@azdisabilitylaw.org

Maya Abela                  mabela@azdisabilitylaw.org

Rose Daly-Rooney:           rdalyrooney@azdisabilitylaw.org

Sara Norman:                snorman@prisonlaw.com

Rita K. Lomio:              rlomio@prisonlaw.com

Eunice Cho                  ECho@aclu.org

Jared G. Keenan             jkeenan@acluaz.org

Casey Arellano              carellano@acluaz.org

Maria V. Morris             mmorris@aclu.org


I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Rachel Love