**Index of Exhibits to Defendants' Response to Plaintiffs' Motion to Enforce the Stipulation (Maximum Custody Performance Measures 1-3, 5-6, and 8) (Doc. 3599)**

| Exhibit | Description | Filing Type |
|---|---|---|
| 1 | Declaration of J. King | Public |
| 2 | Declaration of C. Jackson | Public |
| 3 | Max Custody Monitor Guide | Public |
| 4 | FRE 1006 Summary Chart of comparison of Plaintiffs' Doc. 3600-1 and 3600-2 (Exhibits 1-17, 19) and corresponding Declarant OOCT Forms. | Under Seal |
| 5 | FRE 1006 Summary Chart of Total SMI and Non-SMI Maximum Custody Populations at ASPC-Eyman Browning; ASPC-Eyman SMU I; ASPC-Lewis Rast and ASPC-Florence Kasson for November 2018 to August 2019 with supporting Maximum Custody Notebook Source Documents. | Under Seal |
| 6 | FRE 1006 Summary Chart of Inmates Chosen for MCPM Review by Maximum Custody Unit Location for November 2018 to August 2019 with supporting Maximum Custody Notebook Count Sheet Source Documents. | Under Seal |
| 7 | ADCRR 07/20/2020 Daily Population Count | Public |
| 8 | Cancellation Memos and Accompanying Reports for November 2018 to August 2019. | Under Seal |
| 9 | Maximum Custody Notebooks for November 2016 to August 2019 | To be submitted to the Court as non-electronic exhibits upon Court approval |

**EXHIBIT 1**

**EXHIBIT 1**

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-ROS |
| Plaintiffs, | **DECLARATION OF J. KING** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

I, J. King, make the following Declaration:

1.     I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.     I have been employed with the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") since 2007.

3.     I am currently the Lieutenant for Kasson Unit at Arizona State Prison Complex – Florence ("ASPC-Florence").

4.     Kasson Unit is a single bed unit that houses inmates who are designated by mental health as Seriously Mentally Ill ("SMI").  This includes a population of maximum custody SMI inmates.

5. I am familiar with and directly involved in the monitoring and reporting process for the Maximum Custody Performance Measures (MCPMs) at issue in the *Parsons v. Ryan* Stipulation.

**Max Custody Monitoring System**

6. ADCRR developed a multi-level monitoring and reporting system for MCPMs in order to track and monitor out-of-cell activities and programming offered to maximum custody inmates in conjunction with DI 326/DO 812 and compliance with the MCPMs.

7. Each applicable prison complex that houses maximum custody inmates has DI 326/DO 812 designated staff responsible to ensure operational compliance with DI 326/DO 812 and the MCPMs. DI 326/DO 812 staff are also responsible for monitoring the accuracy of the source documents utilized to monitor and report on the MCPMs, and to ensure operational compliance regarding the same.

8. My duties specifically include ensuring day to day operational compliance with DI 326/DO 812 and the MCPMs as well as monitoring the accuracy of the source documents utilized to monitor and report on the MCPMs on a monthly basis.

9. I likewise participate in the multi-level monitoring and reporting system for MCPMs in order to track and monitor out-of-cell activities and programming offered to maximum custody inmates in conjunction with DI 326/DO 812 and compliance with the MCPMs. The Stipulation protocols for the MCPMs require that at each designated location, OOCT Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly complex location maximum custody inmates and 10 randomly selected SMI maximum custody inmates.

10. Once the monitored week is randomly selected for a monitored month, DI 326/DO 812 staff gather the OOCT Forms for the two 10 randomly selected inmate groups and prepare extensive Maximum Custody Notebooks containing source documents used to monitor and determine compliance for MCPMs. These Maximum Custody Notebooks usually contain between 200-400 pages of source documents per location.

11.     The Maximum Custody Notebook for each prison complex goes through four levels of review to ensure accuracy of monitoring and compliance for CGAR reporting.  Three of the four levels of review receive cross-unit review and I personally regularly participate at multiple levels of review.

12.     Specifically, at the first three levels of review, the Maximum Custody Notebooks are traded among differing complex DI 326 staff and leadership personnel so that personnel from another prison complex audits the accuracy of monitoring and reporting for the MCPMs.

13.     The first level review is conducted by prison complex DI 326/DO 812 staff, including DI 326/DO 812 sergeants and lieutenants.

14.     The second level review is conducted by Deputy Wardens and Associate Deputy Wardens for the prison complexes housing maximum custody inmates.  During this second level review, the accuracy of calculating time out-of-cell activity/programming and MCPM compliance that was conducted at the first level review is double checked. Any inconsistencies, errors, and/or missing source documentation are noted for additional review and follow up. A highly performing staff member from each complex also regularly participates in the second level review to provide understanding and training to all levels of security and programming staff as to MCPM compliance, monitoring, and reporting.

15.     The third level review is conducted by Wardens and Deputy Wardens of Operations for the prison complexes housing maximum custody inmates. During this third level review, the accuracy of calculating time out-of-cell activity/programming and MCPM compliance that was conducted at the first and second level review is triple checked.  Any inconsistencies, errors, and/or missing source documentation are noted for additional review and follow up. A highly performing staff member from each complex also regularly participates in the third level review to provide understanding and training to all levels of security and programming staff as to MCPM compliance, monitoring, and reporting.

16.     The fourth and final level review is conducted by the Warden of the applicable prison complex – the Maximum Custody Notebook having previously been through three levels of cross-prison-complex review.  The Warden conducts a final audit of the Maximum Custody Notebook and then reports CGAR findings for the MCPMs for the complex.

**Max Custody Monitoring Selection Process**

17.     Once the monitored week is randomly selected for a monitored month, DI 326/DO 812 staff gather the OOCT Forms for 10 randomly selected inmates and prepare extensive Maximum Custody Notebooks containing source documents used to monitor and determine compliance for MCPMs.  These Maximum Custody Notebooks usually contain between 200-400 pages of source documents per location.

18.     The random selection of inmates for monthly monitoring is performed utilizing the count sheets for each maximum custody unit housing inmates eligible for DI 326/ DO 812 participation.

19.     ADCRR's count sheets are organized by housing unit, and within the unit by building, and within the building by cell location.

20.     SMI inmates are identified on the count sheets and the OOCT Forms by an "M" following the inmate's ADCRR identification number.

21.     To randomly select maximum custody inmates for monitoring MCPMs 1-2 & 5-6, the total number of inmates eligible for DI 326/DO 812 is divided by 10, and every nth inmate is subject to monitoring for that specified month.

22.     If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week (Saturday to Friday), that inmate's records are not reviewed and the inmate listed either directly above or below the randomly selected inmate who was on the unit for the full seven (7) monitored days is selected for monitoring.  Substitution memos are provided in the monthly Maximum Custody notebooks to identify inmates who were not subject to review for the above-stated reasons. The OOCT Forms are reviewed in order to determine compliance with MCPMs

4

1-2 & 5-6.1  Inmates selected for review for MCPMs 1-2 & 5-6 are noted in yellow highlight on the count sheets contained in the monthly Maximum Custody Notebooks

23.     Next, ten SMI maximum custody inmates from each unit are also randomly selected for monitoring for MCPM 8.  The selection process noted above using count sheets is used for the SMI inmate selection process as well, this time using the total number of inmates classified as SMI at a particular unit, dividing this total number by ten, and every nth inmate is reviewed.

24.     If a randomly selected SMI inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the next SMI inmate listed either directly above or below the randomly selected SMI inmate is selected.  If no SMI inmate is listed either directly above or below the randomly selected SMI inmate, the next SMI inmate listed in the roster who was housed in the unit for the full seven (7) days is used.  The OOCT Forms for the group of ten SMI inmates are reviewed to determine compliance with MCPMs 1-2, 5-6 & 8.

25.     Random selection of maximum custody inmates for review of MCPMs 1-2 & 5-6 (which may also include SMI inmates) is performed first.  The names of these selected inmates are noted on the count sheets in yellow highlight.  When selection of SMI inmates is conducted, if the nth SMI inmate has already been selected for review of MCPMs 1-2 & 5-6 (and thus has been yellow highlighted), he/she is not reselected for review of MCPMs 1-2, 5-6 & 8 but instead the next following SMI inmate will be selected so that SMI inmates are not double-reviewed.  SMI inmates selected for review are noted in green highlight on the count sheets contained in the monthly Maximum Custody Notebooks.

26.     Kasson utilizes the master unit count sheet as the starting point for both the monitoring selection groups totaling 20 inmates selected where the total max custody SMI population has not met exceeded 150 inmates and generally ranges around 130 inmates.

---

[1] This category may include both non-SMI and SMI maximum custody inmates, excluding compliance analysis for MCPM 8 which pertains only to SMI inmates.

Because SMI maximum custody inmates often go on watch status thus rendering them ineligible for monitoring for any week in which they were on watch status, the selection process still allows for monthly variance in the inmates randomly draw for monitoring. However, small numbers of repeat selection do occur because in total, 20 Kasson inmates are selected for monitoring out of small population numbers of less than 200.

**Inmate Recreation Operations System**

27.     Movement for inmate recreation opportunities starts at 0700 hours, daily.

28.     As soon as first shift correctional officers go on duty, they are required to complete inmate safety/security checks of their assigned areas. These checks are completed by approximately 0620 to 0630 hours.

29.     In order to complete an inmate safety/security check, the officer must stop and look into every cell and observe that the inmate is living and breathing.

30.     During these first security walks and according to recreation schedules, officers ask the inmates scheduled for recreation if the inmate wants to go to recreation and awaits a response.

31.     The offer is not made in a whisper, but in a voice loud enough so as to gain a response from the inmate whether that response is verbal or by gesture.  A response of either nature is required because at the same time, the officer is confirming that the inmate is alive and well.

32.     The officers use either the pod count sheet or a notepad to note whether an inmate refuses offered out-of-cell time and the time of the refusal for OOCT Form documentation.

33.     After the first safety/security checks are completed by first shift officers, movement teams start the recreation movement process which requires restraint of inmates for movement to outdoor recreation and thus expenditure of substantial officer resources.

34.     The offer of recreation made during the first shift officers' first security walk is not the first housing activity or noise of the day such that inmates would never

know it was time to wake up, where breakfast is served in-cell between 0400 and 0500 hours and officers continuously enter the housing locations to conduct security checks.

35.     Maximum custody inmates are not deprived of knowing what time it is, however.  Inmates may purchase wrist watches through commissary.

36.     Water is available to inmates participating in outdoor recreation.  Inmates may bring a cup or sports bottle filled with water to outdoor recreation. Water jugs are available for refills.  (Attachment 1, Photos of Kasson Unit Recreation Water Jugs.)

37.     During the winter months, upon request, Kasson SMI max custody inmates are provided a loaner jacket for outdoor recreation.

38.     Recreation enclosures are cleaned daily by inmate porters.  Even with such cleanings, outdoor debris may accumulate in the enclosures.  Upon request, a broom is available to inmates to further clean the enclosure if he wishes.

39.     If an inmate participating in recreation needs to use the restroom during his recreation period, he merely has to advise the recreation officer of the same and will be escorted back to his housing location to use the restroom.  If the inmate would then like to return to recreation, he may do so.

40.     At times, recreation may be cancelled if staffing that particular day does not allow sufficient recreation staff to supervise outdoor recreation.

41.     Attempts are made to make up cancelled recreation opportunities during the monitoring week.

42.     Moreover, efforts are also made, where feasible, to still allow recreation but adjustment is made to the type of recreation enclosures used.  Specifically, if there is not staff available to safely conduct recreation in the large group enclosures, recreation may still be offered to the inmates in the 10x10 enclosures as staffing required to operate the same is less staff intensive and provides the opportunity to still recreate the inmates, albeit in an alternative location.

**Documentation of Recreation and Programming Refusals**

43.     It is not uncommon for certain SMI max custody inmates to regularly choose not to participate in recreation, programming, or unstructured out-of-cell time. Other inmates may prefer to participate in certain categories of out-of-cell time but not others.

44.     It is not uncommon, when asked by correctional officers and/or supervisors why a particular inmate does not want to recreate/program/etc. that the response from the inmate is "I don't want to", "I don't want to go" etc., without further explanation and often delivered also including aggressive or explicative language. This is why documentation of refusals often includes these general descriptors as to why an inmate is refusing offered out-of-cell time.  Staff do not push inmates to further explain themselves so as not to agitate the inmate, leading to inmate behavior that may require an activation of an ICS emergency response and use of force.

45.     DI 326/DO 812 and SMI programming occur in classrooms outside of the housing locations, which require inmate movement to those locations.

46.     If an inmate refuses to participate in out-of-cell programming opportunities, the refusal is documented on the inmate's OOCT Form.

47.     Staff leading the programming also utilize sign in sheets wherein inmates who come to class sign in as attending.

48.     However, if an inmate does not attend, he is not physically in the classroom to sign in and thus staff leading the programming indicate a refusal next to the inmate's name on the sign in sheet.  This provides an additional layer of documentation evidencing that an inmate refused a programming offer.

**Inmate Shower Operations**

49.     Inmates at Kasson are offered showers three days a week, but have the right to refuse the same.

50.     As to general housing unit cleanliness, inmate pod porters and shower porters wipe the railings, mop the floors, and clean the showers on a daily basis. Sufficient cleaning supplies are provided to the porters.

8

51.     Step Level 1 inmates, because of their heightened safety/security risk, are escorted to the shower in restraints, and secured in the shower while showering.

52.     Step Level 1 inmates are not left secured in the shower for hours on end, the exception being an emergency facility lockdown situation requiring that all movement cease during an emergency; or the inmate refuses to exit the shower and an ICS is activated which will include a cool down period wherein correctional and mental health/medical personnel engage in de-escalation methods to attempt to gain compliance without use of force.

53.     Step Level 2 and 3 inmates may walk unrestrained from their cell to the shower at their appointed time.  These inmates are not secured in the shower and thus may exit and return to their shower as soon as they are done showering.

54.     Based upon my experience and daily observation, the sanitation level of the Kasson Unit is appropriate and showers are not invested with mold.

55.     For safety/security reasons, the showers are not dark.  They are illuminated so that correctional personnel can verify inmate conduct and welfare while in the shower.  And, regular required security walks include officers checking the welfare of inmates who are in the shower.  Thus, inmates are not forgotten in the shower for hours on end.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21__ day of July, 2020, in Florence, Arizona.

J. King

**ATTACHMENT 1**

**ATTACHMENT 1**

















**EXHIBIT 2**

**EXHIBIT 2**

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-ROS |
| Plaintiffs, | **DECLARATION OF C. JACKSON** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

I, C. Jackson, make the following Declaration:

1.      I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.      I have been employed with the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") since 2014.

3.      I am currently the DI 326/DO 812 Sergeant the Arizona Prison Complex - Eyman, Browning Unit and have been assigned to the Browning Unit since January 2019.

4.      Browning Unit houses maximum custody inmates in cluster design housing units, providing two-man double bunk cells. Browning Unit houses a small population of maximum custody inmates who are designated by mental health as Seriously Mentally Ill

("SMI).  Many Browning Unit inmates are DI 326/DO 812 Step Level 1 inmates due to their institutional history and dangerousness.  Browning Unit houses ADCRR's maximum custody Security Threat Group inmates (commonly known as validated prison gang members).

5.      I am familiar with and directly involved in the monitoring and reporting process for the Maximum Custody Performance Measures (MCPMs) at issue in the *Parsons v. Ryan* Stipulation.

**Max Custody Monitoring System**

6.      ADCRR developed a multi-level monitoring and reporting system for MCPMs in order to track and monitor out-of-cell activities and programming offered to maximum custody inmates in conjunction with DI 326/DO 812 and compliance with the MCPMs.

7.      Each applicable prison complex that houses maximum custody inmates has DI 326/DO 812 designated staff responsible to ensure operational compliance with DI 326/DO 812 and the MCPMs.  DI 326/DO 812 staff are also responsible for monitoring the accuracy of the source documents utilized to monitor and report on the MCPMs, and to ensure operational compliance regarding the same.

8.      My duties specifically include ensuring day to day operational compliance with DI 326/DO 812 and the MCPMs as well as monitoring the accuracy of the source documents utilized to monitor and report on the MCPMs on a monthly basis.

9.      I likewise participate in the multi-level monitoring and reporting system for MCPMs in order to track and monitor out-of-cell activities and programming offered to maximum custody inmates in conjunction with DI 326/DO 812 and compliance with the MCPMs. The Stipulation protocols for the MCPMs require that at each designated location, OOCT Forms are reviewed for one randomly selected week for each monitored month, for 10 randomly complex location maximum custody inmates and 10 randomly selected SMI maximum custody inmates.

10.     Once the monitored week is randomly selected for a monitored month, DI 326/DO 812 staff gather the OOCT Forms for the two 10 randomly selected inmate groups and prepare extensive Maximum Custody Notebooks containing source documents used to monitor and determine compliance for MCPMs. These Maximum Custody Notebooks usually contain between 200-400 pages of source documents per location.

11.     The Maximum Custody Notebook for each prison complex goes through four levels of review to ensure accuracy of monitoring and compliance for CGAR reporting.  Three of the four levels of review receive cross-unit review and I personally regularly participate at multiple levels of review.

12.     Specifically, at the first three levels of review, the Maximum Custody Notebooks are traded among differing complex DI 326 staff and leadership personnel so that personnel from another prison complex audits the accuracy of monitoring and reporting for the MCPMs.

13.     The first level review is conducted by prison complex DI 326/DO 812 staff, including DI 326/DO 812 sergeants and lieutenants.

14.     The second level review is conducted by Deputy Wardens and Associate Deputy Wardens for the prison complexes housing maximum custody inmates.  During this second level review, the accuracy of calculating time out-of-cell activity/programming and MCPM compliance that was conducted at the first level review is double checked. Any inconsistencies, errors, and/or missing source documentation are noted for additional review and follow up. A highly performing staff member from each complex also regularly participates in the second level review to provide understanding and training to all levels of security and programming staff as to MCPM compliance, monitoring, and reporting.

15.     The third level review is conducted by Wardens and Deputy Wardens of Operations for the prison complexes housing maximum custody inmates. During this third level review, the accuracy of calculating time out-of-cell activity/programming and MCPM compliance that was conducted at the first and second level review is triple

3

checked.  Any inconsistencies, errors, and/or missing source documentation are noted for additional review and follow up. A highly performing staff member from each complex also regularly participates in the third level review to provide understanding and training to all levels of security and programming staff as to MCPM compliance, monitoring, and reporting.

16.    The fourth and final level review is conducted by the Warden of the applicable prison complex – the Maximum Custody Notebook having previously been through three levels of cross-prison-complex review.  The Warden conducts a final audit of the Maximum Custody Notebook and then reports CGAR findings for the MCPMs for the complex.

**Max Custody Monitoring Selection Process**

17.    Once the monitored week is randomly selected for a monitored month, DI 326/DO 812 staff gather the OOCT Forms for 10 randomly selected inmates and prepare extensive Maximum Custody Notebooks containing source documents used to monitor and determine compliance for MCPMs.  These Maximum Custody Notebooks usually contain between 200-400 pages of source documents per location.

18.     The random selection of inmates for monthly monitoring is performed utilizing the count sheets for each maximum custody unit housing inmates eligible for DI 326/ DO 812 participation.

19.    ADCRR's count sheets are organized by housing unit, and within the unit by building, and within the building by cell location.

20.    SMI inmates are identified on the count sheets and the OOCT Forms by an "M" following the inmate's ADCRR identification number.

21.    To randomly select maximum custody inmates for monitoring MCPMs 1-2 & 5-6, the total number of inmates eligible for DI 326/DO 812 is divided by 10, and every nth inmate is subject to monitoring for that specified month.

22.    If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week (Saturday to Friday), that inmate's records are not

reviewed and the inmate listed either directly above or below the randomly selected inmate who was on the unit for the full seven (7) monitored days is selected for monitoring.  Substitution memos are provided in the monthly Maximum Custody notebooks to identify inmates who were not subject to review for the above-stated reasons. The OOCT Forms are reviewed in order to determine compliance with MCPMs 1-2 & 5-6.1  Inmates selected for review for MCPMs 1-2 & 5-6 are noted in yellow highlight on the count sheets contained in the monthly Maximum Custody Notebooks

23.  Next, ten SMI maximum custody inmates from each unit are also randomly selected for monitoring for MCPM 8.  The selection process noted above using count sheets is used for the SMI inmate selection process as well, this time using the total number of inmates classified as SMI at a particular unit, dividing this total number by ten, and every nth inmate is reviewed.

24.  If a randomly selected SMI inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the next SMI inmate listed either directly above or below the randomly selected SMI inmate is selected.  If no SMI inmate is listed either directly above or below the randomly selected SMI inmate, the next SMI inmate listed in the roster who was housed in the unit for the full seven (7) days is used.  The OOCT Forms for the group of ten SMI inmates are reviewed to determine compliance with MCPMs 1-2, 5-6 & 8.

25.  Random selection of maximum custody inmates for review of MCPMs 1-2 & 5-6 (which may also include SMI inmates) is performed first.  The names of these selected inmates are noted on the count sheets in yellow highlight.  When selection of SMI inmates is conducted, if the nth SMI inmate has already been selected for review of MCPMs 1-2 & 5-6 (and thus has been yellow highlighted), he/she is not reselected for review of MCPMs 1-2, 5-6 & 8 but instead the next following SMI inmate will be selected so that SMI inmates are not double-reviewed.  SMI inmates selected for review

---

[1] This category may include both non-SMI and SMI maximum custody inmates, excluding compliance analysis for MCPM 8 which pertains only to SMI inmates.

are noted in green highlight on the count sheets contained in the monthly Maximum Custody Notebooks.

26.     Browning rotates cluster count sheets as the starting point for selection for both of the monitoring selection groups. Each month after the monitoring week is chosen, a different cluster count sheet than was used in the prior few months is chosen as the selection starting point. While there may have been occasional instances where count sheets used in the prior few months have again been used as selection starting points, this was not done intentionally so that certain inmates were monitored as opposed to others. Additionally, because the population changes and there is internal housing movement, cluster/cell assignments change, it does not necessarily follow that the same inmates would be chosen again for monitoring even if cluster count sheet starting points were repeated in a several month period of time.

**Inmate Recreation Operations System**

27.     The first recreation turn at Browning Unit starts at approximately 0600 hours, with additional recreation turns throughout the morning and afternoon. Multiple daily recreation turns are required to recreate on average, the nearly 700 maximum custody inmates who are subject to monitoring in accordance with the MCPMs.

28.     As soon as first shift correctional officers go on duty, they are required to complete inmate safety/security checks of their assigned areas. These checks are completed by approximately 0620 to 0630 hours.

29.     In order to complete an inmate safety/security check, the officer must stop and look into every cell and observe that the inmate is living and breathing.

30.     During these first security walks and according to recreation schedules, officers ask the inmates scheduled for recreation if the inmate wants to go to recreation.

31.     The offer is not made in a whisper, but in a voice loud enough so as to reasonably gain a response from the inmate whether that response is verbal or by gesture. If the officer does not receive a response but can observe that the inmate is breathing,

additional attempts to gain a response are not utilized so as not to create an unnecessary confrontation the inmate.

32.     The officers use either the pod count sheet or a notepad to note whether an inmate refuses offered out-of-cell time and the time of the refusal for OOCT Form documentation.

33.     After the first safety/security checks are completed by first shift officers, movement teams start the recreation movement process which requires restraint of inmates for movement to outdoor recreation and thus expenditure of substantial officer resources.  If an inmate previously did not respond to the offer of recreation (because he was sleeping for instance) but at the time of movement decides he wants to go to recreation, he is permitted to do so if he is dressed and ready to go (so as not to delay the recreation turn for the other inmates and throw the entire day's schedule off).

34.     The offer of recreation made during the first shift officers' first security walk is not the first housing activity or noise of the day such that inmates would never know it was time to wake up, where breakfast is served in-cell between 0400 and 0530 hours in-cell and officers continuously enter the housing locations to conduct security checks.  Additionally, the opening closing of doors into the housing locations is loud. Additionally, daytime cell lights are activated by approximately 6:00 a.m.

35.     Maximum custody inmates are not deprived of knowing what time it is, however.  Inmates may purchase wrist watches through commissary.

36.     Water is available to inmates participating in outdoor recreation.  Inmates may bring a cup or sports bottle filled with water to outdoor recreation. Water jugs are available for refills.  (Attachment 1, Photos of Browning Unit Recreation Water Jugs for maximum custody inmates.)

37.     Maximum custody inmates are not permitted heavy jackets for legitimate safety and security reasons where maximum custody inmates present the highest safety and security risk to themselves, other inmates, and staff by way of assaultive behavior. Allowing maximum custody inmates to possess or use padded jackets poses a legitimate

safety and security risk where the padding in jackets defeats the effectiveness of non-lethal munitions such as pepper ball systems, tasers, and K9s that may be required for use in quelling assaults or disturbances that take place during outdoor recreation.  Allowing maximum custody inmates padded jackets also increases an inmate's ability to conceal weapons or other contraband such as drugs.  Inmates may purchase sweatshirts for use outdoors.  If indigent, facility personnel may work with the inmate to provide a loaner sweatshirt if requested the recreation schedule rotates so that inmates have the opportunity to recreation both in the morning and in the afternoon such that recreation is not always at the same time of day (this also occurs in the summer due to heat).

38.    Recreation enclosures are cleaned daily by inmate porters.

39.    If an inmate participating in recreation needs to use the restroom during his recreation period, he merely has to advise the recreation officer of the same and will be escorted back to his housing location to use the restroom.  If the inmate would then like to return to recreation, he may do so.

40.    At times, recreation may be cancelled if staffing that particular day does not allow sufficient recreation staff to supervise outdoor recreation.

41.    Attempts are made to make up cancelled recreation opportunities during the monitoring week.

42.    Moreover, efforts are also made, where feasible, to still allow recreation but adjustment is made to the type of recreation enclosures used.  For instance, if there is not staff available to safely conduct recreation in the large group enclosures, recreation may still be offered to the inmates in the recreation enclosures attached to the housing location ("chute rec") or 10x10 enclosures as staffing required to operate the same is less staff intensive and provides the opportunity to still recreate the inmates, albeit in an alternative location.  Additionally, recreation may be cancelled for certain housing locations but not for all, and the next time there is a cancellation, the cancellation location changes so that the same inmates are not always affected by partial cancellations.

**Documentation of Recreation and Programming Refusals**

43.     It is not uncommon for certain SMI max custody inmates to regularly choose not to participate in recreation, programming, or unstructured out-of-cell time. Other inmates may prefer to participate in certain categories of out-of-cell time but not others.

44.     It is not uncommon, when asked by correctional officers and/or supervisors why a particular inmate does not want to recreate/program/etc. that the response from the inmate is "I don't want to", "I don't want to go" etc., without further explanation and often delivered also including aggressive or explicative language. This is why documentation of refusals often includes these general descriptors as to why an inmate is refusing offered out-of-cell time.  Staff do not push inmates to further explain themselves so as not to agitate the inmate, leading to inmate behavior that may require an activation of an ICS emergency response and use of force.

45.     DI 326/DO 812 and SMI programming occur in classrooms outside of the housing locations, which require inmate movement to those locations.

46.     If an inmate refuses to participate in out-of-cell programming opportunities, the refusal is documented on the inmate's OOCT Form.

47.     Staff leading the programming also utilize sign in sheets wherein inmates who come to class sign in as attending.

48.     However, if an inmate does not attend, he is not physically in the classroom to sign in and thus staff leading the programming indicate a refusal next to the inmate's name on the sign in sheet.  This provides an additional layer of documentation evidencing that an inmate refused a programming offer.

**Inmate Shower Operations**

49.     Inmates at Browning are offered showers three days a week, but have the right to refuse the same.

50.     As to general housing unit cleanliness, inmate pod porters clean the showers daily.  Additionally, night cleaning crew inmates power wash and disinfect the showers nightly.

51.     Inmates are not left secured in the shower for hours on end, the exception being an emergency facility lockdown situation requiring that all movement cease during an emergency; or the inmate refuses to exit the shower and an ICS is activated which will include a cool down period wherein correctional and mental health/medical personnel engage in de-escalation methods to attempt to gain compliance without use of force.

52.     Based upon my experience and daily observation, the sanitation level of the Browning max custody housing locations and showers are not invested with mold.

53.     For safety/security reasons, the showers are not dark.  They are illuminated so that correctional personnel can verify inmate conduct and welfare while in the shower. And, regular required security walks include officers checking the welfare of inmates who are in the shower.  Thus, inmates are not forgotten in the shower for hours on end because the inmate will have contact with an officer at irregular intervals as close to every 30 minutes as possible but not to exceed 59 minutes.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _21 st_ day of July, 2020, in Florence, Arizona.

C. Jackson













**EXHIBIT 3**

**EXHIBIT 3**

**PERFORMANCE MEASURES**

ARIZONA DEPARTMENT OF CORRECTIONS

# MAX CUSTODY Monitor Guide Duties & Responsibilities

**PERFORMANCE MEASURES**

ARIZONA DEPARTMENT OF CORRECTIONS

# MAX CUSTODY Monitor Guide

July 2017
Arizona Department of Corrections
1831 W. Jefferson
Phoenix, AZ  85007
Phone 602.255.2468

**PERFORMANCE MEASURES**

Max Custody Performance Measure No. 01
Stipulation Category: Max Custody (01)

## CGAR Category: Max Custody

| |
|---|
| **Performance Measure:**<br><br>All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week.   Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week. |
| **CGAR Question:**<br><br>Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence-Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 offered a minimum of 7.5 hours out-of-cell time per week? Are those at Step II offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III offered a minimum of 9.5 hours out-of-cell time per week? |
| **Source of Records/Review:**<br><br>Random number generator printout; Maximum Custody Excel Spreadsheet form/printout ("Overview"); unit count sheets; memo(s) documenting substitution of one randomly selected inmate for another inmate; Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Forms for ten (10) randomly selected inmates (ADC Form #801-19); Warden's Certification(s) attesting that a particular inmate was excluded from participation in DI 326 programming and/or activities for applicable randomly selected inmate(s) (if applicable); Incident Report (IR) documenting cancellation of activity not made up on the same day (if applicable); AIMS data (if applicable); Holiday Make Up Day Memorandum (if applicable); additional Maximum Custody Daily Out of Cell Time Tracking Forms for holiday make-up programming (if applicable) (Note that if an Arizona State Holiday occurs during the monitoring week, the relevant source records and the procedure described below applies for all pertinent Max Custody Performance Measures). |
| **Methodology:**<br><br>   a.  The ADC Division Director of Offender Operations, or designee, randomly selects the week to be used for monitoring on the seventh day (rolling forward if the seventh day is a weekend or State of Arizona holiday) of the following month using a random number generator, such as random.org or other randomizing methodology.  In this way, the last week of a month shall remain eligible for monitoring even if some of the days of the |

**PERFORMANCE MEASURES**

week fall within two different months. Notice of the selected week to be monitored shall be distributed for the prior month on the seventh day of the following month (or the next State of Arizona business day thereafter if the seventh day of the month is not a business day) (e.g., the week to be monitored for January will be announced on the seventh day of February (or the next business day thereafter if the seventh of February is not a State of Arizona business day).

Monitored weeks that include a State of Arizona holiday shall be afforded an additional day during the following week to provide required programs/activities not provided on the holiday due to staffing shortage. The Warden at each designated maximum custody location shall have discretion to select the additional day in the following week to make up any required programs/activities not provided on the holiday that occurred during the monitored week.   The Warden shall author a memorandum ("Holiday Make Up Day Memorandum") designating the selected additional day in the following week that will serve to make up any required programs/activities not provided on the holiday that occurred during the monitored week at that particular maximum custody location, listing the programs/activities subject to make up.   The additional day in the following week that will serve to make up any required programs/activities not provided on the holiday that occurred during the monitored week may vary by maximum custody location, at the discretion of the particular complex Warden, based upon staffing, scheduling, and physical plant considerations unique to each maximum custody location. The Monitor shall review these Memorandum and the additional Out-of-Cell Tracking forms and/or source records to ensure that any holiday make-up programming/activities were provided.    In his/her review, the Monitor shall ensure that the make-up programming/activities are not double-counted towards compliance in the non-monitored week.

The count sheets for the unit are used to determine the pool of eligible inmates.   The total number of inmates eligible for DI 326 is then divided by ten, and every nth inmate is reviewed.   If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the inmate either directly above or below the randomly selected inmate who was on the unit for the full seven (7) days is used.   The Maximum Custody Daily Out of Cell Time Tracking Form for the specified monitoring week is reviewed for each of the ten randomly selected inmates.

b.   At each designated location, Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for the one randomly selected week for each monitored month, for the ten (10) randomly selected inmates.   Step levels for each inmate are noted and compliance

**PERFORMANCE MEASURES**

with MC PM #1 for each inmate is determined.  Beginning and ending times for all out of cell time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offered.  In the case of a refusal, the refusal, should be recorded on the front of the Tracking Form and the amount of time refused should be documented in the "Comments" section on the back side of the individual inmate's out-of-cell tracking form. If the amount of time is not recorded in the "Comments", the Monitor must check the prisoner's Maximum Custody Daily Out of Cell Tracking Form and compare it with the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) to determine the amount of out of cell time refused and indicate that such a comparison was performed in the monitoring documentation.  If the refusal time is not properly documented or cannot be confirmed through a comparison of the unit schedules, the out-of-cell time/programming will not count towards compliance with the Performance Measure.

c.  When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same.  The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell Tracking form). Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal. In the event of an extended pattern of refusals or changed behavior; supervisory personnel shall have a discussion with an inmate regarding refused out-of-cell time and shall document the date and nature of the conversation in the comments section on the back of the Maximum Custody Daily Out of Cell Tracking Form, including, when provided, inmate comments as to refusal or refusals.

d.  The reviewer notes the step level for each inmate in order to determine the minimum amount of out of cell time the inmate should have been afforded during the monitoring week.  This minimum amount of time is compared against the actual amount of time recorded on each inmate's Maximum Custody Daily Out of Cell Time Tracking Form. If the required amount of time for the inmate's step level is not met, there is a finding of non-compliance for that record.

e.  If an inmate selected for this measure is designated Seriously Mentally Ill, SMI time required under MC PM #8 should not be double-counted towards compliance with this

**PERFORMANCE MEASURES**

measure. However, where a SMI inmate receives hour(s) of unstructured out-of-cell time per week in excess of ten (10) hours separately required by MC PM #8, time that exceeds the MC PM #8 ten (10) hour requirement for unstructured out-of-cell time may be counted towards the minimum out-of-cell time required under this MC PM #1.

Max Custody Performance Measure No. 02
Stipulation Category: Max Custody (02)

### CGAR Category: Max Custody

---

**Performance Measure:**

All maximum custody inmates at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III.

---

**CGAR Question:**

Are all maximum custody inmates at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 offered at least one hour of out-of-cell group programming a week at Step II and Step III?

---

**Source of Records/Review:**

Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets (containing inmate signature or the relevant AIMS data demonstrating a prisoner's attendance.

---

**Methodology:**

a. The records of the inmates selected for MC PM #1 are also reviewed for this performance measure. The same week is also reviewed.

b. At each designated location, Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for the one randomly selected week for each monitored month for the ten (10) randomly selected inmates. The Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed to determine if the Step II and Step III inmates were afforded one hour of group programming during the monitoring week. Beginning and ending times for the group programming should be noted on the Tracking Form unless the inmate refuses that time. In the case of a refusal, the refusal should be recorded on the front of the Tracking Form and the amount of time refused should be documented in the "Comments" section on the back side of the individual inmate's Out of Cell Tracking Form. If the amount of time is not recorded in the "Comments", the Monitor

**PERFORMANCE MEASURES**

must check the inmate's Maximum Custody Daily Out of Cell Tracking Form and the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) to determine the amount of out-of-cell time/programming time refused and indicate that such a comparison was performed in the monitoring documentation.  If the refusal time is not properly documented or cannot be confirmed through a comparison of the unit schedule, the out-of-cell time/programming will not count towards compliance with the Performance Measure.

c.   When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out of Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same.  The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell Tracking form). Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal. In the event of an extended pattern of refusals or changed behavior; supervisory personnel shall have a discussion with an inmate regarding refused out-of-cell time and shall document the date and nature of the conversation in the comments section on the back of the Maximum Custody Daily Out of Cell Tracking Form, including, when provided, inmate comments as to refusal or refusals..

d.   At each designated location, Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets for Step II and III are compared against the group programming recorded in the Maximum Custody Daily Out of Cell Time Tracking Forms of the ten (10) randomly selected inmates to confirm that the inmates attended the programs indicated.  Reviewers must confirm that each selected inmate attended the group program by review of Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets; and/or AIMS data. Failure to confirm actual attendance leads to a finding of non-compliance for that record. A determination of actual attendance may be achieved by comparison of (1) either Max Custody/Mental Health Monthly (Program) Activity Schedule(s) and/or  Maximum Custody Daily Out of Cell Time Tracking Form, and (2) either Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets and/or AIMS data or other available documentation.

**PERFORMANCE MEASURES**

**Max Custody Performance Measure No. 03**
**Stipulation Category: Max Custody (03)**

**CGAR Category: Max Custody**

---

**Performance Measure:**

All out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶ 26 of the Stipulation.

---

**CGAR Question:**

Is all out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶ 26 of the Stipulation, which requires the following:

- If such out of cell time is cancelled for legitimate operational or safety and security reasons, such as an unexpected staffing shortage, inclement weather or facility emergency lockdown, then reasonable efforts are made to make up such out of cell time at another date/time.

- If an individual's out of cell time is canceled or limited, then a Warden or his/her designee if the Warden is not available, certifies in writing that allowing that prisoner such out of cell time would pose a significant security risk.  Such certification shall expire after thirty (30) days unless renewed in writing by the Warden or his/her designee.

---

**Source of Records/Review:**

Maximum Custody Daily Out of Cell Time Tracking Forms for the ten (10) inmates randomly selected for the month, for the monitoring week; any IRs, or if no IR then other documentation generated during the monitoring week pertaining to the cancellation or limitation of out-of-cell time is reviewed; documentation of out of cell time made up is also reviewed; Holiday Make Up Day Memorandum (if applicable).

Warden Certification of individual security risk necessitating limitation or cancellation where applicable to randomly selected prisoner.

---

**Methodology:**

a. The records of the inmates selected for MC PM #1 are also reviewed for this performance measure.  The same week is also reviewed.

PERFORMANCE MEASURES

b.  The records of the inmates selected for MC PM #8 are also reviewed for this performance measure.  The same week is also reviewed.

c.  Any cancelled activities required by MC PM #1, #2 and #8 must be  documented in an Information Report (IR).  If out-of-cell programming or activities are cancelled but made up on the same day, an Information (IR) is not required if the time is equivalent.

d.  If there are any cancellations/limitations of out-of-cell time, it is first determined whether it was for legitimate operational or safety and security reasons, such as, but not limited to, an unexpected staffing shortage, inclement weather, or facility emergency lockdown.  The reason for any cancellation/limitation of out-of-cell time is documented in an Information Report (IR).  A reason other than for legitimate operational or safety and security reasons for cancellation requires a finding of non-compliance.  However, where there is a cancellation or limitation for any reason, and the time is made up, this shall result in a finding of compliance.  These findings are documented in the monthly Monitoring Overview for this Performance Measure.

e.  Next it is determined if reasonable steps were taken to make up the out-of-cell time and/or activity.  If no steps were taken to make up the required out-of-cell time and/or activity, the reason is documented.  If the reviewer concludes that reasonable steps could have been taken, this is the basis for a finding of non-compliance.  Insufficient time remaining at the end of a week to make up the out-of-cell time and/or activity is a basis for a finding of compliance (not for a finding of non-compliance).  These findings are documented in the monthly Monitoring Overview for this Performance Measure.

f.  If an individual inmate's required out of cell time under DI 326 is cancelled or limited and is not made up, the complex Warden, or designee, will write a Warden's Certification documenting that allowing such an inmate out-of-cell time would pose a significant security risk.  The lack of such a certification will lead to a finding of non-compliance. The time frame for a Warden's Certification is reviewed to determine whether it is current.  Any Warden's Certification with a date further out than one calendar month is "expired" and leads to a finding of noncompliance.  The Warden's Certification and the findings of compliance/non-compliance for this measure are documented in the monthly Monitoring Overview for this Performance Measure.

**P E R F O R M A N C E   M E A S U R E S**

**Max Custody Performance Measure No. 04**

**Stipulation Category: Max Custody (04)**

**CGAR Category: Max Custody**

| |
|---|
| **Performance Measure:**<br><br>All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. |
| **CGAR Question:**<br><br>Are all maximum custody prisoners receiving meals with the same caloric and nutritional content as meals served to other ADC prisoners? |
| **Source of Records/Review:**<br><br>Max Custody Weekly Cycle Menu (Level 5); Food Vendor Monthly Statement of Nutritional Adequacy |
| **Methodology:**<br><br>a.  At each designated location, the Max Custody Weekly Cycle Menu (Level 5)  are selected for each monitored month.<br><br>b.  The Food Vendor Monthly Statement of Nutritional Adequacy is reviewed to determine whether it certifies that maximum custody inmates are receiving meals with the same caloric and nutritional content as those in lower custody areas on a monthly basis (2700 calories for Adult Male Menus and 2200 calories for Adult Female Menus) and includes the average daily caloric level for the month.  If the Weekly Cycle Menu (Level 5) is not certified as having the same caloric and nutritional content as those in lower custody, there is a finding of non-compliance.  The memo produced by the contracted Food Vendor is uploaded into the CGAR. |

**PERFORMANCE MEASURES**

Max Custody Performance Measure No. 05
Stipulation Category: Max Custody (05)

## CGAR Category: Max Custody

| Performance Measure: |
| --- |
| All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max are offered a minimum of 6 hours of out-of-cell exercise time a week. |

| CGAR Question: |
| --- |
| Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max offered a minimum of 6 hours of out-of-cell exercise time a week? |

| Source of Records/Review: |
| --- |
| Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Forms. |

**Methodology:**

a. The records of the inmates selected for MC PM #1 are also reviewed for this performance measure. The same week is also reviewed.

b. At each designated location, the Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for compliance with this measure. Each record is reviewed to determine whether each inmate was provided or offered a minimum of six hours of out-of-cell exercise/recreation during the monitoring week. If an inmate is afforded less than 6 hours of recreation time per week this will result in a finding of non-compliance.

c. Beginning and ending times for all out-of-cell recreation time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offered. In the case of a refusal, the refusal, should be recorded on the front of the Tracking Form and the amount of time refused should be documented in the "Comments" section on the back side of the individual inmate's out-of-cell tracking form. If the amount of time is not recorded in the "Comments", the Monitor must check the inmate's Maximum Custody Daily Out of Cell Tracking Form and the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity

**PERFORMANCE MEASURES**

Schedule (where applicable) to determine the amount of out of cell time refused and indicate that such a comparison was performed in the monitoring documentation.  If the refusal time is not properly documented or cannot be confirmed through a comparison of the unit schedule, the out-of-cell time/programming will not count towards compliance with the Performance Measure.

d.   When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out of Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same.  The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell Tracking form). Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal. In the event of an extended pattern of refusals or changed behavior; supervisory personnel shall have a discussion with an inmate regarding refused out-of-cell time and shall document the date and nature of the conversation in the comments section on the back of the Maximum Custody Daily Out of Cell Tracking Form, including, when provided, inmate comments as to refusal or refusals.

**Max Custody Performance Measure No. 06**
**Stipulation Category: Max Custody (06)**

**CGAR Category: Max Custody**

---

**Performance Measure:**

All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy.

---

**CGAR Question:**

Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy?

---

**Source of Records/Review:**

Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets (containing prisoner signature or the relevant AIMS data demonstrating a prisoner's attendance); current maximum custody property inventory forms (which may include ADC Form #909-4, Inmate Property Inventory, Form #909-5, Inmate Property Received, and Form #909-1, Inmate Property Inventory Supplement) and/or equivalent information; inmate phone system printout and/or equivalent information; inmate visitation printouts (DV01 and DV05 screens) and/or equivalent information; banking printouts (BK03 balance and transaction screens) and/or equivalent information; AIMs data.

---

**Methodology:**

a.  The records of the inmates selected for MC PM #1 are also reviewed for this performance measure.  The same week is also reviewed.  If an inmate changes Step Levels under DI326 for the week monitored, the Step Level change is noted.  A change in Step Level during the week reviewed is not a basis for a non-compliance finding if eligible incentives reasonably appear to be offered after the Step Level change, in accordance with the greater or lesser incentives available at Step Level changed to.

b.  Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for each inmate to ensure access to the out-of-cell time required under DI 326.  If the required out of cell time was not offered to the inmate there is a finding of noncompliance for that inmate for this

measure.

c.   Current Property Inventory Forms, or equivalent information, for the ten (10) randomly selected inmates are reviewed to identify access to allowable property consistent with the inmate's Step Level under DI 326 for each monitored month.  If an inmate does not have access to property consistent with his/her Step Level due to the actions of ADC, then there is a finding of non-compliance for that inmate for this measure.

d.   Prisoner telephone records, or equivalent information, are reviewed for the ten (10) randomly selected inmates to identify access to telephone privileges consistent with the inmate's Step Level.  If an inmate does not have access to visitation and/or telephone privileges consistent with his/her Step Level, then there is a finding of non-compliance for that inmate for this measure.

e.   Prisoner visitation records, or equivalent information, are reviewed for the ten (10) randomly selected inmates to identify access to visitation privileges consistent with the inmate's Step Level.  If an inmate does not have access to visitation and/or telephone privileges consistent with his/her Step Level, then there is a finding of non-compliance for that inmate for this measure.

f.   Inmate bank account records, or equivalent information, are reviewed for the ten (10) randomly selected inmates to identify whether each inmate has access to the weekly maximum spending amount consistent with the inmate's Incentive Phase (Step Level) amount.  If an inmate does not have access to the weekly maximum spending amount consistent with his/her Incentive Phase (Step Level) due to the actions of ADC, then there is a finding of non-compliance for that inmate for this measure.

g.   The reviewer should note the Step Level for each inmate record reviewed and determine whether the type/location of recreation recorded in the Maximum Custody Daily Out-of-Cell Time Tracking Forms is consistent with the requirements of DI 326.  For example, a Step III inmate at Eyman-SMU I should be offered six hours per week to include one-time per month in a 10 x 10 enclosure (which holds up to four inmates), one time per month in 20 x 40 basketball enclosure (which holds up to eight inmates), and one-time per month recreation/par course field.  The reviewer looks at the week monitored, but if necessary to make an accurate compliance determination, the reviewer must look at the Out-of-Cell Tracking Forms for the month to determine compliance with the requirement that each inmate is offered the appropriate type/location of recreation under DI 326.  These form(s) showing compliance with appropriate type/location of recreation will be copied, highlighted (as to type/location compliance), and inserted behind the tracking form retained for the individual inmate. Failure to offer the appropriate type/location of recreation for the week and/or month will lead to a finding of non-compliance for this measure.

h.   The location of the recreation offered or refused is recorded in the Maximum Custody Daily Out of Cell Time Tracking Form.  Beginning and ending times for all out-of-cell recreation time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offered.  In the case of a refusal, the refusal should be recorded

**PERFORMANCE MEASURES**

on the front of the Tracking Form and the amount of time refused and the type/location of the recreation should be documented in the "Comments" section on the back side of the individual inmate's out-of-cell tracking form. If the amount of time and type/location are not recorded in the "Comments", the Monitor must check the prisoner's Maximum Custody Daily Out of Cell Tracking Form and the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) to determine the amount of out of cell time and the type/location of recreation refused and indicate that such a comparison was performed in the monitoring documentation. If the refusal time and type/location of recreation is not properly documented or cannot be confirmed through a comparison of the unit schedule, the out-of-cell time/programming will not count towards compliance with the Performance Measure.

i. When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and sign the same contemporaneously. The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell Tracking form). Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal. In the event of an extended pattern of refusals or changed behavior; supervisory personnel shall have a discussion with an inmate regarding refused out-of-cell time and shall document the date and nature of the conversation in the comments section on the back of the Maximum Custody Daily Out of Cell Tracking Form, including, when provided, inmate comments as to refusal or refusals.

**P E R F O R M A N C E   M E A S U R E S**

**Max Custody Performance Measure No. 07**
**Stipulation Category: Max Custody (07)**

**CGAR Category: Max Custody**

| |
|---|
| **Performance Measure:**<br><br>No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB-5 or CB-7 unless the cell fronts are substantially modified to increase visibility. |
| **CGAR Question:**<br><br>Are there any prisoners with a mental health classification of MH3 or higher housed in Florence Central-CB-5 or CB-7 without a cell front that has been substantially modified to increase visibility? |
| **Source of Records/Review:**<br><br>Housing Assignment Log for maximum custody prisoners with mental health classification of MH-3 or higher:  The Housing Assignment Log for maximum custody prisoners with mental health classification of MH-3 or higher is reviewed for one randomly selected day of each monitored month. |
| **Methodology:**<br><br>   a.  Pursuant to Defendants providing a declaration from Division Director Carson McWilliams attesting to the alteration of all of the CB5 and CB7 cells, Plaintiffs have agreed that Defendants no longer must monitor this MC PM.  (Letter from Fettig to Gottfried/Rand dated Oct. 4, 2016.)  Defendants have agreed to notify Plaintiffs if the cell fronts in these locations are substantially modified in the future during the life of the Stipulation (Dkt. 1185).  (*Id.*) |

**P E R F O R M A N C E   M E A S U R E S**

Max Custody Performance Measure No. 08
Stipulation Category: Max Custody (08)

## CGAR Category: Max Custody

| **Performance Measure:** |
| --- |
| In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:<br><br>• 10 hours of unstructured out-of-cell time per week<br>•  1 hour of additional out-of-cell mental health programming per week<br>•  1 hour of additional out-of-cell psycho-educational programming per week<br>•  1 hour of additional out-of-cell programming per week |
| **CGAR Question:** |
| In addition to the general privileges and incentives afforded to prisoners under DI 326, are all SMI prisoners in maximum custody, receiving:<br><br>• 10 hours of unstructured out-of-cell time per week<br>•  1 hour of additional out-of-cell mental health programming per week<br>•  1 hour of additional out-of-cell psycho-educational programming per week<br>•  1 hour of additional out-of-cell programming per week |
| **Source of Records/Review:** |
| Maximum Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets (containing inmate signature or the relevant AIMS data demonstrating a prisoner's attendance); Warden's Certification(s) attesting that a particular inmate was excluded from participation in DI 326 programming and/or activities for applicable randomly selected inmate(s) (if applicable); Incident Report (IR) documenting cancellation of activity not made up on the same day (if applicable). AIMS data (if applicable); EOMIS data (if applicable). |
| **Methodology:** |
| a.   The same week selected for MC PM #1 is reviewed for this performance measure.<br><br>b.   At each maximum custody unit where SMI inmates are housed, the count sheets for the unit are used to determine the pool of ten (10) randomly selected records reviewed for this measure.  The total number of inmates classified as SMI is then divided by ten, and every *nth* |

inmate is reviewed.  If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the next SMI inmate either directly above or below the randomly selected SMI inmate is selected.  If no SMI inmate is listed either directly above or below the randomly selected SMI inmate, then the next SMI inmate listed in the roster who was housed in the unit for the full seven (7) days is used.  The Maximum Custody Daily Out of Cell Time Tracking Form for the specified monitoring week is reviewed for each of the ten (10) SMI inmates.

c.   The Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed in order to determine compliance with MC PM ##1-2, 5-6 (DI 326), and 8 for each SMI inmate selected.  Beginning and ending times for all out of cell time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offered. In the case of a refusal, the refusal should be recorded on the front of the Tracking Form and the amount of time refused should be documented in the "Comments" section on the back side of the individual inmate's out-of-cell tracking form. If the amount of time is not recorded in the "Comments", the Monitor must check the prisoner's Maximum Custody Daily Out of Cell Tracking Form and the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) to determine the amount of out of cell time/programming refused and indicate that such a comparison was performed in the monitoring documentation.  If the refusal time is not properly documented or cannot be confirmed through a comparison of the unit schedule, the out-of-cell time/programming will not count towards compliance with the Performance Measure.

d.   When an inmate refuses out-of-cell time/programming, the refusal must be documented on the Out-of-Cell Tracking form and the personnel to whom the inmate stated the refusal must note the refusal and amount of time refused in the Comments section on the back of the Out of Cell Tracking form, and contemporaneously sign the same. The beginning time of the refused out-of-cell time should be documented on the Out of Cell Tracking form with an "R" next to the beginning time indicating a refusal (end time for refused out-of-cell time is not documented on the front of the Out of Cell Tracking form). Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal. In the event of an extended pattern of refusals or changed behavior; supervisory personnel shall have a discussion with an inmate regarding refused out-of-cell time and shall document the date and nature of the conversation in the comments section on the back of the Maximum Custody Daily Out of Cell Tracking Form, including, when provided, inmate comments as to refusal or refusals.

e.   Max Custody and SMI/Mental Health Monthly Programming Attendance/Sign-In Sheets are reviewed for the selected SMI inmates to confirm that the inmates attended all of the programs (e.g., mental health; psychological-education; out-of-cell programming; DI 326) reflected on the Maximum Custody Daily Out of Cell Time Tracking Forms.   Any discrepancies are noted.  Reviewers must confirm that each selected inmate attended the group program by comparison of Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In

Sheets; AIMS data; and/or EOMIS data. Failure to confirm attendance leads to a finding of non-compliance for that record. A determination of attendance may be achieved by comparison of (1) either Max Custody/Mental Health Monthly (Program) Activity Schedule(s) and/<u>or</u> Maximum Custody Daily Out of Cell Time Tracking Form, and (2) either Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets, AIMS data; and/or EOMIS data or other available documentation. If any discrepancies regarding a determination of actual attendance cannot be reconciled that program/activity will not count towards the out-of-cell time required for compliance under this performance measure.

f.   For each of the selected SMI inmates, the Step Level is recorded, and it is determined if the basic requirements of DI 326 are met (MC PM ##1-2, 5-6). A failure to comply with any of these requirements results in a finding of non-compliance for the record.

- Determine whether each selected inmate has received the appropriate out-of-cell time, exercise, property, incentives, and programming according to his/her Step Level under DI 326 (MC PM ##1-2, 5-6).

- Determine whether Step II and III SMI inmates are receiving their one hour of group programming under DI 326 in addition to all of the SMI requirements enumerated below.

g.   For each of the selected SMI inmates determine whether the following requirements have been met. A failure to comply with any of these requirements results in a finding of non-compliance for the record.

- 10 hours of unstructured out-of-cell time during the monitoring week.

- 1 hour of mental health group programming during the monitoring week.

- 1 hour of psychological educational programming during the monitoring week.

- 1 hour of additional out-of-cell programming during the monitoring week.

**PERFORMANCE MEASURES**

Max Custody Performance Measure No. 09
Stipulation Category: Max Custody (09)

## CGAR Category: Max Custody

---

**Performance Measure:**

All use of force incidents involving use of pepper spray and other chemical agents on any maximum custody prisoners classified as SMI, and involving maximum custody prisoners in the following housing areas: Florence CB1 and CB4, Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-Rast Max (4C1 and 4C2), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation.

---

**CGAR Question:**

Do all use of force incidents involving use of pepper spray and other chemical agents on any maximum custody prisoners classified as SMI, and  involving maximum custody prisoners in the following housing areas (where maximum custody SMI inmates and/or maximum custody inmates with substantial mental health issues are housed): Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-Rast Max (4C1 and 4C2), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation.  Those requirements include:

   a. Chemical agents shall be used only in case of imminent threat. An imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance. A decision to use chemical agents shall be based on more than passive resistance to placement in restraints or refusal to follow orders. If the inmate has not responded to staff for an extended period of time, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized.

   b. All controlled uses of force shall be preceded by a cool down period to allow the inmate an opportunity to comply with custody staff orders. The cool down period shall include clinical intervention (attempts to verbally counsel and persuade the inmate to voluntarily exit the area) by a mental health clinician, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a qualified health care professional (QHCP) (other than a LPN) shall provide such clinical intervention. This cool down period may include similar attempts by custody staff.

c.   If it is determined the inmate does not have the ability to understand orders, chemical agents shall not be used without authorization from the Warden, or if the Warden is unavailable, the administrative duty officer.

d.   If it is determined an inmate has the ability to understand orders but has difficulty complying due to mental health issues, or when a mental health clinician believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation, a mental health clinician shall propose reasonable strategies to employ in an effort to gain compliance, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a QHCP (other than a LPN) shall propose such reasonable strategies.

e.   The cool down period may also include use of other available resources/options such as dialogue via religious leaders, correctional counselors, correctional officers and other custody and non-custody staff that have established rapport with the inmate.

**Source of Records/Review:**

SIR Packet; Use of Force Review Packet; Use of Force Memo; all existing incident video capturing use of force and/or cool down period (including hand-held and/or security camera footage). At the discretion of the monitor, medical records; interviews of staff/inmates; and interview notes may also be reviewed if deemed necessary to make accurate compliance findings.

**Methodology:**

a.   The monitor shall review the source records listed above for use of force incidents involving the use of pepper spray and other chemical agents on any maximum custody prisoners classified as SMI, and classified as SMI in the following housing areas (where maximum custody SMI inmates and/or maximum custody inmates with substantial mental health issues are housed): Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-Rast Max (4C1 and 4C2) for the reporting period.  At the discretion of the monitor/designee, the monitor/designee may interview staff/inmates and review any available medical records associated with the subject use of force, if necessary, to make a final compliance finding.

b. If pepper spray and/or other chemical agents were used during the use of force incident, the monitor shall determine whether there was an imminent threat justifying the use of the pepper spray and/or other chemical agent. If the monitor determines that the pepper spray and/or other chemical agents were used without justification, there is a finding of non-compliance. These findings and the reasons for them must be documented in the CGAR.

c. If there was no imminent threat and pepper spray and/or other chemical agents were deployed without engaging in a cool down period and additional consideration and evaluation by staff, there is a finding of non-compliance for the use of force incident. These findings and the reasons for them must be documented in the CGAR.

d. The monitor shall determine whether or not the incident is a controlled use of force involving the use of pepper spray and/or other chemical agents or could have been a controlled use of force. If the monitor determines that the incident should have been a controlled use of force but was erroneously treated as an imminent threat, there is a finding of non-compliance. These findings and the reasons for them must be documented in the CGAR.

e. If the incident is a controlled use of force involving the use of pepper spray and/or other chemical agents it must be preceded by a cool down period to allow the inmate an opportunity to comply with custody staff orders. The length of the cool down period can vary depending upon the circumstances, but should be allowed to continue until all reasonable interventions have been attempted, or an imminent threat exists. If the monitor believes that the cool down period was insufficient under the circumstances, there is a finding of non-compliance. If there is no cool down period documented or otherwise recorded in other source documentation or on video (hand held and/or security camera footage reviewed by the monitor), then the incident must be found non-compliant.

f. A cool down period during a controlled use of force involving the use of pepper spray and/or other chemical agents must include clinical intervention (attempts to verbally counsel and persuade the inmate to cease the behavior that has led to consideration of use of force). This clinical intervention must be conducted by: (1) a mental health clinician, if the incident occurs on a weekday between 8:00 am and 4:00 pm; or (2) a QHCP (other than a LPN) at all other times. This cool down period may include similar attempts by custody staff – but such interventions by custody staff are not a replacement for the required clinical intervention. If no clinical intervention is documented during the cool down period or otherwise recorded in other source documentation or on video (hand held and/or security camera footage reviewed by the

monitor), there is a finding of non-compliance for the incident.

g.  During the clinical intervention, the mental health clinician or QHCP (other than a LPN) must determine whether the inmate has the ability to understand orders; whether the inmate has the ability to understand orders but has difficulty complying due to mental health issues; and whether s/he believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation. Failure to document these determinations in the use of force documentation provided the monitor shall lead to a finding of non-compliance.

h.  If pepper spray and/or other chemical agents were used where a mental health clinician or QHCP (other than an LPN)  determined the inmate does not have the ability to understand orders, the monitor must determine that a Warden, or if the Warden was unavailable, the administrative duty officer, authorized the use of pepper spray and/or other chemical agents.  If no such authorization was obtained, there is a finding of non-compliance for the incident.  These findings and the reasons for them must be documented in the CGAR.

i.  If the mental health clinician or QHCP (other than a LPN) determined that an inmate had the ability to understand orders but had difficulty complying due to mental health issues, or where the mental health clinician or QHCP believed the inmate's mental health issues are such that the controlled use of force involving the use of pepper spray and/or other chemical agents could lead to a substantial risk of decompensation, the mental health clinician or QHCP must propose  reasonable strategies to employ in an effort to gain compliance.  Such strategies might include, but are not limited to:  verbal persuasion, positive behavior modifications, and/or other de-escalation/intervention techniques, or engaging additional clinicians, religious leaders, correctional counselors, correctional officers and other custody and non-custody staff that have an established rapport with the inmate.  If no proposals of reasonable strategies are documented or otherwise recorded in other source documentation or on video (hand held and/or security camera footage reviewed by the monitor), there is a finding of non-compliance for the incident.

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# (FILED UNDER SEAL)

# EXHIBIT 6

# FILED UNDER SEAL

**EXHIBIT 7**

**EXHIBIT 7**

| Custody | UNIT | USE | RATED G.P. | RATED M/MH | RATED TOTAL | TEMP T/G.P. | TEMP T M/MH | TEMP TOTAL | S.U. | T.S.U. | SPECIAL USE TOTAL | RATED G.P. | RATED M/MH | TEMP T/G.P. | TEMP T M/MH | TOTAL | S.U./T.S.U. TOTAL | INSIDE TOTAL | OUTSIDE TOTAL | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASPC-DOUGLAS** | | | | | | | | | | | | | | | | | | | | |
| MIN | Gila | GP | 632 | | 632 | 203 | | 835 | | | | 632 | | 170 | | 802 | 0 | 802 | 4 | 802 |
| MED | Mohave | GP | 803 | | 803 | 140 | | 943 | | | | 803 | | 69 | | 872 | 0 | 872 | 11 | 883 |
| | Complex Detention | DET | | | 0 | | | 0 | 45 | 44 | 89 | | | | | 0 | 66 | 66 | 0 | 66 |
| MED | Eggers | GP | 240 | | 240 | | | 240 | | | 0 | 233 | | 0 | | 233 | 0 | 233 | 2 | 235 |
| MIN | Maricopa | GP | 130 | | 130 | | | 130 | | | 0 | 0 | | | | 0 | 0 | 0 | 0 | 0 |
| MIN | Papago - F | GP | 100 | | 100 | | | 100 | | | | 85 | | 0 | | 85 | 0 | 85 | 0 | 85 |
| | **TOTAL** | | 1905 | 0 | 1905 | 343 | 0 | 2248 | 45 | 44 | 89 | 1753 | 0 | 239 | 0 | 1992 | 66 | 2058 | 13 | 2071 |
| **ASPC-EYMAN** | | | | | | | | | | | | | | | | | | | | |
| MED | Cook | SO | 796 | | 796 | 718 | | 1514 | | | | 796 | | 625 | | 1421 | 0 | 1421 | 4 | 1425 |
| MED | Meadows | SO | 796 | | 796 | 483 | | 1279 | | | | 796 | | 452 | | 1248 | 0 | 1248 | 6 | 1254 |
| CLOSE | Meadows | SO | | | 0 | 80 | | 80 | | | | | | 69 | | 69 | 0 | 69 | 0 | 69 |
| | Rynning Detention | DET | | | 0 | | | 0 | 40 | 40 | 80 | | | | | 0 | 57 | 57 | 1 | 58 |
| CLOSE | Rynning A69 | GP | 400 | | 400 | | | 400 | | | | 366 | | 0 | | 366 | 0 | 366 | 1 | 367 |
| CLOSE | Rynning A12 | GP | 400 | | 400 | | | 400 | | | | 373 | | | | 373 | 0 | 373 | 0 | 373 |
| MAX | SMU I | GP | 352 | | 352 | 32 | | 384 | 7 | | 7 | 352 | | 3 | | 355 | 0 | 355 | 0 | 355 |
| MAX | SMU I ISO | SO | 88 | | 88 | 56 | | 144 | | | | 88 | | 52 | | 140 | 0 | 140 | 0 | 140 |
| CLOSE | SMU I ISO CLOSE | SO | 328 | | 328 | 184 | | 512 | | | | 328 | | 120 | | 448 | 0 | 448 | 1 | 449 |
| MAX | SMU I P.C. | PC | 32 | | 32 | 0 | | 32 | 1 | | 1 | 12 | | 0 | | 12 | 0 | 12 | 2 | 14 |
| | SMU I Detention | DET | | | 0 | | | 0 | 192 | 192 | 384 | | | | | 0 | 242 | 242 | 6 | 248 |
| MAX | SMU I M/H Watch | MH | | 24 | 24 | | | 24 | | | | | 11 | | | 11 | 0 | 11 | 1 | 12 |
| MAX | Browning Intake | GP | 30 | | 30 | 30 | | 60 | | | | 28 | | 0 | | 28 | 0 | 28 | 0 | 28 |
| MAX | Browning Unit | GP | 344 | | 344 | 146 | | 490 | | | | 344 | | 108 | | 452 | 0 | 452 | 5 | 457 |
| MAX | Browning STG | STG | 230 | | 230 | 10 | | 240 | | | | 181 | | 0 | | 181 | 0 | 181 | 3 | 184 |
| MAX | Browning D/Row | DR | 35 | | 35 | | | 35 | | | | 30 | | 0 | | 30 | 0 | 30 | 1 | 31 |
| CLOSE | Browning D/Row | DR | 5 | | 5 | | | 5 | | | | 5 | | 0 | | 5 | 0 | 5 | 0 | 5 |
| MAX | Browning M/H Watch | MH | | 10 | 10 | | | 10 | | | | | 5 | | | 5 | 0 | 5 | 0 | 5 |
| MAX | Browning Enhanced | GP | 60 | | 60 | | | 60 | | | | 50 | | 0 | | 50 | 0 | 50 | 2 | 52 |
| MAX | Browning RSHP | GP | 30 | | 30 | 30 | | 60 | | | | 4 | | 0 | | 4 | 0 | 4 | 0 | 4 |
| CLOSE | Browning Close Management | GP | 24 | | 24 | 24 | | 48 | | | | 24 | | 4 | | 28 | 0 | 28 | 1 | 29 |
| | **TOTAL** | | 3950 | 34 | 3984 | 1793 | 0 | 5777 | 240 | 232 | 472 | 3777 | 16 | 1433 | 0 | 5226 | 299 | 5525 | 34 | 5559 |
| **ASPC-FLORENCE** | | | | | | | | | | | | | | | | | | | | |
| CLOSE | Central Unit Close | GP | 707 | | 707 | | | 707 | | | 0 | 638 | | | | 638 | 0 | 638 | 4 | 642 |
| CLOSE | Central Unit Death Row | GP | 97 | | 97 | | | 97 | | | | 78 | | 0 | | 78 | 0 | 78 | 0 | 78 |
| MAX | Kasson BMU | MH | | 24 | 24 | | | 24 | | | | | 10 | | | 10 | 0 | 10 | 1 | 11 |
| MAX | Kasson MH | MH | | 152 | 152 | | | 152 | | | 0 | | 106 | | | 106 | 0 | 106 | 1 | 107 |
| MAX | Kasson MH Watch | MH | | 16 | 16 | | | 16 | 8 | | 8 | | 21 | | | 21 | 0 | 21 | 1 | 22 |
| MAX | Housing Unit 8 | MED | | 22 | 22 | 20 | | 42 | | | | | 22 | | 16 | 38 | 0 | 38 | 3 | 41 |
| MAX | Health Unit | MED | | | 0 | | | 0 | 15 | | 15 | | | | | 0 | 14 | 14 | 0 | 14 |
| MED | East Unit | GP | 600 | | 600 | 80 | | 680 | | | | 600 | | 61 | | 661 | 0 | 661 | 3 | 664 |
| MIN | North Unit | GP | 872 | | 872 | 124 | | 996 | | | | 565 | | 0 | | 565 | 0 | 565 | 3 | 568 |
| MED | South Unit | SO | 544 | | 544 | 421 | | 965 | | | | 544 | | 356 | | 900 | 0 | 900 | 3 | 903 |
| MIN | Globe | GP | 250 | | 250 | 52 | | 302 | | | | 250 | | 15 | | 265 | 0 | 265 | 0 | 265 |
| | Globe Detention | DET | | | 0 | | | 0 | 9 | | 9 | | | | | 0 | 0 | 0 | 0 | 0 |
| | **TOTAL** | | 3070 | 214 | 3284 | 697 | 0 | 3981 | 32 | 0 | 32 | 2675 | 159 | 432 | 16 | 3282 | 14 | 3296 | 19 | 3315 |
| **ASPC-PERRYVILLE-F** | | | | | | | | | | | | | | | | | | | | |
| MED | Santa Cruz | GP | 576 | | 576 | | | 576 | | | 0 | 565 | | 0 | | 565 | 0 | 565 | 4 | 569 |
| CLOSE | Lumley 1 | GP | 192 | | 192 | | | 192 | | | 0 | 144 | | 0 | | 144 | 0 | 144 | 1 | 145 |
| CLOSE | Santa Cruz 2 | GP | 192 | | 192 | | | 192 | | | | 157 | | 0 | | 157 | 0 | 157 | 2 | 159 |
| CLOSE | Lumley Mental Health | MH | | 36 | 36 | | | 36 | | | | | 22 | | | 22 | 0 | 22 | 0 | 22 |
| CLOSE | Perryville SNU | MED | | | 0 | | 10 | 10 | | | | | | | 8 | 8 | 0 | 8 | 0 | 8 |
| MED | Lumley Medium | GP | 528 | | 528 | | | 528 | | | | 507 | | 0 | | 507 | 0 | 507 | 3 | 510 |
| MED | Santa Maria WTU | MH | | 24 | 24 | | | 24 | | | 0 | | 0 | | | 0 | 0 | 0 | 0 | 0 |
| MED | Perryville Watch Cells | MH | | | 0 | | 26 | 26 | | | | | 0 | | 16 | 16 | 0 | 16 | 0 | 16 |
| | Recp&Asmnt | GP | 144 | | 144 | | | 144 | | | 0 | 41 | | 0 | | 41 | 0 | 41 | 0 | 41 |
| CLOSE | Building 45 Central MH Unit | MH | | 12 | 12 | | | 12 | 2 | | 2 | | 11 | | | 11 | 0 | 11 | 0 | 11 |
| CLOSE | Treatment MH Ward | MH | | | 0 | | 16 | 16 | | | | | | | 14 | 14 | 0 | 14 | 0 | 14 |
| MIN | San Pedro | GP | 432 | | 432 | | | 432 | | | 0 | 411 | | 0 | | 411 | 0 | 411 | 0 | 411 |
| MED | Santa-Maria | GP | 168 | | 168 | 4 | | 172 | | | 0 | 168 | | 5 | | 173 | 0 | 173 | 1 | 174 |
| | Santa Maria Detention | DET | | | | | | | 24 | 20 | 44 | | | | | 0 | 23 | 23 | 1 | 24 |
| CLOSE | Perryville IPC | MED | | 10 | 10 | | 5 | 15 | | | | | 5 | | 0 | 5 | 0 | 5 | 0 | 5 |
| MIN | Piestewa | GP | 210 | | 210 | | | 210 | | | 0 | 0 | | 0 | | 0 | 0 | 0 | 1 | 1 |
| MIN | Piestewa Second Chance Center | GP | 50 | | 50 | | | 50 | | | | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 |
| MIN | Santa Rosa | GP | 390 | | 390 | | | 390 | | | 0 | 390 | | 94 | | 484 | 0 | 484 | 26 | 510 |
| MIN | San Carlos | GP | 1250 | | 1250 | 80 | | 1330 | | | | 1229 | | 0 | | 1229 | 0 | 1229 | 3 | 1232 |
| | **TOTAL** | | 4132 | 82 | 4214 | 84 | 57 | 4355 | 26 | 20 | 46 | 3612 | 38 | 99 | 38 | 3787 | 23 | 3810 | 42 | 3852 |
| **ASPC-PHOENIX** | | | | | | | | | | | | | | | | | | | | |
| MAX | Reception | GP | 207 | | 207 | 129 | | 336 | | | 0 | 164 | | 0 | | 164 | 0 | 164 | 4 | 168 |
| MIN | Inmate Worker | GP | 30 | | 30 | 31 | | 61 | | | 0 | 30 | | 7 | | 37 | 0 | 37 | 0 | 37 |
| MAX | B-Ward | MH | | 40 | 40 | | 8 | 48 | | | 0 | | 31 | | 0 | 31 | 0 | 31 | 2 | 33 |
| CLOSE | Flamenco Ida Ward- M | MH | | 25 | 25 | | | 25 | | | | | 29 | | | 29 | 6 | 35 | 0 | 35 |
| CLOSE | Flamenco Ida Watch M | MH | | 15 | 15 | | | 15 | | | | | 15 | | | 15 | 0 | 15 | 0 | 15 |
| CLOSE | Flamenco John PS- M | MH | | 30 | 30 | | | 30 | 9 | | 9 | | 16 | | | 16 | 0 | 16 | 0 | 16 |
| CLOSE | Flamenco King - M | MH | | 35 | 35 | | | 35 | | | | | 18 | | | 18 | 0 | 18 | 0 | 18 |
| CLOSE | Flamenco-George | MH | | 20 | 20 | | | 20 | 2 | | 2 | | 13 | | | 13 | 0 | 13 | 0 | 13 |
| MED | Aspen/SPU | MH | | 150 | 150 | | | 150 | | | 0 | | 134 | | | 134 | 0 | 134 | 0 | 134 |
| | **TOTAL** | | 237 | 315 | 552 | 160 | 8 | 720 | 11 | 0 | 11 | 194 | 256 | 7 | 0 | 457 | 6 | 463 | 6 | 469 |

| 20-Jul-20 | | | OPERATING CAPACITY | | | | | | ADC INSTITUTIONAL CAPACITY COMMITTED POPULATION | | | INMATE COMMITTED POPULATION AS MIDNIGHT | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | RATED | | | TEMPORARY | | | SPECIAL USE | | | RATED | | TEMPORARY | | | | TOTAL | INSIDE | OUTSIDE | GRAND |
| Custody | UNIT | USE | G.P. | M/MH | TOTAL | T/G.P. | T M/MH | TOTAL | S.U. | T.S.U. | TOTAL | G.P. | M/MH | T/G.P. | T M/MH | TOTAL | S.U./T.S.U. | TOTAL | TOTAL | TOTAL |
| | ASPC-LEWIS | | | | | | | | | | | | | | | | | | | |
| CLOSE | Morey | GP | 800 | | 800 | | | 800 | 16 | | 16 | 0 | | | | 0 | | 0 | 0 | 0 |
| | Morey Detention | DET | | | 0 | | | | 80 | | 80 | | | | | | 73 | 73 | 1 | 74 |
| CLOSE | Rast | PC | 404 | | 404 | | | 404 | | | | 362 | | | | 362 | 0 | 362 | 6 | 368 |
| CLOSE | Rast III | PC | 48 | | 48 | | | 48 | | | | 27 | | | | 27 | 0 | 27 | 0 | 27 |
| CLOSE | RAST III | PC | 96 | | 96 | | | 96 | | | | 94 | | | | 94 | 0 | 94 | 0 | 94 |
| MAX | Rast PC | PC | 320 | | 320 | | | 320 | | | | 302 | | | | 302 | 0 | 302 | 1 | 303 |
| CLOSE | Rast Close Mgt. | PC | 36 | | 36 | | | 36 | | | | 17 | | | | 17 | 0 | 17 | 0 | 17 |
| | Lewis Medical | MED | | | 0 | | | | 17 | | 17 | | | | | | 12 | 12 | 1 | 13 |
| MED | Stiner I | GP | 378 | | 378 | 197 | | 575 | | | | 378 | | 86 | | 464 | 0 | 464 | 4 | 468 |
| MED | Stiner II | GP | 400 | | 400 | 208 | | 608 | | | | 400 | | 170 | | 570 | 0 | 570 | 2 | 572 |
| | Stiner Detention | DET | | | | | | | 70 | | 70 | | | | | | 41 | 41 | 3 | 44 |
| MIN | Bachman PC | PC | 300 | | 300 | 76 | | 376 | | | | 300 | | 13 | | 313 | 0 | 313 | 2 | 315 |
| MED | Bachman GP | GP | 300 | | 300 | 76 | | 376 | | | | 300 | | 15 | | 315 | 0 | 315 | 1 | 316 |
| MED | Stiner Transitory | TRANS | 22 | | 22 | 11 | | 33 | | | | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 |
| | Bachman Detention | DET | | | | | | | 80 | | 80 | | | | | | 71 | 71 | 0 | 71 |
| CLOSE | Buckley PC | PC | 750 | | 750 | | | 750 | 16 | | 16 | 726 | | | | 726 | 0 | 726 | 6 | 732 |
| CLOSE | Buckley PC II | PC | 50 | | 50 | | | 50 | | | | 39 | | | | 39 | 0 | 39 | 1 | 40 |
| CLOSE | Barchey PC I | PC | 370 | | 370 | 150 | | 520 | | | 0 | 370 | | 8 | | 378 | 0 | 378 | 3 | 381 |
| MED | Barchey PC II | PC | 370 | | 370 | 120 | | 490 | | | | 357 | | 0 | | 357 | 0 | 357 | 0 | 357 |
| MED | Barchey PC III | PC | 60 | | 60 | | | 60 | | | | 33 | | | | 33 | 0 | 33 | 1 | 34 |
| MED | Barchey PC Watch Cells | MH | | | | | 20 | 20 | | | | | | | 14 | 14 | 0 | 14 | 0 | 14 |
| MIN | Sunrise | GP | 100 | | 100 | 12 | | 112 | | | | 0 | | 0 | | 0 | 0 | 0 | 0 | 0 |
| MIN | Eagle Point Second Chance Center | GP | 300 | | 300 | | | 300 | | | | 116 | | | | 116 | 0 | 116 | 0 | 116 |
| | TOTAL | | 5104 | 0 | 5104 | 850 | 20 | 5974 | 279 | 0 | 279 | 3821 | 0 | 292 | 14 | 4127 | 197 | 4324 | 32 | 4356 |
| | ASPC-SAFFORD | | | | | | | | | | | | | | | | | | | |
| MIN | Fort Grant | GP | 588 | | 588 | 160 | | 748 | | | | 588 | | 24 | | 612 | 0 | 612 | 0 | 612 |
| | Miles Detention | DET | | | 0 | | | | 25 | 24 | 49 | | | | | | 34 | 34 | 2 | 36 |
| MIN | Graham | GP | 615 | | 615 | 96 | | 711 | | | | 591 | | 0 | | 591 | 0 | 591 | 0 | 591 |
| MED | Tonto | PC | 250 | | 250 | 160 | | 410 | | | | 250 | | 81 | | 331 | 0 | 331 | 1 | 332 |
| | Tonto Detention | DET | | | | | | | 6 | | 6 | | | | | | 0 | 0 | 0 | 0 |
| | TOTAL | | 1453 | 0 | 1453 | 416 | 0 | 1869 | 31 | 24 | 55 | 1429 | 0 | 105 | 0 | 1534 | 34 | 1568 | 3 | 1571 |
| | ASPC-TUCSON | | | | | | | | | | | | | | | | | | | |
| CLOSE | Cimarron | GP | 648 | | 648 | | | 648 | | | | 583 | | 0 | | 583 | 0 | 583 | 6 | 589 |
| | Cimarron Detention | DET | | | | | | | 48 | 48 | 96 | | | | | | 113 | 113 | 0 | 113 |
| CLOSE | Rincon MH Watch | MH | | 79 | 79 | | 6 | 85 | | | 0 | | 44 | | 0 | 44 | 0 | 44 | 0 | 44 |
| CLOSE | Rincon Medical | MED | | | | | | | 66 | | 66 | | 12 | | | 12 | 0 | 12 | 0 | 12 |
| CLOSE | Rincon S.N.U. | MED | | 16 | 16 | | | 16 | | | | | 12 | | | 12 | 0 | 12 | 0 | 12 |
| CLOSE | Cimarron Transitory | TRANS | | | | 24 | | 24 | | | 0 | | | 25 | | 25 | 0 | 25 | 0 | 25 |
| CLOSE | Rincon | GP | 340 | | 340 | | | 340 | | | 0 | 335 | | 0 | | 335 | 0 | 335 | 0 | 335 |
| CLOSE | Rincon MH Program | | | 228 | 228 | | | 228 | | | | | 200 | | | 200 | 0 | 200 | 1 | 201 |
| CLOSE | Minors Male | GP | 152 | | 152 | | | 152 | | | | 42 | | | | 42 | 0 | 42 | 1 | 43 |
| CLOSE | Minors Female | GP | 25 | | 25 | | | 25 | | | | 4 | | | | 4 | 0 | 4 | 0 | 4 |
| | Minors Intake | GP | | | 0 | | | | 16 | | 16 | | | | | | 2 | 2 | 0 | 2 |
| MED | Santa Rita | GP | 768 | | 768 | | | 768 | | | | 722 | | 0 | | 722 | 0 | 722 | 2 | 724 |
| MED | Manzanita S.N.U. | MED | | 25 | 25 | | 20 | 45 | | | 0 | | 25 | | 14 | 39 | 0 | 39 | 1 | 40 |
| MED | Manzanita | GP | 179 | | 179 | 107 | | 286 | 0 | | 0 | 179 | | 79 | | 258 | NA | 258 | 0 | 258 |
| MED | Manzanita Second Chance Center | GP | 48 | | 48 | | | 48 | | | | 6 | | | | 6 | NA | 6 | 0 | 6 |
| MED | Manzanita Watch Cells | MH | | 24 | 24 | | | 24 | | | 0 | | 4 | | | 4 | 0 | 4 | 0 | 4 |
| MED | Manzanita Residential | MED | | 58 | 58 | | | 58 | | | | | 43 | | 0 | 43 | 0 | 43 | 0 | 43 |
| | Manzanita Detention | DET | | | 0 | | | | 12 | 11 | 23 | | | | | | 9 | 9 | 2 | 11 |
| MED | Winchester | GP | 400 | | 400 | 336 | | 736 | | | | 400 | | 309 | | 709 | 0 | 709 | 8 | 717 |
| | Winchester Detention | DET | | | | | | | 12 | 12 | 24 | | | | | | 22 | 22 | 0 | 22 |
| | Complex Detention | DET | | | 0 | | | | 40 | 40 | 80 | | | | | | 89 | 89 | 2 | 91 |
| MIN | Catalina | GP | 360 | | 360 | | | 360 | | | 0 | 348 | | 0 | | 348 | 0 | 348 | 0 | 348 |
| MIN | Whetstone | GP | 1250 | | 1250 | | | 1250 | | | | 1122 | | 0 | | 1122 | 0 | 1122 | 1 | 1123 |
| | TOTAL | | 4170 | 430 | 4600 | 467 | 26 | 5093 | 194 | 111 | 305 | 3741 | 328 | 413 | 14 | 4496 | 290 | 4786 | 26 | 4812 |
| | ASPC-WINSLOW | | | | | | | | | | | | | | | | | | | |
| MIN | Coronado | GP | 492 | | 492 | 136 | | 628 | | | 0 | 230 | | 0 | | 230 | 0 | 230 | 0 | 230 |
| CLOSE | Kaibab | GP | 800 | | 800 | | | 800 | | | 0 | 732 | | | | 732 | 0 | 732 | 4 | 736 |
| | Complex Detention | DET | | | 0 | | | | 20 | 19 | 39 | | | | | | 12 | 12 | 3 | 15 |
| MIN | Apache | GP | 334 | | 334 | 80 | | 414 | | | | 334 | | 7 | | 341 | 0 | 341 | 0 | 341 |
| | Apache Detention | DET | | | | | | | 12 | | 12 | | | | | | 6 | 6 | 0 | 6 |
| | TOTAL | | 1626 | 0 | 1626 | 216 | 0 | 1842 | 32 | 19 | 51 | 1296 | 0 | 7 | 0 | 1303 | 18 | 1321 | 7 | 1328 |
| | ASPC-YUMA | | | | | | | | | | | | | | | | | | | |
| MED | Cheyenne | GP | 800 | | 800 | 324 | | 1124 | | | | 800 | | 305 | | 1105 | 0 | 1105 | 9 | 1114 |
| | Cheyenne Detention | DET | | | 0 | | | | 40 | 39 | 79 | | | | | | 80 | 80 | 1 | 81 |
| MIN | Cocopah | GP | 250 | | 250 | 80 | | 330 | | | 0 | 250 | | 68 | | 318 | 0 | 318 | 0 | 318 |
| CLOSE | Dakota Y03 | GP | 200 | | 200 | | | 200 | 16 | | 16 | 159 | | | | 159 | 0 | 159 | 1 | 160 |
| CLOSE | Dakota Y13 | GP | 600 | | 600 | | | 600 | | | | 589 | | 0 | | 589 | 0 | 589 | 1 | 590 |
| | Dakota Detention | DET | | | 0 | | | | 80 | | 80 | | | | | | 76 | 76 | 1 | 77 |
| MED | Cibola | GP | 1250 | | 1250 | 16 | | 1266 | | | | 1165 | | 0 | | 1165 | 0 | 1165 | 17 | 1182 |
| MIN | La Paz | GP | 1250 | | 1250 | | | 1250 | | | | 1150 | | 0 | | 1150 | 0 | 1150 | 4 | 1154 |
| | TOTAL | | 4350 | 0 | 4350 | 420 | 0 | 4770 | 136 | 39 | 175 | 4113 | 0 | 373 | 0 | 4486 | 156 | 4642 | 34 | 4676 |
| | TOTAL IN-STATE | | 29997 | 1075 | 31072 | 5446 | 111 | 36629 | 1026 | 489 | 1515 | 26411 | 797 | 3400 | 82 | 30690 | 1103 | 31793 | 216 | 32009 |

**20-Jul-20** — OPERATING CAPACITY   ADC INSTITUTIONAL CAPACITY/COMMITTED POPULATION   INMATE COMMITTED POPULATION AS MIDNIGHT

| Custody | UNIT | USE | RATED G.P. | M/MH | TOTAL | TEMPORARY T/G.P. | T M/MH | TOTAL | SPECIAL USE S.U. | T/S.U. | TOTAL | RATED G.P. | M/MH | TEMPORARY T/G.P. | T M/MH | TOTAL | TOTAL S.U./T.S.U. | INSIDE TOTAL | OUTSIDE TOTAL | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MED | CACF - GEO | SO | 1000 | | 1000 | 280 | | 1280 | 40 | | 40 | 1000 | | 210 | | 1210 | 37 | 1247 | 6 | 1253 |
| MIN | Phx. West- DWI - GEO | DUI | 400 | | 400 | 100 | | 500 | 19 | | 19 | 400 | | 15 | | 415 | 5 | 420 | 0 | 420 |
| MIN | Flor. West-   GEO | GP | 200 | | 200 | 50 | | 250 | 4 | 4 | 8 | 148 | | 0 | | 148 | 0 | 148 | 0 | 148 |
| MIN | Flor. West- DWI - GEO | DUI | 400 | | 400 | 100 | | 500 | 10 | 7 | 17 | 388 | | 0 | | 388 | 3 | 391 | 0 | 391 |
| MED | Kingman GEO- Huachuca | SO | 1400 | | 1400 | 108 | | 1508 | 73 | | 73 | 1388 | | 0 | | 1388 | 25 | 1413 | 4 | 1417 |
| MED | Kingman GEO- Cerbat | GP | 2000 | | 2000 | | | 2000 | 80 | | 80 | 1554 | | | | 1554 | 25 | 1579 | 10 | 1589 |
| MIN | Marana - MTC | GP | 500 | | 500 | | | 500 | 7 | | 7 | 365 | | | | 365 | 1 | 366 | 1 | 367 |
| MED | Red Rock- GP- CCA | GP | 2000 | | 2000 | 24 | | 2024 | | | | 1882 | | 0 | | 1882 | | 1882 | 26 | 1908 |
| | Red Rock Det- CCA | DET | | | | | | | 78 | | 78 | | | | | | 36 | 36 | | 36 |
| | **TOTAL CONTRACT** | | **7900** | **0** | **7900** | **662** | **0** | **8562** | **311** | **11** | **322** | **7125** | **0** | **225** | **0** | **7350** | **132** | **7482** | **47** | **7529** |
| | TOTAL IN-STATE | | 29997 | 1075 | 31072 | 662 | 111 | 31629 | 1026 | 489 | 1515 | 26411 | 797 | 3400 | 82 | 30690 | 1103 | 31793 | 216 | 32009 |
| | TOTAL CONTRACT | | 7900 | 0 | 7900 | 662 | 0 | 8562 | 311 | 11 | 322 | 7125 | 0 | 225 | 0 | 7350 | 132 | 7482 | 47 | 7529 |
| | **GRAND TOTAL** | | **37897** | **1075** | **38972** | **6108** | **111** | **45191** | **1337** | **500** | **1837** | **33536** | **797** | **3625** | **82** | **38040** | **1235** | **39275** | **263** | **39538** |

| | RATED G.P. | M/MH | TOTAL | TEMP T/G.P. | T M/MH | TOTAL | S.U. | T.S.U. | TOTAL | RATED G.P. | M/MH | TEMP T/G.P. | T M/MH | TOTAL | S.U./T.S.U. | INSIDE | OUTSIDE | GRAND |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL STATE MALE** | 25740 | 993 | 26733 | 5362 | 54 | 32149 | 1000 | 469 | 1469 | 22710 | 759 | 3301 | 44 | 26814 | 1080 | 27894 | 174 | 28068 |
| **TOTAL CONTRACT MALE** | 7900 | 0 | 7900 | 662 | 0 | 8562 | 311 | 11 | 322 | 7125 | 0 | 225 | 0 | 7350 | 132 | 7482 | 47 | 7529 |
| **TOTAL MALE** | 33640 | 993 | 34633 | 6024 | 54 | 40711 | 1311 | 480 | 1791 | 29835 | 759 | 3526 | 44 | 34164 | 1212 | 35376 | 221 | 35597 |
| **TOTAL STATE FEMALE** | 4257 | 82 | 4339 | 84 | 57 | 4480 | 26 | 20 | 46 | 3701 | 38 | 99 | 38 | 3876 | 23 | 3899 | 42 | 3941 |
| **GRAND TOTAL** | 37897 | 1075 | 38972 | 6108 | 111 | 45191 | 1337 | 500 | 1837 | 33536 | 797 | 3625 | 82 | 38040 | 1235 | 39275 | 263 | 39538 |

| STATE MALE | Rated Beds | Temp Beds | Total Operating Capacity | POPULATION | VACANCIES |
|---|---|---|---|---|---|
| MINIMUM CUSTODY | 7753 | 1050 | 8803 | 6949 | 1854 |
| MEDIUM CUSTODY | 9631 | 3587 | 13218 | 12426 | 792 |
| CLOSE CUSTODY | 7313 | 318 | 7631 | 6626 | 1005 |
| MAXIMUM CUSTODY | 1829 | 332 | 2161 | 1899 | 262 |
| RECEPTION -MAX | 207 | 129 | 336 | 168 | 168 |
| TOTAL | 26733 | 5416 | 32149 | 28068 | 4081 |

| CONTRACT MALE | Rated Beds | Temp Beds | Total Operating Capacity | POPULATION | VACANCIES |
|---|---|---|---|---|---|
| MINIMUM CUSTODY | 3500 | 250 | 3750 | 2915 | 835 |
| MEDIUM CUSTODY | 4400 | 412 | 4812 | 4614 | 198 |
| TOTAL | 7900 | 662 | 8562 | 7529 | 1033 |
| TOTAL MALE | 34633 | 6078 | 40711 | 35597 | 5114 |

| STATE FEMALE | Rated Beds | Temp Beds | Total Operating Capacity | POPULATION | VACANCIES |
|---|---|---|---|---|---|
| MINIMUM CUSTODY | 2432 | 80 | 2512 | 2259 | 253 |
| MEDIUM CUSTODY | 1296 | 4 | 1300 | 1255 | 45 |
| CLOSE CUSTODY | 467 | 57 | 524 | 386 | 138 |
| RECEPTION | 144 | 0 | 144 | 41 | 103 |
| TOTAL | 4339 | 141 | 4480 | 3941 | 539 |
| GRAND TOTAL | 38972 | 6219 | 45191 | 39538 | 5653 |

| RATED/TEMP/ BED VACANCY BREAKDOWN | MINIMUM | MEDIUM | CLOSE | MAXIMUM | TOTAL |
|---|---|---|---|---|---|
| MALE RATED BED VACANCIES: | 1389 | 0 | 687 | 0 | 2076 |
| MALE TEMP BED VACANCIES: | 1300 | 990 | 318 | 262 | 2870 |
| TOTAL MALE BED VACANCIES: | 2689 | 990 | 1005 | 262 | 4946 |
| FEMALE RATED BED VACANCIES: | 173 | 41 | 81 | NA | 295 |
| FEMALE TEMP BED VACANCIES: | 80 | 4 | 57 | NA | 141 |
| TOTAL FEMALE BED VACANCIES: | 253 | 45 | 138 | NA | 436 |
| GRAND TOTAL VACANCIES | 2942 | 1035 | 1143 | 262 | 5382 |

**OUT COUNT**

| | Male | Female | Total |
|---|---|---|---|
| Hospital | 31 | 0 | 31 |
| Fire Crew | 0 | 0 | 0 |
| Other Work | 4 | 25 | 29 |
| Court | 186 | 17 | 203 |
| Total Out | 221 | 42 | 263 |

**OUT TO COURT/AGENCY BREAKDOWN**

| | | | |
|---|---|---|---|
| Apache | 0 | 0 | 0 |
| Cochise | 4 | 0 | 4 |
| Coconino | 11 | 2 | 13 |
| Gila | 1 | 0 | 1 |
| Graham | 0 | 0 | 0 |
| Greenlee | 0 | 0 | 0 |
| Maricopa | 74 | 8 | 82 |
| Mohave | 1 | 0 | 1 |
| Navajo | 0 | 0 | 0 |
| Pima | 32 | 2 | 34 |
| Pinal | 4 | 0 | 4 |
| Santa Cruz | 2 | 0 | 2 |
| Yavapai | 4 | 2 | 6 |
| Yuma | 9 | 0 | 9 |
| La Paz | 2 | 0 | 2 |
| Other | 19 | 0 | 19 |
| Federal | 23 | 3 | 26 |
| Total Court Out | 186 | 17 | 203 |

**COMMUNITY SUPERVISION OFFENDERS**

| | |
|---|---|
| Arizona Parole Prior TIS | 58 |
| Interstate Parole | 654 |
| Work Furlough | 0 |
| Home Arrest | 15 |
| Truth In Sentencing (TIS) | 4577 |
| Total | 5304 |

| Maricopa Re-Entry Center | Sex Offender | Non-Sex Offender |
|---|---|---|
| Sanctioned | 0 | 0 |
| Intensive Treatment | 0 | 0 |
| Without Placement | 0 | 0 |
| Total Maricopa Re-Entry Center | 0 | 0 |

| Pima Re-Entry Center | Sex Offender | Non-Sex Offender |
|---|---|---|
| Sanctioned | 0 | 0 |
| Intensive Treatment | 0 | 0 |
| Without Placement | 0 | 0 |
| Total Pima Re-Entry Center | 0 | 0 |

| Community Corrections Grand Total | 5304 |
|---|---|

**COUNTY JAIL INTAKE**

| | Male | Female | Both |
|---|---|---|---|
| County Jail Intake 07/20/20 | 0 | 0 | 0 |
| County Jail Transfers Pending | 0 | 0 | 0 |
| Inside Count | 35376 | 3899 | 39275 |
| Outside Count | 221 | 42 | 263 |
| Offical Daily Count | 35597 | 3941 | 39538 |

**Count Sheet Changes Effective January 2019**

**Rated Bed Changes:**
Douglas, Maricopa Unit:  Add  130 beds -will remain red-lined.
Douglas, Eggers Unit:  Add 240 beds- will be reactivated and converted to medium custody.
Florence, North Unit:  Remove 100 tent beds due to deterioration.
Tucson, Minors Unit:  Remove 5 beds for conversion to day rooms for female minors; 25 beds converted to female minors.

Perryville, Minors Unit:  Remove 10 beds from building 45 and repurpose beds to IPC unit -  no change in rated bed no.

**Temporary Bed Changes:**
Red Rock: Add 24 beds.  Additional authorization is required to activate and fund the beds.
Eyman, Cook Unit:  add 159 beds; Eyman SMU I:  add 48 beds
Florence, Globe Unit:  add 52 beds.
Winslow, Apache Unit:  add 40 beds; Winslow, Coronado Unit:  add 136 beds
Safford, Ft. Grant Unit:  add 160 beds; Safford, Graham Unit:  add 96 beds
Perryville, IPC:  add 5 beds; Perryville Licensed MH Unit:  add 16 beds

RATED BEDS PLUS TEMPORARY BEDS = OPERATING CAPACITY (R+T=OC).

CURRENTLY THERE ARE NO FEMALE INMATES IN CONTRACT BEDS

# EXHIBIT 8

# FILED UNDER SEAL

# EXHIBIT 9

# MAXIMUM CUSTODY NOTEBOOKS FOR NOVEMBER 2016 – AUGUST 2019

# [TO BE SUBMITTED TO THE COURT AS A NON-ELECTRONIC EXHIBIT UPON COURT APPROVAL]