Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE PARAGRAPH 14 OF THE STIPULATION (Doc. 3623)** |

Defendants oppose Plaintiffs' Motion to Enforce Paragraph 14 of the Stipulation. (Doc. 3623).   Plaintiffs' Motion is based largely on stale information that predates Centurion's assumption of inmate healthcare in July 2019.  To ensure compliance with Paragraph 14 of the Stipulation, Centurion is contractually required to provide interpretation services for inmates with limited English language proficiency, as well as American Sign Language ("ASL") interpretation.  Plaintiffs ignore the robust measures already in place and improperly attempt to expand the Stipulation to create unnecessary new performance measures and monitoring obligations.  For the following reasons, the Court should affirm its prior rulings on this issue and deny Plaintiffs' Motion.

# I.     Background.

Paragraph 14 of the Stipulation states:

> For prisoners who are not fluent in English, language interpretation for healthcare encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service.

(Doc. 1185, at ¶ 14.)  In September 2016, the Court ruled that Paragraph 14's language-interpretation requirements are not categorized as Performance Measures and thus "do not need to be monitored according to the same metric as Performance Measures." (Doc. 1673 at 2.)  The Court further ruled that "Defendants may provide another method demonstrating compliance," and left it to Defendants' discretion to determine how it would be accomplished.  (*Id*.)  Defendants subsequently proposed implementation of a "hard stop" software feature in eOMIS that required providers to answer whether an inmate needed interpretation services (or refused) whenever a "SOAPE"[1] note was generated during a healthcare encounter.  (Doc. 1703 at 2-3; Doc. 1927 at 2.)  Plaintiffs agreed to Defendants' proposal and the eOMIS "hard stop" feature was implemented in early February 2017. (Doc. 1755 at 18–19; Doc. 1782 at 16–17; Doc. 1927 at 1–2.)

In February 2019, Plaintiffs sent Defendants a Notice of Substantial Non-Compliance, alleging that Defendants were not providing deaf inmates with ASL interpretation services during healthcare encounters.  (Doc. 3255-1 at 108–113.)  The parties mediated the dispute in August 2019, but did not reach a resolution.  (Doc. 3348.)  In response to Plaintiffs' monitoring tour document requests, Defendants have regularly produced a list of all patients for whom language interpretation was used for a healthcare encounter, including the inmate's name and number, date of healthcare encounter, and unit location. (Exh. 1, HS Encounter Lists for Tours.)

---

[1] "SOAPE" notes document a healthcare encounter and include the subjective, objective, assessment, plan, and education components of the encounter.

On July 1, 2019, Centurion replaced Corizon as the inmate healthcare vendor for the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR").   Director Shinn replaced Director Ryan in October 2019.   (Doc. 3649-1, ¶ 1.)   Director Shinn appointed Larry Gann as the Assistant Director of the Medical Services Contract Monitoring Bureau ("MSCMB") in April 2020.   (Doc. 3649-2, ¶ 13.)   At no point after Centurion's assumption of inmate healthcare or ADCRR's new leadership did Plaintiffs specifically inquire into Centurion's or ADCRR's compliance with Paragraph 14.   Had Plaintiffs done so, they would have learned that Centurion provides expansive language interpretation services. Instead, they filed their Motion to Enforce *almost a year* after the mediation.

## II.   ADCRR Requires, and Centurion Provides, Language Interpretation Services That Comply With Paragraph 14 and Comport With the Standard of Care.

### A.   The ADCRR-Centurion Contract.

ADCRR requires Centurion to provide language interpreter services for inmates, including those with a significant difficulty in verbal communication.   (Exh. 2, Decl. L. Gann, ¶ 14.) The ADCRR-Centurion contract specifies that "[a] qualified interpreter or a language line interpretation service shall be provided for inmates who are not fluent in English, or exhibit significant difficulty in verbal communication unless the qualified healthcare staff is proficient in the inmate's language."  (Exh. 3, Decl. T. Dolan, ¶ 3.)  This contract requirement substantially mirrors the language in Paragraph 14 of the Stipulation. (See Doc. 1185, ¶ 14.)  ADCRR also contractually requires Centurion to train its healthcare staff on the use of interpreter services and to display posters in the clinics and medical services area to advise healthcare staff and inmates regarding the availability of interpreter services.  (Exh. 2, Decl. L. Gann, ¶14; Exh. 3, Decl. T. Dolan, ¶ 7.)

### B.   Centurion's Compliance with the Contract and Paragraph 14 of the Stipulation.

Centurion understands the importance of effective communication between medical providers and their patients and ensures adequate medical services to Limited English

Proficient ("LEP") inmates, including hearing-impaired inmates, in several ways.  (Exh. 3, Decl. T. Dolan, ¶18.)

### Staffing & Training

As of July 23, 2020, Centurion employed 1,357 providers, nurses, and other medical professionals in ADCRR's ten state-operated prison complexes.  (Exh. 3, Decl. T. Dolan, ¶ 5.)  As of the morning of July 27, 2020, five hundred twenty-four (524) Centurion employees (38.7%) from these complexes and Centurion's Regional Office responded to a survey regarding language proficiency.  (Id.)  Two hundred forty (240) of the respondents (45.8%) indicated that they are proficient in one or more languages.  (Id.)  One hundred thirty-three (133) respondents (25.4%) indicated that they are proficient in Spanish. (Id.)  Other languages spoken by Centurion healthcare staff  include:  Arabic (2), French (13), French Creole (3), German (1), Hindi (2), Japanese (1), Korean (1), Mandarin (1), Panjabi (3), Persian (1), Polish (4), Portuguese (5), Romanian (2), Russian (6), Swahili (3), Tagalong (8), and Urdu (2).  (Id.)  Ten respondents also reported proficiency in languages other than those listed.  Additionally, seven Centurion healthcare staff reported that they are proficient in ASL.  (Id.)

Centurion healthcare staff is trained on the use and availability of interpretive services, and these topics are discussed in detail at every Centurion New Employee Orientation. (Id., ¶ 7.)  Posters are displayed in all medical clinics and other medical service areas to remind staff and inmates of the availability of interpretive services.  (Id.)  The MSCMB verifies that these posters are displayed.  (Exh. 2, Decl. L. Gann, ¶ 14.)

### Audio & Video Translation Services

If an inmate requires translation services, healthcare staff will locate a staff member who is proficient in the patient's language.  (Exh. 3, Decl. T. Dolan, ¶ 4.)  If one is not available, healthcare staff utilizes LanguageLine Solutions services to provide communication assistance.  (Id., ¶¶ 4, 6, 8.)  The LanguageLine Solutions platform is user friendly and diverse.  It provides audio interpreters through any telephone, 24 hours a day, 7 days a week, for over 240 languages.  (Id., ¶8.)  In November 2019, video interpretation

services were added to the LanguageLine Solution platform. (Id., ¶ 12.) Video interpretation services, including ASL, can be accessed from any laptop, desktop, or any other internet connected device that is equipped with a camera, speakers, and microphone. (Id., ¶ 13.) This technology is also available on Centurion's AmWell platform, which is used for telehealth encounters. (Id.) Video interpreters are available 24 hours a day, 7 days a week, in ASL, Spanish, Arabic, Cantonese, Mandarin, Polish, and Russian. (Id., ¶ 10.) Video interpreters are available Monday through Friday in Albanian, Amharic, Armenian, Bengali, Bosnian, British Sign Language, Burmese, Farsi, French, German, Greek, Haitian Creole, Hebrew, Hindi, Hmong, Italian, Japanese, Karen, Khmer, Korean, Laotian, Lithuanian, Malay, Nepali, Portuguese, Punjabi, Romanian, Somali, Swahili, Tagalog, Thai, Tigrigna, Turkish and Vietnamese (with extended weekend hours for Korean, Portuguese, Somali, and Vietnamese). (Id., ¶11.)

In its first year, Centurion healthcare staff placed 2,700 LanguageLine calls for voice translations. (Id., ¶¶ 14-16.) The total length of those calls was over 600 hours, and the average length of each call was 13 ½ minutes. (Id.) The following table summarizes the call details by month:

| Month | Number | Minutes | Avg. Length | Languages |
|-------|--------|---------|-------------|-----------|
| Jul-19 | 200 | 2,540 | 12.7 | Spanish (200) |
| Aug-19 | 197 | 2,519 | 12.8 | Spanish (196); Arabic (1) |
| Sep-19 | 225 | 2,902 | 12.9 | Spanish (225) |
| Oct-19 | 259 | 3,927 | 12.8 | Spanish (253); Arabic (2); Serbian (1); Somali (3) |
| Nov-19 | 194 | 2,435 | 12.5 | Spanish (188); Arabic (2); Karen (2); Vietnamese (2) |
| Dec-19 | 165 | 2,210 | 13.4 | Spanish (157); Arabic (2); Bosnian (1); Serbian (1); Somali (4) |
| Jan-20 | 241 | 3,737 | 14.3 | Spanish (233); Arabic (4); Croatian (1); Dinka (1); Somali (1); Swahili (1) |
| Feb-20 | 303 | 4,156 | 13.7 | Spanish (300); Arabic (1); Dinka (1); Somali (1) |

| Month | Number | Minutes | Avg. Length | Languages |
|---|---|---|---|---|
| Mar-20 | 258 | 3,810 | 14.8 | Spanish (252); Arabic (1); Mandarin (5) |
| Apr-20 | 220 | 2,695 | 12.3 | Spanish (215); Kinyarwanda (4); Somali (1) |
| May-20 | 214 | 2,829 | 13.2 | Spanish (213); Burmese (1) |
| Jun-20 | 224 | 2,820 | 12.6 | Spanish (224) |
| **Totals** | **2,700** | **36,580** | **13.5** | |

(Id., ¶16.)

From November 2019 through June 2020, Centurion healthcare staff used the LanguageLine video interpretation services, including for ASL, 111 times. (Id., ¶ 17.) The total length of those video sessions was over 1,000 minutes, with an average session length of 9.2 minutes. (Id.) The following table summarizes the video details by month.

| Month | Number | Minutes | Avg. Length | Languages |
|---|---|---|---|---|
| Nov-19 | 16 | 109 | 6.8 | ASL (10); Farsi (1); Spanish (5) |
| Dec-19 | 7 | 57 | 8.1 | ASL (4); Spanish (3) |
| Jan-20 | 1 | 10 | 10 | ASL (1) |
| Feb-20 | 6 | 46 | 7.7 | ASL (6) |
| Mar-20 | 17 | 97 | 5.7 | ASL (8); Spanish (8) |
| Apr-20 | 16 | 178 | 11.3 | ASL (13); Spanish (3) |
| May-20 | 22 | 300 | 13.6 | ASL (19); Spanish (3) |
| Jun-20 | 26 | 226 | 8.7 | ASL (19); Spanish (7) |
| **Total** | **111** | **1,023** | **9.2** | |

(Id.)

All Centurion staff has access to simple instructions to access LanguageLine services, and postings are prevalent throughout the medical units, including exam and waiting rooms. (Exh. 2, Decl. L. Gann, ¶ 14; Exh. 4, Decl. A. Cerrillo, ¶ 16.) Inmates are likewise informed about LanguageLine services via postings in English and Spanish in all of the medical clinics, including the intake waiting room. (Id.) ASL and other forms of

non-verbal language are offered through the LanguageLine as a video conference service, using telehealth equipment in the clinic.[2]  (Exh. 3, Decl. T. Dolan, ¶¶ 10, 13.)

### Hard-Stop Function in eOMIS

As discussed above, in February 2017, a "hard stop" function was added to eOMIS, which requires healthcare staff to determine whether an inmate needs translation services before proceeding with documenting a healthcare encounter.   Centurion's on-boarding training for new staff and continuing education for current staff includes training sessions that focus on these steps.  (See Exh. 5, Decl. J. Gahris, ¶¶ 6-8.)   Training instructions are provided for nurse and provider sick call encounters, as well as for chronic care encounters.  (Id., ¶ 8.  )  Similar instructions are provided for mental health and dental encounters.  (Id, ¶ 10.)

Generally, an encounter is created when healthcare staff opens the appointment tab in eOMIS and clicks the patient's date/time hyperlink in the schedule grid for the appropriate appointment.  (Id., ¶ 9.)  The healthcare staff then clicks "Prepare to Add Encounter," which is located at the bottom of the appointment detail, to start a SOAPE note.  (Id)  The staff member then selects the appropriate type of visit.  (Id.)

After completing these steps, the staff member is required to answer an interpreter services question.  (Id., ¶ 11.)  The question asks, "Are interpreter services needed for this inmate?"  (Id.)  This question acts as a hard-stop, which means it must be answered before the staff member can continue.  (Id.)  If the answer is "No," then the staff member may continue to the next section.[3]  (Id.) If the answer is "Yes," then an additional drop-down menu appears and asks, "What type of interpreter services were used for the encounter?"  (Id.)  The choices are "Language Line," "Healthcare Staff Used for Interpreter Services,"

---

[2] At ASPC-Perryville, for example, there are currently seven deaf inmates.  (Exh.4, Decl. A. Cerrillo, ¶ 18.)  All of these inmates have indicated that they are proficient at lip reading and choose this method of communication instead of video interpretation services.  (Id. at 19.)

[3] If the staff member conducting the encounter is proficient in the same language as the inmate, the correct answer is "No."  (Exh. 6, Decl. R. Faulkner, ¶ 14; Exh. 4, Decl. A. Cerrillo, ¶ 14.)

or "Inmate Refused Interpreter Services." (Id.)  This acts as a second hard-stop and must be answered before continuing.  (Id.)

The interpreter service "hard stop" is required for over 70 types of provider, nursing, mental health, and dental encounters.  (Id., ¶ 10.)  For these 70-plus encounter types, healthcare staff must answer the interpreter services hard-stop question(s) before they may continue in the SOAPE note.  (Id., ¶¶ 9, 11.)  Encounters such as pill call or picking up a medical device, however, are two examples where a non-SOAPE encounter can take place. (Id., ¶ 12.)  In these situations, there is no need for interpreter services.   (Id.)

Since July 1, 2019, there have been 6,100 encounters where healthcare staff selected "Yes" indicating that interpreter services were needed. (Id., ¶¶ 13-15.)  Of those, "Language Line" was selected 2,429 times, "Healthcare Staff Used for Interpreter Services" was selected 3,469 times, and "Inmate Refused Interpreter Services" was selected 202 times.[4] (Id., ¶ 14.)  This evidence demonstrates that the "hard stop" function is effective in ensuring that healthcare staff identify whether interpreter services are needed.  (Id., ¶ 16.)

**Intake Processes**

During an inmate's first medical encounter at intake, the "hard stop" eOMIS function identifies inmates who may require translation services.  (Exh. 4, Decl. A. Cerrillo, ¶¶ 8, 11; Exh. 6, Decl. R. Faulkner, ¶¶ 9, 12.)   Deaf inmates are likewise identified and documented during the intake process in conjunction with their "Mobility Restrictions/Physical Disabilities and Impairments" assessment. (Exh. 4, Decl. A. Cerrillo, ¶¶ 8-9; Exh. 6, Decl. R. Faulkner, ¶¶ 9-12.)

New inmates are processed at ASPC-Perryville (female inmates) and ASPC-Phoenix (male inmates), where they receive a comprehensive intake screening and are seen by a nurse, a provider, and dental and mental health professionals.  (Exh. 4, Decl. A. Cerrillo, ¶¶ 6-7; Exh. 6, Decl. R. Faulkner, ¶¶ 7-9.)

---

[4] It is reasonable that the number of encounters where the "hard stop" was entered at the beginning of the encounter would be less than the actual number of calls placed using LanguageLine services.  (Exh. 5, Decl. Gahris, ¶ 15.)

At the start of this medical intake process, a nurse interviews the inmate and completes an Intake Assessment regarding the inmate's current medical conditions.  (Exh. 4, Decl. A. Cerrillo, ¶ 8; Exh. 6, Decl. R. Faulkner, ¶ 9.)  The intake screening includes questions to determine Mobility Restrictions/Physical Disabilities and Impairments, including specific questions to determine if an inmate is blind or deaf.  (Id.)  If the inmate is blind or deaf, the condition is documented as a chronic condition in eOMIS using an ICD-9/10 code (at ASPC-Perryville) or a M4 or M5 designation based on severity (at ASPC-Phoenix)—these codes appear in eOMIS and are clearly visible to all healthcare providers to designate an inmate as blind, deaf, and/or hearing impaired.  (Exh. 4, Decl. A. Cerrillo, ¶ 9; Exh. 6, Decl. R. Faulkner, ¶¶ 10-11.)

Many staff members at ASPC-Perryville, including the intake nurse and intake medical provider, are fluent in both English and Spanish and thus do not require the LanguageLine to effectively communicate with Spanish-speaking inmates.  (Exh. 4, Decl. A. Cerrillo, ¶¶ 11-15.)  Likewise, multiple current staff members at ASPC-Phoenix, including several members of the nursing staff and providers, are bilingual in both English and Spanish and do not require the LanguageLine to effectively communicate with Spanish-speaking inmates.  (Exh. 6, Decl. R. Faulkner, ¶¶ 13-18.)  In addition, currently one ASPC-Phoenix nurse can communicate using ASL.  (Id. at ¶19.)

## C.  Centurion's Language Interpretation Services Meet or Exceed the Correctional Standard of Care.

Centurion's language interpretation services are in accordance with accepted correctional healthcare standards.  (Exh. 7, Attach. 1, Report of Penn M.D., at 67-70.)  Contrary to Plaintiffs' unsubstantiated allegation, the standard of care does not require the use of certified interpreters for all healthcare encounters, nor are they required for group psychotherapy.  (Id. at 50, 67.)  The need for an interpreter is dependent upon the nature and extent of the encounter and the inmate's ability to meaningfully participate, and it is left to the provider's medical discretion.  (Id. at 67.)

The standard of care for accommodating LEP inmates is constantly evolving.  (Id. at 68.)   The current widely accepted practice for community and correctional healthcare providers is to use translation/interpretation services if the healthcare staff member is not proficient in the language spoken by the inmate.  (Id. at 70.)  The staff member assesses their own level of proficiency and determines whether an interpreter or language service is necessary.  (Id. at 69.)   If the staff member is not proficient, then translation and interpretation services may be sought through another staff member who is proficient in the inmate's language, including a nurse, medical assistant, or another healthcare administrative support staff member, or through a commercially available voice language telephone line. (Id. at 70.) The standard of care does not require certification or proficiency testing for a medical encounter.  (Id. at 67.)  With respect to ASL inmates, the current standard is the use of a videoconference service if an ASL proficient staff member is not available.  (Id. at 70.)  ADCRR and Centurion utilize *all* of these services.

Healthcare encounters have a variety of complexities.  (Id. at 69.)  The need for an interpreter, as compared to another accommodation, such as using easily understood English language, speaking slower, or using written communication may be all that is necessary.  (Id.) The standard of care does not require the use of translators/interpreters for all encounters, much less certified translators/interpreters; rather, it depends upon the nature and extent of the encounter.  (Id. at 67, 69.)  For example, an inmate receiving a simple blood pressure measurement, or a finger stick blood sugar test, most likely does not need a translator.  (Id. at 69.)  On the other hand, discussions regarding advance directives are particularly complex, and such discussions, which can be scheduled in advance, should be conducted with someone who is proficient in the inmate's language.  (Id.  Further, in some circumstances, e.g., urgent or emergent situations, there is not time to locate an interpreter.  (Id.)  In those situations, the standard of care is to provide emergency care, even in the absence of an interpreter or translator.  (Id.)  In fact, a delay in care to secure translation services could result in medical malpractice.  (Id.)

With respect to deaf inmates, there are varying degrees of deafness.  (Id. at 70.) Some inmates may be able to effectively communicate with hearing aids.  (Id.)  Other inmates may be comfortable with lip reading.  (Id.)  There is no one-size-fits-all standard for interacting with deaf inmates, and whether ASL interpretation is warranted depends on the inmate and the nature and scope of the particular encounter.  (Id.)

The National Commission on Correctional Healthcare ("NCCHC") and American Correctional Association ("ACA") are the leading authorities on best practices in correctional healthcare.  (Id. at 67-68.)  Centurion's practices comply with both NCCHC and ACA standards.  (Id.)  Although the NCCHC 2018 Prison Healthcare standards do not contain any explicit standard relating to effective communication with LEP inmates, NCCHC references several standards in the notes—Centurion complies with them all. (Id.)  For example, Standard P-E-1, Information on Health Services, states:

> Arrangements should be made for an interpreter or an assistive device whenever effective communication is compromised due to speech, hearing, or language deficits. Selection of the interpreter and form of assistance should consider the patient's needs and abilities.  Inmate and Officer interpreters should not be used except in emergency.[5]

(Id. at 67.)  Standard P-E-2, Receiving Screening, further states:

> Receiving screening should be conducted using a form and language fully understood by the inmate, who may not speak English or may have a physical (e.g., speech, hearing, sight) or mental disability.

(Id. at 68.)

The ACA Performance Based Expected Practices for Adult Correctional Institutions also addresses LEP concerns.  Standard 5-6A-4344 provides, in part, that intake health

---

[5] The intent of NCCHC Standard P-E-1 recommending that other inmates and security staff personnel are only used to translate in the event of an emergency, is to ensure that the inmate patient is comfortable with the translator and does not feel that his medical privacy rights are being violated. (Exh. 7, Attach. 1, Report Penn, M.D., at 70.) Where the inmate specifically consents or requests the use of an inmate or staff member to translate or interpret, it is appropriate to use such a resource.  (Id.)

services orientation information "is conveyed in a language that is easily understood by each inmate.  When a literacy or language problem prevents an inmate from understanding written information, a staff member or translator assists the inmate."  (Id.)  Standard 5-6C-4397 further provides that "[i]nformed consent standards in the jurisdiction are observed and documented in a language understood by the offender."  (Id.)

Plaintiffs' reliance on California Department of Corrections and Rehabilitation ("CDCR") Policy, 15 CCR § 3999.20, and Orleans Parish Prison (a New Orleans Louisiana county jail, not a Louisiana state prison) protocols regarding the use of certified interpreters is misplaced because neither one applies to ADCRR or is incorporated into Paragraph 14 of the Stipulation, and neither one establishes the nationally recognized standard of care. (Id.)  Both were the result of consent judgment settlements, and they *exceed* the correctional healthcare standard of care.[6] (Id.)

Here, Defendants are not required to use only certified translators/interpreters or qualified ASL interpreters to provide healthcare encounter translation services.  Where healthcare staff is proficient in translating for the complexity of the encounter presented, certification is not necessary.  Likewise, where the nature of the encounter is not complex, written notes are an appropriate method for communication with deaf inmates. Moreover, industry standards do not require Defendants to employ a separate intake process to identify what language an inmate speaks when the eOMIS "hard stop" mechanism goes above and beyond, requiring language assessment and need for translation services to be determined each and every time there is a healthcare encounter.  Because Centurion provides translation services for healthcare encounters that meet industry standards, Defendants cannot be found substantially noncompliant with Paragraph 14.

---

[6] *See Armstrong v. Brown*, 939 F. Supp. 2d 1012, 1021 (N.D. Cal. 2013) (challenging CDCR's own remedial plan compliance); *Jones v. Gusman*, 296 F.RD. 416, 454 (E.D. La. 2013) (challenging proposed stipulated consent judgment terms).

**III.    Plaintiffs' Anecdotal Allegations of Substantial Noncompliance Are Based Primarily on Encounters With the Prior Healthcare Vendor and Do Not Establish that Inmates Are Systemically Denied Constitutional Care.**

Plaintiffs' allegation of substantial noncompliance is based on anecdotal allegations by fourteen inmates.  However, most of those encounters go back as far as 2016 and do not reflect the current state of Centurion's translation services.  (Exh 7, Attach. 1, Report of Penn, M.D. at 7.)  Those dated allegations involving Corizon's conduct do not establish that Defendants and Centurion are *currently* noncompliant with Paragraph 14 or are *currently* providing constitutionally deficient care.  Nevertheless, a review of those individual encounters reveals that the provided language accommodations were appropriate in any event.

█████████████

Inmate ████ is a 68-year-old male with a history of sensorineural hearing loss (bilateral), hypertension, diabetes mellitus type 2 without retinopathy, knee pain, lower back pain, ankle joint effusion and joint pain, and elevated lipids.  (Id. at 7.)  Inmate ████ has no history of mental health services and does not have a SMI designation.  (Id.)

Plaintiffs point to eight encounters where it is noted that Inmate ████ is deaf.  (Id.; Doc. 3629, Norris Decl. at ¶¶ 9, 11, 13, 15, 17, 19, 21, 23).  However, those notes include indications that ████ is able to read lips (id. at ¶ 11), and later that he was provided with multiple hearing aids (id. at ¶ 23), both of which suggest that there was effective communication with healthcare staff.  (Id.)  Further, it is noted that on August 12, 2018, a nursing encounter occurred during an Incident Command System ("ICS") incident, where an inmate interpreter was used to provide ASL interpretation (id. at ¶ 19.)  (Id.)  During emergent incidents, which may occur in facility areas where ASL interpretative systems are not located, it would be improper to delay care, and the use of an inmate interpreter comports with the standard of care.  (Id. at 8.)

An eOMIS review further reveals that Inmate ████ submitted 42 Health Needs Requests ("HNRs") between June 2016 and January 2020.  (Id. at 8-11.)  Those HNRs demonstrate that Inmate ████ was able to effectively communicate in writing his

1    healthcare issues (e.g., dental, wheelchair, foot and joint pain, gastrointestinal complaints,

2    ibuprofen refill requests), and healthcare staff responded appropriately.  (Id.)

3         Since July 1, 2019, Inmate ███████ utilized healthcare staff only once (on June 28,

4    2020) for interpretive services.  (See Exh. 5, Decl. J. Gahris, ¶¶ 19, 20.)  Inmate ███████ has

5    not filed any medical grievances while in custody.[7]  (See Exh. 2, Decl. L. Gann, ¶ 7.)

6                                    ███████████████████

7         Inmate ███████ is a 25-year-old male with a history of acquired deaf mutism

8    (disorder), mild intermittent asthma, low vision both eyes, dermatitis, foot pain, and past

9    allergic reactions.  (See Exh. 7, Attach. 1, Report of Penn, M.D., at 11.)  Inmate ███████

10   has no history of mental health services and does not have a SMI designation. (Id.)

11        Plaintiffs detail nine encounters dating back to November 2018, where his deafness

12   is noted (Doc. 3629, Norris Decl. at ¶¶ 42, 44, 46, 48, 54, 58, 62, 70, 72).  (Id.)  During

13   these encounters, there are multiple references to communications conducted in writing,

14   either on paper or on a computer, (id. at ¶¶ 46, 54, 58, 70), as well as a request for hearing

15   aids (id. at ¶ 58).  (Id.)  It is readily apparent from his subsequent encounters and HNRs that

16   his request was granted and hearing aids were provided to him.  (Id.)  This indicates that

17   there was effective communication with healthcare staff, and that use of an ASL interpreter

18   may not have been necessary during these encounters, particularly depending on the nature

19   and complexity of the encounter and if he was using his hearing aids.  (Id.)

20        An eOMIS review further reveals that Inmate ███████ submitted 21 HNRs between

21   November 2018 and May 2020, and was able to effectively communicate in writing his

22   ───────────────────────

23        [7] As outlined in DO 802, inmates have access to an Inmate Grievance Procedure that
     allows them to informally and then formally raise issues related to their medical care.  (Exh.
     2, Decl. L. Gann, ¶ 3.)  An inmate must first attempt to resolve their complaint informally.

24   If they are unable to resolve it informally, they may file a formal grievance.  (Id., ¶ 4.)
     Medical grievances are forwarded to the Facility Health Administrator, who then

25   investigates the grievance and prepares a response. (Id.)  The MSCMB tracks health care
     grievances submitted by inmates to monitor quality of care issues and to monitor whether

26   responses to the grievances were responded to within the time set forth in Performance
     Measure 26 (Are responses to health care grievances completed within fifteen (15) working

27   days of receipt (by health care staff) of the grievance? (Id. ¶ 5.)  Inmates file grievances
     when they have an issue with the healthcare they receive.  This includes, but is not limited

28   to, issues related to treatment, medication, co-pays, interpreter services, etc.  (Id. ¶ 6.)

1  healthcare issues (e.g., hearing aids, bottom bunk requests, gastrointestinal complaints, skin

2  problems, asthma medication and inhaler refill requests, a "cold," and a request for a diet

3  card), and healthcare staff  responded appropriately.  (Id. at 11-13.)

4        Since July 1, 2019, it does not appear that health care staff indicated that Inmate

5  ██████ required interpreter services during an encounter.   (See Exh. 5, Decl. J. Gahris, ¶

6  18.)  Inmate ██████ has not filed any medical grievances while in custody.  (See Exh. 2,

7  Decl. L. Gann, ¶ 7.)

8                                                          ████████████

9        Inmate ██████ is a 55-year-old male with a history of hearing loss and speech and

10  language deficit NOS (not otherwise specified), late effects of cerebrovascular disease, and

11  urinary frequency.  (See Exh. 7, Attach. 1, Report of Penn, M.D. at 13.)  Inmate ██████ has

12  no history of mental health services and does not have a SMI designation. (Id.)

13        He was admitted to ADCRR in July 2007, and was released in September 2018, nine

14  months before Centurion began providing inmate healthcare.  (Id.)  Inmate ██████ submitted

15  only one sick call request, on January 14, 2015, complaining he had "trouble urinating, was

16  seen on January 21, 2015, and was provided medication.  (Id.)   His encounter clearly

17  demonstrates that he was able to effectively communicate his healthcare issue, and that

18  healthcare staff responded appropriately.  (Id. at 14-16.)  Inmate ██████ had active Special

19  Needs Orders (SNOs) on file noting that he required hearing aids and hearing aid batteries

20  during his incarceration.  (Id. at 13.)  His hearing aids were repaired at least two times while

21  he was incarcerated.  (Id.)  He was given four hearing aid batteries on February 19, 2016.

22  (Id.)

23        Inmate ██████ was released prior July 1, 2019, and therefore Centurion does not have

24  data on any prior use of language line interpretation services for this inmate.  (See Exh. 5,

25  Decl. of Gahris, ¶ 18.)  Inmate ██████ has not filed any medical grievances while in custody.

26  (See Exh. 2, Decl. L. Gann, ¶ 7.)

27

28

Inmate ███ is a 38-year-old male with a history of deaf mutism disorder (deaf non-speaking not elsewhere classified), chronic hepatitis C, asthma (uncomplicated), xerosis cutis (dry skin), low back pain, allergic rhinitis, partial edentulism (tooth loss), alcohol dependence, cannabis dependence, other stimulant dependence, and other psychoactive substance dependence. (Exh. 7, Attach. 1, Report Penn, M.D., at 16.)   He was released from custody on June 10, 2019, prior to Centurion assuming the provision of healthcare services. (Exh. 5, Decl. J. Gahris, ¶ 18.)

Dating back to his intake in January 2016, Plaintiffs detail five encounters where his deafness is noted (Doc. 3629, Norris Decl. at ¶¶ 89, 91, 93, 95, 97). (Exh. 7, Attach. 1, Report Penn, M.D. at 16.)   Among these encounters, there are multiple references to communications conducted in writing (id. at ¶¶ 93, 97), as well as to the fact that he could read lips (id. at ¶ 95). (Id. at 16.)

An eOMIS review further reveals that detailed and effective communications were had with healthcare staff, and that use of an ASL interpreter may not have been necessary during many of the encounters, particularly depending on the nature and complexity of the encounter. (Id. at 17.) Plaintiffs detail a May 17, 2018 refusal of an appointment by ███ (Doc. 3629, Norris Decl. at ¶ 99). (Id. at 16-17.)   The provider simply noted that ███ had signed a refusal and did not appear for the encounter. (Id.)   Since no encounter occurred, there was no need for the provider to document how effective communication was achieved since he did not interact with the inmate on that date. (Id.)   Inmate ███ was also able to effectively communicate in writing about his healthcare issues (e.g., dental complaints and a request to mental healthcare staff for a television), and healthcare staff responded appropriately. (Id. at 17-18.)

Inmate ███ was released prior July 1, 2019, and therefore Centurion does not have data on any prior use of language line interpretation services for this inmate. (See Exh. 5, Decl. of Gahris, ¶ 18.)  Inmate ███ has not filed any medical grievances while in custody. (See Exh. 2, Decl. L. Gann, ¶ 7.)

1

2      Inmate ███ is a 26-year-old male with a past medical history of congenital

3  deafness, dermatitis, jaw pain status post closed fracture of mandible, angle of jaw. (Exh.

4  7, Attach. 1, Report Penn, M.D., at 18.)   Inmate ███ also received past psychiatric

5  diagnoses of mood disorder, specifically disruptive mood dysregulation disorder, and

6  anxiety disorder, not otherwise specified.  (Id.)  He did not have an SMI designation.  (Id.)

7      Dating back to his intake in May 2017, Plaintiffs detail 10 encounters where his

8  deafness is noted (Doc. 3629, Norris Decl. at ¶¶ 106, 108, 114, 116, 122, 126, 128, 132,

9  134, 142).   (Id. at 19.)   Among these encounters, there are multiple references to

10 communications conducted in writing (id. at ¶¶ 118, 122–123, 126, 128, 132, 134, 142).

11 (Id.)  These facts indicate that there was effective communication with healthcare staff, and

12 that use of an ASL interpreter may not have been necessary during many of these

13 encounters, particularly depending on the nature and complexity of the encounter.  (Id.)

14 Plaintiffs detail a July 7, 2017 ICS response, but that was an emergent situation, where it

15 would be inappropriate to wait for an interpreter to be available before rendering care (id.

16 at ¶ 118.)  (Id.)  An eOMIS review further reveals that Inmate ███ submitted 24 HNRs

17 between mid-2017 and early 2019.  (Id. at 19-20.) He was released from custody in April

18 2019, before Centurion assumed responsibility for providing healthcare.  He was able to

19 effectively communicate in writing his healthcare issues (e.g., dry skin complaints, work

20 related complaints, dental complaints, jaw injury, right leg, hand, feet, and ear pain, a

21 request to healthcare staff for kitchen work approval to be off due to possible illness, and a

22 request to healthcare staff for a vibration/vibrating watch), and healthcare staff responded

23 appropriately. (Id. at 19-20.)

24      Inmate ███ was released prior July 1, 2019, and therefore Centurion does not

25 have data on any prior use of language line interpretation services for this inmate.  (See

26 Exh. 5, Decl. of Gahris, ¶ 18.)  Although Inmate ███ submitted two medical grievances

27 regarding the lack of an ASL interpreter during medical appointments, both grievances were

28 filed during Corizon's tenure.  (See Exh. 2, Decl. L. Gann, ¶¶ 8-9.)

1                                    ███████████

2          Inmate ██████ is a 35-year-old male with a medical history of congenital deaf

3    mutism, dental cavities, pain in left arm (mononeuropathy unspecified). (Exh. 7, Attach. 1,

4    Report Penn, M.D., at 21.)  He has no history of requiring/receiving any mental health

5    services and is not designated as SMI.  (Id.)

6          Dating back to his intake in August 2016, Plaintiffs detail 13 encounters where his

7    deafness is noted (Doc. 3629, Norris Decl. at ¶¶ 147, 149, 151, 155, 157, 159, 163, 165,

8    167, 169, 173, 175, 177).  (Id.) Among these encounters, there are multiple references to

9    communications conducted in writing (id. at ¶¶ 147, 149, 157, 165, 167, 175).  (Id.)  In

10   addition, there is a reference where he refused an ASL interpreter (id. at ¶ 159), where an

11   ASL interpreter was attempted, but could not connect via videoconference (id. at ¶ 167),

12   and where an ASL interpreter was present via videoconference (id. at ¶¶ 169, 175, 177).

13   (Id.) These facts indicate that there was effective communication with healthcare staff, and

14   that use of an ASL interpreter may not have been necessary during all encounters,

15   particularly depending on the nature and complexity of the encounter.[8]  (Id.)

16         An eOMIS review further reveals that Inmate ██████ submitted 12 HNRs between

17   December 2018 and April 2020, and that he was able to effectively communicate in writing

18   his healthcare issues (e.g., a request for a low bunk, mouth pain, tooth pain, ear pain, nausea,

19   vomiting, gastrointestinal complaints, and a request for a television), and healthcare staff

20   responded appropriately.  (Id. at 22.)

21

22

23         [8] Plaintiffs misclassify two encounters (id. at ¶¶ 161, 171) where ██████ refused
     medical care.  There, medical staff noted that he did not appear for appointments and refusal
24   forms were submitted.  In such instances, an interpreter is not necessary because the inmate
     was not present.  Plaintiffs also note a March 11, 2020 encounter when ██████ was on watch
25   status (id. at ¶ 175.) Since watch contacts often occur at or near the watch cells, where
     videoconference equipment is not located, it may not be medically appropriate to transport
26   the inmate away from the area to permit videoconference interpreter use.  Further, the
     purpose of the watch encounter is to assess the inmate for potential for self-harm, which
27   typically is not a complicated encounter.  In this instance, the provider noted that paper was
     used to communicate effectively, which is appropriate under the circumstance.  (Exh. 7,
28   Attach. 1, Report Penn, M.D., at 21.)

Since July 1, 2019, the LanguageLine was used three times to provide interpretation services to Inmate ███. Inmate ███ refused translation services at one encounter. (See Exh. 5, Decl. J. Gahris, ¶¶ 19, 21.) Although he filed one medical grievance regarding the lack of an ASL interpreter during medical appointments, he submitted the grievance during Corizon's tenure.   (See Exh. 2, Decl. L. Gann, ¶¶ 8, 10.)

███████

Inmate ███ is a 49-year-old male with a past medical history of deaf mutism, deaf nonspeaking not otherwise classified, hydronephrosis with renal and ureteral calculous obstruction, cellulitis and a cutaneous abscess of buttock, chronic low back pain, dental cavities, onychomycosis, and tinea unguium. (Exh. 7, Attach. 1, Report Penn, M.D., at 22.) Inmate ███ has no history of mental health services and does not have a SMI designation. (Id. at 23.)

Dating back to his intake in October 2018, Plaintiffs detail 10 encounters where his deafness is noted (Doc. 3629, Norris Decl. at ¶¶ 182, 186, 192, 196, 198, 200, 201, 204, 206). (Id.) Among these encounters are multiple references to communications conducted in writing (id. at ¶¶ 188, 192, 196, 198, 200, 204), as well as a request for hearing aids (id. at ¶¶ 188 and 190). (Id.) In addition, there is a reference that a mental health staff member provided ASL interpretation (id. at ¶ 188), where a TTY device was attempted to be used during an emergent walk-in encounter on February 11, 2019 (id. at ¶ 196), and where an inmate ASL interpreter came with him to a dental appointment (id. at ¶ 201). (Id.) These facts indicate that there was effective communications with healthcare staff , and that use of an ASL interpreter may not have been necessary during many of these encounters, particularly depending on the nature and complexity of the encounter, or if he had his hearing aids on. (Id.) Further, with respect to the February 11, 2019 emergency walk-in encounter (id. at ¶ 196), while the use of a TTY was attempted, in an emergent situation it is not appropriate to delay emergent care while awaiting use of assistive devices. (Id.)

An eOMIS review further reveals that Inmate ███ submitted 26 HNRs between October 2018 and July 2020, and that he was able to effectively communicate in writing his

healthcare issues (e.g., dental and tooth pain complaints, requests for fillings, a request for new hearing aids, a request for a cotton blanket instead of a wool blanket, changes to emergency family contact information, nail issues, a request for a flu shot and COVID-19 testing, and a request for a low bunk and an alarm clock), and healthcare staff  responded appropriately.  (Id. at 23-25.)

Since July 1, 2019, it does not appear that health care staff indicated that Inmate ███████ required interpreter services during an encounter.   (See Exh. 5, Decl. J. Gahris, ¶ 18.)  Inmate ████ has not filed any medical grievances regarding his medical care.  (See Exh. 2, Decl. L. Gann, ¶ 7.)

███████████████

Inmate ████ (deceased April 4, 2020, after being found nonresponsive in his cell) was a deaf, 57-year-old male. (Exh. 7, Attach. 1, Report Penn, M.D., at 25.)  He had a past medical history significant for mixed conductive and sensorineural hearing loss, bilateral (disorder), unspecified abdominal hernia without obstruction or gangrene versus bilateral inguinal hernia, without obstruction or gangrene, not specified as recurrent, and onychomycosis, tinea and uguium. (Id. at 26.)  Dating back to March 2016, Plaintiffs detail five encounters where his deafness is noted (Doc. 3629, Norris Decl. at ¶¶ 209, 211, 215, 217, 221).  (Id.)    Among these encounters, there are references to communications conducted in writing (id. at ¶¶ 211, 221), as well as a request for a specific inmate ASL interpreter to be assigned to him (id. at ¶ 209).  (Id.)  These facts indicate that there was effective communication with healthcare staff, and that use of an ASL interpreter may not have been necessary during many of these encounters, particularly depending on the nature and complexity of the encounter.  The final three encounters relate to an ICS incident where Inmate ████ was found unresponsive (id. at ¶ 221) and two subsequent nursing rounds in the IPC or infirmary (id. at ¶¶ 223, 225).  (Id.)  In such emergent situations, and when an inmate is not responsive, it is medically inappropriate and/or unnecessary to delay care until the inmate can be connected via videoconference with an ASL interpreter.  (Id.)

An eOMIS review further reveals that Inmate ███ submitted 69 HNRs between July 2014 and January 2020. (Id. at 27 -31.) These requests demonstrate that he was able to effectively communicate in writing his healthcare issues (e.g., dental pain, hernia pain, a request for an audiology evaluation, new hearing aids and a cochlear implant, a request for a flu shot, requests to review copies of his medical records, hearing aid batteries, Vitamin C, and lubricating lotion), and healthcare staff responded appropriately. (Id.)

Since July 1, 2019, it does not appear that health care staff indicated that Inmate ███ required interpreter services during an encounter. (See Exh. 5, Decl. J. Gahris, ¶ 18.) Inmate ███ did not file any medical grievances while in custody. (See Exh. 2, Decl. L. Gann, ¶ 7.)

███████

Inmate ███ is a 31-year-old male with a medical history of chronic hepatitis C, dry eye syndrome of unspecified lacrimal gland, priapism, and unspecified and syndrome of inappropriate vasopressin secretion. (Exh. 7, Attach. 1, Report Penn, M.D., at 32.) Inmate ███ has a history of outpatient regular mental health contact (services) for unspecified mood [affective] disorder and does not have a SMI designation. (Id.)

Plaintiffs note several encounters that explicitly note that LanguageLine services (Spanish) were used to provide translation services for him (Doc. 3629, Norris Decl. ¶¶ 236, 240, 248), as well as an instance where he was able to communicate in English (id. at ¶ 244). (Id.) Of the instances where no interpreter was needed, it is likely that the medical professional was also proficient in Spanish and therefore did not need a third party to provide interpretation services.[9] (Id.) Two of the encounters that Plaintiffs detail—a May 19, 2019 refusal relating to a chronic care appointment and a July 29, 2019 medication evaluation using the Abnormal Involuntary Movement Scale (id. at ¶¶ 230, 242)—are not

---

[9] Where SOAPE notes are detailed as to inmate subjective reports, it is reasonable to conclude that the medical staff member was proficient in the language spoken by the inmate. Otherwise, the medical staff member could not document what the inmate said during the encounter. (Exh. 7, Attach. 1, Report Penn, M.D., at 69.)

1    complex medical encounters, and can be effectively completed with simple written prompts

2    or by proficient Spanish speaking providers.  (Id.)

3         An eOMIS review further reveals that Inmate ███████ submitted 37 HNRs

4    between April 2015 and May 2020. Several HNRs were submitted in Spanish and then

5    translated by healthcare or administrative staff.  (Id. at 32-36.)  These requests demonstrate

6    that Inmate ███████ has been able to effectively communicate in writing his healthcare

7    issues (e.g., vision issues, a request for new eyeglasses, skin and ear problems, ankle pain,

8    request for Hepatitis C treatment, change/resume his antidepressant anti-anxiety

9    medications, hearing voices and trouble sleeping, a request to see the unit mental health

10   staff, testicular pain, request for a special protein diet, and requests for teeth cleaning), and

11   healthcare staff  responded appropriately.  (Id.)

12        Since July 1, 2019, the LanguageLine was used 15 times to provide interpretation

13   services for Inmate ███████ and healthcare staff was used once. Inmate ███████

14   refused translation services at one encounter. (See Exh. 5, Decl. J. Gahris, ¶¶ 19, 22.) He

15   has not filed any medical grievances regarding his medical care.  (See Exh. 2, Decl. L.

16   Gann, ¶ 7.)

17                              ████████████████

18        Inmate ████ is a 60-year-old male with a past medical history of acoustic nerve

19   disorder, hypertension, thyroid cancer, chronic obstructive pulmonary disease (COPD),

20   Type 2 diabetes mellitus without complications, gastroesophageal reflux disease without

21   esophagitis (GERD), universal ulcerative colitis, non-ST elevation (NSTEMI) myocardial

22   infarction, atherosclerotic heart disease of native coronary artery without angina pectoris,

23   status post diverticulitis of large intestine with perforation and abscess without bleeding,

24   status post-acute abdomen, acute ileus, constipation, urinary hesitancy due to benign

25   prostatic hypertrophy, asthma, hypothyroidism, unspecified; bronchitis, scrotal varices, and

26   unspecified abdominal hernia without obstruction or gangrene.  (Exh. 7, Attach. 1, Report

27   Penn, M.D., at 36.)  Inmate ████ previously received mental health services but does not

28   have a SMI designation.  (Id. at 37.)

1      Plaintiffs detail only four encounters where it was not indicated what type of

2  language accommodations (Spanish) were provided for him (Doc. 3629, Norris Decl. at ¶¶

3  255, 257, 259, 261).  (Id. at 36.)  But if the providers were proficient Spanish language

4  speakers, then there was no need to use further interpretation services.  (Id.)  An eOMIS

5  review further reveals that Inmate ███ submitted five HNRs between November 2015 and

6  December 2019, and that he was able to effectively communicate in writing his healthcare

7  issues (e.g., blood in stool, tooth extraction, psychotropic medication refusal, concerns

8  regarding hernia and stomach surgery), and that healthcare staff  responded appropriately.

9  (Id. at 37.)

10      Since July 21 2019, it does not appear that health care staff indicated that Inmate

11  ███ required interpreter services during an encounter.  (See Exh. 5, Decl. J. Gahris, ¶ 18.)

12  Inmate ███ has not filed any medical grievances regarding his medical care.  (See Exh. 2,

13  Decl. L. Gann, ¶ 7.)

14                              ████████████████

15      Inmate ████████ is a 43-year-old  male with a past medical history of diabetes

16  mellitus due to underlying condition with diabetic neuropathy (unspecified), hypertension,

17  hyperlipidemia, enlarged prostate with lower urinary tract symptoms, weak urinary stream

18  due to benign prostatic hypertrophy, low back pain, iron deficiency anemia, foot fungus,

19  and other various issues now resolved. Inmate ████████ has a psychiatric history of

20  unspecified psychosis not due to a substance or known physiological condition, mood

21  disorder (not otherwise specified), and anxiety disorder (unspecified). (Exh. 7, Attach. 1,

22  Report Penn M.D., at 37.)  Inmate ████████ has a history of outpatient mental health

23  services for acute distress and does have an outpatient SMI designation.   (Id.)

24      Plaintiffs identify one encounter—a May 7, 2020 mental health individual

25  counseling session—which indicates that Spanish-language proficient healthcare staff

26  provided translation services for him (Doc. 3629, Norris Decl. ¶ 276).  (Id. at 37-38.)

27  Plaintiffs note six other encounters where it was not documented that translation services

28  were needed (id. at ¶¶ 266, 268, 269, 272, 274, 278), but given the relatively small number

of encounters (and their detailed nature), it is likely that healthcare staff were proficient Spanish speakers and effectively communicated with him. (Id. at 38.)  Moreover, healthcare staff noted in September 2019 that Inmate ███████ speaks English clearly, but writes in Spanish because he cannot write in English.  (Id.)

An eOMIS review further reveals that Inmate ███████ submitted 104 HNRs between October 2014 and July 2020.  (Id. at 39.)  One request (dated December 2, 2019) is particularly detailed:  "I work in the kitchen, on Friday when it was raining I slipped and fell with the water. My right knee hurts because I landed on it and my left hand and it hurt my left shoulder, my left hip also hurts, left side of my neck also. I have a lot of pain. S.M.I." (Id.)  Nursing staff assessed Inmate ███████ that same day. (Id.)  These requests demonstrate that he has been able to effectively communicate in writing his healthcare issues (e.g., numerous physical complaints such as headaches, cough, varying medication refill requests, urination issues, gastrointestinal complaints, requests to see nursing staff and/or mental health staff, a request for a medical pillow, sunscreen, wide brimmed hat, long sleeved shirts to prevent sunburn, skin lubricant, a request to see mental health staff about receiving SMI designation and a television, low bunk requests), and healthcare staff responded appropriately. (Id. at 39-46.)  Of note, a few HNRs were submitted in Spanish and then translated by healthcare or administrative staff.  (Id. at 39.)

Since July 1, 2019, healthcare staff was used four times to provide interpretation services for Inmate ███████. (See Exh. 5, Decl. J. Gahris, ¶¶ 19, 23.) Inmate ███████ has not filed any medical grievances regarding his medical care.  (See Exh. 2, Decl. L. Gann, ¶ 7.)

███████

Inmate ███ is a 62-year-old male with a past medical history significant for deaf nonspeaking (not elsewhere classified), constipation, other chronic pain, asthma, esophageal reflux versus gastro-esophageal reflux disease without esophagitis, and back disorder (not otherwise specified). (Exh. 7, Attach. 1, Report Penn, M.D. at 61.)  Inmate

24

1    ██████ has a mental health designation, Outpatient-Specialized MH Program, but does not

2    have an SMI designation.  (Id. at 62.)

3        Plaintiffs detail five encounters where accommodations were used to effectively

4    communicate with him. Some encounters used written communication (Doc. 3629, Norris

5    Decl. at ¶¶ 281, 283), one references the use of an ASL inmate aide (id. at ¶ 285), one

6    references the use of an ASL interpreter (id. at ¶ 286), and one documents that ASL

7    proficient security personnel provided interpretation, with Inmate ██████ consent (id. at ¶

8    289). (Id. at 62.)   These encounters demonstrate both an awareness of Inmate ██████

9    hearing impairment, and the provision of appropriate language accommodations.  (Id. at 62-

10   67.)

11       An eOMIS review reveals that Inmate ██████ submitted 23 HNRs between December

12   2014 and May 2020 which demonstrates that he has been able to effectively communicate

13   in writing his healthcare issues (e.g., toe nail trimming, medication renewals, diabetic diets,

14   soft mechanical diets, upper respiratory illness complaints, rubber pegs for his cane, and

15   eye glasses), and healthcare staff responded appropriately.  (Id. at 62-67.)

16       Since July 1, 2019, healthcare staff was used two times to provide interpretation

17   services for Inmate ██████.  (Exh. 5, Decl. J. Gahris, ¶¶ 19, 24.) Inmate ██████ has not filed

18   any medical grievances while in custody.  (See Exh. 2, Decl. L. Gann, ¶ 7.)

19                          ██████████████████

20       Inmate ██████████ is a 36-year-old male with a past medical history of abdominal

21   pain, painful urination, skin rash, hemorrhoids, and left shoulder pain.  (Exh. 7, Attach. 1,

22   Report Penn, M.D., at 47.)  Inmate ██████████ has no history of mental health services and

23   does not have a SMI designation.  (Id.)

24       Plaintiffs detail two walk-in nursing sick call encounters where Spanish-language

25   proficient health services personnel were used to provide translation services (Doc. 3629,

26   Norris Decl. at ¶¶ 293, 295).  (Id.)  Plaintiffs also note four encounters with the same mid-

27   level provider, where interpretation services were not marked as necessary (id. at ¶¶ 297,

28

299, 301, 303).  (Id.)  It is probable that this provider is Spanish language-proficient and therefore would not require a translator for effective communication.  (Id.)

An eOMIS review further reveals that Inmate ████ submitted 12 HNRs between July 2018 and July 2020, which demonstrates that he has been able to effectively communicate in writing his healthcare issues (e.g., left knee pain, eye pain, flu symptoms, stomach complaints, lab results, request for COVID-19 testing, several requests for timeframe, dates, status clarification re: specialty GI consultation, possible skin allergic reaction, and a request for a physical exam), and healthcare staff  responded appropriately.  (Id. at 48-49.)  Of note, a majority of the HNRs were submitted in Spanish and then translated by healthcare or administrative staff.  (Id. at 48.)

Since July 1, 2019, healthcare staff was used four times to provide interpretation services for Inmate ████.  (See Exh. 5, Decl. J. Gahris, ¶¶ 19, 25.)  Inmate ████ has not filed any medical grievances regarding his medical care.  (See Exh. 2, Decl. L. Gann, ¶ 7.)

████████████

Inmate ████ is a 52-year-old transgender (trans female) female with a past medical history of Hepatitis C, allergic rhinitis, constipation, hypothyroidism, hyperlipidemia, status post/history of bilateral orchiectomy, allergic dermatitis, candidiasis, low back pain, pyogenic granuloma, and dental cavities.  (Exh. 7, Attach. 1, Report Penn, M.D., at 49.)  Inmate ████ has past psychiatric diagnoses of gender dysphoria (formerly known as gender identity disorder), unspecified mood [affective] disorder, combination/combined drug dependence, and schizophrenia.  (Id. at 49-50.)  Inmate ████ has a mental health designation, Outpatient-Specialized MH Program, for gender dysphoria, but does not have a SMI designation.  (Id. at 50.)

Plaintiffs detail five encounters where Spanish-language translation services were provided (Doc. 3629, Norris Decl. ¶¶ 307, 309, 311, 313, 315).  (Id. at 50.)  Of these, two were with the same Psych Associate who Inmate ████ recognized as speaking Spanish (id. at ¶¶ 307, 309; Doc. 3630, Exh. 165, ████ Decl., ¶¶ 7–8), one was an encounter with

a mid-level provider where a Spanish language proficient nurse was present and provided translation services (id. at ¶ 311; Doc. 3630, Exh. 165, ███ Decl., ¶ 9), and one was an encounter where Inmate ███ did not want to wait for use of the LanguageLine and admitted that effective communication was held in simple English (id. at ¶ 315; Doc. 3630, Exh. 165, ███ Decl., ¶ 12). (Id.) The last encounter was a January 13, 2020 Group Counseling encounter where no interpreter was identified as being present (id. at ¶ 313.) (Id.) Depending on the group dynamics, it may not be appropriate to have a translator present, which can frustrate and interfere with the therapeutic benefit to English speaking members of the group. (Id.) However, the appropriate course of action was undertaken by the providers, as acknowledged by Inmate ███, through the creation of a Spanish-language group. (Id.; Doc.3630, Exh. 165, ███ Decl., ¶ 11.)

An eOMIS review further reveals that Inmate ███ submitted 133 HNRs between October 2014 and October 2019, which demonstrates that Inmate ███ has been able to effectively communicate in writing his healthcare issues (e.g., renewals, increases, or adjustments to estrogen/feminizing hormones, requests to be re-evaluated by endocrinology for hormone treatment and dose increases, suicidal thoughts and suicide monitoring when hormones held/not prescribed, sports bra due to breast growth, HIV testing, flu symptoms, nail clippers, lab testing, headaches/migraines, dental requests, mouth lesion causing distress, glasses, request for Dove soap, request for physical examination, possible allergy to Dove soap, requests for KOP (keep on person) medications, back pain, and request for a back brace), and healthcare staff  responded appropriately. (Id. at 50-61.)

Since July 1, 2019, the LanguageLine was used once to provide interpretation services to Inmate ███ and healthcare staff was used twice. (See Exh. 5, Decl. J. Gahris, ¶¶ 19, 26.) Inmate ███ has submitted seven medical grievances, all before Centurion was the healthcare vendor. None of the grievances complained about interpreter services. (See Exh. 2, Decl. L. Gann, ¶¶ 8, 12.)

In sum, healthcare staff has been able to appropriately and effectively communicate with inmates regarding their medical care. Plaintiffs fail to prove that any individual, let

along systemic, communication challenges resulted in a constitutional injury, or that Defendants were deliberately indifferent to a serious medical need. [10] Either the LanguageLine or healthcare staff interpretation were appropriately utilized, or no translation services were required under the circumstances.   Only two inmates filed grievances regarding the lack of ASL services but those were filed during Corizon's tenure. Furthermore, the lack of grievances is compelling evidence that there is not a systemic interpreter issue. Plaintiffs' anecdotal challenges to translation services fail to establish substantial noncompliance with Paragraph 14.

---

[10] Plaintiffs rely on the opinions of Dr. Pablo Stewart.  However, it is unclear whether Dr. Stewart is board certified in forensic psychiatry, a subspecialty of general psychiatry. Dr. Stewart also lacks experience as a staff psychiatrist either in a direct clinical or administrative capacity in any state or federal prison system.  While Dr. Stewart's CV notes that he was employed for a little over a year as the Director, Forensic Psychiatric Services, for the City and County of San Francisco, which included direct clinical and administrative responsibility of the Jail Psychiatric Services and Forensic Unit at San Francisco General Hospital, the patient population would have been jail inmates, not prison inmates. There are significant clinical, evaluation, and treatment differences between jail and prison inmates and populations.  Dr. Stewart's conclusory opinions are questionable, at best, given his stark clinical inexperience in any state or federal prison system.  (See generally, Exh. 7, Attach. 1, Report Penn, M.D, at 70-77.)

By contrast, Dr. Penn, who offers opinions in support of Defendants' Response, is triple-certified in forensic psychiatry, general psychiatry, and child and adolescent psychiatry by the American Board of Psychiatry and Neurology (ABPN).  Since 1998, he has focused his clinical, administrative, and forensic work within adult and juvenile correctional settings, including jails, prisons, and juvenile detention facilities.  Dr. Penn remains current in the evaluation, diagnosis, and treatment of individuals within both correctional and non-correctional settings as demonstrated by his national board re-certification and maintenance of certification within general, child and adolescent, and forensic psychiatry.  Since 2008, Dr. Penn has served as the Director of Mental Health Services for UTMB Correctional Managed Care (CMC).  He oversees the provision of psychiatric, psychological, and mental health services to approximately 80% (approximately 110,000 adult offenders) of the entire Texas state jail and state adult prison population housed within the Texas Department of Criminal Justice (TDCJ) facilities statewide. He also oversees the delivery of psychiatric services to approximately 1,000 youths housed statewide within state juvenile correctional institutional facilities (referred to as state schools) and halfway houses within the Texas Juvenile Justice Department (TJJD). Dr. Penn additionally oversees the delivery of psychiatric services to several county jails and short term detention facilities in Texas.  (Id. at 2-3).

**IV.  Plaintiffs' Requested Relief Impermissibly Seeks to Rewrite the Stipulation and Imposes Additional Obligations on Defendants.**

This Court has admonished that it will not undue rulings previously issued by Judge Duncan or deviate from the rationale of prior rulings.  (See, e.g., Doc. 3232 at 1; Trans. 12/6/18 at 14:22-25, 16:14-17:7, 30:20-31:9, 31:7-9.)

On September 6, 2016, Judge Duncan ruled that the requirements of Paragraph 14 "are not categorized as Performance Measures in the Stipulation.  Accordingly, these requirements do not need to be monitored according to the same metric as Performance Measures."  (Doc. 1673 at 1-2.)  While Defendants must still comply with Paragraph 14, monthly CGAR reporting is not required.  (Id. at 2.)  As discussed above, Defendants are in compliance with Paragraph 14.

Plaintiffs improperly seek an expansion of the Stipulation and the creation of unnecessary new Performance Measures.  Plaintiffs' misguided attempt has already been rejected once by the Court and should not be reversed now, nearly four years later.  As for Plaintiffs' first request for relief—implementation of a system that identifies inmates during medical intake who are not fluent in English—Defendants and Centurion are already doing this (and have been since 2017). The eOMIS "hard stop" function is utilized during the first medical assessment encounter during intake.  The eOMIS records relied upon by Plaintiffs reveal regular documentation by healthcare providers as to what language challenge prompted a "yes" finding.  There is no need to track inmates who are not fluent in English "at a later time" when eOMIS contemporaneously maintains all prior encounters on an ongoing basis.  Likewise, inmates are already informed how to request interpreter services and healthcare staff is trained on how to secure those services.

Plaintiffs' second request for relief —creation of a process to identify, evaluate, and train "qualified healthcare practitioners" who have non-English language proficiency— far exceeds not only the Stipulation, but the standard of care and is not required.[11]  Moreover,

---

[11] Defendants maintain that Plaintiffs' request for identification of all healthcare staff that speak languages other than English exceeds the scope of the Stipulation and unnecessarily leads to further demands for qualitative assessment and testing of healthcare

1   Plaintiffs' request would create an untenable patchwork of qualitative assessment and
2   testing of healthcare practitioner language skills, which would inevitably lead to the judicial
3   mandating of hiring a certain number and type of staff (certified translators), in violation of
4   Paragraph 36's no-staffing provision.  (Doc. 1185, ¶ 36.)

5        Plaintiffs' third request for relief seeks to create new Performance Measures that
6   require qualitative analysis of both translation needs and provision of services.  Plaintiffs
7   demand that Defendants run reports every month "for all class members who are not fluent
8   in English and determin[e] whether appropriate interpretation in fact was provided."  (Doc.
9   3623 at 17.)  Plaintiffs likewise demand that Defendants determine compliance for *every*
10  *healthcare encounter*, report the compliance numbers, and provide Plaintiffs with all source
11  documents used to support the compliance computation.  The Court has already rejected
12  Plaintiffs' argument that newly created Performance Measures could govern Paragraph 14.
13  Plaintiffs' demand exceeds even the scope of existing monitoring methodologies for
14  Performance Measures, where a small random selection of inmate files is audited at each
15  applicable complex/unit.  Plaintiffs' demand requires qualitative auditing of every single
16  healthcare encounter for every single inmate who may not be fluent in English. To perform
17  such qualitative review would necessarily require an interview of both the healthcare
18  provider and the inmate as to every single encounter that inmate had in a month.  This
19  demand is unduly burdensome, not supported by any precedent in this case or any other
20  case, and far exceeds the scope of the Stipulation and the standard of care.

21  **V.   Conclusion.**

22       For these reasons, Plaintiffs' Motion to Enforce should be denied and Defendants
23  awarded their reasonable attorneys' fees and costs incurred in responding to Plaintiffs'
24  Motion.

25

26

27  practitioner's language skills.  However, in so responding to Plaintiffs' Motion, Defendants
    have provided survey statistics regarding the breadth of languages spoken by a cross section
28  of Centurion's healthcare staff.  (Exh. 3, Decl. T. Dolan, ¶5.)

1     DATED this 27th day of July, 2020.

2                                                STRUCK LOVE BOJANOWSKI & ACEDO, PLC

3

4                                                By /s/Rachel Love
                                                    Daniel P. Struck
5                                                   Rachel Love
                                                    Timothy J. Bojanowski
6                                                   Nicholas D. Acedo
                                                    3100 West Ray Road, Suite 300
7                                                   Chandler, Arizona 85226

8                                                   *Attorneys for Defendants*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |

I hereby certify that on July 27, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:             ahardy@prisonlaw.com

Amelia M. Gerlicher:      agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

Asim Dietrich:            adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Corene T. Kendrick:       ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:      DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:        dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:           dspecter@prisonlaw.com

John Howard Gray:         jhgray@perkinscoie.com; slawson@perkinscoie.com

Jose de Jesus Rico:       jrico@azdisabilitylaw.org

Maya Abela                mabela@azdisabilitylaw.org

Rose Daly-Rooney:         rdalyrooney@azdisabilitylaw.org

Sara Norman:              snorman@prisonlaw.com

Rita K. Lomio:            rlomio@prisonlaw.com

Eunice Cho                ECho@aclu.org

Jared G. Keenan           jkeenan@acluaz.org

Casey Arellano            carellano@acluaz.org

Maria V. Morris           mmorris@aclu.org

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Rachel Love