1  Jared G. Keenan (Bar No. 027068)
   Casey Arellano (Bar No. 031242)
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone: (602) 650-1854
4  Email: jkeenan@acluaz.org
              carellano@acluaz.org
5
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
6  *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy*
   *Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,*
7  *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
   *behalf of themselves and all others similarly situated*
8  **[ADDITIONAL COUNSEL LISTED ON SIGNATURE**
   **PAGE]**
9
   Asim Dietrich (Bar No. 027927)
10 **ARIZONA CENTER FOR DISABILITY LAW**
   5025 East Washington Street, Suite 202
11 Phoenix, Arizona 85034
   Telephone: (602) 274-6287
12 Email: adietrich@azdisabilitylaw.org
13 *Attorneys for Plaintiff Arizona Center for Disability Law*
   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE**
14 **PAGE]**

15              UNITED STATES DISTRICT COURT

16                   DISTRICT OF ARIZONA

17 Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-ROS
   Dustin Brislan; Sonia Rodriguez; Christina
18 Verduzco; Jackie Thomas; Jeremy Smith; Robert
   Gamez; Maryanne Chisholm; Desiree Licci; Joseph        **PLAINTIFFS' REPLY TO**
19 Hefner; Joshua Polson; and Charlotte Wells, on         **DEFENDANTS' RESPONSE**
   behalf of themselves and all others similarly          **TO ORDER TO SHOW**
20 situated; and Arizona Center for Disability Law,       **CAUSE (Dkt. 3490)**
                                                          **[DOC. 3649]**
21                       Plaintiffs,

22          v.

23 David Shinn, Director, Arizona Department of
   Corrections; and Larry Gann, Division Director,
24 Division of Health Services Contract Monitoring
   Bureau, Arizona Department of Corrections, in their
25 official capacities,

26                       Defendants.

27

28

LEGAL23774493.1

1

**INTRODUCTION**

2

The Court's January 31, 2020 Order to Show Cause ("OSC") is unequivocal:

3

4

5

6

7

8

> For the Performance Measures identified above that were compliant in the most recent numbers, Defendants must ensure those Performance Measures remain compliant. If Defendants do not bring every Performance Measure into compliance, or if Defendants allow any previously-compliant Performance Measure to become non-compliant, the Court will impose contempt sanctions unless Defendants can establish they took all reasonable steps to achieve compliance but still fell short. If Defendants are found in contempt, the Court will impose a fine of $100,000 per Performance Measure per location to coerce compliance with this Order. The fines will recur on a monthly basis until Defendants bring each Performance Measure and location into compliance.

9

Doc. 3490 at 3.[1]

10

11

12

13

14

15

16

17

18

19

20

Defendants concede that in February 2020 they were noncompliant with 20 measures in the OSC, which would subject them to a $ 2,000,000 fine for that month alone. [Doc. 3649 at 50] They try to minimize their noncompliance because they were "technically noncompliant[,]" "[m]any fell short of compliance by just a few inmate files[,]" "[m]any were beyond Defendants' control[,]"or there were "inadvertent reasons" for noncompliance. Doc. 3649 at 30, 50. But this is not the legal standard for contempt. And more importantly, subsequent monthly audits show an ongoing failure to comply with the OSC, or show that measures in the OSC that were compliant in February slipped out of compliance more recently. This raises the obvious question whether the frantic scrambling described in Defendants' Response is a sustainable, long-term reform to a broken health care system, or just a reactive game of whack-a-mole.

21

22

23

24

As detailed in Table 1, Defendants showed some improvement in March (15 PMs noncompliant) and April (eight noncompliant), but the May report shows 21 PMs in the OSC as noncompliant.[2] This noncompliance with the OSC through the last month for which Defendants provided reports therefore amounts to $ 6.4 million in contempt fines.

25

26

27

28

[1] All docket citations are to the page number assigned by the Court's electronic filing system.

[2] Defendants assert they "interpret the OSC as requiring them to show cause as to why sanctions should not be imposed for noncompliance in February 2020," (Doc. 3649 at 26 n.10), although the OSC explicitly states that fines will "recur on a monthly basis" and offers the example of future sanctions in months after February. Doc. 3490 at 3.

1

**Table 1: Noncompliant Performance Measures in the Court's OSC[3]**

| PM | Prison | Feb. 2020 (20 PMs) | March 2020 (15 PMs) | April 2020 (8 PMs) | May 2020 (21 PMs) |
|----|--------|--------------------|---------------------|--------------------|--------------------|
| 11 | Eyman | 86% | 82% | 86% | 82% |
| 11 | Lewis | 85% | 85% | 84% | 99% |
| 11 | Tucson | 82% | 95% | 88% | 97% |
| 15 | Eyman | 70% | 98% | 95% | 94% |
| 35 | Florence | 98% | 96% | 89% | 75% |
| 37 | Lewis | 82% | 90% | 93% | 97% |
| 37 | Tucson | 79% | 85% | 91% | 85% |
| 37 | Yuma | 86% | 92% | 84% | 80% |
| 39 | Eyman | 88% | 90% | 86% | 78% |
| 40 | Tucson | 78% | 64% | 100% | 80% |
| 44 | Eyman | 46% | 39% | 75% | 53% |
| 44 | Florence | 56% | 68% | 73% | 74% |
| 44 | Lewis | 76% | 85% | 78% | 77% |
| 44 | Tucson | 72% | 61% | 58% | 80% |
| 47 | Douglas | 80% | 87% | 100% | 94% |
| 47 | Florence | 85% | 82% | 89% | 94% |
| 47 | Phoenix | 50% | 100% | 75% | 80% |
| 49 | Eyman | 75% | 100% | 100% | 100% |
| 50 | Florence | 57% | 40% | 100% | 82% |
| 50 | Tucson | 60% | 68% | 100% | 69% |
| 51 | Eyman | 38% | 34% | 92% | 80% |
| 51 | Florence | 40% | 58% | 96% | 98% |
| 51 | Perryville | 91% | 83% | 97% | 100% |
| 51 | Tucson | 65% | 68% | 96% | 77% |
| 52 | Eyman | 90% | 71% | 86% | 86% |
| 52 | Florence | 90% | 81% | 86% | 87% |
| 52 | Perryville | 90% | 81% | 91% | 95% |
| 52 | Tucson | 82% | 86% | 91% | 91% |

---

[3] This omits the PMs in the OSC which the Court ordered, or the parties stipulated, terminated. [*See* Doc. 3575-1] This only lists the PMs in the OSC with which Defendants were substantially noncompliant in any of the four months. Their February-May 2020 reports also demonstrate substantial noncompliance for multiple PMs not in the OSC.

| PM | Prison | Feb. 2020 (20 PMs) | March 2020 (15 PMs) | April 2020 (8 PMs) | May 2020 (21 PMs) |
|---|---|---|---|---|---|
| 55 | Eyman | 76% | 86% | 86% | 84% |
| 66 | Florence | 96% | 99% | 100% | 83% |
| 66 | Lewis | 99% | 95% | 100% | 84% |
| 66 | Tucson | 96% | 100% | 100% | 81% |
| 67 | Lewis | 97% | 99% | 100% | 66% |
| 67 | Tucson | 94% | 99% | 100% | 57% |
| 85 | Eyman | 100% | 89% | 75% | 88% |
| 98 | Eyman | 88% | 96% | 92% | 84% |
| 98 | Lewis | 81% | 98% | 93% | 92% |
| 98 | Winslow | 70% | 100% | 91% | 100% |

[*See* Doc. 3662-1, *generally*]

## ARGUMENT

### I.    Legal and Procedural Requirements for Civil Contempt

This Court can enforce compliance with its orders through civil contempt. *Parsons v. Ryan*, ("*Parsons III*"), 949 F.3d 443, 454 (9th Cir. 2020); *see also* 18 U.S.C. § 401(d) ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as [. . .] [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."); *Spallone v. United States*, 493 U.S. 265, 276 (1990) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt"). This power is heightened when—as here—a court has overseen litigation and noncompliance with injunctive relief by a governmental institution for a long period of time. The Supreme Court has held that "[a] court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Brown v. Plata*, 563 U.S. 493, 542 (2011); *see also McComb v. Jacksonville Paper Co*., 336 U.S. 187, 192-93 (1949) (holding that a party's "record of continuing and persistent violations" with decree was relevant to a finding of contempt); *Armstrong v. Brown*, 768 F.3d 975,

1   986 (9th Cir. 2014) ("The ongoing, intractable nature of this litigation affords the district

2   court considerable discretion in fashioning relief").

3        Prior to holding a party in civil contempt, a court must find by clear and convincing

4   evidence that:

5        (1)    a valid court order exists that is "specific and definite" (*Balla v. Idaho State*

6   *Bd. of Corrs.*, 869 F.2d 461, 465 (9th Cir. 1989));

7        (2)    the party had notice of the order and an opportunity to be heard about the

8   alleged noncompliance (*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S.

9   821, 827 (1994) ("*Bagwell*"); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999));

10  and

11       (3)    the party failed to take "all reasonable steps to comply with the order."

12  *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original).

13  **II.**    **Defendants Are in Civil Contempt of the Court's OSC**

14      **A.**    **The OSC Is Specific and Definite**

15       The OSC is specific and definite; Defendants do not argue otherwise.  The Court

16  should find by clear and convincing evidence that the order directing Defendants to bring

17  specified PMs / institutions into substantial compliance with the Stipulation requirements

18  was specific and definite, as required by the legal standard.  *Balla*, 869 F.2d at 465.

19      **B.**    **Defendants Had Notice of the OSC and Have Been Heard**

20       Defendants cannot and do not argue that they were unaware of the OSC or the

21  requirements of the Stipulation.  Given the parties entered into the Stipulation in October

22  2014, Defendants cannot argue they are unaware of its requirements.  Defendants have

23  been amply heard about their efforts to comply with the OSC, given their 53 page brief

24  and multiple declarations and exhibits.  The Court should find that Defendants had notice

25  of the OSC, and have been heard.  *Bagwell*, 512 U.S. at 827.[4]

26  _____

27      [4] Defendants request an evidentiary hearing so the Court can hear "directly from
    Director Shinn, Assistant Director Gann, or any Centurion personnel."  Doc. 3649 at 51.
    They do not specify what additional information would be provided at such a hearing

28  beyond the voluminous declarations they have already submitted.  Plaintiffs ask that if the

C.     **Defendants Did Not Take All Reasonable Steps to Comply With the OSC**

The party facing a possible contempt finding has the burden to prove that it took all reasonable steps to comply with the order that is the subject of the contempt proceedings. [*Kelly*, 822 F.3d at 1096]  Defendants point to their alleged compliance with measures *not* in the OSC as somehow relevant to the civil contempt analysis, and to argue that they have taken all reasonable steps to comply with the OSC.  [Doc. 3649 at 16-17, 29-30]  This is not relevant to the Court's analysis.  As detailed in Plaintiffs' Response to Court Order Doc. 3518, (Doc. 3564 at 4-7), Defendants may not unilaterally replace the parties' agreed-upon mechanism for measuring compliance, as the parties agreed to a system where "particular performance measure[s] that appl[y] to . . . specific complex[es]" are evaluated separately for substantial compliance.  [Doc. 1185 ¶ 10]  The Stipulation was structured this way for a reason:  to ensure that Defendants complied with *all* facets of a functional health care system at *all* prisons.  There is nothing to support Defendants' contention that the Court can just ignore the Stipulation's plain language and evaluate compliance in gross, aggregating all performance measures – including those not in the OSC – together at a single moment in time.  [*See*, *e.g.*, *Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 324 (3d Cir. 1990) (holding that allowing aggregate compliance is an "inequitable and disconcerting principle" that lets a defendant "treat a few . . . class members in any fashion they want so long as they comply with the [Stipulation] with regard to a substantial number of other . . . class members")]  Defendants agreed to abide to this structure, and must be held to that agreement.[5]

---

Court chooses to hold a hearing that it do so remotely, given limitations on federal court activity during the pandemic, and shelter-in-place orders impacting counsel's ability to travel to the Phoenix courthouse.  [*See* D. Ariz. Gen. Order 20-15 at 3 ("Individual judges may continue to hold hearings, conferences, and bench trials that they deem necessary consistent with this order. Such proceedings shall be conducted by telephone or video-teleconference when feasible.")]

[5] As this Court observed, "[h]istory has shown that Defendants appear to believe they are empowered to modify the Stipulation to accommodate their own preferences . . . Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable." Doc. 3495 at 5 n. 1.

1    Defendants describe actions taken in late 2019 and early 2020 including, among

2    other things, the replacement of Defendants Ryan and Pratt with Defendants Shinn and

3    Gann, the reorganization and rebranding of the corrections department and the health care

4    monitoring bureau, and Centurion hiring more staff last fall, paying existing staff more,

5    and paying specialists a higher reimbursement rate. [*See generally* Doc. 3649 at 3-26]

6    While these efforts are commendable, long-overdue, and many have been long-called for

7    by the Court's experts and Plaintiffs, they came half a year after Centurion became the

8    State's third and latest correctional health care vendor on July 1, 2019.[6]  And as noted

9    above at pages 2-3, Defendants' continuing noncompliance with the OSC in subsequent

10   months, and the fact that the May 2020 CGARs show even greater noncompliance than

11   February 2020, demonstrates that they have not solved any of the systemic problems to

12   achieving long-term compliance with the Stipulation's performance measures.[7]

13   If a party seeks to defend against a contempt finding by arguing inability to

14   comply, it must show "categorically and in detail" why it cannot comply.  *N.L.R.B. v.*

---

16   [6] Some achievements Defendants tout pre-date the OSC, such as Centurion hiring
     midlevel providers and filling a Staff Physician full time equivalent (FTE) in September
17   and October 2019, (Doc. 3649 at 7-8), so they are not relevant to the analysis of what they
     did in *response* to the OSC.  In any event, on closer review, their math does not add up.
18   For example, Defendants assert that in October 2019, Centurion filled the equivalent of
     7.0 FTE positions (a less than 70% fill rate) of the 10.2 FTE Staff Physician positions
19   required statewide by the contract, and they contracted with three *pro re nata* physicians,
     thus "bringing the hired total to 13 physicians."  Doc. 3649 at 8.  While Defendants'
20   phraseology tries to elide the fact that they were still well under the 10.2 FTE requirement
     by focusing on the total number of doctors on call to potentially work an occasional shift,
21   "13 physicians" does not reflect the FTE hours worked in the Staff Physician position.
     According to their staffing variance report dated October 31, 2019, 7.0 of the 10.2 FTE
22   positions were filled.  [*See* Declaration of Corene Kendrick, ("Kendrick Decl.") Ex. 1 at
     ADCM1595672-80]  The most recent health care staffing report Plaintiffs have, for June
23   2020, shows only 6.0 of the 10.2 contracted FTE positions filled (59%), including zero
     physician FTEs filled at Eyman, Lewis, and Yuma prisons, which respectively have
24   populations of 5,483 people, 4,315 people, and 4,622 people. [*Id.* ¶¶ 3, 4; Ex. 2 at
     ADCM1625069-77; Ex. 3]
25   [7] For example, Defendants point to the overtime paid to existing Centurion staff to
     cover shifts that otherwise are unfilled due to staffing shortages.  Doc. 3649 at 11-12.  But
26   the fact that "[i]n February 2020, mid-level providers worked 270 hours above their hired
     FTE; in March 2012 [sic], mid-level providers worked 276.75 [hours] above their hired
27   FTE; and in May 2020, mid-level providers worked 380.5 hours above their hired FTE,"
     (*id.* at 12), is not something to brag about.  Rather, these large amounts of overtime (either
28   mandatory or voluntary) by overworked employees stretched thin are a recipe for burnout,
     turnover, and potentially fatal errors.  [*See, e.g.*, Doc. 1670 ¶ 7, Doc. 2103 ¶ 4]

*Trans Ocean Export Packing, Inc*., 473 F.2d 612, 616 (9th Cir. 1973).  Defendants do not explain categorically and detail **why** they are unable to meet the benchmarks in the Stipulation that they agreed to six years ago, namely, a monthly compliance rate of at least 85% on each PM at each prison complex.[8]

Defendants minimize the noncompliance and their failure to meet the Stipulation's 85% benchmark as inadvertent or technical mistakes.   Under the Stipulation's plain language, compliance is binary: if a PM is at 85% or above, it is compliant; if it is below 85%, it is not.  A measure that falls "just three files short" of the 85% threshold, (Doc. 3649 at 30), is noncompliant.[9]  The Court previously rejected Defendants' request that it "unilaterally alter the language of [the Stipulation] to better suit Defendants' current practices" (Doc. 3518 at 5); it should do so again.  Defendants cite *General Signal Corp. v. Donallco, Inc*., 787 F.2d 1376 (9th Cir. 1986), for the idea that "technical or inadvertent violations of the order will not support a finding of contempt," (Doc. 3649 at 27, 49), but this is unavailing.  There, the parties entered a settlement that Donallco would stop selling used airplane parts originally made by General Signal as meeting safety standards or "factory new." General Signal moved for contempt after Donallco violated the agreement, Donallco argued that "because of an error in inspecting" it "mistakenly" labeled a used part as new, but had taken steps to prevent mistakes in the future.  The lower court held Donallco had **not** taken all reasonable steps to comply with the settlement, that the mistakes and inspection and auditing errors were **not** technical or inadvertent, and found the defendant in contempt of the decree.  787 F.2d at 1378-79. The Ninth Circuit affirmed

---

[8] Any excuse by Defendants that it was impossible to comply with the OSC due to the COVID-19 pandemic is undermined by their assurances to the Court that they and Centurion were prepared to ensure that health care services in accordance with the Stipulation's requirements would continue uninterrupted. [*See*, *generally*, Doc. 3527] This Court noted, in denying Plaintiffs' emergency motion for a COVID-19 plan, that "Defendants remain obligated to treat prisoners who become ill or critically ill consistent with the Stipulation and Defendants have a solemn responsibility to protect the individuals in their custody." Doc. 3540 at 2.

[9] *See Parsons v. Ryan*, ("*Parsons II*"), 912 F.3d 486, 500 (9th Cir. 2018) (finding that the 85% threshold rate "constitutes compliance for purposes of avoiding judicial enforcement" for a particular performance measure at a particular institution).

1   the contempt finding, while vacating the dollar amount of the sanctions. *Id.* at 1380.

2   Likewise, here, the Court should reject Defendants' minimizing of their failure to meet the

3   Stipulation's requirements due to ostensible mistakes, errors in auditing, or inadvertent

4   oversights.  Their failure to comply with the OSC or the Stipulation is not a technicality,

5   and errors in documentation and other administrative processes in the medical setting can

6   have life or death consequences.

7        Finally, Defendants argue they should not be found in contempt because they tried

8   to comply with the OSC.  [Doc. 3649 at 28-29, 49, 50]  But contempt "need not be willful,

9   and there is no good faith exception to the requirement of obedience to a court order."  *In*

10  *Re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*, 10

11  F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted); *accord*

12  *McComb*, 336 U.S. at 191 ("The absence of willfulness does not relieve [a party] from

13  civil contempt.").[10]

14  **III.   A Finding of Civil Contempt Is Appropriate Here**

15      **A.   The Contemplated Sanctions Are Not Punitive**

16       Once a party is found in civil contempt, a court has "broad equitable power to order

17  appropriate relief . . ."  *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).  When

18  ordering a sanction, the court should consider "the character and magnitude of the harm

19  threatened by continued contumacy, and the probable effectiveness of any suggested

20  sanction in bringing about the result desired."  *United States v. United Mine Workers of*

21  *Am.*, 330 U.S. 258, 304 (1947).  In affirming this Court's 2018 contempt finding, the

---

[10] *Taggart v. Lorenzen*, 139 S.Ct. 1795 (2019), quoted by Defendants for the proposition that there should not be a civil contempt finding "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct" is inapposite. Doc. 3649 at 49 (quoting *id.* at 1801).  The Supreme Court's analysis was focused on the second prong of the contempt analysis – whether there was fair notice to an alleged contemnor – and not the third prong, whether the contemnor took all reasonable steps to comply with the order. *Id.* at 1802 (noting that "principles of basic fairness require that those enjoined receive ***explicit notice of what conduct is outlawed*** before being held in civil contempt") (emphasis added, internal quotation marks and citations omitted).  The Court reaffirmed the longstanding rule that the standard for civil contempt is objective, not subjective. *Id.* at 1804 ("We conclude that the Court of Appeals erred in applying a subjective standard for civil contempt").

Ninth Circuit held that the relief can be coercive or compensatory, or both:

> [T]he district court utilized the paradigmatic coercive contempt sanction of prospective, conditional fines outlined in the Order to Show Cause and ordered Defendants to continue filing monthly reports regarding their compliance. [. . .]

> The sanction was also compensatory. … [T]he district court ruled that it would use the funds for the benefit of the class "to further compliance with the healthcare requirements of the Stipulation[.]"

> [¶¶] Because the Contempt Order was coercive and compensatory, we hold that it was civil in nature[.]

*Parsons III*, 949 F.3d at 455-56.

The Court has the authority to issue monetary sanctions if it determines that such sanctions are necessary to coerce compliance by Defendants and/or to compensate Plaintiffs for their losses and injuries. *Id.*; *see also Bagwell*, 512 U.S. at 829 (noting that a paradigmatic civil contempt sanction "is a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order. . . [S]uch fines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged"). The OSC clearly states that "the Court will impose a fine of $100,000 per Performance Measure per location to coerce compliance with this Order." Doc. 3490 at 3.

The sanctions are not punitive. *Parsons III*, 949 F.3d at 456 ("Prospective, conditional fine schedules do not bear any of the hallmarks of punitive contempt, such as retroactivity and determinacy."); *compare Bagwell*, 512 U.S. at 834, 837-838 (case involving "out-of-court disobedience to complex injunctions" that "often require elaborate and reliable factfinding," about more than $50 million in fines against a labor union that spanned many months of disputes as to union members' behavior and interactions with law enforcement; "[u]nder such circumstances, disinterested factfinding and evenhanded adjudication were essential and petitioners were entitled to a criminal jury trial"). The Ninth Circuit has held that *Bagwell* was "unusual" due to the complex issues at hand, as it involved "the possible abuse of power when a judge orders oppressive sanctions for violations of complex standards of the judge's own making," and is thus distinguishable from civil sanctions issued by a court "seeking to enforce a decree intended to prevent

repeated violations of federal statutory law." *N.L.R.B. v. Ironworkers Local 433*, 169 F.3d 1217, 1219-20 (9th Cir. 1999); *see also Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 and 4*, 721 F.3d 1122, 1129-30 (9th Cir. 2013) (distinguishing *Bagwell*, noting that "[h]ere, the district court's contempt orders are civil, not criminal, because they sought to coerce the Union and its members to comply with the court's injunctions and compensate injured parties for actual losses caused by the Union's and its members' contumacious conduct.").[11]  Unlike *Bagwell*, and similar to *Ahearn*, the Court is trying to coerce compliance with measures with which Defendants previously were found to be and continue to be noncompliant.  The fine also is not punitive, given the Court's past contempt order fining Defendants $1,000 for each instance of noncompliance was apparently insufficient to coerce compliance.

Finally, when the Court previously fined Defendants in June 2018 for failure to comply with its OSC, Defendants were indemnified by their then-vendor, Corizon. This time is no different — a contempt fine will not affect the State's budget and shut schools or impede building new highways — as Defendant Shinn told Centurion that

> [i]f the Court ultimately imposes any sanctions against us, Centurion will be contractually responsible for comprehensive indemnification pursuant to Paragraph 3.22, 3.22.2 & 3.223 of the Contract.  [. . .] This letter therefore constitutes ADCRR's formal demand for full indemnification as well as compliance with the Court's January 31 Order. As named defendant in the lawsuit, I likewise formally demand full indemnification as well as compliance with the Court's Order.

Doc. 3649-1 at 33 (Feb. 14, 2020 Letter from D. Shinn to S. Wheeler).[12]

---

[11] Defendants' reliance on dicta from *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297 (11th Cir. 1991), is not controlling and predates *Bagwell*, *Ironworkers Local 433*, *Ahearn*, and *Parsons III*. In *Watkins*, the sanctions were injunctive, and the Eleventh Circuit affirmed the district court's contempt finding and sanctions.

[12] Defendants' contention that due to its size a $2 million fine is "punitive, not coercive" (Doc. 3649 at 50) is risible.  ADC's FY 2020 budget is $1,308,491,700; even a $6.4 million fine would be less than one percent of that.  *See* Kendrick Dec. ¶ 5, Ex. 4. Similarly Centurion, a fully-owned subsidiary of Centene Corp. (*id*. Ex. 5), cannot plead poverty.  Centene "is the largest Medicaid managed care organization in the U.S., and [. . .] the national leader in managed long-term services and supports, and the number one carrier in the nation on the Health Insurance Marketplace."  *Id*. Ex. 6 at 7.  *Fortune*'s list of the 500 most profitable U.S. companies in 2019 ranked Centene as 42nd, with $74.6 billion in revenue last year.  *Id*. Ex. 7.

**B. Defendants Have Had the Opportunity to Purge the Contempt**

Finally, Defendants argue they did not have the opportunity to purge the contempt, because the OSC was issued on January 31, 2020, a day before the first month for which they faced potential coercive sanctions. [Doc. 3649 at 51]  This is unpersuasive. Courts routinely issue OSCs against parties that require immediate compliance, or compliance within days.  *See, e.g., Shell Offshore Inc. v. Greenpeace, Inc*., 815 F.3d 623 (9th Cir. 2016).  Defendants' complaints that they were unable to purge their contempt ring hollow given their ongoing noncompliance in the four months for which they provided data.  *See* pp. 2-3.  Defendants offer no explanation why Mr. Shinn waited two weeks to notify Centurion that it needed to comply.  *See* Doc. 3649-1 at 30-33 (Feb. 14, 2020 letter from D. Shinn to S. Wheeler); *see also Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1117 n.27 (D. Idaho 2013) (holding that a prospective fine schedule is not punitive because "the amount of fine, if it succeeds in making them comply, should *prevent* the fine from reaching millions because Defendants will fix their behavior and begin living up to their promise in the Settlement Agreement.  If a *prospective* fine leads to $2.4 million in penalties, [defendant] has no one to blame but itself.") (emphasis in original), *aff'd*, 822 F.3d 1085 (9th Cir. 2016); *Trueblood v. Wash. State Dep't of Soc. & Health Servs*., No. C14-1178-MJP, 2017 WL 4700326 at *2 (W.D. Wash. Oct. 19, 2017) (imposing over $30 million civil contempt fine because of defendants' failure to comply with previously issued prospective per diem fine schedule if they failed to conduct competency evaluations on mentally ill incarcerated people within court-ordered timeframes).

## CONCLUSION

For the foregoing reasons, the Court should find Defendants in civil contempt of the OSC, and assess a fine of $6.4 million for Defendants' noncompliance for the months of February – May 2020, and assess additional fines as Defendants' noncompliance is documented in future monitoring reports.

Respectfully submitted,

1    Dated:  August 7, 2020                    **PRISON LAW OFFICE**

2

3                                              By:    s/ Corene T. Kendrick
                                                   Donald Specter (Cal. 83925)*
4                                                  Alison Hardy (Cal. 135966)*
                                                   Sara Norman (Cal. 189536)*
5                                                  Corene T. Kendrick (Cal. 226642)*
                                                   Rita K. Lomio (Cal. 254501)*
6                                                  1917 Fifth Street
                                                   Berkeley, California 94710
7                                                  Telephone:  (510) 280-2621
                                                   Email:    dspecter@prisonlaw.com
8                                                            ahardy@prisonlaw.com
                                                             snorman@prisonlaw.com
9                                                            ckendrick@prisonlaw.com
                                                             rlomio@prisonlaw.com
10
                                                   *Admitted *pro hac vice*
11
                                                   David C. Fathi (Wash. 24893)*
12                                                 Maria V. Morris (Cal. 223903)*
                                                   Eunice Hyunhye Cho (Wash. 53711)*
13                                                 **ACLU NATIONAL PRISON
                                                   PROJECT**
                                                   915 15th Street N.W., 7th Floor
14                                                 Washington, D.C. 20005
                                                   Telephone:  (202) 548-6603
15                                                 Email:    dfathi@aclu.org
                                                             mmorris@aclu.org
16                                                           echo@aclu.org

17                                                 *Admitted *pro hac vice*.  Not admitted in
                                                   DC; practice limited to federal courts.
18
                                                   Daniel C. Barr (Bar No. 010149)
19                                                 Amelia M. Gerlicher (Bar No. 023966)
                                                   John H. Gray (Bar No. 028107)
20                                                 **PERKINS COIE LLP**
                                                   2901 N. Central Avenue, Suite 2000
21                                                 Phoenix, Arizona 85012
                                                   Telephone:  (602) 351-8000
22                                                 Email:    dbarr@perkinscoie.com
                                                             agerlicher@perkinscoie.com
23                                                           jhgray@perkinscoie.com

24

25

26

27

28

LEGAL23774493.1                          -12-

1                                                                        Jared G. Keenan (Bar No. 027068)

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     jkeenan@acluaz.org
           carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Maya Abela
     Asim Dietrich (Bar No. 027927)
     5025 East Washington Street, Suite 202
     Phoenix, Arizona 85034
     Telephone:  (602) 274-6287
     Email:     adietrich@azdisabilitylaw.org

     Rose A. Daly-Rooney (Bar No. 015690)
     J.J. Rico (Bar No. 021292)
     Maya Abela (Bar No. 027232)
     **ARIZONA CENTER FOR DISABILITY LAW**
     177 North Church Avenue, Suite 800
     Tucson, Arizona 85701
     Telephone:  (520) 327-9547
     Email:
       rdalyrooney@azdisabilitylaw.org
         jrico@azdisabilitylaw.org
         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 7, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ C. Kendrick