Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE COURT'S ORDER (Doc. 3635)** |

Defendants respond in Opposition to Plaintiffs' Motion to Enforce Court's Order (Doc. 3635) and this Court's Order (Doc. 3691) regarding the same.  Arizona Department of Corrections, Rehabilitation and Release ("ADCRR") has acted in good faith to comply with the Court's previous Order requiring Defendants to produce:

> **6. RFP134 – Documents sufficient to show average length of stay for prisoners in maximum custody units, including the average length of stay in Step 1, Step 2, and Step 3 under DI 326/DO 812.**

(Doc. 3635 at 4-5.)

From the start, Defendants have advised Plaintiffs that ADCRR does not track maximum custody length of stay and maximum custody Step Level length of stay data.  As

a result, ADCRR had no documents to provide to Plaintiffs with respect to their requests.

In a good faith effort to respond to the Court's Order (Doc. 3635 at 4-5), Defendants advised Plaintiffs during meet and confers regarding ESI responses to Plaintiffs' RFPs 122 and 133 (regarding unavailability/staffing vacancies affecting medication administration and/or health care services and maximum custody units) that although ADCRR has no documents responsive to RFP 134 as it does not track maximum custody/Step Level length of stay statistics, ADCRR was embarking on a difficult, time-consuming, and complicated project designed to derive the requested information from ADCRR's newly employed Arizona Correctional Information System ("ACIS"). Moreover, because of the time consuming nature of the project, compliance with the timeframe set forth in the Court's Order was not also not completely achievable but that Defendants advised Plaintiffs they would complete production as quickly as they could. Plaintiffs did not object that calculation information would be forthcoming.[1]

Because Defendants have acted in good faith and without undue delay in order to create documents and studies not kept in the normal course of ADCRR operations, this Court should deny Plaintiffs' Motion to Enforce and the Court's Show Cause Order contemplating attorneys' fees sanctions. Defendants continue to rework and produce updated calculations and voluminous Excel summary data sets to respond to RFP 134, and alternatively will submit to Plaintiffs, hard copy print outs of every one of ADCRR's 1878

---

[1] In Order to roll production of calculation information, Defendants provided Plaintiffs with maximum custody length of stay and average stay calculation data for ASPC-Eyman and Lewis on June 26, 2020. This production included more than 400 pages of Excel document summary data including for individual maximum inmates at Eyman-SMUI, Eyman-Browning and Lewis-Rast. Plaintiffs concede that Defendants have appropriately responded to RFP 138 which seeks "A list of all prisoners held in maximum custody units at the Florence, Eyman, and Lewis complexes including date classified to maximum custody and current step level under DI 326/DO 802 [sic]." (Doc. 3635 at 4; Doc. 3686 at 3.) Plaintiffs allege that Defendants did not provide Excel documents with embedded calculations but instead explained calculations in a letter. (Doc. 3686 at 3.) Explanation by letter is not inappropriate. Moreover as explained in Section II below, queries and formulas run in MSACCESS data tables running in the background of the ACIS database and Excel spreadsheets are used for summary purposes. (Exh. 1, Decl. Dolny, ¶ 19.)

maximum custody inmate population as of August 14, 2020, to allow Plaintiffs to manually calculate the statistical data they seek and verify the accuracy of the calculations.[2]

## I. DEFENDANTS DO NOT TRACK MAXIMUM CUSTODY AND MAXIMUM CUSTODY STEP LEVEL LENGTH OF STAY STATISTICS.

In December 2019, Plaintiffs requested Defendants produce document responsive to RFP 134 (quoted above). (Doc. 3613 at 2.) Defendants responded that the request was unduly burdensome, requiring manual review of an indeterminable number of documents (since no such tracking occurs). Neither the Stipulation nor the Maximum Custody Performance Measures contemplate tracking or measuring average lengths of stay in the maximum custody classification or the attendant DI 326/DO 812 Step Levels. (Doc. 3613 at 4-5.) Moreover, providing a response requires analysis of voluminous data and tremendous outlay of ADCRR resources to collate and calculate the information necessary to respond to the specific information sought by Plaintiffs. Despite the non-existence of average length of stay batch reports or easily accessed individual inmate data, on June 26, 2020, Defendants began production of statistical data generated to the best of ADCRR's ability within seven days of the Court's Order.[3] (Doc. 3686-2 at 3.)

## II. DEFENDANTS ACTED IN GOOD FAITH IN ATTEMPT TO CALCULATE MAXIMUM CUSTODY AND MAXIMUM CUSTODY STEP LEVEL LENGTH OF STAY STATISTICS.

Fed.R.Civ.P. 34 only requires a party to produce documents that are in existence. *See Stamps.com, Inc. v. Endicia, Inc.*, 2008 WL 11338240, at *3 (C.D. Cal. Oct. 6, 2008). Thus, "a party cannot be compelled to create, or cause to be created, new documents solely for their production" *Id*. (citing *Paramount Pictures Corp. v. Reply TV*, 2002 WL 32151632

---

[2] Upon receipt of Plaintiffs' August 10, 2020, email setting forth data set variances, Defendants' counsel advised ADCRR's Research Unit of Plaintiffs' position and consulted with the Research Unit regarding the same. Defendants' counsel subsequently advised Plaintiffs' counsel that the Research Unit was running test data analysis and requested Plaintiffs reasonably provide Defendants with more than five hours' notice of a demand to correct data analysis that took weeks to compile and analyze. Plaintiffs refused. (Doc. 3686-2 at 35-36, 8/10/2020 email at 7:54 p.m. and 8/10/2020 email at 12:18 p.m.)

[3] Plaintiffs state that they asked for an update on statistical data production on July 27, 2020, but that Defendants did not respond. This is incorrect per Plaintiffs' own exhibits. (Doc. 3686-2 at 9-10.)

1  \*2 (C.D. Cal. 2002) (defendants not required to create new data where creation of data gathered from customers would require defendants to "undertake a major software development effort, incur substantial expense, and spend approximately two months doing so"); *Mon River Towing, Inc. v. Industry Terminal Salvage Co.*, 2008 WL 2412946 (W.D. Pa. 2008) (holding defendant not required to undertake report or analyses of documents and distinguishing cases where a party was only required to formulate queries to derive database information); *Wagner v. SBC Pension Benefit Plan-Non-Bargained Program*, 2007 WL 915209 (D.D.C.) (defendant not required to produce sample calculations that do not otherwise exist)). While court may order query of an existing database to produce requested available information, creation of non-existing reports can be unduly burdensome and so costly as to require the requesting party to bar the expense of production. *Stamps.com* at \*4.

In a good faith effort to comply with the Court's Order, Defendants undertook to create documents, data sets and calculations that did not otherwise exist. It is not disputed that ADCRR does not track average length of inmate stays in the maximum custody classification in the normal course of operations. (Exh.1, Decl. Dolny, ¶ 10.) Nor does ADCRR track average length of maximum custody stays in DI 326/DO 812 Step Levels 1, 2, and 3. (*Id*.) The Step Levels are pro-social behavioral modification program designations within the maximum custody classification, and progression through the Step Levels is governed by Director's Order 812 ("DO812") (and previously Director's Instruction 326 ("DI326")). (*Id*.) In conjunction with the Court's June Order regarding RFP 134, ADCRR's Regional Operations Administrator (over Classification, Protective Custody, Time Computation, and Inmate Records divisions), tasked ADCRR's Research Unit with the complex and challenging project of extracting data from ADCRR's current electronic inmate data management system ("ACIS") in order to compile the data ordered by the Court to be produced. (*Id*., ¶ 11.)

Specifically, the ACIS system (Arizona Correctional Information System) is a host-based electronic data processing system containing the primary inmate database

applications used in inmate management systems. (*Id.*, ¶ 12.) ACIS does not include functionality to run batch reports to derive the maximum custody and Step Level average length of stay data. (*Id.*, ¶ 13.) ADCRR's ACIS system replaced ADCRR's former electronic Arizona Inmate Management System ("AIMS") in December 2019.[4] (*Id.*, ¶ 14.) As ADCRR is not yet even one year into utilization of ACIS, challenges arise at times as to functionality and interface. (*Id.*)

In response to the Court's June Order regarding RFP 134, the Research Unit embarked on the arduous task of determining relevant ACIS data sets and determining how to extract data and combine multiple ACIS data sets for thirteen (13) Curlocs (housing unit locator codes) in order to run MSACESS_SQL queries to attempt to calculate average length of maximum custody classification and maximum custody Step Level stays for nearly 2,000 ADCRR inmates.[5] (*Id.*, ¶ 15.) After determining the above, June 30, 2020 was selected as the data set point for determining average length of stay after data for most recent data set and length of stay calculations produced August 7, 2020. (*Id.*, ¶ 16.) June 30, 2020, was selected as the date of the end of the fiscal year and thus a designated date. (*Id.*) No other significance was attached to this particular date. (*Id.*) The time period leading up to June 30, 2020 was required to determine the multiple locations within the ACIS system where relevant data was located, to account for variables and duplication of entries in individual inmate records, and to write formulas to calculate extracted data tables, and to start calculation of data sets and average length of stay determinations. (*Id.*, ¶ 17.)

---

[4] ADCRR's prior electronic inmate data management system (AIMS) also did not track custody level length of stay or maximum custody Step Level length of stay data. Nor did AIMS have the ability to run batch reports to derive such data, just like the present ACIS inmate data management system.

[5] Current Curlocs (housing unit locator codes) identifying maximum custody housing units are: A08, A21, A27, A30, A38, A48, A50, A51, A52, A73, A74, A76, and L21. The Curloc query identified inmates currently in maximum custody as the query date and calculated the present time in maximum custody. Thus, the calculations pertain to averages based upon the maximum custody populations' current maximum custody stay and does not identify or calculate previous maximum custody classification periods.

1    Multiple data tables existing in multiple locations within ACIS were required to be
2    joined and formulas derived to separately determine both maximum custody and Step Level
3    length of stay. (*Id*., ¶ 18.) The data is processed through an MSACESS database, using
4    Excel spreadsheets for data display and summary information only. (*Id*., ¶ 19.) Currently,
5    the MSACESS database uses over twenty temporary tables and over 40 MSACESS_SQL
6    queries against approximately 20,000,000 records. (*Id*.) Progression through classification
7    custody level and Step Level is not uniform as to time (or Step Level) and is based upon
8    individual inmate behavior. (*Id*., ¶ 20.)  Step Level stays may change often for some
9    inmates and may remain relatively steady for others. (*Id*.)  For instance, an inmate may
10   achieve Step Level 2, revert back to Step Level 1, progress again to Step Level 2 and then
11   Step Level 3, then revert to Step Level 2, progress to Step Level 3, and revert to Step Level
12   1, all based upon the individualized assessment of that inmate's behaviour over time, and
13   the resulting classification and Step Level assessment. (*Id*.) Accounting for application of
14   queries/formulas to consistently identify and synthesize such instances of fluid and
15   changing data proved challenging, problematic, and account for the variances in data
16   provided to Plaintiffs in ADCRR's July production and continuing August production. (*Id*.,
17   ¶ 21.)

18   Upon notification of variances in data identified by Plaintiffs on August 10, 2020,
19   the Research Unit re-ran the data test cases identified by Plaintiffs as well as other test cases
20   and found that query formulas did not consistently apply to calculate maximum custody and
21   Step Level length of stay data due to the complicated nature of the data merge and formula
22   application necessary to attempt to derive statistics not previously tracked by ADCRR. (*Id*.,
23   ¶ 22.)  In some instances, the formulas did not attach to correct Step Level data sets and
24   thus counted time in steps incorrectly. (*Id*.)  In other cases, the merged data and formula
25   application did not correctly calculate maximum custody length of stay. (*Id*.)  In order to
26   derive the statistics demanded, MSACESS_SQL must search through a complex matrix of
27   intertwined data and data locations, as well as identify and include or exclude numerous
28   variables and/or duplication of entry of data within the existing ACIS system. (*Id*., ¶ 23.)

The Excel spreadsheets were then used for summarizing data, only. (*Id.*) Accordingly, the Research Unit continues to re-verify data sets and formula application to reduce errors and consistently apply formulations. (*Id.*) However, the inherent nature of this unique and complicated data will likely continue to prevent complete accuracy unless manual human review is conducted of each and every maximum custody inmate classification and Step Level history using a variety and combination of ACIS records and ACIS screens.[6] (*Id.*) Even manual human review and calculation is fraught with likelihood of inadvertent human error in analysing and calculating complex and intertwined data sets. (*Id.*)

Because of the critical response time requirement, the Research Unit did not have the luxury or benefit of employing critical testing to run numerous data accuracy and formula application tests; thus errors in data merges, time calculations, and average calculations were inadvertent. (*Id.*, ¶ 24.) And, it would have likely taken IT specialists months to write and critically test data and formulas necessary to create complex programming to run maximum custody average length of stay and Step Level length of stay data within the existing ACIS system. (*Id.*, ¶ 25.) As illustration, the ACIS system employs 600 plus data tables from which a multitude of individual inmate data can be derived to include demographic, property, discipline, classification, STG/gang management, assessment, programs, work program, and scheduling information to just name some categories. (*Id.*) However, even under these circumstances, the Research Unit employed good faith, best efforts and worked diligently to derive and join multi-ACIS data sets in order to derive average length of stay data. (*Id.*, ¶ 26.)

Specifically, the Research Unit started with migration of individual inmate data tables as to maximum custody length of stay for all inmates identified as assigned to one of the thirteen (13) maximum custody Curlocs as of June 30, 2020, from the ACIS Inmate Traffic History data set to calculate for each individual inmate, his current length of stay in

---

[6] Manual review and computation also carries with it an undefined margin of error; this especially where data may be analyzed per persons unfamiliar with identifying data duplication or data indicating in some areas unassigned time as to Step Level or custody level, but in other areas the information is defined.

1  maximum custody, tracking movement history and Curloc locator codes backwards from
2  June 30, 2020, until a location and stop date identified a move to a maximum custody locator
3  code, which indicates placement in a maximum custody unit at either ASPC-Eyman,
4  Florence, or Lewis.[7] (*Id.*, ¶ 27.) Movement history data and time in maximum custody is
5  complicated by not only data indicating an inmate moves to a different custody level, but
6  also by interval events such as movement to the hospital, to court, or a detention unit that
7  moves an inmate out of a maximum custody unit but does not change custody level.
8  Creation of formulas to identify and extract maximum custody unit locator codes was
9  required because inmates may remain maximum custody over time but move complex
10 locations or unit locations. (*Id.*, ¶ 28.) In sum, the locator code formulas tracked maximum
11 custody length of stay for each individual maximum custody inmate in his Inmate Traffic
12 History Screen tracking locator codes backwards in time from June 30, 2020, to the earliest
13 date the inmate traffic history did not list the inmate in maximum custody locator code.
14 (*Id.*)

15     For example, for exemplar inmate ADC#▮▮▮▮, formulas were necessarily created
16 to capture and identify maximum custody inmate movement locator codes backwards in
17 time from 5/21/2020 (the last entry) to identify locator codes A08 and A50 which identified
18 movement/assignment to ASPC-Eyman SMU I and Browning maximum custody units, but
19 to exclude locator code attached to ASPC-Winslow, Winslow Kaibab unit which is not a
20 maximum custody location which served in the data analysis as the "stop point" for this
21 inmate's current maximum custody stay. (*Id.*, ¶ 29.) To derive Step Level length of stay
22 data for exemplar inmate ADC#▮▮▮▮, EIP Compliance Screen data for this particular
23 inmate as of June 30, 2020 was used and Excel formulas written to identify and calculate
24 time in Step Levels 1, 2, and 3, but exclude time frames indicated as time in a Phase as
25 inapplicable (because this data does not denote Step Level time). (*Id.*, ¶ 30.) As illustrated,

---

[7] Formulas capture current length of stay in maximum custody during the inmate's current "episode" which indicates the inmate's current incarceration (as opposed to an inmate who has been incarcerated any number of separate times over the course of time).

8

1   with exemplar inmate ADC#▓▓▓▓▓'s history, Step Level reviews occur on nearly a
2   monthly basis and thus Excel formulas were written to calculate total time in Step Levels,
3   identifying and distinguishing where necessary, either duplication of entries in a particular
4   Step Level, or movement up or down through Step Levels. (*Id*., ¶ 30.) Where an inmate
5   such as this exemplar inmate was in Step Level 3 as of 1/31/2019, then changed to Step
6   Level 1 on 1/31/19, then Step Level 2 on 5/2/19, then back to Step Level 2 on 6/6/19, then
7   to Step Level 1 on 6/25/19, the formulas to identify and calculate total historical time in
8   each Step Level for the particular inmate became complicated, and upon review did not
9   correctly or consistently apply. (*Id*., ¶ 32.)  The Research Unit continues to revise the work
10  product as a result of extracting data from the data table. (*Id*.)

11      The second data set produced in August likewise re-ran Step Level calculation
12  formulas to remove extraneous data (multiple entries denoting successive identical Step
13  Level entries) and thus accounts in part for examples provided by Plaintiffs in August 10,
14  2020 email showing less entries for a particular inmate in Step Levels, this second data set
15  deleting duplicative Step Level entries. (*Id*., ¶ 33.)  The August data set also attempted to
16  address periods of time where a Step Level was unassigned or there were gaps in entries in
17  the ACIS system, thus further complicating calculations. (*Id*.)

18      In sum, in order to build a database of tables combining multiple data tables to drill
19  down to derive identification of ADCRR's maximum custody inmate population,
20  identification of current episode most recent maximum custody classification, and
21  identification of individual inmate length of stay in three maximum custody Step Levels
22  history in order to then derive total average maximum custody classification and Step Level
23  length of stay calculations through Excel formulations, the process required search through
24  all of the following variables in the ACIS system:

25  - 40,149 records were drawn to identify the total active ADCRR inmate
26    population as of June 30, 2020;
27  - 2,112,633 records were drawn to link to incarceration episode tables;
28

- 468,177 records were used to identify inmate current episode (only those data elements related to current incarceration);
- 16,820,585 records were used to track inmate movement from location at intake to location at release;
- 866 records were used to describe numerical variables as text to identify maximum custody unit locator codes;
- 178,056 records were used to identify maximum custody current Step Levels;
- 852,306 records were used to identify movement of maximum custody Step Levels prior to the current maximum custody Step Level;
- 84,825 records were used to fill blank current Step Levels or to afford for imbedded gaps in Step Level entries that were calculated as "unassigned" as to data collection dates;
- 17,842 records were used to describe numerical variables as text, i.e., location, Step Level, etc.

(*Id.*, ¶ 34.)

Lengthy, good faith, and complicated efforts undertaken by ADCRR's Research Unit to derive maximum custody length of stay averages and maximum custody Step Level length of stay averages were and continue to be a priority, undertaken against the backdrop of non-existing data sets or presence of batch report functions, requiring creation of background merging of ACIS data tables, and combining of multi-location database information without the benefit of sufficient time for critical testing of standard formula application or IT specialist rewrite of the ACIS system. (*Id.*, ¶ 35.) Defendants have acted in good faith to exceed the bounds of Rule 34. Their good faith efforts are ongoing, with supplementation of data sets to address variances identified by Plaintiffs are target for August 21, 2020. Defendants have acted in good faith to comply with the Court's Order.

///

**III. ATTORNEYS FEES' SANCTIONS ARE NOT WARRANTED WHERE DEFENDANTS ACTED IN GOOD FAITH TO COMPLY WITH THE COURT'S ORDER BY GOING BEYOND THE SCOPE OF FED.R.CIV.P. 34 AND CREATING DOCUMENTS AND DATA SETS TO RESPOND TO RFP 134.**

Defendants have been ordered to show cause why they should not be required to pay Plaintiffs' reasonable attorneys' fees incurred to gain compliance with the Court's June 19, 2020 Order. (Doc. 3691 at 2.) Here, Defendants should not be sanctioned because their actions were in good faith and constituted reasonable interpretation of the Court's Order. *See, e.g., Jones v. A Buyer's Choice Home Inspections*, 2020 WL 774356, at *1 (C.D. Cal. Feb. 2, 2018, 2020); *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006). While a court may assess attorney fees as a sanction for "willful disobedience of a court order or when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons", that is not the circumstance here. *Jones*, 2020 WL 774356, at *2; *Chambers v. NASCO, Inc*., 501 U.S. 32, 45-46 (1991).

As set forth herein, Defendants embarked complex electronic data analysis to derive statistics not maintained in the normal course and scope of ADCRR operations. This, despite that fact that Fed.R.Civ.P. 34 only requires a party to produce documents or reasonably accessible data that is in existence. ADCRR's endeavor to provide statistical analysis and average length of stay calculations that exceed the scope of Rule 34 took many weeks to accomplish and efforts continue today due to the above explained complexity of intertwined electronic data not susceptible to running an existing batch report. Simply put, the demanded statistics are not kept or reported either in the normal course of ADCRR operations or in conjunction with this litigation where maximum custody and Step Level length of stay determinations are not subject to either any Stipulation requirements and are not measured by the Maximum Custody Performance Measures. (Doc. 1185.)

Defendants provided production related to three of ADCRR's four present maximum custody locations within the seven daytime period ordered by the Court. Updated information, including the fourth remaining location was provided on August 7, 2020.

Upon notification by Plaintiffs of variances in information provided as between the two data sets, ADCRR continues to re-check and verify data sets and calculation queries and anticipates supplementation by August 21, 2020. Alternatively, Defendants can provide hardcopy ACIS Inmate Traffic History and EIP Compliance screen printouts for over 1800 maximum custody inmates in order for Plaintiffs to develop their own manual databases, queries, formulas, and analysis to derive the requested statistical analysis. However, this task would be even more arduous as that already in progress by ADCRR. Defendants made substantial efforts to create these reports and data. They should not be sanctioned for going to the lengths that they have to comply with the Court's Order and provide Plaintiffs the information they demand.[8]

## IV.   CONCLUSION

Based upon the foregoing, Defendants respectfully request this Court find that Defendants have reasonably complied with the Court' production Order (with efforts on going) and that because of Defendants' good faith efforts, sanctions need not be awarded in favor of Plaintiffs.

DATED this 17th day of August 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/Rachel Love
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226
    *Attorneys for Defendants*

---

[8] Plaintiffs allege that Defendants did not correctly calculate average length of stay in Step Levels 1, 2, and 3 where Defendants calculated an inmate's total time in a Step Level as opposed to the average length of time the inmate was in a particular Step Level on any one occasion. (Doc. 3686 at 3.) But this is not what RFP 134 asks for. RFP 134 asks for the average length of stay in maximum custody, including "average length of stay in Step 1, Step 2, and Step 3 under DI 326/DO 812." The plain reading of RFP 134 does not ask for individual and separate Step Level average length of stay for each individual maximum custody inmate. Accordingly, Defendants did not fail to respond to RFP 134 in this regard.

# CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com; docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Casey Arellano | carellano@acluaz.org |
| Maria V. Morris | mmorris@aclu.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Rachel Love

13