1   Jared G. Keenan (Bar No. 027068)
    Casey Arellano (Bar No. 031242)
2   **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3   Phoenix, Arizona 85013
    Telephone:  (602) 650-1854
4   Email:  jkeenan@acluaz.org
            carellano@acluaz.org
5
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6   *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
    *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7   *Desiree Licci, Joseph Hefner, Joshua Polson, and*
    *Charlotte Wells, on behalf of themselves and all others*
8   *similarly situated*

    **[ADDITIONAL COUNSEL LISTED ON**
9   **SIGNATURE PAGE]**

10  Asim Dietrich (Bar No. 027927)
    **ARIZONA CENTER FOR DISABILITY LAW**
11  5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
12  Telephone:  (602) 274-6287
    Email: adietrich@azdisabilitylaw.org
13
    *Attorneys for Plaintiff Arizona Center for Disability Law*
14
    **[ADDITIONAL COUNSEL LISTED ON**
    **SIGNATURE PAGE]**
15

16              UNITED STATES DISTRICT COURT

17                  DISTRICT OF ARIZONA

18  Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-ROS
    Dustin Brislan; Sonia Rodriguez; Christina
19  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph        **PLAINTIFFS' REPLY IN**
20  Hefner; Joshua Polson; and Charlotte Wells, on         **SUPPORT OF MOTION TO**
    behalf of themselves and all others similarly          **ENFORCE PARAGRAPH 14**
21  situated; and Arizona Center for Disability Law,       **OF THE STIPULATION**
                                                           **(Doc. 3623)**
22                      Plaintiffs,

23          v.

24  David Shinn, Director, Arizona Department of
    Corrections; and Larry Gann, Division Director,
25  Health Care Services Monitoring Bureau, Arizona
    Department of Corrections, in their official
26  capacities,

27                      Defendants.

28

149342965.1

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................ 1

I. THIS COURT'S PRIOR ORDER HAS FAILED TO CORRECT
THE DEFICIENCIES IN COMPLIANCE WITH PARAGRAPH 14. ........ 1

    A. Defendants' Proposed Method of Demonstrating Compliance
Has Proven Unreliable and Inaccurate. ............................................... 1

        1. The "hard-stop" feature does not identify encounters
where language interpretation was needed but not
provided. ................................................................................. 2

        2. The "hard-stop" feature does not identify all encounters
where language interpretation was provided. ......................... 2

    B. Defendants Never Produced Monthly Compliance Reports. ............. 3

II. DEFENDANTS ASSERT COMPLIANCE BASED ON THE
WRONG LEGAL STANDARD AND ENDS-DRIVEN
SPECULATION. ............................................................................... 5

    A. The Stipulation, Not Private Industry Standards, Controls. ............... 6

    B. Defendants Resort to Speculation and Omission to
Manufacture Compliance. .................................................................... 9

        1. Dr. Penn relies on outdated, unfounded, and
uninformed stereotypes about the communication needs
of D/deaf people. .................................................................... 9

            a. Dr. Penn ignores contrary evidence, including
the declarations of class members and healthcare
staff notes. ................................................................. 10

            b. Dr. Penn misstates the medical record and relies
on inaccurate assumptions about lip reading. ............ 11

            c. Dr. Penn erroneously believes possession of
hearing aids establishes an ability to understand
spoken English. .......................................................... 12

            d. Dr. Penn improperly assumes that healthcare
staff's use of written notes is evidence of
compliance. ................................................................. 13

            e. Dr. Penn's attempt to demonstrate compliance
based on submission of HNRs is nothing more
than *ipse dixit*. ........................................................ 14

**TABLE OF CONTENTS**
**(continued)**

Page

f.   Dr. Penn inexplicably reasons that provision of sign language interpretation is evidence that a class member does not need sign language interpretation. .............................................. 15

g.   The grievance system is no substitute for demonstrating compliance with Paragraph 14. .......... 16

h.   Identification of deafness during intake is not the same as assessing language needs............................. 19

2.   Dr. Penn relies on the same speculative and ends-oriented approach for monolingual Spanish speaking class members. ...................................................... 19

a.   Dr. Penn simply assumes class member "and or" staff proficiency to find compliance. ......................... 19

b.   Submission of HNRs, in Spanish or English, does not establish a class member is fluent in English. .................................................................... 22

III.   DR. STEWART'S EXPERT DECLARATION IS ADMISSIBLE............ 23

IV.   THIS COURT CAN AND SHOULD ORDER SPECIFIC RELIEF TO ENSURE COMPLIANCE WITH PARAGRAPH 14. ....................... 25

A.   The Proposed Order Is Tailored to the Requirements of Paragraph 14.................................................................... 25

B.   Defendants Had Ample Time to Address Their Noncompliance.................................................................. 27

CONCLUSION ............................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abarca v. Franklin Cty. Water Dist.*,
   761 F. Supp. 2d 1007 (E.D. Cal. 2011)........................................................ 11

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
   738 F.3d 960 (9th Cir. 2013) ...................................................................... 16

*Allen v. Am. Capital Ltd.*,
   287 F. Supp. 3d 763 (D. Ariz. 2017) ......................................................... 10

*Armstrong v. Brown*,
   768 F.3d 975 (9th Cir. 2014) ...................................................................... 25

*Boudette v. Barnette*,
   923 F.2d 754 (9th Cir. 1991) ........................................................................ 8

*Brown v. Plata*,
   563 U.S. 493 (2011)............................................................................... 24, 25

*Cent. Hous. Inv. Corp. v. Fed. Nat'l Mortg. Ass'n*,
   248 P.2d 866 (Ariz. 1952)............................................................................. 8

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)................................................................................. 7, 22

*Docusign, Inc. v. Sertifi, Inc.*,
   468 F. Supp. 2d 1305 (W.D. Wash. 2006)................................................. 24

*Domingo ex rel. Domingo v. T.K.*,
   289 F.3d 600 (9th Cir. 2002) ...................................................................... 20

*F.T.C. v. Publ'g Clearing House, Inc.*,
   104 F.3d 1168 (9th Cir. 1997) .................................................................... 12

*Ferreira v. Arpaio*,
   No. CV-15-01845-PHX-JAT, 2017 WL 5504453 (D. Ariz. Nov. 16,
   2017) ..................................................................................................... 23, 24

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004)..................................................................................... 25

*Gates v. Cook*,
   376 F.3d 323 (5th Cir. 2004) ........................................................................ 7

*Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*,
   345 F.3d 15 (1st Cir. 2003).......................................................................... 23

*Hoptowit v. Ray*,
   682 F.2d 1237 (9th Cir. 1982), *overruled on other grounds by Sandin v.*
   *Conner*, 515 U.S. 472 (1995)........................................................................ 7

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

CASES (CONT.)

4

*Indep. Towers of Washington v. Washington,*
    350 F.3d 925 (9th Cir. 2003) ........................................................................ 23

5

6

*Jones v. Gusman,*
    296 F.R.D. 416 (E.D. La. 2013)...................................................................... 27

7

*Keith v. Volpe,*
    833 F.2d 850 (9th Cir. 1987) ......................................................................... 27

8

9

*Mata v. Oregon Health Authority,*
    739 F. App'x 370 (9th Cir. 2018) ................................................................... 13

10

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ......................................................................... 24

11

12

*Parsons v. Ryan,*
    912 F.3d 486 (9th Cir. 2018) ................................................................... 6, 7, 25

13

*Parsons v. Ryan,*
    949 F.3d 443 (9th Cir. 2020) .......................................................... 3, 7, 23, 26

14

15

*Pierce v. District of Columbia,*
    128 F. Supp. 3d 250 (D.D.C. 2015) .......................................... 11, 14, 17, 19

16

*Rhodes v. Chapman,*
    452 U.S. 337 (1981)......................................................................................... 7

17

18

*Swanson v. U.S. Forest Serv.,*
    87 F.3d 339 (9th Cir. 1996) ........................................................................... 24

19

*Thompson v. Dignity Health,*
    364 F. Supp. 3d 1046 (D. Ariz. 2019) ............................................................ 9

20

21

*U.S. Equal Emp't Opportunity Comm'n v. Placer ARC,*
    147 F. Supp. 3d 1053 (E.D. Cal. 2015)........................................................... 9

22

*United States ex rel. Kelly v. Serco, Inc.,*
    846 F.3d 325 (9th Cir. 2017) ........................................................................... 7

23

24

*United States v. Asiru,*
    222 F. App'x 584 (9th Cir. 2007) .................................................................. 10

25

*United States v. Noah,*
    475 F.2d 688 (9th Cir. 1973) ......................................................................... 21

26

27

*United States v. Vest,*
    116 F.3d 1179 (7th Cir. 1997) .................................................................. 10, 14

28

## TABLE OF AUTHORITIES
### (continued)

Page(s)

CASES (CONT.)

*West v. Atkins*,
   487 U.S. 42 (1988) ..................................................................................... 27


**OTHER AUTHORITIES**

28 C.F.R. § 35.160(b)(2) ...................................................................... 10

Fed. R. Evid. 702(a) ............................................................................... 9

Fed. R. Evid. 702(b) ........................................................................ 9, 11

Fed. R. Evid. 702(c) ............................................................................... 9

Fed. R. Evid. 702(d) ............................................................................... 9

LRCiv 7.2(m)(2) .................................................................................... 24

In response to Plaintiffs' Motion, Defendants produced an enormous amount of irrelevant information, including private industry standards, the average length of language line calls, and an "expert" report that twists the medical record, ignores contrary evidence, and relies on speculative and outdated stereotypes about D/deaf people. What Defendants fail to provide is a reliable system to demonstrate compliance with Paragraph 14, and the monthly compliance reports they promised years ago. Even now, Defendants cannot say whether a specific class member is fluent in English, whether a specific healthcare practitioner is proficient in another language, and whether a specific encounter complied with Paragraph 14. Instead, they resort to stubborn assertions of compliance and defend a "hard-stop" system that records only compliance (and not noncompliance). Judicial relief prescribing specific mechanisms of compliance therefore is needed.

Defendants' intimation that the clock should be reset because they switched contractors over a year ago also is meritless. The faulty system in place now has been in place for over three years, resulting in the same repeated and unreported failures to provide language interpretation. And Defendants' current contractor has been aware of the problem for over a year; Centurion's General Counsel, Director of Operations, Vice Presidents of Operations and Mental Health, Chief Medical Officer, Chief of Clinical Operations, and Regional Medical Director attended the mediation on August 28, 2019.[1]

## ARGUMENT

### I. THIS COURT'S PRIOR ORDER HAS FAILED TO CORRECT THE DEFICIENCIES IN COMPLIANCE WITH PARAGRAPH 14.

#### A. Defendants' Proposed Method of Demonstrating Compliance Has Proven Unreliable and Inaccurate.

Defendants continue to rely on the "hard-stop" feature in eOMIS, which they implemented in 2017, to demonstrate compliance with Paragraph 14. [Doc. 3673 at 7-8][2]

---

[1] [Doc. 3348 at 1 (Minute Entry) (listing attendees and noting, "Time in court: 3 hrs. 34 mins."); Doc. 3673-4 at 2 ¶ 2 (Tom Dolan); Supplemental Declaration of Corene T. Kendrick ("Kendrick Suppl. Decl.") ¶ 9 (listing titles for other attendees)]

[2] Pincites to filings are to the PDF page number and not any internal pagination.

149342965.1

As explained below, that feature is inherently unreliable.

### 1. The "hard-stop" feature does not identify encounters where language interpretation was needed but not provided.

The "hard-stop" feature allows healthcare staff to record only compliance (and not noncompliance). If staff document that interpreter services are needed, they are asked, "If so, what type of interpreter services were used for the encounter?" and may select from only three options: "Language Line," "Healthcare Staff Used for Interpreter Services," or "Inmate Refused Interpreter Services." [Doc. 3673 at 7-8; Doc. 3623 at 5]

This problem is reflected in the medical records, as Plaintiffs have explained (and Defendants ignore). [Doc. 3623 at 13-15 (noting multiple encounters in which healthcare staff entered "No" in response to hard-stop question, "Are interpreter services needed for this inmate?," but also wrote "no interpreter was available," "no sign language interpreter was available," "requires a translator," "**Patient needs sign language to communicate," "REQUIRES SIGN LANGUAGE INTREPRETER [sic]," "Patient uses sign language to communicate," and "uses sign language")] And, earlier this year, healthcare staff selected "Inmate Refused Interpreter Services," but also wrote, in the same encounter record, "UNABLE TO PULL UP ASL INTERPRETER," indicating not that the class member refused services but instead that Defendants could not provide them. [*Id.* at 15-16]

In addition, the "hard-stop" feature does not identify encounters in which a class member is not fluent in English and healthcare staff wrongly decides that interpretation is not needed. Plaintiffs again produced ample evidence of that problem through class member declarations and medical records. [*See, e.g.*, Doc. 3623 at 10-13] Because each healthcare staff decides whether an interpreter is needed before each encounter, medical records are littered with inconsistent determinations as to a class member's fluency. [*Id.*]

### 2. The "hard-stop" feature does not identify all encounters where language interpretation was provided.

The "hard-stop" feature also does not identify all encounters where interpretation was provided. First, it does not identify encounters where healthcare staff determined

"after the encounter had begun" that interpretation was needed. [Doc. 3673-6 at 6 ¶ 15 (Declaration of Regional Director of Compliance) ("[T]he eOMIS hard stop does not capture encounters where the decision to use the LanguageLine was not made until after the encounter had begun, such as due to an increasing complexity of the encounter requiring additional interpretive services.")] The record would say "No" in response to: "Are interpreter services needed for this inmate?" when in fact staff determined that such services were needed. The sufficiency of that interpretation then cannot be evaluated.

Second, the "hard-stop" feature does not identify encounters where healthcare staff conducting the encounter provide interpretation themselves. [Doc. 3673 at 7 n.3 (citing Doc. 3673-5 at 3 ¶ 13 (Declaration of Facility Health Administrator) ("If the medical staff member is proficient in the language spoken by the inmate, then the staff member will indicate that interpretive services are not required for the visit.")] In those instances, the medical record again would say "No" in response to: "Are interpreter services needed for this inmate?" There then is no way to know that such services were provided by healthcare staff or to evaluate whether staff was in fact "a qualified health care practitioner who is proficient in the prisoner's language." [Doc. 1185 at 6 ¶ 14]

Defendants' solution is simply to assume compliance. [Doc. 3673 at 21 ("Of the instances where no interpreter was needed, **it is likely that** the medical professional was also proficient in Spanish" (emphasis added)), 26 ("**It is probable that** this provider is Spanish language-proficient and therefore would not require a translator for effective communication." (emphasis added))] That is improper. *Parsons v. Ryan*, 949 F.3d 443, 468-69 (9th Cir. 2020) ("*Parsons III*") (affirming finding of "profound and systemic concerns with the monitoring process at every stage of the process").

### B. Defendants Never Produced Monthly Compliance Reports.

In 2016, this Court held that "Plaintiffs are entitled to timely data demonstrating Defendants' compliance" with Paragraph 14 and ordered Defendants to "propose a reporting procedure to demonstrate compliance." [Doc. 1673 at 2, 8] Defendants represented that they would generate a report based on the "hard-stop" feature and that the

"report will then be produced to Plaintiffs on a monthly basis." [Doc. 1703 at 3] Defendants do not dispute that they never produced the reports. [*See* Doc. 3624 at 4 ¶ 8]

In any event, such reports would have been unreliable because they rely on the "hard-stop" feature, which results in inaccurate, inconsistent, and incomplete data, as explained above. This is readily apparent from the lists that Defendants filed with their Response. In particular, Defendants state that "[i]n response to Plaintiffs' monitoring tour document requests, Defendants have regularly produced a list of all patients for whom language interpretation was used for a healthcare encounter, including the inmate's name and number, date of the healthcare encounter, and unit location." [Doc. 3673 at 2] As Plaintiffs have explained since 2015, such lists cannot demonstrate compliance. [Doc. 1561-1 at 6-7; Doc. 1625 at 11 n.4; Doc. 3624 at 2 ¶ 2] The reason is simple: the lists do not indicate when interpretation should have been provided but was not.[3]

For example, the lists state that J.S.H. received interpretation on June 23, 2020, and the provider noted in the record: "Spanish speaking male." [Supplemental Declaration of Amber Norris ("Norris Suppl. Decl.") ¶¶ 53-54] During encounters on June 13 and July 21, however, the medical record states that interpretation was not needed. [*Id.* ¶¶ 56-57] Those encounters do not appear on Defendants' lists. We cannot tell if those encounters complied with Paragraph 14. They could be noncompliant, because healthcare staff (1) wrongly decided J.S.H. did not need interpretation, (2) wrongly believed she was proficient in Spanish, or (3) was unable to procure interpreter services. The encounters also could be compliant if healthcare staff was proficient in Spanish and conducted the encounter in Spanish. Similarly, the lists state that A.N.B. received interpretation on May 29, 2019. [*Id.* ¶ 11] The lists do not show, however, that just five days later, interpretation was not provided during mental health counseling, even though that entry

---

[3] The lists also are produced only in advance of a monitoring tour, and not monthly for all prisons. [*See* Kendrick Suppl. Decl. ¶¶ 5-6 (Plaintiffs visited six prisons (once each) in 2019, and have visited two prisons (twice each) in 2020)]

indicates that A.N.B. is not fluent in English: "Im speaks and understand a little english." [*Id.* ¶ 14(b)]

These are not isolated occurrences; similar omissions can be found on each list and are the natural consequences of an unreliable system.[4] Defendants' own argument proves how unworkable their process is; they object to monitoring compliance with Paragraph 14 because it would require "qualitative auditing of every single healthcare encounter for every single inmate who may not be fluent in English," including "an interview of both the healthcare provider and the inmate." [Doc. 3673 at 30] But that is because Defendants do not have a system in place to accurately identify class members not fluent in English and qualified healthcare practitioners proficient in other languages.

## II.   DEFENDANTS ASSERT COMPLIANCE BASED ON THE WRONG LEGAL STANDARD AND ENDS-DRIVEN SPECULATION.

To illustrate the invalidity of the "hard-stop" system and Defendants' failure to comply with Paragraph 14, Plaintiffs provided numerous examples of noncompliance based on the medical records and declarations of fourteen class members. [Doc. 3623 at 7-17; Doc. 3627-1] Even now, Defendants are unable to say whether specific healthcare encounters for those class members complied with Paragraph 14. They cannot say whether the class member is fluent in English, or whether healthcare staff was proficient

---

[4] [*See, e.g.*, Norris Suppl. Decl. ¶¶ 47, 50 (J.A. at ASPC-Tucson received interpretation during healthcare encounter on January 1, 2020, but apparently did not receive interpretation during a scheduled sick call encounter five days earlier); *id.* ¶¶ 41, 44(a) (C.B. at ASPC-Tucson received interpretation during encounter on January 16, 2020, but apparently did not receive interpretation during an encounter the day before); *id.* ¶¶ 29, 32(b) (A.C. at ASPC-Eyman received interpretation during encounter on November 23, 2019, but apparently did not receive interpretation during encounter two weeks later); *id.* ¶¶ 35, 38(b) (A.I. at ASPC-Eyman received interpretation after he returned from an offsite appointment on November 22, 2019, but apparently did not receive interpretation during an encounter for follow-up care four days later); *id.* ¶¶ 24, 26 (J.R.P. at ASPC-Yuma received interpretation during encounter on August 6, 2019, but apparently did not receive interpretation during a follow-up encounter the next week); *id.* ¶¶ 17, 20 (G.G. at ASPC-Yuma received interpretation during an encounter on September 25, 2019, but apparently did not receive interpretation during chronic care and sick call encounters the week before); *id.* ¶¶ 5, 8(a) (R.M. at ASPC-Lewis received interpretation during encounter on June 27, 2019, but apparently did not receive interpretation during chronic care encounter on July 7, 2019, or mental health counseling on September 5, 2019)]

1    in another language. [Doc. 3673 at 13-28] The most they can say is that language

2    interpretation "**may** not have been necessary." [*Id.* at 14 (F.L.H.), 16 (G.M.), 17 (J.H.), 18

3    (K.P.), 19 (F.L.), 20 (S.C.) (emphasis added); *see also* Doc. 3673 at 13 (W.D.) (asserting

4    that notations in the medical record "**suggest[s]** that there was effective communication"

5    (emphasis added))] That alone should decide the issue; Defendants simply cannot

6    demonstrate compliance if they cannot determine, even with their purported expert's

7    record review, whether a specific healthcare encounter complied with Paragraph 14.

8         In any event, Defendants and their purported expert apply the wrong legal standard

9    and stretch, mold, and cherry pick from the medical records in an attempt to manufacture

10   compliance. That is improper, and the Court should strike the purported expert's report.

11          **A.    The Stipulation, Not Private Industry Standards, Controls.**

12        Defendants for the first time assert that "[t]he need for an interpreter is dependent

13   upon the nature and extent of the encounter and the inmate's ability to meaningfully

14   participate, and it is left to the provider's medical discretion." [Doc. 3673 at 9] Not so.

15   The language of Paragraph 14 is clear and unambiguous:

16               For prisoners who are not fluent in English, language
                 interpretation for healthcare encounters shall be provided by a
17               qualified health care practitioner who is proficient in the
                 prisoner's language, or by a language line interpretation
18               service.

19   [Doc. 1185 at 6 ¶ 14] The inquiry is simple: Either a class member is fluent in English, or

20   they are not. If they are not, they require interpretation during healthcare encounters by

21   either a qualified healthcare practitioner proficient in their language or language line

22   interpretation. Defendants provide no authority (because there is none) to depart from the

23   longstanding rule that, where "the contractual language is clear, [courts] will afford it its

24   plain and ordinary meaning and apply it as written." *Parsons v. Ryan*, 912 F.3d 486, 497

25   (9th Cir. 2018) ("*Parsons II*") (quotation marks and citation omitted).

26        For the same reason, Defendants' discussion of the "constantly evolving" "standard

27   of care" and the "industry standards" of the American Correctional Association ("ACA")

28   and the National Commission on Correctional Healthcare ("NCCHC") is misplaced.

[Doc. 3673 at 10-12] The constitutional issue already has been decided.[5] *Parsons II*, 912 F.3d at 501 ("the district court was not required to make new findings of a constitutional violation before enforcing the Stipulation"). It is the plain language of the Stipulation that controls. *Parsons III*, 949 F.3d at 459 ("the district court cannot unilaterally alter the terms of the Stipulation" (internal quotation marks and citation omitted)); Doc. 3495 at 5 n.1 (Order) ("History has shown that Defendants appear to believe they are empowered to modify the Stipulation to accommodate their own preferences about the best way to provide care. . . . Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable.").

Defendants' purported expert, Dr. Joseph Penn, bases his opinions on the ACA and NCCHC standards. [Doc. 3673-8 at 11-71 ("I. Opinions Relating to Individual Access to Care of LEP Inmates"), 71-74 ("II. Opinions Related to Standard of Care")] His opinions therefore must be excluded. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (quotation marks and citation omitted)); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 337 (9th Cir. 2017) (affirming exclusion of expert testimony that "was irrelevant to the court's analysis").

Defendants make several assertions based on Dr. Penn's standard of care opinions that conflict with Paragraph 14 and thus must be discounted. **First**, Defendants state that "correctional healthcare standards" do not require interpreters "for group psychotherapy." [Doc. 3673 at 9 (citing Dr. Penn's report)] But the Stipulation plainly does, as Defendants seem to realize later.[6] In particular, Defendants assert that the presence of an interpreter

---

[5] In addition, courts have recognized that "it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards." *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1256-57 (9th Cir. 1982) ("it is error to constitutionalize the standards of particular groups" (referencing ACA standards)), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *Rhodes v. Chapman*, 452 U.S. 337, 350 n.13 (1981) ("such opinions . . . simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question" (internal quotation marks and citations omitted)).

[6] Dr. Penn states, without attribution or citation, "I further understand that the

1    could "interfere with the therapeutic benefit to English speaking members of the group,"

2    and conclude that "the appropriate course of action . . . [is] the creation of a Spanish-

3    language group." [*Id.* at 27] It is not clear how, if at all, Defendants would accommodate

4    class members who speak less common languages and require access to group sessions.

5          **Second**, Defendants suggest that "use of an inmate" or custody staff to interpret "is

6    appropriate." [Doc. 3673 at 11 n.5 (citing Dr. Penn's report)] But Paragraph 14 allows

7    interpretation only by "a qualified health care practitioner who is proficient in the

8    prisoner's language, or by a language line interpretation service." [Doc. 1185 at 6 ¶ 14]

9    Defendants may not add other methods to that list. *Boudette v. Barnette*, 923 F.2d 754,

10   756-57 (9th Cir. 1991) (explaining that doctrine of *expressio unius est exclusio alterius*

11   "creates a presumption that when a statute designates certain persons, things, or manners

12   of operation, all omissions should be understood as exclusions"); *Cent. Hous. Inv. Corp.*

13   *v. Fed. Nat'l Mortg. Ass'n*, 248 P.2d 866, 868 (Ariz. 1952) (doctrine applies to contracts).

14         **Third**, Defendants attempt to carve-out a sweeping, undefined exception for "some

15   circumstances, e.g., urgent or emergent situations." [Doc. 3673 at 10 (citing Dr. Penn's

16   report)] That is similarly unavailing. It also is unnecessary; Defendants elsewhere boast

17   that interpreters "are available 24 hours a day, 7 days a week," "through any telephone"

18   (for audio interpreters) and "any laptop, desktop, or any other internet connected device"

19   (for sign language interpreters). [*Id.* at 4-5]

20         **Finally**, Defendants assert that "[s]ince [suicide] watch contacts often occur at or

21   near the watch cells, where videoconference equipment is not located, it may not be

22

23   Court has determined that group counseling sessions do not count as 'encounters' . . . ."
24   [Doc. 3673-8 at 54] Dr. Penn is misinformed; the Court has said no such thing. Paragraph
     14 applies to all "healthcare encounters." [Doc. 1185 at 6 ¶ 14] Performance Measure 92,
25   which is labeled in the Stipulation as a "Health Care Performance Measure" and a "Health
     Care Outcome Measure," provides that certain class members "shall be seen by a mental
26   health clinician for a 1:1 or group session a minimum of every 30 days." [Doc. 1185-1 at
     1, 8, 14] Neither Dr. Penn nor Defendants explain why an individual mental health session
27   required by PM 92 counts as a "healthcare encounter," but a group mental health session,
     required by the same performance measure, does not. Because Dr. Penn's opinions
28   regarding group counseling sessions are based upon this erroneous premise, those
     opinions should be disregarded or stricken.

medically appropriate to transport the inmate away from the area to permit videoconference interpreter use." [Doc. 3673 at 18 n.8] But the current location of equipment does not excuse noncompliance. Defendants must either provide a qualified healthcare practitioner proficient in sign language or provide videoconference equipment where suicide watch contacts with D/deaf class members occur.

### B. Defendants Resort to Speculation and Omission to Manufacture Compliance.

Applying the wrong legal standard, Defendants resort to base speculation, ignore contrary evidence, and demonstrate an ends-oriented approach. Their Response is lifted almost entirely verbatim from the section of Dr. Penn's report entitled, "I. Opinions Relating to Individual Access to Care of LEP Inmates." [*Compare* Doc. 3673 at 13-28, *with* Doc. 3673-8 at 11-71] That section must be excluded. Plaintiffs outline areas of particular concern below, focusing on the "expert" opinions that Defendants rely upon.

### 1. Dr. Penn relies on outdated, unfounded, and uninformed stereotypes about the communication needs of D/deaf people.

Dr. Penn's opinions regarding D/deaf class members rely on uninformed stereotypes. Those opinions should be excluded. Fed. R. Evid. 702(b)-(d). There also is no indication that Dr. Penn has any specialized experience or knowledge regarding the language needs of D/deaf people. [Doc. 3673-8 at 6-11 ("Overview of Qualifications"), 84-112 (CV), 114-119 (testimony)] His opinions also should be excluded on that basis. Fed. R. Evid. 702(a); *see U.S. Equal Emp't Opportunity Comm'n v. Placer ARC*, 147 F. Supp. 3d 1053, 1061 (E.D. Cal. 2015) ("most laypersons have little or no first-hand experience with the Deaf community"); *Thompson v. Dignity Health*, 364 F. Supp. 3d 1046, 1053 (D. Ariz. 2019) (excluding expert testimony where doctor was "an expert in neurology" but "her opinions primarily concern medical education and personnel decisions—topics that are not within her area of expertise").

1

2

**a.     Dr. Penn ignores contrary evidence, including the declarations of class members and healthcare staff notes.**

3      Dr. Penn primarily derives his opinions from a selective reading of healthcare staff

4   notes in the medical record. [Doc. 3673-8 at 12-35, 65-71] With one exception, Dr. Penn

5   does not mention the declarations of D/deaf class members, where they explained that

6   they are not fluent in English and were not provided a sign language interpreter, which

7   suggests that Dr. Penn did review the declarations but found nothing in them to support

8   his opinions.[7] Such evidence is critical; "the individual with a disability is most familiar

9   with his or her disability and is in the best position to determine what type of aid or

10  service will be effective."[8] U.S. Dep't of Justice, Title II Technical Assistance Manual

11  § II-7.1100; *see also* Rebuttal Declaration of Amy June Rowley, Ph.D. ("Rowley Rebuttal

12  Decl.") ¶¶ 15-16 (same). Dr. Penn also ignores the many times in the medical record when

13  healthcare staff note that an interpreter is needed, including encounters identified by the

14  Regional Director of Compliance. [*See, e.g.*, Doc. 3623 at 13-15; Doc. 3673-6 at 7 ¶ 19

15  (stating that W.D., K.P., and R.S. "all had encounters between July 1, 2019 and July 23,

16  2020 where healthcare staff indicated interpreter services were needed")]

17     An expert may not "cherry-pick data." *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d

18  763, 786 (D. Ariz. 2017). By ignoring pertinent evidence, Dr. Penn "displays an ends-

19  driven approach," and his report must be excluded on that basis. *See id.*; *United States v.*

20  *Asiru*, 222 F. App'x 584, 587 (9th Cir. 2007) (affirming district court exclusion of expert

21  ───────────────────

22  [7] Even then, Dr. Penn simply attempts to impugn a class member's credibility
about the onset of his deafness based only on a note in the medical record. [Doc. 3673-8 at

23  17 (stating the C.P.'s declaration that he has been "deaf since childhood" is "contrary to"
a provider note from 2015 stating that "a stroke due to drug abuse . . . resulted in him

24  becoming deaf and mute")] That is both irrelevant and improper. *United States v. Vest*,
116 F.3d 1179, 1185 (7th Cir. 1997) (noting that "credibility of patients," with "only

25  [medical] records and the patients' statements . . . as evidence," is "something not within
an expert's area of special competence"). Regardless, it is not a fair reading of C.P.'s

26  declaration; C.P. stated: "Growing up, I lost more of my functional hearing." [Doc. 3627-
4 at 26 ¶ 4] And Dr. Penn does not dispute C.P.'s statement that he never received a sign

27  language interpreter while in ADC custody. [*Id.* at 28 ¶ 19]
[8] Federal regulations implementing Title II require public entities to "give primary

28  consideration to the requests of individuals with disabilities" when "determining what
types of auxiliary aids and services are necessary." 28 C.F.R. § 35.160(b)(2).

1  testimony as based on unreliable methodology where expert did not review pertinent

2  documents); *Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n.60 (E.D.

3  Cal. 2011) ("a reliable expert would not ignore contrary data . . . [and] make sweeping

4  statements without support" (citations omitted)); Fed. R. Evid. 702(b).

### b.    Dr. Penn misstates the medical record and relies on inaccurate assumptions about lip reading.

7        Defendants, based on Dr. Penn's report, assert that two D/deaf class members may

8  be able to read lips and therefore do not require sign language. [Doc. 3673 at 13 (W.D.),

9  16 (G.M.)] But they twist the record. Both Defendants and Dr. Penn represent that there

10  are "multiple references to . . . the fact that [G.M.] could read lips." [Doc. 3673 at 16

11  (quoting Doc. 3673-8 at 20, and both citing Doc. 3627 at 17 ¶ 95)] In fact, Defendants and

12  Dr. Penn cite only one medical record, which proves the opposite: "**Patient uses sign**

13  **language** to communicate and can minimally read lips . . . **difficulty communicating** as

14  patient is deaf and **reads minimal lips**." [Doc. 3627 at 17 ¶ 95 (emphasis added)]

15        Moreover, both class members clearly explained in their declarations that they

16  cannot understand a healthcare encounter by lip reading.[9] That is not surprising. [Rowley

17  Rebuttal Decl. ¶ 27 ("The average deaf lipreader will catch approximately 30% of what is

18  on the mouth (and typically that speech is predictable and highly routinized . . .). Most

19  speech is occluded from sight."); *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 276

20  (D.D.C. 2015) ("[I]t goes almost without saying that [defendant]'s argument that

21  [plaintiff] could read lips because [defendant]'s employees believed that he could is a

22  nonstarter; the [defendant] has not shown that its employees had any prior knowledge of,

23  or had received any training about, communicating with deaf inmates.") (rejecting

24  defendant's "lay opinions" as "entirely uninformed speculation")][10]

---

26        [9] [Doc. 3627-1 at 17 ¶ 16 (W.D.) ("I cannot have a conversation with someone by
lip reading."); Doc. 3627-4 at 47 ¶ 21 (G.M.) ("lip reading is not an effective way for me
27  to receive important information. I cannot understand most English words through lip
reading alone.")]

28        [10] Defendants state in a footnote elsewhere in their brief: "At ASPC-Perryville, . . .
there are currently seven deaf inmates. All of these inmates have indicated that they are

### c. Dr. Penn erroneously believes possession of hearing aids establishes an ability to understand spoken English.

Defendants, again based on Dr. Penn's report, assert that hearing aids suggest that a D/deaf person may not require sign language interpretation. [Doc. 3673 at 13 (W.D.), 14 (F.L.H.), 15 (C.P.), 19 (F.L.)] But possession of hearing aids does not mean someone can understand spoken English. [*See* Rowley Rebuttal Decl. ¶ 37 ("For people who have severe to profound hearing loss, traditional hearing aids served as a tool to let them hear sounds around them and alert them to some things in the environment. . . . Having hearing aids does not supplant a Deaf person's need for a sign language interpreter.")] The declarations from each D/deaf class member identified by Defendants explain as much. [*See, e.g.*, Doc. 3627-7 at 86-88 ¶ 5 (F.L.) ("Hearing aids help me hear some sounds and understand my physical surroundings, but I still cannot distinguish words.")][11]

---

proficient at lip reading and choose this method of communication instead of video interpretation services." [Doc. 3673 at 7 n.2 (quoting Doc. 3673-5 at 4 ¶ 18 (Declaration of Facility Health Administrator))] But Defendants do not identify those class members in the supporting declaration, their level of residual hearing, or what information the declaration is based on. The declaration thus does not comport with Federal Rule of Evidence 602. *See also F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Nor did Defendants identify those class members in response to Plaintiffs' previous information requests. [*See* Kendrick Suppl. Decl. ¶¶ 2-3] On Monday, August 17, 2020, Plaintiffs requested the following from Defendants: "Would you please send us their names and ADC numbers, as well as all documentation stating that they are proficient in lip reading and prefer that method of communication?" [Supplemental Declaration of Rita K. Lomio, Ex. 1] As of Sunday, August 23, Defendants have not provided that information. [*Id.* ¶ 3]

[11] [Doc. 3627-1 at 14 ¶ 2 (W.D.) ("I have a little residual hearing, so when I have hearing aids, I can hear environmental sounds and voices, but I cannot distinguish words or understand speech."); Doc. 3627-2 at 37 ¶ 2 (F.L.H.) ("When I have a hearing aid in my right ear, I can hear sounds, voices, and some words, but cannot fully understand speech. My left ear is completely deaf and damaged too severely to benefit from a hearing aid."); Doc. 3627-4 at 26 ¶ 4 (C.P.) ("With hearing aids, I can hear and feel the vibration of loud sounds, such as the slamming of a door or the clapping of an audience."); Doc. 3627-7 at 86-88 ¶ 14 (F.L.) ("Although I cannot understand words, I can make out sounds when I wear hearing aids, which is important during emergency situations. For example, if a riot took place and loud sirens and alarms were going off, if I had hearing aids I would be alerted to it, and I could then look to the corrections officers for further instructions.")]

1

2

### d.    Dr. Penn improperly assumes that healthcare staff's use of written notes is evidence of compliance.

3    Defendants, again based on Dr. Penn's report, consider the fact that healthcare staff

4    attempted to communicate through written English notes as evidence of compliance.

5    [Doc. 3673 at 14 (F.L.H.), 16 (G.M.), 17 (J.H.), 19 (F.L.), 20 (S.C.), 25 (R.S.)] That is

6    nonsensical. D/deaf class members uniformly explained that they are not fluent in English

7    and that they did not understand such notes. [*See, e.g.*, Doc. 3627-2 at 38 ¶ 8 (F.L.H.)

8    ("Written notes during medical appointments are not effective for me because I mostly do

9    not understand the writing. For example, out of several pages of notes the doctors write, I

10   can usually understand just a few words.")][12] Therefore, healthcare staff's use of written

11   English notes, as opposed to use of the language line or a qualified healthcare practitioner

12   proficient in sign language, in fact establishes noncompliance with Paragraph 14.[13]

13   That alone should decide the matter. But there are at least two additional flaws in

14   Dr. Penn's analysis. First, he assumes that, if staff used written notes, they necessarily

15   correctly determined that notes were sufficient. [*See, e.g.*, Doc. 3673-8 at 66] That is not

16   the proper subject of expert testimony. *Mata v. Oregon Health Authority*, 739 F. App'x

17   370, 372 (9th Cir. 2018) (affirming exclusion of expert testimony where "report did little

18

19   ───────────

20   [12] [Doc. 3627-2 at 39-40 ¶¶ 14-18, 20-23 (F.L.H.) (explaining that written notes were ineffective at specific healthcare encounters); Doc. 3627-4 at 46 ¶ 18 (G.M.) ("I cannot effectively communicate with healthcare providers using written notes"); Doc. 3627-5 at 30 ¶ 8 (J.H.) ("I often find it difficult to communicate just by writing in English, so I rely on ASL instead."); Doc. 3627-6 at 70 ¶ 22 (K.P.) ("Handwritten notes are not an effective way for me to communicate with medical staff because I am not fluent in reading and writing in English. . . . Because of the language differences, I may not even know that a misunderstanding has occurred."); Doc. 3627-7 at 86-87 ¶ 8 (F.L.) ("It takes me a long time to decode and decipher what is being written in English. When it comes to more complex information, like medical terms or legal terms, I need an ASL interpreter to effectively communicate."), *id.* at 88 ¶ 15 (explaining that he did not understand a provider's written communications)]

25   [13] Dr. Penn's attempt to rely on the fact that "a TTY device was attempted to be used" to suggest that interpretation may not have been necessary further demonstrates his lack of knowledge and expertise in the area of D/deaf language needs. [Doc. 3673 at 19 (citing Doc. 3673-8 at 27)] He does not seem to know what a TTY is. As a D/deaf class member explained, "the TTY is not effective for our healthcare communications because it is essentially the same as writing notes, except that the information is typed." [Doc. 3627-6 at 72 ¶ 33 (K.P.); *see also* Rowley Rebuttal Decl. ¶ 24 (discussing TTY)]

more than vouch for [one party]'s version of events"); *Vest*, 116 F.3d at 1185 (noting that "credibility of the patients," with "only [medical] records and the patients' statements . . . as evidence," is "something not within an expert's area of special competence").

Second, that assumption also is flat wrong. More likely, because sign language interpretation was not available, healthcare staff simply resorted to what they thought was the next best thing, as their own medical record entries indicate.[14] [Doc. 3623 at 13-15 (quoting, among other things, entry that stated, "as IM is deaf and no interpreter was available, interview was conducted with paper and pen")] It would be difficult if not impossible for healthcare staff to reliably assess the sufficiency of written notes based on notes alone and, under Paragraph 14, they need not do so; sign language interpretation is required. [*See generally* Rowley Rebuttal Decl. ¶ 21 ("One of the greatest obstacles is never knowing for sure if what one thinks they have understood was indeed the message; or worse, assuming one has understood something that was not the case. The simple fact that a Deaf person and a hearing person exchanged written notes does not mean that both parties necessarily fully understood each other."); *Pierce*, 128 F. Supp. 3d at 283-84 (finding improper fact that defendant's "employees and contractors . . . merely *assumed* that [deaf person] could read (and understand) . . . the notes they wrote to him, even after he told them" that he did not understand and requested a sign language interpreter)]

### e. Dr. Penn's attempt to demonstrate compliance based on submission of HNRs is nothing more than *ipse dixit*.

Defendants, again based on Dr. Penn's report, assert that the fact that D/deaf class members submitted Health Needs Requests ("HNRs") "demonstrates" that they were

---

[14] In another example of selective methodology, Defendants, relying on Dr. Penn, state with respect to a single Spanish-speaking class member: "Where SOAPE notes are detailed as to inmate subjective reports, it is reasonable to conclude that the medical staff member was proficient in the language spoken by the inmate." [Doc. 3673 at 21 n.9 (citing Doc. 3673-8 at 73)] But Defendants and Dr. Penn do not apply this same (flawed) reasoning to the subjective notes from encounters with D/deaf class members that were conducted by written notes. [*See, e.g.*, Doc. 3627 at 52 ¶ 281 ("Pt. is mute and therefore the evaluation proceed [sic] with written questions that he answers with **written one-word responses**." (emphasis added))]

"able to effectively communicate in writing." [Doc. 3673 at 13-14 (W.D.), 14-15 (F.L.H.), 17 (J.H.), 18 (K.P.), 19-20 (F.L.), 21 (S.C.), 25 (R.S.)] But that is not relevant to the Paragraph 14 inquiry. The relevant question is whether a class member is fluent in English. The fact that they were able, either on their own or with the assistance of others, to make out a few words or sentences recognizable in English asking for medical help does not demonstrate fluency. [*See* Rowley Rebuttal Decl. ¶¶ 42-43 (noting that "the HNR forms anticipate a simple description of the issue," it is "very common for Deaf people to be helped" by others when filling out such forms, and Deaf people may have "memorized or written down canned phrases")] That is confirmed by class member declarations. [*See* Doc. 3627-1 at 15 ¶ 9 (W.D.) ("Another prisoner helped me write out the HNR; he wrote out the problem on another piece of paper, and I copied the sentence onto the HNR form."); Doc. 3627-2 at 38 ¶ 12 (F.L.H.) ("I sometimes try to fill out HNRs by copying old forms, but I cannot write well so mostly other prisoners write out my HNRs for me.")]

Dr. Penn relies on sweeping generalizations not grounded in evidence. It does not appear he reviewed the HNRs; instead, he relies on an incomplete table summary. [Doc. 3673-8 at 12-35, 65-71; Norris Suppl. Decl. ¶¶ 82-83, 92-93, 100; Kendrick Suppl. Decl. ¶ 8] Even assuming that class members wrote an HNR without help, the HNRs certainly cannot (and do not) demonstrate English fluency. [*See, e.g.*, Norris Suppl. Decl. ¶ 59 (W.D.) ("Please I want to know fix Hurt Dental Ok I am Deaf THANK YOU Nice")][15]

**f.    Dr. Penn inexplicably reasons that provision of sign language interpretation is evidence that a class member does not need sign language interpretation.**

Defendants, again relying on Dr. Penn's report, conclude that an interpreter may

---

[15] [Norris Suppl. Decl. ¶ 63 (F.L.H.) ("my hear aids is kind hurts and Bother me a lot also I must have special mold Ear aids That mold Help Lot Better! Help me I'm Deaf"), ¶ 67 (C.P.) ("Is that why that the thing swim inside my right testicles to cause it?"), ¶ 72 (K.P.) ("My Both ears Hurt. please check And headache Thank you for your Time.  *I am Deaf.  Need have American Sign Language interpreter Due to communicate."), ¶ 84 (R.S.) ("C.S <u>was</u> change stories. I Dont understand ABout it. . . . I Dont Feel with C.S. Dont understand it. please <u>Right</u> <u>Now</u> <u>I need it</u>. I AM DEAF AND MUTE")]

**not** have been necessary because a class member requested that "a specific inmate ASL interpreter . . . be assigned to him" (Doc. 3673 at 20 (S.C.)), "an inmate interpreter was used to provide ASL interpretation" (*id.* at 13 (W.D.); *see id.* at 19 (F.L.); *id.* at 25 (R.S.)), "an ASL interpreter" through videoconference was used (*id.* at 18 (K.P.); *see id.* at 25 (R.S.)), and "ASL proficient security personnel provided interpretation" (*id.* at 25 (R.S.)). These are just the sort of "unreliable nonsense opinions" that are inadmissible. *See Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). The fact that an ASL interpreter of any sort was used is, if anything, evidence that the class member is not fluent in English and needs an interpreter. The inquiry under Paragraph 14 then is whether interpretation was provided by a "qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service." [Doc. 1185 at 6 ¶ 14] If they were not, the encounter is noncompliant.

In one case, Defendants and Dr. Penn note that "an ASL interpreter was attempted, but could not connect via videoconference." [Doc. 3673 at 18 (K.P.) (quoting Doc. 3673-8 at 25)] It is hard to understand how Defendants and Dr. Penn both categorize that as a "fact[] indicat[ing] that there was effective communication with healthcare staff." [*Id.*] To the contrary, it means that staff recognized that an interpreter was needed, attempted to obtain one, and was unsuccessful—a clear violation of Paragraph 14.

### g.    The grievance system is no substitute for demonstrating compliance with Paragraph 14.

Defendants assert that "the lack of grievances is compelling evidence that there is not a systemic interpreter issue."[16] [Doc. 3673 at 28] But that assumes facts not in evidence; for over a year and a half, Defendants have refused to produce all grievances related to interpretation on the grounds that Plaintiffs' request is "outside the scope of the Stipulation" and "vague and ambiguous as to the terms 'grievances', 'responses',

---

[16] Dr. Penn mentions that two class members did not submit any grievances related to interpretation, but fails to mention that J.H. and K.P. did, further evidencing improper cherry picking. [*See* Doc. 3673-8 at 31 (S.C.), 69 (R.S.), 22-23 (J.H.), 25-26 (K.P.)]

'healthcare encounter', and 'interpreter'."[17] [Doc. 3624 at 5 ¶ 11; Doc. 3624-1 at 77] And to try to prove their point here, Defendants did not canvass the entire Plaintiff class but instead only "pulled all medical grievances submitted by those inmates who submitted declarations in support of Plaintiffs' Motion to Enforce." [Doc. 3673-2 at 3 ¶ 7]

In any event, grievances are not a suitable metric. *Cf. Pierce*, 128 F. Supp. 3d at 269 (finding "truly baffling" defendant's argument that they need not accommodate deaf people "if the inmate does not ask for accommodations," and noting that defendant "does not explain how inmates with known communications-related difficulties are supposed to communicate a need" (internal parenthetical omitted)). Defendants' statement that "[o]nly two inmates filed grievances regarding the lack of ASL services" since 2007, and those grievances predated the current contractor, proves the point.[18] [Doc. 3673 at 28]

J.H. filed an Informal Complaint in September 2018, stating: "I dont [sic] get asl intrepreter [sic] when I get see [sic] by nurse." [Doc. 3673-2 at 9] In response, he was told: "it was determined that you have never expressed the need for an interpreter. Please let whatever provider you are seeing . . . know if you need interpretation services." [*Id.* at 8] J.H. then filed a Grievance: "I dont [sic] like how it said on paper. It's not my first time complain about intrepreter [sic]. . . . This yard know that I am deaf inmate. . . . I never get ASL intrepreter [sic] since I'm serving my time in prison." [*Id.* at 7] The response says: "Please put a request for an ASL interpreter on your HNR so we can give that information to the DOC. Also, we will pass this information on to DOC so it can be arranged for you to have an interpreter." [*Id.* at 6 (also stating that the response "is final, and constitutes exhaustion of all remedies within the Department")] Ten days later, J.H. restarted the process by submitting another Informal Complaint: "they never provided ASL intrepreter [sic] as I put HNR request to provide one." [*Id.* at 13] The response says: "we have

---

[17] Plaintiffs requested the grievances not to measure compliance, but instead in an attempt to identify a few class members not fluent in English for further record review.

[18] Defendants presumably did not in fact review all grievances filed by D/deaf class members, just those filed by the seven declarants. [Doc. 3673-2 at 3 ¶ 2] Of those declarants, C.P. had been incarcerated the longest—since 2007. [Doc. 3627-4 at 26 ¶ 1]

reached out to DOC to request that we may be able to use their[] [interpreter] during medical visits. . . . This has resolved your concern." [*Id.* at 12] J.H. then filed a Grievance two weeks later: "I got response from informal complaint response, they never provided or had intrepreter [sic] for my medical appointment. They considered resolved and it was untrue. . . ." [*Id.* at 11] The response, dated January 30, 2019, says: "[I]t was determined that medical has requested the use of interpretation equipment from DOC for your appointments, but that you are also able to communicate via writing and reading lips. . . . [T]his response is final, and constitutes exhaustion of all remedies . . . ." [*Id.* at 10]

In short, J.H. submitted four complaints over five months and the issue still was not resolved.[19] In fact, sign language interpretation was not added until **almost a year later**, in November 2019—only after Plaintiffs' counsel raised the issue and the parties mediated the dispute. [Doc. 3673 at 4-5] The small number of grievances thus cannot demonstrate compliance. Instead, it is evidence of a broken system. It is more likely that the subset of D/deaf people who knew they were entitled to an interpreter already had asked and been turned down, and did not see the point of continuing to ask. [Rowley Rebuttal Decl. ¶ 46 ("Deaf people have been conditioned though experience after experience to recognize that they are a burden to society and that requiring interpreters (even if it benefits both parties better) requires extra steps that providers do not want to deal with")][20]

---

[19] K.P.'s documents tell a similar story. He also submitted an Informal Complaint, and then a Grievance, requesting sign language interpretation. [Doc. 3673-2 at 16, 18] And his attempts also were unsuccessful. On March 4, 2019, he was told: "Medical staff has been working on having the appropriate interpretation equipment available for you visits. This grievance has been addressed. . . . [T]his response is final, and constitutes exhaustion of all remedies within the Department." [*Id.* at 15]

[20] [*See, e.g.*, Doc. 3623 at 8-9; Doc. 3627-1 at 15 ¶ 8 (W.D.) ("I have repeatedly requested ASL interpreters for medical appointments and have been repeatedly told 'no.'"); Doc. 3627 at 25-26, 28, 30, 40, 41 ¶¶ 136, 138, 140, 151, 159, 204, 209 (J.H., K.P., F.L., and S.C. requesting interpreters on HNRs); Norris Suppl. Decl. ¶¶ 72, 75 (K.P. and F.L. requesting interpreters on HNRs), ¶¶ 59, 63, 70, 84 (W.D., F.L.H., K.P., and R.S. writing that they are "DEAF" or "DEAF AND MUTE" on HNRs)] Class members would have no reason to try again after Defendants changed contractors, even if they were aware such a change had taken place; it took Centurion over four months to provide sign language interpretation, and the only outreach reported are postings in the clinics written in English and Spanish (and thus largely inaccessible to relevant class members). [Doc. 3673 at 4, 6; *see* Doc. 3673-4 at 9]

1

2

      **h.**      **Identification of deafness during intake is not the same as assessing language needs.**

3      Defendants state that they determine, at intake, if a person "is blind or deaf."

4      [Doc. 3673 at 9] But documenting that "as a chronic condition" (*id.*) is not the same as

5      assessing and documenting the person's language needs. [Rowley Rebuttal Decl. ¶ 14

6      ("The fact of a person's deafness does not, on its own, identify how that person

7      communicates. For example, someone who was born deaf or has been deaf since

8      childhood will often be a native ASL user, however a person who is deafened late in life

9      may not communicate using ASL because they never learned the language.")]

10      The intake form does not document an assessment of language needs, including

11      whether someone communicates through sign language. [Doc. 3673-5 at 6-10] And

12      Defendants' system does not rely on any intake assessment in determining whether

13      interpretation is needed in the future; instead, healthcare staff are expected to make a lay

14      assessment anew before each encounter. [*Id.* ¶ 11; Doc. 3673 at 7] That is insufficient.

15      [Rowley Rebuttal Decl. ¶ 15 (noting that this system "invites assumptions"); *Pierce*, 128

16      F. Supp. 3d at 253-54, 255-56 (noting that although "prison staff was indisputably aware

17      that [plaintiff] was deaf," "they figuratively shrugged and effectively sat on their hands

18      . . . , presumably content to rely on their own uninformed beliefs about how best to handle

19      him" and failed to "assess[] whether, or to what extent, [he] would need accommodations

20      to ensure that he could communicate effectively with others")]

21

22

      **2.**      **Dr. Penn relies on the same speculative and ends-oriented approach for monolingual Spanish speaking class members.**

23      Defendants and Dr. Penn rely on the same patently flawed reasoning in their

24      review of healthcare encounters for Spanish speaking class members. [Doc. 3673 at 21-

25      27; Doc. 3673-8 at 36-65]

26

27

      **a.**      **Dr. Penn simply assumes class member "and or" staff proficiency to find compliance.**

28      Again with one exception, Dr. Penn and Defendants do not mention class member

declarations where monolingual Spanish speakers explained that they are not fluent in English, that they were not provided an interpreter, and that healthcare staff instead attempted to communicate with them in English or broken Spanish. [Doc. 3623 at 10-13, 16-17][21] The one exception relates to C.M.; Defendants selectively use and mischaracterize her declaration. [Doc. 3673 at 26-27; Doc. 3673-8 at 54] Both Defendants and Dr. Penn state that C.M. had an encounter with a psych associate whom C.M. "recognized as speaking Spanish." [Doc. 3673 at 26; Doc. 3673-8 at 54] What C.M. said, however, is that the particular psych associate "is very limited in her vocabulary," that "no interpreter was present," and that "[t]he inability to communicate with my clinician negatively affects my mental health." [Doc. 3627-11 at 120-21 ¶¶ 7-8]

Dr. Penn at least recognized that C.M. "takes issue with the provider's level of proficiency." [Doc. 3673-8 at 54] His methodology, however, gives such testimony no weight and instead simply assumes compliance:

> Where it was indicated in my analysis that an inmate speaks a language other than English (for example Spanish) but healthcare staff did not indicate interpreter services were required, I concluded that the healthcare staff conducting the encounter was likely proficient in Spanish (and or the inmate patient could also speak sufficient English).

[Doc. 3673-8 at 73] But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). Paragraph 14 is not premised on "sufficient English"; it requires interpretation when a person is "not fluent in English." [Doc. 1185 at 6 ¶ 14] And Defendants and Dr. Penn simply cannot conclude that it is "probable" or "likely" that healthcare staff is

---

[21] [*See, e.g.*, Doc. 3627-9 at 38 ¶ 12 (F.A.H.) ("I asked the psychologist if we could use the telephonic Spanish interpreter because my English skills are not good. The psychologist told me she could understand me in Spanish, and while it did seem like she understood what I was saying during the appointment, she only spoke English back to me and I didn't understand what she was saying. I didn't understand what was going on during the appointment, and I was frustrated that I was unable to ask her whether these medications might be bad for my liver, because I already have Hepatitis C.")]

proficient in Spanish just because they wish it were so.[22] Defendants and Dr. Penn make the same assumption when the medical record states that "Healthcare Staff Used for Interpreter Services"—they simply assume that such staff must have been proficient in Spanish. [*See* Doc. 3673 at 23 (citing Doc. 3673-8 at 42)]

What Defendants and Dr. Penn do not do is state whether a particular healthcare staff person is in fact proficient in Spanish. *Cf. United States v. Noah*, 475 F.2d 688, 691 (9th Cir. 1973) ("The failure of a party to produce a material witness who could elucidate matters under investigation gives rise to a presumption that the testimony of that witness would be unfavorable to that party if the witness is peculiarly within the party's control"). In fact, Defendants refuse to identify "healthcare staff that speak languages other than English," although they claim that they have compiled that information while preparing their response to Plaintiffs' Motion. [Doc. 3673 at 4, 29-30 n.11; Doc. 3673-4 at 3 ¶ 5] Instead, they offer only "survey statistics regarding the breadth of languages spoken by a cross section of Centurion's healthcare staff." [Doc. 3673 at 29-30 n.11] Defendants admit, however, that they do not independently evaluate staff's language proficiency and instead rely on self-reporting. [*Id.* at 4, 29-30 & n.11] Regardless, the statewide total number of staff who self-reported as proficient in a particular language, the statewide total number of language line calls (by month), and the average length of those calls are simply irrelevant. [*See id.* at 5-6] The fact that 133 "providers, nurses, and other medical professionals in ADCRR's ten state-operated prison complexes" "indicated that they are proficient in Spanish" (*id.* at 4) does not demonstrate that a specific healthcare encounter for a specific class member at a specific prison was compliant with Paragraph 14.

---

[22] [Doc. 3673 at 26 (J.F.B.) ("**It is probable** that this provider is Spanish language-proficient and therefore would not require a translator for effective communication." (citing Doc. 3673-8 at 51, and quoting Dr. Penn's report verbatim)); *id.* at 21 (F.H.) ("Of the instances where no interpreter was needed, **it is likely** that the medical professional was also proficient in Spanish" (citing Doc. 3673-8 at 36, but Dr. Penn said only that "**it is possible** that the medical professional was also proficient in Spanish") (emphases added))] Similarly, contrary to Dr. Penn's assertion, "the relatively small number of encounters" where "it is not documented that translation services were needed" hardly can be evidence "that healthcare staff were proficient Spanish speakers." [Doc. 3673 at 23-24 (D.M.) (quoting Doc. 3673-8 at 42)]

1
2

### b.   Submission of HNRs, in Spanish or English, does not establish a class member is fluent in English.

3    Defendants and Dr. Penn again engage in unfounded speculation based on the mere

4   fact that someone has submitted HNRs to request medical care. [Doc. 3673 at 22 (F.A.H.),

5   23 (C.L.), 24 (D.M.); 26 (J.F.B.), 27 (C.M.)] But that shows at most that the person was

6   able to directly, or with help from another, write a few words or sentences recognizable in

7   Spanish or English. It does not establish that they are fluent in English—the relevant

8   inquiry under Paragraph 14. *Daubert*, 509 U.S. at 597 (expert testimony must "rest[] on a

9   reliable foundation" and be "relevant to the task at hand"). Indeed, the HNRs in a single

10  class member's records are in both Spanish and English, in different handwriting, and

11  suggest different levels of written literacy. [Norris Suppl. Decl. ¶¶ 86-112; *see, e.g.*, *id.* at

12  ¶ 111 (C.M.) ("I have a Bad Flue [sic] It Dont [sic] Let me Breath [sic] and a Bad Coff

13  [sic] and mucha tos.") ("mucha tos" is Spanish for "lots of coughing")]

14    Consider, for example, the medical records of J.F.B. Defendants and Dr. Penn

15  conclude that J.F.B.'s submission of twelve HNRs "demonstrates that he has been able to

16  effectively communicate in writing his healthcare issues," even though they also concede

17  that "a majority of the HNRs were submitted in Spanish." [Doc. 3673 at 26 (citing

18  Doc. 3673-8 at 52 (Dr. Penn's report stating that HNRs "clearly demonstrate[]" effective

19  communication))] That is not relevant to the issue at hand; an ability to write in Spanish of

20  course does not establish English fluency. And Defendants and Dr. Penn fail to explain

21  how their conclusion relates to the contradictory declaration of the Regional Director of

22  Compliance, which documents healthcare staff's uniform and repeated entries in the

23  medical record over the past year stating that J.F.B. does in fact need language

24  interpretation. [Doc. 3673 at 26; *see* Doc. 3673-6 at 7 ¶¶ 18, 25]

25    Notably, Defendants discuss the particular wording of an HNR only once. The

26  leaps of logic in the argument are dizzying. Both Defendants and Dr. Penn note that one

27  healthcare staff noted that D.M. "writes in Spanish because he cannot write in English."

28  [Doc. 3673 at 24 (citing Doc. 3673-8 at 42)] In the very next paragraph, Defendants state

that one HNR, written in English, is "particularly detailed" and evidences that "healthcare staff responded appropriately" (to what is unclear). [*Id.* (citing Doc. 3673-8 at 43)] Defendants and Dr. Penn then note that "a few HNRs were submitted in Spanish." [*Id.* (citing Doc. 3673-8 at 43)] What they expect the Court to conclude from this is unclear. Was healthcare staff wrong in writing that D.M. cannot write in English? Or did someone help D.M. write the "particularly detailed" HNR? The latter seems more likely; the handwriting on the "particularly detailed" HNR differs from that found in other HNRs in D.M.'s medical record. [Norris Suppl. Decl. ¶¶ 100-02; *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 25 (1st Cir. 2003) ("One does not need expertise in handwriting analysis to recognize the handwriting of two different people on the same document.")] Regardless, the very fact that Defendants ask the Court to countenance their "spaghetti approach" shows that Defendants do not have a reliable system in place to demonstrate compliance with Paragraph 14.[23]

### III.    DR. STEWART'S EXPERT DECLARATION IS ADMISSIBLE.

In a brief footnote, Defendants discount the expert opinion of Dr. Stewart because, they say, it is "unclear whether [he] is board certified in forensic psychiatry" and he "lacks experience as a staff psychiatrist either in a direct clinical or administrative capacity in any state or federal prison system." [Doc. 3673 at 28 n.10] That is inadequate. *Parsons III*, 949 F.3d at 455 n.2 (holding that Defendants' cursory argument made in a footnote was "forfeited due to inadequate briefing"). In any event, Defendants' attorneys already have tried and lost this argument in this and other litigation. "Dr. Stewart's academic qualifications, in addition to his over thirty years of experience working as a psychiatrist in institutional and correctional settings, demonstrates to the Court that Dr. Stewart possesses the requisite credentials to testify as an expert to his psychiatric, correctional-related opinions in this case." *Ferreira v. Arpaio*, No. CV-15-01845-PHX-JAT, 2017 WL

---

[23] *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("When reading [the party]'s brief, one wonders if [the party], in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick.").

5504453, at *6 (D. Ariz. Nov. 16, 2017); *see id.* at *6 n.2 ("Defendants' argument that Dr. Stewart is not qualified to give his opinions because he is not a board-certified forensic psychiatrist is misplaced."). He is a practicing clinical and forensic psychiatrist. [Doc. 3626-1 at 3-4, 11-12] He has served as the court-appointed monitor in state prison cases and has consulted with the Federal Bureau of Prisons regarding the provision of mental health care. [*Id.* at 11-13] His opinions on the provision of mental health care in state prisons have been credited by this Court, the Ninth Circuit, and the U.S. Supreme Court. *See* Doc. 372 at 9-10 (order citing Dr. Stewart's expert report in support of class certification); Doc. 1040 (order denying Defendants' *Daubert* motion against Dr. Stewart); *Parsons v. Ryan*, 754 F.3d 657, 670-71 (9th Cir. 2014) ("*Parsons I*") (citing Dr. Stewart's expert report in support of class certification); *see also Brown v. Plata*, 563 U.S. 493, 517-19 & n.6 (2011) (citing expert conclusions of Dr. Stewart).

Defendants also attempt to incorporate by reference eight pages of their purported expert's report as legal argument. [Doc. 3673 at 28 n.10 (citing Doc. 3673-8 at 74-81 (section entitled, "III. Opinions regarding the Declaration of Dr. Pablo Stewart"))] That too is improper. *See* LRCiv 7.2(m)(2) ("An objection to (and any argument regarding) the admissibility of evidence offered in . . . opposition to a motion must be presented in the objecting party's responsive . . . memorandum and not in a separate motion to strike or other separate filing."); *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996) ("the incorporation of substantive material by reference is not sanctioned by the federal rules at issue, and the district court did not abuse its discretion in striking the incorporations"); *Docusign, Inc. v. Sertifi, Inc.*, 468 F. Supp. 2d 1305, 1307 n.3 (W.D. Wash. 2006) ("Technical experts are not qualified to make legal conclusions and arguments, and where a party elects to include legal arguments in a technical declaration, rather than in a brief, those arguments may appropriately be disregarded.").

1

2

**IV.    THIS COURT CAN AND SHOULD ORDER SPECIFIC RELIEF TO ENSURE COMPLIANCE WITH PARAGRAPH 14.**

3       Where, as here, a previous order has failed to bring about compliance, the Court

4   has the power—and the duty—to enter further relief. *Brown v. Plata*, 563 U.S. 493, 542

5   (2011) ("[a] court that invokes equity's power to remedy a constitutional violation by an

6   injunction mandating systemic changes to an institution has the continuing duty and

7   responsibility to assess the efficacy and consequences of its order"); *Frew ex rel. Frew v.*

8   *Hawkins*, 540 U.S. 431, 440 (2004) ("Federal courts are not reduced to approving consent

9   decrees and hoping for compliance. Once entered, a consent decree may be enforced.").

10      Similarly, where, as here, the Defendants already have been given "an opportunity

11  to remedy their non-compliance," the Court should direct more specific actions. *See*

12  *Parsons II*, 912 F.3d at 499 (affirming order requiring Defendants to "use all available

13  community healthcare services"); *see also Armstrong v. Brown*, 768 F.3d 975, 986 (9th

14  Cir. 2014) ("relief prescribing more specific mechanisms of compliance is appropriate"

15  where Court's previous attempts to "correct the deficiencies in . . . compliance . . . through

16  less intrusive means . . . have failed").

17      **A.    The Proposed Order Is Tailored to the Requirements of Paragraph 14.**

18      Plaintiffs' proposed order is tailored to the requirements of Paragraph 14.

19  [Doc. 3623-1 (Proposed Order)] In fact, Plaintiffs tied each piece of requested relief to the

20  specific language in Paragraph 14. [Doc. 3623 at 17-20] Defendants' scattershot

21  arguments to the contrary are meritless. [Doc. 3673 at 29-30]

22      **First**, Defendants assert that "monthly CGAR reporting is not required."

23  [Doc. 3673 at 29] That is true. This Court has observed that "[i]ncluding this information

24  in the CGAR appears to be the simplest way to demonstrate that Defendants are compliant

25  with" Paragraph 14, but allowed Defendants to "provide another method of demonstrating

26  compliance." [Doc. 1673 at 2] In response, Defendants represented that they would

27  produce compliance reports to Plaintiffs "on a monthly basis," but **they have never done**

28  **so**. [Doc. 1703 at 3; *see* Doc. 3624 at 4 ¶ 8] Defendants' wishful assertion now that they

"are in compliance with Paragraph 14" is no substitute; this Court already held "that Defendants must demonstrate compliance with" Paragraph 14. [Doc. 1673 at 2] Because they have failed to do so, a more specific order is necessary. *Parsons III*, 949 F.3d at 459 & n.4 ("ordering comprehensive reporting of noncompliance falls within the district court's authority under the Stipulation," including monthly reports (emphasis omitted)).

**Second**, Defendants state that "[t]here is no need to track inmates who are not fluent in English" because that determination is made *de novo* "each and every time" someone has a healthcare encounter. [Doc. 3673 at 12, 29] But Defendants cannot demonstrate that class members not fluent in English are provided interpretation, as required by Paragraph 14, if they cannot accurately identify those class members. This is not a hypothetical problem. Plaintiffs offered declarations by class members stating that they are not fluent in English and that they were not provided interpretation for specific encounters, as well as corresponding medical records that state (wrongly) that no interpretation was needed. [Doc. 3623 at 10-13] Similarly, Plaintiffs produced evidence that for the same class member, medical record entries often were contradictory as to whether interpretation was needed. [*Id.* at 13-16] But English fluency is a binary inquiry; either someone is fluent in English or she is not. Defendants cannot simply ignore evidence that their current system is not accurately and reliably identifying people not fluent in English. In a system this large, it makes no sense to leave it to countless staff members who apparently do not have the knowledge and training to determine the need for interpretation for each encounter. Instead, it is a system designed to artificially reduce the need for an interpreter. An accurate and reliable system can and must be developed. [Doc. 3623 at 18-20 (discussing guidance from the U.S. Department of Justice and court order related to Orleans Parish Prison requiring the relief sought here)][24]

---

[24] Defendants contend that the Court should not consider the consent judgment related to Orleans Parish Prison because it "exceed[s] the correctional healthcare standard of care." [Doc. 3673 at 12 (emphasis removed)] Again, Defendants apply the wrong standard. The consent judgment, like the Stipulation here, complied with the Prison Litigation Reform Act and constitutional standards. *See Jones v. Gusman*, 296 F.R.D. 416, 453 n.448 (E.D. La. 2013) ("The Court concludes that the consent judgment is narrowly

1    **Third**, Defendants contend that they need not identify "'qualified healthcare

2    practitioners' who have non-English language proficiency" because that "would

3    inevitably lead to the judicial mandating of hiring a certain number and type of staff

4    (certified translators), in violation of Paragraph 36's no-staffing provision." [Doc. 3673 at

5    29-30] That argument is nothing short of frivolous. Paragraph 14 requires that

6    interpretation "be provided by a qualified health care practitioner who is proficient in the

7    prisoner's language, **or by a language line interpretation service**." [Doc. 1185 at 6 ¶ 14

8    (emphasis added)] Thus, to demonstrate compliance, Defendants must show that if staff

9    was used for interpretation, they were a "qualified health care practitioner . . . proficient in

10   the prisoner's language." If they were not, the remedy is not for the Court to order the

11   hiring of such staff, it is for "a language line interpretation service" to be used.

12         **B.      Defendants Had Ample Time to Address Their Noncompliance.**

13   Defendants suggest that the clock should be reset because they switched

14   contractors over a year ago, but also complain that Plaintiffs waited until this year to seek

15   enforcement. [Doc. 3673 at 1, 3] Those contradictory arguments are meritless.

16   Defendants, not their contractor, are ultimately responsible for compliance with the

17   Stipulation. *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care

18   does not relieve the State of its constitutional duty"). Regardless, the current contractor

19   has been on notice of the problems for over a year; the contractor's attorneys and senior

20   administrators attended the Paragraph 14 mediation. [Kendrick Suppl. Decl. ¶ 9]

21   And the Stipulation does not require the parties to run immediately to court.

22   [Doc. 1185 at 13 ¶ 31] Nor should it. *Cf. Keith v. Volpe*, 833 F.2d 850, 857 (9th Cir. 1987)

23   ("Forcing the parties to take up positions on the battlefield of litigation . . . is antithetical

24   to the desired goal of amicable implementation of a consent decree."). Plaintiffs provided

25   Defendants and their new contractor ample time to correct the problems. Several months

26   after mediation, Defendants began to provide some sign language interpretation. [Doc.

27

28   drawn with respect to constitutional standards.").

3673 at 4-5] But no other changes were made. The same system that was in place when the parties mediated this dispute last year is still in place and is still producing the same inaccurate data for the same reasons, as Plaintiffs previously explained and supported with ample evidence. [Doc. 3623 (Motion); Doc. 3627 ¶¶ 27, 29, 31, 70, 72, 74, 165, 167, 169, 171, 175, 202, 204, 206, 219, 221, 223, 225, 238, 242, 244, 248, 250, 259, 261, 266, 268, 270, 272, 274, 278, 283, 285, 287, 289, 307, 309, 311, 313, 315 (medical records for encounters after July 1, 2019); Doc. 3627-9 at 38-39 ¶¶ 12-13, 15 (F.A.H.); Doc. 3627-10 at 30 ¶ 11 (C.L.); Doc. 3627-10 at 81-82 ¶¶ 5-9 (D.M.); Doc. 3627-11 at 120-122 ¶¶ 7, 8, 10, 12 (C.M.) (class member declarations regarding noncompliant encounters after July 1, 2019)] In light of Defendants' unyielding refusal to fix their system after being on notice of its serious flaws for a year and a half, judicial relief now is warranted.

## CONCLUSION

The Court should order Defendants to develop an accurate system to demonstrate compliance with Paragraph 14 of the Stipulation. In addition, for the reasons set forth above, the Court should strike the declaration of Dr. Joseph Penn (Doc. 3673-8).

Respectfully submitted this 24th day of August 2020.

**PRISON LAW OFFICE**

By:   s/ Rita K. Lomio
　　　Donald Specter (Cal. 83925)*
　　　Alison Hardy (Cal. 135966)*
　　　Sara Norman (Cal. 189536)*
　　　Corene T. Kendrick (Cal. 226642)*
　　　Rita K. Lomio (Cal. 254501)*
　　　1917 Fifth Street
　　　Berkeley, California 94710
　　　Telephone:  (510) 280-2621
　　　Email:    dspecter@prisonlaw.com
　　　　　　　ahardy@prisonlaw.com
　　　　　　　snorman@prisonlaw.com
　　　　　　　ckendrick@prisonlaw.com
　　　　　　　rlomio@prisonlaw.com

　　　*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
              echo@aclu.org
              mmorris@aclu.org

*Admitted *pro hac vice*. Not admitted in DC;
 practice limited to federal courts.
**Admitted *pro hac vice*

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    jkeenan@acluaz.org
              carellano@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen; Stephen
Swartz; Sonia Rodriguez; Christina Verduzco;
Jackie Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others similarly
situated*

1

2

**ARIZONA CENTER FOR DISABILITY LAW**

3

By:   s/ Maya Abela
      Rose A. Daly-Rooney (Bar No. 015690)

4
      J.J. Rico (Bar No. 021292)
      Maya Abela (Bar No. 027232)

5
      177 North Church Avenue, Suite 800
      Tucson, Arizona 85701

6
      Telephone:  (520) 327-9547
      Email:    rdalyrooney@azdisabilitylaw.org

7
                jrico@azdisabilitylaw.org
                mabela@azdisabilitylaw.org

8
      Asim Dietrich (Bar No. 027927)

9
      **ARIZONA CENTER FOR DISABILITY
      LAW**

10
      5025 East Washington St., Ste. 202
      Phoenix, Arizona 85034

11
      Telephone: (602) 274-6287
       Email:    adietrich@azdisabilitylaw.com

12

      *Attorneys for Arizona Center for Disability Law*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

149342965.1

-30-

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on August 24, 2020, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Michael E. Gottfried
Lucy M. Rand

7

Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov

8

Lucy.Rand@azag.gov

9

Daniel P. Struck
Rachel Love

10

Timothy J. Bojanowski
Nicholas D. Acedo

11

Ashlee B. Hesman
Jacob B. Lee

12

Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC

13

dstruck@strucklove.com
rlove@strucklove.com

14

tbojanowski@strucklove.com
nacedo@strucklove.com

15

ahesman@strucklove.com
jlee@strucklove.com

16

tray@strucklove.com

17

*Attorneys for Defendants*

18

19

s/ D. Freouf

20

21

22

23

24

25

26

27

28

149342965.1                                                   -31-