Jared Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:  jkeenan@acluaz.org
          carellano@acluaz.org

Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,
Sonia Rodriguez, Christina Verduzco, Jackie Thomas,
Jeremy Smith, Robert Gamez, Maryanne Chisholm,
Desiree Licci, Joseph Hefner, Joshua Polson, and
Charlotte Wells, on behalf of themselves and all others
similarly situated

**[ADDITIONAL COUNSEL LISTED BELOW]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW** 5025
East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

Attorneys for Plaintiff Arizona Center for Disability
Law

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-ROS |
| Plaintiffs, | **REBUTTAL DECLARATION OF AMY JUNE ROWLEY, PH.D.** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Larry Gann, Division Director, Division of Health Services Contract Monitoring Bureau, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

I, AMY JUNE ROWLEY,  declare:

1.      I am a professor of American Sign Language  (ASL) at California State University East Bay, and completed my Ph.D. work in Urban Education, Curriculum and Instruction, with a focus on Second Language  Acquisition at the University of Wisconsin, Milwaukee  with a dissertation on implementation procedures and identifying empowering practices in advanced  studies programs in American Sign Language.  I obtained a B.A. in Biology  from Gallaudet  University,  the  primary  national  post-secondary  liberal  arts institution for Deaf students in the U.S., and I also hold a Master's Degree in Deaf Education and  an  ASL  Specialist  Certification  from  Western  Maryland  College,  now  McDaniel College.  Further, I obtained an ASLTA-Professional  level certification (now called Master Level)  in 2000 from the American  Sign Language  Teacher's Association  (ASLTA)  and obtained  a  certification  of  ASLPI-5  (Native  level)  from  the  American  Sign  Language Proficiency Interview (ASLPI).

2.      In  my  former  role  as  Associate  Clinical  Professor  and  Coordinator  of American Sign Language  Programs in the Department of Exceptional  Education at The University  of Wisconsin,  Milwaukee,  I was  responsible  for overseeing  five ASL-related programs  at  both  the  undergraduate  and  post-baccalaureate  levels.  Currently,  as  a  full Professor  in  the  Department  of  Modern  Languages  and  Literatures  at  California  State University  East  Bay,  I  perform  similar  teaching  and  administrative  work,  including curricular development.  At present I also work for the University of Maine as a curriculum specialist for distance teaching of ASL,  where I support and train Deaf instructors as they transition to distance education of ASL.

3.      I am also a nationally recognized authority in the assessment and certification of ASL teachers  and have been involved  with portfolio development  and assessment for ASL  Teacher  Training  Programs.  I  served  on  the  American  Sign  Language  Teachers Association Revision Task  Force to redesign their Teacher Evaluation  and Certification Program, and I am currently the Chair of the Evaluations  and Certifications Program under

the American Sign Language Teachers Association, which is the governing body for certifying teachers of ASL in the United States and beyond. Some of the responsibilities of the Chair include: coordinating evaluation assessment, coordinating training for evaluators, and assessments for candidates. I have published on educational interpreting, the role of ASL in interpreter education, ASL and interpreter education programs, accessibility, and Deaf-related communication access legal cases.

4.      I offer my expert opinion as a native signer of ASL with life-long experience in the Deaf community, a nationally certified teacher of ASL, and assessor of ASL proficiency, and a researcher on second language learners of ASL. I have also served as an expert witness in a variety of cases in Wisconsin related to educational placement, discrimination, and access to interpreters in education, arrest, incarceration, and trial contexts. My current *curriculum vitae* is attached as **Exhibit 1** to this declaration, and the list of previous cases where I have served as an expert witness is attached as **Exhibit 2**.

5.      I have been asked by Plaintiffs' counsel to express an opinion concerning the statements made in Defendants' briefing and declarations (Doc. 3673) concerning Deaf class members and their language interpretation needs, as well as to offer my expert opinion on issues regarding American Sign Language, Deaf Culture, interpreting, and Deaf individuals requiring communication access for medical and mental health services provided in a prison setting.

6.      I also discuss issues regarding other English-based means of communication access, including lipreading and writing back and forth. I will also address the uniquely different conditions under which Deaf individuals learn to read, and the general English fluency levels among the Deaf community.

7.      I have reviewed the following documents:

      a.      The Stipulation (Doc. 1185) in this case;

      b.      The Protective Order (Doc. 140) and Amended Protective Order (Doc. 454);

c.      Plaintiffs' Motion to Enforce Paragraph 14 of the Stipulation (Doc. 3623);

d.      Declaration of Amber Norris in Support of Plaintiffs' Motion to Enforce Paragraph 14 of the Stipulation (Doc. 3627), and Exhibits 1-124 thereto;

e.      Defendants' Response to Plaintiffs' Motion to Enforce Paragraph 14 of the Stipulation (Doc. 3673), and Exhibit 2 (Declaration of Larry Gann), Exhibit 4 (Declaration of Adalia Cerrillo), and Exhibit 7 (Declaration of Joseph V. Penn, MD CCHP FAPA), thereto.

f.      Health Needs Requests submitted by Deaf class members, submitted as Exhibits 42-50 of the Supplemental Declaration of Amber Norris in Support of in Support of Plaintiff's Reply in Support of Motion to Enforce Paragraph 14 of the Stipulation.

g.      Connie Mayer, Chapter 10 – *The Demands of Writing and the Deaf Writer, in* 2 The Oxford Handbook of Deaf Studies, Language, and Education 144 (Marc Marschark & Patricia Elizabeth Spencer eds., 2010).

h.      Marjorie DeVault, Rebecca Garden & Michael A. Schwartz, *Mediated Communication in Context: Narrative Approaches to Understanding Encounters between Health Care Providers and Deaf People*, 31 Disability Stud. Q. 4 (2011).

i.      Michael A. Schwartz, *Communication in the Doctor's Office: Deaf Patients Talk About Their Physicians*, (Ph.D. Dissertation, Syracuse University, 2006).

j.      Michael A. Schwartz, *Deaf Patients, Doctors, and the Law: Compelling a Conversation About Communication*, 35 Fla. St. L. Rev. 947 (2007).

k.      Katrina R. Miller, *Linguistic Diversity in a Deaf Prison Population: Implications for Due Process*, 9 J. Deaf Stud, and Deaf Ed. 1 (2004).

## Terminology

8.      Throughout this declaration, when the word Deaf is capitalized, I am referring to a person who not only has a hearing loss, but who also identifies with Deaf people and Deaf culture. This person is likely to sign American Sign Language and to seek out other Deaf people and attend Deaf events. This is referred to as a cultural perspective on deafness. When the word deaf is used in lower case, I am referring specifically to a person's medical condition of hearing loss. This is referred to as the medical or pathological perspective on deafness. Sometimes the lines are blurred and a person who is hard of hearing identifies as culturally Deaf and vice versa, a profoundly deaf person may not identify with Deaf culture but still be profoundly deaf.

9.      The use of "hearing person" while understandable is rather uncommon except in discussions where people who can hear are being contrasted with Deaf people. I will use hearing both for cases in which a person physically can hear and for people who are coming from a perspective of mainstream, hearing culture.

10.     A person who is referred to as "hard of hearing" has a mild to moderate hearing loss and can with some difficulty (mild) or when using a hearing aid (moderate) hear sounds within the speech range.

## American Sign Language and Deaf Communication

11.     A very common misconception is that American Sign Language is just a manual coding of English on the hands. This is not true. American Sign Language and English are two completely distinct languages that are mutually unintelligible and do not even fall into the same typological categories the way French, Italian, and Spanish do (Romance languages); or English, German, and Dutch do (Germanic languages). They grammatically differ in how they mark subjects and objects, in how they ask questions, make relative clauses, order information in the sentence, mark gender on pronouns, omit

versus require pronouns in subject position, use prepositions, mark verbal aspect (duration, iteration, etc.), tense (present, past, future), as well as adverbials (carefully, recently, etc.). They are as different from one another as English is from Russian, for example—even more so.

12.     American Sign Language is a language completely distinct from English in modality (visual and gestural as opposed to auditory), grammar (polysynthetic (complex word-internal morphology) versus isolating (strings of words without much internal structure)), and use (differing pragmatics and discourse structure).

13.     The deaf population is very heterogeneous. Some have been raised in homes with Deaf families who have signed with them from birth. Others have been raised in homes where all family members can hear and do not sign. In some cases, families may use makeshift gestures, try fingerspell, use Cued Speech (a system that supplements lipreading), write back and forth, or limit communication to the bare minimum. Deaf individuals may need to use multiple modalities to communicate effectively, including residual hearing, hearing aids, lipreading, and sign language. The use of one of these means does not mean that communication access has been achieved.

14.     Identification of the pathological condition of deafness or loss of hearing during the prison intake process is not the same as identification of a person's communication needs. The fact of a person's deafness does not, on its own, identify how that person communicates. For example, someone who was born deaf or has been deaf since childhood will often be a native ASL user, however a person who is deafened late in life may not communicate using ASL because they never learned the language. Furthermore, communication is usually directed by how a person grew up and what type of educational approach they received, as opposed to their etiology.

15.     Communication needs are best defined by the Deaf persons themselves because they are the one that knows how they best communicate and they are more apt to show hearing people how to communicate with them. Determination of communication

needs should not be up to the nurse or doctor at each medical encounter since this method invites assumptions, such as how much a Deaf person actually understands compared to what a service provider may think a Deaf person understands.

16.     The best rule of thumb is to take a Deaf person's request for an interpreter as a valid indication of need. They know themselves well and know best where communication breakdowns and unreliable communication are likely to occur. It is also important for service providers to recognize that they need reliable communication as well and if they sense that communication is not happening, even if the Deaf person does not request one, that an interpreter should be offered. We would not hesitate to do so if the other person were speaking Chinese or French and we did not understand them or they did not seem to be fully understanding us. Not doing so with ASL can follow from the misconception that ASL is "English on the hands" or the assumption that ASL is not a language—both invalid assumptions.

17.     Additionally, it is a misconception that literacy is a matter of learning to crack a writing code. When a hearing person learns to read, typically around first grade but also possibly as an adult, what they are learning is to decode a written orthography and to "read aloud" words and sentences that are <u>already in their language repertoire</u>. This approach to reading is called phonics. The learner can sound out the words on the page and associate them with words and grammar that he or she already knows. We cannot project this same experience onto a deaf person learning to read. They typically come to school to learn a written form of a language they do not already know. They may come with prior fluency in a signed language (a language that is not remotely grammatically related to English), or they may come with no language base at all.

18.     Fluency in English is often more challenging for Deaf individuals because of lack of access to the spoken English around them and poor educational upbringing, often resulting from conflicting philosophies in Deaf Education. As a result, there is a significant majority of Deaf people who remain at a third-grade reading level all of their lives. This is

below the point where students finally transition from "learning to read" to "reading to learn." Since many individuals who are Deaf haven't learned how to read with full efficacy, the skills needed to read to learn aren't present and English usage remains low. Approximately 8% of deaf people read English at an eighth-grade level of above because of the fact that they have always had access to language growing up. Since most do not, many plateau at a 3-4th reading grade level. One study of Deaf prisoners showed that none of them were able to read over 4th grade reading level and more than half were considered to be functionally illiterate—below 2.9th grade level (Miller, 2004).

### Communication By Written Notes

19.     Since American Sign Language is the most accessible language for Deaf people in the United States, communication in other forms such as written English is less desirable because often the Deaf person knows they are not getting full access to language. As noted above, ASL has a different grammatical structure than English, so Deaf people who are trying to use English to write are usually unable to follow the same grammar as English. Many have lower writing levels than reading levels. Deaf people are more likely to read more often than write (e.g., TV captions, texts, email, and social media). There is much written about reading levels among Deaf people, but for writing, which involves much more organization and planning, there is little research that connects with a grade level. Instead what research shows us is that "a typical 17-18 year old deaf student writes at a level that is comparable with a 8-10 year old hearing child" (Mayer, p. 146).

20.     Further, having competency in written English does not mitigate the need for an interpreter, especially when people who can hear typically access interactive communication with their service providers primarily through spoken communication instead of written communication. For people who can hear, communicating in spoken language is less cumbersome, much more efficient, and much more spontaneous than communicating through written language. The same is true for the use of signed language by Deaf people whose primary and preferred language is ASL.

21.     When written communication is expected to be used as the primary form of communication, service providers tend to rush through and reduce how much they write, since the time needed for writing is much more labor intensive and time consuming than for a spoken language interchange. As a result, the Deaf person is shortchanged from a full discussion of the issues being addressed. This often leads to the Deaf person "being left in the dark" due to communication limitations.  In addition to the variety of disincentives to writing back and forth by hand such as less use and proficiency with cursive script and more reliance on printing, as well as the fact that only a small percentage of Deaf people read English with native-level proficiency, the medical domain presents many obstacles for Deaf people because healthcare interactions may require additional probing for understanding, clarification, contextualization, and expansion of information.  One of the greatest obstacles is never knowing for sure if what one thinks they have understood was indeed the message; or worse, assuming one has understood something that was not the case. The simple fact that a Deaf person and a hearing person exchanged written notes does not mean that both parties necessarily fully understood each other.  The following example illustrates this: ASL, like Italian, treats "psychological verbs," like verbs of feeling, differently than English.  In English, we can write *John upset Mary* as a transitive sentence and it means that Mary was the one who was upset, and John caused her to be upset. ASL does not allow the sign UPSET to take an agent (someone who causes someone to be upset). Instead, ASL only allows an "experiencer subject" JOHN UPSET, meaning "John was upset." If a noun phrase follows that sequence, that is taken to be the "cause" of the upsetting. So, the sequence JOHN UPSET MARY in ASL would mean John was upset and Mary had something to do with it. A Deaf person relying upon ASL grammar to understand written English would come to the exact opposite meaning of the sequence *John upset Mary* and may never know that they understood a meaning opposite to what was intended. Such misunderstanding, if ever discovered at all, are what lead Deaf individuals to say, "I need an ASL interpreter to effectively communicate." (Doc. 3627-7 at 88 ¶15) or "because

of the language differences, I may not even know that a misunderstanding has occurred." Doc. 3627-6 at 70 ¶ 22 (K.P.).

22.     While the practice of "teach back" is frequently used when doctors are verbally explaining complex things to patients, doctors and other service providers are not accustomed to having to probe for understanding with their notes. We often write things down to be sure they were understood. However, no other disability has low education levels comparable to what a large portion of the Deaf population experiences as a consequence of growing up with a lack of communication. When healthcare providers think of deafness, they are focused on the inability to hear, as opposed to the lack access to English and to an adequate education. This also affects the level and the nature of the writing that they use in trying to pass notes to Deaf patients.

23.     Writing takes a long time and as a result people on both sides of the dialogue tend to share less information. This leads to frustration from both parties and to curtailed communication. As a result, a Deaf person restricted to reading and writing will not be able to share and access as much information as a hearing person interacting with a hearing service provider using speech. When the healthcare provider sees that there is an additional barrier in terms of the Deaf person's understanding of the written language communication is pared down even further.

24.     Typing back-and-forth on a computer or a teletypewriter (TTY) machine poses the same language barrier in terms of forcing the Deaf person to rely upon weak English skills to communicate. The only difference is that now people are a little more used to typing than writing in cursive script or printing. Until the late 1990s, Deaf people had no choice for "phone conversations" but to use a TTY. This was a device that would couple with a telephone receiver and when one typed into it, sound signals would be sent over the phone line and would be received by a similar device on the receiver's end. As a D/deaf class member explained, "the TTY is not effective for our healthcare communications because it is essentially the same as writing notes, except the information is typed." [Doc. 3627-6 at 72 ¶ 33 (K.P.)] While a welcome innovation in its time, in that finally allowed communication at a distance for Deaf people, it still relied upon English.

If the assumption is made that writing notes back and forth is all that is needed, it is likely that the same assumption is also applied to the use of a TTY. The TTY depended on meticulously typing out word for word in English and strict turn taking. Deaf people without much English would often just type COME NEED TALK to a family member who would then drive to their house to get the information in ASL. Other Deaf people would actually not use English but rather a glossing of English labels in the order of ASL grammar and would write back to each other in a way that only other Deaf ASL signers could understand. For example,

Person 1: TOUCH FINISH CHINESE FOOD YOU QQ GA

Person 2: YES NEW RESTAURANT OPEN YESTERDAY GA

Person 1: MBMB SK

would translate to English as follows:

Person 1: "Have you had Chinese food? (go ahead)".

Person 2: Yes, a new restaurant opened here yesterday (go ahead)".

Person 1: "Oh, is that so, very interesting." (stop keying)".

"MBMB" is actually a Deaf indication of a mouth movement that occurs with a sign for opening and closing the mouth, which is hard to translate, but it is a reaction to something that is intriguing.

25.     The TTY was not great, but for a time it was the only device available to Deaf people to communicate long distance. Today, based upon technology 50 years out of date, the TTY is a dinosaur. There are Deaf young adults who have never seen one. They are akin to the pagers that hearing people tried to use to communicate with each other before the invention of smart phones.

**Lipreading**

26.     Lipreading raises several concerns regarding low accuracy, and it is usually not enough on its own to effectively communicate, particularly in settings like a medical encounter. One of the most important things to know about lipreading is that both the person doing the talking and the person doing the lipreading usually think that communication is more successful than it actually is, which leads to both frustration and

misunderstandings.

27.     The average deaf lipreader will catch approximately 30% of what is on the mouth (and typically that speech is predictable and highly routinized, like: *What's your name? What's your address?,* etc.). Most speech is occluded from sight. For example, *mom* and *Bob* look the same. One cannot see that one involves nasal bilabial consonants (*mom*), dropping the velum while making exactly the same visible speech gesture, and the other (*Bob*) does not. Everything that can be seen is the same. One has to guess which word was intended and guessing opens up the possibility of more misunderstandings.

28.     Except in highly exceptional cases, lipreading should not be relied upon for anything other than very superficial communication such as basic needs: *Where is the restroom? What's your name?* Anything more risks taking away the Deaf person's ability to fully and reliably communicate. Even more troubling is when lipreading is required by virtue of a lack of access to any other alternative such as signing. Deaf people in this situation often feel forced to accept this as the only option. They may think they are understanding what is being said, but they have no way to know this for sure. And they have had a lifetime of experience that speaks to the unreliability of lipreading.

29.     Medical professionals are no better than the members of general hearing community in assuming that lipreading is an effective form of communication when it often is not. If they are trained in communication strategies, then they would be aware of gaps in communication when using lipreading or when a Deaf person is nodding thinking that they understand or that they agree, which would be erroneous.

30.     When communicating with a deaf person, it is a common misconception that nodding one's head is an indication of comprehension. When two people are communicating in English, the receiver often produces a variety of backchanneling signals to show engagement with the person who is talking. The listener may nod their head, which sometimes means agreement with what is being said. Other times shaking the head "no" can indicate disagreement or disbelief. Sometimes, but not always, nodding can mean I am

-11-

listening and "I get it." In Deaf culture, nodding one's head is an indication that the Deaf person is attending to you, but not that they are understanding you. ASL signers indicate understanding with a manual gesture of a hand repeatedly moving forward in the handshape of a Y (fist with thumb and index finger extended). This sign is frequently glossed as O-I-C (for Oh, I see). Hearing people are often confused when a Deaf person nods as a question is being asked. They often assume the answer being given is a yes. And then the person may answer with, "No" or "I don't understand." One of the first, and much emphasized and repeated, lessons in Interpreting 101 is that nodding is not an indication of understanding. Nodding means, "I am attending to what you are saying," and not "I am understanding what you are saying," nor "I am agreeing with what you are saying."

31.     Additionally, the strain of conversing in a language that is not one's primary language can frequently cause the second language user to nod as if understanding, even when not comprehending--as a politeness measure, or just to keep the conversation going. Deaf individuals who spend much of their time with hearing people in this state of non-comprehension are prone to doing this out of exhaustion or sheer frustration. In a situation with a hearing person where lipreading is used, a deaf person will often eventually nod just to get the conversation over with because they are not getting effective access anyway. The hearing person, also pressured by the inability to make oneself understood in this context, readily accepts this nodding as confirmation of comprehension.

32.     The desire to believe that lipreading will suffice combined with nodding behavior on the part of a deaf person can lead an individual to attribute unrealistic lipreading abilities to a deaf interlocutor, when in fact comprehension is severely limited or completely lacking. Such interactions can lead to the hearing person deciding that an interpreter is not necessary, when on the contrary, very little communication is being successfully transmitted.

33.     The medical encounter situation presents even more barriers for effective communication due to the use of specialized terminology which is often unfamiliar to Deaf

people who do not have high enough reading levels to navigate complex terminology; or they learn the specialized terminology, but still don't have the English grammar to use that terminology effectively in sentences to convey their questions or needs.

### Hearing Aids

34.    Dr. Penn also incorrectly assumes that the fact that some of the Deaf patients had hearing aids meant that a sign language interpreter was unnecessary. This misunderstands the nature of hearing aids, and what they can and cannot do, especially for people who have been deaf their entire life, or people with profound hearing loss. The hearing aids that the deaf class members here would have had access to could benefit a person whose hearing loss was mild to moderate by amplifying sound. Until very recently, a hearing aid may have helped a person with a severe hearing loss to hear speech a bit better, but it would not completely correct such a loss. A person with a profound hearing loss could not hear sounds within the speech range even when aided.

35.    Loss of the ability to hear speech is not a matter of amplitude (loudness or volume); it is an issue of the frequencies at which sounds resonate, and whether these frequencies can be detected by a person's auditory system (the nerves in the inner ear that carry sound input to the brain). The following chart illustrates these differences. The area in yellow, often referred to as "the speech banana," indicates the range in which speech sounds fall.



36.     Even many profoundly deaf people can hear some sounds. They may react to an airplane going overhead, to a car horn, or even to someone yelling. What they cannot do is process and understand sounds within the speech range indicated in yellow above.

37.     For people who have severe to profound hearing loss, traditional hearing aids served as a tool to let them hear sounds around them and alert them to some things in the environment. They could be used for situational/safety awareness, such as alarms or sirens. Hearing aids were not similar to glasses which correct vision issues. They just amplified sounds around them and those who haven't learned how to "interpret" the sounds will just hear things, but not necessarily understand anything, including speech. Having hearing aids does not supplant a Deaf person's need for a sign language interpreter. Hearing aids are much more effective for a person with only mild hearing loss, because that person has already been able to hear and can interpret sounds more effectively.

38.     One caveat must be mentioned. Starting in the late 1990s, there have been significant advances in digital hearing aid technology that have made hearing aid technology more applicable to severely and profoundly deaf users. (See the following websites: Phonak History (https://www.phonakpro.com/us/en/about-phonak/history.html); and Oticon History (https://www.oticon.com/inside-oticon/about-us/our-history)).

39.     The initial digital aids were more digital clones of analog technology. However, by 2004, hearing aids had multiple mics in 95 frequencies with compression of sound into more hearable frequencies. By 2010 hearing aids could be linked to Bluetooth, allowing the hearing aid to be controlled by apps on one's phone. Modern high-end digital hearing aids have progressively solved two major issues in hearing technology: (1) the internal AI technology to be ability to shift sounds to whatever frequencies the person hears best (2014); and (2) the ability to analyze and filter out environmental sounds that interfere with hearing (2014; fan, motors, etc.), the things that used to be amplified along with everything else. Many hearing people enjoy this sound-filtering technology on their high-end headphones and Airpods. The ability to control and adapt individual frequencies allows

the right wearer to augment lipreading to a significant degree, even for some people who have a severe-profound or profound hearing loss. So, for the *right* individual, who can afford high-end hearing aids that can cost up to $6,000, these types of hearing aids *may* benefit the person and allow them to hear words.

40.     But even if a person has one of these extremely expensive high-end hearing aids, being able now to hear sounds does not mean the person can understand or process the sounds. Thus, the next question is who is the *right* deaf individual to benefit from these newer hearing aids? Part of using a hearing aid involves training the brain to process this new and altered signal. However, for individuals beyond a critical period in which the brain is primed to engage in such "language-specific, auditory learning," namely a Deaf person who has never heard English, the added "clarity" of these new digital hearing aids is uninterpretable or unhelpful because the brain can no longer learn to process these new sounds that come in as language. For those class members who have had long term hearing loss, brain plasticity is an issue. You can't teach an old brain new tricks. For them, digital hearing aids may make sounds clearer, but they don't make speech more special or more understandable. So, unless they were late-deafened, they are unlikely to benefit from this new technology in the same way that people who could once hear, or people fitted with such aids as young children would.

### Health Needs Requests

41.     The ability to submit a few sentences in English requesting medical help, such as on a health needs request (HNR) form, is not a reliable indicator that a Deaf person can communicate effectively through written notes in a healthcare encounter. A prior assessment of the Deaf person's communication abilities and needs is required to determine this. In addition to the concerns detailed above regarding the use of communication via written notes in a medical encounter, several other factors make this reliance on the presence of HNR forms to show access to effective communication problematic.

42.     First, by their nature, the HNR forms anticipate a simple description of the

issue for which the person is seeking medical care, and they are designed to only give the person a few sentences worth of space to describe their need. The language used in this type of request is by its nature simpler in form and in content than language that would be exchanged in a medical encounter, which requires substantive and spontaneous communication. Furthermore, Deaf people who have been raised culturally Deaf depend on the use of storytelling or elaboration to convey the information they think is needed to the medical professional, as stated in Schwartz (2008). This requires even more language to be conveyed. All but a very few cannot achieve any of this expanded communication with hearing medical providers with the limited language, exemplified below from actual HNRs, that they may have cobbled together on their own to fill out these forms:

- Please I want to know fix hurt dental ok I am deaf thank you nice

- I'm very allergic to Blach [sic] also I have very bad rash all over my body, neck, foot. I has not slove [sic] yet. can you guy help me Thank you

- My hear aids is kind hurts and Bother me a lot also I must have special mold Ear aids That mold Help Lot Better! Help me I'm Deaf Thank you

- I DON'T FEEL GOOD UPSETTING SMOTACH [sic] AND FEEL LIKE VOMIT. I AM DEAF CANNOT HEAR OR TALK

- my both ears hurt. please check and headache Thank you for your time. *I am Deaf. Need have American Sign Language interpreter due to communicate. Thank you.

- since 2 month I have been wait fill back top toot [sic] but now I have other need fill front tooth so it is pain. I am requesting accommodation under American with Disabilities Act. I need an American sign language interpreter for effective communicate for important with dental at the appointment. Thank you.

- I am requesting to be sent to TEMPE HOSPITAL to put ~~bando~~ both wooden flat stick (on top squeeze abit and under) hold for other doctor to wrap bandage casting because the bone sprial is bent. Till 3 month, recheck bone spiral to be flat. If not – 3 to 6 months. Right hand.

[Norris Suppl. Decl. Exs. 42 (W.D.), 43 (F.H.), 46 (K.P.), 47 (F.L.), 48 (S.C.)]

43.    Several Deaf class members also submitted declarations stating that they received assistance from other class members in writing out their HNRs because they are unable to do so independently. It is very common for Deaf people to be helped by family

members, or in this case fellow prisoners, to fill out forms like these. It is also common for Deaf individuals needing to request accommodations to have memorized or written down canned phrases like: " I am requesting accommodation under American with Disabilities Act. I need an American sign language interpreter for effective communicat(ion)" or "Help me. I am Deaf. Thank you." Reliance on the HNRs of such class members as an indication of their ability to access written English and ability to effectively communicate by written notes in a medical encounter would additionally be entirely inappropriate because the HNRs do not necessarily demonstrate that person's actual skill level in written English.

44.    As seen in the examples above, the HNRs submitted by Deaf class members clearly demonstrate that for most, their written English skills are generally poor, for the reasons discussed above concerning the inherent difficulty in acquisition of fluency in English, and limited literacy levels among the Deaf community. Many of these HNR's do not clearly tell the medical provider what the issue is and should serve as red flags that in-depth communication and probing will be necessary to get to the bottom of the medical concern in the medical encounter.

## Grievances

45.    If denied an interpreter, the grievance process, which is also accessed through writing becomes a further barrier, again because of the reading/writing level of most Deaf people. Limitations on reading and writing suggest that lack of access to English and to an adequate education had been a life-long obstacle to this person as well. Older Deaf individuals who experienced their education and their medical care without interpreters (or without privacy by relying upon friends or family members) prior to the Americans with Disabilities Act (ADA), were particularly disempowered in this regard and, over a lifetime, became resigned to a lack of communication access in critical encounters. Even when the ADA was enacted many of them were so resigned to their lack of access that they didn't even ask, or in asking and being denied once, quickly gave up for fear of offending the healthcare provider and not receiving the care they needed. They resigned themselves to

"making do" and suffering the consequences when problems arose. Post ADA, many Deaf people tried to exercise their rights and requested interpreters. In many cases they were told that the final decision as to what constituted an adequate accommodation was in the hands of the service provider; and if they disagreed, they would need to file a grievance or pursue a legal remedy.

46.     Deaf people have been conditioned though experience after experience to recognize that they are a burden to society and that requiring interpreters (even if it benefits both parties better) requires extra steps that providers do not want to deal with, such as calling for an interpreter, scheduling an interpreter, arranging to pay a fee, and sometimes scheduling a longer appointment. Furthermore, in his dissertation, Schwartz (2006) labels a phenomenon called "letting go," which is a response to juggling the stress of dealing with the need to further advocate for communication access on top of worrying about their health and dealing with whatever pain they may be experiencing. In the context of setting up a medical appointment that needs an interpreter with a provider that is resistant to providing one, "letting go" involves a cost benefits analysis that weighs current discomfort and the urgency to be treated, against the risk of missed communication and the consequences that could result from that. Often "letting go" means the priority is on getting immediate care instead of battling it out to get clear and concise access to communication. Choosing communication can result in delays in receiving care, which could lead to more severe health issues in the long run. (DeVault et al, 2011).

I declare under penalty of perjury that the foregoing is true and correct.
Executed on August 23, 2020, in Livermore, California.

s/_____
AMY JUNE ROWLEY, PH.D.

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:     dspecter@prisonlaw.com
            ahardy@prisonlaw.com
            snorman@prisonlaw.com
            ckendrick@prisonlaw.com
            rlomio@prisonlaw.com

*Admitted *pro hac vice*


David C. Fathi (Wash. 24893)*
Maria V. Morris (Cal. 223903)*
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:     dfathi@aclu.org
            mmorris@aclu.org
            echo@aclu.org

*Admitted *pro hac vice*. Not admitted in
 DC; practice limited to federal courts.


Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:     dbarr@perkinscoie.com
            agerlicher@perkinscoie.com
            jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    jkeenan@acluaz.org
            carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
  rdalyrooney@azdisabilitylaw.org
    jrico@azdisabilitylaw.org
    mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR
DISABILITY LAW**
5025 East Washington Street
Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2020 I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf