Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE THE COURT'S ORDERS AND FOR FURTHER RELIEF (Dkt. 3694)** |

After Dr. Stern issued his report recommending how "seen" PMs should be monitored, the Court ordered the parties to submit proposals regarding the recommendations, including whether "seen" PMs should have minimum-length requirements. After reviewing the parties' proposals and applying them to Dr. Stern's recommendations, the Court largely adopted Defendants' methodology. (Dkt. 3518.) Five months later, under the guise of alleged noncompliance, Plaintiffs now challenge that Order. While styled as a motion to enforce, Plaintiffs' Motion is really an untimely motion for reconsideration that rehashes arguments that both the Court and Dr. Stern have already rejected. Plaintiffs' Motion should be denied.

## I. Background.

### A. Dr. Stern's Report.

After reviewing 18 watch-related advocacy letters that alleged short mental health encounters, Dr. Stern opined that, "[i]n most cases, when viewed in the context of the patient's overall care for the acute problem, the fact that the visit was short was not, *in and of itself*, problematic." (Dkt. 3379 at 29, emphasis in original). According to Dr. Stern:

> This is so because very often during watch, the purpose of the visit is rather narrow: to determine if the patient has had any significant change since the previous visits. This can be true even for a visit during which the mental health professional decides that a patient can be advanced to a less intense level of watch.
>
> For example, if a patient has been determined to be improved and stable over several days of constant watch and can appropriately be advanced to 10-minute watches if the improvement has been sustained, **a short visit can conceivably be adequate for determining that sustained improvement**. Short visits may also be appropriate when the visit is conducted at cell-front (i.e., the patient declines to be taken to an examination room) because this is a non-confidential setting and in-depth conversations either risk violating the patient's right to privacy, or engender stilted or less-than-frank information from the patient. Finally, **longer visits may be contraindicated in patients on watch** because if they are agitated and uncooperative – a not-uncommon situation in this acute setting – pressuring the patient to participate in a longer engagement may cause their agitation to escalate.

(*Id.* at 29–30.)

With respect to non-watch related "seen" PMs, Dr. Stern opined that:

> The good intentions of these PMs to set **a minimal visit frequency in a variety of situations, has had the unintended consequence of forcing visits to be scheduled, even when they are not needed.** Indeed, in the typical clinical setting**, the frequency of mental health visits is determined on a case-by-case basis that flows from the clinician's clinical assessment, informed by input from the patient.** A number of mental health professionals at ADC informed me of unnecessary visits that they would not have scheduled but for the requirements of the Stipulation. **It is not surprising – nor inappropriate – if those visits are exceedingly short.**
>
> **Setting a minimally acceptable length of time for visits would likely cause an [sic] negative unintended consequence.** For situations when a short visit is clinically appropriate, professionals would feel obligated to lengthen the

> visit to satisfy the PMs. At best this would unnecessarily waste resources; at worst it could agitate a patient who wanted to be left alone.

(Dkt. 3379 at 30, emphasis added) To address the concern that some visits may be too short, however, Dr. Stern recommended that monitors engage in a subjective inquiry when determining whether encounters monitored for "seen" PMs comply with the Stipulation. (*Id*. at 33–34.)

**B.  The Court's Orders Based Upon Dr. Stern's Recommendations.**

On February 12, 2020, the Court determined that it would "make more sense to allow clinical judgment to guide the assessment of particular visits.  That is, if a mental health professional believed a visit of only one minute was clinically appropriate given the unique circumstances . . . such a visit would comply with the PMs." (Dkt. 3495 at 8.) "[T]o avoid the imposition of a bright line rule that may result in unintended consequences," the Court ordered the parties to confer and submit a joint statement outlining their proposals for future monitoring of "seen" PMs. (*Id*. at 9.)

Contrary to Dr. Stern's recommendations, Plaintiffs and their expert, Dr. Stewart, proposed that: (1) minimum lengths be imposed for "seen" PMs; (2) sessions lasting less than their proposed minimum length be counted complaint only if the clinician documents repeated attempts to engage with the patients, a detailed assessment including risk of self-harm or suicide, the length of the session, and the reasons why the session was shorter than they proposed; (3) ADCRR track and report the number of encounters that fall short of their proposed minimum length of time; and (4) ADCRR adopt a plan to reduce cell-front encounters. (Dkt. 3507 at 5–6.) To avoid a bright-line rule and instead ensure that "clinical judgment and "meaningful interaction" guide the assessment, Defendants and their expert, Dr. Penn, suggested that if an encounter is longer than the minimum length of time, the objective measuring methods in place should apply. (*Id*. at 8.) If, however, an encounter is shorter than the minimum length, "a mental health clinician shall exercise clinical judgment to determine if the length was meaningful and appropriate in the context of the patient's overall care." (*Id*.) If the mental health clinician determines the contact was not

clinically appropriate, the contact is marked non-compliant. If the mental health clinician determines the patient's contact was clinically appropriate, the contact is marked compliant. (*Id*.)

On March 11, 2020, the Court rejected Plaintiffs' proposal and largely adopted Defendants' proposal:

> The Court rejects Plaintiffs' request to go beyond Dr. Stern's recommendations and require shorter visits be deemed acceptable only under "extraordinary circumstances."
>
> The Court also rejects Plaintiffs' request that Defendants "track and report" visits that are less than the minimum and that Defendants be required "to implement a plan to reduce the number of mental health encounters with patients on watch that are conducted at cell-front to no more than 10% of the total number of such encounters."

(Dkt. 3518 at 3–4.) The Court noted, "there is no requirement in the Stipulation for such action." (*Id*. at 4.)

**II.   Legal Argument.**

    **A.   Plaintiffs' Motion Is an Untimely and Improper Motion for Reconsideration.**

Plaintiffs' Motion to Enforce again requests the Court to require that shorter visits be deemed acceptable only under extraordinary circumstances and further require Defendants to track and report visits that are less than the presumptive minimum. (Dkt. 3694 at 14–15.) Under LRCiv 7.2(g)(2), however, a motion seeking reconsideration of a prior order generally must be filed no later than 14 days of the order. Plaintiffs do not attempt to make a showing of good cause to excuse their untimeliness. Furthermore, a motion for reconsideration may not be used to ask a court "to rethink what [it] . . . already thought through." *Morgal v. Maricopa Cty. Bd. of Sup'rs*, 2012 WL 2368478, at *1 (D. Ariz. June 21, 2012) (alterations in original; citations omitted). "Asking a court to rethink its analysis is not a proper basis for seeking reconsideration," *Id*. (citing *O'Connor v. Scottsdale Healthcare Corp*., 2012 WL 2106365, at *1 (D. Ariz. June 11, 2012)), nor is "disagreement or dissatisfaction" with an order, *Ellsworth v. Prison Health Services Inc*., 2013 WL 1149937, at *2 (D. Ariz. March 20, 2013). Because Plaintiffs did not seek this

Court's reconsideration within 14 days of its March 11, 2020 Order, their Motion is untimely and should be denied.

**B.   Plaintiffs' Allegations that Defendants Have Failed to Comply with the Court's March 11 Order Are Meritless.**

To circumvent the reconsideration standard, Plaintiffs style their Motion as a motion to enforce and argue Defendants have not complied with the Court-ordered monitoring methodology.  Specifically, they claim, "Defendants count *all* mental health encounters, regardless of length, as 'meaningful and appropriate'" and that "*every single one*" is counted compliant.  (Dkt. 3694 at 4, emphasis in original).  They are wrong.

**1.   Defendants monitor "seen" PMs in accordance with the Court's Order.**

The March 11 Order requires "seen" PMs to be monitored as follows:

> **Watch PMs (91, 94, 95)**:  If the encounter is more than ten minutes, the file is marked complaint.  If the encounter is less than ten minutes, a Mental Health Clinician shall exercise clinical judgment to determine if the length was meaningful and appropriate in the context of the patient's overall care.
>
> **Non-Watch PMs** (73, 74, 76, 78, and 80–90):   If the encounter is more than thirty minutes, the file is marked complaint.  If the encounter is less than thirty minutes, a Mental Health Clinician shall exercise clinical judgment to determine if the length was meaningful and appropriate in the context of the patient's overall care.

(Dkt. 3518 at 2–5.)

The Court noted, "it is important to stress that the [10 or 30] minute minimum does not prohibit shorter visits.  Rather, it merely requires that visits of less than [10 or 30] minutes be evaluated by a mental health clinician to determine whether 'the length was meaningful and appropriate in the context of the patient's overall care." (*Id*. at 4.)  The Court explained, "if Defendants' expert is correct that a two-minute visit every 90 days is clinically appropriate for a particular prisoner, that visit can be deemed compliant." (*Id*.)

Plaintiffs accuse Defendants of "enthusiastically exploit[ing]" this "loophole" by counting "*every single one*" of these short encounters as compliant.  (Dkt. 3694 at 4., emphasis in original).  But as detailed in the chart below, from March–June 2020, the

5

monitors have found numerous encounters (148) to be noncompliant because the length was not meaningful and appropriate in the context of the inmate's overall care:

| Facility | PM | Month/Year | # Noncompliant |
|---|---|---|---|
| Tucson | PM 78 | April 2020 | 1 |
| Tucson | PM 78 | May 2020 | 1 |
| Tucson | PM 78 | June 2020 | 3 |
| Eyman | PM 80 | April 2020 | 3 |
| Florence | PM 80 | April 2020 | 3 |
| Lewis | PM 80 | April 2020 | 1 |
| Tucson | PM 80 | April 2020 | 1 |
| Florence | PM 82 | April 2020 | 2 |
| Florence | PM 82 | June 2020 | 2 |
| Lewis | PM 82 | June 2020 | 2 |
| Tucson | PM 82 | June 2020 | 2 |
| Lewis | PM 85 | May 2020 | 4 |
| Eyman | PM 86 | May 2020 | 1 |
| Florence | PM 86 | May 2020 | 1 |
| Lewis | PM 86 | May 2020 | 1 |
| Tucson | PM 86 | May 2020 | 4 |
| Yuma | PM 86 | May 2020 | 1 |
| Eyman | PM 86 | June 2020 | 2 |
| Florence | PM 86 | June 2020 | 1 |
| Lewis | PM 86 | June 2020 | 2 |
| Tucson | PM 86 | June 2020 | 4 |
| Yuma | PM 86 | June 2020 | 1 |

| | | | |
|---|---|---|---|
| Phoenix | PM 89 | May 2020 | 1 |
| Lewis | PM 94 | April 2020 | 5 |
| Tucson | PM 94 | April 2020 | 1 |
| Eyman | PM 94 | May 2020 | 6 |
| Lewis | PM 94 | May 2020 | 13 |
| Perryville | PM 94 | May 2020 | 3 |
| Phoenix | PM 94 | May 2020 | 6 |
| Tucson | PM 94 | May 2020 | 9 |
| Winslow | PM 94 | May 2020 | 1 |
| Eyman | PM 94 | June 2020 | 6 |
| Florence | PM 94 | June 2020 | 3 |
| Lewis | PM 94 | June 2020 | 9 |
| Perryville | PM 94 | June 2020 | 3 |
| Phoenix | PM 94 | June 2020 | 4 |
| Tucson | PM 94 | June 2020 | 7 |
| Eyman | PM 95 | April 2020 | 1 |
| Tucson | PM 95 | April 2020 | 2 |
| Eyman | PM 95 | May 2020 | 2 |
| Florence | PM 95 | May 2020 | 5 |
| Lewis | PM 95 | May 2020 | 4 |
| Tucson | PM 95 | May 2020 | 6 |
| Eyman | PM 95 | June 2020 | 1 |
| Florence | PM 95 | June 2020 | 1 |
| Lewis | PM 95 | June 2020 | 3 |
| Perryville | PM 95 | June 2020 | 1 |
| Tucson | PM 95 | June 2020 | 2 |

*See* Exhibit 1 (Declaration of C. Porter) at ¶15; Exhibit 2 (Declaration of K. McCray) at ¶12.

### 2. The Court Should Reject Dr. Stewart's Opinion That Eight Encounters Created a Substantial Risk of Serious Harm.

In support of their Motion, Plaintiffs submit a declaration from Dr. Stewart that states encounters from eight inmate files "were shockingly deficient and created a serious risk of harm to the patient." (Dkt. 3694-03 at ¶12.) Although Dr. Stewart states he is a board-certified psychiatrist "with a specialty in clinical and forensic psychiatry" who is an "expert on prison psychiatry and the provision of mental health services," he conceded when cross examined that he is not board certified in forensic psychiatry and has never completed a forensic psychiatry fellowship. *See* Exhibit 3 (Cross Examination of Dr. Stewart in *Ferreira*) at 141:15–20; (Dkt.3723-02 at 32–34.) And other than briefly serving as a psychiatric monitor for California in the 1990s, and treating patients from jails at an inpatient unit (which ended in 1990), he has no experience directly treating individuals in correctional settings. (Ex. 3 at 143:18–145:11; Dkt. 3723-02 at 34–35.)

Additionally, it appears Dr. Stewart only reviewed spreadsheets[1] and entries, instead of the entirety of the inmates' medical records to determine whether, in that context, the length of the encounter was appropriate and meaningful.[2] (Dkt. 3694-3, ¶ 4.f–g.) Even through the lens of this biased data, of the 8,564 files monitored for "seen" PMs in April and May 2020, Dr. Stewart opines that only *eight* created a risk of harm to the patient. (Dkt.

---

[1] The spreadsheets he reviewed pertain to only three PMs at four facilities. (Dkt. 3694-3, ¶ 4.)

[2] In 2010, a Hawaii District Court found his opinion regarding the competency of a criminal defendant was not credible and that "[t]he unimportance of honesty to Stewart is demonstrated by Stewart's analysis . . . [where he] explain[ed] that honesty is not an advantage to a defendant. . ." *See United States v. Gowadia*, 2010 WL 234829, at *5 (D. Haw. Jan. 21, 2010). "In other words, Stewart thought that [the defendant] lacked rational reasoning merely because [he] thought that honesty was important." *Id.* Additionally, a Georgia state court precluded his testimony after determining his opinions were the product of "unsupported evidence and errant analysis" and were fraught with speculation, error, and clear bias. *Jones v. GDCP Warden*, 753 F.3d 1171, 1181 (11th Cir. 2014).

3694-3, ¶ 12.) These eight encounters were monitored for only two of the eighteen "seen" PMs and took place at only two of ADCRR's ten facilities.

Defendants' expert, Dr. Penn, has extensive experience evaluating and treating individuals in correctional settings. He has spent the majority of his professional career providing direct clinical care and/or administrative oversight and consultation regarding psychiatric, mental health, and other services to incarcerated adults and juveniles across a variety of jails, prisons, juvenile settings, and other correctional settings. (Dkt. 3508-1, ¶¶ 5–6.) He reviewed the medical records for the eight inmate encounters highlighted in Dr. Stewart's Declaration. *See* Exhibit 4 (Declaration of J. Penn) at ¶¶12–19. It is his opinion that each of the encounters were appropriately marked complaint and that none created a substantial risk of harm to the inmate. (*Id.*; ¶¶20, 24–27.) Moreover, he opines that the length of each encounter, in the context of each inmate's overall care, complied with the standard of care and was within the parameters set by the Court. (*Id.*) He further opines that the encounters provided vital information (such as hygiene and stability) to the mental health clinician and were utilized in evaluating the condition of the patient in the context of their overall treatment plan. (*Id.*) Additionally, he appreciated that the inmates were routinely seen by the same provider, which establishes a continuity of care and further justifies why some encounters may be brief due to the provider's familiarity with the patient. (*Id.*) Moreover, he found that the volume of mental health contacts the inmates had further justified why some encounters may be shorter than others—each served different purposes. (*Id.*) His detailed analysis of these charts is contained in Exhibit 4. (*Id.* at ¶¶12–19.)

Significantly, seven of the eight encounters cited by Dr. Stewart were encounters where the inmate verbalized that he or she no longer wished to continue with the encounter and requested it be terminated. (*Id.* at ¶¶13–19.) As both Dr. Penn and Dr. Stern have recognized and cautioned against, these are situations where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone. (Dkt. 3379 at 30; Dkt. 3508-1, ¶ 45.)

It is a dangerous practice to require a minimum length for mental health encounters, as the mental health clinician creates a preventable serious risk of agitating the patient and subjecting both the patient and the staff member to serious harm (e.g., when the patient is upset and agitated they may engage in behavioral dyscontrol, agitation, and assaultive behavior). (Ex. 4 at ¶21.) Moreover, requiring mental health staff to meet with patients for a defined, specified certain length of time increases the risk of ethical and professional boundary violations due to the likelihood that conversations will exceed professional boundaries, as clinicians attempt to fill empty space with discussions regarding personal, family, non-clinical information, views on politics, favorite sports teams, opinions regarding recent prison, local, state, and world events, and weekend plans or family dynamics—topics that are inappropriate for a therapeutic clinician-patient relationship in the correctional setting. (*Id*.)

Instead, the clinicians who saw these inmates appropriately terminated encounters when it became apparent the inmate was no longer interested in continuing the individual therapy/therapeutic encounter. (*Id*. at ¶22.) This builds trust and a rapport with the patient, which permits longer and more in-depth encounters to take place later. (*Id*.) According to Dr. Penn, it is important to meet the patient where they are, and the encounters described above did just that. (*Id*.) Forcing a patient to engage in conversation for the sake of meeting stop-watch timeframes, jeopardizes the ability to establish and build upon this relationship. (*Id*.)

Additionally, one of the encounters highlighted by Dr. Stewart was conducted cell front, after the inmate refused a confidential setting. (*Id*. at ¶17.) As Dr. Stern opined, short visits are appropriate when the visit is conducted cell front "because this is a non-confidential setting and in-depth conversations either risk violating the patient's right to privacy, or engender stilted or less-than-frank information from the patient." (Dkt. 3379 at ¶29.) Further, one encounter was conducted while the inmate was on watch. (*Id*. at ¶19.) Dr. Stern also opined that, "longer visits may be contraindicated in patients on watch because if they are agitated and uncooperative—a not-uncommon situation in this acute

setting—pressuring the patient to participate in a longer engagement may cause their agitation to escalate." (Dkt. 3379 at ¶20.) Unfortunately, this is exactly what Plaintiffs argue should have been done. (*See* Dkt. 3694-3 at 6–7 ["The clinician should make reported efforts to engage with the patient and encourage her to talk."].)

There is no national correctional health standard of care that establishes or defines an expected duration, timeframe, or range of expected duration of time for a mental health professional to conduct any type of a mental health or psychiatric interaction or encounter with a patient. (Dkt. 3508-1, ¶¶ 30–33.) The duration of each mental health encounter is based on the professional's clinical judgment, background, training, and professional community and correctional experience, and an individualized determination of each prisoner's current clinical status and evaluation and individual treatment needs. (*Id*.) Defendants are properly and appropriately monitoring "seen" PMs in accordance with the Court's Order and as required by the standard of care.

**3.   The Court's Order requires the clinical evaluation be conducted by a mental health clinician.**

The Court's March 11, 2020 Order requires the subjective review for "seen" PMs be conducted by a Mental Health Clinician. (Dkt. 3518 at 3–4.) The Stipulation defines Mental Health Clinician as a "psychologist or psychology associate." (Dkt 1185-1 at 4.) The monitors who monitor these PMs meet this definition. (Ex. 1; Ex. 2.) Plaintiffs do not contest this. They argue, however, these reviews must be conducted by a psychiatrist. (Dkt. 3694 at 11.) This argument was never raised in the underlying briefing, despite the fact both Defendants and Dr. Stern utilized and defined the term. (Dkt. 3379 at 30–31, 34.) Plaintiffs cannot argue something different now.

Even if the Court considers the request, Plaintiffs argument that non-physician evaluators are not able to "assess the efficacy of a particular medication regimen" and therefore are unable to assess whether an encounter was meaningful and appropriate is unpersuasive. (Dkt. 3694-3, ¶ 8.) The two mental health monitors who determine whether the length of an encounter is meaningful and appropriate in the context of the inmate's

overall care not only meet the Stipulation's definition of Mental Health Clinician (which was utilized by the parties, their experts, and the Court), they are qualified to make this determination as it does not require the skill set of a psychiatrist or doctoral-level psychologist, as Plaintiffs now suggest. (Ex. 1; Ex. 2.) According to Dr. Penn, this is because they are not evaluating whether any specific treatment was clinically indicated or not. (Ex. 4 at ¶29.) Rather, they are monitoring whether the duration of the encounter was meaningful and appropriate. (*Id*.) Qualified mental health professionals, as defined in national correctional health care standards, include a variety of mental health professionals beyond only non-doctoral level psychologists and non-psychiatrists. (*Id*.) Licensed and master's level counselors are more than qualified to make this determination. (*Id*.) Indeed, mental health clinicians in the Office of Mental Health Monitoring within the Texas Department of Criminal Justice (TDCJ) Health Services Division routinely conduct similar determinations within the TDCJ, the largest state prison system in the United States. (*Id*.) This complies with the standard of care, American Correctional Association, and National Commission on Correctional Health Care requirements.

### 4. Rigid instructions are counterintuitive to the subjective inquiry the Court's Order requires.

Plaintiffs last argue the Court should require the monitors to conduct their subjective inquiry into whether the length of an encounter was meaningful and appropriate pursuant to a prescriptive formula. (Dkt. 3694 at 12–13.) The Court has already rejected an "objective it-happened-or-it-didn't-happen test," and required an inquiry that is subjective and qualitative. (Dkt. 3379 at 31.)

Dr. Penn has opined that the monitors should not be required to follow stringent instructions when determining whether an encounter was meaningful and appropriate in the context of the patient's overall care. (Ex. 4 at ¶28.) This is because the determination of whether an encounter was meaningful and appropriate *in the context of the patient's overall care* is subjective and dependent upon the individual patient, the clinician who saw the patient, the patient's history (which portions of a record are relevant to this determination

will also vary), the type of encounter being monitored, the responses the patient provides, and many other factors. (*Id*.) Restricting monitors to the review of certain records, or requiring that they review certain records, deprives them of the autonomy necessary to make this determination. (*Id*.) Because this determination is akin to a health care peer review, it is better made through individual case discussions and ideas as to what may or may not be sufficient, depending upon the various factors identified above. (*Id*.) This is the analysis the monitors engage in. (Ex. 1; Ex. 2.) The purpose of this review is to improve the quality of health care encounters and overall mental health care delivery instead of attempting to engage in a game of "gotcha" because the monitor consulted different types of records or information depending on the type of encounter reviewed. (*Id*.) This determination requires a qualitative analysis that cannot be accomplished or restricted by a rote cookie-cutter approach or algorithmic formula. (*Id*.)

### III.  Conclusion.

For these reasons, Plaintiffs' Motion should be denied.

DATED this 11th day of September 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/Daniel P. Struck
 Daniel P. Struck
 Rachel Love
 Timothy J. Bojanowski
 Nicholas D. Acedo
 3100 West Ray Road, Suite 300
 Chandler, Arizona 85226

*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com; docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Casey Arellano | carellano@acluaz.org |
| Maria V. Morris | mmorris@aclu.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Daniel P. Struck