# EXHIBIT 3

1          **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

**Shari Ferreira, et al.,**          )
5                                     )   No.  **2:15-cv-01845-JAT**
          Plaintiff,                  )
6                                     )
          vs.                         )        Phoenix, Arizona
7                                     )        May 17, 2018
**Paul Penzone, et al.,**            )        1:09 p.m.
8                                     )
          Defendants.                 )
9  _____   )

10

11

12      **BEFORE:  THE HONORABLE JAMES A. TEILBORG, JUDGE**

13

14          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15        **JURY TRIAL - DAY 5 (P.M. SESSION)**

16          **(Pages 99 to 117, inclusive.)**

17

18

19

20

21   Official Court Reporter:
     Robin G. Bobbie, RMR, CRR, FCRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 37
23   Phoenix, Arizona  85003-2151
     (602) 322-7248

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription
25

1                      <u>**A P P E A R A N C E S**</u>

2

For the Plaintiff:
3       ROBBINS & CURTIN, PLLC
        By:  **Joel B. Robbins,** Esq.
4            **Jesse Morgan Showalter,** Esq.
        301 E. Bethany Home Rd., Ste. B100
5       Phoenix, AZ 85012-3312

6  For the Defendants:
        STRUCK, LOVE, BOJANOWSKI & ACEDO, PLC.
7       By:  **Daniel Patrick Struck,** Esq.
             **Ashlee B. Hesman,** Esq.
8       3100 West Ray Rd., Ste. 300
        Chandler, AZ 85226

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **I N D E X**

2

   **SUMMARY OF PROCEEDINGS**                              **PAGE:**
3
   Proceedings Outside Presence of the Jury        102
4  Sidebar conference                              200

5

   **WITNESS:**              **DIRECT**   **CROSS**   **REDIRECT**  **RECROSS**
6
    Dr. Pablo Stewart        124      141      211
7

8

9

10                      **INDEX OF EXHIBITS**

11 **EXHIBIT**                                        **RECEIVED**

12 **NO.**      **DESCRIPTION**

13
            N/A
14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2       (Proceedings begin, 1:09 p.m.)

3           THE COURT:  The record will reflect the presence of

4   the parties and counsel outside the presence of the jury.  I

5   want to resurrect the subject that we spoke of at sidebar and        13:09:37

6   thrash it out a little further.  And fundamentally, the

7   question into which ultimately the Court sustained the

8   objection was, essentially, a warning by Dr. Stewart to the

9   County, which brought forth an objection that we're getting

10  into the Graves case, etcetera.  And I'm not prepared to get        13:10:08

11  into the Graves case.  But let me ask this question:  What

12  would that warning consist of?  What was the warning?

13          MR. ROBBINS:  It was contained in his affidavit.

14          THE COURT:  Okay.  Tell me either -- either hand me

15  something that I can look at, or tell me the words so that --        13:10:30

16  I'm sure it's found in a lot of different places.

17          MR. ROBBINS:  Well, thankfully it's only on six or

18  seven pages of his affidavit in the Graves case.  But in that,

19  he talks -- and it's also in our report.

20          THE COURT:  Okay.  You're telling me a bunch of stuff        13:10:48

21  where it is.  I want to know exactly what kind of warning I'm

22  telling them about, because I can be -- I can -- you can rest

23  assured he's not going to be going into an extensive lecture

24  about it.  I want to know specifically what it was they were

25  warned of that you claim is significant.                            13:11:08

1          MR. ROBBINS:  At page number 70 of his report --

2          THE COURT:  What's the report exhibit number?

3          MR. SHOWALTER:  Your Honor, at Exhibit 183 --

4          THE COURT:  Okay.  Hold up a second.  Okay.  Page

5   number, you said?                                              13:11:41

6          MR. SHOWALTER:  Exhibit 183, page 149.  And it's the

7   same for the exhibit, itself, and for the report.  And so the

8   opinion is that untreated mentally ill inmates are not only a

9   risk of assaultive behavior, but also being victimized by their

10  fellow inmates.  And then he refers, Dr. Stewart refers to his   13:12:25

11  2013 affidavit where -- which was provided to the County where

12  he stated, "because they are not timely seen by a provider,

13  these patients are not timely transferred to the MHU or to

14  inpatient psychiatric facility, leaving them at increased risk

15  of victimization from other prisoners," and that's the         13:12:44

16  emphasis.

17         THE COURT:  So it's really two prongs, untreated

18  prisoners are potentially going to be victimized by other

19  untreated prisoners?  Is that a correct summary?

20         MR. SHOWALTER:  That's correct.  And on the Monell      13:13:11

21  Claim.

22         THE COURT:  Well, let me just make sure I got the

23  warning first, or what I understand to be a warning.

24         Now, and at sidebar I made the comment -- well, this

25  isn't a negligence case, so warnings, etcetera, etcetera, to    13:13:36

1    which one of -- to which Mr. Robbins responded, well, but --

2    but we have a gross negligence claim which is, basically, a

3    claim that, as I understand it, the gross negligence claim is

4    that -- really quoting now from my order on summary judgment --

5    that the plaintiffs allege jail officers lack the supervision,          13:14:02

6    training, skill, ability, and control to protect from a

7    foreseeable and preventable attack by housing Daughtry with

8    Bates.  And then as I understand it, the gross negligence claim

9    is, basically, a failure to train and supervise, etcetera,

10   claim; is that correct?                                                  13:14:34

11        MR. SHOWALTER:  It's a failure to train and supervise

12   claim, but our focus again and again is on the information that

13   the jail has.  And so we have these -- we have this

14   January 21st psych referral where they say Zach Daughtry is in

15   danger from other inmates in general population, so we're               13:14:51

16   sending him to psych.  Then we have March 4th of 2014, he's not

17   appropriate for maximum security.

18        THE COURT:  You're wading into a lot of evidence right

19   now.  I'm trying to make sure I properly -- properly capsulize

20   the claim.  In other words, it's a claim that but for the               13:15:12

21   training of these officers, this cell assignment, and therefore

22   this death, would not have occurred; is that right?

23        MR. SHOWALTER:  That's correct.  If they had -- and,

24   Your Honor, one of the things that, frankly, has confused us in

25   trying to tell you -- tell the Court our theory of the case, is         13:15:40

1    that, you know, we think that we can show evidence to say this

2    is what should have happened, and, you know, what the -- which

3    we think from Mr. Eiser and Pablo Stewart shows the standard of

4    care.  And so our theory of the case is that they have all of

5    this information demonstrating Zach Daughtry is in serious          13:16:08

6    danger in the jail, and because of the way their policies,

7    customs and practices are set up, that information doesn't get

8    to the right people and it's not used in the cell assignment.

9          THE COURT:  Okay.  It seems to me that if this warning

10   is probative of gross negligence claim, it's probative that --     13:16:51

11   that there was a failure to train, supervise, etcetera, rather

12   than simply a we warned you that this might happen, and it

13   happened, and therefore you're at fault.

14         MR. SHOWALTER:  Well, there's -- there's two things

15   we're talking about.  One is we're talking about Monell, and       13:17:20

16   one we're talking about gross negligence.

17         THE COURT:  I'm just talking about the gross

18   negligence claim at this moment.

19         MR. SHOWALTER:  And so that's, I think, the failure to

20   communicate on our side is for us, the warning is an essential     13:17:32

21   element of our Monell Claim.  The other stuff --

22         THE COURT:  I promise you, we'll get to that in a

23   moment.  Stay away from it for the moment.  Stick with the

24   gross negligence claim.  My order on summary judgment focuses

25   on the gross negligence claim.  I've got to be able to be          13:17:51

1  persuaded that it's probative of the gross negligence claim and

2  not just something that we warned you that something bad was

3  going to happen, something bad happened, therefore, you're at

4  fault, so...

5       MR. SHOWALTER:  So with respect to the gross                13:18:05

6  negligence claim, it shows that they were warned that this type

7  -- exact type of thing would happen, and they recklessly

8  disregarded the risk.

9       THE COURT:  What's that got to do with failure to

10 train, supervise, etcetera?                                      13:18:20

11      MR. SHOWALTER:  Because we have to train and supervise

12 psychiatric staff, train and supervise detention staff to

13 recognize this risk.  They were on notice in 2013 of this

14 significant risk, and they took -- and furthermore, you know,

15 from our position, it's something that's obvious.  The risk,    13:18:43

16 itself, is completely obvious.  And our position is that you

17 almost -- you need expert testimony so that you have the

18 foundation, but it's not a risk that people, you know, can't

19 figure out that you have this man who is locked in a cell for

20 219 days and... and, everybody says, he's at risk of harm from  13:19:07

21 other inmates.  And the very fact of the way it's treated

22 demonstrates that these people were not trained, were not

23 supervised in a way that could protect him.

24      THE COURT:  Well, he -- if he's got something to say

25 on the adequacy of their training and supervision, etcetera,    13:19:35

1    then I would have assumed he would have opined that here's --

2    here's how they were trained, here's how they were not trained.

3    This is a warning about putting inmates suffering from mental

4    illness issues with other inmates suffering from mental illness

5    issues.  I'm not hearing that this warning says a properly          13:20:06

6    trained whatever would have this kind of training.  I've looked

7    into it.  They only have this amount of training.

8              MR. SHOWALTER:  And I think, Your Honor, the context

9    of his warning was blatantly obvious to defendants because it

10   came in the context of ongoing constitutional litigation saying    13:20:29

11   you guys have this problem that you already know about and you

12   are not training them.  And that is why Dr. Stewart's evidence

13   is so important, is because he knows about the history of this.

14   He knows about his warnings.  He knows about the other warnings

15   to Maricopa County, and that's what he relied on in rendering      13:20:50

16   these opinions; that it's not something where, you know, the

17   example I'd give, this isn't something like the Space Shuttle

18   disaster where there's an O-ring and, you know, you need all

19   this specialized engineering knowledge about the O-ring and

20   g-forces and whatever.  This is something where the risks are      13:21:11

21   really, really obvious.

22             THE COURT:  Well, if it's really, really obvious, I

23   guess they shouldn't need a warning.

24             MR. SHOWALTER:  That is -- that is actually the

25   position we would take, but the reason we need the warning is      13:21:26

1   for Monell.

2           THE COURT:  Well, let's get to Monell.

3           The way in which, at least this Court's order on

4   summary judgment, characterized the claimed practice was,

5   according from my order, plaintiffs contend this practice of          13:21:57

6   punishing rather than treating mentally ill inmates in

7   requiring the tower officer to make actual cell assignments and

8   reassignments to the disciplinary segregation unit, without

9   review of the background and risk identification information on

10  each inmate, created a substantial serious risk of -- to          13:22:21

11  Daughtry's safety.

12          Is that still basically a correct statement of what

13  you contend to be the practice?

14          MR. SHOWALTER:  That is correct.  That is from the

15  jail perspective.  If I recall your order, that is referring to          13:22:45

16  Mr. Eiser's testimony --

17          THE COURT:  Well, that's the heart of your Monell

18  Claim, isn't it?

19          MR. SHOWALTER:  We think our Monell Claim has two

20  prongs.  The first is on the jail side, and the second is on          13:22:56

21  the CHS side.  I guess maybe what I should say, one way to look

22  at it is that there's these two issues.  How are mentally ill

23  treated?  That's the Dr. Stewart side.  The other side is the

24  cell assignment issue, which we identified as something that

25  Maricopa County knew created a serious risk of harm to inmates          13:23:20

1    before Zachary Daughtry's, or before Ryan Bates was assigned to

2    Zachary Daughtry's cell.

3              THE COURT:  Now, then if this is, indeed, a fair

4    description of the practice, that the practice has been

5    punishing rather than treating, and requiring the tower          13:23:46

6    operator, tower officer, to make actual cell assignments and

7    reassignments without review of the background and risk

8    identification information on each inmate, if that's the

9    practice, then whether they receive some warning from Dr.

10   Stewart or not is beside the point.  Even if they didn't --       13:24:09

11   even if they didn't get a warning, that's the practice, and if

12   that's constitutionally infirm, it is.

13             MR. SHOWALTER:  Well, I would like to agree with you,

14   Your Honor, but there is a case called *Castro v. Los Angeles*.

15             THE COURT:  I read it.                                  13:24:33

16             MR. SHOWALTER:  And my reading of it says that in

17   order for us to prove deliberate indifference, we actually need

18   to show subjective knowledge of the risk.

19             THE COURT:  And that's my third question.  Does his --

20   does his warning go to -- go to the deliberate indifference       13:24:47

21   prong rather than the constitutional infirmity of the practice

22   itself?

23             MR. SHOWALTER:  As to Dr. Stewart, yes.  But as to the

24   cell assignment issue, that was the evidence we attempted to

25   get in through Mr. Eiser, and again yesterday through Miss        13:25:06

1   Ajir, which was that they knew that having the tower officer

2   make these cell assignments in this fashion had resulted in

3   previous deaths, two of them, in the prior six months.

4           And so, you know, she's -- she knew it and she can

5   testify that Maricopa County knew that.  And we think we have        13:25:27

6   to get that in on that portion of our Monell Claim to show

7   subjective knowledge on the County.  We either have to get it

8   in through Mr. Eiser, or through Miss Ajir, or some other

9   person from Maricopa County.

10          Now, separately as to Dr. Stewart, we do believe that         13:25:48

11  we have a Monell Claim based solely on what he says in setting

12  the cell assignment issue aside, and what that is is that his

13  testimony is that they were on notice in 2013 that the way they

14  are treating the mentally ill endangers them in the jail.

15  Defendants don't deny they had the notice, they simply say it's       13:26:23

16  unduly prejudicial.  But if it's necessary for us to prove our

17  claims, it can't be unduly prejudicial.

18          And so what our position would be is that it shows a

19  Monell violation that Dr. Stewart warned them in the context of

20  a constitutional case, so he's not just warning them that they       13:26:43

21  are falling short of a standard of care, he's warning them that

22  you're violating constitutional rights.

23          THE COURT:  Well, he's not entitled to talk about

24  violating constitutional rights.

25          MR. SHOWALTER:  He's not.  But their knowledge, their         13:26:57

1   knowledge is that they know they are being accused of violating

2   United States constitutional --

3           THE COURT:  You're now trying to make the case for why

4   he should be able to talk about a particular case, a particular

5   prior event; right?  That's what you're trying to argue?                13:27:10

6           MR. SHOWALTER:  I'm not making that case.

7           THE COURT:  Oh, okay.

8           MR. SHOWALTER:  I'm simply saying that to prove Monell

9   under Castro, as we read it, we need to show subjective

10  knowledge on Maricopa County's side that they knew of serious          13:27:25

11  risks, and they -- they went ahead with their policy

12  regardless.  And that's how we get to Monell, and that that is

13  -- and then now they could still beat us at that point if they

14  can show that there was no causation.  That's what we think we

15  should be permitted to do.                                              13:27:52

16          THE COURT:  Let me hear from Mr. Struck.

17          MR. STRUCK:  First, I did want to point out --

18          THE COURT:  Come up to the podium since -- come to the

19  podium.

20          MR. STRUCK:  The section -- I'm sorry.  The section            13:28:04

21  that he cited to that was the warning, "because they are not

22  timely seen by a provider, these patients are not timely

23  transferred to the MHU or to an inpatient psychiatric facility,

24  leaving them at increased risk of victimization from other

25  prisoners and without needed adjustments to their treatment and        13:28:30

1   medications," that -- that's a completely different warning

2   than what I just heard counsel say the warning was; that this

3   is what they just referred to as the warning, and there's --

4   that is not this case.  They are not alleging that they were --

5   didn't receive any treatment.  What they are alleging is that          13:28:52

6   they were not receiving appropriate treatment now, and they

7   were sent back to the general population unit too early.

8   That's what they are -- that's what they have been trying to

9   prove during this case, and this is not a warning, oh, if you

10  continue to -- if you punish these individuals by giving them          13:29:13

11  disciplinaries and increasing their classification to put them

12  in a more dangerous housing unit, that's a completely different

13  warning than what they just read.

14          So I'm not quite sure where they are getting this

15  warning from with respect to Dr. Stewart.  But in this case,           13:29:33

16  it's our assertion that they, in order to prove their Monell

17  Claim, they have to show that there are incidents that are

18  substantially similar to this, and that is you've got two

19  individuals who they say are psychotic and should not be housed

20  together, and they housed them together, and one psychotic             13:30:07

21  inmate killed another one.  They don't have any of those.

22  There's been no evidence at all of those.  Those are the types

23  of incidents that they would have to prove in order to get the

24  Monell Claim to a jury, and there aren't incidents like this,

25  certainly not at the Fourth Avenue Jail or involving two               13:30:32

1    allegedly mentally ill inmates, and that's the crux of their

2    claim here.

3           So right now they have one claim, and in order to show

4    deliberative indifference, they have to show notice by other

5    claims where other serious mentally ill inmates were put          13:30:56

6    together.  And as a result they ended up, one of them was hurt,

7    and they have -- there's been no evidence of that.  They

8    haven't tried to present any evidence of it, because it doesn't

9    exist.  So right now they have one incident.  And for whatever

10   reason, they decided to plead this as a Monell Claim and not      13:31:15

11   simply a -- and they have narrowed the gross negligence claim

12   to training, which this isn't -- there's been no evidence of

13   inadequate training on the part of the detention officers,

14   because that's where this has been narrowed to.  And they

15   haven't presented -- they didn't assert an underlying            13:31:33

16   constitutional claim with respect to putting these two

17   individuals together.

18          So they have kind of painted themselves into a corner,

19   and now they are trying to get out of it by having Dr. Stewart

20   talk about the overall inadequate mental health treatment in     13:31:49

21   the Maricopa County jail.

22          So I guess what -- what our position is, this isn't a

23   warning with respect to the issues in this case.  This is a

24   completely different issue that is not evidence at all by any

25   of the allegations, or facts of the case.                        13:32:11

1          THE COURT:  Just hold for a second.

2          MR. STRUCK:  Sure.

3          THE COURT:  In the summary judgment order that I

4     quoted from and that cites docket, a couple of docket numbers,

5     but anyway, the part I quoted from in the order was,                    13:33:14

6     "plaintiffs contend that this practice of punishing rather than

7     treating mentally ill inmates and requiring the tower officer

8     to make actual cell assignments and reassignments in

9     disciplinary segregation unit without review of the background

10    and risk identification information on each inmate created a       13:33:33

11    substantial and serious risk to Daughtry's safety."

12          Would you agree that's a correct statement of the

13    issue in this case?

14          MR. STRUCK:  That's a correct statement of the issue

15    in the case, yes.  That's what your summary judgment order       13:33:48

16    said.

17          THE COURT:  And that would suggest that, at least,

18    they claim that is the practice that they claim is

19    constitutionally infirm.

20          MR. STRUCK:  In the confines of this case, it's with       13:34:08

21    respect to two what they allege to be seriously mentally ill

22    inmates being put together, as a result of the tower officer

23    not having sufficient information with respect to whatever

24    mental issues the people that are assigning these cells have.

25          THE COURT:  And you're saying there is none of the         13:34:33

1   warnings that are contained in his report go to that point.  In

2   other words, warning the County that if that practice

3   continues, there's going to be an injury or death.

4          MR. STRUCK:  What I'm saying is the 2013 Graves

5   affidavit that they just quoted talks about inmates not being          13:34:57

6   timely seen by a provider and not timely transferred to the

7   mental health unit, or to an inpatient psychiatric facility,

8   leaving them at increased risk to victimization from other

9   prisoners without needed adjustments to their treatment and

10  medications.  That is a different issue than not providing the         13:35:19

11  tower officer with sufficient information with respect to the

12  mental states of the inmates that they are assigning to cells

13  in the housing unit, so that's not -- that's not a warning by

14  Dr. Stewart in Graves.  That's a something -- that's something

15  different.                                                              13:35:45

16         THE COURT:  And it was via Graves that whatever

17  warning was given, the County was -- it was via Graves that the

18  warning was given to the County?

19         MR. STRUCK:  I think that's what they are saying.

20         THE COURT:  All right, thanks.  Last word, Mr.                  13:36:06

21  Showalter?

22         MR. ROBBINS:  Your Honor, could we confer for just one

23  moment?

24         THE COURT:  Sure.  (Pause.)

25         MR. SHOWALTER:  Your Honor, first, I want to address            13:36:57

1    the notion that we need to show it by a similar or identical

2    incident.  That is, as I read it, an attempt to import

3    qualified immunity into a Monell Claim, and there is no

4    qualified immunity for a Monell Claim.  What has to be shown is

5    that a municipality had subjective, actual subjective knowledge          13:37:20

6    of a serious risk, and through its course of conduct, it

7    disregarded that risk.  It didn't change course despite having

8    that knowledge.

9            And so with respect to Dr. Stewart's warning, Dr.

10   Stewart's warning comes in the context of saying you, Maricopa          13:37:42

11   County, are putting detainees at risk because you're not

12   providing them with mental health treatment.  And that, in

13   itself, you're endangering them because they are not being

14   provided with a mental health treatment, because it puts them

15   at risk of harm from other inmates, risks of victimization in           13:38:06

16   jail.  That's it.  That's our case.  And as long as we can show

17   that the County knew prior to Zach Daughtry's death that the

18   way it was providing mental healthcare was failing to provide,

19   was providing for the mentally ill was failing to provide them

20   with healthcare that created a risk of victimization, then they         13:38:30

21   have that notice.  And then we can show in Zach Daughtry's case

22   that he was -- that he was repeatedly noted to be at risk of

23   victimization; that on July 6th, three days before he was

24   fatally assaulted, he was assaulted as a result of mentally ill

25   behavior.                                                               13:38:57

1      THE COURT:  I understand what the evidence is shown,

2  and I have some idea of your argument.

3      MR. SHOWALTER:  Yeah.

4      THE COURT:  He makes the point that -- that -- you

5  don't have a prior incident where you've got two people, one of      13:39:12

6  which is -- two people similarly situated in terms of their

7  mental health condition in which one attacked the other.

8      MR. SHOWALTER:  Your Honor, we do not need that

9  legally.

10      THE COURT:  I didn't ask whether you need it, but you      13:39:33

11  don't have it, do you?

12      MR. SHOWALTER:  We do not have that condition.  We

13  have a condition where people were placed in segregation cells

14  with mentally ill inmates who assaulted them violently and

15  killed them.  And that was the evidence that, if possible, we'd      13:39:44

16  still like to get in through Christine Ajir.  And that happened

17  twice in six months prior to Zach Daughtry's death, and it's

18  separate.  The way the Court phrased it in its order on our

19  motion for summary judgment, or I'm sorry, on defendants'

20  motion for summary judgment, that is never how we presented it.      13:40:03

21  That is a correct summary of what we were alleging, but the way

22  it's read, it sounds like we're alleging that it's the

23  combination of those two things.

24      What we were alleging is those are two separate Monell

25  violations that we think we can show caused Zach Daughtry's      13:40:21

1    death independently from one another, and both of which were --

2    or either of which is sufficient to impose liability on

3    Maricopa County.

4         THE COURT:  Your fundamental problem is, is unless you

5    -- unless you try to state the issue very broadly, and even as          13:40:35

6    I recited it in the summary judgment order, you don't have a

7    Monell issue.  I mean, back to my same point.  Monell issues

8    are classically, in fact, classically it's a written policy,

9    which on its face was constitutionally infirm.  Of course it's

10   broadened to be it doesn't have to be a written policy.  It can        13:41:03

11   be a custom or practice, but it's where there is some -- custom

12   is something more than one incident.  It's where a custom that

13   takes place, and the consequence of it is, it's

14   constitutionally infirm.  Unless you state something very

15   broadly here, you don't have it.  You don't have it.                    13:41:29

16        MR. SHOWALTER:  I believe -- let me rephrase it this

17   way:  Maricopa County has a policy and custom of locking

18   inmates in segregation cells with other inmates, as of

19   January 14th, without any information about who those are,

20   without -- it's like if you -- if you ran a zoo and you                 13:41:48

21   randomly -- and you randomly locked any two animals in a cell

22   together, zebra and a lion, that's the way Maricopa County does

23   their business.  And they knew as of January 14th that that

24   policy caused the death of John Klatt at the hands of Nike

25   Black, who happened to be mentally ill.  April 2nd, 2014, the           13:42:10

1    same policy of not looking at these two people, causes the

2    death of Douglas Walker.  They knew at that point that they had

3    failed to protect because they had information that could have

4    protected Doug Walker from Andrew Ward.

5           In January of 2014, Jeff Eiser had told them with          13:42:34

6    relation to a 2010 case, they had violated the rights of Wietse

7    ten Boden, when he was killed by Lamont Rider, a mentally ill

8    inmate.  And all of it is about vulnerable and violent.  And

9    that's on -- that falls within the confines of Castro.  Castro

10   never says they have to have a similar incident.  Castro is a    13:42:59

11   cell assignment case.

12          THE COURT:  Castro is also a cell design case and a --

13   someone wants almost a negligence per se case, because it

14   didn't comply with the building code, city code, something like

15   that.                                                            13:43:19

16          MR. SHOWALTER:  And that may be, but we have a better

17   case than Castro.  We can show three prior killings as a result

18   of this custom and practice in violation of their Fourteenth

19   Amendment obligation to protect pretrial detainees.  And we can

20   show notice, we can show they failed to investigate it, and     13:43:34

21   they ratified it, and we can show that it then caused more

22   deaths.  And they didn't do anything about it, and they don't

23   investigate him, they know.  And these deaths happened, as

24   vulnerable men getting killed by violent men, and it is a

25   constitutional violation.                                        13:43:53

1            THE COURT:  All right.  We're going to take another

2    ten-minute recess, and I'll come back -- I'll come back and

3    announce any further thoughts I have.

4            MR. ROBBINS:  Your Honor?  Could I just give you five

5    pages to look at?                                          13:44:09

6            THE COURT:  Five pages of what?

7            MR. ROBBINS:  Of the 2003 -- 2013 affidavit?

8            THE COURT:  You've got it there?

9            MR. ROBBINS:  I have three -- well, they are all

10   marked up.                                                 13:44:20

11           THE COURT:  No.  Well, it's in the exhibit book, isn't

12   it?

13           MR. ROBBINS:  It is.

14           THE COURT:  What page is it?

15           MR. ROBBINS:  Okay.  It's page number in Exhibit 183,  13:44:29

16   it's page number 260, 261, 292, 293.

17           THE COURT:  Just a second.  I thought they were

18   consecutive.

19           MR. ROBBINS:  I'm sorry.

20           THE COURT:  260.                                   13:44:50

21           MR. ROBBINS:  261.

22           THE COURT:  261.

23           MR. ROBBINS:  292, 293, and 298.

24           THE COURT:  All right.  Thank you.

25         (Recess taken, 1:45 p.m.)                            13:45:05

1        (Proceedings resume, 2:04 p.m.)

2            THE COURT:  The record will reflect the presence of

3    the parties and counsel outside the presence of the jury.  I

4    have -- I have, indeed, taken time to review the pages I've

5    been furnished which, of course, are just a few of what is a          14:04:43

6    299-page tome.  But as I review it, it is, I think, exactly

7    what defense counsel has characterized it as, number 1, to the

8    extent it focuses on a particular case, Graves, it is not

9    demonstrated that that is sufficiently similar to the facts of

10   this case as to make it probative and -- and then it is,           14:05:22

11   basically, a criticism of the -- the healthcare system, the

12   jail system, and -- and such a broad-sweeping condemnation of

13   the system as to have, in my judgment, no probative value on a

14   Monell Claim.  And, of course, as I suggested before we

15   recessed, one of the -- one of the problems or -- or             14:06:07

16   advantages, depending on how you view it, if you can broaden

17   the description of the Monell Claim broadly enough, then you

18   can start justifying bringing in these broad criticisms of the

19   system.

20           So the -- and finally I would make this point, this      14:06:30

21   is, I think, a classic 403 issue as well.  To the extent there

22   is probative value here, it -- it is substantially outweighed

23   by the danger of unfair prejudice, confusing the issues, and

24   misleading the jury.  So the Court's earlier rulings will

25   stand.                                                            14:07:00

1          Thank you for your patience and taking several

2     additional minutes to do our best to get this issue right, and

3     I'm satisfied with the rulings I've made.

4          MR. SHOWALTER:  Your Honor, may I be heard?  As we

5     view -- as the plaintiff views the case at this point, we've          14:07:18

6     proffered evidence showing notice to Maricopa County for

7     previous deaths resulting from their cell assignment, practice,

8     and custom.  Those -- that evidence was excluded based on 403.

9     That evidence is essential for us to show notice to the County

10    under our Monell Claim.                                               14:07:42

11         Now the Court has excluded evidence of ongoing

12    constitutional violations in the Graves matter that are

13    essential for us to show that Maricopa County had notice that

14    its policies for treating the mentally ill put those mentally

15    ill detainees at risk of harm at the hands of other detainees.       14:08:02

16    And so that also was excluded, at least in part, on the basis

17    of 403, and so we -- we view these defendants -- defendants'

18    counsel said we're painted in a corner.  I don't know that I

19    agree with that, but I do view these evidentiary rulings as

20    being dispositive rulings.  And so at this point, plaintiff          14:08:24

21    moves for a mistrial.

22         THE COURT:  Move for a mistrial?

23         MR. SHOWALTER:  Yes, Your Honor, or for

24    reconsideration of the prior order on Miss Ajir and Mr. Eiser's

25    testimony.  We have to show notice to Maricopa County that its       14:08:46

1    policies put people in serious risk of harm.  And we think that

2    Graves does that, we think that Dr. Stewart can do that, we

3    thought that Mr. Eiser can do that, and we think that Miss Ajir

4    could do that.  But all of that evidence, as far as we can

5    ascertain, is being excluded.  And the only thing still hanging      14:09:09

6    out there is our motion for the Court to take judicial notice

7    of Graves, which includes a finding that as of August 9th of

8    2013, Maricopa County's Correctional Health System was

9    violating United States Constitution.  And included in that

10   finding was notice to the Court, which the Court found facts       14:09:29

11   on, that they were punishing the mentally ill and that that was

12   putting them in danger.

13           And so, you know, at this stage with respect to our

14   Monell Claim, our concern is that the Court's evidentiary

15   rulings have precluded us from bringing it, because we don't       14:09:47

16   know how to show knowledge -- we don't know how to show

17   knowledge on Maricopa County if we can't bring in the ongoing

18   civil rights litigation that -- that told Maricopa County its

19   mental health system is unconstitutional in putting detainees

20   at risk.  And we don't know how we can put knowledge on           14:10:08

21   Maricopa County if we can't show, as the evidence shows, that

22   it knew that the way it housed pretrial detainees in

23   segregation cells put them in significant harm at the hands of

24   other inmates.

25           So given those things, these evidentiary rulings,         14:10:27

124

```
 1    under Castro, mean that if we get a jury verdict -- if we get
 2    past tomorrow in the final presentation of our case, and we go
 3    to a jury and a jury finds in favor of us -- finds in
 4    plaintiff's favor on a Monell Claim, we think we're going to
 5    get to the Ninth Circuit on an appeal.  And they are going to       14:10:51
 6    say you didn't prove subjective knowledge in Maricopa County,
 7    and we're going to say we tried.
 8            THE COURT:  I think you made one or two motions, a
 9    motion for mistrial and a motion for reconsideration.  And I
10    have reconsidered two or three times now the arguments you've        14:11:15
11    made, and the rulings will stand.  And these current motions
12    will be denied, and you can continue with the witness.
13            MR. SHOWALTER:  Thank you, Your Honor.
14        (Jury enters the courtroom.)
15            THE COURT:  Please be seated.  The record will now            14:12:45
16    reflect the presence of the parties and counsel.  And ladies
17    and gentlemen of the jury, once again, we came to a point in
18    the proceedings where we had some rather complex legal issues
19    to further thrash out, and so I apologize for keeping you
20    waiting.  But you may proceed.                                        14:13:03
21            MR. ROBBINS:  Thank you, Your Honor.
22    BY MR. ROBBINS:
23    Q.  One of the things that we had talked about, about Zach
24    Daughtry, was an incident wherein he was disciplined.  And I'm
25    going to -- and this is on 7/6 of 2014.  And on that date he,        14:13:22
```

1    and I'm going to read it, might as well blow it up so my old

2    eyes can read it, "On 7/16/2014, at approximately 12:25 hours,

3    while conducting a routine security walk in 3B, 100 pod, I

4    noticed multiple bruises on inmate Daughtry's face.  He was

5    then pulled out and placed in a Level 3 medical holding tank        14:13:59

6    for further questioning.  Inmate Daughtry stated, 'I peed on my

7    cellee's blanket, and then he told me I need to roll up, and

8    that is when we fought.'  Upon review of video surveillance, it

9    was discovered inmate Daughtry engaged in mutual inmate fight

10   with inmate Juan Cervantes."                                        14:14:22

11          Did you review that document in the preparation of

12   your opinions?

13   A.  Yes.

14   Q.  And did it influence your opinions in terms of Mr. Zach

15   Daughtry's mental condition at the time of the assault three       14:14:35

16   days later?

17   A.  Yes.

18   Q.  And in terms of the decision that a person putting Ryan

19   Bates into that cell with that person, how did that affect your

20   opinion concerning that?                                           14:14:56

21   A.  I really didn't understand the question.

22   Q.  If a person was actually consciously paying some attention

23   to the actual occupants of the cell, how would that affect the

24   decision to place a person like Ryan Bates, as you've

25   described, into that cell?                                         14:15:14

1              MR. STRUCK:  Vague, relevance, 403.  And calls for

2       speculation.

3              THE COURT:  It is -- it is still vague to me as well,

4       so I'll sustain the objection.

5              MR. ROBBINS:  Okay.                                    14:15:31

6              THE COURT:  I don't know who the person consciously

7       paying attention is.  I'm just not sure who you're talking

8       about there.

9       BY MR. ROBBINS:

10      Q.  Well, let's focus for a moment, if we can, and I'm going to  14:15:42

11      show you -- do we have Exhibit 123 in front of the witness?

12      It's over there, Exhibit 123.

13      A.  Yes.

14      Q.  What is Exhibit 123?

15      A.  The title is CHS J-A-08 Communication on Patient's Health  14:16:11

16      Needs.

17      Q.  And is that a -- a policy that was in effect on the date

18      that Ryan Bates was put into a cell with Zach Daughtry?

19      A.  Yes.

20      Q.  And did you consider that in rendering your opinions?       14:16:34

21      A.  Yes.

22              MR. ROBBINS:  Move for admission of Exhibit 123.

23              MR. STRUCK:  Foundation.  Hearsay.

24              MR. ROBBINS:  We've been told that our foundation does

25      not need requiring the calling of a custodian.                 14:16:49

1        MR. STRUCK:  We've waived business records foundation,

2   but there is still foundation that needs to be laid with this

3   exhibit that can't be done through this witness who is not a

4   CHS employee.

5        THE COURT:  And the relevance is?                    14:17:19

6        MR. ROBBINS:  We're dealing, I believe, that we're

7   dealing exclusively with the assignment of Ryan Bates into

8   disciplinary segregation with another inmate, and this deals

9   with that -- that process and deals with correctional health's

10  rules regarding that.                                      14:17:38

11       THE COURT:  Well, foundation sustained.  Obviously if,

12  as I've said before, if he considered this, it doesn't have to

13  come into evidence in order for him to consider it.

14       MR. ROBBINS:  Very good.

15  BY MR. ROBBINS:                                            14:17:57

16  Q.  In terms of the opinions about the placement of these two

17  in the same cell, should there have been some communication

18  from mental health, according to the county's own rules?

19  A.  Yes.  This is --

20  Q.  In terms of that, is it important before taking a person  14:18:15

21  who is floridly psychotic and putting them into a cell with

22  another person in a disciplinary sense, to contact mental

23  health so that they can weigh in on the decision-making

24  process?

25  A.  One is common sense, you would want to do that.  But again,  14:18:34

1    based on this policy that it's required that mental health is

2    consulted, custody staff consult with mental health about the

3    placing of mentally ill inmates.

4    Q.  And it puts -- it's part of the NCCHC standards.  What are

5    they?                                                            14:18:57

6    A.  NCCHC is a organization that has established a variety of

7    standards that jails strive to meet, and one of them is

8    communication on patient's health needs where mental health

9    staff and custody staff need to communicate regarding placement

10   of mentally ill.                                                 14:19:24

11   Q.  And in terms of that, are there different levels of -- in

12   terms of the standards for the NCCHC, are there different

13   levels of, you know, some are like -- it would be nice if you

14   had this, others are important?  Are there any kind of levels?

15   A.  Yes.                                                         14:19:40

16   Q.  And what level is this standard on communication on a

17   patient's health needs?

18   A.  This standard is right here, talks about NCCHC standard

19   J-A-08 in parens essential.

20   Q.  Essential.  Well, it's -- would you agree, probably agree    14:19:56

21   with the defendants -- great policy, isn't it?

22   A.  I think it's a very appropriate policy.

23   Q.  Did they follow it in this case?

24        MR. STRUCK:  Objection.  Foundation.  402, relevance,

25   and 403.                                                         14:20:16

1          THE COURT:  Overruled.

2          THE WITNESS:  Can you repeat the question?

3          MR. ROBBINS:  Yes.

4     BY MR. ROBBINS:

5     Q.  It's kind of a two-parter.  I guess I'm notorious for doing          14:20:27

6     that, so I'm going to break it into two parts.

7          Would you agree with the defendants this is an

8     important or a good policy?

9     A.  It's a very good policy.

10    Q.  Did they follow it in this case?          14:20:39

11    A.  Not that I'm aware of.

12    Q.  Would the failure -- what difference would it have been,

13    have made?

14         MR. STRUCK:  Objection, Your Honor.  Move to strike.

15    Foundation.          14:20:50

16         THE COURT:  Sustained.

17    BY MR. ROBBINS:

18    Q.  In terms of the importance -- well, let's talk a little bit

19    about -- about your history in terms of your background in

20    order to come before this jury and give them your opinions.          14:21:05

21         Where did you start out when you -- when you first

22    left medical school, what did you do?

23    A.  I started my medical school University of California in San

24    Francisco to complete a four-year psychiatric residency

25    program.          14:21:28

UNITED STATES DISTRICT COURT

1    Q.  What made you choose psychiatry?

2    A.  I like psychiatry because it allowed me to care for the

3    entire patient as opposed to other specialties that sort of

4    just dealt with one sort of illness, and then pass the patient

5    on.                                                                    14:21:41

6    Q.  And in terms of that, what interested you in correctional

7    psychology versus going out and talking to folks that, you

8    know, have emotional problems, but not the kind you see in a

9    jail or a prison?

10   A.  I would correct one word from your question, it was          14:21:55

11   correctional psychiatry as opposed to psychology.

12   Q.  Oh, sorry.

13   A.  Well, no.  I think it's a very important distinction to

14   make in that after I completed my residency, I wanted to stay

15   on as faculty at the University of California, which I have       14:22:14

16   been since 1986.  But the types of positions that faculty

17   members hold, you have to have a job to support your position.

18   So you have to work in a clinic.  You have to do surgeries,

19   whatever your specialty is.  So the job that was offered to me

20   was to run the inpatient acute care, you know, maximum security  14:22:37

21   psychiatric ward for the jails in the County hospital.  That

22   was my first job I was offered.  I wanted to stay on faculty.

23   It was, I think, a very important job, and I leapt at the

24   opportunity.  And I really enjoyed that work since then.  I

25   basically stayed -- I've done a lot of other things, but I've    14:23:03

1    stayed in correctional health, so correctional psychiatry for

2    the last 32 years.

3    Q.  In terms of your experience in the -- was that the San

4    Francisco jail?

5    A.  That was the San Francisco County, city and county jails,        14:23:15

6    yes.

7    Q.  Okay.  And so you were providing the acute medical or acute

8    mental healthcare for that jail, the maximum security?

9    A.  When I first started, we were the inpatient facility, and

10   we had a close relationship with the jail that anyone in the         14:23:35

11   jail that had been identified as needing a higher level of

12   mental healthcare than the jail could provide, they were

13   transferred to the hospital, and that's where they came under

14   my care.

15   Q.  So what kind of people would you be dealing with there?          14:23:47

16   A.  Well, you know, look at it from just their charges,

17   anything from loitering -- we used to call it eating and

18   running, meaning getting some food, not paying for it -- all

19   the way to homicides, and everything in between.  And that was

20   from the charges standpoint.                                         14:24:13

21          From a mental health standpoint, all of the people

22   were severely mentally ill because they required

23   inpatient-level care.

24   Q.  Let's talk about that.  What kind of psychiatric conditions

25   require inpatient medical care?                                      14:24:26

1    A.  Well, all of them could.  And so you could have a

2    schizophrenic who was well-maintained on medication and be very

3    safely to be maintained in the jail, because in San Francisco

4    County jail, we had a psychiatric unit in the jail.  It wasn't

5    a hospital, but where we had more staff, and we could more          14:24:45

6    closely watch the inmates, and ensure they were taking their

7    medication.  So the people that couldn't be housed safely in

8    the jail, either because of danger to others, danger to self,

9    or being so mentally ill that they couldn't care for

10   themselves, even in a jail setting, they were transferred to       14:25:05

11   the hospital.  Those were our patients.

12   Q.  So would you cure them of mental illness and then release

13   them back to the jail?

14   A.  Well, it's not really a cure.  I wish there were.

15   Q.  Well, what's the threshold for when they are okay to go        14:25:16

16   back to jail, because they are still going to be mentally ill

17   when they go?

18   A.  The threshold is when they could be safely housed in the

19   jail where they were not going to be a threat to be victimized,

20   or they were not going to victimize other people, or they were     14:25:31

21   not going to commit suicide.

22   Q.  Okay.  And so give us -- do you have an example that would

23   help, maybe, you know, out of your experience of that?  Give us

24   the worst that you've ever had to deal with.

25   A.  Oh, we had a lot worse, but one that comes to mind was real    14:25:48

1  challenging case of a defendant who snuck a gun into a

2  courtroom and took the judge hostage, and then escaped with the

3  judge and went on a big, you know, car chase down the peninsula

4  in the Bay Area.  And luckily the judge was not hurt.  I mean,

5  he was certainly hurt during the whole thing, but he wasn't

6  killed.  And the inmate was arrested and sent back to us, and

7  he was really psychotic, characterized by paranoia.  He would

8  see symbols on a wall that have special meanings to him.  He

9  was very, very psychotic and very, very assaultive.

10         And so we were able to start him off, you know, in

11  restraints, administered medications involuntarily to the point

12  where he could cooperate with treatment, and voluntarily took

13  his medications.  And after maybe a couple of weeks, he was

14  stable enough to be returned back to jail.

15  Q.  And in terms of his return to jail, I mean, obviously, he

16  wasn't cured, but what difference was it between the patient

17  you got and the patient you were able to release after

18  treatment?

19  A.  He still was suffering from, I believe his diagnosis was

20  schizoaffective disorder, which is a type of serious psychotic

21  illness.  We were able to get enough of his psychotic symptoms

22  in control.  So his voices were less, he wasn't necessarily

23  seeing symbols in otherwise inanimate objects, and he wasn't

24  assaultive.  And so it was based on my assessment that he was

25  able to be safely held in the psychiatric supervision area, and

14:26:13

14:26:32

14:26:50

14:27:09

14:27:32

1  where he could be ensured that he was taking his medication.

2  Q.  What would the danger have been to have put him back into

3  the jail population when he was completely psychotic, and like

4  you received him?

5          MR. STRUCK:  Your Honor, relevance.  403.  Foundation.   14:27:50

6  Speculation.

7          THE COURT:  Overruled.

8          THE WITNESS:  We use just one example of a person that

9  was seriously mentally ill, that is my opinion, that if he was

10  allowed to stay in jail with his unmedicated, psychotic state,   14:28:19

11  he would have been involved in other altercations with inmates

12  and staff.

13  BY MR. ROBBINS:

14  Q.  Is that ultimately the danger with releasing a psychotic

15  paranoid schizophrenic, floridly psychotic at the time, into   14:28:36

16  the jail population?

17  A.  It certainly is a serious risk.

18  Q.  And in terms of the -- of this particular case, was Ryan

19  Bates medicated at the time he was assigned to the cell with

20  Zach Daughtry?   14:28:58

21  A.  Not that I'm aware of.

22  Q.  And in terms of the behaviors that the one person who you

23  had described in the San Francisco jails, that was a person

24  with those positive symptoms?

25  A.  His overwhelmingly positive symptoms, yes.   14:29:13

```
 1    Q.  And in terms of what -- what can you -- is there, on a
 2    given day, if you know a person's track record of bizarre
 3    behaviors, is there a way to say if a person is unmedicated
 4    that they are going to -- well, let me strike that.
 5          If a person is unmedicated and is floridly psychotic     14:29:43
 6    and they are in the jail setting, do they get better over time?
 7          MR. STRUCK:  Your Honor, leading.  Relevance.  403.
 8    Foundation.  Speculation.
 9          THE COURT:  Sustained.
10    BY MR. ROBBINS:                                                14:30:09
11    Q.  And in the condition that Ryan Bates was, in your opinion,
12    at the time that he was assigned to a cell, was he a danger to
13    others?
14          MR. STRUCK:  Leading.  Speculation.
15          THE COURT:  Overruled.                                   14:30:23
16          THE WITNESS:  Based on review of his psychiatric
17    history, I believe he was.
18    BY MR. ROBBINS:
19    Q.  And going back, how long did you spend as the chief of the
20    psychiatric mental health unit for San Francisco County?       14:30:38
21    A.  I was in the position of running the hospital unit for a
22    little over four years.  During that time, about 18 months, I
23    was also overseeing the division of mental healthcare in the
24    jail.
25    Q.  And in terms of doing the healthcare in the jail, what was  14:30:58
```

1    that?  What did you do there?

2    A.  Well, I supervised.  I was the chief -- the chief of the

3    whole system, and so I supervised a number of psychiatrists and

4    a number of nonpsychiatric mental health staff.

5    Q.  And while there, did you participate in the decisions about          14:31:18

6    classification?

7    A.  I certainly participated and my staff participated in

8    decisions around housing.

9    Q.  Why is that important?

10   A.  You know, as was reflected in the NCCHC standard we were             14:31:34

11   talking about earlier, is that custody staff need to be aware

12   of the mental health status of the people they're responsible

13   for keeping in the jail.

14   Q.  Does that mean more than just sending them out of mental

15   healthcare and sending them into the general population?                 14:32:03

16          MR. STRUCK:  Objection, Your Honor.  This is

17   cumulative testimony.  We already heard from Mr. Eiser

18   regarding the same issues.  It's 403.

19          THE COURT:  Overruled.

20          THE WITNESS:  State it again, please?                             14:32:27

21          MR. ROBBINS:  Ms. Williams or, sorry, would you please

22   read back the last question?  I apologize.

23      (Record read.)

24          THE WITNESS:  Yes, it absolutely means more than just

25   that.                                                                    14:32:48

1   BY MR. ROBBINS:

2   Q.  What does it mean?

3   A.  It means meeting with the sergeant of the watch.  Meeting

4   with the, you know, the hierarchy in the jail, supervisors, and

5   even the individual custody staff; alerting them to the -- of          14:32:57

6   who they are going to be responsible for, you know, taking care

7   of on their watch.

8   Q.  During the four years that you were with the maximum

9   security psychiatric unit and the -- and the jail unit, does it

10  cause -- you obviously stuck with it.  What was it that               14:33:20

11  appealed to you about -- about working in that setting?

12  A.  I was always interested in providing community psychiatry

13  care, so as opposed to private practice.  And the people in the

14  jail were -- were the most severely mentally ill people in the

15  community mental health system, most of them homeless, many of        14:33:47

16  them had concurrent substance abuse problems, and many of them

17  had concurrent medical problems.  And as challenging as a

18  patient that is with all those issues, I found it very

19  intriguing to be involved in their care, because I could -- you

20  know, don't want to sound like a Pollyanna, but man, I really         14:34:12

21  liked helping these people because they were so sick.  And

22  anything that I could do or my staff could do to help them was

23  very, very, you know, worthwhile for me.  I really enjoyed that

24  aspect of it.

25  Q.  And is it fair to say that treatment, medical treatment,          14:34:26

```
 1   medication as you've described, antipsychotics when needed,

 2   that they have a positive effect on an inmate's ability to get

 3   along in the population?

 4   A.  Yes.

 5   Q.  And how does -- how is it affected?                        14:34:47

 6   A.  Well, in the case of that example I told you about, a

 7   person wasn't as paranoid.  His paranoia was significantly

 8   decreased.  Now, paranoia is an unsubstantiated fear that

 9   people are out to harm you.  So if you're walking around with

10   that as your reality, that you are thinking people are out to   14:35:11

11   harm you when, in fact, they are not, then that often leads to

12   people striking out.

13          And so by just diminishing that symptom, we could not

14   guarantee that that wouldn't happen, but certainly have a much

15   better opinion that it wouldn't happen.                        14:35:27

16   Q.  And in terms of Ryan Bates, is there anything to indicate

17   the treatment would not have assisted him in getting along with

18   the population when he was eventually assigned his cell?

19          MR. STRUCK:  This is leading.  It's asked and

20   answered.  We already heard about this before the lunch break.  14:35:48

21   It's cumulative.

22          THE COURT:  Overruled.

23          THE WITNESS:  Review of Mr. Bates's records suggest

24   that he -- his particular type of mental illness was responsive

25   to medications in the past.                                    14:36:16
```

UNITED STATES DISTRICT COURT

DR. PABLO STEWART - DIRECT                                139

1    BY MR. ROBBINS:

2    Q.  And in terms of your background, after you worked in the

3    mental health unit and in the jail's mental health, what did

4    you do next?

5    A.  At that point, I stayed within the university system and          14:36:30

6    took a lateral transfer to the veterans' hospital, where I ran

7    an inpatient drug and alcohol ward.  But in addition to that, I

8    had been appointed as the federal court psychiatric expert in a

9    consent decree against California Department of Corrections.

10   So I did both of those things simultaneously.                         14:36:54

11   Q.  And you're with the -- presently you're a clinical

12   professor at the Department of Psychiatry at the University of

13   California in San Francisco?

14   A.  Yes.

15   Q.  Tell us about that.                                               14:37:07

16   A.  I don't know what exactly, like, to say.  I've always

17   enjoyed teaching, especially clinical teaching, and so that's

18   when I have students with me.  I have students with me in the

19   jail ward, for example, both medical students and psychiatric

20   residents.  And I would try to teach them about the proper         14:37:30

21   assessment and treatment of acutely and seriously mentally ill

22   people.

23          But in addition, other things I've done as being a

24   professor, have taught classes.  And right now I supervise a

25   group of medical students in basic science program.  So it's        14:37:45

1    really giving me an opportunity to stay up-to-date on my

2    medical knowledge.

3    Q.  You also do some work for the ACLU at times?

4    A.  Once in a great while.

5    Q.  About what, if you had to estimate, what -- what percentage    14:38:02

6    of your income would you estimate that you derive from work

7    with the ACLU to help with human rights in the jails and

8    prisons?

9    A.  It depends.  At different times, I'll do more work with the

10   ACLU.  Currently I'm not involved at all with the ACLU.  When I    14:38:21

11   have done more work with -- it's with the National Prison

12   Project of the ACLU.  Boy, five percent, maybe, my overall

13   annual income.

14   Q.  Why do you work for them?  Some people don't like them.

15   A.  Well, I like working with them, one, because they are --    14:38:45

16   they are really smart people.  The lawyers there are really

17   smart.  The other people that you work with are really, you

18   know, up-to-date on the latest issues.  And so being in that

19   group, really, I liked it.  It helps me stay abreast.  You're

20   around smart people.  It helps you stay, you know, with it.  I    14:39:09

21   really like that part of it.  I like the human rights aspect

22   part of it, because they don't go anywhere and sue people for

23   money, not that I'm aware of, not that I've ever been with

24   them.  We go in there and look at conditions, and conditions in

25   jails and prisons that are causing harm to the inmates.    14:39:28

UNITED STATES DISTRICT COURT

1   Q.  Let me pause for just one moment.  (Pause.)

2          And we've compensated you for your time and you've

3   been, I think, pretty low on your estimates of it.  Is that a

4   criticism you've heard at your home before?

5   A.  Yeah.  I'm not -- I'm not a real good business person.          14:39:53

6          MR. ROBBINS:  Thank you, Dr. Stewart.  That's all the

7   questions I have.

8          THE COURT:  Cross-examination.

9          MR. STRUCK:  Thank you, Your Honor.  Just a moment,

10  please.                                                            14:40:06

11                        CROSS-EXAMINATION

12  BY MR. STRUCK:

13  Q.  Dr. Stewart, good afternoon.

14  A.  Good afternoon.

15  Q.  Now, I think you testified earlier today that you consider   14:41:04

16  yourself a forensic psychiatrist; is that right?

17  A.  I do forensic psychiatric work.

18  Q.  And, but you're not a board-certified forensic

19  psychiatrist; correct?

20  A.  I've never completed a fellowship in forensic psychiatry.    14:41:16

21  Q.  Or a residency in forensic psychiatry?

22  A.  There's no such thing as a residency in forensic

23  psychiatry.

24  Q.  Okay.  So your testimony, there's no such thing as a

25  residency in forensic psychiatry?                                14:41:31

1    A.  Correct.  There's a fellowship.

2    Q.  Have you ever obtained or held certification as a certified

3    correctional health professional?

4    A.  By certification, what do you mean?

5    Q.  I mean, do you know what certified correctional health          14:41:46

6    professional is?  Have you ever heard of that?

7    A.  No, that's why I'm asking.

8    Q.  Okay.  It's an organization that certifies individuals who

9    are qualified or want to -- want to be certified in the actual

10   delivery of correctional healthcare.  You've never heard of        14:42:01

11   that?

12   A.  I'm aware there's for-profit agencies that will give you

13   this certification.  I'm not sure what it means or what it's

14   worth.  My certifications have come from the federal court.

15   Q.  So your answer is no?                                           14:42:18

16   A.  No.  I'm answering your question about certifications.

17   Q.  Excuse me, Doctor.

18   A.  Certifications for being a correctional psychiatric expert

19   have come from federal courts in the eastern district of

20   California, central district of Illinois.                          14:42:32

21   Q.  Okay.

22   A.  In this particular district of Arizona.

23   Q.  Doctor, I didn't ask you that question.  And if we just

24   proceed in a question-and-answer basis, this will go a lot

25   quicker, okay?                                                      14:42:44

1    A.  I thought I was answering your question.

2    Q.  All right.  I asked you about whether you have ever

3    received certification as a certified correctional health

4    professional, and you said no.  So let me go on to my next

5    question.                                                    14:42:57

6          This isn't the first time you've ever testified;

7    correct?

8    A.  Correct.

9    Q.  In fact, you've probably testified in court at least a

10   hundred times, maybe more?                                   14:43:05

11   A.  At least.

12   Q.  You talked a little bit at the end there about your

13   clinical responsibilities at the University of California with

14   respect to the San Francisco jail; right?

15   A.  Correct.                                                 14:43:23

16   Q.  And that ended in, was it, 1990?

17   A.  1990.

18   Q.  Okay.  And you actually provided clinical services to jail

19   detainees who came to the University of California to the

20   12-bed acute care clinic; correct?                          14:43:41

21   A.  They came from the jails, the city and county of San

22   Francisco, in the inpatient unit when it was run by the

23   University of California, yes.

24   Q.  And so that's not in a jail or prison setting; true?

25   A.  Hospital not -- well, the hospital has a jail psychiatric   14:43:59

1   ward, so it's in the jail part of the hospital.

2   Q.   Okay.  But it's a hospital, it's not the jail, but the jail

3   sends detainees who need acute care to the University of

4   California hospital; correct?

5   A.   The jail portion of the University of California hospital.      14:44:18

6   Q.   And how large is that jail portion?

7   A.   There's -- it's one wing of the hospital, and it has 12

8   beds for people that are medically ill that are in custody and

9   it has 12 beds for people who are psychiatrically ill.

10  Q.   Okay.  And was it ever any bigger than a 12-bed -- 12          14:44:36

11  psychiatric beds?

12  A.   Not the inpatient unit.

13  Q.   All right.  Have you, since 1990, ever provided or worked

14  in a jail or correctional setting providing clinical care?

15  A.   Yes.                                                           14:44:54

16  Q.   When?

17  A.   During the decade of the '90s, I was appointed by federal

18  judge in Eastern District of California to be the psychiatric

19  expert in a consent decree.  Part of that authorization that I

20  worked under special master was to provide and teach the staff    14:45:12

21  of the jail prison about providing clinical care.

22  Q.   And how long did you do that?

23  A.   Basically the decade of the '90s.

24  Q.   And that was a full-time job?

25  A.   That was a -- in addition to my job as running the            14:45:27

1   inpatient unit at the VA hospital.

2   Q.  Okay.  So how many days a week did you spend as the court's

3   requested monitor with respect to teaching individuals how to

4   provide mental health treatment?

5   A.  It started off maybe half a day, one day a week during the        14:45:45

6   course of that, probably about halfway through, so like 1995 or

7   so, it became a couple days a week, sometimes more.

8   Q.  All right.  Other than that, have you worked -- has your

9   job been to provide clinical treatment for individuals in a

10  jail or prison setting?                                               14:46:09

11  A.  Not directly.

12  Q.  Okay.  Have you ever testified on behalf of a defendant in

13  a civil case ever?

14  A.  Yes.

15  Q.  And who hired you?                                                14:46:30

16  A.  New Mexico Department of Corrections.

17  Q.  What case was that?

18  A.  Ayers case, A-Y-E-R-S.

19  Q.  And that was a case involving a consent decree?

20  A.  No.  That was a case -- excuse me.  I don't remember it           14:46:45

21  involving a consent decree.  It involved -- my particular role

22  in that was the provision of psychiatric services to those

23  mentally ill inmates who were in segregated housing.

24  Q.  Okay.  And when was that?

25  A.  Oh, it might have been late '90s, early 2000s, off the top        14:47:07

1    of my head.

2    Q.  And was it your opinion in that case that the New Mexico

3    Department of Corrections was providing constitutionally

4    adequate mental health treatment to the inmates at that

5    facility?                                                        14:47:36

6    A.  Not initially.  In fact, that's why they brought me in, to

7    help them achieve constitutional minimal standards.

8    Q.  Okay.  Have you ever been hired by a defendant in a, say,

9    in a case like this to, as an expert to come in and take a look

10   at the issues and determine whether or not somebody --          14:47:55

11   somebody's constitutional rights were violated or the -- or

12   whether the treatment fell below the standard of care?

13   A.  No.  I've never been asked.

14   Q.  In fact, on your website, you advertise yourself as

15   representing plaintiffs, don't you?                              14:48:15

16   A.  I don't have a website.

17   Q.  What's the University of California Criminal Justice Health

18   Consortium?

19   A.  Oh, that's an organization of a multidisciplinary

20   organization of faculty within the University of California      14:48:51

21   system involving a variety of issues regarding mental health

22   and criminal justice, in the most general sense.

23   Q.  And you work with an individual named Craig Haney with that

24   group; is that right?

25   A.  He's a member of that group also.  He's a professor at       14:49:09

1    University of California Santa Cruz.

2    Q.  And Brie Williams?

3    A.  I believe she's the executive director.

4    Q.  Okay.  And in the description of you it says, "I am a

5    forensic psychiatrist with a specialty in all phases of capital     14:49:21

6    litigation."

7         Before I go on, what is capital litigation?

8    A.  Death penalty.

9    Q.  And whom are you generally hired by in those kind of cases?

10   A.  By defense.                                                      14:49:36

11   Q.  By a criminal defendant?

12   A.  Correct.

13   Q.  "As well as being an expert in correctional psychiatry, as

14   a correctional psychiatrist, I have worked as a plaintiff's

15   expert in a number of high-profile prison and jail cases."          14:49:47

16   A.  Yes.

17   Q.  Does that refresh your recollection as to whether you have

18   information on a website with respect to your -- what you do?

19         MR. ROBBINS:  Object to form, Your Honor.  He's

20   actually referring to an earlier question, which misstated          14:50:02

21   that, and I think it inserts testimony.

22         THE COURT:  Overruled.

23   BY MR. STRUCK:

24   Q.  What I read, do you recognize that as being on the

25   University of California Criminal Justice & Health Consortium        14:50:16

UNITED STATES DISTRICT COURT

1   website?

2   A.   Right.  It's in my website, and that -- what you just read

3   is a correct description of my professional activities, yes.

4   Q.   In other words, when you are hired as a consultant in a

5   case like this, you're always hired by the plaintiffs; correct?    14:50:36

6   A.   Except for that case I talked about in New Mexico.

7   Q.   That wasn't a case like this, that was a different kind of

8   case?

9   A.   Correct.  You're correct, thank you.

10  Q.   Nobody was suing for money damages in that case; correct?     14:50:48

11  A.   You're right.

12  Q.   Now, you don't get paid by, as you say, you're still a

13  professor at University of California?

14  A.   Yes.

15  Q.   That's an unpaid position?                                    14:51:17

16  A.   That currently is, yes.

17  Q.   So you derive all of your income with respect to doing

18  things like this, except I guess you have, like, a small rental

19  or a rental property as well; is that right?

20  A.   Yeah, I do have a one rental property.                        14:51:32

21  Q.   But other than the rental property, your entire income is

22  derived from your consultant activities?

23  A.   Correct.  This is what I do for a living.  This is my job.

24  Q.   And how much have you been paid in this case?

25  A.   Boy, under $5,000 so far.                                     14:51:50

```
 1    Q.  And what are you charging for your testimony today?

 2    A.  I'm not charging anything for testimony.  I bill by my

 3    hours of time involved.

 4    Q.  Okay.  So, but you're here all day, so presumably you'll be

 5    charging Mr. Robbins for your time?                              14:52:10

 6    A.  Correct.

 7    Q.  Right?

 8    A.  And my hourly rate in this case is $350 an hour.

 9    Q.  Okay.  And how much income did you derive in 2017 from your

10    -- your -- these type of activities, being a consultant in      14:52:32

11    cases?

12    A.  In plaintiff cases?

13    Q.  Just -- just being a corrections psychiatric consultant?

14    A.  All of my income.

15    Q.  And how much was that?                                      14:52:51

16    A.  In 2017?

17    Q.  Yes, sir.

18    A.  I would say around $350 to $400,000.

19    Q.  Would you consider yourself a prisoners' rights advocate?

20    A.  Explain -- define that for me, and I'll answer that.        14:53:18

21    Q.  Okay.  For example, the ACLU National Prison Project, would

22    you consider them to be prisoners' rights advocates, advocating

23    the rights of prisoners?

24    A.  I think that would be a fair characterization of the ACLU.

25    Q.  Do you consider yourself a prisoners' rights advocate       14:53:39
```

1  advocating the rights of prisoner inmates, and prisoners in

2  prisons and jails?

3  A.  It depends on what context that I'm working.  Sometimes I

4  certainly am.  Other times, like in this case, I don't believe

5  I'm a prisoner rights advocate, but in certain other cases,          14:53:57

6  yes.  I'm absolutely advocating for the rights of prisoners.

7  Q.  And that would be where you're like, for example, if the

8  ACLU hires you, you're advocating for the rights of prisoners,

9  you're assisting them in advocating for the rights of

10  prisoners?                                                          14:54:17

11  A.  Right, the constitutional rights of prisoners.  That's what

12  we advocate for.

13  Q.  And I think you told Mr. Robbins you haven't worked with

14  the ACLU in a while; is that right?

15  A.  I had a little work this year.  This is 2018, yes, I had a     14:54:26

16  little work this year.  And over the -- over the last several

17  years, I have not done a lot of stuff with them, but some

18  stuff.

19  Q.  Well, you were their -- the ACLU National Prison Projects

20  and the Prison Law Office, are you familiar with them?            14:54:50

21  A.  Yes.

22  Q.  Okay.  And they are out of San Quentin?

23  A.  Prison Law Office is from the Bay Area, yes.

24  Q.  And they are also attorneys who are prisoners' rights

25  advocates, would you agree?                                        14:55:03

1    A.  Yes.

2    Q.  And you were hired by the PLO and the -- and the ACLU to

3    represent the inmates in a case against the Arizona Department

4    of Corrections; true?

5    A.  Correct.                                                    14:55:16

6    Q.  And that case is ongoing; right?

7    A.  Correct.

8    Q.  And you're still involved in that case?

9    A.  I haven't been directly involved in that case for several

10   years.                                                         14:55:27

11   Q.  Okay.  Have you been hired by the Southern Poverty Law

12   Center?

13   A.  Yes.

14   Q.  How many times have you been hired by them?

15   A.  It was for one case, one prison in particular.             14:55:40

16   Q.  All right.  Would you consider them to be prisoners' rights

17   attorneys who are prisoners' rights advocates?

18   A.  Oh clearly, yes, absolutely.

19   Q.  And I'm sorry, you may have asked -- you may have told Mr.

20   Robbins, but I didn't catch it.  How many times have you been  14:55:57

21   hired by the ACLU to work with them on cases?

22   A.  You want the number or the names of the cases?

23   Q.  Why don't we start with a number.

24   A.  I've been involved in a couple cases with Arizona.  I've

25   been involved in, I think -- as far as ACLU cases goes, it's   14:56:15

1    only those cases.  I could be wrong, but I'm thinking --

2    Q.  I'm sorry.  And how many times have you been hired by the

3    Prison Law Office?

4    A.  I think the Prison Law Office was co-counsel with ACLU on

5    Arizona Department of Corrections case that was heard here in                14:56:49

6    the federal court.

7    Q.  Aren't you also working with them with respect to the

8    Coleman and Plata cases?

9    A.  I've been with Coleman Plata cases, you know, since the

10   mid-'90s, and I think they are co-counsel also, yes.                         14:57:02

11   Q.  All right.  And that is a case, a consent decree case, in

12   which the State of California is under a consent decree with

13   respect to the delivery of medical care and the reduction of

14   prisoner population; is that right?

15   A.  Well, those things have occurred over the course of the                  14:57:22

16   case.  The original case was about the fact that California

17   Department of Corrections was not providing constitutional

18   minimum care to its inmate population.

19   Q.  And how long have those cases been going on?

20   A.  The Coleman Plata case, if I remember correctly, started in             14:57:39

21   1995, and the state hasn't been able to get out of it.

22   Q.  All right.  The state has not been able to get out of it --

23   A.  Correct.

24   Q.  -- right?  Isn't it true that California has spent more

25   than a billion dollars on new prison medical facilities as a                14:58:00

```
 1    result of those cases?

 2    A.  I know they spent a lot.  They built some brand-new

 3    facilities that were badly needed.

 4    Q.  Are you aware of the fact that California spends four times

 5    the amount that the federal government does for prisoner          14:58:16

 6    healthcare per day?

 7    A.  Yeah, but I don't know if you want to compare it.  If you

 8    want to bring up the federal system, federal system is probably

 9    the worst system I've been involved in.

10    Q.  The Bureau of Prisons is the worst system?                    14:58:32

11    A.  Yes, absolutely.

12    Q.  Okay.  And California was ordered to release more than

13    90,000 inmates as a result of that, that litigation; is that

14    right?

15    A.  I don't know if 90,000.  I think it was more like 40,000      14:58:44

16    and it was -- yes, so they were ordered to release some

17    inmates.

18    Q.  And have you ever -- do you know what the prison law office

19    agenda is with respect to that litigation?

20    A.  Agenda?                                                       14:59:01

21    Q.  Yes.

22            MR. ROBBINS:  Objection, Your Honor.  Irrelevant.

23            MR. STRUCK:  It goes to bias, Your Honor.

24            THE COURT:  Overruled.

25            THE WITNESS:  I'm not, you know, other than what I        14:59:10
```

1   stated earlier about they are a known prisoner rights group.

2   Other than that, I'm not aware of any agenda.

3   BY MR. STRUCK:

4   Q.  Have you ever heard that the prisoner law office agenda is

5   to make incarceration so expensive that law enforcement                14:59:25

6   authorities will have to abandon it for all but the most

7   heinous crimes?  Have you ever heard that?

8   A.  Not familiar with that.

9         MR. STRUCK:  Your Honor, may the witness be handed

10   impeachment Exhibit Number 330?                                        14:59:47

11         COURTROOM DEPUTY:  It's not an impeachment, it's an

12   exhibit.

13         MR. STRUCK:  I'm sorry.  Your Honor, it's supposed to

14   be an impeachment exhibit, I apologize.

15         THE WITNESS:  Yes.                                               15:00:22

16         MR. STRUCK:  I'm sorry, Your Honor.  I meant to hand

17   him Exhibit 329.

18         MR. ROBBINS:  Your Honor, I'm going to object.  It's

19   irrelevant and it's 304 -- 403.

20         THE COURT:  Well, let's see how -- I have no idea.              15:01:08

21   All I know is I've got a piece of paper in my hand, but I don't

22   know what the pending issue is.  Let's see what happens next

23   and then be prepared to object.

24   BY MR. STRUCK:

25   Q.  Have you ever seen that article from the *Wall Street*            15:01:24

1    *Journal* before?

2    A.  No.

3    Q.  No?  And it's an article about the California litigation?

4    A.  Correct.

5    Q.  And if you look on the second page at the bottom, at least?    15:01:38

6    A.  Yes.

7    Q.  And according to the *Wall Street Journal*, that article,

8    that's the agenda of the --

9            MR. ROBBINS:  Your Honor, I'm going to object to this

10   as being improper impeachment.  He's relying on an exhibit that   15:01:59

11   this expert doesn't know about, and it's just to try to scare

12   the jury into thinking this case --

13           THE COURT:  Wait a minute.  I was following your legal

14   argument up to a point.

15           MR. ROBBINS:  Okay.                                       15:02:14

16           THE COURT:  And frankly agree with it, and sustain the

17   objection.

18           MR. STRUCK:  Thank you, Your Honor.

19   BY MR. STRUCK:

20   Q.  What is the American Academy of Psychiatry and the Law?       15:02:28

21   A.  It's exactly as the name implies.  It's a group of

22   psychiatrists that practice forensic psychiatry, you know, the

23   entire gamut of forensic psychiatry.

24   Q.  With respect to providing expert opinions in cases like

25   this, or anytime you're an expert in a case, whether it's a       15:03:05

1   consent decree case or a case like this, there are ethics

2   involved; correct?

3   A.  There's ethics involved every time you testify, certainly

4   in cases like this.

5   Q.  And according to -- if you take a look at -- oh, let me ask          15:03:16

6   you about this:  Isn't it true that the American Academy of

7   Psychiatry and the Law has a section in their ethical

8   guidelines with respect to what you're doing with respect to

9   your providing opinions regarding either jails, prisons, or in

10  cases like this?                                                         15:03:48

11  A.  Yeah, they have, what the title of this is ethics

12  guidelines for the practice of forensic psychiatry, so

13  certainly would apply to this.

14  Q.  And wouldn't you agree that you're required to show honesty

15  and strive for objectivity?                                             15:04:04

16  A.  Absolutely.

17  Q.  And that when psychiatrists function as experts within the

18  legal process, they should adhere to the principal of honesty

19  and should strive for objectivity?

20  A.  Absolutely.                                                         15:04:16

21  Q.  Would you agree with that?

22  A.  Yes.

23  Q.  Although they may be retained by one party to a civil or

24  criminal matter, psychiatrists should adhere to these

25  principals when conducting evaluations applying clinical data           15:04:27

1    to legal criteria and expressing opinions.

2          Would you agree with that?

3    A.   Absolutely.

4    Q.   Would you agree that being retained by one side in a civil

5    or criminal matter exposes psychiatrists to the potential for          15:04:45

6    unintended bias and danger of distortion of their opinion?

7    Would you agree with that?

8    A.   Not always.  It depends on who is hiring you.  You know,

9    even if you're hired by plaintiffs, it doesn't necessarily

10   expose you to potential bias, or if you're hired by either            15:05:06

11   side.  It could, certainly, but not always.

12   Q.   Well, wouldn't you agree, though, if you're hired by the

13   plaintiff, and in order to provide an opinion in support of a

14   plaintiff's claim for damages, there is a potential for bias

15   for you to provide an opinion in favor of that particular            15:05:27

16   plaintiff?

17   A.   There's always a potential for bias, sir.

18   Q.   Okay.  In that situation, there is potential for bias;

19   right?

20   A.   I would underline potential.                                    15:05:46

21   Q.   Okay.  Well, isn't that what the American Academy of

22   Psychiatry and the Law is addressing, that concern?

23   A.   I haven't read this lately.

24   Q.   Okay.  It's -- if you would like to look at it, it's on

25   page 3 of 6 in the middle of the page.  There's a section 5,        15:06:06

1   honesty and striving for objectivity, and there's a commentary

2   section below?

3   A.  Yes, okay.

4   Q.  Have you ever seen that before?

5   A.  Yes.                                                    15:06:17

6   Q.  And so wouldn't you agree that what the AAPL is doing here

7   is trying to point out the potential for bias and the special

8   hazards presented in your field when -- when a plaintiff or a

9   defendant hires you to offer an opinion?

10  A.  Yes.  And again, I would emphasize potential for bias.   15:06:37

11  Q.  Have you ever been hired by a plaintiff in a case like this

12  for money damages, took a look at the mental healthcare that

13  was provided and said, hey, I'm sorry, I can't help you.  They

14  provided treatment within the standard of care?

15  A.  I receive calls on a daily basis from plaintiffs, from     15:07:01

16  criminal defendants, from other organizations that are involved

17  in litigation.  And they asked me, quite frankly, we need you

18  to be able to say this.  And if, in fact, it's something that I

19  could ethically state, then I go further and learn more about

20  the case.  But if they are asking me -- just the other day I    15:07:27

21  got a call from a criminal defendant, wanted me to say, look,

22  we want you to say our guy was crazy, and he was not capable of

23  forming intent, etcetera, etcetera.  I said I can't say that.

24  I say thank you very much, and hang up.  That happens to me all

25  the time.                                                      15:07:45

DR. PABLO STEWART - CROSS

1  Q.  Let me -- let me ask a question just a little more clear

2  than, apparently, the one I just asked.

3       Have you ever been hired by a plaintiff to review the

4  facts of the case and issue an opinion for them in a case like

5  this involving money damages where you took a look at the facts       15:08:07

6  of the case, you looked at the records, you did everything you

7  needed to do to come up with opinion, and you told the

8  plaintiff's attorney, hey, I can't help you.  They were

9  providing mental health treatment that was within the standard

10 of care?                                                              15:08:33

11 A.  Yes, but with the proviso that I wouldn't even go to the

12 fact of being hired.  I would ask for, I need a summary of the

13 case upfront.  And what you were hoping I would be able to say,

14 and if it's something that I can't do, I stop right then, so

15 I'm never even hired.  There have been times during the course      15:08:50

16 of cases where after more thorough review of the facts of the

17 case I'm unable to render an opinion that would necessarily be,

18 you know, in favor what one side was trying to do, then I stop

19 my involvement in the case.

20 Q.  Now, how long have you been working as an expert in this         15:09:12

21 field, was it, since 1994?

22 A.  Probably -- I started doing cases when I was running the

23 jail unit in San Francisco, so that was late '80s, early '90s.

24 Q.  I'm sorry.  How many of these cases do you think you've

25 handled over the years?                                              15:09:34

1    A.  What type of cases?

2    Q.  Civil case involving plaintiffs and defendants, like we

3    have here?

4    A.  Counting my -- like we have here, not a whole lot.

5    Q.  What does that mean?                                    15:09:48

6    A.  Maybe ten, less than ten.

7    Q.  And since -- so since 1990, you've only handled ten

8    plaintiff's cases involving money damages?

9    A.  Correct, and if that many.

10   Q.  And how many cases have you had involving providing an   15:10:05

11   opinion or working with a prisoners' rights advocacy group on

12   cases with respect to the provision of mental healthcare in a

13   jail or prison?

14   A.  Maybe about the same number, ten over the course of that

15   time.                                                        15:10:30

16   Q.  Okay.  And besides those two kinds of cases, I think you

17   also mentioned that you represent criminal defendants?

18   A.  Correct.

19   Q.  And what kinds of cases do you represent, or are you hired

20   by attorneys with respect to their criminal clients?         15:10:47

21   A.  As far as my criminal work, which has been the bulk of my

22   work in my career, most of the cases have been for the defense

23   with a few for the prosecution.  And was your question how many

24   cases?

25   Q.  If you could estimate.                                   15:11:10

1    A.  Several hundred.

2    Q.  All right.  What percentage are the criminal cases as

3    opposed to the civil cases?

4    A.  Oh, overwhelmingly majority is criminal cases.

5    Q.  And how many times have you been hired by the prosecution          15:11:26

6    to take a look at the criminal defendants, and I'm assuming

7    this is incompetency-type situations?

8    A.  Well, that's part of it.  As far as my work with

9    prosecution, I have four cases.  I remember them all because

10   it's not that many.  Two were competency matters, one was          15:11:45

11   rendering opinion about the best placement in the federal

12   Bureau of Prisons for a defendant that had already been

13   convicted.  And my last one was, I was because of my expertise

14   in psychopharmacology, I was asked to consult with district

15   attorney San Mateo County regarding a vehicular manslaughter          15:12:06

16   case.

17   Q.  Okay.  So two times you were hired by the prosecution to

18   examine the criminal defendant and reach a determination as to

19   whether or not he or she was competent to stand trial?

20   A.  Correct.                                                          15:12:23

21   Q.  And what did you -- did you come to a conclusion on those

22   two cases?

23   A.  I believe one I found was I thought it was competent, one I

24   thought was incompetent.

25   Q.  Have you ever been -- how many times have you been hired by          15:12:35

1  a criminal defendant to render an opinion with respect to

2  competency and you determined that, in fact, they were

3  competent to stand trial?

4  A.  I'm thinking.  Sorry.

5  Q.  That's okay.                                              15:13:02

6  A.  The wheels are sort of moving slowly.  Maybe about half

7  dozen at most.

8  Q.  Okay.  And so the, I think did you say hundreds of other

9  cases that you've had?

10  A.  I probably have done at least a hundred competency cases.  15:13:17

11  Q.  So all the rest of them you've found that the criminal

12  defendant was not competent to stand trial?

13  A.  It was my opinion.

14  Q.  Right.  Well, I guess you're not the one to find, but you

15  rendered the opinion --                                      15:13:30

16  A.  Correct.

17  Q.  -- to the court?

18  A.  Correct.

19  Q.  Okay.  And going back to the ethics guidelines of the APL,

20  would you agree that psychiatrists practicing in a forensic    15:13:49

21  role enhanced the honesty and objectivity of their work by

22  basing their forensic opinions, forensic reports, and forensic

23  testimony on all available data.

24        Would you agree with that?

25  A.  Oh, absolutely.                                          15:14:05

1   Q.  They communicate the honesty of their work, efforts to

2   attain objectivity, and the soundness of their clinical opinion

3   by distinguishing to the extent possible between verified and

4   unverified information, as well as clinical facts, inferences,

5   and impressions.                                            15:14:26

6           Would you agree with that?

7   A.  Yes.

8   Q.  Psychiatrists should not distort their opinion in the

9   service of the retaining party.  Would you agree with that?

10  A.  Yes.                                                    15:14:38

11  Q.  Honesty, objectivity -- I'm going to go back and ask you a

12  few more questions about that.  Before I do, I'm going to ask,

13  have you ever had your testimony excluded by a court, to your

14  knowledge?

15  A.  Not to my knowledge.  I know I've had one case where       15:15:12

16  federal magistrate judge noted that he found me not to be

17  credible.  He didn't exclude my testimony.

18  Q.  Which case was that?

19  A.  It was a case in the District Court of Hawaii in Honolulu.

20  I believe the defendant's name was Gowadia, Gowadia.           15:15:33

21  Q.  *United States v. Gowadia*?

22  A.  Yes.

23          MR. STRUCK:  I happen to have a copy of that case.

24  Would the clerk hand the witness Impeachment Exhibit Number 24?

25          THE WITNESS:  Sir, I want to clarify your question      15:17:08

1    that you answered about if my testimony had ever been excluded.

2         MR. STRUCK:  Okay.

3         THE WITNESS:  There have been a few times in federal

4    court where -- excuse me if I get the number wrong -- 403(b)

5    hearing, or a hearing basically not in front of the jury, but          15:17:25

6    with a judge to see if, in fact, my testimony would be allowed

7    to come in.  There's been a couple of those where after the

8    hearing, my testimony was not allowed to come in.

9         MR. STRUCK:  Okay.  And do you remember what those

10   cases were?                                                            15:17:41

11        THE WITNESS:  They were both criminal cases, both

12   criminal cases.  One was -- it was a big RICO case in the Bay

13   Area with a variety of defendants.  Oh, man.  The defendant

14   that I was working with was named Henry Cervantes, and there

15   was another case in Hawaii where the defendant's name was last        15:18:09

16   name Williams.  They are both homicide cases.

17   BY MR. STRUCK:

18   Q.  Both those cases, the judge determined that your opinion

19   could not come into evidence?

20   A.  In the Williams case, it was a particular opinion about the       15:18:27

21   person suffered from diabetes, and I had opined that the

22   diabetes possibly had a contribution to his mental state at the

23   time of the homicide.  And after hearing the judge said I was

24   not a diabetes expert, so I couldn't say that.

25   Q.  Let me ask you about the case that we were just -- that you       15:18:51

```
 1    referred to earlier, United States v. Noshir Gowadia, that's

 2    G-O-W-A-D-I-A.  And I think you testified the magistrate judge

 3    determined that you were not credible; correct?

 4    A.  Correct.

 5    Q.  And, in fact, the district court judge made that same        15:19:10

 6    determination.  Were you aware of that?

 7    A.  I believe he affirmed what the magistrate judge had done.

 8         COURTROOM DEPUTY:  Defendants' Impeachment 24 is now

 9    Exhibit 331.

10    BY MR. STRUCK:                                                   15:19:47

11    Q.  And that was Judge Susan Oki Mollway?

12    A.  She was the judge.

13         MR. ROBBINS:  Objection, Your Honor.  Irrelevant.

14         THE COURT:  Overruled.

15         THE WITNESS:  Judge Mollway was the district court          15:20:01

16    judge.  I never testified in front of her.

17    BY MR. STRUCK:

18    Q.  In that particular case, you administered a test called the

19    MacCAT, MacArthur Competency Assessment Tool.  Do you remember

20    that?                                                            15:20:36

21    A.  Yes.  Yes.

22    Q.  And the Court found that your reliance on the MacCAT as

23    your only test called into question all of your conclusions?

24    A.  Correct.

25    Q.  And the Court determined that an examination of your        15:20:47
```

1   subjective scoring on the -- of the criminal defendant Gowadia

2   on these questions raise serious questions about your heavy

3   reliance on the MacCAT?

4   A.  Correct.

5   Q.  And in this particular case, you -- one of your opinions          15:21:20

6   was that the -- that Gowadia's honesty was not important

7   because that you thought -- it appeared to be designed to

8   address his ability to reason.  If he really -- if he was

9   really competent, he would be dishonest.  That was your opinion

10  in that case?                                                        15:21:50

11  A.  Oh, when was that, 2009?  I certainly don't remember the

12  details.

13  Q.  Okay.  We've got it.  I think you've got it right in front

14  of you.  Do you want to look at page 10 and 11?  And if you see

15  on page 10 in the second paragraph, or the first full                15:22:24

16  paragraph, the criminal defendant told you that he felt that he

17  hadn't done anything wrong, and pleading guilty would be lying.

18  And that the Court stated the unimportance of honesty to

19  Stewart is demonstrated by Stewart's analysis concerning

20  item 15, which appeared to be designed to address Gowadia's          15:22:44

21  ability to reason.

22          Did I read that correctly?

23  A.  Yes.

24          MR. ROBBINS:  Your Honor, object to the relevance of

25  the scoring of the MacCAT test to this particular case.              15:22:53

1       THE COURT:  Overruled.

2   BY MR. STRUCK:

3   Q.  And on page 11, the Court stated that you gave Gowadia a

4   score of 1 on the item 15, explaining that honesty is not a

5   advantage to a defendant for purposes of pleading guilty.                    15:23:08

6   Stewart thought that not exposing one's self to a potential

7   ten-year sentence was an advantage, but identified no advantage

8   in maintaining one's innocence or not lying.

9       Did I read that right?

10  A.  You read it right.                                                        15:23:23

11  Q.  Okay.  So in this particular case, you were suggesting

12  that, perhaps, something was wrong with this person because

13  they were being honest?

14  A.  No.  If I remember that correctly, it's this -- this

15  standardized measure to assess competence.  And the defendant                15:23:41

16  is read by the examiner, by myself in this case, scenarios.

17  And he's asked to come up with a solution to the scenario,

18  whether or not to plead guilty, whether or not to plead

19  innocent, the benefits to pleading guilty versus the benefits

20  of pleading not guilty.  And so that's my memory of that and, I              15:24:05

21  mean, obviously that was my testimony.  That's my testimony.

22  Q.  Okay.  And Judge Mollway thought or stated, "In other

23  words, Stewart thought that Gowadia lacked rational reasoning,

24  merely because Gowadia thought that honesty was important.

25  Stewart's reasoning does not entirely take into account the                  15:24:28

1   factual situation presented to Gowadia."

2           Did I read that correctly?

3   A.  Yes.

4   Q.  "Stewart testified that Gowadia's answer was lacking

5   because it pertained to a spiritual or existential advantage,        15:24:45

6   not a legal advantage."

7           So you thought that the fact that Gowadia was being

8   honest, in your opinion, made him not competent or less

9   competent to stand trial?

10  A.  I don't remember the details, sir.  You know, one thing I      15:25:05

11  can tell you about that case is I've learned a heck of a lot

12  since then.  That's why they call it the practice of medicine.

13  You learn from your cases, and you move on.  And that's what I

14  did in this case.  I've never been found not credible since

15  that time.                                                          15:25:21

16  Q.  This was in January 2010.  And Judge Mollway stated,

17  "Stewart does not explain to this Court's satisfaction why a

18  claim of innocence and reliance on honesty is either irrational

19  or an indication that Gowadia is unable to assist in his

20  defense.  For these reasons, and for the reasons set forth in       15:25:40

21  the findings and recommendations of the magistrate judge,

22  Stewart was simply not credible in his determination that

23  Gowadia was unable to rationally assist in his defense making

24  him incompetent to stand trial."

25           Did I read that right?                                     15:25:55

1    A.  Correct.

2            THE COURT:  Maybe this is a good point to take our

3    afternoon recess, and we'll do so for 15 minutes.  And please

4    remember the admonition.

5            (Jury exits the courtroom.)                          15:26:21

6            (Recess taken, 3:26 p.m.)

7            (Jury enters the courtroom.)

8            (Proceedings resume, 3:49 p.m.)

9            THE COURT:  The record reflect the presence of the

10   parties and counsel, and ladies and gentlemen of the jury.  And  15:49:38

11   you may continue, Mr. Struck.

12           MR. STRUCK:  Thank you, Your Honor.

13           Your Honor, could Ms. Williams hand the witness

14   Defendants' Impeachment Exhibit Number 27, soon to be renamed?

15           COURTROOM DEPUTY:  Defendants' Impeachment 27 is now  15:50:44

16   Exhibit 332.

17   BY MR. STRUCK:

18   Q.  Dr. Stewart, before the break, we were talking about the

19   Hawaii case where Judge Mollway discredited your testimony and

20   I think -- I believe your testimony was since 2010 you have not  15:51:05

21   been discredited; is that --

22   A.  No.  Again, I don't think my testimony was discredited.  I

23   was found not to be credible.

24   Q.  Not to be credible, okay.  Take a look at Exhibit 332.

25   It's a case called *Jones v. GDCP Warden*?                   15:51:28

DR. PABLO STEWART - CROSS                           170

1    A.  Yes.

2    Q.  Do you remember that case?

3    A.  Vaguely.

4    Q.  Okay.  That's a capital case involving a murder of somebody

5    in Georgia, and you were providing an opinion with respect to          15:51:42

6    the person who was convicted regarding that person receiving

7    the death penalty; is that right?

8    A.  It was a post-conviction case, yes.

9    Q.  Okay.  And what was your opinion in that case with respect

10   to the individual who had been convicted and was sentenced to          15:51:57

11   the death penalty?

12   A.  I don't remember.

13   Q.  Okay.  This is a 2014 case out of the Eleventh Circuit

14   Court of Appeals.  Let me refer you to page 8.  It says, "Dr.

15   Pablo Stewart, a psychiatrist, conducted a clinical interview          15:52:25

16   with Jones and reviewed the documentary evidence along with the

17   report submitted by Walker and Israelian."  Who are Walker and

18   Israelian?

19   A.  I have no idea.

20   Q.  "Dr. Stewart too diagnosed Jones with PTSD, Bipolar 1              15:52:40

21   disorder and later cognitive impairments.  Furthermore, Stewart

22   concluded that Jones' mental impairments significantly

23   contributed to the offense for which she was convicted."

24        Does that refresh your recollection about this case?

25   A.  No, I remember that part, yeah.                                    15:52:57

```
 1   Q.  Okay.  All right.  If you would turn to the next page, it's

 2   on page 9.  "The state court found that the mental health

 3   expert's diagnosis of Jones were the product of unsupported

 4   evidence and errant analysis.  The state court noted that Dr.

 5   Stewart 'completely disregarded' the diagnoses of the            15:53:21

 6   psychiatrist who had evaluated Jones in prison, and that the

 7   facts upon which Dr. Stewart relied were 'fraught with

 8   speculation, error, clear bias and do not present an accurate

 9   report of petitioner's life.'"

10          Do you remember that?                                      15:53:40

11   A.  Yes.

12   Q.  Okay.  And that's what the Court found with respect to your

13   opinion in that case; right?

14   A.  That's what the state court found, yes.

15   Q.  Okay.  Well, does it matter if it's state or federal court?   15:53:49

16   A judge found that your opinion was fraught with speculation,

17   error, clear bias, and did not present an accurate report of

18   petitioner's life; correct?

19   A.  That's what it says.

20   Q.  All right.  And you talked a little bit about, I think, you   15:54:05

21   told us a case where you had testimony excluded.  Do you

22   remember a case called *David v. Signal International*?  Does

23   that ring a bell?

24   A.  Oh, yes.

25   Q.  And you had your opinion -- your testimony excluded in that   15:54:40
```

1    case, didn't you?

2    A.  Yes, I wasn't allowed to testify.

3    Q.  You were not allowed to testify.  You were excluded from

4    testimony?

5    A.  Correct.                                                    15:54:54

6    Q.  Your Honor, could Ms. Williams hand the witness Defendants'

7    Impeachment Exhibit Number 15?

8             Dr. Stewart, in the *David v. Signal International*

9    case, and that was -- this is a 2015 decision; right?

10   A.  Yes.                                                        15:55:59

11            MR. STRUCK:  Oh, I'm sorry.  I'm jumping the gun.  I

12   apologize, Your Honor.

13            COURTROOM DEPUTY:  Defendants' Impeachment 15 is now

14   Exhibit 333.

15   BY MR. STRUCK:                                                  15:56:13

16   Q.  If you take a look at Exhibit 333, this is the opinion in

17   *David v. Signal International*.  It's a 2015 case out of

18   Louisiana.

19            Does that -- do you remember that case?

20   A.  Yes.                                                        15:56:27

21   Q.  In fact, that wasn't too long ago, was it?

22   A.  Correct.

23   Q.  And in that case, you were providing opinion with respect

24   to a -- some camp that you thought shared significant and

25   unhealthy attributes with overcrowded correctional facilities. 15:56:44

1   "The main camp's overcrowded living conditions caused the

2   plaintiffs' emotional and mental distress, and likely caused

3   exacerbated some of the physical ailments they experienced

4   during the time.  The prison-like and overcrowded living

5   conditions had a psychologically coercive effect on plaintiffs,   15:57:02

6   and contributed to the climate of fear that rendered the

7   plaintiffs feeling helpless and powerless to leave Signal."

8            And what is signal?  Is that a company?

9   A.  Yeah, it was a company that was importing workers from

10  India and then basically locking them up in a work camp down at   15:57:23

11  the, I believe, it was on the Gulf of Mexico.

12  Q.  And in this particular case, these plaintiffs were suing,

13  was it an employment action?

14  A.  You know, I don't know what the exact nature of the suit

15  was.                                                             15:57:43

16  Q.  Well, it wasn't that long ago.

17  A.  Well, but I don't know -- you know, I'm coming in as a

18  psychiatric consultant.

19  Q.  Sure.  But you have to know something about the case?

20  A.  Yes.                                                         15:57:54

21  Q.  Right?  Okay.  And in that case, these were employees that

22  were suing about the conditions of their -- of their work;

23  right?

24  A.  Conditions of their living situation and the fact that they

25  were not allowed to come and go, and a whole bunch of other      15:58:06

1    things.

2    Q.  Okay.  And in that particular case, you submitted an expert

3    report, much as you did here; right?

4    A.  As I do in most of my cases.

5    Q.  Okay.  And the defendants move to exclude it, and the Court   15:58:20

6    found that importantly Dr. Stewart admits in his deposition

7    that he neither made a formal medical diagnoses as to any of

8    the plaintiffs, nor spoke with any of the plaintiffs, let alone

9    examined them.  His opinion as to the cause of their emotional

10   or mental distress lacks a foundation and sufficient facts or    15:58:43

11   data.

12          Is that right?  Is that what the Court found?

13   A.  Yes.

14   Q.  And it is ordered that Dr. Stewart will not be permitted to

15   testify at trial; is that correct?                               15:58:57

16   A.  Okay, yes.

17   Q.  Any other cases besides that one, or have we covered them?

18   A.  You guys have a better memory than I do.  I'm not aware of

19   any.  I added a couple more that you didn't bring up that --

20   Q.  Okay.                                                        15:59:16

21   A.  The big RICO case in the Bay Area, Henry Cervantes, and the

22   Williams case where I wasn't allowed to testify because I'm not

23   diabetes expert.

24   Q.  Now, you testified earlier today with respect to the mental

25   health treatment and analysis and diagnoses of Dr. Jaffe with    15:59:38

1    respect to Zachary Daughtry, do you remember that?

2    A.  Yes.

3    Q.  Wouldn't you agree that Dr. Jaffe and Dr. Picardo, who

4    actually treated Zachary Daughtry, is in a far better position

5    than you to determine whether or not he was exaggerating his          15:59:58

6    symptoms?

7    A.  Potentially, but no, potentially.

8    Q.  Yes or no?

9           MR. ROBBINS:  Your Honor, he asked him a question and

10   I believe he's entitled to answer.  And he was interrupted in        16:00:12

11   the middle of an answer.

12          THE COURT:  Sustained.

13   BY MR. STRUCK:

14   Q.  Potentially.  My apologies, okay.  Proceed?

15          MR. ROBBINS:  Complete your answer.                           16:00:29

16          THE WITNESS:  I'm cautious to testifying to the extent

17   to which I'm familiar with Dr. Jaffe's work.

18   BY MR. STRUCK:

19   Q.  How about Dr. Picardo?

20   A.  Same with Dr. Picardo.                                           16:00:38

21   Q.  Okay.  They actually saw Zachary Daughtry.  You've never

22   saw him; right?

23   A.  Correct.

24   Q.  And you never treated him?

25   A.  Correct.                                                         16:00:47

1    Q.  And all you're looking at were -- are some records after

2    the fact; right?

3    A.  After the fact of his death.

4    Q.  Yes.

5    A.  Records that were involved in his case.          16:00:57

6    Q.  Yes.

7    A.  Yes.

8    Q.  And did you review all the records?

9    A.  You know, when you ask all the records, I reviewed

10   tremendous amount of records.  And so I don't know if there's   16:01:08

11   other records I'm not privy to.

12   Q.  So when you rendered your report, you wanted to make sure,

13   though, that you reviewed all of, for example, all of the CHS

14   records with respect to Zachary Daughtry's treatment; right?

15   A.  Yes.                                              16:01:26

16   Q.  Okay.  And the same with Ryan Bates.  You wanted to review

17   all of the records with respect to Ryan Bates' treatment;

18   correct?

19   A.  As best as I could, yes.

20   Q.  And before you rendered a report, you did that; right?    16:01:35

21   A.  To the best of my knowledge, I did.

22   Q.  And, in fact, the rules of ethics that we went over demand

23   that you review those records before you render an opinion;

24   correct?

25   A.  Correct.                                          16:01:49

1   Q.  Did you ever, before rendering your opinion, consider

2   whether or not either Mr. Bates or Mr. Daughtry were

3   malingering or exaggerating their symptoms?

4   A.  I consider that in every case that I work.

5   Q.  And why don't you tell me what the clinical factors are          16:02:10

6   that are suggestive of malingering or exaggerating of symptoms?

7   A.  Malingering is a conscious production of symptoms and/or an

8   exaggeration of symptoms to achieve a secondary gain.

9   Q.  Okay.  And can you tell me what the AAPL guidelines are

10  with respect to the factors that you look for regarding            16:02:35

11  malingering?

12  A.  I can't recite them to you.  I'm sorry.

13  Q.  Marked inconsistencies and contradictions, is that one?

14  A.  Yes.

15  Q.  Improbable psychiatric symptoms --                              16:02:47

16  A.  Yes.

17  Q.  -- is that another?

18       Mixed symptom profile, endorsement of depressive

19  systems while mood euphoric?

20  A.  Correct.                                                        16:03:01

21  Q.  Overly dramatic behavior?

22  A.  Yes.

23  Q.  Extremely unusual responses to questions about improbable

24  situations?

25  A.  Yes.                                                            16:03:09

1    Q.  Evasiveness or noncooperation?

2    A.  Yes.

3    Q.  Excessively guarded or hesitant responses?

4    A.  Yes.

5    Q.  Frequent repetition of questions --                    16:03:21

6    A.  Yes.

7    Q.  -- such as, where's junior?  That would be a frequent, if

8    that was said more than once, wouldn't you agree?  If Mr. Bates

9    was saying, "Where's junior?  Where's junior?"  Wouldn't that

10   be a frequent repetition of a question that you needed to      16:03:47

11   consider whether or not he was malingering or exaggerating a

12   symptoms?

13   A.  Sir, again, I'm very cautious and mindful of -- of my

14   testimony, but I haven't personally evaluated Mr. Bates.

15         MR. STRUCK:  Your Honor, move to strike.                16:04:08

16         THE COURT:  Sustained.

17   BY MR. STRUCK:

18   Q.  Frequent repetition of questions, did you consider that?

19   A.  Yes.

20   Q.  Hostile intimidating behavior or seeking to control or    16:04:24

21   refusing to participate in the interview?

22   A.  Yes.

23   Q.  And you considered all of those factors with respect to

24   both Zachary Daughtry and Ryan Bates before you ruled out

25   malingering?                                                  16:04:42

1    A.  Every one of them.

2    Q.  Okay.  Now, you -- since you're an expert witness that you

3    testify quite often in federal court; right?

4    A.  I don't believe I testify quite often in federal court.

5    Q.  Do you prepare reports for cases in federal court?          16:04:59

6    A.  Yes, I have.

7    Q.  And you understand that there's -- there's rules that are

8    applied to what needs to be in an expert report in federal

9    court?

10   A.  Generally, yes.                                              16:05:13

11   Q.  Okay.  And you understand, don't you, that like in this

12   case, there's a requirement, specifically Rule 26(a)(2)(B) that

13   the written report is to be prepared and signed by the

14   witness --

15   A.  Yes.                                                         16:05:28

16   Q.  -- right?  So prepared by you and signed by you?

17   A.  Correct.

18   Q.  Okay.  And is that what you did in this case?

19   A.  Yes.

20           MR. STRUCK:  Your Honor, like to show the witness        16:05:43

21   Exhibit 328.

22   BY MR. STRUCK:

23   Q.  Dr. Stewart, Exhibit 328 is -- well, strike that.  Do you

24   recall that your office received a subpoena from my office with

25   respect to your file materials in this case?                    16:06:31

1    A.   Vaguely.

2    Q.   Okay.  And, well, you responded to that subpoena.  And does

3    that appear to be your file materials, 328?

4              MR. ROBBINS:  Object, Your Honor.  Work product.

5              THE COURT:  I'm not following you, Mr. Robbins.                16:06:57

6              MR. ROBBINS:  To the extent that work product was

7    withheld, it's not a complete representation of the file.

8              THE COURT:  So --

9              MR. ROBBINS:  Incompleteness, also Rule 26 regarding

10   expert materials for preparation under the federal rules.               16:07:23

11             THE COURT:  I hear you, but I'm not sure whether --

12   I'm not sure whether you're making comments or rendering an

13   objection or --

14             MR. ROBBINS:  It's an objection, Your Honor.

15             THE COURT:  And what would -- and tell me again what         16:07:39

16   the objection is?

17             MR. ROBBINS:  He's misrepresenting what the exhibit

18   consists of in his question.

19             THE COURT:  Well, I assume that it was a question.  If

20   there was clarification, the witness would clarify that.                16:07:55

21             MR. ROBBINS:  Very good, Your Honor.

22   BY MR. STRUCK:

23   Q.   Now, if you'll take a look, sir, at page -- at the bottom.

24   It's MCSO 005679.  It's closer to the beginning of the stack of

25   documents.                                                              16:08:21

1   A.  Yes.

2   Q.  Okay.  Isn't it true that when you spoke to Mr. Robbins

3   when he reached out to retain you as an expert in this case,

4   you told him that, as I mentioned, my schedule is much too full

5   at the moment?                                              16:08:51

6        Did you tell Mr. Robbins that on October 9th, 2016?

7   A.  Yes.

8   Q.  Okay.  And if you would, please, sir, you can turn -- it's

9   the very last page of the stack of documents that you produced

10  to us.  It's Bates number 005857?                           16:09:20

11  A.  Yes.

12  Q.  And you'll see there that on Friday, November 18, 2016, at

13  8:23 a.m., you were e-mailed a link from Evan Haglund from Mr.

14  Robbins' office of the draft report.

15       Do you see that?                                       16:09:46

16  A.  Yes.

17  Q.  And your response at 6:10 p.m. was "here it is,"

18  exclamation point.

19  A.  That's what the e-mail says, yeah.

20  Q.  And Mr. Haglund e-mailed you a copy of a draft report;    16:10:05

21  true?

22  A.  Correct.

23  Q.  And then you, approximately a little less than ten hours

24  later, sent him your report, the initial report in this case;

25  true?                                                       16:10:29

1    A.  Correct.

2    Q.  So Mr. Haglund drafted a report for you and then you

3    completed it?

4    A.  Mr. Robbins' office put together in the Word Processing

5    part of the -- of the exhibits -- the exhibits to the exhibits,    16:10:45

6    etcetera, after we had discussions and consultation about what

7    my opinions might be.

8    Q.  Okay.  And so before November 18th, 2016, at 6:10 p.m., you

9    had read all of the materials that you relied upon in that

10   report; is that right?                                             16:11:10

11   A.  I was familiar with the bulk of the materials contained in

12   my report prior to that time, which I had already read, and

13   then any new materials.  Yes, I had read.

14   Q.  Okay.  So sometime between when you e-mailed Mr. Robbins on

15   October 9th and said you didn't have much time, and             16:11:30

16   November 16th when you completed your report, you read the 439

17   documents that were sent to -- that were sent to you by Mr.

18   Robbins' office?

19   A.  Again, sir, I'm very cautious of my testimony.  I was

20   exceedingly familiar with a large portion of those documents.     16:11:53

21   Q.  And included in those documents were just under 1,200 pages

22   of medical records from CHS from Mr. Bates and Mr. Daughtry; is

23   that right?

24   A.  Yes.

25   Q.  Okay.  And you read all of those pages before preparing       16:12:09

1  your report, is that what your testimony is?

2  A.  Yes.

3  Q.  Why don't you take a look at MCSO Document 5681, which is

4  close to the beginning of that stack of documents.

5        Are you there?                                          16:12:59

6  A.  Yes.

7  Q.  And on November 16th, just two days before you completed

8  your initial report, Mr. Robbins' paralegal, Julie Molera,

9  e-mailed you a copy of a document called "liability strategy

10 document"; is that true?                                      16:13:16

11 A.  That's what the e-mail says, yes.

12 Q.  Okay.  And she says, "As promised, attached is a copy of

13 our liability strategy document for your review in the

14 above-reference matter"; is that right?

15 A.  Correct.                                                  16:13:30

16 Q.  Why did you want that document?

17 A.  Well, you know, as we have talked about, I believe, we've

18 talked about it earlier when you were saying about honesty and

19 not being the potential for being biased for one side or the

20 other, on who it depends who hires you, you know, I asked to   16:13:47

21 see what they are thinking about this, what they're, you know,

22 -- how they were thinking about this particular case before I

23 could render my final opinions.

24 Q.  So why would you need to know what they were thinking about

25 the case if you're going to provide them with an objective     16:14:06

1    opinion that was solely your own?  Why would you need to know

2    what they were thinking?

3    A.  Because as we have discussed here, if, you know -- I think

4    the hypothetical that you gave me, if someone presented you a

5    bunch of information, opinions that you couldn't be consistent      16:14:24

6    with that you couldn't support, that you would walk away from

7    the case.  That's exactly what I was doing here.

8    Q.  Okay.  Let's take a look, if you would, sir, at what this

9    liability strategy document is.

10          If you look at the next page, it's page 005682.  Do         16:14:40

11   you see -- these appear to be like snippets from medical

12   records?

13   A.  Correct.

14   Q.  Correct?

15   A.  Correct.                                                        16:14:55

16   Q.  And above each snippet is someone typed in some

17   information.  Someone from Mr. Robbins' office; right?

18   A.  Correct.

19   Q.  And this appears just to be just snippets of documents that

20   somebody wanted you to see from the records; correct?             16:15:19

21   A.  There are portions of the record, yes.

22   Q.  Right.  And, in fact, you took these snippets with these

23   comments written by Mr. Robbins' office and put them directly

24   into your report?

25   A.  Correct.                                                        16:15:41

1    Q.  Correct?

2    A.  Yes.

3    Q.  And, in fact, when Mr. Robbins was asking you questions

4    today, you were using these snippets to support your opinions;

5    right?                                                              16:15:50

6    A.  Absolutely.

7    Q.  Isn't it true, Doctor, that these are the records that you

8    looked at before you rendered your opinion on November 18th,

9    2016?  These snippets of records were what you relied upon when

10   you reached your opinions; isn't that true?                        16:16:04

11   A.  They were part of the record that I reviewed prior to

12   submitting my report.  I certainly looked at them.  I've looked

13   at medical records of Mr. Bates, independent to this.  I've

14   looked at the complete records of the medical records, you said

15   1,200 pages.  I looked at those, and I certainly reviewed these   16:16:25

16   snippets.

17   Q.  Okay.  So what you're saying is, you reviewed all the

18   records before -- did you review them before you were sent

19   these little snippets by Mr. Robbins' office on November 16th?

20   You've reviewed all the medical records?                          16:16:42

21   A.  Yes, it was before this because the thing was sent back on

22   the 18th.

23   Q.  Okay.  And I'm sorry, what was sent on the 18th?

24   A.  The -- after I reviewed the draft report and added my

25   changes to it.                                                     16:16:57

1   Q.  I'm not following you.  What was done after that?

2   A.  I was just trying to answer your question when I reviewed

3   the records.

4   Q.  Right.

5   A.  And I was suggesting that I was reviewing the records prior   16:17:09

6   to my reviewing the snippets.

7   Q.  Well, why would you need the snippet if you had already

8   reviewed the record?

9   A.  Well, because the entire record wasn't necessarily going to

10  be included in my report.  That's not how I write reports.     16:17:23

11  That's not how I participate in writing the reports.

12  Q.  Well, when you go through the records, do you take notes of

13  records that you think are -- might be relevant to your

14  opinion?

15  A.  Yes.                                                       16:17:36

16  Q.  And what did you do with those notes?

17  A.  No, I -- I don't know in this particular case what I did

18  with those notes.

19  Q.  There's no notes in those -- in the subpoena documents, are

20  there?  You can take a look through them, if you want.         16:17:49

21  A.  No, there's no notes.

22  Q.  Did you take notes when you went through the records in

23  this case?

24  A.  Again, I was talking about my general practice.  I don't

25  remember if I took particular notes as I was going through the  16:18:01

1    records.

2    Q.  Do you take notes when you're going through records in

3    every case that you're retained as an expert?

4    A.  Again, it depends on what I'm asked.  And, you know, let me

5    make it real clear.  As you pointed out in one of the earlier          16:18:18

6    e-mails I said, I was very busy.

7    Q.  Right.

8    A.  And I was going to have to rely on Mr. Robbins' office to

9    help gather the information.

10   Q.  And isn't it true, sir, that you were so busy you didn't          16:18:31

11   have time to look at all those records, and instead your report

12   was based upon the snippets that were cherry-picked by Mr.

13   Robbins' office for you to look at; isn't that true?

14   A.  No.

15   Q.  Before I get into some of your testimony today, I want to          16:18:50

16   ask you about this:  You, throughout your testimony, used the

17   term "floridly psychotic"?

18   A.  Yes.

19   Q.  Isn't it true that that isn't a term that's recognized by

20   forensic psychiatrists in the United States, floridly?          16:19:33

21   A.  Absolutely not.  It's a very commonly used psychiatric

22   term.

23   Q.  Here's the DSM 5.  Is it in here?

24   A.  Yes.

25   Q.  Can you show it to me?  I got it right here.          16:19:47

```
 1   A.  It might take me a second.

 2   Q.  I can hand it to you.

 3   A.  It might take me a second.

 4   Q.  Okay.

 5   A.  Sir, I know it's in here.  I'm sorry.  I'm fumbling around     16:21:05

 6   with all these pages right now.

 7   Q.  Well, that's okay.  We'll move on.

 8   A.  Please.

 9   Q.  You reviewed, did you review all the documents, everything

10   that was provided to you by Mr. Robbins with respect to this      16:21:28

11   case?

12   A.  To the best of my ability, yes.

13   Q.  Okay.  Now, I know you were provided with phone

14   conversations that Mr. Bates had while in the jail between his

15   mother and his sister, weren't you?                               16:21:43

16   A.  I believe so.

17   Q.  Did you listen to those?

18   A.  I can't tell you right now as I'm sitting here.

19   Q.  Wouldn't that be something that would be important to

20   listen to in order to determine whether or not, perhaps, Mr.      16:21:57

21   Bates was exaggerating his symptoms?

22   A.  I believe I did.  I just can't recall this very moment,

23   sir.

24   Q.  There's nothing in your report about -- there's no

25   reference to listening to Mr. Bates's phone calls in your         16:22:11
```

1    report, though, is there?

2    A.   Correct.

3    Q.   There was also, I think, there was some testimony today or

4    Mr. Robbins asked you a question about Mr. Daughtry not being

5    able to make a phone call.  Do you remember that?                    16:22:27

6    A.   Yes.

7    Q.   You were provided with a disk that had a phone call on

8    there that he attempted to make, weren't you?

9    A.   That's listed in my materials, yes.

10   Q.   Okay.  Did you -- did you listen to that?                       16:22:43

11   A.   Again, I can't recall right now.

12   Q.   Wouldn't you agree that simply because somebody is

13   seriously mentally ill, that doesn't mean they are violent or

14   dangerous?

15   A.   Correct.                                                        16:23:01

16   Q.   In fact, there are probably no higher percentage of violent

17   people who are SMI than people who aren't SMI, wouldn't you

18   agree with that?

19   A.   Well, no.  The data actually suggests that across the board

20   mentally ill people are not more violent than non-mentally ill,     16:23:17

21   except in the category people have psychotic symptoms,

22   especially with paranoia.  Those people do have a higher rate

23   of violence than not.

24   Q.   So if somebody is severely mentally ill, they are actually

25   less violent than people who aren't severely mentally ill?          16:23:33

1    That's what you said?

2    A.   That's not what I said at all, sir.

3    Q.   Can you say it again, because I must have misunderstood.

4    A.   I said that when you look at the entire universe of

5    mentally ill individuals, that -- that entire universe is not          16:23:46

6    more likely to be violent than the non-mentally ill population.

7    Q.   Okay.

8    A.   Except in those situations where people suffer from

9    psychotic disorders, notably that experience paranoia.

10   Q.   Okay.  And let's extract actively psychotic from that            16:24:06

11   universe of serious mentally ill.  That universe of serious

12   mentally ill that are not actively psychotic are actually less

13   violent than the average person who doesn't -- who is not

14   seriously mentally ill?

15   A.   No, they are not less violent, they are not more violent.        16:24:26

16   Q.   Equally as violent, how about that?

17   A.   Exactly.

18   Q.   The same propensity for violence.  So it's the element of

19   being actively psychotic that makes a person who is seriously

20   mentally ill more violent?                                            16:24:43

21   A.   And again, it isn't just all the psychotic individuals.

22   It's those people that particularly suffer from paranoia.

23   Q.   So it's actively psychotic with elements of paranoia?

24   A.   Correct.

25   Q.   All right.                                                       16:24:55

1   A.  And further on the literature talks about exacerbated by

2   substance use.

3   Q.  Okay.  And that would be someone who is -- who is currently

4   utilizing an illegal drug?

5   A.  At the time.                                            16:25:09

6   Q.  At the time?

7   A.  Yes.

8   Q.  And people who use illegal substance, such as meth, tend to

9   be more violent?

10  A.  Correct.                                                16:25:20

11  Q.  Okay.  And oftentimes when, for example, in a jail setting

12  when people are arrested and they come in, they might very well

13  be on some sort of illegal drug, such as meth?

14  A.  Correct.

15  Q.  Which might very well lead them to appear to have some sort  16:25:35

16  of psychosis going on; right?

17  A.  Your question has a complicated answer.  I'll try to make

18  it as simple as I can.

19       People that are intoxicated on meth can also present,

20  often present, with psychotic symptoms.  People that have used  16:25:59

21  methamphetamine, even if they are not intoxicated, can present

22  with psychotic symptoms.

23  Q.  Wouldn't you agree that in a jail setting that people who

24  are using methamphetamines are more -- and they are coming into

25  the jail on their initial booking -- are more likely to be     16:26:26

1    exhibiting psychotic tendencies than they might be, say, a few

2    days later after the drugs are out of their system?  Wouldn't

3    you agree with that?

4    A.  Not necessarily, because methamphetamine has this

5    particular aspect to it that people can remain psychotic for          16:26:43

6    extended periods of time, even after they stop using.

7    Q.  What percentage of people who use meth remain psychotic

8    after they stopped using it?

9    A.  There's no way to know that because we don't know what the

10   percentage of people who use meth.  It's, in my experience, in       16:26:59

11   the psychiatric literature supports that people, even after

12   they stop using methamphetamine, can remain psychotic for a

13   number of years after they stop using.

14   Q.  Okay.  But you're -- you're not involved in a clinical

15   practice with respect to a jail, and you haven't been for many       16:27:17

16   years; right?

17   A.  Yes.

18   Q.  Okay.  I'm going to ask you some questions regarding some

19   of these snippets that Mr. Robbins showed you today, which you

20   stated supported your opinion with respect to Mr. -- primarily       16:28:04

21   Mr. Bates, your opinion that Mr. Bates was, I guess your term

22   was floridly psychotic, okay?  And if you have Exhibits 183 up

23   there, you might want to refer to that.

24   A.  Yes.

25   Q.  Do you have Exhibit 96 up there as well?                          16:28:46

1    A.  Yes.

2    Q.  Okay.  Because we're going to have kind of going back and

3    forth.  And Exhibit 183 is your amended report that you

4    prepared and that Mr. Robbins was asking you questions about

5    some of the screen shots that were in the report; right?          16:29:03

6    A.  Correct.

7    Q.  Now, one of the dates that you referred to, and I'm looking

8    at page -- excuse me -- Exhibit 183, page 65?

9    A.  Yes.

10   Q.  And in it you -- you referred to -- and I'm looking at       16:30:06

11   April 29th, 2014.

12         Do you see that?

13   A.  Yes.

14   Q.  One of the things that you didn't mention in your testimony

15   was you see that the patient was drinking and using meth?         16:30:22

16   A.  Okay.

17   Q.  How come you didn't mention that to the jury when you were

18   talking about this supporting your opinion that Mr. Bates was

19   psychotic?

20   A.  I don't know why I didn't.  It's -- if anything, I sort of    16:30:44

21   hurt myself, my testimony would have been a lot stronger if I

22   said he was using meth.

23   Q.  Okay.  Wouldn't you agree that people who use meth might --

24   it's drug-induced, a drug-induced --

25   A.  Psychosis.                                                    16:31:13

1   Q.   -- psychosis?

2   A.   Right.  So what?  I mean, what's the difference?  If you

3   have psychosis, you have psychosis, whether it's drug-induced

4   or not, it's psychosis.

5   Q.   But your opinion is that he was, Mr. Bates had psychosis        16:31:26

6   the entire time he was in the Maricopa County jail?

7   A.   Correct.

8   Q.   So if it's drug-induced, it would go away, potentially,

9   when the drugs go out of his system; correct?

10  A.   No, sir.  You obviously didn't listen to my previous           16:31:39

11  testimony.

12  Q.   I think I did.

13  A.   Psychiatric literature, not just me.  I've treated

14  thousands of drug-induced psychosis and the people stay

15  psychotic, certainly for months, if not longer.  The            16:31:52

16  psychiatric literature talks about five years you could remain

17  psychotic after you stopped using methamphetamine.  So the fact

18  that I omitted talking about methamphetamine, actually weakened

19  my testimony.

20  Q.   All right.  So you've treated thousands of individuals who      16:32:09

21  have had drug-induced psychosis?

22  A.   At least that many.

23  Q.   And when was this?

24  A.   It was, well, certainly during the time of my working

25  within the jail.                                                    16:32:23

UNITED STATES DISTRICT COURT

1    Q.  And that was back in the -- 25 years ago?

2    A.  It was from '86 to '90.

3    Q.  And methamphetamine was a big drug back then?

4    A.  In San Francisco, we've always been a methamphetamine city.

5    Prior to methamphetamine being spread across the country,                16:32:38

6    methamphetamine was a major drug in San Francisco.  Since the

7    hippy days, methamphetamine has been a serious drug.

8    Q.  So in the 12-bed facility that you were working at over the

9    course of four years, you've treated thousands of people who

10   had drug-induced psychosis as a result of methamphetamine?          16:32:56

11   A.  Not just there, but also I would mention, it didn't come

12   out on my direct testimony, that between 1983 and 2006, I was a

13   psychiatric director of the Haight-Ashbury Free Clinic drug

14   detoxification program where I was treating a hundred patients

15   a week, for many years, in a city that was awash with                16:33:19

16   methamphetamine.

17   Q.  How many people -- what's the percentage of people who have

18   drug-induced psychosis that remains after the drugs are out of

19   their system?

20   A.  In my personal experience, I would say 75 percent.              16:33:38

21   Q.  And if you look at Exhibit 183, page 69?

22   A.  69, sir?

23   Q.  Yes, sir.

24   A.  Okay.

25   Q.  And this was June 1st, 2014, when Bates was booked into the     16:34:22

1    jail.

2           Do you see that?

3    A.  Yes.

4    Q.  And you said that Bates was suffering from paranoid

5    psychosis because he was asking where his bike was?          16:34:36

6    A.  Well, he was asking where his bike was.

7    Q.  Yeah.

8    A.  But I'm basing that on the description in the record where

9    it says, patient was coming out of the safety cell becoming

10   paranoid.                                                    16:34:56

11   Q.  All right.  And if you look at Exhibit 96 on page 729, let

12   me know when you get there.

13   A.  Almost.  Yes.

14   Q.  And if you look, there's a SOAP note at the top?

15   A.  Yes.                                                     16:35:39

16   Q.  And what's a SOAP note?

17   A.  Okay.  I want to make sure we're looking at the right

18   thing.

19   Q.  It's page 728, Exhibit 96.

20   A.  Okay.                                                    16:35:50

21   Q.  And do you have a SOAP note at the -- on that page?

22   A.  Correct.

23   Q.  Okay.  And could you tell us what a SOAP note is?

24   A.  A SOAP note, S-O-A-P, is a shorthand way of documenting the

25   person's mental state.  S is subjective, so what they are     16:36:04

1   complaining of; the O is objective, what the evaluator can see

2   or determine based on the clinical interview and the behavior;

3   the A is the assessment of what they may be suffering from, and

4   P is the plan.

5   Q.  And that's not just mental health, that's any medical          16:36:21

6   provider would prepare a SOAP note when they are doing an

7   examination?

8   A.  That's -- that's a very accepted way of documenting a

9   particular medical visit.

10  Q.  In this case, this refers to when Mr. Bates came in to the     16:36:36

11  jail at -- on June 1st, 2014, so it's the same date as the

12  snippet that you were relying upon; right?

13  A.  Yes.

14  Q.  And in the SOAP note, he's stating about how he's venting

15  frustrations about the bike and the police.                        16:37:00

16         Do you see that?

17  A.  Yes.

18  Q.  Okay.  Did you ever review any police reports from this

19  arrest?

20  A.  No.                                                            16:37:11

21  Q.  Do you know whether or not Mr. Bates actually had a bicycle

22  with him when he was arrested?

23  A.  No.

24  Q.  Would that make sense as to why he was wondering where his

25  bike was if, in fact, he did have a bike with him when he was      16:37:22

1    arrested by the police?

2    A.  Again, sir, I'm looking at the record, and the record says

3    right after the sentence you just read, looking over his

4    shoulder, venting frustrations about the bike and the police,

5    period.  Psychosis, period.                                    16:37:37

6    Q.  And it also says, patient reports using meth yesterday;

7    right?

8    A.  Which kind of confirms that whole presentation.

9    Q.  Okay.  Right.  A drug-induced psychosis?

10   A.  Absolutely.                                                 16:37:52

11   Q.  And if you look at the next page, page 729.

12   A.  Yes.

13   Q.  You see they ask Mr. Bates a series of questions --

14   A.  Yes.

15   Q.  -- on intake, and they asked him whether he had a plan to   16:38:14

16   harm others.  And his response was no?

17   A.  Correct.

18   Q.  Okay.  And this would be records contained in the Maricopa

19   County in the CHS records; right?

20   A.  Yes.                                                        16:38:31

21   Q.  Okay.  Let me refer you to Exhibit 96, page 866.

22   A.  Yes.

23   Q.  And this was shown to you, or you looked at this with Mr.

24   Robbins, and this was one of the snippets in your report;

25   right?                                                          16:39:30

1    A.  Correct.

2    Q.  And it's dated January 8th, 2013?

3    A.  Yes.

4    Q.  And in it on the signature line it says, "Patient was too

5    bizarre and irritable to give a pen to sign this form"; right?      16:39:40

6    A.  Yes.

7    Q.  And this is -- isn't it true, this is a form that is asked

8    -- they ask all arrestees when they are booked in to sign; do

9    you know?

10   A.  Yes, it's an informed consent form, yes.                        16:40:03

11   Q.  And again, that's dated January 8th, 2013; correct?

12   A.  Correct.

13   Q.  If you take a look at page 833.

14   A.  Yes.

15   Q.  And if you look halfway down the page, it looks like          16:41:01

16   there's a notation from -- this is a progress note, CHS

17   progress note?

18   A.  Yes.

19   Q.  Dated January 8th, 2013; right?

20   A.  Correct.                                                         16:41:14

21   Q.  And that's the same day that he wouldn't -- they wouldn't

22   give him a pen to sign the form; right?

23   A.  Correct.

24   Q.  And it says, "His behavior suggests that he may have been

25   using meth," is that what that says?                                16:41:24

1    A.  That's what that says.

2    Q.  All right.

3            THE COURT:  Mr. Struck, we're going to -- we're going

4    to adjourn a little bit early tonight, but sometime in the next

5    three or four minutes where you find your good break point,        16:41:41

6    would you?

7            MR. STRUCK:  Okay.  Certainly, Your Honor.

8            MR. ROBBINS:  Your Honor, may I approach really

9    quickly?

10           THE COURT:  You may.                                        16:42:01

11       (At sidebar on the record.)

12           MR. ROBBINS:  I prefer to have him be able to finish

13   up than get an award.

14           THE COURT:  Okay.

15           MR. ROBBINS:  Thank you.                                    16:42:27

16       (End of discussion at sidebar.)

17           THE COURT:  All right.  I'll revise what I said, and

18   we'll -- we'll continue until 5:00 o'clock.

19   BY MR. STRUCK:

20   Q.  If you would, please, take a look at Exhibit 96, page 891.      16:42:50

21   A.  Yes.

22   Q.  And Mr. Robbins showed you just a portion of this

23   particular document where it says history of violence.

24           Do you remember that?

25   A.  Correct.                                                        16:43:20

1   Q.  And it says, "should be approached with caution."

2          Do you see that?

3   A.  Yes.

4   Q.  Now, this isn't -- this isn't a form that was prepared

5   while he was in jail; correct?                                16:43:29

6   A.  Correct.  This is a Magellan Health Services of Arizona at

7   Risk Crisis Plan.

8   Q.  So Mr. Bates is actually out in the general public and

9   seeking some sort of mental health or medical treatment; right?

10  A.  Correct.                                                  16:43:47

11  Q.  And it says, if you look at substance abuse, "current use

12  of marijuana and spice, but he denies meth, cocaine, and

13  alcohol use."

14         Do you see that?

15  A.  Yes.                                                      16:44:04

16  Q.  What's spice?

17  A.  Spice is, I guess the best way to describe it is synthetic

18  marijuana, but it has any number of -- any number of

19  potentially intoxicating substances in it, chemicals in it.

20  And so spice in Arizona may be very different than spice in     16:44:21

21  other parts of the country.

22  Q.  So there's no -- no telling what's in the spice?

23  A.  Well, you -- you're not sure.

24  Q.  Okay.  Isn't it true that someone might use spice and it

25  might cause them to have drug-induced psychosis?             16:44:38

1    A.  Yes.

2    Q.  Why don't you take a look at Exhibit 96, page 902.

3    A.  Yes.

4    Q.  And this is Arizona Department of Corrections record, and

5    Mr. Robbins asked you a question about the next page, the next          16:45:19

6    page, but he didn't ask you about this page; right?

7    A.  I don't believe he did.

8    Q.  Okay.  Did you review this before you prepared your report?

9    A.  If -- if it were in the records that I got, I did.  But I

10   must have, because the next page I certainly looked at.                  16:45:38

11   Q.  Okay.  Do you see where it states whether he's experienced

12   auditory or visual hallucinations?  Do you see that?

13   A.  Yes.

14   Q.  And he says only or he says when on acid.

15         Do you see that?                                                    16:46:01

16   A.  Correct.

17   Q.  And it asks if yes, when?

18         Only when on acid; is that right?

19   A.  Correct.

20   Q.  Is that right?                                                        16:46:08

21   A.  Correct.

22   Q.  Wouldn't you agree, sir, that schizophrenia, and I'm

23   probably mispronouncing this schizoaffective disorder, are

24   overdiagnosed out in the general public by psychiatrists who

25   don't see it that often?                                                 16:46:36

```
 1   A.  I wouldn't say it's overdiagnosed.  I would say that there
 2   are certain times when the symptoms from substance abuse can
 3   mimic these disorders, and that's mental health people
 4   diagnosis, without taking into consideration the person's
 5   substance abuse.                                              16:46:55
 6   Q.  Okay.  And but with respect to, say, schizoaffective
 7   disorder, isn't it relatively difficult to diagnose?
 8   A.  No, I don't think so.
 9   Q.  Don't you have to monitor someone over a period of time in
10   order to make that diagnosis?                                 16:47:12
11   A.  Or get a good history, get collateral sources about the
12   person's psychiatric symptoms.
13   Q.  But if you don't have that history, someone just can't come
14   in, say to a psychiatrist that they have never seen before and
15   there's no history, and the psychiatrist can't just diagnose   16:47:31
16   schizoaffective disorder; true?
17   A.  Well, if the patient gives symptoms and a story of their
18   mental illness was consistent with schizoaffective disorder, I
19   think in the absence of documentation, you would say
20   provisional or rule out, or something like that, noting that   16:47:51
21   you can't be 100 percent sure until you get some more
22   observation.
23   Q.  Okay.  Let me show you the next page, Exhibit 2424, and Mr.
24   Robbins asked you about part of this, but he didn't ask you
25   about the rest of it.                                          16:48:05
```

1          See where it says, "goes into rages when feel like
2  'people mess with me'?"
3  A.  Correct.
4  Q.  You see that?
5  A.  Correct.                                           16:48:18
6  Q.  Then it says, "fights one time a year"; is that right?  Do
7  you see that?  "Fights one X year," isn't that what that says?
8  A.  Yeah, I'm not sure what that means.  It could be fight one
9  time a year or been fighting for a year, so I don't know.
10 Q.  Okay.  Do you remember when Mr. Robbins was asking you      16:48:38
11 about Mr. Daughtry attempting to escape from the jail facility?
12          Do you remember that?
13 A.  Yes.
14 Q.  Okay.  Why don't you take a look at Exhibit 183, page 49.
15 A.  Yes.                                                16:49:38
16 Q.  And this is, I guess, a report of Mr. Daughtry trying to
17 scale the fence; correct?
18 A.  Correct.
19 Q.  And if you look at page 48, there's a report at 1022 that
20 it's -- that says, "When uncuffing handcuffs on Main Street in   16:50:06
21 front of housing unit Durango 8, I heard yelling coming from
22 the direction of D8 side entry door.  I looked up to see why
23 the yelling was occurring.  I saw an inmate climbing up the
24 fence and going towards the razor wire.  I immediately ran
25 towards him giving orders in a loud yelling manner for him to    16:50:24

1  get down and for the other inmates to get in their housing

2  unit.  As I approached him, I drew my Taser and advised him to

3  stop climbing, get down off the fence, and if he refused to

4  comply, he would be Tased.  My Taser was turned off at this

5  point, but aimed towards his lower center mass.  After my     16:50:42

6  commands, he looked at me, stopped climbing, and stated very

7  softly, okay, I'll get down.  I'm done."

8        Does that response sound like somebody who is actively

9  psychotic?

10  A.  It certainly could be.                                    16:50:57

11  Q.  But it also could be someone who is not actively psychotic?

12  A.  Correct, just based on that.  And I think I said earlier,

13  just based on that one incident, I'm not able to make a

14  diagnosis.

15  Q.  Right.  In fact --                                        16:51:10

16  A.  But psychotic people, psychotic people would know -- would

17  know they don't want to get Tased.  Just because you're

18  psychotic, doesn't mean you're not familiar with what Tasing

19  is.

20  Q.  In discussing the incident right afterwards, would a      16:51:22

21  psychotic person agree, yeah, that was pretty stupid of me to

22  do that?

23  A.  Potentially.  I say that because this is early on in his

24  incarceration.  His condition deteriorated over the time that

25  he was in jail.                                               16:51:40

1    Q.  Let me refer you to page 183 or, excuse me, page 75,

2    Exhibit 183.

3    A.  Yes.

4    Q.  And Mr. Robbins asked you about June 28, 2014, note, and

5    again there's -- there's something typed above this little        16:52:23

6    snippet of note.  This is something that Mr. Robbins' office

7    put in here; correct?

8    A.  Correct.

9    Q.  Now, Mr. Robbins asked you about that, but he didn't

10   continue reading this.  In fact, he started to read it and       16:52:38

11   stopped.  See below it says, "Provider," and this is Dr. Jaffe;

12   correct?

13   A.  Friday of June 28th notes.

14   Q.  It's right in the middle.

15   A.  Got it.                                                        16:52:57

16   Q.  It says, "Jaffe considers petitioning," do you see that?

17   A.  Yes.

18   Q.  "Provider may consider petitioning patient, but I would

19   like to observe for an extended period prior to following

20   through with a pattern for grounds of pad, and as he could be     16:53:09

21   weak for DTO or DTS."  And again, that means danger to others

22   or danger to self; correct?

23   A.  Correct.

24   Q.  Wouldn't you agree that was an appropriate thing to do for

25   Dr. Jaffe to want to observe Mr. Daughtry for an extended         16:53:34

1    period of time?

2    A.  Not after seven months of documentation of his mental

3    illness.

4    Q.  And the cell that Mr. Daughtry was in was actually smeared

5    in peanut butter, wasn't it?  It wasn't feces?        16:53:57

6    A.  It said either feces or peanut butter.

7    Q.  Look at June 29th, 2014.  "Patient seen cell front multiple

8    times today.  Patient's cell filthy with peanut butter spread

9    on cell windows.  Fingerprinted words in peanut butter saying

10   'help me,' repeated in a vertical line, and a cross made out of   16:54:20

11   pieces of bread spread on a cell door.  Patient volitionally

12   refuses to speak"; is that right?  Is that what it says?

13   A.  That's what it says.

14   Q.  Okay.  And isn't refusing to speak, isn't that one of the

15   signs of malingering, refusing to --                  16:54:41

16   A.  Well.

17   Q.  -- that we talked about before?

18   A.  In the assessment of that one -- on this one time, they

19   made the assessment.  It was his -- it was volitionally not

20   choosing to speak, and I would -- I would say that you've got   16:54:56

21   to take the whole -- the whole story into consideration before

22   you can arrive at whether or not he's volitionally doing

23   something.  Certainly from the record it doesn't appear that it

24   was volitional.

25   Q.  Wouldn't you agree it's just as easy, would it have been   16:55:10

1    just as easy for you to go through and find evidence that, in

2    fact, would support an opinion that Mr. Daughtry was

3    exaggerating his symptoms and malingering, wouldn't you agree?

4    A.  Sir, in reviewing the record, I don't agree with that.

5    Because it's my opinion, based on the records, that he was not          16:55:37

6    exaggerating or malingering symptoms.  So it would be -- you

7    talk about bias, that would be, you know, if I was standing

8    there, go find evidence of malingering and exaggerated

9    symptoms.

10   Q.  Well, I'm not asking you --                                         16:55:54

11   A.  Please -- I believe I did this objectively and looked at

12   his record to suggest that I --

13   Q.  But in virtually every one of the examples that you found,

14   you could also find something that would support malingering;

15   isn't that true?                                                        16:56:16

16   A.  No.  I think you really have an incomplete notion of what

17   malingering is.

18   Q.  Wouldn't you agree that there are -- that you've actually

19   run across inmates who prefer to stay in some sort of a

20   segregated housing unit?  Wouldn't you agree?                           16:56:40

21   A.  Yes, I have.

22   Q.  And isn't it true that Mr. Daughtry might have preferred to

23   stay in that segregation cell than to move somewhere else to

24   general population?

25   A.  The records don't support that.                                     16:56:55

1   Q.  Well, he's refusing to roll up when his segregation time is

2   up; right?

3   A.  And he's described as staring off into space and

4   nonresponsive and not making connections with people that are

5   asking him.  So it's -- it's -- I agree with you that there are          16:57:09

6   people that like to stay locked down.  They don't want to be

7   out in general population, okay?  But the record doesn't

8   support that opinion with Mr. Daughtry.

9   Q.  Now, was Mr. Daughtry, had he been charged with escape?

10  A.  He had been charged with escape.                                     16:57:27

11  Q.  And isn't it true that he was undergoing a Rule 11 analysis

12  to determine whether or not he was competent to stand trial?

13  A.  Right.  He was found incompetent.

14          MR. STRUCK:  Move to strike, Your Honor.

15          THE COURT:  So ordered.                                          16:57:42

16  BY MR. STRUCK:

17  Q.  Isn't it true that during this period of time there were

18  several psychologists who were coming to see Mr. Daughtry to

19  determine whether or not he was competent to stand trial with

20  respect to the escape?                                                   16:58:01

21  A.  Correct.

22  Q.  Wouldn't you agree that it is within the realm of

23  possibility that Mr. Daughtry might have been exaggerating his

24  symptoms in order to aid in convincing a psychologist that he

25  was not competent to stand trial?                                       16:58:23

1    A.   It's -- it's theoretically possible.

2    Q.   Well, it's more than theoretically possible, it might

3    actually be probable; right?

4    A.   No, I wouldn't agree with that.

5    Q.   People do that all the time, don't they?  Act like they          16:58:38

6    aren't competent so they don't have to stand trial?  That's a

7    pretty common occurrence, isn't it?

8    A.   It is not, actually.

9    Q.   In fact, it's so common that you make almost $400,000 a

10   year going around the country testifying that some people             16:58:54

11   aren't competent; right?

12   A.   I wish it were that easy, sir.

13   Q.   Well, that's what most -- you said the majority of your

14   work has to do with criminal situations where people are trying

15   to determine or trying to -- the court is trying to determine         16:59:09

16   whether or not they are competent to stand trial; right?

17   A.   Well, I don't know if I testify exactly to that.

18   Q.   Well, isn't that a large part of the work that you do?

19   A.   It is a part of work that I do.

20   Q.   Okay.  So it's pretty common then for people to -- to try        16:59:23

21   and assert that they are not competent to stand trial; right?

22   A.   Not in my experience.

23          MR. STRUCK:  Okay.  I don't have any more questions,

24   Your Honor.

25          THE COURT:  We'll --                                           16:59:37

1      MR. ROBBINS:  Your Honor, I have just a few questions,

2  and I'll finish within five minutes.

3      THE COURT:  With that avowal, we'll let you do that.

4      MR. ROBBINS:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION                    16:59:49

6  BY MR. ROBBINS:

7  Q.  Not eating up the time we promised our good judge and jury.

8      At the bottom of page or page 11 of your report, which

9  is 183?

10 A.  Page 11.                                               17:00:08

11 Q.  Yes.  Page 11 on the bottom of it.

12 A.  Okay.

13 Q.  Would you read -- you told the defendants, you told the

14 world that reads your report that you had relied on me to

15 provide you with the factual summary from plaintiff's counsel,  17:00:26

16 which includes a summary of the background facts and

17 call-outs --

18 A.  Yes.

19 Q.  -- correct?  You weren't trying to hide anything?

20 A.  No, but that's normal procedure for reports.          17:00:37

21 Q.  And under each of those snippets, there's actually a page

22 number where you can go to and check it?

23 A.  Correct.

24 Q.  And, in fact, you were even good enough to look at the

25 defendants' report and tell them exactly what they did not   17:00:55

1    refer to in their report; fair?

2            MR. STRUCK:  Objection, Your Honor.  That's outside

3    the scope.

4            THE COURT:  Overruled.

5            THE WITNESS:  You know, I did a lot of things.  I        17:01:08

6    don't remember.  I'm sorry.

7    BY MR. ROBBINS:

8    Q.  Go ahead and -- well, you remember your report of June 12th

9    where you actually took the defendant's report and went through

10   and cited all the things that they had forgotten?              17:01:20

11           MR. STRUCK:  Again, outside the scope, Your Honor.

12           THE COURT:  Sustained.

13   BY MR. ROBBINS:

14   Q.  The -- you've talked about -- there was some talk about

15   several poverty law center, and these are things, when you     17:01:35

16   testify on behalf of any group, are you taking, like, reviewing

17   their chart or figure out what they are doing, or do you look

18   at the case and say can I do this case?

19   A.  You know, I certainly am aware of who I'm working for and

20   who is hiring me.  And, but, you know, as we've seen today,     17:01:54

21   anything that I say, anything that I've said in the last 20

22   years of testifying is fair game to be brought up.  So, you

23   know, if anything, this is the most -- this is most intense

24   time to absolutely tell the truth and absolutely represent

25   facts as you see them, because if not, you'll be called on it   17:02:22

1    in another case, as I was called on my inappropriate use of the

2    competency instrument in that one case in Hawaii.  I admit

3    that.  I really made some mistakes there, and I've learned from

4    that and moved on.  But, you know, everything that I say on the

5    record for as long as I've done this is open for scrutiny.        17:02:41

6    Q.  And in this case, do you stick by everything and every

7    testimony -- piece of testimony that you offered to this jury?

8    A.  Yes, with the proviso that I think my opinions could be a

9    lot stronger if given the opportunity to fill in all the

10   details.                                                          17:03:05

11           MR. STRUCK:  Your Honor, move to strike.

12           THE COURT:  So ordered.

13   BY MR. ROBBINS:

14   Q.  One of the things you had talked about was Mr. Struck asked

15   you about Dr. Jaffe and Dr. Picardo.  Have you had the           17:03:13

16   opportunity to observe their practice over the time that you

17   have been an expert?

18           MR. STRUCK:  Your Honor, relevance.  403.  Beyond the

19   scope.  Foundation.

20           MR. ROBBINS:  I believe the door was open, Your Honor.    17:03:32

21           THE COURT:  Relevance sustained.  Beyond the scope

22   sustained.

23   BY MR. ROBBINS:

24   Q.  I believe I promised, and in the jail how many of the

25   people -- there was a question about the population and the      17:03:52

1  percentage of schizophrenics and whether they are overdiagnosed

2  by people that don't see them.  Within the jails, what is the

3  approximate percentage of seriously mentally ill inmates in the

4  average jail?

5  A.  For?                                                         17:04:11

6  Q.  Go ahead.

7  A.  For male jails and prisons are a little different.  For

8  males in jails, it's around 25 to 30 percent.  For females in

9  jails, around 50 percent.

10 Q.  In terms of all of the opinions that you've offered, they   17:04:28

11 are to a reasonable degree of scientific probability or

12 psychiatric probability?

13 A.  Medical certainty.

14      MR. ROBBINS:  Thank you.

15      THE COURT:  All right.  Thank you, sir.  You may step      17:04:41

16 down.

17   (Witness excused.)

18      THE COURT:  We will be in recess until 8:30 tomorrow

19 morning, and remember we're going to have a two-hour break from

20 11:00 until 1:00.  So whatever -- so you can make your plans     17:04:51

21 accordingly.  Remember the admonition.

22   (Jury exits the courtroom.)

23   (Proceedings concluded, 5:04 p.m.)

24

25

1          C E R T I F I C A T E

2

3          I, ROBIN G. BOBBIE, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7   a full, true, and accurate transcript of all of that portion of

8   the proceedings contained herein, had in the above-entitled

9   cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 21st day of May,

12   2018.

13

14

15                         s/Robin G. Bobbie
16                         Robin G. Bobbie, RMR, CRR, FCRR

17

18

19

20

21

22

23

24

25