# EXHIBIT 4

# (REDACTED)

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO,
PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                          Plaintiffs,<br><br>          v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                          Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DECLARATION OF JOSEPH V. PENN, MD CCHP FAPA** |

1.      I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.      I am a psychiatric physician based in Conroe, Texas.  I am triple board-certified in forensic psychiatry, general psychiatry, and child and adolescent psychiatry.  Each of these boards are under the American Board of Psychiatry and Neurology (ABPN), which is a member board of the American Board of Medical Specialties (ABMS) that grants board certification for psychiatrists and neurologists in the United States.  I am fully licensed to practice medicine in Texas.

3.      I have more than 20 years of direct clinical and administrative correctional health care experience working within jails, prisons, juvenile correctional facilities, and other correctional settings.

4.      I have served as a national consultant regarding correctional and non-correctional mental health care delivery and standards of care.  I have published and presented on correctional health care, and numerous law and psychiatry issues, including seclusion and restraint, restrictive housing, psychotropic medications, telemedicine and telepsychiatry, transgender and gender dysphoria, access to mental health care in correctional settings, suicide prevention, violence risk assessment, and prediction of future violence.

5.      My credentials, experience, and responsibilities are further outlined in my February 28, 2020 Declaration.  (Dkt. 3508-1.)

6.      I was asked to opine whether: (1)  the encounters highlighted by Dr. Stewart in his August 14, 2020 Declaration were meaningful and appropriate; (2) the sufficiency of how monitors evaluate whether the duration of encounters for "seen" PMs are meaningful and appropriate; (3) the current monitors are qualified to make the meaningful and appropriate determination; and (4) written instructions are necessary for monitors to make the determination as to whether an encounter was meaningful and appropriate.

7.      In preparation of reaching my opinions and executing this Declaration, I reviewed:

     a.     Mental Health Performance Measures 73, 74, 76, 78, 80-90, 91, 94, and 95;

     b.     Resume of Chy Porter;

     c.     Resume of Kenya McCray;

     d.     Plaintiffs' Motion to Enforce the Court's Orders and for Further Relief (Dkt. 3495, 3518) and associated exhibits/records;

     e.     Declaration of Pablo Stewart, M.D. (Dkt. 3694-03);

     f.     Medical Records and encounters for the eight inmates (#'s ██████, ███████████████████████████,  and ██████) identified in Dr. Stewart's Declaration;

g.      Declaration of Chy Porter (filed concurrently herewith);

h.      Declaration of Kenya McCray (filed concurrently herewith);

i.      Report of Marc Stern (Dkt. 3379);

j.      Court Orders concerning monitoring of "seen" PMs (Dkt. 3495; Dkt. 3518.)

k.      Deposition of Leonel Urdaneta, M.D. December 10, 2019 (Dkt. 3476-1);

l.      March 30, 2020 letter from David Fathi to Tim Bojanowski;

m.      April 14, 2020 letter from Ashlee Hesman to David Fathi;

n.      April 22, 2020 letter from Ashlee Hesman to David Fathi;

o.      April 27, 2020 letter from David Fathi to Ashlee Hesman;

p.      May 12, 2020 letter from Ashlee Hesman to David Fathi;

q.      June 1, 2020 letter from David Fathi to Ashlee Hesman;

r.      June 18, 2020 letter from Ashlee Hesman to David Fathi;

s.      August 7, 2020 letter from Tim Ray to Corene Kendrick;

t.      Worldwide web search of neuropsychiatry fellowships and behavioral neurology and neuropsychiatry fellowships performed on 9/11/2020 using search engine internet explorer and search items, "neuropsychiatry fellowships," and "behavioral neurology and neuropsychiatry fellowships; and

u.      Worldwide web search of the American Board of Psychiatry and Neurology (ABPN) website.

8.      Additionally, I consulted the following scientific literature:

a.      Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2018;

b.      Handbook of Correctional Mental Health, (2010) Second Edition, Edited by Charles L Scott, American Psychiatric Publishing, Inc., Washington, DC;

c.      Trestman, RL (Chair), Penn JV, et al. Psychiatric Services in Correctional Facilities: Third Edition A Work Group Report of the American Psychiatric Association. American Psychiatric Publishing. 2015;

d.      Penn JV. Standards and Accreditation for Jails, Prisons, and Juvenile Facilities, In Oxford Textbook of Correctional Psychiatry. Edited by Trestman R, Appelbaum K, and Metzner J. Oxford University Press, New York, NY, 2015, pp 359-365;

e.  Penn JV, Weinstein HC. Correctional Psychiatry, In Kaplan & Sadock's Comprehensive Textbook of Psychiatry 10th edition. Edited by Sadock BJ, Sadock VA and Ruiz P, Lippincott Williams & Wilkins, Philadelphia, PA (2017).

9.     All opinions stated in this Declaration are based upon my years of training and experience and my review of pertinent records.  Each are to a reasonable degree of medical and psychiatric certainty/probability.

10.     After careful review of the above facts and data, and based on my training, experience, attendance at national correctional health conferences, correctional health committee work nationally, discussion with correctional professionals nationally, my current active practice and full-time work within correctional settings, and approximately 20 years of direct experience in correctional settings, I have sufficient basis and information to form my professional opinion to a reasonable degree of medical/psychiatric and scientific certainty regarding the sufficiency of the encounter durations, qualifications of the monitors who evaluate encounter durations, and whether additional monitoring guidelines are necessary.

11.     It is my professional opinion that the length of the encounters highlighted by Dr. Stewart were meaningful and appropriate in the context of the patient's overall care and met generally accepted standards of care for state prisons.  As detailed below, I disagree with Dr. Stewart's opinion that the encounters were "shockingly deficient" and "created a serious risk of harm to the patient."

12.     #▆▆▆▆▆ (PM 80, Perryville, April 2020):  This inmate is a 27-year-old female.  She has current psychiatric diagnoses of major depressive disorder, recurrent, mild, and PTSD (posttraumatic stress disorder) versus anxiety disorder unspecified, alcohol abuse with intoxication unspecified, abuse of other non-psychoactive substances, nicotine dependence, and cannabis dependence.  On April 7, 2020, she was seen for a treatment plan review, which lasted approximately five minutes.  During this encounter, the inmate identified that her current strengths were "my art, being positive and being considerate of others," and that her limitations were "procrastination."  The mental health professional

4

identified that the inmate's current target problems and behaviors included "mood disturbances" and "PTSD." The inmate also reported that her sleep was disrupted (a clinical concern), and it was identified to be caused by her PTSD. The inmate also identified that she has "trust issues with males." During this encounter, the following treatment goal was established to decrease PTSD symptoms:

> Objective #1: "Gain coping skills to manage symptoms of PTSD and encourage client to discuss trauma."
>
> Objective #2: "Recognize and plan for top five anxiety-provoking situations."
>
> Intervention #1: "Gently and sensitively explore the client's recollection of the facts of the traumatic incident and her cognitive and emotional reactions at the time; assess frequency, intensity, duration, and history of the client's PTSD symptoms and their impact on functioning."
>
> Intervention #2: Conduct a "review staffing" on date July 9, 2020
>
> Progress/Status: "ongoing." This mental health problem was extended.

The length of her April 7, 2020 encounter was meaningful and appropriate in the context of her overall care and complied with the standard of care.

With respect to subsequent mental health treatment services, this inmate underwent routine follow-up psychiatric evaluations on 4/20/20, 6/2/20, and 7/9/20; and individual counselling on 5/6/20, 6/3/20, 6/23/20, 7/2/20, 7/21/20, 8/10/20, and 9/2/20.

Since the April 7, 2020 encounter, this inmate has not engaged in any self-harm, self-mutilation, suicide attempt, and has not demonstrated any clinical deterioration. She has not required any emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, or any inpatient psychiatric hospitalizations. She has not been identified to pose an imminent risk of harm to herself or others. In fact, she is clinically stable and remains compliant with her psychotropic medication treatment and individual counseling to date.

13.   #▬▬▬▬ **(PM 80, Perryville, April 2020):**   This inmate is a 40-year-old female.  She has a past psychiatric diagnosis of schizophrenia, which was per the patient's self report during her intake mental health evaluation.   The patient also reported a past history of bipolar disorder and post partum psychosis.  She did not arrive into the ADCRR system on any psychotropic medications.   She has not required nor been prescribed any psychotropic medications to date.  According to her eOMIS records, she was hospitalized in 2015 in the community for post-partum psychosis.  There is no other documentation regarding any other psychotic symptoms or further clarification regarding this diagnosis of schizophrenia.   She also has a past psychiatric history of major depressive disorder, recurrent, unspecified.   On April 20, 2020, she was seen for an individual counseling encounter.   The encounter concluded after approximately two minutes, after the inmate advised she no longer wanted to participate.

During the encounter, the following was identified and documented:

> IM seen for individual counseling.  IM came into TW office (the mental health professional was identified as a Psych Associate Licensed) and stated she had no MH needs.
>
> IM stood throughout encounter. IM stated "no I'm good, can I get some affirmations? Can I come pick them up later?" IM denies SI/HI/AVH at this time.
>
> TW notes that IM continues to work, TW observes IM on the yard socializing with other IM and appears generally upbeat and cooperative.
>
> IM stated she did not care to talk this day.
>
> IM appears upbeat, alert, oriented x4, no distress noted. IM does not appear to be a danger to self or others at this time.
>
> IM seen for two minutes.  Reason: Patient verbalized feeling the encounter had met her needs and requested to end the session.

In my professional opinion, the clinical decision by the treating mental health professional to end the mental health encounter was clinically effective, clinically appropriate, and justifiable and did not place the inmate at a significant risk of substantial

harm. Instead, it clearly demonstrated this qualified mental health professional's clinical

rationale, decision-making and justification:

  a.  To maintain a therapeutic treatment relationship and to foster alliance with the inmate;

  b.  To work together collaboratively with the inmate who demonstrated by her speech, actions "stood throughout the encounter," and pattern of appropriate and social behaviors with peers, "TW notes that IM continues to work, TW observes IM on the yard socializing with other IM and appears generally upbeat and cooperative";

  c.  Because the mental health professional weighed all of these individual clinical and treatment variables, and in particular, listened and documented in her note the inmate's verbalization that "IM stated she did not care to talk this day," and the current clinical presentation, "IM appears upbeat, alert, oriented x4, no distress noted. IM does not appear to be a danger to self or others at this time";

  d.  Paid attention to inmate's verbalization(s), and her specific request to end the mental health session, "Stated she did not care to talk this day…No, I'm good, can I get some affirmations? Can I come pick them up later?" and took into consideration the lack of any imminent risks of harm to self or others, "IM denies SI/HI/AVH at this time";

  e.  The mental health professional also clearly documented, "IM continues to work, TW observes IM on the yard socializing with other IM and appears generally upbeat and cooperative";

  f.  The mental health professional made an individual treatment-based decision to end the session due to the following clinical factors, "IM appears upbeat, alert, oriented x4, no distress noted. IM does not appear to be a danger to self or others at this time";

  As such, the length of her April 20, 2020 encounter was meaningful and appropriate in the context of her overall care and complied with the standard of care. As both I and Dr. Stern have recognized and cautioned against, this is an example of a situation where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone. (Dkt. 3379 at 30; Dkt. 3508-1 at ¶45.)

  On May 8 and 11, 2020, she was seen for a mental health wellness checks that lasted approximately forty-five minutes. With respect to subsequent mental health treatment services, this inmate underwent individual counselling on 6/5/20, 6/30/20, 7/27/20, and 8/18/20. This inmate underwent subsequent Mental Health - Treatment Plan Reviews on

6/5/2020 and 8/18/20.  With respect to subsequent HSRs (health services requests) from 5/9/2020 to 9/7/20, except for a 5/10/20 mental health complaint during nursing sick call, this inmate has not submitted any subsequent mental health services requests to date.

Since the inmate's April 20, 2020 encounter, she has not engaged in any self-harm, self-mutilation, suicide attempt, nor has she demonstrated any clinical deterioration.  She has not required any emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, or any inpatient psychiatric hospitalizations.  She has not been identified to pose an imminent risk of harm to herself or others.  In fact, she is clinically stable and remains compliant with her individual counselling to date.

14.    #▇▇▇▇(PM 80, Perryville, April 2020):  This inmate is a 26-year-old female with a psychiatric diagnosis of bipolar disorder, current episode mixed, moderate, and adjustment insomnia.  On April 9, 2020, she was seen for a treatment plan review. The encounter concluded after approximately one minute, after the inmate advised she did not want to be seen.  According to the encounter note:

> "IM (inmate) entered TW office, and refused to sit. When asked if she would like to talk with TW IM stated "no". TW encouraged IM to engage however she refused.  IM did deny SI/HI/command AVH (suicidal ideation, homicidal ideation, command auditory and visual hallucinations) this day but refused to engage any further."

> "IM does continue to work WTU and TW observes that IM appears pleasant with other staff. TW has observed IM on the yard in recent days reading, taking breaks and chatting with other IM appropriately, and appears generally stable."

> "IM seen for 1 minute. Reason: Patient communicated unwillingness to engage despite multiple attempts to engage them."

> "Orientation to person, place, time and situation.  Insight was fair.  Judgment was fair.  No abnormal movements.  No current suicidal ideation.  Adequate grooming and hygiene. Mood/affect:  stable affect/mood congruent.  Speech: unremarkable.  Thought form: logical and coherent.  Thought content:  auditory hallucinations.  Cognitive functioning:  no gross cognitive deficits apparent."

> "IM denies SI/HI/command AVH at this time. IM is guarded

with TW but was observed pleasant with other staff and generally stable."

Similarly, in the individual mental health treatment plan/health services encounter, the mental health professional documented the following:

"IM seen for TP (treatment plan). IM refused to engage. Utilizing previous TP and discussions with IM to complete TP."

"…Assessment: Unspecified mood [affective] disorder."

"…Inmate description of the problem: Inmate refused to answer."

"Treatment Goal:  decrease mood disturbances"

"Objective #1:  engage in MH services"

"Objective #2:  utilize coping skills"

"Intervention #1: take med as prescribed, engage in counseling"

"Intervention #2: working, talking with family, reading, writing, exercise, grounding techniques, positive affirmations, art/drawing, etc."

It is my professional opinion, that the clinical decision by the treating mental health professional on April 9, 2020 to end the mental health encounter/treatment plan review was clinically effective, clinically appropriate and justifiable and did not place this inmate at a significant risk of substantial harm.  Instead, it clearly demonstrated this qualified mental health professional's clinical rationale, decision-making and justification to maintain a therapeutic treatment relationship and to foster alliance with this inmate.  As such, the length of her April 20, 2020 encounter was meaningful and appropriate in the context of her overall care and complied with the standard of care.  As both I and Dr. Stern have recognized and cautioned against, this is an example of a situation where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone.  (Dkt. 3379 at 30; Dkt. 3508-1 at ¶45.)

Additionally, her subsequent medical and mental health treatment history evidences she is being appropriately treated and engages in longer interactions with health care staff

when she wants to.  With respect to subsequent mental health treatment services, this inmate underwent routine follow-up psychiatric evaluations on 5/6/20, 6/2/20, 6/10/20, 7/22/20, and 8/18/20.  She also underwent individual counselling on 5/6/20, 6/4/20, 6/30/20, 7/28/20, 8/4/20, and 8/25/20, and group counselling on 9/2/20.  She had a subsequent Mental Health - Treatment Plan Review on 6/30/2020.  On 9/4/20, she submitted a mental health services sick call request.  The licensed psych associate met with her, where the inmate discussed wanting melatonin as a KOP (keep on person) medication and her desire to drop out of a group class due to being uncomfortable with a certain inmate who also attends.  She advised she had no mental health needs at that time.  According to the chart, the provider attempted to continue the session, but the inmate requested to end the session and said, "I need to get back to work."  This verbalization of her intent to be responsible and attend to her work duties is an additional example of her clinical stability and improved functioning.

Since the April 9, 2020 encounter, this inmate has not engaged in any self-harm, self-mutilation, suicide attempt, nor has she demonstrated any clinical deterioration.  She has not required any emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, or any inpatient psychiatric hospitalizations.  She has not been identified to pose an imminent risk of harm to herself or others.  In fact, she is working on the unit and remains clinically stable and compliant with her psychotropic medication treatment and individual counselling to date.

15.    **#▮▮▮▮▮ (PM 80, Perryville, April 2020):**  This inmate is a 29-year-old female with a psychiatric diagnosis of unspecified mood [affective] disorder, cyclothymic disorder, other psychoactive substance abuse with intoxication, unspecified, and tobacco use.  On April 21, 2020, she was seen for a watch follow up.  The encounter lasted approximately three minutes, and was terminated only after the inmate asked to end the encounter. The provider documented the following:

"IM (Ms. ▮▮▮▮) seen for watch f/u."

> "IM stated "how come I have to see you? I just saw you last week?" TW explained time policy for watch f/u. IM stated "oh, I had just put on my shorts and was rolling a cigarette and they called me up here. I'm doing fine. I'm alright, everything is good". IM stated she has no MH needs this day. IM stated she is getting along with her Bunkie and is staying busy. IM asked to end encounter. IM denies SI/HI/AVH at this time. IM appeared upbeat, cooperative, oriented x4, alert, with no distress noted. IM does not appear to be a danger to self or others at this time."

> "IM seen for 3 minutes.   Reason: Patient verbalized feeling the encounter had met her needs and requested to end the session."

In the assessment notes section, the mental health professional noted:

> "IM denies SI/HI/AVH at this time. IM appeared upbeat, cooperative, oriented x4, alert, with no distress noted. IM does not appear to be a danger to self or others at this time."

I disagree with the assertion made by Dr. Stewart that the encounter was too short. The purpose of a suicide watch follow-up by a mental health professional is to identify if the patient currently on suicide watch or recently removed from suicide watch presents with clinical impairment, poses imminent risks of harm to self or others, and to identify what level of supervision and follow-up is clinically indicated or recommended. I also disagree with Dr. Stewart's criticism and conclusion that the inmate was placed at "serious risk of harm" because the clinician did not inquire as to whether she takes Geodon (an atypical antipsychotic medication) with food. Such an inquiry is only appropriate if it is suspected that the patient is demonstrating continued psychotic symptoms (auditory or visual hallucinations, delusional thoughts, disorganized speech and behaviors, inability to reality test or to perform ADL's), clinical impairment, lack of stabilization, and the concern is raised that this antipsychotic medication is not being properly absorbed. The records do not indicate that was an issue here. Significantly, this inmate had refused Geodon since April 10, 2020. Thus, there was no need to question whether the inmate took Geodon with food. Moreover, this inquiry would have been outside the scope of the mental health clinician's practice. Instead, it was an appropriate inquiry for a psychiatric encounter, which occurred on April 23, 2020 when Geodon was discontinued.

It is also my professional opinion that the clinical decision by the treating mental health professional on April 21, 2020 to not extend the time spent conducting the suicide watch follow-up was clinically appropriate and justifiable and did not place this inmate at a significant risk of substantial harm.  Instead, it clearly demonstrated this qualified mental health professional's clinical rationale, decision-making and justification to develop and maintain a therapeutic treatment relationship and to foster mental health treatment alliance with this inmate. The length of her April 21, 2020 encounter was meaningful and appropriate in the context of her overall care and complied with the standard of care.  As both I and Dr. Stern have recognized and cautioned against, this is an example of a situation where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone. (Dkt. 3379 at 30; Dkt. 3508-1 at ¶45.)

With respect to subsequent mental health treatment services, this inmate received individual counselling on 5/5/20, 6/3/20, 6/26/20, 7/20/20, 8/5/20, 8/18/20, and 9/3/20; subsequent treatment plan reviews on 6/3/2020 and 9/3/2020; a release planning meeting with mental health staff on 8/26/20; and routine follow-up psychiatric evaluations on 4/23/20 and 5/19/20.  During the 5/19/20 psychiatric evaluation, the psychiatrist noted:

> "The patient states that upon her request, on 04/23/2020, her provider discontinued her Ziprasidone and she is doing well. She reports good sleep, no anxiety, depression, denies mood swings, racing thoughts, anger problem.  She denies SI / HI and AVH and she is requesting to remove her name from Psychiatry line stating that she does not need any medication."

This inmate has remained euthymic, hopeful, and future-oriented.  She described current and future plans of GED preparation, employment, family, and being released in November 2020 during her individual counselling session on 9/3/20:

> "IM seen for Individual counseling. IM says she is feeling good. IM is not working in the kitchen. IM is going to school to work on GED. Will test when she gets released. IM says that she is sleeping good and her appetite is good. Good relationship with her Bunkie. No issues. No medications. Good family support. IM shared that she misses her daughter who passed away 12/19 and still cries. TW engaged in active listening and shared options and thoughts of encouragement with the IM as well as

> discussed coping skills such as deep breathing exercises for stress relief, reading and writing. Will be released in Nov 2020. IM is excited about leaving IM says that she will be attended church with her grand mother and she has a job lined at Amazon. IM stated no MH needs this day. IM did not verbally endorse SI/HI/DTS/DTO/AVH/SIB at time of visit."

Since the April 21, 2020 encounter, this inmate has not engaged in any self-harm, self-mutilation, suicide attempt, nor has she demonstrated any clinical deterioration.  She has not required any emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, or any inpatient psychiatric hospitalizations.  She has not been identified to pose an imminent risk of harm to herself or others.  In fact, she remains clinically stable and compliant with her individual counselling to date.

16.    **#_____(PM 80, Perryville, April 2020)**:   This inmate is a 70-year-old female.  She has current psychiatric diagnoses of Alzheimer's disease, unspecified dementia with behavioral disturbance, and schizophrenia, unspecified, and numerous medical problems including cerebral infarction due to embolism of unspecified cerebral artery, rheumatoid arthritis, chronic pain, movement and wheelchair dependent/mobility issues (contractures of all four extremities, bed bound, requires nursing assistance for turning, transfers from bed to wheelchair, and other ADL's).  She also requires medical infirmary level of care and is on standing opioid pain medications including Fentanyl (Duragesic) transdermal and liquid morphine for chronic pain in addition to a twice a day dose of a sedating atypical antipsychotic medication (given her size, age, and mobility issues).

On April 23, 2020, she was seen for an individual counseling session, which lasted approximately five minutes.  During this encounter, the clinician noted the following:

> "Pt seen for 1:1 session/ Pt seen in confidential setting 5 min."

> "Nurse assisted with encounter. Pt was able to nonverbally inform TW she is doing good. Pt reports she is sleeping and eating. Nurse reports Pt doesn't like the food but does eat. Nurse reports Pt still has nightmares at times. Pt reports she enjoys watching TV. Pt has been med compliant per nurse. Pt was responsive, coherent, and alert/oriented. Pt did not verbally endorse SI/HI/AVH and DTS/DTO at this time. Pt does not appear to be a danger to self or others at this time."

"…Medication compliant.   No side effects."

"Pt has been med compliant per nurse. Pt was responsive, coherent, and alert/oriented. Pt did not verbally endorse SI/HI/AVH and DTS/DTO (danger to self/danger to others) at this time. Pt does not appear to be a danger to self or others at this time."

I disagree with the assertion made by Dr. Stewart that the April 23, 2020 encounter was too short.   The purpose of an individual counselling session by a mental health professional for medical psychiatric patients such as this inmate housed in a prison medical infirmary setting is to identify current mental health needs, distress, assess current functioning and ADLs, to identify imminent risks of harm to self or others, and to provide supportive psychotherapy when possible to alleviate distress.   This is all conditional depending on the patient's mental status (if they are agitated, combative, oppositional, confused, or have an alteration in mental status) and ability to reality test, and would contraindicate the intended efficacy of individual psychotherapy.   This inmate's clinical course has been complicated and her clinical functioning remains tenuous (as demonstrated by nursing description of "good days and bad days").   The length of her April 23, 2020 encounter was meaningful and appropriate in the context of her overall care and complied with the standard of care.

The decision to not attempt to extend an individual counselling session with a patient with dementia/neurocognitive impairments who may become overstimulated, agitated, combative, and aggressive, and inadvertently fall, self-injure or strike themselves, assault or injure another patient, the mental health professional or any health care professional within proximity clearly demonstrated this qualified mental health professional's clinical rationale, decision-making re: patient safety issues, and justification to further attempt to develop and maintain a therapeutic treatment relationship.   As both I and Dr. Stern have recognized and cautioned against, this is an example of a situation where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone.   (Dkt. 3379 at 30; Dkt. 3508-1 at ¶45.)

With respect to subsequent mental health treatment services, this inmate received routine follow-up psychiatric evaluations on 4/27/20, 5/26/20, and 8/24/20; individual counselling on 5/20/20, 6/15/20, 7/10/20, 8/4/20 and 9/1/20; and treatment plan reviews on 5/20/20 and 8/4/20.

Since the April 23, 2020 encounter, she has not engaged in any self-harm, self-mutilation, suicide attempt, nor has she demonstrated any clinical deterioration.  She has not required any emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, or any inpatient psychiatric hospitalizations.  She has not been identified to pose an imminent risk of harm to herself or others.  She is currently at baseline functioning, but in my professional opinion, there is no amount of individual counselling that will stabilize her complicated co-morbid medical and psychiatric conditions.  A regimen of polypharmacy is being attempted and titrated with clinical effectiveness.

I disagree with Dr. Stewart's statement/opinion that "Of note, this patient should be seen regularly by a psychiatrist, preferably a neuropsychiatrist."  This patient has maintained a pattern of clinical stability and has in fact been seen and re-assessed regularly by a psychiatric nurse practitioner (for example on 4/23/19, 7/23/19, 9/19/19, 11/13/19, 12/9/19, 2/3/20, 3/30/20, and 8/24/20).  The patient remains housed in a medical infirmary setting where she is afforded ongoing monitoring and re-evaluation by a team of health care providers including nursing, medical, mental health, and psychiatric staff.  Dr. Stewart did not identify any specific concern(s) regarding this patient's current diagnoses or psychotropic medication treatment that would warrant consultation with a psychiatrist.

As noted in my qualifications, I have over 20 years of direct clinical and administrative experience within correctional settings.  In my daily work I routinely supervise several psychiatric physician assistant and nurse practitioner professionals.  I also similarly supervise numerous psychiatrists who supervise psychiatric midlevel professionals.  I have a real-world awareness of a variety of clinical issues or patient complexities within a variety of jail, juvenile correctional, and prison settings that would

potentially warrant verbal case consultation, clinical supervision, or alternatively a second opinion psychiatric consultation.  I conducted a chart review of this patient and I did not identify any current unanswered or unaddressed psychiatric diagnostic or medication treatments or any other mental health concerns that would require psychiatric consultation or that "this patient should be seen regularly by a psychiatrist" expectation as argued by Dr. Stewart.  There is no current national correctional health standard that has a mandate or expectation that only a psychiatrist and not a psychiatric physician assistant or nurse practitioner is qualified or allowed to see a patient.

Furthermore, I disagree with Dr. Stewart's assertion that not only should this individual be a psychiatrist, but instead, "preferably a neuropsychiatrist."  The American Board of Psychiatry and Neurology (ABPN), a member board of the American Board of Medical Specialties, is the national/US entity responsible for establishing standards and requirements for initial and continuing board certification, verification of board certification status, and maintenance of certification for psychiatrists and neurologists in the United States. For example, after completing medical school, one may then pursue residency training in a particular medical or surgical specialty (e.g., pediatrics, family medicine, obstetrics and gynecology, internal medicine, general surgery, or general psychiatry), typically 3-4 years in duration. After successful completion of an accredited residency training program, one would be "board eligible" to take a board certification examination and, if successfully passed (together with other eligibility requirements), would be "board certified" in that general specialty. General psychiatry is currently a 4-year residency training program and requires clinical rotations in neurology and psychiatry.  However, contrary to Dr. Stewart's assertion, there is no current ABPN board certification for "neuropsychiatry."  Some psychiatrists may refer to themselves as "neuropsychiatrists," but this is not currently a recognized medical specialty by the American Board of Medical Specialties, or a psychiatry subspecialty by the ABPN.  The ABPN does not offer any psychiatry or neurology subspecialty examinations in "neuropsychiatry."  A very small number of U.S. based psychiatrists may pursue and complete both psychiatry and neurology

residency training programs in the United States (7 plus years of training), and therefore could be eligible to be board certified in both neurology and psychiatry. Whether they would identify or refer to themselves as "neuropsychiatrists" remains unclear.

There are a few dedicated one-year "neuropsychiatry" fellowships available in the U.S. (e.g., Stanford, Brown University), but none are located in the State of Arizona. Individuals who are interested in the intersection of psychiatry and neurology would typically pursue a fellowship in behavioral neurology or behavioral neurology and neuropsychiatry. Again, these programs are very new and very small in number (Brigham and Women's; Massachusetts General Hospital, Boston, Massachusetts; McLean Hospital, Belmont, Massachusetts; Columbia University, New York; Cleveland Clinic, Cleveland, Ohio; Yale University, New Haven Connecticut; and University of Illinois, Chicago). There are no training programs located in the State of Arizona. I am unaware of any neuropsychiatry fellowship trained psychiatrists or any general psychiatrists who have also trained in behavioral neurology and neuropsychiatry who work within correctional settings.

I have a few colleagues who completed both psychiatry and neurology training but they limit their work to academic clinical research settings and focus on movement disorders (Parkinson's disease, Huntington's chorea, severe motor and vocal tics, Tourette's Syndrome), atypical seizure disorders (non-epileptic seizure disorders), and neurocognitive disorders such as multiple sclerosis, traumatic brain injuries, Alzheimer's, and other dementias. I am unaware of any dually trained psychiatrists and neurologists who currently practice or provide clinical consultation onsite within jail, juvenile correctional, or prison settings in the U.S.

There is a well reported national shortage of general and other psychiatrists in the U.S. In my administrative capacity and in my consulting, national presentations, and committee work with other correctional health care professionals nationally I am quite familiar with the challenges in the recruitment and retention of psychiatrists to work within correctional settings. Due to a variety of factors, many psychiatrists avoid practicing in correctional settings. Dr. Stewart's assertion/expectation that only a "neuropsychiatrist" is

qualified to evaluate and treat certain patients within a correctional setting lacks any clinical support or justification.  From a staffing perspective, there is a further shortage or lack of "neuropsychiatrists."  With regard to this particular ADC patient, if there was any question of this patient's evaluation, testing, diagnosis, management, or medication treatment interventions, the psychiatric nurse practitioner, when clinically indicated, could consult with their supervising psychiatrist, and if clinically indicated, the supervising psychiatrist could perform a second opinion consultation.  If there were still diagnostic or treatment uncertainties (which was not the case with this patient), this patient could have been referred for specialty consultation with a neurologist.

17.   **#▮▮▮▮▮ (PM 80, Yuma, May 2020):** This inmate is a 31-year-old male.  He has current psychiatric diagnoses of unspecified depressive disorder, anxiety disorder, unspecified, unspecified psychosis not due to a substance or known physiological condition, post-traumatic stress disorder, unspecified, and nicotine dependence, other tobacco product, uncomplicated.  On May 7, 2020, this inmate was seen for a mental health session while housed in segregation.  After meeting with the inmate for approximately four minutes, the encounter concluded when the inmate advised it had met his needs and requested the session end.  During the encounter, the clinician noted the following:

> "Subjective notes: Offered to be seen in confidential, private area and refused. Seen cell front.  Discussed limits of confidentiality. Informed Pt. writer is under direct supervision of an independent licensed clinician. Pt. reports he is doing "pretty good". Pt. was asleep when this writer arrived and requested to go back to sleep. This writer encouraged to answer a few questions to assess risk factors. Pt. reluctantly agreed. He denies danger to self or others. Denies hallucinations. Denies issues with depression or anxiety at this time and denies issues with eating or sleeping. This writer explained the benefits of engaging with mental health and he was encouraged to do so. Pt. is aware of the HNR (health needs request/sick call submission) process and reports no further requests or questions from mental health at this point."

> "Objective notes: Met with Pt. for 4 minutes Pt. verbalized feeling the encounter had met his needs and requested to end the session."

> "Assessment notes: Stable at this time as evident by his denial of danger to self or others and calm demeanor."

> "Plan notes: Pt. will be seen within 30 days or HNR request."

"Patient education notes: Educated Pt. to continue to utilize mental health as needed as well as explained the benefits of being seen in a confidential setting."

I disagree with the assertion made by Dr. Stewart that the segregation visit by mental health staff on May 7, 2020 was too short.  The length of his May 7, 2020 encounter was meaningful and appropriate in the context of his overall care and complied with the standard of care.

The purpose of a segregation visit by a mental health professional is to identify if the patient currently presents with clinical impairment, impairments in the ADL's and functioning in the restrictive housing setting, and/or poses imminent risks of harm to self or others, and to identify what mental health and other health care follow-up is clinically indicated or recommended.  As both I and Dr. Stern have recognized and cautioned against, this is an example of a situation where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone.  (Dkt. 3379 at 30; Dkt. 3508-1 at ¶45.)

It is also in my professional opinion, the clinical decision by the treating mental health professional to not extend the time based on the inmate's request that he wanted to "go back to sleep" was clinically appropriate and justifiable and did not place the inmate at a significant risk of substantial harm.  Instead, it clearly demonstrated this qualified mental health professional's clinical rationale, decision-making and justification to develop and maintain a therapeutic treatment relationship and to foster mental health treatment alliance with the inmate.

With respect to subsequent treatment, this inmate received segregation visits on 6/17/20, 7/1/20, and 7/29/20; routine follow-up psychiatric evaluations on 6/23/20 and 8/31/20; a subsequent mental health treatment plan review on 7/1/20; and individual counselling on 8/27/20 and 9/3/20.

Since the May 7, 2020 encounter, he has not engaged in any self-harm, self-mutilation, suicide attempt, nor has he demonstrated any clinical deterioration.  He in fact has improved from a behavioral perspective and no longer requires custody

placement/supervision in a restrictive housing setting.  He has not required any emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, or any inpatient psychiatric hospitalizations.  He has not been identified to pose an imminent risk of harm to himself or others.   In fact, he remains clinically stable and compliant with his psychotropic medications and individual counselling to date.

18.   #▬▬▬▬(PM 80, Yuma, May 2020):  This inmate is a 23-year-old male and has current psychiatric diagnoses of bipolar disorder, unspecified depressive disorder, and anxiety disorder, unspecified.  On May 12, 2020, he was seen for an individual counseling session.  During this clinical interaction, the clinician noted the following:

"Seen in private setting."

"Subjective notes: Pt. refused services. He denies danger to self or others. Denies hallucinations. He was encouraged to engage in the next scheduled session. He signed refusal form."

"Objective notes: Met with Pt. for 3 minutes. Pt. verbalized feeling the encounter had met his needs and requested to end the session."

I disagree with Dr. Stewart's assertion that this inmate's May 12, 2020 encounter was too short. While he refused to participate in individual counselling on May 12, 2020, he participated in a subsequent individual counselling session on June 10, 2020 where his medications were discussed.  After twelve minutes, he requested to terminate the encounter as he had no other questions or further concerns.  The length of his May 12, 2020 encounter was meaningful and appropriate in the context of his overall care and complied with the standard of care.

As both I and Dr. Stern have recognized and cautioned against, this is an example of a situation where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone.  (Dkt. 3379 at 30; Dkt. 3508-1 at ¶45.)

With respect to subsequent mental health treatment services, this inmate received segregation visits on 7/8/20, 7/21/20, and 8/18/20; routine follow-up psychiatric evaluations

on 5/21/20, 6/3/20, 7/22/20, and 8/26/20; and individual counselling on 6/10/20.  During his June 10, 2020 encounter, he requested to terminate the encounter after twelve minutes.

Since the May 12, 2020 encounter, he has not engaged in any self-harm, self-mutilation, suicide attempt, nor has he demonstrated any clinical deterioration.  He has not required any emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, or any inpatient psychiatric hospitalizations.  He has not been identified to pose an imminent risk of harm to herself or others.  In fact, he is clinically stable and remains compliant with his psychotropic medication treatment, segregation visits by mental health staff, and individual counselling to date.

19.    #▮▮▮▮▮▮ (PM 94, Phoenix, April 2020):  This inmate is a 20-year-old  male with recent psychiatric diagnoses of amphetamine-type substance use disorder, severe; amphetamine (or other stimulant)-induced psychotic disorder, hallucinogen abuse with hallucinogen persisting perception disorder (flashbacks), opioid use disorder, severe, unspecified anxiety disorder, post-traumatic stress disorder, unspecified inhalant-related disorder, schizophrenia, unspecified, and unspecified schizophrenia spectrum and other psychotic disorder.  On April 12, 2020, he was seen on watch.  While the provider offered to see him in a confidential setting, he refused and was therefore seen cell front.  After approximately three minutes, this inmate verbalized that his needs had been met and requested to end the session.  According to the mental health professional's progress notes of this encounter:

> "Subjective notes: Pt was seen on a 30 min MHW (mental health watch) at approximately 1215 for three minutes. Pt was offered to be seen in a confidential setting but he refused and was seen at cell front. Patient verbalized feeling the encounter had met his needs and requested to end session. Tw walked up to the pt's cell and observed what appeared to be the pt sleeping. Tw knocked on the pt's cell and asked if he would like to meet with tw (MH) and pt said "no, I just want to sleep". Tw asked the pt if he would be willing to answer a few questions and pt said ok. Tw asked the pt if he was DTS/DTO/AVH and pt responded no to all three questions. Tw did not observe the pt reacting to any internal stimuli. Tw asked the pt if he was eating/sleeping ok and pt said that he was eating ok and that he would like to go back to sleep; tw ended session. There have been no reported or observed self-harming events since last mental health contact. Pt remained on a 30 min

MHW."

"Objective notes: Pt was seen on a 30 min MHW at approximately 1215 for three minutes. Pt was offered to be seen in a confidential setting but he refused and was seen at cell front. Patient verbalized feeling the encounter had met his needs and requested to end session. Tw was unable to check boxes below as pt would not participate in assessment for a long enough amount of time."

"Hygiene: unremarkable."

Assessment notes: Pt denied DTS/DTO/AVH. Pt was not reacting to any internal stimuli. Patient was mildly cooperative."

"Plan notes: Patient will remain on a 30 min MHW and will continue to be seen by Mental Health daily to assess for safety and stability. Pt did not acknowledge an understanding of this plan."

I disagree with Dr. Stewart that the April 12, 2020 encounter was too short. The purpose of a suicide watch follow-up by a mental health professional is to identify if the patient currently on suicide watch or recently removed from suicide watch presents with clinical impairment, poses imminent risk of harm to self or others, and to identify what level of supervision and follow-up is clinically indicated or recommended. It is also my professional opinion that the clinical decision by the treating mental health professional on April 12, 2020 to not extend the time spent conducting the suicide watch follow-up was clinically appropriate and justifiable and did not place this inmate at a significant risk of substantial harm. Instead, it clearly demonstrated this qualified mental health professional's clinical rationale, decision-making and justification to develop and maintain a therapeutic treatment relationship and to foster mental health treatment alliance with this inmate. As both I and Dr. Stern have recognized and cautioned against, this is an example of a situation where continuing the encounter just to comply with a minimum length requirement would be clinically inappropriate and could have agitated a patient who wanted to be left alone. (Dkt. 3379 at 30; Dkt. 3508-1 at ¶45.) The length of his April 12, 2020 encounter was meaningful and appropriate in the context of his overall care and complied with the standard of care.

This inmate continues to receive intensive inpatient psychiatric treatment. He continues to receive ongoing and frequent psychiatric and mental health evaluation and

treatment encounters and an extensive amount of mental health treatment services (too voluminous to list here individually).  Additionally, he has been able to successfully participate in group therapy and psychoeducation groups lasting one hour in length as recently as 9/9/20.

Since the April 12, 2020 encounter, he has not engaged in any self-harm, self-mutilation, suicide attempt, nor has he demonstrated any clinical deterioration.  He has not required any off-site emergency mental health evaluations, on-site medical department emergency treatment for injuries, off-site transfers to community hospital emergency departments, and he remains clinically stable in his current inpatient psychiatric prison setting.  He has not been identified to pose an imminent risk of harm to himself or others.  In fact, he remains clinically stable and compliant with his psychotropic medications, group counselling, group psychoeducation sessions, and with individual counselling to date.

20.    I therefore disagree with Dr. Stewart that the above-referenced encounters were "shockingly deficient" and "created a serious risk of harm to the patient." (Dkt. 3694-3 at ¶12.)

21.    As explained within the applicable charts above, it is a dangerous practice to require a minimum length for mental health encounters, as the mental health clinician creates a preventable serious risk of agitating the patient and subjecting both the patient and the staff member to serious harm (e.g., when the patient is upset and agitated they may engage in behavioral dyscontrol, agitation, and assaultive behavior).  Moreover, requiring mental health staff to meet with patients for a defined, specified certain length of time increases the risk of ethical and professional boundary violations due to the likelihood that conversations will exceed professional boundaries, as clinicians attempt to fill empty space with discussions regarding personal, family, non-clinical information, views on politics, favorite sports teams, opinions regarding recent prison, local, state, and world events, and weekend plans or family dynamics—topics that are inappropriate for a therapeutic clinician-patient relationship in the correctional setting.

22.     Instead, the clinicians discussed above terminated encounters after it became apparent the inmates were no longer interested in continuing the individual therapy/therapeutic encounter.   This builds trust and a rapport with the patients, which permits longer and more in-depth encounters to take place at a later time.  It is important to meet the patients where they are, and the encounters described above did just that.  Forcing a patient to engage in conversation for the sake of meeting stop-watch timeframes jeopardizes the ability to establish and build upon this relationship.  Indeed, the only time I have seen minimum length requirements is for insurance billing purposes, which is an unnecessary practice in correctional health care settings.

23.     Additionally, I disagree with Dr. Stewart's criticism of encounters where psychotropic medication issues were not discussed. While psychotropic medications are a piece of the mental health treatment puzzle, they need not be discussed at every encounter. Indeed, nonpsychiatric mental health clinicians are not trained to prescribe psychotropic medications and are unqualified to adjust medications or to give recommendations regarding medication effects, dosing, schedule, and side effects.

24.     It is my opinion that the interactions of clinicians and inmates were "meaningful" and "appropriate" and met the standard of care.  These contacts, although sometimes brief, still provided vital information (such as hygiene and stability) to the mental health clinician, and were utilized in evaluating the condition of the patient.  These contacts are part of an overall treatment plan.  Additionally, in my review of the above-referenced files, the patients are routinely being seen by the same mental health professional, which establishes a continuity of care and further justifies why some encounters may be brief due to the licensed psych associates or psychiatric provider's familiarity with the patient.  Moreover, the volume of past nursing, medical, and mental health contacts that are readily available in the electronic medical records of the inmates discussed above further justifies why some encounters may be shorter than others—each serves a different purpose.

25.     It is also my opinion that the monitors' evaluation of these files was appropriate, within the parameters set by the Court, and was not abuse of the Court's exception.

26.     In my review of the medical/mental health records, I did not find evidence that the length of these mental health contacts was meaningless.  There were no files that involved a situation where being "seen" amounted to a "drive by," superficial, or dismissive mental health encounter.  Each of the mental health contacts involved some level of meaningful and clinically impactful contact with the inmate to assess that inmate's current mental health and overall clinical functioning.

27.     As such, I strongly disagree with Plaintiffs' allegation that Defendants have "abused" and "enthusiastically exploited" the Court's minimum duration exception and, thus, nullified the Court's Order.

28.     I disagree with Dr. Stewart's recommendation that the monitors should abide by stringent instructions when determining whether an encounter was meaningful and appropriate in the context of the patient's overall care.  In my opinion, the determination of whether an encounter was meaningful and appropriate *in the context of the patient's overall care* is subjective and dependent upon the individual patient, the clinician who saw the patient, the patient's history (which portions of a record are relevant to this determination will also vary), the type of encounter being monitored, the responses the patient provides, and many other factors.  Restricting monitors to the review of certain records, or requiring that they review certain records, deprives them of the autonomy necessary to make this determination.  Because this determination is akin to a health care peer review, it is better made through individual case discussions and ideas as to what may or may not be sufficient, depending upon the various factors identified above.  The purpose of this review is to improve the quality of health care encounters and overall mental health care delivery, instead of attempting to engage in a game of "gotcha" because the monitor consulted different types of records or information depending on the type of encounter reviewed.  This

determination requires a qualitative analysis that cannot be accomplished by a rote cookie-cutter approach or algorithmic formula.

29.     Further, it is my professional opinion that Ms. McCray and Ms. Porter meet the definition of "mental health clinician" as defined by the Stipulation (Dkt. 1185-1 at 4) and are qualified to evaluate whether encounters were meaningful and appropriate in the context of the patient's overall care, for the "seen" PMs set forth in the Court's March 11, 2020 Order. (Dkt. 3518 at 3.)  This determination does not require the skill set of a psychiatrist or doctoral-level psychologist.  The monitor is not evaluating whether any specific treatment was clinically indicated or not.  Rather, they are monitoring whether the duration of the encounter was meaningful and appropriate.  Qualified mental health professionals, as defined in national correctional health care standards, include a variety of mental health professionals beyond only non-doctoral level psychologists and non-psychiatrists.  Licensed master's level counselors are more than qualified to make this determination.  Indeed, mental health clinicians in the Office of Mental Health Monitoring within the Texas Department of Criminal Justice (TDCJ) Health Services Division routinely conduct similar determinations within the TDCJ, the largest state prison system in the U.S.  This complies with the standard of care and ACA and NCCHC national correctional health care standards and requirements.

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Executed this  11th  day of September 2020.

3

4   _____

    JOSEPH V. PENN MD CCHP FAPA

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    27