1   Jared G. Keenan (Bar No. 027068)
2   Casey Arellano (Bar No. 031242)
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
    Telephone: (602) 650-1854
4   Email: jkeenan@acluaz.org
            carellano@acluaz.org
5
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6   *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
    *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7   *Desiree Licci, Joseph Hefner, Joshua Polson, and*
    *Charlotte Wells, on behalf of themselves and all others*
8   *similarly situated*

9   **[ADDITIONAL COUNSEL LISTED BELOW]**

10  Asim Dietrich (Bar No. 027927)
    **ARIZONA CENTER FOR DISABILITY LAW**
11  5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
12  Telephone: (602) 274-6287
    Email: adietrich@azdisabilitylaw.org
13
    *Attorneys for Plaintiff Arizona Center for Disability Law*
14
    **[ADDITIONAL COUNSEL LISTED BELOW]**

15              UNITED STATES DISTRICT COURT

16                  DISTRICT OF ARIZONA

17  | Victor Parsons; Shawn Jensen; Stephen Swartz; | No. CV 12-00601-PHX-ROS |
    | Dustin Brislan; Sonia Rodriguez; Christina | |
18  | Verduzco; Jackie Thomas; Jeremy Smith; Robert | |
    | Gamez; Maryanne Chisholm; Desiree Licci; Joseph | **DECLARATION OF** |
19  | Hefner; Joshua Polson; and Charlotte Wells, on | **JESSICA CARNS** |
    | behalf of themselves and all others similarly | |
20  | situated; and Arizona Center for Disability Law, | |
    | Plaintiffs, | |
21  | v. | |
22  | David Shinn, Director, Arizona Department of | |
    | Corrections, Rehabilitation and Reentry; and Larry | |
23  | Gann, Assistant Director, Medical Services Contract | |
    | Monitoring Bureau, Arizona Department of | |
24  | Corrections, Rehabilitation and Reentry, in their | |
    | official capacities, | |
25  | Defendants. | |
26

27

28

I, JESSICA CARNS, declare:

1.      I am a paralegal employed by the ACLU National Prison Project. As part of my regular duties, I track and review compliance documents produced by Defendants in *Parsons v. Shinn* related to the maximum custody performance measures (MCPMs) set forth in the Stipulation. [Docs. 1185, 1185-1, Exs. D, E] Together with the attorneys and legal fellows, the paralegals before me working on this matter developed protocols and procedures for analyzing these compliance documents with regard to the requirements of the Stipulation, which I have continued to follow. These procedures are explained below where applicable. If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

2.      I most recently wrote a declaration in support of Plaintiffs' Motion to Enforce the Stipulation (Maximum Custody Performance Measures 1-3, 5-6, and 8) [Doc. 3599], which was filed with the Court in this case on May 20, 2020. I also wrote a declaration in support of Plaintiffs' Response to Defendants' Motion to Terminate Monitoring of Maximum Custody Performance Measure 1 Through 8 [Doc. 3160], which was filed with the Court in this case on February 22, 2019. Many, if not all, of my findings explained in my February 2019 and May 2020 declarations remain accurate for the latest months of documentation that I have reviewed as provided by Defendants.

3.      Attached to this declaration are a number of Federal Rule of Evidence (FRE) 1006 summary exhibits created because the underlying data and documents are so voluminous that they cannot be conveniently examined by the Court. All of these summaries are based on true and correct copies of the compliance documents produced by Defendants in this matter and reflect Plaintiffs' reasonable analysis of the contents of these documents. Each FRE 1006 summary exhibit is identified as such.

4.      I attach hereto as **Exhibit 1 (under seal)**, "FRE 1006 Summary Exhibit 'Prisoners Chosen for Maximum Custody Performance Measure Review (November 2018 – January 2020).'" The chart shows by month and facility the frequency at which certain prisoners were chosen for monitoring on a monthly basis. The months highlighted in yellow

1    have been added to the chart since my May 2020 declaration, as the max custody notebooks

2    for September 2019 – January 2020 were produced in the interim. The chart was formulated

3    by reviewing the prisoner out-of-cell tracking sheets in the max custody notebooks

4    produced by Defendants for each facility during each month of monitoring. For each facility

5    monitored, every month under review included a prisoner record (out-of-cell tracking sheet)

6    or multiple records that were included in either a month before or a subsequent month

7    during the monitoring period.

8        5.    Under the Maximum Custody Monitoring Guide, Defendants are supposed to

9    select every nth prisoner based on total population. Because the nth prisoner interval is

10   determined the exact same way each month – by dividing the total population of the facility

11   by 10 – the same interval is repeatedly used across months. Therefore, the same prisoners

12   are often chosen for review consecutively across months. For example, there are four

13   Substitution Memos for the month of October 2019 at Florence-Kasson demonstrating that

14   four separate prisoners were chosen for both the max custody and SMI drawing because the

15   skip intervals for each group were numerically so close together. I attach hereto **Exhibit 2**

16   **(under seal)**, these four (4) substitution memos from the Florence-Kasson max custody

17   notebook for October 2019. I also created a chart that shows the total population size for

18   both general population and the SMI population, and the intervals at which prisoners were

19   selected for review; attached hereto as **Exhibit 3**, "FRE 1006 Summary Exhibit 'Skip

20   Intervals Used to Select Prisoners for Maximum Custody Performance Measure Review

21   (November 2018 – January 2020).'" The months highlighted in yellow have been added

22   since my May 2020 declaration.

23       6.    I attach hereto as **Exhibit 4**, "FRE 1006 Summary Exhibit 'Rates of Refusal

24   of Recreation and Programming (November 2018 – January 2020).'" These four (4) charts

25   demonstrate the rates of refusal for: 1) exercise/recreation; 2) programming (which includes

26   mental health programming and group programming) for each facility for September 2019

27   – January 2020; 3) the rates of refusal for chute recreation at Eyman-Browning and Eyman-

28   SMU; and (4) the rates of refusal for 10x10 recreation at Florence-Kasson and Lewis-Rast.

Because chute recreation is not offered at Eyman-Browning and Eyman-SMU facilities, I calculated refusal rates for the next smallest unit for recreation (10x10) at Florence-Kasson and Lewis-Rast for the most recent months of monitoring documentation provided. SMI program unstructured time required under MC PM #8 is not included in this analysis. This exhibit was created by myself and a team of paralegals under my supervision. We calculated the rates of refusal for each of the facilities by reviewing the individual out-of-cell tracking sheet for each prisoner for each month and: 1) adding up the total number of recreation periods/programs offered; and 2) adding up the total number of recreation periods/programs marked as "refused" by prisoners. I further broke-down these totals to non-SMI and SMI prisoners and then added the two together to determine the overall refusal rate. We followed the same procedure for chute recreation and 10x10 specifically, which demonstrates the excessively high refusal rates when prisoners are offered recreation indoors in the smallest area available for recreation.

7.      When determining the total number of refusals, my colleagues and I included in our calculations any instances where a prisoner either refused an entire recreation period/program or elected to return to their cell early, thereby refusing part of the out-of-cell time offered. We did not include in our calculations any instances where a prisoner was either offered or refused a visitation period, unstructured out-of-cell time, or other/incentive out-of-cell time. Due to variations in the way partial refusals were denoted across the various facilities, it is possible that some partial refusals may not have been accounted for in these figures.

8.      In my review of the documentation produced by Defendants, I found numerous instances in which an entire group programming class of up to approximately ten (10) prisoners would allegedly refuse to participate in out-of-cell-programming. This pattern spans across all facilities and all months for the monitoring period of November 2018 through January 2020. Whenever prisoners would refuse group programming, the corresponding sign-in sheet was never actually signed by the prisoners themselves, but the word "refused" was written in place of the prisoners' signatures. When multiple prisoners

1   refused the same hour of group programming, the same correctional officer would write

2   "refused" on the prisoners' signature lines where they should have been signing to verify

3   their own refusal. There are numerous instances where "group programming" actually only

4   consisted of one or two prisoners on the sign-in sheets. More often than not, these one to

5   two prisoners would be recorded as refusals for their group programming.

6        9.     I also found multiple instances in which the refusal of all prisoners offered a

7   certain program was denoted by the word "refused," demonstrating that there was no valid

8   attempt on behalf of the correctional officer to receive even a single prisoner's signature on

9   their refusal. I attach hereto as **Exhibit 5 (under seal)**, true and accurate copies of a few

10   representative samples of these types of sign-in sheets for programming produced by

11   Defendants: ADCM1637911; ADCM1620225-26; ADCM1620017-18; ADCM1612541.

12        10.     Consistent with my findings described in my declaration for the monitoring

13   period of November 2016 through October 2018, I did not find a single refusal in the

14   comments section on the back of prisoners' out-of-cell tracking sheets in which the

15   prisoners themselves signed, thereby verifying their own refusal, from November 2018

16   through January 2020. Throughout my review of maximum custody documentation, I found

17   that there was consistently one (1) correctional officer's signature on refusals listed in the

18   comments section of prisoners' out-of-cell tracking sheets, rather than two (2) signatures as

19   required by the Maximum Custody Monitoring Guide. I saw no notation in the documented

20   monitoring that due to safety, security, or operational concerns it was impossible to a get a

21   second signature or a signature from the refusing prisoner. Moreover, nearly all refusals

22   documented during the monitoring period of September 2019 through January 2020 were

23   accompanied by just one correctional officer's signature instead of two.

24        11.     When reviewing the individual prisoner out-of-cell tracking sheets produced

25   by Defendants, I noted that there were numerous instances when a prisoner would refuse

26   all out-of-cell time offered to them for the entire week, many of which also had only one

27   correctional officer's signature. Again, this is consistent with my findings described in my

28   2019 and May 2020 declarations. This pattern spans across all facilities and all months for

the monitoring period of November 2018 through January 2020.

12. Even more troubling, I found multiple instances in which there was no indication that a correctional officer made any attempt to speak to the prisoner about their persistent pattern of allegedly refusing the out-of-cell time that was being offered to them for that week. This pattern generally spans across all facilities and all months for the monitoring period of November 2018 through January 2020. I found numerous instances in which a prisoner refused all, or nearly all, out-of-cell-time opportunities offered to them that week, all of which were verified by only one correctional officer's signature, and there was no note indicating that the prisoner was counseled in any way. I attach hereto as **Exhibit 6 (under seal)**, true and accurate copies of these types of tracking sheets: ADCM1637270-71; ADCM1619964-65; ADCM1617408-09; ADCM1616478-79; ADCM1616970-71; ADCM1613273-74; ADCM1611613-14; ADCM1611856-57.

13. I found a broad theme of generic and/or repetitive quotes being used from correctional officers across months and facilities throughout the monitoring period of November 2018 to January 2020. Furthermore, I found that correctional officers sometimes used the same, or similar, quote to indicate that they spoke to each prisoner about their consistent pattern of refusing out-of-cell time. For example, for the monitoring week chosen in January 2020, correctional officers at Eyman-SMU indicated that all four (4) SMI prisoners who demonstrated a pattern of refusing out-of-cell time offered to them, "report[ed] no complaints or issues with table time." At Lewis-Rast in January 2020, correctional officers used quotes such as "i[nmate] states he does not want to participate in table time," or "i[nmate] stated that he is good w[ith] the amount of table time offered" to explain seven (7) different SMI prisoners' patterns of refusal. In both instances, not only are the quotes vague and repetitive, but they only address the refusal of table time, when each prisoner also exhibited a pattern of refusing recreation and group programming, including mental health and psycho educational programs.  If not verbatim, there were many similar quotes used to explain high refusal rates. I attach hereto **Exhibit 7 (under seal)**, true and accurate copies of these representative examples of the problematic tracking sheets

produced by Defendants: ADCM1637134; ADCM1637163; ADCM1637176; ADCM1637149; ADCM1637895; ADCM1637925; ADCM1637939; ADCM1637953; ADCM1637970; ADCM1638016; ADCM1638032.

14.     For the recent months of documentation provided by Defendants, September 2019 through January 2020, I noticed a continued trend of cancellations of recreation and programming due to staff shortage. For the aforementioned monitoring period, only one (1) of the total 23 instances of cancelled recreation and programming was recorded as having been successfully rescheduled. Due to variations in the way cancellations were reported across facilities, it is possible that some cancellations may not have been accounted for in these figures. The make-ups for these recreation and programming hours also rarely occurred, most often due to staff shortage. For example, in October 2019, recreation and programming was cancelled on six (6) days of one week at Eyman-SMU I due to staff shortage, none of which were rescheduled also due to lack of staffing. Sometimes there was no written indication of any attempt to reschedule the cancelled recreation or programs. I attach hereto **Exhibit 8 (under seal)**, true and accurate copies of a few representative samples of cancellation memos produced by Defendants: ADCM1612808-20; ADCM1612476-78; ADCM1612172-73.

15.     Defendants produced a series of "Daily Post Sheets," which shows the staffing posts and vacancies for one week of every month at each facility for November 2019 – December 2019. I reviewed each document, recording the number of posts that were most relevant to the administration of recreation and programming, and I recorded the number of absent posts during AM hours for the week provided for each month of monitoring. I attach hereto as **Exhibit 9**, "FRE 1006 Summary Exhibit 'Staffing Daily Post Sheet (AM) Review.'" I found that there were consistently high vacancy levels in the posts most pertinent to recreation and programming at Eyman-Browning and Eyman-SMU. There were fewer relevant positions at Florence-Kasson and Lewis-Rast, and thus, fewer vacancies, however, there were absent posts for every week of documentation provided. Defendants often recorded "split" vacancies where half shifts would be covered and I

1  recorded those as half absences. Sometimes, there were "support" positions provided, where
2  positions such as "Recreation Rovers" were listed and often, but not always, filled.

3      16.    In some instances, assessing compliance was especially difficult due to
4  sloppiness in Defendants' record keeping. For example, the handwritten start and end times
5  on tracking sheets were sometimes difficult to read or illegible. Defendants sometimes
6  crossed out start and end times or wrote over them, making it even more difficult to discern
7  the amount of time offered. I found the same issue of crossing out words or writing over
8  them on the comments section on the back of individual out-of-cell tracking sheets.
9  Sometimes, the documents were scanned in at such a low resolution and high contrast that
10  the text was barely legible. Without being able to calculate the total amount of out-of-cell
11  time a prisoner was offered, it is extremely difficult to properly determine compliance and
12  consistency with CGAR findings. I attach hereto as **Exhibit 10 (under seal)**, true and
13  accurate copies of a few representative samples of these types of illegible out-of-cell
14  tracking sheets: ADCM1620001; ADCM1619955; ADCM1620403; ADCM1612720;
15  ADCM1611713.

16      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing
17  is true and correct.

18      Executed this 2nd of October 2020, in Washington D.C.

21                                    Jessica Carns

**ADDITIONAL COUNSEL:**

David C. Fathi (Wash. 24893)*
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:       dfathi@aclu.org
               echo@aclu.org
               mmorris@aclu.org

*Admitted *pro hac vice*.  Not admitted
  in DC; practice limited to federal
  courts.

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:       dbarr@perkinscoie.com
               agerlicher@perkinscoie.com
               jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     jkeenan@acluaz.org
               carellano@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
               ahardy@prisonlaw.com
               snorman@prisonlaw.com
               ckendrick@prisonlaw.com
               rlomio@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm;*
*Desiree Licci; Joseph Hefner; Joshua*
*Polson; and Charlotte Wells, on behalf of*
*themselves and all others similarly situated*

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR**
**DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:    adietrich@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ Jessica Carns