1  Jared Keenan (Bar No. 027068)
    Casey Arellano (Bar No. 031242)
2  **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
    Telephone:  (602) 650-1854
4  Email:  jkeenan@acluaz.org
          carellano@acluaz.org
5
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6  *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
    *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7  *Desiree Licci, Joseph Hefner, Joshua Polson, and*
    *Charlotte Wells, on behalf of themselves and all others*
8  *similarly situated*

9  Asim Dietrich (Bar No. 027927)
    **ARIZONA CENTER FOR DISABILITY LAW**
10  5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
11  Telephone:  (602) 274-6287
    Email: adietrich@azdisabilitylaw.org
12  *Attorneys for Plaintiff Arizona Center for Disability Law*

13  **[ADDITIONAL COUNSEL LISTED
    ON SIGNATURE PAGE]**

14

15          UNITED STATES DISTRICT COURT

16            DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br>         Plaintiffs, <br><br>    v. <br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, <br><br>         Defendants. | No. CV 12-00601-PHX-ROS <br><br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE THE STIPULATION (MAXIMUM CUSTODY PERFORMANCE MEASURES 1-3, 5, 6, AND 8)** |

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................3

I.  PLAINTIFFS ARE ENTITLED TO MOVE TO ENFORCE MCPMs 1-3, 5-6 AND 8............................................................................................3

II.  DEFENDANTS ADMIT THEY DO NOT RANDOMLY SELECT PRISONER RECORDS AS REQUIRED BY THE STIPULATION ...........4

III.  DEFENDANTS' OFFERS OF OUT-OF-CELL OPPORTUNITIES ARE UNREASONABLE, AND DO NOT SATISFY THE MCPMS....................6

   A.  Defendants Offer Recreation Early in the Morning, When People Are Still Sleeping, and Record the Failure to Respond as a Refusal ............................7

   B.  Defendants "Offer" Recreation in Small Recreation Yards that Encourage Refusals and Violate the Stipulation ............................................................10

   C.  Defendants' "Offer" of Showers, While Not a Recorded Out-of-Cell Time Opportunity, Are also Unreasonable ........................................................11

IV.  THE EXTRAORDINARY REFUSAL RATES FOR OUT-OF-CELL TIME ARE UNRELIABLE BECAUSE DEFENDANTS DO NOT DOCUMENT THE REFUSALS AS REQUIRED BY THE MONITORING GUIDE .......12

   A.  Defendants Are Required to Obtain a Second Signature if Feasible and Almost Never Do .....................................................................................13

   B.  Defendants Routinely Fail to Document Discussions with Subclass Members About Patterns of Refusals ............................................................15

V.  CANCELLATIONS AND LIMITATIONS OF OUT-OF-CELL TIME DUE TO CHRONIC STAFFING SHORTAGES VIOLATE THE STIPULATION ................................................................................16

   A.  Defendants Frequently Cancel Out-of-Cell Time Resulting in Violation of MCPMs 1, 2, 5, 6 and 8..................................................................17

   B.  Defendants Frequently Limit Out-of-Cell Recreation in Violation of MCPMs 6 and 8..................................................................................21

   C.  The Cancellations and Limitations Are Caused by Chronic Staffing Shortages, and thus Result in Non-Compliance with the Stipulation. .........22

   D.  In Violation of ¶ 26 of the Stipulation, Defendants Do Not Make Every Reasonable Effort to Make up Cancelled or Limited Out-of-Cell Time......25

   E.  Defendants Have Indefinitely Cancelled or Limited All Out-of-Cell Recreation and Programming Ostensibly Due to the COVID-19 Pandemic ........................................................................................27

   F.  In Violation of the Stipulation, Defendants Do Not Document the Reasons for the Cancellations or Limitations.............................................28

VI.  DEFENDANTS' FLAWED PRACTICES RELATING TO THE STEP PROGRAM VIOLATE THE STIPULATION ...............................................30

   A.  Defendants Violate MCPMs 6 and 8 by Denying Recreation in the Location Set as an Incentive in the Step Program.......................................31

   B.  Defendants Violate the MCPMs by Denying Subclass Members the Opportunity to Progress Within the Step Program......................................33

VII.  DEFENDANTS' EXHIBITS AND RECENTLY PRODUCED

DOCUMENTS DEMONSTRATE THE ABJECT FAILURE OF THEIR "ROBUST" MCPM MONITORING AND REPORTING SYSTEM..........37

VIII.   DEFENDANTS' VIOLATIONS HAVE WORSENED IN RECENT MONTHS .................................................................41

IX.   THE COURT SHOULD SANCTION DEFENDANTS FOR THEIR FAILURE TO PROVIDE THE ORDERED REPORTS OR TRACK RELEVANT INFORMATION BY HOLDING PLAINTIFFS' ALLEGATIONS REGARDING NONCOMPLIANCE WITH THE MCPMS TO BE ESTABLISHED. ...............................................43

CONCLUSION ..............................................................................44

# TABLE OF AUTHORITIES

**Cases**

*G. v. Hawaii,*
 794 F.Supp.2d 1119, 1152 (D. Haw. 2011) ............................................................44

*Indep. Towers of Washington v. Washington,*
 350 F.3d 925, 929 (9th Cir. 2003) ..........................................................................2

*Rufo v. Inmates of the Suffolk County Jail,*
 502 U.S. 367, 383 (1992)........................................................................................43

*Tacori Enterprises v. Beverlly Jewellery Co.,*
 253 F.R.D. 577, 581-82...........................................................................................44

**Rules**

Fed. R. Civ. P. 37(b)(2)(A) ................................................................................43, 44

On May 20, 2020, Plaintiffs moved this Court to enforce the terms of the Stipulation by finding Defendants substantially non-compliant with Maximum Custody Performance Measures ("MCPMs") 1-3, 5-6, and 8.[1] Plaintiffs submitted evidence that, from November 2016 to August 2019, Defendants' methodology for monitoring their compliance with the MCPMs as well as their underlying administration of out-of-cell time, incentives, and group programming for the subclass members in isolation had been marked by deep methodological errors, inconsistencies, and the lack of good faith. On July 21, 2020, Defendants responded to Plaintiffs' motion, arguing that (1) Plaintiffs are procedurally barred from moving to enforce the MCPMs, (2) Defendants' monitoring methodology is robust and reliable; (3) Defendants' delivery of out-of-cell opportunities satisfies that the Stipulation, and (4) Plaintiffs' arguments regarding the Director's Order #812 ("DO 812")[2] Step Program Matrix and out-of-cell time cancellations exceed the bounds of the Stipulation. All of these arguments are unpersuasive.

Defendants admit they continue to use a sampling methodology in their MCPM audit process that the Court already found to not be random sampling. [Doc. 3359 at 8]

---

[1] MCPMs #1-3, 5-6, and 8 require the following:
- MCPM 1 requires that maximum custody prisoners receive a minimum amount of out-of-cell time per week: Step I (7.5 hours); Step II (8.5 hours); and Step III (9.5 hours);
- MCPM 2 incorporates DI 326's incentive system and requires that all Step II and III prisoners are mandated to be offered at least one hour of out-of-cell group programming a week;
- MCPM 3 requires that if out-of-cell time mandated by MC PM #1, 2, and 8 is limited or cancelled it must be properly documented and justified as required by the Stipulation;
- MCPM 5 requires that all maximum custody prisoners are offered a minimum of 6 hours of out-of-cell exercise a week;
- MCPM 6 requires that all prisoners eligible for participation in DI 326 be offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing;
- MCPM 8, requires that prisoners with serious mental illness be offered all of the privileges and incentives under DI 326 and additional out-of-cell time per week, including ten hours of unstructured time; one hour of additional mental health programming; one hour of psycho-educational programming; and one hour of additional out-of-cell programming.
[Doc. 1185-1 at 41-44]
[2] DO 812 replaces Director's Instruction ("DI") 326, which previously operationalized the Maximum Custody Step Incentive Program, and is referenced throughout the MCPMs.

Further, Defendants continue to disregard the 2017 Max Custody Monitoring Guide's ("Monitoring Guide") documentation standards for verifying subclass member refusals of out-of-cell opportunities. Together, these represent critical flaws in Defendants' monitoring process, casting significant doubt on the veracity of their compliance reporting.

Further, the evidence submitted by Defendants confirms Plaintiffs' arguments and evidence that offers of out-of-cell time are often unreasonable or unattainable such that isolation subclass members are unable to take advantage of those offers.[3] Defendants' failed administration of their DO 812 Step Program Matrix, along with the routine cancellations of out-of-cell opportunities due to ADC's chronic staffing shortages, further exacerbate the issues regarding the delivery of out-of-cell opportunities to subclass members. The reality is that the same facts that led the Court to rule against Defendants on their motion to terminate the MCPMs still remain. [*See* Doc. 3359 at 8]

Defendants rely on their "robust, multi-level" monitoring and review process to argue that they are in compliance with the MCPMs. Doc. 3700 at 2. However, the documents they filed and the documents they have produced to Plaintiffs over recent months (many after repeated orders by this Court) demonstrate that the monitoring process is deeply flawed and routinely fails to identify the many ways in which Defendants are not complying with the Stipulation. Additionally, as a sanction for Defendants' failure to obey the Court's discovery order, the Court should find that

---

[3] Defendants sought to file literally boxes of documents in support of their opposition. Rather than engage with the documents, or the facts that they reflect, Defendants simply reference their exhibits and make assertions about what they may contain – leaving the Court to sort through dozens, hundreds or even thousands of pages to locate the information Defendants assert is included in the exhibit. [*See, e.g.*, Doc. 3700 at 17 (directing the Court's attention generally to the "inmates' OOCT Forms" and "Maximum Custody Notebooks for November 2016 to August 2019") and 19 (directing the Court's attention generally to the "Cancellation Memos and Accompanying Reports for November 2018 to August 2019"). But "judges are not like pigs, hunting for truffles buried in briefs." *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Therefore, Plaintiffs have analyzed the documents submitted, as well as the documents produced pursuant to the Discovery Order [Doc. 3635], and set forth the facts they present with particularity.

Defendants' failure and inability to produce the ordered documents that would show subclass members' progress (or lack thereof) in the DO 812 program necessitates an adverse inference that such progress is not occurring.

Finally, the evidence developed since Plaintiffs filed the Motion to Enforce shows that Defendants' failure to provide out-of-cell time and incentives in compliance with DO 812 and the Stipulation has grown even worse in recent months.  Namely, Defendants have responded to COVID-19 by denying subclass members almost all of the required out-of-cell time.

Defendants' sustained non-compliance continues to significantly harm the subclass members by depriving them of out-of-cell opportunities meant to alleviate the devastating impact of extreme conditions of confinement and isolation, particularly as to those with serious mental illness.  The Court should find Defendants non-compliant with MCPMs 1-3, 5-6, and 8 at Eyman-Browning, Lewis-Rast, Eyman SMU-I, and Florence-Kasson and order a remedial plan to correct that non-compliance.  A revised proposed order is attached.

## ARGUMENT

### I. PLAINTIFFS ARE ENTITLED TO MOVE TO ENFORCE MCPMs 1-3, 5-6 AND 8

Plaintiffs' Motion to Enforce is properly before the Court.  Defendants assert that it is procedurally barred because Plaintiffs "failed to serve Defendants with any Notices of Substantial Noncompliance or mediate before seeking enforcement relief."  [Doc. 3700 at 10-11]  They are wrong.  As discussed in Plaintiffs' opening brief, the Court instructed the parties that Plaintiffs could move to enforce the Stipulation as to the remaining MCPMs if disputes remained after mediation.  [Doc. 3590 at 4]  The parties mediated the MCPM disputes with Judge Fine on October 30, 2019. [Doc. 3396]  Because compliance issues for MCPMs 1-3, 5, 6, and 8 at Eyman-Browning, Lewis-Rast, Eyman-SMU I, and Florence-Kasson remain unresolved, Plaintiffs are entitled to seek enforcement relief.

## II. DEFENDANTS ADMIT THEY DO NOT RANDOMLY SELECT PRISONER RECORDS AS REQUIRED BY THE STIPULATION

The Stipulation requires that, for monitoring purposes, Defendants review the relevant files "for 10 randomly selected prisoners" from the seriously mentally ill ("SMI") and non-SMI populations at "each designated location". [Doc. 1185-1, Ex. E at 41-45] Disregarding the Court's prior ruling that their process for selecting records was not random, (Doc. 3359 at 8), Defendants again argue that the very same selection process is "random." [Doc. 3700 at 3-5]. But the flaw that the Court previously found – the failure to use a random starting point in each housing unit roster – remains. *Id*. After the Court found that Defendants' selection process was not random, and thus did not satisfy the requirements of the Stipulation, Defendants nonetheless maintained the same process. If Defendants disagreed with the Court's order, the proper remedy would be to appeal the decision, not willfully defy it.   They did not appeal; they simply carried on with the improper process.

Defendants use an interval sampling method to monitor their implementation of the MCPM. Interval sampling is a sampling technique in which, after a random start, every Nth sample is selected from a sampling frame containing all possible cases from which to sample records. [Doc. 3237, Declaration of Dr. Craig Haney, at 3, ¶ 8] [4]  The Court previously found that, without a random starting point, the selection process is not random and precluded the Court from granting Defendants' Motion to Terminate.  [Doc. 3359 at 8]  Defendants admit that they have not changed their methodology: They still start counting to the Nth person at the beginning of the bed roster.  [Doc. 3700 at 3]  This Court explained the problem with this approach to Defendants a year ago: "Cut to its core, this is not random sampling."  [Doc. 3359 at 8]

Defendants argue that "population changes, internal housing movement, and cluster/cell assignments changes" provide for sufficient monthly variance in their

---

[4] Where, as here, the internal pagination differs from the ECF pagination, the citation refers to the ECF pagination.

1  sampling. [Doc. 3700 at 5]  However, as explained by Dr. Haney the first time this Court

2  considered Defendants' failure to use a random starting point, selecting a sample in "an

3  arbitrary, haphazard, or idiosyncratic fashion" does not make the sample random.  [Doc.

4  3237 at 3, ¶5]  The minimal variance that may be driven by the cell assignment changes

5  described by Defendants do not result in a random sample; rather, it is the epitome of a

6  sample driven by "arbitrary, haphazard, or idiosyncratic" factors. [*Id.* at 2, ¶5].

7          The likelihood that Defendants' process will result in repeated selections of the

8  same files for review can be seen easily by looking at the bed rosters.  Defendants start at

9  the beginning of the bed roster, and count to the Nth entry, select that file, and then count

10  to the Nth entry from there, and continue in this manner until they reach ten files.  This

11  means that people whose beds are about one interval, or a multiple of the interval, from

12  the top of the bed roster are more likely to be selected than are people whose beds are

13  not.  Because the population does not vary by a lot, the interval does not vary by a lot,

14  and thus the first entry chosen from the bed roster does not vary a lot.  For example, at

15  Eyman-SMU I, the interval for choosing files ranged from 46 to 52 from November 2018

16  through August 2019.    [Doc. 3700-1, Ex. 5, ADCM1562348, ADCM1565630,

17  ADCM1569183, ADCM1574241, ADCM1576228, ADCM1578651, ADCM1582569,

18  ADCM1586145, ADCM1592369, ADCM1600495]  Because the interval did not change

19  very much, the range of entries on the bed roster is small: The first file chosen for review

20  every month during this period were all within eight entries of each other on the bed

21  roster.  [*Id.*; Doc. 3700-1, Ex. 6, pt. 5, ADCM1562358 (showing that the first bed chosen

22  for each of the ten months is within eight entries of each other on the bed roster)].

23  People in those beds had a high likelihood of being chosen for review, whereas, for

24  example, people who were housed in the first forty beds on the bed roster had almost no

25  chance of being chosen for review.  The result is, as discussed in the opening brief, the

26  repeated selection of a few subclass members.  [Doc. 3590 at 6-7][5]

27  _____

28          [5] During the months for which Max Custody Notebooks were produced since the
    filing of the Motion to Enforce, the practice of selecting certain subclass members

1    Defendants' assertion of idiosyncratic factors that prevent them from choosing

2    exactly the same people each month does not change the basic fact that some files are

3    more likely than other files to be chosen as part of the sample.  As the Court found a year

4    ago, Defendants' monitoring selection process is not random within the meaning of the

5    Stipulation. [Doc. 3359 at 8].

6    **III.    DEFENDANTS' OFFERS OF OUT-OF-CELL OPPORTUNITIES ARE UNREASONABLE, AND DO NOT SATISFY THE MCPMS**

7

8    The Court has found that when offers for out-of-cell opportunities are

9    unreasonable – that is, when offers are made in situations when there is no meaningful

10    opportunity to accept them or when the conditions of out-of-cell opportunities are so

11    poor that they discourage acceptance – Defendants have failed to "offer" out-of-cell

12    opportunities within the meaning of the Stipulation and MCPM. [Doc. 3359 at 10].

13    Plaintiffs submitted evidence that Defendants frequently offer recreation early in

14    the morning to sleeping subclass members, some of whom are unable to wake up in time

15    to respond to these offers due to being incapacitated by their psychotropic medications.[6]

16    _____

17    repeatedly has continued.  [Declaration of Jessica Carns, ("Reply Carns Decl."), dated
     October 2, 2020, at ¶¶ 4-5 and Ex. 1]  From September 2019 through January 2020, one

18    person at Eyman-Browning who had already had his file reviewed nine times from
     November 2018 to August 2019 had his file reviewed five more times.  [Reply Carns

19    Decl., Ex. 1]  During the 15 months from November 2018 through January 2020, ten
     people at Eyman-Browning were reviewed five times or more. [*Id.*]  At Lewis-Rast there

20    were four people whose files were reviewed every month from September 2019 through
     January 2020. [*Id.*]  There were 16 people whose files were reviewed at least four times

21    between November 2018 and January 2020.  [*Id.*]  At Eyman-SMU I, nine people were
     reviewed four times or more during this time frame.  [*Id.*]  At Florence-Kasson, 22 people
     were reviewed four times or more during this time period. [*Id.*]

22    [6] [*See* Doc. 3177-1, Declaration of Pablo Stewart, M.D., at ¶ 3 ("During my

23    confidential interviews with SMI prisoners at Eyman, SMU-1, the prisoners also told me
     that they frequently are unable to go to outdoor recreation because it is offered at 6:00 am

24    in the morning and they are not awake when the officers come by… It is wholly
     inappropriate for SMI individuals to be expected to respond immediately at such an early

25    hour of the morning given their medication schedules and the known sedative side effects
     of many psychotropic drugs."); Doc. 3600, Declaration of Curtis Harris ("Harris Decl."),

26    at ¶ 3 (noting that some subclass members are unable to purchase an alarm clock), Doc.
     3600-1 at 10, ¶ 6 ("Offers for recreation and showers are often made early in the morning,

27    sometimes as early as 5:30 am. Because of this, individuals whose psychotropic
     medications make it difficult to wake up in the morning are unable to accept these offers.

28    One such individual in my pod has gone 8 months without leaving his cell"); Doc. 3600-1
     at 19, ¶ 2 ("Offers for recreation and showers are made early in the morning, sometimes as

This evidence is consistent with Defendants' established practice of making unreasonable offers, a practice that previously prevented a finding of substantial compliance with the Stipulation. [Doc. 3359 at 9-11].  Defendants' exhibits confirm that they continue to engage in non-compliant practices as described in the declarations submitted by Plaintiffs with the Motion to Enforce.[7] Defendants admit that they make the offers of recreation early in the morning, and that they offer recreation in undesirable locations that do not comport with the requirements of DO 812 and the Stipulation. Moreover, the declarations filed herewith demonstrate that the recreation conditions have worsened considerably in recent months.[8]

### A.   Defendants Offer Recreation Early in the Morning, When People Are Still Sleeping, and Record the Failure to Respond as a Refusal

In response to Plaintiffs' evidence that recreation is offered early in the morning when subclass members are still asleep, Defendants explain that the "offer" of recreation is made during safety and security checks prior to the start of recreation.  [Doc. 3700 at

---

early as 6:00 am. My psychotropic medications make it difficult for me to wake up in time to respond to these offers; because of this, I'm consistently marked down as having refused recreation and showers")].

[7] Defendants characterize subclass members' declarations as unreliable, focusing their attention on minor factual inconsistencies with the OOCT forms. However, as discussed throughout this brief, the substance of the declarations is confirmed by Defendants' own filing.

[8] Declaration of Maria Morris, dated Oct. 2, 2020, Ex. 19, at ¶ 5 (noting that he and others in his pod had not had recreation outside of the chute since March); Ex. 2, at ¶ 7 (same); Ex. 3, at ¶ 5 (same); Ex. 4, at ¶ 8 ("Recreation takes place exclusively in the chute recreation enclosure regardless of classification or step level."); Ex. 5, at ¶ 4 ("we have not been allowed out [to the outside recreation area] at all since the end of April.  Since they stopped the outdoor exercise, they told us they would give us indoor exercise three times a week in the chute. In the chute, each person is all alone and cannot socialize. They've only been letting us go to the chute about once every two weeks.") Ex. 6, dated July 7, 2020, at ¶ 10 (noting that recreation had been limited to the 10 x 10 enclosures since the start of the COVID-19 pandemic); Ex. 7, at ¶ 8 (same); Ex. 8, at ¶ 8 ("We are offered recreation three times a week exclusively in the small cages regardless of step level."); Ex. 9, at ¶ 5 (since March 2020, recreation is offered only in the 10 x 10 enclosures); Ex. 10, ¶ 11 (since mid-April, recreation has been offered only in the 10 x 10 cages); Ex. 11, ¶ 4 ("ADC started locking us down due to COVID-19 in March or April. Since that time, we are offered recreation three times per week but only in the 10 x 10 cells."); Ex. 12, ¶ 8 ("we are exclusively offered recreation in the small cages regardless of our step levels."); Ex. 13, at ¶ 8 ("Since March 2020, [ ] we only get offered recreation in the 10x10 small cages regardless of our step level.").

1    5-6; Doc. 3700-1, Ex. 1, ¶¶ 28, 33; Doc. 3700-1, Ex. 2, ¶¶ 28, 33] Defendants assert that

2    these checks are completed between 6:20 and 6:30 a.m.  [Doc. 3700 at 5-6; Doc. 3700-1,

3    Ex. 1, ¶ 28; Doc. 3700-1, Ex. 2, ¶ 28]   Thus, even according to Defendants, the offers of

4    recreation are made during a process of going cell to cell throughout the entire unit that is

5    completed by 6:20 or 6:30 a.m.

6         However, Defendants' exhibits suggest that the offers of recreation are made even

7    earlier than this.  Defendants submitted about three months' worth of out-of-cell-time

8    tracking sheets for each of the declarants. [Doc. 3700-1, Ex. 4]  The out-of-cell time

9    tracking sheets reflect that recreation frequently starts before 6:20 a.m.  [E.g., Doc. 3700-

10   1, Ex. 4, pt. 1, at 7[9] (recreation starting at 6:18 and 6:19), 9 (recreation starting at 6:18),

11   11 (recreation starting at 6:19), 15 (recreation starting at 6:00), 94 (recreation starting at

12   6:10, 6:02, and 6:15), 96 (recreation starting at 6:10 on two days), 98 (recreation starting

13   at 6:02), 100 (recreation starting at 6:00)][10]  To have started these recreation sessions at

14   the times recorded in the out-of-cell time tracking sheets, staff would have had to start

15   making the "offers" at 6:00 a.m. or even earlier.

16        Declarations from the subclass members explain that people in the units,

17   especially those on psychiatric medications are often asleep when these early morning

18   "offers" are made.[11]  Moreover, the subclass members explain that they are subsequently

19

20        [9] The documents included in Defendants' Exhibit 4 were not bates labeled.  The
21   Exhibit was filed in two parts.  The citations refer to the part and the page number of the
     .pdf.  For example, this citation is to the seventh page of part 2 of Exhibit 4 to the
     Opposition.
22        [10] The King and Jackson Declarations are demonstrably false as to the timing of
     this process of offering recreation and then escorting people to recreation, suggesting that
23   it actually happens earlier than what is described.  The King Declaration states that at
     Florence-Kasson "movement for inmate recreation opportunities starts at 0700 hours,
24   daily," but, as described above, the out-of-cell time tracking sheets show that recreation
     starts earlier than 7:00 a.m. [Doc. 3700-1, at 8, ¶ 27]  The Jackson Declaration states that
25   recreation starts at 6:00 a.m., after the completion of the safety/security checks at 6:20 or
     6:30 a.m.  [Doc. 3700-1, at 28-29, ¶¶ 27-28, 33]    Given the demonstrable falsity of
26   Defendants' self-serving statements about the timing of the process of offering and
     starting recreation, the times asserted in the King and Jackson Declarations are not
27   reliable.
          [11] [See Doc. 3600-1, at 10, ¶ 6; id. at 15, ¶ 7; id. at 19, ¶ 2; id. at 24-25, ¶ 5; id. at
28   29, ¶ 4; id. at 34, ¶ 4; Doc. 3600-2 at 4, ¶ 6; id. at 8-9, ¶ 6]

informed that the fact that they did not respond – when they were asleep – was taken as a refusal.[12]  As discussed above, Defendants exhibits show that recreation is indeed offered very early in the morning.  The exhibits also support the declarants' statements that failure to respond to such offers is recorded as a refusal, rather than as a failure to make a reasonable offer.   Plaintiffs submitted declarations from three subclass members at Eyman-Browning who stated that the offer of recreation in the early morning hours prevented them from going to recreation.  [Doc. 3600-1, Exs. 1, 3, 7]  According to the out-of-cell time tracking sheets for these individuals, the large majority of their recreation refusals were for recreation periods that started prior to 7:00 a.m.:

|  | Refusals for Recreation starting before 7:00 a.m. | Refusals for Recreation at or after 7:00 am |
| --- | --- | --- |
| [Doc. 3700-1, Ex. 4, pt. 2 at 148-75] | 10/3; 10.7; 10/10; 10/14; 10/21; 10/24; 10/26; 10/28; 10/31; 11/5; 11/7; 11/18; 11/21; 11/28; 12/2; 12/5; 12/9; 12/12; 12/16; 12/19; 12/28; 1/2 | 11/23; 12/24; 12/26 |
| [Doc. 3700-1, Ex. 4, pt. 1 at 210-37 ] | 10/3; 10/6; 10/14; 10/17; 10/26; 10/28; 10/31; 11/4; 11/7; 11/18; 11/21; 11/28; 12/2; 12/5; 12/9; 12/12; 12/16; 12/19; 12/28; 1/2 | 9/28; 10/5; 11/23; 12/10; 12/24; 12/26; 12/31 |
| [Doc. 3700-1, Ex. 4, pt. 2 at 206-33] | 9/31; 10/6; 10/8; 10/15; 10/20; 10/22; 10/29; 11/5; 11/12; 11/19; 11/22; 11/26; 12/1; 12/3; 12/8; 12/10; 12/24; 12/29; 1/3 | 10/13; 10/18; 10/27; 11/8; 11/10; 11/15; 11/24; 12/6; 12/15; 12/22 |

At Florence-Kasson, the same pattern appears.  For example, during the months covered by the out-of-cell time tracking forms filed by Defendants, ███████ never attended recreation that started before 7:00 a.m., but attended more than half of the recreation sessions offered at 7:00 a.m. or later.  [Doc. 3700-1, Ex. 4, pt. 1 at 7-34]  Similarly, █████████ never attended recreation that started before 7:00 a.m., but

---

[12] [*See* Doc. 3600-1, at 5, ¶ 8; *id.* at 15, ¶ 7; *id.* at 19, ¶ 2; *id.* at 29, ¶ 4]

fairly often attended recreation that started later.  [*Id*. at 36-63]  The same holds true for ██████████ [*Id*. at 65-92], ██████████ [Id. at 152-179], ██████████ [Doc. 3700-1, Ex. 4, pt. 2 at 36-63], ██████████ [Id. at 65-88], ██████████ [Id. at 90-117], and ██████████ [Id. at 235-262].

The evidence submitted by Plaintiffs *and Defendants* demonstrates that recreation is indeed offered very early in the morning, at an hour when people may still be asleep or in the process of waking up.  Such offers are not reasonable.  Further, the parties' evidence supports the declarants' assertions that when people cannot accept these offers, they are marked as refusals.

**B.    Defendants "Offer" Recreation in Small Recreation Yards that Encourage Refusals and Violate the Stipulation**

Plaintiffs submitted evidence that Defendants frequently relocate recreation to a smaller or indoor enclosure, and that these relocations result in refusals.[13]  Defendants confirm that they change the location of recreation to the 10 x 10 enclosures or, at Browning, the "chutes," when they do not have enough staff.[14]  [Doc. 3700 at 7][15]

_____

[13]    [*See, e.g.,* Doc. 3600-1, at 4, ¶ 4 ("outdoor exercise … [is] frequently cancelled"); *id.* at 24, ¶ 4 ("Sometimes small cage recreation will be offered instead but the cages are dirty and there is no restroom available.  If small cage recreation is offered, I will refuse to go due to the conditions."); *id.* at 44, ¶ 3 ("I will go entire weeks without being offered recreation opportunities at the 20 x 20 or 20 x 40 recreation enclosures in accordance with my step level."); *id.* at 49-50, ¶ 8 (describing use of 10 x 10 enclosures); Doc. 3600-2, *id.* at 3, ¶ 4-5 ("When I was a Step 2, officers would come up with excuses to cancel Saturday recreation or switch us to small cage recreation because they were short staffed.  Since I've been a Step 3, they have cancelled 'big' recreation (on the larger recreation yard) at least twice.  When I was a Step 1, recreation was offered in small 9 x 10 cages that are dirty and have no access to water or a restroom.  I would often refuse to participate in recreation because of these conditions.  I would also refuse small cage recreation when offered as a Step 2 or 3. … If given the opportunity to do 'big' recreation, I always go."); *id.* at 21-22, ¶ 6 ("When outside exercise is cancelled, it's usually the Step 2 and 3 exercise enclosures that people want to go to.  Instead the 10 x 10 cages will be offered which most people don't like.  I think this is done deliberately to discourage guys from going outside.") ].
[14]    In the Department's September 3, 2020 budget request to the Legislature, Defendant Shinn wrote, "ASPC-Eyman operates at approximately 40% of its operational strength on nearly a daily basis." *See* https://corrections.az.gov/sites/default/files/documents/BudgetReq/adcrr-fy-2022-operating-budget-request_090320.pdf at 2.
[15]    Subclass members state that since March or April 2020, recreation is almost always offered in the chute at Eyman-Browning and in the small 10 x 10 cages in the

1    The location changes make the recreation offers unreasonable and violate the

2    Stipulation, as the larger recreation areas are incentives in the Step Program. [Doc. 3590

3    at 16; Doc. 3600-2 at 44-52] Subclass members who have done what is required of them

4    to earn the opportunity for recreation in a larger recreation area where they can move

5    around and socialize often refuse these "offers" of recreation in the smaller recreation

6    areas. As explained by one man:

7         Even though I am a Step 3, Phase 3, I am frequently only offered outdoor exercise
          in the 10 x 10 cages instead of the larger enclosure that I'm entitled to as a Step 3.
8         This happens to everyone in the unit who is a Step 2 or 3. I believe the officers do
          this on a weekly basis because they know the 10 x 10 cages are considered
9         punishment and therefore the prisoners will refuse to go out. The 10 x 10 cages
          are terrible, they are only concrete and metal with no exercise equipment. They
10        are worse than being in our cells.

11   [Doc. 3600-1 at 50].[16] Moreover, as discussed in more detail in §VI.A., when a person is

12   entitled to recreation in one of the larger recreation areas, the offer of recreation in the

13   small enclosures violates DO 812, MCPM 6, and, if the person is designated as seriously

14   mentally ill ("SMI"), MCPM 8. As the Court has previously noted, "Defendants appear

15   to believe they are empowered to modify the Stipulation to accommodate their own

16   preferences about the best way to provide care. ... Defendants' view of interpreting the

17   Stipulation as they wish is plainly unreasonable." [Doc. 3495 at 5 n. 1] An offer of

18   recreation in these conditions is not a reasonable offer and cannot be used to show

19   compliance.

20        **C. Defendants' "Offer" of Showers, While Not a Recorded Out-of-Cell Time**
          **Opportunity, Are also Unreasonable**
21

22        Despite Defendants' insistence that showers are cleaned by inmate cleaning crews

23   daily, subclass members report that the shower areas are rarely cleaned, and are filthy

24

25   _____

26   other maximum custody units. [*See supra*, n.8]
          [16] The recently produced Maximum Custody Notebooks confirm that the use of the
27   chute at Eyman-Browning and the 10 x 10 cages at the other maximum custody locations
     continues to drive the high refusal rates. [Reply Carns Decl., Ex. 4] The refusal rates for
28   recreation in the chute range from 69% to 100%. [*Id.*] The refusal rates for the 10 x 10
     cages at Florence-Kasson and Lewis-Rast range from 74% to 100%. [*Id.*]

1    with black mold and even fecal matter in some instances.[17] Even when the shower areas

2    are cleaned, it is often ineffective due to the sanitation porters being provided with

3    insufficient cleaning supplies.[18] These conditions discourage subclass members from

4    taking advantage of shower opportunities and has caused many to resort to "bird

5    bathing," where one washes himself with water from the small sink attached to his toilet,

6    in lieu of actual showers.[19]  Additionally, subclass members report that showers are, like

7    recreation, simply cancelled.[20]

8    **IV. THE EXTRAORDINARY REFUSAL RATES FOR OUT-OF-CELL TIME**
     **ARE UNRELIABLE BECAUSE DEFENDANTS DO NOT DOCUMENT**
9    **THE REFUSALS AS REQUIRED BY THE MONITORING GUIDE**

10        The rate of refusal of out-of-cell time in maximum custody units is extremely

11   high, and has been throughout the monitoring of the Stipulation.  [Doc. 1755 at 26-27;

12   3177-1, at 4 ¶ 7; Doc. 3590 at 8; Doc. 3601, at 9-11]  As discussed above, Plaintiffs have

13   submitted evidence that some of the refusals are not truly refusals, but rather are a failure

14   to respond when out-of-cell time is offered to a sleeping person or a declination of an

15   offer that is so unreasonable it should not be counted as an offer at all.

16        In light of the high rate of refusals and questionable accuracy of that rate, the

17   parties negotiated documentation strategies to attempt to ensure, as much as possible,

18   that recorded refusals were genuine refusals.  [Doc. 1755 at 26-28; Trans. Doc. 1836,

19   12/14/2016 Status Hearing, at 82:24-94:9]  Ultimately, Defendants proposed and the

20   Court ordered three safeguards to ensure the accuracy of the recorded refusals: (1) the

21   signature of the person refusing the out-of-cell time, if feasible; (2) the signature of a

22   second staff member, if feasible, and (3) documentation of discussions between

23   supervisory personnel and incarcerated people who show a pattern of refusals.   [Trans.

24   Doc. 1836, 12/14/2016 Status Hearing, at 82:24-85:14, 89:12-16].  These safeguards are

---

[17] [Morris Decl., Ex. 4, at ¶ 9; Ex. 5, at ¶ 8; Ex. 14, at ¶ 13; Ex. 15, at ¶ 10; Ex. 16, at ¶10; Ex. 17, at ¶¶ 7, 9]

[18] [Morris Decl., Ex.17 at ¶ 7; Ex. 16 at ¶ 6; Ex. 4 at ¶ 6; Ex. 6, at ¶ 7]

[19] [Morris Decl., Ex. 2 at ¶ 11; Ex. 4 at ¶ 9; Ex. 16 at ¶ 10; Ex. 17 at ¶ 9; Ex. 15 at ¶ 10]

[20] [Morris Decl., Ex. 19 at ¶ 4; Ex. 2 at ¶ 10; Ex. 14 at ¶ 13]

included in the Monitoring Guide.  [Doc 3177-2 at 13, 19, 23, 26, 29 (applying to MCPMs 1-2, 5-6, and 8)]

Defendants have consistently failed to document and follow-up on subclass member refusals of out of cell time.  By failing to comply with the requirements of the Monitoring Guide, Defendants significantly undermine the veracity of their self-reported, astronomical refusal rates.

Defendants do not dispute the infrequency of their compliance with these documentation requirements. [Doc. 3700 at 7-8, 13-16]  Instead, they argue that there is no "bright line requirement" of a second signature, and they fail to meaningfully address the requirement of supervisory staff discussing extended patterns of refusals or changed behavior with subclass members and documenting such discussions.

### A. Defendants Are Required to Obtain a Second Signature if Feasible and Almost Never Do

The Monitoring Guide requires that Defendants obtain a second signature when feasible, and provides two alternative sources of that second signature: the person who is refusing the out-of-cell time and a second staff member.  [Doc 3177-2 at 15, 18, 23, 26, 29]

As they have unsuccessfully argued in the past, Defendants argue here that the Monitoring Guide is not part of the Stipulation and thus they are not required to follow it. [Doc. 3216 at 6; Doc. 3700 at 15]. However, the Court already rejected that argument, pointing out that it "makes little sense." [Doc. 3359 at 6].  The Court explained a year ago: "The Monitoring Guide is primarily Defendants' own interpretations of the MCPMs and how compliance with the MCPMs will be measured.  If there were no explanation on how to assess compliance, there would be no way to measure it." [*Id.*].  To show that they are complying with the Stipulation and MCPMs, Defendants must comply with the Monitoring Guide.

Further, while it is true that the requirement of a second signature is not absolute, Defendants' falsely argue that it is non-existent.  [Doc. 3700 at 8, 14].  The Monitoring

Guide sets out the methodology for documenting out-of-cell time and refusals.  In the case of refusals, it explains: "Either the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal."  [Doc 3177-2 at 15, 18, 23, 26, 29]    However, Defendants' out-of-cell tracking sheets reveal that Defendants rarely obtain a second officer signature for alleged subclass member refusals, and *never* – from November 2016 to August 2019 – obtained subclass member signatures to corroborate their own alleged refusals.[21] [Doc. 3590 at 11-13]  The same trends have continued in recently produced monitoring documents.  [Reply Carns Decl., ¶¶ 8-11]  Defendants' response to the nearly complete disregard for the requirement set out in the Monitoring Guide is that there is no "bright line requirement."  [Doc. 3700 at 14]  While it is true that there is an exception to the requirement – infeasibility due to safety, security, or operational concerns – Defendants' practice has allowed the exception to entirely swallow the rule.

Moreover, Defendants never document a safety, security, or operational concern that make it impossible to obtain second signatures.[22]  Without any documentation of the safety, security or operational concern, there is no way for the monitors to determine whether officers are obtaining second signatures when feasible, as required by the Monitoring Guide.  [*See* Doc 3177-2 at 20 (explaining need to review reasons for failures to provide out-of-cell time as part of the assessment methodology)]

Finally, the exhibits filed by Defendants demonstrate the importance of complete documentation, as they show that Defendants' assertions that subclass members refused recreation are not reliable.  The exhibits include three full months of out-of-cell time

---

[21] [*See*, Doc. 3601 at ¶ 11 ("Consistent with my findings described in my declaration for the monitoring period of November 2016 through October 2018, I did not find a single refusal in the comments section on the back of prisoners' out-of-cell tracking sheets in which the prisoners themselves signed, thereby verifying their own refusal, through August 2019.")].

[22] [*See*, Doc. 3601 at ¶ 11 ("I saw no notation in the documented monitoring that due to safety, security, or operational concerns it was impossible to a get a second signature or a signature from the refusing prisoner."); Reply Carns Decl., ¶ 10]

1    tracking forms for the people who submitted declarations in support of Plaintiffs' Motion
2    to Enforce.  [Doc. 3700-1, Ex. 4]  One of the declarants, Conrad Alvarez, is at Florence-
3    Kasson, and Defendants submitted his out-of-cell time tracking forms for December 28,
4    2019 through April 3, 2020.  [Doc. 3700-1, Ex. 4, pt. 1 at 36-63]  The Cancellation
5    Memo for January 2020 for Florence-Kasson states that recreation was cancelled on
6    January 26, 2020 due to a staffing shortage.  [Morris Decl., Ex. 27 at ADCM1637246-
7    47]  But on Mr. Alvarez's out-of-cell time tracking form, staff have written that Mr.
8    Alvarez refused recreation on January 26, 2020. [Doc. 3700-1, Ex. 4, pt. 1 at 44-45]
9    This kind of false assertion that a subclass member refused recreation is precisely the
10   danger that the second signature was intended to avoid.

11   **B. Defendants Routinely Fail to Document Discussions with Subclass
12       Members About Patterns of Refusals**

13   Defendants also repeatedly fail to counsel subclass members who exhibited
14   extended patterns of refusing out-of-cell time.  Even when that counseling did occur, the
15   notations describing the follow-ups do not provide, as required, a description of the
16   nature of the conversation, but only perfunctory and generic quotes supposedly taken
17   from the subclass member refusing.  [Doc. 3590 at 13-14][23]

18   Defendants do not dispute the rarity or vacuity of the documentation.  [Doc. 3700
19   at 7]  Indeed, Defendants do not even address their failure to meet this requirement in
20   their argument.  [Doc. 3700 at 13-16]   However, the Court's ruling that the second
21   signature for refusals was not absolutely required in all cases was explicitly premised on
22   the protocol requiring ADC supervisory staff to counsel subclass members demonstrating
23   patterns of refusals and to document those conversations on the backs of the out-of-cell
24   forms. [Trans. Doc. 1836, 12/14/2016 Status Hearing, at 84:4-23, 89:12-89:13]

25
26

27   _____
     [23] Like the lack of a second signature, the failure to document counseling of
28   subclass members who show an extended pattern of refusals continues in the more recent
     monitoring documents.  [Reply Carns Decl., ¶¶ 11-12 and Ex. 6]

Defendants' exhibits to their opposition to Plaintiffs' Motion to Enforce make it even clearer that this discussion often does not take place with subclass members showing patterns of refusals. As an example, Defendants noted that one particular subclass member, █████████, never participated in recreation during the three months for which they submitted his out-of-cell tracking form. [Doc. 3700-1, Ex. 4, pt. 1 at 4]  In fact, ████████, who is seriously mentally ill, refused all of his out-of-cell time for the three months except for six sessions of unstructured out-of-cell time and one recreation session. [Doc. 3700-1, Ex. 4, pt. 2 at 177-204]  He was not counseled. [*Id.*] Defendants similarly note that █████████, "rarely accepts offers of recreation which occur three times a week." [Doc. 3700-1, Ex. 4, pt. 1 at 2] ████████ attended recreation just five times over a three-month period. [*Id.* at 180-208] Despite this, none of his out-of-cell tracking forms indicated that anyone ever counseled him on his habitual refusals. [*Id.*]  Defendants note that declarant █████████ "most often refuses recreation but at times has accepted." [Doc. 3700-1, Ex. 4, pt. 1 at 3].  Like Mr. Chambers, ████████ attended recreation just five times in the three-month period and, like ████████, ████████ was not counseled about the refusals. [Doc. 3700-1, Ex. 4, pt. 2 at 90-117].

As with the requirement of the second signature, the evidence shows that Defendants are simply ignoring the Court's requirement of counseling subclass members who show an extended pattern of refusals.   This documentation failure further undermines the reliability of Defendants' claims that subclass members refuse out-of-cell time at the extraordinary levels that Defendants report.

## V. CANCELLATIONS AND LIMITATIONS OF OUT-OF-CELL TIME DUE TO CHRONIC STAFFING SHORTAGES VIOLATE THE STIPULATION

Defendants' failure to adequately staff maximum custody units results in frequent and routine cancellations and limitations of recreation and programming in violation of the Stipulation.

1       Defendants argue that the cancellations do not violate the Stipulation for two

2   reasons: (1) cancellations are not "constant" or a "systemic pattern of unjustified out-of-

3   cell time cancellations"; and (2) cancellations due to unexpected staffing shortages do not

4   violate the Stipulation.     [Doc. 3700 at 6-7, 18-19]   Defendants admit that they limit

5   recreation to the 10 x 10 recreation cages and chutes  and make no argument as to why

6   that is a permissible limitation.   [*Id*. at 6-7]   Defendants' arguments do not justify the

7   cancellations and limitations.

8       Furthermore, Defendants are now using the COVID-19 pandemic as an excuse to

9   indefinitely suspend or limit all out-of-cell time in the maximum custody units.

10  **A. Defendants Frequently Cancel Out-of-Cell Time Resulting in Violation of**
    **MCPMs 1, 2, 5, 6 and 8**
11

12      The documents filed by Defendants and those produced by Defendants since the

13  filing of the Motion to Enforce demonstrate that, contrary to their arguments,

14  cancellations of recreation and programming are indeed frequent.

15      Defendants filed out-of-cell time tracking forms for seven people at Eyman-

16  Browning from October through December 2019 and for eleven people at Florence-

17  Kasson from January through March 2020.  [Doc. 3700-1, Ex. 4] These out-of-cell time

18  tracking forms provide insight into what is happening in maximum custody units beyond

19  the reporting of one week's worth of files that are chosen by Defendants in their non-

20  randomized process.

21      The out-of-cell time tracking forms that Defendants filed for the subclass members

22  at Eyman-Browning show that cancellations are indeed frequent.   The forms for these

23  seven subclass members show the following cancellations:

|          | Dates of Cancellations | Citation: Doc. 3700-1, Ex. 4 |
|----------|------------------------|------------------------------|
| October  | 10/9; 10/12; 10/19; 10/25 | Pt. 1, pp. 100-01, 216-17, 243-46<br>Pt. 2, pp. 123, 125-26, 152-55 |
| November | 11/2; 11/7; 11/9; 11/13; 11/15; 11/16; 11/25; 11/29; 11/30 | Pt. 1, pp. 106-07, 110-11 191-92, 199-200, 222-23, 249-54, 257-58<br>Pt. 2, pp. 131-32, 160-61, 222-23 |
| December | 12/7; 12/14; 12/20; 12/21; | Pt. 1, pp. 203-06, 259-66 |

| 12/26; 12/27; 12/30 | Pt. 2, pp. 141-42, 230-33 |

These cancellations routinely bring the amount of out-of-cell time below what the Stipulation requires.  For example, the cancellation of recreation during the week of December 21, 2019 resulted in the following violations of Philip Chambers' rights under the Stipulation:

- In violation of MCPM 1 and 5, he was offered only 3 hours of out-of-cell time during the week, [Doc. 1185-1 at 41; Doc. 3700-1, Ex. 4, pt. 1 at 205];

- In violation of MCPM 6, he was not offered out-of-cell time and incentives consistent with his step level, in that he was not offered three 2.5 hour blocks of recreation.  [Doc. 1185-1 at 43; Doc. 3700-1, Ex. 4, pt. 1 at 205; Doc. 3600-2 at 45]

One or more of his rights under the Stipulation were also violated each of the following weeks: 10/12/19,  10/19/19, 11/2/19, 11/9/19, 11/30/19, 12/14/19.  [Doc. 1185-1 at 41-43; Doc. 3700-1, Ex. 4, pt. 1 at 185, 187, 191, 193, 199, 203; Doc. 3600-2 at 45]

The cancellation of recreation on October 19 resulted in the following violations of Stephen Dionne's rights under the Stipulation that week:

- In violation of MCPM 1, he was offered only 7 hours of out-of-cell time during the week, despite being at Step 3 and therefore being entitled to at least 9.5 hours [Doc. 1185-1 at 41; Doc. 3700-1, Ex. 4, pt. 1 at 216];

- In violation of MCPM 6, he was not offered out-of-cell time and incentives consistent with his step level, in that he was not offered three 2.5 hour blocks of recreation.  [Doc. 1185-1 at 43; Doc. 3700-1, Ex. 4, pt. 1 at 216; Doc. 3600-2 at 45]

One or more of Mr. Dionne's rights were also violated the weeks of November 9 and December 14. [Doc. 1185-1 at 41-43; Doc. 3700-1, Ex. 4, pt. 1 at 222, 232; Doc. 3600-2 at 45].

Rather than address the direct evidence that they themselves provided of frequent

cancellations and violations of the MCPMs, Defendants rely on their Cancellation Memos and supporting documentation (collectively "Cancellation Memos") to show their alleged compliance with the out-of-cell time requirements of the Stipulation and the infrequency of the cancellations.  [Doc. 3700 at 18-19; Doc. 3700-1, Ex. 8]  However, there are numerous problems with Defendants' Cancellation Memos that call their accuracy and reliability into question.

First, although the Cancellation Memos state that they are reporting on cancellations for the month, they show cancellations only during the week selected for monitoring.  For example, the Eyman-Browning Cancellation Memo for December 2019 states that there was "one (1) Cancellation Report for the Month of December 2019": December 7, 2019.  [Morris Decl., Ex. 28 at ADCM1619403]  But the out-of-cell time tracking forms filed by Defendants for seven people show that there were recreation or programming cancellations at Eyman-Browning on seven days in December.[24]  [Doc. 3700-1, Ex. 4, pt. 1 at 203-06, 259-66, pt. 2 at 141-42, 230-33]  Similarly, the Eyman-Browning Cancellation Memo for November 2019 states that there were two days of cancellations, November 9 and 15. [Morris Decl., Ex. 29 at ADCM1616219]  The out-of-cell time tracking forms for the declarants show that there were recreation and programming cancellations at Eyman-Browning on eight days in November.  [Doc. 3700-1, Ex. 4, pt. 1 at 102-111, 189-199, 218-28, 247-257, pt. 2 at 127-37, 156-66, 214-24]  Thus, although the Cancellation Memos may reflect one or two cancellations per month, the out-of-cell time tracking forms reveal far more frequent cancellations.

Moreover, even for the one week per month reflected in the Cancellation Memos, the memos are not complete or accurate.  For example, the cancellation memo for November 2019 for Eyman-Browning states "There were two (2) Cancellation Reports for

---

[24] It is worth noting that this does not mean that there were only seven cancellations during the month of December 2019 at Eyman-Browning.  Different cancellations appear on different out-of-cell time tracking forms, as each cancellation applies to a different subset of people.  Thus, the cancellations referenced here reflect only those cancellations that affected the seven individuals for whom Defendants filed out-of-cell time tracking forms.

the Month of November 2019.  Recreation and Programming classes were cancelled on 11/09/2019 due to staff shortage with holiday scheduling . . . Recreation and Programming classes were cancelled on 11/15/2019 due to staff shortage with scheduling."  [Morris Decl., Ex. 29 at ADCM161616219]   But the out-of-cell time tracking forms for Mr. Dionne, Mr. Medina, and Mr. Montoya, state that class was cancelled on a third day that week, November 13, 2019. [Doc. 3700-1, Ex. 4, pt. 1 at 222, pt. 2 at 131, 160].   As discussed above, the Florence-Kasson Cancellation Memo for January 2020 reflects that recreation was cancelled on January 26, but the out-of-cell time tracking form for one of the declarants reflects that he refused.   [Morris Decl., Ex. 27 at ADCM1637246-47; Doc. 3700-1, Ex. 4, pt. 1 at 44-45]   Both cannot be correct.

However, the biggest problem with the Cancellation Memos is that they reveal that they cannot be relied on to reflect actual practices in the maximum custody units.  They demonstrate that correctional staff have knowledge *during the monitoring week* that a particular week has been chosen for monitoring. The Cancellation Memos include Information Reports that are created at the time of the cancellation.  [*See, e.g.*, Doc. 3700-1, Ex. 8 at ADCM1568974; *see also*, Doc. 3177-2 at 19 (noting that the source document for reviewing cancellations include Information Reports generated during the monitoring week)]   Defendants filed a total of 41 Information Reports as part of their Cancellation Memos.  [Doc. 3700-1, Ex.8]  Over a third of the Information Reports explicitly noted that the cancellation was occurring during a "monitor week."  [*Id.* at ADCM1569224-25, ADCM1574284-86, ADCM1586190, ADCM1586193, ADCM1592410, ADCM1592412-14, ADCM1592416, ADCM1592418, ADCM1592420, ADCM1600529-30, ADCM1600533]  The Monitoring Guide provides that staff should not be informed of what week is chosen for monitoring until the seventh day of the following month.  [Doc. 3177-2 at 13-14] This timeframe is critical for reliability: If staff is aware that a particular week is the "monitor week", there can be no assurance that either the actions or the documentation of that week are representative of practices during weeks that are not monitoring weeks.

The direct evidence of cancellations provided by Defendants shows that cancellations are a frequent occurrence. The fact that the frequency of cancellations is not reflected in the Cancellation Memos does not mean that the cancellations do not occur; it means only that the Cancellation Memos are unreliable.

**B. Defendants Frequently Limit Out-of-Cell Recreation in Violation of MCPMs 6 and 8**

The out-of-cell time tracking forms filed by Defendants reflect few cancellations at Florence-Kasson, but many limitations on out-of-cell recreation.

Pursuant to DO 812 and MCPMs 6 and 8, subclass members at Florence-Kasson who are at Step 2 or 3, are entitled to have their out-of-cell exercise time in the larger enclosures. [Doc. 3600-2 at 50; Doc. 1185-1 at 43] However out-of-cell recreation is often limited to the 10 x 10 enclosures instead. Defendants filed out-of-cell time tracking forms for eight subclass members at Kasson who were at Step 2 or 3 at some point during the period covered by the forms, January through March 2020. The forms show that Defendants limited recreation to a 10 x 10 enclosure on the following days:

|  | Dates when a Step 2 or 3 was offered recreation in a 10 x 10 enclosure | Citation: Doc. 3700-1, Ex. 4 |
| --- | --- | --- |
| January | 1/1, 1/11, 1/12, 1/14, 1/16, 1/18, 1/19, 1/21, 1/23, 1/25, 1/27, 1/28, 1/31 | Pt. 1, pp. 15, 44, 69, 123, 129, 131<br>Pt. 2, pp. 11, 13, 15, 42, 243 |
| February | 2/1, 2/2, 2/3, 2/4, 2/6, 2/8, 2/11, 2/13, 2/18, 2/20, 2/22, 2/23, 2/29 | Pt. 1, pp. 17, 19, 23, 46, 48, 75, 77, 79, 81, 139, 162, 164, 168<br>Pt. 2, pp. 17, 19, 23, 46, 77, 79, 245, 247 |
| March | 3/3, 3/5, 3/7; 3/10, 3/12, 3/16, 3/21, 3/27, 3/28 | Pt. 1, pp. 27, 29, 31, 54, 56, 83, 85, 141, 172, 174, 176<br>Pt. 2, pp. 27, 31, 81, 83, 85, 87, 116, 253, 255 |

Defendants admit that they change the location of recreation to a 10 x 10 enclosure or a chute when they are short staffed. [Doc. 3700 at 6-7] Defendants make no argument or assertion about how frequently they make these changes or that they are permissible under the Stipulation. [*Id.*]

-21-

1      **C. The Cancellations and Limitations Are Caused by Chronic Staffing Shortages, and thus Result in Non-Compliance with the Stipulation.**

2

3      Defendants argue that cancellations of out-of-cell time do not defeat compliance

4      with the Stipulation if they are due to unexpected staffing shortages.  [Doc. 3700 at 18]

5      But cancellations and limitations of out-of-cell time for any reason other than "legitimate

6      operational or safety and security reasons, such as  . . . an unexpected staffing shortage"

7      "require[ ] a finding of non-compliance."  [Doc. 3177-2 at 20]  Defendants do not even

8      argue that the cancellations and limitations of out-of-cell time raised by Plaintiffs in the

9      Motion to Enforce are unexpected, nor could they. [Doc. 3700 at 6-7, 18-19][25]

10     Defendants have produced documents since the filing of the Motion to Enforce that

11     demonstrate that the staffing shortages are not unexpected, but rather are chronic, long-

12     term staff shortages that cannot justify or excuse the non-compliance with the out-of-cell

13     requirements.

14     Defendants create "CO Hiring Reports" for each facility each week, reflecting the

15     staff on hand, the staff in training, the staff on leave, the CO vacancy numbers, and the

16     vacancy rate. [Morris Decl., Exs. 21-23]  At Eyman-SMU I, in late 2018, Defendants had

17     a vacancy rate around 22%.  [*Id.*., Ex. 21 at ADCM1626682-83]  That rate has been

18     climbing since, reaching 25% in August 2019, and ███████████████.  [Id. at

19     ADCM1626660-81]  At Eyman-Browning the vacancy rate was about 20% in late 2018,

20     climbing to 27% in August 2019, and ██████████.  [Id. at ADCM1626660-83]  At

21     Florence-Central, which includes Kasson, the maximum custody unit, in late 2018, there

22     was a vacancy rate of 15%.  [Morris Decl., Ex. 23 at ADCM1628130, ADCM1628133]

23     By August 2019, the vacancy rate had swelled to over 30%, █████████████████

24     ████  [*Id.* at ADCM1628127, ADCM1628152]  At Lewis-Rast, staffing levels have been

25     better than at the other maximum custody units, but the vacancy rate is nonetheless high.

26     With the exception of three months, the vacancy rate from November 2018 through July

27

28          [25] *See, e.g.*, Doc. 3590 at 20-21, and n. 13, *supra* (9/3/20 budget request).

1  2020 has ranged from 8% to 16%.  [*See generally,* Morris Decl., Ex. 22]

2  Further, Defendants have to make choices about which posts will go unfilled or

3  "collapsed" when there are vacancies.  Defendants produced Priority Post Charts for each

4  of the ADC facilities that has a maximum custody unit.  These Priority Post Charts show

5  the plan for deciding which posts will be collapsed, in what order, at each housing unit as

6  staffing diminishes.  [*See* Morris Decl., Exs. 24-25]  The Priority Post Plans demonstrate

7  that any reduction in staffing on any given day will have a profound impact on the ability

8  to provide out-of-cell time in accordance with the Stipulation.   For example, at Eyman-

9  Browning, the first positions to be collapsed during the day shift include all ████████

10 ███████████████████████████████████████████████████████

11 ██████████████████████████████  [*Id.*, Ex. 24 at ADCM1626722-23]  At

12 Florence-Kasson, the first positions to be collapsed during the shift are, in order, ████████

13 ███████████████████████████████████████████████████████

14 ████████████████████  Morris Decl., Ex. 25 at ADCM1620623-24][26]  Each of these are

15 posts that could be expected to participate in the process of bringing people to their out-

16 of-cell time recreation and programs.

17 Defendants also produced the Daily Post Sheets, showing which posts were

18 actually filled during each of the monitoring weeks from November 2018 through

19 December 2019, for a total of 98 days of Daily Post Sheets for each facility.  [Reply Carns

20 Decl., ¶15]  The Daily Post Sheets confirm that, day in and day out, over months and

21 months, there were significant numbers of absences in the posts that would be most likely

22 to play a role in bringing people out of their cells.  [*Id.* at Ex. 9]  At Eyman-Browning,

23 during this period there were 23 or 24 positions that appear to be the most likely to be

24 involved in providing out-of-cell time.  [*Id.*]  On 81 of the 98 days for which the Daily

25 Post Sheets were provided, 15 or more of those positions went unfilled.  [*Id.*]    In

26

27    [26] It appears that the first positions to be collapsed at Lewis-Rast are positions that,
   from their titles, are not the positions most likely to be involved in bringing subclass
28 members out of their cells.  [Morris Decl., Ex. 30 at ADCM1629043]

1  November 2019, there was not a single day during the monitoring week when more than 4

2  of the 23 positions was filled.  [*Id.*]  At Eyman-SMU I, there were 23 relevant positions.

3  [*Id.*]   There were just 21 days where half of those positions were filled.  [*Id.*]   At

4  Florence-Kasson, there were just three positions that were dedicated to escorting subclass

5  members and recreation.  [*Id.*]  On more than half of the monitored days, either two or

6  three of those positions were unfilled.  [*Id.*]   At Lewis-Rast, there were nine relevant

7  positions.  [*Id.*]  On half of the monitored days, a third of these positions went unfilled.

8  [*Id.*]

9       The chronic staffing shortages at Florence-Central, which includes Kasson, are so

10  severe that nearly every weekday from at least December 9, 2019 through April 10, 2020,

11  staff informed the facility administration that "[s]taff remain concerned over staffing

12  levels."   [Morris Decl., ¶ 32, Ex. 26 at ADCM1632678 (email and Notes for the

13  Director's Briefing, April 10, 2020) ]For example, on April 10, the notes stated:

14

Staff remain concerned over staffing levels.

15

16

17

18  [*Id.*]

19       Finally, the words of a COIII at Eyman-Browning make clear just how expected

20  and routine the staffing shortages are.  COIII Morgen had to cancel classes on December

21  7, 2019.  In the Information Report, she explained:

22       I, COIII Morgen (2913) being posted, am unable to perform teaching duties
       scheduled for Saturdays.  In addition, as a result of weekly postings, including
23       today and 3 days last week, and weekly previous to that, I have had inadequate
       training for ACIS, am behind in response to Max packets, as yet unknown relapses,
24       RMS, rescission queries, inmate letters, inmate informal grievances, regular walks
       and inmate access to electronic legal files for an ongoing case.
25

26  [Morris Decl., Ex. 28 at ADCM1619406].  COIII Morgen had *eight* classes to teach on

27  December 7, 2019.  [*Id.* at ADCM1619404]

28       While staffing shortages do not, in and of themselves, give rise to a violation of the

Stipulation, this Court has already recognized that "severe staffing shortages have a cascading effect on the provision of out-of-cell time as required by the maximum custody performance measures." [Doc. 3635 at 4]. As Defendants themselves acknowledge in the Monitoring Guide, where a cancellation or limitation is due to staffing shortages that are routine, expected, and thus unjustifiable under the Stipulation, the cancellation or limitation, if not made up, "requires a finding of non-compliance." [Doc. 3177-2 at 20]

### D. In Violation of ¶ 26 of the Stipulation, Defendants Do Not Make Every Reasonable Effort to Make up Cancelled or Limited Out-of-Cell Time

Defendants' submission in opposition to the Motion to Enforce reveals yet another violation of the Stipulation. The Stipulation requires that Defendants make every reasonable effort to make up out-of-cell time that is cancelled or limited due to a legitimate operational or safety and security reasons such as an *unexpected* staffing shortage". [Doc. 1185-1 at ¶ 26] Defendants do not do so.

To the extent Defendants try to make up cancelled out-of-cell time, such efforts are limited to the week during which the cancellation occurs. [Doc. 3700-1, Ex. 1 at ¶ 41; Ex. 2 at 41; Ex. 8] As a result, no effort is made to make up any cancellations that occur on Fridays, the last day of the work week. [*See, e.g.*, Doc. 3700-1, Ex. 4, pt. 1 at 4 ("On 10/25/19, 11/29/19 and 12/20/19 recreation was cancelled but it was the last day of the monitoring week and thus could not be made up."), 5 ("Three cancellations [of recreation] occurred during this time period, but on the last day of the monitoring week so the time could not be made up.")] The Cancellation Memos submitted by Defendants similarly indicate the lack of effort to make up cancellation that occur on Fridays:

- "The cancelled SMI Unstructured Out of Cell Time will not be made up due to today being the last day of the monitor week." [Doc. 3700-1, Ex. 8 at ADCM1569225]

- "The cancelled activities were not be made up due to 6/14/2019 [the day of the cancellations] being the last day of the monitor week." [Doc. 3700-1, Ex. 8 at ADCM1586193]

- "Due to today being the last day of the monitor week, the cancelled recreation will not be made up." [Doc. 3700-1, Ex. 8 at ADCM1592420]

1       The Cancellation Memos also reflect a lack of effort to make up cancellations that

2   occur at an earlier point in the work week.  Frequently staff write some variation of "[t]he

3   cancelled outside recreation will not be made up prior to the end the monitor week due to

4   the scheduling limitations of the outside recreation schedule."  [Doc. 3700-1, Ex. 8 at

5   ADCM1600529;  *see also id.* at  ADCM1562390-91  ("scheduling  limitations"),

6   ADCM1586186 ("cancelled activities will not be made up during the monitor week"),

7   ADCM1586191 ("Outside Recreation was cancelled due to substandard staffing levels"

8   and only 34 of 61 post assignments staffed), ADCM1592411-12  ("substandard staffing

9   levels," only 25 of 61 post assignments filled), ADCM1600536 ("substandard staffing

10  levels" and "scheduling limitations"), ADCM1600538 (same)].

11      Even where Defendants do not pre-emptively declare that they cannot make up

12  cancelled out-of-cell time, the Cancellation Memos routinely note that the cancelled time

13  was not made up due to scheduling conflicts, continuing staff shortages or both.[27]

14      The lack of effort to make up cancelled classes means that few are made up.  Just

15  six of the 41 out-of-cell time cancellations described in the Cancellation Memos filed as

16  Exhibit 8 were made up.  [Doc. 3700-1, Ex. 8 at ADCM1565670, ADCM1569222,

17  ADCM1586374, ADCM1586875].[28]

18      The Stipulation does not relieve Defendants of their obligation to make every

19  reasonable effort to make up cancelled out-of-cell time simply because a cancellation falls

20

21      [27] [Doc. 3700-1, Ex. 8 at ADCM1574029 (scheduling conflicts), ADCM1592103
    (staff shortage), unnumbered page after ADCM1600249 (scheduling conflicts and staff
22  shortage),  ADCM1574284 (staff shortage),  ADCM1574288  (scheduling  conflict),
    ADCM1586188 (staffing shortage), ADCM1586190 (staffing shortage), ADCM1592410
23  (staffing  shortage),  ADCM1592413  (staffing  shortage),  ADCM1592415  (staffing
    shortage), ADCM1592417 (staffing  shortage),  ADCM1592419 (staffing shortage),
24  ADCM1600531 (staffing shortage), ADCM1600534 (scheduling conflict and staffing
    shortage), ADCM1600536 (scheduling conflict), ADCM1600538 (scheduling conflict),
25  ADCM1574773 (scheduling conflict and staffing shortage), ADCM1569492 (staffing
    shortage).
26      [28] The recently produced monitoring documents similarly show that Defendants do
    not usually make up cancelled recreation and programming.  The Cancellation Memos for
27  September 2019 through January 2020 reflect 23 cancellations, of which just one was
    made up.  [Reply Carns Decl., ¶ 14 and Ex. 8]  In most cases, the reason the cancelled out-
28  of-cell time was not made up was the ongoing lack of staffing.  [*Id.*]

on a Friday or because they are unable to find the time and staff to make up the time during the same week.  [*See* Doc. 1185 at ¶ 26]  Defendants' arbitrary decision that they need not attempt to make up cancellations if they cannot do so during the same week is yet another instance of Defendants' interpreting the "Stipulation such that their obligations are hollow."  [Doc. 3734 at 3].

Additionally, Defendants are required to make every reasonable effort to make up limitations of out-of-cell time offered pursuant to ¶¶ 24 and 25 of the Stipulation, as well as cancellations.  [Doc. 1185 at ¶ 26]  As discussed above, at Florence-Kasson, Defendants routinely limit the out-of-cell recreation for people at Step 2 and 3 by offering recreation only in 10 x 10 enclosures, rather than offering recreation in the larger enclosures, an out-of-cell time incentive in the Step Program Matrix to which they are entitled.  Because ¶ 25 provides for the incentives offered through the Step Program Matrix, ¶ 26 requires that Defendants make every reasonable effort to ensure that those out-of-cell time limitations are made up.  [Doc. 1185 at ¶¶ 25-26]  There is no indication anywhere within Defendants' exhibits that they make any effort at all to make up for out-of-cell time that is limited to recreation enclosures that do not meet the requirements of DI326/DO812.

### E. Defendants Have Indefinitely Cancelled or Limited All Out-of-Cell Recreation and Programming Ostensibly Due to the COVID-19 Pandemic

As discussed further in Part VIII below, in recent months Defendants have eliminated out-of-cell programming and limited out-of-cell recreation.

Starting in March or April 2020, Defendants stopped bringing subclass members out of their cells for group programming and, for people with a serious mental illness, unstructured SMI time.[29]

---

[29] [Morris Decl., Ex. 3, ¶¶ 6-7 ("Since I am at the Step 3 level of the program, I am supposed to have one hour per week of out-of-cell group programming.  ADC has not offered any sort of group programming since mid-March, even though it would be possible to safely do it if we spread the desks more than six feet apart from one another, or if they put an inmate in every other desk, and gave us face coverings.  We also are also no longer allowed out-of-cell "table time" in the common area of my pod, when we can play

1    Additionally, starting around the same time, Defendants have restricted almost all

2    recreation to the smallest enclosures.  At Eyman-Browning, recreation is limited to the

3    "chute."[30]  In other locations, recreation has been limited to the 10 x 10 cages.[31]

4    These cancellations and limitations eviscerate the benefits of the Stipulation to the

5    subclass.

6    **F.  In Violation of the Stipulation, Defendants Do Not Document the Reasons**
     **for the Cancellations or Limitations.**

7

8    Defendants do not properly document and justify the reasons for cancellations or

9    limitations of out-of-cell time.  The failure to do so violates MCPM 3.

10   MCPM 3 requires that "if out-of-cell time mandated by MCPM 1, 2, and 8 is

11   limited or cancelled it must be properly documented and justified as required by the

12   Stipulation." Doc. 1185-1, at 42. The Stipulation explicitly provides that cancellations and

13   limitations are justified only when they are for "legitimate operational or safety and

14   security reasons such as an *unexpected* staffing shortage." Doc. 1185 ¶ 26. (emphasis

15   added)

16   The Monitoring Guide echoes the language of the Stipulation that a staffing

17   shortage is a legitimate operational or safety and security reason that justifies cancellation

18   or limitation only if the staffing shortage is unexpected. [Doc 3177-2, Ex. 1, Monitoring

19   Guide at 20].   The reasons for cancellations or limitations must be documented in

20   Information Reports. [*Id*.] "A reason other than for legitimate operational or safety and

21   security reasons for cancellation requires a finding of non-compliance."  [*Id*.]

22

23

---

24   board games by ourselves or write letters.  People at the Step 3 level are supposed to get
     one hour per week of table time.  I have not been offered table time since around February
25   2020."); *see also* Ex. 2, at ¶¶ 8-9; Ex. 14, at ¶ 14; Ex. 18, at ¶ 8; Ex. 19 at ¶ 6; Ex.6, at ¶¶
     11-13; Ex. 7, at ¶¶ 9-11; Ex. 8, at ¶¶ 9-10; Ex. 9, at ¶¶ 9-10; Ex. 10, at ¶¶ 12-13; Ex. 11, at
26   ¶¶ 5-6; Ex. 12, at ¶¶ 9-10; Ex. 13, at ¶¶ 9-11.
          [30] Morris Decl., Ex. 19, at ¶ 5 (noting that he and others in his pod had not had
27   recreation outside of the chute since March); Ex. 2, at ¶ 7; Ex. 3, at ¶ 5; Ex. 4, at ¶ 8; Ex.
     5, at ¶ 4.
          [31] Morris Decl., Ex. 6, at ¶ 10; Ex. 7, at ¶ 8; Ex. 8, at ¶ 8; Ex. 9, at ¶ 5; Ex. 10, at ¶
28   11; Ex. 11, at ¶ 4; Ex. 12, at ¶ 8; Ex. 13, at ¶ 8.

1    Defendants frequently fail to provide a legitimate reason for cancellations of out-

2    of-cell time.  Many of the cancellation memos refer to staffing shortages as the reason for

3    the cancellation.  [*See, e.g.* Doc. 3700-1, Ex. 8 at ADCM1574028-29, ADCM1592102-04,

4    ADCM1600247-250, ADCM1565670-71]  However, while the cancellation memos and

5    supporting documentation reference staffing being "low" or "substandard," they include

6    nothing that indicates that the staffing levels were unusual.[32]  [*See, e.g.* Doc. 3700-1, Ex. 8

7    at ADCM1592103, ADCM1586193, ADCM1569493].    Additionally, several of the

8    cancellation memos explicitly state that the staffing shortage was due to planned,

9    scheduled occurrences.  For example:

10   • Cancellation "due to mass movement affecting Wing 4 as well as a staffing
         deficit" [Doc. 3700-1, Ex. 8 at ADCM1574282]
11

12   • Cancellation "due to staffing numbers and Taser Training recertification"
         [*Id.* at ADCM1574287]

13   • Cancellation "due to Mass movement within WMU Wings #3 and Wing #4"
         [*Id.* at ADCM1586185]
14

15   • Cancellation "due to a mandatory Deputy Warden & COIII Programs
         meeting"  [*Id.*]

16   • Cancellation "due to limited Unit staffing and Mass inmate property
         inventories being conducted due to a substantial back log."  [*Id.*]
17

18   The documentation of the large majority of the cancellations of out-of-cell time

19   does not meet the description of a "legitimate operational or safety and security reason[]".

20   Rather, cancellations are due to chronic staff shortages, scheduling conflicts for use of the

21   yards and programming space, and planned trainings or meetings.  Each of these reasons

22   requires a finding of non-compliance.  [Doc. 3177-2 at 20]

23   Also, nowhere do Defendants document the reasons for limiting the out-of-cell

24   recreation of subclass members with SMI to smaller recreation enclosures than what they

25   are entitled to, pursuant to the Step Program Matrix.  The Court has previously rejected

26   Defendants' attempt to "unilaterally alter the language of the PM to better suit [their]

27   _____

28   [32] As discussed above, short staffing is not unusual or unexpected; it is the result of
     chronic understaffing that has existed, and been known to Defendants, for years.

current practices." [Doc. 3518 at 5] It should do so again here. The failure to document

limitations of out-of-cell time must also be found to violate MCPM 3.

## VI. DEFENDANTS' FLAWED PRACTICES RELATING TO THE STEP PROGRAM VIOLATE THE STIPULATION

Plaintiffs submitted extensive evidence that Defendants are failing to properly administer the Step Program that underpins several of the Maximum Custody Performance Measures. Plaintiffs put forward evidence of two basic failings in the way the Step Program is administered: (1) subclass members are denied the opportunity to have recreation in the larger recreation enclosures to which they are entitled as incentives under the Step Program; and (2) the Step Program is administered in a manner that results in subclass members not progressing through it. [Doc. 3590 at 15-19] Defendants assert that issues related to implementation of and progression through the Step Program exceed the bounds of the Stipulation and MCPMs and thus are irrelevant to the question of Defendants' compliance. [Doc. 3700 at 18-19] Defendants are wrong.

The amount and nature of out-of-cell time required by MCPMs 1-2, 6 and 8 is directly dependent on the subclass member's Step level.[33] If subclass members do not receive the amount and type of out-of-cell time to which they are entitled by virtue of their Step level, Defendants are violating MCPM 6 and, if the subclass member has SMI, MCPM 8. Further, the failure of Defendants' to progress subclass members through the Step Program has a cascading negative impact on the implementation of those MCPMs. The Court has already rejected Defendants' argument that progression through the Step Program Matrix is not relevant to compliance with the Stipulation. [Doc. 3635 at 4-5 ("if prisoners are not actually able to advance through the Steps, Defendants may be in violation of the Stipulation."), Doc. 3734 at 3-4 ("The 'Maximum Custody Outcome Measures' of the Stipulation require implementation of the Step Matrix and set forth

---

[33] *See* n. 1.

1   minimum out-of-cell time for prisoners at each step. (Doc. 1185-1 at 38.) That

2   framework contemplates prisoners moving between steps.")]

3       **A. Defendants Violate MCPMs 6 and 8 by Denying Recreation in the Location**
        **Set as an Incentive in the Step Program.**

4

5       Defendants routinely deny subclass members the opportunity to have recreation in

6   the location to which they are entitled, according to their Step level.  [Doc. 3590 at 16-

7   18][34]  Defendants admit that they provide "recreation with adjustment to the type of

8   recreation enclosures used."  [Doc. 3700 at 6-7]  They go on to explain that in lieu of

9   providing recreation in large enclosures, "recreation may still be offered to the inmates in

10  the 10 x 10 enclosures (or chute recreation at Browning)."  [*Id.* at 7]

11      MCPM 6 requires that subclass members be provided with incentives and

12  privileges in accordance with their step levels. The importance of this requirement is

13  underscored by the Monitoring Guide's specific mandate that the reviewer "should note

14  the Step Level for each inmate record reviewed and determine whether the type/location

15  of recreation recorded in the Maximum Custody Daily Out-of-Cell Time Tracking Forms

16  is consistent with the requirements of DI 326." [Doc. 3177-2 at 25]  "Failure to offer the

17  appropriate type/location of recreation for the week and/or month will lead to a finding of

18  non-compliance for this measure."  [*Id.*]

19      When Defendants change the location of recreation from the large enclosure to

20  which people are entitled to a small enclosure that does not meet the requirements of the

21  Step Program, or of MCPM 6, there is no indication of any reason why such adjustment

22  was made and no recognition that the change means that they are not complying with the

23  Step Program or MCPM 6.  For example, subclass member Abraham Zavala was at Step 3

24  at Florence-Kasson throughout the period for which Defendants produced his out-of-cell

25  time tracking forms.  [*See, e.g.*, Doc. 3700-1, Ex. 4, pt. 2, at 235-72]  According to DO

26  812, he was therefore entitled to three 3-hour blocks of recreation each week in a

27

28      [34] [Doc. 3600-1, at 14, ¶ 2, at 15, ¶ 7, and at 48, ¶ 8; Doc. 3600-2, at 3, ¶ 4, at 9, ¶ 7, and
    at 21-22, ¶ 6; Ex. 15, ¶ 6]

combination of 20 x 20 and 40 x 40 enclosures.  [Doc. 3600-2 at 50].   The week of January 25, 2020, one of the three blocks of recreation was in a 10 x 10 enclosure, and no reason was given for the failure to provide him recreation in the larger enclosure.    [Doc. 3700-1, Ex. 4, pt. 2, at 243-44].  Each of the following two weeks, two of the three blocks of recreation were done in the 10 x 10 enclosure, again with no explanation. [Doc. 3700-1, Ex. 4, pt. 2, at 245-48].  The weeks of February 29 and March 7, 2020, one of the three blocks of recreation was again in a 10 x 10 enclosure, and no reason was given for the failure to provide him recreation in the larger enclosure.    [Doc. 3700-1, Ex. 4, pt. 2, at 253-56]   Although the Monitoring Guide requires a finding of non-compliance when recreation is not offered in the appropriate location, each of these weeks Defendants deemed themselves to have satisfied the weekly requirements for Mr. Zavala.   [Doc. 3700-1, Ex. 4, pt. 2, at 243, 245, 247, 253, 255]    The same pattern holds for all the subclass members and declarants who were at Step 3 at Florence-Kasson at any point during the period for which Defendants submitted out-of-cell time tracking forms:

|  | Weeks at Step 3 during which recreation was offered in 10 x 10 enclosure | Any justification | Weekly expectations deemed to have been met each week | Citation Doc. 3700-1, Ex. 4 |
|---|---|---|---|---|
| D. Gonzalez | 4 of 7 | No | Yes | Pt. 2, at 19-32 |
| J. Gonzalez | 2 of 4 | No | Yes | Pt. 2, at 40-47 |
| D. Carpio | 7 of 14 | No | Yes | Pt. 1, at 152-179 |
| J. Canez | 4 of 5 | No | Yes | Pt. 1, at 123-32 |
| C. Alvarez | 5 of 13 | No | Yes | Pt. 1, at 36-6[35] |
| D. Aguilar | 3 of 5 | No | Yes | Pt. 1, at 25-34 |
| T. Anderson | 2 of 6 | No | Yes | Pt. 1, at 81-92 |

The denial of out-of-cell incentives violates MCPM 6.  Further, it undercuts the purpose of DO 812, the Maximum Custody Management and Incentive Program.

_____

[35] One week cannot be determined, as there was no location indicated for one of the recreation blocks.  The reviewer found that the weekly expectations were met. [Doc. 3700-1, Ex. 4, pt. 2, at 60-61]

Pursuant to DO 812, "Maximum Custody Management is a system that requires inmates in Maximum Custody to work through a program, *utilizing a step incentive system*." [Doc. 3600-2 at 36, (§ 1.0)]   The Step Program provides that incarcerated people in maximum custody have certain responsibilities they must fulfill to qualify for advancement in steps and incentives.  [*Id*. at 38, § 5.0]  In exchange for meeting their responsibilities, they are supposed to be provided with "structured and progressive levels that include increased privileges as an incentive for positive behavior and/or program participation," including "appropriate exercise opportunities."  [*Id*. at 43, Attachment A].[36]  The denial of the incentives that the subclass members have earned by reaching and remaining at Step 3 is a failure of administration of the Step Program.  Because, under MCPM 6, the subclass members are entitled to the same incentives to which they are entitled under DO 812, the denial of the incentives is also a violation of the Stipulation.

██████████████████████████████████████████████████████████

████████████████████████████ [Doc. 3700-1, Ex. 4, pt. 1 at 7, 36, 65, 123, 152; pt. 2 at 7, 36]  MCPM 8 requires that subclass members with SMI receive "the general privileges and incentives afforded to prisoners under DI326" as well as addition out-of-cell time. [Doc. 1185-1 at 44]  By limiting the offer of recreation to small enclosures that do not comport with the incentives set out in DI326/DO812, Defendants violate MCPM 8 as well as MCPM 6.

### B. Defendants Violate the MCPMs by Denying Subclass Members the Opportunity to Progress Within the Step Program

Plaintiffs have presented unchallenged evidence that subclass members have been unable to progress within the Maximum Custody Step Program or graduate out of it, despite participating in the required programming and otherwise meeting the requirements for step progression. As DO 812 describes it, the opportunity for step progression is central to the Step Program, as it is a "system that requires inmates in Maximum Custody

---

[36] The "appropriate exercise opportunities" for subclass members at each Step at each facility are set forth in Attachments B-F.  [Doc. 3600-2 at 44-52]

to work through a program…" [Doc. 3600-2 at 36, (§ 1.0)]  DO 812 further provides that "[b]ased on behavior and programming, inmates may progress from controlled based housing to open privilege based housing where movement outside a cell is without restraint equipment." [*Id*.] According to DO 812, the way to "qualify for advancement in steps and incentives" is to "follow all program requirements on a daily basis."  [*Id*. at 38 (§ 5.1)] DO 812 provides that subclass members are eligible for step progression every 30 calendar days depending on behavior and program participation. [*Id*. at 39 (§ 5.5), 40 (§ 6.5), 41 (§ 7.5), 44, 46, 50]

Rather than adhere to these guiding principles, Defendants have kept subclass members stagnant at the same tep level for inordinate periods of time.  Several of the declarations Plaintiffs submitted in support of the Motion to Enforce describe class members being kept at the same step level for years. [Doc. 3600-1 at 4, ¶ 2 ("I'm a Step 3 and I've been a Step 3 for 3 years. I've been discipline free for the past 3 years too."); Doc. 3600-2, at 13, ¶ 2 ("I am currently at Step level 3 under DO #812 and have been at this level for 5 years, during which time I have not received any disciplinary tickets or infractions"), and at 59, ¶ 3 ("I inquired about my Step 2 because I've completed the requirements in the policy and I was told I am not eligible, 'continue to wait.' I wasn't told why.")].

Since the filing of the Motion, Defendants have produced some data regarding the length of time people spend in maximum custody and at each step level.[37]  Although the

---

[37] The Court has found that the "obvious purpose and intent of the Stipulation" requires that inmates progress through the Step Matrix. [Doc. 3734 at 3]  Despite the obvious need to track how long people spend in maximum custody and at each step in maximum custody, Defendants have chosen not to track such information.  [Doc. 3701 at 1-2]  The information provided by Defendants is, therefore, incomplete.  [Doc. 3755 at 1-3]  Additionally, the information produced by Defendants was provided in a haphazard manner the dramatically limits its usefulness.  For example, the information from the database showing step level progression and reviews for Eyman-SMU-I and Florence-Kasson is not searchable and is not in any discernible order.  [Morris Decl. at ¶¶ 4, 6]  The same data from Lewis-Rast is also not searchable.  [*Id*., at ¶ 5] The first 970 pages are in alphabetical order, but the remainder are not and appear to relate to persons incarcerated at Florence-Kasson.  [*Id*.]  Because Defendants have failed to track this critical data, Plaintiffs are seeking, as a sanction, the adverse inference that subclass members do not progress through the Step Program.  [*See infra* § IX]

-34-

data has significant holes, it nonetheless makes clear that many subclass members do not progress through the Step Program and that Defendants believe that "they can, if they wish, keep prisoners at a particular step level in perpetuity." [*Cf*. Doc. 3734 at 3].

Step 3 is the least restrictive step in the Step Program, and the last Step before consideration for transfer out of maximum custody. [Doc. 3600-2 at 40 (§ 6.7), 39 (§ 5.5)] To remain at Step 3, a person must behave well consistently. For example, at Eyman-Browning, Eyman-SMU-I, and Lewis-Rast, to remain on Step 3, most people must: follow rules and regulations, participate in prescribed programs/classes/individual groups, maintain "meets expectations" on all work evaluations, consistently demonstrate positive social interaction skills, and demonstrate a good work ethic.[38] [Doc. 3600-2 at 44, 46] A person who has "maintained Step [3] for a minimum of 30 consecutive days, without incident, [is] eligible for consideration for placement in a Close Custody housing location." [*Id*. at 39 (§5.5)] But Defendants' data shows that 417 people – *one quarter of all the people housed in maximum custody as of June 30, 2020* – have spent over a year in maximum custody at Step 3. [Morris Decl., ¶ 7 and Ex. 1] Of those, as of June 30, 2020, 109 people had spent more than three years in maximum custody at Step 3.[39] [*Id*.] As of June 30, 2020, six years into the existence of the Step Program, nine people had spent more than five years at Step 3. [*Id*.]

In addition to the admittedly incomplete data showing how much time people had spent at the different steps in maximum custody, Defendants also produced screenshots of the database that records step level reviews and progression through the Step Program. [Doc. 3755 at 1-3] These screenshots provide further evidence that Defendants do not move people through the Step Program. For example:

---

[38] The formulation of what is required to remain on Step 3 is slightly different for people in the Restricted Status Housing Program at Eyman-Browning and Lewis-Rast or in Enhanced Management Step Status. [Doc. 3600-2 at 48, 52] Defendants do not provide any set of requirements to remain in Step 3 at Florence-Kasson. [*Id*. at 50]

[39] There are another 24 people who, if they are still in maximum custody at Step 3 have passed the three-year mark since June 30, 2020.

1
2
- R█████ S█████         has been a Step 3, without a single disciplinary that
  at█   d h███   evel, since June 6, 2014. [Morris Decl., Ex. 31]  Yet he
  remains in maximum custody at Eyman-Browning.  [Id.]

3
4
- J██ O██  has been at Step 3 at Eyman-Browning since June 6, 2014, with
  th  exc   on of a one-month drop to Step 2 in at the end of August 2016.
  [Morris Decl., Ex. 32]  He too remains in maximum custody at Eyman-
  Browning.  [Id.]

5
6
7
8
9
- J██ M████    has been in the Step Program at Eyman-Browning
  c  nuou    ce June 6, 2014, when he was designated as Step 2. [Morris
  Decl., Ex. 33]  He moved up to Step 3 on July 31, 2014.  [Id.]  He remained
  a Step 3, without any disciplinaries, for two and a half years, until he
  received a disciplinary at the end of December 2017 and was put back to
  Step 1.  [Id.]  He worked his way back up to Step 3 by April 3, 2018, where
  he remained until the present, another two and a half years without a
  disciplinary.  [Id.]

10
- D██ P██  has been  at Step 3 at Eyman-SMU-I for over a year.
  [M   s D   Ex. 34]

11
12
- I█ S███  has been at Step 3 at Florence-Kasson for over a year.  [Morris
  D  cl.,   35]

13
14
15
16
17

The progression from Step 1 to Step 2 also appears to be significantly flawed.  To advance from Step 1 to Step 2, most people must be in Step 1, discipline free for 30 days, and behave cooperatively and respectfully.[40]  [Doc 3600-2 at 44, 46]  But Defendants' documents show that 458 people have spent more than a year on Step 1.  [Morris Decl., ¶ 7 and Ex. 1]

18
19

Further, there are people who remain on Step 1 for a year or more without disciplinaries:

20
21
- K██ C██  has been at Step 1 at Eyman-Browning, without disciplinaries,
  fo  ver  o years, since June 2018. [Morris Decl., Ex. 36]

22
23
- E██ B██  has been at Step 1 at Eyman-Browning without disciplinaries
  si  une  19.  [Id., Ex. 37]

24
- P██ R██  has been at Step 1 at Eyman-SMU-I since June 2019, apparently
  w  ou  ny disciplinaries.  [Id., Ex. 38]

25
26
27
28

[40] As with the criteria to remain on Step 3, the formulation of what is required to advance to Step 2 is slightly different for people in the Restricted Status Housing Program at Eyman-Browning and Lewis-Rast, in Enhanced Management Step Status, and at Florence-Kasson.  [Doc. 3600-2 at 48, 50, 52]

- A███████ S██ has been at Step 1 at Florence-Kasson for over a year without an ███ ipl█ ary charges.  [*Id.*, Ex. 39]
- J██ E████ was reduced from Step 3 to Step 1, apparently due to a d██ plin██ charge, in September 2019.  [*Id.*, Ex. 40]  He has not had a disciplinary charge since, but remains at Step 1 at Florence-Kasson.  [*Id.*]

The point of the Step Program is for people to move *through* it, displaying positive behavior in exchange for incentives.   [Doc. 3600-2 at 36 (§ 1.0), 38 (§ 5.1)] The fact that more than a quarter of the people currently in maximum custody have spent a year or more in Step 1 demonstrates that Defendants are allowing people to languish for months and years at the lowest level of incentives.  The system is not working.

As noted above, Defendants do not believe that it matters that people do not move through the Step Program and out of maximum custody.  However, as this Court recently explained, Defendants' "position conflicts with the obvious purpose and intent of the Stipulation." [Doc. 3734 at 3]  The framework of the Stipulation "contemplates prisoners moving between steps." [*Id.*]  If, as Defendants argue, they could simply leave "prisoners at a particular step level in perpetuity,"  the benefits to the subclass of the Stipulation would be rendered "completely illusory."  [*Id.*]  Defendants must implement the Stipulation in a meaningful way. [*Id.*]  The Court should, as it has done in the past, reject "Defendants' invitation to interpret the Stipulation such that their obligations are hollow." [*Id.*]

## VII. DEFENDANTS' EXHIBITS AND RECENTLY PRODUCED DOCUMENTS DEMONSTRATE THE ABJECT FAILURE OF THEIR "ROBUST" MCPM MONITORING AND REPORTING SYSTEM

In their Opposition, Defendants insist upon their "robust, multi-level" monitoring and reporting review system.  Defendants claim their system "ensure[s] accuracy of monitoring and compliance for CGAR reporting." [Doc. 3700 at 2-3]    However, as discussed throughout this brief, the documents Defendants filed in support of their Opposition demonstrate that their system is not robust at all.  Rather, it appears to be a series of rubber stamps, gaping holes and selective information.

Perhaps the most disturbing revelation from Defendants' documents is that *Defendants inform custody staff in advance as to which week will be the monitoring week*. According to the Monitoring Guide, staff must not be informed of the week that was the monitoring week until the seventh day of the following month. [Doc. 3177-2 at 13-14]  This provision ensures that staff cannot vary their conduct or documentation practices for the monitoring week, based on the knowledge that they are being monitored.  However, the Information Reports filed as part of Defendants' Exhibit 8 show that staff contemporaneously know that a given week is a "monitor week." [*See supra* § V.A.; Doc. 3700-1, Ex. 8 at ADCM1569224-25, ADCM1574284-85, ADCM1586190, ADCM1586193, ADCM1592410, ADCM1592412-14, ADCM1592416, ADCM1592418, ADCM1592420, ADCM1600529-30, ADCM1600533]

Another weakness in the implementation of the monitoring system demonstrated by Defendants' submissions relates to the first level of the "multi-level" monitoring and reviewing system.  The Monitoring Guide requires the review of out-of-cell time tracking forms to determine whether the amount, type and location of recreation offered "is consistent with the requirements of DI 326." [Doc. 3177-2 at 25, 20]  The reviewer must review the out-of-cell time tracking forms for the monitoring week. [*Id*. at 25]  The forms contain a "Weekly expectations" section, where the reviewer must check whether the out-of-cell time requirements were met for the particular subclass member.  [*See, e.g.*, Doc. 3700-1, Ex. 4, pt. 1, at 7]  The checking of this box appears to be one of the first steps in Defendants' "robust, multi-level" monitoring system. [Doc. 3177-2 at 14-15, 17, 20, 22, 25, 29-30]

But each of the out-of-cell time tracking forms submitted as in support of Defendants' Opposition indicated that weekly expectations were met for the subclass member, even when the form indicates that one or more of the MCPMs was not met.

[Doc. 3700-1, Ex. 4[41]]  For example, Defendants filed the out-of-cell time tracking forms for subclass member ███████████████ for the period from December 28, 2019 through April 3, 2020.  During this entire period, he was at Step 3 at Florence-Kasson, and was designated as having an SMI. [Doc. 3700-1,  Ex. 4, pt. 1 at 36-63]  Therefore, each week he was entitled to 19.5 hours of out of cell time per week, including 4 hours of out-of-cell programming, 6 hours of outside recreation, and three three-hour recreation sessions in a combination of the 20 x 20 and 40 x 40 recreation enclosures.  [Doc. 1185-1 at 38-39 (MCPM 1, 2, 5, 6, 8); Doc. 3600-1 at 50]  During several weeks, one or more of his recreation periods was in a 10 x 10 enclosure, in violation of DO 812 and MCPMs 6 and 8. [Doc. 3700-1, Ex. 4, pt. 1, at 44, 46, 48, 54, 56]  Yet the reviewer indicated that the weekly expectations were met for each of these weeks.  [*Id.*]  As discussed above, every subclass member who was at Step 3 at Florence-Kasson during the period for which Defendants submitted the out-of-cell tracking sheets had several weeks when they were not offered their recreation in accordance with the requirements of DO812 and MCPM 6 and 8, yet every week the forms indicated that Defendants met the weekly expectations for those subclass members. [*See supra* § V.B.; Doc. 3700-1, Ex. 4]

Another problem with the initial level of review is that, for individuals who are in Step 3 in general population at Browning Unit, or at Step 2 or 3 in Eyman-SMU-I or Lewis-Rast, the incentive structure provides for a monthly recreation incentive.  [Doc. 3600-2 at 45, 47]  In the methodology section regarding MCPM 6, the Monitoring Guide notes that, while the initial reviewer generally reviews just the monitoring week's out-of-cell time tracking forms, the reviewer must look at all forms for the month "if necessary to make an accurate compliance determination."  [Doc. 3177-2 at 25]  If the reviewer has to review the out-of-cell time tracking forms for the whole month, those forms are to be copied and inserted behind the tracking form for the individual subclass member.  [*Id.*]

---

[41] One of the out-of-cell time tracking forms does not indicate one way or the other whether Defendants met the weekly expectations for the individual. [Doc. 3700-1, Ex. 4, pt. 2, at 249]

These additional forms have not been included in any of the Maximum Custody Notebooks Defendants have produced, although they have reviewed the files of individuals who have monthly recreation incentives. [Morris Decl., ¶ 49-50 and Exs. 43-44] The reviewers nonetheless check the box that all expectations were met. [*Id.*]

Yet another weakness in Defendants' monitoring system is that the reviewer adds up all the scheduled out-of-cell time listed on the tracking form and assesses whether the out-of-cell time requirements were met based on the amount of scheduled time, not the amount of time that was actually offered. For example, at Eyman-Browning on December 7, 2019, a COIII class was cancelled. [Morris Decl., Ex. 28]. The reason for the cancellation was that the COIII did not have adequate time to conduct the class and do the other work she was required to do. [*Id.* at ADCM1619406; *see supra* § V.C.] Yet the reviewer found that the weekly expectations were met for people who were scheduled to be in this class, even though the cancellation was not due to an unexpected staffing shortage or other legitimate reason and there was no make-up class. [*Id.* at ADCM1619418; Morris Decl., ¶ 51 and Ex. 45] Similarly, the reviewer found that the out-of-cell time for subclass member Stephen Dionne was met during the week of November 9, 2019, even though he was offered only two recreation periods and his COIII class was cancelled. [Doc. 3700-1, Ex. 4, pt. 1, at 222] There was no explanation for the cancellation of the class on the out-of-cell time tracking form, and the cancellation of the class was not mentioned in the cancellation memo for that monitoring week [*Id.* at 222-23; Morris Decl., Ex.29]. Further, the recreation session that was cancelled was a Saturday recreation. [Doc. 3700-2, Ex. 4, pt. 1, at 222] The cancellation was due to "staff shortage with holiday scheduling." [Morris Decl., Ex. 29]. The short staffing cannot be described as unexpected given that (1) the holiday was not unexpected, and (2) Saturday recreation had been cancelled for three of the preceding four weeks. [Doc. 3700-1, Ex. 4, pt. 1, at 191, 214, 216]

Further, it is often difficult or impossible to determine the amount of time offered because the times listed are illegible. [Reply Carns Decl., ¶ 16 and Ex. 10] Yet the

reviewer finds the amount of time offered satisfies the out-of-cell time requirements.  [*Id.* at ADCM1612720]

Also, in the section on methodology for reviewing for MCPM 6, the Monitoring Guide instructs the reviewer that "[e]ither the inmate or a second staff member should sign the Comments section on the back of the Out of Cell Tracking form where feasible considering safety/security/operational concerns, to verify the refusal," and that there should be documentation of a discussion if there is "an extended pattern of refusals or changed behavior."  [Doc. 3177-2 at 26]  However, the reviewer is not instructed as to what to do to indicate whether there are or are not second signatures and documentation of such a pattern.  [*Id.*]

Additionally, Defendants rely on their Cancellation Memos to show that there is not a "systemic pattern of unjustified out-of-cell time cancellations."  [Doc. 3700 at 18-19]  As discussed above, the Cancellation Memos are inaccurate and frequently provide no indication that the cancellation was justified.  [*See supra* § V.A.]

Defendants' maximum custody reporting continues to be riddled with inaccuracies and omissions.  Their reliance on their "robust" system of monitoring and reporting does not refute the evidence of noncompliance submitted by themselves and by Plaintiffs, nor does it support any argument that they are complying.

## VIII.  DEFENDANTS' VIOLATIONS HAVE WORSENED IN RECENT MONTHS

Since the filing of Plaintiffs' May 20, 2020 Motion to Enforce, subclass members have continued to report Defendants' violations of the MCPMs. In fact, many of the previously identified problems have grown even worse in that period.

Subclass members report that recreation opportunities have been categorically limited to the most restrictive recreation areas, regardless of whether a subclass member's Step level entitles them to participating in recreation at the less restrictive, and often larger enclosures.  At Eyman-Browning, regardless of Step, people have been limited to the "chute".  For example, Raymond Olson is housed at Eyman-Browning and

is at Step 3. [Morris Decl., Ex. 19 at ¶ 2] At Step 3, he is entitled to three recreation session per week, one of which is supposed to be in the 10 x 10 cage or the basketball court. [*Id.* ¶ 5; Doc. 3600-2 at 45] Since March 2020, he has had recreation only in "chute," a concrete enclosure with a chain link fence on the top. [Morris Decl., Ex. 19 at ¶ 5] Further, during this period recreation is usually offered only two times per week, and sometimes only once a week. [*Id.* ¶ 4] Other subclass members at Eyman-Browning report the same limitations and cancellations of recreation.[42] Subclass members at Florence-Kasson report that all recreation there has been in the 10 x 10 cages, regardless of step level, since the start of the pandemic.[43] This denies subclass members access to privileges and incentives that they are entitled to under MCPM 6 and, if they have a serious mental illness, under MCPM 8.

Also, Defendants suspended group programming in early April 2020 and have not been providing it since. Subclass members who have an SMI report that their mental health programming, classes and unstructured out-of-cell time ("table time") have not taken place for months.[44] Instead, these subclass members have been given weekly worksheet packets that they are to complete in their cells.[45] Defendants have confirmed that group counseling was stopped in April 2020, and their electronic medical record system reflects this stoppage as well. [Morris Decl., Exs. 41-42] The failure to provide group programming and unstructured out-of-cell time for subclass members with a serious mental illness is a clear violation of MCPM 8.

Similarly, subclass members report that the CO III programming classes have not taken place for months.[46] Instead, subclass members eligible for CO III programming are

---

[42] [Morris Decl., Ex. 14 at ¶¶ 11-12; Ex. 2 at ¶ 7; Ex. 3 ¶ 5; Ex. 5 at ¶ 4]
[43] [Morris Decl., Ex. 6 at ¶10; Ex. 7 at ¶ 8; Ex. _8 ¶ 8; Ex. 9 ¶ 5; Ex. 10 ¶ 11; Ex. 11 at ¶ 4; Ex. 12 at ¶ 8; Ex. 13 ¶ 8; Ex. 20 at ¶ 5]
[44] [*Id.*, Ex. 6 at ¶¶ 11-13; Ex. 7 at ¶¶ 9-11; Ex. 8 at ¶¶ 9-10; Ex. 9 ¶¶ 8-9; Ex. 10 at ¶¶ 12-13; Ex. 12 at ¶¶ 9-10; Ex. 13 at ¶¶ 9-11; Ex. 20 at ¶¶ 3-4]
[45] [*Id.*, Ex. 6at ¶¶ 11-12; Ex. 7 at ¶¶ 9-10; Ex. 8 at ¶ 9; Ex. 9 at ¶ 8; Ex. 10 at ¶ 12; Ex. 12 at ¶ 9; Ex. 13 at ¶¶ 9-10; Ex. 20 at ¶ 3]
[46] [Morris Decl., Ex. 10 at ¶¶ 2, 12; Ex. 9 at ¶¶ 2, 8; Ex. 11 at ¶¶ 2, 5; Ex. 13 at ¶¶ 2, 9; Ex. 2 at ¶¶ 3, 8; Ex. 3 at ¶¶ 3, 6; Ex. 14 at ¶¶ 2, 14; Ex. 20 at ¶ 3; Ex. 6 at ¶¶ 2, 11; Ex. 7 at ¶¶ 2, 9]

given weekly worksheet packets that they are to complete in their cells.[47] These worksheet assignments, which must be completed by the subclass member, alone, in his cell, without the assistance or guidance of program instructors, are not a meaningful substitute for the previously administered CO III classes.[48] Subclass members point out that the classes could be safely held by moving the desks farther apart or by placing a participant at every other desk.[49] By substituting in-cell, solitary worksheets for out-of-cell group programming for people at Step 2 or 3, Defendants are denying subclass members the privileges and incentives to which they are entitled under DO 812 and MCPM 1 and 6.

These recent practices indicate a clear failure provide meaningful out-of-cell opportunities to the subclass members, and are illustrative of Defendants' overall pattern of non-compliance with the MCPMs and the Stipulation. If Defendants believe that changed circumstances, such as COVID-19, justify a modification of the Stipulation, the remedy is to move the Court for such a modification. [*See Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383 (1992)]. It is not for Defendants to unilaterally decide that they need no longer comply with the Stipulation.

### IX. THE COURT SHOULD SANCTION DEFENDANTS FOR THEIR FAILURE TO PROVIDE THE ORDERED REPORTS OR TRACK RELEVANT INFORMATION BY HOLDING PLAINTIFFS' ALLEGATIONS REGARDING NONCOMPLIANCE WITH THE MCPMS TO BE ESTABLISHED.

Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure sets out the sanctions courts may issue against a party for not obeying a discovery order. These include "directing that the matters embraced in the order or other designated facts be taken as established for the purposes of the action, as the prevailing party claims" or "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." [Fed. R. Civ. P. 37(b)(2)(A)(i) and (ii); *see*

---

[47] [*Id*. at Ex. 10 at ¶ 12; Ex. 9 at ¶ 8; Ex. 11 at ¶ 5; Ex. 13 at ¶ 9; Ex. 20 at ¶ 3]
[48] [*Id*. at Ex. 6 at ¶ 11; Ex. 7 at ¶ 9]
[49] [*See, e.g., id.* at Ex. 3 at ¶ 6; Ex. 2 at ¶ 8; Ex. 14 at ¶ 14]

*also Tacori Enterprises v. Beverlly Jewellery Co.*, 253 F.R.D. 577, 581-82 (C.D. Cal. 2008) (sanctions establishing facts available where disobedience of a court order is not shown to be outside the litigants' control)]

Ironically, Defendants attack Plaintiffs' Motion to Enforce as "[i]solated, anecdotal evidence of a relatively few individual members" and "unsubstantiated and speculative allegation." [Doc. 3756 at 7, quoting *G. v. Hawaii*, 794 F.Supp.2d 1119, 1152 (D. Haw. 2011)] This is false, as Plaintiffs' evidence is abundant, including numerous sworn declarations by subclass members and hundreds of pages of Defendants' own documents. Further, the reason the disputed documents and reports at issue were requested—initially in December 2019—was precisely to show the widespread, systemic nature of the problems. Despite the obvious need identified by the Court for Defendants to track how long people spend in maximum custody and at each step to show compliance with maximum custody performance measures (Doc. 3734 at 3), Defendants admit that they have chosen not to track this, and refuse to produce the ordered information. [Doc. 3701 at 1-2; Doc. 3755 at 3; Doc. 3756 at 8]

Therefore, as a sanction for Defendants' refusal to abide by the Court's September 4th Order, the Court should hold that Plaintiffs' allegations of noncompliance with the maximum custody performance measures are taken as established. [Fed. R. Civ. P. 37(b)(2)(A)(i)]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court find Defendants substantially noncompliant with MCPMs 1-3, 5-6, and 8 at Eyman-Browning, Eyman SMU-I, Lewis-Rast, and Florence-Kasson, for the period November 2016 through August 2019. Plaintiffs additionally request that the Court order Defendants to promptly submit a remedial plan for each noncompliant measure and to report monthly to the Court on their compliance levels.

Dated:  October 2, 2020                     **ACLU NATIONAL PRISON PROJECT**

By:   s/ Maria V. Morris
David C. Fathi (Wash. 24893)*
Eunice Hyunhye Cho (Wash. 53711)*
Maria V. Morris (Cal. 223903)*
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
              echo@aclu.org
              mmorris@aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    jkeenan@acluaz.org
              carellano@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              ckendrick@prisonlaw.com
              rlomio@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**

By:   s/ Maya Abela
        Asim Dietrich (Bar No. 027927)
        5025 East Washington Street, Suite 202
        Phoenix, Arizona 85034
        Telephone: (602) 274-6287
        Email:    adietrich@azdisabilitylaw.org

        Rose A. Daly-Rooney (Bar No. 015690)
        J.J. Rico (Bar No. 021292)
        Maya Abela (Bar No. 027232)
        **ARIZONA CENTER FOR
        DISABILITY LAW**
        177 North Church Avenue, Suite 800
        Tucson, Arizona 85701
        Telephone: (520) 327-9547
        Email:
              rdalyrooney@azdisabilitylaw.org
                  jrico@azdisabilitylaw.org
              mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

-46-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 2, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ Jessica Carns

-47-