Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
         carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE THE COURT'S ORDERS AND FOR FURTHER RELIEF [DOC. 3694]** |

LEGAL23774493.1

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

I.  The large majority of mental health encounters fall below the minimum durations established by the Court, and virtually all of those brief encounters are found to be "meaningful and appropriate." ............................. 2

II.  The Court should credit the expert opinions of Dr. Stewart. ......................... 4

III.  The Court should not credit the opinions of Dr. Penn. .................................. 5

IV.  The Court should grant further relief enforcing the Stipulation and its prior orders. ............................................................................................................. 7

   A.  The court should require the monitors to document their conclusions and require Defendants to submit monthly reports to the Court. .......................... 9

   B.  The Court should require that the clinical judgment whether an encounter is "meaningful and appropriate" be made by a psychiatrist. ......................... 9

   C.  The Court should require written instructions on how to make the "meaningful and appropriate" determination. .............................................. 10

CONCLUSION ............................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*BankAmerica Pension Plan v. McMath*,
  206 F.3d 821 (9th Cir. 2000) ............................................................................... 9

*Brown v. Plata*,
  563 U.S. 493 (2011) ............................................................................................ 5

*Composite Res. Inc. v. Recon Med. LLC*,
  No. 217CV01755MMDVCF (D. Nev. July 5, 2019) ....................................... 10

*Docusign, Inc. v. Sertifi, Inc.*,
  468 F.Supp.2d 1305 (W.D. Wash. 2006) ............................................................ 7

*Ferreira v. Arpaio*,
  No. CV-15-01845-PHX-JAT (D. Ariz. Nov. 16, 2017) ...................................... 4

*Greenawalt v. Ricketts*,
  943 F.2d 1020 (9th Cir. 1991) ............................................................................ 9

*Hernandez v. Cty. of Monterey*,
  305 F.R.D. 132 (N.D. Cal. 2015) ........................................................................ 5

*Inst. of Cetacean Rsch v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014) .............................................................................. 8

*Maness v. Meyers*,
  419 U.S. 449 (1975) ............................................................................................ 8

*Mata v. Ore. Health Auth.*,
  739 Fed. Appx. 370 (9th Cir. 2018) .................................................................... 5

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) .............................................................................. 5

*Parsons v. Ryan*,
  912 F.3d 486 (9th Cir. 2018) ......................................................................... 7, 8

*Parsons v. Ryan*,
  949 F.3d 443 (9th Cir. 2020) .............................................................................. 8

*Phila. Indemnity Ins. Co. v. BMW of North Amer. LLC*,
  No. CV-13-01228-PHX-JZB (D. Ariz. Jan. 29, 2016) ....................................... 6

*Rasho v. Walker*,
  376 F. Supp. 3d 888 (C.D. Ill. 2019) .................................................................. 5

*United States v. Chapman*,
  59 F.Supp.3d 1194 (D.N.M. 2014),
  *aff'd*, 839 F.3d 1232 (10th Cir. 2016) ............................................................... 6

*United States v. Vest*,
  116 F.3d 1179 (7th Cir. 1997) ............................................................................ 6

**Rules**

Fed. R. Evid. 401 ........................................................................................................ 5
Fed. R. Evid. 403 ........................................................................................................ 5
Fed. R. Evid. 608(a)(1) ............................................................................................... 5
Fed. R. Evid. 702 ........................................................................................................ 5

## INTRODUCTION

Defendants' response (Doc. 3739) is significant for what it does not dispute. Defendants admit that the master's-level monitors tasked with determining whether a mental health encounter is "meaningful and appropriate in the context of the patient's overall care" (hereinafter "meaningful and appropriate") (Doc. 3518 at 4), are given no instruction whatsoever on how to perform that analysis. Doc. 3739 at 12.[1] They also admit that in making this determination, the monitors take no account of the individual patient's treatment needs. *Id.* They further do not dispute that these monitors do not document or explain their conclusions in any way. Doc. 3694 at 12-13. And they do not dispute that, despite an order of this Court that presumptively required mental health encounters to increase from two or three minutes in duration to either ten or thirty minutes, they have not increased mental health staffing at all. *Id.* at 13.[2]

Perhaps most importantly, Defendants do not dispute that of the sample of 191 mental health encounters reviewed in Plaintiffs' Motion, 130 fell short of the minimum durations set by the Court, with some encounters as brief as one minute, yet Defendants found *every single one* of those 130 brief encounters to be "meaningful and appropriate," and counted them as compliant with the Stipulation. As a result, Defendants' compliance scores ballooned from 20% and 26% to 100%. Doc. 3694 at 3-10.

Defendants claim that none of this matters because, out of approximately 17,000 mental health encounters over a four-month period, a total of **148** were found not to be "meaningful and appropriate." Doc. 3739 at 6. But that handful of cases does not change the fact that (1) the great majority of mental health encounters fall short – often far short -- of the presumptive minimum durations set by the Court, and (2) virtually all of those short

---

[1] All docket citations are to the page number assigned by the Court's Electronic Case Filing (ECF) system.

[2] Defendants' mental health staffing remains abysmal. *See* Declaration of David C. Fathi ("Fathi Decl."), Exh. 3, at ADCM1652223 (August 2020 staffing report showing 7.75 out of 13.0 psychology associate positions filled at Eyman (59%)); *id.* (0.9 of 3.0 psychologist positions filled at Florence (30%)); *id.* at ADCM1652224 (8.0 out of 12.0 psychology associate positions filled at Lewis (67%)).

1  encounters are rubber-stamped, without explanation, as "meaningful and appropriate."[3]

2  This Court recently stated, "[a]s it has done in the past, the Court again rejects Defendants' invitation to interpret the Stipulation such that their obligations are hollow." Doc. 3734 at 3.  The Court should once again decline Defendants' invitation; Plaintiffs' enforcement motion should be granted.

**I.  The large majority of mental health encounters fall below the minimum durations established by the Court, and virtually all of those brief encounters are found to be "meaningful and appropriate."**

The centerpiece of Defendants' response is the chart that appears at Doc. 3739 at pages 6-7.  But that chart in fact underscores the extreme rarity with which mental health encounters that fall below the minimum durations established by the Court are found to be noncompliant.  Although Defendants state that the chart covers "March-June 2020" (Doc. 3739 at 5), they do not identify a single encounter in March, at any prison or under any Performance Measure, that was found noncompliant.  *Id*. at 6-7.  And over that entire four-month period, they do not identify a single noncompliant encounter found in the reviews of Performance Measures ("PM") 73, 74, 76, 81, 83, 84, 87, 88, 90, or 91, all of which are subject to the Court's order regarding minimum durations.  *See* Doc. 3518 at 2. [4]

Review of the PMs set forth in Defendants' chart shows conclusively that the large majority of encounters fall below the Court-established minima, and virtually all of those short encounters are found to be "meaningful and appropriate," with no documentation or explanation whatsoever:

**PM 80, Eyman, April 2020**.  39 out of 50 encounters were shorter than 30 minutes (with several 2- and 3-minute encounters), yielding a presumptive compliance score of **22%.**  Carns Decl., Exh. 1. But Defendants counted all but three of those short encounters as

---

[3] Defendants state that "8,564 files [were] monitored for 'seen' PMs in April and May 2020," a two-month period. Doc. 3739 at 8. Accordingly, the 148 noncompliant cases Defendants identify "from March-June 2020" (*id*. at 5) – a four-month period – were presumably drawn from a universe of approximately twice that number, or 17,000. Those 148 cases therefore account for approximately **0.87%** of the 17,000 files reviewed.

[4] Tellingly, there is no indication in the CGARs that *any* encounters were determined to be too short to be "meaningful and appropriate," as opposed to being found noncompliant for some other reason (such as occurring outside of required timeframes); we are simply asked to take Defendants' word for it. *See, e.g*., Declaration of Jessica Carns ("Carns Decl."), Exh. 2.

"meaningful and appropriate" and gave themselves a score of **92%.** *Id.*, Exh. 2.

**PM 82, Lewis, June 2020**. 58 out of 61 encounters were shorter than 30 minutes, yielding a presumptive compliance score of **5%.** *Id.*, Exh. 1. But Defendants counted all but two of those short encounters as "meaningful and appropriate" and gave themselves a score of **96.72%.** *Id.*, Exh. 2.

**PM 85, Lewis, May 2020.** All 30 out of 30 encounters were shorter than 30 minutes, yielding a presumptive compliance score of **0%.** *Id.*, Exh. 1. But Defendants counted all but four of those short encounters as "meaningful and appropriate," and gave themselves a score of **86.67%.** *Id.*, Exh. 2.

**PM 86, Yuma, May 2020.** 48 out of 64 encounters were shorter than 30 minutes, yielding a presumptive compliance score of **25%.** *Id.*, Exh. 1. But Defendants counted all but one of those short encounters as "meaningful and appropriate," and gave themselves a score of **98.44%.** *Id.*, Exh. 2.

**PM 94, Lewis, April 2020.** 153 out of 192 encounters were shorter than 10 minutes (with numerous 1-minute encounters), yielding a presumptive compliance score of **20%.** *Id.*, Exh. 1. But Defendants counted all but five of those short encounters as "meaningful and appropriate," and gave themselves a score of **91.15%.** *Id.*, Exh. 2.

The same is true of the many PMs Defendants chose to omit from their chart. For example, for **PM 81 at Florence in June 2020**, 26 out of 44 encounters were shorter than 30 minutes, yielding a presumptive compliance score of **41%.** *Id.*, Exh. 1. But Defendants counted *every single one* of those short encounters as "meaningful and appropriate," and gave themselves a score of **100%.** *Id.*, Exh. 2.[5]

Nor is this epidemic of drive-by mental health encounters limited to those files that are sampled for the CGARs. When reviewing the records of class members in urgent need of mental health care, Plaintiffs have discovered that those patients' mental health encounters, too, consistently fall below the minimum durations established by the Court. *See generally* Fathi Decl. Exh. 4 (advocacy letters to Defendants regarding class members in urgent need of mental health care, showing numerous 2-minute encounters).

In August and September 2020, three *Parsons* class members died by suicide in less than four weeks. For two of these patients, *every single one* of their mental health encounters since the Court's March 11 order (Doc. 3518) fell below the minimum durations

---

[5] Plaintiffs' review of the CGARs in the course of preparing this motion has revealed other respects in which Defendants' monitoring practices are not compliant with the Court's orders. Plaintiffs reserve the right to raise those matters by separate motion.

established by that order. Fathi Decl. Exh. 5 (letters of 9/17/20 and 9/18/20). For one of these patients, three of the brief encounters she received in the final weeks of her life were nevertheless found by Defendants to be "meaningful and appropriate," and counted as compliant. Carns Decl. ¶ 4 & Exh. 3. And for two of these patients, their final interaction with mental health staff before their suicides was an "individual counseling" session that was *three minutes* in duration, at the conclusion of which the clinician concluded that the patient was *not* at risk of self-harm. Declaration of Pablo Stewart, M.D., ("Stewart Decl.") ¶¶ 22, 28.

Dr. Stewart, a board-certified psychiatrist, has reviewed the records of these patients, and concluded that in all three cases the brief and perfunctory nature of their mental health encounters was a contributing factor in their suicides. *See* Stewart Decl. ¶¶ 18, 23, 29.

**II.     The Court should credit the expert opinions of Dr. Stewart.**

Defendants discount the expert opinions of Dr. Pablo Stewart because "he is not board certified in forensic psychiatry." Doc. 3739 at 8. But Defendants' attorneys have already tried this argument, in this and other litigation, and lost. While Defendants cite a transcript from *Ferreira v. Penzone*, they neglect to cite the *Ferreira* court's conclusion that "Dr. Stewart's academic qualifications, in addition to his over thirty years of experience working as a psychiatrist in institutional and correctional settings, demonstrates to the Court that Dr. Stewart possesses the requisite credentials to testify as an expert to his psychiatric, correctional related opinions in this case." *Ferreira v. Arpaio*, No. CV-15-01845-PHX-JAT, 2017 WL 5504453, at *6 (D. Ariz. Nov. 16, 2017); *see also id.* at *6 n.2 ("Defendants' argument that Dr. Stewart is not qualified to give his opinions because he is not a board-certified forensic psychiatrist is misplaced.").[6]

Dr. Stewart is a board-certified psychiatrist, practicing clinical and forensic psychiatry. [Doc. 3626-1 at 3-4, 11-12] He has served as the court-appointed monitor in

---

[6] Some of Defendants' attacks on Dr. Stewart are simply false. For example, Defendants' claim that "a Georgia state court precluded [Dr. Stewart's] testimony" (Doc. 3739 at 8 n. 2) is not supported by the case cited.

state prison cases and has consulted with the Federal Bureau of Prisons regarding the provision of mental health care. [*Id.* at 11-13]. He is currently the Court Monitor in *Rasho v. Walker*, a statewide class action involving the provision of mental health services to Illinois state prisoners. *Rasho v. Walker*, 376 F. Supp. 3d 888, 898 (C.D. Ill. 2019). *See also Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 148 (N.D. Cal. 2015) (describing Dr. Stewart as "a psychiatrist with decades of experience evaluating correctional mental health care systems"). His opinions on the provision of mental health care in state prisons have been credited by this Court, the Ninth Circuit, and the United States Supreme Court. *See* Doc. 372 at 9-10 (order citing Dr. Stewart's expert report in support of class certification); Doc. 1040 (order denying Defendants' *Daubert* motion against Plaintiffs' experts, including Dr. Stewart); *Parsons v. Ryan*, 754 F.3d 657, 670-71 (9th Cir. 2014) ("*Parsons I*") (citing Dr. Stewart's expert report in support of class certification); *see also Brown v. Plata*, 563 U.S. 493, 517-22 & n.6 (2011) (citing expert conclusions of Dr. Stewart).

### III. The Court should not credit the opinions of Dr. Penn.

Having previously declared that two-minute mental health encounters were "meaningful and met the standard of care" (Doc. 3508-1 at 134, ¶ 41), Defendants' expert Dr. Joseph Penn now proclaims that a one-minute encounter is also acceptable. *Compare* Doc. 3694-3 at ¶ 12.c. (Dr. Stewart describing one-minute mental health encounter) *with* Doc. 3739-4 at ¶ 14 (Dr. Penn concludes that this one-minute encounter was "meaningful and appropriate").[7] But Dr. Penn has a troubling history of careless and misleading

---

[7] Dr. Penn erroneously states the date of this encounter as April 20 (Doc. 3739-4 at 10, lines 20-21); the correct date is April 9. Dr. Penn's declaration consists largely of boilerplate passages cut and pasted verbatim with regard to most or all of the patients whose records he reviewed. And while Dr. Penn recites the documentation he purportedly found in the patients' records, he does not rebut Dr. Stewart's observation that most of this "documentation" is computer-generated. *See* Doc. 3694-3 at 6.

Moreover, Defendants' use of Dr. Penn's declaration to vouch for or bolster the credibility and accuracy of health care staff's written notes is not an appropriate subject for expert testimony, as it lacks relevance under Federal Rule of Evidence 401, does not assist the trier of fact as required by Rule 702, and violates Rules 608(a)(1) and 403. *See Mata v. Ore. Health Auth.*, 739 Fed. Appx. 370, 372 (9th Cir. 2018) (affirming district court's exclusion of expert's testimony as his "report did little more than vouch for [the party's]

practices, and of offering extreme and implausible opinions.

In his declaration recently submitted in opposition to Plaintiffs' Motion to Enforce Paragraph 14 of the Stipulation (Doc. 3623), Dr. Penn mischaracterized the orders of this Court; repeatedly resolved factual disputes in Defendants' favor; misstated facts; opined extensively upon topics for which he has no expertise whatsoever (*e.g.*, the communication needs and capabilities of D/deaf people); and simply disregarded evidence that did not support his opinions. *See* Doc. 3714 at 13 n. 6, 15-22, 25-29.

Similarly, in the pre-settlement phase of this litigation, Dr. Penn engaged in practices that were slipshod and often affirmatively misleading. Dr. Penn gave the following deposition testimony:

> Dr. Penn omitted language from a text he quoted in his expert report, without indicating the omission with an ellipsis or in any other way. Fathi Decl. Exh. 1 (April 11, 2014 deposition transcript) at 137:23-138:18; 140:1-16.
>
> Dr. Penn admitted that language set forth in quotation marks in his report was not in fact a quotation, but instead reflected "themes" of what was said. *Id.* Exh. 2 (September 30, 2014 transcript) at 55:9-58:3.
>
> Dr. Penn admitted that he had never actually seen a document that he cited in his report. *Id.* Exh. 1 at 96:16-98:17.
>
> Dr. Penn acknowledged that he provided no source for language quoted in his report, and was unable to identify the source of that language. *Id.* Exh. 2 at 19:5-19. He did not provide citations to articles quoted in his report because "I was under [a] pretty tight deadline." *Id.* at 146:5-148:5.
>
> Dr. Penn stated in his report that a clinical interaction he witnessed was "highly professional," but then admitted that he could not hear most of what was said. *Id.* Exh. 2 at 151:21-154:8.
>
> Dr. Penn admitted that he took no steps to verify that the staffing numbers he quoted in his report are accurate, and he does not know if they are accurate. *Id.* Exh. 1 at 88:4-90:7; 99:25-100:15.
>
> Dr. Penn stated that he intended to testify about the quality of mental health care at

---

version of events"); *United States v. Vest*, 116 F.3d 1179, 1185 (7th Cir. 1997) (holding that where expert testified with only defendant physician's medical records and patients' statements as evidence, the expert was in no better position than a lay person to say whether the patients testified truthfully); *Phila. Indemnity Ins. Co. v. BMW of North Amer. LLC*, No. CV-13-01228-PHX-JZB, 2016 WL 5340539 at *2, (D. Ariz. Jan. 29, 2016) (holding that experts "may not recite the opinions of non-expert witnesses"); *United States v. Chapman*, 59 F.Supp.3d 1194, 1213-14 (D.N.M. 2014), *aff'd*, 839 F.3d 1232 (10th Cir. 2016) (collecting cases).

Arizona prisons that he had never visited, and from which he had never reviewed patient records. *Id*. at 54:7-55:17.

Dr. Penn also expressed the following opinions:

-Failure to see a patient within 30 days his of last mental health appointment as required by policy, when the patient died by suicide four days after the 30-day follow-up should have occurred, meets the standard of care. *Id*. Exh. 2 at 129:21-130:12.

-Failure to conduct required ten-minute watches, disregarding watch-swallow orders, falsely marking a prisoner as refusing medication when in fact the medication was never offered to him, and falsifying a prisoner's medical records after his suicide do not depart from the standard of care. *Id*. Exh. 1 at 272:9-25; 274:6-24; 276:4-14.

-Of all the records Dr. Penn reviewed in preparing his report, he did not find a single instance in which mental health care in the Arizona Department of Corrections fell below the standard of care. *Id.* Exh. 2 at 133:18-134:18.

Simply put, Dr. Penn is not a credible expert witness.[8]

### IV. The Court should grant further relief enforcing the Stipulation and its prior orders.

Most of Dr. Penn's declaration is devoted to arguing that mental health encounters that lasted five minutes, or two minutes, or one minute, did not create "an imminent risk of harm." *See* Doc. 3739-4, ¶¶ 12-19. Dr. Stewart disagrees. Doc. 3694-3 at 5-9. But even if the Court were to credit Dr. Penn's opinions, they are irrelevant to the Court's power and duty to enforce the Stipulation and its own prior orders. The Stipulation is a contract, and Plaintiffs are entitled to enforcement of its terms. *See Parsons v. Ryan*, 912 F.3d 486, 497 (9th Cir. 2018) ("*Parsons II*") (where "the contractual language is clear, [courts] will afford it its plain and ordinary meaning and apply it as written."). There is no requirement that Plaintiffs establish an "imminent risk of harm" as a prerequisite to enforcement. *See id*. at 501 ("the district court was not required to make new findings of a constitutional violation before enforcing the Stipulation").

Similarly, Defendants' obligation to obey the Court's prior orders enforcing the

---

[8] Dr. Penn also argues legal conclusions dressed up as expert opinions (*see* Doc. 3739-4 ¶¶ 25, 27 29), which are improper and should be disregarded. *See Docusign, Inc. v. Sertifi, Inc*., 468 F.Supp.2d 1305, 1307 n. 3 (W.D. Wash. 2006) ("Technical experts are not qualified to make legal conclusions and arguments, and where a party elects to include legal arguments in a technical declaration, rather than in a brief, those arguments may appropriately be disregarded").

Stipulation (Doc. 3495, 3518) is absolute and unconditional:

> We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

*Maness v. Meyers*, 419 U.S. 449, 458 (1975). *See also* Doc. 3734 at 4 (enforcing the Court's prior order and sanctioning Defendants for their noncompliance). Here too, there is no requirement that Plaintiffs show that Defendants' noncompliance with the Court's orders creates an imminent risk of harm before those orders may be enforced.[9]

Defendants do not dispute – nor could they – the abundant body of Supreme Court and Ninth Circuit law (including two Ninth Circuit decisions *in this case*) demonstrating that this Court has ample authority to enforce its prior orders and grant further relief to ensure that Plaintiffs receive the benefits of the Stipulation. *See* Doc. 3694 at 13-14 (citing cases); Doc. 3734 at 3 (enforcing the Court's previous order and granting further relief so that the benefits of the Stipulation are not rendered "completely illusory"). Even if Defendants were to argue that they have not technically violated the letter of this Court's orders, that would not deprive the Court of the power to act:

> The fact that the injunction's terms did not specifically forbid [Defendant's] acts of assistance does not immunize [Defendant] from liability. In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded.

*Inst. of Cetacean Rsch v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) (internal quotation marks, citation omitted). In this case, Defendants have flagrantly disregarded both the letter and the spirit of the Court's orders. [10]

---

[9] Defendants have made this argument before, and the Court has rejected it. *See* Doc. 2504 at 2 ("Defendants' attempt to inject a harmless error analysis into each instance of noncompliance finds no support in the Stipulation's language or purpose. And the fact that a particular treatment plan, noncompliant under the Stipulation, would nevertheless meet the community standard of care is of no moment.").

[10] Because Plaintiffs have explicitly asked the Court to enforce its prior orders and grant further relief, and the Court has abundant power to do so (*see, e.g., Parsons v. Ryan*, ("*Parsons III*"), 949 F.3d 443, 454–55 (9th Cir. 2020); *Parsons II*, 912 F.3d at 497)),

**A. The court should require the monitors to document their conclusions and require Defendants to submit monthly reports to the Court.**

Defendants do not challenge Plaintiffs' contentions that (1) the monitors should be required to document in writing their reasons for determining that a given encounter length was, or was not, "meaningful and appropriate," and (2) Defendants should be required to report monthly to the Court the percentage of mental health encounters sampled for the CGARs that fell short of the minimum durations established by the Court, and of those encounters, the percentage that were nevertheless counted as compliant with the Stipulation. *See* Doc. 3694 at 14-15; Doc. 3694-3 at 9.  Those arguments are accordingly conceded, and the Court should grant Plaintiffs' motion on those issues.  *See Greenawalt v. Ricketts*, 943 F.2d 1020, 1027 (9th Cir. 1991) (deeming failure to argue an issue to be a concession); *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000) ("A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case").

**B. The Court should require that the clinical judgment whether an encounter is "meaningful and appropriate" be made by a psychiatrist.**

Defendants claim that master's-level clinicians are qualified to evaluate whether encounters were "meaningful and appropriate" because "they are not evaluating whether any specific treatment was clinically indicated or not." Doc. 3739 at 12.  This is a startling admission.  The Court's order requires the monitor to "*exercise clinical judgment* to determine if the [encounter] length was meaningful and appropriate[.]" Doc. 3518 at 3 (emphasis added). Defendants do not explain how the monitor can exercise such clinical judgment in accordance with the Court's order, while taking no account whatsoever of the clinical needs of the individual patient. After all, as Defendants concede, this determination must be "dependent upon the individual patient, … the patient's history … the responses the patient provides, and many other factors."  Doc. 3739 at 12-13.  Dr. Stewart explains:

---

Defendants' contention that Plaintiffs' motion is "really an untimely motion for reconsideration" is meritless. *See* Doc. 3739 at 1.

LEGAL23774493.1                                   -9-

> It is simply not possible to determine whether an encounter is "meaningful and appropriate in the context of the patient's overall care" with no regard to the treatment needs of the individual patient. A ten-minute encounter may be "meaningful and appropriate" with regard to a patient who has long been stable, but not for a patient who is experiencing command hallucinations and actively engaging in self-harm and suicide attempts, while suffering serious side effects from his psychotropic medication. If it is in fact true that the monitors take no account of the individual patient's treatment needs in determining whether an encounter was "meaningful and appropriate," then those determinations are essentially meaningless.

Stewart Decl. ¶ 3. Defendants' admission that the monitors take no account of the individual patient's treatment needs confirms that the monitors' determinations are a meaningless exercise in rubber-stamping – a conclusion reinforced by the fact that they find *more than 99%* of the encounters they evaluate to be compliant. *See supra* n. 3.

If the "meaningful and appropriate" determination is to have any basis in reality, it must be made by qualified monitors. As Dr. Stewart explains, the work of a mental health professional must be monitored by a professional of higher qualifications:

> The standard practice for monitors is that they be at least one professional level higher than the clinician being monitored – that is, a doctoral-level psychologist monitors master's level clinicians, a psychiatrist monitors psychologists, and so on. The only exception to this is that psychiatrists routinely review the work of other psychiatrists. In no event is a master's level clinician qualified to monitor the appropriateness of patient encounters with a psychiatrist or doctoral-level psychologist. Because the monitors in this case review encounters with all levels of mental health staff, including doctoral-level psychologists and psychiatrists, the monitors should be psychiatrists.

Stewart Decl. ¶ 4.[11]

### C. The Court should require written instructions on how to make the "meaningful and appropriate" determination.

Defendants' contention that providing any instructions whatsoever to the monitors would somehow be counterproductive is risible. It is also contradicted by Defendants'

---

[11] The declarations of the two monitors submitted by Defendants are essentially verbatim copies of each other. *Compare* Doc. 3739-2, ¶¶ 6-9, 11 *with* Doc. 3739-1, ¶¶ 8-11, 13. The Court should not credit these boilerplate declarations. *See Composite Res. Inc. v. Recon Med. LLC*, No. 217CV01755MMDVCF, 2019 WL 2905050, at *8 (D. Nev. July 5, 2019) (disregarding declarations that are "conclusory, identical, [and] merely parrot the language of the asserted claims").

invitation to Plaintiffs to propose instructions for the monitors. *See* Doc. 3694-5 at 22.[12]

Defendants' argument that the monitors should not be provided "rigid instructions" or "stringent instructions," or be "restrict[ed] … to the review of certain records" (Doc. 3739 at 12-13) attacks a straw man, as Plaintiffs propose no such thing. Establishing baseline procedures for monitors to follow – with the monitors free to exceed this baseline in appropriate cases – would ensure that their conclusions reflected something other than the monitors' idiosyncratic beliefs and preferences.

Finally, Defendants claim that instructions are inappropriate because the determination whether an encounter is "meaningful and appropriate" is "subjective." Doc. 3739 at 12. As Dr. Stewart explains, this is incorrect:

> Mental health care is not a "subjective" discipline. Minimally adequate mental health care is based on objective data such as a patient's clinical presentation, past medical and psychiatric histories, previous responses to treatments including psychotherapeutic and medication interventions, medication-induced side effects, laboratory monitoring of psychotropic medications, and adherence to medication regimens, just to name a few data points. As such, whether an encounter was meaningful and appropriate in the context of the individual patient's overall care is necessarily an objective inquiry; it is not a subjective matter of the monitor's personal preference or inclination.

Stewart Decl. ¶ 6.[13]

> Monitors who are determining whether such an encounter is meaningful and appropriate in the context of the individual patient's overall care must be provided detailed instructions to ensure that they ascertain whether each of these essential tasks has been accomplished. Failure to provide such instructions creates a risk that the monitor's determination will fail to take critical data into account, and will simply reflect the monitors' idiosyncratic beliefs and preferences. Failure to provide written, objective instructions also makes the monitors vulnerable to explicit or implicit pressure to produce "good" results by finding encounters compliant in virtually all cases.

*Id*. ¶ 10. The Court should require written instructions to guide the monitors in their work.[14]

---

[12] Plaintiffs proposed such instructions, which Defendants then rejected out of hand. *Id*. at 24-25, 27.

[13] Although Defendants claim that "[t]he Court has … required an inquiry that is subjective" (Doc. 3739 at 12), this is false. The word "subjective" appears nowhere in the Court's discussion of the mental health performance measures in either of its prior orders. *See* Doc. 3495, 3518.

[14] Dr. Stewart further explains that, accepting Dr. Penn's contention that the monitor's review is "akin to a health care peer review" and that its purpose is "to improve the quality of health care encounters and overall mental health care delivery," this confirms the need for written instructions. *Id.* ¶¶ 7-8.

## CONCLUSION

"History has shown that Defendants appear to believe they are empowered to modify the Stipulation to accommodate their own preferences about the best way to provide care. . . . Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable." Doc. 3495 at 5 n.1 (Order).

This Court has concluded that "[t]he only rational reading of the Stipulation is that to be 'seen' requires a meaningful interaction between the prisoner and the mental health professional." Doc. 3495 at 8. As a result of Defendants' evasion of the Court's previous orders, such meaningful interactions are not occurring. *See* Doc. 3379 at 33 (Dr. Marc Stern's conclusion that "the quality of care delivered during *short visits did, in some cases, pose a significant risk of serious harm*") (emphasis in original); *id*. at 32 n.24 ("care delivered during many of these short visits was not safe"). Further relief to enforce those orders, and the Stipulation, is therefore required. Plaintiffs' enforcement motion should be granted.

| | |
|---|---|
| Dated: October 16, 2020 | **ACLU NATIONAL PRISON PROJECT** |

By:   s/ David C. Fathi
    David C. Fathi (Wash. 24893)*
    Eunice Hyunhye Cho (Wash. 53711)*
    Maria V. Morris (Cal. 223903)*
    915 15th Street N.W., 7th Floor
    Washington, D.C. 20005
    Telephone: (202) 548-6603
    Email:   dfathi@aclu.org
             echo@aclu.org
             mmorris@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
             agerlicher@perkinscoie.com
             jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:   jkeenan@acluaz.org
             carellano@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:  dspecter@prisonlaw.com
   ahardy@prisonlaw.com
   snorman@prisonlaw.com
   ckendrick@prisonlaw.com
   rlomio@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Maya Abela
   Asim Dietrich (Bar No. 027927)
   5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
   Telephone: (602) 274-6287
   Email:   adietrich@azdisabilitylaw.org

   Rose A. Daly-Rooney (Bar No. 015690)
   J.J. Rico (Bar No. 021292)
   Maya Abela (Bar No. 027232)
   **ARIZONA CENTER FOR DISABILITY LAW**
   177 North Church Avenue, Suite 800
   Tucson, Arizona 85701
   Telephone: (520) 327-9547
   Email:
      rdalyrooney@azdisabilitylaw.org
      jrico@azdisabilitylaw.org
      mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

# **CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ Jessica Carns