Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: jkeenan@acluaz.org
         carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **DECLARATION OF PABLO STEWART, M.D.** |

LEGAL23774493.1

**I, PABLO STEWART, M.D., DECLARE:**

1. I am a physician licensed to practice in California and Hawaii and a board-certified psychiatrist, with a specialty in clinical and forensic psychiatry. I have served as an expert witness and consultant in this case since 2013. My background and experience as relevant to my expert testimony in this proceeding have previously been provided to the Court (see Doc. 1538-1 at 3-6) and an updated curriculum vitae was recently filed at Doc. 3626-1.

2. I make this declaration (1) to address certain matters set forth in the declaration of Dr. Joseph Penn (Doc. 3739-4), and (2) to address the suicides of three class members that have occurred since my last declaration on August 14, 2020 (Doc. 3694-3).

**Qualifications of the Monitors**

3. In paragraph 29 of his declaration, Dr. Penn attempts to defend the fact that the Arizona Department of Corrections uses master's level clinicians as monitors, stating that "the monitor is not evaluating whether any specific treatment was clinically indicated or not." This is a truly baffling statement. It is simply not possible to determine whether an encounter is "meaningful and appropriate in the context of the patient's overall care" with no regard to the treatment needs of the individual patient. A ten-minute encounter may be "meaningful and appropriate" with regard to a patient who has long been stable, but not for a patient who is experiencing command hallucinations and actively engaging in self-harm and suicide attempts, while suffering serious side effects from his psychotropic medication. If it is in fact true that the monitors take no account of the individual patient's treatment needs in determining whether an encounter was "meaningful and appropriate," then those determinations are essentially meaningless.

4. A monitor is obligated to review the patient's history, including diagnoses and past treatments, to determine if a given encounter is "meaningful and appropriate in the context of the patient's overall care." This can only occur if the monitor is more professionally qualified than the clinician whose work he/she is monitoring. The standard

practice for monitors is that they be at least one professional level higher than the clinician being monitored – that is, a doctoral-level psychologist monitors master's level clinicians, a psychiatrist monitors psychologists, and so on. The only exception to this is that psychiatrists routinely review the work of other psychiatrists. In no event is a master's level clinician qualified to monitor the appropriateness of patient encounters with a psychiatrist or doctoral-level psychologist. Because the monitors in this case review encounters with all levels of mental health staff, including doctoral-level psychologists and psychiatrists, the monitors should be psychiatrists.

**Absence of Written Instructions for the Monitors**

5.     Dr. Penn states in paragraph 28, "I disagree with Dr. Stewart's recommendation that the monitors should abide by stringent instructions when determining whether an encounter was meaningful and appropriate in the context of the patient's overall care." He goes on to state that this determination is "subjective." Dr. Penn is incorrect.

6.     Mental health care is not a "subjective" discipline. Minimally adequate mental health care is based on objective data such as a patient's clinical presentation, past medical and psychiatric histories, previous responses to treatments including psychotherapeutic and medication interventions, medication-induced side effects, laboratory monitoring of psychotropic medications, and adherence to medication regimens, just to name a few data points. As such, whether an encounter was meaningful and appropriate in the context of the individual patient's overall care is necessarily an objective inquiry; it is not a subjective matter of the monitor's personal preference or inclination.

7.     Dr. Penn next declares the monitors should not be provided any instructions because their review is "akin to a health care peer review" and its purpose is "to improve the quality of health care encounters and overall mental health care delivery." This, too, is incorrect; health care peer review and quality improvement programs are universally based on written instructions requiring consideration of objective data.

1    8. In my role as the court-appointed monitor in *Rasho v. Walker*, a statewide class action involving the provision of mental health services to Illinois state prisoners, I have worked closely with the Illinois Department of Corrections staff for the past four years in developing a system of Continuous Quality Improvement (CQI). This system is based on monitoring a comprehensive set of objective quality measures in the provision of mental health care. The entire system is based on objective data and upon detailed written instructions for evaluating those data. Attached as Exhibit 1 are some of the instructions for this CQI program. This document provides detailed written instructions to the monitors (see p. 8, "Step-by-Step Process in using the MH QI Audit Instrument"), and requires them to document their findings (see p. 17, "Insert your comments, thoughts, or suggestions in this area"). In my 35 years of experience as a correctional psychiatrist and a court-appointed monitor overseeing correctional organizations, I have never encountered a monitoring program solely based on subjective factors, or one that functions entirely without written instructions.

9. A meaningful encounter with a patient with mental illness requires documentation of the patient's subjective experience of his/her illness since the last encounter. Then the clinician must document the course of treatment since the last encounter, including response to medications and/or psychotherapy and any side effects from the medications, and perform a comprehensive mental status examination as well as a safety check regarding the potential for self-harm and harm to others. Finally, the clinician should make a diagnosis and a plan for further treatment.

10. Monitors who are determining whether such an encounter is meaningful and appropriate in the context of the individual patient's overall care must be provided detailed instructions to ensure that they ascertain whether each of these essential tasks has been accomplished. Failure to provide such instructions creates a risk that the monitors' determination will fail to take critical data into account, and will simply reflect the monitors' idiosyncratic beliefs and preferences. Failure to provide written, objective instructions also makes the monitors vulnerable to explicit or implicit pressure to produce

"good" results by finding encounters compliant in virtually all cases.

**Brief and Perfunctory Mental Health Encounters as a Contributor to Suicides**

11. I have reviewed the medical and mental health records of the following three class members who died by suicide between August 27 and September 22, 2020:

12. ▮▮▮▮▮▮▮▮, ADC No. ▮▮▮▮ – **died by suicide August 27, 2020.** This patient received exceedingly poor counseling care and psychiatric care in the weeks leading up to his death.

13. On 7/8, the patient had a midlevel provider encounter lasting 8 minutes. The patient stated "I have a lot of anger" and that his anxiety manifested in a fast heart rate and no sleep. He also reported feeling sad. He was prescribed a subtherapeutic dose of the antidepressant Venlafaxine -- 75 mg every morning. The usual therapeutic dose is between 150 mg -300 mg daily. Instead of increasing the dose of the antidepressant the provider added a 2nd drug, Zyprexa, at a subtherapeutic dose of 2.5 mg daily. The usual therapeutic dose of Zyprexa is 10-20 mg daily.

14. A 7/16 visit by the midlevel provider lasted 10 minutes. The patient's medications were not adjusted even though the patient stated that his anxiety was causing him to have a racing heart and he felt "backed up against a wall". He also reported feeling all alone. The midlevel documented "patient denies the need for med management." This is an amazing statement. A provider may note that the patient does not want his medications adjusted but it is the provider who makes the final determination. This patient was in urgent need of having his antidepressant dose increased. The midlevel failed to appreciate the severity of the patient's clinical situation.

15. A 7/22 visit with a psychology associate lasted 21 minutes. The patient reported having a "plethora of issues," but the counselor did not address any of them. Also, there was no follow up plan documented.

16. An 8/17 visit lasted 5 minutes. Although the clinician asked about suicidal ideation as well as inquiring about medication compliance and side effects, no substantive therapy occurred during this very short visit.

17. An 8/19 visit lasted 10 minutes. This was a very superficial visit where nothing of substance was actually discussed. This visit is especially deficient in that the patient had been placed in segregated housing which very likely exacerbated his underlying depression. The patient hanged himself eight days later.

18. Overall, this patient had significantly deficient psychiatric and counseling care in the weeks before his suicide. Most notably the prescribed medications were incorrectly dosed given the patient's symptoms. Also, the extent of the patient's psychosocial problems was not appreciated or addressed, especially given his placement in segregated housing. It is my opinion that the brief and superficial mental health encounters this patient received were a contributing factor to his death by suicide.

19. **▮▮▮▮, ADC No. ▮▮▮▮ – died by suicide September 13, 2020.** In reviewing this patient's mental health encounters from 7/11, 7/20 & 8/12 it became clear that the patient had a complicated mental health history and that, due to the abbreviated nature of the visits, he was not provided adequate mental health care, which directly contributed to his suicide.

20. The 7/11 visit with a psychology associate lasted 5 minutes and was terminated by the patient. During this visit the patient made a direct request to have his medications restarted. The patient reported being under a lot of stress related to his prison job.

21. The patient had a 7/20 visit with a midlevel provider who reported that the patient was experiencing irritability & depressive and anxiety symptoms. Of note, the patient was diagnosed with Schizophrenia and has been on psychotropic medications in the past. There is no evidence that this provider had reviewed the 7/11 note where the patient requested to be restarted on medications.

22. An 8/12 visit with a psychology associate lasting 3 minutes was the patient's last mental health encounter prior to his death by suicide. This was a very troubling note in that the patient "communicated an unwillingness to engage." Notwithstanding this lack of engagement, the clinician completed the entire computer-generated mental status exam.

1   The clinician then goes on to state that the patient is not a risk for self-harm. I do not
2   understand how the clinician can reach this conclusion given the extreme brevity of the
3   visit and the lack of engagement on the part of the patient.

4       23.    Overall, the brevity of the mental health encounters received by this patient
5   and the lack of coordination between the counselor and the midlevel provider directly
6   contributed to his suicide.

7       24.    **▇▇▇▇▇▇▇, ADC No. ▇▇▇▇ – died by suicide September 22, 2020.** In
8   reviewing this patient's four non-psychiatric mental health visits before her death (7/31,
9   8/6, 8/21 & 9/14), it became very clear that her risk for suicide was directly related to her
10  pain status.

11      25.    The note from the 7/31 encounter with an unlicensed psychology associate
12  confirmed the fact that she was suicidal due to her pain. Of note, this visit was the 1st of 3
13  visits after she came off suicide watch.

14      26.    The 8/6 note by an unlicensed psychology associate documented Ms. ▇▇▇
15  having a flat affect, low appetite and that she was "tired and in pain." The patient ended
16  the session due to her being in pain.

17      27.    The 8/21 note by an unlicensed psychology associate documented her
18  refusing medications, struggling with anxiety and again ending the session due to pain.

19      28.    The 9/14 encounter with an unlicensed psychology associate – the patient's
20  last mental health encounter before her suicide -- was 3 minutes long. The patient
21  terminated the visit "due to being in a lot of pain." Based on the limited clinical data
22  obtained during this encounter, I do not understand how the clinician could state "Pt does
23  not appear to be a danger to self or others at this time." Even though the patient denied
24  experiencing suicidal ideation, a more experienced clinician would have seen past this
25  denial and understood that the reported severity of her pain put her at risk for self-harm.
26  She hanged herself eight days later.

27      29.    Overall, the relationship between her pain and her risk for suicide was
28  missed in these last four visits prior to her death. This was due in part to the inexperience

1  of the clinician and the abbreviated nature of the visits, particularly her final mental health
2  encounter, which lasted 3 minutes. These brief visits did not allow for the clinician to
3  fully appreciate the relationship between her pain and her suicidality. The brevity of these
4  visits and the clinician's failure to appreciate the gravity of the patient's situation directly
5  contributed to her suicide.

6  30.    As noted above, in some cases these patients asked to terminate a mental
7  health encounter. That does not mean that the length of the encounter was meaningful and
8  appropriate. A patient may ask to terminate an encounter precisely because she is in
9  distress – for example, Ms. ▓▓▓ did so because she was in severe physical pain. This
10 does not mean that the patient does not need further attention from mental health staff; in
11 many cases, it means exactly the opposite.

12 31.    In addition, in understaffed correctional mental health systems, mental
13 health staff may communicate, either subtly or overtly, that they are in a hurry and need to
14 move on to the next patient, which may lead the patient to agree to terminate the
15 encounter.

16 32.    It is not acceptable for a mental health clinician to reflexively acquiesce in a
17 patient's request to terminate the encounter. Rather, he or she must attempt to re-engage
18 the patient. If these re-engagement efforts are not successful, the clinician is obligated to
19 see the patient either later in the same day or the first thing the following day. Had the
20 clinicians treating Mr. ▓▓▓ Mr. ▓▓▓ and Ms. ▓▓▓ followed these basic precepts, those
21 patients might be alive today.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14TH day of October, 2020, at Honolulu, Hawaii.

_____
PABLO STEWART, M.D.

| | | |
|---|---|---|
| 1 | **ADDITIONAL COUNSEL:** | David C. Fathi (Wash. 24893)* |
| 2 | | Eunice Hyunhye Cho (Wash. 53711)* |
| | | Maria V. Morris (Cal. 223903)* |
| 3 | | **ACLU NATIONAL PRISON PROJECT** |
| 4 | | 915 15th Street N.W., 7th Floor |
| | | Washington, D.C. 20005 |
| 5 | | Telephone:  (202) 548-6603 |
| | | Email:    dfathi@aclu.org |
| 6 | |         echo@aclu.org |
| | |         mmorris@aclu.org |

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
        agerlicher@perkinscoie.com
        jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    jkeenan@acluaz.org
        carellano@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
        ahardy@prisonlaw.com
        snorman@prisonlaw.com
        ckendrick@prisonlaw.com
        rlomio@prisonlaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
   rdalyrooney@azdisabilitylaw.org
   jrico@azdisabilitylaw.org
   mabela@azdisabilitylaw.org

Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

# **CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ Jessica Carns