1   Jared G. Keenan (Bar No. 027068)
    Casey Arellano (Bar No. 031242)
2   **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3   Phoenix, Arizona 85013
    Telephone: (602) 650-1854
4   Email: jkeenan@acluaz.org
            carellano@acluaz.org
5
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
6   *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy*
    *Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,*
7   *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
    *behalf of themselves and all others similarly situated*
8   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE
    PAGE]**
9
    Asim Dietrich (Bar No. 027927)
10  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
11  Phoenix, Arizona 85034
    Telephone: (602) 274-6287
12  Email: adietrich@azdisabilitylaw.org
13  *Attorneys for Plaintiff Arizona Center for Disability Law*
    **[ADDITIONAL COUNSEL LISTED ON SIGNATURE
14  PAGE]**

15              UNITED STATES DISTRICT COURT

16                  DISTRICT OF ARIZONA

17  Victor Parsons; Shawn Jensen; Stephen Swartz;       No. CV 12-00601-PHX-ROS
    Dustin Brislan; Sonia Rodriguez; Christina
18  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph     **PLAINTIFFS' MOTION TO**
19  Hefner; Joshua Polson; and Charlotte Wells, on      **ENFORCE THE COURT'S**
    behalf of themselves and all others similarly       **ORDER AND FOR FURTHER**
20  situated; and Arizona Center for Disability Law,    **RELIEF (DOC. 3089)**

21                  Plaintiffs,

22          v.

23  David Shinn, Director, Arizona Department of
    Corrections, Rehabilitation, and Reentry; and
24  Larry Gann, Assistant Director of the Medical
    Services Contracting Monitoring Bureau, in their
25  official capacities,

26                  Defendants.

27

28

LEGAL23774493.1

**INTRODUCTION**

On December 11, 2018, the Court appointed Dr. Marc Stern as an expert to analyze "irregularities and errors in the monitoring process that produces compliance numbers," pursuant to a previous court order.  [Doc. 3089 at 1, citing Doc. 2900]  The Court's charge "include[d], but [wa]s not limited to, [. . .] whether the instructions for evaluating compliance as outlined in the Monitoring Guide are being applied correctly, [. . .] and the documentation of any subsequent modifications to proposed numbers."  *Id*. at 1-2.  "If Dr. Stern concludes any aspect of the monitoring process is unreliable or inaccurate, Dr. Stern will provide written recommendations of remedial measures to correct any identified deficiencies."  *Id*. at 2.  On October 4, 2019, he submitted his report, focusing on the methodology used for medical and mental health performance measures.  [Doc. 3379]  The Court adopted many of his recommendations, and directed Defendants to modify their monitoring process accordingly.  [Docs. 3495, 3518]

Unfortunately, Plaintiffs must return to the Court to seek further relief pursuant to the expert appointment order. As detailed below, Plaintiffs have found that subsequent to the COVID-19 pandemic-induced cancellation of routine dental care to class members, Defendants continue to report close to 100% compliance with these performance measures, ***while simultaneously noting that the measured activities are not occurring***. The Court should not countenance such brazen disregard for the Stipulation's requirements and the Court's orders, and Defendants' unilateral decision to find themselves compliant when they are not performing the required actions. *See, e.g*., Doc. 3495 at 5 n.1 ("History has shown that Defendants appear to believe they are empowered to modify the Stipulation to accommodate their own preferences . . . Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable.").

Additionally, Defendants' recent Court filings regarding their auditing of performance measures previously found noncompliant indicate that their reviewers are not including in the audits specialty medical encounters that have been cancelled or postponed due to the pandemic. Defendants cannot unilaterally create an exception to the

Stipulation's requirements regarding the provision of health care to class members.  *See*, *e.g.*, Doc. 3495 at 5 ("Defendants previously determined that they were free to unilaterally undercut the Stipulation by abandoning the HNR-Box system and manipulating their compliance by only assessing HNRs from prisoners who were seen by a health care provider and not counting attempts by prisoners who were unable to visit the Open Clinic due to illness or scheduling conflicts with their prison jobs.")  If Defendants believe that COVID-19 warrants a change in the Stipulation's monitoring requirements, they must seek a court order modifying the Stipulation.  *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992).  They may not unilaterally grant themselves such a modification, without informing Plaintiffs or the Court, as they have done here.

Plaintiffs seek further relief, and request that the Court direct its expert, Dr. Stern, to (1) analyze the methodology used for the dental performance measures, (2) research and determine whether the methodology being used for health care performance measures involves removing from consideration or counting as compliant any encounters that have been cancelled or postponed due to the COVID-19 pandemic; and (3) provide his recommendations for remedial steps to correct Defendants' methodology in measuring compliance with the Stipulation's requirements during the pandemic.  Plaintiffs also request that the Court order Defendants to reaudit all performance measures for which they either counted as compliant, or excluded from review, health care encounters that either did not occur or were delayed due to COVID-19.  Finally, Plaintiffs request that the Court order Defendants to reissue their audit reports for the relevant performance measures with the correct scores, and to the extent the corrected scores fall below the 85% compliance threshold and Defendants were not previously found noncompliant with the relevant measures/institutions, find Defendants substantially noncompliant with those measures.

## BACKGROUND

On April 30, 2020, after numerous reports from class members that Defendants had cancelled all on-site dental care and diagnostic procedures as well as all out-of-cell

activities for people incarcerated in maximum custody units, Plaintiffs' counsel wrote to Defendants and asked for more information regarding any modifications that had been made to the delivery of health care and/or changes to operational policies in maximum custody that could potentially impact Defendants' ability to comply with the Stipulation's performance measures.  [See Declaration of Corene Kendrick ("Kendrick Decl."), ¶ 2, Ex. 1]  On May 21, 2020 Counsel for Defendants responded, stating that

> [T]here have been some process changes designed to protect the inmate population from COVID-19. For example, intake now occurs weekly instead of daily because movement is limited statewide. This allows the newly admitted inmates to quarantine for 14 days in the Baker Ward before being transferred. In addition, on-site visits for routine ophthalmology, audiology, ultrasounds, dental, and some mental health programming (where a potential cluster of inmates may exist) have been limited or delayed to further protect the inmates. As we discussed last week, there have been delays for routine specialty consultations because of the unavailability (office closures) of third-party providers, which has resulted in a backlog. However, those inmates with urgent medical or mental health needs or those in need of cancer treatments are still able to receive necessary care.

*Id*., Ex. 2 at 1.

Defendants did not respond with any detail with regard to the specific PMs spelled out in Plaintiffs' letter.  *Compare id*. Ex. 1 and Ex. 2.  Yet as described below, these delays and cancelled encounters are either marked as compliant in Defendants' CGAR reports, or apparently Defendants exclude them from review.

**I.     Defendants Are Counting Dental Encounters That Were Cancelled or Delayed Due to COVID-19 as Compliant.**

The Stipulation has four Performance Measures related to dental care, three of which are currently in effect:

> [PM] 100 - Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs.

> [PM] 102 - Routine dental care wait times will be no more than 90 days from the date the HNR was received.

> [PM] 103 - Urgent dental care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received.

Doc. 1185-1 at 15; Doc. 3575-1 at 13 (list of current and terminated PMs).

Starting with the March 2020 CGAR reports, Defendants began giving themselves credit for compliance with these requirements when the dental care encounters did not occur.  In the March CGARs for Perryville, Tucson, Winslow, and Yuma, the monitor listed multiple dental encounters as compliant for PM 102, even though the monitor also noted that the appointment had been cancelled.  For example, for Perryville's Santa Cruz, Santa Maria, and Santa Rosa Units, in March 2020, the monitor listed the compliance rate



at each as 10 out of 10, even though the entries clearly state that at least one person in each unit's sample was "not seen due to covid 19" or "not seen possibly due to covid 19": Kendrick Decl., Ex. 3 (ADCM1615396)

In March, these cancelled dental encounters were recorded as compliant at four prisons; in April and May 2020, at nine prisons; and by June 2020 CGARs, at all ten

prisons.  If appointments listed as "not seen due to covid 19" and "delayed due to covid 19" are actually counted as noncompliant, as they must be under the language of the Performance Measures, Defendants' compliance scores consistently fall below the 85% threshold, as seen in Table 1:

**Table 1: PM 102 Discrepancies, March-July 2020**

| Facility | March CGAR | March Actual | April CGAR | April Actual | May CGAR | May Actual | June CGAR | June Actual | July CGAR | July Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | | | 28/30 93% | 27/30 90% | 30/30 100% | 12/30 40% | 29/29 100% | 8/28 29% | 30/30 100% | 22/30 73% |
| Eyman | | | 49/49 100% | 47/49 96% | 49/50 98% | 25/50 50% | 50/50 100% | 3/50 6% | 49/49 100% | 13/49 27% |
| Florence | | | 60/60 100% | 57/60 95% | 60/60 100% | 44/60 73% | 57/58 98% | 5/58 9% | 42/43 98% | 37/43 86% |
| Lewis | | | 76/76 100% | 67/76 88% | 72/73 99% | 38/73 52% | 67/67 100% | 7/67 10% | 57/57 100% | 19/57 33% |
| Perryville | 69/70 99% | 60/70 86% | 51/53 96% | 26/53 49% | 70/70 100% | 19/70 27% | 80/80 100% | 18/80 23% | 21/21 100% | 9/21 43% |
| Phoenix | | | 20/20 100% | 19/20 95% | 26/26 100% | 20/26 77% | 20/20 100% | 6/20 30% | 8/8 100% | 3/8 38% |
| Safford | | | 30/30 100% | 9/30 30% | 25/26 96% | 4/26 15% | 30/30 100% | 0/30 0% | 30/30 100% | 6/30 20% |
| Tucson | 62/68 91% | 57/68 84% | 57/61 93% | 33/61 54% | 63/69 91% | 17/69 25% | 64/64 100% | 14/64 22% | 63/63 100% | 31/63 49% |
| Winslow | 24/24 100% | 23/24 96% | | | | | 26/27 96% | 21/27 78% | | |
| Yuma | 46/50 92% | 44/50 88% | 50/50 100% | 26/50 52% | 50/50 100% | 11/50 22% | 50/50 100% | 11/50 22% | 45/45 100% | 16/45 36% |

Kendrick Dec. Exs. 3-7; *id.* ¶ 9.[1]

Given the facial inaccuracies in the CGARs and the falsely inflated compliance numbers, the Court should find Defendants substantially noncompliant with PM 102 at all facilities except Winslow, and direct Defendants to recalculate their compliance scores.

**II.    Defendants Are Not Including in Their Compliance Reports Specialty Appointments That Are Outside The Stipulation's Timeframes Because The Appointments Have Been Delayed Due to COVID-19.**

Defendants admit that there is a backlog of delayed specialty consults.  [*See* Kendrick Dec. Ex. 8 at 2 ("There are many offsite specialists that have not resumed a full schedule and are still working down backlogs.")][2]   These delays therefore implicate

---

[1] Blank squares on the chart indicate that there was no discrepancy between the reported score and the actual file review.
[2] Defendants' September 23, 2020 email refers to the "State of Arizona Governor's

Performance Measures 50 and 51, which relate to the timeliness of outside specialty care requested on urgent and routine bases:

> [PM] 50 - Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider.

> [PM] 51 – Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider.

Doc. 1185-1 at 11.

The Court previously found Defendants substantially noncompliant with PM 50 at Florence, Perryville, Tucson; and with PM 51 at Douglas, Eyman, Florence, Perryville, Tucson, and Yuma.  [Docs. 2030, 2043, 2764][3]  The Court's October 2017 Order to Show Cause included PM 50 at Florence and PM 51 at Eyman and Florence, Doc. 2373 at 3; in June 2018, Defendants were found in contempt for noncompliance with those measures / facilities, which were responsible for $107,000 of the $1.44 million contempt fine. [Doc. 2898 at 18-19, 21-22]

The Court's May 6, 2019 Order to Show Cause included PM 50 at Florence, and PM 51 at Eyman, Florence, and Tucson.  [Doc. 3235 at 7]  The Court's January 31, 2020 Order to Show Cause included PM 50 at Florence, Perryville, and Tucson, and PM 51 at Douglas, Eyman, Florence, Perryville, Tucson, and Yuma.  [Doc. 3490 at 2]  From February through August 2020, following the January 2020 OSC, Defendants have been noncompliant with PM 50 at Florence and Tucson four out of seven months, and with PM 51 at Eyman five out of seven months, at Tucson four out of seven months, at Florence

---

Executive Orders" as a reason for postponing or delaying specialty care.  Kendrick Decl. Ex. 8 at 1. However, the Governor's executive order that temporarily suspended non-essential surgeries was only in effect for the month of April 2020.  *See* Executive Order 2020-32 (April 22, 2020) (lifting the prohibition on non-essential procedures as of May 1, 2020, if clinics and hospitals meet basic hygiene requirements), *available at* https://azgovernor.gov/sites/default/files/eo_2020-32_elective_surgeries.pdf.

[3] Plaintiffs moved the Court on September 8, 2020, to find Defendants substantially noncompliant with PM 50 at Eyman, Lewis, and Yuma (Doc. 3735), and Defendants conceded they are substantially noncompliant with these PMs / institutions (Doc. 3759 at 5), but the Court has not yet made a formal finding of substantial noncompliance.

three out of seven months, and at Perryville and Yuma one out of seven months.  [*See* Doc. 3799 at 4][4]

Given the historic and chronic noncompliance at many prisons with these performance measures, it was surprising that in April 2020 – the month in which non-essential specialty care was suspended pursuant to the Governor's order (*see* supra note 2) – Defendants achieved perfect or near-perfect compliance scores with these measures.

**Table 2:  Defendants' Compliance with Specialty Care PMs, February – August 2020**

| PM | Prison | Feb. | March | April | May | June | July | Aug. |
|----|--------|------|-------|-------|-----|------|------|------|
| 50 | Eyman | 32% | 30% | 95% | 74% | 90% | 58% | 79% |
| 50 | Florence | 57% | 40% | 100% | 82% | 100% | 50% | 86% |
| 50 | Lewis | 57% | 58% | 100 | 87% | 90% | 64% | 73% |
| 50 | Perryville | 95% | 93% | 100% | 100% | 97% | 96% | 93% |
| 50 | Tucson | 60% | 68% | 100% | 69% | 91% | 72% | 85% |
| 50 | Yuma | 82% | 84.6% | 92% | 96% | 96% | 85% | 83% |
| 51 | Douglas | 93% | 96% | 94% | 91% | 100% | 85% | 95% |
| 51 | Eyman | 38% | 34% | 92% | 80% | 98% | 58% | 84% |
| 51 | Florence | 40% | 58% | 96% | 98% | 91% | 77% | 92% |
| 51 | Lewis | 63% | 58% | 100% | 98% | 89% | 90% | 69% |
| 51 | Perryville | 91% | 83% | 97% | 100% | 99% | 90% | 92% |
| 51 | Tucson | 65% | 68% | 96% | 77% | 99% | 83% | 96% |
| 51 | Yuma | 86% | 86% | 96% | 88% | 100% | 90% | 80% |

[Doc. 3735, 3762, 3797-1, 3800]

More recently, compliance with these specialty care measures has sagged again at some facilities.  But notably, it appears that the reason for the findings of noncompliance is the failure of staff to document in the medical records that the delay or cancellation of specialty care was caused by the COVID-19 pandemic— not the delay or cancellation

[4] On May 6, 2020, Plaintiffs moved the Court to find Defendants in contempt of the May 2019 OSC due to their ongoing failure to comply with PM 50 at Florence through the February 2020, but the Court has not yet ruled on the motion.  [Doc. 3584]

itself.  For example, the explanation offered to the Court for the 83% compliance with Performance Measure 51 at Tucson in July 2020 was that "the audited charts that had been rescheduled or suspended due to COVID did not contain the proper documentation citing COVID or external provider as reason for suspension of consult."  Doc. 3757-1 at 333.  It further described a corrective action plan where the "Clinical Coordinator will document in the EMR [electronic medical record] the cause of delays in service . . ." and there will be "[a] full audit of consults occur[ing] at least once monthly to check for appropriate documentation."  Doc. 3757-1 at 333-34; *see also* Doc. 3797-1 at 321 (explaining noncompliance with PM 51 at Eyman as due to "consults scheduled outside time frames did not contain appropriate documentation,"); Kendrick Decl. Ex. 9 (July 2020 Florence CGAR finding noncompliance with PM 50 and 51 due to "INAPPROPRIATE DOCUMENTATION").

Defendants' practice of omitting cancelled or delayed specialty care encounters from the sample from which they calculate compliance is not simply a matter of using improper methodology, but rather has a palpable impact upon the class members who were to benefit from the Stipulation's requirements.[5]  For example, Plaintiffs' counsel recently notified Defendants of the numerous delays in specialty care to a class member with cancer who died after months of delays and cancellations.  [*See* Kendrick Decl. Ex. 10(noting that staff cited the April 2020 Executive Order as the reason for delays in surgical care that occurred in late May and July 2020, after the Order had been lifted)]

Therefore, pursuant to the Court's Order appointing Dr. Stern to advise the Court as to the proper methodology to be used by Defendants in measuring compliance, the Court should direct Dr. Stern to research and report to the Court whether the methodology

---

[5] Plaintiffs are not required to show that the noncompliance with the Stipulation or with the Court's orders creates an imminent risk of harm before the Stipulation or court orders can be enforced.  Defendants have made this argument before, and the Court has rejected it.  *See* Doc. 2504 at 2 ("Defendants' attempt to inject a harmless error analysis into each instance of noncompliance finds no support in the Stipulation's language or purpose."); *see also Parsons v. Ryan*, 912 F.3d 486, 501 (9th Cir. 2018) ("*Parsons II*") ("the district court was not required to make new findings of a constitutional violation before enforcing the Stipulation.")

1  being used for these performance measures involves removing from consideration any

2  encounters that have been cancelled or postponed due to the COVID-19 pandemic.

3  <center>**ARGUMENT**</center>

4  The Stipulation is a contract, and Plaintiffs are entitled to enforcement of its terms.

5  *See Parsons v. Ryan*, 912 F.3d 486, 497 (9th Cir. 2018) ("*Parsons II*") (where "the

6  contractual language is clear, [courts] will afford it its plain and ordinary meaning and

7  apply it as written."). Defendants are also obligated to obey the Court's prior orders,

8  including the orders regarding the methodology to be used in measuring compliance with

9  the Stipulation:

10
11  > We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.
12
13

14  *Maness v. Meyers*, 419 U.S. 449, 458 (1975). *See also* Doc. 3734 at 4 (enforcing the

15  Court's prior order and sanctioning Defendants for their noncompliance).

16  Regardless of whether Defendants are marking as compliant the delayed and

17  cancelled dental and specialty care encounters that have "documentation" of the reason for

18  the delays or cancellations, or are removing them entirely from consideration for the

19  monthly audit, they cannot unilaterally make such a change in the monitoring

20  methodology to measure compliance. These encounters did not occur, or if they occurred,

21  they were outside of the Stipulation's required timeframes; they must therefore be counted

22  as noncompliant. The COVID-19 pandemic does not justify Defendants' failure to

23  provide health care as required by the Stipulation. *See* Doc. 3540 at 2 (denying Plaintiffs'

24  motion for an order directing Defendants to develop a COVID-19 plan, but noting that

25  despite the pandemic, "Defendants remain obligated to treat prisoners who become ill or

26  critically ill consistent with the Stipulation and Defendants have a solemn responsibility to

27  protect the individuals in their custody.").

28

1    Defendants are not accurately reporting their compliance with the Stipulation to the

2    Court.  The Court has abundant power to enforce its prior orders and grant further relief to

3    Plaintiffs.  *See, e.g., Parsons v. Ryan*, 949 F.3d 443, 454–55 (9th Cir. 2020) ("*Parsons*

4    *III*"); *Parsons II*, 912 F.3d at 497.

5                                              **CONCLUSION**

6        Defendants cannot achieve compliance with the Stipulation by unilaterally

7    deciding to excuse their noncompliance due to the pandemic.  They have thus provided

8    false CGAR audit results for several recent months.

9        Therefore, Plaintiffs request that the Court direct its expert, Dr. Stern, to (1)

10   analyze the methodology used for the dental performance measures, (2) research and

11   report to the Court whether the methodology being used for health care performance

12   measures involves removing from consideration or counting as compliant any encounters

13   that have been cancelled or postponed due to the COVID-19 pandemic; and (3) provide

14   his recommendations for remedial measures to correct Defendants' methodology in

15   measuring compliance with the Stipulation's requirements.

16       Plaintiffs further request that the Court order Defendants to reaudit all performance

17   measures for which they either counted as compliant or excluded from review, health care

18   encounters that either did not occur or were delayed due to COVID-19. Plaintiffs also

19   request that the Court order Defendants to reissue their audit reports for the relevant

20   performance measures with the correct scores, and to the extent the corrected scores fall

21   below the 85% compliance threshold and Defendants were not previously found

22   noncompliant with the relevant measures /institutions, find Defendants substantially

23   noncompliant.

24       A proposed order is attached.

25   //

26   //

27   //

28   //

1                                  Respectfully submitted,

2   Dated:  November 13, 2020             **PRISON LAW OFFICE**

3                          By:    s/ Corene Kendrick

4                            Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              ckendrick@prisonlaw.com
              rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Maria V. Morris (Cal. 223903)*
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@aclu.org
              mmorris@aclu.org
              echo@aclu.org

*Admitted *pro hac vice*.  Not admitted in
  DC; practice limited to federal courts.

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    jkeenan@acluaz.org
              carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:    s/ Maya Abela
       Asim Dietrich (Bar No. 027927)
       5025 East Washington Street, Suite 202
       Phoenix, Arizona 85034
       Telephone:  (602) 274-6287
       Email:    adietrich@azdisabilitylaw.org

       Rose A. Daly-Rooney (Bar No. 015690)
       J.J. Rico (Bar No. 021292)
       Maya Abela (Bar No. 027232)
       **ARIZONA CENTER FOR DISABILITY LAW**
       177 North Church Avenue, Suite 800
       Tucson, Arizona 85701
       Telephone:  (520) 327-9547
       Email:
          rdalyrooney@azdisabilitylaw.org
                jrico@azdisabilitylaw.org
                mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**<ins>CERTIFICATE OF SERVICE</ins>**

I hereby certify that on November 13, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*


                                          s/ C. Kendrick