Index of Exhibits to Declaration of Corene Kendrick

| Exhibit | Description | |
|---|---|---|
| 1 | Letter from C. Kendrick to T. Bojanowski, April 30, 2020, regarding modifications to the delivery of health care or changes to operational policies due to the COVID-19 pandemic. | |
| 2 | Letter from T. Bojanowski to C. Kendrick, May 21, 2020, in response to April 30, 2020 letter. | |
| 3 | March 2020 CGARs for dental performance measures at Perryville, Tucson, Winslow, and Yuma. | UNDER SEAL |
| 4 | April 2020 CGARs for dental performance measures | UNDER SEAL |
| 5 | May 2020 CGARs for dental performance measures | UNDER SEAL |
| 6 | June 2020 CGARs for dental performance measures | UNDER SEAL |
| 7 | July 2020 CGARs for dental performance measures | UNDER SEAL |
| 8 | Email from T. Bojanowski to C. Kendrick, Sept. 23, 2020, regarding modifications to Centurion services. | |
| 9 | July 2020 CGAR for PM 50 and 51 at ASPC-Florence | UNDER SEAL |
| 10 | Letter from C. Kendrick to T. Bojanowski, Sept. 25, 2020, regarding deficiencies in medical treatment for class member. | UNDER SEAL |

# Exhibit 1



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

VIA EMAIL ONLY

April 30, 2020

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

        *Parsons v. Shinn*, 2:12-CV-00601
RE:      Modifications to Policies During COVID-19 Pandemic


Dear Mr. Bojanowski:

      We write to request an update whether ADC and its contractor Centurion has in any way changed or modified its policies and procedures regarding the delivery of health care to ensure compliance with the Stipulation, in response to the COVID-19 pandemic. We would be happy to schedule a conference call to discuss these matters.

**<u>Staffing Performance Measures</u>**
- PM 1: Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week.
- PM 2: Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times.
- PM 3: Dental staffing will be maintained at current contract levels – 30 dentists.
- PM 4: Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries

      We are concerned that the historic health care staffing shortages at many of the state prisons will be exacerbated due to staff being unable to work due to illness or family care obligations. **We request copies of any staffing policy or procedure modifications that ADC/Centurion have put into place that could impact Defendants' ability to comply with these Stipulation requirements. If there have been no changes to staffing policies or procedures in light of the COVID-19 pandemic, please so indicate.**

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
Modifications to Policies During COVID-19 Pandemic
April 30, 2020
Page 2

**Pharmacy / Medication Administration Performance Measures**
- PM 11: Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT.
- PM 13: Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication.
- PM 14: Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication.
- PM 21: Inmates who are paroled or released from the ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contract vendor.
- PM 22: Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order.
- PM 35: All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption.

**We request copies of any custodial operations or health care policy changes related to the administration of medication that could impact Defendants' ability to comply with these Stipulation requirements.** Examples would include modifying pill call practices to ensure 6-foot social distancing as patients wait to collect their medication, changing the hours of pill call, providing Direct Observed Therapy (DOT) medications at the housing units, or switching DOT medications to Keep On Person (KOP) designation. **If there have been no changes to policies related to medication administration in light of the COVID-19 pandemic, please so indicate.**

**Intake Performance Measures**
- PM 33: All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility.
- PM 34: A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility.
- PM 62: All prisoners are screened for tuberculosis upon intake.

- PM 75: A mental health assessment of a prisoner during initial intake shall be completed by mental health staff by the end of the second full day after the prisoner's arrival into ADC.
- PM 76: If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC.

These measures are applicable at Eyman (condemned men); Perryville (women); Phoenix (men); Tucson (minors).  See Doc. 3565-1 at 5, 10.  **We request copies of any policy changes to intake of newly-committed prisoners that may affect Defendants' ability to comply with these Stipulation requirements or result in delays in care. If there have been no changes to policies related to intake in light of the COVID-19 pandemic, please so indicate.**

**Access to Onsite Medical Care Performance Measures**

- PM 36: A LPN or RN will screen HNRs within 24 hours of receipt.
- PM 37: Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need).
- PM 39: Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral.
- PM 40: Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral.
- PM 41: Emergent provider referrals are seen immediately by a Medical Provider.
- PM 42: A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider.

**We request copies of any custodial operations or health care policy or practice changes related to the nurses' line or providers' line that could impact Defendants' ability to comply with these Stipulation requirements.**  Examples would include any changes related to the operation of services to ensure appropriate social distancing, the provision of face coverings to patients awaiting and during encounters with health care staff, changes in the hours of operation of the nurses' line and providers' lines that could result in delays in care, and/or new guidelines for the cleaning of examination rooms and equipment between patients.  **If there have been no changes to policies related to access to onsite medical care in light of the COVID-19 pandemic, please so indicate.**

## Access to Diagnostic Services Performance Measures

- PM 45:  On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine.
- PM 46:  A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison.
- PM 47:  A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request.

**We request copies of any custodial operations or health care policy or practice changes related to the provision of diagnostic services that could impact Defendants' ability to comply with these Stipulation requirements.**  Examples would include any changes to the schedules for x-rays or lab tests that could result in delays, fewer encounters scheduled due to social distancing requirements, the provision of face coverings to patients awaiting and during diagnostic encounters with health care staff, and/or new guidelines for the cleaning of equipment between patients**.  If there have been no changes to policies and practices related to access to diagnostic services in light of the COVID-19 pandemic, please so indicate.**

## Access to Specialty Care Performance Measures

- PM 48:  Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record.
- PM 49:  Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial.
- PM 50: Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider.
- PM 51:  Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider.
- PM 52: Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report.

We request copies of any changes to policies or practices that could impact the ability of Defendants to comply with these Stipulation requirements. For example, on March 19, 2020, Governor Ducey issued an executive order stopping all non-essential surgeries in Arizona, so that hospitals and providers can continue offering vital services. According to the executive order, a non-essential surgery is "a surgery that can be delayed without undue risk to the current or future health of the patient." The order also states that "a licensed medical professional shall use their best medical judgment in determining whether a surgery is non-essential or elective." Therefore, if there have been any changes to Utilization Management policies or practices regarding the approval of specialty requests in light of the Governor's executive order, changes to the criteria to be used when determining if a specialty consult is urgent or routine, or custodial operations policy changes related to the transportation of class members to offsite specialty care, please produce the documents reflecting those changes. If there have been no changes to policies and practices relating to specialty care in light of the COVID-19 pandemic and Governor Ducey's order, please so indicate.

**Chronic Disease Management Performance Measure**
- PM 55: Disease management guidelines will be implemented for chronic diseases.
The Stipulation defines "chronic diseases" to encompass the following conditions:
    - diabetes
    - HIV/AIDs
    - cancer
    - hypertension
    - Respiratory disease (for example, COPD / asthma / cystic fibrosis)
    - Seizure Disorder
    - heart disease
    - sickle cell disease
    - Hepatitis C
    - Tuberculosis
    - Neurological disorders (Parkinson's, multiple sclerosis, myasthenia gravis, etc.)
    - Cocci (Valley Fever)
    - End-Stage Liver Disease
    - Hyperlipidemia
    - Renal Diseases
    - Blood Diseases (including those on anticoagulants (or long term >six months))
    - Rheumatological Diseases (including lupus, rheumatoid arthritis)
    - Hyperthyroidism

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
Modifications to Policies During COVID-19 Pandemic
April 30, 2020
Page 6

   o Crohn's Disease
*See* Doc. 1185-1 at 3.

   Many of these same chronic medical conditions put people at higher risk of complications and death from COVID-19. *See* U.S. Centers for Disease Control and Prevention ("CDC"), *Coronavirus Disease 2019 (COVID-19), Groups at Higher Risk for Severe Illness*, at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (noting that persons with asthma, chronic lung disease, diabetes, serious heart conditions, chronic kidney disease, liver diseases, and immunocompromised persons (such as those with HIV/AIDS or cancer) are at risk of severe illness). As a result, CDC has provided guidelines to individuals with these disease on modifications in the management of their conditions, *see id.*, and the U.S. Department of Health and Human Services and professional organizations have provided guidance for the specialists in these conditions. *See, e.g.*, U.S. Dept. of Health & Human Servs., *Interim Guidance for COVID-19 and Persons with HIV*, at https://aidsinfo.nih.gov/guidelines/html/8/covid-19-and-persons-with-hiv--interim-guidance-/0.

   **Therefore, we request copies of any changes in guidance to providers regarding the implementation of revised or updated disease management guidelines that were made to ensure ongoing compliance with PM 55. If there have been no changes to chronic disease management guidelines, please so indicate.**

## Infirmary Care Performance Measures

- PM 63: In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission.
- PM 64: In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission.
- PM 65: In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission.
- PM 66: In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours.
- PM 67: In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks.
- PM 68: In an IPC, Inmate health records will include admission orders and documentation of care and treatment given.
- PM 69: In an IPC, nursing care plans will be reviewed weekly documented with a date and signature.

These measures only apply to Florence, Lewis, Perryville, and Tucson, the four facilities with infirmaries.  Doc. 2900 at 4-5, 13.  **We request copies of any custodial operations or health care policy or practice changes related to the provision of infirmary care that could impact Defendants' ability to comply with these Stipulation requirements.**  Examples would include any changes related to the operation of services to ensure appropriate social distancing, the provision of face coverings to patients during encounters with health care staff, and/or new guidelines for the cleaning of infirmary spaces and equipment between patients.  **If there have been no changes to policies related to infirmary care in light of the COVID-19 pandemic, please so indicate.**

### Mental Health Performance Measures[1]

- PM 73: All MH-3 minor prisoners shall be seen by a licensed mental health clinician a minimum of every 30 days.
- PM 74:  All female prisoners shall be seen by a licensed mental health clinician within five working days of return from a hospital post-partum.
- PM 77:  Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners.
- PM 78:  All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician.
- PM 79:  If a prisoner's mental health treatment plan includes psychotropic medication, the mental health provider shall indicate in each progress note that he or she has reviewed the treatment plan.
- PM 80:  MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician.
- PM 81:  MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider.
- PM 82:  MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician.
- PM 83:  MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider.  MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or

---

[1] PMs 75 and 76 are referenced under Intake.

major depression shall be seen by a mental health provider a minimum of every 90 days.

- PM 84:  MH-3C prisoners shall be seen a minimum of every 180 days by a mental health provider.
- PM 85:  MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications.
- PM 86:  MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication
- PM 87: MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days.
- PM 88: MH-4 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 90 days.
- PM 89: MH-5 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every seven days.
- PM 90: MH-5 prisoners who are prescribed psychotropic medications shall be seen by a mental health provider a minimum of every 30 days.
- PM 91: MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily.
- PM 92: MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days.
- PM 93: Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody.
- PM 94: All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse.
- PM 95: Only licensed mental health staff may remove a prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch.
- PM 96: A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above.
- PM 97:  A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider.

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
Modifications to Policies During COVID-19 Pandemic
April 30, 2020
Page 9

- PM 98: Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0. **We request copies of any changes to policies or practices that could impact the ability of Defendants to comply with these Stipulation requirements.** Examples would include the imposition of social distancing requirements for patients seeing mental health staff for confidential encounters resulting in delays, the suspension of mental health encounters in offices (substituting cell-front encounters), the suspension of mental health groups, and/or the suspension of telepsychiatry or telepsychology. **If there have been no changes to policies or practices related to mental health care in light of the COVID-19 pandemic, please so indicate.**

### Dental Performance Measures

- PM 100: Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs.
- PM 102: Routine dental care wait times will be no more than 90 days from the date the HNR was received.
- PM 103: Urgent care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received.

**We request copies of any changes to policies or practices that could impact the ability of Defendants to comply with these Stipulation requirements.** Examples would include the imposition of social distancing requirements for patients seeing dental staff, resulting in delays or decreased numbers of patients seen, and/or the suspension of routine or urgent dental encounters. **If there have been no changes to policies or practices related to dental care in light of the COVID-19 pandemic, please so indicate.**

### Maximum Custody Performance Measures

- MCPM 1: All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week. Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week.[2]

---

[2] Since the Stipulation was signed, Defendants opened maximum custody units at Lewis Rast, and closed the maximum custody unit at Perryville-Lumley.

Mr. Timothy Bojanowski
RE: *Parsons v. Shinn*
Modifications to Policies During COVID-19 Pandemic
April 30, 2020
Page 10

- MCPM 2: All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III.
- MCPM 4:  All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners.
- MCPM 5: All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) are offered a minimum of 6 hours of out-of-cell exercise time a week.
- MCPM 8: In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:
  - 10 hours of unstructured out-of-cell time per week
  - 1 hour of additional out-of-cell mental health programming per week
  - 1 hour of additional out-of-cell psycho-educational programming per week
  - 1 hour of additional out-of-cell programming per week

**We request copies of any changes to operational policies in the maximum custody units that could impact Defendants' ability to comply with these Stipulation requirements.**  Examples would include any cancellation of privileges, programming, or out of cell time.  **If there have been no changes to policies or practices related to maximum custody operations in light of the COVID-19 pandemic, please so indicate.**

We appreciate your prompt response to this letter, and as noted on page 1, would be happy to set up a phone call to discuss this further.

Sincerely yours,

Corene Kendrick
Staff Attorney

# Exhibit 2



STRUCK LOVE BOJANOWSKI & ACEDO, PLC

Timothy J. Bojanowski
480.420.1604
tbojanowski@strucklove.com

May 21, 2020

**_VIA EMAIL ONLY_**
Corene Kendrick
PRISON LAW OFFICE
General Delivery
San Quentin, CA 94964

Re:     **_Parsons v. Shinn_**
        Modifications to Policies during COVID-19 Pandemic

Dear Corene:

We write in response to your April 30, 2020 correspondence concerning modifications to policies during the COVID-19 pandemic. There have been no modifications to any policies which impact performance measure compliance or procedures concerning compliance with performance measure requirements in light of COVID-19. Defendants and their healthcare vendor, Centurion, are following the CDC guidelines for correctional facilities and remain committed to comply with all performance measures.

With the evolving nature of COVID-19, there have been some process changes designed to protect the inmate population from COVID-19. For example, intake now occurs weekly instead of daily because movement is limited statewide. This allows the newly admitted inmates to quarantine for 14 days in the Baker Ward before being transferred. In addition, on-site visits for routine ophthalmology, audiology, ultrasounds, dental, and some mental health programming (where a potential cluster of inmates may exist) have been limited or delayed to further protect the inmates. As we discussed last week, there have been delays for routine specialty consultations because of the unavailability (office closures) of third-party providers, which has resulted in a backlog. However, those inmates with urgent medical or mental health needs or those in need of cancer treatments are still able to receive necessary care. Telehealth has been increased so that inmates can be seen, and to begin reducing the backlog. In addition, physical therapy will still continue with a physical therapist onsite.

Corene Kendrick
May 21, 2020
Page 2

Due to the fluidity of COVID-19, Defendants and Centurion continue to evaluate their processes to ensure the healthcare needs of the inmates are being met.

Should you have any other questions, please do not hesitate to contact me.

Regards,

Timothy J. Bojanowski

TJB/eap

cc:    Counsel of record

Exhibit 3

FILED UNDER SEAL

# Exhibit 4

# FILED UNDER SEAL

Exhibit 5

FILED UNDER SEAL

# Exhibit 6

# FILED UNDER SEAL

# Exhibit 7

# FILED UNDER SEAL

# Exhibit 8

**Corene Kendrick**

| | |
|---|---|
| **From:** | Tim Bojanowski <TBojanowski@strucklove.com> on behalf of Tim Bojanowski |
| **Sent:** | Wednesday, September 23, 2020 8:38 AM |
| **To:** | Corene Kendrick |
| **Cc:** | plo-az@prisonlaw.com; David Fathi; Maria Morris; Eunice Cho; Curtis Harris; Jessica Carns; Samantha Weaver; Maya Abela; Jared Keenan; Casey Arellano; Elaine Percevecz; Lucy Rand; mary.beke@azag.gov |
| **Subject:** | Parsons - Question re: Centurion Service Modifications |

Corene,

We've now heard back from Centurion, and below is the information we received.

**Suspend dental services.  Release dental staff to reduce exposure but be available on call for dental emergencies.  Medical providers to provide initial management of infections or pain management in consultation with dental practitioners.   Recommend following the guidance of local dental boards and health department for resumption of services**

- *See* timeline described in Doc. 3527 and 3527-1.
- The Centurion of Arizona dental staff has continuously worked and delivered dental care per the Arizona Governor's Executive Orders within the CDC, ADA, and Arizona dental board guidelines.

**Limit chronic care visits to persons with complex or high priority needs.  Routine renewal of chronic medications for stable patients**

- Centurion did not limit or halt/postpone chronic care visits for its patients, despite the fact that this practice became widespread in the community.  Chronic Care visits continued via both onsite and telemedicine throughout the pandemic.  The reason for this is that patients with chronic conditions are deemed vulnerable or at higher risk for COVID complications, and Centurion's intent is to ensure their stability and the maintenance of continuity of care/access to care.

**Suspend routine, preventive health care services except for high-risk situations**

- Centurion followed the guidelines of the State of Arizona Governor's Executive Orders and the CDC guidelines.

**Review nursing treatments such as blood pressure checks, weights, wound checks for medical necessity**
**Consider holding routine blood glucose checks on persons not receiving insulin**
**Consider postponing routine laboratory, x-rays or ECGs**

- Centurion did not suspend or alter these services during the pandemic, since mitigation efforts were put in place early and per CDC guidelines.  This allowed continued services at medical main points, while small focused teams of medical personnel were assigned to provide all medical services to those patients needing cohort, quarantine, or medical isolation.  This also allowed for judicious use of PPE supplies while limiting the movement of staff in order to protect everyone while continuing to provide optimum medical care.

**Suspend routine optometry clinics**

- Centurion followed the guidelines of the State of Arizona Governor's Executive Orders and suspended onsite optometry services until the order was lifted on 5/1/2020.

**Re-evaluate off-site specialty appointments to determine which can be safely postponed or managed through telemedicine.  Recommend to resume outpatient or elective services based on guidance from local health department**

- Centurion followed the guidelines of the State of Arizona Governor's Executive Orders and the updated CDC Interim Guidance on Management of Coronavirus Disease 2019 for Correctional and Detention Facilities.

Regional Medical Director and Site Medical Directors reviewed offsite specialty appointments and evaluated them individually for telehealth appropriateness. Those deemed appropriate were managed through telemedicine.  All others were either safely postponed or allowed to continue with appropriate precautions (which included requirement for COVID testing prior to scheduling in a majority of cases).  Centurion will resume scheduling based on guidance from the local health department, and individual site protocols.  There are many offsite specialists that have not resumed a full schedule and are still working down backlogs.  Currently, the offsite specialists are either not yet scheduling or scheduling months out.

**Suspend mental health groups and other services not related to acute needs**
- Mental health group services have only continued to occur with Centurion's acute inpatient population. These services have shifted to in-cell programming in lieu of mental health groups for all other populations. Further, all other individual patient contact services have remained in effect throughout the duration of the pandemic.

**Replace in-person, congregate health care staffing meetings with telephonic or telehealth staffing meetings**
- Daily huddles and staff meetings have been and are still completed telephonically.  The Centurion Regional Office will not resume on-site staffing until January 2021 at the earliest.

Please let us know if you have any further questions.

Regards,

Tim



Timothy J. Bojanowski
Partner

**STRUCK LOVE BOJANOWSKI & ACEDO, PLC**
3100 W. Ray Road | Suite 300 | Chandler AZ 85226
p: 480.420.1604 | tbojanowski@strucklove.com | strucklove.com

---

**From:** Corene Kendrick <ckendrick@prisonlaw.com>
**Sent:** Monday, September 14, 2020 3:00 PM
**To:** Tim Bojanowski <TBojanowski@strucklove.com>; Elaine Percevecz <EPercevecz@strucklove.com>; Parsons Team <ParsonsTeam@strucklove.com>; Lucy Rand <Lucy.Rand@azag.gov>; mary.beke@azag.gov
**Cc:** Don Specter <dspecter@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>; Amber Norris <anorris@prisonlaw.com>; Gabriela Pelsinger <gabriela@prisonlaw.com>; Ilian Meza-Peña <ilian@prisonlaw.com>; Juliette Mueller <juliette@prisonlaw.com>; Jordan Payne <jordan@prisonlaw.com>; Tania Amarillas <tania@prisonlaw.com>; Eva Amarillas Diaz <eva@prisonlaw.com>; David Fathi <dfathi@aclu.org>; Curtis Harris <Curtis.Harris@aclu.org>; Maria Morris <MMorris@aclu.org>; Jessica Carns <JCarns@aclu.org>; Samantha Weaver <sweaver@aclu.org>; Maya Abela <mabela@azdisabilitylaw.org>; Jared Keenan <JKeenan@acluaz.org>; Casey Arellano <CArellano@acluaz.org>
**Subject:** RE: Parsons - Question re: Centurion Service Modifications

Tim,

Did you ever get a response from Centurion?

Thanks,

-Corene

**From:** Tim Bojanowski [mailto:TBojanowski@strucklove.com]
**Sent:** Friday, August 21, 2020 11:59 AM
**To:** Corene Kendrick <ckendrick@prisonlaw.com>; Elaine Percevecz <EPercevecz@strucklove.com>; Parsons Team <ParsonsTeam@strucklove.com>; Lucy Rand <Lucy.Rand@azag.gov>; mary.beke@azag.gov
**Cc:** Don Specter <dspecter@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>; Amber Norris <anorris@prisonlaw.com>; Gabriela Pelsinger <gabriela@prisonlaw.com>; Ilian Meza Peña <ilian@prisonlaw.com>; Juliette Mueller <juliette@prisonlaw.com>; Jordan Payne <jordan@prisonlaw.com>; Tania Amarillas <tania@prisonlaw.com>; Eva Amarillas <eva@prisonlaw.com>; David Fathi <dfathi@aclu.org>; Curtis Harris <Curtis.Harris@aclu.org>; Maria Morris <MMorris@aclu.org>; Jessica Carns <JCarns@aclu.org>; Samantha Weaver <sweaver@aclu.org>; Maya Abela <mabela@azdisabilitylaw.org>; Jared Keenan <JKeenan@acluaz.org>; Casey Arellano <CArellano@acluaz.org>
**Subject:** RE: Parsons - Question re: Centurion Service Modifications

Corene-

I sent your request to Centurion and am awaiting a response.

Tim

---

**From:** Corene Kendrick [mailto:ckendrick@prisonlaw.com]
**Sent:** Friday, August 21, 2020 8:47 AM
**To:** Tim Bojanowski <TBojanowski@strucklove.com>; Elaine Percevecz <EPercevecz@strucklove.com>; Parsons Team <ParsonsTeam@strucklove.com>; Lucy Rand <Lucy.Rand@azag.gov>; mary.beke@azag.gov
**Cc:** Don Specter <dspecter@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>; Amber Norris <anorris@prisonlaw.com>; Gabriela Pelsinger <gabriela@prisonlaw.com>; Ilian Meza Peña <ilian@prisonlaw.com>; Juliette Mueller <juliette@prisonlaw.com>; Jordan Payne <jordan@prisonlaw.com>; Tania Amarillas <tania@prisonlaw.com>; Eva Amarillas <eva@prisonlaw.com>; David Fathi <dfathi@aclu.org>; Curtis Harris <Curtis.Harris@aclu.org>; Maria Morris <MMorris@aclu.org>; Jessica Carns <JCarns@aclu.org>; Samantha Weaver <sweaver@aclu.org>; Maya Abela <mabela@azdisabilitylaw.org>; Jared Keenan <JKeenan@acluaz.org>; Casey Arellano <CArellano@acluaz.org>
**Subject:** Parsons - Question re: Centurion Service Modifications

Dear Tim,

Can you confirm which of these Centurion service modifications have been adopted in Arizona?

Suspend dental services.  Release dental staff to reduce exposure but be available on call for dental emergencies.  Medical providers to provide initial management of infections or pain management in consultation with dental practitioners.  Recommend following the guidance of local dental boards and health department for resumption of services.

Limit chronic care visits to persons with complex or high priority needs.  Routine renewal of chronic medications for stable patients.

Suspend routine, preventive health care services except for high risk situations.

Review nursing treatments such as blood pressure checks, weights, wound checks for medical necessity.

Consider holding routine blood glucose checks on persons not receiving insulin.

Consider postponing routine laboratory, x-rays or ECG's.

Suspend routine optometry clinics.

Expand use of "keep on person" (KOP) medications including metered dose inhalers instead of nebulizers.

Re-evaluate off-site specialty appointments to determine which can be safely postponed or managed through telemedicine. Recommend to resume outpatient or elective services based on guidance from local health department.

Suspend mental health groups and other services not related to acute needs

Replace in-person, congregate health care staffing meetings with telephonic or telehealth staffing meetings.

Thanks,

-Corene

Corene Kendrick, Staff Attorney
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710
ckendrick@prisonlaw.com
https://prisonlaw.com/news/arizona-covid-19/
https://prisonlaw.com/news/cdcr-covid-19/

ATTENTION: The State of California has ordered all residents to shelter in place until further notice, in response to COVID-19. PLO staff are working remotely. There may be a delay in processing and responding to U.S. mail, phone calls, and emails. We apologize for any inconvenience, and we appreciate your patience.

This electronic mail transmission contains information from the law firm Struck Love Bojanowski & Acedo, PLC that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

Exhibit 9

FILED UNDER SEAL

# Exhibit 10

# FILED UNDER SEAL



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

VIA EMAIL ONLY

September 25, 2020

Mr. Timothy Bojanowski
Struck, Love, Bojanowski & Acedo, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@strucklove.com

RE:        *Parsons v. Shinn*, 2:12-CV-00601
    ████████████████████████

Dear Mr. Bojanowski:

     We write regarding violations of the Stipulation in the medical care received by ████
████████████████, in the months preceding his death on ████████████, 2020. Mr. ████ was
a ██-year-old housed at ASPC-Florence Central IPC. We previously notified you about delays
with Mr. ████ medical care for his colorectal cancer on March 18, 2020.

     Mr. ████ had received an anal fistula surgery on January 20, 2020. His surgeon, Dr.
Whitman, recommended Mr. ████ have a follow-up appointment within 1-2 weeks of his surgery.
While Mr. ████ provider originally submitted a general surgery consult request on an urgent
basis on January 21, that request was cancelled after Mr. ████ providers learned that Mr.
Whitman was retiring.

     Rather than immediately reconciling the appointment, or Centurion's Utilization
Management team contracting with a second general surgeon, Mr. ████ providers waited over
one month to submit a second general surgery consult request. The second request was submitted
on February 27, 2020, also on an urgent basis. At the time of our previous letter, the consult
remained unscheduled and incomplete, in violation of Performance Measures 48 and 50.

     Next, Mr. ████ consult was erroneously postponed on 4/1/20, with staff citing Executive
Order 2020-10, which mandated that all non-essential procedures be delayed for the month of
April. Mr. ████ previous surgery was essential, and follow up therefore met the definition of
the type of care that should have continued under the Order.  According to the Executive Order
issued by Governor Ducey on March 19, 2020, a procedure should not be deemed non-essential
or elective if "it would threaten the patient's life, threaten permanent dysfunction or impairment

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Timothy Bojanowski

Re: █████████

September 25, 2020

Page 2

of any body part, risk metastasis or progression of staging, or require the patient to remain
hospitalized if the surgery was delayed." On April 22, 2020, Governor Ducey announced that this
order would be lifted as of May 1, 2020, and that hospitals and facilities should begin doing all
procedures again.

Contrary to the guidance provided by the Executive Order, however, Mr. █████providers
appeared to have considered his follow-up consult non-essential. And staff continued to cite the
Executive Order well after it was lifted, as shown in the 5/26/2020 and 7/14/2020 updates added
to Mr. █████consult record.

| | | |
|---|---|---|
| Action Date: | 05/26/2020 | Time: 13:57:31 |
| Staff: | Adams, Megan | |
| Action Type: | Authorization Obtained | |
| Reason: | See Comments | |
| 2nd: | | |
| 3rd: | | |
| Forward Staff: | | |

**Action Taken Comments**

SERVICE SUSPENDED SEE STATE OF AZ EXECUTIVE ORDER 2020-10 COVID19 AND UNIT ON
LOCK DOWN. WILL SCHEDULE WHEN CLEARED

| | | |
|---|---|---|
| Action Date: | 07/14/2020 | Time: 12:40:40 |
| Staff: | GILMORE, SHARON | |
| Action Type: | External Consult Scheduled | |
| Reason: | Scheduled | |
| 2nd: | See Comments | |
| 3rd: | | |
| Forward Staff: | | |

**Action Taken Comments**

APPOINTMENT DELAYED DUE TO SUSPENDED SERVICES STATE OF AZ EXECUTIVE ORDER 2020-
10.

Due to the COVID outbreak, this specialist office is backlogged.
This patient was scheduled for the first available appointment.
FIRST AVAILABLE APPOINTMENT SCHEDULED 08/20/2020 with BANNER IRONWOOD/GENERAL
SURGERY.
TimeStamp: 14 July 2020 12:45:02 --- User: SHARON GILMORE (GILSH02)

//

Mr. Timothy Bojanowski
Re: ██████████
September 25, 2020
Page 3

On 8/19/2020 staff cited possible positive COVID cases in Mr. ██████ housing unit, as justifying continuing to delay his appointment. We note that Mr. ████ was tested for Covid-19 on numerous occasions, including on 8/23/2020, when he tested negative, and he given his negative status, he would not have presented a danger to public health by going to the hospital for his follow-up appointment.

Mr. ██████ medical record shows that the general surgery appointment was never completed in the eight months since it was first requested.

We request that you please notify us of the steps Defendants and Centurion plan to take to ensure that violations of the Stipulation and deficiencies in medical health care of the type that preceded Mr. ████ death do not recur.

Thank you for your prompt attention to this matter.

Sincerely,

*Clendrick*

Corene Kendrick
Staff Attorney

*Ilian Meza*

Ilian Meza-Peña
Litigation Assistant