THIS DOCUMENT IS NOT IN PROPER FORM ACCORDING
TO FEDERAL AND/OR LOCAL RULES AND PRACTICES
AND IS SUBJECT TO REJECTION BY THE COURT.

REFERENCE _General Order_ 14-17
(Rule Number/Section)

✓ FILED          LODGED
   RECEIVED       COPY

DEC 1 1 2020

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

MR Roberto Carrasco Gomez # 131401
ASPC-Lewis-Rast Max
P.O. Box 3600. Buckeye, AZ 85326

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

Victor Parsons et al.,
                    Plaintiff        CASE NO. 12-cv-0601 (ROS)

                                  Notice of Service

David Shinn et al.
              Defendant(s)

On the following date 19 Nov. 20, Opposing Counsel in
the Parsons Class Action Received Notice of CLAIM Grievances
[RE: BREACH OF CONTRACT - STATE LAW CLAIMS]

• Grievance [RE: Breach of Contract]
• Informal Resolution RE: Egregious Misconduct/Fraud in
Support of Anticipated Fed. R. Civ. P. (60)(b) Motion.

Respectfully Submitted this 19th day of Nov 2020
                                   UNDER PENALTY OF PERJURY

                          MR Roberto Carrasco Gomez # 131401
                          ASPC-Lewis-Rast Max
                          P.O. Box 3600 Buckeye, AZ

Exhibit A

*did Not [illegible handwriting] yes on therefore, I'M MOViNg forWARD.*

## ARIZONA DEPARTMENT OF CORRECTIONS
### Inmate Grievance

| | | RECEIVED BY |
| --- | --- | --- |
| | | C. Levels |
| | | TITLE COIII |

*Note:  You may appeal the Grievance Coordinator's decision to the Warden/Deputy Warden/Administrator by filing form 802-3, within 10 calendar days of receipt of this notice*

| BADGE NUMBER | DATE (mm/dd/yyyy) |
| --- | --- |
| 9132 | 11/06/2020 |

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | | DATE (mm/dd/yyyy) |
| --- | --- | --- | --- |
| JAMES Robert | 134101 | | 6 NOV. 20 |

| INSTITUTION/FACILITY | | CASE NUMBER |
| --- | --- | --- |
| ASPC-Lewis RAST MAX | | |

TO:  GRIEVANCE COORDINATOR

**Description of Grievance** (To be completed by the Inmate)

Arizona Department of Corrections ADC's use of Prolonged Isolation in Arizona's SuperMAXiMUM Prison Complex Level and Universal treatment that Creates a Significant Risk of serious HARM and violates the terms of the contract stipulated to in the PARsons contract, ADC implements a continuing policy and practice of housing me in long-TerM Solitary Confinement. Furthermore, ADC's classification policy and Practice does Not place a cap on the duration I'M required to spend in isolation. As a Result, I've spent over 18 years in isolation. My Physical and Mental health has deteriorated due to inadequate Medical, Mental health service.

**Proposed Resolution** (What informal attempts have been made to resolve the problem?  What action(s) would resolve the problem?)

[illegible] Class of Members who have been interred by the breach of contract in the Parsons Stipulation; enforce the Settlement; In Addition, Provide Compensation to those who have been Interred by the breach of contract. Attached form here is 1. InforMal 12Oct.20 2. Of Supplement

| INMATE'S SIGNATURE | DATE (mm/dd/yyyy) | GRIEVANCE COORDINATOR'S | DATE (mm/dd/yyyy) |
| --- | --- | --- | --- |
| | 6 NOV. 20 | | |

| Action taken by | Documentation of Resolution or Attempts at Resolution. |
| --- | --- |
| | |

| STAFF MEMBER'S SIGNATURE | BADGE NUMBER | DATE (mm/dd/yyyy) |
| --- | --- | --- |
| | | |

DISTRIBUTION:  INITIAL:  White and Canary or Copies – Grievance Coordinator; Pink or Copy - Inmate
            FINAL:  White – Inmate; Canary – Grievance File

802-1
12/12/13



# ARIZONA DEPARTMENT OF CORRECTIONS

## Inmate Grievance – GF Supplement

| INMATE'S NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/FACILITY | CASE NUMBER |
|---|---|---|---|
| Dance, Robert | 121401 | ASPC-Eyman | |

including the detrimental health impacts of prolonged isolation.
Multiple times I've been treated in housing that amounts to a wing of an extreme lockdown. Related to my mental illness I have deliberately been placed in cell lockups, used to deliver mental health to inmates who SUPPORT CPS. These things harm me and ultimately I remind Syinda MD, Administrators here, Facility, MH affiliated, these CARE's, or treatment alternative or 'COMPLICATION' with the HP VAD block which the intent of continuing violence I AM CONSTITUTION ABLE more or reduce while inacts appropriate
A prison failure to provide an effective Alternative custody & continuing term from severe isolation to a less restricted housing environment. Acknowledging the ominous effects of prolonged isolation Mr. I'd ask to AMC create the rest of physical and psychological harm by deeply denying a Step Program that allows one following a least restricted that matters to open privilege housing. Alternatives made by the Structural ADA directorate, have been denied a Step level of a detention this, Mentre used on restricted & AMEND and the Litigation the edical custody to remove at the least amount of isolation.

The Step Committee has broad discretion on whose NAME gets submitted to the committee and does not afford me: 1. A notice of hearing OR: 2. A chance to object to the committee's findings when required is the lowest possible level. I have been kept in the most harsh level of solitary confinement since the Pre-ans Contract. I AM trapped in a cycle of chronic behavior Mental deterioration and have received incurred years of disciplinary infractions that have resulted in my indeterminate placement or isolation, in violation of the 14th Amend procedural Due Process clause.

| SIGNATURE | DATE (mm/dd/yyyy) |
|---|---|
| | Nov. 20 |

INITIAL DISTRIBUTION: GF Supplement – White and Canary or Copies – Grievance Coordinator
Pink, or Copy – Inmate

FINAL DISTRIBUTION: White or Copy – Inmate
Canary or Copy – Grievance File

802-7
12/12/13

Exhibit B



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Informal Complaint Resolution**

*Complaints are limited to one page and one issue.*

*Please print all information.*

| INMATE NAME (Last, First M.I.) (Please print) | ADC NUMBER | INSTITUTION/UNIT | DATE (mm/dd/yyyy) |
|---|---|---|---|
| GAMEZ, JOSPH | 131401 | ASPC-lewis-PM | 10/10/20 |

| TO | LOCATION |
|---|---|
| Coordinators | 343 |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I am writing to informally resolve the following problem. During a criminal prosecution in Maricopa, County an Allegations team conducting relentless by the ADC "FTI" and the Attorney Generals Office "AG" constituted a discriminate taking several actions in Muslim detainees by conducting a series of unconstitutional actions in violation of the Equal Protection Clause of the Fourteenth Amend. USC, RFRA/RLUIPA according to law including the First Amend. Retaliation of the free speech/seizure clause.

In 2015 the FTI "FTI" supposedly received a statement from a confidential informant "CI" supposedly by the state that "Gamez" had been receiving cell phones illegally. During "Gamez" stays in the statement was not received by the "CI" even prior to being under investigation and manufactured by ADC. Against such as it appears targeted to discriminate and take actions against "Gamez" being that the person in question is a Muslim he is not torroist. Subsequently obtained a Search Warrant by using informed testimony from the "CI". Forty-Legal boxes containing sensitive Work-Product Information and Legal documents between Gamez, Parsons, Attorneys were searched/Seized by the Opposing counsel in Parsons AG's office. ADC does not have an adequate policy or practice that prevents ADC administrators from viewing the illegal of documents. There liability as a result ADC "FTI" and "ACG" invaded Attorney Client Privilege and discriminated on his Muslim religion. It was recently determined that the special agent in charge of the criminal investigation had performed sexual favors with CI's in exchange for his cooperation in planting/manufacturing evidence against

INMATE SIGNATURE Gamez. Resolution: Investigate the ACG retaliation. All available relief.
DATE (mm/dd/yyyy) Dec 10/10/20

| Have you discussed this with institution staff? ☑ Yes ☐ No |
|---|
| If yes, give the staff member name: D.W. Coleman |

Distribution:   INITIAL:  White and Canary or Copies – Grievance Coordinator, Pink or Copy – Inmate
             FINAL:  White – Inmate; Canary – Grievance Coordinator File

802-11
6/25/14

# PHOENIX
# New Times®



Samuel Mattia / **Facebook**

# A Skinhead Informant, Revenge Porn, and the Extortion of a Phoenix FBI Agent

**RAY STERN  |  APRIL 30, 2020  |  4:17PM**

An explosive new federal complaint accuses an informant of extorting an FBI agent with revenge porn photos and expands on the made-for-Hollywood scenarios that led to the firing in December of the Goodyear police chief.

The nine-page criminal complaint filed on Wednesday charges the FBI informant, Samuel Marian Mattia, with cyberstalking, but also outlines a series of dramatic events and revelations involving the former FBI agent, Mikaila Hughes.

Case 2:12-cv-00601-ROS   Document 3829   Filed 12/11/20   Page 8 of 19

Hughes resigned from the FBI on March 14, 2019. As an April 16 *Phoenix New Times* article revealed, a secret meeting between Hughes and the confidential informant — whose name wasn't known publicly until now — sparked a panicked search mission in the city of Phoenix by the suburban Goodyear Police Department, for whom Hughes' husband, Justin Hughes, works as deputy chief.



One of two photos uploaded to an online bulletin board site in November of Samuel Mattia with a woman he identifies as Mikaila Hughes. (*New Times* has blurred out the agent's face for her safety.) / **Screenshot of website**

The federal complaint contains many new details, including the fact that Mikaila Hughes (identified only as "M.H." in the complaint) was having a sexual relationship with Mattia at the same time she was obtaining information from him about pending FBI cases.

Startling details in the complaint include how Mattia told the FBI he had downloaded information from Hughes' Domestic Joint Task Force for Terrorism laptop, that Hughes claims to have known and been photographed with FBI agents from Arizona and other states, and that he has a recording of Hughes talking about planting evidence on a suspect.

In total, the situation amounts to an epic debacle for the FBI and Hughes, with Goodyear police as collateral damage.

The public already has learned about the Goodyear angle because of public records and meetings related to local law enforcement.

But the FBI remains tight-lipped about Hughes and Mattia, and won't answer questions emailed to its Phoenix office regarding the new complaint. At the very least, it appears as though the FBI failed to protect Hughes from Mattia or her own bad decisions. It remains unknown whether any agents or supervisors have been disciplined, whether sensitive information may have been compromised, and what, if any, changes to policy or training have been made in response to the case.

After *New Times* called the FBI and the U.S. Attorney General's Office for comment about the case, all case records including the complaint were removed from PACER, the government's repository of federal court records, and apparently put under seal.

But not before *New Times* had copied them.

Neither Hughes nor Mattia could be reached for this article. An email sent to Mattia in jail has not yet been answered. The following story is based on the complaint, court and online records, and information from Meg O'Connor's April 16 *New Times* article.

## A Rogue Informant

Somewhere in or near Sacramento, California, on December 7, 2019, Samuel Mattia, a 40-year-old white man with tattoos on his arms and a mustache that droops on the sides like Wyatt Earp's, was arrested on an outstanding warrant related to a domestic violence charge.

The officer who arrested him that day likely was surprised by the story he heard from Mattia — and more so by the fact that Mattia could back it up with hard evidence.

Mattia told the officer he was an FBI informant who had been given permission by the FBI to commit illegal activity, and that his handler was an agent named Mikaila Hughes. They'd had a sexual relationship, and now she was on the government's "Brady list" of officers known to be untrustworthy, Mattia told the officer. Just look at the Dropbox app on his phone, he informed the officer, adding that it was an FBI mobile phone.

In the app, "the officer saw photos of Mattia engaging in sexual activity with a white female with strawberry/blonde hair, thin build, approximately 5'6" tall and 130 lbs."

Mattia identified the woman as Agent Hughes.

A week later, the FBI had downloaded all the information in the phone and corroborated much of what it already knew by then about the revenge photographs and where they had been sent. The evidence also showed someone had used the phone to search for information about Hughes, her husband, her home, and her mother's address.

Case 2:12-cv-00601-ROS   Document 3829   Filed 12/11/20   Page 10 of 19

Mattia grew up in Scottsdale, where he attended Coronado High School, and he studied biblical historical research at Arizona State University, according to his Facebook page. Locked up again in December 2019, Mattia may have practically felt at home. State Department of Corrections records show he has spent most of his adult life behind bars; he first went to prison for trafficking in stolen property when he was 18.His longest prison sentence was his most recent, stemming from a 2009 conviction on two counts of aggravated assault.

In that case, according to court records, Mattia, a "validated gang member (Skin Heads)," hit three people with a wooden club over two days in May 2009 near Southern and 75th avenues. The first was a 66-year-old neighbor who was beaten in the head by Mattia (who was staying in a house nearby) for no apparent reason. On the second day, a 16-year-old teen and her male friend drove to that same house to tell Mattia to stop texting her. He bounded over a fence when she got out of the car, yelling, "You want to fuck with a gangster?" He bashed the girl in the head and ribs with the club, pushed and struck her male friend, smashed their car windows, and grabbed the girl's mobile phone before fleeing the scene.



Mattia's prison mugshot. / **ADOC**

Mattia was sentenced to nine years following a plea deal. He was released on November 18, 2018, and was soon spending lots of time with Special Agent Mikaila Hughes. They already had been working together for a time. At some point, Mattia "was recruited and signed up" as a confidential informant for the FBI while still in prison.

As part of his plea deal in the assault case, Mattia should have received two years of probation for a separate offense after being released from his nine-year sentence. But the FBI can pull strings for its favored informants. In January 2019, Maricopa County court records show, Judge Sam Myers terminated Mattias' probation on the separate offense, following a sealed request from prosecutors.

In the Sacramento County Jail following his arrest last December, Mattia felt talkative: In February, he called the FBI's Sacramento field office and told them what he knew.

Which was a lot.

He knew Hughes' undercover name and that his own FBI name was Matt Dixon. He said Hughes had told him the names of agents from the FBI's Phoenix, New Mexico, and Sacramento field offices.

He revealed that he had accessed Hughes' terrorism task force laptop and downloaded data from it. He said he had carried Hughes' FBI gun around. He claimed to know that Hughes' supervisor had approved money he had been given. He said Hughes had gotten him off probation and had "some other charges dropped."

Mattia told the FBI his relationship with Hughes lasted from November 2018 through March 2019. The complaint goes on to say that "[Hughes] got into trouble and Mattia was there when the FBI came and picked up her car. [Hughes] gave Mattia notebooks and he took the notebooks to an attorney. Mattia is in possession of [Hughes'] laptop, pictures, guns (issued Glock 23), tablets, 2 Samsung Galaxy S9 phones, throw away phones, zip drives with downloaded case information, and recordings between himself and multiple FBI agents."

In that call, and during a March 11, 2020, interview with Special Agent Walker Wicevich, Mattia tried to deflect blame and named Hughes as the primary source of corruption.

As Mattia told it, Hughes tried to manufacture a new criminal case against convicted Arizona terrorist Mahin Khan, and that she even wanted to "plant evidence" as part of the scheme.

## Sex for Information

About a month after being released from prison in November 2018, Mattia received a letter from Mahin Khan, a young man he had known in prison.

Khan, still in prison, wrote that he wanted to have Hughes killed because a search of his cell — an event that Hughes had overseen personally — had resulted in more charges for Khan, who was already serving eight years following his conviction for plotting a terror attack in the name of ISIS. Court records back this up, showing that Khan got into trouble in February 2018 allegedly for promoting prison contraband and assaulting a prison guard, and was later convicted and sentenced to another 2.25 years in prison after pleading guilty to assault.

At age 18, in November 2016, Khan had become the first person convicted of a state-level terrorism charge in Arizona. The facts of the case showed that Khan had communicated with someone he thought was a member of ISIS, but who was actually working with the FBI. With his ersatz co-conspirator, he planned to launch an attack with explosives on a Phoenix-area Motor Vehicle Division office.

Articles in the left-wing sites The Intercept and The Progressive, however, offered an alternative view of the case, revealing that Khan had a childlike mentality and had been monitored closely for four years by the FBI before he was arrested. As Beau Hodai (an occasional New Times freelance writer) wrote for The Progressive in a May 23, 2017 article, "the FBI's entire case was a collection of emails, texts, tweets, and conversations with FBI informants collected over the course of nearly four years — nearly every single word of which was uttered or written by a minor with a demonstrably stunted intellect."

Whatever his capabilities, the FBI took Khan's December 2018 letter to Mattia seriously and began an investigation into the alleged "murder-for-hire."

Hughes had continued working with Mattia on unnamed "pending FBI investigations" after he got out of prison. By January, the FBI agent — whose husband was a deputy chief of police — was in a sexual relationship with her gangster informant.

Their passion for each other didn't last long. Sometime around the end of January or early February, Hughes tried to end the sexual part of the relationship. But she was still his official FBI handler, and he was giving her information on pending investigations.



Mahin Khan / **MCSO**

Mattia had no intention at that point of giving up information without his side benefits. He took some photos of himself and Hughes having sex, some of which she was aware he took; she told the FBI she had not given consent for him to take or distribute the pictures.

Mattia also told her she had to keep giving him sex or he'd tell on her to her supervisor. Hughes "became emotionally distressed and felt that she was being harassed by Mattia, but that she had to keep seeing him because of the importance of the investigations for which Mattia was providing information. Mattia would also continue to contact her because he was providing information for an ongoing investigation and refused to deal with anyone but [her.]"

The FBI transferred the murder-for-hire case involving Khan to Agent Wicevich. At first, everything seemed okay. Mattia was cooperative and indicated he'd keep trying to provide further evidence needed to charge Khan with the plot. On March 5, the FBI removed Hughes as Mattia's handler "because she was a victim" in the Khan case.

The next day, Mattia stopped cooperating with the FBI. He refused to give up a phone number for a woman who had called him about the alleged murder-for-hire. He said he'd do nothing more for the FBI without a letter of immunity from prosecution.

On March 12, Wicevich and another special agent who had worked as Mattia's "co-handler" went to Mattia's home to talk to him about cooperating. He shut the door in their faces.

## A Long Day in Goodyear

Hughes confessed to her bosses about her relationship with Mattia (which they already may have known about) and resigned from the FBI on March 14. But Mattia kept contacting her and giving her information. She told him to contact her co-handler. She tried to persuade him to work with others in the FBI. And she tried to talk him out of sending the sex photos to her family or the news media, which he kept threatening to do if she stopped seeing him.

On April 3, 2019, Hughes decided to meet with Mattia once more. She told her husband that she was going to meet with an agent known as "The Godfather," who she said had information about a $350,000 bounty put on her head by gang members.

It's unclear from records what Deputy Chief Justin Hughes knew about his wife and Mattia at that time. Presumably, he knew that she had resigned from her job. Maybe he even knew why. But one thing is clear from testimony last month at the Goodyear police chief's termination appeal hearing: Justin Hughes thought his wife was in grave danger that day.

He asked her to keep in touch and traced her movements around town with a tracking app that afternoon. When the tracking app showed Hughes' phone had been stationary for a long time, Hughes contacted Sergeant Jason Mattie, the supervisor of Goodyear's Neighborhood Enforcement Team (NET), and asked him to meet at Hughes' home. When Mattie got there, he discovered Justin Hughes in a frenzy.

Justin Hughes told him, "we gotta go, we gotta go," Mattie recalled at the March 4, 2020, hearing. "And I was like, whoa, slow down, what's going on?"

Mikaila may have been kidnapped or killed, Justin Hughes told the sergeant.

The two rendezvoused back at the Goodyear police station, where Mattie eventually talked to Chief Jerry Geier. Based on Hughes' concerns, members of the NET planned to drive into Phoenix to try and find Hughes. Her phone was pinging somewhere near Cactus Road and 32nd Street, the officers determined.

Geier later claimed he told Mattie that Phoenix police or the FBI should be involved, and that the team should not drive into Phoenix. Mattie claimed at Geier's hearing that he only took the team to Phoenix because he had Geier's approval.



Chief Jerry Geier (left) and Deputy Chief Justin Hughes (right). / **Social media**

Approved or not, several members of the team headed to Phoenix at about 5 p.m. They searched several local businesses where the phone seemed to be pinging. One ping seemed to be more valid than the others, and it showed the phone was in a street gutter. Mattie felt confident he was now working a valid kidnapping, he later testified.

"I called Phoenix Fire and had them pull the manhole up so we could try to find her phone, 'cause in my head I was picturing she got kidnapped or killed and they tossed her phone," Mattie said at the hearing.

But then, a Goodyear detective spotted Hughes' truck pulling into a gas station. Mattie drove his vehicle up next to Hughes and asked her what was going on.

"She immediately started lying to me," Mattie testified. "I could tell — the story just sounded so bogus. I said, 'Hey, I know what's going on,' and she eventually divulged that she was meeting a confidential informant and she had hid her phone in the women's bathroom stall."

Testimony by Acting Chief Santiago Rodriguez at Geier's hearing indicated that he and Geier already knew that Mikaila Hughes was under investigation by the FBI, and that she had been placed on administrative leave for the inappropriate relationship with Mattia. Geier testified that he also believed she was being criminally investigated.

Once Goodyear officers knew Hughes was safe, they asked her to meet them at a restaurant that night. There, officers retrieved a gun from Hughes that she had obtained from a lieutenant at Goodyear PD.

"I just remember that she was distraught, possibly even suicidal, she had a mental health issue, and she had a weapon that belonged to one of our other officers," Rodriguez said at the hearing.

Justin Hughes has been on extended medical leave, which has delayed the release of records pertaining to his testimony in Geier's termination appeal. Following the hearing in March of this year, the Goodyear town manager upheld Geier's firing.

## Photos Sent

Mattia kept his promise. When Hughes refused him for the last time on April 3, 2019, a few days later he sent the explicit photos of him and Hughes having sex to Justin Hughes and Hughes' brother-in-law's wife, via Facebook.

"Do u want pictures of [Hughes?]" Mattia taunted Justin Hughes in an accompanying message.

Mattia claimed in his messages that Mikaila Hughes was harassing him and he wanted her to leave him alone, "however [Hughes] disputes that assertion by Mattia, saying that he was upset since she ended their sexual relationship and he was harassing her," according to the complaint.

On April 28, 2019, Mattia sent explicit and nonexplicit photos of him and Hughes having sex to Hughes' co-handler, writing "Here is [Hughes] she told me about u and ur wife and gave pictures."

In interviews with the FBI in May 2019, Hughes told the FBI that many of the photos the co-handler received were the same ones sent to her family. She said she'd been experiencing "extreme emotional distress" and that Mattia was capable of causing harm to her and her family. He had told her he was a "*sicario*," or hitman.

"Mattia told her once that he had thought about grabbing a steering wheel while she was driving and killing them both," according to Hughes. "She was afraid that he would harm her or her family because she did not acquiesce to his demands to continue their relationship."

She was seeking therapy as the result of the "harassment and pain" from Mattia, saying she had not seen him since April 3, 2019.

County records show that a divorce proceedings between Mikaila and Justin Hughes became final on February 14, 2020.



One of two photos uploaded to an online bulletin board site in November of Samuel Mattia with a woman he identifies as Mikaila Hughes. / **Screenshot of website**

For his part, Mattia claimed to the FBI that Hughes was "trying to formulate a case against her husband" and that she "was trying to make it look like there was a hit list against her and other FBI agents to build a case against Khan."

Mattia said Hughes wanted him to "plant evidence" and that he "is in possession of these recorded conversations. Mattia stated to check his Instagram account junior_reed17,

where pictures are posted of himself and multiple FBI agents, including the Unit Chief."

Whether that's true can't be ascertained. His Instagram account is set to private.

Mattia told the FBI his "relationship turned bad" when he refused to help investigate Thomas Bastian, an Arizona prison inmate serving a life sentence for a 2007 murder.

As *New Times* reported in June 2019, the state Attorney General's Office had slapped Bastian with five new terrorism-related felonies related to Bastian's wife's plot to smuggle explosives into Lewis Prison. The wife, Michelle Bastian, was sentenced to 8.5 years in prison.

But the new case against Thomas Bastian disintegrated in March 2019 when Maricopa County Superior Court Judge Danielle Viola ruled that Sheriff's Office employees had "opened, copied, and read" Bastian's legal mail before he saw it, then lied to the court about what they'd done. Two months later, MCSO agreed to pay Bastian $175,000.

While the terrorism charges were still pending against Thomas Bastian, an FBI agent had been assigned to his case: Hughes.

## Feds Keep Mum, Mattia Doesn't

In a March 11, 2020, interview of Mattia by Agent Wicevich, Mattia reportedly admitted he had sent the photos to Hughes' co-handler, along with a message that he wanted Hughes to leave him alone.

Wicevich asked him about the alleged Khan murder-for-hire plot. At first, Mattia denied a woman had ever called him about the scheme. Then he said it might have been Hughes who called him. Then he said it was actually a different woman, whom he named. (*New Times* is withholding her name because her connection to the case is unclear.)

Mattia confused the details by saying he thought someone had called him from Tucson on behalf of Bastian and not Khan.

Wicevich wrote in his report that probable cause exists to support a federal charge of cyberstalking. He referred to a specific Title 18 code that makes it illegal to use electronic communication services with the intention of killing, injuring, harassing, or intimidating another person and engaging in conduct that causes, or could cause "substantial emotional distress to a person."



Mattia said online this is a photo of Mikaila Hughes from the night that she caused the "loss of her clearance." / **Screenshot of website**

Jill McCabe, a spokesperson for the Phoenix FBI field office, would not comment on the case and referred *New Times* to Sean Sullivan, an assistant U.S. Attorney in New Mexico.

"As a matter of policy, we do not comment on pending court cases beyond the information available in the public court record," Sullivan wrote back. "A criminal complaint is only an allegation. A defendant is presumed innocent until proven guilty."

In a follow-up email, Sullivan again declined to comment on any aspect of the case, and would not even reveal basic details about Mikaila Hughes' employment history.

With Mattia now being prosecuted, more answers should be forthcoming — if the feds ever decide to make the case public again. His next court date in the cyberstalking case is also unavailable.

As of this writing, Mattia remains in custody in the Sacramento County Jail on a felony charge of alleged "corporal injury on spouse or cohabitant," online records show. His next court date for that case is in September.

The authorities may not be talking, but before his arrest in November, Mattia uploaded three (nonexplicit) photos of him and Hughes on a bulletin-board-type website for "gun discussion," answering questions on freedom, guns, legal matters – and his relationship with the agent.

"You suddenly get visited by the FBI in your home. What did you do?" says one of the posts with a photo. "Well........ the last time that happened I ended up having sex with her. Which eventually lead to meeting her mother etc. That's me and former agent mikaila hughes at our engagement party/ birthday party."

In one photo purported to be of Hughes from behind, Mattia wrote: "She totally fucked up all kinds ways by getting nervous/paranoid. This was the night she ran causing the loss of her clearance, 2 years investigation, and ultimately getting Brady listed, and a ring of muslim terrorists got to walk free."

*(This story has been modified from the original with information about the Hughes' divorce.)*

RELATED TOPICS:    NEWS     POLICE     ARIZONA     CRIME

Use of this website constitutes acceptance of our terms of use, our cookies policy, and our privacy policy
The Phoenix New Times may earn a portion of sales from products & services purchased through links on our site from our affiliate partners.
©2020 Phoenix New Times, LLC. All rights reserved.
CALIFORNIA RESIDENTS: California Privacy Policy | California Collection Notice | Do Not Sell My Info