Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:  jkeenan@acluaz.org
            carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia
Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy
Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE
PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE
PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections, Rehabilitation, and Reentry; and Larry Gann, Assistant Director of the Medical Services Contracting Monitoring Bureau, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **SUPPLEMENTAL EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE THE STIPULATION (MAXIMUM CUSTODY PERFORMANCE MEASURES 1-3, 5-6, AND 8) (DOC. 3590)** |

**INTRODUCTION**

On May 8, 2020, Plaintiffs filed a Motion to Enforce the Stipulation (Maximum Custody Performance Measures 1-3, 5-6, and 8) (the "Motion").  [Doc. 3590]  Briefing on the Motion was complete on October 6, 2020 with the filing of the Reply in Support of the Motion (the "Reply").  [Doc. 3775]

Unfortunately, in light of evidence of the extraordinarily failures recently produced by Defendants, Plaintiffs must supplement the record in support of the Motion.  People are simply not being taken out of their cells as the Stipulation clearly requires.  As detailed below, Plaintiffs have found that from April through August 2020, at three of the four maximum custody locations, Defendants have cancelled *nearly all* out-of-cell programming for class members in maximum custody and dramatically limited recreation opportunities.  As detailed herein, documents produced to Plaintiffs on December 4, 2020 show that at Florence-Kasson, Eyman-Browning, and Eyman-SMU I, Defendants have had ***0% compliance rates*** with several of the Maximum Custody Performance Measures ("MCPM") over the five-month period addressed herein, and performed miserably on several others.  Defendants' failures to provide out-of-cell time are harming the subclass members, every day, month in, month out.

Nonetheless, most months, Defendants continue to report 100% compliance with these performance measures. This is particularly stunning, given that Defendants recently assured the Court that "the monitoring of no other PM [besides PMs 50, 51, and 102] was affected, changed, or altered due to COVID-19."  [Doc. 3822 at 3][1]  Defendants further averred that there was no methodology to allow "encounters to be 'count[ed] as compliant' if they were cancelled or postponed due to the pandemic."  [*Id.* (alterations in the original)]  Defendants' unilateral decision to continue to find themselves compliant with the Stipulation when they are not performing the required actions should be rejected by the Court. [*See, e.g.*, Doc. 3495 at 5 n.1 ("History has shown that Defendants appear to

---

[1] All page references herein refer to the ECF pagination for previously filed documents and the page number of the .pdf for documents filed herewith.

believe they are empowered to modify the Stipulation to accommodate their own preferences . . . Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable.")][2]

Plaintiffs request that the Court consider this supplemental evidence in ruling on the Motion.  [Doc. 3590]  Plaintiffs previously requested that the Court find Defendants to be substantially noncompliant with MCPMs 1-3, 5, 6 and 8 at all four maximum custody housing units.  [*Id*.]  The documents recently produced by Defendants demonstrate that the failure to comply has grown even worse in recent months.  Defendants' documents show them to be substantially noncompliant with the following MCPMs:

|  | April | May | June | July | August |
|---|---|---|---|---|---|
| MCPM 1 | | | | | |
| Browning | X | X | X | X | X |
| SMU I | X | X | X | X | X |
| MCPM 2 | | | | | |
| Kasson | X | X | X | X | X |
| Browning | X | X | X | X | X |
| SMU I | X | X | X | X | X |
| MCPM 5 | | | | | |
| Browning | X | | X | | |
| SMU I | | X | X | X | X |
| MCPM 6 | | | | | |
| Kasson | X | X | X | X | X |
| Browning | X | X | X | X | X |
| SMU I | X | X | X | X | X |
| MCPM 8 | | | | | |
| Kasson | X | X | X | X | X |
| Browning | X | X | X | X | X |
| SMU I | X | X | | X | X |

For many of these MCPMs, their compliance rate is 0%.

---

[2] Defendants' decision to report 100% compliance when not performing the required actions is not an anomaly.  Plaintiffs recently reported to the Court regarding multiple health care performance measures for which Defendants were marking themselves compliant in the monthly reports (1) when the required actions did not occur or were delayed, or (2) because they were improperly removing the delayed / cancelled encounters from the monitor's review.  [*See* Doc. 3805]

**PROCEDURAL BACKGROUND**

Pending before the Court is Plaintiffs' Motion to Enforce the Stipulation (Maximum Custody Performance Measures 1-3, 5-6, and 8).  [*See* Doc. 3590; *see also* Docs. 3700, 3775]

On December 4, 2020, Defendants produced Maximum Custody Notebooks for April through August 2020.  As described below, these documents prove that Defendants have effectively abandoned all efforts to comply with the MCPMs at Eyman-Browning, Eyman-SMU I, and Florence-Kasson.[3]

In light of the near-total failure of Defendants to comply with the MCPMs during this time period, Plaintiffs respectfully renew their request in the Motion that this Court find Defendants substantially noncompliant with the MCPMs.

**SUPPLEMENTAL FACTS**

**I.     Defendants Have Stopped Providing Out-of-Cell Group Programming for Subclass Members at Steps 2 and 3 as Required by MCPM 2.**

MCPM 2 requires:

> All maximum custody prisoners at . . . who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III.

[Doc. 1185-1 at 38]  Defendants' own documents clearly show that they have not offered this hour of out-of-cell programming, often referred to as a "CO-III class," for months.[4]

---

[3] It does not appear that Defendants have engaged in the same wholesale failure to meet the requirements of the Stipulation at Lewis-Rast as they have at the other Maximum Custody housing units.

For all the reasons discussed in the Motion and the Reply, Lewis-Rast, like the other maximum custody units, has long been noncompliant with the MCPMs.  [Doc. 3590 at 6-8, 13, 16, 21-22; Doc. 3775 at 9-10 n.5, 15 n.16, 26-27, 38-39]  Plaintiffs do not herein address the compliance failures that were addressed in the Motion and Reply, although they continue.  [*See, e.g.,* Declaration of Jessica Carns ("Carns Decl."), Exs. 1-3 (reflecting high rates of refusals).

[4] Defendants' documents confirm the subclass members' declarations sworn under oath that there have not been CO-III classes for months.  [*See* Doc. 3769-1 at 9, 15, 26, 31, 36, 43, 48, 51, 59, 64, 82, 87, 91]

Yet the CGAR reports for the corresponding periods falsely show 100% compliance with this MCPM.

At **Florence-Kasson**, for the months of April through August 2020, each month, on the Saturday of the monitoring week, all classes, groups and unstructured out-of-cell time are cancelled and they are not rescheduled:

> On Saturday 05/09/2020 all Program classes, Mental Health classes, and SMI Unstructured time was cancelled at Kasson Unit for the week due to the COVID-19 pandemic. Information Report 20-A58- 2673 was written and submitted.
>
> On 05/15/2020 all Program classes, Mental Health classes, and SMI Unstructured time was not able to be made up due to staffing, the amount of hours that needed to be made up and the COVID-19 pandemic. Reference Report 20-A58- 2673.

[Declaration of Maria V. Morris ("Morris Decl.") ¶ 5, Ex. 1 at 3, 6, 9, 14, 18]  The Out-of-Cell Time Tracking Forms for the people whose records were reviewed confirm that every CO-III class for every person was cancelled every month.  [Morris Decl. ¶ 6, Ex. 2]

At **Eyman-Browning**, rather than the blanket statements made at Florence-Kasson, the cancellation memos relate specifically to the cancellations noted in the files reviewed for monitoring, but the outcome is the same: all CO-III classes were cancelled for all the files reviewed for the months of April through August.  [Morris Decl. ¶ 7, Ex. 3]  Like at Florence-Kasson, the Out-of-Cell Time Tracking Forms confirm that every CO-III class for every person was cancelled every month.  [Morris Decl. ¶ 8, Ex. 4]

At **Eyman-SMU I**, Defendants have performed slightly better, though they have still missed the vast majority of CO-III classes.  At Eyman-SMU I, for each monitoring week from April to August 2020, the cancellation memo states that SMU Administration cancelled "Outside Recreation" and most or all other out-of-cell time "due to the COVID 19 pandemic."  [Morris Decl. ¶ 9, Ex. 5 at 3, 29, 53, 79, 103]  The memos further state that "[t]he cancellation of Unit Activities will not be made up due to the COVID 19 Pandemic."  [*Id.*]  In April, May, and July, all CO-III classes listed in the Out-of-Cell Time Tracking Forms were cancelled.  [Morris Decl. ¶ 10, Ex. 6 at 2-41, 62-81]  In June,

for the eight people who were at Step 2 or 3 and whose records were reviewed, the class was cancelled in six instances and listed as a refusal in two.  [Morris Decl. ¶ 10, Ex. 6 at 42-61]  In August, for the six people who should have had a CO-III class, there were four cancellations, one refusal, and one person who had a class.  [Morris Decl. ¶ 10, Ex. 6 at 82-101]

Despite the nearly complete failure to provide CO-III classes, the sole requirement of MCPM 2, Defendants have found themselves 100% compliant each month at each of the facilities.   [Morris Decl. ¶ 11] Actual compliance[5] rates for MCPM 2 at the three facilities for April through August are:[6]

|  | April | May | June | July | August |
|---|---|---|---|---|---|
| Florence- Kasson | 0% | 0% | 0% | 0% | 0% |
| Eyman-Browning | 0% | 0% | 0% | 0% | 0% |
| Eyman-SMU I | 0% | 0% | 25% | 0% | 33% |

## II.  Defendants Have Completely Stopped Providing Step Level Recreation Incentives as Required.

MCPM 6 requires:

> All maximum custody prisoners …who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy.

---

[5] As discussed in the Motion, there are significant reasons to doubt the veracity of reports of refusals.  [Doc. 3590 at 7-15]  Nonetheless, for purposes of this brief, Plaintiffs are calculating actual compliance rates based on the assumption that out-of-cell time was offered if it is marked as refused.

[6] The number of people at each step whose files were reviewed for compliance with MCPMs 1, 2 and 6 for the relevant months are as follows:

|  | April | | | May | | | June | | | July | | | August | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 | 1 | 2 | 3 |
| Eyman-Browning | 4 | 2 | 4 | 8 | 0 | 2 | 7 | 0 | 3 | 3 | 3 | 4 | 5 | 3 | 2 |
| Eyman-SMU I | 3 | 0 | 7 | 1 | 1 | 8 | 2 | 1 | 7 | 1 | 1 | 8 | 4 | 0 | 6 |
| Florence-Kasson | 5 | 3 | 2 | 5 | 2 | 3 | 6 | 1 | 3 | 3 | 1 | 6 | 5 | 1 | 4 |

[Morris Decl. ¶ 4]

[Doc. 1185-1 at 38]   Since April, Defendants have failed to provide the required recreational incentives as to the type of recreation enclosure.[7]

At **Florence-Kasson**, DO 812 (the replacement for DI 326), requires that people who are at Step 2 and 3 have their recreation in large recreation yards, not in the 10 x 10 recreation enclosure.   [Doc. 3600-2 at 50]   The 10 x 10 enclosures should be the recreation location only for people at Step 1.  [*Id*.]

At Florence-Kasson, every recreation session listed on the Out-of-Cell Time Tracking Forms reviewed for compliance with MCPM 6 from April through August took place in the 10 x 10 enclosure, although several of the people whose records were reviewed were at Step 2 or 3 and should have had recreation in the larger recreation yards. [Morris Decl. ¶ 6, Ex. 2; Carns Decl. ¶ 4, Ex. 1; *see supra* n.3]  Because the people who were at Step 2 or 3 were not offered recreation in the larger recreation yards, the actual compliance rates at Florence-Kasson are:

|        | April | May | June | July | August |
|--------|-------|-----|------|------|--------|
| MCPM 6 | 30%   | 60% | 60%  | 30%  | 50%    |

The variation in compliance rates between the months hides the reality of what is happening at Florence-Kasson.  Each month, every single recreation session offered was in the 10 x 10 enclosures.  [Morris Decl. ¶ 6, Ex. 2; Carns Decl. ¶ 4, Ex. 1]  The variation in compliance scores is the result of differing numbers of people whose files were selected for review who were at Step 2 or 3 and were thus entitled to recreation in larger recreation yards.  In fact, Defendants failed to comply with the requirement to offer recreation in the larger yards to people at Step 2 or 3 at Florence-Kasson in every single instance during the months of April through August 2020.  Yet Defendants falsely reported compliance as 100% for each of these months.  [Morris Decl. ¶ 11]

---

[7] Subclass members have reported for months that their recreation is limited to the "chute" at Eyman and the 10 x 10 enclosures at Florence-Kasson, regardless of step level. [Doc. 3769-1 at 9, 14, 21, 25, 31, 35-36, 39, 43, 47-48, 51, 54-55, 58-59, 64, 86-87, 91]  Those reports are now fully confirmed by the Defendants' own documents.

At **Eyman-Browning**, people are entitled to three recreation blocks per week. [Doc. 3600-2 at 45]  For those at Step 3, at least one recreation session per week should be in the 10 x 10 enclosure, rather than the "standard enclosure" or "chute".[8]  [*Id.*]  However, this has not occurred:

- April:  Only one of the ten files reviewed showed three blocks of recreation offered, and that was the only file for any of the five months from April to August reflecting a recreation block anywhere other than the chute.

- May:  Only six of the files reviewed showed three offers of recreation.  Of those six, one person was at Step 3 and thus entitled to a block of recreation in the 10 x 10 enclosure, which he was not offered.

- June:  Not a single file showed three offers of recreation.

- July:  All the files reflect three offers of recreation.  However, the offers were all for recreation in the chute, thereby failing to meet the requirements of DO 812 and MCPM 6 for the four people who were at Step 3.

- August:  Four people were offered only two recreation blocks.  One person was offered four recreation blocks but was at Step 3 and was not offered recreation anywhere other than the chute.

[Morris Decl. Ex. 4; Carns Decl., Ex. 2]

Defendants' monthly CGAR reports showed compliance with MCPM 6 at Browning as 100%.  But the actual compliance rates are:

|        | April | May | June | July | August |
|--------|-------|-----|------|------|--------|
| MCPM 6 | 10%   | 50% | 0%   | 60%  | 50%    |

At **Eyman-SMU I**, people are entitled to three recreation blocks per week. [Doc. 3600-2 at 47]  For those at Step 1 and 2, one or more of those recreation blocks

---

[8] People who are in GP status and at Step 3 at Eyman-Browning are also supposed to have one recreation session per month in a larger, 8-person, 20 x 40 enclosure. [Doc. 3600-2 at 45]  Pursuant to the Max Custody Monitoring Guide, "if necessary to make an accurate compliance determination, the reviewer must look at the Out-of-Cell Tracking Forms for the month to determine compliance with the requirement that each inmate is offered the appropriate type/location of recreation under DI 326.  These form(s) showing compliance with appropriate type/location of recreation will be copied, highlighted (as to type/location compliance), and inserted behind the tracking form retained for the individual inmate."  [Doc. 3177-2 at 25]  Although Out-of-Cell Time Tracking forms for the monitoring week for the people at Step 3 at Eyman-Browning did not demonstrate that the monthly incentives were met, Defendants did not produce Out-of-Cell Time Tracking forms for the remainder of the each month. [Morris Decl. ¶ 8, Ex. 4]

must be offered in the 10 x 10 enclosures, rather than the chute. [*Id*.] There are also monthly requirements for recreation in larger yards for people at Step 2 and 3. [*Id*.] As at Eyman-Browning, Defendants failed to comply with DO 812 and MCPM 6 both because they offered too few recreation blocks and because they offered recreation only in the chute. Moreover, the cancellation memoranda for Eyman-SMU I say that all "Outside Recreation"—which includes the 10 x 10 enclosures and the larger recreation yards—was cancelled for the each of the months from April through August. [Morris Decl., Ex. 5] This means both that there was no weekly recreation in the 10 x 10 enclosures for people at Step 1 or 2, and no monthly recreation in the larger recreation yards for the people at Step 2 or 3. The failures to provide recreation as required are as follows:

- April:
  - o Three people at Step 1 were offered recreation only in the chute, denying them the weekly incentive;
  - o Seven people at Step 3 were offered three blocks of recreation in the chute during the week and no out-of-cell time tracking forms were produced to determine if the monthly outside recreation incentives was met; per the Cancellation Memo, outside recreation was cancelled so the monthly incentives were not met;
- May:
  - o Six people were offered only two blocks of recreation;
  - o One person at Step 1 was offered three blocks, but all were in the chute, denying him the weekly incentive;
  - o Three people at Step 3 was offered three blocks of recreation in the chute during the week and no out-of-cell time tracking forms were produced to determine if the monthly outside recreation incentives were met; per the Cancellation Memo, outside recreation was cancelled so the monthly incentives were not met;
- June:
  - o No one was offered three blocks of recreation;
- July:
  - o Seven people were offered only two blocks of recreation;
  - o Two people at Step 1 or 2 were offered three blocks, but all were in the chute, denying them their weekly incentive;

- One person at Step 3 was offered three blocks of recreation in the chute during the week and no out-of-cell time tracking forms were produced to determine if the monthly outside recreation incentives was met; per the Cancellation Memo, outside recreation was cancelled so the monthly incentives were not met;

- August:

  - One person was offered just one block of recreation

  - Five people were offered just two blocks of recreation

  - Two people at Step 1 were offered three blocks, but all were in the chute, denying them their weekly incentive;

  - Two people at Step 3 were offered three blocks of recreation in the chute during the week and no out-of-cell time tracking forms were produced to determine if the monthly outside recreation incentives was met; per the Cancellation Memo, outside recreation was cancelled so the monthly incentives were not met.

[Morris Decl. ¶ 10, Ex. 6; Carns Decl., Ex. 3]   Although Defendants claim 100% compliance for each of these months at Eyman-SMU I, there was actually a 0% compliance rate for MCPM 6 during all of these months.

## III.   Defendants Have Cancelled Nearly All Additional Out-of-Cell Opportunities for Subclass Members with Serious Mental Illness in Violation of MCPM 8

MCPM 8 requires:

> In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:
> - 10 hours of unstructured out-of-cell time per week
> - 1 hour of additional out-of-cell mental health programming per week
> - 1 hour of additional out-of-cell psycho-educational programming per week
> - 1 hour of additional out-of-cell programming per week.

[Doc. 1185-1 at 39]  Defendants have largely eliminated the additional out-of-cell time for people with serious mental illness ("SMI") since April.[9]

---

[9] Subclass members have reported since April that they are not receiving unstructured time (often called "table time") or groups. [Doc. 3769-1 at 31-32, 36, 40, 43, 48, 51, 55, 59, 91]  They report that, instead, they are given "worksheets" to work on in their cells, by themselves.  [*Id.*]  Those reports are now confirmed by the Defendants' documents.

As discussed above, at **Florence-Kasson**, the cancellation memos recently produced state that all program classes, mental health classes, and unstructured out-of-cell time for people with SMI were cancelled and not made up for each of the monitoring weeks from April through August. [Morris Decl., Ex. 1 at 3, 6, 9, 14, 18]  The Out-of-Cell Time Tracking forms recently produced show that every single instance of out-of-cell unstructured time, mental health programming, psycho-educational programming and other programming from April through August was in fact cancelled.  [*Id*. ¶ 15, Ex. 7]  A review of eOMIS (Defendants' electronic medical record system), which reflects mental health and psycho-education programming, also shows that all groups have been cancelled due to COVID-19 since April 13, 2020.  [*Id.* ¶ 14]  Instead of records reflecting mental health groups, the eOMIS entries include some variation of the following:

> MH in cell group programming seg walk on 08/03/2020, today groups were cancelled due to the COVID-19 virus IR#20-A58-4483. Inmate was seen by this writer cell front and was provided with in-cell programming material. Inmate was instructed to complete homework in cell. Inmate understands and states that he will continue the program in cell at this time to stay on track. This inmate did his homework.

[Morris Decl., Ex. 8]  Therefore, the actual compliance rate for Florence-Kasson for MCPM 8 should have been 0% each month from April through August; not the 100% falsely reported by Defendants.  [*See* Morris Decl. ¶ 14]

At **Eyman-Browning**, the cancellation memos regarding out-of-cell time for people with SMI vary from month to month, but the result is the same: all of the required out-of-cell time required under MCPM 8 from April through August was cancelled. [Morris Decl., Ex. 3 at 3, 19, 41, 60, 74]  The Out-of-Cell Time Tracking forms, like those at Florence-Kasson, show that every single out-of-cell opportunity guaranteed by MCPM 8—unstructured time, mental health programming, psycho-educational programming and other programming—was cancelled from April through August.  [Morris Decl., Ex. 9]  Similarly, according to the eOMIS entries for the people whose files were reviewed between April and August, there were out-of-cell mental health groups and psycho-educational classes up through April 9, and none since then.  [Morris Decl. ¶ 14]  Here,

too, the actual compliance for each month from April through August was 0% instead of the 100% falsely reported by Defendants.[10]  [*See* Morris Decl. ¶ 11]

At **Eyman-SMU I**, the picture is somewhat more complicated, but compliance is still abysmal.  The failures were as follows:

- April (Four files at SMU I reviewed for compliance with MCPM 8)
    - o Three files reflected just three hours of unstructured out of cell time, rather than the ten hours required.  [Morris Decl., Ex. 10 at 2-9]
    - o The mental health programming and psycho-educational classes were cancelled for all four.  [Morris Decl. ¶ 18, Ex. 10 at 2-9]
- May (Six files reviewed for compliance with MCPM 8)
    - o One of the people whose record was reviewed was apparently not recognized by staff as being a person with a serious mental illness and was therefore not scheduled for or offered any of the additional out-of-cell time required by MCPM 8.  [Morris Decl., Ex. 10 at 10]
    - o None of the seven people were offered mental health programming and psycho-educational classes.  [Morris Decl. ¶ 19, Ex. 10 at 10-21].
- July (Nine records reviewed for compliance with MCPM 8).
    - o None were offered mental health programming and psycho-educational classes.  [Morris Decl. ¶ 18; Ex. 10 at 42-59].
- August (Ten records reviewed for compliance with MCPM 8)
    - o None were offered mental health programming and psycho-educational classes.  [Morris Decl. ¶ 18; Ex.10 at 60-79]

In June, according to the Out-of-Cell Time Tracking Forms, all the reviewed files were compliant with MCPM 8.  [Morris Decl., Ex. 10 at 22-41]  On June 29, 2020, mental health programming and psycho-educational classes were offered to each of the individuals whose records were reviewed.  [Morris Decl. ¶¶ 14, 18; Ex. 10 at 42-61]  Defendants could, therefore, report compliance for the month.  It is worth noting, however, that June 29 is the only day in June—or in April, May, July, or August—that

---

[10] Defendants submit CGARs for Eyman-Browning and Eyman-SMU I jointly. [Morris Decl. ¶¶ 12-13]  In May, Defendants claimed a total of 87.5% compliance at Eyman with MCPM 8.  [*Id.*]  In May, for MCPM 8, Defendants reviewed 10 files for Eyman-Browning, all of which were found to be compliant.  [*Id.* ¶ 13] They reviewed six files at Eyman-SMU I, of which four—or 67%—were found to be compliant.  [*Id.*]

any mental health programming and psycho-educational classes were offered at Eyman-SMU I.[11]  [Morris Decl. ¶¶ 14, 18; Ex. 10]  As explained by one member of the mental health staff to a person seeking mental health care: "[Patient] was informed that ALL SMI classed have been canceled indefinitely due to COVID."  [Morris Decl., Ex. 11]

Because Defendants offered mental health programming and psycho-educational classes on a single day in June that just happened to fall during the monitoring week, on the face of the Out-of-Cell Time Tracking Forms they can claim 100% compliance at Eyman-SMU I for June.  However, for April, May, July and August, their compliance rate was 0%, not the 100% they falsely claim for April, July and August, nor even the 67% they claim for May.  [*See* Morris Decl. ¶¶ 11-13]

## IV.   At Eyman, Defendants Have Cancelled So Much Recreation Time that They Are Violating MCPM 1 and, in Some Months, MCPM 5.

MCPM 1 requires that subclass members be offered at least 7.5 hours out-of-cell time per week at Step 1, 8.5 hours per week at Step 2, and 9.5 hours per week at Step 3. [Doc. 1185-1 at 41]  MCPM 5 requires that all subclass members be offered at least six hours of out-of-cell exercise time per week.  [*Id*. at 42]  At Eyman, recreation has frequently been cancelled since April, resulting in violations of MCPMs 1 and 5.[12]

At **Eyman-SMU I**, recreation is offered in 2.5 hour blocks.  [Doc. 3600-2 at 47] This means that, in the absence of other out-of-cell time, anyone at Step 1 must be offered three recreation blocks, and anyone at Step 2 or 3 must be offered four recreation blocks, to reach the requirements of MCPM 1.  But many people are not offered the total amount

---

[11] As discussed in the Reply Brief, the Cancellation Memos reveal that staff are, at least sometimes, contemporaneously aware that a particular week is a monitoring week. [Doc. 3775 at 42]   The recently produced Cancellation Memos similarly reflect contemporaneous knowledge that a week has been chosen as a monitoring week.  [*See* Morris Decl., Ex. 3 at 15 (ADCM1660217), 36 (ADCM1661874), and 62-70 (ADCM1665154-62)]  Further, in eOMIS, for the June monitoring week and at no other time during the period from April through December, at Florence-Kasson, staff identified cancelled therapy groups as "Group Counseling." [Morris Decl. ¶ 14]

[12] The cancellations of recreation at Eyman now reported by Defendants confirm the reports of subclass members previously submitted to the Court.  [Doc. 3769-1 at 9, 14, 25, 63-64, 82, 86]

of out-of-cell time required by MCPM 1 or the amount of exercise time required by MCPM 5:

- April (all files showing no out-of-cell time other than recreation)
  - Seven of the ten people whose records were reviewed were at Step 3 and thus entitled to at least 9.5 hours of out-of-cell time. They were each offered only three blocks of recreation, or 7.5 hours. [Morris Decl., Ex. 6 at 2-21; Carns Decl., Ex. 3]

- May (all files showing no out-of-cell time other than recreation)
  - Six of the ten people whose records were reviewed were offered only two recreation blocks, or five hours of recreation. [Morris Decl., Ex. 6 at 22-41; Carns Decl., Ex. 3]
  - Three people at Step 3 were offered three recreation blocks, or 7.5 hours. [*Id.*]

- June
  - All ten of the people whose records were reviewed were offered only two recreation periods, or five hours of out-of-cell recreation. [Morris Decl., Ex. 6 at 42-61; Carns Decl., Ex. 3]
  - Two people were offered a single additional hour of out-of-cell programming; no one else was offered any other out-of-cell time. [*Id.*]

- July (all files showing no out-of-cell time other than recreation)
  - Seven of the ten people whose files were reviewed had only two recreation blocks, or 5 hours of recreation. [Morris Decl., Ex. 6 at 62-81; Carns Decl., Ex. 3]
  - Two of the three people who had three recreation blocks, or 7.5 hours of recreation, were at Step 2 and 3, and thus entitled to 8.5 and 9.5 hours out-of-cell respectively. [*Id.*]

- August
  - Six of the ten people were offered recreation only one or two times. [Morris Decl., Ex. 6 at 82-101; Carns Decl., Ex. 3]
  - Only one of the people offered fewer than three recreation blocks was offered any additional out-of-cell time: a single, one-hour class. Morris Decl., Ex. 6 at 86; Carns Decl., Ex. 3]
  - Two of the four people who were offered recreation three times, or 7.5 hours, were at Step 3. [Morris Decl., Ex. 6 at 84, 94; Carns Decl., Ex. 3] One of them was offered one hour of out-of-cell programming, bringing his total out-of-cell time to 8.5 hours; the other was offered no out-of-cell time other than recreation. [*Id.*]

In sum, contrary to Defendants' claims of 100% compliance for MCPM 1 and 5 at Eyman-SMU I each of these months (*see* Morris Decl. ¶ 11), the actual compliance rates for MCPM 1 and 5 were as follows:

|  | April | May | June | July | August |
|---|---|---|---|---|---|
| MCPM 1 | 30% | 10% | 0% | 10% | 20% |
| MCPM 5 | 100% | 40% | 0% | 30% | 40% |

At **Eyman-Browning**, the recreation blocks are three hours long.  [*See, e.g.*, Morris Decl., Ex. 4 at 2-3]  None of the files produced by Defendants for April through August reflect any subclass member being offered out-of-cell time other than recreation. [Morris Decl. ¶ 8; Ex. 4; Carns Decl., Ex. 2]   Defendants marked themselves as 100% compliant with MCPM 1 and 5 all of these months (*see* Morris Decl. ¶ 11), but every month there were serious compliance failures:

- April

    o Six of the ten people were offered no recreation or just one recreation block. [Morris Decl., Ex. 4 at 2-21; Carns Decl., Ex. 2]

    o Of the remaining four people, three were offered two recreation blocks, or six hours of recreation.  [*Id.*]

    o The only person offered three blocks, or nine hours, of recreation was at Step 3, and entitled to at least 9.5 hours of out-of-cell time.  [*Id.*]

- May

    o Four people were offered only two blocks or six hours of recreation. [Morris Decl., Ex. 4 at 22-41; Carns Decl., Ex. 2]

    o One of the people who was offered three blocks or nine hours was at Step 3 and thus entitled to 9.5 hours of out-of-cell time.  [*Id.*]

- June

    o Every file showed six hours or less of recreation offered.  [Morris Decl., Ex. 4 at 42-61; Carns Decl., Ex. 2]

    o Three of the ten files reviewed (or 30%) showed zero or three hours of recreation.

- July

    o Four of the people at Step 3 were offered three recreation blocks or nine hours of recreation, but were entitled to at least 9.5 hours of out-of-cell time. [Morris Decl., Ex. 4 at 62-81; Carns Decl., Ex. 2]

- August
  - Four of the ten people whose files were reviewed were offered only two blocks or six hours of recreation.  [Morris Decl., Ex. 4 at 82-101; Carns Decl., Ex. 2]

At Eyman-Browning, the actual compliance rates for MCPMs 1 and 5 during April-August were thus as follows:

|        | April | May | June | July | August |
|--------|-------|-----|------|------|--------|
| MCPM 1 | 0%    | 50% | 0%   | 60%  | 60%    |
| MCPM 5 | 40%   | 100%| 70%  | 100% | 100%   |

Defendants nevertheless claimed 100% compliance with both of these MCPMs at Eyman-Browning each month.  [*See* Morris Decl. ¶ 11].

## ARGUMENT

As discussed above, Defendants' failure to comply with the MCPMs has worsened significantly in recent months at Florence-Kasson, Eyman-Browning, and Eyman-SMU I. Defendants' own documents dating through August 2020 show that they have conducted essentially no out-of-cell programming at the three locations from April through August 2020.[13]  When people are brought out of their cells for recreation, it is solitary recreation in small enclosures that are, as described by one subclass member, "terrible, they are only concrete and metal with no exercise equipment.  They are worse than being in our cells." [Doc. 3600-1 at 50]  Despite failing to provide the out-of-cell opportunities that are the crux of the MCPMs, Defendants claim that they are in nearly 100% compliance with the MCPMs month after month—even as they assert that they do not claim compliance when they cancel an encounter due to COVID-19.  [*See* Doc. 3822 at 3]

The psychological impact upon class members of being continually locked down in their cells is incalculable, especially for those with serious mental illness.  Earlier in this case, Dr. Craig Haney noted that isolation has been linked to a host of symptoms:

---

[13] Plaintiffs have reason to believe that these near-total shutdowns continue to this day, based on entries in the electronic medical records and correspondence from subclass members.  [Morris Decl. ¶ 14]  There is a several month lag in receiving the notebooks from Defendants, and thus it was only in early December 2020 that Plaintiffs' counsel received the documentation covering April-August 2020.

"appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations." [Doc. 970 at 15] These symptoms are common among people kept in isolation. [Doc. 970 at 18-19] The harm can last long after the end of isolation. [*Id.* at 21-22] The harms are even more pervasive for people with serious mental illness, often worsening the symptoms from which they already suffer. [*Id.* at 25]

Isolation is harmful to both mental and physical health. [Declaration of Dr. Craig W. Haney, Ph.D. ¶ 9, attached here to as Exhibit A] Defendants' failure to provide out-of-cell time and the elimination of nearly all group activities places the members of the subclass, and particularly those who have a serious mental illness, "at significant risk of grave harm (including damage that is permanent, even fatal)." [*Id.* ¶¶ 10-12]

The harm caused by Defendants' failure to provide even the minimal out-of-cell time required by the Stipulation is borne out in Defendants' maximum custody units. As one subclass member explained—just three months into this period of increased isolation:

> Being locked down almost continuously, with no out-of-cell time or visitation, is making me depressed and anxious, and has caused me to have insomnia. Not having any meaningful interaction with other humans has made me depressed, and I have been prescribed medications to help me sleep.

[Doc. 3769-1 at 65] Another subclass member died by suicide in Eyman-SMU I in late August, eight days after being moved into maximum custody. [Morris Decl. ¶ 22]

Further, the COVID-19 pandemic does not in any way necessitate the kind of isolation Defendants have imposed at Florence-Kasson, Eyman-Browning, and Eyman-SMU I. At Lewis-Rast, the documentation of out-of-cell time during these months looks roughly similar to the documentation of out-of-cell time in prior months. [Morris Decl. ¶ 20] Yet, although there is some COVID-19 present at ASPC-Lewis, there has not been a large outbreak. [*Id.* ¶ 21] At ASPC-Eyman and ASPC-Florence, where subclass members have been denied out-of-cell time since April, there have been significant outbreaks since the beginning of November. [*Id.*]

Just as chronic and profound staffing shortages do not excuse Defendants' failure to comply with the Stipulation's MCPMs (*see* Doc. 3590 at 19-21, Doc. 3775 at 20-34),

1  COVID-19 also cannot justify their staggering noncompliance (and false reporting).
2  Because the evidence is clear that Defendants effectively stopped implementing the
3  MCPMs at Florence-Kasson, Eyman-Browning, and Eyman-SMU I between April and
4  August 2020, yet falsely reported 100% compliance scores to the Court in their CGAR
5  reports, Plaintiffs ask the Court to extend its consideration of Defendants' non-compliance
6  accordingly, and find Defendants to be noncompliant with the MCPMs as set forth herein.

7  **CONCLUSION**

8  As discussed in the Motion and Reply, in every maximum custody unit, Defendants
9  were substantially non-compliant with MCPMs 1-3, 5-6, and 8 even before the COVID-19
10  pandemic. In three of the units, Eyman-Browning, Eyman-SMU I, and Florence-Kasson,
11  their non-compliance has become even more pronounced in the months since the start of
12  the pandemic. Plaintiffs request that the Court find that, as of August 2020, Defendants
13  were substantially noncompliant with:

14  • MCPMs 2, 6, and 8 at Eyman-Browning, Eyman-SMU I, and Florence-
15  Kasson;

16  • MCPM 1 at Eyman-Browning and Eyman-SMU I; and

17  • MCPM 5 at Eyman-SMU I.

18  A proposed revised order is being lodged herewith.

19  . . .

20  . . .

21  . . .

22  . . .

23  . . .

24  . . .

25  . . .

26  . . .

27  . . .

28  . . .

Dated:  December 21, 2020

**ACLU NATIONAL PRISON PROJECT**

By: _s/ Maria V. Morris_
David C. Fathi (Wash. 24893)*
Maria V. Morris (D.C. 1697904)**
Eunice Hyunhye Cho (Wash. 53711)*
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@aclu.org
              mmorris@aclu.org
              echo@aclu.org

*Admitted *pro hac vice*; not admitted
  in DC; practice limited to federal
  courts
**Admitted *pro hac vice*

Corene Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm Street
San Francisco, California 94111
Telephone:  (202) 393-4930
Email:    ckendrick@aclu.org

*Admitted *pro hac vice*

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              rlomio@prisonlaw.com

*Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

-18-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     jkeenan@acluaz.org
           carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**


By:  s/ Maya Abela
    Asim Dietrich (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone:  (602) 274-6287
    Email:    adietrich@azdisabilitylaw.org
    Rose A. Daly-Rooney (Bar No. 015690)
    J.J. Rico (Bar No. 021292)
    Maya Abela (Bar No. 027232)
    **ARIZONA CENTER FOR
    DISABILITY LAW**
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone:  (520) 327-9547
    Email:
        rdalyrooney@azdisabilitylaw.org
             jrico@azdisabilitylaw.org
             mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2020, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ D. Freouf