# EXHIBIT A

## DECLARATION OF DR. CRAIG W. HANEY, PH.D.

I, Craig W. Haney, declare as follows:

1. I am a Distinguished Professor of Psychology and UC Presidential Chair at the University of California, Santa Cruz, located in Santa Cruz, California, where I engage in research applying social psychological principles to legal settings including the assessment of the psychological effects of living and working in institutional environments, especially the psychological effects of incarceration. I have a Ph.D. in psychology and a J.D. degree, both awarded by Stanford University. I was a co-founder and co-director of the UC Criminal Justice & Health Consortium – a collaborative effort of researchers, experts and advocates from across the University of California system working to bring evidence-based health and healthcare solutions to criminal justice reform in California and nationwide.

2. I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations on jail- and prison-related issues. Those agencies and organizations include the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, the United States Department of Justice, the Department of Health and Human Services (HHS), the Department of Homeland Security, and the White House (under both the Clinton and Obama Administrations). In 2012, I testified as an expert witness before the Judiciary Committee of the United States Senate in a hearing that focused on the use and effects of solitary confinement and was appointed as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[1]

3. Additional information about my background and qualifications is set forth in a previous declaration that I filed in this case (Doc. 2048) and in my *curriculum vitae* which is attached to that declaration.

4. I have been asked by Counsel for Plaintiffs to opine about the likely psychological impact of practices, procedures, and conditions that have been implemented by the Defendants to respond to the COVID-19 Pandemic in maximum custody units in the Arizona Department of Corrections, Rehabilitation and Re-entry ("ADCRR") and to recommend appropriate responses to the crisis.

5. I have been provided with a variety of documents that describe conditions in maximum custody units in Arizona prisons, and the practices and procedures that are currently in operation at these facilities, including declarations

---

[1] For example, see *Brown v. Plata,* 563 U.S. 493 (2011).

from incarcerated persons providing further details about the conditions of their confinement and procedures that the prison staff have taken presumably to address COVID-19-related issues.[2]

6.  It is my expert opinion that the actions taken by Defendants at in the maximum custody units at Eyman-Browning, Eyman-SMU I and Florence-Kasson in response to COVID-19 are harmful to the people incarcerated in those units. Appropriate precautions must be taken to ensure that these prisoners are provided with adequate mental health care and out-of-cell time in a manner that is safe.

7.  Social distancing, as a means to limit the spread of COVID-19, presents serious challenges for everyone in every part of our society, but nowhere more than in penal institutions, where living conditions are unusually sparse and prisoners necessarily live in unescapably close quarters with one another.

8.  Prison life is extremely stressful for the persons subjected to it.[3] These stressors can be psychologically and medically harmful in their own right. As a result, incarcerated persons are especially vulnerable to stress-related illness and communicable diseases. In fact, even after they have left prison, formerly incarcerated persons suffer much higher rates of certain psychiatric and medical problems.[4] As a result, incarceration leads to higher rates of morbidity (illness

---

[2] Over the last several years, I have reviewed multiple documents in this case and prior to the Settlement Agreement, I toured the maximum custody units and interviewed numerous persons about the effects of their isolated confinement. In connection with this declaration, I have reviewed the following documents: Mental health records of several prisoners from March 2020 through the present; declarations of numerous prisoners regarding the conditions of confinement during the COVID-19 pandemic; and Out-of-Cell Time Tracking forms from April 2020 through August 2020.

[3] Much of this evidence is summarized in several book-length treatments of the topic. For example, see: Haney, C., *Reforming punishment: Psychological limits to the pains of imprisonment*. Washington, DC: American Psychological Association (2006); Liebling, A., & Maruna, S. (Eds*.), The effects of imprisonment.* Cullompton, UK: Willan (2005); and National Research Council (2014). *The Growth of Incarceration in the United States: Exploring the Causes and Consequences.* Washington, DC: The National Academies Press. In addition, there are numerous empirical studies and published reviews of the available literature. For example, see: Haney, C., Prison effects in the age of mass incarceration. *Prison Journal, 92*, 1-24 (2012); Johns, D., Confronting the disabling effects of imprisonment: Toward prehabilitation. *Social Justice, 45(1),* 27-55.

[4] E.g., see: Schnittaker, J. (2014). The psychological dimensions and the social consequences of incarceration. *Annals of the American Association of Political and Social Science, 651*, 122-138; Turney, K., Wildeman, C., & Schnittker, J., As fathers and felons: Explaining the effects of current and recent incarceration on major

rates) and mortality (i.e., it lowers the age at which people die).[5]

9. In addition to the painful and harmful nature of imprisonment per se, lockdowns and solitary confinement inflict even worse adverse effects. Prison isolation significantly undermines the mental and physical well-being of persons subjected to it. The scientific literature on the harmfulness of solitary confinement in jails and prisons is now widely accepted. The research that documents these harms is both consistent and alarming.[6] It has led a number of professional mental and physical health-related, legal, human rights, and even correctional organizations to call for severe limitations on the degree to which solitary confinement is employed—specifically limiting when, for how long, and on whom it can be imposed.[7]

---

depression. *Journal of Health and Social Behaviour, 53(4)*, 465-481 (2012). See, also: Listwan, S., Colvin, M., Hanley, D., & Flannery, D., Victimization, social support, and psychological well-being: A study of recently released prisoners. *Criminal Justice and Behavior, 37(10)*, 1140-1159 (2010).

[5] E.g., see: Binswanger, I., Stern, M., Deyo, R., et al., Release from prison: A high risk of death for former inmates. *New England Journal of Medicine, 356*, 157-165; Massoglia, M. Incarceration as Exposure: The Prison, Infectious Disease, and Other Stress-Related Illnesses. *Journal of Health and Social Behavior, 49(1)*, 56-71; and Massolglia, M., & Remster, B., Linkages Between Incarceration and Health. *Public Health Reports, 134*(Supplement 1), 85-145 (2019); and Patterson, E. (2013). The dose-response of time served in prison on mortality: New York state, 1989-2003. *American Journal of Public Health, 103(3)*, 523-528.

[6] These many studies have been carefully reviewed in a number of publications. For example, see: K. Cloyes, D. Lovell, D. Allen & L. Rhodes, Assessment of psychosocial impairment in a super-maximum security unit sample, *Criminal Justice and Behavior, 33*, 760-781 (2006); S. Grassian, Psychiatric effects of solitary confinement. *Washington University Journal of Law & Policy, 22*, 325-383 (2006); C. Haney, Restricting the use of solitary confinement. *Annual Review of Criminology, 1*, 285-310 (2018); C. Haney, The science of solitary: Expanding the harmfulness narrative. *Northwestern University Law Review, 115(1)*, 211-256; C. Haney & M. Lynch, Regulating prisons of the future: The psychological consequences of solitary and supermax confinement. *New York Review of Law & Social Change, 23*, 477-570 (1997); C. Haney, B. Williams, & C. Ahalt, Consensus statement of the Santa Cruz Summit on Solitary Confinement and Health, *Northwestern University Law Review, 115(1)*, 335-359; and P. Smith, The effects of solitary confinement on prison inmates: A brief history and review of the literature, in Michael Tonry (Ed.), *Crime and Justice* (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[7] For a list of these organizations and their specific recommendations, see: Haney, C. (2018) Restricting the use of solitary confinement. *Annual Review of Criminology, 1*, 285-310; Haney, C., Ahalt, C., & Williams, B., et al. (2020). Consensus statement

10. It is my understanding from the documents that I have reviewed that at three of the four maximum custody housing units in the ADCRR, Defendants have intensified the already severe levels of isolation to which prisoners are subjected. Defendants have limited recreation to small, one-person recreation enclosures, and have eliminated almost all other out-of-cell time, including mental health treatment and education groups. Prisoners are now confined to their cells for more than 22 hours a day and afforded little if any opportunity for social interaction. At two of the units, Eyman-Browning and Eyman-SMU I, the number of recreation opportunities, even in the one-person enclosures, has been significantly curtailed as well.

11. The manner in which these housing units are now being operated places the prisoners who are confined to them at significant risk of grave harm (including damage that is permanent, even fatal). As I noted, there is a large scientific literature establishing the adverse psychological and physical effects that are incurred when persons are subjected to this level of isolation and inactivity. The well-documented adverse consequences are produced by exactly the kind of severe conditions that now prevail in these three ADCRR maximum custody housing units.

12. Although isolated confinement adversely affects and jeopardize the physical and psychological well-being of virtually everyone subjected to it, this kind of confinement is especially harmful for prisoners with pre-existing mental health conditions. Socially isolated mentally ill prisoners are particularly likely to decompensate, suffer worsening depression and other psychological symptoms, and even engage in self-harming and suicidal behavior.

13. It is my understanding from the documents that I have reviewed that at two of the four maximum custody housing units in the ADCRR (Eyman-Browning and Florence-Kasson), Defendants have limited the additional out-of-cell time, group therapy, and psycho-educational groups that were agreed upon in the Settlement to ameliorate the harm to seriously mentally ill prisoners from being in the maximum custody units. Notably, Florence-Kasson is a mental health unit where people are housed because of their mental health needs – mental health needs that, according to the documents – do not appear to be being met. It is my understanding from the documents that at a third unit, Eyman-SMU I, prisoners with serious mental illness are being offered only unstructured out-of-cell time; they do not have access to group therapy or psycho-educational groups. The reduction in out-of-cell time, extremely limited opportunities for social interaction, and the failure to provide adequate mental health care mean that mentally ill prisoners are being placed at grave risk of decompensation.

14. In light of these facts and this panoply of very serious, well-established

---

of the Santa Cruz summit on solitary confinement. *Northwestern Law Review*, in press.

risks of harm, it is my professional opinion that the ADCRR must urgently take steps to provide the amounts of out-of-cell time, recreation opportunities, mental health groups, and psycho-educational classes for people in the maximum custody units agreed upon in the Settlement, while at the same time implementing the CDC guidelines regarding COVID-19.

15. It is clear that it is possible to provide these necessary services in a manner that does not create an undue medical risk. For example, according to the documents I reviewed, at Lewis-Rast Defendants have maintained roughly their prior level of out-of-cell opportunities, both for those with a serious mental illness and for others. I have been informed by Plaintiffs' counsel that Lewis has had some positive cases of COVID-19, but not a large outbreak.

16. It is my opinion that, unless these steps are taken to mitigate the psychological stress of isolation, prisoners will face grave dangers to their mental and physical health.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 17, 2020 at Santa Cruz, California.

*Craig W. Haney, Ph.D.*
DR. CRAIG W. HANEY, PH.D.