**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-00601-PHX-ROS |
| Plaintiffs, | **ORDER** |
| v. | |
| David Shinn, et al., | |
| Defendants. | |

This Order resolves most pending matters and requires expedited briefing on certain issues.

## I.     Defendants' Rule 60 Motion for Relief from Court Order Doc. 3734 (Doc. 3756)

The Stipulation explicitly requires Defendants "implement" a "Step Program Matrix" that allows maximum custody prisoners to progress through various "steps" according to their behavior.  (Doc. 1185 at 9).  The Step Program Matrix dictates the amount of out-of-cell time and access to other privileges prisoners must receive according to which of three steps the prisoners occupy.  At the time of the Stipulation, that program was known as DI 326, but it was subsequently promulgated as Department Order ("DO") 812.  Thus, the parties often refer to DI 326 and DO 812 interchangeably.

In May 2020, the parties presented a discovery dispute to the Court regarding Plaintiffs' request for "[d]ocuments sufficient [to] show average length of stay for prisoners in maximum custody units, including the average length of stay in Step 1, Step 2, and Step 3 under DI 326/DO 812."  (Doc. 3613 at 2-3).  Plaintiffs argued these documents were

necessary to monitor Defendants' compliance with the Stipulation—specifically, whether Defendants were allowing prisoners to progress through the Step Program Matrix.  The Court ordered Defendants to produce the documents, Defendants produced incomplete and inconsistent data, and, later, the Court awarded Plaintiffs their attorneys' fees.  (Doc. 3635 at 4).

On September 18, 2020, Defendants filed a "Rule 60 Motion for Relief from Court Order."  (Doc. 3756).  According to Defendants, the Court has "expanded the four corners of the Stipulation."  (Doc. 3756 at 2).  Defendants contend "the Stipulation does not mandate prescribed and guaranteed progression through the step program — nor was that the intent of the parties in negotiating the Stipulation."  In addition, "[n]either the Stipulation nor DI 326/DO 812 require ADCRR to advance prisoners through the step matrix at prescribed rates."  (Doc. 3756 at 3).  Thus, Defendants argue it was error to require them to produce documents regarding average length of stay at particular steps, and it was an additional error to award Plaintiffs their attorneys' fees.

The Stipulation requires Defendants "implement" the Step Program Matrix.  (Doc. 1185 at 9).  That requires the program exist and that prisoners be allowed to progress through the steps.  If Defendants mean that they did not have an intent to "implement" the Step Program Matrix, then they acknowledge they entered into the Stipulation in bad faith.

Holding Defendants to their agreement to "implement" the Step Program Matrix does not mean prisoners are entitled to progress at a prescribed rate.  Rather, it merely requires Defendants administer the program such that compliant prisoners do, in fact, progress.  Thus, the Court rules, again, Plaintiffs are entitled to the documents necessary to determine if Defendants are "implement[ing]" the Step Program Matrix or if it merely exists as a theoretical manner.  Plaintiffs also remain entitled to their fees.  Defendants' Rule 60 motion will be denied.

## II. Fines Pursuant to May 2019 OSC (Doc. 3235) and Motion Regarding PM 50 at Florence (Doc. 3584)

In May 2019, the Court issued an Order to Show Cause regarding Defendants' continued noncompliance with its obligations under the Stipulation ("May 2019 OSC").

(Doc. 3235).   The May 2019 OSC directed Defendants to bring specified PMs into compliance for the June 2019 numbers or face contempt sanctions in the amount of $50,000 for each PM at each complex that was noncompliant.   The June 2020 data reflects the following regarding the specified PMs.  (Doc. 3335).

| Compliant PMs | Noncompliant PMs |
|---|---|
| 6, 15, 35, 44, 72 at Eyman | 11, 12, 14, 37, 39, 40, 42, 47, 49, 51, 52 at Eyman |
| 35, 39, 44 at Lewis | 15, 19, 24, 37, 47 at Lewis |
| 44, 49 at Florence | 42, 50, 51, 52, 66 at Florence |
| | 51, 66, 67 at Tucson |

Based on these scores, Defendants did not meet their obligations for 24 of the PMs.[1]

As this Court previously held, "[b]efore finding civil contempt, a court must determine by clear and convincing evidence that: (1) a valid court order exists that is 'specific and definite'; (2) the party had knowledge of the order, and notice of and an opportunity to be heard about the alleged noncompliance; and (3) the party failed to take '*all* reasonable steps to comply with the order.'" *Parsons v. Ryan*, No. CV-12-0601-PHX-DKD, 2018 WL 3239691, at *2 (D. Ariz. June 22, 2018) (citations omitted).  The May 2019 OSC was specific and definite, Defendants had knowledge of the May 2019 OSC, and Defendants were given the opportunity to be heard regarding their failure to comply. Therefore, the only issue is whether Defendants took all reasonable steps to comply with the order.[2]  They did not.

Defendants argue the Court should not impose contempt sanctions because several of the PMs in the May 2019 OSC became compliant and several were "nearing compliance." (Doc. 3339 at 8).   More than five years after implementation of the Stipulation, however, Defendants are aware that 85% is the requirement for compliance

---

[1] This includes PM 12 at Eyman and PM 19 at Lewis, which were subject to the May 2019 OSC and were noncompliant in June 2019.  But because those PMs have since been retired, the Court declines to impose coercive sanctions for Defendants' noncompliance.
[2] Most of Defendants' arguments opposing the May 2019 OSC center around their belief the Court could not impose contempt fines.  The Ninth Circuit rejected this argument in its January 2020 opinion.  *Parsons v. Ryan*, 949 F.3d 443, 454-455 (9th Cir. 2020).  Thus, there is no question the Stipulation empowers the Court to use contempt as an enforcement mechanism.

and anything beneath that measure constitutes failure. "[N]earing compliance" is not enough to avoid sanctions. (*Id.*).

Defendants also argue they had an insufficient opportunity to purge the contempt. That is untrue. Defendants were given a month to come into compliance with their obligations and, in fact, some of the PMs became compliant and, as a result, no sanctions will be imposed for those PMs.

Defendants also assert they took all reasonable steps to comply with the OSC but noncompliance was "largely out of their control." (Doc. 3339 at 7). Plaintiffs correctly note, however, that Defendants make no effort to explain what steps they took to comply with PM 11 at Eyman; PM 39 at Eyman; PM 40 at Eyman; PM 42 at Eyman; PM 42 at Florence; PM 47 at Eyman; PM 47 at Lewis; PM 49 at Eyman; PM 52 at Eyman; and PM 52 at Florence. Therefore, sanctions will be imposed for those noncompliant measures.

As for the remainder of the noncompliant PMs, Defendants point to the transition from Corizon to Centurion in late June and early July 2019 as causing "delays in scanning the documentation needed" (Doc. 3339 at 7); an "inability to create the prescription medication log" (Doc. 3339 at 7, referencing PM 14 at Eyman); and the "scanned copies of inventory logs [being] misplaced" (Doc. 3339 at 7, referencing PM 24 at Lewis). Defendants do not explain why these administrative errors caused their noncompliance and why they were unavoidable.[3]

Defendants also cite the difficulty in staffing open positions and maintaining existing staff at their facilities. Defendants do not articulate the specific steps they took to mitigate the staffing issues and why no other steps were available.[4] This explanation does not avoid a contempt sanction for PM 14 at Eyman; PM 24 at Lewis; PM 37 at Eyman; PM 37 at Lewis; and PM 67 at Tucson.

And finally, as to PM 50 at Florence; PM 51 at Eyman; and PM 51 at Florence,

---

[3] And indeed, this is not the explanation Defendants provided in their monthly report (Doc. 3364-1 at 24).

[4] In the Court's first Order imposing sanctions, the Court identified the written demands and other efforts Defendants made to spur compliance with the OSC and, yet, determined that those actions were insufficient to establish "all reasonable steps" had been taken. (Doc. 2898 at 5-7). In this instance, no similar efforts are identified.

Defendants claim that as a result of the transition, "several outside healthcare providers ended their relationships with Corizon . . . [and] there were [fewer] available providers for specialty consults. (Doc. 3339 at 8). This conflicts with Defendants' basis for noncompliance identified in their performance charts. And there is no explanation why Defendants, with advance notice, did not inform the Court of their difficulties. Nor do Defendants point to evidence establishing sufficient efforts were made to secure alternative outside healthcare providers.

In short, Defendants' response to the May 2019 OSC does not demonstrate all reasonable steps were taken to ensure compliance with the OSC. Defendants will be fined $50,000 for each of the 22 noncompliant and currently active PMs, for a total fine of $1.10 million. Because the Court has imposed sanctions on noncompliant PMs for June 2019, the Court will deny Plaintiffs' Motion to Enforce the May 2019 OSC as to PM 50 as moot.

## III. Motion for Clarification Regarding January 2020 OSC (Doc. 3730) and Imposition of Contempt Sanctions Regarding January 2020 OSC (Doc. 3649, 3683, 3729)

On January 31, 2020, the Court issued an Order to Show Cause requiring Defendants "come into compliance regarding every [listed] Performance Measure and location . . . no later than March 1, 2020" ("January 2020 OSC"). (Doc. 3490 at 4). The Court informed Defendants they would "be required to pay $100,000 for each instance of future non-compliance" of those PMs. (Doc. 3490 at 3). For PMs that had recently been compliant, Defendants were ordered to "ensure those Performance Measures remain complaint." The Court stated the fines would "recur on a monthly basis until Defendants bring each Performance Measure and location into compliance." (Doc. 3490 at 3).

The January 2020 OSC was meant to give Defendants until March 1, 2020, to bring all identified Performance Measures into compliance. That is, to give Defendants the entire month of February 2020 to take whatever actions were necessary to ensure that, as of March 1, 2020, they would meet all their obligations moving forward. Defendants, however, interpreted the OSC as requiring they bring every Performance Measure into compliance as of February 1 which would have allowed them less than twenty-four hours to remedy

their failings.  That was not the intent.

Defendants responded to the January 2020 OSC but, based on their interpretation of the January 2020 OSC, they focused on the February 2020 numbers.  Plaintiffs' responsive briefing addressed February and the following months.  On August 28, 2020, Defendants filed a motion for clarification regarding the January 2020 OSC.  (Doc. 3730).  That motion seeks clarification whether the briefing in response to the January 2020 OSC was to address only the February numbers or if it was to address February and the following months.  Defendants also seek clarification whether the January 2020 OSC contemplated sanctioning them for a Performance Measure that was compliant at some point after January 2020 but became non-compliant in later months.

Pursuant to the January 2020 OSC, the first month for assessment of possible fines was meant to be the period March 1 to March 31, 2020.  The Court will not impose sanctions under the January 2020 OSC for the February 2020 numbers.  In addition, the Stipulation requires Defendants obtain an 85% compliance rate *every* month for *every* PM at *every* location.  The January 2020 OSC identified PMs and warned Defendants they would be fined if, at any point in the future, those PMs fell below the 85% requirement.  If an identified PM was compliant as of March 2020 or became compliant after that date, Defendants face a fine if that PM falls below 85% in any subsequent month.  In other words, Defendants will be sanctioned for *every* instance of noncompliance going forward unless they can adequately justify that noncompliance.  In short, it is mandatory that Defendants bring every identified PM into compliance and keep it there.[5]

Defendants will be required to file a single brief explaining their failures to bring into, or maintain, compliance for the PMs identified in the January 2020 OSC for the months of March, April, May, June, July, August, September, October, November, and

---

[5] Defendants are to understand the legal reason for fines.  They are to coerce compliance with the January 2020 OSC while also compensating Plaintiffs for not receiving the care promised under the Stipulation.  *See Parsons*, 949 F.3d at 456 (concluding contempt sanctions were civil when they were coercive and meant to compensate plaintiffs).  Pursuant to the agreed upon Stipulation, Plaintiffs are entitled to compliance every month, regardless of past compliance.  Becoming compliant for one month does not restart the clock and the remedial process again.

December 2020.  To avoid additional delays, Defendants will be required to do so on an expedited basis.  No extension will be permitted absent extraordinary circumstances.

## IV.    Distribution of Contempt Sanctions

The $1.445-million-dollar contempt sanction imposed by Judge Duncan in June 2018 was affirmed on appeal.  The Court also imposes an additional $1.10-million-dollar contempt sanction for Defendants' failure to comply with the May 2019 OSC.  The parties agree "that a good use of the sanction fines would be to have a system-wide staffing analysis performed and implemented as soon as possible" in order to "effectuate Dr. Stern's critical systemic recommendation that Defendants 'conduct a staffing analysis and then implement staffing changes accordingly.'"  (Doc. 3595 at 2.)  The Court also agrees that funds paid as sanctions will be ordered to complete a systemic analysis of the adequacy of the health care provided to class members (Doc. 3564 at 2-3).  The parties shall agree upon an expert to complete the analysis or each submit two proposed experts.  The Court will then appoint an expert from the parties' submissions or appoint another person the Court deems qualified.

## V.    Motion to Enforce the Stipulation (Maximum Custody PMs 1-3, 5-6, 8) (Doc. 3599, 3700, 3772)

In addition to the healthcare performance measures, the Stipulation requires Defendant comply with nine maximum custody performance measures ("MCPMs").  On May 20, 2020, Plaintiffs filed a motion to enforce the Stipulation regarding the remaining MCPMs.  (Doc. 3599).  The parties' disputes are addressed seriatim.

### A.  Non-Random Sampling

The Stipulation established the "protocol" for assessing Defendants' compliance rate regarding the MCPMs.  (Doc. 1185 at 7, 1185-1 at 41).  That protocol requires Defendants review the records from "one randomly selected week for each monitored month, for 10 randomly selected prisoners."  (Doc. 1185-1 at 43).  Defendants concede they do not conduct random sampling but claim "the inmate selection process is not prohibited by either the maximum custody provisions of the Stipulation, MCPMs, or the Maximum Custody Monitor Guide."  (Doc. 3700 at 11).  That is incorrect.  The Stipulation

explicitly requires Defendants' compliance with the MCPMs be evaluated by "randomly" selecting a week and then "randomly" selecting 10 prisoners.  For all future MCPM compliance monitoring, Defendants shall employ a random selection of prisoners. Defendants must file, within ten days of this Order, a statement setting forth their random sampling method.

### B.  Compliance with Monitoring Guide

Over the years, and pursuant to discussions between the parties and Judge Duncan, the parties developed the "Max Custody Monitor Guide Duties & Responsibilities" to provide additional guidance regarding how Defendants' compliance would be evaluated. (Doc. 3177-2 at 11).  Of particular relevance now, the monitoring guide states that when a prisoner refuses out-of-cell time, the refusal "must be documented" by a staff member's signature along with the signature of "[e]ither the inmate or a second staff member," unless not "feasible considering safety/security/operational concerns." (Doc. 3177-2 at 15).  And when there is "an extended pattern of refusals . . . supervisory personnel shall have a discussion with an inmate regarding refused out-of-cell time." (Doc. 3177-2 at 15).

Defendants concede the monitoring guide states a second signature "should" be obtained in most circumstances.  (Doc. 3700 at 14).  The monitoring guide was the subject of extensive negotiation between the parties and Judge Duncan and it is clear that everyone agreed to the second signature requirement.  Absent clear evidence of impracticality, that requirement shall be followed.  Similarly, the parties agreed that prisoners who persistently refuse to leave their cells must be counseled by a staff member and that counseling documented.  (Doc. 1836 at 89-90).  Every month going forward, Defendants shall provide documentation to Plaintiffs' counsel of that counseling for such prisoners.

### C.  Reasonable Offers

The parties have substantial factual disputes regarding the reasonableness of offers for out-of-cell time.  The Court need not resolve those disputes now given that all prior compliance scores were calculated contrary to the Stipulation's requirement of randomness.  Going forward, the Court will impose bright-line rules regarding offers for

1    out-of-cell time to qualify as reasonable and satisfy the Stipulation.  Offers for out-of-cell

2    time may be made no earlier than 6:00 a.m.[6] and all offers for out-of-cell activities must be

3    made in a normal speaking voice, i.e. not in a whisper.[7]

4            The parties present very different views on the cleanliness of the showers and the

5    recreation enclosures.  The Court need not resolve these disputes now.  To the extent the

6    showers or enclosures were insufficiently cleaned in the past, Defendants shall ensure that

7    is cured.  Unsanitary conditions may be sufficient to deem unreasonable Defendants' offers

8    for showers or recreation.  Similarly, Defendants shall ensure that prisoners are provided

9    appropriate clothing for outdoor activities.

10           **D.  No Advance Knowledge of Monitoring Week**

11           The monitoring guide states the week to be monitored is not selected until the

12   seventh day of the following month.  (Doc. 3177-2 at 14).  If followed, this procedure

13   would prevent staff from knowing in advance which week would be the "monitored week."

14   Records indicate, however, that staff were aware in advance which week was "the monitor

15   week."  (Doc. 3667-7 at 11, 51, 53, 56).  Pursuant to the monitoring guide and common

16   sense, staff members shall not be informed in advance of the week to be monitored.  Any

17   indication that staff members were aware in advance of which week would be monitored

18   will result in a failing score for that location on all MCPMs.

19           **E.  Cancellation of Out-of-Cell Time**

20           The Stipulation allows for cancellations of out-of-cell time in the event of an

21   "unexpected staffing shortage."  (Doc. 1185 at 10).  Chronic shortages are not

22   "unexpected."  Therefore, out-of-cell time can be canceled due to staffing shortages only

23   if those staffing shortages are due to unexpected absences of existing staff.  Such

24   cancellations must be supported by documentation identifying the missing staff members

---

[6] Defendants provided a declaration from the "DI 326/DO 812 Sergeant" that breakfast is served "between 0400 and 0530" and "daytime cell lights are activated by approximately 6:00 a.m."  (Doc. 3700-1 at 29).  Defense counsel previously represented "the day starts" at 6:00 a.m.  (Doc. 1836 at 91).

[7] Without requiring Defendants to carry a decibel meter, there is no way for the Court to impose a more definitive requirement.  Moreover, requiring even a normal speaking voice might be disruptive to those prisoners` wishing to sleep later.  However, there is no perfect solution and requiring "normal speaking voice" is the best available alternative.

and providing an explanation for their absence.  If the identified staff member is unavailable because he or she is assigned to a different location or unit on a particular day, that does not qualify as an "unexpected shortage."

Plaintiffs also argue Defendants have cancelled a large amount of out-of-cell time due to COVID-19 concerns.  The Court recognizes that some cancellations are necessary, and the extraordinary circumstances presented by COVID-19 may not require strict obedience to the Stipulation's requirements.  However, Defendants shall make every effort to provide the out-of-cell time required by the Stipulation, consistent with safe operations in light of COVID-19.  Any cancellations because of COVID-19 shall be supported by clear documentation explaining why that cancellation was necessary and what alternatives were provided.

### F.  Recreation in Appropriate Enclosures

As set forth in the Stipulation, maximum custody prisoners at Step I of DI 326/DO812 must be "offered a minimum of 7.5 hours out-of-cell time per week," prisoners at Step II must be offered 8.5 hours, and prisoners at Step III must be offered 9.5 hours. (Doc. 1185-1 at 38).  All maximum custody prisoners "who are eligible for participation in [DI 326/DO812]" must also be "offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy."

The current version of DO 812 dictates the amount of recreation each prisoner must be offered as well as the size of enclosure where that recreation must occur.  For example, a prisoner at Step III in the SMU I Unit is entitled to recreation in the form of "[t]hree, 2.5-hour blocks per week to include 10x10 enclosure (two inmates)," "[o]ne, 2.50-hour block per month in 20x40 basketball enclosure (up to eight inmates)," and "[o]ne, 2.5-hour block per month in 50x90 (up to 32 inmates)."  If a prisoner in SMU I is at Step III, he must be offered recreation once per month in the 50x90 enclosure and Defendants violate the Stipulation by offering a recreation block in the 10x10 enclosure in lieu of the recreation block in the 50x90 enclosure.

The present record establishes Defendants have not been offering recreation in the

enclosures mandated by the Stipulation and DO 812.  For example, a prisoner at Step III was provided three recreation blocks.  (Doc. 3666-2 at 245).  This prisoner should have been offered three recreation blocks in a combination of the 20x20 and 40x40 enclosures.[8] Instead, he was offered two recreation blocks in a 10x10 enclosure and one recreation block in a 45x90 enclosure.[9]  Despite the offers not matching what is required pursuant to DO 812, the week was deemed compliant.  Plaintiffs have identified numerous other instances of similar failures.  (Doc. 3775 at 36).  The Stipulation is satisfied only if a prisoner is offered recreation in enclosures of the size mandated by DO 812.

### G.  Summary of Maximum Custody Issues

This Order will require Defendants make significant changes to their day-to-day practices and monitoring requirements.  To ensure Defendants' practices have changed, Defendants shall inform Plaintiffs' counsel within ten days of this Order of the specific steps they are implementing to ensure compliance with the Stipulation and this Order regarding maximum custody inmates.

### VI.    Motion to Enforce Paragraph 14 of the Stipulation (Doc. 3623, 3673, 3714)

Paragraph 14 of the Stipulation requires Defendants provide interpretive services when a prisoner is not fluent in English.  Paragraph 14 states:

> For prisoners who are not fluent in English, language interpretation for healthcare encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service.

Thus, Defendants must provide, for *every* healthcare encounter with a prisoner not fluent in English, either 1) "a qualified health care practitioner who is proficient in the prisoner's language"; or 2) "language line interpretation service."

---

[8] The Stipulation and DO 812 appear to conflict with Defendants' form.  The Stipulation and DO 812 contemplate a prisoner at this location and step level will be provided "Three, 3-hour blocks per week in a combination of 20x20 and 40x40."  Defendants' form, however, indicates the possible enclosures are "Chute," 10x10, 20x40, 45x90, "Field," and "Group Rec."  Perhaps there is a way to reconcile this but neither party has provided an explanation.

[9] This inmate refused the two offers for recreation in the 10x10 enclosure.  There is no indication, however, that if he had accepted the offer, the recreation actually would have occurred in the larger enclosure.

Plaintiffs believe Defendants routinely violate Paragraph 14 and Defendants concede as much. Without explaining how they read Paragraph 14 to authorize such behavior, Defendants identify healthcare encounters where a prisoner was not fluent in English and, yet, Paragraph 14 was not followed. Defendants explain those encounters did not involve any problems in communication and, therefore, Paragraph 14 was not implicated.[10] Defendants' analysis is wrong. If a prisoner is not fluent in English, the fact that the medical encounter continued without interpretive services is definitive proof of Defendants' noncompliance with Paragraph 14.

To ensure future compliance with Paragraph 14, Defendants will be given thirty days in which to formulate and file a plan. That plan must, at a minimum, explain how class members who are not fluent in English will be identified, how class members will be informed of their entitlement to interpreter services, and how such services should be requested.

## VII.  Motion to Enforce the Court's Orders and for Further Relief (Mental Health Visit Lengths) (Doc. 3694, 3739, Reply due Oct. 16)

In its March 11, 2020 Order addressing Dr. Marc Stern's recommendations, the Court set a minimum length for mental health visits: 10 minutes for prisoners on suicide watch (because visits address acute issues and are more frequent) and 30 minutes for non-watch visits. The Court further directed that if a visit with a mental health provider is less than 10 or 30 minutes, it may only count as compliant if a "mental health clinician" "exercise[ing] clinical judgment" determines the encounter to be "meaningful and appropriate in the context of the patient's overall care." (Doc. 3518 at 3-4).

According to Plaintiffs, Defendants have essentially ignored the Court's instructions. Plaintiffs identify 191 encounters, 130 of which fell below the minimum duration. Defendants' monitors found all 130 of those encounters "meaningful and appropriate." Defendants do not disagree with the numbers but instead offer an explanation the Court cannot understand.

---

[10] The Court does not doubt that some medical encounters proceeded despite language barriers. But there is no way to determine whether appropriate care was provided.

According to Defendants, the monitors evaluating the short visits "are not evaluating whether any specific treatment was clinically indicated or not. Rather, they are monitoring whether the duration of the encounter was meaningful and appropriate." (Doc. 3739 at 12). Defendants appear to be saying the monitors need not consider appropriateness of the encounter in the context of the particular patient's needs. That is incorrect.[11]

To ensure that visits shorter than the minimum duration are appropriate, the Court will adopt the regime proposed by Plaintiffs. That regime will require a psychiatrist make the determination whether a mental health encounter shorter than the required minimum duration was "meaningful and appropriate in the context of the patient's overall care." The reviewing psychiatrist (i.e., the "evaluator") must

> review in their entirety the eOMIS records for the patient's last five mental health encounters (not including the weekly rounds required by PM 93), as well as the eOMIS records for any ICS involving the patient in the previous six months. The evaluator shall also review the patient's currently operative mental health treatment plan. The evaluator shall then document in writing his or her reasons for determining that the encounter length was, or was not, meaningful and appropriate in the context of the patient's overall care.

Defendants must report to Plaintiffs' counsel monthly the percentage of mental health encounters sampled that fell short of the minimum durations established by the Court, and of those encounters, the percentage that were nonetheless counted as compliant with the Stipulation.

## VIII. Motion to Enforce the Stipulation (PMs 37, 44, 45, 50, 55) (Doc. 3735, 3759, 3761)

Once a Performance Measure is found to be substantially noncompliant, Defendants must be given the opportunity to develop a remedial plan to bring the measure into

---

[11] The risk associated with failure to provide meaningful mental health care cannot be overstated. Indeed, three class members committed suicide between August and September 2020 and for two of them, every mental health encounter since March 11 fell below the minimum durations set by the Court. (Doc. 3791 at 185-188). Dr. Stern already determined in his report that the short length of many of Defendants' mental health encounters—many that are one, two, or three minutes in length— "are too short to be clinically effective, and in the context of the cases, place patients at significant risk of substantial harm." (Doc. 3379 at 31).

- 13 -

compliance.  Plaintiffs request the Court find Defendants substantially noncompliant with nine Performance Measures.[12]  Defendants concede these Performance Measures "meet the Court's definition of substantial noncompliance."  (Doc. 3759 at 1).  To ensure no delay in future enforcement efforts, Defendants will be required to file a remedial plan for these Performance Measures.

Accordingly,

**IT IS ORDERED** that Defendants' Rule 60 Motion for Relief from Court Order Doc. 3734 (Doc. 3756) is **denied.**

**IT IS FURTHER ORDERED** that Defendants are held in civil contempt for failure to comply with the Stipulation as detailed in the Court's May 2019 Order to Show Cause regarding: PM 11 at Eyman; PM 14 at Eyman; PM 15 at Lewis; PM 24 at Lewis; PM 37 at Eyman; PM 37 at Lewis; PM 39 at Eyman; PM 40 at Eyman; PM 42 at Eyman; PM 42 at Florence; PM 47 at Eyman; PM 47 at Lewis; PM 49 at Eyman; PM 50 at Florence; PM 51 at Eyman; PM 51 at Florence; PM 51 at Tucson; PM 52 at Eyman; PM 52 at Florence; PM 66 at Florence; PM 66 at Tucson; and PM 67 at Tucson.

**IT IS FURTHER ORDERED** that the Clerk of Court must enter judgment against Defendants reflecting contempt fines for June 2019 totaling $1,100,000.  Within 14 days, Defendants must remit payment to the Clerk of Court in the amount of $1,100,000.  This total is due and payable into the Registry of the Court, to be kept in the Registry until further order of the Court.  This judgment shall bear interest at the federal statutory rate until satisfied.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Enforce the Stipulation and for Contempt of the May 2019 OSC Regarding PM 50 at Florence (Doc. 3584) is **denied as moot**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Clarification Regarding January 2020 OSC (Doc. 3730) is **granted** to the extent set forth herein.

**IT IS FURTHER ORDERED** that as explained herein, no later than March 12,

---

[12] PM 37 at Perryville; PM 44 at Douglas; PM 45 at Eyman and Florence; PM 50 at Eyman, Lewis, and Yuma; PM 55 at Lewis and Tucson.

2021, Defendants must file a single brief of no more than 25 pages explaining their failures to bring into, or maintain, compliance for the PMs identified in the January 2020 OSC for the months of March, April, May, June, July, August, September, October, November, and December 2020.   No extension of this briefing schedule will be permitted absent extraordinary circumstances.  Plaintiffs may respond to Defendants' brief in no more than 25 pages no later than April 5, 2021.  No reply will be permitted.

**IT IS FURTHER ORDERED** that no later than March 12, 2021, each side must submit two proposed experts to perform a system-wide staffing analysis and a systemic analysis of the adequacy of the health care provided to class members.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Enforce the Stipulation (Maximum Custody PMs 1-3, 5-6, 8) (Doc. 3599) is **granted** as set forth herein.

**IT IS FURTHER ORDERED** that no later than March 12, 2021, Defendants will be required to produce or otherwise make available to Plaintiffs all the records supporting their compliance scores regarding maximum custody for November 1 through November 30, 2020.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Enforce Paragraph 14 of the Stipulation (Doc. 3623) is **granted**.

**IT IS FURTHER ORDERED** that Defendants must file the plan regarding implementation of its obligations under Paragraph 14 of the Stipulation within 30 days of this Order.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Enforce the Court's Orders and for Further Relief (Doc. 3694) is **granted**.

**IT IS FURTHER ORDERED** that a psychiatrist must make the determination whether a mental health encounter that is shorter than the required minimum duration is nonetheless "meaningful and appropriate in the context of the patient's overall care."

**IT IS FURTHER ORDERED** that Defendants must provide to Plaintiffs' counsel the written instruction offered by Plaintiffs to the psychiatrists monitoring the mental health care performance measures.

1    **IT IS FURTHER ORDERED** that Defendants must file monthly reports reflecting

2  the percentage of mental health encounters sampled for the CGARS that fell short of the

3  minimum durations established by the Court, and of those encounters, the percentage that

4  were nonetheless counted as compliant with the Stipulation.

5    **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Enforce the Stipulation

6  (PMs 37, 44, 45, 50, 55) (Doc. 3735) is **granted**.

7    **IT IS FURTHER ORDERED** that Defendants must file a remedial plan addressing

8  PMs 37, 44, 45, 50, and 55 within 30 days of this Order.

9    **IT IS FURTHER ORDERED** Defendants shall inform Plaintiffs' counsel within

10  ten days of this Order of the specific steps they are implementing to ensure compliance

11  with the Stipulation and this Order regarding maximum custody inmates.

12    **IT IS FURTHER ORDERED** Defendants shall provide monthly documentation

13  to Plaintiffs' counsel of the counseling provided to maximum custody inmates who refuse

14  offers to leave their cells.

15    **IT IS FURTHER ORDERED** the Motion for E-Notices (Doc 3820) and Motion

16  to Be Placed Back at Rast (Doc. 3853) are **denied**.

17    Dated this 24th day of February, 2021.

18

19

20    Honorable Roslyn O. Silver
     Senior United States District Judge

21

22

23

24

25

26

27

28