1  Daniel P. Struck, Bar No. 012377
   Rachel Love, Bar No. 019881
2  Timothy J. Bojanowski, Bar No. 022126
   Nicholas D. Acedo, Bar No. 021644
3  STRUCK LOVE BOJANOWSKI & ACEDO, PLC
   3100 West Ray Road, Suite 300
4  Chandler, Arizona  85226
   Telephone:  (480) 420-1600
5  Fax:  (480) 420-1695
   dstruck@strucklove.com
6  rlove@strucklove.com
   tbojanowski@strucklove.com
7  nacedo@strucklove.com

8  *Attorneys for Defendants*

9

**UNITED STATES DISTRICT COURT**

10

**DISTRICT OF ARIZONA**

11

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-ROS |
| Plaintiffs, | **DEFENDANTS' SUPPLEMENTAL RESPONSE TO ORDER TO SHOW CAUSE (Dkt. 3490)** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

19        The COVID-19 pandemic paralyzed nearly every aspect of our society.  States (and

20  even  countries)  locked  down.  The  uncertain  extent  of  its  dangerousness  and

21  infectiousness—complicated by fear mongering and conflicting punditry—generated mass

22  panic.  But while  normalcy  retracted  and  even  courtrooms  shuttered,  the  Arizona

23  Department  of  Corrections,  Rehabilitation  and  Reentry  ("ADCRR")  and  its  health  care

24  vendor, Centurion, had to expand their roles, take on more responsibilities, and expend

25  additional resources—to save lives and protect those in their custody and care.  Their staff

26  did so while placing themselves at risk of harm and even death.  And they did save lives.

27  But it was a struggle and, unfortunately, at the expense of noncompliance with some of the

28  performance measures in the Order to Show Cause ("OSC").

Despite their best efforts, Defendants could not attain full compliance. But they took all reasonable steps within their control and substantially complied. For that reason, Defendants should not be held in contempt or sanctioned for those OSC performance measures that were not in full compliance from March 2020 through December 2020.

## I. Background.

### A. Defendants Incorporate their Prior Facts Demonstrating Efforts to Comply With the OSC.

In their Response to Order to Show Cause, Defendants outlined the significant measures they and Centurion had taken to comply with both the Stipulation and the OSC since the inception of the ADCRR-Centurion partnership in July 2019. (*See* Dkt. 3656, 3656-1 through 3656-4.) Those measures include:

- ADCRR appointed a new Director, Director Shinn, who took ownership of Stipulation noncompliance and immediately ordered changes to improve compliance, including realigning leadership command to increase oversight and accountability.

- Director Shinn appointed a new Assistant Director (Larry Gann) to lead the MSCMB, and together they reorganized it to proactively identify and break down compliance barriers by creating and deploying medical liaison teams to troubleshoot issues, working with Centurion staff to enhance compliance, and inspecting facilities to identify compliance issues and implement real-time corrective action plans.

- Director Shinn obtained a written proposal from NCCHC Resources to conduct a staffing and root-cause (of noncompliance) analysis and asked the Court to use the first $1.445 million in sanctions money to fund it (Dkt. 3512 at 12).

- Director Shinn: mobilized ADCRR's Office of Continuous Improvement to provide additional support to Centurion; added Stipulation compliance to the performance review criteria for Wardens; developed tablets to submit HNRs

and medical-care refusal forms; and moved forward with deactivating ASPC-Florence to redeploy resources and assign inmates with particular medical needs to complexes that can better accommodate them.

- Centurion dramatically: increased staffing, meeting or exceeding contract requirements for many positions; actively recruited new employees with incentives consistent with market competitors; undertook substantial efforts to retain qualified employees through market-based wage adjustments; and authorized and paid overtime pay, coverage pay, and shift bonuses.

- Centurion also: invested and employed a Telehealth Program; streamlined specialty consultation approvals; developed and implemented a Telehealth Nurse Program; deployed nurse line blitzes and nurse line telehealth to erase backlogs; made physicians available to help cover certain complexes; invested in and launched wireless technology; and contracted with CareClix to provide specialty telehealth services and queued up specialty consultation requests.

These collective measures resulted in a dramatic increase of the overall (adjusted) compliance rate with the Stipulation—from 89.01% in June 2019 to 94.74% in February 2020. (Dkt. 3656-1, ¶ 11.) With respect to the 145 PMs in the OSC, Defendants were compliant with 86.89% (126 PMs) in February 2020. (Dkt. 3490, 3571.) Defendants' efforts and these percentages reflected substantial compliance with the OSC in February 2020 and did not warrant a finding of civil contempt or sanctions for the 20 noncompliant PMs in the OSC that month.[1]

**B.     Compliance in March and April 2020.**

ADCRR's and Centurion's efforts continued to pay dividends in March and April 2020.  In those months, Defendants had an overall (adjusted) compliance rate with the

---

[1] Plaintiffs asserted that any efforts taken by ADCRR and Centurion *before* the OSC are irrelevant. (Dkt. 3683 at 7 & n.6.) The OSC, however, is a subset of the Stipulation, and therefore pre-OSC measures necessarily were taken to comply with the OSC.

Stipulation of 96.17% and 94.94%, respectively. (Declaration of Larry Gann, ¶ 5.) And of the 127 remaining PMs in the OSC that had not been terminated, Defendants were compliant with 88.62% applicable PMs in March 2020 (14 noncompliant) and 94.12% applicable PMs in April 2020 (7 noncompliant). (Gann Decl., ¶ 14.) Of the 20 PMs that were noncompliant in February, only eight were noncompliant in March (Dkt. 3605), and only two of those eight PMs were noncompliant in April (Dkt. 3637).

### C.    The COVID-19 Pandemic Strikes.

On January 21, 2020, the Centers for Disease Control and Prevention ("CDC") confirmed the first case of the 2019 Novel Coronavirus ("COVID-19") in the United States. (Declaration of Director Shinn, ¶ 35.) Five days later, the Arizona Department of Health ("ADHS") announced the first confirmed case in Arizona. (Declaration of Tom Dolan, ¶ 4.) On January 31, 2020, Health and Human Services Secretary Alex Azar declared a Public Health Emergency. (Shinn Decl., ¶ 35.) By March 11, 2020, COVID-19 was declared a pandemic and a Public Health Emergency in Arizona. (Shinn Decl., ¶ 37.)

Thereafter, states, including Arizona, implemented a series of mitigation restrictions. For instance, all schools were ordered closed on March 15, 2020, which resulted in staffing issues for many employers, including ADCRR and Centurion. (Dolan, Decl., ¶ 8.) On March 19, 2020, Governor Ducey ordered that "all non-essential or elective surgeries [i.e., those "that can be delayed without undue risk to the current or future health of a patient"] … shall not be performed at any licensed healthcare facility or by any licensed healthcare provider." *See* https://azgovernor.gov/file/34242/download?token=l3JvjX7I. On March 26, 2020, he ordered hospitals to activate their facility emergency plan and implement triage processes, creating competitive shortages. *See* https://azgovernor.gov/file/34323/download?token=Mg-EOJ6K. Although this was necessary to combat the pandemic, as discussed below, these actions resulted in delayed procedures for inmates who receive care from outside specialists. By around June 29, 2020, intensive care units were over 80% capacity with 73,908 diagnosed COVID-19 cases. (Dolan Decl., ¶ 16.) In 2020, COVID-19 infection was at its highest points in July and December:

ADHS COVID-19 Cases by Day Epi Curve



https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited Mar. 24, 2021).

> **D.  COVID-19's Impact on ADCRR's Operations and the Provision of Healthcare.**

COVID-19 dramatically changed the healthcare system in the United States and in Arizona.  (Dolan Decl., ¶ 4.)  It also disrupted the usual operations and provision of healthcare at ADCRR.  (Shinn Decl., ¶ 38.)  ADCRR and Centurion immediately implemented COVID-19 prevention and response action plans to mitigate the potential spread of COVID-19 within ADCRR's complexes.  (Dkt. 3527-1; Shinn Decl., ¶¶ 34, 36; Dolan Decl., ¶ 5.)  *See*  https://corrections.az.gov/covid-19-management-updates.  For example: ADCRR required new intakes to be quarantined for 21 days; it restricted all routine internal inmate movement; it initiated weekly deep cleaning of all facilities; it quarantined inmates who tested positive and/or inmates with symptoms; it required all employees entering a facility to undergo an Infectious Disease Symptoms Check and checked continuously while on shift; and it waived the $4 copay for inmate healthcare services.  (Dkt. 3527-1, ¶ 5; Shinn Decl., ¶¶ 40–41; Dolan Decl., ¶¶ 6, 13.)  ADCRR and Centurion also implemented an Emergency Operations Center that monitored inmates at high risk of complications from COVID-19.  (Shinn Decl., ¶ 40; Dolan Decl., ¶ 9.)

Centurion began screening all inmates at intake for symptoms and travel history. (Dolan Decl., ¶ 5.) Centurion also began testing inmates with symptoms, and conducting targeted surveillance testing, pre-operation/procedure testing, and testing on release. (*Id.*, ¶ 17.) ADCRR and Centurion tested over 48,000 inmates through December 2020, administering more than 10,000 tests in August 2020 and more than 11,000 tests in December 2020. (*Id.*) Centurion was also required to report various testing data daily, a significant undertaking that required intense monitoring. (*Id.*, ¶¶ 7, 14.) As these necessary actions were taken to minimize the effect of COVID-19 on the prison population, the diversion of resources had an impact on the ability to meet some performance measures.

COVID has affected every aspect of providers' daily operations and responsibilities. (Declaration of Jennine Gahris, ¶¶ 28, 67, 115, 126, 133.) The onset of COVID-19 required health care staff to prioritize patients infected with COVID-19 and focus their time and efforts on those patients and mitigate the virus' spread. (Shinn Decl., ¶ 44; Dolan Decl., ¶ 24; Gahris Decl., ¶¶ 39, 44, 58, 67, 74, 91, 129.) Positive tests require medical staff to immediately mobilize, compartmentalize, quarantine, test, monitor, follow-up, and treat. (Shinn Decl., ¶¶ 46–47; Gahris, Decl., ¶¶ 28, 43, 66, 67.) Thus, in addition to their regular, demanding daily assignments, medical staff at ADCRR were assigned increased responsibilities and tasks related to COVID-19. (Dolan Decl., ¶ 25.) Clinical and operational staff exerted Herculean efforts to maintain routine daily care, implement the measures needed to care for COVID-19 patients and reduce infection rates, and comply with its obligations under the Stipulation. (*Id.*, ¶ 26.) For example, in September, October, and November 2020, medical staff had to review 3,947 test results at four facilities and immediately respond to positive results, including increased rounding on the patients to monitor signs and symptoms and ordering testing of others that may have been exposed. (Gahris Decl., ¶ 28.) Indeed, Plaintiffs recognize these increased demands on medical and security staff. (*See* Dkt. 3520 at 13 ["When COVID-19 arrives in the prison system, demands on healthcare services generally—including medical and custody staff—will only increase as more patients require screening, isolation, testing, and clinical management."].)

Compounding these responsibilities, ADCRR's waiver of the $4 copay led to an increase in volume of health needs requests ("HNRs") for all types of services, which spread healthcare and security staff, already strained by the pandemic, even thinner:



(Dolan Decl., ¶¶ 10, 63.)   Centurion responded to 13% more HNRs in March through December 2020 than it did during the same months in 2019.  (*Id.*, ¶ 17.)

To make things even more difficult, the number of available staff to handle all these tasks fluctuated as a direct result of COVID-19.  The mandated school closure caused a day-care crisis for many staff who did not have alternative day-care arrangements during work hours.  (*Id.*, ¶ 8.)  They were left with no viable option other than to not report to work to care for their minor children until other arrangements could be made.  (*Id.*)  Health care workers (and their families) are also not immune for contracting the virus.  As each wave of COVID-19 hit, the number of positive COVID-19 patients increased, as did the number of employees who did not report to work.  (Shinn Decl., ¶¶ 49, 51; Dolan Decl., ¶ 29; Gahris Decl., ¶ 43.)

/ / /

/ / /



ADCRR operations/security staff were also exposed to or contracted the virus, resulting in significant staff absences. (Shinn Decl., ¶ 38.) As of March 25, 2021, 2,734 ADCRR staff have self-reported as testing positive for COVID-19, which compromised staff availability at a time when every staff member was needed. (Shinn Decl., ¶¶ 48–49.) That complicated an already delicate situation: inmates from differing housing locations could not intermix at the medical units because of COVID-19 protocols, requiring carefully orchestrated scheduling and movement to medical. (*Id.*)

The resulting leave of absences of health care and security staff impaired Defendants' ability to fully comply with their obligations under the Stipulation and OSC. As an example, ASPC-Florence fell out of compliance with PM 35 in May and July 2020 (after being compliant since February 2018) because of nursing staff vacancies caused by COVID-19. (Gahris Decl., ¶ 32.) A similar cause and effect happened at ASPC-Tucson. (*Id.*, ¶ 34.) In June 2020, the lead lab technician tested positive for COVID-19 and was out for several weeks. (*Id.*, ¶ 69.) And in December 2020, 27 nursing staff called out for reasons associated with COVID-19, which included the entire inventory coordinator department that oversees the delivery and distribution of medications. (*Id.*, ¶ 36.)

ASPC-Yuma was hit the hardest by COVID-19, as Yuma, Arizona was a COVID-19 hotbed even on a national scale. (Gahris Decl., ¶ 42.) Not surprisingly, this caused Centurion and operational staff to be absent—often very suddenly—due to infection, mandatory quarantine, or to provide emergency assistance to sick family members. (*Id.*,

¶ 43.)  ASPC-Yuma had its first outbreak (over 60 cases) in May 2020 on the Cibola Unit. (Id.)  In June 2020, a second outbreak (over 35 cases) occurred.  (*Id*.)  In November and December 2020, a third wave hit with 65 cases and over 1,300, respectively.  (*Id*.)  Each time, medical and security staff mobilized and compartmentalized patients to decrease widespread, nursing staff were deployed to test all inmates with possible exposure, and provider and nursing lines were established to assist in identifying patients with COVID-19 signs or symptoms.  (*Id*.)  This resulted in noncompliance for several months.  (*Id*.)

Moreover, prior to COVID-19, Centurion averaged 50.9 hires per month and 19.9 voluntary terminations per month.  (Dolan Decl., ¶ 30.)  For the months of March through October of 2020, the average number of hires dropped slightly to 48.4 hires per month, and the voluntary terminations increased to 24.1 per month.  (*Id*.)  After the second wave of COVID-19 hit in November 2020, there was an even larger decrease in people applying for work and a greater increase in people leaving voluntarily.  (*Id*.)  In November 2020, the average number of hires dropped significantly to 36 hires per month, and the number of voluntary terminations per month increased to 31.3.  (*Id*.)  Staff resignations increased in late 2020 because of fear of exposure in a correctional setting and because hospitals offered exceptionally higher wages to entice additional health care workers using CARES Act funds.  (Gahris Decl., ¶ 39.)

**E.     As a Result of COVID-19, Compliance Suffered in May through December 2020.**

COVID-19 and its strain on operational and medical staff unsurprisingly took a toll on compliance with the Stipulation and the OSC.  The necessary shift in care to COVID-19 patients, the resulting increase in responsibilities, the additional HNRs, and the unavoidable absence of staff had an undeniable and profound impact on compliance with the Stipulation and OSC.  (Shinn Decl., ¶¶ 56, 44–45; Dolan Decl., ¶ 29.)  And as each COVID-19 wave hit, there was a concomitant decrease in overall compliance with the Stipulation:



COVID-19 Pandemic Impact on PM Findings

| | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| Employee Leave of Absence | 15 | 17 | 24 | 63 | 68 | 15 | 25 | 27 | 93 | 162 |
| PM Findings | 29 | 37 | 76 | 74 | 79 | 76 | 76 | 55 | 57 | 84 |
| COVID-19 Positive Inmates | 1 | 40 | 132 | 330 | 996 | 507 | 78 | 68 | 703 | 4,475 |

(Dolan Decl., ¶ 29; Gahris Decl., ¶ 7.)  Because COVID-19 recovery time lags, on average, two to four weeks after a positive test, the burden on operations and medical staff continued into the next month, resulting in lagging compliance.  (Shinn Decl., ¶¶ 46, 51.)

Additional factors contributed to these lower numbers.  The elective-surgery executive order adversely affected on-site specialty consultations (optometry, audiology, orthotics, ultrasound, and mammogram services, etc.) and medical transports (unless life threatening).  (Dolan Decl., ¶ 11; Gahris Decl., ¶ 96.)  Outside providers similarly began canceling previously scheduled appointments and were unable or unwilling to reschedule until the restrictions were lifted.  (*Id.*)  Despite the dictates to cancel elective surgeries, numerous specialty service providers also stopped seeing patients for routine and preventative services during this time.  (*Id.*)  Additionally, many providers refused to see nursing home or inmate patients due to their perceived increased risk of infection.  (*Id.*)  This directly affected compliance with PMs 50–51.[2]  (*See* Dkt. 3520 at 13 [Plaintiffs

---

[2] On May 1, 2020, health care facilities could request an exemption from this executive order but they had to satisfy certain criteria that many could not. (Gahris Decl., ¶ 97.) And once providers began scheduling again, there were lengthy backlogs, and some required negative COVID-19 tests from anyone, including transporting officers, within 72 hours of an appointment. (*Id.*) Inmates with appointments would have to reschedule if they

acknowledging that "the availability of community healthcare services, including for hospitalization and specialty appointments, may be substantially curtailed"].)

Also in March 2020, as a proactive measure to mitigate the spread of COVID-19, ADCRR changed the intake process so that intakes occur in 21-day cycles (not daily). (Shinn Decl., ¶ 40.) These intake intervals, however, result in processing approximately 200 inmates in a single day (as opposed to approximately 50 inmates). (Dolan Decl., ¶ 13.) Each person must be tested that same day, requiring additional staff and resources. (*Id*.) Moreover, because of these intervals, care reviews and appointments (e.g., chronic care) are scheduled out for the same day instead of spaced out. (*Id*.)

In August 2020, ADCRR, in conjunction with Centurion and two additional vendors, conducted mass testing (from July 27, 2020 – September 1, 2020). (Shinn Decl., ¶¶ 40, 43; Gann Decl., ¶ 54; Dolan Decl., ¶¶ 18.) More than 10,000 tests were administered. (Dolan Decl., ¶ 17.) Mass testing requires concentrated and extensive operational and medical resources. (Shinn Decl., ¶¶ 40, 47.) To illustrate this burden, the average daily population at ASPC-Tucson in August 2020 was over 5,000. (Gahris Decl., ¶ 35.) During this time, both nurses and providers had to increase their rounds to obtain vital signs for over 700 positive COVID-19 inmates. (*Id*.) Nurses worked tirelessly in collaboration with ADCRR to compartmentalize each unit as positive results were received. (*Id*.) The additional work and effort took away from their regularly scheduled duties and responsibilities, resulting in noncompliance. (*Id*.) At ASPC-Yuma, 4,453 tests were administered in just 48 hours, a colossal feat. (*Id*., ¶ 71.) In December 2020, one unit in Yuma had 655 out of 1,066 inmates test positive, requiring resource-intense quarantining, assessment, and treatment. (Shinn Decl., ¶ 47.)

Consequently, the overall (adjusted) compliance rates for the Stipulation dropped down to approximately 90% to 93% but held steady in that range:

---

tested positive or were quarantined. (*Id*.) Other outside providers themselves were forced to close because of staffing issues. (*Id*.)

| May '20 | June '20 | July '20 | Aug. '20 | Sept. '20 | Oct. '20 | Nov. '20 | Dec. '20 |
|---------|----------|----------|----------|-----------|----------|----------|----------|
| 89.73%  | 89.82%   | 89.09%   | 89.75%   | 89.72%    | 92.54%   | 92.56%   | 88.59%   |

Compliance rates with the OSC also trended downward and were particularly low in those months when COVID-19 spiked in the community and at ADCRR (July, December) and when ADCRR and Centurion conducted mass testing and provided care to many previously asymptomatic, COVID-19 positive inmates (August, September):

| May '20 | June '20 | July '20 | Aug. '20 | Sept. '20 | Oct. '20 | Nov. '20 | Dec. '20 |
|---------|----------|----------|----------|-----------|----------|----------|----------|
| 83.33%  | 87.39%   | 80.83%   | 84.17%   | 79.17%    | 87.39%   | 88.03%   | 77.78%   |
| 20 N/C  | 15 N/C   | 23 N/C   | 19 N/C   | 25 N/C    | 15 N/C   | 14 N/C   | 26 N/C   |

(Gann Decl., ¶ 14.)

These instances of noncompliance can be attributed to COVID-19. At least 131 instances of noncompliance in March 2020 through December 2020 were the direct result of COVID-19: **PM 35**: Eyman (December); Florence (May, July); Tucson (August, December); **PM 37**: Tucson (September, November, December); Yuma (April, May, June, December); **PM 39**: Lewis (July); Yuma (June, July); **PM 42**: Eyman (August, September, December); **PM 44**: Eyman (March, April, May, June, July, August, September, October, November, December); Florence (March, April, May, June, July, August, September, November, December); Lewis (April, May, June, July, September, October, November, December); Winslow (June, August, September, October, November); **PM 45**: Tucson (June); **PM 46**: Eyman (December); Yuma (August); **PM 47**: Eyman (September, October, December); Florence (August); Lewis (September); Tucson (December); Winslow (July, August, September); **PM 50**: Florence (March, May, July, September, October, November, December); Perryville (December); Tucson (March, May, July, October, November, December); **PM 51**: Eyman (March, May, July, August, September, October, December); Florence (March, July, September, October, December); Perryville (March, September, December); Tucson (March, May, July, October, November); Yuma (August, September,

October, November, December); **PM 52**: Eyman (June, July, August, September, November, December); Tucson (March); **PM 55**: Eyman (May, September, December); **PM 66**: Lewis (May, June); Tucson (May, June, July, August), Florence (May, June, July, August); **PM 67**: Lewis (May, June, July, November), Tucson (May, June, July, August); **PM 85**: Tucson (August); **PM 92**: Eyman (August). (*See* Gahris Decl., ¶ 7.)

ADCRR's and Centurion's efforts combatting COVID-19, however, saved lives. The mortality rate is only .3732% among inmates who are confirmed positive for COVID-19. (Shinn Decl., ¶¶ 53–55.) Only 10 other states have a lower total COVID-19 mortality rate. (*Id*.)

**F.     ADCRR's and Centurion's Efforts to Achieve Compliance During COVID-19.**

Notwithstanding COVID-19, Centurion continued to staff, recruit, and retain medical staff and attain full compliance with the PMs. (Dolan Decl., ¶ 31.) It hired mental health professionals (5 Psychologists, 1 Psychiatrist), Mid-Level Providers, Physicians, Physical Therapists, a Provider Service Representative, and Telehealth Physicians, with Mid-Level Providers and Certified Nursing Assistants exceeding contract FTE requirements every month. (*Id*., ¶¶ 36–43, 51; Gahris Decl., ¶¶ 100, 101, 103.) It created three fulltime positions above the contract requirements and hired staff above contract requirements in 14 positions. (Dolan Decl., ¶¶ 31–32.) It increased salaries (for a total increase of $892,557.86 since March 2020), made bonus payments (for a total of $511,514.03 since March 2020), and paid shift bonuses ($337,654.74 between July 2020 and December 2020) and coverage pay. (*Id*., ¶¶ 33, 47–49.) Overtime trends increased, resulting in $4,191,497.03 in overtime pay in 2020. (*Id*., ¶ 34.) It heavily recruited, attending academic events and job fairs, running billboard, newspaper, radio, and on-line advertisements, and launching email and post card campaigns, spending $123,934 since July 2020. (*Id*., ¶¶ 44–46.)

Centurion continued its cutting-edge telehealth initiatives, significantly increasing access to medical providers, on and off-site specialists, psychiatrists, and registered nurses.

(*Id.*, ¶¶ 51–52.) It expanded CareClix (a virtual healthcare platform) to include infectious disease, rheumatology, orthopedics, endocrinology, and genetics counseling, and entered at least 15 provider contracts between March and December 2020. (Dolan Decl., ¶ 53; Gahris Decl., ¶ 101.) When group therapy sessions were suspended in April 2020 to slow the spread of COVID-19, Centurion created in-cell programming modules to ensure patients were still receiving quality care while maintaining recommended social distancing standards. (Dolan Decl., ¶ 55.) In September 2020, it developed a suicide prevention committee and a self-injurious behavior work group to create robust, individualized treatment plans for acute patients, and provided more in-depth trainings on suicide prevention, de-escalation plans, and treatment of suicidal inmates. (*Id.*, ¶¶ 55–57, 60–62.) It also added a Pharmacist above contract requirements, which increased poly-pharmacy review. (*Id.*, ¶ 59.)

As forecasted in the original Response, the relocation and reassignment of medical liaisons to the MSCMB's Central Office went into effect as scheduled in September 2020. (Gann Decl., ¶¶ 37, 39–40, 43–44.) The medical liaisons toured seven complexes to audit operational and medication administration processes. (*Id.*, ¶ 38.) During their site inspections, they review patient charts to identify issues, and debrief with facility staff (both operations and healthcare) their observations and takeaways. (*Id.*, ¶¶ 47–48, 53.) The MSCMB created a team email address for Centurion and ADCRR to communicate directly on any issue, continued its monthly staffing meetings with Centurion, and developed Standard Work Guidelines and training for Centurion employees to address areas that could be improved upon. (*Id.*, ¶¶ 41–44, 51.) The MSCMB also hired an inventory specialist to ensure that medical equipment is being utilized and to update or transfer equipment where necessary. (*Id.*, ¶ 52.) Finally, ADCRR successfully completed the first phase of closure of ASPC-Florence-North Unit. (Shinn Decl., ¶¶ 58–59.) That closure allowed the redeployment of approximately 70% of the Unit's operations-staff resources to ASPC-Eyman (the remaining 30% went to ASPC-Florence) and the absorption of medical staff within Florence. (*Id.*)

## II. The Court Should Not Hold Defendants in Civil Contempt of the OSC.

### A. General Legal Principles.

A party may be held in civil contempt if it fails to comply with "a specific and definite order of the court." *Parsons v. Ryan*, 949 F.3d 443, 454 (9th Cir. 2020) (quoting *Stone v. City and Cty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)). "The proof for civil contempt must be clear and convincing—a higher standard than the preponderance of the evidence standard." *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989); *accord Parsons*, 949 F.3d at 454.

A "[f]ailure to comply consists of not taking 'all the reasonable steps within [one's] power to insure compliance with the order.'" *Balla*, 869 F.2d at 466 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 406 (9th Cir. 1976)) (alterations in original). This does not require a contemnor to employ "every option that the court could conceive." *Stone*, 968 F.2d at 857. Rather, "[a] contemnor fails to take all reasonable steps where there is 'little conscientious effort on the part of the [contemnors] to comply....'" *Herb Reed Enters., Inc. v. Monroe Powell's Platters, LLC*, No. 2:11-CV-02010-PMP-NJK, 2014 WL 3894069, at *6 (D. Nev. Aug. 8, 2014) (quoting *Stone*, 968 F.2d at 857). Moreover, "technical or inadvertent violations of the order will not support a finding of civil contempt." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986).

In addition, "[s]ubstantial compliance with a court order is a defense to an action for civil contempt," *Balla*, 869 F.2d at 466 (citing *Donallco*, 787 F.2d at 1379), which "is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply," *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891 (9th Cir. 1982)). Indeed, the Supreme Court has cautioned that "civil contempt 'should not be resorted to where there is [a] fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting *Calif. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)).

## B. The Scope of the OSC.

The OSC originally listed 35 Health Care Performance Measures at certain facilities, a total of 145 Performance Measures/facilities (hereafter "PMs"). (Dkt. 3490.) In its February 12, 2020 Order, the Court terminated 18 of these PMs,[3] reducing the active OSC PMs to 127 beginning in March 2020. (Dkt. 3495 at 13–14, 23; Gann Decl., ¶ 6.) And in December 2020, at the Court's directive (Dkt. 3495), the parties met and conferred and stipulated that five additional OSC PMs should be terminated,[4] which reduced the applicable OSC PMs to 122 beginning in November 2020. (Dkt. 3824-1.) For these 127/122 OSC PMs, in March through December 2020, Defendants reported noncompliance (below the 85% compliance rate) 178 times. (Gann Decl., ¶ 10.)

As a threshold matter, the Court should exclude from that contempt exposure any noncompliance resulting from a PM that is subject to Defendants' pending Motion to Terminate. (Dkt. 3840.) Defendants moved to terminate 142 PMs because they were substantially compliant and therefore eligible for termination.[5] (*Id.*) Fifteen of those PMs received noncompliant scores between March 2020 and December 2020, some multiple times, for a total of <u>26</u> instances of noncompliance.[6] But they became ripe for termination during the March 2020–December 2020 timeframe. Thus, to the extent that the Court terminates any of these PMs, their noncompliance should be removed from the contempt equation.

---

[3] PM 12: Eyman and Florence; PM 19: Eyman, Lewis, and Phoenix; PM 20: Eyman, Florence, Lewis, Perryville, Phoenix, and Tucson; and PM 54: Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma. (Dkt. 3495 at 13–14, 23.)

[4] PM 15: Eyman, Florence, and Lewis; PM 72: Eyman; and PM 97: Phoenix. (Dkt. 3824-1.)

[5] A PM is eligible for termination if it was compliant for 18 out of the previous 24 months and did not receive noncompliant scores in three or more consecutive months in the previous 18 months. (Dkt. 2644.)

[6] **PM 11**: Lewis (3 times), Winslow, and Yuma; **PM 13**: Eyman (twice), Florence (twice), Lewis (3 times), and Yuma (twice); **PM 35**: Florence (twice) and Tucson (twice); **PM 47**: Florence (twice) and Tucson (twice); **PM 49**: Tucson; and **PM 52**: Perryville, Phoenix, and Tucson. (*Compare* Dkt. 3840; *with* Gann Decl., ¶ 10.)

**C.    The Original OSC Did Not Put Defendants on Notice that They Would Be Held in Contempt and Sanctioned if a PM Fell Out of Compliance.**

A party can only be held in civil contempt if it fails to comply with "a specific and definite court order." *Balla*, 869 F.2d at 466. "[P]rinciples of 'basic fairness requir[e] that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt." *Taggart*, 139 S. Ct. at 1802 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). A party must "know what the court intends to require and what it means to forbid." *Id*. (quoting *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)); *see also In re Hercules Enters., Inc.*, 387 F.3d 1024, 1028 (9th Cir. 2004) (a party facing contempt must have "sufficient notice of [the order's] terms and the fact that he would be sanctioned if he did not comply").

The OSC stated that PMs compliant before February 2020 must "remain compliant," and that if a "previously-compliant" PM "become[s] non-compliant," a fine will be imposed and recur "until Defendants bring each Performance Measure and location into compliance." (Dkt. 3490 at 3.) Defendants interpreted the OSC to mean that, once a PM is compliant, the recurring monthly sanction terminates. For example, a PM that was compliant in January 2020 but noncompliant in February 2020 is subject to a sanction. That same PM is also subject to a sanction in subsequent, consecutive noncompliant months. But what was not ordered, for example, is that Defendants would be sanctioned for a noncompliant PM in March 2020 if that PM was *compliant* in January and *remained compliant* in February; Defendants would be sanctioned for a noncompliant PM in April 2020 if that PM *was* compliant in both February and March; or Defendants would be sanctioned for a noncompliant PM in *any* month after it was compliant.

To the contrary, the OSC states that "[t]he fines will recur on a monthly basis *until Defendants bring each Performance Measure and location into compliance*." (*Id*., emphasis added.) In other words, once a PM is compliant, the recurring fine terminates. Although the OSC begins by stating, "[f]or the Performance Measures identified above that were compliant in *the most recent numbers*, Defendants must ensure *those* Performance

17

Measures *remain compliant*" (*id*., emphasis added), this suggests only that PMs that were compliant in January must remain compliant in February.

Defendants filed their Response on July 10, 2020, and examined only the noncompliant PMs in February. (Dkt. 3656.) Plaintiffs filed their reply on August 7, 2020. (Dkt. 3683.) Their reply went beyond February and sought contempt for Defendants' noncompliance in March, April, and May 2020. (Dkt. 3683.) Plaintiffs interpreted the OSC to say that a PM is subject to a sanction every month regardless of whether it achieved compliance in a prior month. (*Id*.) That disagreement resulted in Defendants' filing a Motion for Clarification on August 28, 2020, arguing that the OSC's recurring fines terminate once a PM comes into compliance. (Dkt. 3730.)

The Court ruled on that Motion in its February 24, 2021 Order. (Dkt. 3861.) There, the Court clarified that: "If an identified PM was compliant as of March 2020 or became compliant after that date, *Defendants face a fine if that PM falls below 85% in any subsequent month*. In other words, Defendants will be sanctioned for every instance of noncompliance going forward unless they can adequately justify that noncompliance. In short, it is mandatory that Defendants bring every identified PM into compliance *and keep it there*." (*Id*. at 6, emphasis added.) The Court then ordered Defendants to show cause why it should not be held in contempt and sanctioned for every instance of noncompliance for the months of March through December 2020. (*Id*. at 6–7.)

Although the Court's February 24, 2021 Order clearly explained that Defendants would be held in contempt and sanctioned if a compliant PM fell out of compliance in a subsequent month, the January 31, 2020 OSC did not. The OSC did not give Defendants notice that they could be held in contempt and sanctioned for those instances of noncompliance. *See United States v. Joyce*, 498 F.2d 592, 596 (7th Cir. 1974) (cited in *Vertex*) ("[C]ontempt will not lie for violation of an order of the court unless the order is clear and decisive and contains no doubt about what it requires to be done."). And by the time they had notice (in February 2021), the show-cause period (March 2020 through December 2020) was over, depriving them an opportunity to purge the noncompliance. *See*

18

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 829 (1994) (a coercive sanction can only be imposed "if the contemnor is afforded an opportunity to purge"); *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) ("[T]he ability to purge is perhaps the most definitive characteristic of coercive civil contempt."); *Bingman v. Ward*, 100 F.3d 653, 656 (9th Cir. 1996) (without an opportunity to purge, any sanction payable to the Court for past noncompliance is impermissibly punitive, not coercive). Thus, Defendants cannot be subject to contempt or sanctions for the <u>155</u> instances of noncompliance after the PM had already attained compliance. (Gann Decl., ¶¶ 10–13.)

### D. Defendants Took All Reasonable Steps Within Their Power to Comply with the OSC.

The *sine qua non* for civil contempt is clear and convincing evidence that a party failed to take "all the reasonable steps *within* [*its*] *power* to insure compliance with the [court's] order." *Balla*, 869 F.2d at 466. As discussed above, and in the Declarations (Dkt. 3656-1 through Dkt. 3656-4) and Supplemental Declarations of Director Shinn, Assistant Director Gann, Tom Dolan, and Jennine Gahris, COVID-19 hampered compliance with the OSC PMs to the point that it rendered them powerless to do anything reasonably more to comply under the circumstances. Those Declarations recount—in significant detail—both the general and specific impact that COVID-19 had on ADCRR operations and Centurion's provision of healthcare and, consequently, compliance with the Stipulation and the OSC.[7] The pandemic wreaked havoc. To save the lives of inmates, staff, and members in our community, ADCRR and Centurion did everything in their power to identify and treat those who tested positive and protect everyone else from contracting it. And ADCRR and Centurion staff did so by risking their own lives. (*See* Dkt. 3533 at 2 ["There is no dispute that both the staff who work for and the people in the custody of ADC face an extreme risk of harm from the COVID-19 pandemic."].)

---

[7] Upon request, Defendants will provide Plaintiffs with the names of the inmates whose charts are highlighted in the Declaration of Jennine Gahris.

Their extraordinary efforts did save lives, but, unfortunately, it resulted in less than full compliance with the OSC. The pandemic diverted and dwindled precious, finite resources. It required health care staff to prioritize and treat infected patients and focus their efforts on mitigating the virus' spread. It required mass testing, monitoring, and reporting. And operations and health care staff had to perform these COVID-19 treatment and prevention tasks in addition to their daily assignments *and* ensuring full compliance with the Stipulation and OSC in this case. This was nearly impossible, particularly when considering other factors outside their control: mitigation policies (e.g., 21-day intake intervals and quarantining), lack of day care, increased HNRs, and no available outside consultations. Staff infections or secondary exposure drastically increased leave of absences, which left even fewer staff to accomplish it all and deterred new staff from coming on board. The many efforts ADCRR and Centurion still took to comply with the OSC must be considered in light of what they were facing—the COVID-19 pandemic. Considered together, Defendants took all reasonable steps within their power to insure compliance with the OSC. *Balla*, 869 F.2d at 466.

Plaintiffs previously argued that civil contempt is appropriate—regardless of the steps taken to comply—whenever there has been noncompliance with a court order. But that is not the law. Civil contempt is "a party's disobedience to a specific and definite court order *by failure to take all reasonable steps within the party's power to comply*." *In re Dual-Deck*, 10 F.3d at 695 (emphasis added).

The Court also indicated that Defendants must "show the particular issue was the result of conditions they did not or could not have anticipated during the previous six years and the issue did not allow for earlier remedial steps," and that "there were new and additional issues that arose that prevented compliance in subsequent months." (Dkt. 3866.) Respectfully, the COVID-19 pandemic was both unforeseen and extraordinary, and it prevented compliance in all months from March through December 2020. The Court acknowledged that "restrictions associated with COVID-19 may be a valid basis for some noncompliance, particularly in the early months of 2020," but added that "even COVID-19

cannot be used as a complete shield against noncompliance because (1) all healthcare could not cease during COVID-19 and (2) there were many noncompliant performance measures before COVID-19." (*Id.*) Defendants agree that the sudden onset of COVID-19 in March 2020 required ADCRR and Centurion to quickly formulate policies and procedures to combat the pandemic, put those policies and procedures in place, and adapt to changing CDC Guidelines (on almost a daily basis). Those intense efforts continued through at least May 2020 (although efforts continue to this day), which were also the months that involved school closures and significant restrictions. But COVID-19 positives first peaked in June and July 2020; mass testing occurred in August 2020; the resulting care from that mass testing carried through October 2020, and then the second wave of COVID-19 hit in November and December 2020. COVID-19 did not relent at any time during 2020.

At a minimum, Defendants should not be held in contempt for failing to comply with those PMs (identified above) that were directly affected by COVID-19. Those <u>131</u> PMs and the causal effect are outlined in the Gahris Declaration. (Gahris Decl., ¶ 7.)

## E. Defendants Substantially Complied with the OSC.

Despite COVID-19, Defendants still managed to substantially comply with the OSC. During the relevant time period (March through December 2020), Defendants' overall adjusted compliance rate with the Stipulation was between 88.59% (December) and 96.17% (March), with scores for each month averaging between 93% and 96%. (Gann Decl., ¶ 5.) Although the compliance rate for those PMs in the OSC ranged between 77.78% (December) and 94.12% (April), the compliance rate was above 85% in five of the 10 months (March, April, June, October, November), and the scores for all 10 months averaged between 89% and 95%. (*Id.*, ¶ 14.) Compliance rates were at their lowest in September and December, following mass testings and positive peaks in the community. (*Id.*) *See also Hallett v. Morgan*, 296 F.3d 732, 750 (9th Cir. 2002) (affirming denial of civil contempt of consent decree regarding prisoner healthcare where prison officials substantially complied); *Duran v. Grisham*, No. CV 77-721 KK/SCY, 2020 WL 1984168, at *7 (D.N.M. Apr. 27, 2020) (denying civil contempt order where prison officials

substantially complied with settlement agreement provisions requiring them to timely award good time credits to inmates and to in-house parolee, where prison officials did not award credits to a "several" of the 19 eligible inmates or the only eligible in-house parolee); *McClendon v. City of Albuquerque*, No. 95 CV 024 JAP/KBM, 2017 WL 4041588, at *4 (D.N.M. Sept. 11, 2017) (denying civil contempt where prison officials substantially complied with agreement to provide 40 hours pre-service and annual in-service mental health training to security employees even though only half of employees received the 40-hours pre-service training but all employees received 8 hours of in-service training); *see also Labor/Cmty. Strategy Ctr. v. Los Angeles Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (distinguishing the defendant's 94–99% compliance rate from other cases where there was "a near total failure" of compliance or the defendant was only 20 percent compliant, stating: "We note that the de minimis level of noncompliance here is nowhere close to the near total noncompliance in cases in which courts concluded that extensions of the consent decrees were warranted."); *Shands v. Tull*, 602 F.2d 1156, 1161 (3d Cir. 1979) ("In this case New Jersey has reached substantial compliance. According to the most recent figures available to the district court, the State met the ninety-day limit in 96% Of the AFDC appeals. In only twelve out of 417 cases did eligible claimants wait past ninety days without receiving benefits. At least for the named plaintiffs, the delays past the ninety-day limit were no more than four to twenty-one days.").

Plaintiffs previously accused Defendants of trying to rewrite the terms of the Stipulation, which requires 85% compliance. (Dkt. 3683 at 6, 8 & n.5.) Defendants do not disagree that the Stipulation requires each PM to meet or exceed 85% compliance each month. (Dkt. 1185, ¶ 10.a.iii.) But here, Defendants are defending against a charge of civil contempt, and substantial compliance with *the OSC* is a valid defense. *In re Dual-Deck*, 10 F.3d at 695. Out of the 1,260 potential instances for OSC noncompliance between March and December 2020, Defendants complied 1,082 times (85.87%). (Gann Decl., ¶ 14.) Plaintiffs also argued that Defendants' overall compliance with the Stipulation is immaterial to the OSC. (Dkt. 3683 at 6.) But Defendants' substantial compliance with the Stipulation

is proof that the "severe remedy" of contempt and drastic sanctions is not warranted. *Taggart*, 139 S. Ct. at 1801 (2019).[8]

At a minimum, the Court should not hold Defendants in contempt for those PMs that barely missed compliance (<u>10</u> instances),[9] where the noncompliance was based on a technical violation (<u>16</u> instances),[10] or where the noncompliance was caused by the inactions or omissions of third-parties (<u>2</u> instances).[11] *See In re Dual-Deck*, 10 F.3d at 695 (substantial compliance "is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply") (citation omitted). Plaintiffs previously argued that contempt is a "binary" choice—compliance or noncompliance—and that contempt is mandatory each time a PM scored less than 85%. (Dkt. 3683 at 2–3, 8 & Table 1.) However, *substantial* compliance is a defense to a charge of civil contempt, *In re Dual-*

---

[8] Plaintiffs have argued that *Taggart* is inapposite because its analysis focused on "whether there was fair notice to an alleged contemnor" and not "whether the contemnor took all reasonable steps to comply with the order." But neither *Taggart*, nor the case it quoted, *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885), limited this principle to any particular element of civil contempt. Plaintiffs have also cited cases that invoked contempt powers to remedy constitutional violations. (Dkt. 3683 at 4–5.) But the OSC is not in place to remedy any constitutional violation.

[9] *See* **PM 11**: ASPC-Eyman (March) [two files]; **PM 40**: ASPC-Tucson (July) [one file]; **PM 44**: ASPC-Winslow (October) [one file]; **PM 47**: ASPC-Phoenix (April) [two files], (May) [one file]; **PM 49**: ASPC-Perryville (September) [one file]; ASPC-Tucson (November) [two files]; **PM 50**: Perryville (December) [one file]; **PM 98**: ASPC-Douglas (July) [one file]; ASPC-Winslow (August) [one file]. (Gahris Decl., ¶¶ 10, 57, 64, 83, 92, 94, 108, 147, 151.)

[10] *See* **PM 11**: ASPC-Eyman (March); ASPC-Yuma (September); **PM 40**: ASPC-Eyman (July); **PM 47**: ASPC-Eyman (September, October, December); ASPC-Florence (March, August); ASPC-Lewis (September); ASPC-Tucson (August), (December); **PM 49**: ASPC-Tucson (November); **PM 92**: ASPC-Lewis (July); **PM 98**: ASPC-Eyman (May, July, September). For example, PM 11 at ASPC-Eyman in March, two files were marked noncompliant not because the inmates did not receive the medication (or did not receive it timely), but because the medication administration was documented in the wrong section of the inmates' charts. For PM 49 at ASPC-Tucson in November, a chart was marked noncompliant because the inmate's refusal to see the provider was documented in the wrong section of the inmate's chart. And for PM 47 at ASPC-Tucson in December, a file was marked noncompliant because the provider utilized an unapproved abbreviation in the medical record. (Gahris Decl., ¶¶ 10, 20, 53, 72, 79, 80, 81, 87, 88, 94, 144, 148,)

[11] **PM 11** at ASPC-Winslow in September was noncompliant because Diamond Pharmacy was using the incorrect fax number, and the facility was not being notified when duplicate orders, or other medication issues, arose. (Gahris Decl., ¶ 18.) **PM 94** at ASPC-Perryville in July was noncompliant because one provider who saw patients this month concealed that his license had lapsed. (Gahris Decl., ¶ 146.)

*Deck*, 10 F.3d at 695, and "technical or inadvertent violations of the order will not support a finding of contempt" if the violating party took all reasonable steps to comply, *Donallco, Inc.*, 787 F.2d at 1379.

### F. A $100,000-Per-Instance-of-Noncompliance Sanction Is Excessive.

Although "[s]anctions may be imposed to coerce the contemnor to comply with the court's order, [they] may not be so excessive as to be punitive in nature." *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991). "Coercive sanctions may only be imposed 'after a reasoned consideration' of 'the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Parsons*, 949 F.3d at 456 (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983)). Furthermore, although the absence of willfulness will not ordinarily insulate a party from civil liability, a party's good faith is relevant in determining an appropriate sanction. *Taggart*, 139 S. Ct. at 1802; *see also In re Dual-Deck*, 10 F.3d at 695 (quoting *Vertex*, 689 F.2d at 889) ("[A] person should not be held in contempt if his action "'appears to be based on a good faith and reasonable interpretation of the [court's order].'").

The Court's $100,000-per-instance-of-noncompliance sanction is disproportionately severe. It is harsh and excessive considering the presence and impact of COVID-19 during the show-cause time period, the many efforts to maintain compliance notwithstanding COVID-19, and the overall and average compliance scores for both the Stipulation and OSC. Indeed, at the time the Court issued the OSC, it was not yet declared a pandemic or a Public Emergency in Arizona. (Shinn Decl., ¶¶ 35, 37.) Not only is a $100,000 sanction excessive for one instance of noncompliance, but it becomes unduly disproportionate when it applies to more than 120 PMs at multiple facilities, and each month for a 10-month period—a possible total exposure of $126,000,000.00. (Gann Decl., ¶ 14.) *See Soroko v. Aina*, No. CIV. A. 91-3072-LFO, 1998 WL 395139, at *1 (D.D.C. July 9, 1998) ("Without a doubt, there are constitutional limits to the Court's power of contempt."); *Carty v. Schneider*, 986 F. Supp. 933, 939–41 (D.V.I. 1997) ("[T]he court finds that monetary

contempt sanctions would affect drastically the public interest and, perhaps more importantly, would impede progress and thwart the defendants' continuing efforts to remedy the conditions of confinement at the CJC."). That crosses the line from coercive to punitive, particularly because the OSC did not clearly explain its recurring sanction application. Furthermore, 18 of the noncompliant PMs had attained substantial compliance under the Stipulation during the show-cause period,[12] and at least 4 PMs had been consistently/consecutively compliant for at least nine months.[13] The sanction amount should be significantly reduced.

### G. Defendants Request an Evidentiary Hearing.

Because a finding of civil contempt is a "severe remedy," *Taggart*, 139 S. Ct. at 1802, Defendants should be afforded every opportunity to defend against it. *See Bagwell*, 512 U.S. at 827 ("[C]ivil contempt sanctions … may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard."); *Watkins*, 943 F.2d at 1304 ("Due process requires that the court … provide a hearing in which the alleged contemnor may explain why the court should not make a contempt finding."). The Court has limited

---

[12] PM 11: ASPC-Lewis; ASPC-Winslow; ASPC-Yuma; PM 13: ASPC-Eyman; ASPC-Florence; ASPC-Yuma; PM 35: ASPC-Florence; ASPC-Tucson; PM 47: ASPC-Florence; ASPC-Tucson; PM 49: ASPC-Perryville; ASPC-Tucson; PM 52: ASPC-Perryville; ASPC-Phoenix; ASPC-Tucson; PM 66: ASPC-Lewis; PM 92: ASPC-Eyman; ASPC-Lewis. (Gahris Decl., ¶¶ 15, 17, 19, 22, 23, 25, 31, 33, 77, 86, 92, 93, 119, 121, 124, 144.)

[13] PM 35: ASPC-Eyman [nine months compliance; one N/A], (Dkt. 3582 at ADCM1609450; Dkt. 3606 at ADCM1615177; Dkt. 3645 at ADCM1621144; Dkt. 3680 at ADCM1626212; Dkt. 3732 at ADCM1643428; Dkt. 3762 at ADCM1652301; Dkt. 3801 at ADCM1656739; Dkt. 3823 at ADCM1668205; Dkt. 3838 at ADCM1671074; Dkt. 3856 at ADCRRM0005940); PM 45: ASPC-Tucson [nine months compliance], (Dkt. 3443 at ADCM1591150; Dkt. 3459 at ADCM1597145; Dkt. 3473 at ADCM1597808; Dkt. 3503 at ADCM1602009; Dkt. 3546 at ADCM1607548; Dkt. 3582 at ADCM1609832; Dkt. 3606 at ADCM1615530; Dkt. 3645 at ADCM1621498; Dkt. 3680 at ADCM1626563); PM 47: ASPC-Lewis [12 months compliance], (Dkt. 3443 at ADCM1590941; Dkt. 3459 at ADCM1596929; Dkt. 3473 at ADCM1597583; Dkt. 3503 at ADCM1601793; Dkt. 3546 at ADCM1607332; Dkt. 3582 at ADCM1609604; Dkt. 3606 at ADCM1615317; Dkt. 3645 at ADCM1621275; Dkt. 3680 at ADCM1626339; Dkt. 3732 at ADCM1643568; Dkt. 3762 at ADCM1652431; Dkt. 3801 at ADCM1656864); PM 66: ASPC-Tucson [10 months compliance], (Dkt. 3375 at ADCM1584011; Dkt. 3397 at ADCM1589469; Dkt. 3443 at ADCM1591110; Dkt. 3459 at ADCM1597105; Dkt. 3473 at ADCM1597767; Dkt. 3503 at ADCM1601971; Dkt. 3546 at ADCM1607509; Dkt. 3582 at ADCM1609794; Dkt. 3606 at ADCM1615494; Dkt. 3645 at ADCM1621459).

Defendants' Response to 25 pages and did not permit a reply. (Dkt. 3861 at 14–15.) It also afforded them only 30 days to explain why they should not be sanctioned more than $17,000,000.00, a task that the Court recognized would "no doubt … require a substantial amount of work." (Dkt. 3866 at 2.) Given the financial exposure, Defendants request an evidentiary hearing to further develop and explain the instances of noncompliance. Although the Declarations and Supplemental Declarations are detailed, they are not a substitute for personally hearing from individuals who were on the ground while fighting the pandemic. Defendants can provide additional evidence and testimony connecting the impact of COVID-19 to noncompliance and explaining other reasons for noncompliance. The Court would benefit from seeing and hearing this evidence. And Defendants are entitled to due process.

## III.    Conclusion.

For these additional reasons, the Court should not find Defendants in civil contempt or impose any sanctions.

DATED this 26th day of March, 2020.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/Daniel P. Struck
　　 Daniel P. Struck
　　 Rachel Love
　　 Timothy J. Bojanowski
　　 Nicholas D. Acedo
　　 3100 West Ray Road, Suite 300
　　 Chandler, Arizona 85226

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Casey Arellano | carellano@acluaz.org |
| Maria V. Morris | mmorris@aclu.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Daniel P. Struck