Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-ROS |
| Plaintiffs, | **SUPPLEMENTAL DECL. OF DAVID SHINN** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

I, David Shinn, make the following Supplemental Declaration:

1.     I am the Director of the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") and have served as Director since October 21, 2019.

2.     On July 10, 2020, I executed a Declaration in support of Defendants' Response to the January 31, 2020 Order to Show Cause. (Doc. 3649-1). I affirm the avowals in that Declaration and incorporate them here.

3.     As Director of ADCRR, I am committed to partnering with Centurion of Arizona ("Centurion") to lead this agency to full compliance with the Stipulation Health Care Performance Measures ("HCPMs") and overall Stipulation compliance.

4.     To that end, I have explored and analyzed the important interplay between prison security operations and the provision of inmate healthcare to identify challenges that may require redirection, improvement, or change in order to achieve both ADCRR and Centurion's common goal of providing quality and Stipulation-compliant healthcare to the inmate population while also maintaining the safety and security of the public, the inmate population, and staff.

5.     I am familiar with the relevant orders in this proceeding, including the Court's June 22, 2018 Order and Judgment of Civil Contempt, the January 31, 2020 Order to Show Cause, the February 24, 2021 Order, and the Order dated March 4, 2021.

6.     Under my leadership, ADCRR continues to take all reasonable steps to comply with the Court's OSC Orders and to achieve Stipulation compliance in order to terminate Court oversight of this matter.

7.     ADCRR's ongoing steps to achieve Stipulation compliance that have been implemented since those that were reported in my July 2020 Declaration (Doc. 3649-1) are outlined herein and are also included in simultaneously submitted declarations from L. Gann, ADCRR's Assistant Director of Medical Services Contract Monitoring Bureau (MSCMB), as well as declarations submitted by Centurion leadership.

8.     As a reference point regarding the provision of medical care to ADCRR inmates assigned to ten ADCRR-operated prison complexes across the state, as of March 23, 2021, the total inmate population at issue was 29,798.  As of March 23rd, ADCRR incarcerated 6,925 inmates in prison facilities operated by private correctional service provider partners under contract with ADCRR.

### Stipulation Compliance for March 2020 to December 2020

9.     Excluding the Maximum Custody and "N/A" Measures, the MSCMB audited 732 Health Care Performance Measures in March 2020; 731 in April 2020; 740 in May 2020; 727 in June 2020; 724 in July 2020; 723 in August 2020; 739 in September 2020; 737 in October 2020; 736 in November 2020; and, 736 in December 2020.

10.    If the Maximum Custody and N/A measures are excluded from both the numerator and denominator in the overall compliance formula, number of applicable measures monitored, the average score of all monitored measures and the adjusted final compliance rates for those months are: [1]

| Month | Applicable Measures Monitored | Average Measure Score | Adjusted Final Compliance Rate |
|---|---|---|---|
| March 2020 | 732 | 96% | 96.17% |
| April 2020 | 731 | 96% | 94.94% |
| May 2020 | 740 | 94% | 89.73% |
| June 2020 | 727 | 93% | 89.82% |
| July 2020 | 724 | 93% | 89.09% |
| August 2020 | 732 | 94% | 89.75% |
| September 2020 | 739 | 93% | 89.72% |
| October 2020 | 737 | 95% | 92.54% |
| November 2020 | 736 | 95% | 92.26% |
| December 2020 | 736 | 94% | 88.59% |

/ / /

/ / /

---

[1] When ADCRR reports the "overall" or "systemwide" compliance rate, it is reporting that percentage based upon a specific formula, which is:

$$\frac{\text{\# activated measures - \# noncompliant activated measures}}{\text{\# activated measures}} \times 100$$

The "activated measures" include the Maximum Custody Outcome Measures, the "N/A" Measures, and Measures that have been terminated or retired by the Court (except PM 54, effective March 2020). Additional rates can be calculated from the underlying data contained in the CGAR reports.

11.   If terminated Health Care Performance Measures are removed from the equation, there is no substantial difference in the compliance scores, although the scores are slightly lower.  The monthly number of applicable measures monitored, average score of all monitored measures, and final adjusted compliance rates for non-terminated Health Care Performance Measures are:

| Month | Applicable Measures Monitored | Average Measure Score | Adjusted Final Compliance Rate |
|---|---|---|---|
| March 2020 | 550 | 95% | 95.27% |
| April 2020 | 559 | 96% | 95.35% |
| May 2020 | 557 | 94% | 89.05% |
| June 2020 | 544 | 93% | 91.18% |
| July 2020 | 541 | 93% | 88.91% |
| August 2020 | 548 | 94% | 89.23% |
| September 2020 | 550 | 93% | 89.09% |
| October 2020 | 540 | 94% | 91.85% |
| November 2020 | 432 | 94% | 90.28% |
| December 2020 | 433 | 93% | 84.99% |

12.   The reason for the difference is because the MCSMB still held the contractor accountable for failing to meet the 85% compliance threshold even for those Health Care Performance Measures that had been terminated by the Court.

13.   Of the total measures subject to the Order to Show Cause, the monthly number of applicable OSC measures monitored (non-terminated OSC measures minus non-terminated OSC measures that were not applicable that particular month ("N/A")), the

4

average score of all non-terminated applicable OSC monitored measures, and the resulting compliance rates for non-terminated OSC measures:

| Month | Applicable Measures Monitored | Number of Noncompliant PMs | Average Measure Score | OSC Compliance Rate |
|---|---|---|---|---|
| March 2020 | 123 | 14 | 92% | 88.62% |
| April 2020 | 119 | 7 | 95% | 94.12% |
| May 2020 | 120 | 20 | 92% | 83.33% |
| June 2020 | 119 | 15 | 92% | 87.39% |
| July 2020 | 120 | 23 | 89% | 80.83% |
| August 2020 | 120 | 19 | 91% | 84.17% |
| September 2020 | 120 | 25 | 91% | 79.17% |
| October 2020 | 119 | 15 | 92% | 87.39% |
| November 2020 | 117 | 14 | 93% | 88.03% |
| December 2020 | 117 | 26 | 91% | 77.78% |

14.    The details of these calculations are more fully set forth in the simultaneously submitted Declaration of L. Gann.

**Contract Sanctions Imposed Upon Centurion**

15.    ADCRR's contract with Centurion, which commenced in July 2019, provides a graduated scale for contract sanctions/offsets resulting from both non-compliance HCPMs as well as staffing deficiencies to promote compliance with both the contract and the Stipulation.

16.    The three-tier system of contract sanctions are designed to promote compliance with the contract, as well as with the Stipulation. Failure to meet the current

monthly 85% compliance threshold at any complex during any audited month results in a fixed-rate performance offset of $500.00 per measure, per month, per facility.

17.     A second-tier of graduated-scale performance sanctions applies only to HCPMs where noncompliance at a particular complex or month will result in the extension of the twenty-four-month rolling compliance period governed by the Stipulation.

18.     The third-tier of sanctions provides for staffing offsets/paybacks for hours of service if the actual number of hours worked by Centurion personnel falls below the level of hours to be worked by a full-time equivalent ("FTE") employee identified in the staffing matrix at the regional office or at a facility.  Where positions are under-filled in a particular month, Centurion is subject to an offset based upon the average hourly rate for that provision for each hour that was uncovered.  To avoid these offsets, Centurion may use more qualified staff to cover the hours (for example an RN may be used to complete the work of an LPN, or a physician may work to cover the hours for a mid-level provider listed in the staffing plan).

19.     The third-tier staffing sanction offset is designed to eliminate any financial incentive if the contractor decides that it may be economically advantageous to leave a position on the staffing plan unfilled, even where there is a sanction for noncompliance.  If a position on the staffing plan is not actually worked in the month, the amount of the payment due to the contractor is offset by the wage or salary due to that particular position for each vacancy.

20.     ADCRR has invoked contract sanctions/offsets and for the first 18 months of contract performance (July 2019 through December 2020) in the amount of $12,277,066.91 as against Centurion to encourage and gain Stipulation compliance.

### **ADCRR Leadership Engagement Regarding  Stipulation Compliance**

21.     Following the Court's January 2020 OSC Order, ADCRR and Centurion leadership increased the existing bi-weekly meetings to weekly meetings to track and discuss HCPM compliance, and to collaboratively address efforts to achieve complete Stipulation compliance and address non-performing HCPMs.

22.     Likewise, ADCRR complex-level security operations and medical leadership continue to meet daily to discuss HCPM compliance, identify and resolve issues that compromise compliance, collaborate to achieve complete Stipulation compliance, and advise on the medical and mental health status of inmates who may require additional security supervision.

23.     Deputy Director J. Profiri continues to meet with Assistant Director L. Gann at least once a week to discuss MSCMB's oversight of Centurion's performance and compliance with the contract, Stipulation, and on-going response to COVID-19.

24.     Additionally, Deputy Director Profiri engages in weekly meetings with the MSCMB and Centurion wherein relevant action items are discussed to include updates on HCPMs that have not reached compliance, the provision of medical, dental and mental health care and obstacles related to the same, status of pharmacy operations, and Centurion staffing. Escalation processes are employed that can result in ADCRR's contracting and procurement officers engaging with Centurion on contract performance issues that coincide with Stipulation and HCPM compliance.

25.     Deputy Director Profiri furthermore participates with ADCRR legal counsel and Centurion leadership to proactively address contract and Stipulation performance issues where performance does not meet Stipulation compliance requirements.

26.     I am apprised of Deputy Director Profiri's engagement with the MSCMB and Centurion on a regular basis.

27.     The appointment of Assistant Director Gann, working in daily collaboration with Deputy Director Profiri, has precipitated a culture shift not only within the MSCMB, but in the relationship between ADCRR and Centurion.

28.     Assistant Director Gann serves as the voice of ADCRR as to the delivery of inmate healthcare services.  If an issue needs to be escalated, first Deputy Director Profiri, and then I become involved to reach resolution.  This structure provides a much more agile and efficient method by which ADCRR's concerns can be made known to Centurion and resolved.

29.    Assistant Director Gann oversees the MSCMB and per my direction, Assistant Director Gann is also responsible for ensuring that Centurion provides ADCRR's inmate population with a quality system of healthcare.

30.    While the MSCMB has a reactive role in imposing sanctions to enforce compliance with the term of the contract, it also has a significant role in proactively assessing and evaluating compliance issues in real-time to reduce the risk of prospective noncompliance, which can negatively impact patient care.

31.    Under Assistant Director Gann's leadership, he has restructured the MSCMB to employ a more efficient and cohesive team of experts that not only monitors Centurion's compliance with Performance Measures but also proactively identifies compliance barriers, breaks them down, provides corrective action plans for the same, and assesses compliance under the corrective action plans.

32.    Achievements of the MSCMB under Assistant Director Gann's leadership include the following measures taken to increase HCPM compliance:

- Relocation and reassignment of ten medical liaisons to MSCMB's Central Office to increase effectiveness of the medical liaisons, with responsibilities to include touring of all ten ADCRR-operated prison complexes to audit operational and medication administrative processes, providing corrective action plans with re-audits to determine areas of noncompliance or barriers to care that still exist, and completing patient chart reviews for specified HCPMs to advocate for positive patient outcomes. The medical liaison team's mission is proactive troubleshooting, and they work to identify and cure Stipulation deficiencies in advance. The liaison team is not made up of monitors but coordinates with the MSCMB monitors to identify and address Stipulation and HCPM compliance issues.  The medical liaison team is made up of clinicians, staffing specialists, and inventory specialists – all working together in conjunction with the monitors, facility operations leadership, and MSCMB leadership to improve the quality of care provided to the inmate population and to achieve Stipulation compliance.

- Creation and implementation of two Operational Team Leader (Program Evaluation Administrators) positions to lead the medical liaison teams, who in turn coordinate implementation of action plans to address barriers to access to healthcare and Stipulation compliance and provide uniform communications between the MSCMB and Centurion staff in the field.

8

• Creation and implementation of training provided to MSCMB and Centurion staff on the following training modules, to be completed both during onboarding for new hires and annually for existing staff:  Basic Orientation Training (to include targeted training regarding *Parsons v. Shinn* Stipulation requirements, Centurion contractual obligations, HCPMs, Stipulation monitoring guidelines); Arizona Management System; Problem Solving; Corrective Action Plan; Identifying Waste in a Process; Problem Solving for Leaders; Medication Audit Training; eOMIS; and COVID-19 Vaccinations and Testing.

• Implementation of quarterly strategic planning meetings to target specific goals utilizing statistical data and resource allocation studies to address and improve HCPM compliance. ADCRR's Office of Continuous Improvement ("OCI"), which is made up in part of seasoned ADCRR security/operations professionals, contribute to the quarterly strategic planning sessions by (1) studying and providing both statistical data to the MSCMB in order to better analyze trends and operational challenges that may impede Stipulation compliance for specified HCPMs; and (2) providing recommendations to improve/eliminate barriers to the provision of quality healthcare and Stipulation compliance by focusing on reduction of operational and security barriers and challenges. Currently, OCI is generally studying Centurion staffing levels/trends/contract compliance and Stipulation compliance rates to address increased compliance. OCI is also currently working on targeted data/operational studies to: (1)  reduce single inmate medical transports to increase completion of timely outside specialist appointments; and (2)  address increased compliance for HCPMs 11, 44, 50, and 51 (as related to timely provision of newly prescribed medications to inmates; timely review and action upon hospital treatment return recommendations; timely scheduling and completion of urgent consultations and specialty diagnostic services; and timely scheduling and completion of routine specialty consultations).

• Development of audit templates to standardize MSCMB's HCPM and contractual auditing processes, consistent with NCCHC (National Commission of Correctional Health Care) operational standards.

• Implementation of on-site audits by the MSCMB medical liaison teams (often conducted unannounced) with post-onsite audit meetings conducted by the MSCMB medical liaisons together with Centurion facility leadership and facility operations leadership (including the complex Warden and/or Deputy Warden of Operations). The post-onsite audit meetings are conducted on-site and serve to communicate audit findings to Centurion and ADCRR operational leadership at the complex level. Corrective action plans are created and implemented to address negative audit findings, with timely follow up to assess the successfulness of the action plans. The post-onsite audit meetings are conducted consistent with NCCHC standards of conduct regarding the same.

- Implementation of chart-review based audits by the MSCMB medical liaison teams to determine fail-points resulting in non-compliance of HCPMs. The patient chart audits are voluminous and can approach 100 chart reviews where warranted. These chart reviews greatly exceed the volume of reviews conducted to determine HCPM compliance for a particular month which is done in arrears versus live time by the medical liaison team. The focus of the medical liaison team's troubleshooting mission is to not only identify aid in correcting past non-compliance, but to proactively identify and address existing challenges as to promote current and future compliance.

- Creation of Corrective Action Plan Trackers to increase the vendor's accountability for helping solve issues identified during an onsite audit and to aid ADCRR in determining contractual non-compliance issues and coinciding contract sanctions.

- Analysis of capital expenditure needs to assess current allocation and status of medical equipment utilized by Centurion to identify existing or future needs for repair, replacement, or purchase of medical equipment in order to provide healthcare that meets and exceeds community and Stipulation standards.

### **COVID-19 Response Operations**

34.     Since the beginning of the 2019 Novel Coronavirus ("COVID-19") pandemic, ADCRR has taken significant action to mitigate the risk and impact of COVID-19 in its facilities consistent with Centers for Disease Control and Prevention ("CDC") guidelines, Arizona Department of Health Services ("ADHS") guidelines, and ADCRR's existing protocols for infectious disease control.

35.     On January 21, 2020, the CDC confirmed the first case of COVID-19 in the United States. Ten days later, on January 31, 2020, Health and Human Services Secretary Alex Azar declared a public health emergency in the United States.

36.     Both ADCRR and Centurion leadership stayed apprised of the COVID-19 developments and began analyzing and planning for operational and healthcare impacts should COVID-19 spread in Arizona's communities.

37.     By March 11, 1010, COVID-19 was declared a pandemic and a Public Health

Emergency in Arizona.

38.     Consistent with the effect on the community, COVID-19 restricted and impacted the provision of healthcare to ADCRR's inmate population, which necessarily included an impact on prison complex staffing (both corrections/operations staff and medical staff) where employees  were also exposed or infected with COVID-19, resulting in significant staff call-out due to exposure or infection.

39.     ADCRR's efforts to mitigate the risk of COVID-19 infection in the inmate population has been successful.

40.     ADCRR's targeted response to mitigate the spread of COVID-19 includes but is not limited to the following actions listed below.  ADCRR's operational responses  were implemented based upon daily analysis of constantly evolving CDC Guidelines and even in advance of the CDC releasing its Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities.  The CDC's Interim Guidance continues to change and evolve:

- •     March 16, 2020: ADCRR activated its Emergency Operations Center, operating in conjunction with state and federal officials, the nation's National Incident Management System (NIMS), and Centurion representatives to manage healthcare, security, administration, and finance needs associated with response to COVID-19.

- •     March 18, 2020:  complex cleaning supplies and hygiene product supplies were inventoried and orders for inmate bar soap were placed with expedited shipping; complex supply usage and inventories were tracked and future usage projections made to determine future purchase needs; detention bed utilization review was completed to allow use of detention beds for quarantine for court returns and violators; weekly deep cleaning and daily cleaning schedules were created and implemented; emergency daycare options were distributed to leadership for distribution to staff; staff/inmate COVID-19 symptom screening process was finalized and implemented; vulnerable inmate populations were identified per CDC guidelines; weekly screening protocols and enhanced education for identified vulnerable inmate population were implemented; Centurion telemedicine expanded as needed; Centurion and ADCRR collaborative tracking and reporting systems were implemented for all instances of potential infection of the inmate population; operations tracking was implemented for potential infection in employees; COVID-

19 education bulletins were posted in English and Spanish on inmate bulletin boards and CCTV; Wardens and Deputy Wardens conducted Town Hall meetings with inmates to discuss COVID-19 mitigation efforts; and non-essential education were suspended to address social distancing recommendations.

• March 18: 2020:  all routine internal movement of inmates across all prison complexes was suspended to mitigate risk of COVID-19 exposure and spread.

• March 18, 2020:  specialty consults were suspended on a case-by-case basis with ongoing review to occur to determine continuing transport needs for emergent or urgent   outside specialty consults. Non-emergent/non-urgent onsite specialty appointments were suspended to mitigate inmate/staff exposure to non-Centurion medical personnel coming into prison facilities from the community (e.g., optometry, audiology, orthotics, ultrasound and mammogram services). Consistent with sound correctional and public health practices, emergency/hospital transports continued based upon medical need as well as external specialty appointments where clinically indicated, and provider appointments were available for the same.

• March 18, 2020:  inmate visitation was suspended to mitigate community exposure and infection.  Inmates were provided two additional free telephone calls per day (except international calls) to allow increased contact with family/friends resulting from suspension of visitation.[2]

• March 18, 2020:  inmate co-pays for medical services were suspended as related to notification/request for care for COVID-19 symptoms to encourage inmates to report and seek medical care for the same.

• March 25, 2020:  off-site work crews were suspended to mitigate COVID-19 exposure and infection from community contacts.  Female inmates working at Hickman's Family Farms were relocated on-site to permit essential operations of the farm to continue while mitigating COVID-19 community exposure and infection from entering ASCP-Perryville via daily returns of inmate workers.

• March 30, 2020:  Arizona's county sheriffs agreed to suspend admission to ADCRR for 21 days, followed by agreement to stagger county jail new admissions to ADCRR in 21-day cycles. ADCRR worked with Arizona county sheriff

---

[2] On March 19, 2020, Executive Order 2020-10 was issued, which suspended non-essential surgeries to conserve the supply of Personal Protective Equipment ("PPE").  As a result of EO 2020-10, outside providers began canceling previously scheduled appointments and were unable to reschedule during the restriction time period.  When the restrictions were lessened or eliminated, scheduling continued to be a challenge due to outside providers' backlogs and limited availability for inmate appointment scheduling. The availability of outside provider appointments continues to improve as providers address their backlogs and the community spread of COVID-19 decreases.

departments to slow, pre-plan, schedule for, and stratify transfers of new admission intakes from the county jails to ADCRR.  The intention of the initial 30-day hold was not only to avoid the introduction of COVID-19 into ADCRR facilities from the county jails, but also to permit Centurion medical staff to focus on the healthcare needs of the existing population during the pandemic rather than diverting medical resources to both complete medical assessment intakes for large numbers of newly admitted inmates and additionally screen, evaluate, and monitor for COVID-19 during the quarantined intake process.  A side effect of the process, however, was that Centurion medical staff faced increased workloads during the cycle intake schedules which in turn could negatively impact Centurion's HCPM compliance rates. However, priority had to be made to mitigate against introduction of COVID-19 into ADCRR's ten prison complexes from county jails.  The staggered intake practice continues.  Furthermore, since March 30, 2020, ADCRR has implemented two additional new admission units located at ASPC-Lewis and ASPC-Rincon to provide appropriate quarantine protocols for new inmate admissions received from Arizona county jails.  The additional intake center located at ASPC-Lewis Morey Unit provides temporary housing for an additional approximate 200 intakes who are housed in a newly renovated cell environment, where they receive services such as food delivery directly to their housing location.  The additional intake center located at ASPC-Tucson Rincon Unit provides temporary intake/quarantine/cohort housing for up to approximately 190 inmates from county jails.  The creation of these two additional intake centers (in addition to existing intake facilities at ASPC-Phoenix) facilitates appropriate initial intake quarantine/testing protocols for new intakes before assignment to housing, thereby mitigating introduction of COVID-19 into the existing inmate population.

• April 1, 2020:  consistent with CDC Guidelines and substantial limitation on PPE supplies across the country for law enforcement, first responders, and healthcare providers, masks were provided to inmates with active COVID-19 symptoms and for those providers directly treating COVID-19 patients.  PPE was made available to ADCRR staff and Centurion providers consistent with CDC guidelines and existing ADCRR direction for meeting all infectious disease threats encountered in the correctional environment.

• April 3, 2020:  ADCRR recommended employees wear non-medical PPE. Masks were issued to ADCRR and Centurion staff.  Inmates with COVID-19 or flu-like symptoms continued to be quarantined consistent with CDC Guidelines.

• April 7, 2020:  the first two ADCRR inmates tested positive for COVID-19 but these inmates were not housed in ADCRR-operated prison complexes.  One inmate tested positive while out to a community hospital and the other inmate tested positive while assigned to a facility operated by a contracted private prison operator.

• April 9, 2020:   the first inmate assigned to an ADCRR-operated prison

complex tested positive for COVID-19 (ASPC-Florence).

• April 10, 2020: ADCRR implemented its COVID-10 Dashboard available at corrections.az.gov to provide the community with updates regarding COVID-19 statistics. COVID-19 Management Strategy Updates via website postings also commenced.

• May 8, 2020: ADCRR announced to the public via COVID-19 Management Strategy Updates available on the ADCRR website that inmate video visitation would be implemented May 10th (Mother's Day) through June 13th providing one free 15-minute video visit per week for those inmates eligible for visitation. Free phone call strategies remained in place as well as existing phone call and mail privileges. Free video visitation opportunities were subsequently further extended.

• May 28, 2020: COVID-19 PCR testing of staff started at ASPC-Yuma as part of a statewide plan to test all correctional staff and prison employees. Testing at other prison complexes followed.

• June 10, 2020: Free video visitation (one 15-minute visit per week) was extended for inmates with visitation privileges.

• June 12, 2020: COVID-19 antibody testing was initiated at ASPC-Florence for employees and contract staff. Testing at other prison complexes followed.

• July 2, 2020: cloth masks were distributed to all ADCRR inmates to include ADCRR and private operated prison complexes. Inmates were educated and encouraged to wear masks at all times except when eating, drinking, sleeping, or when staff request or required a positive identification.

• July 2, 2020: ADCRR began coordination with ADHS to implement mass testing of all inmates at ADCRR-operated prison complexes.

• July 13, 2020: the in-person visitation restriction was extended, with free weekly phone calls and video visitation privileges also extended as described above.

• July 27, 2020 (to September 1, 2020): Phase 1 of mass COVID-19 testing of all ADCRR inmates began and was completed in four weeks versus the original projection timeline of 13 weeks. Centurion staff initiated the testing process but the process pivoted to primary responsibility taken by ADCRR and ADHS. MSCMB clinicians took primary point for completion of inmate testing and worked in conjunction with ADHS which contracted with two additional lab vendors to enhance the timing of return of lab results. The involvement of the MSCMB and ADHS provided Centurion the ability to focus on its primary mission of providing a community standard of health care to ADCRR patients in a timely manner against the backdrop of the unanticipated COVID-19 pandemic. Phase 2 of mass inmate

testing was planned for January 26, 2021 – March 18, 2021 (now complete).

• August 4, 2020: 517 inmates at ASPC-Tucson Whetstone Unit tested positive for COVID-19. Positive inmates were quarantined/cohorted with appropriate medical monitoring and care, as well as meals and other services, provided in the housing locations to enhance restricted movement and protect against unnecessary exposure to staff and other inmates. Inmates requiring a higher level of care for COVID-19 symptoms and related complications were transferred to community hospitals for care. These protocols preceded August 2020 and continue today at all ADCRR-operated facilities.

• August 6, 2020: the in-person visitation restriction was extended, with free weekly phone calls and video visitation privileges (now up to one 30-minute visit per week) extended as described above.

• September 10, 2020: in-person visitation restriction was extended, with free weekly phone calls and video visitation privileges (extended as described above.

• October 22, 2020: in-person visitation restriction was extended again, with free weekly phone calls and video visitation privileges (extended as described above.

• December 8, 2020: in response to increased number of COVID-19 infections in the community, increased testing of inmates at ASPC-Florence Globe and ASPC-Yuma La Paz Units commenced.

• December 8, 2020: ADHS Infection Control Assessment and Response Teams completed onsite surveys to enable ADHS to provide ADCRR with additional assistance and guidance regarding COVID-19 response protocols.

• December 8, 2020: in collaboration with ADHS, ADCRR completed mass PCR testing of all ADCRR inmates in ADCRR-operated prison complexes. ADCRR was among only a handful of state correctional agencies in the country to mass test their entire inmate population.

• December 8, 2020: efforts were made to prepare for vaccination distribution to staff and inmates as vaccines are made available by federal, state, and county officials.

• December 23, 2020: ADCRR expanded its intake capability to address the increase of COVID-19 positive inmates being transferred from county jails. Additional intake facilities were implemented at ASPC-Lewis Morey Unit to provide temporary intake/quarantine housing for an additional 200 inmates (housed in a newly renovated cell environment (newly configured cell doors/locks, fire alarm systems and HVAC systems) with COVID-19 testing, medical assessment/care, and food services provided on-unit.

- December 28, 2020:  ADCRR prepared for Phase 2 of mass inmate COVID-19 testing of all inmates in ADCRR-operated prison complexes, to be completed from January to March 2021.

- ADCRR is currently in the process of vaccinating inmates identified as vulnerable to COVID-19 complications, inmate 55 years of age and older, and critical needs inmate worker inmates who work outside of the prison complexes. Vaccination efforts are ongoing, and ADCRR is working in conjunction with ADHS to obtain and strategically distribute vaccinations to the inmate population.

41.    The above summary of COVID-19 response efforts address 2020 response protocols.   ADCRR continues to be vigilant in implementing robust COVID-19 management strategies that meet or exceed CDC guidelines to reduce the spread of the virus in its facilities to include staff and inmate testing, quarantine/cohort strategies, new admission intake testing/quarantine/cohort strategies, provision of PPE to staff, provision of masks to staff and inmates, implementation of restricted movement operations to reduce intermixing of inmate populations and enhance social distancing, enhanced sanitation protocols, and facility entry symptom/temperature checks for staff/contractors.

42.    In sum, ADCRR and Centurion implemented appropriate quarantine/cohort strategies at all 10 ADCRR prison complexes to isolate and house COVID-19 exposed and infected inmates early in the pandemic, with such strategies continuing today.  To provide appropriate bedspace, for example, female inmates from ASPC-Perryville were temporarily housed at ASPC-Douglas in order that the Piestewa Unit at ASPC-Perryville could be used as a COVID-19 quarantine unit.  Two additional intake operations were also implemented at ASPC-Lewis and ASPC-Tucson as described above.

43.    Two rounds of mass testing of ADCRR's inmate population have been conducted to contain and prevent the rapid spread of COVID-19 among the inmate population and staff.  Mass testing can save lives and reduces the impact that mass infection would have on available medical resources both within ADCRR and in the community.

44.     However, even in these best of circumstances, increased provision of medical care to COVID-19 positive inmates as well as screening and attending to inmates presenting with COVID-19 symptoms was required and diverted pre-COVID-19 medical resources. This in turn necessarily negatively impacted Centurion's ability to meet strict Stipulation compliance in some respects, especially where Centurion also experienced increased callouts by staff because of COVID-19 infection or exposure.

45.     It should be noted that COVID-19 testing was not readily available even in the community, early in the pandemic.  Before COVID-19 tests were available to ADCRR, symptomatic inmates were placed on medical observation status pending diagnosis.  Even with the growing availability of more reliable rapid tests, inmates are likely to remain on a medical watch when reporting/exhibiting COVID-19 symptoms pending test results and depending on the inmate's condition, may remain on medical watch while recovering from COVID-19.  Medical watches are staff intensive for both medical and correctional staff and require constant or frequent observation by correctional staff as well as frequent assessment by medical staff. These staff intensive circumstances reasonably impacted performance on time sensitive HCPMs where both correctional and staff resources were required to be diverted to watch operations.

46.     With the completion of mass testing of inmates in Summer 2020 and implementation of cohorting strategies even for asymptomatic inmates, medical resources were stretched to provide on-unit assessments to asymptomatic inmates as well as monitoring and care of symptomatic COVID-19 positive inmates.  For example, on August 4, 2020, 557 inmates at ASPC-Tucson Whetstone Unit tested positive, which required large-scale quarantine and cohort operations.  Positive tests required not only cohorting of inmates but enhanced medical assessment and treatment operations to provide care to COVID-19 positive inmates.  With recovery time lagging on average two to four weeks after obtaining positive tests, the burden on operations and medical staff continued from one month to the next.  Thus, a spike in COVID-positive inmates in one-month results in stretch and drain of both medical and operational resources into the next month.

17

47.     Mass testing also challenged facility operations as both correctional and medical resources were required to facilitate mass inmate testing, again diverting resources away from normal operations.  Despite the resulting burdens, targeted testing operations that are large scale but less than mass testing continue to be employed where needed. For example, following community spread of the virus after Thanksgiving 2020, certain facility locations likewise experienced a spike.  As a result, selected units underwent widescale testing in December 2020.  Both ASPC-Florence Globe and ASPC-Yuma La Paz Units underwent testing resulting in 655 out of 1,066 inmates at Yuma's La Paz Unit testing positive, then requiring resulting resource-intensive cohort, quarantine, medical assessment/treatment response operations.

48.     As of March 25, 2021, 2734 ADCRR staff self-reported receiving positive COVID-19 tests from community medical providers, with 2724 staff certifying as recovered.

49.     During the time period of May 2020 to December 2020, staff infection rates or suspected exposure compromised ADCRR staffing as follows[3]:

**Impact of COVID-19 on ADCRR Staff Availability**
**(Cumulative measures from last business day of the Month, May 2020 - December 2020)**

| Month | Staff Self-Report Positive | Recovered Self-Reports | Employees Turned Away Due to Screening | Employees Turned Away and Subsequently Returned to Work |
|---|---|---|---|---|
| May | 82 | 61 | 954 | 869 |
| June | 226 | 149 | 1489 | 1200 |

[3] The staff self-report and recovered self-report statistics are for all ADCRR employees state-wide to include Central Office.  The employees turned away due to screening/subsequently returned to work include contracted employees to include for example, Centurion medical staff and Trinity food services staff.

| July | 555 | 463 | 1984 | 1768 |
| August | 679 | 659 | 2217 | 2146 |
| September | 705 | 692 | 2345 | 2299 |
| October | 775 | 726 | 2535 | 2468 |
| November | 1075 | 856 | 2924 | 2729 |
| December | 1863 | 1490 | 3497 | 3232 |

50.      While restricted movement protocols decreased cross-exposure of inmates housed at a particular prison complex or in a particular housing unit.  ADCRR addressed daily staffing needs by staffing priority posts, collapsing non-priority posts, and reassigning duty posts to facilitate necessary movement.  Where necessary, 12-hour shifts and overtime were required to safely operate ADCRR prison complexes with all priority posts filled.  ADCRR took all reasonable steps to mitigate operational challenges and slowdowns to support Centurion in maintaining Stipulation compliance while at the same time providing necessary assessment and care to COVID-19 exposed, suspected, or infected inmates.

51.      Centurion staff callouts also impacted medical staffing, requiring reassignment of Centurion staff to address the healthcare needs of inmates with and without COVID-19 exposure.  Because of COVID-19 exposure and infection among the inmates, Centurion staff had to increase their rounds to obtain vital signs for hundreds of COVID-19 inmates.  In turn, Centurion staff also had to triage and prioritize medical care, giving priority to COVID-19 inmates. Consequently, this then slowed nursing and provider lines resulting in varying and sometimes decreased compliance rates for HCPMs.

52.      ADCRR and Centurion's proactive and successful responses to the COVID-19 pandemic fortunately placed ADCRR at the forefront of correctional agencies as to inmate COVID-19 deaths.  ADCRR continues these efforts in consultation with CDC and ADHS guidelines and recommendations to mitigate COVID-19 infection among the inmate population while continuing to provide continuing quality healthcare to the entire inmate population that meets and exceeds both constitutional and community standards.

/ / /

53.     Considering 29,860 inmates currently in ADCRR's ten ADCRR-operated prison complexes as of March 25, 2021, the total inmate population mortality rate is 0.14%. Considering 30,546 inmates in ADCRR's ten ADCRR-operated prison complexes as of December 31, 2020, the total inmate mortality rate was 0.10%.

54.     Incorporating mortality rates based upon COVID-19 positive tests for inmates in the ten state-operated prison complexes, the mortality rate is 0.3732%.

55.     The Marshall Project consolidates reports of COVID-19 infections in state and federal prisons.  Considering COVID-19 death rates per 10,000 prisoners, only ten other states have lesser mortality rates than Arizona and Arizona's statistics are based on total mortality rates to include confirmed/suspected COVID-19 deaths also at private provider facilities that house ADCRR inmates. Arizona (12); Alaska (10); Idaho (8); Maine (1); Nebraska (11); New York (8); North Dakota (7); Rhode Island (7); Washington (8), Wisconsin (11), and Vermont (0). (*See* https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons; https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons#prisoner-state, then select Arizona from the drop-down, last visited March 25, 2020.)

56.     Despite ADCRR and Centurion's demonstrated success managing COVID-19, the pandemic necessarily diverted both corrections/operation and medical staff from normal duties, impacting Stipulation compliance despite reasonable and best efforts to comply while at the same time proactively and successfully managing the COVID-19 infection rates.

## **Deactivation of ASPC-Florence**

57.     In response to the Court's OSC Order and to increase and maintain Stipulation HCPM compliance, ADCRR continues to move forward with deactivating ASPC-Florence. The first phase of closure of the North Unit has been completed.

58.     The closure of the North Unit resulted in relocation of approximately 900 inmates to existing ADCRR bed space, redeployment of approximately 70% the Unit's operations/security staffing resources to ASPC-Eyman (with 30% remaining at ASPC-Florence), and absorption of medical staff within the Florence Complex to increase medical staffing to better address the healthcare needs of the still-existing ASPC-Florence inmate population that as of March 23, 2021, was 2692 inmates on-site.

59.     The deactivation of ASPC-Florence is dependent on approval of funding which was proposed in the Governor's budget proposal and expected to be included in this year's budget by the Legislature.

**Tablet System Rollout**

60.     As an additional method of increasing efficiency in the provision of medical care, ADCRR continues to roll out a tablet system whereby inmates in most every classification are provided tablets that provide for entertainment and communication opportunities.[4]

61.     But for the exceptions noted in footnote 4, tablets are provided for inmate use at all ten ADCRR-operated prison complexes.

62.     Efforts to implement the tablets with technology capability for submission of Health Needs Requests and medical care refusal forms directly from the tablet to medical personnel has been ongoing since mid-2020 but delayed due to COVID-19.

63.     Despite unanticipated delays due to COVID-19, rollout of the tablet-access HNR system will go into effect in April and May 2021, in phases to include ADCRR staff testing of the tablet-based HNR system; staff training regarding the same; and a projected go-live date of mid to late May.  This capability will increase the efficiency and timeliness

---

[4] Generally, inmates who destroy or attempt to destroy the tablets are subject to restriction on tablet use for legitimate security and disciplinary reasons. Additionally, ASPC-Florence (Kasson Unit) does not provide its seriously mentally ill maximum custody inmates with tablets due to legitimate safety risks where destruction of a tablet by at least one inmate has resulted in attempted serious self-harm.

1   of processing inmate HNRs and medical care refusals.

2   ///

3

4   ///

5

6   ///

7

8   ///

9

10   ///

11

12   ///

13

14        I declare under penalty of perjury that the foregoing is true and correct.

15   Executed this **26** day of March, 2021.

16

17

18                    David Shinn

19

20

21

22

23

24

25

26

27

28