1  Jared G. Keenan (Bar No. 027068)
   Casey Arellano (Bar No. 031242)
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone: (602) 650-1854
4  Email: jkeenan@acluaz.org
            carellano@acluaz.org
5
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
6  *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
   *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
7  *Desiree Licci, Joseph Hefner, Joshua Polson, and*
   *Charlotte Wells, on behalf of themselves and all others*
8  *similarly situated*
   **[ADDITIONAL COUNSEL LISTED ON**
9  **SIGNATURE PAGE]**

10 Asim Dietrich (Bar No. 027927)
   **ARIZONA CENTER FOR DISABILITY LAW**
11 5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
12 Telephone: (602) 274-6287
   Email: adietrich@azdisabilitylaw.org
13
   *Attorneys for Plaintiff Arizona Center for Disability Law*
14 **[ADDITIONAL COUNSEL LISTED ON**
   **SIGNATURE PAGE]**
15
                    UNITED STATES DISTRICT COURT
16
                        DISTRICT OF ARIZONA
17

| | |
|---|---|
| 18  Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-ROS **PLAINTIFFS' RESPONSE TO DEFENDANTS' SUPPLEMENTAL RESPONSE TO ORDER TO SHOW CAUSE (DOC. 3490)** **[Dkt. 3881]** |

18 Victor Parsons; Shawn Jensen; Stephen Swartz;
   Dustin Brislan; Sonia Rodriguez; Christina
19 Verduzco; Jackie Thomas; Jeremy Smith; Robert
   Gamez; Maryanne Chisholm; Desiree Licci; Joseph
20 Hefner; Joshua Polson; and Charlotte Wells, on
   behalf of themselves and all others similarly
21 situated; and Arizona Center for Disability Law,

22                       Plaintiffs,

23           v.

24 David Shinn, Director, Arizona Department of
   Corrections, Rehabilitation and Reentry; and Larry
25 Gann, Assistant Director, Medical Services Contract
   Monitoring Bureau, Arizona Department of
26 Corrections, Rehabilitation and Reentry, in their
   official capacities,

27                       Defendants.

28

No. CV 12-00601-PHX-ROS

**PLAINTIFFS' RESPONSE TO
DEFENDANTS'
SUPPLEMENTAL RESPONSE
TO ORDER TO SHOW CAUSE
(DOC. 3490)**

**[Dkt. 3881]**

**TABLE OF CONTENTS**

Page

FACTUAL BACKGROUND ............................................................................. 1

ARGUMENT .................................................................................................... 6

I.   Legal and Procedural Requirements for Civil Contempt. ............................. 6

II.  Defendants are in Civil Contempt of the Court's January 2020 OSC. ......... 7

    A.   The OSC is Specific and Definite. ...................................................... 7

    B.   Defendants Had Notice of the OSC and Have Been Heard. ............ 10

    C.   Defendants Did Not Take All Reasonable Steps to Comply
         With the OSC. .................................................................................. 10

         1.   Defendants' General Assertions That COVID-19
              Caused Noncompliance Are Contradicted by Previous
              Reports to the Court. ................................................................ 10

         2.   Defendants' Shortages of Custody and Health Care
              Staff Pre-Date the Pandemic and COVID-19-Related
              Shortages Were Foreseeable. ................................................ 12

         3.   Nearing Compliance Is Not Enough to Avoid
              Sanctions. ............................................................................... 15

    D.   Defendants' "Overall Compliance" Is Not How Compliance
         with the OSC and Stipulation Are Measured. ................................. 16

III. A Finding of Civil Contempt Is Appropriate Here. ................................... 18

    A.   The Contemplated Sanctions Are Not Punitive. ............................. 18

    B.   Defendants Have Had the Opportunity to Purge the Contempt
         Fine. ................................................................................................ 22

    C.   The Court Should Impose Non-Monetary Sanctions Against
         Defendants. ...................................................................................... 22

CONCLUSION .............................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 and 4*,

721 F.3d 1122 (9th Cir. 2013) ..................................................... 20

*Balla v. Idaho State Bd. of Corr.*,
869 F.2d 461 (9th Cir. 1989) ............................................... 7, 10

*Carty v. Schneider*,

986 F. Supp. 933 (D.V.I. 1997) ................................................. 21

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) .......................................................................... 9

*Halderman ex rel. Halderman v. Pennhurst State Sch. & Hosp.*,

901 F.2d 311 (3d Cir. 1990) ....................................................... 17

*In re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*,

10 F.3d 693 (9th Cir. 1993) ......................................................... 7

*Inmates of D.C. Jail v. Jackson*,
158 F.3d 1357 (D.C. Cir. 1998) ................................................. 23

*Int'l Union, United Mine Workers of Am. v. Bagwell*,

512 U.S. 821 (1994) ................................................... 7, 10, 19, 20

*Intervet, Inc. v. Merial Ltd.*,
241 F.R.D. 55 (D.D.C. 2007) ..................................................... 21

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ............................................... 7, 14

*Kelly v. Wengler*,
979 F. Supp. 2d 1104 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir.

2016) ............................................................................................ 22

*Maness v. Meyers*,
419 U.S. 449 (1975) .................................................................... 15

*McClendon v. City of Albuquerque*,

No. 95 CV 024, 2017 WL 4041588 (D.N.M. Sept. 11, 2017) .................... 17

*McComb v. Jacksonville Paper Co.*,
336 U.S. 187 (1949) .................................................................. 6, 7

*Mondaca-Vega v. Lynch*,

808 F.3d 413 (9th Cir. 2015) ..................................................... 11

*N.L.R.B. v. Ironworkers Local 433*,
169 F.3d 1217 (9th Cir. 1999) ................................................... 20

*N.L.R.B. v. Trans Ocean Export Packing, Inc.*,
   473 F.2d 612 (9th Cir. 1973) .................................................................. 7, 10

*Parsons v. Ryan*,
   912 F.3d 486 (9th Cir. 2018) ................................................................. 2, 17

*Parsons v. Ryan*,
   949 F.3d 443 (9th Cir. 2020), *cert. denied sub nom. Shinn v. Jensen*, 141
   S. Ct. 1054 (2021) ........................................................................... 7, 18, 19

*Plata v. Schwarzenegger*,
   No. C01-1351-TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005) ............................ 23

*Rodenhurst v. Hawaii*,
   Case No. CV 10-1237-PHX-GMS (MHB), 2010 WL 3342029 (D. Ariz.
   Aug. 25, 2010) ....................................................................................... 8, 9

*S.E.C. v. Hickey*,
   322 F.3d 1123 (9th Cir. 2003) ................................................................... 18

*Salyers v. Metro. Life Ins. Co.*,
   871 F.3d 934 (9th Cir. 2017) ..................................................................... 15

*Shell Offshore Inc. v. Greenpeace, Inc.*,
   815 F.3d 623 (9th Cir. 2016) ..................................................................... 22

*Shuffler v. Heritage Bank*,
   720 F.2d 1141 (9th Cir. 1983) ................................................................... 19

*Spallone v. United States*,
   493 U.S. 265 (1990)................................................................................... 6

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*,
   No. C14-1178-MJP, 2017 WL 4700326 (W.D. Wash. Oct. 19, 2017) ................ 20, 22

*United States v. Ayres*,
   166 F.3d 991 (9th Cir. 1999) ....................................................................... 7

*United States v. Sungard Data Sys., Inc.*,
   173 F. Supp. 2d 20 (D.D.C. 2001) ............................................................... 21

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947)................................................................................. 18

**OTHER AUTHORITIES**

Ninth Cir. R. 27-10(a)(2)................................................................................ 9

LRCiv 7.2(g)(1)............................................................................................ 9

LRCiv 7.2(g)(2)............................................................................................ 9

# FACTUAL BACKGROUND

The Court's January 31, 2020 Order to Show Cause (OSC) is unambiguously clear:

> For the Performance Measures identified above that were compliant in the most recent numbers, Defendants must ensure those Performance Measures remain compliant. If Defendants do not bring every Performance Measure into compliance, or if Defendants allow any previously-compliant Performance Measure to become non-compliant, the Court will impose contempt sanctions unless Defendants can establish they took all reasonable steps to achieve compliance but still fell short. If Defendants are found in contempt, the Court will impose a fine of $100,000 per Performance Measure per location to coerce compliance with this Order. The fines will recur on a monthly basis until Defendants bring each Performance Measure and location into compliance.

[Doc. 3490 at 3][1] After receiving an extension of time, Defendants responded, (Doc. 3656), and in February 2021, the Court permitted them to "file a single brief explaining their failures to bring into, or maintain, compliance for the PMs identified in the January 2020 OSC for the months of March [through] December 2020." [Doc. 3861 at 6-7] Defendants admit to 178 instances of noncompliance with the OSC. [Doc. 3881 at 16][2] But they argue that they should not be held liable for their violations of the OSC because of the efforts that they and their health care vendor took in response to the COVID-19 pandemic.

On March 4, 2021, in granting Defendants' request for an extension of time to file the supplemental response, the Court advised Defendants that they "should not expect invocation of COVID-19 to excuse noncompliance throughout 2020." [Doc. 3866 at 3][3] Yet this is precisely what they have done: they repeatedly invoke, and by conclusory *ipse dixit* blame, the COVID-19 pandemic as the reason for their noncompliance with a constellation of PMs at multiple prisons in a ten-month period. [Doc. 3881 at 4-14] As

---

[1] All citations to the docket are to the page number assigned by the ECF system.
[2] The true number is actually higher. *See* pp. 3-4 and documents cited therein.
[3] In March 2020, after the declaration of international, national, and state emergencies due to the spread of the COVID-19 virus, the Court warned Defendants that even during a pandemic, "Defendants remain obligated to treat prisoners who become ill or critically ill consistent with the Stipulation and Defendants have a solemn responsibility to protect the individuals in their custody." [Doc. 3540 at 2] This warning came after Defendants assured the Court that they and Centurion were able to provide health care services in accordance with the Stipulation's requirements, notwithstanding COVID-19. [*See generally* Doc. 3527]

detailed below in Part I.C. and the documents cited therein, Defendants previously attributed noncompliance with many of the OSC's Performance Measures (PMs) at the time to factors *other than* COVID-19.

Defendants devote much of their brief to describing efforts they and Centurion took to respond to COVID-19. While that was certainly admirable and necessary, the relevant question for the Court here is not whether Defendants took any actions in response to the COVID-19 pandemic, but if they took *all reasonable steps* to comply with the OSC. Defendants fail to meet this legal standard.

Defendants refer to an ostensible "overall compliance" rate with the Stipulation as if it were relevant to the Court's contempt analysis. [Docs. 3881 at 21-24; 3881-1 ¶¶ 10-13; 3881-2 ¶¶ 3-5, 14] But it is not; and Defendants ignore the simple fact that the Stipulation's plain language defines how to measure compliance. Doc. 1185 ¶ 10; *see also Parsons v. Ryan*, ("*Parsons II*"), 912 F.3d 486, 497 (9th Cir. 2018) ("To determine the parties' intent, we look to the plain meaning of the words as viewed in the context of the contract of the whole.") (internal citation and quotation marks omitted). And this "overall compliance" rate counts as compliant past PM scores that were invalidated by the Court due to inaccurate methodology.[4]

Finally, Defendants minimize noncompliance with the OSC because in some cases they were close or "barely missed" the 85% threshold. [*See*, *e.g.*, Doc. 3881 at 23] They previously offered the 'close enough for government work' justification. [*See* Doc. 3649 at 30, 50 (arguing that they were "technically noncompliant[,]" "[m]any [PMs] fell short of compliance by just a few inmate files[,]" or there were "inadvertent reasons" or reasons "beyond Defendants' control")] This isn't the legal standard for contempt, and the Stipulation explicitly defines substantial compliance as being at or above 85% on each PM at each facility each month. As to the OSC, the Court noted, "because compliance

---

[4] For example, the Court's order at Doc. 3518, at 2-5, 13, invalidated the majority of Defendants' past scores on mental health PMs, but they have not re-audited these PMs, and they include the invalidated scores in their calculation of "overall compliance."

[with the OSC] does not require 100% performance each month—Defendants are only required to reach 85% compliance on each performance measure—ample room exists for unforeseeable events in a particular month that might lead to isolated failures." [Doc. 3866 at 2; *see also* Doc. 3861 at 4 ("'Nearing compliance' is not enough to avoid sanctions.")]

\* \* \* \*

As shown in Table 1, Defendants are non-compliant with 236 PMs in the OSC. There are two reasons for the discrepancy from Defendants' calculation of 178 PMs.

First, it appears that in Court filings, Defendants rounded up compliance rates for **seven** PMs/institutions in the OSC to 85%, while the actual CGAR reports show scores below 85%. *See* Table 1 (cells shaded blue); Declaration of Corene Kendrick ("Kendrick Decl."), filed herewith, ¶ 3, Ex. 2 (CGARs for March 2020 – PM 42 and 44 at Lewis; May 2020 – PM 13 at Florence; August 2020 – PM 52 at Tucson and PM 85 at Lewis; September 2020 – PM 52 at Tucson and PM 98 at Winslow). This is impermissible. [*See* Doc. 3861 at 3-4 ("Defendants are aware that 85% is the requirement for compliance and *anything beneath that measure constitutes failure*.") (emphasis added)]

Second, Defendants admitted in response to Plaintiffs' Motion for Further Relief (PMs 50, 51, 102), (Doc. 3805), that the scores that they reported for PMs 50 and 51 for *at least* February-August 2020 were inaccurate, because they had omitted cancelled or delayed specialty care encounters from the sample from which they calculated compliance, rather than counting the delayed/cancelled encounters as noncompliant. [*See* Doc. 3822 at 2 ("[T]hese PMs were inaccurately monitored during the timeframe raised in Plaintiffs' Motion.")][5] But as of their latest filing showing scores for PMs 50 and 51 through January 2021 (Doc. 3875-1), they neither re-audited nor corrected those scores, as Defendant Gann promised they would. [*See* Doc. 3822 at 3 ("Defendants agree to re-audit the PMs raised in Plaintiffs' Motion, or to change the compliance scores to 0%");

---

[5] The Court has not yet ruled on Plaintiffs' motion.

Doc. 3822-1 ¶ 12 (Declaration of Defendant Gann) ("MSCMB is in the process of re-auditing PM 102 and determining whether to undertake the great burden of re-auditing PMs 50 and 51. If the decision is made not to re-audit, Defendants will agree to receive a noncompliant finding (0%) for these months.")] Defendants did not file a revised report showing they re-audited PMs 50 and 51, so the Court should count them as 0%, as Defendant Gann avowed that ADC would do. The OSC lists PM 50 at Florence, Perryville, Tucson; and PM 51 at Douglas, Eyman, Florence, Perryville, Tucson, and Yuma. [Doc. 3490 at 2] Of those PM / prisons, during the March-December 2020 time period, there are **51** scores reported as compliant that need to be reset to 0%. *See* Table 1 (PMs 50 and 51 cells shaded orange).

**Table 1: Noncompliant PMs in the Court's January 2020 OSC**

| PM | Prison | Mar. 2020 | April 2020 | May 2020 | June 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | Eyman | 82% | 86% | 82% | 86% | 86% | 94% | 82% | 92% | 82% | 78% |
| 11 | Lewis | 85% | 84% | 99% | 81% | 90% | 86% | 89% | 90% | 90% | 82% |
| 11 | Winslow | 93% | 88% | 91% | 87% | 92% | 92% | 72% | 96% | 86% | 89% |
| 11 | Yuma | 88% | 94% | 90% | 90% | 94% | 90% | 84% | 88% | 88% | 92% |
| 13 | Eyman | 96% | 86% | 98% | 98% | 94% | 94% | 60% | 76% | 100% | 92% |
| 13 | Florence | 94% | 98% | 84.88% | 86% | 90% | 90% | 81% | 74% | 100% | 90% |
| 13 | Lewis | 95% | 95% | 95% | 95% | 87% | 87% | 75% | 70% | 83% | 90% |
| 13 | Yuma | 92% | 98% | 98% | 98% | 92% | 92% | 76% | 70% | 100% | 90% |
| 35 | Eyman | 94% | 100% | 96% | N/A | 87% | 100% | 100% | 93% | 100% | 83% |
| 35 | Florence | 96% | 89% | 75% | 86% | 83% | 89% | 100% | 92% | 100% | 95% |
| 35 | Tucson | 98% | 95% | 93% | 90% | 90% | 75% | 96% | 90% | 85% | 82% |
| 37 | Tucson | 85% | 91% | 85% | 87% | 88% | 88% | 82% | 92% | 77% | 61% |
| 37 | Winslow | 97% | 93% | 100% | 93% | 100% | 83% | 87% | 93% | 100% | 93% |
| 37 | Yuma | 92% | 84% | 80% | 74% | 92% | 86% | 90% | 96% | 90% | 80% |
| 39 | Eyman | 90% | 86% | 78% | 92% | 86% | 94% | 98% | 98% | 98% | 86% |
| 39 | Lewis | 94% | 92% | 90% | 96% | 83% | 100% | 99% | 99% | 100% | 97% |
| 39 | Yuma | 96% | 90% | 92% | 84% | 84% | 94% | 98% | 96% | 100% | 88% |
| 40 | Eyman | 91% | 100% | 86% | 90% | 68% | 91% | 100% | 100% | 100% | 100% |

| PM | Prison | Mar. 2020 | April 2020 | May 2020 | June 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 |
|----|--------|-----------|------------|----------|-----------|-----------|-----------|------------|-----------|-----------|-----------|
| 40 | Tucson | 64% | 100% | 80% | 67% | 83% | 100% | N/A | 100% | 100% | 67% |
| 42 | Eyman | 94% | 98% | 92% | 98% | 86% | 84% | 82% | 96% | 96% | 82% |
| 42 | Lewis | 84.0% | 99% | 93% | 90% | 100% | 96% | 94% | 98% | 93% | 96% |
| 44 | Eyman | 39% | 75% | 53% | 53% | 47% | 65% | 68% | 63% | 45% | 53% |
| 44 | Florence | 68% | 73% | 74% | 81% | 75% | 72% | 64% | 85% | 64% | 69% |
| 44 | Lewis | 84.62% | 78% | 77% | 74% | 81% | 86% | 70% | 83% | 76% | 70% |
| 44 | Winslow | 92% | 100% | 100% | 75% | 100% | 83% | 57% | 67% | 71% | 100% |
| 45 | Tucson | 94% | 92% | 95% | 84% | 95% | 94% | 86% | 98% | 97% | 93% |
| 46 | Eyman | 86% | 90% | 94% | 92% | 94% | 94% | 90% | 90% | 98% | 80% |
| 46 | Yuma | 98% | 92% | 88% | 92% | 88% | 80% | 94% | 86% | 88% | 88% |
| 47 | Eyman | 91% | 97% | 91% | 89% | 88% | 86% | 70% | 83% | 92% | 83% |
| 47 | Florence | 82% | 89% | 94% | 96% | 90% | 70% | 88% | 92% | 96% | 90% |
| 47 | Lewis | 93% | 90% | 91% | 93% | 94% | 89% | 78% | 97% | 93% | 91% |
| 47 | Phoenix | 100% | 75% | 80% | 100% | 100% | 100% | 92% | 100% | 89% | 100% |
| 47 | Tucson | 97% | 97% | 100% | 89% | 85% | 74% | 88% | 94% | 94% | 82% |
| 47 | Winslow | 100% | N/A | 100% | N/A | 80% | 67% | 67% | N/A | 100% | 100% |
| 49 | Perryville | 100% | 100% | 100% | 100% | 100% | 100% | 83% | 100% | 100% | 100% |
| 49 | Tucson | 92% | 100% | 100% | 100% | 100% | 96% | 89% | 100% | 71% | 92% |
| 50 | Florence | 40% | 100% | 82% | 100% | 50% | 86% | 71% | 74% | 70% | 71% |
| 50 | Perryville | 93% | 100% | 100% | 97% | 96% | 93% | 92% | 86% | 87% | 83% |
| 50 | Tucson | 68% | 100% | 69% | 91% | 72% | 85% | 86% | 68% | 80% | 82% |
| 51 | Douglas | 96% | 94% | 91% | 100% | 85% | 95% | 93% | 100% | 98% | 95% |
| 51 | Eyman | 34% | 92% | 80% | 98% | 58% | 84% | 76% | 74% | 86% | 84% |
| 51 | Florence | 58% | 96% | 98% | 91% | 77% | 92% | 70% | 74% | 90% | 75% |
| 51 | Perryville | 83% | 97% | 100% | 99% | 90% | 92% | 84% | 85% | 86% | 83% |
| 51 | Tucson | 68% | 96% | 77% | 99% | 83% | 96% | 94% | 81% | 82% | 85% |
| 51 | Yuma | 86% | 96% | 88% | 100% | 90% | 80% | 76% | 82% | 84% | 82% |
| 52 | Eyman | 71% | 86% | 86% | 76% | 74% | 76% | 84% | 90% | 80% | 68% |
| 52 | Florence | 81% | 86% | 87% | 87% | 89% | 84.62% | 84.62% | 87% | 87% | 87% |
| 52 | Perryville | 81% | 91% | 95% | 96% | 93% | 89% | 88% | 90% | 93% | 93% |
| 52 | Phoenix | 96% | 100% | 87% | 100% | 90% | 100% | 90% | 100% | 100% | 83% |
| 52 | Tucson | 86% | 91% | 91% | 92% | 90% | 85% | 89% | 92% | 91% | 80% |

| PM | Prison | Mar. 2020 | April 2020 | May 2020 | June 2020 | July 2020 | Aug. 2020 | Sept. 2020 | Oct. 2020 | Nov. 2020 | Dec. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55 | Eyman | 86% | 86% | 84% | 88% | 94% | 86% | 84% | 86% | 86% | 78% |
| 66 | Florence | 99% | 100% | 83% | 68% | 52% | 48% | 94% | 100% | 96% | 95% |
| 66 | Lewis | 95% | 100% | 84% | 83% | 89% | 98% | 100% | 99% | 100% | 91% |
| 66 | Tucson | 100% | 100% | 81% | 81% | 67% | 67% | 85% | 93% | 99% | 100% |
| 67 | Lewis | 99% | 100% | 66% | 61% | 74% | 99% | 100% | 84.5% | 76% | 95% |
| 67 | Tucson | 99% | 100% | 57% | 72% | 46% | 54% | 97% | 89% | 86% | 93% |
| 80 | Lewis | 100% | 94% | 89% | 90% | 98% | 98% | 91% | 95% | 92% | 84% |
| 85 | Eyman | 89% | 75% | 88% | 100% | 95% | 85% | 90% | 100% | 95% | 97% |
| 85 | Lewis | 95% | 100% | 87% | 97% | 88% | 84.85% | 91% | 95% | 88% | 97% |
| 85 | Tucson | 95% | 97% | 97% | 100% | 100% | 83% | 97% | 98% | 98% | 97% |
| 92 | Eyman | 90% | 100% | 95% | 95% | 85% | 80% | 100% | 100% | 95% | 95% |
| 92 | Lewis | 95% | 100% | 100% | 95% | 75% | 100% | 95% | 90% | 85% | 90% |
| 98 | Douglas | 100% | 100% | 100% | 90% | 67% | 100% | 100% | 100% | 100% | 100% |
| 98 | Eyman | 96% | 92% | 84% | 88% | 82% | 86% | 84% | 91% | 88% | 86% |
| 98 | Florence | 91% | 86% | 90% | 90% | 90% | 98% | 94% | 79% | 97% | 89% |
| 98 | Winslow | 100% | 91% | 100% | 100% | 90% | 83% | 84.62% | 100% | 100% | 100% |
| **Total** | | **16** | **7** | **21** | **15** | **22** | **21** | **27** | **16** | **14** | **26** |
| **Total (if PM 50, 51 are 0%)** | | **19** | **16** | **26** | **24** | **26** | **28** | **31** | **19** | **19** | **28** |

[*See* Doc. 3875-1; Kendrick Decl. Ex. 2; *see also* Docs. 3805, 3822, 3822-1, 3827]

## ARGUMENT

## I.     Legal and Procedural Requirements for Civil Contempt

Like any federal court, this Court may enforce compliance with its orders through civil contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt."). This is especially the case when a court has overseen litigation and noncompliance with ordered injunctive relief for a long period of time. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-93 (1949) (holding that a party's "record of continuing and persistent violations" with decree was relevant to a finding of contempt). And the Ninth Circuit held unanimously that the Stipulation empowers ***this*** Court to use contempt as an enforcement

mechanism in ***this*** case. *Parsons v. Ryan*, 949 F.3d 443, 454–55 (9th Cir. 2020) ("*Parsons III*"), *cert. denied sub nom. Shinn v. Jensen*, 141 S. Ct. 1054 (2021).

To hold a party in civil contempt, a court must find by clear and convincing evidence that:

    (1)    a valid court order exists that is "specific and definite" (*Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989));

    (2)    the party had notice of the order and an opportunity to be heard about the alleged noncompliance (*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999)); and,

    (3)    the party failed to take "*all* reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original).

The contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order." *In re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted); *accord McComb*, 336 U.S. at 191 ("The absence of willfulness does not relieve [a party] from civil contempt."). Should a party seek to defend against a contempt finding by arguing inability to comply, it bears the burden to show "categorically and in detail" why it is unable to comply. *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).

## II. Defendants are in Civil Contempt of the Court's January 2020 OSC

### A. The OSC is Specific and Definite.

The Stipulation states that "Defendants shall comply with the health care performance measures set forth in Exhibit B." [Doc. 1185 ¶ 8] The PMs in Exhibit B are clear, unambiguous, and declarative sentences. [Doc. 1185-1 at 8-15] The OSC clearly sets out precisely which prisons and PMs needed to be substantially compliant beginning March 2020, and orders that "[i]f Defendants do not bring every Performance Measure into compliance, *or* if Defendants allow any previously-compliant Performance Measure to become non-compliant, the Court will impose contempt sanctions. [...] The fines will

1  recur on a monthly basis until Defendants bring each Performance Measure and location

2  into compliance." [Doc. 3490 at 2-3 (emphasis added).]

3      By no stretch of the imagination can Defendants plausibly argue that the OSC or

4  the Stipulation are not specific and definite. But nevertheless they do, complaining that

5  they will be penalized for noncompliance for months that they did not realize were part of

6  the OSC. [Doc. 3881 at 17] The Court issued the OSC on January 31, 2020. It either was,

7  or was not, ambiguous on that date. Defendants (and their Counsel) saw the OSC when it

8  issued, and interpreted it to envision the potential for ongoing sanctions. [*See, e.g.*,

9  Doc. 3881-2 at 27-81 (multiple letters from Defendant Gann to Centurion about

10  compliance with the OSC and Stipulation in months beyond March 2020)] But they

11  waited *seven months* to file a motion for clarification, by which time many of the months

12  at issue had already passed. Defendants cannot sit back and wait more than half a year to

13  "clarify" an order that they now claim they do not understand, and then complain that

14  their own dilatory tactics deprived them of an opportunity to purge.[6]

15      Moreover, the Local Rules do not authorize requests for clarification. To the extent

16  this Court even entertains them, they are construed as either a request for interlocutory

17  appeal under 28 U.S.C. § 1292(b), or a motion for reconsideration. *Rodenhurst v. Hawaii*,

18  Case No. CV 10-1237-PHX-GMS (MHB), 2010 WL 3342029, at *2 (D. Ariz. Aug. 25,

19  2010) (citing *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982) and *Sch.*

20  *Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)). Here,

---

21
22      [6] The Court has rejected Defendants' similar eleventh-hour gamesmanship repeatedly. [*See* Doc. 3077 at 9 ("Defendants had years and years to object to Magistrate
23  Judge Duncan's exercise of jurisdiction. They did nothing. Only after compliance proceedings did not evolve as they hoped did Defendants discover and assert their
24  jurisdictional argument. Defendants appear to be engaged in the type of 'gamesmanship' the Supreme Court identified and discouraged."); Doc. 2643 at 4 ("[P]art of Defendants'
25  argument in support of their Motion to Disqualify concerns events that are over seven months old and are only being raised now after Defendants' previous attempts to prevent
26  or limit the February 27 evidentiary hearing were unsuccessful. As detailed above, Defendants have known about both hearings for several months but waited to file the
27  Motion to Stay until after 10 p.m. on Friday, February 23, 2018, one business day before the start of the hearing. Defendants have not explained why they waited until the eve of
28  the evidentiary hearing to seek recusal and have not pointed to any recent documentation, rulings, or developments that could otherwise justify the timing of this motion.")]

Defendants do not meet the "heavy burden of demonstrating that the case is an exceptional one" that warrants interlocutory appeal, *id*. (quoting *White v. Nix*, 43 F.3d 374, 376 (8th Cir. 1994)), nor the Rule 60 standard for reconsideration. *Cf.* Ninth Cir. R. 27-10(a)(2) ("[A] motion for clarification, modification or reconsideration of a court order that does not dispose of the entire case on the merits, terminate a case or otherwise conclude proceedings in this Court must be filed within 14 days after entry of the order"); *see also* LRCiv 7.2(g)(2) ("Absent good cause shown, any motion for reconsideration shall be filed no later than fourteen (14) days after the date of the filing of the Order that is the subject of the motion"); LRCiv 7.2(g)(1) ("Any such motion shall point out with specificity the matters that the movant believes were overlooked or misapprehended by the Court, any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier, and any specific modifications being sought …").

In any event, Defendants' last-minute desperate attack on the OSC is unavailing, and would result in the absurd conclusion that so long as a particular PM staggers past the 85% finish line in a given month, but then subsequently falls below the 85% threshold for judicial involvement, that PM is somehow immunized in perpetuity from any future coercive sanctions. The Stipulation and the Court say otherwise. [*See* Doc. 2179 at 2 ("The [85%] benchmark is the canary in the coal mine: if the benchmark is met, then the Stipulation deems the Defendants to be in compliance. If the benchmark is not met, then Defendants are not in compliance with the Stipulation and the Court's remedial power is in no way limited by the Stipulation's compliance percentage benchmark or sample size specification.")]; *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69 (1987) (Scalia, J., concurring in part and concurring in the judgment) ("A good or lucky day is not a state of compliance. Nor is the dubious state in which a past … problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated.").

The Court should find by clear and convincing evidence that the OSC directing Defendants to bring the specified PMs / institutions into substantial compliance with the

Stipulation as of March 1, 2020 and into the future, was specific and definite, as required by the legal standard. *Balla*, 869 F.2d at 465.

### B. Defendants Had Notice of the OSC and Have Been Heard.

Defendants had notice of the order when it was issued in January 2020, and the Stipulation's requirements that they agreed to in October 2014. They were provided the opportunity to be heard (*see* Doc. 3656 and accompanying declarations and exhibits), and the Court gave them another opportunity to be heard. [*See* Doc. 3881 and accompanying declarations and exhibits] Nonetheless, they argue that they did not receive notice of the OSC until February 2021, when the Court issued an order giving them a chance to supplement their response. [Doc. 3881 at 18] For the same reasons it should find the OSC was specific and definite, the Court should find that Defendants had notice of the OSC, and have had ample opportunity to be heard. *Bagwell*, 512 U.S. at 827. There is no requirement that the Court hold an evidentiary hearing.

### C. Defendants Did Not Take All Reasonable Steps to Comply With the OSC

Defendants must show "categorically and in detail" that they took all reasonable steps to comply with the OSC. *Trans Ocean Export Packing*, 473 F.2d at 616. They fail to do so.

#### 1. Defendants' General Assertions That COVID-19 Caused Noncompliance Are Contradicted by Previous Reports to the Court.

Defendants assert that "at least 131 instances of noncompliance in March 2020 through December 2020 were the direct result of COVID-19." [Doc. 3881-4 ¶ 7; Doc. 3881 at 12-13, 21] However, as detailed in Plaintiffs' exhibit created pursuant to Federal Rules of Evidence, Rule 1006, which compares Defendants' recent declarations with statements in Defendants' past monthly reports to the Court, in many cases, COVID-19 was *not* the explanation Defendants originally provided to the Court at the time of the monthly reports. [*See* Kendrick Decl., Ex. 1] When a party provides conflicting testimony,

"the district court [is] surely entitled to draw an adverse inference from the inconsistency." *Mondaca-Vega v. Lynch*, 808 F.3d 413, 427 (9th Cir. 2015).

As an example, Defendants now justify noncompliance with PM 13 at four prisons (Eyman, Florence, Lewis, and Yuma) for several months on the basis that "at just these four facilities, providers had to review the results of 3,947 COVID-19 tests and take immediate action in response to positive results ...." [Doc. 3881-4 ¶ 28][7] Yet the only explanation that was provided to the Court at the time the scores were calculated was that "[c]hronic care and psychotropic medications were not renewed in the appropriate timeframes to ensure no lapse in treatment." [*See* Kendrick Decl., Ex. 1 at 3, citing Doc. 3875-1 at 24, 26-29, 33-34] COVID-19 was not mentioned.[8]

In some cases, Defendants offer multiple conflicting reasons for noncompliance. For example, they assert that noncompliance with PM 37 at Tucson in September, October, and December 2020 was due to COVID-19. [Doc. 3881 at 12] But in the accompanying declaration, their reason was that "a maximum of 80 Health Needs Requests ("HNRs") are reviewed to determine compliance with this PM. This small sample size, at a facility with an average population of 5,000, is not statistically sound." [Doc. 3881-4 ¶ 37][9] Another proffered reason for noncompliance with PM 37 at Tucson is

---

[7] PM 13 requires that "[c]hronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication." [Doc. 1185-1 at 8]

[8] Defendants repeatedly assert that Centurion's health care staff were unable to perform duties required by the Stipulation and the OSC due to work associated with mass COVID-testing. [*See, e.g.*, Doc. 3881 at 6, 20, 21] Defendant Gann's declaration calls this assertion into question, stating that "Phase 1" mass testing was done from July 27, 2020 to September 1, 2020, and "Phase 2" testing was done January 26, 2021 to March 18, 2021 (outside the window of time relevant to the OSC), and that "ADHS contracted with Vester and SonoraQuest labs" to test incarcerated people, so that "[t]heir assistance allowed Centurion to focus on patient care." [Doc. 3881-2 ¶ 54]

[9] Defendants argue noncompliance with PM 13 (and PM 11) is because "only 10 charts from each unit are monitored to determine compliance..." and this "is insignificant to create a meaningful statistical value." [Doc. 3881-4 ¶ 27; *see also id.* ¶ 9 ("Because the Monitor Guide permits a maximum of 50 charts to be reviewed each month, the compliance rate is determined based upon a review of only 2.5% of eligible events. The community standard for conducting a statistically sound analysis is 10%. The parties agreed to utilize this small sample size prior to the implementation of an electronic medical record system and due to the burden of reviewing paper charts."); ¶¶ 13, 21]

that "during the noncompliant months, there was an increase in positive COVID-19 cases at ASPC-Florence," (*id.* ¶ 39), although it's unclear how the cases at Florence would impact compliance at Tucson (indeed, other prisons were compliant with PM 37 that month). Yet those were not the reasons Defendants gave the Court for noncompliance with PM 37 at Tucson in the monthly noncompliance reports, at the reporting time:

> 11/19/20 Update (**September** data): "The screening nurse did not classify dental pain as urgent. Urgent referrals require same-day assessment by an RN. This caused the patient to not be seen by the RN same day as required with urgent referral." [Doc. 3875-1 at 123]
>
> 1/15/21 Update (**November** data): "1. Several occurrences of HNRs not being seen within timeframe due to short staffing. 2. The screening nurse did not classify dental pain as urgent. Urgent referrals require sameday [sic] assessment by an RN. This caused the patient to not be seen by the RN same day as required with urgent referral." [*Id.*]
>
> 2/17/21 Update (**December** data): "RNs are not seeing inmates within 24 hours of the date we received the HNR or within 48 hours from the date inmate indicates on the HNR." [*Id.* at 124.]

[Kendrick Decl., Ex. 1 at 6] COVID-19 was not mentioned.

> **2.** **Defendants' Shortages of Custody and Health Care Staff Pre-Date the Pandemic and COVID-19-Related Shortages Were Foreseeable.**

Defendants also repeatedly blame noncompliance with a myriad of PMs on a shortage of health care and custody staff who were unable to work due to quarantine, positive results, or family caregiving obligations. [*See, e.g.*, Doc. 3881 at 4 ("all schools

---

Yet Defendants subsequently assert that noncompliance with *other* PMs should be ignored because there were an insufficient number of eligible incidents for review—even when 100% of eligible events were reviewed. [*Id.* ¶ 57 ("[T]he … audit for PM 40 consisted of six charts. One was noncompliant, resulting in a score of 83%"); ¶ 63 ("[O]ne noncompliant file caused the noncompliance."); ¶ 91 ("The small sample size (five charts or less) for each of these month's audits contributed to the noncompliant findings.")]

Ms. Gahris offers no evidentiary basis for her assertion that the "community standard" for statistical analysis is a sample of 10% of the total, or of her training and background in statistics. Nor do Defendants explain why they have never, in the six-year life of the Stipulation, proposed to increase the sample size for their analysis of these PMs. [*See* Kendrick Decl., Ex. 3 (4/4/17 letter from Defendants proposing to increase the sample size for certain mental health performance measures)] Defendants agreed to this sample size and methodology more than six years ago, and have never before objected to the sample being too small, never raised this argument, and never asked Plaintiffs or the Court to increase the sample size for PMs 11 and 13. Defendants cannot now rely upon the Goldilocks principle to justify their noncompliance with various PMs.

1  were ordered closed on March 15, 2020"); *id.* at 8 ("ADCRR operations/security staff
2  were also exposed to or contracted the virus, resulting in significant staff absences […]
3  The resulting leave of absences of health care and security staff impaired Defendants'
4  ability to full comply with their obligations under the Stipulation and OSC.")] For a
5  specific example, again with regard to PM 37 at Tucson in the Fall of 2020, Defendants
6  state that there was "an influx of nursing staff callouts due to quarantine requirements
7  after exposure, their own illnesses, or illnesses of family members to whom they needed
8  to attend." [Doc. 3881-4 ¶ 39]

9        But staffing deficiencies—including among health care staff—were a completely
10  foreseeable and predictable result of the pandemic, and a potential issue that Plaintiffs'
11  counsel had identified and flagged for Defendants and the Court at the very beginning of
12  the pandemic. On March 14, 2020, Plaintiffs' counsel asked Defendants to develop a plan
13  to "*address how prison operations and health care services will continue to operate, when*
14  *staff stay home because they are sick, in self-quarantine, or caring for family members*[,]"
15  especially given the longstanding health care and custody staffing shortages already in
16  existence. [Doc. 3521-1 at 11-12 (emphasis added)] Then, two days later in Plaintiffs'
17  Emergency Motion filed on March 16, 2020, Plaintiffs asked this Court to order
18  Defendants to create such a staffing plan to address these very foreseeable contingencies.
19  [*See* Doc. 3520 at 8] Defendants did not provide information to the Court about their plans
20  to ensure health care staffing would be adequate if there were significant numbers of
21  people unable to report to work, but with regard to custody operations staff, assured the
22  Court that "[t]o address possible staffing deficiencies, Arizona prison complex Wardens
23  have devised twelve-hour security staffing rosters for implementation should staffing
24  deficiencies related to COVID-19 staff-call outs require them." [Doc. 3527 at 5]
25  Defendants cannot now argue that noncompliance due to staffing absences during the
26  pandemic was not foreseeable, especially given ADC's and their three health care
27  vendors' historic and chronic staffing shortages. [*See*, *e.g.*, Doc. 3683 at 7 nn.6-7;

28

Doc. 3352 at 12-13; Doc. 3355-1 Ex. 6; *see also* Doc. 3861 at 9 ("Chronic shortages are not 'unexpected'")]

Defendants argue that because they "continued to staff, recruit, and retain medical staff," they took all steps to ensure adequate staff to comply with the OSC and the Stipulation. [Doc. 3881 at 13] Again, a little digging into their assertions shows that they did not take "*all* reasonable steps to comply with the order." *Wengler*, 822 F.3d at 1096. Centurion's Vice President of Operations Tom Dolan declares that "[i]n 2020, Centurion drastically increased bonus payments" and that "beginning April 2020 bonuses payments increased to an average of $21,303.08 per pay period." [Doc. 3881-3 ¶ 33] But he does not explain what "average" refers to: average bonus per employee? Average per institution? Average for the entire state? It appears that the bonus amount refers to the entire statewide program across all employees and all prisons, as he states that "[t]he bonus payment total during the pandemic from March 2020 through December 2020 was $511,514.03." [*Id.*] Over this ten-month period, that works out to $51,151.40 per month. As there are 1,052 full time equivalent (FTE) health care positions in the Centurion contract,[10] the amount paid out in bonuses is merely $48 per month per FTE.

Defendants also claim that it has been difficult to hire and retain staff during the pandemic. [Doc. 3881 at 9; Doc. 3881-3 ¶ 30] However, at least part of the reason for the difficulty was that—as Defendants concede—Centurion didn't match the wages that other healthcare organizations were paying. [Doc. 3881-4 ¶ 39][11]

---

[10] [*See* Kendrick Decl., Ex. 4 (December 2020 Staffing Variance Report) at ADCRRM0001667]

[11] Ms. Gahris states in her sworn declaration that "it was difficult to compete with facilities that received government subsidies (that were unavailable in correctional healthcare) which were used to entice health care workers by offering higher wages and bonuses." [Doc. 3881-4 ¶ 39] Ms. Gahris offers no specifics about what these "government subsidies" are that were allegedly unavailable to correctional facilities, but Defendants cite to her declaration to mean "CARES funds." [Doc. 3881 at 9]

But there *are* government funds that Defendants and the State of Arizona could have used. The U.S. Department of Treasury issued updated guidance in September 2020 stating that money appropriated to states and localities through the Paycheck Protection Program and Health Care Enhancement Act, Title I, Pub. Law 116-139 (116th Congress, Apr. 24, 2020), could be used for costs related to "improvement of social distancing measures" and "compliance with COVID-19 public health precautions" in correctional

-14-

1    In sum, Defendants did not take all reasonable steps to fill their staffing needs,
2    which in turn led to the failure to meet the requirements of the PMs in the OSC.

3                **3.    Nearing Compliance Is Not Enough to Avoid Sanctions.**

4         Additionally, not for the first time, Defendants argue that they should not be held in
5    contempt for PMs that "barely missed compliance," or where "the noncompliance was
6    based on a technical violation." [Doc. 3881 at 23]. Under the Stipulation's plain language,
7    compliance is binary: if a PM is at 85% or above, it is compliant; if it is below 85%, it is
8    not. The Court has rejected Defendants' excuse in the past, and should do so again here.
9    [Doc. 3861 at 4 ("'Nearing compliance' is not enough to avoid sanctions.")][12]

10                                          * * *

11        In conclusion, if Defendants believed that COVID-19 prevented them from
12   complying with the Stipulation, they could have notified the Court and sought relief. They
13   failed to do so; on the contrary, they assured the Court that COVID-19 would pose no
14   barrier to compliance with the Stipulation. [*See* Doc. 3527] The Court has previously
15   admonished Defendants that simply ignoring the Court's orders is not acceptable. [*See*
16   Doc. 3495 at 22 ("To the extent Defendants believed it would be unduly burdensome to
17   comply with Magistrate Judge Duncan's order, they were required to seek relief from the
18   Court. Defendants certainly were not free simply to ignore the Order.")][13]

19

20   facilities. [*See* Kendrick Decl., Ex. 5 (Tim Stephens and Keith Neely, *Who CARES?*
21   *Crafting a response to COVID-19 in corrections*, Corrections1, Oct. 28, 2020, (noting that
     "[u]nspent CARES Act dollars represent a once-in-a-generation opportunity to address a
     persistent gap in corrections capacity: onsite medical facilities.")]
22        [12] Defendants assert that they should not be held liable for noncompliance that they
23   blame on "third-parties." [Doc. 3881 at 23] But the examples they offer involve agents:
     Diamond Pharmacy is a subcontractor to Centurion, and the provider who practiced at
     Perryville without a license is likewise their agent. [*Id.* at n.11] Any failure by a contractor
24   or subcontractor is attributable to Defendants. *Salyers v. Metro. Life Ins. Co.*, 871 F.3d
     934, 939 (9th Cir. 2017) ("The legal consequences of an agent's actions may be attributed
25   to a principal when the agent is acting within its authority") (citing RESTATEMENT
     (THIRD) OF AGENCY § 2, intro. note (2006)).
26        [13] Defendants argue that they should not be found in contempt with 26 instances of
27   noncompliance with the OSC, because those PMs are the subject of a motion to terminate
     the obligation to monitor and report on compliance. [Doc. 3881 at 16] Unless and until the
     Court orders otherwise, Defendants must comply with the OSC and Stipulation, and be
28   held accountable to it. *Maness v. Meyers*, 419 U.S. 449, 458-59 (1975).

-15-

**D.    Defendants' "Overall Compliance" Is Not How Compliance with the OSC and Stipulation Are Measured**

Defendants argue they should not be found in contempt of the OSC because they calculate an "overall adjusted compliance" rate with all PMs in the Stipulation that ranged from 89% to 96%, and that their overall compliance with the OSC's PMs ranged from 78% to 94%. [Doc. 3881 at 21] This is not the standard for evaluating compliance with the Stipulation, and is not relevant to the analysis of contempt under applicable law.

As a threshold matter, the Stipulation plainly defines "substantial compliance" as achieving 85% on "a particular performance measure … at a particular complex." [Doc. 1185 ¶ 10] The OSC defines "substantial compliance" as reaching 85% on each PM at each prison complex listed within it. Defendants cannot unilaterally rewrite these explicit requirements simply because they now find them inconvenient. Defendants have previously unsuccessfully attempted to obscure their sustained noncompliance with PMs within the Stipulation by pointing to their "overall compliance rate," ignoring the plain language of the Stipulation. [*See*, *e.g.*, Doc. 3512 at 3] The Court has reminded them repeatedly that they may not unilaterally replace the parties' agreed-upon mechanism for measuring compliance. [*See* Doc. 3495 at 5 n.1 ("History has shown that Defendants appear to believe they are empowered to modify the Stipulation to accommodate their own preferences … Defendants' view of interpreting the Stipulation as they wish is plainly unreasonable."); Doc. 3518 at 5 ("For years Defendants have insisted that the Court must remain focused on the precise language of the Stipulation and can only enforce that specific language… Now, however, Defendants propose the Court either 'retire' an inconvenient PM or unilaterally alter the language of the PM to better suit Defendants' current practices."); Doc. 2504 at 2 ("Defendants' attempt to inject a harmless error analysis into each instance of noncompliance finds no support in the Stipulation's language or purpose.")]

Here, the parties agreed to a system where "particular performance measures at particular complexes" are evaluated separately for substantial compliance. [Doc. 1185

¶ 10] Nothing in the Stipulation supports Defendants' contention that the Court can now disregard its plain language and evaluate compliance in gross, aggregating all of the performance measures together at a single moment in time. *See Parsons II*, 912 F.3d at 497 ("The purpose of contract interpretation is to determine the parties' intent and enforce that intent. [. . .] If the contractual language is clear, we will afford it its plain and ordinary meaning and apply it as written.") (citations and internal quotation marks omitted).

The Stipulation was structured this way for a reason. This structure ensured that Defendants needed to comply with *all* facets of a functional health care system at *all* prisons. Defendants agreed to abide to these PMs and the Stipulation's methodology for assessing compliance, and must be held to that agreement. Even if this Court could *sua sponte* revise the unambiguous language in Paragraph 10 of the Stipulation, or ignore the Ninth Circuit's two opinions, Defendants' position would read into the Stipulation a non-existent provision allowing them to not provide medical, dental, or mental health care to 15% of the approximate 30,000 class members (about 4,500 people), or 15% of the time. For example, Defendants could decide to provide no health care at all to the women at the Perryville prison (population 3,493),[14] and as long as they were compliant at the other nine prisons they would—under their reading of the Stipulation—be in compliance. Such a reading is an "inequitable and disconcerting principle" that would allow Defendants "to treat a few . . . class members in any fashion they want so long as they comply with the [Stipulation] with regard to a substantial number of other . . . class members." *Halderman ex rel. Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 324 (3d Cir. 1990).[15]

---

[14] ADC Daily Count Sheet, April 12, 2021, https://corrections.az.gov/sites/default/files/DAILY_COUNT/Apr2021/04122021_count_sheet.pdf (checked April 13 2021).

[15] Defendants claim that in *McClendon v. City of Albuquerque*, No. 95 CV 024 JAP/KBM, 2017 WL 4041588 (D.N.M. Sept. 11, 2017), the court found that "prison officials substantially complied" with the settlement agreement. [Doc. 3881 at 22] This is false; the *McClendon* court actually found that the defendants were *not* substantially compliant with an order to show cause and settlement agreement, but found it relevant that the defendants had changed their position about the settlement's requirements and indicated that they would comply moving forward. *See* 2017 WL 4041588, at *8.

-17-

Finally, Defendants' purported "overall compliance" numbers are meaningless because many self-reported scores have already been invalidated. The Court has ruled:

> Defendants are under no obligation to apply the Final Monitoring Guide's procedures retroactively. However, if Defendants want to persuade the Court that a given Performance Measure[] at a given facility is compliant with the Stipulation, then *Defendants will have to show that this PM/facility was compliant under the Final Monitoring Guide's procedures.* The Court expects that this situation would arise for Defendants in at least three contexts: in response to a Motion to Enforce, when moving to terminate a finding of noncompliance under a remediation plan, *and when moving to terminate the Court's oversight.* (Doc. 1185 at ¶¶ 10, 20)

[Doc. 1951 at 1-2 (emphasis added, footnote omitted)] This Court has issued orders invalidating Defendants' monitoring methodology and giving them the option to retroactively re-audit the relevant PMs, (*see, e.g.*, Doc. 3518 at 4-5, 6; Doc. 3861 at 13, 15-16)—and these invalidated scores are among the PMs on which Defendants rely in their supposed "overall compliance" figures.

## III.    A Finding of Civil Contempt Is Appropriate Here

### A.    The Contemplated Sanctions Are Not Punitive

Once a party is found in civil contempt, a court has "broad equitable power to order appropriate relief . . ." *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). When ordering a sanction, the court should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947). In affirming this Court's 2018 contempt finding, the Ninth Circuit held that the sanction can be coercive, compensatory, or both:

> [T]he district court utilized the paradigmatic coercive contempt sanction of prospective, conditional fines outlined in the Order to Show Cause and ordered Defendants to continue filing monthly reports regarding their compliance. [. . .]
>
> The sanction was also compensatory … [T]he district court ruled that it would use the funds for the benefit of the class "to further compliance with the healthcare requirements of the Stipulation[.]"
>
> [¶¶] Because the Contempt Order was coercive and compensatory, we hold that it was civil in nature[.]

*Parsons III*, 949 F.3d at 455-56.

The Court has the authority to issue monetary sanctions if it determines that such sanctions are necessary to coerce compliance by Defendants and/or to compensate Plaintiffs for their losses and injuries. *Id.*; *see also Bagwell*, 512 U.S. at 829 (noting that a paradigmatic civil contempt sanction "is a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order. . . [S]uch fines exert a constant coercive pressure, and once the jural command is obeyed, the future, indefinite, daily fines are purged"). The OSC clearly states that "the Court will impose a fine of $100,000 per Performance Measure per location to coerce compliance with this Order." [Doc. 3490 at 3]

Defendants argue the fines threatened in the OSC are "disproportionately severe[,]" "harsh and excessive[,]" and "unduly disproportionate" when there are 120 PMs in the Court's order. [Doc. 3881 at 24] But the potential sanctions set forth in the OSC are not punitive. *Parsons III*, 949 F.3d at 456 ("Prospective, conditional fine schedules do not bear any of the hallmarks of punitive contempt, such as retroactivity and determinacy. […] The fact that Defendants had no purge option after December 2017 does not necessarily reflect that the sanctions were imposed as punishment because Defendants were able to avoid the sanctions by complying with the October 2017 Order to Show Cause before the December 2017 reporting period.") (citations omitted); *compare Bagwell*, 512 U.S. at 833-34, 837-38 (case involving "out-of-court disobedience to complex injunctions" that "often require elaborate and reliable factfinding," about more than $50 million in fines against a labor union that spanned many months of disputes as to union members' behavior and interactions with law enforcement; "[u]nder such circumstances, disinterested factfinding and evenhanded adjudication were essential and petitioners were entitled to a criminal jury trial").[16]

---

[16] In their brief Defendants cite *Parsons III*, 949 F.3d at 456, citing *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983), to support their position that the fine is excessive. [*See* Doc. 3881 at 24:7-11] Yet Defendants omit the immediately adjacent passages in which the Ninth Circuit notes that *Shuffler* is "Defendants' sole authority for this point," and then concludes that "[t]he instant case is distinguishable from *Shuffler*." *Parsons III*, 949 F.3d at 456-57.

The Ninth Circuit held that *Bagwell* was "unusual" due to the complex issues at hand, as it involved "the possible abuse of power when a judge orders oppressive sanctions for violations of complex standards of the judge's own making," and is thus distinguishable from civil sanctions issued by a court "seeking to enforce a decree intended to prevent repeated violations of federal statutory law." *N.L.R.B. v. Ironworkers Local 433*, 169 F.3d 1217, 1219-20 (9th Cir. 1999); *see Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 and 4*, 721 F.3d 1122, 1129-30 (9th Cir. 2013) (distinguishing *Bagwell*, noting that "[h]ere, the district court's contempt orders are civil, not criminal, because they sought to coerce the Union and its members to comply with the court's injunctions and to compensate injured parties for actual losses caused by the Union's and its members' contumacious conduct."); *see also Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2017 WL 4700326 at *2 (W.D. Wash. Oct. 19, 2017) (imposing over $30 million civil contempt fine due to State defendants' failure to comply with previously issued prospective per diem fine schedule if they failed to conduct previously-ordered competency evaluations on mentally ill detainees within court-ordered timeframes).

Unlike *Bagwell*, and similar to *Parsons III*, *Ahearn*, and *Trueblood*, the Court is trying to coerce compliance with measures from the Stipulation with which Defendants previously were found to be noncompliant. The fine is not punitive, given that (1) the Court's past contempt order fining Defendants $1,000 for each instance of noncompliance that the Ninth Circuit unanimously affirmed, and (2) the Court's May 2019 OSC (Doc. 3235) threatening fines of $50,000 for each instance of noncompliance, were insufficient to coerce compliance.[17]

---

[17] [*See* Doc. 3235 at 1 ("Defendants' continued excuses for noncompliance do not reflect the seriousness of their prolonged breach of the Stipulation or the ramifications of their failure to meet their obligations in the affected fundamental aspects of health care delivery."); Doc. 2898 at 20 ("That Defendants should exhibit such nonchalance about addressing on-going failures to comply with the Stipulation—even as the sword of sanctions loomed above them—is considerable evidence that a contempt order and monetary sanctions are necessary.")]

Finally, Defendants are indemnified by their vendor:

> [i]f the Court ultimately imposes any sanctions against us, Centurion will be contractually responsible for comprehensive indemnification pursuant to Paragraph 3.22, 3.22.2 & 3.223 of the Contract. [. . .]

> This letter therefore constitutes ADCRR's formal demand for full indemnification as well as compliance with the Court's January 31 Order. As named defendant in the lawsuit, I likewise formally demand full indemnification as well as compliance with the Court's Order.

[Doc. 3649-1 at 33 (Feb. 14, 2020 Letter from D. Shinn to S. Wheeler)]

It is entirely plausible that one reason that the past fines have not had an effect on Defendants' behavior is that they have been indemnified from having to actually pay the fines themselves. The Court has the power to change this dynamic and incentive structure. *See Intervet, Inc. v. Merial Ltd.*, 241 F.R.D. 55, 58 (D.D.C. 2007) (adding language to a confidentiality order that "[a]ny violator may not seek to be reimbursed or indemnified for the payment the violator has made" because "[b]y doing so, I create a powerful incentive to comply with my Order."); *United States v. Sungard Data Sys.*, *Inc.*, 173 F. Supp. 2d 20, 29 (D.D.C. 2001) (issuing protective order that required signatories to agree that "[a]ny violation of this Order will be deemed a contempt and punished by a fine of $250,000. This fine will be paid individually by me and I will not seek to be reimbursed or indemnified for the payment I have made."). The Court should consider ordering that part or all of the contempt fine is non-indemnifiable by Defendants' vendor.[18]

---

[18] Defendants' citation to *Carty v. Schneider*, 986 F. Supp. 933, 940 (D.V.I. 1997) is incomplete and misleading. [*See* Doc. 3881 at 24-25] The full relevant passage reads: "In light of this conclusion [that defendants had very recently reduced the facility's population], and ***cognizant of the socioeconomic and sociopolitical factors pertaining to the Virgin Islands***, the court finds that monetary contempt sanctions would affect drastically the public interest and, perhaps more importantly, would impede progress and thwart the defendants' continuing efforts to remedy the conditions of confinement at the [facility]." (emphasis added).

Unlike the socioeconomic and sociopolitical situation in the Virgin Islands, and as detailed in Plaintiffs' prior Response, (Doc. 3683 at 11 n.12), Centurion is a fully-owned subsidiary of the 42nd most profitable company on the *Fortune* 500, and ADC's FY 2020 budget is over $1.3 billion. Documents recently obtained by members of the media through public records act requests show that through March 11, 2021, the State has spent more than $21.6 million on the litigation of this case. [Kendrick Decl., Ex. 6]

## B. Defendants Have Had the Opportunity to Purge the Contempt Fine

Defendants had ten months to purge contempt. They failed to do so. Defendants argue that if they had been noncompliant with all of the more than 120 PMs over the ten-month period, that they would have faced "a possible total exposure of $126,000,00.00." [Doc. 3881 at 24] But that's the entire point of a prospective fine schedule—to snap a party out of their misbehavior and into compliance. *See Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1117 n.27 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir. 2016) (holding that a prospective fine schedule is not punitive because "the amount of fine, if it succeeds in making them comply, should *prevent* the fine from reaching millions because Defendants will fix their behavior and begin living up to their promise in the Settlement Agreement. If a *prospective* fine leads to $2.4 million in penalties, [defendant] has no one to blame but itself.") (emphasis in original); *Trueblood*, 2017 WL 4700326 at *2 (imposing over $30 million civil contempt fine because of defendants' failure to comply with previously issued prospective per diem fine schedule if they failed to conduct competency evaluations on mentally ill incarcerated people within court-ordered timeframes); *see also Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 630 (9th Cir. 2016) (holding that "[f]urther accrual of the conditional fines could have been avoided by Greenpeace at any time, should it have chosen to recall the activists and comply with the injunction.").

## C. The Court Should Impose Non-Monetary Sanctions Against Defendants

It appears that two fines totaling over $2.5 million, and the ignominy of being held in contempt twice in less than three years, has had zero effect on Defendants' behavior. While there is no legal requirement that there be a showing of harm to find a party in contempt, the Court has recognized that Defendants' ongoing noncompliance places class members at substantial risk of harm. [*See* Doc. 3057 at 8 (finding that "the continued harm the class experiences" continues due to "Defendants' interminable noncompliance.")]

In light of Defendants' ongoing intractable and contumacious behavior, this Court can take additional actions beyond imposing monetary fines. Plaintiffs ask that the Court

enter an order appointing a receiver to manage ADC's delivery of health care services to class members. *See, e.g., Plata v. Schwarzenegger*, No. C01-1351-TEH, 2005 WL 2932253 at *1, *19 (N.D. Cal. Oct. 3, 2005) ("the Court imposes the drastic but necessary remedy of a Receivership in anticipation that a Receiver can reverse the entrenched paralysis and dysfunction and bring the delivery of health care in California prisons up to constitutional standards. … The Court has attempted to move defendants toward meeting constitutional standards by issuing a series of court orders with detailed objectives and measures. Unfortunately, defendants have repeatedly delayed their progress and ultimately failed to achieve even a semblance of compliance."); *see also Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998) ("After years of attempting to get D.C. to voluntarily comply, and appointing a Special Master to coordinate with D.C. in an attempt to alleviate conditions, the district court ordered that the jail's medical and mental health services be placed in receivership in 1995").

## CONCLUSION

For the foregoing reasons, the Court should find Defendants in civil contempt of the OSC, and assess a fine of $23.6 million for Defendants' noncompliance with 236 PMs in the OSC for the months of March – December 2020. Any fines assessed against the State should be deposited with the Court for disbursement as it sees fit to benefit the Plaintiff class. Additionally, the Court should enter an injunctive order pursuant to the Federal Rules of Civil Procedure, Rule 66, appointing a receiver to manage ADC's delivery of health care services to class members.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

Respectfully submitted,

Dated: April 16, 2021

**ACLU NATIONAL PRISON PROJECT**

By: s/ Corene T. Kendrick
David C. Fathi (Wash. 24893)*
Maria V. Morris (D.C. 1697904)**
Eunice Hyunhye Cho (Wash. 53711)*
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@aclu.org
          mmorris@aclu.org
          echo@aclu.org

*Admitted *pro hac vice*. Not admitted in
DC; practice limited to federal courts.

**Admitted *pro hac vice*

Corene T. Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm Street
San Francisco, California 94111
Telephone: (202) 393-4930
Email:    ckendrick@aclu.org

*Admitted *pro hac vice*

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          rlomio@prisonlaw.com

*Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Jared G. Keenan (Bar No. 027068)
Casey Arellano (Bar No. 031242)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:    jkeenan@acluaz.org
          carellano@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm; Desiree
Licci; Joseph Hefner; Joshua Polson; and
Charlotte Wells, on behalf of themselves and
all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**

By:  s/ Maya Abela
     Asim Dietrich (Bar No. 027927)
     5025 East Washington Street, Suite 202
     Phoenix, Arizona 85034
     Telephone: (602) 274-6287
     Email:    adietrich@azdisabilitylaw.org

     Rose A. Daly-Rooney (Bar No. 015690)
     J.J. Rico (Bar No. 021292)
     Maya Abela (Bar No. 027232)
     **ARIZONA CENTER FOR
     DISABILITY LAW**
     177 North Church Avenue, Suite 800
     Tucson, Arizona 85701
     Telephone: (520) 327-9547
     Email:
       rdalyrooney@azdisabilitylaw.org
       jrico@azdisabilitylaw.org
       mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

1    **<u>CERTIFICATE OF SERVICE</u>**

2         I hereby certify that on April 16, 2021, I electronically transmitted the above

3    document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4    Notice of Electronic Filing to the following CM/ECF registrants:

5
                                  Michael E. Gottfried
6                                 Lucy M. Rand
                            Assistant Arizona Attorneys General
7                             Michael.Gottfried@azag.gov
                              Lucy.Rand@azag.gov
8
                                  Daniel P. Struck
9                                 Rachel Love
                                  Timothy J. Bojanowski
10                                Nicholas D. Acedo
                                  Ashlee B. Hesman
11                                Jacob B. Lee
                                  Timothy M. Ray
12                    STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                              dstruck@strucklove.com
13                            rlove@strucklove.com
                              tbojanowski@strucklove.com
14                            nacedo@strucklove.com
                              ahesman@strucklove.com
15                            jlee@strucklove.com
                              tray@strucklove.com
16
                                *Attorneys for Defendants*
17
                                   s/ D. Freouf
18    _____

19

20

21

22

23

24

25

26

27

28