Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE THE COURT'S ORDER RE: DURATION OF MENTAL HEALTH ENCOUNTERS**<br>**(Dkt. 3901)** |

Defendants are in compliance with the Court's February 24, 2021 Order. Plaintiffs are aware of this as Defendants have kept them apprised as to its implementation. Despite this knowledge, Plaintiffs filed a motion requesting that the Court order Defendants to do what they are already doing. Plaintiffs did not meet and confer with Defendants before filing their Motion. This practice is ineffective as it wastes attorney and judicial resources and unnecessarily increases fees and costs.

Plaintiffs' Motion should be denied. Defendants also request that the Court order the parties to meet and confer prior to filing future motions, as outlined in the Stipulation. (Dkt. 1185 at ¶ 30.)

## I. Background & Introduction

### A. Procedural History of Monitoring "Seen" PMs.

Dr. Stern's October 2, 2019 report opined that, "[i]n most cases, when viewed in the context of the patient's overall care for the acute problem, the fact that the visit was short was *not, in and of itself, problematic*." (Dkt. 3379 at 29, emphasis in original). According to Dr. Stern:

> This is so because very often during watch, the purpose of the visit is rather narrow: to determine if the patient has had any significant change since the previous visits. This can be true even for a visit during which the mental health professional decides that a patient can be advanced to a less intense level of watch.
>
> For example, if a patient has been determined to be improved and stable over several days of constant watch and can appropriately be advanced to 10-minute watches if the improvement has been sustained, **a short visit can conceivably be adequate for determining that sustained improvement.** Short visits may also be appropriate when the visit is conducted at cell-front (i.e., the patient declines to be taken to an examination room) because this is a non-confidential setting and in-depth conversations either risk violating the patient's right to privacy, or engender stilted or less-than-frank information from the patient. Finally, **longer visits may be contraindicated in patients on watch because if they are agitated and uncooperative – a not-uncommon situation in this acute setting – pressuring the patient to participate in a longer engagement may cause their agitation to escalate**.

(*Id.* at 29–30, emphasis added.)

With respect to non-watch related "seen" PMs, Dr. Stern opined that:

> The good intentions of these PMs **to set a minimal visit frequency in a variety of situations, has had the unintended consequence of forcing visits to be scheduled, even when they are not needed**. Indeed, in the typical clinical setting, **the frequency of mental health visits is determined on a case-by-case basis that flows from the clinician's clinical assessment**, informed by input from the patient. A number of mental health professionals at ADC informed me of unnecessary visits that they would not have scheduled but for the requirements of the Stipulation. **It is not surprising – nor inappropriate – if those visits are exceedingly short**.
>
> **Setting a minimally acceptable length of time for visits would likely cause an [sic] negative unintended consequence**. For situations when a short visit is clinically appropriate, professionals would feel obligated to lengthen the

2

>     visit to satisfy the PMs.  At best this would unnecessarily waste
>     resources; at worst it could agitate a patient who wanted to be
>     left alone.

(*Id*. at 30, emphasis added.)

To address the concern that some visits may be too short, however, Dr. Stern recommended that monitors engage in a subjective inquiry when determining whether encounters monitored for "seen" PMs comply with the Stipulation. (*Id*. at 33–34.)

On February 12, 2020, the Court determined that it would "make more sense to allow clinical judgment to guide the assessment of particular visits. That is, if a mental health professional believed a visit of only one minute was clinically appropriate given the unique circumstances . . . such a visit would comply with the PMs." (Dkt. 3495 at 8.) "[T]o avoid the imposition of a bright line rule that may result in unintended consequences," the Court ordered the parties to confer and submit a joint statement outlining their proposals for future monitoring of "seen" PMs. (*Id*. at 9.)  Contrary to Dr. Stern's recommendations, Plaintiffs proposed that: (1) minimum lengths be imposed for "seen" PMs; (2) sessions lasting less than their proposed minimum length be counted complaint only if the clinician documents repeated attempts to engage with the patients, a detailed assessment including risk of self harm or suicide, the length of the session, and the reasons why the session was shorter than they proposed; (3) ADCRR track and report the number of encounters that fall short of their proposed minimum length of time; and (4) ADCRR adopt a plan to reduce cell-front encounters. (Dkt. 3507 at 5–6.)

To avoid a bright-line rule and instead ensure that clinical judgment and meaningful interaction guide the assessment, Defendants and their expert, Dr. Penn, suggested that if an encounter is longer than the minimum length of time, the objective measuring methods in place should apply. (*Id*. at 8.)  If, however, an encounter is shorter than the minimum length, "a mental health clinician shall exercise clinical judgment to determine if the length was meaningful and appropriate in the context of the patient's overall care." (*Id*.)  If the mental health clinician determines the contact was not clinically appropriate, the contact is

marked non-compliant. If the mental health clinician determines the patient's contact was clinically appropriate, the contact is marked compliant.

(*Id.*)

On March 11, 2020, the Court rejected Plaintiffs' proposal and largely adopted Defendants':

> The Court rejects Plaintiffs' request to go beyond Dr. Stern's recommendations and require shorter visits be deemed acceptable only under "extraordinary circumstances."
>
> The Court also rejects Plaintiffs' request that Defendants "track and report" visits that are less than the minimum and that Defendants be required "to implement a plan to reduce the number of mental health encounters with patients on watch that are conducted at cell-front to no more than 10% of the total number of such encounters."

(Dkt. 3518 at 3–4.) The Court noted, "there is no requirement in the Stipulation for such action." (*Id.* at 4.)

On August 14, 2020, Plaintiffs filed a Motion to Enforce, requesting the Court reconsider its ruling and require: (1) the "meaningful and appropriate" determination be made by a psychiatrist; (2) that the psychiatrist review specific records when making the determination; and (3) Defendants to report to the Court the percentage of encounters that fell short of the minimum durations. (Dkt. 3694 at 14–15.) On February 24, 2021, the Court granted Plaintiffs' Motion.

**B.     Implementation of the Court's February 24, 2021 Order.**

On February 25, 2021, ADCRR was provided a copy of the Court's February 24, 2021 Order, which (among other things) required that a psychiatrist must make the determination whether a mental health encounter that is shorter than the required minimum duration is nonetheless "meaningful and appropriate in the context of the patient's overall care." *See* Exhibit 1 (Declaration of Dr. Stallcup at ¶ 12.) Additionally, it ordered that the psychiatrist must:

> review in their entirety the eOMIS records for the patient's last five mental health encounters (not including the weekly rounds required by PM 93), as well as the eOMIS records for any ICS involving the patient in the previous six months. The evaluator

> shall also review the patient's currently operative mental health treatment plan. The evaluator shall then document in writing his or her reasons for determining that the encounter length was, or was not, meaningful and appropriate in the context of the patient's overall care.

(*Id.*)

This Order significantly changed how "encounters" had been measured since the inception of the Stipulation—by changing both the type of individual who qualified to conduct the review and the volume of records required to be reviewed. (*Id.* at ¶ 13.) Prior to this Order, and in accordance with Dr. Stern's recommendations and the Court's previous orders, the "meaningful and appropriate" review was conducted by a "mental health clinician," which the Stipulation defines as a psychologist or psychology associate. (*Id.* at ¶ 14.) With respect to document review, prior to the Order, mental health clinicians reviewed any documents they believed were pertinent to determine whether an encounter was "meaningful and appropriate." (*Id.* at ¶ 15.) The type and number of documents reviewed depended on the encounter and inmate. (*Id.*)

Upon receipt of the Order, Defendants discussed, analyzed, and researched how to comply with it, as ADCRR does not employ any psychiatrists. (*Id.* at ¶ 16.) Such discussions included the ability to recruit and hire a psychiatrist whose duties and responsibilities would be limited to administrative document review rather than hands-on clinical experience. (*Id.*) Indeed, the purpose of the "meaningful and appropriate" review is to determine, from a mental health standpoint, whether the length of an encounter is meaningful and appropriate in the context of the patient's overall care. (*Id.*) The purpose is not to view the encounter from the lens of a psychiatrist who prescribes medications. (*Id.*) Psychiatrists are already difficult to come by. (*Id.* at 17.) Recruiting a psychiatrist who did not want to practice psychiatry, would be even more difficult. (*Id.*) Additionally, ADCRR discussed the ability to pay a psychiatrist to conduct this review. (*Id.*) The average psychiatrist's salary is $300,000 a year. (*Id.*) Prior to the Court's Order, ADCRR employed two full-time mental health clinicians whose sole responsibility was to conduct "meaningful and appropriate" reviews. (*Id.* at 18.) Due to the voluminous number

of records the Court's February 24, 2021 Order requires the reviewer to review, ADCRR's Mental Health Program Director, Dr. Stallcup, estimates it would take double the time and manpower to complete the "meaningful and appropriate" review. (*Id*. at 19.) This would require ADCRR to hire four psychiatrists and cost approximately $1.2 million a year. (*Id*.)

After weeks of strategizing how to implement the psychiatrist-review requirement of the Court's February 24, 2021 Order, ADCRR determined it could not be done. (*Id*. at 20.) As such, it was forced to eliminate the "meaningful and appropriate" review and impose minimum durations. (*Id*.) The Court originally rejected Plaintiffs' request to impose minimum durations, due to the risk of creating the negative unintended consequences described above. Plaintiffs knew by convincing the Court to require psychiatrists to conduct the review, it would be too expensive for Defendants to conduct, which would get Plaintiffs what they originally requested—minimum durations.

As a result, the Court's presumptive minimums became actual minimums. (*Id*. at ¶ 20.) If an encounter does not meet them, unless an inmate refuses, it is marked noncompliant. (*Id*.) The minimum-durations methodology went into effect on April 1, 2021. (*Id*.) Due to the review process detailed above, the Monitoring Bureau ("MB") was unable to implement it any sooner, foreclosing on Defendants' ability to rely upon scores prior to March 2021. (*Id*.)

**C.  Plaintiffs Knew Defendants Were Complying With the Court's Order.**

On March 30, 2021, Defendants sent correspondence to Plaintiffs advising that the "minimum durations" methodology would be implemented on April 1, 2021. *See* Exhibit 2 (Declaration of A. Hesman) at ¶ 3. On April 21, 2021, Defendants requested Plaintiffs confirm that Defendants' proposed language could be implemented. (*Id*. at ¶ 4.) Plaintiffs did not respond. (*Id*.) On May 6, 2021, Defendants sent follow up correspondence requesting a response. (*Id*. at ¶ 5.) Plaintiffs did not respond. (*Id*.) Instead, Plaintiffs focused on preparing their instant Motion to Enforce, despite knowing Defendants were awaiting a response from them to edit the Monitor Guide on this very issue, and knowing Defendants were in compliance with the Court's February 24, 2021 Order.

**D. Plaintiffs' Second Motion to Enforce.**

On May 10, 2021, without first attempting to meet and confer with Defendants to resolve the issue without unnecessary Court intervention, Plaintiffs filed a second motion to enforce alleging, "[s]ince the Court issued is order on February 24, 2021, Defendants have compiled and reported three months of CGAR scores while entirely failing to utilize methodology ordered by the Court. . ."[1] (Dkt. 3901 at 3.) The three months of data referenced in Plaintiffs' motion were: (1) December 2020 CGARS; (2) summary of data from January 2021 encounters; and (3) summary of data from February 2021 encounters.[2] (*Id.*)

On May 11, 2021, Defense counsel emailed Plaintiffs' counsel and again explained that Defendants were complying with the Court's Order. *See* Exhibit 2 at ¶ 6. Defense counsel also advised that Defendants were not attempting to rely upon data calculated under the previous methodology (including data generated in December 2020, January 2021, & February 2021) and requested that Plaintiffs withdraw their Motion.[3] (*Id.*) They refused. (*Id.*)

**II. Argument**

**A. Defendants are in Compliance With the Court's February 24, 2021 Order.**

Plaintiffs' claim that Defendants have "compiled and reported three months of CGAR scores" since the Court's February 24, 2021 Order is based upon a misunderstanding as to how CGAR data is generated, analyzed, and reported.

Following the end of a monitored month, Centurion has five days to provide ADCRR with the data generated from that month. *See* Exhibit 1 at ¶ 3. While ADCRR usually

---

[1] This is not the first time Plaintiffs have sought Court intervention without meeting and conferring with Defendants. (e.g., Dkt. 3822) Defendants believe the majority of disputes Plaintiffs bring to the Court's attention can be resolved between the parties, which would conserve resources, eliminate the unnecessary expenditure of attorneys' fees, and promote judicial economy.

[2] As detailed above, these summaries regarding previously compiled data were prepared by Defendants in accordance with the Court's February 24, 2021 Order. (Dkt. 3861 at 16.)

[3] Defendants reserve the right to reaudit these scores utilizing the new methodology.

receives it within this timeframe, sometimes (for a variety of reasons) the receipt of data is delayed.  (*Id*.)  For example, some PMs require each facility to manually generate data, as opposed to running a report in eOMIS.  (*Id*.)

Upon receipt, the MB randomizes the data in preparation of auditing it to determine PM compliance.  (*Id*. at ¶ 4.)  After the audit, the results are input into the CGAR report. (*Id*.)  It is up to each individual monitor within the MB to determine the order in which they audit the PMs and complete the CGAR, both with respect to the individual PM and the complex.  (*Id*. at ¶ 5.)  Not all PMs are created equal and, based upon individualized factors specific to the monitor, facility, and PM, each requires a different amount of time to audit and record.  (*Id*. at ¶ 6.)   Such factors include, but are not limited to, the complexity of the question; quality of source document and medical record entries; availability of staff; and the monitor's schedule.  (*Id*. at ¶ 7.)  While the goal is to have the monitoring month's audit complete by the 25th of the following month, it is not always possible.  (*Id*. at ¶ 8.)

After the audit is complete, Centurion is provided the opportunity to review the preliminary findings and informally discuss them with the monitor before they are placed in the CGAR report. (*Id*. at ¶ 9.)  CGAR reports are generated on the last day of the auditing month.  (*Id*.)  Once these "preliminary findings" are complete, Centurion has ten business days, beginning the first day of the next month, to formally rebut any non-compliant finding.  (*Id*. at ¶ 10.)  Upon receipt of a formal rebuttal, ADCRR reviews and analyzes it, and provides a response within ten business days.  (*Id*. at ¶ 11.)   After the formal rebuttal period has closed, CGARs are deemed final.  (*Id*.)  This is typically completed by the 21st of the month following the auditing month.   (*Id*.)

Data for December 2020 and January 2021 began being audited on January 1, 2021 and February 1, 2021, respectively.  Because the Court's Order was not issued until twenty-three days later, Defendants could not have implemented the new methodology to calculate scores for these months.  While data for February 2021 began being audited on March 1, 2021, because Defendants were still assessing how to hire four psychiatrists, they were unable to implement it on that date—just three business days later.  As such, however,

8

Defendants cannot rely upon the February 2021 (or any previous scores) because they were generated under the previous "mental-health clinician" methodology. Defendants implemented the "minimum durations" methodology on April 1, 2021 and applied it to March 2021 data. Plaintiffs have been aware of this since March 30, 2021 and were aware of it when they filed their Motion. *See* Exhibit 2 at ¶ 3. It is therefore unclear what Plaintiffs' Motion seeks to enforce.

**B. Anecdotal Instances of Individual Inmate Treatment are Irrelevant to Defendants' Compliance With the Stipulation.**

Plaintiffs' Motion claims that "patients die by suicide after having contact with mental health staff that fall below the minimum durations required by the Court[]." (Dkt. 3901 at 4.) Plaintiffs do not attempt to connect such encounters to any suicide, nor is their Motion supported by a declaration from their mental health expert.

The only relevant example Plaintiffs provide relates to alleged short encounters received by Patient 1. Specifically, they allege that two of Patient 1's encounters were included in the sample for Defendants' CGAR reports and marked compliant even though both fell short of the minimum durations established by the Court. This is false and is based upon inaccurate assumptions made by Plaintiffs. *See* Exhibit 1 at ¶ 25. During both encounters, which occurred on December 14 and 21, 2020, Patient 1 was seen for ten minutes. (*Id*. at ¶ 26.) This length meets the Court's minimum durations. (*Id*.) While Plaintiffs assume that these ten minutes *included* "staff consultation and record review," they are wrong.[4] (*Id*.) The encounter record states, "[t]his writer met with Pt for a total of ten minutes *with* staff consultation and review." (emphasis added). (*Id*.) This verbiage means **the patient was seen for ten minutes** and staff consultation and record review were completed thereafter. (*Id*.) In fact, each of Patient 1's contacts met the Court's timeframes, except for the December 17, 2020, when he refused to participate in counseling services and a refusal to submit to treatment was completed. (*Id*. at ¶ 27.)

---

[4] This is another example of an issue that could have been resolved had Plaintiffs conferred with Defendants prior to filing their Motion.

9

**C.      Plaintiffs' Request for Appointment of a Receiver Should be Denied.**

Plaintiffs conclude their Motion with a one-sentence request that the Court appoint a receiver. (Dkt. 3901 at 6–7.) It is the same copy-and-pasted request with which they concluded their Response to Defendants' Supplemental Response to OSC. (Dkt. 3887 at 26–27.)

Any consideration of a receiver is improper. (Dkt. 3456 at 5–6.) Both the Supreme Court and the Ninth Circuit have recognized—particularly in the prisoner litigation context—that a receiver is only appropriate to remedy an established constitutional violation. *See Brown v. Plata,* 563 U.S. 493, 511 (2011) ("Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees."); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1093–94 (9th Cir. 2010) ("[R]eceiverships are recognized equitable tools available to the courts to remedy otherwise uncorrectable violations of the Constitution or laws."); *see also Plata v. Schwarzenegger,* 2005 WL 2932253, at *23 (N.D. Cal. Oct. 3, 2005) (appointing receiver to "remedy the violation of [inmates'] constitutional rights"); *Shaw v. Allen*, 771 F. Supp. 760, 764 (S.D. W.Va. 1990) (appointing receiver to ensure jail met "federal constitutional standards"); *Newman v. State of Ala.*, 466 F. Supp. 628, 630 (M.D. Ala.1979) (appointing a receiver to ensure prison meets "minimum constitutional standards").

Unlike these cases, the Court has never found that Defendants' noncompliance with the Stipulation's performance measures violated the constitutional rights of ADCRR inmates. Even then, a receiver is not automatic. "Receivership is a remedy of last resort." *Bracco v. Lackner*, 462 F. Supp. 436, 456 (N.D. Cal. 1978); *see also Plata*, 2005 WL 2932253, at *1 (acknowledging that appointing a receiver is a "drastic" action); *Dixon v. Barry*, 967 F. Supp. 535, 550 (D.D.C. 1997) (considering a receiver where it was "the only remedy left"). The extraordinary nature of a receiver demands significant procedural protections, for example, an order to show cause why a receiver should not be appointed and an evidentiary hearing. *Plata*, 2005 WL 2932253, at **1-2. And after considering all

1  of the evidence, the Court must consider a variety of factors. *Id*. at *23.  Plaintiffs' request
2  should be denied.

3  **III.   Conclusion**

4  For these reasons, Plaintiffs' Motion should be denied.

5  DATED this 24th day of May, 2021.

6                                          STRUCK LOVE BOJANOWSKI & ACEDO, PLC

8                                          By /s/Daniel P. Struck
                                             Daniel P. Struck
9                                               Rachel Love
                                             Timothy J. Bojanowski
10                                               Nicholas D. Acedo
                                             3100 West Ray Road, Suite 300
11                                               Chandler, Arizona 85226

12                                               *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Asim Dietrich: | adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Corene T. Kendrick: | ckendrick@aclu.org |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Rita K. Lomio: | rlomio@prisonlaw.com |
| Eunice Cho | ECho@aclu.org |
| Jared G. Keenan | jkeenan@acluaz.org |
| Casey Arellano | carellano@acluaz.org |
| Maria V. Morris | mmorris@aclu.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Daniel P. Struck