**EXHIBIT 1**

**EXHIBIT 1**

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DECLARATION OF B. PENNINGTON-STALLCUP** |

I, Bobbie Pennington-Stallcup, make the following Declaration:

1. I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration. I am currently ADCRR's Mental Health Program Director. I have held this position since August 17, 2020.

2. For the majority of the Stipulation's Performance Measures ("PMs"), compliance is determined based upon a review of data provided by Centurion each month.

3. Following the end of a monitored month, Centurion has five days to provide ADCRR with the data generated from that month. While ADCRR usually receives it within this timeframe, sometimes (for a variety of reasons) the receipt of data is delayed. For

1  example, some PMs require each facility to manually generate data, as opposed to running
2  a report in eOMIS.

3      4.    Upon receipt, the Monitoring Bureau ("MB") randomizes the data in
4  preparation of auditing it to determine PM compliance. After the audit, the results are input
5  into the CGAR report.

6      5.    It is up to each individual monitor within the MB to determine the order in
7  which they audit the PMs and complete the CGAR, both with respect to the individual PM
8  and the complex.

9      6.    Not all PMs are created equally and, based upon individualized factors
10 specific to the monitor, facility, and PM, each require a different amount of time to audit
11 and record.

12     7.    Such factors include, but are not limited to, the complexity of the question;
13 quality of source document and medical record entries; availability of staff; and the
14 monitor's schedule.

15     8.    While the goal is to have the monitoring month's audit complete by the 25th
16 of the following month, it is not always possible.

17     9.    After the audit is complete, Centurion is provided the opportunity to review
18 the preliminary findings and informally discuss them with the monitor before they are
19 placed in the CGAR report. CGAR reports are generated on the last day of the auditing
20 month.

21     10.    Once these "preliminary findings" are complete, Centurion has ten business
22 days, beginning the first day of the next month, to formally rebut any non-compliant finding.

23     11.    Upon receipt of a formal rebuttal, ADCRR reviews and analyzes it, and
24 provides a response within ten business days. After the formal rebuttal period has closed,
25 CGARs are deemed final. This is typically completed by the 21st of the month following
26 the auditing month.

27     12.    On February 25, 2021, ADCRR was provided a copy of the Court's February
28 24, 2021 Order, which (among other things) required that a psychiatrist must make the

1  determination whether a mental health encounter that is shorter than the required minimum
2  duration is nonetheless "meaningful and appropriate in the context of the patient's overall
3  care." (Dkt. 3861 at 15.) Additionally, it ordered that the psychiatrist must:

> review in their entirety the eOMIS records for the patient's last five mental health encounters (not including the weekly rounds required by PM 93), as well as the eOMIS records for any ICS involving the patient in the previous six months. The evaluator shall also review the patient's currently operative mental health treatment plan. The evaluator shall then document in writing his or her reasons for determining that the encounter length was, or was not, meaningful and appropriate in the context of the patient's overall care.

(*Id.* at 13.)

13. This Order significantly changed how "encounters" had been measured since the inception of the Stipulation—by changing both the type of individual who is qualified to conduct the review and the volume of records required to be reviewed.

14. Prior to this Order, and in accordance with Dr. Stern's recommendations and the Court's previous orders, the "meaningful and appropriate" review was conducted by a "mental health clinician," which the Stipulation defines as a psychologist or psychology associate. (Dkt. 1185-1 at 4.)

15. With respect to document review, prior to the Order, mental health clinicians reviewed any documents they believed were pertinent to determine whether an encounter was "meaningful and appropriate." The type and number of documents reviewed depended on the encounter and inmate.

16. Upon receipt of the Order, Defendants discussed, analyzed, and researched how to comply with it, as ADCRR does not employ any psychiatrists. Such discussions included the ability to recruit and hire a psychiatrist whose duties and responsibilities would be limited to administrative document review rather than hands-on clinical experience. Moreover, the purpose of the "meaningful and appropriate" review is to determine, from a psychology standpoint whether the length of an encounter is meaningful and appropriate in the context of the patient's overall care. The purpose is not to view the encounter from the lens of a psychiatrist who prescribes medications.

17. Psychiatrists are already difficult to come by. Recruiting a psychiatrist who did not want to practice psychiatry, would be even more difficult. Additionally, ADCRR discussed the ability to pay a psychiatrist to conduct this review. In my experience, the average psychiatrist's salary is $300,000 a year.

18. Prior to the Court's Order, ADCRR employed two full-time mental health clinicians whose sole responsibility was to conduct "meaningful and appropriate" reviews.

19. Due to the voluminous number of records the Court's February 24, 2021 Order requires the reviewer to review, I estimate it would take double the time and manpower to complete the "meaningful and appropriate" review. This would require ADCRR to hire *four* psychiatrists and cost approximately $1.2 million a year.

20. After weeks of strategizing how to implement the psychiatrist review requirement of the Court's February 24, 2021 Order, ADCRR determined it could not be done. As such, it eliminated the "meaningful and appropriate" review. As a result, the Court's presumptive minimums became actual minimums. If an encounter does not meet them, unless an inmate refuses, it is marked noncompliant.

21. The minimum-durations methodology went into effect on April 1, 2021. Due to the review process detailed above, the MB was unable to implement it any sooner.

22. As a result, however, Defendants understand they are unable to rely upon scores from previous months (including December 2020 and January–February 2021).

23. Additionally, the Court's February 24, 2021 Order required Defendants to "file monthly reports reflecting the percentage of mental health encounters sampled for CGARS that fell short of the minimum durations established by the Court, and of those encounters, the percentage that were nonetheless counted as compliant with the Stipulation." (Dkt. 3861 at 16.)

24. Since the Order, the MB has compiled two sets of CGAR data: January and February 2021. We are in the process of compiling March data, which is the first data set that was analyzed under the Court's revised methodology.

4

25. I understand that Plaintiffs allege that "two of the short encounters received by Patient 1 were included in the sample for Defendants' CGAR reports. In both cases, Defendants counted them as compliant, despite the fact that they fell short of the minimum durations established by the Court." (Dkt. 3901 at 5.) This is false and is based upon inaccurate assumptions made by Plaintiffs.

26. During both encounters, which occurred on December 14 and 21, 2020, Patient 1 was seen for ten minutes. This length meets the Court's minimum durations. While Plaintiffs assume that these ten minutes *included* "staff consultation and record review," they are wrong. The encounter actually states, "[t]his writer met with Pt for a total of ten minutes *with* staff consultation and review." (emphasis added). This verbiage means **the patient was seen for ten minutes** and staff consultation and record review were completed thereafter.

27. In fact, each of Patient 1's contacts met the Court's timeframes, except for the December 17, 2020, when he refused to participate in counseling services and a refusal to submit to treatment was completed.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of May, 2021.

_____
Bobbie Pennington-Stallcup

6