1  Victoria López (Bar No. 330042)*
   Jared G. Keenan (Bar No. 027068)
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone: (602) 650-1854
4  Email: vlopez@acluaz.org
            jkeenan@acluaz.org
5
   *Admitted pursuant to Ariz. Sup. Ct. R. 38(d)
6
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia
7  Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy
   Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,
8  Joseph Hefner, Joshua Polson, and Charlotte Wells, on
   behalf of themselves and all others similarly situated*
9
   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE
10 PAGE]**

11 Asim Dietrich (Bar No. 027927)
   **ARIZONA CENTER FOR DISABILITY LAW**
12 5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
13 Telephone: (602) 274-6287
   Email: adietrich@azdisabilitylaw.org
14
   *Attorneys for Plaintiff Arizona Center for Disability Law*
15 **[ADDITIONAL COUNSEL LISTED ON SIGNATURE
   PAGE]**
16
                    UNITED STATES DISTRICT COURT
17
                       DISTRICT OF ARIZONA
18
   Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-ROS
19 Dustin Brislan; Sonia Rodriguez; Christina
   Verduzco; Jackie Thomas; Jeremy Smith; Robert        **EXPERT DECLARATION
20 Gamez; Maryanne Chisholm; Desiree Licci; Joseph       AND DIRECT WRITTEN
   Hefner; Joshua Polson; and Charlotte Wells, on        TESTIMONY OF
21 behalf of themselves and all others similarly         PABLO STEWART, M.D.**
   situated; and Arizona Center for Disability Law,
22
                          Plaintiffs,
23
              v.
24
   David Shinn, Director, Arizona Department of
25 Corrections, Rehabilitation and Reentry; and
   Larry Gann, Assistant Director, Medical Services
26 Contract Monitoring Bureau, Arizona Department
   of Corrections, Rehabilitation and Reentry, in their
27 official capacities,

28                        Defendants.

Pursuant to the Court's September 2, 2021 Order (Doc. 3952 at 4), I, Pablo Stewart, M.D., hereby declare and submit my direct written testimony as follows. I will be called by Plaintiffs to testify to the Court under oath via videoconference regarding the following at 9:00 am on November 3, 2021. For ease of reference by the Court, I include a table of contents for the topics covered herein.

## Table of Contents

I.    Background / Expert Qualifications ................................................................. 2

II.   Basis for Opinion, Information Reviewed, and Methodology ...................................... 4

III.  Opinion: Mental Health Care Provided by ADCRR
      Does Not Meet Minimum Standards of Care ................................................. 9
      A. Opinion: There Are Inadequate Numbers and Types of Mental Health Staff ........ 9
      B. Opinion: Systemic Problems in the Delivery of Mental Health Care
         Continue From The Filing of This Case ................................................. 17
         1. Opinion: ADCRR's Chronic Lack of Staffing Leads to
            an Inability to Provide Adequate Mental Health Care ......................... 17
         2. Opinion: Inadequate Treatment Plans and Failure To Coordinate Care
            Between Psychiatric and Mental Health Staff, or With Medical Providers,
            Puts People at Risk of Harm ..................................................... 35
         3. Opinion: The Failure to Provide Interpretation in Mental Health Treatment
            Places Class Members Not Fluent in English at Risk of Harm ................. 41
      C. Opinion: Clinicians Practicing Below the Standard of Care
         Put Patients at Risk of Harm ......................................................... 52
         1. Opinion: Patients Remain Profoundly Symptomatic
            for Long Periods of Time ............................................................ 52
         2. Opinion: ADC's Practice of Removing and Changing Mental Health Diagnoses
            Puts Class Members at Risk of Harm .............................................. 55
      D. Opinion: The Failure to Properly Prescribe, Deliver, and Manage Psychotropic
         Medications Puts Class Members at Risk of Harm. ................................... 57
         1. Opinion: An Inadequate Formulary Results in People Not Receiving
            Medications Best Suited to Address Their Symptoms ......................... 58
         2. Opinion: Inadequate Medication Administration and Distribution Systems
            Fall Below the Standard of Care ................................................. 59
         3. Opinion: The Failure to Mitigate the Risk of Heat Injury To People on
            Psychotropic Medications Places Class Members at Risk of Harm ............ 67
      E. Opinion: The Failure to Provide Suicidal and Self-Harming Prisoners
         Basic Mental Health Care Falls Below the Standard of Care ..................... 69
      F. Inappropriate Uses of Force on the Mentally Ill .................................... 72
      G. Inappropriate Use of Isolated Confinement on People with Mental Illness ........ 83

## I.      Background / Expert Qualifications

1.     I am a physician licensed to practice in the states of California and Hawai'i, and maintain a practice in clinical and forensic psychiatry. I am currently a Clinical Professor and Psychiatrist at the Burns School of Medicine at the University of Hawai'i. As part of my academic duties, I serve as an attending psychiatrist at the Oahu Community Correctional Center and supervise psychiatry residents assigned to work at the facility. I have extensive experience in forensic and correctional psychiatry, including monitoring conditions of confinement and assessing policies, procedures, and protocols for the adequacy of mental health and medical care in custodial settings.

2.     In 1973, I obtained a Bachelor of Science in chemistry from the U.S. Naval Academy, and served in the U.S. Marine Corps from 1973 to 1978. I received my Doctor of Medicine degree from the University of California, San Francisco ("UCSF") School of Medicine in 1982. I also completed my residency in Psychiatry at UCSF. In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class at UCSF. In 1985-1986, I was the Chief Resident for the Department of Psychiatry at UCSF Hospital and San Francisco General Hospital ("SF General"). I am board-certified in psychiatry.

3.     I have held numerous positions with responsibility for ensuring quality clinical services at inpatient and community-based programs, and maintaining the psychological well-being of incarcerated people, formerly incarcerated people, and unhoused persons. I have extensive clinical, research, and academic experience in the diagnosis, treatment, and community care programs for persons with psychiatric disorders, and the management of patients in institutionalized populations with dual diagnoses, including psychotic disorders. From 1986 to 1990, I was the Senior Attending Psychiatrist at the Forensic Unit at UCSF Hospital and SF General, where I was responsible for a twelve-bed maximum-security psychiatric ward. From 1988 to 1989, I

was the Director of Forensic Psychiatric Services for the City and County of San Francisco, and had administrative and clinical responsibilities for psychiatric services for the jail population. My duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and Forensic Unit at SF General. From 1991 to 1996, I served the U.S. Department of Veterans Affairs Medical Center in San Francisco as: Medical Director of the Comprehensive Homeless Center (where I had overall responsibility for the medical and psychiatric services at the Homeless Center for unhoused veterans); Chief of the Intensive Psychiatric Community Care Program (a community-based case management program); Chief of the Substance Abuse Inpatient Unit (where I had overall clinical and administrative responsibilities for the unit); and Psychiatrist for the Substance Abuse Inpatient Unit (where I provided consultation to the Medical / Surgical Units regarding patients with substance abuse problems). From 1991 to 2006, I served as the Chief of Psychiatric Services at the Haight Ashbury Free Clinic, which serves a large population of unhoused and/or formerly incarcerated persons.

4.     Concurrent to this professional work, I have held several academic appointments where I actively supervise medical students, residents, and fellows in psychiatry. As noted above, I am currently a Clinical Professor and Psychiatrist at the Burns School of Medicine at the University of Hawai'i. At UCSF School of Medicine's Department of Psychiatry, I was a Clinical Professor from 2006 to 2018; Associate Clinical Professor from 1995-2006; Assistant Clinical Professor from 1989-95; and Clinical Instructor from 1986-89. I received multiple awards for "Excellence in Teaching" and "Outstanding Faculty Member of the Year," including the academic years 1985-86, 1986-87, 1988-89, 1990-91, 1994-95 and 2014-15.

5.     As an expert for more than 30 years, I have rendered professional assistance to courts, governmental agencies, and counsel for incarcerated people with regard to managing, monitoring, and reforming correctional mental health and medical care systems, including the implementation of remedial decrees in conditions of confinement cases; assessing the quality of medical and mental health care provided to incarcerated

people; and opining as to conditions of confinement that aggravate or exacerbate traumatic symptoms and mental illness. My responsibilities include inspecting correctional institutions, reviewing custodial, medical, and mental health care policies and procedures, and rendering an opinion on the risks posed to incarcerated populations by inadequate or ineffective custodial and health care procedures. I have served as an expert witness and consultant in this case since 2012.

6.     Most recently, from 2016 to the present, I have been the court-appointed monitor to the U.S. District Court for the Central District of Illinois in *Rasho v. Baldwin*, a statewide class action regarding mental health care in the Illinois state prison system. From 2014 to the present, I have served as an expert in *Hernandez v. County of Monterey*, in the U.S. District Court for the Northern District of California. In 2014, I participated in a year-long review of segregated housing units for the Federal Bureau of Prisons' Special Housing Unit Review. From 2008 to 2019, I served as an expert in *Graves v. Arpaio*, a case before this Court involving conditions in the Maricopa County Jail. I was an expert in the U.S. Supreme Court case *Brown v. Plata*, 563 U.S. 493 (2011), and my opinion is cited in that decision. *Id*. at 519 and n. 6. From 1998 to 2004, I was a psychiatric consultant to the Institute on Crime, Justice and Corrections at George Washington University, which monitored the agreement between the U.S. Department of Justice and the State of Georgia to improve the quality of that State's juvenile justice facilities, critical mental health, medical, and educational services, and treatment programs. From 2003 to 2004, I monitored the provisions of a settlement between incarcerated people and the New Mexico Corrections Department about conditions in the Department's "supermax" unit. I have testified numerous times in state and federal courts as an expert and provided expert opinions relied on by federal district courts, the federal Courts of Appeals, and the Supreme Court. My current CV is attached as **Exhibit 1**.

II.     **Basis for Opinion, Information Reviewed, and Methodology**

7.     In 2012 I was retained by Plaintiffs' counsel in *Parsons v. Ryan* to provide expert opinions on matters relating to whether the system of providing mental health care

and conditions of confinement for people with mental illness in the custody of the Arizona Department of Corrections (ADC, now known as ADCRR) met constitutional minima. In the intervening nine years, I have stayed abreast regarding the provision of mental health care to people in the State's prisons, and have provided this Court with 18 declarations or expert reports that pertain directly to those issues:

- Declaration in support of class certification, dated November 6, 2012 (Doc. 292, Ex. B)

- Declaration regarding the risk of injury due to excessive heat exposure to people prescribed psychotropic medications, dated September 15, 2013 (Doc. 663)

- Expert report describing the delivery of mental health care, conditions of confinement that I observed at various ADC facilities in 2013, information obtained from class members in interviews, and my analysis of the mental health care, dated November 8, 2013 (Doc. 1104-2)

- Supplemental expert report, dated December 9, 2013 (Doc. 1104-6, Ex. 8)

- Rebuttal expert report, dated January 31, 2014 (Doc. 1104-6, Ex. 9)

- Second supplemental expert report, dated February 24, 2014 (Doc. 1104-6, Ex. 10)

- Third supplemental expert report, dated August 29, 2014 (Doc. 1538-1, Ex. 2)

- Declaration and expert report in support of motion to enforce the Stipulation, dated March 30, 2016 (Doc. 1538-1)

- Declaration regarding the length of mental health encounters and patient suicides, dated July 8, 2016 (Doc. 1627)

- Declaration regarding confidential mental health encounters, dated August 5, 2016 (Doc. 1852)

- Declaration regarding the very high rates of refusal of out-of-cell time by people in isolation units, dated February 1, 2017 (Doc. 1939)

- Declaration regarding class member suicides, and remedial efforts for Stipulation Performance Measure 94, dated May 28, 2017 (Doc. 2091)

- Declaration regarding my visit to ASPC-Eyman in January 2019 and conditions in the isolation units, dated February 19, 2019 (Doc. 3158)

- Declaration in response to Court order regarding the frequency and length of mental health encounters, dated February 27, 2020 (Doc. 3511)

- Declaration regarding confidential post-partum mental health encounters, dated March 18, 2020 (Doc. 3532-1)

- Declaration regarding language interpretation and effective communication in mental health encounters, dated June 10, 2020 (Doc. 3626)

- Declaration regarding the duration of mental health encounters, dated August 14, 2020 (Doc. 3694-3)

- Declaration regarding class member suicides and monitoring of mental health performance measures, dated October 14, 2020 (Doc. 3782)

8.     Given the Court's order that the parties prepare for trial in this matter, Plaintiffs' counsel has asked me to update my earlier opinions, based upon a review of current ADCRR and Centurion policies, procedures, and practices; a review of various documents and class members' medical charts; and on-site inspections and class member interviews that I personally conducted.[1] I visited the following state prison complexes in September 2021 that at the time had specially designated mental health programs and housing units within them: Arizona State Prison Complex ("ASPC")-Eyman (Sept. 8, 2021); ASPC-Tucson (Sept. 9, 2021); ASPC-Perryville (Sept. 10, 2021); and ASPC-Phoenix (Sept. 23, 2021). In the course of my September 2021 inspections, I visited housing units where people classified as seriously mentally ill ("SMI") are incarcerated, any units designated for people with mental health needs (regardless of classification), mental health watch units, segregated isolation units including maximum custody and detention units, and I interviewed class members incarcerated in these units.[2]

9.     As I have done in prior tours and inspections, I personally interviewed a number of class members. Prior to the tours, I asked Plaintiffs' counsel to review the most recent months' self-harm logs and mental health watch logs maintained by ADCRR and Centurion, to identify persons at the four prisons who appeared frequently on the logs (for repeated acts of self-harm or multiple stays on suicide watch), or persons with very long lengths of stay on mental watch, so that I could affirmatively attempt to speak to these

---

[1] I am being compensated for my work in this case at a rate of $300 per hour, with a daily cap of $2500.

[2] I previously visited the following Arizona state prisons in connection with this case: ASPC-Eyman (July 16, 2013 and January 25, 2019); ASPC-Florence (July 15, 2013); ASPC-Lewis (July 22, 2013 and November 13-14, 2018); ASPC-Perryville (July 18, 2013); ASPC-Phoenix (July 19, 2013 and January 10, 2019); ASPC-Tucson (July 8-9, 2013 and January 8-9, 2019); and ASPC-Yuma (July 23, 2013)

persons when I was at the facilities. Holding aside seeking out these people and persons who I've previously spoken to on past visits, all other class members who I spoke to on the tours were chosen randomly by walking through the housing units and going cell-to-cell, asking people to speak to me cell-front. Speaking to them cell-front or in their living unit gives me the opportunity to observe the patient's housing situation, as well as their ability to maintain a neat "house" where they live. To the extent that time permitted, I also made a point to request to pull a sample of these people out of their cells who I wanted to speak to for longer periods of time in a private confidential setting, in order to have a more in-depth clinical and therapeutic encounter with them.

10.    I do not speak to (or review records of) a random sample of *all* people in ADCRR custody, nor should I; rather, my methodology is to focus on persons with the most serious mental health concerns or diagnoses. While all people in ADCRR custody could doubtless benefit from a more therapeutic milieu and environment, I focus on the persons with the most profound mental health concerns, because these are the patients that a functioning correctional mental health care system should *at a minimum* prioritize and focus on. As on past tours in conducting my interviews of mentally ill class members, often housed in isolation units or watch units, I found many people displaying severe and disabling mental health conditions, who were profoundly mentally ill or psychotic, or engaging in ongoing acts of self-harm. I observed many people with severe mental illness who were in fragile conditions.

11.    I also focused my review of patients' medical records before and after my visits to analyze the mental health care they are receiving. In some cases, I was assisted in my review of medical records by another psychiatrist, Dr. Greg Nikogosyan. I supervised his medical file review – he went through some patients' medical charts to make a record of dates of prescriptions and psychiatry encounters. I analyzed Dr. Nikogosyan's summary of the documentation of the medical records, and then to the extent necessary supplemented with my own file review, and then created my own analysis and conclusions regarding each patient's care.

12.     I reviewed the medical records and drafted summaries regarding the care of 15 persons discussed in my 2013 Expert Report who remain in the custody of ADCRR, to determine the course of their mental health care over the intervening eight years. I also reviewed the medical records and drafted summaries of approximately 50 class members whom I spoke to on the September 2021 visits to the four prisons. These medical file record review write-ups are appended to this report as **Exhibit 2**.

13.     I also reviewed medical records of 15 of the 23 patients in ADCRR custody who have died by suicide from 2019 to September 2021. After each death by suicide of an incarcerated person, ADCRR is required to conduct a psychological autopsy, or "psych autopsy" designed to identify any causes that led to the patient's suicide, and whether the suicide was preventable. ADCRR staff must complete a psych autopsy within 30 days of the person's death: Defendants provided 20 psych autopsies, which I reviewed. In addition, pursuant to state law, ADCRR is required to complete a mortality review after any death in custody; these serve a similar function and should be completed within 10 days of ADCRR receiving the local county medical examiner's report. Health Services Technical Manual, Chapter 7, Section 7.1, "Inmate Mortality." Defendants provided 20 mortality reviews for patients who died by suicide. My write-ups of the care of these people who died by suicide are appended to this report as **Exhibit 3**.

14.     The systemic problems in the delivery of mental health care that I found on this round of visits and document review are consistent with my past observations. I include more recent and current illustrative examples throughout my report to show the flesh-and-blood impact of the systemic problems. However, as shown in Exhibits 2 and 3, the cases described in the main body of the report are not the only examples of these systemic problems.

15.     This opinion is also based upon the monitoring reports, medical records, my past reports and declarations, and other ADCRR and Centurion documents in connection with this case. In addition to my past reports and declarations listed above, and documents and references cited within this report, a list of documents that were reviewed and that

form the basis of this opinion are listed in **Exhibit 4**. A list of the class members whom I interviewed in the course of the September 2021 tours is **Exhibit 5**. The photos taken by ADCRR staff during these visits are attached as **Exhibit 6** and also appear within this report. These exhibits are all incorporated herein to my testimony.

### III.   Opinion: Mental Health Care Provided by ADCRR Does Not Meet Minimum Standards of Care

16.     In summary, it continues to be my expert opinion that the mental health treatment provided to class members does not meet the minimum standard of care in a number of interrelated and interacting ways, as described more fully below. The operation and delivery of mental health care to people in ADCRR's custody places them at substantial risk of serious harm.

17.     It is my opinion that the chronic shortage of mental health staff, delays in providing or the outright failure to provide mental health treatment, the inadequacies in the provision of psychiatric medications, and the other deficiencies identified in this report are systemic problems, and incarcerated people who need mental health care have already experienced, and will experience, a serious risk of injury to their health if these problems are not addressed. In my experience in correctional mental health care, these types of systemic problems have been addressed through an injunction directed against the directors and administrators of the prison system.

### A.  Opinion: There Are Inadequate Numbers and Types of Mental Health Staff

18.     It is my opinion that the pervasive and longstanding failure to have adequate numbers of mental health care staff undermine the ability of providers and clinicians to provide minimally adequate mental health care services. Sufficient numbers of qualified mental health staff are the foundation of any minimally adequate correctional mental health care system. Without a sufficient number of properly qualified mental health staff, it is impossible to provide adequate mental health treatment.

19.     During my involvement in this case, from 2012 to now, I've been struck by the chronic and extreme shortage of mental health staff in ADCRR. Like many other state

prison systems, ADCRR has been left with the task of caring for many of the most profoundly mentally ill people who live in the State of Arizona. These people struggle with debilitating chronic mental health conditions, and in an earlier era might have been confined to state mental hospitals. Accordingly, ensuring a sufficient number and type of mental health staff are working in the prisons is of the utmost paramount importance and in the public interest.

20.    The number of mental health staff required by ADCRR's contracts with their vendors, and the number of actually filled positions, is abysmally low. *See, e.g.*, Doc. 1538-1 ¶ 25 (3/30/16 report) ("[E]ven if all authorized mental health staff positions were filled, staffing would likely still be inadequate. It is impossible to be completely certain about this, because as far as I can ascertain there has never been a time since the Stipulation went into effect when all authorized mental health staff positions were filled").[3] Centurion's most recent data of August 2021 show only 74% (153.43) of 206.0 contracted mental health positions filled. ADCRR0137140. I am especially concerned about vacancies among staff at prisons with high numbers of people in isolation or detention units, or at prisons that have the most SMI patients incarcerated and where there are supposed to be intensive mental health programs.

//

//

//

//

//

//

//

---

[3] I spoke with Plaintiffs' expert Robert Joy about his planned analysis of the shortcomings in the quantity and allocation of health care staff, and mental health care staffing metrics, twice prior to his issuance of his October 9, 2021 report. I since reviewed his report, and in my opinion, his calculations, conclusions, and opinions regarding the needed quantities and types of mental health and psychiatric staff are sound.

Specifically, the data show:

**ASPC-Eyman:**

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 4.00 | 3.00 | 75% | 3.00 | 75% | 4.00 | 100% | 7.00 | 175% |
| MH Lead | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Clerk | 1.00 | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.00 | 86% | 4.00 | 114% |
| MH RN | 2.00 | 0.90 | 45% | 0.90 | 45% | 0.90 | 45% | 0.90 | 45% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 3.00 | 1.00 | 33% | 1.00 | 33% | 1.00 | 33% | 2.00 | 67% |
| Psych Associate | 13.00 | 5.80 | 45% | 4.00 | 31% | 5.00 | 38% | 8.00 | 62% |
| **TOTAL MH STAFF** | **26.5** | **16.2** | **57%** | **14.4** | **51%** | **15.9** | **56%** | **23.9** | **84%** |

**ASPC-Florence**

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 4.00 | 4.00 | 100% | 4.00 | 100% | 4.00 | 100% | 0.00 | 0% |
| MH Lead | 1.00 | 1.00 | 100% | 1.00 | 100% | 0.00 | 0% | 0.00 | 0% |
| MH Clerk | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.00 | 86% | 3.00 | 86% |
| Mental Health RN | 1.00 | 0.80 | 80% | 1.00 | 100% | 1.00 | 100% | 0.00 | 0% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 3.00 | 0.90 | 30% | 0.90 | 30% | 0.90 | 30% | 0.90 | 30% |
| Psych Associate | 8.00 | 5.00 | 63% | 5.00 | 63% | 5.00 | 63% | 2.00 | 25% |
| **TOTAL MH STAFF** | **22.50** | **17.20** | **76%** | **17.40** | **77%** | **15.90** | **71%** | **7.90** | **35%** |

**ASPC-Lewis**

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 4.00 | 2.00 | 50% | 3.00 | 75% | 3.00 | 75% | 3.00 | 75% |
| MH Lead | 1.00 | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| MH Clerk | 1.00 | 2.00 | 200% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Midlevel (NP/PA) | 3.50 | 2.00 | 57% | 3.00 | 86% | 3.00 | 86% | 3.00 | 86% |
| Mental Health RN | 2.00 | 1.00 | 50% | 0.00 | 0% | 0.00 | 0% | 1.00 | 50% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 3.00 | 3.00 | 100% | 3.00 | 100% | 3.00 | 100% | 2.00 | 67% |
| Psych Associate | 12.00 | 10.25 | 85% | 10.25 | 85% | 10.25 | 85% | 10.25 | 85% |
| **TOTAL MH STAFF** | **27.50** | **21.25** | **77%** | **21.25** | **77%** | **21.25** | **77%** | **21.26** | **77%** |

**ASPC-Phoenix**

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 5.00 | 5.00 | 100% | 5.00 | 100% | 5.00 | 100% | 2.00 | 40% |
| Clinical Director | 1.00 | 1.00 | 100% | 1.00 | 100% | 0.00 | 0% | 0.00 | 0% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.50 | 100% | 3.50 | 100% |
| Mental Health RN | 15.80 | 6.30 | 40% | 6.90 | 44% | 6.00 | 38% | 8.80 | 56% |
| MH RN Charge | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.90 | 190% | 0.90 | 90% |
| Psychiatrist | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| Psychologist | 4.00 | 3.50 | 88% | 3.50 | 88% | 2.50 | 63% | 2.50 | 63% |
| Psych Associate | 11.00 | 9.00 | 82% | 11.00 | 100% | 9.00 | 82% | 9.00 | 82% |
| TOTAL MH STAFF | 42.30 | 31.18 | 74% | 33.78 | 80% | 29.78 | 70% | 28.58 | 68% |

**ASPC-Tucson**

| Position | Contract FTE | May FTE | May % Filled | June FTE | June % Filled | July FTE | July % Filled | Aug FTE | Aug % Filled |
|---|---|---|---|---|---|---|---|---|---|
| Behavioral Health Tech | 6.00 | 6.00 | 100% | 6.00 | 100% | 6.00 | 100% | 4.00 | 67% |
| MH Lead | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Clerk | 1.00 | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% | 1.00 | 100% |
| MH Midlevel (NP/PA) | 3.50 | 3.50 | 100% | 3.50 | 100% | 3.50 | 100% | 4.50 | 129% |
| MH RN | 2.00 | 2.00 | 100% | 2.00 | 100% | 2.00 | 100% | 2.00 | 100% |
| Psychiatrist | 1.00 | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% | 0.00 | 0% |
| Psychologist | 4.00 | 2.00 | 50% | 4.00 | 100% | 3.90 | 98% | 3.90 | 98% |
| Psych Associate | 14.00 | 12.00 | 86% | 11.00 | 79% | 11.00 | 79% | 11.00 | 79% |
| TOTAL MH STAFF | 32.50 | 27.50 | 85% | 28.50 | 88% | 28.40 | 87% | 27.40 | 84% |

(Sources: ADCRR00069737-39 (May-July 2021); ADCRR00137140 (August 2021))

21.     The "mix" of staff is also critically important. In my 2013 report I noted the low level of psychiatrist staffing in the ADC mental health system. Doc. 1104-2 (Nov. 2013 report) at 12-14. In my 2016 expert declaration, I again detailed the dearth of mental health providers, especially at the psychiatrist physician level. Doc. 1538-1 at ¶ 18. This continues to be the case, unfortunately. There are very few psychiatrist physicians working in the system –there are only seven (7) psychiatrist full time equivalent ("FTE") positions listed in the statewide contract. However, according to Centurion's records, only two of those psychiatrist positions appear to be on-site (at Phoenix and Yuma), the others

are listed as practicing remotely via telepsychiatry. (ADCRR000069737). Centurion's staffing model instead relies upon the vast majority of psychiatric services being done by midlevel practitioners such as nurse practitioners, physician assistants, who are designated as "mental health midlevel" providers. *Id*. (showing 24 "Mental Health Midlevel" positions in the statewide contract). The issue that I encountered in the medical record review is that these patients are so incredibly complex, and because of that, the clinical presentations and treatment requirements often exceed the professional preparation of a nurse practitioner. Accordingly, at a minimum there needs to be on-site physician psychiatrist supervision of the mental health midlevel psychiatry staff, due to the complexity of the patients. As detailed in paragraph 18, these are literally the most complex psychiatry patients in the State of Arizona, as people with these serious symptoms are not found in the community. It is incumbent on Defendants to ensure that the midlevel practitioners are properly trained and supervised.

22.     The majority of day-to-day mental health care is provided by psychological associates (some of whom are not licensed), behavioral health technicians, or even correctional officers.[4] Unfortunately, one disturbing pattern that I have seen repeatedly in medical records is that mental health staff without pharmacological training serve as de facto gatekeepers of patients' access to psychiatric prescribers, even when they describe concerning side effects or inefficacy of their medication. There are examples of this described later in this declaration.

23.     In addition, shortages of other health care staff, such as nurses who screen Health Needs Requests filed by patients seeking mental health care, nurses who distribute medications to patients, and medical records staff, can negatively affect the delivery of

---

[4] According to a report provided by Defendants on August 31, 2021, listing all Centurion mental health staff and their current licensure status, there are 14 psychology associates who are listed as not being licensed, including 4 psych associates at Eyman, 2 at Florence, 3 at Lewis, 1 at Perryville, 2 at Phoenix, and 2 at Yuma. ADRR00046154-57. As noted in the charts above at Paragraph 19, for August 2021, that would mean that 50% of the 8 filled psych associate positions at Eyman were unlicensed, 100% of the 2 filled positions at Florence were unlicensed, and between a quarter and third of the psych associates at Phoenix and Lewis were unlicensed.

mental health services and treatment, even if those employees are not formally classified as mental health staff. And shortages and vacancies in custody staff will also adversely affect the delivery of mental health care: whether there are enough officers available to escort class members to mental health encounters (either at a clinic or an out-of-cell location in a housing unit), to work in clinics where telepsychiatry and counseling occurs, to provide security during group mental health services and programs, to properly monitor people placed on suicide or other mental health watches, and to properly supervise and monitor people incarcerated in isolation units who may be experiencing psychological decline due to the harsh conditions.

24. I reviewed Dr. Marc Stern's October 2, 2019 expert report to the Court. Doc. 3379. Dr. Stern made three recommendations about health care staffing: staffing levels need to be increased; the mix of staff (medical doctors / psychiatrists, mid-levels, nursing staff) should be reconfigured so that the bulk of the work is not pushed on to lower-level staff; and salaries may need to be raised to fill positions. Doc. 3379 at 95-101.

25. In recent depositions, both Centurion and ADCRR mental health leadership confirmed the existence of chronic and significant mental health staffing shortages. Dr. Stefanie Platt, who was Centurion's Regional Director of Mental Health for Arizona until late July 2021, testified that she left her position because "I felt as though I didn't have the resources, support, or communication that I needed to do my job in the manner which I saw fit."[5]  She added:

> We had a strong issue with needing more staff to fulfill the obligations within the court order as well as provide the care that we wanted to. We were […] unable at the time to give monetary incentive for retention, and retention was a huge problem.[6]

Asked why retention was a problem, she testified: "I believe morale was very low. People reported morale to be very low. They indicated feeling overworked and undervalued within the global system."[7]

---

[5] 10/15/21 Deposition Transcript of Dr. Stefanie Platt, 17:11-15.
[6] Id. 18:12-15-18.
[7] *Id*., 31:4-11.

26.     Dr. Platt further testified that "every individual on [Centurion's] regional mental health team," including the Regional Director of Psychiatry Dr. Antonio Carr, expressed the view that there was not enough mental health staff working in the prisons.[8] She testified that an internal Centurion study concluded that there was insufficient mental health staff to comply with the Court's order setting forth presumptive minimum durations of ten and thirty minutes for mental health encounters; "[t]here was not enough staff to be able to see the patients specifically as indicated for those periods of time."[9]  She also testified that mental health staff "were seeing patients within time frame and parameters and often times did not feel as though they had enough time allotted to them to do more -- spend more ample time doing these, creating comprehensive treatment plans."[10]

27.     Dr. Platt testified that turnover among mental health staff prevented the development of therapeutic trusting relationships between clinicians and patients.[11]  She expressed this view to others in Centurion leadership, including Dr. Antonio Carr, the Regional Director of Psychiatry, and Tom Dolan, the Vice President of Operations for Arizona, and "it was shared by everybody that I spoke to in the mental health team."[12]

28.     Dr. Bobbie Pennington-Stallcup is ADCRR's Mental Health Program Director.  In her October 15, 2021 deposition, she described a meeting she held with Centurion's mental health staff at the Eyman prison in the summer of 2021, where staff expressed concern "that there was not enough staff at that time to get their job done."[13] Dr. Stallcup testified that she shared that concern.[14]

29.     In her deposition, Dr. Stallcup also confirmed that in an August 27, 2020 email to defendant Larry Gann and Centurion's Tom Dolan, she listed mental health staff vacancies at Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma, and wrote,

---

[8] *Id.*, 26:24-27:9.
[9] *Id.*, 24:1-25:17.
[10] *Id.*, 96:20-24.
[11] *Id.*, 62:15-20.
[12] *Id.*, 62:21-63:9.
[13] 10/15/21 Deposition of Dr. Bobbie Pennington-Stallcup, 7:14-8:8.
[14] *Id.*, 8:9-13.

1    "There are significant vacancies in clinical mental health staff who are primarily

2    responsible for providing the behavioral health contacts required by the courts in the

3    March 11, 2020 order, the psychologists and the psychology associates."[15]  She testified

4    that she did not recall if she ever received a response from Mr. Gann or Mr. Dolan.[16]

5         30.    Dr. Stallcup also testified that she sent a November 12, 2020 email to Mr.

6    Gann, Mr. Dolan, and Dr. Platt, in which she stated that "The quality of care being

7    provided is not adequate as PMs 80, 86, and 95 were failed the last two months in row at

8    Eyman."  Dr. Stallcup confirmed that she believed the quality of care being provided at

9    Eyman at that time was inadequate.[17]

10        31.    At her deposition, Dr. Stallcup was shown an August 2021 staffing

11   document (ADCRR00137140), which showed no mental health staff at all at the Douglas

12   prison, and vacancies in mental health staffing at Eyman, Florence, Lewis, Perryville,

13   Phoenix, Tucson, and Yuma.  Dr. Stallcup testified that these staffing vacancies concern

14   her, and that she is not satisfied with the level of mental health staffing as reflected in the

15   August 2021 document.[18]

16        32.    This sworn testimony by Centurion and ADCRR mental health leadership

17   reinforces my opinion that unless and until these staffing shortfalls are addressed,

18   incarcerated people with mental illness will continue to suffer needlessly – often resulting

19   in permanent psychological trauma and suffering, physical disfigurement due to profound

20   acts of self-harm and self-injurious behavior, and in the most tragic of outcomes, death by

21   suicide. It is my opinion that the other systemic deficiencies set forth below are rooted, in

22   whole or in part, in ADCRR's chronically inadequate health care staffing.

23

24   _____

25        [15] *Id.*, 21:20-23:13 (Deposition Exhibit 11).
          [16] *Id.*, 23:14-18.

26        [17] *Id.*, 24:5-26:5 (Deposition Exhibit 12). PM 80 requires that patients classified as
     MH 3A be seen at least every 30 days by a mental health clinician.  PM 86 pertains to

27   follow-up of patients who have recently discontinued psychotropic medications.  PM 95
     pertains to removal of patients from suicide watch and follow-up of patients who have

28   recently been removed from suicide watch.
          [18] *Id.*, 28:13-31:6.

### B. Opinion: Systemic Problems in the Delivery of Mental Health Care Continue From The Filing of This Case

33.     My most recent observations and review of the documents confirms that the systemic deficiencies that I have repeatedly brought to the Court's attention since 2013 unfortunately persist to this day, even though Defendants have now had three different contracted health care vendors.[19] These problems include delays in the provision of mental health care and the outright failure to provide mental health care; a lack of access to intensive inpatient mental health care for the most profoundly mentally ill patients; brief, non-confidential, and superficial contacts between mentally ill people and staff; inadequate treatment plans; a failure to coordinate psychiatric and psychology staff in treatment plans; a failure of collaboration between medical and psychiatric providers to treat complex patients; a failure to ensure effective communications with people who do not speak English and/or people with disabilities in therapeutic encounters; a failure to properly administer, monitor, and manage psychotropic medications and their potential side effects; a failure to mitigate and address acts of self-harm; inappropriate uses of force on seriously mentally ill people; and inappropriate and prolonged uses of isolation on people with mental illness. As a result, patients remain highly symptomatic, suffer great psychological torment, and oftentimes continue to engage in acts of self-injurious behavior, or most tragically, die by suicide. I address these systemic problems in turn.

#### 1. Opinion: ADCRR's Chronic Lack of Staffing Leads to an Inability to Provide Adequate Mental Health Care

##### a. Delays and Failure to Provide Adequate Mental Health Treatment

34.     When an incarcerated person requests mental health care, it is of paramount importance that their concerns are addressed in a timely manner. Similarly, patients need to be seen on a regular basis for therapeutic encounters and medication management.

---

[19] I concur in Dr. Stern's conclusion that privatization of health care in the prisons to be carried out by for-profit companies creates an unnecessary barrier to the State providing minimally adequate health care, including mental health care.

35.    For example, when I was at ASPC-Eyman, I interviewed ███ ███ ███ at his cell-front. He complained of experiencing severe anxiety, depression and auditory hallucinations. He said his auditory hallucinations "make me want to curl up in a ball and scream" and "I feel like I'm going insane." He went on to state that he's submitted numerous HNRs about his symptoms and wished to change medications but has not receive a response. A review of his record revealed that he submitted an HNR on 8/28/21 stating "who can I talk to about getting my meds changed?" His HNR was screened by a Registered Nurse the next day who wrote that Mr. ███ was experiencing "[i]neffective coping." He finally saw a "mental health midlevel" staff person on 9/8/21. His medications were the antipsychotic, Abilify, at 15 mg daily and Vistaril. He was prescribed the antidepressant, Remeron, at 15 mg every evening. Other examples of delays in care include ███ ███ ███ (Eyman); ███ ███ ███ (Tucson); ███ ███ ███ (Tucson). *See* Exhibit 2.

36.    The mortality review conducted by ADCRR after the death by suicide in ███ of █-year-old ███ ███ ███ found that "delay in access to care" was a contributing cause of his suicide. My review concluded that the significant delays in psychiatric care after he reported severe psychiatric symptoms fell far below the standard of care. *See* Exhibit 3.

37.    A key component of mental health care for seriously mentally ill people, especially those in institutional or carceral settings, is group therapy and programming. As I noted in my November 2013 report,

> An adequate correctional mental health care system must provide a full range of treatment modalities; a system that relies primarily or exclusively on medication does not provide an acceptable level of care. It is my opinion that the ADC mental health care system relies almost exclusively on medication (which it fails to provide reliably or appropriately), and does not provide an appropriate level of non-medication mental health programming. I spent eight full weekdays inspecting seven ADC prison complexes, including the units where the most severely mentally ill prisoners are housed. At every facility, I was surprised to see little or no mental health programming. …This is an extraordinary experience that I do not recall having in any other prison system."

Doc. 1104-2 (Nov. 2013 report) at 37-38.

38.    Group mental health programs are an important component of the treatment modality for populations of people with mental illness, behavior disorders, or serious mental health symptoms. They are an incredibly effective tool because it is not just a one-on-one therapy session, but rather the individual has a whole group of other people who give feedback and point things out, and the patient can hear others' experiences and not feel so isolated or alone. It is powerful for people to get feedback from their peers, and learn to develop empathy for their peers.

39.    This failure to have group mental health care hasn't changed. Many people I spoke to who had recently been in a behavioral management unit at Florence Kasson (which closed on September 7, 2021, before my tours), reported that out-of-cell groups had been cancelled for a year and a half, in part because ADCRR used the unit to isolate non-mentally ill people who were positive for or exposed to COVID-19. Defendants' records show programs cancelled due to COVID-19 **and** "staffing levels at Kasson:

| Time | Date | Location | | |
|------|------|----------|--|--|
| 0600 | 04/18/2020 | CB6-Kasson | | |
| | | **Summary** | | |
| Summary | | | | |
| On 04/18/2020 COIII program classes, mental health classes and SMI unstructured time were cancelled for the week due to the COVID-19 pandemic. All affected OOC forms will reflect the cancellations and recreation will continue as scheduled. | | | | |
| Employee's Signature | | | Title | |
| | | **Action Taken** | | |
| Comments/Action Taken | | | | |
| COIII program classes, mental health classes and SMI unstructured time were cancelled due to the COVID-19 pandemic. The hours required to meet the PVS standard with the staffing levels at Kasson are not be possible with the days left of the week in order for the activities to be made-up. | | | | |
| Employee's Signature | | | Title | |

| Summary |  |
|---|---|
| **Summary** |  |
| On 06/19/2021 COIII program classes, mental health classes and SMI unstructured time were cancelled for the week due to the COVID-19 pandemic. All affected OOC forms will reflect the cancellations and recreation will continue as scheduled. |  |
| Recreation is being offered in 10x10 recreation enclosures to all inmates. |  |
| Employee's Signature | Title |
| **Action Taken** |  |
| Comments/Action Taken |  |
| COIII program classes, mental health classes and SMI unstructured time were cancelled due to the COVID-19 pandemic. The hours required to meet the PVS standard with the staffing levels at Kasson are not be possible with the days left of the week in order for the activities to be made-up. |  |
| Employee's Signature | Title |

Source: ADCRR00054287, 4/18/20; ADCRR00055785, 6/19/21.

40.    On September 8, 2021, at ASPC-Eyman, I spoke with ▇▇▇▇ ▇▇▇▇ ▇▇▇▇ who is diagnosed with schizophrenia and is housed in a maximum custody behavioral management unit designated for people with serious mental illness. He complained that there was no group mental health programming. Of note, his medical record has a discrepancy – one entry from 8/24/21 says he attended group therapy while another that same date says that group programming was cancelled due to staffing shortages. *See* Exhibit 2.

41.    Multiple other people at Eyman reported there had not been any groups until a week or two before my visit. A review of medical records of class members show that week after week group therapy sessions were "cancelled due to Centurion staff shortage." *See, e.g.* ▇▇▇▇ ▇▇▇▇ ▇▇▇▇ (8/31/21 15:01 note; 8/24/21 16:34 note); ▇▇▇▇ ▇▇▇▇ ▇▇▇▇ (8/31/21 15:14 note; 8/24/21 16:46 note).

42.    In my 2013 report, I noted that some mental health groups were being run by persons with little or no mental health training. Doc. 1104-2 at 38 (citing testimony that some groups were run by psych techs, who may have no formal education beyond a high school diploma). Their titles are now "Behavioral Health Techs" but to the extent

there are group programs happening, that's who leads them. It is my opinion that mental health groups should be led and coordinated – at a minimum – by licensed masters' level psychology associates.

43. People at Perryville Lumley's BMU and Eyman Browning's BMU – both housing units supposedly designated for people classified SMI –reported that to the extent there were any out of cell group therapy or programming, it was led by BHTs or custody officers, and often consisted of watching DVDs of TV shows and movies.

### b. Access to Inpatient Intensive Mental Health Care

44. An adequate correctional mental health system must provide a full continuum of care - from outpatient counseling and medication, through inpatient hospitalization. It is entirely foreseeable that the most severely mentally ill prisoners will require an inpatient level of care, and such care must be readily available.

45. I noted in 2013 that "ADC lacks a reliable system to ensure that prisoners needing a higher level of mental health care are transferred in a timely fashion to appropriate facilities." Doc. 1104-2 at p. 40. I again described this in 2016. Doc. 1538-1 at 86-87. And it continues today. This includes people who need to be transferred to ASPC-Phoenix, the prison facility located on the campus of the Arizona State Hospital, that incarcerates male class members with the highest mental health acuity scores (MH-4 and MH-5). During my inspection tours, I saw numerous patients who needed an inpatient level of care, but had not been transferred to such a placement.

46. When I visited ASPC-Phoenix on September 23, 2021, I was struck by how empty the intensive mental health units at Flamenco and Baker Units were. The Baker Unit, which historically was where some of the most profoundly mentally ill max custody level prisoners are housed, including while on suicide watch, was mainly filled with people on quarantine or isolation due to COVID-19 exposure or infection. Only one-third of the inpatient mental health beds in the prison were occupied that day, as seen below:

//

//

| Unit | Capacity | 9/23/21 Pop. | % Beds Filled |
|---|---|---|---|
| Baker Ward | 48 | 24 | 50% |
| Flamenco – Ida Ward | 25 | 14 | 56% |
| Flamenco – Ida Watch | 15 | 0[20] | 0% |
| Flamenco – John PS | 30 | 9 | 30% |
| Flamenco – King Ward | 35 | 9 | 26% |
| Flamenco – George Ward | 20 | 7 | 35% |
| **All MH-5 Beds** | **173** | **63** | **36%** |

Source:
https://corrections.az.gov/sites/default/files/DAILY_COUNT/Sept2021/09232021_count_sheet.pdf

47.    Yet there were many people who I observed at other prisons who are desperately in need of an inpatient level of care, but inexplicably had not been transferred to Phoenix. For example, ███ ███ ███ is SMI and appeared multiple times on ADCRR's self-harm logs in 2021 for self-injurious behavior while housed at Florence-Kasson Unit. He has past diagnoses of paranoid schizophrenia and anxiety, but currently has a diagnosis of unspecified bipolar disorder. He was in the mental health watch unit at Eyman-Browning when I visited on September 8, 2021. He was on continuous watch, naked except for a suicide blanket wrapped around his waist, and was laying on the cement floor by the door. He was extremely disheveled and reported experiencing command hallucinations ordering him to hurt himself. Mr. ███ is a patient I interviewed for my 2013 report (*see* p. PRSN-PS 00186 of Nov. 2013 report) and his appalling mistreatment continues to this day.

48.    Mr. ███' medical record documents that in recent months, he has shown an escalating and extremely dangerous pattern of self-harm, which has not been appropriately recognized or responded to by mental health staff. On 6/28/2021 there was a crisis response when Mr. ███ cut himself on the arm using a "small spring" from his

20 

water bottle. Later he was agitated and yelling at staff. On follow-up on 6/29/2021, the patient endorsed "10/10" on urges to harm himself. He then spit on the social worker, leading to a throw shield being placed in front of his cell. The psychiatric provider on 6/30/2021 documented a "non-clinical contact note" due to the patient's refusal to attend the appointment; the provider visited his cell to confirm refusal of appointment. The record contains no record of the psychiatric provider's impressions given the recent "ICS" activation and the patient's escalating behavior.

49.     On 7/13/2021 Mr. ██████ cut himself three times on the left forearm using a piece of metal. A follow up mental health visit on 7/14/2021 documented suicidal ideation. Further ICS responses were called on 7/17/2021, 7/18/2021 (three times), 7/21/2021, 7/26/2021, 7/29/2021, and 8/2/2021, all for continued self-harm. On 7/18/2021 Mr. ██████ re-opened an old scar on the left forearm which was "2 inches in length and about 1/8-1/4 deep (the depth of the scar mainly)." A follow-up ICS response noted him saying he may cut again later that night, which he subsequently did with a "small rock".

50.     On 7/26/2021 Mr. ██████ was found hanging in his cell with both feet off the ground. He was taken down by officers and found breathing, but not responding. After suicide watch on 8/2/2021, Mr. ██████ was agitated toward staff. Weeks later, on 8/17/2021, he was seen by a psychiatric prescribing provider who only documented "non-clinical provider notes" without adequate assessment, and renewed existing medications. The 8/17/2021 note contains no documentation of an assessment in light of Mr. ██████' recent serious self-harm by hanging. He remained in an "outpatient-specialized MH program," but considering his serious and escalating self-harm, this is an inappropriate level of care.

51.     This patient is receiving highly inadequate and dangerously deficient care. He has engaged in self-harm on multiple occasions leading to crisis response by staff. Despite the escalating severity of his self-harm, he did not receive appropriate psychiatric assessment or change in treatment, with the result that his self-harming behavior continued. His escalating behavior led finally to him being found hanging, feet off the

ground, and unconscious, which could well have resulted in his death. Furthermore, all contact by a psychiatric provider was logged as "non-clinical contact note," despite the provider having seen the patient. In these notes, there was no mention of his escalating self-harm or suicide attempt. Rather, the assessment and diagnosis sections of the notes were left blank, with an inadequate plan. He is at very grave risk of serious injury or death. He should be urgently transferred to an inpatient hospital setting.

52.   Another example is ███████ ███████ who was on suicide watch at ASPC-Eyman on September 8, 2021. I spoke with Mr. ████ in a confidential setting. He has a long history of psychiatric impairments and an extensive history of self-injurious behaviors and suicide attempts. He cuts himself as a way of relieving stress. At the time of my interview, he informed me that he was previously treated with the mood stabilizer, Trileptal, which significantly reduced his incidence of cutting. He stated that he was told by ADC staff that he couldn't be on Trileptal because "inmates abuse it." He recently had a serious incident of cutting himself which required his being sent to an outside hospital. He had numerous bandages on his arms and legs, and reported that he was hospitalized after losing a significant amount of blood after cutting near his femoral artery. I was so concerned about his risk of further injury or death by suicide, that I requested that Plaintiffs' counsel notify attorneys for ADCRR and Centurion that evening of Mr. ████'s need to be immediately transferred to inpatient mental health care and evaluation of his medication by a psychiatrist. Plaintiffs' counsel sent an email that night at my direction, stating:

> Mr. ████ harmed himself again yest███er arriving to Browning, despi██ on a constant watch. Mr. ████ reports that in the past other providers had diagnosed him with ███renia and psychosis; his medical record shows that in November 2018, his active diagnosis was changed to border█████onality disorder. He is prescribed 40 mg QD of Pantoprazole. Mr. ████ last saw "psychiatry midlevel" staff on 7/7/21, when he asked for ████ because it had helped him in the past with his urges to hurt himself. The treating clinician wrote that he reported mood swings, anxiety at a level of 7, depression at 7, auditory and visual hallucinations, but she wrote that she would not prescribe it because Trileptal is not formulary and not FDA approved for his diagnosis of borderline personality disorder. His medical record shows that the last time

he was evaluated by a psychiatrist (M.D.) was 11/21/18 via telemedicine; and he was seen on July 2017 in person by a psychiatrist.

9/8/21 Email from C. Kendrick to Defendants' Counsel, "Patients in Acute Need of Psychiatrist Reevaluation and Higher Levels of Care".

53.     Defendants disregarded my warning and did not refer him to a prescribing psychiatrist, nor evaluate him for transfer to ASPC-Phoenix. Of note, he had a new incident of self-injury on 9/14/21, one week after I notified Defendants and their attorneys. At that time, he reopened a partially healing wound. A very inadequate treatment plan was prepared by a psych associate the next day that failed to mention anything about possible medication modification options. The complexity of this case clearly exceeds the skills of a psych associate, and represents extremely poor care. Mr. ███████ needs to be transferred to a higher level of care and be thoroughly evaluated for psychotropic medications.

54.     ████████ ████ ████ is another patient who has been able to hurt himself repeatedly while on suicide watch. I interviewed Mr. ████ in a confidential setting at Browning's mental health watch unit. He is a 32-year-old man with numerous hospitalizations for self-injurious behavior, including cutting open his abdominal cavity in 2019, and previously attempting to cut his own throat. Mr. ████ informed me that he experiences visual hallucinations and occasionally auditory hallucinations. His current mental health diagnosis is Schizoaffective Disorder, bipolar type. He was moved from Kasson MHW to Browning on September 7, 2021, the day before our interview. His medical record shows that he had been most recently hospitalized on September 4, 2021, after cutting a 7-inch long by one-inch-deep laceration to his right arm, swallowing three razor blades, and inserting three spork handles into his abdominal scar – ***all while on continuous watch at Kasson***. He was also hospitalized on August 5, 2021, after swallowing foreign bodies while on continuous watch at Kasson. On July 14, 2021, the "psychiatry midlevel" staff wrote that "Patient does not respond to medications and continues to self-harm regardless of therapy and medication interventions," but there is no

indication that he has been evaluated for transfer to inpatient mental health care at Phoenix. Mr. ███ is another patient for whom I am extremely concerned, and at my direction, counsel for Plaintiffs contacted ADC's and Centurion's attorneys to request that he be evaluated without further delay for transfer to ASPC-Phoenix. As of October 1, 2021 (the last date I reviewed his record), he was still at Eyman.

55.    The reason for this disconnect and this practice of keeping the inpatient population at ASPC-Phoenix so low is not explicitly stated by ADCRR or Centurion, but it is my opinion that it is rooted in the limited number of mental health staff contracted to work and who actually work at ASPC-Phoenix – these patients require very frequent and ongoing treatment; to the extent that when there are vacancies in mental health staff as at Paragraph 19, there are parallel vacancies in the number of filled beds.

56.    Similarly at Perryville, when I visited the inpatient treatment mental health unit on September 10, 2021, only 7 of 16 beds were occupied.[21] I spoke with women who had been moved to general population or mental health step-down units who reported that while they felt they had received adequate treatment in the inpatient facility, they did not feel stable enough to leave, and history had proven that they would decompensate in general population and cycle back to the more intensive mental health care units. *See*, for example, ███ ███ ███ in Exhibit 2. There are other examples of patients who clearly need a higher level of care than they are receiving. For example, both the mortality review and the psychology autopsy following the suicide of ███ ███ ███ concluded that more timely access to a residential level of care would have been helpful to Ms. ███ *See* Exhibit 3.

### c.  Brief and Superficial Contacts with Mental Health Care Staff

57.    In his October 2019 report, the Court's expert, Marc Stern, M.D., identified the issue of "very short mental health visits (some as short as 5, 3, or 2 minutes)." Doc. 3379 at 28. Dr. Stern concluded that "some of the short visits are too short to be clinically

---

[21]    *See*   https://corrections.az.gov/sites/default/files/DAILY_COUNT/Sept2021/09102021_count_sheet.pdf.

effective, and in the context of the cases, place patients at significant risk of substantial harm." Doc. 3379 at 31. He further concluded that "care delivered during many of these short visits was not safe." Doc. 3379 at 32 n. 24. Having reviewed a number of very short mental health encounters with ADC prisoners, I agree with Dr. Stern's conclusions.

58.     *Mental health diagnosis and treatment take time.* A meaningful encounter with a patient with mental illness requires documentation of their subjective experience of their illness since the last encounter. The clinician must document the course of treatment since the last encounter, including responses to medications and/or therapy and any side effects from the medications, and perform a comprehensive mental status examination as well as a safety check about potential self-harm and harm to others. Finally, the clinician should make a diagnosis and a plan for further treatment.

59.     Mental health professionals interact with patients for a variety of purposes. But one indispensable task the professional must carry out in *every* encounter is a meaningful assessment of the patient's condition and prognosis, including any risk of harm to the patient. This is particularly critical when the patient has already been identified as someone at risk of self-harm or suicide.

60.     It is simply not possible to assess a patient and determine their risk of self-harm or suicide in an encounter lasting five, three, or two minutes. Such an assessment requires more than literally "seeing" a patient; it first requires establishing a therapeutic relationship. Only after this relationship is established is a mental health clinician able to effectively assess the patient. This is especially important when a clinician must evaluate a patient's risk of self-harm or suicide, or, as is the case in ADC, when there is little continuity or turnover, and the patient is seen by different mental health staff from day to day. For example, the psych autopsy for the suicide of ███ ██ notes that he "never had more than three contacts with the same psychiatric provider due to being transferred to other complexes" (*see* Exhibit 3).[22]

_____

[22] Dr. Leonel Urdaneta, a psychiatrist who was Director of Psychiatry for Corizon

61.     Dr. Stern used "10 minutes or more as an acceptable visit length" for PMs 91, 94, and 95, all of which involve "management of patients during or after placement on watch (due to acute psychotic or suicidal states)." Doc. 3379 at 29, 32. I concur with Dr. Stern, it is my opinion that the absolute minimum permissible length of an encounter to determine a patient's risk of self-harm or suicide is **ten minutes**.[23]

62.     Dr. Stern writes that "I would expect encounters in the non-acute setting when chronic care is being provided to generally be longer (in the range of 30 to 60 minutes) than those in the acute watch-related setting when very narrowly focused care is being provided." Doc. 3379 at 32 n. 25. I agree with Dr. Stern. Meaningful mental health treatment requires establishing a therapeutic relationship, evaluating the patient including assessing their risk for self-harm, arriving at a diagnostic assessment, assessing the effectiveness of previous treatment strategies, and providing the most efficacious treatment possible. It is difficult, if not impossible, to accomplish these goals in less than 30 minutes. Accordingly, it is my opinion that **30 minutes** is the minimum acceptable duration for the mental health encounters required by PM 73, 74, 76, 78, and 80-90.

63.     In its March 11, 2020 order, the Court established a presumptive minimum length of ten minutes for mental health encounters pursuant to what it called "watch-related PMs:" PMs 91, 94, and 95. The Court further established a presumptive minimum length of thirty minutes for mental health encounters pursuant to what it called "non-watch-related PMs:" PMs 73, 74, 76, 78, and 80-90. Doc. 3518. However, dangerously brief encounters continued notwithstanding the Court's order. In my declaration of August 14, 2020, I described a number of patient encounters that were so brief and superficial as to place the patient at a significant risk of serious harm:

---

(ADC's previous health care provider) in Arizona between 2017 and 2019, testified that it is not possible to assess a patient's risk of suicide in a cell-front encounter lasting five, three, or two minutes. Deposition of Leonel Urdaneta, M.D., December 10, 2019, Doc. 3476-1, pp. 18-19, 68-69.

[23] Ten minutes is extremely conservative. By way of comparison, the Illinois Department of Corrections requires that daily mental health contacts with persons on watch "shall be at least 15-20 minutes in length per person." Doc. 3511 at 3-4.

- ████ (PM 80, Perryville, April 2020 CGAR, April 7, 2020): This was a **1 nute** meeting. The documentation was extremely terse with a majority of it being computer generated. The patient was currently being prescribed two psychotropic medications, Fluoxetine and Clonidine. No mention was ever made about these medications. There was also no mention about the patient's depression and anxiety. The plan was "continue medications." No mention of psychotherapy, psycho-education, or any other types of therapeutic interventions.

- ████ (PM 80, Perryville, April 2020 CGAR, April 20, 2020): This was a **1 nute** meeting due to the patient allegedly not wanting to stay longer. The documentation regarding the visit was extremely terse with no meaningful interactions occurring. Certainly, no counseling occurred. Again, most of the documentation was computer generated.

- ████ (PM 80, Perryville, April 2020 CGAR, April 9, 2020): This was a **nute** interview because the patient allegedly refused a longer session. During this one-minute interview a computer-generated mental status exam was completed. The assessment portion of this 1-minute interview stated "IM denies SI/HI/command AVH [suicidal ideation/homicidal ideation/command auditory-visual hallucinations]. IM guarded but was observed pleasant with other staff and generally stable." The patient is actually prescribed an antipsychotic, an antidepressant and a mood stabilizing medication. No mention was made about the three psychotropic medications she was prescribed. The fact that the patient was noted to be "guarded" could be due to paranoia, an insidious onset of a serious mood episode or the fact that she actually was psychotic. This is an example of a completely inadequate mental health visit and left the patient at risk for serious harm. If a patient refuses to talk, or wishes to terminate the interview after one or two minutes, it is not acceptable for the clinician to simply walk away. The clinician should make repeated efforts to engage with the patient and encourage her to talk. And even if the patient refuses to talk, the clinician is still required to assess her, including evaluating the patient's risk for self-harm or suicide. This can be accomplished in a number of ways, including observing the patient's hygiene; the cleanliness of the cell; and the patient's demeanor, such as whether she is displaying overt signs of mental illness such as posturing or responding to internal stimuli. These essential steps cannot be performed in a visit lasting one or two minutes.

- ████ (PM 80, Perryville, April 2020 CGAR, April 21, 2020): This was a **minute** meeting that was as vacuous as the encounters described above. Of note, this patient was prescribed the antipsychotic Geodon. This medication requires that it be administered with food in order to ensure proper absorption. This is not an esoteric fact, but rather a commonly known issue surrounding the use of Geodon in correctional settings. No questions were brought up about the patient taking this medication with food. This fact alone places the patient at serious risk of harm.

- ████ (PM 80, Perryville, April 2020 CGAR, April 23, 2020): This was a **minute** interview. Of note, the patient is a 70-year-old female, housed in the infirmary, with a stated complaint of "patient is experiencing psychiatric destabilization to the extent **she is unable to respond**" **(emphasis added.)** The clinician documented that the patient was communicating with nonverbal responses. Even with the patient unable to

give verbal responses, the clinician somehow divined that the patient was not experiencing psychotic symptoms or suicidal/homicidal ideations. The patient was also prescribed the antipsychotic Olanzapine 15mg every morning. She was also receiving opiate pain relievers. No mention was made of the possibility that these very powerful medications could be contributing to the patient's inability to respond. This clinical visit is completely inadequate and places the 70-year-old patient at serious risk of harm. Of note, this patient should be seen regularly by a psychiatrist, preferably a neuro-psychiatrist.

- ████████ (PM 80, Yuma, May 2020 CGAR, May 7, 2020): This was a **four-**interview. The patient suffers from a mood and psychotic disorder for which he is prescribed an antipsychotic and an antidepressant. The overall visit was very superficial given the severity of the patient's psychiatric issues. The writer stated that the patient denies S/H ideations, hallucinations, issues with depression and anxiety, and issues with eating and sleeping. No inquiry was made about the patient's medications including efficacy, side effects or compliance. The superficial nature of this encounter places the patient at risk of harm, especially medication-related problems.

- ████████ (PM 80, Yuma, May 2020 CGAR, May 12, 2020): This was a **minute** encounter with a patient who is diagnosed with Bipolar Disorder and is prescribed an antidepressant and antipsychotic. The clinician documented the patient denies S/H ideation and hallucinations. A computer-generated mental status exam was completed even though the patient "refused services." No documentation about the status of the patient's Bipolar Disorder was present. Also, there was no mention about the medications. It is possible that the refusal to be seen reflects undertreated Bipolar Disorder. Lastly, the stated plan was "will be seen W/I 30 days or HNR request." This is an extremely inadequate clinical encounter.

- ████████ (PM 94, Phoenix, April 2020 CGAR, April 12, 2020): This is a **minute** encounter with a patient on suicide watch who is diagnosed with PTSD and unspecified Schizophrenia spectrum and other psychotic disorder. The patient is also prescribed high doses of a mood stabilizer and an antipsychotic. The clinician only documented that the patient "denied DTS/DTO/AVH;" was "not reacting to any internal stimuli;" and was "eating ok." A computer-generated mental status exam was not completed due to lack of time. No mention of the patient's medication was found in this encounter. This is another example of a very inadequate clinical encounter which places the patient at risk of harm.

Doc. 3704-2, at 5-8 (August 14, 2020). *See also* Doc. 3694-2 (identifying numerous mental health encounters lasting five minutes or less); Doc. 3784-1 (same).

64.    In addition, I concluded that brief and superficial mental health encounters were a contributing factor in the suicides of at least five people in ADC custody. *See* Exhibit 3's discussion of the suicides of ████ ████ ████ ████ ████ ████ ████ ████ ████ and ████ ████

65.     These extremely brief mental health encounters continue to the present time. Examples include ███ ████████ ██████ 9/29/21 (2 minutes), 9/25/21 (2 minutes); ██████ ████████ 8/29/21 (2 minutes), 8/27/21 (2 minutes); ██ █████ ██████ 9/29/21 (3 minutes), 9/24/21 (3 minutes), 9/22/21 (3 minutes); 9/21/21 (3minutes); and ███ ████ ██████ 9/17/21 (3 minutes).

66.     It is my understanding that some of these very short encounters with mental health staff are justified on the ground that the patient asked to terminate the encounter. However, such a request does not mean that the length of the encounter was appropriate. A patient may ask to terminate an encounter precisely because she is in distress. This does not mean that the patient does not need further attention from mental health staff; in many cases, it means exactly the opposite. In addition, in understaffed correctional mental health systems, mental health staff may communicate, either subtly or overtly, that they are in a hurry and need to move on to the next patient, which may lead the patient to agree to terminate the encounter.

67.     It is not acceptable for a mental health clinician to reflexively acquiesce in a patient's request to terminate the encounter. The clinician should make repeated efforts to engage with the patient and encourage him or her to talk. And even if the patient refuses to talk, the clinician is still required to assess and observe the patient, including evaluating his or her risk for self-harm or suicide. This can be accomplished in a variety of ways. The clinician should first observe the patient's hygiene. That is, is their personal appearance including clothing relatively neat or are they dirty, disheveled and malodorous? The cleanliness of the cell is also important to note. Again, is it relatively clean or are there food wrappers and other trash items strewn about the cell? Is the toilet flushed or is it backed up with feces, urine or trash? Next the clinician should carefully observe the patient to determine if they are displaying any overt signs of mental illness such as responding to internal stimuli. If after the clinician has performed this comprehensive observation and has repeatedly attempted to engage the patient in conversation and they still cannot determine the patient's degree of suicidality, then the patient should be

maintained on constant suicide watch status.

68.     If the clinician spends less than 10 minutes (with a patient on suicide watch or in a post-watch follow-up encounter) or less than 30 minutes (with a patient receiving treatment), the clinician must still document the length of the encounter; the reasons why the session was shorter than required; and a detailed assessment of the patient, including risk of self-harm. A cursory note to the effect that "patient was agitated" or "patient waved me away" falls far below the standard of care and is unacceptable.

### d. Lack of Confidentiality/Cell-front Encounters

69.     There is a related issue that must be addressed: the very frequent use of cell-front encounters by mental health staff. Confidentiality of the interaction between patient and clinician is essential to the provision of effective mental health treatment and assessment of the patient's risk. Even more than a clinician treating physical ailments, a mental health clinician must rely on full and frank disclosure by the patient of her symptoms, thoughts, and feelings. If the patient withholds information because of a fear that they will be overheard, the clinician may be unable to establish a therapeutic relationship, make an accurate diagnosis, or effectively plan treatment. In less serious cases this will lead to erroneous diagnosis and ineffective treatment; in more serious cases it may lead the clinician to miss critical warning signs of impending self-harm or suicide.

70.     In his report, Dr. Stern concludes that "Cell-front visits during watch are, unfortunately, very common at ADC." Doc. 3379 at 29 n. 20. He explains:

> [C]onducting [mental health] encounters in a confidential space is of paramount importance for patients on watch because it helps ensure that the patients share complete and accurate information with the clinician, information which is key to assessing risk. Unfortunately, a very high percentage of the watch-related encounters I reviewed were conducted at the cell-front (i.e. non-confidentially).
>
> * * *
>
> Inadequate assessments can result in one or more of the following errors: (1) inappropriate initial assignment to a particular level of watch (i.e., constant observation, 10-minute checks, 30-minute checks); (2) inappropriate promotion to a less intense level of watch; (3) failure to provide adequate treatment or resolution of factors which contributed to the need to be placed in watch.

Doc. 3379 at 121.

71.     Dr. Stern then cites a case in which the repeated use of cell-front encounters with a patient on suicide watch contributed to the patient being placed "at a significant risk of serious harm." Doc. 3379 at 121-22.

72.     While it is my understanding that patients are required to be offered the opportunity to leave their cells to speak with mental health staff in a confidential setting, Dr. Stern explains that ADC policy may discourage patients from doing so:

> [T[he policy of shackling patients when taking them from their cells to private rooms to meet with the mental health clinician merits scrutiny. Currently patients on watch are housed in living units designated as high level of custody. Many, if not most, of these patients do not meet the criteria of high custody. However, they are still subjected to the requirements of high custody (notably shackling before removal from the cell). It is likely that the prospect of having to be shackled serves as a deterrent to agreeing to be taken out of their cell. It is also possible that CO and mental health clinician staffing levels would need to be adjusted because transferring a patient from his or her watch cell to a confidential setting is more time-consuming than cell-front encounters, not only because the transfer takes time, but also because the encounters are likely to last longer.

Doc. 3379 at 123.

73.     The people with mental illness who I spoke with at Eyman Browning and SMU-I overwhelmingly told me that due to the onerous security practices that were in effect every time they left their cells, including strip searches and in some cases body cavity inspections, and being uncomfortably chained at their hands and ankles, that to the extent they were even offered a confidential setting for a mental health encounter, they always refused and said that a cell-front was acceptable. That said, they also indicated that because they were speaking to mental health staff cell-front, normally within earshot of other incarcerated people and correctional officers, they normally self-censored and would not report problematic side effects or symptoms.

74.     Many of the very short mental health encounters I came across in my record reviews – including all of those set forth in III.B.1.c above – occurred at cell-front. Many of these encounters involved desperately ill people –– precisely those who are most in

1  need of unimpeded, confidential communication with mental health professionals so that

2  their illness can be diagnosed and treated.

3      75.    I am also concerned about the inadequacy of the "health and welfare

4  checks" that are conducted on people housed in isolation. The ADC Mental Health

5  Technical Manual requires:

6      All patients (regardless of mental health score) housed in restrictive housing
       shall receive a health and welfare check at least weekly by mental health or
7      medical staff (not to include LPNs).

8      Mental health staff or medical staff (not to included LPNs) shall perform a
       health and welfare check on all SMI patients in restrictive housing three (3)
9      times a week.

10  Chapter 3, Section 8.0, "Mental Health Service Delivery In Restrictive Housing."

11      76.    These periodic clinical rounds function as a mentally ill prisoner's lifeline

12  when he or she is housed in isolation. These encounters are crucially important to ensure

13  that if a prisoner is decompensating, the problems are identified and steps are taken to

14  move him or her to a mental health crisis bed in a clinical setting, and increase monitoring

15  to reduce the likelihood of self-harm or suicide. In order to determine if a prisoner is

16  showing signs and symptoms of a serious mental disorder, there must be meaningful

17  communication between the mental health staff and the patient, and the person performing

18  the rounds must be competent to evaluate the patient for signs of decompensation.

19      77.    The MHTM sets forth no guidance on how these rounds are to be

20  performed, and no minimum qualifications for the persons performing them, except that

21  they must be "mental health staff or medical staff (not to include LPNs)." It appears that

22  in practice these checks are often performed by a "Behavioral Health Technician" or a

23  "Mental Health Clerk." It is not apparent to me that these persons are qualified, or receive

24  any training, to conduct these critically important monitoring visits. Most of the notes

25  from these encounters are extremely superficial – for example, indicating that the patient

26  gave a "thumbs up" sign. In some cases, it is unclear whether the staff person even spoke

27  to the patient. Such encounters are entirely inadequate to determine whether a patient is

28  decompensating under the stresses of isolated confinement.

### 2. Opinion: Inadequate Treatment Plans and Failure To Coordinate Care Between Psychiatric and Mental Health Staff, or With Medical Providers, Puts People at Risk of Harm

78. An adequate treatment plan is the foundation of minimally effective mental health treatment. A treatment plan must be formulated by key members of the treatment team; it must be regularly updated to reflect changes in the patient's condition; and it must be readily accessible when treatment is rendered. The treatment team plans I reviewed do not meet minimum standards. In most cases it reflected no involvement by or input from the psychiatrist. If the patient's treatment includes psychotropic medication – which was the case in virtually every chart I reviewed – this is a serious omission. More generally, the treatment plans were often incomplete, with key information missing.

79. For example, at Tucson Rincon's suicide watch unit on September 9, 2021, I attempted to speak with ███████ ██████ ██████ who appeared severely depressed. He was sitting in his cell staring at the floor, had a very flat affect, and refused come out to speak to me. His medical record showed that the day before I saw him, there was an emergency ICS response where he was brought to the suicide watch unit on a restraint chair, and reported to staff that he was "not feeling me in my head, I can't sleep." Affect for this encounter was described as "flat". Individual counseling session on 9/17/2021 noted mental status exam with stable affect and mood despite in assessment sharing "he is diagnosed with Major Depression, congruent with his presentation." And this encounter note acknowledges the patient being on Lamictal and Risperdal which are "incongruent with his reported symptoms." The patient was described as having "anxiety and depressive symptoms." His varied diagnoses have included: Other specified schizophrenia spectrum and other psychotic disorders, Unspecified Schizophrenia, Unspecified Adjustment Disorder, Unspecified Mood (Affective) Disorder, and Major Depressive Disorder, Recurrent, Moderate Severity. The last psychiatric prescriber mid-level assessment was on 8/10/2021. The diagnosis at this visit was "Unspecified Mood (Affective) Disorder), with a follow-up with the psychiatrist set for 90 days. This case

desperately calls out for a detailed team collaboration between psychiatry providers and psychology staff (and with the patient's input), because his diagnoses of underlying illness keeps changing, and there is disagreement between the treatment team as to the cause of the symptoms, which affects what treatment modalities are most appropriate or which medications can address his symptoms.

80.     ████ ████ ████ at ASPC-Eyman is another example of no apparent coordination between the psychologist and psychiatrist. I attempted to interview Mr. ████ at cell front on 9/8/21. Upon approaching his cell, I noted that he was pacing while shouting at non-existent individuals, displaying rambling and incoherent speech. After many attempts, I was unable to engage him in a proper interview. A review of his records revealed that his most current diagnosis is Schizoaffective Disorder, unspecified type, dated 6/11/18. His medication is a low dose of the antipsychotic Abilify, 5 mg twice a day. A psychiatric progress note from 8/19/21 noted that Mr. ████ has tangential thought processes, delusional thought content, paranoia and auditory/visual hallucinations. The note did not contain any discussion about augmenting the antipsychotic treatment. Finally, a treatment plan dated 9/1/21 noted Mr. ████' psychosis but did not mention anything about referring him back to the psychiatrist for a medication adjustment. This represents poor care due to the patient being highly symptomatic and nothing being done to address these psychotic symptoms.

81.     There also was a lack of coordination between psychiatry and psychology staff in the treatment of ████ ████ ████ I spoke to Ms. ████ at a mental health step-down unit at ASPC-Perryville on September 10, 2021. She had recently come off of mental health watch after experiencing suicidal ideation and cutting herself. She reported that she had engaged in acts of self-harm and hurting others in response to auditory hallucinations since she was 14 years old and living in probation and foster care group homes. Her arms were covered with fresh and healed cut marks. Her medical record showed numerous differing diagnoses, including Unspecified Adjustment Disorder, Unspecified Mood (Affective) Disorder, Chronic PTSD, and Borderline Personality

Disorder. She had a midlevel psychiatric provider evaluation on 8/2/21 the day after one act of self-harm. The patient was noted to be receiving "treatment adequate in managing mood and psychiatric symptoms". Furthermore, on the 8/2/21 and all future mid-level psychiatric prescriber documentation, there is no mention of any other diagnosis other than Unspecified Mood Disorder. In the assessment sections of these notes, there was no effort to explain how diagnosis relates to self-harm behavior. On the contrary, the psychology team's concurrent notes share different diagnoses which include PTSD and Borderline Personality Disorder. Ms. ▮▮▮▮ has multiple diagnoses and different providers on the same team have different diagnoses for her. There appears to be no multidisciplinary team discussion or collaborative treatment of her care. Furthermore, the psychiatric prescriber does not provide adequate documentation explaining how self-harm behavior relates to the listed diagnoses for that encounter. Medications are tailored to diagnosis, and if the diagnoses are not accurate and/or do not reflect the opinions of the whole treatment team, care can remain deficient.

82.     Other examples include:



*See* Exhibit 2.

83.     A related problem is the need for coordination between medical and mental health staff in patient care. For example, I interviewed ▮▮▮ ▮▮▮ ▮▮▮ at ASPC-Phoenix Flamenco Unit on September 23, 2021. He presented as responding to internal stimuli. When I asked if he were hearing voices, he stated that he still hears voices and that they still tell him to hurt himself. He stated that he suffers from Schizophrenia and diabetes. He went on to say that he isn't taking any antipsychotic medication due to the complications with his diabetes. A review of his record revealed that his current diagnosis

is "Schizophrenia, unspecified." He also suffers from Type 2 diabetes for which he receives the oral hypoglycemic agent, Metformin, 1000 mg twice a day. At the time of my interview, he had not taken any antipsychotic medication for over six weeks. The most recent blood test for his diabetes was obtained on 8/18/21. His HbA1c which reflects his blood sugar levels was 7.7 (4.1-6.5 is normal). Given his active psychosis and his issue with elevated blood sugar, his care should necessarily include close coordination between his medical and psychiatric care. I found no evidence of that type of coordination in his records. The patient was scheduled for a 30-day follow up. This really is not a complicated case. It does require a more aggressive treatment for his diabetes and the judicious use of antipsychotic medication. Also, a 30-day follow up is very inappropriate for such a clinically complicated patient.

84. ███ ███ ███ was housed at a step-down inpatient mental health setting at Perryville when I spoke with her on September 10, 2021. She described herself as "schizophrenic" and reported to me that her antidepressant duloxetine (Cymbalta) had been abruptly discontinued and caused multiple withdrawal symptoms, including back pain. Her medical record confirmed that her Duloxetine 60 mg. was discontinued on 8/16/2021 due to concerns regarding mania. There was no titration planned of gradually reducing the dosage. The Medication Administration Record showed a sudden stop on 8/19/2021. Nurses documented in assessment an endorsement of fears regarding pain control without her duloxetine. On 8/22 and 8/23 she activated sick call due to "body pain" and worsening mood symptoms requesting medication for symptoms. It appears Ms. ███ was suddenly discontinued off Cymbalta (Duloxetine) without collaborative discussion respecting her autonomy for her mental health and medical care. Symptoms of pain and the worsening mood were reported shortly after discontinuation of Cymbalta. Furthermore, Cymbalta was not titrated which can lead to withdrawal symptoms consistent with body aches. Given duloxetine was prescribed not only for mood but also pain management, an integrated care approach should have been considered to prevent decompensation.

85.     At Perryville on September 10, 2021, I was at the mental health watch unit and observed ████ ████ ████ facedown on a mat on the floor with apparent involuntary movement and spasms, which resulted in an emergency ICS response by nursing staff. A review of her medical record shows that a medical provider intake note on 8/17/2021 documented "involuntary movements of limbs," but the assessment and plan sections of the note did not explain the involuntary movements. Her intake laboratory findings were significant for elevated ammonia, Hepatitis C RNA levels, and elevated liver function enzymes. An 8/25/2021 medical provider evaluation explored the further history of Ms. ████ and noted that when she was at the jail, she was supposed to have had a brain MRI per Neurology. At this encounter, a MRI of the brain with contrast was requested in the plan, along with starting amantadine and requesting medical records from outside specialists. A follow up medical provider note on 8/27/2021 stated that her movements were possibly exaggerated and possible "psychosomatic" etiology. Records from neurology were not obtained yet. The medical provider's note on 9/10/2021 documented that Ms. ████ was on watch and it revealed neurology workup at the county jail included exploration for multiple etiology. This included Huntington's disease, tardive dyskinesia, and the possibility of a volitional component to the movement. Workup was not completed at that time. A 9/14/2021 assessment by a medical provider led to greater suspicion of volitional component, but it was the first time a neurology consult was requested by the provider. A 9/16/2021 medical provider note described the assessment as psychosomatic versus malingering but she was started and continued on Tetrabenazine for suspected movement disorder. Ms. ████ reported to the team that after receiving Cogentin injections her movements improved for three days before returning. The etiology of Ms. ████'s movements is unclear at best given the lack of thorough neurology workup. The medical team suspects symptoms are due to a psychosomatic etiology or malingering, but medication management with Cogentin and Tetrabenazine does not reflect this mindset. Furthermore, previous neurology work up was not completed and on admission, her liver function enzymes, ammonia level, and hepatitis C

viral RNA count were all elevated. It could be likely there is a psychosomatic component or even volitional component to her symptoms, but you cannot determine these diagnoses without appropriate neurologic workup especially in the presence of abnormal medical lab findings. Such assessments for psychosomatic causes and malingering are made after excluding possible medical and neurologic causes. The possibility of there being a medical etiology which is not worked up in a timely fashion is a burden to the patient as seen by repeated ICS and watch events. Closer collaboration is needed between the medical and mental health providers.

86.    There were at least five recent deaths by suicide where a contributing factor appears to be a breakdown in communication between mental health and medical staff. *See* Exhibit 3 (███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ ███████ Of note, several of the deaths occurred after patients with serious medical conditions – including end stage cancer, disabilities from physical injuries, or fibromyalgia – were told that their pain was not real, or patients were judged as "drug-seeking," and medical providers repeatedly failed to engage with them in a discussion about appropriate and adequate pain management. Patients had their pain medications abruptly discontinued without explanation, in a very callous and hostile attitude by medical providers. Dr. Todd Wilcox has, in past reports, described ADCRR's profound failure to treat serious pain, (*see, e.g.*, Doc. 2496 ¶¶ 6, 17, 18, 27), and has described it as "therapeutic nihilism… that seems to be the norm in the Arizona prison health care system." *Id*. at ¶ 18.

87.    The death by suicide of ███████ ███████ ███████ in ███ 2019 at Tucson-███████ is emblematic of how the failures of mental health and medical care can collide and result in an untimely death. ADC's vendor's Utilization Management department denied a provider's request for a referral to a specialist for a possible recurrence of cancer. The mental health team did not appropriately evaluate and treat the patient for mood disorders. There was a lack of multidisciplinary team discussion in treatment planning. The psychological autopsy conducted after his death by suicide

1   concluded that he would have benefited from interdisciplinary team collaboration, and
2   that there had been no follow up with him to tell him that Utilization Management had
3   cancelled the provider's request for a CT scan to analyze a mass in his throat. The
4   mortality review acknowledged that he had submitted multiple HNRs regarding his cancer
5   pain symptoms, but staff screening the HNRs did not appreciate the level and severity of
6   his pain symptoms, and did not make referrals to practitioners. His medications were
7   discontinued due to apparent non-compliance due to side effects, without counseling by a
8   prescriber. The medical provider prescribed Elavil for treatment of pain, but the
9   psychiatry team switched him to Venlafaxine without consultation with the medical staff.
10  Both the psychological autopsy and mortality review shared significant concerns for the
11  lack of coordination in medical and psychiatric care provided to the patient. There was
12  also an acknowledgment of inadequate pain management. If he had received timely and
13  appropriate medical and psychiatric follow up, better rapport could have been formed with
14  him, which would allow the treatment team to better appreciate the underlying
15  psychological distress from the recurrence of cancer and untreated pain.

16      88.     While physical pain can be a subjective and difficult symptom to treat and
17  manage, the objective and difficult truth is that there are multiple people who -- in the past
18  three years -- were so desperate that they completed an act of suicide after medical
19  providers failed to acknowledge or address their physical pain. If these medical providers
20  thought that the pain these patients described was not real, psychosomatic, related to a
21  substance abuse disorder, or rooted in a need to self-medicate a poorly-treated or managed
22  mental disorder, then the appropriate response would have been for the medical provider
23  to engage and confer with psychology clinicians and psychiatry providers to develop an
24  interdisciplinary treatment plan. That did not happen.

### 3.  Opinion: The Failure to Provide Interpretation in Mental Health Treatment Places Class Members Not Fluent in English at Risk of Harm

27      89.     One of the first things mental health staff should do before commencing any
28  encounter with a patient, is to ensure that they are able to effectively communicate with

the patient. If they cannot do so, then the encounter is largely meaningless and superficial. Effective communication is a fundamental component of providing therapeutic care, especially in the context of mental health treatment, and the burden should be on the staff to ensure that they are communicating fully and effectively with the patient. In my November 2013 expert report, I described the importance of having interpretation as part of medical encounters and being able to communicate with patients in the language for which they are most fluent, to ensure effective communication, that there is a full and complete exchange of information, and so patients can convey information to clinicians and providers. I noted that,

> Accurate mental health diagnosis and effective mental health treatment require accurate communication between the patient and the provider. The patient must be able to describe his or her emotional or cognitive state, and the provider must be able to observe often subtle cues in the patient's speech. It goes without saying that such communication requires a common language.
>
> [. . .] I am concerned that ADC has no system for providing effective, qualified, confidential interpretation for mental health diagnosis and treatment.
>
> [. . .] [A] mental health provider must make very subtle assessments, such as whether a patient is paranoid or attending to internal stimuli, and whether his or her thoughts are tangential. This requires an interpreter who not only is fluent in both languages, but is also specifically trained in interpretation, including specialized psychiatric vocabulary.

*See* Doc. 1104-2, 11/8/13 Report, at 49-51.

90.     I detailed my interviews in 2013 with Spanish-speaking patients who described their frustration with being unable to share vital and nuanced information in a therapeutic relationship with mental health providers and clinicians. *Id*. As a result of the shortcomings that I and others identified, the Stipulation included a provision regarding language interpretation in health care encounters: "For prisoners who are not fluent in English, language interpretation for healthcare encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service." Doc. 1185 ¶ 14.

91.     Paragraph 14 by its plain language limits interpreting to be done by health care staff or an independent interpretation service, and therefore excludes the use of custody staff or other incarcerated people from interpreting in health care encounters. This limitation was on purpose, as the use of corrections officers as interpreters in health care encounters in prison and jail settings is highly inappropriate for a number of reasons. As a threshold matter, using custody staff necessarily results in inappropriate disclosure of confidential patient health information. The presence of custody staff may cause patients to self-censor or alter communications with the provider, depriving the provider of critically important information. For example, if a patient is bothered by intrusive flashbacks to past trauma or the facts of their commitment offense, they may be unlikely to disclose that to the mental health staff in the presence of a corrections officer for fear that the information could get out or be used against them. Similarly, using other incarcerated people as interpreters introduces these same concerns regarding patient confidentiality and safety.

92.     Despite this requirement, over the course of the monitoring of this case, it became clear that ADCRR and their health care vendors did not abide by Paragraph 14. During my visits to prisons in 2018 and 2019, and again in September 2021, I met with Spanish-speaking patients with mental health needs, who reported that they were unable to have meaningful mental health encounters with staff due to language barriers. I am fluent in Spanish; I have spoken it from childhood. When I visit prisons' mental health units, I seek out monolingual Spanish speakers. They often report suicidal thoughts or auditory or visual hallucinations, but when I review their medical charts, there is nothing recorded that reflects that. That is of significant concern.

93.     My 2020 expert declaration in support of Plaintiffs' Paragraph 14 enforcement motion noted that,

> It is important not only for the patient to provide information, but for the patient to receive information, and the parties can't do this in a superficial manner. When a provider (whether it be a medical or mental health provider) is trying to provide patient education, or the diagnoses and treatment modalities and options to the patient, the provider cannot engage

the patient in the treatment process if the parties cannot fully and effectively communicate in a common language.

With regard to mental health care in particular, a recent study published in *Clinical Psychological Science* found clear and consistent differences in the use of language by those with depression, anxiety, and suicidal ideation. *See* Al-Mosaiwi and Johnstone, *In an Absolute State: Elevated Use of Absolutist Words Is a Marker Specific to Anxiety, Depression, and Suicidal Ideation*, Clinical Psychological Science, 2018, 6(4), 529–542, at https://journals.sagepub.com/doi/pdf/10.1177/2167702617747074 [...]

Scientists, psychologists, and psychiatrists have long observed that major depression changes the way people speak and write (sometimes referred to as "the language of depression"), most past studies of this relied upon mental health encounter notes, while this study used computerized textual analysis of thousands of posts on 64 different online mental health fora/support groups. The computerized analysis was able to spot linguistic features including classes of words, lexical diversity, lengths of sentences, and grammatical patterns. The study confirmed what those of us who regularly see people with these conditions recognize: that there are differences in the use of language, both in terms of content and style. With regard to content, people with depression, anxiety, and suicidal thoughts are much more likely to use negative adjectives and adverbs, and first-person pronouns (*e.g.*, "I," "me," "myself") instead of third-person or collective pronouns (*e.g.* "we," "us," "they"). In terms of style (how people express themselves), the use of absolutist words (conveying absolute magnitudes, *e.g.*, "always," "nothing," or "completely") was found to occur quite frequently in people with depression, given their tendency to have a more rigid, black and white view of the world. The study found that the prevalence of absolutist words (compared to control fora) was 50% greater for people with anxiety or depression, and 80% higher for people experiencing suicidal ideation.

The practical implication of this is clear when the primary language of the health care provider and the patient are different. A mental health provider needs to evaluate the severity of the symptoms, especially for those patients with suicidal or homicidal thoughts, or people experiencing auditory or visual hallucinations. Using as an example a patient whose primary language is Spanish and a provider whose primary language is English, even patients with some ability to converse in English will not be able to articulate and express the nuances of their current mental state the way they could if they were speaking in their native tongue of Spanish. Similarly, a provider who may speak some Spanish is not going to understand or know the nuances and phrasing by Spanish-speaking patients that may signal the degree of mental health distress, or be able to pick up on the subtleties of the Spanish language's adjectives and verb tenses.

Doc. 3626, ¶¶ 11-13.

94.     My 2020 declaration referred to specific problematic mental health encounters between clinicians and class members who did not speak English fluently –

either monolingual Spanish speakers, or Deaf people who communicate using American Sign Language or other systems of sign language. *Id.*, ¶¶ 14-16, 18, 24-28.

95.     I have reviewed the Court's February 24, 2021 order, which said "If a prisoner is not fluent in English, the fact that the medical encounter continued without interpretive services is definitive proof of Defendants' noncompliance with Paragraph 14" and ordered Defendants to develop a plan to ensure compliance with Paragraph 14. Doc. 3861 at 12. I have reviewed the Defendants' Revised Compliance Plan (Doc. 3920) dated July 13, 2021, and am concerned that almost eight years after my report detailed why not providing interpretation for mental health services was deeply problematic, the Department continues to not have a system in place to identify and track class members who require an interpreter in health care encounters, nor does it track which staff are bilingual. That is simply unacceptable. As I noted in June 2020,

> ADC and its contractor must develop a process to promptly identify all people for whom English is not their first language, and identify their primary language. This should include people who are deaf and who communicate through sign language. Such identification should occur at intake to ADC custody. This is a standard practice in functional correctional health care systems. ADC and its contractor also must create a system by which patients can later report to health care staff that they need interpreters, so that this information is available when scheduling appointments. This is relevant for when patients who may speak and understand some English, but when confronted with a complicated health care encounter where they are trying to understand complex medical language, or who are attempting to articulate their emotional state, they realize that they need an interpreter to fully communicate with the health care providers so that they can express themselves in their primary language

Doc. 3626 at ¶ 20.

96.     Defendants' failure to adhere to standard health care practice to ensure effective communication in health care encounters does not meet the community standard of care and places non-English speaking class members and class members with disabilities at a significantly higher risk of serious and permanent injury than class members who can communicate freely with mental health staff.

97.     I also previously brought to the Court's attention the failure to provide any sort of group mental health programming or therapy with translation services, or in special

groups for people who do not speak English. Doc. 3626 at ¶¶ 29-34. Defendants' Revised Compliance Plan asserts their position that they "maintain that the intent of Paragraph 14 applies to healthcare encounters involving the individual inmate and health care staff and thus undefined 'group therapy' sessions do not require translation services – nor could translation services be reasonably provided in that type of group setting." Doc. 3920 at 13-14. This is disingenuous at best; first, there is no such limitation in Paragraph 14 to individual encounters; and second, my declaration clearly described how effective communication could be achieved in group mental health therapy sessions. If Defendants and their attorneys truly don't understand what "group therapy" means, then that is a damning admission of willful ignorance about what is a crucial component of the rehabilitative and therapeutic milieu. Doc. 3626 at ¶¶ 33-34.

98.     Defendants' revised compliance plan for interpretation services also asserts that "Plaintiffs' challenge that Defendants do not provide translation services for inmates on suicide watch is in error where, but for emergency circumstances, inmates are taken out of cell for healthcare encounters and conducted in locations with access to LanguageLine services where an inmate requires the same. Thus, inmates are not denied translation services in this setting." Doc. 3920 at 13. This is contradicted by the fact that the majority of people on mental health watch are normally seen cell front, and there is no indication that people who are Deaf or do not speak English fluently somehow are seen cell-front on watch with sign language interpreters or with LanguageLine services.

99.     With regard to Deaf incarcerated people and the need for effective communication in mental health care, the U.S. District Court for the Northern District of California held that I am "an expert on mental health treatment and suicide prevention in prisons, including in segregated housing units," and "qualified to testify on the standards of mental health practices in such settings," when it relied upon my opinion regarding effective communication to order the California prison system to ensure that sign language interpretation was provided to people who are Deaf, including "suicidal prisoners" who were "systematically denied sign language interpreters" while in

segregated housing or suicide watch. *See Armstrong v. Brown*, 939 F.Supp.2d 1012, 1022, and n.6 (N.D. Cal. 2013) (finding that the California prison systems' failure to provide sign language interpreters "created a substantial and unnecessary risk to class members."). A head-shake, "thumbs up," "thumbs down," or finger-spelling simply is inadequate to assess if a person is suicidal. With regard to written notes, given that English is not the first language of most Deaf people, and many if not most have limited reading / writing skills in English, this is patently inadequate for mental health staff to determine if patients exhibit possible signs and symptoms of a serious mental or medical condition and to provide patient education to a patient.

100.   Deaf people are a particularly vulnerable population in a prison, given their almost complete social isolation from others. Even when housed in non-isolation units, their existence, without an ability to communicate with others around them or their loved ones, is a de facto solitary confinement. My 2020 analysis of medical records of Deaf or hearing-impaired class members showed they had gone months – if not years – unable to communicate meaningfully with health care staff without an interpreter. One Deaf class member reported when he met with mental health staff, and had to use notes, "[w]ithout an ASL interpreter, I could not really explain my feelings of loneliness and isolation and what it is like to be deprived constantly of language." Doc. 3627-6; Ex. 83 ¶ 40.

101.   I was appalled to see the written exchange between a psych associate and a Deaf patient when he was put on suicide watch after learning his brother died by suicide:

1   Doc. 3627-7, Ex. 99 at 10.

2   102.   Holding aside the substance of the psych associate's written "counseling"

3   notes ("greif [sic] is like a fart"), this illustrates that health care staff write terser versions

4   of what they would normally verbalize to a hearing patient. It is an awkward, stilted, and

5   slow way to communicate, and does not provide an appropriate or adequate medium to

6   engage the patient in discussion of sensitive and important mental health matters.

7   103.   Another Deaf class member reported that without an SLI in a mental health

8   encounter, "I wanted to discuss my anxiety but I had a hard time discussing it with just

9   pen and paper." Doc. 3627-5, Ex. 62 ¶ 16. These patients are trying to report significant

10   mental health issues, that if unaddressed can lead to an increased risk of self-harm or

11   suicide. Asking a Deaf person experiencing mental health issues to write in a language

12   they are not fluent in is unreliable and totally puts the burden of achieving effective

13   communication on the patient. These people are already burdened enough by being

14   incarcerated, and by being in a setting where they are completely isolated from

15   meaningful human interaction due to their disability, and it is absurd to expect that they

16   will be able to meaningfully engage with treatment staff without interpretation.

17   104.   During the September 2021 visits in anticipation for this report, I again

18   spoke with Spanish-speaking patients regarding their experiences with receiving health

19   care. At ASPC-Tucson on September 9, 2021, Plaintiffs' counsel who separately

20   accompanied medical expert Dr. Todd Wilcox asked me to speak with ███████

21   ███████  ███████  a monolingual Spanish speaker who had just been discharged from the

22   infirmary. Mr. ███████  said that during his hospitalization in the IPC, there were a couple

23   of health care staff who spoke decent Spanish, but the majority of his encounters with

24   nursing and provider staff in the infirmary were not done with interpretation. He indicated

25   that the IPC staff had never used the telephonic Language Line to interpret interactions,

26   and if staff did not speak Spanish, they would either speak to him in English, or use other

27   patients or custody staff who spoke some Spanish to interpret.

28

105.    On September 9, 2021, I met with several monolingual Spanish speakers designated as SMI, housed in specialized mental health units at Tucson, Rincon Unit.

106.    I spoke with ████ ████ ████ at Tucson-Rincon Unit, who told me that he is classified as SMI. He said he cannot speak or write English very well, but can understand enough English "to nod my head." He stated that due to a language barrier with his treatment mental health staff, he does not know his actual mental health diagnosis, nor does he know the names of his medications. He reported that he has not received any patient education about his medications or their potential side effects. He cannot describe the nuances of his emotions and feelings in English. He stated that "at times" the mental health staff speak enough Spanish to communicate with him but otherwise, he relies upon very simple English words to try to convey complex emotions. He reported that most, if not all, group mental health programs have been canceled since March 2020 due to COVID and that the group therapy is never provided in Spanish.

107.    ████ ████ ████ ████ is a Spanish-speaking trans woman incarcerated at Tucson-Rincon Unit, who is classified as SMI, and has diagnoses of gender dysphoria, schizophrenia, depression, paranoia, and anxiety. In addition, Ms. ████ reported that she experiences command auditory hallucinations that instruct her to kill herself, and she has engaged in multiple acts of self-harm including a self-castration in 2017 because she thought her estrogen hormone therapy was not working quickly enough to change her gender. She described multiple suicide attempts, including while on mental health watch and in specialized mental health units. She reported that she has not been able to tell her prescribing psychiatric nurse practitioner that her current medications of Risperdal and Paxil do not mediate the voices, and that she has breakthrough experiences of profound paranoia several times a week. Until a few weeks prior to our interview, she had been incarcerated at the now-closed Florence-Kasson Unit, which she described as a "lonely" location filled with needlessly cruel and abusive custody staff who would physically and verbally abuse and torment her and other seriously mentally ill patients.

108.          ███ ████ ████          is another trans woman at Tucson-Rincon Unit who only speaks Spanish. She reports that she is not classified as SMI, but that she suffers from depression, auditory hallucinations, and insomnia. She reported that none of the mental health programs, including group therapy, are available in Spanish. She said that she cannot connect one-on-one with her mental health clinicians because they are constantly changing. She reported that she was able to build a good rapport and trust with a Spanish-speaking therapist, but that therapist quit, and Ms. ████ was unable to continue that relationship. She stated that to the extent any mental health programming or group therapy is provided to the people in her special mental health unit (and it is little), it has never been provided in Spanish. I found Ms. ████ to be a thoughtful, vivacious person who provided much nuance and insight when I spoke to her in Spanish, but she flatly told me that "I cannot speak English to be myself" to mental health staff.

109.     During my September 23, 2021 visit to ASPC-Phoenix's Flamenco Unit, I was alerted by multiple incarcerated people in that inpatient mental health unit to find and speak with ██ ████████ ████ because the others patients were very concerned about him. The other patients told me that "he isn't doing well" and that he was often seen walking around his cell naked and smearing feces on himself and his cell walls. I went to his cell-front and asked the custody staff to open his door so that I could engage in conversation with him. After failing to get the patient's attention in English, I began addressing him in Spanish. He responded by lifting his head off his bunk and looking at me. In spite of my efforts, he remained mute and unresponsive. Based on my observation, he appeared to be very psychotic, responding to internal stimuli as well as presenting as almost catatonic. A record review showed that he is not prescribed *any* psychotropic medications. This is an absolutely astounding fact given his degree of psychosis.

110.     In fact, Mr. ██████ 's medical record shows that he has spent extensive periods of time on suicide watch at the Phoenix, Florence, and Lewis prisons since he came into custody in August 2020. His record documents that he was on suicide watch at ASPC-Phoenix for *six months without interruption* (from January 19 to July 18, 2021),

and again from September 8-15, 2021; on watch at Florence September 1-7, 2021; and on watch at Lewis-Rast from September 6, 2020 to November 12, 2020 and December 28, 2020 to January 19, 2021. Many of these entries show that he was mute or provided one-word responses in English. I found no indication that mental health staff attempted to speak to him in Spanish or use a qualified interpreter for their encounters.

- Intake – August 12, 2020 at Tucson Rincon
- Moved to Lewis Rast and put on **suicide watch**: Sept. 6– Nov. 12, 2020
- Lewis Rast max **suicide watch**: Dec. 28, 2020-Jan. 19, 2021
- Phoenix **suicide watch**: Jan. 19-July 18, 2021
- Phoenix Flamenco Ida Unit: July 20-Sept. 1, 2021
- Florence **suicide watch**: Sept. 1-7, 2021
- Phoenix **suicide watch**: Sept. 8-15, 2021
- Phoenix Flamenco Ida Unit: Sept. 15-present (I saw him on Sept. 23, his record was last checked on 9/30/2021).

111.    A psychiatric progress note written three days before my evaluation of the patient stated that interpreter services were NOT needed for him. The provider then noted the patient's "underwear had feces on the posterior aspect. It took some time with redirect to get him to change his underwear. He was nonverbal. pt seemed perplexed and had difficult [sic] in responding to directions of CO in changing his underwear." The provider inexplicably went on to state "no evidence of psychosis." This psychiatric visit which occurred on 9/20/21 fails to even approach the standard of care for psychiatric visits. It is also appalling to me that this patient is not receiving any psychotropic medication. Also, the psychiatrist has no idea if the patient is suicidal. The patient is assigned to the inpatient psychiatric care facility at ASPC-Phoenix in name only. He needs a competent psychiatric evaluation from a Spanish-speaking psychiatrist. Based upon the results of that evaluation, a treatment plan must be designed to fit his unique clinical requirements.

//

//

### C. Opinion: Clinicians Practicing Below the Standard of Care Put Patients at Risk of Harm

112.    During my September 2021 review, I saw many examples of diagnosis and treatment decisions that fell below the standard of care. I emphasize that these are not matters of clinical judgment on which reasonable professionals can disagree. Instead, they are examples of clinical decisions that simply don't make any sense – that cannot be explained or justified based on the patient's clinical presentation. These errors put patients at a risk of harm, and in many cases result in needless suffering and deterioration.

#### 1. Opinion: Patients Remain Profoundly Symptomatic for Long Periods of Time

113.    As I spoke with seriously mentally ill people and individuals experiencing severe mental health distress at the four prisons, I was struck by how many of these people reported being highly symptomatic for very long periods of time. My past visits and medical file reviews showed the same. Not only does this mean that the patient is suffering, and in the worst cases may harm or kill herself, but many mental illnesses become more intractable and difficult to treat the longer the patient is symptomatic. This is known as the "kindling effect" in brain science, whereby the more a group of neurons are able to fire and misfire, they affect the other neurons around them. This is why you don't just allow somebody to be psychotic or seriously depressed and ignore or refuse to treat it, the same way that we don't allow people with seizures to continue to have seizures over and over because they worsen in time. These conditions must be addressed because each time there is a cycle of depression or psychosis that is not properly addressed, based on the circuitry of the brain, it gets worse the next time.

114.    For example, I interviewed ███ ███ ███ at Eyman in a confidential setting on 9/8/21. I found him to be overtly psychotic with very loose associations, disorganized and rambling speech, responding to internal stimuli and thought blocking. He was able to tell me that he is not taking any medications currently but has taken the antipsychotic Risperdal in the past. A review of his records reveals that in fact he is not prescribed any psychotropic medications. He was determined to be SMI on

5/20/21 and was diagnosed as suffering from Schizophrenia. Of note he is yet to be seen by a psychiatrist since he was determined to be SMI. A treatment plan dated 9/1/21 had the "psychotic symptoms" box checked but had no mention of antipsychotic medications or a referral to a psychiatric practitioner. This case is the ultimate example of deliberate indifference. That is, the staff acknowledge that Mr. ███████ is psychotic but are not doing anything to address it. He is a very ill young man who requires immediate treatment and close management by a psychiatric provider with an antipsychotic medication.

115.   At ASPC-Phoenix's Baker Unit I spoke with ███████ ███████ ███████ at cell front while he was on watch status. He presented as extremely manic and agitated. He was yelling at the custody staff and running around his cell naked. He had very pressured speech and an aggressive and expansive affect. He showed me the bruises on the left side of his abdomen and his torso where he said that the custody staff fired a paint ball gun at him when he was having a psychotic episode. I requested that staff take a photo of his injuries.



Source: ADCR000158717

116.   A review of his records revealed that Mr. ███████ is only prescribed Risperdal Consta, 37.5 mg every two weeks. Of note, it takes up to ten weeks for this

long-acting antipsychotic medication to reach therapeutic levels. Also, the patient was seen by a rec therapist and a psych associate on the same day of my evaluation. The rec therapist reported that Mr. ███ was "calm and friendly" and the psych associate used the phrase "due to increase stability." I am at a loss to understand how these people came up with their assessments. Of note, the custody staff made me sit behind a special plexiglass barrier when I was conducting my interview due to the aggressiveness and instability of the patient. Finally, he was seen by a psychiatrist the day after my exam. The psychiatrist documented that "his mood was good." He went on to say that the patient's mood "may be somewhat elevated, but he is cheerful." This is a completely incorrect description of a highly manic and psychotic patient; "cheerful" is the last word I would use to describe the patient's demeanor.

117.    The medication management of this patient is extremely poor. One does not attempt to stabilize a highly agitated and psychotic patient using long-acting injectable antipsychotic medication such as Risperdal Consta. As I mentioned above, it takes up to 10 weeks to achieve therapeutic blood levels using this medication. Due to the abysmal medication management, Mr. ███ remains out of control psychiatrically which has resulted in his being paintballed by the custody staff. The patient is not receiving anything close to inpatient level of care.

118.    ███ ███ ███ I interviewed Mr. ███ at cell front on 9/8/21 at Eyman. He told me his was prescribed the antipsychotic Abilify. He also reported experiencing persistent auditory hallucinations of a command type. His voices command him to hurt himself and others. He stated the Abilify "helps a little." A review of his records reveals that he has been prescribed the same dose of Abilify, 15 mg in the evening, since May 14, 2020. This is in spite of a psychologist noting on 9/16/21 the patient's problem with auditory hallucinations. In this note, despite these ongoing symptoms of command hallucinations to hurt himself and others -- 16 months after he was prescribed this medication -- there was no mention by the mental health staff of referring Mr. ███ to the psychiatrist for a dose augmentation. Fifteen milligrams of Abilify is a

low dose of the medication. He should be tried on at least 30 mg daily. If that 30 mg dose doesn't eliminate the auditory hallucinations, then the patient should be tried on a more potent antipsychotic such as Risperdal.

119.   Other examples of patients who remain highly symptomatic include:



*See* Exhibit 2 for more detailed discussions of these patients' care.

### 2. Opinion: ADC's Practice of Removing and Changing Mental Health Diagnoses Puts Class Members at Risk of Harm

120.   Another disturbing trend I noticed in my September 2021 interviews and review is what I refer to as de-diagnosing. In many cases, persons who for years had been diagnosed with major mental illnesses such as schizophrenia or other psychotic disorders, bipolar disorder, or major depression had their diagnoses abruptly changed to behavioral disorders like personality disorders, or other less serious conditions such as "unspecified" mood disorders.

121.   This is highly implausible. Major mental illnesses like schizophrenia are lifelong conditions. They can, and should, be effectively treated and managed, but they cannot be "cured" – the patient will always have a diagnosis of schizophrenia, even if she is no longer experiencing significant symptoms.

122.   There are only two possibilities: either the initial diagnosis of major mental illness was incorrect – in which case the patient was not receiving appropriate treatment –

or that original diagnosis was correct and is now being inappropriately changed. Even if it were plausible that all of these patients were incorrectly diagnosed with major mental illness – often over a period of many years and by a number of different clinicians – there was typically not adequate assessment and documentation in the record to justify the change of diagnosis made by Centurion mental health staff.

123. For example, I interviewed Named Plaintiff ███████ ███████ ███████ at ASPC-Eyman in a confidential setting on 9/8/21. He was responding to internal stimuli, hearing voices, displayed manic-agitated behavior, had pressured speech and was very paranoid. He reported that he had a history of self-injurious behavior and that he had received an injection of long-acting Haldol, 50 mg, on 8/23/21. A review of his records revealed that his diagnosis was changed from Schizoaffective Disorder, bipolar type to unspecified personality disorder. This is blatantly inaccurate. Even if it were accurate, you do not treat a personality disorder with 50 mg of long-acting Haldol every four weeks.

124. At Tucson Rincon Mental Health Unit, ███████ ███████ ███████ is prescribed Depakote 250 mg twice a day and Vistaril 50 mg at bedtime, for his newest diagnosis of Unspecified Mood Disorder. Past documentation of Schizophrenia and Schizoaffective disorders on 8/5/2021 have been discontinued. A previous initial encounter on 8/16/2019 diagnosed Unspecified Schizophrenia. In the recent past he was also taking Paxil, Oxcarbazepine, Olanzapine, and Prolixin Decanoate. This record does not contain adequate assessment or discussion to justify a change in diagnosis from a primary psychotic disorder to only a mood disorder.

125. When I first evaluated Named Plaintiff ███████ ███████ ███████ in 2013, he had a long history of treatment for a diagnosis of bipolar disorder. Since I saw him, he has been assigned a number of different mental health diagnoses, including Bipolar Disorder NOS (5/13/15), Unspecified mood disorder (11/14/16), Anxiety disorder (3/14/19), and Adjustment disorder (5/21/20). Most recently, after a 5-minute cell front visit on 7/29/21, a psych associate concluded that Mr. ██████ – after decades of diagnoses and treatment – now no longer suffers from a mental disorder. If this assessment is accurate (which is

extremely unlikely), then Mr. ▮▮▮ was misdiagnosed and inappropriately treated for at least eight years, including unnecessary treatment with powerful psychotropic mediations that can have serious side effects. Or, much more plausibly, he is currently misdiagnosed and not receiving appropriate treatment.

126.   Other examples of de-diagnosing, or changing peoples' diagnoses from psychiatric disorders to "behavior disorders" or "mood disorders" include:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮▮

127.   Unfortunately, such "de-diagnosing" is a recognized phenomenon in prison mental health systems, particularly those that are subject to litigation. Because the mental health services a patient receives are typically dependent upon his or her diagnosis, or classification, de-diagnosing reduces the burden on what is perhaps already an overtaxed and understaffed prison mental health system. Where the system's performance is being monitored as part of an injunction or settlement in litigation, de-diagnosing can make that performance look better than it actually is. I cannot, of course, know whether the de-diagnosing I have observed in ADC is occurring for this reason, but whatever the reason, it falls below the standard of care and puts patients at risk of harm.

### D. Opinion: The Failure to Properly Prescribe, Deliver, and Manage Psychotropic Medications Puts Class Members at Risk of Harm.

128.   The proper prescription, administration (delivery), and monitoring and management of medication is an essential element of mental health treatment. Patients who are not prescribed appropriate medications responsive to their needs, or who do not receive their medications as prescribed, will not improve and will almost always deteriorate, often to a point of being a danger to themselves and others, or becoming

gravely disabled. In a prison setting, the patient is entirely dependent on the prison health care staff to prescribe, obtain, and timely deliver the medications necessary to treat their mental illness.

### 1. Opinion: An Inadequate Formulary Results in People Not Receiving Medications Best Suited to Address Their Symptoms

129.   As noted in multiple interviews, people with major psychiatric conditions repeatedly told me that they had been prescribed certain medications prior to coming to prison, or at some point during their incarceration, that were abruptly changed to a less efficacious medication, on the basis that the better-performing medication was "not on the formulary." In some cases, the prescribing providers even stated that was the reason for the discontinuation of (or refusal to prescribe) the specific medication.

130.   I reviewed the July 2021 version of Centurion's formulary for ADCRR that was provided by Defendants in this matter. ADCRR00096790-96818. I identified several problematic omissions and inclusions.

131.   Among the antidepressant agents, the most obvious omission (and one I heard about repeatedly from patients I interviewed in September 2021) is Wellbutrin. This is a well-studied medication that is very effective in treating depression. This medication should be an option for the prescribers.

132.   Also, the formulary listed Imipramine and Nortriptyline as available antidepressants. Both of these medications are not currently used in clinical practice due to their terrible side effect profiles. These medications come from the "Pre-Prozac era" and have no business being used today. Additionally, both of these medications place the user at significant risk of heat-related problems due to their being highly anticholinergic.

133.   Among the antimanic agents, the obvious omission (and again, one I heard about several times from patients during my visits) is Trileptal. This medication is highly effective in treating patients with Bipolar Disorder. This medication is also used to successfully treat self-harmers with poor impulse control.

134.    With regard to antipsychotic agents, the obvious omissions are Seroquel and Clozapine. Seroquel is a sedating antipsychotic which is used in those patients with psychosis and also have sleep problems. Clozapine is an extremely effective antipsychotic, used to treat those psychotic patients who do not respond to trials of conventional antipsychotics. This medication should definitely be on Centurion's formulary and available to psychiatrists to prescribe.

135.    Also, the formulary includes three drugs that should not be used: Perphenazine, Prochlorperazine, and Trifluoperazine. These three medications are ***not*** used in modern clinical practice. They have side effect profiles that put the user at serious risk for heat-related problems, which given the high heat found in many of ADCRR's unairconditioned or poorly ventilated buildings, should not be used on patients.

### 2. Opinion: Inadequate Medication Administration and Distribution Systems Fall Below the Standard of Care

136.    In my 2013 report, I discussed ADC's inability to properly manage the delivery of medication to mental health patients. (Doc. 1104-2 at 21-29). Proper timing for the delivery of psychotropic medications is critical: often medications are extended release and must be timed with a consistent frequency every 12 or 8 hours. Other medications, for example, Geodon, must be taken on a full stomach or at the time of meals; otherwise much of the medication is not metabolized or absorbed. Failure to provide timely and consistent delivery and administration of psychotropic medication places patients at substantial risk of serious harm, including pain and suffering, withdrawal symptoms, or deterioration.

137.    Timely delivery and administration of medication relies upon having enough nursing staff available to run efficient "pill calls" or "med pass" (at lower security yards) at a set given time, or to have enough nursing staff to be able to go through isolation and high-security units to deliver medication cell-front to patients. Even if the "pill calls" are occurring at facilities, if there is only one nurse responsible for distributing the medications, and there are dozens of persons (or on some yards, 100-200 persons)

waiting in line, patients report that they will sometimes refuse or give up because they are unable to stand for long periods in extreme temperatures.

138.   ADCRR still lacks a reliable system to ensure medications are provided to patients as prescribed. For example, the March 2021 CQI minutes from Tucson indicate "multiple med errors for missed doses" and "we are still seeing meds not given according to order" (ADCRRM19493-500). Similar notations appear in the March 2021 CQI minutes at Perryville ("multiple med errors were submitted") (ADCRRM19473) and Eyman ("multiple medication errors were discovered") (ADCRRM19940).

139.   I also was extremely concerned to review the summary of Defendants' Incident Reports from the fall of 2019 at the Yuma and Eyman prisons that detailed numerous delays or cancellations of the delivery of medications. *See* Doc. 3431-1 at 2-6; Doc. 3508-1 at 4-21.

140.   Multiple patients housed at the Phoenix-Aspen Unit (an outpatient specialized mental health program for SMI men classified as MH-4), reported that due to a shortage of "pill nurses" at the Phoenix prison, the morning medications that should be delivered at 7:00 am are often delivered much later -- including as late as 10:00 am, and that the evening medications were then delivered at 3:30 or 4:00 pm. If that is the frequency with which psychotropic or other timed medications prescribed for twice daily administration are delivered, it can create complications: first, in providing two doses so close together, and next, having a long period of time during the night where the medications wear off. The August 2021 staffing report from Centurion confirms there is a shortage at Phoenix, where there are 5.75 contracted Nursing Assistant / Patient Care Technician at the facility, but only 1.9 FTE filled positions. (ADCRR00137140).

141.   This is not a recent problem. CQI minutes revealed earlier breakdowns in the delivery of medications at Phoenix:

- Phoenix January 2021 CQI minutes (16 patients in Baker Unit were erroneously given their medications at 4:00 p.m. and again at 8:00 p.m.; "The error occurred due to several breakdowns in communications and staff education error using the Off-Line MAR.") ADCRRM0013395

- Phoenix June 2021 CQI minutes ("medication errors were noted and discussed with individual staff"). ADCRR00107317.

142.   Another component of medication administration is making sure that prescriptions are refilled and renewed without interruption. Performance Measure 13 of the Stipulation requires that "[c]hronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication." But the 2021 data show that many prisons cannot reach the 85% compliance threshold – a cut off level that is too low, as it still condones as acceptable that staff fail 15% of the time. I do not think it is acceptable that 15% of all mentally ill prisoners could day after day experience interruptions in receiving their psychotropic medications, or that on any given day 15% of all patients didn't get their medications. This is such a critical part of ensuring ongoing stability for patients, that the threshold for compliance on a critical performance measure should be set much higher than the 85% threshold:

|  | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| Douglas | 97 | 100 | 100 | 100 | 93 | 96 | 96 |
| Eyman | 86 | 84 | 84 | 80 | 92 | 88 | 92 |
| Florence | 88 | 65 | 77 | 86 | 88 | 88 | 75 |
| Lewis | 69 | 95 | 93 | 99 | 85.71 | 91 | 77 |
| Perryville | 84 | 82 | 86 | 79 | 74 | 73 | 85.56 |
| Phoenix | 94 | 91 | 91 | 97 | 98 | 95 | 100 |
| Safford | 90 | 90 | 100 | 90 | 100 | 97 | 100 |
| Tucson | 90 | 94 | 94 | 82 | 67 | 70 | 79 |
| Winslow | 100 | 100 | 100 | 100 | 93 | 100 | 100 |
| Yuma | 64 | 74 | 78 | 74 | 68 | 76 | 96 |

### 3.  Opinion: The Inadequate Monitoring and Management of Psychotropic Medication and Side Effects Puts Class Members at Risk of Harm

143.   In past reports I have described examples of a profoundly broken psychopharmacology system in ADCRR. Patients taking psychotropic medication need to be monitored by a psychiatrist. Full stop.

144.   The frequency depends on the clinical situation, but in no cases should it be

any less frequently than every 90 days. ADCRR still lacks a reliable system to ensure that incarcerated people taking psychotropic medications are meaningfully evaluated on a regular basis by a psychiatrist. It is essential that a patient who discontinues psychotropic medication be closely followed by a psychiatrist in case the patient decompensates and medications need to be restarted. This was not done in cases I reviewed.

145.    Many psychotropic medications have side effects, some of which can be quite serious and, if not properly managed, can result in permanent damage to the patient. For example, long-term use of potent antipsychotics can result in tardive dyskinesia, which is a nervous system condition that causes repetitive, involuntary twitching, grimacing, lip-smacking, eye-blinking, and movement in the extremities. Any sign of these side effects must be closely monitored and measured using a diagnostic tool like the Abnormal Involuntary Movement Scale ("AIMS"), and if necessary, have the medications adjusted or changed. Another example is that certain antidepressants cause significant weight gain in patients, and this can lead to metabolic problems such as Type II diabetes, and it is important to monitor weight gain in patients on these antidepressants. Patients on atypical antipsychotics such as Risperdal and Zyprexa may experience metabolic side effects such as increased triglycerides, hyperlipidemia, and increased cholesterol. Due to the serious physical implications of these side effects, baseline blood levels must be taken before starting the patient on these atypical antipsychotics, and frequent checks (at least every six months) must be made to monitor the blood parameters.

146.    Thus, monitoring of and management of medication side effects is an essential element of mental health and psychiatric treatment. ADC does not have an adequate system in place to monitor and manage medication side effects. On my visits, I observed many patients who obviously suffered from side effects that were not adequately managed and, in some cases, not noted in the medical chart.

147.    I spoke to ███ ███████ ███ at Eyman on 9/8/21. I interviewed Mr. ███████ when he was on a "security watch" for the suspicion of drinking alcohol. He said he had been on watch for more than two days and had not received his regular dose of

Prozac 40 mg daily during this time. He also reported his anxiety was increasing and he was beginning to have headaches. Of note, increased anxiety and severe headaches are common symptoms associated with Prozac withdrawal. A review of his records shows he was prescribed Prozac 40 mg daily, and that he did not get it on September 7, 8, or 9, 2021. This represents poor medication management. Antidepressant medications cannot just be abruptly stopped, as the patient is at risk of an occurrence of a serious withdrawal syndrome. Finally, his Prozac order was renewed on 9/16/21 without his being seen.

148.   I attempted to interview ███  ███   ███ at cell front on 9/8/21 at Eyman. When I approached his cell, he was pacing while shouting at non-existent individuals, and displayed rambling and incoherent speech. After many attempts, I could not engage him in a proper interview. A review of his records revealed that his most current diagnosis (dated 6/11/18), is Schizoaffective Disorder, unspecified type. His medication is a low dose of the antipsychotic Abilify, 5 mg twice a day. A psychiatric progress note from 8/19/21 noted that he has tangential thought processes, delusional thought content, paranoia and auditory/visual hallucinations. This comported with my observations three weeks later. But the note did not contain any discussion about augmenting or modifying the antipsychotic treatment. Finally, a treatment plan dated 9/1/21 by a psych associate noted Mr. ███ psychosis but did not mention anything about referring him back to the psychiatrist for a medication adjustment. This is poor care, as the patient is highly symptomatic but nothing is being done to address psychotic symptoms. Abilify 5 mg twice a day is very low dose, as this medication can be safely prescribed at 30 or 40 mg daily.

149.   I interviewed ██  ███  ███ at his cell front at Eyman on 9/8/21. He reported a diagnosis of schizophrenia and that he was prescribed the antipsychotic Zyprexa, at 15 mg every evening. He complained of having auditory hallucinations which "remain very bothersome," but that the psychiatrist won't increase the dose of the Zyprexa because he has high cholesterol. A record review confirmed he is only prescribed 15 mg of Zyprexa daily, and that his cholesterol is high 248 (0-200 is normal). Mr. ███ also

had elevated triglycerides, a measure of fat in the blood, of 358 (0-150 is normal). These abnormal labs are an unfortunate metabolic side effect experienced by some patients who receive antipsychotics such as Zyprexa. A psychiatric progress note dated 8/26/21 states that Mr. ██████ reported that, "I always hear voices; I think it's spirits in here." Here, we have a case in which the patient has persistent bothersome psychotic symptoms and is experiencing dangerous metabolic side effects from his antipsychotic medication. Continuing with the status quo is not acceptable. The standard of care in this case requires that the patient be switched to a different antipsychotic that has fewer side effects and that he be closely monitored to see if his triglycerides and cholesterol levels go down. Currently, Mr. ██████ is experiencing the worst of two worlds, unresolved psychotic symptoms, and serious medication side effects.

150.   I spoke with ██████ ██████ ██████ on 9/10/21, cell-front at the inpatient Mental Health Unit at Perryville. She is an older woman classified as SMI who has a diagnosis of schizoaffective disorder, bipolar type. When I spoke with her, she had confused, nonsequential speech, with difficulty following her own train of thoughts, and she appeared with severe psychotic symptoms and an elated affect. She had quite observable tardive dyskinesia with clearly shaking extremities and uncontrolled jerking movements in her face and extremities. According to her medical chart, a psychiatric provider saw her on 9/16/21, within days of my visit. The provider documented symptoms of florid psychosis and that Ms. ██████ was delusional, nude, bizarre, and aggressive, but the provider did not document the clearly obvious tardive dyskinesia – in fact, the "Appearance and Behavior" section of the entry was left blank. The provider increased Ms. ██████'s Risperidone with follow up planned for thirty days at the inpatient psychiatric unit.

151.   Ms. ██████'s last documented AIMS test was done on 6/16/21 with a score of 0, which does not seem reasonable given the severity of symptoms that I observed, and implies that the AIMS was not appropriately performed. I could not find any indication that a future AIMS test is scheduled or when it will be preferred. This carelessness is

concerning as there is a lack of monitoring of the side effects of her psychotropic medications. Furthermore, Ms. ███'s grossly psychotic behavior should have been followed more frequently by the psychiatric provider on the inpatient psychiatric unit. Follow-up at one month is not appropriate given that response to Risperidone dosage can be seen earlier and monitoring for side effects is crucial. Once again Ms. ███ is being treated at the outpatient level of care in terms of frequency of contacts by the prescriber.

152.   Another woman at Perryville's step-down mental health unit, ███ ███████ ███████ told us she had started refusing Haldol injections after she was hospitalized for three days due to low potassium and sodium levels. Her medical record showed that on 2/23/2021, the provider started her on injectable long-acting Haloperidol Decanoate. The note had a box for "consent form" unchecked. It was not until 7/12/2021 after she experienced side effects from Haldol that there was written mention of actually discussing risks and side effects with this medication. It was during this encounter that the consent form box was finally checked, indicating that she consented to continue such treatment. A month later, in August 2021, she was admitted to the outside hospital after she was found suffering seizures on the ground. The documentation revealed the seizures were due to Psychogenic Polydipsia (uncontrolled drinking of water), which in turn caused hyponatremia (dangerously low serum sodium levels). Haldol can both lower seizure threshold and cause a syndrome of inappropriate secretion of antidiuretic hormone (SIADH), which can manifest as increased consumption of water with a simultaneous reduction in urine output. SIADH is a well-known side effect of the use of Haldol. Upon return from the hospital, the psychiatric team did not mention any of these recent events, nor was there any discussion about medications to maintain stabilization of mental health concerns, given her refusal of the Haldol, without any clear plans.

153.   Other examples of a failure to manage or address the side-effects of medication include:

- Eyman: ████████████████████████████████
- Perryville: ██████████████████████████████

- P █████████████████████████████████
  ████████████
- Tucson: ████████████████████████████

*See* Exhibit 2.

154. It is also critically important to monitor the blood levels of certain psychotropic medications, such as Lithium. If the level is too low, the patient will not receive the desired therapeutic effect; if it is too high, it can be toxic. Lithium levels need to be checked at least every six months. Monitoring the patient's lithium level is especially important in the heat of Arizona as lithium makes a person very susceptible to heat-related illnesses. ADC does not appear to have a reliable system in place to monitor and, when necessary, adjust medication levels.

155. Patients whose medication levels were not adequately monitored include:

- ██████████████████████████████ ████████████████████ he had been taking Lithium (which is t ██████ or more than 13 years. On December 31, 2020, he was seen by nursing for an ICS – "Speech was incoherent. Incontinent of urine. Confused and disoriented." He was sent to the hospital, where labs showed acute renal failure and a Lithium level >4, which is extremely elevated and dangerous (normal levels are 0.6-1.2 mEq/L). ███████ y 4___21, he tested positive for COVID-19, and he died on ███████, ██ The ADC Mortality Review includes the following con

  *There were significant lapses in lithium monitoring. It is unclear why a level was not performed in December 2020. May have been due to the patient being housed in isolation at that time. Appropriate observations were made about the patient's altered mental status prior to the ICS, but appropriate actions were not taken.*

  *Including lithium toxicity in the differential diagnosis in these situations is important in guiding decision making and treatment.*
  *Consider provider education for all providers regarding lithium toxicity, as well as toxicity from other psychiatric medications.*

  On the box asking "is it likely that the patient's death was caused by or affected in a negative manner by medical or mental health personnel?" the reviewer checked "Yes." "Complications of treatment for bipolar disorder" was listed as a contributory cause of death.

- ████████ ████████ ██████ I interviewed Mr. ██████ cell front on 9/8/21 at ████████ me that his diagno █████ either Schizoaffective Disorder or Bipolar Disorder. He reports that his condition was previously well controlled on the antipsychotic, Seroquel, but was told

that he can't have it now. A review of his records revealed that his current diagnosis is "Unspecified Mood Disorder" and is treated with Lithium, Zyprexa and Cogentin. There was no explanation in the record why his diagnosis was changed. Of note, his last documented lithium level is from 10/16/20.

156.     Other class members with poorly followed blood testing for drugs such as Lithium and Depakote include: Perryville: ████████████████; Phoenix: ████ ████████████. *See* Exhibit 2.

### 3.  Opinion: The Failure to Mitigate the Risk of Heat Injury To People on Psychotropic Medications Places Class Members at Risk of Harm

157.     It is a well-established medical fact that people with mental illness, or people taking psychotropic medications, are at greater risk of suffering serious heat-related health problems. These problems include heat exhaustion and heat stroke. These are conditions in which the body's temperature-regulating system breaks down and internal body temperature rises, sometimes causing irreversible brain damage and organ system failure. The death rate for heat stroke ranges from 10% to 75%, depending on several variables, including how promptly treatment is sought.

158.     People with mental illness are a high-risk group due to several factors. Their cognitive functioning can often be impaired, which can prevent them from taking adequate precautions to protect themselves from heat-related health problems. Also, some of the symptoms of heat-related health problems such as feeling poorly, irritability, anxiety, and confusion can also be seen in a variety of mental illnesses. This often results in the mentally ill – and their treating providers, or persons who live or work around them – not even appreciating that they are suffering from heat-related health problems versus a manifestation of their mental illness.

159.     Another extremely serious risk factor that places the mentally ill at greater risk of suffering from heat-related problems is the use of psychotropic medications. Many medications used to treat mental illness increase the risk of heat-related health problems. Antipsychotic medications impair the body's ability to regulate its own temperature. Antipsychotic, antidepressant, and anticholinergic medications all impair the body's

ability to perspire, and hence cool itself off. Lithium causes significant fluid loss that can exacerbate heat-related health problems. Finally, a common side effect of psychotropic medications is sedation. All of these factors combine to place the mentally ill, especially those treated with psychotropic medications, at significant risk of suffering from heat-related health problems, including serious injury and death. For all of these reasons, protection from heat injury is an essential element of the proper use of psychotropic medications to treat mental illness.

160.   Given the inhospitable hot temperatures that pervade the State of Arizona for much of the year, Defendants and their correctional and mental health staff must be acutely alert to the substantial risk of harm to incarcerated people with mental illness and/or people taking psychotropic medications, who are in their custody.

161.   Heat-related health problems are completely preventable. At-risk people, including those taking psychotropic medications, should be housed in areas where the ambient temperature does not exceed 85 degrees Fahrenheit. Even in this relatively cool (compared to the average outdoor Arizona temperature) environment, at risk persons need to have unlimited access to cold fluids. The temperature of the fluids is important as the body absorbs cooler solutions faster. Cold water is the best type of fluid replacement. Other fluids, like Gatorade, should also be provided as they contain electrolytes that are lost as a body perspires, or as somebody consumes large quantities of cold water. Humidity is also an important variable, since higher humidity reduces the body's ability to cool itself through perspiration. Patients taking these medications should be counseled on heat risk, and staff who supervise or work with at-risk individuals should receive special training in the recognition and treatment of heat-related health problems.

162.   It is critically important that correctional facilities have in place effective policies to ensure that people on psychotropic medications are protected from dangerous heat levels in their housing units. For example, by court order, the Maricopa County Jail requires that detainees who take psychotropic medications are housed in areas where the

temperature does not exceed 85 degrees Fahrenheit. My understanding is that there is no such requirement in ADCRR.

163.    I conducted expert inspections of several ADCRR prisons during September of 2021. I found the heat in the housing areas to be stifling, and saw obvious signs that both incarcerated people and staff were suffering from its effects. Numerous incarcerated people I spoke with who take psychotropic medications described feeling the ill-effects of the heat, and that they were not provided the opportunity to be in cooler locations.

164.    I reviewed the temperature data provided by the Defendants in this case. Although the data are often fragmentary and incomplete, they are sufficient to show that people in ADCRR's custody who take psychotropic medications are at grave risk of heat injury or death. Many housing units and dormitories at Arizona prisons are not air conditioned, or rely upon swamp coolers to lower the ambient temperature. As a result, spring and summer temperatures of 85 and above are common inside the housing units and cells, and temperatures of 90 and above occur with some frequency.

165.    I am particularly concerned to see that temperatures at ASPC-Phoenix regularly exceed 85 degrees. As detailed above, ASPC-Phoenix is ADCRR's dedicated mental health facility; it is thus entirely foreseeable that a very large proportion of its prisoners will be taking psychotropic medications. The absence of effective climate control at ASPC-Phoenix poses a grave risk of harm to these prisoners. Finally, both my interviews and my chart reviews confirmed that ADC prisoners taking psychotropic medications are not routinely counseled on the risk of heat injury or death, how to recognize its symptoms, and how to protect themselves.

**E.  Opinion: The Failure to Provide Suicidal and Self-Harming Prisoners Basic Mental Health Care Falls Below the Standard of Care**

166.    A completed suicide is the ultimate failure of a correctional mental health system. In my November 2013 report, I concluded that "there are serious deficiencies in ADC's suicide prevent policies and practices, and … these systemic policies and practices pose a substantial risk of serious harm to ADC prisoners." Doc. 1104-2 at 51. Since that

report, I've repeatedly detailed deficiencies in suicide prevention and mental health care that contribute to preventable suicides. *See id.* at 51-58; Doc. 1104-6, Ex. 8 at 5-10, 24-25; Doc. 1104-6, Ex. 10 at 1-8; Doc. 1538-1 at ¶¶ 50-71; Doc. 1627 at ¶¶ 22-23; Doc. 2091 at ¶¶ 4-9; Doc. 3782 at ¶¶ 11-32.

167.    ADCRR data show that Fiscal Year 2021 (July 1, 2020-June 30, 2021) had the highest number of suicides since FY 2011.

**INMATE DEATHS BY YEAR AND CAUSE**

| TYPE | FY 10 | FY 11 | FY 12 | FY 13 | FY 14 | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 | FY 20 | FY 21* | FY 22* | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Natural Causes | 67 | 64 | 71 | 66 | 91 | 82 | 102 | 107 | 105 | 93 | 128 | 134 | 28 | 1138 |
| Suicide | 10 | 13 | 6 | 7 | 8 | 6 | 6 | 8 | 7 | 7 | 6 | 10 | 2 | 96 |
| Accidental | 4 | 5 | 7 | 7 | 3 | 6 | 11 | 15 | 12 | 17 | 8 | 7 | 2 | 104 |
| Homicide | 5 | 4 | 3 | 3 | 3 | 5 | 6 | 6 | 11 | 2 | 3 | 2 | 0 | 53 |
| TOTAL | 86 | 86 | 87 | 83 | 105 | 99 | 125 | 136 | 135 | 119 | 145 | 153 | 32 | 1,391 |
| ADP | 40,458 | 40,226 | 40,011 | 40,048 | 41,084 | 42,132 | 42,902 | 42,428 | 42,113 | 42,074 | 42,105 | 36,569 | **35,410 | |

*FY 2022 as of 9/30/2021
Includes ADCRR and Contract Beds
** Actual inmate population as of 9/30/2021 ADP – Average Daily Population (for Fiscal Year)
Cause of death figures are subject to change based on official medical examiner reports, which may be issued in a subsequent month

*See* https://corrections.az.gov/sites/default/files/REPORTS/Assualt/2021/assaultmortality-sept21.pdf

168.    The understaffing that I described above in Part III.A. directly contributes to the high numbers of suicide. Due to the large caseloads that staff are assigned, they don't have the time to perform adequate visits with the mentally ill patients, especially in isolation units where getting people out of their cells is extremely difficult and can be invasive (for example, high security units that require a person be strip-searched every time he leaves or re-enters his cell), or at prisons with perpetual shortages of custody staff to escort people to and from a confidential encounter.

169.    Exhibit 3 includes my analysis and write-ups of the reviews of many of the persons who died by suicide since 2019. In many cases, the patients received mental health care that fell far below the standard of care in the final months or weeks of their lives, including care that did not comply with the Stipulation's mental health performance measures, or with the Court's orders about the length of mental health encounters.

170.    Another ongoing problem I identified is one that has been featured in past reports: ADCRR's serious flaws in its suicide prevention program. I previously described in Part II.B.1(b), ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ ▮▮▮ ▮▮▮ two

profoundly mentally ill people at Eyman-Browning who I interviewed on September 8, 2021. Both men described how, *while on continuous mental health watch*, they had been able to repeatedly engage in serious acts of self-harm and self-mutilation that had resulted in multiple recent hospitalizations. In my professional opinion, both patients, if left to their current situation and treatment levels, are at high risk of ultimately engaging in an act of self-injury that could lead to death.

171.    I am particularly concerned by the apparently lackadaisical approach to self-harm taken at ASPC-Phoenix, the system's dedicated mental health facility. Month after month, the CQI minutes report that one or two patients had a large number of self-harm incidents. *See* Dec. 2020 Phoenix CQI minutes, ADCRRM0017120 (p. 4) ("Self-Harm incidents in November: 10 of the 14 incidents were completed by 1 inmate"); Feb. 2021 Phoenix CQI minutes, ADCRRM0018565 ("(13) of the (23) [self-harm] incidents were completed by (2) patients"); May 2021 Phoenix CQI minutes, ADCRR0056547 ("Self-Harm incidents in April: 10 of the 17 incidents were completed by 2 IMs").

172.    The patients in question are not identified, so I cannot review their records and ascertain the seriousness of their injuries and their current risk of future harm. However, it is apparent that some of the self-harm occurring at Phoenix has a high degree of lethality. *See* ADCRRM0018566 ("ER send out on 1/02/2020 [sic] for a hanging attempt;" "ER send out on 1/04/2021 for a hanging attempt").

173.    This kind of repeated self-harm is extremely dangerous. There is a very significant risk that one of these self-harm attempts will eventually be fatal, whether the patient intends it or not. What is extraordinary is that there is no indication that the Phoenix mental health staff takes this risk seriously. The CQI minutes contain no indication that any action is ever taken to identify these repeatedly self-harming patients and adjust their treatment to keep them safe.

174.    Also, at the Phoenix facility, on April 28, 2021, a patient was able to remove ten staples from his abdominal wound, and swallow the staples, *while on a continuous watch*. The nurse noted wound dehiscence (splitting open) and "risk for airway

obstruction," and the patient was taken to hospital. I am at a loss to understand how a patient on a continuous watch, at an inpatient mental health facility, was able to engage in such a serious act of self-harm. ADCRR0056570-71.

175.  Other examples of people who had documented acts of self-harm while on mental health watch, include ████████████ (Eyman); ████████████ ████ (Eyman); ████████████ (Perryville); ████████████ (Perryville); ████████████ (Perryville); Named Plaintiff ████████████ (Perryville); ████████████ (Phoenix); ████████████ (Phoenix); ████████████ (Phoenix); Named Plaintiff ████████████ (Tucson); ████████████ (Tucson). *See* Exhibit 2.

**F.  Inappropriate Uses of Force on the Mentally Ill**

176.  The use of chemical agents on prisoners with mental illness is extremely harmful and is contraindicated with these patients. It can increase fear, paranoia, and mistrust; inflict lasting psychological damage; aggravate the symptoms and severity of mental illness; and reduce the chances of successful mental health treatment in the future. It can also increase the risk of self-harm or suicide. In many cases, the mentally ill prisoner against whom chemical agents are used will be in an acutely psychotic state. He or she may be unable to comply with or even comprehend custody directives because of a psychotic or delusional state. In these circumstances, the behavior that prompts the use of chemical agents- disobedience to custody commands- is a direct result of the prisoner's mental illness. In almost all cases, the use of chemical agents on prisoners with mental illness can be totally avoided by appropriate mental health care. At the first sign of a patient decompensating, appropriate mental health intervention should be utilized to prevent worsening of their underlying condition. If the prisoner is failing to comply with custody directives, mental health staff should be called to speak with the prisoner, both to attempt to persuade the prisoner to comply and to assess whether the prisoner's behavior is a symptom of his or her mental illness.

177.   ████  ████████  ██████ is classified as SMI, and carries a diagnosis of "other specified schizophrenia spectrum and other psychotic disorders." Custody officers sprayed him with OC on August 31, 2021 after he used a wire to cut his left wrist. He then received a five-minute cell-front encounter with a psych associate; the note indicates that the patient was not offered the opportunity to speak with the clinician in a confidential area. The psych associate wrote:

> TW [the psych associate] tried to engage Pt in conversation, but Pt had a difficult time talking due to being sprayed by OC spray. Pt reported to TW that he is having fear issues. He stated multiple times, "I have lots of fear right now."

178.   It is not surprising that the patient would "have lots of fear" after having chemical weapons used on him by custody staff. This incident likely aggravated his pre-existing paranoia. *See* Exhibit 2.

179.   As described above, ████  ████████  ██████ at Phoenix-Baker is classified as SMI and diagnosed with a psychotic disorder. Custody staff have repeatedly used OC spray on him while he was in crisis, including on September 13, September 5, August 30, and August 15, 2021. The record indicates that in addition to OC spray, a "fogger" was also used against him on August 30, 2021. That all of these incidents occurred while Mr. ██████ was housed at ASPC-Phoenix, the prison system's designated mental health treatment facility, is especially disturbing. *See* Exhibit 2.

180.   The psych autopsy for ██████  ████  ██████ who died by suicide on August 27, 2020, at Eyman SMU-I's Complex Detention Unit, showed that he was placed in solitary confinement eight days before his death, and he was pepper sprayed by officers a few hours before he hanged himself. *See* Exhibit 3.

181.   A paradigmatic example of excessive use of force on people with serious mental illness is the case of ██████  ████████  ██████ I had planned to interview him during my visit to the Phoenix facility on September 23, 2021, because he had appeared dozens of times on Defendants' self-harm and suicide watch logs for the months before my visit, but upon my arrival I was told that he had been transferred to a different facility

1    hours earlier that very same morning. He has been diagnosed with several serious mental

2    illnesses, including schizophrenia and schizoaffective disorder. The most recent reports

3    Defendants provided showed that he had had frequent lengthy stays on suicide watch and

4    had chemical weapons used against him numerous times, including on July 13, 2021

5    (twice), July 12, 2021, July 9, 2021, July 8, 2021, July 7, 2021, and July 5, 2021 (twice).

6    182.   Subsequent to my visit, I reviewed videos of uses of force on him that

7    Defendants produced after my visit. (ADCRR00159240 and ADCRR00159245).   They

8    were taken at Eyman-Browning Unit on December 16 and December 17, 2020.   As of

9    December 16, 2020, Mr. ███████ had been continuously on watch since December 5,

10   due to psychotic thoughts and voices telling him that he needed to hurt himself, yet his

11   medical record shows he was not seen by a psychiatric provider until December 18, 2020

12   about an adjustment of his medications to address the auditory command hallucinations.

13   183.   According to the video production from Defendants, custody staff either

14   pepper sprayed him or shot him with pepperballs every day from December 10 through

15   December 25, 2020 (except December 14) for banging his head on the wall and cell door

16   while on continuous watch.   Pepperballs are designed to be launched from up to 150 feet,

17   but these videos show him being shot at close range.[24]

18   184.   The December 16, 2020 video shows Mr. ███████ being sprayed in the

19   face with pepper spray by custody staff. The video shows Mr. ███████ clothed in a

20   suicide smock, pacing from the front to the back in his cell, banging his head on the cell

21   door each time he comes to the front of the cell.   There is no indication that mental health

22   staff were present before he was sprayed, or that custody staff know how to de-escalate

23   the situation before resorting to force. After he was sprayed, custody staff took him to the

24   clinic, but he was not decontaminated or allowed to flush the chemicals out of his eyes,

25   even after he and the nurse discuss that his eye hurts.   For much of the time he is in the

26

27

28

clinic he is squeezing his eyes shut and appears to be in pain. The nurse in the clinic asks him what the voices told him, and he reports that they tell him to hurt himself so his daughter won't be raped by the "beast from the sea," and then tells her that the voices tell him he is Moses and can end the world in fire and save his daughter.

185.   After he has been in the clinic for a few minutes, there is a voice in the video that appears to belong to a Psych Associate. She asks if he is still hearing the voices, and if he is focusing on happy memories and remembering that it's not real. He says he doesn't think that works. She says to keep reminding himself they're not real, to "talk the talk," and that banging his head didn't help stop the voices. He tells her that the voices tell him that he has to hurt himself to keep his daughter from being raped, and that he will continue to hurt himself until his daughter lets him know through a telepathic message that she is safe. The encounter with the mental health staff lasts just two and a half minutes, and there are two correctional officers and a nurse in the room with him throughout.  He says that his eyes are burning, but they still were not flushed. The end of the video has only audio, but audio suggests that he was taken out of the clinic without being decontaminated or having his eyes flushed.

186.   The December 17 video starts similarly, with Mr. ████████ dressed in a suicide smock, pacing in his cell and banging his head on the cell front.  Within a minute of the start of the video, custody staff shoot him at close range at least four times with a semi-automatic pepperball launcher,[25] as seen below:

//

//

//

//

//

//

---

[25] See https://www.pepperball.com/products/tac-sf/.



(ADCRR00159245 at 0:00:59)

187.   Again, there is no indication that mental health staff engaged with the patient at all prior to the use of force. The video shows an unidentified person not dressed as a custody officer arriving at his cell seconds before he was shot with pepperballs.  This person did not speak to Mr. ▮▮▮▮▮▮  There is also no indication that custody staff have any knowledge of how to de-escalate situations of this nature with mentally ill patients. Before being taken out of his cell, Mr. ▮▮▮▮▮▮ shouts "I am invincible!"

188.   The video shows him being taken to the medical clinic after he was shot with pepperballs.  He is talking about the voices he is hearing, and a custody officer argues with him, saying "this is behavioral, this is your choice to bang your head." "You chose to bang your head, we told you to stop, and you chose to not stop." "Each time you do this, you're going to get shot with a pepperball now. And if that don't work, I'm gonna tase you." The officer says that he knows that Mr. ▮▮▮▮▮▮ wants to be transferred to Phoenix-Baker (the mental health unit) and "You're not going to Baker Ward. Period." [26] Only after leaving the clinic, on the way back to his cell, is he brought to a shower and water sprayed on the places on his back where he was shot with the pepperballs, more than ten minutes after he was shot.

---

[26] These quotations are approximate.



ADCRR00 at 11:39, 11:53.

189.    The treatment shown in these videos falls below the standard of care for several reasons.  First is the apparent failure to involve mental health staff prior to using force on this patient with serious mental illness.  These uses of force were apparently planned sufficiently in advance that they could be video recorded; it is unclear why mental health staff were not asked to engage with Mr. ████ in an attempt to avoid using force.  Unless an emergency requires immediate use of force, mental health staff should always be called and attempt to de-escalate the situation before force is used on a self-harming patient. Second, it is unclear why Mr. ████ was not immediately decontaminated following the December 16, 2020 use of force. Pepper spray in the eyes and nose can cause excruciating pain, and the failure to immediately decontaminate him, after he had ceased banging his head and was restrained, resulted in needless suffering. Third, it was highly inappropriate for a custody officer to argue with him after the December 17 use of force, and to threaten him with further use of force.  Needless to say, a custody officer is not qualified to diagnose the patient, and determine that his self-harm is "behavioral" or a "choice," or decide whether he would be transferred to a mental health unit. It would have been appropriate for a mental health staff person (not a custody officer) to counsel Mr. ████ after the use of force, but it appears no mental health

staff were present. Finally, it is very concerning that he was self-harming, and was subjected to the use of force, virtually every day for an entire week before he received any attention from a psychiatric provider. He had command hallucinations telling him to harm himself in order to save his daughter. This is a textbook case of severe psychosis requiring immediate administration of antipsychotic medication, to address the voices causing the self-harm. After emergency intervention and administration of antipsychotic medications to stop immediate command hallucinations, a psychiatric provider should have followed up very soon thereafter to re-evaluate his medication regimen.

190.    In this case, Mr. ████████ had been on mental health watch since December 5, when he reported feeling suicidal and hearing voices telling him to hurt himself.  While on watch, he self-harmed, and was subject to use of force, on December 10 and virtually every day thereafter through December 25; he was not seen by a mid-level psychiatric provider until December 18.  This falls far below the standard of care.

191.    Another patient, ████ ████████ ██████ was discussed by Dr. Stefanie Platt during her deposition on October 15, 2021. Dr. Platt was Centurion's Regional Director of Mental Health until late July 2021.  She was questioned regarding a February 12, 2020 email regarding a patient at ASPC-Phoenix, that reads as follows:

> Richard and Vanessa,[27]
>
> This mental health patient at Phoenix has been self harming by banging his head for the past several days resulting in multiple ICS events and the use of OC spray. Mental health appears to be at a loss on how to deal with this inmate.
>
> In an email sent today the Regional Director of Mental Health basically said to continue using OC spray as needed while the on site mental health team comes up with a treatment plan. We are told that Dr. Carr [the Regional Director of Psychiatry] has been consulted by phone but there is minimal documentation in the medical record to support any significant involvement by a psychiatrist. This inmate now has wounds on the back of his head and on his forehead from the head banging. There are staples holding the wound edges together on the back of his head but the forehead wound remains open as the two previous attempts to staple his frontal wound have failed because

---

[27] Based on the response to this email, it appears that the recipients were former named Defendant Richard Pratt, Assistant Director of the ADC Medical Services Contract Monitoring Bureau, and Vanessa Headstream, an employee of the Monitoring Bureau.

of the continuous head banging.

We just received a copy of an I/R [incident report] completed by security staff from last evening indicating that the mental health RN was encouraging the inmate to bang his head so that the restraint chair could be used. At the time of this nurse/patient encounter, the patient was NOT participating in head banging but began banging his head after the nurse told him to do so … which resulted in a Use of Force event. This entire event was captured on video.

The FHA [Facility Health Administrator] and mental health apparently had a meeting this morning about this patient without having any input from Complex Operations. The FHA reported at the Warden Tracker meeting this afternoon that:

- the patient has allegedly lost 30 pounds since December
- Mental health staff and nursing staff are verbally reporting that the condition of this patient "is deteriorating" from his normal baseline standards
- When asked at the Tracker meeting this afternoon why this situation has not (apparently) been escalated to a psychiatric emergency with a Psychiatrist coming to Phoenix to complete a comprehensive examination and evaluation of this patient, the FHA responded that Dr. Carr would be coming on **February 24** to assess the patient. Apparently Dr. Carr is out of town. When the Warden asked the FHA if there is another Psychiatrist in the system who can come to Phoenix to assess the patient, she did not know.

The Warden and I share the concern that this particular issue is a true psychiatric emergency and that the response from the Centurion mental health leaders at the Regional level is inadequate. Warden Weiss is escalating this concern through his chain of command and I am doing likewise.

We will keep you updated.

Thanks.

Richard Watts, RN
Nurse Liaison Program Evaluation Specialist
Prison Operations Division
Arizona Department of Corrections Rehabilitation Reentry
Phoenix Complex

ADCRR 78089-90 (emphasis in original).

192.    Dr. Platt testified that she was aware of this patient and the situation, but at the time she was not the Regional Mental Health Director who allegedly instructed to custody staff to "continue using OC spray" while the mental health team came up with a

treatment plan.[28]  She testified that she and other Centurion leaders at the regional office level did not have "knowledge that the individual was self-harming repeatedly in this way at that time" until the email was sent to them.[29]

193.   This is profoundly troubling for multiple reasons – particularly because this situation occurred at ASPC-Phoenix, which is supposedly ADC's dedicated mental health facility for the most acutely mentally ill persons. It is totally inappropriate under any context for a nurse to tell a patient to harm himself.[30] Indeed, it is profoundly disturbing that it is unknown if this nurse was ever disciplined, terminated, or reported to the State Board of Nursing for investigation for this egregious violation of her duty of care to her patients. It is completely inappropriate for a nurse to make the decision to place somebody into a restraint chair, and Dr. Platt testified that the policy has been that only psychologists and psychiatrists can make orders to place self-harming people in restraints.[31] It is also inappropriate to direct staff "to continue using OC spray as needed while the on site mental health team comes up with a treatment plan."

194.   And it is incomprehensible that, faced with what Nurse Watts calls "a true psychiatric emergency," Dr. Carr (Centurion's Regional Psychiatric Director) was not planning to assess the patient until February 24 – *twelve days* after the date of Nurse Watts' email.  Was there no other Centurion psychiatrist physically in the State of Arizona who could have evaluated the patient?  (Dr. Platt testified that at the time of this incident, there was no on-site psychiatrist who worked at ASPC-Phoenix, that the psychiatric provider for the facility was via telehealth, and that there was only one psychiatrist besides Dr. Carr that worked for Centurion who was physically in Arizona.)[32]  Was it not possible for a psychiatrist from the Arizona State Hospital – which is literally next door to

---

[28] 10/15/21 Deposition of Dr. Stefanie Platt, 88:17-90:4 (Deposition Exhibit 5). Dr. Platt was the Assistant Regional Mental Health Director at the time.
[29] *Id.*, 91:4-12.
[30] Dr. Platt agreed that it was not an appropriate response by the mental health RN to tell the patient to bang his head, and she was not aware of whether the RN was disciplined or sanctioned.  *Id.*, 91:16-92:15.
[31] *Id.*, 92:16-93:2.
[32] *Id.*, 93:12-94:21.

ASPC-Phoenix – to evaluate the patient?  Even if there was no psychiatrist available to evaluate the patient in person, an emergent telepsychiatry consult could have, and should have, been performed.

195.    Dr. Carr responded to Nurse Watts' email on February 12.  He wrote:

This unfortunate situation is a symptom of a larger problem.

Numerous elements impede timely intervention, quality of care, implementation of a comprehensive treatment plan and psychiatric stability.

Our inpatient unit needs a larger investment from Psychiatry, Nursing, Mental Health, ADC and Medical.

As you know our inpatient unit is licensed by DHS. It is imperative we model our clinical program according to clinical guidelines and license rules/regulations.

Patient [] is the immediate focus. However, barriers to care, collaboration, education, training and communication need to be addressed in order to implement a solid care plan.

(ADCRR0078087).

196.    The treatment of this profoundly mentally ill patient, as well as that of other patients cited in my report, is symptomatic of larger problems in ADCRR's mental health care system.[33]  As described in Part III.C.1, all too often, patients with serious mental illness who are engaging in serious acts of self-harm or are profoundly symptomatic, are left to spiral out of control, which results in the "kindling" effect where their neurological damage can become permanent and worsen. It is the height of irresponsibility for facility psychiatric providers and mental health clinicians to throw their hands in the air and say, "we can't do anything for this patient," and let the patients cycle ever deeper into worsening self-injurious and decompensating behavior. This requires a multi-faceted response by an integrated treatment team, addressing both the therapeutic and psychiatric needs of the patient.  If the patient is repeatedly and continuously engaging in self harm, there must be (a) emergent / urgent administration of antipsychotic medication to ease the

---

[33] Dr. Platt testified that she agreed with Dr. Carr's statement that the treatment of this patient was symptomatic of larger systemic problems in ADCRR's correctional mental health care system.  *Id.*, 95:7-96:17.

voices / thoughts prompting and driving the self-harm, (b) very close medication management and readjustment by the psychiatric provider, and (c) intensive one-on-one therapeutic management of the patient by clinicians.  This is not happening in the cases I have reviewed.

197.   At a psychiatric hospital, if a patient were acting this way or feeling these urges to self harm, there would be one or more mental health staff at the patient's side at all times, talking to him, relating to him, walking around with him, engaged as much as possible in a therapeutic interaction and observations.  When incarcerated patients reach such acute and ongoing levels of self-harm, that is the standard of care that they should be receiving.  Having a custody officer sitting at a table reading a book nearby, with a psych associate passing through once a day, is not what would be done at a psychiatric hospital, and it is clearly not sufficient to address the self-harm of these patients.

198.   Moreover, as described above in Part III.C.2, in my discussion of "de-diagnosing," the response of mental health and custody staff to Mr. ████ and Mr. ████ appears to be a practice of minimizing and dismissing peoples' profound mental health disorders and clear symptoms of acute psychosis and altered thinking as merely "behavioral issues," and a belief that these patients are "choosing to bang your head" or "choosing to cut yourself."

199.   Finally, these patients' experiences also illustrate my belief that custody staff assigned to work in facilities or units designated for profoundly mentally ill persons, must receive specialized training above and beyond whatever is given to all officers, about how to interact with people with mental illness or developmental disabilities.[34]   These

---

[34] Dr. Platt testified that custody staff who were assigned to units housing prisoners with developmental disabilities or mental illness did not receive additional training in interacting with these populations, and she agreed it would be helpful if custody staff were required to receive such training.  *Id.*, 99:15-25.

Q:  Do you think that custody officers assigned to work at Phoenix or in suicide units should receive additional training on interacting with people with serious mental illness?
[…]
The Witness: I absolutely do.

1   patients, by virtue of their mental illness and/or disabilities, can be very difficult to work

2   with. Custody staff must be trained how to de-escalate and engage with these patients, and

3   not go to a knee jerk response of chemical agents, pepperball guns, or tasers.[35]

4   **G. Inappropriate Use of Isolated Confinement on People with Mental Illness**

5   200.   As noted in Part II above, during my visits I visited most or all of the key

6   mental health programs in the institution, including all mental health/suicide watch units,

7   visited segregated units including maximum custody and detention units. The persons

8   housed in these extreme conditions of isolation were often profoundly mentally ill and in a

9   very precarious mental health condition. These people with mental illness are particularly

10   vulnerable to the harsh, stressful, chaotic, and violent conditions that prevail in ADCRR

11   today, especially in isolation, and are most at risk of self-harm and suicide.

12   201.   Isolated confinement – that is, confinement in a cell for 22 or more hours

13   each day with limited social interaction and environmental stimulation – can be

14   profoundly damaging to mental health even for prisoners with no known mental illness.

15   For those with serious mental illness, such as psychotic disorders and major mood

16   disorders, it can be devastating, leading to severe deterioration in mental health, self-harm,

17   or suicide. For these reasons, the American Psychiatric Association has declared that

18   "prolonged segregation of adult inmates with serious mental illness, with rare exceptions,

19   should be avoided due to the potential for harm to such inmates." "Prolonged segregation"

20   is defined as a "duration of greater than 3-4 weeks."[36]

21   202.   The consensus against isolated confinement of people with mental illness

22   has grown even more robust since I discussed the issue in my 2013 report (pp. 58-60). The

23

24

25   *Id.*, 106:19-24. She testified that she had recommended that such training occur for custody staff at these units, but "the training did not occur." *Id.*, 106:24-107:14.

26   [35] Dr. Platt also testified that nursing staff were not regularly provided training about psychiatric crisis intervention or uses of restraints at the time of the February 2020

27   incident where the nurse told the patient to bang his head so he could be put into restraints. *Id.*, 100:18-101:21.

28   [36] American Psychiatric Association, Position Statement on Segregation of Prisoners With Mental Illness, Approved Dec. 2012.

National Alliance on Mental Illness "opposes the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses."[37] The Society of Correctional Physicians states that "prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment."[38] And the National Commission on Correctional Health Care (NCCHC) states that juveniles, pregnant persons, and persons with mental illness should be "excluded from solitary confinement of any duration." [39]

203.    And placement in isolated confinement can interfere with appropriate mental health treatment. For example, the ADC Mortality Review for ███ ████ ██████ who died (not by suicide) on January 10, 2021, concluded that "there were significant lapses in lithium monitoring. It is unclear why a level was not performed in December 2020. May have been due to the patient being housed in isolation at that time." ADCRRM26241.

204.    The psychological autopsy for ██████ ████ ██████ who died by suicide in August 2020 in the harsh conditions of Eyman SMU-I's Complex Detention Unit, identified his placement in solitary as a likely contributory factor. It noted:

> His placement in detention and then in maximum custody after requesting protective segregation appeared to have increased his anxiety level and negatively affected his sleep and concentration. In retrospect, it appears he was having difficulty adjusting to a higher level of confinement. Although he had protective factors such as ongoing family communication and support as well as a high school diploma (education), these proved to be insufficient when Mr. Neal was placed in a maximum custody environment.

ADCRR155. *See also* Exhibit 3.

205.    Finally, I close by describing behavior by ADCRR and Centurion officials that graphically illustrate the disregard for the risk of harm to class members with mental

---

[37] National Alliance on Mental Illness. 2016. <u>Public Policy Platform of the National Alliance on Mental Illness</u>. 12th Ed., Sect. 9.8, at <u>https://www.nami.org/About-NAMI/Policy-Platform</u>.

[38] Society of Correctional Physicians. 2013. <u>Position Statement, Restricted Housing of Mentally Ill Inmates</u>. <u>http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates</u>.

[39] National Commission on Correctional Health Care. 2016. Position Statement: Solitary Confinement (Isolation). <u>Journal of Correctional Health Care</u>, 22(3), 357-263.

illness caused by the harsh and prolonged use of solitary. On the morning of September 8, 2021, I went to ASPC-Eyman Browning's Behavioral Management Unit ("BMU") which I was told by staff is designated to house MH-4 (seriously mentally ill) patients. These are small cells with perforated doors and walls, with plexiglass mounted on the inside. As we entered the unit (Dog cluster, pod 4), I immediately saw that the plexiglass fronting of cell 35 was covered with splattered blood. There were pools of blood on the ground as well. The people living in the adjacent cells reported that the previous evening, the man in that cell cut both of his arms and perhaps his legs, and hit an artery. One neighbor reported that despite the incarcerated people banging on their cell doors and yelling "man down," it took at least five minutes for officers to respond, and that no effort had been made to clean this person's cell since the evening before. His neighbors expressed concern that he had potentially "bled to death" and asked us to monitor death announcements in the coming days. Pictures of the cell are below and on the following pages:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Source: ADCRR00137142-46.

206.    What I found most striking about all of this was the fact that despite the prison knowing that I would be visiting with an attorney from the ACLU that morning, with the purpose of visiting mental health units, no effort had been made to clean the cell for at least eight to twelve hours. And during my visit, as with all of my visits to Arizona prisons, ADCRR and Centurion insisted on having a large group of unidentified persons from their central offices and the facility follow me and the attorney around, as if getting to watch me do cell-front interviews is some sort of prestigious assignment. In the past when I have stumbled upon or found disturbing problems, there is sometimes an effort (albeit perhaps just for show or half-hearted) by higher-ups barking orders to officers to clean up or address the problem. Not so here. Rather, the entire time that I and the ACLU attorney were speaking to people around this bloody cell, and asking that photos be taken,

these ADCRR and Centurion people made no effort to address it – let alone, acknowledge it. In fact, there were no efforts made by the prison officials from headquarters or the warden's office to direct officers or porters that the cell be immediately cleaned. I had planned to go visit the unit again late in the afternoon before our visit ended to see if staff had bothered to clean it in the intervening seven hours, but we did not have time.

207.   I reviewed Plaintiffs' December 2019 Eyman monitoring report filed with the Court (Doc. 3508-1, Ex. 1), including the living conditions at Eyman's isolation units at Browning and SMU-I. *Id*. at 39-46. I was saddened but not surprised by the descriptions and photographs of the conditions at Eyman-SMU-I's mental health watch unit at 1-Baker in December 2019. Memorably, this included the graffiti within the entrance to the suicide watch unit, that read, "Don't go suicidal. This place sucks. Please help me.":



Signed October 28, 2021, in Honolulu, Hawai'i.

PABLO STEWART, M.D.

Respectfully submitted,

Dated: October 29, 2021

**ACLU NATIONAL PRISON PROJECT**

By:  s/ Corene T. Kendrick
David C. Fathi (Wash. 24893)**
Maria V. Morris (D.C. 1697904)*
Eunice Hyunhye Cho (Wash. 53711)**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@aclu.org
          mmorris@aclu.org
          echo@aclu.org

Corene T. Kendrick (Cal. 226642)*
39 Drumm Street
San Francisco, California 94111
Telephone: (202) 393-4930
Email:    ckendrick@aclu.org

*Admitted *pro hac vice*
**Admitted *pro hac vice*. Not admitted in
DC; practice limited to federal courts.

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          rlomio@prisonlaw.com
          sophieh@prisonlaw.com

*Admitted *pro hac vice*

Victoria López (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:    vlopez@acluaz.org
          jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(d)

Daniel C. Barr (Bar No. 010149)
John H. Gray (Bar No. 028107)
Austin C. Yost (Bar No. 034602)
Karl J. Worsham (Bar No. 035713)
Kathryn E. Boughton (Bar No. 036105)
Mikaela N. Colby (Bar No. 035667)
Kelly Soldati (Bar No. 036727)
Alisha Tarin-Herman (Bar No. 037040)

**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
         jhgray@perkinscoie.com
         ayost@perkinscoie.com
         kworsham@perkinscoie.com
         kboughton@perkinscoie.com
         mcolby@perkinscoie.com
         ksoldati@perkinscoie.com
         atarinherman@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm; Desiree*
*Licci; Joseph Hefner; Joshua Polson; and*
*Charlotte Wells, on behalf of themselves and*
*all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**


By: s/ Maya Abela
    Asim Dietrich (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone: (602) 274-6287
    Email:   adietrich@azdisabilitylaw.org

    Rose A. Daly-Rooney (Bar No. 015690)
    Maya Abela (Bar No. 027232)
    **ARIZONA CENTER FOR DISABILITY LAW**
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone: (520) 327-9547
    Email:
      rdalyrooney@azdisabilitylaw.org
      mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2021, I electronically transmitted the above

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

/s/ D. Freouf

LEGAL23774493.1

-92-