Index of Exhibits to the Expert Declaration of Pablo Stewart, M.D.

| Ex. | Description | |
|---|---|---|
| 1 | Dr. Stewart's current C.V. | Redacted |
| 2 | Dr. Stewart's write-ups of mental health care | Redacted |
| 3 | Dr. Stewart's suicide reviews | Redacted |
| 4 | Information relied upon by Dr. Stewart | Redacted |
| 5 | List of class members interviewed by Dr. Stewart, September 2021 | Under Seal |
| 6 | Photographs taken at Dr. Stewart's direction during September 2021 prison tours | |

# EXHIBIT 1

# REDACTED AND

# FILED UNDER SEAL

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***



**e-mail:** ███████████

**(Updated July 2021)**

<u>Personal Statement:</u>

As evidenced in my CV, my psychiatric career is based on several guiding principles. These include but are not limited to a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone.

<u>Language Competency:</u>

Fluent in both Spanish and English.

<u>EDUCATION:</u>

University of California, San Francisco, Teaching Certificate in General Medical Education, 2017

University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986

University of California, San Francisco, School of Medicine, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry

<u>LICENSURE:</u>

California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Hawaii Controlled Substances Certificate of Registration #E14341
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564

<u>ACADEMIC APPOINTMENTS:</u>

July 1, 2019-
Present

<u>Academic Appointment:</u> Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine.

February 22, 2018-
February 22, 2019

<u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine.

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco.<br>School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u> Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u> Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u> Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| July 2019-<br>Present | Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I present a lecture series to the psychiatric residents regarding Forensic Psychiatry. I also serve as an Attending Psychiatrist in the Emergency Department and the Psychiatric Inpatient Unit at the Queens Medical Center. |
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues, extensive experience in all phases of capital litigation and correctional psychiatry. |
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u> <u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u> <u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community-based case management program.  Duties also |

include medical/psychiatric consultation to Veteran Comprehensive Homeless Center. This is a social work managed program that provides comprehensive social services to homeless veterans.

April 1991 -
February 1995

<u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical Center, San Francisco.</u>
Overall clinical/administrative responsibility for SAIU.

September 1990 -
March 1991

<u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco.</u> Clinical responsibility for patients admitted to SAIU. Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues.

August 1988 -
December 1989

<u>Director, Forensic Psychiatric Services, City and County of San Francisco</u>. Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco. Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital.

July 1986 -
August 1990

<u>Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital.</u> Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward. Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco. Advise San Francisco City Attorney on issues pertaining to forensic psychiatry.

July 1985
June 1986

<u>Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.</u> Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students.

July 1984 -
March 1987

<u>Physician Specialist, Westside Crisis Center, San Francisco, CA.</u> Responsibility for Crisis Center operations during assigned shifts, admitting privileges at Mount Zion Hospital. Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested.

April 1984 -
July 1985

<u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u>
Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues.

August 1983 -

<u>Physician Specialist, Mission Mental Health Crisis Center,</u>

3

| | |
|---|---|
| November 1984 | <u>San Francisco, CA.</u>   Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge.  Highest rank attained was Captain. |

<u>HONORS AND AWARDS:</u>

| | |
|---|---|
| June 2020 | Recognized by the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii as the recipient ot the 2019-2020 Excellence in Teaching Award-Psychiatry. |
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |

| | |
|---|---|
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.  Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 - January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000- April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001- September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002- June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003- April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003- January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004- June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004- January 2006; February 2017- October 2018 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006- January 2007; April 2013- January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007- March 2013; February 2015- 2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| June 2020- Present | Member of the John A. Burns School of Medicine, University of Hawaii Scholarship Committee. |
| June 2020- Present | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.   Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

<u>TEACHING RESPONSIBILITIES:</u>

| | |
|---|---|
| July 2019-<br>present | Present a lecture series to the psychiatric residents of the Department of Psychiatriy, JABSOM, University of Hawaii on forensic psychiatry. Psychotherapy supervisor Department of Psychiatriy, JABSOM, University of Hawaii. |

| | |
|---|---|
| December 2018-<br>May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of<br>Hawaii. |
| September 2016-<br>June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*,<br>University of California, San Francisco, School of Medicine. |
| August 2014-<br>June 2018 | Small Group Facilitator, Foundations of Patient Care, University<br>of California, San Francisco, School of Medicine. |
| July 2003-<br>June 2018 | Facilitate weekly psychotherapy training group for residents in the<br>Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of<br>California, San Francisco, School of Medicine, "Prisoner<br>Health." This is a 1-unit course, which covers the unique<br>health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency<br>Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug<br>Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans<br>Comprehensive Homeless Center. |
| September 1990-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry,<br>Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of<br>California, San Francisco, School of Medicine. Designed, planned<br>and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse."<br>This is a 1-unit course, which covers the major aspects of drug and<br>alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury<br>Free Clinic, Drug Detoxification and Aftercare Project. Supervise<br>4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency<br>Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric<br>Aspects of Medicine," University of California, San Francisco,<br>School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient<br>Clinic, Department of Psychiatry, University of California, San<br>Francisco, School of Medicine. |

| | |
|---|---|
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric |

|                          | Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
|--------------------------|---------------------------------------------------------------------|
| July 1985 – August 1990  | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital.  Teach and supervise medical residents in interviewing and communication skills.  Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

## COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| May 2016- Present        | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
|--------------------------|---------------------------------------------------------------------|
| June 2015- May 2017      | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014- Ocotber 2018 | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014    | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-present      | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007- Present    | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM.  The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners.  My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order.  *See Brown v. Plata,* ___ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |

| | |
|---|---|
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific<br>Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii,<br>Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement,"<br>New Mexico Corrections Department (NMCD).   This is a<br>settlement arrived at between plaintiffs and the NMCD regarding<br>the provision of constitutionally mandated psychiatric services for<br>inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United<br>States Department of Justice, Civil Rights Division, Special<br>Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training<br>Alliance's Alcohol and Drug Disability Technical Assistance<br>Project.   This Project provides assistance to programs and<br>communities that will have long lasting impact and permanently<br>improve the quality of alcohol and other drug services available to<br>individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and<br>Delinquency (NCCD) in its monitoring of the State of Georgia's<br>secure juvenile detention and treatment facilities.  NCCD is acting<br>as the monitor of the agreement between the United States and<br>Georgia to improve the quality of the juvenile justice facilities,<br>critical mental health, medical and educational services, and<br>treatment programs.  NCCD ceased to be the monitoring agency<br>for this project in June 1999.  At that time, the Institute of Crime,<br>Justice and Corrections at the George Washington University<br>became the monitoring agency.  The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign<br>Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance<br>Abuse Treatment, Substance Abuse and Mental Health Services<br>Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer<br>Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc.<br>Review all research protocols for the clinic per Department of<br>Health and Human Services guidelines. |

| | |
|---|---|
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic.<br>Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services,<br>Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>June 2002<br>June 1991-<br>June 1994 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA.<br>Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1. San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2. Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3. Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4. 24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5. Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6. Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7. First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8. American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9. Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.     University of California, San Diego.   Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17.     National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists.  (9/10/94).  "Psychiatry, Homelessness, and Serious Mental Illness."

18.     Value Behavioral Health/American Psychiatry Management Seminar.   (12/1/1994).  "Substance Abuse/Dual Diagnosis in the Work Setting."

19.     Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20.     San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.    (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01).  "Demystifying Dual Diagnosis."

21.     First Annual Conference on the Dually Disordered.   (3/10/1995).   "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.     Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995).  "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.     Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.    (11/23/95).  "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.     The Labor and Employment Section of the State Bar of California.   (1/19/96).  "Understanding Alcoholism and its Impact on the Legal Profession."   MCCE Conference, San Francisco, CA.

25.     American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27.     Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.     International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.     Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.     Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.     Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.     Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.     DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.     The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.     The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.     American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.     "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.     "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.     Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.     Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.     Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.     "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer."  The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47. Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48. Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51. California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52. California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54. 1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55. "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56. Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57. "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58. Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59.     American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999).  Entry Level Process Group Leader.

60.     "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.     "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.     "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.     "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.     Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.     "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.     California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.     "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.     State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.     11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.     The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho.  (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan.  (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California.  (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California.  (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center.  Kahului, Maui.  (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.     "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.     "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.     "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.     "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.     "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.     "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.     "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.     "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.     "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.     "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.     "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.     "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.   "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.   (6/29 & 7/27/00)

105.   "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.   Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.   "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.   (11/1/00, 3/13/01)

109.   "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.   "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.   "Wasn't One Problem Enough?"   Mental Health and Substance Abuse Issues.   2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.   "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.   "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.   "Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.   Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116.   National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."   I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.   Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders."  San Jose, California.  (6/15/01)

118.   Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser."  Olympia, Washington.  (11/15/01)

119.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (1/14/02)

120.   First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas."  El Centro, California.  (1/28/02)

121.   The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

122.   Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123.   3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System."  (6/5/02)

124.   New Mexico Department of Corrections, "Group Psychotherapy Training."  Santa Fe, New Mexico.  (8/5/02)

125.   Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California.  (8/15/02)

126.   California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California.  (8/22/02)

127.   Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.   Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.   "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (10/1/03), (12/3/03)

130.   "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California.  (10/18/03)

131.   "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California.  (4/2/04)

132.   Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134.   "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.    "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.    Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.    Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.    "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.    Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.    "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.    "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.    "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.    "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.    "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.    "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.    "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.    "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.   Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.   2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.   Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.   Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.   2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.   2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.   Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.   Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.   "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.   San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.   Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.   "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163.   Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

PUBLICATIONS:

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*. Hospital and Community Psychiatry, 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3)   Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)   Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)   Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)  Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)  James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13) Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14) Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

15) Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16) Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17) Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)* Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)* Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.

# EXHIBIT 2

# REDACTED AND

# FILED UNDER SEAL

# Exhibit 2

## Summaries of File Reviews of Class Members

ASPC-Eyman ........................................................................................................ 1

ASPC-Lewis ........................................................................................................ 14

ASPC-Perryville .................................................................................................. 16

ASPC-Phoenix ..................................................................................................... 28

ASPC-Tucson ...................................................................................................... 36

**ASPC-Eyman**

████████████

I interviewed the patient at cell front on 9/8/21. He reported that he is being treated for "depression and schizophrenia" and that he is prescribed Zyprexa and Cogentin. He complained about a lack of programming. A review of his records revealed that in fact he is receiving Zyprexa and Cogentin. He is also prescribed Paxil. His most current diagnosis is "Schizophrenia" which was made in 3/27/19. Of note, his medical record has a discrepancy – one entry from 8/24/21 says he attended group therapy while another that same date says that group programming was cancelled due to staffing shortages.

- Failure to provide mental health programming/therapy.

████████████

I previously interviewed Mr. ██████ in 2013 when he was on continuous watch, and had no medication orders in his chart. Mr. ██████ was on mental health watch when I visited Eyman on 9/8/21. This patient is currently diagnosed with unspecified Bipolar disorder. In recent months, he has shown an escalating and extremely dangerous pattern of self-harm, which has not been appropriately recognized or responded to by mental health staff.

On 6/28/2021 there was a crisis response when Mr. ██████ cut himself on the arm using a "small spring" from his water bottle. Later he was agitated and yelling at staff. On follow-up on 6/29/2021, the patient endorsed "10/10" on urges to harm himself. He then spit on the social worker, leading to a throw shield being placed in front of his cell. The psychiatric provider on 6/30/2021 documented a "non-clinical contact note" due to the patient's refusal to attend the appointment; the provider visited his cell to confirm refusal of appointment. The record contains no record of the psychiatric provider's impressions given the recent "ICS" activation and the patient's escalating behavior.

On 7/13/2021 Mr. ██████ cut himself three times on the left forearm using a piece of metal. A follow up mental health visit on 7/14/2021 documented suicidal ideation. Further ICS responses were called on 7/17/2021, 7/18/2021 (three times), 7/21/2021, 7/26/2021, 7/29/2021, and 8/2/2021, all for continued self-harm. On 7/18/2021 Mr. ██████ re-opened an old scar on the left forearm which was "2 inches in length and about 1/8-1/4 deep (the depth of the scar mainly)." A follow-up ICS response noted the patient saying he may cut again later that night, which he subsequently did with a "small rock". On 7/26/2021 Mr. ██████ was found hanging in his cell with both feet off the ground. He was taken down by officers and found breathing, but not responding. After suicide watch on 8/2/2021, Mr. ██████ was agitated toward staff. The psychiatric prescribing provider only documented "non-clinical provider notes" on 8/17/2021, without adequate assessment, and renewed existing medications. The 8/17/2021 note contains no documentation of an assessment in light of Mr. ██████' recent serious self-harm by

hanging. The patient remained in an "outpatient-specialized MH program," but considering his serious and escalating self-harm, this is an inappropriate level of care.

This patient is receiving highly inadequate and dangerously deficient care. He has engaged in self-harm on multiple occasions leading to crisis response by staff. Despite the escalating severity of his self-harm, the patient did not receive appropriate psychiatric assessment or change in treatment, with the result that his self-harming behavior continued. The patient's escalating behavior led finally to him being found hanging, feet off the ground, and unconscious, which could well have resulted in his death. Furthermore, all contact by a psychiatric provider was logged as "non-clinical contact note," despite the provider having seen the patient. In these notes, there was no mention of the patient's escalating self-harm or suicide attempt. Rather, the assessment and diagnosis sections in the notes were left blank, with an inadequate plan.

This patient is at very grave risk of serious injury or death. He needs to be urgently transferred to an inpatient hospital setting.

- Failure to manage medications.
- Patients who remain highly symptomatic.
- Failure to provide self-harming prisoners basic mental health care.

███████████████

I attempted to interview Mr. ████ at cell front on 9/8/21. Upon approaching his cell, I noted that he was pacing while shouting at non-existent individuals, displaying rambling and incoherent speech. After many attempts, I was unable to engage him in a proper interview. A review of his records revealed that his most current diagnosis is Schizoaffective Disorder, unspecified type, dated 6/11/18. His medication is a low dose of the antipsychotic Abilify, 5 mg twice a day. A psychiatric progress note from 8/19/21 noted that Mr. ████ has tangential thought processes, delusional thought content, paranoia and auditory/visual hallucinations. The note did not contain any discussion about augmenting the antipsychotic treatment. Finally, a treatment plan dated 9/1/21 noted Mr. ████ psychosis but did not mention anything about referring him back to the psychiatrist for a medication adjustment. This represents poor care due to the patient being highly symptomatic and nothing being done to address these psychotic symptoms. Abilify 5 mg twice a day is very low dose as this medication can be safely prescribed at 30 or 40 mg daily. Also, there was no coordination between the psychologist and psychiatrist. Finally, a mental health tech wrote a note on 9/15/21 which stated in part "patient didn't report any mental health concerns." The mental health tech is obviously unqualified to properly assess psychotic patients. The medication management of this patient is extremely poor and places the patient at risk for self-harm or harming others.

- Inadequate treatment plan.
- Failure to manage medications.
- Patients who remain highly symptomatic.
- Failure to provide self-harming prisoners basic mental health care.

- Incompetent clinicians

███████████

I interviewed this patient at cell front on 9/8/21. He presented as very paranoid with ideas of reference and auditory hallucinations. He was psychotic and reported that he'd been tried on a variety of psych meds and that "all of them made me bug out." A review of his records revealed that his most current diagnosis is from 1/3/20 and it is "unspecified schizophrenia spectrum and other psychotic disorder." His medication record showed that his last order for antipsychotic medication, Risperdal 1 mg twice a day, expired on 7/13/20. Of special note is a mental health tech segregation rounds note on the same day that I examined Mr. ██████ that stated, "when asked if the patient had any mental health concerns to report at this time patient denied."

There are many things wrong with this case. I noted the patient to be floridly psychotic and the mental health tech didn't pick up on any of the patient's psychotic symptoms. The patient is untreated for his psychotic disorder and his many debilitating symptoms.
- Failure to provide mental health treatment.
- Failure to manage medication.
- Patients who remain highly symptomatic.
- Incompetent clinicians.

███████████

I interviewed Mr. ██████ at cell front on 9/8/21. He complained of experiencing auditory hallucinations of a command nature that are telling him to hurt himself and others. He also reported having a history of self-injurious behavior including stabbing and cutting himself. A review of his records revealed that his most current diagnosis was made on 3/9/20 and is Schizophrenia, unspecified. His only medication is Risperdal Consta, 12.5 mg injected every two weeks.

This is very dangerous care in that he is at risk of self-harm or harming someone else due to his untreated command auditory hallucinations. The starting dose of the antipsychotic Risperdal Consta is 25 mg injected every two weeks. Very poor medication management.
- Failure to manage medication.
- Failure to provide suicidal and self-harming prisoners basic mental health care.
- Patients who remain highly symptomatic.

███████████

I examined Mr. ██████ in 2013, and found that while he was prescribed Lithium, his levels were very low and he had psychosis.  The 2021 chart review found that this patient's current medications are Fluoxetine 40mg qAM and Trilafon 2mg twice daily, with his last psychiatric diagnosis listed as Unspecified disruptive, impulse-control, and

conduct disorder & Unspecified Mood disorder. He has a history of being on Lithium, Trileptal, Olanzapine, Lamictal, PRN hydroxyzine, and Citalopram back to 2019 from the present.

This patient is not being adequately monitored for medication side effects.  AIMS screening was not conducted from 2017 to 2020, despite the patient being on multiple antipsychotics that can give rise to tardive dyskinesia and other serious, potentially permanent side effects. With Trilafon there is increased concern for tardive dyskinesia. In addition, there was no mention in the medical or psychiatric notes of abnormal thyroid labs collected on 3/6/2020, and no follow-up on those results.  Given that the patient was on Lithium at the time, this was a concerning result that required follow-up.

- Failure to properly manage medications.
- Failure to follow side-effects.


I interviewed Mr. ▮▮▮▮ at cell front on 9/8/21. He told me that his diagnosis is either Schizoaffective Disorder or Bipolar Disorder. He reports that his condition was previously well controlled on the antipsychotic, Seroquel, but was told that he can't have it now. A review of his records revealed that his current diagnosis is "Unspecified Mood Disorder" and is treated with Lithium, Zyprexa and Cogentin. There was no explanation in the record why his diagnosis was changed. Of note, his last documented lithium level is from 10/16/20.  Lithium levels need to be checked at least every six months. Monitoring the patient's lithium level is especially important in the heat of Arizona as lithium makes a person very susceptible to heat-related illnesses.

- Inadequate monitoring and management of medication therapeutic levels.
- Inadequate formulary.
- Risk of heat injury or death.
- Miscellaneous poor care.


I interviewed the patient at cell front on 9/8/21. He was complaining about the lack of programming and how his psychiatric symptoms were getting worse. That is, he was experiencing worsening auditory hallucinations and increased anxiety. He also displayed prominent delusional thought content and ideas of reference. He reported being prescribed the antipsychotic Zyprexa and the antidepressant Prozac. A review of his records revealed that in fact he is prescribed Zyprexa and Prozac. A progress note on the same day that I interviewed him amazingly stated "no evident psychosis." This progress note was completed by a licensed psych associate. This psych associate shouldn't be allowed to see patients independently as she is grossly incompetent. This case also points out the fact that proper psychiatric treatment necessarily includes medications and therapeutic programming.  The lack of adequate out of cell programming was causing his

symptoms to worsen even though he was being prescribed a reasonable medication combination.

- Failure to provide mental health programming/therapy.
- Patients who remain highly symptomatic.
- Incompetent clinicians.

████████████████

I interviewed Mr. ██████ in a confidential setting on 9/8/21. He voluntarily told me that the CIA was monitoring his thoughts. He went on to describe an elaborate delusional system which included the CIA and various government officials. He presented as very paranoid and reporting hearing and seeing high-ranking government officials in his cell. During the course of our interview, he was responding to internal stimuli and scanning the room. He had a silly and inappropriate affect and displayed pressured speech. Mr. ████████ was floridly psychotic which could be easily determined by just observing him. A review of his records revealed that his current diagnosis is "unspecified schizophrenia spectrum and other psychotic disorder" which was made on 11/9/20. His medication was the antipsychotic, Zyprexa 20 mg in the evening. He had been on this dose of Zyprexa for over a month at the time of my evaluation. A psychiatric progress note dated 9/2/21 stated in part "thought content-unremarkable" and "no delusions elicited." The treatment plan was to continue the current dose of Zyprexa and follow up in two months.  The psychiatrist who evaluated Mr. ████████ on 9/2/21completely missed the patient's severe degree of psychosis. This seriously calls into question her clinical competence. Also, it is obvious from the medical record that the Zyprexa is ineffective in reducing the patient's degree of psychosis and either the dose should be increased or switched to a different antipsychotic medication. This represents very poor care.

- Inadequate treatment plan.
- Failure to manage medications.
- Patients who remain highly symptomatic.
- Incompetent clinicians.

████████████████████ **(Named Plaintiff)**

In my 2013 report at page 69, I wrote the following about Mr. ████████

> In addition to his suffering from mental illness, Mr. ██████ also is being treated for asthma and an autoimmune disease for which he is prescribed multiple medications. A psychiatry note dated 4/18/13 documented that Mr. ██████ "still hears voices." He was diagnosed with Psychotic Disorder NOS and prescribed Risperdal, Cogentin and Sertraline (Zoloft.) The MAR from June 2013 confirms that Mr. ██████ was receiving these medications. He then submitted an HNR on 6/14/13 requesting to be taken off all of his psychotropic medications due to the "dangerously high temperatures." He went on to state that the high temperatures combined with his medications were causing an exacerbation of his mental illness.

On 6/24/13 he once again requested to be taken off his psychotropic medications as the combination of the heat and his medications were causing an exacerbation of his medical problems. A faxed medication order dated 6/27/13 discontinued his Risperdal and Cogentin. A progress note on the same date confirmed that his medications were stopped. This is a very serious case where a patient had to request stopping his medications because of heat-related problems. There are no further notes in the chart to document how the patient is doing without his antipsychotic medication.

As with most of the charts I have reviewed in 2021, Mr. ████ has been given a wide variety of diagnoses since I reviewed his case in 2013, including Episodic mood disorder (4/6/15), Recurrent depression, severe (5/14/15), Adjustment disorder with depressed mood  (11/8/15), Major Depressive Disorder, recurrent (2/10/16), Personality disorder, unspecified (2/10/16), Unspecified mood disorder (3/31/17), and Antisocial personality disorder (6/23/17).

Most recently, as of 7/15/21, he is diagnosed with Major Depressive Disorder, recurrent. His Medications are Trileptal 900 mg QAM & Wellbutrin 200 mg BID.  Based on my record review his current diagnosis and treatment are appropriate. However, Mr. ████'s case is concerning for at least two reasons.  First, he has been misdiagnosed, and therefore not receiving appropriate treatment, for much of the last eight years.  Second, he has had this correct diagnosis in the past, only to have it changed to a different diagnosis at least twice.  Therefore, I am concerned that Mr. ████'s diagnosis may be changed yet again in the near future, leading to inappropriate treatment for his mental illness.

████████████████████ **(Named Plaintiff)**

I interviewed the patient in a confidential setting on 9/8/21. At that time, he was responding to internal stimuli, hearing voices, displayed manic-agitated behavior, had pressured speech and was very paranoid. He reported that he had a history of self-injurious behavior and that he had received an injection of long-acting Haldol, 50 mg, on 8/23/21. A review of his records revealed that his diagnosis was changed from Schizoaffective Disorder, bipolar type to unspecified personality disorder. This is blatantly inaccurate. Even if it were accurate, you do not treat a personality disorder with 50 mg of long-acting Haldol every four weeks. Of note, he continues to be symptomatic which means that his current dose of long-acting Haldol is insufficient to control his symptoms. This represents very poor care in the areas of diagnostic accuracy, symptom control and medication management.

- Failure to manage medication.
- Patients who remain highly symptomatic.
- Incompetent clinicians.
- De-diagnosing.

███████████
I interviewed Mr. ██████ while he was on watch for self-injurious behavior, cutting himself, on 9/8/21. He stated that his worsening depression led to this incident of self-harm. He went on to say that he suffers from persistent auditory hallucinations and that his only medication is the antipsychotic, Risperdal. Finally, he stated that he is SMI and is locked down "all of the time." A review of his records reveal that his most current diagnosis made on 1/27/21 is "other specified schizophrenia spectrum and other psychotic disorders." His only medication is the antipsychotic, Risperdal at 2mg twice a day. He did have an incident of self-harming on 8/31/21. He was observed cutting his left arm with a wire and was sprayed with OC. The reason for his self-harming was fear that he was being set up for murder.

He then received a five-minute cell-front encounter with a psych associate; the note indicates that Mr. ██████ was not offered the opportunity to speak with the clinician in a confidential area.  The psych associate wrote:

> TW tried to engage Pt in conversation, but Pt had a difficult time talking due to being sprayed by OC spray. Pt reported to TW that he is having fear issues. He stated multiple times, "I have lots of fear right now."

It is not surprising that Mr. ██████ would "have lots of fear" after having chemical weapons used on him by custody staff. This incident likely aggravated Mr. ██████'s pre-existing paranoia.

A psychiatric progress note from 9/21/21 failed to mention this self-harming incident, his resultant watch status or the patient's paranoia. Also, no modification of his medication regimen was even considered.

There are many things wrong with this case. First, the patient was sprayed with OC at the time of his self-harming incident. Also, the psychiatric provider did not even mention this incident or the reasons that may have led up to it. The care provided to Mr. ██████ falls well below the standard of care.
- Failure to manage medications.
- Failure to provide self-harming patients basic mental health care.
- Inappropriate use of chemical agents on the mentally ill.

███████████
I interviewed Mr. ██████ cell front on 9/8/21. He stated that he was diagnosed with schizophrenia and that he was prescribed the antipsychotic, Zyprexa, at 15 mg every evening. He also added that his psychiatrist won't increase the dose of the Zyprexa due to his having high cholesterol. Finally, he complained of having auditory hallucinations which "remain very bothersome." A review of his records revealed that in fact he is only prescribed 15 mg of Zyprexa daily and that his cholesterol is high 248 (0-200). Mr.

████ also had elevated triglycerides, a measure of fat in the blood, 358 (0-150). These abnormal labs are an unfortunate side effect experienced by some patients who receive antipsychotics such as Zyprexa. A psychiatric progress note dated 8/26/21 stated in part "I always hear voices; I think it's spirits in here." So, we have a case in which the patient has persistent bothersome psychotic symptoms and is experiencing dangerous metabolic side effects from his antipsychotic medication. The standard of care in this case requires that the patient be switched to a different antipsychotic with less metabolic side effects and closely monitored. Currently, Mr. ████ is experiencing the worst of two worlds, unresolved psychotic symptoms, and serious medication side effects.

- Patients who remain highly symptomatic.
- Failure to manage medications.
- Inadequate monitoring and management of medication side effects.

████████

I evaluated Mr. ████ at cell front on 9/8/21. He stated that "my diagnosis is psychosis." He denied being on any medications. He stated that he doesn't like being on medications because they make him too sedated. During my interview, I noted that he was responding to internal stimuli as well as displaying thought blocking. Both of these are serious psychotic symptoms. When asked if he were hearing voices, he responded "the voices are telling me to hurt myself." A review of his records confirmed that he is not prescribed any psychotropic medications. He was prescribed the long-acting antipsychotic, Risperdal Consta, but it was discontinued on 5/25/21. He also was prescribed the antipsychotic, Abilify, but that medication was discontinued on 6/17/21. Finally, he had been prescribed the antidepressant, Zoloft, but that was discontinued 4/17/21. Of note, a mental health tech note written on the same day of my evaluation stated "when asked if the patient had any mental health concerns to report at this time patient said no."

The patient is at risk for self-harm due to his not receiving any treatment for his command auditory hallucinations. Also, the mental health tech is dangerously incompetent. She missed all of the patient's serious psychotic symptoms, especially his command auditory hallucinations. The case represents very dangerous care.

- Failure to manage medications.
- Failure to provide suicidal and self-harming prisoners basic mental health care.
- Patients who remain highly symptomatic.
- Incompetent clinicians.

████████

I interviewed Mr. ████ at cell front on 9/8/21. He complained of experiencing severe anxiety, depression and auditory hallucinations. He described his auditory hallucinations as "mak[ing] me want to curl up in a ball and scream" and "I feel like I'm going insane." He went on to state that he's submitted numerous HNR's about his symptoms and wishes

8

to change medications but has not receive a response. A review of his record revealed that he submitted an HNR on 8/28/21 stating "who can I talk to about getting my meds changed?" His HNR was screened by a Registered Nurse the next day who wrote that Mr. ██████ had "[i]neffective coping." He finally saw a "mental health midlevel" staff person on 9/8/21. His medications were the antipsychotic, Abilify, at 15 mg daily and Vistaril. He was prescribed the antidepressant, Remeron, at 15 mg every evening. Finally, his most current diagnosis was "Adjustment Disorder with mixed emotional features."

There are many problems with this case. His HNR was not responded to in a timely manner, his diagnosis is incorrect and his medications are not sufficient to address his serious symptom profile.
- Failure to manage medications.
- Delays in access to mental health care.
- Patients who remain highly symptomatic.

██████████████

I interviewed Mr. ██████ in a confidential setting on 9/8/21. I found him to be overtly psychotic with very loose associations, disorganized and rambling speech, responding to internal stimuli and thought blocking. He was able to tell me that he is not taking any medications currently but has taken the antipsychotic Risperdal in the past. A review of his records reveals that in fact he is not prescribed any psychotropic medications. He was determined to be SMI on 5/20/21 and was diagnosed as suffering from Schizophrenia. Of note he is yet to be seen by a psychiatrist since he was determined to be SMI. A treatment plan dated 9/1/21 had the "psychotic symptoms" box checked but had no mention of antipsychotic medications or a referral to a psychiatric practitioner.

This case is the ultimate example of deliberate indifference. That is, the staff acknowledge that Mr. ██████ is psychotic but are not doing anything to address it. He is a very ill young man who requires immediate treatment with an antipsychotic medication.
- Delay in access to MH care and failure to provide MH treatment.
- Inadequate treatment plan.
- Failure to manage medication.
- Patients who remain highly symptomatic.

██████████████

I interviewed Mr. ██████ in a confidential setting on 9/8/21. He presented as very cognitively impaired. He was very slow to respond to my questions and displayed concrete thinking. Upon further questioning, he stated that he was in Special Ed classes all through his schooling and that he was only able to complete the 10th grade. Mr. ██████ was able to report that he was begun on psychotropic medications while at the Lower Buckeye Jail although he's not sure which ones. He further states that he hears voices and is feeling "kinda depressed." He has episodic suicidal ideations in the context

9

of previous suicide attempts. He had very poor hygiene and severe hand tremors consistent with side effects from antipsychotic medication. A review of his records revealed his most current diagnosis is "unspecified anxiety disorder." This diagnosis was made on 2/4/21 even though in a psychiatric progress note dated 7/14/21 the diagnosis is listed as "Schizoaffective Disorder, unspecified." Current medications include Cogentin 2 mg, Haldol 5 mg and Depakote 500 mg all ordered for twice a day administration. A blood level of the Depakote was ordered on 2/14/21 but was never obtained. A treatment plan dated 9/4/21 document that the patient is experiencing psychotic symptoms. No referral was made to the psychiatric provider for a possible medication adjustment to address these persistent psychotic symptoms. Also, no mention was made of the patient's medication-induced side effects.

This case is yet another example of the lack of coordination between the mental health and psychiatric staffs. Also, it is clinically dangerous that no recent Depakote blood level was obtained. An elevated Depakote level may partially explain why the patient has such severe hand tremors. Also, no mention was found in the record regarding the patient's impaired cognitive functioning.

- Inadequate treatment plans.
- Inadequate monitoring and management of medication therapeutic levels and side effects.
- Patients who remain highly symptomatic.

█████████████

I interviewed Mr. ████ in a confidential setting on 9/8/21 while he was on mental health watch. He is a 32-year-old man with numerous hospitalizations for self-injurious behavior, including cutting open his abdominal cavity in 2019, and previously attempting to cut his own throat. Mr. ████ informed me that he experiences visual hallucinations and occasionally auditory hallucinations. He has been incarcerated at Phoenix-Alhambra to receive an inpatient level of mental health care, and previously has been diagnosed with PTSD and Borderline Personality Disorder. His current mental health diagnosis is Schizoaffective Disorder, bipolar type. He is prescribed 150 mg of the antidepressant Wellbutrin 150 mg twice a day. He reports numerous mental health hospitalizations dating back to childhood. He was moved from Kasson MHW to Browning on September 7, 2021.

His medical record shows that he was most recently hospitalized on September 4, 2021, after cutting a 7 inch long by one-inch-deep laceration to his right arm, swallowing three razor blades, and inserting three spork handles into his abdominal scar – all while on continuous watch at Kasson. He was also hospitalized on August 5, 2021, after swallowing foreign bodies while on continuous watch at Kasson. On July 14, 2021, the "psychiatry midlevel" staff wrote that "Patient does not respond to medications and continues to self-harm regardless of therapy and medication interventions," but there is no indication that he has been evaluated for transfer to inpatient mental health care at

Phoenix. He was hospitalized in Phoenix-Alhambra until November 2019 when he was hospitalized after cutting open his abdominal cavity and was transferred thereafter to the infirmary at Tucson. The last time he was seen in person by a psychiatrist was January 2020 while still in the IPC recovering from his abdominal injuries.

This case demonstrates just how poor is the psychopharmacology provided to seriously ill prisoners. Mr. ███ has a history replete with multiple serious incidents of self-injurious behavior. His current medication is Wellbutrin 150 mg twice a day. I am at a loss to understand why he is being treated with this medication. Given his history and clinical presentation, he should be tried on a mood stabilizer such as Depakote or Trileptal. In addition, he should be treated with an atypical antipsychotic medication such as Zyprexa or Risperdal. The statement by the midlevel practitioner that Mr. ███ does not respond to medications demonstrates her clinical incompetence. Of note, Mr. ███ remains at risk for self-harm and should be immediately transferred to an inpatient level of care.

- Failure to manage medications.
- Failure to provide suicidal and self-harming patients basic mental health care.
- Patients who remain highly symptomatic.

I interviewed Mr. ███ at the cell front on 9/8/21. He stated that he is diagnosed with Schizophrenia and Bipolar Disorder. He reported being prescribed Remeron, Tegretol and Abilify which are not helping reduce his auditory hallucinations and paranoia. A review of his record reveals his most current diagnosis is "dizziness and giddiness" dated 7/26/21. This diagnosis is not consistent with the most recent treatment plan, 9/4/21, or the most recent psychiatric provider visit of 7/7/21. Both of these visits list a diagnosis of Schizoaffective Disorder, depressive type. He is being prescribed Remeron, Abilify and Cogentin. Both of these visits state that his symptoms are under good control which contradicts his self-reporting.

A proper, consistent diagnosis is the basis for adequate care. It is not readily apparent from the record why the patient carries differing diagnoses.

- Inadequate medical records.
- Inconsistent diagnoses.

I interviewed the patient in a confidential setting on 9/8/21 at mental health watch. He is a 40-year-old African American male with a long history of psychiatric impairments. Most notably, he has an extensive history of self-injurious behavior. He cuts himself as a way of relieving stress. At the time of my interview, he informed me that he was previously treated with the mood stabilizer, Trileptal, which significantly reduced his incidence of cutting. He stated that he was told by ADC staff that he couldn't be on Trileptal because "inmates abuse it." He recently had a serious incident of cutting himself which required his being sent to an outside hospital. He remains at a high risk of repeated

self-injurious behavior. A review of his records revealed that he has had a variety of diagnoses while at ADC:

- Major Depression recurrent – 12/16/16
- Unspecified Mood Disorder – 1/24/18
- Unspecified Depressive Disorder – 11/21/18
- Borderline Personality Disorder – 8/14/19

It is unclear from the record why his diagnosis was changed to a personality disorder after years of mood symptoms and self-injurious behavior. Of note, he had a new incident of self-injurious behavior on 9/14/21. At that time, he reopened a partially healing wound. A very inadequate treatment plan was prepared by a psych associate the next day and failed to mention anything about possible medication options. The complexity of this case clearly exceeds the skills of a psych associate. This represents extremely poor care. The patient needs to be transferred to a higher level of care and be thoroughly evaluated for psychotropic medications.

- Inadequate treatment plan.
- Failure to provide suicidal and self-harming prisoners basic MH care.
- Patients who remain highly symptomatic.
- Inadequate formulary.
- Incompetent clinicians.
- De-diagnosing.

████████████████████

I interviewed Mr. ████ at cell front on 9/8/21. He told me his was prescribed the antipsychotic Abilify. He also reported experiencing persistent auditory hallucinations of a command type. His voices command him to hurt himself and others. He stated the Abilify "helps a little." A review of his records reveals that he has been prescribed the same dose of Abilify, 15 mg in the evening, since 5/14/20. This is in spite of a psychologist noting on 9/16/21 the patient's problem with auditory hallucinations. In this note, there was no mention of referring Mr. ████ to the psychiatrist for a dose augmentation. This is very poor medication management. 15 mg of Abilify is a low dose of the medication. This patient should be tried on at least 30 mg daily. If this 30 mg dose doesn't eliminate the auditory hallucinations then the patient should be tried on a more potent antipsychotic such as Risperdal.

- Inadequate treatment plan.
- Failure to manage medication.
- Patients who remain highly symptomatic.

████████████████████

I interviewed Mr. ██████████ while he was on a "security watch" for the suspicion of drinking alcohol. He stated that he had been on watch for more than two days and that he has not received his regular dose of Prozac 40 mg daily during this time. He also reported

that his anxiety level was increasing and that he was beginning to have headaches. Of note, increased anxiety and headaches are common symptoms associated with Prozac withdrawal. A review of his records revealed that he is being prescribed Prozac 40 mg daily. The record further demonstrates that he was not offered this medication on September 7th, 8th or 9th. Finally, his Prozac order was renewed on 9/16/21 without his being seen.  This represents poor medication management. Antidepressant medications cannot just be abruptly stopped due to the occurrence of a serious withdrawal syndrome.

- Failure to manage medications.

██████████████

I interviewed this patient at cell front on 9/8/21. He was complaining about a lack of programming. He stated that he hasn't had any programming for approximately 3 weeks. Due to this lack of programming, he experienced a worsening of his auditory hallucinations which were commanding him to harm himself. He ended up cutting his right arm. A review of his records revealed that he reported to staff he is going to snap and hurt someone. He went on to state that the voices are taunting him and that he self-harms to get relief. A further review of his medications shows that he is being undermedicated with very low dose Zyprexa, clonidine and Trileptal. A PA's note from 9/14/21 resulted in his Trileptal and Clonidine being discontinued, and his Zyprexa only increased to 10 mg daily. This is extremely poor use of psychotropic medications and demonstrates that the PA really doesn't know what she's doing.

- Failure to provide mental health programming.
- Failure to manage medications.
- Failure to provide suicidal and self-harming prisoners basic mental health care.
- Patients who remain highly symptomatic.
- Incompetent clinicians.

**ASPC-Lewis**



█████████████

In my November 2013 report at page 20, I described Mr. ████'s care as follows:

> ███████████ [sic], █████-This patient had two suicide attempts within 9 months of my evaluation. He was housed on the Flamenco unit of the Phoenix complex. His chart was very disorganized, with the period from 12/1/12 through 2/28/13 missing. No provider orders were in the chart and I was unable to determine which, if any, medications he was taking. These problems are especially serious given his recent suicide attempts.

I also noted that Mr. ████ had been able to attempt suicide while on suicide watch, and that when he was found hanging after one of his suicide attempts, an officer pepper-sprayed him before cutting him down.  November 2013 report at 53, 62.

Currently, Mr. ████ is being treated with an antipsychotic and an antidepressant, even though current clinical contacts document the absence of psychotic symptoms. The patient has been misdiagnosed from my last evaluation in 2013 until 2020. He had been diagnosed with Borderline Personality Disorder, 11/16/15-6/14/16, as well as Schizophrenia, 7/12/19-1/29/20. He was finally diagnosed with Major Depressive Disorder, recurrent on 1/29/20. A review of the records confirms that this is the appropriate diagnosis for this patient.  Of note, an accurate diagnosis is the basis for appropriate treatment. It is my opinion that he was receiving inadequate treatment from 2013 until January 2020.

Mr. ████'s most recent psychiatric visit occurred on 7/9/21 and was 17 minutes in length. The provider changed the diagnosis again, this time to Unspecified Mood Disorder. The provider also continued the antipsychotic medication, even in the absence of any documented psychotic symptoms. This patient is not receiving adequate diagnosis and treatment.
- De-diagnosing.
- Failure to properly diagnose and treat people.
- Patients who remain highly symptomatic.

█████████████ **(Named Plaintiff)**

In my November 2013 report at page 71, I described Mr. ████'s care as follows:

> I evaluated Mr. ████ while he was housed in a lockdown unit at the Eyman prison. He was housed in a cell that was reinforced by Plexiglas. Staff informed me that Mr. ████ had recently destroyed the sprinkler heads in two separate cells, which necessitated his being placed into this special cell. Mr. ████ has a long history of being treated with mood stabilizing medications for Bipolar Disorder.

These medications include Lithium, Tegretol and Celexa. A review of his chart revealed that he had been on Lithium as recently as November 2012. For reasons that aren't immediately apparent, Mr. ███████'s treatment with Lithium was discontinued. This discontinuation may be due in part to his not fully cooperating with blood testing but his chart is silent on what was the actual reason. Regardless, Mr. ███████'s aggressive and agitated behavior can be directly attributed to his not receiving treatment for his bipolar condition. He was asking to be restarted on Lithium when I evaluated him on 7/16/13. Also, a psychiatrist had not seen him by the time of my evaluation.

Since I saw him in 2013, Mr. ███████ has been assigned a number of different mental health diagnoses, including Bipolar Disorder NOS (5/13/15), Unspecified mood disorder (11/14/16), Anxiety disorder (3/14/19), and Adjustment disorder (5/21/20).  Most recently, after a 5-minute cell front visit on 7/29/21, a psych associate concluded that Mr. ███████ does not suffer from a mental disorder. If this assessment is accurate (which is extremely unlikely), then he has been misdiagnosed and inappropriately treated for at least 8 years, including unnecessary treatment with powerful psychotropic medications that can have serious side effects. Otherwise, he is currently misdiagnosed and not receiving appropriate treatment.

- Uncoordinated treatment.
- De-diagnosing.

## ASPC-Perryville

█████████████

I spoke with the patient at the Mental Health Ward (Building 45) on 9/10/21. She denied being depressed or suicidal on the visit, and shared having a history of postpartum psychosis. She last received Haldol Decanoate 50mg August 2021 but stopped taking it after hospitalization due to low sodium levels. She was noted to not be on any medications currently.

Her medical record showed that her psychiatric initial evaluation on 8/31/2018 did not list a diagnosis for the patient despite ascertaining a history of "depression, severe psychosis". On 1/12/2021 she was later diagnosed with Unspecified Psychosis with rule out of Bipolar I Disorder with Psychotic features due to hyperverbal, hyper-religious, argumentative, and paranoid symptoms. The diagnosis was then changed to Bipolar Disorder with the current episode manic with psychotic features on 2/23/2021. During this encounter, the decision was made to start injectable long-acting Haloperidol Decanoate. The note mentions that alternatives were refused. The note had a box for "consent form" left unchecked. It was not until 7/12/2021, after the patient presented with side effects from Haloperidol Decanoate, that there was written mention of discussing risks and side effects with medication. The diagnosis was also altered to Unspecified Mood Disorder and "Schizophrenia per hx". It was during this encounter that the consent form box was finally checked, indicating the patient consented to continue such treatment. The patient was later admitted medically for a seizure after she collapsed. The documentation revealed the seizure was due to Psychogenic Polydipsia (uncontrolled drinking of water) causing hyponatremia (dangerously low serum sodium levels). The psychiatric provider follow-up after her return from the hospital did not mention this incident nor was there any discussion regarding medications to maintain stabilization of mental health concerns. Haloperidol Decanoate orders expired without any clear plans.

Ms. ██████████'s autonomy was violated when she was started on a long-acting injectable without appropriate consent as seen by lack of consent documentation. There was no mention of side effects or risks with Haloperidol Decanoate on initiation of this drug. Furthermore, alternatives were noted to be refused. This is all worrisome as Ms. ██████████ on multiple occasions, had noted she did not want medications and wanted to be "organic". It was not until months later, when she had extrapyramidal side effects, that a medication consent form was completed and there was some attempt at discussing the risks and side effects the medications can cause. Even more concerning is Ms. ██████████ was admitted to the hospital for seizure and found to have significantly low sodium. Etiology was determined to be due to psychogenic polydipsia. Haloperidol Decanoate can both lower seizure threshold and cause SIADH commonly which can be seen as increased consumption of water. Upon return from the hospital, the psychiatric team did not mention any of these recent events and there were no medication plans, allowing orders to expire. There was no mention of continuing or discontinuing Haloperidol

16

Decanoate. This practice constitutes battery by the treatment team given the initiation of involuntarily Haloperidol Decanoate in a non-emergent situation.

- Inadequate mental health care.
- Miscellaneous poor care (practices in breach of patient rights and autonomy).
- Inadequate medical records.
- De-diagnosing.

██████████████ I spoke with the patient at the Mental Health Watch (suicide watch) in a confidential setting on 9/10/21. She reported currently hearing voices telling her to kill herself, and endorsed medications not helping her.

Her medical record showed that on 9/2/2021 the psychiatric provider assessment noted Unspecified Mood Disorder and "probable" Autism Spectrum Disorder. Ms. ████████ had reported ongoing auditory and visual hallucinations. Past chart diagnoses ranged from Bipolar Spectrum Disorders to Schizophrenia Spectrum Disorders. There were no medication changes for this encounter and the patient was continued with Zoloft 200mg daily, Depakote DR 500mg QHS, Topamax 25mg QHS, and Abilify 5mg QHS. ICS was activated on 9/3/2021 (twice), 9/8/2021 (twice), and 9/10/2021 for bizarre behavior, self-reported thoughts of self-harm, and other disorganized behaviors. Escalating behaviors, defecating and urinating on the floor during crisis observation led to psychiatric assessment for inpatient admission on 9/16/2021. During the assessment, she was found to have elevated and "animated" affect, pacing, and irritability. The diagnosis at that time was noted to be Unspecified Mood (Affective) Disorder and the decision was made to admit to the inpatient psychiatric unit. The team decreased Zoloft to 100mg due to suspicion of contributing to manic symptoms. Abilify was increased to 10mg. Follow-up plan set for 30 days.

Ms. ████████ had persistent psychotic and mood symptoms inadequately managed with her medication regimen. The regimen was complicated due to multiple agents being prescribed, with concern for polypharmacy. Furthermore, inadequate treatment of underlying mood disorder with suspected psychotic features leads to further decompensation, as seen by self-defecation and urination. It was not until this more severe level of decompensation occurred that the mental health team considered a transition to inpatient psychiatric unit and conducting medication adjustments. Follow-up inappropriately was planned for 30 days while Ms. ████████ would be on the inpatient psychiatric unit. This falls below the standard for inpatient psychiatric care. That is, the standard of care for a psychiatric inpatient unit is **daily** contact with the psychiatric provider.

- Inadequate pharmacological management.
- Inadequate mental health care.
- Patients who remains highly symptomatic.

17

- Inadequate staffing assumed due to inadequate frequency of prescriber visits.

███████████████████

I spoke with the patient in the inpatient mental health unit on 9/10/21. She reported auditory and visual hallucinations for the last two to four years. I observed her responding to internal stimuli, "giddy" affect and with severe psychosis. She was taking haloperidol 20mg daily.

Her medical record showed that her last psychiatric provider encounter occurred on 9/7/2021 with the diagnosis of "other schizophrenia" and her lithium treatment was discontinued due to noncompliance. Endorsement of continued auditory and visual hallucinations. No other medication recommendations were provided at this visit and follow-up was set for 30 days. She receives Haloperidol Decanoate 50mg every month and Cogentin 1mg twice a day. The patient's appearance and behavior were not documented by the psychiatric provider in this encounter.

Ms. ███████████ remains with significant psychosis and while at the inpatient level of care there is no active plan to improve psychotic symptoms. She remains on the same regimen of haloperidol and there is inadequate pharmacological management of her symptoms. The frequency of mental health prescriber visits at the inpatient level of care is not appropriate.
- Significant unmanaged psychotic symptoms.
- Inadequate pharmacological treatment.
- Inadequate mental health care.
- Inadequate staffing assumed due to the infrequency of prescriber visits.

███████████████████

I spoke with the patient at the Mental Health Ward (Building 45) on 9/10/21. She stated that she was recently on watch for suicidal ideations. Medications provided include naltrexone and Risperdal Consta every two weeks. She reported they gave her Risperdal IM whenever she would self-harm. She reported a history of doing well on Zyprexa when she was in the county jail. In the past she would self-harm during dissociative episodes. Was previously stable on Lithium but stopped due to tremors; no mood stabilizer was substituted. She had recently come off of mental health watch after experiencing suicidal ideation and cutting herself.  She reported that she had engaged in acts of self-harm and hurting others in response to auditory hallucinations since she was 14 years old and living in probation and foster care group homes. Her arms were covered with fresh and healed cut marks.

Her medical record showed that active medications include Depakote DR 500mg BID, Topiramate 25mg QHS, Vistaril 100mg BID PRN, Risperdal Consta 50mg q2 weeks, and Naltrexone 50mg daily. Historical chart diagnosis includes Unspecified Adjustment Disorder, Unspecified Mood (Affective) Disorder, Chronic PTSD, and Borderline

Personality Disorder. In an assessment on 8/2/2021, which occurred the day after self-harm, the patient was noted to be receiving "treatment adequate in managing mood and psychiatric symptoms". Furthermore, on the 8/2/2021 and all future mid-level psychiatric prescriber documentation, there is no mention of any other diagnosis other than Unspecified Mood Disorder. In the assessment sections of these notes, there was no effort to explain how that diagnosis relates to self-harm behavior. On the contrary, the psychology team's concurrent notes share different diagnoses which include PTSD and Borderline Personality Disorder.

Ms. ▮▮▮▮▮▮ has multiple diagnoses and different providers on the same team have different diagnoses for her. There appears to be no multidisciplinary team discussion or collaborative coordination of her care. Furthermore, the psychiatric prescriber does not provide adequate documentation explaining how self-harm behavior relates to the listed diagnoses for that encounter. Medications are tailored to diagnosis, and if the diagnosis is not accurate and does not reflect the opinions of the whole treatment team, care can remain inadequate.

- Inadequate medical records.
- Inadequate team collaboration.
- Inadequate prescribing.
- Ongoing symptomatic mental illness.

▮▮▮▮▮▮▮▮

I observed the patient on 9/10/21 at the Mental Health Watch. She was experiencing involuntary movement and spasms, and noted to be having back pain. Placement into the suicide watch is not likely a reflection of primary mental illness.

Her medical record showed a medical provider intake note on 8/17/2021 reported history of methamphetamine use and IV heroin. There was documentation in the exam of "involuntary movements of limbs". Assessment and plan did not explain these involuntary movements. 8/25/2021 medical provider evaluation explored the further history of Ms. ▮▮▮▮▮ and noted she was supposed to have had a brain MRI per Neurology. At this encounter MRI brain with contrast was noted in the plan, along with starting amantadine with a plan for records request. Follow up on 8/27/2021 noted movements being possibly exaggerated and there being "psychosomatic" etiology. Records from neurology were not obtained yet. The medical provider's note on 9/10/2021 documented that Ms. ▮▮▮▮▮ was on watch and it revealed neurology workup before arrival in the facility included exploration for multiple etiology at the county jail. This included Huntington's disease, tardive dyskinesia, and the possibility of a volitional component to the movement. Workup was not completed at that time. 9/14/2021 assessment by medical provider led to greater suspicion of volitional component, but it was the first time a neurology consult was requested by the provider. 9/16/2021 medical provider note described the assessment as psychosomatic versus malingering but the patient was started and continued on Tetrabenazine for suspected movement disorder.

Ms. ████ reported to the team that after receiving Cogentin injection her movements improved for three days before returning. Laboratory findings were significant for elevated ammonia, hepatitis C RNA levels, and elevated liver function enzymes.

The etiology of Ms. ████'s movements is unclear at best given the lack of thorough neurology workup. The medical team suspects symptoms are due to a psychosomatic etiology or malingering, but medication management with Cogentin and Tetrabenazine is not consistent with this mindset. Furthermore, previous neurology work up was not completed and on admission, her liver function enzymes, ammonia level, and hepatitis C viral RNA count were all elevated. It could be likely there is a psychosomatic component or even volitional component to her symptoms, but you cannot determine these diagnoses without appropriate neurologic workup, especially in the presence of abnormal medical lab findings. Such assessments for psychosomatic causes and malingering can be made only after excluding possible medical and neurologic causes. The possibility of there being a medical etiology which is not worked up in a timely fashion harms the patient as seen by repeated ICS and watch events.

- Inadequate neurological workup.
- Delay of neurological workup.
- Suspected untreated medical issue.

████████████████

I spoke with the patient in the inpatient mental health unit on 9/10/21. Ms. ████ presented with confused, non-sequential speech. I had difficulty in following her train of thought and she appeared with severe psychotic symptoms. Affect was elated. Tardive dyskinesia was observable, and she appeared psychotic and unstable.

Her medical record showed that Ms. ████ was last seen by the psychiatric provider on 9/16/2021 with the diagnosis of Schizoaffective Disorder, Bipolar Type. She showed symptoms of being floridly psychotic and delusional, with mention of her being bizarre, nude, and aggressive. She was noted to have auditory hallucinations. Risperidone was increased on this encounter from 1mg daily to 1mg twice a day with follow-up planned for 30 days while on the inpatient psychiatric unit. The last AIMS was performed on 6/16/2021 with a score of 0. No future AIMS is planned at this time by the treatment team.

From the on-site visit there were notable physical symptoms consistent with tardive dyskinesia which were not noted on a later psychiatric follow up 9/16/2021. Furthermore, the last AIMS was documented to be a 0 for any TD symptoms which means this is a new finding or AIMS was not appropriately performed. Psychiatric assessment on 9/16/2021 left objective findings for "Appearance and Behavior" blank, which can only be interpreted clinically that symptoms for EPS or TD were not assessed. Furthermore, it is unclear when another AIMS will be performed to monitor such symptoms. This carelessness is concerning as there is a lack of monitoring of the side effects of her

psychotropic medications. Furthermore, Ms. █████'s grossly psychotic behavior should have been followed more frequently by the psychiatric provider on the inpatient psychiatric unit. Follow-up at one month is not appropriate given that her response to Risperidone dosage can be seen earlier, and monitoring for side effects is crucial. Once again, Ms. █████ is being treated at the outpatient level of care in terms of frequency of contacts by the prescriber, despite being housed in the inpatient unit.

- Inadequate monitoring and management of medication side effects.
- Inadequate medical records.
- The patient remains highly symptomatic.
- Inadequate staffing assumed due to infrequency of prescriber visits.

█████████████

I spoke with the patient at the Mental Health Ward (Building 45) on 9/10/21. She described experiencing symptoms consistent with withdrawal syndrome when taken off the antidepressant Duloxetine (Cymbalta) abruptly due to concerns of possible mania. She was then started on Geodon 80mg QHS which was then discontinued by her request. The patient self describes herself as "schizophrenic". On Duloxetine, she had reported improved depression and decreased back pain.

Her medical record showed an 8/16/2021 assessment that was concerning for manic-like symptoms leading to discontinuation of Duloxetine from 60mg dosage. Medication MAR and documentation reveal a sudden stop on 8/19/2021. Nursing assessment on 8/20/2021 noted patient was upset her Duloxetine was discontinued and appears she was unaware of the discontinuation. Nursing documented in assessment "ineffective impulse control related to medications". This was shortly followed by endorsement of fears regarding pain control without her duloxetine. On 8/22 and 8/23 patient activated sick call due to "body pain" and worsening mood symptoms requesting medication for symptoms. 8/25/2021 Ms. █████ was started on Zoloft due to ongoing depression and anxiety. Geodon was decreased to 60mg QHS from 80mg due to reported improved psychotic symptoms. The diagnosis was listed as Schizoaffective Disorder, Bipolar type. Ms. █████ requested discontinuation of Geodon on 9/20/2021 assessment by the psychiatric provider.

It appears Ms. █████ was suddenly discontinued off Cymbalta (Duloxetine) without collaborative discussion respecting her autonomy for her mental health and medical care. Symptoms of pain and the worsening mood were reported shortly after discontinuation of Cymbalta. Furthermore, Cymbalta was not titrated which can lead to withdrawal symptoms consistent with body aching. Given duloxetine was prescribed not only for mood but also pain management, an integrated care approach should have been considered to prevent decompensation.

- Miscellaneous poor care.
- Inadequate monitoring and management of medication side effects.

██████████

I spoke with the patient in the inpatient mental health unit on 9/10/21. Ms. ██ reported that although she is taking Risperdal 2mg BID for psychosis, her auditory and visual hallucinations persist. Auditory hallucinations are command type and instructing her to attack other people. She described a history of "blackouts" that would result in her acting out.

Her medical record showed that she is receiving risperidone 1mg BID and Depakote 250mg in the morning and 500mg in the evening. Depakote level was ordered for 9/7/21 but this was canceled, and no follow-up Depakote labs were ordered. She was previously on Olanzapine 10mg and Oxcarbazepine. Ms. ██ was transferred from the crisis observation unit to the inpatient unit due to "florid" psychotic symptoms. Initial psychiatric assessment on 9/7/21 did not obtain thorough past psychiatric hospitalization or treatment history. Significant history of substance abuse with methamphetamine, fentanyl, heroin, and prescription-controlled medications last reported used before arriving at the prison. The diagnosis at this visit was Unspecified Psychosis and Unspecified Bipolar Disorder. It was at this initial assessment that Risperidone was titrated, and Depakote was started. Ms. ██ was seen by mid-level provider 8/30/2021 and described as "floridly psychotic" but follow-up was set for 30 days after medication adjustments were recommended. Initial watch placement occurred due to an incident on 8/26/2021 where she was seen disorganized, responding to internal stimuli, and determined to be at risk to herself and others.

Ms. ██ has significant psychotic symptoms and although she has been followed by psychiatric prescribers it is at inappropriate frequencies, given that she is on crisis watch and remains floridly psychotic. Monthly follow-ups in an inpatient psychiatric setting are not appropriate given the complexity and uncertainties in this case. It is not clear what her past psychiatric history is due to lack of appropriate history on initial psychiatric assessment, and it will be difficult to make such assessment with the few contacts the psychiatric prescribers have with Ms. ██ Without appropriate psychiatric history, it is unclear if mental status changes and psychotic symptoms are new and may need a workup for a medical etiology.
- Significant undermanaged psychotic symptoms.
- The patient remains highly symptomatic.
- Inadequate staffing assumed due to infrequency of prescriber visits.
- Inadequate medical records.

██████████

I spoke with the patient in the inpatient mental health unit on 9/10/21. She reported that she attempted to hang herself in February 2021, leading to hospitalization after the loss of consciousness. She was noted being on Cymbalta, Topamax, and Prazosin. She appeared depressed and currently endorsing a 7/10 mood with command auditory hallucinations to

harm herself. She shared having ongoing poor sleep and nightmares, and reported being stable in the past on trazodone and quetiapine. She was told by the mental health team "they don't have the meds"

Her medical record showed that the patient was last seen on 9/7/2021 by the psychiatric provider. The last medication regimen was noted to be Duloxetine 20mg BID, Topamax 25mg, Depakote DR 500mg BID. Keppra 500mg BID, Cogentin 1mg QHS, Prazosin 3mg QHS, Geodon 20mg qAM and 40mg QHS, and Mirtazapine 30mg QHS. Diagnosis noted to be Unspecified Mood (Affective) Disorder. History in the chart of epilepsy/seizures. On initial psychiatric assessment on 2/18/2021 Ms. ▇▇ self-reported a history of PTSD and being a "sociopath". History of attempting suicide "20 times". Initial assessment diagnosis was documented as "unspecified psychosis not due to substance or known physiological condition", chronic PTSD, and Unspecified mood (affective) disorder. The most recent suicide attempt was on 9/25/2021 where she was found down with a torn piece of blanket that was made into a noose on the inpatient psychiatric unit. Ms. ▇▇ had requested to be placed on watch 9/16/2021 due to self-reported thoughts of "self-harm". Assessment by psychology revealed this was about her brother's death anniversary coming back and flashbacks to her kidnapping which occurred in October.

Ms. ▇▇ is at the inpatient level of care and recently initiated suicide watch due to self-reported thoughts to harm herself. While under the supervision of staff at the inpatient level of care, she was able to attempt suicide on 9/25/2021. She was prematurely discontinued from suicide watch on 9/20/2021. The prescriber had not seen Ms. ▇▇ since the initiation of the most recent suicide watch to better adjust medications for her mood disorder and worsening PTSD due to calendar dates reaching anniversary times for multiple stressors.
- The patient remains highly symptomatic.
- Inadequate formulary.
- Inadequate pharmacological treatment.
- Inadequate mental health care.
- Self-harm and suicide attempt while on inpatient psychiatric level of care.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **(Named Plaintiff)**

In my November 2013 report at page 70, I described Ms. ▇▇▇▇▇'s care as follows:

> She has a long history of serious psychotic and mood symptoms for which she had been prescribed psychotropic medication. She is currently diagnosed with "Schizophrenia, paranoid type" and is prescribed multiple high-dose psychotropic medications. She had a serious suicide attempt on 4/30/13, which required her being transported to an outside hospital for stabilization. When asked about this suicide attempt, she stated "I took a bunch of pills; I just wanted to die." I evaluated her on 7/18/13 at Perryville. I found her lying on the floor of her cell,

appearing extremely sedated. When she did stand up, I noted her displaying significant signs of akathesia. A chart entry from 7/8/13 documented that she is prescribed Prozac, Cogentin, and Buspar in addition to two antipsychotic medications. At the time of my evaluation she was prescribed Geodon 60 mg twice a day and Haldol decanoate, 200mg every four weeks. This is a tremendous amount of medication. She was experiencing severe side effects from this medication combination and was at extreme risk of heat-related medical problems. I cannot adequately express how bad and dangerous is her psychiatric care.

Tragically, Ms. ████████ s condition has not changed significantly in the last 8 years. She describes her mood as "horrible" and she still has uncontrollable legs movements. She has been refusing her medications because of the severe leg shaking. Since she stopped her antipsychotic medication, her auditory hallucinations have worsened, and she is barely sleeping.

The documentation in her medical record is very poor. For example, the "check box" mental status exam says she's fine, but the narrative section describes her deteriorating condition.  Ms. ████████ is receiving extremely poor care.  She has suffered needlessly in the eight years since I last saw her, and is at a high risk for suicide or self-harm.
- Failure to manage side effects of medication.
- Inadequate medical records.

████████████████████████

I spoke with the patient in the inpatient mental health unit on 9/10/21. She reported a history of self-harming which began when she became incarcerated. Past psychiatric history before incarceration of being on Zoloft 200mg daily for PTSD with concurrent depression and anxiety. Patient was stable at this dosage.

The provider discontinued the Zoloft and started low dose Cymbalta with follow-up in three months. Since the medication change, she began cutting herself within one month. Self-harm incidents occurring on 5/20/20, 9/1/20, and thereafter. Later was switched back to Zoloft but it's unclear why there was reluctance to return to her 200mg dosage. The current medication regimen is Cogentin, Vistaril, Zoloft, Topamax, and Geodon. Last self-harm was documented on 9/5/2021 and the patient has been on watch since.

It is unclear from the record why she was taken off a stable dose of Zoloft and, when Zoloft was re-started after she began self-harming, it was at a sub-therapeutic dose.  Ms. ████████ remains engaged in self-harm

Her medical record showed that she was last seen by the psychiatric mid-level provider on 9/7/21 where Zoloft was kept at 100mg and Vistaril increased to 100mg BID. Started on Geodon 20mg BID, and Abilify discontinued. Ms. ████████ was also maintained on Lithium 300mg BID. Diagnoses documented as Unspecified Mood (Affective) Disorder

although in history was noted to be PTSD. The psychiatric mid-level provider documented Ms. ███████ had borderline traits. The patient has remained on continuous watch on the inpatient unit and has had multiple self-harm attempts since the on-site visit on 9/10/21, including on 9/13/2021 and 9/26/2021. Furthermore, the lithium level last checked on 8/10/2021 was subtherapeutic. This level was not commented on by the psychiatric mid-level provider on the 9/7/21 visit.

Ms. ███████'s treatment at the inpatient level of care is inadequate with prescribing psychiatric visits at monthly or longer frequencies. This is inappropriate given the instability of Ms. ███████'s mental health as seen by multiple self-harm attempts while on watch. The frequency of medication management may be appropriate for the outpatient level of care, but is not appropriate for the inpatient unit level of care. Furthermore, there is a lack of discussion in provider notes on important lab levels, as seen by subtherapeutic lithium levels not being noted.  Diagnosis remains unspecified and history of PTSD is not discussed in more recent assessments. There was hinting towards a personality disorder, but the rationale was not explored, and treatment plan considerations were not present. Should this be borderline traits or even possibly Borderline Personality Disorder, extensive and specific psychotherapeutic interventions such as DBT individual and group counseling should be organized for Ms. ███████

- Inadequate mental health care.
- Inadequate treatment plans.
- Failure to manage medications.
- Inadequate monitoring of prisoners taking psychotropic medications.
- Inadequate monitoring and management of medication therapeutic levels.
- Failure to provide suicidal and self-harming prisoners basic MH care.
- Inadequate staffing assumed due to infrequency of prescriber visits.

███████████████

I previously met with Ms. ███████ in 2013, who reported a history of poorly managed bipolar disorder.

A 2021 medical record review showed that she was diagnosed by psychiatry with Schizoaffective Disorder, Depressive Type on 3/24/2021. In this encounter, there was no reported indication for medication changes and there was no subsequent psychiatric follow-up for the patient. The prior assessment on 3/2/2021 gave the diagnosis of unspecified mood disorder with a plan to discontinue psychotropic medications; her prescriptions for Abilify 5mg qAM and Zoloft 100mg qAM were discontinued on this date.  She is noted to be stable without psychotropic medication.

The diagnosis provided by the treatment team is not consistent with the current mental condition of the patient. A diagnosis of Schizoaffective Disorder, Depressive Type does not self-resolve, and it is highly unlikely that a patient with this diagnosis would be stable

without psychotropic medication.   Furthermore, there is a lack of appropriate explanation in the assessment for the Schizoaffective Disorder diagnosis.  It is most likely that this patient has not been correctly diagnosed, thus precluding appropriate treatment for her mental illness.

- Lack of coordination in diagnoses.
- Failure to manage medication.

████████████████████████ **(Named Plaintiff)**

In my November 2013 report at pages 62 and 70, I described Ms. ████████'s care as follows:

> This is a chronically mentally ill individual who I evaluated on 7/18/13 at Perryville. I noted her to have auditory and visual hallucinations as well as thought process difficulties. At the time of my evaluation she was being treated with Hal dol decanoate, Depakote, Prozac and Cogentin. She had also experienced two very serious bouts of dehydration, which required IV therapy. In addition she was noted to be toxic from her Depakote. Her Depakote level was noted to be 123 with normal range being from 50-100 mcg/ml. She is an extremely ill individual who has already suffered through serious medication-related problems. More importantly, she remains acutely psychotic. She requires immediate treatment in a psychiatric hospital where her medications can be more closely monitored and her clinical condition stabilized.

> Chemical agents were used twice against ████████████████, ████████, for "refusing directives to come to the cell front for pill call." ADC 89367. That the response to a seriously mentally ill woman's hesitation to take her medication would be to pepper spray her is beyond belief. This is one of the most egregious examples of mistreatment I have ever seen.

I interviewed Ms. ████████ in January 2019 at ASPC-Phoenix, and again on September 10, 2021 at Perryville's Lumley Unit. She had recently been on mental health watch due to cutting herself while in the mental health treatment program at Building 45.  She described symptoms of paranoia, auditory hallucinations, and fear of being in large groups.  She reported that she was transferred out of the mental health program because staff told her "she had been in it for too long," for four years.

After I evaluated her in 2013, Ms. ████████ was persistently misdiagnosed for seven years.  She was assigned the following diagnoses: Borderline (5/14/14), Borderline (11/05/15), Unspecified mood disorder (2/9/16), Borderline (4/15/16), Borderline (7/6/16), substance-induced psychosis (7/6/16), PTSD (5/29/18), Anxiety disorder, unspecified (9/19/18), Unspecified psychotic disorder (3/19/20), Schizoaffective disorder (7/2/20), Schizoaffective disorder, bipolar (10/26/20), Schizoaffective disorder, bipolar (1/11/21), Other Schizoaffective disorder (8/10/21).

A review of Ms. ████████'s medical record reveals that Schizoaffective Disorder is the most accurate diagnosis.  However, her treatment and case remains concerning.  First, she was misdiagnosed, and therefore inappropriately treated, for seven years after I evaluated her, until the correct diagnosis was finally reached in July 2020.  This kind of delay in diagnosing and treating mental illness can cause the illness to become more severe and more resistant to treatment.  Second, because of the frequency with which Ms. ████████'s diagnosis has been changed in the past, there is a risk that her diagnosis will be inappropriately changed once again.

- Patients who remain symptomatic.
- Lack of coordination in diagnoses.


████████

This patient was last diagnosed with Schizoaffective disorder, Bipolar type.  Within the last year, she was also diagnosed with Other Schizoaffective Disorders, Schizoaffective Depressive Type, Unspecified Mood Disorder, and Unspecified Anxiety Disorder.  She is on Lithium 300mg qAM and 600mg qHS, Zoloft 200mg qAM, Vistaril 60mg QHS PRN, and Risperidone 4mg total daily.

Her Lithium was previously 300mg and 600mg every Monday/Wednesday/Friday; it was changed to 150mg every Tuesday/ Thursday & 600mg every Monday/Wednesday/Friday on 12/8/2020, then to the current regimen on 12/21/2020. A Lithium level was last obtained on 12/29/2020, without subsequent follow-up labs for safety at 2-3 month intervals, as required by the standard of care. The next lithium level order was placed on 8/12/2021. A provider note on 12/30/2020 makes no mention of lithium levels or future lithium labs. Furthermore, there was no order for monitoring thyroid function within six months of the last lithium dosage adjustment in December of 2020, as required by the standard of care.

This patient did not receive the standard lithium level follow-up after Lithium dosage changes. Her Lithium level was checked immediately after the dose adjustment, but there was no further monitoring of her lithium level for up to eight months. In addition, there were no thyroid function labs given after the lithium dosage changes. All of this falls below the standard of care for a patient being treated on Lithium.

- Failure to manage medication and possible side effects.

**ASPC-Phoenix**

███████

I interviewed Mr. ██████ in a confidential setting on 9/23/21 while he was on a watch status. He presented with prominent religious delusions, pressured speech, elevated and expansive affect and auditory hallucinations. He also reported having a decreased need for sleep. He also reported that he was taking the antipsychotic Zyprexa and the mood stabilizer Lithium.

A review of his chart revealed Mr. ██████ recently was being held at MCSO for a court appearance. While there, he was started on Lithium 600 mg twice a day and Zyprexa 15 mg daily.

He was seen by a psychiatric provider the day before I interviewed him. At that time, the psychiatrist found that his only positive finding on his mental status exam was "mood is mildly elevated." Upon my exam, I found the patient to be delusional, experiencing auditory hallucinations with pressured speech and extremely elevated mood and affect. The differences in my findings as compared with the ADC psychiatrist are much more than just a difference of professional opinion. I call into serious question the competency of the ADC psychiatrist, as Mr. ██████'s mental status findings were not subtle.

- Patients who remain highly symptomatic.
- Incompetent clinicians.

███████

I interviewed Mr. ██████ at cell front on 9/23/21 while he was on a watch status. He presented as extremely manic and agitated. He was yelling at the custody staff and running around his cell naked. He had very pressured speech and an aggressive and expansive affect. He showed me the bruises from where the custody staff fired a paint ball gun at him.

A review of his records revealed patient is only prescribed Risperdal Consta, 37.5 mg every two weeks. Of note, it takes up to 10 weeks for this long-acting antipsychotic medication to reach therapeutic levels. Also, the patient was seen by a rec therapist and a psych associate on the day of my evaluation. The rec therapist reported that Mr. ██████ was "calm and friendly" and the psych associate used the phrase "due to increase stability." I am at a loss to understand how these people came up with their assessments. Of note, the custody staff made me sit behind a special plexiglass barrier when I was conducting my interview due to the aggressiveness and instability of the patient. Finally, the patient was seen by a psychiatrist the day after my exam. The psychiatrist documented that "his mood was good." He went on to say that "His mood was good. It may be somewhat elevated but he is cheerful." This is a completely incorrect description of a highly manic and psychotic patient.

The medication management of this patient is extremely poor. One does not attempt to stabilize a highly agitated and psychotic patient using long-acting injectable antipsychotic medication such as Risperdal Consta. As I mentioned above, it takes up to 10 weeks to achieve therapeutic blood levels using this medication. Due to this inadequate medication management, Mr. ▮▮▮▮ remains out of control psychiatrically, which has apparently resulted in his being paintballed by the custody staff. The patient is not receiving anything close to inpatient level of care.

- Incompetent clinicians.
- Lack of staffing impacts the ability to provide inpatient level of care.
- Failure to manage medications.
- Patients who remain highly symptomatic.

▮▮▮▮▮▮▮

I interviewed Mr. ▮▮▮▮ on 9/23/21 while he was on watch status for reporting suicidal ideations. He presented as very depressed with suicidal ideations and auditory hallucinations. These voices are instructing him to harm himself. He told me that he is being treated with an antipsychotic and an antidepressant which are not helping. He further stated that his depression had been well controlled in the past with Wellbutrin therapy. He was told that he could not receive Wellbutrin while on the Flamenco unit. A review of his records revealed that his current diagnosis is "Persistent Depressive Disorder." The patient is actually suffering from Major Depressive Disorder, with psychotic features. Mr. ▮▮▮▮ is prescribed the antidepressant Cymbalta at 60 mg daily and the antianxiety medication Buspar at 15 mg TID. He was only recently started on the antipsychotic Zyprexa at the low dose of 5 mg daily. The psychiatrist in his progress note of 9/16/21 correctly identified that the patient was hearing voices and initiated Zyprexa and scheduled a two week follow up. This two week follow up is much too long to wait to reevaluate this patient. This is especially true in an inpatient setting. The standard of care in an inpatient setting is seeing the patient daily and making medication adjustments accordingly. Finally, the patient should have been started on Wellbutrin.

- Failure to manage medications.
- Inadequate formulary.
- Patients who remain highly symptomatic.
- Lack of staffing impacts ability to provide inpatient level of care.

▮▮▮▮▮▮▮

I interviewed Mr. ▮▮▮▮ on 9/23/21 in a confidential setting. He presented with obvious involuntary mouth movements and hand tremors. He also displayed delusional thought content as well as auditory hallucinations. He claimed that these voices were of God and the devil which were instructing him to harm himself.

A review of his records revealed that his most current diagnosis is Schizoaffective Disorder, bipolar type. He is prescribed the mood stabilizer Depakote 250 mg twice a day

and the antipsychotic Risperdal 3 mg twice a day. A psychiatric progress note dated 9/8/21 stated that the patient is delusional but did not mention the presence of command auditory hallucinations. Of note, there was no mention of the patient's involuntary mouth movements and/or his hand tremors. The psych nurse practitioner went on to document that an AIMS test was not indicated and even checked the box about EPS not being present. The patient had a subtherapeutic Depakote level obtained on 7/15/21 and no mention was made of it in the 9/8/21 progress note. Finally, the follow up was set for 30 days.

Many issues of concern were found in this case. The patient is not receiving adequate psychotropic medications. He is very symptomatic and at risk for self-harm, yet his medications were not adjusted by the nurse practitioner during the most recent visit. Also, the patient displayed blatantly obvious medication-related side effects, yet the nurse practitioner failed to note them. This case represent care that does not meet the accepted standard of care.
- Patients who remain highly symptomatic.
- Failure to manage medications.
- Highly incompetent psychiatric staff.
- Inadequate monitoring and management of medication therapeutic levels and side effects.

I interviewed Mr. ▇▇▇▇▇▇ on 9/23/21 in a confidential setting on the Flamenco unit. He was currently on watch status due to his untreated auditory hallucinations telling him to harm himself. He subsequently stabbed himself in the abdomen. When I asked to see his most recent self-inflicted injury, he lifted the blanket he had wrapped against him and revealed an abdomen that had been stabbed numerous times. I must point out that these self-inflicted stab wounds were not minor scratches of his abdominal area. Rather, they were a variety a serious wounds to his intestines that have resulted in his having an ostomy bag for a year and a half. He reported that medical staff told him that they will not authorize him for a surgery to reverse the ostomy because of his repeated acts of self-harm. The patient admitted that he has been stabbing himself since at least 2017 when he was 21 years old. He went on to report that he is being prescribed the antipsychotics Thorazine and Geodon, which only partially address his command auditory hallucinations. He had a flat affect, and when his ostomy bag started leaking while speaking with me, he appeared to not be aware of that.

A review of his chart revealed that this is one of the most poorly managed cases that I have seen in my 39 years as a psychiatrist. The patient's most current diagnosis from 10/30/19 is "Adjustment Disorder with disturbance of conduct." I am at a loss for words to describe just how bad is this incorrect diagnosis. Treatment is based on an accurate diagnosis. The inappropriate treatment that the patient is receiving is not based on this incorrect diagnosis. The patient is prescribed the antidepressant Remeron 30 mg in the

evening, the opiate antagonist Naltrexone 50 mg daily and the antipsychotic Thorazine 100 mg twice a day. The only appropriate medications are the Naltrexone and Remeron, which have limited efficacy in reducing self-injurious behavior. The use of Thorazine is shockingly below the standard of care. This patient needs aggressive treatment with an atypical antipsychotic such as Risperdal or Zyprexa. Of note, a psychiatrist evaluated the patient the same day that I did and stated that the patient is being prescribed the antidepressant Paxil. A thorough review of the records shows that the patient is NOT prescribed Paxil. The psychiatrist also documented that the patient's thought content was "unremarkable" and that he was not hearing voices.

The problems in this case include, but are not limited to, inaccurate diagnosis, inadequate psychopharmacology, and a psychiatrist who doesn't even know what medications his patient is taking. Finally, the psychiatric follow up was listed for 2 weeks. This patient is allegedly in a hospital. Psychiatric patients in a hospital need to be seen daily.

- Inaccurate diagnosis.
- Lack of staffing impacts ability to provide inpatient level of care.
- Inadequate follow up.
- Failure to manage medications.
- Patients who remain highly symptomatic.

I interviewed Mr. ██████ in a confidential setting. He presented as responding to internal stimuli. When asked if he were hearing voices, he stated he still hears voices and that they still tell him to hurt himself. He stated that he suffers from Schizophrenia and diabetes. He went on to say that he isn't taking any antipsychotic medication due to the complications with his diabetes. A review of his record revealed that his current diagnosis is "Schizophrenia, unspecified." He also suffers from type 2 diabetes for which he receives the oral hypoglycemic agent, Metformin, 1000 mg twice a day. At the time of my interview, he had not taken any antipsychotic medication for over six weeks. The most recent blood test for his diabetes was obtained on 8/18/21. His HbA1c which reflects his blood sugar levels was 7.7 (4.1-6.5). Given his active psychosis and his issue with elevated blood sugar, his care should necessarily include close coordination between his medical and psychiatric care. I found no evidence of that type of coordination in his records. The patient was scheduled for a 30-day follow up.

This really is not a complicated case. It does require a more aggressive treatment for his diabetes and the judicious use of antipsychotic medication. Also, a 30-day follow up is very inappropriate for such a clinically complicated patient.

- Delays in access to mental health care.
- Inadequate monitoring and management of medication side effects.
- Lack of coordination between medical and psychiatric care.

████████████████

I interviewed Mr. ██████ in a confidential setting while he was on a watch status on 9/23/21. He presented with delusional thought content, pressured speech, responding to internal stimuli and hearing voices. These voices have instructed him to harm himself and others in the past. He told me that he has been on watch for at least 10-days and had not received any mental health counseling.

A review of his records revealed that his most recent diagnosis is "unspecified psychosis not due to a substance or known, physiological condition." He is prescribed Zyprexa 10 mg daily, Clonidine 0.1 mg twice a day and Trileptal 600 mg twice a day. Of note, proper monitoring of Trileptal includes episodic blood levels. Mr. ██████ has been prescribed Trileptal on and off since 9/2/18. There are no Trileptal blood levels obtained during this time period. He remains very symptomatic and should have a comprehensive review of his medications. This is especially important given his history of command auditory hallucinations. Also, I didn't find any evidence of his receiving any mental health counseling or group participation.
- Failure to provide mental health programming/therapy.
- Inadequate monitoring and management or medication therapeutic levels.
- Patients who remain highly symptomatic.

████████████████

I interviewed Mr. ██████ in a confidential setting on 9/23/21. He presented as very anxious and paranoid. He also reported experiencing auditory hallucinations of a command type. The voices tell him to hurt himself and kill others. He went on to report that approximately two weeks ago he cut himself as an offering to the demons.

A review of his record revealed patient had a suicide attempt on 9/10/21. He attempted to hang himself with his own shirt. The patient stated at that time "there's pain in my head from all of the thoughts." Of note, this is a common expression of hearing voices. A psychiatric visit on 9/13/21 noted the patient to be hearing voices and communicating with demons. He was begun on Zyprexa 10 mg twice a day. Next, the psychiatrist noted that "no psychosis" and "no DTS/DTO thoughts." This observation occurred on 9/20. Finally, I saw him on 9/23/21 and noted hm to be psychotic and at risk for self-harm and harm to others.

I have no idea what the psychiatrist who saw him on 9/20/21 was thinking. The patient had only been treated with Zyprexa for a week and in my opinion remained psychotic and at risk for self-harm.
- Failure to manage medications.
- Failure to provide suicidal and self-harming prisoners basic mental health care.
- Patients who remain highly symptomatic.

███████████

I previously met with Mr. ████████ in 2013, where I documented ongoing auditory hallucinations despite treatment with Haldol and Zoloft. I documented concerns for tardive dyskinesia given his mouth and tongue movements. This patient has a long history of treatment with antipsychotic medications. He is currently on risperidone 4mg qHS, Cogentin 1mg twice daily, Depakote DR 500mg twice daily, and Buspar 30mg twice daily for a diagnosis of Schizophrenia, Unspecified, last documented 6/29/2021.

His record documents worsening AIMS scores, with a documented score of 0 on 6/3/2020, to a score of 4 on 12/17/2020, and the most recent score of 5 on 6/1/2021, which is consistent with tardive dyskinesia given his moderate symptoms of involuntary lip and perioral movement. However, there is no mention of these worsening AIMS scores and physical symptoms of tardive dyskinesia in the 6/1/2021 provider note, and no evidence that these symptoms were discussed with the patient or that alternative medications were considered. This falls below the standard of care, especially given he was exhibiting these symptoms since 2013. In addition, there is no documentation that the risks of tardive dyskinesia were discussed with the patient as his AIMS scores worsened, thus raising concerns whether the patient gave informed consent to these medications.

I met with Mr. ████████ on 9/23/21 at the Aspen Unit, where he reported that his symptoms were stabilizing, but still had some involuntary movements. He reported that due to a shortage of pill nurses at Phoenix, that the morning medications at the unit were sometimes delivered much later than the 7 am scheduled time, and that evening medications were often delivered as early as 4 pm.
- Failure to manage medications.
- Patients who remain highly symptomatic.
- Inadequate medication administration.

███████████

I was alerted by other incarcerated people to speak with Mr. ████████ I was further told that "he was not doing well" and that he was often observed walking around his cell naked and smearing feces. I had the custody staff open his door and I attempted to engage him in conversation. After failing to do this in English I began speaking with him in Spanish. He responded by lifting his head off his bunk and looking at me. In spite of my efforts, he remained mute and unresponsive. Based on my observation, I concluded that he was very psychotic, responding to internal stimuli as well as presenting as almost catatonic.

A review of his records revealed that he is not prescribed any psychotropic medications. This is an absolutely astounding fact given his degree of psychosis. A psychiatric progress note written three days before my evaluation of the patient stated that interpreter

services were NOT needed for this patient. The psychiatrist went on to document "His underwear had feces on the posterior aspect. It took some time with redirect to get him to change his underwear. He was nonverbal. pt seemed perplexed and had difficult (SIC) in responding to directions of CO in changing his underwear." He even went on to state "no evidence of psychosis."

The patient's medical record shows that he has spent long periods of time on suicide watch at the Phoenix, Florence, and Lewis prisons since he came into custody in August 2020. He was on suicide watch at Phoenix from January 19 to July 18, 2021 and September 8-15, 2021; on watch at Florence September 1-7, 2021; and on suicide watch at Lewis-Rast from September 6, 2020 to November 12, 2020 and December 28, 2020 to January 19, 2021. Many of these entries show that he has been mute or provide one-word responses in English. There was no indication that mental health staff have attempted to speak to the patient in Spanish or use a qualified interpreter for their encounters.

- Intake – August 12, 2020 to Tucson Rincon
- Moved to Lewis Rast and immediately put on **suicide watch**: September 6, 2020 – Nov. 12, 2020
- Lewis Rast max **suicide watch**: Dec. 28, 2020-Jan. 19, 2021
- Phoenix **suicide watch**: Jan. 19-July 18, 2021
- Phoenix Flamenco Ida Unit: July 20-Sept. 1, 2021
- Florence **suicide watch**: Sept. 1-7, 2021
- Phoenix **suicide watch**: Sept. 8-15, 2021
- Phoenix Flamenco Ida Unit: Sept. 15-present (we saw him Sept. 23).

This psychiatric visit which occurred on 9/20/21 fails to even approach the standard of care for psychiatric visits. It is also appalling to me that this patient is not receiving any psychotropic medication. Also, the psychiatrist has no idea if the patient is suicidal. The patient is assigned to inpatient psychiatric care in name only.  This patient needs a competent psychiatric evaluation from a Spanish-speaking psychiatrist. Based upon the results of that evaluation, a treatment plan should be designed to fit his unique clinical requirements.

- Failure to provide mental health programming/therapy.
- Highly incompetent psychiatric staff.
- Lack of language interpretation for mental health treatment.
- Failure to manage medications.
- Patients who remain highly symptomatic.

████████████████ **Phoenix**

In my November 2013 report, I noted that this patient was being treated with the extremely outdated and dangerous medication, Thorazine, and was noted to be experiencing severe extrapyramidal symptoms, or EPS.  November 2013 report at 32. These are movement dysfunctions, such as muscle contractions or spasms, caused by

certain psychotropic medications. Left untreated, they can become permanent and irreversible.

Mr. ▉▉▉▉▉ has had serious self-harm incidents since I last reviewed his case, including foreign body in penis (12/26/14 and 8/16/18), and laceration to left forearm (8/16/18). He is currently diagnosed with Schizoaffective Disorder, NOS. This diagnosis should be refined to specify whether his Schizoaffective Disorder is bipolar, depressed, of mixed type.

A note dated 8/3/21 states he is doing better but he persists with auditory and visual hallucinations as well as paranoia. This is a potentially dangerous situation given his history of self-harm. His current medications include the antidepressant Wellbutrin 200 mg BID and Geodon, an antipsychotic, at only 60 mg daily. This patient is being grossly undermedicated with the Geodon in the face of his persistent psychotic symptoms. He is receiving very poor care given his persistent psychotic symptoms and his history of self-harm.

During my 9/23/21 visit to Phoenix, Mr. ▉▉▉▉▉ was observed rocking in his seat, moving around gesticulating. He reported command auditory hallucinations telling him to hurt himself. He reported that he cannot take Haldol because it caused lockjaw and partial paralysis.
- Failure to manage medications.
- Patients who remain highly symptomatic.

▉▉▉▉▉▉
I interviewed Mr. ▉▉▉▉▉▉ in a confidential setting while he was on watch status. At the time of my interview, he had been on watch for four days due to his tying a shirt around his neck in an apparent suicide attempt. He presented with significant bilateral hand tremors. Finally, I noted that he was responding to internal stimuli as well as complaining about voices that instruct him to harm others. He states that his treatment with the antipsychotic Haldol reduces the voices "a little bit." A review of his records reveals that his most current diagnoses are unspecified mood disorder and unspecified psychotic disorder. He is being treated with Lithium 1200 mg daily, long-acting injectable Haldol 75 mg monthly and Haldol tablets 5 mg twice a day. A psychiatric progress note dated 9/21/21 stated in part "no psychosis" and no EPS. EPS stands for "extrapyramidal side effects" such as tremors.

A major problem in this case is that the psychiatrist, two days before my evaluation of the patient, failed to document the patient's significant bilateral hand tremors. Also, the patient remains psychotic even though he is being treated with large doses of Haldol.
- Failure to manage medication.
- Inadequate monitoring of medication-induced side effects.
- Patients who remain highly symptomatic.

**ASPC-Tucson**

███████████

I previously examined Mr. ███████████ in 2013 and documented a failure to follow up with serious side effects of tardive dyskinesia and involuntary movements, and diagnoses discrepancies.

The 2021 file review shows that this 63 year old man is currently on Haloperidol 2.5mg qHS and Cogentin 0.5mg twice daily for Unspecified Schizoaffective Disorder, last documented on 6/16/2021. This patient *still* is not receiving timely screening for tardive dyskinesia, a debilitating and potentially permanent side effect of antipsychotic medications. The standard of care is to perform AIMS screening exams at six-month intervals. For this patient, it has most recently been performed at intervals of 20 months (2/14/2019 to 10/05/2020) and 8 months (10/5/2020 to 6/16/2021).

Concern for Mr. ███████████'s cognitive function was noted in a 3/19/2021 provider note, and there was a recommendation for a mental status / dementia screening using the SLUMS tool or another cognitive assessment test. But no subsequent testing was attempted or mentioned on the 6/16/2021 follow-up, although the patient was said to have "concerns of memory." There is no documented discussion of the increased morbidity and mortality for those who are on an antipsychotic medication and have a diagnosis of dementia; there is an FDA Black Box warning for antipsychotics being correlated with increased morbidity and mortality for older patients with dementia symptoms. Such a discussion with the patient would be essential for proper informed consent to continue antipsychotic medication given these risks, and there would need to be a clear explanation documented for the continuation of haloperidol if the patient were determined to have dementia. This patient is receiving treatment that is potentially harmful or lethal to him without adequate cognitive assessment to determine if he is suffering from dementia, despite a recommendation for neuropsychiatric testing in the 3/19/21 plan.
- Failure to manage medication.
- Inadequate monitoring of medication-induced side effects.

███████████████ **(Named Plaintiff)**

In my November 2013 report (pages 68-69), I described Mr. ███████'s care as follows:

> He carried the SMI designation prior to his incarceration at the Maricopa County Jail in 2009. Jail staff confirmed his SMI status and noted that he had been treated with both antipsychotics and antidepressants in the community. I evaluated him at the SMU on 7/16/13. He had two recent incidents of self-harm, during one of which chemical agents were used against him. A treatment plan dated 4/3/13 listed his diagnosis as Personality Disorder NOS. Of note this plan was done without psychiatric involvement. A psychiatry note from 5/2/13 listed his diagnosis as Mood Disorder NOS and he was

prescribed the antidepressant Wellbutrin 100 mg twice daily. At the SMU I found him to be extremely agitated and questionably psychotic. I was unable to review his chart at the SMU as I was informed that he was being transferred to the Flamenco Unit. I had a follow up evaluation with him on 7/19/13 on the Flamenco Unit; His condition was unchanged in that he was agitated, yelling and possibly psychotic. I was unable to review his chart at the Flamenco Unit as I was informed by staff that it remained at the SMU. It is extremely poor care to admit someone to a hospital (Flamenco Unit) without a chart and without any admitting orders. I questioned the warden about this practice and he informed me that the orders "follow an inmate" from their previous placement until new orders are written by a local MD. The question in this case is since there is no chart, whose orders are the staff following? Also, how can a proper assessment occur without reviewing his past psychiatric history and treatment records? Of note, I reviewed his medical records that were sent on 7/26/13. In these records, I found a treatment plan and admission orders that were dated 7/17/13. Either the staff misinformed me about not having a chart on my 7/19/13 visit, or a chart was backdated after my visit. I find the handling of this case to be extremely problematic.

Mr. ███████ has had several self-harm incidents since I last reviewed his case, including intentional self-harm by sharp object (8/3/18 and 11/27/18), laceration of right wrist (8/22/18), and laceration of left wrist (9/20/18).  He has been assigned a number of different diagnoses over the years, including Schizophrenia, unspecified (6/20/17), unspecified mood disorder (7/10/17), Borderline personality disorder (3/22/18), Post-traumatic stress disorder (PTSD) (4/9/18), and Delusional disorder (10/11/18).  His current diagnosis, assigned on 10/18/19, is Borderline personality disorder.

Mr. ███████'s current medications, prescribed 8/8/21, are Wellbutrin 100 mg BID, Cogentin 1 mg BID, and Prolixin 1 mg QHS.  But these medications are meant for a patient with Major Depressive Disorder with psychotic features -- a diagnosis Mr. ███████ has never carried -- not Borderline personality disorder.  This patient has suffered misdiagnosis over the past eight years, and is receiving inappropriate treatment for his current diagnosis.  This is another example of a patient who for years demonstrated psychiatric symptoms that recently have been reclassified as a "behavior disorder."

I spoke with Mr. ███████ in a confidential setting at Tucson-Rincon's behavioral health unit on 9/9/21. He had only recently arrived from Florence-Kasson Unit. He reported that he had been on mental health watch at Kasson from late August until his transfer due to suicidal ideation.  During our encounter he was agitated, delusional, and perseverating on whether all of his property had been transferred with him.

- De-diagnosis.
- Failure to manage medications.

37

- Patients who remain highly symptomatic.
- Patients who engage in self-harm.

███████████

I spoke with the patient cell-front at Rincon's behavioral health unit on 9/9/21. He initially refused evaluation, but suddenly became agitated and began rambling on paranoid themes, responding to internal stimuli and posturing in cell. He was seen shouting at non-existent individuals, and showed severe persistent psychotic symptoms.

A review of his medical record showed historical chart diagnoses of Amphetamine dependence, Unspecified Anxiety Disorder, Unspecified Schizophrenia Spectrum and Other Psychotic Disorders, Cannabis Abuse, Nicotine Dependence, Sedative Hypnotic or Anxiolytic abuse with intoxication. Active current medications are listed as Venlafaxine XR 75mg QHS and Hydroxyzine 100mg BID. The last psychiatric provider encounter on 9/23/2021 documented diagnosis of Unspecified Mood (Affective) Disorder. Mental status noted to be non-significant and plan to titrate Venlafaxine up to the current dose of 75mg. Previous assessment on 8/26/2021 shared objective findings of inability to focus and concentrate, thought blocking and restricted affect. Noted to have poverty of thought and borderline intellectual functioning. Identified as "SMI" on this encounter note. Previously on Lamictal and reported to be stable but discontinued due to rash.

The site visit presentation and documentation of this patient differ significantly. I observed him to have grossly psychotic symptoms but this is not reflected on notes from the day of my visit and any time before or after. Furthermore, hints at impaired cognitive functioning have been documented in psychiatric prescriber's notes but no explanation or elaboration as to the cause of cognitive and affect change. Diagnosis remains Unspecified Mood (Affective) Disorder with current treatment on antidepressants when previously on mood stabilizers. Diagnosis and treatment do not match and exploration for further diagnostic clarity should be conducted given his documented significant history of psychosis. This patient remains severely symptomatic without appropriate pharmacological interventions.

- Inadequate diagnostic clarity.
- Inadequate pharmacological management.
- Inadequate medical records.
- Patient remains highly symptomatic.

███████████

I observed the patient on 9/9/21 when he was on mental health watch at the Rincon Unit. He reported that he was on Cymbalta (Duloxetine) 50mg for one year in county jail and has not received this medication for two days at his current location. This raises concern for withdrawal syndrome without appropriate taper, and concern for decompensation of Major Depressive Disorder.

A review of his medical record showed that medication active orders were last adjusted 9/16/2021 with a prescription for ibuprofen and 9/13/2021 for prescription of Hydroxyzine 50mg QHS. Initial MH Intake on 9/8/2021 revealed a history of Major Depressive Disorder, Recurrent, with Moderate Severity. During this visit, it was determined that he does not meet the criteria for MDD and reported no current anxiety or depression. History in note did reveal he was currently on Cymbalta. There was no plan regarding restarting Cymbalta, and follow up determined to be in three months. Initial psychiatric assessment on 9/13 noted a history of Cymbalta and Zoloft but did not explore when the patient was last on these medications. Patient noted on 9/13/2021 encounter with psychology he had been prescribed Vistaril to help with thoughts at night. There was an endorsement of increased anxiety. Patient triggered sick call on 9/20 due to back and neck pain.

The mental health team focused on the patient having no significant anxiety or depression in the setting of diagnosed Major Depressive Disorder, but failed to explore continuing Duloxetine with the patient. The psychiatric prescriber would have known he was currently on Duloxetine at county jail if MH Intake note was reviewed. He may have been well managed on this medication and now is at risk for decompensation of his mood due to not resuming Duloxetine, which he reported receiving before transfer. Furthermore, the patient endorsed worsening neck and back pain which was seen by sick call. This can be due to worsening management of possible chronic pain or withdrawal symptoms from Duloxetine, as even mild symptoms can last up to weeks.
- Inadequate pharmacological management.
- Inadequate treatment team collaboration.

███████████████

In 2013, I observed the patient on watch and identified problems with his medical record documentation.  The 2021 review of his medical record shows that this patient's current medications include Depakote 250mg twice a day and Vistaril 50mg qHS, for his most recent initial assessment diagnosis of Unspecified Mood Disorder. Past documentation of Schizophrenia and Schizoaffective disorders on initial encounter on 8/5/2021 are not discussed. A previous initial encounter on 8/16/2019 diagnosed Unspecified Schizophrenia. In the recent past the patient was also taking Paxil, Oxcarbazepine, Olanzapine, and Prolixin decanoate.  This record does not contain adequate assessment or discussion to justify a change in diagnosis from a primary psychotic disorder to only a mood disorder.
- De-diagnosing.

███████████████

I observed the patient on 9/9/21 when he was on mental health watch at the Rincon Unit. He refused to come out for a confidential evaluation. He was stuttering and had a hard time coming up with his words.

A review of his medical record showed that his active medication orders currently include Abilify 15mg BID and Zoloft 50mg daily. Diagnoses have included Unspecified Schizoaffective Disorder and Major Depressive Disorder, Recurrent with Moderate Severity. The patient was seen for individual counseling on 9/6/2021 where he reported suicidality without a plan and ongoing persistent depressive symptoms. He was placed on Mental Health Watch due to aggressive behavior in the facility. Psychiatric prescriber's note on 9/2/2021 documented the patient appearing "distressed" and responding to internal stimuli. Zoloft was discontinued and Abilify increased to better manage symptoms. MAR reveals Zoloft was recontinued, but this was not documented in the prescriber's notes. Diagnoses documented as "Amphetamine (or other stimulant) – induced bipolar and related disorder. Without use disorder" for this encounter. This diagnosis continues on psychiatric prescriber's evaluation on 9/16/2021. The admission date to prison noted on chart to be 12/16/2020.

Mr. ███ is documented with having an Amphetamine Induced Bipolar Disorder despite being in the correctional system for nine months. Furthermore, he is needing further titration of antipsychotic with BID (twice a day) dosing of Abilify in attempts by the team to better manage his symptoms. The amphetamine induced disorder diagnosis appears inappropriate and misleading as it is likely patient has an underlying Bipolar Spectrum or even possible Schizoaffective Disorder given psychotic symptoms reported. Furthermore, depressive symptoms appear pervasive, and Zoloft is only at starting dose to treat depressive symptoms in addition to Abilify.
- Inadequate diagnostic clarity.
- Inadequate pharmacological management.

███████████

I spoke with the patient cell-front at Rincon's behavioral health unit on 9/9/21. On evaluation he was very labile and agitated; he threatened to kill me and spat at the glass. Observable severe paranoid behavior based on the theme contents he shouted towards me. Neighbors to his cell confirmed that his behavior has been this way for over the last year, and they attempted to calm him down.

A review of his medical record showed that his current active medication is Haloperidol Decanoate 50mg every three weeks started on 9/21/2021 (after I observed him). Last psychiatric mid-level provider encounter on 9/21/2021 noted ongoing delusional and paranoid thoughts with continued poor insight, judgement, and impulse control. Zyprexa and Clonidine were discontinued during this encounter to start Haloperidol Decanoate. Medication history reveals he had been on the Olanzapine and Clonidine regimen since 3/23/2020 without significant dosage changes. Seen on 6/1/2021 regarding continued psychotic symptoms and noted to be non-compliant. Psychiatric prescriber scheduled follow-up planned for 60 days.  8/18/2021 Individual counseling encounter for suicide watch noted patient being labile with impaired judgement and insight. Furthermore, he

was placed on watch due to Mr. ██████ endorsing wanting to harm another patient. Diagnosis for the encounter by the mid-level provider and others was Unspecified Schizophrenia.

Mr. ██████ was inadequately managed on Zyprexa and Clonidine without significant dose adjustments for over a year. This history was evident by charting but also neighboring patients who knew Mr. ██████ Furthermore, despite his psychotic symptoms and dysregulated behavior, he was not attended to at a more regular frequency by psychiatry and follows ups were scheduled at a minimum of 60 days if not longer. This has likely led to further decompensation of Mr. ██████ as he was placed on suicide watch for stating intentions to harm another prisoner. There should have been more psychoeducation and more frequent follow-up by team to encourage change in medications and/or transition to long-acting injectable medications. It was not until after my site visit that the team engaged with Mr. ██████ who agreed to start Haloperidol Decanoate.

- Delay in pharmacological management.
- Inadequate monitoring of patient.
- Inadequate mental health care.
- Patients who remain highly symptomatic.

██████████████████

I observed the patient on 9/9/21 when he was on mental health watch at the Rincon Unit. Patient was seen shouting into the walls and window. He was randomly flushing his toilet and appeared overtly psychotic. He endorsed that he is taking medications.

A review of his medical record showed that his current active medications include Olanzapine 10mg and Trihexyphenidyl 2mg BID. The last psychiatric prescriber note by midlevel occurred on 8/26/21; the patient was deemed not to be severely mentally ill. Diagnoses included Schizoaffective Disorder Bipolar Type, Borderline Personality Disorder and Unspecified Disruptive, Impulse-control, and Conduct Disorder. This encounter was while the patient was on watch for self-harm after attempting to cut his right neck and right face. He was deemed at higher risk for self-harm due to previous attempts, recent personal losses, and changes in the environment. Determined to have weekly therapy, but the next prescriber follow-up was planned to be 90 days. A 10-minute watch contact note on 9/9/2021 documented a normal mental status exam. The team has de-diagnosed the patient to Unspecified Disruptive, Impulse-Control, and Conduct Disorder.

The patient as seen from the on-site visit was severely psychotic and had unmanaged psychiatric symptoms. The mental health notes from the same day I had seen the patient contradict this and report Mr. ██████ having a normal mental status exam. Furthermore, based on the presentation it appears that he is not adequately managed with psychotropic medications and more regular follow-up by mental health prescriber would be necessary

41

to reach stabilization. Although diagnosis preference for Unspecified Disruptive, Impulse-control, and Conduct Disorder was made, it is unclear why the patient is not designated with SMI status given gross psychotic symptoms seen during the visit. The patient has been on continual watch due to his destabilized psychiatric symptoms.

- Inadequate monitoring and oversight.
- The patient remains highly symptomatic.
- Inadequate pharmacological management.
- De-diagnosis.

▮▮▮▮▮▮▮▮▮▮▮

I observed the patient on 9/9/21 when he was on mental health watch at the Rincon Unit. He was staring at the floor, refused to talk with me and refused to be pulled out by security. He appeared severely depressed

A review of his medical record showed that on 9/8/2021 an ICS response occurred where the patient was brought in a "restraint" chair and reported, "not feeling me in my head, I can't sleep". Affect for this encounter was described as "flat". Individual counseling session on 9/17/2021 noted mental status exam with stable affect and mood despite in assessment sharing "he is diagnosed with Major Depression, congruent with his presentation". Furthermore, this encounter note acknowledges the patient being on Lamictal and Risperdal which are "incongruent with his reported symptoms". The patient was described as having "anxiety and depressive symptoms". Chart diagnoses have included Other specified schizophrenia spectrum and other psychotic disorders, Unspecified Schizophrenia, Unspecified Adjustment Disorder, Unspecified Mood (Affective) Disorder, and Major Depressive Disorder, Recurrent, Moderate Severity. The last psychiatric prescriber mid-level assessment was on 8/10/2021. The patient was offered to increase his mood stabilizer but was declined. The diagnosis at this visit was "Unspecified Mood (Affective) Disorder). Follow-up RTC set for 90 days.

This patient is poorly managed and is exhibiting symptoms of depression. The presentation was complicated by a history of psychotic disorders and current suspected Bipolar Spectrum illness. There should be consideration of starting an antidepressant given most recent diagnosis was Major Depressive Disorder. Antidepressant was not discussed or offered as an option on last prescriber meeting. The patient's current regimen of Lamictal and Risperdal is not adequate for managing his symptoms. Team discussion for diagnostic clarity should be had as there are varying opinions on what his underlying illness is, as seen by remarks made by the provider on 9/17/2021. The mental status exam in the notes is not consistent with the subjective and assessments sections of the note.

- Inadequate pharmacological management.
- The patient remains symptomatic with depression.
- Inadequate team collaboration.

- Inadequate diagnostic clarity.
- Inadequate staffing assumed due to infrequency of prescriber visits.
- Inadequate medical records.

██████████████

I spoke with him on 9/9/21 at Rincon's behavioral health unit.  I observed him with rambling speech, hypomanic symptoms, and concern for concurrent psychotic symptoms. He stated he was only on Zoloft.

A review of his medical record showed a psychiatric prescriber encounter on 9/21/2021 where the patient was requesting to take "lithium" to "balance his mood". Mental status exam noted to be not-significant for any negative findings, and discussion was had with Mr. ██████████ explaining reasons why Lithium would not be an indicated medication. The diagnosis at this encounter was Unspecified Depressive Disorder. Mid-level encounter on 7/29/2021 noted an assessment of Unspecified Mood (Affective) Disorder. Noted in this encounter "He did not report any symptoms that warrant lithium". Encounters before these dates alternate diagnoses from Unspecified Depressive Disorder and Unspecified Mood (Affective) Disorder. The last mood stabilizer was Trileptal but discontinued due to subtherapeutic blood level due to patient non-compliance. No further mood stabilizers were considered for this patient.

The patient's hypomanic presentation from onsite assessment is reflected in part from past bipolar spectrum disorders seen in the historical chart. Although the patient was non-compliant with Trileptal, he was requesting starting Lithium. Mental Health Team diagnoses repeatedly alternate from a primary depressive disorder to primary bipolar spectrum disorder, without adequate discussion of reasons. Currently, his management entails only Zoloft, which would be inadequate to manage underlying bipolar disorder given the hypomanic symptoms I witnessed.

- Inadequate diagnostic clarity.
- Inadequate pharmacological management.
- Patient remains symptomatic with affective disorder.

██████████████

I spoke with the patient cell-front at Rincon's behavioral health unit on 9/9/21.  He reported that he is on Haloperidol and Depakote. I observed severe psychotic symptoms, responding to internal stimuli with loose and tangential speech.

A review of his medical record showed that his current active orders include Haloperidol Decanoate 200mg every three weeks and Depakote DR 1500mg QHS. Haloperidol Decanoate was last adjusted 9/3/2021 from 150mg to 200mg. Last AIMS was conducted on 6/11/2021 prior to the start of Haloperidol Decanoate. Haloperidol Decanoate was first initiated at 100mg on 6/23/2021. No follow up AIMS repeated for dose increases at

43

150mg and 200mg. 9/3/2021 prescriber evaluation did not comment on any abnormal motor symptoms for "Appearance/Behavior" objective finding.

The mental health team is titrating up Haloperidol Decanoate to better manage psychotic symptoms, but since starting the long acting injectable and increasing dosage to 200mg there have been no AIMS to detect any EPS or Tardive Dyskinesia. Last provider note made no specific comment regarding abnormal body movements related to drug side effect. Recommendations are to check AIMS at 3-6 months intervals, but it should be performed sooner for rapid titrations or significant dosage changes with high-risk antipsychotics. It has been over three months since last AIMS and patient is on a significant antipsychotic dosage.

- Inadequate monitoring and management of medication side effects.
- Inadequate medical records.

██████████████

I observed the patient on 9/9/21 when he was on mental health watch at the Rincon Unit. He was responding to internal stimuli. Appeared psychotic and disorganized, and was naked. Due to significant thought disorganization, I was not able to properly interview him.  He showed persistent severe psychotic symptoms

A review of his medical record showed that on 3/23/2021 he was placed on suicide watch due to "psychosis". Noted that he appeared psychotic and possibly aggressive. There was no plan to involve a psychiatric prescriber despite reported psychotic symptoms. History in charting reveals multiple diagnoses including Schizophrenia, Unspecified Mood (Affective) Disorder, Schizoaffective Disorder NOS, Unspecified Psychosis, and polysubstance abuse. Initial mental health assessment on 3/27/2021 noted concern for patient's lack of engagement and he was kept on mental health watch. The assessment did not list a diagnosis for the patient. Mid-level psychiatric prescriber on 3/31/2021 noted patient being not responsive to questioning and distracted to internal stimuli. The mental status exam was not completed during this assessment. Diagnosis of Schizophrenia was made with the plan to see the patient in 7-14 days given non-compliance to start medications. The mid-level provider continued to see the patient on 4/9/2021 and 5/30/2021 with a plan to follow up in 7 to 14 days. On 9/2/2021, an ICS response occurred due to the patient assaulting an officer. Mid-level psychiatric provider only saw the patient on 9/9/2021 after witnessing him talking to himself and laughing. At this time referral for PMRB for forced medication was considered which will occur in one month.

The patient was recognized by the mid-level provider to be psychotic, but due to non-compliance was unable to start psychotropic medications. The mid-level provider did not follow through with her listed plan to see the patient in 7-14 days from 5/30/2021. Patient several months later assaulted an officer and was found to be severely decompensated. It was only after this incident that the psychiatric prescriber finally saw the patient. Had he

received more regular follow up with the mental health prescriber, an earlier decision to involve PMRB could have been considered, and the assault possibly avoided. Furthermore, a thorough violence risk assessment should have been performed which would have likely determined the patient to be at high risk leading to earlier referral to PMRB.

- Inadequate monitoring and oversight.
- The patient remains highly symptomatic.

████████████████

In my November 2013 report (at page 20), I described the patient as follows:

> This patient has a history of a serious suicide attempt by scalping himself. His chart was extremely disorganized and contained "double" sections -- that is, there were two medication administration tabs, two mental health tabs, as well as several other duplicate sections in his chart. A psychiatric progress note stated, "Continue Cogentin, Haldol and Symmetrel," but there was no corresponding medication order. [T]his degree of chart disorganization is dangerous given Mr. ████ 's history of a serious suicide attempt.

In addition to the act of self-harm of scalping himself, Mr. ████ self-castrated himself when he became convinced that he had testicular cancer. Currently, the 65-year-old patient has been housed in the Tucson infirmary (IPC) since January 2020 when he announced that he could not use his limbs and told mental health staff on 1/23/20 that he was "trying to find out if I can get the death penalty," and that "I don't want to live no more, not in the condition I'm in." He has been incarcerated for more than four decades. Treatment Plan of 7/28/21 states that he is not receiving any psychotropic medication. A mental health note dated 7/16/21 lists his diagnosis as "Unspecified Psychosis." Of note, this is generally used as a temporary diagnosis until a more definitive one can be made. The prison staff has had 8 years since I saw the patient to refine this diagnosis, which they have failed to do. His last treatment plan was created on 8/30/21, with the goal being "Management of mental health symptoms of AH and delusions." According to a 9/28/21 note by the psych associate, "He does not appear to be making progress with that goal."

His 7/28/21 progress note documents that the patient remains psychotic, but he is not receiving any antipsychotic medication. This is very dangerous in that in the past his auditory hallucinations, which he believes are demons, have commanded him to both castrate himself and scalp himself. He acted on both of these commands and has been taking testosterone replacement, which he is currently refusing. The treatment of this patient is very poor and potentially very dangerous.

- Inadequate diagnostic clarity.
- Patient remains highly symptomatic.

███████████

I spoke with the patient cell-front at Rincon's behavioral health unit on 9/9/21. He was rambling with incoherent speech. Symptoms consistent with pervasive delusions and appeared grossly psychotic. Reportedly on Zyprexa but remains psychotic.

A review of his medical records shows that he is currently on Duloxetine 120mg every morning and Zyprexa 20mg at night. Psychiatric prescriber's evaluation on 9/2/2021 noted the patient having auditory hallucinations and paranoid delusional thoughts. Furthermore, he was noted to have poor impulse control and judgment. Although endorsing psychotic symptoms, the patient did not receive adjustment or changes to his antipsychotic regimen. Cogentin and Vistaril were discontinued. Assessment reflects that the reason for patient going on watch was the symptoms of psychosis and behavioral dysregulation. Diagnosis for this encounter was documented as Unspecified Schizophrenia Spectrum and Other Psychotic Disorder. The patient also is on high dose Zyprexa, but the last metabolic panel collected was 10/25/2020. Prescriber documented next follow-up to occur in one month.

This patient exhibits clear ongoing psychotic symptoms which led to safety watch. Assessment by psychiatry acknowledges psychotic symptoms and behavioral dysregulation as cause for being placed on watch, but did not adjust antipsychotics to better address his auditory hallucinations and paranoia. Furthermore, given watch placement, follow up was inappropriately scheduled for one month. Standard of care calls for this highly symptomatic patient to be seen daily while on watch.
- Inadequate pharmacological management.
- Patient remains highly symptomatic.
- Inadequate monitoring and management of medication side effects.

# EXHIBIT 3

# REDACTED AND

# FILED UNDER SEAL

Exhibit 3

Summaries of Class Member Deaths By Suicide
2019-Present





Mr. ███ died by suicide on ███████, at ████████████████████ ██ .

Due to time constraints, I was unable to review Mr. ████'s medical records, and only could review his mortality review and psychological autopsy..

He was a psychiatric inpatient at the ████████ .  According to the mortality review and psych autopsy, he had recently been taken off of mental health watch prior to his death by hanging in a janitorial supply closet.

The psych autopsy noted the following recommendation:

---

**Section 6: Recommendations**

Overall, Mr. ████'s medical and mental health care conformed to ADC policy.  He was appropriately treated as a psychiatric inpatient and being seen per policy.

It is recommended that the closet door remain locked unless needing to access supplies, and then locked after the supplies are gathered.

It is also recommended that staff reassess ligature points that may be present in the inpatient setting.

---



Mr. ▮▮▮▮▮ died by suicide on ▮▮▮▮▮▮▮▮▮, at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Mr. ▮▮▮▮▮'s death could have been avoided had he been assessed more thoroughly and consistent with the standard of care, given red flag symptoms consistent with a psychotic diathesis. There was a failure to recognize and respond to psychotic symptoms as evidenced below. Furthermore, Mr. ▮▮▮▮▮ had significant past history of multiple severe suicide attempts which in context of distress and psychotic decompensation would place him at a high risk for suicide, which also went unrecognized by mental health staff.

On 11/7/2018, a psych associate had noted the patient laughing inappropriately "as if he was responding to internal stimuli." Discussion regarding "giving away his store" followed by incoherent and tangential thought process as evidenced by a discussion about not wanting more peanut butter is consistent with psychosis. In the mental status exam the patient was noted to have circumstantial thought process but this would be incorrect based on subjective documentation. Furthermore, there was no change in the diagnostic impression. Assessment continued to document Antisocial Personality Disorder and Unspecified Mood Disorder. These red flag symptoms of giving away property, inappropriate laughter, and tangential thought process, were not recognized or appropriately addressed by a more thorough assessment by a psychiatric prescribing provider. Due to the psychotic nature of presentation it would be unrealistic to expect the patient to be able to determine when to seek help and/or expect to start medication management without appropriate medication psychoeducation. A more thorough assessment may have also determined suicide risk and capacity to make decisions to seek help. From this visit there was no clear follow up plan established.

On 1/3/2019, a psych associate once again noted the patient laughing inappropriately. Incorrectly, the psych associate determined that the patient had euthymic mood and affect, no evidence of psychosis and goal directed thinking. Yet as noted in other parts of the entry, Mr. ▮▮▮▮▮ was clearly tangential in thought process, not goal directed, as seen by discussing his uncle's mole on his face when being asked about his mental health packet work. The response to internal stimuli, his inappropriate laughter, and tangential thought process are clearly due to an underlying psychotic process. Diagnostic impression remained unchanged for this visit as well, and the burden of seeking mental

health help was left on the patient, despite clear psychotic symptoms affecting his insight and judgment.

On 2/7/2019, sick call was triggered by Mr. ████████ after feelings of being singled out by other incarcerated people due to his psychotic behavior. In this encounter he continued to present with inappropriate laughter. He was inappropriately assessed as having "stable" mood despite endorsing significant distress related to prison alienation. Furthermore, it was documented that there was "no evident psychosis" in the mental status exam, despite events concerning for paranoia and clear response to internal stimuli. He was inappropriately determined to have "fair" insight and judgement. No change in diagnostic impression or clear follow up to address patient concerns was documented. Mr. ████████'s worsening untreated psychotic condition is directly related to his alienation from the rest of the prisoners.

On 2/9/2019, in context of clear signs of psychosis established from the previous encounter, the patient is presenting with possible worsening paranoia. Mr. ████████ had requested to have STD screening despite endorsing no risk behaviors or physical symptoms.

On 3/7/2019, ████████████████, he was documented as having continued inappropriate laughing which was worse than prior encounters, as now it was documented to be "sometimes uncontrollably". Psych associate incorrectly once again noted mood and affect being "euthymic" despite incongruent affect as seen by his worsening inappropriate laughter.

On ████████, ICS was triggered after he was found hanging.

The psychological autopsy noted history of schizophrenia with command auditory hallucinations to harm self. Prior to ADC he had been on a significant dosage of Risperidone for treatment of psychotic symptoms. Mr. ████████ in this report was noted to have attacked his cell mate directly due to paranoia that his cell mate was going to kill him. It was also documented that he had three suicide attempts and my assessment is that two of these were serious attempts.

The psychological autopsy noted that a more thorough psychological assessment would have been appropriate, given the patient's worsening symptoms. Recommendations included having protocol initiated for team treatment review when patients are referred by other staff for odd behavior or psychiatric symptomatology, and for staff to minimize face shield barriers to allow for improved rapport building which would allow a better assessment of symptoms.

Mr. ████████'s case was examined by Dr. Rowe in the Mortality Review Committee Final Report. The contributing cause analysis revealed there was failure to recognize

symptoms or signs of the patient's psychiatric condition and patient's nonadherence being factors to suicide. Furthermore, general critique noted the diagnosis being inaccurate as symptoms presented were deemed to be "first psychotic break". Dr. Rowe noted the patient may have benefited from psychiatric intervention or placement into a residential MH program.

Although the Mortality Review Committee Final Report deemed the suicide as undetermined in terms of it being avoidable or delayed, in my assessment given all the facts present, the death would have been "possibly avoidable" to "avoidable" if appropriate mental health psychiatric contact was made. Such assessment would have better determined the patient's risk and attempts to support engagement in more appropriate treatment. My review above shows the substandard quality of mental health care as seen by the multiple times Mr. ███████ presented with psychotic symptoms, inaccurate mental status exam assessments, poorly discussed or explored formulations of the patient's condition, and inadequate plans with no clear follow up or consideration for higher level assessment for possible medication management.



Mr. ███ died by suicide on ███████, at ██████████████
███████.

Mr. ███'s suicide was significant in that there were inadequate mental health systems of care, inadequate medication dosing, no consistent medication dosing times, and failure to recognize decompensating psychiatric symptoms with timely treatment response in the last month prior to his death.

On 4/11/2019, a psychiatrist evaluated him regarding transitioning to Ziprasidone from Haloperidol given past reports of this medication being efficacious. In this evaluation the patient was objectively determined to have racing thoughts, poverty of thought content, poor insight, poor judgement, and poor impulse control. Provider decided with patient collaboration to transition to Ziprasidone. During this encounter there was no review of caloric intake or patient's appetite to effectively evaluate whether Ziprasidone would be an appropriate antipsychotic for Mr. ███ Despite SMI designation and determination of having poor judgement and impulse control, psychiatric follow up was scheduled for three months later.

On 4/25/2019, a patient encounter for sick call regarding concerns for safety occurred. Sick call was triggered in response to worsening paranoia. Plan noted mental health was contacted and to be evaluated by psych associate ███. Psych associate's evaluation revealed patient reported he had missed his medications. This fact leaves a discrepancy as it is documented on the medication MAR that he has received medications at this time. He was further determined to have "delusional thinking" but was not provided adequate plan to have a psychiatric provider evaluation given recent medication changes. Patient was placed on a 10-minute watch instead.

On 4/29/2019, Mr. ███ was placed on a 30-minute mental health watch during which assessment revealed withdrawn and delayed responses. He endorsed likely forgetting to take his medications and requested having injection instead due to difficulties remembering to take medications. Plan once again did not consider contacting psychiatric provider for medication adjustments and noted "patient was counseled to take medications as prescribed".

5

On 4/30/2019, the patient was seen by psychiatric provider where he endorsed not having been "administered" Ziprasidone since being on watch. At this encounter he endorsed preference for haloperidol, likely realizing better stabilization of psychiatric symptoms, but alternatives to Ziprasidone were not considered by psychiatric provider. Because of the provider's inability to recognize the patient's distress related to decompensated symptoms, there was a missed opportunity to further titrate up the Ziprasidone on this visit. Patient noted to have been eating with ziprasidone administration.

Ziprasidone given 11:19am to 20:49pm. The night before his suicide he was offered medication at 20:49 and refused it. Given fluctuations in the times Mr. ████'s Ziprasidone was provided there is a concern for inadequate absorption of the medication; a minimum of 500 calories must be consumed for therapeutic level to be achieved due to pharmacokinetics of drug absorption. There is not clear documentation if Mr. ████ was in fact provided adequate caloric intake with medication on initiation. This is a concern given erratic timings of medication being provided. Besides the night before his suicide, Mr. ████ was compliant with taking Ziprasidone in April and May of 2019 when offered based on the MAR, but this MAR does not appear to accurately reflect his medication intake as discussed above. There were consecutive days April 28, 2019 to May 1, 2019 where medication was not available or held per MAR documentation.

Ziprasidone dosage was also inadequate for the treatment of the patient's Schizophrenia. Patient was at below starting dose and nowhere near therapeutic equivalent to prior Haloperidol dosage of 2.5mg daily. Ziprasidone's therapeutic range for Schizophrenia ranges from 40 to 200mg per day. Patient was on 20mg once daily dosing of Ziprasidone only and medication is typically initiated 20mg twice a day.

Mr. ████'s psychological autopsy documented that the patient had become increasingly destabilized in the last two months prior to his death. Noted to have inability to control his impulses as evident by punching the hand of his "Bunkie" when he falsely believed his "Torah" was stolen. Mr. ████ developed more pronounced persecutory delusions. He had a diagnosis of Unspecified Schizophrenia and was designated as SMI. He had been on mental health watch due to mental decompensation manifested in paranoia and delusional thinking. Paranoid thoughts consisted of thinking others were out to kill him. He was noted to have had progressive psychiatric destabilization and medications being administered intermittently. Psychological autopsy recommended there be a more thorough chart review and documentation of assessment when there is a pattern of deterioration. Furthermore, there was recommendation to have a comprehensive review of the factors impacting the inconsistencies in medication administration, and for there to be interdisciplinary communication.

Mr. ████'s case was examined by Dr. Rowe. Dr. Rowe's assessment and opinion were presented in the Mortality Review Committee Final Report. Contributing cause analysis

indicated failure to recognize symptoms or signs of mental health decompensation and medication delivery issues as seen by missed medications. It was listed as "undetermined" if death was caused by or affected in a negative manner by medical or mental health personnel. General critique noted preventative measures were not taken such as placing patient on MH watch prior to death. Treatment was determined to not be timely and an inability to care for patient appropriately due to security issues. Patient noted to have missed his psychiatric appointment the day before his suicide due to the staff not knowing where patient was located due to recent location move. Dr. Rowe notes that the death was "possibly avoidable."

In my assessment Mr. ████'s suicide could have been avoided, had he received appropriate transition to Ziprasidone antipsychotic with timely follow up for therapeutic titration. Patient was on subtherapeutic antipsychotic dosing despite being classified as SMI with diagnosis of Schizophrenia. There were significant inconsistencies in medication administration which were mostly from an administrative level as seen above. He would have benefited from a residential level of care during crucial medication cross titration, in light of his placement on watch on two separate occasions due to concerns related to his psychiatric presentation.





Mr. ████████ died by suicide on ████████████, at ████████████████████.

Mr. ████████ did not have a follow up plan by his prescribing psychiatric provider for worsening depressive symptoms especially given that he was started on psychotropic medication. Assessment for bipolar diathesis was inadequate as presentation was concerning for possible a bipolar mixed episode presentation. There was no mental health contact for a full month despite documented evidence of worsening symptoms by psych associate, despite starting medication treatment.

On 8/28/2018, Mr. ████████ had mental health intake to ADCRR custody. He was noted in this intake to have had history of being admitted to a psychiatric hospital a year prior. He reported being on Sertraline in April of 2018 and that he had been seeing a mental health counselor. Endorsed having a serious episode of depression a month prior to intake. Diagnosis codes included Unspecified Opioid Use, Alcohol Dependence with Withdrawal history, Tobacco Use, Cocaine Abuse, Cannabis Abuse, Unspecified Affective Disorder and Unspecified Depressive Disorder. He was offered to have psychiatry consult, but preferred to wait.

On 9/27/2018, Mr. ████████ noted to the nurse practitioner for the Chronic Care Clinic that he had been diagnosed with HCV in 2012 due to IV drug use. Endorsed being "clean".

He was seen by psych associate on 11/28/2018 for routine visit. He did not endorse any significant symptoms on this visit.

On 4/1/2019, he requested sick call for "mental health," endorsing difficulty with mood. Mr. ████████ was requesting to restart Sertraline and noted to have flat affect on mental status exam. No suicidal thoughts endorsed at this time. Plan for patient to be scheduled to see psychiatric prescriber.

On 4/3/2019, Mr. ████████ was seen by mid-level psychiatric prescriber. The prescriber documented that he reported self-reported impulsivity with risky behavior and decreased need for sleep for multiple consecutive days occurring days prior to current assessment.

8

Further past psychiatric history revealed discrepancies from initial mental health intake. It was noted he had been diagnosed with "manic depression" as a teen, had been on multiple psychotropic medications and had been hospitalized in past for "schizophrenic thoughts, hallucinations". History revealed three suicide attempts by overdose in the past. Further drug use revealed past PCP, LSD, Cocaine, Heroin, NTG, MDMA, and Vicodin. He endorsed being sober for the last two years. Provider's mental status exam determined he had poor insight, poor judgement, and that his "memory was not intact". Furthermore, it was noted he had poverty of speech and thoughts. Assessment at this time was "Unspecified Depressive Disorder" and he was started on Sertraline. No follow-up plan was indicated at this visit.

On 4/17/2019, he was seen by psych associate cell-front. He had endorsed elevated depression and anxiety. Furthermore, he clearly noted being "always anxious" and having difficulty falling asleep. Plan did not indicate or determine need for follow up with prescriber or further mental health engagement. Plan noted "Utilize MH as needed or when in crisis". There were no further points of contact or documentation for the next month leading to his death by suicide on ▮▮▮▮▮▮▮.

It can clearly be appreciated that there was inadequate assessment and follow up by the prescribing psychiatric provider. Consideration of bipolar disorders in assessment was not present, despite past reported bipolar diagnosis, history of multiple psychiatric hospitalizations, endorsement of risky behavior and decreased need for sleep. There was no attempt to obtain past psychiatric documentation for diagnostic clarity. Furthermore, the patient's presentation is concerning for a Bipolar Mixed Episode, which if treated by monotherapy with antidepressant can lead to rapid cycling and increased intensity of symptoms. The psych associate clearly documented the self-reported worsening anxiety, depression and sleep that would be consistent with such rapid cycling. These facts place the patient in a high-risk category for suicide given past suicide attempts, multiple hospitalizations, decompensation, and worsening symptoms.

Aside from failure by the psychiatric provider to make an accurate diagnosis and to have a clear plan for follow up, the psych associate also did not consider alerting the mental health team or psychiatric provider to the patient's deteriorating status. In my professional opinion, death was avoidable had there been timely and appropriate psychiatric assessment.



Ms. ███████ died by suicide on ███████████ at ████████████████████.

She did not receive adequate follow-up for concerns she raised to mental health staff in the weeks and days prior to her suicide.

Her last psychiatric prescribing provider evaluation was on 4/30/2019. Ms. ███████ was on Fluoxetine 60mg for Premenstrual Dysphoric Disorder and Episodic Mood Disorder Not Otherwise Specified. She was noted at this appointment by the provider to be stable.

On 5/10/2019 Ms. ███████ submitted an HNR stating that she wanted to speak with psychiatry. There is no further documentation of reasons why she was asking to see psychiatry. She was not seen until three days later, for five minutes by a psych associate (not a psychiatrist or psychiatry mid-level), at which time she denied having any concerns. During this session no specific follow up plan was noted other than "per policy."

On 6/28/2019, Ms. ███████ was seen for individual counseling after requesting to see psychiatry. Ms. ███████ was requesting to speak to someone regarding her distress related to inability to cope after a recent family death. It was documented that "Medical officer advised CO [corrections officer] and IM [inmate] that PA [psych associate] was unavailable and to contact the afterhours MH on-call if needed for ICS. CO then went against medical officer's direction and brought IM into the medical hub psych office to PA". There appeared to be significant concern on behalf of the correctional officer for the mental health of Ms. ███████ that was not appreciated by either the medical officer or the psych associate.

In the note for this encounter, no diagnosis was listed for Ms. ███████ Ms. ███████ also shared in this appointment that her medications were not helping her.  She was told to ask staff to place her on "watch" if she had worsening thoughts. Ms. ███████ clearly stated that being on watch was not helpful to her.  Despite noting that Ms. ███████ was "visibly agitated," the psych associate inexplicably documented "no acute distress present." During this session Ms. ███████ reported she was told she would be "staffed for WBHU program," a residential mental health program. The psych associate told Ms. ███████ she

10

would follow up on this issue, but this was not listed in the plan, nor brought up to Ms. ███████ at her next, and final, mental health encounter on 7/1/2019.

On 7/1/2019, Ms. ███████ was seen by a psych associate regarding distress from past trauma and self-harming behavior. In this encounter it was documented that she had a medication complaint, but no further documentation about the medication complaint was noted. Furthermore, it was determined on the objective mental status exam that Ms. ███████ had poor sleep. There was no follow up with Ms. ███████ regarding the residential program or her medication concerns. Furthermore, the psychiatric prescribing provider was not notified of Ms. ███████'s medication concerns from 6/28/2019, and was therefore not able to intervene. Ms. ███████ hanged herself the following day.

The medical examiner report indicated manner of death to be suicide due to asphyxiation by hanging, with a history of bipolar disorder, depression, self-harm and suicidal ideations. Recent stressor noted of decedent's aunt passing and that Ms. ███████ was grieving. Toxicology screen was negative, and no sign of foul play was found.

The ADC psychological autopsy (ADCM1588576-88) noted that other prisoners had observed Ms. ███████ crying in the days prior to her suicide and asking an officer if she could see mental health. She was talking about death and wanting to join her recently deceased aunt, whom she also referred to as mother. The report documents multiple self-harm episodes and suicide watches during her incarceration, and a history of self-harm and suicide attempts prior to incarceration.

The psychological autopsy noted that, in addition to the 5/10/19 HNR referenced above, Ms. ███████ had submitted two additional HNRs seeking mental health care, on 6/18/19 and 6/20/19, but those HNRs were not sent for review. The psychological autopsy recommended that the HNR process at Perryville Complex be reviewed to ensure patients are appropriately referred to mental health and to review obstacles to this process. It also recommended that consideration be given for patients with significant trauma to be referred to a residential program to allow adequate treatment in appropriate timeframes, with response to treatment more closely monitored.

The ADC Morality Review (ADCM1588589-94) recited Ms. ███████'s lengthy history of self-harm and watch placements since her intake to ADC in 2012. The review concludes it is "undetermined" whether her death could have been prevented or delayed by more timely intervention, and under "General Critique," checks boxes for "Preventative measures not taken" and "treatment inappropriate." The review further notes that Ms. ███████ had "demonstrated a pattern of engaging in self-injurious behaviors." It continues:

> From the records available, it appears that she was being reviewed for placement
> in the residential program. It is likely that she would have benefitted from

participating in trauma related services in that setting.  The setting she was in at the time of her death may have caused some treatment complications.

On review of all the facts above it is evident that there was a lack of appropriate communication between staff members regarding Ms. ████████'s treatment plan, her need to see her prescribing provider, and staff concerns for her mental health.

Furthermore, Ms. ████████'s need for residential treatment was not followed up on; both the psychological autopsy and the Mortality Review conclude that more timely access to treatment such as a residential level of care would have been helpful to Ms. ████████

Additionally, the psych associate's 6/28/19 statement to Ms. ████████ that she should speak with staff if "needing to utilize watch" was inappropriate.  Ms. ████████ had clearly stated that being on watch was not helpful to her, but if the psych associate nevertheless believed that Ms. ████████'s safety required her to be on watch, it was her duty to place her on watch, rather than putting the onus on the patient.

There was also documentation on Ms. ████████'s last two individual counseling encounters that she had complaints regarding her medication, yet the prescribing mental health provider was not notified, and no plan was noted to address this issue. It is likely that the acute stressor of her aunt's death led to a significant worsening of her depression that would have required further medication changes for adequate treatment.  This suicide was preventable.



Mr. ███████ died by suicide on ███████████, at ██████████████████████.

He did not have an adequate medical referral, follow up, or treatment of medical issues, including a recurrence of cancer. The mental health team did not appropriately evaluate and treat the patient for mood disorders. There was a lack of multidisciplinary team discussion in treatment planning.

3/28/2019: Seen by medical provider and his Amitriptyline (Elavil) was increased due to patient's reported pain. The provider reported, "patient was explained that opioids or gabapentin are medically indicated at this time, patient was offered to increase his Amitriptyline, he agreed".

7/3/2019: Submitted HNR to get back on psychotropic medications.

7/6/2019: Requested to speak with mental health team.

7/16/2019: Psychiatric mid-level provider saw the patient who was requesting "Elavil". Provider documented that the patient reported "mood instability" and "mild depression and anxiety". Reportedly denied suicidal ideations during this visit. Reasons for requesting specifically "Elavil" were not explored during this encounter. Mental status noted the patient had "poor judgment" and "poor impulse control". Patient suspected of taking non-prescribed drug due to low blood pressures and pulse. Started on Effexor for mood.

███████: ICS for being non-responsive; pronounced dead at the scene. The patient utilized a lanyard around his neck, causing asphyxiation.

Psychiatric Disorders include: Adjustment Disorder with Mixed Anxiety and Depressed Mood.

Medical history was significant for HCV infection, Squamous Cell Carcinoma of the base of the tongue, solitary pulmonary nodule, chronic throat pain, upper thigh abscesses, and hypothyroidism.

The last active medication regimen before death is the following: Venlafaxine ER 37.5mg qam, Levothyroxine 0.088 micrograms qam, Vitamin B Complex W-C/FA tabs, Calcium Acetate 667mg BID.

Pertinent Labs: Last thyroid evaluation on 10/28/2018 with TSH elevated at 10.533 [0.550 to 4.780]. An elevated TSH means that the patient is Hypothyroid.

The Mortality Review Committee Final Report recommended the following.  Patients are to be seen and counseled before discontinuation of prescribed medication. Medications that can cause significant side effects should be discussed with the patient and dosed at a time when possible that helps to mitigate significant side effects. The patient had significant throat pain that possibly could have been better controlled with medication trials. Furthermore, the committee noted that preventative measures were not taken with respect to controlling the pain. The review committee determined the death "undetermined" with respect to preventability. In the discussion section of the review, it was acknowledged that multiple HNRs had been submitted by the patient with staff not appreciating the level and severity of the pain symptoms, with no referrals made to health care practitioners.  Medications were discontinued due to the patient's non-compliance without prescriber counseling. The review shared the patient appeared to have been using illegal opioids. The review committee found sufficient care was offered regarding mental health issues.

Medical autopsy did not evaluate for current cancer status given past history. No exam review of tongue noted, but the neck organs noted to be unremarkable.  Unclear if in remission or progressive cancer.

The Psychological Autopsy found that: Mr. ███████ had made "concerning statements that were not addressed by staff." The report states he made statements of wanting to die which were not followed up with staff last in 2018. The psychological autopsy noted, "he did not present with future-oriented thought processes and refused multiple encounters with medical and mental health staff". The report shared he slept most of the day and kept largely to himself. Describes the behavior of Mr. ██████ to be of someone who is "withdrawn and someone who lacked any social contact or support".

The report determined that the patient would have benefited from the medical and mental health staff in obtaining peer opinion and to have had security staff consult the medical or mental health teams. Motivation to end life was related to patient's concerns that his cancer had returned. Endorsed racing thoughts and trouble sleeping due to concern about his cancer returned due to a mass found in his throat in November of 2018.

The medical provider had requested a CT scan with the cancer center, but this was canceled by the health care company's utilization management. There was no follow-up

14

with Mr. ███ informing him that the scan had been canceled.  The psych autopsy
notes that he had been dealing with chronic pain issues and the possible recurrence of
throat cancer.

---

**Recommendations**

It appears that Mr. ███ made concerning statements that were not addressed
by staff. He endorsed wanting to die in an encounter with nursing staff in 2018
and it appers there was no follow up from this statement. He did not present with
future-oriented thought processes and refused multiple encounters with medical
and mental health staff. He also had a history of refusing or not taking his
medication even though it was administered to him. He reported to mental health
staff in July of 2019 that he would die of cancer before releasing. The behavior of
Mr. ███ that was reported by security staff was indicative of someone who
was withdrawn and someone who lacked any social contact or support. Mr.
███'s mental health score was dropped from a 3E to a 2 on 07/19/2017
despite the mental health staff noting that she was unable to assess Mr. ███
based on his refusal to meet with her. It may have been helpful for medical and
mental health staff to consult with peers regarding this case as well as for security
staff to consult with medical and mental health staff for a referral to care.

---

In my professional opinion, the patient had inadequate medical and psychiatric care.

There was a lack of coordination for a multidisciplinary team discussion, as indications
for Elavil appeared to be for treatment of pain by medical providers, but in attempts to
restart Elavil patient was switched to Venlafaxine for mood by the mental health team.
The patient had stopped after two doses shortly before his death. It also appears that the
patient was self-medicating with non-prescribed opiates given the toxicology report.
There was suspicion by the psychiatric provider for drug abuse due to vitals.

It is likely the patient may have severe distress due to ongoing chronic medical issues and
comorbid severe psychological pain. The need to self-medicate indicates inadequately
treated chronic pain, psychological distress or drug dependence. The patient reported
having increased withdrawal from engaging in provider treatment and other social
interactions.  This increased withdrawal is a significant risk factor towards suicide and
should have prompted close observation by the mental health team.

Both the psychological autopsy and Mortality Review Committee shared significant
concerns for the medical and psychiatric care provided to the patient. There was also an
acknowledgment of inadequate pain management. Had the patient had timely and

appropriate medical and psychiatric follow up, better rapport could have been formed with the patient which would have allowed the treatment team to better appreciate the underlying psychological distress as a result of the recurrence of cancer and untreated pain.



Mr. ▮▮▮ died by suicide on ▮▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ .

Defendants have not yet provided a psychological autopsy for Mr. ▮▮▮ and I was
unable to review his medical records.



Mr. ███ died by suicide on ████████ at ████████████.

I was unable to review Mr. ███'s medical records due to time constraints.



Ms. ███ died by suicide on ████████████ at ██████████████████████.

She did not have an adequate mental health intake screening or appropriate services offered for substance abuse. Ms. ████'s history is consistent with likely having poly-substance use disorder. Ms. ████'s death was within one month of her last drug use and prompt follow-up for substance-induced mood disorders did not occur.

2/14/2020: Mental health intake significant for endorsing methamphetamine and Percocet abuse last 2/5/2020. There was no social history obtained in the mental health intake note. The patient was determined to have no emergent mental health needs and left to utilize HNR system.

2/28/2020: ICS response was activated after the patient was assaulted by another prisoner. Patient refused examination after sustaining injury to her head.

████████: ICS response activated when the patient was found down in yard unconscious. 911 was called and the patient was transported to "████████".

No active medication or medical problems noted.

History of significant substance abuse with stimulants and prescription opiates.

Lab work on intake did not include any drug screening.

Mortality Review Committee Final Report findings: Committee determined the patient's death could not have been prevented and that sufficient care was provided. Acknowledged in the report that her suicide by hanging may have been related to depression and the loss of her children. Reported her history of substance abuse and inability to remain sober may have contributed to her death.

Medical Autopsy findings: Found with a ligature around her neck made of socks. No foul play. Death was due to asphyxiation. Only an external exam was performed.

Psychological Autopsy findings: Reported suicide note left was a letter to her parents apologizing to them. Indicated to her parents she has been depressed since childhood and could not live without her children anymore. The letter reiterates multiple times her inability to live without her children. Department of Child Safety was involved and there was a possibility of losing her children. History of abusing methamphetamine and opiates up through February of 2020. Findings report, "it is important to note that her substance abuse appeared to be escalating in severity".  Days prior to her death she was punched in the head by another prisoner who had mental health issues with possible "delusional ideation". The psych autopsy included the recommendation to not house newly-incarcerated people in "Reception and Assessment" alone for an extended period of time. This illustrates the deleterious effects of isolation units, especially for new arrivals to prison.

> **Section 6: Recommendations:**
>
> It is suggested to not house inmates in Reception and Assessment alone for an extended period of time.  She was housed alone over a weekend.  It is recommended to consider not housing inmates alone for more than 24 hours while in Reception and Assessment due to unknown adjustment to the prison setting and being locked down the majority of time.

Based on my professional assessment the patient did not receive adequate screening and treatment for substance use disorders given the prolonged history of drug abuse. Concern for the development of substance-induced mood disorder and/or worsening of undiagnosed underlying depression due to inability to self-medicate her distress with drugs. She was reporting severe distress related to her children being taken away but had no coping skills to hand this psychological pain.

Furthermore, the patient's psychological distress was not appreciated by providers. The mental health intake did not explore social history to determine possible external stressors. This information could have clued the mental health team to the significant stressors related to her concerns with respect to her children.

Additionally, her difficulties with substances were recognized by the Mortality Review Committee but not appropriately followed for possible worsening mood in state of withdrawal or cravings for substances. Given the history of being in a residential treatment program, this should have led to active multiple attempts to engage the patient for continued rehabilitation in the correctional setting. Resources such as medication-assisted treatment of drug addiction were not offered to the patient. Furthermore, her substance abuse was recent and it is likely she may have developed a depressive disorder in relation to no longer using stimulants and opiates along with psychosocial stressors.



Mr. ██████ died by suicide on ██████████, at ████████████████
███████.

He did not have adequate mental health screening on transfer to the facility. Despite Mr.
██████ endorsing having a past psychiatric history with the mental health counselor,
this was not explored in further detail to determine possible suicide or violence risks.
Furthermore, I agree with the psychological autopsy that closer mental health follow-up
of individuals who have chronic pain and lost affiliation with their respective gangs could
prove to be preventative. Given the patient had these risks it places him at a higher risk
category for suicide.

1/14/2020: Mental health counseling encounter after recently arriving from Nevada. The
patient shared at this appointment he had "renounce[d]" from his gang affiliation and that
he wanted to "drop out of the game". The patient had also reported having a mental
health history. The plan was to continue follow-up at 30-day intervals.

2/5/2020: Medical provider saw patient for ongoing chronic pain issues. Determination to
order MRI with and without contrast of the cervical and lumbar spine. Tramadol was
continued and consideration for orthopedic or neurosurgical consult pending imaging.

Mental health welfare rounds did not have significant findings on 2/12/20 or 2/18/2020.

2/24/2020: Seen for scheduled sick call. Noted he needed a "SNO" for his knee brace and
pain management by specialist. Pain was rated to be a 7/10 at time of encounter with
worst pain reported to reach up to a 9/10. Referral was placed to provider for SNO for
knee brace and pain management.

Mental health welfare rounds did not have significant findings on 2/25/20, 3/3/20,
3/10/20, or 3/16/20.

██████████: ICS response activated after finding the patient hanging by the neck from a
shoelace.

Last active medications: Tramadol 50mg BID PRN for pain.

Medical problems: Muscle spasms and chronic back pain.

Psychiatric history: none listed or explored in electronic charting. See psychological autopsy findings below for more history.

Mortality Review Committee Final Report findings: Committee determined the patient's death could not have been prevented and that sufficient care was provided.

Medical Autopsy findings: Pronounced dead at Mountain Vista Medical Center. Significant findings by examiner included toxicology testing which was positive for methamphetamine, amphetamines, methadone, and opiates.

Psychological Autopsy findings: Noted significant history of methamphetamine use shortly before his actions leading to first-degree murder charges. The patient has a significant history of using multiple substances. Past history also revealed significant physical abuse by his uncle in his preadolescent years. Noted in the report that he had significant musculoskeletal pain, which was treated with Tramadol and Cymbalta. It was acknowledged that shortly before his suicide he was debriefed from his Aryan Brotherhood where he reportedly was "third in command". The report indicates this left him "vulnerable to both members of that gang and members of other gangs". The patient became notably isolated after debriefing. The psychological autopsy report noted he was getting anxious in relation to moving from his current housing and hoped to be able to have contact with family. Motivation for suicide was cited as "combination of chronic pain, loss of identity with the gang affiliation, a sense of social isolation, change of environment, being locked-down, limited family contact, and his perception that he was being bullied".

Recommendations included having mental health follow-up for all debriefers given "stressors involved when an inmate steps away from gang membership". Reports states "he has made himself an enemy of those with whom he was previously affiliated. In some instances, family members are threatened if the individual does not commit suicide." Furthermore, the report states "statistically, individuals who have a low sense of belonging and attachment are at higher risk".  The final recommendation was that there should be a collaborative approach between staff. It noted that, "research and clinical experience indicates that chronic pain is frequently a direct contributor to the suicidal acts".

RECOMMENDATIONS

1. Consideration should be given for mental health follow-up for all debriefers due to the several stressors involved when an inmate steps away from gang membership. Typically, the individual has essentially cut ties with past and present friends and his way of life. He has made himself an enemy of those with whom he was previously affiliated. In some instances, family members are threatened if the individual does not commit suicide. Statistically, individuals who have a low sense of belonging and attachment are at higher risk of suicide.

2. Similarly, consideration should be given to a collaborative approach between mental health, physical therapy, and medical staff in helping individuals with chronic pain manage their discomfort and stress. Whether work hardening, muscle strengthening, relaxation, medication, or a combination of all, pain reduction/tolerance might better be affected by use of a combined pain management protocol. Research and clinical experience indicates that chronic pain is frequently a direct contributor to the suicidal acts.

Based on my professional assessment he did not have appropriate past psychiatric history reviewed by the mental health counselor after transfer to the facility, despite endorsing having such past history. Follow-up encounters by mental and medical providers also did not explore past psychiatric history. There was not adequate suicide or violence risk assessment given psychosocial factors were not appropriately reviewed. It can be seen from the psychological autopsy that the patient had significant past trauma history and past substance use disorders.

I agree with the recommendations listed in the psychological autopsy for formal mental health follow-up for those who renounce their gang status and to have collaborative coordination between mental health, medical and physical therapy. The psychological autopsy explains at length the high-risk features related to renouncing gang affiliation, which include possible threats to his family by former gang members should the individual not commit suicide. Had he had formal mental health follow-up, he may have developed better rapport to share psychological distress and suicidal intentions. This may have been a missed opportunity to prevent the patient's suicide.



Mr. ███ died by suicide on ████████ at ██████████████.

Factors that may have increased suicide risk are physical pain and possible mood disorder related to possible substance abuse in prison.

On 7/10/2019, Mr. ███ had mental health intake where he was documented to have no significant mental health concerns despite later being determined having "Opium dependence".

On 8/26/2019, the patient was seen at Urgent Dental Care related to dental concerns reporting having "10/10" pain level which had subsequent treatment and follow up. He had a diagnosis of Periapical abscess without sinus.

On 5/24/2020, Mr. ███ reported having dental pain which he had been experiencing for over a month. Pain sensitive to temperature change and reported to have radiated to face. Assessment by nursing was determined to be "acute pain".

On 6/25/2020, Mr. ███ was seen by dental provider for his self-reported cavity. Provider noted he had tooth "decay" with plan for "NV-HNR fills".

On ███, the patient was found hanging in "2B/D shower". Resuscitation attempts failed.

The Mortality Review Committee Final Report states that a handwritten note was reportedly located on the patient per the Medical Examiner's report. Custody staff had noted that he had written to his mother and sister that he "loved them" and had expressed he was "done doing drugs". The toxicology screen was documented to have been positive for morphine, codeine, and nicotine products. The Mortality Review Committee Final Report determined suicide was unavoidable.

The Psychological autopsy for Mr. ███ was significant for revealing evidence to support a mood related diagnosis although motivation for suicide was less clear. The report endorsed there being a likely underlying mood disorder that was unmanaged. It

was evident that Mr. ███ had carefully planned his suicide as seen by completing a living will and durable health care power of attorney weeks prior to his death. He had also called his mother the day before his suicide with multiple attempts likely indicating his urgency to relieve distress. Psychological autopsy recommendations included "Additional access to substance abuse treatment," and determined that suicide was in response to ending "psychological distress".

In my professional assessment, the circumstances related to Mr. ███'s death were due to an underlying mood disorder from possibly multiple etiologies - acute dental pain, unmanaged substance use disorder and unmanaged mood disorder.

The psychological autopsy report made recommendations for additional substance abuse treatment. This recommendation reflects the dire state of drug addiction treatment in the Arizona Department of Corrections.  Had Mr. ███ received active drug addiction treatment and programming with adequate pain management this may have prevented his suicide.

Although acute physical pain is a high risk factor for suicide, it is also likely that due to his extensive past history of drug dependence Mr. ███ had a comorbid mood disorder with his drug dependence. The substance use for Mr. ███ was likely a self-medication attempt for his underlying psychiatric and/or psychological distress. The extensive drug abuse history should have marked Mr. ███ at a higher mental health level. Although his substance use disorders were acknowledged on multiple occasions, there was a lack of engagement for appropriate programming and treatment to better manage his difficulties with physical and psychological pain.



Mr. ▆▆▆ died by suicide on ▆▆▆▆▆▆▆▆▆ at ▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆ .

He received exceedingly poor counseling care and psychiatric care in the weeks leading
up to his death. On 7/8/20, he had a midlevel provider encounter lasting eight (8)
minutes. He stated "I have a lot of anger" and that his anxiety manifested in a fast heart
rate and no sleep. He also reported feeling sad. He was prescribed a subtherapeutic dose
of the antidepressant Venlafaxine -- 75 mg every morning. The usual therapeutic dose is
between 150 mg -300 mg daily. Instead of increasing the dose of the antidepressant, the
provider added a second drug, Zyprexa, at a subtherapeutic dose of 2.5 mg daily. The
usual therapeutic dose of Zyprexa is 10-20 mg daily.

A 7/16/20 visit by the midlevel provider lasted 10 minutes. The patient's medications
were not adjusted even though he stated that his anxiety was causing him to have a racing
heart and he felt "backed up against a wall." He also reported feeling all alone. The
midlevel documented "patient denies the need for med management." This is an amazing
statement. A provider may note that the patient does not want his medications adjusted,
but it is the provider who makes the final determination. This patient was in urgent need
of having his antidepressant dose increased. The midlevel failed to appreciate the severity
of the patient's clinical situation.

Despite the severe anxiety symptoms that Mr. ▆▆▆ described to the mid-level provider,
follow-up was kept to 90 days or PRN (upon request as needed).  At that time of his
suicide, Mr. ▆▆▆ had not seen a psychiatric provider for approximately six weeks. Given
Mr. ▆▆▆'s high risk factors for suicide, he should have had more frequent and thorough
assessments by a psychiatric provider. These high risk factors include severe anxiety
amounting to panic attacks and ongoing anger, which Mr. ▆▆▆ disclosed to the mid-level
provider during his final encounters.

A 7/22/20 visit with a psych associate lasted 21 minutes. The patient reported having a
"plethora of issues," but the counselor did not address any of them. Also, there was no
follow up plan documented.

An 8/17/20 visit lasted 5 minutes. Although the clinician asked about suicidal ideation as well as inquiring about medication compliance and side effects, no substantive therapy occurred during this very short visit.

An 8/19/20 visit lasted 10 minutes. This was a very superficial visit where nothing of substance was actually discussed. This visit is especially deficient in that the patient had been placed in segregated housing, which very likely exacerbated his underlying depression.

Mr. ■■■ died by suicide eight days later.

The psychological autopsy notes an additional factor that likely contributed to his suicide: "What is significant about the pt.'s psychiatric and mental health contacts was that he never had more than three contacts with the same psychiatric provider due to being transferred to other complexes." ADCRR 152. "Mr. ■■■ was not at any location long enough to have established a solid therapeutic alliance with any mental health clinician though there were a few to whom he felt comfortable enough to self-disclose." ADCRR 153.

The psych autopsy also notes that Mr. ■■■ was transferred to SMU-I, an isolation unit, eight days before his suicide:

> His placement in detention and then in maximum custody after requesting protective segregation appeared to have increased his anxiety level and negatively affected his sleep and concentration.  In retrospect, it appears he was having difficulty adjusting to a higher level of confinement.  Although he had protective factors such as ongoing family communication and support as well as a high school diploma (education), these proved to be insufficient when Mr. ■■■ was placed in a maximum custody environment.

ADCRR155.  The psych autopsy report also notes that, a few hours before his suicide, Mr. ■■■ was pepper-sprayed by custody staff.  ADCRR 153.

Overall, this patient had significantly deficient psychiatric and counseling care in the weeks before his suicide. Most notably the prescribed medications were incorrectly dosed given the patient's symptoms. Also, the extent of the patient's psychosocial problems was not appreciated or addressed, especially given his placement in segregated housing. It is my opinion that the brief and superficial mental health encounters this patient received were a contributing factor to his death by suicide.



Mr. ▮▮ died by suicide on ▮▮▮▮▮▮▮, at ▮▮▮▮▮▮▮.

In reviewing this patient's mental health encounters from 7/11, 7/20 & 8/12/2020, it became clear that the patient had a complicated mental health history and that, due to the abbreviated and brief nature of the mental health visits, he was not provided adequate mental health care, which directly contributed to his suicide.

The 7/11/20 visit with a psych associate lasted 5 minutes and was terminated by the patient. During this visit Mr. ▮▮ made a direct request to have his medications restarted. The patient reported being under a lot of stress related to his prison job.

He had a 7/20/20 visit with a midlevel prescribing provider who reported that the patient was experiencing irritability & depressive and anxiety symptoms. Of note, the patient was diagnosed with Schizophrenia and had been on psychotropic medications in the past. There is no evidence that this provider had reviewed the 7/11/20 note where the patient requested to be restarted on medications.

An 8/12/20 visit with a psych associate lasting three (3) minutes was Mr. ▮▮'s last mental health encounter prior to his death by suicide. This was a very troubling note in that the patient "communicated an unwillingness to engage." Notwithstanding this lack of engagement, the clinician completed the entire computer-generated mental status exam. The clinician then stated that the patient is not a risk for self-harm. I do not understand how the clinician can reach this conclusion given the extreme brevity of the visit and the lack of engagement on the part of the patient.

Another significant flaw in the treatment of this patient is the deficient mental health assessment performed when Mr. ▮▮ entered prison in 2016.  In the "initial psychiatric evaluation" on October 20, 2016 it was documented in the past psychiatric history section regarding medications "took when I was 15 years for paranoid schizophrenia. I never heard voices it was from drugs." By contrast, under history of substance abuse, the provider wrote that Mr. ▮▮ "denies drug abuse".  The Mortality Review Committee Final Report indicated an extensive history of drug use which includes marijuana at age

9, methamphetamine at age 12 and IV heroin at age 16. None of this information was reflected in the initial evaluation.

Similarly, the Mortality Review Committee Final Report noted a history of psychiatric hospitalization, but in the initial psychiatric evaluation it was documented as "none". The "past psychiatric medication history" section of the initial evaluation was not completed.

These flaws in the initial assessment that determined the course of Mr. █████'s future psychiatric care highlight the careless and haphazard nature of his mental health treatment.  Furthermore, this incomplete initial psychiatric assessment could not have allowed for adequate suicide risk determination. Suicide risk assessment is the minimum standard of care.  If an adequate initial assessment had been carried out, crucial suicide risk factors could have been discovered which may have allowed prevention of Mr. █████'s suicide.

Mr. █████'s psychological autopsy was completed on 10/9/20 and stated, "it appears staff provided the appropriate care to Mr. █████ and no specific recommendations are indicated." A review of his medical records tells a different story, as set forth above.

Overall, the brevity of the mental health encounters received by this patient, the lack of coordination between the counselor and the midlevel provider, and the failure to take an adequate history directly contributed to his suicide.



Ms. ▋▋ died by suicide on ▋▋▋▋▋ at ▋▋▋▋▋▋▋.

In reviewing this patient's four non-psychiatric mental health visits before her death (7/31, 8/6, 8/21 & 9/14/20), it became very clear that her risk for suicide was directly related to her pain status.

The note from the 7/31/20 encounter with an unlicensed psych associate confirmed the fact that she was suicidal due to her pain. Of note, this visit was the first of three visits after she came off suicide watch.

The 8/6/20 note by an unlicensed psych associate documented Ms. ▋▋ having a flat affect, low appetite and that she was "tired and in pain." The patient ended the session due to her being in pain.

The 8/21/20 note by an unlicensed psych associate documented her refusing medications, struggling with anxiety and again ending the session due to pain.

The 9/14/20 encounter with an unlicensed psych associate – the patient's last mental health encounter before her suicide -- was 3 minutes long. The patient terminated the visit "due to being in a lot of pain." Based on the limited clinical data obtained during this encounter, I do not understand how the clinician could state "Pt does not appear to be a danger to self or others at this time." Even though the patient denied experiencing suicidal ideation, a more experienced clinician would have seen past this denial and understood that the reported severity of her pain put her at risk for self-harm. She hanged herself eight days later.

Ms. ▋▋'s case, through the Arizona Department of Corrections Rehabilitation and Reentry, was examined by Dr. Phillips. Dr. Phillips' assessment and opinion were presented in the Mortality Review Committee Final Report. In this report, Dr. Phillips' general critique documented "physician guidance and a coordinated multidisciplinary effort would have been appropriate". Furthermore, it was determined the suicide was "possibly avoidable". Further recommendations were provided by Dr. Phillips:

> "*1) when a provider and a patient come to an impasse regarding the treatment of their condition, then a consultation with the site medical director (or statewide medical director) should be done. 2) For challenging cases, convening a multidisciplinary committee to address a patient's care from a medical and mental health standpoint should take place. The site medical director should help guide the patient's care until the multidisciplinary team meets*".

Dr. Phillips further noted "sufficient mental health care was provided". In my professional opinion I do not agree with Dr. Phillips' assessment that sufficient mental health care was provided, especially given his further remarks on the contributing cause analysis section to endorse there being a "Failure to communicate effectively with patient".

A psychological autopsy was completed on 9/24/20. This report noted the relationship between Ms. ████'s pain status and her wishes to end her life. It goes on to state that five days prior to her suicide she "began a known medication to help with pain, Cymbalta, which she took consistently for five days prior to her death." The cause of Ms. ████'s pain was listed as Fibromyalgia. Fibromyalgia is a very serious chronic condition that results in widespread muscle pain and tenderness. Cymbalta is a medication indicated for this condition, but it is only part of the treatment. The complete medication treatment for Fibromyalgia includes SSRIs such as Cymbalta, opiate pain medications for severe pain, nonsteroidal anti-inflammatory medications such as Naproxen, nerve pain medication such as Gabapentin and muscle relaxants such as the benzodiazepines. She was being extremely undermedicated in the days leading up to her death.

Overall, the relationship between her pain and her risk for suicide was missed in the last four visits prior to her death. This was due in part to the inexperience of the unlicensed and unsupervised clinician and the abbreviated nature of the visits, particularly her final mental health encounter, which lasted 3 minutes. These brief visits did not allow for the clinician to fully appreciate the relationship between her pain and her suicidality. The brevity of these visits and the clinician's failure to appreciate the gravity of the patient's situation directly contributed to her suicide.



Mr. ▮▮▮ died by suicide on ▮▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮▮▮.

Due to time constraints, I was unable to review his medical records.



Mr. ███████ died by suicide on ████████████ at ██████████████.

This patient did not receive a timely mental health assessment, despite appropriately notifying health care staff through the HNR system of severe psychiatric symptoms.

On 1/14/2021, upon intake to ADC, an initial mental health assessment by psychology was performed that lasted only five minutes.  It was determined that Mr. ████████ had recently been on medications for anxiety and depression while in jail, which he had discontinued two weeks previously. Evaluation at that time revealed history of methamphetamine use and history of both sexual and physical abuse in childhood. He was determined to have "no emergent MH issues" and no subsequent mental health appointments were scheduled.

On 1/15/2021, his medical intake noted reported history of opioid, methamphetamine, and cannabis use.

On 1/25/2021, Mr. ████████ placed an HNR request, writing "I need to see a psych doctor about the voices I am hearing in my head.  They returned since I stopped taking my medications."  He was not seen by health care staff.[1]

On ████████ at 0025, an officer found Mr. ████████ hanging from a shelf by a sheet wrapped around his neck.

The ADC Mortality Review (ADCRRM26203-06) concluded that sufficient care was not provided regarding Mr. ████████' mental health issues, and identified "failure to recognize symptoms or signs" and "delay in access to care" as contributing causes of his suicide.  Under "General Critique," the Mortality Review identified "diagnosis not timely" and "treatment not timely."  The ADC Mortality Review concludes that Mr. ████████' death was "possibly avoidable."

---

[1] The ADC psychological autopsy for Mr. ████████ incorrectly states that "Mr. ████████ did not submit HNR's for any medical or mental health needs" (ADCRR 144).

The inadequate intake screening of Mr. ██████████ and significant delay in psychiatric care after his report of severe psychiatric symptoms fall below the standard of care. The severity of his psychiatric problems was not appreciated by the mental health or medical staff, perhaps due to the very brief (5-minute) intake evaluation. Given his distressing auditory hallucinations, adequate inquiry about the nature of the voices was not conducted to determine if there was a risk of imminent harm, such as voices commanding Mr. ██████████ to harm himself. Furthermore, given that health care staff had knowledge of Mr. ██████████ having psychiatric treatment in jail, they should have promptly requested and reviewed prior medical records before determining his Mental Health score and level of care.  This suicide was preventable.



Mr. ██████ died by suicide on ████████████ at ████████████████████ ██ .

Due to time constraints, I was unable to review his medical records.



Mr. ███████████ died by suicide on ████████████, at ██████████████████ ██████████.

The patient's death was preventable if a psychiatric prescriber referral had been made for evaluation of concerning psychotic-like symptoms. Furthermore, given the reasons for his incarceration, the patient's paranoia with fears of harm towards him is a significant risk factor for suicide that was not appropriately addressed. I agree with the psychological autopsy that there was not an adequate risk assessment prior to downgrade from suicide watch.

4/7/2021: Mr. ███████████ was seen for sick call. He reported feelings of "depression, anxiety, and not sleeping for days." During this visit, he endorsed issues with "pod" and had thoughts of harming others. Endorsed racing thoughts. The patient was told medications are not given directly for sleep. Mr. ███████████ replied, "what you guys can't just give me a pill to make me sleep?" During this evaluation, his judgment was deemed "poor". The assessment asserted concerns for the patient having possible "secondary gain" due to his physical response when advised to engage in psychotherapy prior to medication trials. The assessment acknowledged that the patient had concerns for his safety. It was determined that the patient did not present as a "high risk for victimization".

4/7/2021: An ICS response activated after the patient's sister called ADC, sharing concerns that the patient may end his life. Mr. ███████████ when questioned, indicated that in the morning he had placed a rope around his neck to get the attention of staff due to fear for his life. The patient shared concerns with another prisoner wanting to kill him. Mr. ███████████ reported his anxiety was "10/10" with both suicidal and homicidal ideations. The patient was not able to engage in safety planning.

4/8/2021: 10-minute watch contact noted the patient perseverated on concerns for his safety.

4/9/2021: 30-minute watch contact reported self-report of auditory hallucinations. "Tw went over anxiety reducing coping skills with Pt to help him reduce AH. Pt was not very

receptive". The patient continued to reiterate not feeling safe outside his cell. The patient threatened if he were to be released from watch he would "do something to come right back".

4/10/2021: 30-minute watch contact noted the patient endorsing coming into crisis watch due to "feeling suicidal". Endorsed that his appetite was "not good" for the second day in a row. Reported he was feeling depressed and continued to share concerns with housing due to his safety concerns.

4/11/2021: 30-minute watch contact told the mental health team that he needed to "get out of the watch pod because he knew that they were raping, torturing, and killing sex offenders at 3 or 4 in the morning and chopping up their bodies and burying them in the desert, seeming genuinely terrified". "They are very dangerous this place gets evil at night they have the can they keep this chemical in that they spray on sex offenders penises to get them hard and then they rape them all night and when they are done they cut off the penis and the testicles and then they chop their bodies up and burry them in the desert you have got to help me". Mental health provider noted that the patient repeatedly looked out of the window suspiciously in cell and endorsed hearing "them making plans". Treatment provider then notes in assessment, "patient is making progress towards his treatment goal by not expressing DTO/DTS ideation."

4/12/2021: Seen for watch follow-up. The patient did not endorse significant psychiatric symptoms to mental health worker.

██████████: ICS response. The patient was unconscious after hanging with "AED and man down bag". It appeared that the patient at this time had been discharged from crisis watch, but no clear documentation on what day or time since 4/12/2021 encounter he was downgraded.

Diagnosis: Adjustment Disorder with mixed anxiety and depressed mood.

Mortality Review Committee Final Report findings: Noted contributory cause of death being Adjustment Disorder. The committee was undetermined whether poor mental or medical health was a cause of his suicide. Contributing factors included failure to recognize symptoms or signs and failure to follow clinical guidelines. Report findings shared there were no suicide risk assessments conducted upon placement or removal from crisis watch. Furthermore, there was no crisis treatment plan developed within one day of placement into crisis watch. The report shares "patient's mental status was significantly worse at the time of discontinuing watch than when it was started". Finally, the findings were concerned about there not being a multidisciplinary consultation prior to discontinuing his watch. Committee remarked the level of care for the patient was "inappropriate". Committee determined the death was "possibly avoidable". Recommendations included implementing education for new and existing employees to

ensure adequate mental health assessments. Furthermore, there is to be review and training on the policies and procedures regarding suicide risk prevention.

**Mortality Review Committee Final Report – Continued**

| | |
|---|---|
| Could the patient's death have been prevented or delayed by more timely intervention? | ☐ Yes<br>☐ No<br>☒ Undetermined |
| Was sufficient care offered/provided regarding Mental Health Issues? | ☐ Yes<br>☒ No |
| Was there an identifiable primary care provider? | ☒ Yes<br>☐ No |

Psychological Autopsy findings: Provided recommendations to have staff training on "suicide prevention, policies, and procedures". Stated need for tracking to ensure completion of appropriate documentation for all suicide watches. The findings highlighted the lack of suicide risk assessment when discharging from crisis watch and emphasized the lack of documentation showing resolution of symptoms before downgrading from suicide watch. Furthermore, the report recommended collaboration between ADCRR partners and psychiatric providers before moving someone off suicide watch.

**Section 6: Recommendations:**

Regional Mental Health staff recommend further staff training on suicide prevention, policies and procedures, as well as tracking completion of the appropriate documentation for all suicide watches. For instance, a suicide risk assessment was not completed upon the decision to discharge this patient from suicide watch. A review of protective and risk factors is crucial to properly assessing risk. Further, resolution of symptoms should be clearly documented in the decision to alter suicide watch levels, as well as discharge patients from a suicide watch status. It would behoove the team to ensure they are collaborating with ADCRR partners and psychiatric providers prior to decisions to remove an individual off of a suicide watch. It is recommended that staff are provided these training tools and further ensure the completion of risk assessments and crisis treatment planning.

Based on my professional assessment, he did not receive an appropriate referral to a prescribing psychiatrist to thoroughly evaluate his psychiatric deterioration. There were significant red flag symptoms that were psychotic in nature which should have prompted immediate involvement of a psychiatric prescriber. On 4/12/2021, the history shared by the patient may not be a good reflection of symptoms he was actually experiencing, and more thorough evaluation and frequent follow-up should have been conducted prior to downgrade from crisis watch. The patient's criminal history as a stressor was not appropriately addressed, given the significant paranoia he reported about this issue.

Furthermore, it is well known that such incarcerated individuals are at significant risk for harm towards them, supporting his paranoia. It is suspected his paranoia was primarily from a delusional psychotic backdrop given the increasing concern for his safety while on crisis watch and endorsement of experiencing auditory hallucinations.

I disagree with the Mortality Review Committee Report that the situation was "possibly avoidable", and conclude that it was "avoidable".

Finally, I agree with the psychological autopsy's determination that there was inadequate documentation about suicide risk prior to his downgrade from suicide watch.  He should have been referred to a psychiatric provider and, at a minimum, referred to an inpatient level of care where the psychiatric prescriber would need to evaluate the patient on a daily basis in order to meet the standard of care and mental health needs of the patient.



Mr. ███████ died by suicide on ███████████, at ████████████████████.

Due to time constraints, I was unable to review his medical records. His psych autopsy discusses how his untreated physical pain was not addressed, and recommends increased coordination, and psychoeducation about the relationship between mental health and chronic pain.



Mr. ▮▮▮ died by suicide on ▮▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮▮▮▮.

Defendants have not provided the mortality review; due to time constraints, I was unable to review his medical records.



Mr. ████ died by suicide on ████████, at ████████████.

Defendants have not provided the patient's psych autopsy or mortality review; due to time constraints, I was unable to review his medical records.



Mr. ██████ died by suicide on ████████████ at ██████████████████.

Defendants have not provided the patient's psych autopsy or mortality review; due to time constraints, I was unable to review his medical records.

# EXHIBIT 4

# REDACTED AND

# FILED UNDER SEAL

# Documents Relied Upon by Dr. Pablo Stewart, M.D.

Death Records (Combined)

- ADCM1584256-1584285 - ███████████████
- ADCM1585574-1585603 - █████████████
- ADCRR00137249-137294 - █████████████
- ADCRR00137295-137318 - █████████████

Mortality Reviews

- ADCRRM0026178-0026181 - ███████████████
- ADCM1623198-1623202 - █████████████
- ADCRRM0026199-0026202 - █████████████
- ADCM1669316-1669319 - █████████████
- ADCM1578083-1578089 - █████████████
- ADCRRM0026203-0026206 - ████████████████
- ADCM1669325-1669328 - ██████████
- ADCM1588589-1588594 - █████████████
- ADCRRM0012739-0012742 - ██████████████
- ADCRRM0005585-5588 - ███████████
- ADCM1578147-1578152 - █████████████
- ADCM1584250-1584255 - █████████████
- ADCM1669339-1669342 - ████████████
- ADCM1610511-1610518 - ██████████
- ADCRRM0026215-0026218 - █████████████
- ADCM1618291-1618295 - ███████████████
- ADCRR00000041-44 - ████████████
- ADCRR00000106-109 - ██████████████
- ADCRRM0026239-0026242 - █████████████

Psychological Autopsies

- ADCRRM0026154-0026177 - ███████████████
- ADCM1624350-1624363 - ███████████
- ADCM1578122-1578129 - █████████████
- ADCRRM0000078-ADCRRM0000088 - ██████████████
- ADCM1588576-1588588 - ████████████
- ADCM1578836-1578855 - █████████████
- ADCM1584786-1584793 - █████████████
- ADCRRM0000069-ADCRRM0000077 - ████████████████

- ADCRRM0000063-ADCRRM0000068 - ███████████████
- ADCM1618561-1618579 - ████████████
- ADCRR00000122-132 - ██████████
- ADCRR00000133-140 - ████████
- ADCRR00000141-148 - ███████████
- ADCRR00000149-155 - █████████
- ADCRR00000156-169 - █████████
- ADCRR00000170-183 - █████████
- ADCRR00000184-193 – █████████████
- ADCRR00137186 - ████████
- ADCRR00137343 - █████████ (Corrected)

Medical Examiner Reports

- ADCM1578071-1578074 - ████████████
- ADCM1588568-1588575 - ███████████
- ADCM1584228-1584236 - ████████████

Toxicology Reports

- ADCM1578130-1578131 - ████████████

Serious Incident Reports

- ADCRR00000776 - ███████████
- ADCRR00000806 - ███████
- ADCRR00000256 - ███████
- ADCRR00000264 - ████████
- ADCRR00000272 - █████████
- ADCRR00000391 - ███████
- ADCRR00000454 - ██████
- ADCRR00000543 - ███████
- ADCRR00000561 - █████████
- ADCRR00000677 - ████████
- ADCRR00000760 - ███████

Use of Force Videos

- ADCRR00159240
- ADCRR00159245

Deposition Transcripts

- Pelton deposition transcript, 10/6/21
- Platt deposition transcript, 10/15/21
- Stallcup (mental health 30(b)(6)) deposition transcript, 10/12/21
- Stallcup (individual) deposition transcript, 10/15/21

Expert Reports

- Expert Report of Robert Joy, dated October 9, 2021
- Expert Report of Dr. Craig Haney, dated October 9, 2021

CQI Meeting Minutes

- ADCRRM0019431-0019448 - Eyman 2021-03
- ADCRRM0019468-0019476 - Perryville 2021-03
- ADCRRM0019493-0019500 - Tucson 2021-03
- ADCRRM0024171-0024181 - Phoenix 2021-04
- ADCRR00056541-56587 - Phoenix 2021-05
- ADCRR00061887-61957 - Phoenix 2021-06
- ADCRR00107315-107385 - Phoenix 2021-06
- ADCRRM0001716-ADCRRM0001723 - Phoenix 2020-12
- ADCRRM0013393-0013398 - Phoenix 2021-01
- ADCRRM0018560-0018568 - Phoenix 2021-02

Temperature Logs

- April 2019
  - ADCM1577601-1577676 Douglas
  - ADCM1577677-1577678 Douglas IR
  - ADCM1577679-1577732 Florence
  - ADCM1577966-1578062 Yuma
  - ADCM1577733 Florence IR
  - ADCM1577734-1577893 2019-04 - Lewis
  - ADCM1577894-1577895 2019-04 - Lewis IR
  - ADCM1577896-1577964 2019-04 - Perryville
  - ADCM1577965 2019-04 - Perryville IR
- May 2019
  - ADCM1579095-1579100 2019-05 - Lewis IRs
  - ADCM1579101-1579268 2019-05 - Lewis
  - ADCM1579269-1579270 2019-05 - Perryville IRs
  - ADCM1579271-1579403 2019-05 - Perryville
  - ADCM1579404-1579409 2019-05 - Phoenix
  - ADCM1579410-1579474 2019-05 - Safford

- o ADCM1579475-1579614 2019-05 - Tucson
- o ADCM1579615-1579617 2019-05 - Winslow IRs
- o ADCM1579618-1579629 2019-05 - Winslow
- o ADCM1579630-1579707 2019-05 - Yuma
- o ADCM1578856-1578861 2019-05 - Douglas IRs
- o ADCM1578862-1578936 2019-05 - Douglas
- o ADCM1578937-1578942 2019-05 - Eyman IRs
- o ADCM1578943-1579087 2019-05 - Eyman
- o ADCM1579088-1579094 2019-05 - Florence
- June 2019
  - o ADCM1581890-1582004 2019-06 - Perryville
  - o ADCM1582005-1582010 2019-06 - Phoenix
  - o ADCM1582011-1582071 2019-06 - Safford
  - o ADCM1582072-1582080 2019-06 - Tucson IRs
  - o ADCM1582081-1582190 2019-06 - Tucson
  - o ADCM1582191-1582220 2019-06 - Winslow
  - o ADCM1582221-1582268 2019-06 - Yuma
  - o ADCM1584794-1584810 2019-06 - Eyman IRs
  - o ADCM1581444-1581518 2019-06 - Douglas
  - o ADCM1581519-1581654 2019-06 - Eyman
  - o ADCM1581655 2019-06 - Florence IR
  - o ADCM1581656-1581737 2019-06 - Florence
  - o ADCM1581738 2019-06 - Lewis IR
  - o ADCM1581739-1581889 2019-06 - Lewis
- July 2019
  - o ADCM1587894-1587926 - Douglas
  - o ADCM1587927-1587982 - Eyman
  - o ADCM1587983-1588017 - Florence
  - o ADCM1588018-1588085 - Lewis
  - o ADCM1588086-1588140 - Perryville
  - o ADCM1588141-1588145 - Phoenix
  - o ADCM1588146-1588174 - Safford
  - o ADCM1588175-1588249 -Tucson
  - o ADCM1588250-1588265 - Winslow
  - o ADCM1588266-1588302 - Yuma
  - o ADCM1587862-1587866 Douglas IRs
  - o ADCM1587867-1587869 Florence IRs
  - o ADCM1587870-1587885 Lewis IRs
  - o ADCM1587886-1587889 Perryville IRs
  - o ADCM1587890 - Safford IRs

4

- o ADCM1587891 - Tucson IRs
- o ADCM1587892-1587893 Yuma IRs
- August 2019
  - o ADCM1590338-1590350 2019-08 - Phoenix
  - o ADCM1590351-1590406 2019-08 - Safford
  - o ADCM1590407 2019-08 - Tucson IR
  - o ADCM1590408-1590594 2019-08 - Tucson
  - o ADCM1590595-1590600 2019-08 - Winslow IRs
  - o ADCM1590601-1590616 2019-08 - Winslow
  - o ADCM1590617-1590683 2019-08 - Yuma
  - o ADCM1591243-1591244 - Sept-Oct 2019
  - o ADCM1589829-1589905 2019-08 - Douglas
  - o ADCM1589906-1590027 2019-08 - Eyman
  - o ADCM1590028-1590030 2019-08 - Florence IRs
  - o ADCM1590031-1590107 2019-08 - Florence
  - o ADCM1590108 2019-08 - Lewis IR
  - o ADCM1590109-1590232 2019-08 - Lewis
  - o ADCM1590233-1590236 2019-08 - Perryville IRs
  - o ADCM1590237-1590337 2019-08 - Perryville
- September 2019
  - o ADCM1593644-1593715 2019-09 - Florence
  - o ADCM1593716-1593847 2019-09 - Lewis
  - o ADCM1593848-1593980 2019-09 - Perryville
  - o ADCM1593981-1593988 2019-09 - Phoenix
  - o ADCM1593989-1594044 2019-09 - Safford
  - o ADCM1594045-1594046 2019-09 - Tucson IRs
  - o ADCM1594047-1594232 2019-09 - Tucson
  - o ADCM1594233-1594234 2019-09 - Winslow IR
  - o ADCM1594235-1594250 2019-09 - Winslow
  - o ADCM1594251-1594311 2019-09 - Yuma
  - o ADCM1593476 2019-09 - Douglas IR
  - o ADCM1593477-1593534 2019-09 - Douglas
  - o ADCM1593535-1593542 2019-09 - Eyman IRs
  - o ADCM1593543-1593643 2019-09 - Eyman
- April 2020
  - o ADCM1614852-1615026 2020-04 - Tucson
  - o ADCM1615027-1615030 2020-04 - Tucson IRs
  - o ADCM1615031-1615070 2020-04 - Winslow
  - o ADCM1615071-1615079 2020-04 - Winslow IRs
  - o ADCM1615080-1615085 2020-04 - Yuma

5

- o ADCM1614256-1614346 2020-04 - Douglas
- o ADCM1614347-1614426 2020-04 - Eyman
- o ADCM1614427-1614503 2020-04 - Florence
- o ADCM1614504-1614653 2020-04 - Lewis
- o ADCM1614654-1614659 2020-04 - Lewis IRs
- o ADCM1614660-1614756 2020-04 - Perryville
- o ADCM1614757-1614786 2020-04 - Phoenix
- o ADCM1614787-1614851 2020-04 - Safford
- May 2020
  - o ADCM1618866-1618867 2020-05 - Lewis IR
  - o ADCM1618868-1618928 2020-05 - Perryville
  - o ADCM1618929-1618950 2020-05 - Phoenix
  - o ADCM1618951-1618996 2020-05 - Safford
  - o ADCM1618997-1619143 2020-05 - Tucson
  - o ADCM1619144-1619174 2020-05 - Winslow
  - o ADCM1619175-1619177 2020-05 - Winslow IR
  - o ADCM1619178-1619183 2020-05 - Yuma
  - o ADCM1618580-1618642 2020-05 - Douglas
  - o ADCM1618643-1618709 2020-05 - Eyman
  - o ADCM1618710-1618759 2020-05 - Florence
  - o ADCM1618760-1618865 2020-05 - Lewis
- June 2020
  - o ADCM1624574-1624672 2020-06 - Lewis
  - o ADCM1624673-1624765 2020-06 - Perryville
  - o ADCM1624766-1624788 2020-06 - Phoenix
  - o ADCM1624789-1624838 2020-06 - Safford
  - o ADCM1624839-1625000 2020-06 - Tucson
  - o ADCM1625001-1625002 2020-06 - Winslow IRs
  - o ADCM1625003-1625038 2020-06 - Winslow
  - o ADCM1625039-1625044 2020-06 - Yuma
  - o ADCM1624364-1624365 2020-06 - Douglas IRs
  - o ADCM1624366-1624424 2020-06 - Douglas
  - o ADCM1624425-1624485 2020-06 - Eyman
  - o ADCM1624486-1624571 2020-06 - Florence
  - o ADCM1624572-1624573 2020-06 - Lewis IRs
- July 2020
  - o ADCM1642448-1642471 2020-07 - Lewis IRs
  - o ADCM1642472-1642591 2020-07 - Lewis
  - o ADCM1642592-1642697 2020-07 - Perryville
  - o ADCM1642698-1642720 2020-07 - Phoenix

6

- o ADCM1642721-1642722 2020-07 - Safford IRs
- o ADCM1642723-1642772 2020-07 - Safford
- o ADCM1642773-1642929 2020-07 - Tucson
- o ADCM1642930-1642933 2020-07 - Winslow IRs
- o ADCM1642934-1642936 2020-07 - Winslow
- o ADCM1642937-1642942 2020-07 - Yuma
- o ADCM1642252-1642307 2020-07 - Douglas
- o ADCM1642308-1642373 2020-07 - Eyman
- o ADCM1642374-1642447 2020-07 - Florence
- August 2020
  - o ADCM1644555-1644664 2020-08 - Perryville
  - o ADCM1644665-1644686 2020-08 - Phoenix
  - o ADCM1644687-1644736 2020-08 - Safford
  - o ADCM1644737-1644817 2020-08 - Tucson
  - o ADCM1644818 2020-08 - Winslow IR
  - o ADCM1644819-1644850 2020-08 - Winslow
  - o ADCM1644851-1644931 2020-08 - Yuma
  - o ADCM1644237-1644299 2020-08 - Douglas
  - o ADCM1644300-1644370 2020-08 - Eyman
  - o ADCM1644371-1644433 2020-08 - Florence
  - o ADCM1644434-1644439 2020-08 - Lewis IRs
  - o ADCM1644440-1644554 2020-08 - Lewis
- September 2020
  - o ADCM1657299-1657396 2020-09 - Perryville
  - o ADCM1657397-1657417 2020-09 - Phoenix
  - o ADCM1657418-1657467 2020-09 - Safford
  - o ADCM1657468-1657469 2020-09 - Tucson IR
  - o ADCM1657470-1657631 2020-09 - Tucson
  - o ADCM1657632-1657633 2020-09 - Winslow IR
  - o ADCM1657634-1657668 2020-09 - Winslow
  - o ADCM1657669-1657674 2020-09 - Yuma
  - o ADCM1656986-1657048 2020-09 - Douglas
  - o ADCM1657049-1657119 2020-09 - Eyman
  - o ADCM1657120-1657189 2020-09 - Florence
  - o ADCM1657190-1657191 2020-09 - Lewis IR
  - o ADCM1657192-1657298 2020-09 - Lewis
- May 2021
  - o ADCRRM0025813-0025877 - 2021-05 Safford
  - o ADCRRM0025878-0026052 - 2021-05 Tucson
  - o ADCRRM0026053-0026132 - 2021-05 Winslow

- ADCRRM0026133-0026139 - 2021-05 Yuma
- ADCRRM0026140-0026141 - 2021-05 - IR - Douglas CDU
- ADCRRM0025226-0025301 - 2021-05 Douglas
- ADCRRM0025302-0025413 - 2021-05 Eyman
- ADCRRM0025414-0025510 - 2021-05 Florence
- ADCRRM0025511-0025670 - 2021-05 Lewis
- ADCRRM0025671-0025780 - 2021-05 Perryville
- ADCRRM0025781-0025812 - 2021-05 Phoenix

- June 2021 (Native)
  - ADCRR00069749 06-2021 - Eyman
  - ADCRR00069750 06-2021 - Tucson
  - ADCRR00069762 06-2021 - Safford
  - ADCRR00069744 06-2021 - Perryville
  - ADCRR00069745 06-2021 - Safford
  - ADCRR00069746 06-2021 - Winslow
  - ADCRR00069747 06-2021 - Yuma
  - ADCRR00069748 06-2021 - Douglas

- July 2021 (Native)
  - ADCRR00069755 07-2021 Eyman, Meadows
  - ADCRR00069756 07-2021 Eyman, Browning
  - ADCRR00069757 07-2021 Eyman, SMU
  - ADCRR00069758 07-2021 Florence
  - ADCRR00069759 07-2021 Lewis
  - ADCRR00069760 07-2021 Perryville
  - ADCRR00069761 07-2021 Phoenix
  - ADCRR00069763 07-2021 Tucson
  - ADCRR00069764 07-2021 Winslow
  - ADCRR00069765 07-2021 Yuma
  - ADCRR00069751 07-2021 Douglas
  - ADCRR00069752 07-2021 Eyman
  - ADCRR00069753 07-2021 Eyman (outside temp)
  - ADCRR00069754 07-2021 Eyman, Cook

- August 2021 (Native)
  - ADCRR00111476
  - ADCRR00111477
  - ADCRR00111478
  - ADCRR00111469
  - ADCRR00111470
  - ADCRR00111471
  - ADCRR00111472

- ○ ADCRR00111473
- ○ ADCRR00111474
- ○ ADCRR00111475

Heat Intolerance Logs

- ADCM1623101-1623102 - 10.2019-06.2020
- ADCM1630341-1630343 - 02-18-2020-07-31-2020
- ADCM1643300-1643304 - 2020-08
- ADCM1655845-1655849 - 2020-09
- ADCM1657160-1657164 - 2020-10
- ADCM1669310-1669310 - 2020-11
- ADCRR00069743 - 2021 (Native)
- ADCRRM0025164 - 2021-05
- ADCM1564947 - Perryville
- ADCM1570722 - 2019-02
- ADCM1570723 - 2019-03
- ADCM1578303 - Lewis (May-June 2019)
- ADCM1584931 - Yuma (June-August 2019)
- ADCM1585567-1585569 - June-August 2019
- ADCM1589599 - 2019-04
- ADCM1589600 - 2019-05
- ADCM1591243-1591244 - Sept-Oct 2019
- ADCM1592049 - Eyman (Aug-Oct 2019)
- ADCRR00098880 (Native)

Mental Health Staffing and Licensure Reports

- ADCRRM0019588-0019591 - 2021-04 - Mental Health Staff Roster with licensure
- ADCM1585548-1585553 - 2019-08 - MH Staff Roster [replaces ADCM1584150-1584159]
- ADCM1601364-1601368 - AZ Centurion Mental Health Staff 2020-02
- ADCRR00046154-46157 - List of MH Clinicians, Licensure (produced 83121)
- ADCRRM0005523-5526 - Mental Health Staff List - RFP 20
- ADCRRM0013422-0013425 - 2021-03 - Mental Health Staff Roster with licensure

Staffing Reports

- ADCRR00069738 - Staffing Contract Variance - June 2021 (Native)

- ADCRR00069739 - Staffing Contract Variance - July 2021 (Native)
- ADCRR00069740 - Specialty Care Report - May 2021 (Native)
- ADCRR00069741 - Specialty Care Report - June 2021 (Native)
- ADCRR00069742 - Specialty Care Report - July 2021 (Native)
- ADCRRM0001654-ADCRRM0001660 - Staffing Report - November 2020
- ADCRRM0001661-ADCRRM0001667 - Staffing Report - December 2020
- ADCRRM0013321-0013327 2021-01 - Variance Report
- ADCRRM0018596-0018602 2021-02 - Variance Report
- ADCRRM0019579-0019585 2021-03 - Variance Report
- ADCRRM0034602-34604 - Health Care Staffing Report
- ADCM199664-199729 - Monthly Staffing Reports
- ADCM1560366-1560376 - Monthly Staffing Report - 2019-01 - Statewide
- ADCM1564068-1564077 - Monthly Staffing Report - 2019-02 - Statewide
- ADCM1566702-1566712 - Monthly Staffing Report - 2019-03 - Statewide
- ADCM1572706-1572716 - Monthly Staffing Report - 2019-04 - Statewide
- ADCM1575434-1575444 - Monthly Staffing Report - 2019-05 - Statewide
- ADCM1578189-1578198 - Monthly Staffing Report - 2019-06 - Statewide
- ADCM1578385-1578395 - Monthly Staffing Report - 2019-06 - Statewide
- ADCM1582320-1582331 - Staffing Variance Report by Facility [through 07.26.2019]
- ADCM1584871-1584882 - Staffing Variance Report by Facility (08.09.2019)
- ADCM1584883-1584894 - Staffing Variance Report by Facility (08.23.2019)
- ADCM1584895-1584906 - Staffing Variance Report by Facility (09.09.2019)
- ADCM1584907-1584918 - Staffing Variance Report by Facility (09.25.2019)
- ADCM1589750-1589769 - Monthly Staffing Rpt (as of 11-15-19) - Statewide
- ADCM1595647-1595658 - Staffing Variance Report by Facility 10.07.19
- ADCM1595659-1595669 - Staffing Variance Report by Facility 10.21.19
- ADCM1595670-1595681 - Staffing Variance Report by Facility 10.31.19
- ADCM1595682-1595688 - Staffing Variance Report by Facility 11.26.19
- ADCM1600190-1600200 - Variance Report by Facility 1.02.20
- ADCM1600201-1600212 - Variance Report by Facility 12.12.19
- ADCM1607084-1607094 - Variance Report by Facility 1.23.20
- ADCM1607095-1607125 - Variance Report by Facility 2.03.20
- ADCM1609358-1609368 - Variance Report by Facility 4-01-20
- ADCM1609369-1609379 - Variance Report by Facility 4-14-20
- ADCM1617948-1617958 - Variance Report by Facility 032920 to 042520
- ADCM1620611 - Eyman CO 6-1-2020
- ADCM1620612 - Eyman CO 6-8-2020

10

- ADCM1620613 - Eyman CO 6-15-2020
- ADCM1620614 - Eyman CO 6-22-2020
- ADCM1620615-1620616 - Eyman Vacancy Rpt 6-1-2020
- ADCM1620617-1620618 - Eyman Vacancy Rpt 6-8-2020
- ADCM1620619-1620620 - Eyman Vacancy Rpt 6-15-2020
- ADCM1620621-1620622 - Eyman Vacancy Rpt 6-22-2020
- ADCM1620623-1620627 - Florence - Current Priority Post Charts
- ADCM1620628-1620631 - Florence - Post Chart
- ADCM1620632 - Florence CO 6-1-2020
- ADCM1620633 - Florence CO 6-8-2020
- ADCM1620634 - Florence CO 6-15-2020
- ADCM1620635 - Florence CO 6-22-2020
- ADCM1620636-1620638 - Florence Vacancy Rpt 6-1-2020
- ADCM1620639-1620641 - Florence Vacancy Rpt 6-8-2020
- ADCM1620642-1620644 - Florence Vacancy Rpt 6-15-2020
- ADCM1620645-1620647 - Florence Vacancy Rpt 6-22-2020
- ADCM1620648-1620652 - Florence-Central Post Sheet
- ADCM1620653 - Globe CO 6-1-2020
- ADCM1620654 - Globe CO 6-8-2020
- ADCM1620655 - Globe CO 6-15-2020
- ADCM1620656 - Globe CO 6-22-2020
- ADCM1620657 - Lewis CO 5-25-2020
- ADCM1620658 - Lewis CO 6-1-2020
- ADCM1620659 - Lewis CO 6-8-2020
- ADCM1620660 - Lewis CO 6-15-2020
- ADCM1620661 - Lewis CO 6-22-2020
- ADCM1620662-1621072 - Max_Moves_by_Curlocv2
- ADCM1622923-1623098 - MC REQ 8 - Correctional Staffing Rosters
- ADCM1625045-1625055 - Variance Report by Facility 032920-042520
- ADCM1625056-1625066 - Variance Report by Facility 042620-052320
- ADCM1625067-1625077 - Variance Report by Facility 051020-060620
- ADCM1629750-1629760 - 2020-06 - Variance Report
- ADCM1642168-1642174 - RFP 1 - 2020-07 - Variance Report
- ADCM1652222-1652228 - RFP 1 - 2020-08 - Variance Report
- ADCM1658025-1658031 - RFP 1 - 2020-09 - Variance Report by Facility
- ADCM1669298-1669309 - 2020-10 - Variance Report
- ADCRR00021949-21976 - Staffing Contract Variance - June 2021
- ADCRR00069737-39 - Staffing Contract Variance May-July 2021 (Native)

- ADCRR00137140 - Staffing Contract Variance August 2021 (Native)

Emergency Response Documents

- ADCM1656365-1656390 - 2020-06 - Phoenix – PM 25
- ADCM1656391-1656645 - 2020-06 - Tucson - PM 25
- ADCM1566807-96 - 19-01
- ADCM1610206-1610224 - RFP 83 - 2020-02
- ADCM1610225-1610243 - RFP 83 - 2020-03
- ADCM1639125-1639318 - 2020-04 - Eyman - PM 25
- ADCM1639518-1639812 - 2020-04 - Perryville - PM 25
- ADCM1640473-1640587 - 2020-05 - Eyman - PM 25
- ADCM1640710-1641006 - 2020-05 - Perryville - PM 25
- ADCM1656071-264 - 20-06-Lewis

Pleadings

- Doc. 1185 Stipulation
- Doc. 1104-2 Expert Report
- Doc. 1104-6 Rebuttal Report
- Doc. 1627 Declaration
- Doc. 2091 Declaration
- Doc. 3782 Declaration
- Doc. 1538-1 Declaration and Report
- Doc. 3626 Declaration
- Doc. 3627-5 Exhibit
- Doc. 3627-6 Exhibit
- Doc. 3627-7 Exhibit
- Doc. 3431-1 Exhibit
- Doc. 3508-1 Plaintiffs' Eyman Monitoring Report
- Doc. 947-1 Sealed Exhibits to (947) Stewart Declaration
- Doc. 3790 Sealed Declaration
- Doc. 3511 Declaration re (3507) Response
- Doc. 3704-2 Sealed Unredacted Declaration
- Doc. 3694-4 Declaration of David C. Fathi
- Doc. 3694-5 Index and Exhibits to the Declaration of David C. Fathi
- Doc. 3694-6 Text of Proposed Order
- Doc. 3739 Defs' Response to Plaintiffs' Motion to Enforce Court's Order (3694)
- Doc. 3739-1 Exhibit Index and Exhibit 1 - Declaration of C. Porter [Redacted]
- Doc. 3739-2 Exhibit 2 - Declaration K. McCray [Redacted]

- Doc. 3739-3 Exhibit 3 - Transcript
- Doc. 3739-4 Exhibit 4 - Declaration of J. Penn [Redacted]
- Doc. 3741 Sealed Exhibits 1, 2, 4 to Defendants' Response to Plaintiffs' Motion to Enforce (3694)
- Doc. 3789 Plaintiffs' Reply In Support of Motion to Enforce Court's Orders and for Further Relief
- Doc. 3790 Sealed Declaration
- Doc. 3791 Sealed Index and Exhibits to the Declaration of David Fathi
- Doc. 3792 Sealed Declaration of Jessica Carns
- Doc. 3792-1 Sealed Index and Exhibits to the Declaration of Jessica Carns
- Doc. 3694 Motion to Enforce the Court's Orders and for Further Relief (Doc. 3495, 3518) [Redacted]
- Doc. 3694 Sealed Unredacted Motion to Enforce
- Doc. 3694-1 Declaration of Jessica Carns
- Doc. 3694-2 Index and Exhibits to the Declaration of Jessica Carns [Redacted]
- Doc. 3694-2 Sealed Index and Exhibits to the Declaration of Jessica Carns
- Doc. 3694-3 Declaration [Redacted]
- Doc. 3694-3 Sealed Declaration
- Doc. 3379 Report of Marc F. Stern, MD, MPH, Federal Rule 706 Expert
- Doc. 3861 February 24, 2021 Contempt Order
- Doc. 3920 Defendants' Response to Plaintiffs' Objections (3880, 3899)
- Doc. 3920-1 Exhibit 1 - Poster
- Doc. 3476-1 Exhibit Index and Exhibits 1-5
- Doc. 3784-1 Index and Exhibits

Letters to Opposing Counsel

- 2019.05.14 Notice of Noncompliance - Phoenix MH drive-bys (with attachments)
- 2019.05.17 Notice of Noncompliance - Lewis MH drive-bys (with attachments)
- 19.02.06 Kendrick to Bojanowski re Tucson tour issues
- 2019.01.29 Letter to T. Bojanowski from D. Fathi
- 2019.01.31 Letter to T. Bojanowski from D. Fathi
- 2019.04.22 Notice of Noncompliance - Perryville MH drive-bys (with attachments)
- 2019.05.01 Notice of Noncompliance - Eyman MH drive-bys (with attachments)
- 2019.05.03 Notice of Noncompliance - Florence MH drive-bys (with attachments)
- 2021.09.08 Email to Defendants' Counsel from C. Kendrick – Patients in Acute Need of Psychiatrist Reevaluation and Higher Levels of Care

Mental Health Policies and Procedures

- ADCM1610068-1610161 - ADCRR Mental Health Technical Manual
- ADCRR00096790-96818 - Centurion-Arizona DOC July 2021 Drug Formulary
- ADCRR00096819 - Total Number Prescription January 2020 - July 2021 (Native)
- ADCRR Health Services Technical Manual

Demonstrative Documents

- STEWART000001-000002 - Patients from Pablo Stewart's 2013-2014 Reports
- STEWART000003 - 2021.08.18 Parsons Suicides since Jan. 1 2019
- STEWART000004 - Docs sent to Dr. Pablo Stewart

Class Member Medical Records











# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

ASPC – Eyman

September 8, 2021



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137142



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137144



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137145



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137147



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137148



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137149



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137150



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00137151



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PARSONS V. SHINN, USDC CV12-00601

ADCRR00137152

ASPC – Phoenix

September 23, 2021



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158717



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158719



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158720