1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                        DISTRICT OF ARIZONA

8

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-ROS |
| Plaintiffs, | **PROPOSED FINAL PRETRIAL ORDER FOR BENCH TRIAL** |
| v. | |
| David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, | |
| Defendants. | |

The following is the parties' joint Proposed Final Pretrial Statement.

**A.    TRIAL COUNSEL FOR THE PARTIES**

Plaintiffs' Class Counsel:

- David C. Fathi
  Maria V. Morris
  ACLU NATIONAL PRISON PROJECT
  915 15th St. N.W., 7th Floor
  Washington, DC 20005
  Telephone: (202) 548-6603
  Email: dfathi@aclu.org
              mmorris@aclu.org

Corene Kendrick
ACLU NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (202) 393-4930
Email: ckendrick@aclu.org

- Donald Specter
  Alison Hardy
  Sara Norman
  Rita K. Lomio
  Sophie Hart
  PRISON LAW OFFICE
  1917 Fifth Street
  Berkeley, California 94710
  Telephone: (510) 280-2621
  Email: dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          rlomio@prisonlaw.com
          sophieh@prisonlaw.com

- Daniel C. Barr
  John H. Gray
  Austin C. Yost
  Karl J. Worsham
  Kathryn E. Boughton
  Mikaela N. Colby
  Kelly Soldati
  Alisha Tarin-Herman
  PERKINS COIE LLP
  2901 N. Central Avenue, Suite 2000
  Phoenix, Arizona 85012
  Telephone: (602) 351-8000
  Fax: (602) 648-7000
  Email: dbarr@perkinscoie.com
          jhgray@perkinscoie.com
          ayost@perkinscoie.com
          kworsham@perkinscoie.com
          kboughton@perkinscoie.com
          mcolby@perkinscoie.com
          ksoldati@perkinscoie.com
          atarinherman@perkinscoie.com

- Victoria Lopez
  Jared G. Keenan
  ACLU FOUNDATION OF ARIZONA
  3707 North 7th Street, Suite 235
  Phoenix, Arizona 85013
  Telephone: (602) 650-1854
  Email: vlopez@acluaz.org
          jkeenan@acluaz.org

1    Counsel for Arizona Center for Disability Law:

2        • Maya Abela
         ARIZONA CENTER FOR DISABILITY LAW
3        100 North Stone Avenue, Suite 305
         Tucson, Arizona 85701
4        Telephone: (520) 327-9547
         Email: mabela@azdisabilitylaw.org

5
        Additional attorneys from the above-listed organizations may participate in the trial
6    on Plaintiffs' behalf.

7    Counsel for Defendants:

8        Daniel P. Struck
         Rachel Love
9        Timothy J. Bojanowski
         Nicholas D. Acedo
10       Ashlee B. Hesman
         Jacob B. Lee
11       Timothy M. Ray
         Anne M. Orcutt
12       Eden Cohen
         STRUCK LOVE BOJANOWSKI & ACEDO, P.L.C.
13       3100 West Ray Road, Suite 300
         Chandler, Arizona 85226
14       Telephone: (480) 420-1600
         Email: dstruck@strucklove.com
15           rlove@strucklove.com
             tbojanowski@strucklove.com
16           nacedo@strucklove.com
             ahesman@strucklove.com
17           jlee@strucklove.com
             tray@strucklove.com
18           aorcutt@strucklove.com
             ecohen@strucklove.com
19
         Michael Gottfried
20       Lucy Rand
         Office of the Attorney General
21       1275 W. Washington Street
         Phoenix, Arizona 85007-2926
22       Telephone: (602) 542-4951
         Email: Michael.Gottfried@azag.gov
23           Lucy.Rand@azag.gov

24

25

26

27

28

**B.** **STATEMENT OF JURISDICTION**

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2.      Jurisdiction is not disputed.

**C.** **NATURE OF ACTION**

**PLAINTIFFS' STATEMENT**

Nearly a decade ago, class Plaintiffs brought this action against the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") and its directors under the Eighth Amendment to the United States Constitution through 28 U.S.C. Section 1983. [*See* Doc. 1]. Plaintiffs alleged serious deficiencies in Arizona's prison health care system and dangerous conditions in the prisons' isolation units. Seven years ago, the parties entered into a Stipulation to address those unconstitutional deficiencies. That effort failed. The record is replete with proof of Defendants' unwillingness or inability to meet critical benchmarks from the Stipulation. This Court went to great length to motivate Defendants to comply, including holding Defendants in contempt of court three times for their failures to adhere to the Stipulation. But Defendants repeatedly resisted the Court's efforts to hold them to their promises and their constitutional obligations. Finding further enforcement of the Stipulation futile, this Court rescinded approval of the Stipulation and set the case for trial on Plaintiffs' original Eighth Amendment claims.

Without this Court's intervention, Defendants' failures will continue to place class members at substantial risk of serious harm because of the inadequate health care provided to the Plaintiff class. In addition, thousands of class members continue to languish in cruel conditions in Defendants' extreme isolation units. Defendants' system-wide deficiencies have existed for years, persisted in the face of Defendants' promises of remediation and this Court's best efforts to enforce the parties' Stipulation, and will continue absent an order from this Court.

**DEFENDANTS' STATEMENT**

In 2012, Plaintiffs filed their Complaint, alleging that Defendants failed to provide constitutionally adequate medical, mental health, and dental care to all ADCRR inmates

and failed to provide constitutionally adequate conditions of confinement to inmates housed in units Plaintiffs contend amount to "isolation." Plaintiffs' Complaint is peppered with anecdotal claims of individual inmates regarding perceived deficiencies with certain aspects of their health care. Plaintiffs' Motion for Class Certification likewise relied on isolated instances identified by Plaintiffs' experts of inmates whose care they allege was deficient. At each stage of the case, Plaintiffs' experts have presented reports or declarations in which they have chosen to focus on a small subset of inmates who have either submitted complaints to Plaintiffs' counsel or have for some other reason been selected by Plaintiffs' counsel for their review and then highlight examples of care they disagree with. When Plaintiffs and their experts purposefully focus their attention on reviewing the "sickest of the sick" from a medical or mental health perspective,[1] it should come as no surprise that they uncover poor outcomes or instances in which the care was untimely or did not meet the standard of care. This is to be expected in a system of nearly 30,000 inmates. Indeed, even in any large health care network or hospital system outside the correctional setting, there will be instances of bad outcomes, medical negligence, medical malpractice, and deaths that were preventable. This does not mean that the health care network or hospital system is broken or indifferent to the health care needs of those in its care.

Following the Stipulation, Plaintiffs and their experts have also focused on a small subset of Performance Measures (PMs) in which ADCRR has not achieved compliance at the levels provided for in the Stipulation at all monitored facilities and chosen to ignore the fact that Defendants have been compliant on the vast majority (90+%) of them for years.

Remarkably, over the course of nearly a decade in this case, Plaintiffs' experts have never followed even the most basic principles of statistics and reviewed random samples of inmates from which they can draw conclusions about the ADCRR population as a whole. Nor have they otherwise presented evidence of any systemic deficiencies in the provision of medical, mental health, or dental care. By contrast, Defendants' experts have reviewed

---

[1] Plaintiffs' counsel, investigators, and experts have had unfettered access to eOMIS for years, allowing them ample opportunity to search for problems.

random samples of inmates with significant medical and mental needs – Dr. Murray reviewed a sample of inmates with two or more chronic conditions and Dr. Penn reviewed a sample of inmates with a mental health score of 3 or higher – and both conclude that the care provided to ADCRR inmates meets or exceeds the standard of care. Both Dr. Murray and Dr. Penn also rely on objective measures and community standards to assess the health care delivery system and quality of care provided. While Plaintiffs' reliance on anecdotal allegations and isolated instances of poor care may have been enough to certify a class or create issues of fact to defeat summary judgment, at the trial stage, it is not enough to meet Plaintiffs' burden of proving systemic deficiencies in the delivery of health care to ADCRR inmates.

With respect to the Subclass, Plaintiffs' experts focus on items that are either irrelevant to the certified claims or were not pled in the Complaint (e.g., cleanliness of the showers, frequency of pest control, site lines into the cells, criticisms of ADCRR's classification system and the length of time inmates spend at various Step levels, etc.). They fail to present any evidence of the inadequacy of several items that were certified claims (e.g., cell illumination, nutrition, and property) and fail to address the most fundamental problem with their case – that inmates in the Subclass are not actually subject to "isolation" as defined in the Complaint or in the Order certifying the class. Many Subclass inmates have cellmates, and all have access to recreation, property, phone/in-person/tablet visitation, daily interaction with medical, mental health, and custody staff, and interaction with other inmates during rec and/or programs. Plaintiffs and their experts also ignore continuous efforts Defendants have made since 2012 to increase the amount of out-of-cell time, programming, and incentives offered to ADCRR inmates through the implementation and evolution of DI 326 and ongoing efforts to reduce the maximum custody population. While Plaintiffs attempt to paint a picture of inmates suffering alone in dark cells with not enough food or access to property, the evidence is very different.

1    **D.    JURY/NON-JURY**

2         No party has demanded a jury trial of all or any of the issues in this suit.

3    **E.    CONTENTIONS OF THE PARTIES**

4         **PLAINTIFFS' STATEMENT**

5         The Eighth Amendment proscribes conditions of confinement that are "incompatible

6    with the evolving standards of decency that mark the progress of a maturing society" or that

7    "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97,

8    102–03 (1976) (citations omitted). In an injunctive case, a plaintiff "need not show that a

9    prison official acted or failed to act believing that harm actually would befall an inmate; it

10   is enough that the official acted or failed to act despite his knowledge of a substantial risk

11   of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*,

12   468 U.S. 517, 526–27 (1984)); *see also Brown v. Plata*, 563 U.S. 493, 531–32 (2011)

13   ("Even prisoners with no present physical or mental illness may become afflicted, and all

14   prisoners in California are at risk so long as the State continues to provide inadequate care.

15   . . . [P]risoners who are not sick or mentally ill . . . [are] in no sense [] remote bystanders in

16   California's medical care system. They are that system's next potential victims."); *Helling*

17   *v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates

18   who plainly proved an unsafe, life-threatening condition in their prison on the ground that

19   nothing yet had happened to them."); *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014)

20   ("[W]e have repeatedly recognized that prison officials are constitutionally prohibited from

21   being deliberately indifferent to policies and practices that expose inmates to a substantial

22   risk of serious harm.").

23        Under the Eighth Amendment, prison officials act with deliberate indifference when

24   they (1) have subjective knowledge of the risks or when those risks are "obvious" and (2)

25   fail to take reasonable action to abate those risks. *Lemire v. Cal. Dep't of Corr. & Rehab.*,

26   726 F.3d 1062, 1078 (9th Cir. 2013) (quoting *Farmer*, 511 U.S. at 842).

27

28

The objective prong is satisfied if the institution deprives a person of "basic human needs," *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993), or a "minimal civilized measure of life's necessities," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (citation omitted).

The subjective prong is satisfied if the defendant acts with "deliberate indifference." *Grenning v. Miller-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014). "A showing of deliberate indifference . . . requires a showing that the defendant knew of an excessive risk to inmate health or safety that the defendant deliberately ignored." *Id.* at 1239.

## **DEFENDANTS' STATEMENT**

Plaintiffs bear the burden of proof as to each of their claims. They omit several key elements. Because they seek prospective relief, Plaintiffs must establish that Defendants have policies or practices that expose all inmates to a substantial risk of serious harm. *Parsons v. Ryan*, 754 F.3d 657, 676–78 (9th Cir. 2014). And because they challenge ADCRR's systemwide, they must prove that the alleged policies or practices exist at all 10 state-operated facilities. *Fraihat v. U.S. Immigration & Customs Enforcement*, No. 20-55634, 2021 WL 4890884, *27–28 (9th Cir. Oct. 20, 2021). Moreover, "[a] prison official acts with deliberate indifference only if the prison official knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citation omitted). A "mere 'difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference." *Id.* at 1058 (citation omitted). Moreover, negligence or medical malpractice do not violate the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Although the Ninth Circuit stated in *Peralta v. Dillard* that "[l]ack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations," 744 F.3d 1076, 1083 (9th Cir. 2014), a "lack of resources or other federalism concerns invoked by the prospect of injunctive relief go only to the ultimate scope of the injunction," *B.K. v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019). And, of course, any injunction must comply with the Prison Litigation Reform Act. *See*, *e.g.*, 18 U.S.C.

§ 3626(a)(1)(A) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.").

**F.    STIPULATIONS AND UNDISPUTED FACTS**

This Court has ordered the following (Doc. 3952):

1.    The parties will be given equal time to present their claims and defenses; with an expected preliminary total of 100 hours available for trial, each side will be allotted 50 hours. [*Id*. at 3]. Time that each side spends on cross-examination of the other side's experts will count towards the cross-examining party's allocation of trial time. [*Id*.].

2.    Expert witness testimony shall be presented through written declaration filed five days before the date that witness will be called. [*Id*. at 4].

The parties have stipulated to the following:

1.    Neither party will make a hearsay objection when an expert witness testifies about the content of the medical records of any patient. The opposing party retains the right to object to specific medical records based on double or triple hearsay. The opposing party also retains the right to argue about the inferences to be drawn from that evidence, and either party may offer particular excerpts of physical medical records to support or oppose that testimony.

2.    Each side may access the eOMIS system directly during trial to display various health care records.

3.    The party that introduces a record from eOMIS at trial will be responsible for printing that record and providing it to the Court as an exhibit.

4.    For deposition designations, the parties will designate/object and counter-designate/object to counter-designations on a rolling basis as follows:

    a.    The party seeking to introduce trial testimony through deposition designations will provide deposition designations no later than 72 hours before the testimony will be introduced at trial;

    b.    The opposing party will provide any objections and counter-designations no later than 48 hours before the testimony will be introduced at trial; and

    c.    The party seeking to introduce trial testimony through deposition designations will provide objections to counter-designations no later than 24 hours before the testimony will be introduced at trial.

**The parties agree that the following facts relevant to trial in this lawsuit are undisputed:**

1.    The Arizona State Prison Complexes ("ASPCs") are Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.

2.    The parties entered into the Stipulation in October 2014, [Doc. 1185], and this Court approved it in March 2015 after a fairness hearing, [Doc. 1458].

3.    Defendants have contracted with Centurion of Arizona ("Centurion") to provide health care services to residents of the ASPCs.

4.    Centurion assumed correctional health care responsibilities beginning July 1, 2019.

5.    Before Centurion's contract to provide health care services for ADCRR, Wexford Health Sources, Inc. and Corizon, Inc. contracted with ADCRR to provide health care services to residents of the ASPCs.

6.     David Shinn is the Director of ADCRR and has been the Director since October 21, 2019.

7.     David Shinn is ultimately responsible for the health care provided to class members and for the conditions of their confinement.

8.     Larry Gann is the Associate Director of ADCRR, and he leads the Medical Services Monitoring Bureau.

9.     The ADCRR Medical Services Monitoring Bureau is charged with monitoring contracted vendors' provision of health care to persons incarcerated in the ASPCs at least for purposes of contract compliance.

10.    On July 16, 2021, this Court issued an Order finding that Defendants "fail[ed] to perform their obligations" under the Stipulation and set the case for trial on November 1. [Doc. 3921].

## G.    PLAINTIFFS' CONTENTIONS OF DISPUTED FACTS

1.     The health care provided to class members places class members at substantial risk of serious harm because of the systemic deficiencies in the delivery of health care.

2.     The conditions of confinement in Defendants' isolation units place class members at substantial risk of serious harm.

3.     This Court has issued orders enforcing the terms of the Stipulation. [*See, e.g.*, Docs. 1582, 1754, 1933, 1956, 2124, 2330, 2373, 2403, 2901, 3235, 3359, 3235, 3385, 3416, 3490, 3495, 3861].

4.     This Court has found Defendants in contempt of court for noncompliance with the Stipulation. [Docs. 2898, 3861, 3862].

5.     This Court has fined Defendants for noncompliance with the Stipulation. [Docs. 2898, 3861, 3862.].

6.     On October 2, 2019, court expert Marc Stern, MD, MPH, submitted a report to this Court regarding health care delivery in ADCRR. [Doc. 3379]. Dr. Stern

1     recommended, among other things, that staffing levels be increased, that the

2     mix of staff (e.g., physician and mid-level provider) be reconfigured, and that

3     performance measures be added to review the quality of decision-making by

4     nurses and primary care providers for episodic, chronic, emergency and

5     inpatient care; the clinical appropriateness of decisions made regarding access

6     to specialty care; and the quality of the mortality review process. [Doc. 3379

7     at 95–101, 113].

8     7.     On February 24, 2021, this Court found that Defendants had violated

9     Paragraph 14 of the Stipulation, which "requires Defendants provide

10    interpretive services when a prisoner is not fluent in English." [Doc. 3861 at

11    11]. This Court ordered that "Defendants will be given thirty days in which

12    to formulate and file a plan." [*Id*. at 12].

13

14    **H.    DEFENDANTS' CONTENTIONS OF DISPUTED FACTS**

15    1.     The health care provided to class members does not place class members at

16    substantial risk of serious harm.

17    2.     There are no systemic deficiencies in the delivery of medical care to ADCRR

18    inmates.

19    3.     Contractual staffing levels and types are sufficient to meet inmate demand for

20    medical, mental health, and dental care.

21    4.     ADCRR provides adequate care for chronic diseases and protection against

22    infectious diseases.

23    5.     ADCRR inmates have adequate access to medically necessary specialty care

24    through onsite clinics, offsite specialty providers, and hospital providers.

25    6.     ADCRR provides timely access to health care.

26    7.     ADCRR provides timely emergency treatment.

27    8.     ADCRR provides necessary medication and medical devices.

28

9.     There are no systemic deficiencies in the delivery of dental care to ADCRR inmates.

10.     ADCRR provides timely access to basic dental treatment.

11.     ADCRR does not have a policy or practice of extracting teeth that can be saved by less intrusive means.

12.     There are no systemic deficiencies in the delivery of mental health care to ADCRR inmates.

13.     ADCRR provides medically necessary mental health treatment (e.g., psychotropic medications, therapy, inpatient treatment) to mentally ill inmates.

14.     ADCRR provides suicidal and self-harming inmates basic mental health care.

15.     ADCRR is not deliberately indifferent to the health care (medical, mental health, dental) needs of ADCRR inmates.

16.     The conditions of confinement in units that fall within the definition of "isolation" do not place class members at substantial risk of serious harm.

17.     ADCRR provides adequate psychiatric monitoring to Subclass inmates.

18.     ADCRR's use of chemical agents is not unconstitutional.

19.     ADCRR Subclass inmates are not denied constitutional levels of recreation or property and are not subjected to extreme "isolation" (segregation from human contact).

20.     Out-of-cell time offered to the Subclass meets or exceeds constitutional requirements and corrections industry standards.

21.     Subclass members are not exposed to unconstitutional levels of cell illumination.

22.     Subclass members receive adequate nutrition.

23.     The pending RFP requires the successful bidder to replace eOMIS with a new electronic health records system.

24. The Court certified 10 class claims, including failure to provide timely access to health care; failure to provide timely emergency treatment; failure to provide necessary medication and medical devices; insufficient health care staffing; failure to provide care for chronic diseases and protection from infectious disease; failure to provide timely access to medically necessary specialty care; failure to provide timely access to basic dental treatment; practice of extracting teeth that could be saved by less intrusive means; failure to provide mentally ill prisoners medically necessary mental health treatment (i.e. psychotropic medication, therapy, and inpatient treatment); and failure to provide suicidal and self-harming prisoners basic mental health care. (Dkt. 372 at 22.)

25. The Court certified 7 Subclass claims, including: inadequate psychiatric monitoring because of chronic understaffing; use of chemical agents against inmates on psychotropic medications; lack of recreation; extreme social isolation; constant cell illumination; limited property; and insufficient nutrition. (Id. at 22-23.)

26. The Court's class certification order defined the Class as including All prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC.

27. The Court's class certification order defined the Subclass as including ADCRR inmates confined in a cell for 22 hours or more each day or assigned to certain housing units, which at the time of class certification, were maximum custody units. (Id. at 22.)

28. As of September 30, 2021, ADCRR incarcerated a total of 35,410 inmates in state-operated and contract facilities. ADCRR's population assigned to the ten state-operated prison complexes as of the same date was 27,794 inmates.

29.     As of September 30, 2021, 1,636 ADCRR inmates were classified as maximum custody; 22 were assigned to close management status; 750 were assigned to detention status; and 81 were on mental health watch.

30.     Since the filing of Plaintiffs' Complaint in March 2012, the ADCRR maximum custody population has dropped from 3,105 to 1,636 inmates.

31.     All 10 ADCRR complexes have achieved and maintain accreditation by the National Commission on Correctional Health Care (NCCHC).

32.     Health care staffing levels have increased over the span of this litigation, ranging from 748.7 total FTEs immediately prior to privatization to 1052.75 total FTEs in the current contract.

# I.     ISSUES OF LAW IN CONTROVERSY

## PLAINTIFFS' STATEMENT

Plaintiffs incorporate their Pretrial Brief by reference here. [Doc. 4105]. To summarize, the issues of law in controversy are:

1.     Are Defendants deliberately indifferent in their provision of health care in violation of the Eighth Amendment?

2.     Do the conditions of confinement in ADCRR's isolation units deprive Plaintiffs of basic human needs in violation of the Eighth Amendment?

3.     Have Defendants persisted for years in their deliberate indifference to the substantial risks of serious harm that Plaintiffs experience because of Defendants' unconstitutional provision of health care and conditions of confinement in ADCRR's isolation units in violation of the Eighth Amendment?

4.     Should this Court issue prospective relief that includes, among other things, an injunction to order Defendants to promptly hire sufficient, qualified staff to provide constitutionally adequate medical and mental health care; improved health care policies and procedures, with qualitative monitoring;

and the appointment of a receiver to manage ADCRR's delivery of health care services?

5.    Should this Court issue prospective relief that includes, among other things, an injunction to prohibit Defendants' placement of persons with serious mental illness or juveniles in ADCRR's isolation units?

6.    Should this Court issue prospective relief that limits the use of isolation to only those circumstances, and only those times, where no other available form of housing will accomplish the required levels of safety and stability?

7.    Should this Court issue prospective relief that requires conditions in ADCRR's isolation units to be such that persons housed have a safe, healthful, and hygienic environment?

8.    Should this Court issue prospective relief that the use of force against persons with serious mental illness housed in ADCRR's isolation units is prohibited?

**<u>DEFENDANTS' STATEMENT</u>**

Defendants incorporate their Trial Brief by reference here as well as Defendants' Statement above.  Additional relevant issues of law in controversy include the following:

1.    Whether Defendants provide constitutionally adequate healthcare as required by the Eighth Amendment.

2.    Whether the conditions of confinement in ADCRR units falling within the definition of "isolation" satisfy the requirements of the Eighth Amendment.

3.    Whether Defendants have been deliberately indifferent to any substantial risk of serious harm.

4.    Whether the class and subclass should be decertified.

5.    Whether Plaintiffs are entitled to the prospective relief they seek.

6.    Whether the Court can order a receiver.

7.    Whether the class and subclass claims should be decertified.

**J.     SEPARATE TRIAL OF ISSUES**

The parties agree that a separate trial of any of the issues in this suit is not advisable or feasible.

**K.     WITNESSES**

**PLAINTIFFS' STATEMENT**

Plaintiffs will call the following named plaintiff and class member witnesses to testify at trial:

1.     Kendall Johnson

Ms. Johnson may testify regarding her experiences seeking and receiving health care while confined at ASPC-Perryville.

Ms. Johnson is currently incarcerated at ASPC-Perryville, Lumley Special Needs Unit. She has multiple sclerosis. While in ADCRR custody, she encountered delays in having multiple sclerosis diagnosed and treated. In September 2017, she reported weeks-long numbness in her feet and legs to medical staff. In October 2017, the NP assessed her as having idiopathic neuropathy or conversion disorder (a psychiatric condition). Ms. Johnson submitted HNRs regularly over the next two years, reporting worsening symptoms, including an inability to ambulate safely. Medical staff repeatedly failed to perform the appropriate exams and her condition deteriorated. In January 2020, she finally received an MRI, and the results strongly supported a diagnosis of multiple sclerosis. In March 2020, she saw a neurologist about her MRI results, and the specialist recommended a series of additional diagnostics and a return visit in one month. She did not return until November 2020, where the neurologist confirmed that she had MS.

Ms. Johnson then experienced delays in receiving treatment. The neurologist asked to see her back in one month to discuss treatment options, but this did not occur. Ms. Johnson next saw the neurologist in January 2021, and the specialist noted that her mobility had progressively declined, she used a wheelchair, and had urinary incontinence. Ms. Johnson did not begin receiving medication for multiple sclerosis until late May 2021. Ms. Johnson now lives in the Special Needs Unit and requires almost full care for her activities of daily living, as she is currently unable to walk, feed, or wash herself, write, and her eyesight is deteriorating. Ms. Johnson is expected to testify regarding delays in care for multiple sclerosis and the ongoing harm she experiences because of these delays.

2.      Ronald Slavin

Mr. Slavin may testify regarding his experiences seeking and receiving health care while confined in ADCRR.

Mr. Slavin is classified as SMI and is currently diagnosed with unspecified psychosis. He previously was diagnosed with bipolar disorder, schizophrenia, and major depression. Mr. Slavin can testify regarding the mental health care he has received, and the failure to place him in a more intensive inpatient mental health setting, despite recommendations of his treating clinician that he was in need of such placement.

3.      Laura Redmond

Ms. Redmond may testify regarding her experiences seeking and receiving health care while confined at ASPC-Perryville, including the challenges that she has experienced accessing care as a Deaf person.

Ms. Redmond is classified as SMI and has a mental health diagnosis of unspecified mood disorder, but she previously had been diagnosed with schizophrenia NOS and bipolar disorder NOS. She takes multiple psychotropic medications for her conditions. She can testify to the barriers she has experienced in accessing medical and mental health treatment due to the lack of a sign language interpreter.

Ms. Redmond is currently incarcerated at ASPC-Perryville, San Carlos Unit. Ms. Redmond is deaf, and her primary language is American Sign Language. She generally does not receive an interpreter during health care appointments. In June and July 2021, Ms. Redmond saw her provider to discuss a cochlear implant for hearing loss. Because her provider failed to request a sign language interpreter for her appointments, Ms. Redmond was unable to understand the provider and deprived of her right to be an active participant in her care. Ms. Redmond is expected to testify regarding the lack of interpretation services during her healthcare encounters and how it has affected her ability to receive constitutionally adequate care.

Additionally, Ms. Redmond is classified as SMI and has a mental health diagnosis of unspecified mood disorder, but she previously had been diagnosed with schizophrenia NOS and bipolar disorder NOS. She takes multiple psychotropic medications for her conditions. She can testify to the barriers she has experienced in accessing mental health treatment due to the lack of a sign language interpreter.

4.      Dustin Brislan

Mr. Brislan may testify regarding his experiences seeking and receiving health care while confined in ADCRR, and regarding the conditions of confinement in isolation.

Mr. Brislan was a Named Plaintiff in this matter, and his original class representative claims from 2012 are detailed in Plaintiffs' complaint. The Court appointed him a class representative and subclass representative. Defendants deposed Mr. Brislan on August 9, 2013. Mr. Brislan was dismissed as a class representative after his release from prison, but he was reincarcerated in ADCRR custody in 2017. He is classified as SMI, and has been assigned a number of diagnoses since then. His current diagnosis is borderline personality disorder, but was previously diagnosed with unspecified Schizophrenia. Until September 2021, Mr. Brislan was incarcerated at the Kasson BMU, and was transferred to Tucson-Rincon's MHU. He can testify regarding the conditions of confinement in these isolation units. He can testify regarding deficiencies in his mental health treatment, including delays and outright failures to provide mental health care, inadequate medication management by prescribing providers, and repeated cancellations of out-of-cell programming and therapy. Mr. Brislan can testify to the numerous acts of self-harm and self-injurious behavior that he has engaged in since 2017, including while on continuous mental health watch. Mr. Brislan can also testify regarding conditions and mental health care to people placed on mental health watch due to thoughts or acts of self-harm; custody staff's uses of force on mentally ill people; and excessive isolation of mentally ill persons.

5.      Rahim Muhammad

Mr. Muhammad may testify regarding his experiences seeking and receiving health care while confined in ADCRR, and regarding the conditions of confinement in isolation.

Mr. Muhammad has a current diagnosis of borderline personality disorder. He previously held a diagnosis of unspecified schizophrenia with psychotic tendencies. He has been incarcerated in Eyman-SMU I, Eyman-Browning, the Florence-Kasson BMU, Phoenix-Flamenco Unit, and on September 23, 2021 was moved to Tucson Rincon Unit from mental health watch at Phoenix-Baker Unit. He can testify regarding the conditions of confinement in these isolation units. Mr. Muhammad has engaged in numerous acts of self-harm, self-injurious behavior, and suicide attempts, including while on mental health watch. He can testify regarding deficiencies in his mental health treatment, including delays and outright failures to provide mental health

care, inadequate medication management by prescribing providers, and repeated cancellations of out-of-cell programming and therapy. He can also testify regarding conditions of confinement and mental health care to people placed on mental health watch due to thoughts or acts of self-harm; custody staff's uses of force on mentally ill people; and excessive isolation of mentally ill persons.

6.    Jason Johnson

Mr. Johnson may testify regarding his experiences seeking and receiving health care while confined in ADCRR, and regarding the conditions of confinement in isolation.

Mr. Johnson is currently diagnosed with major depressive disorder, recurrent, and anxiety; he has previous diagnoses of schizophrenia. He is classified as SMI. Mr. Johnson previously provided declarations to the Court describing conditions and ongoing violations of the Stipulation and ADCRR policies regarding out-of-cell time at the behavioral health unit at Florence-Kasson. Mr. Johnson was incarcerated in the Kasson BMU until October 2020 and was transferred to Eyman SMU-I at that time. He can testify regarding the conditions of confinement in these isolation units. Mr. Johnson can testify regarding deficiencies in his mental health treatment at both Kasson and SMU-I, including delays and outright failures to provide mental health care, inadequate medication management by prescribing providers, and repeated cancellations of out-of-cell programming and therapy. Mr. Johnson can also testify regarding conditions and mental health care to people placed on mental health watch due to thoughts or acts of self-harm; custody staff's uses of force on mentally ill people; and excessive isolation of mentally ill persons.

7.    Shawn Jensen

Mr. Jensen may testify regarding his experiences seeking and receiving health care while confined in ADCRR.

Mr. Jensen is a named plaintiff currently incarcerated at ASPC-Florence, East Unit. Mr. Jensen has a history of prostate cancer. While in ADCRR custody, Mr. Jensen has encountered delays in having the cancer diagnosed and treated. When Mr. Jensen was originally identified as a named plaintiff in 2012, Defendants had delayed a biopsy for two years following labs that showed elevated PSA levels in 2007. The biopsy, done in 2009, revealed that Mr. Jensen had an aggressive form of Stage 2 prostate cancer. Mr. Jensen then endured delays in receiving chemotherapy medication and surgery.

Since then, Mr. Jensen continues to experience harm and injuries caused by Defendants' inadequate medical care. For the last year, medical staff at

ASPC-Florence have caused several delays in critical offsite care necessary for Mr. Jensen to maintain proper catheter hygiene and prevent urinary tract infections (UTIs). As a result, Mr. Jensen has experienced several UTIs and continues to have significant pain at the site of his catheter when it is not changed in a timely manner. Mr. Jensen is expected to testify regarding delays in his medical care and the ongoing harm he suffers because of these delays.

Plaintiffs may call the following witnesses to testify at trial:

1.     Christina Verduzco

Ms. Verduzco may testify regarding her experiences seeking and receiving health care while confined in ADCRR, and regarding the conditions of confinement in isolation.

Ms. Verduzco is a Named Plaintiff in this matter, and her original class representative claims from 2012 are detailed in Plaintiffs' complaint. The Court appointed her a class representative and a subclass representative. Defendants deposed Ms. Verduzco on August 15, 2013. Since then, Ms. Verduzco received a variety of mental health diagnoses, that kept changing, in the intervening eight years. Ms. Verduzco has been incarcerated in the inpatient mental health units at ASPC-Phoenix Flamenco Females, and at ASPC-Perryville. She can testify regarding the mental health treatment and conditions in these units. Ms. Verduzco has engaged in numerous acts of self-harm and self-injurious behavior, and can testify regarding the conditions of confinement in mental health watch units. She can also testify regarding conditions and mental health care to people placed on mental health watch due to thoughts or acts of self-harm; custody staff's uses of force on mentally ill people; and excessive isolation of mentally ill persons.

2.     Stefanie Platt, Psy.D

Dr. Platt is a psychologist who was formerly employed by Centurion of Arizona as its Director of Mental Health Services. If Plaintiffs call Dr. Platt, then she may testify regarding the delivery of mental health care to class members in ADCRR.

3.     Ronald Hochrine

Mr. Hochrine was incarcerated at the ASPC-Tucson Inpatient Component (IPC) infirmary unit prior to his release on October 1, 2021. Intermittently for four and a half years, Mr. Hochrine was prescribed Naproxen, a potent NSAID. In late 2019, Mr. Hochrine's chronic care labs showed decreased kidney function and protein in his urine. Medical staff at the prison failed to make a referral to a nephrologist to manage his chronic kidney disease. Mr.

Hochrine did not see a nephrologist until April 2021. At that time, the nephrologist diagnosed Mr. Hochrine with chronic kidney failure secondary to chronic NSAID exposure. Mr. Hochrine started dialysis in July 2021. Additionally, Mr. Hochrine experienced extreme shortness of breath during his last weeks of incarceration, but received ineffective treatment. Since release, he has been hospitalized with a lung infection. Mr. Hochrine is expected to testify regarding the delays in his diagnoses and care and the resulting harm.

4.   Patricia Borden

Ms. Borden is a Registered Nurse who was formerly employed by Centurion. She may testify that she witnessed countless examples of poor health care and denial of care in Arizona prisons, as well as administrative impropriety. She will testify that she has been asked to falsify health care reports and records. She will testify consistent with this article, which was published on October 15,                                                                     2021: https://www.azcentral.com/story/news/local/arizona/2021/10/15/arizona-prison-nurse-pat-borden-says-centurion-directed-her-falsify-report/8446942002/.

5.   Gabriela Pelsinger

Ms. Pelsinger is an investigator at the Prison Law Office. She may testify about how she created summaries of patient medical records regarding whether they received language interpretation services during healthcare encounters in recent months.

6.   Tania Amarillas

Ms. Amarillas is an investigator at the Prison Law Office. She may testify about how she created the tables of CGAR data and patient medical scores.

7.   Jessica Carns

Ms. Carns is a paralegal at the ACLU National Prison Project. She may testify about how she created summaries of the amount of out-of-cell time offered to prisoners who were chosen for monitoring under the maximum custody performance measures set out in the Stipulation. Carns will supply a declaration with any summaries describing her methodology, and Plaintiffs will make available to Defendants all of the underlying documents, which are the prisoner out-of-cell tracking sheets produced as a part of the Maximum Custody Notebooks by Defendants for each facility during the months of January, April, July, and October for the years 2019-2021.

8.     Anthony Coleman, Deputy Warden

Deputy Warden Coleman may testify regarding the scope of his work, responsibilities, and knowledge related to health care and conditions in isolation among the Plaintiff class.

9.     Larry Gann, Defendant, Associate Director, ADCRR, Medical Services Monitoring Bureau

Mr. Gann may testify regarding the scope of his work, responsibilities, and knowledge related to health care among the Plaintiff class.

10.    David Shinn, Defendant, Director, ADCRR

Mr. Shinn may testify regarding the scope of his work, responsibilities, and knowledge related to health care and conditions in isolation among the Plaintiff class.

11.    Bobbie Pennington-Stallcup, Ph.D., Mental Health Monitor, ADCRR, Medical Services Monitoring Bureau

Dr. Pennington-Stallcup may testify regarding the scope of her work, responsibilities, and knowledge related to health care and conditions in isolation among the Plaintiff class.

12.    Ashley Pelton, Ph.D., Centurion Regional Mental Health Director

Dr. Pelton may testify regarding the scope of her work, responsibilities, and knowledge related to health care and conditions in isolation among the Plaintiff class.

13.    Lori Stickley, Deputy Warden

Deputy Warden Stickley may testify regarding the scope of her work, responsibilities, and knowledge related to conditions in isolation among the Plaintiff class.

14.    Travis Scott, Deputy Warden

Deputy Warden Scott may testify regarding the scope of his work, responsibilities, and knowledge related to conditions in isolation among the Plaintiff class.

15.   Wendy Orm, M.D., Centurion Regional Medical Director

Dr. Orm may testify regarding the scope of her work, responsibilities, and knowledge related to health care among the Plaintiff class.

16.   Grant Phillips, M.D., Medical Director, ADCRR, Medical Services Monitoring Bureau

Dr. Phillips may testify regarding the scope of his work, responsibilities, and knowledge related to health care among the Plaintiff class.

17.   Dr. John Wilson, Centurion Vice President of Behavioral Health Services

Dr. Wilson may testify regarding the scope of his work, responsibilities, and knowledge related to health care among the Plaintiff class.

18.   ADCRR or Centurion Custodian of Records

19.   Any other ADCRR or Centurion witness needed to establish the authenticity of or lay the foundation for documents produced by ADCRR or Centurion

20.   Any other witnesses necessary for rebuttal

**DEFENDANTS' STATEMENT**

Defendants will call the following party and fact witnesses to testify at trial:

1.   Director Shinn

Director Shinn has served as the Director of the ADCRR since October 21, 2019. Director Shinn is expected to testify regarding ADCRR's strategic planning for, and delivery of, dental, mental health, and health care to approximately 30,000 inmates housed in ADCRR's state-operated prison complexes. Director Shinn is expected to testify regarding ADCRR's on-going partnership with Centurion, including ADCRR and Centurion's efforts and successes in leading the agency to near full compliance with overall Stipulation compliance, which includes addressing the important interplay between security operations and the provision of health care to identify challenges that may require redirection, improvement, or change in order to provide health care services that meet and exceed constitutional minimums, corrections industry standards, and community standards. Director Shinn is further expected to testify regarding ADCRR's contractual relationship with Centurion.

Director Shinn is expected to testify regarding appointment of operations and Monitoring Bureau leadership and its corresponding effect on the delivery of

health care and a progressive approach to management of maximum security and high risk/need inmate populations. Director Shinn is also expected to testify regarding his role in the continuation and development of pro-social opportunities afforded to maximum custody inmates, including implementation of a mental health-focused maximum custody unit at ASPC-Tucson-Rincon Unit that will be activated during the fall of 2021. Director Shinn may testify regarding ADCRR's technology advancements that are increasing operational efficiency in the provision of health care to the inmate population. Director Shinn may also testify regarding ADCRR's robust and continuing COVID-19 mitigation operations as well as technology advances simultaneously made to promote inmate socialization and pro-social behavior during the pandemic. Director Shinn is also expected to testify regarding ADCRR's efforts at correctional personnel recruitment and retention against the backdrop of staffing challenges faced by law enforcement, corrections, and detention agencies across the United States.

2.   Larry Gann

Larry Gann is Assistant Director of the Medical Services Contract Monitoring Bureau at ADCRR. Mr. Gann will testify regarding ADCRR policies, practices, and procedures related to inmate medical, mental health, and dental care. Mr. Gann will testify concerning the operation of the Medical Services Contract Monitoring Bureau, the process for monitoring compliance with the contract, including the Performance Measures from the Stipulation that were incorporated into the contract, training and supervision of the monitors, the content of the CGARs and other reports provided by Centurion, the Monitoring Guide created and maintained by the Bureau, contract sanctions and offsets, and the adequacy of monitoring by the Bureau. Mr. Gann is also expected to testify regarding staffing as set forth in the current contract, a new $15M ADCRR initiative to increase healthcare staffing through sign-on bonuses, shift bonuses, shift differentials, and partnerships ADCRR is cultivating with local colleges and nursing schools to recruit interns and recent graduates. He will also testify regarding compliance with contract requirements by Centurion, review and investigation of medical grievances and appeals, and statistics, reports, and historical data relating to medical, mental health, and dental care. Mr. Gann will testify regarding improvements made to the monitoring of the contract, including recent structural changes within the monitoring bureau, hiring of 10 medical liaisons with experience in correctional health to work with Centurion staff at the facilities to identify and break down barriers to contract compliance, development of a new real-time corrective action plan system, and the development of additional qualitative measures to evaluate and improve the quality of care to ADCRR inmates. Mr. Gann is expected to testify regarding improvements to compliance with the Healthcare Performance Measures and overall

1
2

compliance rates. Additionally, Mr. Gann will testify regarding ADCRR facilities' compliance with NCCHC and American Correctional Association standards.

3

3.      Grant C. Phillips, M.D.

4
5
6
7
8
9
10
11
12
13

Dr. Phillips is the Medical Director for ADCRR. Dr. Phillips will testify regarding ADCRR policies, practices, and procedures related to inmate medical care, review and investigation of medical grievances, inmate death investigations and mortality reviews, the electronic health records system in use at ADCRR facilities, telemedicine, language line services, and continuous improvements in the delivery of health care to the ADCRR inmate population. Dr. Phillips will also testify regarding his review of the medical records of the named Plaintiffs and his opinions regarding the treatment rendered to them. In addition to testifying regarding the medical treatment of the named Plaintiffs, Dr. Phillips will also testify regarding the health care provided to the individual inmates specifically referred to by Plaintiffs' experts and whether the care rendered was adequate, appropriate, and in accordance with the standard of care up until the time of trial. Dr. Philipps is also expected to testify that the care provided to ADCRR inmates meets or exceeds community standards of care and is in compliance with constitutional standards.

14

4.      Tom Dolan

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mr. Dolan is the Vice President for Arizona for Centurion. He will testify regarding Centurion's policies and procedures for the provision of medical, mental health, and dental health care to ADCRR's inmate population. He will testify regarding Centurion's obligations under the Contract with ADCRR and the content and review of monthly and quarterly reports and statistics provided to ADCRR pursuant to the contract. Mr. Dolan will testify regarding the ongoing partnership between ADCRR and Centurion and continuous efforts to improve both inmate access to care and the quality of care provided. He will testify regarding the implementation of the Arizona Telehealth Program and Telehealth Registered Nurse Program, improvements made to ensure timely access to specialty care and follow-up of discharge/treatment recommendations, use of the CareClix virtual healthcare platform provide specialty telehealth services, a pilot program for the use of real-time documentation technology, and other improvements. He is expected to testify regarding how Centurion determined the staffing levels needed for the ADCRR contract, increases and other changes Centurion has made to staffing during the contract, use of premium pay and agency staffing, and a comparison of Centurion's staffing levels in Arizona versus staffing levels in other states. He is further expected to testify regarding Centurion's recruiting, hiring, training, retention, compensation, and incentive policies and practices. He is also expected to testify regarding improvements made to compliance

levels under the Stipulation since Centurion took over the contract. He is expected to testify concerning Centurion's compliance with NCCHC standards regarding staffing and provision of health care to the inmate population.

5.   Wendy Orm, M.D.

Dr. Orm is the Regional Medical Director for Centurion in Arizona. Dr. Orm will testify based on her education, training, qualifications, and experience, as well as her ongoing tours of the ADCRR medical facilities and review and knowledge of inmate healthcare records, reports, and data during the course of her employment. Dr. Orm will testify regarding her knowledge of ADCRR and Centurion policies, procedures, and practices regarding the provision of medical care and medications to ADCRR inmates. Dr. Orm is also expected to testify regarding quality assurance reviews and activities, review and investigation of inmate grievances pertaining to medical care and medications, contract monitoring and compliance, supervision and peer reviews of medical providers, and statistical data relating to the provision of medical care to ADCRR inmates. She is expected to testify regarding Centurion's staffing, recruiting, hiring, training, and retention policies and practices for medical staff. Dr. Orm will also testify regarding continuous improvements in the delivery of medical care to the ADCRR inmate population, including a leading-edge program she has implemented statewide for treating/curing Hepatitis C patients with advanced liver disease. Dr. Orm will also testify regarding ADCRR's response to COVID-19 and her involvement in securing multi-agency assistance with the administration of inmate and staff vaccinations.

6.   Johnny Wu, M.D., FACP, FACCP, CCHP-P, CCHP-A

Dr. Wu is the Chief Clinical Officer at Centurion and has extensive experience in the field of correctional medicine, including as a practicing correctional physician. Dr. Wu serves on the Board of Directors for the American College of Correctional Physicians and previously served on the Board of Directors for the NCCHC. Dr. Wu is expected to testify regarding Centurion's policies and procedures for the provision of health care to inmates. He is expected to testify regarding how Centurion determined the staffing levels needed for the ADCRR contract, changes Centurion has made to staffing during the contract, and a comparison of Centurion's staffing levels in Arizona versus staffing levels in other states. He is further expected to testify regarding Centurion's recruiting, hiring, credentialling, training, retention, and compensation policies and practices. He is expected to testify concerning Centurion's compliance with NCCHC standards regarding staffing and provision of health care to the inmate population at ADCRR. Dr. Wu is expected to testify regarding continuous improvements made to the

delivery of healthcare to ADCRR inmates. Dr. Wu is expected to testify regarding his opinion that the care delivered to ADCRR inmates meets or exceeds community standards of care and constitutional requirements.

7.     Bobbie Pennington-Stallcup, Ph.D.

Dr. Stallcup is the Mental Health Program Director for the Medical Services Contract Monitoring Bureau at ADCRR. Dr. Stallcup will testify regarding ADCRR policies, practices, and procedures related to inmate mental health care and programming including the various ways in which mental health encounters are conducted, review and investigation of inmate grievances pertaining to mental health care and programming (including via telepsychiatry or telepsychology), inmate mental health classification (including admission to in-patient units), the process for evaluation and designation of inmates as SMI, the processes and procedures regarding mental health watch, administration of psychiatric medications, inmate death investigations and mortality reviews, Centurion's compliance with the contract with respect to delivery of mental health care and programming, and continuous improvements in the delivery of mental health care to the ADCRR inmate population.  Dr. Stallcup will further testify regarding mental health staffing and how staffing rates have increased. She will also testify regarding suicide-prevention policies, procedures, and practices including suicides rates at ADCRR.

8.     John S. Wilson, Ph.D., CCHP-MH, CPHQ

Dr. Wilson is the Vice President for Behavioral Health Services at MHM/Centurion. Dr. Wilson is expected to testify regarding Centurion's policies and procedures for the provision of mental health care to inmates. He is expected to testify regarding how Centurion determined the staffing levels needed for the ADCRR contract, changes Centurion has made to staffing during the contract, and a comparison of Centurion's staffing levels in Arizona versus staffing levels in other states. He is further expected to testify regarding Centurion's recruiting, hiring, credentialling, training, retention, and compensation policies and practices for mental health staff. Dr. Wilson is also expected to testify regarding contract monitoring and compliance activities, supervision and peer reviews of mental health staff, and statistical data relating to the provision of mental health care to ADCRR inmates. Dr. Wilson will also testify regarding continuous improvements in the delivery of mental health care and programming to the ADCRR inmate population. Dr. Wilson is expected to testify regarding his opinion that the mental health care and programming delivered to ADCRR inmates meets or exceeds community standards of care and constitutional requirements.

9.     Kendrick Gray, D.D.S.

Dr. Gray is the Regional Dental Director for Centurion in Arizona. Dr. Gray will testify regarding his knowledge of ADCRR's and Centurion's policies and procedures for delivery of dental care and dental devices to ADCRR's inmate population, including the scope of diagnostic and treatment services provided, the dental intake process, triage of dental HNRs, wait times for routine, urgent, and emergent dental care, the review and resolution of inmate grievances related to dental care, training provided to dental providers and dental assistants, electronic health records pertaining to dental care, and the overall delivery of dental care to ADCRR inmates. Dr. Gray will also testify regarding continuous improvements in the delivery of dental care to the ADCRR inmate population. Dr. Gray will also testify regarding his review of the dental records of the named Plaintiffs, and any other inmates referenced by Plaintiffs' experts in their expert reports and/or any Declarations prepared for trial, and his opinions regarding the adequacy of their dental treatment. Dr. Gray is expected to testify regarding the adequacy of dental care provided to ADCRR inmates, including compliance with community standards of care and constitutional requirements.

10.    Deputy Director Frank Strada

Deputy Director Strada will testify regarding ADCRR policies and procedures that govern conditions of confinement for maximum custody inmates to include weekly time out of cell, programming, and privileges afforded to maximum custody inmates commiserate with Step Level (Step Level 1, 2, 3). To the extent the Court permits Plaintiff to introduce evidence as to the following, he is also likely to testify regarding what factors result in a maximum custody classification as well as what pro-social behavioral factors may earn a reduction in classification, the ongoing classification and Step Level review process employed by ADCRR, and validation of those processes by corrections experts. Deputy Director Strada will testify regarding the Department's policies and procedures related to conditions of confinement for Subclass members classified as maximum custody or assigned to close management, detention, or mental health watch housing locations. Conditions of confinement subjects and associated ADCRR policies/procedures at issue include chemical agent use of force on inmates taking psychotropic medications; cell conditions; offered out-of-cell, recreation and programming opportunities; social and human interaction opportunities; property allowances; and food services; as well as security operations necessitated by the challenging inmate populations that make up the Subclass.  Deputy Director Strada will also generally testify regarding ADCRR policies and procedures that govern placement in maximum custody or assignment to detention or mental health watch. He will also testify

regarding changes to policies and procedures governing the inmate disciplinary process, STG management and maximum custody step level progression. He will also testify to and explain the reduction in the maximum custody and detention population since 2012 and since he became Deputy Director in 2020, and the operational initiatives that do and will affect the same. Deputy Director Strada, based upon his extensive training and experience in corrections, will also likely testify regarding the unique challenges at play in managing maximum security inmates, and how ADCRR continues to offer ample out-of-cell time, socialization opportunities, and programming opportunities that meet and exceed corrections industry standards, against the backdrop of both staffing challenges and COVID-19 mitigation efforts faced by corrections and detention departments across the United States. Deputy Director Strada is also expected to testify regarding the reasonableness of the uses of force incidents referred to by Plaintiffs' experts in their expert reports.

11.    J. Kimble

Warden Kimble is currently Warden of ASPC-Eyman. Previously, he was Warden of ASPC-Lewis. Warden Kimble is expected to testify regarding policies and procedures that govern conditions of confinement for maximum custody inmates to include weekly time out of cell, programming, and privileges afforded to maximum custody inmates commiserate with Step Level (Step Level 1, 2, 3). He is likely to testify regarding what pro-social behavioral factors may earn a reduction in classification or Step Level, and the ongoing classification and Step Level review process employed by ADCRR. He is likely to testify regarding management of mental health inmates in maximum custody or detention units, which each require special considerations in how ADCRR addresses their housing, movement, and programming. He is likely to testify regarding housing, security, and operation of ASPC-Eyman and Lewis maximum custody units; a physical description of the maximum custody housing locations, including pod and cell set up, recreation enclosures, programming facilities, on-site medical facilities, and shower facilities; sanitation and maintenance protocols; programming, recreational, educational, religious, and work programs offered to maximum custody inmates and the procedures for offering the same; and all matters raised in the Court's certification of subclass as it relates to conditions of confinement and use of chemical agent use of force on maximum custody inmates and subclass members designated as SMI (seriously mentally ill). These conditions of confinement may include cell conditions, food service, recreational activities, leisure activities, social programming, educational programming, mental health programming, access to visitation, access to mail, access to telephone calls, access to commissary, and access to property.

Warden Kimble will also likely testify regarding the unique challenges at play in managing maximum security inmates, and how ADCRR continues to offer ample out-of-cell time, socialization opportunities, and programming opportunities, against the backdrop of both staffing challenges and COVID-19 mitigation efforts. He will likely testify regarding the frequency with which inmates have contact with other inmates, correctional staff, programming staff, medical staff, and mental health staff. Warden Kimble will likely testify regarding security protocols that govern maximum security housing locations to include health and welfare checks, counts, and safety equipment used by staff working in maximum custody and detention units which are a direct result of and necessitated by past incidents of extreme violent acts committed by such inmates. As to use of chemical agent use of force on subclass members, he will also testify regarding ADCRR's training and emphasis on the use of de-escalation techniques and cool down periods, barring emergency situations that require immediate response to include circumstances of inmate self-harm.

Warden Kimble will also likely testify regarding the conditions of confinement allegations made by party-representative subclass Plaintiffs and any subclass Plaintiffs identified or examined at trial by Plaintiffs that are/were housed at ASPC-Eyman or Lewis, to include conditions of confinement for the specified inmates as well as their institutional history to include criminal, disciplinary, classification, behavioral, STG, programming, and grievance histories. Warden Kimble is also expected to testify regarding monitoring and compliance for offered out-of-cell time and programming during his tenure as Warden of ASPC-Eyman and previously, ASPC-Lewis, as governed by the Stipulation that previously applied to this lawsuit as well as the corresponding mandates of DO 812.

This witness is also expected to testify regarding any use of force videos or documents listed by Plaintiffs in their exhibit list or referred to by their experts for uses of force occurring at their unit locations during the relevant time period. He will additionally testify regarding his review of individual instances of chemical agent use of force on Subclass members taking psychotropic medications that are addressed at trial.

12. J. Van Winkle

Warden Van Winkle is currently Warden of ASPC-Florence. Warden Van Winkle is expected to testify regarding policies and procedures that govern conditions of confinement for maximum custody inmates to include weekly time out of cell, programming, and privileges afforded to maximum custody inmates commiserate with Step Level (Step Level 1, 2, 3). He is likely to

testify regarding what pro-social behavioral factors may earn a reduction in classification or Step Level, and the ongoing classification and Step Level review process employed by ADCRR. He is likely to testify regarding management of mental health inmates in maximum custody or detention units, which each require special considerations in how ADCRR addresses their housing, movement, and programming. He is likely to testify regarding housing, security, and operation of ASPC-Eyman and Lewis maximum custody units; a physical description of the maximum custody housing locations, including pod and cell set up, recreation enclosures, programming facilities, on-site medical facilities, and shower facilities; sanitation and maintenance protocols; programming, recreational, educational, religious, and work programs offered to maximum custody inmates and the procedures for offering the same; and all matters raised in the Court's certification of subclass as it relates to conditions of confinement and use of chemical agent use of force on maximum custody inmates and subclass members designated as SMI (seriously mentally ill). These conditions of confinement may include cell conditions, food service, recreational activities, leisure activities, social programming, educational programming, mental health programming, access to visitation, access to mail, access to telephone calls, access to commissary, and access to property.

Warden Van Winkle will also likely testify regarding the unique challenges at play in managing maximum security inmates, and how ADCRR continues to offer ample out-of-cell time, socialization opportunities, and programming opportunities, against the backdrop of both staffing challenges and COVID-19 mitigation efforts. He will likely testify regarding the frequency with which inmates have contact with other inmates, correctional staff, programming staff, medical staff, and mental health staff. Warden Van Winkle will likely testify regarding security protocols that govern maximum security housing locations to include health and welfare checks, counts, and safety equipment used by staff working in maximum custody and detention units which are a direct result of and necessitated by past incidents of extreme violent acts committed by such inmates. As to use of chemical agent use of force on subclass members, he will also testify regarding ADCRR's training and emphasis on the use of de-escalation techniques and cool down periods, barring emergency situations that require immediate response to include circumstances of inmate self-harm.

Warden Van Winkle will also likely testify regarding the conditions of confinement allegations made by party-representative subclass Plaintiffs and any subclass Plaintiffs identified or examined at trial by Plaintiffs that are/were housed at ASPC-Florence, to include conditions of confinement for the specified inmates as well as their institutional history to include criminal, disciplinary, classification, behavioral, STG, programming, and grievance

histories. Warden Van Winkle is also expected to testify regarding monitoring and compliance for offered out-of-cell time and programming during his tenure as Warden (and prior Deputy Warden of Operations) of ASPC-Florence, as governed by the Stipulation that previously applied to this lawsuit as well as the corresponding mandates of DO 812.

This witness is also expected to testify regarding any use of force videos or documents listed by Plaintiffs in their exhibit list or referred to by their experts for uses of force occurring at their unit locations during the relevant time period. He will additionally testify regarding his review of individual instances of chemical agent use of force on Subclass members taking psychotropic medications that are addressed at trial. Warden Winkle will also testify regarding all subject matter addressed in his 30(b)(6) deposition.

13.   K. Schwestak

Associate Deputy Warden Schwestak is currently ADW of ASPC-Tucson-Rincon Unit. ADW Schwestak is expected to testify regarding policies and procedures that govern conditions of confinement for maximum custody inmates previously housed at ASPC-Florence-Kasson Unit, that by the time of trial, will be housed at the Rincon Unit to include weekly time out of cell, programming, and privileges afforded to maximum custody inmates commiserate with Step Level (Step Level 1, 2, 3). She is likely to testify regarding management of mental health inmates in maximum custody or detention units at the Rincon Unit, which each require special considerations in how ADCRR addresses their housing, movement, and programming. She is likely to testify regarding housing, security, and operation of ASPC-Tucson-Rincon maximum custody unit; a physical description of the maximum custody housing location, including pod and cell set up, recreation enclosures, programming facilities, on-site medical facilities, and shower facilities; sanitation and maintenance protocols; programming, recreational, educational, religious, and work programs offered to maximum custody inmates and the procedures for offering the same; and all matters raised in the Court's certification of subclass as it relates to conditions of confinement and use of chemical agent use of force on maximum custody inmates and subclass members designated as SMI (seriously mentally ill). These conditions of confinement may include cell conditions, food service, recreational activities, leisure activities, social programming, educational programming, mental health programming, access to visitation, access to mail, access to telephone calls, access to commissary, and access to property.

ADW Schwestak will also likely testify regarding the unique challenges at play in managing maximum security inmates, and how ADCRR continues to offer ample out-of-cell time, socialization opportunities, and programming

opportunities, against the backdrop of both staffing challenges and COVID-19 mitigation efforts. She will likely testify regarding the frequency with which inmates have contact with other inmates, correctional staff, programming staff, medical staff, and mental health staff. ADW Schwestak will likely testify regarding security protocols that govern Rincon Unit maximum inmates to include health and welfare checks, counts, and safety equipment used by staff working in maximum custody and detention units which are a direct result of and necessitated by past incidents of extreme violent acts committed by such inmates. As to use of chemical agent use of force on subclass members, she will also testify regarding ADCRR's training and emphasis on the use of de-escalation techniques and cool down periods, barring emergency situations that require immediate response to include circumstances of inmate self-harm.

ADW Schwestak will also likely testify regarding the conditions of confinement allegations made by party-representative subclass Plaintiffs and any subclass Plaintiffs identified or examined at trial by Plaintiffs that are housed at the Rincon Unit, to include conditions of confinement for the specified inmates as well as their institutional history to include criminal, disciplinary, classification, behavioral, STG, programming, and grievance histories. She is also expected to testify regarding monitoring and compliance for offered out-of-cell time and programming afforded to maximum custody inmates to be housed at the Rincon Unit, and modification/additions made to the Rincon Unit to house maximum custody inmates.

This witness is also expected to testify regarding any use of force videos or documents listed by Plaintiffs in their exhibit list or referred to by their experts for uses of force occurring at their unit locations during the relevant time period. She will additionally testify regarding her review of individual instances of chemical agent use of force on Subclass members taking psychotropic medications that are addressed at trial.

Defendants may call the following party and fact witnesses to testify at trial:

14.    Elijah Jordan, M.D.

Dr. Jordan is the Site Medical Director at ASPC-Yuma. Dr. Jordan is expected to testify regarding his knowledge of ADCRR's and Centurion's policies and procedures for delivery of medical care to ADCRR's inmate population, the day-to-day operation of health services at Yuma, inmate access to care, and the overall delivery of healthcare to the inmates at Yuma, including medications, medical devices, routine, urgent, and emergency care, diagnostic services, chronic care, and on-site and off-site specialty care. Dr. Jordan is also expected to testify regarding any treatment he provided to the named Plaintiffs, as well as to any other inmates who testify at trial or who are

referenced by Plaintiffs' experts, and the adequacy of the care he provided. Dr. Jordan is expected to testify regarding continuous improvements made to the delivery of healthcare to ADCRR inmates.

15.   Abel Salazar, M.D.

Dr. Salazar is the Site Medical Director at ASPC-Tucson. Dr. Salazar is expected to testify regarding his knowledge of ADCRR's and Centurion's policies and procedures for delivery of medical care to ADCRR's inmate population, the day-to-day operation of health services at Tucson, inmate access to care, and the overall delivery of healthcare to the inmates at Tucson, including medications, medical devices, routine, urgent, and emergency care, diagnostic services, chronic care, and on-site and off-site specialty care. Dr. Salazar is also expected to testify regarding any treatment he provided to the named Plaintiffs, as well as to any other inmates who testify at trial or who are referenced by Plaintiffs' experts, and the adequacy of the care he provided. Dr. Salazar is expected to testify regarding continuous improvements made to the delivery of healthcare to ADCRR inmates.

16.   Josephine Sharr, Ph.D.

Dr. Sharr is the mental health lead at ASPC-Tucson.  She also treats patients at that complex. Dr. Sharr will testify regarding her knowledge of ADCRR and Centurion policies and procedures relating to delivery of mental health care and programming to ADCRR's inmate population, mental health treatment plan implementation and follow-up, mental health services and programming provided to the inmates at Tucson and other complexes where she has treated patients, the process for evaluation and designation of inmates as SMI, and policies and procedures for placement and removal of inmates on mental health and/or suicide watch. Dr. Sharr is also expected to testify regarding continuous improvements made to the delivery of mental health services and programming to ADCRR inmates. Dr. Sharr may testify regarding any treatment she provided to the named Plaintiffs, as well as to any other inmates who testify at trial or who are referenced by Plaintiffs' experts, and the adequacy of the care she provided.

17.   Katie Masters

Katie Masters is the mental health lead at ASPC-Phoenix, has served as the mental health lead at ASPC-Eyman, and has treated patients at both complexes. Ms. Masters will testify regarding her knowledge of ADCRR and Centurion policies and procedures relating to delivery of mental health care and programming to ADCRR's inmate population, mental health treatment plan implementation and follow-up, mental health services and programming provided to the inmates at Phoenix and Eyman, the process for evaluation and

designation of inmates as SMI, and policies and procedures for placement and removal of inmates on mental health and/or suicide watch. Ms. Masters is also expected to testify regarding continuous improvements made to the delivery of mental health services and programming to ADCRR inmates. Ms. Masters may testify regarding any treatment she provided to the named Plaintiffs, as well as to any other inmates who testify at trial or who are referenced by Plaintiffs' experts, and the adequacy of the care she provided.

18.    Stephanie Leonard, Psy.D.

Dr. Leonard is a clinical psychologist at ASPC-Perryville and works in the Women's Treatment Unit. She will testify regarding her knowledge of ADCRR and Centurion policies and procedures relating to delivery of mental health care and programming to ADCRR's inmate population, mental health treatment plan implementation and follow-up, mental health services and programming provided to the inmates at Perryville, the process for evaluation and designation of inmates as SMI, and policies and procedures for placement and removal of inmates on mental health and/or suicide watch. Dr. Leonard is also expected to testify regarding continuous improvements made to the delivery of mental health services and programming to ADCRR inmates. Dr. Leonard may testify regarding any treatment she provided to the named Plaintiffs, as well as to any other inmates who testify at trial or who are referenced by Plaintiffs' experts, and the adequacy of the care she provided.

19.    Bianca Mocha

Bianca Mocha is the mental health lead at ASPC-Florence and also treats patients at that complex. Ms. Mocha will testify regarding her knowledge of ADCRR and Centurion policies and procedures relating to delivery of mental health care and programming to ADCRR's inmate population, mental health treatment plan implementation and follow-up, mental health services and programming provided to the inmates at Florence, the process for evaluation and designation of inmates as SMI, and policies and procedures for placement and removal of inmates on mental health and/or suicide watch. Ms. Mocha is also expected to testify regarding continuous improvements made to the delivery of mental health services and programming to ADCRR inmates. Ms. Mocha may testify regarding any treatment she provided to the named Plaintiffs, as well as to any other inmates who testify at trial or who are referenced by Plaintiffs' experts, and the adequacy of the care she provided.

20.    Jackie Miller

Jackie Miller is a Release and Discharge Planner. Ms. Miller is responsible for ensuring that SMI inmates have release plans in place prior to their release dates and will testify regarding policies, procedures, and practices relating to

release planning. She is expected to testify regarding continuous improvements made to ensure continuity of care to ADCRR inmates.

21.   Deputy Warden A. Coleman

Deputy Warden Coleman is currently DW of ASPC-Lewis, Rast Unit. He is expected to testify regarding policies and procedures that govern conditions of confinement for maximum custody inmates housed at the Rast Unit to include weekly offered out-of-cell time, programming, and privileges provided pursuant to DO 812's Step Level (Step Level 1, 2, 3) program. He will also testify regarding management of close management, mental health watch, and detention status inmates which each require special considerations in how ADCRR addresses their conditions of confinement to include privileges and out-of-cell time.  As to maximum custody and these three additional housing statues, he will testify regarding housing, security, and operations; a physical description of the housing locations, including pod and cell set up, recreation enclosures, programming facilities, on-site medical facilities, and shower facilities; sanitation and maintenance protocols; programming, recreational, educational, religious, and work programs offered to maximum custody inmates and the procedures for offering the same; and all matters raised in the Court's certification of Subclass claims as it relates to conditions of confinement. These conditions of confinement may also include food service, recreational activities, social opportunities, educational programming, mental health programming, access to visitation, access to mail, access to telephone calls, access to commissary, access to property, and cell illumination.

DW Coleman will also testify regarding the unique challenges at play in managing maximum security inmates, and how ADCRR continues to offer ample out-of-cell time, socialization opportunities, and programming opportunities, against the backdrop of both staffing challenges and COVID-19 mitigation efforts. He will likely testify regarding the frequency with which inmates have contact with other inmates, correctional staff, programming staff, medical staff, and mental health staff. He may also testify regarding security protocols that govern maximum custody, close management, detention and mental health watch inmates to include health and welfare checks, counts, and safety equipment used by staff which are a direct result of and necessitated by past incidents violent acts committed by such inmates. As to use of chemical agent use of force on Subclass members who are taking psychotropic medications, he will also testify regarding ADCRR's policies, procedure, training and emphasis on the use of de-escalation techniques and cool down periods, barring emergency situations that require immediate response to include circumstances of inmate self-harm.

DW Coleman will also likely testify regarding the conditions of confinement allegations made by party-representative subclass Plaintiffs and any Subclass members identified or examined at trial by Plaintiffs that are housed at the Rast Unit, to include conditions of confinement for the specified inmates as well as their institutional history to include criminal, disciplinary, classification, behavioral, STG, programming, and grievance histories. He is also expected to testify regarding monitoring and compliance for offered out-of-cell time and programming afforded to maximum custody inmates.  This witness is expected to testify regarding any use of force incidents, videos, or documents listed by Defendants or Plaintiffs in their exhibit lists or referred to by Plaintiffs' experts. He will additionally testify regarding the results of any review of individual instances of chemical agent use of force on Subclass members taking psychotropic medications conducted by him and the conclusions drawn regarding the appropriateness of the use of force, as well as the basis for such conclusions.

22.   Deputy Warden L. Stickley

Deputy Warden Stickley is currently DW of ASPC-Eyman, SMU I Unit. She is expected to testify policies and procedures that govern conditions of confinement for maximum custody inmates housed at the SMU I Unit to include weekly offered out-of-cell time, programming, and privileges provided pursuant to DO 812's Step Level (Step Level 1, 2, 3) program. She will also testify regarding management of close management, mental health watch, and detention status inmates which each require special considerations in how ADCRR addresses their conditions of confinement to include privileges and out-of-cell time.  As to maximum custody and these three additional housing locations, she will testify regarding housing, security, and operations; a physical description of the housing locations, including pod and cell set up, recreation enclosures, programming facilities, on-site medical facilities, and shower facilities; sanitation and maintenance protocols; programming, recreational, educational, religious, and work programs offered to maximum custody inmates and the procedures for offering the same; and all matters raised in the Court's certification of Subclass claims as it relates to conditions of confinement. These conditions of confinement may also include food service, recreational activities, social opportunities, educational programming, mental health programming, access to visitation, access to mail, access to telephone calls, access to commissary, access to property, and cell illumination.

DW Stickley will also testify regarding the unique challenges at play in managing maximum security inmates, and how ADCRR continues to offer ample out-of-cell time, socialization opportunities, and programming opportunities, against the backdrop of both staffing challenges and COVID-

19 mitigation efforts. She will likely testify regarding the frequency with which inmates have contact with other inmates, correctional staff, programming staff, medical staff, and mental health staff.  She may also testify regarding security protocols that govern maximum custody, close management, detention and mental health watch inmates to include health and welfare checks, counts, and safety equipment used by staff which are a direct result of and necessitated by past incidents violent acts committed by such inmates. As to use of chemical agent use of force on Subclass members who are taking psychotropic medications, she will also testify regarding ADCRR's policies, procedure, training and emphasis on the use of de-escalation techniques and cool down periods, barring emergency situations that require immediate response to include circumstances of inmate self-harm.

DW Stickley will also likely testify regarding the conditions of confinement allegations made by party-representative subclass Plaintiffs and any Subclass members identified or examined at trial by Plaintiffs that are housed at the SMU I Unit, to include conditions of confinement for the specified inmates as well as their institutional history to include criminal, disciplinary, classification, behavioral, STG, programming, and grievance histories. She is also expected to testify regarding monitoring and compliance for offered out-of-cell time and programming afforded to maximum custody inmates.  This witness is expected to testify regarding any use of force incidents, videos, or documents listed by Defendants or Plaintiffs in their exhibit lists or referred to by Plaintiffs' experts. She will additionally will testify regarding the results of any review of individual instances of chemical agent use of force on Subclass members taking psychotropic medications conducted by her and the conclusions drawn regarding the appropriateness of the use of force, as well as the basis for such conclusions.

23.    Deputy Warden T. Scott

Deputy Warden Scott is currently DW of ASPC-Eyman, Browning Unit. He is expected to testify regarding policies and procedures that govern conditions of confinement for maximum custody inmates housed at the Browning Unit to include weekly offered out-of-cell time, programming, and privileges provided pursuant to DO 812's Step Level (Step Level 1, 2, 3) program. He will also testify regarding management of mental health watch status inmates which requires special considerations in how ADCRR addresses those conditions of confinement as related to privileges and out-of-cell time.  As to maximum custody and mental health watch status inmates, he will testify regarding housing, security, and operations; a physical description of the housing locations, including pod and cell set up, recreation enclosures, programming facilities, on-site medical facilities, and shower facilities; sanitation and maintenance protocols; programming, recreational,

educational, religious, and work programs offered to maximum custody inmates and the procedures for offering the same; and all matters raised in the Court's certification of Subclass claims as it relates to conditions of confinement. These conditions of confinement may also include food service, recreational activities, social opportunities, educational programming, mental health programming, access to visitation, access to mail, access to telephone calls, access to commissary, access to property, and cell illumination.

DW Scott will also testify regarding the unique challenges at play in managing maximum security inmates, and how ADCRR continues to offer ample out-of-cell time, socialization opportunities, and programming opportunities, against the backdrop of both staffing challenges and COVID-19 mitigation efforts. He will likely testify regarding the frequency with which inmates have contact with other inmates, correctional staff, programming staff, medical staff, and mental health staff. He may also testify regarding security protocols that govern maximum custody and mental health watch inmates to include health and welfare checks, counts, and safety equipment used by staff which are a direct result of and necessitated by past incidents violent acts committed by such inmates. As to use of chemical agent use of force on Subclass members who are taking psychotropic medications, he will also testify regarding ADCRR's policies, procedure, training and emphasis on the use of de-escalation techniques and cool down periods, barring emergency situations that require immediate response to include circumstances of inmate self-harm.

DW Scott will also likely testify regarding the conditions of confinement allegations made by party-representative subclass Plaintiffs and any Subclass members identified or examined at trial by Plaintiffs that are housed at the Browning Unit, to include conditions of confinement for the specified inmates as well as their institutional history to include criminal, disciplinary, classification, behavioral, STG, programming, and grievance histories. He is also expected to testify regarding monitoring and compliance for offered out-of-cell time and programming afforded to maximum custody inmates.  This witness is expected to testify regarding any use of force incidents, videos, or documents listed by Defendants or Plaintiffs in their exhibit lists or referred to by Plaintiffs' experts. He will additionally testify regarding the results of any review of individual instances of chemical agent use of force on Subclass members taking psychotropic medications conducted by him and the conclusions drawn regarding the appropriateness of the use of force, as well as the basis for such conclusions.

24.   Any witnesses necessary to lay foundation for documents or other evidence presented at trial.

25.     Any other witnesses necessary for rebuttal and/or impeachment.

**L.     EXPERTS**

**PLAINTIFFS' STATEMENT**

Plaintiffs will call the following expert witnesses to testify at trial:

1.     Pablo Stewart, M.D.

Dr. Stewart will testify regarding his expert analysis and opinion on whether the system of providing mental health care, and the conditions of confinement, for people with mental illness in the custody of ADCRR meets constitutional minima. His expert opinion is based upon a review of current ADCRR and Centurion policies, procedures, and practices; a review of various documents (including monitoring reports, tracking logs, meeting minutes, and communications produced by Defendants) and class members' medical charts; and on-site inspections and class member interviews that he personally conducted in September 2021 at four ASPCs. Dr. Stewart visited housing units where people classified as seriously mentally ill ("SMI") are incarcerated, any units designated for people with mental health needs (regardless of classification), mental health watch units, segregated isolation units including maximum custody and detention units. Dr. Stewart also reviewed the medical records and drafted summaries regarding the care of persons discussed in his 2013 Expert Report who remain in the custody of ADCRR, to determine the course of their mental health care over the intervening eight years. Dr. Stewart also reviewed medical reports pertaining to 15 of the 23 people in ADCRR custody who died by suicide from January 1, 2019 to September 2019.

2.     Martin F. Horn

Mr. Horn will testify regarding his expert analysis and opinion on whether ADCRR is overusing isolation and the conditions in ADCRR isolation units. His expert opinion is based upon his years as a corrections professional, his analyses of a variety of correctional systems, his review of ADCRR policies, and documents and videos produced by ADCRR in this matter, on-site inspections of ASPC-Lewis Rast, ASPC-Lewis Stiner Detention Unit, ASPC-Eyman Browning, ASPC-Eyman Rynning Detention and Close Management Units, and ASPC-Eyman SMU I, subclass member declarations, and interviews with subclass members. He will testify regarding current isolation practices and standards in corrections

3.   Craig Haney, Ph.D., J.D.

Dr. Haney will testify regarding his expert analysis and opinion on three inter-related topics: (a) a summary of what is known about the negative psychological consequences of confinement in isolation units or "supermax" prisons; (b) an explanation of whether and how those negative consequences can be exacerbated for incarcerated persons with mental health disorders; and (c) based upon his institutional inspections and case-specific discovery he was provided and reviewed, the extent to which persons incarcerated by ADCRR are subjected to solitary-type confinement that places them at a serious risk of substantial psychological harm. Dr. Haney will testify regarding his observations and interviews during visits in September 2021 where members of the subclass currently are incarcerated, including ASPC-Eyman Browning and SMU-I Units; and ASPC-Lewis Rast, Morey, Stiner, Sunrise (Minors), and Barchey Unit; and detention and mental health units within these facilities. Dr. Haney will testify regarding his interviews with subclass members, including interviews with all incarcerated persons previously discussed in his past expert reports, to assess their opinions about whether and how the ADCRR conditions, policies, and practices had changed since the settlement of this case in 2014.

4.   Robert Joy

Mr. Joy will testify regarding his development of a staffing model for the delivery of healthcare at ADCRR complexes, including his analysis regarding adequate staffing, hiring, and allocation numbers required to provide primary health care services to ADCRR residents.

5.   Todd Randall Wilcox, M.D., M.B.A, C.C.H.P.-A.

Dr. Wilcox will testify regarding the quality and accessibility of healthcare for people incarcerated in the ADCRR complexes. The bases for his testimony will include his site visits, patient interviews, review of patient medical records, and mortality reviews.

**DEFENDANTS' STATEMENT**

Defendants will call the following expert witnesses to testify at trial:

1.   Owen Murry, D.O., MBA

Dr. Murray will testify regarding his expert analysis and opinion that the medical care provided to ADCRR inmates meets or exceeds the community standard of care. Dr. Murray bases his opinions on his tours of all 10 ADCRR complexes in September and October 2021, interviews with ADCRR and Centurion staff, and his review of ADCRR policies and procedures, medical

records of a random sample of inmates with two or more chronic care diagnoses, data regarding system-wide delivery of medical care, and clinical outcome and other metrics. Dr. Murray is also expected to testify regarding his opinion that current contracted health care staffing levels are sufficient to meet demand for services. Dr. Murray may also testify regarding the medical treatment provided to ADCRR Inmate Jason Robinson.

2.    Joseph Penn, M.D., CCHP, FAPA

Dr. Penn will testify regarding his expert analysis and opinion that the mental health care provided to ADCRR inmates meets or exceeds the community/correctional standards of care. This is based upon his over 8 years of experience serving as an expert in this case. Most recently, Dr. Penn bases his opinions on his September 2021 tours of ADCRR's corridor facilities, interviews with ADCRR and Centurion staff, review of ADCRR policies & procedures, review of a random sample of inmates on the mental health case load, data regarding system-wide delivery of mental health care, national correctional standards and data and ADCRR's comparison to same, ADCRR's compliance with NCCHC standards and NCCHC accreditation, review of mortality reviews & psychological autopsies, and Centurion staffing patterns and variances.  Dr. Penn is also expected to testify regarding his opinion that current contracted health care staffing levels are sufficient to meet demand for services.

3.    Grant C. Phillips, M.D.

Dr. Phillips is the Medical Director for ADCRR. Dr. Phillips will testify that it is not the standard of care to provide ongoing medication assisted treatment (MAT) for substance use disorder (SUD) in a prison population. Dr. Phillips will also testify regarding improvements made to ADCRR/Centurion's treatment of inmates with chronic hepatitis C.

4.    Johnny Wu, M.D., FACP, FACCP, CCHP-P, CCHP-A

Dr. Wu is the Executive Vice President and Chief Clinic Officer for Centurion and oversees the corporate clinic operations and utilization of telehealth across Centurion's contracts. Dr. Wu will testify regarding Centurion's accredited telehealth program and improvements made to access to/delivery of care, including a pilot program for unchaperoned telehealth visits. Dr. Wu will testify regarding Centurion's staffing levels and practices, credentialing, supervision, and use of interdisciplinary team collaboration in case management. Dr. Wu will also testify regarding NCCHC standards on staffing and appropriate interpretation of the Pew Charitable Trust Foundation data on corrections spending. Dr. Wu may also testify regarding the community standard for treatment of substance use disorders.

5.       John S. Wilson, Ph.D., CCHP-MH, CPHQ

Dr. Wilson is the Vice President for Behavioral Health Services at Centurion and provides clinical consultation, guidance, and leadership across Centurion's correctional healthcare programs in 13 state corrections systems and 4 county detention systems across the U.S. Dr. Wilson is expected to testify regarding Centurion's development of peer-reviewed, evidence-based resources for clinicians, including behavioral health group curricula, in-cell self-study programming for inmates, and patient education handouts covering common behavioral health issues. Dr. Wilson will testify regarding enhanced training Centurion has provided for behavioral health staff regarding use of restraints and behavior change strategies for self-injury, as well as efforts to address the challenges of patient self-injury. Dr. Wilson will testify regarding positive trends in data regarding suicide spectrum behaviors in ADCRR, including reduction of clinical restraint use and emergency room send outs. Dr. Wilson will testify regarding Centurion's model of care that utilizes multidisciplinary collaboration, staffing and licensure requirements for group programming, and mental health diagnoses.

6.       Kendrick Gray, D.D.S.

Dr. Gray is the Regional Dental Director for Centurion in Arizona and will testify regarding his opinion that the dental care provided to ADCRR inmates is timely and meets the standard of care. Dr. Gray bases his opinions on his experience as a correctional dentist, including nine years of employment at ADCRR under all three contracted vendors, his own treatment of ADCRR inmates and supervision/review of the treatment provided by others, his review of the dental records of the inmates listed on Plaintiffs' witness disclosures, and his knowledge of the policies, procedures, and practices in effect at ADCRR pertaining to the dental treatment of ADCRR inmates. Dr. Gray will also testify that extractions are not the primary dental service provided to ADCRR inmates and are only performed when clinically indicated based on the condition of the tooth. Dr. Gray will also testify that dental staffing levels under the current contract are sufficient.

7.       Deputy Director Frank Strada

ADCRR Deputy Director Strada will testify, based upon his 33 years in corrections, including leadership positions with the Federal Bureau of Prisons, a national private correctional services provider, and ADCRR, that the Department's policies and procedures related to conditions of confinement for Subclass members classified as maximum custody or assigned to close management, detention, or mental health watch housing locations meet corrections industry standards and do not constitute cruel and unusual punishment. Conditions of confinement subjects and associated

-44-

ADCRR policies/procedures at issue include chemical agent use of force on inmates taking psychotropic medications; cell conditions; offered out-of-cell, recreation and programming opportunities; social and human interaction opportunities; property allowances; and food services; as well as security operations necessitated by the challenging inmate populations that make up the Subclass. Deputy Director Strada will also generally testify regarding ADCRR policies and procedures that govern placement in maximum custody, or assignment to detention or mental health watch, and will opine that these policies and procedures comport with corrections industry standards. He will also testify regarding changes to policies and procedures governing the inmate disciplinary process, STG management and maximum custody step level progression. His testimony and opinions are based upon over three decades of correctional experience and knowledge of ADCRR policies, practices and prison operations that are overseen by him as a Deputy Director. Deputy Director Strada is also expected to testify that uses of force referred to and highlighted by Plaintiffs' experts do not, under the circumstances presented, constitute excessive force. He will also testify to and explain the reduction in the maximum custody and detention population since 2012 and since he became Deputy Director in 2020, and the operational initiatives that do and will affect the same. Deputy Director Strada will testify regarding subject matter addressed in his Rule 26(a)(2)(C) disclosure and deposition testimony.

**M.    EXHIBITS**

**PLAINTIFFS' STATEMENT**

A chart of Plaintiffs' trial exhibits, including a description of each of those exhibits and Defendants' objections to those exhibits is attached here as **Exhibit 1**. Plaintiffs anticipate marking additional trial exhibits of eOMIS pages that are shown to witnesses and printed at trial.

Plaintiffs received Defendants' list of trial exhibits after business hours the evening of Oct. 28—the night before this joint statement was due. Because of the tight deadline and the number of exhibits, Plaintiffs did not have time to provide an exhibit-by-exhibit objection list. Plaintiffs and Defendants are working together, however, to agree on a procedure for exchanging objections "expediently." [*See* Doc. 4112 at 2].

Plaintiffs reserve all objections to Defendants' exhibit list. In particular, Defendants' exhibits may be objectionable depending on how they are presented, especially if evidence

is irrelevant for a particular purpose or issue or if the use of evidence becomes unduly cumulative or prejudicial under Fed. R. Evid. 403. Plaintiffs also object to at least the following categories of exhibits, subject to the ongoing discussions with Defendants regarding an efficient and expedient procedure for exhibit objections:

- Accreditation Reports, Exhibits 3303–25 – Hearsay, Fed. R. Evid 802;
- Expert reports, declarations, disclosure statements, and associated materials, Exhibits 4990–98 – Hearsay, Fed. R. Evid 802;
- Any records that appear to be altered, incomplete, or falsified - Relevance, Fed. R. Evid. 401; Authenticity, Fed. R. Evid. 901;
- Records to show class members' disciplinary infractions or the details of criminal convictions, except if relevant under Fed. R. Evid. 401 – Relevance, Fed. R. Evid. 401; Criminal Conviction, Fed. R. Evid. 609.

Beyond that, Defendants provided their objections to Plaintiffs' trial exhibits at 8 p.m. on the date that this joint statement is due to be filed. Plaintiffs therefore lack a meaningful opportunity to respond to each of those objections but do reserve their right to respond if necessary at trial because many or all of the objections are baseless.

To summarize, Defendants object to a host of exhibits as being irrelevant. As Plaintiffs will show at trial, these exhibits are certainly relevant to the health care and isolation claims in this class action suit. Defendants also object to numerous exhibits as violating the hearsay rules. But most or all of those exhibits are admissible as admissions or as falling under the business record or statement made for medical diagnosis or treatment exceptions to the hearsay rule. And even were they not admissible as admissions or as falling under exceptions to the hearsay rule, they would be admissible not for the truth of the matter asserted but because they show that Defendants had notice and thus acted with deliberate indifference. Finally, Defendants object to several exhibits as violating Rule 106. Defendants fail to explain, though, which other documents they think ought to be considered with the objected to exhibits or how Defendants are somehow unable to introduce those documents during cross-examination or in their case-in-chief.

**DEFENDANTS' STATEMENT**

A chart of Defendants' trial exhibits, including a description of each exhibit and Plaintiffs' objections, if any, is attached as **Exhibit 2**.

Plaintiffs provided their more than 2,300 trial exhibits to Defendants at approximately 3:00 p.m. on October 28, 2021, about an hour before Plaintiffs received Defendants' trial exhibits (which included only 760 documents and videos and 621 designated slots for eOMIS records).  Defendants spent the subsequent 24 hours combing through their exhibits and preserving objections and provided those objections as soon as they were done.  In addition to the objections to specific trial exhibits of Plaintiffs provided in Exhibit 1, Defendants also reserve the right to object to foundation as to an exhibit if Plaintiffs do not proffer its admission through an appropriate witness. In making this reservation, Defendants do not intend to object to the authenticity of ADCRR documents which were produced by Defendants, or to the authenticity of medical records contained within eOMIS. However, the foundation objection also applies to any relevant use of force videos/documents Plaintiffs intend to introduce at trial where Plaintiffs must call witnesses with personal knowledge of the incident or the subsequent incident review to testify regarding the circumstances requiring the use of force and/or basis for review and conclusion as to whether the use of force was appropriate in order for the exhibits to be admissible at trial. Additionally, Plaintiffs' designation of videos does not identify the inmate at issue and thus does not provide Defendants with easily accessible information to determine whether the inmate was on psychotropic medications at the time of the use of force such that the use of force falls within the certified class claims.

Due to the vast number of exhibits included in Plaintiffs' trial exhibit list (more than 2300 items, totaling more than 165,000 pages, 82 excel spreadsheets, and 147 videos), Plaintiffs' assertion that they may continue to add additional exhibits, and the fact that Defendants have less than 24 hours to review and make objections to all of Plaintiffs' exhibits, Defendants also wish to preserve an objection to any exhibits that were not properly disclosed.

1    Finally, Defendants believe that many of Plaintiffs exhibits that predate July 2019,
2    when Centurion took over the provision of health care, are not relevant to the issue of
3    whether the health care delivery system is constitutionally deficient. Likewise, Defendants
4    believe that the relevant time period for exhibits pertaining to conditions of confinement
5    should be 2019 to present, as the relevant inquiry is whether there exists a constitutional
6    violation with respect to current conditions of confinement that could be resolved through
7    prospective injunctive relief.

8    ## N.    MOTIONS IN LIMINE & REQUESTED EVIDENTIARY RULINGS
9    ### PLAINTIFFS' STATEMENT

10   Plaintiffs filed a Motion to Exclude Certain Testimony on October 27, 2021 in which
11   Plaintiffs seek an order from this Court excluding the following categories of improper
12   testimony by Defendants' witnesses: (1) testimony from health care providers relating to
13   the medical/mental health treatment of class members that the purported witness did not
14   personally provide, (2) testimony regarding purportedly planned future changes to
15   ADCRR's or Centurion's policies or *modus operandi*, and (3) any other expert opinion
16   testimony that was not properly disclosed under Federal Rule of Civil Procedure 26. On
17   October 29, this Court granted the Motion to Exclude Certain Testimony in part, holding
18   that Ashley Pelton, Antonio Carr, Wendy Orm, J. Mahn, and Grant Phillips are prohibited
19   from "offer[ing] non-disclosed expert testimony." [Doc. 4107 at 2].

20   Plaintiffs also anticipate filing a motion to exclude any testimony regarding
21   information that was within the scope of the Federal Rule of Civil Procedure 30(b)(6)
22   deposition notice on isolation but was not known to the designated deponent, and to exclude
23   the testimony of Deputy Director Frank Strada because of his improper designation as an
24   expert under Federal Rule of Civil Procedure 26(a)(2)(c).

25   ### DEFENDANTS' STATEMENT

26   Defendants seek an evidentiary ruling on the following issues and will follow the
27   Court's guidance with respect to the preferred means and timing (e.g., oral argument at trial,
28   briefing, etc.) of raising them:

(1) Whether Defendants are entitled to judgment as a matter of law on Plaintiffs' dental claims where (a) Plaintiffs do not have a dental expert, (b) none of the inmates on Plaintiffs' fact witness disclosures have disclosed any potential testimony regarding their dental treatment, (c) Plaintiffs did not provide any affirmative responses to Defendants' discovery requests regarding the substance of their anticipated witness testimony as it relates to dental care, and (d) Plaintiffs' trial brief (Dkt. 4105) does not even mention dental care.

(2) Whether Plaintiffs may present evidence regarding substance use disorder (SUD) treatment and related staffing at trial when no issues regarding SUD treatment were pled in the Complaint, no claims regarding SUD treatment were certified, none of the inmate witnesses listed on Plaintiffs' disclosures have been disclosed to testify regarding SUD conditions or treatment, and SUD treatment has never been raised by Plaintiffs as an issue in this case until the submission of their expert reports three weeks before trial.

(3) Whether Plaintiffs may present evidence of uses of force on inmates in maximum custody beyond the use of chemical agents on inmates who are taking psychotropic medications when the Court's class certification order (Dkt. 372) certified only "[u]se of chemical agents against inmates on psychotropic medications." (Dkt. 372 at 18.)

(4) Whether Plaintiffs may present evidence regarding issues with language interpretation when such issues were not pled in the Complaint, raised during briefing on class certification, or certified as a claim in the Court's class certification order.

(5) Whether Plaintiffs may present evidence of the alleged conditions outlined in Horn's report that are not included in the Complaint and were not certified by the Court.

(6) Whether Robert Joy is qualified to render opinions as an expert on state correctional staffing when he has not relied upon information or materials

customarily relied upon by experts in the field and utilized a methodology that should render his opinions excluded pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

(7) Whether Plaintiffs may call Ronald Hochrine as a fact witness at trial when his existence and potential testimony were known to Plaintiffs prior to the fact witness disclosure deadline because Plaintiffs' expert Dr. Wilcox met with him during a tour, but he was not disclosed until a month after the deadline.

(8) Whether Plaintiffs may call Patricia Borden, a former Centurion employee, who was not timely disclosed prior to the fact witness disclosure deadline and was not added to Plaintiffs' disclosures until the final day of the fact discovery period.

## O.    PROBABLE LENGTH OF TRIAL

Under this Court's order, the length of trial will be three weeks, beginning "on November 1, 2021, and end[ing] on November 19, 2021." [Doc. 3931 at 1]. The trial may also continue to November 22. [Doc. 4112 at 3].

## P.    TRIAL DATE

Under this Court's order, the length of trial will be three weeks, beginning "on November 1, 2021, and end[ing] on November 19, 2021." [Doc. 3931 at 1]. The trial may also continue to November 22. [Doc. 4112 at 3].

## Q.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
##        PLAINTIFFS' STATEMENT

The following proposed findings of fact and conclusions of law are preliminary. Plaintiffs request post-trial briefing to further address their proposed findings of fact and conclusions of law in this suit.

1.    Defendants are deliberately indifferent in their provision of health care in violation of the Eighth Amendment.

2.    The conditions of confinement in ADCRR's isolation units deprive Plaintiffs of basic human needs in violation of the Eighth Amendment.

3.      Defendants have persisted for years in their deliberate indifference to the substantial risks of serious harm that Plaintiffs experience because of Defendants' unconstitutional provision of health care and conditions of confinement in ADCRR's isolation units in violation of the Eighth Amendment.

4.      To remedy Defendants' constitutional violations, it is appropriate to order prospective relief that includes, among other things, an injunction to order Defendants to promptly hire sufficient, qualified staff to provide constitutionally adequate health care; robust, qualitative monitoring of delivery of health care services; and the appointment of a receiver to manage ADCRR's delivery of health care services.

**DEFENDANTS' STATEMENT**

Defendants request post-trial briefing to address their proposed findings of fact and conclusions of law based on the evidence presented by the parties at trial. Preliminarily, Defendants state the following.

1.      Defendants are not deliberately indifferent in their provision of medical, mental health, and dental care to ADCRR inmates.

2.      The conditions of confinement in units falling within the definition of "isolation" as set forth in the Court's class certification order (Dkt. 372 at 22) do not deprive Plaintiffs of basic human needs in violation of the Eighth Amendment.

3.      Defendants are not deliberately indifferent to a substantial risk of serious harm to ADCRR inmates based on Defendants' provision of health care and conditions of confinement in units falling within the definition of "isolation."

4.      Plaintiffs are not entitled to the injunctive relief sought because they cannot establish Defendants are in violation of their Eighth Amendment rights.

1  **R.   MISCELLANEOUS**

2  **PLAINTIFFS' STATEMENT**

3  To the extent that Defendants designate deposition testimony from any named

4  Plaintiffs, Plaintiffs reserve the right to call those named Plaintiffs live at trial as rebuttal

5  witnesses.

6  **DEFENDANTS' STATEMENT**

7  Defendants reserve the right to designate deposition testimony from the named

8  Plaintiffs in their entirety as to any of the named Plaintiffs who are not called live or through

9  video conferencing at trial.

10  Defendants reserve the right to object to any testimony from Plaintiffs' experts that

11  exceeds the four corners of their expert reports. Defendants also reserve the right to object

12  to the admission of exhibits attached to the declarations of Plaintiffs' experts.

13  **S.   MODIFICATION OF ORDER**

14  The Court may, in order to prevent manifest injustice or for good cause shown, at

15  the trial of the action or prior thereto upon application of counsel for either party, made in

16  good faith, or upon the motion of the Court, modify the Final Pretrial Order upon such

17  conditions as the Court may deem just and proper.

18

19  **APPROVED AS TO FORM AND CONTENT:**

20

21   s/ John H. Gray                                      s/ Nick Acedo
    Attorney for Plaintiffs                          Attorney for Defendants

22

23

24

25

26

27

28

1      Based on the foregoing,

2      **IT IS ORDERED** that this Proposed Final Pretrial Order jointly submitted by the

3  parties is hereby **APPROVED** and **ADOPTED** as the official Pretrial Order of this Court.

4

5      DATED this ___ day of _____, 2021.

# EXHIBIT 1

# FILED UNDER SEAL

# EXHIBIT 2

# FILED UNDER SEAL