Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                        Plaintiffs,<br><br>         v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                        Defendants. | NO. 2:12-cv-00601-ROS<br><br>**DEFENDANTS' TRIAL BRIEF** |

Plaintiffs have the burden to prove by a preponderance of the evidence that the practices they allege exist (1) actually exist (2) at all 10 state-operated facilities and (3) expose every single ADCRR inmate to a substantial risk of serious harm. They will not be able to satisfy their burden. Despite having years of unfettered access to inmate healthcare records, inmate interviews, and facility tours, Plaintiffs critique a small percentage of inmate care. For example, their medical expert substantively discusses medical care of approximately 60 inmates, their mental health expert substantively discusses the mental health care of approximately 34 inmates, and neither discuss care provided to inmates at four ADCRR facilities. No system—public or private—is perfect, and every system inevitably has its imperfections. But Plaintiffs fall woefully short in establishing that each of the alleged practices exist systemwide, that each one exposes every ADCRR inmate to a substantial risk of serious harm, and that Defendants have been deliberately indifferent to that risk. To the contrary, ADCRR provides constitutionally adequate healthcare, and the conditions of confinement therein do not violate the Eighth Amendment.

## I. The Class Claims Govern the Scope of the Forthcoming Trial.

Plaintiffs brought this class action on behalf of themselves and all others similarly situated. The Court certified two classes and 17 class claims:

> (a) Class—All prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC. The Class is certified as to the following alleged practices:
>
> i. Failure to provide timely access to health care;
>
> ii. Failure to provide timely emergency treatment;
>
> iii. Failure to provide necessary medication and medical devices;
>
> iv. Insufficient health care staffing;
>
> v. Failure to provide care for chronic diseases and protection from infectious disease;
>
> vi. Failure to provide timely access to medically necessary specialty care;

| | |
|---|---|
| vii. | Failure to provide timely access to basic dental treatment; |
| viii. | Practice of extracting teeth that could be saved by less intrusive means; |
| ix. | Failure to provide mentally ill prisoners medically necessary mental health treatment (i.e. psychotropic medication, therapy, and inpatient treatment); and |
| x. | Failure to provide suicidal and self-harming prisoners basic mental health care. |

(b) Subclass—All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area. The Subclass is certified as to the following alleged practices:

| | |
|---|---|
| i. | Inadequate psychiatric monitoring because of chronic understaffing; |
| ii. | Use of chemical agents against inmates on psychotropic medications; |
| iii. | Lack of recreation; |
| iv. | Extreme social isolation; |
| v. | Constant cell illumination; |
| vi. | Limited property; and |
| vii. | Insufficient nutrition. |

(Dkt. 372 at 22–23.) In certifying those claims, the Court carefully analyzed Plaintiffs' class evidence and applied that evidence to Rule 23's rigorous requirements. (*Id*. at 5–18.) And in affirming that order, the Ninth Circuit held that these 17 specified alleged practices were the "glue" that held the respective classes together and permitted class certification. *See Parsons v. Ryan*, 754 F.3d 657, 678–79 (9th Cir. 2014). The common contentions to be resolved at trial are whether any of these practices currently exist on a systemic level and, if so, whether they "are deliberately indifferent to inmates' health and safety in violation of the Eighth Amendment and subjection to unconstitutional conditions of confinement." *Id*. at 673 (quoting Dkt. 372 at 11).

**II. Plaintiffs Do Not Appear to Be Pursuing Some of The Class Claims and Seek to Raise Claims That Were Not Certified.**

Now that discovery has closed, it has become apparent that Plaintiffs do not intend to pursue several of the certified class claims. For example, they did not disclose a dental expert and none of their disclosed experts opine as to the provision of dental care; their medical expert, Dr. Todd Wilcox, does not opine as to an alleged failure to protect from infectious diseases; and their conditions-of-confinement expert, Martin Horn, does not provide an opinion regarding cell illumination. To streamline the trial, Plaintiffs should voluntarily dismiss those class claims that they are no longer pursuing.

It has also become apparent that Plaintiffs are attempting to expand the scope of this trial to include allegations/claims that were never raised in the Complaint or certified by the Court. For example, two of Plaintiffs' experts, Dr. Wilcox and Dr. Pablo Stewart, opine on the adequacy of ADCRR's language interpretive services. Dr. Wilcox also opines on ADCRR's substance use treatment (raised for the first time three weeks before trial), inmate access to their own health care records, and alleged failings in the mortality review process. And Horn opines that: showers are not clean in some units; inmates are not receiving programming or unstructured out-of-cell time required by the Stipulation; some water fountains and toilets are inoperable; there are no mister systems; the use of double celling falls below the standard of care; padlocks on cell doors are dangerous; there is inadequate ventilation in some cells; inmates are irregularly provided cleaning supplies and toiletries; staff are not responsive to grievances; inmates in detention do not have tablet computers; staff should not wear security equipment (because it demonizes inmates); there is inadequate security staffing and inadequate supervision of inmates; there is perfunctory security checks; ADCRR improperly classifies inmates and prolongs their detention; and staff excessively use force involving non-chemical agents. Plaintiffs' Complaint, however, is devoid of such claims.

The Court ordered that the trial will proceed "on Plaintiffs' claims in the original complaint." (Dkt. 3921 at 2.) Plaintiffs cannot expand those claims now.

**III. Plaintiffs Will Not Meet Their Evidentiary Burden at Trial.**

**A. Plaintiffs Must Establish Systemwide Deficiencies.**

Plaintiffs styled this class-action lawsuit as a systemic challenge to the healthcare and conditions at ADCRR's state-operated facilities. *See Parsons*, 754 F.3d at 664 ("The 74–page complaint in this case contains detailed factual allegations concerning the existence of uniform, statewide policies and practices in *all* ADC facilities.") (emphasis added); *id*. at 676, 681 (Plaintiffs' claims are grounded in allegations "that ADC policies and practices of statewide and systemic application expose all inmates in ADC custody to a substantial risk of serious harm. … It involves uniform statewide practices."). As such, it is not enough to establish a unit-wide or even a facility-wide deficiency. Plaintiffs must prove that the alleged practices and constitutional infirmities exist systemwide—i.e., at *all 10* facilities. *See id*. at 684 n.28 (noting Plaintiffs' burden of proving existence of alleged practices "across all ADC facilities"). Deficiencies at one, some, or even most facilities do not satisfy their burden of proof.

The Ninth Circuit recently made this clear. In *Fraihat v. U.S. Immigration & Customs Enforcement*, No. 20-55634, 2021 WL 4890884, *3 (9th Cir. Oct. 20, 2021), detainees challenged the federal government's "systemwide" response to COVID-19 in its immigration detention centers. "In contrast to the comparatively focused, facility-specific relief" sought in cases that challenged the conditions at particular facilities, the detainees' systemwide claim "necessarily attacked ICE's detention policies at every one of its more than 250 facilities across the country" and, thus, "demanded proof that would meet it." *Id*. at *27–28. Proof of deficiencies at only three facilities was "insufficient to support a finding as to ICE's allegedly deliberately indifferent 'system-wide response.'" *Id*. at *28; *see also id*. at *27 ("Plaintiffs have not demonstrated that the conditions at their individual facilities support a showing that ICE has acted with deliberate indifference or reckless disregard as to the approximately 250 immigration detention facilities nationwide."). The same is true here. Plaintiffs must—but will not be able to—establish that the alleged practices exist at *all* 10 facilities and expose *every* ADCRR inmate to a substantial risk of harm.

## B. Plaintiffs Cannot Establish Systemic Constitutional Violations.

The Court certified the class claims in 2013 in large part because ADC's September 21, 2012 Cure Notification to the healthcare vendor at the time (Wexford) conceded that the deficiencies "existed at all ten ADC complexes." (Dkt. 372 at 14; *see also* Dkt. 395.) That evidence "tip[ped] the balance in favor of concluding that the problems identified in the provision of health care are not merely isolated instances but, rather, examples of systemic deficiencies that expose all inmates to a substantial risk of serious harm." (*Id.*) The Ninth Circuit held that the evidence submitted at the class certification stage— "unrebutted expert reports, the detailed allegations in the 74-page complaint, hundreds of internal ADC documents, and declarations by the named plaintiffs"—supported the class claims. *Parsons*, 754 F.3d at 683. Now, in 2021, we are in a different posture. Any evidence submitted at the class certification stage—in 2013—is stale;[1] Plaintiffs cannot rely on their Complaint allegations; and Plaintiffs' expert reports *are* rebutted.

Furthermore, since the Court began monitoring the Stipulation in 2015, Plaintiffs have not proven—and the Court has not found—a constitutional violation, much less a systemic one. Nor did the Court have any reason to adjudicate the existence of constitutional violations. The Court simply monitored compliance with agreed-upon Performance Measures ("PMs")—more than 1,000 PMs. Defendants did not put-up perfect scores every month, and several PMs were chronically noncompliant. But the relatively small subset of noncompliant PMs at certain facilities is not evidence of systemic constitutional violations.[2] Neither the Stipulation nor the accompanying PMs established a constitutional minimum. Even Plaintiffs' experts and the appointed Rule 702 expert agreed that the PMs largely focused on counting the number of events occurring or the time

---

[1] To secure the prospective relief requested in their Complaint, Plaintiffs must establish a *current* constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994); *Green v. Mansour*, 474 U.S. 64, 73 (1985); *see generally* 18 U.S.C. § 3626.

[2] The Court terminated 140 healthcare PMs. (Dkt. 2900.) Of the remaining 890 PMs, the Court issued three Orders to Show Cause, identifying 146 chronically noncompliant PMs at some facilities. (Dkt. 2373, 3235, 3490.)

elapsing between events. If anything, the PMs set benchmarks that *exceed* the constitutional standard of care. Moreover, Defendants were consistently compliant with most of the PMs (90+%), a trend that steadily increased over time. (Dkt. 3649-1, ¶ 11.) If the Stipulation is indicative of anything, it is that there are *not* systemic deficiencies.

To succeed at trial, Plaintiffs have a steep hill to climb. Generally, to prove a denial of constitutionally adequate healthcare, an inmate must show "deliberate indifference" to "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Because Plaintiffs seek only prospective relief, Plaintiffs must establish that Defendants have policies or practices that expose all inmates to a substantial risk of serious harm and that Defendants are deliberately indifferent to that risk. *Parsons*, 754 F.3d at 676–78. "A prison official acts with deliberate indifference only if the prison official knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citation omitted). A "mere 'difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference." *Id*. at 1058 (citation omitted). Moreover, negligence or medical malpractice do not violate the Eighth Amendment. *Estelle*, 429 U.S. at 106. Plaintiffs will not be able to prove at trial that any of the alleged practices exist, much less on a systemic level, or that Defendants are deliberately indifferent to a substantial risk of harm.

## Medical Care

Plaintiffs cannot prove systemic constitutional violations in the provision of medical care to all ADCRR inmates. Plaintiffs' medical expert, Dr. Wilcox, relies on anecdotal allegations regarding the medical treatment provided to inmates in two categories: (1) inmates who died while in ADCRR custody; and (2) inmates who were handpicked by Plaintiffs' counsel for his review. Dr. Wilcox expressly avows that he chose not to review a random sample of inmate records. (Report at 10.) Consequently, his conclusions regarding the individual medical files that he reviewed cannot be generalized to the care provided to all ADCRR inmates.

Even the inmates highlighted by Dr. Wilcox as allegedly receiving inadequate care are unavailing. For example, Dr. Wilcox claims that an inmate's penis had to be amputated because he did not receive accommodations for his disability (*id*. at 103), but his medical records tell a very different story—that of an inmate who has refused care and medical advice from onsite nurses and providers, offsite specialists, and hospital providers literally hundreds of times. Dr. Wilcox also claims that during a September 2021 tour of ASPC-Florence, he discovered that the inmate had a UTI based on the appearance of the urine in his collection bag, and he directed nursing staff to provide treatment. (*Id*. at 100–01.) However, the standard of care for a patient with a chronic indwelling subrapubic catheter is not to perform a urinalysis or administer antibiotics in the absence of objective symptoms of infection, which the inmate did not have. Dr. Wilcox also focuses on six PMs in the Stipulation that did not exceed the 85% compliance threshold at some facilities. (*Id*. at 109, 113, 135, 156, 162, 211.) However, these isolated instances of noncompliance cannot support a finding of a systemic failure in the delivery of healthcare to all ADCRR inmates. In July 2021, the last month of monitoring pursuant to the Stipulation, 89% of the 732 actively monitored PMs were compliant.

In contrast to Dr. Wilcox, Defendants' medical expert, Dr. Owen Murray, reviewed the records of a random sample of 80 inmates with two or more chronic conditions from 8 of the 10 ADCRR facilities.[3] (Report at 28.) For each of the inmates reviewed, Dr. Murray and his team assessed the quality of chronic and episodic care provided, as well as the quality of the chronic care documented in the chart, on a scale of 1 to 5, with 1 being poor and 5 being excellent. (*Id*. at 30.) Overall, average scores for the sample ranged from good to very good, with quality of documentation averaging 3.4, quality of chronic care averaging 3.8, and quality of episodic care averaging 4.4. (*Id*. at 126–27.) Based on Dr. Murray's sampling methodology, his findings regarding the quality of care provided *can* be

---

[3] Florence and Phoenix were excluded from review because the former is closing, and the latter is primarily an intake facility where most inmates are not present long enough to have chronic care appointments.

generalized to the larger ADCRR population.  (*Id*. at 29.)  And, he concludes that Defendants are delivering care that meets or exceeds the constitutional standard.

Dr. Murray also cites to HEDIS measures, which are used by more than 90% of U.S. health plans to evaluate and compare performance on critical aspects of care and service delivery.  (Report at 139.)  Specifically, Dr. Murray cites to HEDIS metrics for control of hypertensive blood pressure, diabetic blood pressure, and hemoglobin A1c for diabetic patients that compare the ADCRR population of all inmates diagnosed with hypertension (sample size=4806) and diabetes (sample size=787) against national averages for commercial HMOs, commercial PPOs, and Medicaid recipients.  (*Id*. at 141–44.)  Notably, each ADCRR facility scored above the national benchmarks for each of the three measures.  (*Id*.)  Dr. Murray's random sample of chronic care files was used to validate the HEDIS data.  Similarly, ADCRR's COVID-19 vaccine rate (80%) far outpaces the vaccine rates for the State of Arizona (57.3%) and the United States (66.9%), reflecting the efficacy of ADCRR patient educational processes and successful coordination between medical staff, custody staff, and outside agencies.  (*Id*. at 146.)  ADCRR's mortality rate also compares favorably to the mortality rate of other large prison populations based on the latest available figures from the U.S. Bureau of Justice.  (*Id*. at 147.)

**Mental Health Care**

Plaintiffs cannot prove systemic constitutional violations in the provision of mental health care to all ADCRR inmates.  Like Dr. Wilcox, their mental health expert, Dr. Stewart, relies solely on isolated instances of allegedly deficient mental health treatment. Dr. Stewart's review was limited to: (1) inmates chosen by Plaintiffs' counsel because they had engaged in acts of self-harm or had been on mental health watch for a "long" period; (2) a subset of inmates he had previously commented in his 2013 expert report; (3) a selection of the inmates who died by suicide between 2019 and September 2021; and (4) inmates who chose to speak with him during his September 2021 expert tours.  (Report of at 6–8.)  He concedes that, in preparation of rendering his opinions, he did not review a random sample of inmate medical records and instead chose to exclusively "focus on persons with the most

serious mental health concerns or diagnoses." (*Id.* at 7.) As a result, his findings cannot be extrapolated to ADCRR as a whole.

By contrast, Defendants' mental health expert, Dr. Joseph Penn, and his team of practicing correctional psychiatrists reviewed a randomized blind sample of inmates at ADCRR's corridor facilities (Eyman, Florence, Phoenix, Lewis, Tucson, Yuma, and Perryville) with a MH score of 3 or higher. (Report at 11.) In forming his opinions, Dr. Penn also extensively relied upon ADCRR's compliance with applicable National Commission on Correctional Health Care ("NCCHC") standards for health services in correctional facilities[4] on critical measures (e.g., staffing; credentialing; access to care; continuity, coordination, and quality of care; mental health screening; privacy of care; mental health treatment plans; pharmaceutical operations; medication services; emergency psychotropic medication administration; suicide prevention; segregation, etc.) (*Id.* at 17, 25, 28–30, 34–35, 39, 41–42, 44–45, 50–51, 57–60, 67–68.) Additionally, Dr. Penn relies upon the suicide data recently released by the Department of Justice, Bureau of Justice Statistics (October 2021), which reveals a *nationwide* long-term trend of increasing suicides in all custodial environments, and he compares it to recent suicide statistics from ADCRR which do not show the same trend. Based on his review of the random sample of inmate charts, ADCRR's compliance with NCCHC standards, systemwide and national data, and other records and documents reviewed, Dr. Penn concludes that the mental health treatment provided to inmates incarcerated within ADCRR facilities exceeds constitutional standards.

**Conditions of Confinement**

Plaintiffs cannot prove that the conditions of confinement for all Subclass inmates are unconstitutional. When this lawsuit was filed in March 2012, there were 3,105 inmates in maximum custody. As of September 30, 2021, there were 27,794 inmates assigned to the ten state-operated facilities; 1,636 classified as maximum custody, 22 were assigned to

---

[4] ADCRR maintains NCCHC accreditation at all 10 complexes. By contrast, less than 5% of U.S. jails, prisons, detention and correctional facilities, and opioid treatment programs within correctional settings are currently NCCHC accredited. (Report at 14.)

close management status, 750 were assigned to detention status, and 81 were on mental health watch.

For the claims that are certified, Plaintiffs' conditions-of-confinement expert (Horn) does not provide a substantive opinion that property restrictions and nutritional intake are unconstitutional.[5]  Moreover, many Subclass inmates have cellmates, and all have access to recreation, property, phone calls, visitation, daily interaction with staff and inmates.  Absent certain circumstances, non-SMI maximum custody inmates are offered at least 7.5, 8.5, and 9.5 hours of out-of-cell time a week (including a minimum of 6 hours of recreation and one hour of programming for step levels 2 and 3), and SMI maximum custody inmates are offered 20.5, 21.5 and 22.5 hours of out-of-cell time per week.  This offered out-of-cell time exceeds constitutional requirements and corrections industry standards.  Finally, any chemical agent use of force complies with constitutional standards and does not amount to cruel and unusual punishment.  The evidence will show that, as a matter of law, the conditions of confinement are constitutional.

### No Deliberate Indifference

The evidence will show that Defendants have continuously strived to improve all aspects of healthcare and the management and confinement of ADCRR inmates.  Those efforts include changing healthcare vendors, changing ADCRR leadership, creating and then reorganizing the Medical Services Contract Monitoring Bureau, increasing staffing, increasing recruitment and retention efforts, increasing compensation, improving telehealth, and increasing access to out-of-cell programming, recreation, and property.  Defendants have not been indifferent to the needs of ADCRR inmates.

---

[5] A Trinity licensed dietician registered with the Commission on Dietetic Registration and specializes in the provision of food service for correctional institutions devises the rotating meal plans that comport with corrections industry standards. Nutritional adequacy and calorie count complies with nutritional standards set by the National Academies of Sciences (2800 (+/- 200) for males & 2200 (+/- for females). Moreover, Plaintiffs agreed to terminate the maximum custody PM governing food services for maximum custody inmates in 2019. (Dkt. 3177 at 5 n.1; Dkt. 3359 at 11.)

DATED this 29th day of October, 2021.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/ Daniel P. Struck
  Daniel P. Struck
  Rachel Love
  Timothy J. Bojanowski
  Nicholas D. Acedo
  3100 West Ray Road, Suite 300
  Chandler, Arizona 85226

  *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alisha Tarin-Herman    atarinherman@perkinscoie.com

Alison Hardy:    ahardy@prisonlaw.com

Asim Dietrich:    adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Austin C. Yost:    ayost@perkinscoie.com; docketPHX@perkinscoie.com

Corene T. Kendrick:    ckendrick@aclu.org

Daniel Clayton Barr:    DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:    dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:    dspecter@prisonlaw.com

Eunice Cho    ECho@aclu.org

Jared G. Keenan    jkeenan@acluaz.org

John Howard Gray:    jhgray@perkinscoie.com; slawson@perkinscoie.com

Karl J. Worsham:    kworsham@perkinscoie.com; docketphx@perkinscoie.com

Kathryn E. Boughton:    kboughton@perkinscoie.com; docketphx@perkinscoie.com

Kelly Soldati    ksoldati@perkinscoie.com; docketphx@perkinscoie.com

Maria V. Morris    mmorris@aclu.org

Maya Abela    mabela@azdisabilitylaw.org

Mikaela N. Colby:    mcolby@perkinscoie.com; docketphx@perkinscoie.com

Rita K. Lomio:    rlomio@prisonlaw.com

Rose Daly-Rooney:    rdalyrooney@azdisabilitylaw.org

Sara Norman:    snorman@prisonlaw.com

Sophie Jedeikin Hart    sophieh@prisonlaw.com

Victoria Lopez:    vlopez@acluaz.org

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/     Daniel P. Struck