Victoria López (Bar No. 330042)*
Jared G. Keenan (Bar No. 027068)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: vlopez@acluaz.org
        jkeenan@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(d)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-ROS <br><br> **EXPERT DECLARATION AND DIRECT WRITTEN TESTIMONY OF CRAIG HANEY, Ph.D., J.D.** |

LEGAL23774493.1

1         Pursuant to the Court's September 2, 2021 Order (Doc. 3952 at 4), I, Craig Haney,

2    Ph.D., J.D., hereby declare and submit my direct written testimony as follows. I will be

3    called by Plaintiffs to testify to the Court under oath regarding the following at 9:00 am on

4    November 4, 2021. For ease of reference by the Court, I include a table of contents for the

5    topics covered herein.

LEGAL23774493.1

## I. Background and Expert Qualifications

1.     I am a Distinguished Professor of Psychology at the University of California, Santa Cruz, and am a U.C. Presidential Chair. I have also served at U.C. Santa Cruz as the Director of the Legal Studies Program, Chair of the Department of Psychology, Chair of the Department of Sociology, and the Director of the Graduate Program in Social Psychology. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards.

2.     I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement. In addition to these scholarly articles and book chapters, I have published three sole-authored books: Death by Design: Capital Punishment as a Social Psychological System (Oxford University Press, 2005), Reforming Punishment: Psychological Limits to the Pains of Imprisonment (American Psychological Association Books, 2006), and Criminality in Context: Psychological Foundations of Criminal Justice Reform (American Psychological Association Books, 2020). Along with other members of a National Science Foundation committee on which I served, I also co-authored a fourth book, The Growth of Incarceration in the United States: Exploring the Causes and Consequences (National Academy Press, 2014)

3.     In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional histories in explaining criminal violence, the psychological effects of living and working

in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

4.     I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, and the U.S. Department of Justice. For example, in the summer of 2000, I was invited to attend and participated in a White House Forum on the uses of science and technology to improve crime and prison policy, and in 2001 participated in a conference jointly sponsored by the U.S. Department of Health and Human Services (DHHS) concerning government policies and programs that could better address the needs of formerly incarcerated persons as they were reintegrated into their communities. I continued to work with DHHS on the issue of how best to insure the successful reintegration of incarcerated persons into the communities from which they have come. More recently, I have served as a consultant to the Department of Homeland Security, a consultant to and an expert witness before the U.S. Congress, and was appointed in 2012 as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. In conjunction with the publication of the National Academy of Sciences committee report on the growth of incarceration in the United States, in 2014 I collaborated with several other committee members to brief the White House Domestic Policy Council and various members of the U.S. House and Senate on its contents and policy recommendations. (My curriculum vitae is attached to this Report as **Appendix A**).

5.     My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly

assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a classic study in the field, demonstrating the power of institutional settings to change and transform the persons who enter them.[1]

6.     Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement). In the course of that work, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Louisiana, Maine, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado and federal death row in Terre Haute, Indiana), as well as prisons in Canada, Cuba, England, Hungary, Mexico, the Netherlands, Norway, and Russia. I also have conducted numerous interviews with correctional officials, guards, and incarcerated persons to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of incarcerated persons to adjust to them.[2]

---

[1] For example, see Craig Haney, Curtis Banks & Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney & Philip Zimbardo, The Socialization into Criminality: On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society: Psychological and Legal Issues. (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, Personality and Social Psychology Bulletin, 35, 807-814 (2009).
[2] For example, Craig Haney, Infamous Punishment: The Psychological Effects of Isolation, 8 National Prison Project Journal 3 (1993); Craig Haney, Psychology and Prison

7.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Alabama, Arkansas, California, Georgia, New Mexico, Pennsylvania, Texas, and Washington, and in numerous state courts, including courts in Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeals, and the United States Supreme Court.[3] A list of prior cases in which I have testified at trial or deposition in the past four years and a statement of compensation are attached as **Appendix B**.

## II. Nature and Basis of Expert Opinion

8.     In 2012 I was retained by counsel for the plaintiffs in the case then known as *Parsons v. Ryan* to provide expert opinions on three inter-related topics: a) a summary of what is known about the negative psychological consequences of confinement in isolation or "supermax" prisons; b) an explanation of whether and how those negative consequences can be exacerbated for incarcerated persons who are suffering from serious mental illness ("SMI");[4] and, finally, c) based on institutional inspections and the case-

---

Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, University of Missouri-Kansas City Law Review, 77, 911-946 (2009); Craig Haney, Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," Connecticut Public Interest Law Review, 9, 139-196 (2010); Craig Haney, The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, American Criminal Law Review, 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; and Craig Haney, Prison Effects in the Age of Mass Imprisonment, The Prison Journal, 92, 1-24 (2012).
[3] For example, see Brown v. Plata, 563 U.S. 493 (2011).
[4] The definition of a serious mental illness or SMI generally includes persons with a current diagnosis or significant recent history of types of DSM-IV-TR Axis I diagnoses

specific discovery that I have been provided and reviewed, the extent to which incarcerated persons housed in the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR"), including those who suffer from SMI, are subjected to solitary-type confinement that may place them at a serious risk of psychological harm.

9.    I have filed three previous declarations in this case that pertain directly to those issues: a) a declaration in support of class certification (dated July 8, 2012), (Doc. 240-1, Ex. E); b) an expert report that included opinions about conditions of confinement that I observed in various ADC facilities and their effects on incarcerated persons housed in them, including many of whom I had personally interviewed (dated November 7, 2013), (Doc. 1104-8 and 1104-9 (Ex. 17)); and c) a rebuttal report responding to several of the Defendant's experts (date January 31, 2014) (Doc.1104-10, Ex. 18).

10.    Plaintiffs' counsel asked that I update these earlier stated opinions, based on my review of the most current scientific literature that has been published on the nature and effects of isolated confinement, currently operative ADC-specific policies and various documents that I have been provided by counsel, and the inspections and interviews that I personally conducted *after* my earlier opinions were reached and expressed in prior declarations. This Report contains those updated opinions.

11.    I have toured and inspected and interviewed incarcerated persons confined in ADCRR facilities on a number of occasions. As part of the basis for my November 7, 2013 Expert Report, I conducted inspections and interviews in a number of facilities and housing units where members of the *Parsons* subclass resided, including: Perryville–Lumley Special Management Area (SMA); Florence Central Unit; Florence Kasson Unit;

---

(including schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic disorder, psychotic disorder not otherwise specified, major depressive disorders, and bipolar disorder I and II), persons who suffer from other diagnosed Axis I psychiatric disorders commonly characterized by breaks with reality, or perceptions of reality, or that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health, and persons diagnosed with severe personality disorders that are manifested by episodes of psychosis or depression, and result in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

Eyman – SMU 1; and Eyman – Browning Unit.[5] These tours and interviews took place over a two-week period in July 2013. In the course of these inspections I made a point of visiting a representative sample of housing units where incarcerated persons with mental illness were housed, in addition to isolation housing units with general population maximum custody incarcerated persons. Subsequent to the filing of my 2013 Expert Report, I also conducted a series of additional inspections and interviews in facilities and housing units where members of the *Parsons* subclass continued to reside, including: Perryville–Lumley Special Management Area (SMA); Florence Central Unit; Eyman – Browning Unit; and SMU-I. These tours and interviews took place on August 10-14, 2014. Following the Settlement Agreement being entered into in the present case, I once again conducted additional inspections and interviews in facilities and housing units where members of the *Parsons* subclass continued to reside, including: Perryville general population units and the Lumley-SMA; and the Lewis Rast Max Unit. These tours and interviews took place on May 24-26, 2016. Finally, I recently returned to conduct additional inspections and interviews in housing units where members of the subclass currently reside, including: Eyman – Browning Unit; Eyman - SMU I; and the Lewis Rast, Morey, Stiner, Sunrise (Minors), and Barchey Units; and all detention and mental health units within these facilities. These tours and interviews took place on September 13-14 and September 29-30, 2021.

12.     The opinions expressed in the current Declaration are based in part on the documents I was provided by Plaintiffs' counsel and reviewed in advance of preparing my earlier reports, as well as additional documents that I was provided more recently, a list of which is appended as **Appendix C**.

---

[5] In March 2013, this Court certified the subclass as "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day, or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area." Doc. 372 at 22.

13.     As was the case in my previous tours and inspections, I was able to personally interview a number of incarcerated persons on my most recent visits to the ADCRR in September, 2021. Many of these incarcerated persons were chosen randomly and interviewed cell-front in the course of inspecting the various housing units. Where possible, however, I also made a point of interviewing incarcerated persons housed in the units I was touring and inspecting whom I had interviewed on past visits, to assess their opinions about whether and how the ADCRR conditions, policies, and practices had changed since the entry of the Stipulation. In addition, I was able to specifically request that particular incarcerated persons be brought out of their cells, so that I could conduct the interview at greater length and on a more confidential basis than was possible in the cell blocks. A list of all of the incarcerated persons whom I interviewed in the courses of the tours and inspections conducted in September 2021 is contained in **Appendix D**. I also requested access to medical and mental health records of the incarcerated persons whom I interviewed during the September 2021 visits, which I was able to review after the prison tours and inspections had taken place. I have attached as **Appendix E**, all summaries of the interviews I did in 2013 with incarcerated people, and **Appendix F** is my write up of all of the interviews I did during these 2021 visits.

14.     Finally, as with my past tours and inspections, in the course of my September 2021 tours of ADCRR facilities, institution staff photographed a number of different areas inside and outside the prisons at my direction. I have reviewed and relied on those photographs in developing my opinions in this matter, and many are included as exhibits to this report. All photos taken during my tour are attached as **Appendix G**.

15.     By way of summary, it continues to be my expert opinion that being housed in solitary or isolated confinement can produce a number of negative psychological effects and places incarcerated persons at significant risk of serious psychological harm. In fact, these effects are even better understood and more extensively described in the scientific literature than they were when I previously opined about them. Since the earlier declarations that I filed in this case, scientific knowledge of the effects of isolation has

been buttressed by a number of additional empirical studies. Those studies form the underlying basis for a widespread consensus that has emerged among scientific, mental health, human rights, legal, and even correctional organizations about the harmful effects of solitary confinement. The empirical findings continue to be "robust"—that is, they come from studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, they were completed and have been published over a period of many decades, and they are empirically very consistent with one another. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated incarcerated persons endure and the risk of psychological harm that they confront while kept in isolated confinement.

16.     In addition, the empirical conclusions that continue to be reached in these studies are theoretically sound. That is, there are numerous sound theoretical explanations for the fact that long-term isolation, the absence of meaningful social interaction and activity, and the other severe deprivations that are common under conditions of isolated or solitary confinement will have harmful psychological consequences. Indeed, because the kinds of conditions and experiences that are imposed on isolated incarcerated persons are *known* to produce adverse psychological effects in contexts more benign than prison, it makes perfect theoretical sense that they produce similar or worse outcomes when persons encounter them in much harsher prison environments.

17.     It continues to be my opinion that the policies, practices, and admissions of ADCRR regarding conditions of confinement in its isolation units, as depicted in the documents and materials I have reviewed, the tours and inspections of facilities in which I participated, and the interviews that I conducted with incarcerated persons, very clearly constitute exactly the kind of harsh and depriving conditions of isolated confinement that my own experience and research—supported, as I noted, by many decades of scientific research and study by others—have found to be detrimental to all persons subjected to them. As such, <u>all incarcerated persons are at significant risk of serious psychological harm under ADCRR's current isolation policy and practice and conditions</u>.

18.     It is also now a widely accepted fact that incarcerated persons who suffer from serious mental illnesses have a more difficult time tolerating the painful experience of isolation or solitary confinement. This empirical fact is also rooted in sound theory. It results in part from the greater vulnerability of the mentally ill in general to stressful, traumatic conditions, and in part because some of the extraordinary conditions of isolation adversely impact the particular symptoms from which seriously mentally ill people suffer (such as depression) or directly aggravate aspects of their pre-existing psychiatric conditions.

19.     Thus, it continues to be my opinion that <u>the failure of ADCRR to categorically exclude incarcerated persons who suffer from serious mental illness from its isolation units places all such incarcerated persons at significant risk of substantial harm</u>. It is even more inconsistent with sound corrections and mental health practice than it was when I expressed this opinion in my 2013 declarations.

20.     An additional development from my previous visits, is that in my September 2021 visit, I visited Lewis Sunrise Unit, where all youth under the age of 18 who were convicted of crimes as an adult and sentenced as adults are housed until their 18th birthday, at which time they are transferred to an adult prison facility or unit.[6] In 2019, Arizona was an extreme outlier, as the third highest state in the United States for number of youth age 17 or younger who incarcerated in adult prisons, and many states either do not charge juveniles as adults, or if they do, incarcerate youth who are convicted as adults in juvenile prisons until their 18th, 21st, or 23rd birthday.[7]

---

[6] Under the federal Juvenile Justice and Delinquency Prevention Act (JJDPA) of 1974, juveniles many not have "sight or sound contact" with adults in carceral settings. 34 U.S.C. § 11133(a)(11)(B). JJDPA's "separation requirement," as it is commonly known, is why youth under the age of 18 sentenced as adults to state prison must be physically separated from adults.

[7] "Reported number of inmates age 17 or younger held in custody in federal or state prisons, Dec. 13, 2000-2019," U.S. Dep't of Justice, Bureau of Justice Statistics, "Corrections Statistical Analysis Tool," at https://www.bjs.gov/index.cfm?ty=nps (last checked Oct. 7, 2021). In 2019, the number of children incarcerated in adult prisons nationwide was 626. Arizona accounted for 55 of the national total. Only Florida (81 children) and North Carolina (61 children) incarcerated more youth in its adult prisons in the United States than Arizona. Id. Twenty states and the District of Columbia did not

1      21.     Widespread and accepted scientific research shows that the psychological

2   anguish of being in isolation is categorically greater in children, and can cause potentially

3   irreversible physical and mental harm. Furthermore, the vast majority of incarcerated

4   youth – whether in adult or juvenile facilities – have already experienced a great deal of

5   adverse childhood experiences.[8] Thus, incarceration of these youth in and of itself

6   represents additional trauma for these children,[9] and the compounded trauma produced by

7   incarceration in solitary confinement makes it even worse. The widely accepted fact that

8   isolation is even more dangerous for children than for adults is why a number of

9   professional mental and physical health-related, legal, human rights, and other

10  organizations call for the drastic reduction or outright elimination in the use of solitary

11  confinement with juveniles.[10] Many jurisdictions across the United States have laws that

12  prohibit or greatly restrict the use of isolation on youth; for example, current California

13  law significantly limits the use of solitary or solitary-like confinement for juveniles to

14  durations of no longer than *four hours*.[11] However, while at the Sunrise Unit I spoke with

15  three juveniles who had been in windowless detention cells for *almost three weeks*. It is

16

17  permit the incarceration of youth in adult prisons in 2019; another fourteen states had
    fewer than 10 youth in adult facilities in that year. Ibid.

18      [8] For example, see Carly Dierkhising, Susan Ko, Briana Woods-Jaeger, et al.
    Trauma Histories Among Justice-Involved Youth: Findings from the National Child
19  Traumatic Stress Network, European Journal of Psychotraumatology, 4 (2013).

20      [9] See Sue Burrell, Trauma and the Environment of Care in Juvenile Institutions,
    National Child Traumatic Stress Network (2013).

21      [10] For example, in December 2015 the U.N. General Assembly adopted the United
    Nations Standard Minimum Rules for the Treatment of Prisoners ("The Nelson Mandela
22  Rules") that, among other things, flatly prohibited the use of solitary confinement for
    juveniles. Commission on Crime Prevention and Criminal Justice, United Nations
23  Standard Minimum Rules for the Treatment of Prisoners. New York: U.N. Economic and
    Social Council (2015). In the exceedingly rare instances where longer times of solitary
24  confinement beyond minutes or a few hours at most are absolutely necessary for a
    juvenile, in response to emergency situations, they should be limited to the shortest
25  amount of additional time possible and even then, always under the intensive supervision
    and care of a licensed physician or psychologist.

26      [11] Calif. Welf. & Inst. Code § 208.3. Carceral facilities often use different terms for
    solitary confinement for juveniles, such as "segregation," "detention," "seclusion," or
27  "room confinement." My statements about solitary confinement and isolation apply to
    those terms as well when referring to juveniles. E.g., see Sue Burrell and Ji Seon Song,
28  Ending "Solitary Confinement" of Youth in California, Children's Legal Rights Journal,
    39, 42, 45 (2019).

1   my opinion that <u>ADCRR's policies and practices allowing people ages 17 and younger to</u>

2   <u>be indefinitely subject to harsh conditions of solitary, places all youth in its prisons at</u>

3   <u>substantial risk of the most profoundly damaging psychological harm</u>.

4          22.     Finally, it was apparent to me, based on my own observations, review of

5   relevant documents, and interviews with incarcerated persons that very little had changed

6   in the ADC's practices followed and conditions of confinement imposed in its isolation

7   units since my earlier tours, inspections, and interviews. <u>The practices and conditions to</u>

8   <u>which isolated incarcerated persons in these ADC units are exposed not only subject them</u>

9   <u>to pain and suffering but also a significant risk of serious psychological harm</u>. Prolonged

10  confinement in these units is thus not only unpleasant but dangerous—it may result in

11  physical and psychological damage that is long-lasting and even fatal.

### III.   A Review of Past Research on the Adverse Psychological Effects of Isolation

12

13         23.     As I noted in my November 7, 2013 Expert Report, "solitary confinement"

14  and "isolated confinement" are terms of art in correctional practice and scholarship. For

15  perhaps obvious reasons, total and absolute solitary confinement—literally complete

16  isolation from any form of human contact—does not exist in prison and never has.

17  Instead, the term is generally used to refer to conditions of extreme (but not total) isolation

18  from others, where incarcerated persons are denied any meaningful contact with other

19  human beings. I have defined it elsewhere, in a way that is entirely consistent with its use

20  in the broader correctional literature, as:

21

22         [S]egregation from the mainstream prisoner population in attached housing
           units or free-standing facilities where prisoners are involuntarily confined in
23         their cells for upwards of 23 hours a day or more, given only extremely
           limited or no opportunities for direct and normal social contact with other
24         persons (i.e., contact that is not mediated by bars, restraints, security glass or
           screens, and the like), and afforded extremely limited if any access to
25         meaningful programming of any kind.[12]

26

27  _____

28  [12] Craig Haney, The Social Psychology of Isolation: Why Solitary Confinement is
    Psychologically Harmful, <u>Prison Service Journal</u>, <u>12</u> (January, 2009), at n.1.

24.     Indeed, because of their extreme isolation from the mainstream population of incarcerated persons, their near or complete exclusion from prison activities and programs, and the fact that they are confined in their cells virtually around-the-clock, even incarcerated persons in "isolated confinement" who are double-celled (i.e., housed with another incarcerated person) may suffer some of the worst effects described in the following paragraphs. Indeed, in some ways, these incarcerated persons have the worst of both worlds: "crowded" and confined with another person inside a small cell but simultaneously deprived of even minimal freedoms, access to programs, and "normal" and meaningful forms of social interaction.

25.     Presumably designed to limit and control violence by keeping incarcerated persons isolated from one another, solitary confinement or "supermax" prisons subject incarcerated persons to especially harsh and deprived conditions of confinement that past research showed created a significant risk of psychological harm. As a general matter, as I noted in passing above, psychologists have long known from studies of behavior, adjustment, and well-being in free society that social isolation in general can be very harmful and can cause irreparable damage to overall psychological functioning.[13] Its effects were shown to be no less harmful in prison.

26.     At the time of my November 2013 Report, there was already a large and what I characterized as "growing" literature on the many ways that solitary or so-called "supermax" confinement could very seriously damage the overall mental health of incarcerated persons. Researchers and mental health experts understood that the long-term absence of meaningful human contact and social interaction, the enforced idleness and inactivity, and the oppressive security and surveillance procedures (and the weapons, hardware, and other paraphernalia that go along with them) were often all combined inside starkly deprived conditions of confinement. These conditions were known to

---

[13] For example, see: Graham Thornicroft, Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, British Journal of Psychiatry, 158, 475-484 (1991).

predictably impair the cognitive and mental health functioning of many incarcerated persons who were subjected to them.[14] For some, these impairments were documented as permanent and even life-threatening.

27.    As I noted in my earlier Report, in the admitted absence of a single "perfect" study of the phenomenon,[15] it was important to look at the overall distinctive *patterns* of harmful psychological effects documented in an already substantial body of published about what happens to persons when they are placed in solitary confinement. These broad patterns were consistently identified in personal accounts written by persons confined in isolation, in descriptive studies authored by mental health professionals who worked in many such places, and in systematic research conducted on the nature and effects of solitary or "supermax" confinement. Even in 2013, the studies spanned a period of over four decades, and were conducted in locations across several continents by researchers

---

[14] For example, see: Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample, Criminal Justice and Behavior, 33, 760-781 (2006): Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement. Crime & Delinquency, 49, 124-156 (2003); and Peter Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[15] No more than basic knowledge of research methodology is required to design the "perfect" study of the effects of solitary confinement: dividing a representative sample of prisoners (who had never been in solitary confinement) into two groups by randomly assigning half to either a treatment condition (say, two or more years in solitary confinement) or a control condition (the same length of time residing in a typical prison housing unit), and conducting longitudinal assessments of both groups (i.e., before, during, and after their experiences), by impartial researchers skilled at gaining the trust of prisoners (including ones perceived by the prisoner-participants as having absolutely no connection to the prison administration). Unfortunately, no more than basic knowledge of the realities of prison life and the practicalities of conducting research in prisons is required to understand why such a study would be impossible to ever conduct. Moreover, any prison system that allowed truly independent, experienced researchers to perform even a reasonable approximation of such a study would be, almost by definition, so atypical as to call the generalizability of the results into question. Keep in mind also that the assessment process itself—depending on who carried it out, how often it was done, and in what manner—might well provide the solitary confinement participants with more meaningful social contact than they are currently afforded in a number of such units with which I am familiar, thereby significantly changing (and improving) the conditions of their confinement.

with different professional expertise, whose expertise ranged from psychiatry to sociology and architecture.[16]

28.    For example, mental health and correctional staff who had worked in disciplinary segregation and isolation units reported observing a range of problematic symptoms manifested by the people confined in these places.[17] Cormier and Williams, the authors of one of the early studies of solitary confinement summarized their findings by concluding in 1966 that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[18]

29.    A decade after Cormier and Williams, Professor Hans Toch's large-scale psychological study of incarcerated persons "in crisis" in New York State correctional facilities made important observations about the effects of isolation.[19] After conducting numerous in-depth interviews of incarcerated people, Toch concluded that "isolation panic" was a serious problem in solitary. The symptoms he reported included rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-harm.[20] He noted that while isolation

---

[16] For example, see: Arrigo, B., & Bullock, J., The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change, International Journal of Offender Therapy and Comparative Criminology, 52, 622-640 (2008); Haney, C., supra note 12; Haney, C., & Lynch, M., Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, New York University Review of Law and Social Change 23, 477-570 (1997); Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in M. Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[17] For detailed reviews of all of these psychological issues, and references to the many empirical studies that support these statements, see: C. Haney and M. Lynch, supra note 16, and C. Haney, supra note 14.

[18] Bruno M. Cormier & Paul J. Williams, Excessive Deprivation of Liberty, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, Canadian Psychiatric Association Journal, 12, 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, Effect of Solitary Confinement on Prisoners, American Journal of Psychiatry, 119, 771-773 (1963).

[19] Hans Toch, Men in Crisis: Human Breakdowns in Prisons. Aldine Publishing Co.: Chicago (1975).

[20] Id. at 54.

1  panic could occur under other conditions of confinement it was "most sharply prevalent in

2  segregation." Moreover, it marked an important dichotomy for incarcerated persons: the

3  "distinction between imprisonment, which is tolerable, and isolation, which is not."[21]

4    30.    Studies done in the 1980s and 1990s identified other adverse psychological

5  symptoms produced by these conditions, including: appetite and sleep disturbances,

6  anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Direct

7  studies of prison isolation have documented an extremely broad range of harmful

8  psychological reactions. These include increases in the following potentially damaging

9  symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations,

10  cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage,

11  paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and

12  suicidal ideation and behavior.[22] In addition to the studies in the United States, there was a

13  significant _international_ literature on the adverse effects of solitary confinement.[23]

---

14

15  [21] Ibid.
    [22] The references cited in notes 12-16 above provide detailed reviews and
    discussions of these numerous studies.

16  [23] For example, see: Henri N. Barte, L'Isolement Carceral, Perspectives
    Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic"

17  effects of solitary confinement in French prisons and concluded that prisoners placed there

18  for extended periods of time could become schizophrenic instead of receptive to social
    rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a

19  denial of the bonds that unite humankind." In addition, see: Reto Volkart, Einzelhaft: Eine
    Literaturubersicht (Solitary confinement: A literature survey), Psychologie -

20  Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983)
    (reviewing the empirical and theoretical literature on the negative effects of solitary

21  confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, Eine
    Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A

22  controlled investigation on psychopathological effects of solitary confinement),
    Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-

23  46 (1983) (when prisoners in "normal" conditions of confinement were compared to those
    in solitary confinement, the latter were found to display considerably more

24  psychopathological symptoms that included heightened feelings of anxiety, emotional
    hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al.,

25  Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a
    risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that

26  prisoners who were hospitalized in a psychiatric clinic included a disproportionate number
    who had been kept in solitary confinement); Boguslaw Waligora, Funkcjonowanie

27  Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of
    penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding

28  that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the
    asocial features in the criminal's personality thus becoming an essential cause of

31.    Additional research established a relationship between housing type and various kinds of incident reports in prison. It showed that self-harm and suicide are much more prevalent in isolated, punitive housing units like administrative segregation and security housing, where people are subjected to solitary-like conditions. In 2008, researchers attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" generated by "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[24] They reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[25] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence were all found to be more prevalent in these units.[26]

difficulties and failures in the process of his resocialization"). See, also, Ida Koch, Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time and ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, Long-Term Mental Sequelae of Political Imprisonment in East Germany, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.
[24] Raymond Patterson & Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, Psychiatric Services, 59, 676-682 (2008), at p. 678.
[25] Ibid. See also: Lindsay M. Hayes, National Study of Jail Suicides: Seven Years Later. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, Vulnerability and Prison Suicide, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, Prison Suicide and Prisoner Coping, Crime and Justice, 26, 283-359 (1999).
[26] For example, see: Howard Bidna, Effects of Increased Security on Prison Violence, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital,

32.     The painfulness and damaging potential of extreme forms of solitary confinement was also underscored by its use in so-called "brainwashing" and certain forms of torture. In fact, many negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture techniques.[27]

33.     The prevalence of these negative psychological symptoms as shown in earlier research—that is, the extent to which incarcerated persons who were placed in these units suffered from these and related symptoms—was often very high. For example, in an early 1990s study that I conducted of a representative sample of one hundred incarcerated persons who were housed in the Security Housing Unit at Pelican Bay Prison, in California—a facility that California prison officials acknowledged was "modeled" on Arizona's 1986 SMU I facility that they toured in advance of Pelican Bay's construction

Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, Felon Self-Mutilation: Correlate of Stress in Prison, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, The Implications of Research Explaining Prison Violence and Disruption, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, A Prison Environment: Its Effect on Health Care Utilization, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, Managing Violent Individuals in Correctional Settings, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, Using Situational Factors to Predict Types of Prison Violence, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

[27] Solitary confinement is among the most frequently used psychological torture techniques. In D. Foster, Detention & Torture in South Africa: Psychological, Legal & Historical Studies, Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at p. 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at p. 136). See also: Matthew Lippman, The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 27 Boston College Int'l & Comparative Law Review, 27, 275 (1994); Tim Shallice, Solitary Confinement—A Torture Revived? New Scientist, November 28, 1974; F.E. Somnier & I.K. Genefke, Psychotherapy for Victims of Torture, British Journal of Psychiatry, 149, 323-329 (1986); and Shaun R. Whittaker, Counseling Torture Victims, The Counseling Psychologist, 16, 272-278 (1988).

in 1988 [28]—I found that every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the persons interviewed.[29] Many of the symptoms were reported by two-thirds or more of the people assessed in this unit, and some symptoms were suffered by nearly everyone. Well over half of the people reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension.

34.     I also found that almost all of the people whom I evaluated reported ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of them reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

35.     These specific symptoms of psychological stress and the psychopathological reactions to isolation were numerous and well-documented, even then, and certainly provided one index of the magnitude of the risk of harm this kind of experience presented. But they did not encompass all of the psychological pain and dysfunction that such confinement was shown to incur, or the magnitude of the negative changes it might bring about, or even the full range of the risk of harm it represented. Among other things, researchers and mental health experts understood that such extreme deprivation of social contact could undermine a person's social identity, destabilize his or her sense of self, and ultimately destroy his or her ability to function in free society.

---

[28] Mona Lynch, Sunbelt Justice: Arizona and the Transformation of American Punishment, 5, 135-38 (2010).

[29] See Haney, supra note 12.

36.     In fact, depriving persons of contact with others for long periods of time is known to be psychologically harmful and potentially destabilizing for another, related set of reasons. The importance of "affiliation"—the opportunity to have meaningful contact with others—in reducing anxiety in the face of uncertain or fear-arousing stimuli was long-established in social psychological literature.[30] Psychologists have documented that one of the ways that people determine the appropriateness of their feelings—indeed, how we establish the very nature and tenor of our emotions—is through contact with others.[31]

37.     Whatever else it represents, solitary confinement is a socially pathological environment that forces long-term inhabitants to adapt to the absence of meaningful contact with other humans. People have no choice but to develop their own socially pathological adaptations in order to function and survive. In the course of doing so, people will gradually change their patterns of thinking, acting, and feeling in order to cope with their largely asocial world, and the impossibility of relying on social support or the routine feedback that comes from normal contact with other human beings.

38.     Clearly, such adaptations represent "social pathologies" brought about by the atypical, abnormal, painful, and potentially harmful pathology of isolation. While these adaptations are "functional," and may even be necessary under these extreme circumstances, certain kinds of short-term survival strategies can result in people experiencing even more psychological pain and harm later on. A "downward spiral" may begin in which one dysfunctional adaptation leads to another. In their desperation, an

---

[30] For example, see: Stanley Schachter, The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness. Stanford, CA: Stanford University Press (1959); Irving Sarnoff & Philip Zimbardo, Anxiety, Fear, and Social Affiliation, Journal of Abnormal Social Psychology, 62, 356-363 (1961); Philip Zimbardo & Robert Formica, Emotional Comparison and Self-Esteem as Determinants of Affiliation, Journal of Personality, 31, 141-162 (1963).

[31] For example, see: A. Fischer, A. Manstead, & R. Zaalberg, Social Influences on the Emotion Process, in M. Hewstone & W. Stroebe (Eds.), European Review of Social Psychology (pp. 171-202). Volume 14. Wiley Press (2004); C. Saarni, The Development of Emotional Competence. New York: Guilford Press (1999); Stanley Schachter & Jerome Singer, Cognitive, Social, and Physiological Determinants of Emotional State, Psychological Review, 69, 379-399 (1962); L. Tiedens & C. Leach (Eds.), The Social Life of Emotions. New York: Cambridge University Press (2004); and S. Truax, Determinants of Emotion Attributions: A Unifying View, Motivation and Emotion, 8, 33-54 (1984).

isolated incarcerated person may adopt forms of coping that inadvertently make their situation worse rather than better. For example, some people cope with the a-sociality of their daily existence by paradoxically creating even more. That is, they socially withdraw further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. Others move from initially being starved for social contact, to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in the presence of others.[32]

39.     Over time, extreme adaptations made to this abnormal environment can become internalized—they move from being conscious strategies of survival or reactions to immediate conditions of confinement to more deeply ingrained ways of being. Incarcerated persons may develop extreme habits, tendencies, perspectives, and beliefs that are difficult or impossible to relinquish once they are released from custody or in isolation. Although they may have been functional in isolation (or appeared to be so), they are typically acutely dysfunctional in the social world they are expected to re-enter. Yet they have been internalized so deeply that they persist and become disabling. Researchers and mental health experts have known about these pathological reactions for a considerable period of time. Indeed, I wrote about them in an article published in 2003, fully a decade before my November 7, 2013 Expert Report and nearly a decade since the *Parsons* Stipulation was entered into by ADCRR.[33]

40.     In addition, researchers and mental health experts have long known that, although the "core" psychological component of solitary confinement is social

_____

[32] For evidence that solitary confinement may lead to a withdrawal from social contact or an increased tendency to find the presence of people increasingly aversive or anxiety-arousing, see: Cormier, B., & Williams, supra note 18; Haney, supra note 14; H. Miller & G. Young, Prison Segregation: Administrative Detention Remedy or Mental Health Problem?, Criminal Behaviour and Mental Health, 7, 85-94 (1997); Scott & Gendreau, supra note 18; Toch, supra note 19; and Waligora, supra note 23.

[33] See the discussion in Haney, supra note 14.

deprivation, and social deprivation is the source of the most intense psychological pain and greatest risk of harm, prison isolation units also typically deprive people of much more than social contact. Isolated persons are typically subjected to extremely high levels of repressive control, enforced idleness and inactivity, reduced environmental stimulation, and a number of physical restrictions and deprivations that collectively exacerbate their psychological distress and can create even more lasting negative consequences. Indeed, most of the things that penologists have long known are beneficial to incarcerated persons—such as increased participation in institutional programming, visits with persons from outside the prison, physical exercise, and so on[34]—are either functionally denied to people in isolation or permitted on a greatly restricted basis. In addition to the direct pain and harm of isolation and the social pathologies that commonly develop in response, these other deprivations add to the negative psychological effects.

41.     For example, we know that people in general require a certain level of mental and physical activity in order to remain mentally and physically healthy. Simply put, human beings need movement and exercise to maintain normal functioning. The greatly restricted opportunities for movement and exercise in isolation units—typically no more than an hour or so a day out of their cells—can negatively impact the physical and psychological well-being of incarcerated persons.

42.     Apart from the profound social, mental and physical restrictions and deprivations that solitary confinement imposes, people housed in these units are subjected to prolonged periods of monotony and idleness. Many of them experience a form of sensory deprivation—there is an unvarying sameness to the physical stimuli that surround them, they exist within the same limited spaces and are subjected to the same repetitive routines, and there is little or no external variation to the experiences they are permitted to

---

[34] J. Wooldredge, Inmate Experiences and Psychological Well-Being, <u>Criminal Justice and Behavior</u>, <u>26</u>, 235-250 (1999).

have or can create for themselves. This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important related skills and capacities.[35]

43.     As I said in my November 2013 Expert Report, not every isolated incarcerated person experiences all or even most of the range of adverse reactions that I have described above. But the nature and magnitude of the negative psychological consequences themselves underscore the stressfulness of this kind of confinement, the lengths to which incarcerated persons must go to adapt and adjust to it, and the risk of serious psychological harm that is created by isolation and the broad range of severe stressors and deprivations that accompanies it. The devastating effects of the conditions of confinement typically found in prison isolation units have been underscored by the very high numbers of suicide deaths and incidents of self-harm and self-mutilation that have occurred there over a many year period.

44.     In summary, the accumulated weight of the scientific evidence that I have cited and summarized above demonstrates the painful nature of isolated confinement, and the serious risk of significant psychological harm at which it places incarcerated persons. When persons are deprived of normal social contact for extended periods of time they experience mental pain and suffering, are more susceptible to severe stress-related maladies and disorders, are subject to deterioration and dysfunction along a number of mental, emotional, and physical dimensions, and are placed risk of even more serious harm, including the loss of their sanity and even their lives. The broad range of adverse effects that derive from social deprivation underscores the fundamental importance of meaningful social contact and interaction and, in essence, establishes these things as identifiable human needs. Over the long-term, meaningful social contact and interaction may be as essential to a person's psychological well-being as adequate food, clothing, and shelter are to his or her physical well-being. This appears to be true for incarcerated persons in general but, as I discuss in the next section, it is especially true for mentally ill

---

[35] For examples of this range of symptoms, see: Haney, supra note 14; Miller & Young, supra note 32; and Volkart, et al., supra note 23.

incarcerated persons who are particularly vulnerable to the pains of isolated confinement and susceptible to its harmful effects.

### IV. The Exacerbating Effects of Isolation on Mental Illness

45.    Although prison isolation places all incarcerated persons at serious risk of harm, its adverse psychological effects are expected to vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences) but also as a function of the characteristics of the incarcerated persons subjected to it. A rare and unusually resilient incarcerated person might be able to withstand even harsh forms of solitary confinement with few or minor adverse effects, especially if the experience does not last for an extended period of time. Conversely, some incarcerated persons are especially vulnerable to the psychological pain and pressure of solitary confinement, and deteriorate even after brief exposure. Mentally ill incarcerated persons are particularly at risk in these isolated environments and have been precluded from them by legal and human rights mandates precisely because of this. There are several reasons why this is so.

46.    For one, as I have noted, solitary or isolated confinement subjects incarcerated persons to significantly more stress and psychological pain than other forms of imprisonment. Mentally ill incarcerated persons are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create within genuinely therapeutic environments. Not surprisingly, mentally ill incarcerated persons are more likely to deteriorate and decompensate when they are subjected to the harshness and stress of prison isolation.

47.    Some of the deterioration and decompensation that mentally ill incarcerated persons suffer in isolated confinement results from the critically important role that social contact and social interaction play in maintaining psychological equilibrium. The

esteemed psychiatrist Harry Stack Sullivan once summarized the clinical significance of meaningful social contact by observing that "[w]e can't be alone in things and be very clear on what happened to us, and we… can't be alone and be very clear even on what is happening in us very long—excepting that it gets simpler and simpler, and more primitive and more primitive, and less and less socially acceptable."[36]  Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

48.     Thus, the experience of isolation is psychologically destabilizing.  It undermines a person's sense of self or social identity and erodes his connection to a shared social reality. Isolated incarcerated persons have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[37]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, so bizarre, and so impossible to make sense of that some people create their own reality— they live in a world of fantasy instead of the intolerable one that surrounds them.

49.     Finally, many of the direct negative psychological effects of isolation are themselves very similar if not identical to certain symptoms of mental illness. Even though the direct effects of isolation, experienced in reaction to adverse conditions of confinement, are generally less chronic than those that are produced by a diagnosable mental illness, they can add to and compound a mentally ill incarcerated person's outward manifestation of symptoms as well as the internal experience of their disorder.  For

---

[36] Harry Stack Sullivan, The Illusion of Personal Individuality, Psychiatry, 12, 317-332 (1971), at p. 326.
[37] Compare, also, Margaret K. Cooke & Jeffrey H. Goldstein, Social Isolation and Violent Behavior, Forensic Reports, 2, 287-294 (1989), at p. 288.

1   example, many studies have documented the degree to which isolated confinement
2   contributes to feelings of lethargy, hopelessness, and depression. For already clinically
3   depressed incarcerated persons, these acute situational effects are likely to exacerbate their
4   pre-existing chronic condition and lead to worsening of their depressed state. Similarly,
5   the mood swings that some incarcerated persons report experiencing in isolation would be
6   expected to amplify the pre-existing emotional instability that incarcerated persons
7   diagnosed with bi-polar disorder suffer. Incarcerated persons who suffer from disorders of
8   impulse control would likely find their pre-existing condition made worse by the
9   frustration, irritability, and anger that many isolated incarcerated persons report
10  experiencing. And incarcerated persons prone to psychotic breaks may suffer more in
11  isolated confinement due to conditions that deny them the stabilizing influence of social
12  feedback that grounds their sense of reality in a stable and meaningful social world.

13       50.     As I noted in passing above, widespread recognition of the heightened
14  vulnerability of mentally ill incarcerated persons to the adverse psychological effects of
15  isolated confinement has led numerous corrections officials, professional mental health
16  groups, and human rights organizations to prohibit their placement in such units or, if it is
17  absolutely necessary (and only as a last resort) to confine them there, to very strictly limit
18  the duration of such confinement and to provide incarcerated persons with significant
19  amounts of out-of-cell time and augmented access to care. For example, in 2012, just a
20  short time before my November 7, 2013 Expert Report and the 2014 Parsons Settlement
21  Agreement, the American Psychiatric Association ("APA") issued a Position Statement
22  on Segregation of Prisoners with Mental Illness stating:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space an adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals.[38]

[38]AM. PSYCH. ASSOC., POSITION STATEMENTS: SEGREGATION OF PRISONERS WITH

The APA's position on this issue reflected what was already an accepted fact at the time, namely that mentally ill incarcerated persons were especially vulnerable to isolation -- and stress-related regression, deterioration, and decompensation that worsened their psychiatric conditions and intensified their mental health-related symptoms and maladies (including depression, psychosis, and self-harm).

51.    This widely accepted fact about the heightened vulnerability of mentally ill persons to isolated confinement was already being acknowledged in the standard operating procedures that governed the admission and retention of mentally ill people in solitary confinement units in many prison systems. In California, for example, mental health staff have been required for many years to screen incarcerated persons in advance of their possible placement in certain isolation units and either to exclude them from such confinement or house them in special units where they receive enhanced treatment. Moreover, they are charged with the additional responsibility of regularly monitoring isolated incarcerated persons with the same intended purpose—to identify any incarcerated persons who may be manifesting the signs and symptoms of emerging mental illness and to remove them from these harmful environments.

52.    Courts that have been presented with evidence on this issue in the past have reached the same conclusions about the vulnerability of the mentally ill to severe forms of prison isolation. For example, more than 25 years ago, one such court addressed the effects of solitary confinement in the Pelican Bay Security Housing Unit in California, a unit explicitly modeled after Arizona's SMU I facility. The judge noted that those incarcerated persons for whom the psychological risks of isolated confinement were "particularly"—and unacceptably—high included anyone suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a

---

MENTAL ILLNESS (2012), *available at* http://www.psychiatry.org/advocacy--newsroom/position-statements.

result of the conditions in [solitary confinement]."[39] He found that the group of incarcerated persons who must be excluded from isolation should include:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[40]

## V. An Updated Review of *New* Literature On The Adverse Psychological Effects of Isolation Published Since The *Parsons* Settlement

53.     As I have summarized in the preceding two sections, there were many studies done long before I filed my November 7, 2013 Expert Report that established the harmful psychological effects of solitary confinement. As I noted earlier, the research was robust—documented across time and place and the disciplinary orientation of the researchers—consistent (that is, with no more than a very few "outlier" studies showing few if any adverse effects),[41] and grounded in sound scientific theory, leaving little doubt about the negative psychological effects of solitary confinement. The experience of solitary confinement was shown not only to be painful and unpleasant but also capable of doing do real harm and inflicting real damage. The demonstrated damage was often severe, sometimes irreversible and, in the case of suicide, even fatal. Indeed, as researchers and mental health experts had learned over many decades, for some prisoners, the attempt to cope with isolated confinement set in motion a set of cognitive, emotional, and behavioral changes that could persist beyond the time that the incarcerated persons were housed in isolation and could lead to long-term disability and dysfunction.

54.     As I noted earlier, the literature specific to solitary confinement should be understood within the framework of an already vast literature on the harmful effects of social isolation, social exclusion, and loneliness in society at large, which has continued to

---

[39] *Madrid v. Gomez*, 889 F.Supp. 1146, 1265 (N.D. Cal. 1995).
[40] *Id*.
[41] For a discussion of these studies and their "outlier" status, see Craig Haney, The Psychological Effects of Solitary Confinement: A Systematic Critique, <u>Crime and Justice</u>, <u>47</u>, 365-416 (2018).

be amassed in recent years.[42] In addition, since November 7, 2013, and following the Settlement Agreement the ADC entered into in 2014, the empirical literature on the harmful effects of solitary confinement was buttressed by a number of additional studies, leading to a consensus among professional scientific, mental health, human rights, and even correctional organizations that its use should be drastically limited overall and prohibited entirely in the case of certain vulnerable groups (such as juveniles and the mentally ill). Some of those developments are summarized in the following paragraphs.

55.     For example, in 2018 I published the results of a study that used a structured interview and systematic assessment format to compare the prevalence of symptoms of psychological stress, trauma, and isolation-related psychopathology in a randomly selected sample of extremely long-term SHU incarcerated persons (who had spent ten years or more in continuous solitary confinement) with a randomly selected sample of general population (GP) incarcerated persons who had spent ten years or more of continuous imprisonment.[43] The isolated incarcerated persons reported nearly twice the mean number of symptoms of both stress-related trauma (e.g., troubled sleep, heart palpitations, feelings of an impending breakdown) and isolation -related pathology (e.g., ruminations, irrational anger, depression, social withdrawal) overall compared to the incarcerated persons who were currently housed in general population and who had been in prison for similar amounts of time. The intensity with which the reported symptoms was reported also differed very significantly—on average they were experienced well over twice as intensely by the isolated group. In addition, incarcerated persons in long-term solitary confinement were not only significantly more "lonely" than the long-term general population incarcerated persons but also reported extremely high levels of loneliness rarely found anywhere else in the literature.[44]

---

[42] For a discussion of some of this literature, Craig Haney, The Science of Solitary: Expanding the Harmfulness Narrative, <u>Northwestern University Law Review</u>, <u>115</u>, 211-256.

[43] Craig Haney, Restricting the Use of Solitary Confinement. <u>Annual Review of Criminology</u>, <u>1</u>, 285-310 (2018).

[44] See, also: Craig Haney, Solitary Confinement, Loneliness, and Psychological

56.     Other researchers also documented high levels of psychological distress in persons housed in solitary confinement. For example, in a 2020 publication, Professor Keramet Reiter and her colleagues found clinically significant symptoms in sizable numbers of persons housed under isolated conditions, prevalence rates for serious mental illness and self-harming behavior in solitary confinement that were approximately twice as high as among general population incarcerated persons, "[s]ymptoms such as anxiety and depression [that] were especially prevalent in [the isolated] population, along with symptoms ostensibly specific to solitary confinement, such as sensory hypersensitivity and a perceived loss of identity…" as well as respondents who "pointed to psychiatric distress—in profoundly existential terms…"[45]

57.     A 2020 synthesis of the results from a number of independently conducted quantitative studies concluded that, especially in the case of those studies that the authors characterized as "higher quality," the evidence showed "solitary confinement was associated with an increase in adverse psychological effects, self-harm, and mortality, especially by suicide."[46] Similarly, another 2020 literature review that took into account an even broader range of studies "found evidence to support the view that segregation is significantly associated with negative psychological outcomes."[47]

58.     Scientific research published after my November 7, 2013 Expert Report also continued to indicate that the adverse effects of isolated confinement can persist long after such confinement ends. For example, a group of Stanford researchers found that

---

Harm, in J. Lobel & P. Scharff Smith (Eds.), Solitary Confinement: Effects, Practices, and Pathways to Reform (pp. 129-152). New York: Oxford University Press 2020).

[45] Keramet Reiter, Joseph Ventura, David Lovell, Dallas Augustine, et al., Psychological Distress in Solitary Confinement: Symptoms, Severity, and Prevalence in the United States, 2017-2018. American Journal of Public Health, 110, 556-562 (2020), p. 560.

[46] Mimosa Luigi, Laura Dellazizzo, Charles-Edouard Giguere, Marie-Helene Goulet, & Alexandre Dumais, Shedding Light on "the Hole": A Systematic Review and Meta-Analysis on Adverse Psychological Effects and Mortality Following Solitary Confinement in Correctional Settings. Frontiers in Psychiatry, 11, Article 840 (2020), p. 1.

[47] Ellie Brown, A Systematic Review of the Effects of Prison Segregation. Aggression and Violent Behavior, 52, p. 12; https://doi.org/10.1016/j.avb.2020.101389.

behavioral patterns and psychological reactions developed in the course of adapting to solitary confinement were persistent and problematic when formerly long-term isolated incarcerated persons attempted to transition back to mainline prison housing.[48] Psychiatrist Terry Kupers, who has written extensively about the mental health risks of solitary confinement, has termed the lingering negative effects of the experience "SHU postrelease syndrome."[49] In fact, recent research suggests that the harmful effects of solitary confinement persist even after a person has been released from prison. For example, solitary confinement survivors suffer post-prison adjustment problems at higher rates than the already high rates experienced by formerly incarcerated persons in general, including being more likely to manifest symptoms of PTSD.[50]

59.    Relatedly, there is evidence that the stressfulness and long-term damage that is inflicted by solitary confinement can adversely affect someone's life expectancy. A 2019 study done by medical researcher Lauren Brinkley-Rubinstein and her colleagues, analyzing the experiences of more than 200,0000 persons who were released from a state prison system between 2000 and 2015, confirmed this. The researchers found that those persons who spent *any* time in solitary-type confinement (such as administrative or disciplinary segregation) "were 24% more likely to die in the first year after release."[51] Incarcerated persons who spent time in solitary-type confinement also were more likely to commit suicide (78% more likely than other prisoners) and to be victims of homicide

[48] *See* Human Rights in Trauma Mental Health Lab, Stanford Univ., Mental Health Consequences Following Release from Long-Term Solitary Confinement in California (2017) available at https://perma.cc/5WGK-UBBN.
[49] See: Terry Kupers (2017). Solitary: The Inside Story of Supermax Isolation and What We Can Do to Abolish It. Oakland, CA: University of California Press, especially pp. 151-167.
[50] See e.g., Brian Hagan et al., History of Solitary Confinement Is Associated with Post-Traumatic Stress Disorder Symptoms among Individuals Recently Released from Prison, Journal of Urban Health, 95, 141-148 (2018); and Arthur Ryan & Jordan DeVylder, Previously Incarcerated Individuals with Psychotic Symptoms Are More Likely to Report a History of Solitary Confinement. Psychiatry Research, 290, 113064 (2020). https://doi.org/10.1016/j.psychres.2020.113064.
[51] Lauren Brinkley-Rubinstein, et al., Association of Restrictive Housing During Incarceration with Mortality After Release, Journal of American Medicine (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

1    (54% more likely) after being released from prison,[52] and they were "127% more likely to

2    die of an opioid overdose in the first 2 weeks after release."[53]

3         60.    In addition, and largely in response to the growing scientific evidence on the

4    harmful effects on solitary confinement in general and for mentally ill incarcerated

5    persons in particular, many professional organizations built on the 2012 recommendation

6    by the American Psychiatric Association and have recommended drastic limitations on the

7    use of solitary confinement or outright prohibitions against placing certain vulnerable

8    populations (such as juveniles and the mentally ill) in isolated housing. For example, in

9    2017, the American Psychological Association acknowledged that solitary confinement

10   was associated with heightened risk of self-mutilation and suicidality, a range of adverse

11   psychological symptoms such as anxiety, depression, sleep disturbance, paranoia and

12   aggression as well as the exacerbation of pre-existing mental illness and trauma-related

13   symptoms.[54] The American Public Health Association issued a statement in which it

14   detailed the public-health harms posed by solitary confinement, urged correctional

15   authorities to "eliminate solitary confinement for security purposes unless no other less

16   restrictive option is available to manage a current, serious, and ongoing threat to the safety

17   of others," and recommended that "[p]unitive segregation should be eliminated."[55] The

18   position statement of the Society of Correctional Physicians similarly acknowledged "that

19   prolonged segregation of inmates with serious mental illness, with rare exceptions,

20   violates basic tenets of mental health treatment," and recommended against holding these

21   incarcerated persons in segregated housing for more than four weeks.[56]

22

23   ――――――――――――――――

24        [52] Id.
          [53] Id.
25        [54] American Psychological Association. 2017. Solitary Confinement of Juvenile
     Offenders. https://www.apa.org/about/gr/issues/cyf/solitary.pdf
26        [55] American Public Health Association. 2013. Solitary Confinement as a Public
     Health Issue. Policy No. 201310.   http://www.apha.org/advocacy/policy/policysearch/
27   default.htm?id=1462
          [56] Society of Correctional Physicians. 2013. Position Statement, Restricted Housing
28   of Mentally Ill Inmates.   http://societyofcorrectionalphysicians.org/resources/position-
     statements/restricted-housing-of-mentally-ill-inmates

61.     Other organizations have also recommended drastically limiting the use of solitary confinement and banning it outright for use with incarcerated persons who are mentally ill, including the United Nations' "Mandela Rules[57] and the National Commission on Correctional Healthcare ("NCCHC").[58] The NCCHC's guidelines on this issue are especially notable because it is the premier organization of corrections professionals who work in prison medical and mental healthcare. Its Position Statement included the provision that juveniles, mentally ill individuals, and pregnant women should be "excluded from solitary confinement of <u>any</u> duration" (emphasis added), and that health care staff should advocate to correctional officials that stays in solitary confinement should never exceed 15 days continuous duration, and also advocate to them that they should bar juveniles and mentally ill incarcerated persons entirely from such confinement. Similarly, the National Alliance on Mental Illness issued a statement "oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses."[59]

62.     Consistent with these recommendations, in 2018, a group of international legal, medical, mental health, and human rights scholars and experts were convened in Santa Cruz, California, to produce a set of "guiding principles" designed to advance solitary confinement reform in the United States and internationally. The principles established in the Consensus Statement that resulted from this meeting included the overarching admonitions that solitary confinement should only be used when absolutely necessary (i.e., in response to exigent circumstances that cannot be addressed any other way), for the shortest amount of time possible (from periods of a few hours to no more

---

[57] Commission on Crime Prevention and Criminal Justice, <u>United Nations Standard Minimum Rules for the Treatment of Prisoners</u>. New York: UN Economic and Social Council (2015), commonly known as the "Mandela Rules."

[58] National Commission on Correctional Healthcare (2016). Position Statement: Solitary Confinement (Isolation). <u>Journal of Correctional Health Care</u>, <u>22(3)</u>, 357-263.

[59] National Alliance on Mental Illness. 2016. <u>Public Policy Platform of the National Alliance on Mental Illness</u>. 12th Edition. Arlington, VA: NAMI. <u>https://www.nami.org/About-NAMI/Policy-Platform,</u> Section 9.8.

1    than a 15-day maximum), and *never* with certain vulnerable populations (such as juveniles

2    and the mentally ill).[60]

3         63.    Finally, a number of jurisdictions across the U.S. are moving toward

4    severely restricting or ending the use of long-term solitary confinement based on the

5    scientific findings and outcomes I have summarized above. For example, in 2017,

6    Colorado, led by the director of its Department of Corrections, barred the use of isolation

7    in its prisons other than for serious disciplinary infractions and limited the length of stay

8    to no longer than 15 days. In 2019, New Jersey passed a law prohibiting use of solitary

9    confinement in prisons and jails statewide for more than 20 consecutive days, or more

10   than 30 days during a 60-day period. New Jersey also prohibited use of solitary

11   confinement for persons with serious mental illness. Also in 2019, the Washington State

12   Department of Corrections joined a number of states that have entered into a partnership

13   with the Vera Institute of Justice to reduce the use of restrictive housing. I am a member

14   of this Advisory Board of the Vera Institute program, called Safe Alternatives to

15   Segregation, and can attest that, over the last several years, a number of state correctional

16   and county jail systems also have enrolled in this program and have implemented steps to

17   significantly reduce the population of incarcerated persons held in isolation/solitary

18   confinement, significantly improve the conditions of confinement to which they are

19   subjected, and imposed time limits on lengths of stay in these units. Even more recently,

20   New York State enacted legislation prohibiting prison and jails statewide from holding

21   persons in solitary confinement for more than 15 consecutive days, and disallowing

22   solitary confinement completely for persons under 22 or over 54 years of age, those who

23   are pregnant, persons with disabilities, and persons with serious mental illness.[61]

24   _____

25        [60] Craig Haney, Brie Williams, & Cyrus Ahalt, Consensus statement from the
     Santa Cruz Summit on Solitary Confinement and Health, <u>Northwestern University Law
     Review</u>, <u>115</u>, 335-360 (2020)

26        [61] Links to news reports that detail these solitary confinement reforms can be found
27   here: https://www.nytimes.com/2021/04/01/nyregion/solitary-confinement-restricted.html;
     https://www.governor.ny.gov/news/governor-cuomo-signs-halt-solitary-confinement-act-
     law; https://www.aclu.org/blog/prisoners-rights/solitary-confinement/why-i-ended-horror-
28   long-term-solitary-colorados-prisons;        https://www.aclu-nj.org/news/2019/07/11/gov-

64.    To summarize the empirical literature on the adverse effects of solitary confinement, published both before and, especially, *after* my November 7, 2013 Expert Report: The accumulated weight of the scientific evidence that I have cited to and summarized above demonstrates the negative psychological effects of isolated confinement—what happens to persons who are deprived of normal social contact for extended periods of time. This evidence underscores the substantial dangers that isolation creates for human beings in the form of mental pain and suffering and increased tendencies towards self-harm and suicide, and even physical damage, susceptibility to harmful medical conditions, and heightened mortality. The evidence further underscores the psychological <u>and</u> medical importance of meaningful social contact and interaction, and in essence establishes these things as identifiable human needs. Over the long-term, they may be as essential to a person's psychological well-being as adequate food, clothing, and shelter are to his or her physical well-being.

**VI. ADCRR's Continued Use of Harmful Forms of Prolonged Solitary**

65.    All other things being equal, the adverse psychological effects of solitary confinement should vary as a function of the severity of the conditions and the amount of time incarcerated persons are confined in them. There are better and worse isolation units, including some that attempt to ameliorate the harsh conditions they impose and minimize their worst effects on incarcerated persons. Moreover, incarcerated persons vary in their resiliency, their ability to withstand the stress, pain, and harmfulness of this kind of confinement, and the degree to which they are able to recover after having been released. These variations qualify but do not contradict what is known about the suffering that isolated confinement inflicts and the serious risk of significant harm that it represents for all incarcerated persons who are subjected to it.

66.    Based on the conditions of isolated confinement that I observed in the various ADCRR units that I inspected, the individuals I interviewed, and the documentary

murphy-signs-isolated-confinement-restriction-act-law;
https://www.doc.wa.gov/news/2020/10282020.htm

evidence that I have reviewed regarding those conditions (including ADC general policies and practices as well as those that pertained to the nature and amount of available mental health care for isolated incarcerated persons), I have concluded that the incarcerated persons in these isolation units[62] continue to be at serious risk of significant harm due to their conditions of confinement. This is especially true for those incarcerated persons who suffer from mental illness.

A.    **Summary of Expert Opinions**

1.    **ADCRR's Harsh Isolation Units and The Negative Impact on Mentally Ill People**

67.    ADCRR has no written policy prohibiting incarcerated persons whom the system itself has designated as suffering from the most serious forms of mental illness—what is traditionally referred to as SMI—from being housed in what are traditionally referred to as solitary confinement or supermax-type units. To the contrary, ADCRR policy specifically provides for placing even persons with an SMI into solitary confinement.[63] This is in addition to those persons who, although they may not be designated SMI, nonetheless suffer from serious mental health problems (including having been given diagnoses such as major depression or schizophrenia, and prescribed psychotropic medications by psychiatric providers, and having lengthy psychiatric histories and histories of suicidal behavior). Indeed, based on the tours that I conducted (discussed at greater length below), and Defendants' records and documents, it is very clear that many such people are currently housed in such units within ADCRR.[64]

---

[62] In defining isolation units I have followed the Court's definition of the subclass in this matter; "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman—SMU I; Eyman—Browning Unit; Florence—Central Unit; Florence—Kasson Unit; or Perryville—Lumley Special Management Area." Order, March 6, 2013, at 22 (Doc. 372). There is now a Maximum Custody housing unit at Lewis—Rast. It is my understanding that there is no longer a Maximum Custody housing unit at Florence or Perryville.

[63] Dep't Ord. 812 (Inmate Maximum Custody Management and Incentive System), July 24, 2019 at § 2.1.2.

[64] This was confirmed not only by the self-reports of the incarcerated persons whom I interviewed but also by their ADCRR records.

68.     Moreover, contrary to sound correctional and clinical practice, there is no written policy requiring that a face-to-face mental health evaluation be conducted before placing an incarcerated person in one of these units.[65] For some, but not all, of the harshest categories of isolation, there is a requirement that persons designated as SMI have a face-to-face interview with mental health staff, but this evaluation is not required until three days after the person has been placed into solitary confinement.[66] Dr. Bobbie Stallcup, ADCRR's Mental Health Program Director and the Department's designated 30(b)(6) deponent with regard to mental health and isolation conditions, testified that there is no requirement that a person receive a mental health evaluation before being placed into detention or maximum custody, except for placement into the "Restrictive [Status] Housing Program."[67] Dr. Stallcup testified that although there is a review process that she participates in prior to people classified as SMI being placed into the RSHP, she has never recommended that a patient classified as SMI not be transferred to RSHP. [68]

69.     Additionally, Dr. Stallcup testified that there is no written policy restricting the housing of patients classified as SMI in detention or maximum custody, and that there are people classified as SMI in both of these types of isolation.[69] DW Coleman similarly testified that there is no bar to placing people classified as SMI into detention, close management, or maximum custody.[70] Both he and DW Stickley testified that there are, in fact, people classified as SMI in detention and maximum custody.[71] Indeed, DW Coleman

---

[65] Dep't Ord. 812 at § 2.2.1 (requiring an evaluation by mental health staff within three days of placement); *cf.* 812 at § 2.3.2 (requiring "a face-to-face interview" with correctional staff); Van Winkle (30(b)(6) – Isolation) dep. – 49:14-50:13

[66] Dep't Ord. 812 at §§ 6.2 (regarding Restrictive Status Housing Program), 7.3 (regarding Enhanced Management Housing Program). There is no such requirement for persons being placed into detention or close management, or into the Maximum Custody Security Threat Groups unit. *See* Dep't Ord. 804 (Inmate Behavior Control), Nov. 1, 2019, at § 1 (regarding placement into detention); Dep't Ord. 813 (Close Management), May 6, 2020; Dep't Ord. 806 (Security Threat Groups (STGs)), Apr. 15, 2021.

[67] Deposition of Dr. Bobbie Stallcup,– Mental Health, 30(b)(6) – Isolation Topics 7-9, Oct. 12, 2021 (hereinafter "Stallcup Dep."), 47:12-49:11, 51:11-15, 63:3-6.

[68] Stallcup Dep., 50:12-16. .

[69] Stallcup Dep., 120:16-121:4.

[70] Deposition of Deputy Warden Anthony Coleman, Oct. 14, 2014 (hereinafter "Coleman Dep."), 36:7-37:20.

[71] Coleman Dep., 37:24-38:6; Deposition of Deputy Warden Lori Stickley, Oct. 12,

1    testified that one of the reasons that he recommended that someone should be kept in

2    maximum custody was that he was classified as SMI.[72]

3        70.    And Centurion's former Regional Mental Health Director, Dr. Stefanie

4    Platt, testified that if mental health staff believed a person in max custody should be

5    transferred to the Aspen unit, a residential mental health unit at ASPC-Phoenix, patient

6    could not be transferred unless custody staff decided to grant a custody override.[73]

7        71.    Finally, there is apparently no written policy that provides for mental health

8    staff to not only monitor the mental health of people in isolation units, but also take action

9    when a mentally ill—or any—person deteriorates in isolation (except under the extreme

10   circumstance in which inpatient care is determined necessary).[74]

11       72.    Based on the numerous interviews that I conducted, as described below, I

12   found a surprisingly high number incarcerated persons who reported struggling with

13   serious mental health problems in every housing unit I toured. Many of them were housed

14   among other isolated incarcerated persons, rather than in ADCRR's designated mental

15   health housing areas in the isolation units. Indeed, numerous people I spoke with who

16   were on ADCRR's mental health caseload appeared to be clearly suffering as a result of

17   their isolated confinement, yet they reported receiving little or no meaningful

18   psychological treatment. In my professional opinion, placing individuals with serious

19   mental health problems in Defendants' isolation units poses an especially significant risk

20   of serious harm. As I have noted, mentally ill incarcerated persons are prone to deteriorate

21   psychologically under isolated conditions. This psychological deterioration—or what

22   clinicians refer to as "decompensation"—often takes the form of acting out and engaging

23   in behavior that constitutes rule infractions. In these instances, this "bad" and troublesome

24   behavior is the direct product of their mental illness and the ways that illness exacerbates

25   the psychological and behavioral reactions they have to the pain and stress of isolated

26

27   2021 (hereinafter "Stickley Dep."),., 84:8-11.
       [72] Coleman Dep., 160:25-161:5.
       [73] Deposition of Dr. Stefanie Platt, Oct. 15, 2021, 86:9-11.
28     [74] Van Winkle (30(b)(6) – Isolation) dep. 200:21-24.

1    confinement (in an environment that, as I have indicated, they should never have been

2    placed in in the first place). Punishing them for behavior that they cannot control, and that

3    has been caused in part by the decisions of corrections officials themselves, is wrong as a

4    matter of simple fairness. In addition, it is a singularly inappropriate way to respond to

5    mental illness and can result in the incarcerated person's further deterioration.

6                        **a.  Use of Force on Mentally Ill Incarcerated People**

7            73.    It is further apparent that some of the seriously mentally ill incarcerated

8    persons in these units, including those who are on psychotropic medications and those

9    who are on mental health watch, have been subjected to the use of chemical agents, a

10   practice that is explicitly permitted by ADCRR policy.[75] More than merely being

11   permitted by policy, the use of chemical agents on mentally ill people appears to occur

12   frequently. As I detail below, incarcerated persons in the isolation units I inspected

13   repeatedly described either being subjected to chemical spray themselves or witnessing

14   the use of chemical spray on others. Even (perhaps especially) those incarcerated persons

15   "in crisis" and on mental health watch were subjected to such treatment.

16          74.    I reviewed several videos showing the use of chemical agents on ███

17   ███████████, and, to have a better understanding of the context, have reviewed

18   Mr. ████████'s medical records and several letters written to ADCRR by Plaintiffs'

19   counsel regarding Mr. ████████ I understand that he has been subjected to chemical

20   agents more than forty times over the last year. The videos I reviewed are from two time

21   periods, August 2020 at Eyman-SMU I and December 2020 at Eyman-Browning. I have

22   not reviewed all of the videos ADCRR has produced relating to the use of force against

23   Mr. ████████  According to his medical records, he has been diagnosed with

24   schizophrenia, schizoaffective disorder, borderline personality disorder, and unspecified

25   psychosis, yet he is not considered to have a serious mental illness.

26

27

28          [75] Dep't Ord. 804 § 4.1.3.1.

75.     Mr. ████████'s medical records show that he was on mental health watch at the times these videos I reviewed were taken. The videos show a gross failure to provide him the mental health care \ he needs. He clearly appears to be in severe mental health crisis—he is in distress, not responding to verbal commands, and is pacing and banging his head into the metal door of his cell each time he comes to it. In some videos, it appears that correctional staff ask him to stop, and warn him that if he does not stop he will be sprayed with pepper spray or, in some cases, shot with pepperballs.

76.     In most of the videos, there is no evidence that anyone from mental health staff came to talk with him. This is despite his extensive mental health history, his current "watch" status, his unresponsiveness, apparent distress, and self-harming behavior. In one two-minute video, taken on December 23, 2020 at 10:09 a.m., it appears there is mental health staff present from the beginning of the video, but it appears that Mr. ████████ is sprayed with pepper spray about 42 seconds into the video.  At that point the person whom I believe to be a mental health staff member backs away, and then leaves. A six-minute video taken about a half hour later at 10:43 a.m., also shows what appears to be a mental health staff member. She arrives at Mr. ████████'s cell one minute and six seconds into the video, and leaves at one minute and twenty-eight seconds into the video – talking to Mr. ████████ for just twenty-two seconds.

77.     Throughout these videos, Mr. ████████ is obviously in need of basic, meaningful mental health care—attempting to alleviate his distress, address his mental health symptoms and concerns, and de-escalate a deteriorating situation. Instead of receiving it, he is repeatedly shot with pepper spray and pepper balls. He is eventually placed in restraints and escorted out of the unit.

### b.  Risk of Heat Injury or Death

78.     At the same time, people with mental illness incarcerated in the isolation units are exposed to extreme levels of heat, regardless of their diagnosis and regardless of the types of medications they take. To my knowledge, there is no ADCRR policy that

1    limits the temperatures in the units where incarcerated persons taking psychotropic
2    medications are housed.

3        79.    During my facility inspections in July 2013, I repeatedly heard from people
4    that they experienced difficulty with the heat on the units and in the recreation areas. For
5    many, being trapped in small, airless cells all day, every day, made their conditions of
6    confinement in isolation even more difficult to bear. It was also abundantly clear from my
7    own observation that incarcerated persons, staff, and others who accompanied us on the
8    tours were experiencing difficulties with the extreme heat on the units, Moreover, at
9    Eyman-Browning and Eyman-SMU I, many of the cell-fronts are a thick metal mesh with
10   plexiglass over them. This further limits airflow in the cells. The 2021 tour revealed the
11   same problems with excessive heat in the isolation units that I visited.

12       80.    Although at first blush they may appear to be unrelated, it is my opinion that
13   these two practices—the use of chemical agents and the failure to monitor heat levels—
14   are joined by the underlying deliberate indifference that they both reflect. Not only has
15   ADCRR taken the ill-advised step of housing large numbers of mentally ill people in
16   isolated conditions that cause suffering and place their psychological well-being at risk,
17   but its officials also have chosen to adopt policies that place these persons in even greater
18   jeopardy. Both practices not only reflect deliberate indifference to the plight of the
19   mentally ill in isolated confinement, but also add to the feelings of vulnerability and
20   helplessness from which mentally ill people suffer in these units. People with mental
21   illness are literally placed in situations and settings in which, because of the punitive
22   actions (in the case of pepper spraying) and dangerously indifferent inaction (in the case
23   of the failure to monitor and limit heat exposure) of corrections officials, they are—and
24   know they are—in danger.

25       81.    Both ADCRR's policy of subjecting seriously mentally ill persons, most of
26   whom are on psychotropic medications, to chemical spray and its failure to protect those
27   who are on psychotropic medications from heat-related injury add to the grave risks of
28   harm for people with mental illness in the isolation units.

1    82.    During the course of my facility tours in 2021 I interviewed numerous

2    people who are now confined in Defendants' isolation units who reported that they

3    suffered from serious mental health problems (including lengthy psychiatric histories that

4    dated to childhood and included mental hospitalizations) and reported receiving

5    psychotropic medications. As I discuss below, and note in my summaries, many describe

6    symptoms of mental suffering, mental illness, suicidal thoughts and acts, and incidents of

7    self-harm, including repeated acts of self-mutilation (the after-effects of which were often

8    visibly apparent). The problems they described are consistent with the types of symptoms

9    and suffering that I would expect to find in a system with the kind of stark and extreme

10   isolation conditions, policies, and practices that I have observed in the ADCRR.

### 2. Lack of Meaningful Treatment for Incarcerated People With Mental Illness in Isolation Units

83.    It is my opinion that the lack of meaningful mental health care in ADCRR's

isolation units places people with mental illness at extreme risk of serious harm. As I

mentioned above, it is the position of numerous corrections officials, courts, and

professional mental health and human rights organizations that incarcerated persons with

mental illness should be prohibited from placement in such units, and in the rare

circumstances where such placement is absolutely necessary, that strict limits be placed

on the duration of isolation and significant amounts of out-of-cell time and structured

therapeutic activities must be provided.

84.    It is clear that under ADCRR policy, the duration of time people with

mental illness spend in the isolation units in and of itself creates significant risks of harm.

By policy, every person with a life sentence must spend a minimum of 2 years in these

units—regardless of their mental health status or behavior.[76] Defendants do not monitor

the mean or median length of time incarcerated persons spend in isolation.[77] And Eyman-

Browning DW Scott testified that the length of stay in isolation is not a factor that is

---

[76] Dep't Ord. 801 (Inmate Classification), May 11, 2019, at § 3.3.3.
[77] Van Winkle (30(b)(6) – Isolation) dep. 192:19-193:9.

considered in the decision whether to keep or release them from isolation.[78] Indeed, Warden Van Winkle, ADCRR's 30(b)(6) designee to testify on isolation, testified that there is no limit to the amount of time an incarcerated person may stay in isolation.[79]

85.     At the same time, Defendants' mental health programs within the isolation units are wholly inadequate to meet the needs of mentally ill incarcerated persons. For the most part, these programs appear to be very limited and only available to a relatively small number of persons held in maximum custody; those in detention and mental health watch do not have access to programs.[80] In some units, particularly in some maximum custody units, group programming has been made available through the use of classrooms that have tables to which incarcerated persons can be handcuffed. However, the people I spoke to at Eyman and Lewis reported, and ADCRR witnesses confirmed, that mental health programming is available only to people designated as SMI.[81] And, as I learned in my 2021 tours and interviews, even those classified as SMI are denied such programming, including when it is cancelled or offered only sporadically. In addition, many people who were diagnosed with serious mental illnesses by ADCRR mental health clinicians, including schizophrenia, or who report hallucinations or other symptoms of psychosis, and/or who may have multiple instances of suicidal behavior, are not classified as SMI, and thus are not offered even the meager mental health programming that exists in the maximum custody units.

86.     Moreover, during a period from March or April 2020 through June 2021, all mental health programming was cancelled at Eyman-Browning and Florence-Kasson.[82] Even "table time" – unstructured out-of-cell time – was eliminated for most of this period.[83]

---

[78] Scott dep. 145:1-5.
[79] Van Winkle (30(b)(6) – Isolation) dep. 110:3-5, 118:12-14, 120:18-21, 122:8-11.
[80] Van Winkle (30(b)(6) – Isolation) dep. 133: 4-15, 136:7-14, 137:1-11. Dep't Ord. s 804 § 2, 812, 813
[81] Scott dep. 131:8-13.
[82] Scott dep. 131:8-19; Florence-Kasson Cancellation Information Reports, ADCRR00054278-00054354, ADCRR00055737-55786.
[83] Scott dep. 131:21-132:6; Florence-Kasson Cancellation Information Reports,

87.     Some people are supposed to have greater access to one-on-one counseling.[84] However, the amount of mental health programming and one-on-one counseling provided—by policy and in practice—does not come close to providing the nature and amount of adequate out-of-cell time and necessary structured therapeutic activities that mentally ill isolated incarcerated persons require.

88.     There are variations in the actual and promised programs that I detail in my inspection findings below. Indeed, the actual operation of the programs currently underway appeared to be episodic and ad hoc at best. During my 2021 inspections, I spoke to a number of persons who had been to one or two group sessions only recently, or who had started a group in the past only to have it discontinued. Many others said they wanted to participate in groups, but none were being offered, or they had asked to participate but never received a response from mental health staff. Very few people, even those in designated mental health units, had any clear idea of what the program was or what they needed to do to successfully participate. The incarcerated persons I spoke with acknowledged that they were happy to be out of their cells for programs, but had mixed reactions to the facilitators, including that they were often CO-IIIs with no mental health training. Even when they participated in the groups, however, many acknowledged having no idea what the group was actually about or how it addressed their mental health needs — "it's chit chat," as one said.  Several at Eyman noted that they had finally been allowed out of their cells to watch the movie "The Hangover: Part Three" with others.

89.     When I inspected the facilities in 2013, I noted that the provision of mental health programming was episodic and ad hoc. It appears that this not only remains true but may have gotten worse. As noted above, very little mental health programming was provided in maximum custody units during more than a year of the COVID pandemic.

---

ADCRR00054278-00054354, ADCRR00055737-55786..
[84] ADC Mental Health Technical Manual, Dec. 24, 2019, Chapter 3, § 5.

1    While there was some increase in the amount of mental health programming after June

2    2021, the facilities continued to cancel many—if not most—of the programs.[85]

3          90.    Additionally, in detention units there is even less mental health

4    programming and out-of-cell time. People in detention have no programming of any kind,

5    and people in close management have only classes, not mental health groups.[86] Even those

6    persons who are designated SMI are not given table time in detention or on close custody

7    status.[87] Dr. Bobbie Stallcup, the Mental Health Program Director for ADCRR, and the

8    Department's designated 30(b)(6) deponent regarding mental health care and certain

9    isolation topics as they related to mental health care, testified that mental health groups

10   are not provided in detention.[88]  DW Stickley of Eyman SMU I, testified that the only

11   reasons people come out of their cells in detention units is for recreation and showers.[89]

12         91.    I also heard a frequently-voiced complaint about a serious problem—the

13   common use of cell-front encounters by mental health staff. By their very nature, such

14   encounters tend to be superficial and uninformative; many patients are unwilling to share

15   relevant information because other incarcerated people or custody staff are around. This

16   makes it difficult or impossible for a treating clinician to accurately treat a patient whose

17   problems or concerns have not surfaced in the encounter. Moreover, cell-front mental

18   health encounters reduce the already meager out-of-cell time that SMI or other persons

19   experiencing serious mental health problems receive while housed in isolation units.

20         92.    Dr. Marc Stern, the Court's expert, found that:

21       [C]onducting encounters in a confidential space is of paramount importance
    for patients on watch because it helps ensure that the patients share complete

22       and accurate information with the clinician, information which is key to
    assessing risk. Unfortunately, a very high percentage of the watch-related

23       encounters I reviewed were conducted at the cell-front (i.e. non-
    confidentially).

24

25   [85] Information Reports for Eyman-Browning (7/6/2021, 7/13/2021, 7/20/2021,
7/27/2021, 8/3/2021, 8/10/2021), Eyman-SMU I (7/6/2021, 7/12/2021, 7/13/2021,

26   7/26/2021 (ADCRR00055695), 8/2/2021), Florence-Kasson (7/26/2021).

27   [86] Van Winkle (30(b)(6) – Isolation) dep. 137:1-22 ; Dep't Ord. 813, Attachment B.
[87] Van Winkle (30(b)(6) – Isolation) dep. 135:1-6, 137:1-22

28   [88] Stallcup Dep., 107:18-21.
[89] Stickley Dep. 118: 16-119:11.

1   Doc. 3379 at 121.

2   93.    Although it is my understanding that patients are supposed to be offered a

3   confidential setting to speak with mental health staff, many decline to do so, in part

4   because of the onerous security procedures to which they must submit in order to attend a

5   confidential encounter. As Dr. Stern explained, ADCRR custodial policies likely

6   discourage patients from receiving out-of-cell clinical encounters:

7
        [T]he policy of shackling patients when taking them from their cells to
8       private rooms to meet with the mental health clinician merits scrutiny.
        Currently patients on watch are housed in living units designated as high
9       level of custody. Many, if not most, of these patients do not meet the criteria
        of high custody. However, they are still subjected to the requirements of
10      high custody (notably shackling before removal from the cell). It is likely
        that the prospect of having to be shackled serves as a deterrent to agreeing to
11      be taken out of their cell.

    Doc. 3379 at 123.
12
    94.    In addition, it is important to note that many incarcerated persons report that
13
    they decline out-of-cell contacts with mental health staff, even though they are potentially
14
    much more meaningful than the cell-front contacts, because what are referred to in
15
    ADCRR records as encounters in "a confidential, private setting" take place in small
16
    rooms in which the patient sits in a small telephone booth-like cage, still in restraints.
17
    (One such treatment cage is depicted below.) Many people said that they find this
18
    procedure dehumanizing and hardly conducive to building trust and rapport, or
19
    encouraging candor. It is also the case that this physical configuration and arrangement is
20
    difficult if not impossible for persons with mobility-related impairments to use.
21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16      *Cage for mental health treatment, ASPC-Eyman (ADCRR00108104)*

17      95.     Beyond the lack of actual mental health treatment, there also appears to be

18   an insufficient amount of out-of-cell time or and little or no congregate or group time

19   provided to mentally ill incarcerated persons in all of the isolation units. Some of the

20   maximum custody units provide a small number of opportunities for group exercise, and

21   some persons in maximum custody and close management are offered a class in

22   congregate settings, but there are too few such opportunities.[90] Further, as with mental

23   health programming, many of the incarcerated persons with whom I spoke in my 2021

24   tours and interviews reported that outside exercise, classes, and even inside exercise are

25   frequently cancelled. Their reports are corroborated by ADCRR documents.[91]

26

27      [90] Van Winkle (30(b)(6) – Isolation) dep. 133:4-17, 136:1-14137:16-22; Dep't Ord. 812, 813.

28      [91] Information Reports, Bates Nos. ADCRR00052183 -00055787.

96.     Defendants' policy and practice limit out-of-cell exercise for persons in detention and close management to six hours a week.[92] None of the incarcerated persons with whom I spoke in detention and close management units told me that they were receiving more than that minimal amount of recreation time, and a number told me that they were not getting that much. This minimal amount of time out-of-cell, even if occasionally complemented by a group session or a meal with others, is not sufficient to ameliorate the adverse effects that confinement in the harsh isolation units has on mentally ill incarcerated persons.

97.     According to ADCRR policy, persons on mental health watch are allowed recreation *if* the mental health staff so indicates on the order placing them on watch.[93] Warden Van Winkle, the warden at Florence, where there was, until recently, a mental health unit that included a 16-person mental health watch pod, testified that "it does not happen often" that mental health staff indicate that a person on watch can go to recreation.[94] DW Scott testified that at Eyman-Browning, although mental health staff can order that a person on watch be allowed recreation, in most instances when such a recommendation is made, there is no way for Eyman-Browning staff to provide recreation.[95] Centurion's Director of Mental Health Dr. Ashley Pelton testified to the contrary, that "at the end of the day security is responsible for security, and removing the person from the cell," and custody staff make the final determination as to whether a person on mental watch is allowed out for recreation.[96]

98.     In addition to the inadequacy of care provided to people in the formally designated mental health "programs" that exist in certain isolation units, the other people in isolation units—including many who are identified as mentally ill—are not receiving

---

[92] Dep't Ord. 804 § 2.0, 813; Van Winkle (30(b)(6) – Isolation) dep. 137:12-15 .
[93] Dep't Ord. 807 § 7.6; Van Winkle (30(b)(6) – Isolation) dep. 139:5-18.
[94] Van Winkle (30(b)(6) – Isolation) dep. 140:9-23.
[95] Scott dep. 127:11-129:14.
[96] Pelton dep. 145:12-16 (Rough Trans.).

proper mental health screening, monitoring, or care. This was apparent from the interviews I conducted.

### 3. Extreme Social Isolation and Harsh Conditions Put All Incarcerated Persons in Isolation at Risk of Harm

99.     It is my opinion that the failure of Defendants to categorically exclude all incarcerated persons who suffer from SMI from being confined in its isolation units is at odds with sound correctional and mental health practice. It places all incarcerated persons with SMI at very significant risk of serious harm. It is also my opinion that the conditions of confinement in the isolation units that I toured and the policies and practices that I reviewed and admissions of ADCRR regarding conditions of confinement in its isolation units (as reflected in the documents, materials, and admissions I have reviewed), place all other incarcerated persons exposed to them at significant risk of serious harm. This includes but is not limited to those persons who, although not formally designated SMI have been given serious mental health diagnoses by ADCRR clinicians, prescribed psychotropic medications for their conditions, and have lengthy psychiatric histories and/or multiple instances of suicidal behavior. The conditions, practices, and policies that I observed in these units and that were reported to me by numerous incarcerated persons are ones that, my own experience and research and the decades of scientific research and study done by others have found can adversely affect virtually everyone exposed to them, regardless of whether they suffer from pre-existing mental illness. Thus, the conditions of isolation to which incarcerated persons are subjected in ADCRR places them at significant risk of serious psychological harm.

100.     These units are harsh and severe by any measure, and they subject incarcerated persons to extreme forms of social isolation and other potentially debilitating deprivations. For example, as mandated by statewide policy, people in isolation units are afforded extremely limited out-of-cell time. Official policy and practice allow for only 6 hours of exercise a week in three separate two hour blocks for persons in detention and

1     close management.[97] The "every-other-day" configuration means that incarcerated

2     persons will spend half the days of the week confined continuously inside their small

3     cells. If their exercise time is cancelled, for whatever reason—which I was repeatedly told

4     was not uncommon—then their periods of continuous in-cell confinement are even longer.

5     Moreover, it reduces their exercise time to no more than 3-4 hours per week, far below

6     what is commonly regarded as the minimal amount of out-of-cell exercise time for

7     isolated incarcerated persons.

8           101.    Persons in maximum custody are, by policy, offered slightly more, generally

9     three blocks of two and a half to three and a half hours over the course of a week.[98] For

10    many persons in maximum custody, all or most of their "exercise" takes place in specially

11    designed "enclosures" that are constructed of chain link fencing or steel mesh or concrete

12    walls and contain no equipment.[99] Detention units and close management units offer even

13    less out-of-cell time. People in these units are, by policy, offered just six hours per week

14    of recreation.[100]

15          102.    Incarcerated persons who are in Enhanced Management Housing Status

16    Unit ("EMHS") or Restricted Status Housing Program ("RSHP"), and detention are

17    denied access to the prison's out-of-cell educational programming.[101] Indeed, access to

18    any programming or activity of any kind appears extremely limited in these units,

19    resulting in widespread and debilitating idleness.

20          103.    The conditions of confinement in these units are stark and barren, the

21    deprivations imposed on the incarcerated persons housed within them are severe, and the

22    degree of isolation is extreme.

23          104.    Incarcerated persons also reported that the meals they are provided are

24    inadequate. Persons in isolation units reported uniformly that they receive a sack meal,

25

26    [97] Dep't Ord. 804 § 2.0, 813.

27    [98] Dep't Ord. 812.
      [99] Id.

28    [100] Dep't Ords. 804 § 1.2.6.6, 813, Attachment A.
      [101] Id.; Dep't Ord. 809, Earned Incentive Program (Jan. 13, 2020).

1  containing what is supposed to serve as both breakfast and lunch, at three or four in the

2  morning, and dinner at around three in the afternoon. They uniformly reported that the

3  food is not enough and they remain hungry most of the time.

4       105.   The stark conditions in isolation are further exacerbated by the lighting. The

5  isolation cells have 24-hour illumination. I saw many cells where the persons living in the

6  cell had covered up the light, demonstrating that the light has a negative impact on them.

7  At the same time, the cells, particularly at Eyman-Browning and Eyman-SMU I, were

8  lacking in natural light. The housing units at Eyman-Browning, Eyman-SMU I, and

9  Lewis-Rast all lack windows allowing natural light directly into the cells. At Lewis-Rast,

10 there are windows in the walls of the hallway in the housing pods, providing some natural

11 light into the cells, but at Eyman-Browning and Eyman-SMU I, the only natural light is

12 from opaque skylights in the ceiling of the units. Little of the light makes it into the cells,

13 particularly the cells on the lower tiers. Both the constant artificial illumination and the

14 minimal natural light adds to disorienting nature of the conditions in these units.

15      106.   Particularly in detention, close management, intake into maximum custody

16 and mental health watch, people are permitted very limited property. One tangible

17 improvement in conditions since I inspected the facilities in 2013 is that many

18 incarcerated persons now have tablets on which they can access electronic materials and

19 write emails. Although the tablets definitely help to alleviate idleness, they do not

20 substitute for the lack of meaningful human contact and interaction. Moreover, persons in

21 the Behavioral Management Unit ("BMU") in maximum custody are not permitted to

22 have tablets. It seems profoundly counterintuitive to single out the persons with serious

23 mental illness in the BMUs as the group **not** allowed to have tablets.

24      107.   Finally, from my interviews with persons in isolation and review of records,

25 it is evident that many persons spend years and years in the bleak conditions described

26 above. Moreover, many persons informed me that they had been "stuck" in the maximum

27 custody step program for long periods of time, and did not know if or when they would be

28 let out of isolation, or what they could do to get released from isolation. According to

1   Defendants' policy, once a person has been at Step 3 for 30 days without incident, he is

2   eligible for consideration for release from isolation.[102] But many prisoners spend much

3   longer than that at Step 3, and there is no policy requiring that persons be informed of the

4   reasons why they have not been moved out of isolation or out of one or another status in

5   isolation.[103] This unpredictability about their fate, and their inability to influence it,

6   increases the psychological pain of the experience and can lead to a sense of hopelessness.

7   ADCRR's lack of clarity with them about whether, how, and when they might be released

8   from isolation increases the anxiety and trauma of being in isolation.

9       108.   The only regular contact that incarcerated persons in these units have with

10  other human beings is limited almost entirely to the brief, routinized "interactions" that

11  occur twice a day, when they receive their meals (which, of course, they are required to

12  eat in their cells). The atmosphere in many of the housing units has a kind of "war zone"

13  quality to it, with flak jacketed staff patrolling the areas outside the cells where the

14  incarcerated persons live around-the-clock. Not only does this extra paraphernalia add to

15  the oppressive heat staff must contend with in these units, but it also conveys the

16  unmistakable message to the incarcerated persons that they are categorically regarded by

17  staff as dangerous, untrustworthy, poised to attack, and never to be approached person-to-

18  person. Even the mental health staff members are outfitted in this garb.

19      109.   Incarcerated persons repeatedly reported to me—and it was consistent with

20  my observations in the course of both my 2013 and 2021 tours of the various ADCRR

21  facilities—that there was little or no routine, meaningful contact with mental health staff.

22  In fact, regular mental health monitoring of incarcerated persons is so superficial and

23  sporadic that many of them seemed puzzled when I asked about how often it occurred.

24  Many could not remember the last time such monitoring occurred or how often; most

25  emphasized that, when it did take place, it consisted of little more than quick "walk

26  throughs" or "drive-bys" in which someone asks, "you okay?" and moves on. They

_____

[102] Dep't Ord. 812 § 5.5
[103] Van Winkle (30(b)(6) – Isolation) dep. 88:17-89:24.

emphasized that mental health staff rarely if ever bothered to stop and actually meaningfully engage with them as they rapidly passed by. This lack of meaningful engagement means that a number of incarcerated persons in these units are silently suffering and deteriorating, without anyone noticing until their mental health problems become severe and perhaps irreversible.

110. The conditions of extreme social isolation and enforced idleness that I witnessed on my tours and which were described in the documents that I reviewed are virtually identical to the worst kinds of isolated conditions that I have seen and studied in other correctional institutions. These harsh and severe conditions and forms of treatment create a significant risk of serious harm for all persons subjected to them.

111. A substantial number of incarcerated persons are being subjected to these harsh and dangerous conditions in ADCRR. Based on the documents that I have reviewed and the facilities I inspected, I estimate that more than 3,000 incarcerated persons are housed in ADCRR's various types of isolation units across the ten Arizona State Prison Complexes.[104]

112. It is important to note that the fact that while some incarcerated persons may be housed with cellmates (*i.e.*, are "double-celled"), that does not mitigate, and indeed may exacerbate, the psychological impact of their deprived conditions. The interactions that take place between persons forced to live virtually around-the-clock in a space roughly the size of a king-sized bed (with an all-in-one toilet/sink in the corner) are necessarily forced and strained. Not only can they hardly be described as constituting meaningful social contact, but they actually may become an additional stressor in their own right; these forced accommodations become a source of tension and even conflict for many prisoners that exacerbate some of the negative reactions brought about by the severe

---

[104] Institutional Capacity Committed Population, Sept. 29, 2021, available at https://corrections.az.gov/sites/default/files/DAILY_COUNT/Sept2021/09292021_count_sheet.pdf (showing counts of persons in detention, mental health watch, and/or max custody totaling approximately 3,048 (Douglas – 31; Eyman – 1,842; Florence – 0; Lewis – 530; Perryville – 176; Phoenix – 29; Safford – 16; Tucson – 286; Winslow – 25; Yuma – 113)). The population of all people in the ten state prisons on that day was 27,809.

1   restrictions and deprivations imposed in these units. This is the primary reason that

2   assaults (and sometime lethal violence) between cellmates is a serious problem in many

3   isolation units. Especially for incarcerated persons who cannot pick their cellmates—but

4   often even for those who can—essentially constant, forced, inescapable, and unremitting

5   contact with another person in such a small and enclosed space soon becomes intolerable;

6   many incarcerated persons report that it worsens (rather than ameliorates) the most

7   negative aspects of isolated confinement.

8       113.   The serious risk of significant harm to which isolated incarcerated persons

9   are subjected is tragically manifested in the extremely high number of suicides in Arizona

10  prisons. ADCRR had 10 suicides in FY2021.[105] This is the highest number of suicides

11  since FY2011, when the overall prison population was significantly higher.[106]

12      114.   Correctional mental health experts are aware that a disproportionate number

13  of suicides and incidents of self-harm take place in isolation units. ADCRR's isolation

14  units are no exception. Based on a review of patient records and ADCRR's

15  announcements of deaths by suicide since my previous report  and my mid-September

16  2021 visits, more than half (33 out of 54) of deaths by suicide since January 1, 2014,

17  happened in some type of an isolation unit (either max custody unit, detention unit, or

18  mental health watch), while those units house about eleven percent of the incarcerated

19  population.

| Date of Death | Location at time of death | Custody Classification | Isolation at death? | Notes |
|---|---|---|---|---|
| 9/8/21 | Lewis, Buckley | Close | No | |
| 8/28/21 | Eyman, Browning | Max | Yes | |
| 6/9/21 | Tucson, Santa Rita | Medium | No | |
| 5/31/21 | Yuma, La Paz | Minimum | No | |
| 4/15/21 | Eyman, SMU I CDU | Detention | Yes | |
| 2/3/21 | Tucson, Rincon MHW | Close | Yes | |

---

[105] ADCRR, Inmate Assault, Self-Harm, & Mortality Data, FY 2022 as of 8/31/2021, available at https://corrections.az.gov/sites/default/files/REPORTS/Assault/2021/assaultmortality-aug21.pdf.
    [106] Id.

| Date of Death | Location at time of death | Custody Classification | Isolation at death? | Notes |
|---|---|---|---|---|
| 1/28/21 | Lewis, Morey MASH | Medium | ? | |
| 1/6/21 | Lewis, Buckley I | Close | No | *recently off watch |
| 9/22/20 | Perryville, Santa Cruz | Medium | No | |
| 9/13/20 | Tucson, Santa Rita | Medium | No | |
| 8/26/20 | Eyman, SMU CDU | Detention | Yes | |
| 8/5/20 | Winslow, Kaibab I | Close | No | |
| 3/21/20 | Eyman, SMU I CDU | Detention | Yes | |
| 3/7/20 | Perryville, Reception | Minimum | ? | |
| 2/21/20 | Eyman, Cook | Medium | No | |
| 8/30/19 | Lewis, Morey CDU | Detention | Yes | |
| 7/22/19 | Tucson, Winchester | Medium | No | |
| 7/2/19 | Perryville, Santa Cruz | Close | No | *recently off watch |
| 5/17/19 | Tucson, Whetstone | Minimum | No | |
| 5/16/19 | Eyman, SMU I CDU | Detention | Yes | |
| 3/10/19 | Eyman, Browning | Max | Yes | |
| 3/3/19 | Phoenix, Flamenco -Ida | Close | No | *recently off watch |
| 11/19/18 | Eyman, SMU I | Max | Yes | |
| 10/6/18 | Lewis, Rast | Max | Yes | |
| 8/20/18 | Eyman, SMU I | Max | Yes | |
| 6/27/18 | Tucson, Santa Rita | Medium | No | |
| 6/16/18 | Perryville, Lumley CMU | Close | Yes | |
| 3/15/18 | Yuma, La Paz | Minimum | No | *recently off watch |
| 2/28/18 | Eyman, SMU I CDU | Detention | Yes | |
| 2/12/18 | Eyman, SMU I CDU | Detention | Yes | |
| 10/23/17 | Phoenix, Alhambra | Max | Yes | |
| 8/7/17 | Eyman, Browning | Max | Yes | |
| 5/8/17 | Eyman, SMU I CDU | Detention | Yes | |
| 5/4/17 | Tucson, Cimarron I | Close | No | |
| 4/23/17 | Lewis, Rast | Max | Yes | |
| 11/23/16 | Tucson, Complex CDU | Detention | Yes | |
| 9/16/16 | Lewis, Rast | Max | Yes | |
| 8/9/16 | Tucson, Manzanita CDU | Detention | Yes | |
| 7/20/16 | Perryville, Lumley MH | Max | Yes | *recently off watch |
| 5/3/16 | Lewis, Buckley I | Max | Yes | |
| 3/9/16 | Tucson, Cimarron I | Medium | No | |
| 2/16/16 | Eyman, SMU I | Max | Yes | |
| 2/15/16 | Florence-Kasson | Max | Yes | |
| 8/26/15 | Perryville, Lumley SMA | Max | Yes | |
| 7/28/15 | Eyman, SMU I | Max | Yes | |
| 4/28/15 | Eyman, SMU I | Max | Yes | |

| Date of Death | Location at time of death | Custody Classification | Isolation at death? | Notes |
|---|---|---|---|---|
| 1/5/15 | Eyman, SMU I | Max | Yes | |
| 1/3/15 | Eyman, SMU I | Max | Yes | |
| 1/1/15 | Lewis, Stiner CDU | Detention | Yes | |
| 9/5/14 | Tucson, Cimarron I | Medium | No | *recently left PHX Flamenco |
| 8/27/14 | Safford, Ft Grant CDU | Detention | Yes | |
| 6/5/14 | Eyman, Rynning Close | Close | No | |
| 5/15/14 | Tucson, Santa Rita | Close | No | |
| 1/27/14 | Eyman, Browning DRW | Max | Yes | |

115.    These suicide data are consistent with and underscore the importance of the very high level of desperation and hopelessness that I witnessed among an unusually large number of people incarcerated in the isolation units. They suggest also that ADCRR itself does not appear to have adequate procedures, policies, and mechanisms in place to address this problem. It is my opinion that Defendants' policy of placing people in its especially harsh and extreme isolation units, its failure to exclude seriously mentally ill persons from these units, and its failure to regularly and meaningfully monitor the mental health status of *all* of the incarcerated persons confined in such places, all significantly contribute to the extremely high suicide rate from which the system suffers.

116.    Finally, the placement of people with seriously mentally illness in isolated confinement is not only harmful to them, but also jeopardizes the well-being of other incarcerated persons as well as correctional staff. People with mental illness whose psychiatric conditions are likely to worsen in isolated confinement may become assaultive to staff and to other incarcerated people. They frequently engage in loud, disruptive, and otherwise noxious behavior (e.g., smearing themselves in feces) to which other incarcerated people and staff are exposed, and from which they cannot escape. This behavior can have a "ripple effect" throughout an entire housing unit, increasing the levels of tension and irritability of prisoners and staff, interfere with already troubled sleep patterns among others, and further destabilize the atmosphere inside the housing unit. In addition, the acting out and non-compliant behavior of mentally ill incarcerated persons in

isolation often precipitates forceful interventions by staff (e.g., the use of chemical agents) that adversely affect the well-being of everyone in the unit.

**B.** **Institutional Inspections and Reviews**

**1. Eyman – SMU I and Browning Units**

**a. Overview of Facilities**

117.    I inspected the SMU I and Browning units from July 23-25, 2013 and again on September 13-14, 2021. The conditions units that I saw in 2013 were extremely harsh and severe; they had not changed when I returned in 2021. There were few if any changes in the physical condition of the units except they appeared older and dirtier than before.

118.    The people I interviewed reported that they were not given cleaning materials with which to keep their cells clean, and they were especially upset about vermin infestations—in fact, one showed me a mouse he had caught in his cell. Others showed how they \ devised methods to hang foodstuffs in bags that hung off the floor, (rather than the usual method of storing in boxes or shelves). Two men showed me peanut butter traps e to capture insects that they put out at night in order to try to keep the roaches from crawling on to their bodies or beds while they tried to sleep. See Appendix G and below:



*Homemade traps to capture insects (9/13/21, ADCRR108091)*

1
2
3
4
5
6
7
8
9
10
11
12



*Hanging perishables away from vermin in SMU-I (9/13/21, ADCRR108090).*

13
14
15

119.    Roaches and crickets were clearly visible in many of the pods I visited—they were on the floors of the cells and tiers, on the walls, and especially in the concrete pens where the men were taken to exercise. See below, see Appendix G:

16
17
18
19
20
21
22
23
24



25

*Outdoor concrete recreation pod with bugs, SMU-I, 9/13/21 (ADCRR108105).*

26
27
28

120.    In the cell-front and confidential interviews I conducted, throughout the units I toured, incarcerated persons complained about unsanitary conditions, many of which I was able to observe myself. The complaints ranged from the lack of cleaning

materials to insect and rodent infestations to unsanitary showers to not being allowed to exchange clothes through the laundry (thus being forced to wash them in the sinks in their cells) to flooding inside the cells. Multiple people reported that there is no laundry service available at these units in Eyman.

121.   I personally saw mold on the walls, insects on the floors, a large puddle of musty-smelling and moldy water outside one person's cell that came from a leak inside, and a mouse that one incarcerated person had trapped in his cell.



*(Left) Mold on wall outside cell, Eyman-SMU I (ADCR108095)*
*(Right) Shower at Eyman SMU-I, 3-Baker-Pod 2 (ADCRR108102)*

122.   The tray slots through which food trays are passed in a number of the units were worn and dirty. See Appendix G.

123.   Both facilities are extremely similar in physical structure. There are no outside facing windows in any of the Eyman SMU-I or Browning cells. The only light available comes through gritty skylights in the ceiling outside the cells. Some of these housing units are so completely cut off from the surrounding natural environment that there were times when I was passing through them that I had the distinct feeling that I was underground:

1

2

3

4

5

6

7

8

9

10

11

12



13 ***Hallway between housing units at Eyman SMU-I, 9/13/21 (ADCRR108087).***

14       124.     The cells are a bare concrete box with metal stool, shelf, toilet/sink and

15 either a single or double slab for a bed. Each cell is quite small, less than 8 feet by 12 feet.

16 More than any other isolation units in the ADCRR system, the SMU-I and Browning cells

17 give a sense of being entombed in a small, concrete box. The doors to the cells have no

18 windows but are made of perforated steel. Some housing pods have an additional plastic

19 shield covering the doors for "enhanced security." However, right before my visit these

20 units were converted to house the seriously mentally ill Behavioral Management Unit

21 patients who had been transferred from Florence-Kasson in early September 2021.

22       125.     Browning and SMU I differ somewhat in the populations held in isolation.

23 In SMU I the isolation units hold general population maximum custody, protective

24 custody, sex offenders, a small suicide watch pod, and a detention unit. In Browning,

25 there are general population maximum custody, the Behavioral Management Unit,

26 "enhanced security," multiple "STG" (security threat group) units for people identified as

27 gang members, mental health units, suicide watch cells, and some condemned prisoners

28

1   housed in max custody and close custody Death Row. Despite these varying populations

2   the conditions of confinement on these units are uniformly harsh—shockingly so—and

3   the level of isolation, deprivation, and enforced inactivity places these incarcerated

4   persons at serious risk of significant psychological harm.

5           **b.   Eyman SMU-I's and Browning Unit's Conditions of
            Confinement Place All Incarcerated Persons There at Risk of
6           Harm**

7           126.   Like all of the ADCRR isolation units, Eyman-SMU I and Browning impose

8   overall conditions of confinement and operate with a set of policies and practices that

9   deprive incarcerated persons of meaningful social contact and human interaction, subject

10  them to profound levels of deprivation, and enforce almost total idleness and inactivity on

11  the persons housed there. In addition to the psychological pain and despair that this kind

12  of environment generates, it places the mental health of even psychologically strong

13  incarcerated persons in jeopardy and creates especially high risks of harm for those whose

14  mental illness makes them especially vulnerable.

15          127.   In some ways, many of the Eyman-SMU I and Browning units impose even

16  greater levels of isolation and deprivation than those that exist in the other ADCRR

17  isolation units. This is largely because of the type of recreation allowed the majority of

18  people housed in these units. For incarcerated persons who are not part of the limited

19  mental health programming in the Eyman isolation units, and even for some that I spoke

20  to who told me they were <u>supposed</u> to be part of the mental health programs, recreation is

21  limited to the small, concrete enclosure attached to the housing pod. This "rec pod"

22  enclosure is approximately 11 feet by 24 feet, with solid concrete enclosure walls

23  approximately 15 feet high with a covering of metal mesh over the top, so that a person

24  cannot actually see the sky or clouds. There are no views to a horizon, or much of

25  anything else from inside these small concrete boxes, which during the warmer months in

26  Arizona feel like stepping into an extremely hot sauna. At most you can see only a sliver

27  of sky between the mesh covering. In addition, the only piece of "equipment" I saw in one

28  enclosure during the 2021 tour was a small, blue handball. The enclosures themselves had

very little breeze and I was told no mister systems are installed, although incarcerated persons are permitted to bring a water bottle with them.

128.    Both SMU I and Browning have larger areas where they installed individual recreation cages. There were approximately 10 individual cages, but numerous people I spoke to reported that they had never been out to these cages in months or years, due to cancellations due to "staffing shortages." Indeed, when I went to view these individual rec cages, the doors were all open, and in some cases, appeared to have rusted in place. See Appendix G and below:



***Recreation cages at Eyman-Browning, 9/14/21 (ADCRR108111)***

129.    In addition, just as was the case at Florence Central and SMA in 2013, there are very many seriously mentally ill incarcerated persons who are confined in the Eyman isolation units and yet who are not in any of the officially designated mental health programs. This was true in 2013 and it appeared to be equally true in 2021. The level of out-of-cell time—even for those who <u>are</u> in the mental health program—conforms to the ADCRR norm, which limits them to the same two-hour time blocks that incarcerated

persons are afforded, no more than 3 days a week. As I have explained above, this is starkly insufficient for any group of incarcerated persons who are as isolated and otherwise deprived and inactive as those in the ADCRR isolation units. It is especially so for these seriously mentally ill incarcerated persons. Moreover, the 2 hours, 3 times a week outdoor recreation schedule represents a "best case" scenario; incarcerated persons at Eyman frequently told me that recreation was often cancelled and this complaint, if anything, was more frequently voiced in 2021 than it had been in 2013. Incarcerated persons in the mental health programs also told me that the outside recreation is not always offered and they are often only given the option of using the concrete recreation pod in their unit.

### c. Excessively Harsh Conditions for Mentally Ill Persons and Lack of Appropriate and Meaningful Treatment

130.    The incarcerated persons in these units were suffering in 2013 and those housed there in 2021 are suffering as well. They talked candidly about the psychological pain that they are experiencing in response to the lack of human contact, the material deprivations, and the profound levels of enforced idleness and inactivity to which they are subjected. They also expressed fear and anxiety over the anticipated psychological impact of their conditions and the way they were being treated, and complained repeatedly about the lack of mental health care they were afforded (even to those whose serious mental health problems were well-documented and long-standing).

### 2. Lewis Complex Units

### a. Overview of Facilities

131.    The Lewis Complex comprises several different facilities or "units." I spent one full day inspecting areas inside the Rast Unit and interviewing persons there because it holds the largest number of persons in some form of isolated confinement. The next day I toured parts of the Morey and Barchey Units and, especially, the Stiner Detention Unit. I also visited the Sunrise Unit, which now houses all juveniles convicted as adults and sentenced to state prison, who previously were held at the Tucson prison. I visited the

1   detention unit at Sunrise Unit where I saw three youth under the age of 18 who had been
2   in isolation for almost three weeks.

3       132.    The isolation units in both Rast and Stiner were physically and operationally
4   very similar to Browning and SMU I. In fact, as one incarcerated person told me, Rast is
5   sometimes referred to as "SMU III" because of the similarities between the two facilities.
6   The cells in the isolation units are small and the units are stark and inhospitable. See
7   Appendix G and below:



***Above: Cell at Lewis-Rast (ADCRR158748)***

133.    Similar to Browning and SMU I, Lewis isolation units impose overall
conditions of confinement and operate with policies and practices that deprive people of
meaningful social contact and human interaction, subject them to profound levels of
deprivation, and enforce almost total idleness and inactivity on the persons housed there.
Persons in the detention unit cells often lacked sheets or bedding.  Below is a photograph
of the Stiner Detention Unit, and an isolation cell:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Stiner Detention Unit, Wing A (ADCRR00158782)*



*Cell in Stiner Detention Unit (ADCRR00158778)*

134.   In addition to the psychological pain and despair that this kind of environment generates, it places the mental health of even psychologically strong incarcerated persons in jeopardy and creates especially high risks of harm for those whose mental illness makes them especially vulnerable.

135.   I was shocked to see that the ADCRR imposes a severe form of isolated confinement on the children in its custody. At the Sunrise Unit at Lewis, I encountered three boys under age 18 who had been confined in unconscionably harsh and depriving forms of isolation, in windowless cells built of concrete blocks, with solid doors with one small window in the door. All three boys had been confined there for close to three weeks.[107] See Appendix G and below.



*Windowless cell and solid doors of Sunrise Minors Detention Unit (ADCRR158764-65)*

136.   In my opinion, this extended solitary confinement and isolation of youth – especially in such gratuitously harsh conditions – is singularly inappropriate and highly dangerous. Putting children in such abominable conditions puts them at substantial risk of

---

[107] As of October 7, 2021, ADCRR still had two youth in Sunrise Detention Unit. See https://corrections.az.gov/sites/default/files/DAILY_COUNT/Oct2021/10072021_count_sheet.pdf at p. 2.

serious harm, including acts of self-harm and suicide. According to statistics from the U.S. Department of Justice, more than 60 percent of young people who die by suicide in carceral settings had a history of being held in isolation.[108] The DOJ report noted that, "When placed in a cold and empty room by themselves, suicidal youth have little to focus on – except all of their reasons for being depressed and the various ways that they can attempt to kill themselves."[109]

137.   I was especially shocked by the use of solitary on the teens, because apparently ADCRR has learned nothing from its own tragic history from five years ago when I and Plaintiffs' counsel notified Defendants that their practice of putting youth in prolonged solitary put these children at serious risk of harm. On my May 2016 visit to Perryville, I learned of a then-17-year-old girl named ███████ # ████ who had been held in solitary confinement for more than two months at Perryville's Minors Unit in violation of the Settlement's Maximum Custody Performance Measures 3 and 8. I directed Plaintiffs' counsel to notify Defendants' attorneys about the possibility that Ms. ██████ was at serious risk of self-harm due to the prolonged period of time she was held in solitary. Shortly after our visit, she turned 18 years old, was moved to Perryville's max custody Lumley yard, where less than a month later, she died by suicide.[110] In the aftermath of her suicide, ADCRR said it would end the use of isolation in the girls' Minors unit at Perryville.

138.   Apparently, ADCRR has learned nothing from that young woman's tragic and preventable death. I certainly hope that history does not repeat itself, but ADCRR is

---

[108] Lindsay M. Hayes, U.S. Dep't of Justice, Off. of Juv. Just. & Delinquency Prevention, *Juvenile Suicide in Confinement: A National Survey* (2009), available at https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf.

[109] Id. at 42.

[110] M. Wasser, *Teen Inmate Commits Suicide After AZ Department of Corrections Was Warned of Her Mental Health*, Phoenix New Times (Aug. 16, 2016), https://www.phoenixnewtimes.com/news/teen-inmate-commits-suicide-after-az-department-of-corrections-was-warned-of-her-mental-health-problems-8533867; see also T. Mooney and L. Armstrong, *Mentally ill prisoners are dying. Are private health care companies to blame?*, CBS News (Oct. 4, 2019), available at https://www.cbsnews.com/news/private-prison-health-care-perils-cbsn-originals/.

1  playing with fire. No more teens should die in ADCRR's custody. Mental health and

2  human rights groups have vociferously advocated for the categorical exclusion of

3  juveniles from any form of solitary confinement, and it is one of the key tenets of the

4  United Nations' "Mandela Rules." See Paragraphs 20-21, above. It is my opinion that no

5  civilized society should put juveniles in solitary confinement, and that the unconscionable

6  practices at ADCRR must be ended once and for all.

7       **b. The Lewis Complex Conditions of Isolated Confinement Place**

8       **All Incarcerated Persons There at Risk of Harm**

9       139.  In the Lewis isolation units, like Browning and SMU I, many persons

10  complained about little or no out-of-cell time and being given access to outdoor rec in an

11  area that was "another box," and so many also "refused," especially when going required

12  being subjected to the indignity of being strip searched and shackled.



*ATTENTION ALL*

Beginning 06/01/2020, All Inmates and their Cells shall be in 704 Compliance before Inmates will be allowed to go to Recreation.  Also, the Inmates will be awake and ready to exit the cell when the officers arrive.  Failure to be in compliance, or failure to be ready to submit to the strip search or any unreasonable delay once the officer arrives will be considered a refusal of Recreation and will be documented on the DO812 forms as such.

1
2
3
4
5
6
7
8
9
10



> **EVERY SINGLE INMATE ON THIS UNIT REGARDLESS OF STEP WILL BE HANDCUFFED AT ALL TIMES WHEN OUT OF THEIR CELLS.**
>
> Effective immediately, all step 3 inmates at Rast Max (3B5 included) will be handcuffed when they leave their cells. This includes recreation for step 3 inmates in both 3B5 and max custody with the exception of porters.

*Signs at Lewis-Rast, 9/29/21 (ADCRR158725)*

140.    But here, too, remaining inside an isolation cell around-the-clock, for an extended period of time, contributes to worsening mental health that can spiral into incidents of self-harm and other forms of deterioration or decompensation—or acting out behavior that can extend their stay in isolation. In fact, the refusal to engage in recreation is itself a sign that a person is having mental health problems. A number of the outdoor rec pens I saw in other Lewis isolation units appeared to be used very little, and even the otherwise larger pens (equipped with a basketball hoop) had little equipment and, in any event, were accessible to only a limited number of eligible persons. The "outdoor rec" I saw in one Rast housing unit consisted of small cages, made of a tight metal wire mesh, including overhead, that were rusted in many places. See Appendix G. I was told by staff that if people using the cages had to use the restroom, they would be escorted back to the unit, and their rec time would be cancelled. I also saw larger rec cages at Rast, including two that had basketball hoops and one with several outdoor tables.

141.    I was also struck in both Rast and Stiner with the sheer level of deprivation and isolation to which the persons housed in these units were subjected. They are forced to endure some of the most extreme conditions and restrictions I have ever encountered in a long-term (i.e., longer than a few days) isolated housing unit.

142.   Moreover, the logic by which persons were incarcerated in these units, especially in the so-called Refuse to House or RTH units (or people placed in Detention for supposedly refusing to house) added to the painfulness of the experience. Numerous people told me that they had been the <u>victims</u> of assaults and were asking ADCRR for protection. Instead being treated as victims, and having their mental and physical safety addressed and ensured, they were place in RTH units or RTH detention, and deprived of virtually every possible amenity that might otherwise make their lives bearable. Ironically, and tragically, many of these persons appeared to be among the most vulnerable in ADCRR custody, either mentally ill or vulnerable on other bases, but among the least able to protect themselves, the least deserving of the punishment to which they were subjected, and the least capable of enduring the truly extreme forms of isolation and deprivation to which they were subjected.

### c. Excessively Harsh Conditions for Mentally Ill Persons and Lack of Appropriate and Meaningful Treatment

143.   In the cell-front interviews I did in the Lewis isolation units—Rast and Stiner Detention—I found a many people who reported serious mental health problems, including several who appeared obviously and profoundly mentally ill. The people I interviewed in all units, even one supposedly designed as a mental health transition program, consistently reported no more than a paltry level of clinical programming. Those whom I interviewed consistently reported they were suffering, and many of them were aware that they were psychologically deteriorating. They talked candidly about the psychological pain that they experience in response to the lack of meaningful human contact, the material deprivations, and the profound levels of enforced idleness and inactivity to which they are subjected. They expressed fear and anxiety over the anticipated psychological impact of their conditions and the way they were treated, and complained repeatedly about the lack of mental health care they received (even to those whose serious mental health problems were well-documented and long-standing).

1    Moreover, they expressed fear of reporting any thoughts of self-harm, because of the

2    unduly harsh conditions to which they would be subjected in suicide watch:



*Signage at Lewis suicide watch unit: (ADCRR158743)*



*View into a suicide watch cell at ASPC-Lewis (ADCR158746)*

VII.  **Follow-Up Interviews With Incarcerated Persons Documenting the Lack of Post-Settlement Reforms**

144.   There were a number of people whom I originally interviewed in 2013 who were still in ADCRR custody when I returned in 2021. I located and re-interviewed those housed at the two facilities that I toured in 2021. Their updated prison histories and the observations they provided about what had happened in ADCRR in the intervening eight years, when the terms of the *Parsons* settlement were presumably being implemented, help to address the question of whether and how much ADCRR had modified its conditions, practices, and procedures during this critical period. I re-interviewed them at the facilities where they were currently housed rather than the ones in which they were confined in 2013, and the results of those interviews are summarized below.

145.   I also provide two appendices summarizing interviews I conducted in 2013 (**Appendix E**) and 2021 (**Appendix F**). The notable consistencies in their observations—made at two different time periods—about the nature of their conditions of confinement, the excessive deprivations and mistreatment to which they were being subjected, the lack of adequate mental health care received, and expressions of psychological pain and harm underscore the lack of progress in remedying these systemic failures.

**A. Follow-Up Interviews Conducted at Eyman Browning and SMU I in 2021**

146.   When I interviewed him originally in 2013, ████ ████ ████, who was in the Browning general population at the time, told me that he and others in the unit where he was housed got only 2 hours of recreation or shower every other day, which meant that he was completely locked down in his cell in the days in between. Even on the days that it was his turn to go to yard, he said: "We go out and run in circles. There is a little ball out there, that's all." He told me that the emptiness and inactivity were having a psychological impact on him: "We have no program, no teacher, it takes a toll."

147.   When I spoke to him in 2021, he was still housed in the Eyman Browning Unit. He told me that things had not gotten better at all in the eight intervening years and that some things had deteriorated since then. Mr. ████ was especially frustrated over the

lack of educational programs. He said there was no schooling taking place and "we are deteriorating in here." He went on to say, we "need schooling and we have nothing." He expressed concerns that "I don't know how to live on the outside. They aren't helping and it is getting to me." Mr. ██████ said he had been in SMU II (the previous name for Browning Unit) for 15 years, punctuated by no more than about 20 days in a general population yard. Later that same day, when I spoke to Mr. ██████ individually and confidentially, he was even more emphatic that nothing had changed since my interview with him eight years ago: "I have nothing and it is still wearing me down. The only thing that's different is that I don't expect anything from them. I spend my time working on trying to force them to do what they are supposed to do." In fact, he said, he thought there were more programs for people in the STG program before 2013. He said "even mental health care is harder to get—people in the unit make requests and get no response."

148.   When I first spoke to ██████ ██████ ██████, in 2013, he told me, remarkably, that he had been on lockdown, in one isolation unit or another in the ADCRR *since 1979*. He said that he had been kept in lockdown for disciplinary infractions committed decades ago and that, even though he kept trying to get into a step-down program that would allow him more human contact, he continued to be denied. This meant, among other things, that Mr. ██████ had not had a contact visit, or touched a loved one or family member with affection, for 34 years.

149.   When I re-interviewed Mr. ██████ cell-front at Eyman Browning, during my 2021 tour, he was *still* in isolation. He told he had been in his current STG unit for a little more than a year, but that nothing much had changed over that period of time. "Yard," he said, was mostly restricted to the "concrete box" at the end of the unit, and that showers and outdoor recreation were often cancelled. Phone calls are restricted to 3 times per week, for 15 minutes each, but they get only one visit a week, on a video monitor, for 30 minutes. The prison still uses gurneys with five-point restraints for transporting certain prisoners. Mr. ██████ said that there are men in the unit with mental health problems but, because of their supposed STG status, they are reluctant to make an issue of it.

150.    Later in the day, when I interviewed him individually and confidentially, he reiterated that nothing much had changed in recent years. However, his primary concerns now involve his medical care—he is medically infirm and appears weak and sick. Mr. ███████ said he was certain he had been retaliated against for having talked to me and the lawyers in the course of the last round of litigation. He observed that, for himself and others designated STG, not only had nothing changed for the better but, in some ways, things had gotten worse since I saw him in 2013. For example, he said they used to go to the outdoor rec cages three times a week but that now they "hardly ever go," and showers are also more infrequent. Although he observed that "being in prison does something to your brain, and it's worse in isolation," he said he has never had a single one-on-one mental health contact. Mental health staff only come cell-front and "walk by me."

151.    I had interviewed ████ ████ ███████ at Eyman Browning in 2013. He told me then that he had a long juvenile and adult prison history, and a lengthy mental health history, both of which began in California. He said he struggled with suicide all his life. He said: "I've tried a bunch of times to kill myself, since I was a kid." He was identified as having very serious mental health problems in California Youth Authority ("CYA") and in the adult prison system. In fact, he told me he was designated as a "Category J" (the California prison system's most serious mental health designation at the time). When he arrived in the Arizona prison system, he was given a long list of different medications—"you name it"—and, when I interviewed him in 2013, said he was taking Haldol, Lithium, and Zoloft (which he said sometimes worked and sometime did not). Mr. ████ reported that he had been on Suicide Watch, including one instance in which he remained there for 8 straight days without having any mental health professional came to see him. Aside from his medications, he said that every six months or so he was seen by a doctor "who asks if I think about killing myself—that's it." Otherwise, Mr. ████ said: "we get no counseling, no group, no nothing."

152.    In addition, in the course of my 2013 interview, Mr. ████ reported he was having a whole host of very serious negative reactions to his isolated confinement,

including constantly feeling anxious and on edge ("including when I sleep"), feeling like he was going to have a breakdown and lose control of himself (including "times when I do lose it"), ruminating over small things, being easily and irrationally angered all the time, losing the ability to feel or care ("sometimes I think I am completely without feelings now"), suffering from profound depression that he cannot make go away, frequently having thoughts of suicide (which he does not share because he does not want to be put in the watch cells—"I don't want the watch cells, you want to die there"), and being very uncomfortable around other persons all the time now ("I don't leave my cell").

153.    In 2021, I found Mr. ███ back at Browning, returned to prison after being released the year before. He said he had been out for only a short time before being arrested on a parole violation and going back to prison and being housed in an STG unit. He confirmed the extensive mental health history that he had first discussed with me years earlier, elaborating that, in California, he was diagnosed with paranoid schizophrenia with bi-polar disorder, and told me he "was taking tons of meds—Thorazine, Mellaril, Paxil." Once he came into the Arizona prison system, he was placed on Haldol (which he said he is still taking) and Abilify. However, despite this extensive psychiatric history, he told me that he has not seen a mental health staff member since early August. "I only get meds review, no treatment." He told me, "I'm hurting bad back here."

154.    When I interviewed him again later that same day, individually and confidentially, Mr. ███ told me that, in contrast to his time in prison in California, he is not getting any mental health treatment in his current ADCRR housing unit: "even though I was SMI before, now I get nothing." Mr. ███ explained that although he is prescribed Haldol, he had only gotten to talk to the mental health staff "through the tray slot [and] I was in cuffs, had to bend over to talk to her, not even face-to-face." Mr. ███ explained that, despite his extensive psychiatric history and having taken multiple psychotropic medications in the past, "I've gotten no treatment because they say I'm STG." He said that he fears that when he eventually gets out of prison "it will be the same—I won't be able to make it."

155.   When I interviewed another person at Browning in 2013, Named Plaintiff ████ ████ ████, he came to his confidential interview with me under "enhanced security," which meant that he was escorted by four officers, including a sergeant and a supervisor, was in leg irons, and had his restraints connected to a "leash" that one of the officer held. He was apparently subjected to this every time he left his cell—including shower and outdoor rec. I noted at the time that this was a striking to see because Mr. ████ is very small and slightly built (he said he weighs around 140 pounds). In the course of my interview he described a life filled with parental abandonment, chaos and instability, exposure to violence and drugs and gangs, and prison experiences that began at a relatively young age. After an initial stint in prison, in 2003 he returned at age 23 with a life sentence, and was sent to isolation. He told me, in 2013, that he been in isolation continuously since then, including in virtually all of the isolation units in the Arizona system. Mr. ████ complained about what he said was excessive pepper-spraying in his present unit and said that it was even used on persons who were in the watch cells. Mr. ████ told me that he personally has been to suicide watch and that he was pepper-sprayed there. At the time I interviewed him, he was housed in one of the pods where the cells had plastic shields over the doors. Mr. ████'s mental health problems have been very severe at times—he reported hearing voices, had made a number of suicide attempts, and had been prescribed a broad range of psychotropic medications. He said in 2013 that he "was paranoid schizo and they put me on Thorazine" but the side effects were too drastic. Mr. ████ also told me that in all the time he had spent in prison isolation, despite his long-standing and severe mental health problems, he had not had any therapeutic groups or one-to-one counseling. He said those things are "brand new" in his unit, and only recently begun.

156.   Mr. ████ reported to me in 2013 that he suffered many very severe adverse reactions to isolated confinement. They included being bothered by troubled sleep, nightmares, constant anxiety, auditory hallucinations (children's voices speaking to him, and others threatening him), ruminations, fantasies of revenge, losing the ability to

feel or care, problems concentrating and focusing, concerns over his overall deterioration ("the environment takes over and there's no coming back"), depression, and thoughts of suicide. He is convinced that he "can't be around persons anymore because of this"—the long-term isolation to which he has been subjected.

157.   When I returned to SMU I in 2021, I re-interviewed Mr. ███, who was still in the unit. He said, simply, "I'm in SMU I. It's as bad as it gets." He elaborated that "every day I wake up and fight against the depression and decide whether to live or not." Mr. ███ said that even though he is still taking psychotropic medications, "there's no real mental health (treatment) in here." He said that the mental health nurse merely asks him "'are you okay?'—that's it, it's just paperwork and even then they don't come regularly." He told me that they started him on groups about two months ago, but the experience was not at all what he expected or felt that he needed. He elaborated by saying: "[They] take you to a room with a table, four or so guys and a CO 3, who is the leader. It is so meaningless. I don't even know what it is called or [what it's] for, but I go because if I don't they take away your privileges" and reduce your step level. He also said that they are supposed to go to outdoor yard but it is often cancelled and that there are no jobs. Mr. ███ said he was surprised that "I haven't been destroyed by this, but who knows when it will be too much and [I'll] finally get more than I can handle?"

158.   In 2013, I also conducted an individual and confidential interview with ███ ███ ███, who was housed in SMU I at the time. He estimated for me then that he had done most of his approximately 25 years in prison in isolation of some sort. In part because he was convicted of a sex offense, he said, he was housed in a unit that is primarily comprised of seriously mentally ill incarcerated persons, although he said he did not take psychotropic medications and had never been a mental patient, in or out of prison. He did, however, acknowledge that "I have a number of suicide attempts." In 2013 he was not participating in groups, even though they were offered "every month or so" because "they are useless, plus [staff] come and go here, they don't stick around." Mr. ███ told me in 2013 that he found isolated confinement to be a very stressful situation,

and reported suffering from feelings of anxiety often, as well as often having the sense that he was on the verge of breaking down from the pressure of isolation. In addition, Mr. ▮ reported experiencing a number of other isolation-related symptoms, including fantasizing about revenge ("it's the only thing that keeps me going"), to overreacting to certain stimuli (especially the sound of other persons talking—it "drives me nuts"), experiencing irrational anger, and having problems concentrating.

159.    When I saw Mr. ▮ again in 2021, he was still in SMU I. He appeared to have aged considerably, and was difficult to interview because he perseverated on a single topic—remembering or finding out what was his Social Security number. He told me that he thought he had been in isolation for so long that "I don't know about getting out, being around people, you get used to being by yourself so people make me nervous."

160.    When I saw him at the end of the day, to interview him individually and confidentially, he once again perseverated about the Social Security issue that he had raised with me cell-front. However, when I asked him about whether and how things had changed in the ADCRR since I had interviewed him eight years earlier, he was emphatic about the fact that there had been few if any positive changes in the SMU. The only positive he could think of was the introduction of tablets, but he complained that, in order to obtain them, the prison required him and others to sign a statement that they were willing to have an "integrated" cellmate. He said that, after so much time in isolation, he much preferred to be by himself and that it is hard to socialize with others, even during times when he was taken out of the unit. He acknowledged his past suicide attempts but said that, despite them, he was not getting meaningful mental healthcare—"no group stuff, they just put you in a cage." When mental health staff come into the unit, Mr. ▮ said, they just ask "'how are you doing?' Then they go away." He said that, because he is in a lower level of isolation" now, he gets "pod time," which consists of going out on the unit twice a day, "but I don't really socialize, [I] have my ear phones on and walk around." He said that he is supposed to be released in 2025 and is concerned about how he will survive. He said he has been in isolation so long, "where else can you go?"

161.   Finally, ████ ████ ████, is someone whom I interviewed in 2013 when he was housed in Cellblock 1 ("CB-1"), in Florence. I noted at that time that, although on some levels the people housed in CB-1, and in the somewhat similar mental health program in the Kasson Unit at Florence, were better off than their counterparts who were housed in other isolation units (where there was for the most part no mental health treatment at all), they were still being subjected to overwhelmingly isolating conditions that placed them at serious risk of harm. At the time I first interviewed him in 2013, Mr. ████ told me that he had come to prison as a minor, in 1997, and that he was doing his third stint in prison. When he was released from prison the last time, he said, it was directly from isolation back to the community: "They released me to the streets from a little cage… no program to prepare us to get out." In 2013 he recalled that he and many others were extremely frustrated over the lack of mental health treatment, saying that "we've had lots of outbursts in here over conditions—spraying, burning, throwing things—these things have been happening for years." Mr. ████ saw the CB-1 program as "the only chance at programming we've had," but he also noted that, other than that, "they are not really doing the programs" they are supposed to—"they don't have the staff, the groups get cancelled." He told me that, even in this special mental health "program," the only time anyone got individual contact with the mental health staff was when they explicitly request it. Mr. ████ reported in 2013 that he was bothered often by headaches in isolation, and by nightmares or bad dreams. In addition, he said he was always nervous and anxious ("unless I'm mad"), that he often felt like he was on the verge of losing it, fantasized about revenge all the time, often experienced problems thinking or concentrating, felt he was losing the ability to feel or care, and had mood swings, feelings of depression and hopelessness.

162.   When I located Mr. ████ in 2021, he was in SMU I and doubled-celled with ████ ████ ████. I interviewed the two of them cell-front, during which time, Mr. ████ especially, was clearly in distress. He complained about the difficulties of being double-celled around-the-clock and how painful and difficult it was. He expressed

frustration over being stuck in the unit without a clear pathway out and also about staff ignoring requests for things like visitation. Both men talked about the fact that the "class" they are allowed to go to lacks any meaningful content—"it's just a group chat," they said, one in which there is "no real counseling or instructions, no self-development, [it's] meaningless." Both men complained about the unsanitary conditions in the unit, including the fact that they had to barricade the bottom of their door to keep the rats and mice out of their cell and also that their toilet had been broken some five different times in recent days. They said: "do you know what it's like to have poop in your toilet [that] you can't flush?" They said that it was humiliating to live like that and that the other persons living in the unit got mad at them because the entire pod eventually began to smell. They also said that they rarely get the access to outside rec cages they are supposed to be entitled to, and that the mental health staff does little more than "drive-bys" when they come into the unit, asking whether they are "okay?" rather than providing any counseling.

163.   Later in the day, I spoke individually and confidentially with Mr. ███. He told me that, after I had seen him in SMU, in 2013, he "went 805" [essentially, officially requesting protective custody], which resulted in his being transferred from one prison unit to another. He said that he continued to be housed with cellmates "who were crazy and assaulted me." About a year ago, he said, he had an incompatible cellmate and when he told the correctional staff, they "told us to fight." He said that he had come into the prison system while still a teenager (age 17) and once he "found God" he had tried to be non-violent, "but in here it is really hard." Mr. ███ said that living conditions in SMU I "are horrible—you cannot clean your cell, you live with filth, plus there are rats everywhere." He acknowledged having had a "breakdown" and said that there are times when he "can't take it." He said, "I desperately need to talk to people" but staff tells him "no one's here." His mental state had deteriorated to the point where he has considered suicide, because "nothing is getting better, just all the same." He said he is frustrated and under stress all the time and "[I] just desperately need a way out of lockdown." Because he cannot foresee a way out, however, he said, the level of frustration "keeps getting

1   greater… the longer I stay in the room, which is what my life is, is wearing me down."

2   Mr. ████ told me further that "it is so bad, I feel hopeless. They don't give you a life

3   or any hope about your situation."

4         **B. Follow-Up Interviews Conducted at Various Lewis Complex Units in 2021**

5         164.   In my 2013 report I noted that that even in the Behavioral Management

6   Unit, which was supposed to have among the most well-structured and elaborate mental

7   health programming in ADCRR, incarcerated persons repeatedly voiced a host of similar

8   complaints about the lack of mental health contact. One person I interviewed in the unit at

9   the time, ████ ████ ████, told me simply, "the psych program here is no good."

10  He went on to explain that the mental health program only started about two months ago,

11  and since then they have had only two groups—"they put us in cages in the rec yard." Mr.

12  ████ said the groups last "maybe 35 minutes" and, he noted, they only happened once a

13  month. Moreover, he was emphatic that there were no regularly scheduled one-on-one

14  mental health contacts. He said further that "no one comes to check on us, except once

15  every 3 months, and they do it cell front, in front of everyone."

16         165.   When I returned to the ADCRR in 2021, I found Mr. ████ in max custody

17  in the Rast Unit at Lewis. When I first went to his assigned cell, he was not there and I

18  was told he was "programming." (I later learned that he was in the library.) I noticed that

19  he had placed several pieces of paper on the front of his cell door, accusing ADCRR

20  officials of "setting him up," making reference to a "gang hit," and stating "I have suicidal

21  tendencies." Later in the day, when I inquired of his whereabouts and asked if he had been

22  returned to his cell, I was taken to a holding cell near the library, to interview him. He

23  immediately began talking about the "terrible retaliation" that he said was taking place at

24  Rast against prisoners who complained. He recalled talking to me years earlier—in

25  SMU I—and said that his condition had worsened since then: "I am in real trouble here

26  mentally—there has been no improvement at all" over the intervening eight-year period:

27  "Nothing has gotten better, [it's] only gotten worse since 2013."

28

166.   I talked to him once more, at the end of the day, individually and confidentially, to have him clarify his accusations. Mr. ███████ appears to sincerely believe that he is being conspired against and "set up" by prison officials and others because of something mysterious in his background (that he would not reveal). He very emotionally told me that: "I am in danger. They are setting me up to be killed." He shared an elaborate and seemingly farfetched story that involved state officials that he believes are conspiring against him. He handed me a number of documents that he had brought with him and wanted me to review but that did not appear to be related to what he was telling me, and were not from the sources where he indicated they originated. He told me that he was taking psychotropic medications for his mental health problems but had filed a complaint against mental health staff for not providing him with treatment. Mr. ███████ stated emphatically that he would not talk to any mental health staff when they came by his cell and "treat" him cell-front because "it is out in front of everyone" and "security misuses the information they overhear." Consistent what appeared to me to be his seriously deteriorated mental health, Mr. ███████ contrasted his condition now with his mental state eight years earlier: "I am in such bad shape now, so much worse than in 2013 when I saw you. My mental health has gotten so much worse. I thought it as bad then but it's worse now. I've begged for better treatment," including wanting to meet with the warden to get it, but to no avail.

167.   In 2013, I conducted an individual and confidential interview with Named Plaintiff ███████ ███████ ███████, who was in SMU I at the time. He told me that he had come into the adult criminal justice system in Arizona as a 16-year-old boy and that his mental health problems with depression were identified then, and resulting in him being given psychotropic medications. He told me that after he left prison the first time, he was hospitalized in a mental institution and diagnosed as bipolar. When he returned to prison he said he was moved back and forth between several prisons in the ADCRR, after asking for protection and being denied, being accused of gang affiliations and beginning a debriefing process (that included two years in SMU I). He had been returned to SMU I

just three weeks before I interviewed him, to what he referred to as a "mental health cluster." He told me then that the cells in the unit had plexiglass shields on the outer doors, and that, despite his own mental health problems, the other incarcerated persons in the unit were far more disturbed than he. In 2013, Mr. ███ reported that he experienced a number of symptoms that many isolated incarcerated persons suffer, including constant problems with sleep, frequent bouts with anxiety, the feeling that he may be on the verge of breaking down or losing control, constantly being preoccupied or ruminating ("I can't let things go"), fantasizing about revenge ("I'm trying not to think about it"), having irrational anger and mood swings, feeling that he is deteriorating overall, and social withdrawal ("I don't want to be around persons in here").

168.   In 2021, I re-interviewed Mr. ███ at Rast Mas at Lewis. He said he had been released from prison in 2017 but returned in 2019. When I asked him about changes in programming and mental health care since my 2013 interview, he recalled that things had gotten "a little better at first in 2015" but then, he said, it was as if prison officials "just gave up." Since then, things have "gotten worse and worse." He described mental health care at Rast as "ridiculous" because all they do is "come to your cell, ask if you 'suicidal? homicidal?' And that's it. [They] never pull you out." Mr. ███ confirmed that when he was released from prison he was diagnosed as bipolar with panic attacks, and designated SMI. In fact, he told me that his past psychiatric history included three prior mental hospitalizations in the community. Yet, so far, Mr. ███ said, he was getting "no mental health call outs, no groups" and only "some meds whose name I don't know."

169.   Also in the Eyman Browning BMU in 2013, I interviewed ████████ ████████ ████. Mr. ███████ told me then that he was in protective custody and that, although he had been under psychiatric care on the streets for anxiety, and sought treatment in prison, he could not get any adequate care. "They say there is a psych program here but I don't see anything happening." He told me it had taken 3 months for mental health staff to even see him after he came to prison, despite him having submitted

an HNR to get help. When he was finally "seen," it was over the television. Other than that, he said, he had not had any other mental health contact.

170.   I was able to re-interview Mr. ███████ in 2021, individually and confidentially, after locating him in Lewis' Barchey Unit. Like virtually everyone else I spoke to on my recent tours, he, too, told me that there had been no improvements in mental health care since the first time I saw him. In fact, he said that even in the medium security unit that he is in now, a lot of people complained about the lack of services. Mr. ███████ told me that he had stayed for a while in the Browning BMU where I saw him in 2013 and he told me that it "never really improved—it was and stayed bad," in part because they were locked down so much. Unfortunately, Rast max, where he was sent next, was hardly any better. In fact, he said Rast max is known among the incarcerated persons in the ADCRR as "SMU III" because it is so harsh. There is no regular mental health care, and people are seen only when they request contact. Otherwise, "the psych lady walks through units, asks 'how are you doing?' and that's it. No one-on-one, no mental health groups." This despite the fact that he said he has a mental health diagnosis that includes PTSD and anxiety disorder.

171.   In 2013, I spoke to ███████ ███████ ███████ in Cellblock 5 ("CB-5") at Florence. At the time, Mr. ███████ said, "I'm terrified I'm getting schizophrenia, but no treatment." He repeatedly said he felt like he was "losing it," was "trying to hold on," and needed help. He said he "thought" he was taking Zoloft and Remeron but that he was still hearing voices. He was on suicide watch at Kasson—he had become so desperate that he said: "I thought I might as well kill myself." But after he stabilized he was brought back to CB-5, where I saw him, and he said he received no treatment: "[Mental health staff] haven't talked to me for therapy, just for drugs, once in person, once on the TV.

172.   In 2021, I located Mr. ███████ to re-interview him individually and confidentially. He was housed at the Morey Unit in the Lewis Complex. He told me that he had been released from prison several times since I had seen him eight years earlier. He said that he is still considered SMI, both in prison and in the community, and told me that

when he came back to prison in 2016, he was placed in a Rast SMI pod. However, he said "they didn't do nothing for us, just stuck all the SMI in the same building but didn't treat us, just kept us on meds." Mr. ██████ said that he is still on medication—Remeron—for his mental illness. In fact, he told me about an extensive mental health history that began in childhood, and that included psychiatric care and psychotropic medications. He said: "I hear voices, I've been on suicide watch many times—I don't know how many." Mr. ██████ told me there has been "no improvement at all since 2013 in terms of mental health treatment or anything else." He said, "in here, I have no program, all I do now is watch TV. I get depressed all the time, so I sleep a lot." The mental health contact he receives consists of nothing more than "check-ins" rather than therapy. The mental health staff member "just gives me puzzles and things to take back to my cell to color."

173. ██████ ████████ ████████ was another incarcerated person whom I first interviewed in 2013. He was housed in the Wing 1 mental health program at Kasson at the time, after having been moved from CB-1 at Florence. At that time he told me that he was "doing alright," that he did not know his exact mental health diagnosis, but said that he was taking psychotropic medications and participating in a group on anger management. He told me that the group was held in the outside heat and requiring them to "stand up in the cage" during the duration of the group. He said that they were limited to only one group per week but that, for him, that was "not enough—[there] is nothing else to do [and] we have no regularly scheduled individual contact." Mr. ██████ explained that persons in the unit had to explicitly request to see the psychologist, otherwise they did not come to see you. Mr. ██████ said that he much preferred being in CB-1 to his housing in Kasson. He said that although CB-1 provided only limited opportunities for treatment, they were better than in Kasson. He said that his only out-of-cell session with a psychologist or psychiatrist pertained to his medications— "he didn't talk to me about [my] problems at all."

174. In 2021, I re-interviewed Mr. ██████ individually and confidentially in the Barchey Unit at Lewis. He told me that he had been released from prison twice since I last

saw him in 2013, but was returned both times. The first time he was released, he said, it was directly out of the Kasson mental health unit, where I had seen him. Not surprisingly, he reported that his readjustment to the world outside prison, coming directly from an isolation unit, "was hard," made worse by the fact that he received no transitional help from ADCRR, and no direct services once he arrived back in the community. As he put it, "I couldn't control my emotions or my thoughts. I was there but I wasn't." Being in isolation, he said, had "made it hard to be around people." Similarly, when he was released the second time, he re-entered society without any transitional program or assistance of any kind. Coincidentally, he was scheduled to be released from prison the very next day after our 2021 interview but still had not received prerelease planning or assistance: "No one has helped me with my re-entry. I'm on my own…" Reflecting back to the time in 2013 when I first saw him, Mr. ████ told me that he could think of "no improvements in programming or mental health or anything" in ADCRR.

175.   In 2013 I also spoke to ████ ████ ████, who was then housed in Eyman Browning. At that time, he complained about the total lack of activity and the high degree of isolation, telling me that he had been in Browning since the facility opened in 1996, and that he wanted "to break down and cry, it's so awful." He said that the recreation time that they are supposed to be offered is often not the amount they actually got; he estimated that about a quarter of the time, rec was cancelled because of staffing shortages or other reasons, and that there are times when prisoners do not get outdoor rec "for a week or more."

176.   When I re-interviewed Mr. ████ in 2021, he was in the Rast max unit at Lewis, where he had just arrived from Browning (where he had gone, before that, from SMU I). In comparison, he said, the Rast max unit he was now in seemed "slightly better" than Browning which meant, as he later explained, that he could get a little rec time in Rast unit, which is something he was not getting at Browning. Rast also permitted him to attend a "group" yard and a weekly class (consisting of about 10 incarcerated persons at a time). He said that he was going before the Parole Board in January and attended class

because he was hopeful that it would create a favorable impression. Mr. ▮▮▮▮ said that he had been in some form of isolation for the better part of 32 years and that "I am a mess. I need help." He went on to say that "nothing good" had happened at Browning after I spoke with him in 2013 and, "in fact, it got worse, really bad over the years." He said that despite his many years in isolation "I never got mental health treatment. It would have been good but [it was] never offered." He told me that he once asked for psychiatric evaluation but was discouraged from getting one by a mental health worker who told him "you don't want a psych jacket." Mr. ▮▮▮▮ observed that "when you have been in isolation so long, you fight for your sanity."

177.   I did a 2021 follow-up interview with ▮▮ ▮▮▮ ▮▮▮, at the Barchey Unit at Lewis, where he is currently housed. He is another person whom I had originally interviewed in SMU I in 2013. In my original interview, Mr. ▮▮▮ described a cycle that is all too common in extremely harsh isolation units like those that ADCRR operates. He told me then that he had very serious mental health problems that dated back to when he was placed in a mental hospital at age 7 or 8. He said that he continued to hear voices since then and that he was virtually always in distress. He found isolation especially hard to deal with—"I can't take it." He told me that there was a time when he was in CB-5 in the Florence-Central facility, when "I lost it, acting bizarrely, I flipped out. They gassed me and put me in Kasson suicide watch for 10 days but it made me crazier." Even after he had been placed on suicide watch, Mr. ▮▮▮ said that he had gotten no treatment, neither in groups nor on a one-to-one basis. He told me he had arrived at SMU I just a week before I interviewed him in 2013 and, despite long-standing psychiatric problems and the fact that he had recently been on suicide watch, no one from mental health had come to visit or evaluate him.

178.   In 2021, Mr. ▮▮▮ was at the Lewis-Barchey Unit, where I interviewed him individually and confidentially. He told me that he had continued to have mental health problems in the intervening years but had received little or no meaningful treatment for them. Mr. ▮▮▮ said that he had been placed on suicide watch multiple times and

reported that he continued to hear voices. Despite getting some attention from one caring mental health staff member ("Ms. Klaus"), he said he had gotten no group therapy. Since my interview with him eight years earlier, he had actually been released from prison but he soon returned. Mr. ███████ told me that when he was released from prison earlier, the ADC had done nothing to prepare him for release. In fact, he said, he was so desperate for help that he had committed some petty offenses just to get put in jail so that he could receive some psychological help. He told me "the system is exactly the same as in 2013." He said that he meant that ADC would not give you any help, often even when you ask for it. More poignantly, he said that the ADC still does nothing to help prepare you to get out—poignantly because he was scheduled to be released the very next day, and said he was extremely worried about whether and how he could adjust to free society. With respect to mental health care, Mr. ███████ reported that, despite his extensive psychiatric history, his regular mental health contacts were limited to once a month, even though he is in a medium security unit now, rather than isolation: "It's just like max, really. Nothing." He said his "program" in the Barchey Unit consisted of "TV and rocking myself to sleep at night to pass time. Nothing but depressing. No classes, no jobs, except for pod porter, which is something to do but not helpful for when I get out."

179.   As these follow-up interviews make clear, there have been few if any positive, enduring changes made in the ADC's conditions, practices, and policies in the eight years that passed since I systematically assessed these conditions and interviewed incarcerated persons about them. Whatever modest positive changes began to be implemented in the wake of the *Parsons* settlement quickly eroded, and the ADC's isolation units reverted to their previous dysfunctional, depriving, and dangerous state.

## VIII.  Conclusion

180.   As I have noted repeatedly in the above paragraphs, the adverse psychological effects of solitary or isolated confinement and the significant risk of serious psychological harm that they pose for incarcerated persons have been well documented in the scientific literature and firsthand accounts and widely acknowledged by various

human rights groups, professional organizations, and judicial rulings amassed over the last half century. Indeed, in many ways they replicate the considered judgments of similar commentators offered much earlier in history, when more 130 years ago the U.S. Supreme Court characterized solitary confinement as an "infamous punishment," because "a considerable number of prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still committed suicide, while those who stood the ordeal better were not generally reformed…"[111] Because, the Court noted, "in most cases [they] did not recover sufficient mental acuity to be of any subsequent service," the punishment of "solitary confinement was found to be too severe."[112]

181.    The broad recognition of the nature and magnitude of the harmfulness of solitary confinement about which I wrote in my 2013 report has become significantly more widespread in the years since then, so much so that there is a nearly universal consensus among scientific, mental health, human rights, legal, and even correctional organizations that solitary confinement places persons at significant risk of serious harm. It is painful, harmful, and dangerous. In fact, a number of prison systems across the U.S. have recognized the magnitude of the risks and dangers that solitary confinement—even in its "modern" form—continues to pose for the basic well-being of incarcerated persons. They have taken steps to drastically limit (if not virtually eliminate) its use on a long-term basis, to exclude certain groups of especially vulnerable incarcerated persons from being subjected to its potential harms, and to ameliorate its harshness, painfulness, and damaging features as much as possible (by shortening the length of stay, improving overall conditions of confinement, and affording people enhanced programming and treatment to improve their chances to survive relatively unscathed). ADC has done none of these things. Instead, it continues to expose a very large number of incarcerated people

---

[111] *In re Medley*, 134 U.S. 160, 168 (1890).
[112] *Id.*

1    to truly severe, extremely harsh and punitive forms of isolation, and retains many of them

2    under these harmful and potentially dangerous conditions for very long periods of time.

3        182.    As I directly observed, and as the people whom I interviewed reported, there

4    were few if any real changes to living conditions or the procedures by which the ADC's

5    isolated housing units were operated. As a result, their suffering has not appreciably

6    abated in the past eight years. Indeed, the conditions of isolated confinement were as

7    draconian in 2021 as I observed on my last visit to many of these units in 2013, and the

8    significant risk of serious harm to the persons incarcerated in these facilities has not been

9    reduced at all. Literally every person whom I interviewed who was in ADCRR during the

10   relevant post-2013 time period, and therefore could provide observations about the nature

11   of any changes or reforms—and virtually all of them could—reported that, aside from in

12   some instances being given access to tablets, that there were no changes for the better and

13   many changes for the worse.

14       183.    A number of them clarified that, in their opinion, around the time of the

15   *Parsons* settlement in 2014, and for a short time thereafter, there did appear to be some

16   progress. For example, they indicated that being given access to the newly constructed,

17   larger outdoor yards (for those who were given access) was an improvement. A few

18   recalled that there had been increased programming for a brief period, and that it seemed

19   like the "step" program was being operated through a more predictable and transparent

20   process, such that they were told what they needed to do in order to progress and that it

21   was possible to advance through the steps by meeting these requirements. They

22   acknowledged that all of these changes were potentially beneficial improvements but

23   vehemently complained that any changes were short-lived. That is, they reported that the

24   improvements began to disappear within a year or two of the settlement, and ADC had

25   returned to its pre-settlement state (if not, in some instances, much worse).

26       184.    As I have noted, for a variety of previously stated reasons, mentally ill

27   persons are especially vulnerable to the painful stressors of isolated confinement. The risk

28   that they will incur further psychological damage from placement in such units is

especially high. Indeed, this risk is so high—and so readily apparent—that it has led many correctional officials and courts across the country to exclude the mentally ill from being placed there in the first place. When mentally ill persons predictably react to the harshness of their environment, punishment-oriented systems like ADCRR respond with more punishment rather than treatment, sending them into a downward spiral from which they may not return, and the cycle of harsh treatment leading to deterioration that precipitates even harsher treatment and more deterioration continues to repeat itself.

185.   Thus, in my professional opinion, and in the opinion of many others who have carefully studied this issue, all incarcerated persons with a diagnosis of severe mental illness should be categorically excluded from long-term isolated housing, because they face a serious risk of significant psychological harm in that setting. ADCRR's continuing policy to the contrary—their willingness to house significant numbers of seriously mentally ill persons under conditions of isolation and other extreme deprivations—is not only ill-advised but dangerous.

186.   Indeed, contrary to sound correctional practice and the weight of psychological and psychiatric opinion, ADCRR continues to house seriously mentally ill incarcerated persons in its isolation units. ADCRR's failure to have and to properly implement a policy that excludes these incarcerated persons from these units places these incarcerated persons at a heightened and unreasonable risk of serious harm.

187.   Of equally grave concern is that fact that ADCRR subjects juveniles to similar conditions of harsh and dangerous isolation, something that is virtually universally condemned. For previously stated reasons, I believe that the ADCRR's own direct experience with the tragic, fatal consequences of this practice should have underscored the unacceptable risks and led them to end it. Shockingly, it did not.

188.   My inspections of the various ADCRR isolation units, the cell-front and one-on-one confidential interviews I conducted, and the extensive documents that I have reviewed pertaining to the policies, procedures, and conditions that continue in operation in ADCRR's isolation units confirm the fact that Arizona prisons do indeed *continue* to

impose truly severe forms of "solitary confinement" on persons incarcerated in them. The forms of extreme isolation and severe deprivations that I observed firsthand and that incarcerated persons described to me are precisely the kinds that have been identified and described in the scientific literature as producing adverse psychological and even harmful physical effects. Indeed, in my experience, some of the ADCRR's current isolation units are as punitive and extreme as any I have ever seen; they represent extremely harsh versions of the kind of isolation that researchers have documented as deeply harmful, and human rights and mental health organizations have condemned as unjustifiably cruel.

189.   In addition to the risk of harm they represent for the mentally ill, conditions of such extreme isolation can do great damage to even previously healthy persons. ADCRR's failure to devise and implement careful mental health monitoring policies for all people subject to the extremely isolated conditions in their isolation units, and Defendants' failure to take meaningful steps to ameliorate conditions of extreme social isolation in those units, places *all* people subject to these conditions at an unreasonable risk of harm. The adverse consequences of exposure to these conditions are extreme and even irreversible, including the loss of psychological stability, significantly impaired mental functioning, the inability to function in social settings and personal relationships, self-mutilation and self-harm, and even death.

190.   Based on my experience studying these kinds of environments and their psychological effects for approximately four decades, and in providing guidance and advice to correctional systems and the federal courts about how best to address and ameliorate these problems in different states across the country, I can offer the strongly held opinion that the range of egregious conditions, practices, and policies that I have described in the preceding pages can be remedied through system-wide relief that is ordered by the courts.

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Executed on October 30, 2021, in Santa Cruz, CA.

4

5

6    CRAIG HANEY, Ph.D., J.D.

1    Respectfully submitted,

2    Dated: October 30, 2021                    **ACLU NATIONAL PRISON PROJECT**

3
                                                By: _s/ Corene T. Kendrick_
4                                                  David C. Fathi (Wash. 24893)**
                                                   Maria V. Morris (D.C. 1697904)*
5                                                  Eunice Hyunhye Cho (Wash. 53711)**
                                                   915 15th Street N.W., 7th Floor
6                                                  Washington, D.C. 20005
                                                   Telephone: (202) 548-6603
7                                                  Email:    dfathi@aclu.org
                                                             mmorris@aclu.org
8                                                            echo@aclu.org

9                                                  Corene T. Kendrick (Cal. 226642)*
                                                   39 Drumm Street
10                                                 San Francisco, California 94111
                                                   Telephone: (202) 393-4930
11                                                 Email:    ckendrick@aclu.org

12                                                 *Admitted _pro hac vice_
                                                   **Admitted _pro hac vice_. Not admitted in
13                                                 DC; practice limited to federal courts.

14                                                 Donald Specter (Cal. 83925)*
                                                   Alison Hardy (Cal. 135966)*
15                                                 Sara Norman (Cal. 189536)*
                                                   Rita K. Lomio (Cal. 254501)*
16                                                 Sophie Hart (Cal. 321663)*
                                                   **PRISON LAW OFFICE**
17                                                 1917 Fifth Street
                                                   Berkeley, California 94710
18                                                 Telephone: (510) 280-2621
                                                   Email:    dspecter@prisonlaw.com
19                                                           ahardy@prisonlaw.com
                                                             snorman@prisonlaw.com
20                                                           rlomio@prisonlaw.com
                                                             sophieh@prisonlaw.com
21
                                                   *Admitted _pro hac vice_
22
                                                   Victoria López (Bar No. 330042)*
23                                                 Jared G. Keenan (Bar No. 027068)
                                                   **ACLU FOUNDATION OF ARIZONA**
24                                                 3707 North 7th Street, Suite 235
                                                   Phoenix, Arizona 85013
25                                                 Telephone: (602) 650-1854
                                                   Email:    vlopez@acluaz.org
26                                                           jkeenan@acluaz.org

27                                                 *Admitted pursuant to Ariz. Sup. Ct. R.
                                                   38(d)
28

Daniel C. Barr (Bar No. 010149)
John H. Gray (Bar No. 028107)
Austin C. Yost (Bar No. 034602)
Karl J. Worsham (Bar No. 035713)
Kathryn E. Boughton (Bar No. 036105)
Mikaela N. Colby (Bar No. 035667)
Kelly Soldati (Bar No. 036727)
Alisha Tarin-Herman (Bar No. 037040)

**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:     dbarr@perkinscoie.com
           jhgray@perkinscoie.com
           ayost@perkinscoie.com
           kworsham@perkinscoie.com
           kboughton@perkinscoie.com
           mcolby@perkinscoie.com
           ksoldati@perkinscoie.com
           atarinherman@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm; Desiree*
*Licci; Joseph Hefner; Joshua Polson; and*
*Charlotte Wells, on behalf of themselves and*
*all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**

By: s/ Maya Abela
      Asim Dietrich (Bar No. 027927)
      5025 East Washington Street, Suite 202
      Phoenix, Arizona 85034
      Telephone: (602) 274-6287
      Email:     adietrich@azdisabilitylaw.org

      Rose A. Daly-Rooney (Bar No. 015690)
      Maya Abela (Bar No. 027232)
      **ARIZONA CENTER FOR
      DISABILITY LAW**
      177 North Church Avenue, Suite 800
      Tucson, Arizona 85701
      Telephone: (520) 327-9547
      Email:
          rdalyrooney@azdisabilitylaw.org
          mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

LEGAL23774493.1                    -95-

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 30, 2021, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ C. Kendrick