**Index of Appendices to Declaration of Craig Haney, Ph.D., J.D.**

| Appx. | Description | |
|-------|-------------|--|
| A | CV of Dr. Haney | Redacted |
| B | Testimony and Compensation Report | |
| C | Documents Relied Upon for Declaration | Redacted |
| D | List of 2021 Interviews with Subclass Members | Under Seal |
| E | Summaries of 2013 Subclass Member Interviews | Redacted |
| F | Summaries of 2021 Subclass Member Interviews | Redacted |
| G | Photographs Taken During 2021 Tours<br><br>• Part 1: ASPC-Eyman (Sept. 13-14, 2021)<br><br>• Part 2: ASPC-Lewis (Sept. 29-30, 2021) | |

# APPENDIX A

CURRICULUM VITAE


Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064


home address:     ████████████████

phone:            ████████████████
fax:              ████████
email:            psylaw@ucsc.edu


PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |


EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |

1

| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

## HONORS AWARDS GRANTS

| 2021 | Finalist, Association of American Publishers, Professional and Scholarly Excellence (PROSE) Award for Excellence in Social Science (for Criminality in Context: Psychological Foundations of Criminal Justice Reform). |
| 2020 | Finalist, Stockholm Prize in Criminology (for "outstanding achievements in criminological research or for the application of research results by practitioners for the reduction of crime and the advancement of human rights"). |
| 2018 | Emerald Literati Award for "Outstanding Paper" (for "Reducing the Use and Impact of Solitary Confinement in Corrections"). |
| 2016 | Vera Institute of Justice "Reimagining Prisons" Initiative Advisory Council. |
| | Psychology Department "Most Inspiring Lecturer" |
| 2015 | University of California Presidential Chair (2015-2018 Term) |
| | Martin F. Chemers Award for Outstanding Research in Social Science |
| | Excellence in Teaching Award (Academic Senate Committee on Teaching). |
| | President's Research Catalyst Award for "UC Consortium on Criminal Justice Healthcare" (with Brie Williams and Scott Allen). |
| | Vera Institute of Justice "Safe Alternatives to Segregation" (SAS) Initiative Advisory Council. |
| | Who's Who in Psychology (Top 20 Psychology Professors in California) [http://careersinpsychology.org/psychology-degrees-schools-employment-ca/#ca-psych-prof] |
| 2014 | Distinguished Faculty Research Lecturer, University of California, Santa Cruz. |

| | |
|---|---|
| 2013 | Distinguished Plenary Speaker, American Psychological Association Annual Convention. |
| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
| | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>). |
| | Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
| | Invited Expert Witness, United States House of Representatives, Subcommittee on Immigration, Border Security, and Claims, Committee on the Judiciary |
| | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |
| | Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley). |
| 2004 | "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz. |
| | National Science Foundation Grant to Study Capital Jury Decision-making |

2002   Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000   Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999   American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997   National Science Foundation Grant to Study Capital Jury Decision-making.

1996   Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995   Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994   Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992   Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

| | |
|---|---|
| 1991 | Alumni Association Teaching Award ("Favorite Professor") |
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

## UNIVERSITY SERVICE AND ADMINISTRATION

| | |
|---|---|
| 2010-2016 | Director, Legal Studies Program |
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |

| | |
|---|---|
| 1990-1992 | Committee on Academic Personnel |
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

## WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

## PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

| | |
|---|---|
| 2020 | Criminality in Context: The Psychological Foundations of Criminal Justice Reform. Washington, DC: American Psychological Association Books. |
| 2014 | The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press. |
| 2006 | Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books. |
| 2005 | Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press. |

6

Monographs and Technical Reports

> 1989    Employment Testing and Employment Discrimination (with
> Hurtado). Technical Report for the National Commission on
> Testing and Public Policy. New York: Ford Foundation.

> 2005    Conditions of Confinement for Detained Asylum Seekers Subject to
> Expedited Removal (Appendix C in Study of Asylum Seekers in
> Expedited Removal As Authorized by Section 605 of International
> Religious Freedom Act of 1998).

Articles in Professional Journals and Book Chapters

> 2021    "Sykes's Prison in Context: Change and Continuity in the Life Span
> of a Penitentiary," in B. Crewe, A. Goldsmith, & M. Halsey (Eds.),
> Power and authority in the modern prison: Revisiting the Society of
> Captives. New York: Oxford University Press, in press.

> "The Impact of Isolation on Brain Health" (with Vibol Heng and
> Richard Smeyne), in M. Zigmond, L. Rowland, & J. Coyle (Eds.),
> The Neurobiology of Brain Disorders: Biological Basis of
> Neurological and Psychiatric Disorders. Second Edition. Elsevier, in
> press.

> "'We Just Need to Open the Door': A Case Study of North Dakota
> Department of Corrections' Quest to End Solitary Confinement"
> (with David Cloud, Dallas Augustine, Cyrus Ahalt, & Brie Williams),
> Heath & Justice, in press.

> "The Continuing Unfairness of Death Qualification: Changing Death
> Penalty Attitudes and Capital Jury Selection" (with Eileen
> Zurbriggen & Joanna Weill), Psychology, Public Policy, and Law, in
> press.

> 2020    "Solitary Confinement, Loneliness, and Psychological Harm," in
> Jules Lobel and Peter Scharff Smith (Eds.), Solitary Confinement:
> Effects, Practices, and Pathways to Reform (129-152). New York:
> Oxford University Press.

> "Continuing to Acknowledge the Power of Dehumanizing
> Environments: Responding to Haslam, et al. (2019) and Le Texier
> (2019)" (with Philip Zimbardo), American Psychologist, 75(3), 400-
> 402.

"Framing Criminal Justice and Crime in the News, 2015-2017" (with Camille Conrey), Journal of Crime and Justice, in press.

"The Science of Solitary: Expanding the Harmfulness Narrative," Northwestern Law Review, 115(1), 211-256.

"Consensus Statement from the Santa Cruz Summit on Solitary Confinement and Health" (with Brie Williams and Cyrus Ahalt), Northwestern University Law Review, 115(1), 335-360.

"Solitary Confinement is Not Solitude: The Worst Case Scenario of Being 'Along' in Prison," in Robert Coplan, Julie Bowker, & Larry Nelson (Eds.), Handbook of Solitude: Psychological Perspectives on Isolation, Social Withdrawal, and Being Alone. Second Edition. New York: Wiley-Blackwell, in press.

2019    "Afterword," in Robert Johnson, Condemned to Die: Life Under Sentence of Death (pp. 137-141). Second Edition. New York: Routledge.

"Changing Correctional Culture: Exploring the Role of U.S.-Norway Exchange in Placing Health and Well-Being at the Center of U.S. Prison Reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), American Journal of Public Health, 110(S1), S27-S29.

2018    "Restricting the Use of Solitary Confinement," Annual Review of Criminology, 1, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), Law & Policy, 40(2), 148-171.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. Journal of General Internal Medicine, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), The Criminalization of Mental Illness (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic

8

Critique," <u>Crime and Justice</u>, <u>47</u>, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), <u>Psychology, Public Policy, and Law</u>, <u>24</u>, 326-346.

2017   "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," <u>Punishment and Society</u>, <u>19</u>, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), <u>Torture and Its Definition in International Law: An Interdisciplinary Approach</u> (pp. 139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, <u>International Journal of Prisoner Health</u>, <u>13</u>, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), <u>International Journal of Prisoner Health</u>, <u>13</u>, 41-48.

2016   "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), <u>The Prison Journal</u>, <u>96</u>, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book <u>Moral Disengagement: How People Do Harm and Live With Themselves</u>, by A. Bandura], <u>PsycCRITIQUES</u>, 61(8).

2015   "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), <u>Law & Social Inquiry</u>, <u>40</u>, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books.

"Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

"Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011    "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), <u>Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors</u> (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), <u>Michigan State Law Review</u>, 2011, 573-608.

2010 "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" <u>Connecticut Public Interest Law Review</u>, <u>9</u>, 139-196.

"Hiding From the Death Penalty," <u>Huffington Post</u>, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in <u>Sentencing and Justice Reform Advocate</u>, <u>2</u>, 3 (February, 2011).

2009 "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), <u>Law and Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>, <u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," University of Missouri-Kansas City Law Review, 77, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

2008    "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293.

[Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

"Preface," D. Jones (Ed.), Humane Prisons. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), The Effects of Imprisonment (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), Harvard Journal of Hispanic Policy, 17, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), Report on Asylum Seekers in Expedited Removal. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), Psychology, Public Policy, and Law, 10, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), Psychology, Public Policy, and Law, 10, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), Psychology, Public Policy, and Law, 10, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," DePaul Law Review, 53, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," <u>Crime & Delinquency</u> (special issue on mental health and the criminal justice system), <u>49</u>, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), <u>Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities</u> (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," <u>Capital University Law Review</u>.

2002    "Making Law Modern: Toward a Contextual Model of Justice, <u>Psychology, Public  Policy, and Law</u>, <u>7</u>, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001    "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000      "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

         "Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999      "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

         "Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998      "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

         "Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

         "Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997      "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," Psychology, Public Policy, and Law, 3, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" Psychology, Public Policy, and Law, 3, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," Stanford Law Review, 49, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), Law and Human Behavior, 21, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" Studies in Law, Politics, and Society, 16, 3-69.

1995    "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," Santa Clara Law Review, 35, 547-609. [Reprinted in part in David Papke (Ed.), Law and Popular Culture, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," Indiana Law Journal, 70, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," California Criminal Defense Practice Reporter, 1995(1), 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), Law and Human Behavior, 18, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), Law and Human Behavior, 18, 411-434.

16

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners, and Prisoners</u> (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," <u>Law and Human Behavior</u>, <u>17</u>, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). <u>Forum</u>, <u>19</u>, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. <u>Behavioral Science and Law</u>, <u>10</u>, 179-195.

1991   "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," <u>Law and Human Behavior</u>, <u>15</u>, 183-204.

1988   "In Defense of the Jury," <u>Contemporary Psychology</u>, <u>33</u>, 653-655.

1986   "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984   "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

     "On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

     "Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

     "Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

     "Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

     "Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983   "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

     "The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

     "Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

18

1982        "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981        "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive</u> <u>Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980        "Juries and the Death Penalty:  Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Loh, Wallace (Ed.), <u>Social Research and the Judicial Process.</u> New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), <u>The People's Law Review</u>. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), <u>Readings on the Social Animal</u>. San Francisco, W.H. Freeman, pp. 125-136.

1979        "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), <u>Challenges and Alternatives to the Criminal Justice System.</u> Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), <u>Social Psychology and Modern Life</u>. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), <u>Law and Society Review</u>, <u>13</u>, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), <u>Criminal Law and Its Processes</u>. Boston: Little, Brown, 1983.]

1977       "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), <u>The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology</u>, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), <u>Law, Justice, and the Individual in Society: Psychological and Legal Issues</u> (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976       "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), <u>The Research Experience</u>, pp. 177-190. Itasca, IL: Peacock.

1975       "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  <u>Psychology</u> <u>Today</u>, 26ff.

"Implementing Research Results in Criminal Justice Settings," <u>Proceedings</u>, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), <u>Theory and Research in Abnormal Psychology</u>.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), <u>Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving</u>.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) <u>Contemporary Issues in Social Psychology</u>.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  <u>Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships</u>. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, <u>Revisita de Psicologia Social</u>, 1, 95-105 (1986).]

1973        "Social Roles, Role-Playing, and Education" (with P. Zimbardo),
            <u>The Behavioral and Social Science Teacher</u>, Fall, 1(1), pp. 24-45.
            [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) <u>Psychology For
            Our Times</u>. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E.
            and Hunt, R. (Eds.) <u>Current Perspectives in Social Psychology</u>.
            Third Edition. New York: Oxford University Press, 1978.]

            "The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P.
            Zimbardo, C. Banks, and D. Jaffe), <u>The New York Times Magazine</u>,
            April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.),
            Psychology Is Social:  Readings and Conversations in Social
            Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

            "Interpersonal Dynamics in a Simulated Prison" (with C. Banks and
            P. Zimbardo), <u>International Journal of Criminology and Penology</u>,
            1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry,
            Robert (Eds.) <u>Examining Deviance Experimentally</u>. New York:
            Alfred Publishing, 1975; Golden, P. (Ed.) <u>The Research Experience</u>.
            Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) <u>The Sociology of
            Corrections.</u> New York:  John Wiley, 1977; <u>A kiserleti tarsadalom-
            lelektan foarma</u>. Budapest, Hungary: Gondolat Konyvkiado, 1977;
            Johnston, Norman, and Savitz, L. <u>Justice and Corrections</u>. New
            York: John Wiley, 1978; <u>Research Methods in Education and Social
            Sciences.</u> The Open University, 1979; Goldstein, J. (Ed.), <u>Modern
            Sociology</u>. British Columbia:  Open Learning Institute, 1980; Ross,
            Robert R. (Ed.), <u>Prison Guard/ Correctional Officer: The Use and
            Abuse of Human Resources of Prison.</u> Toronto:  Butterworth's 1981;
            Monahan, John, and Walker, Laurens (Eds.), <u>Social Science in Law:
            Cases, Materials, and Problems</u>. Foundation Press, 1985; Siuta,
            Jerzy (Ed.), <u>The Context of Human Behavior</u>. Jagiellonian
            University Press, 2001; Ferguson, Susan (Ed.), <u>Mapping the Social
            Landscape: Readings in Sociology</u>. St. Enumclaw, WA: Mayfield
            Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), <u>Menschenversuche
            (Experiments with Humans)</u>. Frankfurt, Germany: Suhrkamp
            Verlag, 2006.]

            "A Study of Prisoners and Guards" (with C. Banks and P.
            Zimbardo).  <u>Naval Research Reviews</u>, <u>1</u>-<u>17</u>. [Reprinted in Aronson,
            E. (Ed.) <u>Readings About the Social Animal</u>. San Francisco: W.H.
            Freeman, 1980; Gross, R. (Ed.) <u>Key Studies in Psychology</u>. Third
            Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), <u>Basic
            Themes in Law and Jurisprudence</u>. Anderson Publishing, 2000.]

MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC
MEETINGS AND RELATED SETTINGS (SELECTED)

2019    "The Recent History of Corrections in Norway and the United
States," Plenary Address, Justice Reinvestment Summit, Salem, OR,
February.

"The Dimensions of Suffering in Solitary Confinement," Plenary
Address, Washington College of Law at American University,
Washington, DC, March.

"Implementing Norwegian Correctional Principles to Change Prison
Culture in Oregon Prisons," Invited Address, Oregon Department of
Corrections Leadership Team, Salem, OR, June.

"Humanizing American Jails and Prisons," Center for Court
Innovation, International Summit, New York, NY, June.

"From the Stanford Prison Experiment to Supermax Prisons and
Back Again: Changing the Narrative in Criminal Justice Reform,"
Invited Address, Norwegian Correctional Academy, Oslo, Norway,
September.

Plenary Address, "Perspectives on Solitary Confinement,"
Northwestern University Law Review Symposium, Chicago, IL,
November.

2018    "The Art and Science of Capital Mitigation," Federal Death Penalty
Training Conference, Atlanta, Georgia, June.

"From Eastern State Penitentiary to Supermax Prisons," Safe
Alternatives to Segregation Conference, Vera Institute of Justice,
Philadelphia, PA, June.

Plenary Address, "Advancing Prisoners' Rights Through Law and Psychology," Denver Law Prisoners' Advocates Conference, University of Denver Sturm College of Law, Denver, CO, October.

"In Praise of Positivism in the Age of 'Fake News' and 'Alternative Facts,'" Research Frontiers Conference, Santa Cruz, CA, October.

2017    "Neuroscience in Policy: Solitary Confinement in California," Law & Neuroscience Conference, San Francisco, CA, February.

"In My Solitude: The Detrimental Effects of Solitary Confinement on the Brain," Exploratorium-Fisher Bay Observation Gallery, San Francisco, CA, February.

"Brief History of Correctional Reform in the United States," Community Corrections Partnership/Smart on Crime Community Forum, Santa Cruz Civic Auditorium, May.

"Reducing and Eliminating the Use of Solitary Confinement in Irish Prisons," Joint Conference with the Irish Prison Service, Department of Justice, and Irish Penal Reform Trust, Dublin, Ireland, June.

"The Emerging Consensus on When, for How Long, and On Whom Solitary Confinement Should Ever Be Imposed," Leadership, Culture and Managing Prisons: Knowledge Exchange between the USA and Europe (LEADERS), Trinity College, Dublin, Ireland, June.

"Sykes and Solitary: The Transformation of the Penal Subject in the Devolution from a 'Society of Captives' to Supermax Prisons," Power and Authority in Modern Prisons: Essays in Memory of Gresham Sykes Workshop, Centre for Prison Research, Cambridge University, Cambridge, England, September.

"Context Is Everything: The Social Psychology of Imprisonment," Joint USA/Scandinavian Correctional Exchange Program, Oslo, Norway, September.

2016    "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: <u>Coleman</u> and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

2014      "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013 "Isolation and Mental Health," Michigan Journal of Race and Law Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012 "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011 "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye

on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010        "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009        "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008 "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007 "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006 "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005    "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004    "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003        "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002     "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001     "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000       "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999       "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998    "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997    "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996    "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995    "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

| | |
|---|---|
| 1994 | "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara. |
| 1992 | "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August. |
| 1991 | "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August. |
| 1990 | "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA. |
| 1989 | "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August. |
| | "Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June. |
| | "The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June. |
| 1987 | "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August. |
| | "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July. |
| 1986 | Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August. |

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985   "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983   "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982   "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982   "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982   "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980   "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

35

1975          "Social Change and the Ideology of Individualism in Psychology and
              Law." Paper presented at the Western Psychological Association
              Annual Meeting, April.


## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2018-present:   Editorial Consultant, PLoS ONE.

2016-present    Editorial Consultant, Translational Issues in Psychological Science.

2016-present    Editorial Consultant, International Journal of Law and Psychiatry.

2016-present    Editorial Consultant, Justice Quarterly.

2015-present    Editorial Consultant, Criminal Justice Review.

2015-present    Editorial Consultant, American Journal of Criminal Justice.

2015-present    Editorial Consultant, American Journal of Psychology.

2015-present    Editorial Consultant, Criminal Justice Policy Review.

2014-2018       Editorial Board Member, Law and Social Inquiry.

2013-present    Editorial Consultant, Criminal Justice and Behavior.

2012-present:   Editorial Consultant, American Sociological Review.

2012-present:   Editorial Consultant, Criminology.

2011-present    Editorial Consultant, Social Psychological and Personality Science.

2008-present    Editorial Consultant, New England Journal of Medicine.

2007-present    Editorial Board Member, Correctional Mental Health Reporter.

2007-present    Editorial Consultant, Journal of Offender Rehabilitation.

2004-2016       Editorial Board Member, American Psychology and Law Society

Book Series, Oxford University Press.

| | |
|---|---|
| 2000-2003 | Reviewer, Society for the Study of Social Issues Grants-in-Aid Program. |
| 2000-present: | Editorial Consultant, <u>Punishment and Society</u>. |
| 2000-2015 | Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues) |
| 1997-2004 | Editorial Board Member, <u>Psychology, Public Policy, and Law</u> |
| 1997-present | Editorial Consultant, <u>Psychology, Public Policy, and Law</u> |
| 1991 | Editorial Consultant, Brooks/Cole Publishing |
| 1989-present | Editorial Consultant, <u>Journal of Personality and Social Psychology</u> |
| 1988-present | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985-present | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-present | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |

<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCIRF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-2005.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and

Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of The Growth of Incarceration in the United States: Exploring the Causes and Consequences (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

## PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION

Hoptowit v. Ray [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities. [See Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014)].

Coleman v. Brown (United States District Court, District of California, 2013-2014). Evaluation of treatment of mentally ill prisoners housed in administrative segregation in California prisons. [See Coleman v. Brown, 28 F.Supp.3d 1068 (2014).]

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# APPENDIX B

Professor Craig Haney

Statement of Compensation: My rate of compensation is $350/hour for out-of-court legal consulting, $500/hour for deposition and trial testimony.

Trial and Deposition Testimony Over the Past Four Years
(2017 through present)

2017   Braggs v. Dunn (federal), trial testimony.

United States v. Con-Ui (federal), trial testimony.

BCCLA v. Attorney General of Canada (Supreme Court of British Columbia), trial testimony.

2018   Braggs v. Dunn (federal), hearing testimony.

People v. Bracamontes, trial testimony.

Gumm v. Ward, (federal), deposition testimony. [Georgia isolation]

2019   Francis v. Her Majesty the Queen in Right of Ontario (Canada), deposition testimony.

Sabata v. Nebraska Department of Correctional Services (federal), deposition testimony.

Henry Davis et al. v. John Baldwin et al. (federal), deposition testimony.

2020   U.S. v. Alejandro Toledo (federal), hearing testimony.

Raymond Tarlton, et al. v. Kenneth Sealey, et al. (federal), deposition testimony. [NC Henry McCollum, Leon Brown]

Novoa v. GEO (federal), deposition testimony.

In re Lisle (federal), hearing testimony.

2021   Raymond Tarlton, et al. v. Kenneth Sealey, et al. (federal), trial testimony. [NC Henry McCollum, Leon Brown]

Tellis v. LeBlanc (federal), deposition testimony.

Harvard v. Inch (federal), deposition testimony.

# APPENDIX C

**Documents Relied Upon by Craig Haney, Ph.D., J.D.**

Death Records

- ADCM1584256-1584285 - ████████████████
- ADCM1585574-1585603 - ████████████████

Mortality Reviews

- ADCM228189-228192 - ██████████
- ADCM428892-428896 - ████████████████████
- ADCM584960-584963 - ██████████████
- ADCM603810-603813 - ████████████
- ADCM603831-603834 - ██████████
- ADCM628009-628012 - ██████████
- ADCM722995-723001 - ██████████
- ADCM757506-757512 - █████████
- ADCM772341-772346 - ███████████████
- ADCM842345-842350 - █████████
- ADCM999490-999493 - ████████
- ADCM1038313-1038318 - ██████████
- ADCM1517522-1517525 - ██████████
- ADCM1530761-1530765 - ██████████
- ADCM1545525-1545530 - ████████████████
- ADCM1555003-1555008 - ████████
- ADCM1557616-1557620 - ████████
- ADCM1561848-1561852 - ████████
- ADCM1561857-1561862 - ████████
- ADCM1561868-1561873 - ████████
- ADCM1561923-1561928 - ████████
- ADCM1561934-1561938 - ████████
- ADCM1570561-1570566 - ██████████
- ADCM1578083-1578089 - ████████
- ADCM1578147-1578152 - ████████
- ADCM1584250-1584255 - █████████
- ADCM1588589-1588594 - ████████
- ADCM1610511-1610518 - ████████
- ADCM1618291-1618295 - ██████████
- ADCM1623198-1623202 - █████████
- ADCM1669316-1669319 - ████████████

1

- ADCM1669325-1669328 - 
- ADCM1669339-1669342 -
- ADCRR00000041-44
- ADCRR00000106-109
- ADCRRM0005585-5588 -
- ADCRRM0012739-0012742
- ADCRRM0026178-0026181 -
- ADCRRM0026199-0026202 -
- ADCRRM0026203-0026206 -
- ADCM196736-196739 -

Psychological Autopsies

- ADCRRM0026154-0026177 - 
- ADCM497282-497298 -
- ADCM584964-584977 -
- ADCM585349-585359 -
- ADCM585360-585367 -
- ADCM628030-628040 -
- ADCM701208-701219 -
- ADCM723002-723008 -
- ADCM833211-833218 -
- ADCM1037390-1037399 -
- ADCM1038299-1038312 -
- ADCM1517638-1517646 -
- ADCM1530786-1530795 -
- ADCM1545487-1545504 -
- ADCM1555084-1555104 -
- ADCM1557720-1557746 -
- ADCM1561945-1561955 -
- ADCM1561956-1561967 -
- ADCM1561968-1561980 -
- ADCM1561981-1561991 -
- ADCM1561992-1562003 -
- ADCM1570599-1570606 -
- ADCM1578122-1578129 -
- ADCM1578836-1578855 -
- ADCM1584786-1584793 -
- ADCM1588576-1588588 -

- ADCM1618561-1618579 - 
- ADCM1624350-1624363 -
- ADCRR00000122-132 -
- ADCRR00000133-140 -
- ADCRR00000141-148 -
- ADCRR00000149-155 -
- ADCRR00000156-169 -
- ADCRR00000170-183 -
- ADCRR00000184-193 -
- ADCRRM0000063-ADCRRM0000068 -
- ADCRRM0000069-ADCRRM0000077 -
- ADCRRM0000078-ADCRRM0000088 -
- ADCM196783-196791 -
- ADCM196792-196801 -
- ADCM196802-196815 -

Use of Force Videos

- ADCRR00159240
- ADCRR00159241
- ADCRR00159242
- ADCRR00159243
- ADCRR00159244
- ADCRR00159245
- ADCRR00159246
- ADCRR00159248
- ADCRR00159249
- ADCRR00159251
- ADCRR00159253
- ADCRR00159258
- ADCRR00159259

Pleadings

- 950-1 Sealed 2013-2014 Reports
- 3379 Report of Marc F. Stern, MD, MPH, Federal Rule 706 Expert
- 3599 Motion to Enforce the Stipulation (Maximum Custody Performance Measures 1-3, 5-6 and 8)
- 3600 Declaration of Curtis Harris in Support of Plaintiffs' Motion to Enforce the Stipulation

- 3600-1 Exhibits 1 - 10
- 3600-2 Exhibits 11 - 19
- 3601 Declaration of Jessica Carns in Support Plaintiffs' Motion to Enforce (3599)
- 3602 Sealed Exhibits to Declaration of Jessica Carns
- 3700 Defendants' Response to Motion to Enforce (3599)
- 3700-1 Index and Exhibits
- 3770 Declaration of Jessica Carns
- 3775 Plaintiffs' Reply in Support of (3599) Motion to Enforce the Stipulation (Redacted and Sealed Versions)
  - Sealed Exhibits to the Declaration of Jessica Carns
  - Sealed Declaration of Maria Morris
  - Sealed Exhibits to the Declaration of Maria Morris Exhibits
- 3613-1 Exhibits 1-8
- 3635 Order re (3613) Discovery Dispute
- 3613 Report of Joint Statement of Discovery Dispute
- 3476-1 Exhibit Index and Exhibits 1-5
- 3700 Defendants' Response to Motion to Enforce
- 3701-1 Exhibit 1 - Declaration of M. Dolny
- 3703 Sealed Defendants' Response in Opposition to Motion to Enforce Court's Order (Doc. 3635)
- 3703 Sealed Exhibit 1 - Declaration of M. Dolny
- 3907-1 Exhibit 1 - Declaration of B. Pennington-Stallcup
- 3649-1 Exhibit Declaration of D. Shinn 7.10.2020 (OSC)
- 3649-2 Exhibit Declaration of L. Gann 7.10.2020 (OSC)
- 3656-1 Declaration of David Shinn 7.14.2020 (OSC, Redacted)
- 3656-2 Declaration of Larry Gann 7.14.2020 (OSC, Redacted)
- 3822-1 Exhibit 1 - Declaration L. Gann
- 3840-1 Exhibit 1 - Declaration of L. Gann
- 3881-1 Declaration - D. Shinn (Suppl OSC)
- 3881-2 Declaration - L. Gann (Suppl OSC)

Demonstrative documents

- HANEY000001-000003 – Parsons Suicides Since 2014 – Updated
- HANEY000004-000006 – 2021.08.19 People discussed in Craig Haney's Reports

Letters to Opposing Counsel

- 18.11.16 Kendrick to Bojanowski re Lewis tour
- 18.11.30 Kendrick to Bojanowski re Lewis Tour

- 18.11.30 Kendrick to Bojanowski re Lewis Tour - Exhibits A-C
- 2016.06.07 Letter from PLO re Notice of Noncompliance - █████████

Depositions

- Rough Platt deposition transcript, 10/15/21
- Rough Stallcup (30(b)(6)) deposition transcript, 10/12/21
- Rough Stallcup (individual) deposition transcript, 10/15/21
- Rough Coleman deposition transcript, 10/14/21
- Rough Stickley deposition transcript, 10/12/21

Class Member Medical Records







7





# APPENDIX D

# (Filed Under Seal)

# APPENDIX E

Appendix E: Summary Data from Interviews Conducted in 2013

My 2013 interviews with incarcerated persons who were housed in Eyman Browning had revealed that they were suffering because of the extreme isolation and inactivity to which they were subjected. For example, in addition to the incarcerated persons who I interviewed in 2013 and again in 2021, and whose follow-up interviews are described in the main body of my Report, ███████████████, told me in 2013 that he had been at the facility since it opened in 1996, and that he wanted "to break down and cry, it's so awful." He said that the recreation time that they are <u>supposed</u> to be offered is often not the amount they <u>actually</u> get; he estimates that about a quarter of the time, rec is cancelled because of staffing shortages or other reasons, and that there are times when incarcerated persons do not get outdoor rec "for a week or more." Other Browning incarcerated persons echoed the same sentiments about the painfulness of the isolation they experienced, the lack of activity and programming, and the fact that "no one comes to check on us back here." As one of them put it, "this is really hard. It breaks persons."

Conditions in SMU I were harsh and severe when I inspected them in 2013, and a number of incarcerated persons described their adverse effects. For example, ████ ██████████████, for example, described the program in SMU I as "really, 24/7 lockdown." He said that they promised rec time rarely happens when or in the amounts it is supposed to, and that some of the flagrantly mentally ill incarcerated persons who are confined in the units "scream all night." He said, "I haven't had human contact for years, but just shaking someone's hand on the basketball court was priceless." He said that these conditions have "affected my mind—my mind is distressed over it, it's awful, it's sick, it's painful to be in isolation."

Even in the BMU, which was supposed to have the most well-structured and elaborate mental health programming, incarcerated persons repeatedly complained about the lack of mental health contact. █████████████, for example, told me he had a long psychiatric history, was psychotic, and also got into fights with other incarcerated

persons. He thought he was being sent to the BMU to get help with those problems and to finally get the treatment he needed. Instead, he said, "you are lucky if you get a group for 30 minutes" a week, and there were no one-to-one contacts offered as part of the program (which is what he thought he was being sent to BMU to receive).

In 2013, ████████████████████, described coming from the mental health program (such as it is) at Kasson, and having been in the suicide watch cells there more than a dozen times by the time he came to SMU I. Yet, he said he had been at this facility fully 5 months before being called out to be seen by mental health (which oddly enough just happened for the first time this week). He said that "no mental health person comes to see us or check on us," and even when you come out of suicide watch, "nobody comes to check on me after that." Finally, there was the case of ███████████████, who was a slightly built but articulate young man who was placed in prison for the first time, because, he said, he violated the terms of his SMI outpatient probation on the streets, something that was undoubtedly ordered out of recognition of his mental health problems. He was approved to go to a minimum security yard, serving a short sentence. However, he was denied entry into the Flamenco facility and was sent to a mainline prison instead. He had been diagnosed with schizoaffective disorder and he began to deteriorate in prison—he said he has "auditory hallucinations, terrible mood swings, and anxiety" and, in part because of this, he apparently got into a fight with another incarcerated person (who may well have attacked him). He told me that he was on a downward spiral since then. He was in SMU I, "begging for treatment," but said he could not get any. Instead, he said, the officers put him on suicide watch—"it was horrible. I was desperate in watch. I really was losing it, it traumatized me." When I saw him 8 years ago, he said he was still desperate to get out of this severe form of isolation, where not treatment was forthcoming. He said: "They have not treatment plan, no therapy, and no help."

I also conducted a set of longer and confidential interviews with a group of incarcerated persons whom I selected from Browning and SMU I. The results of some of those interviews are summarized below.

I interviewed ████████████████████, a Browning incarcerated person who was seen in the visiting area of the prison. However, Mr. ██████ was so disturbed and at times incoherent that I was unable to ask him all the questions about symptoms and reactions to his isolated confinement that I ordinarily would have. I was nonetheless able to learn a great deal about Mr. ██████ and to observe how profoundly mentally ill he was. Mr. ██████ told me that he had been taking psychotropic medications and receiving treatment for his mental problems since age 13. He said he had a long history of self-harm, including banging his head against the wall, biting himself, and trying to gouge out his own eyeballs. He has heard voices in the past (the last time he heard them, he said, was when "the devil was on my body and mind") and he has a history of suicidality, which apparently resulted in him being admitted to the Flamingo facility (on perhaps more than one occasion). Mr. ██████ had a difficult time remembering things or staying focused. At one point he looked meaningfully at me and said, "I am not at ease. The world is on my chest. I can't hold it." He talked about being afraid in the prison system and about being victimized. He has learned to fear other persons, he said, and has attacked his cellmates because he becomes convinced that they are going to attack him. I concluded in 2013 that Mr. ██████ was a tragic example of the kind of incarcerated person who is so seriously mentally ill that he should <u>never</u> be housed in a "regular" isolation unit. The stress and pain of isolation, especially in the absence of intensive therapeutic contact and enhanced programming, was only likely to worsen his condition and place him and possibly many others at risk.

I interviewed another Browning incarcerated person, ██████████████ in 2013. He was an older man doing a relatively short prison (3-year) prison sentence, although he had been incarcerated before. He told me that he never had mental health problems until he came to prison, but has had them continuously since. He was certain that the prison was experimenting with persons and that prison officials somehow gave him Hepatitis C. He said that over his years in prison (about 12 years, before his current term), the only regular psychiatric contact he ever had was through the tele-psychiatry medication checks that he got every three months. In addition, he said, about 6 months

ago someone from the psych staff started to come by his cell once a month. He said, they "spend 30 seconds with you—'How are you? Are you eating?' That's it." He said that there used to be a lot of physical abuse at the prison—guards in special black uniforms used to beat incarcerated persons with sticks—but it has stopped. Instead, he said, they pepper spray incarcerated persons (including by blowing the spray through the vents of the cells).

Mr. ███████ acknowledged suffering many problematic symptoms and reactions that are associated with long-term isolation. He told me that he had terrible headaches, was constantly on edge and anxious, especially around persons (for example, he said he was afraid to come out of his cell for his interview with me), and often felt like he might be on the verge of an emotional breakdown. He also told me that he heard voices—they spoke to him out of the light socket, they constantly criticized him, and he could not make them stop. He was plagued by ruminations, a heightened sensitivity to lights, irrational anger and irritability, problems concentrating, and the sense that he was losing the ability to feel or care about things. Indeed, he said that he was often profoundly depressed, and no longer wanted to be around other persons. He said: "I don't like anybody anymore. I can't trust anyone. They are all out to get me." Mr. ███████ told me that he was going to be released from prison in about a week.

Another incarcerated person whom I interviewed at Browning in 2013, ███████ ███████, told me that he had serious mental problems before coming to prison, was designated "SMI" (seriously mentally ill), assigned a caseworker, and prescribed psychotropic medications. When he came to prison, he said he attempted suicide multiple times and was placed in Suicide Watch cells, which he described as "terrible," in part because, he said, they sprayed people with pepper spray when they were kept there. He told me that his feelings of desperation had intensified when he came to SMU II at the end of 2012. He estimated that, since then, he had engaged in self harm, including attempting suicide, more than 20 times. He described the "mental health program" at the facility as consisting of a weekly group and a brief one-on-one counseling session with a clinician that lasted about 20 minutes ("or, if you don't have an issue, 1 minute"), and

said that it took place in a cage inside the clinician's office. Mr. █████'s main negative
reactions to isolation involved his continuing feeling of being on the verge of being
overwhelmed, of breaking down emotionally. He also complained of ruminations and
depression.

████████████ appeared to be a profoundly mentally ill and obviously vulnerable
incarcerated person when I interviewed him in 2013, when he was housed at Browning.
He told me that he was presently incarcerated on a burglary conviction, for which he
received a 6-year term.  He said that he had a long history of mental health problems that
dated back to early childhood. He was hospitalized for these problems beginning at age 9
and "many times after that." He was deemed SMI on the streets, and had taken a variety
of psychotropic medications. He told me that he was taking Seroquel and Klonopin
before coming to prison but they were discontinued once he arrived because they are not
on the prison formulary. Instead, he was taking Thorazine, Wellbutrin, Tegretal "and
something else." He told me that, in the Behavioral Management Unit (BMU) where he
was currently housed, they would take his property away "if I don't drink my meds." He
has had many suicide attempts, showed me many serious scars on his body where he had
cut himself, apparently very deeply (including in his stomach), and told me he had
swallowed pencils and other objects. He said that his mental health problems were well
known by the ADC and "anytime I get off the bus" coming into the prison system, he
goes directly to a psych ward (including at the Flamingo facility). Mr. ████████ arrived at
Browning on May, 2012.

Mr. ████████ told me further that "the only reason they sent me here was because I
was trying to kill myself—I have no other disciplinary infractions. I get my points jacked
up because of suicide, not violence." However, he was having an extremely difficult time
in isolation. He told me, "I can't handle this stuff in my head, and it is getting worse. I'm
going to kill myself someday." He told me that he has been treated badly at the Browning
facility. He did not believe that he was getting enough mental health treatment or
receiving in a way that benefitted him. He said that during the one-on-one sessions with
the clinician, "the [correctional] staff sits outside the room" where the session takes place

and that the "guards tell guys on the tier what I tell the doctor." He said that participation in treatment—one group and a single one-on-one per week—was compelled and that "you <u>have</u> to go [or] they take your property away." Mr. ███████ said he had been sprayed with chemical agents multiple times since he had been in the BMU and had been on Suicide Watch multiple times as well. The Suicide Watch typically lasts for about 8 days and, he said, "they use mace in suicide watch <u>all</u> the time." He said the conditions in suicide watch cells were horrible. The use of chemical sprays affected all of the incarcerated persons on watch, because it circulated to the other cells, and that the watch cells were filthy: "There were feces and blood in these units until last week." He got out of the hospital just 3 weeks ago from his last suicide attempt—he said "I was out of it, out of my mind, I'm schizophrenic and I lose it." However, after coming back from the hospital, he soon was placed on suicide watch: "I got off suicide watch last week."

Mr. ██████ described many symptoms and suffering much psychological pain in isolation. He was bothered by headaches, troubled sleep, nightmares, constant anxiety, the feeling that he was on the verge of losing control, visual and auditory hallucinations, ruminations, fantasies of revenge, oversensitivity to certain stimuli (lights, and the perception that he could smell chemicals coming out of the vent in his cell), the sense that he had lost the capacity to feel positive emotion ("I think violently all the time and the place has done it"), deep depression, thoughts of suicide, a feeling of overall deterioration, and social withdrawal ("I tell persons in my pod, leave me alone"). Mr. ██████ said that he was scheduled to end his prison sentence next year (2014) "but before I get back to the streets I have to go to the state hospital to see if I can be released."

██████████████ was a 35 year-old Browning incarcerated person who told me he came to the United States when he was around 10 or 11 years old, his mother was murdered when he was 14, and he was hospitalized for mental health problems by the time he was 18. He explained that in 2007 he was diagnosed as suffering from PTSD and that, when I interviewed him in 2013, he was taking "a lot" of a medication whose name he could not exactly recall. Other than the medication, however, "I haven't gotten

any treatment. Once or twice they came to my cell, once they pulled me out—but the guard is standing right there"—within earshot of the interview—so Mr. ████ was not comfortable talking openly. He said he was currently in a "renouncer" pod for incarcerated persons who wished to renounce their prior affiliation with a gang. "I was going crazy [in] here. I couldn't take it, even though I had a TV." Mr. ████ told me that he had very troubled sleep, and was bothered by headaches. He also was bothered by ruminations, oversensitivity to stimuli (especially sound, "guys making noise all the time"), and is felt that he was badly deteriorating overall in isolation.

████████████ was a 28 year-old SMU I incarcerated person when I interviewed him in 2013. He described an early troubled life that included mental health problems and receiving a variety of psychotropic medications "when I was very young." He said he is "a cutter" and that his self-harming behavior started when he was just 9 years old. He told me: "Nobody would love me or care about me—the cutting makes the tension go away." (Mr. ████ described a terribly traumatic childhood in which his grandfather, who fathered him when he raped Mr. ████'s mother, then molested him as Mr. ████ was growing up.) He had been placed in mental institutions on 6 or 7 different occasions. Not long after he came into the ADC in 2006, with a 10-year flat sentence, he was raped. When he was transferred to another prison, he was beaten up and raped there as well. As a result, he had to be placed in protective custody. He has been in SMU I for 7 years now. Mr. ████ was very vocal about the lack of mental health care in SMU I: "They don't help you in here. I put in HNRs and they don't come. I do to group every Friday, I've been 2 times, in the cages with the therapist in the middle. I don't get any one-on-ones. He said he used to get them, sporadically, "but then it just stopped" and now he gets "nothing." He said: "The staff here doesn't care about you—if you cut yourself, they just gas you." He said this is especially true in suicide watch cells where, if you are acting out, "they just gas you." Mr. ████ said that he is schizophrenic and also has multiple personalities. His mental problems had resulted in him going to Suicide Watch "dozens of times," and being currently prescribed lots of psychotropic medications, including a Haldol shot. He explained: "The voices are in my

head all the time. They tell me to cut myself. I can see ghosts and spirits, the dead, bugs and things that no one else can see.

Mr. ████ was having a very difficult time in isolation. He reported suffering from headaches all the time, from troubled sleep and constant nightmares, he said he was always anxious, constantly felt on the verge of losing control of his emotions, had continuous hallucinations, fantasies about revenge, he reported ruminating often (about taking his own life), constantly overreacting to stimuli (lights and smells), told me that he got angry often, had problems thinking, felt he was becoming hardened by his experiences in isolation, had mood swings, deep depressions, thoughts of suicide, felt he was deteriorating overall, and said he had changed to the point where he was always uncomfortable being around persons. Mr. ████ told me that he was scheduled to be released from prison in less than 2 years. He said: "I'm worried. I don't know what will happen to me. I will be homeless."

# APPENDIX F

Appendix F: Summaries of Additional 2021 Interviews

Below I summarize the information I obtained in the interviews I conducted (mostly cell-front) during my inspections of various housing units in Eyman Browning, SMU I, and the several Units I visited in the Lewis Complex in 2021. They do not include the follow-up interviews conducted with the persons I originally interviewed in 2013 (which are contained in the body of my Report).

<u>SMU I</u> (September 13, 2021)



████████████████, who told me he will be released from prison in a few months, said that little or nothing had changed in his living conditions or treatment over the last several years. As he put it, "it's still hell in here." Echoing themes I would hear time and again, Mr. ██████ reported showering in his sink (taking "bird baths") because officers often cancelled showers, and rarely gave persons in the unit an opportunity to go to the outdoor "rec pens." Although he reported having mental health problems as a child, and having been on the mental health caseload (including being prescribed psychotropic medications) he told me that he no longer receives mental health treatment—he said, the mental health staff "just ignore me, [give me] no help."

████████████ voiced numerous complaints about his treatment and reported a great deal of pain and suffering as a result of his conditions. He said that he believes that the fact that he has complained to staff has resulted in retaliation and worsened his plight. Mr. █████ was very upset about the fact that he was not given supplies to keep his cell clean and complained about the rodent and insect infestation. In fact, he said roaches and rodents were everywhere in the unit. As evidence of this, he actually showed me a mouse that he had trapped in his cell. Mr. █████ told me further that he has being diagnosed as suffering from paranoid schizophrenia and PTSD, takes several psychotropic medications, and is supposed to be given a one-on-one mental health contact every two weeks. He said that the mental health contacts do not occur as frequently as they are supposed to but that, when they do, the clinician spends no more than a few minutes with him ("5 minutes max"). Mr. █████ said he has been suicidal in the past (and showed me scars from multiple prior attempts) but that when he tells COs he is suicidal that taunt him by saying, "you need help? you want a razor blade?"

████████████ told me that he had been classified as SMI at Lewis Rast and had attempted suicide there. However, he said that when he was finally put in a mental health program in Rast it was "meaningless." When he told prison staff that he was not benefitting from the program, he said, he was transferred to SMU I. In the SMU I unit where he is now, he said, there is no real contact with mental health staff, who just walk by the cells and say, "you good?" without ever acknowledging or asking about his prior mental health problems or treatment. Mr. █████ explained that the men in the unit

rarely come out of their cells—there are no jobs, no programs: "it's bad, we just sit and do nothing." He told me he was deteriorating under the conditions.

███████████████████████ told me that he had been in SMU I for more than three years, after spending a number of years in the isolation unit at the Maricopa County Jail. Although he is now at a high enough step level that he has access to "dayroom" on the tier, he said that there is very little to do once you are out of your cell. Moreover, he said that even though he was fortunate enough to have a "job" cleaning up in the pod, his opportunity to get out of his cell "is still staying in this little pod—it is our whole world." He added, "you get dull from the empty time." Mr. ███████████████ said that although he asked for help with his mental health problems, he sees mental health staff no more than about once every three months, in contacts that he said last "10-15 minutes."

███████████████████ was in a Suicide Watch cell when I saw him. He said he had been brought to SMU I from another prison (Meadows) because he wanted to hurt himself. He said he "needed help [but] hasn't' really gotten any" and now does not want to stay in the Watch cell at this facility any longer. He said he was brought there several days ago but "no one has come to see me from mental health." He was emotional, his speech was very slurred, and it was difficult for him to talk.

███████████████ was in distress when I saw him. He said that he has gotten beaten up by staff for requesting a single cell and put in "with men who are crazy and [who] attack me." He told me that he is taking psychotropic medications for his mental health problems but that he continues to hear voices and is not getting the help that he feels he needs. Mr. ████████ said he goes home next year and is worried about his adjustment because of what he has been exposed to.

███████████████ told me that he had to fight someone in order get a single cell. He said he has serious mental health problems for which he takes psychotropic medications. Mr. ████ said that the correctional officers hassle him so much that he chooses not to go outside to the rec cages or even to showers, preferring to take "bird baths" in his cell. Mr. ████ said he was suffering from paranoia and anxiety disorder, that he hears voices, and has tried to take his own life several times. He said he was supposed to get mental health treatment for these problems but had to wait three months before even being contacted. He said the mental health "pull outs" consist of being taken to a room just outside the entrance to the pod and placed in a cage, and sometimes last for no more than a few minutes.

██████████████████ & ███████████████ were double-celled when I interviewed them. Both reported that they were under stress and having difficulty adjusting to the harsh conditions. They pointed to the unsanitary way in which they unit was run—the filth and the rats. Mr. ████████ described living in the unit as "torture" and said that

mental health staff not only comes infrequently but when they do they just "drive by" and "hardly care about you."

███████████████ told me that he was being adversely affected by his time in isolation and that he was worried about his stability when he is released from prison next year, wondering "what I'll be like when I get out?" Mr. ████ complained that during their drive-bys, the mental health staff ignores men who are asleep and merely asks the others who are awake, "you okay?" and moves on. In addition, he said that the "class" they were allowed to attend was "a joke"—there is "no teaching or anything helpful" taking place in it.

███████████████ was noticeably frustrated and upset when I talked to him, complaining about being kept in SMU I for nearly eight years. He said that it is nearly impossible for him to live under conditions like these, especially with a cellmate. However, he said that the staff tells persons in the unit "you have to fight" before they will move cellmates. Mr. ████ said that this is the case even when someone is housed with a person who has serious mental health problems, including what he described as overmedicated "zombies." He was very disdainful of the mental health staff, whom he said were only interested in putting people on meds. Mr. ████ complained that the pod rec area was so filthy that he did not go out even when it was offered, and that the "class" that recently began is "nothing," because you just "sit there, [and] stare at each other."

In Wing 3, a Detention Unit, there were literally no staff members in the unit when we arrived. No one was present in the entire unit, including in the control booth. Our escorts had to look for someone to open the doors so we could go into the housing pods.

Once in the pod, ███████████████ told me that he had been in prison for some 20 years, including a number of stints in isolation. He said that "nothing" had changed for the better in recent years—"it's hell." He said that officers still harass you, you get no treatment or care, and that the SMUs are the worst part. Mr. ████ complained especially about the medical and mental health staff, whom he said "see you suffer and walk by, if you do lose it, they strip you naked until you beg to get out." He said that he had been given mental health treatment as a child but not after that. In prison, he said, the mental health staff just "come around once in a while," ask "how are you doing?" and "smile and walk away." When I asked what his daily routine was, he gestured to his cell and replied: "You are looking at it. My cell, a TV, my tablet." He said there were no classes and no programs; as he put it, there is "nothing back here—this cell is it." He explained that it was impossible to keep mice and insects out of his cell, no matter how hard he tried to keep it clean: "you have to hang your food up from the floor on strings" to keep it from them. Although Mr. ████ has a shower next door to his cell, he said he uses his sink instead because the officers "leave you for an hour or more [in the shower], you just stand there." In order to go to "rec"—which consists of "the little box at the end of the unit," you are required to "jump through hoops," including being required to strip naked,

bend over to show your body cavities, cough," get back in your clothes, and kneel on the floor to be put in restraints before you come out of your cell. So, he said, "I don't go." He told me that the isolation in this and in similar units that he has been in is so complete that "you hear people's voices for months or years" but you "never see their faces [and] you start to wonder, 'was there ever anybody there?'" Mr. ▮▮▮ said he knows that he is in prison for a reason but that not being treated like a human being is "not right," and that he is suffering and finding it hard to hold on.

The only incarcerated person who refused to speak with me at all during the tour of SMU I was ▮▮▮▮▮▮▮▮▮▮▮▮▮, who told me he was in this unit "for protection" and was reluctant to talk for fear of jeopardizing his safety.

When I approached ▮▮▮▮▮▮▮▮▮▮▮▮▮ he immediately told me about an incident in which he had passed out because of heat stroke but which correctional officers interpreted as an overdose. When they revived him with NARCAN, he was startled and aggressive when he first woke up and had to be forcibly restrained. However, he told me that so much force was used on him that he was severely injured and required hospitalization. The injuries were lasting ones, he said, and he still suffers from them. He complained about the total lack of programming in his present housing unit and the fact that he has not been allowed to go to rec since he arrived here nearly six weeks ago. Mr. ▮▮▮ said he had been receiving mental health treatment in the past, until he took himself off psychotropic medications several years ago. However, he told me that he soon realized that "it's so bad in here you can't take it" without medication. The adverse conditions prompted him to resume taking Celexa for anxiety and depression. However, other than medications, he said that mental health staff only "stop by every couple of weeks, just cell-front, [to ask] basic questions" to make sure you aren't going to hurt yourself. He said he gets out of prison in a year and is worried about "getting his head right" before he does.

▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮ were double-celled when I interviewed them. Mr. ▮▮▮ told me he was accused of assaulting a staff member and that "I've been treated like a dog" for the several months that he had been in this unit, including not getting a mattress or bedding when he was first sent to the unit. He said, "they singled me out for abuse." Mr. ▮▮▮ who seemed unstable and at times incoherent, said he was supposed to be taking psychotropic medications but had not yet received them: "I've been asking for my meds since I got here, they haven't brought them. I'm hurting [and] need help." Mr. ▮▮▮ said "we are just back here suffering." He told me: "I have schizophrenia and paranoia [and] it is hard for us to be together." He explained that he had been taking psychotropic medications (including Seroquel and Wellbutrin) but was concerned about side effects. He asked for counseling instead of just medications, but said he never got any. "Every three months somebody comes by my cell, that's it." However, he said that he was reluctant to talk to the mental health staff

under these conditions: "Who wants to talk about your personal problems in front of your cellie?" Neither man knew when he would be released from the unit.

████████████████ said that he had not been offered showers for a month, despite being housed next door to one. He told me that the nearby shower, which is the one he is required to use, does not have a light in it, so that he and others must shower in the dark. Mr. ████ told me that the mental health staff "just breeze through," asking only if you want to hurt yourself. He said he had asked for mental health contact as soon as he arrived in the unit about a month ago but no one has come to see him. He summarized the overall conditions in the unit where I saw him this way: "They cancel showers, have no program, and 'yard' is a box [with] no water, no bathroom… [and you] also get degraded to go."

I saw ████████████████ in Ms. Kendrick's presence because Mr. ████ is a Spanish-only speaker. He showed me the many crosses that he had made and placed throughout his cell to ward off "evil spirits" that inhabit the cell and that he believes want to harm his family. He said that the presence of the spirits prevented him from sleeping at night and that, when he does go to sleep, they appear in the nightmares he has. Mr. ████ who told me he is 70 years old and will be released from prison in approximately eight months, said that he takes psychotropic medications but could not recall their names. He told me that he had been in this isolation unit for about a year, during which time he said it was impossible for him to speak with any mental health staff members because none of them speak Spanish.

Individual/Confidential Interviews:

In addition to the follow-up interviews I conducted with some of the persons whom I had originally interviewed in 2013 (summarized in the main body of my Report), I conducted individual, confidential interviews in the visiting room of the SMU I facility with several other persons.

████████████████ told me that he was Native American and grown up on a reservation. He said he was arrested at age 16, and had been in the justice system ever since then—he is now 43 years old.  In the several decades that Mr. ████████ has been in prison, he said he spent much of the time in solitary confinement, and continuously since 2007. He said that the ADC did away with some of the most egregious units in the system, such as the "violence control unit," and that he thought conditions very slowly began to improve until 2016 or so, mostly because they new outdoor rec pens were installed. But, he said, the staff cancels outdoor rec often, telling them, "we are short staffed." He thought the persons living in the unit were actually getting less rec time now than before, despite the new rec pens, because of so many cancelations. He said that the same thing (cancelations) happens with the "class" they are supposed to have for an hour once a week. When they do take place, "the classes, run by CO 3, is just a conversation—whatever they want to

discuss, could be anything." He acknowledged problems communicating and feeling discomfort around people (saying that ours was the longest conversation he'd had in a very long time): "I'm no longer used to being around people. I get really anxious and uncomfortable around people."

███████████, who appeared weak and infirm, told me that he is not getting the medical care that he needs. He said he was in the hospital last year and was told by the medical staff that he should not be returned to prison, but was brought back to SMU I anyway, despite not having any disciplinary write-ups for years. He complained at length about the insects in the areas where the men live. He also said that he and the other persons incarcerated in the unit were idle in them most of the time, including having outdoor rec cages and classes cancelled often. He said the classes were nothing more than people sitting talking and telling jokes, so he does not go to them. Mr. ████████ said the mental health staff comes by "maybe once a week, asking 'you good?'" and that's all. When he did go to an out-of-cell mental health contact once, a few years ago, because the isolation was "getting to me," he said that the staff told him it was not their responsibility to help.

Eyman Browning September 14, 2021

When I toured Eyman Browning, my first cell-front interview was with █████████████ █████, who told me that he expects to be released from prison soon. He said he is on psychotropic medications for his bi-polar disorder. Mr. ██████ told me that he has been incarcerated for 11 years and had no mental health treatment needs before coming to prison. However, he said that he is very worried about what will happen to him when he gets released, in part because he was released before and his mental health problems led to a parole violation and return to prison. He seemed nervous and told me he was reluctant to talk further with me because he did not want his cooperation to jeopardize his release from prison. Before I ended the interview, he told me that the "class" they had been holding once a week has not met for "a while" and that outdoor yard gets cancelled "a lot."

█████████████████████ told me he had been in isolation for 14 years and was about to be released in February of next year. He was worried about getting out and seemed nervous about talking in the presence of staff and said he was reluctant to talk any further.

In the next pod I entered, █████████████████████ complained about the lights being on in his cell 24 hours a day, which he said led to sleep deprivation. At age 41, he told me he had been in prison a long time, with no release date. Although he said that there was a brief time in the distant past when persons in his unit were getting 10 hours of out-of-cell time, it did not last long. Now, he said, they get out once a week to yard, at best.

7

Otherwise, they go to the "concrete block." The "classes," he said, are not helpful at all, "nothing beneficial in any way, nothing meaningful about them." He said that the CO 3s who run them "don't engage us in any education or even real conversation." He complained about the length of the steps in the stepdown program, what he said were 2 years for each of 3 steps. He said further that, even though they are supposed to have outdoor rec 3 times per week in this unit, in reality "we go once a week to cages—1 by 1 cages, at most once a week for 3 hours." He noted that mental health staff came through the unit once a week but said they "don't do anything, [ask] 'are you good?' but don't engage anyone."

███████████████ is a 69 year-old man who told me he had been incarcerated for decades. He said he had many medical problems, including eyesight that is so poor it impairs his ability to see the television or people's faces. He said he was convicted of being involved in the killing of an officer in 1973, and has been in isolation since 1980, even though, he said, he has not had a write-up in more than 8 years. He told me, "now I am a different man, I'm an old man, [and I] want out of this. [There are] too many restrictions. I have no life. Locked up year after year." He said that he does not trust the mental health staff because they are eager to put people on psychotropic medications. He said they come by each week and say, "'hi, how are you doing?' wave and go by." Mr. ██████ told me he tries to exercise to stay healthy but "they cancel our rec all the time" and the "box out back where we rec is full of bugs."

███████████████ told me that he had come to prison when he was in his mid-teens and is now 26, expecting to be released in a few years. He complained about not having access to school. He said that he needs help to learn, but none is forthcoming. The "class," he said, "is nothing—no educational aspect to it." The staff complains about being shorthanded, so we get nothing." Outdoor rec, for example, is "often cancelled." The indoor concrete rec pen is "filled with insects" and "it smells, so I don't like to go." He said the staff will not clean it. He told me that he had done most of his prison time in lockup or isolation and that he had seen very little change in these units, except for the rumor, not yet the reality, that the reclassification process was going to be modified. Mr. ████ went on to say, "its hard in here. Nothing to do wears you down. My mind is affected. [It] feels like there's no future, nothing to care about, just stuck in nothing, 24 hours a day." When I asked further about his mental state, Mr. ████ told me: "I have been affected badly by this. They don't work with us on getting us ready to be around people, to really function in the world, [or] examine the things that have happened to us." He acknowledged that he feels he would have to have counseling to help prepare himself "to overcome what has happened to me in here—I haven't been around a real 'people' yard in so many years."

███████████████ said he was a 48 year-old man who had been in this isolation unit for 7 years. He said he was on psychotropic medications for a diagnosed depression condition. [Mr. ████ was "outside" in the concrete "yard" when I attempted to talk with

him, through the door to the yard. He said he was reluctant to talk within earshot of staff
and so I terminated the interview.]

█████████████████████ said he had been in prison for 15 years, including the last 4 in
the STG unit where, he said, he had not noticed any real changes, except for the
introduction of porters on the unit. Even then, he said, the staff does not always allow
them to clean. He told me "we need people. You have to have contact. Humans suffer
without people. I have no positive interaction and it's hurting me. I am suffering. I'm not
used to people anymore." He went on to say, "I'm suffering and I'm worried. No one is
helping me, no preparation. [I'm] worried and want to make it out of here. I can't get real
education. I need help to get my GED—I've been down 15 years and couldn't get a GED.
I need help to reintegrate, to get skills." He went on to say: "Think about it. This is your
life. You are in your cell. You build barriers when you are denied contact with others.
[You] get no help with any of this. The [mental health staff] isn't concerned with any of
that. The 'class' is nothing. No content—a chance to be around people, which is cool, but
there is no content." Talking further about mental health, he said, there is "no counseling
here. Mental health just comes by quickly. You are left to deal with it on your own."

In the next pod I spoke to ████████████████ who said he was spending "too much
time in my cell." He had served 20 years in prison, about 3 or 4 years of which was in
isolation. "You have to fight off the effects. It gets to you. You—I—deteriorate, [you]
can't associate with people." He told me he is supposed to go to the outside rec cage once
a week but that it is cancelled a lot: "I haven't been out there in over a month." The
"class," too, gets cancelled. Mr. ███████ told me "it gets to you, wears you down. You
become anti-social, want to stay away from people." He said, "you live your whole life in
your cell. I'm depressed all the time, [there is] no meaning to life." The mental health
staff comes through once a week but "just pass through." He said he gets out of prison
next year and "I definitely am worried. Can I make it? I have no hope, no help, no
programs."

█████████████ said he was 54 years old and had spent most of his 30 years in
prison in isolation. He recalled some positive changes right after 2008, but then, he said,
they took them away. Now, he said, there is no table time, hardly any rec cage time,
because "everything is 'no staff.'" The "classes" are no more than "chit chat" but he
acknowledged that they are at least "something to do." Mental health staff comes once a
week but merely asks "how are you doing?"

██████████████████ told me that he had been in this unit for about 10 years. He
described it as "mental torture, a struggle to keep your sanity. You expect certain minimal
things—rec, shower, not very much—but they don't even give you that." He said that he
was in this unit at the time of the supposed settlement in 2013-2014, but "they fixed
nothing. It was downhill." In fact, he said, incarcerated persons in the ADC got even less
in the aftermath, fewer hours of outdoor rec, no tier time, and things kept getting

cancelled. On reflection, he allowed that there might have been a small step forward in 2014, but certainly by 2016, it was "all backward movement, all downhill." Mr. ███████ told me he was 38 years old and getting out of prison in less than 2 years. "I'm stuck in my cell with no hope of preparing myself, bettering myself. It gets to you mentally. You are frustrated, depressed." He decried what he perceived as the lack of help he was getting from prison authorities: "I've gone repeatedly to these 'classes' for years. [There is] nothing to them, so I don't go anymore. Mental health comes through once a week. They are a rubber stamp. They just do the formality of walking through—they aren't interested in you."

███████████████ was the last person in the unit I spoke to, as I was leaving the unit. He said that he had come to prison as a 17 year-old teenager and, remarkably, had been in exactly the same isolation cell for 15 straight years. He is hopeful that he will be resentenced in light of the <u>Miller</u> decision. He told me that it was impossible for him to describe how hard it had been for him to survive in the environment where he was living.

I went next to the Behavioral Management Unit or "BMU," which I was told was reserved for persons with behavioral problems. It is an unusual unit configured with plexiglass shields covering the cell doors. I looked for ███████████████, whom I had interviewed years earlier. When I found him in his cell, he looked very distraught and disheveled. He told me, "I'm in really bad shape, I'm having a breakdown." He told me that a few months ago he had swallowed batteries and stabbed himself. He said the batteries had "exploded in my stomach" and he had to be placed on a ventilator. Mr. ██████ told me "lockdown is destroying me." He said that the time he spent in the infirmary when he was being treated for his medical problems felt like "freedom" and that he was doing well there. But then he was sent back to lockdown and began deteriorating again. He said: "It's the lockdown that is killing me—they just send me back." Even after you have been put on suicide watch, he said, staff stabilizes you and sends you back. He told me that he was taking psychotropic medications but was not sure which ones. Mr. ██████ promised to come out to see me a little later, on a call out, so that I could interview him further. However, he never made it. When I asked staff to bring him for an interview later in the afternoon, they told me that Mr. ██████ had tried to kill himself and was in the infirmary receiving treatment.

I went next to the "Enhanced Unit," and talked first to ███████████████. Mr. ██████ told me he had been moved into this unit with the other persons housed there just last week, from the unit I had just left with the plexiglass shield on the cell doors. No one told him why the move was made. He was emphatic that "all we got since <u>Parsons</u> was tablets." He said the men in this unit did not get to go to outside rec but instead were restricted to the concrete pens. As he put it, "we are enclosed everywhere we go." According to him, those housed in the Enhanced Unit get no classes, and receive only showers and time in small concrete yard. He characterized the mental health contacts as "superficial" and described the interactions as consisting of staff asking "how are you

doin?" He said the contact was largely "for show" and that staff "address none of our concerns, so no one ever wants to talk to them." Mr. ███ said he had been on "enhanced" status for 7 years and that, even without any disciplinary write-ups, he was still retained without explanation. Mr. ███ described his attempt to adapt to this kind of treatment this way: "You have to do everything you can to distance yourself—it's like torture in here, it hurts your body and your mind." He described the plexiglass shields in the previous unit as "horrible," explaining that "you feel like you aren't able to breathe, you are closed off." He said that the escort procedure in the Enhanced Unit involved using a "dog leash" type apparatus (that we were shown when we entered the unit): "they put you on the leash, [and] want us to mentally feel like we are dogs, and we <u>do</u> feel like we are dogs in an animal state of mind."

I also spoke to ███████████ in the Enhanced Unit. He told me that he had done time in a California SHU unit that I am familiar with—the very harsh isolation unit at Tehachapi prison. He said his Arizona unit was worse because there was no end date to the time that he could be retained in isolation. He told me he had been in Arizona prisons since 2009, about 7 years of which he had been in isolation, and 4 years on "enhanced" status. He told me: "Nothing has improved in this unit. We are locked down all the time." He explained further: "If we are lucky, we come out of our cells once a week. Other times, they tell us, we don't have staff. So we suffer. And we <u>are</u> suffering. We have nothing. Nothing to do. Our 'program' is our cell." He complained also about the fact that there are bugs, including roaches everywhere in the unit. Mr. ███ told me that he suffers from depression and PTSD and had been prescribed psychotropic medications in the past. He said he had attempted suicide on the streets and was placed in a mental hospital in California. He witnessed people killed before he came to prison and was himself shot, which he believes is the source of his PTSD. Mr. ███ said his condition has deteriorated because of the stress and he acknowledged having ongoing mental health issues. In addition to having problems sleeping and a loss of appetite, he said: "I'm anxious all the time, and depressed, but I try to ignore it."

The last person I spoke with in this unit was ████████████, who told me that he suffers from mood swings and also that he hears "bad" things that others do not hear. He told me he has engaged in self harm in the past and suffers from anxiety. Mr. ███ said he is taking psychotropic medications. He said that he had been in a treatment program at the Kasson Unit in Central prison, but that in his current housing unit "there is nothing." He explained further, "I am on the edge. I need mental health treatment. I should be SMI."

In addition to the re-interviewees with whom I spoke at Eyman (whose interviews are summarized in the body of my Report), I individually and confidentially interviewed ████████████, whom I had seen cell-front and had told me he had come to prison as a 17 year-old teenager and had been in the same isolation cell for 15 straight years. Mr. ███ told me that he had some mental health treatment as a child but not

in prison, despite acknowledging "I have problems. I have mood swings and am very emotional." He said the only "contact I have with people" is through television and that he finds himself crying at commercials because, as he put it, "it's my only human connection." Mr. ▆▆▆▆▆▆ complained that, although he was trying to improve himself in prison, in anticipation of going before the parole board next year, there were no programs through which he could do this. In fact, he said that there used to be more programs. He said there were "no changes at all since 2014, in fact it's gotten worse. No programming at all. They constantly say, 'short staffed,' so we get nothing."

September 29, 2021: Lewis Complex-Rast Unit

At the Lewis Rast Unit, I first entered a max custody pod where I spoke to ▆▆▆▆▆▆▆▆ ▆▆▆▆. He told me he had been prison several times before, and had recently arrived in the present unit about a month and a half earlier. He said that he has mental health problems and is being medicated for them in the ADC—Celexa for depression and anxiety—but that the nurse "forgets" to give them to him and he has to keep asking for them. Mr. ▆▆▆▆ told me that he had been on Suicide Watch before because he had tried to kill himself, including a very serious incident in which he slit his neck with a razor blade. In fact, he said, he was suicidal when he was last released from the ADC and reached out for help, but received a new charge and was returned to prison before he could get any. Once back in prison, he said, "I started to get really depressed again." Despite his status in prison as mentally ill and receiving psychotropic medication, and having a history of past suicide attempts, he said "I haven't seen any mental health [staff] since I got here. I've requested, sent email, [but] they never answered." He elaborated that there are "no groups, no nothing, despite my history of suicide attempts. My mental health gets worse because I am locked up all the time." He acknowledged that there were times in the past when his mental health treatment, although still not ideal, was much better than what he was receiving at Rast, which he described as the "worse I've ever seen." Mr. ▆▆▆▆ complained that "we are essentially [in] 24-hour lockdown—come out a couple hours every other day to rec cages" but "they are hot and dirty" and "many don't go." He also was troubled by the fact that, as he put it, "I haven't been told what I have to do to get out of here or how long it will be."

In the same unit, ▆▆▆▆▆▆▆▆▆▆ told me he had been in the Flamenco Mental Health Center for 8 months and was recently sent to Rast. He told me he had been diagnosed schizophrenic, heard voices, and was on psychotropic medications, including Zoloft and Clonidine. On the streets, he said, he had been prescribed Thorazine. Mr. ▆▆▆▆ explained that he had a very serious suicide attempt that necessitated CPR to revive him—"the hospital said I was essentially dead." It resulted in him being sent to Flamenco, where he was getting mental health treatment once a week. But in Rast, he said, "you get no regular contact" with mental health staff. Other than a "telepsych" visit, he had not been seen by a mental health staff member except during their perfunctory

cell-front checks, during which time "I won't open up during because they are not confidential." Mr. ██████ said "there is really no programming [in Rast]," just "packets" that are handed out that you are expected to fill out on your own. He went on to say that he was deteriorating in the unit where he was living and that he was increasingly concerned about how he would make it after his impending release in late October of this year: "I sit in my cell with nothing. I am scared to death about getting out. I am getting worse, [I get] no help in here, no help planning what I am going to do or how I will survive. I don't even know where I'll live." He said he had been in prison for the last 15 years—"the last phone I've seen was a flip phone"—and "I know I need mental health treatment when I'm released but I don't know how to find it or even find a place to live."

I noticed a nearby cell, belonging to Mr. ████████████ that was incredibly disheveled and I asked where he was. I was told that, like Mr. ██████ he was at a program.

█████████████████ explained to me that he was considered an STG "renouncer." He said he had been in and out of prison and, although he had complaints about Rast, he compared it favorably to Browning: "I was in Browning for years before I came here around 2019. Browning was awful. If you are not mentally strong, it will destroy you there." He characterized the classes at Browning as "a joke," and told me that "the only thing <u>Parsons</u> gave us was the rec cages—you could socialize and that was better." But he went on to say that staff shortages resulted in rec cancellations. Although he had been in prison several different times, he said "I haven't had any programs to help me. Nothing to prepare me for the free world…" Mr. ██████ said that the mental health staff comes in the unit on a weekly basis and says "'how are you doing?' that's all. I say 'fine.'" Although he tries to handle his mental health issues on his own, he acknowledged that "I am deteriorating in here. It is an everyday thing. You fight against losing it. I have been able to fight it off so far. [But] I feel sad, depressed [and] I notice the toll it's taking."

In 4C5A pod, I talked to ████████████████ who told me that, far from <u>Parsons</u> improving things, "it is being used to penalize us." That is, "we are supposed to get out-of-cell exercise and out-of-cell time but they arbitrarily take it away, which means we are locked down for 30 straight days with only showers." Mr. ██████ said he was a "step 3" in the stepdown program, but was not really getting meaningful "programming," in part because the people in the group he was assigned "are coming and going" so that there is no real continuity or progression. The topics assigned are not tailored to the people in the group (e.g., although he has no drug issues, a lot of the workbooks and classes address that topic). Mr. ████████'s experience in Kasson mental health program in 2015 was a positive one, at least in comparison to his time in Rast: "They sent me here [Rast] in 2015—terrible, terrible, terrible in every way. This place is a black hole of despair." He said that he was actually somewhat reluctant to tell me exactly how bad it was at Rast because of fear of retaliation—"if you complain here, they punish you." From his perspective, the prison does what it calls "programming" just to meet the <u>Parsons</u> requirements, they "don't really care about making sure it is real programming."

Moreover, "mental health care in this unit is terrible." He said the mental health contacts are pro forma. "Treatment," he said, is "just meds." Even though he was diagnosed as suffering from bi-polar disorder, "they won't give me treatment" (other than medications). He went on to describe his suffering in the unit: "It has been really hard on me. I am trying to block out as much negativity as possible, but now I feel utterly defeated. I am frustrated, hopeless, in despair. [It's] the worse I've felt in 20 plus years. It's crushing in here." Mr. ███████ told me that he had been in Rast continuously since 2015 and "there has been no positive change in here" since then. Actually, he said, "it's gotten worse and worse—much of it because there is so little to do. People are frustrated, tense, angry, and the tension gets to you." The fact that the staff exercises so much discretion over how long people stay at particular steps and whether anyone advances out of the stepdown program "is really causing mental problems."

I conducted a cell-front interview with ████████████, a man in the unit whose cell was flooded with water. He told me that there was some kind of leak in the cell that staff had not fixed for days; although he said it is a cell that is not supposed to be inhabited until the leak is fixed, he is nonetheless housed in it. Mr. ██████ told me that he had been in prison for some 13 years, much of it at Browning. Rast, however, was "as bad or worse than Browning." In part, he said, that was because staff at Rast "completely ignore us. [They] give us rotten milk and people get sick and they just don't care." In addition, he said, although he has had mental health problems since early childhood and ones for which he was treated, is recognized by the prison as having mental health problems, including being given psychotropic medications for depression and anxiety, the mental health care at Rast is "really bad, neglectful. I ask [for it], they say okay, and then don't come." When he was in Browning and SMU I he at least occasionally got one-on-one mental health sessions, but not at Rast.

    Suicide Watch

In the Suicide Watch area of Rast, I spoke with ███████████████████, who was on "continuous" watch. He told me had already been there for 5 days. He said he was approved for a mental health program but never got a psychiatric evaluation—they "just put me in Watch and said it was because I cut myself." In fact, he had cut himself repeatedly (and showed me the large length-wise scars on his arm), because "I learned I wouldn't get into a program for my mental health problems." He was very upset as he spoke to me, telling me he needed help: "When I cut myself, I am desperate for help and all they do is punish me. It is a merry-go-round and I get no help." He said the BMU where he had been housed at Browning was "really bad," including being gassed when he cut himself. He also said the mental health staff had come to see him while he was on Suicide Watch and told him that he "should" have gotten an SMI evaluation. Mr. ██████ said he feels "hopeless and helpless" because he is unable to get help and it is affecting him. He also told me that a previous prison mental health staff member had advised him that "anxiety was a choice" and he should "choose to make it go away."

Another person on Watch, ███████████████████ told me that, except for a 5 day break in August, he had been there for 3½ months, during which time he was living in a barren cell and could not make phone calls. He explained that he had a "mental breakdown" at Rast several years ago, "because I don't tolerate isolation—it overwhelms me and makes me panic." He was sent to the Kasson Unit but stayed in his cell the whole time because he was uncomfortable around people and "felt trapped." Although he said he does see mental health for call outs from time to time, he does not want to take psychotropic medications because of their adverse effects. Mr. ███████ said he was considered SMI in prison as well as in the community. He described having violent dreams, difficulties sleeping, always being anxious, and feeling so depressed that he does not get out of bed for days. He elaborated further: "I am suicidal all the time now. I have never been a cutter, but I think about it all the time. I don't know how to get out of this cell, get to a place where I am safe and can get some help." He has a recurrent fantasy now of hanging himself with a shirt and he said he "can't stop thin king about it." When I asked if he would come out of his cell so that I could take a photo of it, he said he was afraid to do so.


Refuse to House ("RTH")

In the "refuse to house" or RTH unit at Rast, I spoke first to ███████████████ who told me he was 29 years old and had been in prison for the past 17 years, about 9 years of which he estimates he has been in isolation. He explained that he is not "refusing to house" with cellmates but rather that he told the prison authorities that he has problems with certain groups and needs to be housed safely in certain prisons. He said his concerns are entirely based on safety issues. Mr. ███████ told me that the total deprivation he experienced in the RTH unit is getting to him. He said he has a long mental health history that dates back to when he was a young child: "I was in a mental health facility at age 11, [where they] said I was bi-polar with anxiety disorder." When he came to prison he was prescribed "lots of meds" but no actual counseling or groups. He said he told prison staff that he needed a program but "they ignore me." Mr. ███████ was emphatic that he had not seen "<u>any</u> positive changes since 2013" and said that, in max custody, "it's gotten worse." He called RTH a "black hole" because no one even "comes to check on you." The only "program" is yard, which he described as "another little cage," 3 times a week—"that's it." He elaborated: "You get nothing in here—no tablet, no nothings. We are otherwise just in our cells." Mr. ███████ described suffering in this extremely harsh regime, including having problems sleeping, terrible anxiety, and paranoia.

Another person in RTH, ████████████████ told me that he had been in prison since 2014 and had problems on the yard he was assigned to. As a result, "I had a complete breakdown." He said that he was psychotic, paranoid, and considered SMI. He told me he was taking Prolixin injections because of the seriousness of his mental health

problems. He has heard voices since he was 7 or 8 years old and cannot make them stop. Because he is SMI, he said, he is vulnerable to being exploited, and has been, including sexually. He said, "it's not my fault I can't protect myself," but they keep him in an extremely harsh RTH unit anyway, one where he said you get "nothing"—you don't get call outs, "have no store, no nothing—we only get rec in small cages 3 times a week for a little more than an hour or so, otherwise [we are] in our cells." Because there is nothing to do, he is consigned "to sit and listen to the voices." Mr. ███████ explained that "just last month, I kept cutting myself, trying to get mental health treatment, [and] all they did was put me on Watch." The treatment was never forthcoming. In fact, the only "treatment" he has gotten in 6 months in the unit "is some packets and puzzles" rather than counseling.

I spoke cell-front to ████████████████████ in the same unit. He told me that he has multiple psychiatric problems that include being diagnosed with schizophrenia, bi-polar disorder, and depression, and has taken numerous psychotropic medications in prison, including Thorazine, Mellaril, and Seroquel. He said "we get nothing in here. Just the cages and food that we eat in our cells." He believes the isolation has badly affected him: "I can no longer be around people anymore, that is the real problem, being locked up. You live in your own world and that's all you are around." He said that, in the course of all the isolation he was subjected to, "I realized in here that I'm not regular anymore, I'm not like I was. You are used to living one way, alone in your cell, not around people. I don't know if I can."

I also interviewed ████████████████ in the RTH unit. He told me he had a cellmate who sexually assaulted him but that, as a result, he (██████) was sent to RTH, which he said was "worse than the hole." He explained that he was being punished for being a victim: We get "no phone, no visits, no store, we are treated like animals. [It's] horrible here." When he finally got a psychological evaluation after the sexual assault, he was prescribed Zoloft. Mr. ██████ believes he was retaliated against for reporting the assault, and that being place in RTH was punishment for having done so. He made a point of showing me the meager amount of property he is allowed to have in his cell as a result of his RTH status.

I returned to 4C3A to interview the man whose cell appeared in such disarray and who (I learned) had been on Suicide Watch when I was in his housing unit earlier. ████████ ████████████ told me that he had mental problems on the street but that they had gotten much worse during his many years of incarceration. He said he experienced a great deal of trauma as a child and felt these issues carried over to prison. But "things really got bad at Rast max, when I came 3 years ago. The doc here made me SMI" which was subsequently taken away, he believes, as punishment for a conflict he got into with an officer. He said "when I was on Suicide Watch, they sprayed me, just retaliated against [me]." He said that the lack of programs at Rast "messed me up bad," and that he could not take it. Mr. █████ told me: "I tried suicide three times, at Rast, only at Rast, that's how bad the hole is." He said he has a diagnosis of schizophrenia and bi-polar and

is on psychotropic medications that unfortunately do not help a great deal. Otherwise the mental health staff comes by "once a week or so, [and] asks you 'how are you doing?' but don't try to help you." Mr. █████ told me that he "hears voices a lot, and I feel overwhelmed—there is nothing good here, [it is] hard to handle it, especially with my mind the way it is." He said, "I surely want to get out of here, but how do I do it?"


September 30, 2021: Lewis Complex-Various Units

   Barchey Mental Health Transition Unit (4B)

In the small dormitory, "mental health transition unit" at Barchey I interviewed █████ █████. He told me that he was designated SMI, both in prison and in the community. He said he was diagnosed bi-polar and "other things" and was taking a number of psychotropic medications. He said that, in fact, in this unit he was receiving a one-on-one counseling session and two groups each week. Before coming to this unit, he said, he was on Suicide Watch and in the Stiner Detention Unit. In those places, he said, there was "very little or no mental health care. This unit is a dramatic change and improvement." He said that the only drawback was that it was a "transition" unit, which means that he is being prepared to leave, which he does not want to do. He knows, he said, that "I need treatment and I can't get it except for special programs like this one."

I spoke with █████ in the same unit. He told me that he had been traumatized in the ADC, including having suffered a rape, which compounded the extensive childhood traumas he had suffered. He said that he was trying to stop taking psychotropic medications but just could not do it. He also showed me many scars on his arms from prior instances in which he cut himself. He said that he had tried to kill himself many times, including having cut his neck. Mr. █████ told me "I need real help, more than I can get here." He said that although they do get mental health contact in this unit, the staff is not qualified to provide it—they are practicing on us, putting in hours here to become real doctors." He told me also that "the mental health care has not improved at [all] in ADC of the years, nothing [is] getting better." He did say that he would rather be in this unit than others, because "at least there's something, but not as much as I need." Mr. █████ went on to tell me that he had been placed in RTH Detention in the past, and that it was "unbearable." In fact, the only way he believes he got out was because he continued to cut himself, "again and again" and was placed on Watch for 2 months. But, he said, I don't need a "transition" pod, "I need a real mental health unit."

   Barchey RTH

In a small Refuse to House dorm at Barchey I spoke first with █████, who was very upset as I entered the unit. He very emotionally told me that he was "deprived of everything" in this unit, explaining that he had been assaulted earlier but,

despite being the victim, he was brought to a unit in which he was deprived of nearly everything: "We get 45 minutes of rec a day, no store, no nothing. We are denied visits, no phone calls, no tablets, no emails, no TV." Mr. ████ told me "I'm desperate for help and for release." The only way out, he said he has been told, is to sign a release saying he will return to the unit where he was assaulted, which he will not do. He was emphatic when he told me that "I'm deteriorating badly in here, in response to this, it's destroying me." A short time later, after I had gone to the back of the dormitory to interview another person, it appeared that Mr. ████ was being forcibly removed from the front of the unit where his bunk was. I was later told that he had asked to be removed from the unit.

In the same RTH unit, I interviewed ████████████ who said he had been kept there for nearly a full year. He expressed frustration over the fact he had apparently been cleared for a residential treatment program to assist him with his "mental health issues" and showed me a letter to that effect He told me "I need real treatment, I know it, but can't get it. They won't do it. I was desperate." He said he has been diagnosed with severe PTSD and suffers from paranoia, mental health disorders for which he was prescribed psychotropic medications. Mr. ████ told me that he has been in the ADC off and on since 2007 and that "there has never been effective treatment and it hasn't gotten better. I have PTSD and they give me a PTSD workbook or packet—the mental health staff might spend 20 minutes with you in a month." He said that RTH is really a punishment unit for people who tell the prison administration that they are not safe, usually because they have been the victims of assaults.

<u>Sunset (Juvenile Facility)</u>

I traveled to the nearby ADC juvenile facility, the Sunset Unit, where juveniles who have been tried as adults are housed. There I interviewed ███████████████ on an individual, confidential basis. Ms. ████ told me that she is 17 years-old and is the only girl at the facility, among 20 boys. She is awaiting transfer to the adult women's facility at Perryville when she turns 18, in about six months. She told me that she had been incarcerated for several years now, and expects to be released in 2026. She said that although she goes to classes, recreation, and meals with the boys, she lives alone, in a separate unit. Ms. ████ told me that she had already had a number of mental health problems before she came to the ADC. She said she had been prescribed many different kinds of psychotropic medications for suicidality and for PTSD—she could remember Zoloft, Risperidone, and Geodon. She said that her current psychiatrist wanted to reduce the number she took just to Zyprexa. Although in March of this past year Ms. ████ decided to go without any medications, she said that is difficult to adjust. Moreover, once she stopped taking psychotropic medications, the psychiatrist stopped seeing her. She does, however, get weekly or bi-weekly mental health contact, although there are no mental health groups at the facility. Ms. ████'s cell is located at the end of a row of cells that, except for hers, are all empty. Her cell is stark and small and, although she has a tablet and a small television, there was very little personal property. She is permitted to

go to the "dayroom" area at the other end of the hallway, but it she is the only one permitted there; the dayroom for the boys is on the other side of the unit.

Juvenile Detention

I individually and confidentially interviewed three boys who were housed in the detention area of the facility. It was frankly shocking to see them in the isolation cells where they were housed, and apparently had been there for nearly three weeks already. The unit is small and separated from the other housing units in the facility, and doubles as the Suicide Watch area. The windowless cells are also small and the boys had very little property in them. I was told that a correctional officer sits and the end of the small hallway to monitor them, however the boys also told me that he is not always there.

████████████████████ told me that he was 16 years-old and that, before coming into "the system," he had a great deal of trauma in his early life and was "on the run" since he was 11 years-old. He said there had not been given any real mental health treatment since he had arrived in the facility, including since being placed in detention. He and the others are required by law to be in "school," so the teacher comes by the detention unit with materials for them in lieu of actual class. He explained that "detention is terrible—[it's] not sanitary, [we] can only shower every three days" and they are required to eat in their cells. He also said the cells are unsanitary—there are bugs and even scorpions in the cells. He told me that the staff hasn't picked their clothing to be washed and that they had to do this themselves, in the shower. He complained most about the fact that there was nothing to do in the unit—all he does is read and sleep. He said his phone calls and visits were restricted and that they were not given access to tablets, so could not write emails to communicate with their families. He also said that the time spent there was open-ended— no one told him or the others when they would be released.

The next boy I spoke with, ████████████████ told me that he had been in the ADC facility since March, 2020 and would be transferred to adult prison in August, 2022. He described detention as "bad" and elaborated that they were confined to their cells nearly around-the-clock and have chow and school in their cells. They get out of the cells for showers every 3 days but otherwise, never; there is no recreation time at all in detention. Mr. ██████ told me "I can't ever sleep—[I] stay up all night. I'm irritable, plus it's depressing." He said he tries to talk to others across the hallway, but "it's not the same." The CO on duty in the hallway is supposed to be there all the time but actually is not. He also said the unit was dirty and infested with insects: "I put a stack of books at [the] bottom of my cell door to keep bugs out.

████████████████ told me simple, "it's awful in detention." He said "they don't bring us clothes, we have nothing to do, we kept asking when we get out, they just ignored us." He said that the detention unit hallway had been cleaned up the day before because, as he heard staff say, there's tour coming. Mr. ██████ added: "It's crazy back

here. I was in a cell for a week without a light in it. [There were] bugs crawling all over me. I was scared." He confirmed that there was no recreation whatsoever in detention—he had not been out of his cell for nearly three straight weeks. Moreover, "no mental health comes to check on us; we are just stuck there." He said he started to "freak out" at first, including feeling claustrophobic in his cell, but then he was eventually able stabilize, especially because he learned that day that he would be released.

Stiner Unit Detention

I learned when we entered the Stiner Detention Unit that there were a number of different reasons that incarcerated persons could be housed there, including being on RTH status, in or awaiting a decision on their 805 status, or pending the disposition of a disciplinary hearing.

I was told that the first person I asked to speak with, ████████████████████████, was volatile and dangerous. The staff attempted to dissuade me from speaking to him. He was in fact very animated and loud when I approached his cell but he agreed to speak with me. Mr. ██████████ told me that he was upset and angry over his treatment in the unit. He said that he was being harassed and tormented to the point of losing control. He acknowledged "I am going crazy here. I can't make it but get no help and I get out of control and in danger." He said that he had come into prison with only a 3-year sentence and was supposed to get out next year. Mr. ████████████ said he was "locked in this hold for 3 months and I don't know why." But, he said, it was affecting him mentally: "My mental problems are normal given the environment I'm living in, because it is really impossible to live here." As he described his treatment and his reactions to it he became increasingly animated and loud, saying: I am really out of control and my mind is so bad I can't tell whether to hurt someone or hurt myself." Mr. ██████████ claimed that staff members, including the mental health and dental staff, had badly mistreated him (including claiming that some of his teeth had been pulled as punishment). He said that staff not only had threatened him but also his mother, telling me that they told him they would go to her house and harass her.

In the same unit, I spoke to ████████████████ and ██████████████████, who were double-celled. The cells are small and placing two men in them, especially when they have extremely little out-of-cell time, is especially onerous. In fact, it can be psychologically as well as physically dangerous. Mr. ██████ told me that "I can't get anything in here, we have nothing, [they] don't even give you a towel when you shower." He was especially distraught over the fact that he did not know how long it would take to get released to another more tolerable living situation, but had been led to believe that it could take as long as 6 months. Although the men on this side of the detention unit were allowed to have tablets, they had no electricity, so were dependent on staff to charge their devices. Both men complained that they did not get any outdoor yard, and pointed to the only rec area they said they were permitted to go—a closed-in area off the first floor of

the unit. They said only one person was allowed there at a time, that there was no equipment in it, and that they were told it was infected with scabies. Mr. ███ said he was currently taking psychotropic medications for PTSD and that mental health staff come to the unit once a week to "check on crisis-level mental health problems" but provides no actual mental health treatment.

I spoke with another person incarcerated in the Stiner Detention Unit, █████████
████████████. He was very impaired and incoherent. He and his cell were extremely disheveled and it was impossible to comprehend much of what he said. For example, he told me that "I'm already dead," and proceeded to tell me a story about "dead veterans" and said that he was a "ranking SWAT officer." When I asked about his original prison sentence and how much time he had remaining, he told me "I'm down for killing Batman, but my friends did it." Mr. ██████████ told me that he had been designated psychologically disabled in California and said he had taken a lot of medications in the past, including Thorazine and Seroquel. Near the end of my conversation with him, he appeared to begin to talk to persons who were not present, and it was difficult to continue the interview. Mr. █████████ was one of the most profoundly mentally impaired persons I encountered during my 2021 tours, and his placement in such a harsh and deprived isolation unit is shocking and unjustifiable.

Another incarcerated person in the unit with whom I spoke, ████████████████
said that he, too, was uncertain how long he would be in detention. He was upset because he had been housed on an "805 yard" for protection but was assaulted there nonetheless. However, after the assault he was the one taken to detention. He told me that although he had taken Zyprexa until about a year ago, he had not gotten any other mental health treatment in the ADC—"no counseling, no groups." The medication he had received in the past was for an anxiety disorder. He told me that event the 805 yards in the ADC are not safe, "so where do you go?" Mr. ██████ confirmed that the only "rec yard" persons housed in this unit have access to is the concrete enclosed area. He encouraged me to look at it and it appeared to be perhaps twice the size of the cells in the unit and surrounded by concrete walls.

████████████████ told me that he was housed in this unit for RTH, which he explained occurred when he was forced off his previous yard by a group of other incarcerated persons. He said that he was supposed to be given the option of choosing to be on 805 status when he was attacked, but that he never was. He told me he had never been in max before, and had never really been in trouble in prison, but in detention "it's really hard to survive… I can't sleep" and he said he was "really stressed out." He went on to explain that there is no electricity in the unit and the prison does not do their laundry. Also, there is "no yard here. No one goes, the 'yard' here is the little room on the first floor, where no one goes."

The final incarcerated person with whom I in the Stiner RTH unit, █████████
████████ told me he was upset because, despite being SMI, he had been placed in
detention: "I got nothing here." He said that he is currently taking psychotropic
medications, including Zoloft and Risperdal and that once a month a mental health staff
person comes to the door to as "you okay?" Mr. ████████ told me that he had been on
Suicide Watch in the past but that it was harsh: "[It] makes you more crazy, [and] really
want to kill yourself." The final thing he told me was that the correctional staff in the unit
were "cruel" and that they "treat us like animals" and "provoke us until we do
something."

# APPENDIX G

# Tour Photos

# ASPC-Eyman

# September 13-14, 2021



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108087



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108088



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108089



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108090



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108091



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108092



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PARSONS V. SHINN, USDC CV12-00601

ADCRR00108093



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PARSONS V. SHINN, USDC CV12-00601

ADCRR00108094



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108095



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108096



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108097



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PARSONS V. SHINN, USDC CV12-00601

ADCRR00108098



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108099



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108100



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108101



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108102



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108103



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108104



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108105



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108106



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108107



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108108



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108109



CONFIDENTIAL - SUBJECT TO PROTECTIVE
ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108110



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108111