1   Victoria López (Bar No. 330042)*
    Jared G. Keenan (Bar No. 027068)
2   **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3   Phoenix, Arizona 85013
    Telephone: (602) 650-1854F
4   Email: vlopez@acluaz.org
            jkeenan@acluaz.org
5   *Admitted pursuant to Ariz. Sup. Ct. R. 38(d)

6   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
    *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy*
7   *Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,*
    *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
8   *behalf of themselves and all others similarly situated*

9   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE
    PAGE]**

10  Asim Dietrich (Bar No. 027927)
    **ARIZONA CENTER FOR DISABILITY LAW**
11  5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
12  Telephone: (602) 274-6287
    Email: adietrich@azdisabilitylaw.org
13

    *Attorneys for Plaintiff Arizona Center for Disability Law*
14
    **[ADDITIONAL COUNSEL LISTED ON SIGNATURE
15  PAGE]**

16              UNITED STATES DISTRICT COURT

17                 DISTRICT OF ARIZONA

18  Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-ROS
    Dustin Brislan; Sonia Rodriguez; Christina
19  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph     **EXPERT DECLARATION
20  Hefner; Joshua Polson; and Charlotte Wells, on       AND DIRECT WRITTEN
    behalf of themselves and all others similarly        TESTIMONY OF
21  situated; and Arizona Center for Disability Law,     MARTIN F. HORN**

22                          Plaintiffs,

23          v.

24  David Shinn, Director, Arizona Department of
    Corrections, Rehabilitation and Reentry; and
25  Larry Gann, Assistant Director, Medical Services
    Contract Monitoring Bureau, Arizona Department
26  of Corrections, Rehabilitation and Reentry, in their
    official capacities,
27
                            Defendants.
28

LEGAL23774493.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to the Court's September 2, 2021 Order (Doc. 3952 at 4), I, Martin Horn, hereby declare and submit my direct written testimony as follows. I will be called by Plaintiffs to testify to the Court under oath regarding the following at 12:30 pm on November 8, 2021. For ease of reference by the Court, I include a table of contents for the topics covered herein.

I.      INTRODUCTION AND QUALIFICATIONS ............................................ 3

II.     ACCEPTED CORRECTIONAL INDUSTRY STANDARDS ............................ 5

III.    STANDARDS OF PRACTICE........................................................... 10
        A.   Restrictive Housing ........................................................ 10
        B.   Methodology to Determine Actual Practice in ADCRR ................ 13

IV.     POLICIES RELATING TO ISOLATION.............................................. 14
        A.   Department Order (DO) 801: Inmate Classification ................... 14
        B.   Department Order 812: Inmate Maximum Custody Management and Incentive
             System ........................................................................ 18
             1.   Restrictive Status Housing Program (RSHP)....................... 21
             2.   Enhanced Management Housing Status (EMHS) ................. 22
             3.   STG ...................................................................... 23
        C.   Department Order 804: Inmate Behavior Control........................ 23
        D.   Department Order 813: Close Management................................ 25
        E.   Behavioral Management Unit ("BMU") ................................... 25

V.      OVERUSE OF ISOLATION ............................................................ 26
        A.   These Various Classification Statuses Are All Isolation, Despite the Varied
             Nomenclature and Policies ................................................. 26
        B.   Overuse of Isolation ......................................................... 27
        C.   Overuse of Isolation – Examples from File Reviews.................... 29
        D.   Additional Examples of Overuse of Isolation ............................ 41

VI.     CONDITIONS OF ISOLATION ....................................................... 44
        A.   Out-of-Cell Time ............................................................. 44
             1.   Recreation............................................................... 44
             2.   Showers.................................................................. 55
             3.   Programming............................................................ 57
        B.   Out-of-Cell Time and Conditions in Detention ........................... 60
        C.   Additional Concerns About Conditions in Isolation Units.............. 66
             1.   Double Cells ........................................................... 68
             2.   Ventilation, Light and Temperature ................................ 70
             3.   General Conditions.................................................... 72
        D.   Supervision of Inmates ..................................................... 77
        E.   Inadequate Supervision and Punitive Treatment of People with Serious
             Mental Health Needs ........................................................ 83
        F.   Use ............................................................................. 84
             1.   ████████████████████ ........................................... 88
        G.   Use ████████████rizona Endangers Public Safety ............... 96
        H.   Concerns Regarding Director Shinn's Knowledge of and Engagement in the
             Use and Conditions of Isolation in ADCRR ............................. 97

VII.    FINDINGS........................................................................... 100

VIII.   CONCLUSION....................................................................... 104

## I.    INTRODUCTION AND QUALIFICATIONS

1.      Plaintiffs' Counsel has retained me to provide expert opinion regarding restrictive housing conditions in the Arizona prisons, and to provide my opinions on whether the Arizona Department of Corrections Rehabilitation and Reentry (ADCRR) acted in a manner that was consistent with industry standards and accepted correctional practice.

2.      In reaching my conclusions and opinions, I reviewed documents provided to me by counsel including previously filed expert reports as well as reference to authoritative relevant statements of sound correctional practice.  A reference list of the documents and materials that I reviewed in preparation for this report is attached to my report as Exhibit 1.  I also relied upon site visits made in September 2021 to ASPC-Eyman and ASPC-Lewis, interviews with more than 60 inmates during my inspections, a review of the photographs that were taken at my direction during the visits, and my education, experience and training with correctional practices and the community standard of practice that is widely recognized in the profession.  The opinions and conclusions offered herein are made to a reasonable degree of professional certainty in the relevant field of correctional practice.

3.      I am being paid $400/ hour for my services. The fee I am receiving has not affected my opinion.

4.      My notes are attached as Exhibit 2.  A key identifying the inmates I interviewed is attached as Exhibit 3.  A chart summarizing Out-of-cell-time Tracking Forms is attached as Exhibit 4.  The photos taken during my site visits are attached as Exhibit 5.

5.      I earned a Bachelor of the Arts in Government from Franklin & Marshall College in 1969 and a Masters of the Arts in Criminal Justice from John Jay College in 1974.  I retired in January 2020 after 10 years as Distinguished Lecturer in Corrections at the John Jay College of Criminal Justice, City University of New York and served as Executive Director of the New York State Sentencing Commission by appointment of the Chief Judge of the State of New York during that time as well.

6.      I began my career as a New York State Parole Officer in 1969.  After six years

in that position, I worked an assistant professor of criminal justice at the State University College in Utica, New York from 1975 to 1977.  I then served in a variety of roles for the New York State Department of Correctional Services from 1978-1985, including as the Assistant Commissioner for the department and later as the Superintendent of the Hudson Correctional Facility.  In 1985, I returned to work for the New York State Division of Parole as the Director of Parole Operations until 1991 and then as Executive Director until 1995.

7.    After that, I served as Pennsylvania's Secretary of Corrections until 2000. During my tenure staff and inmate safety and health care improved, suicides were reduced, three long-standing consent decrees that predated my arrival were dissolved, and classification and information systems were modernized. We created an innovative addiction treatment program that for the first time provided funding for post release treatment of released offenders. Under my leadership, improvements to the provision of mental health services were made including an enlargement of facility based acute care and step-down programs, "rule out" protocols to keep mentally ill inmates out of punitive segregation, and innovative release programs for inmates with mental illness were initiated. I was responsible for policy and procedures including those relating to use of force.

8.    I was appointed by Mayor Michael Bloomberg to serve as Commissioner of the New York City Department of Probation, effective January 1, 2002. A year later Mayor Bloomberg appointed me to serve as Commissioner of the New York City Department of Correction, the City's jail system, and I held both positions simultaneously until July 31, 2009.  As New York City Correction Commissioner, I introduced programs and training that reduced suicides and cut jail violence in half.   I also authored and approved the use of force policies of the New York City Department of Correction and oversaw a reduction in the use of force resulting in serious injury to inmates.   Under my leadership several conditions of confinement lawsuits that predated my arrival were satisfactorily resolved.  In a major case alleging excessive use of force by officers, a settlement was reached in 2006; that settlement successfully expired in 2009.   During my tenure, we reduced the introduction of drugs into jail by initiating New York's first drug interdiction program,

including the first wide scale drug testing in the City's jails and reduced suicides among inmates. We created one of the largest and most ambitious jail reentry programs in the nation. We reengineered the intake process to ensure that inmates were properly screened for vulnerability. We worked with the City's housing and homeless services community to institute programs and systems designed to assist inmates and detainees post release with housing and employment. We assisted them in gathering documents needed to work upon release and created transitional job opportunities for persons released from jail. We also implemented systems to identify high frequency jail and shelter users to be more proactive in addressing their needs.

9. I have also served as co-chair of the American Bar Association Corrections Committee and chaired the policy and resolutions committees of both the American Correctional Association and the Association of State Corrections Administrators. I have served as a member of the Board of Governors of the American Correctional Association and a Commissioner of the Commission on Accreditation for Corrections and am a member of the Psychiatric Advisory Board of the New York State Justice Center established by the State's Special Housing Unit Exclusion Law (NYS Correction Law § 401-a (3)).

10. I have written and published articles and delivered addresses to professional meetings throughout my career. A representative list of those articles and addresses are included in my CV, which is attached to this report. I have testified on behalf of government agencies before Congress and legislative bodies, and in both State and Federal Courts and have served as an expert in both State and Federal litigation.

11. My full CV is attached hereto as Exhibit 6.

## II.   ACCEPTED CORRECTIONAL INDUSTRY STANDARDS

12. It is well established in the profession that prisoners must be afforded safe and healthful living conditions, kept safe from each other and from wrongful use of force by staff, receive necessary medical and mental health care, be protected from communicable disease, and that they must have adequate opportunity to exercise and to provide for their own personal hygiene.

13.     Current thinking in the profession of corrections about the use of restrictive housing and extreme social isolation underscores the severe physical and mental hardships that inmates endure during extreme social isolation, and the lack of a penological justification for automatic and long-term solitary confinement.  Leaders in the corrections profession have acknowledged that prolonged solitary confinement creates or exacerbates mental illness. While short-term restrictive housing is sometimes necessary to separate those most violent inmates that pose a risk to themselves or others, where restrictive housing is over-utilized, it causes substantial harm to inmates and provides little if any benefit in terms of security of the correctional institution.

14.     There is substantial consensus among correctional professionals that solitary confinement causes debilitating mental and physical harms. Because humans require social interaction, extreme social isolation and deprivation of occupational stimulus results in changes to brain function and structure, quickly degrading brain function.[1] A recent report for the National Aeronautics and Space Administration ("NASA") recognized that prolonged sensory deprivation and isolation leads to the "development of adverse behavioral conditions and psychiatric disorders."[2] Sensory deprivation causes the body to produce increased cortisol, "well-documented to have negative health consequences for both the body and the brain," negatively affecting cognition, mood, and well-being.[3] Those detrimental effects occur after as little as two days, and the risk increases the longer an individual is subjected to deprivation.[4]

15.     Solitary confinement leads to immediately obvious physical harm, including self-mutilation and suicide; persons exposed to solitary confinement had about seven times higher risk of being in a self-harm cohort.[5] It is estimated that roughly half of prison suicides

---

[1] *See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. Pol'y 325, 331 (2006).
[2] Edward Vessel & Steven Russo, NASA, Effects of Reduced Sensory Stimulation and Assessment of Countermeasures for Sensory Stimulation Augmentation (2015).
[3] *Id*. at i, 20, 23, 28, 51–52, 65–66.
[4] *Id*. at 22, 28.
[5] National Public Radio, *Former Physician At Rikers Island Exposes Health Risks Of Incarceration*, March 18, 2019, https://www.npr.org/sections/health-

occur in solitary confinement.[6] It is not unusual for inmates in solitary confinement to swallow razors, smash their heads into walls, compulsively cut their flesh, and try to hang themselves.[7]

16.     The Supreme Court, describing solitary confinement more than a century ago, recognized that "[a] considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane."[8] Extreme isolation is also associated with substantial psychological trauma, including anxiety, headaches, troubled sleep, or lethargy, heart palpitations, obsessive ruminations, confusion, irrational anger, withdrawal, violent fantasies, hallucinations, perceptual distortions, and emotional flatness.[9]

17.     A recent survey of both modern prisoner studies and studies of extreme isolation in other contexts found wide-ranging consensus on "deterioration in the ability to think and reason, perceptual distortions, gross disturbances in feeling states, and vivid imagery in the form of hallucinations and delusions."[10] Lasting effects of solitary confinement, which continue after release from solitary, include "persistent symptoms of

---

shots/2019/03/18/704424675/former-physician-at-rikers-island-exposes-health-risks-of-incarceration, downloaded September 24, 2021.

[6] *See* Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement*, 13 Correctional Mental Health Rep. 1, 11 (2011).

[7] *See also* Thomas Benjamin & Kenneth Lux, *Constitutional and Psychological Implications of the Use of Solitary Confinement: Experience at the Maine State Prison*, 9 Clearinghouse Rev. 83, 84 (1975) (one inmate nearly died from loss of blood after cutting himself with his broken light bulb, another swallowed glass, numerous others attempted hanging, several successfully).

[8] *In re Medley*, 134 U.S. 160, 168 (1890).

[9] *See also* John Cacioppo *et al.*, *Social Isolation*, 1231 Annals N.Y. Acad. Sci. 17, 17 (2011) (solitary confinement is a "strong … risk factor for morbidity and mortality"); Homer Venters *et al.*, *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 Am. J. Pub. Health 442, 445 (2014) (inmates subjected to solitary confinement are over six times more likely to attempt or commit suicide); Jeffrey Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010) (solitary confinement "can be as clinically distressing as physical torture"). *See* Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 130–31 (2003). The research is "strikingly consistent." Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450, 1450–54 (1983).

[10] Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 Indiana L.J. 741, 756 (2015).

post-traumatic stress (such as flashbacks, chronic hyper vigilance, and a pervasive sense of hopelessness)."[11] Senator John McCain, a former prisoner of war, described solitary confinement as "an awful thing" that "crushes your spirit and weakens your resistance more effectively than any other form of mistreatment."[12]

18. The American Correctional Association in 2013 adopted a resolution addressing the use of restrictive housing.[13] The best expression of these professional expectations is contained in the published Standards of the American Correctional Association.[14] The purpose of these standards is to promote improvement in the management of correctional agencies. The standards establish clear goals and objectives critical to the provision of a humane correctional confinement. And, while it is recognized that these standards are not obligatory or binding upon all adult confinement facilities, they are cited herein as the best expression of the considered opinion of the profession about how to operate a prison.

19. The industry recognizes there are basic human welfare considerations and health and safety concerns that every prison must meet. The provision of basic physical and mental health needs applies irrespective of the nature of the facility, or the length of stay. Persons who enter a prison should be safe from dangers such as fire, communicable disease, or mental deterioration, and treated in a manner consistent with their dignity as human beings. Incarcerated people should be provided with an opportunity to access natural light, fresh air, exercise, and adequate time outside of their cell. Prisons need to have policies, procedures, and practices designed to identify suicide prone individuals and to protect them from harm.

---

[11] Grassian, Psychiatric Effects of Solitary Confinement, supra, at 353.
[12] Atul Gawande, Hellhole, *New Yorker*, Mar. 30, 2009, at 38 (quoting Sen. McCain's remarks).
[13] American Correctional Association *Use of Restrictive Housing* 2013-2. Adopted by the American Correctional Association at the 143rd Congress of Correction in Washington, DC, August 13th, 2013.
[14] Commission on Accreditation for Corrections, *Performance Based Standards and Expected Practices for Adult Correctional Facilities*, 5th ed., March 2020, American Correctional Association, Alexandria, Va.

20.     As I stated above, the best expression of these professional expectations is contained in the published Standards of the American Correctional Association. The purpose of these standards is to promote professional management of correctional agencies. The standards establish clear goals and objectives critical to the provision of a humane correctional confinement.

21.     In addition to these national standards, other professional organizations have promulgated standards and policies.  Among these organizations are the Correctional Leaders Association, formerly Association of State Correctional Administrators (ASCA)[15], and the American Psychiatric Association.[16] The United States Department of Justice in 2016 published "Guiding Principles" intended as "best practices for correctional facilities within the American criminal justice system."[17]  A colloquium made up of correctional administrators and inmate advocates at John Jay College of Criminal Justice, which I chaired, arrived at a consensus on 24 recommendations for the administration of restrictive housing in 2015.[18]

22.     While not obligatory, these standards together constitute a statement of the prevailing community standards of practice in prison administration.  I base my opinions on these statements of the profession, as well as my education, training, and experience in the field.

---

[15] Association of State Correctional Administrators, *Resolution # 24 – Restrictive Status Housing Policy Guidelines.* Adopted September 4, 2013. *See also* Association of State Correctional Administrators, *Restrictive Status Housing Policy Guidelines*, August 9, 2013.

[16] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness*. Approved by the Board of Trustees, December 2012; Approved by the Assembly, November 2012.

[17] U.S. Department of Justice. Report and Recommendations Concerning the Use of Restrictive Housing, "Guiding Principles", January 2016.

[18] John Jay College of Criminal Justice, *Proceedings of a Colloquium to further a National Consensus on Ending the Over-Use of Extreme Isolation in Prisons*, 2015 (available at:
https://www.prisonlegalnews.org/media/publications/Ending%20the%20Over-Use%20of%20Isolation%20in%20Prisons,%20Prisoner%20Reentry%20Institute%20,%202015.pdf).

III.    **STANDARDS OF PRACTICE**

A. **Restrictive Housing**

23.    According to the Association of State Correctional Administrators (ASCA/CLA), restrictive status housing is a term used by correctional professionals to encompass a large number of agency-specific nomenclatures. In general terms, restrictive status housing is a form of housing for inmates whose continued presence in the general population would pose a serious threat to life, property, self, staff, or other inmates, or to the security or orderly operation of a correctional facility. This definition does not include protective custody. Restrictive status housing is designed to support a safe and productive environment for facility staff and inmates assigned to general population as well as to create a path for those inmates in this status to successfully transition to a less restrictive setting.[19]

24.    According to the ACA principles:

- Restrictive housing of inmates should be conducted in a just, humane, and constitutional manner;

- Restrictive housing of inmates should be used only when no alternative disposition would be adequate to control the inmate's behavior or sufficient to alter the findings of objective classification review factors;

- Correctional authorities must give due consideration to the special needs of inmates when placing them in restrictive housing;

- Restrictive housing should only be used in circumstances where no other available form of housing will accomplish the required levels of safety and stability;

- Inmates in restrictive housing should receive periodic classification reviews leading to meaningful outcomes;

- Inmates in restrictive housing should be provided with appropriate and timely medical and mental health care, provided exercise opportunities and the ability to maintain proper levels of personal hygiene; and

- Staff assigned to work in restrictive housing should receive specialized training that reflects the challenges associated with this type of assignment.[20]

---

[19] Association of State Correctional Administrators, Resolution # 24 – Restrictive Status Housing Policy Guidelines, *Op. cit.*

[20] American Correctional Association *Use of Restrictive Housing* 2013-2, *Op. cit.*

25.     And, the American Psychiatric Association says, "Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/ psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals."[21]

26.     The first recommendation of the John Jay College Colloquium was, "Segregation should be used for the minimum time and in the least restrictive conditions necessary to resolve the condition that led to the segregation." It goes on to say segregation "should include, at a minimum: access to natural light; control of light in cells; basic sanitary and safe environmental conditions including adequate space, ventilation and temperature; adequate nutrition; adequate medical and mental health services; and reading materials. There should be initial and subsequent periodic mental health evaluations of those in segregation or restricted housing to determine whether changes in conditions of confinement are warranted for mental health reasons."[22]

27.     The ACA Standards demonstrate an awareness of the deprivation and potential harms of isolated confinement and provide considerable detail and direction as to the operations and procedures of restrictive housing. A recent amendment to the Standards, section 5-ACI-4B-01, effective October 20, 2020, provides very explicit criteria for admission, it states, "…placement of an inmate in Restrictive Housing shall be limited to those circumstances that pose a direct threat to the safety of persons or a clear threat to the safe and secure operations of the facility.  The policy governing the placement of an inmate in Restrictive Housing shall include:

---

[21] American Psychiatric Association, Position Statement on Segregation of Prisoners with Mental Illness, *Op. cit.*

[22] *See* note 18 *supra*, at p. 9.

- the relationship between the threat the inmates poses, and the behaviors articulated in the policy

- the impact that Restrictive Housing may have on medical and mental health conditions exhibited by the inmate and the possible alternatives that may be available to compensate for such conditions

- a description of alternatives that may be available to safely deal with the threat posed by the inmate other than restrictive housing.[23]

28.    The ACA Standards state, "Inmates who pose a threat are separated from general population as defined by the agency and placed in a cell in a special management unit/cell for periods of time *less than 22 hours per day*. (Special Management may include administrative status, protective custody, or disciplinary detention.)"[24]

29.    The standards then provide considerably more detailed direction. All cells in Special Management Housing should, "provide a minimum of 80 square feet, and shall provide 35 square feet of unencumbered space for the first occupant and 25 square feet of unencumbered space for each additional occupant."[25]

30.    Standard 5-ACI-4A-01 says, "…Unless medical attention is needed more frequently, each offender in special management housing receives a daily visit from a qualified health care professional. The visit ensures that offenders have access to the health care system. The presence of a health care provider in special management housing is announced and recorded…"[26]

31.    Standard 5-ACI-4A-05 states, "Written policy, procedure, and practice provide that an inmate is admitted to the special management unit for protective custody only when there is documentation that protective custody is warranted, and no reasonable alternatives are available."

32.    Standard 5-ACI-4A-10 effective October 1, 2020 requires a mental health appraisal of every inmate admitted to Special Management Housing by a mental health

---

[23] *Id*., p. 123.
[24] Commission on Accreditation for Corrections, *id*., p. 113 (emphasis added).
[25] *Id*.
[26] *Id*.

1   professional within 7 days of placement and that, "…If confinement continues beyond 30

2   days, a behavioral health assessment by a mental health practitioner/provider is completed

3   every 30 days for offenders with a diagnosed behavioral health disorder…For offenders

4   without a behavioral health disorder, an assessment is completed every 90 days and more

5   frequently if clinically indicated…"[27]

6      33.   Standard 5-ACI-4A-11 effective October 1, 2020, requires that, "all special

7   management inmates are personally observed by a correctional officer twice per hour, but

8   no more than 40 minutes apart, on an irregular schedule.  Inmates who are violent or

9   mentally disordered or who demonstrate unusual or bizarre behavior receive more frequent

10  observation…Observation shall be documented on a log…"[28]

11  **B.  Methodology to Determine Actual Practice in ADCRR**

12     34.   To determine if the actual practices of the ADCRR are inconsistent with the

13  prevailing community standard of practice, one must look to the lived experience and

14  records of inmates in ADCRR custody and test them against these principles of good and

15  accepted correctional practice.  To do this one would ask:

16  1. Is the restrictive housing conducted in a just and humane and manner?

17

18  2. Is restrictive housing used only when no alternative disposition is adequate to control the inmate's behavior or sufficient to alter the findings of objective classification review factors?

19

20  3. Does the ADCRR give due consideration to the special needs of inmates when placing them in restrictive housing?

21  4. Do inmates in restrictive housing receive periodic classification reviews leading to meaningful outcomes?

22

23  5. Are inmates in restrictive housing provided with appropriate and timely medical and mental health care?

24  6. Are inmates in restrictive housing provided exercise opportunities and the ability to maintain proper levels of personal hygiene?

25

26

27  _____

28  [27] *Id*., p. 126.
    [28] *Id*., p. 127.

7. Are staff assigned to work in restrictive housing provided specialized training that reflects the challenges associate with this type of assignment?

8. Do correctional mental health authorities work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals?

9. Do inmates in restrictive housing have access to natural light and control of light in their cells?

10. Do inmates in restrictive housing have adequate environmental conditions including adequate space, ventilation, and temperature?

11. Are inmates in restrictive housing receiving periodic mental health evaluations to determine whether changes in conditions of confinement are warranted for mental health reasons?

35.     To accomplish this, I will refer to my personal observations and inmate interviews during site visits, to the reports of previous experts filed with the court, the exhibits in the record, and to the policies and records of the ADCRR made available to me.

## IV.   POLICIES RELATING TO ISOLATION

### A. Department Order (DO) 801: Inmate Classification

36.     The assignment of inmates to Maximum Custody is governed by §3 *et seq.* of the above referenced ADCRR policy.  Section 2.3.1 describes Maximum Custody as being for persons

> who represent the highest risk to the public and staff and require housing in a single cell or double cell environment.  These inmates have limited work opportunities within the secure perimeter and require frequent monitoring. These inmates require controlled movement within the institution. This custody level does not apply to female inmates or juveniles adjudicated as adults.

37.     The Order sets forth criteria for determining classification levels §3.1 and §3.2, and in addition sets forth several criteria for mandatory assignment to Maximum Custody including Life Sentenced (including natural life and 25-to-life sentenced (§3.4)) inmates who have served less than 2 years (§3.3.3), "Validated Unrenounced Security Threat Group" (§3.3.7), and Internal Risk Scores of 5 (Adult Males Only)(§3.3.15).[29]

---

[29] DO 801 § 3.3.1.1 provides that a person who is sentenced to death shall not be

38.     Section 5.0 of DO 801 provides for Discretionary Overrides.  These may be initiated by the CO III, the CO IV, the Deputy Warden, or designee based upon, "file review, interaction with the inmate, incident reports, investigations, etc." Such Discretionary Overrides require review and approval by the Central Office Classifications office, which has the authority to independently initiate overrides of custody classification, internal risk levels, and institutional assignments." Section 5.2 goes on to say, "Custody and/or internal risk levels with finalized discretionary overrides shall be reviewed every six months."  And, the above referenced Classification Manual says, "Points shall not be the sole basis for determining an inmate's final custody level. Staff will make decisions for inmates as individuals in determining the appropriate custody level."[30]

39.     An increase in the inmate's custody level may be recommended "whenever the inmate's behavior or new information indicates increased security measures are appropriate to ensure the safety of the public, staff, and/or other inmates." (§5.3). This is very broad and allows for overrides for a wide variety of reasons without setting forth rules for weighing the basis of the determination.  Rather, it sets forth broad categories including

- Escape Risk including suspicion (§5.4.1)
- Security Risk (§5.4.2)
- High Profile (§5.4.3) ("Inmates who require increased security based on intense media coverage or public concern as a result of their crime")
- Aggravated Offense (§5.4.4) ("The circumstances of the current offense or a prior offense are depicted as heinous and suggest that the custody level shall be increased to ensure public safety.")

40.     Taken together, these criteria create an invitation to overclassify otherwise compliant inmates, leading to a potential to overuse Maximum Custody. The fact that an inmate's crime received a great deal of media attention does not, in my experience, create a behavioral risk or a risk of escape. In my experience, often, inmates whose crimes have

---

classified as Maximum Custody based solely on the death sentence.  However, the *Objective Classification: Custody & Internal Risk Technical Manual,* (hereinafter Classification Manual) October 28, 2010, which operationalizes the policies in DO 801, indicates that a Death Sentence *is* a non-discretionary override to Maximum Custody, contrary to what is set forth in DO 801 and is, therefore, confusing.

[30] *Id*., p. 4.

1   received the most media attention are the most compliant.  Additionally, placing inmates

2   whose crimes are "depicted as heinous," constitutes punishment beyond the sentence

3   imposed by the court for the crime of conviction. It is not at all clear what is meant by the

4   vague term of "heinous," and this well may be left to the subjective judgment of individual

5   staff.[31] Moreover, in my experience there is no correlation between the "heinous" nature of

6   a prisoner's crime and their in-prison behavior.

7       41.     The Department Order and the Classification Manual do require that

8   overrides be reviewed, and a final decision made by Central Office Classification[32] and the

9   Classification Manual sets forth criteria for evaluating overrides.[33]

10      42.     As I note below, inmates are discouraged from filing an appeal.[34]

11      43.     The Classification Manual also allows placement in Maximum Custody at the

12  request of a Warden, Deputy Warden, or designee.[35] And it spells out "Criteria Governing

13  Placement in Maximum Security."[36] These include "The nature of the criminal offense

14  committed prior to incarceration constitutes a current threat to the security and orderly

15  operation of the institution and to the safety of others, for example, serious assaults against

16  law enforcement, participation in organized criminal activity…"[37] By this definition any

17  inmate who has allegedly assaulted a law enforcement officer or participated in organized

18  crime may be placed in Maximum Custody. In my experience inmates with these

19  characteristics are often compliant and function very well in the general population of a

20  prison and do not need Maximum Custody or restrictive housing solely based on this aspect

21  of their criminal history. Making placement in the severe conditions of Maximum Custody

22  automatic or based on the subjective preferences of the facility administration for inmates

23  convicted of these crimes amounts to the imposition of an additional dose of punishment

24

25  [31] *See* 30(b)(6) Deposition of Jeffrey Van Winkle, September 24, 2021  (hereinafter "Van Winkle Deposition"), pp. 26-27.

26  [32] Classification Manual, §801.06(1.11) p. 31; DO 801 § 10.4.
    [33] Classification Manual, § 801.06 (1.2, 1.5-1.11).

27  [34] *See* § V.B *infra*.
    [35]  Classification Manual, § 801.11 (1.2).

28  [36] *Id*. § 801.11 (1.1).
    [37] *Id*. § 801.11 (1.1.5).

for the crime of conviction, imposed by the Warden, Deputy Warden, or designee, on top of that which was imposed by the court.

44.    A process is laid out in the Classification Manual that allows an inmate to appear before the CO III or IV who makes the recommendation to the Warden or designee for transmittal to Central Classification, Inmate Services Bureau for final approval or denial.[38] An appeal process for the inmate is provided.[39] However, as discussed below in the discussion of institutional files, inmates are routinely not provided with either a copy of the Hearing Findings of their maximum custody placement hearing  or the Notice of Appeal of Maximum Custody Placement.

45.    Once an inmate has been classified to Maximum Custody, that classification is not reviewed until 6 months after the initial decision and may not be changed earlier.[40] If not changed at the 6-month review, subsequent reviews do not occur thereafter for a year, or every six months if the person is placed in maximum custody through an override.[41] However, DO 812 §5.5 states, "Inmates who have maintained Step III for a minimum of 30 consecutive days, without incident, are eligible for consideration for placement in a Close Custody housing location." Eyman-Browning Deputy Warden Travis Scott was asked about this at his deposition, and answered thusly:

> Q.   So if a person was at step 3 for 30 days at the time they come up for classification reclassification, they could be considered for placement in close custody: correct?
> A.   They could be, yes.
> Q.    If they are not granted the change in custody at that time, they would have to wait another year; correct?
> A.   Correct.[42]

46.    An inmate may thus meet the requirements for transfer to a Close Custody housing unit in accordance with DO 812 §5.5 but not be reclassified for several months and remain in Maximum Custody longer than necessary by virtue of DO 801 §10.9. The policies

---

[38] *Id*. § 801.11 (1.2).
[39] *Id*. § 801.11 (1.3).
[40] DO 801 § 10.9.
[41] *Id*.
[42] Deposition of Deputy Warden Travis Scott, October 5, 2021 (hereinafter "Scott Deposition"), p. 67.

1   are in conflict and are contradictory.

2        47.    The policies allow for placement into Maximum Custody for a wide array of

3   reasons, several of which are not directly related to in-prison behavior, escape risk or

4   dangerousness. Once an inmate has been placed in Maximum Custody it is very difficult

5   to get out of that status. Inmates who demonstrate successful adjustment in Maximum

6   Custody but are deemed to require further structured supervision may be considered for

7   placement in Close Management status.[43] There is no reviewable record of decisions made

8   concerning an inmate's step level review. Deputy Warden Travis Scott said at his

9   deposition, "I don't think there's anything that's kept as far as saying, hey, this is the review

10  that we did and here's the results."[44]

11  **B. Department Order 812: Inmate Maximum Custody Management and**
    **Incentive System**
12

13       48.    DO 812, entitled *Inmate Maximum Custody and Incentive System*, dated

14  December 13, 2019, states, "This Department Order establishes procedures governing the

15  Maximum Custody Management and modifies the concept of programming Maximum

16  Custody inmates and the Guiding Principles developed by the Association of State

17  Correctional Administrators (ASCA)."[45]

18       49.    The ADCRR has chosen to modify the "Guiding Principles" for restrictive

19  housing established by the ASCA. (DO 812, Attachment A) A close examination of the two

20  documents shows very little difference except to the extent the ADCRR substitutes

21  Maximum Custody for the term restrictive housing is used in the ASCA document.[46] Both

22  call for a meaningful process and periodic review of assignment of inmates to Maximum

23  Custody or restrictive housing. Both call for in-person mental health assessments within 3

24  days of placement into Maximum Custody and periodic evaluations thereafter. Both call for

25

26  [43] Arizona Department of Corrections Rehabilitation and Reentry, Department Order
    813 § 1.1.
27  [44] Scott Deposition, p. 84.
    [45] Arizona Department of Corrections, Department Order 812, p.1.
28  [46] *See* note 15, *supra.*

an appropriate mental health treatment plan.  Both call for structured and progressive levels and increased privileges as an incentive for positive behavior and/or program participation. Both require that the determination of an inmate's assignment to Maximum Custody be based upon the nature and level of threat to the safe and orderly operation of general population.  The ADCRR, however, goes beyond ASCA by adding "rule compliance and the recommendation of the person(s) assigned to conduct the classification review," to the criteria for assignment to Maximum Custody.

50.     This is an important difference.  It allows the ADCRR to base advancement to increased privileges and movement out of Maximum Custody upon the subjective judgement of individual staff, and on rules that, as will be demonstrated below, are designed to be broken.

51.     According to DO 812, "Assignments to specific housing areas within Maximum Custody and the step level assigned are not subject to the grievance or appeal process." (§2.5.1). Consequently, there is no review of or appeal from the subjective judgement of the person making the step level determination.  Without advancement to Step 3, an inmate may not be considered for or obtain release from Maximum Custody and return to general inmate population.  (§5.5). There is no entry made in the inmate file of the results of step level reviews.[47]

52.     "Advancement through step levels and/or movement to a less restrictive housing location requires completion of all mandatory programs (as assigned) and compliance with rules." (§3.2) Section 5.2 sets forth a set of rules that inmates must follow on a "daily basis." (§5.1) Among these rules is §5.2.4 "Refrain from creating excessive banging, noise or yelling."  Yet the Maximum Custody units are set up and operate in a fashion that the inmates are forced to engage in yelling, making noise, and "banging" on their cell doors to obtain the attention of officers if the inmate is in distress, ill, needs to see a counselor, doctor or nurse,[48] needs a grievance or other ADCRR form, or there is a

---

[47] Scott Deposition, pp 72-73.
[48] *See* Eldon Vail expert report, November 8, 2013, Doc. 1104-7, Ex. 14

problem with his cell such as, leaks,[49] vermin,[50] rodents,[51] or equipment malfunction.  There is no intercom or call button or any effective way for an inmate to obtain the attention of the correction officer.[52] This becomes a ready way in which officers can cite an inmate for these rule infractions and use those infractions to prevent advancement through the step incentive system established in the Order.

53.     According to the ADCRR 30(b)(6) witness Warden Jeffrey Van Winkle at his deposition on September 24, 2021, the program review relies upon "information reports" submitted by staff. It appears that DO 105 §2.2 governs the preparation of Information Reports (form 105-2)  There is nothing in the policy that requires the inmate be provided a copy of such reports or given an opportunity to respond or rebut allegations contained in them.[53] Nor does the DO 105 specify how these reports are to be used to document failure to comply with rules in the context of Maximum Custody. Deputy Warden Scott testified that information about whether a cell was in compliance "could [be written] down on a piece of paper."[54]  During my observations I did not see where or how non-compliance with rules was documented, made known to inmates, or that the inmates were given any opportunity to rebut an allegation of non-compliance.

54.     Combined with the unreviewable subjectivity of the staff member making the step level determination, this renders the "process" unfair and subject to abuse.

55.     Collectively, these policies and procedures allow for an overly broad constellation of factors upon which assignment to and retention in Maximum Custody may be justified. The rules that must be adhered to in Maximum Custody, combined with the invidious way in which Maximum Custody is operated, make it exceedingly difficult for an inmate to avoid rule violations that may serve to delay movement to a higher step or may

---

(hereinafter "Vail Report"), p. 28
[49] *Id*.  p.18.
[50] *Id*. p. 19.
[51] *Id*. p. 20.
[52] Van Winkle Deposition, p. 129.
[53] Van Winkle Deposition, pp. 83-84.
[54] Scott Deposition, pp. 15-16.

1   make it inevitable that an inmate is reduced in step level for rule violations.  According to

2   DO 812, an inmate only becomes eligible for consideration for placement in Close Custody,

3   a less severe setting, when they have maintained a minimum of 30 consecutive days in Step

4   III, without incident.

5           56.    The difficulty in completing the step progression, combined with the overly

6   broad definition of who requires Maximum Custody, in my opinion leads to an overuse of

7   Maximum Custody.

8           57.    Additionally, several categories within Maximum Custody further exacerbate

9   the overuse of Maximum Custody.

10                  **1.  Restrictive Status Housing Program (RSHP)**

11          58.    DO 812 also includes a section entitled Restrictive Status Housing Program

12   §6.0 *et seq.*  "The purpose of the Restrictive Status Housing Program (RSHP) addresses the

13   Forbidden Three (serious assaults on staff, a serious inmate on inmate assault(s) with a

14   weapon or multiple inmates assaulting an inmate with a serious injury) offenses and give

15   inmates an opportunity to modify behavior in a positive way so they can return to the general

16   population." (§6.0)[55]

17          59.    Placement in this status is determined by the Complex Warden and Regional

18   Operations Director (ROD). (§6.1). An "Assessment Team" is supposed to develop a

19   program plan and discuss the plan with the inmate, explain to the inmate the requirements

20   for the return to general population and document the decisions on the program. (§6.3)

21          60.    The Department Order does not tell inmates or staff what those requirements

22   are.  Inmates are to be reviewed every 30 days by the Assessment Team "for program

23   participation and step progression." (§6.5). These reviews are to be documented.   All

24   inmates enter at step 1 and "Restraints are used at all steps in the RSHP." (§6.7.1)

25          61.    Inmates classified as seriously mentally ill ("SMI") are not to be placed in

26   RSHP, "without review by the Health Services Contract Monitoring Bureau Mental Health

27   _____

28

1     Director and contract Mental Health Director." (§6.4.3)

2     **2.  Enhanced Management Housing Status (EMHS)**

3     62.     DO 812 also includes a section entitled Enhanced Management Housing

4 Status (EMHS) §7.0 *et seq.* This status is for inmates who present "exceptional security

5 concerns, continued violations of the Forbidden Three acts," as well as inmates who have

6 "demonstrated actions indicating a serious escape risk or physically assaultive behavior

7 resulting in: assaulted or attempted to assault, another with a deadly weapon, Serious

8 physical injury, Death of any person." (§ 7.1.1) In addition, an inmate may be placed in

9 EMHS if, "The nature of the criminal offense committed prior to incarceration constitutes

10 a current threat to the security and orderly operation of the institution and to the safety of

11 others.  For example, serious assaults against law enforcement, participation in organized

12 criminal activity, or 1st degree Murder." (§ 7.1.1.4)  I described above the subjectivity of

13 basing a person's classification level solely upon the nature of their commitment offense,

14 without analysis of their actual in-custody behavior.

15     63.     Inmates in EMHS status are subject to being placed in full restraints, "to

16 include a lead chain and camera…during all out of cell movement, at all steps in the EMHS.

17 (§7.7)

18     64.     Inmates in this status are supposed to be reviewed for program participation

19 and step progression a minimum of every 30 calendar days.  (§ 7.5) And a decision to

20 remove an inmate from EMHS status may be made by the ROD, Deputy Warden and

21 Complex Warden in consultation with the Assistant Director for Prison Operations. (§ 7.6)

22 There is no documentation of these reviews.[56] If inmates are advised of the results of these

23 reviews, they are not advised of anything other than the outcome; they are not told what

24 they need to do to improve their status and move up a level.[57]

25     65.     Inmates classified as SMI may not be placed in EMHS without review by the

26

27 ――――――――――――

28     [56] Scott Deposition, pp. 64-65, 78.
     [57] *Id*.

Health Services Contract Monitoring Bureau Mental Health Director and contract Mental Health Director. (§7.4.2)

66.     Unlike the section addressing RSHP, nowhere in the Department Order does it state that the requirements for removal from EMHS will be explained to the inmate.

### 3.  STG

67.     DO 806, entitled *Security Threat Groups (STGs)*, dated April 15, 2021, says, "An inmate validated as a member of a STG may be considered for Maximum Custody placement if determined by SSU/STG that he/she are actively involved in STG activities." (§3.7.8) This adds a broad category of inmates into the Maximum Custody pool and contributes to its broad utilization.

68.     The recent revision to DO 806 provides a mechanism for inmates to obtain a reduction in custody level in accordance with DO 801 (Inmate Classification).  (§§5.3.3, 5.3.4)  However, almost six months after this revision came into effect, Deputy Warden Scott, who is responsible for the only housing unit where people are held in Maximum Custody STG units, did not know how many people had been reclassified under the revised order, or how many of those who had been reclassified had in fact been moved out of Maximum Custody.[58]  He was able to identify a single person who had been reclassified and moved out.[59]  The inability of the only deputy warden responsible for a STG unit to describe the policy change in action raises the distinct possibility that this new process for reclassification exists only on paper and not in practice, or that staff have not been properly trained in the new policy.

### C.  Department Order 804: Inmate Behavior Control

69.     DO 804, entitled Inmate Behavior Control, dated November 1, 2019, grants Wardens and Deputy Wardens broad authority to place inmates in detention units for a variety of reasons. (§ 1.0)

---

[58] Scott Deposition, pp. 82-83.
[59] *Id*.

70.     There is no requirement for review by mental health staff when an inmate is placed in a detention unit, other than that the inmate be monitored in accordance with the rules governing health care generally.  (§1.2.4). According to policy, inmates in detention are supposed to receive the opportunity to exercise outside the cell for a minimum of two hours, 3 times a week. (§1.2.6.5) All inmate privileges listed in §1.2.4-1.2.16.3 may be restricted if the Warden or Deputy Warden believes it necessary.

71.     I spoke with several inmates who had been in detention status for longer than a month, including some who had been in detention for upwards of a year. (R-12, R-9, R-10, R-8, L-5, S-3). All inmates in detention that I spoke with told me they do not receive the opportunity to leave their cells for recreation for at least 30 days and in some cases do not have any personal property.

72.     Section 1.2.7 of DO 804 says inmates may have "property in accordance with Department Order #909, Inmate Property, except when precluded by disciplinary sanctions or restricted as clinically indicated while inmate(s) are on a Mental Health Watch. A Mental Health Watch Order, Form 807-1, should reflect items that are issued on watches ONLY if they have been ordered by a clinician." Only some, but not all, inmates who I spoke to were subject to loss of privileges because of discipline. Not all inmates in detention units are there for disciplinary reasons.  It is puzzling to me why they would be deprived of outdoor exercise and property. Nowhere did I find a policy that authorizes deprivation of outside exercise.

73.     Inmates in detention units for Refusal to House (RTH) reasons said that staff told them they could be released from detention if they "snitched" on who threatened him, but as they said, to do so would place them in further danger as they would be labelled a "snitch" and unable to reside in any housing unit. (L-15, L-16) Practices like these make it difficult, if not impossible, for an inmate to get out of isolation and serve to increase the number of people held in restrictive housing.

**D.  Department Order 813: Close Management**

74.     DO 813 creates another category of inmate who may be housed in isolation. "Close Management Status is designed for inmates who [engage in certain behaviors] and are considered as management problems, unable to live in general population yet not requiring Maximum Custody placement.  Additionally, those inmates who demonstrate successful adjustment in Maximum Custody but deemed (sic) to require further structured supervision may be considered for placement in Close Management status." (§1.1) In other words, completing the steps in Maximum Custody and getting reclassified to Close Custody is not necessarily a ticket out.  Inmates who have successfully complied with the requirements of Maximum Custody may not ever be released.  And, a person can be sent to Close Management, which in some ways is more restrictive than Maximum Custody and for which no programming is prescribed, for conduct, or even for no conduct-that would not get them placed in Maximum Custody to begin with. This contributes to the overbreadth of the use of restrictive housing in the ADCRR.

75.     According to DO 813 governing Close Management, "Conditions not specified in this Department Order are otherwise the same as detention." (§5.2.3) An inmate in Close Management (R-3) said that, despite having completed Maximum Custody, now that he was in Close Management, he is again put in restraints whenever he leaves his cell.

**E.  Behavioral Management Unit ("BMU")**

76.     The ADCRR also has a Maximum Custody BMU at Eyman-Browning.  There is no mention of a BMU in DO 812, and at his October 5, 2021 deposition, Deputy Warden Scott was unaware of policies relating to the BMU.[60]  This could be because the BMU at Browning Unit opened in early September 2021, when ADCRR closed the Florence-Kasson BMU.

---

[60] Scott Deposition, pp. 61, 84.

## V.    OVERUSE OF ISOLATION

### A. These Various Classification Statuses Are All Isolation, Despite the Varied Nomenclature and Policies

77.    During site visits made to several units at ASPC Lewis and ASPC Eyman in September 2021, I visited several of these units and spoke with many inmates held in a variety of statuses.    Based upon my observations, these different categories and classifications of inmates are distinctions without difference in terms of the living conditions of the inmates and the processes by which they enter and leave these statuses. The many different statuses and categories of inmates held in isolation make it extremely difficult for staff to manage.  There was nothing on the front of each cell in Maximum Custody that would tell an officer what category, phase or step an inmate was in and therefore no way for the officer to determine while on the run what privileges the inmate was entitled to. (Run is a term the ADCRR uses to refer to the discrete housing unit, or pod on which an inmate is housed).  Inmates on different steps are housed in the same run. And I did not see any document on the runs or in the various control rooms that tracked whether an inmate was receiving the services, treatment, or privileges appropriate to his status category, phase, or step. Nor did I observe anything in the control rooms I visited that would alert an officer making security checks what Step and Phase an inmate was on.

78.    Unlike the requirement for EMHS and RSHP, there is no requirement that SMI inmates be reviewed by Mental Health professionals for placement in Detention or Close Management units. The deprivations I observed in the Detention and Close Management units were equally or more severe than what was observed in Maximum Custody, RMHP or EMHS. Browning Deputy Warden Scott is not aware of policies to prevent inmates diagnosed as SMI from being placed in Maximum Custody and he says there are SMI inmates among that population.[61]  He also says that inmates may go directly from Mental Health Watch to Maximum Custody.[62]  And, he says, there are no special

---

[61] Scott Deposition, pp. 25-26.
[62] *Id*., p. 27

precautions taken when an inmate moves from Mental Health Watch to Maximum Custody.[63]  He confirmed that there is no policy preventing an inmate who is SMI from being placed in Close Management.[64]

79.     In my observation, there were no meaningful differences between inmates in these various statuses, except that Step 2 and 3 Maximum Custody inmates did tell me they were offered use of the larger exercise pens once a week and another (E-5) told me the only difference between Enhanced Management and Restrictive Status Housing was whether he was shackled at the ankles when he left his cell.  All said that most days the only out-of-cell time offered was recreation in the "standard enclosure" if that.[65]  Inmates I interviewed described moving from one status to another, e.g., from Enhanced Supervision to Restricted Supervision, with no difference in their treatment or privileges, and with no process or explanation. In my observation there was no meaningful distinction between the various Step levels and Phases in terms of the degree of social isolation experienced.

**B.  Overuse of Isolation**

80.     I observed and met with inmates held in various categories of isolation at ASPC-Eyman and ASPC-Lewis who did not know why they were in the status they were in, how long they would remain in that status, or what they needed to do to return to the general prison population.  I met very few inmates who said they had received any documents or forms telling them why they were being held in the isolation units or what they need to do to return to the general prison population.

81.     As noted above, the language of DO 801 allows for a wide variety of behaviors and conviction offenses to constitute grounds for placement in Maximum Custody and uses very broad language to describe the types of conduct and behaviors that may cause an inmate to be placed in isolation, and DO 813 broadens that range of behaviors

---

[63] *Id.*, p. 28.
[64] *Id.*, p. 29.
[65] The concrete enclosures at the end of each housing unit in Eyman-Browning, Eyman-SMU I and Lewis-Rast are referred to in DO 812 Attachment B as the "standard enclosure" and by Deputy Warden Scott as the "chute".  Scott Deposition, pp. 56-57.

even further. Also, the explicit language of the Technical Manual says, "Points shall not be the sole basis for determining an inmate's final custody level. Staff will make decisions for inmates as individuals in determining the appropriate custody level."[66] This creates a situation where individual judgments, unconstrained by substantive policy, dictate whether an inmate is placed in isolation in Maximum Custody housing. And, although the classification decision is supposedly appealable, inmates told me that they are told not to bother appealing because it won't change anything. One inmate in Enhanced Supervision Housing (E-11) told me that he was told he had the right to appeal the determination but that, 'it won't help," and that appeal was useless.

82.     In addition, inmates are placed in detention because the inmate feels unsafe and expresses his fear. Inmates who ask for protection are essentially punished.  I spoke with numerous inmates in Detention status who were place there ostensibly for "Refusal to House" (RTH).  DO 704 spells out the ADCRR approach to inmates who they identify as refusing to accept a cell assignment.  I understand the need for the ADCRR be in control of where inmates live within their institutions. However, I also understand that there are inmates with legitimate safety and health concerns who make earnest requests for different housing.  During my site visits I spoke with several inmates whose request for different housing than was assigned to them was based upon apparently genuine and reasonable concerns. Nonetheless, DO 704 states, "If a viable housing option cannot be found within the complex, the inmate shall not be eligible for movement out of the complex for a minimum of six months."[67] And although it does not explicitly so state, it appears in practice that inmates designated RTH are placed in Detention, which in all respects is Maximum Custody with even fewer privileges.[68]  Inmates with a reasonable and sincere fear of being harmed should not be penalized by isolation and loss of property, visitation, and phone calls. This practice creates a chilling effect upon inmates' willingness to tell prison officials about

---

[66] Classification Manual, p. 4.
[67] Department Order 704 §10.2.
[68] *Id*. §11.

genuine threats to their safety.

## C. Overuse of Isolation – Examples from File Reviews

83.    I have reviewed several inmate files produced by ADCRR and represented to be institutional files.  The files do not appear to be complete institutional files.  Nonetheless, the inmate files I reviewed confirm my previously stated opinion that people are placed into maximum custody for reasons that are not penologically sound, and that they are kept in maximum custody for equally unsound reasons.  Several examples are discussed below.

84.    ███████████████████████:  According to the records provided, Mr. ████████ came into ADCRR custody on April 1, 2019 with a life sentence. [69] He was initially moved to ASPC-Eyman Browning, a maximum custody unit, on April 2, 2019, and subsequently moved to ASPC-Lewis Rast Max in June 2019, where he remains today.[70]

85.    On April 8, 2019, Mr. ██████ had a hearing in which the Classification Officer recommended that he be placed into Maximum Custody because he had served less than two years on a life sentence.[71]  The Deputy Warden and Warden agreed for the same reason and the Classification Administrator approved placement into Maximum Custody.[72]

86.    At the time, Mr. ██████ "scores" were 16 and 14, and his levels were 5 and 3.[73]  Although the scores are reported, there is no clear statement in the hearing document regarding what the scores mean.  At his deposition, Deputy Warden Coleman, one of the people who routinely reviews the recommendation of Classification Officers and makes recommendations, struggled to explain the 5 and 3, and, ultimately gave responses about their meanings that are inconsistent with the classification manual.  According to Deputy Warden Coleman, the two scores were a range of possible custody classifications.[74]

---

[69] ADCRR00163429.
[70] ADCRR00163428-163429; *see also* Deposition of Deputy Warden Anthony Coleman, October 14, 2021 (hereinafter "Coleman Deposition"), p.140.  Deputy Warden Anthony Coleman is the deputy warden of ASPC-Lewis Rast.
[71] ADCRR00163358-163359.
[72] *Id.*; Coleman Deposition, p. 148 (describing the various roles in the recommendation and approval process).
[73] ADCRR00163359.
[74] Coleman Deposition, p. 118.

ADCRR's classification manual does not indicate that people have a range of possible custody classifications.  Rather, the manual has detailed worksheets that result in a total number of points for determining custody level and what they call Internal Risk.  The scores reported, 16 and 14, translate to Medium Custody or Custody Level 3 and an Internal Risk level of 2 or low risk.[75]  The classification documents reflecting how the scores were calculated were not included in Mr. ███████ institutional file, although Deputy Warden Coleman testified that they should be.[76]

87.     Mr. ███████ continued placement in Maximum Custody was reviewed on October 17, 2019, approximately six months into his time in Maximum Custody, with the same results: continuation of Maximum Custody because he had not yet served two years of his life sentence.[77]  It was noted that he had had no disciplinaries, was at Step 3 and was enrolled in programming.[78]  It was noted that his total scores were "24/13   5/2".[79] According to the Classification Manual, a custody score of 24 would lead to a custody level of minimum or 2 in a reclassification process, and an internal risk score of 13 would lead to an internal risk level of 2 or low risk.[80]

88.     Mr. ███████ continued placement in Maximum Custody was again reviewed on March 10, 2020, with the same results.[81]  At this point, it was reported that Mr. ███████ had gone for a year without any disciplinaries, was enrolled in programming and had obtained a pod porter job with no issues. [82]  Although it was not mentioned in the Maximum Custody placement review document, Mr. ███████ had been at Step 3 for approximately five months at the time of this review.[83]

---

[75] Arizona Department of Corrections, 801-TM-OPS, Objective Classification: Custody & Internal Risk Technical Manual (hereinafter "Classification Manual"), pp. 61, 63; Arizona Department of Corrections Department Order ("DO") 801, Inmate Classification, at § 6.4.
[76] Coleman Deposition, p. 117.
[77] ADCRR00163373-163374.
[78] Id.
[79] Id.
[80] Classification Manual, pp. 62-63; DO 801 § 6.4.
[81] ADCRR00163371-163372.
[82] Id.
[83] ADCR1649799.

89.     The Maximum Custody placement was again reviewed in October 2020, at which point, the Classification Officer stated, apparently erroneously, that Mr. ███ had served more than two years in maximum custody, and recommended Mr. ███ for close custody.[84]  It was again noted that Mr. ███ scores were 24/13, but now listed the classification levels as 3/2 – medium custody, low risk.[85]  It was noted that Mr. ███ had not had any disciplinaries, and that he had maintained Step 3, maintained a porter job with no issues, and was enrolled in programming.[86]  Two deputy wardens agreed that Mr. ███ could be managed at a lower custody level and recommended moving him out of maximum custody.[87]  The Central Office Classification Administrator, who had the final say, decided that Mr. ███ would remain in maximum custody, without explanation.[88]

90.     There are a total of three Maximum Custody Placement hearing forms from May 3 through June 16, 2021.  In each of them, the classification officer notes that Mr. ███ scores are 24/13, but that somehow these scores now result in classification levels of 5/4 – maximum custody and high risk – and that Mr. ███ has "completed the required 2 years", earned Step 3 and Phase 3, and had no disciplinaries, and recommended him for close custody.[89]  Each time, the two deputy wardens agreed with the recommendation of close custody.[90]  However, the Classification Administrator decided that Mr. ███ should remain in maximum custody.[91]

91.     According to Deputy Warden Coleman, Mr. ███ has since been reclassified to close custody and now is recommended for medium custody, but, as of October 14, 2021, remained at Lewis-Rast Max.[92]  No documentation of the reclassification to close custody or pending reclassification to medium was included in the institutional file

---

[84] ADCR00163369-163370.
[85] Id.
[86] Id.
[87] Id.
[88] Id.
[89] ADCRR00163363-163368.
[90] Id.
[91] Id.
[92] Coleman Deposition, pp. 140.

that was produced by ADCRR.   I have found no ADCRR policy preventing a person's remaining in maximum custody after approved for removal.

92.   Mr. ███ record demonstrates very clearly the irrationality of the requirement that a person serving a life sentence spend the first two years in maximum custody solely on the basis of their sentence.  Mr. ███ did not have any disciplinaries during his first two years of confinement.[93]  He was able to reach Step 3 quickly and maintain it from October 2019 through at least June 2021.   According to DO 812, maintaining Step 3 requires consistent good behavior – not just avoiding disciplinaries, but also following all institutional rules and regulations, programming, maintaining "meets expectation" on work evaluations, consistently demonstrating positive social interaction skills, and demonstrating a good work ethic.[94]  From the records provided, there was no penological justification for keeping Mr. ███ in maximum custody.

93.   Further, Mr. ███ record reflects significant procedural and administrative failings that undermine the legitimacy of the classification process.  Mr. ███ was not provided with the findings of his hearings on whether he should be placed into or continued in maximum custody.  He was not provided with a notice of appeal of the placement decisions.  There are no classification documents in his institutional file, showing how the scores were calculated or how they were translated into custody and internal risk levels, and it appears that the scores were translated into custody and internal risk levels in a manner that was inconsistent over the course of the two years and inconsistent with the classification manual.   Finally, the decisions ultimately made to keep Mr. ███ in maximum custody, despite his good behavior and low scores, are wholly unexplained.

94.   ███ : ███ entered ADC custody on June 14, 2019.[95]  On June 17, 2019, he was moved into maximum custody at ASPC-Eyman SMU I,

_____

[93] Presumably, he did not have any disciplinaries since June 2021 either, given the recommended decrease in custody level.
[94] DO 812 at Appendix C.
[95] ADCRR00163212-163214.

where he remained until mid-July 2021, when he was moved to a close custody unit.[96]

95.   Like Mr. ███████ Mr. ██████ was placed into maximum custody because he was at the beginning of a life sentence.[97]   At his initial maximum custody placement hearing it was noted that his total points were 10/7 – points that would, according to the classification manual result in a custody level of medium or 3, and an internal risk level of 1 or the lowest risk.[98]  Each person who reviewed the maximum custody hearing document recommended maximum custody because of the "sentence structure", and the Classification Administrator approved of the maximum custody placement.[99]  Mr. ██████ was not provided with a copy of the hearing findings or the notice of appeal for maximum custody placement.[100]

96.   Mr. ██████ maximum custody placement was reviewed in January 2020, when it was noted that his score was 15/07 which meant medium custody, that he was at Phase 2 and Step 3.[101]  The document did not discuss disciplinaries, but his records show he had not had any.[102]  Each person who reviewed the maximum custody hearing document recommended maximum custody, and the Classification Administrator approved of the maximum custody placement.[103]

97.   Mr. ██████ continued placement in maximum custody was again reviewed in November 2020.  At that point his score was still 15/07, but the classification officer noted that he was scoring at minimum custody.[104]  It was noted that he had no disciplinaries.[105]  Though not indicated on the form, he had been at Step 3 for almost a year.[106]  The

---

[96] *Id*.; *see also* Deposition of Deputy Warden Lori Stickley, October 12, 2021 (hereinafter "Stickley Deposition"), pp. 20-21 (discussing the locator codes for different housing units and their meanings).
[97] ADCRR00163196-163197.
[98] *Id*.; *see also* Classification Manual, pp. 61, 63; DO 801 § 6.5.
[99] ADCRR00163196-163197.
[100] *Id*.
[101] ADCRR00163192-163194.
[102] *Id*.; ADCRR00052083-52085.
[103] ADCRR00163192-163193.
[104] ADCRR00163200-163203.
[105] *Id*.
[106] ADCM1647466.

classification officer and the two deputy wardens who reviewed Mr. ███ continued maximum custody placement all recommended that he remain in maximum custody because of his sentence, and the Classification Administrator approved of the continued placement in maximum custody.[107]

98.    On June 17, 2021, Mr. ███ placement in maximum custody was again reviewed.  His scores were 15/7, which are, according to the Classification Manual, scores indicating minimum custody and the lowest internal risk.[108]   It was noted that he had not had any disciplinaries.[109]  Although again not noted on the form, he had remained at Step 3.[110]   The classification officer, the deputy warden, the warden, and the classification administrator all agreed that Mr. ███ should be reclassified to close custody.[111]   The approval process took a month, and Mr. ███ was transferred to a close custody unit on July 15, 2021.[112]

99.    As with Mr. ███ the record demonstrates clearly that there was no penological justification for Mr. ███ placement in maximum custody for two years. According to ADCRR, he is among the lowest risk inmates in ADCRR custody.  He had no disciplinary infractions.  He maintained a Step 3 for a year and a half.  Even now that he has been moved to close custody, he is still held in a far more restrictive setting than ADCRR's classification process or his behavior suggests that he warrants.

100.    Mr. ███ like Mr. ███ did not receive the findings of his hearings on whether he should be placed into or continued in maximum custody or the notices of appeal of the placement decisions.

101.    Also, as with Mr. ███ the institutional file that was produced for Mr. ███ did not include the classification calculations.

102.    Further, the failure to even note that Mr. ███ was at Step 3 from December

---

[107] ADCRR00163200-163203.
[108] ADCRR00163204-163210; Classification Manual, pp. 62, 63; DO 801 § 6.5.
[109] *Id*.
[110] ADCRR00052007-52018.
[111] ADCRR00163204-163210
[112] *Id*.; ADCRR00163212.

2019 through June 2021 suggests that the administration at SMU I do not consider the step program that ADCRR put in place to require inmates "to work through a program" so that they may "may progress from controlled based housing to open privilege based housing where movement outside a cell is without restraint equipment."[113]   Eyman SMU I Deputy Warden Stickley was unfamiliar with the provision in DO 812 that establishes the connection between maintaining Step 3 for 30 days and being eligible to be considered for reclassification out of maximum custody, testifying first that it related only to people in the Restricted Status Housing Program, and then saying that it was not "emphasized" any more.[114]   By setting out this step program and requiring inmates to follow it, and then completely failing to provide the most important of all the incentives – release from maximum custody – ADCRR demonstrates to inmates in maximum custody that the system is not fair and thereby undermines the legitimacy of the entire step matrix process.

103.   ███████████████: ███████████ was placed in maximum custody in 2012 for a very serious violation: he kidnapped a staff member and held her hostage for 30-40 minutes.[115]   He was placed into maximum custody, and at his first six-month review, the classification officer states that Mr. ██████ is "not to be removed from max custody without approval from the OSBA."[116][117]

104.   Mr. ██████ has had numerous reviews over the course of the years since 2012.[118]   At each of them, he remains in maximum custody because of the 2012 violation. Many of the reviews mention an "OSB hold," which, according to Deputy Warden Coleman, means that central office does not want the person to be released from maximum

---

[113] *See* DO 812 § 1.0.
[114] Stickley Deposition, pp. 104-107.
[115] ADCRR00161689-161691, ADCRR00161695-161696.
[116] ADCRR00161689-161691.
[117] According to the ADCRR website, the OSB or Offender Services Bureau is responsible for assessment and classification, among other things.   Deputy Warden Coleman testified that the OSB is the Offender Standards Bureau, or the central administration.  Coleman Deposition, 159. "OSBA" refers to Offender Standards Bureau Administrator.
[118] ADCRR00161664-161696.

1    custody.[119]

2    105.   In October 2017, at the review, it was noted that his scores were 39/29 and

3    3/3, meaning medium custody and medium internal risk.[120]   It was noted that he was

4    classified as SMI, was at Step 3 and was programming and enrolled in a variety of classes,

5    and that he had not had a major violation since the 2012 incident.[121]   Because of the 2012

6    incident, he was continued in maximum custody.[122]

7    106.   In April 2018, Mr. ███████ placement in maximum custody was again

8    reviewed.  It was noted at that time that he had had no disciplinaries since the 2012 violation,

9    and that he had been at step 3 for a year.[123]  His scores at that time were noted as 33/24 and

10   3/3, so medium custody and medium internal risk.[124]   The classification officer

11   recommended Mr. ██████ for reclassification to close custody.[125] The deputy warden

12   agreed, but the warden noted the OSB hold and approved Mr. █████ for continued

13   placement in maximum custody.[126]   The classification administrator also approved Mr.

14   ██████ for continued maximum custody.[127]   In October 2018, Mr. ██████ was again

15   reviewed; his lack of disciplinaries since the prior review was noted, as was the fact that he

16   was still at Step 3 and was enrolled in COIII programs.[128]  His scores had not changed.[129]

17   He was again continued in maximum custody due to the OSB hold.[130]

18   107.   Mr. █████ was reviewed twice in 2020, both times with essentially the same

19   outcomes.[131]  By September 2020, Mr. ██████ was no longer at Step 3; he had been

20   reduced to Step 1 for "not wanting to program" – an entirely predictable outcome of the

21

22   [119] *See*, e.g., ADCRR00161669.
     [120] ADCRR00161664-161665; Classification Manual, pp. 62-63; DO 801 § 6.3.
23   [121] ADCRR00161664-161665
     [122] *Id.*
24   [123] ADCRR00161675-161676.
     [124] *Id.*; Classification Manual, pp. 62-63; DO 801 § 6.3.
25   [125] ADCRR00161675-161676.
     [126] *Id.*
26   [127] *Id.*
     [128] ADCRR00161673-161674.
27   [129] *Id.*
     [130] *Id.*
28   [131] ADCRR00161666-161671.

apparent futility of doing what was required in the step program.[132] Notably, the hostage incident was wrongly identified in both 2020 reviews as having occurred in 2015, an error that made the incident appear significantly more recent than it was.[133]

108. The records produced do not include anything from 2021. The ADCRR website indicates that Mr. ███ remains at Lewis Rast, and that he is still maximum custody.

109. While there can be no dispute that the incident that resulted in Mr. ███ being placed in maximum custody was a very serious one, there is nothing in his institutional file that indicates that he needs to remain in maximum custody. According to his file, he has had no disciplinaries in nine years; the classification scores – which presumably incorporate the 2012 incident – place Mr. ███ in medium custody. He maintained Step 3 for a long time, and went to Step 1 only because he stopped participating in programs, not for misconduct. The decision to keep him in maximum custody because of what he did in 2012, regardless of his conduct since then, undermines the purpose of the step matrix program which promises greater freedoms in exchange for good conduct and renders it a cruel hoax. By failing to let Mr. ███ try to live in a lower custody yard, despite nine years of good behavior, the ADCRR has essentially shown him that there is no point in behaving as required to move through the step program. There is no rational basis for keeping Mr. ███ in maximum custody and the failure to reclassify him makes the system appear unfair and retributive.

110. Further, as with the files for Mr. ███ and Mr. ███ the hearing notices indicate that Mr. ███ was not provided with the findings of the hearings or the notices of appeal. And, as with the other records, the classification calculation data is not in his institutional file.

111. ███████████: In May and early June 2019, ████████

---

[132] ADCRR00161667.
[133] ADCRR00161666-161671.

received six disciplinary tickets and was sent to maximum custody as a result.[134]

112.   In June 2020, Mr. ███████ was reviewed and approved for reclassification as close custody.[135]  In May 2021, Mr. ██████ was again considered for reclassification into maximum custody, but was maintained at close custody.[136]

113.   Unfortunately, according to his records, Mr. ██████ was treated as though he was in maximum custody throughout the period he was purportedly in close custody. ADCRR produced Maximum Custody Daily Out-of-Cell Time Tracking sheets for Mr. ██████ from October 1, 2020 through July 23, 2021, showing that (a) they considered him maximum custody; and (b) he was restricted to his cell in the same manner as other people in maximum custody.[137]  ADCRR also produced a screenshot of classification results for Mr. ██████ showing that he was reclassified to close custody in July 2020, but that he continued to have "Max Custody Step Reviews" every month through at least August 6, 2021.[138]  Further, Mr. ██████ was given a disciplinary in May 2021 for refusing to give back the handcuffs that had been put on him.[139]  But because Mr. ██████ was classified as close custody, he should not have been restrained to begin with.[140]

114.   ADCRR kept Mr. ██████ who is seriously mentally ill,[141] in maximum custody conditions for more than a year after it had determined that he could and should be managed in a less restrictive setting.  And they disciplined him for an action that could not have occurred, but for their failure to move Mr. ██████ out of maximum custody and his justifiable confusion about what their policy is. There can be no justification for such actions.   These actions are further evidence of the irrationality and unfairness of maximum custody in ADCRR.

---

[134] ADCRR00162363-162364.
[135] ADCRR00162357-162358.
[136] ADCRR00162352-162353.
[137] ADCRR00050614-50713.
[138] ADCRR00052156-52158.
[139] ADCRR00162351-162353.
[140] *See* Scott Deposition, pp. 122, 92 (testifying that people in close management are in close custody, and as such, do not have to be restrained).
[141] ADCRR00050614-50713.

115.  Mr. ████████ files, like the others reviewed, indicate that he was not provided with the findings of most of his hearings on maximum custody placements, though in his most recent review, he was provided with the findings.[142]  He was not provided with a notice of appeal for any of the hearings.[143]  His records include no documents relating to the calculation of his classification scores.

116.  ████████████████ : ████████ came into ADC custody on August 3, 2018.  According to the Inmate Record, Full Detail Report produced for Mr. ████████ he was placed in maximum custody upon arrival, but then bounced between maximum, close and medium over the next three years.[144]  The earliest document in Mr. ████████ file that indicates anything about his custody level is a "Screening Report for New Arrivals", dated March 14, 2019, and stating that his custody level is 3 (medium) and that his internal risk level is also 3 (medium).[145]  Nonetheless, the Inmate Record, Full Detail Report indicates that on March 14, 2019, he was moved to maximum custody housing, where he stayed until May 21, 2019, when he was moved to medium.[146] According to the Inmate Record, Full Detail Report, he continued to change custody levels, landing in maximum custody housing on December 30, 2019, and staying there until at least October 12, 2020.[147]

117.  The documentation from his institutional file shows that on July 1, 2020, he was transferred to KCRF-Huachuca, where he was placed into a detention unit for a 14-day COVID quarantine.[148]  Sixteen days later, still on quarantine, he told staff that he did not feel safe on the Huachuca Unit and the process of screening him for protective custody started.[149]  At this time, his custody and internal risk levels were 3/3 – medium and medium.[150]  On September 24, 2020, Mr. ████████ had a maximum custody placement

---

[142] ADCRR00162352-162364.
[143] *Id.*
[144] ADCRR00163313.
[145] ADCRR00163251.
[146] ADCRR00163313.
[147] *Id.*
[148] ADCRR00163229.
[149] ADCRR00163228.
[150] *Id.*

hearing.[151]   He was recommended and approved for maximum custody because of "exhausting all other housing options."[152]   One of the reviewers indicated that Mr. ███ "meets criteria for max custody" but it is not clear from the document what criteria Mr. ███ met.[153]

118.   Not being able to figure out how to keep a medium security inmate safe is not a justification for placing that person into isolation.

119.   Mr. ███ records are even more disjointed and apparently incomplete than the institutional files discussed herein.  The failure to maintain records in a manner that they are useable and can be referred to by staff in making decisions about inmates invites errors, improper placements, and violations of people's rights.

120.   ████████████████: ████████████ has been in maximum custody since February 7, 2019.[154]   The institutional file produced for Mr. ███ includes several disciplinaries from April 2021, but no hearing documents relating to his placement into or retention in maximum custody.[155]   That he has in fact been in maximum custody is shown by the Maximum Custody Daily Out-of-Cell Time Tracking sheets ADCRR produced for Mr. ███ from October 1, 2020 through July 23, 2021.[156]

121.   The records are incomplete.  Any system of review based on such documents is bound to be unjust and create many errors.   Further, none of the records reviewed contained any documents reflecting the reasoning in the step level reviews.

122.   My review of these records recently produced by ADCRR strengthens my previously stated opinion regarding the overuse of isolation in ADCRR prisons.   These records show the ADCRR places people into isolation without penological justification, and keeps them there, also without justification.   The individuals discussed herein have spent

---

[151] ADCRR00163221-163223.
[152] *Id.*
[153] *Id.*
[154] ADCRR00052164-52166.
[155] ADCRR00162272-162277; *see also* ADCRR00162271, ADCRR0162278-162288, ADCRR00050772-50859, ADCRR00052164-52175.
[156] ADCRR00050772-50859.

years in isolation for no reason.

123.    This does not make a prison system safer.  To the contrary, it delegitimizes the system as a whole, potentially leading to more disruption rather than less.  For a prison to function well, it must be run fairly, and it must be seen to run fairly.  Otherwise, inmates – like all people – lose confidence in the system and stop doing what is asked of them.  The example above of Mr. ███ is typical of this problem.  Given the arbitrary rules, the arbitrary implementation of the rules, and ADCRR's general failure to comply with its own procedural requirements, the system of deciding who goes into maximum custody, who stays in maximum custody and who eventually gets out of maximum custody is unfair, illegitimate, and results in unnecessary and unwarranted isolation.

**D. Additional Examples of Overuse of Isolation**

124.    During his deposition, Browning Deputy Warden Scott testified that a Mr. ███ had recently been moved from Enhanced Management, where he had been for ten years, to Maximum Custody.[157]  Deputy Warden Scott further testified that Mr. ███ had not had a disciplinary since 2011.[158]

125.    Inmate L-1, interviewed at ASPC Lewis told me in September 2021 that he had been in Detention since May 2021 and that he was unaware of efforts to find him a place in another prison or prison setting where he might be safe. And, contrary to the requirements of DO 704 §10.5 he has not received the required 30-day reviews of his status. Moreover, DO 704 §10.5 requires that every 30 days the inmate receive a new disciplinary report for Disobeying an Order if the inmate continues insist that he feels he would be unsafe in population.  Inmate L-1 told me he had not seen the CO IV as required by DO 704, he has not been given any plan telling him what he must do to obtain release from Detention or get his privileges restored, nor has he received any responses to his requests for information.

---

[157] Scott Deposition, pp. 147-148.
[158] *Id.*

126.    Inmate L-5 told me he has been in Detention status for more than 2 years.  For more than a year he has not received a disciplinary report.  He says that he is being held "pending investigation," but does not know what is being investigated.  He has been on loss of privileges status (LOP) for two years.

127.    Another inmate in the same unit, inmate L-8 interviewed the same day told me he had likewise been in detention since May 2021. This inmate was in a "suicide watch cell."  I met other inmates who had not received any disciplinary reports but were deemed RTH and held in detention (L-10, L-11, L-12, L-14, L-15, L-17, S-1, S-2)

128.    Inmate S-3 had been in detention since April of 2020 when I saw him in September 2021.  This inmate told me he had not received any paperwork about his situation or status since August 2020. Another inmate told me that the only way he could return to population was to "snitch" on the inmates he was in fear of, and he felt to do that would make it impossible for him to return to any yard in population. Another inmate (L-18) told me he was not being provided with toilet paper or bedding and had been requesting these items for weeks.  This inmate said he had not been told what to do to be released from Detention.

129.    I interviewed an inmate (L-19) who has cancer and dementia who asked to be housed in a location where he would not be exposed to the smoke of other inmates smoking meth, heroin, spice, marijuana, and cigarettes. He instead had been placed in Detention for RTH under punitive conditions, deprived of his property and subject to the Maximum Custody rules and limitations.

130.    Another inmate (L-20) with whom I spoke appears to be and says he had been designated SMI because he had cut himself and that he suffered from Arthritis and had pain and cramps that were going untreated in Detention.  He says he never refused to house but had nonetheless been designated RTH and was being held in Detention without property and without legal supplies. He also says he is not being given cleaning supplies with which to clean his cell.

131.    I spoke with an inmate (E-5) on Restricted Status Housing who has had no

1   disciplinary reports for over a year and had spent a year and seven months in Enhanced

2   Management before being transferred to Restrictive Status Housing.  He is Maximum

3   Custody Step 3 Level 3 and has been for over 4 months.

4        132.   I met an inmate (E-13) at ASPC Eyman who has lived in the same cell for 15

5   years. He was designated as an STG (Security Threat Group) member 15 years ago.  He

6   was so designated because his name was on a "hit list" found in the possession of another

7   inmate. He never requested protection or refused to accept a housing assignment.

8   Nonetheless, the ADCRR continues to house him in Maximum Custody.  He has filed

9   grievances since 2016 asking to be "stepped down" to general population. He complains of

10  depression. He has not had a disciplinary report since 2003. He is Maximum Custody Step

11  3 Phase 3.  He has requested to be allowed to participate in the ADCRR Integrative Housing

12  Program (IHP), but this request was denied.  He is nearing his release eligibility and going

13  to the Parole Board next year, the prospect looms that he may be released to the community

14  directly from Maximum Custody.

15       133.   One inmate I spoke with (E-21) told me he had been on Enhanced

16  Management status for four years and had not received a disciplinary report in that time.

17  He is told that he can't be released from Enhanced Management because there is an

18  investigation pending into an event that occurred four years ago. He claims all other inmates

19  allegedly involved in the incident he is being investigated for have since been released from

20  restrictive housing.  He doesn't know or understand why the investigation into his actions

21  continues and cannot be ended.  He admits to being a member of an STG and wants to enter

22  the STG step down program but is not being permitted to because of this pending

23  investigation.  He says he has a learning disability.  He is Maximum Custody Step 3 Phase

24  3 and has been for 3 years.

25       134.   Another inmate (R-11) told me that 6 months ago he had been reclassified to

26  Close Custody status but continued to be held in Maximum Custody status "awaiting

27  assignment."  This inmate was placed in Maximum Custody because he is serving a life

28  sentence which carries a mandatory 2 year stay in confinement.

135.   And another inmate (R-12) who said he had been designated SMI was being held in the Sex Offender Unit for 2 years and during that time had received no mental health treatment.  He is awaiting placement in a "Sex Offender Program."  He does not know what step or phase he is on and says he has not received medication since November 2020.

136.   And yet another inmate (E-2) told me he had successfully completed the Maximum Custody program on December 20, 2020 but was still housed in Maximum Custody and doesn't know why.

137.   A review of documents produced by Defendants showing the step level review dates, outcomes, and dates of disciplinaries confirms that inmates in Maximum Custody frequently spend six months or more at Step 3.[159]

138.   The presence in isolation of inmates who had not had a disciplinary report or STG activity in several years or who have been at Step 3 Phase 3 for a long period of time is evidence to me of the lack of relationship between the security threat posed and the continued placement in isolation.

## VI.   CONDITIONS OF ISOLATION

### A.   Out-of-Cell Time

#### 1.   Recreation

139.   Inmates' access to out of cell recreation, exercise, table time and classes varied across the units I visited.  In many units on many runs, I was told that inmates were not being offered the opportunity to utilize outside exercise areas, that they were frequently denied the opportunity for outside exercise and recreation for minor or petty reasons, and that officers would find the tiniest excuse to deny outside exercise to inmates.

140.   DO 812 and the Settlement agreement in this case establish different sets of rules for inmates' out-of-cell time, mostly recreation and outdoor exercise, but also including classes and other programs.  These different rules on recreation are difficult to

---

[159] *See generally* ADCM 1644974-1651458. (Specifically, for example, *see* ADCM 1645006, 1645122, 1645124, 1645004)

understand and to track. Moreover, they apply only to inmates in Maximum Custody, and do not appear to apply to inmates in Detention, Close Management and on mental health watch.

141. The fundamental issue is this—every inmate, no matter what his status, needs to get out of his cell. This has been recognized by most states and by the standards of the profession. Some states, Colorado for example, have adopted a programming method is sometimes referred to as "10 and 10," meaning ten hours per week of outside recreation and ten hours per week of therapeutic intervention, averaging about three hours daily.[160]

142. The practice in Arizona that I observed is that inmates are "offered" recreation outside their cell 3 times a week, rather than daily. Maximum Custody inmates are supposed to be offered, at a minimum 2.5 hours out of cell outdoor recreation (7.5 hours/week and depending upon their step they may be offered up to 9.5 hours/week). What is occurring is that when inmates are offered the opportunity to leave their cells for outdoor exercise, even Step 1 inmates are often left in the enclosures for more than 2.5 hours, without access to water or toilets, and often in extreme heat. The amount of time an inmate spends in outside recreation in the enclosures is dependent upon how many officers are working on the run and when they are available to remove the inmate from the enclosure and return him to his cell.

143. Inmates in Detention told me they do not receive outside recreation, do not leave their cells for at least 30 days, sometimes longer. (L-7, L-9, L-13, S-1,). All inmates being reclassified to Maximum Custody are placed in Detention prior to completion of the classification process.[161] An inmate (R-6) in Detention status told me that he had been at the facility 4 weeks and has had no outside exercise since arrival.

144. Often, according to many inmates (L-8, L-14, S-2, S-3, L-17, E-13, I-1) outside recreation gets cancelled, sometimes because of staff shortages and sometimes

---

[160] Proceedings of a Colloquium to further a National Consensus on Ending the Over-Use of Extreme Isolation in Prisons. *Op cit*. p. 26.
[161] DO 801 §10.7.

1   because the officers say it is too hot to go outside. When this occurs, there is no rescheduling

2   or "makeup" of the recreation opportunity, and the inmate may go several additional days

3   before the opportunity to go outside and exercise is offered again.   Some inmates say they

4   get the opportunity to go outside for recreation once a week or twice a month. (E-3, E-4)

5   and some told me they don't get outside recreation at all (E-9); another (E-17) who said he

6   is Step 3 told me recreation is "hit or miss" depending on the officer(s) on duty. An inmate

7   in Restrictive Status Housing who had been in Enhanced Management (E-22) said that

8   while in Enhanced Supervision Housing he did not receive the opportunity to go outside for

9   exercise at all. Another, in STG housing (E-17) told me that two weeks can pass with no

10   opportunity for outside exercise and that use of the "enclosure" is frequently cancelled.  He

11   added that if outside exercise is cancelled due to short staffing, showers are cancelled for

12   that day as well. And another STG inmate (E-13) said he is offered outside exercise in the

13   enclosure up to 6 hours a week, not in the larger exercise areas even though he is Step 3

14   Phase 3.

15      145.   One inmate (E-11) who says he is Step 2 Phase 2 told me that he generally

16   gets out of his cell once per week for 3 hours and not more often because of short staffing.

17   Another inmate (E-21) said he is Step 3 Phase 3 and is not getting out of his cell 9.5 hours

18   a week but, rather, is "lucky to get out 3.5 hours a week." He says when recreation is

19   cancelled for short staffing there is no "makeup" offered.

20      146.   Inmates also reported that officers find excuses to say that inmates refuse

21   recreation.   If an inmate has a clothesline hanging in his cell or a towel hanging up to dry,

22   that can be a reason to be recorded as a refusal. (E-11, E-21). If an inmate is not dressed

23   and ready, if he is taking a "birdbath" in his cell and is not immediately ready to leave when

24   officers come to offer him rec, it is recorded as a refusal (E-11).  Officers use any excuse to

25   record a refusal to take advantage of outdoor exercise.  (E-11)

26      147.   The below was observed on the wall at ASPC Lewis during my visit there:

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158448

20    148.   Arizona's security protocols for inmates in Maximum Custody, including

21  Enhanced Management, Restrictive Status Housing, STG, and BMU, and according to the

22  inmates, for Detention, requires that the inmate be strip searched, handcuffed and, in some

23  cases  shackled  at  the  ankles  when  moved  anywhere.[162]  For  inmates  in  Enhanced

24  Management and Restrictive Housing more than one officer is needed to escort the inmate

25  any time he or she leaves the cell.[163] Consequently, inmates told me that, irrespective of

26  their status, whether they had the opportunity for outside recreation or exercise was

27  _____

28    [162] Scott Deposition, pp. 89-92.
         [163] Id.

dependent on the number of officers available, and how long they remained in the "enclosures" was a matter of the availability of officers to escort them back to their cell. In other words, even Step 1 inmates reported being left in the enclosure for more than 3 hours because no officers were available to escort them back to their cell.  These inmates said that there was no escape from the heat in the enclosures and often there was no water available. Inmates reported being left in the enclosure for up to 5 hours without access to a toilet or urinal.   As explained by one inmate (E-21), if he needs to use the toilet when outside in the 20 x 40 enclosure, he must wait for officers to arrive to escort him back inside, and he forfeits the rest of his recreation time.

149.    For Maximum Custody inmates, their activities, including out of cell time, exercise and programs are supposed to be recorded on the "Maximum Custody Daily Out-of-Cell Time Tracking" form (form 801-19). I have examined those forms for several months (January, April, July and October 2019; January, April, July and October 2020 and January 2021) as provided in the Maximum Custody Notebooks sent by the ADCRR to the attorneys for plaintiff inmates.[164]  What is most striking about them is that there are months when the ADCRR says over 80% of inmates have refused outside recreation.[165]  This high rate of refusals corroborates what I was told by inmates about being recorded as a refusal even though they did not intend to refuse.

150.    According to DO 704 §1.2 entitled, "Inmate Exercise Enclosures (Maximum Custody/Detention/Mental Health Units)" inmates should receive six hours of outdoor exercise weekly to be afforded to the inmate in two-hour blocks, three times weekly. Further, DO 704 §12.2 says, "Movement of Maximum Custody inmates to and from exercise enclosures shall be logged in the Unit Control Room's Correctional Service Log Form."   I entered the control room in several Units and observed and looked at the Correctional Service Log, sometimes referred to as the journal.  In none did I see *any*

---

[164] Maximum Custody Notebooks and summary spreadsheets (Ex. 4).
[165] I note that these forms were nowhere to be found on the runs I visited, and it appears they are not being filled in contemporaneously.  They were not in the run where the cells were located nor were they in the Maximum Custody control rooms I entered.

logging of movement of any category of inmates to exercise enclosures on the days I was there.  DO 704 §12.2.1 goes on to say that staff "shall make a visual check (health and welfare) on the inmates in the enclosures a minimum of every 30 minutes and ensure the check is logged in the Correctional Service Log form." On the Correctional Service Logs that I reviewed, I did not see any entries for these 30-minute checks, and the inmates I interviewed told me that officers do not check on them every 30 minutes when they are in the "standard enclosures."

151.   DO 704 §12.3 says that when a detention inmate goes to an exercise period, the movement shall be recorded on the Individual Inmate Detention Record, form 804-03. At the SMU-I unit of ASPC Eyman, I asked to see this form for the inmates in detention. The forms were not in the control rooms for 3Able and 3Baker. Ultimately the Deputy Warden found notebooks containing the forms in an office located a distance from the Units and the runs.  Upon inspection, there were no entries regarding recreation in these forms for any day that week. It appeared to me that either no inmates had not received any outdoor recreation that week (at the time it was after 3 pm on Wednesday of that week; the week on the form started on Monday), or the form was not being maintained pursuant to policy.

152.   Also, as to the 804-03 form (Detention) and the 801-19 Out of Cell Time form (Maximum Custody), it does not appear to me that these forms are being maintained contemporaneously by the officers performing the escorts to the recreation enclosures or by the control room officers who appear too busy to maintain such a log at the individual inmate level.

153.   Per DO 813, "Significant interaction, behavioral observations, and key activities of inmates in Close Management shall be noted in the Inmate Activity/Behavior Log form." (§3.1.1) During my visit I did not see any such record of activity for inmates in Close Management.  The ADCRR 30(b)(6) witness Warden Van Winkle testified that he was unaware of out-of-cell time being documented anywhere for people on Close

Management.[166] Consequently, we cannot say whether inmates in Close Management are receiving outside recreation or not.

154.    According to Department Order 807, people on Mental Health Watch should have recreation and other privileges unless determined by licensed mental health staff to be contraindicated. (§7.6)  In the Mental Health Watch Unit at SMU-I in ASPC Eyman there was, on the front of the cell of each inmate on watch status, an "Observation Record" form 1101-16 with places to enter codes to document an inmate's activity when the officer makes his or her rounds, there is a code "i" for exercise to indicate when the inmate was exercising. I examined those forms for each of the inmates on that run that day and in none of them did I see an "'i" entered.  This suggests to me that these inmates who may most need stimulation and outside exercise are not receiving it at all.  According to Browning Deputy Warden Travis Scott, inmates on Mental Health Watch may not get recreation in the chute enclosures at all because staff cannot perform the required watches when they are in the enclosure.[167]  Given the testimony of Deputy Warden Scott, it appears to me that if they had more officers available on the watch units these inmates would be able to receive outside exercise.

155.    A review of Information Reports (105-2(e)) filed concerning cancellation of activities demonstrates ongoing, frequent cancellations of outside recreation, as well as cancellation of indoor out of cell activities due to staffing shortages. For example:

- On February 3, 2020, Outside Recreation at Browning Unit was curtailed because 26 positions were vacant that day (ADCRR 00055262)

- On July 6, 2021, recreation activities were curtailed because they were 35 officers short at SMU 1 (ADCRR 00055697)

- On August 15, 2021, at SMU 1 they were 37 officers short and inside recreation and table time were cancelled and outside recreation was cancelled for half the day. (ADCRR 00055711)

---

[166] Van Winkle Deposition, p. 141
[167] Scott Deposition, p. 127-128.

- On April 2, 2021, at Kasson Unit CO III classes, MH classes, and SMI unstructured time were cancelled for the week due to COVID.  (ADCRR00055767)

- Likewise, the same occurred on June 12, 2021, at Kasson (ADCRR 00055783)

- Deputy Warden Scott testified that recreation for some pods at Browning gets cancelled two or three times per week.[168]

156.    The General Order for Post 35, the Housing Unit Security Officer, sets out the required entries on a Correctional Service Log.  These entries include the time for "turnouts" starting and ending, and the number of people that go.[169]   Turnouts refer to any time multiple people are being moved for some activity, such as recreation or showers.[170] As testified to by Deputy Director Strada, this is important for accountability – for knowing where inmates are.[171]   But, Deputy Warden Stickley, who oversees maximum custody units and the statewide detention unit at Eyman SMU I, testified that it is a matter of the officer's personal preference whether to include this information.[172]  Few of the correctional service logs that I have reviewed in the ADCRR include this information.  By line staff failing to include the information, and supervisors failing to recognize that line staff are not including it, the ADCRR loses a primary method of accountability as to where people are, what recreation time people are actually receiving, and what practices relating to showers are. The failure to record such information makes it impossible to ADCRR leadership to review and to know what is happening in the housing units.

157.    I have several observations about outdoor exercise and recreation.  First, as a correctional administrator I would be alarmed those inmates held in restrictive housing are refusing the opportunity to leave their cells for outdoor recreation and exercise so frequently and would want to know why.  As an official responsible for the safety and well-being of the persons committed to my custody and dependent upon me for their welfare, I would feel

---

[168] Scott Deposition, p. 130.
[169] ADCRR00221014-221020 (General Order Post 35 § 3.3.14).
[170] Deposition of Deputy Director Frank Strada, October 26, 2021 (hereinafter "Strada Deposition"), p. 260.
[171] Strada Deposition, pp. 259-264.
[172] Stickley Deposition, pp. 124-127.

obligated to inquire into this phenomenon for an explanation.  Browning Deputy Warden Scott testified that Browning does not track refusal rates.[173]  The failure of prison administration to take note of this phenomenon and address it either at the individual level with inmates or at the procedural level with staff suggests, to me, callous indifference to the welfare of the inmates.

158.   Indeed, Warden Van Winkle said out of cell time is, "…actually really good for the inmate's mental health state. It's good for the inmate to get out and about, talk with others."[174] That being so, it is irresponsible for the ADCRR administrators not to attempt to increase the use of outdoor exercise.

159.   When I asked inmates, I was told they sometimes chose not to take advantage of an opportunity for outside exercise.  They told me that it was because they did not wish to exercise in the pod's rec "enclosure."  This reluctance derived in part from the stark conditions in what is essentially a cell with an opening to the sky, that has no toilet and no water and can become very hot in the Arizona sun, as shown in the photo below:

//

//

//

//

//

//

//

//

//

//

//

//

---

[173] Scott Deposition, p. 140
[174] Van Winkle Deposition, p. 132.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601                    ADCRR00158526

16
17
18
19
20
21

160.    Many of the inmates told me that they cannot rely on the officers to allow them out of the enclosure when they need to use the toilet or when it is too hot to remain there, and that the officers sometimes leave them in the enclosure for as long as 6 hours (E-22). Inmates said that because it takes at least 2 officers to move them, to remove them from an enclosure often won't occur because there are insufficient staff to make the move.

161.    Some inmates prefer to use the single inmate 10' by 10' outside cages if that is available because they can socialize with other inmates in that setting, as the 10' by 10' enclosures are set up in a line, as shown below:

22
23
24
25
26
27
28

//

//

//

//



09/21/2021  10:25

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158555

162.    However, inmates told me that if they are in the outside exercise enclosures, either the 10' by 10' or the larger enclosures they can occasionally use if they are Step 2 or 3, their outdoor recreation is often terminated if they request to use the toilet (E-21).

163.    In reviewing the Maximum Custody Notebooks provided by ADCRR to the plaintiffs' counsel, I noted several times when recreation was indeed cancelled due to short staffing.[175]  This is a long-standing problem noted by Eldon Vail in his 2013 report to the court where he said, "The reason given by ADC in their reports for the frequent recreation

---

[175] For example, ADCM1569225, ADCM1569493; *see also* ADCRRM0031202-0031519 February 8, 2021, memo from Walter Hensley, Warden ASPC Eyman to L. Hetmer, Assistant Director of Operations.

cancelations is most often 'staff shortage.'"[176]

164.   Outside recreation is also cancelled due to malfunctions in the door locking systems in the isolation units.[177] Inmates also told me that often recreation is cancelled at the discretion of the officer simply because it is too hot. (L-8, L-13, S-1, E-13)

165.   Based on my review of the documents and the statements given to me by the inmates I interviewed, I believe that outside exercise is not provided consistently and in conformity either with the ADCRR policies or the settlement agreement, and that the inmates who need it most, those in long term isolation and inmates on watch, are often not receiving exercise at all. Further, I believe that outdoor exercise is not being provided in the larger enclosures in accordance with DO 812 or with the terms of the settlement.

166.   Many state prison systems provide inmates in restrictive housing the opportunity to exercise outdoors daily or 5 days a week on weekdays.  Having recreation more often is preferable insofar as, if recreation in Arizona gets cancelled on a Friday, Arizona inmates held in these restrictive conditions may not be allowed outdoors until Monday. This means there will be a period of 4 full days (Thursday through Sunday), or more, that may go by without the opportunity to be outdoors.  This is inconsistent with the usual practices of the profession of corrections.  Combined with the apparently common practice of recording refusals for the slightest reason and the practice of ending outside recreation if an inmate must use the toilet, actual access to outside exercise for prisoners in isolated housing is substantially less in Arizona than is the accepted practice throughout the country.

**2.  Showers**

167.   There is no record that I can find that shows whether, when and for how long an inmate in restrictive housing showered.

168.   In the housing units I visited at ASPC Lewis and ASPC Eyman the shower

---

[176] Vail Report, p. 23.
[177] For example, ADCRR00055237, ADCRR00055343.

1   rooms that I saw were for the most part moldy, with peeling paint, soap encrusted and

2   corroded, as shown in the photo below:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
ADCRR00158714
PARSONS V. SHINN, USDC CV12-00601

169.   Only in ASPC Lewis Rast Maximum Custody unit did the showers meet an acceptable standard of cleanliness. Numerous inmates complained about the condition of the showers.

170.   Several inmates told me that they do not use the showers and prefer to take a "birdbath" using the sink in their cell.  This is both because of the condition of the showers and the way in which the officers take them to and from showers.  Two inmates (L-11 and L-19) told me they did not have shower shoes and were therefore unable to shower.

171.   In Enhanced Management, Restrictive Status Housing Program, and any Maximum Custody location where inmates are double-celled, it requires multiple officers

to take them to shower.[178]  And, once they are brought to the shower they may be left there, in the small, confined shower room, with the moisture and the heat, with no place to sit but on the floor and no access to a toilet for up to several hours.  This is because the officers do not return to extract them from the shower after a reasonable period. Sometimes there are not enough officers on duty to take them out of the shower after a reasonable period, say 20 minutes or half an hour. Rather, the officer(s) may not return for up to 3 hours (E-11, E-21, R-3, R-12) and they are forced to remain in the shower room, and sometimes must relieve themselves in the shower room, which they prefer not to do.  This description of showers was repeated to me by enough inmates to ring true.

172.    In 2013 Eldon Vail reported to the Court, "It is demeaning to be expected to keep one's body clean in a space that is not kept clean itself. It reflects and communicates to the inmates a profound lack of care for their physical health and wellbeing, which is not conducive or motivating for inmates to want to participate in treatment for their mental illness." He was right and the problem remains.[179]

### 3. Programming

173.    DO 812 sets forth an ambitious and robust program and expectations for the Maximum Custody program.  It sets out a step incentive system "providing the opportunity to participate in jobs, programs, and other out of cell activities.  Based on behavior and programming, inmate may progress from controlled based housing to open privilege-based housing where movement outside a cell is without restraint equipment." (§1.0)

174.    The first step upon arrival at Maximum Custody is intake and assessment. Inmates are to be evaluated within 3 days of arrival by a contract mental health clinician who is to identify program/treatment needs. (§2.2.1). There is no indication that I observed that this is occurring, no inmate I spoke with said it had occurred or that there was a specific program given to him, other than to follow the rules. According to the DO, inmates are to

---

[178] Scott Deposition, pp. 58-59, 90-91.
[179] Vail Report, p. 16.

be assigned to specific housing areas based upon their step level (§2.4) However, there is no indication this is occurring, as I observed inmates in housing pods and on runs who were of different step levels.

175.    After initial placement, a "Program Team" is supposed to review inmates monthly to, "decide step movement, housing, and review program needs and completion." (§812.3.1) According to the DO, "Advancement through step levels and /or movement to a less restrictive housing location requires completion of all mandatory programs (as assigned) and compliance with rules. (§812.3.2) "The step level incentives and requirements vary in out-of-cell activities based on the unit where the inmate is housed as outlined in the Matrices, Attachments B through E." (§812.4.2)

176.    To qualify for advancement in steps and incentives an inmate must follow all program requirements daily. "Step advancement shall be determined by the Program Team." (§812.5.1) According to Warden Van Winkle, these step level reviews take between 1 and 4 minutes.[180] According to Deputy Warden Scott, who participates in all the step level reviews at Eyman-Browning, every month approximately 700 people's step level reviews are conducted in meetings on Fridays that last "an hour to an hour and a half."[181]

177.    Attachment G and H to DO 812 list the various program areas, completion of which is mandatory to move to the next step and Attachment I specify some additional requirements for inmates in Restrictive Status Housing.   There are columns on the attachments labeled "Mandatory Move to Next Level;" and "Addictive Behaviors." It is not at all clear what the column entitled "Addictive Behaviors" refers to or requires.  Several of the items listed in the Mandatory Move column appear to refer to self-study and others to classroom work. The matrix is difficult to comprehend.

178.    All the inmates I spoke with in Maximum Custody reported receiving self-study "booklets" which they were to complete and turn in to staff. No inmate indicated that they had received any feedback from staff concerning their completed work.  Some said

---

[180] Van Winkle Deposition, p. 91.
[181] Scott Deposition, p. 63, 93.

they were able to attend classroom programs in the last month or so although those had been cancelled for several months during the pandemic.   The classrooms consisted of approximately a dozen school type chair/desk combinations with appurtenances with which an inmate might be cuffed or shackled to the chair/desk.

179.   An inmate in RSHP (E-22) told me he had recently moved to that status from Enhanced Management where he did not receive any programming. He told me that the lack of activity, "messed me up." And he said, "we weren't meant to be alone." He told me he was taking a medication called Zyprexa.

180.   Inmates in Detention status did not report participating in any programs or classes.  As discussed in more detail below, this is confirmed by Defendants' Individual Inmate Detention Records.

181.   I interviewed an inmate (L-5) who told me he had completed the Maximum Custody program and had been transferred to Close Management, had not had a disciplinary report in over a year and was not receiving any programming.  He saw no way out; he simply believed the ADCRR doesn't want him "on a yard."

182.   Another inmate, a validated STG member at ASPC Eyman (E-14) told me he has locked down for 2.5 years with no program. And another (E-16) said he has had no Disciplinary Reports since 2016 but has not received any programming nor had he had the 180-day review.

183.   An inmate (E-21) told me he has learning disabilities and cannot work the booklets and receives no assistance in doing so.

184.   At his deposition, Browning Deputy Warden Travis Scott said that all mental health classes were cancelled every week during the period March 2020 through June 2021.[182]

185.   The Settlement agreement required programming and unstructured out-of-cell time or table time for inmates in Maximum Custody who were designated as having an

---

[182] Scott Deposition, pp. 130-131.

SMI.  They are not receiving the required table time. (E-20).  Deputy Warden Scott testified that all table time was cancelled from March 2020 until about March 2021.[183]

186.    Additionally, as explained above, correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for people who are in restrictive housing and are seriously mentally ill. During my observations, I saw no evidence of such a collaboration. Several inmates (E-12, R-12, E-22, I-1) told me they were not receiving mental health treatment. In my professional experience and in my opinion that is not good practice.

**B. Out-of-Cell Time and Conditions in Detention**

187.    It is my understanding that, on October 20, 2021, ADCRR produced over 18,000 pages of Individual Inmate Detention Records ("Detention Records").  I have reviewed several weeks of Detention Records from a variety of Detention Units in the ADCRR.  I have not reviewed all of the Detention Records.

188.    The Detention Records I reviewed show that many people are not receiving the six hours of out-of-cell recreation that they are supposed to receive, according to Department Order ("DO") 804 § 1.2.6.5. Further, in some Detention Units, they do not have three opportunities to shower each week, nor do they have appropriate laundry and linen exchange as required by policy.  *See* DO 804 §§ 1.2.6.1, 1.2.6.4.  In some Detention Units, some weeks, the Detention Records indicate that ADCRR is not providing adequate food to people in detention.  *See* DO 804 § 1.2.3.

189.    I have reviewed logs from two different weeks at each location selected, and I reviewed both large and small detention units.

**ASPC-Eyman SMU I, 2/15/21-2/21/21[184]**

190.    The Detention Records for the Detention Unit at Eyman SMU I during the week of February 15, 202, that I reviewed, reflect data about the out-of-cell time, showers,

---

[183] *Id.*, pp. 131-132.
[184] ADCRR00183335-183586

meals and laundry and linen exchange for 126 people.  There is one person whose Detention Record states that he was moved out of the unit on February 19.  However, the Detention Record states that he received breakfast and lunch and had a laundry and linen exchange on February 20 and 21, and an officer has signed for these entries.[185]  This is extremely disturbing, as it suggests that the forms were pre-filled.[186]  I have not counted this Detention Record in my description of the Detention Records of this week at Eyman SMU I.

191.  Of the 125 Detention Records I reviewed, fewer than half reflect 2 offers of recreation, about half reflect a single offer of recreation, and about a tenth reflect no offers of recreation.  In my review, I did not identify a single record where a person was offered recreation three times during the week.  Also, I did not see any record reflecting that any person actually went to recreation.   While ADCRR cannot force people to go to recreation, as I noted in my original report, such a high level of refusals is a serious red flag that people are being discouraged from going to recreation.

192.  The offers of showers are nearly identical to the offers of recreation, with the large majority of people being offered showers one or two times during the week and a handful not being offered showers at all.  There was also high rate of shower refusals.  The majority of the handful of records I reviewed that reflect a shower show that the person was left in the shower for approximately an hour.[187]  The high refusal rate for showers, like the refusal rate for recreation, is a red flag that people are being discouraged from taking showers.

193.  Approximately one fifth of the records reflected that the person was not given dinner on 4 days during the week, or, in one case, five days.

194.  Approximately one-third of the records reflect cell cleaning.  None of them reflect laundry or linen exchange.

---

[185] ADCRR00183575-183576
[186] Further, the Detention Records reflect that most of the people in detention have four or five laundry and linen exchanges during the week.  While not objectionable, this would be extremely unusual and again calls into question the veracity of the logs.
[187] This is consistent with what I was told by inmates I interviewed during my earlier site visits.

1

**ASPC-Eyman SMU I,  9/13/21-9/19/21**[188]

2

195.    The log for Eyman SMU I for the week of September 13, 2021that I reviewed

3 was significantly better than the one from February, but problems remain.  Of the 158

4 Detention Records I reviewed that showed an entire week of detention, about one-tenth

5 show that the person was offered only one or two showers and one or two recreation periods.

6

196.    The refusal rates remained very high.  As in February, not a single person

7 went to recreation.  Only about a fifth of the records reflect that the person took a shower.

8 The majority of the showers are listed as taking a full hour.

9

197.    One Detention Record indicated that the person left the unit at mid-week.[189]

10 However, there are entries filled out for days after the person left.[190]   Again, this raises a

11 concern that the Detention Records are falsified by pre-filling.

12

**ASPC-Yuma Cheyenne, 2/8/21-2/14/21**[191]

13

198.    The Detention Records produced for Yuma Cheyenne for the week of

14 February 8, 2021 include 23 Detention Records, all of which cover the entire week.

15

199.    All of the records I reviewed reflect three opportunities to shower.  About half

16 of the records show 2 offers of recreation, about half show three.  No one went to recreation

17 during the week.  As noted above, this is a red flag.

18

200.    All of the records reflect cell cleaning nearly every day.  None of the records

19 reflect any laundry or linen exchange.

20

201.    All of the records reflect two or three meals each day.

21

**ASPC-Yuma Cheyenne, 7/5/21-7/11/21**[192]

22

202.    The Detention Records produced for Yuma Cheyenne for the week of July 5,

23 2021 that I reviewed include 24 Detention Records that cover the entire week.  Of those 24,

24 about half show that the person was offered only 2 recreation periods, and a couple show

25

26 [188] ADCRR00184639-184956
[189] ADCRR00184745
27 [190] *Id.*
[191] ADCRR00196127-196172
28 [192] ADCRR00195879-195928

that the person was offered only 2 showers during the week. About half of the records show that the person received two or fewer meals on two separate days, and about half of the records show that the person received two or fewer meals on three separate days.[193]  None of the records reflect any laundry or linen exchange.

**ASPC-Lewis Morey, 7/12/21-7/18/21[194]**

203.    The Detention Records produced for Lewis Morey for the week of July 11, 2021that I reviewed include 57 Detention Records that cover the entire week.

204.    Of those 57, about half show no offers or one offer of recreation, and about half show two offers of recreation. Just a couple of the records I reviewed show that the person was offered recreation three times, as required. Most of the Detention Records I reviewed show that the person was offered three showers, but a couple of the records reflect only two shower offers.

205.    The Detention Records I reviewed also show that people frequently receive fewer than three meals a day. Most of the records I reviewed showed three days when the person received just two meals. A few people also had a day with just one meal, and one person had a day with no meals, a day with one meal, and two days with two meals.[195]

206.    None of the records I reviewed reflect any cell cleaning, or laundry or linen exchange.

207.    The records I reviewed are also concerning in that almost everyone refused almost every recreation offer. Just three people went to recreation during the week. As noted above, this is a red flag.

208.    Also, the few entries that show that people did go to recreation indicate that,

_____

[193] I would note that at the facilities I visited inmates were only given food twice a day. In the morning, very early, between 430AM and 6AM inmates are given what are referred to as "megasacks" containing both breakfast and lunch food. I will acknowledge that it is possible that the detention records may be distorted by staff noting the distribution of food twice rather than 3 times a day. Nonetheless, at some facilities 3 meals were noted on the forms and at others 3 meals were noted at the same facility where other officers on other days only noted 2. It is difficult, at best, to say with certainty that 3 meals are being served based upon these forms.
[194] ADCRR00187702-187821
[195] ADCRR187724, ADCRR00187726, ADCRR00187788

1   contrary to policy, recreation blocks are not two hours long.  Most of the recreation times

2   listed are under an hour.

3       **ASPC-Lewis Morey, 9/13/21-9/19/21[196]**

4       209.   The Detention Records produced for Lewis Morey for the week of September

5   13, 2021that I reviewed include 63 Detention Records that cover the entire week.

6       210.   Most people received two offers of showers during the week, with a few

7   having three opportunities to shower, and a couple people having just one.

8       211.   Roughly half the people were offered recreation on two days during the week,

9   and slightly less than half the people were offered recreation just once.  One person was

10  never offered recreation during the week.[197]  A small number of people were offered

11  recreation on three different days.

12      212.   The majority of people in Lewis Morey had four days during the week when

13  they received just one meal.  About a third of the people had three days when they received

14  only one meal, and a couple people had two days when they received only one meal.  No

15  one had fewer than two days when they received only one meal.   Almost a quarter of the

16  records reflect people who had 4 days with just one meal also having at least one day with

17  no meals, as do several of the records of people who had 3 days with just one meal.[198]

18      213.   None of the records reflected cell cleaning or laundry or linen exchange.

19      **ASPC-Lewis Bachman 7/5/21-7/11/21[199]**

20      214.   The Detention Records for ASPC-Lewis Bachman for the week of July 5,

21  2021 are alarming.  There are a total of 72 Detention Records, two of which indicate that

22  the person was in detention for less than the full week.  I have not counted the two where

23  there is an indication that the person was in detention for less than the full week.  Because

24  there are so few notations on the Detention Records, there is no way to identify if people

25  were not in the unit for the full week, other than the two records that explicitly state it.  It is

26  _____

27  [196] ADCRR00188208-188365
    [197] ADCRR00188282
28  [198] ADCRR00188234-188238, ADCRR00188252, ADCRR00188268-188314
    [199] ADCRR00187822-187965

standard practice in the corrections profession that the restrictive housing out-of-cell time tracking forms indicate when people move into or out of a unit during the week recorded on the form.

215.   Several of the 70 Detention Records I reviewed reflect no offers of recreation or showers, a majority reflect a single offer of recreation and showers, and just under a third reflect two offers of recreation and showers.

216.   Most of the records I reviewed reflect few meals. Twenty-five of the records reflect 10-12 meals during the week, all the rest reflect fewer than that. One record reflects just one meal during the week, another reflects just two.[200]

217.   Most of the Detention Records indicate that the person had "cell cleaning" one or more times. None of the records reflect laundry or linen exchange.

**ASPC-Lewis Bachman 8/16/21-8/22/21**[201]

218.   The Detention Records for ASPC-Lewis Bachman for the week of August 16, 2021 which I reviewed are similar to those from July. There are a total of 56 Detention Records, none of which indicate that the person was in detention for less than the full week.

219.   Almost half of the Detention Records I reviewed reflect no offers of recreation or showers, almost half reflect a single offer of recreation and showers, and a small handful reflect two offers of recreation and showers.

220.   All of the records reflect just one day, Monday, that all three meals were provided. Most of the records reflect four days with just one meal and two days with no meals. On the days when there is just one meal, it is breakfast. A couple records reflect three days on which no meals were provided. About a fifth of the records reflect one day when no meal was provided.

221.   Several of the Detention Records I reviewed indicate that the person had "cell cleaning" one time. None of the records I reviewed reflect laundry or linen exchange.

222.   In summary, the Detention Records I reviewed show that the ADCRR is not

---

[200] ADCRR00187862, ADCRR00187866
[201] ADCRR00187966-187077

providing people in detention out-of-cell time, hygiene, cleaning opportunities, or even food in accordance with either ADCRR policy or the basic needs of human beings.

### C. Additional Concerns About Conditions in Isolation Units

223.    Although the housing units in different buildings are somewhat different, the conditions are, for the most part, identical in all these different units, irrespective of what they are called (Lewis Rast Maximum Custody was an exception, as it was built in 2014). They are all marked by desultory conditions, in most the shower areas are moldy, with paint peeling and metal corroding.  In the most severe units, such as Detention, the inmates are not allowed possessions, personal property, phone calls or visits.  Except for some, though not all, suicide watch runs, none of the units had a corrections officer on the unit. Supervision of the inmates was from a central control booth and in many of the units the line of sight from the control booth was such that an officer in the booth would have no way to see whether an inmate was in distress in the cell or to hear an inmate call for assistance.

224.    Many of the cell fronts were completely covered by plexiglass.  For example, below is a photo of a cell front at Eyman-Browning:



225.   It is not uncommon for prisons to do this to house inmates who throw bodily fluids. However, inmates with no history of throwing anything were housed in these cells. The plexiglass reduced the circulation of air in the cell making them warmer than the run itself. Also, the plexiglass reduced visibility into the cell by an officer or staff member walking by and reduced the ability of an inmate to communicate with staff at the cell front or to make themselves heard to the officer in the control room in an emergency or to make a request of an officer passing by.  Additionally, at Eyman many of the cell doors consisted of metal with small holes for air, some covered by plexiglass, that made it very difficult to see into the cell or for the inmate to see out.

226.   When asked what they would do if an inmate were having a heart attack, inmates said, in every unit I visited, they would bang on their cell doors (a rule violation) and loudly call, "Man Down!" Indeed, many inmates I spoke with said that the only way to obtain officer attention if they needed help was to make a lot of noise.

227.   In Lewis-Stiner and at Eyman-SMU I observed padlocks on individual cell doors. In the event of a fire or smoke condition each cell (there were 20 on each run) would have to be opened individually. This is dangerous, if the officer is overcome by smoke or does not have time to unlock each cell, the inmate is stuck in the cell.  This was true as well in several of the units at Eyman.

228.   In all the units there is a recreation "enclosure" that is accessed directly from the pod. These enclosures have high concrete walls and are topped by expanded metal. Most that I observed offer no shade from the sun. None have a toilet or urinal and none that I observed had water available to inmates, although DO 704 §12.4 requires water to be available during exercise periods.  Water fountains were inoperable. In several, but not all, runs the inmates told me they are permitted to take a water bottle of their own with them to the enclosure.

229.   In addition, in each prison visited there were outside recreation areas.  At Lewis-Rast, Eyman-Rynning, and Eyman-Browning, I saw  0' by 10' outside recreation enclosures.  At Lewis-Rast and Eyman-Browning, I saw larger enclosures that could be

used by multiple people at once.[202]  The units typically had water coolers.  Most contained fresh cold, clear water when I visited.  There was a set of urinals in the area where these larger exercise pens were located, and I was told by staff that inmates could make use of them without having to end their exercise period.  There were no toilets or urinals in the areas of the 10' by 10' enclosures.  Also, most of these pens had some covering on the top that provided shade to some or all the pens.  None of the recreation areas were in use at the time of my visit.

230.  DO 704 §12.4 also requires that there be a "mister system," or evaporative cooler system for temperatures exceeding 100 degrees.  I did not see that in any of the "enclosures," and did not see such systems in any of the larger outside enclosures.  Several inmates (L-8, L-12, S-10, E-17) told me outside recreation, even in the enclosures, is cancelled if the temperature exceeds 100 degrees.

231.  In all the units the inmates said that when and if recreation outside their cell was offered it depended on the officers assigned, that sometimes it was not offered or was cancelled.  And in every unit, I was told that officers only patrolled the unit runs less frequently than hourly, sometimes not even every 3 hours.  If an inmate were in a shower, he was liable to be left there until the officer next passed through. Inmates told of being left in the shower for 3 hours or more with no place to sit but on the wet, often moldy, floor and no place to relieve themselves.

232.  Inmates also said that while recreation was offered intermittently, often cancelled or not offered at all because it required multiple officers to move them, if they went to the individual recreation enclosure for their run they might be left out in the heat for several hours until the officers returned to escort them back to their cell.

### 1.  Double Cells

233.  The ACA standard effective October 1, 2020, for cells holding inmates in restrictive housing is, "All cells/room in Restrictive Housing provide a minimum of 80-

---

[202] *See also* DO 812, Attachments B-F.

1    square feet and shall provide 35-square feet of unencumbered space for the first occupant
2    and 25-square feet of unencumbered space for each additional occupant."[203]

3    234.    Two-man cells I observed at ASPC Lewis Rast Detention and Stiner and at
4    ASPC Eyman did not meet that standard.  Many cells held two inmates and were quite
5    cramped.  To their credit, the ADCRR allow inmates in Maximum Custody and Close
6    Management to possess personal property including a television and a tablet computer.
7    Most of the inmate personal property is stored in cardboard boxes.

8    235.    In all the cells inmates shared a single stainless steel combination
9    commode/sink and were in each other's presence when the other was urinating or
10   defecating. The same commode/sink was used by both inmates for drinking water, and at
11   the units where there is no laundry exchange, including at Lewis, is where prisoners wash
12   their clothes and linens.

13   236.    These cells often had doors covered completely in plexiglass and often also a
14   steel plate with small holes for air that made the cells dark and difficult to see into or out
15   of. In those cells it would be extremely difficult for an officer passing by for a security
16   check to discern if one of the inmates had been harmed by the other. And the setup of these
17   cells makes it difficult for an inmate to say something to a staff member without being
18   overheard by his cellmate.  This contributes to the isolation of inmates and their inability to
19   get officers to pay attention to their needs.

20   237.    The air circulation in these cells, especially those on the second level of the
21   run and covered with plexiglass and with the steel covering I have described is poor and the
22   inmate's must live with each other's body odors.

23   238.    Combined with the extraordinarily long hours inmates are confined to these
24   cells, because of the infrequency of recreation and the frequent cancellation of recreation—
25   the living conditions in these cells for two inmates was unacceptable, in my opinion.

26   239.    In his 2013 report to the Court, Eldon Vail wrote, "Given that most inmates

27

28          [203] Commission on Accreditation for Corrections, Op. cit., 5-ACI-4B-06, p. 125.

held in isolation in the ADC spend four days a week, 24 hours a day in their cells..., the lack of adequate space within the cell is important to consider when understanding the inmate's living conditions."[204] Based upon my observations, I agree.

## 2. Ventilation, Light and Temperature

240.    The cells I observed at ASPC Lewis-Rast Maximum Custody which were built in 2014 were in good condition and provided adequate light and ventilation. However, the other cells I visited at ASPC Lewis and at ASPC Eyman were not.

241.    The buildings were of concrete block and poured concrete construction with polished concrete floors.

242.    In none of the units did the cells have outside windows.  At ASPC Lewis-Rast the light entered from skylights and succeeded in lighting the walkways in the housing units but it is unclear how much natural light enters the cells. The inmates in those cells did not have any view of the outside, of a horizon.  At ASPC Eyman the light entered from skylights that did not allow in adequate light. In some units the skylights were covered with cobwebs. In some others a piece of plexiglass further cut down on the light from the skylights.

243.    Also, in Stiner and Eyman some cell doors were covered entirely in plexiglass.  This reduces air flow.

244.    Cells at ASPC Eyman on several units, as previously noted, had doors that were made of steel with small round holes and were covered with plexiglass.  These were noted in the SMU-I building at Eyman. At Eyman Browning I noted that in the A4 run it was almost impossible to see through the mesh. It was almost impossible to see into these cells and when I entered an empty cell, it was difficult to see out of.  These cells housed inmates in BMU and on Watch, also sex offenders.  These are often inmates with mental health problems.  These doors substantially reduced the amount of natural light entering from the skylights.  In his 2013 report Eldon Vail noted a "dearth of natural light into ADC's

---

[204] Vail Report, p. 17.

isolation cells,"[205] and I agree.

245.   The ACA standards require, "Circulation is at least 15 cubic feet of outside or recirculated filtered air per minute per occupant for cells/rooms…as documented by a qualified technician and should be checked not less than once every 3-year accreditation cycle."[206]  I could not measure the circulation during my inspection, but in  my opinion, it is very unlikely that these cells with their doors covered by plexiglass meet that standard.[207] Inmates in these cells complained about the heat in the cells. These housing units were not air conditioned, though some had what are referred to as "swamp coolers."

246.   ADCRR's Site-Specific Post Orders for the Detention Unit Security Officers and the Housing Unit Security Officers require heat mitigation efforts only if the temperature in a cell reaches 95 degrees.[208]   ADCRR's General Post Orders for the Detention Unit Security Officers and the Housing Unit Security Officers are silent on the issue of checking temperatures and taking mitigation efforts.[209] By not requiring mitigation efforts at temperatures significantly lower than 95 degrees, ADCRR is putting the health and even lives of all people confined to cells in ADCRR at risk.  Notably, Deputy Wardens Travis Scott and Lori Stickley both testified that they thought or believed that the temperature at which mitigation efforts would begin was 85 degrees – 10 degrees lower than the Post Orders actually require.[210] Inmates in these various units reported being on psychotropic medication, some reported asthma, diabetes, and others were obese or over 60 years of age. In my experience inmates, with these conditions or using these drugs should

---

[205] *Id*.

[206] Commission on Accreditation for Corrections, Op. cit., 5ACI-2-D-08, (for cells built prior to January 1, 1990, the comparable standard 5ACI-2D-09 calls for 10 cubic feet of air to circulate per minute per occupant.) p. 63.

[207] I reiterate my understanding that these standards are not obligatory on a correctional agency. Rather, as I have said, they express the thinking of the profession about how a prison should be run and I agree with them.

[208] ADCRR00220672-220686   (Eyman Browning Post Order 35 § 9.1.5); ADCRR00220705-220727 (Eyman SMU I Post Order 35 § 5.1.5); ADCRR00220568-220569 (Douglas Mojave Post Order 12 § 3.7); ADCRR00220636-220643 (Eyman Rynning Post Order 35 § 6.1.5)

[209] ADCRR00221155-221163 (General Order Post 12); ADCRR00221014-221020 (General Order Post 35).

[210] Scott Deposition, p. 31; Stickley Deposition, p. 88.

not be housed in conditions where the temperature exceeds 85 degrees Fahrenheit.[211] During my site visits in late September, the temperature felt warm to me, especially on the upper tiers of the runs.  No inmates told me of any mitigation measures they were aware of nor did I observe any on the days I was present, when the outside temperature was over 97 degrees.

### 3. General Conditions

247.    Other than at ASPC Lewis-Rast Maximum Custody built in 2014, the housing units I visited were marked by the same problems.

248.    Shower rooms were uniformly noted to be moldy, with peeling paint, rust, and corrosion. Many were marked by an accumulation of soap scum.



View of shower at ASPC Eyman

249.    In many of the vacant cells I entered I noted that the commode sinks did not operate as they should. Typically, one of the water buttons failed in making water flow, often the pressure of the cold water was insufficient for a person to use it as a drinking

---

[211] <u>Benjamin v. Horn</u>, No. 75 civ. 3073(HB), 2008 WL 2462027 (S.D.N.Y. June 18, 2008). *See also*, <u>Graves v. Arpaio</u>, 623 F.3d 1043 (9th Cir. 2010).

fountain or even to successfully put water into a cup.  Most frequently there was not hot water.

250.    In Eyman-Rynning, Eyman-SMU I and Lewis-Stiner there were padlocks or bolts preventing the cell fronts from being opened by the control room officer. This is a fire and smoke hazard. In Eyman-SMU I, there was no hose closet, and no sprinkler system.  In my opinion, combined with the bolted or locked cell doors this is a life safety hazard.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158704

Bolt on the front of a cell in Eyman-SMU I.

251.    Inmates are not regularly provided with cleaning fluids and supplies to clean cells and commodes.   As a result, many cells were extremely dirty, as shown in the photo below:



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158539

Interior of a vacant cell in ASPC-Eyman Browning.

252.   In some cells mold was noted on the walls, air vents, and undersides of mattresses.

//

//

//

//

//

//

//

//

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158515

253.    Mop closets were empty of mops.

254.    Inmates are provided 1 roll of toilet paper every 10 days.

255.    Inmates I interviewed (L-1, L-8, E-13, E-11, E-12, R-2, R-9) told me that they had filed grievances about conditions and privileges but not received a response or perceived the grievance system as unresponsive. This is consistent with the findings of the recently released Performance Audit issued by Arizona Auditor General that said, "the Department does not have a reliable process for tracking and monitoring compliance with its time frames."[212]

256.    Many flying insects were noted in many housing units as well as infestations of crickets, what appeared to be beetles, and roaches. In some cells caulking around the

---

[212] Arizona Auditor General, *Performance Audit and Sunset Review Report 21-119*, September 2021, at www.azauditor.gov. p. 19.

sink/commode was missing and bugs were coming from behind the commodes. Inmates say they have not seen an exterminator for many months, they say when an exterminator comes, they only spray the hallways and showers, not the cells.

257.    Inmates in detention, the BMU, or who have lost privileges (LOP) do not have tablet computers and therefore must ask officer for HNR or Grievance forms. Officers often do not respond to requests, walk past cells, and ignore the request for assistance or can't hear the inmate because of the way the cell doors are constructed.

258.    On many runs, large numbers of inmates were noted to be sleeping in the middle of the day, their heads covered by their blankets.[213]

259.    Inmates uniformly reported that they receive food only twice a day, typically at 3-4 a.m. and again at approximately 4:30 p.m.  In the morning inmates are given a "megasack" containing what is supposed to be their breakfast and their lunch.  This is not consistent with general industry practice which suggests that inmates receive three meals a day (including two hot meals) at "regular mealtimes, variations may be made on weekends and holidays.[214]  I was unable to determine if dinners typically track the ADCRR weekly cycle menus. Inmates described the meals to me as repetitive, unappetizing, and insufficient in quantity.  The breakfast and lunch were mostly bread and served cold.  If not consumed at the time of delivery milk was described as likely to curdle and inmates reported needing to supplement the meal with purchased food.  This works a hardship on those inmates whose families cannot put funds into their prison store account.

260.    In his report, Eldon Vail observed that the extreme security precautions required in these units, and especially at ASPC Eyman including the use of ballistic vests, eye coverings and the like are unique to ADCRR. That is consistent with my experience, and like Mr. Vail, I believe it serves to unnecessarily demonize the inmates and prevents effective human interaction with staff. As Mr. Vail said, "Every opportunity for routine human interaction is transformed into the inmate having to converse with a person more

---

[213] *See* note 9-10 *supra.*
[214] Commission on Accreditation for Corrections, *Op. cit.*, 5-ACI-5C-16, p. 153.

ready for combat than to have a normal conversation."[215] This is wrong and, in my opinion, unnecessary.

261.    Mr. Vail also said," The problems endemic to those units are multiple-from physical plant design to routine maintenance and repair to their daily operational practices-add significant risk of harm to all prisoners, but especially prisoners with mental illness."[216] Eight years later, after inspecting the prisons, speaking with inmates, and reviewing ADCRR documents, I agree with his observations and conclusions.

### D. Supervision of Inmates

262.    There are poor sight lines preventing effective supervision of inmates from the control rooms. The layout of the runs is such that the officer in the control room cannot see the front of the cells nor see into the cells, especially where the cell doors are covered with plexiglass and mesh or steel with small round holes.

//
//
//
//
//
//
//
//
//
//
//
//
//

---

[215] Vail Report, p. 24.
[216] *Ibid.*, p. 16.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158695

View into a run from a control room at Eyman-SMU I.

263.    Neither can the control room officer hear inmates unless they yell and bang on their cell doors. One inmate (I-1) told me it can take 20 minutes for officers to respond when that happens. Given what we know about the effects of restrictive housing and the high number of inmate suicides there,[217] in my opinion and based upon my experience and training, this is dangerous.

264.    I was particularly concerned to see this in the BMU unit at Eyman where the inmates are more likely to be engaging in self-harm and there did not appear always to be an officer on the run.

265.    I observed at least one control room that was not staffed and therefore there

---

[217] *See* notes 9-10 *supra*.

were no officers observing the inmates or available to hear them if there was a problem. I note for example, that on January 18, 2020, at Browning Unit there was only one officer assigned to two control rooms and 4 floor positions were not covered due to staffing shortages. (ADCRR 000552236) Browning Deputy Warden Travis Scott confirmed that when they are short staffed, one officer may work 2 control rooms.[218] It was my observation that one cannot hear or see anything happening in the other control room at Browning from its opposite control room.  Deputy Warden Scott confirmed that a control room officer in the control booth for one cluster cannot see into the runs on another cluster.[219]

266.    Considering the staffing issues well documented in the record and spoken about by staff[220], it appears to me that the inmates in these various restrictive housing units-- except perhaps for the watch units which do appear to have an officer on the run at most, if not all, times--are essentially unsupervised. This also to my mind makes it difficult for me to understand how officers can evaluate the behavior of the inmates for purposes of advancing them along the step levels in DO 812. And it suggests to me a callous indifference to the well-being of the inmates.

267.    Especially where inmates are double bunked the presence of an officer is critical if the inmates fight, or one assaults the other. The presence of an officer who can intervene is critical in this situation.[221]

268.    Browning operates with a 40% vacancy level among correction officers according to Deputy Warden Scott.[222]

269.    I have reviewed several Post Orders.  Post Orders are, essentially, descriptions of what a person staffing a particular post is supposed to do.[223]  In the ADCRR, there are General Post Orders that apply to all people in a particular post across all facilities, and

---

[218] Scott Deposition, pp. 41-42.
[219] Scott Deposition, p. 99.
[220] Van Winkle Deposition, pp. 168-169.
[221] Fights between inmates in a shared cell is common. *See*, for example, ADCRR 00069285, 00066697, 00069280, 00069302, 00066709, 00066763.
[222] *Id*., p. 48.
[223] Strada Deposition, pp. 253-254.

there are Site-Specific Post Orders that can add to the provisions in the General Post Orders but cannot subtract from or change the terms of the General Post Orders.[224]

270.   General Orders 12 and 35, which apply respectively to Detention Unit Security Officers and Housing Unit Security Officers, provide that health and welfare checks should be done "as close to 30 minutes (as duties allow) but not to exceed one hour in the assigned area."[225]  Site-Specific Post Orders for these posts use similar language, though some of them indicate that the time between checks should not exceed 59 minutes.[226] This effectively halves the requirement that is accepted industry practice that in restrictive housing units, inmates should be personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, on an irregular schedule.[227]  The systems in which I have worked, and the systems I have assessed in my role as an expert, have had a requirement of twice-hourly health and safety checks.   Moreover, the ACA standard requires more frequent observation for inmates "who are violent or mentally disordered or who demonstrate unusual or bizarre behavior or self-harm."[228]  I saw significant evidence during my on-site inspections, as I noted in my original report, that there are people in the maximum custody and detention units who are mentally disturbed or who demonstrate unusual or bizarre behavior but are not in mental health watch.  There does not appear to be anything in ADCRR policy that provides for more frequent observation without moving the person onto watch.  Further, when asked during their depositions what happens if health and safety checks are missed, Deputy Wardens Scott and Coleman discussed the operational side of what would happen.[229]  They did not mention that the failure to conduct adequate

---

[224] *Id.* pp. 249-254.
[225] ADCRR00221155-221163 (General Order Post 12, § 1.1.1 ); ADCRR00221014-221020 (General Order Post 35 § 1.5).
[226] *See, e.g.*, ADCRR0022220657-220660 (Eyman Browning Post Order 12, § 1.7); ADCRR00220672-220686  (Eyman Browning Post Order 35 § 1.3.3); ADCRR00220705-220727 (Eyman SMU I Post Order 35 § 1.6.5).
[227] American  Correctional  Association,  Commission  on  Accreditation  for Corrections, Performance-Based Expected Practices for Adult Correctional Institutions, 5th ed., 2018, § 5-4B-0011.
[228] *Id.*
[229] Scott Deposition, pp. 20-22, Coleman Deposition, pp. 32-33.

1    health and safety checks puts inmates' health and safety at risk.

2         271.    A review of Correctional Service Log forms (105-6) indicates to me that when

3    officers do make "security checks' these are perfunctory and do not afford the officer time

4    to look into each cell (especially those covered in plexiglass) and determine the actual

5    welfare of each inmate. In many of the log forms I reviewed I found that the officers spent

6    only a minute on each run. The pattern is sufficiently repetitive for me to conclude, based

7    on my experience, that it is a common practice. For example:

8         a.   On July 6, 2019, at Browning Unit officers made their security checks on
              some runs in a minute or less (ADCRR 0012620 and 00126211 "E" pod;
9             ADCRR 00126213 and 00126214 "I" pod; ADCRR 00126215 "B" pod;
              ADCRR 00126218 "K" pod.
10

11        b.   Similarly, on July 12, 2019, security checks at Browning Unit were conducted
              in a minute on several pods. (ADCRR 00126637 "B" pod; 00126640 "K"
12            pod; 00126643 "D" pod)

13        c.   On July 17, 2020, the same pattern appears in the log for "A" pod (ADCRR
              00128067)
14
          d.   And again, the pattern is seen at Browning in 4 Baker on February 8, 2020
15            (ADCRR00129470)
16
          e.   And in SMU 1 on July 10, 2021, in 3 Clusters A and D. (ADCRR 00130075)

17        272.    Further, it is difficult to see into the cells, particularly those with plexiglass

18   over the cell front.  Below is the view into a cell at ASPC-Eyman Browning:

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158519

273. The profession believes that inmates in restrictive housing should be personally observed by a correctional officer twice an hour, no more than 40 minutes apart, on an irregular schedule.[230]  Additionally, "inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior or self-harm," should "receive more frequent observation."[231]

274. In Arizona, correctional staff are supposed to do health and safety checks of the inmates locked in these units every 30 minutes but no later than 59 minutes.[232]

---

[230] Commission on Accreditation for Corrections, 5-ACI-4B-11, p. 127.
[231] Id.
[232] Van Winkle Deposition, pp. 187-188; see also Scott Deposition, p. 21.

However, the unanimous statements of the inmates I interviewed was that officers do not regularly conduct these security checks, do not "walk" the runs.  Sometimes, depending on staffing, officers do not "walk" more frequently than every 3 hours (E-10).

275.    Arizona's policy regarding health and safety checks is inadequate and puts inmate's lives and well-being in danger.   Moreover, it is not even meeting its own substandard policy.

276.    This is an important shortcoming because inmates in restrictive housing experience emergencies including medical and psychiatric emergencies. Also, inmates who are double celled as they are in ADCRR may fight and need to be frequently observed.

**E.  Inadequate Supervision and Punitive Treatment of People with Serious Mental Health Needs**

277.    I observed several inmates who to my mind needed psychiatric attention and did not appear to be receiving it. (R-5, L-8, L-20, E-1, I-1, E-20, E-22, E-23, R-12,)

278.    In one instance I tried to interview an inmate who I believe was in detention status in SMU I (R-5) who was behaving most bizarrely.  This inmate was at the last cell on the top tier of the run, farthest from the control room.  He was standing in his cell wearing only his undershorts, not by itself unusual in the heat. However, he told me his name was "Calzin Einstein Waterszon." That was not his name. He was rocking back and forth, talking to himself for some time while I observed.  He was not in a BMU or on a Watch unit. I do not know what his status was or if he was receiving mental health care, but it did not appear so to me. If I was the Warden I would be very concerned about this inmate. There was no way for the officer in control to observe or hear this inmate and if the officers make their security checks even hourly it is, in my opinion, insufficient.

279.    Inmates on watch for self-harm are left alone in their cells for long periods of time with no possessions, no TV or Tablet and no clothing.  At ASPC-Lewis, the following sign was observed on the wall:

//

//



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00158439

280.   Notably, the blanket prohibition on property stated in this sign is contrary to both written policy and the testimony of Warden Van Winkle, both of which state that mental health staff determine what property a person on Mental Health Watch may have.[233]

281.   People on Mental Health Watch wear a "suicide smock" and are given a blanket made of the same material as the "smock," which is dehumanizing and degrading. Although such items may appropriate under certain circumstances, combined with the extreme social isolation of their housing I do not believe it is good correctional practice for these inmates to be as isolated as they are. In my experience, inmates who are suicidal require more interpersonal engagement, not isolation.

**F. Use of Force**

282.   On October 15, 2021 I received Use of Force Packets.  When the Use of Force Packets were produced, with the exception the use of force packets relating to inmate ▮▮▮▮

---

[233] DO 807 §§ 8.1.5, 8.2.3, 8.3.4; Van Winkle Deposition, p. 165.

1   ██████████████ (see below), none of the other packets were accompanied by video
2   of the incidents. In some, the packets say video exists, but the video was not made available.
3   In others there is not hand-held video with sound, but only fixed video which is silent.
4   Neither was made available, except for the ████████equently, the my initial
5   observations and conclusions I have reached were preliminary and subject to change upon
6   reviewing further information.

7       283.   However, after reviewing 18 such packets I believe that they demonstrate
8   several shortcomings with respect to the use of force in the isolation units.

9       284.   It appears to me that the correction officers and supervisors working in these
10  units are ill prepared and ill trained to properly understand and address the behaviors of
11  mentally ill prisoners. In several cases the inmates are engaging in self-harming behaviors.
12  While prompt action to protect the inmate is appropriate, the frequency with which it occurs
13  and the frequency with which the response is the resort to force, including application of
14  chemical agents, is troubling. Also, officers appear to demand strict conformance to rules
15  from inmates who, because of their mental illness, may be unable to understand or to
16  comply with those rules with the alacrity demanded. Officers appear to me often to have
17  the option of walking away; the inmate is secure in his cell and there is no immediate risk
18  of self-harm, harm to others, or of escape or property damage. In my opinion, based on my
19  education, training and experience, in situations like these, time is on the officers' side.

20      285.   Another issue involves the inability of ADCRR staff to properly supervise
21  and respond to double celled inmates and other inmates in isolation.  In each of the uses of
22  force I reviewed there was a response by the Incident Command System that involves a
23  response to the scene by additional officers from other posts within the facility. For
24  example, the daily post sheet for July 26, 2021, at Eyman SMU 1 indicates that the Incident
25  Command Services that day were to be provided by officers Pablo Hernandez, Ray
26  Miranda, Eevin Badriyah, Petya Lozanova and Phillip Zamora—but each of these officers
27  had another assignment that day as well.  For example, Hernandez was 3 A/D floor officer,
28  Badriyah was 2 A/D floor officer, and Miranda was 4 A/D floor officer. Each of these officers

1    might have to leave their post in the event of an ICS activation.  Although I can't say

2    whether and how often that occurred on July 26, 2021, the point is evident--if and when it

3    happened, the pods they were supposed to be covering went uncovered for some period of

4    time.  Combined with the shortage of staff discussed previously, this means that inmates in

5    isolation, several if not many with mental illness, were not being properly observed. This is

6    dangerous.

7         286.    The fact that no video is even maintained for several of the instances of use

8    of force reviewed is troubling. Especially in isolation units it is important for the safety of

9    all parties, and it is sound practice, to have a functional video recording system that observes

10   cell fronts and common areas from several angles and that retains the video for a substantial

11   period of time. With advanced technology the storage costs of retaining video have come

12   down and are employed well in many jurisdictions. Video not only preserves a real time

13   record of who did what and when, but also may serve as a valuable training tool.

14        287.    Although preliminary, my review of the use of force packets left me with the

15   concerns or questions set out below.

16        288.    ███████████:  In this instance inmate ███████████ is

17   described as having a seizure and as disoriented and yet is taken to the ground.  Without

18   viewing the video I cannot render a judgment about whether the use of force here was

19   unjustified or excessive.

20        289.    ███████████: Similarly, an incident involving inmate ███████

21   described him as having been placed on 10-minute watch due to decompensating and

22   refusing and ignoring orders to get into compliance with the written watch orders.  If this

23   inmate was indeed decompensating it is not unreasonable to conclude that he was at that

24   moment incapable of understanding or following "written" orders. Although a mental health

25   professional was on scene, the inmate continued not to comply and after application of

26   chemical agent an extraction team entered the cell and restrained the inmate. The staff was

27   seeking immediate understanding and immediate compliance.  I believe that given more

28   time and perhaps taking the inmate to the mental health unit for further evaluation and

1    treatment by a mental health professional this use of force could have been avoided.

2       290.   ███████████ : ████████████ is observed attempting to

3    commit self-harm with a button from a pair of pants. Chemical agent was applied twice and

4    after the second burst the inmate complied with orders to stop and he submitted to restraints.

5    There is no indication that a mental health professional was asked to respond or that the

6    threat of self-harm was real and immediate. Indeed, to their credit, the supervisors at Eyman

7    SMU 1 concluded the same thing. "The use of force was not necessary. The force used was

8    not appropriate. The officer used chemical agents on an inmate for a cell view obstruction.

9    The officer never activated ICS or reported his use of force to a supervisor."

10      291.   ███████████ : ██████████ wanted a "medical blanket" and

11   was verbally abusive toward staff.  Rather than deescalating the situation and backing off,

12   the officer continued to engage with the inmate and ultimately the inmate threw water filled

13   bottles at an officer.  Chemical agents were used and the inmate ultimately submitted to

14   restraints.  Without the video of the incident, it is difficult to reach a firm conclusion,

15   however, in my professional opinion, based upon my education, training and experience I

16   believe that this incident might have been avoided if the officer had backed off for a few

17   minutes. The inmate was secure in his cell, he wasn't going anywhere, was not attempting

18   self-harm, and was not harming anyone else. I don't see the urgency of using force in this

19   situation.

20      292.   Several use of force incidents were impossible to evaluate from the written

21   reports alone:

22   •   ██████████████ was a known SMI inmate, and subject to the use of force

23       while being escorted to recreation.

24   •   ████████████ was a known SMI inmate, was subjected to the use of force for

25       resisting court-ordered psychiatric medications.

26   •   ███████████████ was also a known SMI inmate, attempting self-harm with

27       plastic cutlery.

28   •   ████████████████ was a known SMI inmate ██████████ was attempting

self-harm with a clothesline—the record does not indicate a mental health professional was asked for by the custodial staff on the scene.

- ████████████████ was attempting to pick at an existing wound, removing a bandage off his arm, the officer administered chemical agent, no effort was made to obtain assistance from a mental health professional.  No video of the incident exists.

- ████████████████ is an inmate known to have an SMI.  He was observed punching and hitting his head on the cell front and stated, "I am going to cut my arm off." Chemical agents were applied before a mental health professional was called for.  Although video exists, without seeing it I am unable to render a judgment about whether the officers could have waited longer before administering the chemical agent.

- ████████████████ was assaulting an officer, outside his cell, no video is available.

293.   Finally, the use of force packets reflected frequent uses of force against certain individuals.  In addition to ████████████, discussed in detail below, there were two other inmates, both known to be SMI, who were repeatedly subjected to uses of force at Florence-Kasson. ████████████████, was the subject of 14 uses of force just during the month of July 2021. Nearly all of these uses of force were related to his self-harm. ████████████, discussed above, was the subject of eight uses of force during the month of July 2021 alone.  Again, nearly all of these instances related to his self-harm.

   **1.** ████████████████

294.   According to the records provided, beginning in August 2020 at Eyman SMU 1, this inmate was repeatedly the subject of several uses of force by means of the application of chemical agents.

295.   On August 17, 2020, at 649 AM, while on continuous watch, he was observed engaging in self-harming behavior by banging his head on his cell door. He failed to comply with verbal orders to stop, ICS was activated and following application of chemical agents he stopped. He was decontaminated but there is no indication that a mental health

professional was on the scene or that evaluation was performed thereafter.  He had previously been placed on watch status by psych staff because the health unit was closed due to COVID , this suggests to me that the psych staff had some concerns about his mental health status. Nonetheless, custodial staff did not see him as an SMI inmate.

296.    On August 20, 2020, at 1220 PM at SMU 1, he was still on continuous watch when he again engaged in the same self-harming behavior.  An ICS alarm was again initiated and ███████ was instructed verbally by the watch officer to cease the head banging but he did not comply.  The officer administered chemical agents and ███████ stopped banging his head.  He was decontaminated and there were no further issues.  Although he was taken to medical for "evaluation and decontamination," it is not apparent in the file if any psychiatric or mental health professional evaluated him. No further action was "needed," and the Use of Force Committee deemed the use of force necessary to stop the self-harm.

297.    The next record I reviewed shows that again, on December 11, 2020, now at Eyman Browning Unit, ███████ was in a watch pod cell when, at 1135 AM, a Sergeant entered the watch pod and observed him banging his head and refusing verbal directives.  The Sergeant activated the ICS and gave ███████ "one final verbal directive to stop banging his head or chemical agents would be deployed in to the cell…" the inmate did not comply and chemical agents were deployed whereupon ███████ complied and was placed in restraints.  In this event, following decontamination he was evaluated by "Psych Luffman," and cleared to return to his cell.  Nonetheless, there is no indication that any mental health professional was on the scene or attempted to defuse the situation prior to the application of the chemical agent.  The Chief of Security noted this is, "the same self injurious," behavior and the Deputy Warden observed, "The inmate has continued to inflict self-harm despite intervention from mental health staff."  The Use of Force Committee found the use of force proper.

298.    Next, on December 15, 2020, at Eyman Browning Watch pod at 1134 AM Sgt. Lopez activated ICS because ███████ was again banging his head on the cell and

"refusing all verbal directives to stop causing self-harm." The Sergeant then deployed chemical agents and ███████████ complied and was placed in restraints. There is no indication that mental health staff was called for or was present prior to the application of chemical agents. The Deputy Warden noted, "Inmate has had multiple incidents of self-harm," and the Use of Force Committee found the use of force proper. There is nothing in the record to demonstrate any involvement by mental health personnel.

299. Next day, December 16, 2020, at 1121 AM in Eyman Browning watch pod a Sergeant activated ICS because the inmate was banging his head on the cell front and refusing verbal directives to stop causing self-harm. The Sergeant administered chemical agents and the inmate complied with verbal directives and was placed in restraints. ███████████ was taken to medical for evaluation, but was not decontaminated. Someone who may have been mental health staff talked to ███████████ for about two minutes in the medical office, with correctional officers and medical staff present.

300. The Chief of Security noted that ███████████ was on continuous watch, "when he began self harming for the seventh continuous day." The Deputy Warden observed that, "Inmate ███████████ continues to attempt to severely injure himself through banging his head on the cell front." Warden stated the inmate, "continues to create self-harm by banging his head." Nothing in the use of force packet indicates that mental health evaluation or consultation was requested or obtained.

301. On December 17, 2020, at 1136 AM in Eyman Browning watch pod an officer conducting a security check observed the inmate banging his head against the cell front. The officer gave ███████████ "several loud verbal directives to stop banging his head, to which he refused all directives." The officer then had ███████████ shot with pepperballs. There is no indication that mental health staff was called for or responded to the incident. Likewise, this incident raises in my mind the question of where the assigned watch officer was and why he did not observe the behavior? The video shows that ███████████ was decontaminated only after leaving medical, about 10 minutes after he was shot with the pepperballs.

302.   The Chief of Security observed, "this notes the eighth consecutive day of Inmate ████████ committing self harm with this exact same behavior." The Use of Force Committee noted that the inmate was, "treated by medical returned to watch." There is no indication that there was any mental health evaluation performed.

303.   On December 18, 2020, at 950 AM, in Eyman Browning watch pod, the same Sergeant activated ICS because ████████ was banging his head on the cell front and causing self-harm. The Sergeant directed an officer to deploy the "pepper ball launcher," which was done 4 times, striking the inmate in the lower left back, right lower back on the left elbow and to the top of the cell. There is no indication that mental health staff was called for or arrived prior to the use of the pepper ball launcher. After the chemical agent from the pepper ball launcher were deployed ████████ complied with directives and was placed in restraints. He was decontaminated and the inmate was returned to his cell. At 1010 AM ████████ again commenced banging his head on the cell front and the officer was again instructed by the Sergeant to use the launcher, firing three rounds of pepper balls striking the inmate twice on the chest and "one round for saturation." Thereafter the inmate complied with directives and was decontaminated, upon return to his cell he again commenced the behavior and three more rounds of pepper ball were deployed striking ████████ in the chest twice and once in the stomach. He was treated by medical staff, and after consulting with Dr. Carr inmate agreed to receive an "injection of medication to stabilize the inmate." Thereafter he was cleared to return to his cell and the incident ended.

304.   The Chief of Security noted in his review that this was, "now the ninth consecutive day that this inmate committed self-harm while on watch and that the force used was "reasonable and justified." The Deputy Warden upon review noted, "Inmate ████████ has been continuing to bang his head for over a week. Medical and psych staff have intervened on several occasions without success. His risk for significant injury increases as he continues to bang his head on his cell front," the use of force was deemed appropriate and necessary.

305.   On December 21, 2020, at 841 AM in Eyman Browning watch pod the

Sergeant again activated the ICS because ███████ was banging his head on the cell front and refusing all verbal orders to stop.   After giving the inmate several "clear verbal directives," to stop, he deployed chemical agents, this time from his mark-9 fogger.   The inmate complied with directives and was placed in restraints and taken to medical for evaluation and then for decontamination.   There is no indication that mental health personnel were called for or on scene prior to the application of chemical agent.

306.   The Chief of Security reviewing the incident stated that, "This inmate has been staffed by mental health personnel for potential housing at BMU."   The Deputy Warden and the Use of Force Committee reviewed the incident and deemed the use of force necessary to prevent injury.

307.   On December 22, 2020, at 1030 AM in Eyman Browning watch pod, a Sergeant responded to inmate ███████ committing self-harm.   He gave three verbal directives to stop and the inmate refused, another officer then administered chemical agent whereupon the inmate submitted to restraints.   They escorted inmate to the health unit where he was cleared medically and taken to decontamination. There is no indication that mental health staff were involved at any time.

308.   Reviewing the incident, the Chief of Security noted, "this self-destructive behavior continuously displayed by this inmate is a disruption to the operations of Browning Unit.   The inmate should be housed in an environment better suited for his behavioral management."   The Deputy Warden noted, "Medical and mental health continue to consult for better options.   The overall consensus is that this is a behavioral issue and not a mental health crisis."   The Use of Force Committee took no issue with this use of force.

309.   On December 23, 2020, at 1007 AM an officer activated ICS because inmate ███████ was committing self-harm by banging his head and shoulders against the cell front door.   A Sergeant responded and "tried to reason with inmate ███████ with negative results."   ███████ tried to climb over the toilet and the Sergeant deployed OC spray whereupon the inmate complied to submit to restraints.   ███████ was decontaminated and then cleared by medical and "placed in assessment mode at 1022

hours."

310.   At 1045 AM ███████ again began to bang his head against the cell front door and the Sergeant gave him verbal orders to stop which he ignored.  OC spray was again administered to ███████ who then submitted to restraint and was escorted back to the health unit where medical staff evaluated him.   At 1057 AM Psych staff arrived for evaluation, and ███████ was placed in a helmet and mittens to stop further harm to himself for his own safety.  He was then kept in a holding enclosure under an officer's observation until 223 PM when the helmet and mittens were removed and he was returned to his cell on the watch pod.

311.   Review by the Chief of Security found the use of force "appropriate and justified."  The Deputy Warden noted that, "due to the continued self-harm designated staff are assigned to assist with inmate ███████ in conjunction with a mental health behavior plan," and the Use of Force Committee took no issue with the use of force in this instance.

312.   Because of the recency and the volume of the production of documents and videos relating to the uses of force against ███████, I have not had the opportunity to review all of them. It is my understanding that ADCRR has produced the following regarding uses of force against ███████ since August 1, 2020:

Use of Force Packets:

- 8/9/20
- 8/11/20
- 8/13/20
- 8/17/20
- 8/19/20
- 11/9/20
- 12/10/20-12/13/20
- 12/15/20-12/18/20
- 12/21/20-12/25/20
- 12/29/20

1   • 7/5/20

2   • 7/8/21

3   • 7/9/21

4   • 7/12/21

5   • 7/13/21

6   Videos of the use of force:

7   • 8/9/20

8   • 8/11/20

9   • 8/17/20

10   • 8/19/20

11   • 11/9/20

12   • 12/10/20-12/13/20

13   • 12/15/20-12/18/20

14   • 12/21/20-12/25/20

15   • 12/29/20

16   • 1/20/21

17   • 3/12/21

18   • 4/4/21

19   • 4/10/21

20   • 4/18/21-4/20/21

21   • 4/22/21

22   • 5/22/21-5/23/21

23   • 6/23/21

24   • 6/27/21

25   • 6/28/21

26   • 7/5/21

27   • 7/8/21

28   • 7/9/21

1          • 7/12/21

2          • 7/13/21

3          313.   This is an extraordinary number of uses of force against one individual who

4  is not outwardly aggressive over the course of a year.

5          314.   This is a very disturbing case. I have no doubt that ██████████

6  presented grave challenges to the staff at Eyman Browning and at SMU 1.   However, I

7  believe that this matter could have and should have been better managed.

8          315.   I also question whether we have seen the full file of documents relating to all

9  uses of force involving this inmate dating back at least as far as August 2020.  Notably,

10  there are many more videos of the use of force against ████████   than there are use of

11  force packets.

12          316.   In my professional opinion over the four months covered by the documents

13  reviewed, earlier involvement and consultation with mental health professionals was called

14  for. The failure to seek such intervention until December 2020 is troubling.  Although I am

15  a layman and not a mental health professional I question that this inmate was not judged to

16  be SMI during the entire period reviewed. This is especially so because in several of the

17  accompanying videos the inmate is observed and heard to say that voices are telling him to

18  engage in this self-harming behavior, although this is never noted in the written reports.

19          317.   Custodial staff demonstrated commendable forbearance and patience with the

20  inmate in each individual incident, however, I must question whether the supervisory and

21  administrative staff of the Browning and SMU units were sufficiently trained to understand

22  the nature of the inmate's mental illness, or to deal appropriately with his behavior.

23  Certainly a behavioral management plan or transfer to a unit better equipped to handle the

24  challenges inmate ████████   presented could have been sought and crafted earlier. It is

25  noted that on at least one occasion medication was administered that appears to have

26  ameliorated the inmate's behaviors . Could this not have served as a regimen to be followed

27  to avoid self-harm going forward? Was it considered and if so, why was it not used? If it

28  was not considered, why not?

318.   And in each instance reviewed, while it is true a risk of self-harm existed, nonetheless effort could have been made to obtain intervention from a mental health professional prior to the administration of the chemical agent. However, it does not appear that is part of the ADCRR response.

319.   I have only been able to review Incident Reports (form 804-2a) and videos for a limited number of uses of force incidents, all involving SMI inmates and the use of chemical agents in Maximum Custody units. Given the limited scope of these I am unable to render an opinion concerning the use of force involving inmates in restrictive housing generally.  I reserve the right to enlarge my findings and conclusions when and if further documentation is provided.

**G. Use of Restrictive Housing in Arizona Endangers Public Safety**

320.   Employing restrictive housing under the conditions I observed, is contrary to public safety and increases the inmates' likelihood to fail upon release to the community.

321.   I spoke with an inmate (E-17) who was housed in Maximum Custody for 10 years as a validated STG member. He was released to the community in February 2021 but returned to prison within 3 months, in July 2021.  He says he has been in prison since he was 18 years old; he is now in his late 30s.  He asked for help preparing for his return to the community but received none.  He says that after 10 years in restrictive housing he is uncomfortable with people around.  He had earned his GED during incarceration on a prior sentence, but that while in STG status in Maximum Custody received no programming to prepare him for release.  He said he had never been charged with assault and had not received a disciplinary report for years. He was back in Maximum Custody only because of his prior STG status. He said that his opportunity to participate in group recreation is cancelled regularly due to short staffing.  He says if recreation is cancelled showers are cancelled that day also, depending on the officer on duty that day.  He is not permitted to participate in programs that might earn him a sentence reduction and that the last two weeks the "class" for Maximum Custody has been cancelled.  He says he receives no addiction

treatment and does not get out of his cell for anywhere close to 7.5 hours a week.

322.    Another inmate (E-13) who has been in Maximum Custody as a validated STG member for 15 years told me he is going to the parole board next year and has requested but not received any preparation for release or assistance in finding a job or a place to live. He has been not received a disciplinary report since 2003 and told me he gets emotional for no reason.  Releasing this man to the community directly from Maximum Custody after all this time would perpetuate a hardship not only on him, but also on the community he will return to.

**H. Concerns Regarding Director Shinn's Knowledge of and Engagement in the Use and Conditions of Isolation in ADCRR**

323.    I reviewed the deposition of ADCRR Director David Shinn, taken on October 21, 2021.  Director Shinn was asked whether ADCRR had, since his appointment in 2019, increased the amount of time that maximum custody prisoners were getting out of their cell. He stated that it had, but could not give any basis for his belief that it had, nor could he identify any documents that would reflect the claimed increase in out-of-cell time.  His responses were limited to an assertion that ADCRR was looking for "every opportunity to get folks out of cell" and that he believed there were documents that would reflect the out of cell time that had been produced to Plaintiffs.[234] As a manager of a prison system, it is critical to know what is happening in the system: if you can't measure it, you can't manage it.  The failure of Director Shinn to provide any substantive response to the questions about out-of-cell time for maximum custody inmates suggests a concerning lack of knowledge about what is happening.

324.    Director Shinn also testified that people who are on mental health watch "do not have the ability in that moment of crisis to participate [in out of cell time]."[235]  This is contrary to policy, and to the testimony of the Deputy Wardens who stated that whether a

---

[234] Deposition of Director David Shinn, October 21, 2021 (hereinafter "Shinn Deposition"), pp. 118-123.

[235] Shinn Deposition, pp. 130-131.

person was able to go to recreation while on mental health watch is a clinical judgment of the mental health professionals.[236]   Director Shinn evidences a disconnect between what his own staff  know to be true, as explained by ADCRR Warden Jeffrey Van Winkle who said, out of cell time is, "…actually really good for the inmate's mental health state. It's good for the inmate to get out and about, talk with others,"[237] and actual ADCRR practice.

325.   Director Shinn testified that he had repeatedly written letters, which he believed to be true, stating that the daily operational strength at Florence and Eyman was frequently between 40% and 50%.[238]  He further stated in the letters that the high number of vacancies in these high security prison complexes "cause operational strain, contribute to unsafe working conditions for staff, and unsafe living conditions for inmates, and curtail access to inmate programming," and testified that he believed the statements to be true.[239] I agree that running high security prison complexes with such high levels of vacancies contributes to unsafe working and living conditions and results in the curtailment of inmate programming.  Further, the Information Reports (105-2(e)) filed concerning cancellation of activities, out-of-cell time tracking forms and Detention Records I have reviewed show clearly that inmate out-of-cell time is, in fact, being severely negatively impacted by the lack of staff, compromising the health and well-being of the affected inmates.

326.   When asked at his deposition about the penological justification for requiring that all persons coming into ADCRR on a life sentence spend two years in maximum custody, Director Shinn did not have an answer; he stated that he did not have "that information" in front of him.[240]  Similarly, when asked about "overrides" that result in people who have scored to a lower classification level nonetheless going to maximum custody, his responses were based on generalized claims that the overrides served the

---

[236] DO 807 § 7.6; Scott Deposition, pp. 124-125; Stickley Deposition, pp. 121-122. Notably, Deputy Warden Scott testified that even if mental health staff said a person on watch could have recreation, it would usually not be possible, due to the physical layout and staffing levels at Eyman Browning.  Scott Deposition, 126-129.
[237] Van Winkle Deposition, p. 132.
[238] Shinn Deposition, pp. 134-136, 138-141.
[239] Shinn Deposition, pp. 134-136.
[240] Shinn Deposition, p. 145.

interest of protecting the security of the person who was being sent to maximum custody.[241] The research evidence does not support this assertion and increasing an individual's classification because of the notoriety of the crime or publicity surrounding it does not protect the security of the person being classified.[242]

327.   Director Shinn testified that he doesn't know how many people have been at Step 3 in the step level program for an extended period and that the only way to find that out is by going through individual files.[243] For a prison system to know how it is performing, and to improve its performance, it must have a way of measuring.  That which is not measured is not managed.  The failure of ADCRR to track in any meaningful way the amount of time people spend in maximum custody demonstrates a lack of interest in the well-being of the people in these units.

328.   Finally, Director Shinn testified that ADCRR does not in any way track the frequency of OC spray use or the number of uses of OC spray in total, in each housing unit, or by each officer.  Without such information, ADCRR cannot determine whether there is a problem with the excessive use of OC spray, or appropriately address any problems that there are.

329.   There is obvious misunderstanding and confusion among the top leadership of the prisons and the ADCRR itself, up to and including Director Shinn, about what is happening within these confinement units as to out-of-cell time, conditions of confinement, inmate showers, laundry and linen exchange, severe heat procedures and the use of isolation as a result of inmate classification processes and practices.  These contribute to the overuse

---

[241] Shinn Deposition, pp.145-158.
[242] According to one study, "Comparative data showed that convicted murderers did not account for a disproportionate share of prison violence, however defined. Furthermore, negative binomial regression models revealed that convicted murderers were not significantly more likely to engage in disciplinary misconduct or commit acts of institutional violence than were inmates serving time for other offenses." Sorensen J, Cunningham, MD, *Conviction Offense and Prison Violence: A Comparative Study of Murderers and Other Offenders*. Crime & Delinquency. 2010;56(1):103-125. (https://journals.sagepub.com/doi/10.1177/0011128707307175, downloaded October 1, 2021).
[243] Shinn Deposition, pp. 158-163.

of isolation and a wide disparity between policy and practice by officers and supervisors within these units, further exacerbated by chronic short staffing.

## VII.   FINDINGS

**330.   The ADCRR overuses isolation. There are more inmates held in restrictive housing than are necessary. The lack of a rational basis for who to confine in restrictive housing leads to overuse. More inmates are in restrictive housing than require that level of security.**

331.   As of October 1, 2015, based on a survey of state and federal correctional agencies, 4.9% of the prison populations were housed in restrictive housing, defined as the population held in-cell 15+ consecutive days for 22+ hours per day.[244] Arizona substantially exceeds that.[245]

**332.   The ADCRR employs isolation in restrictive housing for categories of inmates without regard to an objective consideration of the risk the inmate poses to the safe and secure operation of the prison.**

333.   ADCRR has an overly broad definition of who needs to be in restrictive housing including inmates based solely on their conviction offense, notoriety, or the nature of their crime.[246] ADCRR employs a classification process that is open to abuse and offers very broad and unreviewed discretion to staff to place inmates in restrictive housing for a wide variety of behaviors.

---

[244] United States Department of Justice, National Institute of Corrections, *Objective Prison Classification: A Guide for Correctional Agencies*, 2d ed. Washington, D.C. September 2021, p. 14.

[245] Based on the September 30, 2021, report of ADC Institutional Capacity Committed Population with at least 2678 inmates in some form of restrictive housing and a total of 27,794 inmates, 9.6% of ADCRR inmates are in restrictive housing.

[246] According to one study, "Comparative data showed that convicted murderers did not account for a disproportionate share of prison violence, however defined. Furthermore, negative binomial regression models revealed that convicted murderers were not significantly more likely to engage in disciplinary misconduct or commit acts of institutional violence than were inmates serving time for other offenses." Sorensen J, Cunningham, MD, *Conviction Offense and Prison Violence: A Comparative Study of Murderers and Other Offenders*. Crime & Delinquency. 2010;56(1):103-125. (https://journals.sagepub.com/doi/10.1177/0011128707307175, downloaded October 1, 2021).

334.   According to the National Institute of Corrections, "The vast majority of incarcerated individuals never become disruptive or difficult to manage. The most serious forms of disruptive behaviors within a prison, such as homicide, escape, aggravated assault on others or staff, and rioting, are rare events."[247]

335.   ADCRR employs categories of restrictive housing that are outside the operation of its classification process, broadly discretionary, unappealable and unreviewed.

336.   ADCRR has an unusually and unnecessarily complicated process for moving inmates through the various stages of Maximum Custody and a program matrix that is difficult for the inmates to follow. Consequently, inmates do not know how to extricate themselves from restrictive housing.

337.   ADCRR leaves inmates in Maximum Custody beyond the time they have completed their "program" and uses Close Management to extend an inmate's time in restrictive housing without a fair process of review and consideration.

338.   Inmates in Enhanced Management and Restrictive Housing as well as inmates in Close Management are not afforded a clear pathway out of that status.

339.   **The ADCRR places persons who are SMI in restrictive housing without consideration of their mental health needs.**

340.   The record indicates to me that inmates are place in various categories of restrictive housing and subject to the deprivations of that status without regard to their SMI or mental health needs or the effects of long-term social isolation on their well-being.

341.   **ADCRR double punishes inmate misbehavior.**

342.   Based upon my review of the policies and the histories of the inmates in various categories of restrictive housing in the ADCRR who I interviewed during my September 2021 visit, it appears to me that many inmates, in addition to receiving a disciplinary sanction such as loss of privileges or loss of good time are subsequently and as a result of the discipline reclassified to Maximum Custody or placed in Detention or Close

---

[247] *Id.*, p. 13.

1   Management in addition to any penalty imposed for the disciplinary violation itself.  Deputy

2   Warden Scott explained at his deposition the reasons inmates are placed in Close

3   Management as, "Having drugs, having phones, assaults, minor assaults, disruptive

4   behavior on a close custody, not conforming to close custody."[248]

5          343.    Inmates who violate DO 704 rules, rather than receiving a disciplinary report

6   are instead determined to have refused recreation or programs and denied these critically

7   important activities. This summary punishment is used as an informal and undocumented

8   sanction.

9          344.    **The duration of inmate stays in restrictive housing contribute to overuse.**

10         345.    Inmates are remaining in restrictive housing longer than necessary and longer

11   than required by ADCRR policies.  During my interviews I identifies inmates (see above)

12   who had been in restrictive housing for periods of up to 15 years.  Inmates interviewed had

13   been free of any discipline for years at a time yet were continued in restrictive housing

14   without explanation.  Inmates who had met the requirements set forth in the various

15   ADCRR policies were nonetheless kept in restrictive housing for long periods of time after

16   they had seemingly met the requirements for return to close custody. ADCRR uses Close

17   Management, Detention and Restrictive Housing to extend the stay of inmates in restrictive

18   housing rather than allowing the inmate to return to close custody.

19         346.    **Inmates do not receive meaningful reviews of their progress toward**

20   **higher step levels or release from restrictive housing.**

21         347.    Based on my interviews and review of depositions I find that there is no

22   systematic, reviewable method for noting making note of an inmate's progress toward step

23   level requirements or lack of compliance with DO 704 rules.  If notations of non-compliance

24   are made on an Information form, it is not provided to the inmate nor is the inmate afforded

25   an opportunity to challenge or contest the allegation. Individual officers each have their

26   own way of keeping track or don't.  The greater likelihood based upon staffing levels and

27

28         [248] Scott Deposition, p. 85-86.

1    my observations is that officers do not have the time to keep track of inmate behaviors and

2    progress.  Step level reviews are brief to the point of perfunctory and no record of those

3    review is maintained. The inmate is not provided a statement of the substance of those

4    reviews based upon which to modify his or her behavior.

5         348.    **The conditions in restrictive housing including Maximum Custody, Close**

6    **Management, Detention, STG Step Down, Watch are unhealthy, unsanitary,**

7    **conducive to the physical and mental deterioration of the inmates housed there.**

8         349.    As noted above the cells, housing units and bathing facilities at ASPC Lewis

9    (other than Rast Max) were poorly ventilated, unclean, unsanitary and many cells were

10   crowded, holding two inmates in an insufficient amount of space.

11        350.    The way the restrictive housing units operated at ASPC Lewis and at ASPC

12   Eyman were inconsistent, did not conform to the written policies of the ADCRR or the

13   settlement and subjected the inmates to unnecessary hardships including insufficient out of

14   cell and outdoor exercise, lack of mental stimulation, inability to maintain their cells to a

15   satisfactory level of cleanliness.

16        351.    **Restrictive Housing units are operated in an unsafe manner.**

17        352.    As described above, there are an insufficient number of officers available to

18   supervise the inmates adequately and properly in restrictive housing in a fashion that keeps

19   them safe.  Additionally, sight lines and ability to hear inmates make supervision from the

20   control rooms inadequate, the officer in control cannot see into the cells or hear inmates and

21   cannot know if an inmate is self-harming, in distress, or if two inmates are fighting.  The

22   frequency and duration of security checks made by officers on the pods is insufficient to

23   properly determine whether an inmate is in distress or not.  The way in which many of the

24   cell fronts are constructed and the use of plexiglass coverings make it nearly impossible for

25   officers to see into the cells when making their rounds of brief duration.  In some pods there

26   are serious life safety shortcomings.

27        353.    **Inmates do not have the opportunity to leave their cells for recreation,**

28   **programs, and exercise.**

354.   As discussed above, inmates in all categories of restrictive housing are not receiving the amount of time outside of their cells and actual outdoor exercise necessary to maintain their well-being. The actual practices at ASPC Lewis and ASPC Eyman that I observed, that are documented in the Correctional Service Logs and the Out of Cell Time reports as well as the deposition testimony of ADCRR staff demonstrate that most inmates do not get to leave their cells for the one hour per day five days a week recommended by the profession. Moreover, although some inmates may take advantage of the opportunities offered to them to leave their cells for up to 3.5 hours, 3 days a week-and some may be left in outside recreation areas for even longer than 3.5 hours-most inmates are not getting out of their cells for the requisite number or hours.  The ADCRR staff uses a variety of means to obscure the reality of what is happening and inmates both refuse recreation for a variety of reasons and are often recorded as refusing recreation when they have not.  ADCRR does not have sufficient staff to operate the restrictive housing units the way they say they do, and recreation and programs are often cancelled.

**VIII. CONCLUSION**

355.   Earlier I set forth 11 criteria by which to determine whether, as operated, the ADCRR restrictive housing program is operated in a fashion consistent with the practices of the community of corrections professionals.

356.   Restrictive housing is not used only when there is no alternative disposition to control the inmates' behavior, nor is it used when other alternatives might be sufficient to alter the findings of objective classification factors.

357.   ADCRR does not give due consideration to the special needs of inmates when placing them in restrictive housing.

358.   Not all inmates in restrictive housing receive reviews leading to meaningful outcomes. Many do not receive any reviews and those that do receive perfunctory reviews, are not told the outcomes of the reviews, and are not told what they need to do differently to obtain release from restrictive housing.

359.   I did not assess the timeliness or adequacy of medical and mental health care

provided to inmates in restrictive housing.

360.    Inmates in restrictive housing are not afforded the equipment, supplies and opportunities to maintain proper levels of personal hygiene.

361.    Staff assigned to work in restrictive housing are not provided with specialized training that reflects the challenges associated with this type of assignment.

362.    Staff assigned to work in restrictive housing are not provided with specialized training that reflects the challenges associated with this type of assignment.

363.    There is no indication that correctional mental health authorities work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for individuals in restrictive housing.

364.    Inmates in restrictive housing have access to natural light only indirectly through skylights in common areas or windows on facing walls. Most inmates cannot see a horizon.

365.    Inmates in restrictive housing do not have adequate environmental conditions and many do not have adequate living space. Ventilation appears inadequate and temperatures excessively high.

366.    I did not assess the frequency or adequacy of periodic mental health examination to determine whether changes in conditions of confinement were warranted for mental health reasons.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November  2 , 2021, in  Sarasota, Fl

_____
MARTIN HORN

1    Respectfully submitted,

2    Dated: November 3, 2021                    **ACLU NATIONAL PRISON PROJECT**

3
                                               By:  s/ Maria V. Morris
4                                                   David C. Fathi (Wash. 24893)**
                                                    Maria V. Morris (D.C. 1697904)*
5                                                   Eunice Hyunhye Cho (Wash. 53711)**
                                                    915 15th Street N.W., 7th Floor
6                                                   Washington, D.C. 20005
                                                    Telephone: (202) 548-6603
7                                                   Email:   dfathi@aclu.org
                                                             mmorris@aclu.org
8                                                            echo@aclu.org

9                                                   Corene T. Kendrick (Cal. 226642)*
                                                    39 Drumm Street
10                                                  San Francisco, California 94111
                                                    Telephone: (202) 393-4930
11                                                  Email:   ckendrick@aclu.org

12                                                  *Admitted *pro hac vice*
                                                    **Admitted *pro hac vice*. Not admitted in
13                                                  DC; practice limited to federal courts.

14                                                  Donald Specter (Cal. 83925)*
                                                    Alison Hardy (Cal. 135966)*
15                                                  Sara Norman (Cal. 189536)*
                                                    Rita K. Lomio (Cal. 254501)*
16                                                  Sophie Hart (Cal. 321663)*
                                                    **PRISON LAW OFFICE**
17                                                  1917 Fifth Street
                                                    Berkeley, California 94710
18                                                  Telephone: (510) 280-2621
                                                    Email:   dspecter@prisonlaw.com
19                                                           ahardy@prisonlaw.com
                                                             snorman@prisonlaw.com
20                                                           rlomio@prisonlaw.com
                                                             sophieh@prisonlaw.com
21
                                                    *Admitted *pro hac vice*
22
                                                    Victoria López (Bar No. 330042)*
23                                                  Jared G. Keenan (Bar No. 027068)
                                                    **ACLU FOUNDATION OF ARIZONA**
24                                                  3707 North 7th Street, Suite 235
                                                    Phoenix, Arizona 85013
25                                                  Telephone: (602) 650-1854
                                                    Email:   vlopez@acluaz.org
26                                                           jkeenan@acluaz.org

27                                                  *Admitted pursuant to Ariz. Sup. Ct. R.
                                                    38(d)
28

Daniel C. Barr (Bar No. 010149)
John H. Gray (Bar No. 028107)
Austin C. Yost (Bar No. 034602)
Karl J. Worsham (Bar No. 035713)
Kathryn E. Boughton (Bar No. 036105)
Mikaela N. Colby (Bar No. 035667)
Kelly Soldati (Bar No. 036727)
Alisha Tarin-Herman (Bar No. 037040)

**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:    dbarr@perkinscoie.com
             jhgray@perkinscoie.com
             ayost@perkinscoie.com
             kworsham@perkinscoie.com
             kboughton@perkinscoie.com
             mcolby@perkinscoie.com
             ksoldati@perkinscoie.com
             atarinherman@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm; Desiree*
*Licci; Joseph Hefner; Joshua Polson; and*
*Charlotte Wells, on behalf of themselves and*
*all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:  s/ Maya Abela
         Asim Dietrich (Bar No. 027927)
         5025 East Washington Street, Suite 202
         Phoenix, Arizona 85034
         Telephone: (602) 274-6287
         Email:    adietrich@azdisabilitylaw.org

         Rose A. Daly-Rooney (Bar No. 015690)
         Maya Abela (Bar No. 027232)
         **ARIZONA CENTER FOR**
         **DISABILITY LAW**
         177 North Church Avenue, Suite 800
         Tucson, Arizona 85701
         Telephone: (520) 327-9547
         Email:
             rdalyrooney@azdisabilitylaw.org
                 mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

LEGAL23774493.1                                                 -107-

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2021, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com

*Attorneys for Defendants*

s/ Jessica Carns