1   Victoria Lopez (Bar No. 330042)*
    Jared G. Keenan (Bar No. 027068)
2   **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3   Phoenix, Arizona 85013
    Telephone: (602) 650-1854
4   Email: vlopez@acluaz.org
              jkeenan@acluaz.org
5   *Admitted pursuant to Ariz. Sup. Ct. R. 38(d)

6   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
    *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy*
7   *Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,*
    *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
8   *behalf of themselves and all others similarly situated*

9   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

10  Asim Dietrich (Bar No. 027927)
11  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
12  Phoenix, Arizona 85034
    Telephone: (602) 274-6287
13  Email: adietrich@azdisabilitylaw.org

    *Attorneys for Plaintiff Arizona Center for Disability Law*
14
    **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**
15

16                  UNITED STATES DISTRICT COURT

17                       DISTRICT OF ARIZONA

18  Victor Parsons; Shawn Jensen; Stephen Swartz;
    Dustin Brislan; Sonia Rodriguez; Christina
19  Verduzco; Jackie Thomas; Jeremy Smith; Robert      No. CV 12-00601-PHX-ROS
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
20  Hefner; Joshua Polson; and Charlotte Wells, on
    behalf of themselves and all others similarly       **EXPERT DECLARATION**
21  situated; and Arizona Center for Disability Law,    **OF DR. TODD WILCOX,**
                                                        **M.D.**
22                              Plaintiffs,
                                                        **(REDACTED)**
23               v.

24  David Shinn, Director, Arizona Department of
    Corrections, Rehabilitation and Reentry; and Larry
25  Gann, Assistant Director, Medical Services Contract
    Monitoring Bureau, Arizona Department of
26  Corrections, Rehabilitation and Reentry, in their
    official capacities,
27
                                Defendants.
28

23774493.1

1

# TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND .......................................................................1

    I.     Qualifications ...............................................................................1
    II.    Previous Reports .........................................................................2
    III.   Information Sources .....................................................................2
    IV.   Methodology ................................................................................9

EXPERT OPINIONS ..............................................................................................12

    I.     People are needlessly suffering and dying in ADCRR custody due to grossly inadequate healthcare ...............................................................12

        A.  Inadequate care has resulted in  preventable deaths....................14
            1.                ......................................................................14
            2.                ......................................................................24
            3.                ......................................................................32

        B.  Inadequate care has led to permanent harm...............................38
            1.  Kendall Johnson...............................................................39
            2.                ......................................................................44

    II.    The ADCRR lacks the capacity for self-correction.........................49

        A.  Defendants' mortality review process fails to identify and correct systemic and individual medical treatment errors........................49

        B.  Testimony from the Centurion Medical Director for Arizona supports my findings of a high level dysfunction in the ADCRR healthcare delivery system ......................................................................................56

        C.  ADCRR healthcare leaders have no capacity to improve the clearly deficient staffing................................................................................59

    III.   People in ADCRR custody are at substantial risk of serious harm because prison nurses fail to provide adequate care and act as a barrier for patients seeking access to their primary care providers...................................64

        A.  The nurse line serves as a barrier to timely health care as nurses exceed the scope of their licenses, perform inadequate assessments, and improperly deny patient access to providers .............................67

        B.  Nurses do not have adequate clinic space to treat patients...........80

C.  Appointments are not timely....................................................................82

IV.   People in ADCRR custody are at substantial risk of serious harm because the prisons have too few physicians and because many primary care providers deliver inadequate care.........................................................................85

A.  The ADCRR relies heavily on mid-level providers who do not have the necessary skills to treat complex patients...................................................86

B.  Providers deliver inadequate care to patients .............................................87

1.   Providers do not develop and test different diagnoses..........................87
2.   Providers fail to adequately manage their chronic care and complex cases ....................................................................................95
3.   Providers fail to follow-up on significantly abnormal diagnostic test results .........................................................................................106
4.   Providers fail to obtain hospital records and review and act on them........................................................................................112
5.   Providers fail to provide adequate pain medication to those who need it ..............................................................................................117
6.   Providers delay treatment for patients with hepatitis C ........................122
7.   Providers fail to treat Substance Use Disorder with community-standard evidence-based treatment .......................................................125
8.   Providers fail to offer or follow-up on necessary health screenings based on age, medical history , and gender .............................................131

V.   People in ADCRR custody are at substantial risk of serious harm because the ADCRR fails to ensure they consistently receive their essential medications...................................................................................................134

VI.   People in ADCRR custody are at substantial risk of serious harm because they cannot reliably see specialists when medically necessary .......................139

A.  Providers fail to recognize when patients require specialty care.................140

B.  Specialty care is not provided in a timely manner ......................................142

1.   Unreasonable delays in specialty care place patients at substantial risk of serious harm.......................................................................142
2.   The ADCRR's own data and documents show significant delays in specialty care..................................................................................152

C.  Providers fail to timely review and act on recommendations from specialists ..................................................................................................156

23774493.1

VII.    People in ADCRR custody are at substantial risk of serious harm because
        Defendants lack an adequate emergency response system..............................159

VIII.   People with disabilities in ADCRR custody are at a substantial risk of
        serious harm because Defendants fail to provide them with medically
        necessary care, supplies and equipment ........................................................166

IX.     People in ADCRR custody who are not fluent in English are at substantial
        risk of serious harm because Defendants fail to provide adequate language
        interpretation..................................................................................................175

        A. The ADCRR fails to provide essential interpretation services, rendering
           patient care inadequate and placing patients at risk of harm......................176

        B. Defendants have failed to fix this long-standing problem ..........................184

X.      People in ADCRR custody are at a substantial risk of serious harm because
        Defendants fail to maintain complete, accurate and accessible medical
        records ............................................................................................................186

        A. Medical records are incomplete and contain inaccurate information ..........186

            1. Notes by healthcare staff....................................................................187
            2. Current health problems and conditions ..............................................189
            3. Medical scores ....................................................................................192

        B. The ADCRR's electronic system is a barrier to care because it makes it
           very difficult for healthcare staff to review and compare critical
           information ..................................................................................................194

XI.     People in ADCRR custody are at substantial risk of serious harm because
        they are barred from knowing their own healthcare information ....................197

        A. Patients have limited and delayed access to their own medical records......198

        B. Specialists are instructed not to discuss treatment options with patients.....200

XII.    People in ADCRR custody are at substantial risk of serious harm when
        they are exposed to isolated confinement ......................................................202

CONCLUSION...........................................................................................................202

23774493.1

I, Todd Randall Wilcox, M.D., declare:

1.    I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.

## INTRODUCTION AND BACKGROUND

### I.    Qualifications

2.    I have worked as a physician in jails and prisons for 27 years. My opinions in this case are derived from extensive experience in the design, administration and delivery of correctional healthcare as well as the national standards that govern the field. I actively practice correctional healthcare as the Medical Director of the Salt Lake County Jail System and am frequently called upon as a consultant to assist facilities and organizations nationally in improving their delivery of care, including California Department of Corrections, Mississippi Department of Corrections, Maricopa County (Phoenix, AZ), Santa Clara County Jail (San Jose, CA), Pima County Department of Institutional Health (Tucson, AZ), Washington County Jail (Hurricane, UT), Utah County Jail (Spanish Fork, UT), Seattle-King County Jail (Seattle, WA), the National Institute of Corrections, and the American Jail Association.

3.    I am board-certified by exam by the American Board of Urgent Care Medicine. I am also board-certified by exam by the American Academy of HIV Medicine. I also hold advanced certifications from the National Commission on Correctional Healthcare as a Certified Correctional Health Professional, a Certified Correctional Health Professional Administrator and a Certified Correctional Health Physician.

4.    I was the President of the American College of Correctional Physicians from 2015-2017, and have served on the Board of Directors for the National Commission

on Correctional Health Care's CCHP program. In 2019, I was awarded the Armond Start Award from the American College of Correctional Physicians for excellence in correctional healthcare.

5.      My curriculum vitae is attached as Appendix A. The cases in which I have been deposed and/or given trial testimony in the last four years are listed in Appendix B. My rate of compensation for this case is $300 per hour.

**II.     Previous Reports**

6.      I have been involved in this action since 2013 as a medical expert for the Plaintiff class. I have submitted multiple reports and declarations regarding the delivery of healthcare in the Arizona state prisons, and most have been filed with this Court. (*See* Docs. 946-1 (Exs. 1 and 3), 1539, 1670, 2103 and 2496.) These reports document that, since 2012, the ADCRR's healthcare delivery system has been seriously deficient, placing the people who live in the prisons at serious risk of harm and death. At the core of these deficiencies has been a long-standing failure to provide enough competent clinical staff with the appropriate level of expertise to care for this population.

**III.    Information Sources**

7.      I have attached as Appendix C a complete list of the documents that I reviewed for this report.

8.      I reviewed the October 2, 2019 Report to the Court submitted by Marc Stern, MD, MPH, as it applies to medical care delivery. (Doc. 3379.) Of particular relevance to this report is Dr. Stern's review of whether and how the "failure to successfully perform on PMs poses a significant risk of harm to patients." (*Id.* at 72.) In that section, Dr. Stern catalogued harm or serious risk of harm suffered by patients as a

-2-

23774493.1

result of failure to comply with medical Performance Measures 5, 6, 10, 11, 15, 23, 24, 31, 35-37, 39, 40, 42-46, 48-50, 51-53, 55, 63-68. As set forth below in greater detail, I agree that Defendants' long-standing failure to comply with many of the very basic healthcare measures embodied in the parties' Stipulation has harmed patients and placed them at serious risk of harm.

9.     Dr. Stern also opined regarding the reason for Defendants' noncompliance with the Stipulation's provisions addressing, at certain prisons, seven areas of healthcare delivery: Pharmacy (PM 15 and 19); Intersystem Transfers (PM 35); Access to Care (PMs 39, 40, 42 and 44); Diagnostic Services (PM 46 and 47); Access to Specialty Care (PMs 49-52); Chronic Care (PMs 54 and 55); and Infirmary Care (PMs 66 and 67). (Doc. 3379 at 89-90.) Addressing the macro-level barriers to care, Dr. Stern concluded the most critical barriers to the ADCRR's compliance are insufficient funding of healthcare services and the privatization of healthcare services. Using data from the Arizona Health Care Cost Containment System (AHCCCS), which insures Arizonans on Medicaid, Dr. Stern calculated that the $195 million that the ADCRR spent on healthcare annually, as of July 1, 2019, was approximately $73 million lower than what the approximate cost of healthcare would be for the ADCRR population if that care were paid for by AHCCCS.

10.     Dr. Stern recommended that these additional funds be allocated to address what I agree is the most critical systemic deficiency facing the ADCRR's healthcare delivery system -- **staffing**. His first three recommendations are:

  a.  Staffing levels need to be increased.

b. The mix of staff (e.g., physician and mid-level provider) needs to be reconfigured.

c. Salaries may need to be increased.

(Doc. 3379 at 95-101.) I strongly agree with these recommendations. Until the ADCRR is staffed appropriately, with the necessary level of expertise and supervision, incarcerated people will continue to be at substantial risk of serious harm from poor care.[1]

11.     In the final portion of his report, Dr. Stern considered whether scores on the Stipulation's Performance Measures accurately reflected the adequacy of care provided. He found, and I agree, that they did not. In his analysis, he noted that most of the existing Performance Measures were "extrinsic" measures that measured whether a task was completed or timely. (Doc. 3379 at 113.) Dr. Stern advocated adding "intrinsic" measures, i.e., measures that determine whether a task was completed appropriately. In particular,

---

[1] The Expert Report of Robert Joy, Oct. 9, 2021, that was prepared for this litigation, supports my conclusions on staffing. Over my career I have been closely involved with using this type of staffing model in large correctional facilities. I helped design the mathematical models, and I validated them against the actual practice of medicine. I was co-leader of the team that then deployed those models in Maricopa County Correctional Health Services and the State of California prison system. The methodology that Mr. Joy developed is consistent with the workload staffing models that I have used in the past, and I believe it is sound. Mr. Joy's analysis is thorough and capitalizes on the most accurate data available; I have been calling for such a study in the Arizona prisons for years because I believed that there was a significant gap based on my observations of barriers to delivery of adequate medical care, particularly with respect to deficient practice by, and inadequate oversight of, nurses and mid-level providers.

Mr. Joy's findings -- ADCRR healthcare staffing shortages for every classification of medical, mental and dental care, including a 30-40% deficit for primary care providers and a 33-46% deficit for registered nurses -- bear out my predictions based on my review of the healthcare system within the ADCRR and the deficiencies in quality that I have identified. The magnitude of the gap is in line with what I expected.

-4-

regarding medical care, he recommended that Performance Measures be added to review the quality of decision-making by nurses and primary care providers for episodic, chronic, emergency and inpatient care, as well as the clinical appropriateness of decisions made regarding access to specialty care. He also recommended a Performance Measure addressing the quality of the mortality review process.  (*Id.*)

12.    Dr. Stern recognized that whether or not a nurse or provider sees a patient within the requisite number of days, weeks or months in keeping with the parties' Stipulation does not, on its own, tell the whole story about whether a patient receives the treatment they require. In recommending that the quality of the health encounters be evaluated, *i.e.*, that the clinicians who treat patients be assessed on whether they provided care that is clinically correct, Dr. Stern cited numerous clinical encounters where, under the extrinsic measures, the care may have been timely, but the patients actually suffered harm or were placed at risk of harm because the care provided was deficient.[2]

13.    In reviewing nursing quality, Dr. Stern accurately pointed out that RNs in the ADCRR "are given a tremendous amount of responsibility … to independently manage a broad spectrum of health conditions which are ordinarily managed by providers

---

[2] Dr. Stern noted that for his report, he "was not charged by the court to evaluate, did not design [his] methodology to, and therefore with rare exception [does] not offer an opinion on, whether, overall, the systems of care in place to delivery health care at the ADC pose a significant risk of serious harm to its residents." (Doc. 3379 at 4.) The errors that Dr. Stern identified in his report are, unfortunately, entirely consistent with the types of errors I have found in my broader review, which included site visits to four prisons, interviews with patients, and the review of hundreds of medical charts and mortality reviews. When viewed in the context of my more comprehensive survey, Dr. Stern's Report is further evidence of the gross systemic deficiencies in the ADCRR's healthcare system that place all class members at substantial risk of serious harm.

23774493.1

in the community." (Doc. 3379 at 113.) He identified two instances where nurses failed to perform necessary assessments, placing the patients at significant risk of serious harm. In one case, an RN prescribed a hernia belt for a patient without determining whether the patient's hernia was reducible, which could have caused a life-threatening injury if the patient's intestines had become strangulated. (Doc. 3379 at 114.) The second patient was seen by an RN for a foot wound that should have been treated urgently and possibly emergently. The nurse placed the patient at risk of serious harm, including possible amputation, by failing to arrange for an urgent provider visit. (*Id.* at 114-15.) As set forth below, these deficiencies are entirely consistent with the types of failings that I saw repeatedly in health care records and in patient interviews.

14.     Dr. Stern also identified problems with provider (*i.e.*, physicians, nurse practitioners and physician assistants) decision-making that were not detected with the existing performance measures. He explained that medical providers make clinical decisions in three general settings: (a) during face-to-face patient encounters, (b) in response to an inquiry from a nurse, and (c) upon receipt of test results or reports from a consultant. (Doc. 3379 at 115-16.) In these three settings, he "found many examples of poor quality clinical decisions made by medical providers …, [and] most of these were made by mid-level providers." (*Id.* at 116.). He cited several of these serious deficiencies that likely contributed to or hastened the deaths of two patients. In one case, a nurse practitioner (NP) ordered blood tests for a 64-year-old patient with multiple serious medical conditions who complained of shortness of breath, abdominal pain and other symptoms. The NP should have ordered the tests on an expedited basis, but they were not

done for two weeks, and the results were quite abnormal, suggesting a serious active infection. A physician reviewed the results and, rather than take immediate action, indicated the results would be reviewed at the patient's next chronic care appointment. No such visit was on the schedule. A week later, the patient was admitted to the hospital with acute abdominal pain and was diagnosed with metastatic pancreatic cancer. He died the following month. (*Id.*) In another case, a 41-year-old patient who was, on admission, sweating, acting erratically, and had dilated pupils, was treated with the emergency antidote for opiate overdose, despite having no symptoms to suggest opiate intoxication. Because he was on anticoagulants, he required careful monitoring. The treating providers (an NP and a physician assistant (PA)) made multiple treatment errors, and the patient died the next day of cardiac arrest with methamphetamine toxicity. Dr. Stern determined that "[a]ppropriate decision-making by either provider had a high likelihood of preventing the patient's death." (*Id.* at 116-18.)

15. The problems Dr. Stern found in episodic care with provider judgment were mirrored in the chronic care program, in emergency response, and in care provided in the infirmary units. He described a case where a patient who was being monitored for a history of treated prostate cancer exhibited clinical signs of possible recurrence. His providers failed to manage and monitor his referrals to specialists, resulting in an 18-month lapse between the time of his suspicious tests until the time he finally saw an oncologist, placing him at serious risk of harm from a cancer that, if treated timely, is potentially curable. (Doc. 3379 at 119.)

23774493.1

16.     In his review of provider and nursing judgment in the emergency response

context, Dr. Stern cited the following incident involving a patient who had suffered a blow

to the head and a wrist injury in an altercation. The patient required that his head be kept

still until he could be evaluated for a possible fractured neck. He also required an

evaluation for a wrist fracture, stitches to the head and close monitoring of his unstable

vital signs. "With input from the NP, the care the patient received [from a nurse] included

none of these elements and he was sent back to his living unit with a fresh dressing on his

laceration which he was told to '[follow up] with medical' at some unspecified date and

time." (Doc. 3379 at 126.) In addition, "the nurse had the patient intentionally bend his

neck in all directions." If the patient had had a fractured neck, this movement could have

damaged or even severed his spinal cord. Another emergency was called for this patient

an hour later, due to changes in the patient's behavior. He died shortly thereafter. Dr.

Stern reviewed mortality review conducted by the ADCRR, which noted the "[Patient]

obviously became apneic [stopped breathing] and received CPR after significant delay."

(*Id.*) Dr. Stern found that the documentation of this case was poor, and concluded "the

acts and omissions of the nurse and NP created a significant risk of serious harm. (*Id.*)

17.     I concur with Dr. Stern's recommendations regarding the need to measure

quality of care provided to patients in clinical encounters. Defendants' consistent failure

to comply with critical Performance Measures, in particular those related to timely access

to specialty care and continuity of care when returning from hospitalization, endangered

patients. **However, even if Defendants had complied with all of the Stipulation's**

**Performance Measures, the patients would have continued to be at substantial risk**

-8-

**of serious harm because when they did see providers and nurses, those clinicians often exercised poor clinical judgment and failed to provide clinical care that meets community standards for such care.** As set forth below, the poor quality of clinical decision-making demonstrated by nurses and providers in the ADCRR harms patients and places them at an unreasonable and substantial risk of serious harm.

## IV.     Methodology

18.     Plaintiffs' counsel asked that I evaluate the adequacy of the current medical care delivery system in the ADCRR. I focused my review on healthcare processes and outcomes. I reviewed the written policies and procedures of the ADCRR, in particular the Department Orders and the Medical Services Technical Manual.

19.     The CGAR data, which measures compliance with the Performance Measures in the Stipulation, although imperfect for the reasons described by Dr. Stern, provide a limited view into processes, and I have incorporated that data in this report where appropriate. I also identified patterns and practices of poor processes while reviewing outcomes, because many poor outcomes are the result of poor processes.

20.     To review outcomes (and the processes that led to them), I examined medical records for approximately 120 patients, many but not all of whom are discussed in this Declaration. In some cases, I was assisted in my review of medical records by physicians and a nurse practitioner working under my direction.

21.     It is impossible to review medical records for all patients in a large system, so it is necessary to select records that allow for a thorough analysis of systemic processes. In my experience, the examination of health care records of patients who have

23774493.1

died provides tremendous insight into quality of care for some of the most complex, difficult, and fragile patients in the system. Often, this population has enhanced needs for specialty care, hospitalization, emergency care, and the coordination of complex conditions that can test a system's capacity. Of the 322 patients who died in ADCRR custody between January 1, 2019, and September 26, 2021, and had ADCRR mortality reviews, I examined records for 94. I focused primarily on more recent deaths to gain the most accurate picture of the current state of affairs in the ADCRR healthcare system.

22.     In addition, I visited all four ASPCs with IPCs (infirmaries), and interviewed a number of patients in the IPCs, special needs units, and other housing units; I then reviewed many of these patients' medical records to follow up on what they told me. I also asked Plaintiffs' counsel for names of patients with complex needs and/or concerns over their care, and reviewed many of those records.

23.     Given the size of the ADCRR system and the need to select specific patients for records reviews, my choices were made in order to maximize the opportunities for care presented by individual patients, and to shed light on the system's ability to address significant needs.

24.     The problems I found, as described in this Declaration, were consistent across the different categories of medical records I reviewed (those who died, those I met during site visits, and those identified by Plaintiffs' counsel). In this Declaration, I incorporate examples from each to illustrate the problems.

25.     I did not review a random sample of all patients in ADCRR custody. This is because when evaluating a healthcare delivery system, it is generally not as helpful to

23774493.1

examine care for healthy people as it is to look at the treatment of sick patients, particularly those with complex or chronic conditions that require coordination, communication, and judgment. Healthy patients or those with minimal needs can more readily get their needs met even from systems that offer poor clinical care and lack basic organizational structures; examining their records tells us little. It is the complex patients who test the capacity of staff and systems alike.

26.     I visited ASPC-Lewis, ASPC-Perryville, ASPC-Tucson, and ASPC-Florence on August 31-September 1 and September 8-9, 2021. At ASPC-Tucson and ASPC-Florence, I was accompanied by my colleague, APRN Michelle Teasdale. During the visits, I spoke with patients, toured clinic spaces, and spoke with some healthcare staff. I spoke directly with patients in order to gather additional information and to make my own professional medical judgment with respect to the acuity of their illness as best I could without being able to examine them except visually. I reviewed their medical records to verify the information they gave me. Although my role on these tours was to gather information, I felt obligated to report cases to prison officials and attorneys where, based on my observation and interviews (and without yet reviewing the medical record), I believed immediate action was needed.

27.     It is important to acknowledge that the COVID-19 pandemic has put a tremendous strain on all healthcare systems, including my own, and has resulted in unavoidable disruptions and delays in care. I evaluated the care provided to patients in light of the pandemic-related constraints relevant to the time period. For example, my findings of systemic failures with regard to specialty care do not rely on shortcomings in

-11-

23774493.1

obtaining timely specialty consultations during much of 2020, when many specialists were not seeing patients and safe transportation was not always possible. My work throughout this case has demonstrated that without a doubt the ADCRR has provided dangerously substandard care for years, both before and during the pandemic, continuing to the present day. The strains and limitations of the last 18 months in no way excuse the depth and breadth of chronic systemic failures I identify in this report.

## EXPERT OPINIONS

**I.     People are needlessly suffering and dying in ADCRR custody due to grossly inadequate healthcare.**

28.     Based on my visits to the ASPCs, interviews with patients, and extensive review of medical records and mortality reviews, it is my opinion that the healthcare delivery system in the ASPCs continues to harm many patients and continues to place all at substantial risk of serious harm. The problems I have found previously persist to this day. By design, healthcare decisions in the ASPCs are pushed down to the lowest possible level – nurses who are practicing poorly and far outside the scope of their licenses. There is a clear pattern of failure by nurses to complete an adequate nursing assessment, take patient reports seriously, recognize dangerous symptoms, and elevate concerns to providers. Too often, nurses simply send patients back to their housing unit and tell them to submit another written sick call request if symptoms worsen.

29.     When a patient is referred to a provider, it almost always is to mid-level practitioners who miss, with alarming frequency, serious and urgent medical symptoms. Care for complex patients is scattered throughout the system so no one provider or physician is ultimately responsible for the patient, resulting in serious deficits in care. This

-12-

23774493.1

problem is made worse by the medical records, which are incomplete, inaccurate, and hard to navigate, and which make it very difficult for anyone (including myself) to get a complete picture of a patient and their current needs. The painstaking, frustrating, time-consuming reviews I undertook to piece together an understanding of needs and prior care for many of these patients is simply impossible for busy providers to perform before each appointment. That impossibility translates directly into inadequate care.

30.     The ADCRR healthcare system also is missing the foundation of any credible healthcare practice: differential diagnoses. Far too often, healthcare staff "treat," in a cursory manner, the symptom, but fail altogether to identify, test, and otherwise evaluate the underlying cause of the symptom. This practice has led to failure to diagnose accurately and to treat serious, life-threatening conditions. Providers often will order laboratory or other diagnostic tests without a diagnostic strategy. They rarely identify a differential diagnosis, and, when they do, the tests ordered are often not relevant to the condition they are trying to rule out. They fail to follow up on significantly abnormal results, and instead order to recheck labs or schedule a follow-up in an inappropriate time interval and then fail to reference previous results. They do not ensure continuity of care for their sickest patients returning from hospitals.

31.     As discussed in more detail below, these problems appear to be the result of a combination of factors, including inadequate staffing, inadequate physician-level attention to problems, and poor attitude of medical staff, which probably is itself related to inadequate staffing and demanding workloads. In addition, the electronic health record in use within the ADCRR is poorly designed and greatly impairs the clinician's capacity to

synthesize a comprehensive picture of a patient's healthcare. These problems have resulted in, and will continue to result in, permanent harm to patients, including avoidable death. In this report, I identify and provide examples of common failures in the ADCRR healthcare delivery system. Before doing so, however, I present several case studies that show how these failures directly impact patients.

**A.    Inadequate care has resulted in preventable deaths.**

      **1.**

32.                                was a 69-year-old man who died from metastatic lung cancer that first went undetected and then was ignored for years. Multiple red flags should have alerted the prison medical staff to Mr.                    possible cancer diagnosis but were overlooked. Once clearcut imaging plainly established the diagnosis, the prison healthcare staff repeatedly reviewed the information but failed to act on it. And finally, as Mr.            slowly and agonizingly deteriorated, staff failed to provide him with critical pain management. He died a horrific and painful death as a result.

33.    Mr.            began complaining of significant weight loss in 2015 when housed at ASPC-Eyman. According to his health record, at 5'10", he weighed 190 lbs in 2013, and on 9/3/15, he weighed 146 lbs at his chronic care appointment. His provider acknowledged the complaint but the only intervention was to provide him a "wasting diet"

23774493.1

and liquid supplements. Mr.          further complained about weight loss in 2017, and at

a 6/21/17 chronic care visit, he informed his provider that he had lost approximately 20

lbs despite eating all his meals. He weighed 126 lbs. At this visit, which was completed

via Telemed, Mr.          told Dr. Watson he was afraid he had cancer. Unfortunately, he

was correct. But despite his obvious risk factors for cancer, the physician ordered only

some simple imaging and stool blood testing, and instructed him to quit smoking.

34.     On 6/19/18, Mr.          put in another HNR indicating his concern about

weight loss. He was seen on 7/2/18 by NP Okafor who ordered another chest x-ray and an

HIV test and continued his wasting diet. NP Okafor saw him back in follow-up on

7/23/18, and she indicated that his "HIV was non reactive, CXR was negative for

disease." It appears that these were the only potential causes of weight loss she could

think of, because she signed off on his case, ordered him liquid nutritional supplements

and did not schedule any follow-up. This patient with an ominous physical finding with

verifiable objective confirmation was simply ignored. By the time his next appointment

occurred, the patient had gone from his baseline weight in 2013 of 190 lbs to 122 lbs. He

complained about it, the data was in the chart, and nobody was paying attention.

35.     Mr.          had another chronic care appointment on 12/24/18, this time

with NP Thomas, and there is no mention of or follow-up about his weight loss.

36.     On 2/13/19, NP Thomas saw Mr.          and wrote he complained of:

> vomiting and nausea, can't keep nothing down. states he had 3 bowel
> movements today which was bloody…. [complains of] abdominal pain….
> hx of hiatal hernia and acid reflux.  It has been going on since last
> Wednesday...States he lost more than 10 pounds in one week.

23774493.1

His weight on this visit was down to 110 lbs. He was sent to the emergency department, where they diagnosed him with a bleeding duodenal ulcer. The ulcer was so severe that he required open abdominal surgery to fix it. During his workup, CT scan images of his abdomen showed "scattered nodular opacities in the bilateral lungs concerning for metastatic disease." This was a new and very serious finding, and it was clearly documented in the hospital paperwork that it needed evaluation.

37.    On 2/26/19, Mr.          transferred from the hospital to the IPC at ASPC-Florence. NP Eze, listed as a mental health mid-level provider, signed off on the hospital discharge paperwork, which was scanned into Mr.          record on 2/28/19.  NP Eze's note reviewed that Mr.          had had an ulcer repaired, was given multiple blood transfusions, "*and was found to have lung nodules that appear to be consistent with metastatic lung disease*." The consult section of that note, however, states: "None [at] this time." No follow-up was ordered.

38.    On 3/12/19, Dr. Stewart discharged Mr.          to the general population with a note stating: "Inmate was received from the hospital after treatment of a duodenal ulcer. He healed his abdominal wound and a decubitus wound he received in the hospital. He is doing well at this time and can be d/c'd [discharged]." That note is true except for the lung cancer that was well documented but that continued to be ignored. Mr. returned to ASPC-Eyman general population yard on 3/13/19.

39.    On 5/1/19 and again on 5/20/19, Mr.          submitted HNRs complaining of a very sore throat. The RN who treated him on 5/2/19 noted his throat was red and neck glands were palpable and obtained a verbal order from NP Thomas for amoxicillin /

23774493.1

clavulanic acid (Augmentin). The RN's wholly inadequate assessment of this patient's problem was conveyed telephonically to a provider who, without even seeing the patient, or having any lab information or any diagnosis, ordered a completely inappropriate high-powered antibiotic.

40.     During a second nurse follow up, on 5/27/19, Mr.           complained of difficulty swallowing. RN Floyd saw him and reviewed his chart. She noticed the documentation regarding the lung nodules and wrote, "ADON Brown notified, as per ADON Brown, AFHA and FA to be contacted to schedule inmate with provider as unit HCP not available this week." (I believe ADON stands for Assistant Director of Nursing, AFHA stands for Assistant Facility Health Administrator, FA stands for Facility Administrator, and HCP stands for Health Care Provider.) She referred him to the provider line on an urgent basis.

41.     Mr.           saw Dr. Stewart on 5/29/19, who wrote that, per the patient's report, he had a very sore throat, that antibiotics had not helped, and that his food was getting stuck in his esophagus. Dr. Stewart noted he had a neck mass, unexplained weight loss and states he "discussed case with inmate and he is aware that his symptoms may reflect a new diagnosis of cancer." He weighed 115 lbs. Based on what happened over the next few months, and Mr.           interactions with medical providers months later, I suspect Dr. Stewart was not forthright about or did not effectively communicate to the patient about the possible cancer diagnosis.

42.     On 5/30/19, RN Arambula submitted requests for CT scans with contrast of the abdomen, chest and brain. What was needed most at this point was a CT of the chest.

-17-

That CT was denied on 6/7/19, with the comment, "A CT of the chest was performed on 5/23/19. The necessity of a repeat study at this time is not demonstrated. Consider managing based on results of the recent CT." But there is no 5/23/19 CT scan, and there is nothing in the record to suggest one had been ordered.

43.     Mr.          had CT scans of his brain, abdomen and neck (but not the chest) on 5/31/19. These results arrived at the prison on 6/13/19 and 6/17/19. After reviewing them, Provider Maureen Gay wrote on 6/19/19: "Numerous necrotic lymph node at level concerning of metastatic disease. Numerous nodules of the right lung consistent with lime [sic] metastatic disease. will schedule patient in office next provider visit day for review of CT scan results and treatment plan."

44.     That appointment never happened. Shockingly, Mr.          was not seen in person by a provider until almost three months later, on 9/10/19, and that was only because **he** initiated the visit because his throat hurt so badly he could not eat. Notably, he did not raise any concerns about following up on Dr. Stewart's discussion with him about a possible lung cancer diagnosis in his HNR, or when he saw NP Thomas, strongly suggesting that he had not been told.

45.     At that visit, NP Thomas recorded that the patient's weight was down to 100 lbs. There is no indication in the record that NP Thomas was concerned about Mr.          massive weight loss. A grown man who has lost 90 pounds from his baseline is a medical crisis that demands an explanation. Instead, NP Thomas advised him to "eat slow and cut food in small pieces" and to "follow up as needed." That advice, in light of what was known about Mr.          condition, is offensive to me as a medical

-18-

23774493.1

professional. In addition, there is no indication in the note that NP Thomas was even aware of the CT findings. Instead, and despite multiple obvious entries into the patient's medical record, NP Thomas wondered whether the patient might have a possible neck injury, chronic pharyngitis/mass or tumor. He decided to request a consult with an ENT. Again, Mr.            did not raise concerns about a possible cancer diagnosis with the NP.

46.    On 10/28/19, Mr.            was seen in the telemedicine chronic care clinic by PA Racowsky. The note says it is for an evaluation of latent tuberculosis and the first part of the subjective notes says, "Patient denies cough, hemoptysis SOB weight loss or night sweats." The next section in the same part of the chart indicates that the patient was being seen for follow-up of cancer and that the patient "does have significant weight loss and lymphadenopathy if [sic] cervical nodes." Then, down in the click-box section the risk factors are not even filled out and the clickbox indicates a "No" to the prompt of "Recent weight loss/cachexia." This note is a clear example of a "cut and paste" chronic care clinic visit, something I saw repeatedly in my records reviews. This kind of dangerously sloppy charting happens when providers are just cycling patients through these visits as fast as possible with no intent to deliver thorough care, which is certainly what happened, over and over, to Mr.

47.    The ENT saw Mr.            on 11/5/19, diagnosed him with an otopharyngeal mass suspicious for cancer, and recommended a CT scan, biopsy and endoscopy. But Mr.            apparently was not aware of these recommendations: as apparently is true for all Centurion consult visits, the consultant completed Centurion's visit record form that admonishes, "For security reasons, inmates must NOT be informed

of recommended treatment or possible hospitalization." On his return from his 11/5/19

ENT visit, Mr.           who now apparently had been diagnosed with throat and chest

cancer, told the RN his only complaint was throat pain and unintentional weight loss.

48.     The RN documented placing him on the provider line, but he was not seen

again until he called an ICS on 11/25/19 for coughing up blood. His oxygen saturation

was 77%. He was sent to the hospital via ambulance, and was admitted.

49.     Mr.          remained in the hospital until 12/19/19. According to the

hospital record dated 12/13/19, he had a "left thoracotomy with wedge resection lung

biopsy ... with pathology confirming squamous cell carcinoma." The note states Mr.

         was referred to oncology for further evaluation. "Per their recommendation, the

patient's treatment plan would be palliative not curative." Upon his discharge, his

diagnoses included severe malnutrition, lung cancer, cervical lymphadenopathy,

hypertension, anemia, and aortic aneurysm.

50.     On 12/19/19, Mr.           transferred from the hospital to the ASPC-

Tucson infirmary. The RN's admission note writes that Mr.            arrived on a stretcher.

He had an unstageable ulcer on his coccyx. He was ordered total parenteral nutrition with

Lipid, but "per provider on call, TPN and LIPID should be HELD until appropriate

TUBING IS AVAILABLE." His hospital discharge medications were reviewed, and NP

Bell significantly decreased his pain management from Norco 5 mg-325 mg every six

hours as needed for pain, to Tylenol # 3 every eight hours, three times a day, for two days.

51.     The following day, Dr. DeGuzman wrote "Seen curled in bed very cachectic

and c/o [complains of] not able to swallow liquid food. IM is severely malnourished w/

23774493.1

cancer of lungs and needing TPN [total parenteral nutrition, *i.e.*, intravenous feeding] w/ IM unable to swallow food, even liquid food." At this point Mr.          was down to 96 pounds. Despite his previous massive GI bleed due to NSAIDS, they decide to put him back on ibuprofen four times per day during his admission to the infirmary. This is malpractice: the patient had already had a life-threatening GI bleed from NSAIDS but they decided to put him back on NSAIDS without any protection for his stomach.

52.     In addition, despite the fact that he could barely swallow, healthcare staff put him on Tylenol #3 for pain even though he had metastatic cancer. They also started him on Toradol which is a potent NSAID, so now he was on double NSAIDS -- double malpractice. They started Mr.          on Total Parenteral Nutrition (TPN) because he could not swallow. It is unclear how he was taking his pills. A note in the medical record says he was supposed to have weekly electrolytes done (which is the bare minimum for a patient on TPN). That was never done. From 12/25/19 until his death on 3/23/20, labs were done on 1/2/20 (with repeat of potassium on 1/6/20), 1/4/20 (but electrolyte values were not able to be reported so this doesn't count), 2/25/20 (this was an incomplete panel of four different results which also doesn't count). That's it. This is totally inadequate for a patient on TPN because they are being given nutritional components such as electrolytes directly into their bloodstream without any filtering or buffering by the GI system or the liver. As a result, you can have wild and dangerous swings in electrolytes that have to be monitored for safety.

53.     On 12/25/19, PA Salyer rounded on Mr.          and indicated that he needed oncology and ENT consults for possible radiation therapy and palliative care.

-21-

23774493.1

Inexplicably, Centurion cancelled the referral because the patient was a "Do Not Resuscitate" status. They cancelled palliative care for an end-stage cancer patient.

54.    On 1/10/20, his weight was down to 90 pounds. He signed a DNR order on 1/15/20, and Centurion supposedly began "hospice care for comfort care." But this end-stage cancer patient had no pain medication ordered for him other than the Ibuprofen and Toradol discussed above. **Even though he was in the infirmary, he went from 12/20/2019 until 2/7/2020 without appropriate pain medication.**

55.    On 3/16/20, the rounding note indicates that IV morphine had been ordered because the patient could not swallow but they were awaiting the arrival of that medication. Why they did not have any morphine available in stock or why they did not make arrangements to get morphine from the emergency pharmacy is a mystery, and it is unacceptable.

56.    On 3/17/20, the records show that the IV morphine had arrived but the nurses were very sporadic about giving him any pain medication. The medication administration record shows the following: For the six days that Mr.            had an active order for meaningful pain management prior to his death, on only one day did he receive all four ordered doses, while on another day, he did not receive a single dose

57.    Mr.            end of life care does not conform to any standard of care for palliative or hospice care. His cachetic body was racked with pain, and he wasted away with no reasonable assistance from medical science in the form of comfort or compassionate pain control. On infirmary rounds on 3/22/20, RN Landeros documented

23774493.1

that the patient's pain level was 9/10, and he has "pain all over." It is shocking to see how

neglected he was in his end days when he was too weak to advocate for himself.

58.     The ADCRR's mortality review for this case correctly recognizes that Mr.

death was possibly preventable and that his death could have been prevented or

delayed by more timely intervention. (ADCM1608411-1608420.) Under "General

Critique," the reviewer checked the box for "Treatment not timely" and wrote "Failure to

follow up on hospital findings." The reviewer made the following recommendations:

> When returning from offsite, the chart needs to reflect where and what was
> the reason for the send out.
> Educate staff towards higher levels of competency regarding charting,
> updating problem lists, and follow up.
> Share findings of final mortality reviews with all of the providers and
> complexes involved in the case

*Id.*

59.     These tepid and general recommendations regarding a case where doctors,

NPs, and nurses repeatedly and over many months abdicated their responsibility to care

for a sick and dying patient and permitted him to die in pain, are profoundly inadequate. I

am appalled by a system that allows this level of sustained incompetence and cruelty, and

fails to take decisive action to determine the causes of these myriad and horrific

breakdowns and to ensure that the people involved in this case do not continue to practice

medicine with such dangerous departures from the standard of care.

/// 

///

///

///

23774493.1

1

      **2.**

2

3

4

5

6

7

8       60.                         who was 60 years old and housed at ASPC-Lewis

9  when he died earlier this year, is another example of how episodic, check-box care

10  without physician-level oversight within the ADCRR can lead to entirely avoidable

11  deaths. Mr.      who had severe liver fibrosis resulting from hepatitis C, repeatedly

12  informed medical staff of his urgent health concerns and, with no physician-level

13  oversight, died as a result of a severe upper gastrointestinal bleed due to portal

14

15  hypertension secondary to liver scarring. Mr.     was a patient who was "followed" in

16  the chronic care clinic but that clinic failed to understand his underlying medical

17  conditions and did nothing to identify, diagnose, or treat his increasing hepatic

18  insufficiency and complications of cirrhosis. This is a classic example of the situation

19

20  where a patient is seen by a nurse practitioner, a chronic care clinic encounter is

21  completed, but the quality of the encounter is so poor that it completely misses the

22  primary medical problem and completely fails to address his serious healthcare needs.

23

24       61.    Mr.     had fibrosis of his liver as a result of his long-standing hepatitis C

25  that was never treated. Medical providers knew he had fibrosis because he had a lab test

26  done on 9/21/19, which showed a fibrosis score of F-3 (severe liver scarring). Patients

27  with hepatitis C and severe fibrosis need to be monitored closely for disease progression

28

and development of complications. Mr.          should have had liver ultrasounds performed

(none were ever done) and been on pre-primary prophylaxis for upper GI bleeds (no beta-

blockers were prescribed for him). Further, because he had a known platelet count of less

than 150,000 per microliter, he should have had routine screening or surveillance for

possible esophageal varices (enlarged or swollen veins) via an upper endoscopy at least

yearly and have any varices banded to prevent upper gastrointestinal bleeding episodes

like the one that ultimately caused his death. None of these routine preventative

interventions was, according to the medical record, ever considered or ordered for him.

62.     In addition, the nurse practitioner overseeing Mr.          care decided to

manage him on high dose indomethacin, a potent non-selective non-steroidal anti-

inflammatory drugs (NSAIDS) that is one of the highest risk non-steroidals with respect

to causing gastrointestinal bleeding. The consequence of this medication order error,

compounded when the dosage was subsequently increased, was fatal. On 8/17/20, Mr.

had a normal hematocrit (the percentage by volume of red blood cells in blood) of

46.3. On 11/16/20, he was started on indomethacin. On 1/15/21, lab work showed his

hematocrit had dropped to 38.2, a substantial decrease and medically significant for a 60-

year-old man. Clearly, the lab result signaled that Mr.          was bleeding internally. But

nobody noticed or appreciated the significant change in the hematocrit result, or the

obvious correlation of the onset of the internal bleed with the starting of indomethacin.

Instead, a provider scheduled the patient for routine follow-up within 30 days to discuss

the lab results.

23774493.1

63.     In addition, indomethacin is a potent platelet inhibitor which makes it a particularly risky choice in a patient with known thrombocytopenia (decreased platelet counts). Furthermore, non-steroidals are known to increase blood pressure which is the absolute last thing you want in a patient such as Mr.        who are at increased risk of gastrointestinal bleeding because higher blood pressure further increases the chance of bleeding. Indeed, at the time his indomethacin was initiated, his blood pressure increased above his historical baseline for a while and then as he bled over time, his hematocrit slowly decreased, and his blood pressure actually was significantly below his historical baseline, but nobody noticed.

64.     The indomethacin, presumably for pain control, was the worst possible choice for this patient. There are many other medications that could have been used for pain that would have been substantially safer for Mr.        but none of those was chosen. The prescribing guidelines for indomethacin admonish the prescriber to "Use the lowest effective dose for the shortest duration of time." (*See* Indomethacin: Drug Information from Lexicomp, UptoDate.com (last visited 10/2/21), https://www.uptodate.com/ contents/indomethacin-drug-information?search= indomethacin%20Lexicomp&source=search_result&selectedTitle=1~150&usage_type=d efault&display_rank=1.) Indeed, when Mr.        had increased pain, the nurse practitioner compounded the error by not giving him a safer medication, but instead, on 3/23/21, **tripling** his dose of indomethacin, thus putting him at the top end of the dosing range and increasing the risk of internal bleeding -- without even seeing him in person. Mr.

died a month later, on 4/23/21, from a massive gastrointestinal bleed exacerbated by

inappropriate indomethacin dosing in a patient with multiple contraindications.

65.     In the 42 days before his death, Mr.          submitted at least five Health

Needs Request forms (HNRs) reporting severe pain, difficulty breathing, bleeding, an

inability to eat, an inability to use the restroom and an inability to walk. (*See* HNRs dated

3/12/21, 3/19/21, 3/24/21, undated (scanned into the medical record on 4/7/21), and

4/19/21.) His deteriorating condition and increasing desperation can be seen in the HNRs,

where he begged to be taken to the hospital. In an HNR dated 3/24/21, he wrote

> for the past almost 3 months ago nothing has changed about the treatment
> you gave me. Nothing. I woke up bleeding out my nose, my stomach is
> hurting even [worse] or it could be my liver is [hardening]. You need to
> send me to an outside hospital because I might die. Please send me to a
> hospital. This isn't a joke. It's my life [you're] playing with me. Hurry
> before I die?? Hurry please.

66.     Less than a month later, and four days before he died, Mr.          reported: "I

can not walk, I can not eat, I can not use the restroom and I am partially [paralyzed]." (*See*

HNR dated 4/19/21.)

67.     Mr.          was seen by at least six different RNs, none of whom referred him

to a provider. They occasionally consulted with NP Johnson by telephone and she made

decisions about his care, including ordering a Comprehensive Metabolic Panel (CMP),

Complete Blood Count (CBC), diagnostic labs, and HCV RNA, and, inexplicably, as

described above, increasing his indomethacin to even more dangerous levels (50 mg, three

times a day). (*See* Nurse - Treatment Call (3/23/21) ("Discussed with NP Johnson, will

increase indomethacin dose.").)

68.     Neither NP Johnson nor any of the RNs realized that the medication Mr.

was prescribed was killing him, even after one RN documented that after Mr.

took out a tissue "waded up into his left nostril," "a clot of blood fell out." (*See* Nurse -

Treatment Call (3/20/21) ("NP Johnson notified of this occurrence and no new orders

given.").) According to the medical record, the RNs directed Mr.        to file an HNR if

he had any new or worsening symptoms, which he continued to do up until his death.

69.     Mr.        was seen by another provider, NP Jennings, on 4/12/21 "for lab

review." That apparently was the only time he would be seen by a provider until his death.

NP Jennings observed Mr.          dire condition and documented her observations in the

medical record; she wrote that Mr.         had a slow gait, was "limping toward exam

room," "required assistance," was "unable to tolerate getting up on the exam table," and

that a "Correctional Officer placed the patient in a rolling chair for comfort in the exam

room so assessment could be completed." Although NP Jennings wrote that "Medicine

profile was reviewed with the patient medications," she did not recognize the harm caused

by the high dosage of toxic indomethacin he was prescribed. No changes were made to his

prescribed medication. An abdominal ultrasound was requested urgently on 4/12/21, but

Mr.        would die before it was scheduled. NP Jennings wrote that she instructed Mr.

"to follow-up as needed via HNR for medical concerns and needs," and "to initiate

an ICS if emergent situation arises in which immediate interventions, care, or concerns

develop." (*See* Provider - Follow Up Care (4/12/21).)

70.     Later that day, an ICS was in fact initiated for Mr.         RN Ziegler noted

in the medical record that Mr.         "states he is unable to walk because of the pain and

23774493.1

[it's] been this way for a month, can't go to meals because it hurts." Nonetheless, RN Ziegler determined that no referral to a provider was necessary, and wrote: "use indomethacin as ordered." It appears the provider ordered an x-ray without seeing Mr.

The next day, another RN, RN Saunders, issued a special needs order (SNO) for a lay-in. On 4/19/21, again without seeing Mr.          NP Johnson prescribed a laxative.

71.     In an HNR dated 4/19/21, and scanned into the medical record the next day, Mr.      wrote: "I've had numerous medical problems starting with my liver, kidneys, lung, and . . . my legs. I can not walk, I can not eat, I can not use the rest room and I am partially [paralyzed]. I need my walker, and my lay-in, and a lower lower. I need to be deemed a ADA and need a helper cause I can't do it." RN Oca scheduled Mr.        for the nurse line the next day, but he was not seen. The following morning, on 4/21/21, an ICS was called. RN Tomanek wrote in the medical record: "When this RN arrived pt was lying on bed with approximately 1 liter of frank and clotted blood on cell floor. Pt reports being sick for 1-2 weeks and feels he is dying. Vitals taken and pt brought to hub." After discussion with NP Daoud, RN Tomanek received verbal orders "for 911 send out." Mr.      died at the hospital two days later.

72.     There were many errors of omission in Mr.        care that directly contributed to his death. He was not appropriately monitored for his fibrosis; in that regard, he should have had but did not have a screening ultrasound performed on his liver, preventative medications to minimize the chance of an esophageal bleed, and preventative upper endoscopies to identify and treat dilated blood vessels in his esophagus. He also

never had lab work to monitor his coagulation state, meaning his providers did not even know that his ability to clot was significantly impaired.

73.     There were numerous, serious errors of commission in Mr.          care which led to his death. The treatment Mr.          received for low back pain (indomethacin) in fact was deadly. The medicine was prescribed at a dose, frequency, and duration that was contraindicated for someone with liver disease, like Mr.          The RNs and NPs did not take appropriate action even though Mr.          repeatedly reported significant changes in his condition, including the inability to walk, eat, or use the bathroom. They also did not note an ominous change in his lab results. The RNs were managing a tremendously complicated patient far outside of their scope of practice. There was insufficient NP oversight, and there was no physician-level oversight.

74.     This case also illustrates the failure of the HNR process. Even when Mr.          repeatedly alerted medical staff to dire changes in his condition, medical staff did not properly diagnose him and, too often, simply attempted to treat the symptoms (as opposed to meaningfully diagnose the underlying problem), sent him back to his housing unit, and told him to submit an HNR if the problem continued. It is obvious from his hospital admission that Mr.          was in crisis for some time prior to when the staff finally sent him to the hospital. His admission blood ammonia level was 350 (normal is 15-45), which is extraordinarily elevated and indicates that he had severe hepatic encephalopathy. This is not a condition that develops suddenly; the staff at the prison just failed to recognize how cognitively impaired he was because they barely interacted with him. In addition, his INR (measure of ability to clot blood) was 2.06 (normal is <1.1), which

shows that he had significant decrease in liver function and is yet another contraindication to using indomethacin. The prison never drew this lab despite all of the chronic care visits for liver issues. We also know that he had significant ascites in his abdomen. This physical exam finding is common in patients with advanced cirrhosis (most advanced level of fibrosis), and he had complained about a distended abdomen for quite some time. This was never evaluated by anyone at the prison even though it is a standard element of the physical exam for a patient with hepatic insufficiency. His chronic care visits were cursory and missed all of the critical elements that should have been monitored in a patient with his medical conditions. His hepatic insufficiency was never even added as a problem to his master problem list despite the many years and many visits that he had with the healthcare system. This pattern of "nurse primary care" with telephonic orders from an NP working with no supervision ultimately led to his death. This patient was so medically fragile that he should have been managed by a physician with frequent visits and comprehensive surveillance.

75. The ADCRR's mortality review for Mr.           concluded that they could not determine whether his death was avoidable, nor could they determine whether his death could have been delayed by more timely intervention. (ADCRR00000098-101.) That is absurd. The medication that healthcare staff gave Mr.           is absolutely contraindicated for people with serious liver disease, and they increased his dose as he became sicker and sicker, until he died – tragically but predictably – of a massive hemorrhage. In addition, none of the standard preventative measures were implemented which could have prevented his massive GI bleed. This was entirely avoidable. The anemic

recommendations noted by the mortality reviewer fail to address in any serious way the

multitude and severity of the individual and systemic errors that occurred in this case.

**3.**

76.                                    death just a few months ago, at only 30 years of

age, also illustrates continued, repeated, and all-too-common failures of care. While at

ASPC-Tucson, he submitted an HNR dated 8/5/20, reporting a "super sensitive" lump on

his left testicle. On 8/7/20, Mr.             was seen by RN Worden for a complaint about a

"tender lump on testicle." She documented that the lump had been present for two months.

She used the musculoskeletal NET assessment, which has nothing to do with the

genitourinary system. Her assessment of the patient indicated the following:

      a.   Handgrips equal and strong
      b.   Posture erect
      c.   Gait symmetrical

77.    There was not a single assessment element that concerned his testicle.

78.    RN Worden's disposition of this problem was to tell Mr.             to "go easy

on workouts, notify medical if symptoms worsen." She indicated in one part of the note

that no sick call follow-up was needed, then in another part of the note entitled "Plan

Notes," she wrote she will "refer for PL (provider line)." That referral never happened,

1  and Mr.          was never seen regarding this problem. The note was signed off by NP

2  Jillian Riley on 8/7/20.

3       79.    On 10/3/20, Mr.          submitted another HNR indicating that his left

4  testicle was swollen and that he had severe abdominal pain. He was seen on the nursing

5  line on 10/5/20 by RN Dutton. She assessed the patient and asked Dr. Hines to see the

6  patient. Dr. Hines saw the patient on 10/5/20 in the clinic and documented a "~3cm x 2cm

7  mass in left testicle with tenderness to palpation and swelling of left testicle." Her plan

8  was to obtain an ultrasound of the testicle and to obtain labs. She entered the consult order

9  for the ultrasound but did not enter lab orders until a week after the appointment.

10      80.    On 10/23/20, the ultrasound was completed, indicating he had a 2.6 cm left

11  intratesticular mass "highly concerning for a testicular malignancy. Recommend an urgent

12  urology consultation."

13      81.    On 10/26/20, Dr. Hines signed off on the ultrasound result and indicated a

14  plan to discuss the findings with the patient at his next chronic care visit. I am astounded

15  that Dr. Hines did not have any apparent sense of urgency about this ominous finding. The

16  patient should have been called down that day and had the results reviewed and a plan

17  should have been laid out. It is unethical to withhold this critical information.

18      82.    On 10/27/20, Dr. Hines requested a urology consult on an urgent basis, and

19  Mr.          saw a urologist via telemedicine on 11/25/20. The urologist recommended a

20  radical orchiectomy STAT. Inexplicably, Dr. Hines waited until 12/13/20 to order the

21  consult for the orchiectomy, and then ordered it on a routine basis. The order was then

22  cancelled on 1/22/21, because the urologist Mr.          had seen was no longer available.

23774493.1

83.     On 2/16/21, Mr.            finally saw another urologist. Unfortunately, Centurion did not send any of the ultrasound results or the labs so the visit was essentially worthless. The urologist had them repeat the studies that they had already done.

84.     There were delays in ordering the labs and ultrasound. On 3/16/21, the ultrasound ordered by the urologist was finally done—a month after it was ordered.

85.     On 3/16/21, NP Elliott noted the results of the ultrasound and cited his tumor marker labs. She reported that his Beta HCG level of 81065 mIU/ml was normal. In fact, this lab was astronomically elevated and suggestive of advanced testicular tumor burden. Her interpretation of this lab as "normal" demonstrates that she did not understand anything about the patient or the disease she was managing. In women, that test is run to assess the progress of a pregnancy. For a pregnant woman, that test result would be normal if she were between 11 and 15 weeks pregnant. In males, that test is a tumor marker used to identify possible testicular tumors.  For a male, that result is massively abnormal. The normal range for a male is <6.51 mIU/ml. Apparently not realizing the urgency, NP Elliot submitted a consult request for a "Possible Urology consult" on a routine basis.

86.     That consult request was cancelled on 3/30/21, when Dr. Homayoon, the urologist, notified Centurion that Mr.            in fact needed urgent surgery, and it was scheduled for 4/8/21.

87.     Mr.            finally had his radical orchiectomy on 4/8/21. Centurion failed to send Mr.            back to the surgeon for post-surgical follow-up.

-34-

23774493.1

88.     On 6/10/21, Centurion requested the pathology report from Valleywise Health. The report, faxed that day, confirmed the tumor was cancer -- a mixed germ cell tumor of the testis. There is a special comment: "Note is made of the greatly elevated Beta HCG.  …additional workup should be undertaken in order to determine if there is tumor outside of the test." Mr.          urologist Dr. Homayoon signed off on this result on 5/14/21 and wrote: "Will discuss with the patient." Since Centurion never sent Mr. back for that visit, that discussion never occurred. As a result, Mr.          never saw an oncologist to do any disease surveillance regarding his additional tumor, and he never had the chance to have any adjuvant therapy like chemotherapy or radiation therapy as is usually necessary in testicular tumor cases.

89.     In addition, Mr.          presented at least three times with obvious signs and symptoms of serious gastrointestinal bleeding on 5/27/21, and twice on 5/30/21, and was inadequately evaluated and treated every time. The care he received was shockingly poor. It took five days to get him to the hospital, when it should have been obvious to any competent physician that he was having a very serious gastrointestinal bleed and needed an emergency department evaluation immediately. Mr.          suffered needlessly in the days leading to his untimely death due to the extreme incompetence of medical staff.

90.     More specifically, Mr.          submitted an HNR dated 5/26/21, which stated: "Something is seriously wrong with my stomach and mid section. I haven't been able to eat anything without feeling nasiated. My stools are dark almost black and I am getting sharp stabbing pains in my right side. This has been going on for about a week

now." He was seen by an RN on 5/27/21, who called an NP who ordered an abdominal x-ray, which was never done.

91.     In an HNR dated 5/29/21, Mr.          reported: "I've puked up black bio 3 times so far today and my stools are liquid black. I am in extreme pain in my stomach and appendix." He was seen that day by an RN, different from the one he saw two days before, and apparently not in response to the HNR, which was not scanned into the medical record until 6/2/21, but because he had been "referred to medical by security for unresolved abdominal pain, vomiting and dark tarry stools." The RN noted an elevated heart rate and that Mr.          was "in obvious discomfort with a noticeably abnormal appearing pallor; very pale, almost jaundiced in appearance." The nurse also documented that Mr.          reported vomit that "appears dark brown or black" and diarrhea and bowel movements "dark/black in appearance." The RN sent Mr.          back to his housing with a fecal occult blood (FOB) kit to collect a sample and a container for vomit.

92.     Mr.          returned later that same day and the FOB was positive, which objectively and strongly suggested that he was bleeding in his GI tract internally. The RN wrote: "inmate returned a bag with what legitimately appeared to be approximately 100ml of watery vomit with what appeared to be coagulated blood in it. Inmate's pallor continues to be pale and inmate appears to be in discomfort." In response to this, Mr.          was scheduled for a follow-up nursing appointment the following day, on 5/30/21, to assess vital signs and an abdominal exam, and had a routine referral to the provider within 14 days. Given his abnormal vital signs, his pallor, and the objective evidence of internal bleeding, he should have been sent emergently to the hospital.

23774493.1

93.     The 5/30/21 appointment never happened. An ICS was called on 5/31/21, the day after the follow-up nursing encounter should have happened. For the 5/31/21 ICS, an RN entered the following notes in the medical record:

> At ~ 2050 patient was brought to medical for dizziness and throwing-up, very sleepy. Pt states he has only vomited x 1 today for about 20 minutes. He states he has not ate or drank much in the last 5 days. When he did vomit he stated it was black and red in color. He did have a water stool at some point today that was black in color. He states he is over all a healthy guy until this. He takes no meds. Fecal Occult was collect within the last couple of days that was + for blood. Per CO, who worked yesterday, stated that patient is more yellow today then yesterday.

His heart rate was 133. The RN called the NP, who ordered promethazine for vomiting, and the on-call provider, who ordered that Mr.          be sent to the Emergency Room by ADCRR transport.

94.     Once at the hospital, it was found that Mr.          had a widely metastatic tumor and metastasis to the stomach that were causing the gastrointestinal bleeding. They were unable to get good control of the stomach bleeding, and Mr.          died at age 30.

95.     Mr.          case is particularly tragic because it is so familiar. In my 2016 declaration (Doc. 1539 at 6-8), I described the cases of three young men who were also all housed at ASPC-Tucson, and who also all received terrible treatment for their testicular cancer.                         died of testicular cancer on 10/28/15, less than a month shy of his 43rd birthday. Mr.          sought care for an enlarged testicle in June 2014. His testicle was removed in September, but he did not see an oncologist until five months after the surgery, on 2/12/15. Eight months later, he underwent surgery to remove lymph nodes and the surgeons found that he had widespread cancer in major blood vessels. He ultimately died of shock resulting from a severe postoperative bleed.

-37-

23774493.1

died at ASPC-Tucson on 4/30/16, three weeks after I submitted my April 2016 declaration. His complaints of testicular pain, beginning in June 2013, were essentially ignored for months. After a urologist recommended removal of his testicle, the surgery was delayed six months. By 2016, his cancer had spread to his lungs, and he, like Mr.        died at age 30. A third young man,                complained of testicular pain in July 2015, and had his testicle removed in October 2015. When I interviewed him in December 2015, he had not yet seen an oncologist for a treatment plan, so I notified ADC staff of his urgent need for treatment. When I reviewed his record in February 2016 for my April report, he had still not been seen by an oncologist. Mr.

apparently discharged from prison in March 2016, and I hope he was able to receive the care he needed urgently.

96.     The ADCRR's mortality review for Mr.        case correctly recognized that this case was preventable, that there was a failure to recognize symptoms, a delay in access to care, and a failure to follow up/identify abnormal test results. (ADCRR00000005-08.) That just scratches the surface. The providers and nurses treating Mr.        had a young patient with a life-threatening but highly treatable disease, and their failures and delays in care cost him his life. Testicular cancer is one of the most curable cancers and accounted for only 0.1 percent of all deaths from cancer in men in the United States in 2019. It has a five-year survival rate of over 95 percent.

**B.     Inadequate care has led to permanent harm.**

97.     I saw similar problems reflected in the medical records of patients I met during my site visits. Patients clearly had been seriously and permanently harmed by

-38-

wholly deficient care, including inadequate physician-level oversight. I provide two representative examples below.

### 1.   Kendall Johnson



98.    Kendall Johnson (189644) received care from a physician and an NP over a period of years, and her case tragically illustrates a pattern of grossly deficient care, failure to utilize a differential diagnosis, and substantial confirmation bias by the clinicians (*i.e.,* the tendency to process information by looking for, or interpreting, information that is consistent with one's existing beliefs). Ms. Johnson ultimately received a very delayed diagnosis of multiple sclerosis and her treatment was so delayed that the disease progressed irreversibly to the point that she now lives in the ASPC-Perryville Special Needs Unit and requires almost full care for her activities of daily living.

99.    Multiple sclerosis (MS) is a chronic disease of the central nervous system (spinal cord, brain and optic nerves). People with MS develop multiple areas of scar tissue in response to the nerve damage and, depending on where the damage occurs, symptoms may include problems with muscle control, vision, balance and speech. The type of MS that Ms. Johnson has is called "primary-progressive." There is no cure for this disease, and it is characterized by steady and constant decline in functionality. However, if identified timely and adequately treated, the progression can be substantially delayed.

23774493.1

100.    Ms. Johnson enjoyed relatively good health until September 2017, when she submitted an HNR stating that her feet and legs had been numb for weeks. An NP assessed her, indicating they should rule out multiple sclerosis vs. idiopathic neuropathy (an illness where sensory and motor nerves of the peripheral nervous system are affected and no obvious underlying etiology is found). The NP did a poor patient history, failing to inquire about ocular symptoms or incontinence, as would be expected with this presentation. Suspecting MS, the NP should have ordered an MRI and done a physical exam, including a test of each cranial nerve. She should have done an appropriate cerebellar exam and pain and light touch testing in her distal extremities. All of these tests would have helped rule in or rule out MS. She documented none of these. Instead, she ordered lab tests, alpha lipoic acid (a nutritional supplement that is not a medically recognized treatment for nerve pain), and made a return appointment in a month.

101.    If the NP was concerned the patient had peripheral neuropathy, she should have tested for the conditions that cause it -- diabetes, HIV, HCV and syphilis. Instead, she ordered a Complete Blood Count and a Complete Metabolic Panel, both of which were useless in this situation.

102.    In October 2017, Ms. Johnson again saw the NP and reported no change in symptoms in the previous month. The lab results, from the tests ordered in September, were normal, and the NP assessed the patient as having idiopathic neuropathy or conversion disorder (a mental condition where the patient has dysfunction of the nervous system that cannot be explained by medical evaluation). Without doing the appropriate

MRI or documenting the necessary physical exams, the NP apparently ruled out multiple sclerosis.

103.    Conversion disorder is a psychiatric condition that is considered a diagnosis of exclusion that is reached after all physical explanations have been ruled out. Since the medical staff failed to investigate Ms. Johnson's medical condition with proper and thorough testing, the diagnosis "conversion disorder" cannot even be considered. Moreover, Ms. Johnson's clinicians did not refer her to mental health or neurology for this rare diagnosis, as would have been appropriate.

104.    For the next two years, Ms. Johnson submitted HNRs regularly, complaining that her symptoms were worsening. She consistently complained of severe weakness in her legs, numbness and swelling in her feet and toes, and eventually, balance problems leading to falls. She politely requested help, stating, "I would like to be seen to find out why [numbness in toes and ankle swelling] is happening. Thank you" (HNR dated 9/22/18), and, "I would like to find out what is going on with my lower body. Thank you." (HNR dated 7/1/19.)

105.    In response, she saw nurses, her NP, and, starting in September 2018, a physician. Over and over, the nurses, MDs and NPs failed to do the appropriate physical exams or the necessary MRI to determine whether she had MS, despite the fact that she consistently exhibited symptoms that should have been investigated.

106.    Predictably, her condition deteriorated. In May 2019, she told her physician that she would stumble and fall to the ground after five minutes of walking, and could not catch herself. Inexplicably, again without doing the appropriate exams or ordering the

necessary MRI, the doctor concluded again that the "signs and symptoms don't make sense for MS," when in fact they did.

107.   On 7/10/19, she again saw her physician and described an ICS in June where her knees locked up. The physician described her gait with "flopping feet almost as if foot drop" and she cannot dorsiflex. His assessment was "likely conversion disorder (particularly because patient does not appear to be very emotionally distressed by her current condition.[)] Doubt MS." This is a clinically incorrect and completely unprofessional conclusion.

108.   When she saw a nurse in October 2019, the nurse's objective notes stated "steady and even gait," which appears to be cut and pasted, because she then stated "IM gait was unstable, IM was holding on to anything she could while she was walking in."

109.   Finally on 12/4/19, after more than two years of staff dismissing her concerns, Ms. Johnson's doctor ordered the critical MRI. At that visit, he wrote: "Gait she walks almost as if you would see in a Frankenstein movie. Very awkward and needs her hands for balance." Again, this is a grossly unprofessional and dehumanizing nonmedical assessment of a very sick patient. He also ordered lab tests, including for Myasthenia Gravis, even though nothing about this case points to that diagnosis.

110.   The 1/23/20 MRI results strongly supported a diagnosis of MS.

111.   Two months later on 3/20/20, Ms. Johnson finally saw a neurologist regarding her MRI results, who recommended a series of additional imaging studies, lab tests and a return visit in one month. She should have returned promptly to the neurologist with the recommended studies and test results for confirmation of the diagnosis and a

-42-

treatment plan, but did not return until November 2020. At that point, the neurologist finally confirmed that she had MS, more than three years after she initially reported symptoms. He asked to see Ms. Johnson back in a month to discuss treatment options, but that did not happen. When she next saw a neurologist on 1/28/21, the specialist wrote that her mobility had progressively declined, and she used a wheelchair, had urinary incontinence, and had not been given an MS medication. The neurologist recommended she go to the "local MS center" to set up a treatment plan.

112.    On 4/6/21, her physician in a consult request noted Ms. Johnson's "debilitating muscle spasms" and referred her to an MS clinic. That referral was cancelled because it was determined Ms. Johnson would start receiving MS medications at the prison. On 5/28/21, Ms. Johnson finally started receiving Ocrevus (ocrelizumab), the appropriate medication for her condition.

113.    Treatment with Ocrevus will not cure Ms. Johnson, nor will it reverse her deterioration. At best, it will slow the progression of her disease. Had she been started on Ocrevus four years ago, when she first exhibited symptoms, she might have staved off her more severe symptoms for months or even years.

114.    I met Ms. Johnson at Perryville on 8/31/21. She is unable to walk, feed or wash herself, or write, and her eyesight is failing. She is completely dependent on others to help her with toileting, eating, washing and virtually every activity of daily living. The best she can hope for is that the Ocrevus will allow her to continue to speak, swallow, and shift her body weight for some period in the future. She is 36 years old. At this point in

23774493.1

time, she has a Kurtzke disability scale rating of 9 out of 10 (with 10 being death). She is

profoundly disabled.

**2.**

115.    I met                          when I visited the infirmary at ASPC-Florence

on 9/8/21. He is another example of repeated failures to take a patient's reports seriously,

resulting in unacceptable delays in diagnosis and what likely will be a lifelong disability.

116.    Mr.       reported severe pain in his neck beginning on 2/23/21. He was 44

years old at the time and housed at ASPC-Florence. (*See* Nurse - ICS Response (2/24/21)

("Patient states that he started having left shoulder pain that radiated to his left upper back

since yesterday morning. . . . Describes pain as sharp, INTERMITENT [sic] DIZZINESS

AND sob [shortness of breath]"; also states he had been asking for ICS since yesterday.);

HNR dated 2/24/21 ("Emergency - dying of pain, pinched nerve in neck Need help

ASAP.").)

117.    Mr.       was seen by three different RNs on 2/24/21 and 2/25/21 for his

reports of a new onset of major neck pain with neurological elements. On 2/24/21, RN

Kidd-McDonald noted verbal orders from NP Fullmer for an EKG, x-ray, and Toradol.

She also noted orders for prednisone, diazepam, capsaicin cream, and ibuprofen. These

23774493.1

orders were dangerous: prednisone, ibuprofen, and Toradol are contraindicated for use together, and could have led to a gastric ulcer or rupture.

118.    RN Kohlmeier saw him later that day, and reported in the medical record that Mr.        reported that he was in tremendous pain and that, on a scale of 10, his pain was at a 20. The RN contacted a provider, who denied Mr.        request for a repeated dose of diazepam and Toradol and advised an ice pack (given) and ibuprofen (given). She wrote the following Plan Notes: "Continue plan of care as ordered by provider." On 2/25/21, in response to his HNR, Mr.        was seen by RN Andre, who assessed him with "Altered comfort RT neck," determined that no referral to a provider was necessary, and wrote, under Plan Notes, "no follow up."

119.    Six days later, on 3/3/21, an ICS was called for pain, and Mr.        was scheduled to see a provider. He was seen by NP Fullmer on 3/4/21. She noted that she had informed Mr.        the day before that he should see him on 3/4/21 "to discuss plan of care to manage his pain and eliminate the need to initiate an ICS inappropriately." She noted that Mr.        "reports no change in his pain despite topical creams and NSAIDS" and that "he has very limited mobility" and "'twinges' of pain to the low back." NP Fullmer did not perform an appropriate neuro exam for a patient complaining of back pain and neck pain. She never tested reflexes, and there is no assessment for clonus (a physical exam finding of an involuntary rhythmic contraction of muscles caused by damage to the central nervous system). When he was admitted to the hospital a few days later, he had significant clonus on exam, which is an ominous finding. NP Fullmer listed the following Plan Notes: "review XR, f/u as needed."

23774493.1

120.    A rheumatoid panel was ordered on 3/4/21, which returned a C-reactive protein (CRP) result of 20.3 (normal is 0.8-1.0), which is significantly elevated and indicative of acute inflammation, which is strongly suggestive of infection. NP Fullmer reviewed the results on 3/13/21, and wrote only: "acute inflammation" and "f/u in 1-2 wks." Additional labs and studies should have been ordered after the CRP results were received. Mr.          in fact, as was determined about a week later at a community hospital, had developed a blood infection that had settled in his vertebra, which usually is a very painful condition. Further, while medical staff delayed diagnosis, an abscess in his spine was growing and compressing his spine more. Had a provider taken his medical history seriously, performed an appropriate physical exam, and interpreted his labs correctly, they should have easily suspected the infection and sent him out for diagnostic confirmation and treatment much earlier.

121.    Mr.          was not seen again by medical staff at ASPC-Florence, and was transferred to ASPC-Eyman on 3/16/21. He reported back pain upon arrival and was given ibuprofen. Over the next two days, three ICSs were called for severe pain that affected his mobility. (*See* Nurse - ICS Response (3/17/21) (called for "severe, excruciating pain in neck and down back"); Nurse - ICS Response (3/18/21) (called after Mr.          reported "he tried getting up for food and his back gave out."); Nurse - ICS Response (3/18/21) (called after Mr.          reported that he fell off his bunk after his back gave out when he tried to get up to use the restroom; he reported "neck pain, back pain, and tingling radiating down the arms and back," as well as "difficulty breathing").) After the first two ICSs, he was given Toradol shots. He had to be moved by wheelchair to be evaluated after

23774493.1

the ICS on 3/17/21, and had to be transported to the clinic on a gurney for the two ICSs on 3/18/21.

122.    Mr.        was seen by NP Brathwaite on 3/19/21. NP Brathwaite's notes in the medical record document Mr.          deterioration and increasing neurological dysfunction: "Patient reports to clinic on stretcher complaining of severe back pain and complete loss of sensation on right side of body incontinence inability to ambulate," and "Patient reports bladder incontinence, inability to ambulate x 2 weeks." The NP sent Mr.       by ambulance to a community hospital emergency room.

123.    There, Mr.        was diagnosed with suspicion of spinal abscess and admitted to the hospital. He had surgery for an epidural abscess C6-7 on around 3/21/21, nearly four weeks after his initial complaint. Following the surgery, Mr.        was transferred to a subacute hospital where he stayed for two months. The epidural abscess grew in size over time and the symptoms he was having were the result of the abscess compressing his spinal cord. That compression for a long period of time causes nerves to die and his current disability is due to the damage from that prolonged pressure.

124.    I met Mr.        on 9/8/21, over five months after he had been sent to the ER. At that time, he was housed in the infirmary. As can be seen in the video taken during my visit, Mr.        still struggles to walk, even with the support of a walker. (*See* ADCRR00108128.) He probably will never regain normal functioning, which he had before this happened. He will be substantially impaired the rest of his life. Mr.        is lucky to be functioning as high as he is. A lot of patients with abscesses like his end up completely paralyzed.

23774493.1

125.   This was preventable. Mr.        described his problem clearly and he reported it to medical staff numerous times for almost a month. It is axiomatic that any time a patient presents with a new onset of severe pain coupled with neurological disability they have to be worked up fully for the problem. If they had taken his reports seriously, and attempted to identify the source of the problem instead of simply temporarily treating the pain, medical staff could have caught and treated it early, before it compressed his spine so much that it caused permanent damage. The medical documentation also is poor, rudimentary, and incomplete, with no documentation of a proper neurological exam. Testing for reflexes and assessing for clonus are simple and important tests to identify issues with the central nervous system. This is basic clinical practice that all providers are trained to do – but all Mr.        providers failed him.

* * * * *

126.   These five case studies illustrate several common failings of the healthcare delivery system in Arizona prisons that I observed repeatedly in patient files, including nurses practicing outside the scope of their licenses, nurses performing inadequate assessments and failing to refer patients to providers, providers failing to develop and test differential diagnoses to evaluate the cause of symptoms, providers failing to do basic physical exams, minimal or no involvement of a physician in the care for complex patients, failure to provide adequate pain management to end-stage cancer patients, and unreasonable delays in specialty care, all of which can lead (and, as the examples above show, has led) to unnecessary suffering, permanent harm and death. In the remainder of this report, I identify and discuss these and other systemic issues in turn. It is important to

23774493.1

remember, however, that they do not occur in isolation -- as can be seen from the cases above, patients often suffer from these failings in combination, and quite regularly.

## II.     The ADCRR lacks the capacity for self-correction

127.    Central to the performance of any health care system is the capacity to identify errors and fix them. My review of systemic failures of the ADCRR system begins with a discussion of the leadership's demonstrated inability to self-correct.

### A.     Defendants' mortality review process fails to identify and correct systemic and individual medical treatment errors.

128.    Court expert Dr. Stern, in his report to the Court in 2019, noted that a mortality review "is a critically important element of patient safety because it can identify important systematic errors -- both those causally related to the current death as well as those which are not, but might cause future deaths if left unrecognized -- and lead to their remediation." (Doc. 3379 at 132-33.) Thus, after a patient dies in custody, the ADCRR must conduct a comprehensive mortality review to identify errors in care and process, learn from experience, improve quality of care, and take action to avoid serious and fatal mistakes in the future.

129.    Dr. Stern noted that the Stipulation's requirements focused on timeframes and were "silent with regard to the adequacy of the [mortality review] process." (Doc. 3379 at 133.) He noted that there were four aspects of adequacy that were not addressed: (1) "the PMs do not measure whether all significant errors were identified," (2) "the PMs do not measure whether the root cause of a significant identified error was determined," (3) "the PMs do not measure whether the plan was appropriate and sustainable nor

whether it was actually implemented," and (4) "the PMs do not measure whether the implemented remediation was effective." (Doc. 3379 at 133-34.)

130.    Dr. Stern identified serious deficiencies in the ADCRR's mortality reviews and suggested the following metric: "Following a death, all significant errors are identified. Based on prioritization of all errors identified in the organization, root cause analysis is conducted as appropriate, from which an effective and sustainable remedial plan is implemented. The remedial plan is monitored for effectiveness and appropriate modifications are made to the plan based on the monitoring." (Doc. 3379 at 135.)

131.    I agree with Dr. Stern's findings and recommendation. It is clear, through my analysis of mortality reviews authored in the last two years, that there are still significant deficiencies in the process. I did not find the mortality reviews, on the whole, to be honest, thorough, or effective. They minimized the harm caused by healthcare staff, lacked the requisite specificity, failed to identify clear errors in care, failed to offer effective recommendations, and evidenced no staff accountability, even after identification of serious errors that led to a patient's death.

132.    Unfortunately, as can be seen throughout this report, the types of problems that were or should have been identified through mortality reviews are endemic to the ADCRR healthcare system and remain uncorrected to this day.

133.    First, the ADCRR's mortality reviews continue to minimize the harm caused by healthcare staff. For example, the reviewer concluded that it was "undetermined" whether                           death was avoidable. (ADCRR0000099.) I disagree. Healthcare providers both prescribed a medication that was

23774493.1

very dangerous for Mr.          which caused gastrointestinal bleeding, and failed, repeatedly, to identify the problem, even when lab work clearly showed that he was bleeding internally, and even when Mr.          repeatedly reported severe pain, difficulty breathing, bleeding, and an inability to perform activities of daily living, and instead increased the dosage to even more dangerous levels until he finally died from a massive gastrointestinal bleed. (The mortality review properly notes, as contributing causes, "[f]ailure to recognize symptoms or signs" and "[f]ailure to follow-up/identify abnormal test results," and that Mr.          was "on chronic high dose NSAIDs" that "can cause GI bleeding." (ADCRR00000098-0100.))

134.    Second, the mortality reviews fail to identify clear errors and responsible parties. The mortality review of                          for example, made no mention of staff's failure to provide any pain management to the end-stage cancer patient in the months before his death. (ADCM1608411-1608420.) And "discussion" of the factors contributing to                          death is, in full: "Clinical signs on 1/9/20 and 1/11/20 indicated the patient should have been sent out." (ADCM1615640.) There is no discussion of which healthcare staff were involved, or what "clinical signs" they missed. The case summary, too, does not identify specific healthcare staff. (ADCM1615638.) (I discuss concerns with this patient's care below, in Section IV(B)(1).) In fact, on the whole, and even where healthcare staff were found at least partially at fault, staff names are not included. The mortality reviews are a form of peer review and when individual mistakes are identified, there should be a specific corrective action plan for that individual that is identified and then implemented.

23774493.1

135.   In addition, some mortality reviews miss the mark entirely by failing to identify and address the core cause of many of these problems: nurses practicing outside the scope of practice, insufficient physician-level oversight, and failure to refer the patient to someone qualified to diagnose and treat them. (*See, e.g.,*                      discussed in Section I(A)(2), above;                              discussed in Sections III and IV, below;                         discussed in Section IV(B)(2), below.)[3] These are fundamental flaws in the ADCRR's medical delivery system generally and should have been identified and addressed through this process, but were not. In fact, in reviewing the care provided to Mr.            the reviewer wrote: "Should the patient have been referred to a provider for the complaints of shortness of breath and diffuse pain? No. The evaluation and recommendations by nursing were appropriate given the clinical presentation." (ADCRR00000035.) That simply is incorrect. Indeed, as I discuss in Section III(A), below, the nurses failed to abide by the criteria of the NET itself to refer Mr.            to a provider given his reported symptoms.

_____

[3] An exception is the mortality review of                      which at least identified that "the patient presented 3 times with signs/symptoms of a GI bleed and this was not escalated to the provider level." (ADCRR00000007.) The only related recommendation, however, was training that "will emphasize the importance of a physical exam, as well as elevation of care to a provider for emergencies, including suspected GI bleeds." (ADCRR00000008.) That is insufficient to address the systemic and structural infirmities of the healthcare system in Arizona prisons. Similarly, the mortality review for                      noted that the first reviewer "indicated that giving subq epinephrine without appropriate monitoring was out of scope of nursing practice." (ADCM1652233.) The related recommendation ("CAP has been implemented regarding the appropriate use of Epinephrine when providing emergent care in a suspected cardiac arrest situation." (ADCM1652234)) again was too narrow to address the endemic issue of nurses practicing outside the scope of their licenses with insufficient physician oversight.

136.    Third, the recommendations often are incomplete, do not address all identified errors, and are too general or cursory to be effective. For example, there are only two recommendations related to Mr.            death: (1) that hemoccult test orders be documented and nurse's follow-up to ensure that patients return the tests, and (2) that patients started on chronic NSAIDs have a follow-up 30 to 45 days after any new medication start or dosing change. (ADCRR00000101.) The identified errors in care in this case are detailed in Section I(A)(2) above, and they are much more profound than what the mortality review determined. The mortality reviews tend to gloss over major deficiencies and understate the severity of the breaches in the standard of care.

137.    In addition, although the reviewer correctly found that

        "pain was not addressed adequately," there are no recommendations on how to address that problem. (ADCM1589819-1589820.) And the mortality reviews of those who died from substance misuse failed to identify the need for medication assisted treatment (as I discuss in more detail in Section IV(B)(7), below). (*See*                          ,

ADCM1615615-1615618;                          ADCRRM0004662-4665;

                ADCM1575247-1575250;

ADCM1570724-1570728; and                          ADCM1603925-1603928.)

138.    Often, recommendations simply restate what should already have been the standard, without explaining what will be done to ensure it is followed in the future or what will be done to hold staff accountable for violating it. (*See, e.g.*,

        ADCM1615641 (sole recommendation is: "Recognizing and rechecking any abnormal vital signs and be alert for questionable clinical findings and escalate");

-53-

23774493.1

ADCM1669338 ("1. If a patient is pronounced deceased by emergency medical services, then this must be documented in the medical record. 2. Patients with suspected COVID-19 must be assessed during every shift by nursing and once per day by a provider. 3. Handoff communication must be documented in the medical record. 4. Nursing encounters should be documented on the appropriate form in the medical record.");

ADCRR00000016 (sole recommendation is: "Scheduled follow up visits for provider, pulmonary clinic, and chronic care visits shall be documented in the electronic health record.");                    , ADCM1623209 ("1. Logical, sequential documentation of care provided should be done by the Health Care Practitioner (HCP) and Nursing staff especially when multiple recommendations are made by the Consultant. 2. Patients returning from outside consultations should have consistent documentation as to where they went and if any records returned with the patient. 3. When Consultant's notes are reviewed by the HCP, notation should be made detailing the next plan of care.");                    , ADCRRM0000021 ("1. Patients with cardiomyopathy should be comanaged with a cardiologist. 2. EMS should always be activated first (prior to notifying a provider) during a code response.").)

139.    This is true even in those mortality reviews where the reviewer correctly found that the death was possibly avoidable. (*See, e.g.*, ADCM1608412;                    ADCRR00000006;

ADCM1591248).) For example, as discussed in detail in Section I(A)(1), there were numerous, shocking errors that led to the death of                    And yet the only recommendations in the mortality review are: "When returning from offsite, the

-54-

23774493.1

chart needs to reflect where and what was the reason for the send out. Educate staff towards higher levels of competency regarding charting, updating problem lists, and follow up. Share findings of final mortality reviews with all of the providers and complexes involved in the case." (ADCM1608420.)

140. Those recommendations are fine to make, but the key to leveraging what you learn from reviewing a death is to conduct quality studies after the recommendations have been put in place to ensure that they have been implemented and the ongoing practices have been changed. The fact that these simplistic, commonsense items continue to show up as deficits in mortality reviews suggests strongly that the recommendations are not really taken seriously or incorporated into the institutional practices.

141. Fourth, the ADCRR does not appear to have a system to translate findings from the mortality reports into corrective action. According to Dr. Wendy Orm, Centurion's Medical Director for Arizona, when a recommendation in a mortality review is "actionable, then a CAP [corrective action plan] will be written," and the CAP will be documented in CQI meeting minutes[4] and monitored by the monitoring bureau. Dr. Orm testified that the CQI committee at each ASPC was responsible for reviewing the recommendations and "turn[ing] them into a CAP in answer to their interpretation of that recommendation, however it's written." (Deposition of Dr. Wendy Michelle Orm,–

---

[4] CQI (continuous quality improvement) committees meet regularly at each ASPC. My review of these minutes shows that like the mortality reviews, they often miss central deficiencies and fail to ensure correction of those deficiencies that they identify. As I discuss elsewhere in this report, the CAPs they generate are all too often utterly inadequate to address the underlying problems.

23774493.1

Medical, Individual – October 13, 2021 (hereinafter "Orm Dep. Individual"), 140:5-12, 18-23; 141:3-4.)

142.    Development of an appropriate CAP therefore is contingent on "actionable" recommendations, which too often I did not see in the mortality reviews, as discussed above. In fact, when asked how the recommendation in                    mortality review that "Patients started on chronic NSAIDs should have a 30- to 45- day follow up after any new medication start or dosing change" would be translated into a CAP, Dr. Orm, who signed off on that review in August 2021, and who is responsible for reviewing all mortality reviews unless she is on leave, responded only: "Good question. I'm not sure how they translated this recommendation into a CAP." (Orm Dep. Individual, 165: 5-18; 168:12-21; 172:1-5, 17-20; 173:15-18; 175:20-21.) If the recommendations in the mortality review are to be the foundation for CAPs and allow the ADCRR to learn from their mistakes, it is critical that they be drafted in such a way to provide appropriate guidance to the institutions, that the healthcare staff impacted by the new CAPs be educated about them, and that continued oversight be provided by statewide officials.

**B.    Testimony from the Centurion Medical Director for Arizona supports my findings of a high level of dysfunction in the ADCRR healthcare delivery system.**

143.    Dr. Wendy Orm testified in her deposition that, as the Centurion Medical Director for Arizona, her duties are to oversee the delivery of medical care "to all of the inmates at . . . the 10 state prisons in Arizona." (*Id.*, 11:14-18.) Based on my review of her testimony, I believe that her failure to monitor and recognize the clear deficiencies I

23774493.1

have identified demonstrates a lack of leadership that contributes significantly to the perpetuation of those deficiencies.

144. Specifically, Dr. Orm's testimony indicated a troubling lack of insight into deficiencies in nursing care, the use of mid-level providers, continuity of care following hospitalizations, and medication assisted therapy for substance use disorder.

145. For example, she testified that she is satisfied that the nurses appropriately assess patients and believes that they accurately determine when and whether to refer patients to a provider for care. (*Id.*, 100:12-16.) She was not, however, able to point to any studies that would support her belief, and the medical records that I reviewed show her belief is unfounded, as I describe in Section III, below. (*Id.*, 100:17-102:22.)

146. The medical director is responsible for quality of care throughout the system. Dr. Orm's failure to have conducted any quality assurance studies on the accuracy and appropriateness of the nursing assessments and on the limited throughput of patients to providers is an abrogation of her basic duties. While this should be done as a routine oversight practice, what is even more alarming is that multiple death reviews have implicated inadequate nursing referral and errors made by nurses as causal elements of preventable deaths, as discussed above. Given these findings, it is inexcusable that Dr. Orm has never studied this matter and does not feel that this is an important element of her oversight of the system.

147. As explained in Section IV(A), below, when patients are able to see a provider, it is almost always a mid-level practitioner, who may be unqualified to address the patient's complex medical needs. Dr. Orm confirmed that there is no requirement that

-57-

23774493.1

certain patients be assigned to a physician for care. (*Id.*, 29:4-7.) She believes that mid-level providers appropriately seek review from a physician in complex medical cases, but she testified that she does not review charts to review whether they in fact do so, nor does she have studies to support that belief. In fact, she stated she would not know how to set up such a study. (*Id.*, 107:20-109:3.) Assessing appropriateness of referral is one of the most basic elements of peer review and it is one of the core tasks of the medical director role. If Dr. Orm does not know how to conduct peer review, then she is not qualified to serve as the medical director of a complex healthcare system.

148.    Designing a study to survey whether mid-level providers appropriately seek a physician's assistance when caring for people with highly complex conditions would not be difficult. In fact, I did such an analysis in much of my report. There are many ways to approach this, but the most fundamental and critical would be to start with the death reviews and do a deep dive on whether the patient received appropriate care from nursing, whether the nurses appropriately referred problems to providers, and whether providers acted reasonably in working up patients and requesting help from supervising physicians. Unfortunately, many of the death reviews identified deficiencies in these areas but the action plan to investigate further was ineffective and the death reviews were summarily signed off by Dr. Orm without any further identifiable action plan.

149.    One of the weakest links I found in reviewing medical records for continuity of care was the hand-off between hospitals, following admission, and the prison upon the patient's return (*see* Section V, below). The previous Stipulation included a Performance Measure requiring that providers review and act on a hospital's treatment

23774493.1

recommendations within 24 hours of a patient returning from an inpatient stay or ER transport. (Doc. 1185-1 at 11.) Dr. Orm acknowledged that it would not be acceptable for 15 percent of patients to return from the hospital and not have their hospital discharge recommendations reviewed by a provider within 24 hours. (Orm Dep. Individual, 35:23-36:17.) As noted below, the ADCRR's own data shows such unacceptable ratings frequently in various ASPCs in 2021.

150.    Dr. Orm testified that despite this data, she believes that patient's discharge recommendations are timely reviewed, based on what site leadership tell her, and the fact that she has reviewed health records where the discharge summaries were reviewed within 24 hours. (*Id.*, 42:19-25; 43:3-21.) Dr. Orm chooses not to believe Defendants' own data on this measure, calculated pursuant to a process agreed upon by the parties. I have seen no basis for disbelieving the CGAR data on this issue, and Dr. Orm offers no meaningful alternative to measure compliance. I disagree with Dr. Orm's rejection of the ADCRR data, which, while based on a relatively small sample size, has regularly documented poor performance over many months and is consistent with the health records that I reviewed.

**C.    ADCRR healthcare leaders have no capacity to improve the clearly deficient staffing.**

151.    One of the key functions of leaders responsible for healthcare operations in correctional systems is to ensure that staffing is adequate. As I noted above, I agree with Dr. Marc Stern that staffing deficiencies have long been fundamental to the problems with healthcare in the ADCRR. Unfortunately, the leaders responsible for healthcare operations in Arizona state prisons have failed for years to address these deficiencies.

-59-

23774493.1

152.     The persistence of this problem can be understood from reading the deposition testimony of Dr. Wendy Orm, Centurion Medical Director for Arizona, and ADCRR's Assistant Director Larry Gann, speaking on behalf of Centurion and the ADCRR respectively. Their statements demonstrate that both Centurion and the ADCRR have absolved themselves from any responsibility over staffing levels, with each claiming they have no power to impact either the type or number of healthcare workers hired. This bureaucratic intransigence ensures that the staffing levels will not be scrutinized, staffing deficiencies will not be addressed, and patients will continue to be denied access to the level of healthcare they need.

153.     Dr. Orm[5] disavowed any input into or influence over the healthcare staffing levels in the ADCRR. Instead, she testified that the level of staffing needed at each prison complex was "predetermined" prior to the start of Centurion's contract and that Centurion is "bound to what was determined and dictated" to them. (Deposition of Dr. Wendy Michelle Orm, – Medical, 30(b)(6) – October 13, 2021 (hereinafter "Orm Dep. 30(b)(6)"), 17:20-24; 19:12-20:1; 28:1-12.) According to Dr. Orm, "whatever that staffing matrix was that was agreed on that the ADCRR supplies is how we assign staff." (Orm Dep. 30(b)(6), 22:8-10.) She testified that she did not know whether Centurion provided information to assist in setting the staffing levels, and had no knowledge regarding how those staffing

---

[5] Dr. Orm was designated to speak on behalf of Centurion on the issues of how policies and procedures and community healthcare standards impact specific types and quantities of healthcare staff and how they impact levels of healthcare staff at the ten prisons. Additionally, she was designated to testify regarding the policies and procedures related to the recruitment and retention of healthcare staff, and the licensure requirements for each classification of medical staff.

-60-

levels were determined. (*Id.*, 28:5-8.) She also testified that, although she is Centurion's Medical Director, she is not involved in providing feedback to the ADCRR about their staffing levels. (*Id.*, 18:8-12.)

154.    Assistant Director Larry Gann is charged with "manag[ing] the entire contract" with Centurion "and the provision of the health care that's provided." (Deposition of Larry Gann, Jr. – Medical, 30(b)(6) – October 13, 2021 (hereinafter "Gann Dep. 30(b)(6)"), 84:12-13.) Testifying as the ADCRR's most knowledgeable person about staffing, Mr. Gann stated that "the [staffing] model has been in place for a number of years and it was not something that is negotiated by us ongoing."[6] (*Id.*, 13:19-21.)

155.    Whereas Dr. Orm claimed that the staffing levels were preset before Centurion entered into the contract, Mr. Gann testified the staffing number "was set into place by … Centurion" based on "what their needs were going to be to run this contract." (*Id.*, 13:24-14:2.) When asked whether the ADCRR had authority to tell Centurion to hire additional staff if they find staffing levels insufficient, Mr. Gann replied, "That's

_____

[6] In particular, Mr. Gann was designated to speak on behalf of the ADCRR on the development and maintenance of the ADCRR's currently healthcare staffing models and allocation of healthcare staff across the ten prisons; the ADCRR policies and procedures regarding specific types and quantities of healthcare staff across the ten prisons; the ADCRR policies and procedures with respect to healthcare staffing levels; how policies and procedures and community healthcare standards impact specific types and quantities of healthcare staff; policies and procedures and community healthcare standards impact the levels of healthcare staff; how demands for specific types of healthcare services are determined based on incarcerated persons, clinical demographic, and security characteristics; policies and procedures related to the recruitment and retention of healthcare staff; the type of licensure requirements for each classification of healthcare staff; the average number of holidays and paid leave available to each healthcare staff member; and the inputs of healthcare staffing schedules such as the inclusion of paid or unpaid leave.

something I've never been able to do." (*Id.*, 33:14-17.) He then explained, "I hire Centurion to take care of this contract. They are the experts. They are the biggest in the field. We chose them. I'm not going to tell them how to do their job." (*Id.*, 35:10-13.)

156.    The ADCRR has no written policies or procedures regarding the type or quantity of healthcare staff that each facility needs. As Mr. Gann said, "We rely strictly on the vendor for that." (*Id.*, 35:19-36:12.)

157.    The ADCRR defers to Centurion for most healthcare staffing-related issues. For example, Mr. Gann testified that he has no authority to tell Centurion who to hire, or how to discipline their employees. (*Id.*, 35:16-18.) He said, "I can't tell them who to discipline, who to coach, who to let work certain hours and who not to." (*Id.*, 84:13-15.) The ADCRR does not track whether healthcare staff members are on duty. (*Id.*, 84:16-18.) Mr. Gann does not have access to information about when a site is having staffing vacancies because they cannot cover shifts. (*Id.*, 85:9-12.)

158.    According to Mr. Gann, vacancies are a significant problem -- indeed, he acknowledged having imposed over $12 million in penalties against Centurion for positions remaining vacant.[7] (*Id.*, 28:7-14.) Mr. Gann regularly receives requests for

---

[7] Despite these admissions, Mr. Gann touts the fact that the ADCRR prisons have met National Commission on Correctional Health Care (NCCHC) accreditation standards, suggesting that this indicates patients are receiving necessary healthcare. (*Id.*, 39:25-40:5.) As I have explained in a previous report filed in this case, the NCCHC's accreditation of the ADCRR raises an inherent conflict of interest. "Centurion is a prominent financial supporter of NCCHC, including underwriting and sponsoring its many trainings and conferences held throughout the year, and frequently advertising in NCCHC's publications." (Doc. 3610-1 at 2.) In any event, the NCCHC has never and does not now purport to assess the adequacy of staffing levels as part of its accreditation process. In

additional staff because the facilities are "not completely staffed. They are trying to recruit people and they have a great deal of vacancies at this time." (*Id.*, 61:11-13.) "I don't know that any facility has a fully staffed complement at this particular time." (*Id.*, 61:20-21.) These vacancies persist, according to Mr. Gann, because Centurion is "having a huge issues with recruiting." (*Id.*, 64:3-4.) Mr. Gann's monthly analyses show the most vacancies in leadership, middle management and nurses (LPNs and RNs).[8] (*Id.*, 64:20-25.)

159.    The executives in charge of healthcare systems must make staffing a top priority.  The fact that neither the Centurion Medical Director nor the ADCRR's most knowledgeable person on staffing believe that they have any control over the level of staffing, nor do they apparently have the capacity to address intractable staff vacancies, goes far to explain why the ADCRR continues to operate with a gross staffing deficit.

---

fact, the NCCHC has always declined to offer any guidance on staffing other than to provide an umbrella statement that "The responsible health authority (RHA) ensures sufficient numbers and types of health care staff to care for the inmate population." (NCCHC Standards for Health Services in Prison, 2018, pg 61).  Moreover, the NCCHC accreditation process involves only a cursory review of quality of care -- their standards instead focus heavily on the existence of processes and whether certain required policies and procedures are in place.

[8] Mr. Gann confirmed the severe staffing shortages of RNs and LPNs in the system, particularly at ASPC-Tucson and ASPC-Yuma. (Deposition of Larry Gann, Jr. – Medical, Individual – October 13, 2021 (hereinafter "Gann Dep. Individual"), 48:1-3, 9-11.) He also described how these shortages adversely impact patient care – particularly, in the discovery by an ADCRR monitor of 20 canceled nursing lines at ASPC-Tucson. (*Id.*, Gann Dep., 72:3-13.) Mr. Gann stated, "[w]e were told that nursing lines were being held and . . . we discovered that they were not being held." (*Id.*, 72:19-21.) He confirmed "extreme staffing issues" at ASPC-Tucson, and "Centurion was not conducting lines on a regular basis." (*Id.*, 73:7-9.) While the failure to hold nursing lines at any prison is a very serious problem, it is particularly alarming at ASPC-Tucson, the ADCRR prison that typically houses many of the sickest patients in the system.

23774493.1

160.    The testimony of Dr. Orm and Mr. Gann leaves me even more firmly convinced that staffing is the root of the ADCRR's healthcare deficiencies. These staffing problems persist and recur because neither the ADCRR nor Centurion adequately analyze, monitor, or take responsibility for addressing them.

**III.    People in ADCRR custody are at substantial risk of serious harm because prison nurses fail to provide adequate care and act as a barrier for patients seeking access to their primary care providers.**

161.    The ADCRR's nursing triage process is fundamentally broken and results in terrible care for patients.

162.    In a healthy system, nurses perform triage. In particular, a nurse should assess the patient and assign a degree of urgency to the patient's condition, and then refer the patient for care on that basis. To do this, a nurse should take and record vital signs, take the patient's history, examine the patient and, based on that information, determine how fast the patient should be seen for the problem by a provider. The patient then should be scheduled to see a provider, in accord with the nurse's assessment of urgency. The provider, in turn, should review the patient's chart, including the nurse's triage note, before seeing the patient so they understand the patient's history and current health issue(s) and are prepared for the encounter. There will be times when the nurse can resolve limited, straightforward health issues, including when following adequate nursing protocols. An example of this would be providing some over-the-counter antifungal cream to a patient who has an uncomplicated case of athlete's foot. However, in a well-functioning system, a high percentage of patients should pass through the triage process to see a provider, who can then diagnose their condition and prescribe appropriate treatment.

-64-

163.    The ADCRR has set up an entirely different model in its prison system, and it is dangerous. Essentially, the ADCRR has set up a nursing sick call system, in which Registered Nurses (RNs) function as primary care providers (PCP), as guided by nursing protocols embedded in Nursing Encounter Tools (NETs). The NETs are templates for care that are supposed to guide the nurse's exam and assessment of the patient, and help the nurse formulate a plan of care, including whether to send the patient to a PCP.[9]

164.    This model does not work. In reviewing hundreds of individual healthcare encounter records, I have observed that nurses routinely fail to accurately identify the patient's presenting complaints, choose the wrong NET for the patient's complaints, fail to complete the nursing NETs that are supposed to guide their actions, and often fail to reach the correct disposition. Rather than facilitating a timely referral to the patient's provider for diagnosis and treatment, with an accurate record reflecting the patient's current condition, the nurse line has become a barrier that must be overcome in order to reach a provider to receive medical treatment. In interviewing patients during my most recent tours, I frequently encountered statements that the system has an unwritten practice that you have to be seen at least three times by a nurse before they will allow you to see a provider. I found many instances in my review of charts that support this statement.

---

[9] According to the ADCRR Medical Services Technical Manual, "The purposes of the Nursing Emergency Response Orders, Nursing Assessment Protocols and Nursing Encounter Tools (NETS), are to provide Vendor nursing staff with standardized nursing practices based on nursing statutes and regulations to deliver quality nursing care to the inmate population." (Medical Services Technical Manual (MSTM), Ch. 5, § 1.5.) "The NETS and Nursing Assessment Protocols provide[] step-by-step guidelines in the management of the patient, and provide the guidance to the Nurse in advising the patient what over the counter medication the inmate can utilize in the maintenance of basic illness/injury." (*Id.*)

165.   As a result, patients end up placing multiple HNRs, and in response see nurses multiple times, without ever actually receiving the care they need. Through this process, patients' reports of healthcare needs get discounted, delayed, and diminished, and the patients languish without treatment. In some cases, their conditions deteriorate, and by the time the patient is finally seen by a provider or sent to the hospital, where they can be properly diagnosed, it is too late, and they have suffered serious and permanent harm, as was seen in the cases of Mr.          and Mr.          discussed previously.

166.   The current system's dangerous inadequacy is not a secret. Even the ADCRR's own mortality reviews identify the problem again and again. (*See, e.g.*, ADCM1591249, Mortality Review of                          (11/26/19) ("Care should have been escalated to the Health Care Practitioner in a more timely manner after two HNRs were submitted by the patient for the same complaint."); ADCM1589820, Mortality Review of                          (10/31/19) ("Nursing to be provided education regarding multiple HNR for the same complaint to be elevated to the practitioner."); ADCM1584249, Mortality Review of                          (9/16/19) ("It is important [that] patients with neurologic changes be elevated to the attention of a provider."); ADCM1578158, Mortality Review of                          (8/8/19) (recommending "[n]ursing education regarding signs and symptoms and when to alert the provider to see the inmate"); ADCM1580652, Mortality Review of                          (8/16/19) (recommending that "[a]fter nursing sees a patient twice with the same complaint that appears to be getting worse, the patient must be seen by a provider per policy and NCCHC standards"); ADCM1598094, Mortality Review of

(10/8/19) (recommending "[e]ducation in nursing assessment in the recognition

of 'red flag' warning signs for CHF and the need to escalate to higher level");

ADCM1608434, Mortality Review of                                    (3/16/20) ("**Nursing** It is

important to communicate with the provider and elevate care as appropriate. Noted

change in patients [sic] physical findings was not elevated to appropriate provider.").)

167.    I, too, have written about it in my past reports. In a report from 2013, which

later was filed under seal with the Court (Doc. 946-1, Ex. 1), for example, I wrote (at

pages 43-44): "The heart of a functional healthcare delivery system is the ability of the

appropriate clinicians to exercise their professional medical judgment regarding patient

care. In order for that to happen, providers must first be able to see patients and second

must be equipped with the appropriate information to diagnose and treat them. Nurses

cannot dictate care in the same way; I am extremely concerned about the degree to which

Arizona relies on nurses practicing outside the scope of their licenses to provide basic

care." That, unfortunately, still remains true in the Arizona state prison system.

> **A.**    **The nurse line serves as a barrier to timely health care as nurses exceed the scope of their licenses, perform inadequate assessments, and improperly deny patient access to providers.**

168.    In the Arizona prison system, the nurse line essentially functions as a

separate provider line, rather than as an evaluative first step towards seeing a provider.

Nowhere in the ADCRR Medical Technical Manual are there directives establishing that

the function of the RN is to assess patients and refer them to a provider, based upon the urgency of their symptoms.[10]

169.    Nurses routinely function outside the scope of their licenses and act as providers, guided primarily, or only, by NETs. The ADCRR's nursing model essentially makes the visit to a nurse an end in itself, rather than an assessment to facilitate appropriate treatment. This results in repeated visits where patients present with the same or worsening symptoms, and are told to return to housing, hydrate, and submit an HNR or call an ICS if their symptoms worsen, as illustrated in the case of Mr.        above.

170.    This system is failing for a number of reasons. First, in reviewing hundreds of healthcare encounter records, I have observed that the nurses often choose the wrong NET, fail to fully complete them, and often choose the wrong disposition or fail to follow the guidance listed on the NET. Second, those same records show that nurses often fail to refer patients to providers urgently (or at all) when needed.

171.    Patients submit their HNRs seeking medical treatment, and based on those HNRs are scheduled with an RN, not a provider, regardless of the seriousness of their asserted symptoms and regardless of whether the patient has already seen the RN for the same symptoms. Based on my interviews with patients and my review of over one hundred health records, it is apparent that the nurses routinely prevent people with serious medical conditions that they are not qualified to treat from seeing a provider by failing to make the necessary referral. This is true even when patients filed repeated HNRs.

---

[10] The only reference to the process for referring a patient from the nurse line to the provider line states: "Nurse line referrals to Practitioner/Provider will be evaluated on Provider Line within fourteen days of referral date." (MSTM, Ch. 5, § 3.0 at 3.4.)

23774493.1

172.    In addition, review of the records shows that RNs all too often fail to adequately perform even the limited role they should be playing – to triage, assess, and document concerns. Nurses repeatedly fail to consider patients' overall health or recent history, and instead focus only on the symptoms immediately before them. In practice, nurse line visits are perfunctory, self-contained episodic visits that do not incorporate the patient's history and trending of repeat complaints. I found health records that clearly showed a lack of coordination and communication between the nurse line and the provider line, such that, when RNs saw patients on the nurse line, they were oblivious to the patient's treatment history, including their recent treatment history from their provider.

173.    This system results in terrible care that places patients at great risk of harm.

174.                                is a good example. He was seen on 3/24/21 by an RN at ASPC-Eyman, two weeks before he died at age 37. He told the nurse that, during the previous three days, he had had severe asthma attacks where his rescue inhaler "was of no assistance," that he felt faint after short walks, and that it took him 30 minutes to dress himself. These are very alarming symptoms and warranted an immediate referral to a provider. The RN, however, did not refer him to a provider.

175.    Review of the Subjective NET used for that encounter reveals that the nurse left most of the template empty, failing to document Mr.              last TB test, any associated or precipitating factors, what asthma medications he was taking, or how often he used his inhaler. For the objective part of the NET, she checked that the patient had a "[q]uiet chest, acute respiratory distress," which, according to the template, should have triggered an immediate call to the provider, as the form itself directs.

-69-

23774493.1

**NET - Upper Respiratory Symptoms: Objective**

Vital signs: Call practitioner if T>100, P>100, or SBP<100.

Chronic care clinic:  ○ Y  ○ N    What Clinic(s):

☑ Quiet chest, acute respiratory distress        *IMMEDIATE CALL TO PRACTITIONER*

176.    The RN did not fill out any of the data elements in the subjective portion of the nursing NET, which are of critical importance in understanding the severity of the asthma. In addition, no peak flow testing was done which is the most effective means to determine the severity of the asthma at that moment in time. On the objective portion of the nursing NET, the nurse indicated that he is in acute respiratory distress but that his respiratory exam is normal. Which is it? The "Nursing Diagnosis" check boxes are empty.

**NET-Assessment - Nursing Diagnosis**

**Nursing Diagnosis:**

☐ Ineffective breathing pattern     ☐ Risk of infection

☐ Alteration in comfort

☐ Other

**Related To:**

☐ Asthma                 ☐ Allergic Rhinitis (Hayfever)

☐ Common cold symptoms   ☐ Nosebleed

☐ Other

Rev #: 1293

177.    For "Patient Education," the RN documented only telling the patient to call an ICS if his inhalers did not resolve his asthma symptoms.

23774493.1

178.   Four days later,                    saw a different RN for "extreme pain" that was exacerbated by all activity and interfered with his sleep. Again, these are alarming symptoms that warranted an immediate referral to the provider, particularly in light of his complaints on 3/24/20. And again, the RN did not refer Mr.           to a provider.

179.   Instead, this RN used a NET for Musculoskeletal symptoms, recording that the patient reported his pain as 7-10/10 and that it impaired his activities of daily living. While choosing a NET for musculoskeletal pain is fine given his complaint, there was no acknowledgement of the fact that he was seen a few days earlier for an asthma attack, essential information for an accurate diagnosis. The language of the musculoskeletal NET does not allow for such a nuance and that is exactly why these NETs can be so misleading to someone who lacks a broader understanding of disease manifestations. Mr.           had a systemic infection that was contributing to both his prior asthma attack and his complaint of pain, but both nurses missed that connection because these episodic nursing NETs are superficial and simplistic. For the Assessment, the RN checked "Alteration in comfort," and she attributed his symptoms to an undiagnosed, undefined disease process. This is myopic medicine, and in this case it was fatal.

180.   The RN determined no provider referral was necessary, and advised Mr.            to continue using his over-the-counter medications for pain. Remarkably, it appears this encounter was not documented in Mr.           medical record (and therefore was unavailable for review) until 4/2/21, five days after it occurred.

181.   Mr.           died nine days later from disseminated Valley Fever, a fungal infection endemic to Arizona, which had not previously been diagnosed.

23774493.1

182.                          at ASPC-Florence is another example. Mr.

who died at 42, had a complicated medical history, including hypertension, Type 2 diabetes, and morbid obesity. In his last 60 days at ASPC-Florence, before he was sent to an outside hospital, he was seen by nurses four times. Each time, the nurse failed to appreciate his complicated medical condition (and worsening symptoms), failed to follow the NETs, and failed to refer him to a provider.[11]

183.    On 3/8/20, three days after seeing his PCP for shortness of breath, Mr.

saw the RN for a cough and runny nose. The RN did an incomplete assessment, failing to complete the NET and failing to note that Mr.        is diabetic and that he was recently seen with shortness of breath. Instead, she simply gave him over-the-counter allergy medications and told him to hydrate, and did not refer him to a provider.

184.    A month later, on 4/5/20, Mr.        saw a different nurse after complaining of a persistent cough that was worse at night and had lasted about three weeks. Rather than investigate the cause of the cough, the RN prescribed a cough suppressant through a verbal order from the provider and again did not refer him to a provider.

185.    Mr.        filed an HNR on 4/30/20, reporting that he had stomach problems and bloating ("have to sit to ease pain") and had tried Beano and PeptoBismol without relief. The following day, Mr.        saw the nurse for persistent abdominal pain, watery stools, and decreased appetite. An x-ray of his abdomen was ordered and was read as "limited," but not showing anything grossly wrong. When patients complain of

---

[11] As explained in Section IV(B)(2), below, his PCP also failed to adequately manage his care, and he was not being followed by a cardiologist and other specialists.

abdominal pain, part of the work up must include lab tests; here, several were ordered but not done. In fact, the gastrointestinal NET, which the RN used, states: "FSBG and Urine Dipstick are required for this encounter." These tests are essential for the abdominal pain work-up to review possible etiologies of the abdominal pain. Neither test was done. The RN assessed him as constipated and "sold [him] OTC medications per site guidelines." The RN's diagnosis made no sense: "Alteration in elimination r/t gas constipation." The RN determined that no referral to a provider was necessary -- the third such failure.

186.    Five days later, on 5/6/20, Mr.          again saw an RN about his abdominal distress, describing limited bowel movements with bloating and bouts of loose stool. The RN used no NET for this encounter, but noted that he is "having difficulty moving around." The RN assessed him as being constipated and advised him again to hydrate and take his prescribed medication. The nurse ordered no labs, and he failed to note that the previously ordered labs had not been done. Notwithstanding Mr.          worsening symptoms, the nurse declined to refer him to a provider, the fourth time nursing staff had declined to do so in this period.

187.    The nurses who saw Mr.          in the series of visits over a brief period of time failed to recognize that this patient, with his complex medical profile and worsening symptoms, was rapidly declining and needed urgent medical care. Although these encounters all happened in a short period of time, and three of them involved the same RN, Maurice Owiti, the RNs failed to see the link and deterioration in Mr. condition. On 5/8/20, two days after he last had an appointment with an RN, Mr. fell while walking towards the medication cart and hit his head on the floor. He was taken

to the hospital because of this head injury but his admission work-up in the emergency

department described how profoundly sick he was on arrival: in acute renal failure with

significant electrolyte abnormalities. His admission creatinine was dramatically increased

from his on-site labs a few weeks earlier, showing that he had been deteriorating

substantially for the previous few weeks and, although he was trying to be seen by a

provider, he could not get past the nurse line and the multiple nurses failed to recognize

how profoundly sick he had become. If a nurse had known enough to just run some labs,

his situation would have been easily diagnosed, he could have been treated much earlier

than he was, and he likely would have survived. Instead, Mr.          died of complications

of septic shock most likely related to Valley Fever and small bowel obstruction.

188.    In the two above-described cases, nurses failed to take appropriate histories,

failed to document adequate physical exams, and failed to recognize that the patient was

extremely ill and required immediate attention from a provider. Remarkably, in both

cases, the ADCRR's mortality review process determined that the "[c]are met community

standards and/or correctional standards without negative findings" and made no

recommendations. (*See* ADCRR00000033-36 (          ); ADCRRM0005581-85 (          ).)

(I discuss my concerns with the inadequacy of the ADCRR's mortality review process in

Section II(A) of this declaration.)

189.    I found the same type of problem during my site visits. For example, I met

                              in the IPC at ASPC-Florence on 9/8/21. He was recovering

from and being treated for an episode of acute sepsis, which resulted in the development

23774493.1

of bacterial endocarditis (deposition of bacterial clusters on the heart valve leaflets, which frequently causes damage to the heart valves). He is 22 years old.

190.    Over a ten-day period in August 2021, Mr.            became increasingly ill. On 8/2/21, Mr.            called an ICS because he was unable to walk. He had mild knee swelling and pain, and reported 10/10 pain when he tried to weight bear. He had an x-ray. An NP saw him later that day and prescribed ice, ibuprofen, and an ace bandage, and recommended he follow up with his provider.

191.    Mr.            saw an RN again on 8/5/21, after submitting an HNR reporting that he was "waking up with a new pain every day. (knee, wrist, shoulder, now the left side of my back and my kidney is in pain.) It literally hurts to breath[e]." He was also constipated. The RN assessed him with "Alteration in comfort RT pain" and determined that he did not need to be referred to a provider. The RN gave him milk of magnesia and told him to submit another HNR if his symptoms worsened.

192.    Two days later, Mr.            submitted an HNR stating, "I got my COVID shot and ever since I got it, I have been having joint pains and body pains and … shortness of breath. I have no energy…. I need to be seen ASAP." The nurse saw him the next day and told him the side effects of the COVID vaccine could last a few days. She advised him to rest and stay hydrated, and, again, did not refer him to a medical provider.

193.    On 8/9/21, Mr.            submitted yet another HNR, stating, "I have said multiple times I believe I have a blood infection. I need a blood test asap!" He was not seen in response to that HNR.

194.   On 8/12/21, Mr.            submitted another HNR, stating, "literally my entire body is in extreme pain and I can't get out of bed at all. u people said that there is nothing wrong with me. I'm fucken dying. Im bed ridden at 21 years old. some thing is not right. I need my blood test and all the test. I am struggling to breathe on top of everything." Shortly thereafter, an ICS was called for Mr.            who complained of body aches, head-to-toe and shortness of breath. He reported his pain level as 10/10. By this point, his condition was life-threatening. Finally, he was sent to the emergency department, where he was admitted and spent the next two weeks fighting for his life.

195.   Mr.            was profoundly sick at the time he was admitted. His admitting white blood cell count was significantly elevated and he had acute kidney injury from the sepsis. Mr.            is lucky to be alive. Frequently patients with such severe sepsis and severe endocarditis do not survive. However, although his immediate crisis is over, he is not out of the woods yet. When I met him he was undergoing extended IV antibiotic therapy to try to eliminate the clusters of bacteria on his valves. He now has moderate tricuspid valve regurgitation, which will cause him to have impaired circulation in his body the rest of his life with associated complications. He may need to have his valve replaced at some point in the future if it continues to worsen. Had the nurses and the one NP he saw taken Mr.            complaints seriously, they should have recognized his dire situation -- that he had a blood infection and needed to be seen by a provider immediately. Instead, he became septic and gravely ill.

196.   Mr.            was not the only young man to have his concerns repeatedly overlooked by nurses and have his endocarditis go undiagnosed.

-76-

23774493.1

at ASPC-Lewis, also 22 years old, saw nurses at least ten times from 6/13/21 until 7/30/21, when he was finally sent to a hospital where he was diagnosed with endocarditis, a life-threatening condition.

197.   Mr.            first presented at nurse sick call on 6/13/21, with nausea, diarrhea, and pain in his side when he breathed. The nurse took his vitals, diagnosed him with "alteration in elimination," apparently palpated his abdomen, and cleared him to return to his housing. Although the GI Nursing Encounter Tool she used required taking a fingerstick blood sugar reading and a dipstick urinalysis for this encounter, she did neither, and she did not refer him to the provider line. Given his symptoms, an appropriate nursing work up should have included taking a full history of his symptoms and his recent drug use, orthostatic blood pressure readings, possibly IV liquids if dehydrated, medication for his nausea/vomiting, and a referral to the provider.  He also should have been placed in isolation until it was determined whether he had an infectious disease.

198.   Mr.            submitted multiple HNRs and had multiple nurse visits over the next six weeks where he reported nausea and vomiting, weight loss, fatigue, myalgia and chest pain. He had multiple lab results that were significantly abnormal and tested positive for Valley Fever. He saw a PA only once, and no one diagnosed his endocarditis.

199.   Mr.            stat lab results from 7/1/21 likely signaled he had an active serious systemic infection, and he should have been sent to the Emergency Department on an urgent basis.  Instead, a nurse got more verbal orders, for breathing treatments, ibuprofen and clindamycin.

200.    On 7/25/21, Mr.              presented with a fever, a bad headache, chills, diarrhea, ataxia and a very rapid pulse. He was treated at the medical hub, by a nurse who got a verbal order from an NP for stat labs, IV fluids, a stool sample and an injection for pain. Again, he had no diagnosis, received no real treatment, and did not see a provider.

201.    Finally, on 7/30/21, after six weeks of reporting alarming and worsening symptoms for his undiagnosed condition, yet having received a raft of medicines from nurses and a PA, Mr.              arrived at the clinic with a fever of 101.3, a very rapid pulse, and rapid bowel sounds.              was very, very sick, and finally, he was sent to the hospital, where he stayed for the next ten days.

202.    The nurses who saw Mr.              for six weeks, while he deteriorated dangerously, consistently operated outside the scope of their practice, obtaining verbal orders from a host of mid-level providers, where there is no evidence that the providers ever participated in the treatment of the patient. The mid-level providers perpetuated the incorrect and poorly reasoned conclusions of the RNs. At no time did anyone engage in the process of identifying differential diagnoses for his alarming symptoms. And all the while the patient was getting sicker and sicker.

203.    Mr.              hospital records from August 2021 are not in his file. They should be. His bout with endocarditis has no doubt damaged his heart, and he will suffer ill effects from this episode for years. He was discharged from the hospital on 8/10/21 with instructions to follow up with the cardiologist in two weeks. That follow-up did not occur until 9/22/21.

23774493.1

204.                                also at ASPC-Lewis, called ICSs and submitted multiple HNRs complaining of worsening abdominal pain he believed was related to a hernia, beginning in April 2020. He was seen by an RN for an ICS on 4/11/20; the nurse noted his burning pain in his abdomen, but did not document an abdominal exam. The RN told him he could take ibuprofen, notified the provider he needed a hernia belt, and advised Mr.            to alert an officer about worsening symptoms. The RN did not refer Mr.            to the provider. He submitted an HNR on 5/29/20, complaining of daily pain from his hernia, and saw RN who noted he had tenderness on palpation and located a 1" soft mass in his lower left pelvic region. The RN obtained a verbal order for ibuprofen and ordered a hernia belt, again, with no referral to a provider, and the patient was told to submit another HNR for new or worsening issues.

205.   On 8/9/20, Mr.            submitted another HNR related to his hernia -- "the pain is too bad." The RN saw him on 8/10/20, and again told him to submit a sick call slip if he had new or worsening issues. When he saw an NP on 8/13/20 for his hepatitis C chronic care appointment, Mr.            raised his hernia pain, and the NP wrote they would reassess his hernia in 30 days, but provided no treatment. Mr.            submitted another HNR on 8/23/20 because he had problems using the bathroom because of hernia pain. On 8/24/20, the RN again failed to provide treatment and told him to submit a sick call slip if his symptoms worsened.

206.   On 9/1/20, Mr.            submitted his fourth HNR for hernia pain, and asked to see a specialist for pain. It was not until this last visit, five months after the first

ICS, that the RN finally referred Mr.            to see the provider about his hernia, and the patient was finally referred to a surgeon to consider hernia repair.

207.    Mr.            repeated complaints of severe pain warranted a comprehensive work up when he first began to complain. Instead, because the RNs repeatedly failed to do an adequate work-up, and failed to refer the patient to the provider, diagnosis of his condition was delayed by months. When Mr.            finally had his hernia repair surgery on 3/22/21, almost a year after he began complaining of severe abdominal pain, the surgeon found metastatic and inoperable cancer in his abdomen. Mr.            is currently receiving chemotherapy for colorectal cancer.

208.    These are but a few examples of the numerous instances, across prisons, that I saw documented in the medical records of nurses acting well outside the scope of their practice, blocking access to providers, and failing to perform even their limited function adequately, all of which can result in serious harm to patients.

**B.    Nurses do not have adequate clinic space to treat patients.**

209.    The ADCRR requires, appropriately, that "all complexes and ADCRR facilities have designated adequate clinical space for providing health services to inmate-patients." (ADCRR Medical Services Technical Manual, Ch. 3, § 5.0.) Basic equipment for medical services includes an exam table, which is essential for competently performing certain nursing assessments, including abdominal exams and orthostatic blood pressure checks. (*Id.*)

210.    In some clinics that I observed, the clinical space allocated to the nursing staff made it impossible for nurses to adequately do their jobs. At ASPC-Lewis, I visited

four clinics, each with two exam rooms that were in use simultaneously by the PCP and the triage RN. The room with the PCP had an exam table, but the RN's room did not. Failing to adequately furnish the rooms where RNs provide health care reinforces the notion that a nurse's physical assessment is not necessary. Unfortunately, all too often, the records of the nursing "assessments" that I reviewed appeared to encompass only the taking of vital signs and a brief interview with the patient. That is insufficient.

211.    I reprint below the pictures of the RN exam rooms at ASPC-Lewis. These rooms were clearly pointed out to me as places where RNs currently perform exams, and I observed nurses having visits with patients in these rooms.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108134

ASPC-LEWIS, BUCKLEY CLINIC

23774493.1



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108135

ASPC-LEWIS, BUCKLEY CLINIC

### C.  Appointments are not timely.

212.  The Stipulation did not address the substantive problems with the nurse triage process set forth above. Instead, it evaluated only the timeliness of an encounter, and not whether the nurse provided appropriate care or ensured that the patient was properly referred to a provider -- issues critical to the delivery of healthcare.

213.  The ADCRR consistently has failed to meet this timeliness requirement. Performance Measure 37 provided: "Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need)." (Doc. 1185-1, Ex. B at 10; *see also* Department Order 1101, Inmate Access to Health Care § 3.2.1.) Yet many ADCRR

23774493.1

prisons have chronically and repeatedly failed to meet this standard, as seen in the table below setting forth Defendants' self-reported CGAR data.[12]

| | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 97.30 | 97.30 | 100.00 | 96.67 | 100.00 | 100.00 | 100.00 |
| **Eyman** | 88.00 | 92.00 | 94.00 | 92.00 | 88.00 | 94.00 | 88.00 |
| **Florence** | 86.27 | 95.00 | 94.55 | 96.43 | 98.21 | 96.43 | 100.00 |
| **Lewis** | 87.34 | 91.25 | 79.27 | 89.87 | 80.49 | 86.25 | 69.44 |
| **Perryville** | 94.68 | 87.00 | 92.08 | 88.00 | 84.27 | 86.67 | 96.70 |
| **Phoenix** | 100.00 | 100.00 | 98.65 | 96.00 | 100.00 | 95.89 | 89.74 |
| **Safford** | 96.67 | 96.67 | 100.00 | 100.00 | 96.67 | 96.67 | 100.00 |
| **Tucson** | 63.95 | 48.78 | 44.83 | 57.47 | 72.29 | 43.84 | 58.57 |
| **Winslow** | 93.33 | 100.00 | 100.00 | 96.67 | 96.67 | 100.00 | 93.33 |
| **Yuma** | 78.00 | 84.00 | 88.00 | 90.00 | 66.00 | 74.00 | 88.00 |

214. Over six years after the ADCRR agreed to implement a basic procedure to ensure that patients are seen timely after notifying staff that they require medical attention, at four of the larger ASPCs, nurses still are not seeing patients within the agreed upon time limits much of the time. As can be seen in the table above, nurses at ASPC-Tucson, a

---

[12] The CGAR tables that appear in this report can be found at WILCOX000108-118. Red font and highlighting in the table reflects those CGAR percentages that fell below 85%. This is because compliance with a particular performance measure was defined as, "[a]fter the first twenty four months after the effective date of this Stipulation, meeting or exceeding an eighty-five percent (85%) threshold for the particular performance measure." (*See* Doc. 1185 at 4.) Yellow highlighting indicates a score below 100%.

23774493.1

prison with some of the highest acuity patients in the state, failed this basic requirement each month in 2021, and in some months scored less than 50%.

215.    The ADCRR is supposed to have a built-in system to correct its own errors: the Corrective Action Plan (CAP) process. Under the Stipulation, "[i]n the event the Court finds that Defendants have not complied with the Stipulation, it shall in the first instance require Defendants to submit a plan approved by the Court to remedy the deficiencies identified by the Court." (Doc. 1185 at 14.) I reviewed the ADCRR's compendium of CAPs filed with the Court on 6/21/21 (Doc. 3916-1). I found that this process was an utter failure in the case of Performance Measure 37.

216.    For example, at ASPC-Tucson, several years of CAPs have repeatedly identified short-staffing as the reason for non-compliance: "[a] nursing shortage" in July and September 2019 (Doc. 3916-1 at 126, 127); "[l]ow staffing" in November 2019 as well as in January, February, March, and April 2020 (*id.* at 127-28); "short staffing" in January, March, and April 2021 (*id.* at 129, 130, 131); and, as of May and June 2021, "[c]ritically low RN and LPN staffing." (*Id.* at 131, 132.) Over and over, the CAPs announce that the solution is to hire and train nurses and to use agency nurses to fill the gaps; over and over, this measure fails. The dismal results are demonstrated in the monthly compliance failures (*id.* at 126-32), and the patients pay the price in poor care.

217.    ASPC-Lewis has also had CAPs in place for several years for this PM. As with the Tucson facility, a shortage of staff is identified as the consistent root of the problem: "The Lewis facility was down 13 RNs" in September 2018 (Doc. 3916-1 at 118); noncompliance was due to "issues with nurse staffing" in December 2018 (*id.* at

-84-

119), a "shortage of RNs" in February 2019 (*id.* at 120), a "nursing shortage" in May,

June, July, August, and September 2019 (*id.* at 121, 122), "[l]ow staffing" in November

2019 (*id.* at 123), "inadequate staffing" in December 2019 and January and February 2020

(*id.* at 123, 124), "low RN staffing" in March 2020 (*id.* at 124), and then, in May 2021,

"[c]ritically low RN and LPN staffing." (*Id.* at 125.) As with ASPC-Tucson, year after

year, the plan is to hire and train more nurses. The result? Lewis achieved only 69%

compliance with PM 37 in July 2021. The CAP process has failed completely to address

these persistent problems.

**IV.   People in ADCRR custody are at substantial risk of serious harm because the prisons have too few physicians and because many primary care providers deliver inadequate care.**

218.    Primary care providers (PCPs) in any healthcare system manage patients'

day-to-day health care needs. In the Arizona prison system, the PCPs are supposed to treat

patients for episodic care, chronic conditions, and preventive health screening, and refer

them for care from specialists when necessary. They are also supposed to coordinate care

when patients return from treatment at an offsite hospital.

219.    When patients successfully break through the nurse line obstacle and do see

their PCPs, the care they receive is often poor quality, particularly if they have complex

medical conditions. As explained below, this is due in part to the ADCRR's heavy

reliance on non-physician mid-level practitioners -- nurse practitioners and physician

assistants -- to provide most of the primary care in their system. In many cases, these non-

physician practitioners lack the necessary training and expertise to treat their complex

patients. The problem is not limited, however, to the mid-levels. The medical records I

reviewed revealed a broken system where providers of every level fail to do basic

-85-

23774493.1

screening, fail to analyze and diagnose their patients, fail to manage their complex

patients following specialty consults and hospitalizations, and sometimes fail to treat them

with humanity. The result is many patients receive terrible care.

**A.  The ADCRR relies heavily on mid-level providers who do not have the necessary skills to treat complex patients.**

220.    In the Arizona prison system, primary care is provided by physicians and

mid-level providers. According to the ADCRR's June 2021 Staffing Variance Report, the

prisons were staffed with the equivalent of 58.66 mid-level providers providing medical

care to patients and 8.48 staff physicians. (ADCRR00021949.) Three prisons (ASPC-

Douglas, ASPC-Safford and ASPC-Winslow) list no staff physicians at the facilities. (*Id.*)

221.    Mid-level providers are able to handle many routine health care duties. They

cannot, however, take the place of a physician because they do not have the training and

expertise necessary to treat more complex patients, including patients with multiple

chronic conditions.

222.    Physician assistants cannot practice independently, but can practice only as

the agent of a supervising physician, under the terms of a written agreement. (A.R.S. § 32-

2531.) "The physician assistant may provide any medical service that is delegated by the

supervising physician if the service is within the physician assistant's skills, is within the

physician's scope of practice, and is supervised by the physician." (*Id.*)

223.    The role of a nurse practitioner, also called a registered nurse practitioner, is

also more limited than that of a physician. According to the Rules of the Arizona State

Board of Nursing, Standards Related to Registered Nurse Practitioner Scope of Practice,

"An RNP shall refer a patient to a physician or another health care provider if the referral

will protect the health and welfare of the patient and consult with a physician and other health care providers if a situation or condition occurs in a patient that is beyond the RNP's knowledge and experience." (R4-19-508, Standards Related to Registered Nurse Practitioner Scope of Practice (6/3/19), https://www.azbn.gov/sites/default/files/2020-03/RULES.Effective.June3_.2019.pdf.)

224.    As referenced above, the ratio of staff physicians to mid-level providers in the ADCRR is about 1:7. I am aware of no healthcare systems that provide primary care to patients on a large scale where the physicians are overwhelmingly outnumbered by the mid-level providers. That is because large systems inevitably have numerous patients who require complex care beyond the scope of mid-level providers.

225.    Given the paucity of physicians in the Arizona prison system, with some prisons having no staff physicians on site (ASPC-Douglas, ASPC-Safford, and ASPC-Winslow) (ADCRR00021949), I was not surprised to encounter and review records for complex patients who were receiving deficient care from mid-level practitioners who clearly lacked the expertise to treat the patients and/or were poorly supervised. As a result, many patients suffered harm and all are at serious risk of harm, as illustrated in the cases I discuss throughout this report.

**B.      Providers deliver inadequate care to patients.**

226.    I have deep concerns with the adequacy of care provided by providers in the Arizona prison system, which I outline in the sections below.

**1.      Providers do not develop and test differential diagnoses.**

227.    Accurate diagnoses are essential to the provision of appropriate treatment. The diagnostic process involves identifying or determining the etiology of a disease or

-87-

condition through evaluation of patient history, physical examination, and review of laboratory data or diagnostic imaging; and the subsequent descriptive title of that finding.

228.    To arrive at a diagnosis, providers must often use the differential diagnosis process. Determining the differential diagnosis is the process of distinguishing one disease from another that presents with similar symptoms. With the chief complaint established, the provider takes a patient history and performs a physical examination. Analyzing the information gathered, the provider generates a list of possible diseases by ranking the most common diagnoses and the most serious or "not to miss" diagnoses.

229.    For example, when the patient presents with a cough, the provider considers the most common diseases that present with cough, forming a working differential diagnosis list. The provider analyzes the data obtained, eliminates some diseases, and narrows down the differential diagnosis. At times, further diagnostic testing is needed to make the final diagnosis. The construction of a differential diagnosis and the methodical working through the various possibilities to prove or disprove them is essential in making an accurate diagnosis.

230.    In the charts I reviewed, I found repeated examples of physicians and mid-levels failing to go through the critical process of identifying possible diagnoses and then failing to take the necessary diagnostic steps to rule in or out the condition. The ADCRR also has identified this issue in its mortality review process. (*See, e.g.*, ADCM1589820, Mortality Review of                            (10/31/19) ("Provider to be educated regarding the formulation of a differential diagnosis and alarm[ing] symptoms that requ[i]re more urgent work up."); ADCM1578125, Mortality Review of

-88-

(7/11/19) ("Despite the patient's complaints of severe pain in legs, no attempts were made to find the reason for the pain.").)

231.   In                          case, discussed above, he presented with significant weight loss (over 60 pounds between 2018 and 2013). He was ordered a chest x-ray and stool test in 2017, but it appears the latter test did not happen. In 2018, he had a negative chest x-ray and negative HIV test, but the NP simply ordered nutritional supplements and failed to investigate any other cause of this unexplained weight loss.

232.   Similarly, in                          case, discussed above, she complained for three years of symptoms, including numbness and weakness in her legs, yet her provider failed to identify and then test for the illnesses that might cause them.

233.                          likewise failed to receive an adequate work-up for alarming symptoms. The patient was 56 years old and was morbidly obese (BMI of 43), suffered from hypertension, and started blood pressure medications in 2020.

234.   On 5/5/21, Mr.          was seen by an NP for "tightness." The diagnosis of dyspnea (difficult or labored breathing) appears on the problem list on this date. The diagnosis in the note states "unspecified abnormality of breathing." Dyspnea and "unspecified abnormalities of breathing" are not diagnoses; they are symptoms that require an investigation to determine the underlying etiology. A chest x-ray was done and read as normal, but I suspect this reading was not correct as one month later the chest x-ray in the hospital showed cardiomegaly and this does not develop overnight. (As noted in Section X(B) of this report, x-ray films are not available in the health record, which is highly problematic.)

-89-

23774493.1

235.    The NP should have considered the possible diagnoses that can result in shortness of breath, including asthma, chronic obstructive pulmonary disorder (COPD) and congestive heart failure. Then, she should have ordered appropriate diagnostic tests, including lab work and an EKG, in addition to the chest x-ray. This "differential diagnosis" process would have provided necessary data to enable the provider to rule certain diagnoses in or out, and provide appropriate treatment. A chest-x-ray alone is insufficient. She treated him with an albuterol inhaler and the antibiotic azithromycin, but on this record, it is not clear why.

236.    When he saw the NP ten days later, on 5/15/21, he complained of difficulty breathing for at least ten days. The NP attributed symptoms to "asthma -- possible obesity induced," added asthma to the problem list on this date, and prescribed inhalers Xopenex and Alvesco. This visit gave the NP a second opportunity to investigate the causes of Mr. breathing problem, but again, she failed to provide the standard work up to determine the cause of the shortness of breath -- a chest x-ray, lab work including a BNP, and an EKG. When newly diagnosing someone with asthma, one should do a peak flow test (done in the office) and order pulmonary function tests. The NP did neither. There is no consideration of congestive heart failure in the NP's notes.

237.    On 6/3/21, his oxygen saturation had fallen to 84%, and he was sent offsite to the emergency department. At the hospital, his oxygen saturation was 75%, and his chest x-ray showed cardiomegaly and bilateral hilar congestion (wet, soggy lung tissue due to fluid overload). His lab tests (massively elevated BNP level of over 2,000 (normal is < 100) were consistent with a diagnosis of significant congestive heart failure.

-90-

238.   He was admitted to the hospital, where he died shortly thereafter of congestive heart failure, an entirely treatable disease that was easily diagnosable. This patient's death was very likely avoidable, had the provider simply used standard diagnostic tools to identify the cause of Mr.                symptoms. The ADCRR, after its review of Mr.                death, made the following recommendation: "Providers: For patients with cardiovascular risk factors and symptoms of cardiovascular disease, including shortness of breath, a list of differential diagnoses should be developed. The appropriate workup should then be implemented, consistent with current clinical guidelines." (ADCRR00000004.)

239.                              case likewise illustrates the total failure of NPs to investigate the patient's symptoms in a disciplined manner to arrive at a diagnosis and treatment plan. Mr.          submitted an HNR on 6/13/21, stating that he was "having severe stomach problem. Would like to have it checked out. Thank you." He was seen the next day by an RN who later consulted with NP Dauod. He told them the abdominal ache was worse after eating. (This is a classic sign of an ulcer or gastritis.) The assessment states "alteration in comfort [related to] ache in stomach," and they ordered a KUB, amylase, lipase, and H. Pylori.

240.   The record contains no differential diagnoses, and the diagnostic tests ordered were incomplete. The lab assessment for abdominal pain should always include a CBC and urinalysis and these were not ordered. The patient was taking 50 mg of indomethacin up to 3 times per day and also took a calcium antacid frequently (likely for the gastritis the indomethacin caused). Indomethacin is rarely used now as it causes

gastric bleeding/gastritis/ulcers, and this is a very large dose for a 66-year-old patient to be on. If a physician had been involved in the care of the patient this likely would have been figured out. He had a CBC later in early September 2021, and he was anemic with a hematocrit of 33. This is very likely due to the bleeding from the gastritis caused by the indomethacin.

241.                                             whose history of hypertension and smoking was well-documented in her record, saw her NP on 1/9/20 for nausea, vomiting and abdominal pain, which the NP suspected was due to a urinary tract infection. The NP prescribed an antibiotic and APAP, and ordered an x-ray and urine culture. When Ms.                     returned to the NP two days later with worsening symptoms, the NP told her to continue taking her medications.

242.    However, at the second visit, her blood pressure was 90/60, and then two hours later was 90/78, which should have been a red flag for the NP. This narrow pulse pressure suggests underlying heart failure or decreased blood volume. Also, the patient was known to be chronically hypertensive, had discontinued her hypertension medications on 1/7/20, and had systolic blood pressure of 150 on 1/8/20, and of 90 during the visit on 1/11/20. The NP should have recognized these signs of a more severe underlying cause of her abdominal pain.

243.    Two hours later, Ms.                     was found unresponsive in her cell, and she died later that day. The mortality review lists her cause of death as ruptured aortic dissection due to atherosclerotic cardiovascular disease. (ADCM1615638.)

23774493.1

244.    Severe, recurrent, and worsening abdominal pain in a patient with a significant smoking history, suspected coronary artery disease, and a history of hypertension newly found to be hypotensive after discontinuation of BP meds should absolutely alert the provider to consider aortic aneurysm. This patient should have been worked up due to her concerning clinical picture and sent out to a hospital if the prison was unable to complete a thorough workup

245.                                                   died on            The 71-year-old, immunocompromised patient presented with obvious signs of infection that the nurses, and eventually the nurse practitioner, failed to recognize and treat and, as a result, he became septic and suffered multi-organ failure.

246.    On 11/29/19, Mr.            called an ICS for "swollen ankles/feet." The LPN noted that the patient had significant swelling in both ankles (3+ edema) and wrote that the NP would evaluate him, but there is no note from the NP that day. The patient was seen repeatedly over the next month by nurses and by an NP who noted that Mr. had significant swelling in his lower extremities, a boil on his shoulder, and on 12/12/19, the NP noted the patient's "toes and space between them" were blue with a "strong odor." The NP assessed him as having bilateral feet edema (which is a description of a condition, not a diagnosis) and foot fungus. The patient was prescribed foot soaks and fluconazole. The NP failed to investigate the reason for the swelling or the foot wounds.

247.    On 12/23/19, an ICS was called when Mr.            reported disabling pain to his right foot and left leg. The patient had a fever of 100.2, had significantly swollen legs (4+ pitting edema) and his right lower leg was red and warm, his pulses were difficult

to find, and he had "open wounds … around both feet/toes that have a bad odor." He complained of pain at a level of 10/10. This is an alarming presentation, signaling a major infection, and he should have been sent to the hospital immediately.

248.   Instead, the nurse obtained a verbal order from the NP for Bactrim and Tylenol #3, and ordered the patient to be moved to the infirmary for observation. Bactrim was wholly inadequate for his infection, and Tylenol #3 would not have been appropriate for his level of pain. (I discuss Tylenol #3 in more detail below.) Two hours later, it was apparently determined that there was no room in the infirmary, and Mr.          was finally sent to the hospital. (ADCM1603929.) On admission, lab tests showed that his organs were failing, and he died a week later.

249.   The ADCRR's mortality review determined this was a possibly avoidable death. (ADCM1603929-1603932). The reviewer checked the boxes for untimely diagnosis, inaccurate diagnosis, untimely treatment, inappropriate treatment and level of care inappropriate for level of illness. I agree with all of the checked boxes -- this was an avoidable death, had Mr.          been timely and accurately diagnosed. Mr. developed an infection that started off localized and could have been easily treated had the practitioners recognized what they were dealing with when they saw him. Instead, they tried some treatments that they should have known would not work and during that time his localized infection blew up into total body sepsis. Even then, the practitioners did not perceive the severity of his condition, and he was sent to the hospital only because the infirmary was full. His care was extraordinarily poor.

-94-

23774493.1

250.    Finally, I met                              , a 31-year-old man, at ASPC-Tucson. At his 8/13/20 medical intake, he reported a history of asthma, rheumatoid arthritis and myocardial infarction. In response to his medical concerns, the provider ordered, among other things, a rheumatoid panel. The lab work was never completed. Mr.              began complaining of swelling in his distal extremities soon after, beginning on 9/22/20, and continuing for months with reports of worsening pain and swelling in his extremities, an inability to bend his fingers, and the spread of the pain to his upper shoulders and legs. On multiple occasions, he was provided with NSAIDs and ultimately an order of prednisone, a steroid, to address the continued swelling.

251.    Although his records reflect lab work in January 2021 demonstrating elevated ANA levels, often reflective of an autoimmune condition such as lupus, rheumatoid arthritis, or scleroderma, no further work-up was done for Mr.              for months, despite his worsening symptoms.  He was finally referred to a rheumatologist in August 2021, who saw him 9/14/21 and did lab tests and requested a two-month follow-up.  The working diagnosis is now scleroderma, a rare progressive autoimmune disease that causes skin to become thick and hard, damages internal organs, and can be life-threatening.  Prompt and regular follow ups will likely be critical for Mr.              care.

**2.    Providers fail to adequately manage their chronic care and complex cases.**

252.    Related to the problem of failing to develop differential diagnoses is the larger issue of patient management. Patients who are incarcerated tend to be less healthy, to have more chronic illnesses including substance use disorder, and to have additional stressors in their lives than people who live in the general community. (*See* Medical

-95-

Problems of State and Federal Prisoners and Jail Inmates, 2011-12, U.S. Department of

Justice Programs, Bureau of Justice Statistics (rev. 10/4/16),

https://bjs.ojp.gov/content/pub/pdf/mpsfpji1112.pdf.)

253.    Management of patients with multiple medical (and, sometimes, mental

health) conditions is complicated and requires coordination between nursing and provider

staff and the patient. Such patients should be managed by, or at least have access to, a

physician. I have written about the lack of competent chronic care management within the

Arizona prison system in past reports. In a report from 2013, which later was filed under

seal with the Court (Doc. 946-1, Ex. 1), I wrote (at pages 32 and 35): "In Arizona prisons,

the chronic care is haphazard at best. . . . These deficiencies present a serious danger

because we know that those [chronic care] patients are fragile and at risk for developing

significant complications. With this group of patients, more than anywhere else, an ounce

of prevention is worth a pound of cure, because many complications of these diseases are

preventable if clinicians keep a careful watch on them." In a supplemental report from

2014, served on Defendants on 9/9/14 (Doc. 1105), I wrote (at pages 22 and 23): "The

updated medical records I reviewed revealed, as before, that seriously ill patients do not

receive necessary treatment, monitoring or medications for their complex medical

conditions. As a result, some patients suffer unnecessarily and all are at risk of serious

harm."

254.    Unfortunately, the records I reviewed for highly complex patients were still

often simply a mess, with zero coordination, inconsistent prescriptions, and no evidence

of a coherent treatment plan. In many cases, the patients were treated exclusively by a

23774493.1

nurse practitioner or a physician assistant, and often, those practitioners lacked the expertise to provide adequate treatment.

255.                                    , discussed above, is one such patient, who died prematurely at age 42, on 6/4/20. He was admitted to prison in 2012 with a history of hypertension, Type 2 diabetes, morbid obesity (BMI ~40), and hypothyroidism. In 2015, he developed atrial fibrillation and was placed on amiodarone and diltiazem. He should have been seen and followed by a cardiologist, but this did not happen.

256.    Amiodarone is a drug with a lot of side effects, and is usually only used in fairly old individuals with no other treatment options. Mr.        did not receive the required monitoring tests that amiodarone requires (*i.e.*, an EKG every six months, liver function tests at least yearly and annual pulmonary function tests). He was on a high dose for many years, and the drug accumulates in the body. Mr.        hypothyroidism is very likely due to the amiodarone; it started the year after he began it and almost all patients on amiodarone become either hypo or hyperthyroid.

257.    Mr.        problem list documented that he had had protein in his urine since 2014, which is usually a sign of kidney disease. All his urine tests in the eight months before he died (10/16/19, 10/29/19, 12/3/19) showed clinical albuminuria (protein in the urine). His provider should have ordered tests to measure how many grams of protein he was spilling in his urine. His serum albumin steadily declined, reaching abnormally low levels on 2/25/20 since he was losing so much albumin in the urine. Protein in the urine is toxic to the kidneys and this certainly played a role in his kidney failure when he presented to the hospital on 5/8/2020. His NPs failed to recognize these

-97-

23774493.1

obvious signs of kidney disease and failed to refer him to a nephrologist for a renal

consult. It was not until his final hospitalization that he was diagnosed with end stage

kidney disease.

258.    Mr.        also had increasingly elevated liver function test results starting

in his last year of life. GGT levels are a measure of liver function, and the normal range is

9-48 units per liter. In July, 2019, his GGT was 113, and steadily rose to 912 in March,

2020. Alkaline phosphatase is another marker for liver disease. The patient's alkaline

phosphatase values were normal in July, 2019, and significantly abnormal in February,

2020, at 190.

259.    Mr.        saw his PCP for the last time on 3/5/20 via telemedicine. NP

Powell noted that the patient reported dyspnea on exertion (shortness of breath) and that

he would sometimes "gasp" for air. She also noted the elevated liver function test results.

She did not work up in response to his report of shortness of breath. She ruled out

hepatitis, but failed to investigate further why his liver test values had been increasing for

a year. She should have but failed to refer him to a gastroenterologist or hepatologist

before his final hospitalization.

260.    When Mr.        arrived at the hospital, he was bradycardic (slow heartbeat,

possibly due to amiodarone), hyperkalemic with a potassium of 6.9, and in renal failure

with a creatinine of 5.1. He was in the hospital for about a month before he died.

261.    Mr.        death was possibly avoidable. His NPs utterly failed to manage

his care in the last 18 months of his life, and they failed to recognize very clear and

obvious signs that he was quickly deteriorating. His case was very poorly managed by

23774493.1

mid-level providers who clearly required, and did not receive, physician supervision. Had he been diagnosed a week earlier with the rising potassium and renal failure he may not have been so sick when he finally reached the hospital, and he could have survived. It is also possible amiodarone played a role in his illness; prescribing that medication without monitoring from a cardiologist was dangerous. I disagree with the ADCRR's conclusions, in the mortality review, that Mr.          death was unavoidable and "[c]are met community standards and/or correctional standards without negative findings." (ADCRRM0005583.)

262.    In                         case, he received inadequate care from both a physician (via telemedicine) and a nurse practitioner during his four months in prison. Mr.          was 60 years old when arrived at the Phoenix intake facility on 4/10/20. At his intake exam, the NP noticed he had hypertension and latent tuberculosis infection. He was prescribed lisinopril 20mg for hypertension.

263.    On 7/28/20, Mr.          saw a physician who increased his dose to 40mg. His average blood pressure stayed above the American Heart Association recommendations. There are three days where clonidine was ordered for BP control (7/27 – 182/108, 7/30 - 194/118, 8/3/20 – several blood pressures in the 180s/100s). These are dangerously high levels. His physician attempted to control him with lisinopril (monotherapy). He was prescribed the maximum dose, so when that was not sufficient, he needed additional families of medications to try to control his pressure. However, the use of clonidine sporadically is dangerous and not in accordance with the standard of care.

23774493.1

264.    This patient's hypertension management was a total failure. Thus, it was no surprise that he died, four months after arriving at the prison, of an intracranial hemorrhage. In the mortality review, Dr. Rowe concluded this patient's death was unavoidable, and that his care met the community standard of care. (ADCM1652229-234.) I strongly disagree. This was a preventable death if the clinicians had controlled his blood pressure appropriately.

265.                              died at age 65 on 4/8/20, and had a complicated medical history that included non-Hodgkin's lymphoma, hepatitis C, hypertension and immune thrombocytopenic purpura, a blood disorder characterized by a decrease in the number of platelets in the blood that can cause easy bruising and internal bleeding. A very complicated patient, Mr.                    needed a cohesive plan of treatment that should be managed by a single provider. Instead, during his final year of life, he saw at least six different providers, and the documentation is terrible and confusing, making essential care coordination impossible.

266.                              died in custody at 26 years of age only two months after her arrival. On the day of her arrival, she had a life-threatening asthma exacerbation for which she was taken by ambulance to the Emergency Department. When she saw her NP two days after returning to the prison, the NP ordered Alvesco (a steroid inhaler) as KOP (keep on person), and allergy medication. The NP noted some of her treatment and ordered a return chronic care visit in six months. Given her recent hospitalization and a lack of any evidence that her issues had totally resolved, she should have been seen by a provider much sooner than six months. Despite multiple nursing

-100-

encounters over the next month for asthma symptoms, Ms.          was not seen by a

provider again until 2/24/21, after she was admitted to the infirmary for observation, after

another asthma exacerbation, where her oxygen saturation was 88%, and her pulse at 126.

267.    A month later, Ms.          had another asthma exacerbation after midnight,

and sought medical care. She was provided a breathing treatment, and appears to have

been released from the clinic with an oxygen level of 91%. A couple of hours later, she

became unresponsive, and her oxygen saturation measured 20%. She was transported to

the hospital and died two days later.

268.    Asthma is a manageable chronic illness. Had Ms.          NP recognized

her need for careful management, or followed up with her after one of her numerous

contacts with nursing staff in February, Ms.          probably would not have died at only

26 years of age.

269.                        was a very complex older gentleman living at ASPC-

Eyman who required careful management. He had several underlying serious medical

conditions (coronary artery disease with approximately four prior myocardial infarctions

and approximately 12 stents, hypertension, stage 3 or 4 chronic kidney disease, and

superficial bladder cancers with chronic suprapubic catheter) who was treated with aspirin

and Plavix with no protection for his stomach for many years.

270.    On 9/28/20, he first complained of problems with his stomach and not being

able to keep food down. On 10/2/20, he was sent to the hospital where he was apparently

treated for syncope (there are discharge instructions but no hospital records in the chart for

23774493.1

this hospitalization). He returned to prison 10/8/20, and three days later complained of diarrhea and abdominal pain.

271.    A patient who starts having diarrhea days after a hospitalization requires a work-up so that he can be diagnosed and treated. Instead, he repeatedly saw an NP who ignored multiple red flags indicating he was seriously ill and getting sicker. Shockingly, the provider did not do a single diagnostic blood or stool test during the next two weeks. The NP and RNs who treated him were in over their heads and apparently lacked the physician supervision they required to care for an older patient like this who has an acute illness and is getting worse.

272.    When the NP saw him on 10/12/20, he complained of diarrhea and trouble walking. No vital signs were taken, and his recent hospitalization was not noted. The NP treated his symptoms, giving him Pepto-Bismol and a walker, without investigating the reasons for them. Three days later, he told the NP he had had diarrhea for four days, was unable to eat, and was having trouble walking due to weakness. His BP was lowish at 100/80 and pulse readings were 83 and 158 within ten minutes of each other. He was "alert but appears drowsy." The NP diagnosed a stage 2 pressure/decubitus ulcer on back/buttock/hips, dehydration, and diarrhea. She ordered Imodium for diarrhea, a poor choice for a patient with clear signs of a bacterial infection, as the toxin will be retained for a longer period of time in the colon. She ordered IV fluids, but when the RN was unable to get a working IV in, the NP advised the patient to drink fluids. This is totally inappropriate for a patient who has said he is unable to eat so that he has gotten dehydrated. The NP also ordered wound care for the decubitus ulcer, a stool test, CBC,

and Complete Metabolic Panel, and adult diapers. The stool test and blood work were never done. A patient so sick that he is developing pressure ulcers needs an aggressive work-up to identify and treat the underlying problem here -- which is C. diff colitis (a bacteria that causes serious inflammation of the colon.). Instead, the NP provided an anti-diarrheal medication that might improve his symptoms for a short period of time, but ultimately will make his condition worse.

273.     On 10/21/20, Mr.          fell out of bed and was sent to the hospital, where he was diagnosed with a urinary tract infection. He returned to the prison the next day, on antibiotics. There are again no hospital records in his record for this visit, and Mr. did not see a provider on his return. On 10/25/21, he was seen for wound care and catheter care. Mumbling incoherently, he passed in and out of consciousness. His pulse was 47 and barely palpable, and his BP was 90/50. He was sent to the hospital via 911.

274.     At the hospital, he was diagnosed with chronic renal failure, C. diff colitis, sepsis, malnutrition, anemia with multiple ulcers in the stomach and duodenum. He died on

275.     An elderly person on daily aspirin is at high risk for stomach irritation from the aspirin. With any stomach complaints, like the one made on 9/28/20, aspirin should be stopped and an acid blocker type medication started. He was also on Plavix and since his coronary artery stents were several years old he did not need dual anti-platelet medications with the aspirin and Plavix. Most physicians would have stopped the aspirin a long time ago. The aspirin is likely the cause of the multiple ulcers seen in his upper GI tract during his final hospitalization.

23774493.1

276.    This death was avoidable had he received care from a competent physician. An earlier diagnosis of C. diff colitis as the cause of his diarrhea could have been easily made and treated. He was so debilitated by the colitis/diarrhea that by the time he made it to the hospital he was malnourished, with bedsores, and unable to recover.

277.                                   is currently a patient at ASPC-Perryville, and I have concerns that she could be the next unnecessary death. At 47 years old, she has multiple health conditions: hypertension, asthma, hyperlipidemia, schizoaffective disorder, bipolar type and chronic pain from sciatica and a compressed S1 nerve root. Over the course of the last year, her blood pressure readings have been consistently high to very high, ranging from 150/85 to 191/103. Hypertension at this level places her at significant risk for heart attack. She has seen nurses repeatedly and her NP on at least four occasions since September 2020; she has been prescribed medications with minimal follow-up to determine efficacy. Essential follow-up has not been done and she is at serious risk.

278.                                  , who is currently being treated for liver cancer (discussed below), also has a history of untreated severe hypertension that has placed him at serious risk of harm or death. He had roughly 20 elevated blood pressure readings in 2021, ranging as high as 180/100. After three elevated readings, hypertension can be diagnosed and medications started. For Mr.          it took 11 months of high readings for the NP to start medication on 9/14/21. The delay is dangerous and inexcusable.

279.    Appropriate management of complex patients also appears to be impeded by providers treating patients with suspicion and with a lack of professionalism. Many of the health records I reviewed reveal a shocking level of hostility and mistrust towards patients

-104-

among the providers in the ADCRR. Providers' notes suggest over and over that patients are lying or malingering, and this bias against patients interferes with the providers' capacity to recognize serious medical conditions. That is consistent with what I have heard from patients -- that healthcare staff often distrust them and suspect them of trying to game the system to get drugs.

280.    Kendall Johnson (189644), the MS patient discussed above, is one example: she was essentially told that her very real symptoms of multiple sclerosis were all in her head for years, and when her physician finally recognized the need to do an actual work-up for her condition, his note describing her gait as similar to a Frankenstein movie struck me as unprofessional and unkind.

281.                            is another example. Mr.        was dying from undetected disseminated Valley Fever when a nurse saw him in response to an HNR dated 4/2/21 that stated "I can't get out of bed" due to pain he rated at 7-10/10. The nurse wrote, "IM able to not only get out of bed on his own, albeit slowly; he ambulated down the run and down the stairs for NL appt with slow, steady gait unassisted." Had the RN checked his recent lab results (received two weeks before the appointment), she would have seen that Mr.        was extremely ill. Instead, she sent him back to his cell and advised him to continue taking over-the-counter medications. Four days later, he was found dead.

282.    In addition, I have particular concerns about the treatment of                     who is paraplegic. Mr.              is a complicated case, and his record documents an at times adversarial relationship with healthcare staff. What is clear is that Mr.              requires accommodations for his physical disabilities, he did not receive

-105-

23774493.1

them, and his physical condition deteriorated so disastrously that he had to have his penis amputated. Mr.                    who has to self-stimulate in order to defecate, recently filed a grievance requesting wipes to properly clean himself and his catheter and reported that his provider told him that "I wont be babied like I was in Central Medical by being given wipes." (ADCRR00049645.) Remarkably, the RN responding to his grievance did not address reports of unprofessional behavior by the provider. (ADCRR00049644.)

283.    Mutual trust and respect are essential to a healthy patient-clinician relationship. A patient who trusts their provider or nurse is much more likely to provide personal information that will facilitate better care. Providers earn that trust by listening to their patients and treating them with respect.

### 3.    Providers fail to follow-up on significantly abnormal diagnostic test results.

284.    Providers must timely review the results of diagnostic laboratory and imaging tests. Values that are outside the normal range to a degree that may constitute an immediate health risk to the individual constitute "critical lab values" and usually require immediate action. Normal values should be communicated to the patient, but may require no other action from the provider. In between those two extremes, providers must make a choice about how the results should impact the plan of care for the patient and when the patient should be notified.

285.    The health records I reviewed are replete with examples of providers failing to timely review laboratory results and/or to appreciate their significance and modify the patient's treatment plan accordingly or work through differential diagnoses. This failure places patients at risk of serious harm, including death. For example, I discuss below

23774493.1

under screenings the case of                              whose abnormal Pap screening

results were ignored for four years, by which point she had developed cancer.

286.    Another example worth discussing at length is 37-year-old

whose care I discuss above, regarding poor nursing care. Mr.          had a

series of lab tests over a two-year period with results that should have alerted health care

staff to the fact that he was quite ill, but the NPs who saw him either failed to notice or

ignored significantly abnormal results up to his death from Valley Fever on 4/6/21.

287.    On 7/25/19, Mr.          had blood test results that showed he had an

abnormal white blood cell count of 3.45, and a low absolute neutrophil count (neutrophils

are a type of white blood cell), which should have been investigated to determine the

cause. Instead, Mr.          was not seen by his provider until 11/29/19, over four months

later. The NP at that visit simply wrote "labs discussed." At that point, she should have

run more tests to find out whether he still had a low white blood cell count and whether

the neutrophil count had changed. She should have developed a list of differential

diagnoses to investigate, and Valley Fever should have been on that list. Instead, however,

the NP kicked the can further down the road and ordered lab tests to be drawn before his

next chronic care appointment.

288.    The labs ordered for Mr.          in November were drawn in early January.

These results again showed abnormal low white blood cell count and a low absolute

neutrophil count. The NP then ordered an anemia panel, which resulted on 1/9/20 and

showed hematocrit 39.7, hemoglobin 12.7, and MCH 26.6. These results were much

worse than the July labs,  showing that Mr.          was anemic. Again, the NP should

have investigated what was causing these abnormal labs. Instead, she ordered a hemoccult lab test to be done before his next chronic care visit, which was five months away. A hemoccult test is ordered to determine whether the patient has internal bleeding. Ordering a hemoccult test for five months in the future makes no sense under these circumstances. In any case, that test was apparently never done.

289.   Mr.          saw his NP on 4/14/20 about a rash and his diet, but the NP did not mention the very abnormal labs from three months earlier. When Mr.          finally had his next chronic care appointment on 7/1/20, the NP focused on his asthma, and ordered a six-month follow up for neutropenia. She completely failed to appreciate that Mr.          January lab results showed he was potentially quite sick.

290.   Over the next year, Mr.          had several appointments with his NP, including for pain in his wrist, shoulder and back, for which he was encouraged to take NSAIDS. Mr.          refused his lab draw on 7/1/20.  At his chronic care appointment the same day, the NP noted "need for labs explained and last labs reviewed," but there is no documentation that anyone discussed his history of abnormal labs or their significance.

291.   Mr.          lab results dated 3/19/21 were alarming -- clear evidence of a systemic process that needed to be investigated. By then, he was very anemic and had a significant increase in eosinophils (infection-fighting white blood cells) compared to his previous labs. A significant jump in eosinophils is commonly associated with Valley Fever and this should have prompted a workup. An NP reviewed these lab results and, once again, ordered another round of labs, 30 days later. The NP failed to recognize the significance of the change in the eosinophils and the likely implications of that lab result.

23774493.1

292.     On 3/24/21, Mr.          saw an RN complaining of shortness of breath not improved by using his rescue inhaler. As discussed above, she did not refer him to the PCP, and told him to call an ICS if his inhalers did not help his asthma attacks. The nurse who saw him four days later likewise failed to refer him to a provider.

293.     That was Mr.          final encounter with the medical staff while he was conscious. On 4/6/21, an ICS was called for him when he was found unresponsive and not breathing in his cell. He was uninjured. Nurses were unable to obtain vital signs, and he was pronounced dead an hour later at the hospital where for the first time he was diagnosed with Valley Fever (coccidioidomycosis).

294.     Mr.          is not the only patient whose death could possibly have been averted had the provider appropriately followed up on abnormal lab results.

              whose care I discuss at greater length above, had an orchiectomy performed in an outside hospital on 4/8/21, after experiencing unconscionable delays in care. When he returned to the prison, the NP noted the concern for testicular cancer but failed to note the extremely elevated hormone levels and failed to perform essential follow-up such as additional scans or a referral to oncology. Two months after the surgery, Mr.          was dead.

295.                           at ASPC-Eyman was prescribed hydrocortisone on 8/2/18, which he should have received at least daily, probably for the rest of his life, to serve as a hormone replacement and address his adrenal insufficiency. Medication administration was inconsistent and at one point the system forgot to order it for him for an extended period of time, as discussed in more detail below. On 6/8/19, his level of

-109-

thyroid stimulating hormone was dangerously high; this danger signal also went

unaddressed. On 10/3/19, an ICS was called for him and he was sent to the hospital. His

admission labs confirmed that he had not had his necessary hydrocortisone. In addition,

the fact that he had adrenal insufficiency was not communicated to the EMTs or the

hospital, which resulted in delays in identifying his major medical issues upon admission.

He died on          from sepsis most likely exacerbated by the failure to treat his adrenal

insufficiency which put him into an adrenal crisis (lack of cortisol).

296.    Other failures on the part of providers to follow up on abnormal lab results

include                         (multiple abnormal lab results on 7/1/21 after several

weeks of complaints of nausea, diarrhea, and pain while breathing, strongly suggesting the

presence of an active serious systemic infection; the labs were not resulted until 7/11/21,

which is a problematic delay in diagnosis, and he was finally sent to the hospital on

7/30/21 where he was diagnosed with endocarditis and has likely suffered heart damage);

(61-year-old with lab results consistent with iron deficiency

anemia on 2/17/21 and low ferritin on 3/22/21 should have been immediately referred for

an endoscopy or colonoscopy to rule out a bleeding gastrointestinal lesion; several weeks

later, after being sent out to a hospital with pain in his right upper abdomen, he had a CT

scan and was found to have colon cancer); and                         at ASPC-Lewis

(diagnosed with hepatitis C; abnormal liver function tests and very elevated HCV titer

were seen on 9/8/20, but no treatment or expert evaluation). (*See also* ADCM1578125,

Mortality Review of                         (7/11/19) ("It appears that follow up of

abnormal labs were not made in a timely manner.").).

23774493.1

297.     This problem is not new. I have written about it before. In a report from 2013, which later was filed under seal with the Court (Doc. 946-1, Ex. 1), I wrote (at page 73): "I looked at many of the unreviewed lab reports and found significant abnormal levels. If lab results are not reviewed promptly, they do the patient no good – they might as well not have been ordered." In a supplemental report from 2014, which later was filed under seal with the Court (Doc. 946-1, Ex. 3), I wrote (at page 15): "When labs are done and the results are abnormal, follow-up is often untimely or non-existent." And in a report from 2016, filed under seal with the Court (Doc. 1539), I wrote (at page 54): "The failure to act timely on abnormal labs and diagnostic imaging places patients at enormous risk of harm. Given ADC's widespread non-compliance on this measure, it is not surprising that I found numerous examples of patients who were suffering unnecessarily because their providers had failed to act upon their abnormal results."

298.     The ADCRR has itself identified substandard performance on the part of its providers in this area, as seen in CGAR data for Performance Measure 46 ("Are Medical Providers reviewing the diagnostic report, including pathology reports, and acting upon the reports with abnormal values within five (5) calendar days of receiving the report at the prison?" (Doc. 1185-1, Ex. B at 11)):

|  | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 95.00 | 95.00 | 92.50 | 96.77 | 96.67 | 96.67 | 100.00 |
| **Eyman** | 90.00 | 88.00 | 88.00 | 86.00 | 88.33 | 86.00 | 94.00 |
| **Florence** | 87.04 | 91.67 | 86.67 | 91.67 | 88.33 | 95.00 | 95.00 |

23774493.1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Lewis** | 97.78 | 98.89 | 90.00 | 95.56 | 95.12 | 91.11 | 90.70 |
| **Perryville** | 96.23 | 95.88 | 85.98 | 85.29 | 85.57 | 86.02 | 80.90 |
| **Phoenix** | 90.00 | 88.00 | 84.72 | 87.30 | 84.00 | 87.27 | 79.37 |
| **Safford** | 90.00 | 100.00 | 93.33 | 96.55 | 100.00 | 95.65 | 96.67 |
| **Tucson** | 96.67 | 91.00 | 90.48 | 82.02 | 84.88 | 86.25 | 87.50 |
| **Winslow** | 80.40 | 90.00 | 76.67 | 73.33 | 93.33 | 93.33 | 90.00 |
| **Yuma** | 86.00 | 86.00 | 90.00 | 92.00 | 78.00 | 88.00 | 90.00 |

299.    The Stipulation's standard for substantial noncompliance of 85% for this Performance Measure is not medically defensible. Anything less than 100% performance on this is inadequate and it puts patients at risk. If a clinician feels strongly that a diagnostic test is medically necessary for a patient, then the results of that test must be timely reviewed, 100% of the time.

### 4.    Providers fail to obtain hospital records and review and act on them.

300.    Patients who go to the hospital – among the most vulnerable in the system -- must have the records of their hospitalization timely reviewed, and be timely seen by their provider upon their return, so that adequate care can be provided. In a declaration from 2017, filed with the Court (Doc. 2103), I wrote (at page 14): "Defendants are also noncompliant in reviewing and acting upon discharge recommendations from hospitals."

301.    This problem, too, has not been addressed. I saw many charts for complex patients who had been hospitalized that lacked the record of the course of their hospital stay or, if the hospital record was present, no indication that it had been reviewed by a provider. This is dangerous and can lead to serious treatment lapses and errors.

23774493.1

302.                              , for example, underwent an unnecessary and invasive procedure because the provider failed to review and document in his record a diagnosis made during his hospitalization. On 12/8/20, Mr.          was seen by a provider for a chronic care visit. His 11/3/20 CT scan report identified a lung mass, enlarged lymph nodes, and numerous pulmonary nodules "concerning for neoplasm." At the 12/8/20 visit, Mr.          reported hemoptysis (coughing up blood), vomiting, and shortness of breath and was sent to the hospital where the lung mass was worked up. Bronchoscopy and EBUS (endobronchial ultrasound guided biopsy) were performed and both lung and lymph nodes were biopsied. These were negative for cancer. Infectious etiologies were ruled out and Mr.          was diagnosed with sarcoidosis (an autoimmune disease that leads to inflammation, usually in the lungs, skin, or lymph nodes), which was treated with prednisone for one month. Mr.          was discharged from the hospital and returned to prison on 12/25/20. This diagnosis has not been added to the master problem list nor is there any mention of the extensive diagnostic work-up done for the lung mass/adenopathy during the hospitalization, except in the hospital discharge summary that is filed under the "Other" tab in the electronic medical record.

303.   It appears to me that no one in the prison system ever looked at those outside records of his hospitalization. Mr.          was seen by an NP on 12/28/20, who wrote that Mr.          "is being seen for return from hospital visit from Banner Estrella with the diagnosis of Lung nodules." No mention is made of the sarcoidosis diagnosis. In addition, four months later, on 4/22/2021, he saw a pulmonologist (through a consult requested by the prison before Mr.          hospitalization, as discussed later in my

report), and the pulmonologist noted previous 11/3/20 chest CT scan results, restated the concern for malignancy, and stated "there has been no further work-up that has been reported." Of course, that was not correct, as he had extensive work-up and diagnosis of sarcoidosis made during his lengthy hospitalization in December 2020.

304.    Mr.          received a PET CT scan on 5/12/21, which had been ordered before his hospitalization. It showed a 3.2 cm hypermetabolic right hilar mass, and many hypermetabolic lymph nodes. He was referred for another lung biopsy, this time a CT guided needle biopsy of the right upper lobe. This was unnecessary given the hospital work-up and diagnosis of sarcoidosis. This unnecessary procedure was complicated by a right pneumothorax (collapsed lung) and required a right thoracostomy chest tube. Mr.

saw the pulmonologist on 6/28/21, who diagnosed sarcoidosis (as had already been diagnosed six months earlier). This diagnosis was still not on Mr.          problem list as of my last review, a failure that is highly problematic since this will be a significant disease that affects Mr.          the rest of his life and will require careful management.

305.    Other examples appear elsewhere in this report (see discussion of                   in Section III(B),                          in Section IV(B)(2), and                   in Sections IV(B)(5) and VI(B)(1)). The ADCRR has itself identified this problem in its mortality review process. (*See, e.g.*, ADCM1651473, Mortality Review of                          (9/22/20) ("There are several gaps in the scanned documentation where hospitalizations should have been placed."); ADCRRM0012721, Mortality Review of                          (2/19/21) ("The hospital discharge summary was not scanned into the medical record until 2/3/2021.").)

23774493.1

306.    The problem also is demonstrated by the ADCRR's own CGAR data. Nine of the 10 ASPCs, for example, scored abysmally low this year on Performance Measure 44, which requires that providers review and act upon a hospital's treatment recommendations within 24 hours of a patient returning from an inpatient hospital stay or ER transport. (Doc. 1185-1, Ex. B at 11.)

| | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 100.00 | 85.71 | 100.00 | 100.00 | 75.00 | 100.00 | 100.00 |
| **Eyman** | 51.85 | 56.00 | 69.23 | 77.78 | 55.56 | 68.42 | 56.52 |
| **Florence** | 87.88 | 65.63 | 70.97 | 60.71 | 86.84 | 53.13 | 71.43 |
| **Lewis** | 80.77 | 88.00 | 65.52 | 72.00 | 70.97 | 75.61 | 75.76 |
| **Perryville** | 82.35 | 79.17 | 87.50 | 94.74 | 80.77 | 91.67 | 82.14 |
| **Phoenix** | 50.00 | 50.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 |
| **Safford** | 100.00 | 100.00 | N/A | 100.00 | 100.00 | 100.00 | 100.00 |
| **Tucson** | 74.07 | 60.47 | 58.97 | 66.67 | 65.22 | 34.15 | 65.96 |
| **Winslow** | 54.55 | 100.00 | 100.00 | 83.33 | 100.00 | 100.00 | 100.00 |
| **Yuma** | 40.00 | 80.00 | 37.50 | 80.00 | 85.00 | 65.00 | 70.37 |

307.    The ADCRR's data demonstrates not only the failures in this area, but the system's inability to self-correct. According to the ADCRR, the basis for ASPC-Eyman's dismal performance on Performance Measure 44 has been consistent over nearly four years: providers fail to timely note responses to each hospital discharge order and fail to justify any changes to the orders; and nurses fail to administer the treatment that is ordered by providers. (Doc. 3916-1 at 201-215.) Unfortunately, the ASPC-Eyman CAPs

23774493.1

have set forth essentially the same actions, month after month, and year after year: for the most part, they state that a supervisor and/or other staff will review discharges for compliance and that providers and nurses will be trained and reeducated. (*Id.*) These measures, along with others occasionally included ("[m]edication will be ordered as KOP vers[u]s DOT when appropriate" (*id.* at 213 [February 2021]); progressive discipline will be provided as appropriate (*id.* at 210-211 [November 2020], 211 [December 2020], 212 [February 2021], 215 [June 2021])) are not actually corrective steps but rather hallmarks of a functional system. They describe what should ordinarily be done. But ordinary measures have already failed, as the scores demonstrate. How will the prison's record of persistent, dangerous failures in this area be fixed? Clearly, not through the CAP process.

308.    I saw essentially the same problems and the same CAPs regarding this performance measure for ASPC-Florence (Doc. 3916-1 at 216-228) and ASPC-Lewis[13] (*id.* at 229-240). ASPC-Tucson, which scored far below the compliance threshold every month of 2021, had nearly identical problems identified and nearly identical CAPs in May, June, July, and August 2020, and April, May, and June 2021. My review of these

---

[13] I was also concerned to see in the ASPC-Lewis CAPs from March and May 2021 the following: "Centurion sought clarification from the auditor to determine what exactly was considered insufficient reasoning for a provider to disagree with a specific medication [recommended by a specialist]. The provider documented 'not previously on this medication.' This reasoning is considered insufficient and is not compliant.  Providers have been issued a notification concerning the adequacy of explanation needed to obtain compliance and will act on it." (Doc. 3916-1 at 238, 239.) I am distressed that any clarification was needed on this point. It is common for patients returning from the hospital to be placed on new medications. Denial of a new medication on the grounds that it is new is ludicrous, and the failure to recognize it as such disturbs me.

23774493.1

CAPs supports my conclusion that even when the ADCRR identifies problems, it does not have the ability to self-correct.

### 5. Providers fail to provide adequate pain medication to those who need it.

309.    I am particularly disturbed by a clear pattern of inadequate or no pain management, which results in severe and unnecessary pain and suffering, including for end-stage cancer patients.                              , whose case was discussed in detail in Section I(A)(1), is one horrific example. As explained previously, in the months leading to his death from metastatic lung cancer, he was given either no pain medication or grossly inadequate pain medication. That was nothing short of malpractice. And

died in prison of pancreatic cancer in 2019 after enduring significant and unnecessary pain because his PCPs failed to provide adequate pain management.

310.    Patients who suffer from cancer, have had a traumatic injury, or are recovering from surgery require pain management. When visiting the prisons and reviewing charts, I found that pain medication that was prescribed at a hospital or by a specialist was often disrupted, discontinued, or ignored without explanation once the patient returned to prison. And patients who had been on certain pain medications for some time were abruptly removed from them and not provided an adequate substitute, often apparently without any notice or consultation with the patient. The failure to provide proper pain management is an indication of callous disregard for patients and consistent with what patients told me of an often hostile relationship with healthcare staff who view them as drug-seeking and do not take their reports of pain seriously.

23774493.1

311.    I have reviewed the Centurion formulary and it lacks appropriate options for pain medication. They have the exceptionally weak Tylenol #3, #4, and then they jump to morphine. (ADCRR00096793.) They need to have an intermediate option like Norco or equivalent to provide the full spectrum of pain relief options.

312.    When medication for pain is prescribed in the prisons, it appears to be, except in the infirmary units, almost always Tylenol #3 (Tylenol with codeine). That is an extremely poor choice for a number of reasons, as I explained in my declaration four years ago. (Doc. 2496 at ¶ 17.) The medication is short-acting and must be taken frequently to achieve pain relief (every four to six hours), but ADCRR patients are almost invariably prescribed the medication only twice daily. (*See id.*) The medication thus wears off well before the next dose becomes available, forcing the patient to endure unnecessary pain. This is cruel. Many healthcare systems have removed codeine from their formulary for lack of efficacy. Modern medicine just does not use Tylenol #3 because there are so many better alternatives. In my 27 years of medical practice supervising the care of hundreds of thousands of patients, I have never written for nor have I seen any other physician write for Tylenol #3 for an adult patient. It simply is rarely used anymore, so to find it as the mainstay of pain management in the Arizona prison system is troubling and it confirms that patients are not receiving meaningful pain management for their medical conditions.

313.    This problem is not new. In a declaration filed with the Court in this case on 12/18/17, for example, I explained the "broken system of providing pain management" (then under Corizon) and inappropriateness of abruptly discontinuing pain medications without a tapering-down schedule, and I provided a detailed discussion of one cancer

-118-

23774493.1

patient who received profoundly inadequate pain management through only Tylenol #3,

dosed twice a day, before his death (Doc. 2496 at ¶¶ 6, 17, 27),

314.    Unfortunately, the problem continues.                    discussed

above, is one example of the misuse of Tylenol #3. The NP's verbal order for Tylenol #3

was inappropriate for the level of pain he experienced the week before his death from

organ failure. In his hospital admission documentation, he told he doctor that he called an

ICS because he could not tolerate the pain any longer. The first thing the hospital did was

to provide him with appropriate pain medication in the form of oxycodone.

315.                              , 47 years old, is another example. She first reported

severe arm/shoulder pain in her dominant arm with limited range of motion about 18

months ago, and has since submitted about 20 HNRs seeking treatment. In response, she

has seen an NP multiple times, had a cortisone injection, and tried physical therapy. This

provided her little to no relief. Ten months after her first complaint, she was seen on

2/23/21 by an orthopedic surgeon who diagnosed her with a partial tear in her rotator cuff

and recommended surgical repair. After twice denying her referral for the surgery, the

surgery was finally approved on 4/6/21, and then took four months to schedule.

316.    Throughout these lengthy delays as well as post-surgery, healthcare staff

grossly undertreated her pain, causing her to suffer needlessly. Ms.          repeatedly

reported that the medications that she was prescribed, including NSAIDS and tramadol,

were not addressing her pain. For example, on 3/27/21, she wrote:

> I was placed on tramadol & indomethacin for the pain for the last few weeks
> I have been in [excruciating] pain it is completely unbearable to the point
> w[h]ere I can't sleep my pain level is a 20.

23774493.1

317.   In April 2021, her NP prescribed Tylenol #3 twice daily as needed. As explained above, this is a short-acting pain reliever that wears off quickly. Ms. continued to complain of severe pain, including on 6/30/21, when she wrote:

> BEEN WAITING [PATIENTLY] TO GO OUT FOR SURGERY IN A LOT OF PAIN DID EVERYTHING YOU ASK ME TO DO.BUT [THE PAIN] IS GETTING SO BAD I FEEL LIKE I HAVE NERVE DAMAGE SO CAN YOU PLEASE TELL ME SOMETHING OK!!!!!! I WOULD HATE TO LOSE USE OF MY ARM SOME DAY[]S CAN'T USE IT! IT'S MY LEFT ARM AND I'M LEFT HANDED."

318.   Her medications were not changed in response.

319.   Ms.          had her surgery in early August. There are no hospital records in her chart regarding the actual surgery, but discharge orders from the surgery center prescribed oxycodone every six hours for five days and for her to "continue" Norco 10/325, and use ibuprofen 200-400 mg for breakthrough pain. These prescriptions are standard, well within the normal range of appropriate care following surgery of this kind. None of these prescriptions were filled, however, when she returned to the prison on 8/4/21. Instead, that evening she received two Tylenol #3. After two days, her Tylenol #3 dose was increased to three times a day for a week, but then returned to twice a day. When I met with Ms.          at the end of August, she described ongoing severe pain.

320.   Healthcare staff also prescribe pain medications that are contraindicated for use together or are contraindicated in light of the patient's medical condition.

          is one example. As discussed in Section I(A)(2), above, he was prescribed pain medication that was contraindicated for someone with liver disease, and it appears he died from the bleeding caused by the medication.                    also discussed in Section I(B)(2), above, was treated with prednisone, ibuprofen, and Toradol. Those are

-120-

23774493.1

contraindicated to use together; it is fortunate that he did not develop a gastric ulcer and

rupture.                                    who died earlier this year, was prescribed ibuprofen for

pain despite taking methotrexate, which is known to potentially lead to renal impairment

as both are metabolized in the kidney. A baseline creatinine should have been ordered at

the time the ibuprofen was prescribed.

321.                                    is another example of cruelly ineffective

pain management, resulting in the likely unnecessary amputation of her leg. She had

significant pain in her leg due to prior trauma and she submitted many HNRs over time

begging for pain relief. Chronic pain inadequately treated can be debilitating, and the care

she received does not meet the community standard of care.

322.   In the 18 months leading up to her amputation, Ms.                leg pain

was treated with gabapentin, acetaminophen, and ibuprofen -- all short-acting, requiring

dosing up to every eight hours.[14] Multiple HNRs from her indicated that this regimen was

ineffective. There are a multitude of options available to a patient like this, including

electrical stimulation like TENS units and definitive surgery that should have been

explored prior to amputation. In addition, she was an ideal patient for long-half-life

opiates (methadone, buprenorphine, etc.) for controlling her chronic pain which is

standard of care for this type of patient. These long-half-life opiates are ideal for a

---

[14] One provider attempted to provide her with reasonable pain relief. He prescribed her oxycodone on 1/29/20 and filled out the non-formulary justification for this medication indicating that she had constant pain despite the use of multiple other medications and that this medication was to treat her pain until her amputation could be scheduled. Ms.                received three doses of this medication and then it was cancelled for reasons that I cannot discern.

-121-

correctional facility because they can be dosed once or twice per day which matches up with the frequency of pill call.  None of these options was tried.

323.    These options should have been tried prior to any consideration of an amputation for pain control. Indeed, her orthopedic surgeon indicated that he had an extensive discussion with her about operative versus nonoperative treatment. He stated that Ms.                        requested the amputation due in part to her severe daily pain and her ongoing complications from the chronic NSAID regimen that was all that was allowed by the prison. I am deeply offended as a medical professional that the ADCRR providers would not or could not attempt to control her chronic pain using widely available and inexpensive medications that are intended for such a patient, to the point that she chose amputation as her only means of relief from terrible pain.

**6.    Providers delay treatment for patients with hepatitis C.**

324.    Hepatitis C is a viral infection that causes liver inflammation, sometimes leading to serious liver damage. The hepatitis C virus (HCV) spreads through contaminated blood. The U.S. Preventive Services Task Force recommends that all adults ages 18 to 79 years be screened for HCV.

325.    While a new infection with HCV does not always require treatment, as the immune response in some people will clear the infection, chronic HCV infection must be treated. The goal of treatment is to cure the disease. All patients should be monitored for disease staging and progression and considered for treatment. The urgency with which to treat chronic HCV infection and which regimen to use is based upon several factors, including the infecting genotype, the natural history and stage of the disease, the expected

23774493.1

efficacy of therapy, prior treatment history, potential side effects of and ability to tolerate the appropriate treatment regimen. Evaluation prior to management decisions should focus on these factors. The new Direct Acting Antivirals used to treat hepatitis C are amazing advances in medicine: initial cure rates are 95-99%, they are well tolerated by patients, the treatment timeline is less than 24 weeks, and they generally do not create significant drug-interaction issues with other medications. With these new medications, HCV can be cured, and it is conceivable that transmission of the virus can be eliminated.

326.    The ADCRR very recently released a revised protocol for treating HCV dated 8/24/21. (*See* MSTM at 305, Appendix C, § 2, Clinical Practice Guidelines for the Evaluation and Treatment of Viral Hepatitis C (eff. 8/24/21).) Under this new protocol, patients with a confirmed diagnosis of chronic HCV are evaluated for possible treatment based on their degree of liver fibrosis and other factors that make them vulnerable to severe illness from HCV. Patients are assigned to one of three priority levels for treatment, with the Priority Level 1 patients who are at highest risk for developing severe illness from HCV to be treated first. Patients in that group include people with stage 4 fibrosis, liver transplant candidates, liver cancer, and co-infection with HIV and/or hepatitis B. Patients in Priority Level 2 include those with stage 3 fibrosis, stage 2 fibrosis with comorbidities, and diabetes. Priority Level 2 includes people with stage 2 fibrosis without comorbidities, and stages 0 and 1 fibrosis. (*Id.* at 308-09.)

327.    I have reviewed the transcript for Dr. Grant Phillips's deposition, taken on 10/4/21. Dr. Phillips estimates that there are approximately 8,000 people in ADCRR prisons who have chronic hepatitis. (Deposition of Grant Phillips at 91:20-23 (10/4/21).)

He testified that approximately 1,200 people in the ADCRR have qualified for HCV treatment in the first priority group (with overlap into the second group), that Centurion has so far treated approximately 650 people in priority groups 1 and 2, and that by June 2022, the plan is to complete treatment for all people with stage 3 or 4 fibrosis. (*Id.* at 90:7-20.) Dr. Phillips stated they were enrolling people in treatment at the rate of about 50 patients per month. (*Id.* at 92:2-4.)

328.    Under the ADCRR's plan, it appears it will take twelve more years to treat the patients who are currently identified as having chronic HCV. While it is appropriate for Defendants to prioritize which patients to treat first, the timeline that Defendants are rolling out is simply too long, and will result in some people getting seriously ill unnecessarily in the meantime.

329.    Review of the health records shows that, for years, the ADCRR has failed to follow the community standard for treating patients with HCV and, as a result, patients have been harmed, and some have died.

330.                                   is one of the patients who has been harmed. He was diagnosed with HCV in the 1990s, and it has been on his health problem list since 2003. Well tolerated, simple, oral treatments became available for use in 2014. Under the community standard of care, since that time, Mr.            qualified for treatment and should have received it. He was not treated, and now he has liver cancer that likely could have been prevented.

331.    Now that Mr.         has liver cancer, he cannot receive anti-viral treatment until his tumor is treated, as anti-viral treatment can make the tumor more aggressive.

23774493.1

Once he has completed his radiation therapy, the HCV needs to be treated. Unbelievably, on 9/14/21 the RNP wrote that he does not meet criteria for treatment.

332.                          is diagnosed with HCV and as of 1/17/2020, had a very elevated HCV titer, but he has not been treated yet or even evaluated by a gastroenterologist.

333.                          died of complications of metastatic liver cancer on 1/17/20. His death might have been delayed with more timely treatment for his HCV. He had an APRI >2 in 2015; a score greater than 1.0 is strongly suggestive of liver cirrhosis. This result should have led to a more formal workup for cirrhosis/fibrosis and likely ongoing monitoring in the form of hepatic ultrasounds. Instead, his providers delayed his treatment. When they finally did a liver ultrasound in August 2018 they found a significant sized hepatic lesion that likely would have been detected much earlier with appropriate surveillance or prevented entirely with timely HCV treatment.

334.                          died of complications of untreated hepatitis C. In March, 2017, he had an APRI score of 2.0 which made him a potential candidate for HCV treatment. He was never treated. An abdominal ultrasound was done on 5/16/17 which showed no liver masses. No further abdominal ultrasounds can be found. Based on his record, he should have had a liver ultrasound or alpha-fetoprotein every six months. Neither was done, and he died on 3/1/19 of liver cancer, a complication of untreated HCV.

**7.      Providers fail to treat Substance Use Disorder with community-standard evidence-based treatment.**

335.   As is true in most correctional settings, there are a significant number of people confined in the ADCRR with a history of Substance Use Disorder (SUD), and

-125-

23774493.1

many people continue to use illicit substances, including injected opiates, while in

ADCRR prisons.[15] The community standard for treating SUD, and particularly Opiate Use

Disorder (OUD), includes the use of Medication Assisted Treatment (MAT). MAT is the

use of medications, in combination with counseling and behavioral therapies, to provide a

"whole-patient" approach to the treatment of substance use disorders. MAT is approved

by the FDA,[16] World Health Organization, Department of Health and Human Services,[17]

the National Institute on Drug Abuse,[18] the Office of National Drug Control Policy,[19] and

the Substance Abuse and Mental Health Services Administration (SAMHSA).[20] MAT is

---

[15] Dr. Wendy Orm of Centurion confirmed that patients in the ADCRR misuse controlled substances, and she is aware of this because patients test positive in drug screens, they overdose, they are found with controlled substances in their possession, and they become reinfected with hepatitis C. (Orm Dep. Individual, 60:17-21; 61:2-7.)

[16] (*See* U.S. Food & Drug Administration, Information About Medication-Assisted Treatment (MAT) (2/14/19), https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat.)

[17] (*See* U.S. Dep't of Health & Human Services, How to Find Opioid Treatment Programs? (4/19/18), https://www.hhs.gov/opioids/treatment/index.html.)

[18] (*See* Nat'l Institutes of Health, Policy Brief: Effective Treatments for Opioid Addiction (Nov. 2016), https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction.)

[19] (*See* Office of Nat'l Drug Control Policy, National Treatment Plan for Substance Use Disorder 2020 (Feb. 2020), https://trumpwhitehouse.archives.gov/wp-content/uploads/2020/02/2020-NDCS-Treatment-Plan.pdf.) This Report, from the administration of President Donald J. Trump, calls use of "opioid agonist therapy," the central pillar of MAT, "the standard of care for OUD," and notes that the federal "SUPPORT Act, enacted in October 2018, requires state Medicaid programs to cover MAT for OUD . . . ." (*Id.* at 7-8.)

[20] (*See* U.S. Dep't of Health & Human Services, Substance Abuse and Mental Health Services Administration, Medication-Assisted Treatment (MAT) (10/7/21),

clinically effective to alleviate symptoms of withdrawal, reduce cravings, and block the brain's ability to experience the opiate's effect. MAT maintenance has been proven to cut overdose rates in half and decrease rates of HIV and Hepatitis C transition. Research shows that a combination of MAT and behavioral therapies is a successful method to treat SUD. MAT in correctional settings has been proven to lower mortality on release: the Rhode Island Department of Corrections dropped overdose deaths by 61% within a year of their MAT program (which offers all MAT options – buprenorphine/Suboxone, methadone, and naltrexone/Vivitrol) to incarcerated people.[21]

336.    Other than providing methadone to pregnant women who are admitted to prison while taking methadone therapy, the ADCRR's Medical Services Technical Manual contains no provisions for providing MAT to patients with SUD. In my many visits to ASPCs over the years, I have seen no evidence of a comprehensive treatment program using MAT. Dr. Orm confirmed that the ADCRR does not provide medication assisted treatment for patients who have substance use disorder, except for those few patients who are pregnant and receiving methadone maintenance therapy, and those who were on the medications prior to incarceration and are then tapered off during intake into the prison system. (Orm Dep. Individual, 61:8-62:1.)

337.    The failure to offer community standard of care for SUD, including MAT, harms incarcerated people and places them at unreasonable risk of harm. Without a MAT

---

https://www.samhsa.gov/medication-assisted-treatment.)
[21] (*See* Traci C. Green, PhD, MSc, Jennifer Clarke, MD, and Lauren Brinkley-Rubinstein, PhD, Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System, JAMA Psychiatry 75(4):405-407 (2018), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2671411.)

23774493.1

program, ADCRR will continue to have unnecessary cases of morbidity and mortality related to illegal drug use inside the prison.

338.   While SUD is often endemic in correctional settings, I believe that substance abuse problems in the ADCRR are compounded by the grossly deficient approach to managing pain that I have discussed more fully above. In a setting where providers fail to provide adequate pain management to people with acute and/or chronic pain from an injury, cancer or other serious condition, there is a serious risk that their patients will engage in self-medication.

339.   I reviewed the death records for five people who died of substance misuse in ADCRR custody, possibly because their SUD went untreated. Forty-four-year-old                      had a known history of IV drug use and was diagnosed with HCV, a diagnosis common among IV drug users. He had a history of back pain, submitted multiple HNRs related to back pain in 2019, and was receiving trigger point injections. He reported he suffered from pain at 10/10 75% of the time. On 2/3/20, he was found in his cell, unresponsive, having apparently overdosed on fentanyl and heroin. (*See* ADCM1615615-1615618.)

340.   The "Current Health Status" tab in                      record documented his history of withdrawal from heroin and amphetamine abuse. He also had a documented history of back pain due to levoscoliosis, for which he sought pain relief and was intermittently prescribed NSAIDs and tramadol. On 8/29/20, the 31-year-old was found dead in his cell at ASPC-Lewis. According to the ADCRR mortality review, Mr.                      cellmate reported Mr.                      "had a history of probable drug use while in

-128-

23774493.1

custody." Mr.        toxicology screen showed morphine, codeine and a metabolite of

fentanyl, and listed his cause of death as heroin and fentanyl intoxication.

(ADCRRM0004662-4665.)

341.                          was 33 years old when he died on        at

ASPC-Lewis. The record contains ample evidence showing Mr.                suffered from

SUD. In 2012, while incarcerated, he was also diagnosed with HCV. When he saw an NP

for his chronic care appointment (for HCV and latent tuberculosis infection) on 8/22/18,

the NP noted his history of "injectable drug use."

342.    Mr.                healthcare record also shows he struggled with chronic

pain. On 10/4/18, he submitted an HNR stating, "I AM IN NEED TO TALK TO THE

PROVIDER I AM IN SERIOUS PAIN IN MY BACK NECK AND SYADIC NERVE."

He saw the RN the same day, and reported feeling pain at 6/10 at that time, and 8/10 at the

worst, which he ascribed to "multiple surgeries." The RN took his vital signs, observed he

could walk independently, and could stand up and touch his toes. She did not document a

history of the patient, she provided no care, and she did not refer him to a provider.

343.    Starting 1/14/19, Mr.              had a series of ICSs. Early in the morning

on 1/15/19, he had an EKG showing a possible myocardial infarction. Although the NP on

duty was alerted, there is no record that he reviewed the EKG. Mr.                should have

been sent to the hospital that night. Instead, he died the following day of a lethal dose of

heroin, according to the autopsy. Had the medical system taken his chest pain seriously,

especially with evidence of ischemic chest pain, he would not have been forced to self-

medicate to treat his chest pain and might not have died of an overdose.

23774493.1

344.                              was 28 years old when he died on             at the

maximum custody unit in ASPC-Lewis. He had been diagnosed with HCV, possibly

acquired from a history of IVDU (intravenous drug use) and sharing needles, as stated in

the note for a 2/6/17 provider encounter. I found no indication that Mr.                    was

offered treatment for his SUD.

345.   Mr.                    had a long history of complaints regarding his knee pain. On

10/12/18, he submitted an HNR, prompting an x-ray of his knee, but he was not seen by

the RN until 11/10/18. He complained of pain at 8/10. The patient was provided muscle

rub and an NSAID. When he saw the provider two weeks later, a knee brace and sleeve

were ordered, and the NSAID dosage increased. On 12/19/18, he submitted another HNR

that said "my left knee issue is severe nerve damage in the front on my knee cap that

occurred from a motorcycle accident. I have no feeling to the touch but I am in a lot of

pain, constantly. My medication does not help with this knee and the pain is inhibiting me

from easily moving around in my cell." The nurse who saw him on 12/22/18 referred him

to the PCP, without providing treatment. It took nearly three months – until 3/8/19 – for

Mr.                    to be seen by a provider. On that date, he reported severe pain to his left

knee, "almost unbearable at times." The provider requested an MRI, ultrasound, or CAT

scan on a routine basis, stating that Mr.                        reported the knee pain was "severe . . .

to the point of feeling like having heart attack." Nevertheless, the provider's note states,

"no other medication for knee pain than NSAIDS."

346.   Mr.                    died on 3/10/19, the day after he saw the provider.

According to the medical examiner report, he died of a medication overdose, and tested

23774493.1

positive for morphine, codeine, dihydrocodeine, oxycodone, oxymorphone, acetyl

fentanyl, norfentanyl, amphetamines, barbiturates, and canabinoids.

347.                                was 55 years old and had HCV and a known

history of injection drug use. There is no indication in his record that he was offered SUD

treatment. According to the mortality review, Mr.              died of fentanyl intoxication

on 12/12/19 at ASPC-Tucson. (ADCM1603925-1603928.) As that report acknowledges,

there is "no record in the medical record referencing the terminal event."

(ADCM1603925.)

348.   The loss of these five people is tragic -- in each case, there was ample

information in their healthcare records documenting histories of substance use disorder.

These men could well have been good candidates for participating in SUD treatment, that

could possibly have saved their lives.

### 8.   Providers fail to offer or follow-up on necessary health screenings based on age, medical history, and gender.

349.   Providers must promote the health and well-being of their patients by

educating them and offering them periodic screening tests. Two cancer screenings in

particular are critical for adults. All women aged 21-65 should be screened for cervical

cancer every three years, and all adults aged 45-75 should be screened for colorectal

cancer (until this year, the age was 50-75). In addition, men aged 55-69 should have an

opportunity to discuss the potential benefits and harms of periodic screening for prostate

cancer with their clinician and be permitted to choose whether to have the prostate-

specific antigen screening, which is typically done every two years. The ADCRR's

Medical Services Technical Manual requires the colon and cervical cancer screenings.

23774493.1

(MSTM, Ch. 5, § 3 at 5.4.) I found no provisions regarding the offering of PSA screening to men from 55-69 years.

350.    I did not undertake a systemic review to determine whether the ADCRR ensures that all people are offered the screenings on the prescribed schedule. However, several cases raised concerns that this does not happen.

351.                          was admitted to ADCRR custody on 11/22/16, and was appropriately provided a Pap smear to screen for cervical cancer as part of the admission process. The results, reported several days later, were abnormal and indicated she had "atypical squamous cells," a condition that sometimes resolves spontaneously. The standard of care at that time was to follow up with a repeat Pap smear a few months later, or do a colposcopy sooner. Dr. Lee signed off on the results, and Ms.                          was told, incorrectly, that the results were normal. She confirmed this when I spoke to her at ASPC-Perryville on 8/31/21. Under the ADCRR's screening schedule, Ms.                          should have had another Pap smear at the end of 2019, but did not receive one until December 2020. By that time she had developed squamous cell carcinoma and had developed a cervical mass that is also cancer.

352.    Ms.                          saw providers several times in the intervening period, and it is shocking that no one in the medical department caught this serious error. Had her abnormal Pap been appropriately evaluated and followed up, it is very unlikely that she would have developed invasive cervical carcinoma four years later.

353.                          died at age 61, on 5/29/21, apparently of coronary artery disease. He had also been recently diagnosed with colon cancer. His

-132-

cancer was quite advanced when it was first detected in April 2021, and he expired

quickly. Mr.          had been in ADCRR custody since 2004. I found no evidence that

he was ever offered a colon cancer screening, and nor did the ADCRR's mortality review,

which noted his anemia and iron deficiency should have prompted a colonoscopy.

(ADCRR00000110-113.) Had he been screened and his cancer detected earlier, it is

possible that he would have had more treatment options.

354.                          died of prostate cancer on 3/11/20.

(ADCM1651463.) I found no indication in his record that the medical staff ever discussed

PSA screening with Mr.          and no tests were done until late 2019, when he submitted

an HNR complaining of urinary difficulties and pain. At that point, his PSA was 66.1, far

about the normal range of 0-5.4. While there is a small benefit in mortality to screening

versus not screening, the patient should be educated on the option and allowed to choose

whether to screen.

355.   People with certain illnesses should also be screened periodically for certain

conditions. This includes diabetic patients, who should be screened annually for diabetic

retinopathy, which can cause vision impairment and blindness.                          was

admitted to prison in 2013, but did not see an optometrist or ophthalmologist until 2019,

after he submitted an HNR reporting that he was having trouble seeing. When his eyes

were finally examined he had severe non-proliferative retinopathy, and four months later,

he had progressed to severe proliferative retinopathy. Had he received the standard annual

exams, this damage could have been prevented.

23774493.1

**V.    People in ADCRR custody are at substantial risk of serious harm because the ADCRR fails to ensure they consistently receive their essential medications.**

356.    I previously have identified concerns with medication administration. In a report from 2013, which later was filed under seal with the Court (Doc. 946-1, Ex. 1), I wrote (at page 71): "The ADC monitors have documented extensively that prescriptions are commonly allowed to expire before being reordered or renewed and expired medication continues to be distributed." In a supplemental report from 2014, served on Defendants on 9/8/14 (Doc. 1105), I wrote: "Prescriptions are consistently renewed after expiration dates, leading to lapses in delivery of necessary medications to patients." (WILCOX000046.) In a declaration from 2016, filed under seal with the Court (Doc. 1539), I wrote (at page 51): "Medications must be renewed regularly and without interruption, and prisoners must be able to transfer housing locations without medication interruptions. ADC monitors' reports show that administration of prescription medication is frequently delayed or missed, and that prescriptions for chronic care medications frequently lapse despite the patients refill requests."

357.    There continue to be unacceptable disruptions in administration of medication. This problem manifests in different ways, including through failure to promptly provide medications when they are first prescribed, to ensure medication continuity, and to administer medications on a timely basis, including after transfer, any of which can result in serious harm to patients.[22]

---

[22] ADCRR Assistant Director Larry Gann identified another medication administration problem at his deposition: he noted that nurses were found to be pre-pouring medications into envelopes at Lewis, Eyman, Tucson and Yuma, which he

23774493.1

358.    Interruption of some critical medications can be especially harmful following hospitalization, when the patient is recuperating. Given the ADCRR's poor record in ensuring that patients are promptly followed by a provider when discharged from the hospital, patients are at substantial risk of harm because their medications are so often not provided to them.

359.    Failure to ensure timely and consistent medication places patients at substantial risk of serious harm, including needless pain and suffering. For example, as explained in more detail in Section I(A)(1), healthcare staff failed to provide                     with prescribed pain medication in the days leading up to his death from cancer.

360.    Another example is                          at ASPC-Eyman, who was diagnosed with Addison's crisis in 2018. Mr.               adrenal glands stopped producing cortisol, a hormone necessary for many critical body functions. As a result, he had to be given hydrocortisone, which substitutes for natural cortisol, for his body to work correctly. He did not receive the medication consistently, and in the five months before his death at age 34, he did not receive it at all. The failure to provide Mr.               with hydrocortisone and renew his prescription very likely contributed to his decline

---

correctly characterized as "improper conduct for medication administration." (Gann Dep. Individual, 95:14-15; 97:21-25.) As Mr. Gann acknowledged, it is "not ethical" and "illegal" because pre-pouring constitutes dispensing medication, and that is not in the scope of practice for nurses. (*Id.*, 96:14-17; 97:1-10.) Pre-pouring medications is dangerous because it increases the risk that a patient will receive the wrong medication. According to Mr. Gann, the practice has ended, but it took "almost a year" to stop it. (*Id.*, 98:9-11.)

23774493.1

361.    For example, Mr.                 prescription for hydrocortisone expired on 1/28/19, and was not renewed until 2/19/19. Labs taken on 2/20/19 showed critically abnormal results, likely because he had not received hydrocortisone in over three weeks. When his prescription was renewed, it matched his previous dosage (15 mg per day) on paper, but it appears he was provided only 30 - 5 mg pills each month, and that he received no hydrocortisone from 3/22/19-4/22/19.

362.    On 6/18/19, the day the prescription was set to expire, lab results showed that his potassium and sodium levels had been corrected (although his TSH was dangerously high and went unaddressed). The improvement probably was because he was receiving at least part of his dose of hydrocortisone around that time. However, the hydrocortisone was not renewed again before his death on 11/8/19. I see no reason in the medical record why this is so; in fact, he was not seen by medical staff between 6/18/19 and 10/3/19, when an ICS was called and he "arrived via gurney lethargic, ashened skin, short of breath, and stating he was nauseated."

363.    This was not an isolated incident. The ADCRR has self-reported extensive violations of the Stipulation related to medication continuity. Performance Measure 13 required that "[c]hronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication." (Doc. 1185-1, Ex. B at 8.) As can be seen by the table below, six years after the Stipulation was entered, the ADCRR still is not able to meet this critical requirement consistently.[23] Further, the 85%

---

[23] The ADCRR has self-reported other failures in this area. Performance Measure

23774493.1

target that was set is unacceptably low from a medical standpoint. All of these medications are presumably medically necessary for mental health and chronic health conditions. As such, continuity of care must be maintained and the medically acceptable target has to be 100 percent. Glitches do happen with mail-order medication renewals, which is why the on-site pharmacy and the backup pharmacy exist -- so those glitches can be bridged and continuity of medically necessary medication can be ensured.

|  | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 97.06 | 100.00 | 100.00 | 100.00 | 93.33 | 96.00 | 95.65 |
| **Eyman** | 86.00 | 84.00 | 84.00 | 80.00 | 92.00 | 88.00 | 92.00 |
| **Florence** | 87.50 | 65.38 | 76.62 | 86.25 | 88.46 | 88.31 | 74.68 |
| **Lewis** | 68.75 | 95.95 | 93.15 | 98.70 | 85.71 | 91.03 | 76.54 |
| **Perryville** | 83.51 | 82.14 | 86.46 | 78.85 | 74.49 | 72.55 | 85.56 |
| **Phoenix** | 94.29 | 91.49 | 91.49 | 97.06 | 97.73 | 94.74 | 100.00 |
| **Safford** | 90.00 | 89.66 | 100.00 | 90.00 | 100.00 | 96.67 | 100.00 |
| **Tucson** | 90.48 | 94.44 | 94.44 | 82.42 | 66.67 | 70.00 | 78.65 |
| **Winslow** | 100.00 | 100.00 | 100.00 | 100.00 | 93.33 | 100.00 | 100.00 |
| **Yuma** | 64.00 | 74.00 | 78.00 | 74.00 | 68.00 | 76.00 | 96.00 |

---

11 required that "[n]ewly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT." (Doc. 1185-1, Ex. B at 8.) In the first seven months of 2021, five ASPCs (Eyman, Perryville, Phoenix, Safford, and Tucson) scored below 85% on this measure at least once. And four ASPCs (Douglas, Lewis, Tucson, and Winslow) scored below 85% at least once between January and July 2021 on Performance Measure 35, which provides that "[a]ll inmate medications . . . will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption." (*Id.* at 10.)

23774493.1

364.    CAPs have not remedied this problem. At half of the ASPCs, Eyman, Florence, Lewis, Perryville, and Yuma, repeated unacceptable scores since November 2020 have been met time and again with the essentially same CAP: the pharmacy will issue a regular report of expiring medications, the Site Medical Director will ensure that all medications are renewed at least one week before expiration, and providers at chronic care appointments will ensure that medications are active and not due to expire before the next appointment. (Doc. 3916-1 at 24-34, 36-39.) This is not strictly speaking a corrective action plan; it describes standard operating procedure in a well-functioning system. The issuance of these same CAPs over and over is the equivalent of the ADCRR stating that to correct this problem they will no longer fail to follow appropriate procedure. A real corrective action plan imposes a creative solution, a different methodology, an added layer of review, some degree of accountability, or a combination of those measures. And yet I saw the same ineffective CAP consistently imposed at these five ASPCs from November 2020 through June 2021, with essentially no variation -- and without fixing the underlying problem.[24] The CAP system in the ADCRR simply does not work.

---

[24] The one variation I saw is that at ASPC-Tucson, after three months of dismal scores, the CAP for June 2021 consists of education of some staff "regarding the failure" and the requirement that the MH lead and Site Medical Director be copied on medication renewal requests sent to providers. (Doc. 3916-1 at 35.) Based on what I have seen of the Tucson health care delivery system and the months of poor performance for this measure, I do not anticipate that this CAP, without more, will be successful.

23774493.1

**VI.    People in ADCRR custody are at substantial risk of serious harm because they cannot reliably see specialists when medically necessary.**

365.    Dr. Stern, the Court expert, noted that "[r]eferrals to specialists is a key component of safe provision of health care." (Doc. 3379 at 110.) I agree. As I noted in my 2013 report, the exercise of professional judgment sometimes requires more in-depth knowledge than primary care providers possess. (Doc. 946-1, Ex. 1 at 55.) In those cases, the provider must recognize the need and be able to refer patients for consultations with a specialist, such as a neurosurgeon, cardiologist, urologist, infectious disease specialist, pulmonologist, or ophthalmologist. Unfortunately, almost eight years since my 2013 report, patients in ADCRR custody still are placed at substantial risk of serious harm because they do not timely receive specialty care. As explained below, these failures can be seen in patient medical records and the ADCRR's own documents and CGAR data.[25]

366.    All too often, healthcare staff fail to recognize the need to request a specialty consult for their patient. When they do submit a request, the request is reviewed by Utilization Management, which will either approve or deny it. Denials usually take the form of "Alternate Treatment Plans," also called ATPs.

---

[25] The Stipulation did not include qualitative review of the specialty care process and did not evaluate whether providers appropriately sought specialty consults or whether Utilization Management properly reviewed and authorized those requests. Instead, the Stipulation contained performance measures regarding documentation of Utilization Management's decision (Performance Measure 48) and communication of that decision to patients (Performance Measure 49). In March and April of this year, most ASPCs scored below 85% on Performance Measure 48 ("Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record."). (Doc. 1185-1, Ex. B at 11.)

-139-

367.   I have serious concerns with the failure by providers to seek specialty consults at all, or on an urgent basis when medically necessary, and by delays caused by failures to implement and follow-up on Alternative Treatment Plans recommended by Utilization Management. Finally, even when specialty care is authorized, it often does not occur timely, placing patients at substantial risk of serious harm.

**A.     Providers fail to recognize when patients require specialty care.**

368.   Too often, providers, and particularly mid-level providers, fail to recognize when patients need a specialist to address diseases and conditions that require additional expertise. This problem is not new. In a report from 2013, which later was filed under seal with the Court (Doc. 946-1, Ex. 1), I wrote (at page 55): "I saw numerous examples of people whose cases clearly required input from specialists or a more advanced understanding of their complex needs but yet they were not referred for that care."

369.   The case of                          , described above, amply illustrates this problem. As already recounted, Mr.           , who died at 42, had a complex medical history, including a heart condition for which he was long prescribed medications -- amiodarone and diltiazem -- that must be monitored by a cardiologist. He was never referred to a cardiologist, nor was he referred to a gastroenterologist or hepatologist to address his grossly abnormal liver tests. Finally, the urine tests he was given during the last eight months of his life all showed he had protein in his urine -- a clear sign of kidney disease. He should have been referred to a nephrologist. Instead, he was diagnosed with end-stage kidney disease only when hospitalized shortly before his death.

23774493.1

370.                        had "heart failure" and severe mitral valve regurgitation (a condition in which the heart's mitral valve does not close tightly, allowing blood to flow backward in the heart), and should have been managed by a cardiologist. Last year at age 50 she was found with facial drooping and foaming at the mouth and was pronounced dead an hour later. The cause of death was hypertensive atherosclerotic cardiovascular disease and cardiomyopathy. She had last been seen by a cardiologist in 2017. Even the ADCRR's own mortality review concluded that she "should have been comanaged with a cardiologist." (ADCRRM0000020.)

371.   I met                        when I visited ASPC-Florence on 9/8/21. He had a subclavian central venous catheter for initial dialysis access. He later had an arm AV fistula placed for access. The AV fistula had been working for months, so the subclavian catheter should have been removed a while ago. There is a serious risk to the patient of having an unnecessary central venous catheter, including through infection, thrombosis or stenosis of the catheter, and risks of it inadvertently getting pulled or tugged. There was simply no excuse to leave it in, particularly since for the relevant period, Mr.        was housed in the IPC, and was required to be seen by an RN each shift and by a provider at least every 72 hours. The catheter is clearly visible. I shared my concerns at the end of my visit. I was pleased to see that Mr.        's catheter was finally removed on 9/30/21.

372.   I met                        in the IPC at ASPC-Tucson. Mr. was started on naproxen (a potent NSAID) on 1/5/16 and had repeated prescriptions for that medication for the next approximately 4.5 years, apparently for osteoarthritis. In

23774493.1

November 2019 he was noted to have decreased renal function. His labs from that visit place him as having stage 2 chronic kidney disease 2 (mild). He also had documented protein in his urine on 10/11/19. These factors should have triggered a referral to a nephrologist to manage his chronic kidney disease. That did not happen.

373.   Mr.            's very concerning kidney failure decline is documented in his laboratory findings from October 2019 to March 2021. When he was finally seen by a nephrologist on 4/5/21, the diagnosis was chronic kidney failure secondary to chronic analgesic exposure and possible undiagnosed glomerulonephritis, and he started dialysis in July 2021. Had he been timely seen by a nephrologist, it is likely that the correct diagnosis would have been made, the NSAIDS would have been stopped, and his renal function could have been preserved enough to avoid or significantly delay dialysis.

**B.     Specialty care is not provided in a timely manner.**

**1.     Unreasonable delays in specialty care place patients at substantial risk of serious harm.**

374.   Even when specialty consults are requested and authorized, patients suffer from unreasonable delays in being seen. Through my records review and encounters with people in the prisons, I have identified a pattern of unreasonable delays that places patients at risk of serious harm.

375.   This is not a new problem. In a report from 2013, which later was filed under seal with the Court (Doc. 946-1, Ex. 1), I wrote (at page 62): "In my review of the medical records across all of the facilities I visited, the failure to schedule consult appointments in a timely fashion was rampant in the charts." And in a supplemental rebuttal report from 2014, served on Defendants on 9/8/14 (Doc. 1105), I wrote: "I

23774493.1

frequently see referrals that are carried out only after lengthy delays or numerous repeated requests, or that are never carried out at all." (WILCOX000034.)

376.    For this review, I have identified a pattern of delays in cancer diagnosis and treatment. For example, consider the case of                              , the young man discussed in Section I(A)(3), who died of testicular cancer earlier this year. A testicular ultrasound was completed on 10/23/20. The specialist noted: "2.6 cm left intratesticular mass is highly concerning for testicular malignancy. Recommend an urgent urology consultation." However, it took almost a month before Mr.        was seen by a urologist via a video appointment on 11/23/20. The urologist recommended that labs, including HCG, be drawn "STAT" and a "left radical orchiectomy STAT." The HCG test results requested by the urologist were received 12/14/20 and were 512.6, a significantly elevated level and worrisome for testicular cancer (normal is under 6.5).

377.    It took four more months for him to receive the orchiectomy due to multiple errors. The initial consult request, submitted on 12/13/20, was inexplicably submitted on a routine (as opposed to urgent) basis. It was cancelled over a month later, on 1/22/21, because the urologist "no longer has his practice." A new request was entered on 1/22/21, this time on an urgent basis. When Mr.        was seen by a second urologist on 2/16/21, the specialist said he did not have access to the prior lab work and requested that the labs and ultrasound be repeated. It took a month to get the second ultrasound and lab results, which showed extremely elevated HCG (81,066) and very likely indicated metastatic and fast-growing testicular cancer. On 3/16/21, a NP reviewed the lab results and ultrasound and incorrectly documented the greatly increased and grossly abnormal HCG lab result as

23774493.1

"normal." The NP stated: "Possible urology consult vs review of ultrasound and blood work" by the specialists. It is clear the NP grossly misinterpreted the HCG results and did not understand the patient's condition; I cannot imagine this error taking place if she had adequate physician supervision.

378.    That same day, the NP submitted a request for a "possible urology consult" on a routine basis, which was authorized on 3/25/21, and then cancelled on 3/30/21, at which time a new consult request was entered, with the following note: "Authorized follow up for urology cancelled as Per Dr Homayoon inmate needs surgery. IM is scheduled for **urgent surgery on 4/8/21 with Dr Homayoon** and this surgery needs authorized[sic] instead of the follow up." (The bold formatting appears in the medical record.) On 4/8/21, Mr.          finally had the orchiectomy that a specialist more than four months earlier said should take place "STAT."

379.    The failure in specialty referrals did not end there. When Mr.          returned to the prison, the NP saw him, noted the concern for testicular cancer, but failed to note the extremely elevated HCG, documented no plan to follow-up on the pathology report, and did not order scans for the metastatic work-up or enter a referral to oncology. Tragically, he died only two months later.

380.    Another example is                          at ASPC-Lewis, who experienced unconscionable delays in diagnosis and then treatment for his very significant and dangerous prostate cancer. This allowed the cancer to spread for more than a year between the first elevated PSA (8/22/19) and radical prostatectomy (9/10/20). Delays of a month or two are common in cancer diagnosis and treatment, and may not be harmful to

-144-

the patient, at least where a specialist has not called for prompt work-up or treatment.

Delays of over a year, however, are an entirely different story. Indeed, when Mr.

finally received a prostate biopsy on 2/20/20 (which had been requested by a urologist on

12/3/19), it showed widespread cancer in all segments of his prostate. His Gleason score

was 9, which indicates an aggressive neoplasm. At the time of his surgery, he had local

extensions of his prostate cancer, stage IVA, which carries a poor prognosis—30% five-

year survival overall.

381.    In my opinion, this is clear malpractice and the failure to appropriately

diagnose this common and treatable condition within a reasonable period of time has

likely led to a worsened overall prognosis for Mr.          . There appear to be a number of

causes for the delays, including submission of multiple specialty requests on a routine (as

opposed to urgent) basis, delays in authorization and scheduling, and failure to obtain the

relevant specialty reports in a timely manner. Indeed, the pathology report dated 2/26/20

was not stamped received at ASPC-Lewis until 4/13/20.

382.                           at ASPC-Lewis, discussed above in Section

IV(B)(4), received a CT scan of his abdomen on 9/22/20. It showed a right hilar lung mass

and multiple nodules throughout both lungs suspicious for malignancy. A chest CT was

recommended but not done until two months later, on 11/3/20. It showed a right upper

lobe mass 3.1 x 3.0 cm with enlarged mediastinal lymph nodes and numerous pulmonary

nodules bilaterally and was considered suspicious for neoplasm (or, less likely, infection).

The specialty report was not stamped received by the prison until 11/23/20, twenty days

later. An urgent referral for a PET CT scan was not submitted until four weeks later, on

23774493.1

11/29/20, and was not completed until 5/12/21, five months later. Time is of the essence when dealing with a new cancer diagnosis. It is imperative to get the cell type identified and to get the cancer staged because those are necessary to design any treatment plan for the patient. Getting the cancer treated is what reduces the chance of spread so unnecessary delays greatly increase the mortality rate from cancer.

383.                              , a 61-year-old patient I met during my visit to ASPC-Florence, was experiencing unacceptable delays in getting a biopsy. In particular, an ultrasound in January 2021 showed new hepatic lesions. Those lesions were not added to the list of health problems/conditions in the medical record as of 10/8/21. A biopsy was recommended but additional imaging was needed. A CT was completed on 5/27/21. The full results, which apparently were not reviewed by a provider until 7/20/21, showed a cirrhotic appearing liver. A consult request for a biopsy was submitted on 7/20/21, but not scheduled. On 9/10/21, the specialist requested an MRI before proceeding with the biopsy. As of 10/8/21, the MRI has been scheduled but has not been completed, and the biopsy still had not been scheduled, even though Mr.          has submitted at least twelve HNRs on the subject between January 2021 and September 2021.

384.   Cancer is not the only condition for which patients experienced serious and damaging delays in specialty referrals.                              at ASPC-Lewis has gone almost two years without effective therapy after diagnosis of obstructing left kidney stone on 12/30/19. Mr.          saw a urologist on 2/26/20, who recommended that he be scheduled for a "left ureteroscopy w/ laser lithotripsy" with "left ureteral stent placement once blood pressure under optimal control." On 3/4/20, NP Johnson reviewed the

-146-

urology's report and wrote "pt to be monitored in IPC for b/p concerns." No therapy was even attempted until 7/2/21, over a year later, when a specialist attempted, unsuccessfully, to snare the stone via a ureteroscopy. The medical record suggests that Mr.          's blood pressure was too high to attempt treatment earlier. That simply is false. Part of the reason his blood pressure may have been so high is because of the obstructing stone. In any event, high blood pressure should be readily treatable within a few weeks of effective care. There are several notes in the medical record that suggest that some of the specialty care delays were, at least in part, due to Arizona Executive Order 2020-10, dated 3/19/20, which suspended non-essential or elective surgeries that utilize personal protective equipment or ventilators. That does not excuse the lengthy delays here. Arizona Executive Order 2020-32, dated 4/22/20, allowed hospitals, healthcare facilities, and providers that met certain criteria to begin performing those surgeries on or after 5/1/20.

385.          at ASPC-Perryville suffered from severe arm/shoulder pain in her dominant arm, with sharply limited range of motion, for at least ten months before she was finally allowed to see an orthopedic surgeon on 2/23/21. The surgeon recommended surgery to repair her painful tear. After twice denying her referral for the surgery, the surgery was finally approved on 4/6/21, and took an additional four months to finally schedule. Because of these lengthy delays, coupled with the failure to adequately treat her pain, as discussed in more detail above, Ms.          spent many months in severe pain unnecessarily.

386.    Ms.          had her surgery in early August. (There are no hospital records in her chart regarding the actual surgery, only the discharge orders from the surgery center.)

-147-

23774493.1

When I met Ms.        at the end of August, she had not been informed of a plan for physical therapy. According to her health record, she finally had her first physical therapy session on 10/5/21. Not surprisingly, the physical therapist described her shoulder as "very tight." Timely and adequate physical therapy is the key to successful shoulder surgery. Delays and insufficient therapy greatly compromise the end result. Her therapy has been delayed. At the time that I saw her, her range of motion was significantly diminished and her pain level was high. The physical therapist has a lot of work to do to catch up and successful therapy will require successful pain management which, sadly, will probably not happen in this system.

387.    I also saw unacceptable delays in hernia repair. Mr.                      for example, has had several large abdominal wall hernias that were first assessed at his intake on 3/1/17, over four years ago, which have gotten larger and more uncomfortable. He also has filed at least seventeen HNRs about his hernias between 2017 and 2021, including related to pain, discomfort, and enlargement. He has seen three different general surgeons on 12/4/19, 6/24/20, and 5/21/21, all of whom recommended surgery. On 5/21/21, he was assessed with a 15 cm ventral incisional hernia in the upper abdomen, an 8 cm ventral incisional hernia in the lower abdomen, and a left inguinal hernia. These all are plainly visible on observation and are commented on in multiple provider encounter notes. No surgery, however, had been arranged as of 10/09/21.

388.    I saw other examples where failures of coordination between healthcare staff at the institutions and Utilization Management resulted in unnecessary delays in care. For example,                                    is diagnosed with lupus and Addison's

23774493.1

disease. After reporting numbness in her left hand and arm, the endocrinologist on 4/16/21 recommended that she be seen by a neurologist. The request was denied and additional information was requested by Utilization Management. On 5/19/21, Ms.        was seen by her provider to gather additional information in response to Utilization Management's denial, but no further action was taken to get her to a neurologist.

389.        had spinal surgery completed in September 2020 and was seen in December 2020 for post-operative follow-up. At that time, it was noted that he had not received the recommended x-rays and thus the specialist again requested x-rays and a follow-up in three months. A referral for the follow-up with the neurosurgeon was submitted on February 3, 2021, but Utilization Management recommended an Alternative Treatment Plan instead, to take the x-rays and review the results before requesting a follow-up with the specialist. X-rays were completed on 2/17/21, and the ATP was noted as complete on 3/9/21, but the records do not reflect that a referral was resubmitted for a neurosurgery consult.

390.        has Valley Fever, for which he requires regular visits to the pulmonologist. At his 5/24/19 visit, the pulmonologist reviewed his recent CT scan and recommended another in six months, recommended a new inhaler, ordered labs, and recommended a follow-up visit in two months. At his visit on 7/24/19, the pulmonologist noted that the ADCRR had not started the inhaler, nor had they performed the recommended labs, and wrote, "These recommendations are necessary," and further documented, "unfortunately recommendations from multiple visits have been ignored." She asked for a follow-up in three months, but it apparently did not happen and the next

23774493.1

pulmonology report is dated 4/12/21, more than a year later. The patient reported that his Valley Fever symptoms (dyspnea with exertion and pleuritic pain) were recurring, and he described them as moderately severe. The pulmonologist stated, "this is a precarious situation, but the patient does need close follow-up and monitoring." She recommended a return visit in a month or sooner. He was not seen for another three months. This haphazard approach to Mr. ____'s care for Valley Fever is alarming, and places him at risk for worsening disease.

391.    I also saw inadequate specialty care for patients with diabetes.

____ at ASPC-Perryville for example has Type 1 diabetes, with very variable control and frequent hypoglycemic episodes, for which she has been housed in the infirmary intermittently. Ms. ____ was seen by an endocrinologist on 5/28/21, who recommended that she return in three months. According to the medical record, Dr. Ibrahim reviewed the endocrinologist's recommendation on 6/14/21, and wrote: "Reviewed. Will order labs at Future visit. 3 month endocrine follow up." As of 10/9/21, I see no indication that any follow-up appointment has been requested, much less scheduled, even though it is now overdue. Ms. ____ is at major risk of short term and long term complications.

392.    Another example is ____, a 39-year-old patient with Type 1 insulin-dependent diabetes. He entered prison in 2013, but it appears he did not see an optometrist or ophthalmologist until 2019. That is well below the standard of care, which requires an annual retinal exam screening for diabetic retinopathy, one of the most debilitating complications of diabetes, which can cause blindness. Fortunately, most patients with this condition can be treated successfully, but only if it is caught at the early

23774493.1

stages. As a result, it is important for diabetics to have regular checkups with an ophthalmologist because they have the necessary equipment to visualize the retina and to treat the retinopathy if any is detected. If this had been done for Mr.      it could have prevented the serious and permanent harm that followed.

393.   In June 2019, Mr.      reported vision trouble. When he finally saw an ophthalmologist in October 2019, he was diagnosed with severe non-proliferative retinopathy that, within four months, became severe proliferative retinopathy with multiple vitreous hemorrhages. In February 2020 the retinal specialist recommended pan-retinal photocoagulation ("PRP") to be done within a month. A consult request was entered on 3/2/20, on a routine (not urgent, as the time frame required) basis and was not authorized until 4/10/20, after the PRP should have taken place. It was not completed for several months. Because retinopathy is a progressive disease that causes irreversible damage to the retina, the longer you wait to treat it, the more damage occurs to the retina and the more vision is lost.

394.   Mr.      also had a severe decrease in his left eye vision that started in December 2020 and was diagnosed on 2/17/21 as a retinal detachment, with a sudden loss of vision in the left eye on 2/26/21, for which he was sent to the emergency room. It was not until 3/19/21 that he had surgery for the retinal detachment—three months after the symptoms started. The retina is a very thin and fragile piece of tissue. When a detachment occurs, the tissue folds and crinkles and that results in vision loss. The earlier you repair the tissue and get it back to its normal shape the better chance you have of preserving vision in the long run.

395.    Mr.        's trials were not over. After filing an HNR on 4/10/21 reporting difficulty seeing out of his right eye, he was seen by the on-site optometrist who recommended that he see a retinal specialist "ASAP." It took over a month for him to be seen, on 6/29/21, and he was found to have a worse vitreous hemorrhage on the right and trace edema bilaterally. He elected to proceed with the same surgery on the right eye that was recommended. He finally received the surgery on 7/30/21.

396.    There are many reasons for these delays, as can be seen from the examples outlined above: healthcare staff do not request the appropriate appointments, do not request appointments as urgent or emergent when necessary, fail to provide the specialist with necessary medical records to conduct the encounter and develop a treatment plan, fail to timely obtain and act on specialty reports, and otherwise fail to adequately manage and coordinate care. These failures place their patients at serious risk of harm.

### 2.    The ADCRR's own data and documents show significant delays in specialty care.

397.    The Stipulation focused only on the timeliness of consults after they had been entered, and so did not capture consults entered untimely or as routine as opposed to urgent, and also did not capture consults that had to be cancelled, rescheduled, or re-done because healthcare staff did not provide sufficient information to specialists or Utilization Management improperly denied the request, so the usefulness of the data for this issue is limited. Even with that limited purpose, the CGAR data for Performance Measures 50 and 51 of the Stipulation, reproduced below, shows that, for the first seven months of 2021, all of the prisons except ASPC-Douglas (one of the smaller prisons) failed to meet the 85% benchmark for timely scheduling approved appointments at least once.

23774493.1

**PM 50:** Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider. (Doc. 1185-1, Ex. B at 11.)

| | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 85.71 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Eyman** | 57.89 | 75.76 | 69.05 | 82.05 | 85.71 | 90.00 | 100.00 |
| **Florence** | 69.44 | 82.86 | 74.29 | 80.56 | 79.07 | 84.62 | 93.33 |
| **Lewis** | 64.71 | 70.31 | 64.00 | 88.00 | 76.67 | 87.10 | 87.50 |
| **Perryville** | 85.37 | 90.20 | 80.49 | 95.35 | 88.64 | 88.64 | 97.22 |
| **Phoenix** | 75.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Safford** | 100.00 | 100.00 | 80.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Tucson** | 58.97 | 93.10 | 89.06 | 91.67 | 97.30 | 94.83 | 100.00 |
| **Winslow** | 100.00 | 85.71 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Yuma** | 56.67 | 88.00 | 84.00 | 77.14 | 76.92 | 96.97 | 58.06 |

**PM 51:** Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider. (Doc. 1185-1, Ex. B at 11.)

| | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 85.71 | 97.22 | 94.87 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Eyman** | 76.00 | 68.00 | 92.00 | 92.00 | 98.00 | 96.00 | 90.00 |
| **Florence** | 62.50 | 90.00 | 86.67 | 93.10 | 88.33 | 96.49 | 95.00 |
| **Lewis** | 60.27 | 81.93 | 82.67 | 83.78 | 82.61 | 91.89 | 92.75 |
| **Perryville** | 81.33 | 76.39 | 72.00 | 82.89 | 86.49 | 89.16 | 87.67 |
| **Phoenix** | 84.21 | 100.00 | 87.50 | 100.00 | 100.00 | 95.00 | 100.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Safford** | 86.67 | 96.67 | 96.67 | 93.33 | 100.00 | 96.67 | 100.00 |
| **Tucson** | 80.00 | 82.56 | 84.71 | 89.53 | 93.83 | 95.24 | 92.77 |
| **Winslow** | 96.67 | 90.00 | 90.00 | 96.15 | 76.67 | 96.67 | 79.31 |
| **Yuma** | 72.00 | 86.00 | 86.00 | 80.00 | 88.00 | 88.00 | 86.00 |

398.    The reasons are varied. The ADCRR, like many other correctional facilities across the country, experienced delays in specialty care due to the COVID-19 pandemic, particularly in the early months of the pandemic. However, monthly CQI meeting minutes at the institutions identified a number of other causes for delay in specialty care that extended beyond the effects of the pandemic and were preventable. This included delays in having consult requests approved by Utilization Management. (*See, e.g.*, ADCRR00099608-99609, ADCRR00148477, ADCRR00100014 (ASPC-Douglas) (Feb. 2020, Mar. 2020, Apr. 2020) ("It is taking about 3 weeks to get items approved[.] This is leaving us with very little time to get appointments scheduled and completed[.]"); ADCRR00148512 (ASPC-Eyman) (Mar. 2020) ("There is a time delay in approvals. Routines are taking approximately one month and Urgents take approximately 1-2 weeks."); ADCRR00099784, ADCRR00148728, ADCRR00100249, ADCRR00100755, ADCRR00101086 (ASPC-Perryville) (Feb. 2020, Mar. 2020, Apr. 2020, May 2020, June 2020) ("Clinical Coordinator note that consults are taking at least 3 weeks to review by the UM team. Discussed how to elevate in cases that will fall out of compliance."); ADCRR00148734 (ASPC-Phoenix) (Mar. 2020) ("Timeliness for UM to approve consults continues to be challenging."); ADCRR00148790 (ASPC-Tucson) (Mar. 2020) ("increased consults; delay in approvals"); ADCRR00148863 (ASPC-Winslow) (Mar.

-154-

2020) ("Slow to approve 'urgent' consult, has been out for twelve (12) days.");

ADCRR00100496 (ASPC-Yuma) (Apr. 2020) ("We are seeing and tracking the increase

in time from sending consults to the UM team and them being approved/ATP.").)

399.    Specialty care has also been unnecessarily delayed by the failure of health

care staff to properly prepare patients for their procedures. (*See, e.g.*, ADCRRRM0018579,

ADCRR00105794 (ASPC-Tucson) (Feb. 2021, Mar. 2021) ("experiencing delays in

consults due to improper (lack of) procedure prep on the yards."); ADCRR00106425,

ADCRR00056669, ADCRR00062006, ADCRR0000862, ADCRR00137012 (ASPC-

Tucson) (Apr. 2021, May 2021, June 2021, July 2021, Aug. 2021) ("We have had some

issues with pre-op prep, to include COVID testing, being completed in a timely

manner.").) Disturbingly, the CQI committee at ASPC-Eyman noted that a neurologist

refused to see patients because providers at the institution fail to follow the neurologist's

recommendations. (*See* ADCRR00099642 (ASPC-Eyman) (Feb. 2020) ("Onsite providers

are not following protocol set in place by Neuro surgeons and as a result, they are denying

our patients.").)

400.    In addition, providers' poorly written consult requests apparently caused

Utilization Management to issue Alternative Treatment Plans (ATPs), thereby delaying

patient's specialty care. (*See, e.g.*, ADCRR00101013 (ASPC-Eyman) (June 2020)

("Ophthalmology consult placed without Acuities causing increase of ATP. Providers not

responding to NMI [Need More Information] causing increase of ATP.");

ADCRRRM0018527 (ASPC-Eyman) (Feb. 2021) ("Providers need to be more detailed on

what they are requesting."); ADCRR00104368, ADCRRRM0018558, ADCRR00105681,

ADCRR00106331, ADCRR00056515, ADCRR00061883, ADCRR00062547,

ADCRR00136940 (ASPC-Perryville) (Jan. 2021, Feb. 2021, Mar. 2021, Apr. 2021, May

2021, June 2021, July 2021, Aug. 2021) ("starting to see an increase in ATPS for

specialty consults. Please be thorough in your request for a consult.").)

401. These are self-inflicted wounds: these types of delays in specialty care are

entirely avoidable. The fact that they are still experienced in such significant numbers

demonstrates a systemic failure that places patients at risk of harm.

### C. Providers fail to timely review and act on recommendations from specialists.

402. After patients are seen by specialty consultants, their provider must review

the resulting report to follow-up on recommended treatment and make adjustments to the

treatment plan as necessary. I have written about providers' failure to review specialists'

recommendations in past reports. In a report from 2013, which later was filed under seal

with the Court (Doc. 946-1, Ex. 1), I wrote (at page 60): "Even when notified, providers

often do not review referral reports in a timely manner." In a supplemental report from

2014, served on Defendants on 9/8/14 (Doc. 1105), I wrote: "The monitors also found that

specialty consult reports are routinely reviewed late by providers. This step is important

for the orderly and timely progress of informed treatment decisions. Without timely

review of specialists' findings and recommendations, there is a risk that care will not be

appropriate, as I have too often seen in patient charts." (WILCOX000039-40.) In a

declaration from 2017, filed with the Court (Doc. 2103), I wrote (at page 14): "Failure to

review and implement the recommendations of outside specialists and care rendered at the

hospital multiplies the risks of a bad outcome, because the patient is clearly sick enough to

23774493.1

require care beyond what is available in a correctional facility and it is of singular importance to review the recommendations and to continue the care recommended."

403.   Unfortunately, the problems persist to this day. The cases I reviewed often lacked sufficient (or any) documentation showing that the provider had reviewed the recommendations or discharge plans. Sometimes the provider acted only after a lengthy, dangerous delay. These practices place patients at substantial risk of serious harm. For example,                        , discussed further above, is a brittle diabetic who should be closely followed by an endocrinologist. The endocrinologist who saw her last, on 5/28/21, recommended labs, a change in medication, and a return visit in three months. The record indicates that a provider reviewed the consult report on 6/14/21, and in the "Action Taken Comments" stated that a follow-up appointment would be ordered. However, as of 10/9/21 there was no pending order, and I found no indication he ever discussed the report with the patient, even though he is required to see the patient at least every three days, as she is housed in the IPC.

404.   Other examples include                        (saw urologist for his enlarged prostate, who recommended a transrectal ultrasound and an MRI on 11/8/19; it appears an abdominal ultrasound was done instead, and I found no record of an MRI before he died of metastatic prostate cancer on 3/11/20);                        (repeated lengthy delays for eye procedures that retinal specialist ordered as urgent over the last two years, discussed above);                        (lengthy delays in seeing pulmonologist for coccidioidomycosis, with failure to follow consult instructions, described above).

405. Untimely provider reviews of specialty consultants' reports is a widespread practice in the Arizona prison system, as seen in the CGAR data for Performance Measure 52 ("Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report"), set forth in the table below. (Doc. 1185-1, Ex. B at 11.)

|  | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 94.29 | 97.44 | 97.22 | 100.00 | 95.45 | 100.00 | 100.00 |
| **Eyman** | 84.00 | 78.00 | 74.00 | 82.00 | 92.00 | 84.00 | 88.00 |
| **Florence** | 77.59 | 84.62 | 80.36 | 80.36 | 84.62 | 94.83 | 85.00 |
| **Lewis** | 86.59 | 90.24 | 83.54 | 78.57 | 84.00 | 79.73 | 88.46 |
| **Perryville** | 90.91 | 90.28 | 89.47 | 85.33 | 77.33 | 84.51 | 87.67 |
| **Phoenix** | 100.00 | 94.44 | 100.00 | 100.00 | 93.75 | 84.62 | 100.00 |
| **Safford** | 95.00 | 95.00 | 95.83 | 89.29 | 90.00 | 92.86 | 95.45 |
| **Tucson** | 85.54 | 86.75 | 87.95 | 84.42 | 92.31 | 86.42 | 83.75 |
| **Winslow** | 86.67 | 92.00 | 91.67 | 89.47 | 95.24 | 100.00 | 82.61 |
| **Yuma** | 76.09 | 80.00 | 90.00 | 89.13 | 76.00 | 92.00 | 86.00 |

406. The CAP process appears to be helpless to fix these chronic deficiencies. I reviewed the ASPC-Eyman CAPs, which date from 2017 to June 2021. They describe a wide range of reasons for compliance failures, including new staff, delays in scanning, provider shortages, high turnover for the Clinical Coordinator and scheduler positions, and inadequately educated providers. (Doc. 3916-1 at 427-438.) Similarly, the CAPs for ASPC-Florence identify problems with a new staff, scanning delays, the lack of a clinical

coordinator, staffing vacancies among providers, high turnover in the Clinical Coordinator and scheduler positions, new and poorly trained staff, and inadequately educated providers. (*Id.* at 439-447.)

407. The persistently noncompliant ratings at these prisons attest to the failure of the CAP process to fix this serious problem.

**VII.    People in ADCRR custody are at substantial risk of serious harm because Defendants lack an adequate emergency response system.**

408. To ensure the safety and wellbeing of the people who are confined in Arizona state prisons, the ADCRR must have an effective emergency response system that involves both custody staff (who are often the first responders) and medical staff. The documents and health records show they do not. Instead, in many patients' cases I reviewed, I found (a) unreasonable delays, (b) slipshod nursing care that endangers patients, and (c) sloppy or nonexistent charting that makes oversight and self-correction difficult or impossible.

409. These problems are evident in the charts of several patients who have died. _____, for example, died on _____, at the age of 33, at ASPC-Lewis. (ADCM1575247.) I discuss the care he received prior to his death in Section IV(B)(7). On the day of his death, he had an ICS for chest pain. According to the Mortality Review Committee, "[h]e walked into the HUB holding cell and was left briefly and found down shortly after." (*Id.*) He was given CPR and Narcan to no avail. (*Id.*) The Mortality Review Committee correctly identified significant problems with this response:

> Very poor charting on perimortem events. Video suggests nurse saw pt and left him on the floor without performing evaluation. It is important to note here that policy and procedures were not followed during the time spent in

23774493.1

the medical holding area for chest pain. There was no[] assessment or EKG done by nursing.

(ADCM1575249.) I share these concerns about the nursing response to this emergency; I am shocked by the apparent disregard for this patient's very serious needs.

410.                              died on            at the age of 50, at ASPC-Perryville. (ADCRRM000018.) I discuss the care she received prior to her death in Section VI(A). On the day of her death, an ICS was called for nausea and vomiting, but nursing staff did not arrive until 13 minutes later. (*Id.*) She became unresponsive, with "facial drooping and foaming at the mouth." (*Id.*) During transport to the medical clinic, she was determined to have stopped breathing and no pulse was detected. (*Id.*) The Mortality Review Committee found serious nursing errors in the emergency response:

> ICS documentation states that CPR was initiated, then nursing called the on call provider, prior to calling 911. Also, documentation of EMS arrival time was 22:21, which was 20 minutes after the initiation of CPR. However, nursing documentation states that EMS did not arrive for 45 minutes. It is not possible to know how long the patient received CPR prior to EMS arriving, based on this documentation. There was no explanation for a prolonged 45 minute delay.

(ADCRRM0000020.) The Committee concluded that "EMS should always be activated first (prior to notifying a provider) during a code response." (ADCRRM0000021.) I agree, and I share the Committee's concerns about the nursing response in this case.

411.                              died only a few months ago at ASPC-Tucson. He was 67 years old. On the day of his death, the sole entry in his medical records is an account from RN Anna Cromer. According to RN Cromer, a COII notified her at 4:07 a.m. that Mr.        "was found unresponsive"; the RN "advised to call 911." On calling back "after a few minutes," the RN was told "pt. had cuts to the back of the neck and that

23774493.1

pressure was being applied." The RN also notes being told that at "0410 CPR was started

by COs" and that the Tucson Fire Department "responded at 0425 and arrived on scene at

0428," and subsequently "pronounced inmate and cancelled ambulance response." The

RN documented that the on-call provider was notified of the incident at "approx. 0610."

412.    This account is alarming for several reasons. Why did the COII not call 911

immediately, instead of waiting to be told to make this call by the nurse? It does not take

medical training to know you should call 911 when you see a bleeding and unconscious

person. This failing echoes the findings with                    's death, where the nurse

called a provider before calling 911 for an unresponsive patient. The emergency response

system in any correctional setting must mandate that 911 is called as soon as possible in

cases of serious medical emergency.[26]

413.    Moreover, this is a patient who was unresponsive and bleeding from his

neck, but it does not appear that medical staff ever responded. That is a disturbing failure.

In any properly functioning emergency medical response system, nurses respond

immediately to serious reports such as this and provide appropriate treatment or

observations. They do not simply document information as it comes to them from custody

staff without ever seeing or assessing the patient.

---

[26] ADCRR policy does in fact require this: it mandates that "a complex specific
system be created by the Vendor Facility Health Administrator or designee and the
Warden that ensures that the personnel arriving and/or responding to a medical emergency
contact the most appropriate level of medical support. That is, Security Staff may be the
staff who makes the call to 911 to acquire an ambulance. This will typically be at the
direction of the attending medical staff. However, if awaiting medical staff's arrival will
endanger the life of an inmate, security staff may make the call." (MSTM, Ch. 1, § 6.0
(Incident Command System) at 2.4.)

23774493.1

414.    Finally, the on-call provider was not notified until two hours after the incident. Again, this is simply sloppy medicine: it is the duty of the RN to inform the provider of significant incidents like this to determine the need for any additional steps.

415.    The problems I identified in these three cases are unfortunately not unique. The ADCRR's CQI minutes from individual prisons document the same deficiencies.

416.    I saw delays in emergency response by both medical and custody staff. For example, ASPC-Eyman leadership in July 2021 found that an ICS was called at 21:30 for post-surgical jaw pain and health care staff did not arrive until 22:40, over an hour later, with "[n]o documentation on how patient transports to health unit and where medical met with patient or if man down bag was with ICS." (ADCRR00062247, ADCRR00062249.) In some cases, the delays were caused by custody staff or other unnecessary custodial barriers. This appears to be a particular problem at ASPC-Safford:

- "No key for medical to access yard office, medical could not get in, yard office too loud to hear medical knock, had to flag down CO to open door. 1 nurse for multiple ICS's @ same time." (ADCRR00103785 (Nov. 2020).)

- "Required 2 request calls to open gate 2." (ADCRR00103408 (Oct. 2020).)

- "When RN called Complex to call for ambulance control officer needed to speak to CO supervisor prior to calling which could lead to ambulance response time being delayed." (ADCRR00103409 (Oct. 2020).)

- "Emergency key set at sallyport - took officers some time to open cell." (ADCRR00101133 (June 2020) (discussing drill).)

- "There was delay in medical response time due to waiting at gate 2, while control was answering radio traffic and medical not being announced on site until after I was checked in." (ADCRR00100306 (Apr. 2020).)

- "Medical was waiting [at] gate two while security was escorting pt to yard office, prolonging response time." (ADCRR00100311 (Apr. 2020).)

Those serious problems, however, do not appear to have been resolved. After an incident

on 5/15/21, an RN noted: "Need to escort Medical to area for evaluation rather than wait at Gate 6." (ADCRR00061984 (June 2021).)

417.    I saw many examples of dangerously poor nursing care in response to emergencies. The CQI committee at ASPC-Florence, for example, noted in November 2020 that "[i]f patient had o2 saturations that were dropping into the low 80's and required a nonrebreather to maintain saturations, provider should have immediately been notified and the patient sent out. An EKG should have been performed while awaiting arrival of emergency services due to the patient's well known and complicated cardiac history. Patient had multiple symptoms of an MI including shortness of breath, anxiety, and vomiting. Vital signs were not documented in the vital sign section, unable to differentiate if the patients HR was regular or tachy/brady." (ADCRR00103667.) Similarly, the September 2020 minutes for ASPC-Phoenix detailed a case in which an ICS was called for chest pain; it was determined that the charting showed "No time of ICS initiation" and "No time 911 contacted, 911 arrived, or left w pt"; further, "[a]ssessment not conducted on Pt - including but not limited to - Heart sounds, pulse, lung sounds/ Skin indicated as warm and dry, but in charting listed as sweating. . . No history in chart - but internal defibrillator indicated/ No indication of condition of pt when left 911/No indication of EKG performed." (ADCRR00102609.) These nursing failures in the case of possible heart attacks are very serious and could have been disastrous to the patients.

418.    I also saw nursing care that disregarded patients' serious distress in ways that could have endangered them physically. The August 2020 CQI minutes for ASPC-Phoenix discussed a case in which an ICS was "initiated for crying and shaking in bunk"

23774493.1

but "[t]here was no assessment completed by the nurse during the ICS./Full set of vitals missing with no weight indicated./MH was not notified of IMs mental distress./There was no mention of looking into hx of methadone treatment or history on what he was taking, how often or where he was receiving his medication./The plan was to continue to monitor – but no indication of what was to be monitored./No education offered to IM./No indication of how IM was left in cell or stand down from ICS time." (ADCRR00102047.) Similarly, in a case reviewed in April 2020 at ASPC-Eyman, "[t]he patient was returned to a bed that was damp and smelled of urine. This would increase the risk of skin breakdown and should have raised a red flag as to the patient's cognitive well[-]being." (ADCRR00100087.)

419.    Finally, the CQI meeting minutes were replete with examples of shoddy documentation during emergencies. In fact, the committee at ASPC-Perryville in August 2021 recognized that "[t]he common trend [in ICS] was lack of documentation in medical record." (ADCRR00136940.) The mortality review for Mr.              discussed above, also recognized the long-term nature of the "[v]ery poor charting" in that case: "Charting continues to be an issue." (ADCM1575249.)

420.    At ASPC-Perryville in April 2021, one emergency response for seizures and stroke-like symptoms had "[n]o times documented, No documentation of how patient came to medical/No documentation of time 911 arrived and left/No documentation of which hospital patient is being transported to." (ADCRR00106342, ADCRR00106344.) In another ICS for seizures reviewed the same month, "[e]ncounter was not completed, no documentation in Objective section" and "no note of contact with provider regarding

elevated VS, no documentation/d[e]scription of observed seizure." (ADCRR00106348.) In the same month at ASPC-Perryville, another case had "[n]o documentation of which hospital patient is being transported to" and "[n]o review to provider sending patient out." (ADCRR00106340.)

421.   Two cases at ASPC-Phoenix also had shockingly poor documentation: an ICS for chest pain reviewed in August 2020 had "no time stated" for when the ICS was initiated, as well as "911 contacted w out any mention of time of call, arrival of 911, departure of 911 or stand down of ICS" and "No charting indicating condition of pt when leaving out 911"; "Reported hx of Cardiac issues - w no hx included in current charting"; "No assessment including lung, heart, eye, neuro charted"; "No indication of what IM was doing prior to CP"; and "No education, EKG or protocol meds given." (ADCRR00102047.) In the second case, the July 2020 meeting minutes note that "[a]fter 911 initiated there was no follow through on what time EMS arrived, how the pt was transported out of unit, pt condition on transfer and what time EMS left with patient./There is no indication in the chart that the pt is positive for COVID[.]/There is no nurse to nurse hand off recorded with the hospital." (ADCRR00101560.)

422.   ASPC-Yuma recorded the results of self-audits of emergency responses. Time and again, I saw extremely low scores – 0%, 13%, 25%, 50% – for essential charting requirements: time, location, and condition of the patient. (ADCRR00106036-106039 (Mar. 2021); ADCRR00104680-104686 (Jan. 2021); ADCRR00103935 (ASPC-Yuma Nov. 2020); ADCRR00102902 (ASPC-Yuma, Sept. 2020).)

423.    These accounts, and many others too numerous to quote from the CQI

minutes, support my conclusion that inadequate emergency medical care in ADCRR

places patients at serious risk of harm.

**VIII. People with disabilities in ADCRR custody are at substantial risk of serious harm because Defendants fail to provide them with medically necessary care, supplies and equipment.**

424.    Prisons must be equipped and staffed to ensure that people who have

disabilities are provided medically necessary care, supplies and equipment in order to

protect them from physical injury and pain, and to allow them to safely perform basic life

functions like using the toilet. On my visits to the ASPCs, I met a number of patients with

disabilities who were receiving inadequate care, supplies and equipment related to their

disabilities and had been harmed or were at substantial risk of serious harm as a result.

This is simply grossly inadequate medical care.

425.    The problems already identified throughout this report apply equally to

patients with disabilities, including provider indifference and delays in specialty care

related to assistive devices needed as a result of their disabilities. For example, I met

                    at ASPC-Tucson on 9/9/21. Mr.                    at that time was

forced to use a wheelchair because he had an ill-fitting, below-knee prosthetic. He told me

that he reported the problem to his doctor, who said he could not do anything because Mr.

            previously said that the prosthesis fit fine. Mr.                    explained to me that

it was only after using the prosthesis for a while that he found it chafed against his skin

and was too tall. On 7/2/21, Dr. DeGuzman saw Mr.                    and wrote in the medical

record: "IM WC BOUND AT PRESENT DUE TO NON FITTING BK PROSTHESIS."

No action, apparently, was taken to address this problem, since when I saw Mr.

-166-

two months later, he still had the ill-fitting prosthetic and still had to use a wheelchair for mobility. I directed that a photograph be taken showing where use of the prosthesis had injured him, as well as a video of him putting on the prosthesis and demonstrating that it was too tall to be used without causing him injury.

426.    It is critical that a prosthesis be properly fitted. Not only does an improperly fitted prosthesis cause unnecessary pain, but any time someone has an amputation, it is absolutely imperative to protect the skin on the stump and the health of the stump. If they get an infection of the stump, it can be challenging to heal and cause long-term complications. If the infection reaches the bone, they may have to amputate even higher. As can be seen in the photograph below, when I met Mr.                I saw evidence of bruising, skin breakdown, and stump irritation, which is evidence of an ill-fitting prosthesis. (I added arrows to the photograph to indicate skin breakdown and redness and stump irritation. (*See* WILCOX000106.)) In addition, and as can be seen in the video of Mr.                when I met with him (ADCRR00108148), the prosthesis was too long for him and caused a leg length discrepancy. That throws off his balance and the alignment of his spine, which can lead to increased degenerative changes of the spine and, ultimately, arthritis and further impairment due to an uneven gait. Instead, Mr.                was forced to use a wheelchair, a less healthy way to live that risks ulcer, muscle atrophy, and unnecessarily complicates activities of daily living including transferring to a toilet.

427.    I was pleased to see that after I took the video and interviewed him during the tour, a consult to have his prosthetic fitted was entered. But I am deeply concerned that it took outside scrutiny to make the system provide this basic crucial need.

23774493.1

CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00108146

428.     That does not appear to be a one-off occurrence. In October 2020,

began reporting that his prosthetic leg was in need of repair. (*See* HNR

(10/12/20) (requesting to see provider "ASAP"); HNR (12/29/20) ("My fake leg <u>needs</u>

<u>repair</u>! I was told months ago I was on a list to see provider! It been at least 3 it very

painful"); HNR (3/3/21) ("This is my 3rd H.N.R. over the same issue my fake leg is broke

I have notified medical months and months ago. It is very painful and I have no mobility.

I was told months ago DOC would order the part! Whats my status?").)

429.    He was not seen by an orthotic specialist until 6/3/21, almost eight months

after first reporting the problem. The specialist noted that his "[s]upplies are all badly

worn," the "[p]rosthetic foot shell is badly damaged," and "[t]he holes in his liners have

resulted in the painful callus on the end of his cut tibia." The specialist noted that "[i]f

new liners are not provided soon, there is an increased risk of skin breakdown and

possible infection." The specialist's plan notes state: "will order necessary supplies for

patient and submit for auth to DOC / - Once auth received from DOC, supplies to be

delivered ASAP." According to the medical record, Mr.         only received a portion of

his supplies on 7/15/21, and it appears he did not receive his medical shoes until 8/23/21.

430.    I also am particularly concerned with the care provided for patients with

paraplegia, who are particularly medically fragile and need appropriate care and support.

                              at ASPC-Florence, is one example. Mr.          who is 43

years old, is paraplegic and arrived at prison using a wheelchair in 2013. I met him first on

a tour in January 2019, at ASPC-Eyman. At that time, Mr.            explained that he

was unable to safely transfer from his wheelchair to the toilet or his bunk. He also

explained that he needed flap surgery on his buttocks for a quarter-sized open wound. I

spoke again with Mr.          on a virtual tour in July 2020, in the IPC at ASPC-

Florence. During this encounter, he was in pain, had open wounds on his buttocks and

scrotum from the combination of exposure to urine and feces and the failure to provide

23774493.1

him with an airbed to offload his weight, and told me he was feeling despondent and desperate about the amputation of his penis.

431.    When I encountered Mr.            on 9/8/21, I was glad to see that his wounds are mostly healed, though he did not have the basic disability equipment he needs. In order to protect this progress, Mr.            must be provided with all equipment necessary for him to perform activities of daily living as much as possible.

432.    Mr.            requires a global assessment of his physical needs. One of his biggest daily challenges is transferring to the toilet from his wheelchair. When he does, he scrapes his buttocks and genitals on the large wheel, which tears up his skin. It is obvious he requires a sliding board to allow him to slide from his chair onto the toilet safely and without causing injury to himself. Given his history of injuries, I am gravely concerned by the NP who responded to his request for a sliding board on 8/16/21 with the comment: "Patient was doing transfer from bed to chair without any sliding board all of this time on a yard, it's unknown why does he need it now."

433.    The wheelchair Mr.            was using when I saw him had broken arms and was the wrong size. His leg rests were not long enough, so when he sits, his feet are under pressure, and consequently, he has pressure ulcers on the bottom of his feet, as I indicated with an arrow in a photograph below. (WILCOX000107.) His feet are swollen and he did not have properly fitting shoes. Although he cannot ambulate, he needs shoes to protect his feet when he bangs into objects while moving in his chair (and, apparently, to be allowed by custody staff in certain areas). The same NP who denied Mr.            's request for a sliding board also denied his request for medical shoes on 8/16/21 because

23774493.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"patient is paraplegic and not walking, it's unknown why he needs medical shoes." As a

medical professional, the NP should have understood that it was essential to provide Mr.

with shoes that protected his feet from further harm, whether "medical" or not.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601                                    ADCRR00108123

23774493.1



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601                                      ADCRR00108125

PHOTOGRAPH OF EARLY SKIN BREAKDOWN SECONDARY TO PROLONGED EXPOSURE TO URINE, STOOL, WET CLOTHING, FRICTION

434.    In addition, because he has a suprapubic catheter and cannot control his bowel movements, cleanliness for him is critical. The prison must supply him with ample moistened wipes to protect his very fragile skin, not just toilet paper, which is too abrasive for him. He needs to have more frequent clothing changes, as he reported that he often soils his clothes with feces, and he sits in the stool, causing more skin breakdown.

435.    I was deeply disturbed to learn later that Mr.            's request for moistened wipes had been denied. In particular, Mr.            submitted a grievance dated 5/22/21. He wrote:

-172-

(I wrote Grievance on issue on 4-27-21 but no response.)
I wrote a Grievance about the medical provider refusing to give me medical
supplies for my disability. I wear diaper briefs and need wipes to properly
clean myself and my catheter. I bleed from time to time when I have to self
stimulate, using tissue only breaks up an fall apart. Wipes help me keep my
super pubic catheter clean and the hole in my bladder. For months medical
has been refusing to give me wipes to better complete my bowel care. When
I poop my diaper it's hard to clean myself with tissue. I've had wipes in the
past to use but this provider for some reason wont give them to me. I was
told that I wont be babied like I was in Central Medical by being giving
wipes. My disability requires me to use wipes, medical states I dont qualify
for wipes.

(ADCRR00049645.)

436.   These are serious allegations describing healthcare staff's unprofessional

treatment of Mr.                    and callous disregard for his serious medical and disability-

related needs. They should have been investigated. The response, dated 6/11/21, ignored

those allegations and instead simply stated:

On 5/11/2021, the RN noted on your HNR, "Per the provider you are not
eligible for wipes". The decision to order supplies is a clinical decision
based on the practitioner's medical judgement and not an administrative
decision based on the dictates of the patient. If you are having issues, please
submit an HNR requesting to be seen for the issue. . . . I find this matter
resolved and closed.

(ADCRR00049644.)

437.   That response evidences a troubling lack of understanding by the healthcare

staff about how to care for a paraplegic patient with urine and stool incontinence and is

consistent with what patients tell me about how some healthcare staff disregard their

concerns in a cursory fashion.

438.   I also met                            40 years old, in the IPC at ASPC-

Tucson. He is a large man who also is paraplegic and has had significant issues with skin

23774493.1

breakdown because he's essentially bedridden. He needs to be on an air bed with an appropriate style sheet so he is not developing skin breakdown due to friction, but neither had been provided. His health record suggests that he has had and currently has an air bed, but he did not when I met him in early September 2021, and I raised my concerns with his treatment at the end of the day with ADCRR representatives, including that he needed an air bed with an appropriate style sheet so he is not developing friction. Given his size and his lack of mobility, without appropriate equipment he is very likely to develop large decubitus ulcers that will be challenging and expensive to fix.

439.                          is another person with paraplegia living in the IPC at ASPC-Tucson. He has had, for many months, a chronic stage IV sacral ulcer. It appears he is receiving daily dressing changes, though the documentation for this was incomplete and included very few descriptions of the wound site. Mr.          transferred from the Manzanita Unit at ASPC-Tucson to that prison's IPC on 9/2/21, "for stricter wound care." He had received an air mattress on 8/2/21, but it did not transfer with him, he did not have it when I spoke to him on 9/9/21, and it does not appear that he has received it since then, even after I raised this issue with the prison staff during my visit. An air mattress will be critical to his healing process, and must be provided.

440.                          is another patient with paraplegia I met at ASPC-Tucson. He has a neurogenic bladder, which means that he must use a catheter to empty his bladder. He reported delays in getting a condom catheter and in getting inadequate supplies per week, and having to sometimes wrap a surgical glove around his penis to catch his urine. He recently requested, in a 9/18/21 HNR, that he be provided more than

23774493.1

one straight catheter per day, because he self-catheterizes his bladder three times daily.

The Director of Nursing, Danielle Dennis, responded, "Catheters are not one time use.

You are issued an appropriate number for use for one day each."

441.    Reusing catheters is a dangerous practice in any setting, and is particularly

problematic in a prison, where people live communally and it can be hard to maintain

clean conditions, let alone sterile ones. Mr.              was only admitted to the ADCRR in

July 2021, and he has already had to be treated for a urinary tract infection. Requiring

people in prison with neurogenic bladders to reuse their straight catheters unnecessarily

increases their risk of infection.

**IX.    People in ADCRR custody who are not fluent in English are at substantial risk of serious harm because Defendants fail to provide adequate language interpretation.**

442.    Communication with patients is essential to providing adequate medical

care. Patients must be able to answer questions, fully and accurately describe their

symptoms and concerns, and understand information about their medical conditions,

treatment options, and treatment plans, including those related to medication

administration and dangerous side-effects. This often requires use of medical terminology

and nuanced language.

443.    Ideally, healthcare staff who have been evaluated and determined to be

qualified to conduct healthcare encounters in the patient's language would conduct the

healthcare encounter directly in that language. That, of course, is not always possible.

When it is not possible, other qualified bilingual healthcare staff or qualified interpreters

with experience with medical terminology must be used to ensure that healthcare staff and

the patient are communicating effectively.[27] Otherwise, the communication that is essential to patient care simply cannot happen, and adequate care is out of reach.

### A.   The ADCRR fails to provide essential interpretation services, rendering patient care inadequate and placing patients at risk of harm.

444.   I have several grave concerns about the ADCRR's capacity to provide adequate medical care to people who are not fluent English speakers.

445.   First, Defendants have admitted that they do not have any written policies or procedures for identifying, tracking, and/or evaluating the proficiency of health care staff in a non-English language or languages. (*See* Defendants' Response to Plaintiffs' First Requests for Admission, No. 10, Oct. 13, 2021.) That is unacceptable. Defendants cannot permit healthcare staff to conduct a healthcare encounter in a non-English language unless that staff person has been evaluated and determined to be qualified to do so.

446.   Second, Defendants have admitted that they do not have any written policies or procedures for identifying incarcerated persons who are not fluent in English, their primary language, and/or their need for an interpreter. (*See* Defendants' Response to Plaintiffs' First Set of Requests for Admission, Number 3, Oct. 13, 2021.) That is also unacceptable. Healthcare staff must be provided clear guidance on how to ensure patients are properly identified as needing language interpretation.

---

[27] The U.S. Department of Justice has issued guidance on this subject, stating, among other things: "If . . . a prison serves a high proportion of LEP [Limited English Proficiency] individuals who speak Spanish, then the prison health care provider should likely have available qualified bilingual medical staff or interpreters versed in medical terms." (U.S. Dep't of Justice, Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41,455, 41,470 (June 18, 2002).)

-176-

447.   I found serious problems with the identification of patients who require interpreters. For example, I interviewed two monolingual Spanish speakers at ASPC-Tucson on 9/9/21 using the LanguageLine interpretation services (

and                                              ). Both are, as of 10/9/21, improperly identified in the medical record as **not** needing an interpreter, and it does not appear that they had been provided interpretation recently. (*See* eOMIS Header for both patients (last visited 10/9/21) ("Interpreter Needed: No").)

448.   Based on my discussion with them, it was clear that neither could have a full and meaningful healthcare encounter in English. And, indeed, both their records also include documentation suggesting a need for Spanish language interpretation. (*See, e.g.*,

, Nurse - ICS Response (4/30/21) ("Spanish speaking male"), Nurse - Sick Call - Scheduled (9/22/20) ("Spanish speaking only, used Language line interpreter ID #247981."), and Provider - Chronic Care (5/28/20) ("IM Spanish speaking only. Will need to be rescheduled for language lane [sic] onsite provider.");

Nurse - Infirmary Rounds (2/26/21) ("prefers to speak Spanish"), and Provider - Infirmary Rounds (7/17/20) ("Spanish speaking only- able to minimally communicate").) I have serious concerns about the sufficiency of healthcare encounters conducted in English for both patients, including during infirmary rounds and chronic care appointments, which have only perfunctory documentation in the medical record. (*See, e.g.*,                           &                           Nurse - Infirmary Rounds (9/20/21, 9/19/21, 9/18/21).)

23774493.1

449.    In talking with these two patients, I asked them if the healthcare staff utilized a language interpreter when they spoke to them and they indicated "no." One patient stated that there was a porter (incarcerated worker) who worked in the infirmary who would sometimes interpret for healthcare staff.  It is inappropriate to use incarcerated people to interpret during healthcare encounters; patients may not be comfortable disclosing sensitive, potentially embarrassing medical information in front of such people. Sharing certain diagnoses, such as HIV/AIDS or other contagious diseases, can also lead to ostracization and potentially dangerous situations in prison for the patient.

450.    Another example of the ADCRR's failure to identify patients' language needs is Named Plaintiff Laura Redmond (166546), who has stated that she is deaf, that her primary language is American Sign Language, and that she generally does not receive an interpreter during healthcare appointments. (Doc. 4006-1, Ex. C at 11.) That is not surprising, given that on 10/9/21, the date I disclosed my expert opinions to Defendants, her electronic medical record stated: "Interpreter Needed: No."

| Name: REDMOND, LAURA J. | | | ADC #: 166546  PID #: 0128865 |
|---|---|---|---|
| Facility: ASPC-PV SAN CARLOS | Area \| Bed: "C11 \| "67L | Medical Grade: 2 | PPD Date \| Result: 06/23/2021 \| Negative |
| Admission: 04/13/2020 | SMI: Yes | Dental Grade: 3 | CXR Date \| Result: None Found |
| Discharge: None | SMIC: Yes | MH Status: Acute Distress or Outpatient SMI | Interpreter Needed: No |

451.    Plaintiffs' counsel provided me with screenshots demonstrating that, at least on 10/14/21, that had been changed, and the top banner on Ms. Redmond's medical record had been updated to say: "Interpreter Needed: Yes." (WILCOX001062 (10/14/21 screenshot); *see also* WILCOX001061 (10/9/21 screenshot).) I attach these in Appendix F. I was disappointed to see, when personally reviewing her records on 10/18/21 as I

23774493.1

finalized this supplemental report, that Ms. Redmond's electronic medical record had been changed again without any explanation to say: "Interpreter Needed: No."

452.    Ms. Redmond's statement that she has rarely been provided with a sign language interpreter during healthcare encounters is borne out by a review of her chart. Only occasionally, and particularly for recent mental health encounters, has an interpreter been provided. (*See, e.g.*, MH - Mid-Level - Scheduled (9/22/21) ("Video/sign language line interpreter services needed for assessment."); MH - Non-Clinical Contact Note (8/26/21) ("Face to face communication with IM, assistance provided re: use of ASL language line with IM and provider"); Nurse - Sick Call - Scheduled (7/9/21) ("NOTES: ASL interpreter used badge #248681"); Nurse - Sick Call - Scheduled (8/30/20) ("American Sign Language Interpreter: Connor").)

453.    In fact, a psychologist wrote on 8/26/21 that "it appears that not all staff are aware of IM's level of hearing impairment and/or do have have [sic], or are unaware of, Centurion staff access to ASL interpreter." Nonetheless, Ms. Redmond's record was not updated at that time to say that she needed an interpreter.[28]

---

[28] Documentation in Ms. Redmond's medical record for recent healthcare encounters suggests that she still is not receiving reliable access to a sign language interpreter. On 10/14/21, for example, she was seen by RN Brittnie Sosa. In the notes for that healthcare encounter, "Healthcare Staff Used for Interpreter Services" was selected in response to "What type of interpreter services were used for the encounter*." But the notes make no mention of which healthcare staff provided such services, and, as noted above, no healthcare staff has been evaluated by Defendants as qualified to act as a sign language interpreter during healthcare encounters. And, during an individual mental health counseling appointment two days earlier, a Psych Associate wrote in the medical record entry for that encounter that interpreter services were not needed, even though she also wrote in the Subjective Notes section: "Pt. reported that she was told that her

23774493.1

454.    Third, providers simply do not understand patients' language interpretation needs. It is very difficult for healthcare staff to know whether and how much a patient actually understands what is being communicated in English when the patient is not fluent in spoken English. Healthcare staff can think the patient understands more than they do. This can lead to abbreviated encounters, misunderstandings, and/or lack of complete understanding, all of which can result in misdiagnosis, failure to follow treatment plans, and inability to provide full and informed consent to medical treatment and procedures, which in turn can lead to inadequate medical care. That is why it is critical to accurately identify a patient's language needs.

455.    Ms. Redmond is a good example of this problem. She reports that she has "had to attempt to communicate with healthcare providers by trying to lip-read." (Doc. 4006-1, Ex. C at 11.) I am concerned about the number of times references to lipreading appear in her medical record, and how often providers conclude that she can understand them without an interpreter and by lipreading. (*See, e.g.*, Provider - Follow Up Care (7/26/21) ("She was able to read my lips and had no issues with understanding me."); Provider - Follow Up Care (7/15/21) ("Hard of hearing able to read lips and communicate"); Provider - Follow Up Care (6/30/21) ("Pt is able to read lips and speaks a

_____

Neurology appointment has been cancelled. Pt. states that she does not know why her Neurology appt. was cancelled. She stated that 'the providers refuse her an interpreter'." Ms. Redmond was seen again on 10/17/21 by RN Uduak for an unscheduled nursing sick call and the nursing note indicates that no interpreter was necessary and none was provided. How they communicated about her headache is not clear in the note.

little. . . . She doesn [sic] know American sign language and can read lips.”); Provider - Follow Up Care (5/12/21) (“She reads lips during appt and is very hard of hearing.”).)

456.    That conflicts with what Ms. Redmond herself apparently told healthcare staff and what mental health staff concluded. (*See, e.g.*, Provider - Follow Up Care (7/22/21) (“states she has difficulty reading lips”); MH - Non-Clinical Contact Note (8/26/21) (“Minimal ability to lip read.”).)

457.    On 6/30/21, Ms. Redmond was seen by Physician Assistant Johnson, who wrote: “Pt is here today for discuss cochlear implant for hearing loss and per audiology recommendation for consult writing. I attempted to use on-line sign language line but it did not work. Pt is able to read lips and speaks a little. She was recommended by recent audiology specialist to have cochlea [sic] implants for her deafness. She became deaf at a young age of 15 months from a PCN reaction. She says she learned how to speak at 7 yrs old and had her first hearing aides [sic] at 5 yrs old. She became legally deaf approx. 20 yrs ago. She says she can hear ‘some sounds’ with hearing aides [sic] but not clearly enough to hear voice and understand. She currently has issues with hearing commands from officers in bay and has her ADLs affected accordingly. She doesn [sic] know American sign language and can read lips.”

458.    Two weeks later, on 7/15/21, Ms. Redmond was seen by NP John to discuss denial of an ENT consult for cochlear implant. The NP wrote that no interpreter was needed and “POC discussed.” (“POC” here presumably means “plan of care.”) The next day, a Friday, Ms. Redmond submitted an HNR, stating: “I was seen with a provider on Thursday n I was not able to understand what the provider was saying to me cuz she

-181-

didn't have an interpreter for me n I want to know why I was denied for cochlear

implant?"

459.    Ms. Redmond was seen by PA Johnson on 7/26/21 for "knowledge of denial

of implant." Remarkably, even though this appointment was scheduled because Ms.

Redmond said she could not understand the previous appointment without an interpreter,

PA Johnson wrote that no interpreter was necessary and asserted (emphasis added): "She

was able to read my lips and had no issues with understanding me. . . . Pt was able to read

my lips and hear me **through my mask** as well when I talked louder."

460.    This is entirely inappropriate. The patient is in the best position to determine

their disability and language needs so that they can fully participate in a healthcare

encounter and fully understand their condition and treatment plan. I agree with Dr. Amy

June Rowley's August 2020 declaration that lipreading "is usually not enough on its own

to effectively communicate, particularly in settings like a medical encounter. One of the

most important things to know about lipreading is that both the person doing the talking

and the person doing the lipreading usually think that communication is more successful

than it actually is, which leads to both frustration and misunderstandings." (Doc. 3718 at

11-12; *see also id.* at 12 ("The average deaf lipreader will catch approximately 30% of

what is on the mouth").) In my own practice I have found lipreading to be extremely

inadequate and unreliable. While some patients are better at it than others, the complexity

of medical vocabulary makes lipreading virtually worthless. There are several viable

alternatives that are more reliable, and I generally allow the patient to guide the encounter

with respect to what type of accommodation they are most comfortable using: writing or

23774493.1

typing (for the many deaf or hard-of-hearing patients who do not know sign language), or

a certified sign language interpreter (for those who use sign language).

461.    Fourth, Defendants rely heavily on remote interpretation services. I have

seen their plan filed with the Court stating that they place "primary emphasis … on use of

LanguageLine Solutions (audio and video interpretation services) and AmWell platform

(telehealth video platform) video interpretation services." (Doc. 3920 at 5.)

462.    The problem with that plan is that the telephone interpretation service

apparently is not always available where patients are seen. When I visited the IPC at

ASPC-Tucson on 9/9/21, I met at least two monolingual Spanish speakers who were

housed there. I asked to use the LanguageLine to speak with them. I could not do so in the

IPC examination room, since there was no telephone and neither IPC staff nor the

ADCRR attorney who accompanied me were able to get the LanguageLine to work on a

cordless phone. The only place that could be found for me to use the LanguageLine to

speak to the patients was in the provider's office, which does not have an exam table and

would not have been appropriate for a healthcare encounter. Patients in the infirmary also

get frequent bed-side visits, so it was a serious concern that LanguageLine could not be

used on the infirmary's cordless phone for those locations. Given that LanguageLine is

apparently not available bedside or in the provider's office, I am concerned that it is not

an option for patients in the ASPC-Tucon infirmary, placing medically fragile non-

English speakers at grave risk of inadequate care.

463.    I have also seen inappropriate use of Google Translate to "interpret" during

healthcare encounters. (*See, e.g.*,                              Nurse - TB Follow-Up

-183-

(7/1/21) (Objective Notes: "IM speaks Spanish and minimal English. Used google translation for interpretation of questions and responses." Assessment Notes: "Alteration in communication with anxiety r/t language barrier.").) Automated translation services are unreliable and do not facilitate meaningful or accurate communication between the patient and healthcare staff. They must not be used for healthcare encounters.

### B.   Defendants have failed to fix this long-standing problem.

464.   According to Defendants, the electronic healthcare records system ensures that all patients who are recognized as needing an interpreter will get one in non-emergency situations. That is because for each healthcare encounter, healthcare staff must answer, "Are interpreter services needed for this inmate?" and, if the answer is "Yes," they must answer, "What type of interpreter services were used for the encounter?" (Doc. 3920 at 8-9.) They have only three options: "LanguageLine," "Healthcare Staff Used for Interpreter Services," or "Inmate Refused Interpreter Services." (*Id.*) In their plan submitted to the Court, Defendants said: "Where the encounter will not proceed due to unavailability of translation services because of lack of both audio/video translation services and/or available staff translation resources, the creation of a SOAPE note described above will not occur – because the encounter will not proceed. As a result, additional dropdown menu options requested by Plaintiffs such as "Interpretation Services Unavailable/Non-Compliant" are unnecessary." (*Id.*)

465.   I agree that except in rare cases of a true medical emergency, healthcare encounters with patients not fluent in English should only proceed with an interpreter. But Defendants' assurance that non-emergency encounters do not and cannot proceed in the

absence of an interpreter is not borne out in practice. Even when patients are recognized to require interpreter services, providers continue to perform non-emergency encounters without such services, sometimes because they do not work. For example, on 6/30/21, a provider documented that interpreter services were **not** needed for Laura Redmond (166546), but also wrote: "I attempted to use on-line sign language line but it did not work. PT is able to read lips and speaks a little. . . . She says she can hear 'some sounds' with hearing aides but not clearly enough to hear voice and understand."

466.    Similarly, a nurse documented that LanguageLine was used during an encounter for                    on 8/20/21, but also wrote: "During encounter pt tried to explain that he once was taking a pill for his stomach and would like to take it again, but due to the language barrier and poor reception with the language line interpreter, we could not determine what medication the patient was referring to."

467.    On 6/17/21, a provider documented that interpreter services were provided by LanguageLine for                    but also wrote: "(sign language line tried no one came on line / answered  from the sign language site,) communicated with IM by writing her questions and written answer."[29]

---

[29] Written notes are a wholly inadequate substitute for sign language interpretation. It is burdensome and slow to communicate by written notes, and healthcare staff are likely to "say" less in writing, leading to a less comprehensive encounter solely because of the patient's disability. Dr. Rowley noted in her declaration: "For people who can hear, communicating in spoken language is less cumbersome, much more efficient, and much more spontaneous than communicating through written language. The same is true for the use of signed language by Deaf people whose primary and preferred language is ASL. When written communication is expected to be used as the primary form of communication, service providers tend to rush through and reduce how much they write, since the time needed for writing is much more labor intensive and time consuming than for a spoken language interchange. As a result, the Deaf person is shortchanged from a full discussion of the issues being addressed. This often leads to the Deaf person 'being

23774493.1

468.   Based on what I have seen in the record, it appears that Defendants have failed to address this long-standing problem that has significant consequences for the medical care of patients who are not fluent in spoken English.

**X.     People in ADCRR custody are at substantial risk of serious harm because Defendants fail to maintain complete, accurate and accessible medical records.**

469.   I previously have explained that poor medical recordkeeping makes it very difficult to determine medical histories and provide adequate care. In a report from 2013, which later was filed under seal with the Court (Doc. 946-1, Ex. 1), I wrote (at page 45): "The charts I reviewed at all the prisons were inadequate to convey current patient care. Simply put, they were a gigantic mess. There was often no way to track the care logically through the chart; it was generally very hard to tell medical histories and medication administration." In a supplemental report from 2014, served on Defendants on 9/8/14 (Doc. 1105), I wrote: "Poor medical record-keeping and charting practices persist. The updated records I reviewed are just as incomplete, illegible, and difficult to follow as the prior ones." (WILCOX000030.) That remains true today.

**A.     Medical records are incomplete and contain inaccurate information.**

470.   The healthcare record is only as good as the information put into it. As noted in Section IV(B)(4), hospital records are often missing or scanned in the record late.

---

left in the dark' due to communication limitations. . . . The simple fact that a Deaf person and a hearing person exchanged written notes does not mean that both parties necessarily fully understood each other." (Doc. 3718 at 8-9.) In addition, many D/deaf patients have lower levels of English literacy, as Dr. Rowley also explained. (*Id.* at 7.) In my experience, written notes for patients who use sign language are inadequate for the reasons that Dr. Rowley outlines. In my practice, I will use written notes only for urgent situations and to convey to the patient that the current appointment will need to be rescheduled to provide us with time to move the patient to an appropriate space and to make arrangements for a certified interpreter.

-186-

471.    In the course of my review of medical records, I in some cases had to spend many hours in just one patient's chart to try to understand what was going on. That is time healthcare staff in the Arizona prison system just do not have. This problem was exacerbated by records being scanned in the wrong place or not being scanned at all, and chronic care encounter notes doing little more than simply listing the patient's chronic conditions. This, too, is reflected in the ADCRR's own mortality reviews. (*See, e.g.*, ADCM1615630, Mortality Review of                    (5/19/20) ("following the patients [sic] course in the electronic health record is cumbersome and difficult."); ADCM1623212, Mortality Review of                    (7/14/20) ("Medical record documentation very confusing, especially in the scanned hospital reports"); ADCM1618281, Mortality Review of                    (6/4/20) ("Parts of the scanned record are duplicated, making review difficult to perform."); ADCRRM0012721, Mortality Review of                    (2/19/21) ("The Living Will/POA forms had been scanned into the medical record, but the quality of the scan was poor; unreadable in places.").)

472.    There is a real danger that healthcare staff will make poor or dangerous decisions based on inaccurate, incomplete and confusing information in the medical record, including through ordering unnecessary and invasive tests.

### 1.    Notes by healthcare staff

473.    As discussed throughout this declaration, healthcare staff provide incomplete and, at times, contradictory documentation in the medical record. The ADCRR uses the "SOAPE" format to write notes in a patient's chart, which was required by the

-187-

23774493.1

Stipulation. (*See* Doc. 1185-1, Ex. B at 8, Performance Measure 9 ("SOAPE format will be utilized in the medical record for encounters.").) "SOAPE" stands for subjective, objective, assessment, plan, and education. The SOAPE notes, on the whole, were awful. The vast majority of the time, the notes were cursory, incomplete and entirely insufficient to facilitate adequate healthcare. Medical staff often simply clicked boxes and entered 1-2 lines of text. That, of course, would be a concern in any system, but it is particularly disruptive and dangerous here, where responsibility for a single patient is episodic and dispersed among a legion of different RNs, NPs, and other medical staff, with minimal or no physician- or provider-level oversight or encounters or longitudinal planning. Healthcare staff are forced to rely on the little information about a patient entered across the electronic medical record, which provides an incomplete and, in some cases, inaccurate view of the patient and their needs.

474.    The failure to list differential diagnoses, discussed earlier in this report, is of particular concern. The next staff person who sees a patient will have no idea what diagnoses were considered or are being tested, and cannot continue evaluation and care in a logical and efficient manner. It demonstrates that healthcare staff are not practicing the fundamentals of medicine, and instead are practicing click-box medicine.

475.    In my practice, I often dictate a summary note, which essentially is a recap of what is going on with a patient after looking at all the records. If there was a significant series of tests, for example, I will dictate a summary note. That note may describe my differential diagnosis, or may say that an issue has been ruled out, so no one has to go back and figure it all out again later. I did not see such summary notes being used

23774493.1

regularly in the patient charts I reviewed. The cases were complicated enough, however, that they should have been.

476.                              , who died last year, is one example. He was a complicated patient with multiple comorbidities, and a good example of how poorly the system handles patients with any complexity. As the ADCRR's own mortality review found, the documentation in his record is terrible. There are lots of missing elements, including lack of documentation of what care was supposed to be as a result of specialty consults. (*See* ADCM1623208, Mortality Review of                      (7/14/20) ("Consult reports were many times reviewd [sic] with additional consults submitted without a documented logical sequential plan of care.").) This demonstrates why a single provider needs to be in charge of complex care; someone needs to synthesize all of the information because there was no comprehensive plan in place for this patient.

477.   I also have concerns about the veracity of some of the information in the medical record. For example, as noted in Section I(A)(1), above, I question whether                              was in fact informed of his cancer diagnosis by Dr. Stewart. And, as discussed in the previous section, I am concerned that deaf and monolingual Spanish speaking patients did not in fact understand encounters that were conducted without an interpreter. And I am concerned, as noted in Section I(B)(1), above, by healthcare staff's annotation that Kendall Johnson (189644) had a "steady and even gait."

### 2.   Current health problems and conditions

478.   In addition, I also have seen a pattern of healthcare staff failing to keep the list of "Current Health Problem/Conditions" accurate and up-to-date. This problem also

-189-

23774493.1

has been noted in the ADCRR's own mortality reviews. (*See, e.g.*, ADCM1651465-1651466, Mortality Review of _____ (9/17/20) ("Another major concern in this case is documentation. For example, the problem list does not even mention neoplasm. Also, the scans of what is available of the outside medical records are almost impossible to track due to improper labeling, such as an ultrasound of kidneys and bladder being labeled an MRI L spine. . . . It is absolutely imperative that the medical record reflect the patients [sic] current condition . . . ."); ADCM1608413, Mortality Review of _____ (4/20/20) ("Confusion arises from inadequately updated problem list, a general lack of continuum of care, and a cumbersome medical record."); ADCM1623213, Mortality Review of _____ (7/14/20) ("To ensure continuity in care and treatment, the expectation is . . . that upon discharge from the hospital that all providers update the problem list based up [sic] hospital findings.").)

479.    For example, as of 10/9/21, the Current Health Problem/Conditions list for _____ was a mess. It listed Mr. _____ as having both Type 1 and Type 2 diabetes (see table below).

| ID# | Category | Type | National HIE Code(s) | Diagnosis Code | Onset Date | Last Encounter Date |
|---|---|---|---|---|---|---|
| 049 | Other Diagnosis | Other Diagnosis | SNOMED: 59276001 - Proliferative diabetic retinopathy (disorder) | Type 2 diabetes mellitus with proliferative diabetic retinopathy without macular edema [E11.359] | 09/08/2021 | 09/08/2021 |

23774493.1

| 038 | Chronic Conditions | Diabetes Type I | SNOMED: 46635009 - Diabetes mellitus type 1 (disorder) | Type 1 diabetes mellitus without complications [E10.9] | 05/23/2019 | 05/23/2019 |
|---|---|---|---|---|---|---|
| 028 | Chronic Conditions | Diabetes Type II | | Type 2 diabetes mellitus without complications [E11.9] | 10/13/2015 | 03/14/2021 |
| 001 | Chronic Conditions | Diabetes Type I | | | 06/05/2014 | 06/05/2014 |

480.   And, as noted in Section IV(B)(4), above,

diagnosis with Sarcoidosis in December 2020, and again in June 2021, never were listed

on his problem list, but the incorrect diagnosis of "solitary pulmonary nodule" was still

there as of 10/9/21. As explained above, this may have, at least in part, caused him to be

subjected to an unnecessary and invasive biopsy. (*See also*

(January 2021 ultrasound showed new hepatic lesions, but the finding was not added to

the list of health problems/conditions in the medical record).)

481.   This is not a new problem.                    was sent to the

hospital as an emergency in 2018, and was diagnosed with Addison's crisis, a life-

threatening situation that results in low blood pressure, low blood levels of sugar, and high

blood levels of potassium. His problem list was never updated with Addison's disease or

adrenal insufficiency, which is a major and dangerous omission.

482.   He received disastrously inadequate care after his diagnosis with Addison's,

and the failure to treat his Addison's left him with no reserves when he later became sick.

When he was sent to the hospital on 10/3/19, the hospital apparently was not notified of

his previous Addison's diagnosis. (*See* ADCM1608405, Mortality Review of

("[T]he previous dx of Addison's disease and with previous

Addisonian crisis was not documented . . . . When the patient was sent out to the Hospital

on 10/3/19, it is not clear whether the previous dianosis [sic] of Addisonian Crisis was

documented on the transfe [sic] summary in order to alert the hospital staff of the pt's

diagnosis of Addison's Disease. . . . Due to the fact that the patient was hospitalized at a

different hospital and carried the dignosis [sic] of prior Addison's Disease with previous

Addisonian crisis, the diagnosis was apparently not appreciated by hospital staff.").) He

died a month later.

### 3.    Medical scores

483.    A medical classification system, if used properly, makes it easier to manage

a healthcare system and estimate demand for care. It is useful for, among other things,

determining how many physician-level positions should be allocated and determining

which patients must be seen regularly by a physician (as opposed to a mid-level).

484.    The ADCRR uses a medical score system, requiring that practitioners

"assign accurate medical scores to all inmates," and that the score "will be updated

whenever there is a change in the inmate's medical condition that warrants a change in

their medical score." (MSTM, Ch. 7, § 9.0 at 1.2.) According to information published on

the ADCRR website, the medical scores are as follows:

| Score | Criteria |
|-------|----------|
| 1 | Maximum sustained physical capacity consistent with age; no special requirements |
| 2 | Sustained physical capacity consistent with age; stable physical illness or |

| | | chronic condition, no special requirements |
|---|---|---|
| | 3 | Restricted physical capacity; requires special housing or reasonable accommodations |
| | 4 | Limited physical capacity and stamina; severe physical illness or chronic condition; requires housing in a corridor institution |
| | 5 | Severely limited physical capacity and stamina; requires assistance with Activities of Daily Living (ADLS); requires housing in Inpatient Component or Assisted Living area |

(ADCRR, Admissions, Release, Confined Population Fact Sheet at 3, available at

https://corrections.az.gov/sites/default/files/REPORTS/Inmate_Population/inmate_popfact

s_sheet_2019.pdf (last visited 10/7/21); *see also* MSTM, Ch. 7, § 9.0 at 1.1 (noting that

patients with scores of 4 or 5 "may require placement in medical sheltered housing at the

discretion of the health care practitioner").)

485.    In practice, the medical scores assigned to patients have little basis in

reality. I saw no evidence that patients were regularly assigned proper scores or that

healthcare staff updated scores after a material change in the patient's medical condition.

486.    I reviewed the scores for the deceased patients whose care I discussed in this

report. Most had scores of only 1 or 2 at the time of their death, which does not appear to

accurately describe their medical conditions at that time. I asked Plaintiffs' counsel to

create tables compiling this information, which I reproduce in Appendix D.

487.    I also reviewed the scores for some of the people I interviewed in the IPCs

and who either remained housed there, had died, were released, or were in the hospital as

of 10/7/21. (WILCOX000120-123.) Again, many were under-classified and had scores of

only 1 or 2, as seen in the tables set forth in Appendix D. This includes

who currently is on long-term IV antibiotics with a damaged heart valve that

-193-

impairs his physical activities, but who nonetheless has a medical score of 1, and

, who is partially paralyzed and has difficulty getting out of bed, but who

nonetheless has a medical score of 2. They clearly are not scored appropriately.

488.    Finally, I reviewed the scores for several patients I spoke with in the SNU at

ASPC-Perryville, again as of 10/7/21. Kendall Johnson (189644) in particular stands out.

As noted in Section I(B)(1), above, she is bed-bound, unable to walk, and cannot feed

herself, yet her medical score was only 3.

**B.      The ADCRR's electronic system is a barrier to care because it makes it
very difficult for healthcare staff to review and compare critical
information.**

489.    The medical record system used by the ADCRR, the electronic Offender

Management Information System (eOMIS), also serves as a barrier to providing adequate

care to patients. eOMIS makes it very difficult to get a complete view of patients' medical

conditions because the data in the record is poorly organized and presented.

490.    For example, a provider is not able to view, at one time, lab results and see

changes in lab results over time. Instead, the provider must click through a variety of

screens to find each lab result. Scattering critical information throughout the chart makes

it hard to identify trends and compare lab result histories, a basic functionality in most

electronic medical records.

491.    In addition, lab results are reported alphabetically, not grouped in a way that

would inform analysis. For example, all of the components of a Complete Blood Count

should be reviewed together, but they are listed far apart. The White Blood Cells are listed

at the bottom and the eosinophils are listed at the top because of the alphabetical order.

This slows down and obscures the delivery of care.

-194-

492.    The medication administration records are likewise very difficult to use as they permit one to review the patients' medication history only in three month periods. That is, when you click "View MAR [Medication Administration Record] Summary," you can view medications administered only three consecutive months at a time. If you try to view a longer range, you get the message: "Please select a date range that is less than 90 days apart." This makes reviewing historical medication trends and calculating medication compliance cumbersome and reduces it to a manual process as opposed to an automatic one as is typical in most electronic health records.

493.    Providers also apparently have access only to the interpretation of x-rays by a radiologist, and not access to the actual x-ray images through eOMIS. But radiologists do not have any clinical correlation; they may give a report that does not answer the question that the provider was trying to find out. For example, I visited with

at the ASPC-Lewis Buckley Unit. He was frustrated because he has had substantial surgery on his cervical spine with significant hardware placement and a fusion and the healthcare providers had downplayed his pain.  He felt they were not appreciating the magnitude of his surgical reconstruction. He indicated to me that the mid-level provider had reviewed the radiology report from his cervical spine films and told him there were no problems. I looked in the medical record and found the following radiology readout of his cervical spine films along with the PA's "interpretation." Based on this, everything appears fine.

-195-

23774493.1

**Results Comments**

The following XRay Results were processed on 08/25/2020 06:15

CERVICAL SPINE 4 OR 5 VIEWS FINDINGS: There is anatomic alignment of the cervical vertebrae. The vertebral bodies show mild degenerative osteophytic spurring. No fracture is seen, however. Posterior elements are intact. Occipitocervical junction is normal, as is the C1-C2 relationship. No prevertebral soft tissue swelling or radiopaque foreign body is seen. CONCLUSION: Mild degenerative changes of the cervical spine. Old surgery C2-7 ELECTRONICALLY SIGNED BY ELLIOT WAGNER, M.D. 8/25/2020 7:04:34 AM MDT.

Reviewed Date: 08/25/2020                          Time: 10:11:59
Review Staff: Coronado, Oyuki
Inmate Notice: Results Reviewed, No Further Action Needed At This Time
**Review Notes**

C-spine x-ray results reviewed
No further action required at this time - communique to pt

494.    I then attempted to view the films myself to verify the information. That is my practice as a physician and it is the practice of all responsible physicians who order imaging. I asked at ASPC-Lewis for the provider who was there on site to show me the films for this patient. I was told that the provider was "new" and "hadn't been trained yet on how to do that." The attorneys for Centurion indicated that they would seek out someone who knew how to access the actual images, and they spent the afternoon attempting to do that. I was told at the end of the day that nobody on site at ASPC-Lewis knew how to access the images. I returned to the ADCRR the following week and toured ASPC-Florence. While we were there, I encountered a radiology technician and asked him about how I would access the films for a patient. He indicated that only the radiology technicians know how to do that and it would require some time as he has to call the main office and have them find the films and send them to him. I gave him some time and about 1.5 hours later he was able to pull up Mr.              's films for me. I was shocked to see how different the actual films were from the reading above. This patient has had extensive

23774493.1

surgery with both an anterior and posterior fusion and the presence of a rather massive

amount of hardware in his cervical spine. None of that was acknowledged in any way that

would inform the line provider of the issue. The only comment about the hardware was a

reference to "old surgery C2-7." That's a profound understatement. What is clear is that

the providers in this system do not have the diagnostic tools available to them that they

should and the patients suffer because of it.

**XI.   People in ADCRR custody are at substantial risk of serious harm because they are barred from knowing their own healthcare information.**

495.   Patients have a right to know about their own healthcare and treatment plan.

In the community, individuals have a legal and enforceable right to see and receive copies

of the information in their medical records just by requesting it. Unfortunately, the

ADCRR makes it incredibly difficult for patients to obtain basic information about their

own healthcare. Providing patients with full and complete information about their medical

condition(s) and treatment plan would help support quality control within the healthcare

system.[30] I have seen many cases where there was a critical missed diagnosis. If the

patient actually knew what was supposed to happen, and what symptoms to look out for,

they could help hold the system accountable and advocate for themselves.

---

[30] (*See* U.S. Dep't of Health & Human Services, Individuals' Right under HIPAA to Access their Health Information 45 CFR § 164.524 (Jan. 31, 2020), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/access/index.html ("Providing individuals with easy access to their health information empowers them to be more in control of decisions regarding their health and well-being. For example, individuals with access to their health information are better able to monitor chronic conditions, adhere to treatment plans, find and fix errors in their health records, track progress in wellness or disease management programs, and directly contribute their information to research.").)

-197-

496.   One common theme in my interviews with patients is that providers refuse to tell them about their healthcare and do not discuss test results with them. In fact, at least outside of IPC settings, patients often describe an adversarial relationship with healthcare staff, who they feel do not listen to them, do not believe them, and do not tell them basic information about their medical condition or treatment plan. I have found that when I meet with these patients, even though I am not their doctor, I often have to share basic information about their medical condition and discuss, in general terms, various treatment possibilities for that condition. They simply had not been told that information before.

A.   **Patients have limited and delayed access to their own medical records.**

497.   Patients also report that it is very difficult to view and obtain copies of their own medical record. Department Order 1104, Inmate Medical Records, outlines the process by which patients can view their medical records: they must submit a written request (*id.* § 2.1.1), may only review records "once per quarter" (*id.* § 2.4.2.3), and only for "a maximum of 45 minutes." (*Id.* § 2.3.4.) They are "allowed to make handwritten notes during the review" (*id.* § 2.3.3.1) but not to obtain copies of their medical record unless they are acting as their own attorney in a lawsuit pursuant to a filed discovery request where the Attorney General's office has not objected to the document production. (*Id.* § 3.1.1.) Even then, non-indigent patients are charged 0.50 cents per page, a considerable sum to many. (*Id.* § 3.2.1.)

498.   That simply is not sufficient access. It is very time-consuming and difficult to review, much less take handwritten notes of, a medical record, particularly one as poorly maintained and scattered as those in the ADCRR, as my own review of patients'

23774493.1

medical records demonstrates. I do not understand why the ADCRR restricts the ability to

obtain copies of medical records to so few. The policy also seems to conflict with the

Health Insurance Portability and Accountability Act of 1996 (HIPAA), which provides

that patients have a right of timely access to inspect and obtain a copy of certain medical

information. (45 C.F.R. § 164.524.) Although there is a limited exception where "an

inmate's request to obtain a copy of protected health information . . . would jeopardize the

health, safety, security, custody, or rehabilitation of the individual or of other inmates, or

the safety of any officer, employee, or other person at the correctional institution or

responsible for the transporting of the inmate" (*id.* § 164.524(a)(2)(ii)), that in my

experience is quite rare and certainly cannot support an absolute bar on providing

incarcerated patients with copies of their records, and limiting them to only as much as

they can handwrite during a 45-minute period every three months.

499.    Patients repeatedly have described to me just how hard it is to view their

own healthcare records through this process, detailing delays and being given the run-

around. One patient reported at first only being given access to HNRs he had submitted,

and not the rest of their medical record. Several told me they simply have given up and do

not bother trying to access their medical records any more.

500.    This type of delay and opacity only breeds distrust and anger, and prevents

patients from advocating for themselves. To provide effective healthcare, there needs to

be trust and transparency between patients and healthcare staff.

501.    Unfortunately, the prior Stipulation did not cover patient access to their own

healthcare information in any comprehensive way. Performance Measure 47 did require

23774493.1

providers to "communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request." (Doc. 1185-1, Ex. B at 11.) The ADCRR failed to consistently comply with even that quite limited provision.

| | Jan. 2021 | Feb. 2021 | Mar. 2021 | Apr. 2021 | May 2021 | June 2021 | July 2021 |
|---|---|---|---|---|---|---|---|
| **Douglas** | 90.91 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| **Eyman** | 78.00 | 88.00 | 90.48 | 93.33 | 97.56 | 90.24 | 89.74 |
| **Florence** | 88.00 | 100.00 | 96.00 | 95.45 | 92.59 | 90.00 | 96.55 |
| **Lewis** | 91.49 | 74.47 | 86.67 | 86.11 | 66.67 | 70.59 | 54.17 |
| **Perryville** | 73.17 | 86.21 | 76.47 | 87.50 | 93.75 | 82.86 | 77.78 |
| **Phoenix** | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 83.33 | 100.00 |
| **Safford** | 87.50 | 100.00 | 75.00 | 100.00 | N/A | 100.00 | 100.00 |
| **Tucson** | 79.31 | 82.76 | 86.49 | 82.22 | 81.40 | 84.85 | 81.25 |
| **Winslow** | 100.00 | 100.00 | 100.00 | 100.00 | 66.67 | N/A | 100.00 |
| **Yuma** | 94.00 | 91.67 | 100.00 | 90.24 | 92.59 | 96.00 | 93.10 |

**B.    Specialists are instructed not to discuss treatment options with patients.**

502.    I also am deeply concerned to see, in the medical records, Centurion forms that explicitly direct specialists **not** to discuss treatment options with their patients, including in the case of                    discussed in Section I(A)(1). A Centurion Practitioner Consultation Report for                    also said: "For security reasons inmates must NOT be informed of recommended treatment or possible hospitalization." The same language appears in the medical records of

-200-

23774493.1

1    and                              from last month.  The relevant excerpts from these

2    reports are reproduced in Appendix E.

3

4        503.    Although I understand that there may be security concerns in informing an

5    incarcerated patient when they will next be transported offsite, it is entirely inappropriate

6    and unacceptable to direct specialty care providers not to tell and discuss with their

7    patients recommended treatment, including possible hospitalization. Patients have a right

8    to know and participate in their care as well as to refuse care. If the specialists are not

9    even allowed to talk to the patient about the care they are supposed to receive, how can

10   anyone reasonably consent to or refuse future care? This creates an impossible

11   conundrum. In my correctional practice we want the specialists to discuss care with the

12   patient and to have them participate in an informed collaborative decision making process.

13

14   I cannot imagine playing secrets with patients about healthcare. It breeds suspicion and

15   anger and it runs counter to everything we are taught regarding the ethical practice of

16   medicine. This current practice must change.

17        504.    I saw the same language in the coversheet of a specialty report for

18

19                               reproduced in Appendix E. With the same specialty report, there also

20   was a full-page document entitled, "Centurion INSTRUCTIONS TO PRACTITIONER,"

21   which said: "THIS PATIENT IS AN INMATE WITH THE ARIZONA DEPARTMENT

22   OF CORRECTIONS FOR SECURTIY [sic] REASONS: DO NOT allow the inmate to

23   overhear any discussion about Recommended treatments, medications or follow-up

24

25   appointments." Again, for the reasons above, that is entirely inappropriate.

26

27

28

23774493.1

## XII. People in ADCRR custody are at substantial risk of serious harm when they are exposed to isolated confinement.

505.     In my 27 years of experience as a physician in jails and prisons, I have witnessed the negative effects of isolated confinement on a patient's physical wellbeing. These effects include, for example, migraine headaches, fatigue, insomnia, heart palpitations, excessive sweating, back and joint pains, eyesight deterioration, reduced appetite, weight loss, diarrhea, weakness, tremulousness, vitamin D deficiency, skin irritations such as rashes, dry skin, and fungus development.

506.     Isolated confinement and the deprivations of such confinement exacerbate chronic physical health problems such as musculoskeletal pain due to the lack of regular movement. Other chronic conditions, such as hypertension and diabetes, may also be exacerbated by the use of isolated confinement and lack of physical activity. Patients with memory impairments, particularly older adults, may also experience declining health due to conditions in isolated confinement that decrease mental activity and make it difficult to get regular sleep. Finally, patients with physical disabilities, such as hearing impairments, experience heightened social isolation while in isolated confinement. Adverse health effects associated with social isolation include functional decline, cognitive impairment, depression, cardiovascular disease, and death.

## CONCLUSION

507.     Medical care in Arizona state prisons continues to be grossly inadequate to meet the basic needs of incarcerated patients who are ill or injured. As a result, many patients suffer needlessly and die, and all are at substantial risk of serious harm. In my previous reports, I evaluated the adequacy of the delivery of medical care in the state

prison system when the ADCRR contracted with Corizon to run the correctional

healthcare system. Unfortunately, although a new contractor, Centurion, has replaced

Corizon in recent years, the fundamental and pervasive infirmities of the medical care

delivery system remain largely unchanged. It has been almost eight years since my first

report in this case, yet the medical care in the ADCRR remains as poor as I have ever seen

in a correctional setting. Indeed, the very building blocks of a functional healthcare

system -- clear lines of responsibility and authority among nurses, mid-level providers,

and physicians; the testing of differential diagnoses; clear communication and respect for

patients; and accurate and complete recordkeeping -- are wholly absent.

508.    In order to address the entrenched, systemic dysfunction that pervades its

healthcare delivery system, the ADCRR must overhaul its system and reform the many

components that, in combination, lead to unconstitutional care. Among other things, the

ADCRR must:

a.    Install and empower healthcare leadership capable of providing meaningful oversight to identify and correct problems.

b.    Adopt a system-wide quality and patient safety model that studies and holds staff accountable for performance in the areas of deficiency identified in this declaration, including access to treatment, quality of care, medication administration, specialty referrals, and emergency care.

c.    Using an objective staffing study, identify the staffing needs of the entire system to meet the actual demand for services.

d.    Restructure the role of nurses so that they timely perform triage and assess patient urgency for the provider line.

e.    Adjust the balance of physicians to mid-level providers to ensure that care for complex patients is managed by Board eligible or Board certified physicians in internal medicine, family practice or urgent care.

23774493.1

f.  Implement appropriate and community-standard pain management practices that allow for necessary use of available pain medications.

g.  Establish a medication assisted therapy program to treat patients with Substance Use Disorder.

h.  Establish a system to ensure providers and nurses are aware of patients' need for language interpretation, and appropriate interpretation resources are readily available and carefully monitored.

i.  Implement an electronic healthcare record that is effective and efficient in managing care and providing useful data. The electronic health record should be owned and controlled by the State of Arizona instead of private vendors.

j.  Provide patients with meaningful access to their own healthcare records.

k.  Implement a hospice and end of life program with dedicated housing.

l.  Delete the requirement that specialists are compensated at the below market Medicaid rate.


I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that the foregoing is true and correct.

Executed this 3rd day of November, 2021, in Salt Lake City, Utah.


_____
Todd Wilcox, M.D.

-204-

**ADDITIONAL COUNSEL**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Rita K. Lomio (Cal. 254501)*
Sophie Hart (Cal. 321663)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         rlomio@prisonlaw.com
         sophieh@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Maria V. Morris (D.C. 1697904)**
Eunice Hyunhye Cho (Wash. 53711)*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
         mmorris@aclu.org
         echo@aclu.org

*Admitted *pro hac vice*; not admitted
in DC; practice limited to federal
courts
**Admitted *pro hac vice*

Corene Kendrick (Cal. 226642)*
**ACLU NATIONAL PRISON
PROJECT**
39 Drumm Street
San Francisco, California 94111
Telephone: (202) 393-4930
Email: ckendrick@aclu.org

*Admitted *pro hac vice*

23774493.1

Daniel C. Barr (Bar No. 010149)
John H. Gray (Bar No. 028107)
Austin C. Yost (Bar No. 034602)
Karl J. Worsham (Bar No. 035713)
Kathryn E. Boughton (Bar No. 036105)
Mikaela N. Colby (Bar No. 035667)
Kelly Soldati (Bar No. 036727)
Alisha Tarin-Herman (Bar No. 037040)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
          jhgray@perkinscoie.com
          ayost@perkinscoie.com
          kworsham@perkinscoie.com
          kboughton@perkinscoie.com
          mcolby@perkinscoie.com
          ksoldati@perkinscoie.com
          atarinherman@perkinscoie.com
          docketphx@perkinscoie.com

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm; Desiree
Licci; Joseph Hefner; Joshua Polson; and
Charlotte Wells, on behalf of themselves and
all others similarly situated*

Rose A. Daly-Rooney (Bar No. 015690)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
rdalyrooney@azdisabilitylaw.org
          mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

-206-

23774493.1

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on November 4, 2021, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

7

8

9

Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Hesman
Jacob B. Lee
Timothy M. Ray
Anne M. Orcutt
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com
ahesman@strucklove.com
jlee@strucklove.com
tray@strucklove.com
aorcutt@strucklove.com

10

11

12

13

14

15

16

17

18

*Attorneys for Defendants*

19

s/ D. Freouf

20

21

22

23

24

25

26

27

28

-207-

23774493.1