# EXHIBIT INDEX

## Deposition Designations

| Exhibit No. | Description |
|:---:|:---|
| 1 | Deposition Designation Chart |
| 2 | Carr, Antonio / Dolan, Thomas<br><br>Centurion Staffing 30(b)(6) |
| 3 | Coleman, Anthony |
| 4 | Gann, Larry<br><br>Arizona Department of Corrections, Rehabilitation and Reentry Staffing 30(b)(6) |
| 5 | Gann, Larry |
| 6 | Orm, Wendy<br><br>Centurion Staffing 30(b)(6) |
| 7 | Orm, Wendy                    **(FILED UNDER SEAL)** |
| 8 | Pelton, Ashley |
| 9 | Pennington-Stallcup, Bobbie<br><br>Arizona Department of Corrections, Rehabilitation and Reentry Mental Health and Isolation 30(b)(6) |
| 10 | Pennington-Stallcup, Bobbie |
| 11 | Phillips, Grant                    **(FILED UNDER SEAL)**<br><br>Arizona Department of Corrections, Rehabilitation and Reentry Medical 30(b)(6) |
| 12 | Scott, Travis |
| 13 | Shinn, David |
| 14 | Stickley, Lori |

| Exhibit No. | Description |
|:---:|:---|
| 15 | Van Winkle, Jeffrey<br><br>Arizona Department of Corrections, Rehabilitation and Reentry Isolation 30(b)(6) |
| 16 | Wilson, John Seddon |

78204.0001\154517878.1

# EXHIBIT 1

**Parsons Deposition Designations and Objections to Shinn Counter-Designations,**
**Shinn's Objections to Parsons Deposition Designations and Counter Designations**

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| **Centurion Staffing 30(b)(6) Carr, Antonio** | 2021-10-19 | | | | | | |
| | | | 78:22-24 | | | | |
| | | Exhibit 1 | 81:14-83:18 | | | | |
| | | | 106:1-107:10 | | | | |
| | | | 109:24-110:3 | | | | |
| | | | | | | | |
| **Centurion Staffing 30(b)(6) Dolan, Thomas** | 2021-10-19 | | | | | | |
| | | | 131:3-9 | | | | |
| | | Exhibit 1 | 133:13-139:24 | | | | |
| | | | 145:25-146:14 | | | | |
| | | | 148:15-149:21 | | | | |
| | | | 150:16-151:3 | | | | |
| | | | 165:10-22 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Exhibit 8 | 165:23-168:13 | | | | |
| | | | | | | | |
| **Coleman, Anthony (Deputy Warden)** | 2021-10-14 | | | | | | |
| | | | 9:25-10:14 | | | | |
| | | | 12:22-13:10 | | | | |
| | | | 13:15-15:21 | | | | |
| | | | 15:25-16:2 | | | | |
| | | | 17:2-9 | | | | |
| | | | 17:20-25 | | | | |
| | | | 19:15-20:1 | | | | |
| | | | 20:21-21:8 | | | | |
| | | | 21:11-23:13 | | | | |
| | | | 24:20-25:11 | | | | |
| | | | 25:14-19 | | | | |
| | | | 26:11-28.13 | | | | |
| | | | 29:22-31:25 | | | | |
| | | | 32:5-32:8 | | | | |
| | | | 32:19-33:20 | | | | |
| | | | 34:22-35:9 | | | | |
| | | | 35:21-36:6 | | | | |
| | | | 37:14-37:23 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 38:3-38:19 | | | | |
| | | | 39:13-39:20 | | | | |
| | | | 39:23-40:7 | | | | |
| | | | 41:15-42:3 | | | | |
| | | | 44:4-44:22 | | | | |
| | | | 46:18-47:9 | | | | |
| | | | 50:22-52:13 | | | | |
| | | | 53:17-53:23 | | | | |
| | | | 54:6-54:13 | | | | |
| | | | 54:16-54:20 | | | | |
| | | | 55:13-56:4 | | | | |
| | | | 58:5-58:25 | | | | |
| | | | 59:3-59:6 | | | | |
| | | Exhibit 2 | 60:9-61:14 | | | | |
| | | Exhibit 2 | 63:7-63:10 | | | | |
| | | Exhibit 2 | 64:11-64:13 | | | | |
| | | Exhibit 2 | 65:15-66:16 | | | | |
| | | Exhibit 2 | 67:4-68:19 | | | | |
| | | Exhibit 2 | 71:20-71:25 | | | | |
| | | Exhibit 3 | 73:14-73:18 | | | | |
| | | Exhibit 3 | 74:18-75:16 | | | | |
| | | Exhibit 4 | 79:16-80:8 | | | | |
| | | Exhibit 4 | 82:5-83:16 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Exhibit 4 | 84:4-84:10 | | | | |
| | | Exhibit 4 | 92:13-93:11 | | | | |
| | | Exhibit 5 | 93:24-94:25 | | | | |
| | | | 95:8-96:9 | | | | |
| | | Isolation Exhibit 3 | 96:16-101:3 | | | | |
| | | | 101:24-102:20 | | | | |
| | | | 103:11-105:17 | | | | |
| | | | 106:4-111:14 | | | | |
| | | | 113:19-114:15 | | | | |
| | | | 115:15-117:19 | | | | |
| | | Exhibit 6 | 118:9-120:2 | | | | |
| | | Exhibit 6 | 121:7-123:9 | | | | |
| | | | 123:22-124:5 | | | | |
| | | Exhibit 7 | 125:9-126:23 | | | | |
| | | | 127:7-132:18 | | | | |
| | | | 133:22-134:3 | | | | |
| | | Exhibit 7 | 137:8-137:23 | | | | |
| | | | 140:2-143:10 | | | | |

- 4 -

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Exhibit 7 | 145:3-145:17 | | | | |
| | | Exhibit 7 | 148:4-149:14 | | | | |
| | | | 150:6-150:11 | | | | |
| | | | 153:9-154:6 | | | | |
| | | Exhibit 9 | 156:2-157:9 | | | | |
| | | | 157:25-160:5 | | | | |
| | | | 160:20-162:6 | | | | |
| | | | 163:25-166:8 | | | | |
| | | Exhibit 10 | 166:23-169:4 | | | | |
| | | | 171:2-171:13 | | | | |
| | | | | | | | |
| **Arizona Department of Corrections, Rehabilitation and Reentry Staffing 30(b)(6) Gann, Larry** | 2021-10-13 | | | | | | |
| | | | 5:14 -22 | | | | |
| | | | 6:22- 7:4 | | | | |
| | | | 7:18 – 10:19 | | | | |
| | | | 11:18 – 14:8 | | | | |
| | | | 13:12 – 14:8 | | | | |
| | | Exhibit 4 | 16:13 – 17:9 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Exhibit 4 | 18:12-22 | | | | |
| | | Exhibit 4 | 21:1-13 | | | | |
| | | Exhibit 5 | 22:22 – 23:25 | | | | |
| | | | 27:14 – 28:25 | | | | |
| | | | 29:19 – 30:2 | | | | |
| | | | 33:14 – 33:25 | | | | |
| | | | 35:4-18 | | | | |
| | | | 35:19 – 36:12 | | | | |
| | | Exhibit 13 | 58:3 – 60:21 60:24 – 61:2 | | | | |
| | | Exhibit 15 | 73:1-14 | | | | |
| | | | | | | | |
| **Gann, Larry** | 2021-10-13 | | | | | | |
| | | | 33:14-34:16 | | | | |
| | | | 35:10-35:19 | | | | |
| | | | 40:15-40:16 | | | | |
| | | | 41:13-42:13 | | | | |
| | | | 42:18-43:4 | | | | |
| | | | 43:11-44:11 | | | | |
| | | | 46:22-47:13 | | | | |
| | | | 47:21-48:3 | | | | |
| | | | 48:9-48:15 | | | | |
| | | | 49:8-50:10 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 53:8-54:19 | | | | |
| | | | 55:15-58:17 | | | | |
| | | | 59:9-61:7 | | | | |
| | | | 72:2-73:9 | | | | |
| | | | 73:20-73:22 | | | | |
| | | | 74:2-74:5 | | | | |
| | | | 74:19-75:24 | | | | |
| | | | 76:4-76:20 | | | | |
| | | | 78:3-78:9 | | | | |
| | | | 79:2-79:6 | | | | |
| | | | 80:23-81:19 | | | | |
| | | | 82:25-83:2 | | | | |
| | | | 85:5-85:25 | | | | |
| | | | 87:4-87:15 | | | | |
| | | | 87:25-88:3 | | | | |
| | | | 92:5-92:8 | | | | |
| | | | 93:6-93:11 | | | | |
| | | | 94:2-12 | | | | |
| | | | 95:7-97:10 | | | | |
| | | | 97:21-98:2 | | | | |
| | | | 98:21-24 | | | | |
| | | | 103:3-14 | | | | |
| | | | 104:6-13 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 105:6-10 | | | | |
| | | | 108:24-109:3 | | | | |
| | | | 111:10-12 | | | | |
| | | | 112:3 | | | | |
| | | | 113:19-21 | | | | |
| | | | 116:18-23 | | | | |
| | | | 121:17-123:3 | | | | |
| | | | 124:3-6 | | | | |
| | | | 125:11-18 | | | | |
| | | | 126:10-25 | | | | |
| | | | 129:2-19 | | | | |
| | | | 131:2-12 | | | | |
| | | | 131:24-133:3 | | | | |
| | | | 134:9-12 | | | | |
| | | | 135:18-22 | | | | |
| | | | 144:16-19 | | | | |
| | | | 156:23-157:2 | | | | |
| | | | 164:3-5 | | | | |
| | | | 165:15-22 | | | | |
| | | | 167:16-168:4 | | | | |
| | | | 168:22-169:1 | | | | |
| | | | 171:5-172:4 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 172:9-13; 173:20-174:10 | | | | |
| | | | | | | | |
| **Centurion Staffing 30(b)(6) Orm, Wendy** | 2021-10-13 | | | | | | |
| | | | 5:18-19 | | | | |
| | | | 7:16-18 | | | | |
| | | | 7:22-24 | | | | |
| | | | 11:4-12 11:14 | | | | |
| | | | 12:14-25 13:11-21 | | | | |
| | | | 17:19-21 17:23 - 18:1 18:3 | | | | |
| | | | 18:17 - 18:19 18:21 - 18:22 | | | | |
| | | | 19:12 - 19:15 19:17 - 19:22 19:24 - 20:1 | | | | |
| | | | 23:18 - 23:22 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 23:25 - 24:5 | | | | |
| | | | 25:1 - 25:4 | | | | |
| | | | 27:19 - 27:22 27:24 - 27:25 | | | | |
| | | | 28:1 - 28:12 | | | | |
| | | | 38:22 - 38:23 39:1 - 39:3 | | | | |
| | | | 51:21-23 | | | | |
| | | | 52:1 - 52:6 52:9 - 52:13 | | | | |
| | | | 68:4 - 68:6 68:10 - 68:13 68:15 - 68:16 | | | | |
| | | | | | | | |
| **Orm, Wendy** | 2021-10-13 | | | | | | |
| | | | 11:10-13 | | | | |
| | | | 12:10-11 | | | | |
| | | | 12:16- 13:12 | | | | |
| | | | 16:11-15 | | | | |
| | | Ex. 2 | 19:13-24 | | | | |
| | | Ex. 2 | 20:5-9 | | | | |
| | | Ex. 2 | 21:2-22:7 | | | | |
| | | | 22:13-23:4 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 26:5-13 | | | | |
| | | | 27:14-20 | | | | |
| | | | 33:20-34:6 | | | | |
| | | | 34:16-36:17 | | | | |
| | | | 54:2-23 | | | | |
| | | | 55:3-25 | | | | |
| | | | 57:5-23 | | | | |
| | | | 60:13-61:7 | | | | |
| | | | 61:13-62:1 | | | | |
| | | | 65:14-19 | | | | |
| | | | 66:24-67:10 | | | | |
| | | | 68:8-68:20 | | | | |
| | | | 69:4-69:17 | | | | |
| | | | 69:24-70:7 | | | | |
| | | | 70:19-72:4 | | | | |
| | | | 72:14-19 | | | | |
| | | | 79:2-12 | | | | |
| | | | 79:25-80:10 | | | | |
| | | | 82:6-12 | | | | |
| | | | 91:10-93:4 | | | | |
| | | | 100:6-101:14 | | | | |
| | | | 101:17-22 | | | | |
| | | | 102:15-22 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 105:19-106:11 | | | | |
| | | | 108:10-109:3 | | | | |
| | | | 116:19-117:1 | | | | |
| | | | 118:14-119:23 | | | | |
| | | | 122:12-18 | | | | |
| | | | 123:5-11 | | | | |
| | | | 129:14-22 | | | | |
| | | | 131:18-24 | | | | |
| | | | 132:6-133:9 | | | | |
| | | | 139:21-141:9 | | | | |
| | | | 156:19-157:12 | | | | |
| | | | 164:13-165:1 | | | | |
| | | Ex. 12 | 167:7-168:5 | | | | |
| | | Ex. 13 | 171:18-172:10 | | | | |
| | | Ex. 13 | 173:7-18 | | | | |
| | | | | | | | |
| **Pelton, Ashley** | 2021-10-06 | | | | | | |
| | | | 22:10-23:18 | | | | |
| | | | 27:25-29:10 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 98:12-17 | | | | |
| | | | 100:8-16 | | | | |
| | | | 108:14-109:16 | | | | |
| | | | 114:14-115:16 | | | | |
| | | | 126:6-128:15 | | | | |
| | | | 134:5-135:1 | | | | |
| | | | 139:8-142:20 | | | | |
| | | | 146:2-148:1 | | | | |
| | | | 152:24-153:22 | | | | |
| | | | 154:14-155:19 | | | | |
| | | | 156:1-157:4 | | | | |
| | | | 158:5-161:17 | | | | |
| | | | 161:21-168:6 | | | | |
| | | | 168:16-170:25 | | | | |
| | | | 175:1-176:7 | | | | |
| | | | 189:5-193:19 | | | | |
| | | | 194:8-12 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 196:17-197:14 | | | | |
| | | | 200:16-201:6 | | | | |
| | | | 204:4-17 | | | | |
| | | | 204:21-205:17 | | | | |
| | | | 209:9-210:11 | | | | |
| | | | 216:5-19 | | | | |
| | | | 217:17-218:25 | | | | |
| | | | 219:18-220:5 | | | | |
| | | | 221:20-222:17 | | | | |
| | | | 227:3-7 | | | | |
| | | | 228:1-229:1 | | | | |
| | | | Ex. 6 | | | | |
| | | | Ex. 7 | | | | |
| | | | Ex. 8 | | | | |
| | | | Ex. 14 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| **Arizona Department of Corrections, Rehabilitation and Reentry Mental Health and Isolation 30(b)(6) Pennington-Stallcup, Bobbie** | 2021-10-12 | | | | | | |
| | | | 23:5-13 | | | | |
| | | | 25:12-14 | | | | |
| | | | 26:7-11 | | | | |
| | | | 34:4-35:24 | | | | |
| | | | 36:9-37:22 | | | | |
| | | | 38:22-40:9 | | | | |
| | | | 41:14-24 | | | | |
| | | | 44:4-24 | | | | |
| | | | 51:9-55:18 | | | | |
| | | | 60:8-61:14 | | | | |
| | | | 63:3-6 | | | | |
| | | | 67:1-68:5 | | | | |
| | | | 69:4-17 | | | | |
| | | | 71:20-72:17 | | | | |
| | | | 75:9-21 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 76:18-77:10 | | | | |
| | | | 78:14-20 | | | | |
| | | | 79:4-19 | | | | |
| | | | 81:16-83:5 | | | | |
| | | | 83:22-86:2 | | | | |
| | | | 87:16-17 | | | | |
| | | | 89:10-90:10 | | | | |
| | | | 92:15-93:9 | | | | |
| | | | 93:17-22 | | | | |
| | | | 94:21-95:20 | | | | |
| | | | 96:8-13 | | | | |
| | | | 97:6-13 | | | | |
| | | Ex. 2, Ex. 3 | 101:3-12 | | | | |
| | | Ex. 2, Ex. 3 | 102:18-103:10 | | | | |
| | | | 103:22-104:23 | | | | |
| | | | 107:18-21 | | | | |
| | | | 109:1-110:25 | | | | |
| | | | 112:23-113:6 | | | | |
| | | | 114:22-116:8 | | | | |
| | | | 116:14-118:3 | | | | |
| | | | 118:9-119:19 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 120:16-123:12 | | | | |
| | | | 124:5-126:20 | | | | |
| | | | 128:16-131:15 | | | | |
| | | | 132:9-134:8 | | | | |
| | | | 134:25-136:8 | | | | |
| | | | 138:9-140:12 | | | | |
| | | Ex. 5 | 140:13-25 | | | | |
| | | Ex. 5 | 142:20-143:14 | | | | |
| | | Ex. 5 | 144:6-145:2 | | | | |
| | | | 145:3-146:6 | | | | |
| | | | 148:8-150:16 | | | | |
| | | Ex. 4 | 153:3-154:7 | | | | |
| | | | 157:19-158:17 | | | | |
| | | Ex. 6 | 158:18-160:11 | | | | |
| | | | 161:11-19 | | | | |
| | | | 162:13-163:13 | | | | |
| | | | 164:6-168:1 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 168:13-173:6 | | | | |
| | | | 174:10-176:19 | | | | |
| | | | 179:2-180: 24 | | | | |
| | | | 182:1-184:1 | | | | |
| | | Ex. 2 | 184:6-185:16 | | | | |
| | | | 185:24-188:18 | | | | |
| | | | 189:14-195:21 | | | | |
| | | | 197:5-210:11 | | | | |
| | | Ex. 2 | 210:23-215:22 | | | | |
| | | | 216:10-219:6 | | | | |
| | | Ex. 2 | 219:20-225:4 | | | | |
| | | | 225:20-228:7 | | | | |
| | | | 228:15-229:15 | | | | |
| | | | | | | | |
| **Pennington-Stallcup, Bobbie** | 2021-10-15 | | | | | | |
| | | | 6:18-20 | | | | |
| | | | 7:14-9:4 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 13:6-13:24 | | | | |
| | | | 14:9-22 | | | | |
| | | Exhibit 7 | 19:16-20:21 | | | | |
| | | | 21:8-17 | | | | |
| | | Exhibit 11 | 22:1-23:18 | | | | |
| | | Exhibit 12 | 24:6-26:18 | | | | |
| | | Exhibit 13 | 26:19-27:9 | | | | |
| | | Exhibit 14 | 28:11-31:6 | | | | |
| | | Exhibit 14 | 32:16-33:7 | | | | |
| | | | 34:5-35:2 | | | | |
| | | | 39:11-14 | | | | |
| | | | 43:6-44:20 | | | | |
| | | Exhibit 15 | 46:13-51:9 | | | | |
| | | Exhibit 16 | 52:1-55:2 | | | | |
| | | Exhibit 17 | 55:12-56:19 | | | | |
| | | | 57:24-58:2 | | | | |
| | | Exhibit 18 | 60:13-62:9 | | | | |
| | | Exhibit 19 | 62:10-65:15 | | | | |
| | | Exhibit 19 | 66:21-67:25 | | | | |
| | | Exhibit 19 | 68:3-69:10 | | | | |
| | | Exhibit 19 | 70:5-19 | | | | |
| | | Exhibit 20 | 71:22-72:25 | | | | |
| | | Exhibit 20 | 75:21-77:10 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Exhibit 21 | 77:15-78:6 | | | | |
| | | Exhibit 21 | 83:20-85:25 | | | | |
| | | Exhibit 22 | 90:12-92:14 | | | | |
| | | Exhibit 23 | 92:18-96:23 | | | | |
| | | | 98:8-101:18 | | | | |
| | | | | | | | |
| **Arizona Department of Corrections, Rehabilitation and Reentry Medical 30(b)(6) Phillips, Grant** | 2021-10-04 and 05 | | | | | | |
| | | | 30:12-31:4 | | | | |
| | | Ex. 5 | 33:2-37:2 | | | | |
| | | Ex. 5 | 37:5-38:9 | | | | |
| | | | 39:15-23 | | | | |
| | | Ex. 4 | 40:11-25 | | | | |
| | | Ex. 6 | 41:1-42:10 | | | | |
| | | | 43:5-18 | | | | |
| | | Ex. 7 | 44:6-47:14 | | | | |
| | | | 57:3-6 | | | | |
| | | | 57:16-58:2 | | | | |
| | | Ex. 9 | 58:17-62:20 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 63:13-20 | | | | |
| | | Ex. 10 | 67:5-15 | | | | |
| | | | 70:13-71:19 | | | | |
| | | Ex. 10 | 73:13-75:17 | | | | |
| | | | 77:2-22 | | | | |
| | | | 84:14-17 | | | | |
| | | | 88:20-89:3 | | | | |
| | | | 90:3-92:4 | | | | |
| | | | 92:10-93:6 | | | | |
| | | | 94:17-97:17 | | | | |
| | | | 98:14-99:23 | | | | |
| | | | 100:2-21 | | | | |
| | | | 101:12-103:20 | | | | |
| | | | 110:12-17 | | | | |
| | | | 111:3-22 | | | | |
| | | | 118:11-20 | | | | |
| | | | 119:2-4 | | | | |
| | | | 119:11-15 | | | | |
| | | | 122:25-123:19 | | | | |
| | | | 124:8-12 | | | | |
| | | | 125:14-126:6 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 130:6-15 | | | | |
| | | | 133:2-9 | | | | |
| | | Ex. 16 | 138:22-139:2 | | | | |
| | | Ex. 17 | 141:13-142:25 | | | | |
| | | | 144:8-145:1 | | | | |
| | | Ex. 20 | 152:19-154:4 | | | | |
| | | Ex. 20 | 155:19-156:3 | | | | |
| | | Ex. 20 | 157:9-15 | | | | |
| | | | 160:19-23 | | | | |
| | | Ex. 20 | 162:8-25 | | | | |
| | | Ex. 20 | 163:2-166:12 | | | | |
| | | Ex. 20 | 166:25-167:21 | | | | |
| | | Ex. 21 | 173:5-174:6 | | | | |
| | | Ex. 22 | 183:5-20 | | | | |
| | | Ex. 22 | 185:8-24 | | | | |
| | | Ex. 22 | 186:19-22 | | | | |
| | | Ex. 22 | 189:18-190:21 | | | | |
| | | Ex. 22 | 191:20-192:2 | | | | |
| | | Ex. 22 | 192:21-24 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Ex. 23 | 199:20-200:10 | | | | |
| | | Ex. 24 | 219:4-8 | | | | |
| | | Ex. 24 | 221:13-25 | | | | |
| | | | 230:23-231:10 | | | | |
| | | | 231:25-234:1 | | | | |
| | | Ex. 27 | 242:15-243:13 | | | | |
| | | | | | | | |
| **Scott, Travis (Deputy Warden)** | 2021-10-05 | | | | | | |
| | | | 4:15-16 | | | | |
| | | | 8:9-14 | | | | |
| | | | 8:20-9:4 | | | | |
| | | | 10:7-8 | | | | |
| | | | 15:12-18:5 | | | | |
| | | | 19:11-20:1 | | | | |
| | | | 20:10-22:9 | | | | |
| | | | 23:19-24 | | | | |
| | | | 25:16-26:13 | | | | |
| | | | 26:21-27:22 | | | | |
| | | | 28:8-29:21 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 30:3-15 | | | | |
| | | | 31:1-22 | | | | |
| | | | 32:3-6 | | | | |
| | | | 33:2-4 | | | | |
| | | Scott Ex. 1 | 35:23-40:21 | | | | |
| | | Scott Ex. 1 | 41:6-45:19 | | | | |
| | | Scott Ex. 3 | 46:13-48:23 | | | | |
| | | | 49:6-53:7 | | | | |
| | | | 53:19-22 | | | | |
| | | | 54:15-55:8 | | | | |
| | | | 55:23-57:14 | | | | |
| | | | 58:4-23 | | | | |
| | | | 59:1-60:1 | | | | |
| | | Isolation Exs. 3, 4 | 61:4-83:8 | | | | |
| | | | 83:19-86:15 | | | | |
| | | | 87:7-23 | | | | |
| | | | 88:22-93:13 | | | | |
| | | | 93:21-95:8 | | | | |
| | | Scott Ex. 5 | 96:12-107:21 | | | | |
| | | Scott Ex. 5 | 108:20-110:18 | | | | |
| | | Scott Ex. 5 | 111:3-5 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Scott Ex. 5 | 111:22-112:7 | | | | |
| | | Scott Ex. 8 | 114:21-116:23 | | | | |
| | | Scott Ex. 8 | 117:13-119:10 | | | | |
| | | | 120:5-9 | | | | |
| | | | 120:12-14 | | | | |
| | | | 120:25-124:4 | | | | |
| | | Scott Ex. 6 | 124:25-125:11 | | | | |
| | | Scott Ex. 6 | 125:24-133:19 | | | | |
| | | Scott Ex. 7 | 134:2-136:12 | | | | |
| | | Scott Ex. 7 | 137:15-140:17 | | | | |
| | | | 140:22-141:10 | | | | |
| | | | 144:17-146:5 | | | | |
| | | | 146:22-147:23 | | | | |
| | | | 148:4-149:14 | | | | |
| | | | 150:19-152:5 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| **Shinn, David** | 2021-10-21 | | | | | | |
| | | | 12:23-13:7 | | | | |
| | | | 41:14-42:18 | | | | |
| | | | 43:16-44:12 | | | | |
| | | | 45:2-25 | | | | |
| | | | 46:5-24 | | | | |
| | | | 48:19-49:12 | | | | |
| | | | 53:19-24 | | | | |
| | | | 57:7-17 | | | | |
| | | | 58:8-25 | | | | |
| | | | 59:1-14 | | | | |
| | | | 59:23-60:5 | | | | |
| | | | 61:21-24 | | | | |
| | | | 63:17-65:2 | | | | |
| | | | 66:5-10 | | | | |
| | | | 66:25-67:8 | | | | |
| | | | 70:17-22 | | | | |
| | | | 72:22-73:10 | | | | |
| | | | 81:3-7 | | | | |
| | | | 81:19-25 | | | | |
| | | | 89:6-11 | | | | |
| | | | 92:12-21 | | | | |
| | | | 93:3-9 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 93:17-23 | | | | |
| | | | 104:7-11 | | | | |
| | | | 106:19-21 | | | | |
| | | | 135:23-136:1 | | | | |
| | | | 136:18-137:1 | | | | |
| | | | 139:20-25 | | | | |
| | | | 140:22-141:2 | | | | |
| | | | 143:1-9 | | | | |
| | | | 143:16-21 | | | | |
| | | | 145:1-9 | | | | |
| | | | 156:8-14 | | | | |
| | | | 158:20-159:10 | | | | |
| | | | 163:7-16 | | | | |
| | | | 165:19-25 | | | | |
| | | | 166:13-23 | | | | |
| | | | 168:2-5 | | | | |
| | | | 169:22-170:4 | | | | |
| | | | 173:4-17 | | | | |
| | | | 181:15-22 | | | | |
| | | | 184:4-9 | | | | |
| | | | 185:4-9 | | | | |
| | | | 185:17-186:1 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 186:11-21 | | | | |
| | | | 188:25-189:6 | | | | |
| | | | 197:21-198:3 | | | | |
| | | | 200:8-12 | | | | |
| | | | | | | | |
| **Stickley, Lori (Warden)** | 2021-10-12 | | | | | | |
| | | | 4:20-21 | | | | |
| | | | 10:3-12 | | | | |
| | | | 11:12-12:1 | | | | |
| | | | 15:19-22 | | | | |
| | | | 16:2-23 | | | | |
| | | | 17:6-18:18 | | | | |
| | | | 20:1-22:23 | | | | |
| | | | 23:2-24:12 | | | | |
| | | | 25:9-26:7 | | | | |
| | | | 27:13-32:2 | | | | |
| | | | 34:12-36:20 | | | | |
| | | | 37:5-41:9 | | | | |
| | | | 42:11-48:4 | | | | |
| | | Stickley Ex. 1 | 52:19-57:12 | | | | |
| | | Stickley Ex. 1 | 57:23-62:22 | | | | |
| | | Stickley Ex. 1 | 63:8-65:20 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Stickley Ex. 1 | 67:17-69:21 | | | | |
| | | Stickley Ex. 1 | 71:13-72:12 | | | | |
| | | Stickley Ex. 1 | 72:19-74:9 | | | | |
| | | Stickley Ex. 1 | 74:21-76:21 | | | | |
| | | Stickley Exs. 2, 3 | 77:12-84:2 | | | | |
| | | | 84:8-87:3 | | | | |
| | | | 87:10-20 | | | | |
| | | | 88:8-22 | | | | |
| | | | 89:7-92:25 | | | | |
| | | | 93:5-101:14 | | | | |
| | | Isolation Ex. 3 | 103:6-109:16 | | | | |
| | | Isolation Ex. 3 | 109:25-119:11 | | | | |
| | | | 119:25-120:18 | | | | |
| | | | 121:11-19 | | | | |
| | | | 122:20-123:1 | | | | |
| | | | 123:23-129:9 | | | | |
| | | Stickley Ex. 5 | 136:25-140:20 | | | | |
| | | Stickley Ex. 6 | 141:21-151:19 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 152:8-24 | | | | |
| | | | | | | | |
| **Arizona Department of Corrections, Rehabilitation and Reentry Isolation 30(b)(6) Van Winkle, Jeffrey (Warden)** | 2021-09-24 | | | | | | |
| | | | 12:23-13:7 | | | | |
| | | | 22:2-24:12 | | | | |
| | | Isolation Ex. 2 | 24:19-26:9 | | | | |
| | | Isolation Ex. 2 | 26:17-33:19 | | | | |
| | | Isolation Ex. 2 | 34:15-38:1 | | | | |
| | | Isolation Ex. 3 | 38:13-19 | | | | |
| | | Isolation Ex. 3 | 39:19-40:7 | | | | |
| | | Isolation Ex. 3 | 41:14-18 | | | | |
| | | | 42:13-44:13 | | | | |
| | | Isolation Ex. 2 | 44:23-45:14 | | | | |
| | | | 46:14-51:16 | | | | |
| | | | 53:16-25 | | | | |
| | | | 56:1-14 | | | | |
| | | Isolation Ex. 3 | 56:25-80:11 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Isolation Ex. 3 | 80:22-84:10 | | | | |
| | | Isolation Ex. 3 | 88:17-99:4 | | | | |
| | | Isolation Exs. 3, 4, 5, 7 | 99:10-127:2 | | | | |
| | | | 129:7-134:15 | | | | |
| | | Isolation Exs. 3, 5 | 135:1-149:23 | | | | |
| | | | 153:16-156:13 | | | | |
| | | Isolation Exs. 3, 5, 6 | 158:3-170:18 | | | | |
| | | | 171:2-21 | | | | |
| | | | 172:1-174:21 | | | | |
| | | | 177:9-178:10 | | | | |
| | | | 179:1-184:10 | | | | |
| | | Isolation Exs. 3, 5, 6 | 185:16-196:23 | | | | |
| | | | 197:12-200:17 | | | | |
| | | | 200:21-202:21 | | | | |
| | | Isolation Exs. 14, 19 | 203:2-225:3 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | Isolation Exs. 6, 19 | 225:22-235:11 | | | | |
| | | | | | | | |
| **Wilson, John Seddon** | 2021-10-28 | | | | | | |
| | | | 24:18-25:7 | | | | |
| | | | 25:19-32:6 | | | | |
| | | | 32:15-34:10 | | | | |
| | | | 35:13-24 | | | | |
| | | | 40:9-24 | | | | |
| | | | 41:2-42:10 | | | | |
| | | | 43:1-16 | | | | |
| | | | 45:1-47:15 | | | | |
| | | | 47:18-48:21 | | | | |
| | | | 49:16-23 | | | | |
| | | | 50:5-11 | | | | |
| | | | 50:22-52:9 | | | | |
| | | | 53:19-54:24 | | | | |
| | | | 58:3-8 | | | | |
| | | | 58:21-62:7 | | | | |
| | | | 62:11-25 | | | | |
| | | Exhibit 2 | 64:3-66:20 | | | | |
| | | Exhibit 2 | 67:4-7 | | | | |
| | | | 67:10-18 | | | | |

| Deponent Name | Date | Referenced Exhibit | Parsons Initial Designations | Shinn Objections | Shinn Counter-Designations | Parsons Objections to Shinn Counter-Designations | Court Ruling |
|---|---|---|---|---|---|---|---|
| | | | 68:18-23 | | | | |
| | | | 69:13-71:15 | | | | |
| | | | 73:5-74:23 | | | | |
| | | | 77:13-81:5 | | | | |
| | | | 81:24-82:17 | | | | |
| | | | 83:2-11 | | | | |
| | | | 85:1-8 | | | | |
| | | | 87:3-88:11 | | | | |
| | | Exhibit 9 | 90:15-96:6 | | | | |
| | | | 98:23-25 | | | | |
| | | Exhibit 10 | 100:1-101:15 | | | | |
| | | | 103:24-104:2 | | | | |
| | | | 105:23-106:24 | | | | |
| | | | 109:12-115:13 | | | | |
| | | Exhibit 8 | 122:22-125:21 | | | | |
| | | Exhibit 8 | 130:11-22 | | | | |
| | | Exhibit 8 | 131:9-135:3 | | | | |
| | | | 141:15-142:8 | | | | |
| | | | 147:21-25 | | | | |
| | | | 148:20-25 | | | | |

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VICTOR PARSONS; SHAWN JENSEN; STEPHEN SWARTZ; DUSTIN BRISLAN; SONIA RODRIGUEZ; CHRISTINA VERDUZCO; JACKIE THOMAS; JEREMY SMITH; ROBERT GAMEZ; MARYANNE CHISHOLM; DESIREE LICCI; JOSEPH HEFNER; JOSHUA POLSON; and CHARLOTTE WELLS, on behalf of themselves and all others similarly situated; and ARIZONA CENTER FOR DISABILITY LAW, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. ) CV 12-00601-PHX-ROS ) |
| DAVID SHINN, DIRECTOR, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY; and LARRY GANN, ASSISTANT DIRECTOR, MEDICAL SERVICES CONTRACT MONITORING BUREAU, ARIZONA DEPARTMENT OF CORRECTIONS, REHABILITATION AND REENTRY, in their official capacities, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

30(b)(6) DEPOSITION OF CENTURION OF ARIZONA, LLC
(ANTONIO CARR, M.D. AND THOMAS RUSSELL DOLAN)
Volume 2 - (Pages 73 - 216)
Via Zoom Videoconference
October 19, 2021
9:00 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020
602.266.6535
www.glennie-reporting.com

Prepared by:
Robin L. B. Osterode
CSR, RPR
CA CSR No. 7750
AZ CR No. 50695

74

1                       I N D E X

2    WITNESS                                      PAGE

3    CENTURION OF ARIZONA, LLC
     (ANTONIO CARR, M.D.)
4

5              Examination by Ms. Colby            78

6    WITNESS                                      PAGE

7    CENTURION OF ARIZONA, LLC
     (THOMAS RUSSELL DOLAN)
8

9              Examination by Ms. Colby           131

10

11

12                  INDEX TO EXHIBITS

13   Description                                  Page

14   Exhibit 1  Amended Subpoena to Testify at      81
                a Deposition in a Civil Action;
15              6 pages

16   Exhibit 2  Curriculum vitae of Antonio Carr,   84
                M.D.; 3 pages
17
     Exhibit 3  Curriculum vitae of Tom Dolan;     142
18              5 pages

19   Exhibit 4  Bates stamped documents            151
                PLTFS002213 - PLTFS002789
20
     Exhibit 5  Document entitled "Staffing        154
21              Plan"; 1 page

22   Exhibit 7  Excel spreadsheet entitled "Staffing 162
                Variances - Hired FTE vs. Contract
23              FTE"; 11 pages

24   Exhibit 8  Bates stamped documents            165
                PLTFS002187 - PLTFS002208
25

75

1    INDEX (Continued):

2

                        INDEX TO EXHIBITS
3    Description                                          Page

4    Exhibit 9   Bates stamped documents              173
                 ADCRR00110925 - ADCRR00110926
5                (Confidential)

6    Exhibit 10  Bates stamped documents              115
                 ADCRR00078068 - ADCRR00078074
7                (Confidential)

8    Exhibit 11  Excel spreadsheet with header        125
                 "Site/Unit" on first page; 6 pages
9

     Exhibit 12  Bates stamped documents              110
10               ADCRR00070635 - ADCRR00070645
                 (Confidential)
11

     Exhibit 13  Bates stamped documents              111
12               ADCRR00074732 - ADCRR00074736
                 (Confidential)
13

     Exhibit 15  Bates stamped documents              204
14               ADCRR00021949 - ADCRR00021976
                 (Confidential)
15

     Exhibit 16  Bates stamped document PLTFS001698   207
16

     Exhibit 17  Bates stamped documents              208
17               ADCRR00078885 - ADCRR00078887
                 (Confidential)
18

     Exhibit 18  Bates stamped documents              210
19               ADCRR00074864 - ADCRR00074865
                 (Confidential)

20

21

22

23

24

25

76

1  INDEX (Continued):

2

3                    INSTRUCTION NOT TO ANSWER

4                         Page     Line

5                         120        7

6

7

8          PORTIONS OF TRANSCRIPT MARKED CONFIDENTIAL

9                            Pages

10                         111-120
                           174-179
11                         196-199
                           205-206
12                         209-212

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              DEPOSITION OF CENTURION OF ARIZONA, LLC

2                  The deposition of CENTURION OF ARIZONA, LLC,

3    Volume 2, (ANTONIO CARR, M.D. AND THOMAS RUSSELL DOLAN),

4    via Zoom Videoconference, was taken on October 19, 2021,

5    commencing at 9:00 a.m., at Phoenix, Arizona, before

6    ROBIN L. B. OSTERODE, RPR, CSR, California Shorthand

7    Reporter No. 7750 and Arizona Certified Reporter

8    No. 50695.

9    APPEARANCES:

10   For Plaintiffs:

11           PERKINS COIE, LLP
             By: Mikaela Colby
12           2901 North Central Avenue, Suite 2000
             Phoenix, Arizona 85012
13           (602) 351-8000
             mcolby@perkinscoie.com
14           (Videoconference appearance.)

15   For Defendants:

16           STRUCK LOVE BOJANOWSKI & ACEDO, PLC
             By: Timothy J. Bojanowski
17           3100 West Ray Road, Suite 300
             Chandler, Arizona 85226
18           (480) 420-1616
             tbojanowski@strucklove.com
19           EPercevecz@strucklove.com
             (Videoconference appearance.)
20
     For Deponent:
21
             BROENING OBERG WOODS & WILSON
22           By: Sarah L. Barnes
             2800 N. Central Ave, Suite 1600
23           Phoenix Arizona 85004
             (602) 271-7793
24           slb@bowwlaw.com
             (Videoconference appearance.)
25
```

78

1           THE REPORTER:  Before we proceed, I will ask

2    counsel to agree on the record that there is no objection

3    to this officer of the court administering a binding oath

4    to a witness not appearing personally before me.

5           Please state your agreement on the record.

6           MR. BOJANOWSKI:  No objection.

7           MS. BARNES:  No objection.

8           MS. COLBY:  No objection.

9

10                ANTONIO CARR, M.D.,

11   called as a witness herein, having been first duly sworn

12   by the Certified Reporter to speak the whole truth and

13   nothing but the truth, was examined and testified as

14   follows:

15

16              E X A M I N A T I O N

17   BY MS. COLBY:

18      Q.    Hello, my name is Mikaela Colby.  I'm with

19   Perkins Coie.  I'm one of the attorneys for the prison

20   plaintiffs in Parsons v. Shinn; that's the case you've

21   been called for this deposition.

22           Can you please state your full name for the

23   record.

24      A.    Antonio Carr.

25      Q.    And can I call you "Dr. Carr"?

81

1      Q.    Okay.  If you need to answer, we'll just step

2  out to take a break.

3      A.    Okay.

4      Q.    When I refer to "ADC," do we have an

5  understanding that I'm referring to the Arizona

6  Department of Corrections, Rehabilitation, and Reentry?

7      A.    Yes.

8      Q.    And when I refer to "prisons" or "facilities,"

9  can we have an understanding I'm referring to the 10

10  Arizona State Prison complexes?

11      A.    Yes.

12            MS. COLBY:  Okay.  I'm going to mark this as

13  Exhibit 1.

14            (Marked for identification Exhibit 1.)

15  BY MS. COLBY:

16      Q.    Can you see this on the screen?

17      A.    Yes.

18      Q.    And do you recognize this document?  This is

19  the subpoena for Centurion that called you to testify

20  here today.

21      A.    Yes.

22      Q.    And are you here on behalf of Centurion, not

23  yourself as an individual?

24      A.    Yes.

25      Q.    Here is a caption Attachment A, and this lists

**30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -**
**Vol. II - 10/19/2021**

82

1    the topics that Centurion is to testify about today.   I

2    understand that you're only designated for two topics

3    today; is that correct?

4         A.    Yes.

5         Q.    So I'm just going to go through the two topics

6    that you've been designated for and confirm whether

7    you're prepared to testify on that topic.   Topic 7 is

8    "The policies and procedures related to the recruitment

9    and retention of healthcare staff at the 10 ASPCs."

10            Are you the person at Centurion with the most

11   knowledge concerning this document?

12            MS. BARNES:   Form.

13            THE WITNESS:   I have knowledge.   I cannot say

14   that I'm the most knowledgeable, depending on what you

15   ask.   I do have knowledge of policies and procedures

16   related to recruitment and retention of healthcare staff

17   at the 10 ASPC facilities.

18   BY MS. COLBY:

19        Q.    Do you know of anyone who would be more

20   knowledgeable?

21        A.    No, I do not.

22        Q.    Are you prepared to testify to this topic

23   today?

24        A.    Yes.

25        Q.    And Topic 8 is the type of licensure

1   requirements for each classification of healthcare and

2   mental care staff.  Are you prepared to testify regarding

3   Topic 8?

4        A.    To the best of my ability, yes.

5        Q.    Are you the person at Centurion with the most

6   knowledge concerning this topic?

7              MS. BARNES:  Form.

8              THE WITNESS:  I am.

9              MS. BARNES:  Form.

10             Go ahead.

11             THE WITNESS:  I have knowledge.  I can't say

12  I'm the most knowledgeable.  Depending on your questions,

13  I can answer or participate with this discussion.

14  BY MS. COLBY:

15       Q.    Okay.  Are there any other topics that you've

16  been designated to testify to today or are these the only

17  two?

18       A.    Those are the only two.

19       Q.    Okay.  Did you do anything to prepare for this

20  deposition to testify on behalf of Centurion?

21       A.    Yes.

22       Q.    What did you do?

23       A.    I reviewed some of my notes.  As the statewide

24  psychiatric director, I am continually involved with

25  various conversations, meetings, and I take various notes

106

1      Q.     Has anyone who works for ADC said to you

2  verbally or in writing that they think changes need to be

3  made to the staffing levels?

4      A.     No.

5      Q.     What about anyone at Centurion?

6      A.     No.

7      Q.     Have you heard that from any of the mental

8  healthcare staff?

9      A.     Yes.

10      Q.     What have you heard?

11      A.     Again, as a statewide psychiatric director, I

12  would like to believe that I'm pretty hands-on, whether

13  I'm in Yuma, Lewis Complex, Tucson Complex.  Staff, you

14  know, we have a pretty open relationship, so they share

15  their thoughts, they try to be creative, and help us

16  provide a comprehensive program.  And so it's not

17  uncommon for a mental health nurse or a psychology

18  associate to say, "Hey, Carr, I think we need more

19  staff."  Realistically, some of the things they are

20  wanting assistance with maybe time management, maybe

21  helping with prioritization.

22           That does not always mean that we just go out

23  and hire staff, because someone mentions "Hey, we need

24  more staff."  So in passing staff will make those

25  comments, but we'll sit down and talk about it and

1    realistically look at the data to determine, yeah, we

2    need more troops on the ground, so to speak.

3        Q.     Have you heard those comments at all the

4    facilities or only some of them?

5        A.     I can't recall if it's been all.   It's

6    generally here or there, especially when we have our team

7    meetings and we talk about how staff is doing, staff

8    morale.   And, again, it's usually something that's

9    brought up, "we need more staff," and again, we'll break

10   that down.

11            But I can't recall if it's every facility that

12   I've been to.  I know, for example, Phoenix, things are

13   good at Phoenix right now.  The census of the inpatient

14   unit is low, so no one is really concerned about -- well,

15   I shouldn't say no one -- the site providers are doing

16   well, and so they have the support that they need.

17       Q.     You said earlier that you attend meetings with

18   ADC as a part of your job.  Correct?

19       A.     Correct.

20       Q.     Do you discuss staffing levels at those

21   meetings?

22       A.     No.

23       Q.     Do you discuss staffing allocations in

24   different facilities at those meetings?

25            MS. BARNES:  Can you repeat that question?  I

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

109

1              MR. BOJANOWSKI:  Form.

2              THE WITNESS:  It's a collaborative effort.

3    When you say "frequently," it's not every day or every

4    week we're having these discussions, but they show an

5    interest in helping us retain and recruit staff.

6    BY MS. COLBY:

7       Q.    Aside from what you just mentioned with the

8    interns, is there anything specifically that ADC does to

9    help with recruitment?

10             MR. BOJANOWSKI:  Form, foundation.

11             THE WITNESS:  I -- I think their involvement

12   and support, it's help, right, it's asking the questions,

13   "What can we do?"  "What are we doing?"  I think it's

14   helpful.  That's all I have to say.

15   BY MS. COLBY:

16      Q.    Is Centurion having any problems filling mental

17   healthcare staffing positions?

18      A.    No.

19      Q.    Is it Centurion's position that all the

20   facilities are adequately staffed?

21             MS. BARNES:  Form, foundation.

22             THE WITNESS:  Repeat the question, please.

23   BY MS. COLBY:

24      Q.    Is it Centurion's position that all the

25   facilities are adequately staffed in terms of mental

1    healthcare staffing?

2              MS. BARNES:   Same objections.

3              THE WITNESS:   Yes.

4              MS. COLBY:   I'm going to mark this as

5    Exhibit 12.

6              (Marked for identification Exhibit 12.)

7              (The following testimony is Confidential

8         Information Pursuant to the Protective Order.)

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

131

1                    E X A M I N A T I O N

2    BY MS. COLBY:

3        Q.    Hi, Mr. Dolan, my name is Mikaela Colby with

4    Perkins Coie.  I'm one of the attorneys for the prison

5    plaintiffs in the case Parsons v. Shinn.  That's the case

6    that you've been called for for this deposition.

7              Will you please state your full name for the

8    record.

9        A.    Thomas Russell Dolan.

10       Q.    Have you ever been deposed before?

11       A.    Yes, I have.

12       Q.    How many times?

13       A.    Three or four times, that I can remember.

14       Q.    Okay.  Do you know for what cases?

15       A.    They were in a different company and a

16   different contract, but yes, they were regarding medical

17   care in corrections.  One of them was -- I don't

18   remember, to be honest with you.  It was all regarding

19   work, though.

20       Q.    Do you understand that I'm going to be asking

21   you questions and you're going to be answering them under

22   oath?

23       A.    Yes.

24       Q.    And do you understand that the oath you took

25   here today has the same force and effect if you were

 1    Zoom screen, such as a document or a cell phone?

 2         A.    I have a few notes in front of me that have

 3    specific data points or numbers regarding potential

 4    questions you may ask today.

 5         Q.    Okay.  When I refer to "ADC," can we have an

 6    understanding that I'm referring to the Arizona

 7    Department of Corrections, Rehabilitation, and Reentry?

 8         A.    Yes.

 9         Q.    And when I refer to "prisons" or "facilities,"

10    can we have an understanding that I'm referring to the 10

11    Arizona State Prison complexes?

12         A.    Yes.

13              MS. COLBY:  Going to mark this as Exhibit 1.

14         Q.    Can you see this document, the Subpoena to

15    Testify at a Deposition in a Civil Action?

16         A.    Yes --

17              MS. BARNES:  Just to clarify, Mikaela, I just

18    want to make sure we're all on the same page, when you

19    say "mark this as Exhibit 1," you're actually referring

20    to this as the Exhibit 1 that's already been marked from

21    this volume of the deposition?

22              MS. COLBY:  Yes, I'm sorry.  These are all the

23    same exhibits.  There are a few that I'm going to reuse,

24    such as this one.  And then I will mark a couple new

25    ones.

134

1              THE REPORTER:  Can you designate which ones are

2    new since I wasn't the reporter from the previous volume?

3              MS. COLBY:  Yes.  And, to be clear, these are

4    all exhibits just from today, not from -- not from the

5    previous 30(b)(6).

6              THE REPORTER:  Okay.

7    BY MS. COLBY:

8        Q.    Do you recognize the subpoena, Mr. Dolan?

9        A.    Yes, I do.

10       Q.    And is this the subpoena that is directed to

11   Centurion that called you to testify here today?

12             MS. BARNES:  Form.

13             THE WITNESS:  It appears to be that document,

14   yes.

15   BY MS. COLBY:

16       Q.    And are you here on behalf of Centurion, not

17   yourself as an individual?

18       A.    Yes, I am.

19       Q.    And here in Attachment A we have all of the

20   topics.  Are you the person who has been designated by

21   Centurion to speak on its behalf with respect to the

22   topics listed in Attachment A?

23       A.    Yes, I am.

24       Q.    Who designated you to speak on behalf of

25   Centurion?

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

135

1           MS. BARNES:   Form, foundation.

2           If you know, you can answer.  If you don't

3   know, you don't know.

4           THE WITNESS:   I'm not exactly sure who

5   designated me, but I'm assuming it was an attorney.

6   BY MS. COLBY:

7      Q.    An attorney at Centurion, you're assuming?

8      A.    Yes.

9      Q.    I'm going to briefly go through each topic and

10  confirm whether you're prepared to testify on that topic.

11  Topic 1 is, "The development and maintenance of ADC's

12  current healthcare staffing models and the allocation of

13  healthcare staff across the 10 facilities."

14          Are you prepared to testify regarding Topic 1?

15     A.    Yes.

16     Q.    And are you the person at Centurion with the

17  most knowledge concerning this topic?

18          MS. BARNES:   Form, foundation.

19          THE WITNESS:   I'm not sure I have the most

20  knowledge, but I'm pretty familiar with the document or

21  the staffing questions, and I should be able to discuss

22  it today.

23  BY MS. COLBY:

24     Q.    Topic 2 is, "Any ADC policies and procedures

25  regarding specific types and quantities of healthcare

136

1   staff across the 10 facilities."

2              Are you prepared to testify regarding Topic 2?

3      A.    Yes.

4      Q.    And are you the person at Centurion with the

5   most knowledge concerning this topic?

6              MS. BARNES:  Form and foundation.

7              THE WITNESS:  Not sure if I'm the most

8   knowledgeable, but I'll do my best.

9              MS. BARNES:  And if you don't mind, Mikaela,

10  can he just refer back to his answer?

11             MS. COLBY:  Yes.

12             MS. BARNES:  So just refer back to that answer

13  for each one, unless it's different.

14             THE WITNESS:  Okay.

15  BY MS. COLBY:

16     Q.    Topic 3 is, "Any ADC policies and procedures

17  with respect to healthcare staffing levels across the 10

18  facilities."

19             Are you prepared to testify regarding Topic 3?

20     A.    I refer to my previous answer.

21             MS. BARNES:  You can say you are prepared to

22  testify, but if she asks you if you are the person most

23  knowledgeable --

24             THE WITNESS:  Okay.  All right.

25             So yes.

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

137

1  BY MS. COLBY:

2       Q.    And are you the person at Centurion with the

3  most knowledge concerning this topic?

4            MS. BARNES:  Same objections.

5            THE WITNESS:  Previous response.

6  BY MS. COLBY:

7       Q.    Topic 4 is, "All policies and procedures and

8  community healthcare standards and specific types of

9  quantities of healthcare staff across the 10 facilities."

10           Are you prepared to testify regarding Topic 4?

11      A.    Yes.

12      Q.    And are you the person at Centurion with the

13  most knowledge concerning this topic?

14           MS. BARNES:  Same objections.

15           THE WITNESS:  Previous response.

16  BY MS. COLBY:

17      Q.    Topic 5 is, "How policies and procedures and

18  community healthcare standards impact the levels of

19  healthcare staff across the 10 facilities."

20           Are you prepared to testify regarding Topic 5?

21      A.    Yes.

22      Q.    And are you the person at Centurion with the

23  most knowledge concerning this topic?

24           MS. BARNES:  Same objections.

25           THE WITNESS:  Previous response.

138

1   BY MS. COLBY:

2        Q.     Topic 6 is, "How demands for specific types of

3   healthcare services are determined based on incarcerated

4   persons, clinical demographic, security characteristics."

5              Are you prepared to testify regarding Topic 6?

6        A.     Yes.

7        Q.     And are you the person at Centurion with the

8   most knowledge concerning this topic?

9              MS. BARNES:   Same objections.

10             THE WITNESS:   Previous answer.

11  BY MS. COLBY:

12       Q.     Topic 7 is, "Policies and procedures related to

13  the recruitment and retention of healthcare staff across

14  the 10 facilities."

15             Are you prepared to testify regarding Topic 7?

16       A.     Yes, I am.

17       Q.     Are you the person at Centurion with the most

18  knowledge concerning this topic?

19             MS. BARNES:   Same objections.

20             THE WITNESS:   Previous response.

21  BY MS. COLBY:

22       Q.     Topic 8 is, "The type of licensure requirement

23  for each classification of healthcare staff."

24             Are you prepared to testify regarding Topic 8?

25       A.     Yes, I am.

139

1      Q.      And are you the person at Centurion with the

2   most knowledge concerning this topic?

3              MS. BARNES:  Same objections.

4              THE WITNESS:  Previous answer.

5   BY MS. COLBY:

6      Q.      Topic 9 is, "The average number of holidays and

7   paid leave available for each healthcare staff member."

8              Are you prepared to testify regarding Topic 9?

9      A.      Yes.

10     Q.      And are you the person at Centurion with the

11  most knowledge concerning this topic?

12     A.      Previous answer.

13             MS. BARNES:  Same objection to that last

14  question.  I apologize.

15  BY MS. COLBY:

16     Q.      And last topic, Topic 10 is, "The inputs of

17  healthcare staffing schedules, such as the inclusion of

18  paid or unpaid leave."

19             Are you prepared to testify regarding Topic 10?

20     A.      Yes.

21     Q.      And are you the person at Centurion with the

22  most knowledge concerning this topic?

23             MS. BARNES:  Same objections.

24             THE WITNESS:  Same response.

25  BY MS. COLBY:

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

145

1        Q.      Okay.  Do you participate in the development of

2    any Centurion policies and procedures?

3              MS. BARNES:  Form.

4              THE WITNESS:  Not -- not for Centurion, but you

5    know, we do work with the DOC on the MSTM, which is our

6    policy and procedure manual in Arizona.

7    BY MS. COLBY:

8        Q.      Does your position involve staff recruitment?

9        A.      Yes.  I work with the corporate recruiting

10   department with that function.

11       Q.      And is your job limited to the Arizona State

12   Prison Medical Services Contract?

13       A.      Yes.

14       Q.      So ADC has contracted with Centurion to provide

15   healthcare services to its 10 state prison complexes.

16   Correct?

17       A.      Yes.

18       Q.      And, generally, what is the interplay between

19   Centurion and ADC in determining staffing?

20              MS. BARNES:  Form, foundation.

21              MR. BOJANOWSKI:  Join.

22              THE WITNESS:  Would you mind repeating that

23   question?  I apologize.

24   BY MS. COLBY:

25       Q.      Uh-huh.  What is the interplay between

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

146

1   Centurion and ADC in determining staffing?   So, in other

2   words, how do Centurion and ADC work together to

3   determine staffing levels?

4                 MS. BARNES:   Same objections.

5                 Go ahead.

6                 THE WITNESS:   The staffing levels were

7   determined in the RFP in 2019 that we agreed to, to be a

8   part of the -- participate in that RFP process.

9   BY MS. COLBY:

10       Q.     And the RFP you're referring to is the request

11   for proposal that ADC put out to different healthcare

12   vendors.   Correct?

13                 MS. BARNES:   Form and foundation.

14                 THE WITNESS:   Yes, that's correct.

15   BY MS. COLBY:

16       Q.     And how did Centurion secure the contract with

17   ADC?

18                 MS. BARNES:   Form and foundation.

19                 THE WITNESS:   That was before I was hired.   I

20   came on after that was completed, all the negotiations,

21   and that process to secure the contract.   So I don't have

22   any knowledge of that.

23   BY MS. COLBY:

24       Q.     So you don't know anything about the bidding

25   process?

1   then based on different demands or the changes in

2   admission at the facilities, we will flex our staffing to

3   support operations.

4       Q.    Do you mean hiring additional above the

5   contract?  What are you referring to?

6       A.    Yes, a couple of things, we hire above the

7   contract and we (inaudible) --

8            THE REPORTER:  I'm sorry, could you repeat

9   that.  Your audio cut out on my end.

10           THE WITNESS:  Sure.

11           Do you mind repeating the question, Mikaela, so

12  we get a good connection.

13  BY MS. COLBY:

14      Q.    Absolutely.

15           So when -- do you ever hire above the contract?

16      A.    Yes.

17      Q.    And when do you do that?

18      A.    Please ask that again.  I missed that first

19  part.

20      Q.    When do you hire above the contract?  When does

21  Centurion decide to do so?

22      A.    Whenever we identify -- whenever we identify

23  any demands or needs based on volume or community level,

24  we'll adjust our staffing to meet those demands.

25      Q.    Does Centurion need ADC's approval to hire

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) - Vol. II - 10/19/2021

149

1   above the contract?

2        A.      They do not.

3        Q.      Does Centurion discuss hiring above the

4   contract with ADC?

5        A.      Yes, we have.

6        Q.      Do you always do so?

7        A.      I don't know if we always do so, but we've had

8   conversations regarding the staffing levels over the last

9   two years.

10       Q.      Does ADC have a healthcare staffing model?

11              MS. BARNES:   Form and foundation.

12              MR. BOJANOWSKI:   Join.

13              THE WITNESS:   I'm not sure I would say it's a

14  staffing model, but there was a staffing matrix that was

15  included in the RFP in 2019.

16  BY MS. COLBY:

17       Q.      Does Centurion have a healthcare staffing model

18  aside from the matrix?

19              MS. BARNES:   Form.

20              THE WITNESS:   We do not have a template

21  staffing model.

22  BY MS. COLBY:

23       Q.      How does Centurion decide how many healthcare

24  staff to hire?

25       A.      There's lots of variables that go into that

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

150

1    process.  We've initially worked off the staffing matrix

2    that was in the RFP, but if we identify additional needs

3    that require additional staff, we'll make the adjustments

4    in order to satisfy those needs.

5        Q.    What factors are considered in that process?

6        A.    Acuity level, mission of the facility, it could

7    be an intake facility.  They could have an infirmary.

8    They could have a large mental health component to that

9    facility.  And also, there's logistical elements that we

10   have to consider when we're adjusting to meet the demands

11   of the -- of our patients' needs.

12       Q.    Who is involved in that process?

13       A.    Typically, it's the regional leadership, as

14   needed, depending on the different staff type.  And then

15   the site-level leadership will be involved as well.

16       Q.    And so you say you make these decisions when

17   you're adjusting, how often does Centurion decide to

18   adjust staffing levels?

19       A.    It's -- it happens in real-time, so as we

20   identify -- again, as we identified needs of the facility

21   that something's changed or if we had to provide

22   additional services, we'll make the adjustment on the

23   fly.  And I think that's it.

24       Q.    Does Centurion have a process for allocating

25   staff to the individual facilities?

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

151

```
 1              MS. BARNES:   Form.

 2              THE WITNESS:   We've allocated our staff based

 3    on the staffing matrix and the RFP.

 4              MS. COLBY:   I am going to mark this as

 5    Exhibit 4.   This is a new exhibit.   And it is Bates

 6    stamped 002213.

 7              (Marked for identification Exhibit 4.)

 8    BY MS. COLBY:

 9        Q.    Do you recognize this document?

10        A.    Yes, I do.

11        Q.    And what is this?

12        A.    It appears to be Centurion's response to the

13    ADC's request for proposal.

14        Q.    And I'm going to show you here page 477, Bates

15    stamped 002680.   You can go ahead and read what's in this

16    gray box, and let me know when you're finished.

17        A.    Yes, I'm finished.

18        Q.    So it says, "The contractor shall employ

19    sufficient staffing."

20              What do you take "sufficient staffing" to mean?

21              MS. BARNES:   Form and foundation.

22              MR. BOJANOWSKI:   Join.

23              THE WITNESS:   Well, I'd have to believe they're

24    referring to the staffing matrix.

25    BY MS. COLBY:
```

1   BY MS. COLBY:

2       Q.    And what do you mean by "what we're seeing"?

3             MS. BARNES:  What do you mean by what?

4   BY MS. COLBY:

5       Q.    What we're seeing.

6       A.    An operations -- in our daily operations, if we

7   see that there's additional needs to support or to

8   provide patient care to our patients, then we'll hire

9   above contract.

10      Q.    What influence does ADC have as to whether

11  these numbers change?

12      A.    I'm sorry, could you reask that?  I'm not sure

13  what numbers you're referring to.

14      Q.    What influence does ADC have over whether the

15  contract FTE numbers change?

16            MS. BARNES:  Form.

17            MR. BOJANOWSKI:  Join.

18            THE WITNESS:  I would assume they have total

19  control over the contracted FTEs.  We, as a company,

20  could offer a proposal, but they have to accept it and

21  both parties have to agree to amend the contract in order

22  to change the FTEs.

23            MS. COLBY:  I'm going to mark this as a new

24  exhibit, Exhibit 8.  And it is Bates stamped 002187.

25            (Marked for identification Exhibit 8.)

166

1   BY MS. COLBY:

2       Q.    Do you recognize this?  It's titled "Contract

3   Change Order/Amendment"?

4       A.    Yes, I recognize this form.

5       Q.    And what is this document?

6       A.    It would be a contract change order/amendment

7   document.

8       Q.    And here in number 4, it says, "The total

9   staffing plan count is revised from 1046.75 to 1052.75,

10  as stipulated in staffing comparison Attachment A of this

11  amendment and in accordance with Exhibit 24 Revision

12  Staffing Plan."

13           Is this the document that you were referring to

14  earlier?

15      A.    Yes.

16      Q.    And do you know why they decided to increase

17  healthcare staffing in this amendment?

18      A.    I believe the staffing matrix that was in the

19  RFP, the 1046.75 was potentially an older staffing

20  matrix.  And the current one that was in place was the

21  1052.75 staffing matrix.

22      Q.    Do you know who was involved in the decision to

23  increase it to 1052.75?

24      A.    I'm not sure who at the DOC or who had input

25  into that number.  I'm --

30(b)(6) Centurion of Arizona, LLC,(Antonio Carr, M.D. and Thomas R. Dolan) -
Vol. II - 10/19/2021

167

1      Q.     Do you know if Centurion was involved?

2      A.     We were not involved in determining that

3  number.  That number was already identified by the ADC,

4  and the amendment was to accurately reflect what current

5  staffing matrix they were using at that time.

6      Q.     Did Centurion do some kind of independent

7  evaluation to determine if that number was sufficient?

8      A.     Yes.

9      Q.     And what was -- how did that process work?

10     A.     We looked at the current staffing overages.  We

11  looked at the current needs.  We worked with the sites to

12  identify what additional positions they need in order to

13  comply with the contract and to provide services to meet

14  the performance measures.  And we created a proposal that

15  was submitted to the ADC, but nothing -- nothing

16  materialized out of it.

17     Q.     What do you mean nothing materialized out of

18  it?

19     A.     The DOC was not open to amending the contract

20  to add additional FTEs.

21     Q.     So to be clear, are you saying Centurion

22  suggested hiring above 1052.75, and that that was not

23  accepted, that proposal?

24            MR. BOJANOWSKI:  Form.

25            THE WITNESS:  We do not propose to the DOC to

168

1    hire above.   We proposed the DOC to amend the staffing

2    matrix.

3    BY MS. COLBY:

4        Q.      To be above 1052.75?

5        A.      Yes.

6        Q.      And that was at this time, around August 2019?

7        A.      It was in -- probably the third or fourth

8    quarter of 2019, if I remember correctly.

9        Q.      Do you know why they rejected that proposal?

10              MR. BOJANOWSKI:   Form.

11              MS. BARNES:   Form and foundation.

12              THE WITNESS:   I wouldn't have an idea why it

13   was rejected.

14   BY MS. COLBY:

15       Q.      Okay.  So we're going to talk about what goes

16   into allocating staff at each location.  Does the level

17   of care required by inmates impact staffing allocations

18   at each facility?

19       A.      Yes, it does.

20       Q.      Does it impact the number -- the licensure

21   level of the staff?

22       A.      Potentially.

23       Q.      How so?

24       A.      If, for example, if we have a higher acuity

25   patient that requires infirmary care and they're admitted

214

1                     SIGNATURE PAGE

2

3          I, ANTONIO CARR, M.D., a 30(b)(6) deponent,
   exercising my right to read and sign my deposition taken
4  on October 19, 2021, place my signature hereon and make
   the following changes on this _____day
5  of_____, 2021.

6          (IF THERE ARE NO CHANGES, WRITE "NONE.")

7

8                     _____
                      ANTONIO CARR, M.D.

9

10   PAGE      LINE      READS        CHANGE TO        REASON

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25   _____     _____     _____

215

1                          SIGNATURE PAGE

2

3          I, THOMAS RUSSELL DOLAN, a 30(b)(6) deponent,
   exercising my right to read and sign my deposition taken
4  on October 19, 2021, place my signature hereon and make
   the following changes on this _____day
5  of_____, 2021.

6          (IF THERE ARE NO CHANGES, WRITE "NONE.")

7

8                          _____
                           THOMAS RUSSELL DOLAN

9

10  PAGE      LINE      READS        CHANGE TO        REASON

11  _____     _____     _____

12  _____     _____     _____

13  _____     _____     _____

14  _____     _____     _____

15  _____     _____     _____

16  _____     _____     _____

17  _____     _____     _____

18  _____     _____     _____

19  _____     _____     _____

20  _____     _____     _____

21  _____     _____     _____

22  _____     _____     _____

23  _____     _____     _____

24  _____     _____     _____

25  _____     _____     _____

216

1   STATE OF ARIZONA    )
    COUNTY OF MARICOPA  )

2

3           BE IT KNOWN that the foregoing proceedings
  were taken before me; that the witness before testifying
  was duly sworn by me to testify to the whole truth; that

4   the foregoing pages are a full, true, and accurate record
  of the proceedings all done to the best of my skill and

5   ability; that the proceedings were taken down by me in
  shorthand and thereafter reduced to print under my

6   direction.

7       [X] Review and signature was requested.

8       [ ] Review and signature was waived.

9       [ ] Review and signature not required.

10        I FURTHER CERTIFY that I have complied with
  the ethical obligations set forth in the ACJA 7-206(F)(3)

11  and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
  Arizona, this 1st day of November, 2021.

12

13

14

15     _____
      ROBIN L. B. OSTERODE, RPR

16       CA CSR No. 7750
      AZ CR No. 50695

17

18       *   *   *   *   *
       I CERTIFY that Glennie Reporting Services,

19  LLC, has complied with the ethical obligations set forth
  in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23   _____

24   GLENNIE REPORTING SERVICES, LLC
  Registered Reporting Firm

25   Arizona RRF No. R1035

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA


| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>              Plaintiffs,<br>     vs.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities,<br><br>              Defendants. | No.<br>CV 12-00601-PHX-ROS |


DEPOSITION OF ANTHONY R. COLEMAN
(via videoconference)

October 14, 2021
9:01 a.m.
Chandler, Arizona




Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

602.266.6535                    Prepared by:
www.glennie-reporting.com       Jennifer Honn, RPR
                                Arizona CR No. 50885

2

1                             I N D E X

2    WITNESS                                              PAGE

3    ANTHONY R. COLEMAN

4         Examination by Ms. Abela                          5

5

6

7

8                        INDEX TO EXHIBITS

9    Description                                          Page

10   Exhibit 1     Curriculum Vitae                        11
                   Anthony R. Coleman
11                 (6 pages)

12   Exhibit 2     Daily Post Sheet                        60
                   ACDRR00098817 -98818
13

14   Exhibit 3     Daily Post Sheet                        73
                   ADCRR00098815 -98816

15   Exhibit 4     Complex Priority Posting Chart          79
                   ADCRR00098841 -98844
16

17   Exhibit 5     Weekly CO Status/Hiring Report          93
                   8/23/2021
                   ADCRR00056115 -56119
18

19   Exhibit 6     Institutional File Side 1              117
                   ADCRR00163356 -163361

20   Exhibit 7     Institutional File Side 2              123
                   ADCRR00163362 -163375
21

22   Exhibit 8     https://inmatedatasearch.             138
                   azcorrections.gov/PrintInmate.
23                 aspx?ID=334615
                   (2 pages)

24   Exhibit 9     Institutional File Side 2              154
                   ADCRR00161663 -161727
25

3

1                          INDEX TO EXHIBITS

2    Description                                        Page

3    Exhibit 10   *Attention All* bulletin                167
                 ADCRR00158448

4                          *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          DEPOSITION OF ANTHONY R. COLEMAN
                  (via videoconference)
2

3          The deposition of ANTHONY R. COLEMAN was taken

4    on October 14, 2021, commencing at 9:01 a.m., via

5    videoconference, the witness appearing at the law offices

6    of STRUCK LOVE BOJANOWSKI & ACEDO, PLC, 3100 West Ray

7    Road, Suite 300, Chandler, Arizona, before JENNIFER HONN,

8    a Certified Reporter, Certificate No. 50885, for the

9    State of Arizona.

10

11   APPEARANCES:

12   For Plaintiffs:

13        ACLU NATIONAL PRISON PROJECT
          Maria V. Morris, Esq.
14        915 15th Street N.W., 7th Floor
          Washington, D.C. 20005
15        Mmorris@aclu.org

16        ARIZONA CENTER FOR DISABILITY LAW
          Maya Abela, Esq.
17        177 North Church Avenue
          Suite 800
18        Tucson, Arizona 85701
          Mabela@azdisabilitylaw.org
19
     For Defendant:
20
          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
21        Rachel Love, Esq.
          3100 West Ray Road
22        Suite 300
          Chandler, Arizona 85226
23        rlove@strucklove.com

24

25

9

 1   today?

 2        A.   No.

 3        Q.   Are there any other reasons that you are unable

 4   to give your full and accurate testimony today?

 5        A.   No.

 6        Q.   As there is a lot of specialized areas, there is

 7   some, you know, unique terminology in this case.  I'm

 8   going to use some terms today that I thought it might

 9   kind of make sense to agree to from the top.

10            If I use the term "ADCRR," do you understand

11   that to mean the Arizona Department of Corrections

12   Rehabilitation and Reentry?

13        A.   Yes.

14        Q.   Okay.  And if I use the term "maximum custody"

15   (sic), can we agree that means maximum custody?

16        A.   Yes.

17        Q.   Okay.  And if I use the term "SMI," do you

18   understand that I mean serious mental illness or

19   seriously mentally ill?

20        A.   Yes.

21        Q.   And if I use the term "rec" as a shorthand for

22   recreation, do you understand that?

23        A.   Yes.

24        Q.   Great.  So where do you work?

25        A.   I work at the Lewis Prison Complex.  I'm the

Anthony R. Coleman - 10/14/2021

10

1    deputy warden at the Rast Unit.

2        Q.    Okay.   You mentioned you're a deputy warden at

3    Rast.   How long have you held that position?

4        A.    36 months.

5        Q.    36 months.   Okay.   And what are your job

6    responsibilities as deputy warden at the Rast unit?

7        A.    To oversee and ensure that the inmates are safe,

8    staff are safe, and the running of security operations.

9    Also I advise the warden of anything that's going on at

10   Rast.

11       Q.    Okay.   Any other specific duties that you do as

12   deputy warden?

13       A.    Wow, a lot.   I'm responsible for the overall

14   operation of the unit.

15       Q.    Okay.   And do you report to the warden?

16       A.    Yes.   I report to the warden.

17       Q.    Do you report to anybody else?

18       A.    The warden.

19       Q.    Just the warden of the Lewis complex?

20       A.    In the chain of command, I report to the warden

21   of the Lewis complex.

22       Q.    And who reports to you as deputy warden?

23       A.    My associate deputy warden, my captains.   Those

24   are my direct reports.   And my CO-4s, those are my direct

25   reports.

12

1    Q.   All right.  I just wanted to point out, we did

2  redact at the very top on the first page of the header

3  your home address, telephone number, and private e-mails

4  from the top of the document to protect your privacy.

5         Other than those redactions, is this a document

6  that you wrote?

7    A.   Yes.

8    Q.   And I can scroll through if that's needed.

9  Looks like that last page is blank.  Is this your

10  complete resume?

11    A.   Yes.

12    Q.   Okay.  And does the information that's within

13  the resume document accurately reflect your work history

14  and educational experience to date?

15    A.   Yes.

16    Q.   Do you have anything that you would add or

17  change to this document to make it current?

18    A.   No.  I'm still at Rast.

19    Q.   Okay.  I'm going to go ahead and get into a

20  couple questions about Rast and the unit operations

21  there.

22         Where are the locations in Lewis Rast where

23  people might stay in their cells for 22 or more hours per

24  day?

25    A.   Probably the watch pod.

13

1      Q.    Okay.  Is that the mental health watch?

2      A.    Yes.

3      Q.    Okay.  Are there any other locations where

4   somebody might stay in their cell for 22 or more hours

5   per day?

6      A.    In basic, give them showers, make sure you give

7   them rec, make sure you give them medical attention.  So

8   not that I can think of right now for 22 a day.

9      Q.    Do you have maximum custody inmates at Rast?

10     A.    Yes, we do.

11     Q.    Okay.  What kinds of maximum custody inmates do

12  you have there at Rast?

13     A.    Could you clarify "what kind"?  I don't

14  understand what you're asking.

15     Q.    Are there any specialty populations that you

16  have at Rast?

17     A.    We have SMI inmates.  We have -- I don't know

18  the correct -- now I can't even think of it.  Protective

19  custody inmates.  Yeah.  I mean, those are the two

20  categories for maximum custody.  It's broken down into

21  GP, which we don't have.  We have protective custody and

22  some of those inmates are SMI.

23     Q.    Okay.  So you just mentioned there are no, what

24  we would call, general population maximum custody housed

25  at Rast; is that correct?

Anthony R. Coleman - 10/14/2021

14

1     A.    Right.

2     Q.    Okay.  So they're all either under protective

3   custody or you mentioned SMI as another category?

4     A.    Well, they're all protective custody.

5     Q.    Everybody housed at Rast in maximum custody is

6   under protective custody?

7     A.    Yes.

8     Q.    Okay.  Is there a particular custody location

9   code or CURLOC (phonetic) that corresponds with that

10   designation, somebody being under maximum custody and

11   protective custody?

12     A.    Could you repeat the question?  I don't

13   understand it.

14     Q.    Sure.  Is there a corresponding custody location

15   code?  I've seen like L-21, for example, or L-39?

16     A.    That's max custody.

17     Q.    Okay.  So is there a particular code like that

18   that applies to people who are in maximum custody under

19   protective custody?

20     A.    Well, all of it is protected custody in that

21   Lewis is -- Rast is protective custody.  Maximum inmates.

22   So that would be L-21.

23     Q.    L-21?

24     A.    That's the location code.

25     Q.    Got it.  And do you also have inmates that are

Anthony R. Coleman - 10/14/2021

15

1   in detention at Rast?

2       A.    Not anymore.

3       Q.    You have no detention units at Rast?

4       A.    No.  We had at one time Morey and Bachman, but

5   they are no longer there.  They are back, because their

6   detentions were under construction.  We held their

7   inmates till the construction was complete.

8       Q.    And when did the Morey and Bachman detention

9   move back to their respective units?

10      A.    Yesterday -- I'm sorry.  I correct.  Bachman is

11  still there.  The Morey inmates are gone.  I apologize.

12  Bachman is still there.

13      Q.    Okay.  So at Rast, as of today, there are people

14  who are in Bachman detention?

15      A.    Bachman detention is on the blue yard of Rast.

16      Q.    Okay.

17      A.    Housing Unit 1.

18      Q.    Other than the Bachman detention incarcerated

19  people in the blue yard at Rast, are there any other

20  detention inmates at Rast?

21      A.    No.

22      Q.    Do you have any people under close management at

23  Rast?

24      A.    How many?

25      Q.    I said, "Do you have any people under close

1    management at Rast"?

2       A.    Yes, we do.

3       Q.    Okay.  And you mentioned that there are people

4    on mental health watch at Rast as well; right?

5       A.    Yes.

6       Q.    There aren't currently any STG enhanced

7    management or restricted status housing program units at

8    Rast, are there?

9       A.    We don't have enhanced management at Rast.

10      Q.    Do you have any STG units at Rast?

11      A.    No.  When they're coming to Rast, they -- well,

12   yes.  We would have them if they're stepping down and

13   trying to come to close.

14      Q.    Do you have any units at Rast that are managed

15   like an STG unit?

16      A.    No.

17             MS. LOVE:  Object to form and foundation.

18      Q.    (By Ms. Abela) I'm sorry.  Could you repeat your

19   answer?

20      A.    "No."

21      Q.    Okay.  Do you have any restricted status housing

22   programs at Rast?

23      A.    No.

24      Q.    Was there ever a restricted status housing

25   program at Rast?

Anthony R. Coleman - 10/14/2021

17

1     A.    Not since I've been there.

2     Q.    Okay.  All right.  So what areas at Lewis Rast

3  hold people who are in maximum custody, protective

4  custody?

5     A.    What do you mean what areas?

6     Q.    A building, a housing unit.

7     A.    We have inmates in Rast max that are PC inmates.

8  We have them in the 300 corridor.  We have them in the

9  400 corridor.

10    Q.    And are those particular housing units in the

11 300 and 400 corridor where they're housed?

12    A.    Well, when we say housing units, are you talking

13 about -- you're not talking about the blue side.  You're

14 talking about the max side; right?

15    Q.    I'm talking people who are in maximum custody

16 and protective custody, yes.

17    A.    Okay.  So there are pods.  We have pods in the

18 4 corridor and the 3 corridor -- 300 corridor, 400

19 corridor.

20    Q.    Which pods in the 300 corridor house people in

21 maximum custody, protective custody?

22    A.    All of them.

23    Q.    So the entire 300 corridor is assigned for that

24 population?

25    A.    Max custody, yes.

19

1    to really think about that.  I'm sorry.  Take that back.

2    There's 12.  There's 12 in A -- there's six in A and six

3    in B.

4         Q.   Okay.  So 12 pods --

5         A.   18, because there's three control rooms.  Okay.

6    So there's six to each one.  So, yes.

7         Q.   Okay.  I'm just going to summarize here.  In the

8    300 corridor, are there A, B, and C cluster?

9         A.   There's A, B clusters in the 300.  So that's six

10   pods each.  So that's -- I'm sorry.  And then you have

11   the 400 cluster.  There's six pods.

12        Q.   Okay.  But just focusing on the 300 cluster --

13        A.   There's 12.  Now that I think about it, there's

14   12.  12 pods.

15        Q.   Okay.  So the 300 cluster has 12 pods?

16        A.   Yes.

17        Q.   How many pods does the 400 corridor have?

18        A.   Six.

19        Q.   And how many cells are in each pod?

20        A.   There are cells of 24.  And there's some cells

21   with 16.  And I don't know which one exactly they are.

22        Q.   Okay.  Are there any people that live in those

23   12 pods on the 300 corridor or those six pods on the 400

24   corridor that we were just talking about that are not

25   classified as maximum custody?

Anthony R. Coleman - 10/14/2021

20

1     A.    No.

2     Q.    Okay.  And has Rast always housed people in max

3  custody who are in protective custody?

4     A.    Max -- as far as since I've been there, Rast has

5  always been a PC unit.

6     Q.    So for the last, I think you mentioned,

7  36 months?

8     A.    Almost three years.

9     Q.    Okay.  When a person is declassified from max

10  custody, how quickly are they moved out of max custody?

11            MS. LOVE:  Object to form.

12            Go ahead.

13            THE WITNESS:  When you say -- are they

14  stepping down?  Are they getting stepped down to close;

15  is that what you're asking?

16     Q.    (By Ms. Abela) Correct.

17     A.    If there's a bed available, as soon as possible.

18  But to give you a standard to say it's this amount of

19  time, I can't.  It depends on availability of the bed in

20  close.

21     Q.    Okay.  Do you know how long it's taken somebody

22  to move from max to close after they've been reclassified

23  as a close custody?

24     A.    It depends on the availability of the bed.  It

25  could -- sometimes it's a day.  We have a waiting list.

Anthony R. Coleman - 10/14/2021

21

 1    Sometimes it's a day.  Sometimes it's longer.  But right

 2    now with our close custody being down for construction

 3    and we're holding the detention right now, we don't have

 4    anybody in there.

 5        Q.    Okay.  So today if somebody were to be

 6    reclassified to close custody, there wouldn't be a bed

 7    for them in close custody for them to move to?

 8        A.    At Rast, no.

 9        Q.    Would there be --

10        A.    Go ahead.  I'm sorry.

11        Q.    I'm sorry.  I was going to ask if there would be

12    a bed in other units?

13        A.    Yes.  If it's available, availability of beds.

14    And there's a list.

15        Q.    Do you know how many people are on the waitlist

16    right now?

17        A.    No, I don't.

18        Q.    Do you have an estimate?

19        A.    No, I don't.

20        Q.    What is your current population of people in max

21    custody at Rast?

22        A.    At max custody today, I couldn't tell you

23    because I don't have the chart sheet with me.

24        Q.    Do you know what it was yesterday?

25        A.    Yesterday I had a total of 539 -- -34 inmates,

Anthony R. Coleman - 10/14/2021

22

1  minus 80 and 76, which are detention or was detention.

2  And that's the answer.  153 from 534.  And that's --

3      Q.    Okay.  So it's a matter of subtraction here.

4  You mentioned that there were 80 people in detention

5  yesterday.  Is that what I heard?

6      A.    Yes.

7      Q.    Okay.  And what was the other number that you

8  mentioned?

9      A.    73.

10      Q.    I'm sorry.  Could you say that one more time?

11      A.    73.

12      Q.    I'm losing that last number.

13      A.    7-3, 73.

14      Q.    And what does that 73 number refer to?

15      A.    That refers to the housing on the blue side.  So

16  in total, 153 yesterday on the blue side, minus -- so if

17  you took 534 minus 153, that would be my total for max

18  yesterday.

19      Q.    Okay.  And you used the term "blue side" a

20  couple times.  What does that refer to at Rast?

21      A.    The blue side is the close side.  We have a red

22  side, which is the max side.  The blue side is the close

23  side.  Rast houses max inmates and close inmates.

24      Q.    Okay.  What are the areas at Lewis Rast that

25  hold people who are in detention right now?

1       A.    Right now that would be Housing Unit 1.

2       Q.    Okay.  Is that on a particular corridor?

3       A.    No.  That's Housing Unit 1 on the blue side,

4  detention.

5       Q.    On the blue side, okay.  Are there any other

6  locations where people in detention are housed at Rast?

7       A.    No.

8       Q.    And are all the people in Housing Unit 1 on the

9  blue side the people from Bachman detention?

10      A.    At this time, yes.

11      Q.    Are there any people living in Housing Unit 1

12  who are not in detention?

13      A.    No.

14      Q.    Okay.  Where are the areas in Lewis that hold

15  people that are in close management?

16      A.    The close management inmates have been -- they

17  are held in Rast max.  I can't remember the locator code.

18  But they are in the 300 corridor.

19      Q.    Are they in a particular pod in the 300

20  corridor?

21      A.    Yes.  They are in a particular pod.

22      Q.    Okay.  Which pod is that?

23      A.    I do not remember at this time.

24      Q.    Are they in more than one pod?

25      A.    No.

1      Q.   So all of the close management inmates at

2  Lewis Rast are in one pod in the 300 corridor?

3      A.   Yes.

4      Q.   Is there -- remember when we were talking about

5  the L-21 code for max custody?

6      A.   Yes.

7      Q.   Is there a similar code for people that are in

8  close management?

9      A.   Yes.

10      Q.   Okay.  What is that code?

11      A.   I'm sorry, I have eight codes I have to

12  remember.  And I don't remember them all.  I can't tell

13  you honestly at this time.

14      Q.   You can't remember the code?

15      A.   No.  Let me see if I have -- no, I don't.

16  Normally I carry around -- I print it out every morning,

17  my census.  And I have everybody where they're supposed

18  to be.  But I'm not at work today.  So I didn't print one

19  out.

20      Q.   Okay.  Do you know the code for the people who

21  are in detention?

22      A.   The people that are in detention from Bachman?

23      Q.   Yes.

24      A.   That is L-62.

25      Q.   Is there a code that's assigned when people are

Anthony R. Coleman - 10/14/2021

25

1    on mental health watch?

2         A.   L-39.

3         Q.   All right.   And where in Rast are people held on

4    mental health watch?

5         A.   3 Abel 6.

6         Q.   Okay.   Is that one pod?

7         A.   Yes.

8         Q.   Other than 3 Abel 6, are there any other

9    locations where people are held in maximum custody -- I'm

10   sorry -- on mental health watch?

11        A.   No.

12        Q.   So you have one mental health watch pod?

13        A.   Yes.

14        Q.   Do you know how many people -- sort of, like,

15   what's the maximum capacity for 3 Abel 6?

16        A.   There's 24 cells.   The bottom ones are single.

17   The top ones are, I want to say, I believe, 18.

18        Q.   Okay.

19        A.   All cells are not double bed cells.

20        Q.   Okay.   Are there any people that are living in

21   3 Abel 6 that are not on mental health watch?

22        A.   Well, okay, to answer that question, let's say I

23   just was taken off my 30-minute watch and now I'm off of

24   watch.   Well, as soon as a bed comes available, I'll go

25   back to the unit where I came from.   Where I came from, I

26

1    would go back.

2            So that could take a day, that could take

3    minutes.  That could take hours.  So when an inmate comes

4    off of watch, they're removed from the watch pod as soon

5    as possible.

6        Q.    Okay.  So other than people who are currently on

7    watch or people that have been recently removed from

8    watch, are there any other people housed in 3 Abel 6 that

9    are not on mental health watch?

10       A.    No.

11       Q.    Are there any other kinds of watch other than

12   mental health watch?

13       A.    There's mental health watch and there's a

14   security watch.

15       Q.    Okay.  What does security watch mean?

16       A.    A security watch.  Let's say we have an inmate

17   that's disruptive, or let's say we had an inmate that we

18   found he was under the influence of drugs or something

19   like that.  He would go on like a security watch.

20            Mental health -- if they don't put him on a

21   mental health watch, they'll put him on a security watch

22   for at least 24 hours to be observed to make sure there's

23   no after effects of anything.

24            Or if an inmate is disruptive, he'll go on a

25   security watch.  And he's disruptive to the operation of

Anthony R. Coleman - 10/14/2021

27

1    the unit, he'll go on a security watch.  And you have a

2    defecation watch.  I'm sorry.  I forget about that one.

3        Q.    Could you explain what a defecation watch is?

4        A.    If an inmate -- if it is believed to be or

5    witnessed that an inmate swallowed something, that inmate

6    would be placed on a defecation watch.  Meaning that

7    inmate would spend 72 hours on a defecation watch, or he

8    has to have a minimum of three bowel movements, which the

9    bowel movements are inspected by staff.

10       Q.    Are security watches set forth in policy

11   anywhere?

12       A.    Security watches are authorized by the deputy

13   warden or designee.

14       Q.    Okay.  I'm going to go back to my question,

15   though.  Is it set forth in a written policy anywhere?

16       A.    I believe so.

17       Q.    Do you happen to know where?

18       A.    I would have to look it up.

19       Q.    And what about a defecation watch?  Is that set

20   forth in policy somewhere?

21       A.    Yes, it is.

22       Q.    Okay.  And do you know where?

23       A.    I would have to look it up.

24       Q.    About how long would you expect somebody to stay

25   on a security watch?

Anthony R. Coleman - 10/14/2021

28

1      A.    24 hours minimum.   Before they are taken off,
2   they have to be cleared by mental health.
3      Q.    Is there any maximum?
4      A.    No.   There's not a maximum.   For security watch,
5   it depends on the situation.   And if mental health does
6   not clear them, then mental health could turn it into a
7   mental health watch for any reason they find he shouldn't
8   be taken off.
9      Q.    Okay.   And you mentioned 72 hours for a
10  defecation watch.
11     A.    Yes.
12     Q.    Is that the minimum amount of time?
13     A.    72 hours is the maximum amount of time.
14     Q.    I wanted to go back, if we could, to the census
15  numbers that we were talking about.   I believe that you
16  said when we were talking about the total population,
17  that there were 73 people on the blue side yesterday; is
18  that right?
19     A.    There was -- I believe it was 73.
20     Q.    Okay.   And you had also said there were 80 in
21  detention yesterday; right?
22     A.    Yes.   According to the records, yeah.
23     Q.    Okay.   Are the people in detention not on the
24  blue side?
25     A.    Yes.   They are on the blue side.   You have

29

1  Bachman -- you have Bachman and Morey.  Morey was moved

2  yesterday.  But we do that count at four in the morning.

3  So when I got that count, they were still there.  But

4  they were moved starting at seven a.m. yesterday.  So

5  Morey is no longer there.  It's just Bachman.

6      Q.   Okay.  So the difference in -- I guess I'm

7  trying to understand who's counted in the 73 that you

8  mentioned on the blue side?

9      A.   The 73 was, we have L-61 and L-62.  L-61 is

10  Morey.  L-62 is Bachman.  So Morey inmates are no longer

11  there.  Bachman inmates are still there.

12      Q.   Okay.  And so was the 73 number both the L-61

13  Morey and L-62 Bachman people?

14      A.   Repeat your question.

15      Q.   Yeah.  Was the 73 that you mentioned that were

16  on the blue side as of yesterday, the L-61 Morey and the

17  L-62 Bachman?

18      A.   No.  One was Morey -- one number was Bachman.

19  One number was Morey.

20      Q.   Do you know which was which?

21      A.   No.  No, I couldn't say.  I don't remember.

22      Q.   Okay.  At Rast when people refuse their housing

23  assignment, where are they put?

24      A.   Refuse to house?

25      Q.   Is there a particular area at Rast where refuse

Anthony R. Coleman - 10/14/2021

30

1    to house people are put?

2         A.    Yes.

3         Q.    Okay.  Where is that?

4         A.    I would like to say -- I would like to say L-42.

5         Q.    Okay.  That's the locator code.  Is there a

6    location where people who are classified as refuse to

7    house are --

8         A.    Yes.  That would be in the 300 corridor.

9         Q.    So they are mixed in with people from maximum

10   custody, protective custody as well?

11        A.    They're all PC inmates.

12        Q.    Okay.  So you don't have anybody in refuse to

13   house that's not a PC inmate?

14        A.    No.

15        Q.    Are there particular pods in the 300 corridor

16   where people that are refuse to house are housed?

17        A.    Yes.  They're in the Baker side.

18        Q.    Any particular pods on the Baker side?

19        A.    I can't remember the pods.

20        Q.    But are there particular pods where they are

21   located?

22        A.    Yes.  Refuse to house, yes.

23        Q.    Do you know how many refuse to house pods you

24   have on the Baker side?

25        A.    I'll say one.  One.

Anthony R. Coleman - 10/14/2021

31

1    Q.   Are there any other areas other than that one

2  refuse to house pod on the Baker side where people in

3  refuse to house live at Rast?

4    A.   No.

5    Q.   Do you know the size of the cells at Rast?

6    A.   I want to say eight by ten.

7    Q.   Okay.   Would that apply to all of the cells?

8    A.   I can't -- I can't answer that, honestly.

9    Q.   What is a health and welfare check?

10   A.   A health and welfare -- health and welfare

11 check?

12   Q.   Correct.

13   A.   A health and welfare check is when the floor

14 officer, he walks the pod checking on the health and

15 welfare of the inmates.

16   Q.   Okay.   And how frequently are those checks

17 supposed to be performed at Rast?

18   A.   You also have a security watch -- I mean a

19 security walk that's also the same thing.   So they should

20 be happening 30 minutes, every 30 minutes to an hour.

21   Q.   Do you know if that 30 minutes to an hour time

22 frame is in policy anywhere?

23   A.   Yes.

24   Q.   Okay.   Do you know where it is?

25   A.   I would have to look it up.

32

1    Q.   Do you have an estimate, like, is it in a

2  department order, or where would you expect to find it?

3    A.   It would be in the post orders, specific post

4  orders for that post for the floor officer.

5    Q.   And for the time that you've been deputy warden

6  at Rast, has the frequency of health and welfare checks

7  always been 30 minutes to an hour?

8    A.   Yes.

9    Q.   And what would happen if -- I think you -- a

10  health and welfare check or a security walk, is that what

11  you called it?

12    A.   Okay.

13    Q.   Are there any other terms that are used to

14  describe that process?

15    A.   No.  That's -- you said it.  Health and welfare

16  check or security walk, security check.

17    Q.   Okay.  What would happen if a health and welfare

18  check would not -- withdrawn.

19        What happens if a health and welfare check is

20  not done every 30 minutes to an hour?

21    A.   We would address it with the officer to find out

22  why it wasn't done, and get with the officer and find out

23  why it wasn't done.

24    Q.   Would there be -- would you expect there to be

25  any discipline that would follow?

33

1      A.   Well, that depends on the situation.  Was there

2  an ICS that he or she were involved in?  Were they doing

3  an escort?  Were they doing showers?  Were they turning

4  out for rec, turning in for rec?  It's situational.

5      Q.   Sure.

6      A.   So we talk to the officer and get his or her

7  side and say, "Why wasn't this completed?"

8      Q.   Understood.  Is an officer supposed to take any

9  action when they anticipate that they are not going to be

10  able to do a security walk every 30 minutes to an hour?

11      A.   Yes.  They're expected to contact a floor

12  officer or a supervisor and explain to them, "I'm not

13  going to make my check.  I'm doing this, this, and this."

14  And someone will come do the check for them.  That's the

15  expectation.

16      Q.   If somebody failed to do that, would you

17  anticipate there would be discipline for that?

18      A.   It would be addressed.  And depending on the

19  outcome, what actions should or should not be taken,

20  again, would depend on the situation.

21      Q.   Okay.  So you just mentioned the situation of

22  incidents command system, or an ICS; right?

23      A.   Yes.

24      Q.   If that were to be called at Rast, who would --

25  who would be -- pardon me.  Who is supposed to respond to

34

1  an ICS?

2       A.   An ICS is supposed to, you have a -- you have an

3  A team and a B team.  The A team normally composed of

4  five people.  And they're told what their positions are

5  at the beginning of shift.  So if there were an ICS, they

6  don't necessarily have to respond, because, again, the

7  ICS is to gain resources.

8            And sometimes the officer doesn't need

9  resources.  Sometimes the officer just needs a

10  supervisor.  So if I activate an ICS, unless I have an

11  inmate who refuses directives, all I need is a

12  supervisor.  Then the only people who would show up would

13  probably be the supervisor.  All right?

14            Or I would say, "I need an A team response."

15  Then those people know they need to respond.

16       Q.   Okay.  You mentioned an A team and a B team for

17  ICS responses.  How many people are on the B team?

18       A.   Same.  Five.

19       Q.   And does the people assigned to respond to an

20  ICS change for every shift?

21       A.   Yes.

22       Q.   Are there any staff that are assigned just to

23  responding to ICS's?

24       A.   No.  No.

25       Q.   Okay.

Anthony R. Coleman - 10/14/2021

1     A.  Their whole existence just for that day to

2  respond to ICS?  Nothing else?  Is that what you're

3  asking?

4     Q.  Yes.

5     A.  No.  Every officer has a job and assignment.

6     Q.  Okay.  So in addition to being assigned to

7  respond to an ICS, they're also performing other duties;

8  correct?

9     A.  Yes.

10    Q.  Would it be possible for somebody who is, say,

11  assigned to respond to an ICS for their shift and an ICS

12  is called in Baker Pod 6, would it be possible for that

13  person to be outside monitoring recreation at the time

14  the ICS is called?

15    A.  No.  We have a rec team for that.

16    Q.  So what kinds of shifts -- I'm sorry.  What

17  kinds of posts are people also assigned when they're

18  assigned to an ICS team for a shift?

19    A.  You have your floor officers.  You have

20  supervisors.  You have escort officers.

21    Q.  Okay.  So would it be possible for an escort

22  officer to be assigned to respond to an ICS for that

23  shift and be escorting somebody to a medical appointment

24  at the time an ICS is called?

25    A.  Yeah.  It's possible.  It could happen.

36

1     Q.    Okay.   Would you expect them to respond to the
2     ICS or would somebody else be responding at that point?
3     A.    Well, if that officer is -- if him or her were
4     in the middle of an escort, more likely they would get
5     the inmate to the destination and then they would
6     respond.
7     Q.    Okay.   Is there any written policy that would
8     prevent people with serious medical illness from being
9     placed into max custody?
10    A.    Not that I know of.   That would prevent an SMI
11    inmate from being max custody?
12    Q.    Correct.
13    A.    Not that I know of, no.
14    Q.    Is there any written policy that prevents people
15    with SMI from being placed into detention?
16    A.    Could you repeat that question?
17    Q.    Yeah.   Is there any written policy that would
18    prevent people with SMI from being placed into detention?
19    A.    Not that I'm aware of.
20    Q.    Do you expect you would know if there were a
21    policy?
22    A.    If -- if there's a problem with an SMI inmate,
23    and I mean what reason would they be going to detention,
24    I would have to ask.   I don't understand.   I mean,
25    because if an inmate was SMI and they were being

Anthony R. Coleman - 10/14/2021

37

1  disruptive, they would be seen by mental health and

2  mental health may put them on a watch.  More than likely

3  they would.

4      Q.   Understood.  But I was asking about -- you had

5  mentioned several times that you -- that there are not

6  any written policies that you know of that apply in these

7  situations.  Would you expect that you know, you would

8  know if there were a policy?

9      A.   Yeah.  I think I would.  I mean you're saying

10 that an SMI inmate can never be placed in detention?  Is

11 that -- see, I'm sorry, I --

12     Q.   That's okay.  I'll repeat the question.

13     A.   Okay.

14     Q.   The question was, is there any written policy

15 that prevents people with SMI from being placed into

16 detention?

17     A.   Not that I'm aware of.

18     Q.   Is there any written policy that prevents people

19 with SMI from being placed into close management?

20     A.   No.

21     Q.   And is there any written policy that prevents

22 people with SMI from being placed into refuse to house?

23     A.   No.

24     Q.   Are there people -- I believe you mentioned this

25 earlier, but just to confirm.  Are there people with SMI

Anthony R. Coleman - 10/14/2021

38

1    in max custody at Rast?

2        A.   Yes.

3        Q.   How many people with SMI are housed at Rast

4    currently?

5        A.   I -- I couldn't tell you off the top of my head.

6    We have a lot of SMI inmates at Rast.

7        Q.   Okay.  Do you have an estimate for how many

8    people?

9        A.   I would probably say SMI, maybe -- at this time

10   maybe 13 or 15 or less.

11       Q.   I'm sorry, did you say 13 or 15 to less?

12       A.   I would say around 13 or less.  If (audio

13   distortion) up to 16.

14       Q.   So of your total several hundred people that

15   live in maximum custody at Rast, you think 13 to 16 may

16   be SMI?

17       A.   Yes.  You mean the total max?  Max?

18       Q.   Correct.

19       A.   Yeah.

20       Q.   I'm sorry.  Go ahead.

21       A.   Go ahead.  No, go ahead.

22       Q.   I was just going to ask, do you track how many

23   people with SMI are --

24       A.   Yes.

25       Q.   -- housed at Rast?

39

1    A.    Yes.

2    Q.    Okay.  How do you track that?

3    A.    Through our 812 inmates that are SMI, we have to

4    track them when they're out-of-cell time and in program

5    and stuff like that.

6    Q.    And you just mentioned A-12.  Is that a locator

7    code for people who are SMI?

8    A.    No.  That's a policy for Parsons versus Shinn,

9    and the book out-of-cell tracking sheets and all that

10   stuff.

11   Q.    I apologize.  I heard A-12, not 812.

12   A.    I'm sorry.  Okay.

13   Q.    Okay.  Is there a particular location where

14   people with serious mental illness in maximum custody are

15   held at Rast?

16   A.    Yes.  We recently moved them to -- it's in the

17   300 corridor.  And I can't remember the pod.

18   Q.    Okay.  Do you have more than one pod in the 300

19   corridor that houses people with SMI?

20   A.    No.  Right now just one.

21   Q.    Okay.  So one pod in the 300 corridor?

22   A.    Yes.

23   Q.    Do you have anybody in maximum custody at Rast

24   who's gone from a mental health watch directly back into

25   maximum custody?

Anthony R. Coleman - 10/14/2021

40

1       A.   Do I have anyone that's ever gone from mental
2  health watch back into maximum custody?
3       Q.   Correct.
4       A.   You take them off mental health watch and put
5  back in max custody population?
6       Q.   Correct.
7       A.   All the time.
8       Q.   Do you have an estimate for how many people are
9  in that situation right now?
10       A.   Can you clarify your question?  How many are --
11       Q.   Sure.  Do you have an estimate for how many
12  people have recently come from a mental health watch and
13  have been put back on max custody?
14       A.   Well, to be honest with you, we have inmates on
15  mental health watch that come from other units.  If an
16  inmate is placed on a mental health watch for -- from
17  another unit, they would come to -- if we have a bed,
18  they would come to Rast watch pod for a mental health
19  watch.
20            So sometimes they go back to their unit which
21  could be close, and sometimes it's max.  Or sometimes
22  it's -- if there's a mental health watch, PC, it could be
23  medium.
24       Q.   Do you have people that go to mental health
25  watch at Rast from any other classification levels other

41

1   than medium, close, or max?

2       A.   Yes.  We have close inmates that go to mental

3   health watch.  The mental health pod is for mental health

4   watches.

5       Q.   Okay.  Do you have anybody on mental health

6   watch at Rast other than people who are from close, max,

7   or medium custody?

8       A.   I can't -- I don't know the population today or

9   who's in there.  So I couldn't be honest, to honestly

10  answer that.

11      Q.   Would it be possible for that to occur?  Like,

12  does the mental health watch at Rast receive people from

13  lower custody levels?

14      A.   Yes.

15      Q.   Do you track people coming from mental health

16  watch back to maximum custody at Rast?

17              MS. LOVE:  Object to form and foundation.

18              THE WITNESS:  When you say do we track

19  people going back to max custody, we have paperwork.  And

20  when they come off watch, they go back to where they came

21  from.

22      Q.   (By Ms. Abela) Do you do anything to review the

23  paperwork after they get back to their maximum custody

24  housing location?

25              MS. LOVE:  Form.

42

1          THE WITNESS:  We review the paperwork, but

2   actually to come off watch is really mental health,

3   that's their call when an inmate comes off of watch.

4       Q.   (By Ms. Abela) Are there any procedures that are

5   taken when somebody returns to max custody after coming

6   off of the watch?

7               MS. LOVE:  Form.

8               THE WITNESS:  Can you elaborate on what you

9   mean by procedures?

10      Q.   (By Ms. Abela) I mean, are there any steps that

11  are taken particular to that person coming off of a

12  mental health watch after they return to their housing

13  location in max custody?

14      A.    None that I -- I don't know.  When mental health

15  says -- when they do their -- when they go through their

16  constant 10, 30 and then off, they tell us, "Hey, that

17  inmate is off of watch.  They can be returned to wherever

18  they came from."

19          We put in movement orders.  And we move the

20  inmate to where they're supposed to go.

21      Q.   So there aren't any particular precautions that

22  are taken by custody staff when somebody has recently

23  come back from mental health watch and has been returned

24  to their housing location; is that right?

25              MS. LOVE:  Form and foundation.

44

1    We'll get in touch with Buckley.  And we will get the

2    move orders done."  The inmate is then picked up by

3    transportation, taken back to Buckley.

4        Q.    (By Ms. Abela) If somebody came off watch and

5    went back to Rast, which is what I was asking about,

6    there's no other follow-up that's done by the security

7    side; is that right?

8        A.    The staff would get the move-in order, move the

9    inmate to a cell or back to his cell sometimes.  And

10   that's it.

11       Q.    Okay.  Are there people in max custody at Rast

12   who have kind of repeatedly gone back and forth between

13   max custody and mental health watch, back to max custody?

14       A.    Yes.  We call them frequent fliers.

15       Q.    Okay.  How many frequent fliers would you have

16   right now?

17       A.    Wow.  I couldn't give you a number.  Sometimes

18   we'll have inmates that cycle back and forth for a month,

19   for a week.  And we don't hear anything from them for a

20   month or weeks.  So I couldn't tell you.  We do what

21   we're supposed to do when we're supposed -- we try to do

22   what we're supposed to do when we're supposed to do it.

23       Q.    Do you think you have more than five people in

24   that situation right now?

25       A.    Yes.  Because we have inmates that really want

Anthony R. Coleman - 10/14/2021

46

1        A.   Yes, we do.

2        Q.   Okay.  How do you track it?

3        A.   We have a mental health meeting.  And we meet

4    with the mental health professionals.  And we have a list

5    of inmates that are on watch.  And we discuss each and

6    every one.

7        Q.   Okay.  Now, how often do you have those mental

8    health meetings?

9        A.   Weekly.

10       Q.   Do you usually participate in those?

11       A.   Yes.  Myself, my ADW, my CO-4s, mental health.

12       Q.   Do you discuss anything other than the list of

13   inmates on watch at that time?

14       A.   No.  Just the inmates on watch.  Why they're on

15   watch, what the expectation is on their future, what we

16   need to do, what their situations are, and how we can

17   best help them.

18       Q.   Are there people with SMI in detention at Rast?

19       A.   Are there people with SMI in detention at Rast?

20   There are people at Rast that are SMI, yes.

21       Q.   Are those people with SMI in detention?

22       A.   You mean on the blue side?  Are you talking

23   about Rast max?

24       Q.   Anywhere.

25       A.   Yes.  We have SMI inmates at Rast max.  But

Anthony R. Coleman - 10/14/2021

47

1   right now, we've been directed to put on that Rast max --

2   put the SMIs in the same area.

3       Q.   Okay.  Who directed you to do that?

4       A.   The warden and mental health.

5       Q.   And when was that direction given?

6       A.   Maybe two months ago, a month ago, two months

7   ago.  I don't know.

8       Q.   Do you know why that was directed?

9       A.   No.  No.

10      Q.   Okay.  Now, do you have people with SMI in

11  detention at Rast?

12      A.   Rast doesn't really have a detention.

13      Q.   Weren't you saying earlier that there are people

14  from Bachman detention currently housed at Rast?

15      A.   Yes, on the blue side.  That's why I kept asking

16  do you mean the blue side or the red side, the max side

17  or the close side?

18      Q.   Let's take them one at a time.

19      A.   Okay.

20      Q.   Do you have people with SMI in detention at the

21  blue side on Rast?

22      A.   I don't know, because that's being handled by

23  the Bachman staff.  We just manage the inmates there.

24  But they're managed by their staff and their

25  administration.  Even though they're at Rast, we respond

50

1    just my understanding when you kept saying "detention."

2    So you can't take a detention inmate.  If I was a close

3    inmate and I got disruptive and I messed up and got

4    re-classed to detention -- I mean re-classed to max, I

5    would go to max.  In the meantime, I would have to go to

6    detention and get held there until I went to max.

7         Q.   Other than a change in housing assignment, are

8    there any other changes to living conditions that go with

9    being in detention?

10        A.   Any other changes compared to --

11             MS. LOVE:  Object to form.  Are we talking

12   about max or are we talking about detention?  I think

13   that's where we're getting confused.

14        Q.   (By Ms. Abela) My question is:  Are there any

15   other changes that you would expect to somebody's

16   circumstances when they're in detention as opposed to any

17   prior housing assignment?

18             MS. LOVE:  Object to form.  Foundation.

19             THE WITNESS:  I'm really trying to

20   understand your question.  When you -- okay.  Repeat your

21   question, please.

22        Q.   (By Ms. Abela) Are there any other changes to

23   somebody's living circumstances that go along with being

24   in detention other than the change --

25        A.   I'm sorry.  Go ahead.

Anthony R. Coleman - 10/14/2021

51

1     Q.   -- other than the change in where they're
2  physically housed?
3              MS. LOVE:   Form.   Foundation.
4              THE WITNESS:   Yeah, there's certain things
5  that they won't be allowed to have while they're in
6  detention.
7     Q.   (By Ms. Abela) Okay.   Do you have -- what --
8  what sorts of things would a person in detention not be
9  allowed to have?
10    A.   A person in detention, they would not get a TV.
11 They would -- they would be fed the same.   They would
12 have the same laundry.   I mean, there are just certain
13 privileges that you wouldn't have.
14    Q.   Do you have anybody on the red side at Rast who
15 is SMI that is denied the privileges as they would be if
16 they were in detention?
17             MS. LOVE:   Form and foundation.
18             THE WITNESS:   Okay.   Do I have anybody on
19 the red side at max that we're treating like they're in
20 detention?
21    Q.   (By Ms. Abela) Correct.
22    A.   Is that what you meant?   No.   Refuse to house,
23 refuse to house inmates.   They don't get certain things
24 that a regular inmate on max would get.   Am I answering
25 you?

Anthony R. Coleman - 10/14/2021

52

1    Q.   Yeah, I think so.  Do you have any people who
2  are SMI that are refuse to house right now?
3    A.   I don't know.  I do know we have SMI inmates in
4  different -- I can't tell you for sure if there's someone
5  who is refuse to house with SMI.
6    Q.   Okay.
7    A.   It's a good possibility, but I can't tell you
8  for sure.
9    Q.   Okay.  Do you know if there are people with SMI
10  in close management at Rast?
11    A.   There could be.  There's a good possibility.
12  And the reason I don't want to say there is right now
13  because I don't have (audio distortion).
14    Q.   Okay.
15    A.   But there's a possibility an inmate with SMI can
16  be in close management.
17    Q.   Do you track that?
18    A.   Yes.  We track the SMI inmates in close
19  management.
20    Q.   Are there people at Rast in close management
21  who've gone between mental health watch and close
22  management?
23    A.   You mean are there inmates that are in close
24  management that have been on mental health watches?
25    Q.   Yes.

53

1     A.    Okay.  I mean, there probably has been, you

2  know, since the time I've been there, but I couldn't --

3  who they are and when it happened, I don't know.

4     Q.    Do you think you have anybody there that that

5  has happened to currently?

6     A.    That anybody has currently gone from close

7  management to mental health watch and back to close

8  management?

9     Q.    Correct.

10     A.    Yeah.

11     Q.    Do you know how many people would be in that

12  situation?

13     A.    I could not tell you that.

14     Q.    Okay.  Any estimate?

15     A.    No.  I don't want to -- I just don't want to

16  lie.

17     Q.    No, I understand.  Are there people on mental

18  health watch at Rast right now that have SMI?

19     A.    Are there inmates that are in the watch pod that

20  are SMI?  Is that what you're asking me?

21     Q.    Correct.

22     A.    Yes.  There are inmates in the watch pod

23  currently that are SMI.  How many, I do not know.

24     Q.    Do you have an estimate?

25     A.    No.  We have a list of -- we can look and see

Anthony R. Coleman - 10/14/2021

54

1    every morning who's in the watch pod.  That changes

2    daily.

3        Q.   And would that list also designate if the person

4    is SMI?

5        A.   Yes.

6        Q.   Are there people prescribed psychiatric

7    medications in max custody at Rast?

8            MS. LOVE:   Object to foundation and form.

9            THE WITNESS:   I believe so.

10       Q.   (By Ms. Abela) Do you have any estimate for how

11   many people are in that situation?

12       A.   You would have to talk to mental health because

13   we don't really track the medication.

14       Q.   Does mental health track that?

15       A.   Yes.

16       Q.   Do you know if there are any policies regarding

17   the temperature of units where people who are SMI are

18   housed?

19       A.   There's a policy for all inmates housed on the

20   temperatures.

21       Q.   Do you know what policy that is?

22       A.   It's in the 7 -- I want to say it's in the 700s.

23       Q.   Is that a direct order?

24       A.   It's a section, but I don't know specifically

25   which section.  I would have to look it up.

Anthony R. Coleman - 10/14/2021

55

1      Q.   Do you know if there's a section that applies to

2  people with SMI?

3      A.   You mean is there a policy specifically for SMI

4  and temperature checks in their living area?

5      Q.   Correct.

6      A.   That's for all inmates.

7      Q.   What about any particular policy regarding

8  temperature of units where people who are prescribed

9  psychiatric medications are housed?

10     A.   The temperature checks are for all -- it's not

11  just for the SMI population.  The temperature checks is

12  done for the whole population in their living areas.

13     Q.   At Rast, do most people have an electronic

14  tablet?

15     A.   Most, yes.

16     Q.   Okay.  Who would not have an electronic tablet?

17     A.   Refuse to house inmates and inmates in the watch

18  pod.

19     Q.   Anybody else?

20     A.   Not that I can think of.

21     Q.   Do people in detention have access to electronic

22  tablets?

23     A.   I don't know.  I don't think so.  Those tablets

24  are --

25     Q.   Do people who are on security watch have access

1    to them?

2         A.    People on security watch?

3         Q.    Correct.

4         A.    No.

5              MS. ABELA:  All right.  I think this is

6    probably a good time to pause for a break.  So we'll go

7    off the record and do 10 minutes.  Does that work?

8              MS. LOVE:  Sure.

9              (Recess from 10:19 a.m. to 10:32 a.m.)

10        Q.    (By Ms. Abela) So we're back on the record.

11             Are you familiar with daily post sheets?

12        A.    Pardon?

13        Q.    Are you familiar with daily post sheets?

14        A.    Yes.

15        Q.    Do you review daily post sheets for Lewis as

16   part of your job?

17        A.    Yes, I do.

18        Q.    And the posts that are listed out for a

19   particular shift on the post sheet, those don't change

20   from day to day, do they?

21        A.    What do you mean the post?  I mean, we have

22   priority posting that you have to do and sometimes

23   depending on the amount of staff you have, and have to do

24   priority postings.

25        Q.    We'll get into priority posting.  I'm focusing

Anthony R. Coleman - 10/14/2021

58

1              THE WITNESS:  Could you please explain what
2    do you mean -- I mean, there is a post priority chart.
3              And could you ask the question again,
4    please?
5        Q.    (By Ms. Abela) I'll try to rephrase it.  Who
6    decides which posts appear on Lewis Rast's daily post
7    sheets?
8              MS. LOVE:  Form.
9              THE WITNESS:  That's decided by the
10   administration of Lewis, in concentration with the chief
11   of security, the major, the warden, the DWOP, the DWs,
12   then we determine what posts are priority and for --
13   depending upon the number of staff we have.  Did I answer
14   you?  I'm hoping I did.
15       Q.    (By Ms. Abela) So are you involved in the
16   process of determining which posts appear on the post
17   sheet?
18             MS. LOVE:  Object to form and foundation.
19             THE WITNESS:  I have say-so, but, I mean, I
20   don't have the final word.  I have input.
21       Q.    (By Ms. Abela) I'm sorry.  Go ahead and finish
22   your answer.
23       A.    I have input, but I don't have the final word.
24       Q.    Okay.  Who would have the final word?
25       A.    The warden.

59

1    Q.   Of Lewis?

2    A.   Yes.

3    Q.   Okay.  Are all of the posts that are listed on

4    daily post sheets critical posts?

5    A.   Yes.  They're prioritized and the critical posts

6    are the most important posts.

7    Q.   Okay.  How do you determine which are priority?

8    A.   Okay.  So let me give you an example.  The first

9    most important post, the first post you want to have is

10   your control room, because you really can't -- it's the

11   nucleus of the unit.  So there's your control room.

12        Then for Rast, you have the main control room.

13   You have main control.  So those two control rooms are --

14   would be.  I guess you would say we prioritize from the

15   bottom up.  So what posts do we not need?  You know, if

16   we had to empty a post, what would we get rid of.

17        So let's say you had positions for four floor

18   officers, but you only have enough people for two.  So

19   then you would not have floor officers 3 and 4.  Is that

20   clear?

21   Q.   Yeah, those examples are helpful.  So you say

22   you kind of go backwards for what is not priority.  So

23   what is kind of the number one post that is not priority?

24   A.   That depends on the unit, and the infrastructure

25   of the unit.  The infrastructure of the unit is going to

Anthony R. Coleman - 10/14/2021

60

1  say how that unit is posted.

2      Q.   Okay.  Let's pull up.  I'm going to share my

3  screen.  Give me one moment and pull up what's marked

4  Coleman Exhibit 2.

5              (Deposition Exhibit 2 was marked for

6  identification.)

7      Q.   (By Ms. Abela) Can you see this document?

8      A.   Yes.

9      Q.   All right.  So this is a document that's

10 Bates-numbered ADCRR 00098817.  It's a two-page document.

11         Can you tell me what this document is?

12     A.   Daily post sheet.

13     Q.   And it's for Friday, July 30, 2021, at Lewis

14 Complex Rast for the a.m. shift; right?

15     A.   Okay.

16     Q.   Does that sound accurate to you?

17     A.   Yes.

18     Q.   Okay.  So we were just talking about

19 prioritization of posts.  Could you tell me which posts

20 on this post sheet are not critical?

21     A.   Well, if you go to the bottom, and we talked

22 about prioritization, and you would start from the bottom

23 and work your way up.  If you go to the top, which the

24 main control is the first one, being the most important.

25 You see what I'm saying?  So that's how it's prioritized.

Anthony R. Coleman - 10/14/2021

61

1      Q.    Okay.  So if I were looking at this daily post

2   sheet and I'm going to scroll all the way to the bottom

3   of the section that says "Required posts" --

4      A.    Okay.

5      Q.    -- am I understanding correctly, when you say

6   it's listed in reverse prioritization order -- so the

7   last post listed is 4-C, Floor No. 3 max; right?

8      A.    Right.

9      Q.    Okay.  Would that be considered the least

10  prioritized post?

11     A.    Yes.

12     Q.    Okay.  And main control at the top of the

13  required post list is the most prioritized post; correct?

14     A.    Yes.

15     Q.    Okay.  I'm going to look over here to the

16  right-hand side.  Do you see the box where it says "Total

17  Staff"?

18     A.    Total Staff, yes.

19     Q.    Okay.  And what does authorized FTEs mean?

20     A.    Those are the amount of people that I'm

21  authorized to have for that shift.

22     Q.    Okay.  And for this a.m. shift, you're

23  authorized to have 45; correct?

24     A.    Yes.

25     Q.    All right.  And what is -- the line under it

1   their RDOs at that time.

2       Q.   And could you tell us what RDO stands for?

3       A.   Regular days off.

4       Q.   Okay.  And the line at the bottom of that group

5   of data is, it says "Total Available 12"?

6       A.   12.

7       Q.   Does that mean that there were 12 staff assigned

8   and available to work the a.m. shift at Rast that

9   morning?

10      A.   Yes.

11      Q.   And so looking back over at that "Required

12  Posts" section over to the left, if there's not a name

13  listed under "Staff Assigned" next to a particular post

14  that day, does that mean that there was no staff assigned

15  to that post for that shift?

16      A.   Well, at that time when this was made, you're

17  correct.  But what we do is to get up to our -- our

18  numbers, we cross level.

19           That means -- cross level is basically when we

20  look at the numbers across the complex.  And we look at

21  the required numbers for certain units.  And we take

22  staff from other places and bring them -- to bring other

23  units up to where they need to be.

24      Q.   Is there a place on the daily post sheets where

25  staff that have been cross leveled from other units is

1    listed?

2        A.    Could you scroll down?  There could be.  Could

3    you go back up, please?

4        Q.    Sure.

5        A.    These staff could -- go up more.  Keep going,

6    yeah.  So when you look at these staff, what would happen

7    is this is the daily post sheet.  So this was already

8    made of who's going to be there.  So if we don't have

9    enough people, then we would cross level people in.  And

10   those names should be in there.

11       Q.    Okay.  Where would those names be listed if they

12   were cross leveled?

13       A.    It would be in the assigned staff.

14       Q.    So somebody that got cross leveled in from,

15   let's say, Morey unit, they would appear under staff

16   assigned just like the staff assigned for Rast would?

17       A.    I don't -- I don't know if this was taken from

18   the -- they're supposed to be two weeks out.  So I don't

19   know when this was taken.  Was it taken from the two

20   weeks out?

21             Because on July 30, 2021, if we didn't have

22   enough people, they would be cross leveled over.  And

23   this would change on that day.

24       Q.    Okay.  I'm going to repeat my question because I

25   don't think that you answered it.  I'm just trying to

Anthony R. Coleman - 10/14/2021

65

```
1    understand if somebody were to have been cross leveled --
2         A.    Yes.  They would be put on there.
3         Q.    They would be put on the staff-assigned column;
4    right?
5         A.    Yes.
6         Q.    Okay.  Going back to that total assigned number
7    that we were looking at on the right-hand side, is this
8    the total assigned for all day shifts at Rast or just
9    this particular day shift?
10        A.    No.  Well, all day shifts at Rast.
11        Q.    All day shifts?
12        A.    Yes.
13        Q.    And this -- I'm sorry.  Go ahead.
14        A.    Yes.  You're correct.
15        Q.    Okay.  I believe earlier you agreed that if
16   there is not a name listed in staff designed next to a
17   required post, it means that somebody's not assigned for
18   that shift.  Is that right?
19        A.    At that time, yes.
20        Q.    At that time, okay.  Does that mean that other
21   staff are expected to cover those duties?
22        A.    Sometimes a floor has to cover more than one
23   floor, yes.
24        Q.    Okay.  Would any other assignments be asked to
25   cover more than one?
```

Anthony R. Coleman - 10/14/2021

66

1      A.    There have been times where we've been short, if

2   something has happened and a control room officer may

3   have to handle two control rooms.   That can happen, too.

4      Q.    How is it communicated that a staff person

5   showing up for their shift that day would have to cover

6   more than one assigned post?

7      A.    They would be told from the beginning of the

8   shift that you need to cover A/B and all -- both A/B --

9   A/B sides.

10     Q.    Are they being told that by a supervisor?

11     A.    Yes.

12     Q.    Is that documented anywhere?

13     A.    Not necessarily.   I mean, if they're just told

14  to cover both, they're -- this is their primary post.

15  But they need to cover both.   I mean, they wouldn't write

16  their name in there twice.

17     Q.    I'm going to look down here at the bottom of the

18  page where -- if you're following, can you see my little

19  hand cursor?

20     A.    Yeah.

21     Q.    See where it says it was printed August 31,

22  2021?

23     A.    Okay.

24     Q.    Would that tell you whether this reflected kind

25  of the staffing at the end of the shift?

67

1      A.    Well, it should reflect, yeah, by the end of the

2    shift it should reflect if anybody else showed up for

3    those posts.

4      Q.    Okay.  So because this was printed after

5    July 30, 2021, this would be an accurate picture of the

6    shifts -- I'm sorry, the assignments as of the end of

7    that shift; right?

8      A.    It should be, yes.

9      Q.    Okay.  So I'm going to go back up to the top.

10   Just again making sure I'm reading this correctly, for

11   this day, would it be correct that the 3-A control was

12   not staffed for that day?

13     A.    Not necessarily.  We could have had a cross

14   level.

15     Q.    Didn't you say earlier that a cross level would

16   be listed under the staff assigned?

17     A.    Yes.

18     Q.    Okay.  So the fact that there's not anybody

19   listed under the staff assigned, you still think that

20   somebody would be cross leveled into that post?

21     A.    Well, because of what I'm reading apparently

22   there was no one there.  But what I'm also saying is I

23   would have to look at the cross level.

24     Q.    Okay.  Where would you go to find the cross

25   levels?

68

1       A.   I would go to the supervisor and ask her about

2   that day.   And I would take them this piece of paper.

3   And I'd say, "Can you show me if there was any cross

4   levels; if there were, what were they?"

5       Q.   Okay.   How would the supervisor remember that?

6   Is it documented anywhere?

7       A.   Yeah.   It should be documented.

8       Q.   Okay.   Where would it be documented?

9       A.   But I am -- I'm sorry.   I apologize.   I talked

10  over you.

11      Q.   I was just asking, where would it be documented?

12      A.   It should have -- it should have been documented

13  here.

14      Q.   Okay.   If it's not documented here, is there

15  anyone else it would be documented?

16      A.   It would be documented in the journal.   But

17  because it's not, I can only assume that there was no one

18  at that post because that was in July.

19      Q.   Okay.   And when you just said it might be

20  documented in the journal, could you tell me what "the

21  journal" means?

22      A.   The post journal.   I would probably pull that

23  post journal and find out who was the control room

24  officer at that time.

25      Q.   Scrolling down here, it looks like there are a

1  location or the records for that particular incarcerated

2  person to find who was --

3      A.   I would go to the location.  I would go to the

4  location.  I could go to the supervisors.  I could get

5  the complex to find out what they cross leveled over

6  then.

7      Q.   Okay.  I'm going to share a different --

8      A.   And go -- I was just -- okay.  I'm sorry, I

9  wanted to show you something.  Could you bring that back?

10     Q.   I will.  Give me one moment.

11     A.   Thank you.

12     Q.   Okay.

13     A.   If you could scroll down, please.

14     Q.   To the second page?

15     A.   Yes, please.  Okay.  Special assignments, okay.

16  So that's normally where they would go.  All right.  And

17  like you say here, you have suicide watch, which is a

18  constant watch.  That's Vidal, Officer Vidal, who would

19  be on constant watch.

20     Q.   So if somebody is listed under this special

21  assignments --

22     A.   Yes.

23     Q.   -- category, and if it says suicide watch,

24  they're assigned to a continuous watch?

25     A.   Yes.

1    agreed that it was -- this would then have captured what

2    happened at the end -- by the end of the shift?

3        A.   Yeah.  As I just said, what I said was, it

4    should be.  Now, he was on special assignment which was

5    suicide watch, which was at the beginning of the shift.

6    If someone went on in the middle of watch, it should have

7    changed.  If they didn't change it, then I don't have --

8    I don't want to lie to you, but they made a mistake.

9    They should have documented that.

10       Q.   All right.  I'm going to bring up another

11   document.  That is Coleman Exhibit 3.

12              (Deposition Exhibit 3 was marked for

13   identification.)

14       Q.   (By Ms. Abela) And what is this document?

15       A.   Another daily post sheet.

16       Q.   And it's from July 29, 2021, Lewis Complex at

17   Rast for the p.m. shift; correct?

18       A.   Yes.

19       Q.   Okay.  Do you see under staff assigned where it

20   says "collapsed" in several of the posts?

21       A.   Yes.  Yes.

22       Q.   What does it mean if a post is collapsed?

23       A.   That means that that post -- the kitchen is

24   closed.  So you don't need a kitchen officer.  You don't

25   need a -- you don't need a second floor officer.  So they

74

1   collapse it.  Or you don't have a second floor officer

2   they collapsed it.  Kitchen floor, collapsed.  It means

3   they don't need the post.  So they don't have a post.

4       Q.   I'm sorry.  Does it mean they don't need the

5   post because of the shift or that they don't have the

6   post?

7       A.   That either they don't have enough people to

8   post it or they don't need the post.

9       Q.   So if I under --

10      A.   But in this case, if you look at watch floor 1,

11  it's collapsed -- I'm sorry, 2 C/D floor 1, collapsed.

12  Kitchen control room, collapsed.  So you would have to

13  ask, is it because you were short of people or you didn't

14  need the post?

15           Does that --

16      Q.   I --

17      A.   Go ahead.  I'm sorry.

18      Q.   I just want to make sure I'm understanding your

19  testimony correctly.  You're saying it could be either

20  that there is not a kitchen control needed for the p.m.

21  post --

22      A.   Right.

23      Q.   -- or that there is not enough staff to staff a

24  particular post; is that correct?

25      A.   Right.  Right.

Anthony R. Coleman - 10/14/2021

75

1    Q.   Okay.  So for the p.m. shift, would the C and D
2    floor officer number 1 be a needed post?
3    A.   Well, it's one of the priorities because it's up
4    top, yes.
5    Q.   Okay.  So the fact that it says "collapsed" next
6    to it, what does that mean to you?
7    A.   It was collapsed.  I would have to talk to the
8    supervisor, say -- when you use the phrase "collapsed,"
9    the post was collapsed, but I would have to ask why.
10    Q.   Using your professional judgment, why do you
11    think the C and D floor number 1 on this p.m. post was
12    collapsed?
13    A.   There may not have had enough people.
14    Q.   Okay.  And the same might be true for these A
15    and B floor number 1 posts?
16    A.   Yes.
17    Q.   So who would decide which posts would be
18    collapsed for a particular shift?
19    A.   Well, the supervisor using the post priority
20    check.
21    Q.   Which supervisor?
22    A.   Go back up.  You'll have to see who's on duty
23    that night.  So that would be Lieutenant Luft.
24    Q.   Is it always the lieutenant that decides?
25    A.   It should be.  Yes, he's the senior.  He or she.

Anthony R. Coleman - 10/14/2021

79

1    the same RDOs.

2          Q.   Can you explain what you mean by that?

3          A.   Okay.  In a 12-hour shift, you have a.m. backs

4    and p.m. backs.  You have -- you have a.m. fronts

5    and p.m. fronts.

6               So when you say a.m. fronts, that means that

7    shift days off are the front of the week.  If you say

8    backs, that shift's days off are the back of the weeks.

9               So you have four different shifts to cover

10   12-hour shifts.

11         Q.   Okay.  I'm going to ask my question a different

12   way.  Can you explain why the total available for that

13   day -- I'm sorry -- for that shift is 18?

14         A.   Because that's how many staff they have.

15         Q.   Okay.  I'm going to switch to a different

16   exhibit.  I'm going to bring up what is marked as Coleman

17   Exhibit 4.

18               (Deposition Exhibit 4 was marked for

19   identification.)

20         Q.   (By Ms. Abela) Which is a four-page document

21   beginning at Bates No. ADCRR 00098841.

22               Do you recognize what this exhibit is?  Can you

23   see okay?

24         A.   Can you enlarge it?

25         Q.   I'm trying.  Is that helping?

Anthony R. Coleman - 10/14/2021

80

1      A.    Okay.

2      Q.    Do you recognize what this document is?

3      A.    Yes, I do.

4      Q.    Okay.  What is this?

5      A.    It is the -- basically the complex priority

6   posting chart.

7      Q.    Is that complex for Lewis?

8      A.    Yes.

9      Q.    Okay.  I'll confess, this is a very confusing

10  document.  Can you explain to me how this priority post

11  chart works?

12     A.    Okay.  So if you go to the bottom.

13     Q.    I'm scrolling all the way to the final page of

14  the document, which is --

15     A.    All right.  So can you blow it up a little more?

16     Q.    You want the third or the fourth page?

17     A.    Let's go with -- we can go with this one.  Can

18  you blow it up more?

19     Q.    Let me see.

20     A.    Okay.  It's very hard to read.

21           This one won't work.  Go --

22     Q.    I'm sorry.  Say that one more time?

23     A.    Hold on.  I'm looking at something.  I'm trying

24  to figure out why we have letters and -- oh, okay.  I get

25  it.  Do me a favor and go to the top?

82

1       A.    Okay.  So there's 150.

2       Q.    Okay.  How many --

3       A.    So -- go ahead.  I'm sorry.

4       Q.    That's fine.  I think you were beating me to my

5    question.  But, for example, how many -- where would I go

6    to find how many people are working at Rast if 150 people

7    show up?

8       A.    Complex is going to tell you.  Complex is going

9    to tell you that because they have a staffing manager for

10   every shift.  Every shift, every day, they have a

11   staffing manager, which manages the staff, the staffing

12   at the complex.  So that staffing manager is an extension

13   of the major and the warden.  So whether it's a sergeant

14   or lieutenant, they're basically going to -- they're the

15   orchestrator of where everybody needs to go to make sure

16   that the institution can be operational safely for staff

17   and inmates.  So they're the ones that are responsible to

18   be sure that everybody has what they need and we do the

19   best of what we got.

20      Q.    Okay.  Does the staffing manager at complex use

21   this priority post chart to decide --

22      A.    Yes.

23      Q.    -- where people go at Lewis?

24      A.    Yes.

25      Q.    Okay.  So say yesterday 150 people showed up to

83

1   work at Lewis.  How many people are going to get assigned

2   to Rast in that circumstance?

3                MS. LOVE:  Foundation.

4                THE WITNESS:  It depends on what we have

5   going on.  We have specials.  You know, let's say on that

6   day, we're supposed to have 14 -- normally on that day,

7   we have 14 people.  And -- but we have six constant

8   watches.  Now I'm going to need three more people for

9   those constant watches.  Okay?

10                How is that going to affect the other

11  units?  So it's a priority.  We may not be able to do rec

12  that day.  We'll have to cancel rec.  We might not get

13  showers done on that shift.  You know, it depends.  We

14  know we got to get mail out.  We know we got to keep them

15  fed.  We know we have to do count.  And then we have to

16  prioritize what the duties are that we have to get done.

17       Q.   (By Ms. Abela) Okay.

18       A.   With 150 people there, I'm going to get this set

19  number?  I can't tell you that.  But they do the best

20  they can with what they got.  And also I just need to --

21  I'm trying to answer you as I'm thinking.  We also have

22  hospital.  So it depends on how many inmates we have out

23  at the hospital, because complex wide every one inmate we

24  have at the hospital, that's two officers that have to go

25  to the hospital.

1           So I don't want to sit here and say, yes, this
2   is what we're going to have that day, because it's all
3   speculation on the situation.  I hope I answered you.
4       Q.   Okay.  I have a follow-up question.  And that
5   is -- you mentioned a couple variables.  One is people on
6   a continuous watch, and then the other is people out to
7   the hospital.  Are those circumstances captured anywhere
8   on this priority chart?
9               MS. LOVE:  Foundation.
10              THE WITNESS:  No.
11      Q.   (By Ms. Abela) Using this priority chart, where
12  would we go to find out roughly how many people would get
13  assigned to Rast?
14              MS. LOVE:  Foundation.
15              THE WITNESS:  Okay.  Do you have a sheet of
16  paper or something I can -- I'm just trying to -- as I go
17  across this thing, I can't keep up on the same line.
18              MS. LOVE:  Okay.  We're going to -- he
19  wants to be able to follow this, because you can't do it
20  on the screen.  So can we take a break and I'll see if I
21  can print this out?
22              MS. ABELA:  Is there a way just to hold up
23  the sheet to the screen?  Would that work?
24              MS. LOVE:  We're going to have to climb
25  over tables.

92

1   And we really don't argue with them.

2       Q.   Okay.  And who are the supervisors that you're

3   referring to just now?

4       A.   The supervisors of the unit.  That's who they

5   communicate with as to the movement of staff.

6       Q.   Are those captains?

7       A.   They start -- normally the staffing manager is a

8   sergeant or lieutenant who will speak directly to the

9   shift supervisors, the sergeants and lieutenants.  And

10  they orchestrate.  If there's disagreement or a problem,

11  then captains may get involved.  But the staffing manager

12  basically has the last word.

13      Q.   Okay.  So this is, looking back at Exhibit 4,

14  this is the priority chart for Lewis complex-wide.  Is

15  there a priority chart -- priority post chart for just

16  the Rast unit?

17      A.   Yes.  Well, yes.

18      Q.   Okay.  Does that detail which posts are to get

19  filled first --

20      A.   Yes.

21      Q.   -- in the event that -- I'm sorry, let me finish

22  my question.

23           In the event that you're not fully staffed?

24      A.   Yes.

25      Q.   Okay.  I'm going to switch exhibits, and bring

Anthony R. Coleman - 10/14/2021

93

1   up what has been marked Coleman Exhibit 5.

2                    (Deposition Exhibit 5 was marked for

3   identification.)

4        Q.   (By Ms. Abela) This is a document beginning in

5   Bates No. ADCRR 00056115.  Can you see the document?

6        A.   Yes.

7        Q.   Okay.  What is this document?

8        A.   It's the hiring report.

9        Q.   All right.  And it's for ASPC-Lewis dated

10  August 23, 2021; right?

11       A.   Yes.

12       Q.   Okay.  And Lewis Rast has a certain number of

13  authorized full-time employee positions; right?

14       A.   Yes.

15       Q.   I'm sorry?

16       A.   Yes.

17       Q.   Yes, okay.  And if I'm reading the chart

18  correctly, that number for authorized FTEs is 194; right?

19       A.   Yes.

20       Q.   If you could speak up a little bit that would be

21  helpful.  I'm sorry.

22       A.   Yes.

23       Q.   You're kind of fading out.

24            Okay.  And then I'm looking over on the column

25  to see that under the hiring vacancy full-time employees

94

1    number, there are 33.25 full-time employee positions

2    currently vacant; right?

3        A.    Yes.

4        Q.    Okay.   And on the chart, it says that that's

5    about 16 percent --

6        A.    Yes.

7        Q.    -- is that right?

8        A.    Yes.

9        Q.    Does that mean kind of on any given day roughly

10   16 percent of the positions at Rast are empty?

11       A.    I can say our vacancy rate would be 16 percent,

12   16.30 percent, according to that.

13       Q.    Okay.   Is that about the staffing vacancy level

14   that you've had, say, over the last two years or so?

15       A.    It varies, yes, a little.

16       Q.    A little.   Do you know if it has ever fallen

17   below 15 percent?

18       A.    Has it ever fallen below 15 percent?

19       Q.    Yes.

20       A.    It probably has.

21       Q.    Has it been ever below 10 percent?

22       A.    Not that I remember.

23       Q.    Okay.   Do you know what the highest percentage

24   it's been in the last two years?

25       A.    No.   I can't tell you that.

Anthony R. Coleman - 10/14/2021

95

1      Q.   Okay.  So somewhere between 10 and 16 percent?

2      A.   Yes.

3      Q.   Do you know if people who are classified into

4   max custody can appeal that decision?

5      A.   Okay.  I'm sorry.  I was thinking -- when you

6   said that, I was thinking about percentages.

7      Q.   Sorry.  Switching gears.

8      A.   Are you talking about when an inmate is placed

9   into max custody?

10     Q.   Yes.  When they are classified into max custody,

11  do you know if they can appeal that decision?

12     A.   They can appeal it, yes.

13     Q.   Okay.  Do you know how many people actually do

14  appeal that decision?

15     A.   No.

16     Q.   Do you have an estimate?

17     A.   No.

18     Q.   You wouldn't then know how many people are

19  actually successful appealing a max custody placement

20  decision?

21     A.   I would not know that.

22     Q.   Okay.  Do you have any role in the decisions

23  about whether to place somebody in max custody?

24     A.   Yes, I do.

25     Q.   Okay.  Could you describe that role?

Anthony R. Coleman - 10/14/2021

96

1      A.    We look at -- we have an inmate that's been

2   disruptive that's -- let's say they're a close custody,

3   and they've been disruptive.   They've been -- a

4   repetitive behavior of disruption.   They don't follow the

5   rules.   They got quite a few -- they can't be managed at

6   that close -- at that close level.

7           So once they've proven to us that they can't be

8   managed and more structure supervision is needed, we

9   recommend max custody.

10     Q.    Okay.   And how do you go about recommending max

11  custody in that circumstance?

12     A.    Basically we would do what's called a max

13  packet.

14     Q.    I'm sorry.   You faded.

15     A.    A max packet.

16     Q.    Max packet.   Okay.   Who else is involved in the

17  decision to put together a max packet for somebody?

18     A.    A CO-IV, ADW.   We get information from

19  disciplinary.   We get information from the CO-III, the

20  caseload.   The CO-III that has the caseload.   And we make

21  a decision on what would be best for the institution, for

22  the order and operation of the institution or unit.

23     Q.    Would somebody had to have had a formal

24  disciplinary to be -- have a max packet initiated?

25     A.    Yeah.   Normally that's what we do, yes.

1    Q.    Okay.  You said normally that's what you do.
2  Are there any exceptions to that?
3    A.    Max is for inmates with violent behavior,
4  disruptive behavior.  So most likely often and more than
5  not the inmate has discipline.
6    Q.    Have you ever recommended max custody for a
7  person that has not had a formal disciplinary issue?
8    A.    No.
9    Q.    Okay.  What is an override in the context of a
10  decision to place somebody in maximum custody?
11    A.    An override is when an inmate is -- even though
12  they say he's close -- let's say we have a max inmate.
13  And this max inmate has not gone through the time spent
14  in max custody to go to close.  But in this -- in his
15  review, in a yearly review, the inmate's doing well.
16  He's programming.  He's -- you know, he's doing what he's
17  supposed to do.  And he has a job.  And he's proven that
18  he can be managed at a lower custody.  We'll give him an
19  override down to close.  Meaning he's really max, but
20  we're going to make you a close custody inmate because
21  you're performing well.
22    Q.    Okay.  So is an override kind of like an
23  exception?
24    A.    If you want to label it as an exception, yes.
25    Q.    I'm just trying to kind of find a layman's term

Anthony R. Coleman - 10/14/2021

98

1   that is analogous to that.

2       A.   The inmate's performing well, he's doing

3   everything he's supposed to do, doesn't have any

4   disciplinary.  I don't like using the phrase model

5   inmate, because, you know, but -- and he's -- you know,

6   "Hey, he won't be eligible for max until next year, but

7   because of the things you're doing and the recommendation

8   we've talked about and all the things you're doing, we're

9   going to give you an -- we're going to grant you an

10  override.  We're going to grant you an override."

11      Q.   Okay.  And is there such a thing as a

12  discretionary override?

13      A.   Yes.

14      Q.   Okay.  And what does that mean?

15      A.   It's like I'm going to give you the override,

16  but you've got this much time to mess up and you're going

17  right back to where you belong.  It's -- I guess it would

18  be at the unit level, my discretion or the unit

19  discretion.

20          And then you have non-discretion, which is

21  they're triggered.  They meet everything.  They meet the

22  time span.  They've served everything they're supposed to

23  do.

24          So the first one is discretion and then you have

25  non-discretion.

Anthony R. Coleman - 10/14/2021

99

1    Q.   Okay.  So are you saying it is considered a
2    nondiscretionary override if somebody has met all the
3    criteria for moving out of max custody?
4    A.   Yeah.
5    Q.   Okay.  It's considered discretionary override if
6    they haven't met all the -- they haven't met the time
7    criteria, but they are performing well enough to --
8    A.   Yeah.
9    Q.   -- move to close custody?
10   A.   Yeah.  There is still a certain amount of time
11   with discretionary you have to meet.  And you can do
12   that.  Sometimes when they trigger for re-class, they
13   still haven't -- they're doing everything right, but they
14   haven't met the time span.  But because they're doing
15   everything right and they haven't met the time span, so
16   let's trigger.  Then they trigger and then we do it.
17   Q.   Okay.  Is -- is it -- are discretionary
18   overrides set out in policy anywhere?
19   A.   Yes, they are.
20   Q.   Do you happen to remember where?
21   A.   No.  I knew you were going to ask me that.  I
22   was trying to remember.  It's in the classification
23   policy.
24   Q.   Okay.  I'm going to go ahead and bring up what
25   has been previously marked as Isolation Exhibit 3, which

100

1    is DO-812.   Give me one moment.

2              Okay.   I'm going to scroll down to Section 2.4.

3    Do you see in Section 2.4, it says, "Inmates classified

4    to maximum custody units shall be assigned to specific

5    housing areas, using a system of steps for managing

6    inmates in the least restrictive way necessary to carry

7    out the department's mission"?

8        A.    Yes.

9        Q.    Okay.   Where that policy says "a system of

10   steps," what do you understand a system of steps to mean?

11       A.    The incentive step 1, step 2, step 3.   They're

12   steps to give inmates -- allow inmates more freedom at

13   the end of their sentence.

14       Q.    I believe you're describing the Step Matrix

15   Program; is that correct?

16       A.    Yes.

17       Q.    And so what is the purpose of the Step Matrix

18   Program as you understand it?

19       A.    As I understand it, to get the inmates when

20   you -- to allow the inmates to have an opportunity and

21   chance based on their behavior and then their cooperation

22   and everything to allow them more freedom, least -- to

23   lessen the restrictive actions of the department, and,

24   again, to get them to understand their choice is their

25   consequences.

Anthony R. Coleman - 10/14/2021

101

1          If they make good choices, then things will

2    happen.  If they make bad choices, they'll be held

3    accountable.  It's just --

4       Q.   Okay.  I'm sorry.  I didn't mean to interrupt

5    you.

6       A.   No problem.

7       Q.   So I'm going to look at the subsection right

8    below 2.4, which is 2.4.1.  And it says there that

9    Section 2.4 applies to all maximum custody groups

10   including specialty population groups; right?

11      A.   Yes.

12      Q.   Do you know what specialty population groups

13   they're referring to here?

14      A.   They could be referring to SMI inmates.  That's

15   a specialty population.  That's all I can come up with

16   right now.

17      Q.   Okay.  Would it apply equally to people in

18   protective custody?

19      A.   Yes.

20      Q.   I believe you mentioned earlier that those are

21   the two groups that you have in maximum custody at Rast

22   max -- max Rast?

23      A.   Yes.

24      Q.   So all of the people in max custody are part of

25   the step program; right?

Anthony R. Coleman - 10/14/2021

102

1      A.     Yes.

2      Q.     And the expectation --

3      A.     With the exception -- I'm sorry, I talked over

4   you.  I apologize.

5      Q.     Go ahead.  Finish your thought.

6      A.     With the exception of the watch pod and

7   refuse-to-house.

8      Q.     So people in watch and people in refuse-to-house

9   don't move through the step program matrix; is that what

10  you mean?

11     A.     Yeah.  Once they're in refuse-to-house or watch

12  pod, everything kind of stops for them.

13     Q.     And when you mean it kind of stops, is that

14  saying that if somebody was in max custody before then

15  and they then move to refuse-to-house, they're not

16  eligible to progress through the Step Matrix?

17     A.     Exactly.

18     Q.     If they agree to house, would they then be able

19  to move through Step Matrix?

20     A.     Yes.

21     Q.     Would they be able to move through the Step

22  Matrix if they had agreed to house but they didn't yet

23  have a housing assignment to go to yet?

24     A.     Their time would start.  If we didn't have a bed

25  for them, we would look at that.

Anthony R. Coleman - 10/14/2021

103

1   Q.   When you say their time would start, what do you
2   mean?
3   A.   Let's say on the 1st on the month, I agreed to
4   house and they didn't move me until the 5th, they would
5   take into consideration that I agreed to house on the 1st
6   and that time would count towards my 60 or 90 -- 60 -- 30
7   to 90 days -- 30 to 60 days.
8   Q.   So it would count for their time to move through
9   the Step Matrix?
10  A.   Yes.
11  Q.   Okay.  Do you have any role in reviewing
12  people's max custody step level?
13  A.   Yes.
14  Q.   Okay.  Can you please describe your role in that
15  process?
16  A.   Well, weekly we have a step meeting.  It
17  involves both CO-IVs, the CO-IIIs, security, depending on
18  the inmate, if it's an SMI inmate, we include mental
19  health.
20       And we talk about the inmates and if -- whether
21  they're up for review.  If they've done everything they
22  should to get to the next step, we discuss the ones that
23  have -- are up for review and they've got -- he's got two
24  tickets for refusing directives.  So he will not get his
25  next step.

Anthony R. Coleman - 10/14/2021

104

1          I -- I -- I don't run the meeting.  I basically
2    facilitate the meeting.  The meeting is run by programs,
3    but I facilitate the meeting.  And that's my role.
4          Q.   And so you attend all of these meetings; is that
5    right?
6          A.   If I don't attend, my ADW attends them.
7    Sometimes we both do.
8          Q.   Okay.
9          A.   And the chief security -- I'm sorry.  The
10   captain also.
11         Q.   How often are people's maximum custody step
12   levels reviewed at Rast?
13         A.   Well, everybody doesn't have the same review
14   date.  That's why we do it weekly.  So I have to say
15   weekly.  We do it weekly.
16         Q.   So let's say Joe Smith is a max custody inmate
17   at Rast.
18         A.   Okay.
19         Q.   How frequently is his step level going to get
20   reviewed?
21         A.   Every 30 days.
22         Q.   Okay.
23         A.   If they're up for review.
24         Q.   If somebody is not up for review, will they not
25   get reviewed every 30 days?

Anthony R. Coleman - 10/14/2021

105

1      A.    Well, okay, if Joe Smith -- let's say we know
2  Joe Smith just got two tickets last week for fighting.
3  And today is Wednesday.   We know, yeah, he's going to --
4  his name is going to come up.   We're going to say, "Well,
5  he's not -- he's got two tickets.   He's still waiting to
6  be seen by disciplinary."   So he's not going to get a
7  step.
8      Q.    You're still discussing his step level; correct?
9      A.    Yes.   Yes.
10     Q.    Okay.   You mentioned that those step level
11 meetings happen weekly.   Does that mean there are four
12 meetings per month?
13     A.    Yes.
14     Q.    How long do those meetings typically last?
15     A.    Depending on how many inmates are being
16 reviewed.   Depending on the discussion.   It could go
17 anywhere from 30 minutes to hour and a half, two hours.
18     Q.    And how is it determined which incarcerated
19 people will be reviewed at a particular step meeting?
20     A.    Well, you mean how is it determined who we
21 review?
22     Q.    Yes.
23     A.    Every 30 days, we do a review.   When those
24 people come up, those are the people that are on the
25 list.

Anthony R. Coleman - 10/14/2021

106

1      Q.    I guess who tracks the time between the last
2  review?

3      A.    The caseworkers, the CO-IIIs.

4      Q.    Is the incarcerated person ever present at their
5  step review meeting?

6      A.    No.

7      Q.    Does anybody at Rast keep minutes from the
8  maximum custody step level review meetings?

9      A.    Yes.

10     Q.    Okay.   Who keeps those minutes?

11     A.    It's different, whoever they're assigned for
12  that meeting.   One of the CO-IIIs.

13     Q.    Q.   And where does that -- where do those
14  minutes get filed?

15     A.    They're taken by the CO-IV.   I want to say the
16  CO-IV keeps the minutes.

17     Q.    Is that documentation called anything specific?

18     A.    Step meeting minutes.

19     Q.    And is it your understanding that there should
20  be step meeting minutes for every step meeting that's
21  held?

22     A.    It's my understanding there should.

23     Q.    I want to just make sure I understood.   For
24  people in max custody at Rast, they get their step level
25  reviewed every 30 days; right?

Anthony R. Coleman - 10/14/2021

107

1     A.   Yes.  I believe there's 60 days in between 2 and
2  3, though.
3     Q.   You cut out.  I heard --
4     A.   I believe there's 60 days between 2 and 3,
5  step 2 and 3.
6     Q.   So those people aren't going to get their step
7  level reviewed every 30 days?
8     A.   Well, I believe there's 60 days between step 2
9  and 3.
10    Q.   I understand.  But that's not my question.  My
11  question is do their step levels get reviewed even if
12  there are more than 30 days between step levels?
13    A.   Probably not.  Because there's a need if the
14  step level is -- I believe they're 60 days between 2
15  and 3.  So we probably wouldn't look at -- if they're
16  step 2 and they have to be good for 60 days, we probably
17  wouldn't look at them until the upcoming 60 days.
18    Q.   I want to make sure I'm understanding --
19    A.   Unless --
20    Q.   Go ahead.
21    A.   -- there's a disciplinary issue with the step 2.
22  Then they'd probably have to go back down to a step 1.
23    Q.   Do you review people who are at step 2 every 30
24  days?
25    A.   If there's a need to, yes.

Anthony R. Coleman - 10/14/2021

108

1      Q.    I guess how do you determine if there's a need
2   to unless there are --
3      A.    Okay.  Let's go back to Joe Smith.  Joe Smith is
4   now a step 2.  If I'm correct, there's 60 days.  But
5   let's say Joe Smith just got two tickets on day 49.  So
6   when his name comes up, they would say, "Joe Smith,
7   step 2, just got two tickets.  What are we going to do?"
8   Goes back to step 1 and starts over.
9      Q.    Does what you just described count as a review?
10     A.    Yes.
11     Q.    Okay.  So you are reviewing people at step 2; is
12  that right?
13     A.    Yes.
14     Q.    Do you review everybody at step 2 every 30 days?
15     A.    Yes.  If there's a reason to.  If they're doing
16  good -- let's say they're at step 2 and they're going
17  good, we don't have to look at them again for their
18  step 3.  No, we won't.  It's one of those things, the
19  CO-IIIs will not bring it to the table because there's a
20  meet.
21          The CO-IIIs talk to these guys basically almost
22  every day almost.  But they see them in a week, these
23  guys, two or three times.  They're monitoring these guys
24  like daily.
25     Q.    So is the CO-III deciding who at step 2 gets

Anthony R. Coleman - 10/14/2021

109

1   reviewed?

2        A.   No, unless there's a need.   If an inmate gets a

3   ticket, then that's going to be brought to the step

4   meeting.   If the inmate is doing fine at step 2, and

5   there's no need, then we don't need to review them

6   because they're doing okay.   Just keep it moving.

7        Q.   Okay.   Are you aware that DO-812 requires that

8   everybody in max custody get reviewed monthly?

9        A.   Yes.

10       Q.   And do you review everybody in maximum custody

11   monthly?

12       A.   Okay.   So if I have an inmate that is step 2 and

13   I'm CO-III and the guy is doing well, and he's on his --

14   if I'm a step 2, and the guy's doing well, he's on his

15   way to step 3, and the CO-III has reviewed that and seen

16   it doesn't need to be brought to the meeting, he was

17   reviewed.   He's doing fine.   So why -- okay.   That's it.

18       Q.   If a CO-III decided that somebody at step level

19   2 was doing well, where would that be documented?

20       A.   Probably in their notes somewhere.   I mean, they

21   don't have anything -- I mean, if he's on his way to a

22   step 3, I mean he should review the documentation in

23   ACIS.   And say, "Hey, talked to Joe Smith, doing well."

24   So it should be documented in ACIS.

25       Q.   So the CO-III notes about how somebody's doing

Anthony R. Coleman - 10/14/2021

110

1   and whether or not they might need a review is documented

2   in ACIS?

3       A.   It should be.

4       Q.   Is it also documented in the step meeting

5   minutes that you described?

6       A.   If -- if -- everything we talk about in step

7   meetings should be reported on everybody.

8       Q.   If a CO-III had noted somebody was doing well at

9   step 2, would that be discussed at all in the step

10  meeting -- in the step meeting?

11      A.   He would say, "Hey, what about Joe Smith?  Oh,

12  he's doing well.  Keep it moving.  He's on his way.  He

13  hasn't had any problems out here."

14      Q.   And would that get documented in the minutes?

15      A.   It may.  It should.

16      Q.   What information concerning the step level

17  review is provided to an incarcerated person who had

18  their step level reviewed?

19              MS. LOVE:  Form.

20              THE WITNESS:  You went up for review, you

21  did or did not get your step, and this is why.

22      Q.   (By Ms. Abela) Okay.  And how is that

23  information communicated to them?

24      A.   It can be in writing or it can be -- you know,

25  if the officer -- the CO-III can go talk to him.

Anthony R. Coleman - 10/14/2021

111

1    Sometimes the inmate already knows, because -- let's say
2    the inmate gets a ticket for not keeping his cell clean,
3    you tell him he's on your report.  And you let him know,
4    "You are on report."  And the inmate knows he's probably
5    going to lose a step.
6        Q.   And so I think you mentioned in the course of
7    that answer that it would be the CO-III that talks to
8    them; is that right?
9        A.   Uh-huh.
10       Q.   Anybody else communicate that information to an
11   incarcerated person?
12       A.   If the CO-III does it.  Maybe the CO-IV, if
13   there's a problem.  And sometimes it could be part of his
14   disciplinary sanctions.
15       Q.   Does somebody review the monthly step level
16   reviews that you do at Rast?
17                MS. LOVE:  Form.
18                THE WITNESS:  Yes.
19        Q.   (By Ms. Abela) Okay.  Who reviews those?
20       A.   I believe the CO-IV.
21       Q.   Does anybody above the CO-IV review them?
22       A.   No.
23       Q.   I missed that.  I'm sorry.
24       A.   No.
25       Q.   Is that review automatic?

113

1       A.   I cannot say that the warden reviews those.  And

2   I can't say he doesn't.  I don't know.

3       Q.   Okay.  Do you know if anybody at complex reviews

4   them?

5       A.   I do not know.

6       Q.   I'm going to move to a -- no, it's the same

7   exhibit.  I apologize.  I'm going to re-share.

8            I'm going to look in isolation at Exhibit 3,

9   which is DO-812 at Section 5.5.  Do you see there where

10  it says, "Inmates who maintain step 3 for a minimum of 30

11  consecutive days without incident are eligible for

12  consideration for placement in a close custody housing

13  location"?

14      A.   Yes.

15      Q.   What would -- I guess what does it mean that a

16  person is eligible for consideration?

17      A.   The inmate is eligible to be looked at for

18  placement in close custody.

19      Q.   So if a person had been at step 3 for that

20  required minimum of 30 days without incident, and the

21  program team believes they're doing well, could the

22  program team make the decision to move that person out of

23  max custody?

24      A.   They can make the decision to ask central office

25  to move him into close custody, yes.  Central office, we

1    would -- we would make the suggestion.  Central office

2    would make the final decision.

3         Q.    Okay.  So are you saying the program team makes

4    a suggestion or recommendation?

5         A.    Yes.

6         Q.    And then central office ultimately makes the

7    decision about who can be placed in max custody?

8         A.    Close custody; correct?  You meant close

9    custody; right?

10        Q.    Yes, I did.  Thank you.

11        A.    Yes.

12        Q.    So somebody at central office makes the final

13   decision; is that correct?

14        A.    Yes.  All our classification goes through

15   central office.

16        Q.    So is the decision that's made during your

17   monthly review a recommendation decision?

18                 MS. LOVE:  Form.

19                 THE WITNESS:  Is the decision that's made

20   during the review a recommendation decision?  Not always.

21   Sometimes we'll talk about that after the meeting, or --

22   you know, I'll give you a prime example.

23                 We may be done with a meeting, then we may

24   talk about, "Hey, how's Jones doing?"

25                 "He's doing well.  He's done everything

1  he's supposed to do," yada, yada, yada, you know.  And

2  the CO-III may go back and start the paperwork for the

3  max -- the close custody override, or close custody will.

4      Q.   (By Ms. Abela) So what you were just discussing

5  is not considered to be part of the step review meeting?

6      A.   It is part of it, but I mean you're asking about

7  the recommendation part; correct?

8      Q.   Correct.

9      A.   Okay.  So, yeah.  And there are times when

10  people say, "Hey, we'd like to recommend them for close

11  custody.  Start the paperwork."

12      Q.   Does that happen in the context of your step

13  review meetings?

14      A.   Yeah, it does.  It does.

15      Q.   Okay.  I am going to ask a couple questions

16  about person's institutional file.  Are you familiar with

17  what a person's institutional file is?

18      A.   Yes.

19      Q.   Okay.  Do you know what is in Side 1 of a

20  person's institutional file?

21      A.   Their prison history, their work history, their

22  work plans, personal information, crime.  As I said,

23  incarceration history.  A lot of things.

24      Q.   Okay.  What about what's in Side 2 of a person's

25  institutional file?

Anthony R. Coleman - 10/14/2021

116

1      A.   I couldn't tell you as far as breaking the --
2   between breaking the packet down to sections, no, I could
3   not answer that.
4      Q.   Was what you were describing as part of Side 1
5   things that might be found throughout somebody's
6   institutional file?
7      A.   I was describing what might be in their
8   institutional file.  I don't know what sections they
9   would be in.
10      Q.   Okay.  Were there any other things that you can
11   think of that might be in somebody's institutional file?
12      A.   Some of their mental health history.  Their --
13   wow.  That's it.
14      Q.   I missed that last word.  I'm sorry.
15      A.   Part of their -- some of their mental health
16   history, their work history.  I said their crime.  Their
17   disciplinary.  That's about it.  That's all I can think
18   of right now.
19      Q.   If a person were housed in max custody, would
20   you expect any other documents to be in somebody's
21   institutional file?
22      A.   I guess their max packet.
23      Q.   Okay.  What is in a max packet?
24      A.   Max packet is basically broken down to if an
25   inmate is recommended for max custody, the recommendation

Anthony R. Coleman - 10/14/2021

117

1    is done, their disciplinary history, the reason that

2    they're going to max.

3            Their work history, any affiliation with direct

4    groups, their disciplinary history, like violent

5    behavior, disruptive behavior.  The reason they're going

6    to -- the reason they're recommended for max custody.

7        Q.    Okay.

8        A.    And -- okay.

9        Q.    No.  Go ahead.  Finish your thought.

10       A.    No, I'm good.

11       Q.    All right.  And any other things that you think

12   of that are -- would be expected to be in a max packet?

13       A.    The recommendation from the caseload -- the

14   CO-III.  Their recommendation of why they're recommending

15   what they're recommending.  The CO-IV reviews it, their

16   recommendation, and their thoughts and input on it.

17       Q.    Okay.  Would somebody's classification documents

18   also be in their institutional file?

19       A.    Yes.

20       Q.    All right.  I'm going to bring up what has been

21   marked Coleman Exhibit 6.

22            (Deposition Exhibit 6 was marked for

23   identification.)

24       Q.    (By Ms. Abela) This is a six-page document that

25   begins on Bates stamp ADCRR 00163356.

Anthony R. Coleman - 10/14/2021

118

```
 1              I'm going to scroll to the third page of this
 2      document.
 3          A.    Okay.
 4          Q.    That's ADCRR 00163358.  What is this document?
 5          A.    Max custody placement recommendation/approval.
 6          Q.    Okay.  And it looks like it is for Collins whose
 7      number is 334615; correct?
 8          A.    Yes.
 9          Q.    Okay.  Do you see at the top here where it says
10      total scores?
11          A.    Yes.
12          Q.    And levels, max 5/3?
13          A.    Uh-huh.
14          Q.    What does max 5/3 mean?
15          A.    His max is level five.  His classification score
16      is 5.  The highest is 5.  And I guess the lowest you can
17      go is 3.
18          Q.    Okay.  So that first number --
19          A.    That's what I believe it is.
20          Q.    -- is a classification score; is that right?
21          A.    That's what I believe it is.
22          Q.    And what is that second number, which is 3 in
23      this case?
24          A.    I believe it's the lowest that he can go.
25          Q.    "The lowest he can go," what does that mean?
```

Anthony R. Coleman - 10/14/2021

119

1     A.   The lowest -- level 3 is the lowest he can go.
2   I believe that's what it is.
3     Q.   What level is that referring to?
4     A.   That would be, I believe, medium.
5     Q.   Is that a custody level?
6     A.   Yes.
7     Q.   So am I reading it correctly to say his
8   classification --
9     A.   To be honest with you, I'm not sure if you're
10  reading it correctly.  Because you're asking me what I
11  think it is.  I'm telling you what I think it is.
12    Q.   Okay.  So what is this person's classification
13  score?
14          MS. LOVE:   Foundation.
15          THE WITNESS:   I will say max 5.
16    Q.   (By Ms. Abela) What is the person's custody
17  level?
18    A.   Well, that would be -- their custody level at
19  this time?  I would say max.
20    Q.   Okay.  What is your understanding of what that 3
21  means?
22    A.   I don't know.
23    Q.   You don't know what that 3 means?
24    A.   No.
25    Q.   Do you have an estimate of what that 3 means?

1              MS. LOVE:  Foundation.

2              THE WITNESS:  I don't.

3      Q.    (By Ms. Abela) Okay.  So according to this form,

4  what are the reasons that Mr. Collins here was classified

5  as max custody?

6              MS. LOVE:  Foundation.

7              THE WITNESS:  He's in on a life sentence.

8  So an inmate doing a life sentence has to serve at least

9  two years in max custody.

10     Q.    (By Ms. Abela) Okay.  And you know that from

11  looking at this evidence relied on to support the

12  recommendation section; correct?

13     A.    I know this from where?

14     Q.    You -- you answered that question based on

15  reading the section titled Evidence Relied on to Support

16  the Recommendation; correct?

17     A.    I don't understand your question.  You're asking

18  me why I know that?

19     Q.    Yes.

20     A.    It's -- as far as I know, it's always been an

21  inmate that is doing a life sentence has to serve two

22  years.

23     Q.    Yeah.  And I was asking how you knew that about

24  Mr. Collins?

25              MS. LOVE:  Foundation.

1              THE WITNESS:  Inmate Collins has served

2    less than two years of a life sentence.

3         Q.   (By Ms. Abela) Right.  And you were reading that

4    under the section that says Evidence Relied on to Support

5    the Recommendation; right?

6         A.   Oh, yes, yes, yes.

7         Q.   Okay.  Based on this document, was Mr. Collins

8    given a copy of the hearing findings?

9              MS. LOVE:  Foundation.

10              THE WITNESS:  Was the inmate notified of

11    his appeal process?  Is that what you're asking me?

12         Q.   (By Ms. Abela) No, I asked --

13         A.   Was he provided a copy of the hearing finding?

14    Well, right there, it says no.

15         Q.   Okay.  And based on this document, was

16    Mr. Collins provided a notice of the appeal of maximum

17    custody placement?

18              MS. LOVE:  Foundation.

19              THE WITNESS:  It says yes, according to the

20    document.

21         Q.   (By Ms. Abela) Does it?

22         A.   "Inmate notified of appeal process," and the box

23    is checked "yes."

24         Q.   I had asked were they given a copy of the notice

25    of appeal for maximum custody placement?

Anthony R. Coleman - 10/14/2021

122

1                    MS. LOVE:  Foundation.

2                    THE WITNESS:  It says no.

3                    MS. LOVE:  There's been no testimony that

4       he authored this document.  So he can read from it, but

5       it's going to be a foundation objection as to all.

6                    MS. ABELA:  I'm asking him what it says

7       according to the document.

8                    MS. LOVE:  Foundation as to all questions.

9            Q.   (By Ms. Abela) In this form here, it says that a

10      copy is designated to go to the inmate; is that correct?

11           A.   Yes.

12           Q.   Okay.  And it looks like from this document that

13      on April 24, I believe, 2019, Mr. Collins was approved to

14      be in max custody; correct?

15                   MS. LOVE:  Foundation.

16                   THE WITNESS:  That's what it looks like

17      reading from the form.

18           Q.   (By Ms. Abela) Can I ask you, do you sometimes

19      review these maximum custody recommendation and approval

20      documents?

21           A.   Yes.

22           Q.   How frequently would you say you review them?

23           A.   When I have to sign them and approve them.

24           Q.   Okay.  Do you understand the documents when you

25      do that review?

Anthony R. Coleman - 10/14/2021

123

1      A.    Yes.

2      Q.    Okay.  So you're familiar with this form;

3   correct?

4      A.    Yes.

5      Q.    And you've signed these forms in the past?

6      A.    Yes.

7      Q.    Would you say you signed these forms fairly

8   frequently in the past?

9      A.    At least three times a week.

10      Q.    Okay.  I'm going to bring up what has been

11   marked Coleman Exhibit 7.

12              (Deposition Exhibit 7 was marked for

13   identification.)

14      Q.    (By Ms. Abela) And this is a 14-page document

15   that begins on Bates ADCRR 00163362.  What is this

16   document that we're looking at right now?  I'm looking at

17   the first page of this document.

18      A.    Institutional file Side 2.

19      Q.    It looks sort of like it's a header document.

20   Would you agree with that?

21      A.    It says institutional file Side 2.

22      Q.    Okay.  And do you know if the institutional

23   file, sort of the organization of an institutional file,

24   is standard across ADCRR?

25      A.    If institutional files are standard across the

124

1    whole organization?

2         Q.    Yes.

3         A.    Yes.

4         Q.    I'm sorry, I missed your answer.

5         A.    Yes, they should be.

6         Q.    And I believe you testified earlier that you did

7    not recall specifically what is included in institutional

8    file Side 2.  Is that correct?

9         A.    Yes.  I don't know them by sections.

10        Q.    Okay.  I'm going to scroll to some documents.

11   And I'm going to apologize in advance.  They're in

12   reverse chronological order.  So it's a little back and

13   forth to follow.

14               I'm going to go to the third page of Exhibit 7,

15   which is Bates stamp ADCRR 00163364.

16               What is this document?

17        A.    Notice of hearing, inmate's rights, postpone

18   maximum custody placement.

19        Q.    Okay.  And this particular one is for

20   Mr. Collins who is on -- housed at Rast; correct?

21        A.    Okay.  Yes.

22        Q.    And it's for a hearing date of June 16, 2021;

23   right?

24        A.    Okay.

25        Q.    Did I read that correctly?

Anthony R. Coleman - 10/14/2021

125

1      A.    Yes.

2      Q.    Okay.

3      A.    6-16-21.

4      Q.    Correct.  And this was -- I'm going to scroll

5   down.  I'm sorry.  Give me one second -- more than two

6   years after he entered maximum custody; is that correct?

7              MS. LOVE:  Foundation.

8              THE WITNESS:  Yes.

9      Q.    (By Ms. Abela) This part here that we're looking

10   at right now where it says rationale for placement and

11   then there's some text that follows, who would fill in

12   this bottom portion on this form?

13      A.    CO-III.

14      Q.    Do you see here where we have line that says,

15   "Scores 24/13, 5/4"?

16      A.    Yes.

17      Q.    Okay.  What does the 4 stand for here, do you

18   know?

19      A.    Institutional score and public score, risk

20   scores.

21      Q.    Is 4 the risk score?

22      A.    It's the institutional, and 4 is the public

23   risk.

24      Q.    So 4 is the public risk score?

25      A.    Yeah.  5/4.  Yes.

Anthony R. Coleman - 10/14/2021

126

1    Q.    And did I understand you correctly to say that 5
2  is the institutional risk score?
3    A.    Yes.
4    Q.    What do you understand the public risk score to
5  mean?
6    A.    The score of his risk to be around staff, around
7  inmates, out in the public, is my understanding.
8    Q.    Is that -- do you know what the top level is for
9  that score?  Is it 5?
10   A.    Yes.
11   Q.    Okay.  What do you understand the institutional
12 risk score to be?
13   A.    His risk in the institution.
14   Q.    Okay.  How is that different from the public
15 risk score?
16   A.    1 is can he be out in public, can he get a job
17 working off-site in the community.
18   Q.    That's the public risk score; right?
19   A.    Yes.
20   Q.    And the institutional risk score?
21   A.    In the institution.
22   Q.    His risk in the institution?
23   A.    Yes.
24   Q.    I'm going to scroll up to the second page of
25 this document, which is Bates ADCRR 00163363.  Where it

127

1   says "Mr. Collins," you'll see sort of in the Evidence

2   Relied on to Support the Recommendation section that he

3   had no disciplinaries and he had been at phase 3, step 3?

4        A.   Uh-huh.

5        Q.   Correct?

6        A.   Yes.

7        Q.   Okay.  So if you recall when we were looking

8   previously at his score numbers, he started as a 5/3;

9   right?

10                  MS. LOVE:  Foundation.

11                  THE WITNESS:  He started as a 5/3?

12       Q.   (By Ms. Abela) Yeah.  That first document we

13   looked at for Mr. Collins said he was at 5/3.

14       A.   Yes.

15       Q.   Do you know why his public risk score went from

16   3 to 4 if he had had no disciplinaries and he was at

17   phase 3, step 3?

18       A.   No.  I did not sign off on this one.

19       Q.   Do you know why somebody's score might do that?

20       A.   Could you scroll down?

21       Q.   I'm sorry, did you say up or down?

22       A.   Down.  Hold right there.  Go back up, please.

23   Okay.  It was denied.  His close custody override, it was

24   an override.  So at this time even though he's doing

25   well, it was at their discretion that they did not grant

Anthony R. Coleman - 10/14/2021

128

1    the override.

2        Q.    So he stayed in max custody; right?

3        A.    Yes.

4        Q.    Okay.  And I understand that you didn't look at

5    this one, but can you give me an example of why

6    somebody's public risk score would increase if they had

7    had no disciplinary and that they were at phase 3 and

8    step 3?

9                MS. LOVE:   Foundation.

10               THE WITNESS:   I can't explain why someone

11   else would make that decision.

12               Perhaps there's something going on, an

13   investigation, or the inmate is just not ready to be

14   given an override yet.  Or someone just did not --

15   because when you put your name on there, you're basically

16   saying that this inmate is going to do everything right.

17   You're recommending this for this inmate.

18               And if the inmate is displaying -- even

19   though he's got his phase 3, step 3, he's still not

20   displaying the right attitude that you would trust to

21   give him in a lower custody.  Maybe he's doing well in

22   the higher custody.  He's being managed well in the

23   higher custody.  But they don't feel he can be managed

24   well in the lower custody.  So they are not going to

25   recommend it.

Anthony R. Coleman - 10/14/2021

129

1                   So they may deny it right now.  They may
2      tell them, "Let's wait another six months.  Let's wait
3      another 60 days.  Let's wait.  Let's wait another 30
4      days.  But at this time you're phase 3, step 3, you're
5      doing great, but we don't feel like you're ready to be
6      granted an override."
7           Q.   (By Ms. Abela) Would you anticipate that type of
8      information would get documented in one of these sections
9      that says Evidence Relied on to Support the
10     Recommendation?
11                   MS. LOVE:   Foundation.
12                   THE WITNESS:   Scroll up -- I mean down.
13     Down.  I'm sorry.  Okay.  Inmate can be managed on close
14     custody.  Recommend facility override.  Custody override
15     to close custody.  I'm sorry, not facility.
16                   The deputy warden denied it.  And the
17     deputy warden of operations denied it.
18          Q.   (By Ms. Abela) I was trying to understand.  You
19     were describing a whole sort of line of analysis that
20     somebody might --
21          A.   Well, you asked me -- I'm sorry.
22          Q.   That somebody might go through when they're
23     considering whether to recommend somebody to move
24     classification levels; right?
25          A.   Okay.

Anthony R. Coleman - 10/14/2021

130

1    Q.   But I was asking if you would expect that

2    analysis to be documented in this form.

3                MS. LOVE:   Form and foundation.

4                THE WITNESS:   I don't know.  I have had

5    talks with inmates and explained to them why in my

6    experience.  Didn't always document it.  You know, they

7    may say, "Hey, you didn't approve my override."

8                I'll say, "This is why I didn't approve

9    your override.  Even though you're at 3/3, phase 3,

10   step 3, but your actions are really not close custody

11   appropriate."

12               So do I always document it?  No.  Sometimes

13   it's just like that.  You tell the inmate this is why.

14   And I don't always document.  The inmate may catch me in

15   the yard and say, you know, "Why did you disapprove it?"

16               I'll say, "This is why I disapproved it."

17   Or they already know why they were disapproved.

18       Q.   (By Ms. Abela) When you review these maximum

19   custody placement recommendation and approval forms, do

20   you review the documents that show the person's

21   classification scores and how they were calculated?

22       A.   No.  I look at everything through ACIS.  I look

23   them up.  I talk to the CO-III.  We look at the

24   paperwork.  We talk about it.  And then we make the

25   decision -- make my decision based on that.

131

1     Q.    Are people's classification scores in ACIS?

2     A.    Yes.

3     Q.    Okay.  Who is the classification administrator?

4     A.    CO-IVs.  For the unit at Rast?

5     Q.    Yes.

6     A.    CO-IVs and the ADW.

7     Q.    So how does that person, the CO-IVs and ADW,

8     know what's going on with a particular individual's

9     behavior beyond their disciplinary and their step levels?

10    A.    We talk.  We tour.  We have ICSs.  So the

11    administration is involved.  We walk and talk to the

12    inmates.  We talk to the CO-IIIs.  You just got to know

13    your population.  And just walk and talk.  I mean --

14    Q.    So there are considerations that are taken into

15    account that are not documented on a maximum custody

16    placement form?

17              MS. LOVE:  Form and foundation.

18              THE WITNESS:  I would say there are

19    considerations taken that aren't documented.  Everything

20    that needs to be documented is documented.  If the inmate

21    is not acting appropriately, then it's documented.

22              As you can see, as I said before, sometimes

23    they have a step 3.  They have a phase 3.  And they're

24    doing well in that higher custody because of the way

25    they're managed.  But, you know, from experience, you

Anthony R. Coleman - 10/14/2021

132

1    know if he goes to a lower custody, he will not act the

2    way he should.

3                   So sometimes with this, you might just tell

4    the inmate -- I would tell the inmate to wait and let's

5    see how he does, how he performs later on.

6                   Everyone that comes up for consideration

7    does not have to be approved.  If there's circumstances.

8        Q.    (By Ms. Abela) I'm going to page 3 of Exhibit 7.

9    With those scores we were talking about earlier, where on

10   this document it's 24/13, 5/4.  Who calculates those

11   scores?

12       A.    I want to say central office.

13       Q.    And does that apply for both 24/13 and the 5/4?

14       A.    I believe so.  Total scores.

15       Q.    So where would the calculation of those scores

16   be reflected in somebody's file?

17                  MS. LOVE:  Foundation and form.

18                  THE WITNESS:  I don't know.

19       Q.    (By Ms. Abela) I'm looking here at the beginning

20   of this paragraph where it says "triggered max custody

21   review."

22       A.    Uh-huh.

23       Q.    What does that mean?

24       A.    Sometimes incidents can be where you review a

25   file, inmate's file, it could be event triggered.  Or

1  I'll give you -- like you want to say the -- or time
2  triggered.
3       So it's time for a review, annual review, or the
4  inmate got a ticket and which triggered a review for his
5  custody level.  It depends.  But triggered max custody
6  review for Inmate Collins.  So his review was triggered.
7       Q.   Okay.  So I want to make sure I understood.  You
8  said there could be a trigger for a max custody review
9  based on time?
10      A.   An event or time.
11      Q.   An event or time.  Okay.  Would anything other
12  than the formal disciplinary ticket trigger a max custody
13  review?
14      A.   Time.
15      Q.   Anything else?
16      A.   I mean, I don't know.  There could be all kinds
17  of stuff.  It can be if they needed to recalculate his
18  time, his release date, or something like that, his
19  score, that could trigger it.  So that's an event.  It
20  just says, "trigger max custody review for Inmate
21  Collins."
22      Q.   Other than time, a formal disciplinary ticket or
23  when somebody might need to have their release date
24  recalculated, are there any other things that might
25  trigger a maximum custody review?

1          MS. LOVE:   Foundation.

2          THE WITNESS:   None that I can think of

3   right now.

4     Q.   (By Ms. Abela) Okay.   So I'm going back up to

5   page 2, which as I said it's in reverse chronological

6   order.   So this is actually the second page of the

7   document we were just looking at.   This is Bates stamp

8   ADCRR 00163363.

9          And what is this document?

10    A.   Max custody placement recommendation.

11    Q.   For Mr. Collins; correct?

12    A.   Yes.

13    Q.   And on 6-16, kind of scrolling to the middle of

14   the page there, the classification officer recommended

15   close custody; isn't that right?

16    A.   Yes.   The CO-III.

17    Q.   Okay.   What does it mean that the box right

18   below Garcia, the classification officer's name printed,

19   is checked.   Do you see where it's --

20    A.   That has nothing to do -- that box has nothing

21   to do with Garcia.

22    Q.   Okay.   Could you tell me what the recommended

23   and denied boxes mean?

24    A.   Placement is recommended or denied.

25    Q.   Okay.   And who would have filled out this

Anthony R. Coleman - 10/14/2021

137

1        A.    All right.   So if they say recommended, that

2    means they're recommending him for close for max custody.

3    What they're saying is the inmate can't be managed at

4    close custody.   Recommend override -- custody override to

5    close custody.   So they're saying close custody is

6    denied, recommending -- they're saying max custody is

7    denied, recommending close custody.

8        Q.    Okay.   So the recommendations of the deputy

9    warden and the warden here was that this person should be

10   moved to close custody; correct?

11       A.    Exactly.

12       Q.    Okay.   And CO-IV Dempsey who's the

13   classification administrator for this says, I agree with

14   you.   I'm approving that movement.   And this means close

15   custody is approved for this person?

16       A.    Yes.

17             MS. LOVE:   Foundation.   Try to pause a

18   little bit before you answer.   So I can say my objection.

19             THE WITNESS:   I'm sorry.

20             MS. LOVE:   That's okay.

21       Q.    (By Ms. Abela) Do you know if Mr. Collins is

22   still in max custody?

23       A.    I don't.

24       Q.    I'm going to switch documents here.   Give me one

25   moment.   All right.   I'm bringing up what is marked as

1          MS. ABELA:  And we're back on the record.

2     Q.   (By Ms. Abela) Mr. Coleman, Ms. Love was just

3 telling me you had made a phone call while we are on

4 break.  Can you please tell me who you contacted?

5     A.   I contacted one of the CO-3s at the Rast unit to

6 ask -- to inquire about the status of Inmate Collins.

7 And Inmate Collins did get approved his override to

8 close.

9          However, he stayed at max at close supervision,

10 because the blue side is closed for construction.  So we

11 did not have a bed for him for close management.

12          Currently, his packet is at central office

13 waiting to be approved.  He is now triggered for medium

14 custody.  And it looks like that's going to be approved.

15 So he'll be leaving Rast max and heading to a medium yard

16 as soon as central office approves that.

17     Q.   So am I understanding correctly that central

18 office still has to approve his transfer to medium

19 custody?

20     A.   Yes.

21     Q.   Is there anything that would result in him not

22 getting transferred to medium custody?

23     A.   When I spoke with the CO-3, it looks like we're,

24 just -- she says it looks like we just -- she was very

25 positive about it.  She said, "Well, it looks like we're

Anthony R. Coleman - 10/14/2021

141

1   going to do it, because it looks like everyone approved

2   it.  We're just going to hand him his walking papers and

3   send him to medium."

4       Q.   And so how -- how is that transition documented

5   in his max custody decision paperwork?

6       A.   As far as the medium thing or the --

7       Q.   Yes.

8       A.   Well, it looks like he triggered for review for

9   medium custody.  And everything was sent up.  And it

10  looks like he's probably going to get it.

11      Q.   Okay.  Is he for sure going to get it?

12      A.   The CO-3, she was looking at her ACIS and his

13  paperwork and said it looks like he looks good.  He's

14  going to get it.  He has no disciplinary.  He hasn't done

15  anything bad.  So it looks like he'll get his medium

16  custody.

17      Q.   As of today he is not yet medium custody; is

18  that correct?

19      A.   No, he is close custody.

20      Q.   And where is he currently housed?  Did you find

21  that out?

22      A.   He's housed at Rast max.

23      Q.   So he's a close custody inmate that's housed

24  still in Rast max?

25      A.   Yes.

Anthony R. Coleman - 10/14/2021

142

1      Q.    And how long would he remain there?

2      A.    As soon as we can find him a bed.  With our

3   close side closed for construction, and we have the

4   detention inmates there, we really don't -- we had to

5   send all our close custody inmates elsewhere.  So we

6   really don't have any beds for close custody.

7      Q.    And do you know when he was reviewed?

8      A.    For medium?

9      Q.    Yeah.

10     A.    No, I don't.  I didn't -- she didn't tell me

11   that.

12     Q.    Is that documented anywhere?

13     A.    Wait a minute.  I'm sorry.  He's being reviewed.

14   He's in the -- right now he's in the middle of being

15   reviewed for medium custody.  But it looks good, is what

16   she told me.

17     Q.    All right.  I'd like to know when Mr. Collins

18   was reviewed and changed to close custody.  Do you know

19   that?

20     A.    No, I don't.

21     Q.    Where would you look for in his paperwork to

22   find out?

23     A.    It would be in ACIS.  You would find out when he

24   became close custody.

25     Q.    Would it be in his institutional file?

Anthony R. Coleman - 10/14/2021

143

1      A.    It should be.

2      Q.    Would it be anywhere else if it's not in his

3   institutional file other than ACIS?

4      A.    Those are the only two that I know of.  It had

5   to be after Ms. -- I can't think of her name from central

6   office.  She was on the paperwork.  Beginning with a D.

7   It would have to be after her approval.

8      Q.    What is her role?

9      A.    She's the classification administrator at

10  central office.

11     Q.    All right.  I'm going to pull up Exhibit 7 again

12  so I can understand the flow of this process a bit

13  better.  Oh, can you see my screen?

14     A.    Yes.

15     Q.    Okay.  Going to page 5 of this document, which

16  is ADCRR 00163366.  This was for a hearing that was on

17  May 3; correct?

18     A.    Okay.  Yes.

19     Q.    And that was more than two years after

20  Mr. Collins was placed into maximum custody?

21     A.    I don't remember the date he was placed on

22  maximum custody.

23     Q.    We were reviewing that earlier.

24     A.    Uh-huh.

25     Q.    I'm scrolling up.

Anthony R. Coleman - 10/14/2021

145

1    were looking at?

2        A.   No, I can't answer that.

3        Q.   Okay.  And, again, looking at boxes here,

4    according to the document, was Mr. Collins given a copy

5    of the hearing findings?

6        A.   No.

7        Q.   And was he provided a notice of appeal of

8    maximum custody placement?

9        A.   Yes.

10       Q.   Is the box that's next to inmate given a copy of

11   a notice of appeal for maximum custody placement checked

12   for yes or no?

13       A.   No.

14       Q.   So that would indicate he was not given a copy

15   of the notice of appeal for maximum custody placement;

16   right?

17       A.   Correct.

18       Q.   I'd like to scroll down in this document.  And

19   I'm on page 7, which is ADCRR 00163368, which is another

20   hearing notice dated May 15 -- I'm sorry, May 17, 2021;

21   correct?

22       A.   Yes.

23       Q.   For Mr. Collins.  Do you know why he might have

24   had two hearings in pretty close proximity to each other?

25       A.   No, I do not.

Anthony R. Coleman - 10/14/2021

148

1    Q.   And that he had had no disciplinaries and
2    maintained his phase 3, step 3; right?
3    A.   Yes.
4    Q.   How would somebody's score have changed in that
5    eight months here in October as a 3/2 and then in June as
6    a 5/4 when he had no disciplinaries and he was
7    maintaining his phase 3 and step 3?
8             MS. LOVE:   Foundation.
9             THE WITNESS:   I would say you have to talk
10   to time comp.
11   Q.   (By Ms. Abela) So you're saying time comp
12   determines institutional risk score and the public risk
13   score?
14   A.   Well, that's -- well, it's done through programs
15   and you would have to talk to someone at central office.
16   Q.   Are people in programs at the unit or are they
17   at the central office?
18   A.   Both.   But the administrator for the final --
19   for the final word on approving max custody placement or
20   classification, that comes from central office.   And as
21   far as their score, that's done at central office.
22   Q.   Okay.   So central office calculates the
23   institutional risk score and the public risk score?
24   A.   Yes.
25   Q.   Do you know if they document that anywhere?

Anthony R. Coleman - 10/14/2021

149

1      A.    It should be in ACIS or the institutional file.

2      Q.    Do you know if ACIS contains more information

3   than somebody's -- withdrawn.

4          If you were to look up a person in ACIS, would

5   the information in ACIS also be reflected in their

6   institutional file?

7      A.    There would be some of the same information in

8   both, yes.

9      Q.    But they're not identical?

10     A.    No.  I think you would find more in their

11  institutional file than you probably would in ACIS.

12     Q.    Okay.  So the institutional file is more

13  complete than what is in ACIS; is that right?

14     A.    It's my understanding, yes.

15     Q.    I'm going to scroll down to page -- I'm sorry,

16  scroll up to page 8 of this document.  And I'm looking

17  here in the Evidence Relied on to Support the

18  Recommendation box section in the far right-hand side.

19  Do you see where my cursor is?

20     A.    Yes.

21     Q.    It says 4/R or L/R.  Do you see that?

22     A.    I couldn't make that out either.  I don't know

23  if it says L/R or 4/R.

24     Q.    Do you know what this means?

25     A.    No.

Anthony R. Coleman - 10/14/2021

150

1        Q.    Okay.  Do you know who might have written it?

2        A.    No.

3        Q.    Okay.  And you see in this evidence section

4    where it just says "no disciplinary"; right?

5        A.    Yes.

6        Q.    Okay.  And the first box here on this form is

7    checked "denied," right, above your name?

8        A.    Yes.

9        Q.    Okay.  And that means that you were recommending

10   close custody; correct?

11       A.    Yes.

12       Q.    Okay.  And then the box above the warden also

13   says "denied"; right?

14       A.    Yes.

15       Q.    Indicating that they are also recommending

16   management at close custody; correct?

17       A.    Yes.

18       Q.    And then the final box is the classification

19   administrator's box and it's checked "approved"; correct?

20       A.    Yes.

21       Q.    And in the comments, I believe it says "max

22   cust," maybe short for max custody.  Is that how you read

23   it as well?

24       A.    Yes.

25       Q.    Okay.  Why does that say max custody in the

Anthony R. Coleman - 10/14/2021

153

```
1    said earlier, but I understand if you're changing your
2    testimony now to say that.
3              MS. LOVE:  Form.  Misstates testimony.
4         Q.   (By Ms. Abela) I'm going to go to page 9
5    again -- sorry, page 8.  So tell me again what
6    classification Administrator Flores is recommending here.
7              MS. LOVE:  Form and foundation.
8              THE WITNESS:  Approved max custody.
9         Q.   (By Ms. Abela) All right.  When an inmate is
10   being reviewed for their maximum custody placement, is
11   the ultimate decision about whether they stay in max
12   custody left up to the classification administrator?
13        A.   Yes.  The ultimate, yes, as you can see.
14        Q.   And does the classification administrator work
15   for complex?
16        A.   No.  Central office.
17        Q.   Sorry.  Central office, okay.
18             So is a classification administrator somebody
19   who would be expected to know an incarcerated person
20   who's up for review?
21             MS. LOVE:  Foundation.
22             THE WITNESS:  When you say "know," you mean
23   have knowledge of them?  Talk with them?  What?
24        Q.   (By Ms. Abela) Yes.  Would they have talked to
25   them in the past, met with them?
```

154

1        A.    Not -- I'm sorry.  Go ahead.

2        Q.    Yes.  Would the classification administrator

3   that makes the ultimate decision have previously met with

4   or know the person being reviewed?

5              MS. LOVE:  Foundation.

6              THE WITNESS:  No.

7        Q.    (By Ms. Abela) I am going to switch exhibits.

8   All right.  This is Coleman Exhibit 9, ADCRR 00161663.

9              (Deposition Exhibit 9 was marked for

10  identification.)

11       Q.    (By Ms. Abela) I'm going to go ahead and scroll

12  to page 3.  What is this document?

13       A.    Notice of hearing and inmate rights.

14       Q.    And it is for Mr. Jimenez and it's dated

15  October 2, 2017; right?

16       A.    Yes.

17       Q.    In the rationale for placement, it has his total

18  scores of 39/29 and then 3/2 -- I'm sorry, 3/3; correct?

19       A.    Uh-huh.

20       Q.    I'm sorry?

21       A.    Yes.  I'm sorry.  I'm reading.

22       Q.    And that means based on your prior testimony

23  that his institutional risk score is 3 and his public

24  risk score is 3; correct?

25       A.    Yes.

1      A.    Yes.

2      Q.    So going to page 2, which is the maximum custody

3  recommendation approval.  I'll let you review it here,

4  but everybody that did this review concluded that he

5  should remain in max custody due to the nature of the

6  kidnapping; correct?

7            MS. LOVE:   Foundation.  I'm just noting for

8  the record foundation objections, that all line of

9  questioning as to the document, that his name does not

10  appear on it as the author.  Standing objection.

11            Go ahead.

12      Q.    (By Ms. Abela) Can you answer the question,

13  Mr. Coleman?

14      A.    What was the question again?  For him to remain

15  in max custody?

16      Q.    Yes.

17      A.    Yes.  That's what it says.

18      Q.    Okay.  And you review these forms pretty

19  frequently, right, in your work?

20      A.    Yes.

21      Q.    Okay.  And then looking at the final box here,

22  the clarification administrator recommended that the

23  person stay in maximum custody; correct?

24      A.    Yes.

25      Q.    And do you see where -- I'm sorry, looking at

1    page 2, still Evidence Relied on to Support the

2    Recommendation, where it says 39/29?

3        A.    Uh-huh.

4        Q.    I'm sorry?

5        A.    Yes.   Sorry.

6        Q.    Does that refer to his scores?

7            MS. LOVE:   Foundation.

8            THE WITNESS:   I don't know.

9        Q.    (By Ms. Abela) And based on this document, was

10   Mr. Jimenez given a copy of the hearing findings?

11       A.    From what I'm reading, the "no" box is checked.

12       Q.    Based on the document, was Mr. Jimenez given a

13   copy of a notice of appeal of maximum custody placement?

14       A.    Well, it says, "Was the inmate notified of the

15   appeal process?"  So was he given a piece of paper?  I

16   don't know.  Was he notified verbally?  I don't know.

17   But the box says "yes."

18       Q.    Was he given a copy of the notice of appeal of

19   maximum custody placement?

20       A.    No.  The box checked says "no."

21       Q.    I'm going to scroll down to page 5 of this

22   document.  This is another notice of hearing for

23   Mr. Jimenez dated 9-14-20; correct?

24       A.    Yes.

25       Q.    And the rationale for placement, at the very

Anthony R. Coleman - 10/14/2021

1   bottom, it says, "Due to USB [sic] hold, a C/O/R to max

2   is recommended."

3           Did I read that right?

4       A.   Yes.

5       Q.   What does a USB hold mean?

6       A.   I don't even remember right now.

7       Q.   Do you know what it would signify?

8       A.   I'd have to remember what the OSB means, and I

9   can't even think of it right now.

10      Q.   So the term USB hold -- I'm sorry, OSB hold

11  doesn't hold any meaning for you?

12      A.   It does.  I can't remember what it means.

13      Q.   Okay.  So what does it mean for you?

14      A.   It's a certain type of hold.

15      Q.   Okay.  What would a hold in this context refer

16  to?

17      A.   His max -- due to his crime, his max custody is

18  being upheld -- on hold.  I'm trying to remember what the

19  OSB stands for, but I can't remember.

20      Q.   Okay.  Do you know if that's in a policy

21  anywhere?  Could it be looked up?

22      A.   Under -- yeah, it can be looked up.  I just

23  can't remember.  I don't remember what it stands for.

24      Q.   Okay.  Do you remember, do you know what C/O/R

25  stands for here?

Anthony R. Coleman - 10/14/2021

159

1      A.    It's a type of override.

2      Q.    Okay.  What kind of override?

3      A.    I don't remember.  It'll come to me.

4      Q.    What would that -- what would that type of an

5  override mean in this context?

6            MS. LOVE:  Form and foundation.

7      Q.    (By Ms. Abela) I'm going to back up --

8      A.    OSB stands for offender standards bureau hold,

9  which is central office.  A -- you have, I don't remember

10  the override to max.  So offender standards bureau is

11  OSB.

12     Q.    Okay.  And you said that's central office;

13  correct?

14     A.    Yes.

15     Q.    So central office can put a hold on people and

16  keep them in max custody?

17     A.    Yes.

18     Q.    Okay.  Do you know the reasons they would put a

19  hold on somebody?

20     A.    At this time they don't feel that that person is

21  warranted to be out of max custody.

22     Q.    Okay.  Do you know what they base that decision

23  on?

24     A.    His history.  In this case, this is still

25  Mr. Jimenez.  He took a staff member hostage.  And that's

1    a pretty serious thing.

2        Q.   Do you know if there are any limits on how long

3    central office can put a hold on somebody's maximum

4    custody status?

5        A.   No, I don't.

6        Q.   Did you happen to think of the type of override

7    that C/O/R is?

8        A.   Not yet.

9        Q.   Okay.  I'm going up to 4, which is the max

10   custody placement recommendation for Mr. Jimenez

11   for no -- sorry, September 16, 2020; right?  I'm sorry?

12       A.   I said okay.

13       Q.   Okay.  Do you see the Evidence Relied on to

14   Support the Recommendation section?

15       A.   Yes.

16       Q.   And that there's handwritten 4/R or L/R --

17       A.   Yes.

18       Q.   -- in that box.  Do you know what that means?

19       A.   No.

20       Q.   Under the deputy warden section of this

21   document, that's your signature and name; correct?

22       A.   Yes.

23       Q.   So you reviewed this form; right?

24       A.   Yes.

25       Q.   Okay.  Do you remember why you recommended this

Anthony R. Coleman - 10/14/2021

161

1   person be kept in max custody at this time?

2       A.   Because of the nature of his crime, took a

3   hostage with a weapon.  He's SMI.  And at that time, I

4   did not feel that it warranted being removed from max

5   custody.

6       Q.   Okay.  In the comment section, I believe you

7   wrote "remains a threat to the operational security of

8   the institution."  How did you know he remained a threat?

9       A.   Because of the incident that happened.

10      Q.   And you're referring to the incident in 2012;

11  correct?

12      A.   Yes.

13      Q.   And this was dated October of 2020; correct?

14      A.   Yes.

15      Q.   So eight years later, you believe he still

16  remained a threat to the operational security of the

17  institution?

18      A.   Yes.

19      Q.   Is that analysis documented in his file

20  anywhere?

21               MS. LOVE:  Form.

22               THE WITNESS:  My analysis?

23      Q.   (By Ms. Abela) Yes.

24      A.   It's documented right there.

25      Q.   Okay.  So this is the -- the comment section is

Anthony R. Coleman - 10/14/2021

162

1    the extent of the documentation as to why you recommended

2    he remain in max custody?

3        A.    Yes.

4        Q.    And the warden also agreed with that decision;

5    correct?

6        A.    Yes.

7        Q.    And in the comment section there, the warden

8    states, "Inmate's behavior warrants maximum custody

9    placement."

10           Did I read that right?

11       A.    Yes.

12           MS. LOVE:  Object to the form.  And for the

13    record, it says "deputy warden," not "warden."

14           MS. ABELA:  Noted.

15       Q.    (By Ms. Abela) Do you know if that comment

16    related to anything other than the 2012 kidnapping?

17       A.    Right now, I couldn't tell you.

18       Q.    Okay.  And in this section, we see that the

19    classification administrator comments say, I believe,

20    C/O/R to max; correct?

21       A.    Yes.

22       Q.    Any recollection of what those initials mean?

23       A.    No.  I just know it's a type of override.

24       Q.    Do you know what the effect of that kind of

25    override is?

163

1      A.    Pardon?

2      Q.    The effect of a C/O/R override?

3      A.    What do you mean by "effect"?  I don't

4   understand.

5      Q.    You recognize it to be a type of override?

6      A.    Yes.

7      Q.    What would having somebody C/O/R to max mean to

8   you?

9      A.    It could be a classification override.  I'm not

10  sure what the C stands for.  Could be conditional

11  override.  I don't know.

12     Q.    Does the O/R part of that stand for "override"?

13     A.    Yes.

14     Q.    Okay.  I'm going to turn off the screen share.

15  And is there any reason somebody would be denied an

16  opportunity to go to recreation at Rast?

17            MS. LOVE:  Foundation.

18            THE WITNESS:  Yes.

19     Q.    (By Ms. Abela) Yes?  Okay.  What are those

20  reasons?

21            MS. LOVE:  Can we clarify, please, in the

22  questions when you say "Rast," if you're referring to a

23  certain location or custody level?  Because Rast has a

24  lot of different populations.

25     Q.    (By Ms. Abela) Is there a reason somebody would

Anthony R. Coleman - 10/14/2021

164

1  be denied the opportunity to go to recreation at Rast

2  max?

3        A.   Yes.

4        Q.   Okay.  What are those reasons?

5        A.   Assaultive behavior, threatening, refusing to go

6  to rec.

7        Q.   Any other reasons?

8        A.   That's all I can think of right now.

9        Q.   Is there any reason somebody would be denied the

10 opportunity to go to recreation at Rast close?

11       A.   At Rast close?

12       Q.   Yes.

13       A.   If a close inmate doesn't want to go to rec,

14 they don't go to rec.  If they've had assaultive

15 behavior, they probably won't be at Rast close.  Rast

16 close is basically controlled movement.  But if an inmate

17 has assaulted or -- or assaulted staff or inmates or been

18 disruptive, he probably won't be at Rast close.

19       Q.   So the only reason somebody would not -- or be

20 denied an opportunity to go to rec is if they refuse, if

21 they're on the close side; correct?

22       A.   Yes.

23       Q.   Are you generally familiar with Department

24 Order 704?

25       A.   Yes.

Anthony R. Coleman - 10/14/2021

165

1      Q.   Okay.  What does 704 relate to?

2      A.   It relates to the inmate's cell being clean,

3 following the rules, doing what they're supposed to do.

4 It's --

5      Q.   Okay.  Would someone hanging up -- I'm sorry, go

6 ahead.

7      A.   It's the guidelines for how the inmate should

8 act.

9      Q.   Okay.  And would somebody hanging up wet laundry

10 in their cell to dry be an example of a common

11 noncompliance with the requirements of 704?

12      A.   Yes.

13      Q.   If somebody's cell is not in compliance with the

14 requirements of 704, where would that be recorded?

15      A.   On the 704 inspection sheet.

16      Q.   Okay.  Who fills that out?

17      A.   Whomever is doing the inspection.

18      Q.   And who is that?

19      A.   It can be a sergeant.  It can be an officer.  It

20 can be a CO-3.  It could be a lieutenant.  It can be me.

21 It can be the ADW.  Whoever performs the 704 checks.

22      Q.   Where are the inspection forms kept?

23      A.   They're filed away.  We review them and file

24 them away in admin at Rast.

25      Q.   I'm sorry?

Anthony R. Coleman - 10/14/2021

166

1      A.    Then we file them away in admin at Rast.

2      Q.    Okay.  Where would they ultimately be filed?

3      A.    In administration at Rast.

4      Q.    Okay.  Is that an institutional record or the

5   person's institutional file?

6      A.    It's not in their file.  The inspection sheet is

7   filed in administration at Rast, in the administrative

8   area at Rast.

9      Q.    How frequently would you say that you visit the

10  housing units at Rast?

11     A.    Are we talking max or close?

12     Q.    Let's start with max.

13     A.    Max?  At least five times a week, at the least.

14     Q.    And how about close?

15     A.    At least five times a week.

16     Q.    Are you also visiting the folks that are in

17  detention from Bachman that frequently?

18     A.    Yes.  I don't go -- I -- probably three times a

19  week.  But anytime there's an incident that goes on, I go

20  down there, check on it, supervise and oversee.  We also

21  have their supervisors coming over and checking and

22  overseeing everything.

23     Q.    Okay.  Is noncompliance with DO-704 considered a

24  refusal of recreation?

25              MS. LOVE:  Form.

Anthony R. Coleman - 10/14/2021

167

1          THE WITNESS:  If you're out of compliance,

2     yes.  The inmates are told if you're not in compliance,

3     that will be considered a refusal.  Because when the

4     inmates know that when you come to let them out for rec,

5     they need to be in compliance.

6          Q.   (By Ms. Abela) I'm going to bring up Coleman

7     Exhibit 10, which is Bates-stamped ADCRR 00158448.

8               (Deposition Exhibit 10 was marked for

9     identification.)

10          Q.   (By Ms. Abela) I'm going to zoom out so you can

11     see the whole document.  Can you see that?

12          A.   Yes.

13          Q.   Do you recognize this document?

14          A.   Yes.

15          Q.   Okay.  What do you recognize it as?

16          A.   My unit, Rast.

17          Q.   So this document is in your housing units at

18     Rast?

19          A.   Yes.

20          Q.   I'll submit that this is a photo we took on a

21     tour on September 20th of a sign that was posted in 3

22     Baker, pod 4.  Does that sound right?

23          A.   Yes.

24          Q.   Okay.  And the sign reads, "Beginning

25     06/01/2020, all inmates and their cells shall be in 704

Anthony R. Coleman - 10/14/2021

168

1   compliance before inmates will be allowed to go to

2   recreation.  Also, the inmates will be awake and ready to

3   exit the cell when the officers arrive.  Failure to be in

4   compliance or failure to be ready to submit to a strip

5   search or any unreasonable delay once the officer arrives

6   will be considered a refusal of recreation and will be

7   documented on the DO-812 forms as such."

8           Did I read that right?

9       A.   Yes.

10      Q.   So it sounded like you were aware of this

11  practice of counting DO-704 noncompliance as a refusal to

12  recreation; is that right?

13      A.   Yes.

14      Q.   Would it be fair, then, to assume that for all

15  out-of-cell tracking forms in Rast beginning June 1,

16  2020, an officer may have documented a person refused

17  recreation when their cell was noncompliant with 704?

18           MS. LOVE:   Foundation.  Form.

19           THE WITNESS:   It could be.

20      Q.   (By Ms. Abela) Is a 704 inspection recorded in

21  the correctional service log?

22      A.   The 704 inspection, I don't know if they're

23  putting them in the service log.  But when they do an

24  inspection, they have to document, fill out a 704

25  inspection tour sheet.

Anthony R. Coleman - 10/14/2021

169

1      Q.    But a 704 inspection is not necessarily in the

2   correctional service log; is that what I understood you

3   to say?

4      A.    Yes.

5      Q.    So was the decision to count 704 noncompliance

6   as a refusal of recreation -- withdrawn.

7            Why was the decision made to count 704

8   noncompliance as a refusal of recreation?

9      A.    Because we have had a pattern of inmates not

10  ready to submit to strip search or not willing to submit

11  to strip search, inmates, hey, come back and get me

12  later, I'm doing this, this, or this.

13           Once an inmate, if that -- if that first inmate

14  or second inmate, if we stop and wait for them, that's a

15  domino effect for every other inmate in there.  And we

16  will not be able to do everything in a timely manner like

17  we should.

18           So we talk to the inmates and we told them this

19  is what we're going to do.  And we put these up to let

20  them know that if they're not ready, if they don't want

21  to submit to the strip search, and if -- if they're

22  delaying, then that's going to be counted as a refusal.

23     Q.    Why was this change made in June 1, 2020?

24     A.    Because we gave a 30-day notice of when this is

25  going to take effect.

Anthony R. Coleman - 10/14/2021

171

1    ready, and then we have to do something.

2        Q.    (By Ms. Abela) Was there any policy updates made

3    regarding this change?

4        A.    No.

5        Q.    What are all the things that an officer or a

6    sergeant or whomever is doing a 704 inspection looks for

7    when they're doing a 704 inspection?

8        A.    They're looking for the lights not covered.

9    They make sure the cell door is not covered.  They're

10   making sure the beds are made at the right time.  They're

11   making sure the cell is in a clean, orderly fashion, or

12   some facsimile of.  No clotheslines are hanging out.

13          And those are some of the things we look at.

14       Q.    Okay.  Is there any laundry service at Lewis

15   Rast max?

16       A.    Yes, there is.

17       Q.    Okay.

18              MS. LOVE:  We're over the four-hour mark at

19   this point.

20              MS. ABELA:  I'm sorry, Rachel, I missed

21   that.

22              MS. LOVE:  We can check with the court

23   reporter, but I believe we're several minutes over the

24   four-hour limit.

25              MS. ABELA:  Could we get a time check?

173

1                          SIGNATURE PAGE

2          I, ANTHONY R. COLEMAN, a deponent exercising my
   right to read and sign my deposition taken on October 14,
3  2021, place my signature hereon and make the following
   changes on this _____ day of _____,2021.

4       (IF THERE ARE NO CHANGES, WRITE "NONE.")

5

6                              _____
                               ANTHONY R. COLEMAN
7

8  PAGE  LINE  READS          CHANGE TO           REASON

9  _____ _____ _____

10 _____ _____ _____

11 _____ _____ _____

12 _____ _____ _____

13 _____ _____ _____

14 _____ _____ _____

15 _____ _____ _____

16 _____ _____ _____

17 _____ _____ _____

18 _____ _____ _____

19 _____ _____ _____

20 _____ _____ _____

21 _____ _____ _____

22 _____ _____ _____

23 _____ _____ _____

24 _____ _____ _____

25 _____ _____ _____

174

1  STATE OF ARIZONA    )
                       )
2  COUNTY OF MARICOPA )

3           BE IT KNOWN that I took the foregoing
   deposition pursuant to Notice; that the witness was duly
4  sworn by me; and that said transcript is a full, true,
   and accurate record of the proceedings; that the
5  proceedings were taken down by me in shorthand and
   thereafter reduced to print under my direction; that I
6  have acted in compliance with ACJA 7-206.

7           I CERTIFY that I am in no way related to
   any of the parties hereto nor am I in any way interested
8  in the outcome hereof.

9           Pursuant to request, notification was
   provided that the deposition is available for review and
10 signature.

11          Dated this 25th day of October, 2021.

12
                        _____
13
14                      Jennifer Honn
                        Certified Reporter
15                      Arizona CR No. 50885

16

17          I CERTIFY that GLENNIE REPORTING SERVICES,
   LLC, has complied with the ethical obligations set forth
18 in ACJA 7-206.

19

20

21

22

23 _____
24 GLENNIE REPORTING SERVICES, LLC
   Registered Reporting Firm
25 Arizona RRF No. R1035

# EXHIBIT 4

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, Plaintiffs, v. David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, Defendants. | Case No. CV12-00601-PHX-ROS |

RULE 30(b)(6) DEPOSITION OF ARIZONA DEPARTMENT OF
CORRECTIONS, REHABILITATION, AND REENTRY
("ADCRR") STAFFING (LARRY L. GANN, JR.)

Via Zoom Videoconference
Chandler, Arizona
October 13, 2021; 1:42 p.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona  85020

602.266.6535
www.glennie-reporting.com

Prepared by:
Janet Hauck, RPR
Arizona CR No. 50522

2

1                              I N D E X

2

3   Witness                                          Page

4   LARRY L. GANN, JR.

5        Examination by Ms. Colby:                     5

6

7

8                     INDEX TO EXHIBITS

9   Description                                      Page

10  Exhibit 1      Amended Notice of 30(b)(6)          6
11                 Deposition

    Exhibit 4      Notice of Request for Proposal      16
12
    Exhibit 5      Staffing Plan                       21
13
    Exhibit 6      Variance Report - CONFIDENTIAL      42
14
    Exhibit 7      Inmate Net Growth 12 Month Rolling  46
15                 Average Annualized as of 6/30/21 -
                   CONFIDENTIAL Subject to Protective
16                 Order

17  Exhibit 9      Monitored Conditions Spreadsheet -  51
                   CONFIDENTIAL
18
    Exhibit 11     Clinical Data Reports -             52
19                 CONFIDENTIAL

20  Exhibit 12     Contract Change Order Amendment     55

21  Exhibit 13     E-mail exchange originating from    58
                   Richard Watts to Larry Gann, 7/8/20
22                 CONFIDENTIAL - Subject to
                   Protective Order
23
    Exhibit 14     Staffing Analysis - CONFIDENTIAL    64
24                 Subject to Protective Order

25

3

1                    INDEX TO EXHIBITS, Continuing

2    Description                                        Page

3    Exhibit 15    E-mail exchange originating from      72
                   Bobbie Stallcup to Tom Dolan,
4                  8/27/20 - CONFIDENTIAL Subject to
                   Protective Order
5
     Exhibit 17    Actual v. Contract Variance, 6/21 -   81
6                  CONFIDENTIAL Subject to Protective
                   Order
7
     Exhibit 18    Contract Amendment, 6/18/21           85
8
     Exhibit 19    E-mail exchange originating from      88
9                  Jennine Gahris to Larry Gann,
                   6/30/21

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1               RULE 30(b)(6) DEPOSITION OF ARIZONA

2   DEPARTMENT OF CORRECTIONS, REHABILITATION, AND REENTRY

3   ("ADCRR") STAFFING (LARRY L. GANN, JR.), was taken on

4   October 13, 2021, via Zoom videoconference, commencing at

5   1:42 p.m., before JANET HAUCK, RPR, a Certified Reporter,

6   Certificate No. 50522, for the State of Arizona.

7

8   VIDEOCONFERENCE APPEARANCES:

9   For Plaintiffs Shawn Jensen; Stephen Swartz;
    Sonia Rodriguez; Christina Verduzco; Jackie Thomas;
10  Jeremy Smith; Robert Gamez; Maryanne Chisholm;
    Desiree Licci; Joseph Hefner; Joshua Polson; and
11  Charlotte Wells, on behalf of themselves and all others
    similarly situated:

12
                PERKINS COIE, LLP
13              Mikaela N. Colby, Esq.
                Daniel C. Barr, Esq.
14              2901 North Central Avenue, Suite 2000
                Phoenix, Arizona  85012
15

16  For Defendants:

17              STRUCK LOVE BOJANOWSKI & ACEDO, PLC
                Timothy Bojanowski, Esq.
18              3100 West Ray Road, Suite 300
                Chandler, Arizona  85226
19

20

21

22

23

24

25

## 30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021

5

1           COURT REPORTER:  Before we proceed, will

2   counsel agree on the record that there is no objection to

3   me administering an oath to a witness not appearing

4   personally before me.

5               MS. COLBY:  Yes.

6               MR. BOJANOWSKI:  No objection.

7

8               LARRY L. GANN, JR.,

9   called as a witness herein having been first duly sworn by

10  the Certified Reporter to tell the whole truth and nothing

11  but the truth, was examined and testified as follows:

12

13                  EXAMINATION

14  BY MS. COLBY:

15      Q.    Hi, Mr. Gann.  My name is Mikaela Colby.  I'm

16  with Perkins Coie.  We're one of the attorneys for

17  plaintiffs in Parsons v. Shinn.

18               Can you please state your name and title

19  for the record.

20      A.    Sure.  My name is Larry Gann, Jr., and I am

21  assistant director of the Medical Services Contract

22  Monitoring Bureau.

23      Q.    And that's for the Arizona Department of

24  Corrections Rehabilitation and Reentry, correct?

25      A.    Yes, ma'am.

### 30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021

6

1      Q.    And I'm going to refer to that as ADC for
2  reference.  Is that okay?
3      A.    That's fine.
4      Q.    And when I refer to prisons or facilities, can
5  we have an understanding that I'm referring to the ten
6  Arizona state prison complexes?
7      A.    Yes.
8      Q.    And you understood the ground rules for your
9  deposition in your individual capacity this morning?
10     A.    Yes.
11     Q.    And you understand those same rules apply here?
12     A.    Yes.
13     Q.    And if you need to take a break at any time,
14  just let me know.
15              (Exhibit 1 identified for the record.)
16     Q.    BY MS. COLBY:  Can you see this Exhibit 1?
17     A.    Yes.
18     Q.    And do you recognize this document?
19     A.    Yes.
20     Q.    Is this the notice of your deposition today?
21     A.    Yes.
22     Q.    And you're here on behalf of ADC, not yourself
23  as an individual?
24     A.    Correct.
25     Q.    Are you the person who has been designated by

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

7

1    ADC to speak on its behalf with respect to the topics

2    listed in Exhibit 1?   I'll give you a second to look

3    through the topics.

4           A.     Yes.

5           Q.     Who designated you to speak on behalf of ADC?

6           A.     I was designated by the ADCRR department to

7    represent discussions on staffing.

8           Q.     And why did they designate you?

9           A.     I am assistant director.   I have extensive

10   experience with privatization staffing as well as self-op

11   staffing in former positions.   I also understand the

12   staffing allocation offsets and the variations of staffing

13   in the different facilities.

14          Q.     I'm going to briefly go through each topic and

15   confirm whether you're prepared to testify on that topic,

16   okay?

17          A.     Okay.

18          Q.     So topic 1 is the development and maintenance

19   of ADC's current health care staffing models and the

20   allocation of health care staff across the ten facilities.

21   Are you prepared to testify regarding topic 1?

22          A.     I am.

23          Q.     Are you the person at ADC with the most

24   knowledge concerning this topic?

25          A.     I believe so, yes.

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

8

1    Q.    Topic 2 is any ADC policies and procedures

2  regarding specific types and quantities of health care

3  staff across the ten facilities.  Are you prepared to

4  testify regarding topic 2?

5    A.    Yes.

6    Q.    And are you the person at ADC with the most

7  knowledge concerning this topic?

8    A.    Yes.

9    Q.    Topic 3 is any ADC policies and procedures with

10  respect to health care staffing levels across the ten

11  facilities.  Are you prepared to testify regarding topic

12  3?

13    A.    Yes.

14    Q.    And are you the person at ADC with the most

15  knowledge concerning this topic?

16    A.    Yes.

17    Q.    Topic 4 is how policies and procedures and

18  community health care standards impact specific types and

19  quantities of health care staff across the ten facilities.

20  Are you prepared to testify regarding topic 4?

21    A.    Yes.

22    Q.    And are you the person at ADC with the most

23  knowledge concerning this topic?

24    A.    Yes.

25    Q.    Topic 5 is how policies and procedures and

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

9

1    community health care standards impact the levels of

2    health care staff across the ten facilities.  Are you

3    prepared to testify regarding topic 5?

4         A.    Yes.

5         Q.    And are you the person at ADC with the most

6    knowledge on this topic?

7         A.    Yes.

8         Q.    Topic 6 is how demands for specific types of

9    health care services are determined based on incarcerated

10   persons, clinical, demographic, and security

11   characteristics.  Are you prepared to testify regarding

12   topic 6?

13        A.    Yes.

14        Q.    And are you the person at ADC with the most

15   knowledge concerning this topic?

16        A.    Yes.

17        Q.    Topic 7 is policies and procedures related to

18   the recruitment and retention of health care staff.  Are

19   you prepared to testify regarding topic 7?

20        A.    Yes.

21        Q.    And are you the person at ADC with the most

22   knowledge concerning this topic?

23        A.    Yes.

24        Q.    Topic 8 is the type of licensure requirements

25   for each classification of health care staff.  Are you

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

10

1    prepared to testify regarding topic 8?

2        A.    Yes.

3        Q.    And you person at ADC with the most knowledge

4    concerning this topic?

5        A.    Yes.

6        Q.    Topic 9 is average number of holidays and paid

7    leave available to each health care staff member.  Are you

8    prepared to testify regarding topic 9?

9        A.    Yes.

10       Q.    Are you the person at ADC with the most

11   knowledge concerning this topic?

12       A.    Yes.

13       Q.    And last, topic 10 is the inputs of health care

14   staffing schedules such as the inclusion of paid or unpaid

15   leave.  Are you prepared to testify regarding topic 10?

16       A.    Yes.

17       Q.    And are you the person at ADC with the most

18   knowledge on this topic?

19       A.    Yes.

20       Q.    You said in your fact deposition this morning

21   that you reviewed several documents to prepare for that

22   deposition and that you met once with your attorney,

23   correct?

24       A.    That's correct.

25       Q.    Did you do anything additional to prepare for

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

11

1    this deposition to testify on behalf of ADC?

2         A.    No.

3         Q.    And did you meet with anyone additional to

4    prepare for this deposition to testify on behalf of ADC?

5         A.    No.

6         Q.    Can you describe to me the duties of your

7    current job?

8         A.    My duties are to ensure the quality of the

9    health care and patient advocacy throughout the state

10   meets the constitutional needs of the community and

11   correctional health care standards, the NCCHC, and our

12   community here.

13        Q.    And to monitor the state medical contracted

14   vendor, correct?

15        A.    Absolutely.

16        Q.    And that's Centurion?

17        A.    It is.

18        Q.    And you specifically deal with staffing issues?

19        A.    I do deal with staffing issues.

20        Q.    And do you communicate frequently with

21   Centurion regarding staffing issues?

22        A.    We do.

23        Q.    Do you monitor levels of staffing at the ADC

24   facilities?

25        A.    We do.

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

12

1     Q.     And how do you do that?

2     A.     Each of the contracted facilities have a

3 staffing matrix that is attached to it.  What we do is we

4 work with Centurion to make sure that staffing levels are

5 met in each one of the facilities.  It would be a

6 difficult -- we have found a way -- with including expert

7 staffing agency folks that we have hired -- to basically

8 reconcile positions in the facility on an ongoing basis.

9     Q.     Who are the expert staffing agency folks?

10    A.     We hired Joe Tapia and Darci Pink.  And they

11 have been working in the correctional field for probably

12 seven, eight years apiece doing nothing but staffing,

13 retention, and turnover, and understanding how to track

14 vacancies, and the hiring of staff throughout the

15 facilities.

16    Q.     And they work for you or Centurion?

17    A.     They work for me in the Medical Services

18 Contract Monitoring Bureau.

19    Q.     Will you describe their roles?

20    A.     Will I describe their roles?

21    Q.     Yes.

22    A.     Sure.  About a year ago we recognized the need

23 to understand better the staffing allocation offsets that

24 we were being delivered from Centurion and understanding

25 what the actual staffing on these facilities were on an

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

13

1   ongoing basis.  At that point I hired these two

2   individuals to come in and help me better track Centurion

3   staff from facility to facility.  Their vacancies were not

4   being aged and we were kind of in the dark as an agency to

5   understand what their true vacancy rates were and how

6   staffing allocation offsets were being applied on a

7   monthly basis.

8        Q.     Just so I understand, are you saying Centurion

9   wasn't communicating the vacancies to ADC on a regular

10  basis?

11       A.     Not to my satisfaction, no.

12       Q.     Does ADC have a health care staffing model?

13       A.     We do have a health care staffing model that

14  was put in the original RFP adjusted from Corizon to

15  Centurion prior to my hire, but yes, 1,052 health care

16  providers throughout the state for this contract.

17       Q.     But does ADC have a model for coming up with

18  that number?

19       A.     You know, the model has been in place for a

20  number of years, and it was not something that is

21  negotiated by us ongoing.  We have changed some positions.

22  We have made a couple of amendments since I've been with

23  the agency, but as far as coming up with that number, that

24  number was from previous leadership and it was set into

25  place by previous practices probably changed by Wexford,

1    Corizon, and ultimately Centurion to what their needs were

2    going to be to run this contract.  And this is what they

3    felt, that it was more than adequate care, it's more than

4    what's currently in place, and they felt in their best and

5    final offer that this was appropriate staffing to not only

6    provide the day-to-day care for this patient population,

7    but also to make the remedies for Parsons versus Shinn

8    lawsuit.

9        Q.    Will you describe the staffing matrix for each

10   facility?

11       A.    I can if you want me to go through --

12              MR. BOJANOWSKI:  What topic are we talking

13   about now?

14              MS. COLBY:  This is topic 1.

15              MR. BOJANOWSKI:  Okay.  It talked about

16   current models and you're asking about a matrix for each

17   facility?

18              MS. COLBY:  Yes, for the models for

19   staffing and the staffing matrix that relate to that.

20              MR. BOJANOWSKI:  Do you understand the

21   question?

22              THE WITNESS:  I understand the question,

23   but a more appropriate person to probably answer the

24   specific models by facility would be the actual vendor

25   that supplies it.

## 30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021

16

1    provision of health care to that population.

2                    Some minimum security facilities are

3    healthier than others.  They're going to have a reduced

4    number of staff.  They're going to be provided enough

5    medication nurses to pass the meds, R.N.s to assess and

6    triage sick-call requests, and physicians to provide sick

7    call to that particular population.

8                    There are industry standards specific that

9    kind of relate back to the staffing levels that have been

10   developed by Centurion, and they're pretty much in keeping

11   with what you see across the country, different models.

12                    (Exhibit 4 identified for the record.)

13        Q.     BY MS. COLBY:  I'm going to pull up another

14   exhibit.  This will be Exhibit 4.  And do you recognize

15   this document?

16        A.     I was not present during the time of this

17   proposal.

18        Q.     But are you aware of what it is?

19        A.     Yes.  It's a request for proposals, yes.  It's

20   part of the beginning of a process for a contract.

21        Q.     And this was to secure a health care provider,

22   correct, Centurion?

23        A.     Yes.

24        Q.     So here in 1.17.1 where it says:  Sufficient

25   staffing.  The contractor shall employ sufficient staffing

1   and utilize appropriate resources.

2              What does it mean by sufficient staffing?

3      A.    I mean, I agree with you.  That's kind of a

4   gray area.  I think sufficient staffing was referencing a

5   successful Parsons versus Shinn stipulation agreement but

6   also referencing the ability to provide quality care that

7   meets not only community standards, but, to be really

8   honest with you, NCCHC standards which come in and grade

9   our ability to provide that care in a three-year process.

10     Q.    So what factors go into consideration for this

11  term "sufficient staffing"?

12     A.    There's number of things that go into that.

13  Population, of course, the amount of the population that's

14  currently there.  You look at the facility and you look at

15  the community that surrounds it as far as mirroring it.

16  They often have the same issues.  If they have an area

17  that has a lot of drug abuse, you're going to mirror that

18  in the facility.  So you have to make sure that you have,

19  you know, methadone treatment programs, detox programs.

20  That can sometimes stipulate the fact that you will need

21  more staff.

22              There are also a lot of indications you

23  want to look at.  You want to look at the total number of

24  medications that are passed in the facility in a module on

25  a daily basis.  We also want to look and see exactly how

18

1    many mental health patients you may have.  So you're going

2    to examine how many people are on psychotropic

3    medications.  That will not only tell you how many LPNs

4    you're going to need for med pass, but in a lot of ways it

5    tells you what your special needs are going to be and how

6    many people you can expect to see in an HNR process on a

7    daily basis.

8                    With that being said, with the statistics

9    in offsite referral history as well as pharmaceutical

10   records, per se, a year or so, you can do a pretty good

11   job of pinpointing what your staffing needs to be.

12                   A lot of times states like this will give

13   you a minimum staffing level and then tell you, this is

14   your minimum staffing level, for which we did.  We agreed

15   that, you know, 1,052 was going to be the minimum

16   staffing.  If they need to supply more, you're basically

17   telling them that they will employ sufficient staffing.

18   If they need to make adjustments, maybe facility by

19   facility or module by module, they are more than welcome

20   to come back and look at the staffing patterns and we can

21   help them adjust those through the procurement process to

22   make amendments to the contract.

23                   Currently, we just did something much like

24   this at the Florence facility which is closing down.

25   That's going to basically move over 120 staff throughout

## 30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021

21

1           So there's a lot of different ways to get
2    to the number, I guess I'm trying to tell you, for a
3    facility.  And that's what Centurion did.  They examined,
4    and they came back from what Corizon had previously, and
5    they said:  This is exactly what we need and we feel will
6    be sufficient to get this job done.  As a matter of fact,
7    in their best and final offer, they almost repeat this
8    entire paragraph in its entirety and state that there is
9    more than sufficient staffing in order to provide a
10   community standard of care throughout this system but also
11   enough staffing to meet the obligations of the Parsons
12   versus Shinn lawsuit, and that's in their best and final
13   offer.
14        Q.    And I'm sorry.  Did you say EMR?
15        A.    Yes.  Electronic medical record, yes, ma'am.
16              (Exhibit 5 identified for the record.)
17        Q.    BY MS. COLBY:  All right.  I'm going to mark a
18   new exhibit.  This is Exhibit 5.  Can you see at the top
19   where it says, staffing plan?
20        A.    I do.
21        Q.    Solicitation number ADOC 18-00008264?
22        A.    I see it, yes.
23        Q.    And do you know what this is?
24        A.    It looks like a staffing matrix broken down by
25   facility and position, yes.

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

22

1      Q.     And do you see where it says Exhibit 24 at the
2   top?
3      A.     I do.
4      Q.     Do you know that this was one of the exhibits
5   attached to ADC's original RFP that we were just looking
6   at in Exhibit 4?
7      A.     I understand, if that's what you say.  I've
8   never seen it, no.  I have not reviewed it before as this
9   RFP, and this contract was signed prior to me being in
10  this position.
11     Q.     So the staffing plan, I understand what you
12  were saying about Centurion considering all the factors
13  and creating their staffing plan, but the attached exhibit
14  was connected to ADC's RFP.  So would you agree that ADC
15  came up with these numbers?
16     A.     I can't answer to that.  I wasn't here at the
17  time.  I don't even know what the total number is that's
18  on this matrix.
19     Q.     It's that number that you were referencing.
20     A.     Okay.  So it looks like it's six positions off
21  of what currently is in the contract.
22     Q.     If this was attached to ADC's RFP, to the best
23  of your knowledge, how does ADC come up with these
24  numbers?
25     A.     I can't really speculate.  I don't know how

23

1   they came up with these numbers.  These numbers were

2   probably relevant to the previous vendor.

3        Q.    So you are assuming that they pulled these from

4   the Corizon contract?

5        A.    That's what I'm assuming.  I cannot guarantee

6   that, but that's often what you will see in those RFP

7   processes.

8        Q.    Is it your position that, for your current

9   staffing numbers at this time, that only Centurion

10  developed those numbers, not ADC?

11       A.    We reviewed these for the current RFP that is

12  out.  And to be quite honest with you, we stopped with

13  1,052, but you always want to have a minimum when you put

14  an RFP out to go with.  We do encourage, due to each

15  company having its own talent, whether it be leadership,

16  or an amazing EMR, or some other type of mix that they're

17  good at, they're able to present an alternative plan if

18  they so desire.

19              I don't know how these actual positions

20  line up in each facility to the actual contract that's in

21  place now.  I recognize the 1,046 is close to the 1,052,

22  but I don't know if the numbers line up specifically.  And

23  like I said, I can tell you that Centurion has added

24  approximately 89 people to this in support service

25  positions and clerical positions.

1    can actually fall to a correctional officer to deal with.

2    The stipulation agreement states that it will be either an

3    LPN or an R.N.  Again, with the HNR process on 39 it

4    requires a face-to-face with an R.N. within 24 hours.

5    That's not an NCCHC standard anywhere.  It just has to be

6    the appropriate level of care.

7                    So that's great that we're doing that and

8    we're over and beyond the requirements of the NCCHC, but

9    that dictates they you'll need more R.N.s in that facility

10   in order to provide that type of provisional care at that

11   level.  So that was probably some adjustments that went in

12   when this went away from a self-op type of environment to

13   a privatized environment.

14       Q.     Does ADC monitor Centurion's compliance with

15   its staffing numbers?

16       A.     We do.  And I'm developing better ways to do it

17   as we speak.  So far over this contract with Centurion we

18   have sanctioned them for 12,485,000 and some-odd dollars

19   in staffing allocation offsets, and those are basically

20   sent to them on a monthly basis.

21       Q.     So you mentioned sanctioned.  So if ADC

22   determines Centurion isn't complying with the contract

23   staffing level, is that the remedy?

24       A.     Well, it's not a remedy, but we're not going to

25   let them specifically take our monies and not provide the

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

28

```
1   staffing.  Now, in the new RFP that we just came out with,
2   if you do not fill a position within 30 days, then we will
3   basically charge you 125 percent of what that position is
4   currently worth.  So we are trying to make it a little bit
5   more cohesive in getting the sense of urgency for staffing
6   taken care of.
7        Q.    In terms of staffing, what exactly has ADC
8   sanctioned Centurion for?
9        A.    In terms of staffing we apply, just like I
10  said, $12,485,000 over the life of this contract so far.
11       Q.    Well, that's the amount of money, but what was
12  it for?
13       A.    For not filling positions, the positions
14  vacant.  They're required under the contract to fill so
15  many hours.  And whatever they don't fill hours they're
16  required to pay back the state.  So there's staffing
17  allocation offsets that are applied to them along with
18  their sanctions that are recorded on a monthly basis.
19       Q.    What positions were vacant?
20       A.    All positions, any position that's vacant.  The
21  positions that are left vacant, like the hours that are
22  not filled by each scope of practice, those hours are
23  required to be paid back to the state on a monthly basis.
24       Q.    And at what facilities?
25       A.    All facilities.  Any openings for hours, yes.
```

### 30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021

29

1      Q.    And so if ADC determines Centurion was not

2   complying with staffing levels, what is the process for

3   sanctions?

4      A.    The process for sanctions goes to procurement,

5   if that is the case.  It has to be a situation to where

6   they are not trying to staff facilities.  And I think

7   during the COVID epidemic they put a number of measures

8   into place, including stipends.  They put in quite a bit

9   of different shift differentials and bonuses as well as

10  sign-on bonuses to get positions filled.

11              It's not a really great market out there

12  for hiring R.N.s right now.  You have staffing agencies

13  paying between $95 and $115 and up to $125 an hour to

14  R.N.s at this particular time.  LPNs are making up to $75

15  an hour.  That's in this market here, and that's with

16  their current staffing agency, Maxim.  I've called them,

17  as well.  There are no nurses to be had.  They're 1,500

18  nurses short right now.

19      Q.    How many months has ADC sanctioned Centurion?

20      A.    We sanctioned staffing allocation offsets every

21  month they've been in place throughout this contract.

22      Q.    Since maybe one RFP?

23      A.    Yes.  That's not uncommon for any vendor to be

24  sanctioned for not supplying the correct amount of staff.

25  Nobody in this industry is 100 percent staffed.

1       Q.      And that's every month consecutively?

2       A.      Yes, absolutely.

3       Q.      Are there any other remedies or things that ADC

4   does if Centurion doesn't fulfill staffing levels under

5   the contract?

6       A.      No.   It's one of these situations where

7   everyone is kind of in the same boat with this throughout

8   the entire community.

9               What we are doing to help Centurion is

10  we've come up with a $15,000,000 bonus structure program

11  that also has a recruitment retention added to it.   And

12  this was negotiated in the last negotiation process for

13  the current contract.   This $15,000,000 will be paid out

14  as sign-on bonuses.   It's a significant increase over what

15  they were able to pay.   And then on top of that we set

16  aside moneys for the improvement of the performance

17  measures, you know, that we've targeted:   44, 50, 51, 16,

18  11, and we're looking at 38, 37, and 39 right now because

19  want to see improvement in those performance measures.

20  They're difficult because they require extensive

21  documentation.

22              So what we're doing is we have set up a

23  very structured bonus performance improvement plan that

24  recognizes achievement of three months of continuous

25  success in each performance measure.   And then bonuses are

1   them for being there every day because they had a choice

2   to make every day to get up.  You know, it might not be to

3   come to work to where they have to work and where they do

4   work.  But people that work in corrections do it not for

5   the money.  They do it for the passion and the calling.

6   They want to be here, in particular with special needs

7   populations.

8              The fact that Centurion is understaffed is

9   a component of their environment in this particular

10  setting.  There are a lot of nursing schools here.  They

11  are just going elsewhere where the money is when they wake

12  up in the mornings.  Texas and California mainly right

13  now.

14      Q.    BY MS. COLBY:  Does ADC have authority to hire

15  additional staff if they find staffing levels

16  insufficient?

17      A.    That's something I've never been able to do.

18  It's not my position to make that call.  We employ

19  Centurion to be experts and to employ the right amount of

20  people to provide the contract.  I think recognizing the

21  fact that in their best and final they said they had more

22  than adequate staff and they hired another 89 people --

23  and I understand the 89 people they hired is out of 114

24  that they're hoping themselves that they want to hire, but

25  again, they can't find some of these people.  They're just

30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021

35

1  recruiting and it's going to take some training.  And I
2  think they're trying to do the best they can in this
3  particular time.
4      Q.    BY MS. COLBY:  Which facilities are
5  underperforming?
6      A.    I would say it's, you know, the Eymans, the
7  Lewises, Tucsons, Florence, and Yuma, yeah.
8      Q.    Did the ADC have the authority to tell
9  Centurion to hire more staff?
10     A.    Now, I hire Centurion to take care of this
11  contract.  They are the experts.  They are the biggest in
12  the field.  We chose them.  I'm not going to tell them how
13  to do their jobs.  I will hold them accountable, I will
14  monitor them, and I will ensure that the quality of the
15  health care is in place, and when it's not, I do my job.
16  But for me to tell them what they're going to hire, I
17  can't do that.  I can't tell them how to discipline their
18  employees either.  That's their job.
19     Q.    Are there any ADC policies or procedures for
20  determining the type of health care staff each facility
21  needs?
22     A.    It's based off the population and it's based
23  off the security, whether it's maximum or medium security.
24  Those are the things that you look at to base the staffing
25  levels off of, and I think Centurion takes that into

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

36

1    account as well.

2         Q.      Are those policies and procedure written down?

3         A.      Those policies and procedures are not within

4    our MSTM manual, and we do not have policies and

5    procedures that dictate the care.  We just have policies

6    and procedures that dictate how care is to be provided in

7    certain instances, in NCCHC standard, and the stipulation

8    agreement.

9         Q.      Are there policies and procedures regarding the

10   quantity of health care staff that each facility needs?

11        A.      There are not, no.  We rely strictly on our

12   vendor for that.

13        Q.      How often are staffing allocations reviewed?

14        A.      Staffing allocations can be reviewed at any

15   time, to be very honest with you.  I know one amendment is

16   in the books, and I'm getting ready to work on two more

17   right now.  One is going to be for looking at mental

18   health psychologists and trying to create more mental

19   health psych associated positions because we simply can't

20   hire enough mental health psychologists.  You can't find

21   them.  So we're looking at an alteration [sic] in order to

22   be able to provide the care because I really don't need a

23   psychologist for some of the things that they're being

24   used for.  What I need are more boots on the ground.  I

25   need psych associates to help.

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

58

1    and Tom Dolan and his executive team.

2                    (Exhibit 13 identified for the record.)

3        Q.    BY MS. COLBY:  I'm going to mark Exhibit 13.

4    Can you see here it's Bates stamp 110925?

5        A.    I do.

6        Q.    And we'll start at this bottom e-mail.  Do you

7    recognize these e-mails?

8        A.    I do.

9        Q.    And what are these?

10       A.    This was basically something that was coming

11   from recognition from one of the sites looking at possible

12   staffing changes if we needed them.  So do you mind if I

13   read it?

14       Q.    Yeah.

15       A.    Can you shrink it down for me, please?  That

16   will work.  Can you scroll it up for me, please?  That's

17   good.

18               Okay, yes.

19       Q.    And what is this e-mail concerning?

20       A.    This was concerning the fact that at the Aspen

21   unit they didn't feel there was enough staffing.  They had

22   relayed this to my monitor, Richard Watts.  He forwarded

23   it to me.  I took this to Tom Dolan, the VPO, and if I

24   remember correctly, he found a nurse that they could put

25   over there to help out.

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

59

1        Q.    And this was done without amending the

2    contract, correct?

3        A.    I don't know because this wasn't an additional

4    nurse.  He found the nurse internally that he already had

5    to perform these duties.

6        Q.    And this top e-mail from Tom Dolan that says

7    the staffing in the contract was set by the ADC, what does

8    he mean by that?

9        A.    Saying that the contract was set by us.  And

10    let me read the rest of it.

11            Okay.  So basically he's telling me that --

12    I forwarded that on to Tom, and Tom said:  Okay, I

13    understand your concerns from Richard Watts.  I think he

14    was more upset that [indistinct] talked to Richard Watts

15    about this and not brought it to him.

16            But he's stating in the paragraph that

17    basically he's not sure that it really requires a 24/7

18    nurse, and he states what they've done in other

19    facilities.  Because of COVID they had to redeploy staff

20    here and there to kind of handle the pandemic.  And he's

21    further telling me that if I'm interested in putting a

22    24/7 nurse in there he would be happy to do a contract

23    amendment and have me pay for it.  That's what he's

24    stating.

25        Q.    Was he stating that the staffing was sufficient

**30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021**

60

1   at the Aspen facility?

2       A.     That's what he is stating when he says in other

3   COVID units we reassigned staff temporarily.  We used PRN

4   and flexed staff to assist any additional rounding and

5   work in these units.  I'm not necessarily sure it requires

6   a 24/7 nurse to be on hand, though.  So it is a temporary

7   problem.  I think what he's been doing in other areas,

8   which I've seen him do in Lewis, I've seen him do in

9   Perryville and most of our infirmary area, is they'll

10  reassign staff there and get them tested on a weekly basis

11  to ensure that care can be provided through the pandemic.

12  But I don't think he was really interested in hiring

13  another nurse when the pandemic is going to be over and

14  then he really doesn't need that position.

15      Q.     And did you agree with his decision?

16      A.     It's not my decision to make.  He provides the

17  health care, and I was just making sure that he was aware

18  of the concerns of his staff and my staff and his

19  response, too.

20      Q.     But did you agree that the staffing at Aspen

21  was sufficient?

22              MR. BOJANOWSKI:  Note an objection.

23              Go ahead.

24              THE WITNESS:  I have not seen Aspen.  I

25  don't know.  This is a concern.  I get concerns like this

61

1    every day, and I forward it on to the appropriate people

2    that make those decisions, and that would be Tom Dolan.

3        Q.    BY MS. COLBY:  So you frequently receive

4    e-mails asking for additional staff?

5        A.    Not for staffing.  For other problems that go

6    on throughout the state, not just staffing.

7        Q.    But you do receive e-mails asking for

8    additional staff?

9        A.    I think we are basically getting requests for

10   additional staff when we see it and we talk to people in

11   the field on our tours because they're not completely

12   staffed.  They are trying to recruit people and they have

13   a great deal of vacancies at this time.  I don't think

14   we've ever seen any company thus far fully staffed.  So

15   it's kind of hard to criticize their performance when they

16   haven't had the ability to be fully staffed.

17       Q.    Do you ever receive a request for additional

18   staff from a facility that has a full number of staff

19   under the contract?

20       A.    I don't know that any facility has a fully

21   staffed complement at this particular time.  I do get --

22   and I'm not going to say that I don't get requests to look

23   at certain things because I have, but I can't recall all

24   of them.  It's not been that many.

25       Q.    Does ADC recruit any health care staff?

## 30(b)(6) ADCRR Staffing (Larry L. Gann, Jr.) - 10/13/2021

73

1      Q.     BY MS. COLBY:  I'm going to mark this as

2  Exhibit 15.  Can you see here it's Bates stamped 74733?

3      A.     Yes.

4      Q.     And do you recognize this e-mail?

5      A.     I sure do.  This references specifically the

6  mental health shortages throughout the state, but

7  specifically this outlines the shortages at the Eyman

8  complex that were most concerned that we just moved our

9  mental health/behavioral health unit over to from

10 Florence.  So major concern, something that we talk

11 regularly on, and this is actually a vendor-performance

12 report currently that is in the works for sanctioning.

13     Q.     And this was sent to you by Dr. Stallcup?

14     A.     It was.  She's my mental health director.

15     Q.     And does she frequently bring vacancy issues to

16 your attention?

17     A.     Her and I have been working concurrently on

18 this problem probably over the last year.  And I'm at the

19 situation where we supplied the $15,000,000 bonus and

20 sign-on recruitment program.  And we've done everything we

21 can do and we're expecting performance out of Centurion on

22 this.  So we turned this into a vendor-performance report.

23 It's been turned over to procurement.  Letters have been

24 written, caps have been provided, and we're currently at

25 the sanctioning state right now.

91

1                          SIGNATURE PAGE

2              I, LARRY L. GANN, JR., a deponent
    exercising my right to read and sign my deposition taken
3   on October 13, 2021, place my signature hereon and make
    the following changes on this ____ day of _____,
4   2021.

5              (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

    _____
7            LARRY L. GANN, JR.

8   PAGE    LINE    READS              CHANGE TO          REASON

9   _____   _____   _____   _____   _____

10  _____   _____   _____   _____   _____

11  _____   _____   _____   _____   _____

12  _____   _____   _____   _____   _____

13  _____   _____   _____   _____   _____

14  _____   _____   _____   _____   _____

15  _____   _____   _____   _____   _____

16  _____   _____   _____   _____   _____

17  _____   _____   _____   _____   _____

18  _____   _____   _____   _____   _____

19  _____   _____   _____   _____   _____

20  _____   _____   _____   _____   _____

21  _____   _____   _____   _____   _____

22  _____   _____   _____   _____   _____

23  _____   _____   _____   _____   _____

24  _____   _____   _____   _____   _____

25  _____   _____   _____   _____   _____

92

```
1   STATE OF ARIZONA      )
                          )
2   COUNTY OF MARICOPA    )

3           BE IT KNOWN that I took the foregoing deposition
    pursuant to Notice; that the witness was duly sworn by
4   me; and that said transcript is a full, true, and
    accurate record of the proceedings; that the proceedings
5   were taken down by me in shorthand and thereafter reduced
    to print under my direction; that I have acted in
6   compliance with ACJA 7-206.

7           I CERTIFY that I am in no way related to any of
    the parties hereto nor am I in any way interested in the
8   outcome hereof.

9           Pursuant to request, notification was provided
    that the deposition is available for review and
10  signature.

11          Dated this 25th day of October, 2021.

12

13  _____

14                              Janet Hauck, RPR
                                Certified Reporter
15                              Arizona CR No. 50522

16

17          I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
    has complied with the ethical obligations set forth in
18  ACJA 7-206.

19

20

21

22

23  _____
    GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
24  Arizona RRF No. R1035

25
```

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

VICTOR PARSONS; SHAWN JENSEN;          )
STEPHEN SWARTZ;DUSTIN BRISLAN;         )
SONIA RODRIGUEZ; CHRISTINA             )
VERDUZCO; JACKIE THOMAS; JEREMY        )
SMITH; ROBERT GAMEZ; MARYANNE          )
CHISHOLM; DESIREE LICCI; JOSEPH        )
HEFNER; JOSHUA POLSON; and             )
CHARLOTTE WELLS, on behalf of          )
themselves and all others             )
similarly situated; and ARIZONA       )
CENTER FOR DISABILITY LAW,             )
                                       )
                  Plaintiffs,          )
                                       )Case No.
v.                                     )CV 12-00601-PHX-ROS
                                       )
DAVID SHINN, DIRECTOR, ARIZONA         )
DEPARTMENT OF CORRECTIONS,             )
REHABILITATION AND REENTRY; and        )
LARRY GANN, ASSISTANT DIRECTOR,        )
MEDICAL SERVICES CONTRACT              )
MONITORING BUREAU, ARIZONA             )
DEPARTMENT OF CORRECTIONS,             )
REHABILITATION AND REENTRY, in         )
their official capacities,             )
                                       )
                  Defendants.          )

DEPOSITION OF LARRY GANN, JR., R.N.

Via Zoom Videoconference
October 13, 2021
9:00 a.m.
Chandler, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue        Prepared by:
Phoenix, Arizona 85020             Robin L. B. Osterode
602.266.6535                       CSR, RPR
www.glennie-reporting.com          CA CSR No. 7750
                                   AZ CR No. 50695

2

1                          I N D E X

2    WITNESS                                          PAGE

3    LARRY GANN, JR., R.N.

4              Examination by Ms. Kendrick              6

5

6

7                   INDEX TO EXHIBITS

8    Description                                      Page

9    Exhibit 1   Declaration of Larry Gann;            13
                 153 pages
10
     Exhibit 2   Curriculum vitae of Larry L.          22
11               Gann, Jr., RN, MSN, MHA, BBA,
                 CCHP; 8 pages
12
     Exhibit 3   Defendants' First Supplemental        25
13               Pretrial Disclosure Statement;
                 81 pages
14
     Exhibit 4   Department Order 802; 12 pages        32
15
     Exhibit 5   Bates stamped documents               51
16               ADCRR00070089 - ADCRR00070091

17   Exhibit 6   Bates stamped documents               65
                 ADCRR00070093 - ADCRR00070095
18
     Exhibit 7   Bates stamped documents               71
19               ADCRR00075935 - ADCRR00075937

20   Exhibit 8   Bates stamped documents               80
                 ADCRR00076089 - ADCRR00076090
21
     Exhibit 9   Bates stamped documents               89
22               ADCRR00076092 - ADCRR00076095

23   Exhibit 10  Bates stamped document                94
                 ADCRR00070019
24

25

3

1    INDEX (Continued):

2
                        INDEX TO EXHIBITS
3
     Description                                           Page

4
     Exhibit 11  Declaration of Larry Gann; 3 pages        100
5
     Exhibit 12  Supplemental Declaration of Larry         115
6                Gann; 81 pages

7    Exhibit 13  Bates stamped documents                   119
                 ADCRR00110927 - ADCRR00110930
8
     Exhibit 14  Bates stamped documents                   123
9                ADCRR00075397 - ADCRR00075405

10   Exhibit 15  Bates stamped documents                   131
                 ADCRR00109883 - ADCRR00109885
11
     Exhibit 16  Bates stamped documents                   144
12               ADCRR00110017 - ADCRR00110019

13   Exhibit 17  Bates stamped documents                   150
                 ADCRR00074864 - ADCRR00074865
14
     Exhibit 18  Bates stamped documents                   164
15               PLTFS001698

16   Exhibit 19  Bates stamped documents                   176
                 ADCRR00078885 - ADCRR00078887
17

18

19

20

21

22

23

24

25

4

1            DEPOSITION OF LARRY GANN, JR., R.N.

2            The deposition of LARRY GANN, JR., R.N., via

3   Zoom Videoconference, was taken on October 13, 2021,

4   commencing at 9:00 a.m., at Chandler, Arizona, before

5   ROBIN L. B. OSTERODE, RPR, CSR, California Shorthand

6   Reporter No. 7750 and Arizona Certified Reporter

7   No. 50695.

8

9   APPEARANCES:

10  For Plaintiffs:

11         ACLU NATIONAL PRISON PROJECT
           By: Corene Kendrick
12         39 Drumm Street
           San Francisco, California 94111
13         (202) 393-4930
           ckendrick@aclu.org
14         (Videoconference appearance.)

15         ACLU NATIONAL PRISON PROJECT
           By: David C. Fathi
16         915 15th Street N.W., 7th Floor
           Washington, D.C. 20005
17         (202) 548-6603
           dfathi@aclu.org
18         (Videoconference appearance.)

19         PERKINS COIE, LLP
           By: Mikaela Colby
20         2901 North Central Avenue, Suite 2000
           Phoenix, Arizona 85012
21         (602) 351-8000
           mcolby@perkinscoie.com
22         (Videoconference appearance.)

23

24

25

5

1   APPEARANCES (Continued):

2   For Defendants:

3           STRUCK LOVE BOJANOWSKI & ACEDO, PLC
            By: Timothy J. Bojanowski
4           3100 West Ray Road, Suite 300
            Chandler, Arizona 85226
5           (480) 420-1616
            tbojanowski@strucklove.com
6           EPercevecz@strucklove.com
            (Videoconference appearance.)

7   Also Present:

8           Samantha Weaver
9           (Videoconference appearance.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      Q.    So right here it says, Section 5.0, "Formal

2   grievance process (medical)," this is what I'm referring

3   to when I talk about the medical grievance process.  And

4   you had indicated that many of the grievances that you

5   review come from family members, but do family members

6   file grievances using this process?

7      A.    No, they do not.  What I said was we -- a lot

8   of the issues that we get come in the form of a grievance

9   or a complaint from the family.  So a lot of times they

10   coincide together.  While I get a grievance, I will most

11   normally -- most definitely get something from the

12   friends and family lines or constituent services through

13   our director's office, and they will coincide.

14      Q.    Okay.  So let's walk through Department Order

15   802 together.  Can you see it or do we need to enlarge it

16   a little?

17      A.    No, that's good.

18      Q.    Okay.  So it says at Section 5.2 that, "Upon

19   receipt of a grievance, the COIV grievance coordinator

20   forwards the grievance to the contract director of

21   nursing."  So that is a Centurion employee.  Correct?

22      A.    That's correct, yes.

23      Q.    And it says that that director of nursing

24   prepares the response, so the response does not come from

25   the ADC.  Correct?

Larry Gann, Jr., RN - 10/13/2021

34

1       A.     No, but the complaint --

2       Q.     If we scroll down to 5.2.4.  This says,

3    "Appeals to the contract facility health administrator."

4    The facility health administrator, also know as the FHA

5    or "the FHA," this person is a Centurion employee.

6    Correct?

7       A.     They are, yes.

8       Q.     And then if we go to the next page, the top,

9    6.5, it says, "The decision of the contract facility

10   health administrator is final and constitutes exhaustion

11   of all remedies within the department."  Correct?

12      A.     That's what it says, yes.

13      Q.     Okay.  So this means that nobody at ADC

14   responds to the grievance or the appeal, according to the

15   policy.  Correct?

16      A.     That's what the policy says, yes.

17      Q.     Okay.  Are you aware of any cases in which the

18   timelines for responses were not met?

19      A.     No, I'm not.

20      Q.     Okay.  And do you track the time frames for

21   responding to grievances by Centurion?

22      A.     I do not track them, no.

23      Q.     Does Ms. Headstream track them?

24      A.     I am not sure.  I know that we keep -- we keep

25   records of the complaints that we get not only through

1    constituent services but from the friends and family

2    line, from families, in general, that reach out to our

3    department.  There are quite a few people that not only

4    call my line, but call Vanessa directly --

5         Q.    Okay.

6         A.    -- and that we address issues.  And that may

7    involve having to go back and investigate grievances.

8         Q.    Okay.  I'm trying to ask a question.

9              You can take that down, Sam.

10             So what my question was, that nobody from ADC

11   is responsible for responding to this grievance or the

12   appeal in the policy.  Correct?

13        A.    We do not provide the healthcare, so --

14        Q.    Okay.  That was not my question.  My question

15   was nobody from ADC is responsible --

16        A.    No.

17        Q.    -- for responding to the grievance or the

18   appeal based on the policy?

19        A.    That is correct, by the policy.

20        Q.    Okay.  Thank you.

21             So another item that we just went over that the

22   disclosure statement said that you planned to testify

23   about was statistics reports and historical data relating

24   to healthcare.

25             What are the statistics that you are going to

40

1     Q.    Okay.  Is there a written job description for

2    the medical liaison position?

3     A.    There are, yes.

4     Q.    Okay.  To whom do they report?

5     A.    They report directly to Meggie Washington, and

6    she is our bureau chief.

7     Q.    And I believe you previously described them as

8    troubleshooters who go out to the facilities?

9     A.    They are.

10     Q.    And do you go out to those facilities yourself?

11     A.    I do.

12     Q.    How often?

13     A.    As often as I can get there.  Most recently I

14    was at Perryville a week and a half ago, yes.

15     Q.    Have you visited the Douglas Prison?

16     A.    The Douglas Prison, I have not.

17     Q.    How about Eyman?

18     A.    Yes, many times.

19     Q.    When is the last time you visited Eyman?

20     A.    Maybe a month ago, month and a half.

21     Q.    Okay.  And how long were you there?

22     A.    Again, I don't recall.  I hit Eyman and

23    Florence in the same day; I split the day.

24     Q.    Okay.  And when was the last time you had been

25    to Eyman or Florence before the most recent trip?

Larry Gann, Jr., RN - 10/13/2021

41

1     A.     I don't recall, to be very honest with you.

2     Q.     Okay.  Have you been to the Lewis Prison?

3     A.     Yes, many times.

4     Q.     When was the last time?

5     A.     Lewis, maybe three, four months ago.

6     Q.     And were you there for a full day, half a day,

7   multiple days?

8     A.     I really am not sure, to be honest with you,

9   how long I was there.  I go there for meetings sometimes.

10  I will go there sometimes for meetings with leadership.

11  We've been out there to vaccinate.  We've been out there

12  to test.  I can't recall.

13    Q.     Were you -- you said you were out there to test

14  and to vaccinate, were you actually administering tests

15  or administering vaccines?

16    A.     We were when -- when Centurion was first asked

17  to mass test the entire state, their lab services

18  company's machine broke, and very quickly we worked with

19  DHS to set up a contract with Sonora Quest.  And out of

20  the 30 or so thousand patients that were tested, my

21  Medical Services Contract Monitoring Bureau tested 21,000

22  of these people.  We were constantly in the facilities

23  testing the patient population as quickly as possible,

24  yes, and getting those results back.

25    Q.     Were you personally administering tests

Larry Gann, Jr., RN - 10/13/2021

42

1    yourself --

2         A.    I was.

3         Q.    -- at Lewis?

4         A.    Thousands, yes.

5         Q.    Any other prisons besides Lewis?

6         A.    Yes, we tested Perryville, Lewis, Eyman --

7         Q.    When you say "we," do you mean yourself

8    personally?  I'm asking about you personally.

9         A.    Personally, yes.  Yeah.  A lot of early

10   mornings and late nights, yes.  So I went out with my

11   team.  I usually took around 20 to 22 people with me for

12   those days that we tested, Yuma, Tucson, these are all

13   two-day trips.  So yes, I've spent a great deal of time

14   in these facilities over the last year and a half.

15        Q.    And you, yourself, personally tested thousands

16   of people?

17        A.    Yes.

18        Q.    And are there some medical liaisons who do not

19   have a healthcare degree currently in those 10 positions?

20        A.    There are, yes.  There's --

21        Q.    How many?

22        A.    I'm counting, hang on.  Four or five.

23        Q.    Do you know what their degrees are in?

24        A.    No, they're specialists within their field, so

25   I'm not sure what their degrees are in.

Larry Gann, Jr., RN - 10/13/2021

43

1      Q.      Is a college degree a requirement for this

2   position?

3      A.      Not always, no.   Not even the LPNs have a

4   college degree; those are certificate programs.

5      Q.     Okay.   Going back to the disclosure statement,

6   Exhibit 3, just real quickly.

7            If you can pop it up, Samantha.

8            On line 24 it says that you will "testify about

9   working to break down barriers to contract compliance."

10     A.     Uh-huh, absolutely.

11     Q.      Okay.   In your opinion, what are the barriers

12   to contract compliance?

13            MR. BOJANOWSKI:   Note an objection.

14            Go ahead.

15            THE WITNESS:   Wow, that's a very open-ended

16   question.   There can be many things that are barriers.

17   It could be Centurion people not having the correct

18   equipment to do their jobs.   It can be as simple as not

19   having enough med carts.   It could also have something to

20   do with what's called a correctional clock, how care is

21   provided around the clock, based on the security needs of

22   each facility.   These are broken down by actual modules

23   sometimes.   So that's why post orders have to be created

24   in order to provide this care in a timely manner, and as

25   systematically efficient as possible when you're

Larry Gann, Jr., RN - 10/13/2021

44

1   coordinating with operations.  Sometimes the barriers can

2   be as simple as, you know, people don't have the

3   identification tags maybe on their arms.  Maybe they need

4   to be renewed, so you can better identify the patient.

5   Sometimes these patients don't take, you know, their

6   bands to, or their cards, to their wardens or to their

7   officers and say, "Hey, my card's beat up.  I need a new

8   card."  That would be a barrier to that medical

9   administration, nurses going out trying to verify that

10  she has the correct patient in front of her to supply the

11  medications.

12          We get involved in the weed level with this

13  type of stuff, something the Medical Services Contract

14  Monitoring Bureau has never done prior to this particular

15  team being put together.

16      Q.    Okay.  And you said sometimes it can be ID

17  tags.  Are you referring to the ID cards that

18  incarcerated people are supposed to carry?

19      A.    Yes, ma'am.

20      Q.    Okay.  You referenced something about their

21  bracelets, so I didn't know what that was referring to.

22      A.    Some systems have bracelets; some have cards.

23      Q.    Okay.

24      A.    It's just to make sure they're readable is my

25  point.

46

1    A.    Yes.  And then we did a second round where we

2  worked with Sonora Quest, and I went out on the first few

3  runs of that as well just to make sure that Sonora Quest

4  was properly trained.

5    Q.    Was that in the summertime of last year?

6    A.    You know, I think it was.  I think it was more

7  towards the end of the year.  I can get you those dates

8  if you want.  I don't have them in front of me.

9    Q.    I'm just trying to get your best estimate.

10   A.    I know I was involved in two mass testings, and

11 I think they were done within eight to nine months of one

12 another.

13   Q.    Okay.  And you had mentioned Yuma as well; was

14 the last time you were at Yuma as part of the testing?

15   A.    No, I've been to Yuma several times.  I was

16 there about a month and a half ago.

17   Q.    For how long?

18   A.    13 hours, actually, that day.

19   Q.    Why were you there?

20   A.    I wanted to hit every module in that facility

21 and touch every Centurion employee.

22   Q.    Okay.  So you described some of the barriers

23 that you see that exist that could affect contract

24 compliance.  Since you took this job in April 2020, has

25 anybody working for ADC told you that insufficient

Larry Gann, Jr., RN - 10/13/2021

47

1    numbers of healthcare staff is a barrier to compliance?

2         A.    I've heard that, yes.   I don't think the --

3         Q.    Who did you hear that from?

4         A.    Well, I've heard that from many people.   I hear

5    it from staff in the field.   That's the most important

6    people I hear telling it to me, to be very honest with

7    you --

8         Q.    I'm sorry, you faded out.   You said you hear it

9    from the staff?

10        A.    I hear it from the staff in the field during my

11   tours.

12        Q.    The healthcare staff?

13        A.    Sure.   Yes.

14              MR. BOJANOWSKI:   Same objection.

15              Go ahead.

16   BY MS. KENDRICK:

17        Q.    And do you hear it from custody staff?

18        A.    I don't hear it from custody staff.   I don't

19   really interlink with the custody staff in the field as

20   much as I do the executive staff.

21        Q.    You said you hear that from healthcare staff in

22   the field, do they identify any specific type of staff

23   that is -- that they feel there needs to be more of?

24              MR. BOJANOWSKI:   Note an objection.

25              Go ahead.

Larry Gann, Jr., RN - 10/13/2021

48

1            THE WITNESS:  This entire system is built on a

2    backbone of nursing, so LPN and RN are primarily where we

3    hear there are shortages.

4    BY MS. KENDRICK:

5         Q.    Do you hear this at every facility or just

6    specific facilities?

7            MR. BOJANOWSKI:  Same objection.

8            Go ahead.

9            THE WITNESS:  Specific facilities, often.  Two

10   of our probably least staffed facilities would probably

11   be Tucson and Yuma.  And I wouldn't say it's related to

12   contractual staffing matrixes.  It's really related to

13   the treatment retention and the ability to hire staff.

14   They're kind of out there on their own islands.  It's

15   really difficult to find staff in those areas.

16   BY MS. KENDRICK:

17        Q.    Tucson is like a -- you said, is there like an

18   island?

19        A.    No, when you look at it from a standpoint of

20   hiring healthcare staff, you may have a university there,

21   but corrections is not the first place that a nurse

22   getting out of school is going to apply.  I'll be very

23   honest with you, they don't even know about corrections

24   when they're in school.  I certainly didn't.  Mainly

25   people that graduate from nursing school, they're looking

Larry Gann, Jr., RN - 10/13/2021

49

1    for jobs in hospitals.  Most of the LPNs can't find jobs

2    in hospitals.

3            So what they do is they seek other employment

4    at nursing homes where they can find -- and assisted

5    living facilities.  But you have to realize there are

6    just over 10,000 LPNs licensed in the state, to begin

7    with.

8        Q.    Okay.  Thank you.  Since you took the job, has

9    anybody ever told you that insufficient number of custody

10   staff is a barrier to compliance and providing adequate

11   healthcare?

12           MR. BOJANOWSKI:   Same objection.

13           Go ahead.

14           THE WITNESS:  You know, it depends, there are

15   specific instances, maybe on med pass or maybe for HNR

16   line, they don't have an officer to go with them, from a

17   security standpoint.  So what we do is work with them on

18   those barriers and work with the wardens to make sure

19   staff is provided to these healthcare workers as escorts,

20   and we usually solve those issues pretty easily.

21   BY MS. KENDRICK:

22       Q.    And what institutions has this come up at?

23       A.    I've only heard that at Tucson, to be honest

24   with you.

25       Q.    How about Eyman?

1      A.      Eyman is -- yeah, Eyman is one of the

2   facilities that is probably, you know, understaffed with

3   officers, I recognize that.  And it is with healthcare

4   staff as well and services like mental health, but they

5   work together pretty much as a team there, the warden

6   does, to make sure that the medical is afforded

7   (inaudible) --

8            THE REPORTER:  I'm sorry, is afforded what?

9            THE WITNESS:  -- the ability to have escorts,

10   medical escorts.

11   BY MS. KENDRICK:

12      Q.      How frequently is it a problem that they don't

13   have enough staff to run medical escorts?

14      A.      I've honestly only heard that twice from Eyman.

15      Q.      And what happened as a result, was the clinic

16   closed, no nurses line or provider line?

17      A.      No, it was really -- it was a daily operational

18   situation where they might have had some call-offs, and

19   it wasn't a day-to-day problem, it was a day problem

20   where it happened on that one instance.

21      Q.      And you mentioned Tucson as well, any other

22   facilities where this has come up with the custody staff

23   not being available?

24            MR. BOJANOWSKI:  Same objection.

25            Go ahead.

Larry Gann, Jr., RN - 10/13/2021

53

1    the -- by everybody's picture, so it's -- I can't see --

2           MS. KENDRICK:  Oh, you need to move it.  It's

3    ADCRR00070089.

4           MR. BOJANOWSKI:  Okay.

5           MS. KENDRICK:  And also I just want to note

6    that it was produced to us with the yellow highlights

7    already on it.  We did not do any highlighting on it.

8        Q.    So about halfway down there's a bullet point

9    that says "Diamond audits/monthly audits" and it says,

10   "Centurion has failed to comply with Section 1.12.16 and

11   1.12.33 regarding inspections and audits since the

12   initiation of the contract.  The expectation is to be in

13   full compliance on or before 5/1/2021."

14           Diamond's the pharmacy vendor?

15       A.    Diamond is their Class C pharmacy, mail-in

16   pharmacy that they distribute the meds to Centurion, yes.

17       Q.    Okay.  And the references to the sections

18   that's referring to the contract between ADC and

19   Centurion.  Correct?

20       A.    It is, yes, ma'am.

21       Q.    Okay.  And this document is dated June 7th,

22   2021, but is referring to future compliance to be done on

23   May 1st.  Correct?

24       A.    Yes.

25       Q.    Okay.  Has Diamond come into compliance with

1    these requirements?

2        A.    They have gotten better.   I won't say that

3    they're in full compliance with what we expect from

4    them --

5        Q.    Okay.   And what --

6        A.    -- like --

7        Q.    What sanctions have been assessed against

8    Centurion for violating sections of the contract since

9    the initiation of it?

10       A.    There is a current Vendor Performance Report

11   that has been done regarding this matter, and it is in

12   the process with procurement at this point, yes.

13       Q.    What are the sanctions going to be?

14       A.    That is to be determined, you know, once the

15   cure period has been noticed and that is really based

16   upon, you know, what the Corrective Action Plan says.

17       Q.    So to date no sanctions have been assessed.

18   Correct?

19       A.    Not on this issue, no.

20       Q.    And it's possible that no sanctions will be

21   addressed.   Correct?

22       A.    That's --

23             MR. BOJANOWSKI:   Objection; leading.

24             THE WITNESS:   What is your question, yes or no,

25   I mean --

Larry Gann, Jr., RN - 10/13/2021

55

1  BY MS. KENDRICK:

2       Q.    No, my question is, is it possible that

3  sanctions will not be assessed?

4            MR. BOJANOWSKI:  Same objection.

5            THE WITNESS:  No, it's fine.  It is not

6  possible that sanctions will not be addressed.

7  BY MS. KENDRICK:

8       Q.    So as you sit here, you are saying that

9  sanctions absolutely will be assessed?

10      A.    Yes.

11      Q.    But as you sit here, you do not know what those

12  sanctions will be?

13      A.    They have not been determined yet, no.

14      Q.    Okay.  If we can go down a little bit, please.

15            It says here, "Mark Haldane program evaluator,"

16  does Mr. Haldane report to you?

17      A.    He reports to Meggie Washington.

18      Q.    Okay.  And it says, the first bullet point,

19  "Nurses lines-32 more cancelled."

20            Where were the nurses lines cancelled?

21      A.    Various modules throughout the facility at

22  Tucson.  This is basically produced and given to us by

23  Centurion on their daily essentials report, and --

24      Q.    So all 32 of the cancelled nurses lines

25  referenced on June 7th, 2021, related to Tucson?

Larry Gann, Jr., RN - 10/13/2021

56

1      A.     Uh-huh.

2      Q.     No other -- you nodded your head; is that a

3   yes?

4      A.     That is a rolling number.  That is not per one

5   day, so we are addressing multiple nursing lines over the

6   course of date ranges.  I'm not even sure even with this

7   document that we are addressing.

8      Q.     So what time period does it cover the previous

9   week or the previous two weeks?

10     A.     I'm not sure.  If you go to the top of this

11  item, it might give me some reference to look.

12     Q.     So you testified that it's a weekly meeting, so

13  would it be since the previous week, the update?

14     A.     No, not necessarily.  We'll keep a

15  rolling -- we'll basically keep a rolling count on some

16  of these issues until there's resolution or corrective

17  action plans are put in place, and it's been resolved.

18  There is currently an outstanding Vendor Performance

19  Report on this particular item at Tucson.

20     Q.     Okay.  Let's go back to that.  Which units at

21  Tucson was nursing line cancelled?

22     A.     I'm not sure which unit, but it's been on

23  different units at different times.

24     Q.     And your testimony is you don't know what time

25  period this refers to?

Larry Gann, Jr., RN - 10/13/2021

57

1      A.      Not this specific document, no.

2      Q.      Okay.

3      A.      We keep track of this in other ways as well.

4  This is just an agenda --

5      Q.      Perfect.

6      A.      -- for this particular meeting.

7      Q.      And what sanctions were asserted against

8  Centurion for cancelling nursing line 32 times?

9      A.      That's what I just told you, there's currently

10  an outstanding Vendor Performance Report on this with

11  procurement.

12      Q.      Have they been sanctioned yet?

13      A.      They have not been sanctioned yet.  They have

14  provided a Corrective Action Plan, which has not been

15  accepted.

16      Q.      What was the Corrective Action Plan?

17      A.      The Corrective Action Plan had to do with

18  bringing in regional management to help oversee this, use

19  nurse practitioners in the place of nurses to go out and

20  not only triage, but to provide care, hopefully in a more

21  expeditious manner, like a one-stop shop, go out and go

22  to triage the HNR and provide the care in one -- one --

23      Q.      When was -- why was the CAP rejected?

24      A.      Because I received the same CAP before and I'm

25  not -- you know, I'm not really optimistic that it was

Larry Gann, Jr., RN - 10/13/2021

58

1   going to solve the problem.  The problem was a staffing

2   issue.

3       Q.     What is the staffing issue?

4       A.     Staffing issue is we need more nurses in

5   Tucson.

6       Q.     Okay.  And the third bullet point says, "No

7   follow-up on failure to respond to ICS."

8              ICS is an emergency?

9       A.     It is.  So -- and I'm not sure of this

10  particular case, but we had an ICS that we did not feel

11  that there was proper follow-up on.  It had to do with, I

12  believe, a staffing issue as well.  Once the resolution

13  was determined on what had happened and I just was not

14  happy with the time frame that it took for a response.

15      Q.     Okay.  And was Centurion sanctioned for the

16  failure to respond to this ICS?

17      A.     No, they were not, because --

18      Q.     Okay.  And the next bullet point --

19             MR. BOJANOWSKI:  Corene -- Corene, stop, you're

20  cutting him off and he's not allowed to answer the

21  question.  So can you let him finish his answer.

22             MS. KENDRICK:  Yes, Tim, but I'm also the

23  person asking the questions, and I only have four hours,

24  so --

25             MR. BOJANOWSKI:  I understand that.  But when

59

1    you cut him off, he's not giving the full answer to the

2    question.  So if you want partial answers, that's fine,

3    but --

4              MS. KENDRICK:  Okay.

5              MR. BOJANOWSKI:  -- you know.

6              MS. KENDRICK:  And I will indicate if I just

7    need a yes-or-no answer versus a long discussion, but

8    thank you, Tim.

9        Q.    The fourth bullet point says, "No follow-up

10   from Lewis regarding missing liquid gabapentin."

11             Tell me about this; what happened?

12       A.    To be really honest with you, there was an IR

13   that was instituted on this, which was an incident

14   report.  My team followed up on it.  Like I said, we were

15   in the weeds with medication problems with this

16   particular vendor, and you just don't lose meds, you

17   don't lose sharps, you don't lose needles, you don't do

18   those things in prisons.  So when this was escalated to

19   my team's attention, we put it on this agenda.  We wanted

20   resolution.

21             And, basically, this medication was never

22   found.  And what we did at that point is we took the

23   white logbooks that narcotics are often tracked in, we

24   made gabapentin a tracked medication by dose.

25       Q.    How much gabapentin was missing?

Larry Gann, Jr., RN - 10/13/2021

60

1      A.      I'm not really for sure with this particular
2  instance of liquid.  I don't know how the dosages are
3  broken down, how big the bottle is.
4      Q.      Was the staff person who was responsible for
5  the loss identified?
6      A.      No, gabapentin is a medication where it's not a
7  trackable narcotic or anything.  It is a medication that
8  can be used for abuse if overprescribed or overdosed.
9  And it is a high commodity item in a prison setting.  So
10 that's why it was so important to me that it was missing,
11 but it was basically put into the narcotic logbooks and
12 we tracked it by that.
13     Q.      Gabapentin is a controlled substance, yes?
14     A.      It is not a controlled substance.
15     Q.      It is not, okay.
16     A.      But it is a drug of high abuse.
17     Q.      Right.  And I asked if the staff person was
18 identified --
19     A.      There was no way to identify staff --
20     Q.      Okay.
21     A.      -- for the missing medication.
22     Q.      What sanctions were asserted against Centurion
23 for the missing gabapentin?
24     A.      What we asked them to do is track this in a
25 narcotics log and we had it investigated.  It was

Larry Gann, Jr., RN - 10/13/2021

61

1    investigated for quite some time.  We came up with

2    corrective action plans.  And, like I said, we decided

3    statewide to start tracking gabapentin.  There was no VPR

4    done on this particular instance.

5        Q.    Okay.  And no financial sanctions were assessed

6    for this?

7        A.    No, they were not.

8        Q.    Okay.  If we can go to the top of page 3, the

9    first bullet point says, "Gabapentin found in the vent of

10   a Trinity truck.  Has there been any investigation by

11   Centurion regarding whether it came from medical stock?"

12             Trinity is the food vendor.  Correct?

13       A.    That is correct.

14       Q.    Okay.  Where did this occur?

15       A.    I believe this was at Perryville.

16       Q.    Do you remember when this occurred?

17       A.    It was a few months ago, yes.

18       Q.    Okay.  The meeting notes are from June, so was

19   it --

20       A.    It was --

21       Q.    -- before June 7th?

22       A.    This was probably the first time or the second

23   time this might have been on the agenda, it was

24   investigated, but you know, when you find meds and the

25   way this was found wrapped, I can't link that

Larry Gann, Jr., RN - 10/13/2021

72

1    Right there.

2        Q.    Okay.  So she says in the first line,

3    "Cancelled NLs, nurses lines equals 20 and other delays

4    since last Wednesday's meeting."

5            So this is referring to the Tucson prison?

6        A.    Yes, it is.

7        Q.    And she has the details for the various dates

8    between February 3rd and February 8th and the cancelled

9    nurses lines at the facilities.  She also notes, "On

10   February 4th Winchester only one LPN, med pass delayed.

11   Insulins not given until after 11:00."  And then further

12   down, "February 3rd, Winchester, only one LPN, med pass

13   delayed.  Insulins not given until after 11:00."

14           Do you know how many nursing positions were

15   vacant in February at Tucson?

16       A.    I do not.

17       Q.    Did anybody say to you that a lack of nursing

18   staff was the reason they were cancelling nurses line?

19       A.    They -- we were told that nursing lines were

20   being held and we were told -- and when we discovered

21   that they were not being held, Marlena's one of our

22   monitors in that facility, Ms. Palmer Neefe, that the

23   e-mail came from is the regional nursing director at

24   Centurion at the time.  She no longer works there; she

25   resigned.

Larry Gann, Jr., RN - 10/13/2021

73

1          So what we were unhappy with was that nursing

2     lines weren't being performed, and keep in mind that

3     Marlena's job is to monitor and audit charts on a daily

4     basis.  She works in the field, so she makes me aware of

5     when we have issues like this in our facilities.  So with

6     that being said, nursing lines at the time of this e-mail

7     is when we first started learning that there were extreme

8     staffing issues there and that Centurion was not

9     conducting lines on a regular basis.  We started tracking

10    this issue, and we had done VPRs on these issues.  And we

11    are in the sanction phase of this issue.

12         Q.    Okay --

13         A.    Many corrective actions have been filed for

14    this particular issue.

15         Q.    Okay.  We'll break all of that down, but thank

16    you for that overview.  Is that when you started getting

17    those daily essential reports, around this time?

18         A.    This is about the time we started looking at

19    them and trying to classify if they were accurate or not.

20    So at this particular time, the daily essentials report

21    didn't always line up with what we were seeing in the

22    field with our monitors.  And to be honest with you,

23    sometimes my monitors were wrong and sometimes the report

24    was wrong.  So we conducted many meetings to get this

25    squared away to where the report was accurate, and that

1    my monitors were being made aware when these nursing

2    lines were actually missed, because some of these were

3    missed on the weekends, some of them during holidays, and

4    things like that.  So when you're going to be short of

5    staff -- overall issue, it was staffing.

6        Q.    So in some of these cases Centurion was

7    incorrectly reporting to you that nurses line had

8    occurred when your monitors, people like Ms. Bedoya, who

9    were there kind of like your eyes and ears, were seeing

10   something to the contrary; is that correct?

11       A.    I believe that's a true statement, yes.

12       Q.    And what time is insulin supposed to be

13   provided to diabetic patients?

14       A.    That is determined about when the -- I'm sorry,

15   when the actual food was delivered and every module is on

16   a different clock for that, so I can't answer

17   specifically, but 11:00 would not be the right time in

18   this instance.

19       Q.    And it's important for diabetics to get their

20   insulin at the right time with the food.  Correct?

21       A.    It's extremely important.  And this is

22   predated.  Prior to the e-mail that you saw previously in

23   June, we started seeing issues with this in different

24   complexes.  That's when we made it down to the ADON level

25   with Dr. Wendy Orm to solve this problem, as she directs

Larry Gann, Jr., RN - 10/13/2021

75

1    the care for Centurion, and we wanted it resolved at

2    once.  And we worked with them in June to solve this

3    issue.

4        Q.    And I believe you said Laura Palmer Neefe at

5    the time in February that this e-mail relates to, she was

6    the regional director of nursing, but is no longer in

7    that position?

8        A.    That's correct.  She used to actually be the

9    director of nursing for the Tucson facility, and was

10   promoted last fall into that regional position.

11       Q.    And when did she leave Centurion?

12       A.    I don't think she's been gone but for

13   maybe -- maybe three or four months.  I know that

14   she's -- I think she's currently working at Maricopa

15   County Jail Systems.

16       Q.    Was she terminated by Centurion?

17       A.    She was not, no.

18       Q.    And what sanctions were assessed against

19   Centurion for these multiple cancellations of nurses line

20   and late insulin at Tucson?

21       A.    VPRs were written on these and a cure period

22   was put in place.  Corrective Action Plans were done,

23   hiring campaigns went on, but no physical or monetary

24   sanctions were put into place for these.

25       Q.    Okay.  And you see a little bit further down on

1    the page, where it's highlighted in orange -- and again,

2    I just want to note for the record the document came to

3    us with the highlighting on it, Tim -- it says,

4    Ms. Bedoya wrote that, "You will see the HNR backlog

5    numbers from Centurion central office totaling 166 for

6    Tucson complex.  On the tour of Winchester today 83 HNRs

7    were found not triaged yet and being triaged today."

8            Was that the first time that you were made

9    aware of a backlog of HNRs at Tucson?

10       A.    No, some of these complexes have ongoing issues

11   of backlogs of HNR, depending on the staff that's

12   assigned.  And when they come up, you know, we've had

13   issues with dental backlogs as well.  And when we get in

14   there we do troubleshooting and Corrective Action Plans

15   to get it solved, but usually -- Tucson was so

16   understaffed at one point that they were bringing in

17   staff members from around the state to work there and

18   putting them up in hotel rooms, whatever they had to do

19   because the recruiting efforts just weren't working

20   regardless of the signup bonuses that were being offered.

21       Q.    Okay.  And then the next bullet point that

22   Ms. Bedoya wrote says, "There is also the staffing sheet

23   attached whereby our complex is reporting our medical

24   staffing complement as only two staff members down."  And

25   she says, "If that is the case, why are so many nurses

1    Once something has aged 30 days, they will be having

2    staffing offsets of 125 percent.

3           Currently the contract doesn't support that, so

4    it's very hard for me to track this.  It's very hard for

5    me to see who is moving and who is working in each

6    facility.  So it's difficult for the Medical Services

7    Contract Monitoring Bureau to have a clear, transparent

8    view of where we're missing staff and where this

9    particular vendor is using their resources.  That is

10   something that I do not want to see continuing in the

11   next contract.

12         Q.     Okay.  So given there were 20 nurses line

13   cancellations in a week, and Ms. Bedoya is saying that

14   they were only down to two staff members, does that

15   indicate that the number of positions currently in the

16   contract are not adequate for the patient needs of the

17   facility?

18         A.     No, not at all.  That may be, like I said, that

19   may be a daily issue, but we don't know how many people

20   also called off.  I'm not understanding if she's

21   indicating here if there are two staff members down,

22   meaning vacant positions that need to be hired, which I

23   doubt, or does that mean they just had two people call

24   off?  I'm not really clear what that meant, but the

25   bottom line is 20 nursing lines were missed, and that's

1    my issue and that's what I dealt with.

2          Q.    But they were not sanctioned for these 20

3    nurses lines?

4          A.    If you read the contract, you just don't

5    sanction someone for a mistake, there has to be a cure

6    period of 10 days.  You have to have a Corrective Action

7    Plan that is agreed upon between the Medical Services

8    Contract Monitoring Bureau and the vendor to move forward

9    with procurement to sanction someone.  It's not as easy

10   as me saying I'm sanctioning $10,000 from your system; it

11   doesn't work that way.  There are contractual obligations

12   and considerations that have to be approved prior to

13   sanction.  But I can assure you there is a VPR on this

14   nursing line at this particular time.  And it is in the

15   sanctioning stages, yes.

16         Q.    Okay.  So just to summarize and make sure I

17   understand, what you're saying here is they were not

18   sanctioned because the contract does not authorize or

19   envision ADC being able to say you did this thing and we

20   want to sanction you, there's -- it's not currently in

21   the contract?

22         A.    It is, but it's a process that has to be

23   followed.  It's not just -- you have to investigate it.

24   You have to see what the problem is.  And you have to

25   basically give them a cure period of 10 days, come back

1   with a Corrective Action Plan.  If that Corrective Action

2   Plan can be accepted or denied, I might have to give them

3   another 10 days.  It's a procurement process as well,

4   because they handle contractual items with the vendor.  I

5   am the contract monitoring bureau that recognizes the

6   issues that need to be addressed, and when they get to

7   that level, I include procurement.

8        Q.    Okay.  Great.

9              Could we go to Exhibit 8, please, Sam.

10             (Marked for identification Exhibit 8.)

11   BY MS. KENDRICK:

12       Q.    All right.  This is an e-mail from Mary Fuller,

13   dated February 3rd, 2021, your name is on there as one of

14   the recipients -- and if you could just scroll down a

15   little, Sam, so we can see this -- it says "Centurion

16   Action Meeting Minutes February 1st, 2021," and let's see

17   if we can get the Bates number for Tim.

18             Do you see that, Tim?

19             MR. BOJANOWSKI:  Yeah, give me a second.

20             MS. KENDRICK:  It's 76089.

21             MR. BOJANOWSKI:  Okay.

22   BY MS. KENDRICK:

23       Q.    All right.  So about eight lines from the

24   bottom, there's indented text that says, "Tucson IR, a

25   nurse was told not to respond to ICSs after 1800 hours.

Larry Gann, Jr., RN - 10/13/2021

81

1   If not life-threatening, bring the inmate up to the

2   yard."

3          And I believe we've said this before, an ICS is

4   the term the Department uses to refer to emergencies.

5   Correct?

6      A.    Yeah, it's -- to be honest with you, any time

7   after hours if they don't have a nurse or they don't have

8   someone in that module that can address an issue, a lot

9   of times they'll have to call an ICS to get someone there

10  because there's not that many staff there in the

11  overnight areas.  This particular issue, when we looked

12  into it, what the deal was, you have a RN that is staffed

13  inside the Tucson complex, and you have one that is

14  staffed outside the Tucson complex for the outlying

15  facilities.  This particular night what was discovered

16  when investigated with Centurion, is that the Tucson RN

17  inside the complex, she basically had called off, so all

18  they had was a nurse outside, and I think they had one

19  LPN working in the infirmary inside.

20          Our resolution with this was we didn't really

21  care.  They were contractually obligated to respond to an

22  ICS, and staffing needed to be appropriate.  I told them

23  I really didn't care if their ADON had to work

24  overnights, or you had to put someone in leadership

25  overnights, this can't happen again, so --

Larry Gann, Jr., RN - 10/13/2021

82

1      Q.     And there's also a performance measure that

2   requires a certain number of nursing staff at the

3   infirmaries overnight.   Correct?

4      A.     There is.  There is.  A RN cannot leave the

5   infirmary either.  I believe a LPN ended up leaving to

6   address this, but it's not the right scope of practice,

7   and that's why I was not happy with the situation.

8      Q.     How did this come to your attention?

9      A.     Usually my monitors, even though they're out

10  there auditing, doing their monitoring work, they make me

11  aware of issues like this.  And this one came through

12  Mark Haldane, who is the supervisor of those monitors in

13  that complex, and he brings it to my attention.

14     Q.     Okay.  Do you know who told the nurse not to

15  respond to ICSs?

16     A.     No, I do not.

17     Q.     Okay.  And do you know, was this a -- I

18  apologize if I interrupted you -- but was this a one-time

19  event or was this an ongoing practice at the Tucson

20  prison?

21     A.     No, this is a one-time event and you need to

22  understand that you're dealing with the day-to-day

23  operations and the issues that come up, a lot of things

24  that we have addressed today are not things that have

25  been a consistent problem over the years.  It's just been

1   a consistent problem since the staffing issues have been

2   at Tucson complex.

3       Q.    And as part of the investigation, was it

4   determined how many ICSs happened that night that she did

5   not respond to?

6       A.    There was just the one that I understand.

7       Q.    Okay.  And what was the facts of that incident?

8   What was the emergency?

9       A.    I mean, I do not recall, to be very honest with

10  you.

11      Q.    Okay.  Okay.  Do you recall what happened to

12  the person, like, did they call EMS, or how did they get

13  the person help?

14      A.    I don't recall.  Sorry.

15      Q.    Okay.  And, again, due to this incident and I

16  think because of your previous testimony due to your

17  hands being tied by the contract, there was no sanction

18  assessed against the Department for this.  Correct?  I

19  mean, against Centurion, sorry, against Centurion.

20          MR. BOJANOWSKI:  Same objection.

21          Go ahead.

22          THE WITNESS:  Yeah, not with a one-off

23  situation like this.  I mean, there has to be a

24  consistent system failure, to look at something like

25  this, and to, you know, apply a VPR process, you're

Larry Gann, Jr., RN - 10/13/2021

85

1   is not getting their HNRs met in a timely manner, I don't

2   address it, because it's a performance measure, I address

3   it because that person needs to be seen face to face

4   within 24 hours.

5       Q.    Did you ask anybody to track how many times the

6   nurses line was cancelled at Tucson in January?

7       A.    Yeah, we are tracking these on a daily basis

8   and I will tell you that I've sent my team down there

9   more times than I can actually count right now to address

10  this issue.  They've been basically living down there,

11  and processes are in place to solve it.  It's a staffing

12  issue.  That's the main overlying theme of this

13  particular issue in Tucson.

14      Q.    Okay.  So is there -- would there be a written

15  document somewhere that would actually show for each

16  month or each week how many nurses lines were cancelled

17  at Tucson?

18      A.    Yes, there's currently a Vendor Performance

19  Report, you know, basically in procurement that is

20  addressing this issue, and if more nurse lines are

21  cancelled, we are tracking them and accepting procurement

22  on a weekly basis at this point.

23      Q.    You said to date they haven't been sanctioned

24  for this?

25      A.    Not this particular date, no.

Larry Gann, Jr., RN - 10/13/2021

87

1    happened?

2         A.    Not that I recall.  I don't -- I'm not sure

3    about that, no.

4         Q.    Okay.  And, again, this was not something where

5    you could assess a sanction against Centurion for putting

6    a blind patient at risk like this?

7         A.    I guess the issue would be that the way it

8    reads here sounds pretty horrific.  I don't know the

9    details of the actual case, so I can't tell you if it

10   really met the -- it's a one-off, so it's an employee

11   relations issue, and I'm not sure that it would meet the

12   level of VPR.  It's not something that I've really seen,

13   actually, before.

14        Q.    But they were not sanctioned.  Correct?

15        A.    No, ma'am.

16        Q.    Okay.  It says, "Follow-up on delayed insulin

17   lines," to your memory, is that again referring to the

18   Tucson facility?

19        A.    It is.  That is definitely part of the Tucson

20   facility, the staffing issue.

21        Q.    And since this is from February 1st, it would

22   be referring back to delays in January or earlier.

23   Correct?

24        A.    Yes, ma'am.

25        Q.    Okay.  And do you -- did you have anybody track

1    for you how many times insulin administration was

2    delayed?

3        A.    No, ma'am.  We basically were looking at these

4    as they came in.  And we were following up on this, so

5    this could be the same incident from previous that we

6    continued to follow up on throughout the weeks.  As new

7    ones come up, you know, it would add to the list and

8    that's where we got to the level of Grant Phillips where

9    he addressed it with the medical director of Centurion,

10   and we adjusted all the insulin lines throughout the

11   state to get them more in line with not only the times

12   that people were being fed, but they were getting done in

13   the correct times with a sense of urgency.

14       Q.    Okay.  And then on the top of the next page,

15   the second bullet point, it says, "Process to take

16   inmates who have exceeded medical cap."

17             What is a medical cap?

18       A.    Well, this deals with our private prisons.  So

19   they only have so much responsibility of these patients

20   financially.  And when they hit that cap, then they

21   become, you know, the responsibility of what's considered

22   to be a corridor facility.  It may be even to the point

23   where the other vendor, whether it's, you know, CoreCivic

24   or Geo, MTC, when they recognize that, hey, this

25   particular person is no longer appropriate for our

92

```
1        Q.     You have better eyes than me.

2        A.     Okay.

3        Q.     So this --

4        A.     Yeah, okay.

5        Q.     This e-mail says that because there was no

6    sergeant available to open the door, Dr. Stewart was

7    unable to conduct a physical assessment.   Correct?

8        A.     That's what it says, yes.

9        Q.     Yeah.  And would you consider this an example

10   of not having custody staff being a barrier to receiving

11   care?

12       A.     No, this particular instance I -- I considered,

13   to be quite honest with you, a lack of sense of urgency

14   by the vendor not to go make the lieutenant or the

15   sergeant aware, because I've never had an instance like

16   this, where somebody needed to be seen for an exam and an

17   officer wasn't available to open the door.

18              And the consensus on this was, with Centurion's

19   vice president of operations, is why didn't they go talk

20   with someone else.  You can't just say I didn't have

21   anybody to open the door, so I couldn't get it done.

22   Somebody will open that door, it's just the appropriate

23   authority was not involved.

24       Q.     Okay.  And then if we can scroll to the top of

25   page 1, so in this e-mail at the very top written by
```

1   Helen Kline, who works for Centurion, it's sent on

2   January 30th, at 12:09 in the morning.  She says, "Good

3   evening, treatment plans have been entered.  Insulin for

4   the patient was ordered with an effective date of

5   tomorrow."

6           And we saw that Mr. Haldane had asked her

7   shortly after noon on the 29th to make sure that the

8   patient got insulin, and then almost 12 hours later she's

9   saying that he will get it effective tomorrow.

10          Does that concern you?

11      A.    It did concern us.   And this was brought up at

12  leadership with Centurion as well.  Yeah, I do remember

13  this case.  And I remember addressing it.  And I believe

14  that Mark did a good job of documenting it.  Corrective

15  Action Plan -- this was one of the examples that we

16  included for a Corrective Action Plan on insulin,

17  provision of insulin, in general, yes.

18      Q.    And the Corrective Action Plan on the provision

19  of insulin, was that just at Eyman prison or was that for

20  all 10 prisons?

21      A.    We were actually looking at this, as we talked

22  about, with meal times throughout the state.  We were

23  very concerned with this, like I said, that's why I said

24  I had to get Dr. Grant Phillips involved as my medical

25  director to kind of -- to share this, to make sure that

Larry Gann, Jr., RN - 10/13/2021

94

```
 1    these issues were addressed in a timely manner.
 2         Q.    And you mentioned the Corrective Action Plan
 3    was required, but again, because of the way the contract
 4    is made, you couldn't sanction them for this incident?
 5         A.    It's not necessarily the way the contract is
 6    made.  It's just the contract has a process for
 7    sanctioning, and this was something that we were working
 8    together with them to solve.  That's the way you solve
 9    these problems is troubleshoot.  You come up with better
10    process.
11         Q.    So there was no sanction.  Correct?
12         A.    No, ma'am.
13         Q.    Okay.  All right.
14               Could we pull up Exhibit 10, please, Samantha.
15               (Marked for identification Exhibit 10.)
16    BY MS. KENDRICK:
17         Q.    So this is another Action Items Meeting Agenda,
18    it's dated January 11th, if we can scroll down a little
19    so that we can see the Bates number.  The Bates number is
20    70019.  And if we can go back up under Mr. Haldane, it
21    says "SMU1 insulin issue."
22               What was the insulin issue at SMU1?
23         A.    Ma'am, I don't recall what the insulin issue
24    was at this particular date and time with SMU1.
25         Q.    Okay.  So you just -- do you not remember this?
```

95

1      A.    No, there's not enough information on that line

2    for me to remember.  I deal with things like this 20 a

3    week sometimes, different issues.

4      Q.    Uh-huh.  Okay.  So you just can't remember if

5    it was like a one-off or some sort of kind of --

6      A.    I can't remember, no.  I cannot remember this.

7      Q.    Okay.  All right.  The last thing under

8    Mr. Haldane's name is, it says Lew, L-e-w, pre-pouring.

9            Is "Lew" short for Lewis, as in Lewis Prison?

10     A.    I'm not sure.  But I can basically address the

11   pre-pouring if you would like.

12     Q.    Yeah, that was my next question is, what does

13   pre-pouring mean?

14     A.    Pre-pouring is a -- it's improper conduct for

15   medication administration.  It's something that, as I've

16   been explained years ago, there was an, I guess you would

17   say, some type of an agreement or I want to use the right

18   word here.  There was an agreement with the Board of

19   Pharmacy and the state facilities in the way medications

20   could be passed throughout the facility.  Currently the

21   way meds are arranged within the state, they're

22   patient-specific except for when you get someone new and

23   you have to use clinic stock, so you can do that for a

24   few days until the medication comes in, and it needs to

25   be started immediately.  The process of pre-pouring is

Larry Gann, Jr., RN - 10/13/2021

96

1   where LPNs use their down time to prepare their

2   medications, with the cards and identification of the

3   inmates, and then they go out and pass the cards.

4          I have a problem with that, being a nurse,

5   because it's improper medication administration.  Because

6   each facility is set up with a Class 3 or Class C mail-in

7   pharmacy.  So they receive the medications from Diamond.

8   These medications are basically, you know, have

9   pharmacists from Diamond sending them.

10          Once we receive them, they have to be received

11  from -- by a LPN or a higher scope of practice and these

12  medications need to be distributed to the carts

13  appropriately, they need to be inventoried and they need

14  to be renewed at times.  So when these medications come

15  in, it is not ethical for a nurse to take the medications

16  out of a blister pack, put them in envelopes, and then

17  administer them to the patient.  That is not following

18  the five rights of medication administration.  I think

19  there are 13 right now since I graduated nursing school,

20  if that tells you anything.

21          But it doesn't matter.  It's not the proper

22  method for tracking and administering medications.  I've

23  never condoned it.  And I've stopped it in every facility

24  I've ever worked in.  It does seem to be, I would say, a

25  culture in corrections to use this format, but as far as

Larry Gann, Jr., RN - 10/13/2021

97

1    I'm concerned, it's illegal and I've stopped it in every

2    facility since I've been here.

3         Q.    Does it --

4         A.    I'm sorry?

5         Q.    When the nurses do that, isn't it technically

6    they're engaging in the practice of dispensing --

7         A.    Agree --

8         Q.    -- medication the way a pharmacist would?

9         A.    I agree, because they are not in the scope of

10   practice to repackage medications.  And that's something

11   that my pharmacist, Marty, that you see in a lot of these

12   e-mails, and we're talking about the pharmacy and the

13   audits and things like that, one of the biggest issues we

14   have found is the perpetual inventory system and the way

15   that medications are tracked throughout the state, using

16   the EMR, vendor EMR, and it's a process that I don't

17   believe is a good one.  And it's something that we've

18   been trying to remedy with not only the software designer

19   eOMIS, but with Centurion just to stop doing it.  And it

20   took me quite a few months to get that stopped.

21        Q.    And were they doing the pre-pouring at all the

22   facilities or just at Lewis?

23        A.    The facilities that I was mainly concerned with

24   was Lewis, Eyman, Tucson, Yuma, some of our bigger

25   facilities is where I found it, because it's one of the

1     things that when you start to see staffing vacancies,

2     it's a shortcut.  And I just don't condone it.  And I

3     think I've got it stopped.  But when I have one-offs like

4     that, I make a big deal out of them, and I bring them to

5     everyone's attention, and I make sure that appropriate

6     discipline's applied.

7         Q.    When was pre-pouring ended systemwide?  You

8     said you've put a stop to it, when did you --

9         A.    From what I understand, it's stopped, unless I

10    see issues like this that pop up.  I would say it took me

11    almost a year to get it stopped.  And that was hard

12    because I had my monitors working on it.  I had my teams

13    going out looking for it.  But it got to the point where

14    I was making performance reports.  It was brought to the

15    senior vice president of Centurion, even the CEO of their

16    company, that if it didn't stop there would be sanctions

17    involved.  And that's when it did stop.

18         With that being said, it's often a culture.

19    It's indicative of this industry, but it's not condoned

20    by anybody on my team.

21         Q.    And you said that sanctions were threatened for

22    this ongoing problem at multiple facilities, were those

23    sanctions actually assessed?

24         A.    No, we had several Corrective Action Plans,

25    that's one of the first things I started working on when

Larry Gann, Jr., RN - 10/13/2021

103

1    to provide the care.  I mean, they basically were scared

2    for their lives to do it.

3           So with that being said, dental backlogs were

4    created, and the dental backlog of almost six months came

5    out of what resulted from COVID.  I worked on a

6    Corrective Action Plan with Centurion on that, and I was

7    told that six months was unacceptable to take care of the

8    dental needs throughout the state with the current

9    backlog.  And with my dental director, Dr. Chu, and their

10   dental director, as well as Tom Dolan, we came up with

11   the process to alleviate the backlog, and did.  But they

12   were basically noncompliant for the months that were, I

13   feel, misaudited when we looked at the data.  And that's

14   why we did that.

15   BY MS. KENDRICK:

16        Q.    Right.  So the motion, and what plaintiffs

17   allege, was that these encounters, if you looked at them

18   on the face, were not happening.  But then the monitor

19   was giving a 100 percent score -- let's talk about the

20   dental care right now -- for the dental care.

21           And so did you address that with the monitor

22   about why she was awarding them 100 percent compliance

23   when she was writing in there?

24        A.    I did.  And basically it was because she was

25   following ADA guidelines and basically following, in a

Larry Gann, Jr., RN - 10/13/2021

104

1   way, what the governor put into practice with his

2   emergency order.  And that was why she was extending

3   this, because of ADA.  And to be very honest with you,

4   nobody was happy with my decision to reverse that and

5   reaudit those, but we follow the CDC guidelines.

6            And I kind of looked at it, to be honest with

7   you, from a common sense standpoint, if I wanted to go to

8   the dentist, I could go to the dentist.  So I didn't

9   think that it was fair for my patients not to be able to

10  go to the dentist or for Centurion to get credit for

11  something that they weren't doing.  So I reaudited those

12  and basically held them accountable for those areas where

13  they were noncompliant.

14       Q.    Who does Dr. Chu report to?

15       A.    Dr. Chu reports at this time to myself and

16  Grant Phillips, my medical director.

17       Q.    Okay.  So she did not tell you or others in

18  advance that that was how she was going to monitor?  She

19  just took it upon herself to award them 100 percent based

20  on the American Dental Association guidelines?

21       A.    That is one way to look at it.  I don't think

22  that's what she had done in taking this on herself.  I

23  think she was working with Centurion's dental director

24  and medical director at the time, for which I didn't

25  agree with.  And I didn't have a medical director like

 1  Dr. Phillips before this.  And I had him weigh in on it

 2  with me and I had Mark Haldane work on it with me.  And

 3  the decision was made between the four of us that while

 4  it wasn't a popular decision, I thought it was the right

 5  decision.

 6      Q.    And did you at any point bring this to the

 7  attention of the Court in Parsons to say, "We can't

 8  comply with dental requirements because of American

 9  Dental Association guidelines"?

10      A.    No, because we follow CDC guidelines.  And I,

11  at that moment, wasn't even, you know, really aware that

12  we were following ADA guidelines and not CDC guidelines.

13  So I wasn't very happy about that.

14      Q.    Okay.  And was any corrective action or

15  disciplinary action taken against Dr. Chu for reporting

16  100 percent compliance when the encounters were not

17  occurring?

18      A.    Well, that's where the miscommunication was.  I

19  feel it was between Dr. Chu and with the direction that

20  Centurion was going in.  And, yeah, is she ultimately

21  responsible, yes.  And conversations did happen regarding

22  that.  Disciplinary action was not administered for that

23  particular case, because I felt that there was some

24  miscommunication and direction, but I did feel that it

25  was relevant because of the backlog.  I held three

1  inmate-based, you know, to the patient level, we're

2  addressing those in those meetings now.  So we're kind of

3  building our entire quality assurance team around this,

4  at this particular time.  And we've geared our staffing

5  to meet that need.

6      Q.    And so were the CGAR reports changed and

7  updated with the reaudited numbers, to your knowledge?

8      A.    To my knowledge -- I'm not sure.  I'd be happy

9  to check on that and get back to you today.  I don't have

10  a problem.  It would be very easy to find out for you.

11      Q.    And did you provide an update to the Court with

12  the new numbers after the reaudit was done?

13      A.    Yeah, if the reaudit was done, yes, those were

14  corrected because the actual letters had to be changed

15  that went out to the vendors, as well on compliance.

16      Q.    Okay.  You said if the reaudit was done.  I

17  thought you said it was done?

18      A.    I have to check on that.  I have to see if the

19  numbers actually changed.  I'm not sure if it was

20  reaudited or not.  It was going to be a great burden, and

21  to be honest with you, that was quite a while ago and I

22  don't recall the specifics of that.  So I can check on it

23  for you today.

24      Q.    Okay.  So, I'm sorry, I must have misunderstood

25  something you said earlier, so just to be clear, right

1    now you're not sure if 50 and 51 were actually reaudited

2    or if a 0 percent was taken for those months?

3         A.    I would have to clarify that for you.

4         Q.    Okay.

5         A.    I would like to clarify that for you, to be

6    honest with you.

7         Q.    Okay.  Just so you know, no update has been

8    provided to the Court or to the plaintiffs, that's why I

9    was asking you?

10        A.    Yeah, I can check on that for you.

11        Q.    Was any sort of corrective action or directive

12   taken with the monitor who misstated the results for 50

13   and 51?

14        A.    I think provided reeducation and counseling on

15   basically working within scope of practice, with that

16   particular monitor.

17        Q.    And then paragraph 13 you say, "To ensure no

18   additional oversights were made.  I conferred with each

19   of the monitors and analyzed CGAR findings from the

20   relevant time period.  Based on my investigation and

21   discussions, I can confirm that no other PM's methodology

22   was altered (e.g. excluding or marking files compliant

23   due to a delay or cancellation) as the result of

24   COVID-19."

25              Do you stand by that sworn statement to the

Larry Gann, Jr., RN - 10/13/2021

111

```
 1   supervisors.  Vanessa is now in a quality assurance role
 2   that we're developing to work more in tune with our
 3   vendor.  And we have a another nurse that has come into
 4   that supervisor position and monitors the (inaudible) --
 5              THE REPORTER:  That monitors what?
 6              THE WITNESS:  The other -- we have another RN
 7   who has come in to monitor -- or to manage those other
 8   six monitors, sorry.
 9   BY MS. KENDRICK:
10      Q.    So just to be clear I understood you, you met
11   with the supervisors, but not with every single monitor?
12      A.    No, I did not.  Not regarding this issue, no,
13   but --
14      Q.    Okay.  Thank you.  Okay.  One of the other
15   things that the disclosure statement said you were going
16   to testify about, and I can pull it up or I can just tell
17   you, is it says that you're going to testify about
18   something that's called, quote, a new real-time
19   Corrective Action Plan system.
20              Can you describe everything you plan to testify
21   about this new real-time Corrective Action Plan system?
22      A.    Sure.  So one of the most difficult aspects of
23   doing the monitoring with the Medical Services Contract
24   Monitoring Bureau, and then actually, you know, creating
25   a change process and fixing the issues, is the fact that
```

1    we're often monitoring two months in arrears.  That's an

2    entirely inefficient system.  Most of this is based upon

3    the fact that our EMR is just completely inadequate.  It

4    is not data driven.  It's not data viable, and one of our

5    biggest issues is it doesn't allow us to show our work.

6            When you have a proper correctional electronic

7    medical record, it is able to calculate and give you

8    health services reports on a daily basis, to kind of show

9    you the fitness of each facility and to show you where

10   your underlying problems are.  Within this next RFP that

11   we just finished writing, I wrote the EMR section myself

12   and made sure that the EMR was inclusive of this bid

13   process by the vendor that is selected.

14           There will be separate meetings on the EMR to

15   make sure that it is customizable to the effect that it

16   will be able to present reports for every performance

17   measure possible.  That can be data-driven for real-time

18   reporting.  I've done this in other systems before.  Most

19   recently in Maricopa County, the EMR that they have there

20   was customized for the Graves versus Arpaio case where

21   Penzone's has been basically terminated, and that was

22   because we were able to work with a company that could

23   provide a data monitor EMR that would be able to show the

24   methodologies and formulate those along with the care

25   that's provided and show the work that's being done with

1   the compliance rate.

2          If you can do that, then what you can do is you

3   don't even need, per se, what a quality assurance program

4   does, a lot of hospitals do.  You can actually go ahead

5   and see an issue that might be happening in the industry

6   and take and generate, you know, with your ad hoc report

7   builder and look backwards two months from where you are

8   right now and see if you've even got the problem before

9   you start addressing.  So it doesn't allow you to waste

10  time, it's very efficient.

11          And then with the problems that you do have,

12  you know, they're ongoing issues, like some of the

13  stipulation agreement performance measures are probably

14  something that I'll probably never get rid of because

15  they support the NCCHC measures.  But others, I would

16  want to adjust the methodology to make them more adherent

17  to what really you see in the community standard of care,

18  more geared towards qualitative care, not quantitative

19  care.  I can put check boxes on documents all day, but it

20  doesn't tell me that the care that was provided was

21  quality.

22          So I want to engineer that a little bit

23  differently.  And I've done it in several different

24  facilities, where we didn't have an EMR.  In Baltimore I

25  was able to put process in place that we could show our

Larry Gann, Jr., RN - 10/13/2021

116

1   on it?  It was filed on March 26th, 2021, at Docket

2   3881-2.

3          Sam, can you go to page 22 of the -- so I want

4   to look at paragraph 47, and it's describing chart

5   reviews.  And I'm curious, is what you're describing

6   here, is this part of the real-time correction action

7   plan system or is this something else?

8       A.   Give me just one moment.

9       Q.   Of course.

10      A.   Yeah, I can speak to this.

11      Q.   Is that part of this overall kind of more

12   real-time monitoring?

13      A.   No, this is me interjecting myself into the

14   current day-to-day operations of Centurion, and

15   recognizing that they have problems, being the

16   performance measure compliance rates, and using my

17   troubleshooting team to check their processes,

18   essentially Centurion doesn't really have a quality

19   assurance team.

20          What they have is a compliance team, but that's

21   the problem, if I'm spending all my time tracking

22   compliance, I'm not fixing the problems in the first

23   place.  So my goal was not only to have a monitoring

24   bureau, but my goal was to have a troubleshooting side to

25   it.

121

1    and understands quality assurance.  And when she's

2    auditing and she sees problems, you know, she's auditing,

3    she's formulating what their compliance is.  She's giving

4    them a heads-up prior to having to wait for the formal

5    report to come from the monitoring bureau.  And she's

6    like, look, you're not improving on this, you know.

7           She's talking about being ghosted here because

8    they changed leadership at Eyman, as recently discussed,

9    and they just promoted the Florence FHA to the director

10   of operations.  So she's just not -- she doesn't have

11   those personal relationships she had before with the FHAs

12   who would answer her, and that's her frustration.

13       Q.    Okay.

14       A.    So we addressed this issue, Mark and I did.

15       Q.    Okay.

16       A.    So that's what's going on here.

17       Q.    Okay.  So if we go to the -- down on the

18   exhibit to the third page of it, I apologize.  This is an

19   e-mail from Lisa and it's dated July 26th, and she says,

20   "Hi, Phoenix Complex, I need the following encounters to

21   be signed off by Dr. Stabinsky ASAP.  Please see the far

22   right column and advise when complete."

23           And then if you scroll up on it, Ms. Konishi

24   sends another e-mail to the same people the next day, the

25   27th, asking if there was an update for Dr. Stabinsky to

Larry Gann, Jr., RN - 10/13/2021

122

1    sign off on the two encounters.  She says, "I did not

2    receive any type of response or acknowledgement from you.

3    Please note this is holding up your audit results for

4    PM 39."

5            And you see that?

6        A.    I see it, yeah.

7        Q.    So if Dr. Stabinsky goes into the record and

8    signs off on the things that she flagged for them,

9    they'll be able to be marked as compliant with PM 39.

10   Correct?

11       A.    I would not say correct.  If it wasn't done

12   prior to the audit they shouldn't be getting credit for

13   it.  And I will follow up on this.  But, no, I wasn't

14   made aware that changes were being made in this fashion,

15   no.

16       Q.    Okay.  And if we just scroll up a little bit

17   more.  So then it looks like in response --

18       A.    Yeah.

19       Q.    -- Jennine Gahris, who is the regional director

20   of compliance sent an e-mail to the doctor saying,

21   "Dr. Stabinsky, please sign off on the two orders in the

22   below e-mail.  This will improve the compliance of

23   routine provider referrals."

24            So if he made those changes as ordered, then it

25   appears that those would be marked as compliant

123

1    encounters.  Correct?

2        A.    That's what it reads to me, but that should not

3    be the case, no.

4        Q.    Do you know if Dr. Stabinsky changed his

5    entries as directed to do so by the monitor?

6        A.    I do not know.  I do not.

7        Q.    Okay.

8        A.    I don't recall this exchange right here.

9             MS. KENDRICK:  Okay.  Let's go to Exhibit 14.

10            (Marked for identification Exhibit 14.)

11   BY MS. KENDRICK:

12        Q.    So this is from Karen Padron, who her title is

13   listed as Compliance Monitor II at Lewis Prison, sent

14   6/29/2020, and the Bates number, if we scroll down, is

15   75397.

16            This is a pretty long chain.  So, actually, I'm

17   going to start at the beginning of it, which I believe is

18   on page 7.  So this is page 7, Bates number 75403, and

19   this is an e-mail sent Sunday, June 21st, 2020, at

20   1:01 p.m., by somebody named Philip Weston.  And

21   Mr. Weston says, "On 6/21/2020, at approximately

22   1220 hours, Mr. Quigs refused to complete a.m. pill call

23   for 4B pod."

24            Do you know who Mr. Weston is?

25        A.    I don't know who Mr. Weston is, but I do know

```
 1    about this incident and I do know who Mr. Quigs is.

 2         Q.    Okay.  If we can scroll up to -- so I guess my

 3    first question is, he did not complete a.m. pill call.

 4    Should a.m. pill call have been completed earlier than

 5    12:20 p.m.?

 6         A.    Yes, they had call-offs.  This person,

 7    Mr. Quigs you're referring to, is actually the assistant

 8    director of nursing.

 9         Q.    Okay.  So if we could scroll up to page 5.

10    Donna -- Donna Mendoza, who has a Centurion e-mail

11    address, but it doesn't say her title, on June 24th, a

12    couple days later, I don't know if you can see this, but

13    it is about eight lines in, it says, "The officer took

14    the nurse to the next pod, and when they completed that

15    pod it was past noon and too late to return and give the

16    a.m. meds."

17              So was it the practice that once it hit noon

18    that if the a.m. meds weren't delivered, you just gave

19    up?

20         A.    No, the issue with this particular case had

21    nothing to do with that mentality.  What it was was we

22    had call-offs at this particular facility, Donna Mendoza,

23    by the way, is the director of nursing for Lewis.

24         Q.    Okay.

25         A.    And what she's saying is fine, but the real
```

1   issue was this particular ADON, Quigs, had to take over

2   the med pass and went out, was being disrespected by the

3   inmates.  And the nurse as well, from what I understand,

4   was not professional.  I spoke extensively about this to

5   Tom Dolan, the VPO.  And this gentleman resigned after he

6   was investigated for this.  Because I didn't feel it was

7   very good patient advocacy.  And I just wasn't thinking

8   it was very good leadership skills.  I mean, any ADON and

9   DON needs to be ready to take a cart and go pass the meds

10  and not have an issue with it.

11      Q.    Well, yeah, that was going to be my next

12  question is, normally the assistant director of nursing

13  is not doing -- handing out the pills themselves.  Right?

14      A.    Yeah.

15      Q.    Why was the ADON having to do this?  Did they

16  not have the LPNs to do it?

17      A.    Correct.  They were understaffed and the LPN

18  had called off that day.  And he had to fill in and he

19  didn't want to do it.  I was very frustrated.  I'll be

20  honest with you, a RN cannot pass meds like LPNs.  Those

21  are amazing people that pass the meds.  And they can pass

22  to 350 people in a med pass.  They know the medications

23  better than a registered nurse, because it's not really

24  their scope of practice; it's not what they do every day.

25              So I've had to do it before.  It takes me a

Larry Gann, Jr., RN - 10/13/2021

126

1  while, but I can do it, and I can do it safely.  But it

2  can be very frustrating.  It's loud.  It can be scary.  I

3  think one of the issues with this particular -- this

4  particular person was, he didn't feel safe in that

5  particular module.  And I think he was getting yelled at

6  and he walked off the job

7       Q.    Yeah.  Yeah.  So I have a question about

8  something else that she said here.  And I don't know if

9  you can see it, but we can try to adjust it, but after

10  she wrote that it was too late to give a.m. meds, she

11  says, "I called the medical provider and received hold

12  orders for some BID meds.  I called psychiatry and

13  received hold orders for all a.m. meds and wrote a med

14  error report for the remainder."

15            Just so we are agreeing on the same verbiage,

16  "BID" is a medical abbreviation that means twice a day

17  for medication.  Correct?

18       A.    It does.

19       Q.    Okay.  And what is a hold order?

20       A.    I'm not sure what she refers to as a hold

21  order, but any time a medication is missed like this,

22  you're required to call the physician and let him know

23  that his order was not able to be carried out and why.

24  And at that point the doctor can determine what he wants

25  to do.  I don't know that terminology either, to be very

Larry Gann, Jr., RN - 10/13/2021

129

1   BY MS. KENDRICK:

2       Q.    Okay.  If those charts were reviewed for a

3   CGAR, that would show the reason the person didn't get

4   the medication was because it was held by order, not

5   because the nurse walked off the job.  Correct?

6       A.    That I agree.  There shouldn't be documentation

7   that the med was given, it's just like if an inmate

8   refuses a med, the proper refusal documentation needs to

9   be done, signed, and entered into the EMR in the

10  appropriate manner, which is with a refusal check.

11      Q.    Okay.  Do you know who the physician is that

12  agreed to a blanket hold order?

13      A.    No, I do not.

14      Q.    Do you know who the psychiatric provider is who

15  agreed to a blanket hold order?

16      A.    I do not.

17      Q.    Okay.  Do you know if this incident was

18  reported to the State Board of Nursing?

19      A.    I do not know if it was or not.  I can tell you

20  of the things that have been reported to the Board of

21  Nursing, they usually came from me.  So this would be

22  Centurion leadership, as they provide the care, they

23  should actually be given a disciplinary action as well.

24      Q.    And your pharmacy monitor, Mr. Winland, was he

25  alerted to this misdelivery?

1    Centurion.

2        Q.    Okay.  So you don't, as a licensed registered

3    nursing professional by the State of Arizona, do you have

4    an obligation to report other mispractices that you

5    observed?

6        A.    I have an obligation to make sure that

7    leadership is informed about such issues like this.  And

8    that they should take action on it, yes.

9        Q.    Okay.  But they -- just to be clear for the

10   record, the answer is no, you did not personally report

11   this --

12       A.    No, absolutely not.

13       Q.    Okay.  Okay.  Can we go to Exhibit 15, please,

14   Sam?

15            (Marked for identification Exhibit 15.)

16   BY MS. KENDRICK:

17       Q.    This is an e-mail, dated September 29th, 2020,

18   from Amber Puckett at Centurion to Vanessa Headstream,

19   who you said earlier works in the Department?

20       A.    Correct.

21            MS. KENDRICK:  And if we could scroll down so

22   we can get the Bates number for -- the Bates number is

23   109883.  If we can go to the bottom of page 2.

24       Q.    So this is from Ms. Headstream to Ms. Puckett,

25   and it's regarding an incarcerated person as the subject

1    line.  And then in parentheses, it says "out to court,"

2    and Ms. Headstream writes, "The above I/M," inmate, "has

3    been out to court since 8/12/2020, yet MH," mental

4    health, "staff continue to document in the chart for seg

5    visits as if he is, 'not in his cell at the time of the

6    visit.'  Why is the record documented in while he is out

7    to court?"

8              Why would Ms. Headstream be concerned about

9    this?

10        A.    We were very concerned about this, for a couple

11   reasons, but the main reason is this particular inmate

12   was receiving hepatitis C medication, so to be put into

13   the hepatitis C program, it's an eight-week program to

14   cure the actual virus.  Okay?  So basically the way --

15   please understand that we only catch what we audit, and

16   when we see what problems when we audit or what the

17   monitors tell us, that's what we can actually act on.

18              So when this was brought to our attention, we

19   immediately noticed this particular patient was a hep C

20   patient.  So we tracked the documentation in our EMR

21   ourselves, and we were kind of puzzled with how could

22   this person even be receiving their medication if they're

23   out to court and seg rounds are being done at the same

24   time.

25              So this was a huge documentation error, we

1    felt, by Centurion.  We brought it to their attention,

2    and we asked for a Corrective Action Plan and remediation

3    of the staff.

4           It's important for the hep C program, because

5    now if this particular inmate was receiving hep C meds,

6    and they miss this many days, it might be required to

7    start the entire therapy program over again.  Not only

8    injuring his cure, but costing the taxpayers thousands of

9    dollars.

10    Q.    Okay.  Yeah, so that -- I -- that makes sense

11    why Ms. Headstream would be concerned.  So if we could

12    just go up a little bit to see the response.  Right here,

13    the response from Ms. Puckett, who is listed as the

14    assistant facility health administrator at Lewis Prison,

15    she says, "I was under the impression that was how mental

16    health was directed to document on guys in these

17    instances."

18           Do you know if Ms. Puckett told mental health

19    staff to stop writing in records that people were seen in

20    custody when they were out to court?

21    A.    Yeah, I do not know.  Amber Puckett is no

22    longer working there, nor has she been there for, gosh,

23    almost a year.  I would say she currently works over in a

24    private facility somewhere for Geo, yeah, I don't --

25    Q.    So the practice was to have the mental health

1   staff say when they were doing the segregation rounds

2   that the person -- that they saw the person even though

3   the person was out to court?

4        A.    Absolutely not.  That would be fraudulent

5   documentation.  That's why Vanessa researched it, solved

6   the issues, with not only that but the hep C medication

7   administration and brought it up.  So this patient is

8   somewhere else and not even getting their medications,

9   and that was her main concern.  But also the

10  documentation, which to me is considered fraudulent on

11  Centurion's part if they are, in fact, documenting that

12  people are there when they are not.

13       Q.    And Ms. Puckett here she says she was under the

14  impression that that was how they were supposed to do it.

15  Was corrective instruction sent out to all mental health

16  staff so they would know that they should not be doing

17  that practice anymore?

18       A.    I'm sure it was.  But I don't know either if

19  that had a lot to do with Ms. Puckett being employed by

20  Centurion's rival then.

21       Q.    Okay.  Did one of your mental health monitors

22  or anybody investigate whether this was a widespread

23  practice among mental health staff either at Lewis or at

24  other facilities?

25       A.    I can tell you that I don't know that it's a

1    widespread issue, but I would have to check on this

2    particular instance to see what follow-up was done on it.

3    I don't recall at all.

4         Q.    Okay.  Did you ask, I think at the time,

5    Dr. Stallcup or Dr. Platt to investigate this?

6         A.    I really don't recall.  I may have.  Like I

7    said, I deal with a lot of issues like this.  And if this

8    came across my desk, the first thing I would say, well,

9    if they're documenting on someone that's not in the cell,

10   it's fraudulent documentation and I want to know why.

11   Yeah, I may have said that to her.  She may have done it,

12   but I'd have to look back in my e-mails to see what the

13   outcome was.

14        Q.    Okay.  But as you're sitting here today you do

15   not remember --

16        A.    I don't.  I don't remember what happened with

17   this particular instance, I'm sorry.

18        Q.    Okay.  And, to your knowledge, was Centurion

19   sanctioned for this incident with this patient not

20   getting his hepatitis C meds and being documented as

21   being in the prison?

22        A.    No, they were not.

23        Q.    Okay.

24        A.    But this is a current part of the Vendor

25   Performance Report on medication administration that's in

Larry Gann, Jr., RN - 10/13/2021

144

1   graduated amount on retired performance measures, then

2   they're not going to be applied.  That's what it sounds

3   like to me.

4        Q.    And I can't remember, can we scroll down to see

5   who signed this letter, please?

6             So it's Ms. Corella.  So she -- is Ms. Corella

7   from -- her title says, "Interim Chief Procurement

8   Officer."

9        A.    Yes.

10       Q.    She's the person who makes the final call about

11  how much the sanction will be?

12       A.    So during this particular period of time with

13  contractual items, leadership made a decision that

14  procurement would be signing these letters.  And that's

15  why my signature is on the line.

16       Q.    Okay.  So this decision to not sanction the

17  performance measures cost ADC $80,000 this month.

18  Correct?

19       A.    That's what it appears to me, yes.

20       Q.    Yeah, okay.

21             Could we go to Exhibit 16, please, Sam.

22             (Marked for identification Exhibit 16.)

23  BY MS. KENDRICK:

24       Q.    So this is a letter dated June 28th, that's

25  from Mr. Dolan at Centurion, addressed to you.  I'll get

1   able to assist with testing, as they will be mass

2   testing.  And then have their own heavy needs for COVID

3   care."

4        A.    Sure.

5        Q.    How did you take that?

6        A.    Well, I mean, it's a bunch of conjecture.  It's

7   a bunch of -- you know, it means nothing because the

8   virus at that time was spreading and, you know, it's not

9   something you can see or be able to hear coming at you.

10  I mean, if people are going to get sick, they're going to

11  get sick, but in order to protect our patients what we

12  recognized very quickly is we've got to be able to

13  quarantine them and isolate people who are found

14  positive.  It was a massive undertaking.  I'm not even

15  going to --

16       Q.    Yeah.

17       A.    It was very hard to do and, you know, I worked

18  with Sonora Quest and they were so great.  They had

19  results coming to me within six hours of me actually even

20  performing tests.  I was wrapping facilities up within a

21  day and a half.  And the wardens were able to get these

22  reports and isolate the positives very quickly.

23            This particular e-mail, to me, I don't know, I

24  can take it a lot of different ways, but any way I took

25  it, I wasn't really happy with it, because I needed my

1    contracted medical vendor to be a part of the solution,

2    not to give me reasons why I couldn't get it done.

3        Q.    And was one of the ways you took it that

4    Mr. Dolan was urging you that they slow down COVID

5    testing so that, therefore, they wouldn't have to provide

6    the nursing care to people who tested positive?

7              MR. BOJANOWSKI:  Note an objection.

8              THE WITNESS:  No, to be really honest with you,

9    I don't think that was the reason behind it.  I think the

10   reason behind it is when we involved Sonora Quest,

11   because there was a discussion prior to this e-mail of my

12   team helping -- but you need to understand, when my team

13   helps, he gets paid less, because my team are doing it

14   for nothing, and Sonora Quest has a contract with DHS,

15   and they're supplying the testing.

16             So the way I interpreted it is, we can't do it

17   in eight weeks and if you're going to do it in four

18   weeks, I'd rather you not do it in four weeks, because

19   then I can't contribute to my contract with DHS.  That's

20   the way I viewed it.  And that to me wasn't acceptable

21   when you need to be a patient advocate right now and get

22   this job done.  And that's what we did.

23       Q.    Okay.  Well, if you go down a little bit, in

24   the third paragraph it says, "The current timeline has

25   been adhered to so far and rapid changes to the current

1    I'll take that all day long rather -- over letting

2    someone get in trouble and die.  We had to provide care

3    on a daily basis.  My team has offered to go out and be

4    part of the leadership, answer phones, do whatever we can

5    where they're short-staffed to help out.  We do that

6    constantly to try to supply that type of leadership and

7    resources to our vendor.  And to be honest with you,

8    we're all kind of in this together, and we're trying to

9    help each other out.

10        Q.    Okay.  Glad to hear that.

11              Could we go to Exhibit 18, please, Samantha.

12              (Marked for identification Exhibit 18.)

13    BY MS. KENDRICK:

14        Q.    So this is a contract amendment for the Inmate

15    Correctional Healthcare.  It's Contract Amendment 4,

16    dated June 18th, 2021, it's from the State -- State

17    Office, and it does have a Bates number on it.  It's off

18    the website, PLAINTIFFS001698.

19              Were you familiar with this contract amendment,

20    Mr. Gann?

21        A.    I am.  I am, yes.

22        Q.    So I just have a few questions on this.  In

23    paragraph 2 it says that the contract is going to be

24    amended to give an increase of 12 million for a total of

25    $216,709,753 for the year; is that correct?

1      A.     Correct.

2      Q.     Okay.  And then paragraph 3 references a $15

3   million medical staffing project, and I'm going to have

4   more questions about that for you in a second.  But it

5   says in here that Centurion is going to submit a plan for

6   this.

7           Have they submitted a plan for how they're

8   going to spend this $15 million?

9      A.     Yeah, they have.  It's quite comprehensive,

10  actually, pretty impressive.

11     Q.     How many more positions are they adding?

12     A.     To the contract, they're not adding any -- two.

13  Two positions to the contract.  One person to track the

14  entire program, because it's $15 million, and I want to

15  make sure it's done appropriately.  And the other issue

16  is their constituent services liaison, friends and

17  family, they've got one person, and it's not enough, so I

18  asked if we could make that inclusive of this $15 million

19  as well, to make sure that people are doing the job and

20  getting the answers about their loved ones that they

21  need, because I don't feel like Centurion is meeting the

22  bar there.

23     Q.     Okay.  Where is the $15 million coming from?

24     A.     I don't know specifically where it's coming

25  from.  I know it was basically allotted to us through the

Larry Gann, Jr., RN - 10/13/2021

167

1    expenses?

2         A.    Yeah.

3         Q.    That obviously was not anticipated at the time

4    of the contract?

5         A.    Yeah.  Yeah.

6         Q.    So when I add those numbers up, I get 233

7    million, but you had said earlier that you thought it was

8    260?

9         A.    Yeah, it had always been explained to me that

10   we were already at 240.  And I was just putting the

11   numbers into that to get into the number that I had.

12   That number has been repeated to me before as well --

13        Q.    I'm sorry, I didn't hear that.

14        A.    I said I hadn't seen it broken down in this

15   format and added up the way it was.

16        Q.    The final thing I want to ask you about is,

17   with this document, is paragraph 5 says, "The contract is

18   hereby amended to cap the indemnification of Centurion to

19   $2 million on Court ordered judicial sanctions and fees

20   related to Parsons versus Shinn."

21              Why was that cap put in place?

22        A.    It was a -- you know, it was a -- a matter of

23   negotiation by Centurion.  And I don't think that they

24   were going to renew the contract had we not put it in

25   place.

Larry Gann, Jr., RN - 10/13/2021

168

1    Q.    They threatened to walk, if you didn't put that

2    cap in there?

3    A.    It was part of the negotiation process and it

4    was something they were not willing to bend on.

5    Q.    Okay.  So now under this new contract the

6    maximum fine in a given year or the maximum amount they

7    can pay for noncompliance would be $2 million, which is

8    less than 1 percent of the contract amount.  Correct?

9    A.    Sounds like the appropriate math, yes.

10    Q.    Okay.  And why did ADC agree to give Centurion

11    more money?

12    A.    One of the things that's in there for the 12

13    million was, you know, a lot of these nurses haven't had

14    any raises since they started with Centurion.  So cost of

15    living raise.  The 15 million was a way to kind of help

16    with the burnout, help with getting these people staffed.

17    COVID really ran down and there was a lot of overtime.

18    There was a ton of people all around the state -- with

19    the sign-on bonuses that Centurion was offering, they

20    still weren't able to attract anybody really into,

21    especially, the leadership positions.

22          We've had facilities go without leadership for

23    nearly a year.  At one point all we have is the nurse --

24    like Donna Mendoza, she had no assistant FHA, because

25    that was Amber Puckett; she left.  And then they had no

1    FHA as well in that position.

2            They were struggling with sign-on bonuses, and

3    the reason I thought this was a great idea was it might

4    be able to attract someone from outside the state, that

5    has an expertise, and you know, they need

6    troubleshooters.  They need people that can come in and

7    work with my team and kind of solve process issues.

8    Because they're so thinly staffed that they really don't

9    have the ability to plan, they're just trying to get the

10   basics done every day.

11       Q.   Were you concerned that if you didn't give

12   Centurion more money, that they would exit the contract?

13       A.    I don't know.  I mean, that's way above my

14   negotiations.  I basically was in this to see what we

15   could do coming up with a $15 million plan.  The money

16   that was set aside for COVID, that was because most

17   states, including Baltimore, they're having to pay for

18   surveillance testing.  So I tell you, Centurion was doing

19   surveillance testing at a 10 percent level for the entire

20   epidemic, and they're nearly at that right now, still

21   doing testing throughout the states, and they weren't

22   being reimbursed for any of it.  They didn't get all the

23   contract money from DHS.  They barely touched the 10,000

24   of the --

25       Q.    Okay.  So you said the negotiations were above

Larry Gann, Jr., RN - 10/13/2021

1      Q.    Yeah, so --

2      A.    I wasn't even done --

3            THE REPORTER:  Wait, hold on.

4   BY MS. KENDRICK:

5      Q.    All right.  I want to ask a question.  So to be

6   clear, so I'm talking about the main 216 million, you

7   know, whatever, the big one.  You are saying you were not

8   involved in negotiating the details of kind of the big

9   one.  Your involvement was more focused on the

10  $15 million incentive bonus part of it?

11     A.    That's correct.

12     Q.    Okay.  So procurement, you said, handles a lot

13  of the negotiations.  Procurement is part of ADC.

14  Correct?

15     A.    They are a department within the ADCRR.

16     Q.    Okay.

17     A.    And they deal with the contracts and

18  negotiations.

19     Q.    Okay.  So they report up to Director Shinn,

20  then, as far as you know?

21     A.    Yes.

22     Q.    Okay.  Okay.  So it was somebody from

23  procurement and higher -- higher level than you.  Was

24  Mr. Profiri involved in the negotiations?

25     A.    Yeah, I really don't know.  I'll be honest with

Larry Gann, Jr., RN - 10/13/2021

172

1   you, Tom Dolan, senior vice president, and Keith Lueking,

2   none of us were involved in that negotiation process.

3   That was done by Centurion or Centene.  I'm not sure who

4   was actually involved with coming up with the numbers.

5       Q.   Okay.  Are you familiar with the report that

6   the Court's expert, Dr. Mark Stern, submitted in

7   October 2019 to the Court?

8       A.   I'm familiar with pieces of it, yes.

9       Q.   Okay.  Are you aware that Dr. Stern recommended

10  that the law privatizing healthcare in Arizona be

11  rescinded and have care be provided directly by the

12  Department?

13      A.   I heard that before, yes.

14      Q.   Okay.  Have you ever spoken with anyone at ADC

15  about the need to rescind the privatization law?

16          MR. BOJANOWSKI:  Note an objection.

17          Go ahead.

18          THE WITNESS:  That's something that has been

19  speculated here and there.  But I've never had a

20  conversation with anyone seriously about it and allowed

21  to make that determination.

22  BY MS. KENDRICK:

23      Q.   What do you mean "speculated"?

24          MR. BOJANOWSKI:  Same objection.

25          Go ahead.

1           THE WITNESS:  People -- you know, people want
2      to know.  I mean a lot of people want to know if we'll
3      ever go back to a self-FHA [sic] system, or will it stay
4      privatized, but there's nothing I know whether that would
5      change or not, no.
6      BY MS. KENDRICK:
7           Q.   Who are the people that you've heard this from?
8                MR. BOJANOWSKI:  Same objection.
9                Go ahead.
10               THE WITNESS:  Staff in the field.
11     BY MS. KENDRICK:
12          Q.   Staff in the field?
13          A.   Yeah.
14          Q.   How about anybody who works at the monitoring
15     bureau with you?
16               MR. BOJANOWSKI:  Same objection.
17               THE WITNESS:  Yeah, it's come up.  But, you
18     know, it's -- the law's the law.
19     BY MS. KENDRICK:
20          Q.   Have you spoken to any member of the Arizona
21     legislature or their staff about this law?
22          A.   No.
23          Q.   Have you spoken to any member of Governor
24     Ducey's staff or the governor himself about this law?
25          A.   No.

1      Q.      Okay.  Has anyone in ADC asked the Arizona

2   legislature to reverse this law privatizing healthcare?

3              MR. BOJANOWSKI:   Same objection.

4              Go ahead.

5              THE WITNESS:   Not that I'm aware of.

6   BY MS. KENDRICK:

7      Q.      How about anyone in ADC asking the governor to

8   support reversing the privatization of healthcare?

9              MR. BOJANOWSKI:   Same objection.

10             THE WITNESS:   Nothing that I know formally.

11  We've looked at several different models of care that

12  might, you know, be something that we can move towards.

13  But no, nothing of a formal nature that I know of that,

14  you know, happened.

15  BY MS. KENDRICK:

16     Q.      Okay.  And you made reference earlier that the

17  new request for proposal, RFP, is under development.   For

18  how many years will the RFP be for?

19     A.      So the RFP is already on the street and we've

20  already done -- we'll finalize the tours in two days of

21  the facilities by the prospective vendors that are here

22  to bid.  So they've got until November 15th to submit

23  their proposal, you know, provided there's no delays or

24  amendments or more questions about the process.  But

25  it's -- it's slated to be, at this particular point, a

181

1                          SIGNATURE PAGE

2

3          I, LARRY GANN, JR., R.N., a deponent
exercising my right to read and sign my deposition taken
4   on October 13, 2021, place my signature hereon and make
the following changes on this _____day
5   of_____, 2021.

6          (IF THERE ARE NO CHANGES, WRITE "NONE.")

7

8                          _____
                           LARRY GANN, JR., R.N.

9

10   PAGE     LINE     READS        CHANGE TO        REASON

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23   _____    _____    _____

24   _____    _____    _____

25   _____    _____    _____

182

1  STATE OF ARIZONA    )
   COUNTY OF MARICOPA  )
2
            BE IT KNOWN that the foregoing proceedings
3  were taken before me; that the witness before testifying
   was duly sworn by me to testify to the whole truth; that
4  the foregoing pages are a full, true, and accurate record
   of the proceedings all done to the best of my skill and
5  ability; that the proceedings were taken down by me in
   shorthand and thereafter reduced to print under my
6  direction.

7        [X] Review and signature was requested.

8        [ ] Review and signature was waived.

9        [ ] Review and signature not required.

10           I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in the ACJA 7-206(F)(3)
11 and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
   Arizona, this 17th day of October, 2021.

12

13

14

15   _____
           ROBIN L. B. OSTERODE, RPR
16         CA CSR No. 7750
           AZ CR No. 50695
17
               *   *   *   *   *
18           I CERTIFY that Glennie Reporting Services,
   LLC, has complied with the ethical obligations set forth
19 in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23

24 _____
   GLENNIE REPORTING SERVICES, LLC
   Registered Reporting Firm
25 Arizona RRF No. R1035

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) No. ) CV 12-00601-PHX-ROS ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION OF 30(b)(6) CENTURION
(Wendy Michelle Orm, M.D.)
(via videoconference)

October 13, 2021
2:19 p.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

Prepared by:
602.266.6535                    Jennifer Honn, RPR
www.glennie-reporting.com       Arizona CR No. 50885

2

<pre>
 1                        I N D E X

 2   WITNESS                                        PAGE

 3   WENDY MICHELLE ORM, M.D.

 4       Examination by Ms. Boughton                 5

 5

 6

 7

 8                  INDEX TO EXHIBITS

 9   Description                                    Page
</pre>

<pre>
10   Exhibit 1   Amended Notice of 30(b)(6) Deposition   8
                 (9 pages)
11
     Exhibit 2   E-mail RE: Centurion Subpoena          14
12               PLTFS002790 -2796

13   Exhibit 3   Curriculum Vitae - Wendy M. Orm, M.D.   15
                 (9 pages)
14
     Exhibit 4   Centurion Contract Scope of Work       21
15               PLTFS002213 -2789

16   Exhibit 5   Tab 9 Additional Materials             21
                 PLTFS002806 -3373
17
     Exhibit 6   Spreadsheet                            28
18               ADCRR00137140

19   Exhibit 7   Contract Change Order/Amendment        57
                 PLTFS002187 -2208
20
     Exhibit 8   Spreadsheet                            59
21               ADCRR00069938
</pre>

<pre>
22

23

24

25
</pre>

3

1              DEPOSITION OF 30(b)(6) CENTURION
                    (Wendy Michelle Orm, M.D.)
2                     (via videoconference)

3

          The deposition of DEPOSITION OF 30(b)(6)
4
     CENTURION (Wendy Michelle Orm, M.D.) was taken on
5
     October 13, 2021, commencing at 2:19 p.m., via
6
     videoconference, the witness appearing in at the law
7
     offices of BROENING OBERG WOODS & WILSON, 2800 North
8
     Central Avenue, Suite 1600, Phoenix, Arizona, before
9
     JENNIFER HONN, a Certified Reporter, Certificate No.
10
     50885, for the State of Arizona.
11

12
     APPEARANCES:
13
     For Deponent:
14
          BROENING OBERG WOODS & WILSON
15        Sarah L. Barnes, Esq.
          2800 North Central Avenue
16        Suite 1600
          Phoenix, Arizona 85004
17        Slb@bowwlaw.com

18   For Plaintiffs:

19        PRISON LAW OFFICE
          Alison Hardy, Esq.
20        1917 Fifth Street
          Berkeley, California 94710
21        ahardy@prisonlaw.com

22        PERKINS COIE LLP
          Kathryn E. Boughton, Esq.
23        2901 North Central Avenue
          Suite 2000
24        Phoenix, Arizona 85012
          Kboughton@perkinscoie.com

25

4

1    APPEARANCES: (continued)

2    For Defendant:

3         STRUCK LOVE BOJANOWSKI & ACEDO, PLC
          Anne M. Orcutt, Esq.
4         3100 West Ray Road
          Suite 300
5         Chandler, Arizona 85226
          aorcutt@strucklove.com

6

7                        *  *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    WENDY MICHELLE ORM, M.D.

2   called as a witness herein, having been first duly sworn

3   by the Certified Reporter to speak the whole truth and

4   nothing but the truth, was examined and testified as

5   follows:

6

7                         EXAMINATION

8   BY MS. BOUGHTON:

9       Q.   (By Ms. Boughton) Good afternoon.  My name is

10   Kathryn Boughton, and I'm with Perkins Coie.

11             MS. BARNES:  Volume?

12             MS. BOUGHTON:  Oh.  Is that better?

13             MS. BARNES:  Better.

14       Q.   (By Ms. Boughton) Okay.  I'll just speak up a

15   bit.  My name is Kathryn Boughton, and I'm with Perkins

16   Coie.  I'll be taking the 30(b)(6) portion of your

17   deposition today.

18             Can you please restate your name for the record?

19       A.   Wendy Michelle Orm.

20       Q.   Thank you.  And I just want to go over that you

21   understood the ground rules for your individual

22   deposition?

23       A.   Yes.

24       Q.   Okay.  And can we have an understanding that

25   those same rules apply here?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

7

1    you from providing truthful and reliable testimony today?

2        A.    No.

3        Q.    Can we agree that if I say "ADC," I am referring

4    to the Arizona Department of Corrections Rehabilitation

5    and Reentry?

6        A.    Yes.

7        Q.    Okay.  Thank you.  If I say "prison" or

8    "facility" or "complex," I'm referring to an Arizona

9    state prison complex for which Centurion of Arizona

10   provides healthcare services, okay?

11       A.    Okay.

12       Q.    And if I intend to reference a specific facility

13   I will specify the location.  Okay?

14       A.    Okay.

15       Q.    Okay.  Great.

16             Can you please restate your position?

17       A.    I am the Statewide Medical Director for Arizona

18   under Centurion.

19       Q.    And you've worked with Centurion since 2019; is

20   that correct?

21       A.    Correct.

22       Q.    Okay.  Do you understand that you have been

23   designated as a deponent under Rule 30(b)(6) today?

24       A.    Yes.

25       Q.    And do you understand what that means?

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

11

1      Q.   In total approximately how much time have you

2   spent preparing for this deposition?

3      A.   Maybe an hour.

4      Q.   Next we're just going to briefly go through the

5   topics that you have been designated to testify on and

6   confirm what you're prepared to testify about.  Okay?

7      A.   Okay.

8      Q.   So topic 4 is, "How policies and procedures and

9   community healthcare standards impact specific types and

10  quantities of healthcare staff across the 10 ASPC's under

11  the Centurion contract."  Are you prepared to testify

12  regarding Topic 4?

13               MS. BARNES:  Answer the best you can.

14               THE WITNESS:  Yes.

15     Q.   (By Ms. Boughton) And are you the person most

16  knowledgeable about Topic 4 today?

17               MS. BARNES:  Form and foundation.

18               MS. ORCUTT:  Form.

19               THE WITNESS:  Am I the most knowledgeable

20  in all of Centurion about this?

21     Q.   (By Ms. Boughton) Correct.

22               MS. BARNES:  Form and foundation.

23               MS. ORCUTT:  Same.

24               THE WITNESS:  I think it depends on how the

25  questions are asked and what information you're looking

1    for.

2              I can't tell based on how that is worded

3    whether I'm the ultimate best person to speak to the

4    topic of policies and procedures and community healthcare

5    standards impacting types and quantities of healthcare

6    staff across all 10 sites.  I'm not sure.

7         Q.    (By Ms. Boughton) Okay.  Is there a person at

8    Centurion that you believe may be more knowledgeable?

9              MS. BARNES:  Form and foundation.

10              MS. ORCUTT:  Form.

11              THE WITNESS:  I would have to have more of

12    a definition of what you're looking for in Topic 4 to be

13    able to answer that question.

14         Q.    (By Ms. Boughton) Okay.  Let's move on to Topic

15    5.  Topic 5 is, "How policies and procedures and

16    community healthcare standards impact the levels of

17    healthcare staff across the 10 ASPC's under the Centurion

18    contract."

19              Are you prepared to testify regarding Topic 5?

20         A.    Yes.

21         Q.    Topic 7 is, "Policies and procedures related to

22    the recruitment and retention of healthcare staff at the

23    10 ASPC's under the Centurion contract" -- oh, pardon me,

24    "at the 10 ASPC's."

25              Are you prepared to testify regarding Topic 7?

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

13

1          MS. BARNES:  I just -- I just want to

2    interject here to make it clear, Kathryn, that we

3    provided you a limited portion of that topic for which

4    we're designating Dr. Orm.

5          So if you could clarify your question to

6    include that limitation, I'd appreciate it.

7          THE WITNESS:  And can you scroll your

8    screen so I can actually read it as you do?  Thank you.

9          MS. BOUGHTON:  Is it on your screen now?

10         MS. BARNES:  Yes.

11         THE WITNESS:  Yes.

12    Q.    (By Ms. Boughton) Great.  We will go through

13    those limitations next.  Pardon me.  Did you answer?  Are

14    you -- are you prepared to testify regarding Topic 7?

15    A.    Yes.

16    Q.    Topic 8 is, "Licensure requirements of each

17    classification of healthcare and mental healthcare

18    staff."

19          Are you prepared to testify regarding Topic 8

20    with respect to health care licensure?

21    A.    Yes.

22    Q.    But not mental health care staff; correct?

23    A.    Correct.

24    Q.    And just to clarify, as your counsel mentioned,

25    I understand that you have not been designated as a

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

17

1      Q.   And how often are you in communication with

2   Dr. Phillips, approximately?

3      A.   Nearly daily.

4      Q.   Thank you.  So ADC has contracted with Centurion

5   to provide health care services to its 10 state prison

6   complexes; correct?

7      A.   Correct.

8      Q.   And can you generally explain the interplay

9   between Centurion and ADC in determining staffing

10   facilities?

11             MS. ORCUTT:  Form and foundation.

12             MS. BARNES:  Can you repeat that, Kathryn?

13   I didn't hear it.

14      Q.   (By Ms. Boughton) Generally can you explain the

15   interplay between Centurion and ADC in determining the

16   staffing at the prison complexes?

17             MS. ORCUTT:  Form.

18             THE WITNESS:  I can't.

19      Q.   (By Ms. Boughton) So can you say -- pardon me --

20   how does Centurion determine the amount of staff needed

21   at a given complex?

22             MS. ORCUTT:  Form and foundation.

23             THE WITNESS:  That -- that was

24   predetermined prior to the start of contract.

25      Q.   (By Ms. Boughton) Did Centurion provide any

1   information to assist in those determinations?

2            MS. ORCUTT:  Form.

3            THE WITNESS:  I do not know.

4   Q.   (By Ms. Boughton) Since being awarded the

5   contract, does Centurion provide ADC information to

6   assist in the determination of staffing?

7            MS. ORCUTT:  Form.

8            THE WITNESS:  Centurion provides staffing

9   metrics continually to ADCRR.

10  Q.   (By Ms. Boughton) And what are those metrics?

11  A.   Just hours worked, FTEs filled.  I'm not sure.

12  I'm not involved in that piece.

13  Q.   Do you know who is involved in that process?

14           MS. BARNES:  Foundation.

15           THE WITNESS:  I think our compliance

16  department provides those statistics on a regular basis.

17  Q.   (By Ms. Boughton) Do you know what

18  considerations go into determining the amount, the number

19  of staff needed for a complex?

20           MS. ORCUTT:  Form and foundation.

21           THE WITNESS:  Again, that was predetermined

22  prior to the start of the contract.

23  Q.   (By Ms. Boughton) And since being awarded the

24  contract, does Centurion provide inputs or guidance to

25  ADC about staffing levels?

1              MS. ORCUTT:  Form.

2              MS. BARNES:  Form.

3              THE WITNESS:  Yes, I believe they provide

4    information on a continual basis.

5        Q.   (By Ms. Boughton) And do you know -- and what --

6    what information do they provide?

7              MS. ORCUTT:  Form and foundation.

8              THE WITNESS:  I believe they provide

9    staffing levels, par levels, hours worked, all of those

10   staffing metrics.  I'm not familiar with them.  I'm not

11   involved in that reporting.

12       Q.   (By Ms. Boughton) Are there any Centurion

13   policies and procedures regarding determining health care

14   staff positions -- pardon me, determining which health

15   care staff positions each facility needs?

16             MS. ORCUTT:  Form.

17             THE WITNESS:  No.  We are bound to what was

18   determined and dictated to us at the start of the

19   contract.

20       Q.   (By Ms. Boughton) So other than the contract

21   there are no Centurion policies or procedures regarding

22   the amount of health care staff at a given facility?

23             MS. ORCUTT:  Form.

24             THE WITNESS:  No.  The contract states we

25   will follow the -- the dictated matrix that was provided

1    at the start of the contract.

2        Q.   (By Ms. Boughton) Let's go ahead.  I'm going to

3    mark -- Dr. Orm, do you recognize the document on your

4    screen?

5        A.   No.

6        Q.   No.  Okay.  What does it appear to be to you?

7             MS. BARNES:  Form.

8             MS. ORCUTT:  Form.  Foundation.

9             THE WITNESS:  I'm not sure what this is.

10       Q.   (By Ms. Boughton) That is the tab of another --

11   let's try this.

12            Do you recognize this document?

13       A.   That looks like part of the RFP or contract.

14       Q.   Correct.  And if I told you that this RFP had

15   several tabs and attachments, would that -- would that be

16   accurate with your understanding of how the RFP was put

17   together?

18            MS. ORCUTT:  Form and foundation.

19            MS. BARNES:  Form and foundation.  And

20   Kathryn, I'm not really sure what I'm following how this

21   fits into the topics, the aspects of the topics for which

22   we said that Dr. Orm is to testify, because she -- that's

23   not a part of the topics that she's designated for.  So

24   I'm not really following.

25            MS. BOUGHTON:  So this is a question about

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

23

1        MS. BARNES:  Form and foundation.

2        THE WITNESS:  If -- if you define what this

3   chart is, I may have seen it in a different format.  But

4   I'm not familiar with what this is.

5        Q.   (By Ms. Boughton) Okay.

6        A.   Is this a staffing matrix?

7        Q.   This is included in the staffing amendment tab

8   to Centurion's RFP proposal.  There are multiple of these

9   for each facility.  And so I'm -- I'm hoping to get your

10  clarification on Centurion's creation and assignment of

11  staff at each facility, and specifically the policies and

12  procedures that shape those determinations.

13       A.   Those were already dictated to us.  So I'm not

14  sure if this tab is following what was already dictated

15  it would be.  Or if this is what Centurion proposed as

16  best practice.  I'm not sure what the context is of that

17  tab.

18       Q.   So it's your testimony that you weren't -- do

19  not know if Centurion provided ADC with specific

20  proposals for each facility under the contract?

21       A.   I'm not sure.

22       Q.   And do you know who might be sure at Centurion?

23       A.   Well --

24       MS. BARNES:  Form and foundation.

25       THE WITNESS:  You may need to go to

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

24

1    Centurion corporate, because this was all determined

2    before we started the contract and were hired.

3        Q.    (By Ms. Boughton) And did you talk to anyone at

4    Centurion corporate before today's deposition?

5        A.    No.

6        Q.    Okay.  Go back to Exhibit 4.  This again is the

7    request for proposal and response to ADC's request for

8    proposal.

9            And we're going to go to page 468, which is

10   Bates stamped 2680.  Do you see this paragraph right

11   here, Dr. Orm, "In order to meet the performance

12   measures" -- "performance measure requirements and other

13   obligations under the Parsons stipulation agreement,

14   Centurion has looked critically at each outcome

15   measurement and staffing requirement.

16           "Based on this review, we concur that the ASPC

17   staffing found in Exhibit 24 will meet the requirements

18   of the stipulation."

19           Did I read that correctly?

20       A.    Yes.

21       Q.    Do you know what information was considered in

22   that review?

23       A.    I do not.

24       Q.    Do you know what that review is referencing?

25       A.    I do not.

1    Q.   Do you know if there are any Centurion policies
2    and procedures that would have been consulted and/or
3    reviewed to determine whether staffing is adequate?
4    A.   I do not.
5    Q.   Do you see right here, I'm going to highlight
6    this, hopefully this isn't distracting, right here where
7    this says, "Our improved understanding of the units
8    within the complexes as a result of the site visits, our
9    appreciation for the information that the department has
10   provided, and our recognition of the increases in the RFP
11   suggested staffing plan have caused us to be comfortable
12   with the ASPC staffing plan as promulgated by the ADC in
13   Exhibit 24, as opposed to the much higher staffing
14   pattern we proposed in 2016."
15        Did I read that correctly?
16   A.   Correct.
17   Q.   Do you know what information led to Centurion's
18   improved understanding affecting staffing analysis?
19             MS. ORCUTT:  Form.
20             THE WITNESS:  I do not.
21   Q.   (By Ms. Boughton) Do you know who would at
22   Centurion?
23   A.   From 2016 on, I don't know.
24             MS. BARNES:  And Kathryn, I can -- I really
25   can try to, like, streamline this because, again, the

1   staffing analysis.

2             We have covered that.

3             MS. BARNES:  I appreciate that, and so I

4   guess just following up on that just, again, I'm just

5   trying to make sure that you understand what she's here

6   for so that we don't, you know, waste your time talking

7   to her about things she doesn't have any idea about.

8             She can talk in general about how maybe

9   some of these things impact the health care staff

10  providers at the facilities in general.  She just doesn't

11  have information about how that was all structured and

12  created to begin with.  That's all I wanted to be clear

13  about.

14            MS. BOUGHTON:  Understood.  Understood.  I

15  just want to clarify what Dr. Orm does have knowledge of

16  in terms of what analytical inputs go into staffing,

17  including the policies and procedures and requirements

18  for a physician and other medical staff.

19      Q.   (By Ms. Boughton) So, Dr. Orm, do you -- to your

20  knowledge are there any analytic assumptions used to

21  determine staff -- determine staffing levels for each

22  health care staff classification?

23            MS. ORCUTT:  Form and foundation.

24            THE WITNESS:  Not that I'm aware of.  I'm

25  not sure.

1      Q.    (By Ms. Boughton) Okay.  Do you know how

2    Centurion, for example, determines that Complex A needs

3    seven physicians and six RNs, and Complex B needs three

4    physicians and 10 RNs?

5      A.    As I said, that was predetermined before the

6    start of the contract.  So I have -- I have no knowledge

7    as to how -- what analytics they used or how they came

8    to -- to that decision.

9      Q.    So it's your testimony today that the specific

10   levels of -- pardon me.  The specific allocations of

11   health care roles were predetermined under the contract?

12     A.    To my understanding, yes.

13             MS. BOUGHTON:  Brought up on the screen

14   what we'll mark Exhibit 6.

15             (Deposition Exhibit 6 was marked for

16   identification.)

17     Q.    (By Ms. Boughton) Dr. Orm, have you seen this

18   document before?

19     A.    I'm not familiar with that document.

20     Q.    What does it appear to be to you?

21             MS. BARNES:  Form.

22             MS. ORCUTT:  Same.

23             THE WITNESS:  It looks like FTE variance,

24   hired versus contractual, just based on the headings of

25   the table.

38

```
 1    again, I really do think I'm going to have to be making

 2    these numerous, unnecessary objections, Kathryn.

 3               All I've asked that I think is totally

 4    reasonably, based on our designation of this witness, is

 5    that you change your question just for her to remove the

 6    reference to "staff" and change it to "provider."

 7               Because she's only here to testify about

 8    medical provider aspects of health care staff.  We have

 9    two other people that will talk about the rest of them.

10               So if you don't do that, then I've got to

11    do these objections every single question.  All I'm

12    asking you to do is limit which portion of the staff

13    you're asking her about because that's the only portion

14    of the staff that she's here to testify about.

15               MS. BOUGHTON:  That has been noted on the

16    record.  I believe the question was pending.  Can you

17    answer it?

18               MS. BARNES:  Form and foundation.

19               MS. ORCUTT:  Same.

20               THE WITNESS:  Can you repeat that question

21    for me?

22       Q.   (By Ms. Boughton) Is Centurion having any

23    problems filling health care staff positions?

24               MS. BARNES:  Form and foundation.

25               MS. ORCUTT:  Same.
```

1              THE WITNESS:  In the remote areas of the
2    state, it can be more difficult than in the central or
3    more populated areas of the state.
4        Q.    (By Ms. Boughton) And is Centurion having any
5    problem filling provider positions at ADC?
6        A.    No.
7        Q.    Have you observed any problems that could be
8    resolved in whole -- whole or in part with more
9    providers?
10              MS. ORCUTT:  Form.
11              MS. BARNES:  I -- I didn't hear the
12    question.  You cut off at the end.
13        Q.    (By Ms. Boughton) Have you observed any problems
14    that you feel could be resolved with the addition of more
15    providers at an ADC facility?
16              MS. ORCUTT:  Form.
17              THE WITNESS:  No.  The answer is not always
18    more providers, so I would say no.
19              MS. BOUGHTON:  We've been going for just
20    under an hour.  How about we take a quick five-minute
21    break?
22              MS. BARNES:  If we can stick to five
23    minutes, that would be great.
24              MS. BOUGHTON:  3:02.  We'll do 3:07.  Thank
25    you.

1    determine whether that extra volume, extra acuity, gets

2    you more staff.

3              My -- my hunch is, yes, because those tend

4    to be our larger sites that have more staff already.  But

5    I'm not sure exactly what you're asking.

6        Q.   (By Ms. Boughton) Okay.  Do medical

7    classifications used by ADC, that is the M-1 to M-5

8    classification, do those affect staffing allocations?

9        A.   No.

10       Q.   Okay.  So if Centurion assessed that an inmate

11   needed a higher level of care and moved them up the

12   M classification, that would not be considered a change

13   in the staffing analysis?

14             MS. BARNES:  Form and foundation.

15             MS. ORCUTT:  Same.

16             THE WITNESS:  No.  That would -- that

17   would -- that would equal a move of that individual to an

18   appropriate housing unit that housed that level of

19   medical necessity, and those units would be staffed for

20   that acuity.

21       Q.   (By Ms. Boughton) Does security classification

22   of inmates impact staffing for providers?

23       A.   No.

24       Q.   No?

25       A.   No.

30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021

52

1     Q.    Is this documented in any security policies or

2  procedures?

3     A.    Is what documented?

4     Q.    What impacts staffing, whether security

5  classifications or the medical classifications we just

6  discussed?

7               MS. ORCUTT:  Form.

8               MS. BARNES:  Form.  Foundation.

9               THE WITNESS:  We wouldn't be referred to

10  any Centurion policies and procedures.  It's the ADCRR

11  that we would be -- so you need to refer to the ADCRR

12  MSTM, the technical manual, or orders that define that

13  for you.

14     Q.    (By Ms. Boughton) So other than the ADCRR

15  policies there are no separate Centurion policies on that

16  point?

17     A.    Based on security levels and staffing, no.

18     Q.    Does the age of a -- does the age of inmates at

19  given a facility impact staffing?

20     A.    No.

21               MS. BARNES:  Form and foundation.

22               MS. ORCUTT:  Same.

23               THE WITNESS:  No.

24     Q.    (By Ms. Boughton) So we've talked about medical

25  classification, age, the number of inmates, acuity of

**30(b)(6) Centurion (Wendy Michelle Orm, M.D.) - 10/13/2021**

68

1              MS. BARNES:  If you don't understand the
2     question, let her ask it again.
3              THE WITNESS:  Okay.
4        Q.   (By Ms. Boughton) To clarify, your testimony is
5     that the staffing level, its requirements for providers
6     were set prior to Centurion's being awarded the contract?
7              MS. BARNES:  Form.
8              MS. ORCUTT:  Same.
9              MS. BARNES:  Foundation.
10             THE WITNESS:  Whatever contract was decided
11    on included those staffing levels.
12       Q.   (By Ms. Boughton) And did Centurion play a role
13    in determining those levels?
14             MS. BARNES:  Form and foundation.
15             THE WITNESS:  I'm sure that was negotiated
16    prior to deciding and agreeing on a contract.
17       Q.   (By Ms. Boughton) Okay.  Thank you.  A few final
18    questions, Dr. Orm.
19         Are activity technicians medical providers?
20             MS. ORCUTT:  Form.
21             THE WITNESS:  Are what?  Can you repeat?
22       Q.   (By Ms. Boughton) Activity technicians?
23       A.   I don't know what those are.
24       Q.   Okay.  Activity therapists?
25       A.   I don't know what those are.

71

1                        SIGNATURE PAGE

2            I, WENDY MICHELLE ORM, M.D., a deponent
    exercising my right to read and sign my deposition taken
3   on October 13, 2021, place my signature hereon and make
    the following changes on this _____ day of
4   _____,2021.

5       (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

7                                 _____
                                  WENDY MICHELLE ORM, M.D.

8
    PAGE   LINE   READS            CHANGE TO            REASON
9
    ____   ____   _____
10
    ____   ____   _____
11
    ____   ____   _____
12
    ____   ____   _____
13
    ____   ____   _____
14
    ____   ____   _____
15
    ____   ____   _____
16
    ____   ____   _____
17
    ____   ____   _____
18
    ____   ____   _____
19
    ____   ____   _____
20
    ____   ____   _____
21
    ____   ____   _____
22
    ____   ____   _____
23
    ____   ____   _____
24
    ____   ____   _____
25

72

1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA )

3               BE IT KNOWN that I took the foregoing
    deposition pursuant to Notice; that the witness was duly
4   sworn by me; and that said transcript is a full, true,
    and accurate record of the proceedings; that the
5   proceedings were taken down by me in shorthand and
    thereafter reduced to print under my direction; that I
6   have acted in compliance with ACJA 7-206.

7               I CERTIFY that I am in no way related to
    any of the parties hereto nor am I in any way interested
8   in the outcome hereof.

9               Pursuant to request, notification was
    provided that the deposition is available for review and
10  signature.

11              Dated this 18th day of October, 2021.

12

13                          _____

14                          Jennifer Honn
                            Certified Reporter
15                          Arizona CR No. 50885

16

17              I CERTIFY that GLENNIE REPORTING SERVICES,
    LLC, has complied with the ethical obligations set forth
18  in ACJA 7-206.

19

20

21

22

23  _____

24  GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
25  Arizona RRF No. R1035

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

VICTOR PARSONS; SHAWN JENSEN;      )
STEPHEN SWARTZ;DUSTIN BRISLAN;     )
SONIA RODRIGUEZ; CHRISTINA         )
VERDUZCO; JACKIE THOMAS; JEREMY    )
SMITH; ROBERT GAMEZ; MARYANNE      )
CHISHOLM; DESIREE LICCI; JOSEPH    )
HEFNER; JOSHUA POLSON; and         )
CHARLOTTE WELLS, on behalf of      )
themselves and all others         )
similarly situated; and ARIZONA   )
CENTER FOR DISABILITY LAW,         )
                                   )
                Plaintiffs,        )
                                   )Case No.
          v.                       )CV 12-00601-PHX-ROS
                                   )
DAVID SHINN, DIRECTOR, ARIZONA     )
DEPARTMENT OF CORRECTIONS,         )
REHABILITATION AND REENTRY; and    )
LARRY GANN, ASSISTANT DIRECTOR,    )
MEDICAL SERVICES CONTRACT          )
MONITORING BUREAU, ARIZONA         )
DEPARTMENT OF CORRECTIONS,         )
REHABILITATION AND REENTRY, in     )
their official capacities,         )
                                   )
                Defendants.        )

DEPOSITION OF ASHLEY PELTON, Ph.D.

Via Zoom Videoconference
October 6, 2021
9:00 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue      Prepared by:
Phoenix, Arizona 85020           Robin L. B. Osterode
602.266.6535                     CSR, RPR
www.glennie-reporting.com        CA CSR No. 7750
                                 AZ CR No. 50695

2

1                          I N D E X

2     WITNESS                                          PAGE

3     ASHLEY PELTON, Ph.D.

4            Examination by Mr. Fathi                    6

5

6

7

8                    INDEX TO EXHIBITS

9     Description                                       Page

10    Exhibit 1  Curriculum vitae of Ashley Pelton,      14
                 M.A.; 4 pages
11
      Exhibit 2  Defendants' First Supplemental          29
12               Pretrial Disclosure Statement;
                 12 pages
13
      Exhibit 3  Document entitled "Parsons Named        42
14               Plaintiffs"; 1 page

15    Exhibit 4  Document entitled "Suicides in ADC      53
                 Custody, January 1, 2019 - present";
16               1 page

17    Exhibit 5  Document entitled "Files Reviewed       62
                 by Pablo Stewart"; 4 pages
18
      Exhibit 6  Bates stamped documents                158
19               ADCRRM0000069 - ADCRRM0000077

20    Exhibit 7  Bates stamped documents                161
                 ADCRRM0000122 - ADCRRM0000132
21
      Exhibit 8  Bates stamped documents                168
22               ADCRRM0000170 - ADCRRM0000183

23    Exhibit 9  Bates stamped documents                 84
                 ADCRRM0019588 - ADCRRM0019591
24
      Exhibit 10 (Not marked in this deposition.)        --
25

3

1   INDEX (Continued):

2                      INDEX TO EXHIBITS
    Description                                    Page

3

    Exhibit 11 Document entitled "Continuous         180
4              Quality Improvement (CQI) CQI
               Meeting Attendance Sheet," dated
5              December 10, 2020; 8 pages

6   Exhibit 12 Bates stamped documents               185
               ADCRRM0018560 - ADCRRM0018568
7
    Exhibit 13 (Not marked in this deposition.)      --
8
    Exhibit 14 Bates stamped documents               187
9              ADCRRM00056541 - ADCRRM00056587

10  Exhibit 15 Document entitled "ADC                223
               Institutional Capacity Committed
11             Population"; 3 pages

12

13

14                INSTRUCTION NOT TO ANSWER

15                    Page      Line

16                    30        16
17                    31         3
                      31        12
18                    48         3

19

20

21

22

23

24

25

4

1           DEPOSITION OF ASHLEY PELTON, Ph.D.

2              The deposition of ASHLEY PELTON, Ph.D., via

3    Zoom Videoconference, was taken on October 6, 2021,

4    commencing at 9:00 a.m., at Phoenix, Arizona, before

5    ROBIN L. B. OSTERODE, RPR, CSR, California Shorthand

6    Reporter No. 7750 and Arizona Certified Reporter

7    No. 50695.

8

9    APPEARANCES:

10   For Plaintiffs:

11           ACLU NATIONAL PRISON PROJECT
             By: David C. Fathi
12           915 15th Street N.W., 7th Floor
             Washington, D.C. 20005
13           (202) 548-6603
             dfathi@aclu.org
14           (Videoconference appearance.)

15           ACLU NATIONAL PRISON PROJECT
             By: Corene Kendrick
16           39 Drumm Street
             San Francisco, California 94111
17           (202) 393-4930
             ckendrick@aclu.org
18           (Videoconference appearance.)

19   For Defendants:

20           STRUCK LOVE BOJANOWSKI & ACEDO, PLC
             By: Anne M. Orcutt
21           3100 West Ray Road, Suite 300
             Chandler, Arizona 85226
22           (480) 420-1616
             aorcutt@strucklove.com
23           (Videoconference appearance.)

24

25

5

 1   APPEARANCES (Continued):

 2   For Nonparty Centurion, LLC and Deponent:

 3           BROENING OBERG WOODS & WILSON, P.C.
           By: Sarah L. Barnes
 4         2800 North Central Avenue, Suite 1600
           Phoenix, Arizona 85004
 5         (602) 271-7793
           slb@bowwlaw.com
 6         (Videoconference appearance.)

 7   Also Present:

 8           Jessica Carns
           (Videoconference appearance.)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ashley Pelton, Ph.D. - 10/06/2021

22

1          Who was your supervisor in that position?

2     A.    Eddie Taylor.

3     Q.    And what was Dr. Taylor's job title?

4     A.    He was the clinical director at the time.

5     Q.    Okay.  And I called him Dr. Taylor, did he have

6  a doctoral degree?

7     A.    He did.

8     Q.    He was the clinical director at what facility?

9     A.    At Phoenix Complex.

10     Q.    Okay.  And as a psychologist, between

11  approximately September of 2019 and June or July of 2020,

12  at what facilities did you provide services?

13     A.    I provided services at Phoenix Complex, and I

14  also assisted at Florence Complex.

15     Q.    Did you assist at Florence Complex for the

16  entire term of your job as a psychologist, or did that

17  occur only at certain times?

18     A.    It was primarily toward the end.

19     Q.    And why were you providing assistance at the

20  Florence Complex at that time?

21     A.    In order to assist the facility with their

22  responsibilities, because they needed assistance with

23  another psychologist, as well as the individual who is in

24  the current lead position was transitioning out of the

25  company.

Ashley Pelton, Ph.D. - 10/06/2021

23

1      Q.      When you said they needed assistance, is that
2  because a position was vacant at the Florence Complex?
3              MS. ORCUTT:   Form.
4              THE WITNESS:   I believe there was a vacancy for
5  a psychology associate.
6  BY MR. FATHI:
7      Q.      And was that -- were you filling that vacancy
8  on a temporary basis?
9      A.      I wasn't filling the vacancy.   I was assisting.
10     Q.      Let me ask it a different way.   The Florence
11 Complex had its own psychologists and psych associates
12 assigned.   Correct?
13     A.      Correct.
14     Q.      So why were you asked to also perform services
15 at the Florence Complex?
16     A.      I believe at the time there was a vacancy for
17 psychology associates, and they needed assistance with
18 completing tasks, such as suicide watches.
19     Q.      Okay.   What was your next position beginning, I
20 guess, in approximately June or July of 2020?
21     A.      I was the lead psychologist at Florence
22 Complex.
23     Q.      And what dates did you hold that position?
24     A.      That would have been, I believe it was June or
25 July of 2020, to approximately July of -- hold on, I need

Ashley Pelton, Ph.D. - 10/06/2021

27

 1     A.    Periodically.

 2     Q.    On an average week when you -- when you had

 3   this clinical director position, how many hours in an

 4   average week would you provide direct patient care to

 5   people at the Phoenix facility?

 6     A.    One or two, if that.  It was primarily

 7   supervisory.

 8     Q.    And when you had this position on an average

 9   week, how many hours would you spend providing direct

10   patient care at the Perryville facility?

11     A.    One, if that.

12     Q.    Were there ever any weeks when you didn't

13   provide any direct patient care?

14     A.    Yes.

15     Q.    Did that happen frequently?

16     A.    Yes.

17     Q.    During your period -- your employment with the

18   Arizona Department of Corrections, regardless of whether

19   you were employed by Corizon or Centurion, have you ever

20   given expert testimony?

21     A.    No.

22     Q.    Have you ever provided a written declaration

23   for use in a court case?

24     A.    Not that I'm aware of.

25     Q.    Who has your old job as clinical director over

Ashley Pelton, Ph.D. - 10/06/2021

28

1    Perryville and Phoenix?

2        A.    We just hired someone who is starting in

3    October -- or October 11th.

4        Q.    And what's that person's name?

5        A.    Dr. Cessna.

6        Q.    Can you spell that please?

7        A.    I believe it's C-e-s-s-n-a.

8        Q.    Okay.  So was that position vacant from August

9    until October of this year?

10           MS. BARNES:   Foundation.

11           THE WITNESS:   I assisted with the role.

12   BY MR. FATHI:

13       Q.    Okay.  But we'll get to that, but was anybody

14   officially in that position of clinical director between

15   the time you left in August and Dr. Cessna's anticipated

16   start date in October of this year?

17           MS. BARNES:   Foundation.

18           MS. ORCUTT:   Lacks foundation.

19           THE WITNESS:   No.

20   BY MR. FATHI:

21       Q.    And when you say you assisted with the role,

22   tell me about that.

23       A.    Yes, so I assist with the Phoenix and

24   Perryville complexes in terms of providing the clinical

25   director responsibilities on an ongoing basis.

Ashley Pelton, Ph.D. - 10/06/2021

29

1      Q.     So is your position as regional mental health

2   director a full-time job?

3      A.     Yes, it is.

4      Q.     And is the position of clinical director over

5   Phoenix and Perryville a full-time job?

6      A.     Yes.

7      Q.     And you've been doing both of those jobs for

8   the last couple of months?

9             MS. ORCUTT:  Form.

10            THE WITNESS:  Yes.

11            MR. FATHI:  Could we have Exhibit 2, please.

12            (Marked for identification Exhibit 2.)

13   BY MR. FATHI:

14      Q.    Showing you Exhibit 2, Dr. Pelton, have you

15   seen this document before?

16      A.    I can't tell from just looking at that, I'm

17   sorry.

18      Q.    Well, this is a document in which the

19   defendants in this case tell us about who is going to

20   testify and what they're going to testify about, and you

21   are discussed at pages 11 and 12.  So let's go to pages

22   11 and 12, please.

23      A.    Okay.

24      Q.    And would you please read, beginning where it

25   starts with your name on page 11, and on to page 12.  And

Ashley Pelton, Ph.D. - 10/06/2021

98

```
 1              THE WITNESS:  That is correct.
 2   BY MR. FATHI:
 3       Q.    And is it required that their degree be from an
 4   accredited university, their master's degree?
 5              MS. ORCUTT:  Form and foundation.
 6              THE WITNESS:  I'll have to refer to the
 7   licensing department.
 8   BY MR. FATHI:
 9       Q.    So you don't know?
10              MS. ORCUTT:  Form.
11              THE WITNESS:  Correct.  I do not know.
12   BY MR. FATHI:
13       Q.    Are all mental health professionals or psych
14   associates working in the Arizona Department of
15   Corrections licensed?
16              MS. ORCUTT:  Form, foundation.
17              THE WITNESS:  I do not believe so, no.
18   BY MR. FATHI:
19       Q.    Why does the Arizona Department of
20   Corrections -- or let me rephrase that -- why does
21   Centurion employ mental health professionals or psych
22   associates who are not licensed?
23              MS. ORCUTT:  Form and foundation.
24              THE WITNESS:  Can you repeat the question?  I'm
25   not sure what you mean.
```

Ashley Pelton, Ph.D. - 10/06/2021

100

1      Q.    So those are things that a licensed psych

2  associate can do, but an unlicensed psych associate

3  cannot do.  Correct?

4          MS. ORCUTT:  Form, foundation.

5          THE WITNESS:  Currently, that is what the

6  responsibilities of only licensed staff perform right

7  now.

8  BY MR. FATHI:

9      Q.    And unlicensed staff cannot perform those

10  duties.  Correct?

11          MS. ORCUTT:  Form, foundation.

12          THE WITNESS:  Technically, an unlicensed staff

13  member could complete a mental health intake in order --

14  and then have a licensed staff review it; however, we

15  prefer to have a licensed staff complete a mental health

16  intake.

17  BY MR. FATHI:

18      Q.    What about checks of people who are on watch,

19  is that something that unlicensed psych associates can

20  do?

21          MS. ORCUTT:  Form, foundation.

22          THE WITNESS:  We do not have unlicensed staff

23  see individuals for mental health watch counseling

24  sessions.

25  BY MR. FATHI:

Ashley Pelton, Ph.D. - 10/06/2021

108

1            MS. ORCUTT:  Form, foundation.

2            THE WITNESS:  I do not know.

3   BY MR. FATHI:

4      Q.    Do they have any interaction with patients?

5            MS. ORCUTT:  Form, foundation.

6            THE WITNESS:  I do not know.

7            MR. FATHI:  All right.  Let's go back to

8   Exhibit 2, please.

9      Q.    Before we get back to Exhibit 2, Doctor, are

10  you familiar with the term "behavioral health tech"?

11           THE WITNESS:  (Inaudible.)

12           THE REPORTER:  I'm sorry, I didn't hear that.

13           THE WITNESS:  Yes.

14  BY MR. FATHI:

15     Q.    What are the job duties of a behavioral health

16  tech?

17           MS. ORCUTT:  Form.

18           THE WITNESS:  Typically, a behavioral health

19  tech at the facility will assist with segregation visits,

20  welfare checks, group therapy, and assisting the patient

21  in any other needs.

22  BY MR. FATHI:

23     Q.    So it sounds like they do interact with

24  patients?

25     A.    That is correct.

Ashley Pelton, Ph.D. - 10/06/2021

1      Q.      And you said, "Assist with group therapy."   Are

2   they assisting someone else who is running the group or

3   are they running the group?

4            MS. ORCUTT:   Form.

5            THE WITNESS:   Primarily they run the groups.

6   BY MR. FATHI:

7      Q.      And what are the minimum requirements to be a

8   behavioral health tech?

9            MS. ORCUTT:   Form, foundation.

10            THE WITNESS:   I'm not sure of the exact

11   credentialing.

12   BY MR. FATHI:

13      Q.      Are behavioral health techs required to have

14   any kind of license?

15            MS. ORCUTT:   Form and foundation.

16            THE WITNESS:   Not to my knowledge.

17   BY MR. FATHI:

18      Q.      Not to your knowledge or you don't know?

19            MS. ORCUTT:   Form.

20            THE WITNESS:   I don't know.

21   BY MR. FATHI:

22      Q.      Did you get that, Ms. Court Reporter?

23            THE REPORTER:   "I don't know."

24            MR. FATHI:   Thank you.

25            Let's go back to Exhibit 2, please.

Ashley Pelton, Ph.D. - 10/06/2021

114

1              Do you understand that, Doctor?

2       A.    Yes.

3       Q.    Okay.  So have you ever heard anyone other than

4    your counsel express the view that current mental health

5    staffing levels in the Arizona Department of Corrections

6    are insufficient to meet the needs of the prisoner

7    population, either systemwide or at a particular complex

8    or unit?

9              MS. ORCUTT:  Form.

10             THE WITNESS:  Can you rephrase the question?

11             MS. BARNES:  You want him to rephrase it or

12    repeat it?

13             THE WITNESS:  Try repeating it first.

14    BY MR. FATHI:

15       Q.    Okay.  My question is, have you ever heard

16    anyone express to you that current staffing levels for

17    mental health are insufficient to meet the needs of the

18    Arizona prison population, either systemwide or in a

19    particular unit or complex?

20             MS. ORCUTT:  Form.

21             THE WITNESS:  I don't know about the word

22    "insufficient," but we have had fewer than optimal staff

23    at certain sites.  Correct?

24    BY MR. FATHI:

25       Q.    Okay.  Tell me what sites those are.

1              MS. ORCUTT:   Form.

2              THE WITNESS:   There's been a period of time

3    more recently at Eyman that has been shorter staffed.

4    BY MR. FATHI:

5        Q.     And when you say "shorter staffed," break that

6    down for me, if you would.

7              MS. ORCUTT:   Form.

8              THE WITNESS:   I'm not sure of the specific

9    numbers, but I know we were not fully staffed for mental

10   health.

11   BY MR. FATHI:

12       Q.     And what period of time are we talking about

13   here?

14             MS. ORCUTT:   Form.

15             THE WITNESS:   I'm not sure of the specifics,

16   but probably the last three to four months.

17   BY MR. FATHI:

18       Q.     And continuing to the present time?

19       A.     No, I would say -- I would say that they're

20   closer to staffed, or getting there, I should say.

21       Q.     Well, I'm sorry, I'm not sure I understand.

22   Are you saying that Eyman Mental Health is not fully

23   staffed?

24             MS. ORCUTT:   Form.

25             THE WITNESS:   It is not currently fully

Ashley Pelton, Ph.D. - 10/06/2021

126

1    Q.    And how sure are you about that?

2         MS. ORCUTT:  Form.

3         THE WITNESS:  I'm not as sure on the

4    psychiatrist piece, since I don't hire psychiatrists, but

5    in terms of psych associates, I'm sure about.

6    BY MR. FATHI:

7    Q.    And you said conversations -- you said there

8    have been conversations about needing more staff.  You've

9    talked about Eyman.  Have there been conversations about

10   needing more staff at other facilities?

11        MS. ORCUTT:  Form.

12   BY MR. FATHI:

13   Q.    And, again, I'm talking about mental health

14   staff.

15   A.    Mental health staff?

16   Q.    Yes.

17   A.    Yes.

18   Q.    Which facilities?

19   A.    In the more recent, Tucson staff.

20   Q.    Uh-huh.  Okay.  Tell me about Tucson.

21        MS. ORCUTT:  Form.

22        THE WITNESS:  There have been some individuals

23   out for medical reasons, therefore, needing additional

24   support.

25   BY MR. FATHI:

Ashley Pelton, Ph.D. - 10/06/2021

127

1      Q.     Uh-huh.  What positions were those people who
2  were out for medical reasons?
3              MS. ORCUTT:  Form, foundation.
4              THE WITNESS:  To my knowledge, behavioral
5  health techs and a psychologist.
6  BY MR. FATHI:
7      Q.     So a total of how many positions?
8              MS. ORCUTT:  Form.
9              THE WITNESS:  I'm aware of three.
10 BY MR. FATHI:
11     Q.     So one psychologist and two behavioral health
12 techs?
13             MS. ORCUTT:  Form.
14             THE WITNESS:  Those are three that I'm aware
15 of.
16 BY MR. FATHI:
17     Q.     And what was done to fill those positions?
18             MS. ORCUTT:  Form.
19             THE WITNESS:  We've had people from across the
20 state assist with those responsibilities that are needed
21 and go to the site.
22 BY MR. FATHI:
23     Q.     So those are people who already have jobs
24 working in mental health at other complexes going to
25 Tucson to assist; is that right?

Ashley Pelton, Ph.D. - 10/06/2021

128

1          MS. ORCUTT:  Form.

2          THE WITNESS:  That is correct, in terms of the

3   immediate need.

4   BY MR. FATHI:

5      Q.    Other complexes where there have been -- you've

6   heard discussions about needing more staff?

7          MS. ORCUTT:  Form.

8          THE WITNESS:  Potentially Perryville.  We've

9   had discussions about wanting more psychologists.

10  BY MR. FATHI:

11     Q.    Uh-huh.  And why do you want more psychologists

12  at Perryville?

13         MS. ORCUTT:  Form.

14         THE WITNESS:  To continue to work with our

15  mental health population.

16  BY MR. FATHI:

17     Q.    What would those additional psychologists do

18  that isn't being done now, if you were to get them?

19         MS. ORCUTT:  Form.

20         THE WITNESS:  I think just continue to improve

21  and, as always, just focus on individualized treatment

22  like we do.

23  BY MR. FATHI:

24     Q.    So what specific concrete tasks would be

25  getting done that aren't being done now, if you were to

Ashley Pelton, Ph.D. - 10/06/2021

134

1      Q.    Are there any weeks where you don't participate

2   in any interviews of prospective mental health staff?

3           MS. ORCUTT:  Form.

4           THE WITNESS:  I believe so.

5   BY MR. FATHI:

6      Q.    Are you aware, Doctor, that the Court has

7   entered various orders about the minimum duration of

8   mental health visits in this case?

9           MS. ORCUTT:  Form.

10          THE WITNESS:  Yes.

11  BY MR. FATHI:

12     Q.    Does Centurion or ADC currently have any policy

13  regarding the minimum duration of mental health

14  encounters?

15          MS. ORCUTT:  Form.

16          THE WITNESS:  Not sure if it's necessarily

17  written into policy, but we meet with everyone for

18  individual therapy for 30 minutes for individual

19  counseling, and then a minimum of 10 minutes for suicide

20  watch contacts.

21  BY MR. FATHI:

22     Q.    And you're saying you don't believe that's

23  written down anywhere?

24          MS. ORCUTT:  Form.

25          THE WITNESS:  I don't know that it's written in

1    an actual policy.

2    BY MR. FATHI:

3        Q.    And how are those minimum durations enforced?

4    How do you satisfy yourself that staff are abiding by

5    those minimum durations?

6              MS. ORCUTT:   Form.

7              THE WITNESS:   Our people who do scheduling and

8    complete the scheduling lists review.

9    BY MR. FATHI:

10       Q.    Review what?

11       A.    Review the charts to see whether or not people

12   were seen within 10 minutes or 30 minutes.   And then if

13   it's not seen within that time frame, we attempt, to the

14   best of our ability, to track if the refusal is entered

15   in the chart, so we do periodic chart reviews.

16       Q.    I see.

17             Has any staff member ever been subject to any

18   discipline or corrective action for not abiding by these

19   minimum durational requirements?

20             MS. ORCUTT:   Form, foundation.

21             THE WITNESS:   I'm not sure, just given that I'm

22   not included on every single write-up.

23   BY MR. FATHI:

24       Q.    Okay.   So your answer is you don't know?

25       A.    I don't know.

Ashley Pelton, Ph.D. - 10/06/2021

139

1          MS. BARNES:  And I would like to take -- I

2     would like to take a pause before your next question, and

3     I would like the court reporter to please read back her

4     answer prior to that, please.

5               (Record read.)

6               MS. BARNES:  Thank you.

7     BY MR. FATHI:

8          Q.     Dr. Pelton, in your view, is a three-minute

9     encounter sufficient to assess a patient's risk of

10    self-harm or suicide?

11              MS. ORCUTT:  Form.

12              THE WITNESS:  It's not optimal, but again, I

13    would say that you could obtain enough information to

14    support that they're not a current danger to themselves

15    or other people.

16    BY MR. FATHI:

17         Q.     In a three-minute encounter?

18         A.     Correct.

19         Q.     Dr. Pelton, in your view, is a one-minute

20    encounter sufficient to assess a patient's risk of

21    self-harm or suicide?

22              MS. ORCUTT:  Form.

23              THE WITNESS:  It's not going to be optimal, but

24    again, there's going to be situations where you could

25    make a definitive answer that they're going to be a

Ashley Pelton, Ph.D. - 10/06/2021

140

1    danger to themselves and other people.

2    BY MR. FATHI:

3        Q.    In your view, is a one-minute encounter

4    sufficient to determine that a patient is not at risk of

5    self-harm or suicide?

6            MS. ORCUTT:   Form.

7            THE WITNESS:   Again, it's not going to be

8    optimal, but I do believe that there are situations that

9    within a one-minute encounter you could obtain enough

10    information to indicate that they're not currently a

11    danger to themselves or other people.

12    BY MR. FATHI:

13        Q.    In your opinion, is a 30-second encounter

14    sufficient to determine that a patient is not at risk of

15    self-harm or suicide?

16            MS. ORCUTT:   Form.

17            THE WITNESS:   Again, I'd have to know the

18    specifics on a situation.   Again, it's not going to be

19    optimal.

20    BY MR. FATHI:

21        Q.    I'm asking you is it ever -- in your view, is a

22    30-second encounter ever sufficient to determine that a

23    patient is not at risk of self-harm or suicide?

24            MS. ORCUTT:   Form.

25            THE WITNESS:   I'd have to know more specifics

Ashley Pelton, Ph.D. - 10/06/2021

141

1    about the situation.

2    BY MR. FATHI:

3         Q.    So your testimony is that it could be

4    sufficient; is that right?

5              MS. ORCUTT:   Form.

6              THE WITNESS:   It could be, depending on the

7    situation.

8    BY MR. FATHI:

9         Q.    Okay.  Doctor, is a 15-second mental health

10   encounter sufficient to determine that a patient is not

11   at risk of self-harm or suicide?

12             MS. ORCUTT:   Form.

13             THE WITNESS:   I mean, I would -- I would say

14   that people need to meet with someone more than

15   15 seconds.

16   BY MR. FATHI:

17        Q.    Okay.  Could you answer my question?

18             MS. ORCUTT:   Form.   She did.

19             THE WITNESS:   I would say it's not optimal.

20   Everyone has different clinical judgment, but I would say

21   that they need to have -- they have clinical information

22   and base it on that clinical information.

23   BY MR. FATHI:

24        Q.    Is a 15-second encounter sufficient to

25   determine that a patient is not at risk of self-harm or

Ashley Pelton, Ph.D. - 10/06/2021

142

1    suicide?

2              MS. ORCUTT:   Form.   Asked and answered.

3              THE WITNESS:   I would say it would depend on

4    the situation and what clinical information was given.

5    BY MR. FATHI:

6        Q.    So your testimony is there are circumstances

7    where a 15-second encounter could be sufficient to

8    determine that the patient is not at risk of self-harm or

9    suicide?

10             MS. ORCUTT:   Form.

11             THE WITNESS:   I would have to review the

12   situation and specifics to better understand what's going

13   on with the person.

14   BY MR. FATHI:

15       Q.    But your testimony is that 15 seconds could be

16   sufficient?

17             MS. ORCUTT:   Form.   Asked and answered.

18             THE WITNESS:   I think it's possible that that

19   could be, but again, without knowing specifics of the

20   situation.

21             MR. FATHI:   All right.   Can we go back to

22   Exhibit 2, please.   All right.   Page 12, please.

23       Q.    All right.   Starting on line 11, Doctor, it

24   says, "Dr. Pelton will also testify regarding continuous

25   improvements in the delivery of mental healthcare and

Ashley Pelton, Ph.D. - 10/06/2021

146

```
1              THE WITNESS:  I don't know.
2   BY MR. FATHI:
3      Q.    When a person is on suicide watch or mental
4   health watch, are they ever let out of their cell for
5   recreation or exercise?
6              MS. ORCUTT:  Form.
7              THE WITNESS:  Yes.
8   BY MR. FATHI:
9      Q.    Is everyone on watch let out for recreation or
10  exercise or is it a case-by-case determination?
11             MS. ORCUTT:  Form.
12             MS. BARNES:  Foundation.
13             THE WITNESS:  So all of our -- we follow the
14  mental health watch guidelines set by ADCRR, so I'd have
15  to reference that in terms of who is allowed recreation,
16  and then we also, in addition to that, evaluate
17  individual needs in terms of if they're too much of a
18  danger to go to recreation or -- but we try our best to
19  make sure everyone is entitled to recreation.
20  BY MR. FATHI:
21     Q.    Okay.  But as I understand your testimony, some
22  people on watch get out for recreation, but some don't;
23  is that right?
24             MS. ORCUTT:  Form.
25             THE WITNESS:  I think that would be an accurate
```

Ashley Pelton, Ph.D. - 10/06/2021

147

1    statement.

2    BY MR. FATHI:

3         Q.    Okay.  So who decides?

4              MS. ORCUTT:  Form, foundation.

5              THE WITNESS:  First and foremost, it would go

6    off of the ADCRR watch guidelines.

7    BY MR. FATHI:

8         Q.    And is that a document that you're referring

9    to?

10        A.    Yes.

11        Q.    But concretely, if you're there in the watch

12   unit and Patient Smith is on watch, who decides if he

13   gets out for rec or doesn't get out for rec?  Is that a

14   mental health decision or is that a custody decision?

15             MS. ORCUTT:  Form, foundation.

16             THE WITNESS:  I would say overall it's a

17   combination of the two.  I would say that we work

18   together between mental health and the security staff in

19   terms of what's best for the incarcerated individual.

20   BY MR. FATHI:

21        Q.    And what if mental health and security staff

22   disagree?  Who decides?

23             MS. ORCUTT:  Form.

24             THE WITNESS:  I would say, at the end of the

25   day, ADCRR's our client, so we do the -- we go with what

1    they'd like to do.

2    BY MR. FATHI:

3        Q.    Okay.  So if Patient Smith is on watch and the

4    mental health person thinks he should get out for rec and

5    custody thinks he shouldn't, then he doesn't go out for

6    rec; is that right?

7              MS. BARNES:  Foundation.

8              MS. ORCUTT:  Form.

9              THE WITNESS:  I would have to say it depends on

10   the situation, so --

11   BY MR. FATHI:

12       Q.    I'm sorry, Doctor.  I thought you said that if

13   security and mental health disagree, that security made

14   the decision.  Did I misunderstand?

15             MS. ORCUTT:  Form.

16             THE WITNESS:  I mean, at the end of the day,

17   security is responsible for security and removing the

18   person from the cell.  So, yes, it's a combination, but

19   at the end of the day, yes, ADCRR would make the final

20   determination.

21   BY MR. FATHI:

22       Q.    Okay.  So if someone doesn't get out of their

23   watch cell for rec, do they ever get out of the cell at

24   all?

25             MS. ORCUTT:  Form.

Ashley Pelton, Ph.D. - 10/06/2021

152

1      Q.    I'm sorry, I thought that was your testimony.

2    Didn't you testify that some people on watch don't get

3    out for rec?  Correct?

4            MS. ORCUTT:  Form.

5            THE WITNESS:  There are certain situations for

6    individual days that they do not get out for rec.

7    BY MR. FATHI:

8      Q.    And you just testified that some people don't

9    get out for individual counseling.  Correct?

10           MS. ORCUTT:  Form.

11           THE WITNESS:  It's not going to be an absolute.

12   It will be situational based, so it's assessed daily.

13   BY MR. FATHI:

14     Q.    But there are some days that people on watch

15   don't get out of their cells for individual counseling.

16   Correct?

17     A.    Correct.

18     Q.    Is there any policy limiting how long a patient

19   can be continuously on watch?

20           MS. ORCUTT:  Form.

21           THE WITNESS:  Not to my knowledge, but we do

22   our best to get people off watch as soon as possible.

23   BY MR. FATHI:

24     Q.    Doctor, I'd really be grateful if you listen to

25   my questions and answer my question.  My question was, is

Ashley Pelton, Ph.D. - 10/06/2021

153

1    there a policy limiting how long a patient can be

2    continuously on watch?

3              MS. ORCUTT:   Form.

4              THE WITNESS:   Not to my knowledge.

5    BY MR. FATHI:

6       Q.    What's the longest you're aware of a patient

7    being continuously on watch?

8              MS. ORCUTT:   Form.

9              THE WITNESS:   Historically, I don't know.   I

10   know there's been people on watch for a long period of

11   time.

12   BY MR. FATHI:

13      Q.    How long?

14             MS. ORCUTT:   Form.

15             THE WITNESS:   I don't know of any specifics.

16   BY MR. FATHI:

17      Q.    I'm asking what's the longest that you're aware

18   of.

19             MS. ORCUTT:   Form.

20             THE WITNESS:   Again, I don't know the

21   specifics, but I know there's people that have been on

22   watch for months.

23   BY MR. FATHI:

24      Q.    Months?

25      A.    Uh-huh.

Ashley Pelton, Ph.D. - 10/06/2021

154

1          MS. BARNES:  Is that a yes?  You can't say
2     "uh-huh."

3          THE WITNESS:  Oh, sorry.

4          Yes, there's been people living on watch for
5     months.

6     BY MR. FATHI:

7     Q.    Okay.  Are you ever aware of people on watch
8     being not offered out-of-cell counseling because there
9     weren't enough security staff?

10         MS. ORCUTT:  Form, foundation.

11         THE WITNESS:  I'm sorry.  I missed the last
12    part of the question.

13    BY MR. FATHI:

14    Q.    My question is, are you aware of it ever
15    happening that someone on watch was not offered
16    out-of-cell counseling because there wasn't sufficient
17    security staff to bring them out of the cell and
18    supervise them?

19         MS. ORCUTT:  Form, foundation.

20         THE WITNESS:  I believe I -- I believe there's
21    been situations.

22    BY MR. FATHI:

23    Q.    At what facilities are you aware of that
24    happening?

25         MS. ORCUTT:  Form.

Ashley Pelton, Ph.D. - 10/06/2021

155

1           THE WITNESS:  I believe there was a situation

2    at Phoenix.

3    BY MR. FATHI:

4        Q.    Any other facilities?

5           MS. ORCUTT:  Form.

6           THE WITNESS:  I'm not aware of any specifics.

7    BY MR. FATHI:

8        Q.    How about generalities?

9           MS. ORCUTT:  Form.

10          THE WITNESS:  I can't think of even any

11   generalities that I can speak to.

12   BY MR. FATHI:

13       Q.    Are you aware of this ever happening at

14   Phoenix, where people on watch were not taken out for

15   counseling because there wasn't sufficient security staff

16   to escort them?

17          MS. ORCUTT:  Form.

18          THE WITNESS:  Yes, I believe there has been

19   some situations.

20   BY MR. FATHI:

21       Q.    Okay.  Any other facilities where you're aware

22   of this happening?

23          MS. ORCUTT:  Form.

24          THE WITNESS:  I can't think of any specific

25   cases.

Ashley Pelton, Ph.D. - 10/06/2021

156

1    BY MR. FATHI:

2         Q.     Doctor, what is a psychological autopsy?

3                MS. ORCUTT:   Form.

4                THE WITNESS:   A psychological autopsy is

5    essentially an evaluation after an individual has been

6    ruled a suicide.   It's essentially a re-creation of the

7    situation, the events that led up to the situation.

8    BY MR. FATHI:

9         Q.     The events that led up to the death by suicide?

10        A.     Correct.

11        Q.     And what is the purpose of a psychological

12   autopsy?

13               MS. ORCUTT:   Form.

14               THE WITNESS:   The purpose of the autopsy is

15   essentially to determine if there's any corrective action

16   that needs to take and any improvements that we can make

17   in terms of providing care.

18   BY MR. FATHI:

19        Q.     And does the psychological autopsy sometimes

20   have recommendations that are made?

21               MS. ORCUTT:   Form.

22               THE WITNESS:   Yes.

23   BY MR. FATHI:

24        Q.     And what is the purpose of those

25   recommendations?

1          MS. ORCUTT:   Form.

2          THE WITNESS:   To review to see if there's

3   anything that we can do better going forward, in terms of

4   healthcare.

5   BY MR. FATHI:

6      Q.    When you were the -- at Phoenix, was your title

7   clinical director or mental health director?

8      A.    Clinical director.

9      Q.    In that position, did you have any role in the

10  preparation of psych autopsies?

11          MS. ORCUTT:   Form.

12          THE WITNESS:   As the clinical director, no --

13  or rephrase the question.

14  BY MR. FATHI:

15     Q.    In your position as clinical director at

16  Phoenix, did you have any role in the preparation of

17  psych autopsies?

18     A.    As a psychologist, I completed a psychological

19  autopsy while in that position.

20     Q.    In your current position as mental health

21  director, do you have any role in the preparation of

22  psych autopsies?

23          MS. ORCUTT:   Form.

24          THE WITNESS:   I assist with the signing of

25  psychologists to complete the psych autopsy and I also

Ashley Pelton, Ph.D. - 10/06/2021

1    review it.

2              MR. FATHI:  All right.  Let's look at

3    Exhibit 6, please.

4              (Marked for identification Exhibit 6.)

5    BY MR. FATHI:

6        Q.    Doctor, showing you Exhibit 6, which is the

7    psychological autopsy of Patrick Pruitt, who died by

8    suicide on August 5th of 2020, have you seen this

9    document before?

10       A.    Yes.

11       Q.    And it says on the first page that you

12   completed this psych autopsy; is that accurate?

13       A.    Yes.

14       Q.    And did you do it on or about September 4th of

15   2020?

16       A.    Correct.

17       Q.    Tell me how you went about completing this

18   report.

19             MS. ORCUTT:  Form.

20             THE WITNESS:  I reviewed Mr. Pruitt's record, I

21   spoke to CIU, and I reviewed the detentional record as

22   well.

23             MR. FATHI:  Okay.  Can we go to page 76,

24   please, using the Bates number, and maybe blow it up a

25   little.  Okay.  Scroll up a little bit, please.  Sorry,

Ashley Pelton, Ph.D. - 10/06/2021

1    other direction.  All right.  Thank you.

2        Q.    Doctor, do you see the section that says

3    "Recommendations"?

4        A.    Uh-huh, yes.

5        Q.    Did you write those recommendations?

6        A.    Yes.

7        Q.    Okay.  So the first recommendation is,

8    "Reevaluate inmate's access to after-hours jobs without

9    supervision."

10           Do you see that, Doctor?

11       A.    Yes.

12       Q.    What has been done to implement that

13   recommendation?

14           MS. ORCUTT:  Form.

15           MS. BARNES:  Foundation.

16           THE WITNESS:  I don't have access to that

17   information, or I did not at the time.

18   BY MR. FATHI:

19       Q.    Has anything been done to implement this

20   recommendation?

21           MS. ORCUTT:  Form, foundation.

22           THE WITNESS:  I don't know.

23   BY MR. FATHI:

24       Q.    The second recommendation is, "Additional

25   access to substance abuse treatment."  What has been done

1    to implement this recommendation?

2              MS. ORCUTT:  Form and foundation.

3              THE WITNESS:  I'm not sure of the specifics,

4    but I know that majority of our sites provided substance

5    abuse treatment through ADCRR.

6    BY MR. FATHI:

7         Q.    Well, the recommendation is additional access

8    to substance abuse treatment, so do incarcerated people

9    now have more access to substance abuse treatment than

10   they did as of the date of this report?

11             MS. ORCUTT:  Form, foundation.

12             THE WITNESS:  I don't know the specifics.

13   BY MR. FATHI:

14        Q.    Has anything been done to implement this

15   recommendation?

16             MS. ORCUTT:  Form, foundation.

17             THE WITNESS:  I don't know the specifics.

18   BY MR. FATHI:

19        Q.    I'm sorry.  I don't understand that answer.

20        A.    I -- I was not in -- I was not in this role as

21   the mental health director, so I don't have a clear

22   understanding of the substance abuse treatment that was

23   provided before Mr. Pruitt's being deceased and after.

24        Q.    Okay.  Well, tell me what has been done to

25   implement this recommendation number 2.

Ashley Pelton, Ph.D. - 10/06/2021

161

1          MS. ORCUTT:   Form, foundation.   Asked and
2     answered.
3          THE WITNESS:   I don't know the specifics of
4     what has been done.
5     BY MR. FATHI:
6     Q.     Has anything been done to implement this
7     recommendation?
8          MS. ORCUTT:   Form, foundation.   Asked and
9     answered.
10         THE WITNESS:   I'm not sure about what has been
11    done.   I don't know the specifics.
12    BY MR. FATHI:
13    Q.     Do you know if anything has been done to
14    implement this recommendation?
15         MS. ORCUTT:   Form, foundation.   Asked and
16    answered.
17         THE WITNESS:   I'm not sure.   I don't know.
18         MR. FATHI:   Okay.   Exhibit 7, please.
19         (Marked for identification Exhibit 7.)
20    BY MR. FATHI:
21    Q.     Exhibit 7 is the psychological autopsy of David
22    Crawford, who died by suicide on May 31st, 2021.
23         Have you seen this document, Doctor?
24    A.     Yes.
25    Q.     All right.   Let's go to the last page, please.

Ashley Pelton, Ph.D. - 10/06/2021

162

```
1    And on the last page, this says that you reviewed this
2    report.  Correct, Doctor?
3         A.    That is correct.
4         Q.    Is that your signature?
5         A.    Yes, it is.
6         Q.    And you signed it on or about July 29th of this
7    year?
8         A.    Correct.
9         Q.    And what does your signature on this document
10   signify?
11               MS. ORCUTT:  Form.
12               THE WITNESS:  That I reviewed the document.
13   BY MR. FATHI:
14        Q.    All right.  So on the previous page, if we
15   scroll up, yes, under Section 6, "Recommendations," you
16   see there are three recommendations there, Doctor?
17        A.    Yes.
18        Q.    Do you agree with those recommendations?
19               MS. ORCUTT:  Form.
20               THE WITNESS:  Let me read them.  Hold on.
21               MS. ORCUTT:  Form and foundation.
22               THE WITNESS:  Okay.  Go ahead.  What's the
23   question?
24   BY MR. FATHI:
25        Q.    The question is, do you agree with these
```

Ashley Pelton, Ph.D. - 10/06/2021

163

1    recommendations?

2                    MS. ORCUTT:   Form.

3                    THE WITNESS:   Can you rephrase by "agree"?

4    BY MR. FATHI:

5         Q.    Let me ask it another way.   You reviewed this

6    report.   Right?

7         A.    Correct.

8         Q.    And your review included these recommendations?

9         A.    This is Dr. Leonard's psychological autopsy

10   recommendations.

11        Q.    You reviewed this report.   Correct?

12        A.    Correct.

13        Q.    And you signed this report.   Correct?

14        A.    Correct.

15        Q.    And you didn't indicate anywhere on this report

16   that you disagreed with those recommendations.   Correct?

17                    MS. ORCUTT:   Form.

18                    THE WITNESS:   I don't know that we write on

19   documents, but -- because this was Dr. Leonard's

20   recommendations.

21   BY MR. FATHI:

22        Q.    You didn't indicate anywhere on this document

23   that you disagree with those recommendations, did you?

24        A.    That is correct.

25        Q.    All right.   First recommendation, "Increase

Ashley Pelton, Ph.D. - 10/06/2021

164

1   psychoeducation, specifically understanding the cycles of

2   depression, where there may be times a patient may feel

3   good, whereas at times one can go into depressive

4   episodes."

5          What's been done to implement this

6   recommendation?

7          MS. ORCUTT:  Form, foundation.

8          THE WITNESS:  I don't have the exact

9   information in terms of what specifically is being done,

10  but we provide ongoing education to all of our staff with

11  regards to continuing to provide treatment around

12  depression.

13  BY MR. FATHI:

14      Q.    Uh-huh.  What's been done to implement this

15  recommendation?

16          MS. ORCUTT:  Form.  Asked and answered.

17          MS. BARNES:  (Inaudible.)

18          THE REPORTER:  I'm sorry, Ms. Barnes, did you

19  say something?

20          MS. BARNES:  I said "form" as well.

21          You can go ahead.

22          THE WITNESS:  Can you repeat the question?

23  BY MR. FATHI:

24      Q.    Let me try it another way.  The first

25  recommendation says, "Increased psychoeducation."

Ashley Pelton, Ph.D. - 10/06/2021

165

1          Do you see that?

2      A.    Yes.

3      Q.    What has been done since the date of this

4  report to increase psychoeducation on the cycles of

5  depression?

6          MS. ORCUTT:   Form.

7          THE WITNESS:   We continue to try to increase

8  access to group therapy.

9  BY MR. FATHI:

10     Q.    Uh-huh.  So tell me the specific steps that

11  have been taken to increase psychoeducation, specifically

12  understanding the cycles of depression?

13         MS. ORCUTT:   Form.

14         THE WITNESS:   I would say that it's on an

15  individual basis with the patient.  It can't be

16  generalized to all individuals.  Therefore, continuing to

17  educate staff in terms of educating the individuals who

18  are going through depressive episodes.

19  BY MR. FATHI:

20     Q.    All right.  Let me ask this another way.  Going

21  back to the first page of Exhibit 7, the date of report

22  is June 30, 2021.  Correct?

23     A.    I'd have to go to the first page.

24     Q.    Oh, I'm sorry.  Let's scroll to the first page.

25          Okay.  Can you see the date of report,

Ashley Pelton, Ph.D. - 10/06/2021

1   6/30/2021?

2        A.      Yes.

3        Q.      Do you have any reason to believe that date is

4   incorrect?

5        A.      No.

6        Q.      Okay.   Let's go back to the recommendations.

7   Okay.   So tell me what has been done to increase

8   psychoeducation, specifically understanding the cycles of

9   depression, since this recommendation was made on

10  June 30th, 2021?

11              MS. BARNES:   Form.   Asked and answered.

12              Go ahead.

13              THE WITNESS:   I can't speak to the specifics of

14  what has been done.   Again, we continue to educate other

15  clinicians and our psychiatric providers surrounding

16  depression and the treatment of depression.

17  BY MR. FATHI:

18       Q.      But your testimony is you're not aware of

19  anything that's been done specifically in reference to

20  this recommendation; is that correct?

21              MS. ORCUTT:   Form.   Asked and answered.

22              THE WITNESS:   There's nothing, to my knowledge,

23  about specifics.

24  BY MR. FATHI:

25       Q.      Okay.   Second recommendation.   What has been

1    done to implement this recommendation?

2              MS. ORCUTT:  Form, foundation.

3              THE WITNESS:  This recommendation speaks

4    primarily to security and nursing, so I can't speak to

5    that.

6    BY MR. FATHI:

7       Q.    Uh-huh.  To your knowledge, has anything been

8    done to implement this recommendation?

9              MS. ORCUTT:  Form.

10             THE WITNESS:  I don't know.

11   BY MR. FATHI:

12      Q.    Third recommendation, "Increase psychoeducation

13   on relationship between mental health and chronic pain."

14   What's been done to implement this recommendation?

15             MS. ORCUTT:  Form.

16             THE WITNESS:  We speak, in terms with our

17   staff, about, again, providing care about mental health,

18   chronic pain, and making sure we evaluate all the risk

19   factors.

20   BY MR. FATHI:

21      Q.    Yeah.  Again, Doctor, my question is, what has

22   been done to implement this recommendation?  This is a

23   suicide -- or a psych autopsy, dated June 30th of this

24   year, and the recommendation is "Increase psychoeducation

25   on the relationship between mental health and chronic

1    pain."   So my specific question is, what has been done to

2    implement this recommendation of increased

3    psychoeducation?

4              MS. BARNES:   Form.   Asked and answered.

5              THE WITNESS:   And I don't know of anything

6    specific.

7    BY MR. FATHI:

8        Q.    Okay.   Thank you.   Exhibit 8 --

9              MS. BARNES:   Give me one second.   I'd like to

10   just take a three-minute break.   I'm having a temperature

11   issue in this room.

12             MR. FATHI:   Okay.

13             MS. BARNES:   It's 12:41, we'll be back on by

14   12:45, so four minutes.

15             (Recessed from 12:41 p.m. until 12:46 p.m.)

16             MR. FATHI:   All right.   Exhibit 8, please.

17             (Marked for identification Exhibit 8.)

18   BY MR. FATHI:

19       Q.    Dr. Pelton, this is the psychological autopsy

20   of Michael Ring, who died by suicide on June 9th, 2021.

21             Have you seen this document before?

22       A.    Yes.

23             MR. FATHI:   And can we go to the last page,

24   please.

25       Q.    And that is your signature.   Correct?

Ashley Pelton, Ph.D. - 10/06/2021

169

1      A.      Correct.

2      Q.      And that indicates that you reviewed this

3   psychological autopsy?

4      A.      Correct.

5              MR. FATHI:   All right.   Let's go back two

6   pages, please, and maybe -- yes, "Recommendations."

7   Try -- blow it up a little bit, if we can, please.

8      Q.      Now, there's a number of recommendations.   Do

9   you see -- do you see those, Dr. Pelton?

10     A.      Yes.   It's a little blurry.

11     Q.      Would you like it enlarged?

12     A.      Yeah, a little bit, if you can.   Thank you.

13     Q.      Okay.   So I'm going to ask first about the

14   question -- the paragraph that begins, "It is

15   recommended."

16             Do you see that?

17     A.      Yes.

18     Q.      So --

19     A.      Yes.

20     Q.      So this reads, "It is recommended that a

21   standardized, evidence-based risk assessment tool

22   designed for patrol violators be part of the mental

23   health intake process."

24             Do you see that?

25     A.      Yes.

Ashley Pelton, Ph.D. - 10/06/2021

170

1      Q.    What steps have you taken to implement this

2   recommendation?

3           MS. ORCUTT:  Form, foundation.

4           THE WITNESS:  All individuals who come in as a

5   parole violator are screened by mental health intake

6   process.

7   BY MR. FATHI:

8      Q.    The recommendation is that a standardized

9   evidence-based risk assessment tool designed for parole

10  violators be part of the mental health intake process,

11  and my question is, what steps have been taken to

12  implement this recommendation?

13          MS. ORCUTT:  Form.

14          THE WITNESS:  With regards to the

15  recommendation, on evidence-based risk assessment, there

16  is no -- evidence-based is oddly written.  Everyone does

17  have a risk assessment in terms of being assessed,

18  whether or not they're a danger to themselves or other

19  people.

20  BY MR. FATHI:

21     Q.    So is it a -- has a new standardized

22  evidence-based risk assessment tool designed for parole

23  violators been implemented since the date of this review?

24          MS. ORCUTT:  Form.

25          THE WITNESS:  No.

Ashley Pelton, Ph.D. - 10/06/2021

175

1           All right.  Let's scroll down to page 13,

2  please.

3           All right.  In the paragraph that begins

4  "Currently," it says the following, "It is recommended

5  that the Arizona Department of Corrections Rehabilitation

6  and Reentry consider partnering with other correctional

7  institutions, political bodies, and academic research

8  partners to facilitate prison-based research toward the

9  development of such a tool with peer review and

10  transparent knowledge translation."

11           Do you see that, Doctor?

12     A.    Yes.

13     Q.    What steps have been taken to implement this

14  recommendation?

15           MS. ORCUTT:  Form.

16           THE WITNESS:  None, to my knowledge.

17  Or -- hold on.  Let me read it again.

18           I don't believe that there's any research that

19  is currently undergoing.

20  BY MR. FATHI:

21     Q.    So no steps have been taken to implement this

22  recommendation?

23           MS. ORCUTT:  Form.  Asked and answered.

24           THE WITNESS:  There is no research projects

25  that are currently undergoing.

176

1  BY MR. FATHI:

2      Q.    So no steps have been taken to implement this

3  recommendation?

4          MS. ORCUTT:  Form.  Asked and answered.

5          THE WITNESS:  In terms of developing a

6  structured risk tool in relation to other correctional

7  facilities, no, there's no research projects.

8  BY MR. FATHI:

9      Q.    Okay.  In the next paragraph, the paragraph

10  that begins "Older males," the final sentence reads, "It

11  is therefore recommended that institutional policy be

12  reviewed in light of this growing population.  This

13  refers to older male prisoners and recommendations be

14  sought and developed to address their potential unique

15  mental health needs."

16          Do you see that, Doctor?

17          MS. ORCUTT:  Form.

18          THE WITNESS:  Yes.

19  BY MR. FATHI:

20      Q.    What steps have been taken to implement this

21  recommendation?

22          MS. ORCUTT:  Form.

23          THE WITNESS:  I believe -- I would say that we

24  continually work with ADCRR in terms of our growing older

25  population and what we can do to provide adequate mental

Ashley Pelton, Ph.D. - 10/06/2021

189

1     Q.     So who were they?

2            MS. ORCUTT:  Form.

3            THE WITNESS:  I don't know at this time because

4     that was several months ago.

5            MR. FATHI:  All right.  Would you turn to

6     page 56571, please.

7     Q.     Doctor, at the top of this page, it refers to

8     an ICS response for self-harm while on continuous suicide

9     watch.  Was this an actual incident or was it a

10    simulation?

11           MS. ORCUTT:  Form.

12           THE WITNESS:  I believe it was an actual

13    incident.

14    BY MR. FATHI:

15    Q.     Uh-huh.  Do you have any recollection of this

16    incident?

17           MS. ORCUTT:  Form.

18           THE WITNESS:  Let me read it real quick.

19           I'm not sure the specifics of the situation.

20    BY MR. FATHI:

21    Q.     Do you have any recollection of this incident

22    at all?

23           MS. ORCUTT:  Form.

24           THE WITNESS:  I'd have to review the record to

25    know who specifically this person was.

Ashley Pelton, Ph.D. - 10/06/2021

190

1   BY MR. FATHI:

2       Q.      No, my question is, do you have any

3   recollection of this incident at all?

4              MS. ORCUTT:   Form.   Asked and answered.

5              THE WITNESS:   Are you referencing the incident

6   of the ICS?

7   BY MR. FATHI:

8       Q.      Yes.

9       A.      Again, I would have to review the record.   We

10  have a significant amount of ICS situations.

11      Q.      So this type of incident is not uncommon?

12             MS. ORCUTT:   Form.

13             THE WITNESS:   I won't say that it's common, but

14  it does happen.

15  BY MR. FATHI:

16      Q.      What is a continuous suicide watch, Doctor?

17             MS. ORCUTT:   Form.

18             THE WITNESS:   It is a suicide watch where the

19  person is determined to be a significant risk to

20  themselves or other people, specifically someone's

21  engaging in self-harm behavior or has a plan to commit

22  suicide.

23  BY MR. FATHI:

24      Q.      And how is a continuous suicide watch

25  implemented?   What's done with a person on continuous

Ashley Pelton, Ph.D. - 10/06/2021

191

1    suicide watch?

2              MS. ORCUTT:   Form.

3              THE WITNESS:   I'm not sure I understand the

4    question.

5    BY MR. FATHI:

6      Q.     Is a person who is on a continuous suicide

7    watch supposed to be watched continuously?

8              MS. ORCUTT:   Form.

9              THE WITNESS:   That is correct.

10   BY MR. FATHI:

11     Q.     Uh-huh.  According to this document, this

12   patient who was on continuous suicide watch removed 10

13   staples from an abdominal wound and then swallowed the

14   staples.

15             Do you see that?

16     A.     Yes.

17     Q.     How was he able to do this while on a

18   continuous suicide watch?

19             MS. BARNES:   Form and foundation.

20             THE WITNESS:   I'd have to refer to the security

21   staff, as I was, number one, not there; and, number two,

22   I'm not responsible for that.

23   BY MR. FATHI:

24     Q.     Was there any investigation of this incident?

25             MS. ORCUTT:   Form.

Ashley Pelton, Ph.D. - 10/06/2021

192

1          MS. BARNES:  Form and foundation.

2          THE WITNESS:  I don't have access to that.  I

3    don't know.

4    BY MR. FATHI:

5      Q.    Did this incident cause you any concern about

6    whether continuous suicide watches were being carried out

7    in an effective way?

8          MS. ORCUTT:  Form.

9          THE WITNESS:  Yes.

10   BY MR. FATHI:

11     Q.    So what steps did you take in response to that

12   concern?

13         MS. ORCUTT:  Form.

14         THE WITNESS:  I can't speak to this specific

15   situation, but I have meetings with the deputy warden on

16   a regular basis, in terms of ensuring the best care that

17   we can for our incarcerated individuals and ensuring that

18   the constant suicide watches are being completed

19   correctly.

20   BY MR. FATHI:

21     Q.    Did you take any steps in response to this

22   particular incident to ensure that continuous suicide

23   watches were being carried out in an effective manner?

24         MS. ORCUTT:  Form.

25         THE WITNESS:  I can't speak to the specific

Ashley Pelton, Ph.D. - 10/06/2021

193

1   situation, but any time that I felt that the person -- or

2   if there's a situation where they were not being watched

3   on a continuous basis or were able to remove staples,

4   such as that, I have conversations with the deputy warden

5   or sergeant or lieutenant.

6   BY MR. FATHI:

7        Q.    Is this something that shouldn't have been able

8   to happen?

9              MS. ORCUTT:   Form.

10             THE WITNESS:   Can you rephrase the question?

11   BY MR. FATHI:

12        Q.    Did it concern you that somebody that was on a

13   continuous suicide watch was able to remove 10 staples

14   from an abdominal wound and swallow the staples?

15             MS. ORCUTT:   Form.

16             THE WITNESS:   Yes.

17   BY MR. FATHI:

18        Q.    I'm sorry?

19        A.    Yes.

20        Q.    Doctor, are you familiar with the term "SMI"?

21        A.    Yes.

22        Q.    What does it mean?

23        A.    "Seriously mentally ill."

24        Q.    Are you familiar with any policy that restricts

25   the placement of people with -- who are classified as SMI

1    into maximum custody?

2              MS. ORCUTT:  Form.

3              THE WITNESS:  Anyone who is SMI, we evaluate

4    them upon arrival for -- excuse me -- for placement in

5    restrictive housing.  And if they have to be, if you

6    will, in maximum custody, we provide them with additional

7    therapy services.

8    BY MR. FATHI:

9        Q.      Uh-huh.  But people with SMI can be placed in

10   maximum custody.  Correct?

11             MS. ORCUTT:  Form.

12             THE WITNESS:  That is my understanding, yes.

13   BY MR. FATHI:

14       Q.    And what are the additional therapy services

15   you provide to people with SMI in max custody?

16             MS. ORCUTT:  Form.

17             THE WITNESS:  They receive three groups of

18   psychoeducation by BHT a week and three groups a week by

19   a psych associate -- or I'm -- I mean, I'm sorry, one

20   group a week, my apologies, and three psychoeducation

21   visits a week by a BHT.

22   BY MR. FATHI:

23       Q.    And is it your understanding that those groups

24   happen reliably at all of the max custody units?

25             MS. ORCUTT:  Form.

1    regular basis, three times a week or once a week, in all

2    the max custody units?

3              MS. ORCUTT:  Form.

4              THE WITNESS:  So I want to clarify, the three

5    and one, it's one group a week by BHT, one group a week

6    by a psych associate, and then three psychoeducation

7    welfare visits by a BHT.

8    BY MR. FATHI:

9        Q.    And my question is, are the groups occurring

10   regularly as scheduled in all of the max custody units?

11             MS. ORCUTT:  Form.

12             THE WITNESS:  To my knowledge.

13   BY MR. FATHI:

14       Q.    Yeah.  And how do you know that?

15       A.    I have meetings with my mental health leads

16   from those complexes.

17       Q.    Are you aware of any policy that restricts the

18   placement of someone with SMI in a detention unit?

19             MS. ORCUTT:  Form.

20             THE WITNESS:  I would have to reference and

21   review the policies, but to my knowledge, there's nothing

22   to indicate that they are unallow- -- or not allowed to

23   be in max custody.

24   BY MR. FATHI:

25       Q.    My question was about detention.  Are people

Ashley Pelton, Ph.D. - 10/06/2021

197

1    with SMI --

2        A.    I'm sorry, I missed the word.  Can you say it

3    again?

4        Q.    Are you aware of a policy that restricts the

5    placement of people with SMI in detention?

6              MS. ORCUTT:  Form.

7              THE WITNESS:  I would have to go back and

8    review the policy, but there's nothing that I'm aware of

9    that restricts them from being in detention.

10   BY MR. FATHI:

11       Q.    Are you aware of cases of people with SMI who

12   have been placed in detention?

13             MS. ORCUTT:  Form.

14             THE WITNESS:  Yes.

15   BY MR. FATHI:

16       Q.    Are you familiar with any policy restricting

17   the use of OC spray on people classified as SMI?

18             MS. ORCUTT:  Form.

19             THE WITNESS:  I can't speak to the use of OC

20   spray, as I am not one of the individuals who is allowed

21   to carry it.

22   BY MR. FATHI:

23       Q.    I'm simply asking, are you aware of any policy

24   that restricts the use of OC spray on people with SMI?

25             MS. ORCUTT:  Form.

Ashley Pelton, Ph.D. - 10/06/2021

200

1  addresses the use of OC spray on people who are taking

2  psychotropic medication?

3          MS. ORCUTT:  Form.

4          THE WITNESS:  I don't know about the specifics

5  on someone who is taking psychotropic medication, and I

6  would say the same thing in terms of OC spray in our

7  mentally ill patients.

8  BY MR. FATHI:

9      Q.   So you've never seen a written policy that

10  discusses that?

11          MS. ORCUTT:  Form.  Asked and answered.

12          THE WITNESS:  Again, I have not specifically

13  reviewed any policy recently.  I can't speak to whether

14  or not there is one.

15  BY MR. FATHI:

16      Q.   Doctor, are there are some psychotropic

17  medications that can make people more susceptible to heat

18  injury?

19          MS. ORCUTT:  Form, foundation.

20          MS. BARNES:  To what?

21          MR. FATHI:  Heat injury.

22          THE WITNESS:  I'd like to defer to psychiatry

23  to answer that question, as that is slightly outside of

24  my scope of practice.

25  BY MR. FATHI:

Ashley Pelton, Ph.D. - 10/06/2021

201

1    Q.    So I'm entitled to the best of your knowledge.

2  If you simply don't know, that's fine, but I'd like you

3  to answer my question.

4    A.    I don't know the specifics, but I know there

5  are certain psychotropic medications that can be

6  detrimental in high temperatures.

7    Q.    Are you aware of any policy, either an ADC or

8  Centurion policy, that people taking psychotropic

9  medications have to be housed in areas with certain

10  temperatures?

11            MS. ORCUTT:  Form.

12            THE WITNESS:  What was the beginning of the

13  question?

14  BY MR. FATHI:

15    Q.    Are you aware of any policy, either an ADC

16  policy or Centurion policy, requiring people who are

17  taking psychotropic medications to be housed in areas

18  that are below a certain temperature because of the risk

19  of heat injury?

20    A.    Yes.

21    Q.    Okay.  Where is that policy written down?

22            MS. ORCUTT:  Form.

23            THE WITNESS:  I'm not sure of the specific

24  policy and where it's written.  I know that there is a

25  policy that indicates that there's a certain temperature

Ashley Pelton, Ph.D. - 10/06/2021

204

1  belief, separate and apart from any conversation with an

2  attorney, then you can answer that.

3           THE WITNESS:  Can you rephrase the question?

4  BY MR. FATHI:

5       Q.    Has anyone in Centurion leadership told you

6  that Centurion is required to continue complying with the

7  performance measures?

8               MS. ORCUTT:  Form.

9               THE WITNESS:  I don't know that anyone has said

10  that we're required.  We continue to meet those

11  standards.

12  BY MR. FATHI:

13      Q.    Has anyone in ADC leadership told you that

14  Centurion is required to continue to comply with those

15  performance measures?

16              MS. ORCUTT:  Form.

17              THE WITNESS:  I don't think so.

18              MR. FATHI:  Okay.  Let's take a five-minute

19  break.

20           (Recessed from 1:24 p.m. until 1:31 p.m.)

21  BY MR. FATHI:

22      Q.    Doctor, are you aware of any case in which OC

23  spray has been used on someone who is classified as SMI?

24      A.    Yes.

25      Q.    Are you aware of any case in which OC spray has

1    been used on someone who is using psychotropic

2    medications?

3         A.      Yes.

4         Q.      Are you aware of any cases in which the mental

5    health groups for people in max custody was cancelled

6    because there wasn't sufficient custody staff?

7                 MS. ORCUTT:   Form.

8                 THE WITNESS:   Yes.

9    BY MR. FATHI:

10        Q.      What facilities has that happened at?

11                MS. ORCUTT:   Form.

12                THE WITNESS:   I believe there's been situations

13   at Florence, that they were unable to do group because

14   there was not staffing.

15   BY MR. FATHI:

16        Q.      Custody staffing?

17        A.      Correct.

18        Q.      Are you aware of that happening at any other

19   complex?

20                MS. ORCUTT:   Form.

21                THE WITNESS:   I don't think so.   Nothing

22   specific comes to mind.

23   BY MR. FATHI:

24        Q.      Are you aware of that ever happening at Eyman?

25                MS. ORCUTT:   Form.

Ashley Pelton, Ph.D. - 10/06/2021

209

1    closed custody individuals who are still acute, but

2    subacute and have the ability to be around others more

3    frequently.  And George Unit is going to be our most

4    acute and typically houses max custody inmates.

5    BY MR. FATHI:

6        Q.    All right.  What about Quiet Unit?

7        A.    Quiet Unit is where we house our people who are

8    on suicide watch.

9        Q.    Tell me about Baker Unit.

10       A.    Baker Unit, due to COVID, changed to housing

11   our COVID individuals.

12       Q.    And when did that happen?

13       A.    During COVID.

14       Q.    Yes.  No, I understand that, but when,

15   approximately, did it start to be used as a COVID unit?

16             MS. ORCUTT:  Form, foundation.

17             THE WITNESS:  I was not there at the time, so I

18   can't speak to the date.

19   BY MR. FATHI:

20       Q.    So is it your testimony that Baker Unit is

21   not -- is currently not functioning as a mental health

22   unit?

23             MS. ORCUTT:  Form.

24             THE WITNESS:  Correct.  We are currently

25   utilizing it for watches and ADCRR has determined that it

Ashley Pelton, Ph.D. - 10/06/2021

210

1   is going to be for intake and COVID isolation -- or COVID

2   quarantine.

3   BY MR. FATHI:

4        Q.     Okay.  But at one time, Baker was, in its

5   entirety, a mental health unit.   Correct?

6               MS. ORCUTT:   Form.

7               THE WITNESS:   Correct.

8   BY MR. FATHI:

9        Q.     But that's no longer the case?

10              MS. ORCUTT:   Form.

11              THE WITNESS:   Correct.

12  BY MR. FATHI:

13       Q.     Are there any mental health patients -- are

14  there any people in Baker Unit for mental health reasons

15  right now?

16              MS. ORCUTT:   Form.

17              THE WITNESS:   For individuals who are on mental

18  health watch.

19  BY MR. FATHI:

20       Q.     And how many of those would there be at a given

21  time?

22              MS. ORCUTT:   Form.

23              THE WITNESS:   It depends on the institution's

24  need for mental health watches at the time and if Quiet

25  is full.

1          THE WITNESS:  The custody then evaluates the

2   individual based on their security requirements and needs

3   and to determine whether or not the individual would be

4   appropriately placed there.

5   BY MR. FATHI:

6       Q.    So does custody have the power to prevent a

7   transfer that's been recommended by a mental health

8   staff?

9              MS. ORCUTT:  Form.

10             THE WITNESS:  Yes, but we then continue to try

11  to discuss the best needs of the patient and then

12  potentially figure out what that is.

13  BY MR. FATHI:

14      Q.    Right.  But my question is, it can happen that

15  the mental health staff wants to transfer this person to

16  Phoenix and custody staff can say no because of security

17  reasons; is that right?

18             MS. ORCUTT:  Form.

19             THE WITNESS:  That is correct.

20  BY MR. FATHI:

21      Q.    Okay.

22      A.    But we usually try to -- especially when it

23  comes to going to Phoenix, I would say security works

24  with us and I don't think that's ever been a situation

25  where we said that someone can't go to Phoenix for

Ashley Pelton, Ph.D. - 10/06/2021

217

1    security concerns.

2         Q.    So you don't remember it ever happening that

3    there was a transfer to Phoenix that was presented by

4    mental health staff but security said no?

5              MS. ORCUTT:  Form.

6              THE WITNESS:  Specifically to Phoenix, I can't

7    think of an example.

8    BY MR. FATHI:

9         Q.    How --

10        A.    I was going to say I'm not sure.  I can't say

11   it's never happened, but I can't think of an example.

12        Q.    How long does this whole process typically

13   take?

14             MS. ORCUTT:  Form.

15             THE WITNESS:  The --

16   BY MR. FATHI:

17        Q.    Let me be more specific.  From the time that

18   someone at Eyman says, "Let's transfer this person to

19   Phoenix," to the time they physically end up in Phoenix,

20   how long does that typically take?

21             MS. ORCUTT:  Form.

22             THE WITNESS:  It's going to -- we're going to

23   evaluate a couple different things: If it's an immediate

24   concern and we do not believe that Eyman is able to house

25   them for -- due to not having adequate -- whatever it

Ashley Pelton, Ph.D. - 10/06/2021

218

1    might be, and need that inpatient care immediately, we

2    are able to move them the same day.

3    BY MR. FATHI:

4        Q.    Uh-huh.  Right.  But my question is, how long

5    does it typically take, an average case?

6              MS. ORCUTT:  Form.

7              THE WITNESS:  In a typical case, anywhere from

8    four days to a week.

9    BY MR. FATHI:

10       Q.    What's the longest that you're aware of it ever

11   taking?

12             MS. ORCUTT:  Form.

13             THE WITNESS:  The longest, a couple weeks, but

14   it's been -- what --

15   BY MR. FATHI:

16       Q.    Meaning two weeks?

17       A.    Meaning two weeks.  I can't think of any recent

18   examples where it's taken longer.

19       Q.    Can you think of any examples at all, recent or

20   not, where the process has taken more than two weeks?

21             MS. ORCUTT:  Form.

22             THE WITNESS:  I can't speak to the past in

23   the -- when it's taken longer.  I believe in the past

24   when we had COVID and COVID restrictions, it did take

25   longer.

Ashley Pelton, Ph.D. - 10/06/2021

219

1    BY MR. FATHI:

2        Q.    How long did it take under those circumstances?

3              MS. ORCUTT:  Form.

4              MS. BARNES:  Form, foundation.

5              THE WITNESS:  I'd have to review the specifics

6    but, again, we'd have to look at -- we had to look at

7    COVID testing and ensure the safety for all the medical

8    pieces of it.

9    BY MR. FATHI:

10       Q.    Yes, I'm simply asking, what's the longest you

11   remember it taking under COVID circumstances?

12       A.    I don't know.

13       Q.    Where is this process written down?

14             MS. ORCUTT:  Form.

15             THE WITNESS:  The process is written down in

16   the mental health tech manual.

17   BY MR. FATHI:

18       Q.    Are you aware of anyone ever being transferred

19   to Phoenix as a result of advocacy from the ACLU or other

20   counsel in the Parsons case?

21             MS. ORCUTT:  Form.

22             THE WITNESS:  You're asking specifically from

23   the ACLU?

24   BY MR. FATHI:

25       Q.    Or plaintiffs' counsel in the Parsons case, the

Ashley Pelton, Ph.D. - 10/06/2021

220

1    ACLU, The Prison Law Office, Arizona Center for

2    Disability Law?

3              MS. ORCUTT:  Form.

4              THE WITNESS:   I can't think of any examples,

5    no.

6    BY MR. FATHI:

7        Q.    So you can't think of an example where that's

8    happened?

9              MS. ORCUTT:  Form.

10             THE WITNESS:  No.  We look at everything based

11   on the individual needs in terms of who needs the

12   inpatient care.

13   BY MR. FATHI:

14       Q.    Did you work at all with Angela Fisher at the

15   Phoenix facility?

16             MS. ORCUTT:  Form.

17             THE WITNESS:  Are you referencing the mental

18   health employee?

19   BY MR. FATHI:

20       Q.    Yes.

21       A.    Yes, there was a brief time where I worked with

22   her.

23       Q.    Do you believe her to be a competent clinician?

24             MS. ORCUTT:  Form.

25             MS. BARNES:  Form and foundation.

1          THE WITNESS:  I haven't worked with her in some

2   time.  In what capacity are you asking?

3   BY MR. FATHI:

4      Q.    I'm asking, do you think she was competent at

5   her job as a psych associate?

6          MS. ORCUTT:  Form.

7          THE WITNESS:  I do.

8   BY MR. FATHI:

9      Q.    Do you believe she's a truthful person?

10          MS. ORCUTT:  Form, foundation.

11          THE WITNESS:  I believe she says what she

12   believes is her truth, yeah.

13   BY MR. FATHI:

14      Q.    Do you believe she's a truthful person?

15          MS. ORCUTT:  Form.

16          MS. BARNES:  Form, foundation.

17          THE WITNESS:  Yes, I believe she speaks to what

18   she believes is true.

19   BY MR. FATHI:

20      Q.    If I wanted to know how many people had been

21   transferred to Phoenix in the last -- let's say in

22   September, how would I find that out?

23          MS. ORCUTT:  Form.

24          THE WITNESS:  I would not know.  I don't know

25   what was done previously before I took this role in terms

Ashley Pelton, Ph.D. - 10/06/2021

222

1    of any recordkeeping.

2    BY MR. FATHI:

3        Q.     But you've been there since August, right, in

4    this role?

5        A.     Correct.

6        Q.     So if you wanted to know how many people had

7    been transferred into the Phoenix facility in September,

8    how would you find out?

9            MS. ORCUTT:   Form.

10           THE WITNESS:   We have an admissions log of

11   everyone who transfers in and out of every facility and

12   we keep record of --

13   BY MR. FATHI:

14       Q.     So you would just have to look at the log and

15   manually count; is that right?

16           MS. ORCUTT:   Form.

17           THE WITNESS:   Correct.

18           MR. FATHI:   Okay.

19           MS. ORCUTT:   David, how much longer do you

20   anticipate going?   Because I believe we've gone over our

21   four hours at this point.

22           MR. FATHI:   I don't think we've gone over four

23   hours of on-the-record time, but probably about 10 or 15

24   minutes.

25           MS. BARNES:   Robin, can you let us know how

```
 1              MS. ORCUTT:  Form.

 2              THE WITNESS:  Yes.

 3   BY MR. FATHI:

 4       Q.     Can someone who is max custody be transferred

 5   to Aspen?

 6              MS. ORCUTT:   Form.

 7              THE WITNESS:   No.

 8   BY MR. FATHI:

 9       Q.     So how long were you the clinical director at

10   the Phoenix facility?

11              MS. ORCUTT:  Form.

12              THE WITNESS:  Approximately one year.

13   BY MR. FATHI:

14       Q.     And during that one year, did it ever occur

15   that the Phoenix -- sorry, the Flamenco unit was entirely

16   full?

17              MS. ORCUTT:  Form.

18              THE WITNESS:  I guess you'd have to define

19   "full."

20   BY MR. FATHI:

21       Q.     At capacity.

22       A.     Again, at capacity -- this is more based on

23   clinical need, and some individuals require to not be

24   housed with other people and so we take that into

25   consideration.
```

Ashley Pelton, Ph.D. - 10/06/2021

228

1      Q.     You're not understanding my question.   Every
2  unit has a capacity.   It can hold up to so many people.
3  So did it ever happen during the year that you were
4  clinical director at Phoenix that Flamenco Unit was at
5  capacity?
6              MS. ORCUTT:   Form.
7              THE WITNESS:   Not that I'm aware of.   I'd have
8  to go back and review all the numbers.
9  BY MR. FATHI:
10     Q.     And is that because the determination was made
11  that there weren't people at other facilities who could
12  benefit from placement at Phoenix?
13             MS. BARNES:   Form.
14             MS. ORCUTT:   Form.
15             THE WITNESS:   So, again, we review everyone on
16  a regular basis in terms of being able to come into the
17  inpatient unit and level of need.
18  BY MR. FATHI:
19     Q.     So if there's empty beds in the inpatient unit,
20  that means you have determined that there aren't other
21  people that need to be in that unit; is that correct?
22             MS. ORCUTT:   Form.
23             THE WITNESS:   I would say that that's -- we --
24  as long as we know that there's no one that needs that
25  higher level of care -- if someone needs that higher

1   level of care, we work to get them into Phoenix.

2           MR. FATHI:  All right.  Let me take just one

3   minute with co-counsel, but I think we're almost

4   finished.

5           All right.  Because Dr. Pelton has been

6   designated as an expert, we do reserve the right to

7   depose her as an expert after she submits her report on

8   October 22nd, but for now, we're finished.

9           And I thank you very much, Doctor.

10          MS. Orcutt:  Thank you, Dr. Pelton.

11          THE WITNESS:  Thank you.

12          MS. BARNES:  She will read and sign.

13          THE REPORTER:  Thank you.

14          MS. ORCUTT:  Thank you.

15          (Proceedings concluded at 1:57 p.m.)

16

17

18

19

20

21

22

23

24

25

230

1                        SIGNATURE PAGE

2

3            I, ASHLEY PELTON, Ph.D., a deponent exercising
   my right to read and sign my deposition taken on October
4  6, 2021, place my signature hereon and make the following
   changes on this _____day of_____, 2021.
5
              (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

7                        _____

8                        ASHLEY PELTON, Ph.D.

9

10   PAGE      LINE      READS        CHANGE TO        REASON

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25   _____     _____     _____

231

1  STATE OF ARIZONA      )
   COUNTY OF MARICOPA  )
2
              BE IT KNOWN that the foregoing proceedings
3  were taken before me; that the witness before testifying
   was duly sworn by me to testify to the whole truth; that
4  the foregoing pages are a full, true, and accurate record
   of the proceedings all done to the best of my skill and
5  ability; that the proceedings were taken down by me in
   shorthand and thereafter reduced to print under my
6  direction.

7          [X] Review and signature was requested.

8          [ ] Review and signature was waived.

9          [ ] Review and signature not required.

10          I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in the ACJA 7-206(F)(3)
11  and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
   Arizona, this 17th day of October, 2021.

12

13

14

15  _____
          ROBIN L. B. OSTERODE, RPR
16          CA CSR No. 7750
          AZ CR No. 50695
17
              *    *    *    *    *
18          I CERTIFY that Glennie Reporting Services,
   LLC, has complied with the ethical obligations set forth
19  in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23

24  _____
   GLENNIE REPORTING SERVICES, LLC
   Registered Reporting Firm
25  Arizona RRF No. R1035

# EXHIBIT 9

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) No. ) CV 12-00601-PHX-ROS ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

DEPOSITION OF 30(b)(6) ARIZONA DEPARTMENT OF
CORRECTIONS, REHABILITATION, AND REENTRY
(Bobbie Pennington-Stallcup)
(via videoconference)

October 12, 2021
9:01 a.m.
Chandler, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

602.266.6535
www.glennie-reporting.com

Prepared by:
Jennifer Honn, RPR
Arizona CR No. 50885

2

1                          I N D E X

2    WITNESS                                        PAGE

3    Bobbie Pennington-Stallcup

4         Examination by Mr. Fathi                    5

5

6

7

8                      INDEX TO EXHIBITS

9    Description                                    Page

10   Exhibit 1    Curriculum Vitae                   17
                  Dr. Bobbie Pennington-Stallcup
11                (7 pages)

12   Exhibit 2    Second Amended Notice of           29
                  30(b)(6) Deposition
13                Document 3998

14   Exhibit 3    Notice of 30(b)(6) Deposition      30
                  Document 3957
15

16   Exhibit 4    ADC Institutional Capacity Committed   150
                  Population spreadsheet
                  (3 pages)
17

18   Exhibit 5    Excerpt of the ADCRR Mental Health     140
                  Technical Manual
19                12/24/2019
                  (11 pages)

20   Exhibit 6    Arizona DOC Department Order Manual    158
                  Chapter: 800
21                (23 pages)

22

23

24

25

3

```
 1          DEPOSITION OF 30(b)(6) ARIZONA DEPARTMENT OF
                CORRECTIONS, REHABILITATION, AND REENTRY
 2                 (Bobbie Pennington-Stallcup)
                      (via videoconference)
 3

 4            The deposition of 30(b)(6) ARIZONA DEPARTMENT OF

 5   CORRECTIONS, REHABILITATION, AND REENTRY (Bobbie

 6   Pennington-Stallcup) was taken on October 12, 2021,

 7   commencing at 9:01 a.m., via videoconference, the witness

 8   appearing in at the law offices of STRUCK LOVE BOJANOWSKI

 9   & ACEDO, PLC, 3100 West Ray Road, Suite 300, Chandler,

10   Arizona, before JENNIFER HONN, a Certified Reporter,

11   Certificate No. 50885, for the State of Arizona.

12
     APPEARANCES:
13
     For Plaintiffs:
14
          ACLU NATIONAL PRISON PROJECT
15        David C. Fathi, Esq.
          915 15th Street N.W., 7th Floor
16        Washington, D.C. 20005
          Dfathi@aclu.org
17
          ACLU NATIONAL PRISON PROJECT
18        Corene Kendrick, Esq.
          39 Drumm Street
19        San Francisco, California 94111
          Ckendrick@aclu.org
20
     For Defendant:
21
          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
22        Ashlee B. Hesman, Esq.
          3100 West Ray Road
23        Suite 300
          Chandler, Arizona 85226
24        ahesman@strucklove.com

25   Also Present:    Ms. Jessica Carns
```

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

23

1      A.    No.  I wrote a clinical research project.

2      Q.    And what was the topic?

3      A.    It was on the development of an anger management

4  program specifically for adolescent females.

5      Q.    Now, in terms of your employment with the

6  Arizona Department of Corrections, according to this

7  resume, Exhibit 1, you were a lead psychologist at the

8  Lewis Prison from April 2013 to March 2014.  Is that

9  correct?

10     A.    Yes.

11     Q.    And since August of 2020, you are the mental

12 health program director; correct?

13     A.    That's correct.

14            MR. FATHI:  Could we stop on page 2,

15 please?

16     Q.    (By Mr. Fathi) Now, along with mental health

17 program director on page 2 of your resume, you also list

18 clinical psychologist.  Do you see that?

19     A.    Yes.

20     Q.    Is that a separate job position in addition to

21 mental health program director?

22     A.    No, it is not.

23     Q.    So you just have one job with the Arizona

24 Department of Corrections, and that is mental health

25 program director; correct?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

25

1       A.   Yes, they are.

2       Q.   Are you part of something that's called the

3   Monitoring Bureau?

4       A.   Yes.

5       Q.   Let's go back to page 2 of your resume.

6            Now, on page 2 of your resume, you describe a

7   number of duties as a mental health program director.  Is

8   this both a complete and accurate statement of your

9   duties as mental health program director?

10           MS. HESMAN:  Form.

11           THE WITNESS:  Yes.

12      Q.   (By Mr. Fathi) As health program director, do

13   you provide any direct patient care?

14      A.   No.

15      Q.   Do you as part of your duties review patient

16   medical charts?

17      A.   Yes.

18      Q.   And about how many hours a week do you spend

19   doing that?

20      A.   I don't track that time in any way.

21      Q.   I'm just looking for an estimate.

22      A.   I would say approximately 20 hours.

23      Q.   So in an average week you spend about 20 hours

24   reviewing patient charts?

25      A.   That's an estimate.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

26

1      Q.   And what is the purpose of those reviews?

2      A.   My -- as listed in my resume, a part of my job,

3  to ensure the quality of care being provided meets or

4  exceeds community standards.

5      Q.   As part of your --

6      A.   Mental health standards.  I'm sorry.

7      Q.   As part of your job, do you participate in

8  mortality reviews?

9      A.   Yes, I do.

10      Q.   Do you participate in psych autopsies?

11      A.   Yes, I do.

12      Q.   Do you participate in mortality reviews only of

13  patients who die by suicide or also mortality reviews of

14  those who did not die by suicide?

15      A.   Can you --

16           MS. HESMAN:  Form.

17           THE WITNESS:  -- rephrase the question,

18  please?

19      Q.   (By Mr. Fathi) Sure.  You testified that as part

20  of your job, you participate in mortality reviews; is

21  that right?

22      A.   Yes.

23      Q.   So my question is do you participate in

24  mortality reviews only of people who died by suicide?

25      A.   No.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

34

1    cannot speak to the other disciplines.

2              Would you like me to describe the mental health

3    process?

4        Q.   Yes, I thought that's what I said.  But if it

5    isn't, that's my intention.  Please describe the mental

6    health intake process when the prisoner arrives at

7    Department of Corrections.

8                   MS. HESMAN:  Form.

9                   THE WITNESS:  So all inmate patients

10   admitted to ADCRR are seen by a mental health

11   professional within 72 hours of being admitted to the

12   department.

13                   The policy allows for that to be a licensed

14   or unlicensed clinician.  However, our practice is to

15   have that -- a licensed clinician perform that

16   evaluation.

17                   So they perform that evaluation and assign

18   them a mental health score.  And then they are seen by

19   nursing, and they have their medication, psychiatric

20   medications continued, if they're verified upon arrival.

21                   And then they are scheduled for follow-up

22   appointments or scheduled or transferred to -- and

23   scheduled, I would say, or transferred to the appropriate

24   facility.

25       Q.   (By Mr. Fathi) Thank you.  Is the process you've

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

35

1    just described the same whether the person is a new

2    commitment or a parole violator?

3         A.    Parole violators may have a slightly different

4    process as sometimes they may be admitted directly to an

5    institution.  But that same process is the same process

6    that's followed whether it's at intake or at another

7    institution.

8         Q.    Okay.  So other than the location where it

9    happens, the intake -- the mental health intake process

10   is exactly the same for new commitments versus parole

11   violators; is that right?

12        A.    That's my understanding, yes.

13        Q.    Now, you said that the intake is conducted by a

14   mental health professional; is that right?

15        A.    That's correct.  The mental health intake.

16        Q.    Yes.  That's all we're talking about, is the

17   mental health intake.

18        A.    Okay.

19        Q.    So that is conducted by -- the term you used is

20   "mental health professional"; correct?

21        A.    That's correct.

22        Q.    And you said that can be either a licensed or an

23   unlicensed clinician?

24        A.    That is correct.

25        Q.    Could it be done -- is it ever done by any other

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

36

1    kinds of mental health staff?

2                MS. HESMAN:   Form.

3                THE WITNESS:   No.

4        Q.    (By Mr. Fathi) Are you aware of any cases in

5    which that intake was done by someone other than a

6    licensed or unlicensed clinician?

7                MS. HESMAN:   Form and foundation.

8                THE WITNESS:   No.

9        Q.    (By Mr. Fathi) And you said this is supposed to

10   happen within 72 hours of their admission; is that

11   correct?

12       A.    Yes.

13       Q.    So when does that 72-hour clock start to run?

14       A.    When they're admitted to ADCRR as I mentioned

15   earlier.

16       Q.    And by "admission," does that mean when they

17   physically arrive at the intake facility?

18       A.    That's a technicality that I don't feel the most

19   comfortable to answer.

20       Q.    Well, what I'm getting at is, as I said, when

21   does the 72-hour clock start?  Does it start when they

22   get off the bus at Perryville or Phoenix or does it start

23   at some later point?  If you don't know, that's fine.

24       A.    It's when they're admitted to ADCRR.

25       Q.    And what does "admitted" mean?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

37

1     A.   When they have been processed and are documented

2  as admitted in ACIS and eOMIS.

3     Q.   So the clock doesn't start to run when they get

4  off the bus; is that correct?

5              MS. HESMAN:  Form.

6              THE WITNESS:  I didn't say that.

7     Q.  (By Mr. Fathi) Okay.  Let me start again.  There

8  are various times that that 72 hours could start to run.

9  It could start to run when they get off the bus.  It

10  could start to run when someone checks them into the

11  facility.  It could start to run at some other time.

12  What I'm asking is at which of those points does the

13  72-hour clock start to run?

14              MS. HESMAN:  Form.  Asked and answered.

15              THE WITNESS:  I had answered that already

16  and stated when they've been processed as admitted in

17  eOMIS and ACIS.

18     Q.  (By Mr. Fathi) Typically how long after they get

19  off the bus have they been processed in eOMIS and ACIS?

20              MS. HESMAN:  Form.  Foundation.

21              THE WITNESS:  I can't answer that.  I don't

22  have direct knowledge of that.

23     Q.  (By Mr. Fathi) Are you ever aware -- are you

24  aware of any cases in which this mental health intake did

25  not take place within 72 hours of admission?

38

```
1                    MS. HESMAN:  Form.  Foundation.

2                    THE WITNESS:  No.

3                    MS. HESMAN:  Just pause a second.

4                    THE WITNESS:  Sorry.

5                    MS. HESMAN:  That's okay.

6        Q.   (By Mr. Fathi) I'm sorry.  What was your answer,

7   Doctor?

8        A.   No.  I'm not aware of any situation where that

9   didn't occur within 72 hours.

10       Q.   Does the mental health intake involve a

11   face-to-face interview?

12       A.   Yes.

13       Q.   Is it -- does a face-to-face interview happen

14   for mental health intake in all circumstances?

15                   MS. HESMAN:  Form.  Foundation.

16                   THE WITNESS:  Yes.

17       Q.   (By Mr. Fathi) So you're not aware of any

18   instances in which the mental health intake did not

19   involve a face-to-face interview?

20                   MS. HESMAN:  Form.

21                   THE WITNESS:  No, I am not.

22       Q.   (By Mr. Fathi) Is there a minimum amount of time

23   that that interview is supposed to last?

24       A.   No, there is not.

25       Q.   Would a five-minute intake interview be
```

1    consistent with policy?

2                    MS. HESMAN:  Form.  Foundation.

3                    THE WITNESS:  As I mentioned before, there

4    is no time requirement for the intake in policy.  So that

5    wouldn't apply.

6        Q.   (By Mr. Fathi) Would a five-minute intake be

7    consistent with policy?

8                    MS. HESMAN:  Same objection.  Asked and

9    answered.

10                   THE WITNESS:  There is no time requirement

11   in the policy.  So there would be no determination made

12   based on the length of the time of that intake.

13       Q.   (By Mr. Fathi) So the answer to my question is

14   that a five-minute intake interview would be consistent

15   with policy?

16                   MS. HESMAN:  Form.

17                   THE WITNESS:  I didn't say that.  My answer

18   is as I stated, that there would be no determination made

19   based on the amount of time that it took.  It would be

20   based on the quality of the intake.

21       Q.   (By Mr. Fathi) And who assesses the quality of

22   the intake?

23                   MS. HESMAN:  Form.  Foundation.

24                   THE WITNESS:  The supervisors as well as

25   the monitoring bureau.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

40

1      Q.     (By Mr. Fathi) Is the quality of every mental

2    health intake assessed by either supervisors or the

3    monitoring bureau?

4                  MS. HESMAN:   Form.   Foundation.

5                  THE WITNESS:   No.

6      Q.     (By Mr. Fathi) What's the average length of

7    these intake face-to-face interviews?

8                  MS. HESMAN:   Form.   Foundation.

9                  THE WITNESS:   I don't know.

10      Q.     (By Mr. Fathi) Is there a form that --

11                  MS. HESMAN:   David, you broke up.   Can you

12    re-ask that?

13      Q.     (By Mr. Fathi) Is there a form that's used for

14    the mental health intake interview?

15      A.     Yes.

16      Q.     And what's the name of that form, if you know?

17      A.     I can't say specifically what it is, but it's

18    the mental health intake form.   But the specific name, I

19    probably am botching that.

20      Q.     And is that an ADC form or a Centurion form?

21      A.     Both.

22      Q.     I'm sorry.   Are there two different forms or

23    just one?

24      A.     There's one form.

25      Q.     Was the form created by ADC or by Centurion?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

41

1           MS. HESMAN:  Form.  Foundation.

2           THE WITNESS:  ADC.

3      Q.   (By Mr. Fathi) When was the form last revised?

4           MS. HESMAN:  Form.  Foundation.

5           THE WITNESS:  Within the last year.

6      Q.   (By Mr. Fathi) And is the date of the last

7  revision indicated on the face of the form?

8           MS. HESMAN:  Form.  Foundation.

9           THE WITNESS:  Given that it's electronic,

10 I'm not sure.  If you could pull it up, I can let you

11 know if that's the date of the last revision.

12     Q.   (By Mr. Fathi) Were you personally involved in

13 the last revision of the mental health intake form?

14     A.   Yes.

15     Q.   As part of the mental health intake process, is

16 there a requirement to request the patient's records from

17 the county jail if that's where the patient's coming

18 from?

19     A.   As a part of the form?

20     Q.   No.  I'm asking as part of the mental health

21 intake process, is there a requirement to request the

22 patient's records from the county jail if that's where

23 the patient is coming from?

24     A.   I don't know.

25     Q.   As part of the mental health intake process, is

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

44

1      Q.   (By Mr. Fathi) And you said a transfer summary

2   accompanies the patient; is that correct?

3      A.   Yes.

4      Q.   Is it typical for the patient's complete records

5   from county jail to accompany him or her to ADC?

6              MS. HESMAN:   Form.   Foundation.

7              THE WITNESS:   It is not typical that I'm

8   aware of.

9      Q.   (By Mr. Fathi) Is there a requirement that the

10  person conducting the initial mental health intake

11  interview consult with either a psychologist or a

12  psychiatrist under certain circumstances?

13             MS. HESMAN:   Form.

14             THE WITNESS:   Can you be a little more

15  specific in your question, please?

16     Q.   (By Mr. Fathi) Sure.   You testified that the

17  initial intake interview is done by either a licensed or

18  an unlicensed mental health counselor; is that correct?

19     A.   Yes.

20     Q.   So my question is:   Is there a requirement in

21  some cases that the person doing that initial intake

22  consult with either a psychologist or a psychiatrist?

23             MS. HESMAN:   Form.

24             THE WITNESS:   No, there is not.

25     Q.   (By Mr. Fathi) All right.   Moving on to

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

51

1    correct.

2        Q.   I'm sorry.  I'm talking about max custody.

3        A.   That was why we asked you to define it early on

4    because --

5        Q.   Okay.

6        A.   -- they're all different variations of what

7    you're referring to as max custody.  So I'm referring to

8    the restrictive housing program.

9        Q.   Okay.  So that's not my question, Doctor.  My

10   question is -- let's try this again.

11           Before a patient can be transferred to

12   Eyman-Browning, Eyman-SMU-I or Lewis-Rast max, is there

13   any mental health evaluation that is required to take

14   place before that transfer occurs?

15       A.   For a regular max setting, no.

16       Q.   Okay.  Now, you mentioned an evaluation that is

17   required to take place after the patient's arrival at,

18   again, just so we're clear, let's say we're talking about

19   Eyman-Browning, Eyman-SMU-I or Lewis-Rast.  Okay?  You

20   need to answer audibly.

21       A.   I'm sorry.  Yes.

22       Q.   Okay.  And as I understand your testimony, you

23   said there is some evaluation that's required to take

24   place after the person already arrives at one of those

25   facilities; is that correct?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

52

1          A.    That is correct.

2          Q.    And where is that requirement written down?

3          A.    In the mental health technical manual as well as

4     the DO relating to isolation and restrictive housing, max

5     custody.

6          Q.    And which DO is that?

7          A.    I don't know the numbers off the top of my head.

8     I'm sorry.

9          Q.    Okay.  So describe in your own words what is

10    required after a patient's transfer to SMU-I, Browning or

11    Rast max?

12         A.    So they're seen by a mental health counselor,

13    and they are assessed before any current mental health

14    needs.  And this is, again, for all patients, regardless

15    of their mental health determination.

16              So they are requested for any -- they are

17    assessed for their current mental health status as well

18    as any mental health needs.  It is at this point that the

19    clinician can determine if they are in need of a

20    different level of care or custody.  If they are not

21    suitable to go into a max custody setting, then they can

22    be referred to inpatient housing or residential treatment

23    housing.  So it's at that point that they can be

24    determined that another setting is more appropriate for

25    them than max housing.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

53

1      Q.    And this evaluation is required to take place
2   within what time frame?
3      A.    48 hours for all inmates regardless of their
4   mental health classification.   24 hours for all SMI
5   patients.
6      Q.    Okay.   And where is -- where is that time frame
7   written down?
8      A.    Again --
9            MS. HESMAN:   Form.   Go ahead.
10            THE WITNESS:   Or, again, in the mental
11   health technical manual and the DOs relating to max
12   custody.
13      Q.    (By Mr. Fathi) Are you aware of any cases in
14   which the required evaluation did not take place within
15   the required time frame?
16            MS. HESMAN:   Form.   Foundation.
17            THE WITNESS:   No, I am not.
18      Q.    (By Mr. Fathi) Now, you said that the person is
19   seen by a mental health counselor.   Would that be a psych
20   associate?
21      A.    Yes.
22      Q.    Could it be an unlicensed psych associate?
23      A.    Yes, it could be.
24      Q.    Could it be any classification of mental health
25   staff besides a psych associate?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

54

1       A.    No.

2       Q.    Does this process involve a face-to-face
3  interview?

4       A.    Yes.

5       Q.    Is there a minimum amount of time that that
6  interview is expected to last?

7       A.    No.

8       Q.    What's the average amount of time those
9  interviews last?

10              MS. HESMAN:   Form.   Foundation.

11              THE WITNESS:  I don't know.  We don't keep
12  track of that.

13       Q.    (By Mr. Fathi) Is there a form that's used for
14  that interview?

15       A.    The mental health psychologist's progress note.

16       Q.    Okay.  So there's not a specific form that is
17  used for these evaluations that happen after transfer to
18  max custody; is that right?

19              MS. HESMAN:   Form.

20              THE WITNESS:   That's correct.

21              Sorry.

22       Q.    (By Mr. Fathi) Is there any requirement that the
23  psych associate conducting this interview consult with
24  either a psychologist or a psychiatrist in some
25  circumstances?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

55

1          MS. HESMAN:  Form.

2          THE WITNESS:  Unlicensed staff will always

3   be consulting with their supervisor.  Other than that,

4   they're independently licensed and able to make the

5   determination on their own.

6       Q.   (By Mr. Fathi) Okay.  So for a licensed psych

7   associate, there's no requirement that they consult with

8   a psychologist or psychiatrist; is that correct?

9       A.   That's correct.

10      Q.   And an unlicensed psych associate would have to

11  consult someone; correct?

12      A.   With their supervisor.

13      Q.   And could there -- a licensed psych associate?

14          MS. HESMAN:  Could you repeat that?  You

15  broke up again, David.

16      Q.   (By Mr. Fathi) Could the unlicensed psych

17  associate supervisor be a licensed psych associate?

18      A.   Yes.

19      Q.   Does the mental health -- does mental health

20  staff have the power to direct that a patient be removed

21  from max custody if they believe he is suffering adverse

22  mental health effects?

23          MS. HESMAN:  Form.

24          THE WITNESS:  Yes.  Absolutely.

25      Q.   (By Mr. Fathi) So they can direct that a patient

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

60

1    documents, the Internet, your phone during the break?

2              MS. HESMAN:  David, you're going to have to

3    repeat that.  We couldn't hear you.

4       Q.   (By Mr. Fathi) Doctor, during the break, did you

5    consult the Internet, your phone, any documents, any

6    source of information?

7       A.   No.  I did not.

8       Q.   Now, you testified before the break, Doctor,

9    that when mental health staff recommended that someone be

10   removed from max custody for mental health reasons, that

11   security always agreed with that decision; is that

12   correct?

13      A.   No.  That's not correct.  I said in my time that

14   I have been here, when we have recommended that someone

15   be transferred from max custody to inpatient treatment,

16   we have never had any push back from custody not allowing

17   that to occur.

18      Q.   And so in every one of those cases, the transfer

19   has occurred?

20              MS. HESMAN:  Form.  Foundation.

21              THE WITNESS:  Every case that I'm aware of,

22   yes.

23      Q.   (By Mr. Fathi) And how many such cases are you

24   aware?

25      A.   I don't keep count.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

61

1      Q.     Is it more than 50?

2      A.     Honestly I can't speculate on that, because I

3   don't keep count as to who that we're referring as coming

4   from what location and what level.   So I couldn't

5   speculate on that, sir.

6      Q.     Are you able to give me any kind of estimate?

7      A.     No.

8      Q.   Has it ever happened?

9           MS. HESMAN:   Form.

10          THE WITNESS:   Yes.

11     Q.   (By Mr. Fathi) But you don't know how many

12  times?

13     A.   No, I don't keep track of that.   We don't keep a

14  log of that, sir.

15     Q.   In a typical week, how often does it happen that

16  mental health recommends someone be removed from max

17  custody for mental health reasons?

18          MS. HESMAN:   Form.   Foundation.

19          THE WITNESS:   Again, I can't speak to that

20  because we refer people from all over the setting, all

21  over the system, from all levels of care.

22     Q.   (By Mr. Fathi) I'm asking specifically about --

23  I'm sorry?

24     A.   Every week.

25     Q.   I'm asking specifically about people who mental

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

63

1   say "detention"?

2       A.   Yes.

3       Q.   Okay.  Is there any requirement that -- for a

4   mental health evaluation before a patient can be

5   transferred to detention?

6       A.   No.  There is not.

7       Q.   All right.  Let's look at topic 2 on Exhibit 2,

8   please.

9            Topic 2 is, "The availability of the mental

10  healthcare other than medication within the ADCRR system,

11  including individual counseling, group therapy, and other

12  mental health programming."

13           Do you see that, Doctor?

14      A.   Yes, I do.

15      Q.   What did you do to prepare yourself to testify

16  on this topic?

17               MS. HESMAN:  Form.

18               THE WITNESS:  The same answer for all of

19  these questions, sir.  As I mentioned in the beginning, I

20  reviewed the mental health technical manual and the DOs

21  applicable to the EP number.  And I do not have the DOs

22  memorized as far as their numbers.

23      Q.   (By Mr. Fathi) Whom did you speak to, to prepare

24  yourself to testify on this topic?

25               MS. HESMAN:  Form.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

67

1      Q.    Okay.   Can an unlicensed psych associate provide

2  individual counseling?

3      A.    Under the supervision of their

4  independently-licensed supervisor, yes, they can.

5      Q.    Why does ADC permit unlicensed people to work as

6  psych associates?

7      A.    It's within the limitations of the rules and

8  regulations set out by the Arizona Board of Behavioral

9  Health and Human Services.   It's within their scope under

10 the supervision of an independently-licensed mental

11 health staff.

12     Q.    Why doesn't ADC require that all psych

13 associates be licensed --

14              MS. HESMAN:   David, you're going to have to

15 repeat that.

16     Q.    (By Mr. Fathi) Why doesn't ADC require that all

17 psych associates be licensed?

18              MS. HESMAN:   Form.   Foundation.

19              THE WITNESS:   Again, unlicensed are within

20 their scope of practice performing the job under the

21 supervision of an independently-licensed clinician.

22     Q.    (By Mr. Fathi) Has there ever been any

23 discussion in ADC about requiring that all psych

24 associates be licensed?

25              MS. HESMAN:   Form.   Foundation.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

68

1              THE WITNESS:  No.

2       Q.   (By Mr. Fathi) Never been discussed to your

3   knowledge?

4              MS. HESMAN:  Form.  Asked and answered.

5              THE WITNESS:  Not that I'm aware of.

6       Q.   (By Mr. Fathi) What are the minimum requirements

7   to be a substance abuse counselor?

8       A.   I don't have those minimum requirements -- I'm

9   not very knowledgeable in the minimum requirements for a

10  substance abuse counselor.  But they do not provide any

11  of the counseling provided in regards to this case.

12             MS. HESMAN:  I'll just object to this line

13  of questioning is beyond the scope of topic No. 2.  Topic

14  No. 2 discusses availability of mental health care, not

15  whether individuals who are conducting the mental health

16  care hold certain licensures.

17      Q.   (By Mr. Fathi) So, Doctor, is it your testimony

18  that substance abuse counselors do not provide individual

19  counseling?

20             MS. HESMAN:  Same objection.

21             THE WITNESS:  They do not provide any of

22  the care in the stipulations from the court --

23      Q.   (By Mr. Fathi) Yeah.  That's not my question.

24      A.   -- provide additional care.

25             MS. HESMAN:  David, please let her answer.

1    I'd appreciate it.  Thank you so much.

2              MR. FATHI:  I would really appreciate it if

3    she'd answer.

4        Q.   (By Mr. Fathi) Doctor, again, my question is:

5    Do substance abuse counselors provide individual

6    counseling?

7              MS. HESMAN:  Form.  Asked and answered.

8              THE WITNESS:  Yes.

9        Q.   (By Mr. Fathi) Okay.  And what are the minimum

10   requirements to be a substance abuse counselor?

11             MS. HESMAN:  Objection.  Beyond the scope

12   of this topic, unless you can point me to where this is

13   in another topic, David.

14             THE WITNESS:  Look, so for me in order to

15   find that information, I would go to the Arizona Board of

16   Behavioral Health Examiners.  I don't have that -- those

17   requirements memorized by any stretch of the imagination.

18       Q.   (By Mr. Fathi) Do behavioral health techs ever

19   provide individual counseling?

20       A.   No, they do not.

21       Q.   How often are patients required to receive

22   individual counseling?

23             MS. HESMAN:  Form.  Foundation.

24             THE WITNESS:  I have to get ready, because

25   it's a long answer.  I apologize.

71

```
1   counseling at least every seven days.  And these are the
2   minimums; not the maximums.
3       Q.   (By Mr. Fathi) Thank you, Doctor.  Are you aware
4   of any cases in which patients did not receive individual
5   counseling as required by the timetables you've just
6   outlined?
7                MS. HESMAN:  Form.  Foundation.  I'm also
8   objecting to any question about individual care.  David,
9   I think we have an agreement that the 30(b)(6) is about
10  policies and procedures, not about whether an individual
11  inmate received counseling on a particular day.
12               MR. FATHI:  It is also about the extent to
13  which actual practice does or does not comply with --
14  with policies.
15      Q.   (By Mr. Fathi) Would you answer the question,
16  Doctor?
17               MS. HESMAN:  Same objection.
18               THE WITNESS:  Can you ask it again?  I'm
19  sorry.
20      Q.   (By Mr. Fathi) Sure.  You outlined the frequency
21  with which people with various classifications are
22  required to receive individual counseling; correct?
23      A.   I answered the frequency in which they are
24  offered the opportunity to participate in individual,
25  confidential, out-of-cell counseling.
```

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

72

1      Q.   And my question is are you aware of any cases in

2   which patients were not, in fact, offered individual

3   counseling on the timetables required?

4              MS. HESMAN:   Form.   Foundation.   Beyond the

5   scope of the notice.

6              THE WITNESS:   Yes.

7      Q.   (By Mr. Fathi) At which facilities are you aware

8   of that happening?

9      A.   I don't remember facilities in particular.

10     Q.   Are you aware of -- facilities?

11     A.   I'm sorry, you broke up.   I couldn't hear you.

12     Q.   Are you aware of that happening at all ADC

13  facilities?

14             MS. HESMAN:   Form.   Foundation.

15             THE WITNESS:   No.   Again, I don't feel I

16  could accurately answer at this time which facilities it

17  has or has not occurred at.

18     Q.   (By Mr. Fathi) Do you track that at all?

19     A.   Yes, we do, in our monthly audits.

20     Q.   Now, you testified also that anyone regardless

21  of their mental health score if they want individual

22  counseling, they can put it in an HNR and they'll receive

23  it.   Is that right?

24     A.   Yes.   That's correct.

25     Q.   So anyone that wants counseling, they can put it

75

1    individual counseling gets individual counseling; right?

2              MS. HESMAN:  Form.  Misstates her

3    testimony.

4              THE WITNESS:  As I mentioned before, every

5    person that puts in an HNR has the opportunity to

6    participate in confidential, out-of-cell counseling

7    within five days of submitting that HNR or five days of

8    triage.

9        Q.    (By Mr. Fathi) Okay.  When putting in an HNR

10   requesting individual counseling and didn't receive it in

11   five days, within five days of triage that would be

12   contrary to policy; correct?

13       A.    That's correct.

14       Q.    Are you aware of that ever happening?

15              MS. HESMAN:  Form.  Foundation.  Exceeds

16   the scope.

17              THE WITNESS:  I certainly can't speak to

18   every HNR that has ever been submitted.

19       Q.    (By Mr. Fathi) Could you answer my question?

20       A.    Am I aware of that ever not occurring?  I would

21   say yes.

22       Q.    At what facilities are you aware of that not

23   occurring?

24       A.    Again, like I said, we provide all the CGAR data

25   to you all.  And we measure that monthly.  And it

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

76

1    includes that data as well.  I can't speak to at this

2    time a category in my head of this -- this facility, not

3    this facility, this facility.  All of that is documented

4    very, very thoroughly every single month.

5         Q.   If a patient requests individual counseling more

6    than his mental health score would indicate, is that more

7    frequent counseling provided?

8              MS. HESMAN:  David, you're going to have to

9    repeat that.  You broke up again.

10        Q.   (By Mr. Fathi) If a patient requests individual

11   counseling more frequently than would normally be

12   provided based on his mental health score, is that more

13   frequent counseling provided?

14             MS. HESMAN:  Form.  Foundation.

15             THE WITNESS:  Yes.

16        Q.   (By Mr. Fathi) Is it provided in every case?

17        A.   I can't speak to every case.

18        Q.   Are you aware of any cases where patients did

19   not receive mental health counseling, individual

20   counseling, because of a lack of mental health staff?

21             MS. HESMAN:  Form.  Foundation.

22             THE WITNESS:  Yes.

23        Q.   (By Mr. Fathi) And what facilities did that

24   occur at?

25        A.   Eyman.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

77

1      Q.    Any other facilities?

2      A.    Not that I'm aware of.

3      Q.    When did this occur at Eyman?

4      A.    Not inclusive of, but in the summer of this

5   year.

6      Q.    Summer of 2021?

7      A.    Yes.

8      Q.    What's the most recently you remember this

9   occurring at Eyman?

10     A.    July of 2021.

11     Q.    Are you aware of any cases where a patient

12   didn't receive individual counseling because there was a

13   lack of custody staff?

14            MS. HESMAN:  Form.  Foundation.

15            THE WITNESS:  No, I'm not.

16     Q.    (By Mr. Fathi) To your knowledge, that's never

17   happened?

18            MS. HESMAN:  Form.  Asked and answered.

19   Foundation.

20            THE WITNESS:  I'm not aware of that

21   occurring.

22     Q.    (By Mr. Fathi) Are you aware of any periods

23   during which individual counseling was suspended at a

24   given complex or unit?

25            MS. HESMAN:  Form.  Foundation.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

78

```
1              THE WITNESS:  No.  I'm not.
2       Q.   (By Mr. Fathi) Who provides group therapy in
3    ADC?
4              MS. HESMAN:  Form.
5              THE WITNESS:  So all of the therapy
6    services are provided by psych associates and then,
7    again, or the substance abuse counselors.
8       Q.   (By Mr. Fathi) Do behavioral health technicians
9    run mental health groups?
10      A.   You're asking about two separate topics.  So you
11   said therapy groups, and then you said mental health
12   groups.  So if you could specify what you mean for both,
13   that would be helpful for me.
14      Q.   All right.  Who runs mental health groups in the
15   Arizona Department of Corrections?  What job
16   classifications?
17      A.   So, again, mental health groups are provided by
18   the substance abuse counselors and the psych associates.
19   I would say educational groups are provided by BHTs as
20   well as CO-IIIs.
21      Q.   And what's the difference between mental health
22   groups and educational groups?
23      A.   Mental health groups, I would consider those to
24   be psychotherapeutic, not just psychoeducational or not
25   just educational.  So there's a therapeutic process to
```

1    them that is done by the licensed or -- actually licensed

2    staff, and then there are the educational groups that are

3    done by the others.

4        Q.   Are unlicensed psych associates allowed to run

5    mental health groups?

6        A.   Under the supervision of an

7    independently-licensed professional, yes.

8        Q.   What are the minimum educational and background

9    requirements to be a behavioral health technician?

10               MS. HESMAN:  Form.  Foundation.  Exceeds

11   the scope of the topic.

12               THE WITNESS:  The behavioral health

13   technicians, I believe they have to have some --

14   actually, I'm not very familiar with the exact

15   qualifications for the BHT.  And I don't want to misspeak

16   on that.

17       Q.   (By Mr. Fathi) BHTs are considered mental health

18   staff; correct?

19       A.   That is correct.

20       Q.   What are the minimum requirements to be a

21   CO-III?

22               MS. HESMAN:  David, can you tell me what

23   topic area asks for this information?

24               THE WITNESS:  The CO --

25               MS. HESMAN:  Hold on.  David, what's --

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

81

1    requirements to be a CO-III?

2        A.   I don't know.  I don't --

3             MS. HESMAN:  Don't answer that.  I'm going

4    to instruct her not to answer that question.

5        Q.   (By Mr. Fathi) CO-IIIs are allowed to run mental

6    health groups; is that correct?

7        A.   No, it is not.

8        Q.   What groups do CO-IIIs run?

9        A.   Educational groups.

10       Q.   How many --

11       A.   And BHTs -- sorry.

12       Q.   I'm sorry?

13       A.   The same with BHTs.  BHTs and CO-IIIs do not --

14   do not run mental health groups.  They only run

15   educational groups.

16       Q.   How many people are typically in a mental health

17   group?

18             MS. HESMAN:  Form.  Foundation.  What do

19   you mean by "people"?

20       Q.   (By Mr. Fathi) How many participants are

21   typically in a mental health group?

22             MS. HESMAN:  Same objection.

23             THE WITNESS:  It varies.  It can be

24   anywhere from two to 20, I would say.

25       Q.   (By Mr. Fathi) Is there a maximum number?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

82

1      A.    It would depend on the type of group and the

2  setting.

3      Q.    So tell me what the maximum numbers are for

4  various types of groups.

5            MS. HESMAN:   Form.   Foundation.

6            THE WITNESS:   I don't have those laid out

7  for you.   Like I said, it would be anywhere from two to

8  20.   The higher numbers being the educational groups.

9  The lower numbers being the therapy groups.

10     Q.    (By Mr. Fathi) Okay.   And I'm asking, is there

11 any maximum number of participants, any number beyond

12 which you say, "We don't want more than 10 participants

13 in a group"?

14     A.    20.

15     Q.    20 is the maximum?

16     A.    Sure.

17     Q.    How long do groups typically last?

18            MS. HESMAN:   Form.   Foundation.

19            THE WITNESS:   From 30 to 90 minutes.

20     Q.    (By Mr. Fathi) Do these groups have a written

21 lesson plan or syllabus?

22            MS. HESMAN:   Form.   Foundation.

23            THE WITNESS:   Some do.   Some do not.

24     Q.    (By Mr. Fathi) And what's the difference between

25 those that do and those that do not?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

83

1      A.    They can -- one of them may be more manualized
2    than the other.
3      Q.    So is it permissible for a mental health group
4    to not have a written lesson plan or syllabus?
5      A.    Yes.
6      Q.    How often are patients supposed to receive group
7    therapy?
8              MS. HESMAN:   Form.   Foundation.
9              THE WITNESS:   In the residential treatment
10   setting, they are offered group therapy or out-of-cell
11   structured activities.   So let me get my Rolodex working
12   here.   One moment.
13             So they are offered a psychoeducational
14   group, a psychotherapy group, and an educational group.
15   Again, educational from the CO-III, the psychoeducational
16   from the BHTs, and the psychotherapy group from the
17   mental health staff.
18             In the residential setting, they're offered
19   those on a weekly basis.   And on an inpatient, they're
20   offered structured, out-of-cell time that may include
21   those groups on a daily basis.
22     Q.    (By Mr. Fathi) Are you aware of any cases in
23   which patients were not offered group therapy on the
24   schedule that you just outlined?
25             MS. HESMAN:   Form.   Foundation.   Outside

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

84

1    the scope.

2                        THE WITNESS:   Yes.

3        Q.    (By Mr. Fathi) At which complexes are you aware

4    of that happening?

5        A.    Different complexes.

6        Q.    List them, please.

7        A.    Eyman, Tucson, and Phoenix.

8        Q.    When did this most recently occur at Eyman?

9        A.    It was -- only occurred when there were

10   COVID-positive cases that would put the inmates or staff

11   at risk.

12       Q.    Could you answer my question?

13                       MS. HESMAN:   She just did.

14                       THE WITNESS:   The last --

15                       MS. HESMAN:   Ask a different question.   Ask

16   a different question.

17                       MR. FATHI:   No.

18       Q.    (By Mr. Fathi) My question is:   When did this

19   most recently occur at Eyman?

20                       MS. HESMAN:   Form.   Foundation.   Asked and

21   answered.

22                       THE WITNESS:   The last time there were

23   confirmed COVID cases that would have put staff or

24   inmates in danger.

25       Q.    (By Mr. Fathi) And when was that?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

85

1      A.    You know by now, the dates -- I'm not going to

2   have a specific date for you.  I would say the beginning

3   of the summer.

4      Q.    Of 2021?

5      A.    Yes.

6      Q.    When was the most recent time this occurred at

7   Tucson?

8      A.    I just answered that.

9      Q.    I'm sorry.  Then my question was when -- I

10  thought you were answering about Eyman.

11     A.    Oh, that's for all locations.

12     Q.    Okay.  So the most recent time this occurred at

13  Eyman, Tucson, and Phoenix, for all three was the summer

14  of this year?

15     A.    The beginning of the summer of this year.

16     Q.    Are you aware of any cases in which group

17  therapy was canceled because of a lack of mental health

18  staff?

19            MS. HESMAN:  Form.  Foundation.

20            THE WITNESS:  Yes.

21     Q.    (By Mr. Fathi) And which facilities did that

22  happen at?

23     A.    At Eyman.

24     Q.    Any others?

25     A.    No.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

86

1    Q.    When was the last time this occurred at Eyman?

2    A.    This summer.   July.

3    Q.    Are you aware of any cases in which a patient

4    didn't receive group therapy because of a lack of custody

5    staff?

6              MS. HESMAN:   Form.   Foundation.

7              THE WITNESS:   No, I'm not.

8    Q.    (By Mr. Fathi) Are you aware of any periods

9    during which group therapy was suspended at a given

10    prison or unit?

11    A.    No, I'm not.

12    Q.    Is there any other kind of mental health

13    programming offered in ADC other than medication -- the

14    individual -- we discussed or the group therapy we've

15    discussed?

16              MS. HESMAN:   David, you're going to have to

17    repeat yourself.   You broke up again.

18    Q.    (By Mr. Fathi) Doctor, other than medication,

19    the individual counseling we've discussed, and the group

20    therapy we've discussed, is there any other kind of

21    mental health programming provided in ADC?

22    A.    So as we mentioned, there's individual, group,

23    crisis -- crisis intervention.   There's psychotherapy

24    group, psychoeducational group, educational group.

25              In addition, they have self-help modules that

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

87

1    they can assess on their tablets.  And we do -- of

2    course, we have all the release planning as well.

3             I think that covers everything.

4        Q.   And that's all considered mental health

5    programming?

6        A.   I would say those are all services that better

7    their mental health.

8        Q.   All right.

9        A.   I don't know what you mean by "mental health

10   programming," or are going to somehow tie that in, in

11   some weird way that is not accurate.

12       Q.   Is there any other kind of mental health

13   programming in ADC other than what you've already

14   discussed?

15       A.   Not that I can think of at the moment.

16       Q.   Do all incarcerated people at ADC have tablets?

17       A.   No.

18       Q.   Let's turn to topic 3, please, on Exhibit 2.

19   Topic 3 is, "Policies and procedures regarding language

20   interpretation services provided to incarcerated persons

21   who are not fluent in English, in mental health care

22   encounters, including individual counseling, group

23   therapy, other mental health programming, and in

24   encounters with incarcerated persons placed on mental

25   health watch."

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

89

1      Q.    Are you the most knowledgeable person in ADC
2  about this topic?
3                MS. HESMAN:   Form.   Foundation.
4                THE WITNESS:   I cannot speak to anybody
5  else's knowledge of the topic.
6      Q.    (By Mr. Fathi) Who might be more knowledgeable
7  than you about this topic in the --
8                MS. HESMAN:   Form.   Foundation.
9                THE WITNESS:   I don't know.
10     Q.    (By Mr. Fathi) Is there a written ADC policy on
11  this topic?
12     A.    There is instruction in the mental -- medical
13  services technical manual.
14     Q.    Is there any other written ADC policy on this
15  topic?
16     A.    DO 1101.
17     Q.    What's the title of DO 1101?
18     A.    It's the medical services department order.
19     Q.    And it discusses language interpretation?
20     A.    It refers you to the medical services technical
21  manual that does specifically speak about interpreter
22  services.
23     Q.    Does any other written ADC policy specifically
24  speak about interpreter services other than the mental
25  health technical manual -- I'm sorry, the medical

1    technical manual?

2        A.    Medical services technical manual.

3            I believe it is also listed in a DO, but I don't

4    remember the number.  We focus mainly on the tech

5    manuals, and custody focuses mainly on the department

6    orders.

7        Q.    Is there a written Centurion policy on this

8    topic?

9                MS. HESMAN:  Form.  Foundation.

10               THE WITNESS:  I don't know.

11       Q.    (By Mr. Fathi) How does ADC identify prisoners

12   who are not fluent in English?

13       A.    When individuals come in and they receive their

14   assessment, the clinician, whether they be medical or

15   mental health, are required to answer on each and every

16   note if they require interpreter services and what

17   services were provided.

18           And then on the front page of their health

19   record, it has that indication that interpreter services

20   are required.

21       Q.    And where are those requirements written down?

22               MS. HESMAN:  Form.

23               THE WITNESS:  You cannot continue on the

24   form without answering these questions.

25       Q.    (By Mr. Fathi) But my question is --

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

92

1          A.    It's all under interpreter services, yes.

2          Q.    And you said that there was a field in the -- in

3     the medical record note to check whether or not the

4     patient requires interpreter services; is that right?

5          A.    That's correct.

6          Q.    In your experience, are those -- is that field

7     always filled out accurately?

8                    MS. HESMAN:   Form.   Foundation.

9                    THE WITNESS:   As mentioned, it has to be

10    completed in order for the form to be completed.   I have

11    not seen it completed incorrectly.

12         Q.    (By Mr. Fathi) Never seen that happen?

13         A.    No.   Not in the charts that I have reviewed, I

14    have not seen that.

15         Q.    How does ADC identify healthcare staff who are

16    proficient in a language other than English?

17         A.    I know that ADC healthcare services require --

18    uses the interpreter line primarily as opposed to

19    individuals providing that interpreter service.

20         Q.    But some healthcare staff do provide

21    interpretation service; correct?

22         A.    Some healthcare staff, yes, sir.

23         Q.    And some mental health staff?

24         A.    Yes.

25         Q.    So my question is:   How does ADC identify mental

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

93

```
 1    health staff who are competent to provide interpretation
 2    services?
 3                 MS. HESMAN:  You're going to have to repeat
 4    that, David.
 5        Q.   (By Mr. Fathi) How does ADC identify mental
 6    health staff who are competent to provide interpretation
 7    services?
 8                 MS. HESMAN:  Form.
 9                 THE WITNESS:  I don't know.
10        Q.   (By Mr. Fathi) If a mental health staff member
11    says that he or she is proficient in another language,
12    how is that tested?
13                 MS. HESMAN:  Form.
14                 THE WITNESS:  You -- you broke up.
15                 MS. HESMAN:  And I couldn't hear the last
16    piece of that.
17        Q.   (By Mr. Fathi) How does ADC identify healthcare
18    staff who are proficient in sign language?
19        A.   I don't know that there are any.
20        Q.   So you're not aware of any ADC healthcare staff
21    ever communicating with a patient in sign language?
22        A.   No, I'm not.
23        Q.   What is ADC policy on the provision of language
24    interpretation for mental health services for patients
25    who are not proficient in English?
```

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

94

1              MS. HESMAN:  Form.

2              THE WITNESS:  I thought that we had

3    answered that already.  That the interpreter services be

4    provided if needed and documented that they have been

5    provided as mentioned earlier.

6         Q.   (By Mr. Fathi) And what is the policy on

7    provision of language interpretation for mental health

8    services for patients who are deaf and communicate using

9    sign language?

10             MS. HESMAN:  Form.

11             THE WITNESS:  The use of interpreters.

12        Q.   (By Mr. Fathi) And who serves as interpreters?

13             MS. HESMAN:  Form.  Foundation.

14             THE WITNESS:  Either healthcare staff or

15   the language line.

16        Q.   (By Mr. Fathi) I'm sorry.  I thought you just

17   testified that you weren't aware of any healthcare staff

18   providing sign language interpretation.

19        A.   Well, you didn't specify sign language this

20   time.

21        Q.   All right.  Let's back up.  How is sign language

22   interpretation provided for mental health services for

23   patients who are deaf?

24             MS. HESMAN:  Form.  Foundation.

25             THE WITNESS:  That would have to be

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

95

1  contracted out, to my knowledge, unless there is someone

2  in ADCRR who is fluent in ASL.

3      Q.   (By Mr. Fathi) Is it permissible to use custody

4  staff to interpret for mental health services?

5      A.   Only in emergencies.  And that's in line with

6  NCCH standards -- NCCHC standards as well.  Excuse me.

7      Q.   Are you aware of any cases -- are you aware of

8  any cases in which custody staff have been used to

9  interpret for mental health services?

10              MS. HESMAN:  Form.  Foundation.

11              THE WITNESS:  No, I'm not.

12      Q.   (By Mr. Fathi) Is it permissible for

13  incarcerated people to interpret for mental health

14  services?

15              MS. HESMAN:  You're going to have to

16  repeat.

17      Q.   (By Mr. Fathi) Is it permissible to use

18  incarcerated people to interpret for mental health

19  services?

20      A.   No, it is not.

21      Q.   Are you aware of it ever happening, that

22  incarcerated people were used to interpret for mental

23  health services?

24              MS. HESMAN:  Form.  Foundation.

25              THE WITNESS:  No, I am not.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

96

1       Q.   (By Mr. Fathi) Is there access to video phones

2  in all locations where mental health services are

3  provided?

4               MS. HESMAN:  Form.  Foundation.

5               THE WITNESS:  There are access to -- there

6  is access to phones and interpreter services everywhere

7  that inmates are located.

8       Q.   (By Mr. Fathi) My question, though, is are there

9  video phones in all places where mental health encounters

10  are held?

11              MS. HESMAN:  Form.

12              THE WITNESS:  I don't know the answer to

13  that question.

14       Q.   (By Mr. Fathi) And you said that for deaf

15  patients, the language line would be used?

16       A.   No, I didn't.  I said that that would have to be

17  contracted out unless we have somebody on staff that's

18  fluent in ASL.

19              MS. HESMAN:  And, David, the topic talks

20  about those who are not fluent in English.  Can you show

21  me where it says that it also includes deaf individuals?

22              MR. FATHI:  Deaf people are not fluent in

23  English.  They communicate using a different language.

24              MS. HESMAN:  I think I would disagree with

25  that.  It says they're not fluent in the English

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

97

```
 1    language.  Just because someone's deaf doesn't mean that
 2    they're not fluent in English.
 3                  MR. FATHI:  I think you need to learn a
 4    little bit more about deaf culture, Ashlee.
 5                  MS. HESMAN:  Okay.
 6        Q.    (By Mr. Fathi) Doctor, is it permissible for
 7    mental health staff to communicate with deaf patients by
 8    writing notes?
 9                  MS. HESMAN:  Objection.  Beyond the scope
10    of the topic.
11                  THE WITNESS:  Yes.
12        Q.    (By Mr. Fathi) That is permissible?
13        A.    Yes.
14        Q.    Are you aware of any cases in which a patient
15    who was not fluent in English did not receive
16    interpretation for a mental health encounter?
17                  MS. HESMAN:  Form.  Foundation.
18                  THE WITNESS:  No.  I'm not aware of any
19    cases like that.
20        Q.    (By Mr. Fathi) Are you aware of any cases in
21    which a patient who is deaf did not receive
22    interpretation for a mental health encounter?
23                  MS. HESMAN:  Form.  Foundation.  Beyond the
24    scope.
25                  THE WITNESS:  No, I am not.
```

**30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021**

101

```
 1              Do you see all three of those topics, Doctor?

 2       A.   Yes.

 3       Q.   What did you do to prepare yourself to testify

 4   on these topics?

 5               MS. HESMAN:  Objection.  Asked and

 6   answered.

 7               THE WITNESS:  Reviewed the mental health

 8   technical manual and the related DOs.

 9       Q.   (By Mr. Fathi) And which DOs are those?

10       A.   On max custody and isolation.

11       Q.   And what numbers are those?

12       A.   I don't remember what numbers they are.

13       Q.   Whom did you speak to to prepare for testifying

14   on this topic?

15               MS. HESMAN:  Form.  Asked and answered.

16               THE WITNESS:  Ms. Hesman.

17       Q.   (By Mr. Fathi) I'm sorry, could you answer

18   again, Doctor?

19       A.   Ms. Hesman.

20       Q.   Anyone else?

21       A.   No.

22       Q.   How much time did you spend preparing yourself

23   to testify on this topic?

24               MS. HESMAN:  Form.  Asked and answered.

25               THE WITNESS:  12 hours preparing for all
```

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

102

```
 1    topics.  Did not keep track of each topic individually.
 2         Q.   (By Mr. Fathi) Are you the most knowledgeable
 3    person in ADC about this topic?
 4                   MS. HESMAN:  Form.  Foundation.
 5                   THE WITNESS:  I cannot speak to the
 6    knowledge of anybody else in regards to this policy.  So
 7    to make a comparison as to my knowledge versus somebody
 8    else's would not be accurate.
 9         Q.   (By Mr. Fathi) Who in ADC might know more than
10    you about this topic?
11                   MS. HESMAN:  Form.  Foundation.
12                   THE WITNESS:  I don't know.
13         Q.   (By Mr. Fathi) Is there a written ADC policy on
14    this topic?
15                   MS. HESMAN:  Which topic?
16                   MR. FATHI:  On any of these topics.
17                   THE WITNESS:  Can you be more specific?
18         Q.   (By Mr. Fathi) Is there a written ADC policy
19    that pertains to any aspect of the three topics that
20    we're discussing?
21         A.   Yes.
22         Q.   And what is that?
23         A.   There are ADC policies for all of the topics
24    that you mentioned.
25         Q.   And what policies are those?
```

1        A.    The mental health technical manual, the

2    isolation or max custody DOs, the watch DOs, and I would

3    say the healthcare services DO as well.

4        Q.    Any others?

5        A.    There may be others, but I cannot remember them

6    at this time.

7        Q.    Is there a written Centurion policy on any of

8    those topics?

9                  MS. HESMAN:   Form.   Foundation.

10                 THE WITNESS:   I don't know.

11       Q.    (By Mr. Fathi) How do incarcerated people access

12   mental healthcare?

13       A.    As mentioned already, every single person that

14   comes into the system is assessed for current or past

15   symptoms of mental health, mental illness and needs for

16   mental health treatment.

17            And then once they are incarcerated, they have

18   the opportunity to be assessed and treated any time

19   during that incarceration from start to finish via HNR or

20   referral, or scheduled appointments based on their level

21   of care.

22       Q.    Now, you mentioned the HNR process.   Are HNRs

23   supposed to be triaged within a certain amount of time?

24       A.    We already answered that earlier.   They're

25   triaged face-to-face within 24 hours.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

104

1      Q.    And that applies to mental health HNRs also?

2      A.    That's correct.

3      Q.    Are you aware of any cases in which those time

4   frames were not met?

5             MS. HESMAN:   Form.  Foundation.

6             THE WITNESS:   Yes.

7      Q.    (By Mr. Fathi) At what facilities are you aware

8   of that happening?

9      A.    Lewis.

10     Q.    Where else?

11     A.    I cannot think of any others in particular.

12     Q.    So your testimony is that Lewis is the only

13  facility you're aware of this happening?

14            MS. HESMAN:   Form.  Misstates her

15  testimony.

16            THE WITNESS:   No.  I cannot state that

17  that's the only place that has happened, but that is the

18  only place that I remember in particular that having

19  occurred.

20     Q.    (By Mr. Fathi) Which is the last time you're

21  aware of this occurring at Lewis?

22     A.    Early this year.

23     Q.    Early in 2021?

24     A.    Yes.

25     Q.    Are there any specific policies about the

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

107

1    checks as described earlier.

2        Q.   So is it your testimony that the 24- or 48-hour

3    assessment that applies to people transferred to max

4    custody also applies to people transferred to detention?

5        A.   Yes.

6        Q.   Okay.  And where is that written down?

7        A.   In the mental health technical manual.

8        Q.   And then the requirement that people in for 805

9    reasons be seen every 30 days, is that also written down

10   in the mental health technical manual?

11       A.   Yes.  As well as the department order that

12   speaks to the 805 process.

13       Q.   Any other requirements pertain specifically to

14   mental health services for people in detention?

15              MS. HESMAN:  Form.

16              THE WITNESS:  Not that I can think of at

17   this time.

18       Q.   (By Mr. Fathi) Are mental health groups offered

19   in detention?

20              MS. HESMAN:  Form.  Foundation.

21              THE WITNESS:  Not that I'm aware of.

22              MR. FATHI:  Let's take a five-minute break.

23              MS. HESMAN:  Okay.  Just a quick question.

24   Are you going to be okay with a brief lunch break, like,

25   25, 30 minutes, maybe, in the next hour or so?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

109

1      Q.    Doctor, are you familiar with the term "close
2   management"?

3      A.    Yes.

4      Q.    What's your understanding of close management?

5      A.    It is kind of -- and this is more a custody term
6   than -- very far from a mental health term.  But my
7   understanding from the mental health lens is it's kind of
8   in between medium and max custody.

9      Q.    Okay.  Are there any policies that relate
10   specifically to the provision of mental healthcare to
11   people who are --

12              MS. HESMAN:  Sorry, can you repeat that?

13      Q.    (By Mr. Fathi) Are there any policies that
14   relate specifically to the provision of mental healthcare
15   to people that are in close management?

16      A.    So if you're referring to the level of custody
17   overall that all people classified as that, they're
18   classified -- they're treated the same as the -- the rest
19   of the population.

20              I'm not sure if that's what you're referring to
21   or not.  But if that's what you're referring to is that
22   overall classification similar to minimum, medium,
23   maximum, and then that whole entire classification of
24   close, they -- they are treated the same.

25      Q.    Well, you testified --

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

110

1      A.    As far as the provision of mental health
2   services.
3      Q.    You testified about some policies that pertain
4   specifically to max custody; right?
5      A.    Yes.
6      Q.    And you testified about some policies that
7   pertain specifically to detention; right?
8      A.    Right.
9      Q.    So now my question is are there similarly
10   policies about mental health services that pertain
11   specifically to close management?
12      A.    I'm not sure that I'm understanding what you're
13   meaning by close management, because we do have special
14   programs.   That's one thing.
15         But close management as just a custody level,
16   they're not max custody.   So I'm not sure what you're
17   asking there.
18      Q.    What I'm asking is are there any policies
19   pertaining to the provision of mental healthcare to
20   people in close management, similar to the policies that
21   you've described that pertain to people in max custody or
22   detention?
23      A.    I would say they are not in max custody, so
24   unless you're referring to a specific program, there is
25   not.

1   classifying, reclassifying, or identifying incarcerated

2   persons as SMI, MH-3 through MH-5, or any other mental

3   health classification employed by ADCRR or Centurion."

4           Do you see that, Doctor?

5       A.   Yes.  I do.

6       Q.   And if I were to ask you what you did to prepare

7   yourself to testify on this topic, would your answer be

8   the same as -- as the one you have given with respect to

9   other topics?

10      A.   Absolutely.

11      Q.   Is there a written ADC policy on the

12  classification as patients -- of patients as SMI or on

13  the MH-1 through 5 scale?

14               MS. HESMAN:   Form.

15               THE WITNESS:   Yes.

16      Q.   (By Mr. Fathi) And what is that policy?

17      A.   DO 1103 of the mental health technical manual.

18      Q.   Anything else?

19      A.   Those are the guiding policies.

20      Q.   Are there any other policies?

21      A.   Not that I'm aware of off the top of my head at

22  the moment.

23      Q.   Is there a written Centurion policy on the

24  classification of patients as SMI or on the MH-1

25  through 5 scale?

1              MS. HESMAN:  Form.  Foundation.

2              THE WITNESS:  I don't know.  They're

3     required to follow all of our policies and procedures.

4        Q.   (By Mr. Fathi) But you don't know if there's a

5     separate Centurion policy on this?

6        A.   I do not.

7        Q.   Who makes the decision whether someone is SMI or

8     not SMI?

9              MS. HESMAN:  Form.  Foundation.

10             THE WITNESS:  There are two avenues for an

11     individual to be deemed SMI.  One would be by the

12     regional behavioral health authority in the community.

13             If that occurs, then their SMI designation

14     is carried on throughout their incarceration.  So that's

15     one designation.

16             And then the second designation would occur

17     within the system by a mental health counselor.  Or a

18     psych associate -- my apologies -- or a psychologist.

19        Q.   (By Mr. Fathi) Does assessment of a person for

20     possible SMI status happen upon intake?

21             MS. HESMAN:  Form.  Foundation.

22             THE WITNESS:  Yes.

23        Q.   (By Mr. Fathi) Is it a separate process or is it

24     part of the same mental health intake process we

25     discussed earlier?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

114

1      A.   It's part of the same process as well as the

2   electronic feed that we get from the regional behavioral

3   health authority.

4      Q.   And what about the classification of a person on

5   the MH-1 through 5 scale?  Who makes that decision?

6      A.   The psych associate, psychologist, or

7   psychiatrist or -- medical provider.

8      Q.   And is that done on intake?

9      A.   That is one of the -- one of the opportunities

10   for that to occur as well as the SMI that can occur

11   through their incarceration.

12      Q.   Is everyone coming in to ADC assigned an MH-1

13   through 5 score upon intake?

14      A.   Yes.  Uh-huh.

15      Q.   And is that a separate process or is it part of

16   the mental health intake process we've already discussed?

17      A.   It's part of the mental health intake process we

18   discussed.

19      Q.   So it's done by the same staff as carry out

20   the -- the general mental health intake process?

21      A.   That's -- yes, that's correct.

22      Q.   Is a person's SMI status, whether or not they're

23   SMI, is that periodically reviewed?

24           MS. HESMAN:   Form.

25      Q.   (By Mr. Fathi) I'm sorry.  I just didn't hear

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

115

1  your answer, Doctor?

2      A.   Yes.

3      Q.   At what intervals?

4      A.   I would say it's their level of care overall is

5  reviewed at every visit.

6      Q.   My question was specifically about their status

7  as SMI.  Is that reviewed on a fixed interval, say every

8  six months, or is it your testimony that on every visit

9  their status as SMI or not SMI is reviewed?

10     A.   It is reviewed on every visit.

11     Q.   And what sort of notation is made in the record

12  about their review of their SMI status?

13               MS. HESMAN:  Form.  Foundation.

14               THE WITNESS:  Their review of their overall

15  mental health is documented in the visit, and that

16  determines whether they're classified as SMI or any other

17  level of care.

18     Q.   (By Mr. Fathi) So there's no separate review of

19  their SMI status that's documented in the record; is that

20  correct?

21               MS. HESMAN:  Form.

22               THE WITNESS:  I think I explained how it's

23  reviewed, as well as during the treatment team.  It's

24  reviewed during the treatment team as well.

25     Q.   (By Mr. Fathi) Who's on the treatment team?

1              MS. HESMAN:  Form.  Foundation.

2              THE WITNESS:  It depends on the patient's

3    needs.  At minimum, it is the counselor and the patient.

4    If needed, it also includes psychiatry, medical and

5    custody depending on the patient's needs.

6         Q.   (By Mr. Fathi) So the treatment team could be

7    just the counselor and the patient; is that right?

8         A.   That's true.

9         Q.   Okay.  Is that the case in the majority of

10   cases; do you think?

11             MS. HESMAN:  Form.  Foundation.

12             THE WITNESS:  I can't speak to the majority

13   of the cases, because I haven't reviewed all of them.

14        Q.   (By Mr. Fathi) What level of health staff has

15   the authority to make someone SMI who was not previously

16   SMI?

17        A.   Licensed mental health staff, so either a

18   licensed psych associate or a psychologist.

19        Q.   Can a licensed psych associate do that

20   unilaterally without the approval of anybody else?

21        A.   Licensed -- an independently-licensed counselor

22   would have that ability, and it's within their scope of

23   practice.

24        Q.   And who has the authority to remove someone's

25   SMI designation, assume -- assume they weren't SMI in the

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

117

1    community.   Who has the authority to remove that SMI

2    designation?

3        A.    It would be the same as the designation.

4        Q.    So a licensed psych associate could remove

5    someone's SMI designation?

6        A.    That's correct.

7        Q.    If someone's SMI designation has been removed,

8    is that reviewed by anyone else on the mental health

9    staff?

10       A.    It may or may not be.

11       Q.    Is there a policy that requires that the removal

12   of someone's SMI designation be reviewed by someone other

13   than the clinician who made the decision?

14       A.    There's no policy that I'm aware of.

15       Q.    How often does it happen that someone's SMI

16   designation is removed?

17               MS. HESMAN:   Sorry.   I didn't hear the last

18   part.

19       Q.    (By Mr. Fathi) How often does it happen that

20   someone's SMI designation is removed?

21               MS. HESMAN:   Form.   Foundation.

22               THE WITNESS:   I can't speak to everyone,

23   but from my knowledge, very, very rarely.

24       Q.    (By Mr. Fathi) Is that tracked at all?

25       A.    No.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

118

1   Q.   Can custody staff request that a patient's SMI
2   designation be removed?
3   A.   Anybody can request anything they would like.
4   Q.   Has it ever happened to your knowledge that
5   custody staff has requested that a patient's SMI
6   designation be removed?
7           MS. HESMAN:  Form.  Foundation.
8           THE WITNESS:  No.
9   Q.   (By Mr. Fathi) What percentage of the Arizona
10  prison population is classified SMI, approximately?
11          MS. HESMAN:  Form.  Foundation.
12          THE WITNESS:  I think approximately six.
13  Q.   (By Mr. Fathi) Six percent?
14  A.   I think.
15  Q.   And how does the percentage of the incarcerated
16  population classified as SMI in Arizona compare to that
17  in other state prison systems?
18          MS. HESMAN:  Form.  Foundation.
19          THE WITNESS:  I don't know.
20          MS. HESMAN:  Beyond the scope.
21  Q.   (By Mr. Fathi) Have you ever looked into that,
22  Doctor?
23          MS. HESMAN:  Form.  Foundation.  Beyond the
24  scope.
25          THE WITNESS:  No, I have not.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

119

1      Q.    (By Mr. Fathi) You used to work in the
2  California prison system; correct?
3      A.    That's correct.
4      Q.    How does the percentage of the population
5  classified as SMI in Arizona prisons compare to the
6  percentage of the population with a similar diagnosis or
7  designation in the California prisons?
8              MS. HESMAN:   David, how is that relevant to
9  Topic 5?  If you can show me where it is, I'll -- I just
10  don't see how other -- other systems are included within
11  your topic area.
12              MR. FATHI:   It's relevant to the process
13  that's used to add or more relevantly remove the SMI
14  designation.
15      Q.    (By Mr. Fathi) Could you answer the question,
16  Doctor?
17              MS. HESMAN:   I'm objecting as beyond the
18  scope.
19              THE WITNESS:   I don't know.
20      Q.    (By Mr. Fathi) All right.  Let's go back to
21  Exhibit 2, Topic 6, please.
22              Topic 6 is, "Policies and procedures for
23  restrictions or limitations on housing of incarcerated
24  persons classified, reclassified or identified as SMI,
25  MH-3 through MH-5, or any other mental health

120

1   classification employed by ADCRR or Centurion, including

2   restrictions or limitations on housing of such

3   incarcerated persons in isolation."

4           Do you see that, Doctor?

5       A.   I do.

6       Q.   If I were to ask you how you prepared to testify

7   on this topic, would your answer be the same as the

8   answer you have previously given?

9       A.   Yes, it would.

10      Q.   Are you the most knowledgeable in -- person in

11  ADC about this topic?

12           MS. HESMAN:  Form.  Foundation.

13           THE WITNESS:  I'm going to say the same

14  thing I said every other time.  I can't speak to anybody

15  else's knowledge about the topic.

16      Q.   (By Mr. Fathi) Is there any written policy

17  restricting the housing of patients classified as SMI in

18  max custody?

19      A.   No.

20      Q.   To your knowledge are there some patients who

21  are classified SMI who are housed in max custody?

22      A.   Yes.

23      Q.   Is there any written policy restricting or

24  limiting the housing of patients classified SMI in

25  detention?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

121

1      A.    No.

2      Q.    To your knowledge are there some patients who

3  are classified as SMI housed in detention?

4      A.    Yes.

5      Q.    Is there any written policy restricting or

6  limiting the housing of patients with certain MH scores

7  in max custody?

8      A.    No.

9      Q.    Is there any written policy restricting --

10     A.    Oh, so wait.   Wait.   Wait.   Wait.   No, that's

11  not true.   Because MH-4s and 5s are in inpatient housing.

12  I'm sorry.   MH-4s are in residential, and MH-5 are in

13  inpatient --

14     Q.    Okay.

15     A.    -- where folks would go if they were

16  inappropriate for any kind of max or isolative housing.

17     Q.    Okay.   And is it your custody that none of the

18  MH-4 or MH-5 units are classified as max custody?

19              MS. HESMAN:   Can you repeat that, David?   I

20  think you misspoke.   You used the word "custody."

21     Q.    (By Mr. Fathi) Is it your testimony, Doctor,

22  that none of the MH-4 or MH-5 housing units are

23  classified as max custody?

24     A.    Again, that's kind of more on the custody side.

25  However, the MH-4s and 5s are in inpatient licensed

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

122

1    settings.

2         Q.    And is one of those inpatient settings or

3    residential settings the Kasson unit?

4         A.    No.

5         Q.    Is one of those settings the -- the Rincon unit

6    at Tucson?

7         A.    Yes.

8         Q.    Okay.   And that is a max custody unit; correct?

9         A.    You know, I'm not sure how they left that.

10   However -- or where that stands on the custody side.

11   However, I do know that we have folks that are both

12   single celled and double celled there.   So it's not a

13   single cell environment.

14        Q.    But you don't know whether it's max custody;

15   correct?

16        A.    A portion of the Rincon mental health may be max

17   custody.

18        Q.    Is one of the residential units you're referring

19   to the BMU in Browning?

20        A.    Yes.

21        Q.    And Browning unit is max custody; correct?

22        A.    Yes.

23        Q.    And is one of the inpatient units you're

24   referring to Baker at the Phoenix facility?

25        A.    No.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

123

1      Q.    And Baker is no longer a mental health facility?

2      A.    No.

3      Q.    Was Baker a mental health facility at any time

4    during your tenure with ADC since 2020?

5      A.    Yes.

6      Q.    And at that time, Baker was classified max

7    custody; correct?

8      A.    I'm not sure.

9      Q.    Okay.  Is there any written policy restricting

10   or limiting the housing of patients with certain MH

11   scores in detention?

12     A.    No.

13             MR. FATHI:  I'm about to move on to a

14   different topic, so we can break now or break in 15 or 20

15   minutes.  It's up to you.

16             MS. HESMAN:  Do you want to break now?

17             THE WITNESS:  Yeah.

18             MS. HESMAN:  We'll break now.  We only need

19   30 minutes.

20             MR. FATHI:  All right.  SO let's come back

21   at --

22             MS. HESMAN:  12:30.

23             MR. FATHI:  30 minutes past the hour.

24             MS. HESMAN:  Thank you.

25             MR. FATHI:  Thank you.

124

1        (Recess from 11:56 a.m. to 12:32 p.m.)

2    Q.   (By Mr. Fathi) Doctor, did you communicate with

3  anyone in any way during the break besides Ms. Hesman?

4    A.   No.

5    Q.   All right.  Before the break, Doctor, we were

6  talking about the various -- three different kinds of

7  group treatment, and I think you described them as mental

8  health groups, psychoeducational groups, and was there a

9  third?

10    A.   Psychotherapy, psychoeducation and educational.

11    Q.   Okay.  And is the difference between those three

12  written down somewhere?

13    A.   I don't believe so.

14    Q.   So what is the difference between those three

15  types of groups?

16    A.   I already had answered that before.  The

17  psychotherapy is a group that includes the therapeutic

18  process.

19        The psychoeducational is just educational, does

20  not include therapy.

21        And the educational, purely educational is

22  provided by the CO-3s, and it's just an added benefit for

23  the -- the patients in the system.

24    Q.   If I'm a patient, how is my experience different

25  in those three different types of groups?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

125

1                    MS. HESMAN:  Form.  Foundation.

2                    THE WITNESS:  I don't feel like I can

3    answer that because I'm not a patient in those groups.

4        Q.    (By Mr. Fathi) Have you ever observed a

5    psychotherapy group?

6        A.    Absolutely.

7        Q.    Have you ever observed a psychoeducation group?

8        A.    Yes.

9        Q.    Have you ever observed an education group?

10       A.    Maybe.  Maybe on the third one.  But definitely

11   the first two.

12       Q.    Okay.  So -- so how are they different?  That's

13   what I'm trying to get at.

14       A.    So the psychotherapy group, you're going to have

15   more processing of emotions, experiences -- experiences

16   by the participants.  It's going to be much more

17   experiential, if you will.

18            The psychoeducational and the educational groups

19   are a lot less experiential and more of teaching certain

20   skills to the patients.

21       Q.    And what sorts of skills are taught to the

22   patients in the psychoeducation and education groups?

23                    MS. HESMAN:  Form.  Foundation.

24                    THE WITNESS:  The psychoeducation groups

25   include things like education to their ADLs, completing

1   activities of daily living, making sure that they're

2   taking their medication as prescribed.  Things along

3   those lines.  More hands-on skills, if you will.

4            And the education courses provided by the

5   CO-3s, of course they're not under my purview, they're

6   under custody, so I can't speak as much to what their

7   groups consist of.

8       Q.   (By Mr. Fathi) Okay.  So the education groups

9   conducted by CO-3s, those are not mental health

10   treatment; correct?

11      A.   They're in addition to mental health treatment.

12      Q.   They're not under your supervision; correct?

13      A.   That's true.

14      Q.   Okay.  And when you said the psychotherapy are

15   more experiential, what do you mean by the word

16   "experiential"?

17      A.   More process oriented, where the patients are

18   processing kind of their own emotions, their own

19   reactions, a lot more of that as opposed to just learning

20   a skill.

21      Q.   All right.  Let's go back to Exhibit 2, please.

22   Topics 8 and 9.  Topics 8 and 9 both have to do with

23   among other things providing inpatient mental healthcare.

24   Do you see that, Doctor?

25      A.   Yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

128

1        A.   Not that I can think of off the top of my head.

2        Q.   Is there a Centurion written policy on this

3    subject?

4               MS. HESMAN:  Form.  Foundation.

5               THE WITNESS:  I don't know.

6        Q.   (By Mr. Fathi) Is there a different process or

7    an additional process for transfer of people from max

8    custody to the inpatient units, or is it the same process

9    as for everyone else?

10       A.   It's the same process as for everyone else.

11       Q.   And is there a different process or additional

12   process for transfer of people from detention to the

13   inpatient facilities, or is it the same for everyone

14   else?

15       A.   It's the same as for everyone else.

16       Q.   Okay.  Let's begin with the mental health units

17   at the Phoenix facility.  Can you please tell me what

18   those units are and give me a description of each of

19   them?

20       A.   I can give you an overall description because

21   they are inpatient units at Phoenix.  So they -- they are

22   all inpatient.  Baker ward, George ward, King ward -- oh,

23   not Baker, I'm sorry.  King, George, John, and Ida,

24   they're all inpatient facility -- all inpatient --

25   inpatient mental health treatment.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

129

1      Q.    And what about Quiet unit?

2      A.    Quiet is where watches are placed.

3      Q.    Okay.  So what is the specific mission or

4   function of each of these units?  Let's begin with

5   George.  What's the specific mission or function of

6   George?

7      A.    So I don't see them as having separate missions

8   or functions based on the location.  I see them as having

9   one mission based on being a licensed inpatient mental

10  health facility as a whole.

11     Q.    Do the different units, George, Ida, John, King,

12  house different populations with different needs?  Or is

13  the population all the same?

14     A.    The population all requires inpatient level

15  treatment.  Some of the different custody levels are

16  housed in different areas.  But I don't have the

17  specifics on the custody level differences there.

18          But they all are in need of inpatient care, so

19  they're all the same in that way.  Just different levels

20  of custody, really.

21     Q.    So putting aside differences in custody, there's

22  no difference in mental health needs and no difference in

23  mental health treatment provided as between George, Ida,

24  John and King units; is that right?

25     A.    That's the way that I see that program, yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

130

1    Q.    And you said Quiet unit is a watch unit?

2    A.    Yes.

3    Q.    And Baker is no longer a mental health unit?

4    A.    That's correct.

5    Q.    When did Baker cease being a mental health unit?

6    A.    It was within the last couple of months.

7    They're in the process of transitioning that unit.

8    Q.    From what to what?

9    A.    From a mental health unit to an IPC.

10   Q.    An IPC is basically an infirmary?

11   A.    Yes.

12   Q.    So that means that there are going to be

13   something like 40 fewer inpatient mental health beds than

14   there were before; is that right?

15             MS. HESMAN:   Form.   Foundation.

16             THE WITNESS:   I can't verify that.

17   Q.    (By Mr. Fathi) Which part of it can't you

18   verify?

19   A.    Well, I would need to look at the occupancy of

20   Baker before and then kind of where we're going from

21   there.

22   Q.    Okay.   But the beds at Baker that were formerly

23   available for mental health patients are going to be no

24   longer available for mental health patients; correct?

25   A.    That's correct.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

1      Q.    Does that concern you at all?

2                  MS. HESMAN:  Form.  Foundation.  Beyond the

3      scope of the topic.

4                  THE WITNESS:  Not at this time.  We don't

5      have a wait list for any of our inpatient facilities, so

6      we are well within capacity to manage the need in the

7      prisons right now.

8      Q.    (By Mr. Fathi) So let's assume that Baker is 40

9      beds and you're not going to have those 40 mental health

10     beds anymore.  That doesn't concern you?

11                 MS. HESMAN:  Form.  Asked and answered.

12                 THE WITNESS:  As I answered before, we

13     are -- have no wait list.  We have plenty of inpatient

14     beds available for the need.  So I do not have a concern

15     about that at this time.

16     Q.    (By Mr. Fathi) Tell me about Aspen unit.

17                 MS. HESMAN:  Form.

18                 THE WITNESS:  Can you be more specific?

19     Q.    (By Mr. Fathi) What is the role, what is the

20     function of Aspen unit?

21                 MS. HESMAN:  Same objection.

22                 THE WITNESS:  It is a residential treatment

23     unit.

24     Q.    (By Mr. Fathi) Yes?

25     A.    Yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

132

1             MS. HESMAN:  I didn't hear a question.  She

2     said it's a residential treatment unit.  And then I

3     didn't hear any of the questions after that.

4         Q.   (By Mr. Fathi) What is the function of the Aspen

5     unit?

6             MS. HESMAN:  Form.

7             THE WITNESS:  I don't understand what your

8     question is, sir.  Can you rephrase that?

9         Q.   (By Mr. Fathi) What's the purpose of the Aspen

10    unit?  What is its role in the department's mental health

11    program that you supervise?

12        A.   So it provides a residential level of care which

13    is our MH-4s.  So it is the -- where the folks are in

14    acute need, but have stabilized, but still need a higher

15    intensity of level of care.

16             So they are seen by the mental health counselors

17    a minimum of once a month, and provided weekly structured

18    activities while they're in that setting as well as, of

19    course, their psychiatric visits every 90 days or less.

20             And they're housed with other inmates who are at

21    that same level of care and have that same need.

22        Q.   What's the capacity of Aspen unit?

23        A.   150 beds.

24        Q.   What's the capacity of Quiet unit?

25        A.   I don't know that off the top of my head.  I'm

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

133

1   sorry.

2        Q.    John?

3        A.    I don't know those off the top of my head.

4        Q.    King?

5        A.    I don't know.

6        Q.    George?

7        A.    I don't know.

8        Q.    Ida?

9        A.    Don't know.

10       Q.    And I think you already testified you don't know

11  the capacity of Baker unit; correct?

12       A.    It's no longer a mental health unit.

13       Q.    What was the capacity when it was a mental

14  health unit?

15       A.    I don't know.

16       Q.    What's the process for transferring a patient

17  from another prison to either the Flamenco unit or Aspen?

18            MS. HESMAN:   Form.

19            THE WITNESS:   So the mental health lead and

20  the mental health director in Centurion have a weekly

21  meeting to discuss any referrals for what I would term a

22  higher level of care.

23            If they determine amongst themselves that a

24  higher level of care is appropriate for the inmate, then

25  that referral goes on to a meeting with the deputy

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

134

1    wardens, myself, and the mental health director of

2    Centurion.

3                 And we set forth those recommendations.

4    They are reviewed by custody for any custody concerns

5    such as do-not-house-with concerns, things like that.

6    And then they are approved or denied, and they're moved

7    within 48 hours of approval or quicker if we -- as

8    needed.

9                 There have been times where we have had

10   individuals that required inpatient level of care and

11   we've coordinated with custody to get them moved within a

12   24-hour time frame.

13       Q.    (By Mr. Fathi) And this whole policy that you --

14   or process that you've just described, where is that

15   written down?

16       A.    In the mental health technical manual as well as

17   the DOs.  I don't know -- don't remember the numbers but

18   they're also -- and there are some found in

19   transportation, inmate control, all of that because

20   there's so many different processes that all come

21   together to make this move.

22       Q.    You referred to DO-11.  What's -- what's that?

23       A.    I'm sorry, DO-1103.  Did I say DO-11?  Oh,

24   sorry, DO-1103, the mental health department order.

25       Q.    How long does the whole process take from when

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

135

1   it's initiated or the person's recommended for transfer
2   until the transfer is actually effected?
3                    MS. HESMAN:   Form.   Foundation.
4                    THE WITNESS:   And I -- I just answered
5   that, but I will answer it again happily, because I'm
6   very impressed with it.
7                    When there's an urgent need it can happen
8   pretty immediately, up to 48 hours for the routine
9   transfer.
10      Q.   (By Mr. Fathi) Doctor, you testified that the 48
11  hours was from the time the transfer is approved.  My --
12  my question is from the time the process is initiated,
13  someone says, "This person should be transferred to
14  Phoenix," until the transfer is effected, how long does
15  that take?
16                   MS. HESMAN:   Form.   Foundation.
17                   THE WITNESS:   So I would say anywhere
18  depending on the patient need, again, from within a few
19  hours to within three days.
20      Q.   (By Mr. Fathi) So to your knowledge, it's never
21  taken longer than three days from the initiation of the
22  process to the physical transfer of the patient?
23                   MS. HESMAN:   Form.   Foundation.   Misstates
24  her testimony.
25                   THE WITNESS:   No, I -- I didn't say that.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

136

1  But I do believe that the majority of the time, that's

2  when it occurs.

3      Q.   (By Mr. Fathi) What's the longest that it's ever

4  taken to your knowledge?

5              MS. HESMAN:  Form.  Foundation.

6              THE WITNESS:  I don't know.  We have not

7  had any trouble processing the transfers or making the

8  transfers happen that we've requested.

9      Q.   (By Mr. Fathi) If custody and mental health

10  disagree about the propriety of the transfer, who makes

11  the final decision?

12              MS. HESMAN:  Form.  Foundation.

13              THE WITNESS:  I haven't had a situation

14  where if it has rosen [sic] to my level that we could not

15  work with custody at my level and come up with an

16  agreeable plan.

17      Q.   (By Mr. Fathi) I understand.  But there must be

18  some decision, there must be some process written down

19  for what happens if there is a disagreement.  Who

20  decides?  Is it mental health or is it custody?

21      A.   It's --

22              MS. HESMAN:  Form.  Foundation.

23              THE WITNESS:  -- a joint decision.

24      Q.   (By Mr. Fathi) What happens if mental health and

25  custody disagree?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

138

1    Q.   So your testimony is that to your knowledge

2  custody has never overruled or blocked or vetoed a

3  transfer of a patient to the Phoenix facility; is that

4  correct?

5           MS. HESMAN:  Form.  Misstates her

6  testimony.

7           THE WITNESS:  I don't believe that's an

8  accurate restatement of what I said.

9    Q.   (By Mr. Fathi) All right.  Well, let's move on.

10  Are there some patients who are ineligible for transfer

11  to the Phoenix facility because of their custody level?

12    A.   The only one that I am aware of is if they are

13  on death row.

14    Q.   Can a max custody patient be transferred to

15  Flamenco?

16    A.   Absolutely.

17    Q.   Even though Flamenco is not a max custody

18  facility?

19    A.   And anybody other than death row inmates can be

20  transferred to the inpatient facility at Phoenix.

21    Q.   Okay.  Can a max custody patient be transferred

22  to Aspen?

23    A.   No.  Because Aspen is minimum, medium.  The

24  maximum residential treatment is at Rincon.  So they

25  would just go to a different residential treatment,

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

139

1    because we have several.

2        Q.    What happens to someone who is sentenced to

3    death if they -- if they need inpatient mental health

4    treatment?

5        A.    We bring the services to them.

6        Q.    And why wouldn't you transfer them to the

7    inpatient facility at Phoenix?

8        A.    It is written in, I believe it's even

9    legislation that they cannot, that they're not allowed to

10   be placed other than a place designated for death row.

11       Q.    Have you ever tried to get that legislation

12   changed?

13               MS. HESMAN:   Form.   Foundation.   Exceeds

14   the scope.

15               THE WITNESS:   In the year that I've been in

16   this position, no, I have not.

17       Q.    (By Mr. Fathi) Do you track how many people are

18   transferred into the Phoenix mental health facilities

19   every month?

20       A.    I know how many people are in there, but I don't

21   necessarily track how many are transferred in and out.

22       Q.    Is it written down anywhere?

23       A.    Yes.   And I provided that to the attorney on

24   several occasions.

25       Q.    So what is the document called where you list or

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

140

1    enumerate all the patients who are transferred to Phoenix

2    in a given month?

3         A.    It -- it doesn't list, again, the number of

4    transferred in.  It lists the population in the inpatient

5    and residential treatment units.  And I believe it's the

6    e-mail titled Mental Health Count.

7         Q.    That's a different question, Doctor.  I'm not

8    asking about the number of people who are there at any

9    given time.  I'm asking about the number of patients who

10   are transferred from one facility to Phoenix in a given

11   month.  Is that tracked in any way?

12        A.    Not that I'm aware of.

13        Q.    Okay.  Thank you.  Let's look at Exhibit 5,

14   please.

15                (Deposition Exhibit 5 was marked for

16   identification.)

17        Q.    (By Mr. Fathi) Now, let's look at the first page

18   for the moment.  Exhibit 5 is a portion of the ADCRR

19   Mental Health Technical Manual to which you have made

20   frequent reference.

21                Doctor, my first question is counsel has

22   represented to us that this version revised 12-24-2019 is

23   the currently operative version.  Is that correct?

24        A.    I can't see the entire manual, but, yes, the

25   manual updated 12-24-19 is the current manual.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

142

1      A.    No.

2      Q.    Is there any involvement by anyone from ADC?

3      A.    The -- with that portion, no.

4      Q.    Okay.

5      A.    It's 1.2 where the deputy wardens and myself

6  become involved.

7      Q.    Okay.  When do these weekly teleconferences

8  happen?

9            MS. HESMAN:  Form.  Foundation.

10           THE WITNESS:  They used to happen

11  on Wednesdays; now they happen on Tuesdays.

12     Q.    (By Mr. Fathi) And what time?

13     A.    One o'clock.

14     Q.    How long do they last?

15     A.    It depends based -- it depends based on the

16  number of patients being discussed.

17     Q.    Give me a range, if you would, please.

18           MS. HESMAN:  Form.  Foundation.

19           THE WITNESS:  A half an hour to 90 minutes.

20     Q.    (By Mr. Fathi) And paragraph 1.1.4 requires that

21  a record of the patients discussed during the

22  teleconference shall be kept.

23           Do you see that language, Doctor?

24     A.    I do.

25     Q.    Are written minutes of these meetings kept?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

143

1              MS. HESMAN:  Form.  Foundation.

2              THE WITNESS:  Centurion would be

3    responsible for doing that, and they are responsible for

4    following our technical manual.  So I would believe that

5    they are following the technical manual as they are

6    supposed to.

7       Q.   (By Mr. Fathi) Do you have any knowledge that

8    these records are actually kept?

9       A.   I do not have any knowledge that they are kept

10   or not kept.  But they are bound to the mental health

11   technical manual by their contract.

12      Q.   Have you ever seen the records referred to in

13   paragraph 1.1.4?

14      A.   No, but I have not requested them either.

15      Q.   Now, as you mentioned, 1.2 provides for a weekly

16   teleconference that includes a number of people including

17   yourself.  Is that right?

18      A.   That's correct.

19      Q.   How long does it -- what's the time gap between

20   the weekly teleconference that we previously discussed

21   and a decision on the transfer?

22      A.   One day.

23      Q.   Okay.  So the teleconference that involves just

24   Centurion staff happens on a Monday?

25      A.   Yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

144

1    Q.    And then there's a decision on the transfer on a

2    Tuesday?

3    A.    Yes.  It used to be on Wednesday, but we wanted

4    to officiate these moves quicker, so we moved it to

5    Tuesday.

6    Q.    So when do the weekly meetings discussed in 1.2

7    happen?

8    A.    Tuesday.

9    Q.    At what time?

10   A.    One o'clock.

11   Q.    And are any minutes or written record of those

12   meetings kept?

13   A.    Again, that would be kept by the contractor, so

14   I would recommend asking them about it.

15   Q.    But if I'm asking you --

16   A.    I do not personally keep minutes of these

17   meetings.

18   Q.    Do you know if minutes are kept of these

19   meetings?

20   A.    I believe that they are, but I don't -- like I

21   said, I do not personally keep minutes for these

22   meetings.

23   Q.    Have you ever seen minutes of these meetings?

24   A.    No.  But I have not requested them.  I have had

25   no reason to.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

145

1      Q.    Do you keep your own notes of these meetings?

2      A.    I do not.

3      Q.    Since you've been in your position, has a person

4   ever been recommended for transfer to the Phoenix

5   facility by the first meeting, the one that's just

6   Centurion staff, and that transfer ultimately didn't

7   happen?

8              MS. HESMAN:   Form.  foundation.

9              THE WITNESS:   Yes.   In that they were not

10  transferred to the facility requested, but to an

11  alternate facility that provided the same level of care.

12     Q.    (By Mr. Fathi) So since you've been in your

13  role, how many times has the meeting in paragraph 1.1

14  recommended the transfer of someone to an inpatient

15  facility, and that patient was not ultimately transferred

16  to that facility?

17             MS. HESMAN:   Form.  Foundation.

18             THE WITNESS:   I can only think of one time,

19  and that was the inmate on death row.

20     Q.    (By Mr. Fathi) And was the decision not to

21  transfer him to Phoenix based on the fact -- a

22  determination that he didn't need the services at

23  Phoenix?

24             MS. HESMAN:   Form.  Foundation.   Exceeds

25  the scope of the topic.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

146

1          THE WITNESS:   As I had mentioned earlier,

2     it's laid out in legislation that death row inmates have

3     to be where death row inmates are.

4          Q.    (By Mr. Fathi) And what's the name of this

5     patient?

6          A.    I don't know.   I'm sorry.

7          Q.    So this is to your knowledge the only time that

8     a transfer recommended by the meeting in paragraph 1.1

9     has not been approved and implemented?

10         A.    That's correct.

11         Q.    And you don't remember the patient's name?

12         A.    No.

13         Q.    Have you ever seen, Doctor, a letter from either

14    the ACLU or the prison law office asking that a

15    particular patient be transferred to the Phoenix

16    facility?

17              MS. HESMAN:   Form.   Foundation.   Exceeds

18    the scope.

19              THE WITNESS:   Yes.

20         Q.   (By Mr. Fathi) And has a patient ever been

21    transferred to the Phoenix facility in response to a

22    letter from the ACLU or the prison law office?

23              MS. HESMAN:   Same objections.

24              THE WITNESS:   If the patient was assessed

25    to be clinically in need of inpatient services by their

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

148

1          MS. HESMAN:  Same objections.

2          THE WITNESS:  I don't think so.  Maybe.

3     Q.  (By Mr. Fathi) All right.  We've talked about

4     the Phoenix facility.  You mentioned before the lunch

5     break residential treatment units.  Do I have that term

6     correct?

7     A.   Yes.

8     Q.   All right.  Will you please list for me all the

9     residential treatment units that exist in the Arizona

10    Department of Corrections?  Again, putting aside Phoenix,

11    which we've already discussed.

12    A.   So Aspen at Phoenix is a residential treatment

13    unit.  And then we have residential treatments at units

14    at Rincon and at Perryville, and the BMU at Eyman.

15    Q.   Okay.  And at Rincon, is there just one unit?

16    A.   No.  There is two units.  The Rincon, we kind of

17    refer to them as Rincon 1 and Rincon 2.  Rincon 1 is the

18    lower custody, and Rincon 2 is the higher custody.

19    Q.   And what about -- what are the units at

20    Perryville?

21    A.   I'm blanking on those right now.

22    Q.   How many are there?

23    A.   Two.  Lumley and another one.

24    Q.   And at Eyman is there just the one, the BMU?

25    A.   The BMU, uh-huh.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

149

1      Q.    Now, do all of those units, putting aside

2    custody difference, house the same population and provide

3    the same treatment or are they different?

4      A.    All except for the BMU.

5      Q.    All right.  Let's start with the BMU.  Tell me

6    about that unit.

7      A.    The BMU is primarily for individuals that have

8    primary access to diagnoses that result in a lot of

9    acting out behaviors that are, again, a result of that

10   Axis II diagnosis as opposed to Axis I.

11           They are folks that really are not appropriate

12   for placement in the other units because they also have a

13   tendency to influence other very mentally ill patients.

14   So it's for that population.

15     Q.    And what about the other units, the two units at

16   Rincon and the two units at Perryville?

17     A.    So those are for folks that are -- have acute,

18   fairly serious illness that require pretty frequent

19   interaction with mental health staff and also need to

20   have the community of only others who have that level of

21   mental health need around them.

22     Q.    Can a maximum custody patient be transferred to

23   the Rincon units?

24     A.    Yes.

25     Q.    To both of them or just to one?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

150

1      A.    Just to one, but they provide the same services,

2    just at different levels of custody.

3      Q.    Okay.   What's the capacity of Rincon 1?

4      A.    I don't know.

5      Q.    What's the capacity of Rincon 2?

6      A.    I don't know.   And I don't want to guess.

7      Q.    What's the capacity of the two residential

8    treatment units at Perryville?

9      A.    Again, this is what I provide in writing because

10   I don't want to guess on numbers.

11     Q.    So you don't know?

12     A.    I provided that in writing on several occasions.

13     Q.    But as you sit here today, you don't know?

14     A.    I don't memorize them.   No, I do not.

15     Q.    And what is the capacity of the BMU at Eyman?

16     A.    Again, I don't want to guess.

17     Q.    Let's look at Exhibit 4, please.

18            (Deposition Exhibit 4 was marked for

19   identification.)

20     Q.    (By Mr. Fathi) Doctor, Exhibit 4 is the ADC

21   daily count sheet for October 8 of 2021.  Are you

22   generally familiar with this document?

23            MS. HESMAN:  Hold on.  Before you answer

24   can you just scroll down so I see a Bates number on this?

25            MR. FATHI:  There's no Bates number.  It's

**30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -**
**10/12/2021**

153

1    down.   Okay.   Now back over.

2              Yes, I can agree with that.

3       Q.    Okay.   And I think you yourself mentioned,

4    Doctor, that -- that when I asked if you were concerned

5    about Baker unit no longer being a mental health unit,

6    you said you weren't concerned because the units were --

7    the mental health units were below capacity.   Is that

8    right?

9       A.    That's correct.

10      Q.    So my question is why are all the mental health

11   units, at least all of the ones at Phoenix, below

12   capacity?

13              MS. HESMAN:   Form.   Foundation.

14              THE WITNESS:   Because there are not enough

15   inmates that need that level of care to fill them up.

16      Q.    (By Mr. Fathi) Is it because there aren't enough

17   mental health staff to operate the mental health units if

18   they were at full capacity?

19              MS. HESMAN:   Form.   Foundation.

20              THE WITNESS:   Absolutely not.   The unit is

21   well staffed and able to manage all of the beds being

22   full.

23      Q.    (By Mr. Fathi) Is it because there aren't

24   custody staff to operate the mental health units if

25   they -- if they were at full capacity?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

154

1            MS. HESMAN:  Form.  Foundation.  Exceeds
2  the topic.
3            THE WITNESS:  Not that I'm aware of.
4     Q.    (By Mr. Fathi) It's because there aren't
5  prisoners elsewhere in the system who need these beds.
6  Is that your testimony?
7     A.    That is.
8     Q.    All right.  Let's go back to Exhibit 2, please.
9            Exhibit 4 will have all the unit names if you
10  need the spellings.
11            Just one moment.  All right.  Exhibit 2, Topics
12  10 and 11.  Do you see those, Doctor?
13     A.    Yes, I do.
14     Q.    Both Topics 10 and 11 on Exhibit 2 have to do
15  with mental health watch, would you agree?
16     A.    Yes.
17     Q.    And let's go to Exhibit 3, please.  And we're
18  going to look at Topic 8.  Topic 8 on Exhibit 3 also has
19  to do with suicide and self-harm prevention for,
20  specifically for incarcerated people in isolation.
21            Do you see that, Doctor?
22     A.    I do.
23     Q.    All right.  So let's talk about these three
24  topics together.
25            First, if I were to ask you what you did to

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

157

1   detention receive?

2       A.   Again, that all MH-3s and above receive the

3   opportunity to come out of their cell for individual

4   confidential counseling at least every 30 days and any

5   more if -- if requested.

6       Q.   So if an MH-3 patient in detention wanted to

7   come out for three individual counseling sessions a

8   month, that would be provided?

9       A.   Yes.   That's absolutely fine.

10      Q.   So to your knowledge, has a patient in

11  detention, MH-3 or above, ever asked for additional

12  counseling and it hadn't been provided?

13              MS. HESMAN:   Form.   Foundation.

14              THE WITNESS:   Not that I'm aware of.

15      Q.   (By Mr. Fathi) And would that be a violation of

16  policy if it wasn't provided?

17      A.   We'll have to -- give me little more -- or can

18  you rephrase the question?

19      Q.   Yeah, I'm sorry.   Maybe I'm misunderstanding

20  your testimony.   I thought you said that if an MH-3

21  patient in detention wanted to be seen more than once a

22  month for individual counseling, he wanted to be seen

23  three times a month or five times a month, that that

24  would be provided.   Is that your testimony?

25      A.   If it is clinically indicated.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

158

1      Q.    Okay.  Well, that's -- that's a little bit

2  different from your last answer.  Who decides if it's

3  clinically indicated?

4      A.    The mental health professional.

5      Q.    So a mental health professional could decide

6  that it's not clinically indicated for this person to

7  have three sessions a month, and then he wouldn't receive

8  those three sessions a month; is that correct?

9      A.    Or they could determine it's appropriate for

10  them to have 10.  It would depend on the patient's

11  individual need.

12      Q.    Right.  But if you listen to my question,

13  Doctor, my question was if the clinician decided it

14  wasn't clinically indicated to have three sessions a

15  month, then the person would not have three sessions a

16  month; correct?

17      A.    That's correct.

18      Q.    Okay.  Thank you.  All right.  Let's go to

19  Exhibit 6, please.

20            (Deposition Exhibit 6 was marked for

21  identification.)

22      Q.    (By Mr. Fathi) Doctor, could you please identify

23  Exhibit 6?

24      A.    I can't see all of it.  It looks like the front

25  page of DO-807, inmate suicide watch -- or, I'm sorry,

**30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021**

159

1  Inmate Suicide Prevention, Mental Health Watch and

2  Progressive Mental Health Restraints.

3      Q.    Doctor, I think we have the entire policy here,

4  but if you would like to scroll through all the pages we

5  can certainly do that.

6          Doctor, would you like us to continue or are you

7  satisfied this is the full policy?

8      A.    Yes.  Please continue.

9      Q.    Okay.  All right.  Doctor, are you now satisfied

10  that this is in fact DO-807?

11      A.    Yes, sir.

12      Q.    And is this the currently operative version of

13  DO-807?

14      A.    I didn't see a date on it, but I do believe so.

15      Q.    Would you look at the date on the first page?

16      A.    Oh, yes.  Yes.  I see that.  Thank you.

17      Q.    Is this the currently operative version?

18      A.    Yes.  It is.

19      Q.    Is there any other written ADC policy that

20  governs suicide watch or mental health watch?

21      A.    The DO-1103 and the mental health technical

22  manual.

23      Q.    Is there any other ADC policy besides what you

24  just mentioned?

25      A.    Not that I'm aware of.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

160

1    Q.    Is there any written Centurion policy on suicide
2  prevention or mental health watches?
3              MS. HESMAN:   Form.   Foundation.
4              THE WITNESS:   I don't know.
5    Q.    (By Mr. Fathi) Is there any written policy that
6  limits how long a patient can be continuously on watch?
7    A.    No.   There is not.
8    Q.    What's the longest a patient has ever been
9  continuously on watch, to your knowledge?
10              MS. HESMAN:   Form.   Foundation.
11              THE WITNESS:   I don't know.
12    Q.    (By Mr. Fathi) No, I'm asking to your knowledge
13  what is longest a patient has ever been continuously on
14  watch, to your knowledge?
15              MS. HESMAN:   Same objection.
16              THE WITNESS:   I don't know.   It's as long
17  as it's clinically indicated to keep them safe.
18    Q.    (By Mr. Fathi) When a person is on suicide or
19  mental health watch, is it possible for them to be let
20  out of their cell for recreation or exercise?
21    A.    Yes.
22    Q.    And who makes the decision if a given patient on
23  watch is going to get out of their cell for recreation or
24  exercise?
25    A.    All of the inmate patients on watch are eligible

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

161

1    to have all of their recreation, telephone privileges and

2    visiting privileges, unless it's designated otherwise by

3    mental health staff.

4           And it is not usually designated otherwise.  So

5    they're -- they're eligible to have that while they're on

6    watch.

7       Q.   But I think you just testified that in some

8    cases people on watch are not given out-of-cell exercise.

9    Is that correct?

10      A.   No, I did not.

11      Q.   Oh, I'm sorry.  So is it your testimony that

12   everyone on watch is offered out-of-cell exercise?

13              MS. HESMAN:   Form.

14              THE WITNESS:   Unless it is clinically

15   contraindicated.

16      Q.   (By Mr. Fathi) Right.  So in cases in which it's

17   clinically contraindicated, the person on watch is not

18   offered out-of-cell recreation; correct?

19      A.   That would -- could be the case, yes.

20      Q.   Okay.  I'm just trying to understand, is it your

21   testimony that everyone on watch is offered out-of-cell

22   exercise, yes or no?

23              MS. HESMAN:   Form.  Asked and answered.

24              THE WITNESS:   Unless it is clinically

25   contraindicated as written on the watch order.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

162

1      Q.    (By Mr. Fathi) And is it sometimes determined to

2    be clinically contraindicated?

3               MS. HESMAN:   Form.   Foundation.

4               THE WITNESS:   It may be.   I haven't

5    personally ever seen that written on a watch order.

6      Q.    (By Mr. Fathi) Okay.   So you're not aware of any

7    case in which a person on watch was not offered

8    out-of-cell exercise; is that correct?

9               MS. HESMAN:   Form.   Foundation.

10              THE WITNESS:   I am not aware of anybody on

11   watch having their out-of-cell exercise time restricted

12   based on their mental health.

13     Q.    (By Mr. Fathi) Are you aware of anyone on watch

14   having their out-of-cell exercise restricted for any

15   other reason?

16     A.    I think there may have been a time or two when

17   custody did not bring them out to recreation.   But I

18   can't speak to why or even how often.   I just think that

19   there may have been a time that that has occurred.

20     Q.    So who decides if a given patient on watch is

21   going to get offered out-of-cell exercise?

22     A.    So, again, mental health controls the mental

23   health piece, and custody controls the custody piece.   So

24   they're always controlling kind of that movement, if you

25   will, and we're providing recommendations based on their

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

163

1    mental health.

2         Q.    And who makes the ultimate decision?

3         A.    Well, the custody staff ultimately open the door

4    and allow the inmate to go out to rec.

5         Q.    So custody makes the ultimate decision?

6              MS. HESMAN:   Form.

7              THE WITNESS:   As I said, we make

8    recommendations based on their mental health, and custody

9    is ultimately the person that opens that door and lets

10   them out, because we have different roles.

11        Q.    (By Mr. Fathi) Or doesn't open the door and let

12   them out as the case may be; correct?

13        A.    Yes, they are the ones that control the doors.

14        Q.    Is there a written policy that sets forth that

15   decision-making structure that you just described?

16        A.    It's outlined in DO-807, and it states that

17   their privileges are not changed unless written by the

18   mental health professional.

19        Q.    Now, you testified, I think you mentioned a

20   couple of times health and welfare checks that occur in

21   max custody and detention.  Is that right?

22        A.    That's correct.

23        Q.    Am I using the correct term?  Health and welfare

24   checks?

25        A.    Yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

164

1      Q.    Okay.  Are there any other settings besides max
2    custody and detention where health and welfare checks
3    occur?

4      A.    Max custody, restrictive housing programs,
5    detention, all of those settings.

6      Q.    What are restrictive housing programs?

7      A.    They are housing programs that are within the
8    max custody where they receive additional services that I
9    had mentioned earlier.

10            With the 10 hours out-of-cell rec time, the
11    three hours of group per week, in addition to the 30-day
12    mental health checks, and they also have that requirement
13    of being approved by myself and the mental health
14    director at Centurion.

15      Q.    Approved for what?

16      A.    For housing in the restrictive housing program.

17      Q.    Where are the restrictive housing units located?

18      A.    There's two.  There's enhanced -- there's two
19    separate terms used; restrictive housing program and
20    enhanced housing, and they're both at Eyman.

21      Q.    In which unit?

22      A.    I'm not sure.

23      Q.    What's the capacity of the restricted housing
24    unit?

25      A.    I don't know.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

165

1        Q.    What's the capacity of the enhanced housing

2    unit?

3        A.    I don't know.

4                MS. HESMAN:   Objection.   Exceeds the scope

5    of these topic areas.

6        Q.    (By Mr. Fathi) Are -- are those housing units

7    reserved for people who have been determined to be

8    seriously mentally ill?

9        A.    No.

10       Q.    Okay.  So is it your testimony that -- well, let

11   me back up.

12             Are there people who are seriously mentally ill

13   in either of those housing units?

14               MS. HESMAN:   Form.   Foundation.

15               THE WITNESS:   As I just mentioned, the SMI

16   individuals that are even potential placements in that

17   unit have to be approved by the mental health director of

18   the vendor and ADCRR.  And, yes, there are SMI

19   individuals in that housing.

20       Q.    (By Mr. Fathi) In both enhanced housing and in

21   restrictive housing?

22       A.    I'm not sure if in both of them.  I kind of lump

23   those two together as that kind of additional max

24   setting, if you will.

25       Q.    Okay.  But your testimony is that there -- there

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

166

1   are SMI patients in one or both of those facilities;

2   correct?

3        A.   Yes.

4        Q.   Okay.  And is it your testimony that everybody

5   in enhanced housing and restrictive housing, SMI or not,

6   gets the 10 hours of out-of-cell time and the three

7   groups a week?

8        A.   No, it is not.

9        Q.   So who gets the 10 hours of out-of-cell time and

10  three groups a week?

11       A.   The SMI patients.

12       Q.   So how much out-of-cell time do the non-SMI

13  patients in enhanced housing get?

14       A.   I don't know because it's not a mental health

15  program.  It's a custody program.

16       Q.   Okay.  What's the mental health program for

17  non-SMI people in enhanced housing?

18            MS. HESMAN:  Form.

19            THE WITNESS:  It's -- it's the same as max

20  custody.

21       Q.   (By Mr. Fathi) And what's the mental health

22  program for the non-SMI people in restrictive housing?

23       A.   It's the same as max custody.

24       Q.   All right.  So let's talk about these health and

25  welfare checks.  First of all, who does them?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

167

1      A.    The psych associates or an RN.

2      Q.    Are they ever done by a behavioral health

3   technician?

4      A.    I don't believe so.

5      Q.    So if I saw a record in a note that health and

6   welfare was done by a behavioral health technician that

7   would be contrary to policy?

8                  MS. HESMAN:   Form.

9                  THE WITNESS:   No.   I'm not saying that, and

10   I may need to look at the -- a piece of that order to

11   answer that because I'm feeling a little bit confused

12   about -- because I do know the BHTs do some type of

13   rounds, but I know the rounds that are required are done

14   by an RN or mental health staff.

15                  And I need to research a little bit further

16   to see if the BHTs are included in that mental health

17   staff, if you will.

18      Q.    (By Mr. Fathi) Are these mental health and

19   welfare checks ever done by mental health clerks?

20      A.    No.

21      Q.    So if I saw a notation in a record that a mental

22   health check was done by a mental health -- I'm sorry, a

23   health and welfare check was done by a mental health

24   clerk, that would be contrary to policy?

25                  MS. HESMAN:   Form.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

168

1              THE WITNESS:  Yes.

2      Q.   (By Mr. Fathi) Okay.  Are there more than one

3  kind of checks that are done on people in max custody?

4              MS. HESMAN:  Form.

5              THE WITNESS:  That was kind of back to my

6  statement that I would want to look at that piece a

7  little more thoroughly.

8              Because I do know the BHTs do some type of

9  round, and it may be just a -- management.  And I know

10  that the psych associates and RNs also do a round for the

11  folks in max.  So I would want to research that a little

12  bit more.

13      Q.   (By Mr. Fathi) All right.  But when we're

14  talking about health and welfare checks, that's -- that's

15  a specific type of check that's done I think you said

16  once a week?

17      A.   For all mental health 3 and above it's once a

18  week, and for the SMI it's three times a week.

19      Q.   Okay.  And this is all written down in the

20  mental health technical manual?

21      A.   That's correct.

22      Q.   Okay.  Now, these checks are done cell front,

23  correct?

24      A.   Yes.

25      Q.   The patient isn't offered the chance to be seen

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

169

1    in a confidential setting?

2                    MS. HESMAN:   Form.

3                    THE WITNESS:   That's -- they have the

4    opportunity to request to come out of the cell, but I

5    wouldn't say it's routinely offered for this welfare

6    check.

7         Q.   (By Mr. Fathi) Is there a requirement for the

8    health and welfare checks that the patient be offered to

9    come out of the cell to a confidential setting?

10        A.   No.

11        Q.   Is there a minimum duration for these health and

12   welfare checks?

13        A.   No.  There is not.

14        Q.   If the check on a particular patient lasted one

15   minute, would that be a violation of policy?

16                    MS. HESMAN:   Form.  Foundation.

17                    THE WITNESS:   We don't have time

18   requirements in our policies, so it would depend on the

19   assessment of the patient.

20        Q.   (By Mr. Fathi) The assessment made by whom?

21        A.   The clinician doing the round.

22        Q.   So if the clinician decided that she only needed

23   to spend a minute on this health and welfare check, that

24   would be accepted?

25                    MS. HESMAN:   Form.  Foundation.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

170

1           THE WITNESS:   Again, like I said we don't

2    have time requirements in the policy.   It would depend on

3    the patient's presentation.

4       Q.   (By Mr. Fathi) But you just told me that the

5    person who made the decision is the person doing the

6    health and welfare checks; correct?

7               MS. HESMAN:   Form.

8               THE WITNESS:   That's correct.

9       Q.   (By Mr. Fathi) Okay.   So if the person doing the

10   health and welfare checks decided to spend one minute,

11   that wouldn't be contrary to policy?

12      A.   Again, we have no time requirements in -- in our

13   policy.   It is the requirement to do the quality job;

14   there's not a requirement to spend a predesignated amount

15   of time.

16      Q.   If the health and welfare check lasted 30

17   seconds, would that be contrary to policy?

18               MS. HESMAN:   Form.   Foundation.

19               THE WITNESS:   My answer is the same.   That

20   we don't have a time requirement in the policy.   And it

21   depends on what was -- what occurred during that

22   assessment.

23      Q.   (By Mr. Fathi) If the health and welfare check

24   lasted 15 seconds, would that be a violation of policy?

25               MS. HESMAN:   Same objection.   Asked and

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

171

1  answered.

2              THE WITNESS:  The -- the same answer, sir.

3    Q.   (By Mr. Fathi) So it would not be a violation of

4  policy?

5              MS. HESMAN:  Same objection.

6              THE WITNESS:  I didn't say that.

7    Q.   (By Mr. Fathi) So it would be a violation of

8  policy?

9    A.   I did not say that either.  I said we do not

10  have any time requirement in the policy.

11    Q.   Doctor, how are health and welfare checks done

12  on people who aren't fluent in English?

13    A.   Using the interpreter line or a staff that's

14  fluent in the language.

15    Q.   So it's your testimony that the person doing the

16  health and welfare check would -- tell me how this works.

17              How do they get the interpreter line up to the

18  front of the cell?

19    A.   Either with a State cell phone or the cordless

20  telephone from the ADCRR staff.

21    Q.   Are you aware of any instances in which a health

22  and welfare check was done on a person who wasn't fluent

23  in English when interpretation was not provided?

24              MS. HESMAN:  Form.  Foundation.

25              THE WITNESS:  No.  I'm not.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

172

1     Q.    (By Mr. Fathi) I'm sorry, Doctor?

2     A.    No, I'm not.

3     Q.    How are health and welfare checks done on people

4  who are deaf?

5              MS. HESMAN:   Exceeds the scope.

6              THE WITNESS:   The same answer, sir.

7  With -- obviously without the -- without the interpreter

8  line, but with a staff that is either fluent in ASL or

9  somebody that's contracted to come out and do that.

10    Q.    (By Mr. Fathi) So your testimony is that the

11 Department would hire an ASL interpreter to come out in

12 order to do the health and welfare checks; is that

13 correct?

14             MS. HESMAN:   Form.

15             THE WITNESS:   If there was not somebody on

16 staff that could provide the service.

17    Q.    (By Mr. Fathi) How many healthcare staff are

18 there in ADC who are fluent in ASL?

19             MS. HESMAN:   Form.   Foundation.

20             THE WITNESS:   I don't know.   You asked me

21 that already.

22             MS. HESMAN:   And I don't see how that's

23 relevant to these topic areas, David, but maybe you can

24 point me to somewhere where it says that.

25    Q.    (By Mr. Fathi) What was the -- what was your

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

173

1    answer, Doctor?

2        A.    I don't know.  You had already asked me that.

3        Q.    Are there any healthcare staff in ADC who are

4    fluent in ASL?

5                    MS. HESMAN:  Same objection.

6                    THE WITNESS:  I don't know.

7        Q.    (By Mr. Fathi) While a patient is on health

8    watch, who decides what property he or she can have?

9        A.    Clinician as outlined in -- outlined in the

10   watch order.

11       Q.    I'm sorry.  What is the watch order?

12       A.    The form that they utilize when placing the

13   patient on watch.

14       Q.    And what is -- is there a written policy that

15   provides guidance to the clinician in deciding what

16   property the person on watch should be allowed to have?

17       A.    807 and the mental health technical manual, and

18   1103.

19       Q.    So you're saying that 807 provides guidance on

20   what property the person on watch should be allowed to

21   have?

22       A.    807 and the mental health technical manual do.

23       Q.    And what are the minimum qualifications for the

24   clinician who decides what property the person on watch

25   is able to have?

1          MS. HESMAN:  Form.  Foundation.  Exceeds

2    the scope.

3          THE WITNESS:  They have to be licensed

4    mental health staff.

5    Q.   (By Mr. Fathi) So this is something that an

6    unlicensed person could not do?

7          MS. HESMAN:  Same objection.

8    Q.   (By Mr. Fathi) I'm sorry, Doctor?

9    A.   That's correct.

10   Q.   Could you describe the various kinds of mental

11   health watch that exist in ADC?

12   A.   So there's the continuous watch for somebody

13   who's at imminent harm to themselves or others.  Either

14   they are actively self-harming or hurting others, or they

15   have thoughts about hurting themselves, including a plan.

16   So those folks are on continuous watch.

17          The 10-minute watch is for folks that are

18   suicide risk but not an imminent risk and don't, you

19   know, they are not self-harming anymore, they don't have

20   a plan to self harm, they're stabilizing, if you will.

21          And then the 30-minute is for individuals that

22   are not a danger to themselves but are psychiatrically,

23   psychologically unstable and need further intervention

24   and assessment before being taken off watch.

25   Q.   And does a patient, when she's initially put on

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

175

1    watch, always go on a continuous watch or can she go on a

2    lesser watch as well?

3        A.    They can go on a lesser watch based on their

4    individual need.

5        Q.    So they could be placed on watch and put on a

6    30-minute watch; is that correct?

7        A.    In some circumstances, yes.

8        Q.    What mental health staff can put a patient on

9    watch?

10       A.    Licensed clinicians and psychiatric providers.

11   And when I say licensed clinicians, of course I mean

12   psych associates and psychologists.

13       Q.    So an unlicensed psych associate cannot put

14   someone on watch?

15       A.    I believe they can put somebody on watch, but

16   they cannot do their follow-ups or take them off a watch

17   or change their level of care.  Because we want to have

18   the most access if somebody's in need to go ahead and

19   place them on watch.

20       Q.    So could a psych associate placing someone on

21   watch decide that they're going to place them on a

22   30-minute as opposed to a 10-minute or continuous watch?

23       A.    A psych associate?

24       Q.    Yes.

25       A.    Yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

176

1     Q.   Could an unlicensed psych associate do that?

2     A.   No.  They would need to place them on a

3 10-minute or above.

4     Q.   So an unlicensed psych associate could make the

5 judgment as between a 10-minute and a continuous watch;

6 is that right?

7     A.   That's -- perhaps.

8     Q.   Perhaps, or yes?

9     A.   I know that the unlicensed psych associates do

10 not do the follow-up or change of care.  But I know that

11 anybody can initially place somebody on watch, but they

12 would need to be seen by a licensed professional within I

13 think 24 hours.  I'm getting a little -- little confused

14 there.

15     Q.   Right.  I thought your testimony was that a

16 unlicensed psych associate can put someone on watch and

17 can make the decision whether to put them on a 10-minute

18 or a continuous watch.  Did I understand that correctly?

19     A.   Yes.

20     Q.   Okay.  Now, when someone's on watch, who does

21 the watching?

22            MS. HESMAN:  Form.  Foundation.

23            THE WITNESS:  Can you rephrase your

24 question?

25     Q.   (By Mr. Fathi) Sure.  If someone's on watch,

**30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -**
**10/12/2021**

179

1                    MS. HESMAN:  Same objection.

2        Q.    (By Mr. Fathi) I wasn't finished with my

3    question, Ashlee.  I'd appreciate it, and you have -- you

4    have asked me any number of times to not interrupt.  I'd

5    appreciate it if you would follow your own advice.

6              Let me begin again, Doctor.

7              Do the officers who are performing 10- or

8    30-minute or continuous watches receive any additional

9    training to allow them to perform their function?

10                   MS. HESMAN:  Are you finished?  Same

11   objection.  Beyond the scope.  Form.  Asked and answered.

12                   THE WITNESS:  I don't have the knowledge to

13   answer that question, sir.

14       Q.    (By Mr. Fathi) Do they receive any training

15   that's provided by mental health staff?

16                   MS. HESMAN:  Same objections.  Form.

17   Foundation.  Beyond the scope.

18                   THE WITNESS:  Again, as I mentioned

19   earlier, they're trained in 807 where the suicide watch

20   policy is located.

21                   As to any other specifics beyond that,

22   you'd have to ask operations because that's in their

23   purview.

24       Q.    (By Mr. Fathi) But, Doctor, my question was do

25   they receive any training that is provided by mental

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

180

1  health, and I believe mental health is in your purview,

2  so could you answer that question, please?

3          MS. HESMAN:  Same objections.  Beyond the

4  scope.  And you've been unable to point me to where it's

5  in the topics so far.

6          THE WITNESS:  As I mentioned several times,

7  sir, I'm aware that they receive training in 807.  Any

8  training beyond that for suicide watch, I don't have the

9  knowledge to answer.

10     Q.   (By Mr. Fathi) If a person is on 30-minute watch

11 and they are not, in fact, checked by the officer

12 every -- at least every 30 minutes, would that be a

13 violation of policy?

14         MS. HESMAN:  Form.  Foundation.

15         THE WITNESS:  Yes.

16     Q.   (By Mr. Fathi) If a person is on 10-minute watch

17 and they're not, in fact, checked at least every 10

18 minutes by the officer, would that be a violation of

19 policy?

20     A.   Yes.

21     Q.   If a person is on continuous watch and they are

22 not, in fact, being continuously watched by the officer,

23 would that be a violation of policy?

24     A.   Yes.

25         MR. FATHI:  Okay.  Let's take a 10-minute

1    Q.    (By Mr. Fathi) Doctor, do mental health staff
2    provide any training at all to custody staff?
3                    MS. HESMAN:   Form.   Foundation.   Beyond the
4    scope.
5                    THE WITNESS:   Yes.   I'm actually glad that
6    you asked that.   So the mental health staff assist in the
7    three-day additional training that all of the custody
8    staff that work in the residential and inpatient
9    treatment units receive.
10   Q.    (By Mr. Fathi) Okay.   So the custody staff who
11   received this are those who work in the inpatient units
12   which are at Phoenix; correct?
13   A.    And Perryville.
14   Q.    Okay.   And the custody staff who work in the
15   residential units which are at Phoenix, Tucson,
16   Perryville, and Eyman; correct?
17   A.    Correct.
18   Q.    Are those the only custody staff who receive
19   that training?
20   A.    The additional three-day training, yes.
21   Q.    And tell me about that three-day training.
22   A.    I don't have -- that's not kind of in my
23   immediate wheelhouse.   The contractor -- the contract
24   mental health staff provide that, and are part of that
25   training.   Like I said, I don't really -- that's not

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

183

1    immediately in my wheelhouse so I can't speak to all that
2    is contained in that.
3            But I can certainly get, you know, any
4    information that you need about that and provide it to
5    you.
6        Q.    So that training is conducted by Centurion
7    staff?
8        A.    That's correct.
9        Q.    Have you ever participated in or observed that
10   training?
11       A.    No, I have not.
12       Q.    Are there written materials that the custody
13   staff receive as part of that training?
14             MS. HESMAN:   Again I'm objecting to all of
15   this as beyond the scope of the topic areas.
16             THE WITNESS:   Yes, I believe there are.
17       Q.    (By Mr. Fathi) Have you seen any of the written
18   materials that are provided to the custody staff as part
19   of this training?
20             MS. HESMAN:   Same objections.
21             THE WITNESS:   No.
22       Q.    (By Mr. Fathi) When did this three-day training
23   begin?  When was it instituted?
24             MS. HESMAN:   Same objections.
25             THE WITNESS:   I'm sorry.  I don't know

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

184

1   that, sir.

2        Q.   (By Mr. Fathi) Was it already in place when you

3   began your position in 2020?

4                  MS. HESMAN:  Same objections.

5                  THE WITNESS:  Yes.

6        Q.   (By Mr. Fathi) All right.  Let's go back to

7   Exhibit 2, please.  And let's look at pages -- well,

8   Topics 12 and 15, which are on different pages.

9             Topic 12 is about monitoring and managing

10  incarcerated persons on psychiatric medications, and

11  Topic 15 is about the provision of mental healthcare via

12  telepsychiatry or telepsychology.  Do you see those two

13  topics, Doctor?

14       A.   Yes.

15       Q.   All right.  We're going to discuss those

16  together.  If I asked you what you did to prepare to

17  testify on behalf of the department on these two topics,

18  would you give the same answer that you have given to

19  that question previously?

20       A.   Actually, no, because I did ask -- I did reach

21  out to Dr. Pelton and ask her if they had a telepsych

22  kind of technical manual, if you will.

23       Q.   And what did you find out?

24       A.   The -- the preparation was the same.  Yes, they

25  do.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

185

1      Q.    And what's the title of that document?

2      A.    I don't know.  It's essentially a telepsych or

3    telehealth technical manual.  I don't know exactly what

4    the name is, but they do have one.

5      Q.    And when did you have this communication with

6    Dr. Pelton?

7      A.    I don't know what day it was.  I'm literally in

8    contact with her every day.  I don't know what day it

9    was.  Sometime within the last week.

10     Q.    And is this a ADC document or a Centurion

11   document?

12     A.    It's a Centurion document.

13     Q.    Did she provide it to you?

14     A.    Yes.

15     Q.    Did you review it?

16     A.    No.  I didn't have time.

17     Q.    All right.  Other than this additional

18   communication with Dr. Pelton, is there any -- any

19   additional way that you -- any additional steps you took

20   to prepare to testify on behalf of the department on

21   these two topics, other than the answer you have -- you

22   have given to that question for other topics?

23     A.    Nothing other than that.

24     Q.    Is -- is there a psychiatrist employed anywhere

25   in ADC?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

1       A.    Not that I'm aware of.

2       Q.    Is there a psychiatric mid level practitioner

3    employed anywhere in ADC?

4       A.    Not that I'm aware of.

5       Q.    Who prescribes psychotropic medications to

6    people in ADC custody?

7       A.    The vendor psychiatric -- or psychiatric

8    providers.   The vendor psychiatric providers.

9       Q.    And the vendor of course is Centurion?

10      A.    Yes.   That's correct.

11      Q.    And I understand some of those psychiatric

12   providers are psychiatrists?

13      A.    Yes.

14      Q.    And others are psychiatric nurse practitioners

15   or psychiatric mid levels; is that correct?

16      A.    That's correct.

17      Q.    Does ADC use those two job classifications

18   interchangeably?

19            MS. HESMAN:   Form.

20            THE WITNESS:   I believe so.

21      Q.    (By Mr. Fathi) So is there -- another way to ask

22   the question is, is there anything a psychiatrist can do

23   that a psychiatrist mid level cannot do?

24      A.    Not that I'm aware of.

25      Q.    Is there any policy requiring that certain

187

1  categories of patients be seen by a psychiatrist rather

2  than a psychiatric mid level?

3       A.   Not that I'm aware of.

4       Q.   Do you have the authority to request or to

5  require that a certain patient be seen by a psychiatrist

6  rather than a psychiatric mid level?

7       A.   In the monitoring bureau I don't provide care.

8  So I would consult with the psychiatric director and, you

9  know, let him know what my concerns were.  But I don't

10  provide care --

11       Q.   No, I understand that, but --

12       A.   -- in the monitoring bureau.

13       Q.   I'm sorry, go ahead.

14       A.   Yeah, in the monitoring bureau we don't provide

15  care, so telling them to provide specific care to a

16  specific patient from a person at a certain level may be

17  overstepping that bound as opposed to saying what my

18  concerns are to the psychiatric director.

19       Q.   Well, do you have the authority should you

20  choose to use it to require that a certain patient be

21  seen by a psychiatrist rather than a psychiatric mid

22  level?

23       A.   One individual patient?

24       Q.   Yes.

25       A.   Yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

188

1      Q.    Have you ever done that?

2      A.    No.

3      Q.    Do you have the authority to require that

4   certain categories of patients be seen by a

5   psychiatric -- by a psychiatrist rather than a

6   psychiatric mid level?

7           MS. HESMAN:   I'm objecting to this line of

8   questioning as exceeding the scope of these topics.

9           THE WITNESS:   Through the change in the

10  department order and technical manual that's made as a

11  team, then that change could be made.

12     Q.    (By Mr. Fathi) So you do have the authority to

13  require that?

14     A.    In coordination with the team, yes.

15     Q.    Have you ever requested that certain categories

16  of patients be seen by a psychiatrist rather than a

17  psychiatric mid level?

18     A.    No.  I have not.

19     Q.    You talked about the Centurion telepsych manual.

20  Is there an ADC policy that governs the -- either the

21  provision of medication, psychotropic medication, or the

22  use of telepsych?

23     A.    The -- you confused me with your question.  Can

24  you --

25     Q.    I'll ask the question again.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

189

1     A.   -- two questions.

2     Q.   Is there a written ADC policy that governs the

3  use of psychiatrists, psychiatric mid levels and the

4  prescription of psychotropic medications?

5     A.   Yes.  And that's in the mental health technical

6  manual.

7     Q.   Any other written policy --

8     A.   DO-1103.

9     Q.   Anything else?

10    A.   Perhaps there may be some sections that also

11  refer to it in the medical services technical manual.

12    Q.   Anything else?

13    A.   That's it that I'm aware of.

14    Q.   Is there any ADC written policy on the use of

15  telepsychiatry or telepsychology?

16    A.   Not that I'm aware of.

17    Q.   Now, since you testified that the two

18  psychiatrists and psychiatric mid levels are used

19  interchangeably in ADC, I'm going to use the term

20  "psychiatric provider" to describe them both.  Is that

21  okay?

22    A.   Yes.

23    Q.   Now, some psychiatric providers see patients in

24  person and some see them remotely via video; is that

25  correct?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

190

1      A.    That's correct.

2      Q.    Okay.  And I'm going to use the term "telepsych"

3  to describe the latter situation in which the patient is

4  seen by video.  Okay?

5      A.    Okay.

6      Q.    Does ADC use in-person and remote psychiatric

7  providers interchangeably?

8            MS. HESMAN:   Form.

9            THE WITNESS:   No.  Because telepsych

10  providers are not used in inpatient settings.

11     Q.    (By Mr. Fathi) Okay.  So everyone in an

12  inpatient setting has their psychotropic medication

13  prescribed by a psychiatric provider who sees them

14  face to face; is that correct?

15     A.    That's correct.

16     Q.    So there's no use of telepsych in the inpatient

17  facilities; is that correct?

18     A.    That's correct.

19     Q.    What about the residential treatment programs?

20  Is telepsych used in those programs?

21     A.    I don't think it is used there, but it may be

22  used there.  I know for certain that it is not used in

23  inpatient at all.  It may be used in residential.

24     Q.    And is there a written policy that says

25  telepsych is not used in inpatient facilities, or is that

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo - 10/12/2021

191

1   just the way it happens to be now and that could change?

2       A.   I'm not aware of any policy regarding telepsych

3   and where it's used at this time.

4       Q.   Okay.  So as far as you know --

5       A.   It's not used in inpatient.  We have providers

6   on site providing that care.

7       Q.   Okay.  But as far as you know there's no written

8   policy that prohibits the use of telepsych in inpatient

9   facilities?

10      A.   That's correct.

11      Q.   Is there any other distinction between how ADC

12  uses in-person psychiatric providers and how it uses

13  telepsych psychiatric providers?

14      A.   The only other thing I can think of is if it is

15  clinically contraindicated, then we would have the

16  individual set up to see an in-person provider.  But

17  other than that, they would be used interchangeably.

18      Q.   Can you give me an example of when it might be

19  clinically contraindicated?

20      A.   I have not come across that situation in my

21  experience with telepsych.  But if it did, the patient

22  felt uncomfortable, maybe was psychotic or what have you

23  and felt uncomfortable with that communication via

24  telepsych, then we would schedule them to be seen in

25  person.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

192

1           Or really any other reason that they were unable

2     to participate meaningfully in that telepsych --

3       Q.    Do you have -- I'm sorry.

4           Do you have on-site psychiatric providers at all

5     ten ADC complexes?

6       A.    We do.  And the only -- sorry.  Go ahead.

7       Q.    No, I didn't say anything.  Let me just ask that

8     again so the record's clear.

9           Your testimony is that you have on-site

10    psychiatric providers at all 10 ADC complexes?

11      A.    That's correct.

12      Q.    So any patient who would rather see an

13    on-site -- on-site psychiatric provider can see one?

14           MS. HESMAN:  Form.

15           THE WITNESS:  Again, I feel like we're

16    going back to similar questions that you've asked in the

17    past.  So our decisions based -- in providing care are

18    based on clinical need as opposed to a patient's wishes,

19    per se.

20           So if it is clinically indicated that the

21    patient be seen in person as opposed to via telepsych,

22    then they can be seen in person because we do have

23    psychiatric providers on site at all facilities.

24      Q.    (By Mr. Fathi) And who decides if it's

25    clinically indicated?

**30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021**

193

1      A.   I would say the treatment team.  And in that

2  case, I would be referring to the psychiatrist, the psych

3  associate, and the patient.

4      Q.   Okay.  And where is this written down that if

5  telepsych is clinically contraindicated the person will

6  see an in-person psych provider?

7      A.   As mentioned earlier, I'm not aware of a policy

8  that specifies the provision of services via telepsych.

9      Q.   Okay.  So to your knowledge what you just told

10  me, that if telepsych is contraindicated the patient can

11  see an in-person psych provider, that's not written down

12  anywhere?

13      A.   Not that I'm aware of.

14      Q.   Okay.  So I take it from your testimony that a

15  patient could say, "I don't want to see telepsych.  I'd

16  rather see a live provider," and the patient could --

17  that request would not be granted; is that correct?

18           MS. HESMAN:   Form.  Misstates her

19  testimony.

20           THE WITNESS:  No, I don't agree to that.

21      Q.   (By Mr. Fathi) Okay.  Let me ask it a different

22  way.

23      A.   I've never -- I've never had that situation

24  occur.  Like I said, even in the most severe of

25  situations in which you think it may occur, it has never

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

194

1    occurred.   So I can't speculate other than it would be a

2    treatment team decision.

3        Q.    Let me ask it a different way.

4            Is any patient who asks to see a live, in-person

5    provider rather than a telepsych provider allowed to see

6    a live, in-person provider?

7                MS. HESMAN:   Form.

8                THE WITNESS:   They may be.

9        Q.    (By Mr. Fathi) No.   My question, Doctor, was is

10   any person who asks to see an in-person psychiatric

11   provider rather than a telepsych provider allowed to see

12   an in-person psychiatric provider?

13               MS. HESMAN:   Form.   Asked and answered.

14               THE WITNESS:   If it's clinically indicated.

15       Q.    (By Mr. Fathi) Okay, Doctor, I'm going to ask

16   you to please listen to my question and answer the

17   question I'm asking.

18            Is any patient who requests to see an in-person

19   psychiatric provider rather than a telepsych provider

20   allowed to see an in-person psychiatric provider?

21               MS. HESMAN:   Form.   Asked and answered.

22   You don't like her answer, but she's answered the

23   question I think three times now.

24       Q.    (By Mr. Fathi) Doctor?

25       A.    If it's clinically indicated.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

195

1    Q.    And so if it's decided that it's not clinically

2  indicated, the patient will not see an in-person psych

3  provider; is that correct?

4    A.    Given this is all speculation, because I've

5  never seen this occur in all of the time that we've had

6  telepsych.

7    Q.    Doctor, you are here testifying on behalf of the

8  Arizona Department of Corrections.  So I am entitled --

9  and I'm asking you about policy.  I'm not asking you what

10 you've seen --

11   A.    There's no written policy about telepsych.

12   Q.    Nothing at all?

13   A.    Nothing that I'm aware of at all about

14 telepsych.

15   Q.    Okay.  Thank you.

16         So I just want to make sure.  You are sure that

17 there is currently an on-site psychiatric provider at all

18 10 ADC complexes.  Is that right?

19              MS. HESMAN:  Form.  Foundation.  Asked and

20 answered.

21              THE WITNESS:  I am positive.

22   Q.    (By Mr. Fathi) You are positive, okay.  Thank

23 you.

24         If a patient wants to see a psychiatric provider

25 how does he go about that?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

197

1          MS. HESMAN:  Same objection.

2          THE WITNESS:  You asked if I was aware of

3     any occasions where that had not -- had occurred, and I'm

4     not.

5       Q.   (By Mr. Fathi) If someone is taking psychotropic

6     medications, how often is he or she required by policy to

7     be seen by the psychiatric provider?

8       A.   So it depends on their level of mental

9     healthcare.  So the 3-Es are not on psychotropic

10    medication so they're not seen at all.  The 3-Bs have

11    discontinued their medication recently, and they're seen

12    once -- 30 days after discontinuing their medication.

13          The 3-Cs are seen every 180 days or less.  All

14    of these are, again, maximum time frames, not minimums.

15    And they can always request to be seen via HNR before

16    that.  So the 3-Cs are seen every 180 days.

17          The 3-Bs, if they have major depressed -- major

18    depression, bipolar disorder or a psychotic disorder are

19    seen every 90 days.

20          Everyone classified as a 3-B is seen every 180

21    days.

22          The 3-As are seen every 90 days.  4s every 90

23    days.  And 5s every month at most.  Again, they can

24    request to be seen any time other than that as well.

25       Q.   And if a patient requests to see a psychiatric

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

198

1    provider more frequently than those time frames, will he

2    or she be seen?

3                    MS. HESMAN:   Form.   Foundation.

4                    THE WITNESS:   Yes, they may do so.

5        Q.    (By Mr. Fathi) No, I'm asking will the patient

6    be seen?

7                    MS. HESMAN:   Same objections.

8                    THE WITNESS:   Yes.   Unless it's clinically

9    contraindicated and noted why in the chart.

10       Q.    (By Mr. Fathi) And Who decides if it's

11   clinically contraindicated?

12       A.    The psychiatric provider.

13       Q.    So it's up to the psychiatrist or the

14   psychiatric provider whether or not to grant the

15   patient's request to -- to be seen more frequently; is

16   that right?

17       A.    Yeah, same as in the community.   If you --

18   you're a psychiatrist, every day they're going to let you

19   know what's appropriate and schedule you at that

20   interval.

21       Q.    And are there any guidelines to guide the

22   psychiatric provider's decision about whether to see the

23   patient more frequently?

24       A.    It's in the mental health technical manual, yes.

25       Q.    Okay.   So in the mental health technical manual

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

199

1  there are guidelines that advise the psychiatric provider

2  how to decide whether or not to see someone who asks to

3  be seen more frequently.  Is that your testimony?

4      A.   No.  Now we're -- seem like we're crossing

5  different paths.  So if we're sticking to the path of the

6  patient requesting to be seen more frequently, then the

7  psychiatric provider is going to determine what is

8  clinically appropriate for that patient.

9      Q.   And my question is is there any ADC written

10  policy or Centurion written policy that sets forth

11  guidelines for the psychiatric provider to make that

12  decision?

13      A.   That would be based on their clinical training

14  and judgment, clinical guidelines, FDA requirements, and

15  the manufacturer's requirements on the medication.

16      Q.   Can you answer my question, Doctor?

17      A.   I did.

18      Q.   No, my question was is there any written ADC or

19  Centurion policy that sets forth guidelines for the

20  psychiatric provider to consider when asked by a patient

21  to be seen more frequently?

22          MS. HESMAN:  Form.  Asked and answered.

23          THE WITNESS:  Those are the guidelines that

24  would inform that decision, sir.

25      Q.   (By Mr. Fathi) Is there an ADC written policy on

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

200

1  that?

2                  MS. HESMAN:   Same objection.

3                  THE WITNESS:   The mental health technical

4  manual serves as the written policy.

5     Q.   (By Mr. Fathi) So the mental health technical

6  manual sets forth the considerations that the psychiatric

7  provider should take into account when deciding whether

8  to see a patient more frequently?

9                  MS. HESMAN:   Form.

10                  THE WITNESS:   No.   That's not what I

11  stated.   What I stated was my answer, and that all of

12  those sources would inform their decision.

13     Q.   (By Mr. Fathi) Doctor, this will go so much more

14  quickly if you'll just answer my question.

15                  MS. HESMAN:   David, she's answering your

16  questions.   You don't like it.   You're asking the same

17  question over and over.   But she's answering your

18  questions, and you're being rude.

19                  MR. FATHI:   The record -- the record will

20  speak for itself.

21                  MS. HESMAN:   I agree.   So she's answered

22  your questions.   Why don't you move on?

23                  MR. FATHI:   And -- okay.

24     Q.   (By Mr. Fathi) Doctor, is there a written ADC

25  policy that sets forth the considerations that a

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

1   psychiatric provider should take into account when a

2   patient asks to be seen more frequently than policy

3   provides?

4                 MS. HESMAN:   Form.

5       Q.   (By Mr. Fathi) Yes or no.

6       A.   The 1103.

7       Q.   Is there a written Centurion policy that sets

8   forth those guidelines?

9       A.   I don't know.

10                MS. HESMAN:   Form.   Foundation.

11      Q.   (By Mr. Fathi) I'm sorry, Doctor?

12      A.   I don't know.

13      Q.   So a moment ago you set forth the -- the various

14  timelines on which patients are required by policy to be

15  seen by the psychiatric provider.   Do you remember that

16  testimony?

17      A.   Yes.

18      Q.   Are you aware of any instances in which those

19  time frames were not met?

20                MS. HESMAN:   Form.   Foundation.

21                THE WITNESS:   Yes.

22      Q.   (By Mr. Fathi) At what facilities are you aware

23  of those time frames not being met?

24      A.   I don't have that on the top of my head.

25  However, it is one of the audits that we run every month.

202

1   And at times there are -- there have been times where

2   that time frame is not met.  But well above 90 percent of

3   the time, they are met.

4       Q.   So is it your testimony that on none of these

5   time frames has compliance ever fallen below 85 percent?

6              MS. HESMAN:   Form.

7              THE WITNESS:   That's not what I said.

8       Q.   (By Mr. Fathi) You said they were well above

9   90 percent.  Did I misunderstand your testimony?

10      A.   Yeah.  I think you did because I didn't say that

11  they had never fallen below anything.  But I said that we

12  monitor them monthly and they're routinely well above

13  90 percent.

14      Q.   Who's responsible for monitoring the therapeutic

15  effects and side effects of psychotropic medications?

16             MS. HESMAN:   Form.  Foundation.

17             THE WITNESS:   The psychiatric provider that

18  prescribed the medication.

19      Q.   (By Mr. Fathi) Is there any written ADC policy

20  that addresses monitoring of therapeutic effects or side

21  effects of psychiatric medication?

22      A.   Yes.  The mental health technical manual.

23      Q.   Is there a minimum frequency with which labs

24  must be drawn for patients taking lithium, for example?

25             MS. HESMAN:   Form.

1            THE WITNESS:  Those are based in the

2    clinical guidelines, the FDA requirements and the

3    manufacturer's recommendations.  I'm not aware of

4    specific drugs being outlined in the mental health

5    technical manual.

6        Q.    (By Mr. Fathi) Is there any minimum policy -- is

7    there any minimum frequency with which labs must be drawn

8    set forth in any ADC written policy?

9            MS. HESMAN:  Same objections.

10            THE WITNESS:  As I mentioned, I'm not aware

11    of any specific guidelines like that.  However, they

12    would default to the clinical guidelines, the FDA

13    requirements and the manufacturer's requirements.

14        Q.    (By Mr. Fathi) Doctor, I'm not asking you about

15    FDA requirements.  I'm not asking you about

16    manufacturers' requirements.  I'm asking you about ADC

17    written policy.

18            Is there any ADC written policy that sets forth

19    any minimum frequency with which labs must be drawn for

20    patients on psychotropic medications?

21            MS. HESMAN:  Form.  Asked and answered.

22            THE WITNESS:  They are to be drawn as

23    required by the specific medication.  Like I said,

24    they're not -- the technical manual is not broken down by

25    specific medication.  So they are required to be drawn as

**30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021**

204

1    indicated for that medication.

2                I'm not aware of any specific timelines

3    regarding labs or blood draws or anything like that for

4    psychotropic medication in the tech manual.

5        Q.   (By Mr. Fathi) Doctor, are you familiar with the

6    acronym AIMS?

7        A.   Several different acronyms for AIMS, yes.  Which

8    one are you referring to?

9        Q.   The one I'm referring to is the one that has to

10   do with involuntary movements as side effects for certain

11   psychotropic medications.  Are you familiar with that

12   term?

13       A.   Yes, I am.

14       Q.   Is there any written ADC policy that sets forth

15   minimum frequency with which AIMS tests must be

16   administered?

17       A.   I'm not sure.

18       Q.   Is there any Centurion written policy that sets

19   forth a minimum frequency with which AIMS tests must be

20   administered?

21            MS. HESMAN:  Form.  Foundation.

22            THE WITNESS:  I don't know.

23       Q.   (By Mr. Fathi) Doctor, would you agree that some

24   psychotropic medications can increase a patient's

25   vulnerability to heat injury?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

205

1                          MS. HESMAN:   Form.   Foundation.   Beyond the

2      scope.

3                          THE WITNESS:   Can you ask the question

4      again, please?

5          Q.   (By Mr. Fathi) Yes.   Doctor, would you agree

6      that there are certain psychotropic medications that can

7      increase a patient's vulnerability to heat injury?

8                          MS. HESMAN:   Same objections.

9                          THE WITNESS:   Yes.

10         Q.   (By Mr. Fathi) And who in ADC is responsible for

11     protecting patients who are taking psychotropic

12     medications from heat injury?

13                         MS. HESMAN:   Form.   Foundation.

14                         THE WITNESS:   That's a really broad

15     question.

16         Q.   (By Mr. Fathi) I -- I don't think it's a broad

17     question.   If -- if there are multiple people who are

18     responsible for that, then please tell me that.

19                         MS. HESMAN:   Same objection.

20                         THE WITNESS:   So it seems a very broad

21     question.   Can you try and ask it a little bit

22     differently so I can avoid kind of the broadness of it?

23         Q.   (By Mr. Fathi) Are mental health -- do mental

24     health staff have any responsibility for protecting

25     patients who are taking psychotropic medications from a

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

206

1   heat injury?

2                   MS. HESMAN:   Form.   Foundation.   Beyond the

3   scope.

4                   THE WITNESS:   Okay.   Yes.

5       Q.   (By Mr. Fathi) And what is the nature of that

6   responsibility?

7                   MS. HESMAN:   Same objection.

8                   THE WITNESS:   So I would say even broader

9   than that that really everyone that provides healthcare

10  to the inmate has responsibility for protecting the

11  inmate from a heat-related interaction.

12                  And they are to respond to them, assess

13  them, and refer them to the psychiatrist as appropriate

14  and treat them as needed.   I would go -- like I said,

15  it's super broad, so I don't think it can be answered

16  summarily.

17      Q.   (By Mr. Fathi) And those requirements that you

18  just articulated, where are those written down?

19      A.   In the mental health technical manual.

20      Q.   Is there any written ADC policy specifying

21  maximum temperatures for the units where patients taking

22  psychotropic medications are housed?

23      A.   No, I don't believe there is.   However, there is

24  practice in place because of the stipulation.

25      Q.   Okay.   Tell me about that practice.

207

1      A.   So the -- the units are monitored for their

2   temperature, and if it becomes above 85, then they take

3   certain steps to bring it below 85 and go from there.

4           And if it was a patient that was on psych meds

5   became ill and you couldn't mediate the heat, then they

6   would have to be moved to another setting where the

7   temperature was less than 85 degrees.

8      Q.   And where is that written down?

9           MS. HESMAN:   Form.

10          THE WITNESS:   In the Department -- I'm not

11  sure what department order it is in, but for sure it's in

12  the mental health technical manual.

13          And I believe -- well, no, like I said, the

14  process takes place in the department based on the

15  stipulation, but the specifics of what to do if a patient

16  is determined to have suffered a heat-related illness are

17  covered in the mental health technical manual.

18     Q.   (By Mr. Fathi) So as I understand your

19  testimony, there's no policy that says people being --

20  people taking psychotropic medication can't be housed in

21  temperatures 85 or above, 90 above, there's no policy of

22  that nature; is that right?

23          MS. HESMAN:   Form.

24          THE WITNESS:   I'm not aware of one.

25  However, I explained the practice based on the

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

208

1    stipulation.

2         Q.    (By Mr. Fathi) Right.  So does the practice that

3    you outlined refer to all patients taking psychotropic

4    medications, or does it only apply once someone is

5    already showing signs of heat illness?

6         A.    No, the practice that I described refers to all

7    patients.  That's why they submit the temperature logs.

8    It's a part of the auditing that goes on every month

9    based on the stipulation.

10        Q.    So is -- I'm afraid I misunderstand your

11   testimony.

12            So what -- what is supposed to be done with

13   patients taking psych -- psychotropic medications when it

14   comes to heat?

15            MS. HESMAN:   Form.

16            THE WITNESS:   I don't understand your

17   question.

18        Q.    (By Mr. Fathi) I thought you described a set of

19   requirements that took effect only once the patient is

20   already experiencing signs or symptoms of -- of heat

21   illness, but you're telling me that's not correct; right?

22        A.    I think we're talking about different things.

23   Keep going, and we'll meet in the middle.

24        Q.    Okay.  What -- what steps is the department

25   prepared to take by policy to protect people taking

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

209

1    psychotropic medications from heat injury?

2                    MS. HESMAN:  Form.

3                    THE WITNESS:  Again, the only requirements

4    are stipulation based at this time.

5        Q.   (By Mr. Fathi) And what is your understanding of

6    those requirements?

7                    MS. HESMAN:  Form.

8                    THE WITNESS:  The -- what I explained

9    already, that they are to monitor the temperatures in the

10   housing units, and if they get above 85, then they are to

11   take steps to bring the temperature down.

12                   And then if somebody experiences symptoms

13   of heat illness, all that other -- all of the other steps

14   go into play.

15       Q.   (By Mr. Fathi) All right.  And -- and that is

16   written down in the mental health technical manual?

17                   MS. HESMAN:  Form.

18                   THE WITNESS:  So the first part about

19   monitoring is in the stipulation.  The second part about

20   heat illness is in the technical manual.

21       Q.   (By Mr. Fathi) Since you've been at ADC, how

22   many patients have been transferred to a different

23   housing area pursuant to this policy?

24                   MS. HESMAN:  Form.  Foundation.

25                   THE WITNESS:  I don't know.

**30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021**

210

1     Q.    (By Mr. Fathi) Since you've been at ADC have any

2   patients been transferred to a different housing area

3   pursuant to this policy?

4              MS. HESMAN:   Same objection.

5              THE WITNESS:   I don't know.

6     Q.    (By Mr. Fathi) Since you've been at ADC how many

7   patients have been transported to an off-site medical

8   facility because of heat illness?

9              MS. HESMAN:   Same objection.   Exceeds the

10   scope of the topic.

11              THE WITNESS:   I don't know.

12     Q.   (By Mr. Fathi) All right.   Let's look at

13   Exhibit 2, Topic 13, please.

14              Doctor, Topic 13 on Exhibit 2 has to do with the

15   PMRB in administrating involuntary psychotropic

16   medications.   Do you see that?

17     A.   Yes.

18     Q.   And is -- if I asked you what you did to prepare

19   to testify on behalf of the department on this topic,

20   would your answer be the same as the answer that you have

21   frequently given to that question?

22     A.   Yes, it would.

23     Q.   What does PMRB stand for?

24     A.   Psychotropic Medication Review Board.

25     Q.   And what is the purpose or function of the PMRB?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

211

1      A.   To determine if a patient requires involuntary

2   psychotropic medication.

3      Q.   And does the PMRB meet on a regular basis or

4   does it meet more on an as-needed basis?

5           MS. HESMAN:   Form.   Foundation.

6           THE WITNESS:   So the PMRB, when you say

7   that -- can you answer -- ask that differently?   Because

8   the way you're stating it makes me think that you're

9   referring to something different from the PMRB.

10      Q.   (By Mr. Fathi) Well, let me -- let me take a

11   step back.   The PMRB is the Psychiatric Medication Review

12   Board.   Is that correct?

13      A.   Yes.

14      Q.   Okay.   And who are the members of the PMRB?

15      A.   The nontreating psychologist, nontreating

16   psychiatrist, and the deputy warden.

17      Q.   So those are the only three members?

18      A.   Yes.

19      Q.   So my question is does the PM -- first of all,

20   is there one PMRB in all of ADC?

21      A.   No.   That's why I was -- that's why I was

22   thinking we were getting a little mixed up.   No, there's

23   not.

24      Q.   Okay.   So does every complex have a PMRB?   Does

25   every unit have a PMRB?   How does that work?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

212

1      A.    No.   It is based on the patient, where the

2   patient is located, and then the members of the PMRB are

3   determined based on that.   There's not like a standing

4   board per se.

5      Q.    I see.   So the PMRB is -- is convened to

6   consider an individual patient; is that correct?

7      A.    That's correct.

8      Q.    Okay.   And who -- who has authority to convene

9   the PMRB?

10      A.    The mental health lead would have that

11   authority.

12      Q.    I'm sorry, who would?

13      A.    The mental health lead at the facility.

14      Q.    Okay.   And you said the PMRB consists of a

15   nontreating psychologist, a nontreating psychiatrist, and

16   the deputy warden?

17      A.    That's correct.

18      Q.    Okay.   So walk -- walk us through the process.

19   The mental health lead convenes the PMRB.   What happens

20   next?

21      A.    So, of course, it's laid out very well in the

22   mental health technical manual, and there are very

23   specific steps that must be followed.   And I do not have

24   them memorized by heart.   But I can give you a general

25   overview of how it happens, if you'd like.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

213

1      Q.    Please.

2      A.    Okay.  So the mental health lead or whoever is

3   requesting the PMRB would go to the mental health lead

4   and say, "I think the person needs a PMRB."  And then

5   they would discuss it, say, "Okay, yes, I think that he

6   does."

7            And then they would start the -- it's kind of a

8   legal process, really, where they serve notice that

9   you're going to have a PMRB.  I believe, like I said, I'm

10  not going to -- I don't know all those steps by heart.

11           But they go through the judicial process, if you

12  will, of serving the patient, letting him know he will be

13  having a PMRB.  They get together the parties that are

14  needed.

15           And then they go and basically present the case,

16  say, "Hey, I think this guy needs PMRB because they're a

17  danger to themselves or others, or they're unable to care

18  for themselves.  And they're unwilling to take the

19  medication or participate in their treatment."  And, you

20  know, just present the case.

21           And then the three members that are nontreating

22  make the determination as to whether or not the PMRB is

23  put into place.  If it is put into place, it stays in

24  place for six months.

25     Q.    Okay.  Is there any appeal from the decision of

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

214

1    the PMRB?

2         A.    Yes.   The patient can appeal it.

3         Q.    And who hears that appeal?

4         A.    I'm not sure, and I'm not going to guess.   Like

5    I said, that process is very detailed and laid out super

6    clearly in the mental health technical manual, and I

7    don't want to guess to probably exactly what you're

8    looking at right now.   So --

9         Q.    So your testimony is that the process as laid

10   out in the mental health technical manual is -- is an

11   accurate description of the PMRB process?

12        A.    Yes.

13        Q.    And are you aware of the PMRB process laid out

14   in the manual ever not being observed or followed in

15   practice?

16             MS. HESMAN:   Form.   Foundation.

17             THE WITNESS:   No.   I'm not.

18        Q.    (By Mr. Fathi) In a typical month how many PMRBs

19   are -- are held?

20             MS. HESMAN:   Form.   Foundation.

21             THE WITNESS:   I don't know.   We did provide

22   a PMRB log, or it was requested, but I don't know how

23   many are performed a month.   Just a guess would be maybe

24   two or three a month.   But that's probably on the high

25   end because we are very good at engaging our patients in

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

215

1   the treatment that they need.

2        Q.   (By Mr. Fathi) So you're saying two or three a

3   month in the entire system?

4        A.   Yes.

5        Q.   Okay.

6        A.   That's -- honestly, that's a guess, and I would

7   refer you to the PMRB log.

8        Q.   Okay.  Is the PMRB log something that's kept in

9   the ordinary course of business?

10       A.   Yes.

11       Q.   Okay.  So it's not something that was created

12   just because of this lawsuit; is that right?

13       A.   Oh, no.

14       Q.   Okay.  Does the patient have the right to any --

15   does the patient have the right to address the -- the

16   PMRB?

17       A.   Yes.

18       Q.   Does the patient have the right to legal

19   representation or other representation before the PMRB?

20       A.   I'm not sure.

21       Q.   Do you have any role in the PMRB process?

22       A.   I do not.

23       Q.   Let me go back to the heat question for a

24   moment.

25            I -- I think you said that the policy requires

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

216

1    that if the temperature is above 85 degrees Fahrenheit,

2    then steps have to be taken to try to lower the

3    temperature; is that right?

4        A.   No.  I said that was based on the stipulation.

5        Q.   I thought you said that was the current policy

6    in -- in ADC.  Is that correct?

7                 MS. HESMAN:  Form.

8                 THE WITNESS:  No.  I did not.  I said that

9    was based on the stipulation.

10       Q.   (By Mr. Fathi) All right.  Well, let me ask you

11   this:  Is ADC's position that it is still obligated to

12   comply with the stipulation?

13                MS. HESMAN:  Form.  Foundation.  Exceeds

14   the scope of the notice.

15                THE WITNESS:  I can't answer that.

16       Q.   (By Mr. Fathi) Well, actually, Doctor, you can.

17   You are here as a representative of ADC, so I'm entitled

18   to your answer as to whether ADC believes it is still

19   bound to comply with the stipulation or that it doesn't

20   have to.

21                MS. HESMAN:  What topic is that under,

22   David?  Could you refer me to that?

23       Q.   (By Mr. Fathi) Doctor?

24                MS. HESMAN:  Can you answer my question,

25   David?  Because if you don't answer it, it seems like

217

1    it's not relevant to any topic.  So which topic talks

2    about compliance with the stipulation and whether the

3    department's -- what the department's position is on

4    that?

5                   MR. FATHI:  The doctor raised the

6    stipulation, and I'm getting confusing testimony from her

7    on whether or not she thinks it's in effect.  So that's

8    why I'm asking the question.

9                   MS. HESMAN:  All right.  so you're unable

10   to point to any topic that would cover that question;

11   right?

12                  MR. FATHI:  Ashlee, I'm not going to argue

13   with you anymore.

14       Q.    (By Mr. Fathi) Doctor, would you answer the

15   question, please?

16                  MS. HESMAN:  Okay.  That exceeds the scope,

17   and she's already answered the question with respect to

18   the heat-specific question.

19       Q.    (By Mr. Fathi) Would you answer the question,

20   please, Doctor?

21       A.    So as I mentioned earlier the -- the process for

22   monitoring the heat is in place because of the

23   stipulation.  The process beyond that is laid out in the

24   mental health technical manual.

25       Q.    Right.  And my question is does the

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

218

1    department --

2        A.    The process is still being followed.

3        Q.    Is the mental health staff continuing to comply

4    with the stipulation?

5                MS. HESMAN:  Form.  Foundation.  Exceeds

6    the scope.

7                THE WITNESS:  Yes.

8        Q.    (By Mr. Fathi) So in that case, back to my

9    original question, when the temperature is above 85

10   degrees, what steps are taken to reduce the temperature?

11               MS. HESMAN:  Form.  Asked and answered.

12               THE WITNESS:  Honestly, I'm not the best

13   person to ask that because it's an operations action that

14   occurs, so I would refer you to operations for a good

15   answer to that question because I'm not operations and I

16   don't know all of the steps that they take in those

17   circumstances.

18       Q.    (By Mr. Fathi) Well, I assure you we'll ask them

19   too, but, again, you are designated to testify on behalf

20   of the department on topics including protection of

21   people on psychotropic medications from heat.  So I'm

22   entitled to your best answer.

23               What steps are taken when the temperature

24   exceeds 85 degrees to try to lower the temperature?

25               MS. HESMAN:  Form.  Asked and answered.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

219

1            THE WITNESS:  Like I said, you would have

2    to ask the operations side of that.  I am not a

3    professional in lowering the temperature in buildings,

4    otherwise it would be lowered right now, but it is not.

5    I'm not a professional in that, and I don't have a -- the

6    answer to give you.

7        Q.   (By Mr. Fathi) Okay.  Let's go to Exhibit 2,

8    please.  Topic 14.

9            Doctor, Topic 14 is, "Policies and procedures

10   regarding minimum duration of mental health encounters

11   including policies and procedures for complying with the

12   court's orders on minimum duration of mental health

13   encounters."

14           Do you see that, Doctor?

15       A.   I do.

16       Q.   And if I were to ask you what you did to prepare

17   to testify on behalf of the department on this topic,

18   would you give the same answer?

19       A.   Yes.

20       Q.   Are you aware that the court in this case has

21   entered various orders about the minimum duration of

22   mental health encounters?

23       A.   Yes.

24       Q.   And what is your understanding of what those

25   orders require?

1      A.    Prior to February of this year, they required

2   that watch-related contacts be a minimum duration of 10

3   minutes or less, or be reviewed by a mental health

4   clinician to determine whether or not they were

5   clinically appropriate in the patient's overall care.

6            Or -- and then for nonwatch-related they had to

7   be 30 minutes or reviewed for the same criteria.

8            Then in February, the requirement was that they

9   had to meet those time durations or be reviewed by a

10  psychiatric provider to determine the appropriateness of

11  the interaction within the patient's context of their

12  overall care.

13     Q.    And is the department still complying with those

14  orders?

15     A.    Yes.

16     Q.    Okay.  Other than the court orders, does ADC

17  currently have any written policy regarding the minimum

18  duration of mental health encounters?

19     A.    No.  They do not.

20     Q.    Again, other than the court orders, does

21  Centurion currently have any policy regarding the minimum

22  duration of mental health encounters?

23            MS. HESMAN:  Form.  Foundation.

24            THE WITNESS:  I don't know.

25     Q.    (By Mr. Fathi) How is compliance with the

1    court's orders regarding minimum duration monitored and

2    enforced?

3         A.   So prior to February of this year, it was

4    monitored through the CGAR, and all contacts that didn't

5    meet the minimum duration were reviewed by

6    independently-licensed mental health staff to determine

7    whether or not that contact was meaningful in -- in the

8    context of overall care.

9              After the order came in to have that reviewed by

10   a psychiatrist, the same level of documentation and

11   service was required.

12             However, there were -- the inmate patients were

13   then required to sign a form, basically a refusal form

14   saying that they didn't want to meet for -- didn't want

15   or need to meet for any longer than they did.

16             And so after February, and with the compliance

17   that was put into effect April 1st, and after April 1st,

18   you will see a dip in the mental health compliance, but

19   that is a really false dip because it was just a change

20   in practice because the requirement of the signed refusal

21   was now in place.

22        Q.   So if the encounter was shorter than 10 minutes

23   or 30 minutes as the case may be, but there is a signed

24   refusal, does ADC still count the encounter as compliant?

25        A.   Yes.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

222

1    Q.    And do the staff who are conducting these

2  encounters ever ask the patient if he wants to sign a

3  refusal?

4                    MS. HESMAN:   Form.   Foundation.

5                    THE WITNESS:   Yes.   How else would it get

6  signed?   I don't understand the question, I guess.

7    Q.    (By Mr. Fathi) Are mental health staff

8  instructed not to -- not to suggest terminating the

9  session earlier?

10                   MS. HESMAN:   Form.   Foundation.

11                   THE WITNESS:   Yes.

12    Q.   (By Mr. Fathi) Okay.   And where are those

13  instructions written down?

14    A.   We would never instruct our staff to suggest

15  ending the session early.   Never.   I have never seen that

16  suggested anywhere and it's not -- we wouldn't do that.

17  We don't do that.

18    Q.    Okay.   But I thought you just testified that

19  staff are instructed not to suggest ending the session

20  early.   Did I understand that correctly?

21    A.    There is no -- no instruction around that.

22    Q.    Okay.   To your knowledge, have any mental health

23  staff been disciplined for failure to comply with these

24  durational requirements?

25                   MS. HESMAN:   Form.   Foundation.   Exceeds

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

223

1    the scope.

2                    THE WITNESS:  I don't know.  Not to my

3    knowledge.

4        Q.    (By Mr. Fathi) To your knowledge have any mental

5    health staff been counseled or received any corrective

6    action for failure to comply with these durational

7    requirements?

8                    MS. HESMAN:  Same objections.

9                    THE WITNESS:  Our feedback from the

10   monitoring bureau has been based on the quality of care,

11   not simply a duration of a session.

12                   So many, many, many, people have received

13   feedback regarding the quality of care, but we do not

14   make our determination based on an arbitrary number.

15   It's based on the quality of care and the documentation

16   to support that.

17       Q.    (By Mr. Fathi) Well, the -- what you call the

18   arbitrary number is set forth in a court order, so my

19   question is have any mental health staff ever been

20   counseled or received any corrective action for failure

21   to comply with the minimum duration set forth in the

22   court order?

23                   MS. HESMAN:  Same objections.

24                   THE WITNESS:  No.  Because the minimum

25   durations were recommended and left the -- the ability to

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

224

1   see them for a shorter period if deemed clinically

2   appropriate, which is what they had been doing.

3        Q.    (By Mr. Fathi) Okay.  So -- so is the department

4   still evaluating short encounters and counting them as

5   compliant if they're deemed to be clinically appropriate?

6               MS. HESMAN:  Form.

7               THE WITNESS:  Not unless there is a signed

8   signature at this point, a signed refusal form.

9        Q.    (By Mr. Fathi) Okay.  So the only way a short

10  encounter, and by that I mean less than 10 minutes or 30

11  minutes, is counted as compliant is if there is a signed

12  refusal; correct?

13       A.    As of today, yes.

14       Q.    How long has that been the case?

15              MS. HESMAN:  Form.  Foundation.  Asked and

16  answered.

17              THE WITNESS:  Yes.  As of April 1.

18       Q.    (By Mr. Fathi) And is there any --

19       A.    Where you see that artificial decrease in

20  compliance.

21       Q.    Well, I guess we can disagree about whether it's

22  artificial, but is there any plan to change the -- the

23  way you determine whether short encounters are compliant

24  or not?

25              MS. HESMAN:  Form.  Foundation.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

225

1          THE WITNESS:  If I had my -- if it were my

2    way, I would return to evaluating the encounters based on

3    the quality of the note and not a specified duration of

4    time.

5          MR. FATHI:  All right.  let's take a

6    five-minute break.  I think we may be getting close to

7    finished with the 30(b)(6).

8          (Recess from 2:52 p.m. to 3:02 p.m.)

9       Q.   (By Mr. Fathi) Doctor, did you communicate in

10   any way with anyone besides Ms. Hesman during the break?

11      A.   Yes.  Somebody else working on the case, I said

12   hi.

13      Q.   Wow, what a friendly office.

14      A.   I don't know who it was.

15      Q.   Anyone else?

16      A.   No.

17      Q.   Did you consult your phone or computer or any

18   other source of information?

19      A.   No.

20      Q.   All right.  Just a few more questions, then I

21   think we'll be finished with the 30(b)(6) portion of the

22   deposition.

23          You gave some testimony earlier about health and

24   welfare checks that occur in max custody and in

25   detention.  Do you recall that testimony?

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

226

1      A.    Yes.

2      Q.    Do the people who perform those health and

3  welfare checks receive any training specific to

4  performing health and welfare checks?

5      A.    Yes.  As they are covered in the mental health

6  technical manual in what they're looking for.

7      Q.    Right.  Other than what's written down in the

8  mental health technical manual, do they receive any

9  training on how to carry out these health and welfare

10  checks?

11      A.    In the time when they are shadowing the person

12  that is training them and in their period of training, I

13  would say yes, they do.

14      Q.    Tell me about that training.

15      A.    I don't -- again, I don't have all the aspects

16  of the training, but I do believe that they receive at

17  least training on what's in the mental health technical

18  manual and what to look for during those rounds.

19      Q.    Okay.  But, I'm -- I'm sorry, I'm not

20  understanding what training they receive beyond what's

21  written in the mental health technical manual.

22           MS. HESMAN:  Objection.  Exceeds the scope

23  with respect to training.

24           THE WITNESS:  Yeah, I don't have -- I don't

25  have copies of all of the Centurion training.  Sorry

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

227

1    about that.

2        Q.    (By Mr. Fathi) Do you -- do you know that those

3    who perform health and welfare checks receive any formal

4    training beyond what's in the mental health technical

5    manual?

6              MS. HESMAN:   Form.

7              THE WITNESS:   I can't speak to the training

8    that Centurion provides.  Like I said, I don't have that,

9    and I can't speak to the training that they provide.

10       Q.    (By Mr. Fathi) Do you know if Centurion provides

11   any training?

12       A.    Yes, they do, but the details of that training,

13   I do not have.

14       Q.    Does the contract between ADC and Centurion

15   require training for people who are doing health and

16   welfare checks?

17             MS. HESMAN:   Form.   Foundation.   And

18   exceeds the scope of the notice.

19             THE WITNESS:   It requires training of all

20   health care staff, and that would include those doing the

21   rounds.  I'm sorry I can't give you a more direct

22   question -- answer than that because I don't -- I'm not

23   intimately knowledgeable of Centurion's training that

24   they provide to their staff.

25       Q.    (By Mr. Fathi) Have you seen any written

228

1    training materials that are used with the staff who are

2    doing health and welfare checks?

3        A.    No, I have not.

4        Q.    Do staff doing health and welfare checks receive

5    any training on when to alert other mental health staff

6    to a patient's possible decompensation?

7        A.    I do not know.

8        Q.    We had some discussion about what is done to

9    monitor the mental health of people in max custody and --

10   and detention.

11       A.    Okay.

12       Q.    And -- I'm sorry, there seems to be bit of an

13   echo.  Has that been fixed?

14            MS. HESMAN:  I don't hear an echo.

15       Q.    (By Mr. Fathi) Okay.  Let me begin again.

16            Doctor, we've had some discussion, you've

17   testified about various things that are done to monitor

18   the mental health of people who are in max custody and

19   detention.  Do you remember that testimony?

20       A.    Yes.

21       Q.    I -- I now simply want to ask you is there

22   any -- anything else that's done to monitor the mental

23   health of people in max custody and detention that we

24   haven't already discussed?

25       A.    Not that I'm aware of.

30(b)(6) Arizona Department of Corrections, Rehabilitation, and Reentry (Bo -
10/12/2021

229

1        Q.    Other than what we've already discussed, is

2   there anything in addition that's done to monitor the

3   mental health of people in the restrictive status housing

4   program?

5        A.    Not that I'm aware of.

6        Q.    In max custody protective custody?

7        A.    Not that I'm aware of.  I believe we covered

8   everything.

9        Q.    In the maximum custody STG unit?

10       A.    What -- what is that?

11       Q.    If you don't know what it is, that's fine.

12             Anything other than what we've already discussed

13   that is done to monitor the mental health of people in

14   the behavioral management unit?

15       A.    No.

16             MR. FATHI:  All right.  Well, those are all

17   my questions for the 30(b)(6) portion of the deposition.

18   That is all topics on the mental health 30(b)(6) and

19   topics 7, 8, 10 and with respect to mental healthcare

20   topic 9 on the isolation 30(b)(6).

21             I don't know if Ashlee, you have any

22   questions?

23             MS. HESMAN:  I don't.

24             MR. FATHI:  All right.  Well, in that case

25   we will conclude at this point and reconvene for the

232

SIGNATURE PAGE

        I, BOBBIE PENNINGTON-STALLCUP, a deponent
exercising my right to read and sign my deposition taken
on October 12, 2021, place my signature hereon and make
the following changes on this _____ day of
_____,2021.

    (IF THERE ARE NO CHANGES, WRITE "NONE.")

                          _____
                          BOBBIE PENNINGTON-STALLCUP

PAGE   LINE   READS         CHANGE TO              REASON

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

233

```
 1   STATE OF ARIZONA    )
                         )
 2   COUNTY OF MARICOPA  )

 3              BE IT KNOWN that I took the foregoing
     deposition pursuant to Notice; that the witness was duly
 4   sworn by me; and that said transcript is a full, true,
     and accurate record of the proceedings; that the
 5   proceedings were taken down by me in shorthand and
     thereafter reduced to print under my direction; that I
 6   have acted in compliance with ACJA 7-206.

 7              I CERTIFY that I am in no way related to
     any of the parties hereto nor am I in any way interested
 8   in the outcome hereof.

 9              Pursuant to request, notification was
     provided that the deposition is available for review and
10   signature.

11              Dated this 13th day of October, 2021.

12                         _____

13

14                         _____
                           Jennifer Honn
                           Certified Reporter
15                         Arizona CR No. 50885

16

17              I CERTIFY that GLENNIE REPORTING SERVICES,
     LLC, has complied with the ethical obligations set forth
18   in ACJA 7-206.

19

20

21

22

23   _____
24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035
```

# EXHIBIT 10

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;          )
Stephen Swartz; Dustin Brislan;        ) No.
Sonia Rodriguez; Christina             ) CV 12-00601-PHX-ROS
Verduzco; Jackie Thomas; Jeremy        )
Smith; Robert Gamez; Maryanne          )
Chisholm; Desiree Licci; Joseph        )
Hefner; Joshua Polson; and             )
Charlotte Wells, on behalf of          )
themselves and all others similarly    )
situated; and Arizona Center for       )
Disability Law,                        )
                                       )
            Plaintiffs,                )
       vs.                             )
                                       )
David Shinn, Director, Arizona         )
Department of Corrections,             )
Rehabilitation and Reentry; and        )
Larry Gann, Assistant Director,        )
Medical Services Contract              )
Monitoring Bureau, Arizona             )
Department of Corrections,             )
Rehabilitation and Reentry, in         )
their official capacities,             )
                                       )
            Defendants.                )
_____)

DEPOSITION OF BOBBIE PENNINGTON-STALLCUP
(via videoconference)

October 15, 2021
8:57 a.m.
Chandler, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

Prepared by:
602.266.6535                    Jennifer Honn, RPR
www.glennie-reporting.com       Arizona CR No. 50885

2

1                              I N D E X

2    WITNESS                                          PAGE

3    BOBBIE PENNINGTON-STALLCUP

4        Examination by Mr. Fathi                        5

5

6

7

8                      INDEX TO EXHIBITS

9    Description                                      Page

10   Exhibit 7     Defendants' First Supplemental        16
                   Pretrial Disclosure Statement
11                 (81 pages)

12   Exhibit 8    (Not marked.)
     Exhibit 9    (Not marked.)
13   Exhibit 10   (Not marked.)

14   Exhibit 11   E-mails Re: MH Vacancies              21
                  ADCRR00074732 -74736
15

     Exhibit 12   E-mails Re: MH Vacancies              24
16                ADCRR00078985 -78988

17   Exhibit 13   E-mails Re: Eyman Mental Health...     26
                  ADCRR00078969 -78970
18

     Exhibit 14   Staffing Variances -                  27
19                Hired FTE vs Contract FTE
                  (8 pages)
20

     Exhibit 15   E-mails Re: Mental health source...   46
21                ADCRR00074703 -74731

22   Exhibit 16   E-mails Re:...Lewis/Rast (out to...   51
                  ADCRR00109883 -109885
23

     Exhibit 17   Results by MassIngenuity              55
24                ADCRR00070603 -70615

25

3

1                    INDEX TO EXHIBITS (continued)

2    Description                                              Page

3    Exhibit 18   Inmate Assault, Self-Harm, &              60
                  Mortality Data
4                 (4 pages)

5    Exhibit 19   Mortality Review Committee Final Report  62
                  (4 pages)
6
     Exhibit 20   Mortality Review Committee Final Report  71
7                 ADCRR00000106 -109

8    Exhibit 21   E-mails Re: Please ensure immediate...   77
                  ADCRR00080556
9
     Exhibit 22   Centurion CQI Meeting Agenda/Minutes     88
10                ADCRR00056541 -56587

11   Exhibit 23   Declaration of B. Pennington-Stallcup    92

12


13   Instructions not to answer:  97, 98

14

15

16

17

18

19

20

21

22

23

24

25

4

1              DEPOSITION OF BOBBIE PENNINGTON-STALLCUP
                        (via videoconference)
2

3              The deposition of BOBBIE PENNINGTON-STALLCUP was

4    taken on October 15, 2021, commencing at 8:57 a.m., via

5    videoconference, the witness appearing at the law offices

6    of STRUCK LOVE BOJANOWSKI & ACEDO, PLC, 3100 West Ray

7    Road, Suite 300, Chandler, Arizona, before JENNIFER HONN,

8    a Certified Reporter, Certificate No. 50885, for the

9    State of Arizona.

10

11   APPEARANCES:

12   For Plaintiffs:

13        ACLU NATIONAL PRISON PROJECT
          David C. Fathi, Esq.
14        915 15th Street N.W., 7th Floor
          Washington, D.C. 20005
15        Dfathi@aclu.org

16        ACLU NATIONAL PRISON PROJECT
          Corene Kendrick, Esq.
17        39 Drumm Street
          San Francisco, California 94111
18        Ckendrick@aclu.org

19   For Defendant:

20        STRUCK LOVE BOJANOWSKI & ACEDO, PLC
          Ashlee B. Hesman, Esq.
21        3100 West Ray Road
          Suite 300
22        Chandler, Arizona 85226
          ahesman@strucklove.com

23

24   Also Present:    Samantha Weaver

25

6

1      Q.   So you haven't spoken with your counsel about

2   today's deposition since Tuesday?

3      A.   Maybe for five seconds this morning.

4      Q.   Okay.  Did you speak with anyone else in

5   preparation for your deposition today?

6      A.   No, I did not.

7      Q.   Okay.  And I said "speak," but I should have

8   said "communicate."  Did you communicate with anyone else

9   by phone, Zoom, text, in person about your deposition

10  today?

11     A.   No, I did not.

12     Q.   Dr. Pelton, when was the last time you were at

13  the Douglas prison?

14          MS. HESMAN:  I think you meant

15  Dr. Stallcup.

16     Q.   (By Mr. Fathi) I'm sorry.  I had "Pelton" on

17  my -- my document.

18          Dr. Stallcup, when was the last time you were at

19  the Douglas prison?

20     A.   I have not been to the Douglas prison yet.

21     Q.   When was the last time you were at the Eyman

22  prison?

23     A.   Within the last month.

24     Q.   And what was the purpose of that visit?

25     A.   A tour.

Bobbie Pennington-Stallcup - 10/15/2021

7

1      Q.   And who else was on the tour besides you?

2      A.   The plaintiffs' experts and several people from

3   ADCRR.

4      Q.   Was that Dr. Stewart?

5      A.   I'm sorry, no.  The defendants' experts.

6      Q.   Oh.  And what are their names?

7      A.   My apologies.

8              MS. HESMAN:  Form.  Foundation.

9              THE WITNESS:  No, now that we've crossed

10   paths going that way, I'm like, oh, gosh.  Dr. Penn.

11      Q.   (By Mr. Fathi) Okay.  So how long were you at

12   Eyman with Dr. Penn?

13      A.   For approximately four hours.

14      Q.   Okay.  And when was the last time before that

15   that you were at the Eyman prison?

16      A.   Within the last -- probably this summer.

17      Q.   And what was the purpose of that visit?

18      A.   Meeting with the staff, the mental health staff.

19      Q.   About any particular subject?

20      A.   Staffing and just the ability to do their job.

21      Q.   Were the staff or any of the staff expressing

22   concerns about the levels of staffing at the Eyman

23   prison?

24              MS. HESMAN:  Form.

25              THE WITNESS:  At that time, yes.

Bobbie Pennington-Stallcup - 10/15/2021

8

1    Q.    (By Mr. Fathi) Tell me what -- what was said.

2              MS. HESMAN:  Form.

3              THE WITNESS:  I don't remember exactly what

4    was said.  But there were concerns that there was not

5    enough staff at that time to get their job done.

6    Q.    (By Mr. Fathi) And, again, you're talking

7    specifically about mental health staff; correct?

8    A.    That's correct.

9    Q.    Okay.  Were you concerned at that time that

10   there was not enough staffing for the mental health staff

11   to get their job done at Eyman?

12             MS. HESMAN:  Form.

13             THE WITNESS:  Yes.

14   Q.    (By Mr. Fathi) Doctor, when was the last time

15   you were at the Florence prison?

16   A.    At the beginning -- or, I mean, not the

17   beginning, but this summer as well.  No, I wasn't.  I'm

18   sorry.  I was not at Florence this summer.

19             Let's see.  I don't remember the last time that

20   I was at Florence, but over the last year.

21   Q.    So sometime in the last year?

22   A.    Yes.

23   Q.    Was it more than six months ago?

24   A.    Yes.  Probably.

25   Q.    When was the last time you were at the Lewis

1  prison?

2      A.   It was early this year.

3      Q.   So early in 2021?

4      A.   I believe so.

5      Q.   Do you remember the month?

6      A.   I do not.

7      Q.   And what was the purpose of that visit?

8      A.   Just visiting the staff and getting an idea of

9  how they're doing, how things are going there.

10     Q.   Did the mental health staff at the Lewis prison

11 express concerns about staffing at that time?

12          MS. HESMAN:  Form.

13          THE WITNESS:  No.

14     Q.   (By Mr. Fathi) When was the last time you were

15 at the Perryville facility?

16     A.   Let's see, when was the last time.  It was very

17 recently.  Within the last couple of weeks.

18     Q.   And what was the purpose of that visit?

19     A.   I was, again, with our -- with the defendants'

20 expert, Dr. Penn.

21     Q.   And how long did you spend at the Perryville

22 prison with Dr. Penn?

23     A.   Three to four hours.

24     Q.   When was the last time before that that you were

25 at the Perryville prison?

**Bobbie Pennington-Stallcup - 10/15/2021**

13

1      A.    Yes.

2      Q.    Do you know if that custody staff person is

3  still working at Phoenix?

4              MS. HESMAN:   Form.  Foundation.

5              THE WITNESS:   No, I do not.

6      Q.    (By Mr. Fathi) Okay.   When was the last time you

7  were at the Safford prison?

8      A.    I have not been to the Safford prison.

9      Q.    When was the last time you were at the Tucson

10  prison?

11     A.    Within the past month.

12     Q.    And what was the purpose of that visit?

13     A.    The defendants' expert tours.

14     Q.    So you were there with Dr. Penn?

15     A.    Yes.

16     Q.    And how long were you at Tucson with Dr. Penn?

17     A.    Approximately five hours.

18     Q.    And before that, when was the last time you were

19  at the Tucson prison?

20     A.    It was earlier this year.

21     Q.    So what part of the year?

22     A.    Probably spring.  Spring of this year.

23     Q.    So March or April?

24     A.    Yes.

25     Q.    And what was the purpose of that visit?

**Bobbie Pennington-Stallcup - 10/15/2021**

14

1      A.    Looking at the facility and planning for the

2  transfer of the inmates from the Kasson mental health

3  unit to Rincon, what we call Rincon 2 now.

4      Q.    Did any mental health staff express any concern

5  to you about the staffing level during that visit to

6  Tucson?

7                MS. HESMAN:  Form.

8                THE WITNESS:  No.

9      Q.    (By Mr. Fathi) When was the last time you were

10  at the Winslow facility?

11     A.    I have not been to the Winslow facility.

12     Q.    When was the last time you were at the Yuma

13  facility?

14     A.    In the last month.

15     Q.    And what was the purpose of that visit?

16     A.    Touring with the defendants' expert, Dr. Penn.

17     Q.    And how long did you spend with Dr. Penn at the

18  Yuma facility?

19     A.    Approximately three to four hours.

20     Q.    And before that, when was the last time you were

21  at the Yuma facility?

22     A.    I had not been before that.

23     Q.    Did you and Dr. Penn speak to any patients at

24  any of these facilities?

25                MS. HESMAN:  Form.

**Bobbie Pennington-Stallcup - 10/15/2021**

1    Q.    (By Mr. Fathi) Are you going to testify about

2   the mental health care received by any individual

3   incarcerated person?

4                MS. HESMAN:  Form.  Foundation.

5                THE WITNESS:  Not that I'm aware of.  I

6   have not been asked to.

7    Q.    (By Mr. Fathi) Okay.  Dr. Stallcup, the

8   second-to-last sentence of the part of Exhibit 7 that

9   pertains to you says, "Dr. Stallcup will also testify

10  pursuant to Federal Rule of Civil Procedure 26(a)(2)(C)."

11               Do you see that?

12   A.   I do.

13   Q.   What does that mean?

14               MS. HESMAN:  Form.  Foundation.

15               THE WITNESS:  I'm not sure.

16   Q.    (By Mr. Fathi) All right.  Let's scroll up a

17  little bit, still on this page.

18               So on line 10, Doctor, it says you will testify

19  about, "Centurion's compliance with the contract with

20  respect to delivery of mental health care and

21  programming."

22               Do you see that?

23   A.   I do.

24   Q.   And "the contract" refers to the contract

25  between ADC and Centurion for the provision of the health

**Bobbie Pennington-Stallcup - 10/15/2021**

20

1    care to incarcerated people; correct?

2       A.    Yes.

3       Q.    Since you started your job in August of 2020,

4    has Centurion been continuously in compliance with the

5    contract with respect to delivery of mental health care

6    and programming?

7                  MS. HESMAN:   Form.   Foundation.

8                  THE WITNESS:   When the court ordered a

9    change in the way things are monitored, that created, as

10   I have mentioned before, a -- a false negative in their

11   compliance with the court orders.

12                 But other than that, yes, they have.

13      Q.    (By Mr. Fathi) So your testimony is that

14   Centurion has been continuously in compliance with the

15   contract with respect to delivery of mental health care

16   and programming since August of 2020?

17                 MS. HESMAN:   Form.   Foundation.

18                 THE WITNESS:   Aside from April when the

19   change in the process of monitoring occurred and a new

20   process that they had to implement immediately occurred.

21   Other than that, yes.

22      Q.    (By Mr. Fathi) On line 12 it says that you will

23   testify, "regarding mental health staffing and how

24   staffing rates have increased."

25                 Do you see that?

**Bobbie Pennington-Stallcup - 10/15/2021**

21

1       A.   I do.

2       Q.   Doctor, have you ever expressed concern about

3    the level of mental health staffing in ADC?

4                MS. HESMAN:  Form.

5                THE WITNESS:  As the contract is written,

6    no.  It is adequately staffed if the vendor is staffed up

7    to the contract's requirements.

8       Q.   (By Mr. Fathi) Have you ever expressed concern

9    about the fact that the vendor was not staffed up to the

10   contract's requirements?

11               MS. HESMAN:  Form.

12               THE WITNESS:  Yes.

13      Q.   (By Mr. Fathi) And at which facilities have you

14   expressed -- about which facilities have you expressed

15   that concern?

16               MS. HESMAN:  Form.

17               THE WITNESS:  Eyman.

18      Q.   (By Mr. Fathi) Any others?

19      A.   I don't believe so.

20      Q.   All right.  Let's look at Exhibit 11, please.

21               (Deposition Exhibit 11 was marked for

22   identification.)

23      Q.   (By Mr. Fathi) And could we scroll down to the

24   second page, please.  A little bit further up on the

25   page, please.  Okay.  Perfect.  Thank you.

Bobbie Pennington-Stallcup - 10/15/2021

22

1          Doctor, this is -- Exhibit 11 is an August 27,

2    2020, e-mail from you to Larry Gann and Tom Dolan.  Do

3    you see that?

4        A.   I do.

5        Q.   And who is Larry Gann?

6        A.   He is the -- he is my direct supervisor and

7    boss.

8        Q.   And who is Tom Dolan?

9        A.   He is the lead or, basically, the boss at

10   Centurion.

11       Q.   For the entire company?

12            MS. HESMAN:   Form.  Foundation.

13            THE WITNESS:   No.  For the Arizona

14   contract, I believe.  Although I'm not intimately

15   familiar with the structure of their organization.

16       Q.   (By Mr. Fathi) Okay.  In this e-mail you write,

17   "In reviewing the mental health vacancies, I have some

18   concerns that I would like to address."

19            Do you see that?

20       A.   Yes.

21       Q.   Did you write those words?

22       A.   I did.

23       Q.   And then below the body of your e-mail, you list

24   vacant mental health positions at Eyman, Florence, Lewis,

25   Perryville, Phoenix, Tucson, and Yuma.  Correct?

Bobbie Pennington-Stallcup - 10/15/2021

23

1      A.    Can you scroll down, please?

2            Yes.  That is correct.

3      Q.    Back up to page 2, please.

4            In the body of your e-mail you also write,

5      "There are significant vacancies in clinical mental

6      health staff who are primarily responsible for providing

7      the behavioral health contacts required by the courts in

8      the March 11, 2020, order, the psychologists and the

9      psychology associates."

10           Do you see that?

11     A.    Yes.

12     Q.    Did you write those words?

13     A.    I did.

14     Q.    Did you ever get a response to this e-mail from

15     Mr. Dolan or Mr. Gann?

16     A.    Well, I cannot say whether or not I did because

17     I don't know.  It was literally over a year ago, about a

18     week after I started.  I don't remember if I did.

19           But I do remember there were things put in place

20     from that time because of this concern.

21     Q.    Okay.  What was put in place?

22           MS. HESMAN:  Form.  Foundation.

23           THE WITNESS:  So, again, we provided

24     information for agencies that contract for mental health

25     staff in correctional settings.  And then I required that

**Bobbie Pennington-Stallcup - 10/15/2021**

24

1    they provide me a weekly update of the staffing and

2    recruitment process.

3        Q.    (By Mr. Fathi) Anything else?

4        A.    I think that was probably it.

5        Q.    Okay.  Exhibit 12, please.

6              (Deposition Exhibit 12 was marked for

7    identification.)

8        Q.    (By Mr. Fathi) And could we go to the second

9    page, please.  That's perfect.

10             Doctor, Exhibit 12, this portion of Exhibit 12,

11   is a November 9, 2020, e-mail from you to Stefanie Platt,

12   copying Tom Dolan and Larry Gann.

13             Who is Stefanie Platt?

14       A.    She was the mental health director at Centurion

15   at that time.

16       Q.    Statewide?

17             MS. HESMAN:   Form.   Foundation.

18             THE WITNESS:   Yes.

19       Q.    (By Mr. Fathi) And when did she leave that

20   position?

21             MS. HESMAN:   Foundation.

22             THE WITNESS:   Late summer.

23       Q.    (By Mr. Fathi) Of what year?

24       A.    Midsummer of this year.

25       Q.    So August?

**Bobbie Pennington-Stallcup - 10/15/2021**

25

1      A.   I don't know.  I know that it was during the
2    summer of this year.
3      Q.   Okay.  Now, at the bottom of this page
4    continuing onto the next page, Dr. Platt sends you a list
5    of vacant mental health positions at Eyman, Florence,
6    Lewis, Yuma, and Tucson.  Correct?
7      A.   Yes.
8      Q.   Okay.  Scroll back up, please.
9           And then in response to Dr. Platt, you write, "I
10    am really concerned about the vacancies at Florence and
11    Eyman, given the high need and high risk patient
12    population."
13           Did you write those words, Doctor?
14      A.   Yes.
15      Q.   At the time, were you really concerned about the
16    vacancies at Florence and Eyman?
17      A.   Yes.
18      Q.   Okay.  Could we go to the first page of
19    Exhibit 12, please.  A little bit further down.  Thank
20    you.
21           So, Doctor, on November 12, 2020, you write to
22    Dr. Platt, Mr. Dolan, and Mr. Gann, "The quality of care
23    being provided is not adequate as PMs 80, 86, and 95 were
24    failed the last two months in a row at Eyman."
25           Do you see that?

Bobbie Pennington-Stallcup - 10/15/2021

26

1      A.   Yes, I do.

2      Q.   At that time, did you believe that the quality

3  of care being provided was not adequate?

4           MS. HESMAN:   Form.

5           THE WITNESS:   I did.

6      Q.   (By Mr. Fathi) What is PM 80?

7      A.   I'm not so good with the numbers, as we have

8  already established.  So asking me to know them by the

9  number is not -- not going to be very effective.

10     Q.   What is PM 86?

11     A.   Again, like I said, I'm not very good with

12 remembering the numbers, so questioning me about the

13 numbers is not going to be very effective.

14     Q.   And what is PM 95?

15     A.   The same answer, sir.

16     Q.   Okay.  Are PM 80, 86, and 95 mental health

17 performance measures?

18     A.   Yes.  They are.

19     Q.   All right.  Exhibit 13, please.  Scroll down to

20 the bottom of this page, please.  Thank you.

21           (Deposition Exhibit 13 was marked for

22 identification.)

23     Q.   (By Mr. Fathi) Dr. Stallcup, Exhibit 13 is a

24 January 5, 2021, e-mail from you to the same three

25 people, Dr. Platt, Mr. Dolan, and Mr. Gann.

**Bobbie Pennington-Stallcup - 10/15/2021**

27

```
 1            And you write, "I am concerned about Eyman
 2   mental health services.  The staffing has improved, yet
 3   we have four consecutive months, August to November, of
 4   failures on PM 80."
 5            Did you write those words?
 6       A.   I did.
 7       Q.   Were you concerned about Eyman mental health
 8   services?
 9       A.   As stated in the e-mail, yes, I was.
10       Q.   Okay.  Let's go to Exhibit 14, please.
11            (Deposition Exhibit 14 was marked for
12   identification.)
13       Q.   (By Mr. Fathi) Could we maybe blow it up a
14   little bit?  Thank you.
15            Exhibit 14 is the --
16            MS. HESMAN:  David, just a second.  It
17   looks like we're -- her phone's ringing in the corner.
18   Why don't you go turn that off.  Sorry.
19            Can we take a break?  It's her daughter's
20   school calling.
21            MR. FATHI:  Okay.  How long?
22            MS. HESMAN:  Five minutes I think will be
23   good.
24            MR. FATHI:  Okay.
25            (Recess from 9:27 a.m. to 9:32 a.m.)
```

**Bobbie Pennington-Stallcup - 10/15/2021**

28

1      Q.    (By Mr. Fathi) Doctor, have you been asked to
2   review medical records to prepare for your testimony in
3   this trial?
4              MS. HESMAN:  Form.
5              THE WITNESS:  No.
6      Q.    (By Mr. Fathi) Are you planning to review
7   medical records to prepare for your testimony in this
8   trial?
9              MS. HESMAN:  Form.
10             THE WITNESS:  No.
11     Q.    (By Mr. Fathi) Let's go back to Exhibit 14,
12  please.
13             Exhibit 14 is the August 2021 Staffing Contract
14  Variance Report.  This PDF version does not have a Bates
15  number, but it -- it was produced to us in native format
16  at ADCRR 137140.
17             Doctor, are you generally familiar with this
18  document?
19     A.    Yes.
20     Q.    Okay.  What does that document show?
21             MS. HESMAN:  Form.
22             THE WITNESS:  What they are required to
23  have filled and what is filled in their positions.
24             MS. HESMAN:  David, does it say on here
25  what month or time period we're talking about?

**Bobbie Pennington-Stallcup - 10/15/2021**

29

1            MR. FATHI:  This is August.  Again, that
2    might have been in the document title.  But that's --
3            MS. HESMAN:  That's okay.  I just wanted to
4    make sure she knew.  Thank you.
5            MR. FATHI:  August 2021, which is the most
6    recent we've been provided.
7            THE WITNESS:  Okay.
8       Q.   (By Mr. Fathi) Doctor, do you have any reason to
9    believe that the figures in this document are inaccurate?
10      A.   No, I do not.
11      Q.   Okay.  Let's just scroll down to Douglas.  All
12   right.  Okay.
13           Doctor, this shows vacancies in mental health
14   staff at -- I think we need to go on to the next page.
15   I'm sorry.
16           Okay.  This shows a vacancy in the mental health
17   staff at Douglas; correct?
18      A.   Yes.
19      Q.   And, in fact, according to this, there's no
20   mental health staff at all at Douglas; correct?
21      A.   Can you go up, please?  Yes, that is correct.
22      Q.   Okay.  And this shows vacancies in mental health
23   staff at Eyman; correct?
24      A.   Yes.
25      Q.   Down to Florence, please.  Next page, please.

**Bobbie Pennington-Stallcup - 10/15/2021**

30

```
1            And this shows vacancies in mental health staff
2    at Florence; correct?
3        A.   One moment.   That is correct.
4        Q.   Let's look at Lewis.   Next page.
5            This shows vacancies in mental health staff at
6    Lewis; correct?
7        A.   That is correct.
8        Q.   And this shows vacancies in mental health staff
9    at Perryville; correct?
10       A.   That is correct.
11       Q.   Let's look at Phoenix.
12            This shows vacancies in mental health staff at
13   Phoenix; correct?
14       A.   That is correct.
15       Q.   Let's look at Tucson.
16            This shows vacancies in mental health staff at
17   Tucson; correct?
18       A.   Correct.
19       Q.   And Yuma.
20            And this shows vacancies in the mental health
21   staff at Yuma; correct?
22       A.   Correct.
23       Q.   So this document shows that as of August 2021
24   there were vacancies in mental health staff at all
25   complexes except Safford and Winslow; right?
```

**Bobbie Pennington-Stallcup - 10/15/2021**

31

1      A.    I don't remember the summation of it.  But it
2    did show the vacancies where I verified that they are.
3      Q.    Do these vacancies in the mental health staff
4    concern you, Doctor?
5              MS. HESMAN:   Form.
6              THE WITNESS:   It would be -- yes.
7      Q.    (By Mr. Fathi) Are you taking any steps to
8    address these vacancies?
9      A.    Yes.
10     Q.    And what are you doing to address these
11   vacancies?
12     A.    So we worked with Centurion to develop a
13   recruitment and retention, as well as hiring, somewhere
14   around $12 million bonus so that they could fill the
15   vacancies, retain the staff that they have, and hopefully
16   solve the staffing concerns.
17     Q.    And when did that -- when did that go into
18   effect?
19     A.    With the new fiscal year.
20     Q.    Which started when?
21     A.    July.
22     Q.    Is there a particular date?
23     A.    I believe it's effective as of the beginning of
24   the fiscal year, July 1.
25     Q.    Okay.  So that was begun before the month of

**Bobbie Pennington-Stallcup - 10/15/2021**

32

```
1    August whose results we've just been looking at now;
2    correct?
3         A.    Barely, yes.
4         Q.    Any other steps you're taking to address these
5    mental health staffing vacancies?
6         A.    Continuing to get regular updates, and
7    requesting any information regarding any barriers that
8    they are having to recruiting and maintaining staff, and
9    attempting to assist them in addressing those however I
10   can as a part of the monitoring bureau.
11        Q.    And how does periodic updates address these
12   staff vacancies?
13        A.    It lets me know if we are making progress in the
14   right direction or the wrong direction and to know kind
15   of if we need to take further measures.
16        Q.    Are you satisfied with the levels of mental
17   health staffing that are reflected in this August 2021
18   document?
19              MS. HESMAN:   Form.
20              THE WITNESS:   The levels that are required?
21   Yes.
22        Q.    (By Mr. Fathi) I'm sorry.   I wasn't clear.   Are
23   you satisfied with the levels of actual staffing that are
24   reflected in this August 2021 document?
25              MS. HESMAN:   Form.
```

33

1          THE WITNESS:  What do you mean by "actual

2     staffing," sir?

3     Q.   (By Mr. Fathi) The number of staff who are

4     actually providing services as opposed to the number of

5     positions that are allocated?

6               MS. HESMAN:  Form.

7               THE WITNESS:  No.

8     Q.   (By Mr. Fathi) Okay.  Doctor, I think you just

9     mentioned some barriers to filling positions.

10               MS. HESMAN:  Can you just repeat that,

11     David?  You broke up a little bit.

12     Q.   (By Mr. Fathi) Doctor, I believe you mentioned a

13     moment ago identifying barriers to filling mental health

14     staff positions?

15               MS. HESMAN:  Form.

16               THE WITNESS:  Yes.

17     Q.   (By Mr. Fathi) What are some of the barriers

18     you've identified?

19     A.   Well, some of the constant barriers are working

20     in a correctional setting.  Folks don't generally like to

21     do that, and so that's kind of always consistent.

22               And then with COVID, there has been a migration

23     of health care staff away from the in-person, one-on-one

24     care to the telehealth.  Which, as we discussed

25     previously, all health care cannot be provided via

1  telehealth.  So that's created some issues, kind of the

2  overall impact that COVID has had on the health care

3  staff and just kind of that migration away from

4  face-to-face care.

5      Q.   Any other barriers you've identified to filling

6  mental health staff positions?

7      A.   The pay.  We've heard that folks are able --

8  again, with the impact of COVID, other entities have had

9  increased budget to pay more.  So folks have reported

10  going elsewhere and being paid more.

11      Q.   Any other barriers you've identified?

12      A.   We noticed that the training could be improved

13  once folks are on -- on the ground.  So we -- we're

14  working with Centurion to address that as well.

15      Q.   And how -- how could the training be improved?

16      A.   More on-site, site-specific training.  That's

17  it.  Kind of the same as everywhere.

18      Q.   And you said you're working with Centurion to

19  improve the training?

20      A.   We have recommended the implementation of

21  regional trainers instead of just folks that are

22  currently on the job providing the training.  Having

23  folks that are not on the job but are dedicated to

24  training.

25      Q.   And have those regional training positions been

**Bobbie Pennington-Stallcup - 10/15/2021**

35

1   created?

2       A.   I'm not sure if they are created or filled yet.

3       Q.   Okay.  Any other barriers that have been

4   identified to filling mental health staff positions?

5       A.   That's all I can think of at the time -- at this

6   time.

7       Q.   Has the workload of the mental health staff been

8   identified as a barrier either to recruitment or

9   retention of mental health staff?

10              MS. HESMAN:  Form.  Foundation.

11              THE WITNESS:  The 10-30 requirements in

12   particular has.  But I wouldn't say -- I guess -- I guess

13   if we put that together as workload, that had -- has been

14   mentioned kind of early year -- early this year for

15   some -- actually, along the whole time it has been

16   mentioned as a -- as a reason that folks were not staying

17   any longer.

18       Q.   (By Mr. Fathi) And when you say "10-30," you

19   mean the court order that established presumptive minimum

20   durations for mental health encounters of either 10

21   minutes or 30 minutes?

22       A.   That's correct.

23       Q.   And why was that a barrier?

24       A.   Clinicians mentioned feeling as if they could

25   not do their job and use their clinical judgment to

**Bobbie Pennington-Stallcup - 10/15/2021**

39

1      Q.   (By Mr. Fathi) If I wanted your calculations,

2   what do I call --

3      A.   That's what you would ask for.

4      Q.   Okay.  And just to be clear, you make these

5   calculations based on the total number of staff in --

6   provided for in the contract; correct?

7      A.   Yes.

8      Q.   Have you done these calculations for all 10

9   facilities?

10     A.   I'm not sure.

11     Q.   Since you've been in your position, has there

12   ever been a time when all of the mental health staff

13   positions required by the contract have been filled?

14     A.   No.

15     Q.   All right.  Let's go back to Exhibit 7, please.

16          Doctor, before we get to Exhibit 7, when did you

17   last do the calculations that you just described?

18     A.   Within the last month.

19     Q.   And for which facilities did you do them?

20     A.   Like I said, I'm not sure if it was all 10 or

21   just the main seven.

22     Q.   Which are the ones for which you definitely

23   remember doing them within the last month?

24          MS. HESMAN:  Form.

25          THE WITNESS:  Yuma, Tucson, Eyman,

**Bobbie Pennington-Stallcup - 10/15/2021**

43

1    of Florence?

2                    MS. HESMAN:   Foundation.

3        Q.   (By Mr. Fathi) I'm sorry.   What was your answer,

4    Doctor?

5        A.   No.

6        Q.   Okay.   Doctor, do you ever have any -- have you

7    ever had any concerns about the accuracy of the mental

8    health records created or maintained by Centurion?

9                    MS. HESMAN:   Form.

10                   THE WITNESS:   Yes.

11       Q.   (By Mr. Fathi) Okay.   Tell me about that.

12       A.   Well, in our auditing, in the beginning, I

13   didn't think that what they had been documenting was

14   reflective of the care they had been providing.

15            So I put forth some recommendations to include

16   in the documentation as well as in the provision of care.

17   And that was implemented.

18            And, of course, small things that come up where

19   a date -- a number on a date is different or an amount of

20   time is different than you think would be accurate.

21       Q.   Okay.   Thank you, Doctor.   To be clear, I'm not

22   asking so much about individual, isolated mistakes, a

23   typographical error or something of that nature.

24            Have you ever had concerns that -- about the

25   accuracy of the mental health records maintained by

**Bobbie Pennington-Stallcup - 10/15/2021**

44

1    Centurion in sort of a -- in a more systematic way?

2                  MS. HESMAN:   Form.

3                  THE WITNESS:   No.

4        Q.    (By Mr. Fathi) Well, I think you mentioned --

5        A.    I don't -- I guess I don't understand what

6    you're asking.  Because I answered it based on what you

7    said, and then I don't understand what you're saying.  So

8    maybe we could try that question again.

9        Q.    Let's do that.  I think you testified that you

10   felt that the documentation was not accurately capturing

11   the care provided.  Is that what you said?

12       A.    Yes.  When I first started in this position.

13       Q.    Okay.  Can you tell me more about that?

14       A.    The notes were very sparse.

15       Q.    And by that, you mean the notes entered in eOMIS

16   by the clinicians?

17       A.    Yes.

18       Q.    And was that at certain facilities or was it

19   more of a system-wide issue?

20       A.    System-wide.

21       Q.    And what did you do to address that?

22       A.    I would say system-wide except for Phoenix.

23             So I laid out some guidelines for care and

24   documentation of that care that I wanted implemented.

25       Q.    And when was this approximately that you laid

**Bobbie Pennington-Stallcup - 10/15/2021**

46

1      A.   At times, the source documents have been a

2   little -- little bit off.  So if we ever see that, we

3   just reach out to our counterparts in Centurion and say,

4   "Hey, this data is" -- whatever the issue is with the

5   data, and we request that they provide the accurate data.

6      Q.   And is that problem isolated to certain

7   facilities, or is it, again, more of system-wide problem?

8      A.   It's a very infrequent problem.  But it does

9   come up from time to time.

10      Q.   All right.  Let's look at Exhibit 15, please.

11           (Deposition Exhibit 15 was marked for

12   identification.)

13      Q.   (By Mr. Fathi) Doctor, Exhibit 15 is an

14   August 27, 2021, e-mail from Mark Haldane to Dr. Platt,

15   copying a number of people, including you.

16           First, who is Mark Haldane?

17      A.   He is an administrator in the bureau.

18      Q.   And what is his job?

19      A.   He is the administrator of state prison

20   complexes and the prison -- private prison complexes.

21           (Reporter clarification.)

22           THE WITNESS:  He is the bureau

23   administrator for half of the state prisons as well as

24   the private prisons.  So he's -- he oversees the

25   monitoring of those.

**Bobbie Pennington-Stallcup - 10/15/2021**

47

1              And this was approximately nine days after

2   I started.  But go on.

3       Q.    (By Mr. Fathi) Doctor, when you received this

4   e-mail, did it concern you?

5       A.    You're asking me if something concerned me nine

6   days after I started a -- a year ago.  Let me read

7   through it.

8       Q.    Of course.

9       A.    Okay.  Can you scroll down a little?  Thank you.

10  Scroll down.  That's good.  Thank you.

11             It looks like there were issues that were being

12  addressed.  I honestly cannot say if I was concerned at

13  the time a year ago.  But it is concerning that there

14  were issues.  But it looked like they were being

15  addressed.

16      Q.    After you received this e-mail, did you take any

17  steps to address these issues?

18      A.    I don't remember.

19      Q.    Okay.  Can we scroll up a little bit, please.

20             So Mr. Haldane writes, "For the past year, there

21  have been numerous issues with obtaining accurate mental

22  health source documents in a timely manner.  This matter

23  has been addressed with Centurion staff on several

24  occasions."

25             Doctor, what are mental health source documents?

**Bobbie Pennington-Stallcup - 10/15/2021**

48

1      A.    They are documents that Centurion provides for

2   us to complete the audits of -- the CGAR audits.

3      Q.    And he writes in the next paragraph, there's a

4   typographical error but I think it is meant to be, "Watch

5   logs have been missing/incorrect dates, missing events,

6   and missing additional watches."

7            Do you see that?

8      A.    I do.

9      Q.    What are the watch logs?

10     A.    The -- it's self-explanatory.  The logs that

11  show patients placed and taken off of watch.

12     Q.    And that's suicide or mental health watch;

13  correct?

14            MS. HESMAN:  Form.

15            THE WITNESS:  Yes.

16     Q.    (By Mr. Fathi) And there are performance

17  measures that are specifically related to patients on

18  mental health or suicide watch; correct?

19     A.    Yes.

20     Q.    Did you investigate the cause of this problem

21  with the watch logs?

22            MS. HESMAN:  Form.

23            THE WITNESS:  I don't remember.

24     Q.    (By Mr. Fathi) Did anyone else investigate the

25  cause of this problem with the watch logs?

**Bobbie Pennington-Stallcup - 10/15/2021**

49

1              MS. HESMAN:  Form.  Foundation.

2              THE WITNESS:  Again, I don't remember.

3  This was seven days after I started a year ago.  I do not

4  remember.

5      Q.   (By Mr. Fathi) Was this problem with the watch

6  logs ever fixed?

7              MS. HESMAN:  Form.  Foundation.

8              THE WITNESS:  Yes.  I believe that it was.

9      Q.   (By Mr. Fathi) And what's your basis for that

10  belief?

11      A.   Well, my -- the staff that does the auditing are

12  the staff that bring up all of the errors when they

13  occur, and the watch logs have not -- not been in this

14  state for quite some time.

15              I will note last month they were a little bit

16  funky, but the -- I think they're having a change in who

17  is keeping track of the documentation for that, and that

18  may account for why their things might have been little

19  bit messy.

20      Q.   And did you take any steps in response to

21  learning that the watch logs last month were a little bit

22  messy?

23      A.   Yes, I followed up to see what the plan is, and

24  the plan is to centralize the keeping of the watch logs.

25      Q.   And has that been done?

1              MS. HESMAN:  Form.  Foundation.

2              THE WITNESS:  I believe it is being done

3     now.

4        Q.   (By Mr. Fathi) Okay.  So to your knowledge, it's

5     in process but not completed?

6        A.   I didn't say that.

7        Q.   I'm sorry.  Is it -- it's being done now?

8              MS. HESMAN:  Form.  Foundation.

9              THE WITNESS:  I believe that it is.

10       Q.   (By Mr. Fathi) Has it been completed?

11             MS. HESMAN:  Same objection.

12             THE WITNESS:  I'm not sure.

13       Q.   (By Mr. Fathi) Okay.  Further down in the same

14    paragraph, Mr. Haldane writes, "MH3D logs have incorrect

15    discontinuation and follow-up dates.  The location is

16    sometimes missing or not accurate."

17             Do you see that?

18       A.   I do.

19       Q.   What are the MH3D logs?

20       A.   The logs that contain all patients newly

21    designated as 3D who have had their medication

22    discontinued and need 30 days follow-up and mental health

23    follow-up every 90 days at least twice for the six-month

24    period.

25       Q.   And is there a performance measure related to

**Bobbie Pennington-Stallcup - 10/15/2021**

51

1   that follow up for MH3Ds?

2       A.   Yes, there is.

3       Q.   Did you do anything to investigate the cause of

4   this problem with the MH3D logs?

5       A.   I don't remember.

6       Q.   Did anyone do anything to investigate the cause

7   of these problems with the MH3D logs?

8               MS. HESMAN:   Form.  Foundation.

9               THE WITNESS:  I don't remember.

10      Q.   (By Mr. Fathi) Was this problem with the MH3D

11  logs fixed?

12              MS. HESMAN:  Form.  Foundation.

13              THE WITNESS:  Yes.

14      Q.   (By Mr. Fathi) And how do you know that?

15      A.   Again, my staff that do the audits are the ones

16  who point out all of the errors, and the 3D logs we have

17  had consistently accurate for quite some time.

18      Q.   So when would you say this problem with the MH3D

19  logs was fixed?

20      A.   Approximately six months ago.

21      Q.   Okay.  Let's look at Exhibit 16, please.  And

22  we're going to look at the bottom of the second page of

23  this exhibit.

24              (Deposition Exhibit 16 was marked for

25  identification.)

Bobbie Pennington-Stallcup - 10/15/2021

52

1      Q.    (By Mr. Fathi) Doctor, this portion of

2  Exhibit 16 is a September 29, 2020, e-mail from Vanessa

3  Headstream to Amber Puckett copying someone named Grant

4  Roberts and yourself.  Do you see that?

5      A.    I do.

6      Q.    Who is Ms. Headstream?

7      A.    She is another administrator in the bureau.

8      Q.    And what is her job?

9             MS. HESMAN:   Foundation.

10            THE WITNESS:  I'm not sure.

11     Q.    (By Mr. Fathi) Okay.  So on September 29, 2020,

12  Ms. Headstream writes, "The above inmate has been out to

13  court since August 12, 2020, yet MH staff continue to

14  document in the chart for Seg visits as if he is not in

15  his cell at the time of visit.  Why is the record

16  documented in while he is out to court?"

17            Do you see that?

18     A.    Yes.

19     Q.    When you received this e-mail, did it concern

20  you?

21            MS. HESMAN:   Form.

22            THE WITNESS:  No.  Actually, I would prefer

23  that they are documenting that they are continuing to

24  attempt to provide the service if they are out.  So that

25  is not a concern for me.

**Bobbie Pennington-Stallcup - 10/15/2021**

53

1      Q.    (By Mr. Fathi) Is that how you interpret this
2    language?

3      A.    Yes.

4      Q.    Okay.   If what is meant is that the staff are
5    documenting --

6                MS. HESMAN:   David, I'm sorry.   There's
7    construction or something going on in the hallway.   Let
8    me just put an end to that really quickly.   Just one
9    moment.

10                Okay.   I'm sorry.

11      Q.    (By Mr. Fathi) Doctor, if what Ms. Headstream
12    meant is that the mental health staff is indicating that
13    the patient is in the prison when, in fact, he is out to
14    court, would that concern you?

15      A.    I don't read this e-mail to indicate that.

16      Q.    I understand that.   My question is if that is
17    what Ms. Headstream meant, would that concern you?

18                MS. HESMAN:   Form.

19                THE WITNESS:   That seems like speculation
20    and not what is written here.

21      Q.    (By Mr. Fathi) Could you answer the question,
22    Doctor?

23                MS. HESMAN:   Form.

24                THE WITNESS:   Can you ask it again?

25      Q.    (By Mr. Fathi) If what Ms. Headstream meant by

**Bobbie Pennington-Stallcup - 10/15/2021**

54

1  this language is that mental health staff is indicating

2  in the record that the patient is in the prison when

3  he's, in fact, out to court, would that concern you?

4              MS. HESMAN:   Form.

5              THE WITNESS:   I -- I think, again, them

6  documenting that they are attempting to provide the

7  service and that the patient is not available is exactly

8  what I want to occur.

9      Q.    (By Mr. Fathi) Okay.   Please listen to my

10  question, Doctor.   I understand that you have a different

11  interpretation of this language.

12              But what I'm saying is the following:   If

13  Ms. Headstream -- if what Ms. Headstream meant by this

14  language was that the mental health staff is documenting

15  in the record that the patient is in the prison, in the

16  facility, when, in fact, the patient is not in the

17  facility because he's out to court, would that concern

18  you?

19              MS. HESMAN:   Form.

20              THE WITNESS:   It -- it doesn't state that.

21              But if a clinician lied about the

22  whereabouts of a patient, of course that would be

23  concerning.

24      Q.    (By Mr. Fathi) Okay.   Did you take any steps in

25  response to this e-mail?

1                    MS. HESMAN:  Form.

2                    THE WITNESS:  I don't remember.

3      Q.   (By Mr. Fathi) Okay.

4      A.   I -- so, go ahead.

5      Q.   Let's look at Exhibit 7 again, please.

6           Doctor, beginning on line 13 it says that you

7      will, "testify regarding suicide prevention policies,

8      procedures, and practices including suicide rates at

9      ADCRR."

10          Do you see that?

11     A.   I do.

12     Q.   All right.  Let's look at Exhibit 17, please.

13               (Deposition Exhibit 17 was marked for

14     identification.)

15     Q.   (By Mr. Fathi) And let's look at the third page

16     of the document, please.  Bates number ending in 605.

17     Yes, that's the one.

18          Doctor, do you recognize this document?

19     A.   I do.

20     Q.   And what is it?

21     A.   It is a document that is discussed at the

22     business review meeting.

23     Q.   And how frequently does that meeting occur?

24     A.   Monthly.

25     Q.   And do you regularly participate in that

**Bobbie Pennington-Stallcup - 10/15/2021**

56

1    meeting?

2        A.    No.

3        Q.    Do you ever participate in that meeting?

4        A.    Yes.

5        Q.    Now, toward the top of this page, it says

6    "National standard is six suicides per year."

7              Do you see that?

8        A.    I do.

9        Q.    Have you ever heard it said that national

10   standard is six suicides per year?

11                   MS. HESMAN:   Form.

12                   THE WITNESS:   That would be according to

13   the population of ADCRR.   That would be along with

14   national standards at our population level.

15       Q.    (By Mr. Fathi) Okay.   So you have heard it said

16   that for the population of ADCRR, the national standard

17   would be approximately six suicides per year?

18                   MS. HESMAN:   Form.

19                   THE WITNESS:   Not standard, but average.

20       Q.    (By Mr. Fathi) And how is that calculation made?

21                   MS. HESMAN:   Form.   Foundation.

22                   THE WITNESS:   It's based on national data.

23       Q.    (By Mr. Fathi) Did you make that calculation?

24       A.    No, I did not.

25       Q.    Who made that calculation?

**Bobbie Pennington-Stallcup - 10/15/2021**

57

```
 1              MS. HESMAN:  Foundation.
 2              THE WITNESS:  The Bureau of Justice
 3   Statistics.
 4       Q.   (By Mr. Fathi) Well, who applied the numbers
 5   from the Bureau of Justice Statistics to the Arizona
 6   prison population to come up with the number six?
 7              MS. HESMAN:  Form.  Foundation.
 8              THE WITNESS:  I don't know.
 9       Q.   (By Mr. Fathi) In the lower right-hand corner of
10   this page that's labeled "Suicides," it says, "FY
11   target," and then the number, "6."
12            Do you see that?
13       A.   No.
14       Q.   It's in the lower right-hand corner, "FY
15   target:  6."  Do you see that?
16       A.   Oh, yes, yes.
17       Q.   Is it ADC's target to have six suicides per
18   year?
19       A.   No.
20       Q.   What is ADC's target in terms of number of
21   suicides per year?
22              MS. HESMAN:  Form.
23              THE WITNESS:  Zero.
24       Q.   (By Mr. Fathi) Would you be satisfied with ADC's
25   suicide prevention if there were six suicides per year?
```

1              MS. HESMAN:   Form.

2              THE WITNESS:   No.

3        Q.    (By Mr. Fathi) Okay.  I'm sorry, Doctor, what

4   are these meetings called again where this document is

5   discussed?

6              MS. HESMAN:   Form.  Foundation.

7              THE WITNESS:   I don't know the exact name

8   of the meeting.  I'm sorry.

9        Q.    (By Mr. Fathi) Well, you gave a name.  You said

10  business something?

11       A.    I think it's the business review meeting.

12       Q.    Okay.  And you said those meetings are monthly?

13       A.    Yes.

14       Q.    And who attends those meetings?

15              MS. HESMAN:   Form.  Foundation.

16              THE WITNESS:   The director and several

17  wardens, my boss, sometimes myself, and a couple others.

18       Q.    (By Mr. Fathi) And who are the couple others?

19       A.    I don't know.  I don't know everybody that's

20  present in the room.

21       Q.    Well, you sometimes attend those meetings;

22  correct?

23       A.    I did mention that already.  Yes, that is

24  correct.

25       Q.    And what determines when you attend these

**Bobbie Pennington-Stallcup - 10/15/2021**

60

1    Q.   Is the custody person you mentioned Frank

2    Strada?

3    A.   Yes.

4    Q.   Okay.  Anyone else you can name?

5    A.   No.

6    Q.   All right.  Let's look at Exhibit --

7    A.   AD Hetner is there.

8    Q.   And what is his position?

9    A.   Assistant director Hetner.  He's an assistant

10   director on the custody side.

11   Q.   Any other names you can remember?

12   A.   That's it.

13   Q.   All right.  Thank you.  Let's look at

14   Exhibit 18, please.

15            (Deposition Exhibit 18 was marked for

16   identification.)

17   Q.   (By Mr. Fathi) Doctor, Exhibit 18 is a report

18   available on the ADCRR website called "Inmate Assault,

19   Self-harm and Mortality Data."  Are you generally

20   familiar with this report?

21   A.   Generally.

22   Q.   Would you scroll down to the last page, please.

23   Is that the last page?  There we are.  Okay.

24            On the last page of this document, there's a

25   chart titled "Inmate Deaths By Year and Cause."

**Bobbie Pennington-Stallcup - 10/15/2021**

61

1          Do you see that?

2     A.    Yes.

3     Q.    And the -- there are columns labeled FY, which I

4  assume means "fiscal year."  Is that right?

5     A.    Yes.

6     Q.    I think you testified that the fiscal year runs

7  from July 1 through June 30?

8     A.    I do believe that to be the case.

9     Q.    Okay.  So would fiscal year '21 be the fiscal

10 year that ended on June 30 of this year?

11    A.    I believe so.

12    Q.    So according to this chart, there were 10

13 suicides in ADC in fiscal year '21; correct?

14    A.    Correct.

15    Q.    Do you have any reason to doubt the accuracy of

16 that figure?

17    A.    No.

18    Q.    And that is the highest number of suicides per

19 year since fiscal year '11; correct?

20    A.    Fiscal year '11 was higher.

21    Q.    Right.  But you have to go back to fiscal

22 year '11 to find a year that had as many or more suicides

23 than fiscal year '21; correct?

24    A.    Correct.

25    Q.    And in fiscal year '11, the prison population

**Bobbie Pennington-Stallcup - 10/15/2021**

62

1    was higher by several thousand than in fiscal year '21;

2    correct?

3                MS. HESMAN:  Form.  Foundation.

4                THE WITNESS:  I see that.

5        Q.    (By Mr. Fathi) So is that correct?

6        A.    It was looks like five -- less than 5,000 more.

7        Q.    Less than 5,000 more in fiscal year '11 than in

8    fiscal year '21; correct?

9        A.    Yes.

10       Q.    Okay.  Let's go to Exhibit 19, please.

11             (Deposition Exhibit 19 was marked for

12   identification.)

13       Q.    (By Mr. Fathi) Doctor, what is Exhibit 19?

14   And let's try not to use patient names, okay?

15       A.    Okay.  It's a mortality review report.

16       Q.    And this person died on January 28, 2021;

17   correct?

18       A.    Yes.

19       Q.    And he died by suicide?

20       A.    Yes.

21       Q.    Did you participate in this mortality review?

22       A.    Yes.

23       Q.    So you've seen this document before?

24       A.    Yes.

25       Q.    So let's look at the second page.  So toward the

Bobbie Pennington-Stallcup - 10/15/2021

63

1    top of the second page, it asks, "Was sufficient care

2    offered/provided regarding mental health issues," and the

3    box is checked, "No."

4              Do you see that?

5     A.    I do.

6     Q.    Do you agree with that?

7     A.    I do.

8     Q.    And a little lower under "Contributing Cause

9    Analysis," boxes are checked for "Failure to recognize

10   symptoms or signs" and "Delay in access to care."

11             Do you agree with both of those?

12    A.    I do.

13    Q.    Could we go to the following page, please?  A

14   little bit further down.

15             Under "General Critique," boxes are checked for

16   "Diagnosis not timely" and "Treatment not timely."

17             Do you agree with those?

18    A.    I do.

19    Q.    And then a little bit lower, the reviewer

20   concludes that this death was possibly avoidable.

21             Do you agree with that?

22    A.    I do.

23    Q.    Now, on the last page, I guess it is the fourth

24   and final page of this document, there is a -- a list of

25   recommendations.  Do you see that?

**Bobbie Pennington-Stallcup - 10/15/2021**

64

1      A.    I do.

2      Q.    When a mortality review or a psych autopsy makes

3  recommendations after someone dies by suicide, who is

4  responsible for implementing those recommendations?

5              MS. HESMAN:  Form.  Foundation.

6              THE WITNESS:  The contract health care

7  vendor.

8      Q.    (By Mr. Fathi) So Centurion?

9      A.    Yes.

10     Q.    And is there a particular individual within

11 Centurion who is responsible for implementing these

12 recommendations?

13             MS. HESMAN:  Form.  Foundation.

14             THE WITNESS:  The mental health and

15 psychiatric directors.

16     Q.    (By Mr. Fathi) So in terms of the current staff,

17 that would be Dr. Pelton and Dr. Carr; is that right?

18     A.    That's correct.

19     Q.    Do you have any role -- let me rephrase that.

20             Do you have any responsibility for ensuring that

21 recommendations that are made by mortality reviews for

22 people who have died by suicide are implemented?

23     A.    Ensuring that the recommendations were

24 implemented.

25     Q.    So that is a responsibility of yours?

Bobbie Pennington-Stallcup - 10/15/2021

65

1        A.    Yes.

2        Q.    And how do you do that?

3        A.    Record review and continuous communication with

4    the mental health director and psychiatric director.

5        Q.    And do you have responsibility to ensure that

6    recommendations that are made in a psych autopsy when a

7    patient dies by suicide, that those recommendations are

8    implemented?

9        A.    Yes.

10       Q.    And how do you go about doing that?

11       A.    The -- didn't I just answer that?

12       Q.    Well, my first -- my last question was about

13   mortality reviews.   This question is about psych

14   autopsies.   If the answer is the same, that's fine.

15       A.    It's the same.  I'm sorry.

16       Q.    Okay.  So let's look at these four

17   recommendations on page 4 of page 19.

18            First recommendation that pertains to health

19   needs requests, what steps have been taken to implement

20   this recommendation?

21                 MS. HESMAN:  Form.  Foundation.

22                 THE WITNESS:  So I asked the mental health

23   director what the plan is to ensure that these encounters

24   occur within the time frame.  And she let me know what

25   the plan is, actually, they did from the facilities

Bobbie Pennington-Stallcup - 10/15/2021

66

1   themselves.

2            Was this -- you said the first one.  And at

3   the -- at this time, we started very closely looking at

4   health care needs requests and ensuring overall that they

5   are being answered in a timely fashion and require that

6   they send us a daily -- a daily report letting us know if

7   the nurse lines were held or not as this was important in

8   this case.

9       Q.   (By Mr. Fathi) So when did those daily reports

10  start being sent?

11            MS. HESMAN:  Form.  Foundation.

12            THE WITNESS:  Shortly -- I would say within

13  a month of this mortality review.  Maybe sooner.

14      Q.   (By Mr. Fathi) And are they still being sent

15  today?

16      A.   They are.

17      Q.   So has recommendation 1 now been fully

18  implemented?

19            MS. HESMAN:  Form.

20            THE WITNESS:  Yes.

21      Q.   (By Mr. Fathi) All right.  Let's look at

22  recommendation 2.  What steps have been taken to

23  implement this recommendation?

24      A.   Education to the staff, primarily the nursing

25  staff.  Because they are the ones doing the triage face

**Bobbie Pennington-Stallcup - 10/15/2021**

67

1    to face within 24 hours.

2              Then anything like hearing voices, danger to

3    self or others, need to be seen immediately.  So

4    additional education being provided there.

5              Along with the plan for regardless of that, for

6    them all to be seen in the timeline that they're required

7    to be seen.

8         Q.   And when did that education take place?

9              MS. HESMAN:  Form.  Foundation.

10             THE WITNESS:  I would say, again, within a

11   month of the mortality review, if not sooner.

12        Q.   (By Mr. Fathi) And how do you know that?

13        A.   Feedback from the mental health director.

14        Q.   Was that education documented in any way?

15             MS. HESMAN:  Form.  Foundation.

16             THE WITNESS:  I can't speak to that because

17   that would be documented in Centurion's training.  But I

18   certainly believe they did.

19        Q.   (By Mr. Fathi) And your basis for believing that

20   they did is that the Centurion mental health director

21   told you so?

22        A.   Yes.

23        Q.   Did you take any steps beyond that to verify

24   that this training had happened?

25        A.   No.

Bobbie Pennington-Stallcup - 10/15/2021

68

1     Q.   Has recommendation 2 now been fully implemented?

2     A.   Yes.

3     Q.   Recommendation 3, what steps have been taken to

4  implement this recommendation?

5     A.   Again, and this -- this has to do primarily with

6  intake.  Education to the intake staff that the referrals

7  need to be made to psychiatry when there are serious

8  symptoms, for intake and in the field.

9          Because there was the discontinuation of

10 medication shortly before he came as well as the hearing

11 voices written in the HNR.  Reeducating on the need to

12 make appropriate referrals to psychiatry.

13    Q.   So has that education now been completed?

14    A.   Yes.

15    Q.   And what is your basis for saying that?

16    A.   Again, my communication with the mental health

17 director.

18    Q.   Have you done anything beyond communicate with

19 the mental health director to verify that this education

20 has happened?

21    A.   Again, we're -- our bureau is reviewing charts,

22 not quite 24/7, but every business day and providing

23 feedback continuously regarding all of these issues.  So

24 if we see it again, then we would know that there's

25 further action that needs to take place.

**Bobbie Pennington-Stallcup - 10/15/2021**

69

1    Q.    But the staff education you're talking about
2    wouldn't be documented in patient charts, would it?
3    A.    No.   But you would see that the same errors were
4    occurring in patient care.
5    Q.    Okay.   But my question is with regard to
6    recommendation 3, did you take any steps beyond your
7    communication with the Centurion mental health director
8    to verify that this education has, in fact, taken place?
9                MS. HESMAN:   Form.
10               THE WITNESS:   No.
11   Q.    (By Mr. Fathi) Have you seen any documentation
12   confirming that this education has taken place?
13               MS. HESMAN:   Form.
14               THE WITNESS:   No.   However, it was not
15   requested, either.
16   Q.    (By Mr. Fathi) I'm sorry, what was not
17   requested?
18   A.    Documentation regarding the training.
19   Q.    So you're saying you did not request --
20   A.    If the mental health director said it was
21   completed, that it was completed.
22   Q.    So you're saying you did not request
23   documentation that the treatment had been completed?
24               MS. HESMAN:   Form.
25               THE WITNESS:   What treatment?

**Bobbie Pennington-Stallcup - 10/15/2021**

70

1      Q.   (By Mr. Fathi) I'm sorry, the training had been
2   completed?
3                MS. HESMAN:  Same objection.
4                THE WITNESS:  Correct.
5      Q.   (By Mr. Fathi) Okay.  Fourth objective -- fourth
6   recommendation, "A multidisciplinary committee will be
7   convened."
8           What steps have been taken to implement this
9   recommendation?
10     A.   We had several multidisciplinary meetings
11  regarding the classification of inmates when they are
12  coming in.  And one of the recommendations that came out
13  of that was possibly updating our tech manual to change
14  one of the requirements for the 3D inmates.  And we're
15  going to -- when we do our next update, we're going to
16  include that.
17     Q.   Has that update to the tech manual been made as
18  of today?
19     A.   No.
20     Q.   When was the multidisciplinary committee
21  convened?
22     A.   In the -- I would say in the two months
23  following this mortality review.
24     Q.   And who are the members of that committee?
25     A.   Myself, Dr. Phillips, and some other individuals

**Bobbie Pennington-Stallcup - 10/15/2021**

71

```
 1    that -- I don't remember who else was included.
 2         Q.   Can you remember anyone besides yourself and
 3    Dr. Phillips?
 4         A.   No.
 5         Q.   How many times as of today has this
 6    multidisciplinary committee met?
 7         A.   I think we met three times.
 8         Q.   Are you planning to meet again, or is the
 9    committee's work considered complete?
10         A.   I think it is complete for now.
11         Q.   Those three meetings, about how long did they
12    last?
13         A.   I would say 30 minutes to an hour.
14         Q.   Were any written minutes kept?
15         A.   I'm not sure.
16         Q.   Did you keep any written notes?
17         A.   I did not.  I took away my to-do list from that,
18    which was updating the portion of the tech manual.
19         Q.   Exhibit 20, please.
20              (Deposition Exhibit 20 was marked for
21    identification.)
22         Q.   (By Mr. Fathi) Doctor, Exhibit 20 is a mortality
23    review for patient who died by suicide on April 15, 2021.
24    Is that correct?
25         A.   Yes.
```

**Bobbie Pennington-Stallcup - 10/15/2021**

72

1    Q.    Did you participate in this mortality review?

2    A.    I did.

3    Q.    So you are familiar with this document?

4    A.    I am.

5    Q.    All right.  Let's go to the top of page 2,

6    please.  So where the question is asked, "Was sufficient

7    care offered/provided regarding mental health issues,"

8    the box is checked, "No."

9          Do you agree with that, Doctor?

10   A.    I do.

11   Q.    A little bit lower down under "Contributing

12   Cause Analysis," boxes are checked for "Failure to

13   recognize symptoms or signs" and "Failure to follow

14   clinical guidelines."

15         Do you agree with that, Doctor?

16   A.    I do.

17   Q.    Let's go to the bottom of page 3.  On page 3

18   under "General Critique," a box is checked for, "Level of

19   care inappropriate for the severity of illness."

20         Do you agree with that, Doctor?

21   A.    I do.

22   Q.    And, finally, the reviewer concludes that this

23   death was possibly avoidable.

24         Do you agree with that?

25   A.    I do.

1           MS. HESMAN:  Foundation.

2           THE WITNESS:  Pretty immediately after.  I

3   would say within the month following the mortality

4   review.

5       Q.   (By Mr. Fathi) And is this training a one-time

6   event, or is it going to be recurrent?

7       A.   It's ongoing.

8       Q.   So when was the most recent iteration of this

9   training?

10          MS. HESMAN:  Foundation.

11          THE WITNESS:  Within the month of the

12   suicide, as well as for all new employees coming on board

13   and everybody that's due for their annual training.

14      Q.   (By Mr. Fathi) Okay.  So when was the most

15   recently this training was provided to mental health

16   staff?

17          MS. HESMAN:  Foundation.  Form.

18          THE WITNESS:  It would have been the last

19   time the mental health staff was brought on board which,

20   I mean, that could be within days.

21      Q.   (By Mr. Fathi) Okay.  Recommendation 2, what has

22   been done to implement this recommendation?

23      A.   So, again, the mental health technical manual,

24   807 they were provided, as well as a webinar.  And I did

25   see some of the material on the suicide prevention

**Bobbie Pennington-Stallcup - 10/15/2021**

76

1     training as well.

2          Q.    So can you describe the material that was

3     provided to the trainees?

4                    MS. HESMAN:   Foundation.

5                    THE WITNESS:  I cannot.

6          Q.    (By Mr. Fathi) Were they provided any written

7     materials?

8                    MS. HESMAN:   Foundation.

9                    THE WITNESS:  Yes.  I just answered that.

10         Q.    (By Mr. Fathi) I'm sorry, that was -- we were

11    talking about recommendation 1.  Is it your testimony

12    that the training provided for recommendation 1 and

13    recommendation 2 is the same training?

14         A.    No.  The recommendation 2, as you just asked me

15    what was provided, I said DO-7 and the mental health

16    technical manual as well as additional suicide prevention

17    training.

18         Q.    And how -- was the training in 2 provided to

19    each and every mental health staff member?

20                   MS. HESMAN:   Foundation.

21                   THE WITNESS:  Yes.

22         Q.    (By Mr. Fathi) How long does the training last?

23                   MS. HESMAN:   Foundation.

24                   THE WITNESS:  I don't know.

25         Q.    (By Mr. Fathi) Who provides the training?

Bobbie Pennington-Stallcup - 10/15/2021

77

```
 1                    MS. HESMAN:  Foundation.
 2                    THE WITNESS:  Centurion mental health
 3    leaders.
 4        Q.   (By Mr. Fathi) Do you know which individuals
 5    provide the training?
 6        A.   No.
 7        Q.   Do you know what level of training and
 8    credential the trainers have?
 9                    MS. HESMAN:  Foundation.
10                    THE WITNESS:  No.
11        Q.   (By Mr. Fathi) All right.  Let's look at
12    Exhibit 21, please.
13                    (Deposition Exhibit 21 was marked for
14    identification.)
15        Q.   (By Mr. Fathi) Doctor, Exhibit 21 is an e-mail
16    from you dated May 18, '21, to Dr. Platt, Tom Dolan, and
17    Dr. Carr, and copied to some other people including
18    Dr. Phillips and Mr. Gann.  Is that correct?
19        A.   That's correct.
20        Q.   And this e-mail pertains to the same patient who
21    died by suicide whose mortality review we just looked at
22    in Exhibit 20; correct?
23        A.   Correct.
24        Q.   And the subject matter of -- or subject line of
25    your e-mail is, "Please ensure immediate compliance."
```

1    Correct?

2        A.    Correct.

3        Q.    Why did you send this e-mail, Doctor?

4        A.    Because there were errors that occurred in the

5    Rothlisberger case, and it was important that they were

6    remedied immediately.

7        Q.    And the final paragraph of your e-mail says,

8    "Please let me know by 5 PM Tuesday, June 1, 2021, what

9    actions have been taken to ensure immediate compliance.

10   Please include any and all training, e-mails, and/or

11   corrective actions that have been taken."

12            Did you receive any response by this June 1

13   deadline?

14       A.    I did.  I don't remember what time it was of the

15   day or if it was June 1st or 2nd, but, yes, I did.

16       Q.    And from whom did you receive responses?

17       A.    From Dr. Platt.

18       Q.    Anyone else?

19       A.    No.  I believe that it was from Dr. Platt.

20       Q.    And what was the substance of Dr. Platt's

21   response?

22       A.    It was very detailed.  And I think you probably

23   have it, which I don't have it right now.  But if you

24   brought it up, I could certainly discuss it if you would

25   like.

1  this recommendation 2 since August of 2020?

2      A.   I would say the first couple months of me -- me

3  starting, there was definitely -- kind of when this

4  began.  Hey, this needs to occur, it needs to be

5  documented, and moving on.

6      Q.   Why did you need to say it again in an e-mail on

7  May 18, 2021?

8      A.   Because in regards to this case, I don't feel

9  like -- it either didn't occur or wasn't documented that

10  it occurred sufficiently in my opinion.

11      Q.   Okay.  Is 2 now occurring sufficiently on a

12  consistent basis?

13      A.   I believe so.

14      Q.   And what's your basis for that belief?

15      A.   Again, constant review of the charts.  And the

16  way that the cases are being handled, I would say yes.

17          MR. FATHI:  Okay.  Let's take a break.  Is

18  five minutes enough?

19          (Recess from 10:49 a.m. to 10:57 a.m.)

20      Q.   (By Mr. Fathi) Doctor, we were talking about

21  Exhibit 21.  Could we have that on the screen, please?

22      A.   Yes.

23      Q.   So your paragraph 3, "A suicide risk assessment

24  must be completed prior to removing an individual from

25  watch."

Bobbie Pennington-Stallcup - 10/15/2021

84

1            First of all, did that happen in the case of the
2    patient who's being discussed here?
3        A.   No, it did not.
4        Q.   So what steps did you take to ensure that this
5    recommendation 3 has -- was implemented?
6        A.   Sending out this e-mail, and then doing --
7    having my staff do the daily audits on every single
8    individual on watch in the system every day except for
9    Saturday and Sunday.  But they catch up with them on
10   Monday.
11       Q.   And when they do those audits, what are they
12   looking for?
13       A.   The crisis treatment plan being completed within
14   one business day of placement and the suicide risk
15   assessment being completed prior to being taken off of
16   watch.
17       Q.   So has your recommendation 3 been fully
18   implemented?
19       A.   Yes.
20       Q.   And what is the basis for that statement?
21       A.   The audits being done daily.
22       Q.   And, I'm sorry, who does those audits?
23       A.   Courtney and Brittany.  They are my staff.
24       Q.   What are their last names?
25       A.   Brittany Cowans and Courtney Smith.

**Bobbie Pennington-Stallcup - 10/15/2021**

85

1      Q.    And what is their -- I think you said they're
2  auditors.   But what is their function?   What do they do?
3      A.    They're clinical liaisons or clinical liaison
4  specialists.
5      Q.    And just in lay terms, what's their job?
6      A.    They do a lot of the kind of data management and
7  calculation, if you will.
8      Q.    Okay.   And what's their level of professional
9  training or credentialing?
10     A.    Both of them have been in the -- in correctional
11  mental health for -- Brittany has been for over five
12  years, and Courtney has been for over 20 years.
13     Q.    And what's their education and licensing?
14     A.    They are not licensed.   So they're not making
15  clinical judgments.   They are seeing if -- if the two
16  things are included.
17     Q.    What's their educational level?
18     A.    I believe Brittany has a bachelor's and Courtney
19  has a high school diploma.
20     Q.    Okay.   Finally, your paragraph 4, "The rationale
21  for discontinuing a patient from watch needs to be
22  clearly documented in the patient's health record."
23           First, was this done with the patient we're
24  discussing?
25     A.    Not to a degree that I was satisfied with.

**Bobbie Pennington-Stallcup - 10/15/2021**

90

1    the incident, so, Doctor, would you take a moment and

2    read that to yourself, please?

3        A.    Okay.

4        Q.    Doctor, were you aware of this incident before

5    seeing this document?

6        A.    I can't say because I don't even see a patient

7    name on here.  So I cannot answer whether or not I was

8    aware of that.

9        Q.    Are incidents of this type pretty common?

10             MS. HESMAN:  Form.

11             THE WITNESS:  No.

12       Q.    (By Mr. Fathi) So according to this document,

13   this patient was on continuous suicide watch and removed

14   10 staples from his abdominal wound and then swallowed

15   the staples.

16             Do you see that?

17       A.    I do see that.

18       Q.    What is a continuous suicide watch, Doctor?

19       A.    A watch where they are being -- or a suicide

20   watch where they are being watched continuously by a

21   custody officer.

22       Q.    How is a patient who is on a continuous suicide

23   watch able to remove 10 staples from his abdomen and

24   swallow the staples?

25             MS. HESMAN:  Form.  Foundation.

1           THE WITNESS:  I don't know.

2      Q.   (By Mr. Fathi) The third line down says that,

3   the nurse, "noted wound dehiscense and risk for airway

4   obstruction."

5           Do you see that?

6      A.   Yes, I do.

7      Q.   What is "dehiscense"?

8      A.   I have no clue.

9      Q.   Was there an investigation of this incident?

10          MS. HESMAN:  Form.  Foundation.

11          THE WITNESS:  I don't know.  I have already

12   answered that I don't know which case this is referring

13   to.

14      Q.   (By Mr. Fathi) Was anyone disciplined as a

15   result of this incident?

16          MS. HESMAN:  Form.  Foundation.

17          THE WITNESS:  Again, I don't know, as I

18   already testified I don't know what patient or incident

19   this is referring to.

20      Q.   (By Mr. Fathi) Okay.  Reading the description of

21   this incident, does this cause you any concern about

22   whether continuous suicide watches were being carried out

23   correctly?

24          MS. HESMAN:  Form.

25          THE WITNESS:  Yes.

**Bobbie Pennington-Stallcup - 10/15/2021**

92

1     Q.     (By Mr. Fathi) What concern is that?

2     A.     Actually, it's -- I would say it's I'm unsure.

3  Because I don't know at what point the staff intervened.

4  Perhaps they were trying to intervene before, you know,

5  when he first removed a staple and tried to swallow it.

6  I don't know.

7           So I can't really say because I don't know the

8  timing of the incident and what intervention was

9  occurring while this took place.

10    Q.    Is it surprising to you that a patient on a

11 continuous watch was able to remove 10 staples from his

12 abdominal wound and then swallow the staples?

13              MS. HESMAN:   Form.

14              THE WITNESS:  Yes.

15    Q.    (By Mr. Fathi) Exhibit 23, please.

16           (Deposition Exhibit 23 was marked for

17 identification.)

18    Q.    (By Mr. Fathi) Doctor, Exhibit 23 is a

19 declaration that is signed by you that has been filed in

20 this case at Document 3907-1.

21           First of all, is this your declaration?

22    A.    Can you scroll through it?

23    Q.    Sure.  Doctor, you're welcome to read the entire

24 thing.  I'm not going to be asking you about the entire

25 thing.  I'm going to be asking you about one paragraph at

**Bobbie Pennington-Stallcup - 10/15/2021**

93

1   the end, but it's up to you.

2        A.    Scroll down a little more, please.   Scroll down

3   a little more, please.   Thank you.   Go up a little.

4   Okay.   Scroll down a little more.   That's good.   Scroll

5   down a little more.   Scroll down a little more.   Thank

6   you.   Okay.   Scroll down a little more.   Scroll down a

7   little more.   Thank you.   Scroll down a little more.

8   Thank you.   Scroll down a little more.   Thank you.   Okay.

9   Okay.   Okay.

10       Q.    Doctor, is this your declaration?

11       A.    It is.

12       Q.    Could we go to the last page, please?   Is that

13   your signature?

14       A.    It is.

15       Q.    So you signed this declaration; correct?

16       A.    Yes.

17       Q.    And you signed it under penalty of perjury?

18       A.    That's correct.

19       Q.    Could we go to Exhibit 1, please?   And in the

20   first paragraph you say that you have personal knowledge

21   of the matters set forth in this declaration; correct?

22       A.    Yes.

23       Q.    Could we go to paragraph 25, please.

24             It's actually paragraph 26.   So here you are

25   describing two mental health encounters that occurred on

Bobbie Pennington-Stallcup - 10/15/2021

94

1    December 14 and December 21, 2020; correct?

2         A.    Yes.

3         Q.    And you say that during both encounters the

4    patient was seen for 10 minutes.  Do you see that?

5         A.    That's correct.

6         Q.    Doctor, were you -- for the December 14

7    encounter, were you physically present?

8         A.    No, I was not.

9         Q.    Were you present by any sort of remote means by

10   telephone or video link?

11        A.    No.  I was not.

12        Q.    For the December 21 encounter, were you

13   physically present, Doctor?

14        A.    No.  I was not.

15        Q.    Were you present by any kind of remote means

16   such as telephone or video link?

17        A.    No.  I was not.

18        Q.    Doctor, in this declaration, you refer to the

19   report of Dr. Mark Stern, who is the court's expert in

20   this case; correct?

21        A.    Yes.

22        Q.    Have you read Dr. Stern's report?

23        A.    Yes.

24        Q.    Have you read it in its entirety?

25        A.    Yes.

**Bobbie Pennington-Stallcup - 10/15/2021**

95

1      Q.   What steps have you taken to implement the
2   recommendations in Dr. Stern's report?
3              MS. HESMAN:   Form.
4              THE WITNESS:   We have been doing that the
5   whole time since I started, requiring that either folks
6   meet those minimum durations or document clearly as to
7   why they were not met.
8              And that regardless of the time spent with
9   the patient, that there's clear evidence that the patient
10  was assessed, treated, and given a plan to follow between
11  sessions.
12     Q.   (By Mr. Fathi) Dr. Stern's report contained a
13  lot of other material other than just the durational
14  requirements for mental health encounters.
15             Have you taken any other steps to implement the
16  recommendations in Dr. Stern's report?
17             MS. HESMAN:   Form.   And objection to this
18  question to the extent the court didn't require that
19  certain steps be taken.
20             THE WITNESS:   Well, I would say the
21  auditing that we have been doing the entire time is also
22  in response to Dr. Stern's recommendations.
23     Q.   (By Mr. Fathi) What auditing is that?
24     A.   Through the CGAR, the CGAR audits that actually
25  assess all of the mental health contacts including the

**Bobbie Pennington-Stallcup - 10/15/2021**

96

1    watch related and nonwatch related.

2        Q.    So is it your testimony that you weren't doing

3    those audits before Dr. Stern's report?

4        A.    No.   But they were done differently.

5        Q.    How were they done differently in response to

6    Dr. Stern's report?

7                  MS. HESMAN:   Form.   Foundation.

8                  THE WITNESS:   There was no time

9    requirement.   There was just a requirement to document

10   whether they had been seen face to face or not.   There

11   really wasn't a time requirement associated with that or

12   much of anything else.

13       Q.    (By Mr. Fathi) Any other steps you've taken to

14   implement the recommendations of Dr. Stern's report?

15                  MS. HESMAN:   Form.   Same objection.

16                  THE WITNESS:   Not that I can summarize at

17   this point above what I've already stated.

18       Q.    (By Mr. Fathi) Okay.   Doctor, have you read the

19   report of Dr. Pablo Stewart?

20       A.    I don't believe I have.

21       Q.    Have you read the expert report of Dr. Craig

22   Haney?

23       A.    No.

24       Q.    Now, earlier on you testified about visiting

25   some of the prisons with Dr. Joseph Penn.   Do you

**Bobbie Pennington-Stallcup - 10/15/2021**

98

 1   answer?

 2            MS. HESMAN:  I'm instructing her not to

 3   answer.

 4       Q.   (By Mr. Fathi) Doctor, have you been involved in

 5   Dr. Penn's work on this case in any other way?

 6            MS. HESMAN:  Same objection.  Instructing

 7   not to answer.

 8       Q.   (By Mr. Fathi) Doctor, in your view, is a

 9   five-minute mental health encounter sufficient to

10   determine that a patient is not at risk of self-harm or

11   suicide?

12            MS. HESMAN:  Form.

13            THE WITNESS:  It depends on the clinical

14   presentation of the patient as well as the clinician's

15   ability to assess them.

16       Q.   (By Mr. Fathi) So is it your testimony that a

17   five-minute encounter can be sufficient to determine that

18   a patient is not at risk of self-harm or suicide?

19            MS. HESMAN:  Form.

20            THE WITNESS:  No, it is not.  My answer is

21   what I said.  That it depends on the presentation of the

22   inmate as well as the skill and knowledge of the

23   professional assessing them.

24       Q.   (By Mr. Fathi) So in some circumstances, a

25   five-minute encounter could be sufficient; correct?

**Bobbie Pennington-Stallcup - 10/15/2021**

99

1     A.    I can't -- that's a hypothetical question.   And
2   it depends --
3     Q.    No, it's -- it's really not --
4               MS. HESMAN:   David, please let her finish.
5   Thank you.
6               THE WITNESS:   It depends on the clinical
7   situation and the presentation from the patient as well
8   as the clinician assessing them.
9     Q.    (By Mr. Fathi) Are there circumstances in which
10   a five-minute encounter is sufficient to determine that a
11   patient is not at risk of self-harm or suicide?
12               MS. HESMAN:   Form.   Asked and answered.
13               THE WITNESS:   I would say, again, it
14   depends on the -- the individual situation, the
15   presentation of the patient, as well as the clinician.
16     Q.    (By Mr. Fathi) Is a three-minute encounter
17   sufficient to determine that a patient is not at risk of
18   self-harm or suicide?
19               MS. HESMAN:   Same objection.
20               THE WITNESS:   Again, it depends on the
21   individual situation as well as the person assessing the
22   situation.
23     Q.    (By Mr. Fathi) Are there circumstances in which
24   a three-minute encounter is sufficient to determine that
25   a patient is not at risk of self-harm or suicide?

**Bobbie Pennington-Stallcup - 10/15/2021**

100

1              MS. HESMAN:  Form.

2              THE WITNESS:  The answer is the same.  It

3    depends on the individual circumstances in the case, the

4    patient, as well as the clinician.

5        Q.   (By Mr. Fathi) Is a one-minute encounter

6    sufficient to determine that a patient is not at risk of

7    self-harm or suicide?

8              MS. HESMAN:  Form.

9              THE WITNESS:  No.

10       Q.   (By Mr. Fathi) Doctor, do you know a Centurion

11   nurse at Phoenix facility named Pat Borden?

12       A.   No.

13       Q.   Are you aware that in an article in today's

14   Arizona Republic, Ms. Borden alleges that she was

15   instructed by Centurion to falsify records in order to

16   avoid fines from the court in this case?

17       A.   No.  If I knew that, there would be disciplinary

18   action that occurred.

19       Q.   If a former Centurion nurse made such an

20   allegation, would that concern you?

21              MS. HESMAN:  Form.

22              THE WITNESS:  Yes.

23       Q.   (By Mr. Fathi) Would it cause you to question

24   the veracity or reliability of the CGAR scores that were

25   reported?

Bobbie Pennington-Stallcup - 10/15/2021

101

1                    MS. HESMAN:  Form.

2                    THE WITNESS:  That's a big -- that's a big

3    jump to go from one person's report to questioning all of

4    the CGARs' accuracy.

5                    So I think we have checks and balances in

6    place with the CGARs that at least what is being audited

7    is being audited correctly.

8        Q.   (By Mr. Fathi) So what's the answer to my

9    question, Doctor?

10                   MS. HESMAN:  Form.  Asked and answered.

11       Q.   (By Mr. Fathi) Let me ask it again.

12                   If a former Centurion nurse alleged that she had

13   been instructed by Centurion to falsify records in order

14   to avoid fines from the court in this case, would that

15   cause you to question the veracity or reliability of the

16   CGAR scores?

17                   MS. HESMAN:  Form.

18                   THE WITNESS:  It could.

19                   MR. FATHI:  Okay.  Let's take a five-minute

20   break, but I think we're almost finished.

21                   MS. HESMAN:  Okay.

22                   (Recess from 11:23 a.m. to 11:30 a.m.)

23                   MR. FATHI:  Doctor, thank you for your

24   testimony.  Because you have been identified as an

25   expert, we need to reserve the right to redepose you as

103

1                                SIGNATURE PAGE

2           I, BOBBIE PENNINGTON-STALLCUP, a deponent
    exercising my right to read and sign my deposition taken
3   on October 15, 2021, place my signature hereon and make
    the following changes on this _____ day of
4   _____,2021.

5       (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

7                             _____
                              BOBBIE PENNINGTON-STALLCUP

8   PAGE   LINE   READS            CHANGE TO            REASON

9   _____  _____  _____

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  _____  _____

16  _____  _____  _____

17  _____  _____  _____

18  _____  _____  _____

19  _____  _____  _____

20  _____  _____  _____

21  _____  _____  _____

22  _____  _____  _____

23  _____  _____  _____

24  _____  _____  _____

25  _____  _____  _____

104

1  STATE OF ARIZONA    )
                        )
2  COUNTY OF MARICOPA  )

3          BE IT KNOWN that I took the foregoing
   deposition pursuant to Notice; that the witness was duly
4  sworn by me; and that said transcript is a full, true,
   and accurate record of the proceedings; that the
5  proceedings were taken down by me in shorthand and
   thereafter reduced to print under my direction; that I
6  have acted in compliance with ACJA 7-206.

7          I CERTIFY that I am in no way related to
   any of the parties hereto nor am I in any way interested
8  in the outcome hereof.

9          Pursuant to request, notification was
   provided that the deposition is available for review and
10 signature.

11         Dated this 18th day of October, 2021.

12

13
                    _____
14                  Jennifer Honn
                    Certified Reporter
15                  Arizona CR No. 50885

16

17         I CERTIFY that GLENNIE REPORTING SERVICES,
   LLC, has complied with the ethical obligations set forth
18 in ACJA 7-206.

19

20

21

22

23 _____
24 GLENNIE REPORTING SERVICES, LLC
   Registered Reporting Firm
25 Arizona RRF No. R1035

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;      )
Stephen Swartz; Dustin             )
Brislan; Sonia Rodriguez;          )
Christina Verduzco; Jackie         )
Thomas; Jeremy Smith; Robert       ) No.
Gamez; Maryanne Chisholm;          ) CV12-00601-PHX-ROS
Desiree Licci; Joseph Hefner;      )
Joshua Polson; and Charlotte       )
Wells, on behalf of themselves     )
and all others similarly           )
situated; and Arizona Center       )
for Disability Law,                )
                                   )
              Plaintiffs,           )
                                   )
v.                                 )
                                   )
David Shinn, Director, Arizona     )
Department of Corrections,         )
Rehabilitation and Reentry;        )
and Larry Gann, Assistant          )
Director, Medical Services         )
Contract Monitoring Bureau,        )
Arizona Department of              )
Corrections, Rehabilitation        )
and Reentry, in their official     )
capacities,                        )
                                   )
              Defendants.           )
_____)

VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF
DEPUTY WARDEN TRAVIS SCOTT

October 5, 2021
9:59 a.m.
Chandler, Arizona


Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020

                              Prepared by:
602.266.6535                  Cindy Mahoney, RPR, RMR
www.glennie-reporting.com     Arizona CR No. 50680

2

1                          I N D E X

2    WITNESS                                          PAGE

3     DEPUTY WARDEN TRAVIS SCOTT

4         EXAMINATION BY MS. MORRIS                    4

5

6                       INDEX TO EXHIBITS

7
     EXHIBITS                DESCRIPTION              PAGE
8

9    Exhibit 1     Daily Post Sheet, Fri, July 30,     37
                   2021
10                 ADCRR0097496-97498

11   Exhibit 3     Posts Collapsed by Unit document   45
                   ADCRR00098821-98826
12
     Exhibit 5     Arizona Department of Corrections   98
13                 Correctional Service Log, 7/14/21
                   ADCRR00129059-129072
14
     Exhibit 6     Arizona Department of Corrections  125
15                 Mental Health Watch Order

16   Exhibit 7     Arizona Department of Corrections  133
                   Rehabilitation and Reentry
17                 Information Report
                   ADCRR00055285-55292
18
     Exhibit 8     Arizona Department of Corrections  114
19                 Correctional Service Log, 7/11/21
                   ADCRR00128900-128912
20

21
                   PREVIOUSLY MARKED EXHIBITS
22
                   Isolation Exhibit 3   Page 60
23
                   Isolation Exhibit 4   Page 80
24

25

3

1              DEPOSITION OF DEPUTY WARDEN TRAVIS SCOTT

2

3              The video-recorded videoconference deposition of

4    DEPUTY WARDEN TRAVIS SCOTT was taken on October 5, 2021,

5    commencing at 9:59 a.m. at the law offices of Struck Love

6    Bojanowski & Acedo, PLC, 3100 West Ray Road, Suite 300,

7    Chandler, Arizona, before Cindy Mahoney, RPR, RMR (via

8    videoconference), a Certified Reporter, Certificate No.

9    50680, for the State of Arizona

10   APPEARANCES:

11      For Plaintiffs (via videoconference):
            ACLU NATIONAL PRISON PROJECT
12          Maria V. Morris, Esq.
            915 15th Street N.W.
13          7th Floor
            Washington, D.C. 20005
14          202-548-6603
            Mmorris@aclu.org
15

        For Plaintiff Arizona Center for Disability Law
16       (via videoconference):
            ARIZONA CENTER FOR DISABILITY LAW
17          Maya Abela, Esq.
            177 North Church Avenue
18          Suite 800
            Tucson, Arizona 85701
19          520-327-9547
            Mabela@azdisabilitylaw.org
20

        For Defendants:
21          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
            Rachel Love
22          3100 West Ray Road
            Suite 300
23          Chandler, Arizona 85226
            480-420-1600
24          Rlove@strucklove.com

25

## Deputy Warden Travis Scott - 10/05/2021

4

```
 1                THE COURT REPORTER:  I will ask counsel to
 2   agree on the record that there is no objection to the court
 3   reporter administering a binding oath to the witness
 4   remotely.  Please state your agreement on the record.
 5                MS. MORRIS:  None from plaintiffs -- I mean
 6   no objection from plaintiffs.  We agree.
 7                MS. LOVE:  Same from defendants.  We agree.
 8
 9                DEPUTY WARDEN TRAVIS SCOTT,
10         the witness herein, being first duly sworn,
11            was examined and testified as follows:
12
13                         EXAMINATION
14   BY MS. MORRIS:
15      Q.   Could you please state your name for the record.
16      A.   Travis Scott.
17      Q.   Have you ever been deposed before?
18      A.   Yes.
19      Q.   How many times?
20      A.   Once.
21      Q.   What was the case?
22      A.   It was -- I don't -- it was a use of force case
23   out of 2011, I believe.
24      Q.   Okay.  Was it -- who was it that was alleged to
25   have used force?
```

**Deputy Warden Travis Scott - 10/05/2021**

8

1     A.   I understand.

2     Q.   All right.  Are you taking any medications that

3  limit your ability to give your full and accurate testimony

4  today?

5     A.   No.

6     Q.   Are there any other reasons that you're unable to

7  give your full and accurate testimony today?

8     A.   No.

9     Q.   Okay.  All right.  What is your job title?

10    A.   Deputy warden.

11    Q.   And that's with the Alabama Department of

12 Corrections Reentry -- Rehabilitation and Reentry?

13    A.   No.  It would be with the Arizona Department of

14 Corrections Rehabilitation and Reentry.

15    Q.   Thank you.  I'm sorry.  I get that mixed up

16 surprisingly often.

17              And if we call it ADCRR, is -- is that okay?

18    A.   Yes.

19    Q.   Okay.  How long -- actually, withdrawn.

20              Where are you the deputy warden?

21    A.   I am the deputy warden of the Browning Unit in

22 ASPC -- Arizona State Prison Complex - Eyman in Florence,

23 Arizona.

24    Q.   For the course of today, can we just refer to that

25 as Browning?

Deputy Warden Travis Scott - 10/05/2021

9

1      A.    Yes.

2      Q.    Okay.  Since when have you been the deputy warden

3   at Browning?

4      A.    Since March 2020.

5      Q.    What are your job responsibilities as the deputy

6   warden at Browning?

7      A.    I oversee all operations of the unit to -- I have

8   one direct report, which is my associate deputy warden.

9   And then I have indirect supervisory responsibilities over

10  two captains, two correctional officer 4s, 16 CO 3s, and

11  right now about 130 officers, 26 sergeants, and 6

12  lieutenants.

13     Q.    Okay.  I'm going to just say we got a little bit

14  of feedback or something there.  There was a couple places

15  where you broke up a little bit.  So I think it's probably

16  going to be really important over the course of the day to

17  just keep in mind that you need to keep speaking up.  It

18  didn't sound like you were very --

19     A.    I was speaking normal.

20              (An off-the-record discussion ensued.)

21  BY MS. MORRIS:

22     Q.    Is there anything else that you're responsible for

23  that you haven't mentioned yet?

24     A.    No.

25     Q.    Okay.  Who do you report to?

**Deputy Warden Travis Scott - 10/05/2021**

10

1      A.   To Warden James Kimble.

2      Q.   And you said you have one direct report?

3      A.   That is correct.

4      Q.   And who is that?

5      A.   Associate Deputy Warden Orin Romney, spelled

6   O-r-i-n, R-o-m-n-e-y.

7      Q.   How long have you worked for ADCRR?

8      A.   Total time is 25 years.  Almost 25 years.

9      Q.   I just realized I had not started the recording,

10   and I'm going to start that right now.

11               (An off-the-record discussion ensued.)

12               MS. MORRIS:  Let's take a quick break.

13               (A recess ensued from 10:08 a.m. to 10:11

14   a.m.)

15   BY MS. MORRIS:

16      Q.   How long have you worked for ADCRR?

17      A.   Almost 25 years total time.

18      Q.   Okay.  And what were you when you started out at

19   ADCRR?

20      A.   Started off as a cadet and then correctional

21   officer -- correction service officer 1.

22               Do you want me to go through all of the

23   ranks, ma'am?

24      Q.   How about from the -- when did you become a CO 2

25   roughly?

**Deputy Warden Travis Scott - 10/05/2021**

15

1      A.    At GCU, Grand Canyon University.

2      Q.    I'm sorry?

3      A.    Grand Canyon University.

4      Q.    Okay.  And is that something that's still in

5   process or ...

6      A.    I've taken a break for a little bit, but yes,

7   still in process.

8      Q.    Okay.  All right.  I'm going to jump right in.

9   And this question is going to be completely out of context

10  because I haven't figured out where to put it in my

11  outline.

12              People are supposed to keep -- people who are

13  incarcerated are supposed to keep their cells in compliance

14  with the regulations in DO 704; correct?

15      A.    Yes.

16      Q.    If they don't, where is that recorded?

17      A.    It could be recorded on -- well, it can be

18  recorded in disciplinary, so they can receive disciplinary

19  infraction.  Could also be recorded in step reviews on

20  officers walking around and doing housing unit inspections,

21  informal thing that they do.

22      Q.    What do you mean when you say it could be recorded

23  in step reviews?  Like, what would be the documentation in

24  that -- in what you just described?

25      A.    So the CO 3 could -- when they go and they do

**Deputy Warden Travis Scott - 10/05/2021**

16

1   their walks through the cluster, they could write down on a

2   piece of paper the cell was in compliance.

3       Q.   Do they keep notebooks of these things or just a

4   lot of pieces of paper or what?

5       A.   Pieces of paper and notes that they take.

6       Q.   Okay.  All right.  What are all the locations at

7   Eyman Browning where people might stay in their cells for

8   22 or more hours per day?

9            And you can -- you can give me categories

10  rather than housing units if that's easier.

11      A.   Enhanced security.  It's a max custody unit.  It

12  depends on inmate step process on how much out-of-cell time

13  they receive.  So it would be the max custody inmates.

14      Q.   What about people in close management?

15      A.   I don't have close management at my unit.

16      Q.   Okay.  And you don't have detention in your unit

17  either; correct?

18      A.   I do not have detention.

19      Q.   Okay.  What about people in mental health watch?

20      A.   Yes, mental health watch.

21      Q.   There are -- there are specific pods or -- or

22  housing units -- or --

23      A.   Clusters.

24      Q.   Clusters.

25            Or can we -- clusters are a group of six

**Deputy Warden Travis Scott - 10/05/2021**

17

1    pods; correct?

2        A.    Yes.

3        Q.    Okay.   There are pods where people are on watch;

4    correct?

5        A.    There is one pod --

6        Q.    Okay.

7        A.    -- where people are on watch.

8        Q.    And which pod is that?

9        A.    That is in wing 1, Able cluster, pod 6.

10       Q.    Okay.   Are there any people in wing 1 -- wing 1,

11   Able cluster, pod 6 who are on any kind of watch other than

12   a mental health watch?

13       A.    There are -- most of the time, no.   There are

14   occasions where we'll put a -- place an inmate in there on

15   a security watch.

16       Q.    What's a security watch?

17       A.    Basically it's a watch to see the inmate's

18   behavior or to place them there until we can find alternate

19   housing for them.

20       Q.    What would result in a person being placed on a

21   security watch?

22       A.    Erratic behavior that -- you know, throwing on

23   staff or getting into a confrontation with another inmate.

24   So we're putting them outside of their normal housing until

25   we can get them into -- into a new cell, is the most reason

**Deputy Warden Travis Scott - 10/05/2021**

18

1   why we put an inmate on a security watch.

2      Q.   Okay.  If an inmate is on a security watch, are

3   they on -- are they being observed in the same way that a

4   person who was on a mental health watch would be observed?

5      A.   No.

6      Q.   Okay.  And about how often -- you said it doesn't

7   happen a lot, but about how often would you say there's

8   someone on security watch?

9      A.   Once a week maybe.

10      Q.   Okay.  And how long does security watch last

11   usually?

12      A.   There's too many variables.  It -- I would say an

13   average is maybe one to two days.

14      Q.   Okay.  You were saying that it's a max custody

15   unit, so it depends somewhat on people's step, and you

16   mentioned specifically enhanced would have people in their

17   cell more than 22 hours a day.  Would RSHP?

18             MS. LOVE:  Object to form.  Go ahead.

19             THE WITNESS:  Yes.  Based off of their steps

20   as well, though.

21   BY MS. MORRIS:

22      Q.   Okay.  So some people might and some people might

23   not be in their --

24      A.   Correct.

25      Q.   -- cells more than 22 hours a day?

**Deputy Warden Travis Scott - 10/05/2021**

19

1    A.   Correct.

2    Q.   What about the STG Unit at -- at Browning?

3    A.   Depending on our programming for each individual

4    day, so it's not every day, but if it's their day to have

5    programming or to have recreation, then no.

6    Q.   So there -- there would be some days that they

7    would get out of their cell more than two hours a day --

8    A.   Yes.

9    Q.   -- in the STG Unit?

10   A.   Yes.

11   Q.   On average, over the course of a week, do people

12   in the STG Unit get out of their cells more than 14 hours a

13   week?

14   A.   Yes.

15   Q.   Everyone in the STG Unit or some people?

16   A.   Can I review the steps, the matrix to look at the

17   amount of time they're all supposed to be out?  I don't

18   know it by heart.  Some -- you know, the steps will

19   determine how much extra time they get out of their cells.

20   So ...

21   Q.   Okay.  So it's -- so it's the amount of

22   out-of-cell time that people in the STG Unit get is

23   dependent on the step matrix from --

24   A.   Correct.

25   Q.   -- DO 812; correct?

**Deputy Warden Travis Scott - 10/05/2021**

20

1      A.    Correct.

2      Q.    Okay.  All right.  Going back to the question of

3  security watch, are people who are on security watch

4  allowed property?

5      A.    Yes.

6      Q.    And are they allowed clothing?

7      A.    Yes.

8      Q.    What is the size of cells in Eyman Browning?

9      A.    I do not know.  I've never measured them.

10     Q.    Okay.  How frequently are health and welfare

11 checks supposed to be done at Browning?

12     A.    No more than one hour apart.

13     Q.    What happens if they are more than an hour apart?

14     A.    They're supposed to call their shift supervisor

15 and let them know that -- the control room officer is

16 supposed to call the shift supervisor and let them know

17 they need someone to come down and do a security health and

18 welfare check.  [Indiscernible.]

19     Q.    Okay.

20            THE COURT REPORTER:  I'm sorry.  What was the

21 answer?

22            THE WITNESS:  If it goes longer and if it's

23 getting close to the time of a security check is to be

24 completed, the control room officer is required to notify

25 the shift supervisors that they need someone to come down

**Deputy Warden Travis Scott - 10/05/2021**

21

1   and conduct a security health and welfare check.

2   BY MS. MORRIS:

3       Q.   You said that's what's required when it gets close

4   to time to do it?

5       A.   Correct.  If -- if there is not an officer

6   available and, say, the officer assigned to that area is

7   escorting an inmate somewhere and it's getting close to

8   that one-hour mark, then the control room officer is

9   required to notify the shift supervisor or the shift

10  commander that they need someone to come down and conduct a

11  security health and welfare check.

12      Q.   Okay.  Just so that I'm sure I understand, if, for

13  example, it's been 55 minutes since there was a health and

14  welfare check in a unit and the control officer notes that

15  the person who's the floor officer for that unit or for

16  that pod or for that cluster, I guess, for that cluster is

17  busy escorting somebody, the control officer would call

18  whom to get it -- someone to come do a health and welfare

19  check?

20      A.   The shift sergeant or the shift commander.

21      Q.   Okay.  And in that case, would -- who would be

22  doing the health and welfare check following that phone

23  call?

24      A.   Depends on which staff member is available.  It

25  could be the shift sergeant.  It could be the shift

**Deputy Warden Travis Scott - 10/05/2021**

22

1   commander that comes down.  It could be a CO 3 that might

2   be in the area.  It could be anybody.

3       Q.   Okay.

4       A.   Depends on who would be available.

5       Q.   What happens if the control officer doesn't make

6   that phone call and the health and welfare check doesn't

7   happen every hour?

8       A.   If it's found out, then that officer could face

9   disciplinary action.

10      Q.   Okay.

11      A.   Correction.

12      Q.   So it would be the -- the control officer would

13  face disciplinary action?

14      A.   Correct.

15      Q.   Would the floor officer face disciplinary action?

16      A.   Depends on what the floor officer was doing.

17      Q.   Okay.

18      A.   If the officer has a legitimate reason of why they

19  were not in the area, then no.  But if the floor officer

20  was involved in an activity that prevented them from doing

21  that and the control room officer failed to make

22  notification that a walk needed to be completed, then the

23  responsibility falls on to the control room officer, not

24  the officer on the floor.

25      Q.   Okay.  Have you ever responded to a situation

23

1   where an incarcerated person in a cell at Browning was

2   having an emergency?

3       A.   Yes.

4       Q.   And have you ever reviewed documentation about

5   that kind of situation?

6       A.   Yes.

7       Q.   If there's no officer in the pod at the time of

8   the emergency, about how long does it take to get someone

9   to the cell from the time the control officer realizes

10  there's an emergency?

11      A.   Very short amount of time.

12      Q.   Like, how many minutes?

13      A.   It wouldn't be minutes.  It would be seconds.

14      Q.   Seconds.  Okay.

15      A.   Yes.  Because the control room officer, when he is

16  notified there is an emergency, he's going to activate the

17  Incident Command System, and staff are going to be there in

18  a matter of seconds.  No more than 30 seconds.

19      Q.   Are there people who are assigned on each shift to

20  respond to an ICS?

21      A.   Yes.

22      Q.   And where are -- where are they when they're not

23  responding to an ICS?

24      A.   They are at their assigned post.

25      Q.   Okay.  So it's -- it would be they have a post and

1    like, who the officers are that are supposed to respond to

2    that.

3        Q.   Okay.  Why would you never have -- what is a

4    type 2?

5        A.   That's a large-scale event.  That's involving,

6    like, the complex.

7        Q.   Okay.  All right.

8        A.   It's -- it's a very broad incident, very large

9    incident.

10       Q.   Okay.  All right.  I'm going to switch gears a

11   little bit.

12             Are there any written policies that prevent

13   people with a serious mental illness from being placed into

14   max custody?

15       A.   Can you repeat the question, please?

16       Q.   Are there any written policies that prevent a

17   person with an -- with a serious mental illness from being

18   placed into max custody?

19       A.   Not that I'm aware of.

20       Q.   Are there people with a serious mental illness in

21   maximum custody at Browning right now?

22       A.   Yes.

23       Q.   Do you know how many?

24       A.   I don't know the exact count.

25       Q.   Do you have an estimate?

**Deputy Warden Travis Scott - 10/05/2021**

26

1      A.   35 to 40.

2      Q.   Okay.  Do you track that somewhere?

3      A.   It's -- no.  It's not tracked.

4      Q.   So how is it that you -- you have -- you seem to

5  have a pretty good idea of it.  How is it that you have

6  that idea of how many there are?

7      A.   Based off of the population.  And it's-- it's

8  delineated on the count sheets with the inmates' number.

9  It will show that they have an identifier that would show

10  that they're an SMI.

11     Q.   Okay.  So just from you seeing the count sheets,

12  you have a pretty good sense of that's how many there are?

13     A.   In my involvement in the unit, yes.

14     Q.   Okay.

15     A.   I -- being down in the areas, I -- there's not a

16  formal tracking system that I use.  I just ask, hey, how

17  many SMIs do we have, and that's how I know.

18     Q.   Okay.  Is there any particular location in

19  Browning where people with an SMI are more like -- a

20  serious mental illness.

21          If I say SMI --

22     A.   I'm good with that.

23     Q.   -- do you understand that as serious mental

24  illness?

25     A.   Yes, ma'am.  I said it first.

Deputy Warden Travis Scott - 10/05/2021

27

1      Q.    Is there a particular location in Browning where

2  people with an SMI who are in maximum custody are likely to

3  be held?

4      A.    Yes.

5      Q.    Where is that?

6      A.    1 Able.

7      Q.    Okay.

8      A.    And 1 Dog.

9      Q.    Are there people who are in maximum custody at

10  Browning who have gone from mental health watch directly

11  into maximum custody?

12      A.    Not unless they were -- there are some, but not --

13  they don't come into the unit and stay in the unit if

14  they're -- let me -- let me back this up.

15          If an inmate comes to Browning Unit and is

16  placed on a mental health watch and they are not a maximum

17  custody inmate, when their mental health watch ends, they

18  go back to the unit that they were sent from.

19          If they are an inmate assigned to Browning

20  Unit and they get placed on a mental health watch, when

21  their mental health watch ends, they go back to their cell

22  at the Browning Unit.

23      Q.   Okay.  Thank you.  That was a very clear

24  explanation.

25          Are there any particular precautions that

Deputy Warden Travis Scott - 10/05/2021

28

```
 1   have to be taken when a person who was in the Browning Unit
 2   and has now gone on to watch is about to leave watch and
 3   return to their prior location in the Browning Unit?
 4               MS. LOVE:  Object to form.
 5               THE WITNESS:  Can you repeat the question,
 6   please?
 7   BY MS. MORRIS:
 8       Q.   Okay.  So in the -- in the situation where someone
 9   who has been in Browning Unit goes on to mental health
10   watch and then they're being released from mental health
11   watch and they're going back to their prior location within
12   Browning Unit, are there any special precautions that are
13   taken in that sort of situation?
14       A.   No.
15       Q.   Are there people who are at Browning who have
16   repeatedly gone from their housing unit in Browning into
17   mental health watch, back to their housing unit, back to
18   mental health watch and cycled in that way?
19       A.   Yes.
20       Q.   Do you know about how many?
21       A.   No.
22       Q.   Okay.  Do you think there's more than five people
23   who are in that situation?
24       A.   Yes.
25       Q.   Do you think there's more than ten people who are
```

**Deputy Warden Travis Scott - 10/05/2021**

29

1    in that situation?

2        A.    No.

3        Q.    Okay.   So somewhere between five and ten probably?

4        A.    Yes.

5        Q.    You said that there's not anyone on close

6    management at Browning; is that right?

7        A.    The close management program is no longer at the

8    Browning Unit.

9        Q.    Okay.   Since when?

10        A.    Since the beginning of September.

11        Q.    Did it move -- did the close management unit that

12    was at Browning move to Rynning Unit?

13        A.    Yes.

14        Q.    Okay.   Thank you.

15              When there was a close management unit at

16    Eyman Browning, were there people with an SMI in that unit

17    sometimes?

18        A.    I don't know.

19        Q.    Is there any policy that would prevent a person

20    with an SMI from being placed in close management?

21        A.    Not that I'm aware of.

22        Q.    Are there people who were in close management at

23    Browning and went into mental health watch and then were

24    released back to close management?

25        A.    I don't recall that.

**Deputy Warden Travis Scott - 10/05/2021**

30

```
 1        Q.    Okay.

 2        A.    Not aware of it.

 3        Q.    Okay.  If a person who was in close management

 4   needed to go on mental health watch when they were

 5   released, would they be released back to close management?

 6        A.    Yes.

 7        Q.    Are there people in mental health watch who have

 8   some -- sometimes, not necessarily today, but are there

 9   sometimes people at Browning who have an SMI who are in

10   mental health watch?

11        A.    Yes.

12        Q.    Do you have any estimate of how many of the people

13   who go on watch -- go on mental health watch at Browning

14   have an SMI?

15        A.    No.

16        Q.    Okay.  Do you think it's a majority?

17        A.    That would be an assumption.

18        Q.    Okay.  I don't want you to assume.  Yeah.

19              Are there people who are prescribed

20   psychiatric medications in maximum custody?

21        A.    I don't know that -- I'm not -- Centurion, I

22   assume, but I know there's inmates that take medication,

23   but I don't know exactly what their medication is --

24        Q.    Okay.

25        A.    -- they take for it.
```

**Deputy Warden Travis Scott - 10/05/2021**

31

1    Q.    Okay.  Are there policies regarding the
2  temperature of units -- of housing units where people who
3  are SMI are housed?
4    A.    There's a policy on all units regarding the
5  temperature, not just for SMIs.
6    Q.    Okay.  And what policy is that?
7    A.    Can I look?  Because I don't know off the top of
8  my head.
9    Q.    Do you know what the substance of the policy is?
10  Like, what it says about temperature?
11    A.    When it gets to a certain degrees, then we're
12  supposed to do mitigation efforts to lower the temperature
13  of the house housing area.
14    Q.    Do you know what the certain degree is?
15    A.    85 degrees, I believe.
16    Q.    Okay.  And that applies for all housing units
17  regardless of who's in them?
18    A.    Correct.
19    Q.    Okay.  Are there any particular policies relating
20  to the -- the temperatures where people with SMIs are --
21  with an SMI are?
22    A.    Not that I'm aware of.
23    Q.    Are there any particular -- any policies regarding
24  people who are prescribed psychiatric medications?
25              MS. LOVE:  Form and foundation.

Deputy Warden Travis Scott - 10/05/2021

32

```
 1    MS. MORRIS:
 2        Q.   That was not a clear question.
 3             Are there any policies regarding the
 4    temperature of units where people who are prescribed
 5    psychiatric medications are housed?
 6        A.   Not that I am aware of.
 7        Q.   Okay.  At Browning, most people have electronic
 8    tablets; correct?
 9        A.   Yes.
10        Q.   Are there locations where people don't have
11    tablets?
12        A.   Just on watch.
13        Q.   On watch?
14        A.   Correct.  In the watch pod.
15        Q.   If someone's on security watch in the watch pod,
16    would they have access to a tablet?
17        A.   They can.  There's just -- there's no outlets in
18    there for them to be able to recharge them.  But I have
19    allowed inmates on a security watch to have a tablet.
20        Q.   Okay.  What about people in the BMU?
21        A.   BMU?
22        Q.   Behavioral Modification Unit?
23        A.   Yes, they are.  It's a new program.  So yes, they
24    do have their tablets.  Sorry.
25        Q.   Okay.  Is it behavioral management program or --
```

**Deputy Warden Travis Scott - 10/05/2021**

33

1      A.   The Behavioral Management Unit.

2      Q.   Okay.  Who is the unit administrator at Eyman

3   Browning?

4      A.   I am.

5      Q.   You are.  Okay.

6           And do you usually work the day shift?

7      A.   Yes.

8      Q.   Do you work Monday through Friday?

9      A.   Yes.

10     Q.   Do you work weekends?

11     A.   On occasions.

12     Q.   Okay.  And who is the captain at Eyman Browning?

13     A.   I have two captains.

14     Q.   Okay.  Do they have different shifts or different

15   zones?  Or how -- what is the distinction between the two

16   captains?

17     A.   One captain is the chief of security and the other

18   captain is the chief of operations.

19     Q.   What's the difference between those two things?

20     A.   Chief of security manages the security aspects of

21   the unit and has the shifts [indiscernible].

22           THE COURT REPORTER:  "And has the shifts"

23   what?  "And has the shifts" --

24           THE WITNESS:  They -- they supervise the

25   shift -- the shifts, so the shift commanders and the chief

1      A.   Correct.

2      Q.   Okay.  How many CO 4s are there at Eyman Browning?

3      A.   Two.

4      Q.   And how -- how are they distinguished?

5      A.   They're both CO 4s.  They just have -- they

6   supervise different CO 3s.  But as far as their duties go,

7   they just -- there's no exact distinction.  There's just

8   this -- one CO 4 will supervise, like, the disciplinary CO

9   3, the WIPP CO 3.  And then certain CO 3s down in the unit

10   and the other one will have the opposite CO 3s.  There's a

11   total of 16 CO 3s.  So one will supervise eight, and the

12   other one supervises the other eight.

13      Q.   And do the two CO 4s have a set group of eight CO

14   3s that they oversee?

15      A.   Yes.

16      Q.   Okay.  So that doesn't change from week to week?

17      A.   No.

18      Q.   How many correctional lieutenants are there at

19   Eyman --

20      A.   Six.

21      Q.   And what is the -- how -- how are their duties

22   broken up between them?

23      A.   By shifts.  So I have four different shifts in the

24   unit.  And then I have support service lieutenants.

25      Q.   What are the four shifts?

**Deputy Warden Travis Scott - 10/05/2021**

36

1      A.   One has their days off, and it's in between a.m.
2   and p.m.   A.m. hours are from 0600 to 1800, and then the
3   p.m. hours are from 1800 to 0600.   And then it is also
4   based off of their regular days off.   One group, one shift
5   on day shift has Sunday, Monday, Tuesdays, and every other
6   Wednesday off.   The other shift has Thursday, Friday,
7   Saturday, and every other Wednesday off.
8             P.m. shift, same thing.   One group has
9   Sunday, Monday, Tuesday, and every other Wednesday.   The
10   other shift has Thursday, Friday, Saturday, and every other
11   Wednesday.   So those are how the shifts are -- are split.
12      Q.   Okay.   Thank you.
13             I'd like to talk a little bit about daily
14   post sheets, which I think you also called rosters?
15      A.   Yes.
16      Q.   Okay.   The posts listed on -- so not who's filling
17   them, but the posts listed on the daily post sheets don't
18   change from day to day, do they?
19      A.   No.
20      Q.   They do change from a.m. shift to p.m. shift,
21   though; correct?
22      A.   Yes.
23      Q.   Okay.   How is it determined what posts need to be
24   included on the daily post sheet?
25      A.   The -- the posting chart for the unit is what

**Deputy Warden Travis Scott - 10/05/2021**

37

1  determines what posts are placed on the posting chart or

2  the posting sheet.

3      Q.   Is -- what is the posting chart?

4      A.   Posting chart allots me the amount of positions

5  I'm allowed to have on each shift and how many full-time

6  employees for those positions.

7      Q.   How often do the positions listed on the roster

8  get revised?

9      A.   It hasn't happened since I've been there.  It's --

10  it hasn't -- the actual posts on the roster, on the post

11  sheet, those have not changed.

12      Q.   Okay.  All right.  Are all of the posts listed on

13  the daily post sheet critical posts?

14      A.   Yes.

15      Q.   Okay.  I'm going to share my screen and show you

16  what I am marking as Scott Exhibit 1.

17              (The document was marked as Exhibit 1 for

18  identification.)

19  BY MS. MORRIS:

20      Q.   Can you -- what are you seeing on your screen now?

21      A.   The top portion of the daily -- the daily post

22  sheet.

23      Q.   Okay.

24      A.   But I can't see the total authorized positions

25  that are on the right side of the screen due to the camera

**Deputy Warden Travis Scott - 10/05/2021**

38

1    views.   There.   Now I can see it all.

2       Q.   You can see it all?

3       A.   Yes.

4       Q.   Okay.   I know you can still only see the top?

5       A.   Yeah, I can still only see the top portion.

6       Q.   Okay.   So when we were talking about the posts

7    that are listed on every -- on every daily post sheet for

8    the a.m. shift, that's these posts listed in under required

9    posts on Exhibit 1?

10      A.   Yes.

11      Q.   Okay.   And just for the record, could you tell us

12   what Exhibit 1 is?

13      A.   This is a daily post sheet from Friday, July 30,

14   2021, for the a.m. shift.

15      Q.   At Eyman Browning?

16      A.   Correct.   It would have been the front side.

17      Q.   What do you mean, it would be the front side?

18      A.   So we -- we identify our different shifts based

19   off of a.m. back, a.m. front, and on p.m. shift, a.m.

20   front, p.m. back.

21              The a.m. front is because they have the days

22   off in the front part of the week, which would be Sunday,

23   Monday, Tuesday, so we identify them as a.m. front since

24   that's what correlates with their days off.

25      Q.   Got it.   That makes sense.   Thank you.

Deputy Warden Travis Scott - 10/05/2021

39

1      A.    For part of the week.

2      Q.    Looking at the far right-hand side of the daily

3  post sheet where it says, Total staff, do you see that?

4      A.    Yes.

5      Q.    I'm trying to make sure that I understand how this

6  form works.

7      A.    Okay.

8      Q.    Authorized FTEs, that's the number of full-time

9  employees that Eyman Browning would have assigned to both

10  day shifts, fronts and backs, a.m. shift --

11      A.    Correct.

12      Q.    -- is that correct?

13      A.    That is correct.

14      Q.    Okay.  And the vacancies are 78 vacancies, for

15  both fronts and backs a.m. shift; correct?

16      A.    That is correct.

17      Q.    Okay.  And then the total assigned are the number

18  of people who work at Browning on fronts and backs, a.m.

19  shift?

20      A.    That is correct.

21      Q.    Okay.  And so as of this date, that was 57 people

22  out of 135 authorized; correct?

23      A.    Yes.

24      Q.    So it then says, Total staff on RDO.  And that's

25  regular day off?

**Deputy Warden Travis Scott - 10/05/2021**

40

1      A.    Yes.

2      Q.    I am confused by why the total available staff and

3  the total RDO -- staff on RDO don't add up to the total

4  assigned.  Can you explain that to me?

5      A.    Why the total number assigned and the total of

6  staff on RDO doesn't add up to what?

7      Q.    So the total -- it says, Total available, 30.

8  So --

9      A.    Okay.

10     Q.    Is that -- is that the number of people who are

11  available to work this particular shift on this day?

12     A.    Yes.

13     Q.    Okay.  It says that there's 30 of those people and

14  there's 33 people who are assigned to Eyman Browning but

15  are on their -- on the a.m. shift but are on their regular

16  day off.  And when I add those two together, I get 63.

17     A.    Correct.

18     Q.    But it says that the total assigned people are 57.

19     A.    Correct.

20     Q.    So where do the other six people come from?

21     A.    Overtime.

22     Q.    Okay.

23     A.    It counts -- it counts people -- what has been

24  captured in the total staff.  It does not capture staff

25  that are working overtime or staff that are working on --

**Deputy Warden Travis Scott - 10/05/2021**

41

1    working as -- it's mainly -- it's just overtime.  So there

2    should be six people on the roster showing as working as

3    overtime.

4        Q.    Okay.  All right.

5        A.    Which isn't captured in that area.

6        Q.    Okay.  All right.  And it's my understanding from

7    looking at this that on this particular day, North Wing was

8    not staffed.  The position called North Wing was not

9    staffed; is that right?

10       A.    Yeah.  But that wouldn't -- that's -- that

11   wouldn't be the case, though.  That's what it's showing,

12   yes, but that's not possible.

13       Q.    Okay.  What about Able Control?

14       A.    It's showing that it wasn't posted.

15       Q.    Okay.  Do you think that's also not possible?

16       A.    I think that both -- because I also see that Dog

17   Control is empty, which is not possible, because you would

18   have to have somebody up there to work either -- to work

19   both Able and Dog Control.  So it -- it must have been a

20   typo.

21       Q.    Okay.  What about Lincoln Control?

22       A.    Lincoln Control didn't have somebody in it because

23   Ida Control was posted, and we didn't have an officer for

24   both sides.  So the way the control rooms are, they're

25   right across from each other.  So most of the -- almost

**Deputy Warden Travis Scott - 10/05/2021**

42

1   every day it's one officer working both control rooms.

2       Q.   Okay.  So you would expect to see someone in at

3   least Able or Dog?

4       A.   Correct.

5       Q.   Baker or Charlie?

6       A.   Correct.

7       Q.   Ida or Lincoln?

8       A.   Correct.

9       Q.   Easy or --

10      A.   Fox.

11      Q.   Fox.  I don't see Fox at all.  Okay.  There's Fox.

12   Okay.

13              So you would expect to see someone in the

14   control post for at least one of each two clusters that are

15   across the hall from each other; is that right?

16      A.   Correct.

17      Q.   Okay.  What about the floor officers that are

18   listed as empty, like Lincoln floor?  Do you have any

19   reason to think that that's not accurate?

20      A.   No.  That's accurate.  Because [indiscernible].

21              THE COURT REPORTER:  There's what?

22              THE WITNESS:  There is somebody covering Ida

23   floor.  So there was one floor officer for those two

24   clusters.

25   BY MS. MORRIS:

**Deputy Warden Travis Scott - 10/05/2021**

43

1      Q.    And Ida and Lincoln are across the hall from each

2   other?

3      A.    Correct.

4      Q.    Do you have any reason to think that it's not

5   accurate that there was one recreation officer post empty?

6      A.    No.   That's -- that's accurate.

7      Q.    Okay.   What about the positions that -- do you

8   think there's -- withdrawn.

9            Do you have any reason to think that the

10   mental health/medical/programs 2, 3, and 4 positions would

11   not have been empty?

12      A.    No.   They would have been empty.

13      Q.    Do you have any reason to think that the DI

14   326/recreation escort/SMI numbers 1 and 2 were not empty?

15      A.    No.   They were empty.

16      Q.    Do you have any reason to think that the

17   recreation officers 3 and 4 were not empty?

18      A.    No.   They were empty.

19      Q.    Okay.   Then going down to the second page of

20   Exhibit 1, which is ADCRR00097497, the only positions that

21   are shown on the roster as being filled are the yard

22   officer 1 and B/C rover?

23      A.    Correct.

24      Q.    Do you have any reason to think that the other

25   listed positions that don't have anyone listed as staffing

**Deputy Warden Travis Scott - 10/05/2021**

44

```
 1   them would have been staffed?
 2        A.    No.
 3        Q.    So you think there are on inaccuracies page 1
 4   regarding a couple of the control officers, but other than
 5   that, you think that the roster is accurate?
 6        A.    Yes.
 7        Q.    Does anyone check the rosters to make sure they're
 8   accurate?
 9        A.    Yes.
10        Q.    Who?
11        A.    The shift lieutenant and then the chief of
12   security.  And then in the morning meeting they would have
13   been reviewed.
14        Q.    They would have been reviewed by whom?
15        A.    By myself and my associate deputy warden.
16        Q.    Earlier you were saying that there are people who
17   are assigned to ICS who are to respond for ICS?
18        A.    Yes.
19        Q.    Is that what appears in the special
20   assignments area?
21        A.    No.  No.
22        Q.    No.
23              These are different positions than that?
24        A.    These are how we keep track of people on overtime.
25        Q.    Can you explain that to me?
```

**Deputy Warden Travis Scott - 10/05/2021**

45

1      A.   So because they're not assigned to this shift, we

2    have to be able to show how they're being put on the

3    roster, like, how -- because they're not assigned to the

4    shift.

5               So for exact -- for example, the very top

6    one, Michael Sutphin, he was assigned to support services.

7    So in order to -- it's done for accountability as far as

8    making sure that when people are turning in their overtime

9    forms, we can look at the roster and see that they were on

10   the roster that day, therefore verifying that they worked

11   the overtime that they're claiming.

12     Q.   All right.  Okay.  So when you said earlier

13   that -- when we were talking about the total available

14   staff and you said that there were people who would show up

15   on overtime in -- in this special assignments area, that

16   you would see those people?

17     A.   Yes.

18     Q.   Okay.  Thank you.  That is all I have to ask on

19   that one.

20              I'm going to show you what I'm going to mark

21   as Exhibit 3, which I am going a little bit out of order.

22              (The document was marked as Exhibit 3 for

23   identification.)

24   BY MS. MORRIS:

25     Q.   Can you see my -- no, you can't.

**Deputy Warden Travis Scott - 10/05/2021**

46

1              Can you see my screen?

2       A.    It's blank.  Yes, now I can.

3       Q.    Okay.  Can you tell me what Exhibit 3 is?

4       A.    It shows posts collapsed by unit.  It's -- this is

5  a form that Complex uses.

6       Q.    Okay.  Do you ever review this form?

7       A.    No.

8       Q.    Do you know how this form is used?

9       A.    I do not.

10      Q.    Do you know whether there is a specific order in

11  which, if you are short-staffed, you're supposed to -- I'm

12  going to step back from that question just a little bit.

13              Can you explain to me what it means when a

14  post is collapsed?

15      A.    Sure.  It means that there wasn't someone to fill

16  the position.

17      Q.    Okay.  Is there a way that you know how you're

18  supposed to -- which -- which posts should be collapsed in

19  which order if you are short-staffed?

20      A.    Based on the activities during the day will

21  determine how I'm collapsing my post in my unit.

22      Q.    Okay.  Have you been told that there is a chart

23  that says the order in which you're supposed to collapse

24  the -- the positions?

25      A.    Are you referring to the priority posting chart?

Deputy Warden Travis Scott - 10/05/2021

47

1      Q.    Yes.

2      A.    Okay.  So yes, I'm aware of a priority posting

3  chart, if that's what you're asking.

4      Q.    Do you know what it looks like?

5      A.    I've never worked at Complex, and that's who keeps

6  the priority posting chart.  So I -- I don't know what it

7  looks like.  I know where -- I know how it's supposed to

8  work, but I don't use that priority posting chart.

9      Q.    And the Complex -- when you say the Complex,

10  that's sort of the central administration of Eyman?

11      A.    Correct.

12      Q.    Okay.  And they have not communicated to you which

13  posts are supposed to be collapsed first?

14      A.    They don't --

15              THE WITNESS:  Go ahead.

16              MS. LOVE:  Form.  Object to form.

17              THE WITNESS:  They don't tell me.  I make the

18  decisions through my shift commanders based off of the

19  activities of the unit during the day.  They tell us how

20  many officers they need to send out of my unit to

21  cross-level to another unit, but the -- the Complex shift

22  commander cannot dictate what activities take place based

23  off of my staffing that I'm left with inside of the unit.

24  BY MS. MORRIS:

25      Q.    Okay.  All right.  Eyman Browning has staffing

**Deputy Warden Travis Scott - 10/05/2021**

48

1   levels of approximately 65 percent of what's required -- of

2   what its authorized staff is; is that correct?

3       A.   I don't believe that's accurate.

4       Q.   Okay.  What do you think the number is?

5       A.   40 -- it's in the 40 percent of my allotted

6   positions.

7       Q.   For Browning overall?

8       A.   For Browning overall, correct.

9       Q.   How long has that been true?

10      A.   A while.  Since I've been there.  I can tell you

11  I've been there -- it has gotten worse than when -- when I

12  first started.  So at Browning Unit, the vacancies have

13  increased.

14      Q.   So as -- as I understand what you just said,

15  Browning Unit has approximately 40 percent of the staff

16  that it's authorized to have?

17      A.   No.  That is not what I said.  We --

18      Q.   Okay.

19      A.   40 percent vacancies.

20      Q.   Okay.  I thought I might have gotten those two

21  things switched around.

22      A.   Right.  So basically saying I have 60 percent of

23  the staff that I need.

24      Q.   Okay.  All right.  Thank you.

25               I am going to take a short break now.  Maybe

Deputy Warden Travis Scott - 10/05/2021

49

1   ten minutes.

2        A.   Okay.

3                 (A recess ensued from 11:11 a.m. to 11:25

4   a.m.)

5   BY MS. MORRIS:

6        Q.   Warden Scott, there's an Intake Unit for maximum

7   custody at Browning; correct?

8        A.   Yes.

9        Q.   About how many people come into the Intake Unit

10  each month?

11       A.   I don't know.

12       Q.   Okay.

13       A.   I mean, it depends.

14       Q.   Okay.  About how many people are usually in the

15  Intake Unit?

16       A.   15 to 20.

17       Q.   Okay.

18       A.   Sometimes more, sometimes less.

19       Q.   Do all people who get classified to maximum

20  custody go into maximum custody through the Intake Unit?

21       A.   No.

22       Q.   In what situation would they not?

23       A.   For example, inmates going into enhanced don't go

24  through the intake at A 50.

25                 THE COURT REPORTER:  I'm sorry.  "At A 50"?

**Deputy Warden Travis Scott - 10/05/2021**

50

1                    THE WITNESS:   A 50 is the locator code for

2    intake.   I apologize.   So inmates being sent to the

3    restricted -- restricted housing or to enhanced would not

4    go through A 50.   Also, inmates sentenced to death would

5    not go into A 50.

6    BY MS. MORRIS:

7         Q.   What about inmates who are going into the STG

8    Unit?

9         A.   And also inmates going into the STG Unit also

10   would not go through the intake.

11        Q.   So the intake is only for people who are going

12   into just general population maximum custody; is that

13   right?

14        A.   That is correct.

15        Q.   Okay.   All right.   Can you -- you -- you mentioned

16   A 50 for intake.   Does enhanced have a code like that?

17        A.   Yes.

18        Q.   What is enhanced code -- the enhanced code?

19        A.   I don't know.

20        Q.   Okay.   That's fine.

21        A.   I'm sorry.   Yeah, it -- I don't -- I'm drawing a

22   blank on it right now.

23        Q.   Okay.   Do you know the one for restricted status

24   housing program?

25        A.   I believe it's A 73.

**Deputy Warden Travis Scott - 10/05/2021**

51

1      Q.    What about STG?

2      A.    A 52.

3      Q.    Okay.  Is there just one for all of sort of

4    general population maximum custody or do they have

5    multiple --

6      A.    Yes.

7      Q.    -- numbers?

8      A.    One.

9      Q.    What is that?

10     A.    A 21.

11     Q.    A 21.  Okay.

12            Going back to the questions about the Intake

13   Unit, how long do people usually stay in the Intake Unit?

14     A.    Less than 30 days.

15     Q.    Is there a time limit on how long they can stay

16   there?

17     A.    No.  It's dependent upon bed availability.

18     Q.    Are there programs offered in the Intake Unit?

19     A.    No.

20     Q.    When people are in the Intake Unit, do they have a

21   step level?

22     A.    No.  Well, they're all step level 1s when they

23   come into max custody.  That's automatically assigned.

24     Q.    Okay.  So they -- they are counted as step 1 while

25   they're in intake?

**Deputy Warden Travis Scott - 10/05/2021**

52

1     A.    Correct.

2     Q.    Okay.  All right.  Does the time in intake count

3  towards the amount of time that their -- the minimum amount

4  of time they have to spend at step 1?

5     A.    I don't know that answer.

6     Q.    When people are in max custody intake -- if I say

7  max custody, you understand that to mean maximum custody?

8     A.    Yes.

9     Q.    Okay.  When people are in max custody intake, what

10  do they get out of their cells for?

11     A.    To go to recreation and to shower.

12     Q.    Anything else?

13     A.    If they go to medical or they get visits, things

14  like that.

15     Q.    Okay.  Do people in max custody intake have

16  property?

17     A.    Yes.  Not initially, but after a week or so, if

18  they're going to move, then yes, we'll give them their

19  property.

20     Q.    So is that -- when do they get their property?

21     A.    It depends on how long they're there for.  If

22  they're there for beds -- bed spacing -- I changed it when

23  I got there in March of 2020.  They weren't giving them

24  their property, and I said, give them their property.

25  Because it doesn't make any sense to withhold their

**Deputy Warden Travis Scott - 10/05/2021**

53

1    property.  So they were giving it to them when they got

2    there instead of holding it.  Because we were having a

3    delay based off of bed availability.  So we were issuing

4    them the property.

5        Q.   So in general, about how long are people there

6    before they get their property?

7        A.   Probably three to four days.

8        Q.   Okay.

9        A.   Depends on the amount -- the amount of inmates

10   that came in and how backed up we are in the property room,

11   because we have to do a thorough inventory, search their

12   property before it's given to them.

13       Q.   People who are being classified into max custody

14   can appeal that decision; correct?

15       A.   Correct.

16       Q.   Do you know anything about how many do?

17       A.   No.  I don't have a clue of how many do.

18       Q.   Okay.  Do you know anything about if -- withdrawn.

19            If a person's appealing their classification

20   into max custody, they would be likely in Browning while

21   that appeal was going on; is that right?

22       A.   Yes.

23       Q.   Would you be likely to know anything about the

24   appeal process happening?

25       A.   No.  I don't deal with the appeal process.

**Deputy Warden Travis Scott - 10/05/2021**

54

1      Q.    Okay.

2      A.    [Indiscernible.]

3            THE COURT REPORTER:  I'm sorry.  What was --

4            THE WITNESS:  I do not -- I do not have

5   anything to do with the appeal process for max custody

6   placement.

7   BY MS. MORRIS:

8      Q.    Do you know when people have a successful appeal?

9      A.    Not off the top of my head.  I mean, I wouldn't

10  know.  Because I don't -- they either are there or they're

11  not.  So if -- I wouldn't know why an inmate -- he would

12  just be gone.  You know, he came in max custody and then

13  suddenly he leaves, I'm not notified that he won his appeal

14  or he's just put on movement and he moves.

15     Q.    Okay.  All right.  Do you have any role in

16  deciding whether a person will be placed into max custody?

17     A.    I make a recommendation.

18     Q.    And who are the people that your -- what -- what

19  group of people are the people that you might be making

20  recommendation about?

21     A.    Any inmate coming into max custody, if they've --

22  once they're there, they've already been classified as max

23  custody, so their classification is done when they come

24  into intake.  They are already classified as a max custody.

25     Q.    Okay.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

**Deputy Warden Travis Scott - 10/05/2021**

55

1    A.    The only max custody reviews and recommendations I

2    make on are the inmates that are already at Browning Unit

3    and they're going for reclassification.

4    Q.    Okay.  All right.  So you would recommend either

5    that they remain in max custody or that they no longer be

6    in max custody?

7    A.    Correct.  And it's only a recommendation.  It's

8    not binding.

9    Q.    Okay.  All right.  Do you have any -- it may have

10   already gotten answered, but I'm going to ask it anyway.

11            Do you have any role in determining where in

12   max custody a person at -- where at Browning a person will

13   be housed?

14   A.    No.  Are you talking from intake, coming from

15   intake?

16   Q.    Let's -- yeah, let's start with that.

17            From --

18   A.    No.

19   Q.    -- intake, would you have any decision-making?

20   A.    No.  I don't go that far down.  I -- my count

21   movement officer takes care of that.  I don't have input on

22   it.

23   Q.    Okay.  Do you have any role in deciding who will

24   go into enhanced management?

25   A.    No.

## Deputy Warden Travis Scott - 10/05/2021

56

1      Q.   What about into restricted status housing program?

2      A.   No.

3      Q.   What about the STG max custody unit?

4      A.   No.  I'm not the decision-maker on any of those.

5      Q.   Okay.  What about the BMU?

6      A.   No.

7      Q.   Okay.  Do you know, when people are in the Intake

8 Unit, if they're there -- if they've been classified to max

9 custody through an override?

10     A.   You mean overridden up to max custody?  I -- I

11 don't know.  They're just max custody.  I don't know if

12 they're there as an override to max custody or if they're

13 truly a max custody.  I would -- I can tell you that there

14 are certain instances where there are non-discretionary

15 overrides that would place somebody into max custody.

16     Q.   But you don't have any knowledge about what

17 percentage of the people --

18     A.   No.

19     Q.   -- in max custody are there because of -- of an

20 override of some sort?

21     A.   No.

22     Q.   Okay.  When people are in the Intake Unit, do they

23 go -- where do they go to rec?

24     A.   It's a Chute rec.  It's a recreation enclosure

25 inside of a pod, at the end of the pod.

**Deputy Warden Travis Scott - 10/05/2021**

57

1      Q.   And you called that Chute rec?

2      A.   Yes.  That's what it's commonly referred to.

3      Q.   All right.  So if we talk -- as -- as we go

4   through the day, if we talk about Chute rec, we're talking

5   about the concrete enclosure with wires over the top at the

6   end of the housing units, the housing pods at Browning; is

7   that right?

8      A.   Yeah.  Can we clarify that it's not wires?  It's

9   expanded metal.

10     Q.   Okay.  Certainly.  Okay.

11              So in intake, they go to Chute rec?

12     A.   Correct.

13     Q.   Okay.  They don't go to outside rec at all?

14     A.   No.

15     Q.   Okay.  Do you know what the size of the Chute

16   enclosures is?

17     A.   We measured them.  I don't remember the

18   measurements, no.  Not off the top of my head.

19     Q.   Okay.  That's fine.

20     A.   I'm sorry.

21     Q.   Is visitation allowed for people in the Intake

22   Unit?

23     A.   Yes.

24     Q.   Are there -- what are the limits on it?

25     A.   Based off of current protocols, they would have to

**Deputy Warden Travis Scott - 10/05/2021**

58

1   be -- it would be for two hours or they could have

2   30-minute video visits.  But if they're eligible for an

3   in-person visit, it would be a two-hour time frame.

4       Q.   Okay.  Are they governed by the matrix for general

5   population at Browning?

6       A.   So yes.  Yes, they are.  As far as -- I mean,

7   they're step 1s when they come in, so they'll be able to

8   get video visits, is what they would be able to get.  Not

9   in-person.  Sorry.

10      Q.   Okay.  That's -- that's fine.

11               When a person is in intake, how many officers

12  are required to escort them?

13      A.   If they are single-housed, only one.

14      Q.   Okay.  And if they're double-housed?

15      A.   Then it takes two officers to be able to access

16  the cell.

17      Q.   Okay.  If -- let's say -- let's say a -- an

18  incarcerated person is double-housed and they go to the

19  shower, so it requires two officers to access the cell to

20  take them to the shower; correct?

21      A.   It requires two officers to access the cell but

22  only one officer then to escort the inmate to the cell --

23  to the shower.

24      Q.   Okay.  Coming back --

25      A.   Okay.  Go ahead.  I'm sorry.

**Deputy Warden Travis Scott - 10/05/2021**

59

1      Q.    Coming back, would they require one officer to get

2    them out of the shower but then two for the purpose of

3    getting them into their cell?

4      A.    Yes.

5      Q.    Okay.  In intake, what restraints are required

6    when a person leaves their cell?

7      A.    Handcuffs --

8      Q.    Okay.

9      A.    -- [indiscernible].

10              THE COURT REPORTER:  What was the --

11    handcuffs on what?

12              THE WITNESS:  Handcuffs behind the back.

13    They have -- their hands are cuffed behind their back.

14    BY MS. MORRIS:

15      Q.    And in intake, do they have to be strip searched

16    before they leave their cell?

17      A.    Yes.

18      Q.    So we talked a little bit about the -- we just

19    mentioned the step matrix.

20              What is your understanding of the purpose of

21    the matrix?

22      A.    To encourage pro social behavior.

23      Q.    Okay.  And how does it do that?

24      A.    By rewarding, having incentives of store limits,

25    amount of phone time, additional out-of-cell time,

1    programming.

2         Q.   Okay.  I'm going to show -- actually, do you know

3    the term specialty population groups?

4         A.   No.

5         Q.   No.  Okay.

6              I'm going to show you that term in context

7    and --

8         A.   Okay.

9         Q.   -- and hopefully it will make more sense then.

10        A.   Okay.

11        Q.   Can you see my screen?

12        A.   Yes.

13        Q.   Okay.  And this is -- this is what was previously

14   marked as Isolation Exhibit 3.  It's the Department Order

15   812, which is the Inmate Maximum Custody Management and

16   Incentive System.

17              Are you familiar with this policy?

18        A.   Yes.

19        Q.   Okay.  So if we go to section 2.4, it says,

20   Inmates classified to maximum custody units shall be

21   assigned to specific housing areas using a system of steps

22   for managing inmates in the least restrictive way necessary

23   to carry out the department's mission.

24              And then in 2.4.1 it says, This applies to

25   all maximum custody groups, including specialty population

**Deputy Warden Travis Scott - 10/05/2021**

61

1    groups.

2               Does that help you understand that term?

3        A.    Yes.

4        Q.    Okay.  What does that -- the term specialty

5    population groups mean?

6        A.    I would -- I take it to mean that it's talking

7    about inmates and enhanced inmates in restricted housing,

8    death row, max custody death row, and max.  Those would be

9    the specialty groups.

10       Q.    Okay.  Would also BMU, max custody BMU?

11       A.    Yes.  I would have -- BMU, I'm new to that.  So

12   I've only had BMU since the beginning of September, and so

13   I'm not fully versed with them yet.  Plus I was on leave

14   all last week, so basically I've only had them for two

15   weeks, is my experience with the BMU program so far.

16       Q.    Okay.  Do you know if the max custody STG

17   population would be considered part of the specialty group?

18       A.    Yes.

19       Q.    Specialty population groups?

20       A.    Yes.

21       Q.    So that -- so the specialty population groups

22   refers to basically everyone who's not in the general

23   population maximum custody; is that right?

24       A.    Yes.

25       Q.    Are all people in maximum custody, both general

**Deputy Warden Travis Scott - 10/05/2021**

62

1   population maximum custody and specialty population groups,

2   are they all participants in the step program?

3       A.   Yes.

4       Q.   So the expectations for everyone in max custody,

5   specialty population groups, and general population max

6   custody, are laid out in 812, DO 812?

7       A.   Yes.  Except there are certain -- with the STGs,

8   they also fall underneath a separate policy as well.

9       Q.   Okay.  And that's DO 806?

10      A.   That is correct.

11      Q.   Okay.  The privileges for people in max custody,

12  whether general population or specialty population groups,

13  are all set out in 812 as well; correct?

14      A.   Yes.

15      Q.   And the review process for people in max custody

16  is also set out in 812; correct?

17      A.   Correct.

18      Q.   Okay.  Do you have a role in reviewing people's

19  step level at Browning?

20      A.   Yes.

21      Q.   What -- could you just describe that role?

22      A.   I sit down with the CO 4 and the CO 3, we review

23  the inmates.  We review every inmate at least once a month

24  to see how their behavior has been, should their step be

25  increased, if they received any disciplinary, if they're

**Deputy Warden Travis Scott - 10/05/2021**

63

1   participating in programming.

2       Q.   And is that for everyone at Browning?

3       A.   Yes.  Every max custody inmate at Browning.

4       Q.   Are there people at Browning who are not max

5   custody?

6       A.   Yes.

7       Q.   Where?

8       A.   We recently -- it is the condemned row, close

9   custody.  So I have 16 inmates that are close custody,

10  condemned row.

11      Q.   Okay.  Anyone else at Browning who is not max

12  custody?

13      A.   No.

14      Q.   So everyone else you do the step review for every

15  month?

16      A.   Yes.

17      Q.   And that step review process, is that -- you said

18  that's done at a meeting?

19      A.   Yes.

20      Q.   How many days a month do you have meetings about

21  step review process?

22      A.   Every Friday.

23      Q.   Every Friday.

24           And how long do those meetings last?

25      A.   About an hour to an hour and a half.

**Deputy Warden Travis Scott - 10/05/2021**

64

1      Q.   And you said it's you, the CO 4, and the CO 3?

2      A.   And the respective CO 3s from the clusters that

3    we're reviewing, yes.

4      Q.   So how do you -- how do you organize who's getting

5    reviewed on a particular Friday?

6      A.   The CO 4 has a schedule that they follow.

7      Q.   Okay.  Does it go basically cluster by cluster?

8      A.   Yes.

9      Q.   Okay.  So --

10     A.   It's a set of clusters.  It would be more than one

11   cluster, obviously, because of the amount of clusters that

12   we have.  So we'll do three to four clusters sometimes.

13     Q.   Okay.  Does anyone take notes in these meetings?

14     A.   No.  We -- the -- the notes are -- the CO 3 comes

15   up usually with their information and their

16   recommendations.  And they'll have it written on, you know,

17   on a piece of paper, and therefore then we'll -- we'll look

18   at it.  And it's not like a -- it's not a department form,

19   but it's a form that they've created, like an Excel

20   spreadsheet, that will have the inmate's name, number, if

21   they've had disciplinary recommendation.  And then we'll

22   review it and go from there.

23     Q.   Is there any documentation of the review process?

24   Like, do you fill out a form because of the review or does

25   someone --

**Deputy Warden Travis Scott - 10/05/2021**

65

1      A.    No.

2      Q.    -- fill out a form?   No.

3      A.    No.

4      Q.    What information is provided to the incarcerated

5   person about the review, if any?

6      A.    I know they're informed.   I don't know if it's in

7   writing or if it's just verbal.   I mean, they're -- they're

8   notified.   I just -- I'm not part of that -- I don't -- I'm

9   not the one that makes the notification to them.   So I

10   honestly -- I don't know if they go down and if they give

11   them something saying in writing or just what.

12      Q.    And what are they notified of?

13      A.    They're notified if their step increased or if it

14   decreased.

15      Q.    Anything else?

16      A.    Or if it stayed the same.

17      Q.    Anything else?

18      A.    Not that I'm aware of.

19      Q.    Okay.   In DO 812, it says that an inmate who has

20   been -- who's maintained step 3 for a minimum of 30

21   consecutive days without incident is eligible for

22   consideration for placement in a close custody housing

23   location.   Are you familiar with that?

24      A.    Can you show it to me?

25      Q.    Sure.

1              Okay.  So do you see 812?

2     A.    Yes.

3     Q.    Okay.  So I was discussing section 5.5 down here.

4     A.    Uh-huh.

5     Q.    Are you familiar with that?

6     A.    Yes.

7     Q.    Yes?

8     A.    Yes.

9     Q.    What does it mean that a person is eligible for

10  consideration?

11     A.    That based on their behavior, if they come up for

12  reclassification, they'll be eligible because they've been

13  behaving.  So it doesn't necessarily mean that they're

14  going to go to close custody.  It just says that they're

15  eligible for consideration based off of their behavior when

16  their next classification comes up.

17     Q.    Okay.  If a person -- actually, withdrawn.

18              So you said they're eligible at their next

19  classification; is that right?

20     A.    They're eligible for consideration.

21     Q.    Eligible for consideration at that -- the next

22  classification.

23              And the classification happens after 180 days

24  of going into maximum custody and every year thereafter;

25  correct?

**Deputy Warden Travis Scott - 10/05/2021**

67

1      A.    Correct.

2      Q.    If a person is -- I want to try to understand

3  the -- sort of the interplay between the classification

4  schedule and -- and this 30-day requirement.

5      A.    Okay.

6      Q.    So if a person was at step -- at step 3 for

7  30 days at the time they come up for classification -- for

8  reclassification, they could be considered for placement in

9  close custody; correct?

10      A.    They could be, yes.

11      Q.    If they are not granted the change in custody at

12  that time, they would have to wait another year; correct?

13      A.    Correct.

14      Q.    And at that -- when -- when they come up for

15  reclassification again, they would need to have been at

16  step 3 for 30 days at that point in time --

17      A.    No.

18      Q.    -- correct?   No?

19      A.    No.

20      Q.    So they could have -- if a -- let's say a person

21  was on step 3 from four months to eight months after they

22  were placed in maximum custody, and so they had their

23  reclassification during that time period, but they were not

24  reclassified, and then they go down to step 1 and maybe are

25  at step 2 when their next classification comes up, could

**Deputy Warden Travis Scott - 10/05/2021**

68

1    they be reclassified?

2                    MS. LOVE:   Form, foundation.

3                    THE WITNESS:   The steps do not affect

4    classification.   They're two separate things.   So just --

5    classification is based off of their behavior.   Now, the

6    privileges is what the steps are for while they're in

7    there.

8                    And if the -- you know, if they're a step 3

9    and it's time for clarification, yeah, the person has been

10   doing good, they're a step 3, but if their points are still

11   too high or if they have a non-discretionary override,

12   they're not going to decrease in classification.   Just, you

13   know, there's too much that's subjective with determining

14   or the recommendation made on whether or not an inmate is

15   going to reduce in custody or not.

16   BY MS. MORRIS:

17       Q.   Okay.   If a person is coming up for their

18   second -- the second time they're being reclassified since

19   they've gone into maximum custody, so they've been in

20   maximum custody for a year and a half, right?

21       A.   Okay.

22       Q.   And they have only been on -- they're on step 3,

23   but they've only been on step 3 for ten days, are they

24   eligible to be considered for a reduction in custody?

25                    MS. LOVE:   Form and foundation.

**Deputy Warden Travis Scott - 10/05/2021**

69

```
 1            THE WITNESS:  That -- yes.  But it's
 2   determined by their classification score.  So yes, they
 3   would be -- they could be reduced in custody.
 4   BY MS. MORRIS:
 5       Q.   So what do you understand the meaning of
 6   section 5.5 to be?
 7       A.   That you can use it as a mitigating circumstance
 8   for their classification.  You can use that in the inmate's
 9   favor basically saying, you know what?  The individual's
10   been in programming.  They've reached the level of step 3.
11   It basically shows that the inmate is attempting to change
12   their behavior.  And you should use the fact that the
13   inmate is a step 3 when recommending reclassification.
14       Q.   Okay.  And you do not understand section 5.5 to
15   mean that a person -- that in order to be eligible for
16   consideration for placement in close custody, a person must
17   have maintained step 3 for a minimum of 30 consecutive
18   days?
19       A.   Because that's not a requirement.  They do not
20   have to be a step 3 for 30 days in order to be considered
21   for a reduction in classification.
22       Q.   Okay.  Do you know how many people get
23   reclassified without being a step 3 for 30 days?
24       A.   No.
25       Q.   Do you know if that ever happens?
```

**Deputy Warden Travis Scott - 10/05/2021**

1      A.    Yes.

2      Q.    How often?

3      A.    I don't know.  I make the recommendations and then

4   it goes up.  And what Central Office does, they're -- they

5   have the final determination whether or not the person gets

6   reclassified to close custody or not.  I just know that my

7   names change and people come in and people leave.  So --

8   but I don't track that information.

9      Q.    How often would you say that you recommend that

10  someone who has not maintained step 3 for 30 days be

11  reclassified to close custody?

12     A.    I look at the reasons why -- I look at their

13  disciplinary.  So if they're -- they might be a step 2, but

14  it's not because of violence.  They've maybe not kept their

15  disciplinary [indiscernible].

16          THE COURT REPORTER:  "They have not kept

17  their" what?

18          THE WITNESS:  They have not kept their living

19  area in 704 compliance.  That might be why their step was

20  reduced.  But in actuality, it's a non-violent offense, so

21  therefore, I would make a recommendation based off of their

22  score and their behavior of if they were being violent or

23  not to recommend they go to close custody as long as they

24  haven't had any violence.

25  BY MS. MORRIS:

**Deputy Warden Travis Scott - 10/05/2021**

71

1     Q.    About how often would you say that you make a

2  recommendation that someone who is not at step 3 for at

3  least 30 days be -- have their custody reduced?

4     A.    I don't know that.

5     Q.    Do you think you do it more than once a month?

6     A.    I would say a -- I just -- I don't know how to

7  answer that, because when they come through, I'm looking at

8  their classification and -- and their disciplinary, is what

9  I'm using.  And what their score is.  I'm not looking at

10  their steps when I'm -- when I'm doing my recommendation.

11            If the CO 3 writes it in their recommendation

12  and I see it, and I'll -- I'll use it then, but it's not

13  something I personally go and look and see what step they

14  are at.  I look at what their behavior has been since

15  they've been incarcerated in a max custody unit and what

16  their -- if they've been violent, how long it's been, what

17  their score is now.  That's what I look at.

18     Q.    Is the point when you're making your

19  recommendation as to whether or not the person should be

20  reclassified down to close custody, is that part of the

21  step level review process or is that --

22     A.    No.

23     Q.    -- a separate process?

24     A.    That's separate.

25     Q.    Okay.  Would your recommendations get into an

1  inmate's file anywhere?

2      A.   Their -- my recommendation on the classification

3  would get into their file, yes.

4      Q.   Okay.  This may sound silly.

5           Into their classification file?

6      A.   Yes.

7      Q.   Okay.  And would anything from the step review

8  process get into an inmate's file?

9      A.   No.

10     Q.   No.

11          It would only be that -- nothing?

12     A.   Nothing.  Unless it's mentioned in the -- in the

13 comments by the CO 3 when they make their -- when they do

14 their max custody hearing placement or placement hearing,

15 if they wrote in there as far as giving their reasoning for

16 why the inmate should be reclassified to a lower custody or

17 if they should remain, they could mention it in that

18 portion there.  But nothing from the actual step review

19 process goes into the max -- the max custody hearing

20 packet.

21     Q.   Okay.  But would it go anywhere into the inmate's

22 files?

23     A.   Not that I'm aware of.

24     Q.   Okay.

25     A.   Are you talking about the classification or are

**Deputy Warden Travis Scott - 10/05/2021**

73

1    you talking about the steps?

2         Q.   The step level review.

3         A.   No.   That does not go into their file.   Not that

4    I'm aware of.   I know it's notated on AIM -- or on ACIS.

5    Sorry.   It's -- it's inputted into ACIS, but I don't

6    believe that's part of their classification.

7         Q.   Is there any documentation, whether hard copy or

8    electronic, as to why a decision about an individual's step

9    advancement or not was made?

10        A.   I -- I don't know.   Because that's not something

11   that I do.   So that's not something -- I don't get that far

12   down into it --

13        Q.   Okay.

14        A.   -- as far as that.

15        Q.   Are there any differences in the process for

16   reviewing step levels for people in the restrictive

17   housing -- Restrictive Status Housing Program?

18        A.   It's still -- I would have to re -- there is

19   differences, but I can't quote it right now without looking

20   at the policy.   As far as the step reviews go, no; but the

21   rest of it, yes.   There's a restricted housing committee

22   that's involved with inmates coming out of restrictive

23   housing.

24               But as far as, like, the step levels of while

25   they're in there, it's based off of their behavior, their

**Deputy Warden Travis Scott - 10/05/2021**

74

1   programming, so on and so forth.  And it's just a regular

2   step review.

3       Q.    Is it a regular step review carried out by the

4   same people that carry out the step reviews for general

5   population max custody?

6       A.    Yes.

7       Q.    Is it -- is there a different -- withdrawn.

8             Is there a meeting at which whether a person

9   can be removed from Restrictive Status Housing Program is

10  discussed?

11      A.    There's a committee.

12      Q.    Okay.  Are you on the committee?

13      A.    No, I am not.

14      Q.    Okay.  And that committee is only deciding whether

15  the person continues in Restrictive Status Housing Program,

16  not what the step level is; correct?

17      A.    Correct.

18      Q.    Okay.  Do you know how it is determined that a

19  person should go into Restrictive Status Housing Program?

20      A.    It's a decision made by the regional operations

21  director and the warden.

22      Q.    The warden of --

23      A.    [Indiscernible.]

24      Q.    I'm sorry?

25      A.    The warden of the sending complex where the inmate

**Deputy Warden Travis Scott - 10/05/2021**

75

1   was previously located and the regional operations

2   director.  They're the ones that make that decision.

3      Q.   Okay.  Do you know anything about how it is

4   determined whether a person can be released from the

5   Restrictive Status Housing Program?

6      A.   It's based off of that committee and reviewing how

7   they've programmed, if they're ready to come out.  I'm not

8   a part of it.

9      Q.   Okay.  In general, if a person is leaving the

10  Restrictive Status Housing Program, will they go into

11  general population max custody?

12     A.   Yes.

13     Q.   Is there a difference in the step review process

14  for people in enhanced management?

15     A.   No.

16     Q.   Okay.  So you participate in that as well?

17     A.   Yes.

18     Q.   Does the decision about whether a person can be

19  removed from enhanced management get made in the same

20  meeting process?

21     A.   Not as restricted housing, no.

22     Q.   I'm sorry.

23          In the same process as the step review

24  process?

25     A.   No.

**Deputy Warden Travis Scott - 10/05/2021**

76

1      Q.     Are you -- do you participate in the decisions

2   about removing someone from enhanced management?

3      A.     Yes.

4      Q.     What is your role?

5      A.     I'm part of the committee.

6      Q.     Okay.  Who's on the committee?

7      A.     The warden and the regional operations director.

8      Q.     So you're on the committee for enhanced management

9   but not for Restrictive Status Housing Program?

10     A.     Correct.

11     Q.     Okay.

12     A.     Correct.

13     Q.     What are the things that can result in a person

14  being placed in enhanced management?

15     A.     Their serious assaults on staff and serious

16  assaults on inmates that resulting in serious bodily

17  injuries.

18     Q.     And how does a -- like, what -- how does a person

19  get out of enhanced management status?

20     A.     Based on their behavior while they're inside

21  there.  Also, if they're -- there are several different

22  factors on whether or not an inmate would be brought out of

23  enhanced.

24     Q.     Okay.  What are the factors?

25     A.     If they're still under litigation pending trial,

Deputy Warden Travis Scott - 10/05/2021

77

1   what their behavior has been, the severity of the incident

2   that occurred, previous incidents, how many times they've

3   done things, multiple -- with other inmates, they're very

4   dangerous, very violent individuals that have not one but

5   multiple homicides since being incarcerated, things like

6   that.

7        Q.   You said pending litigation?

8        A.   Uh-huh.

9        Q.   Can you explain how that --

10       A.   Criminal charges.

11       Q.   Okay.  So if a person has criminal charges pending

12  that haven't been resolved and they're in enhanced

13  management, does that mean they cannot be removed from

14  enhanced management?

15       A.   Correct.

16       Q.   Okay.

17       A.   For that incident -- incident that put them into

18  enhanced.

19       Q.   Okay.  All right.

20       A.   Just for that incident.  If they murdered an

21  inmate, another inmate, they're going to stay enhanced

22  while that is proceeding through the court process.

23       Q.   Okay.  Does restrictive status housing have a

24  similar provision about if there's a pending investigation

25  of criminal charges?

**Deputy Warden Travis Scott - 10/05/2021**

78

1        A.   I don't know.

2        Q.   You don't know.   Okay.

3        A.   I don't know.

4        Q.   Is the review process for removal from enhanced

5   management documented anywhere?

6        A.   Yes.

7        Q.   Where?

8        A.   On the -- it's on an Excel spreadsheet that we use

9   that we take notes and the minutes on.

10       Q.   Okay.   How frequently are people reviewed for

11   whether they need to remain in enhanced management?

12       A.   Every 30 days.

13       Q.   Is that review documented anywhere within any

14   inmate file?

15       A.   No.

16       Q.   So it's purely an internal thing that has no --

17   that isn't part of the official documentation system; is

18   that right?

19       A.   Correct.

20            MS. LOVE:   Form.

21            THE WITNESS:   Correct.

22   BY MS. MORRIS:

23       Q.   Okay.   How often is someone in RSHP reviewed for

24   whether they can be removed from that program?

25       A.   After 90 days.   That would be the soonest.

**Deputy Warden Travis Scott - 10/05/2021**

79

1    Q.   And then after the 90 days, how frequently?

2    A.   Once a month, I believe.  But I'm not part of

3    that, so I don't know.

4    Q.   For the STG Unit -- for people in the STG Unit, is

5    the step review process the same as for general population

6    max custody?

7    A.   Yes.

8    Q.   But the process for -- but there's a separate

9    process for considering if a person can be removed from the

10   STG Unit; correct?

11   A.   That's not exactly true.

12   Q.   Okay.  Explain to me what I've got wrong.

13   A.   Okay.  So an inmate that's in STG can reclass now

14   without going through any type of review in order to go to

15   a close custody.  It's based off of their -- their scores

16   now, based of their classification.  So they don't have to

17   go through a review process.  There's no meetings.  There's

18   no committees.

19             The only thing there is in the new DO 806, it

20   talks about as long as an inmate has not had any

21   STGA-related activity in the prior 24 months and they score

22   out as a close custody inmate, they can go to a close

23   custody unit without any further review.

24   Q.   Okay.  And that's the new -- that's the revision

25   to the policy --

**Deputy Warden Travis Scott - 10/05/2021**

80

1      A.   The DO 806.

2      Q.   -- from April of this year?

3      A.   Yes, ma'am.

4      Q.   Okay.  I'm going to bring this up and look at -- I

5  have a question for you about this.

6      A.   Okay.

7      Q.   And this document was previously identified, and

8  I'm not marking it here.  But it was previously identified

9  as Isolation Exhibit 4.

10          Can you see my -- can you see --

11     A.   Yes.

12     Q.   -- the DO 806?  Okay.

13     A.   Yes.

14     Q.   And this is the one that became effective on

15  April 15, 2021; right?

16     A.   Yes.

17     Q.   So going to the bottom of page 9 and the top of

18  page 10, section 5.3 is about custody reductions and that

19  process.  Do you see that?

20     A.   Yep.

21     Q.   And these are the changes that you were just

22  talking about; right?

23     A.   Yes.

24     Q.   Okay.  And it's my understanding that they added

25  5.3.3 and 5.3.4; is that right?

**Deputy Warden Travis Scott - 10/05/2021**

81

1      A.    Yes.

2      Q.    Can you explain to me what the difference between

3   5.3.3 and 5.3.4 is?

4      A.    So the difference between -- if you look up a

5   little bit, I believe it's -- so basically -- so basically

6   5.3.3 is referring back to how it would just be in

7   department 801.  Department Order 801, they make

8   classification.  So if they've been in max custody for

9   24 months and they have not participated in any documented

10  STG or gang activity, they are -- they qualify for

11  custody -- basically, they could get an override to close

12  custody.

13          The 5.3.4 is just saying that they're

14  eligible that if they -- they don't have to be an STG -- in

15  STG for two years.  If they come in or if they score --

16  suddenly if they score a close custody and it wasn't STG

17  related, why they got moved to max custody, then they could

18  reduce in custody to close custody as long as they haven't

19  had and they meet the qualifications of not having any STG

20  activity in the prior 24 months.

21     Q.    Okay.  For reduction under 5.3.3, does the STG/SSU

22  have any input into that process?

23     A.    They're asked if the inmate has had any STG

24  activity.  And that's it.  That's -- they're asked, you

25  know, hey, can we reduce this guy to close custody?  Has

Deputy Warden Travis Scott - 10/05/2021

82

1   had he any STG activity?   Are there any pending -- that

2   could be a question of, does the inmate have any pending

3   criminal charges that we might not be aware of?   And they

4   have sensitive information that isn't put out.

5        Q.   Okay.   And then under 5.3.4, does the person have

6   to have completed all three steps of the Maximum Custody

7   Management and Incentive System?

8        A.   No.

9        Q.   No?

10       A.   No.

11       Q.   Okay.   Do you know how many people at Browning

12   have been reclassified under this new policy?

13       A.   Sorry.   Yes.   I don't know exactly how many.   I

14   know there's been a few.

15       Q.   Okay.

16       A.   Like, right off the top of my head, his name is

17   Inmate Olson.

18       Q.   Okay.

19       A.   That's -- but I know there's been others.

20       Q.   Do you know how many of the people who have been

21   reclassified under this policy have been moved out of the

22   STG Unit?

23       A.   A few.   I don't know the exact amount.   I know

24   Olson.

25       Q.   Okay.

**Deputy Warden Travis Scott - 10/05/2021**

83

1      A.   If that's what you're talking about.  He was moved

2  to another complex completely.  He was made a close custody

3  inmate.

4      Q.   Do you know if all of the people who have been

5  reclassified under this new policy have been moved?

6      A.   No.  Not all of them.  The last I knew, not all of

7  them had.  There were some that were just pending bed

8  space.  That's the only reason.

9      Q.   Okay.

10     A.   I've made quite a few recommendations up to

11  Central Office for them to reduce in custody and then some

12  of them have left.  There was one that was an -- I have one

13  inmate that -- or two, actually, that are validated

14  condemned row that I reclassified to close custody

15  condemned row that are validated STG based off of no STG

16  activity in the last two years.  And so I reduced them in

17  custody and put them at the close custody condemned row

18  inmates.

19     Q.   All right.  Is there a step level review process

20  for the BMU?  I realize it's a brand new unit for you.  But

21  is there -- is there a process set up?

22     A.   Yes.  In -- in conjunction with mental health,

23  it's -- I want to say it's -- I don't want to guess.  I

24  know there's -- I just don't know what it is.  Like I said,

25  I only had them for two weeks and I went on leave.  So I'm

**Deputy Warden Travis Scott - 10/05/2021**

84

1   new to the program.  I don't know everything there is about

2   it just yet.

3        Q.   Are all of the people who were in the BMU at

4   Browning max custody?

5        A.   Yes.

6        Q.   Okay.  Do you know if there are policies set up

7   for the BMU, like, if there's a matrix for the BMU?

8        A.   I'm not aware at this time, ma'am.

9        Q.   Okay.  Is there anyone who reviews -- anyone above

10  you who reviews the monthly step level reviews at Browning?

11       A.   Not in the past, no.

12       Q.   When you say "not in the past," what do you mean?

13  Do you do it now?

14       A.   Now.  Going back, I haven't had to have anybody

15  review my step level meetings.

16       Q.   Okay.  All right.  If some -- if a person who was

17  above you in the -- in the hierarchy wanted to review the

18  step level review process at Browning, what would they look

19  at?

20              MS. LOVE:  Form and foundation.

21              THE WITNESS:  They would have to come down at

22  that time to when we were doing it.  I don't know -- I

23  honestly don't know if there's something that -- I don't

24  think there's anything that's kept as far as saying, hey,

25  this is the review that we did and here's the results.

Deputy Warden Travis Scott - 10/05/2021

85

1          MS. MORRIS:  Okay.  All right.  I think we

2  should take a break for the court reporter now.

3          (A recess ensued from 12:21 p.m. to 12:38

4  p.m.)

5  BY MS. MORRIS:

6      Q.   Warden Scott, you said you do participate in the

7  meetings where people's continuation in enhanced management

8  is considered; right?

9      A.   Yes.

10     Q.   How often do those meetings happen?

11     A.   Every 30 days.

12     Q.   And how long do they last?

13     A.   Between an hour to -- it's usually within an hour.

14     Q.   And that reviews everyone who's in enhanced?

15     A.   Correct.

16     Q.   Okay.  Back when there was a close management unit

17  or cluster at Eyman Browning, who would be the person who

18  would have decided that a person was going into close

19  management?

20     A.   That would have been the regional operations

21  director and the sending warden --

22     Q.   Okay.

23     A.   -- to determine --

24     Q.   Okay.  And what are the reasons that people get

25  placed into close management?

Deputy Warden Travis Scott - 10/05/2021

86

1       A.    Having drugs, having phones, assaults, minor
2   assaults, disruptive behavior on a close custody, not
3   conforming to close custody.
4       Q.    Okay.  Can a person who's being put into close
5   management appeal that decision?
6       A.    I believe so.  It's -- I'm -- I'm not sure.
7       Q.    Okay.
8       A.    Because they're not changing classification, but
9   I -- I don't know.
10      Q.    Okay.  All right.  I'm guessing that means that
11  you don't know how many people do?
12      A.    No.  I have no clue.
13      Q.    Okay.  Is there a minimum amount of time that
14  people have to spend in close management?
15      A.    90 days.
16      Q.    Is there a standard amount of time that people
17  spend in close management?
18      A.    Normally 90 days.
19      Q.    Okay.  Is there a program for people -- like, some
20  kind of set programming for people who are in close
21  management?
22      A.    Yes.
23      Q.    And that's laid out in DO 813?
24      A.    I would have to review the policy, but I believe
25  so.

**Deputy Warden Travis Scott - 10/05/2021**

87

```
 1      Q.   Okay.  It's in the policy on --
 2      A.   Right.
 3      Q.   -- the DO on close management?
 4      A.   Right.
 5      Q.   Okay.  All right.  How often does a person --
 6   actually, withdrawn.
 7               Are there steps for people in close
 8   management?
 9      A.   Yes.
10      Q.   And how often does a person in close management
11   have a review?
12      A.   Every 30 days.
13      Q.   Okay.  When there was a close management unit at
14   Browning, did you participate in those reviews?
15      A.   No.
16      Q.   Okay.  Who does?
17      A.   The CO 3 and the CO 4.  It was based on the
18   [indiscernible] participation in the program.
19               THE COURT REPORTER:  On the what
20   participation?
21               THE WITNESS:  The inmate's participation in
22   the program.  It was based on their disciplinary, if they
23   were programming, so on and so forth.
24   BY MS. MORRIS:
25      Q.   Do you have any understanding of why the close
```

88

1   management at Eyman was moved from Browning to Rynning?

2       A.   Yes.

3       Q.   And what -- what is your understanding?

4       A.   To make room for -- it was a reorganization of the

5   population at Browning SMU and Meadows Unit to make room

6   for the closure of Central Unit where the condemned row

7   close custody is going to be moving back to Eyman.

8       Q.   Okay.  Do you have any role in determining who

9   gets out of mental health watch?

10      A.   No.

11      Q.   Do you have any role in determining who gets out

12  of security watch?

13      A.   I -- yeah.  I tell them, you know, find the inmate

14  a new living and get him off the security watch, get him

15  out of that pod.  I do that whenever, you know, I come in.

16              Usually, it's on, like, a Monday morning when

17  I walk in, you know, we had an incident, and they say, hey,

18  this is what's going on.  I say, okay, find him a bed, get

19  him out of there.

20              So it's not a committee.  It's just me

21  saying, hey, let's get him housed.

22      Q.   How is security watch different from detention?

23      A.   Detention is usually somebody's going to be --

24  they're under investigation for something or they were 805

25  process.  They're in a protective custody review process or

Deputy Warden Travis Scott - 10/05/2021

89

1    they've committed a serious offense to where they're going

2    to be pending classification.

3                On a security watch, the inmate's not pending

4    classification, not pending an investigation.  They're

5    basically just in an -- a different location for the time

6    being until a different house -- or I'm sorry, a different

7    cell can be found inside of Browning Unit.

8       Q.   Okay.  All right.  What are the escorting

9    requirements for a person in maximum custody who's not in

10   one of the specialty population groups?

11      A.   One officer, inmate's in restraints behind the

12   back, handcuffs behind the back, and the officer is walking

13   next to the inmate with their hand on the inmate's elbow.

14      Q.   Okay.  And do all people -- do all people at

15   Browning -- this will shorten the questions.

16                Do all people at Browning, if they're leaving

17   their cell, have to be strip searched?

18      A.   Yes.  Except -- no.  Not the close custody

19   inmates.  Not the close custody condemned row.

20      Q.   Okay.  So other than close custody condemned row?

21      A.   Yes.  All other max custody -- if you want --

22   because all max custody inmates at Browning Unit, when

23   they -- when they -- before they exit the cell, they have

24   to be strip searched.

25      Q.   Okay.  And if the person in max custody -- general

**Deputy Warden Travis Scott - 10/05/2021**

90

1    population max custody is double-celled, then it requires

2    two officers to access the cell; is that right?

3        A.   Correct.

4        Q.   Okay.  What are the restraint and escorting

5    requirements for a person in enhanced management?

6        A.   Inmate is -- there's two officers, a sergeant, a

7    camera, the upper restraints, which include a lead device

8    and lower restraints, ankle restraints.

9        Q.   You said two officers, a sergeant, and a camera?

10        A.   Correct.

11        Q.   Does that mean -- does the camera require a fourth

12    person or is someone of the three people you just mentioned

13    carrying the camera?

14        A.   The sergeant is normally carrying the camera.

15        Q.   And upper restraints means cuffs and a belly

16    chain?

17        A.   No.  Upper restraints, it's an -- it's a lead

18    device.  It's a -- it's a tool that is used to restrain the

19    inmate.  It's normal handcuffs and it has a chain on it

20    that comes to a device on the end that prevents the inmate

21    from being able to pull the restraints inside of the cell.

22        Q.   It's like a sort of pyramid shaped thing --

23        A.   Yes, ma'am.

24        Q.   -- on the end of the chain?  Okay.

25        A.   Yes, ma'am.

**Deputy Warden Travis Scott - 10/05/2021**

91

1     Q.    So they have cuffs and this chain and leg

2   shackles?

3     A.    Leg irons, yes, ma'am.

4     Q.    Leg irons.   Okay.

5           And if there's two -- are there ever two

6   people in an enhanced management cell?

7     A.    No.

8     Q.    No.   Okay.

9           What are the restraint and escorting

10   requirements for people in Restrictive Status Housing

11   Program?

12     A.    Two officers, upper and lower restraints.   Just

13   regular restraints.

14     Q.    Okay.   So they don't have that lead chain that you

15   were talking about?

16     A.    Correct.

17     Q.    Okay.   Are people in Restrictive Status Housing

18   Program ever double-housed, double-celled?

19     A.    No.

20     Q.    What are the restraint and escorting requirements

21   for people in the STG max custody unit?

22     A.    Upper restraints, handcuffs behind the back.

23     Q.    And how many officers?

24     A.    One.

25     Q.    So --

**Deputy Warden Travis Scott - 10/05/2021**

92

1      A.    I'm sorry.

2      Q.    I'm sorry?

3      A.    Go ahead.

4      Q.    So it's the same as for general population max

5    custody?

6      A.    Correct.  Except for they're never double-bunked,

7    is what I was going to say.

8      Q.    Okay.  What are the restraint and escorting

9    requirements for people in the max custody BMU?

10     A.    Upper restraints, handcuffs, one officer.

11     Q.    Are they ever double-bunked, double-celled?

12     A.    I don't -- I don't know.  I don't think so.

13     Q.    Okay.

14     A.    But like I said, they're new, so I don't believe

15    so.

16     Q.    When there was a close management unit at

17    Browning, what were the restraint and escorting

18    requirements for close management?

19     A.    No restraints and one officer with a group of

20    inmates.

21     Q.    So one officer could escort multiple people in

22    close management?

23     A.    Right.  Without restraints.

24     Q.    Okay.  Is there a limit on how many the CO could

25    escort?

**Deputy Warden Travis Scott - 10/05/2021**

93

1      A.   I wouldn't -- there's nothing in writing, but
2   personally, if you want that aspect of it, but there's
3   nothing in writing.
4      Q.   Okay.  All right.
5      A.   Nothing that determines that.
6      Q.   What are the restraint and escorting requirements
7   for someone who's on mental health watch if they're leaving
8   their cell?
9      A.   If they're on a mental health watch, upper
10  restraints, lower restraints, and two officers.
11     Q.   Can you tell me what the average census of
12  Browning is, more or less?
13     A.   700.
14     Q.   Okay.  Do you know what it is today?
15     A.   Not without looking at my phone.  I have it on an
16  email that I saw it earlier, but I don't remember.
17     Q.   Okay.  Do you remember what it was yesterday?
18     A.   No.
19     Q.   Okay.  Okay.  We're going to shift gears a little
20  bit.
21            Could you explain to me what a correctional
22  service log is?
23     A.   That is the log inside of the control rooms, or
24  could be done on the floor, that annotates all the
25  activities for the post that the person is assigned to.

**Deputy Warden Travis Scott - 10/05/2021**

94

1    Q.   What is supposed to go into the correctional

2    service log?

3    A.   At the beginning of the shift, annotating they --

4    they completed their inventories, that fire safety watch

5    was conducted, a health and welfare check was conducted,

6    and then anywhere from any movement that took place,

7    inmates coming in or out of, where the inmates are going,

8    if an inmate is going to visitation, who's going out to

9    recreation, who's turning out to shower, health and welfare

10   checks all throughout the day, making sure those are

11   annotated, any -- any person that normally isn't working in

12   that area that someone visits the area, you want to mark

13   them down as being in that area, what pods they went into,

14   any incidents that take place during the day, the clearing

15   of count.

16   Q.   Okay.  Does it indicate the difference -- does it

17   indicate if people go out for outside rec?

18   A.   Yes, it should.

19   Q.   And you said it should indicate who was going out?

20   A.   Yes.

21   Q.   Does it indicate who was going out to Chute rec?

22   A.   It should.

23   Q.   Does it indicate who's going to showers?

24   A.   Yes.

25   Q.   Does it indicate when people are coming back from

**Deputy Warden Travis Scott - 10/05/2021**

95

1   showers?

2       A.   Yes.  It should.

3       Q.   Does it indicate when people go out for table

4   time?

5       A.   It should.

6       Q.   Does it indicate when someone has done a

7   temperature check on the unit?

8       A.   Yes.

9       Q.   I've seen the word red flag on some of them.  What

10   does that mean?

11       A.   Red flag?

12       Q.   It -- it's in connection with some of the

13   inventories.

14       A.   On the correctional log?

15       Q.   Maybe we'll find one later and we can come back to

16   that.

17       A.   Yeah.  Because, like, the actual word red flag?

18       Q.   Yeah.  Word "red flag."  Or red tag maybe?

19       A.   Red tag, yes.

20       Q.   Okay.  What's a red tag?

21       A.   Red tag is -- it's kind of like a locking device

22   that has a number encoded on it.  So in the control rooms,

23   there is a box that has trauma shears in it, so -- and it

24   won't have, like, a lock on it, but it will have a red tag

25   that shows that it is secure.  And then you'll write down

**Deputy Warden Travis Scott - 10/05/2021**

96

1    the number of the red tag.  And then if you have to break

2    that, it's easy to break so that way you could access the

3    trauma shears.

4               You have to write that the red tag number so

5    and so was broken and red tag, what the number was replaced

6    to secure the items.  That way the previous -- or the

7    oncoming shift will be able to verify that the ending red

8    tag is going to be the same one.  It's for accountability

9    purposes.

10       Q.   Okay.  That makes complete sense.  Thank you.

11       A.   Okay.

12       Q.   What is a fire check or fire watch?

13       A.   Basically, you're looking for signs of smoke.

14       Q.   Okay.

15       A.   Signs of a fire.

16       Q.   Okay.  All right.  What is the purpose of having

17   the correctional service log?

18       A.   To annotate the daily activities.

19       Q.   Why?

20       A.   So that we can go back and review them.  And

21   especially if a significant incident occurred, you want to

22   go back and make sure that the checks and the walks were

23   being conducted within the proper amount of time.  You can

24   verify it for which inmates went out.  It's just -- it's an

25   information log that is useful for when you need to conduct

Deputy Warden Travis Scott - 10/05/2021

97

1    a review.

2        Q.    And do you review correctional service logs at

3    Browning?

4        A.    At times, yes, I have.

5        Q.    Do you do it on a regular basis?

6        A.    Not on a regular basis.  Usually my associate

7    deputy warden will handle that for me, so in my place.

8    It's one of the duties I task him with.  He's not there,

9    then yes.

10       Q.    And is it your understanding that he reviews all

11   of the correctional service logs?

12       A.    As many as possible.  Maybe not all of them get

13   done.  But yeah, I mean, that's -- it's a lot of paperwork.

14   So yeah, it's going through pages and pages and pages of

15   documentation.

16       Q.    Is it important that they're getting reviewed?

17       A.    Yes.

18       Q.    Why?

19       A.    So you can make sure that the -- that the staff

20   are putting in the proper information, that we're being

21   consistent with the type of information that's being

22   reported, being able to make sure staff are journalling the

23   activities like they're supposed to be.

24       Q.    Okay.  Let's look at what I'm going to identify as

25   Scott Exhibit 5.

**Deputy Warden Travis Scott - 10/05/2021**

98

1           (The document was marked as Exhibit 5 for

2    identification.)

3    BY MS. MORRIS:

4        Q.    Can you see my screen?

5        A.    Yes.

6        Q.    Okay.  Can you tell me what it is that we're

7    looking at right now?

8        A.    We are looking at a journal for George/Henry

9    Control for July 14th, 2021, starting at 0600.  But it

10   looks like this is the Henry Control room journal.

11       Q.    Okay.  And for the record, this document is a

12   14-page document starting at Bates Number ADCRR00129059.

13             I'm going to go to the second page, which is

14   ADCRR00129060.

15             And, now, this is for that same day and

16   shift; correct?

17       A.    Correct.

18       Q.    But now this is in J/K?

19       A.    John/King.

20       Q.    John/King.  Okay.

21             Is -- earlier when we were looking at the

22   daily post sheets and you said you have to have someone in

23   John or King Control, do you remember that?

24       A.    Yep.

25       Q.    And so would this be -- this would be a person who

**Deputy Warden Travis Scott - 10/05/2021**

99

1   is assigned to one of those two units, one of those two

2   posts, or would they be assigned to both posts?

3       A.    They're assigned to both of the control rooms.

4       Q.    Okay.  And a person in the John Control booth see

5   into the King Control booth -- into the King housing pods?

6       A.    No.

7       Q.    They have to cross the hallway to the King Control

8   booth to see into the King housing pods; right?

9       A.    Yes.

10      Q.    And that's true for all of the control booths; you

11  can only see into one cluster at a time; correct?

12      A.    Correct.

13      Q.    Okay.  Looking at page ADCRR00129060, we're going

14  to look about nine lines down at the line that says, 6:00.

15            Can you see the little hand on my screen?

16      A.    Yes.

17      Q.    Okay.  That helps.

18            So that nine lines down, there's an entry for

19  6:00 that says, Security check conducted, King.

20            Do you see that?

21      A.    Yes.

22      Q.    Can you explain what that entry means?

23      A.    It means that they are starting the security

24  checks, is what that means.

25      Q.    Okay.

**Deputy Warden Travis Scott - 10/05/2021**

100

1      A.   That's the time that they're starting.

2      Q.   Okay.  And then is the security check also
3  sometimes referred to as a health and welfare check?

4      A.   Yes.

5      Q.   Is it also sometimes referred to as a living,
6  breathing flesh check?

7      A.   Yes.

8      Q.   So all of those terms mean essentially the same
9  thing; is that right?

10     A.   Correct.  And you're also doing a fire check at
11  the same time.

12     Q.   Okay.

13     A.   Make sure you're not seeing signs of smoke.

14     Q.   Okay.  There are numbers on the next two lines.
15  You see there's, like, a one in a circle, 0600, and then
16  under underneath that 0602.

17     A.   Okay.

18     Q.   And then it goes all the way down that row.  Do
19  you see that?

20     A.   Yes.

21     Q.   Do you understand what those numbers are
22  referencing?

23     A.   Yes.

24     Q.   Can you explain it to me?

25     A.   So the one circle is pod 1.  The 0600 is the time

**Deputy Warden Travis Scott - 10/05/2021**

101

1   they entered the pod.  0602 is the time they exited the

2   pod.  Two circled is pod 2.  Time they entered the pod was

3   0602.  Time they left the pod was 0605.  Three is for pod

4   3, same thing.  Time they entered, time they exited, so on

5   and so forth.

6        Q.   Okay.  Thank you.

7             Going down to the bottom of this page there

8   is a box where shift commander is checked.  Do you see

9   that?

10       A.   Yes.

11       Q.   And there's a signature next to that?

12       A.   Yes.

13       Q.   What is the reason that that box is checked?

14       A.   The shift commander is verifying that they

15   reviewed the journal.

16       Q.   Okay.  So that would be something that would

17   happen after the shift?

18       A.   At the end of the shift, yes.

19       Q.   Okay.  And the fact that the other two boxes for

20   chief of security and deputy warden are not checked means

21   that the chief of security and the deputy warden, yourself,

22   have not reviewed this correctional service log; right?

23       A.   If it's the -- no, that's not correct.  Because

24   the white ones are kept separate from the carbon copy

25   that's underneath it.

Deputy Warden Travis Scott - 10/05/2021

102

1          So the journals -- like, if you have the
2     entire journal, then you're going to get -- it will have
3     just the shift commanders in there.  The yellow copy that's
4     torn out is what's turned in with their shift paperwork
5     that comes up front that goes into the morning meeting, and
6     those are the ones that get reviewed, but the actual
7     journal stays down in the unit.
8          Q.   So who is -- who is reviewing the yellow -- the
9     yellow sheet?
10         A.   So on the yellow sheet, it should be the chief of
11    security and the deputy warden.
12         Q.   Okay.  All right.  So this would be -- the
13    white -- the one -- the one we're looking at in Exhibit 5
14    is the white sheet that remains in the journal?
15         A.   Correct.
16         Q.   Okay.  Thank you.
17              You see that there is an entry at 7:31 for
18    security check conducted, nurse escort King.  Do you see
19    that?
20         A.   Yes.
21         Q.   Okay.  And then we're going to go to the -- and
22    then there's no other security checks after 7:31 on this
23    page at -- in King unit; right?
24         A.   Okay.  I see that.
25         Q.   Okay.  So going to the next page, we see that the

Deputy Warden Travis Scott - 10/05/2021

103

1   next security check for King is at 8:36; right?

2       A.   Yes.

3       Q.   So that's an hour and five minutes later?

4       A.   Yes.

5       Q.   And then the next one is at 9:57 for King;

6   correct?

7       A.   Yes.

8       Q.   So that's an hour and 11 minutes after the prior

9   one?

10      A.   Yes.

11      Q.   Actually, no.

12              An hour and 21 minutes after?

13      A.   Correct.  Yeah, I see that.

14      Q.   Okay.  And then the next one in King is in -- is

15   at 11:12.  Do you see that?

16      A.   Yes.

17      Q.   Which is an hour and 15 minutes later?

18      A.   Right.

19      Q.   So all of those security checks that we just

20   looked at for King took place more than an hour apart;

21   right?

22      A.   Yes.

23      Q.   Do you know what, if anything, was done to address

24   the going beyond the hour?

25      A.   No, I don't know.

**Deputy Warden Travis Scott - 10/05/2021**

104

1      Q.    Okay.  Do you know if correctional officers get

2  disciplined for doing -- for allowing that to happen?

3      A.    They may.

4      Q.    Okay.  Do you know if they do at Browning?

5      A.    I have.

6      Q.    When was the last time you disciplined a

7  correctional officer for allowing more time than an hour to

8  pass between security checks?

9      A.    It's usually -- I'm trying to recall.  I don't

10  recall having -- when I said I have, I haven't at Browning,

11  but I have in the past.  I haven't seen -- or I have not

12  done formal disciplinary on an employee for not getting the

13  checks done in time.  There's been written redirection as

14  far as informal on their MAP, but not formal where they

15  received disciplinary.

16      Q.    What does informal on their MAP mean?

17      A.    Informal means it doesn't stay in their -- in

18  their personnel record for the rest of their career.  It's

19  -- it's an informal redirection, informal correction

20  without it becoming a permanent mark on their file.

21      Q.    And how often do you give a staff member or any --

22  any staff member at Browning an informal written

23  redirection regarding security checks having more --

24      A.    I don't.

25      Q.    -- than an hour between them?

**Deputy Warden Travis Scott - 10/05/2021**

105

1      A.   I don't.  Their -- their supervisors are the ones

2   that make the entries, not me.

3      Q.   If there is a pattern of not having security

4   checks every hour, would you expect to hear about it?

5      A.   Not necessarily.  If it's chronic to where the

6   same officers are doing it over and over, then yes.

7   Otherwise, I expect my shift commanders and my shift -- my

8   shift sergeants to address it.  They're leaders.  They

9   should be addressing their staff.

10      Q.   How long would it have to go on for you to think

11   of it as chronic?

12      A.   I would have to look at the situation and

13   determine what was going on.  And if it was -- if it's

14   intentional, I believe a person's intentions and their

15   actions, you know, did they call the shift commander?

16   Those types of things come into play.  It's situational.

17           It's not just a blanket, hey, you know,

18   without speaking with the officer or the supervisors,

19   without them speaking to the officers to find out, you

20   know, what's going on.  Are you -- are you -- what are you

21   doing to correct it?  And there's too many variables to

22   come into play.

23      Q.   Is there any way to determine from the

24   correctional services log -- service log whether the

25   control officer called the supervisor?

**Deputy Warden Travis Scott - 10/05/2021**

106

1      A.    No.

2      Q.    No?

3      A.    Not unless they wrote it down.

4      Q.    Okay.  On this same page, looking at the entry at

5    10:28, right here, do you see that?

6      A.    Yes.

7      Q.    It reads, Rec team pulls IMs from K 7, 11, 53, 31,

8    and 40.

9            Do you see that?

10     A.    Yes.

11     Q.    And then a few lines down from that at 10:42, we

12   see, Rec team pulls IMs from J 59, 37, 32, either 31 or 21,

13   and 12.

14           Do you see that?

15     A.    Yes.

16     Q.    First of all, IMs means inmates; right?

17     A.    Correct.

18     Q.    Okay.  Would this be for outside rec?

19     A.    Yes.

20     Q.    How can you tell that?

21     A.    Because it's the rec team pulling them.

22     Q.    Okay.  Who is the rec team?

23     A.    A sergeant and usually four staff.

24     Q.    Okay.  Would they be on the daily post sheet?

25     A.    They should be.

Deputy Warden Travis Scott - 10/05/2021

107

1    Q.   And would they be identified as recreation
2  officers?
3    A.   Yes.  Recreation escort officers.  It depends.
4  With the current conditions, one officer could be listed as
5  the medical officer, but in actuality, besides doing
6  medical, he could also be helping out doing the rec team.
7  If he's got some down time and with everybody chipping in
8  to help out in several different areas, they could be
9  listed in one post when they're actually not at that post
10  at that time.  They're helping out the rec team.
11         So it's just -- it depends on the days, the
12  staffing, what we're juggling to be able to get things
13  accomplished.  It's fluid.
14    Q.   Okay.  And the situation that you were just
15  describing, that's because of the fact that Eyman Browning
16  is running at about 60 percent of authorized staff; is that
17  right?
18    A.   Correct.
19    Q.   Okay.
20    A.   It's based off of staffing.  There's no ifs, ands,
21  or buts about it.  I'm short-staffed.
22    Q.   Okay.  So going back to what we were just looking
23  at on Exhibit 5, so at 10:28, the rec team pulls inmates
24  from -- pulls five people from King for rec; right?
25    A.   Yes.

**Deputy Warden Travis Scott - 10/05/2021**

108

1     Q.   And then at 10:42, the rec team pulls five inmates

2  from John; right?

3     A.   Yes.

4     Q.   Does that mean that essentially it took 14 minutes

5  to get the inmates -- the five inmates from King out of

6  their cells and into the rec enclosures?

7             MS. LOVE:  Form.  Go ahead.

8             THE WITNESS:  Not necessarily.  What that's

9  saying is that's what time they pulled them out at.  I

10  don't know what they did in between from going from King

11  over to John.  They might have done something else.  I

12  would imagine it would take a few minutes because you're

13  unrestraining inmates.  So not knowing if they stopped off

14  and did something else or that time period is not

15  annotated.

16             So -- but it doesn't necessarily mean it took

17  them 14 minutes, like, because of turning out the rec, they

18  might have got sidetracked on something else.

19  BY MS. MORRIS:

20     Q.   Okay.  How long would you expect it to take to get

21  five people out of their cells -- for the rec team to get

22  five people out of their cells and to the recreation

23  enclosures in King unit?

24             MS. LOVE:  Object to form and foundation.

25             THE WITNESS:  Depends on how many staff are

**Deputy Warden Travis Scott - 10/05/2021**

109

1    involved.   More staff I have, the quicker it's going to

2    take; less staff I have, the longer it's going to take.

3    BY MS. MORRIS:

4        Q.    Okay.

5        A.    So it depends.   It's a variable I can't guess at.

6    If I have enough staff, it would take a couple minutes.   If

7    I'm doing it with two staff, it's going to take longer.   So

8    it just depends.

9        Q.    How long would you expect that to take if you had,

10    say, three staff?

11        A.    Probably -- from the time they take them out?

12        Q.    From the time they start the process of taking

13    them out.   So they -- the time they walk into King Unit to

14    go to the very first cell that they're going to.

15        A.    With three staff, five inmates, probably ten

16    minutes.

17        Q.    Okay.   Would the rec team be doing things other

18    than rec?

19        A.    I don't understand.

20        Q.    So you said the rec team might be -- when I asked

21    if it would take -- if this log could be read as suggesting

22    that it take -- took them 14 minutes --

23        A.    Okay.

24        Q.    -- you said they might stop off and do something

25    else.

Deputy Warden Travis Scott - 10/05/2021

110

1    A.    Okay.  So yes, they're not just dedicated to doing

2  rec is --

3    Q.    Okay.  What other things do the rec team do?

4    A.    They could escort programs.  They could escort an

5  inmate up to medical.  So just because they're listed as

6  rec team does not mean that that's the only thing that

7  they're doing during the day.

8        Due to staffing levels, they could be used

9  then to say, hey, can you take this inmate -- grab this

10 inmate, take him up to medical, or could you take this

11 group of inmates, go take them up to programs, then come

12 back and do the rec turn and take the inmates back out to

13 rec.

14        So there's many different things that they

15 could be doing.  They could stop and help count or they

16 could stop and help pass something out to an inmate.

17 They're not just -- unfortunately, they can't just be

18 assigned to do recreation turns only.

19    Q.    Okay.  Looking at page ADCRR00129061 of Exhibit 5,

20 and where we just saw the -- the two sets of five inmates

21 in each one -- one set of five inmates from K and one set

22 from -- of five inmates from J, are these the only people

23 that went to rec from John and King that day?

24        MS. LOVE:  Form and foundation.

25        THE WITNESS:  I wouldn't be able to tell you

**Deputy Warden Travis Scott - 10/05/2021**

111

1    other than what they put on the journal.  So I don't know.

2    BY MS. MORRIS:

3        Q.   Okay.  So would you expect that the people who

4    went to rec on this day would be listed on the journal?

5        A.   Correct.

6        Q.   So assuming that no one else is listed on the

7    journal as having gone to rec from John and King, does that

8    mean that everyone else in John and King refused rec that

9    day?

10       A.   It could.

11             MS. LOVE:  Foundation.

12             THE WITNESS:  I'm sorry.  It could.  It could

13   mean they chose not to go out that day.

14   BY MS. MORRIS:

15       Q.   What else could it mean?

16       A.   They weren't in their cell.  They were at medical.

17       Q.   Okay.

18       A.   Or a visit.  They were out -- there's many

19   different things of why they couldn't -- maybe they weren't

20   there.  They went on an outside transport.  I mean, to say

21   all of them refused, that's too broad a statement.

22       Q.   Okay.  All right.  Going to the next page, which

23   is ADCRR00129062, we see that at 12:46, all J and K inmates

24   returned with rec team.  Do you see that?

25       A.   Yes.

**Deputy Warden Travis Scott - 10/05/2021**

112

1      Q.   So that's when they're coming back from what we
2  saw on the prior page of them going -- being pulled out to
3  rec?
4      A.   Yes.
5      Q.   So they came back to the housing unit just over
6  two hours after the people were pulled out of J; correct?
7      A.   Correct.
8      Q.   Okay.  Let's go to page ADCRR00129068.  And this
9  is the log for the same day, though a little bit later in
10 the day, in Ida/Lincoln; correct?
11     A.   Yes.
12     Q.   Okay.  Looking at the fourth entry down at 1303,
13 it says, CO 3 Harper -- actually, could you read what it
14 says?
15     A.   [Reading] CO 3 Harper, CO 3 Law conducts a
16 programs walk in Ida.
17     Q.   Okay.  Can you explain what that means?
18     A.   They're CO 3s.  They were going through doing
19 their CO 3 pod walks.
20     Q.   What's a program walk?
21     A.   So they're going in asking the inmates, you know,
22 what do you need?  So it's a requirement that the CO 3s
23 tour their pods to go in, to answer questions from the
24 inmates, to pick up any paperwork, get inmate letters,
25 informal resolutions, whatever it might be.

**Deputy Warden Travis Scott - 10/05/2021**

114

1  them, answer any questions.  It just depends on -- on why

2  they were entering those pods.  They could have been just

3  going in and returning information to the inmates.

4      Q.   Okay.  So you don't know why they call it a

5  program walk?

6      A.   Probably because the officer doing the journal is

7  a newer officer, knows the CO 3s do programs, just figures

8  that, you know, you have programs and you have security.

9  So he's seeing CO 3s going in, so he's just calling it a

10  programs walk.

11      Q.   Okay.  All right.

12      A.   It's just to differentiate between the security

13  and programs.  That's all.

14      Q.   Okay.  All right.  And now I'm going to show you

15  what I'm going to mark as Exhibit 8.

16             (The document was marked as Exhibit 8 for

17  identification.)

18  BY MS. MORRIS:

19      Q.   Can you see Exhibit 8?

20      A.   Yes.

21      Q.   And can you tell me what Exhibit 8 is?

22      A.   South Wing Control.  On July 11 from 06 to noon by

23  Pennell, who's a correctional trainee.

24      Q.   Okay.  And I will state for the record that the --

25  this is a 13-page document starting at ADCRR00128900.

Deputy Warden Travis Scott - 10/05/2021

115

1          We're going to go to ADCRR00128909.  So
2   that's where we are.
3          And this is the same day that we were just
4   looking at, but you just identified; correct?
5      A.   Yes.  [Indiscernible.]
6      Q.   I'm sorry?
7      A.   It's for a different area than what the very first
8   page was.
9      Q.   Okay.  And this is for Ida and Lincoln?
10     A.   Correct.
11     Q.   And Lincoln is enhanced; correct?
12     A.   Not on that date it wasn't.
13     Q.   How do you know that?
14     A.   Because we didn't move them there until August.
15     Q.   Oh, okay.  What was the status of these two units
16   at that time?
17     A.   General population, max custody, except for pods
18   1, 2, and 3 in Ida were STGs.
19     Q.   Okay.  Looking at the entry for -- at 6:10, about
20   eight or nine entries down.
21     A.   Okay.
22     Q.   Okay.
23     A.   Yes, I see it.
24     Q.   Okay.  And it reads, Beginning health security,
25   fire rec/shower inspections conducted by CO 2 Wilson and CO

**Deputy Warden Travis Scott - 10/05/2021**

116

1    2 Elam.

2                    Do you see that?

3        A.    Yes.

4        Q.    What does it mean in that entry where it says

5    rec/shower?

6        A.    So what they're doing is they're looking at the

7    recreation enclosures in the showers to make sure they're

8    free of contraband.  They inspected them.

9        Q.    Okay.  So this is only about inspections; it's

10   not --

11       A.    Correct.

12       Q.    Okay.  Okay.  So the record is clear, I'm going to

13   ask that question again.

14                    This entry at 6:10 is not about taking people

15   to recreation or showers; is that correct?

16       A.    That is correct.

17       Q.    Okay.  Is there some place where the results of

18   the inspections are recorded?

19       A.    It should have been -- basically, if there was

20   something wrong, it would have been put in there, but

21   they -- they should have put no discrepancies noted,

22   something like that.  It would have been just logged in the

23   journal.

24       Q.    Okay.  And in this --

25       A.    I'm trying to find --

**Deputy Warden Travis Scott - 10/05/2021**

117

1      Q.   In this correctional services log, that's where

2   you would --

3      A.   Correct.  Correct.

4            THE COURT REPORTER:  And just a reminder, one

5   at a time, please.

6            MS. MORRIS:  Sorry.

7            THE WITNESS:  Sorry.  So yes, it would have

8   been -- basically, since there was no discrepancies, they

9   just didn't write "no discrepancies."  If there would have

10  been a discrepancy, then they would have annotated it in

11  the journal.

12  BY MS. MORRIS:

13     Q.   Okay.  At 7:06 on the same day, a few lines down,

14  it says, CO 2 Wilson and CO 2 Elam conduct fire security,

15  shower, rec turns.

16            Do you see that?

17     A.   Yes.

18     Q.   What does shower and rec turns refer to in this

19  entry?

20     A.   Taking inmates to the showers or taking them out

21  to Chute rec.

22     Q.   Okay.  Can you tell who is going to showers or

23  rec?

24     A.   No.

25     Q.   Can you tell how many people are going to showers

**Deputy Warden Travis Scott - 10/05/2021**

118

1    or rec?

2         A.    No.

3         Q.    Okay.  And that's also true for the line at 7:27?

4         A.    Correct.

5         Q.    Do you know if anyone was issued any kind of

6    written redirection that they're supposed to be including

7    who's -- who goes to rec?

8         A.    No.

9                   MS. LOVE:  Form and foundation.

10                  THE WITNESS:  No.

11   BY MS. MORRIS:

12        Q.    Is there any way of telling on this form -- and I

13   can scroll down a little bit -- for anyone who did go to

14   rec or showers when they came back from rec or showers?

15        A.    No.

16        Q.    Okay.  I think --

17                  MS. LOVE:  For the record, and we're only

18   looking at the end of the page that you just scrolled to,

19   which is Bates ADCRR128900.

20   BY MS. MORRIS:

21        Q.    Okay.  And we can go to the next line.

22                  Do you see any indication of when those

23   people, if they went to rec or showers, returned from rec

24   or showers, whoever they may have been?

25        A.    No.

**Deputy Warden Travis Scott - 10/05/2021**

119

1    Q.   And given that the entries for rec and shower

2  turns -- the showers and rec turns were shortly after

3  7:00 a.m. and we're now looking through past one in the

4  afternoon, would you expect that if it was -- if there was

5  any indication of when people returned from showers or rec,

6  it would have been on the forms that we're looking at, the

7  parts of the forms that we've looked at?

8    A.   It should have been, but -- however, the staff

9  down on the floor would have been doing the out-of-cell

10  tracking sheets.  Should have been.

11              MS. MORRIS:  All right.  I think let's take

12  another break.

13              (A recess ensued from 1:31 p.m. to 1:42

14  p.m.)

15  BY MS. MORRIS:

16    Q.   We are back on the record.

17              I have one more question about the

18  correctional service logs.

19              So if one wanted to see who had reviewed a

20  correctional service log, you have to look both at the

21  white log that's maintained in the control room as well as

22  in the yellow copies that are pulled out?

23    A.   Yes.

24    Q.   And where are the yellow copies maintained?

25    A.   In a file room at my unit.

Deputy Warden Travis Scott - 10/05/2021

120

1    Q.   Okay.  Like, in a -- in an administrative office
2    essentially?
3    A.   Yeah.  In a box in a -- in an area, just a little
4    storage room.
5    Q.   Okay.  How often do you talk to the associate
6    deputy warden about what he is seeing in the correctional
7    service logs?
8    A.   I haven't really spoke to him about it, to be
9    honest with you.
10   Q.   Okay.
11   A.   It's not a topic that comes up.
12   Q.   Where is out-of-cell time for people in max
13   custody documented?
14   A.   On the out-of-cell tracking form.
15   Q.   Where are those forms kept?
16   A.   During the week that we're monitoring down in the
17   clusters and then when completed, stored in an out-of-cell
18   or in a small area, storage area in a box.
19   Q.   When you say "in the clusters," where in the
20   clusters are they kept?
21   A.   Usually at the entrance to each pod and -- or in
22   the officers' station in a binder is more likely where
23   they're at most of the time.  So that way the officers can
24   go and annotate in them.
25   Q.   Who is the person who's filling those out?

**Deputy Warden Travis Scott - 10/05/2021**

121

1       A.   The correctional officer 2.

2       Q.   Okay.  And is that the person -- like, if, for

3    example, we were talking about Lincoln cluster, would that

4    be the floor post?

5       A.   Yes.

6       Q.   Okay.

7       A.   It would be the officers assigned to the floor in

8    Lincoln clusters, Lincoln and King clusters.  Because

9    they're usually working together.

10      Q.   When are people in max custody asked if they want

11   to go to recreation?

12      A.   First time, usually around 6:30.

13      Q.   Okay.  And are their responses written down

14   somewhere?

15      A.   Yes.  It would be written down on the out-of-cell

16   tracking sheet if they wanted to go.  If -- if they -- what

17   would be written down is their refusal.  If they refused

18   recreation, that would be annotated on the out-of-cell

19   tracking form.

20      Q.   When officers do the walk where they ask whether

21   people want to go to rec, do they carry the binder of

22   out-of-cell forms with them?

23      A.   Not necessarily.  They can, but not necessarily.

24   They can -- it would be a lot easier to just walk with a

25   piece of paper and mark who's wanting to go to rec and then

**Deputy Warden Travis Scott - 10/05/2021**

122

1   go back and annotate it in the book instead of trying to

2   carry a book through all of the cluster and do it while

3   you're standing up.

4       Q.   Okay.  Where are -- where is out-of-cell time

5   documented for people on mental health watch?

6       A.   On the out-of-cell -- no.  It's done on the -- on

7   their watch sheet, on the --

8       Q.   The observation record?

9       A.   The -- the mental health watch log, that's where

10  it would be annotated if they were out of cell.

11      Q.   That's -- that's the form that shows every 10 or

12  15 or 30-minutes --

13      A.   Correct.

14      Q.   -- that someone looked in at them?

15      A.   Correct.

16      Q.   Okay.  Where is out-of-cell time documented for

17  people in close management?

18      A.   There isn't.  They're close custody.

19      Q.   Okay.  But there are people who are in close

20  management no longer at Browning, but until recently there

21  were?

22      A.   They're close custody.  The -- they're not max

23  custody inmates.  They didn't have out-of-cell tracking

24  sheets.  So would have just -- in the journal is where it

25  would have been logged.

**Deputy Warden Travis Scott - 10/05/2021**

123

1     Q.    The correctional services log?

2     A.    Correct.

3     Q.    Okay.  When there was a close management unit at

4   Browning, there were some programs that people came out of

5   cell for; correct?

6     A.    Yes.

7     Q.    And those are -- those are classes; right?

8     A.    Yes.

9     Q.    How long does a class meeting last --

10    A.    Normally --

11    Q.    -- or did it last?

12    A.    Normally one hour.

13    Q.    And how many class meetings would there be per

14  week?

15    A.    I'd have to refer to -- I don't know off the top

16  of my head.

17    Q.    Okay.  Do you know how many weeks a class would

18  last generally?

19    A.    Four weeks, because the inmate would move on to

20  another class.

21    Q.    Okay.  And -- I'm sorry.  Go ahead.

22    A.    And then they would progress into the next step

23  and have more classes.  So they would be continually going

24  to class during the entire time that they were there for

25  the 90 days.

Deputy Warden Travis Scott - 10/05/2021

124

1      Q.    And how many classes would be running for a
2  person, say, at the first step in close management at a
3  time?
4      A.    I don't know.
5      Q.    Okay.  Do you know if there would be -- I'm not --
6  not multiple class -- like, different subject classes,
7  would they be happening at the same time?
8      A.    Yes.
9      Q.    Yes.  Okay.
10              But you don't know how many?
11     A.    No.
12     Q.    And just to be clear, close management is not part
13  of max custody?
14     A.    That is correct.  It is not part of max custody.
15     Q.    Okay.
16     A.    They're not classified as max custody.
17     Q.    Okay.  Can a person who's in close management,
18  when Browning had a close management unit, could they take
19  more than one class at a time?
20     A.    I believe there was -- yes.
21     Q.    Okay.
22     A.    Yeah, they would be able -- if they were doing
23  multiple classes, different subjects, then yes, they would
24  be able to take more than one class at a time.
25     Q.    Okay.  Do people on mental health watch get

**Deputy Warden Travis Scott - 10/05/2021**

125

1    out-of-cell time?

2        A.    No.  It depends on what the watch orders say.

3        Q.    Okay.

4        A.    We follow the -- the watch orders from the mental

5    health professional and whatever those watch orders says is

6    what we do.

7        Q.    Okay.  I am going to show you what I'm going to

8    identify as Scott Exhibit 6.

9                (The document was marked as Exhibit 6 for

10   identification.)

11   BY MS. MORRIS:

12       Q.    And this is a watch order that -- that I redacted

13   the name off of.

14       A.    Okay.

15       Q.    Can you -- is this the watch order that you

16   were -- the type of form that you were just describing?

17              MS. LOVE:  We don't see the form yet.

18              MS. MORRIS:  Oh, that's because I haven't

19   shared my screen.

20              THE WITNESS:  I was waiting.

21   BY MS. MORRIS:

22       Q.    Can you see it?

23       A.    Yes.

24       Q.    Is Exhibit 6 the type of watch order that you were

25   just describing?

**Deputy Warden Travis Scott - 10/05/2021**

126

1      A.   Yes.

2      Q.   And for the record, this -- Exhibit 6 is a

3  one-page form with the Bates number OTRSO10C, electronic

4  document/image page.

5           Where would it indicate whether a person can

6  have out-of-cell time?

7      A.   Additional items, instructions underneath the --

8  where it says, for females, just underneath there,

9  additional items, instructions.

10     Q.   Okay.

11     A.   Can you go down a little bit?

12     Q.   Yeah.

13     A.   So yeah, that's where.

14     Q.   Okay.  In the -- sort of the middle of the page,

15  there's a section that says, Conditions for all mental

16  health watches.

17           Do you see that?

18     A.   Yes.

19     Q.   Okay.  Now I'm going to make it a little bit

20  bigger again.

21     A.   That's fine.

22     Q.   And this -- this sets out conditions for all

23  mental health watches; correct?

24     A.   That's what it says, yes.

25     Q.   Including random observation checks?

**Deputy Warden Travis Scott - 10/05/2021**

127

1      A.   Correct.

2      Q.   And cells being searched before occupancy;

3   correct?   Correct?

4      A.   Yes.   Yes.

5      Q.   And supervised use of towels, shower shoes,

6   personal hygiene items, not to be kept in the cell?

7      A.   Yes.

8      Q.   And provide telephone, recreation, and visitation

9   privileges, do you see that?

10      A.   Yes.

11      Q.   Does this form that we're looking at right now

12   indicate that the person could have recreation?

13                MS. LOVE:   Foundation.

14                THE WITNESS:   If the circumstances were

15   correct and the physical plant was correct, yes.

16   BY MS. MORRIS:

17      Q.   What does -- what does it mean, if the

18   circumstances were correct and the physical plant was

19   correct?

20      A.   If you're able to keep a visual on the inmate and

21   to be able to see them, then we would be able to do

22   recreation.   So --

23      Q.   Okay.

24      A.   -- we don't have that physical plant to allow that

25   to happen for inmates on mental health watches.

**Deputy Warden Travis Scott - 10/05/2021**

128

1      Q.    Why not?

2                 I don't understand what you're --

3      A.    Okay.

4      Q.    -- why you're saying that you don't have it.

5      A.    Because we -- in the recreation enclosure that we

6   have, it is not physically possible to be able to see the

7   inmate at all times.

8      Q.    If you're outside of the enclosure?

9      A.    Correct.

10     Q.    Because they could be essentially up against the

11  wall --

12     A.    They could be up against the wall and doing harm

13  to themselves.

14     Q.    And so because of that, a person who was in mental

15  health watch, would this order as written, would not be

16  able to go to recreation?

17     A.    Correct.

18     Q.    Does that mean that at Eyman Browning, no one on

19  mental health watch goes to recreation?

20     A.    The majority of the time, yes.

21     Q.    How would it ever be possible, given what you just

22  said about the inability to observe people, that someone on

23  watch at Eyman Browning could go to recreation?

24     A.    If I only have one inmate on a 30-minute watch,

25  that individual could then be escorted out and where we

**Deputy Warden Travis Scott - 10/05/2021**

129

1   would be able to have the full visual on them if I only had

2   one.  That would be the only time that we could facilitate

3   that.  Otherwise, because I only have one officer on the

4   watch pod and that officer can't be in multiple places at

5   once.  So that would be the only instance where we could do

6   recreation for an inmate on a mental health watch, if there

7   was only one inmate on the watch.

8        Q.   And so then you would be taking them to an outside

9   rec then?

10        A.   Correct.

11        Q.   Okay.  Do you know how frequently there are people

12   on watch at Eyman Browning who are able to go to

13   recreation?

14        A.   No.

15        Q.   What are the reasons that out-of-cell time gets

16   canceled at Browning?

17        A.   Staffing.

18        Q.   Anything else?

19        A.   It depends.  Like, significant event happens in

20   the complex, an example, water shortage to where we've got

21   no water, obviously, we're not going to be able to run

22   normal because we're doing all these other extra -- extra

23   duties or controlling an incident that would, you know,

24   interrupt it.

25                In ICS's, Incident Command System, that drags

**Deputy Warden Travis Scott - 10/05/2021**

130

1   on for a lengthy amount of time.  Maybe it's at another

2   unit, to where there was a disturbance or actions that took

3   place, that might cause a cancellation, and ICS within the

4   unit to where I'm now losing staff to go on a hospital

5   transport or we're tied up doing an ICS.  Once something

6   happens, it creates a domino effect to where the rest of

7   the day we're going to miss out on something.

8        Q.   Is the main reason for cancellations of

9   out-of-cell activities staffing?

10       A.   Yes.

11       Q.   How often would you say there's a curtailment of

12  recreation for at least some pods at Browning?

13       A.   Two to three times per week.

14       Q.   Was there --

15       A.   Sorry.  Some weeks are better than others.  It

16  depends.

17       Q.   Was there a period that Eyman Browning was most

18  affected by the COVID pandemic?

19       A.   Yes.

20       Q.   From when to when would you say?

21       A.   March 2020 through June 2021.

22       Q.   What activities -- out-of-cell activities for

23  incarcerated people were impacted by that?

24       A.   Programming class, rec -- group recreation,

25  outside recreation, SMI classes, education.

**Deputy Warden Travis Scott - 10/05/2021**

131

1    Q.   How often were mental health classes or programs

2    canceled during that period?

3    A.   Every week.

4    Q.   And when you say "every week," does that mean all

5    the classes or at least one class every week?

6    A.   All the classes.  For the SMIs?  Every week.  All

7    of them.

8    Q.   Okay.  What about -- are there any mental health

9    classes offered for people who are not SMI?

10   A.   I don't know if we could classify them as mental

11   health classes, like Thinking For a Change.  There's

12   programs, but I don't know that they're mental health

13   classes.

14   Q.   Were those -- how often were those kinds of

15   programs that you just described canceled during the period

16   when the facility was most impacted by COVID?

17   A.   All of them.

18   Q.   All of them?

19   A.   All of them.

20   Q.   How often -- actually, withdrawn.

21        Was table time impacted by COVID?

22   A.   At the start?

23   Q.   Well, during -- during that time period that you

24   were just describing.

25   A.   It was -- it was affected for -- but not as long

**Deputy Warden Travis Scott - 10/05/2021**

132

1   as the others.

2       Q.    Okay.

3       A.    I made the decision to -- hey, we need to at least

4   get some table time going.  So it -- in small amounts.

5       Q.    And when did -- when did you make that decision?

6       A.    March of this year.

7       Q.    Okay.  So a few months earlier than the other --

8       A.    Correct.

9       Q.    Okay.

10      A.    Correct.

11      Q.    How often was recreation canceled during that time

12  period when the facility was most impacted by COVID?

13      A.    Outside rec was canceled the entire time.

14      Q.    Okay.  So people only had Chute rec?

15      A.    Correct.

16      Q.    Okay.  And how often was Chute rec canceled?

17      A.    I don't know.  It depends on the day of the

18  staffing.  I honestly don't know.

19      Q.    When rec gets canceled, is it usually just a

20  couple clusters?  A couple pods?  Everybody?  Can you say?

21      A.    Usually it's a cluster.  It just -- it depends

22  on -- sometimes it's everybody.  Depends on what the

23  staffing area or what the staffing levels are that day.

24  They can be -- it's -- it's usually no less than a cluster,

25  but not the whole unit.  So it just depends on what -- what

**Deputy Warden Travis Scott - 10/05/2021**

133

 1   the staffing level is.

 2       Q.   How is it decided which clusters will have rec

 3   curtailed?

 4       A.   Who last -- so you look at, number 1, your

 5   staffing.  Then you look at who last got canceled.  And so

 6   that way you're trying not to cancel the same group twice

 7   in a row.  So that way, you know, you're trying to make it

 8   as equitable as possible for the entire inmate population.

 9   So you don't want to keep canceling the same inmates over

10   and over and over.

11       Q.   What efforts are made at Browning to make up

12   out-of-cell time that gets canceled?

13       A.   Bringing in staff on overtime if there's a day

14   that we're better staffed then we -- we created a -- I

15   created a board in the office to where we track what areas

16   were canceled so that if there is a day that we have

17   additional staffing or a good staffing day, then we look

18   back at what got canceled and make it up on that day if

19   it's possible as best we can.

20       Q.   Okay.  I'm going to show you what I am identifying

21   as Exhibit 7, Scott Exhibit 7.

22                 (The document was marked as Exhibit 7 for

23   identification.)

24   BY MS. MORRIS:

25       Q.   Can you see Scott Exhibit 7?

**Deputy Warden Travis Scott - 10/05/2021**

134

1     A.   Yes.

2          Q.   Can you tell me what Scott Exhibit 7 is?  I'll

3     make it a little smaller.

4          A.    It is an information report from July 30, 2021,

5     from Lieutenant Hoyt to Captain Brewer.

6          Q.   Okay.  And for the record, it is -- Exhibit 7 is

7     an eight-page document, and the first page is

8     ADCRR00055285.

9               So in this -- actually, can you explain to me

10    what is being discussed in this information report that is

11    Exhibit 7?

12         A.   Yeah.  The lieutenant is reporting how many staff

13    he's short.  So there was 33 positions collapsed.  The

14    three medical lines were scheduled with two staff, so

15    basically we had to provide two staff for the three medical

16    lines.

17              And then it lists the activities that were

18    curtailed due to the low staffing numbers and then saying

19    that Chute rec for Dog cluster wasn't conducted.  Henry rec

20    1 through 6 was not conducted.  And John pods 5 and 6 class

21    was canceled.

22         Q.   When did -- just as -- so when it says Dog Chute

23    rec and just Henry rec, does that mean that Henry rec is

24    outside rec?

25         A.    That's what I'm interpreting it as.

**Deputy Warden Travis Scott - 10/05/2021**

135

1      Q.    But maybe, maybe not?

2      A.    Correct.

3      Q.    Okay.  All right.  A moment ago you said something

4    about a good staffing day.

5      A.    Uh-huh.

6      Q.    So on this day, the shift started with 33 posts

7    collapsed?

8      A.    Correct.

9      Q.    How many posts would be collapsed on a good

10   staffing day?

11     A.    20.

12     Q.    Okay.

13     A.    Well, actually, on a good staffing day, none would

14   be collapsed, because all posts are critical.  I have

15   [indiscernible] posts.

16               THE COURT REPORTER:  "I have" what?

17               THE WITNESS:  I have 56 posts.  So a good

18   staffing day would be none collapsed.

19   BY MS. MORRIS:

20     Q.    How would you describe the -- a day that you only

21   had 20 posts collapsed?

22     A.    70 percent, give it a C.  Because that's basically

23   30 percent of my posts are collapsed.

24     Q.    Okay.  And again, when we're saying collapsed,

25   that means those are posts that are not staffed on this

**Deputy Warden Travis Scott - 10/05/2021**

136

1    day?

2        A.    Correct.  Hold on.  It's not -- it's -- it's not

3    staffed on the roster.  However, it doesn't mean that an

4    officer isn't working two posts.  You just can't put the

5    officer down in two posts.

6               So when you look at the control rooms, for

7    example, John/King, there will be one officer listed for

8    John, but he's also covering King.  So it's covering both

9    of those posts.  So it's not saying those posts are

10   completely vacant.  It's just those are posts that if I

11   have the staff, I would be able to have two there instead

12   of one.  If that makes sense.

13       Q.    Okay.  I'm going to go to page ADCRR00055287,

14   which is the third page of this document.

15               And can you explain to me what the page we're

16   looking at now is?

17       A.    It's an -- it's basically a reflection of what the

18   post sheet says.

19       Q.    And what does it mean for -- so page ADCRR00055285

20   lists numerous posts, and then it says, Is not scheduled.

21   Do you see that?

22       A.    Yes.

23       Q.    What does it mean when it's saying, Is not

24   scheduled?

25       A.    It means that there wasn't somebody scheduled for

**Deputy Warden Travis Scott - 10/05/2021**

137

1    that post on -- on the roster.

2         Q.   When is it determined that there's -- that there's

3    not anyone scheduled for a post?

4         A.   When you run out of people on the roster.

5         Q.   So this is -- although it says, Is not scheduled,

6    it's about on the day who's actually assigned to a

7    particular post; is that correct?

8         A.   Right.  So basically what this is a copy and paste

9    off of the -- off of the post sheet because that's how it

10   shows up on the rosters.  When there's not somebody listed

11   in that post, it shows up as not scheduled.  So they copied

12   and paste it from the post sheet and put it into the

13   information report instead of just attaching the roster to

14   the information report.

15        Q.   Okay.  And going up to the next page, is that your

16   signature at the bottom of --

17        A.   It is.

18        Q.   -- the page?  Okay.

19              Which means that you reviewed this

20   information report?

21        A.   Correct.

22        Q.   So going down to page ADCRR00055289, this is the

23   daily post sheet -- it's actually the same one we looked at

24   earlier; right?

25        A.   Yes.

**Deputy Warden Travis Scott - 10/05/2021**

138

1      Q.   And it's for that same day of the information --
2  that the information report was showing they were down --
3  you all were down 33 people; correct?
4      A.   Yes.
5      Q.   And it -- it shows both Able Control and Dog
6  Control not staffed; right?
7      A.   On this part, yes.
8      Q.   Okay.  Would you have reviewed the daily post
9  sheet together with the information report when you
10  received it?
11      A.   I would have reviewed -- if this was all attached
12  together in the IR, I would have reviewed all of it, yes.
13  So --
14      Q.   Okay.
15      A.   Yeah, if it was all put together with the IR, then
16  yes, I would have reviewed it.
17      Q.   Do you recall there being a time when the daily
18  post sheet indicated that there was no one in either Able
19  Control or Dog Control?
20      A.   I don't remember.  Obviously, I signed it, but
21  there's a part of the rosters that -- it's not a static
22  document.  It changes multiple times throughout the day.
23  So I would have concentrated more on what was actually
24  collapsed compared to what the roster -- the daily post
25  sheet showed, because it's very fluid.

**Deputy Warden Travis Scott - 10/05/2021**

139

1              And this might have been what they printed

2      off at the very beginning of a shift, or it could be

3      something that they printed off at the very end of the

4      shift.

5              So it's not always an accurate reflection of

6      what has been posted that day.  It doesn't -- it doesn't

7      just -- this is it for the roster.  This could have been in

8      the middle of a change, at the end of the day.  There's too

9      many circumstances that come into play with people coming

10     in and out of the unit on shift all throughout the day.

11             So this post could have been -- one of these

12     two posts could have been filled during the morning, and

13     then when that person left at, say, 2:00 because their

14     overtime was done, you take them off the roster, now it

15     shows that the Able Control was empty or that the Dog

16     Control was empty, because once you remove a person off the

17     roster, it doesn't memorialize it in the system.  It just

18     takes them off.

19             So it's not -- it's not an -- an accurate

20     reflection of what the actual postings were like that day.

21     It's not possible with the amount of changes that happen

22     during the day to accurately capture the rosters because

23     there's too many changes.

24     Q.   Are you saying that there is no place to look to

25     see something you can rely on as an accurate record as to

**Deputy Warden Travis Scott - 10/05/2021**

140

```
 1   who was assigned to what posts on a given day?
 2                   MS. LOVE:   Foundation, form.
 3                   THE WITNESS:   I can tell you that I can have
 4   the same roster for the same day, one printed off at 0600
 5   and another one printed off at 1800, and they will look
 6   nothing the same.
 7   BY MS. MORRIS:
 8       Q.   Okay.   Is there somewhere in ADCRR record keeping
 9   where ADCRR has an accurate and reliable record of who is
10   posted to a particular post on a particular day?
11       A.   No.   Other than grabbing the journals.   If you
12   need to know who was in a post on a certain day, you can go
13   back.   If you're looking for, say, John cluster on
14   July 30th, who was down there working in John cluster on
15   July 30th from 06 to 1800, you can go and grab the journal
16   and the journal should annotate who was working that post
17   that day.
18       Q.   Okay.   I'm going to switch gears a little bit.
19            Do people in maximum custody sometimes refuse
20   to go out to rec or to some other out-of-cell activity?
21       A.   Yes.
22       Q.   Do you know what the refusal rate in max custody
23   at Browning is for recreation?
24       A.   No.   We don't track that.
25       Q.   Do you know what the refusal rate is for classes?
```

**Deputy Warden Travis Scott - 10/05/2021**

141

1    A.    I said no.  I didn't know.

2    Q.    I'm sorry.  I didn't hear you.  Okay.

3          Do you know what the refusal rate is for

4    mental health programs?

5    A.    No.

6    Q.    Do you know what the refusal rate is for table

7    time?

8    A.    No.

9    Q.    And does ADCRR track any of those?

10   A.    No.  Not that I'm aware of.

11   Q.    Do you think it would be possible to track refusal

12   rates?

13   A.    I don't think -- it would be more reflective of

14   the time of year that it is.  And for, like, recreation,

15   inmates aren't going to want to go out to recreation when

16   it's 115 degrees.  So it would be environmental for that

17   aspect of it.  It's a lot to put on as far as tracking and

18   keeping the percentages.

19          It's -- I don't think -- it's -- it's not

20   possible with our current infrastructure as far as there's

21   programs out there that would be able to track it, but we

22   don't have those programs now.

23   Q.    Okay.  All right.  What happens if it -- if

24   anything, if an incarcerated person shows a pattern of

25   refusing to go out of cell?

1   people who have shown a pattern or changed their practices

2   about how often they're reviewing, those go into the max

3   custody notebooks?

4        A.   Yes.  We started putting them in there.

5        Q.   Okay.  When you review the logs, what are you

6   looking for?

7        A.   To see what the reasons are.  I'll go through it.

8   I'll look at it, see who the inmate is, see what the

9   sergeant says, what they wrote down as the reason being to

10  just make sure, number 1, that it's being done, that they

11  are going down there and having those conversations with

12  the inmates, trying to encourage them to attend class or go

13  to recreation if, you know, when it's afforded to them.

14       Q.   And do you find that annotations to be

15  informative?

16       A.   Yes.

17       Q.   Okay.  Is the length of stay in isolation a factor

18  in considering whether a person should stay in isolation?

19                 MS. LOVE:  Form and foundation.

20                 THE WITNESS:  What isolation?

21  BY MS. MORRIS:

22       Q.   Max custody, for example.

23       A.   They're in max custody because of different

24  reasons, but their classification system is what determines

25  how long they stay in max custody and their behavior.

Deputy Warden Travis Scott - 10/05/2021

1    Q.   Okay.  Does the length of time that they have been

2  in max custody factor into the consideration of whether a

3  person should remain in max custody?

4                MS. LOVE:  Foundation.

5                THE WITNESS:  No.

6  BY MS. MORRIS:

7    Q.   Is there any limit on how long a person can stay

8  in max custody?

9    A.   No.

10    Q.   Is there any limit on how long a person can stay

11  in enhanced management?

12    A.   No.

13    Q.   Is there any limit on how long a person can stay

14  in Restrictive Housing -- Restrictive Status Housing

15  Program?

16    A.   No.

17    Q.   Is there any limit on how long a person can stay

18  in mental health watch?

19    A.   That's not something I determine.  That's done by

20  mental health.

21    Q.   Okay.  But do you know if there's a limit?

22    A.   I don't know what their parameters are.

23    Q.   Okay.  Are there any reasons that a person cannot

24  be placed into max custody?

25    A.   No.

**Deputy Warden Travis Scott - 10/05/2021**

146

1    Q.   Are there any special procedures, when considering

2  a -- placing a person into max custody, if the person is

3  mentally ill?

4              MS. LOVE:   Foundation.

5              THE WITNESS:   No.

6  BY MS. MORRIS:

7    Q.   How long, on average, do people spend in max

8  custody Intake Unit?

9    A.   A couple weeks.  No more than -- hopefully no more

10 than 30 days, but it's depending -- it depends on bed

11 availability at a -- at the max custody.

12   Q.   Does anyone do anything to track the amount of

13 time people spend in the Intake Unit for max custody?

14   A.   Yes.

15   Q.   What?

16   A.   My CO 3 tracks it, keeps track of how long they've

17 been there, and reports out to me and my correctional

18 officer 4, my CO 4.  And if I get in -- if I get guys that

19 have been there for a while, then I start making phone

20 calls up to Central Office to say, hey, I need these guys

21 placed.

22   Q.   How long do people spend, on average, in max

23 custody at Eyman Browning?

24   A.   I have no idea.  There's just -- it depends.

25 There's too many variables to give a clear answer to that.

**Deputy Warden Travis Scott - 10/05/2021**

147

1      Q.    How long do people spend, on average, at step 1 of

2   max custody in Eyman Browning?

3      A.    I don't know.  I don't track that.

4      Q.    How many -- how long, on average, do people on

5   step 2 of max custody at Eyman Browning?

6      A.    I don't track that.

7      Q.    How long, on average, do people spend at step 3 of

8   max custody at Eyman Browning?

9      A.    I don't track that.

10      Q.    Do you know if anyone at ADCRR tracks those

11   averages?

12      A.    I don't believe so.  I don't know, though.

13      Q.    How long do people spend, on average, in enhanced

14   management at Eyman Browning?

15      A.    It's not tracked.  I can tell you it depends.

16   Depends on why they were in enhanced, what their behavior

17   has been since they've been in enhanced.

18      Q.    What's the longest time anyone has spent in

19   enhanced management, to your knowledge?

20      A.    Ten years.

21      Q.    Is that Mr. Eggers?

22      A.    Yep.  Yes.  Sorry.  I didn't mean to say yep.

23   Sorry.  He's no longer in enhanced, though.

24              THE COURT REPORTER:  Was that Eggers?

25              THE WITNESS:  Eggers, E-g-g-e-r-s.

Deputy Warden Travis Scott - 10/05/2021

148

1            THE COURT REPORTER:  Thank you.

2            THE WITNESS:  You're welcome.

3    BY MS. MORRIS:

4        Q.   Do you know how long it had been since he had had

5    a disciplinary at the time that he was released from

6    enhanced management?

7        A.   Ten years.

8        Q.   Does anyone in ADCRR track how long people spend

9    in enhanced management?

10       A.   Not that I'm aware of.

11       Q.   How long do people spend, on average, in

12   Restrictive Status Housing Program at Eyman Browning?

13       A.   To be honest, there hasn't been that many since

14   I've been there to be able to establish an average for

15   the -- we just barely started putting inmates back into the

16   restrictive housing program.  It wasn't being used for the

17   last year and a half.

18       Q.   When did it start up again?

19       A.   About a month ago, two months ago.

20       Q.   Why was it not being used?  And why did it start

21   up again?

22       A.   I don't know why it wasn't being used.  And then I

23   recommended that instead of sending inmates to enhanced, we

24   could make better use of the restricted housing instead of

25   enhanced for certain individuals.  And then inmates that

**Deputy Warden Travis Scott - 10/05/2021**

149

1   were in enhanced I recommended step down to restrictive

2   housing before they go into regular max custody.  So that's

3   why I have -- I have four in restrictive right now.

4        Q.   Did Mr. Eggers go to restrictive status?

5        A.   No, he did not.

6        Q.   Did he just go to regular max custody?

7        A.   Yes.

8        Q.   How long do people spend, on average, in the max

9   custody STG Unit?

10       A.   Don't know.  Long -- it depends.  Before the new

11  806, there was only one way out, and that was to do the

12  step-down program and to be STG-free.  So I know there's

13  been some that were in there for a very, very, very long

14  time.

15       Q.   When you say "a very, very, very long time" --

16       A.   Since the beginning.

17       Q.   When was the beginning?

18       A.   When they started validating inmates in 1997.

19       Q.   So until at least this spring, there were people

20  in the STG max custody unit that have been in STG max

21  custody since 1997?

22       A.   No.  No.  I don't think anybody had been there

23  that length of time.

24       Q.   Okay.

25       A.   What I'm saying is, since they started the -- from

**Deputy Warden Travis Scott - 10/05/2021**

150

```
1   1997 until 2008, there was no movement out of STG.  They --
2   there was no step-down program.  So some of them had been
3   in there for 11 years from the time --
4       Q.  In 2008?
5       A.  In 2008.  Then when they started the step-down
6   program, there was inmates that -- like I said, in 2008,
7   they had been in there for 11 years.  And then they stepped
8   down, did good, but then if they got in trouble they went
9   back, so I would say the longest --
10                  (Dog barking.)
11                  THE COURT REPORTER:  I'm sorry.  "The
12  longest" what?
13                  THE WITNESS:  The longest anybody was in
14  there was probably 11 years, is what I'm assuming.
15  BY MS. MORRIS:
16      Q.  11 years ending in 2008?
17      A.  Correct.  And I don't think anybody's been there
18  that length of time since.
19      Q.  Of the people who are there now, do you have any
20  sense of who's been there the longest and how long?
21      A.  No.  It's dramatically reduced, population has
22  reduced almost by half since my arrival.
23      Q.  Do you know how long people spend, on average, in
24  mental health watch at Browning?
25      A.  No.
```

**Deputy Warden Travis Scott - 10/05/2021**

151

1      Q.    Do you know --

2      A.    It's determined by the mental health.

3      Q.    Do you know what the longest amount of time anyone

4   has spent in mental health watch at Browning is?

5      A.    Couple weeks.

6      Q.    Is that a guess or do you know that?

7      A.    I know that -- I know of at least one inmate that

8   spent two weeks on mental health watch.

9      Q.    Okay.  Does ADCRR do anything to track how long

10  people spend, on average, or how long people spend on

11  mental health watch?

12     A.    No.  Not that I'm aware of.

13     Q.    What is the last time that an exterminator came

14  into Eyman Browning housing units?

15     A.    I think it was the week before -- I don't know if

16  they went down into the housing units.  It was the week

17  before I left on vacation, so the Monday before I left.  I

18  don't know what that date is without looking.  So ...

19     Q.    Sometime around the 20th of September, you're

20  saying?

21     A.    That sounds about right, if I'm not mistaken.

22     Q.    Do you know if they service -- when -- when an

23  exterminator comes to the housing units, do they service

24  the cells?

25     A.    They're supposed to, yes.

1    Q.   Do you know if they do?

2    A.   They haven't been.

3    Q.   I'm sorry?

4    A.   They hadn't been.  So -- and I don't know if they

5    did on this last visit.  I don't know if they went down

6    into the cells.  So ...

7    Q.   Okay.

8              MS. MORRIS:  That is all that I have.

9              MS. LOVE:  No questions for me.

10             We will read and sign.

11             THE COURT REPORTER:  Rachel, do you want a

12   copy of the transcript?

13             MS. LOVE:  Yes, a copy.  But I don't need a

14   rough draft.

15             (The proceedings concluded at 2:33 p.m.)

16

17   _____
     DEPUTY WARDEN TRAVIS SCOTT

18

19

20

21

22

23

24

25

1 | STATE OF ARIZONA    )
    COUNTY OF MARICOPA )
2

3        BE IT KNOWN that the foregoing deposition was taken

4   by me pursuant to stipulation of counsel; that I was then

5   and there a Certified Court Reporter in the State of

6   Arizona, and by virtue hereof authorized to administer an

7   oath; that the witness before testifying was duly sworn by

8   me to testify to the whole truth; pursuant to request,

9   notification was provided that the deposition is available

10  for review and signature; that the questions propounded by

11  counsel and the answers of the witness thereto were taken

12  down by me in shorthand and thereafter transcribed into

13  typewriting under my direction; that the foregoing pages

14  are a full, true and accurate transcript of all the

15  proceedings had upon the taking of deposition, all done to

16  the best of my skill and ability.

17        I FURTHER CERTIFY that I am in no way related

18  to nor employed by any parties hereto; nor am I in any

19  way interested in the outcome thereof.

20        Dated at Phoenix, Arizona, this 18th day of

21  October, 2021.

22

23        _____

24          CINDY MAHONEY, RPR, RMR NO. 50680

25

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;     )
Stephen Swartz; Dustin Brislan;   )
Sonia Rodriguez; Christina        )
Verduzco; Jackie Thomas; Jeremy   )
Smith; Robert Gamez; Maryanne     ) NO.
Chisholm; Desiree Licci; Joseph   ) CV 12-00601-PHX-ROS
Hefner; Joshua Polson; and        )
Charlotte Wells, on behalf of     )
themselves and all others         )
similarly situated; and Arizona   )
Center for Disability Law,        )
                                  )
                Plaintiffs,       )
vs.                               )
                                  )
David Shinn, Director, Arizona    )
Department of Corrections,        )
Rehabilitation and Reentry; and   )
Larry Gann, Assistant Director,   )
Medical Services Contract         )
Monitoring Bureau, Arizona        )
Department of Corrections,        )
Rehabilitation and Reentry, in    )
their official capacities,        )
                                  )
                Defendants.       )
                                  )

DEPOSITION OF DAVID SHINN

Via Zoom videoconference
October 21, 2021
9:03 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue       Prepared by:
Phoenix, Arizona 85020
                                  Jill Marnell, RPR
602.266.6535                      Arizona Certified
www.glennie-reporting.com         Reporter No. 50021

2

1                              INDEX

2    WITNESS                                          PAGE

3    DAVID SHINN

4            Examination by Mr. Fathi                  7

5

                        INDEX TO EXHIBITS
6
        No.          Description                    Page
7
     Exhibit 1     Curriculum vitae, not Bates stamped    192
8
     Exhibit 2     Defendants' First Supplemental      25
9                  Pretrial Disclosure Statement, not
                   Bates stamped
10
     Exhibit 3     Declaration of David Shinn, and     30
11                 attachment, not Bates stamped

12   Exhibit 4     1/14/2020 email to V. Headstrom from    56
                   T. Dolan, and attachments, Bates
13                 stamped ADCRR00111128 through
                   ADCRR00111131, marked CONFIDENTIAL -
14                 SUBJECT TO PROTECTIVE ORDER
                   PARSONS V. SHINN, CV12-00601
15
     Exhibit 5     Document titled "Staffing Variances    62
16                 - Hired FTE vs Contract FTE," Bates
                   stamped ADCRR0137140, marked
17                 CONFIDENTIAL

18   Exhibit 6     1/4/2021 email to M. Gress from     73
                   spotts@azadc.gov, and attachment,
19                 Bates stamped ADCRR0011396 through
                   ACDRR00111400, marked CONFIDENTIAL -
20                 SUBJECT TO PROTECTIVE ORDER
                   PARSONS V. SHINN, CV12-00601
21
     Exhibit 7     Supplemental Decl. of David Shinn,    83
22                 not Bates stamped

23   Exhibit 8     News release "Breaking:  Governor    85
                   Ducey:  "We're Shutting Down A State
24                 Prison," not Bates stamped

25

3

1                    INDEX TO EXHIBITS CONTINUED

2     No.           Description                            Page

3     Exhibit 9     Supplemental Decl. Of Larry Gann,        91
                    and attachments, not Bates stamped
4
      Exhibit 10    Document titled "Contract                95
5                   Amendment," dated June 18, 2021,
                    Bates stamped PLTFS001698
6
      Exhibit 11    Organizational chart titled "Arizona     96
7                   Department of Corrections
                    Rehabilitation & Reentry," revised
8                   9/17/2020, Bates stamped PLTFS002186

9     Exhibit 12    September 17, 2020 letter to            134
                    D. Gowan from D. Shinn, Bates
10                  stamped ADCRR00111462 through
                    ADCRR00111468, marked CONFIDENTIAL -
11                  SUBJECT TO PROTECTIVE ORDER
                    PARSONS V. SHINN, CV12-00601
12
      Exhibit 13    November 25, 2020 letter to            138
13                  D. Gowan from D. Shinn, Bates
                    stamped ADCRR00111402 through
14                  ADCRR00111409, marked CONFIDENTIAL -
                    SUBJECT TO PROTECTIVE ORDER
15                  PARSONS V. SHINN, CV12-00601

16    Exhibit 14    January 28, 2021 letter to             140
                    D. Gowan from D. Shinn, Bates
17                  stamped ADCRR00111388 through
                    ADCRR00111395, marked CONFIDENTIAL -
18                  SUBJECT TO PROTECTIVE ORDER
                    PARSONS V. SHINN, CV12-00601
19
      Exhibit 15    Document titled "Arizona Department    141
20                  of Corrections Weekly CO
                    Status/Hiring Report ASPC Lewis
21                  8/23/2021," Bates stamped
                    ADCRR00056115 through ADCRR00056119,
22                  marked CONFIDENTIAL - SUBJECT TO
                    PROTECTIVE ORDER
23                  PARSONS V. SHINN, CV12-00601

24

25

4

1                      INDEX TO EXHIBITS CONTINUED

2     No.              Description                              Page

3     Exhibit 16       Document titled "Arizona Department      142
                       of Corrections Weekly CO
4                      Status/Hiring Report ASPC Eyman
                       8/23/2021," Bates stamped
5                      ADCRR00055894 through ADCRR00055899,
                       marked CONFIDENTIAL - SUBJECT TO
6                      PROTECTIVE ORDER
                       PARSONS V. SHINN, CV12-00601
7
      Exhibit 17       Document titled "Department Order:       147
8                      801 - Inmate Classification,"
                       effective date July 21, 2017, not
9                      Bates stamped

10    Exhibit 18       Document titled "Department Order:       157
                       812 - Inmate Maximum Custody
11                     Management and Incentive System,"
                       effective date July 24, 2019, not
12                     Bates stamped

13    Exhibit 20       Order signed July 16, 2021, in           193
                       Jensen, et al, v. Pratt, et al.,
14                     CV-12-00601-PHX-ROS, not Bates
                       stamped
15

16

17

18

19

20

21

22

23

24

25

5

1                  DEPOSITION OF DAVID SHINN

2    was taken on October 21, 2021, commencing at 9:03 a.m.,

3    via Zoom videoconference, before Jill Marnell, a Certified

4    Reporter in the State of Arizona.

5                        ---oOo---

6    APPEARANCES

7    For the Plaintiffs:

8            DAVID C. FATHI
             MARIA V. MORRIS
9            ACLU National Prison Project
             915 15th Street N.W.
10           7th Floor
             Washington, D.C. 20005
11           202.548.6603
             dfathi@aclu.org
12           mmorris@aclu.org

13                   and

14           CORENE KENDRICK
             ACLU National Prison Project
15           39 Drumm Street
             San Francisco, California 94111
16           202.393.4930
             ckendrick@aclu.org

17                   and

18           RITA K. LOMIO
19           Prison Law Office
             1917 Fifth Street
20           Berkeley, California 94710
             510.280.2621
21           rlomio@prisonlaw.com

22

23

24

25

6

1   APPEARANCES CONTINUED

2

   For the Defendants:

3
            DANIEL P. STRUCK
4           Struck Love Bojanowski & Acedo
            3100 West Ray Road
5           Suite 300
            Chandler, Arizona 85226
6           480.420.1616
            dstruck@strucklove.com
7

8   Also present:  Brad K. Keogh

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12

1      Q.   All right.  Unless I ask you to, please do not,

2   while we're on the record, consult anything else; again,

3   any other screen on your computer or your phone, any

4   notes, any texting, emails, anything of that nature.  All

5   right?

6      A.   Yes.

7      Q.   All right.  And again, I cannot see Mr. Struck

8   but it is -- it is improper for him to attempt to

9   communicate with you in any way while we're on the record.

10  Do you understand that?

11     A.   Yes.

12     Q.   So finally, please do not communicate with anyone

13  besides me while we're on the record.  That includes

14  either of your lawyers who are with you.  It includes not

15  checking email, text messages, any other form of

16  communication.  Okay?

17     A.   Yes.

18     Q.   Director Shinn, did you review any documents to

19  prepare for this deposition?

20     A.   None.

21     Q.   Did you review any depositions that have been

22  taken in this case?

23     A.   No.

24     Q.   Did you communicate with anyone to prepare for

25  this deposition?

David Shinn - 10/21/2021

13

1      A.    My attorney.

2      Q.    Which attorney?

3      A.    Dan Struck.

4      Q.    And when did you communicate with Mr. Struck to

5   prepare for this deposition?

6      A.    Would you like each and every time I've spoken

7   with Mr. Struck?

8      Q.    Specifically to prepare for this deposition, yes.

9      A.    Yesterday.

10      Q.    Okay.  And was that in person or through some

11   other medium?

12      A.    It was in person.

13      Q.    And where did that occur?

14      A.    At his office.

15      Q.    And how long did that meeting last?

16      A.    I don't know the specific length of time.

17      Q.    Can you give me an estimate?

18      A.    An hour.

19      Q.    I'm sorry, an hour?

20      A.    Approximately.

21      Q.    Okay.  Was anyone else present?

22      A.    My general counsel.

23      Q.    That's Mr. Keogh?

24      A.    Yes, sir.

25      Q.    Any -- Have you communicated with anyone else or

**David Shinn - 10/21/2021**

1    Q.    Again, Director Shinn, I want to be very clear.

2  I'm not asking if you have information in front of you

3  in -- in the form of notes or other documents.  I'm asking

4  for your recollection.  So with that clarification, did

5  you instruct Centurion to reallocate existing Arizona

6  healthcare staff because there were healthcare vacancies

7  at certain facilities?

8    A.    As I've said, I was concerned about delivery of

9  the service for our inmate population.

10   Q.    Could you answer my question, please.

11   A.    Would you like me to agree with the statement

12  that you are making or would you like me to answer the

13  question?

14   Q.    I would like you to answer whether you instructed

15  Centurion to reallocate existing healthcare personnel

16  because there were vacancies in healthcare staff at

17  certain facilities.

18   A.    I requested Centurion to relocate personnel to

19  provide delivery of services to our inmate population and

20  meet their needs.

21   Q.    Okay.  In response to your instruction, how many

22  healthcare personnel were reallocated from one facility to

23  another?

24   A.    As I've said, sir, I don't have that information

25  in front of me and I cannot accurately and truthfully

1    respond to your question.

2        Q.   From which facilities were healthcare staff

3    reallocated?

4        A.   Once again, sir, I do not have that information

5    in front of me and I cannot accurately and truthfully

6    respond to your question.

7        Q.   To which facilities were healthcare staff

8    reallocated?

9        A.   Would you like me to repeat my previous answer,

10   sir?

11       Q.   I'm asking you a different question.  So I'd like

12   you to answer the question I just asked you.

13       A.   I do not have that information in front of me to

14   provide you a truthful, accurate answer.

15       Q.   Were any healthcare personnel reallocated from

16   one facility to another?

17       A.   Once again, sir, I don't have that information in

18   front of me to provide you a truthful and accurate answer.

19       Q.   Okay.  Tell me all the steps you took to ensure

20   that Centurion reallocated existing healthcare staff from

21   one facility to another.

22       A.   The evidence is in front of you in this exhibit.

23       Q.   Uh-huh.  Did you do anything else besides send

24   that one letter?

25       A.   It is an ongoing conversation that we have.

**David Shinn - 10/21/2021**

43

1    Beyond biweekly meetings and everything else, it is a

2    constant conversation that we've had.

3        Q.    So tell me everything you did besides send this

4    letter to ensure that Centurion reallocated healthcare

5    staff from one facility to another.

6                    MR. STRUCK:  Object to the form.

7                    THE WITNESS:  As I've stated, it is an

8    ongoing conversation that both I and the staff that I have

9    (indecipherable) to this project --

10                   THE COURT REPORTER:  I'm sorry, that you

11   have what to this project?

12                   THE WITNESS:  The staff that I have

13   dedicated from the department to provide medical services

14   to our inmate population.  Every single conversation

15   centers around delivery of service.

16       Q.   BY MR. FATHI:  Okay.  The second bullet you

17   instructed Centurion to temporarily transfer Centurion

18   healthcare personnel from other states to assist in

19   achieving compliance.  Is that correct?

20       A.    Yes, sir, that's what was stated in the document.

21       Q.    And is that in fact what you instructed

22   Centurion?

23       A.    It is literally --

24                   MR. STRUCK:  Object to the form.

25                   THE WITNESS:  -- in the document, sir.

David Shinn - 10/21/2021

44

1              MR. FATHI:   Uh-huh.

2              THE WITNESS:   That's correct.

3      Q.   BY MR. FATHI:   How many Centurion healthcare

4  personnel were temporarily transferred from other states

5  to Arizona?

6      A.   I don't have the information to provide you a

7  truthful and accurate answer.

8      Q.   Uh-huh.  Were any Centurion healthcare staff

9  temporarily transferred from other states to Arizona?

10     A.   As I said, sir, I don't have the information

11 present to truthfully and accurately respond to your

12 question.

13     Q.   All right.  The third bullet says that you

14 instructed Centurion to increase the use of telemedicine;

15 correct?

16     A.   Yes.

17     Q.   Did Centurion increase the use of telemedicine?

18     A.   Yes, they have.

19     Q.   At which facilities?

20     A.   I don't have the information in front of me to

21 truthfully and accurately respond to the question.

22     Q.   Uh-huh.  And in which specialties did Centurion

23 increase the use of telemedicine?

24     A.   Once again, sir, I don't have that specific

25 information in front of me to accurately and truthfully

1    respond to your question.

2         Q.   Uh-huh.  By how many FTEs did Centurion increase

3    the use of telemedicine?

4              MR. STRUCK:  Object to the form.

5              THE WITNESS:  I do not have the information

6    available to me at this moment to respond truthfully and

7    accurately to your question.

8         Q.   BY MR. FATHI:  And in the fourth bullet you

9    instructed Centurion to increase the use of overtime to

10   provide supplemental healthcare resources.  Is that

11   correct?

12        A.   Yes, sir.

13        Q.   Did Centurion increase the use of overtime?

14        A.   They have.

15        Q.   At which facilities?

16        A.   I don't have the specific information to respond

17   to that question.

18        Q.   And in what healthcare job classifications has

19   Centurion increased the use of overtime?

20        A.   In the delivery of healthcare services to our

21   inmate population.

22        Q.   No, I'm asking in which healthcare

23   classification.  So is it physicians?  Is it nurses?  Is

24   it psychiatrists?  Is it dentists?

25        A.   In all classes.

David Shinn - 10/21/2021

46

1     Q.   So your testimony is that Centurion has increased

2     the use of overtime in every single healthcare job

3     classification?

4     A.   For delivery of services, yes, sir.

5     Q.   And by how many FTEs has Centurion increased the

6     use of overtime?

7               MR. STRUCK:  Object to the form.

8               THE WITNESS:  As I previously stated, sir, I

9     don't have that information available to me to accurately

10    and truthfully respond to your question.

11    Q.   BY MR. FATHI:  And you also don't know at which

12    facilities Centurion has increased the use of overtime;

13    correct?

14    A.   I don't have that information available, no, sir.

15    Q.   In the fifth bullet you instructed Centurion to

16    continue daily facility-level meetings with ADCRR

17    leadership to report on compliance and discuss strategies

18    to improve/achieve compliance.

19               Is that correct?

20    A.   Yes.

21    Q.   Uh-huh.  At the time of this letter were all ten

22    facilities conducting these daily meetings between

23    facility leadership and Centurion healthcare leadership?

24    A.   I'm not aware.

25    Q.   And as we sit here today, are these -- are all

**David Shinn - 10/21/2021**

48

```
 1   so I have no knowledge of that.
 2        Q.   You said the wardens report to you that these
 3   meetings are happening daily at all ten facilities;
 4   correct?
 5        A.   They report through their chain of command, yes,
 6   sir.
 7        Q.   And are those written reports?
 8        A.   Those are verbal reports, sir.
 9        Q.   I see.
10             So nothing is ever written down; correct?
11             MR. STRUCK:  Form and foundation.
12             THE WITNESS:  The verbal report is a
13   non-written report, yes, sir.
14        Q.   BY MR. FATHI:  But your testimony under oath is
15   that these meetings are happening daily at all ten
16   facilities; correct?
17        A.   As I previously said, which is truthful and
18   accurate, yes.
19        Q.   Okay.  In the seventh bullet you instructed
20   Centurion to take all reasonable efforts to fill current
21   FTE vacancies to improve/achieve compliance in the
22   continuing months.
23             Did you do that?
24        A.   Yes.
25        Q.   What efforts did Centurion take to fill current
```

David Shinn - 10/21/2021

49

1   FTE vacancies?

2                MR. STRUCK:  Form and foundation.

3                THE WITNESS:  I do not have that information

4   with me, sir.

5       Q.   BY MR. FATHI:  Uh-huh.  How many vacancies were

6   filled?

7       A.   I do not have that information with me, sir.

8       Q.   Were any vacancies filled?

9                MR. STRUCK:  Form and foundation.

10               THE WITNESS:  As you have requested I have

11  nothing in front of me.  So I'm unable to answer that

12  question with any specificity.

13      Q.   BY MR. FATHI:  Director Shinn, I'm going to say

14  this again.  I am not asking if you have a document or

15  other source of information in front of you.  I understand

16  that you don't.  I'm asking for your recollection.  So let

17  me ask the question again.

18               How many vacancies were filled pursuant to

19  your instruction?

20               MR. STRUCK:  Form; foundation.

21               THE WITNESS:  As I have previously stated,

22  sir, I am under oath and I must provide truthful and

23  accurate information.

24               MR. FATHI:  Yes, you must.

25               THE WITNESS:  Minus the ability to review

David Shinn - 10/21/2021

53

 1  correct?

 2      A.    My testimony is I have read some reports.  I

 3  never instructed Centurion to submit those reports to me

 4  directly.  Part of the structure that we have set up in

 5  the department since my arrival is a multilevel system of

 6  review through our medical monitoring branch.  The

 7  assistant director is in charge of those efforts and can

 8  attest to much of what you're asking.

 9      Q.    You instructed Centurion to provide written

10  reports; correct?

11      A.    Yes, sir.

12      Q.    Right.  And my question, which I think is a

13  simple and straightforward one, is, have you ever

14  personally reviewed any of those reports?

15              MR. STRUCK:  Asked and answered.

16              THE WITNESS:  I will repeat my previous

17  testimony, which is truthful and accurate.  Yes, I have

18  reviewed some reports.

19      Q.    BY MR. FATHI:  In the ninth bullet you instructed

20  Centurion to seriously consider whether increased staffing

21  beyond the current vacant FTEs is warranted in an effort

22  to achieve performance measure compliance.

23              Did you do that?

24      A.    Yes.

25      Q.    So the department is -- is Centurion's client;

David Shinn - 10/21/2021

57

```
1            THE WITNESS:  I'm going to look away while
2    you're doing the scrolling there.
3        Q.   BY MR. FATHI:  Okay.  All done.
4            Director Shinn, have you seen this
5    January 14th, 2020, email from Tom Dolan before?
6        A.   No, I don't recall seeing it.
7        Q.   All right.  Mr. Dolan writes, quote, prior to
8    Parsons versus Shinn mediation Richard asked us to review
9    the staffing matrix and submit a staffing proposal without
10   budget constraints.  Attached is the proposal, end of
11   quote.
12            Why was Mr. Dolan sending this staffing
13   proposal to ADC?
14       A.   To be honest with you, I am not sure.
15       Q.   Uh-huh.
16       A.   I did not direct -- I believe Richard is
17   referring to an employee who is no longer with us.
18       Q.   And who was that?
19       A.   I don't recall his last name.
20       Q.   Uh-huh.  Did you direct Mr. Pratt to ask for this
21   proposal?
22       A.   No.
23       Q.   Were you aware that Mr. Pratt asked for this
24   proposal?
25       A.   No.
```

1     Q.   Did you review Centurion's proposal which is

2   attached to this email?

3     A.   No.

4          MR. FATHI:   Okay.   All right.   Let's scroll

5   down to the last page of the spreadsheet, please.

6          THE WITNESS:   I'm going to look away while

7   you're scrolling.

8     Q.   BY MR. FATHI:   All right.   Director Shinn, at the

9   bottom of this page -- Well, there are three columns:

10  contract FTE, recommended FTE, and FTE variance.

11         Do you see that?

12    A.   Yes.

13    Q.   Okay.   And the final line is -- is labeled total

14  contract versus recommended variance.

15         Do you see that?

16    A.   Yes.

17    Q.   Okay.   And the total contract FTE is 1052.75.

18         Do you see that?

19    A.   Yes.

20    Q.   And the recommended FTE is 1214.25.

21         Do you see that?

22    A.   Yes.

23    Q.   So this proposal was that staffing be increased

24  by 161.5 FTE positions; correct?

25    A.   That's what the document says, yes.

**David Shinn - 10/21/2021**

1    Q.   All right.  Was this recommended staff increase

2  done?

3                MR. STRUCK:  Object to the form; foundation.

4                THE WITNESS:  I'm not aware there was, no.

5    Q.   BY MR. FATHI:  Okay.  Why was it not done?

6    A.   I don't have the ability to appropriate

7  funding --

8    Q.   Uh-huh.

9    A.   -- to increase these.

10   Q.   Did you want to make these increases?

11               MR. STRUCK:  Object to the form and

12  foundation.

13               THE WITNESS:  As I said, sir, I didn't

14  request this.

15   Q.   BY MR. FATHI:  Okay.  Did you ask the legislature

16  to appropriate the money to pay for these additional

17  positions?

18   A.   I asked Centurion to comply with providing

19  delivery of services to our inmate population.  I was not

20  concerned about the number of FTEs that they had.  I was

21  simply concerned that services were provided as specified

22  in the contract.

23   Q.   All right.  Did you ask the legislature to

24  appropriate funds to pay for these additional positions?

25               MR. STRUCK:  Object to the form.

1              THE WITNESS:  I did not.
2       Q.   BY MR. FATHI:  Did you ask the governor to
3  request funds to pay for these additional positions?
4              MR. STRUCK:  Object to the form.
5              THE WITNESS:  I did not.
6       Q.   BY MR. FATHI:  Have any of these additional
7  recommended positions been added?
8       A.   I don't have access to their organizational table
9  and the number of positions that they have.
10      Q.   So you don't know how many positions are
11 currently provided for in the contract?
12      A.   As I said, sir, I don't have access to that
13 information.
14      Q.   When you said you don't have access to it you
15 mean you couldn't find it out if you wanted to?
16      A.   As we sit here today while I'm providing
17 testimony to you, no, sir.
18      Q.   Okay.
19      A.   You instructed me not to.
20      Q.   Okay.  But you don't know just as the director of
21 the department how many positions are provided for in the
22 Centurion contract?
23              MR. STRUCK:  Object to the form.
24              THE WITNESS:  As I've said, sir, I -- I am
25 not concerned with the number of positions.  What I am

**David Shinn - 10/21/2021**

61

1    concerned with is outcomes and performance.

2         Q.   BY MR. FATHI:  Uh-huh.  And I think you've

3    testified that you are satisfied with the outcomes and

4    performance delivered by Centurion.

5                   MR. STRUCK:  Object to the form; misstates

6    his testimony.

7                   THE WITNESS:  I previously answered that

8    question, sir.  And they have done some extraordinary work

9    under very difficult circumstances.

10        Q.   BY MR. FATHI:  And you are satisfied with their

11   performance?

12                  MR. STRUCK:  Object to the form.

13                  THE WITNESS:  As I've said, sir, they have

14   done some very extraordinary work under extremely

15   difficult circumstances.

16        Q.   BY MR. FATHI:  Are you satisfied with their

17   performance, yes or no?

18                  MR. STRUCK:  Object to the form.

19                  THE WITNESS:  They have done some

20   exceptional work, yes.

21        Q.   BY MR. FATHI:  Are you satisfied with their

22   performance, yes or no?

23                  MR. STRUCK:  Object to the form.

24                  THE WITNESS:  Yes, they have done some

25   exceptional work during a very difficult time and an

**David Shinn - 10/21/2021**

63

1      A.    That's what the document says, yes.

2      Q.    Okay.  Do you have any reason to doubt that this

3  document is accurate?

4      A.    I have not seen the document previously.

5            THE COURT REPORTER:  Was there an objection?

6      Q.  BY MR. FATHI:  Do you have any --

7            THE COURT REPORTER:  Excuse me, was there an

8  objection?

9            MR. STRUCK:  Yeah, object to the form.

10     Q.   BY MR. FATHI:  Director Shinn, this is a document

11  that's been produced by your counsel in this case.  Do you

12  have any reason to believe that this document is

13  inaccurate?

14            MR. STRUCK:  Form.

15            THE WITNESS:  I can -- I cannot attest to

16  the accuracy of it, as I have not seen it before.

17     Q.   BY MR. FATHI:  Okay.  So this document indicates

18  that as of August 2021 the contract calls for 1052.75

19  positions, FTE positions.  Do you agree with that?

20     A.    That's what the document says, sir.

21            MR. FATHI:  Okay.  And let's go back to

22  Exhibit 4.

23     Q.   BY MR. FATHI:  And Exhibit 4 indicates that as of

24  January 2020 the contract also called for 1052.75 FTE; is

25  that correct?

David Shinn - 10/21/2021

64

1      A.   There is no date on this document for me to know
2   that it's January of 2020.
3                MR. FATHI:   Let's go back to the -- to the
4   email on the first page of Exhibit 4.
5      Q.   BY MR. FATHI:   Do you see the date there,
6   1/14/2020, Director Shinn?
7      A.   I do.
8      Q.   And do you see that in his email Tom Dolan says
9   attached is the proposal?
10               Do you see that?
11     A.   Yes.
12     Q.   Okay.   So do you have any reason to doubt that
13   the attached proposal is dated January of 2020?
14               MR. STRUCK:   Object to the form.
15               THE WITNESS:   If that's what you're telling
16   me.
17               MR. FATHI:   Okay.   So let's go down to the
18   last page of Exhibit 4.   I'm sorry, the penult -- Yes,
19   there we are.
20     Q.   BY MR. FATHI:   So this document indicates that in
21   January of 2020 the total contract FTE was 1052.75;
22   correct?
23     A.   Yes.
24     Q.   Okay.   So that means that between January of 2020
25   and August of 2021 not a single additional FTE has been

David Shinn - 10/21/2021

65

1    added to the contract; is that correct?

2         A.    The numbers are the same, that's correct.

3         Q.    Uh-huh.   When you said --

4         A.    What this document does not show is the number of

5    filled FTEs.

6         Q.    Understood.   I'm talking about the contract.

7         A.    The contract has no impact generally on

8    performance.   It's a number of filled positions that are

9    front line providing services each day.

10        Q.    Uh-huh.

11        A.    That has a far greater impact on performance and

12   outcomes.

13        Q.    So it's your testimony that the number of FTEs

14   provided for in the contract has no impact on the delivery

15   of healthcare services?

16             MR. STRUCK:   Object to the form.

17             THE WITNESS:   It is not the sole factor that

18   impacts contract performance.

19        Q.    BY MR. FATHI:   Uh-huh.   It is a factor, isn't it?

20        A.    It is a factor, one of many factors that impact

21   contract performance.

22             Actually the document that I wrote to

23   Centurion provides them opportunities to use many factors

24   on contract performance.   It is, in fact, a strategy for

25   success.   And it doesn't focus solely on the number of

1  FTEs.  There's a number of factors that can be addressed

2  without adding a single FTE to the contract.  This is but

3  one of many strategies, as you showed me from that

4  document, that would achieve success.

5      Q.    Okay.  But you agree that these documents show

6  that between January of 2020 and August of 2021 there were

7  no additions, not a single FTE was added to the contract;

8  is that correct?

9      A.    Yes, I agree to that but as I have also said, it

10  does not show the number of positions filled.

11              MR. FATHI:  All right.  Well, let's go to

12  Exhibit -- let's go back to Exhibit 5.

13      Q.   BY MR. FATHI:  So on the last page of Exhibit 5

14  there's a column labeled contract FTE and then hired FTE;

15  correct?

16      A.   Yes.

17      Q.   Uh-huh.  And would you agree that the column that

18  says hired FTE is what you were talking about earlier, the

19  number of staff who are actually in place delivering

20  healthcare services?

21              MR. STRUCK:  Object to the form.

22              THE WITNESS:  Yes, I'm talking about the

23  number of actual employees who are hired and performing

24  work.

25      Q.   BY MR. FATHI:  Uh-huh.  So this document shows

1    that out of 1052.75 positions there were 894.94 FTEs

2    actually working; correct?

3        A.    It says hired and contracted, yes, sir.

4        Q.    Okay.   So that means that 157.81 FTEs were not

5    filled; correct?

6                    MR. STRUCK:   Object to the form.

7                    THE WITNESS:   I don't have the math, but it

8    shows a difference between hired and contracted, yes.

9        Q.    BY MR. FATHI:   And the figure it gives is 157.81

10   FTEs; correct?

11       A.    I don't see that, but I -- as I said, I don't --

12       Q.    It's in the lower right-hand corner of the

13   document, 157.81.

14       A.    Yes, I see that.

15                   MR. FATHI:   Okay.   Let's go back to

16   Exhibit 3, please.   Paragraph 46, please.

17       Q.    BY MR. FATHI:   In Paragraph 46 you write, quote,

18   I am further aware that the Court was critical of

19   Amendment 10 of the Corizon contract, which provided a

20   $5,000-a-month sanction for noncompliant HCPMs, end of

21   quote.

22               Do you see that, Director Shinn?   Do you see

23   those words?

24       A.    I'm reading it.

25               Yes.

1               Who did negotiate the Centurion contract?

2      A.   I wasn't present for those negotiations, sir.

3      Q.   So you don't know?

4      A.   I do not.

5      Q.   Why was the decision made to cut the monthly

6  sanction from $5,000 to $500?

7      A.   As I have said, I was not present and I am

8  unaware of who negotiated those -- either of those

9  contracts.

10     Q.   Yeah.  My question, though, was, why was the

11  decision made to cut the sanction from $5,000 to $500?

12               MR. STRUCK:  Foundation.

13               THE WITNESS:  As I have said, sir, I was not

14  involved in contract negotiations, strategy, any of those

15  things.  And I cannot truthfully and accurately attest to

16  any reason for these contracts.

17     Q.   BY MR. FATHI:  Uh-huh.  Do you think it was a

18  good decision to cut the monthly sanction from $5,000 to

19  $500?

20               MR. STRUCK:  Object to the form.

21               THE WITNESS:  I am unaware of the reasons

22  that that would have been done.

23     Q.   BY MR. FATHI:  Uh-huh.  Was that a smart business

24  decision?

25               MR. STRUCK:  Object to the form.

1   the contract would you cut the sanction from 5,000 to

2   $500?

3              MR. STRUCK:  Object to the form.

4              THE WITNESS:  As I've said, sir, there's a

5   number of factors to be determined in negotiating a

6   contract.  This is one of hundreds of factors to be

7   considered.  And it does not solely have the -- an impact

8   on the outcome of the performance.

9       Q.   BY MR. FATHI:  Uh-huh.  Does cutting the sanction

10  from 5,000 to $500 encourage Centurion to comply?

11             MR. STRUCK:  Object to the form.

12             THE WITNESS:  I'm not a Centurion employee,

13  sir, and I don't know their business strategy.  I -- I

14  cannot answer that question.

15      Q.   BY MR. FATHI:  Uh-huh.  Do you have any interest

16  in Centurion complying with its contract with the

17  department?

18      A.   Every single day since my arrival I have been

19  focused on their compliance with the contract.  Not a

20  single day has elapsed when I have not been concerned with

21  that very fact or we would not be sitting here today.

22      Q.   Okay.  Paragraph 49 on the same page, you're

23  referring to the Centurion contract and you write, quote,

24  significantly, there is no longer a cap on the amount of

25  noncompliance sanctions, and there also is no "incentive

David Shinn - 10/21/2021

73

1   payment" for compliance, end of quote.

2                  Do you see that language?

3      A.   I'm sorry, which paragraph?

4      Q.   Paragraph 49.

5      A.   Yes.

6      Q.   As we sit here today, is that still true?

7      A.   I don't have the specific contract in front of

8   me.

9      Q.   So you don't know?

10     A.   I don't have that information in front of me,

11  sir.

12                  MR. FATHI:  Let's go to Exhibit 6, please.

13     Q.   BY MR. FATHI:  Director Shinn, how many official

14  email addresses do you have?

15     A.   One.

16     Q.   And what is that?

17     A.   Dshinn@azadc.gov.

18     Q.   Uh-huh.  And the reason I ask is because this

19  email -- let's go back to the first page -- is sent from

20  directoroffice@azadc.gov.

21                  Do you see that?

22     A.   I do.

23     Q.   Is that an email that you sometimes use?

24     A.   I don't personally use that, no.  My personal

25  email address is dshinn@azadc.gov.  There is also a

1          You wrote those words, Director Shinn?

2     A.    Yes, I did.

3     Q.    In January 2021 when you wrote this letter did

4  you believe that the high CO vacancy rate at Eyman posed

5  safety and security risks to staff and inmates?

6     A.    It is one aspect that (indecipherable) absolutely

7  does, yes, sir.

8     Q.    Do you believe --

9               THE COURT REPORTER:  I'm sorry.  I'm sorry,

10  wait a minute.  It is one aspect that what?

11              THE WITNESS:  That absolutely does.  Yes.

12     Q.    BY MR. FATHI:  Do you believe that today the CO

13  vacancy rate at Eyman poses safety and security risks to

14  staff and inmates?

15              MR. STRUCK:  Form.

16              THE WITNESS:  If left unchecked with no

17  other resolutions it can.  However, we are providing other

18  resolutions internally within the department's resources.

19     Q.    BY MR. FATHI:  Well, I'm asking you as of today,

20  do you believe that the high CO vacancy rate at Eyman

21  poses safety and security risks to staff and inmates?

22              MR. STRUCK:  Form.

23              THE WITNESS:  As I previously answered, sir,

24  yes, if left unchecked with no other resources diverted

25  through the department it can.  However --

1    considered with the deactivation of Florence.  It is one

2    of many factors.  And there are plenty of public documents

3    that are available to describe the reasons for

4    deactivation of Florence.  Among which are redeployment of

5    both correctional officers and medical staff, yes, sir.

6        Q.   BY MR. FATHI:  So you stand by your sworn

7    statement that the decision to close Florence was made in

8    response to the Court's OSC order; correct?

9                MR. STRUCK:  Asked and answered; form.

10               THE WITNESS:  It is in response to a body of

11   orders, yes, sir.

12       Q.   BY MR. FATHI:  Which orders are those?

13       A.   As --

14               MR. STRUCK:  Form.

15               THE WITNESS:  -- I have answered for you

16   more than one time, there were many orders, sir.

17       Q.   BY MR. FATHI:  Uh-huh.  What were the dates?

18               MR. STRUCK:  Foundation.

19               THE WITNESS:  As I said, sir, there are many

20   orders that have happened in this case since its

21   inception.

22       Q.   BY MR. FATHI:  Yeah.  And what are the dates of

23   the orders that you're referring to in Paragraph 57?

24               MR. STRUCK:  Foundation; form.

25               THE WITNESS:  As I've said, sir, it is a

David Shinn - 10/21/2021

92

1  performance measures that had been terminated by the

2  Court?

3       A.   That would be a contract decision from our chief

4  procurement officer.

5       Q.   And what is that person's name?

6       A.   Currently it is Denel Pickering.

7       Q.   Uh-huh.  And she is an employee of the Arizona

8  Department of Corrections, Rehabilitation and Reentry?

9       A.   Yes, sir.

10      Q.   So you're ultimately her boss?

11      A.   I'm ultimately everyone's boss.  Yes, sir.

12      Q.   Okay.  So did you approve of this decision to no

13  longer impose graduated rate offsets for these performance

14  measures?

15      A.   I was not involved in that decision, no, sir.

16      Q.   Did you know of this decision before I just drew

17  it to your attention?

18      A.   There are many decisions that have been made over

19  the course of this contract.  This is one of many.

20      Q.   Can you answer my question, please.

21      A.   Not specifically, no.

22      Q.   So you were not aware of this decision until I

23  just drew it to your attention?

24               MR. STRUCK:  Form.

25               THE WITNESS:  As I've said, sir, there have

David Shinn - 10/21/2021

93

```
 1    been many decisions which have been made over the course
 2    of this contract and -- and this litigation.
 3        Q.   BY MR. FATHI:  Were you aware of this decision to
 4    stop imposing graduated rate offsets for retired
 5    performance measures before I just drew it to your
 6    attention?
 7                  MR. STRUCK:  Object to the form.
 8                  THE WITNESS:  As I said, sir, I was not
 9    involved in that decision.
10        Q.   BY MR. FATHI:  All right.  Why was the decision
11    made to discontinue sanctioning Centurion for these
12    performance measures?
13                  MR. STRUCK:  Form; foundation.
14                  THE WITNESS:  As I said, sir, I was not
15    involved in the decision and I cannot provide you that
16    information.
17        Q.   BY MR. FATHI:  Do you believe that reducing these
18    sanctions would encourage Centurion to come into
19    compliance?
20                  MR. STRUCK:  Object to the form.
21                  THE WITNESS:  I was concerned with outcome
22    measures and providing those delivery of services to the
23    inmate population, not sanctions.
24        Q.   BY MR. FATHI:  Do you believe that reducing the
25    sanctions on Centurion would encourage them to come into
```

1          MR. STRUCK:  Form and foundation.

2          THE WITNESS:  It was part of the final

3   negotiation, sir.

4     Q.   BY MR. FATHI:  Did you believe that capping

5   Centurion's liability would bring them into compliance?

6     A.   I was not involved with the negotiation, sir.

7     Q.   Do you think it was a smart business decision to

8   agree to a $2 million cap on Centurion's liability?

9          MR. STRUCK:  Form and foundation.

10          THE WITNESS:  It was part of the contractual

11   negotiations to get to where we are today, yes, sir.

12     Q.   BY MR. FATHI:  Uh-huh.  So it was a smart

13   business decision.

14          MR. STRUCK:  Form.

15          THE WITNESS:  Those are your words, sir, not

16   mine.

17     Q.   BY MR. FATHI:  No.  I'm asking you, was it a

18   smart business decision?

19          MR. STRUCK:  Form.

20          THE WITNESS:  If you want me to agree with

21   you, I don't think that that's appropriate.  However, as I

22   said, it was part of the contract negotiations to get to

23   where we are today, to provide community standard, quality

24   healthcare to our inmate population, yes, sir.

25     Q.   BY MR. FATHI:  Uh-huh.  Did Centurion threaten to

**David Shinn - 10/21/2021**

1          MR. STRUCK:  I didn't object on that one.

2      Q.   BY MR. FATHI:  Were you worried that if you

3  didn't give them more money and cap their liability that

4  Centurion would exit the contract?

5          MR. STRUCK:  Form and foundation.

6          THE WITNESS:  No, sir.

7      Q.   BY MR. FATHI:  Now, Centurion is the department's

8  third private healthcare vendor since 2012; correct?

9      A.   I have been involved since 2019.  And I can't

10  attest to previous vendors, sir.

11     Q.   You don't know?

12     A.   I do not.

13     Q.   And the healthcare for the department was

14  privatized by State legislation; correct?

15     A.   I wasn't involved during that period of time,

16  sir.

17     Q.   So you don't know?

18     A.   No, I don't.

19     Q.   Have you read the report by the Court expert,

20  Dr. Marc Stern?

21     A.   No, sir.

22     Q.   Are you aware that Dr. Stern recommended that the

23  privatization law be rescinded?

24          MR. STRUCK:  Form; foundation.

25          THE WITNESS:  I am aware of Dr. Stern's

**David Shinn - 10/21/2021**

1    A.   Yes, it appears to be.

2              MR. FATHI:  All right.  Let's go down to the

3    bottom of the first page.

4    Q.   BY MR. FATHI:  Okay.  At the bottom of the first

5    page of this letter you write, quote, at the hard to fill

6    prison locations -- ASPC Florence, ASPC Eyman, and ASPC

7    Winslow -- the vacancy rates range from 20 -- 20.94

8    percent to as 37.75 percent.  Daily operational strength

9    at the Florence and Eyman prisons is frequently between 40

10   and 50 percent, end of quote.

11             Did you write those words, Director Shinn?

12   A.   Yes, sir.

13   Q.   Why was the operational strength at Florence and

14   Eyman frequently between 40 and 50 percent?

15   A.   If you were to look solely at the personnel

16   assigned to those locations, that's where it lies.  But as

17   I have previously testified, we look at our workforce in

18   its totality and adjust the workforce to the needs of

19   those locations, to (indecipherable) --

20             THE COURT REPORTER:  I'm sorry, to augment?

21             THE WITNESS:  Yes, to augment the workforce.

22   I apologize.

23   Q.   BY MR. FATHI:  So what you wrote here is that at

24   Eyman and Florence between 40 and 50 percent of the CO

25   positions were actually filled; is that correct?

David Shinn - 10/21/2021

136

1      A.   The assigned COs to that location, yes, sir.

2      Q.   Okay.  And then in the same -- in the next

3 paragraph you write, quote, these same prison complexes

4 contain high custody level populations wherein high CO

5 vacancy rates cause additional operational strain,

6 contribute to unsafe working conditions for staff, and

7 unsafe living conditions for inmates and curtail access to

8 inmate programming, end of quote.

9           Did you write those words, Director Shinn?

10     A.   Yes, sir.

11     Q.   And did you believe them when you wrote them?

12     A.   I wouldn't have written them if I didn't believe

13 them.

14     Q.   Uh-huh.  What does operational strain mean?

15     A.   The labor-intensive process of moving inmates

16 from one place to another, many of the other things which

17 go on.

18     Q.   Uh-huh.  And when you say that the shortages or

19 high vacancy rates curtail access to inmate programming,

20 what does that include?

21     A.   If left unchecked and resources are not diverted

22 from other locations, it reduces the capacity to provide

23 some of those programs.

24     Q.   Does it reduce the capacity to provide

25 out-of-cell time?

1       A.    It may potentially reduce that capacity, yes,

2    sir.

3       Q.    Does it reduce the --

4             Sorry.

5       A.    I -- Along with a number of other factors.  Over

6    the past two years, the one thing that we have not

7    discussed at all is the impact of COVID and out-of-cell

8    time and programming.  One of our greatest needs during

9    that period of time was preservation of life.  That far

10   exceeds out-of-cell time, any other programming, anything

11   else.  And that's one of the things that has not been part

12   of this discussion today, which is extremely relevant to

13   both.

14      Q.    Well, you will certainly have an opportunity to

15   talk about that at -- at trial.

16            Director Shinn, are you aware of vacancies

17   in custody staff ever resulting in delays or cancellation

18   of medical care?

19      A.    No.

20      Q.    Never happened?

21      A.    No.

22      Q.    Are you aware of vacancies in custody staff ever

23   resulting in delays or cancellation of mental health care?

24      A.    No.

25      Q.    Are you aware of vacancies in custody staff ever

David Shinn - 10/21/2021

1        THE WITNESS:  Overall staffing throughout
2   the department actually was significantly improved during
3   that period of time.

4        Q.   BY MR. FATHI:  Are you sure about that?

5        A.   Yes, sir.  Upon my arrival we had somewhere in
6   the neighborhood of 1,400 vacancies.  During this period
7   of time our vacancies were reduced to right around 1,000,
8   1,015.

9        Q.   But again, Director Shinn, you're not answering
10  my question.  My question is, why was there little or no
11  improvement between your September 17th, 2020, letter and
12  your November 25th, 2020, letter?

13        MR. STRUCK:  Object to the form.

14        THE WITNESS:  We're talking about two
15  separate issues.  You are referring to specific locations
16  and as I mentioned, we manage our workforce in its
17  totality.  So if I have additional officers at other
18  locations I can deploy those officers to Eyman and
19  Florence.

20        Q.   BY MR. FATHI:  Uh-huh.  But as of November 25th,
21  2020, daily operational strength at the Florence and Eyman
22  prisons is frequently between 40 percent and 50 percent;
23  correct?

24        A.   Yes, if we're relying on solely by the staff
25  available at those locations.  However, as I mentioned, we

1    approach this from a total workforce rather than just the

2    available boots on the ground at those locations.

3        Q.   So why did you give this figure of 40 to

4    50 percent to the legislature?

5        A.   Because it is reality at those locations.  Would

6    we like to not have to send folks from other locations to

7    these?  Certainly.  But we're not simply going to stop

8    because we don't have resources.  We will do everything

9    humanly possible to provide resources to these locations.

10                MR. FATHI:  All right.  Exhibit 14.

11       Q.   BY MR. FATHI:  Director Shinn, Exhibit 14 is a

12   January 28th, 2021, letter from you to David Gowan and

13   Regina Cobb; is that correct?

14       A.   Yes.

15                MR. FATHI:  And can we scroll down to the

16   bottom of the first page.

17       Q.   BY MR. FATHI:  And the final paragraph on this

18   page, the first page of Exhibit 14, is essentially

19   identical to the language in your September 17th, 2020,

20   and your November 25th, 2020, letters; correct?

21       A.   Very similar, yes.

22       Q.   Yeah.  So there have not been any significant

23   improvements between September 17th, 2020, and

24   January 28th, 2021; correct?

25                MR. STRUCK:  Object to the form.

David Shinn - 10/21/2021

141

1           THE WITNESS:  As I mentioned, if you are

2     looking at individual locations, that is accurate.  If you

3     are looking at the picture in its totality, that is not

4     accurate.

5           MR. FATHI:  Exhibit 15.

6     Q.   BY MR. FATHI:  Director Shinn, Exhibit 15 is a

7     document produced by your attorneys in this case called

8     weekly CO status hiring report, ASPC Lewis August 23rd,

9     2021.

10          Do you see that?

11    A.   I can see the top but the body is far too small

12    to see.

13    Q.   Okay.  Is that better?

14    A.   No, still the same size.

15          That is better.

16          MR. FATHI:  All right.  Could we move a

17    little bit to the right, please.

18    Q.   BY MR. FATHI:  So this shows that as of

19    August 23rd, 2021, at this Lewis complex the vacancy rates

20    of the different units ranged from a low of 16 point --

21    I'm sorry -- a low of 15.87 percent to a high of

22    61.76 percent.

23          Do you see that?

24    A.   Yes.

25    Q.   Uh-huh.  Have these numbers changed appreciably

David Shinn - 10/21/2021

143

1      Q.   BY MR. FATHI:  So according to the column titled
2  hiring vacancy percent, this shows that the vacancy rates
3  at the various living units at Eyman on August 23rd, 2021,
4  range from a low of 30.71 percent to a high of
5  48.24 percent.  Do you agree?
6      A.   Yes.
7      Q.   Okay.  Have these numbers changed appreciably
8  since August 23rd, 2021?
9      A.   I don't have the data to compare it to, sir.
10     Q.   Do you have any reason to believe these numbers
11  have changed appreciably since August 23rd, 2021?
12              MR. STRUCK:  Form and foundation.
13              THE WITNESS:  Minus the data to compare it
14  to, sir, I cannot provide you a truthful or accurate
15  testimony.
16     Q.   BY MR. FATHI:  Do CO shortages at the max-custody
17  facilities sometimes affect the ability to provide
18  out-of-cell recreation and programming for prisoners in
19  max custody?
20     A.   Correctional officer vacancies, if we rely solely
21  on the numbers at one location, can.  As I have testified
22  already, we don't rely solely on that information.  We
23  move correctional officers from other locations to
24  supplement and support the lack of officers at that
25  location.

David Shinn - 10/21/2021

145

1      Q.    Director Shinn, there's an ADC policy that a
2  person entering prison with a life sentence must spend the
3  first two years in max custody; is that correct?
4      A.    I believe so, yes.
5      Q.    What's the penological justification for that
6  policy?
7                  MR. STRUCK:   Object to the form; foundation.
8                  THE WITNESS:   I don't have that information
9  with me, sir.
10      Q.   BY MR. FATHI:  If a person followed all the rules
11  and regulations, participated in programs, consistently
12  demonstrated positive social behavior, is there a
13  penological justification for keeping that person in max
14  custody for three years?
15                  MR. STRUCK:   Object to the form and
16  foundation.
17                  THE WITNESS:   We are looking for every
18  opportunity for that individual to earn their way to lower
19  custody levels, yes.
20      Q.   BY MR. FATHI:  Could you answer my question,
21  please.
22      A.    I just did.
23      Q.    If a person has followed all the rules and
24  regulations, participated in programs, consistently
25  demonstrated positive social interaction for three years,

1          THE WITNESS:  As I said, sir, based on the

2     threat to that individual, the classification team

3     responds to create a safe environment to preserve their

4     safety and their life.

5          Q.   BY MR. FATHI:  And if the classification team

6     disagrees among themselves, who makes the final decision?

7          A.   Whoever is leading that team, sir.

8          Q.   Okay.  And where is the term depicted as heinous

9     defined?

10         A.   I'm sure the Webster's dictionary or other

11    sources can be used to describe heinous, sir.  I'm not an

12    expert on the individual language.

13         Q.   So it's not defined by ADCRR; correct?

14         A.   It's defined by common sense, sir.

15         Q.   So what sort of guidance does the head of the

16    classification team receive in how to decide whether a

17    crime is or is not depicted as heinous?

18              MR. STRUCK:  Object to the form.

19              THE WITNESS:  As I've said, sir, it's an

20    assessment of the threat from the general population to

21    that individual based on the crime that was committed and

22    our concern for their safety and preservation of their

23    life.

24         Q.   BY MR. FATHI:  And show me if you would where in

25    Paragraph 5.4.4.1 it talks about the threat to the

1      A.    I don't see that in front of me, sir.

2      Q.    I'm just asking, do you know that?

3      A.    There are -- by the definition, there are

4  incentives, yes, sir.

5      Q.    So DO 812 sets forth a step program and incentive

6  program for prisoners in max custody; is that right?

7      A.    As I said, sir, I don't have the details in front

8  of me, but by the definition of the policy it does include

9  incentives, yes, sir.

10              MR. FATHI:  All right.  Let's go to

11  Section 5.5, please.

12      Q.    BY MR. FATHI:  Section 5.5 reads, quote, inmates

13  who have maintained Step III for a minimum of 30

14  consecutive days without incident are eligible for

15  consideration for placement in a close-custody housing

16  location, end of quote.

17              Did I -- did I read that right, Director

18  Shinn?

19      A.    Yes, sir.

20      Q.    How many people in max custody right now have

21  been there in Step III for 30 days?

22              MR. STRUCK:  Form and foundation.

23              THE WITNESS:  I don't have that data to

24  accurately respond to your question, sir.

25      Q.    BY MR. FATHI:  How many people in max custody

David Shinn - 10/21/2021

159

1   right now have been at Step III for 180 days?

2                   MR. STRUCK:   Form and foundation.

3                   THE WITNESS:  Once again, sir, I don't have

4   information sufficient to respond to your question

5   truthfully and accurately.

6       Q.   BY MR. FATHI:  How many people in max custody

7   right now have been at Step III for one year?

8                   MR. STRUCK:   Form and foundation.

9                   THE WITNESS:  I don't have that information

10  to respond truthfully and accurately to your question,

11  sir.

12      Q.   BY MR. FATHI:  Does anybody have that

13  information?

14      A.   Absolutely, but they are not with me and I have

15  been instructed by you to not speak to anyone or review

16  any documents during this deposition.

17      Q.   Director Shinn, that is not correct.  I think if

18  you review the transcript, I -- those instructions apply

19  only to while we are on the record.  And, again, it was

20  certainly not me who instructed you not to review any

21  documents in preparation for your deposition.

22      A.   So I have access to all this information with one

23  phone call.  If you'd like me to make the phone call, I

24  can have that information for you in minutes.

25      Q.   Uh-huh.

1            MR. STRUCK:  Form and foundation.

2            THE WITNESS:  As I said, sir, the

3    information is available.  The form is irrelevant.

4       Q.   BY MR. FATHI:  It's not irrelevant to me,

5    Director Shinn, and I'd be very grateful if you would

6    answer my question.

7            Other than looking at individual prisoner's

8    files, is there any way to know how many people have been

9    on Level III for 180 days, yes or no?

10           MR. STRUCK:   Foundation.

11           THE WITNESS:   It is available in the

12    individual file, yes, sir.

13       Q.   BY MR. FATHI:  Is it available in any other

14    format?

15       A.   Not that I'm aware of at this moment because I do

16    not have access to that information, which you have

17    precluded me from having access to.

18       Q.   That is false, as we have discussed many times,

19    Director Shinn.

20           MR. STRUCK:  Hey, David, we're going to take

21    a break right now.  It's been about 45 minutes.  We have

22    had some food delivered, so we need about 15 minutes.

23           MR. FATHI:  Okay.

24           MR. STRUCK:  And then we'll be back.

25           MR. FATHI:  All right.  Bon appétit.

David Shinn - 10/21/2021

1      A.   Can you scroll to that portion, please?

2      Q.   Is this what you were talking about,

3   Director Shinn?

4      A.   Yes, sir.

5      Q.   Okay.  For the record, this is Page 5 of the

6   letter.

7      A.   It shows where the compensation for correctional

8   officers stand among the law enforcement agencies within

9   the State.

10      Q.   And I'm sorry, my question was, why -- why do

11   23 percent of COs leave the agency during their first year

12   of service.  And you think that it has to do with

13   compensation?

14      A.   It's a pretty basic math equation when it comes

15   to the chart that we're looking at presently.

16      Q.   Uh-huh.

17           MR. FATHI:  All right.  Let's go back to

18   Page 4.

19      Q.   BY MR. FATHI:  So under the 23 percent figure

20   under the heading significant factors cited for leaving,

21   9 percent cited that compensation was not competitive.

22           Director Shinn, do you still think that

23   compensation is the main reason why 23 percent leave the

24   agency during their first year of service?

25      A.   Yes, sir, I do.

1      Q.    Uh-huh.

2      A.    I have literally seen the signs outside of our

3   academy and at other locations throughout the State by our

4   16 facilities that say -- from sheriff's departments and

5   other sources -- we will hire you immediately once you

6   clear your COTA, our (indecipherable).

7      Q.    Uh-huh.  Have you directed --

8              THE COURT REPORTER:  I'm sorry, I'm sorry,

9   wait a minute.  Once you clear your COTA, and what?

10             THE WITNESS:  COTA, which is our

11   correctional officer training academy.

12             MR. FATHI:  C-O-T-A.

13     Q.    BY MR. FATHI:  Director Shinn, have you directed

14   anyone in the department to do an analysis of why

15   23 percent of COs leave the agency during their first year

16   of service?

17     A.    As I said, sir, it is very evident from the

18   compensation and where we stand within the State.  The

19   struggle to not hire, because we hire 12- to 1,300

20   correctional officers a year, but to retain those folks

21   when other agencies simply offer more.  Much like the

22   challenge right now in the healthcare industry between

23   State service and everyone else.

24     Q.    Uh-huh.  I understand that that's your belief,

25   but my question is, have you directed anyone in the

1  valuable resources on a futile project, sir.

2      Q.   Do you think it's a problem that 23 percent leave

3  during their first year?

4              MR. STRUCK:  Object to the form.

5              THE WITNESS:  I believe absolutely, yes.  We

6  would like to do better when it comes to that part.

7      Q.   BY MR. FATHI:  Okay.  Let's go back to talking

8  about max custody.

9              How many people in max custody right now are

10  there due to an override?

11     A.   As I previously said before the break, sir, I do

12  not have that data to provide you an accurate and truthful

13  answer.

14     Q.   What proportion of people in max custody right

15  now are there due to an override?

16             MR. STRUCK:  Form and foundation.

17             THE WITNESS:  As I previously answered, sir,

18  and you asked, I don't have the data to provide you a

19  truthful and accurate answer.

20     Q.   BY MR. FATHI:  Do you have any idea?

21     A.   As I will repeat once again, sir, I don't have

22  the data to provide you a truthful and accurate answer.

23  And as I'm under oath, I don't want to be wrong.

24     Q.   I understand that, but I'm entitled to your

25  estimate -- your best estimate.

1                    So what is your best estimate of what

2    percentage of people in max custody right now are there

3    due to an override?

4         A.   As I said, sir, I am unable to estimate that and

5    provide you an answer to that question without data to

6    support it.

7         Q.   Uh-huh.  Director Shinn, have you ever reviewed

8    any decisions to keep a person in max custody as a result

9    of an override?

10        A.   I have previous in my career when I was a warden

11   and I was directly involved in those decisions.  I no

12   longer occupy that role and I have an exceptional team of

13   wardens throughout the state who fulfill that role for

14   this department.

15        Q.   Since you have been director of this department

16   have you ever looked at any decisions to keep a person in

17   max custody based on an override?

18        A.   As I said, sir, we have a phenomenal team of

19   wardens whose responsibility it is to make those decisions

20   on behalf of the department and they do an exceptional job

21   at that.

22        Q.   Uh-huh.  So the answer to my question is, no, you

23   have never reviewed the decision to keep someone in max

24   custody as a result of an override since you have been in

25   this position; correct?

1    A.    It is not my role, sir, as I've said several

2    times.

3    Q.    And so you have not done it?

4    A.    It is not my role, sir, that's correct.

5    Q.    If the facility warden and the central office

6    classification team have both decided that a person should

7    be removed from max custody, what's the penological

8    justification for keeping the person in max custody?

9              MR. STRUCK:  Form; foundation; improper

10    hypothetical.

11              THE WITNESS:  I believe you identified the

12    people who can provide justification for that, sir.

13    Q.    BY MR. FATHI:  No, but I'm asking you as the head

14    of the department.  If the warden --

15    A.    I --

16    Q.    Let me finish my question.

17    A.    Yes, sir.

18    Q.    If the warden of the facility and the central

19    office classification team have both decided that a person

20    should be removed from max custody, what is the

21    penological justification for keeping that person in max

22    custody?

23              MR. STRUCK:  Form; foundation; improper

24    hypothetical.

25              THE WITNESS:  Allow me to explain the

1          THE WITNESS:  Once again, sir, I don't deal
2    with what-ifs.  I deal with actual facts and individuals.
3    These are people.  These are important decisions that we
4    make and they are individualized based on the
5    characteristics and behavior of that individual and the
6    inmate population.
7       Q.   BY MR. FATHI:  If someone who had been cleared
8    for transfer to close custody remained in max custody for
9    six months because there wasn't a close-custody bed
10   available, would that concern you?
11          MR. STRUCK:  Form; foundation; improper
12   hypothetical.
13          THE WITNESS:  I would look at the individual
14   facts of that case and identify any causes.
15      Q.   BY MR. FATHI:  Is there any tracking as to
16   whether people who have been cleared for release from max
17   to close custody nevertheless remain in max custody due to
18   lack of a bed?
19          MR. STRUCK:  Form and foundation.
20          THE WITNESS:  As I've stated, sir, I don't
21   have that information.  But I could certainly point you in
22   the direction of folks who deal with those things on a
23   daily basis.
24      Q.   BY MR. FATHI:  My question is, is it tracked, yes
25   or no?

David Shinn - 10/21/2021

181

1    Q.   You're not providing an answer to my question,

2    Director Shinn.

3              MR. STRUCK:  Ask a question, David.

4              THE WITNESS:  If you don't like my answer,

5    sir, I'm sorry.  But I'm providing you a truthful and

6    accurate answer with the information that I have to

7    provide.

8    Q.   BY MR. FATHI:  Director Shinn, what are health

9    and welfare checks?

10   A.   As they state, health and welfare.  Are you still

11   alive and breathing?

12   Q.   Why are they done?

13   A.   For the purpose I just said, sir.  To make sure

14   that individual is still alive and breathing.

15   Q.   In max-custody units who performs the health and

16   welfare checks?

17   A.   Any employee who is present on that unit can

18   perform a health and welfare check.

19   Q.   So there are no minimum requirements as to what

20   kind of staff are required to perform health and welfare

21   checks?

22   A.   No, sir, anyone can do it.

23   Q.   Are you aware --

24   A.   (Indecipherable due to simultaneous crosstalk.)

25              THE COURT REPORTER:  I'm sorry, what?  Say

**David Shinn - 10/21/2021**

184

1    checks for people in restrictive housing?

2                    MR. STRUCK:  Form; foundation; asked and

3    answered.

4                    THE WITNESS:  It is a tenet of the business

5    that we perform to make sure people are still alive and

6    well in our custody.  It is unnecessary to specify the

7    minimum time frame.  There is no minimum time frame.  In

8    reality, we want to make sure people are constantly alive

9    and well.

10   Q.  BY MR. FATHI:  So your testimony is that the

11   department has no written policy regarding the required

12   frequency of health and welfare checks on people in

13   restrictive housing; is that right?

14                   MR. STRUCK:  Form; foundation; misstates

15   testimony.

16                   THE WITNESS:  As I said, sir, that is not my

17   testimony.  That is your assertion.

18   Q.  BY MR. FATHI:  Is there an ADCRR written policy

19   setting forth the required frequency of health and welfare

20   checks for people in restrictive housing, yes or no?

21                   MR. STRUCK:  Same objection; asked and

22   answered.

23                   THE WITNESS:  And as I said, sir, I do not

24   have that information in front of me and I do not want to

25   misrepresent or misstate under oath that information you

David Shinn - 10/21/2021

185

1    are asking.

2        Q.    BY MR. FATHI:  Okay.  You don't know.  That's

3    fine.

4                        What is OC spray, Director Shinn?

5        A.    It is pepper spray.

6        Q.    Uh-huh.  And what is pepper spray used for?

7        A.    It is a less lethal use of force option.

8        Q.    Uh-huh.  Does it result in pain?

9        A.    It can, yes, sir.

10       Q.    Have you ever been sprayed with pepper spray?

11       A.    I have.

12       Q.    Was it painful?

13       A.    It doesn't really have much of an effect on me at

14   this point and it's happened so frequently.

15                       THE COURT REPORTER:  What?  It's happened so

16   frequently?

17                       THE WITNESS:  Yes.

18       Q.    BY MR. FATHI:  Does the department track how much

19   OC spray it uses?

20       A.    No, sir.

21       Q.    Does the department track how much OC spray is

22   used at each facility?

23       A.    No, sir.

24       Q.    Does the department track how much OC spray is

25   used by each officer?

David Shinn - 10/21/2021

186

1    A.    No, sir.

2    Q.    Does the department track the number of times OC

3  spray is used in each housing unit?

4    A.    When -- Sorry.  When force is used, including

5  less lethal force, an (indecipherable).

6              THE COURT REPORTER:  I'm sorry, I need you

7  to repeat that.

8              THE WITNESS:  When force, including less

9  lethal force is used, an incident report and review is

10  conducted.

11   Q.    BY MR. FATHI:  Other than reviewing the

12  individual incident reports is there any way to know how

13  many times OC spray was used, say, in Browning unit in

14  September?

15   A.    No, sir.

16   Q.    Does the department specifically track the use of

17  OC spray on people on mental health watch?

18              MR. STRUCK:  Form.

19              THE WITNESS:  As I've stated, sir, every use

20  of force, including less lethal is tracked, but not by

21  specific mental or medical condition.

22   Q.    BY MR. FATHI:  Okay.  What does ADC policy

23  require in terms of video recording uses of force?

24              MR. STRUCK:  Foundation; form.

25              THE WITNESS:  There's two types of

David Shinn - 10/21/2021

188

```
 1   life or self-harm, it is not.
 2        Q.   Yeah, that wasn't my question, Director Shinn.
 3             Is there a policy that requires planned uses
 4   of force to be video recorded?
 5             MR. STRUCK:  Form; foundation.
 6             THE WITNESS:  As I said, sir, I don't have
 7   that information in front of me to provide an accurate --
 8        Q.   BY MR. FATHI:  Okay.  You don't know.
 9        A.   That's not my statement, sir.
10        Q.   What is your statement?
11        A.   Exactly what I just told you, sir.
12        Q.   Which is that you don't know.
13        A.   That is your --
14             MR. STRUCK:  Form.
15             THE WITNESS:  -- characterization, sir, but
16   that is not my answer.
17        Q.   BY MR. FATHI:  All right.  Well, I'm --
18        A.   I'm simply telling you I cannot under oath
19   accurately and truthfully testify to something without
20   having that information in front of me.  I don't believe
21   that this is intended as a memory test.  The policies
22   exist, but I don't have those in front of me and I don't
23   want to misstate something, particularly given the fact
24   that I'm under oath.
25        Q.   In your view as a correctional administrator
```

1    would it be good practice to have mental health try to

2    de-escalate the situation before using force?

3                    MR. STRUCK:  Form.

4                    THE WITNESS:  If the situation does not

5    involve self-harm or harm to others or preservation of

6    life, generally, yes.

7        Q.   BY MR. FATHI:  Since you have been director of

8    this department how many times has an officer been

9    disciplined in any way for his or her use of force?

10       A.   I don't have that information to respond to that

11   question, sir.

12       Q.   Has it ever happened since you have been

13   director?

14       A.   Yes.

15       Q.   Approximately how many times?

16       A.   As I said, sir, I can't answer that question.

17   With any --

18       Q.   I'm entitled to your best estimate.  Is it more

19   than a hundred times?

20       A.   I don't know, sir.  I don't have that information

21   in front of me.

22       Q.   So it could be more than a hundred times, is what

23   you are saying?

24                    MR. STRUCK:  Form; foundation.

25                    THE WITNESS:  I do not believe it's more

1   question so that we can have a clear record to take this

2   to the Court.

3                MR. STRUCK:  Well, let's hear what the

4   question is, but this doesn't have anything to do with the

5   upcoming trial.

6                MR. FATHI:  I respectfully disagree, Dan.

7   Let me --

8                MR. STRUCK:  (Indecipherable due to

9   simultaneous crosstalk.)

10                MR. FATHI:  Dan --

11                MR. STRUCK:  What's -- explain the

12   relevance.

13                MR. FATHI:  Dan, may I please ask my

14   question so that we can get your instruction not to answer

15   clearly on the record?

16                MR. STRUCK:  Explain your relevance.

17      Q.   BY MR. FATHI:  Director Shinn, at Lines 8 and 9

18   of this document Judge Silver writes that defendants,

19   quote, relied on the falsified compliance numbers, end of

20   quote.

21                My question is, did you open an

22   investigation into this matter?

23      A.   I will repeat that on advice of counsel I will

24   decline to answer that question.

25                MR. STRUCK:  You can answer that question.

**David Shinn - 10/21/2021**

198

1          THE WITNESS:  No, we did not.  This was a

2    misinterpretation issue and not an intentional or willful

3    misrepresentation of information.

4        Q.   BY MR. FATHI:  This was a misinterpretation by

5    Judge Silver?

6        A.   By our staff.

7        Q.   I see.

8             Director Shinn, does the name Pat Borden

9    mean anything to you?

10       A.   No.

11       Q.   Are you aware that Pat Borden, a former nurse at

12   the Phoenix facility, has alleged in the Arizona Republic

13   that she was instructed to falsify a document?

14       A.   No.

15       Q.   No?  Have you opened an investigation into that

16   matter?

17       A.   I don't have any information on that with me.

18       Q.   Uh-huh.  Are you planning to seek more

19   information now that I have presented this to you?

20            MR. STRUCK:  Object to the form and

21   foundation.

22            THE WITNESS:  If someone falsified

23   information, as we have found in the past, yes, we will.

24       Q.   BY MR. FATHI:  Are you planning to open an

25   investigation into this matter?

1    thousands, if not hundreds of thousands of matters, sir,

2    so I simply do not.

3         Q.   Uh-huh.  Hundreds of thousands of matters?

4         A.   Without a doubt, yes.

5         Q.   All right.  That is very impressive.

6         A.   Thank you.

7         Q.   Just one moment.

8              Director Shinn, you were also quoted in a

9    news story as saying that the -- the prison was actually

10   the safest place to be during COVID.

11             Do you remember that?

12        A.   I do recall making that statement, yes, sir.

13        Q.   Uh-huh.  As we sit here today do you still

14   believe that that is the case?

15        A.   Based on our recovery rate, which

16   exceeds 99 percent, I 100 percent believe the prison was

17   one of the safest places to be during this worldwide

18   pandemic of COVID, based on the evidence that we have been

19   able to accomplish.

20             MR. FATHI:  All right.  Well, I need to

21   reserve the right to call you back because we have not

22   been provided with a privilege log for documents that were

23   withheld that may be relevant to this depositions, but --

24   this deposition, but for now, we're finished.

25             Thank you, Director Shinn.

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF YAVAPAI       )

 3        BE IT KNOWN that the foregoing proceedings were
     taken before me; that the witness before testifying was
 4   duly sworn by me to testify to the whole truth; that the
     foregoing pages are a full, true, and accurate record of
 5   the proceedings, all done to the best of my skill and
     ability; that the proceedings were taken down by me in
 6   shorthand and thereafter reduced to print under my
     direction.
 7        I CERTIFY that I am in no way related to, nor
     employed by any of the parties hereto, and have no
 8   interest in the outcome thereof.

 9        [X] Review and signature was requested.
          [ ] Review and signature was waived.
10        [ ] Review and signature not requested.

11        I CERTIFY that I have complied with the ethical
     obligations set forth in ACJA 7-206(F)(3) and ACJA
12   7-206(J)(1)(g)(1) and (2).  Dated at Prescott, Arizona,
     this 25th day of October, 2021.

13

14

15                        _Jill Marnell_

16        _____
                        JILL MARNELL
17               Certified Reporter #50021
               Registered Professional Reporter

18          *     *     *     *     *     *

19        I CERTIFY that GLENNIE REPORTING SERVICES, LLC, has
     complied with the ethical obligations set forth in ACJA
20   7-206(J)(1)(g)(1) through (6).

21

22

23

24        _____
                 GLENNIE REPORTING SERVICES, LLC
                    Registered Reporting Firm
25                  Arizona RRF No. R1035
```

204

1                    SIGNATURE OF WITNESS

2

3      I, DAVID SHINN, the witness in the above deposition, do
    hereby certify that I have read the foregoing deposition,
4    and that the said deposition is a true and correct record
    of my testimony, with such corrections and changes, if
5    necessary, listed below.

6    _____
                         WITNESS

7    PAGE: LINE: SHOULD READ:          REASON FOR CHANGE:

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24   _____  _____  _____

25   _____  _____  _____

# EXHIBIT 14

IN  THE  UNITED  STATES  DISTRICT  COURT

IN  AND  FOR  THE  DISTRICT  OF  ARIZONA


VICTOR PARSONS; SHAWN JENSEN;          )
STEPHEN SWARTZ;DUSTIN BRISLAN;         )
SONIA RODRIGUEZ; CHRISTINA             )
VERDUZCO; JACKIE THOMAS; JEREMY        )
SMITH; ROBERT GAMEZ; MARYANNE          )
CHISHOLM; DESIREE LICCI; JOSEPH        )
HEFNER; JOSHUA POLSON; and             )
CHARLOTTE WELLS, on behalf of          )
themselves and all others             )
similarly situated; and ARIZONA       )
CENTER FOR DISABILITY LAW,             )
                                       )
                Plaintiffs,            )
                                       )Case No.
v.                                     )CV 12-00601-PHX-ROS
                                       )
DAVID SHINN, DIRECTOR, ARIZONA         )
DEPARTMENT OF CORRECTIONS,             )
REHABILITATION AND REENTRY; and        )
LARRY GANN, ASSISTANT DIRECTOR,        )
MEDICAL SERVICES CONTRACT              )
MONITORING BUREAU, ARIZONA             )
DEPARTMENT OF CORRECTIONS,             )
REHABILITATION AND REENTRY, in         )
their official capacities,            )
                                       )
                Defendants.            )


DEPOSITION OF LORI STICKLEY

Via Zoom Videoconference
October 12, 2021
9:00 a.m.
Chandler, Arizona



Glennie Reporting Services, LLC
1555 East Orangewood Avenue          Prepared by:
Phoenix, Arizona 85020               Robin L. B. Osterode
602.266.6535                         CSR, RPR
www.glennie-reporting.com            CA CSR No. 7750
                                     AZ CR No. 50695

2

1                          I N D E X

2    WITNESS                                           PAGE

3    LORI STICKLEY

4              Examination by Ms. Morris                 4

5

6

7

8

9                    INDEX TO EXHIBITS

10   Description                                       Page

11   Exhibit 1  Bates stamped documents                 53
                ADCRR00097767 - ADCRR00097772
12              (Confidential)

13   Exhibit 2  Bates stamped documents                 77
                ADCRR00098821 - ADCRR00098826
14              (Confidential)

15   Exhibit 3  Bates stamped documents                 81
                ADCRR00055894 - ADCRR00055899
16              (Confidential)

17   Exhibit 4  Bates stamped documents                131
                ADCRR00130131 - ADCRR00130150
18              (Confidential)

19   Exhibit 5  Bates stamped documents                136
                ADCRR00130151 - ADCRR00130173
20              (Confidential)

21   Exhibit 6  Bates stamped documents                142
                ADCRR00055681 - ADCRR00055682
22              (Confidential)

23

24

25

3

1                    DEPOSITION OF LORI STICKLEY

2              The deposition of LORI STICKLEY, via Zoom

3   Videoconference, was taken on October 12, 2021,

4   commencing at 9:00 a.m., at Chandler, Arizona, before

5   ROBIN L. B. OSTERODE, RPR, CSR, California Shorthand

6   Reporter No. 7750 and Arizona Certified Reporter

7   No. 50695.

8

9   APPEARANCES:

10  For Plaintiffs:

11          ACLU NATIONAL PRISON PROJECT
            By: Maria Morris
12          915 15th Street N.W., 7th Floor
            Washington, D.C. 20005
13          (202) 548-6603
            mmorris@aclu.org
14          (Videoconference appearance.)

15          ARIZONA CENTER FOR DISABILITY LAW
            By: Maya Abela
16          177 North Church Avenue, Suite 800
            Tucson, Arizona 85701
17          (520) 327-9547
            mabela@azdisabilitylaw.org
18          (Videoconference appearance.)

19  For Defendants:

20          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
            By: Rachel Love
21          3100 West Ray Road, Suite 300
            Chandler, Arizona 85226
22          (480) 420-1616
            rlove@strucklove.com
23          (Videoconference appearance.)

24

25

Lori Stickley - 10/12/2021

4

1          THE REPORTER:  Before we proceed, I will ask

2     counsel to agree on the record that there is no objection

3     to this officer of the court administering a binding oath

4     to a witness not appearing personally before me.

5          Please state your agreement on the record.

6          MS. LOVE:  No objection from defendants.

7          THE REPORTER:  Ms. Morris?

8          MS. LOVE:  Looks like her video froze.

9          MS. MORRIS:  I do agree that you can swear in

10    the witness remotely.

11

12               LORI STICKLEY,

13    called as a witness herein, having been first duly sworn

14    by the Certified Reporter to speak the whole truth and

15    nothing but the truth, was examined and testified as

16    follows:

17

18               E X A M I N A T I O N

19    BY MS. MORRIS:

20    Q.    Can you please state your name for the record.

21    A.    Lori Stickley.

22    Q.    Okay.  Have you ever been deposed before?

23    A.    Yes.

24    Q.    How many times?

25    A.    Once.

**Glennie Reporting Services, LLC**
**602.266.6535  www.glennie-reporting.com**

Lori Stickley - 10/12/2021

10

1    today?

2        A.    No.

3        Q.    Could you state what your current position is?

4        A.    I'm the deputy warden at SMU, at Eyman Complex.

5        Q.    How long have you been the deputy warden at

6    Eyman SMU?

7        A.    Since July of 2020 -- like June 29th was my

8    effective date, but --

9        Q.    Okay.  And are -- I'm sorry, did you say SMU1

10   or SMU?

11       A.    Well, it's SMU1 is the Special Management Unit

12   1 is the official title, so --

13       Q.    Okay.  All right.  And what were you before you

14   were the deputy warden of Eyman SMU1?

15       A.    I was the deputy warden at North Unit and at

16   ASPC Florence.

17       Q.    Is that a promotion?

18       A.    Yes.

19       Q.    Okay.

20       A.    To SMU?

21       Q.    Yes.

22       A.    Yes.

23       Q.    Okay.  And how long were you the deputy warden

24   for the North Unit at Florence?

25       A.    Six months.

Lori Stickley - 10/12/2021

11

1      Q.     And what were you before that?

2      A.     The deputy warden at South Unit, at Florence,

3    I'm sorry.

4      Q.     And that sounds like a lateral transfer?

5      A.     It was a lateral, from South to North Unit,

6    yes.

7      Q.     Okay.  And how long were you the deputy warden

8    at the South Unit at Florence?

9      A.     Two and a half years.

10      Q.     And what were you -- what was your position

11    before deputy warden at South Unit of Florence?

12      A.     I was the compliance deputy warden for Florence

13    Complex.

14      Q.     What is a compliance deputy warden?

15      A.     So the compliance deputy warden reviews

16    policies, does tours, works with the unit to just ensure

17    that they're following policies and procedures, and if

18    something is a discrepancy, then I would do a report and

19    give it to the warden.

20      Q.     And that was for the entirety of the Florence

21    Complex?

22      A.     Yes.

23      Q.     Okay.  How long were you the deputy warden

24    for -- the compliance deputy warden for Florence?

25      A.     That was about a year and -- about a year and

1   three months.

2      Q.   And what were you before that?

3      A.   I was the major at Phoenix Complex.

4      Q.   How long were you the major at Phoenix Complex?

5      A.   Probably about a year and a half.

6      Q.   And what was your role as major at the Phoenix

7   Complex?

8      A.   So as the major you're the chief of security

9   for the whole complex.  So overseeing -- you're the top

10  security person.  So you work with the captains to ensure

11  staffing, post orders, policies, procedures are updated

12  and working with the outside work crews, monitoring

13  transportation, K-9, all the specialty projects or

14  programs area.

15     Q.   Okay.  And Phoenix includes the intake, the

16  reception center for the Arizona Department of

17  Corrections?

18     A.   Yes.  ASPC Phoenix has Alhambra, Flamenco,

19  Aspen, and is the receiving for all incoming inmates into

20  the department.

21     Q.   All men?  Incoming men?

22     A.   Yes.

23     Q.   Okay.

24     A.   Yeah, the females go directly to Perryville.

25     Q.   Okay.  All right.  And what were you before you

15

```
 1   years.

 2        Q.    I'm sorry, how long did you say you were a

 3   sergeant at Lewis Buckley?

 4        A.    I think it was like a year and a half.

 5        Q.    Okay.

 6        A.    And then I was at Douglas Complex as a

 7   sergeant.

 8        Q.    Okay.

 9        A.    Trying to remember the dates.

10        Q.    And before that?

11        A.    Then I was an officer.  And that's when I

12   started with the Department in 2000.

13        Q.    And does that mean you were a COII?

14        A.    I was a COII at Douglas -- at the Douglas

15   Prison, yes.

16        Q.    And how long were you a COII?

17        A.    Two and a half to three years, because I

18   promoted in 2003 to sergeant, so --

19        Q.    So you started with the Department around 2001?

20        A.    2000.

21        Q.    2000?

22        A.    April 10th, 2000, is when I started.

23        Q.    Okay.

24        A.    So hopefully all those dates add up.

25        Q.    If it doesn't, we'll be coming back for
```

1    you -- no, that is entirely a joke.

2           As the deputy warden at Eyman SMU, what are

3    your job duties?

4       A.    So the main is overseeing everything, but

5    working with each area between programs and security to

6    ensure that they're doing their jobs, mentoring,

7    training, ensuring everything is getting done on a daily

8    basis.

9       Q.    How do you ensure that everything is getting

10   done on a daily basis?

11      A.    A lot of walking and talking through the unit,

12   meeting with the staff, reviewing paperwork, reviewing

13   logs.

14      Q.    What kind of logs do you review?

15      A.    Anything from the ingress/egress logs, to see

16   who's there, what time people show up, because that's

17   important.  You need to make sure they're showing up when

18   they're supposed to, down to the correctional journals

19   that stuff is being written, being logged, the daily

20   activities.  We're turning classes.  We're turning rec.

21   We're doing security walks.  We're doing security checks.

22   To information reports, to incident command reports, SIR

23   reports.

24      Q.    Okay.  All right.  And when you say the

25   ingress/egress log, is that when people come in and out

Lori Stickley - 10/12/2021

17

1    of the facility?

2         A.    Yes.  At main control when people come into the

3    unit.

4         Q.    Okay.  Into Eyman SMU1?

5         A.    Yes.

6         Q.    Okay.  All right.  Okay.  If you see that

7    things that are supposed to be happening are not

8    happening when you're going through any of these logs

9    that you review, what do you do about it?

10        A.    So it's a case by case.  It depends really what

11   it is.  If it's something simple, for I guess security

12   device, where maybe a key was broken, then I would be

13   following up with the captain and the key control officer

14   to make sure that it gets fixed, because there's

15   certain -- did they log it correctly.  If it's maybe the

16   connection with the kitchen where the dish machine wasn't

17   working, then I would follow up with maintenance.

18              So depending on what the incident is in the

19   information report or in the journal would depend what

20   the outcome is.

21        Q.    Okay.  Do things that you find in the journals

22   ever result in the initiation of any sort of disciplinary

23   process?

24              MS. LOVE:  Object to the form and foundation.

25              Go ahead.

Lori Stickley - 10/12/2021

18

1              THE WITNESS:  It could, depending on what it
2     is.  We would obviously start at the lowest level, you
3     know, you start with the supervisors, the captain with
4     the lieutenant and sergeants, the officer saying, you
5     know, what happened, if you missed -- like if they failed
6     to log a security check, what happened, what was going
7     on, why.  And then you would start with the lowest level
8     and progress in discipline, if it continued to be a
9     pattern.
10    BY MS. MORRIS:
11        Q.    Okay.  All right.  And do you look to see if
12    there are patterns of continued failings to do things?
13        A.    We review the journals every day, so I wouldn't
14    say it's a target.  We're looking for a pattern, but we
15    review the journals every day.  The camera reviews them.
16    I review them.  If it's noticed, we might -- if it's an
17    individual officer that's doing the same thing, we might.
18    I have not had that, though, so it's a -- it's possible.
19        Q.    Okay.  All right.  What education do you have
20    beyond high school?
21        A.    In order or just in general?
22        Q.    You can start with the highest, if you want.
23        A.    I have a master's degree in educational
24    leadership with an emphasis on community college.
25        Q.    With an emphasis on community college, you

Lori Stickley - 10/12/2021

20

1      Q.    Okay.  All right.  Let's talk a little bit

2   about Eyman SMU1.  If -- if we just call it SMU, would

3   that be all right?

4      A.    Yes.  That's fine.

5      Q.    Okay.  And so we both understand if I say SMU,

6   we're talking about ASPC Eyman SMU1.  Correct?

7      A.    Yes.

8      Q.    Okay.  Excellent.  What are all of the

9   locations in SMU where an incarcerated person might be

10  kept in their cells for 22 hours or more on any given

11  day?

12     A.    What do you mean by "locations"?

13     Q.    You could give me either sort of statuses, like

14  max custody --

15     A.    Okay.

16     Q.    -- and detention, or you could give me

17  clusters.  And either way I'm going to have to ask you

18  sort of the cross-referencing question.  So whichever one

19  is easiest for you.

20     A.    So there's six locator codes for custodies that

21  SMU has relating to max custody.  There is A08, which is

22  max custody general population.  There's A38, which is

23  max custody sex offenders.  Then there's A34, which is

24  statewide detention.  And then A30, which is max custody

25  protective custody.  Then A40 is our mental health watch

Lori Stickley - 10/12/2021

21

1   pods.   Just because there's a variety of different

2   inmates that could come at different custody levels, per

3   policy, it's treated as the highest level because,

4   depending on who is in there, for safety purposes we

5   treat it as the highest level.

6       Q.     Do people come to the watch pods at SMU from

7   all over ASPC Eyman?

8       A.     Yes.   And Florence and Winslow and wherever.

9       Q.     Okay.   So people in the watch pods at SMU could

10  be from any male facility in the state?

11      A.     Yes.

12      Q.     Okay.   I think you told me six locator codes

13  and I've only got five.

14      A.     So the last one is A70, which is closed

15  (inaudible) --

16          THE REPORTER:   Which is closed what?

17          THE WITNESS:   Close custody sex offenders.

18          THE REPORTER:   Thank you.

19  BY MS. MORRIS:

20      Q.     Okay.   What clusters have the max custody

21  general population, A08 people?

22      A.     So SMU is set up exactly the same.   So

23  everything is the same, so there's four wings, so A08 is

24  wing 4 and four clusters, Able, Baker, Charlie, Dog.

25      Q.     And all four of those are max custody general

Lori Stickley - 10/12/2021

22

1  population?

2       A.    Yes, wing 4 is A08.

3       Q.    All right.  What clusters are max custody sex

4  offenders, A38?

5       A.    That is wing 3, Able, Dog.

6       Q.    What clusters are statewide detention or A34?

7       A.    That will be wing 3, Baker, Charlie, and then

8  wing 1, Able.

9       Q.    Which clusters are maximum custody protective

10  custody, A30?

11      A.    So that is wing 1.  So they don't have a whole

12  cluster, because I only have 16 beds.  So they are wing

13  1, Able pod 6, and wing 1, Baker pod 1.

14      Q.    So Able pod 6, Baker pod 1, and something

15  happened on my computer and I didn't hear the middle one.

16      A.    So there's only two pods.

17      Q.    Okay.

18      A.    So I'm pretty positive, I'm trying to remember

19  the map.  It's Able -- so they're both -- they're down

20  wing 1, one pod is Able -- 1 Able pod 6, and then 1 Baker

21  pod 1.

22      Q.    Okay.  Where are the mental health watch pods?

23      A.    That is wing 1 Dog cluster, pods 4, 5, and 6.

24      Q.    And where are the closed custody sex offenders?

25      A.    Wing 2, Able, Baker, Charlie, Dog, and then

1    wing 1, Baker, Charlie.

2         Q.    Are there any distinctions between the people

3    who are placed into the different clusters in max custody

4    general population?

5         A.    What do you mean by that?

6         Q.    Like are there any rules that would guide who

7    goes into 4A versus 4B versus 4C versus 4D?

8         A.    No, it's based off -- well, yes, based off a

9    classification.  So when an inmate comes in, movement

10   would look at the floor, look at their crime, their age.

11   So classification for housing and detention in a two-man

12   cell.  There is a criteria to match them to a cellie, if

13   they're going to have a cell mate.  So that's where they

14   would determine where they would go.  The first open

15   cells we have, and then who we would match with.

16        Q.    Okay.

17        A.    So there's no distinction as far as -- they're

18   all the same.  It's based off of housing priority.

19        Q.    Okay.  Are some of the clusters in A -- 4A, B,

20   C and D, two-person cells and some of them one-person

21   cells?

22        A.    Wing 4 is all double-man cells.

23        Q.    It may not be that every single cell is

24   actually occupied by two people.  Correct?

25        A.    Correct.

Lori Stickley - 10/12/2021

24

1      Q.     But all of them can be?

2      A.     Yes.

3      Q.     And all of the cells in wing 4 are not

4   intentionally held as one-person cells; is that right?

5      A.     Correct.

6      Q.     Okay.  All right.  And there's not a

7   distinction, like people who are at Step 1 are in one

8   cluster and people who are at Step 2 are in a different

9   cluster.  Is there anything like that?

10     A.     No, housing is not determined by step or

11  phases.  It's based off of straight-up classification,

12  crime, age, sentence length.

13     Q.     Okay.  Is there any distinction between the two

14  clusters for maximum custody sex offenders?

15     A.     No, everything is across the board the same.

16     Q.     Okay.

17     A.     Just the location where -- where they're at.

18     Q.     Okay.  Are there any policy differences in the

19  way sex offenders -- max custody sex offenders and max

20  custody general population are treated?

21            MS. LOVE:  Form, foundation.

22            Go ahead.

23            THE WITNESS:  Only to the fact that they can't

24  house together.  I mean, the sex offenders have to be

25  within the sex offender population, and that's based off

```
 1    of classification.  So, I mean, they're just housed
 2    within their area.
 3    BY MS. MORRIS:
 4         Q.    Okay.  But there's no differences in things
 5    like what's required for escorting them?
 6         A.    No.  Escort's based off of actual custody
 7    level, whether it's max custody or close custody, medium,
 8    minimum, that determines how inmates are escorted.
 9         Q.    Okay.  And are 3 Able and 3 Dog all double-man
10    cells?
11         A.    I believe so.  I mean, I have some cells -- I
12    don't have them off the top of my head though -- which
13    there are some cells that only have a single bunk in them
14    based off of physical design, but I believe 3 Able are
15    all double-bunked, 3 Able and Baker.
16         Q.    In the places where there's only one -- one
17    bunk, is that whole clusters that only have one bunk or,
18    like, a particular corner of every cluster?  How is that?
19         A.    So all I can tell is what I know when I got
20    there, because some, based on physical design way back
21    whenever, SMU was only single cells.  But over the years,
22    like years, they -- the populations increased and they
23    ended up adding second bunks.  How they determined that,
24    I don't know, that was way before my time.
25                As far as the physical layout of when they
```

Lori Stickley - 10/12/2021

26

1    decided which pods would be a single cell or which

2    clusters -- I don't have a whole cluster that's single

3    pod, though.  So it's -- there's no rhyme or reason to

4    say that one over that one, to answer that question.

5        Q.    Okay.  All right.  3 Baker and Charlie and 1

6    Able, you said, are the state detention cells or units?

7        A.    Yes.

8        Q.    Is there any distinction between those -- any

9    of those three clusters as to why someone would go into a

10   particular cluster?

11       A.    No, it's just physical design, because we just

12   took more inmates into the A70 population, so we just had

13   to move, and so that's where there's a break up

14   between -- because we try to keep all, like, locator

15   codes together, but we recently moved and switched

16   around, because my A70 population increased due to

17   Florence closing down, so we had to adjust and move.

18   Because I wanted to keep A70 as close as possible with

19   each other, so we had to do some adjustments and moves

20   within house.

21       Q.    Okay.  How long have -- actually, withdrawn.

22             What were the changes that you made in terms of

23   which units were going to be closed custody sex

24   offenders?

25       A.    So wing 2 and 1 Charlie was already A70, so

Lori Stickley - 10/12/2021

27

1  when they advised that we would be getting 65 more close

2  custody inmates, we looked at the physical layout of job

3  duties, requirements, turns, and what would be the -- for

4  the lack of the easiest or the less impact on inmates and

5  staff, so we decided that 1 Baker, which is right across

6  from 1 Charlie, would be the best location to put the 65

7  new inmates.

8          So because of that, I moved A38, which is the

9  max custody sex offenders, over to wing 3.  So that's

10 why -- so that was the move, because I was -- we looked

11 at keeping max custody all in wing 3, wing 4, and then

12 close custody more to wing 1 and 2, to try to simplify.

13    Q.    And so now you've got max custody and most of

14 statewide detention in wings 3 and 4.  Correct?

15    A.    Correct.

16    Q.    And then max custody PC, mental health watch,

17 close custody sex offenders and a little bit of statewide

18 detention in wings 1 and 2?

19    A.    Correct.

20    Q.    Okay.  All right.  That actually helps a lot in

21 understanding sort of how it all fits together.  Are

22 people in statewide detention double-bunked?

23    A.    Yes.  If they match.

24    Q.    Okay.  And when you say "if they match," can

25 you explain that a little bit more?

Lori Stickley - 10/12/2021

28

1      A.      Based off of classification and why they are in
2   statewide detention.
3      Q.      What do you mean by why they're in statewide
4   detention?
5      A.      I just opened up Pandora's box.  So inmates
6   will get moved to statewide detention if they ask for
7   protective custody, 805.  If they refuse to house.  If
8   they're under investigation for something that happened
9   at their unit.  So then that unit administration or that
10  Complex will say we need to move them to detention for
11  protection while they go through the 805 process until
12  they can find alternative housing for refuse-to-house
13  inmates, or to complete an investigation, either
14  internally or externally.
15          So on top of classification, they also have
16  to -- only 805s can be put with 805s, because they're
17  there for protection.  Refuse-to-houses would only be,
18  you know, so on top of the normal classification
19  requirement, then we're also ensuring another step to
20  make sure like inmates, as far as requests, 805 requests,
21  refuse to house, are also housed properly, because we
22  don't want anything to happen.
23     Q.      Okay.  Let me make sure that I understand what
24  you just said.  So if someone requests protective
25  custody, they'll be placed in detention during the

1  process of determining whether or not they should be

2  given protective custody, which is the 805 process; is

3  that correct?

4      A.    Correct.

5      Q.    And two people who are going through the 805

6  process could be housed together?

7      A.    They could as long as the classification also

8  matches.

9      Q.    Okay.  All right.  If someone refuses to house,

10  they could be put into detention for that.  Correct?

11      A.    Yes.

12      Q.    And they could be put into detention with

13  another person who is also refused to house if they have

14  similar classifications?

15      A.    Yes.

16      Q.    And if a person is being investigated for some

17  incident that occurred, they could be placed in

18  detention?

19      A.    Correct.

20      Q.    And if a person is in detention because of an

21  ongoing investigation into something that occurred, they

22  could be housed together with someone else who is under

23  investigation for something that occurred if the

24  classification matches.  Correct?

25      A.    Correct.

Lori Stickley - 10/12/2021

30

1      Q.     Okay.  All right.  Can you explain what the
2   difference between asking for protective custody and
3   refusing to house is?
4      A.     So 805 is the inmate himself coming to staff
5   saying whatever reason, it could be a drug debt, it could
6   be they're fearful.  They could say that they've been
7   told by another inmate that they're going to get beaten
8   up for X, Y, Z, whatever reason.  They could have
9   something even in their crime, if they have a crime
10   against children, but it's farther down in the crimes,
11   and the inmates find out, then they could be fearful.
12          So then they come up to staff, and say X, Y, Z,
13   "I'm afraid, I need protective custody."  So there's
14   paperwork that's filled out.  The administration is
15   notified by, you know, the shift commanders, it's
16   elevated, then they ask for a bed over in detention, and
17   then the inmate gets moved to detention.
18          A refuse to house is from intake.  An inmate
19   arrives in Alhambra, and they go through the process and
20   they say, "Okay, you're a close custody inmate, general
21   population, we're going to house you at Central Unit."
22   They get on the bus, they drive to Central Unit, they get
23   off the bus, they get to the gate, the inmate looks at
24   staff and says, "No, I'm not going to house at Central."
25   "Well, why not?"  X, Y, Z reasons.  "No, this is where

31

1   you're supposed to house."  The inmate says, "I'm not

2   housing there."

3          So he's marked as a refuse to house.  He goes

4   to detention because we have to put him somewhere while

5   they re-look at his classification.  We look at his issue

6   to find appropriate housing.

7      Q.    If a person is in a housing unit, just a --

8   a -- a yard --

9      A.    Okay.

10     Q.    -- and they get beaten up badly, would they get

11  placed in protective custody or detention as refusal to

12  house or for the protective custody process as a result

13  of that?

14         MS. LOVE:  Object to the form.

15         THE WITNESS:  It -- they could.  It depends.

16  We don't involuntary place people in protective custody.

17  If they're -- if the assault -- if it's like an assault,

18  so your question was on a fight.  So two inmates get into

19  a fight and it's not an automatic, the inmates are

20  interviewed, SSU talks to them, they say it was X, Y, Z

21  disrespect, we're both good.  We can return.  They sign

22  paperwork saying "Nope, we're good.  We can stay in the

23  yard."  They're rehoused.  They might move the location,

24  so that way they're not at rec together or go to chow

25  together or anything anymore, but it's not an automatic.

1          So, unfortunately, there's not a cookie cutter

2      answer, because each incident would be different.

3      BY MS. MORRIS:

4          Q.    You've said a couple times that there will be

5      some paperwork filled out where -- and that could be

6      about asking for protective custody or an agreement with

7      this person that they had a fight with, things like that,

8      where -- where would that paperwork get stored?  Where

9      would it go?

10          A.    So the Department Order 805 has a whole

11      checklist and a packet for protective custody.  So when I

12      refer to paperwork, so the 805-1, which is part of the

13      protective custody packet is the inmate statement.  So

14      the inmate would write that saying, "Yes, I'm in fear,"

15      or "No, I'm not in fear."  And so then that would get --

16      if he asks for protection, it would be part of the

17      packet.  It would be -- there's four or five sheets to

18      the 805 packet that the inmate fills out, the shift

19      commander fills out, based on the interview.

20              And then that would follow him to detention and

21      then gets put in his file.  Because there's a review

22      process that goes to PCU, the protective custody unit,

23      that would review all the information that the inmate

24      said why he needed protection.

25          Q.    And when you say it would go into his file,

1   so I guess kind of pseudoelectronic, it could -- a little

2   bit, because any inmate that's in ACIS and the discipline

3   report is uploaded, and there's a section in there for

4   discipline, for classification, for protective custody,

5   for do-not-house issues, you know, everything is uploaded

6   into it and there's a document section within ACIS, so

7   small standard yes of electronic.  But the actual file is

8   a hard copy file.

9      Q.    So there is both a hard copy file of all of the

10  documents relating to the inmate?

11     A.    Yes.

12     Q.    And an ACIS file which includes tabs for

13  different areas, such as discipline or classification,

14  where the documents get uploaded so there's a picture of

15  the documents essentially.  Correct?

16     A.    Yeah.  Like a scanned, uploaded copy of the

17  document.

18     Q.    Okay.  All right.  Thank you.  If a person

19  comes to the administration, a person who is incarcerated

20  at SMU comes to the administration and says "I'm afraid,"

21  but does not ask for protective custody, how is that

22  treated?

23     A.    So if the inmate comes to any staff member, it

24  doesn't just have to be administration, any staff member

25  and says "I'm afraid," they will be isolated, as far as

Lori Stickley - 10/12/2021

35

1    like taken into an office to be interviewed.  And then we

2    would just talk to them, like, "Well, what do you mean?

3    What are you afraid of?  What's going on?"  And interview

4    them and see what's going on.  And find out why he's

5    saying he's afraid.  And then depending on what he says,

6    either walk them through it, talk them through it type of

7    thing, because it might have been something very minor.

8         Or if it is something serious or something that

9    we're, like, okay, yeah, this doesn't kind of sound

10   right, we can start him in the process of protective

11   custody.  If the inmate is saying, "Hey, this is,"

12   walking them through, and then he would go through he'd

13   be pending 805 until the final review.

14   Q.    If the person is -- comes to a staff member and

15   says "I'm afraid" --

16   A.    Okay.

17   Q.    -- and in the course of that interview the

18   staff person doesn't feel like this is appropriate for

19   protective custody, but the person says I'm not going

20   back out on that yard because I'm afraid, would that be a

21   refuse to house?

22   A.    Yes.  If -- if it comes down to where it does

23   not fit the 805 process and we can't get him to house as

24   far as, well, we could move you to a different house,

25   maybe to a different side of the yard or something, and

1   the inmate flat out says, "No, I'm not going to house,"

2   then yes, that's when it would become a refuse to house.

3       Q.    Can you tell me what the average max custody

4   census, or roughly what the census for max custody at SMU

5   is?

6       A.    What do you mean by "census"?

7       Q.    The number of people.

8       A.    Oh, like the population?

9       Q.    Yeah, yeah.

10      A.    So like in A08, I have, like, 300 -- I think

11  like 354 right now.  I'm trying to remember from Friday's

12  numbers, because I don't work over the weekend.  And then

13  in A38, which is the max custody sex offenders, I want to

14  say I have like 158-ish.

15      Q.    So about 500, maybe a little more?

16      A.    Well, and then statewide detention, even though

17  they could be different custody levels, they're treated

18  as max, because the max facility in -- as the highest

19  level, so we're at like 3- -- statewide detention, like,

20  174 right now.

21      Q.    I don't know if it was just in error when you

22  were talking, but you started by saying "3-."

23      A.    Well, because I was looking at what I can

24  house, but I have 170-some vacancies, so I have, like,

25  174 actually there.  So I was doing math in my head

1   speaking out loud.  Sorry.

2       Q.    That's totally okay.  That was a better

3   explanation of that kind of statement that I've almost

4   ever heard, to be honest, and it made a lot of sense.

5           You said people in statewide detention are

6   treated like max custody.  Can you explain what you mean

7   by that?

8       A.    For the safety of operations and for the safety

9   of the inmates, once they come to detention, they're

10   treated at the highest level, which is a max custody, as

11   a 5/5, because they interact with different custody

12   levels.  Everybody's treated the same because, for

13   consistency, we couldn't have -- because (inaudible) --

14           THE REPORTER:  I'm sorry.  I'm sorry.  Hold on.

15   You're breaking up a little bit.  Because what?

16           THE WITNESS:  So, like, if a medium custody

17   inmate would come over, he is a 3/3, but a close custody

18   that's a 4/4, a max custody that is a 5/5, they can all

19   be in detention at the same time.  So that area is always

20   handled at 5/5, for the safety of everybody, because we

21   don't want anybody to come out of their cell that could

22   get to somebody else or hurt somebody or an issue could

23   happen.  So it's treated as a 5/5, once they come into

24   statewide, regardless of their actual custody, it's ran

25   like a max custody facility for safety purposes.

Lori Stickley - 10/12/2021

38

1    Q.    When you say 5/5, is that -- what are the two
2  fives?
3    A.    So you have custody and you have institution,
4  so you have what they're sentenced, based off of their
5  sentencing, and then they have internal scores based off
6  of age, their discipline, so they can -- they have two
7  scores.
8    Q.    Is all detention that way, that everybody is
9  treated as 5/5 or is it specifically because it's
10  statewide detention?
11    A.    To my knowledge, it's across the board.  It's
12  just because it's a detention.
13    Q.    Okay.  So a detention unit in a, like at
14  Douglas, Douglas is not at Level 5.  Correct?
15    A.    Correct.
16    Q.    So a detention unit at 5 -- I'm sorry, at
17  Douglas everyone would still be treated as 5/5?
18    A.    Yes.  Their CDU would be ran like a 5/5.
19    Q.    Do you know why?
20    A.    Well, A, besides policy says, we're dealing
21  with detention, you know, a complex detention unit.  The
22  main reason my understanding, my belief, is when you're
23  bringing mixed custodies together for different, various
24  reasons, the easiest or overall way to make sure
25  everybody's protected is to treat them all at one level.

Lori Stickley - 10/12/2021

39

1    Because it would be hard to treat, you know, if you have

2    20 inmates and they're all different custody levels, he

3    gets to do this, he gets to do that, he gets to do this,

4    where everybody's the same.

5           They come in, property's the same, escorting is

6    the same, the meal's the same.  Because policy across the

7    board, based on minimum, medium, close has different

8    privileges or different incentives or different things

9    they have access to.  But when you go to detention, it

10   would be hard to run all of those different issues

11   related to each custody level, so it's treated as one

12   level, one unit.

13          And it's temporary.  It's not their housing

14   location.  It's not their end home.  It's a temporary

15   break or step aside from their normal everyday life,

16   because of whatever issue happened, whether it's an 805,

17   whether it's a refuse to house, whether it's

18   investigation, it's a temporary stay.  Finish that

19   process and then get them back into their forever home

20   again.

21       Q.     Okay.

22       A.     While with us they're with us, not forever.

23       Q.     Okay.  You gave me the number of people that

24   you think were in A08 and A38 and detention last Friday.

25   Are those fairly typical numbers?

40

1      A.      Yes, it fluctuates, though.  Really the only

2  one that fluctuates a lot is statewide detention.  The

3  other numbers are pretty stagnant based off of sentence

4  because there's really no other place.  In the max

5  custody facility, that's where they're at until they get

6  out.

7      Q.      Okay.  All right.  What is a health and welfare

8  check?

9      A.      So a health and welfare check is a doctor doing

10  their -- between 30, to not exceed 59 minutes, walking

11  every pod, every one, to make sure everybody's doing

12  okay.  I think policy classifies it as, you know,

13  visually alive, breathing, making sure nothing's going on

14  and happening.

15      Q.      So what -- withdrawn.

16              Are those also called security checks?

17      A.      They -- yes.  They're interchangeable.

18      Q.      Okay.

19      A.      But health and welfare and security checks,

20  yes, every -- they can be interchangeable word choice,

21  but it all means the same, yes.

22      Q.      Okay.  And then does living, breathing flesh

23  check, also mean the same thing?

24      A.      It's all written within like the post orders,

25  yes, because even for count, whether it's informal or

Lori Stickley - 10/12/2021

41

1    formal, that's what they're supposed to be doing, going

2    to each cell, making sure you actually have the person

3    that it's not, you know, nobody got out of their cell and

4    they're somewhere else.  So you're checking to make sure

5    you actually have a person, and they're alive and

6    breathing and doing well.

7        Q.    What units are supposed to have these checks

8    regardless of what they're called?

9        A.    All units.

10       Q.    All units, okay.

11             Have you ever done anything to try to figure

12   out how long it takes to do a check of a pod?

13             MS. LOVE:  Form.

14             THE WITNESS:  I guess I don't know what you

15   mean by your question.

16   BY MS. MORRIS:

17       Q.    Like, have you ever walked a pod to just see

18   how long it takes to go and actually look into each cell,

19   see -- see that if the people who are there are

20   supposed to be -- are the people who are supposed to be

21   there, and they're all alive and walk up and down the

22   whole pod to see how long that takes?

23       A.    Not on an intent of starting my watch and

24   actually walking each cluster, each pod, no.  But I have

25   walked them, you know, when I do my tours.

Lori Stickley - 10/12/2021

42

1    Q.    Uh-huh.

2    A.    Granted, I get stopped a lot and asked

3  questions, so it's hard for me to just go start to finish

4  to see how long it would actually take.

5    Q.    Okay.  Do you have any idea of how long it

6  takes?

7    A.    I mean, each walk when they go to do them

8  takes, from start to finish, I want to say like 10 to

9  15 minutes, if they're not doing anything else at the

10  same time.

11    Q.    And at Eyman, how many cells are there per pod?

12    A.    96.  If it's a double-bunked.

13    Q.    I'm sorry, per pod?

14    A.    Oh, per pod?

15    Q.    Yes.

16    A.    There's eight cells per pod.

17    Q.    Eight cells per pod.  Four on top and four on

18  bottom?

19    A.    Yes.

20    Q.    Do all the cells at SMU have plexiglass over

21  the front?

22    A.    No.

23    Q.    Does that depend on the housing unit or the

24  cluster?

25    A.    No, the only cells that have the plexiglass are

Lori Stickley - 10/12/2021

43

1   the watch cells, the watch pod.

2        Q.     And that's 1 Dog 4, 5, and 6?

3        A.     Correct.

4        Q.     Why do the watch cells have plexiglass?

5        A.     For easier visibility and to prevent items

6   being thrown on the staff.

7        Q.     So they have plexiglass and the -- the metal,

8   perforated metal --

9        A.     Metal, yes.

10        Q.     Okay.  You said that health and welfare checks

11   are supposed to be done every 30 to not more than 59

12   minutes?

13        A.     Not to exceed.

14        Q.     Okay.  Not to -- okay.

15               Do you know where that's in policy?

16        A.     It's in the officer's post orders.

17        Q.     And what happens if -- withdrawn.

18               Why is it necessary to do health and

19   safety -- health and welfare checks?

20        A.     Because that's what our job is.  I mean,

21   accountability, making sure everything is okay.

22        Q.     Okay.  Can you explain that a little bit more?

23   When you say making sure everything's okay, what do you

24   mean?

25        A.     Well, I mean, just -- walking and -- I mean,

44

1   you have -- for max custody, I mean -- and it's across

2   the board, all units.  I mean, it doesn't matter if it's

3   minimum custody, medium custody, close, max.  We do

4   health and welfare checks just to ensure that everything

5   is okay and everybody is accounted for.  That there's

6   nothing going on, officer presence, making the rounds,

7   walking, you know, making sure we're visible, the inmates

8   can see us, and we can see them.

9       Q.    Okay.  Why does it matter that the inmates can

10  see you?

11      A.    Because if they have a question or a concern or

12  something's going on, they can ask the staff member.

13      Q.    Okay.  And why is it important for staff to see

14  inmates?

15      A.    Same thing, to talk to the inmates, to make

16  sure that they're doing fine, if they have any questions,

17  and to make sure everybody is doing well and nobody's

18  gotten hurt, nobody -- I mean, it could be a number of

19  things, but I mean, the biggest one is just visual

20  checking and making sure everybody's doing okay.

21      Q.    Okay.  What happens if -- if health and safety

22  checks, or health and security -- sorry, I'm mixing up

23  all the many words that go into this.  What happens if

24  health and welfare checks aren't done as frequently as

25  they're supposed to be?

Lori Stickley - 10/12/2021

45

1             MS. LOVE:   Form and foundation.

2             THE WITNESS:   What do you mean by if they're

3    not done?   Like --

4    BY MS MORRIS:

5        Q.    Let's say there's two hours between two health

6    and welfare checks.

7             MS. LOVE:   Same objections.

8             THE WITNESS:   So within content I'm not -- I

9    guess I'm trying to understand what -- what the question,

10   what you're wanting, because like if I become aware, like

11   you want to know what I would do if I found out, like a

12   security check was missed or are you just, in general, is

13   it the end of the world if a security check is missed?

14   BY MS. MORRIS:

15       Q.    If you become aware that a security check is

16   missed, what would you do about it?

17       A.    Okay.   So because we review the journals and if

18   we notice, like, hey, a security check wasn't done, we

19   would start back with what was going on during that time,

20   was that whole pod vacant because they were out at rec,

21   so they wouldn't have done a health and welfare security

22   check because nobody's in the pod?   Could there have been

23   a huge -- based off staffing, did they notify the

24   supervisor, "Hey, I'm with the nurse and I couldn't get

25   over to Baker cluster, can someone come down because I

Lori Stickley - 10/12/2021

46

1    missed my health and welfare check."

2              So there's multiple things that we would put in

3    place if we became aware.  The staff are supposed to

4    notify, or the control room, if a security check is

5    missed due to this is why the security check couldn't be

6    done.  If we found out after the fact, we would

7    investigate to see, like, what was going on, what

8    happened, why was that missed, and when was the next one?

9    Was it at two minutes and -- you know, was it at an hour

10   and two minutes or was it an hour and 15 minutes?  I

11   mean -- and when was the next security check done?

12             And, you know, we would obviously start with

13   verbal redirection, and then we would progress if it

14   became a pattern with either that officer or that control

15   room, you know, we would do progressive discipline.

16        Q.    Is going for an hour and 15 minutes more

17   significant of an issue than going for an hour and two

18   minutes --

19             MS. LOVE:   Form and foundation.

20   BY MS. MORRIS:

21        Q.     -- without a health and security check, welfare

22   check?

23        A.    They're all the same, anything over -- anything

24   outside of the 30 to 59 minutes would be treated the same

25   whether it's two minutes or 15 minutes, you know, we have

Lori Stickley - 10/12/2021

47

1   a standard and we have procedures and we need to follow.

2        Q.    What does it mean that the standard is from 30

3   to 59 minutes?

4        A.    So for, across the board, it's really

5   30 minutes, due to staffing and the physical layout of

6   SMU and the lockdown.  I say they loosely, because I

7   don't know who "they" is.  At one time, the post order

8   was updated, it was amended to allow -- give a little bit

9   more leeway, because of all the duties the staff members

10  have to do, they could not get back and do every

11  30 minutes, so they loosened it to say 30 to not exceed

12  59 minutes.

13            Because the floor officer is doing many tasks,

14  escorting the nurse, doing shop orders, doing rec turns,

15  doing medical lines, maybe feeding, maybe doing a

16  roll-up, you know, there's multiple things the officer

17  could be doing to stop and "I've got to go do a welfare

18  check.  I've got to go do my walk," so they amended it

19  years ago before my time at SMU to give a buffer to give

20  them an extra 29 minutes added into that 30 to do a

21  security walk.

22       Q.    When you started that explanation you said

23  across the board it's 30.  What did you mean by "across

24  the board"?

25       A.    Across the state, so minimum, medium, close

1    custody, the health and welfare checks are every

2    30 minutes.   But at SMU, and I will only speak of SMU, in

3    our post orders it is amended where it does give them

4    59 minutes to finish a health and welfare check.

5        Q.    Do you know if Florence has that same amendment

6    in their post orders?

7        A.    I do not know.

8        Q.    When you were working at Florence, do you know

9    whether staff were required to do health and welfare

10   checks every 30 minutes or every not more than

11   59 minutes?

12       A.    At North and South Unit, it was every

13   30 minutes.

14       Q.    Okay.  When you were the compliance deputy

15   warden at Florence, do you know whether staff throughout

16   the complex were -- had this -- were required to do

17   health and welfare checks every 30 minutes or did they

18   have up to 59 minutes?

19       A.    It -- I never was made aware or found an issue

20   with the welfare checks.  So I can't directly speak of

21   East and Central, because I just don't remember.  I

22   don't -- I never had to address the issue that I noticed

23   or found outside of the boundaries of doing health and

24   welfare checks.

25       Q.    Okay.  But you don't remember what the boundary

Lori Stickley - 10/12/2021

52

1    A.    Yes, because that's when we run visitation,

2    yes.

3    Q.    Okay.  What are some of the other positions

4    that -- and if it would be easier, I could pull up a post

5    sheet for you to look at while you answer this.  Just

6    tell me if that would be helpful.

7          What are the posts that, whether or not they

8    are assigned, changes by day of the week?

9    A.    So -- so this is going to be a loaded question,

10   though.  So there's shift, which never changes, and then

11   there's support that does change.  So shift runs

12   Monday -- well, seven days a week.  And those posts never

13   change, they're always required.  Support are the ones

14   that fluctuate, like visitation, medical, maintenance,

15   key control.  So those are the ones that fluctuate

16   support, but shift never fluctuates.

17   Q.    Okay.  I'm going to pull up a -- what I'm going

18   to --

19         Okay.  Can you see my screen?

20   A.    Yes.

21   Q.    And what are you looking at on my screen?

22   A.    Friday, July 30th, 2021, at 5:00 in the

23   morning.  So it would be day shift, a.m.

24         MS. MORRIS:  Okay.  And for the record, this

25   will be marked as Exhibit 1, and it starts at Bates

53

1   number ADCRR00097767, and it is a six-page -- it is a

2   six-page document.

3              (Marked for identification Exhibit 1.)

4   BY MS. MORRIS:

5       Q.    I'm going to go to the third page, so that

6   we're looking at -- withdrawn.

7              So you noted that this says it's at 5:00 in the

8   morning?

9       A.    Uh-huh.

10      Q.    And that's because it says 0500 at the top?

11      A.    Yes.

12      Q.    Just below that, and off to the right it says

13  "p.m."

14             Do you see that?

15      A.    No, because the screen in front of us.

16      Q.    Can you see it now?

17      A.    Yes.  P.M.

18      Q.    Okay.  Sorry, technology.

19             Do you see -- do you see the p.m.?

20      A.    Yes.

21      Q.    So would this be the p.m. -- essentially close

22  to the end of the p.m. shift?

23      A.    Yes, this would be the end of p.m. shift if

24  it's marked at 0500, because they get off at 06.

25      Q.    Okay.  All right.  I'm going to go to the third

Lori Stickley - 10/12/2021

54

1    page of this document, which is Bates number

2    ADCRR00097769.   And this is the Daily Post Sheet for the

3    a.m. shift on July 30th, 2021, at SMU.   Correct?

4        A.    Correct.

5        Q.    So when you said a moment ago that the shifts

6    don't change but the support does, is this the shift that

7    you were talking about?   Like what you meant when you

8    said that --

9        A.    Yeah.   So when I refer to "shift," that would

10   be the a.m. or p.m.

11       Q.    Okay.   All right.   So the people who are -- or

12   the posts that are required for the a.m. shift, just what

13   we're looking at on ADCRR0097769, or at least the start

14   of one, those don't change from day to day?

15       A.    Correct.

16       Q.    I'm sorry?

17       A.    Correct.

18       Q.    Okay.   All right.   Do you agree with Warden Van

19   Winkel that all the posts listed for the shift on the

20   Daily Post Sheets are critical?

21            MS. LOVE:   Form and foundation.

22            THE WITNESS:   Well, not knowing what Warden Van

23   Winkel said, but related to your question as in are the

24   positions on the post sheet critical, yes, I agree, that

25   the posts listed on the post sheets are critical.

Lori Stickley - 10/12/2021

55

1    BY MS. MORRIS:

2        Q.    Are there any posts that are listed on the post

3    sheet for the shifts that are not critical?

4              MS. LOVE:   Form.

5              THE WITNESS:   No, they all -- they're all

6    needed.

7    BY MS. MORRIS:

8        Q.    Okay.  So looking at this post sheet,

9    Exhibit 1, the post sheet for Friday, July 30th, 2021 --

10   let me see if I can make it a little smaller.  So do you

11   have any reason to -- withdrawn.

12             Are the post sheets -- are the Daily Post

13   Sheets important?

14             MS. LOVE:   Form and foundation.

15             THE WITNESS:   In regards to what?  I mean --

16   BY MS. MORRIS:

17       Q.    Running a prison.

18             MS. LOVE:   Same objection.

19             THE WITNESS:   I mean, they're important to the

20   fact of it's accountability.  It's knowing where staff

21   are posted.  It's knowing what is covered in what areas,

22   who is working where, instead of everybody just running

23   amok.  I mean, it alleviates chaos.

24   BY MS. MORRIS:

25       Q.    So the post sheet shows where people are

1    assigned.  Correct?

2        A.    Correct.

3        Q.    And it allows for accountability in knowing

4    where people are assigned?

5        A.    Correct.

6        Q.    Do you know whether the post sheets are

7    accurate?

8             MS. LOVE:  Form.

9             THE WITNESS:  As far as them being filled out,

10   there's always room for error.  It's a living, breathing

11   document all day long.  Staff incidents happen, staff get

12   moved around, staff go home, staff get sick, staff get

13   reassigned.  So throughout the day, this -- that roster

14   could change four or five times, six, seven times.

15   BY MS. MORRIS:

16       Q.    So if you wanted as -- as an administrator, if

17   you wanted to know who was working where on a particular

18   day last week, where would you look?

19       A.    So I would first go, because this is computer

20   generized [sic], it's electronic, I would first log in

21   and I would look at it.  But I'd also go pull the hard

22   copies, because even though the computer is only going to

23   show the very last update, but as the shift commander,

24   the sergeant or the lieutenant makes changes, they print

25   it off.

Lori Stickley - 10/12/2021

57

1      Q.      Okay.  And -- sorry.  A couple times in the

2  course of that answer you said "it," and I just wanted to

3  confirm that you were talking about the Daily Post

4  Sheets?

5      A.      Correct.

6      Q.      All right.  So as changes are made, they're

7  printed off?

8      A.      Yes.

9      Q.      By "it" being the Daily Post Sheets?

10      A.      As changes are made with staffing, the post

11  sheet is printed off and put with the daily paperwork

12  that's turned in at the end of their day.

13      Q.      Okay.  Okay.  Is there any way to tell, and I'm

14  going to make this a little bit smaller, in case that's

15  helpful.  Is there any way to tell when a Daily Post

16  Sheet was printed off, like when -- what time during the

17  shift?

18      A.      No.

19      Q.      Okay.  Other than if someone has added

20  something like we saw on that very first page where it

21  was typed in 0500?

22      A.      Correct.

23      Q.      Okay.  So it -- is it fair to say that human

24  error aside, this Daily Post Sheet would have been

25  accurate at some point during the shift on Friday,

Lori Stickley - 10/12/2021

58

1    July 30th, 2021, during the a.m. shift?

2                MS. LOVE:   Form.

3                THE WITNESS:   Yes, within -- within reason, I

4    wouldn't even -- yeah, I mean, at one time, I mean, it

5    could have been correct all day long if there were no

6    changes, I mean -- so --

7    BY MS. MORRIS:

8        Q.     Okay.  So it could have been correct all day

9    long and no changes, or it could have been that it was

10   correct first thing in the morning, and then later on

11   someone left or someone came?

12       A.     It is possible that the post sheet could have

13   been changed if staff came or left or if they added staff

14   to it, or it could have been correct all day.

15       Q.     Okay.  But it would be your expectation that

16   this Daily Post Sheet that we're looking at right now was

17   at some point correct?

18       A.     Yes.

19       Q.     Okay.  According to this, Exhibit 1, the third

20   page, which is ADCRR00097769, at the time reflected on

21   this Daily Post Sheet, there was a control room staff

22   person only in 1A and 3A.  Correct?

23       A.     According -- so according to the paper Daily

24   Post Sheet, yes, is what it says.  I don't know how you

25   got that, because -- but yeah, well, according to the

59

1    posting, yeah.

2        Q.    What do you mean by I don't know how I got

3    that?  What is it that you don't know how I got?

4        A.    Well, so sometimes we have part-time or COT

5    employees that are not in the computerized, and so they

6    have to be handwritten in, the -- they're called "white

7    shirts," but they're COTs.

8              And starting back in July, we don't have that

9    position anymore currently, today, but back in July we

10   did.  And they would have been handwritten into the

11   control rooms, because we have to have a staff member, at

12   least, in one control room on every wing, so --

13       Q.    Why do you have to have someone in each control

14   room on every wing?

15       A.    Because the doors are electronic and controlled

16   by the computer system, so an officer has to be in the

17   control room to open up the doors.

18       Q.    If the -- if there were COTs working in the

19   control rooms, and they were handwritten in, that would

20   be on paper somewhere.  Correct?

21       A.    Correct.  It would be on a journal for that

22   day, or in the briefing notes that is part of the Daily

23   Post Sheet packet that's turned in.

24       Q.    Would it be on a Daily Post Sheet anywhere?

25       A.    Yes.  So there's a briefing sheet that is part

Lori Stickley - 10/12/2021

60

1   of the Daily Post Sheet that they would have made notes

2   in, so I don't know if you scroll down more if there's a

3   note section.

4        Q.    Yes.   Okay.   So we're going to go to --

5        A.    Yes, so --

6        Q.    The final page.   Is this the notes section

7   you're talking about?

8        A.    Yeah, it would be the employee notes and for

9   the staff members, but also if they put anybody else in,

10  but there's a briefing sheet also, I don't know

11  if -- where the COIIs could be listed.

12       Q.    If you had wanted -- if you had seen this Daily

13  Post Sheet, which shows someone in the control rooms only

14  in 1A and 3A, and you wanted to know whether, in fact,

15  the other control rooms were staffed, how would you go

16  about figuring that out?

17       A.    I would look at the daily briefing sheet that

18  would be attached to this, because I sign off on them

19  every morning.   I could cross check the journals for the

20  other control rooms to see who is posted in the control

21  rooms.

22       Q.    Okay.   And going back up to the first page of

23  the a.m. shift, which is the third page of Exhibit 1,

24  ADCRR00097769, and there are people listed as "floor,"

25  like, that's the post that's listed for various wings and

Lori Stickley - 10/12/2021

61

1   clusters.

2            Do you see that?

3   A.      Yes.

4   Q.      What are the duties of the people listed as

5   floor?

6   A.      So the floor officers are the staff that are

7   doing the security checks, would be doing showers, would

8   be escorting the nurse, would be turning -- helping to

9   turn rec, would be taking an inmate out to the COIII, if

10  the COIII asks for them.

11           So the floor officer is the one down on the

12  ground, walking all day long, walking in and out of the

13  pods, doing anything that needs to be done.

14  Q.      What are the duties of the people who have the

15  post control?

16  A.      So the control room is the person up in

17  the -- it's a bubble, the control room, that controls the

18  opening and closing of the doors whenever the floor

19  officer requests it, they log the journal, so any time

20  somebody comes in or out, they're responsible for making

21  all the notes in the journal, answering the phone, or the

22  control room if somebody comes down, or returning the

23  count, once the officer does it and hands it to him,

24  so --

25  Q.      Does the floor officer hand the count to the

Lori Stickley - 10/12/2021

62

 1    control officer?

 2         A.    Sometimes the floor officer will have the count

 3    sheets.  He might hand them up to the control officer for

 4    them to call it in or they will go down to the other

 5    office and call it in themselves.  So it can be done

 6    either way.

 7         Q.    Okay.  If you're in the control room in one

 8    cluster, can you see into any other cluster?

 9         A.    To -- into the pods where the inmates are at?

10         Q.    Yeah.

11         A.    No.

12         Q.    If you're in the control room, looking into the

13    pods where you -- in the cluster where you are in the

14    control room -- so let's say you're in 1 Able --

15         A.    Okay.

16         Q.    -- in the control room in 1 Able, can you see

17    into the cells in 1 Able?

18         A.    Not particularly.

19         Q.    Can you see into the cells at all?

20         A.    You can -- depending on the time of the day

21    from the control room you can see movement or shadows,

22    but you can't see directly into the cell.

23         Q.    If you're in the control room, what can you

24    hear from the cluster where you're in the control room?

25         A.    A lot, pretty much.

Lori Stickley - 10/12/2021

63

1    Q.    I mean, can you hear people just talking?

2    A.    Depending on where they're talking at, but you

3  can hear the doors opening, you can hear inmates yelling

4  back and forth if they're trying to talk from one pod to

5  another pod.  You can hear if somebody started kicking or

6  banging on a cell front, that way you could relay or I

7  mean -- so it's not soundproof, you can hear.

8    Q.    Okay.  If you're in the control room for one

9  cluster, can you hear anything from the cluster across

10  the hall?

11    A.    You would be able to hear noises.  Depending on

12  how loud they were talking, you might be able to pick out

13  a few things, because they're -- they're not that far

14  from each other.  So you could hear stuff.  You might not

15  be able to make out exactly what they're saying, but you

16  could tell they're -- if there was commotion or something

17  going on, you could hear, yes.

18    Q.    If you're in a control room for a cluster,

19  would you be able to hear noises from any cluster other

20  than the one you're in and the one across the hall, the

21  one directly across the hall?

22    A.    So if you're in 1 Able Dog, which is at the

23  front of the wing, you should be able to hear if

24  something was going on in Baker Charlie, which is at the

25  end of the wing?  I -- I don't know.

Lori Stickley - 10/12/2021

64

1      Q.      Going down toward the middle of this page,
2    there's watch pod 1, watch pod 2 and watch pod 3.
3            Do you see those?
4      A.      Yes.
5      Q.      What are watch pod officers?
6      A.      They're the ones assigned to 1 Dog 4, 5, and 6
7    for the mental health watches.
8      Q.      And what is their job?
9      A.      To conduct the security checks, observations,
10   duties on those pods, either, A, based off of the watch
11   orders or just; B, based off of standard procedures for
12   that area.
13     Q.      Are health and welfare checks done in watch
14   pods?
15     A.      Yes.
16     Q.      How many -- withdrawn.
17            Is the -- is a watch pod officer the person who
18   does the observations of a person on mental health watch,
19   whether it's constant or 10-minute or 30-minute?
20     A.      No, so -- well, yes and no.  So the watch pod
21   officers have the basic watch pod.  If there's an officer
22   that's placed on a constant, then another officer's
23   assigned.  Because the watch pod officers would be in and
24   out doing showers, doing rec, doing feeding, doing count.
25            Where if an inmate is on a constant, obviously,

65

1    the officer has to be constant there.  Cannot come and

2    go.

3              So an additional officer has to be assigned

4    under special assignment and I think you can see that

5    down at the bottom Officer Gonzalez is on a mental

6    health, I think.

7        Q.    The person who is listed at mental

8    health/medical programs escort 1 --

9        A.    Oh, okay.  I was trying to see what's on the

10   side.

11       Q.    I can make it a little bigger.  I was just

12   trying to get you able to see the whole page.

13       A.    Yeah.  They might -- that might be a

14   different -- so those are escorts.  So they would be

15   special assignments, where I think on page 2 or page --

16       Q.    So this -- so page 2, there's -- special

17   assignments start?

18       A.    Right.  Yeah.  So that's where they would be

19   marked, they would be a special assignment assigned if

20   they were on a constant watch.

21       Q.    Okay.  Can you tell, and I'm going to scroll

22   down a little bit so you can see more of the special

23   assignments.

24       A.    Uh-huh.

25       Q.    So we're looking at pages ADCRR00097770 --

1   would be like in the briefing sheet or on our overtime

2   form that they turned in.

3       Q.    Okay.   And it's also not possible from the

4   Daily Post Sheet, the portion of the Daily Post Sheet

5   that we're looking at to determine whether -- what post

6   they were working?

7       A.    If done correctly, at 100 percent correctly,

8   they would then be back up to page 3 in a post.

9       Q.    So we'd be able to find, for example, Louis

10  Romero on --

11      A.    Right, if he stayed --

12      Q.    Like he's that 3C floor split, we see?

13      A.    Right.

14      Q.    So at whatever time it was that this is a

15  snapshot of, that's where he was assigned?

16      A.    Correct.

17      Q.    Okay.   Can you tell me what a mental

18  health/medical/programs escort is?

19      A.    So those officers escort the inmates up to

20  medical for nurses line, provider line, dental line,

21  program class, so if they -- they're the ones that help

22  escort the inmates from point A to point B.

23      Q.    Do you see where it says "split" on a couple of

24  these?

25      A.    Yes.

Lori Stickley - 10/12/2021

68

1     Q.     Can you explain what it means when it says
2   "split"?
3     A.     So the way the roster was set, the person -- so
4   Christopher Mansfield is working overtime, so he's not
5   going to be there all day.  He came in or stayed after
6   his regular shift, and so they put him in, but then they
7   had to split fill it with another person when they are
8   going to leave, because he's not going to be there the
9   whole day.  So either earlier in the day or later in the
10  day, depending on what time this was printed, somebody
11  else would be in that post or his name would be removed.
12  So that way he -- it just lets me at a glance know that
13  he did not work that post for the 8 or 12 hours.
14    Q.     Okay.  What is a DI 326/recreation escort?
15    A.     So the DI 326 would be the director's
16  instruction for and it's just a policy number, so
17  it's -- it's the Parsons versus Ryan terms for when to do
18  the recreation escort.  So that's how they named the
19  extra positions when the stipulations came into play.
20    Q.     Okay.  What does that person do?
21    A.     Escorts inmates to recreation, and then sits
22  out there and watches them while they're at -- watches
23  the inmates while at recreation for safety.
24    Q.     And what is a recreation officer?
25    A.     Same.  They are the ones that are out dealing

1   with recreation, watching recreation, or turning

2   recreation.

3       Q.     Is there any distinction between DI 326

4   recreation escort and recreation officer?

5       A.     No, it's -- they're all the same.  It's just we

6   were given so many positions to fill, but with staffing,

7   and that's the officer error, as we kind of termed it

8   earlier, where the staff member, the sergeant puts the

9   name in.  So, I mean, because Officers Atondo and

10  Petersen are assigned to SMU on the recreation team, so

11  they're my recreation officers.  They're the ones that

12  sit and watch recreation while the inmates are out.

13          Durazo, that is in the split fill, he's

14  actually the recreation sergeant.  So he was working

15  overtime that day, so they put him on the roster.  He is

16  part of the recreation team.  And Gonzalez was probably

17  doing overtime, because he's on a split, so --

18      Q.     And by "Gonzalez," you're talking about

19  Gerardo?

20      A.     Well, Gonzalez, Andres, down at the bottom

21  where it says recreation officer 4.

22      Q.     Okay.  Sorry, there's a lot of Gonzalezes on

23  this particular page.

24      A.     Yes.

25      Q.     So you said this is -- this is the officer

71

1   watching the recreation turn.  So that's why I'm saying

2   they're all doing the same duties, but it's just properly

3   giving them that title for that day, you are doing

4   escorts versus you're watching, so --

5       Q.    Is there a distinction in what they actually

6   do?

7       A.    No, they're interchangeable.  They all do the

8   same.  It's just who is actually going into the billing

9   and doing the strip search, who is restraining, who is

10  escorting them out.  And who is actually standing

11  watching them at recreation that day.  They all know how

12  to do the same task.

13      Q.    Are the people who are listed as recreation

14  escort DI 326 recreation escort or recreation officer,

15  are those people referred to as "the rec team"?

16      A.    Yes.

17      Q.    Are there other people that would be included

18  in the rec team, other than those positions?

19      A.    Only if they called in and we had to replace

20  somebody because of a call-in but the rec team are the

21  ones that always turn rec.

22      Q.    Okay.  Going up to the top of page 3, which is

23  ADCRR00097769, there's a box where it talks about total

24  staff.

25            Do you see that?

72

1      A.      Yes.

2      Q.      So it says that the authorized full-time

3   employees for the a.m. staff for SMU are 159.  Right?

4      A.      That's what it says.

5      Q.      And that they're -- is that wrong?

6      A.      I -- I don't know.  Back in July, I don't -- I

7   can't -- it should be right, I mean, it's a computer

8   generized program.

9      Q.      Do you know what the authorized FTEs for the

10  a.m. shift are right now?

11     A.      That would be 100 and -- it would be 126, plus

12  or minus.

13     Q.      Do you know why it has changed?

14     A.      So -- so CORE Staffing is the program and it's

15  human entered, so the major goes in and enters the

16  full-time positions into it, so if it's not updated or

17  changed every week when personnel sends out the update,

18  it could be wrong, so --

19     Q.      How frequently does the authorized number of

20  FTEs change?

21     A.      Not often.  But like when they took away the

22  COT positions, it would change the numbers, and when

23  they -- they just changed a couple -- I want to say a

24  month ago, so --

25     Q.      What were the changes a month ago?

Lori Stickley - 10/12/2021

73

1      A.      They -- the director and the governor approved
2  new corporal positions, so I mean, just the numbers
3  changed out a little bit.
4      Q.      So that would have caused the number to go up a
5  little bit.  Right?
6      A.      No, they took -- they took it -- it would go
7  down.
8      Q.      Why?
9      A.      Because the numbers were taken out of officer
10  positions and made corporal positions, so it's like a
11  mid-level supervisor between the officer and the
12  sergeant.
13      Q.      Does total staff include only COIIs?
14      A.      Yes.  For the authorized FTEs right there?
15      Q.      Yeah.
16      A.      Yes.
17      Q.      Okay.  And until some point during the summer
18  that authorized FTEs included COTs?
19      A.      At some time, yes.
20      Q.      But no longer?
21      A.      But no longer.
22      Q.      And COTs are COs in training or CO trainees?
23      A.      Yeah.  Yeah, the first entry level.
24      Q.      Okay.  Do you see that it says that there were
25  94 people assigned or I guess 94 COIIs assigned to the

Lori Stickley - 10/12/2021

74

1    a.m. shift at SMU.

2              Do you see that?

3    A.    I see that, yes.

4    Q.    And it says that there are 33 people on RDOs?

5    A.    Uh-huh, yes.

6    Q.    Which means their regular day off?

7    A.    Yes.

8    Q.    And that total available are 35?

9    A.    I see that.

10   Q.    Do you understand why there's only 35 people

11   available if there's 94 people assigned and 33 people on

12   RDO?

13   A.    Well, and that's why I'm saying it's

14   computer-generated based off the numbers, and they don't

15   add up.  And that's -- CORE Staffing isn't a great

16   program.

17   Q.    Okay.  So there might be errors in that?

18   A.    Right.  Those numbers don't match, that's kind

19   of what I was trying to get to earlier, the numbers are

20   off.  And I don't know why, but --

21   Q.    Okay.  And just to be clear, the places on the

22   Daily Post Sheet where there's no name next to one of the

23   required posts, what that means is that that particular

24   post was not staffed according to this Daily Post Sheet;

25   is that correct?

Lori Stickley - 10/12/2021

75

1      A.      According to this sheet, yes, that's what it's
2  saying.   If there is no name there, that there's nobody
3  assigned.

4      Q.      Okay.  Can you tell from the Daily Post Sheet
5  who is supposed to respond if an ICS is called?

6      A.      So -- yes.

7      Q.      How?

8      A.      So on the right column where it says Incident
9  Command Services, the amount of time (inaudible) --

10             THE REPORTER:  I'm sorry?  I'm sorry, can you
11  repeat?

12             THE WITNESS:  On the right-hand column under
13  Incident Command Services, there's A team, B team, team
14  leader, and camera operator.  Those staff are identified
15  and they are to respond.

16             THE REPORTER:  Maria, can I interrupt for a
17  second?

18             MS. MORRIS:  Yes.

19             (Discussion off the record.)

20  BY MS. STICKLEY:

21      Q.      Okay.  So the people who are listed on the far
22  right-hand side of the third page of Stickley Exhibit 1
23  under Incident Command Services, those are the people who
24  are assigned to respond if there's an ICS?

25      A.      Yes, that's correct.

Lori Stickley - 10/12/2021

76

1      Q.      What is the difference between A team and B
2  team?
3      A.      So the -- the difference between -- it's based
4  on how many staff you need to respond.  So when the
5  officer, whoever initiates the Incident Command System,
6  they will either ask for an A team or B team type 5,
7  type 4, because we have different terminologies, so it's
8  just -- so it's staff members, it's to prevent everybody
9  from responding, and you have 20 people standing there,
10  versus dedicating only two to three.  If you need more,
11  then you would ask for, you know, additional resources,
12  so that way it controls the amount of people responding.
13      Q.      So the smallest ICS need would be for just A
14  team?
15      A.      Yeah, it could even be less, I mean, they could
16  even activate an ICS and just ask for a supervisor,
17  because it can just be handled with the supervisor coming
18  down, or just -- so it just depends on the situation,
19  unfortunately.  But it gives -- it identifies the staff
20  member in the beginning of the day so that they know if
21  an ICS does happen, who is supposed to respond.
22      Q.      And what is the team leader role?
23      A.      So when they would get there, depending on who
24  arrived first, they would take over command, because the
25  person, per policy, the person that actually activates

1    the ICS is not -- doesn't take over command because they

2    might be involved in it, so when the team leader would

3    respond, they're more of a senior officer, you know, with

4    experience, that they would go over, have a face-to-face

5    with the person that initiated the ICS, and then take

6    over command and help direct resources.

7        Q.    Is ICS generally activated by a floor officer

8    or a control officer or could it be either?

9        A.    It could be any person.  Any staff member,

10   medical, contract vendor, could activate an ICS if they

11   felt the need to.

12       Q.    Are you familiar with the Post Priority Chart?

13       A.    Yes.

14       Q.    Have you reviewed it?

15       A.    Not recently, but I'm familiar with it.

16       Q.    Okay.  All right.  I am going to show you a

17   Post Priority Chart.  Can you see a colorful chart on my

18   screen?

19       A.    Yes.

20            MS. MORRIS:  Okay.  And I'm going to mark this

21   as Stickley Exhibit 2.

22            (Marked for identification Exhibit 2.)

23   BY MS. MORRIS:

24       Q.    Can you tell me what Stickley Exhibit 2 is?

25       A.    So it is a chart that has AM blocks and it

Lori Stickley - 10/12/2021

78

```
1    says, "Posts Collapsed By Unit," and "Total," and it has
2    a running number system from zero to whatever, because it
3    increases as the columns go down and then it has the full
4    roster, and it has the different units and posts listed.
5         Q.    Okay.  Do you know how the chart -- the Post
6    Priority Chart works?
7         A.    I do.
8         Q.    Can you explain it to me, please?
9         A.    So to clarify -- so, in general, or how this
10   one works?
11        Q.    Let's start with in general, and then go to
12   whether there's any variations in this one.
13        A.    Okay.  So, in general, the concept of the Post
14   Priority Chart is if it's 5:00 and staff start arriving,
15   and you only had 10 people show up to work, I mean, I'm
16   going to use small numbers, where would you put them?
17   Where -- what are the priority posts that need to be
18   filled first.  That is the concept of the Post Priority
19   Chart.  It is if an incident or if staff didn't come to
20   work or a huge accident on I-10 and staff couldn't get
21   there and you only had 10 people report or 20 people
22   report, where would you put those 20 people?
23             So that is the overall concept of the Post
24   Priority Chart.  So individually each complex has one.
25   And as a major, this is one of my -- when I was a major,
```

1   that was one of my responsibilities was ensuring the Post

2   Priority Chart was always updated, met regularly with the

3   captains, which are the unit chief of securities to

4   ensure that we are posting correctly, based on the unit

5   activities of what is the priority.

6           So, individually, at Eyman Complex, I don't

7   know when they did it, I was never part of it, it was

8   already established.  They had a meeting, and they looked

9   at if we, you know, starting off what would be the

10  priority of posting the complex if, as staff arrived, we

11  would send them in a numerical order and staff the

12  complex.

13      Q.    So just as an example, and hopefully this will

14  never ever happen, at Eyman if one day all of Eyman there

15  were only 14 people working, what you would see?  You

16  would go to the line 14, and you see that there would be

17  six people working at Cook, six people working at Meadows

18  and two people working at Rynning; is that accurate?

19      A.    So from my understanding, if you have read the

20  chart, they do it backwards at Eyman.  I don't know why,

21  they actually go in negative.

22      Q.    Okay.  I'm going to go to the last page of

23  this, then.

24      A.    Right.

25      Q.    And see if that makes more sense.

Lori Stickley - 10/12/2021

80

1     A.     Yes.  So when you said like 14, they're saying

2  they're only 14 down.  So they do it in reverse, for some

3  reason, at Eyman.

4     Q.     Oh.

5     A.     Negative instead of a positive.  So at 220

6  that's at 100 percent staffing, so they -- they just do

7  it opposite.  So as staff would leave, you would see the

8  numbers starting to decrease on the sheet and it tells

9  you which posts to collapse, so if we only had 200 staff

10  on-site, there would be 51, you know, it's across the

11  board that way.

12     Q.     Okay.  That makes sense.  Thank you.

13            So if -- if SMU had all its expected staff show

14  up on a particular day --

15     A.     Uh-huh.

16     Q.     -- but Rynning did not, does that mean that

17  there would be staff that could be moved from SMU to

18  Rynning?

19     A.     Yes, based off of the post collapse chart, it's

20  called cross-leveling, and that is managed by Complex.

21  The numbers are reported daily throughout the day as

22  changes happen.  You know, a lot of things, we could have

23  emergency transport, medical transports, where the

24  numbers would change OR fluctuate, but yes, we could be

25  called by Complex, according to the post chart, just a --

Lori Stickley - 10/12/2021

81

1    you need to send two staff over to Rynning Unit.  And

2    then we would cross-level them over to Rynning Unit, and

3    then it dedicates what post is collapsed.

4        Q.    And would you at SMU use the priority post

5    chart to determine which post would not be staffed at SMU

6    because you had sent people over to Rynning?

7        A.    Yes.

8        Q.    Are you familiar with the weekly CO

9    status/hiring reports?

10       A.    Yes.  I get them on Fridays from HR when they

11   send them out, the vacancy reports.

12       Q.    Okay.

13       A.    I'm familiar.  I look at them.

14       Q.    Okay.  I'm going to show you one when my

15   computer decides it wants to.

16             Can you see a hiring chart on my screen?

17       A.    Yes.

18             MS. MORRIS:  Okay.  I'm going to mark this

19   document as Stickley Exhibit 3, and it's a six-page

20   document starting on ADCRR00055894.

21             (Marked for identification Exhibit 3.)

22   BY MS. MORRIS:

23       Q.    Can you tell me what Stickley Exhibit 3 is?

24       A.    So it's the Arizona Department of Corrections

25   weekly CO Status/Hiring Report for Eyman, dated

Lori Stickley - 10/12/2021

82

1    August 23rd, '21.

2        Q.    Okay.  And this shows -- actually withdrawn.

3              What is the purpose of this report?

4        A.    So it comes out from HR to let us know how many

5    positions we have available, what our vacancy rate is,

6    what -- what's filled, what's not filled.

7        Q.    And SMU was at -- at -- it had 37.97 percent

8    vacancies as of this date?

9        A.    Yes.  According to the report.

10       Q.    And is that what your understanding of what the

11   vacancy rate was?

12       A.    Yeah, I mean, that would be accurate.  I mean,

13   that's what the report says.

14       Q.    Okay.  All right.  And at this time there were

15   COT positions.  Correct?

16       A.    I believe yes, we still had COTs, because there

17   are four filled, according to the report.

18       Q.    Okay.  So it was sometime after August 23rd

19   that COTs were no longer authorized?

20       A.    Yeah, they changed, yes.  I don't know the date

21   though.

22       Q.    Okay.  Is this about the same level -- is the

23   staffing level that's reflected in Stickley Exhibit 3

24   about the same staffing level that has -- that there's

25   been at SMU since you've been the deputy warden?

Lori Stickley - 10/12/2021

83

1          MS. LOVE:   Foundation.

2          THE WITNESS:   Plus or minus, yeah, we've been

3   operating at a vacancy in the 30 percents, since I've

4   been at SMU1, yes.

5   BY MS. MORRIS:

6      Q.   Okay.   All right.   What are things that don't

7   get done because you're operating in the 30 percent

8   vacancy range?

9          MS. LOVE:   Form.

10         THE WITNESS:   Unfortunately, it depends.   It

11  fluctuates, so -- and it really is sometimes it's day to

12  day, sometimes it can be hour by hour.   We can start off

13  the morning with, you know, at an acceptable range to run

14  everything, to run recreation, to run showers, to run

15  classes, something could happen at another unit that they

16  need to take staff to cross-level or an incident could

17  happen at our unit where we have to shut down certain

18  things.

19         So, I mean, there's not -- there's not an exact

20  answer to say what does or doesn't get done

21  based -- because we attempt to try to get everything done

22  within reason, and what's possible for our staffing

23  levels.   It might just be slower on the turn getting it

24  done, but we, you know, every day we have certain tasks

25  we have to get done and on the most part I think we're

1   pretty successful at getting everything done that we

2   physically can get done with the staff we have on-site.

3              MS. MORRIS:  Okay.  Let's take a break.  And

4   come back in 10 minutes.

5              MS. LOVE:  Okay.

6              (Recessed from 11:29 a.m. until 11:45 a.m.)

7              MS. MORRIS:  Back on the record.

8       Q.    Are there people with serious mental illness in

9   max custody at SMU right now?

10      A.    I do have some inmates that are SMI inmates,

11   yes.

12      Q.    Okay.  Do you track that at all?

13      A.    They're marked on the count sheets at SMI,

14   and -- but I don't have, like, a spreadsheet, just that I

15   go check on them everyday or track them.  I mean, we

16   track them based off of other reports that we have to do,

17   like in max custody we have to do out-of-cell tracking

18   sheets.  In detention, we have to do individual detention

19   records.

20              So, I mean, so if they're in those areas, they

21   have the standard sheet, just like any other inmate.  I

22   don't have just a special SMI tracking that I just track

23   them.  We try to track them as much as possible as normal

24   population inmates.

25      Q.    Are there any particular locations where people

Lori Stickley - 10/12/2021

85

1    are held in max custody at SMU, where they're more likely

2    to be held if they have a SMI in max custody at SMU?

3        A.    No, the BMU program is at Browning Unit, so --

4        Q.    Are there people in max custody at SMU who have

5    gone from mental health watch to max custody?

6             MS. LOVE:   Form and foundation.

7             THE WITNESS:   Only if they were already max

8    custody to begin with, and when --

9    BY MS. MORRIS:

10       Q.    Okay.

11       A.    -- on watch.   And then they would go back when

12   they completed their treatment.

13       Q.    Are there any particular precautions that have

14   to be taken when a person who was in max custody went to

15   mental health watch is being returned to max custody?

16            MS. LOVE:   Form.

17            THE WITNESS:   Not any additional precautions.

18   I mean, it's the same standard with any inmate that comes

19   off watch.   They have to be cleared by medical and mental

20   health, and they have their procedures that they have to

21   do and follow-up and time frames, but nothing on the

22   security side.   It would be their side.

23   BY MS. MORRIS:

24       Q.    Do you know if there are people in max custody

25   at SMU who have repeatedly gone back and forth between

Lori Stickley - 10/12/2021

86

1   max custody, mental health watch, and max custody?

2       A.    Probably, but off the top of my head, I can't

3   give you any examples.

4       Q.    Okay.  Does anyone track that?

5       A.    Mental health might, I don't know.

6       Q.    You don't know, okay.  You -- you and people in

7   your supervision chain do not track that?

8       A.    No.  No.

9       Q.    Are there people with a serious mental illness

10  in detention at SMU?

11      A.    Probably.

12      Q.    Do you track that?

13      A.    No.

14      Q.    Are there people who have gone from mental

15  health watch to detention?

16      A.    Yes.

17      Q.    Are there people -- actually, withdrawn.

18            Are there any particular precautions that are

19  taken when someone is moved from mental health watch to

20  detention?

21            MS. LOVE:  Form and foundation.

22            THE WITNESS:  Just the same, based off of

23  mental health and what their procedures are.

24  BY MS. MORRIS:

25      Q.    Are there people in detention who repeatedly go

1   from detention to mental health watch to detention?

2       A.    Yes.  I don't know any names off the top of my

3   head, though.

4       Q.    Is there close management anywhere at SMU?

5       A.    No.

6       Q.    Have you -- has there been close management at

7   any location where you have been deputy warden at the

8   time you were deputy warden?

9       A.    No.

10      Q.    Are there any policies regarding the

11  temperatures in housing units where people with a serious

12  mental illness are housed at SMU?

13          MS. LOVE:  Form.

14          THE WITNESS:  There is policy regarding SMI

15  inmates and there's policy regarding temperatures, and

16  then there is a section that talks about certain

17  medications, yes.  I do not -- to my knowledge, I do not

18  have any inmate at SMU that are any -- that are on any

19  psychotropic meds that would require that temperature

20  requirement for their area.

21  BY MS. MORRIS:

22      Q.    Okay.  Do you know what policy it is that lays

23  out what medications it is?

24      A.    I don't think it lists the medications, it

25  would be like in the 1100 series, I'd have to look at,

Lori Stickley - 10/12/2021

88

1   like, the index to see which one, but it would be

2   referencing in the mental health side of it, but I

3   believe they -- from my remembering what it said, it just

4   refers to psychotropic meds, it doesn't give, like, what

5   type of psych -- so I don't know to what degree, if

6   there's a bunch of different ones or if that's just what

7   they're called.

8        Q.    Okay.  But you said a moment ago that you don't

9   believe there are people taking the medications that

10  would implicate that policy at SMU?

11       A.    And the reason I say that is because at the

12  beginning of the summer medical would advise us if we had

13  any inmates under SMI taking psychotropic meds, and I

14  don't have any at SMU that they've advised me of, to

15  where we have to clarify maintain that temperature below,

16  I want to say it's 85 off of memory.

17            So, I mean, and that's why -- because medical

18  mental health would advise, so that way we would know if

19  we had an inmate that was on that type of medication.

20       Q.    And so you weren't advised of anyone being on

21  those kinds of medications this year?

22       A.    At SMU, correct.

23       Q.    Okay.  I'm going to shift gears now.  You're

24  familiar with the Department Order 812.  Right?

25       A.    Can you tell me the name of it?  I mean I know

Lori Stickley - 10/12/2021

89

1    of the number, but --

2         Q.    It lays out the Step Matrix Program for people

3    in custody?

4         A.    Oh, okay.

5         Q.    Are you familiar with it?

6         A.    Yes, I'm familiar with it.

7         Q.    Okay.  What is the purpose, as you understand

8    it, of the Step Matrix Program?

9         A.    So my understanding of the step matrix is

10   inmates that are in max custody that have a significant

11   sentence structure or time, is the ability to give them

12   incentives of privileges that they might not be able to

13   achieve because they will not lower in custody ever to

14   get down.

15              So they introduced this step to give incentives

16   or, you know, to help maintain a productive area within

17   max custody, so they have something to do.

18        Q.    Why would it -- why is it -- why give them

19   something to do?

20        A.    Because if you have nothing to do, I mean, just

21   like anybody, I mean, if you're sitting around bored all

22   day with nothing to do, your mind can wander and either

23   do destructive things or can be mentally, you know,

24   discouraging or, you know -- I guess to be productive is

25   helpful.

Lori Stickley - 10/12/2021

90

1      Q.     Do you understand the step program as having

2  any role in people getting out of max custody?

3      A.     From the way I look at it, there -- they run

4  parallel, they don't interchange, because max custody is

5  based off of a classification in their sentence that they

6  were sentenced to, and because of their scores, where

7  they might not ever go low enough to get out of max

8  custody, depending on their sentence.

9             The step in phases is behavioral, based on

10  their -- if they -- or everyday interaction with the

11  inmate population, with staff, and their individual

12  behaviors that moves them up or down within the step

13  phase program.  They're -- they're not connected.

14     Q.     Are all people in max custody in the step

15  program at SMU?

16     A.     At some level, yes.

17     Q.     And when you say at some level, they're at

18  Step 1, 2, or 3?

19     A.     Correct.  At some level, yes, Step 1, 2, or 3.

20     Q.     Okay.  Do you have any role in reviewing the

21  step level of people at SMU?

22     A.     I -- yes and no.  So we have a committee, and

23  we meet every Thursday and so either between the ADW or

24  myself, so it's not -- I'm not at every committee review,

25  because I have different things going on, but I go

Lori Stickley - 10/12/2021

91

1    to -- I frequent them often, yes.

2         Q.     Okay.  So it would be either you or the

3    associate deputy attorney [sic]?

4         A.     The associate deputy warden --

5         Q.     Warden, sorry.

6         A.     -- correctional officer fours, the captain, so

7    yes, so there is a committee of multiple different people

8    from different disciplines within SMU that go to the

9    committee review.

10        Q.     When did those meetings happen?

11        A.     Every Thursday.

12        Q.     What time?

13        A.     12:00.

14        Q.     And when do they go until?

15        A.     Depending on how many inmates, it could go

16   30 minutes, it could go 45, it could go an hour, just

17   depends on how many inmates, because we have to review

18   100 percent a month.  So we break it up every week and so

19   it just depends on -- and it depends on how lengthy the

20   discussions go, and based off the inmates' discipline

21   if -- or so -- or programming.  So sometimes we have

22   in-depth discussions and sometimes it goes very quick.

23        Q.     Is there review of documents as part of that

24   review process?

25        A.     It could be.  Usually it's more on the

92

1    discipline side if we're lowering a step.  Because if an

2    inmate was involved in any type of discipline violation,

3    we will review the ticket or the information report so

4    that way -- because not everybody that's in the committee

5    might be aware of the disciplinary violation, so we want

6    to make sure that everybody is educated about the

7    incident, so they will have the information report or the

8    disciplinary violation, so that way it can be reviewed in

9    its entirety.

10        Q.    Is anything else reviewed in -- on documents

11   for the step-level review process?

12        A.    On the program side if an inmate completed his

13   program requirements, they'll review that also to -- but

14   a lot of the program side review it either is pass --

15   excuse me, it's a pass or fail.  They either complete it

16   or they didn't.  It's not like an assignment,

17   teacherwise, where we're grading it to see if they passed

18   to go to the next step.  It's either they completed the

19   programming, they completed the class, or they completed

20   the books.

21             So it's a pass/fail, as long as they did the

22   required work, but we don't have to review it for

23   complete -- not -- for content.  We're reviewing it for

24   completion, not the content.  At the level he completed

25   it, as long as he completed it, it's a pass.

Lori Stickley - 10/12/2021

93

1      Q.     I'm not sharing my screen, am I?

2      A.     No.

3      Q.     Thank you.  That wouldn't be terrible if I was

4    on this one, but just curious.  Good to know.

5           In the -- in the step-level matrix, among the

6    things that are required for advancement are displaying

7    behavior that's cooperative and respectful.

8           Does that sound familiar to you?

9      A.     Yes.

10      Q.     How is that evaluated?

11      A.     So that's more on the evaluation from the

12    teachers, so part of the step review are the max custody

13    COIII, which is correction officer three, the teachers,

14    they're in -- they're present, and they can verbally

15    speak, and that's why I'm saying sometimes meetings can

16    go 30 minutes, 40 minutes, to an hour, because it's that

17    verbal declaration by the program teacher saying yes,

18    Inmate Smith, you know, was helpful or he helped another

19    inmate or he's always cordial or he's, you know,

20    productive in class, he doesn't waste time.  So it's the

21    verbal assessment from the program teachers that teach

22    the class.

23      Q.     In the matrix it also says that among the

24    expectation for people in the step-level process -- in

25    the step-level program are following rules and

1   regulations, including the Department Order 704 inmate

2   regulations.

3           Does that sound familiar to you?

4   A.      Yes.

5   Q.      And so that includes things like the state of

6   your cell and whether it's clean.  Right?

7   A.      Correct.

8   Q.      Is that considered at all in the step-level

9   review process?

10  A.      It is considered in there, but I don't -- the

11  easiest way to explain, it's a minor thing, because as

12  going to some of the meetings, and this was a

13  discretionary call by myself and in talking with the

14  committee, that there's got to be something else that is

15  a violation to significantly use as evidence to decrease

16  a step.

17          I'm not going to decrease a step just because

18  maybe one time they were on a 704 compliance.  You know,

19  I mean I guess I take it as a parent concept with your

20  kids, you can tell your kid to make their bed 10 times,

21  they can make it twice.  But you're not going to stop

22  telling your kids to make the bed.

23          So for that, it is considered, but it's very --

24  it holds very low points to, you know, there's got to be

25  other stuff.  If that's the only infraction, it's not

Lori Stickley - 10/12/2021

95

1    going to reduce his step.  And that's one thing when I

2    started going to the meetings that I noticed that I'm

3    like, certain things should be weighed stronger than

4    others.  If it's just a 704 violation, that's a minor

5    violation to me.  That could be corrected just through

6    officer presence and walking in the pods and having

7    discussions with the inmate.  But the overall is still

8    trying to have them be productive and, you know, working

9    towards a better goal.

10       Q.    Is there any documentation of the step-level

11   review process?

12       A.    What do you mean by "documentation"?

13       Q.    Like a form that gets filled out that says we

14   decided to keep the person at the same step for these

15   five reasons?

16       A.    So there's not a form form, like -- no.  So

17   there's not a form like that, but there is -- we do track

18   it.  It does get uploaded -- well, it gets updated.  A

19   comment gets updated in an ACIS that, you know, they

20   remain Step 2 or they went up to Step 3.  So there is a

21   section in ACIS that takes them up or down and then if

22   they come down there's always a place for a comment in

23   notes to be made on the fly.

24           And so I've recently started tracking the step

25   meetings just to see -- I, internally myself, started

Lori Stickley - 10/12/2021

96

1   just tracking it after the meetings to just start seeing

2   what is the up or down, what were the deciding factors,

3   just to make sure we are following everything correctly.

4        Q.    Is there any place where the reasons for a

5   person not advancing or advancing -- so putting aside

6   when people go down a level, a step, putting aside those

7   instances --

8        A.    Uh-huh.

9        Q.    -- is there anyplace where it's documented why

10  a person either stayed at a level or -- or went up a

11  level?

12       A.    ACIS -- it's one of the functions within ACIS

13  for the step, and it -- it's just a section, and you go

14  into it and when there's -- it just gets marked up that

15  it's their day for review, and that they're increased to

16  the next step.  There is a section that you can make a

17  comment, but if they're increasing going up, it -- they

18  just met requirements and they -- we just increase them.

19  And it's just a timestamp for them increasing.

20            The inmates are notified, typically by inmate

21  letter, from the COIII, and saying, hey, you know, you've

22  been moved up a step or you've been moved down.  And then

23  in the inmate letter, it would be noted if he was moved

24  down and it would be noted why.  Where there is a recent

25  violation, disciplinary violation, you didn't complete

Lori Stickley - 10/12/2021

97

1  programming, I mean, there's very specific reasons why

2  they decreased, so -- but the inmates are notified by

3  inmate letter.

4       Q.    So the inmates are notified of --

5       A.    The status change --

6       Q.    -- what the step -- before and after whether

7  the step changed or not and how it changed?

8       A.    Correct.

9       Q.    But they are not informed -- withdrawn.

10            When are -- what are they informed of regarding

11  the reasons for the decision of the step-level review

12  process?  What are they informed of?

13      A.    Okay.  So they're notified that the review

14  committee met and you moved to Step 3, or the review

15  committee met and due to recent disciplinary on this

16  date, you stayed the same or due to discipline on this

17  date, you were decreased to Step 1, so the inmates are

18  notified.

19      Q.    So if there's a disciplinary, they're informed

20  that they had a disciplinary and that that had an impact

21  on the step-level review process?

22      A.    Correct.

23      Q.    Are they -- are they informed of any other

24  reasons for the outcomes of the step-level review

25  process?

Lori Stickley - 10/12/2021

98

1      A.      Well, they're all (inaudible) --

2              THE REPORTER:  I'm sorry?

3              THE WITNESS:  The inmates are --

4              THE REPORTER:  Go ahead.

5              THE WITNESS:  So the inmates are notified after

6   their review date and if they're increased, they're just

7   told they're increased.  If they were decreased, they're

8   told they were decreased, either due to discipline, due

9   to lack of programming, but they are told.

10  BY MS. MORRIS:

11      Q.      What are they told if they -- their step

12  doesn't change?

13      A.      That they just stay the same.

14      Q.      Are they told anything about why their step

15  didn't change?

16      A.      Well, because if it didn't change, then they

17  have, they -- yes, they're told, like, you have to finish

18  this class or you have to finish this to be able to go to

19  the next step.

20      Q.      And that would be in an inmate letter?

21      A.      In an inmate letter or verbally at self-front,

22  because their assigned COIII, because, you know, if we

23  review 20 inmates that day, then it's given back and then

24  the COIII, when they do their walk would talk to the

25  inmate, and say, "Hey, you didn't finish this class yet,

Lori Stickley - 10/12/2021

99

1    so you're still in Step 2 until you finish this class.

2    Once you finish this, then, you'll go to the," you know,

3    "your name will go to the review committee again."

4         Q.    How do you know that that's (inaudible) --

5               THE REPORTER:  I'm sorry, hold on.  You froze.

6               Okay.  Go ahead.  It looks like the internet's

7    unstable, so --

8               Go ahead, Ms. Morris, if you can repeat.

9    BY MS. MORRIS:

10        Q.    How do you know that inmates are informed of

11   the reasons why they stayed the same?

12        A.    Well, one, it's the expectation and

13   requirement; two, I know when I walk the pods and talk

14   with the inmates if I'm not getting hit up by every

15   single inmate asking what their phase is every second I

16   walk, then I know they're being informed and told what's

17   going on.  Because, if not, I would be getting inmate

18   letters every day or the inmates would be talking to me

19   directly when I'm doing my walk, saying, "I never see my

20   COIII.  I don't know about this.  I don't know about

21   that."

22               So sometimes you can tell what's being done

23   just for the fact that I'm not being questioned by every

24   single inmate.  I mean there's always going to be one or

25   two that, yes, they didn't get the inmate letter.  They

Lori Stickley - 10/12/2021

100

1    didn't get notified because something happened.  But on

2    the overall, I would have a thousand inmates complaining

3    if they didn't.  And when I only have one or two, that,

4    to me, tells me that they are doing their job.  They are

5    doing what they're supposed to, because that's the

6    procedure and the expectation.

7           And then the 1s or 2s that come up, then I

8    directly address the COIII, I'm, like, "Hey, are you guys

9    going and doing this?  When was the last time you went

10   and talked to the inmate?  He's asking about his phase."

11   And I follow up on a one-on-one basis.

12      Q.    When you said that they're required to, is it

13   that they're required to tell the inmates what step they

14   are now at or that they are required to tell them the

15   reason they are at whatever step they are now at or both?

16      A.    Both.

17      Q.    Okay.  Where is that -- where is that written

18   that they're supposed to do that?

19           MS. LOVE:  Form, foundation.

20           THE WITNESS:  Off the top of my head, I can't

21   tell you exactly where it's written, but it's from -- it

22   might just be the standard procedure when they initially

23   started it that after the review committee, they went

24   back and told the inmates what had happened within, you

25   know, the following week.  It might just be standard

1    practice.  I don't know if it's written down or not.  I

2    just know that's what -- when I started at SMU and going

3    to the review committees what I was told and what they

4    do.

5    BY MS. MORRIS:

6        Q.    Is there any documentation in an inmate file,

7    whether in ACIS or in the hard copy file, of the reasons

8    for the decision in the step-level review process?

9        A.    I'm going to say no because the part in ACIS is

10   only capturing if there's Step 1, Step 2, Step 3, and who

11   entered it on what date and time.

12       Q.    And then there's nothing in the hard copy file

13   either?

14       A.    Not that I know of.

15       Q.    And just to be -- to confirm something I think

16   you said, either you or the ADW attends every one of the

17   meetings that are reviewing step-level process; is that

18   correct?

19       A.    Part of the committee, yes, between the

20   captain, the COIV, the ADW, and myself, we attend with

21   this -- I mean, the core group is, like, SSU is there,

22   the COIIIs, the max custody teachers, the COIV, the

23   captain, the ADW, and myself.  Have there been probably

24   one or two that we've missed?  Probably.  Do we try to

25   get to every single one?  Yes.  But have we missed some?

1    there's other stuff that happens that they look into and

2    review.  I mean there's drug trafficking, contraband

3    trafficking, you know, so they deal with more than just

4    the security threat groups.

5        Q.    How is it -- how -- withdrawn.

6              At each review meeting, is it like you choose a

7    cluster or two or several pods?  How do you organize who

8    will be reviewed at any given meeting?

9        A.    So I actually don't 100 percent have that

10   answer, because the COIII Rivera, who runs the committee

11   meetings pulls the inmates based off of the last review

12   date, to see who needs to be reviewed because -- through

13   ACIS, so they already have the list ready to go.

14             So, honestly, I just kind of show up.  They do

15   all the work and I just come in and I'm there, and the

16   list of inmates is already ready for us to review.  And

17   we start going through the list of the inmates that are

18   scheduled for that day.

19       Q.    Okay.  And every person who is in max custody

20   has to be reviewed every month.  Right?

21       A.    Yes.

22       Q.    Does anyone keep minutes of the meetings where

23   you -- where the step-level review -- step levels are

24   reviewed?

25       A.    Yes.  Within reason, not like complete minutes

1    of what, like, everybody said.  It's more the consensus

2    summary of Inmate Smith is being reviewed and he

3    completed everything, so he went up to the next step.  Or

4    Inmate Smith is being reviewed and due to disciplinary

5    violation this or that, it was decided to remain the same

6    or step-down.  But it's not like minutes like a court

7    reporter saying, "Well, Officer X said this," they said

8    this and this and that.

9           So there's not meeting agenda notes or printed

10   at the end or anything.  I mean, it's just taking the

11   notes so that way when it's over they can go into ACIS,

12   update each inmate according to their step.

13       Q.    Okay.  I'm going to show you what was

14   previously marked as Isolation Exhibit 3, which is --

15   I'll go to the first page, so you can see what it is.  It

16   is DO 812, Inmate Maximum Custody Management and

17   Incentive System.

18       A.    Uh-huh.

19       Q.    And we've talked a little bit about this.

20   Right?

21       A.    Okay.

22       Q.    And we're going to go to page -- page 4.  Do

23   you see about sort of near the bottom of the screen,

24   Section 5.5?

25           Do you see that?

1      A.     Yes.

2      Q.     And it says that, "Inmates who have maintained

3  Step 3 for a minimum of 30 consecutive days without

4  incident are eligible for consideration for placement in

5  a close custody housing location."

6             Do you see that?

7      A.     Uh-huh.

8      Q.     What is your understanding of this provision?

9      A.     Can I flip to it, because -- what is the --

10     Q.     Yes.   Absolutely, yeah.

11     A.     Because this is for restricted housing, so I

12  don't know what --

13     Q.     Section 6 is restrictive housing, but you can

14  certainly look at the policy itself.

15     A.     All right.   Okay.   So I -- I can speak about

16  it, but -- so my understanding of Section 5.5 is when

17  this program initially was implemented with the steps, it

18  was a step-down program also, where they would start in

19  Browning and then they would go to SMU, and then from SMU

20  they would go to Central Unit.

21             And they stopped doing that prior to me taking

22  over at SMU.   With the closure of Florence, there hasn't

23  been any more -- there's no place for them to go right

24  now.   And so this hasn't been being emphasized a lot.

25  So, yes, is it a possibility that if an inmate maintains

1    Step 3 that if their custody scores can be lower, then

2    they can go to a close custody housing location.  But

3    that was when it was set up with Browning, SMU, and

4    Central.

5        Q.    Is there anything in DO 812 that refers to

6    there being a process of step-down from Browning to SMU

7    to Central?

8        A.    When they were -- it talks about with the

9    restrictive and the enhanced and everything, it was all

10   kind of -- and that's my understanding of it, was when

11   they were looking at the whole package of the enhanced,

12   restricted housing, the close custody management, it kind

13   of was all grouped together.  Because for them to

14   actually go to close custody, their score has to actually

15   drop or we have to do a facility override to lower their

16   score, so --

17       Q.    Are you considered part of the program team for

18   step-level reviews?

19            MS. LOVE:   Form and foundation.

20   BY MS. MORRIS:

21       Q.    Do you know the term "program team" with regard

22   to step levels?

23       A.    No, I don't -- the program team, from my

24   understanding, has always usually been from, like, the

25   mental health side when they put in a program team to

1   work an inmate through what plan for them they're working

2   on.  And that's usually the COIII and the COIV.  It's

3   right there in 5.4.  But the program team is going to be

4   more the COIII that teaches the class, working with the

5   COIV that supervises them.

6       Q.    Okay.  If you go to the prior page, at the top

7   of it, it says page 3, Section 5.0.

8       A.    Uh-huh.

9       Q.    It says 5.1, and so this is maximum custody

10  population, except restrictive -- restrictive or enhanced

11  status housing program.  Right?

12      A.    Correct.

13      Q.    And it says, "To qualify for advancement in

14  steps and incentives inmates must follow all program

15  requirements on a daily basis, step advancement shall be

16  determined by the program team."

17            Do you see that?

18      A.    Yes.

19      Q.    And if you go up to Section 3.0, which is at

20  the bottom of page 2 and on to page 3 --

21      A.    Uh-huh.

22      Q.    -- it talks about the purpose of the program

23  team being to review inmates monthly.

24            Do you see that?

25      A.    Yes.

1      Q.    And it says, "The program team shall be
2  com-" -- in Section 3.1.1, it says, "The program team
3  shall be comprised of correctional services staff, i.e.,
4  unit administrator, captain, COIV, correctional
5  lieutenant, correctional sergeant, COIII, and COII, that
6  are assigned to that housing" unit -- "to that
7  unit/housing area."
8          Do you see that?
9      A.    Yes.
10     Q.    Are you part of the program team for people
11  based on the meaning laid out in DO 812?
12     A.    Not on a regular basis, like what I said
13  earlier, between the ADW or myself, when we go to the
14  review committees, that's when we meet that Thursday at
15  12:00.
16     Q.    So that's the program team meeting, that
17  Thursday meeting.  Right?
18     A.    Yes.  The review committee, so same --
19  different terminology, but same meeting, yes.
20     Q.    The terminology I'm using is from the policy.
21  Correct?
22     A.    Correct.
23     Q.    Okay.  Going -- could you turn to, I believe
24  it's Attachment B at the end of 812.  Actually, it's
25  Attachment C.

1      A.      Okay.

2      Q.      So step-level -- according to Attachment C,

3  step-level advancement is a recommendation -- is based on

4  recommendation from the program team.   Right?

5      A.      Yes.

6      Q.      Thinking back to Section 5.5, that we looked at

7  a little while ago, where it says if a person's been at

8  Step 3 for 30 days without incident, they can be

9  considered for close custody.

10            Do you recall that?

11     A.      Yup.

12     Q.      Does the program team at SMU make

13  recommendations that people be considered for close

14  custody?

15     A.      Yeah.   We have a lot of inmates pending to go

16  to close custody once the beds become available.

17            MS. MORRIS:   I'm going to take one quick pause.

18            Robin, were you able to catch that okay?

19            THE REPORTER:   Yes.   "Once the beds" --

20            MS. MORRIS:   Sorry, it got very jumbled on my

21  end.

22            THE REPORTER:   "Once the beds become

23  available."

24  BY MS. MORRIS:

25     Q.      Warden Stickley, did you say once the beds

Lori Stickley - 10/12/2021

110

1    become available?

2         A.    Yes, because we submit inmates for movement,

3    and it's a pending travel order.  It goes to Central

4    office.  They -- they're the final review.  And then they

5    have to find a bed in close custody for them.  So even

6    though they might -- we might make the recommendation or

7    they reduce the custody, it's still waiting for a bed in

8    close custody to come available for them to be moved.  It

9    doesn't happen instantly.

10        Q.    At the time you send a request for movement and

11   are beginning to wait for a bed to become available, the

12   person's already been reclassified for close custody.

13   Right?

14        A.    If -- yes, I mean, if he -- at that time, yes,

15   because they have to be at a 4/4 to be able to move to

16   close custody or lower.

17        Q.    Okay.  When a person is still classified as max

18   custody, and they've been at Level 3 for 30 days without

19   incident, does the program team at SMU ever make a

20   recommendation that they should be -- recommendation to

21   classification that they should be considered for close

22   custody?

23        A.    It can be a recommendation and then they will

24   look to see if he -- we could do an automatic trigger, so

25   classification automatically triggers every six months.

Lori Stickley - 10/12/2021

111

1    If, based off of review, you know, discipline, and it's

2    not that six months yet, we can do a manual trigger, and

3    either, A, see if he will lower automatically or if we

4    have to do like a facility override or, you know, to

5    reduce the score, so we can do that, yes.

6         Q.    How often do you do that at SMU?

7         A.    I don't -- periodically.  I don't have any

8    numbers or statistics to say how often it happens.

9         Q.    About how many times have you requested that

10   someone be reviewed by classification early in the time

11   that you've been at SMU?

12        A.    A handful of times.  I mean, I -- I mean, I

13   don't have a number, unfortunately.  I -- I have

14   recommended it.  The team has recommended it.  I don't

15   have any numbers to say how often, though.

16        Q.    Okay.  Do you think it's more than 10 times?

17        A.    Probably -- probably not.  It's not -- it's not

18   been a massive number, no, it's not been --

19        Q.    Do you think it's more than five times?

20        A.    Yeah, probably 5 to 10.

21        Q.    Okay.  All right.  And of the times that you

22   and the program team recommended that someone be

23   considered for reclassification to close custody outside

24   of their ordinary cycle, how many times were they, in

25   fact, reclassified to close custody outside of their

112

1    regular cycle?

2        A.     I don't know.

3        Q.     Would the recommendation that a person be

4    reclass- -- be considered for reclassification to close

5    custody outside of regular cycle get into their

6    classification record anywhere?

7        A.     I don't know based off of the notes

8    when -- when they do the reclass- -- I don't know.  And I

9    don't track it.  I mean, I guess that's my failure.  That

10   would be on me, you know.  I don't follow back up after

11   the next meeting or months down the road to see, like, is

12   he still pending or not, so -- I don't have an answer for

13   that, unfortunately.

14       Q.     You said that Section 5.5 was really more from

15   when there was this step -- this concept of a step-down,

16   and that it's not really emphasized anymore?

17       A.     Well, because Central Unit's closing down, so

18   we have nowhere for them to go.

19       Q.     Are there no other places where people could go

20   for close custody?

21              MS. LOVE:  Form and foundation.

22              THE WITNESS:  So the way -- and this is my

23   understanding: So when the process started, and they

24   introduced the step program for max custody, it was

25   between Browning, SMU, and Central, because they were all

Lori Stickley - 10/12/2021

113

1   through -- all right there.  And so part of it was that

2   step-down is that as they moved up, increased, Browning

3   was the first step.  And then as they stepped up a little

4   bit more, then they would go to SMU.  And then they would

5   go to Central.

6          So it would be a progression through going up

7   in step, getting more privileges, more incentives, and

8   they would move over to SMU, where it's not as strict as

9   Browning.  And then successful at SMU, they would step up

10  again, and they'd be able to go to Central Unit, but that

11  was -- ever since I came to SMU, Florence has been

12  closing, so we haven't been running that three-step

13  process between Browning, SMU, and Central.

14  BY MS. MORRIS:

15      Q.   When people would -- under that process that

16  you just described, when they went to -- from SMU to

17  Central, were they still in max custody?

18      A.   No, because Central was close custody.

19      Q.   Okay.  The policy says people can be considered

20  for reclassification to close custody.  Right?

21      A.   They can be considered.

22      Q.   And that doesn't mean that it has to be close

23  custody at Central, it could be close custody somewhere

24  else, couldn't it?

25          MS. LOVE:   Form and foundation.

Lori Stickley - 10/12/2021

114

1              THE WITNESS:  It could.

2    BY MS. MORRIS:

3        Q.     But, to your knowledge, Section 5.5 is not

4    being used to do that now, because Kasson -- or Central

5    is closing?

6        A.     So it's just making it harder to move out of

7    SMU down into close custody, because they're moving

8    Central close custody to the other close custodies, so

9    it's just not as frequent or as quick as it used to be.

10       Q.     Do -- does what the -- withdrawn.

11              Does the fact that it's harder to actually move

12   someone if they are reclassified as close custody than it

13   used to be affect the process of whether someone becomes

14   eligible for consideration for movement to close custody?

15       A.     No.  I just have more close custody sitting in

16   A08 waiting to be moved, so it doesn't stop the process.

17   We still run the process.  I just have more eligible

18   inmates for close custody waiting to be moved.

19       Q.     Do you know how many people you have in A08

20   right now who are not max custody?

21       A.     Not off the top of my head, no.

22       Q.     Do you know roughly?

23       A.     No.  A couple months ago I reached out to

24   Central office because I did look into it, and I had -- I

25   want to say there's like 33 that were close custody

Lori Stickley - 10/12/2021

115

1    waiting that had travel orders trying to get them moved

2    and pushed out.  You know, so we -- we track it.  We

3    monitor it.  I mean, my count movement, you know, because

4    if we don't have to have them all in max custody, we want

5    to get them out of max custody, just as much as they want

6    to get out of max custody, so --

7         Q.    When you looked into it and there were 33

8    people, did you look at how long any of them had been

9    waiting?

10        A.    No.  I was just, overall numbers, and letting

11   them know I have this many inmates pending close custody

12   and, you know, it was on the heels of opening movement

13   back up from, you know, a lot of statewide movement had

14   been closed because of COVID.  And so, you know, trying

15   to be the squeaky wheel of, "Hey, we're doing statewide

16   movement, let's get going."

17        Q.    At SMU, who decides whether a person should go

18   into detention?

19        A.    You'd have to clarify, I don't --

20        Q.    I realized as I was asking it that that

21   probably wasn't the right question.

22              Do people in detention at SMU -- you said that

23   they're coming from all over the state; is that right?

24        A.    Yes.

25        Q.    So you're not involved in making the decision

Lori Stickley - 10/12/2021

116

1    that this person needs to go into detention; am I right

2    on that?

3        A.    Correct.   So I guess -- so my understanding of

4    your question is who ultimately decides an inmate goes

5    over to detention?   It would be the sending unit, for

6    whatever reason.   So wherever that inmate is housed at,

7    he had an issue, like what we talked about before whether

8    it was 805, refused to house, a disciplinary, the sending

9    unit are the ones ultimately making that decision.

10            Now, because I run SMU, do I want to be

11   notified?   Do I want to know why they're coming?   Do I

12   want to make sure it's a verified actual issue?   So

13   it -- to say it's like an 80/20, because I have stopped

14   inmates from coming, because refused to houses, policy

15   says try to find like housing first before just going to

16   detention.

17            So if Meadows Unit, who is a medium custody sex

18   offender yard that has an inmate that wants to refuse to

19   house, they'll call and ask for a bed.   I will ask them,

20   "Well, can he go to Cook or South Unit," which is also

21   medium custody sex offender beds, "to eliminate going

22   into detention?"   So, yes, the sending unit is

23   80 percent, but then there's the 20 percent of me that is

24   reviewing it to make sure, like, did we try all avenues

25   first before just putting an inmate into detention?

Lori Stickley - 10/12/2021

117

1      Q.     Okay.  That is helpful.

2             Are there specific detention units at SMU for,

3      like -- withdrawn.

4             Are there particular clusters where people in

5      detention for refusal to house would be placed at SMU?

6      A.     No.  It's based off of bed vacancy.  We don't

7      dictate this pod is 805, this pod is this, this pod is

8      that, you just go in with who they match with.  It's

9      really based off of classification and the existing

10     population and who the inmate that's coming in, why he's

11     coming in, and who he matches with.

12     Q.     Do you have any role in determining when a

13     person who is in detention at SMU gets out of detention?

14     A.     No.  It's based off of -- for 805 it's

15     determining once the initial 805 packet is done and it's

16     sent to the PCU unit, Protective Custody Unit, and their

17     final review, they will either approve him for 805, or

18     they will say no, he doesn't meet the criteria, for

19     whatever reason.  And they will place him -- we will be

20     advised and we will begin to get travel orders to get

21     them moved according to the decision that was made.

22             So it's not, "Oh, can he go home?," and I'm,

23     like, "No, he's got to stay."  I don't determine -- same

24     thing with the refuse to house, if the inmate is

25     interviewed for policy every 30 days and says, "I will go

Lori Stickley - 10/12/2021

118

1    house now," "Okay.  Then go house.  Go be happy wherever

2    you're supposed to go," and remove him out of detention,

3    so --

4        Q.    Do the privileges that people have in detention

5    change at all over time, are there different levels of

6    privileges within detention?

7        A.    It's based off of policy and what they're there

8    for.  So policy for refuse to house has a certain list of

9    what they're allowed to have and not allowed to have.  If

10   they're there for disciplinary, if they're there for

11   investigation, or if they're there for 805.  So it just

12   depends on why they're in detention, on what level of

13   either property items or -- I would not use the word

14   "privileges" because it's really based off the policy of

15   what's allowed and not allowed while in detention status.

16       Q.    Does what's allowed in terms of out-of-cell

17   time change over time --

18       A.    No.

19       Q.    -- in detention status?

20       A.    No.  It's just straightforward, standard, the

21   three days for rec and showers, it's pretty standard.

22       Q.    I'm sorry, did you say the three days?

23       A.    Yeah, it's the -- for recreation and showers,

24   it's standard.  It doesn't fluctuate (inaudible) --

25             THE REPORTER:  Hold on.  Did you say anything

1   else after "it doesn't fluctuate"?

2            THE WITNESS:  I think I just said it doesn't

3   fluctuate.  It's a standard based on detention status.

4   BY MS. MORRIS:

5       Q.    And by -- and by detention status that is the

6   question of whether it's disciplinary, refuse to house,

7   805, or investigation?

8       A.    No.  It's based on being in detention.

9       Q.    Oh, so it's the same for everybody who is in

10  detention?

11      A.    Correct.

12      Q.    Okay.  Is there any limit on out-of-cell time

13  particular to the first 30 days of detention?

14      A.    What do you mean by "limit," like restrictions,

15  like they can only come out once, no.  Once

16  they're -- let me rephrase.  So because it's a standard

17  on certain days, depending on when the inmate arrives, he

18  could have missed his rec day, because like rec might run

19  Sunday, Tuesdays, and Thursdays for lower tier.  Upper

20  tier might be then the Monday, Wednesday, Friday.

21            So if an inmate came in and is housed in the

22  upper tier, but he came in on Friday, he might have

23  missed, so he wouldn't go to rec until, like, the next

24  rec scheduled day.

25      Q.    Okay.  What are the restraint and escorting

1  requirements at SMU for people in max custody?

2      A.    They're handcuffed restraint behind their back

3  and hands-on escort.  So the officer will hold the upper

4  forearm on the officer's strong side and assist.  And

5  it's not a grip, it's just a hands-on in case, you know,

6  someone trips, falls, or redirect happens, they could

7  apply pressure, but it's just a hands-on.

8      Q.    And it's just one officer per inmate?

9      A.    Two.

10     Q.    Two?

11     A.    So sometimes, like, they might be doing

12  multiple.  So one might be at the front of the line, and

13  one might be in the back of the line, but, you know, if

14  they're moving multiple inmates, but if it's a one on

15  one, then there would be two officers for max custody.

16     Q.    Okay.  So if one person is being moved, there

17  would be two officers?

18     A.    Correct.

19     Q.    If there's a line of inmates being moved --

20     A.    There would be --

21     Q.    -- explain what you were just saying?

22     A.    So -- yeah, okay, so like when we do rec turns,

23  they're -- we would be pulling out the whole lower tier.

24  So, you know, there's a possibility of 16 inmates.

25  That's where we're going back to the CORE Staffing where

1   we have the recreation officers, the recreation escorts.

2   So you have the floor officers plus the recreation team

3   helping with escorts.  So they would be put into a line

4   and walked single file, but then the officers would be

5   staggered, because they're going out to recreation.

6   Where it wouldn't be a true one-on-one hands-on

7   officer/inmate walking, that that's where, you know --

8   there's that discretion, because we have enough officers

9   in the area, but it wouldn't be a true one inmate,

10  officer, inmate, officer escort.

11      Q.    Okay.  All right.  Are people who are on mental

12  health watch allowed out of their cells?

13      A.    Yes.  If -- per the watch order.

14      Q.    Okay.  And where would that be on the watch

15  order?  Would it be written in?

16      A.    It would be written in by the doctor's notes or

17  the whoever put him on the watch, the psych associate, or

18  whatever, but also they come out for showers, so, you

19  know, they do come out.

20      Q.    How frequently do -- are there people who are

21  on watch at SMU who are allowed to come out for

22  recreation?

23      A.    It -- I guess I need clarification on your

24  question.  A number of like -- it's -- it's offered per

25  policy.  The three days a week for the six hours, and if

Lori Stickley - 10/12/2021

122

1  it's allowable on their watch order, it's offered.

2  Whether they choose to go out to shoot rec or not is up

3  to the inmate.  We do not force them, even if they are on

4  a watch, we don't force them, and we don't drag them out

5  and throw them out in the rec -- in the shoot.  So, I

6  mean, they can refuse.

7      Q.    How often have you seen it written onto a

8  mental health watch order that someone could go to rec?

9      A.    Frequently.  I mean, it's -- I mean, and I've

10  also seen it where they said, you know, that due to the

11  inmate that there should be no rec, you know.  So, I

12  mean, but typically sometimes, I mean, I've seen

13  where -- when they're on a constant, they're only on a

14  constant for one or two or three days.  And then they

15  step through the process through mental health.  And so

16  the only restrict them for that one or two days, because

17  depending on when they get put on the watch, when they

18  come up for rec.  So it's really an inmate-by-inmate,

19  case-by-case basis.

20      Q.    And if -- if the mental health staff believes

21  that it's okay for the person to go to rec, they would

22  handwrite on the mental health order "this person can go

23  to rec"?

24      A.    Yes, they can.  Yes.

25      Q.    And that's how it would be communicated?

1        A.      Yes.

2        Q.      And is there a place at SMU where a person

3    would go to rec if they were on watch and they were

4    allowed to go to watch -- go to rec?

5        A.      So you came out and toured.  Correct?

6        Q.      Yes.

7        A.      Okay.  So the shoot rec's at the end of the pod

8    is where they would go out to rec.

9        Q.      A person who is on watch can be put in the

10   shoot watch?

11       A.      Yes.  So in pod 6, there is an expanded metal

12   fence just on the other side of the doorway when you go

13   out to shoot rec, so that way the officer -- the inmate

14   could be put into shoot rec, and then the officer can

15   stand right there in the doorway for safety for everybody

16   still, and still observe the inmate.

17              MS. MORRIS:  Okay.  All right.  Let's take what

18   will likely be our last break before our last section of

19   the depo.

20              MS. LOVE:  Okay.

21              (Recessed from 12:52 p.m. until 1:02 p.m.)

22   BY MS. MORRIS:

23       Q.      Okay.  All right.  Warden Stickley, can you

24   tell me what a Correctional Service Log is?

25       A.      The Correctional Service Log journal is the

Lori Stickley - 10/12/2021

124

1    daily activities that the control room officer writes

2    down during their (inaudible) --

3              THE REPORTER:   "During their"?   I'm sorry,

4    "during their" -- you cut out.

5              THE WITNESS:   Shift.   Their shift.

6    BY MS. MORRIS:

7        Q.    What -- what is supposed to go into the

8    Correctional Service Log?

9        A.    So the short answer is anything and everything

10   that happens during their time at their post, comings and

11   goings of staff members, comings and goings of inmates,

12   counts, security checks, feeding.   I mean, some staff

13   write everything down and do 110 percent.   Other staff

14   log the basics, security check, security device,

15   inspections, equipment, so -- but that's overall, I mean,

16   anything that's related to that post, the comings and

17   goings is supposed to be logged.

18       Q.    Is rec -- when inmates go to rec, should that

19   be logged?

20       A.    Yes.   So that would be a coming and going.   So

21   there should be a log that at this time, you know, rec

22   team arrived to turn, you know, 1 Baker pod 2 out for

23   rec.   So there should be some notation that that activity

24   occurred.

25       Q.    And then should it also be noted when they come

1   back from rec?

2        A.     Yes.   It should be noted when they come back.

3        Q.     Should it be possible to tell who went to rec?

4        A.     That would be the details, depending on the

5   officer up there, if the floor officer or the rec team

6   gave them a, like, the turn-out list to say these five

7   cells went, they could log it, or they could just

8   reference the pod itself turned out for rec.   Because

9   they don't have -- they don't know who stayed or not.

10              So, I mean, unless they went to go do a count

11  afterwards, they would have to get that information from

12  the rec team that's down in the pod to say, you know,

13  cell 5 and 6 didn't go or something, so -- it would just

14  be verbal communications, and then they would have to log

15  it in the journal.

16       Q.     Okay.   Would they know -- would they include

17  how many people went to rec?

18       A.     They could.   I mean, they have it where they

19  would stay, you know, 15 turned out.   So, again,

20  it's -- you're at the mercy of the level of the staff

21  member that's in the control bubble to actually log it,

22  to how detailed down -- the requirement is not you must

23  log X, Y, Z when you do a rec turn so the officer could

24  just write "0800 pod 5 turned out for rec."   Some

25  officers that are very detailed would say "0800 pod 5

Lori Stickley - 10/12/2021

126

1   turned out for rec, 6 inmates went."  So there's no cut

2   and paste dry exactly how they're supposed to log that

3   entry.

4       Q.    And the people who review the logs don't

5   communicate to staff what they want in the logs?

6       A.    No, well, I mean, we do, but it's personal

7   preference.  There's nothing in policy that dictates or

8   specifies how to make that log.  There's certain things

9   that we do.  We -- we give them examples of the

10  literature of how to do beginning and ending inventories,

11  you know, count for the key set, account for when you do

12  a formal count.  You need to put how many inmates, so

13  there are certain activities that there is clear

14  direction of how to log it.  Other items there's not.  I

15  mean, there's no way to give every example of how to log

16  an entry.

17      Q.    Okay.  Should showers be included on the logs?

18      A.    Individual, they -- there's, again, you're

19  relying on the officer on how detailed they want to be.

20  So they would say, started showers at this time, ended

21  showers at that time.  Or if it's worker showers, kitchen

22  workers return, worker showers that day.  So it could be

23  a very general entry or it could be very detailed.  It's

24  really for the lack -- it's based on the officer up in

25  the control room on how detailed they are when they log

Lori Stickley - 10/12/2021

127

1    stuff in writing.

2         Q.    Is there anyplace where you as the

3    administrator of SMU can look to find out how frequently

4    any individual inmate is showering?

5              MS. LOVE:   Form and foundation.

6              THE WITNESS:   There is no log or anything to

7    easily look up.   Like, there is no Excel built sheet that

8    I could type in "Inmate Smith" and it would pull up for

9    the last 30 days this is when he showered, no.   Other

10   than he lives in 4 Able, I would have to go to the

11   journals and look through, but in max custody, you know,

12   they have the out-of-cell sheets, reviewing the camera

13   footage if there was a complaint that the inmate said he

14   didn't get his showers, but there's no -- there's no

15   shower log to -- to mark that, no.

16   BY MS. MORRIS:

17        Q.    And going to showers and coming back from the

18   showers, does that count as comings and goings of

19   inmates?

20        A.    No, because they're in the pod.   If they left

21   the pod, like, if they went to medical or somewhere.

22        Q.    Okay.   And you mentioned the out-of-cell sheets

23   for max custody, but showers aren't included on that, are

24   they?

25        A.    They're not.   That's when I was -- wait a

Lori Stickley - 10/12/2021

128

1  minute, we do rec, but not showers.  Showers aren't

2  logged on the out-of-cell sheets.

3      Q.    So if the control room officer feels like

4  including information about showers on the CS -- on the

5  Correctional Service Log, then there would be information

6  about when people went to showers, but otherwise not?

7      A.    Right.  And it would be -- it would be a

8  journal entry saying "at 0800 pod 5 started showers," it

9  wouldn't be individual cell 12 went.  And then 12 -- it

10  wouldn't be an individual running log; it would be

11  started at this time, completed at this time.

12      Q.    Without any indication of how many people went?

13      A.    Most likely, correct, yeah.

14      Q.    Okay.  I am going to -- actually, before I get

15  there, where is out-of-cell time documented for people in

16  detention?

17      A.    Well, so they have an individual detention

18  record that would show if they went to the shower or if

19  they went to recreation, but it's not the same set-up as

20  the out-of-cell sheets that tracks time.  It just tracks

21  activities, like did they eat, did they get rec, did they

22  get a shower.  They're more -- the IDRs, the Individual

23  Inmate Detention Record is more of a yes, no, and not

24  necessarily -- and when versus how long.  Where the

25  out-of-cell tracking sheets are hours, to ensure that we

1   meet the hours.

2        Q.     Who fills out the individual

3   detention -- individual -- individual detention records?

4        A.     The IDRs are completed by the floor officers

5   that do the activity down with the inmate.

6        Q.     And when do they fill them out?

7        A.     Either while they're doing it or shortly after

8   they finish completing something, then they would go and

9   log it in the -- in the individual detention record.

10       Q.     Okay.  Where are the individual detention

11   records kept while they're -- each one lasts for a week.

12   Right?

13       A.     Correct.

14       Q.     Where are they kept during that week that

15   they're being filled out?

16       A.     They're in a binder down in the security office

17   of the wing.

18       Q.     Where are out-of-cell time records kept while

19   they are -- during the week that they're being filled

20   out?

21       A.     Down in the --

22              MS. LOVE:  Form.

23              THE WITNESS:  -- pods.  Oh, sorry.  Also down

24   in the wings in the -- in the pods.  So that way when

25   programs people come in, they're -- they have like a

1  know if the actual copy would have been, you know, easier

2  to read versus a scanned copy, so it does make it

3  difficult to read on a computer screen.  I mean, they

4  were doing something with escorts and, like, east rec,

5  so --

6       Q.    It looks like it says, "To," after escorts.

7  Right?

8       A.    Right.  Right.  And that's why I'm saying,

9  like, I don't want to guess completely.  So it looks like

10  they were doing something escorting the inmates to east

11  rec.  And then they finished up security checks and the

12  times that they were in those pods for the security

13  checks.

14       Q.    Okay.  When it says "turn rec" or "turn

15  showers" or "turn rec and showers," does that mean they

16  are actually taking people to rec and showers?

17       A.    Yeah, that means they're conducting them.

18       Q.    Okay.  I gave up on a couple of the things

19  because they are too hard to read.

20            Okay.  Let's look at what I'm going to mark as

21  Stickley Exhibit 5, which is, happily, much easier to

22  read.

23            (Marked for identification Exhibit 5.)

24  BY MS. MORRIS:

25       Q.    Can you tell me what Stickley Exhibit 5 is?

Lori Stickley - 10/12/2021

137

1      A.     So it's a Correctional Service Journal listed

2  as ASPC Eyman, SMU 3 Baker, Charlie control, from 06 to

3  0931 on July 14th, 2021.

4             MS. MORRIS:   And, just for the record,

5  Exhibit -- Stickley Exhibit 5 is a 23-page document that

6  starts at ADCRR00130151.

7      Q.     I'm going to shrink this a little bit, so if it

8  gets too small, tell me that you need it bigger.

9             Who is the person that's filling out this

10 Correctional Service Log?

11     A.     Officer Robles.

12     Q.     Okay.  And Officer Robles at that time was the

13 BC control officer?

14     A.     Just because of the way it works, yes, he would

15 be the -- they would be the control officer, because

16 they're the ones making all the entries, so it's based

17 off the journal.  Yes, I would say he was assigned to the

18 control room.

19     Q.     Okay.  And we see there's a security check at

20 6:24 of 3 Baker, 3B.

21             Do you see that?

22     A.     Yes.

23     Q.     And it's by COII McGrew, Juarez, and Garcia?

24     A.     Correct.

25     Q.     After that it just says "all secure"; is that

138

1    right?

2        A.    Yes.

3        Q.    Okay.  All right.  And then at 6:27 a security

4    check of 3 Charlie by the same officers.  Correct?

5        A.    Correct.

6        Q.    Okay.  We're going to go to the seventh page

7    of -- so this is 6:00 in the morning on 7/14/2021.

8    Right?  And just -- we'll look at the beginning of the

9    shift.

10       A.    Yup.

11       Q.    Okay.  So now this is also 7/14/2021.  Right?

12       A.    Yes.

13       Q.    And also the a.m. shift, starting at 6:00 a.m.

14   Correct?

15       A.    Correct.

16       Q.    And this is 3 Able, Dog.  Correct?

17       A.    Yup.

18       Q.    And it's Officer Robles again filling out the

19   form.  Correct?

20       A.    Correct.

21       Q.    So at the beginning of the shift on July 14th,

22   Officer Robles was the control officer for 3 Able, Baker,

23   Charlie, and Dog; is that right?

24       A.    It appears that way, yes.

25       Q.    Okay.  And then on line 6 at 6:20, we see that

Lori Stickley - 10/12/2021

139

1    3 A, 3 Able security check.

2            Do you see that?

3    A.      Uh-huh.

4    Q.      And that's by COII McGrew, Juarez, and Garcia?

5    A.      Correct.

6    Q.      And the same for at 6:22, 3 Dog security checks

7    by the same -- or by Officer Garcia in pod 6.  Right?

8    A.      That's what it says, yes.

9    Q.      So Officers McGrew, Juarez, and Garcia were --

10   were the four officers for all four clusters at that

11   time; is that right?

12   A.      That's the way it would appear, yes.

13   Q.      Okay.  Do you know why it would only be a

14   security check in one pod in 3 Dog?

15   A.      Why only one officer went?

16   Q.      No, it says, "3 D security check in pod 6 by

17   COII Garcia."

18   A.      No.  Not 100 percent.

19   Q.      Okay.

20   A.      Unless 1 through 5 was empty and it didn't have

21   anybody in there at the time.

22   Q.      Okay.  Is that something that happens?

23   A.      It does.  And back in July there are cells,

24   they're called red line, because we are working on a door

25   project, so those cells are not being used.  So, yeah, I

Lori Stickley - 10/12/2021

140

1    mean, if they're vacant, and he knows that they're

2    vacant, they wouldn't walk those pods.

3        Q.    But you're not sure that -- you don't know one

4    way or the other why it says they only went to --

5        A.    No.

6        Q.    -- pod 6?

7        A.    No.

8        Q.    Okay.  All right.  If there is a cancellation

9    of an activity noted on a Correctional Service Log,

10   should there be an information report about that

11   cancellation?

12       A.    Yes, there should be.

13       Q.    Okay.  Is there anyone who does anything to

14   determine whether or not all cancellations have

15   information reports?

16       A.    Well, so -- I mean, yes, for max custody, my

17   PDR staff assigned in that area, they track what

18   activities were cancelled, and they correlate to, you

19   know, the IR to make sure that it was documented to why

20   it was cancelled.  So yes, they track it.

21       Q.    Is that only for max custody?

22       A.    Yes.

23       Q.    Was -- withdrawn.

24            Has max custody moved in recent months?

25       A.    What do you mean?

Lori Stickley - 10/12/2021

141

1      Q.      Earlier you talked a little bit about having to
2   move around what some of the pods and clusters were being
3   used for?

4      A.      Uh-huh.

5      Q.      Has max custody moved at all in the last couple
6   of months?

7      A.      It did.  The max custody sex offenders I moved
8   from wing 1 to wing 3.

9      Q.      But 4 Able, Baker, Dog and Charlie -- sorry, I
10  don't know my alphabet -- the four of them have
11  all -- those four clusters have been max custody since
12  the beginning of the summer?

13     A.      For wing 4?

14     Q.      Yeah.

15     A.      Yes.

16     Q.      Okay.

17     A.      But the journal that you asked about was wing
18  3.

19     Q.      The one that we just looked at, yes.

20     A.      Yes.

21     Q.      Okay.  What are some of the reasons that
22  out-of-cell time gets cancelled at SMU?

23     A.      For max custody?

24     Q.      For anyone who is -- let's start with max
25  custody, sure.

Lori Stickley - 10/12/2021

142

1    A.    Biggest is staffing would be the first one.  If

2    we don't have the staffing, if the teachers don't show

3    up, they're not there to teach.  If they're something

4    unrelated, a power outage, water shortage, I mean,

5    there's multiple reasons that could cause a class or rec

6    or something to be cancelled.

7    Q.    Are activities -- out-of-cell activities

8    cancelled in detention?

9    A.    They can be, yes.

10   Q.    And are they for the same kinds of reasons?

11   A.    Same kind of reasons, yes.

12   Q.    Let's look at a cancellation form.

13         And I'm going to mark this as Stickley

14   Exhibit 6.

15         (Marked for identification Exhibit 6.)

16   BY MS. MORRIS:

17   Q.    Can you see the form on my screen?

18   A.    Yes.

19   Q.    Can you tell us what Stickley Exhibit 6 is?

20   A.    It is an information report dated from

21   July 25th, 2021, written by Sgt. Cooper for curtailment

22   of unit activities.

23         MS. MORRIS:  Okay.  And for the record this is

24   a two page document, starting at Bates number

25   ADCRR00055681.

Lori Stickley - 10/12/2021

143

1      Q.      In the summary section it states that "At

2  approximately 0600 hours on 7/25/2021, SMU1 staffing is

3  at 42 officers down, to include six staff calling in."

4          Do you see that?

5      A.      Yes.

6      Q.      What does it mean that it's 42 officers down,

7  to include six staff calling in?

8      A.      So daily staffing is 63 at 100 percent, and

9  when they say 42 down, that means we're 42 staff did not

10  show up.  So out of 63 that leaves, what, 21 staff left

11  to fill 63 posts.  So stuff is curtailed.

12      Q.      So when you say 42 people did not show up, does

13  that mean they were scheduled to be there and they didn't

14  show up?

15      A.      It's a combination of vacancies.  So part of

16  that is vacancies.  Part of it is staff on their days

17  off.  Part of it is staff calling in, yes.

18      Q.      Okay.  So if -- so then it says that six staff

19  called in.  Right?

20      A.      According -- yes.

21      Q.      Okay.  So if nobody had called in, then

22  staffing would have been at 36 officers down.  Right?

23      A.      Yes.

24      Q.      Does that mean that the people who were

25  scheduled for that shift on that day were 36 less than

Lori Stickley - 10/12/2021

144

1    the 63 that you just mentioned?

2              MS. LOVE:   Form.

3              THE WITNESS:   I didn't -- can you repeat it?   I

4    didn't understand the way you asked it.

5    BY MS. MORRIS:

6        Q.     So a moment ago I asked what does it mean when

7    there's 42 down.

8        A.     Okay.

9        Q.     You said full staffing is 63.   Do you recall

10   that?

11       A.     Yes.

12       Q.     Okay.   So if it's 36 down and then also six

13   people called in, were those 36 people ever scheduled to

14   work that day?

15       A.     Yes.   So -- okay.   So -- well, I mean,

16   it's -- it's half and half, because some of it is just

17   our vacancy because we don't have enough staff scheduled.

18   So but they're taking it and, see, that's what's

19   confusing with Eyman is they work in the negative instead

20   of the positive, because out of the 63, we were 42 down,

21   but we didn't really have all of those 42 people, because

22   our vacancy rate is at 37 percent.   So out of the staff

23   assigned to day shift, minus the 42, the 42 could be a

24   combination of vacancies.   And that's why they clarify

25   that they -- we had six call-ins that day on the IR

Lori Stickley - 10/12/2021

145

1    because that 42 down is part of call-ins, but also part

2    of the vacancy.

3         Q.    Okay.  So we know that it's six call-ins.  Does

4    that mean that the 36 other people that you're down are

5    vacancies?

6         A.    Yes, part of it -- the same as the 42, yes.  So

7    the 36 would still be part of -- and it could be -- they

8    could be at training, they could be on annual leave, they

9    could be part of the vacancies.  So out of that 36 people

10   not there, without seeing a roster that day, I don't know

11   how many -- there might have been two people on annual

12   leave.  There might have been somebody at training.  And

13   out of that 36, maybe only 20 or 25 were a vacant,

14   not-filled position, but -- so -- but that would be on

15   the CORE Staffing rosters.

16        Q.    Okay.  But when -- before the shift started --

17        A.    Okay.

18        Q.    -- was it known that the 36 positions that this

19   is saying SMU was down that are not about the calling in,

20   was it already known that those are positions that are

21   not going to be filled on that particular day?

22             MS. LOVE:  Form and foundation.

23             THE WITNESS:  More than likely, because we do

24   our rosters two weeks in advance, so minus the staff

25   calling in, we know roughly what we're coming -- what the

1    numbers we'll be coming in with, so we know that

2    we're -- we know that if we're going to be coming in at

3    negative 40 or maybe negative 35, or -- so we have

4    numbers, that's based off of the negative numbers.  We

5    already know what we can and cannot run safely.  So they

6    know if it gets to 40 down, they know they have to call,

7    because we're going to -- we're at negative 39, we're

8    going to start curtailing activities.

9           And they have to call me and advise me what the

10   staffing is.  And at 5:30, 6:00 in the morning we're

11   talking on the phone and going over what we have and what

12   we can do safely on both sides, for inmate safety and for

13   the officers' safety.

14   BY MS. MORRIS:

15       Q.     Okay.  And you can -- you know in advance who

16   is going to be out on annual leave or training?

17       A.     Yes.

18       Q.     Right?

19              Yeah, okay.

20       A.     Correct.

21       Q.     Is there a number where at SMU on the day

22   shift, where you know that you have to start curtailing

23   staff?

24       A.     Yes.

25              MS. LOVE:   Form.

1   BY MS. MORRIS:

2       Q.    What's that number?

3       A.    So at 36 down we can run.  At negative 39 is

4   when we start -- at 30 -- yeah, let me do my math here.

5   So at 37 we will start curtailing.  And then at 39 or 40,

6   we're stopping stuff.  So --

7       Q.    What is the difference between "curtailing" and

8   "stopping stuff"?

9       A.    Okay.  So curtailing might be we just go

10  slower.  So we -- it might take longer to turn the --

11  turn the rec team out.  So, I mean, they still get the

12  whole time, because the time doesn't start until the last

13  inmate gets there.  But we might only be able to turn

14  three pods at a time instead of, like, all four pods,

15  or -- so we just slow things down.  We might only run --

16  curtailing, instead of outside rec, we offer everybody

17  shoot rec, inside rec, because it's easier to run rec

18  just in shoot rec.

19          For -- and it depends on, like, how many

20  medical lines we have.  So if we can pull from medical or

21  from support to help, so sometimes we just have to -- we

22  slow things down, and it just takes longer to get it

23  done.  Like programs, we will maybe only run one class at

24  a time instead of two classes, because we'll combine

25  resources.

Lori Stickley - 10/12/2021

148

1    Q.    And when you create the roster two weeks in

2  advance, as you said a moment ago, what are you generally

3  expecting to be down?

4    A.    As far as staffing numbers?

5    Q.    Yeah.

6    A.    Okay.  So, I mean -- well, typically, I'd like

7  to not be down at all.  And to come in, you know, hitting

8  at that 33, 34, because that's when we can run everything

9  as normal.

10    Q.    So when you say not down at all, come in at 33

11  or 34, you're saying down by 33 or 34.  Right?

12    A.    Yeah, I mean, and that's -- it's sad to say

13  that's what our new norm is.  I mean, I'd obviously love

14  to be 100 percent staff.  I'd love to only be negative 5,

15  negative 10.  Unfortunately, that's not the environment

16  we're in right now.

17        So today's current environment, a good day, a

18  day that we can run as normal is I'm only down 35 staff,

19  with accommodation of vacancies, annual leave, call-ins

20  and stuff, so --

21    Q.    Okay.  And just so we're clear, at the bottom

22  of the second page of Exhibit 6, ADCRR00055682, that's

23  your signature.  Correct?

24    A.    That is correct.

25    Q.    Okay.  All right.  If a person is not ready to

Lori Stickley - 10/12/2021

149

1    go at the time the rec team is there to pull people out,

2    is that considered a refusal?

3         A.    Within reason, yes.

4         Q.    If a person's cell is not in 704 compliance, is

5    that considered -- at the time the rec team comes to pull

6    people out for rec, is that considered a refusal?

7         A.    Depending on what the out of compliance is,

8    yes.

9         Q.    So what -- what are things that would count

10   as -- an out of compliance that counts as a refusal?

11        A.    So if it's something -- so when they come

12   through and they're letting them know, "Hey, you know,

13   we're going to do the rec turn," they might, like, "Hey,

14   take off the light covering."  Or, you know, if it's

15   something that can be easily fixed or they fix at the

16   officer's direction, then they'll still go.  But if the

17   inmate declines and does not remove the items or fixes it

18   within that window, then it's taken as a refusal.  So

19   they are given the opportunity to self-correct.

20        Q.    Do you know what the longest anyone in max

21   custody at SMU has -- what the longest -- withdrawn.

22            Do you know what the average length of time

23   that people spend in max custody at SMU is?

24        A.    No.

25        Q.    Do you know what the longest anyone who is

Lori Stickley - 10/12/2021

150

1   currently in max custody at SMU, how long they've been

2   there?

3       A.    No.  It could be their whole sentence, if

4   they're on max custody.  I don't -- I don't know.  I

5   mean, they could be there a year, two years, five years,

6   I mean, if they're a max custody, and they haven't had

7   any issues, but their custody is still max custody,

8   because they have that type of sentence, they could spend

9   their whole time at SMU in max custody.

10      Q.    Do you know how long people spend, on average,

11  in detention at SMU?

12      A.    No.

13      Q.    Do you know what the longest time anyone has

14  spent in detention while you've been at SMU?

15      A.    Yes.  Currently I reviewed my detention report

16  last week, and I found an inmate that had, he was at like

17  200, I want to say.  I think it was like 235 days, and he

18  has now been moved to a different unit.

19      Q.    Is he in a detention unit?

20      A.    No.  He went to the unit.  He was a

21  refuse-to-house inmate and he was refusing to house

22  everywhere they -- so he came over from another unit as a

23  refuse to house.  They tried to house him somewhere else.

24  He went there, was only there for like a couple of hours,

25  and turned around and came right back.

Lori Stickley - 10/12/2021

151

1          And because of the way the process -- and, you
2   know, every 30 days, they have to go and talk to the
3   inmate about "Will you house?  Will you house?"  And so
4   myself reviewing the detention report, I'm, like, "Why
5   hasn't he moved?"  So -- and now he has successfully
6   housed at a -- on a yard.
7      Q.    Okay.  What is the detention report?
8      A.    So the detention report is a self-made Google
9   sheet that my COIV does to track when an inmate arrives
10  at SMU.  And it's just a Google sheet, so we can
11  internally track it, when they arrive, what they're there
12  for, what the other unit -- because it's the
13  responsibility of the sending unit to track and finalize
14  their inmate.  Even though he's housed at SMU, it's the
15  sending unit's responsibility to still stay on top.
16          So because they're still assigned to the
17  sending unit, it's an internal Excel sheet that we create
18  to track.  So that way we can stay on top of it too, to
19  remind them.
20     Q.    When force is used at Eyman SMU, do you review
21  the use of force?
22     A.    Most of the time, yes.
23     Q.    What do you review?
24     A.    I will review the use of force packet.  So the
25  incident report, the supplement.  If there's camera

1    footage, I will review the camera footage.

2        Q.    Do you at some point have to say your opinion

3    on whether or not the use of force was appropriate?

4        A.    Yes.

5        Q.    And is that in the use of force packet that you

6    do that?

7        A.    Yes.

8        Q.    Okay.  Approximately how often is force used in

9    mental health watch at SMU?

10            MS. LOVE:  Object to form and foundation.

11            THE WITNESS:  I don't have a percentage.  When

12   use of -- when any type of use of force is used, it is

13   usually to -- so far in my dealings with, have always

14   been to stop the behavior of the inmate that is trying to

15   conduct some type of self-harm in the mental health watch

16   area.

17   BY MS. MORRIS:

18       Q.    Okay.  So in the watch pods the use of force is

19   pretty close to always about stopping self-harm?

20       A.    Correct.  Well, any -- any use of force would

21   be to stop some type of self-harm.  Whether it's an

22   inmate fight or an inmate is doing it to himself, I mean,

23   that's the only time force would be used to stop

24   behavior.

25       Q.    Okay.  But the --

154

1                          SIGNATURE PAGE

2

3          I, LORI STICKLEY, a deponent exercising my
   right to read and sign my deposition taken on October 12,
4  2021, place my signature hereon and make the following
   changes on this _____day of_____, 2021.
5
          (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

7                          _____

8                          LORI STICKLEY

9

10  PAGE      LINE      READS        CHANGE TO        REASON

11  _____     _____     _____

12  _____     _____     _____

13  _____     _____     _____

14  _____     _____     _____

15  _____     _____     _____

16  _____     _____     _____

17  _____     _____     _____

18  _____     _____     _____

19  _____     _____     _____

20  _____     _____     _____

21  _____     _____     _____

22  _____     _____     _____

23  _____     _____     _____

24  _____     _____     _____

25  _____     _____     _____

155

```
 1   STATE OF ARIZONA     )
     COUNTY OF MARICOPA   )
 2
             BE IT KNOWN that the foregoing proceedings
 3   were taken before me; that the witness before testifying
     was duly sworn by me to testify to the whole truth; that
 4   the foregoing pages are a full, true, and accurate record
     of the proceedings all done to the best of my skill and
 5   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 6   direction.

 7           [X] Review and signature was requested.

 8           [ ] Review and signature was waived.

 9           [ ] Review and signature not required.

10           I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in the ACJA 7-206(F)(3)
11   and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
     Arizona, this 26th day of October, 2021.

12

13

14

15   _____
             ROBIN L. B. OSTERODE, RPR
16           CA CSR No. 7750
             AZ CR No. 50695
17
                 *    *    *    *    *
18           I CERTIFY that Glennie Reporting Services,
     LLC, has complied with the ethical obligations set forth
19   in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23

24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035
```

# EXHIBIT 15

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;        )
Stephen Swartz; Dustin Brislan;      )
Sonia Rodriguez; Christina Verduzco; )
Jackie Thomas; Jeremy Smith; Robert  )
Gamez; Maryanne Chisholm; Desiree    )
Licci; Joseph Hefner; Joshua Polson; )
and Charlotte Wells, on behalf of    )
themselves and all others similarly  )
situated; and Arizona Center for     )
Disability Law,                      )
              Plaintiffs,            )
     v.                              )  Case No.
                                     )  CV12-00601-PHX-ROS
David Shinn, Director, Arizona       )
Department of Corrections,           )
Rehabilitation and Reentry; and      )
Larry Gann, Assistant Director,      )
Medical Services Contract Monitoring )
Bureau, Arizona Department of        )
Corrections, Rehabilitation and      )
Reentry, in their official           )
capacities,                          )
              Defendants.            )
_____)


     RULE 30(b)(6) DEPOSITION OF ARIZONA DEPARTMENT OF
     CORRECTIONS, REHABILITATION, AND REENTRY ("ADCRR")

                (WARDEN JEFFREY VAN WINKLE)

                Via Zoom Videoconference
                    Phoenix, Arizona
                September 24, 2021; 9:08 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona  85020
                              Prepared by:
602.266.6535                  Janet Hauck, RPR
www.glennie-reporting.com     Arizona CR No. 50522

2

1                              I N D E X

2

3    Witness                                          Page

4    WARDEN JEFFREY VAN WINKLE

5         Examination by Ms. Morris:                     4

6         Examination by Ms. Love:                     235

7         Further Examination by Ms. Morris:           236

8

9                       INDEX TO EXHIBITS

10   Description                                      Page

11   Exhibit 1      Notice of 30(b)(6) Deposition       8

12   Exhibit 2      Department Order Manual effective   18
                    7/21/17
13
     Exhibit 3      Department Order Manual effective   38
14                  7/24/19

15   Exhibit 4      Department Order Manual 4/15/21     111

16   Exhibit 5      Department Order Manual effective  116
                    5/6/21
17
     Exhibit 6      Department Order Manual effective  175
18                  9/20/18

19   Exhibit 7      Department Order Manual effective  125
                    5/5/20
20
     Exhibit 14     Daily Post Sheet - CONFIDENTIAL    208
21                  SUBJECT TO PROTECTIVE ORDER

22   Exhibit 19     Priority Posting Chart -           223
                    CONFIDENTIAL SUBJECT TO PROTECTIVE
23                  ORDER

24   Exhibit 21     Yard Staffing Levels - CONFIDENTIAL 225
                    SUBJECT TO PROTECTIVE ORDER
25

3

1                     RULE 30(b)(6) DEPOSITION OF ARIZONA

2      DEPARTMENT OF CORRECTIONS, REHABILITATION, AND REENTRY

3      ("ADCRR") (WARDEN JEFFREY VAN WINKLE), was taken on

4      September 24, 2021, via Zoom videoconference, commencing

5      at 9:08 a.m., before JANET HAUCK, RPR, a Certified

6      Reporter, Certificate No. 50522, for the State of Arizona.

7

8      VIDEOCONFERENCE APPEARANCES:

9      For Plaintiff Arizona Center for Disability Law:

10             ARIZONA CENTER FOR DISABILITY LAW
               Maya Abela, Esq.
11             177 North Church Avenue, Suite 800
               Tucson, Arizona  85701
12
       For Plaintiffs Shawn Jensen; Stephen Swartz;
13     Sonia Rodriguez; Christina Verduzco; Jackie Thomas;
       Jeremy Smith; Robert Gamez; Maryanne Chisholm;
14     Desiree Licci; Joseph Hefner; Joshua Polson; and
       Charlotte Wells, on behalf of themselves and all others
15     similarly situated:

16             ACLU NATIONAL PRISON PROJECT
               Maria V. Morris, Esq.
17             915 15th Street N.W., Seventh Floor
               Washington, D.C.  20005
18
               PERKINS COIE, LLP
19             Alisha Tarin-Herman, Esq. (not yet admitted)
               2901 North Central Avenue, Suite 2000
20             Phoenix, Arizona  85012

21

22     For Defendants:

23             STRUCK LOVE BOJANOWSKI & ACEDO, PLC
               Rachel Love, Esq.
24             3100 West Ray Road, Suite 300
               Chandler, Arizona  85226
25

1       Q.    BY MS. MORRIS:  Okay.  And then topic 12 is

2    training provided to correctional staff who are regularly

3    assigned to work in isolation units.  Are you prepared to

4    testify regarding topic 12?

5       A.    Yes.

6            MS. MORRIS:  And, Rachel, is it the same

7    situation there, that if there is something that you

8    believe he's going to be able to testify, but it's

9    possible that it will need to be designated to someone

10   else, as well?

11           MS. LOVE:  Correct, yes.  We are prepared.

12   We've done a lot of preparation for these, but if there's

13   a tiny little detail that he might not be able to answer,

14   we might have to designate an additional person.

15      Q.    BY MS. MORRIS:  All right.  Topic 13 is

16   correctional staff posts at each isolation unit for each

17   shift, including knowledge of post orders and daily job

18   duties.  Are you prepared to testify regarding topic 13?

19      A.    Yes.

20      Q.    Topic 14 is required correctional staff levels

21   for each isolation unit for each shift, including current

22   staffing schedules.  Are you prepared to testify regarding

23   that topic?

24      A.    Yes.

25      Q.    Then finally, topic 15 is policies and

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

13

1    procedures regarding the use of force or restraints by

2    ADCRR staff on incarcerated persons on mental health watch

3    or on incarcerated persons classified as SMI, MH-3 through

4    MH-5, or any other mental health classifications employed

5    by the ADC or Centurion while housed in isolation.  Are

6    you prepared to testify regarding that subject?

7         A.    Yes.

8         Q.    Okay.  I'd like to agree on some terminology

9    before we get going.  Can we agree that the term max

10   custody means maximum custody?

11        A.    Yes.

12        Q.    And can we agree that, if I use the term

13   general population max custody, that means maximum custody

14   that doesn't have some other special designation such as

15   enhanced management, restrictive status housing program,

16   behavioral modification, or STG?

17        A.    Yes.

18        Q.    And can we agree that mental health watch means

19   continuous mental health watch, ten-minute mental health

20   watch, 30-minute mental health watch, and precautionary

21   security watch, unless one of us specifies that we're

22   talking about some specific level of watch?

23        A.    Yes.

24        Q.    Okay.  All right.  Let's start with topic 1,

25   policies and procedures for placement and retention in and

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

22

1      A.    Yes, ma'am.

2      Q.    So if a person came into maximum custody and

3  did exactly the things that they're required to do to move

4  through the steps, there's no possibility that they would

5  be removed from max custody in less than six months; is

6  that accurate?

7      A.    Yes, ma'am.  And if I could go back just real

8  quickly.

9      Q.    Yeah.

10      A.    There are elements within the classification

11 policy that would allow us to initiate that process if we

12 so wanted to do so, I believe, if I remember correctly, in

13 regards to the policy.

14      Q.    Okay.

15      A.    It could, in fact, be initiated by the CO 3 and

16 it could go up through the chain.  To my knowledge, though,

17 I don't believe the inmates can be brought down in custody

18 level from max within the first six months.

19      Q.    All right.  When you were talking a moment ago

20 about -- you think there's way to speed that up and start

21 the process of reducing someone's max custody

22 classification, is that about people who are sentenced to

23 life sentences in their first two years, is it possible

24 that's what you were thinking about?

25      A.    No, ma'am.  That's non-discretionary.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

23

1      Q.      Okay.

2      A.      An inmate that comes in with a life sentence has

3  to be two years in maximum custody.

4      Q.      Okay.  Do you know if that can be overridden in

5  any way?

6      A.      I don't believe there's a possibility of that.

7  No, ma'am.

8      Q.      Can you explain what a discretionary override

9  is?

10      A.      A discretionary override would be basically, as

11  I explained, if the CO 3 has noticed that the inmates

12  aren't doing things that they're supposed to do according

13  to their corrections plan, they are programming, staying

14  out of trouble, not getting disciplinary, and basically

15  being a model inmate within the system, they can put in for

16  discretionary override to place that inmate in a lower

17  custody level.  And they can initiate the paperwork on that

18  that would go up through the CO 4, through the deputy

19  warden, through the warden, and then ultimately up to

20  central office for final approval.

21      Q.      How is that different than simply moving

22  through the steps and being reclassified?

23      A.      That could happen in between the cycles of the

24  classification.

25      Q.      Okay.  Do you have any knowledge about how

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

24

1   often that happens?

2        A.     It actually happens quite a bit.  I know at

3   Florence complex where I'm currently located we do

4   discretionary overrides for inmates from maximum custody

5   down to close custody so that they can remain -- actually,

6   that's usually part of their regular classification.  If

7   you're specifically talking about discretionary overrides

8   that happen in between a regular classification, I don't

9   believe those happen a lot, but I know that they happen.

10       Q.     Do you know if ADCRR tracks how often those

11  happen?

12       A.     Yes.  Everything would be tracked through ACIS.

13       Q.     And through ACIS you would be able to see both

14  the number of people being reclassified through the

15  classification process, but also being reclassified

16  through a discretionary override process?

17       A.     Yes, ma'am.  They should be able to pull that up

18  through our system.

19       Q.     All right.  One reason that people might have a

20  discretionary override to put them into max custody is

21  because they're high profile, correct?

22                  MS. LOVE:  Object to the form; foundation.

23                  Go ahead.

24                  THE WITNESS:  Please explain high profile.

25       Q.     BY MS. MORRIS:  Well, that was going to be my

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

25

1   question to you.   One second.

2                    So we're looking at the section about

3   custody override types.   Do you see that?

4        A.    Yes, ma'am.

5        Q.    Okay.   And if we scroll down to Section 5.4.3

6   it says, high profile.   Do you see that?

7        A.    Yes, ma'am.

8        Q.    What does high profile mean in terms of

9   classification?

10       A.    So in this particular instance, all she's

11  referring to, if it is, for instance, a case that is very

12  well known, whether it be nationally or here in Arizona, an

13  inmate coming in that everybody is going to know who they

14  are, that would be considered a high profile inmate.

15       Q.    And why is that a reason to place someone in

16  max custody?

17       A.    Because we're looking at risk involving them,

18  risk involving us, looking at their protection more than

19  anything.   Inmates coming into the system that are high

20  profile, obviously, all the other inmates within our

21  population know about it and know about the inmate.   We do

22  that for security conditions and for safety reasons for the

23  inmate.

24       Q.    There is protective custody that's not max

25  custody, correct?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

26

1        A.      Yes, ma'am.

2        Q.      But a person who is high profile might be

3    placed into max custody solely because of being high

4    profile?

5        A.      They could.  Yes, ma'am.  And we could do that

6    so that we could look at whether it's in the inmate's best

7    interest to place them in protective custody.  So while

8    that process is going on we would place them in a maximum

9    custody setting.

10       Q.      Let me make sure that I understand what you

11   just said.

12               While determining whether a person who is

13   high profile needs to be in protective custody and at what

14   level of security, they would be housed in max custody

15   while you're making that determination; is that right?

16       A.      Yes, ma'am, for the inmate's safety.

17       Q.      All right.  One of the other reasons that a

18   person might be placed into max custody on an override is

19   in Section 5.4.4.1, if the current offense or a prior

20   offense are depicted as heinous.  Do you see that?

21       A.      Yes, ma'am.

22       Q.      What does this mean?

23       A.      It's based on the inmate's crime.  So if the

24   inmate -- and this could also go back to a high profile

25   inmate.  If you have an inmate that committed a very bad

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

27

1    act -- I'll try not to use the word heinous here, because a

2    terrible act out in the public that everybody has knowledge

3    of and we consider them a risk within our prison system,

4    then we would place them in maximum custody.

5        Q.    What does it mean that it's depicted as?

6        A.    I would say that it -- well, it would be the

7    case itself.  It would be the actual circumstances involved

8    with the case.  So I can give you a for instance, but of

9    course it would be my opinion on what heinous is.  But if

10   we're looking at a child murderer and this individual is

11   all over the news and everybody knows about it, that could

12   potentially be looked at as a heinous crime.  And we would

13   look at that as a safety for the inmate coming as well as

14   safety for public why we would place them in maximum

15   custody.

16       Q.    Is it because of that being all over the news,

17   or is it because of the nature of the crime?

18       A.    It could be both.  It could be both.

19       Q.    Could be either?

20       A.    It could be either.

21       Q.    And then can you explain what other major

22   reason, the next section, Section 5.4.5, what kinds of

23   things fall under that as a reason for a discretionary

24   override?

25       A.    So extensive and violent, obviously, if the

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

28

1  inmate is committing --

2      Q.    I'm sorry.  Not Section 5.4.4.2, but the one

3  right below that where it says, other major reason.  Do

4  you see that?

5      A.    Yes.

6      Q.    What kind of things fall within that reasoning

7  for an override?

8      A.    Well, you could look at, for instance, an inmate

9  that has an escape history, which would obviously pose a

10  risk to the public.  You could look at inmates that have

11  utilized a weapon on another inmate or staff member.  So

12  that kind of stuff.

13      Q.    Are those kinds of things that you just

14  described already considered within the classification

15  process?

16      A.    Yes, ma'am.  That kind of stuff would be looked

17  at during the classification process.

18      Q.    So even if you looked at it in the

19  classification process but the classification process

20  doesn't result in a max custody classification, the same

21  facts that didn't result in a max custody classification

22  could be the basis for an override to put the person into

23  max custody; is that correct?

24      A.    If we feel that there was a significant risk to

25  public staff or other inmates, then yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

29

1      Q.    Okay.   All right.   Let's go to page 16 of

2  Isolation Exhibit 2, the criteria governing placement into

3  max custody, Section 9.

4                 Do you see at Section 9.1 it says:   The

5  maximum custody due process is not applicable to inmates

6  in detention pending investigation, discipline, or

7  protective custody unless the inmate scores out as maximum

8  custody.   Do you see that?

9      A.    Yes, ma'am.

10     Q.    Can you explain that, what that means?

11     A.    So an inmate placed in detention, we're not

12  necessarily going to place him right into maximum custody

13  because of the circumstances involved in placing him in

14  detention.

15                 So we have a process called a two-way

16  investigation.   It's a disciplinary, and what we're doing

17  is investigating that.   So in order to provide the inmate

18  due process during that investigation, we want to make

19  sure that what he did is investigated and we know that is,

20  in fact, what he did before we were to move him out of

21  detention and place him in a maximum custody setting, if

22  that's what's warranted.

23     Q.    Okay.   But he doesn't have the due process that

24  he would have for placement into maximum custody while

25  he's in detention -- for his placement in detention?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

30

1       A.      That's correct.

2       Q.      And the due process is also not applicable to

3   inmates housed in maximum custody medical and/or mental

4   health care units, regardless of their custody level.  Do

5   you see that?

6       A.      Yes.

7       Q.      Can you explain that provision to me?

8       A.      That would be a decision made by mental health

9   staff, medical staff, or contracted medical staff.  And

10  that's the best explanation I can give you on that.  It's

11  their discretion to place them within those mental health

12  care units or those medical units based on their health or

13  their mental health needs at the time.

14      Q.      And so if I'm understanding correctly, there

15  are medical and mental health units that are max custody

16  units, and a person who needs the type of care that is

17  provided in those units could be moved into them,

18  regardless of custody level; is that accurate?

19      A.      That is accurate.  Yes, ma'am.

20      Q.      So we're going to look now at Section 10 of

21  DO 801, which is Isolation Exhibit 2, which is procedures

22  for maximum custody place assessment and removal.

23              Does the process that's described here, the

24  hearing process, does that apply to people who are first

25  coming into the system, and in their initial

1    classification they are classified as max custody?

2         A.    I don't believe that process is for the initial

3    intake of inmates into max custody.  The hearing process

4    would be for individuals that are currently within the

5    system going into max custody.

6         Q.    Is there anyone in ADCRR who would be able to

7    answer that question definitively?

8         A.    Yes, ma'am.  Our administrator for

9    classification, Stacey Crabtree, would be able to answer

10   that question.

11        Q.    So any of the people listed in 10.1 are able to

12   initiate a request for placement into max custody,

13   correct?

14        A.    Yes, ma'am.

15        Q.    So that's the warden, the deputy warden, or the

16   associate deputy warden, correct?

17        A.    Correct.

18        Q.    The CO 3 and CO 4 cannot initiate that,

19   correct?

20        A.    No.  They would actually be responsible for

21   taking care of the paperwork involved in that hearing

22   process, but the request would come from the warden, deputy

23   warden, or associate deputy warden, or central office.

24        Q.    Okay.  And all of the forms that were filled

25   out and are described in here, form 801-6, 801-2, 801-7,

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

32

1    these would all be placed into a file on the inmate?

2         A.    Yes, ma'am.

3         Q.    What file would they go into?

4         A.    All of this information is placed within ACIS,

5    our system.

6         Q.    Okay.  Is there a disciplinary file?

7         A.    I'm sorry.  Disciplinary file?

8         Q.    Yeah.

9         A.    Within ACIS?  Yes, ma'am.  There is.

10        Q.    Would these forms go into the disciplinary file

11   in ACIS?

12        A.    No.  They would go within the classification

13   file.

14        Q.    In the classification file.  Okay.

15              Can you explain to me what the maximum

16   custody placement recommendations/approval form, form

17   801-7, is?

18        A.    I believe this is the form that actually goes

19   through the recommendations for maximum placement.  So this

20   form is signed by the inmate.  It goes through the deputy

21   warden and the deputy warden makes a recommendation.  That

22   form then comes up to the warden's office.  The warden goes

23   through the packet, makes their recommendation, whether

24   they approve the maximum custody or do not approve the

25   maximum custody.  That packet then gets sent up to central

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

33

1    office classification.  They go through the packet, and

2    they either agree with the recommendations made by the

3    warden or they disagree with it, and subsequently the

4    inmate is either placed in maximum custody or he is not.

5         Q.    Is the recommendation/approval form filled out

6    regardless of the outcome of the hearing?

7         A.    The hearing for the inmate during my hearing

8    process?  Is that what we're talking about?

9         Q.    Yeah, yes.  So let's say the inmate goes

10   through the hearing process and the hearing officer says:

11   I don't think you need to go to max custody.  Does form

12   801-7 get filled out?

13        A.    It does.

14        Q.    It does?

15        A.    Yes.  More than likely, if there's not a reason

16   for the maximum custody placement and there wasn't a

17   directive given to begin that process, then that more than

18   likely wouldn't happen that way.  So we wouldn't start this

19   hearing process unless there was a reason for it.

20        Q.    Do you have any knowledge as to what percent of

21   max custody placement hearings result in a recommendation

22   that the person be placed in max custody?

23        A.    I do not have that percentage, no, ma'am.

24        Q.    Do you know if ADCRR tracks that?

25        A.    Yes, ma'am.  Everybody placed in maximum custody

1  we would have knowledge of, yes.

2      Q.    I guess my question is:  Does ADCRR track both

3  the number of hearings that do result in placement in max

4  custody and the number of hearings that result in a

5  recommendation that the person not go into max custody?

6      A.    I'm positive we do because all of that

7  information is placed within our ACIS system.  Yes, ma'am.

8      Q.    But you personally don't know that information?

9      A.    No, ma'am.  I can offer the fact that our

10  maximum custody population has reduced significantly in the

11  last five or six years.  I think currently normally we have

12  about a little over 1,600 max custody inmates in the entire

13  system in the state.  So I don't know the exact

14  percentages, but I know they have gone down significantly.

15      Q.    Okay.  If a hearing officer finds that the

16  person should not be placed in max custody, would the

17  maximum custody placement recommendation/approval form

18  saying that be forwarded to the warden or the warden's

19  designee?

20      A.    It would be so that we can document that the

21  hearing process took place.  And it would then, again, be

22  reviewed by the deputy warden to find out reasons for the

23  hearing officer's recommendation and whether the deputy

24  warden agrees with that recommendation or not, and then it

25  goes to the warden and, again, reviewed by the warden

35

1    trying to figure out why that decision of a recommendation

2    for not placing in maximum custody goes through.  And then

3    the warden would make the decision, as I explained earlier,

4    and then it would go to central office for their final

5    decision.

6        Q.    If the hearing officer recommends that the

7    person not go to maximum custody, could the deputy warden

8    decide that the person should go to max custody?

9        A.    They could make that recommendation.  They're

10   not the final approving authority.

11       Q.    Okay.  But they could make a recommendation?

12       A.    Yes, ma'am.

13       Q.    And if the hearing officer has not found that

14   the person should go to maximum custody, can the warden

15   decide that the person should go to maximum custody?

16       A.    Yes, ma'am.  It would be the warden's

17   recommendation, if they so choose, to place them in maximum

18   custody or not.  And, again, the final approving authority

19   would be central office.

20       Q.    Okay.  Can central office decide to place

21   someone in max custody if the hearing officer has

22   recommended against it?

23       A.    Yes, ma'am.  Central office can make the

24   determination to place the inmate in maximum custody if the

25   hearing officer, the deputy warden, and the warden all

36

1   recommended placing him in max custody.  Central office

2   still makes the final approving authority as far as max

3   custody or not.

4        Q.    All right.  Going down to Section 10.7, it says

5   that a person who is being reclassified as max custody is

6   placed in administrative detention prior to the completion

7   of the classification process and approval from central

8   classification.

9              Is that detention in a detention unit or in

10  a max custody unit?

11       A.    That would be placement in a detention facility.

12       Q.    Okay.  And how long can that process take?

13       A.    That process should not take more than 30 days.

14       Q.    At what point in the process -- from the time

15  of the hearing or even before hearing through to the

16  central office, at what point in that process is the

17  person moved to administrative detention?

18       A.    As soon as central office makes that

19  determination and places that decision within ACIS and that

20  paperwork is sent back so that that paperwork can be served

21  to the inmate, at that point the inmate is placed in

22  maximum custody if beds are available in maximum custody.

23       Q.    Okay.  I was going to get to that question in a

24  little while, but that would be a little different than

25  what I was asking.

37

1           At what point does the person get put into

2   detention?

3        A.   So as soon as the packet is initiated for

4   maximum custody, if there are enough points to place the

5   inmate in maximum custody and the maximum custody hearing

6   is going to -- the process is going to start, at that point

7   the inmate can be placed in detention.

8        Q.   Okay.  And that's what should not last more

9   than 30 days?

10       A.   Yes, ma'am.

11       Q.   All right.  Thank you.  So section 10.8 is

12   about the timing of reviews after maximum custody

13   approval.  Do you see that?

14       A.   Yes, ma'am.

15       Q.   And it says the person will be reviewed 180

16   days from maximum custody approval and annually thereafter

17   unless the approval was a maximum custody override, and if

18   it was an override, the inmate will be reviewed every 180

19   days, correct?

20       A.   Yes.

21       Q.   Can a person be removed from max custody other

22   than through the process that's being described in Section

23   10.8?

24       A.   At this point I don't believe they could be, no.

25   They would have to do that a minimum of 180 days until

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

38

1   their next classification for them to go down in level.

2       Q.    Okay.  Are you certain of that?

3       A.    I'm not, only because -- and I don't think that

4   it happens, but I believe the policy allows for

5   discretionary override similar to what we spoke about

6   earlier, but I believe they have to do that 180 days.

7       Q.    Okay.  Is there anyone who would be able to

8   answer that question definitively?

9       A.    Again, our administrator of classification,

10  Stacey Crabtree.

11      Q.    You said Stacey --

12      A.    Crabtree.

13      Q.    Okay.  We'll spend a lot of today looking at

14  DO 812, but I'm just going to represent to you that inside

15  of DO 812 it says that a person can be considered for

16  removal from max custody once they've been at step 3 for

17  at least 30 days.  Does that sound familiar to you?

18      A.    No, it does not.

19              (Exhibit 3 identified for the record.)

20      Q.    BY MS. MORRIS:  Are you familiar with what I've

21  designated as Isolation Exhibit 3, plaintiffs' department

22  order 812?

23      A.    Yes, ma'am.

24      Q.    Okay.  And can you tell me what department

25  order 812 is?

39

1    A.    Maximum custody management and incentive system.

2    Q.    Okay.  We're on page 6 of the PDF that is

3    document 812.  It says page 4 at the top.  Do you see

4    that?

5    A.    Yes, ma'am.

6    Q.    We're looking at Section 5.5, and it says:

7    Inmates who have maintained step 3 for a minimum of 30

8    consecutive days without incident are eligible for

9    consideration for placement in a close custody housing

10   location.  Do you see that?

11   A.    Yes, ma'am, I do.

12   Q.    Okay.  So I want to see if I can understand the

13   interaction between the 180-day or annually thereafter

14   review and this provision of DO 812 that says you're

15   eligible to be considered after 30 days.  I'll give you a

16   couple of examples and try to figure out how those two

17   things work together, okay?

18   A.    Yes, ma'am.

19   Q.    Okay.  So if a person is in max custody and

20   they've been in max custody for 180 days and so they come

21   up for review and there is step 2 at that point, they

22   cannot be removed from max custody through that review

23   process at that time, correct?

24   A.    Again, a discretionary override could be

25   initiated at that point.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

40

1     Q.     Can a discretionary override be used to remove
2  someone who has not gotten to step 3 from max custody?
3     A.     It could be, but more than likely, it would not
4  be.
5     Q.     Do you know if that has ever been done?
6     A.     I'm not aware if it has been done or not, ma'am,
7  no.
8     Q.     So with the exception of the discretionary
9  override that you're not aware of ever having occurred,
10 that person who was a step 2 at the time they came up for
11 that initial review after 180 days, they would not be
12 considered for removal from max custody for another year
13 after that, correct?
14    A.     You're saying if it did not involve a
15 discretionary override, correct?
16    Q.     If the person was in max custody because of
17 being classified as max custody, not because of any
18 override.  So the person goes through the classification
19 process and they get placed into max custody as a result
20 of the classification process, if they were at step 2 when
21 they come up for their first review at 180 days, they
22 would not be able to be reviewed for removal from max
23 custody for another year after that; is that correct?
24    A.     I believe max custody is reviewed every 180
25 days, ma'am.

1      Q.    Okay.  So looking at Section 10.8 it says:

2   Inmates shall be reviewed 180 days from max custody

3   approval and annually thereafter unless the approval for

4   max custody was an override.  Do you see that?

5      A.    Yes, ma'am.

6      Q.    Do you believe that the review for max custody,

7   for removal from max custody, happens every 180 days?

8      A.    According to that it's the initial 180 days and

9   annually after that, just as it's written.

10     Q.    And when we say "that," we're talking about

11  DO 801 Section 10.8, and we're talking about the policy on

12  inmate classification, correct?

13     A.    Correct.

14     Q.    So the policy on inmate classification is that

15  a person placed into maximum custody not based on an

16  override is reviewed at 180 days and then annually

17  thereafter, correct?

18     A.    Correct.

19     Q.    Do you have any knowledge of the percentage of

20  people who are in maximum custody who are in max custody

21  because of an override?

22     A.    I don't have that percentage.  No, ma'am.

23     Q.    Would ADC have that knowledge, ADCRR?

24     A.    Yes, ma'am.  We would have that knowledge.

25     Q.    Would Stacey Crabtree know that information?

1      A.    Yes, ma'am.   More than likely she would.

2      Q.    Okay.   It's my understanding from what you've

3  testified about so far that you don't know how frequently

4  overrides happen either for placing someone into maximum

5  custody or for changing the timing of the review for

6  removal from max custody; is that accurate?

7      A.    I do not have those percentages, correct.

8      Q.    Okay.   All right.   Then for the next examples

9  that I give, let's just go on the assumption that these

10  are not due to overrides.   So these are just sort of the

11  default process, okay?

12      A.    Yes, ma'am.

13      Q.    Okay.   So if a person who is placed into

14  maximum custody and they have been at step 3 for more than

15  30 days at the time they come up for review at 180 days,

16  okay?   Does that make sense?

17      A.    Yes.

18      Q.    At that point they could be considered for

19  removal from max custody, correct?

20      A.    That is correct.

21      Q.    If they are not removed from max custody

22  through that review, they would have to wait for another

23  year to be reviewed for removal from max custody, correct?

24      A.    That is correct.

25      Q.    And to be removed from max custody at that

43

1   review a year later, they would need to have been at that

2   point at step 3 for at least 30 days, correct?

3       A.    Correct.

4       Q.    You sounded like there was a hesitation in what

5   you were saying.

6       A.    I want to say that we have classified inmates

7   that were a step 2 down to close custody at that next

8   review as long as they were doing the things they were

9   supposed to do and hadn't had any disciplinary and were

10  programmed.  And those kind of go hand in hand.  So if

11  they're doing the things they're supposed to do and the

12  programming, more than likely they're going to be -- at

13  that year's time they're going to be a step 3.

14      Q.    You don't know how many people have been

15  removed from max custody through a review process when

16  they were step 2s, correct?

17      A.    No, ma'am, I don't.

18      Q.    Next example, a person is in maximum custody,

19  it's their initial review at 180 days, and at that time

20  they have been a step 3 for 28 days.  Can they be removed

21  from max custody through that review process?

22      A.    I would say yes, they could.

23      Q.    Okay.  Where is that in the policy?

24      A.    It would actually be an override.  It would be

25  an override.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

44

1      Q.      Okay.  And, again, you don't know if or how
2  often such overrides happen?
3      A.      No, ma'am, I don't.
4      Q.      If someone was in that kind of a situation
5  where they're almost eligible but not quite, who would be
6  the person that could start the override process?
7      A.      At that 180-day review it would be the CO 3 that
8  would initiate the hearing.
9      Q.      I'm sorry.  The hearing?  What hearing are you
10  talking about there?
11      A.      The removal from max custody.  I'm sorry.  It's
12  the packet and the paperwork.  Not exactly the hearing.
13  It's the packet.
14      Q.      Okay.  Could the CO 3 be making the decision to
15  start that process, or would the warden, deputy warden, or
16  associate deputy warden be making that decision and asking
17  the CO 3 to start the process?
18      A.      At that review, if it's for the regular review,
19  it would be the CO 3.  It would be an inmate on their
20  caseload, and that would trigger on their caseload as
21  needing that review to be completed.  So it would initiate
22  that.
23      Q.      All right.  Section 11 of Isolation Exhibit 2
24  DO 801 is maximum custody appeals.  That process can take
25  up to 45 days to complete, correct?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

45

1      A.     Yes, ma'am, it can.

2      Q.     Where is the incarcerated person housed during

3   that appeal process?

4      A.     That's going to depend on where they currently

5   are at.  So you could have somebody in a close custody unit

6   that would remain in that close custody unit while that

7   takes place.

8      Q.     Okay.  What if a person was in a medium custody

9   unit?

10     A.     Medium custody unit, this would be where, if

11  they were designated to go into maximum custody and we

12  started that process, we would place them in detention.

13     Q.     And that would be the same for minimum?

14     A.     Yes, ma'am.

15     Q.     Okay.  Section 12 sets out the process for

16  administrative reviews, correct?

17     A.     Yes, ma'am.

18     Q.     Does this process apply to people classified to

19  maximum custody?

20     A.     It could.  Yes, ma'am.

21          MS. MORRIS:  Let's take a five-minute break

22  and then come back.

23          (Recess from 10:22 a.m. to 10:30 a.m.)

24          MS. MORRIS:  Going back on the record.

25     Q.     BY MS. MORRIS:  How is it decided where a

1   person is going to be housed if they're in max custody?

2          A.    So it would be depending on their

3   classification.  So, like I said earlier, whether they're

4   general population, whether they're a sex offender, whether

5   they are coming back as a validated security threat group

6   number.  So it would be based on the description of when

7   they come in.

8                Previously if they had incarceration we

9   would look at that.  So if they were in protective custody

10  we would send them to Lewis complex where we house our

11  protective custody population.  And all that is based on

12  what each complex has designated as far as the population

13  type.

14         Q.    Are there any reasons that a person, according

15  to policy, cannot be placed into maximum custody?

16         A.    Not to my knowledge, no, unless of course they

17  have, for instance, an ADA restriction and we don't have

18  any ADA beds in our specific facility.  We would have to

19  look at all placement until a bed becomes available, but

20  other than that, that's the only thing I could think of.

21         Q.    Does that include mental health related ADA

22  concerns?

23         A.    It could, yes.

24         Q.    But that's a question about bed space and

25  whether bed space is available, not an actual exclusion of

47

1    the person from maximum custody; is that correct?

2         A.    Well, you mentioned a mental health individual.

3    If we have an inmate that is reviewed by mental health as

4    they came in and mental health felt that that individual

5    couldn't be placed in a maximum custody setting, then we

6    would be placing them elsewhere in a mental health setting.

7         Q.    What policy says that?

8         A.    I am not sure of that policy number, ma'am.

9         Q.    But you're sure that there is such a policy?

10        A.    Whether it's within our policies or if it's

11   within the health services manual, I'm not exactly sure,

12   ma'am.

13        Q.    Okay.  Does mental health staff have the

14   ability to determine that a person cannot be sent to

15   maximum custody?

16        A.    So this is a difficult question to answer

17   because we have mental health areas that are a maximum

18   custody setting.  So if, for instance, an inmate came in

19   through the Browning unit and through an initial assessment

20   a mental health staff determines that they needed to be

21   placed in a mental health program, and we have a mental

22   health program that is designated maximum custody.  So they

23   would place that individual in that program.  They would

24   still be considered maximum custody but they would be

25   within the mental health program.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

48

1      Q.    Could mental health say this person cannot go
2    into maximum custody, regardless?
3      A.    No, they would not be able to do that unless
4    they showed reason why that individual could not due to
5    mental health concerns.
6      Q.    Is there a policy that says that they can
7    prevent a person from being placed into maximum custody
8    due to mental health concerns?
9      A.    Again, ma'am, that's similar to what I responded
10   to earlier.  I'm not sure if that's within our policy
11   guidelines or if that's within the Centurion guidelines.
12   I'm not sure.
13     Q.    Do you know whether or not there is such a
14   policy either for ADCRR or for Centurion?
15     A.    Again, I'm not sure.
16     Q.    Are there any special procedures when
17   considering placing someone who is mentally ill into max
18   custody?
19              MS. LOVE:  Object to form; foundation.
20              THE WITNESS:  I'm not aware of the
21   specifics in regards to that, ma'am.
22     Q.    BY MS. MORRIS:  Is anyone in ADCRR aware of the
23   specifics in regard to that?
24     A.    Again, I would probably state Stacey Crabtree.
25     Q.    For people who are newly classified as maximum

1    custody, what are the intake procedures for maximum

2    custody?

3         A.    Well, when an inmate comes in, again, their

4    initial classification is completed.  If they are, in fact,

5    maximum custody they would go through the intake center and

6    be placed within whatever category they came in at, as I

7    said before, a sex offender, general population.  They're

8    assigned a cell.  They're placed within a cell with a

9    receiving bag that has clothing and it has hygiene stuff.

10   It has bedding.  And they are given an orientation for the

11   specific unit and for the department.

12        Q.    Can we back up a moment?

13        A.    Sure.

14        Q.    You mentioned an intake, Eyman max custody

15   intake.  Is there a period of time that people spend in

16   the intake unit, the max custody intake unit?

17        A.    There could be.  Yes, ma'am.

18        Q.    Is there?

19        A.    Well, so, as they come in they could be placed

20   within that intake unit.  Now, they're usually there until

21   their classification is complete and we know exactly where

22   they're going to go and there is a bed available for them.

23   So once that's completed they are out of that intake area.

24        Q.    Okay.  So once it's determined where they will

25   go and there is a bed available they go out of the intake?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

50

1       A.      Yes, ma'am.  We have to keep that area clear
2   because we have inmates coming in and out of there.
3       Q.      Okay.  I'll make a note for myself to remember
4   something later for a question.
5               While they are in the intake area do they
6   have a mental health review?
7       A.      Yes, they do.  During that intake process mental
8   health screens the inmate within a specified time period.
9       Q.      I'm sorry?
10      A.      Within a specified time period mental health
11  will evaluate that inmate.  Yes, ma'am.
12      Q.      What's the specified time period?
13      A.      I believe it is three days.
14      Q.      What about a medical review?  Do they have a
15  medical review in the intake?
16      A.      Medical would also have to review.  Yes, ma'am.
17      Q.      Is that a same time period?
18      A.      I'm not sure about the time period for medical.
19      Q.      Does orientation for max custody happen in the
20  intake unit?
21      A.      Normally not.  That is scheduled as soon as
22  they're housed within the facility itself.
23      Q.      So sex offender unit, STG unit, that kind of
24  thing?
25      A.      Yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

51

1      Q.     Okay.  While they're in the intake unit do they
2   have access to any programs?
3      A.     No, they do not.
4      Q.     Do they have access to property beyond the max
5   custody receiving bag that you described?
6      A.     No, ma'am, they do not.
7      Q.     Do they have access to visitation while they
8   are in intake?
9      A.     No, ma'am, because we're still trying to
10   determine where they're going to go.
11      Q.     Do they have access to phone calls while they
12   are in intake?
13      A.     I don't believe so.  Again, that's a short
14   period of time that they're in there, and all that is
15   determined once they get to the unit that they are
16   assigned.
17      Q.     What is the restricted status housing program?
18      A.     Restricted status housing program is a program
19   within maximum custody where we potentially could place
20   inmates that have violated what we call our forbidden
21   three, which would be a serious assault on a staff member,
22   a serious assault on another inmate with a weapon, or
23   multiple inmates on one inmate that would result in serious
24   harm to that particular inmate.
25      Q.     Where is there a restricted status housing

1    the event that results in a person being placed into

2    restricted status happens when the person is not in max

3    custody the person would be reclassified for max custody

4    as well as being placed into restricted status; is that

5    right?

6        A.    Yes, ma'am.

7        Q.    And if the person was already max custody and

8    something happened that resulted in the person being

9    placed in restricted status, that would not be a

10   classification decision, correct?

11       A.    It still would because that disciplinary that

12   they would receive for that act would trigger a

13   classification action.  Even though they're in maximum

14   custody, it would bring their points higher than what they

15   previously were.

16       Q.    Okay.  Who makes the decision to start the

17   process of putting somebody into a restricted status

18   housing program?

19       A.    The warden of the facility that the incident

20   took place at, they would make a phone call to the regional

21   operations director of that particular facility.  And the

22   decision would be made in consultation with the Eyman or

23   the Lewis warden to basically advise them that this

24   particular inmate is going to be placed in restricted

25   status housing.

56

1      Q.      Where is the decision about whether or not to
2  place a person into restricted housing, where is that
3  documented?
4      A.      Well, it would be documented in our movement
5  screens through ACIS, and it would be documented in the
6  disciplinary ticket that would be generated due to the act
7  of placing them in restricted status housing, and then
8  ultimately the ticket results in a trigger for the
9  classification.  So it would be within the classification
10  system, as well.
11      Q.      And if a person was considered for restricted
12  status housing and then was not sent to restricted status
13  housing would that be documented anywhere?
14      A.      No, it wouldn't.
15      Q.      Are there any particular intake procedures for
16  coming into a restricted status housing program beyond
17  what there would be for coming into maximum custody or
18  different from what there would be for maximum custody?
19      A.      No, it would be fairly similar.  The inmate
20  would be brought in, be placed within a cell, given the
21  items that would be needed in the cell as far as the
22  bedding and clothing.  They would be given an orientation
23  by the individuals over that particular area within the
24  unit.  So it would be very similar.
25      Q.      Okay.  Are there any categorical reasons that a

1    person cannot be placed into restricted status housing

2    program?

3          A.    The only thing that comes to mind would be, as

4    we spoke about earlier, if there was any particular mental

5    health concerns in regards to that, then that would be

6    brought up by mental health staff and then that would be

7    talked about.

8          Q.    So an individual's mental health issues might

9    result in not being placed into restricted status,

10   correct?

11         A.    It could, yes.   Each one of them has their

12   place, and restricted status housing would be reviewed by

13   mental health staff.

14         Q.    Okay.   Is there any policy like a person with

15   serious mental illness cannot be placed into restricted

16   status?   That's what I mean by a categorical thing.

17         A.    Very similar to the response earlier, ma'am.

18   I'm not exactly sure of that policy.

19         Q.    So you don't know whether or not there is such

20   a policy?

21         A.    I do not.

22         Q.    Are there any categorical reasons that require

23   additional review prior to placing someone into

24   restrictive status?

25         A.    Not that I'm aware of, no, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

58

1      Q.    Okay.  Do you know whether there are?

2      A.    Just off the top of my head I'm thinking of

3   medical reasons, mental health reasons.  Those are the only

4   two things I can think of that would potentially be looked

5   at as why someone could not go into restrictive status

6   housing.

7      Q.    But, again, what you sound like you're

8   describing is an individual consideration.  I could

9   imagine something like you can't put people who are on

10   dialysis into restricted status because you won't be able

11   to get them to dialysis, something like that.

12             Are there any categorical things that you

13   can just say:  There is this situation, and, therefore,

14   there is no chance that the person would go in?

15      A.    No, ma'am.  That's why I kept it broad.  Medical

16   and mental health issues -- you mentioned dialysis but we

17   could, in fact, place the dialysis inmate within there

18   because we knew the transportations for those dialysis

19   inmates.  We could make those accommodations within

20   restricted status housing.

21      Q.    It was definitely just meant as an example of a

22   kind of thing that might result in there being a

23   categorical exclusion.

24      A.    I understand.

25      Q.    Okay.  All right.  Can you explain what

59

1  enhanced management status is?

2       A.    Enhanced management status is a program within

3  Browning unit.  It is a program designed for inmates that

4  have done the worst of the worst within the department and

5  the decision was made to place them with enhanced security.

6       Q.    Is that a classification decision?

7       A.    It's just a program within max custody very

8  similar to restricted status housing.

9       Q.    Okay.  What do you mean when you say it's a

10 program?

11      A.    So it is a program where we manage inmates that

12 have done horrific violations within the department.  For

13 instance, an inmate that escapes the department would be

14 looked at for enhanced security.  An inmate that has

15 committed a homicide within the prison would be looked at

16 for enhanced security as specific examples.

17      Q.    And just so we're super clear for the record,

18 when you say enhanced security you're using that

19 interchangeably with enhanced management?

20      A.    Yes, ma'am, I am.  My apologies.

21      Q.    No problem.  I just wanted to be sure that

22 there wasn't another status that I was going to have to

23 ask about.

24            Who makes the decision about whether a

25 person should go into enhanced management?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

60

1     A.    That's a decision very similar to restricted

2    status housing that we spoke about by the sending warden

3    through the regional operations director.   It could

4    potentially go through assistant director of prison

5    operations, and then, of course, the receiving warden at

6    Eyman would be notified, as well.

7     Q.    Okay.   And are there any intake procedures for

8    someone who is being transferred into enhanced management

9    beyond what we've talked about with regard to the max

10   custody, generally?

11    A.    Not beyond what we've talked about.   No, ma'am.

12    Q.    Okay.   Are there any categorical reasons a

13   person cannot be placed into enhanced management?

14    A.    Very similar to restricted status housing,

15   ma'am.   It could potentially be medical or mental health

16   issues with a particular inmate.

17    Q.    But there are no categories of people that

18   cannot, because they belong to a category, be placed into

19   enhanced management; is that right?

20    A.    That's correct.   We've had different categories

21   within there such as general population, sex offender,

22   protective custody.

23    Q.    Okay.   Can a person who has a serious mental

24   illness be placed in an enhanced management?

25    A.    That would be in consultation with mental health

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

61

1    staff and would be determined with a discussion between

2    mental health staff and security staff on whether that

3    would be something that we would want to do or if it would

4    negatively affect that particular inmate.  So those

5    considerations would be looked at before we place that

6    individual on enhanced security.

7         Q.    So that would be a consideration of the

8    individual's mental health, correct?

9         A.    Yes, ma'am.

10        Q.    Is there any categorical rule, any rule that

11   limits the placement of people with SMI into enhanced

12   management?

13        A.    No, ma'am, other than if they're already within

14   our mental health program, again, that would be assessed by

15   mental health staff and security staff.

16        Q.    What is the STG unit?

17        A.    Also an area within Browning unit where we house

18   security threat group members that have been validated.

19        Q.    And security threat groups are often commonly

20   referred to as gangs; is that correct?

21        A.    That's correct.  Yes, ma'am.  And these are

22   designated gangs within our Arizona Revised Statutes.

23        Q.    Okay.  All right.  Is it a classification

24   decision to put somebody into the STG unit?

25        A.    Yes, ma'am.  It could be.  So a validated STG,

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

62

1    if it has been decided that they need to be placed within

2    Browning unit, then if -- for instance, as I mentioned

3    earlier, if they're a medium-custody inmate, then that

4    information would go through classification and placing

5    them at maximum custody Browning unit at Eyman complex.

6         Q.    If a person is validated as an STG member do

7    they necessarily become max custody?

8         A.    They don't.  So as of recently that has changed.

9    Before they did, and that policy was revised within the

10   past year, and now it's taken on a case-by-case basis and

11   reviewed by a committee.

12        Q.    By what committee?

13        A.    There's an STG committee that's put together

14   that reviews the STG placements.

15        Q.    Are there any intake procedures that are

16   different for someone coming into the maximum custody STG

17   unit different than what there would be in max custody

18   general population?

19        A.    No, ma'am.

20        Q.    Are there any categorical reasons a person

21   cannot be placed into the STG unit?

22        A.    For the STG unit I don't believe there is,

23   ma'am.  Up to then, again, if there were mental health

24   concerns where the individual could potentially take a

25   downturn with their health, that would be discussed with

63

1    mental health staff or medical staff and security staff.

2        Q.    Okay.  What is the BMU at Eyman/Browning?

3        A.    Browning unit houses behavioral management unit.

4    These are SMI or mental health inmates that have a history

5    of assaultive behavior, self-harm behavior, and they're

6    difficult inmates to manage within our system.

7        Q.    And this is a new unit, correct?

8        A.    No, ma'am.  This has been around for quite some

9    time.

10        Q.    At Eyman/Browning?

11        A.    It started at Eyman/Browning unit, and this was

12    back in, I believe, the early 2000s.  It started at

13    Browning and moved to SMU 1.  It was at SMU 1 for a little

14    while and then it moved to cell block Kasson at Central

15    unit at Florence complex.  And as of last month it was

16    moved back to ASPC Eyman/Browning unit.

17        Q.    So Kasson had a larger capacity than the BMU at

18    Eyman/Browning, correct?

19        A.    No, ma'am, completely the opposite.  We had 24

20    beds for BMU at cell block Kasson -- or, I'm sorry,

21    browning unit has 30 beds allocated for BMU.

22        Q.    So the only people that would have moved from

23    Kasson to the BMU at Eyman/Browning are people who were in

24    the area of Kasson that was designated as the BMU; is that

25    correct?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

64

1       A.      That's correct.  We basically picked the program
2    up and moved it over to Browning unit.
3       Q.      Are there people in the BMU at Browning who are
4    not maximum custody?
5       A.      Yes, ma'am, there could be.
6       Q.      Okay.  There could be.  Do you know if there
7    are?
8       A.      I know at one point there were.  I'm not exactly
9    sure what that population looks like currently.
10      Q.      Okay.  When the BMU was at Kasson, were there
11   people in the BMU who were not maximum custody?
12      A.      We did have some individuals that were not
13   maximum custody.  Yes, ma'am.
14      Q.      And was that also true in the Kasson unit more
15   generally?  So not just the BMU but the rest of the Kasson
16   unit?
17      A.      The residential mental health program at Kasson,
18   yes, ma'am.  We also had individuals that were not
19   considered maximum custody within that program.
20      Q.      Are there any particular intake procedures for
21   someone being transferred into the BMU, different than
22   what we talked about for max custody?
23      A.      It's a little more intensive in regards to the
24   evaluations given to them by mental health staff, but
25   ultimately, it's very similar.  Yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

65

1      Q.    Okay.  What is detention?

2      A.    Detention is a temporary holding area where we

3  place inmates that could potentially have disciplinary

4  issues, have protective custody, or what we call 805

5  issues, where they're in fear for their life, disciplinary

6  issues.  So it's a temporary holding area for us.

7      Q.    Okay.  Is that a classification decision?

8      A.    Detention, I believe it is a classification

9  action.  Yes, ma'am.

10     Q.    Okay.  Who makes the decision to put someone

11  into detention?

12     A.    More times than not, the deputy warden will

13  basically call the warden's office of whatever facility it

14  happens at and the decision would be made by the warden to

15  place an inmate within detention.

16     Q.    Are there intake procedures for someone who is

17  being placed into detention?

18     A.    There are.  And it's very similar to what we

19  spoke about previously, but the inmate's property is

20  removed from them and it's gone through.  And they're, of

21  course, given orientation as to why they're being placed in

22  detention.  So everything else is pretty much the same.

23  They're given the same kind of hygiene items, clothing

24  items, that kind of stuff.

25     Q.    Are there any categorical reasons a person

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

66

1   cannot be placed in detention?

2        A.    The only ones, again, that come to mind could

3   potentially be a medical reason or a mental health reason.

4   Other than that, I don't believe there is, no.

5        Q.    And that would be a case-by-case basis, not a

6   category, correct?

7        A.    That is correct.

8        Q.    Okay.   What is close management?

9        A.    Close management is also a program within

10  Browning unit, and there is also close management at Lewis

11  complex at Rast.   Close management is a program that they

12  place inmates that are not necessarily rising to the level

13  of maximum custody in regards to their behavior but are

14  inmates that we don't believe can possibly function

15  correctly within a close custody setting and we want to

16  monitor a little more closely.   And so it is a designated

17  program for those particular inmates.   They're usually

18  inmates that have been in some type of issue disciplinary-

19  wise.

20       Q.    Who makes the decision to put a person into

21  close management?

22       A.    The decision to place an inmate in close

23  management is similar to the other programs.   It would go

24  through the warden, through the regional operations

25  director, and potentially could involve the assistant

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

67

1   director of prison operations.

2       Q.    And where would that decision be documented?

3       A.    There is a packet that has to be done in order

4   to place an inmate within close management.  That

5   documentation is kept and that document is also placed

6   within ACIS.

7       Q.    What are the kinds of reasons that result in a

8   person being placed in close management?

9       A.    An inmate could potentially be placed in close

10  management for being associated with an inmate that has

11  committed one of the forbidden three acts.  So when they do

12  their investigation within that they will find out if there

13  are any associates involved with that particular inmate.

14  Those associates, if during the investigation it is found

15  that they are part of that act that was committed, they

16  could potentially end up in close management.

17      Q.    Okay.  Any other examples?

18      A.     I would say close management could also be

19  utilized for inmates that we are just not comfortable

20  placing on a close custody yard due to a disciplinary

21  infraction and we wanted to monitor a little more closely

22  before we placed them on that close custody yard and find

23  out whether or not they would be able to function on a

24  close custody yard.  There is a probationary period when

25  they come out of close custody management so that we can

68

1    review them to make sure that they will, in fact, function

2    correctly on a close custody yard.   That's about it.

3        Q.    And the situation that you just described where

4    you're thinking about placing someone in a close custody

5    yard but you're not sure they will be able to function

6    there, is that for people who are coming out of maximum

7    custody?

8        A.    More times than not, no, but it could.

9        Q.    Okay.   So what would be the situation where it

10   wasn't someone coming out of max custody but you weren't

11   sure that they could function in a close custody yard?

12       A.    From one program to another, if you're looking

13   at restrictive status housing, for example, and a

14   particular inmate committed one of these forbidden three

15   acts that I spoke about earlier, we could potentially move

16   them down through close custody management to ensure that

17   they can, in fact, go to a close custody yard without any

18   kind of issues.

19       Q.    But that would mean they -- if they were in

20   restricted status then they were max custody, weren't

21   they?

22       A.    Correct.   That was your question I understood it

23   as.

24       Q.    Okay.   So that person, it's been decided

25   they're in max custody in restricted status, okay.   And

1    it's been decided that they no longer need restricted

2    status, they no longer need max custody, they are going to

3    go to close custody, but you're not sure they're quite

4    ready for it yet and so you put them into close

5    management; is that what you're saying?

6        A.    Yes, ma'am.  They have to meet the parameters to

7    be removed from the restrict status housing program, and

8    from there we could place them into close custody

9    management, if we choose to do so.

10       Q.    When you say, close custody management, that's

11   close management, right?

12       A.    Yes, ma'am.  I'm sorry.  Yes.

13       Q.    That particular set of terms I find very

14   confusing.

15       A.    My apologies.

16       Q.    No problem.  Okay.

17       A.    Just as a side note in regards to close custody

18   management, we really don't use the program a whole heck of

19   a lot.  I think currently in the state we've only got 26

20   inmates within that program.

21       Q.    And, again, that's close management?

22       A.    Close management.  Yes, ma'am.

23       Q.    Are there any categorical reasons that a person

24   cannot be placed into close management?

25       A.    Not that I'm aware of.  No, ma'am.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

70

1     Q.    Okay.  What is mental health watch?

2     A.    Mental health watch is a watch where we would

3   place an inmate that shows self-harm behavior, whether

4   they've actually committed self-harm, whether they state

5   that they are going to commit self-harm.  They would be

6   placed by mental health staff on a mental health watch

7   within a cell.  It could vary from a continuous watch where

8   an officer is sitting on that particular individual with

9   eyes on him all the time, to a ten-minute watch where they

10  check on him every ten minutes, to a 30-minute watch and

11  check on him every 30 minutes.

12    Q.    There's also something called a precautionary

13  security watch?

14    A.    Yes, ma'am.

15    Q.    Can you explain what that is?

16    A.    And I can give you an example of this.  As a

17  warden of a facility, if I have an inmate that comes in

18  after hours and I don't have the ability to get mental

19  health to see them, medical had seen the particular inmate

20  and medical has stated that they have some concerns but

21  don't choose to place them on a mental health watch, I have

22  the ability to place them on a security watch.  I can place

23  them on a security watch until I can have mental health

24  staff see that particular individual.  And the security

25  watch is basically a 30-minute watch where we can keep

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

71

1    track of the inmate to make sure they don't self-harm.

2        Q.    Okay.  Can security staff place someone onto a

3    mental health watch that's not a precautionary security

4    watch?

5        A.    No, ma'am.  It has to be done by the mental

6    health staff.

7        Q.    Okay.  All right.  Are there any policies that

8    govern the practices in -- I'm sorry.  I'm going to give

9    you a little bit of a map where I'm going.  I'm going to

10   start now talking in more depth about enhanced management.

11       A.    Yes, ma'am.

12       Q.    Okay.  Are there any policies other than DO 812

13   that set out the enhanced management program policies?

14       A.    Not to my knowledge.  I believe that is the only

15   policy that contains information regarding enhanced

16   management.

17       Q.    Looking now at Isolation Exhibit 3, which is DO

18   812, and we're looking at Section 7 relating to the

19   enhanced management housing status.  Do you see that?

20       A.    No, ma'am.  It's not on my screen.

21       Q.    That's because I didn't actually successfully

22   share my screen.  Now do you see it?

23       A.    Yes, ma'am.  I do.

24       Q.    Excellent.  7.1.1 lays out actions that -- so

25   it says that the person is either a serious escape risk or

1   physically assaultive behavior, and it lists four

2   categories of reasons why a person might be placed on

3   enhanced management.  Do you see that?

4       A.    Yes, ma'am.

5       Q.    If a person commits one of the actions listed

6   here -- a serious physical injury, an assault with a

7   dangerous weapon, an assault causing a serious physical

8   injury, or an assault resulting in the death of any

9   person -- is it automatic that the person will go into

10  enhanced management status?

11      A.    No, ma'am.  It's not automatic.  I mean, it's

12  upon actually what happened.  So it's all based on a

13  case-by-case basis.  The facts of the matter are relayed

14  from the warden to the regional operations director and the

15  determination is made whether they're placed in there or

16  not.

17      Q.    And who makes that?

18      A.    Regional operations director, or it potentially

19  could go to the assistant director of prison operations.

20      Q.    If a person is convicted of one of the crimes

21  listed in 7.1.1.4, is it automatic that they'll be placed

22  into enhanced management status?

23      A.    It is not automatic, no, ma'am.  Again, it's

24  taken on a case-by-case basis and the details of exactly

25  what happened.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

73

1     Q.    Does consideration of the crime look only at
2  the current conviction or would it look at the full
3  criminal record?
4     A.    For enhanced management we're looking at the
5  current offense.
6     Q.    Okay.  All right.  Is it written into policy
7  anywhere how the criteria for placement into enhanced
8  management are considered so that there's guidance as to
9  whether or not the person should be placed into enhanced
10  management?
11              MS. LOVE:  Form.
12              THE WITNESS:  There's not, ma'am.  As we
13  spoke about, it's a case-by-case basis.
14     Q.    BY MS. MORRIS:  Okay.  But there's no policy
15  guiding that case-by-case decision-making process?
16     A.    No, ma'am.  The policy in front of me is the
17  only policy we have on enhanced management, to my
18  knowledge.
19     Q.    Okay.  Going down to Section 7.4, and
20  specifically 7.4.2, it says:  Inmates classified as SMI
21  shall not be placed in EMHS, enhanced management housing
22  status, without review by the health services contract
23  monitoring bureau mental health director and contract
24  mental health director.  Do you see that?
25     A.    Yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

74

1      Q.    Is that review documented somewhere?

2      A.    So that assessment that's done by mental health

3   staff, to my knowledge, that is placed within their eOMIS

4   system.  That would be the documentation in regards to that

5   assessment.

6      Q.    So that would be the only documentation of that

7   review?

8      A.    To my knowledge.  Yes, ma'am.

9      Q.    Okay.  Is that review done in person or is it a

10  review of records?

11     A.    That review would have to be done in person, to

12  my knowledge.  Yes, ma'am.

13     Q.    Okay.  When you say to your knowledge, does

14  that mean that's what you think, or do you know that?

15     A.    I am not in charge of Eyman complex nor Browning

16  unit, ma'am.  So I'm going by what the policy states.

17     Q.    Where in the policy are you getting that it has

18  to be in person?

19     A.    So when mental health assessments are done --

20  and I am not exactly sure where the policy is on this, but

21  when mental health assessments are done they're supposed to

22  be done in person by the mental health staff.

23     Q.    This review is done by the monitoring bureau

24  mental health director and contract mental health

25  director?

75

1    A.    So we might be talking about two different

2  things.   The assessment I'm talking about is the on-site

3  mental health staff, and that inmate is placed in enhanced

4  security.   7.4.2 is in regards to individuals that I

5  believe are over that individual taking that mental health

6  assessment at the unit.   So, of course, they would not be

7  at the unit.   And so they would, yes, of course, be looking

8  at it through notes, phone calls, whatever the case may be.

9    Q.    Okay.   When does the review that's described in

10  7.4.2 happen in relation to placement into enhanced

11  management?

12    A.    In regards to the directors on 7.4.2., I'm not

13  exactly sure when that takes place, ma'am.

14    Q.    Okay.

15    A.    Above that on 7.4, it says within the five

16  business days, and since that's a subcategory of 7.4, I

17  would assume it would be within those five business days.

18    Q.    But that's just an assumption?

19    A.    Yes, ma'am.

20    Q.    Okay.   All right.   Let's talk now about the

21  restricted status housing program.   That's also governed

22  by DO 812, correct?

23    A.    Yes, ma'am.

24    Q.    Are there any other policies that set out

25  provisions relating to the restrictive status housing

76

1    program?

2         A.    Not that I'm aware of.  No, ma'am.

3         Q.    Okay.  So in section 6.4, which is on the

4    screen right now, can you see it?

5         A.    Yes, ma'am.

6         Q.    Okay.  And in section 6.4.3 it says, again,

7    that inmates classified as SMI shall not be placed in RSHP

8    without review by the mental health services contract

9    monitoring bureau mental health director and the contract

10   mental health director.  Do you see that?

11        A.    I'm sorry.  Could you repeat that?  I'm sorry.

12        Q.    This one, also, for restricted housing, there's

13   also this provision that there has to be review for people

14   who have an SMI to be placed into restricted housing just

15   like there was for enhanced management, correct?

16        A.    Yes, ma'am.

17        Q.    Is that the same type of review that happens

18   for enhanced management?

19        A.    Yes, ma'am, it is.

20        Q.    And do you know when that review has to occur?

21        A.    Similarly, because it's a subsection of 6.4, I'm

22   assuming it's within five business days.

23        Q.    Okay.  And, again, that review would be

24   documented in eOMIS?

25        A.    Yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

77

1      Q.     And it wouldn't be documented anywhere else?

2      A.     Not to my knowledge.  No, ma'am.

3      Q.     How does ADCRR ensure that the provisions about

4   having a review for a person with an SMI who is going into

5   restricted status housing program or enhanced management

6   actually occurs?

7      A.     So an inmate that is designated SMI within our

8   system, we have a code that tells us that the particular

9   inmate is, in fact, SMI.  So as the inmate is received from

10  whatever sending unit is sending them to the receiving

11  unit, then, as soon as they come in, we know, based on a

12  designated code behind their ADC number, that they are an

13  SMI inmate.  Does that answer that question for you?

14     Q.     Yes.  That's an M, correct?

15     A.     That is correct.

16     Q.     Does ADCRR have a system for making sure that

17  the review of a person who is classified as an SMI

18  actually occurs when that person is placed into RSHP or

19  enhanced management?

20     A.     So a couple different ways we know this.  So,

21  like I said, as they come in they're already designated

22  SMI, and because of that, that information is relayed.  We

23  have individuals that are in charge of that restricted

24  status housing program.  They will know when that inmate

25  comes in that they are, in fact, SMI.  All the inmates that

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

78

1    come into that program are automatically reviewed by mental

2    health staff just to make sure they're not going to harm

3    themselves when we place them in the program.

4                    Mental health staff, as that inmate enters,

5    is automatically going to know by that designator code

6    that the inmate is SMI.  SMI inmates, obviously, are given

7    a little bit more attention through mental health staff

8    than other inmates within the facility.  So whether that

9    inmate is in that program or just a regular inmate not in

10   the program and designated SMI, that shows up on our

11   mental health staff's -- I don't know if it's their eOMIS

12   or what their tracking system is, but they know that that

13   inmate has to be seen as an SMI inmate.

14        Q.    Okay.  But that explains who knows and how they

15   know that the person has an SMI, but how does anyone at

16   ADCRR know that the review that's required for an SMI

17   inmate has actually occurred?

18        A.    So that individual that's over that program --

19   and it could, in fact, also involve the deputy warden of

20   that particular unit.  There's going to be communication

21   between them and the mental health staff to ensure that

22   that was, in fact, completed, and that's found out by the

23   entries within eOMIS.

24        Q.    Do you know what the entry would be called in

25   eOMIS?

79

1      A.    I do not, ma'am.  I don't utilize that system.

2   That's a medical system.

3      Q.    Do correctional personnel have access to eOMIS?

4      A.    No, we do not.

5      Q.    Does ADCRR in any way audit to determine

6   whether or not the reviews that are required for placing a

7   person with an SMI into restricted housing or enhanced

8   management that those reviews, in fact, occur?

9      A.    We can ask for a screen printout from eOMIS that

10  mental health staff or nursing staff could provide to that

11  individual over that program if that's what they wanted to

12  do.  We also have a monitoring bureau that can look at that

13  for us, as well.

14     Q.    Do you know if the monitoring bureau does look

15  at it?

16     A.    I don't know that offhand, ma'am.

17     Q.    Okay.  Let's talk a little bit about the STG

18  units.  These are primarily governed by DO 806, correct?

19     A.    Yes, ma'am.

20     Q.    Okay.  And DO 806 was recently revised,

21  correct?

22     A.    Yes, ma'am, within this year.

23     Q.    Yeah.  What were the main changes to DO 806?

24     A.    As I spoke about earlier, there's a couple of

25  big changes within that, one of which is we used to utilize

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

80

1    a point system in order to validate inmates.  That has

2    changed to now we look at an inmate being validated if they

3    meet three of the criteria set forth for a validated STG.

4    And then the other one that we spoke about was the -- they

5    don't automatically go to Browning unit if they are

6    validated.  That's taken on a case-by-case basis and looked

7    at.

8        Q.    Was there also a revision into the way people

9    can be removed from the STG unit?

10       A.    I'm not familiar with what the old system was

11   compared to the new system, ma'am.

12       Q.    Okay.  Fair enough.  I will ask you about it

13   when I get to that part of my outline.

14               Is there a new max custody unit at Lumley?

15       A.    Not that I'm aware of, ma'am.

16       Q.    Do you know if there's one that is in the

17   process of being set up?

18       A.    Not that I'm aware of, ma'am.

19       Q.    Okay.  Are there any other statuses of people

20   in max custody other than the ones that we've discussed?

21       A.    No, ma'am.  Not that I'm aware of.

22       Q.    Okay.  All right.  Let's talk a little bit

23   about the step program matrix for people in max custody,

24   and that is laid out in DO 812, correct?

25       A.    Yes, ma'am.

81

1      Q.    Okay.   Before we get into the details of it,
2   can you tell me, what's the purpose for the step-level
3   matrix for max custody?
4      A.    It's an incentive program basically set up so
5   that inmates get more privileges as they're doing things
6   that they should be doing.   Stay out of trouble,
7   programming, that kind of stuff.
8      Q.    Does everybody in max custody have to start at
9   step one?
10     A.    Yes, ma'am, they do.
11     Q.    Okay.   In the intake unit at Eyman do people
12   have a step level at that point?
13     A.    I don't believe they start that step program
14   until they're actually assigned to a unit.
15     Q.    All right.   So looking at Exhibit 3, the
16   maximum custody management subsequent reviews, section
17   3.0.   Do you see that?
18     A.    Yes, ma'am.
19     Q.    Okay.   There are step-level reviews every
20   month, correct?
21     A.    Yes, ma'am.
22     Q.    Is there any procedure to ensure that every
23   incarcerated person in max custody actually has a review
24   every month?
25     A.    So when those reviews take place the individuals

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

82

1   that are looked at, that entry is made within ACIS.

2       Q.    Okay.   Is there anyone that goes through ACIS

3   and make sure that every single person in max custody had

4   a review?

5       A.    That's usually done by the assigned CO 3s of the

6   particular inmates.

7       Q.    Okay.   And does anyone over the CO 3s make sure

8   that each of the CO 3s within their chain of command did,

9   in fact, make sure that all of the people had their

10  reviews?

11      A.    That would be the job of the CO 4 who is in

12  charge of the CO 3s.

13      Q.    All right.   Is there any auditing process to

14  make sure that everybody gets a review every month?

15      A.    Not that I'm aware of, no, ma'am.

16      Q.    Okay.   Could you describe the review process

17  for me?

18      A.    So as they come up for review these program

19  teams sit down and they discuss the different areas that

20  the inmate is supposed to be meeting to get to that next

21  step or subsequently to be reduced.   So if they are, like I

22  said earlier, doing things they're supposed to do, if

23  they're up for a step review and they have met the

24  qualifications within the matrix to move to the next step,

25  and they're programming, and they're disciplinary-free, and

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

83

1   they're showering and taking care of their areas, then they

2   would then be moved up in step based on the matrix at the

3   end of this policy.

4        Q.    Okay.  So that review process is, in fact, a

5   meeting, correct?

6        A.    It is.  They go over all the information that

7   may come up on that particular inmate, whether it be

8   disciplinary reports, information reports that are done.

9   They can have mental health staff in those meetings,

10  medical staff in those meetings.  And it's basically

11  everybody putting their heads together to make sure that

12  inmate is placed in the correct step.  And, again, it's per

13  the matrix.

14       Q.    Is there documentation of the review process?

15       A.    Other than the entries that are made in ACIS,

16  the particular administrator of the unit that's having a

17  program team meeting can keep minutes, if they so choose,

18  but I don't think there's a requirement for that.

19       Q.    Okay.  And when you say what's entered into

20  ACIS, that's just what the outcome of the review was; is

21  that correct?

22       A.    That's correct.

23       Q.    So what's entered into ACIS is not the

24  reasoning for what the outcome was; is that correct?

25       A.    I haven't been in that system in a long time,

84

1    but I believe there's a notes section in there that notes

2    can be entered in.

3         Q.    Do you know if they are entered in?

4         A.    That, I don't know, ma'am.

5         Q.    Okay.  So DO 812, section 3.1.1, lists the

6    people who are on the program team.  Do you see that?

7         A.    Yes, ma'am.

8         Q.    What is a unit administrator?

9         A.    Unit administrator is usually the associate

10   deputy warden or the deputy warden.

11        Q.    Okay.  And how many people would a captain be

12   involved in reviewing each month?

13        A.    The captain is usually involved in all of these

14   reviews.  So the captain is responsible for reviewing all

15   the information reports in the unit.  They review the

16   disciplinary reports in the unit.  So they would have

17   knowledge of any reports that would come up on an

18   individual and they would be involved in those meetings.

19        Q.    Okay.  So I guess the question is:  How many

20   people in max custody could there be in the area that a

21   captain has responsibility for?

22        A.    The captain is the chief of security of the

23   entire unit.

24        Q.    Of the entire unit?

25        A.    Yes, ma'am.

1    charge of those inmates the next day.  So it just depends

2    on where they're posted that day.

3        Q.    So in terms of the program team how is it

4    determined who the CO 2 that's assigned to the unit or

5    housing area is?

6        A.    It's going to be dependent upon who they're

7    reviewing in the program team meeting.

8        Q.    So is it just -- like if we're having a program

9    team meeting on Friday the 24th, wherever the CO 2 happens

10   to be assigned on Friday the 24th, that's the CO 2 that is

11   going to be responding about those individuals?

12       A.    Correct.  If we have to bring up more than one

13   CO 2 we would bring up CO 2s that are knowledgeable of the

14   inmates in that area they've been working, send them back,

15   bring up another CO 2 in another area, and so on and so

16   forth, if that's what we need to do.

17       Q.    Is the incarcerated person present at the

18   review?

19       A.    No, they are not.

20       Q.    Okay.  Are there forms that are filled out

21   regarding the review?

22       A.    Not that I'm aware of.  No, ma'am.

23       Q.    Is there any information given to the

24   incarcerated person who is being reviewed beyond whether

25   or not their step changed?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

89

1      A.    I believe the CO 3 provides them with that
2  change in level.  Yes, ma'am.
3      Q.    So the CO 3 tells them whether or not their
4  level changed?
5      A.    It tells them or may give them a inmate letter
6  response with that information on it.  I'm not exactly sure
7  of that, but the inmate is informed one way or another.
8      Q.    Okay.  But is the inmate informed of the
9  reasons for the decision?
10      A.    I'm not sure about that, ma'am.  The inmate can
11  however, if, for instance, the CO 3 said that your step has
12  been decreased, and the inmate says why, and the reason is
13  not given by the CO 3, the inmate can provide an inmate
14  letter asking for those reasons and a response has to be
15  provided to them.
16      Q.    Is that written in policy somewhere?
17      A.    It's written in policy that an inmate can fill
18  out an inmate letter if he has concerns about something,
19  and it must be responded to.  Yes, ma'am.
20      Q.    Is it written anywhere that an inmate who asks
21  for the reasons why a step was reduced or not changed must
22  be told what those reasons are?
23      A.    I'm not aware of that in writing, but that's
24  just good practice that we're doing that.
25      Q.    Okay.  Would those responses to inmate letters

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

90

1   be entered into the inmate's file anywhere?

2        A.    Probably not.  No, ma'am.  The inmate is given a

3   copy of all that, however.  So, if the inmate chooses to

4   file that, if the CO 3 is making copies and keeping a file

5   on that particular inmate, it could be kept in that

6   fashion.

7        Q.    But that would be up to the CO 3?

8        A.    Yes, ma'am.

9        Q.    How long does a meeting to review inmate's step

10  level last?

11       A.    It's going to depend on how many inmates are

12  being reviewed during that meeting.

13       Q.    How long does it take to review one inmate?

14       A.    It could be very similar or it could involve

15  several different documents.

16       Q.    I'm looking for a time range.

17       A.    It's a case-by-case basis, ma'am.

18       Q.    Okay.  Is it ever done in one minute?

19       A.    It could be, sure.

20       Q.    Okay.  Does it ever take an hour?

21       A.    I highly doubt it would ever take that long to

22  determine an inmate's step level.

23       Q.    Does it ever take half an hour?

24       A.    I don't believe it would ever take that long,

25  ma'am, no.

91

1      Q.      Does it ever take 15 minutes?

2      A.      I don't believe it would take that long either,

3   ma'am.

4      Q.      What is the longest that you think would be

5   within that sort of normal range for reviewing an

6   individual's step progress?

7      A.      I would say anywhere between one to three or

8   four minutes.  And that's based on how many documents are

9   involved and how many individuals are speaking on behalf or

10   getting information on that particular inmate.

11      Q.      I'm going to go to a matrix.  So this is

12   attachment B, which is the matrix for Browning unit,

13   general population, STG, and condemned row.  Do you see

14   that?

15      A.      Yes, ma'am.

16      Q.      And then going down to the row that says,

17   step-level advancement, do you see that row?

18      A.      Yes, ma'am.

19      Q.      And it says, recommended by program team.  Do

20   you see that?

21      A.      Yes, ma'am.

22      Q.      And then below that there's a row that says,

23   step-level reduction.  Do you see that?

24      A.      Yes.

25      Q.      And it says:  Decision by program team on a

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

92

1   case-by-case basis.  Do you see that?

2        A.    Yes, ma'am.

3        Q.    What is the difference between recommending and

4   deciding?

5        A.    Well, I can state the obvious.  The

6   recommendation is them recommending and the deputy warden

7   of the unit approving and the program team making the

8   decision that they're going to reduce it.

9        Q.    So is it the policy that the program team, when

10  they believe that someone should advance, they just make a

11  recommendation, but then that decision is made by someone

12  else?

13       A.    My historical knowledge of this is the program

14  team makes the decision on the step level.  Now, I know

15  there has been discussion regarding changing this and

16  recommendations being made by the program team and the

17  final decision for maximum custody step level be made by

18  the assistant director, but that has not been put out yet.

19       Q.    Okay.  So, to your knowledge, even though

20  there's different language for step-level advancement and

21  step-level reduction, the thing that the program team is

22  doing for both of those is, in fact, deciding; is that

23  right?

24       A.    That is correct.

25       Q.    Okay.  And is there any reason that step-level

 1    reduction says on a case-by-case basis and step-level

 2    advancement doesn't?

 3          A.    No, ma'am.  Not to my knowledge.

 4          Q.    Okay.  So each of the matrixes has some variety

 5    in terms of what is listed here.  So starting with the one

 6    that we're looking at right now, Browning unit, in the

 7    policy it says that one of the criteria for moving up is:

 8    Display behavior that is cooperative and respectful.  How

 9    is that determined in the step-level review?

10          A.    So in the step-level reviews that I have been in

11    in the past, unless there is some information provided,

12    whether it be by a staff member or whether it be by

13    information report or a disciplinary report that shows that

14    they are not doing that, then it is assumed that they are

15    doing it, that they are behaving themselves and being

16    respectful.

17          Q.    Okay.  And I'm sorry.  Did you say information

18    or did you say document?

19          A.    It's one and the same.  So any documentation to

20    include an information report.

21          Q.    Okay.  All right.  So the person is understood

22    to be displaying behavior that's cooperative and

23    respectful unless there is documentation in their file

24    that says that they're not; is that correct?

25          A.    That is correct, or, for instance, as we're

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

94

1   having that meeting we have a mental health staff member at

2   the meeting that says:  Well, you know, I went and saw the

3   inmate at his cell front last week and he was disrespectful

4   and he was being vulgar and making inappropriate comments,

5   that would be taken into consideration during that meeting.

6        Q.    Okay.  Is that only about mental health staff

7   or is that --

8        A.    No, that would be anybody.

9        Q.    Okay.  All right.  I just wanted to be sure.

10       A.    Just an example.

11       Q.    Okay.  For moving from step 1 to step 2 there's

12   a minimum of 90 days in step 1.  Do you see that?

13       A.    Where is that, ma'am?  I'm sorry.

14       Q.    On the step-level advancement row.

15       A.    Okay.  Yes.  Minimum of 30 calendar days in step

16   1.

17       Q.    Okay.  And then for step 3 you need a minimum

18   of 30 calendar days in step 2.  Do you see that?

19       A.    Yes, ma'am.

20       Q.    And then for step 3 it just says N/A.  Do you

21   see that?

22       A.    Yes, ma'am.

23       Q.    Are there no -- why does it say N/A?  Do you

24   understand that?

25       A.    Because if you're in step 3 you're in step 3.

95

1    There's no minimum requirement of days to be in step 3.

2    You're already step 3.

3         Q.    Okay.   Going back to that provision on

4    step-level advancement to step 3, so you're in step 2.

5    You must complete or actively participate in all programs

6    as per program plan.   Do you see that?

7         A.    Yes, ma'am.

8         Q.    Who decides whether the person is actively

9    participating?

10         A.    Normally, it's the CO 3, because most of those

11   programs that the inmate is supposed to be participating in

12   is being put on by the CO 3s.   They're the ones

13   facilitating the classes that the inmate would have to

14   complete.

15         Q.    What happens if a program isn't available?

16         A.    That is not a factor that would keep them from

17   moving up to step 3 if that program is not available and

18   it's within their program plan.

19         Q.    Is that stated in policy anywhere?

20         A.    I'm not sure if it is or not, ma'am.

21         Q.    In the row at step-level reduction from step 2

22   to step 1 there are a couple criteria relating

23   disciplinaries and then refusal to program, and then

24   consistently demonstrate poor socialization skills and/or

25   noncooperative behavior.   Do you see that?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

96

1        A.      Yes, ma'am.

2        Q.      How would that be evaluated?

3        A.      Very similar to what we spoke about earlier.   If

4    it's documented that they're not cooperating with staff,

5    whether it be security staff, medical staff, mental health

6    staff, if that's placed on any documentation such as an

7    information report or a disciplinary report, that would be

8    looked at.

9        Q.      What would an information report that is

10   reporting on poor socialization skills look like?   So an

11   information report that's not a disciplinary report.   I

12   mean, what kind of thing would be described there?

13       A.      That would vary based on the author of the

14   report, ma'am.   If it was me writing that report then I

15   could tell you my report would say:   On the above date and

16   approximate time inmate so-and-so was disrespectful to me,

17   failed to follow my directives, was uncooperative, so on

18   and so forth.   More times than not, if the information

19   report is being written by a staff member, a disciplinary

20   report has also been written on that particular violation.

21       Q.      Okay.   So would you expect that if there is no

22   documentation of poor socialization skills or a lack of

23   respect, that kind of thing, and there is no disciplinary,

24   then a person would move from step 1 to step 2 at the

25   first review after they've done 30 days?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

1      A.    Yes, ma'am.  If they meet the matrix, yes,

2   ma'am.

3      Q.    And if there is no indication of disrespectful

4   behavior or non-cooperativeness and there's no

5   disciplinaries and they are going to those programs that

6   are offered, would you expect that the person would go

7   from step 2 to step 3 at their first monthly review after

8   they become a step 2?

9      A.    Yes, ma'am.  If they meet the requirements of

10   the matrix they would move up a step.

11      Q.    Okay.  We saw earlier that at step 3, if you're

12   at step 3 for a minimum of 30 days with no disciplinary,

13   no incidents, that you're eligible for consideration to be

14   moved out of max custody.  Do you remember that?

15      A.    Yes, ma'am.

16      Q.    Would you expect that a person who has done at

17   least 30 days as a step 3, doesn't have any

18   disciplinaries, and doesn't have anything in the record

19   indicating disrespectful behavior, bad socialization,

20   refusal to program, would be removed from max custody at

21   the first review by the classification board?

22          MS. LOVE:  Form and foundation.

23          THE WITNESS:  It's very similar to what we

24   spoke about earlier.  I would expect that inmate probably

25   to not reduce until he's been evaluated in maximum custody

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

98

1    for that 180 days.

2         Q.    BY MS. MORRIS:   Is there any process by which

3    the step reviews are reviewed by ADCRR?

4         A.    Not to my knowledge, other than anybody can go

5    on and look at step levels, make sure that they are up to

6    date.  For instance, the CO 4 at particular units to go on

7    and make sure that those are, in fact, being completed by

8    their staff or CO 3s.

9              As far as an internal audit of the step

10   system, I'm not aware of that.  No, ma'am.

11        Q.    Okay.  Is there any policy regarding how long a

12   person can be kept in max custody?

13        A.    I am not aware of that, ma'am.

14        Q.    Is there any policy regarding how long a person

15   can be kept at any of the step levels in max custody?

16        A.    Not that I'm aware of.

17        Q.    Is there any policy regarding how quickly a

18   person must be moved once they're reclassified as close

19   custody?

20        A.    Not that I'm aware of, ma'am.  No, ma'am.

21        Q.    Is there any policy as to how a person who has

22   been reclassified as close custody but not yet moved is

23   treated?

24        A.    Define treated.

25              MS. LOVE:   Form.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

99

1      Q.    BY MS. MORRIS:  Whether they are treated as if

2   they were in max custody or as if they were in close

3   custody.

4      A.    No, not that I'm aware of.  No, ma'am.

5            MS. MORRIS:  Okay.  I'm ready to take a

6   break.  Would it make sense to take a lunch break now?

7            MS. LOVE:  Sure.

8            (Recess from 12:03 p.m. to 12:53 p.m.)

9            MS. MORRIS:  Back on the record at 12:53.

10     Q.    BY MS. MORRIS:  I want to talk about DO 812 and

11  enhanced management a little bit more.  I'm going to share

12  my screen.  Now I'm going to talk a little bit about how

13  people get reviewed in enhanced management and out of

14  enhanced management.

15            Section 7.5 says, the ROD -- that's

16  regional operations director, correct?

17     A.    Yes, ma'am.

18     Q.    The ROD, complex warden, and unit deputy warden

19  shall review the inmates in the EMHS program for

20  participation in step progression a minimum of every 30

21  calendar days.  Do you see that?

22     A.    Yes, ma'am.

23     Q.    Are those the only people that are involved in

24  review of enhanced management inmates?

25     A.    Yes, ma'am.

100

1      Q.    So the program team does not participate in

2  that review?

3      A.    No, they do not.

4      Q.    Okay.  Is that review based on records in the

5  inmates' files?

6      A.    There are records kept on that meeting.  I'm not

7  sure where those records are kept, however.

8      Q.    Okay.  That's a slightly different question

9  than I was trying to get to.

10              What do the ROD, the complex warden, the

11  deputy warden, the unit deputy warden review or consider

12  in this review process?

13      A.    They're looking at the matrix for enhanced

14  management, whether or not they're programming in their

15  cell, whether or not they've gotten any disciplinary.

16  They're looking at that kind of stuff.

17      Q.    And do they have individual knowledge about the

18  person's behavior, or are they reviewing documents for

19  that information?

20      A.    Both.  So the deputy warden of the unit is aware

21  of that individual and why they're in there.  The complex

22  warden is because they're notified when they're placed in

23  there, and the ROD is usually the approving authority.  So

24  they're also aware of why they're in there.

25      Q.    But is why they're in there part of the review

1    for step progression and EMHS program participation?

2         A.    No.  So they're in there because of what they

3    did, but during the review they're just looking to make

4    sure that the inmate is doing the things they're supposed

5    to do while they're in there.

6         Q.    Right.  And that's my question.  Like, how do

7    these three individuals know what people are doing in the

8    enhanced management program once they're in there?

9         A.    Because the individual in charge of that program

10   is documenting what the inmates are doing.

11        Q.    Okay.  So it's from the documents?

12        A.    Yes, ma'am.

13        Q.    And the documents would be in the inmates'

14   files?

15        A.    The inmates' files are kept there at the unit.

16   So I want to make sure I clarify.  It wouldn't be

17   information in the inmates' institutional file.  It would

18   just be their enhanced management file that they have there

19   at Browning.

20        Q.    What's in the enhanced management file at

21   Browning?

22        A.    Just that information.  Anything that is kept on

23   the inmate in regards to keeping track of what he's

24   programming on, what he's doing, any disciplinary he's

25   getting.  That kind of stuff.

1     Q.     Is there any policy that talks about what's in

2  the enhanced management file?

3     A.     No, ma'am, not that I'm aware of.

4     Q.     And the review is for both deciding whether the

5  person is progressing from step 1 to step 2 to step 3 and

6  also whether they need to be maintained in the enhanced

7  management program, correct?

8     A.     I'm not sure if that review has anything to do

9  with the steps.  That review is to determine whether or not

10  they need to remain in enhanced management or not.

11     Q.     Okay.  So when it says that they are reviewing

12  them for program participation and step progression,

13  you're not certain whether that means that they're

14  reviewing them for whether they should go from one step to

15  another?

16     A.     I believe that's done by the program team as far

17  as the steps go just like any other inmate in the Browning

18  unit.  This review is being completed to make sure they're

19  doing the things within that program they're supposed to,

20  and if they are, are they doing enough to be removed from

21  that program or not.

22     Q.     Okay.  What are the things they're supposed to

23  be doing that are not relevant to the step progression?

24     A.     It's very similar.  Basically, if they're doing

25  the things they're supposed to be doing to progress in

1   step, then that's what they're reviewing.  They're making

2   sure that the inmates are doing what they're supposed to be

3   doing all in the program.

4        Q.    Okay.  Let's look at attachment F to DO 812,

5   which is, again, in Exhibit 3, and this is the matrix for

6   enhanced management.  Do you see that?

7        A.    Yes, ma'am.

8        Q.    On the row that says, step-level advancement,

9   do you see that?

10        A.    Yes, ma'am.

11        Q.    Says, recommended by ROD and complex warden?

12        A.    Yes.

13        Q.    And then below that in the step-level reduction

14   row it says:  Decision by ROD and complex warden on a

15   case-by-case basis.  Do you see that?

16        A.    Yes, ma'am.  If that answers the question that

17   they are, in fact, looking at step level as well during

18   that meeting.

19        Q.    Okay.  But you were unaware of that?

20        A.    I was not aware of that at the time until I just

21   read that, ma'am.

22        Q.    Okay.  Is there any policy regarding reporting

23   anything relating to the placement into enhanced

24   management?

25        A.    Other than the enhanced management program

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

104

1   information within that policy, I don't believe there's

2   anything written on enhanced management.

3        Q.    Okay.  Is there any policy requiring reporting

4   of anything relating to the reviews of step progression

5   and continued participation in enhanced management?

6        A.    Not necessarily in regards to enhanced

7   management, but there is a policy regarding information

8   reporting, meaning if there is anything going on in

9   enhanced management and an officer or another staff member

10  sees something going on, then they're required to report it

11  through an information report, yes.

12       Q.    Okay.  But I'm asking about the review process.

13  Is there any reporting of the review process, that monthly

14  review that they're supposed to be doing for every person

15  in enhanced management?

16       A.    I believe there is.  I'm not aware of that

17  paperwork, however, ma'am.

18       Q.    Who would be?

19       A.    The complex warden at Eyman, the regional

20  operations director over Eyman, or even the deputy warden

21  at Browning unit would be aware of that information.

22       Q.    Okay.  Is there any policy requiring reporting

23  of anything relating to decisions regarding removals from

24  enhanced management?

25       A.    Just what's within that policy that we're

1  currently looking at.

2      Q.     Is there any policy regarding how long a person

3  can be kept in enhanced management?

4      A.     Not that I'm aware of.

5      Q.     Is there any policy regarding how quickly a

6  person must be moved out of enhanced management once

7  they're deemed to not require enhanced management?

8      A.     Not that I'm aware of.

9      Q.     Is there any policy regarding whether a person

10 is treated as if they are still in enhanced management

11 when they have been deemed to no longer require enhanced

12 management but they haven't yet been moved?

13     A.     I'm not aware of that verbiage in the policy,

14 but if they're no longer in the enhanced management program

15 they would no longer be managed as enhanced management.

16     Q.     Okay.  So they could be in an enhanced

17 management unit waiting for transfer and they would not be

18 treated as though they were still in enhanced management,

19 you're saying?

20     A.     That transfer is a very quick transfer out of

21 that program.  Once the decision has been made to remove

22 them from enhanced management, that movement usually takes

23 place that same day.

24     Q.     Okay.  How do you know that?

25     A.     I'm one of the ones that wrote the policy on

1    enhanced management.

2          Q.     Is that in the policy anywhere --

3          A.     I used to manage it at Browning unit when I was

4    the assistant deputy warden many years ago.

5          Q.     Okay.  Is it in the policy anywhere that it

6    should take place that quickly?

7          A.     No, ma'am.

8          Q.     Okay.  All right.  So talking a little bit

9    about the reviews in restrictive housing status, and we're

10   looking at section 6.5 in DO 812, which is Isolation

11   Exhibit 3.  It says:  The assessment team shall review

12   inmates in RSHP for program participation and step

13   progression on a minimum of every 30 calendar days.  Do

14   you see that?

15         A.     Yes, ma'am.

16         Q.     Is that assessment team that's described in 6.5

17   the same as the RSHP committee that is described in 6.4.1?

18         A.     I would say no, ma'am, because if you read the

19   subsection below that it also states that the mental health

20   staff would participate in that, which is not part of that

21   RSHP independent review committee that we spoke about in

22   6.4.

23         Q.     Okay.  So who is on the assessment team, then?

24         A.     I don't have that information, ma'am.  I'm not

25   exactly sure.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

107

1          Q.     Okay.   This review that's happening every 30

2     days, that's for both continued participation in RSHP --

3     or continued placement in RSHP and step progression,

4     correct?

5          A.     Yes, ma'am.

6          Q.     Okay.   Looking at attachment D, which is page

7     15 of DO 812, it says that the step-level advancement for

8     RSHP and step-level reduction for RSHP is done by the RSHP

9     committee.   Do you see that?

10         A.     I do.

11         Q.     So does that mean that the assessment team and

12    the RSHP committee are the same thing?

13         A.     It would appear that way in the policy.   Yes,

14    ma'am.

15         Q.     So you think it's not that way in practice?

16    I'm only asking because the way you said it would appear

17    that way in the policies made it sound like maybe in

18    practice it's different.

19         A.     So I know that the team that reviews RSHP, the

20    committee is not supposed to be personnel that's within

21    that unit that the RSHP program is within.   Now, the

22    assessment team could be staff that are within the unit.

23    So that's why I'm thinking that those are two different

24    entities.

25         Q.     So how would you square that with what it says

1   in the policy about the step-level advancement being done

2   by the RSHP committee?

3       A.    Could you rephrase your question, please.

4       Q.    The RSHP committee, according to policy, is

5   making recommendations or decisions about whether a person

6   advances or is reduced in step, correct?

7       A.    Yes, ma'am, according to the policy.

8       Q.    According to the policy.  And then if we go

9   back to section 6.4 and 6.5 we see that the step review

10  process is done by the assessment team.

11      A.    Correct.  I'd actually like to look at that

12  entire policy to see if there is anything in that policy

13  that basically talks about who is made up of the assessment

14  team.  I don't know if there's anything prior to that in

15  that policy that explains that.

16      Q.    You can see my screen?

17      A.    Yes, ma'am.

18      Q.    I'm going to search on --

19            MS. LOVE:  Maria, I also have a copy of the

20  policy.  Is it okay if I put the -- while you both look,

21  maybe?

22            MS. MORRIS:  Yeah, that would be great.

23            THE WITNESS:  So if you look at 2.3, ma'am,

24  it says:  The assessment team consisting of a deputy

25  warden, chief security, correctional officer 4,

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

109

1    correctional sergeant, and a CO 3.  So that would be the

2    assessment team.

3         Q.    BY MS. MORRIS:  So that's the assessment team,

4    and they do a review, but it's not their review that

5    decides step progression, or is it just an error in the

6    policy?

7         A.    I would take a guess that that's an error in

8    this policy, ma'am, because they would be the ones that

9    would have to do with step progression.

10        Q.    Okay.  Who is making the decision about whether

11   a person needs to continue to be housed in the restricted

12   status housing program?

13        A.    That would be the other committee that is not

14   part of that unit.

15        Q.    Which is the RSHP committee?

16        A.    Yes, ma'am.

17        Q.    Is there any policy requiring any reporting

18   about the reviews of step progression in restrictive

19   housing status?

20        A.    Not that I'm aware of, ma'am, no.

21        Q.    Is there any policy requiring reporting of

22   reviews for continued placement in RSHP?

23        A.    Not that I'm aware of, ma'am, no.

24        Q.    Is there any policy requiring reporting

25   anything relating to decisions regarding removal from

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

110

1   RSHP?

2         A.    Not that I'm aware of, ma'am, no.

3         Q.    Is there any policy regarding how long a person

4   can be kept in RSHP?

5         A.    Not that I'm aware of, ma'am, no.

6         Q.    Is there any policy regarding the minimum

7   amount of time a person can be held in RSHP?

8         A.    Not that I'm aware of, ma'am, no.

9         Q.    Is there any policy regarding how quickly a

10  person must be moved once they're deemed not to require

11  RSHP?

12        A.    Not that I'm aware of, ma'am, no.

13        Q.    Do you think that this is another situation

14  where people are moved quickly within the day after the

15  decision to remove them is made?

16        A.    Historically, yes.  Anytime an inmate is removed

17  from these type of programs it's within that exact same

18  day.

19        Q.    When you say, "these type of programs," what do

20  you mean?

21        A.    RSHP, enhanced management, close management.

22        Q.    Okay.  The step-level matrix also applies to

23  people in STG units, correct?

24        A.    Yes, ma'am.

25        Q.    In that setting?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

111

1        A.      Yes.

2        Q.      Is there any difference in the review process

3  for people in max custody who are validated members of an

4  STG?

5        A.      There are differences in that review, according

6  to the policy on STGs, ma'am.  Yes, ma'am.

7        Q.      For the step progression?

8        A.      No.  No differences with the step progression.

9  No, ma'am.

10        Q.      Okay.  But there are differences in terms of

11  whether they can be moved out of max custody, correct?

12        A.      Yes, ma'am.

13        Q.      Is that set out in DO 806?

14        A.      If that is the policy regarding security threat

15  groups, then yes, ma'am, it is.

16                (Exhibit 4 identified for the record.)

17        Q.      BY MS. MORRIS:  Let's look at what we've

18  identified as Exhibit 4.  I'm showing you what I'm

19  identifying as Exhibit 4.  Can you tell me what this

20  document is?

21        A.      This is the department order 806 on security

22  threat groups.

23        Q.      Okay.  And is this the policy that discusses

24  how people who have been validated as a STG would be moved

25  out of an STG program?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

112

1     A.     Yes, ma'am.

2     Q.     Okay.  Looking at Section 5.3, which is at the

3  bottom of page 11 and onto page 12 of the PDF that is

4  Exhibit 4, this sets out the ways that people can have a

5  custody reduction on housing status change once they've

6  been validated as an STG member, correct?

7     A.     Yes, ma'am.

8     Q.     And 5.3.1 is renouncing the STG, correct?

9     A.     Yes, ma'am.

10    Q.     And 5.3.2 is completing the step-down program?

11    A.     Yes, ma'am.

12    Q.     5.3.3 is:  Qualify for custody reductions as

13  outlined in department order 801, inmate classification,

14  after having successfully completed a 24-month period

15  where they have not participated in any documented

16  STG/gang or terrorist activity.  Do you see that?

17    A.     Yes, ma'am.

18    Q.     Is that a new provision?

19    A.     As I said earlier, I'm not sure what the

20  previous policy stated compared to this one.  So I'm not

21  sure if that's new or not.

22    Q.     Okay.  5.3.3 has a sub-point that says that:

23  While housed in maximum custody the inmate shall complete

24  all three steps of the inmate maximum custody management

25  incentive system.  Do you see that?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

113

1      A.      Yes, ma'am.

2      Q.      Is that true regardless of what way out of STG

3   status the person has?

4      A.      Not that I'm aware of.   No, ma'am.

5      Q.      So it's only under 5.3.3?

6      A.      Yes, ma'am.

7      Q.      Can you tell me what the difference between

8   5.3.3 and 5.3.4 is?

9      A.      I can only assume that it is talking about

10   whether or not information has been gathered that a

11   particular inmate would no longer be part of a security

12   threat group, but, again, I'm assuming on that, ma'am.

13      Q.      Okay.   So you don't know what the basis for the

14   different provisions of 5.3.3 and 5.3.4 are?

15      A.      No, ma'am, I do not.

16      Q.      Okay.   So a person can get out of STG status if

17   they successfully complete a 24-month period where they

18   haven't participated in STG gang activity, correct?

19      A.      Correct.   It has to go through a committee

20   before that's approved, however.

21      Q.      What committee?

22      A.      The STG committee or the coordinator.

23      Q.      Where is that in the policy?

24      A.      I believe earlier on in the policy it talks

25   about that specific group that reviews the STGs.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

114

1      Q.     So is this what you're talking about, Section

2   1.4.2?

3      A.     The threat assessment committee.  I believe

4   that's it, ma'am.  Yes, ma'am.

5      Q.     Okay.  So it would be an annual decision?

6      A.     According to the policy, it would be in that

7   24-month period.

8      Q.     Okay.  So if a person is in STG status, and

9   let's say they had an annual review by the committee in

10  January, and then starting from March they had no

11  documented STG activities for two years, would they be

12  reviewed for removal from STG status in March once they

13  hit the two-year mark, or would they have to wait until

14  the annual review in January?

15     A.     The contradiction in the policy, according to

16  the one below, it's at the 24-month mark.  According to

17  this, the committee looks at these annually.  So I would

18  have to get clarification on that, ma'am.

19     Q.     Is there any policy regarding how long a person

20  can be kept in STG?

21     A.     No, ma'am, but the policy describes in detail

22  how they can get out of being a validated STG.

23     Q.     Okay.  Is there any policy regarding how

24  quickly a person must be moved once they're deemed not to

25  require being housed in STG anymore?

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

115

1      A.     Not that I'm aware of, ma'am, no.

2      Q.     Would you expect that this is another one of

3  those programs where it would happen very quickly?

4      A.     I would.  And simply because, for instance, if

5  an inmate decided to debrief, at that point we're removing

6  him from that STG population for his own safety and

7  removing him so that no harm comes to him.

8      Q.     Okay.  Do you know anything about what

9  percentage of people that get removed from STG are removed

10  via debriefing, via the step-down program, or via this

11  process of just being without any documented activities

12  for 24 months?

13      A.     I do not have that information but I know we

14  keep that information.

15      Q.     I'm sorry?

16      A.     I said I do not have that information.  However,

17  I know that information is kept by the department.

18      Q.     Okay.  I'm going to switch now to talk about

19  close management.

20             What policies govern placement in detention

21  and release from close management?

22      A.     The only information on close management is

23  within that close management policy, to my knowledge.

24      Q.     That's DO 813?

25      A.     Yes, ma'am.

1   Q.   And as far as you know, that is the only policy

2   regarding close management?

3   A.   To my knowledge, yes, ma'am.

4   Q.   Okay.  Are there things that a person in close

5   management is supposed to do to progress out of close

6   management?

7   A.   There is a matrix in the back of that policy

8   that talks about programming that needs to be completed.

9   (Exhibit 5 identified for the record.)

10   Q.   BY MS. MORRIS:  I'm going to open up what I'm

11   identifying as Exhibit 5.  Can you tell me what Exhibit 5

12   is?

13   A.   That is department order 813, close management.

14   Q.   Okay.  And this is the policy that you were

15   saying contains the policies relating to close management?

16   A.   Yes, ma'am.

17   Q.   Okay.  And the matrix is attachment B, the last

18   page, the matrix we were just talking about?

19   A.   Yes, ma'am.

20   Q.   So a person needs to go through these programs

21   in the three different phases to get out of close

22   management?

23   A.   Yes, ma'am.

24   Q.   Do each of these phases have any kind of time

25   requirement?  Do you have to spend a certain amount of

1   time at each phase?

2       A.    Not that I'm aware of, ma'am.

3       Q.    So at the bottom it says, asterisk denotes live

4   class facilitated by CO 3 with no more than 15

5   participants.  Do you see that?

6       A.    Yes, ma'am.  I do.

7       Q.    And there are some classes that have an

8   asterisk, but not a lot, right?  I actually only see one,

9   money management -- oh.  Money management and

10  self-control, yeah?

11      A.    Yes, ma'am.  I see that.

12      Q.    Do you know how long those two classes run for?

13      A.    I do not.  Typically, the CO 3 taught classes

14  run around eight weeks long.

15      Q.    Okay.  Would there be more than one class being

16  offered at a time in a given unit?

17      A.    More times than not, no, ma'am.

18      Q.    Okay.  So in order to take both of the classes

19  listed in phase 3 it would probably take at least 16 weeks

20  just of the --

21      A.    Let me clarify.  So different correctional

22  officer 3s are responsible for teaching different classes.

23  So to clarify my answer on your last question, there could

24  be two different CO 3s that are teaching those two classes

25  at the same time.  So, yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

118

1      Q.    Okay.  Do you know how often that happens?

2      A.    Quite a bit, actually, in every unit.

3      Q.    So in a single unit would you expect to see two

4    different CO 3 classes proceeding at the same time?

5      A.    Yes, ma'am.

6      Q.    Over the same, like, eight-week period?

7      A.    Yes, ma'am.

8      Q.    All right.  Thank you.  Is there a minimum

9    amount of time that people have to spend in close

10    management once they've been placed into close management?

11      A.    Not that I'm aware of, ma'am.

12      Q.    Is there a maximum amount of time they can

13    spend in close management?

14      A.    Not that I'm aware of.

15      Q.    The only policy that governs placement into

16    detention is policy DO 804, correct?

17      A.    Yes, ma'am.

18      Q.    Are there any other policies that relate to the

19    placement of people into detention?

20      A.    I believe the classification policy 801 may

21    describe placement in detention, but I'm not exactly

22    positive about that.

23      Q.    Okay.  What is the process for removing someone

24    from detention?

25      A.    So it depends on what they're in detention for.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

119

1   So, for instance, an inmate is placed in detention for a

2   disciplinary reason, and the inmate is served what we call

3   a 2A form for a disciplinary detention.  We have 30 days to

4   complete that investigation on that disciplinary to decide

5   what we're doing with that inmate.  And at that 30-day mark

6   that investigation has to be complete and we have to decide

7   where we're placing the inmate, whether he's going back to

8   the unit he came from or whether he's being reclassed to a

9   higher custody.  If the investigation lasts longer than

10  that 30 days we would have to reserve another 2A, and that

11  would have to be done in the next 30 days.  And then at

12  that point we need to know where we're placing that inmate.

13       Q.    How many --

14       A.    I'm sorry.  There's one other, and that's 805s,

15  which would be inmates in fear for their life.  We place

16  them in detention.  We're doing a review on that to decide

17  whether or not there is, in fact, a threat against the

18  inmate's life and whether we're going to proceed with

19  protective custody or not.  That process could be a little

20  longer.  There is no set time frame for getting them out.

21  At this point the investigation is completed.  The review

22  for protective custody goes up to central office.  A

23  decision is made on whether to move them out to another

24  unit or actually place them in protective custody, at which

25  point they would be sent over to Lewis complex.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

120

1      Q.     Okay.  Going back to the 2As, you said you've

2  got 30 days to do the investigation, and if the

3  investigation isn't completed within the 30 days you serve

4  another 2A that gives you another 30 days, right?

5      A.     Yes, ma'am.

6      Q.     Is there a limit on the number of times that

7  can happen for an individual being investigated?

8      A.     I've never seen that go past the second 2A,

9  ma'am, unless the charges turn into criminal charges, then

10 it could potentially prolong that investigation.

11     Q.     And if that were the case what would happen?

12 Where would the person be housed?

13     A.     They would stay at detention unless, of course,

14 that investigation gets completed, we find out what the

15 charge is, and that particular charge could place them in

16 another custody level, and they'd be moved out at that

17 point.

18     Q.     Is there any limit on how long they could be in

19 detention in that situation?

20     A.     No, ma'am, because it would be based on the

21 criminal investigation.

22     Q.     Okay.  Going to the 805 status, when a person

23 says they're in fear for their life, is there any limit on

24 the amount of time that ADCRR can take to investigate and

25 make a decision on whether the person should be placed in

121

1  protective custody?

2       A.    We have stuck to a 30-day time frame.  However,

3  I know with 805s sometimes it takes a little longer than

4  that, especially if they're reviewing for protective

5  custody.  We don't want inmates in detention because,

6  obviously, if we fill up those beds and there's no place to

7  place an inmate, if we need to use a detention bed that

8  becomes problematic for us.  So we try and make that

9  process as quickly as we possibly can.  Normally, we're

10 sticking within 30 days.  There are times, especially with

11 805s, that they could go past that 30-day time frame.

12      Q.    Do you know how much past they can go?

13      A.    Actually, it depends on a couple of different

14 things.  So, obviously, it depends on how long it takes for

15 the decision to be made on protective custody.  It could

16 depend on bed space, as well.  So if I have a inmate that

17 has a sex offense those are premium beds for us in the

18 department.  So if there are no beds available and the

19 decision has been made and we need to place them in a

20 sex-offender unit, we have to wait for a bed to become

21 available before we can move them out.

22      Q.    If a person has said they're in fear for their

23 life and ADCRR does the investigation for protective

24 custody and decides that the situation does not warrant

25 protective custody, what happens to the person?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

122

1        A.      The inmate is alternatively housed to another
2    unit of custody level that he's at.
3        Q.      Okay.
4        A.      And, of course, we take into consideration any
5    do-not-house-withs that the inmate may have.  So we have to
6    look at all those factors before we could place them in
7    another unit.
8        Q.      Okay.  Going back to the 2A investigation
9    status people, is there a limit on the number of times a
10   2A notice can be served?
11       A.      Not that I'm aware of.
12       Q.      Can you explain to me what the procedures are
13   for refusal to house?
14       A.      A refusal to house is an inmate that obviously
15   does not want to house in a unit we're attempting to place
16   him at.  At that point he is or she is placed in detention.
17   We have a process in place where we will go and try and
18   convince the inmate to house.  If the inmate refuses then
19   disciplinary is issued, and we will continue this process
20   to try and get the inmate to house.  We'll look at
21   different alternatives to try and get them to house.  But,
22   ultimately, if they continue to house [sic], we will issue
23   disciplinary when the offers are made.  And if they are
24   reclassed to a higher level -- which normally that's what
25   they're looking for as a refusal to house so they can have

123

1    either their own cell or a cell with another individual --

2    at that point we'll move them to maximum custody if that's

3    what is warranted.

4         Q.    If a person says that in the yard where they

5    are they are in fear for their life is that a refusal to

6    house?

7         A.    No.   That would be an 805.

8         Q.    If a person asks for an alternative housing

9    placement is that a refusal to house?

10         A.    If they refuse to house in that particular unit

11    and they're looking for another unit, then that would be

12    considered a refusal to house.

13              Inmates can put in inmate letters asking to

14    be moved to other facilities or other units, but that

15    doesn't take place unless, of course, we have a situation

16    where we need to do a one-for-one because of a

17    do-not-house order or something like that, and we would

18    consider moving them at that point, but they have to

19    continue housing at the unit that they're at.   They can't

20    just refuse to house and walk up to a shift commander and

21    say:  I'm not going back to my house.   You guys need to

22    move me off the yard.

23         Q.    Unless they say they're in fear for their life?

24         A.    If they say they're in fear for their life they

25    can come in 805.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

124

1      Q.    Okay.  If a person is assaulted in a housing
2  unit can that be a reason for considering them to have
3  refused to house?
4      A.    No, it is not.  At that point we're
5  investigating it.  And it depends on the circumstances.
6  A lot of times the inmates will say that I'm no longer safe
7  here.  We will 805 them.  Sometimes we have inmates that
8  will come up and say that they are not going to identify
9  the aggressors that assaulted them, and we make them an 805
10  at that point just for their own safety.
11      Q.    So if a person is assaulted and will not
12  identify their attacker they become an 805?
13      A.    Yes, ma'am.  At that point for their safety
14  we'll make them an 805.
15      Q.    And if you make them an 805 that would appear
16  in their records somewhere, correct?
17      A.    Yes, ma'am, it will.
18      Q.    Where would it be in their records?
19      A.    That 805 packet would go into their
20  institutional file, I believe.
21      Q.    If something goes into the institutional file
22  does it eventually make it into the central record?
23      A.    The institutional file basically is their
24  record.  That's kind of a hard file, and then we also have
25  ACIS, which is our electronic file.  So that 805 would be

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

125

1    logged inside ACIS, as well.

2         Q.    All right.  If a person is placed in detention

3    for refusing to house, are they placed in detention for at

4    least six months?  Is that a policy?

5         A.    Not that I'm aware of, no.

6              (Exhibit 7 identified for the record.)

7         Q.    BY MS. MORRIS:  I'm going to show you what I'm

8    identifying as Exhibit 7, D0 704.  Are you familiar with

9    this policy?

10        A.    Yes, ma'am, I am.

11        Q.    And I'm going to have to figure out where it is

12   in the policy.

13              So I'm looking at Section 10, refusal to

14   house procedures.  Do you see that?

15        A.    Yes, ma'am, I do.

16        Q.    Okay.  And if you go down to 10.2, if a viable

17   housing option cannot be found within the complex the

18   inmate shall not be eligible for movement out of the

19   complex for a minimum of six months.  Do you see that?

20        A.    I do, ma'am.

21        Q.    Is the person in detention during that time

22   period?

23        A.    Yes, ma'am.  They would be.

24        Q.    Okay.  You sound like -- and I'm very familiar

25   with that policy, and maybe I was misunderstanding the

1    policy when I asked about it before about a refusal to

2    house requiring six months in detention.

3                   Can you explain in what circumstance would

4    a refusal to house not result in a six-months detention

5    stint?

6         A.    Basically, if we can convince them to house

7    someplace else.  Quite truthfully, that's about it.

8    Refusal to houses have been a big problem for us in the

9    department, managing them, because, of course, they take up

10   detention beds.  So we're trying to come up with viable

11   options regarding our refuse-to-house inmates in the

12   department.

13        Q.    As long as a person is in detention for refusal

14   to house, they get a disciplinary every 30 days; is that

15   correct?

16        A.    I believe that's what the policy states, yes.

17   So every time they refuse to house when we're offering them

18   a housing option, they would receive a disciplinary for

19   that.

20        Q.    And that housing option could be the housing

21   location where they came from?

22        A.    Yes, ma'am.  If they're still eligible for that

23   particular yard, then, yes, ma'am, it could be.

24        Q.    Okay.  And if they're refusing to house and

25   getting a disciplinary every 30 days, that will increase

127

1   their custody level and their inmate risk score level,

2   correct?

3       A.   Yes, ma'am, it will.

4       Q.   What are holding enclosures?

5       A.   Holding enclosures are areas, whether they're

6   outside or inside, that inmates are placed in temporarily

7   while we decide what we're going to do with them, whether

8   it be a transport or taking them inside a health unit, that

9   kind of thing.

10      Q.   Is there any policy regarding how long a person

11  can be held in a temporary enclosure?

12      A.   There is.  They're not supposed to be held any

13  more than an hour in a enclosure -- outside enclosure, I

14  believe, is what the policy states.

15      Q.   And do you know what policy that is?

16      A.   I don't off the top of my head, ma'am.

17      Q.   Okay.  Does ADCRR know what that policy is?

18      A.   Yes, ma'am, they do.

19      Q.   They do.  Okay.

20      A.   I've read that in the policy.  So I do know it

21  is within a policy.

22      Q.   Unfortunately, that is not terribly helpful to

23  me.

24      A.   I'm sorry.

25           MS. MORRIS:  Rachel, I'm just going to say

1   than an hour.  So it would have to be exigent circumstances

2   to go over that hour.

3        Q.   Okay.  And then would it have to be every hour

4   thereafter that there was approval like if there was a

5   riot going on or something like that?

6        A.   Yes, ma'am.

7        Q.   Okay.  All right.  Now we're going to talk

8   about topic 2, conditions of confinement in isolation.

9   Are there any call buttons of any sort in the cells in max

10  custody?

11       A.   No, ma'am.

12       Q.   How does a person in max custody get staff

13  attention in an emergency?

14       A.   So historically -- of course, we do our security

15  checks.  At any time an inmate can stop an officer and say

16  that they need something in an emergency situation.  That

17  officer, of course, will either take care of the issue or

18  call a supervisor to take care of that issue.  If it's in

19  between security checks -- I know having worked at Browning

20  SMU 1 in Central -- banging on the cell front, yelling in

21  the pod usually gets the attention of staff.  Staff will

22  enter that area and take care of whatever issue is taking

23  place at the time.

24       Q.   And do you know if that's acknowledged in any

25  policy?

1     A.    I don't, other than the inmates are told if they

2   have any issues they can bring it to a staff member's

3   attention.

4     Q.    Okay.  Inmates are also told that they are not

5   supposed to engage in excessive banging and noise,

6   correct?

7     A.    Yes, ma'am, but that is overlooked if it's an

8   emergency situation.

9     Q.    Okay.  Was that in the policy anywhere?

10    A.    No, ma'am.

11    Q.    Okay.  What we just talked about regarding how

12   people get staff attention in an emergency, is that true

13   for the enhanced management units, the restricted status

14   housing program, the STG units, and the BMU units?

15    A.    Yes, ma'am.  It's all within the same facility.

16    Q.    Okay.  What about in detention units?  Is it

17   the same?

18    A.    Same concept.  Yes, ma'am.

19    Q.    And is it the same in close management units?

20    A.    Yes, ma'am.

21    Q.    Are there call buttons of any sort in mental

22   health watch units?

23    A.    Not that I'm aware of.

24    Q.    So for a person who's not on constant

25   observation how would they get staff attention in an

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

131

1     emergency?  Was it the same thing?

2          A.    Same concept.  Yes, ma'am.  They're out and

3     about and they're walking and they're using continuous

4     motion.  So you don't see very many instances, if any at

5     all, where inmates are not able to get the attention of an

6     officer.

7          Q.    How do you know that?

8          A.    Based on reviewing our significant incident

9     reports every morning.

10         Q.    When a significant incident report is created

11    it's created by staff members, correct?

12         A.    Correct.

13         Q.    So -- and this is purely a hypothetical.  Let's

14    say a person in a maximum custody unit is having serious

15    chest pains and his cellmate starts banging on the door

16    and yelling, other people start yelling, too, to get the

17    attention of the staff member, and this starts at

18    8:02 a.m., and the staff member hears this and comes in at

19    8:15.  Wouldn't the significant incident report reflect

20    the time that the incident started as 8:15 when the person

21    heard the noise and came in?

22         A.    Yes, ma'am, it would.

23         Q.    So it wouldn't capture how long it took to get

24    the person's attention, correct?

25         A.    Correct.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

132

1    Q.    So is there any other way that ADCRR would have

2    to know how long it takes to get staff members' attention?

3    A.    Could you rephrase that question again?  I'm

4    sorry.

5    Q.    Is there any way, other than the significant

6    incident reports, that ADCRR would have to determine how

7    long it takes to respond to incarcerated people calling

8    out for help in an emergency?

9              MS. LOVE:  Foundation.

10             THE WITNESS:  No, ma'am.  Not that I'm

11   aware of.

12   Q.    BY MS. MORRIS:  Let talk about out-of-cell

13   time.  Is out-of-cell time important?

14   A.    Absolutely.

15   Q.    Why?

16   A.    It's actually really good for the inmates'

17   mental health state.  It's good for the inmate to get out

18   and about, talk with others.  It actually has done wonders

19   for us since we started the program in regards to

20   interaction with staff and inmates and interaction amongst

21   other inmates, teaching pro-social behavior, and it gives

22   them an out from just everyday cell life.

23             It, in my opinion, has helped reduce a lot

24   of the problems we've had with some of our problematic

25   inmates just getting them out sitting at a table, going

133

1    out to rec, conversing with staff while staff is walking

2    through doing security checks.  It's been very good for us

3    as a department.

4         Q.    Okay.  What are the things that people in max

5    custody get out of cell for?

6         A.    Inmates get out for recreation.  Inmates get out

7    for showers.  Inmates get out for visitation.  Inmates get

8    out for medical appointments.  They get out for table time,

9    which would be pod time.  They get out for, for instance,

10   community meetings.  They get to get out for that and

11   converse with the deputy warden or the ADW of the units.

12   That's all that comes to mind right now.

13        Q.    What about classes or programs there?

14        A.    There you go.  I'm sorry.  Classes and programs.

15   Thank you.

16        Q.    Sure thing.  What about jobs?

17        A.    And jobs.  Yes, ma'am.

18        Q.    What about religious services?

19        A.    In maximum custody -- we don't have religious

20   services in maximum custody.

21        Q.    Okay.  How often do community meetings happen?

22        A.    Once a month.

23        Q.    Once a month.  And would a whole cluster go to

24   a community meeting, or one run?  Or how many people would

25   go to -- like, what unit of people would go to a community

134

1    meeting?

2         A.    So it's up to the unit administration, and they

3    usually will break it up between -- so, for instance, at

4    Browning unit it has different areas within it.  So they

5    could have designated, validated STG members come.  The

6    next month they could have general population max custody

7    and so on and so forth so that they're hitting everybody.

8         Q.    Okay.  So it's not that every person who is in

9    max custody would have the opportunity to go to a

10   community meeting every month?

11        A.    No.

12        Q.    There would be a community meeting every month,

13   and over the course of several months every max custody

14   person would have the opportunity to go to one?

15        A.    Correct.

16        Q.    Okay.  All right.

17        A.    And those meeting minutes are taken and they're

18   distributed out to the population so that the population

19   knows what was talked about in that community meeting.

20        Q.    Okay.  All right.  Are they distributed by

21   tablet?

22        A.    You know, I believe we have started doing that.

23   We started doing that at Florence complex.  Previously, it

24   was just by paper, and it would be placed up on bulletin

25   boards within the pods and clusters in the areas.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

135

1    Q.    Okay.  So the things you mentioned were the

2   community meetings, rec, showers, medical, classes or

3   programs, jobs, visitation, and table time or pod time as

4   things that people in max custody get out of cell for,

5   right?

6    A.    Yes, ma'am.

7    Q.    Is that the same for people in enhanced

8   management units, restricted status housing program, STG

9   units, and BMU units?

10    A.    BMU, yes.  So BMU takes place -- or I'm sorry.

11   They actually do all of that, as well.  They do pod time.

12   They go out for classes, that kind of stuff.  Enhanced

13   security, I don't believe that all of that is done with

14   them.

15    Q.    So what would they get for out-of-cell time?

16    A.    I would have to look at the policy, at the

17   matrix, to find out exactly what they're authorized to do

18   in enhanced security.

19    Q.    And the policy being the 812 matrix?

20    A.    Yes, ma'am.

21    Q.    So I see recreation, visitation, phone.  Which

22   of those are out of cell?

23    A.    Visitation and recreation.

24    Q.    Okay.  Phone is not out of cell, correct?

25    A.    No.  That would be in cell.  That's a cordless

136

1   phone that they're given.

2       Q.    And then resource center library access.  Is

3   that out of cell?

4       A.    Not for enhanced management.  No, ma'am.  They

5   would be making any requests through the library for the

6   resources that they need and that would be brought to them.

7       Q.    Okay.  And you might need -- I'm guessing that

8   Rachel has a copy of this policy.

9               MS. LOVE:  We do.

10      Q.    BY MS. MORRIS:  Would you want to look at it to

11  see if there's anything else on here that would talk about

12  what out-of-cell time they get and that would be helpful

13  for you?

14      A.    Yes, ma'am.  It looks like that's it, ma'am,

15  enhanced security.  They get out for recreation, showers,

16  visitation.

17      Q.    They typically also get out for medical if they

18  need it, correct?

19      A.    Yes, ma'am.  If they need to take any medical

20  they would also be removed and taken to medical.

21      Q.    And is that the same rec, shower, visits, and

22  medical for restricted status?

23      A.    Yes, ma'am.  It would be.

24      Q.    And is that the same for STG?

25      A.    No, it is not.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

137

1      Q.     Okay.  What out-of-cell time do people get in

2  STG?

3      A.     STG population is going to get the same

4  out-of-cell time that our general population would get.

5      Q.     The general population max custody?

6      A.     Yes, ma'am.

7      Q.     Okay.  What about detention units?

8      A.     Detention units would get the recreation and

9  they would get the visitation and also the showers.

10     Q.     And medical if they need it?

11     A.     And medical if they need it.  Yes, ma'am.

12     Q.     How much recreation time do people in detention

13  units get?

14     A.     Inmates in detention get six hours a week of

15  recreation.

16     Q.     What kind of out-of-cell time do people in

17  close management units get?

18     A.     Close management units would get the same.

19  Recreation, showers, visitation.  I believe they also have

20  programming requirements if they're on a step 3 that they

21  would actually come out and do programming.  And that may

22  be it.

23     Q.     Okay.  How much recreation time do they get?

24     A.     Close management, I would have to look at that

25  matrix, as well.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

138

1          MS. LOVE:   I've also handed the warden a
2    copy, just so you know, a clean copy of the policy.
3          MS. MORRIS:   Okay.
4     Q.    BY MS. MORRIS:   On the screen now I'm showing
5    you Exhibit 5, DO 813, the close management one.   Remember
6    how earlier we were talking about live classes?
7     A.    Yes.
8     Q.    I'm looking at some of these classes and they
9    say small class.   I mean, in phase 3, feelings, a small
10   class and self-study.   Additional options include social
11   values, small class.   And if releasing within six months,
12   merging two worlds, small class.   Are those live classes
13   even if they don't have an asterisk?
14    A.    I'm sorry.   What was the question?   They're what
15   kind of classes?
16    Q.    Are they live classes even though they don't
17   have an asterisk?
18    A.    Yes, they are.
19    Q.    Okay.   All right.   So whatever of those classes
20   are being offered in a unit at a particular time, people
21   in close management would be able to go out of cell for,
22   correct?
23    A.    For phase 3.   Yes, ma'am.
24    Q.    And then if we go up to the close management
25   privileges we see six hours per week for recreation; is

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

139

1    that right?

2         A.    Yes, ma'am.  All three phases.

3         Q.    Okay.  Can people in close management have

4    jobs?

5         A.    I believe they can, depending on the phase.

6         Q.    How would you find out?

7         A.    It should be in this policy.  I don't see it

8    within the policy.  So I'm going to say, no, they cannot.

9         Q.    Okay.  What out-of-cell time do people on

10   mental health watch get?

11        A.    Out-of-cell time for mental health watch would

12   be designated by the mental health staff.  So what they

13   place on the watch order for that particular inmate is what

14   they would get.  So if they deem the inmate is safe to go

15   out to recreation and they designate that on the watch

16   order, then security staff would accommodate that, take the

17   inmate out for that recreation.  So it would be based on

18   what mental health staff agrees to.

19        Q.    Okay.  At Florence how often did you see a

20   person who was on mental health watch having documents

21   that say they can go out for rec?

22        A.    I have seen it done.  It does not happen often,

23   however.

24        Q.    Okay.  When a person who's in max custody

25   leaves their cell where is that documented?

1      A.     On the out-of-cell tracking form.

2      Q.     And that's true in general population, max

3 custody, enhanced management, restricted status, STG, and

4 BMU?

5      A.     Yes, ma'am.

6      Q.     Okay.  When a person in a detention unit leaves

7 their cell is that documented?

8      A.     It is.  It's on their detention form.  It's very

9 similar to the out-of-cell tracking form, but it's for

10 detention inmates.

11      Q.     Is it called the inmate detention record?

12      A.     That is it.  Yes, ma'am.

13      Q.     Okay.  All right.  And what about for someone

14 in close management?  Is their out-of-cell time

15 documented?

16      A.     Not that I'm aware of.

17      Q.     And if someone is on mental health watch and

18 they have out-of-cell time, where is that documented?

19      A.     That's documented on the observation form.

20 That's kept by the watch officer.

21      Q.     Where are the out-of-cell time tracking forms

22 that are used in max custody, where are they kept once a

23 form is filled out?

24      A.     Once a form is filled out and completed they are

25 kept at the unit.

141

1    Q.    At the unit.  It's a weekly form, right?

2    A.    Yes, ma'am.

3    Q.    And so the whole week for the unit would be

4  kept together; is that what you're saying?

5    A.    Yes, yes.  All of the weekly forms for that

6  particular week would be kept together.

7    Q.    Okay.  Is there any record of the out-of-cell

8  time that goes into the inmate's record?

9    A.    Not that I'm aware of.  No, ma'am.  The only

10  out-of-cell tracking is the out-of-cell tracking form.

11    Q.    Okay.  And for a detention unit, the inmate

12  detention record, are those also kept at the unit once the

13  week is filled out?

14    A.    Yes, it is.

15    Q.    Okay.  Are the inmate detention records audited

16  by anyone to see whether people are getting the

17  out-of-cell time required by policy?

18    A.    They are.  They are audited by our audit team

19  when the audit comes around for our particular areas.

20    Q.    Where are the observation forms kept once an

21  observation form is filled out completely for a mental

22  health watch?

23    A.    They're also kept at the unit.

24    Q.    Okay.  Are they audited by anyone?

25    A.    Yes, they are.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

142

```
 1        Q.     Who are they audited by?

 2        A.     Same audit team.

 3        Q.     Okay.  Is that the same audit team that audits

 4   the out-of-cell time tracking forms?

 5        A.     Yes, it is.  It's our annual audit team that

 6   comes around and audits operations within the complex.

 7        Q.     Okay.  Do the observation forms get provided to

 8   mental health at all?

 9        A.     I'm not sure if they are provided to mental

10   health or not.  I know mental health has access to them,

11   but I'm not sure if we provide them for their keeping.

12        Q.     Okay.  Do you know if the observation forms get

13   entered into eOMIS?

14        A.     The observation forms themselves, I am not sure

15   if they are or not.  I know the actual order, and that

16   information is placed within eOMIS.

17        Q.     So the order which would say whether or not the

18   person got out-of-cell time would be in eOMIS?

19        A.     Yes, to include when the watch started and when

20   it ended and any notation by the medical staff.

21        Q.     Okay.  When people in -- this one I think I

22   have to specify.  General population max custody, when

23   they leave their cells, what are the procedures for them

24   leaving the cell?

25        A.     Max custody, general population, they would be
```

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

143

1    strip searched to make sure they don't have any dangerous

2    contraband on them, and depending on their step level will

3    be restrained coming out of the cell.  Step 3 inmates, they

4    can come out unrestrained.  And then at that point they're

5    escorted to wherever they're going.

6        Q.    Step 2, are they restrained?

7        A.    Yes, they are.

8        Q.    With cuffs?

9        A.    Just handcuffs.  Yes, ma'am.

10       Q.    In back?

11       A.    Yes, ma'am.

12       Q.    Okay.  That's the only restraint for step 2?

13       A.    Yes, ma'am.

14       Q.    And in step 1 are they cuffed?

15       A.    Yes, ma'am.

16       Q.    Are there any other restraints?

17       A.    No, ma'am.

18       Q.    Okay.  At max custody general population how

19   many people are required to escort someone?

20       A.    It depends on how many inmates are in the cell.

21   So if I have a double-cell environment, two inmates in the

22   cell, then two officers or two staff members are required

23   to be there when the door is opened.  If it is one inmate

24   in the cell then one officer can be that escort.

25       Q.    And that doesn't depend on step level?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

144

1    A.    No, it does not.

2    Q.    Is all of what you just said in a policy?

3    A.    Yes, it is.

4    Q.    What policy?

5    A.    I believe that's actually in the post order for

6    our housing unit officers.

7    Q.    For the floor officers?

8    A.    Yes, ma'am.

9    Q.    Are there any differences in what we just

10   discussed for people who are in max custody intake?

11   A.    Not that I'm aware of, no, ma'am.

12   Q.    Are there any differences in what we just

13   discussed for people who are in enhanced management?

14   A.    There are differences with enhanced.  They are

15   fully restrained, to my knowledge.

16   Q.    And what does fully restrained mean?

17   A.    They would have both handcuffs and also leg

18   restraints.  And depending on the severity of the reason

19   the inmate is in there, they could potentially have an

20   order to be transported in a transport chair.

21   Q.    Do you have any knowledge of what percent or

22   how many people in enhanced management are transported in

23   transport chairs?

24   A.    I do not have that information, ma'am.

25   Q.    Do you think that ADCRR maintains that

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

145

1    information?

2         A.    A unit deputy warden would have that

3    information.  Yes, ma'am.

4         Q.    And they're also subject to strip searches

5    before leaving their cell?

6         A.    Yes, ma'am.

7         Q.    Are there any differences regarding escorting

8    for people in enhanced management?

9         A.    In enhanced I believe there has to be two

10   officers present.  And, again, depending on severity, there

11   could potentially be a supervisor required as well.

12        Q.    Do you know if that's all in the policy

13   somewhere?

14        A.    I am not sure if that is in the actual post

15   order for that particular area or not.

16        Q.    Okay.  Could you describe what a transport

17   chair is?

18        A.    A transport chair is a chair that has four

19   wheels on it.  It is set up to where the inmate sits down

20   in it and their arms and legs and a chest piece is placed

21   over them so that they cannot get out of the chair, and

22   they are wheeled to wherever they're being transported to.

23        Q.    And if a person has been deemed to require

24   transport in a transport chair, would that even be true

25   for something like coming out of the cell to go to the

1  shower, so you're not leaving the run but you are leaving

2  the cell?

3      A.    No.  Not for showers.  No, ma'am.

4      Q.    Okay.  What about for rec in the chute, in the

5  recreation enclosure in the run?

6      A.    No, ma'am.

7      Q.    That would be only used if you're leaving the

8  run where you are?

9      A.    Yes.  If they're removing them from the pod,

10  that would be used potentially, yes.

11      Q.    Okay.  What about for people in restricted

12  status housing program?  What are the procedures for them

13  leaving their cells?

14      A.    They're strip searched.  The upper cuffs are

15  placed, handcuffs are placed, and they're removed from the

16  cell and taken to the destination.

17      Q.    Okay.  How many people have to escort someone

18  in restricted status housing?

19      A.    That's a unit complex-wide, state-wide order

20  that, if there are two inmates in the cell, two staff

21  members will be present when the door is open.

22      Q.    All right.  But if there's only one person in

23  the cell it would just be one officer?

24      A.    Yes, ma'am.

25      Q.    What about for STG units?  Any differences from

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

147

1    what you just described?

2        A.    No, ma'am.

3        Q.    Any differences from what you just described

4    for the BMU?

5        A.    No, ma'am, other than, depending on the inmate

6    that is being escorted and where they're being escorted

7    from, they could potentially use a transport chair for that

8    individual based on their history or propensity for

9    violence.

10        Q.    So the only places that you've mentioned that

11    there might be a transport chair are the BMU and the

12    enhanced management; is that right?

13        A.    Yes, ma'am.

14        Q.    Okay.  Are there any differences from what

15    we've discussed excluding the transport chair for people

16    in detention?

17        A.    No, ma'am.  Detention inmates are brought out

18    just the same.  Stripped, placed in handcuffs, and escorted

19    to where they need to go.

20        Q.    What about close management?

21        A.    Same, to my knowledge.

22        Q.    And what about people in mental health watch?

23        A.    Same.  They are strip searched, they are removed

24    with upper cuffs.  Depending on, again, their propensity

25    for violence, they could potentially be placed in lower

148

1    restraints and a chair utilized for them, as well.

2        Q.    So the places the chair might be used are

3    enhanced management, BMU, and mental health watch, and

4    that's it?

5        A.    They can utilize the chair anytime they think

6    that they need to utilize it.  However, it's not utilized

7    unless there is a perceived threat from the inmate.

8        Q.    Would it be right to say that most of the time

9    that the chair is used it's used in one of those three

10   units?

11       A.    Yes, ma'am.

12       Q.    But it could be used in any of the units?

13       A.    Yes, ma'am.

14       Q.    Okay.  All right.  For general population max

15   custody how many people go to rec at the same time?

16       A.    You could look at potentially turning out a

17   couple of pods at a time if you're utilizing the big rec

18   area at the max custodies.  You could potentially have two

19   pods out at one time.

20       Q.    Okay.  Are people in general population max

21   custody transported one at a time to the rec enclosures?

22       A.    Well, if they're utilizing the large rec area

23   they're likely -- or they are a step 3, and they are

24   escorted by recreation escort staff to the areas they are

25   going, usually by pod.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

149

1    Q.    So the whole pod would go at the same -- they

2  would all sort of walk out in a line?

3    A.    Yes.  So you would bring the four on the bottom

4  at SU 1 or the five on the bottom at Browning.  And then

5  you would bring the other five on the top tier from

6  Browning or four from SMU 1, and you would escort them out

7  to the recreation enclosure and then do the same thing for

8  the next pod you're going to place out there for step 3

9  inmates.

10    Q.    Okay.  About how long does it take to get all

11  the people who are going to rec at one time when you've

12  got multiple people going out to rec?

13            MS. LOVE:  Form.

14            THE WITNESS:  It has the potential to take

15  awhile because of the different step levels.  The step 3

16  inmates, obviously, are easier.  The step 2 inmates are

17  restrained and taken to the 20 by 40 or the 10 by 10s.

18  The step 1 inmates are taken to the 10 by 10s.  So it can

19  be very time consuming.

20    Q.    BY MS. MORRIS:  Okay.  And the step 3 sounds

21  like they're not being restrained.  They do have to be

22  strip searched, right?

23    A.    Yes, they do.

24    Q.    Okay.  Given that it takes a chunk of time,

25  some amount of time to get everybody out to rec, what time

153

1    to their cells and then people who are in pod 2 back to

2    their cells and then people who are in pod 3 back to their

3    cells, are the out-of-cell time sheets going to say a

4    different time for the people on pod 1, people on pod 2,

5    and people on pod 3 for the end of rec?

6         A.    Yes, they should, because we are entering the

7    time that they exit the cell and the time that they enter

8    back into the cell.  That's on an individual basis.  So if

9    I've got two guys that came back from recreation in pod 1,

10   and then one guy -- after you've gone through 2, 3, 4, and

11   5, one guy coming back at 6, his time should be different

12   as he enters back into the cell than the time of the two

13   guys entered pod 1.  Does that clarify it a little bit

14   more?

15        Q.    Yes, it does.  Thank you very much.

16             In max custody how often do people get

17   showers?

18        A.    Three times a week.

19        Q.    And how long do people have for their showers?

20        A.    We usually allow them a 30-minute shower.  And,

21   of course, that's going to be dependent on, you know,

22   what's going on in the unit.  If an emergency situation

23   happens or whatever, they could spend a little bit more

24   time than the 30 minutes in the shower.

25        Q.    And the showers in max custody units are

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

154

1    single-person showers, correct?

2        A.    Yes, ma'am.

3        Q.    When someone is taking a shower is there a CO

4    just waiting for them, or is the CO doing other things?

5        A.    The CO is doing other things.

6        Q.    Okay.  Do you know whether people in max

7    custody ever get left in the shower for lengthy periods?

8            MS. LOVE:  Form.

9            THE WITNESS:  It's definitely a

10   possibility.  Like I said, if an emergency situation

11   happens, depending on staffing, if we're very

12   short-staffed and people have to respond to an emergency

13   situation, the possibility of an inmate staying in the

14   shower longer than they're supposed to can definitely

15   happen, yes.

16       Q.    BY MS. MORRIS:  And the time for showers both

17   leaving the cell and getting back into the cell is not

18   recorded on the out-of-cell time sheets, correct?

19       A.    That is correct.

20       Q.    Is there any way to know how often people get

21   left in the shower for a lengthy period?

22            MS. LOVE:  Form.

23            THE WITNESS:  Unless it is logged on a

24   Correctional Service Journal up in the control room when

25   showers take place, then no, there is not.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

155

```
1        Q.     BY MS. MORRIS:   Okay.   Is there any difference
2   in what we just talked about regarding showers for people
3   in enhanced management?
4        A.     No.   They get three showers a week, as well.
5        Q.     Okay.   And it's the same situation where they
6   have roughly a half an hour, but it could be longer, and
7   the officers are doing other things during the shower?
8        A.     Yes, ma'am.   That would be the same throughout.
9        Q.     And that's also true in restricted status, STG
10  units, and the BMU?
11       A.     Yes, ma'am.
12       Q.     It's also true in detention?
13       A.     Yes, ma'am.
14       Q.     Also true in close management?
15       A.     Yes, ma'am.
16       Q.     What about in mental health watch?
17       A.     Actually, that doesn't happen in mental health
18  watch.   It's only because there's a designated officer in
19  those areas.   That particular officer, if an emergency
20  situation kicks off, is not authorized to leave that area
21  because they have to conduct the watches.   So there is a
22  designated officer in those areas that takes care of the
23  showers and recreation and that kind of thing.
24       Q.     But a person in mental health watch has three
25  showers a week, as well?
```

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

156

1        A.      Yes, they do, if the watch order dictates that,

2    which I haven't seen one yet that does not.

3        Q.      Okay.   For max custody how often do people go

4    out to classes -- or I'm sorry.   I think I have to do

5    general population max custody on this one.   How often do

6    people go out to classes or group programs?

7        A.      That's going to depend on their step level.   So

8    step-level 1s do self-study inside their cell.   Step 2 and

9    step 3, if their program plan dictates that they take those

10   program classes and on the priority program chart it says

11   that they need to take that class and they're offered that

12   class and they go out to that class -- it just depends on

13   the classes that are offered at the time.

14       Q.      How many people go to a class or a program at

15   the same time in general population max custody?

16       A.      That is going to be dependent on the CO 4 and

17   the CO 3 with that particular class.   I've seen classes get

18   up to 20 inmates at a time.

19       Q.      Okay.   If people are all going to the same

20   class will they be transported together?

21       A.      That's going to depend on their step level, so

22   whether or not they need to be restrained or not.

23   Normally, what they try and do just to save time is they

24   will get everybody within a pod, escort them together, get

25   them situated in the class.   If it's more than one pod in

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

158

```
1    much.
2         A.    You're welcome.
3         Q.    All right.  The amounts and types of visitation
4    are set out for max custody units in 812, correct?
5         A.    Yes, ma'am.
6         Q.    And for close management in 813?
7         A.    Yes, ma'am.
8         Q.    During COVID, were there any in-person --
9    whether contact or noncontact, were there any in-person
10   visits?
11        A.    No.  Everything was done through Zoom.
12        Q.    What about now?
13        A.    Now we're doing both Zoom and in-person visits.
14   It is all currently noncontact still, but we do have family
15   members coming in.  And what we have done is place a bio
16   shield in the middle of the table, and they cannot embrace
17   or any of that kind of stuff.  So it's basically kind of
18   like noncontact visitation, but the family members get to
19   come in and have that visit with the inmates.
20        Q.    Okay.  When did that start back up?
21        A.    Oh, don't quote me exactly, but we started that
22   back up, I believe, in June or July.
23        Q.    Okay.  What are the visitation policies for
24   people in detention?
25        A.    I believe they're the same.  So, of course, step
```

159

1   level and phase level is not utilized when they're in

2   detention, but I believe that they still -- well, it's all

3   noncontact.  I'm sorry.  It's all noncontact visitation

4   with detention.

5        Q.    Okay.  Do you know how much they're allowed?

6        A.    I believe it's within the policy on detention,

7   if I'm not mistaken.

8        Q.    Okay.  So in 804, in DO 804?

9        A.    I believe so.  Yes, ma'am.  I do remember that

10  all the visitation for detention, however, is noncontact.

11       Q.    Okay.  Are people on mental health watch

12  allowed visitation?

13       A.    Yes, if the mental health staff is in agreement

14  with that, then absolutely they can have visitation, yes.

15       Q.    Would that have to be written on the order, or

16  would it be something that would be asked if someone was

17  going to visit?

18       A.    I believe that has to be written on the order,

19  but, of course, it's not going to have to be written on the

20  order if somebody asks for it and mental health decides to

21  do it, so --

22       Q.    All right.  A little while ago, I think it was

23  when we were talking about showers and I asked about where

24  it would be recorded, the time, and you said, if I recall

25  correctly, that it might be in the Correctional Service

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

160

1    Journal?

2         A.    For your control room officer, yes.

3         Q.    Okay.  Is there any policy on what's supposed

4    to be included in the Correctional Service Journal?

5         A.    There is, but if I recall, it's vague, and I

6    believe it's a post order.

7         Q.    Okay.  A post order for the control officer?

8         A.    Correct.

9         Q.    Okay.  The housing unit control officer?

10        A.    And it could even be placed within the general

11   post order, as well, because there are more journals than

12   just the control room officer.  You know, we've got

13   journals in medical and -- so I know that there are

14   specific criteria that's supposed to be at the beginning

15   and ending of journals, and of course there is verbiage

16   talking about entering information anytime an individual

17   enters your unit and exits your -- or not unit, but area.

18             So, for instance, if the deputy warden

19   walked into medical, then it should be logged in the

20   Correctional Service Journal for the medical officer to

21   put deputy warden so-and-so was here at this time, deputy

22   warden so-and-so left at this time.

23        Q.    But people coming and going from a cell but not

24   leaving a pod might or might not get into a journal?

25        A.    So because they have designated shower times in

1  those pods, I have seen in -- because administration

2  reviews those journal entries every day.  I have seen where

3  staff have placed actual showers of actual specific inmates

4  going from the cell to the shower and back to their cell in

5  the Correctional Service Journals, and that's hit or miss.

6      Q.   Okay.  All right.  You mentioned earlier table

7  time.  Can you explain what table time is?

8      A.   So we have placed tables inside the pods.  And

9  what we have done is allowed inmates to come out of their

10  cell and sit at the table, and whether it be doing their

11  homework, or doing activities in their programming class,

12  or sitting down and eating, or just doing any activity,

13  maybe an activity that our CO 3 gave to him, we've allowed

14  designated times for inmates to come out and sit at the

15  tables.

16          It depends on their step level on how they

17  sit at the table.  So a step 3 can come out and sit at the

18  table without restraints.  A step 2 could come out and sit

19  at the table and be restrained to the table as well as a

20  step 1.

21      Q.   Okay.  Is the step 2 restrained at their hands

22  and their legs at the table?

23      A.   No.  So their hands are free.

24      Q.   Their hands are free?

25      A.   Their leg would be tethered to the table.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

162

1      Q.    Okay.  And that's the same for step 1?

2      A.    Yes, ma'am.  Step 1 may also have one of their

3  hands tethered to table, as well, if I remember the policy

4  correctly.

5      Q.    Does everyone in max custody get table time?

6  I'm sorry.  In general population max custody.  Let's

7  start there.

8      A.    I'm not exactly sure if they're giving general

9  population inmates table time or not.  I know for a fact

10  that table time is given to inmates at BMU, inmates that

11  are in the mental health program.  I'm not sure if it's

12  given to general population inmates currently.  I know

13  early on it was.  I'm not sure if that's the current

14  practice.

15      Q.    Okay.  Do you know if people with an SMI in

16  enhanced management get table time?

17      A.    SMIs do get table time, yes.

18      Q.    Okay.  Regardless of the type of max custody?

19      A.    I have not seen an SMI placed in enhanced

20  security.  That's not to say it hasn't happened.  I have

21  not seen that, but they would be allowed table time if

22  they're in there.  That's a requirement of this particular

23  case.

24      Q.    Okay.  And is that true for all of the statuses

25  of max custody?

163

1        A.        For SMI inmates, yes, ma'am.

2        Q.        Okay.   Do people in enhanced management who are

3    not SMI get table time?

4        A.        I know at one point they were allowing that.   I

5    don't know if that has continued.

6        Q.        Okay.   Is that the same for restrictive status?

7        A.        Yes, ma'am, it would be.

8        Q.        Is that the same for STG units?

9        A.        I'm not sure about that.   STGs are treated

10   exactly the same as general population.   It's just a

11   designated code that they're a validated STG, but they get

12   all the same privileges that a general population inmate

13   gets.

14       Q.        All right.   Do people in detention with an SMI

15   get table time?

16       A.        I don't believe they do, no.

17       Q.        Okay.   Do people in detention who don't have an

18   SMI get table time?

19       A.        No, ma'am.

20       Q.        Do people in close management who have an SMI

21   get table time?

22       A.        I'm not aware of that.

23       Q.        Do people who don't have an SMI in close

24   management get table time?

25       A.        I am also not aware of that.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

164

1      Q.    And when you say you're not aware of that, I'm

2  understanding that you're saying that you don't think that

3  happens; am I right?

4      A.    I'm just not sure.  I haven't been over at Eyman

5  complex for a while.  I've been a deputy warden of

6  operations and the warden at Florence for the past little

7  over five years now.  So I haven't been over there in a

8  little while.

9      Q.    So you don't know one way or the other?

10     A.    No, ma'am, I don't.

11     Q.    All right.  Do people in general population max

12  custody, are they allowed to go to the library or law

13  library?

14     A.    I believe in maximum custody they have to

15  request the materials and the materials are sent to them.

16     Q.    Okay.  How do they know what they can request?

17     A.    The library puts out a listing of what they have

18  available.

19     Q.    Okay.  Is that the same in enhanced management?

20     A.    It's all of Browning unit or SMU 1, the max

21  custodies.

22     Q.    Okay.  So all statuses of max custody, that's

23  the way they access the library or law library?

24     A.    Yes, ma'am.

25     Q.    And that includes pleasure reading as well as

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

165

1    legal materials?

2         A.    Yes, ma'am.

3         Q.    Is that the same for the people in detention?

4         A.    It would be.  Yes, ma'am.

5         Q.    And for people in close management?

6         A.    It would be.  Yes, ma'am.

7         Q.    What about for people on mental health watch?

8         A.    That material would have to be approved from

9    mental health staff.  So in order for them to have a book

10   it would have to be approved by mental health staff.  If

11   mental health staff approved it, then yes, it would have

12   it.

13        Q.    And if mental staff approved it, it would

14   happen in the same manner?

15        A.    Yes, ma'am.

16        Q.    Okay.  The same manner as the other isolation

17   statuses that we've been discussing?

18        A.    Yes, ma'am, if it is approved.

19        Q.    Okay.  In general population max custody

20   what percent of people have jobs?

21        A.    I do not know the exact percentage, but I can

22   tell you that there are porter jobs that are given to

23   maximum custody inmates.

24        Q.    Do you think as many as 20 percent of the

25   people have jobs?

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

166

1        A.        Again, ma'am, I don't know the percentage.  I

2    don't want to give you wrong information.

3        Q.        All right.  So the jobs are porter jobs, you

4    said?

5        A.        Yes, ma'am.

6        Q.        Are there any other jobs that people in max

7    custody can do?

8        A.        Currently, the only jobs that I have been made

9    aware of by the deputy warden at Browning, SMU 1, and Rast

10   are porter position jobs.

11       Q.        If a porter was assigned, for example, for

12   housing unit cleaning, how many pods would that porter be

13   responsible for cleaning?

14       A.        Normally, they assign porters per pod.  You

15   would have an inmate that's assigned to porter in pod 1, an

16   inmate assigned to porter in pod 2, and so on and so forth.

17       Q.        In general, would the person who is assigned to

18   be the porter in pod 1 be someone who lived in pod 1?

19       A.        Correct.

20       Q.        Okay.  All right.  And generally only one

21   person per pod would be assigned to be a porter at a time?

22       A.        You could potentially have up to three porters

23   in that pod.  You could have a pod porter, you could have a

24   shower porter, you could have a recreation area porter.

25       Q.        Okay.  All right.  Do you know whether, in

1   fact, most units have three porters per pod?

2        A.    I don't know that for a fact.  However, I could

3   tell you that Browning and SMU 1 do it that way.  I'm not

4   certain about Rast.  We usually share the same model.  So I

5   would be pretty confident in saying that that's how they're

6   doing it.

7        Q.    Okay.  About how many hours a week does a

8   porter work as a porter?

9        A.    That could depend, actually.  It could depend on

10  staffing issues that happen, emergencies within the unit,

11  that kind of stuff.  It could vary.

12       Q.    Okay.  If everything was smooth sailing, which

13  I realize is an unusual event, but if everything was going

14  along in the way that it was scheduled, how much would a

15  porter work during a week?

16       A.    You could look at a porter in a max custody

17  facility working potentially up to, oh, gosh, anywhere

18  between 20 and 30 hours a week, potentially.

19       Q.    Does ADCRR track how many people in max custody

20  units have jobs?

21       A.    The particular unit does.

22       Q.    The unit does, okay.  Do the units also track

23  how many hours they're working?

24       A.    They do.  They're all paid through our work

25  incentive program, our WIP program.  All of that is

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

168

1   documented on pay sheets and those have to be signed by the

2   supervisors to be turned in and the inmates are paid

3   accordingly.  The hours are logged on that pay sheet.

4        Q.    Earlier I asked you about religious services,

5   and you told me that people in maximum custody cannot go

6   to religious services.  Can people in detention go to

7   religious services?

8        A.    No, they can not.

9        Q.    Can people in close management go to religious

10   services?

11       A.    Not that I'm aware of, no.  They can request to

12   see a chaplain.  Any inmate within the facility can request

13   to see a chaplain at any time, but they do not currently

14   have religious services in maximum custody.

15       Q.    Okay.  Can people on mental health watch go to

16   religious services?

17       A.    I have not seen that happen.  That actually

18   would be up to a mental health provider, but usually the

19   mental health watches are in maximum custody facilities,

20   and, again, they don't have religious services in those

21   areas, so --

22       Q.    Okay.  Let's talk a little bit about

23   cancellations of out-of-cell time.

24               What are reasons that out-of-cell time get

25   canceled?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

169

1      A.      Staffing is a big one, especially in the
2    Florence/Eyman area where our staffing levels are extremely
3    low.  So I have seen cancellations in regards to staffing.
4    I've seen cancellations in regards to emergency situations,
5    ICSs that are happening within the units.  Those are the
6    two big ones as to why a cancellation would occur.
7      Q.      All right.  Is there any sort of priority or
8    ranking as to what activities will be curtailed if there
9    is a need to cut back on the out-of-cell time?
10     A.      Priority number one, anytime we have to curtail
11   any activities is -- and it's getting out for medical.  If
12   they have medical appointments, mental health appointments,
13   those take priority over everything.  After that, any kind
14   of education or programming classes -- and, of course, rec
15   is usually the first one that's canceled.  And, of course,
16   we had makeup dates at all the units.  We attempt to make
17   up those cancellations as best we can, so --
18     Q.      How are efforts to make up canceled activities
19   recorded?
20     A.      They're actually recorded on the out-of-cell
21   tracking form.  Also, anytime there's a cancellation we
22   complete in the information report basically outlining when
23   the cancellation took place, who it affected, and why that
24   cancellation happened.  Usually, that IR is reviewed by the
25   unit administration.  And at that point they make efforts

1   to make that up on the makeup day.  If we have the staff to

2   do it, if we don't have other things on the schedule that

3   need to be completed, they will attempt to get it done at

4   that time.  And then as they go out for that particular

5   activity it's recorded on the out-of-cell tracking form.

6       Q.    When you say "the makeup day," are you saying

7   that there's a day that is assigned week after week as:

8   If we need a makeup, this is the day the makeup happens?

9       A.    Yeah.  So each unit will look at their 24-hour

10  clock and what they have going on in a particular unit.

11  And if they have an open spot then they will try and fit

12  that activity into that area.  Does that make sense?

13      Q.    Yeah, yeah.  Does ADCRR track cancellations of

14  different activities?

15      A.    We do.  Like I said, an information report is

16  generated and we keep that on file.  We also track that

17  cancellation on an out-of-cell tracking form for the

18  individuals that it affects.

19      Q.    So those forms, they show -- one out-of-cell

20  tracking form shows one person and the things that were

21  canceled for that person, right, for one week?

22      A.    Yes.

23      Q.    And the incident report form, the information

24  report for the cancellation talks about whatever was

25  canceled in a particular unit on a particular day, right?

171

1      A.    Yes, ma'am.

2      Q.    So those are individual points of data.  Is
3   there any effort in ADCRR to know how many activities are
4   being canceled to, like, compile that into any kind of
5   database or report?

6      A.    So at this point there is no system that I am
7   aware of in place for that.  However, gathering that
8   information would be pretty easy because you would simply
9   have to gather those information reports that are
10  generated.  So you could easily do it that way.  Have all
11  of the units start gathering that information through the
12  information report.

13     Q.    But to your knowledge, ADCRR has not done that?

14     A.    No, ma'am.

15     Q.    Okay.  Similarly, does ADCRR do anything to
16  track how many cancellations are actually made up?

17     A.    No.  But, again, that's information that they
18  could gather simply by looking at the documentation I just
19  mentioned that that stuff would be located on.  People do
20  it that way, but there's no formal system in place that
21  shows that information currently.

22     Q.    Okay.  Great.  People in max custody sometimes
23  refuse to go to rec or to some other out-of-cell activity,
24  correct?

25     A.    Yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

172

1     Q.    Does ADCRR track the refusal rate in max

2   custody for recreation?

3     A.    They don't track the refusal rate, but, again,

4   it's very similar to what we just discussed.  That

5   information is placed on out-of-cell tracking forms.  So it

6   could be tracked through the out-of-cell tracking forms.

7     Q.    Okay.  And that would also be true for refusals

8   for other types of out-of-cell time, correct?

9     A.    That's correct.

10    Q.    Do you know the reasons that people have for

11  refusing out-of-cell time are?

12    A.    Most of my experience is with the mental health

13  inmates that were at Kasson.  I have personally gone over

14  and talked to a few of them that habitually refuse to go

15  out.  And I've heard reasons range from, I just don't feel

16  like it, it's too cold out, it's too hot out.  And some of

17  them won't respond at all.  So there's a large list of

18  reasons why they don't go out.

19              We usually try and encourage them to go

20  out.  Shift supervisors, when they see our usual

21  inmates -- and it's usually around the same ones that are

22  doing it.  They will go and talk to them, and the

23  responses are usually the same.

24    Q.    If a person isn't ready to go right at the

25  moment that the officer comes and says:  Do you want to go

1    to rec, or do you want to go to the shower, maybe they're

2    not dressed yet, or they're using the bathroom or doing a

3    birdbath, does that count as a refusal?

4         A.    At the time that they're asking, if they say

5    that they're not going out, at that point it is recorded as

6    a refusal.  If we've started that turnout and they all of a

7    sudden change their mind and we've already moved out of

8    that area, more than likely we are not going to allow that

9    individual out.  If we're in the area still and we're still

10   continuing to bring inmates out of that area and they want

11   to go and they change their mind, I've seen that happen

12   where officers will say:  Okay, we'll change the form and

13   let them go out.

14              But as far as going back to allow somebody

15   to go out after they've changed their mind and initially

16   refused, we try not to get in the habit of doing that

17   because it creates an operational nightmare for us.

18        Q.    Okay.  But let's say the person is taking a

19   birdbath -- which is what I've been told it's called when

20   they essentially shower in their sink -- when the officer

21   comes around and says, rec, and they say:  Yes, I want to

22   go to rec but I have to get my clothes on, and, therefore,

23   that's going to take a couple minutes, is that considered

24   a refusal?

25        A.    No, because they have other inmates that they

1  need to get out in that pod.  And so they will take care of

2  those individuals first and come back for that individual.

3  At least that's what I've seen historically done.

4        Q.    Do you know if policy would consider that a

5  refusal?

6        A.    I don't believe there's anything in policy that

7  would call that a refusal, no.

8        Q.    If a person has got something like a towel

9  hanging up in their cell to dry, and is, therefore, not in

10  compliance, is that considered a refusal?

11        A.    No.  That would potentially lead to a

12  disciplinary ticket for 704 compliance, but if the inmate

13  says they want to go to rec, then I don't know why a towel

14  hanging in their cell would constitute a refusal, no.

15        Q.    Okay.  Has ADCRR done anything to address the

16  rate of refusals?

17        A.    Other than the conversations I spoke about

18  earlier, going all the way up, like I said, to the warden

19  level, I'm trying to talk to these guys and figure out why

20  they're not going out, or if we could convince them

21  otherwise, that's what's been done.

22        Q.    Let's talk a little bit about commissary.  The

23  amount of commissary that people are allowed in the

24  different types of max custody is all set out in 812,

25  correct?

177

1  would get your store that day.

2      Q.    Okay.  And is that the same for detention and

3  close management as well as all of the max custody

4  statuses?

5      A.    That's department-wide, ma'am.

6      Q.    And for people on mental health watch, is that

7  all dependent on what mental health staff say?

8      A.    It is.  Yes, ma'am.

9      Q.    All right.  What hygiene supplies are provided

10 to people in max custody?

11     A.    When they come in, like I said, they get issued

12 standard bedding, their clothing, they get soap, they get

13 shampoo, they get a towel, they get a wash cloth.  Let me

14 see what else.  Toothbrush, toothpaste.  I know I'm missing

15 something here, but --

16     Q.    Toilet paper?

17     A.    Toilet paper.  Yes, ma'am.

18     Q.    And you said they get clothing.  How many sets

19 of clothing do they receive?

20     A.    So they will come in with what they have on

21 their back, usually pants and a T-shirt, boxers, socks.

22 And then in that first pack they're given an additional

23 set.  And as they get moved to their cell then they will

24 get a property sheet that they can fill out and they get up

25 to the limit that's allowed per the policy.  They can have

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

178

1    up to seven T-shirts, seven boxers, seven socks.  I believe

2    it's two pairs of pants.  I think it's one blanket, sheet,

3    pillowcase, towel, wash cloth.  And I think that's it.

4        Q.    Okay.  Is that the same in all max custody

5    statuses?

6        A.    Yes, ma'am.  It is.

7        Q.    Is that the same for detention?

8        A.    That's the same for detention.  Yes, ma'am.

9        Q.    Is that the same for close management?

10       A.    Yes, ma'am.

11       Q.    So if a person was told they could only get a

12   sheet in close management once they get to phase 2, that

13   would be against policy, correct?

14       A.    In addition to the sheet that was already issued

15   to them, is that what we're talking about?

16       Q.    Yes, a sheet at all.

17       A.    So when they come in they should be issued a

18   sheet.

19       Q.    Okay.  And if they're not, that is contrary to

20   policy?

21       A.    Yes, they should be issued a sheet.  The only

22   difference to that, of course, is mental health watches.

23       Q.    Right.  And that is going to depend on the

24   mental health staff and what they say?

25       A.    That's correct.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

179

1      Q.    Okay.   All right.   Are the controls for light
2    fixtures in max custody cells inside or outside of the
3    cells?
4      A.    The controls are outside of the cells.   They are
5    controlled by the control room officer.
6      Q.    Okay.   Can the person who is inside a cell ask
7    to have it turned on and off, or off?
8      A.    They have designated times when lights are on
9    and lights are off.   So each cell has a security light in
10    it.   And per the policy, and I believe it's department
11    order 704, dictates when lights are on in the morning and
12    when lights are off on weekdays and weekends.
13      Q.    Okay.   Is the security light the light that's
14    above the toilet/sink thing?
15      A.    Yes, ma'am, it is.   So you have the regular
16    light in the cell, and then that security light is above
17    that light, if I remember correctly.
18      Q.    Okay.   So there's the big light above the
19    toilet/sink combination and then a smaller light above
20    that that's the security light?
21      A.    Yes, ma'am.
22      Q.    And the security light stays on at night?
23      A.    It stays on at all times.   Yes, ma'am.
24      Q.    Do you know if there are any light fixtures in
25    max custody that are currently broken?

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

180

1     A.    I'm not aware of that, ma'am, no.  As officers

2  are going through during their security checks at night and

3  they notice that a light is out, then they're to do a work

4  order and information report on that so that we can get it

5  fixed immediately.  That's a security device.

6     Q.    Okay.  Has ADCRR done anything to determine how

7  much natural light is getting into the max custody cells

8  in the different units?

9     A.    Not that I'm aware of.  I know that there was a

10  lighting initiative that was started a couple years ago

11  where we were trying to switch out all the lights to LED

12  lights, but that's the only thing I'm aware of in regards

13  to the lighting.

14     Q.    Okay.  And what was discussed about lighting in

15  max custody units, is that the same in detention cells?

16     A.    Yes, ma'am.

17     Q.    And in close management cells?

18     A.    Yes, ma'am.

19     Q.    What is the lighting situation in mental health

20  watch cells?

21     A.    Those lights would always be on.

22     Q.    Both the main light and the security light or

23  just the security light?

24     A.    Both of those lights would be on so that the

25  officers can observe the inmates.

181

1    Q.    Okay.  What are the policies about having a TV
2    in max custody?
3    A.    If an inmate can afford to buy a television then
4    they are authorized to buy the television.  And we do
5    have -- in the mental health program we have a lot of
6    inmates that are not able to afford them, and we do have a
7    loaner television program where we can loan televisions
8    out, as long as we have them, to inmates that are indigent
9    and cannot afford a television.
10    Q.    Okay.  So I'm going to come back to the loaner
11    television program.  For people in max custody can anyone
12    in any status of max custody, if they can afford it, get a
13    television?
14    A.    To my knowledge, yes, as long as they meet the
15    qualifications on their matrix.  I'm not sure if TV is
16    still on the matrix or not, but I'm not aware of anybody
17    that's not authorized other than on a mental health watch.
18    Q.    Okay.  And on the loaner program you said
19    people in the mental health program can get a loaner TV if
20    there is one available and they're indigent?
21    A.    Yes, ma'am.
22    Q.    Is that people who are in specific mental
23    health units, or is it people who are designated as having
24    mental health needs?  Who are the people who are eligible
25    for that loaner program?

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

182

1      A.    So I can specifically speak to the BMU program

2   and the residential mental health program that was at

3   Kasson.  And that program basically was picked up and taken

4   down to Tucson Rincon unit, and I believe they have adopted

5   the same procedures and policies that we have at Kasson.

6   So if we have inmates that are unable to afford televisions

7   and they are indigent status and we have televisions in our

8   loaner program that we can loan out, then we will loan them

9   to those inmates.

10      Q.    Okay.  What is the policy on having a tablet in

11   max custody?

12      A.    Tablets were given out to all inmates with the

13   exception of inmates in the BMU program, I believe.

14      Q.    Why not in the BMU program?

15      A.    These inmates are known for very poor

16   self-injurious behavior.  There was a fear that they would

17   utilize those tablets to cut themselves or hurt themselves

18   or swallow pieces of that tablet.  It's just placed on

19   hold, to my knowledge.  They have not made the decision to

20   give those tablets to the BMU inmates as of yet.

21      Q.    All right.  Is there any kind of loaner program

22   regarding the tablets?

23      A.    There's not only because every inmate is

24   entitled to have the tablet.

25      Q.    If a tablet gets broken does it get replaced?

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

183

1      A.      It does, and that is going to be dependent on

2   how it's broken.   For instance, if a CO sees an inmate just

3   take the tablet and throw it down and break it, then

4   there's going to be a period of time before that inmate

5   gets another tablet, to my knowledge.

6              But just a regular broken tablet, one

7   that's not working when an inmate is trying to do his work

8   or do something on the tablet and it's just not working,

9   then that information is provided to our contract partner,

10  JPay.   We have a liaison at every one of the complexes.

11  They'll go in and assess the situation.   If they can't fix

12  it then they'll be issued a new tablet.

13      Q.      How many meals per day do people get in max

14  custody?

15      A.      Max custody gets three meals a day, two of which

16  are given in a MegaSack and a hot meal.

17      Q.      And is that the same on weekends and weekdays?

18      A.      Yes, it is.   There's an exception, I believe, on

19  holidays where they get an enhanced meal.

20      Q.      I'm sorry.   They get a what?

21      A.      An enhanced meal.

22      Q.      Okay.   What does that mean?

23      A.      Meaning that they get -- it's different than

24  what's on the menu.

25      Q.      Okay.   Are there any differences among the

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

184

1    different statuses of max custody regarding their food,

2    their meals?

3         A.    No, not that I'm aware of, other than we would

4    be careful about utensils and that kind of stuff that's

5    handed out to mental health inmates -- I'm sorry -- inmates

6    on watch.

7         Q.    Okay.  What about people in detention and close

8    management?  Do they all get the same food as the people

9    in max custody?

10        A.    Yes, ma'am, they do.

11        Q.    Looking at Exhibit 6, Isolation Exhibit 6,

12   which is DO 804, Section 1.9 says, sanitation inspections.

13   So this is for people in detention.  The policy requires

14   there be a sanitation inspection during each shift,

15   correct?

16        A.    Yes, ma'am.

17        Q.    And that sanitation deficiencies need to be

18   documented and corrected as quickly as possible?

19        A.    Yes, ma'am.

20        Q.    What is a sanitation deficiency?

21        A.    For instance, if the inmate has trash on the

22   floor in their cell, their general hygiene is poor within

23   the cell.  They could have feces or urine that's inside

24   their toilet that has not been flushed.  Basically, just

25   making sure that the cell is in good order and the inmate

185

1    is keeping up on his sanitation within the cell.

2        Q.    Things that are not in the cell, can they be

3    sanitation deficiencies?

4               MS. LOVE:  Form.

5               THE WITNESS:  Clarify that, please.

6        Q.    BY MS. MORRIS:  So, for example, a dirty

7    shower, would that be a sanitation deficiency?

8        A.    If the inmate just took a shower and left it in

9    poor condition, meaning there's shampoo all over the walls

10   or something of that nature, it could potentially lead to a

11   disciplinary ticket on that inmate, yes.

12       Q.    So a sanitation inspection and sanitation

13   deficiencies are things that attach to inmates, not to the

14   pod; is that what I'm understanding from you?

15       A.    Yes, ma'am.

16       Q.    Okay.  So, for example, there being mice in the

17   pod is not a sanitation deficiency?

18       A.    That is a unit sanitation deficiency that needs

19   to be reported so that we can get exterminator services in

20   there immediately.

21       Q.    Okay.  And that's what should happen if there's

22   mice?

23       A.    Absolutely.

24       Q.    And should that happen if there's rats?

25       A.    Anything of that nature, yes, should be reported

1    immediately so that we can get that taken care of

2    immediately.

3         Q.    And what if there's roaches?

4         A.    Same.  Our pest control service should be

5    contacted through the business office and pest control

6    services should come out and spray those areas.

7         Q.    What about mold?

8         A.    Again, reported.  And what happens with reports

9    of mold, we have our occupational safety consultant come in

10   and evaluate to find out if it is, in fact, mold.  If it is

11   determined to be mold then we need to take the appropriate

12   action to get somebody out to take care of it.  If it's

13   not, then we need to sanitize that area.

14        Q.    Okay.  But the things that we've just been

15   discussing, the bugs, mice, rats, those kind of things,

16   those are not what's being inspected for in the sanitation

17   inspection described in Section 1.9 of DO 804; is that

18   correct?

19        A.    The one that we're referring to is a security

20   and sanitation inspection -- not security, but a sanitation

21   inspection, as you stated, in the detention area.  The

22   officers, however, as they assume a post, are required to

23   do a sanitation inspection of the post.  So, yes, it's two

24   different things.  However, a sanitation inspection of both

25   areas has to occur during that shift.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

187

1      Q.     So where is it in the policy that officers have

2  to do a sanitation inspection of the post?

3      A.     That would be within that post order we spoke

4  about earlier in regards to the information that needs to

5  be entered into the Correctional Service Journal.

6      Q.     Okay.  Do they also have to do sanitation

7  inspections of the post in max custody?

8      A.     All posts that an officer assumes, there should

9  be a sanitation inspection completed of that area.

10      Q.     Okay.  Earlier you mentioned that officers do

11  security checks.  It was in response to my question about

12  if there's an emergency how do people get the attention of

13  the officer.

14      A.     Yes, ma'am.

15      Q.     Could you explain what a security check is?

16      A.     It's a security health and welfare check where

17  they're going through, they are looking for living,

18  breathing flesh on inmates, making sure that everyone is

19  alive and well, addressing concerns as they come up.  They

20  are required to do these every 30 minutes but no later than

21  every 59 minutes on every single inmate within the

22  facility.

23      Q.     What does it mean every 30 minutes but no later

24  than every 59 minutes?

25      A.     It means that they have to conduct that check

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

188

1   within that time period.

2        Q.    But that's two different time periods.

3        A.    It's a range within that time period that they

4   need to conduct that check.  So no later than that

5   59-minute mark can that security check be conducted without

6   the supervisor being notified.

7        Q.    So, essentially, they have to do a security

8   check every hour --

9        A.    Yes, ma'am.

10       Q.    -- is that accurate?

11       A.    Within that time frame given, and it's very

12   specific in the policy.

13       Q.    Within 59 minutes?

14       A.    Yes.

15       Q.    Okay.  What policy is that?

16       A.    And it might actually be a post order, and that

17   would be the floor officer post order, housing unit post

18   order.

19       Q.    But you're not sure?

20       A.    It is in the post order.  I'm not sure which

21   exact one it is.  It might be in the general order.

22       Q.    How is temperature monitored in max custody

23   units?

24       A.    We're required to do a temperature check during

25   the months of April through the end of October, October

189

1   31st, or if the temperature is above 100 degrees during any

2   other month we're also required to do temperature checks,

3   but they're to be done twice a day.  They're done at 11:00

4   and 1500 hours.  And what the staff do is they have a set

5   schedule and set areas that they go in with an anemometer

6   and they take the temperatures in those areas.  And the

7   different areas, of course, are in a max custody setting or

8   a cell setting or an open dorm-style setting.  In a maximum

9   custody setting they're taking temperatures inside the

10  cells.  And they have to do a bottom run and a top run in

11  those particular pods and that is all logged.  An open

12  dorm-style setting, taking those at the front of the run

13  and the back of the run of those particular runs within an

14  open-dorm setting.  And it's all being logged at the 11:00

15  hour and the 1500 hour throughout the month.

16       Q.   I'm going to talk now about topic 3.  Can you

17  tell us what types of programming -- what type of classes

18  are available to people in max custody?

19       A.   As you've seen by the matrixes we've looked at,

20  you can see that there are various programming.  Most of

21  them revolve around cognitive restructuring programming,

22  socialization programming.  We do have cultural diversity

23  programming, and we also have pre-release programming, as

24  well, for inmates that are 18 months before they're

25  released.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

190

1      Q.    I'm going to show you in Exhibit 3, attachment
2  G, where it says, Browning mandatory programs.
3      A.    Yes, ma'am.
4      Q.    Are these programs that you're talking about?
5      A.    Yes, ma'am.
6      Q.    Okay.  Are there any others besides what's
7  included in the Browning mandatory programs?
8      A.    We do have some other programs that are offered.
9  I think there's a money management.  I'm not sure if that's
10  listed there or not.
11      Q.    I think that's listed in the close management
12  one.  Money management is in Exhibit 5, DO 813.
13      A.    I see it.  Yes, ma'am.
14      Q.    Is it available to people in max custody if
15  it's not on that list?
16      A.    If it's not on that list that would be a
17  decision by the deputy warden to start that program.  And,
18  obviously, there would have to be availability of CO 3s to
19  teach that program, and there would have to be interest by
20  the inmate population to take that program.  So if all of
21  that meshed together and worked out really well, then there
22  would be a possibility for that, but you'd have to have a
23  trained CO 3 to teach that class, however, as well.
24      Q.    Okay.  So are the classes that are available
25  the classes that are listed in the matrix for the Browning

191

1    mandatory programs and the close management matrix?

2        A.    So, yes, those programs would be taught by

3    correctional officer 3s in those areas, yes.

4        Q.    Are there other classes that are taught by

5    CO 3s in any of the statuses that we've been talking

6    about?

7        A.    Not that I am aware of at this point, no.

8        Q.    So, again, looking at 812, so, for example,

9    looking at the step-level 2 initial placement there's a

10   self-control class and the Hazelden Socialization Workbook

11   parts 1 and 2.  Do you see that?

12       A.    Yes, ma'am.

13       Q.    If a person has already done those programs and

14   they are still in step 2, would they be required to do

15   them again in order to be considered to be programming?

16       A.    So just to clarify your question, they were

17   already a step 2 at one point, completed the classes, moved

18   down, and then became a step 2, again, is that --

19       Q.    No, no.  That was not it.  They just haven't

20   moved yet.  They have not been moved to step 3.

21       A.    They would only need to take those classes once.

22   They wouldn't be required to take them twice in order to

23   move to step 3 if they remained in step 2.  They just need

24   to take them the one time.

25       Q.    Okay.  But then if something happens and they

192

1    get moved down a step and then they have to start back up

2    they would have to do that class again?

3        A.    Yes, ma'am, because it's part of the matrix and

4    that would be a requirement.

5        Q.    Okay.  What kinds of rehabilitative services

6    are there offered to people in maximum custody, if any?

7        A.    As far as rehabilitation, there are just the

8    classes that you see in the matrix unless, of course, like

9    I said, the deputy warden authorized any other classes

10   because they had the availability to do that.  But as it

11   stands, the rehabilitation classes are usually given as

12   they decrease from maximum custody.

13       Q.    Okay.  So is there any programming available in

14   isolation other than the classes listed in the matrix for

15   the Browning mandatory programs in 812 and the close

16   management program matrix in 813?

17                   MS. LOVE:   Form.

18                   THE WITNESS:   Not that I'm aware of, no.

19       Q.    BY MS. MORRIS:   Okay.  We're going to go to

20   topic 4, which is about length of stay in isolation,

21   including mean, median, and maximum lengths of confinement

22   in each isolation unit.  How long do people spend, on

23   average, in max custody?

24       A.    That's actually going to vary by the inmate,

25   their behavior, whether or not they're doing what they're

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

193

1    supposed to do as far as programming, disciplinary, that

2    kind of stuff like we talked about earlier.

3         Q.    Well, the average isn't going to change per

4    person because that's the way averages are, including all

5    people, right?

6         A.    I'm sorry.  Could you repeat that?

7         Q.    The question was:  How long do people spend, on

8    average, in max custody?

9         A.    I don't have that information, ma'am.

10        Q.    Okay.  What is the longest time anyone in ADCRR

11   custody has spent in max custody?

12        A.    I don't have that information, ma'am.

13        Q.    Would it be possible to know that?

14        A.    I'm not exactly sure if that's information that

15   we would have on hand.

16        Q.    Okay.  What is the longest time that anyone

17   currently in max custody has spent in max custody?

18        A.    Now, we have a condemned row in max custody, and

19   I can speak to that population.  I know we have an inmate

20   on condemned row that's been incarcerated since 1978.  Now,

21   he, however, has, within the last three or four years,

22   moved down to close custody, but at the time I would

23   probably put him up against anybody else.

24        Q.    How long do people spend, on average, at step 1

25   of max custody?

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

194

1        A.      I don't have that information, ma'am.

2        Q.      How long do people spend, on average, at step 2

3    of max custody?

4        A.      I do not have that information, ma'am.

5        Q.      How long do people spend, on average, at step 3

6    of max custody?

7        A.      I also do not have that information, ma'am.

8        Q.      Does ADCRR do anything to track the amount of

9    time people spend in max custody?

10        A.      Not that I'm aware of at this point.

11        Q.      Does ADCRR do anything to track the amount of

12    time people spend in any of the steps in max custody?

13        A.      Not that I'm aware of at this time, ma'am.

14        Q.      Would there be a way to track how long people

15    spend in max custody?

16        A.      I am not aware of that information.

17        Q.      Okay.  What percent of men sentenced to life

18    have their custody reduced to close custody in less than

19    two years?

20        A.      I do not have that information either, ma'am.

21        Q.      Once a person is reclassified to close custody

22    from max custody, how long do people spend, on average, in

23    max custody awaiting rehousing?

24        A.      I'm sorry.  Could you repeat that?

25        Q.      Once a person is reclassified to close custody

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

195

1   from max custody, how long do people spend, on average, in

2   max custody awaiting rehousing?

3       A.     I don't have those averages, ma'am.

4       Q.     What is the longest time anyone in ADCRR

5   custody has spent in max custody after having been

6   reclassified to close custody?

7       A.     Again, I do not have that information, ma'am.

8       Q.     How long, on average, do people spend in STG

9   status in max custody?

10       A.     I do not have that average, ma'am.

11       Q.     Does ADCRR do anything to track the amount of

12   time people spend in STG status in max custody?

13       A.     Not that I'm aware of.

14       Q.     What's the longest time anyone in ADCRR custody

15   has spent in STG status max custody?

16       A.     I do not have that information, ma'am.

17       Q.     What's the longest time anyone currently in STG

18   status in max custody has spent in STG status in max

19   custody?

20       A.     Again, I do not have that information, ma'am.

21       Q.     Once a person is approved to be removed from an

22   STG status, how long do people spend, on average, in STG

23   status awaiting rehousing?

24       A.     That would be dependent upon housing.  And like

25   I said earlier, it's usually a fairly quick process, but I

1    do not have an average on that.

2         Q.    Okay.  What's the longest time anyone in ADCRR

3    custody has spent in STG status after having been

4    reclassified to max custody?

5         A.    I do not have that information, ma'am.

6         Q.    How many people have been reclassified out of

7    STG since the new policy came into effect in April

8    allowing people to be removed based on 24 months of no

9    documented STG activity?

10        A.    I also do not have that information, ma'am.

11        Q.    How long, on average, do people spend in

12   enhanced management in max custody?

13        A.    I also do not have that information, ma'am.

14        Q.    Does ADCRR do anything to track the amount of

15   time people spend in enhanced management in max custody?

16        A.    I am not aware of that.

17        Q.    You're not aware of them doing that, or that

18   means you don't know one way or the other?

19        A.    I'm not aware of them tracking that, ma'am.

20        Q.    Okay.  Does that mean you think they do not

21   track it or you just don't know?

22        A.    I just don't know.

23        Q.    Okay.  Thank you.

24             MS. LOVE:  And I can state for the record,

25   as we've previously communicated about both on the record

197

1   and in pleadings and in confers [sic] that none of the

2   statistics that you're asking about for tracking max,

3   minimum, median, average lengths of time in any location

4   defined by the classification order as constituting --

5            MS. MORRIS:  I'm going to stop you.  I

6   think that would be a speaking objection that you're

7   making right now.

8            MS. LOVE:  Right, but, I mean, you have

9   your seven hours to use today, and I'm just trying to

10  shorten it up because, as I've previously communicated,

11  ADC is not tracking those statistics.

12       Q.    BY MS. MORRIS:  What's the longest time anyone

13  in ADCRR custody has spent in enhanced management in max

14  custody?

15       A.    I do not have that information, ma'am.

16       Q.    Once a person is approved to be removed from

17  enhanced management, how long do people spend, on average,

18  in enhanced management awaiting rehousing?

19       A.    As I stated earlier, that's a pretty quick

20  process, but I do not have that average, ma'am.

21       Q.    How long, on average, do people spend in

22  restrictive housing program status in max custody?

23       A.    I do not have that average, ma'am.

24       Q.    What's the longest time anyone in ADCRR custody

25  has spent in restrictive housing program status in max

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

198

1    custody?

2         A.    I also do not have that information, ma'am.

3         Q.    Once a person is approved to be removed from

4    restricted status housing program, how long do people

5    spend, on average, before being rehoused?

6         A.    I don't have that information, ma'am.

7         Q.    How long, on average, do people spend in a

8    behavioral management unit or in a mental health unit in

9    max custody?

10        A.    I do not have that average, ma'am.

11        Q.    What's the longest amount of time anyone in

12   ADCRR custody has spent in a behavioral management unit or

13   mental health unit in max custody?

14        A.    I also do not have that information, ma'am.

15        Q.    Once a person is approved to be removed from

16   the behavioral management unit, how long do people spend,

17   on average, in the BMU awaiting rehousing?

18        A.    As I stated before, it's a pretty quick process,

19   but I don't have that average, ma'am.

20        Q.    You don't actually know how long it is?

21        A.    No, ma'am.

22        Q.    Okay.  How long, on average, do people spend in

23   close management status?

24        A.    I do not have that information, ma'am.

25        Q.    What's the longest time anyone in ADCRR custody

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

199

1    has spent in close management status?

2         A.     I also do not have that information, ma'am.

3         Q.     How long, on average, do people spend in

4    detention status?

5         A.     I do not have that information, ma'am.

6         Q.     What's the longest time anyone in ADCRR custody

7    has spent in detention status?

8         A.     I do not have that information, ma'am.

9         Q.     People classified as max custody can seek

10   administrative review of that classification, right?

11        A.     Yes, ma'am.

12        Q.     And that process takes about 45 days or up to

13   45 days?

14        A.     Yes, ma'am.

15        Q.     What percentage of people classified as max

16   custody seek an administrative review of that

17   classification?

18        A.     I also do not have that information, ma'am.

19        Q.     Do you know what percent of administrative

20   reviews result in a change to the max custody

21   classification?

22        A.     I do not know that, ma'am.

23        Q.     People classified as max custody can also

24   appeal the classification, correct?

25        A.     Yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

200

1    Q.    And that process can take up to 30 days?

2    A.    Yes, ma'am.

3    Q.    What percent of people classified as max

4  custody actually appeal that classification?

5    A.    I don't have that information, ma'am.

6    Q.    Do you know what percent of appeals result in a

7  change to max custody classification?

8    A.    I do not know that, ma'am.

9    Q.    How long do people spend on mental health

10  watch, on average?

11    A.    I do not have that average, ma'am.

12    Q.    What is the longest time anyone in ADCRR has

13  spent in mental health watch?

14    A.    I do not have that information, ma'am.

15    Q.    Does ADCRR do anything to track the amount of

16  time people spend in mental health watch?

17    A.    Not that I'm aware of.

18          MS. MORRIS:  Okay.  Let's do a break.

19          (Recess from 3:54 p.m. to 4:11 p.m.)

20          MS. MORRIS:  And we are back on the record.

21    Q.    BY MS. MORRIS:  Are there any ADCRR policies

22  regarding monitoring the mental and physical health of

23  people in isolation?

24    A.    Not that I'm aware of, no.

25          MS. LOVE:  I'm just clarifying that,

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

201

1   because these are kind of the dual designations that he's

2   speaking, unless he says otherwise, from the operations

3   side.

4        Q.   BY MS. MORRIS:   Okay.   All right.   I'm going to

5   go quickly through these topics because they're the

6   dual-designations ones.

7                    So for topic H, does ADCRR have any

8   policies and procedures regarding self-harm and suicide

9   prevention for people in isolation?

10       A.   I'm sorry.   One more time.

11       Q.   Does ADCRR have any policies and procedures

12  regarding suicide and self-harm prevention for people in

13  isolation?

14       A.   Yes, we do.

15       Q.   And is that policy DO 807?

16       A.   I believe it is.   I'm trying to do it right now.

17  I apologize.

18                MS. LOVE:   Can you give him the title of

19  it, of 807?

20       Q.   BY MS. MORRIS:   Inmate suicide --

21       A.   Yes, ma'am, that would be it.

22       Q.   Are there any other policies besides DO 807

23  that relate to suicide and self-harm prevention for people

24  in isolation?

25       A.   Not that I'm aware of, no.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

202

1     Q.    Does ADCRR have any policies and procedures

2  regarding the provision of health care to people in

3  isolation?

4     A.    Yes, I believe we do.

5     Q.    What policies are those?

6     A.    I'm not aware of what the actual number is,

7  ma'am.

8     Q.    Okay.  What do the policies require?

9     A.    The policy would require that we are providing

10  health care to our inmate population, I mean, to put it

11  very vaguely.

12     Q.    Yeah.  Well, I mean, but you also don't know

13  what policy it is?

14     A.    No, ma'am, I don't.  And just to go a little

15  further, there is specifics within the policy about our

16  response time to provide health care to the inmate

17  population in cases of emergency, and that would also carry

18  over into detention areas, maximum custody.

19     Q.    Okay.  But, again, you don't know what policy

20  it is?

21     A.    I don't, ma'am.

22     Q.    Okay.  And if I can recall correctly, you are

23  not testifying at all regarding topic 10; is that correct?

24     A.    That is correct.

25     Q.    Okay.  Topic 11 is training provided to health

203

1    care staff who work with incarcerated people in isolation.

2                   Does ADCRR provide any training to health

3    care staff who work with people in max custody about

4    working in max custody?

5         A.    So we have general classes that would encompass

6    maximum custody for all of our staff to include health care

7    staff, yes.

8         Q.    Okay.  Does anything in those classes address

9    max custody or other isolation units specifically even if

10   the class as a whole is broader than that?

11        A.    Those elements are discussed in a couple of our

12   trainings.  Yes, ma'am.

13        Q.    Okay.  Who provides the training?

14        A.    We have a department or an area within the

15   department that is in charge of developing and

16   administering training to our employees and our contracted

17   employees.

18        Q.    Okay.  Is that called, like, the training

19   department or does it have a title?

20        A.    For lack of a better word, yes, ma'am.

21        Q.    How many hours of training do health care staff

22   receive from ADCRR regarding working with people in

23   isolation units?

24        A.    I believe they're at right around 40 hours.

25        Q.    40 hours about isolation units?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

204

1      A.      No.  Training in total.

2      Q.      Okay.  About how many of those 40 hours relate

3  to working with people in isolation units?

4      A.      I don't have the specifics on the amount of time

5  for that specific of an area.

6      Q.      Okay.  What subjects relating to working with

7  people in isolation units are included in the training for

8  health care staff?

9      A.      So we do training on suicide prevention.  We do

10  training on maximum restraints.  We do care training, which

11  is our health care training.  And all three of those are

12  for all of our staff to include our contracted staff.

13  Those are the three that come to mind.

14              MS. LOVE:  Do you want to refer to your

15  notes?

16              THE WITNESS:  May I refer to notes on that,

17  ma'am?

18              MS. LOVE:  And for the record, Maria, he

19  has notes which I'm happy to, after this, excise out of

20  the attorney-client privileged communications, but he did

21  speak with the training bureau.  So he has notes and he

22  can give you specific designations of the titles, which, I

23  think, is what you're probably after.

24              MS. MORRIS:  Okay.  I would appreciate

25  that.  Thank you.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

205

1          THE WITNESS:  So specific to maximum

2   custody, actually of all population types for Centurion

3   staff, we offer a consolidated mental health class, a

4   nonviolent crisis intervention class, preventing inmate

5   suicides that I mentioned already, progressive mental

6   health restraints, which I mentioned, recognizing and

7   managing inmate mental health needs.  And then we have

8   five specific classes that are offered to Centurion staff

9   that are not offered to our regular security staff or any

10  other contractors, and those five are nurses line

11  encounter and Cegar, C-E-G-A-R, provider line encounters,

12  nurses line to provider line referrals, medical NHR, and

13  Cegar, C-E-G-A-R, and pharmacy.

14      Q.    BY MS. MORRIS:  Okay.  Is there any training

15  besides what you've already talked about that is provided

16  to correctional staff who are regularly assigned to work

17  in isolation units about working in isolation units?

18      A.    Those classes that I mentioned are, like I said,

19  for everybody with the exception of those last five.  We do

20  a training on inmate discipline, which would have effects

21  within max custody.  We do have a class on chemical agents,

22  the utilization of, communicable disease prevention.  We

23  started a brand-new class on Coronavirus and COVID 19

24  prevention and management.  We do a defensive tactics

25  class.

206

1      Q.    These classes that you're listing, do they

2  specifically address anything about people in isolation,

3  or are they general trainings regarding working in the

4  prison system?

5      A.    These are general trainings that would affect

6  all custody levels.

7      Q.    Are there any trainings that are specifically

8  about working in isolation units?

9      A.    We do a class -- and this is actually a class

10  for everybody, as well, our contractor partners, as well.

11  We do a three-day mental health training class, and this is

12  in regards to -- it's more about mental health inmates,

13  dealing with mental health inmates, use of force on mental

14  health inmates, which would talk about maximum custody.

15      Q.    Okay.  Anything else?

16      A.    Let me go through this list really quick to make

17  sure I didn't miss anything.

18      Q.    Okay.

19      A.    I believe that's it, ma'am.

20      Q.    Okay.  And are people in ADCRR trained on the

21  importance of documentation?

22      A.    We do have a class in regards to documentation.

23      Q.    And would you say that people are trained on

24  the importance of documentation?

25      A.    Yes, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

207

1      Q.    Are people in ADCRR trained on the importance
2   of legible documentation?
3      A.    We actually talk about that within the class.
4   The class was geared toward the out-of-cell tracking forms.
5      Q.    Okay.  We're going to talk about correctional
6   staff posts, topic 13, and we're going to combine topics
7   13 and 14 because they overlap.
8              The posts for a particular housing unit
9   will differ between a.m. and p.m. shifts, correct?
10     A.    They can.  Yes, ma'am.
11     Q.    Okay.  Do they differ between weekday and
12   weekend shifts?
13     A.    Well, they could, yes, ma'am, depending
14   on officers posted for medical lines.  So we usually do
15   most of our medical lines during the week and it's a
16   reduced number on the weekends.  So that could affect it,
17   yes.
18     Q.    Okay.  All right.  Do the posts in each
19   isolation unit differ between Saturday and Sunday shifts?
20     A.    Not that I'm aware of, no, ma'am.
21     Q.    Okay.  Do they differ from weekday to weekday?
22     A.    No, they do not.
23     Q.    Okay.
24     A.    Let me go back to that.  So we could have
25   transportation staff that have to go out because an inmate

208

1   goes out to the hospital.  So that could differ, but other

2   than that, I can't think of anything else that would

3   differ.

4       Q.    Okay.  All right.   In looking at daily post

5   sheets I've seen that they have the same -- do the daily

6   post sheets include essentially everyone that is on any

7   shift assigned to a particular housing unit?

8       A.    So we have a staffing roster that has everybody

9   assigned to a particular unit and it's broken down by what

10  shift those individuals are on.  And then the daily post

11  sheet shows where those particular staff on that shift are

12  posted into what post.

13      Q.    Okay.  I think I'm going to bring up a daily

14  post sheet because I think it will be easier to talk about

15  it while looking at it.

16           (Exhibit 14 identified for the record.)

17      Q.    BY MS. MORRIS:  So this is Isolation Exhibit

18  14.  So can you tell me what this document is?

19      A.    That is the daily post sheet off of our staffing

20  rosters, yes, ma'am.

21      Q.    And this particular one is for Eyman on Friday,

22  July 30, 2021, for Browning, a 12-hour shift, the a.m.

23  shift, correct?

24      A.    Yes, ma'am.

25      Q.    Okay.  So the column on the right where it

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

209

1    says, required posts -- I'm sorry, the left.

2        A.    Yes, ma'am.

3        Q.    What is that column showing?

4        A.    Those are the posts within the unit.

5        Q.    Okay.  Are all of the posts that are listed in

6    that going to be CO 2s?

7        A.    Yes, they will be.

8        Q.    Okay.  When you say that they're the posts in

9    the unit, are they posts that are supposed to be staffed

10   for the shift that's listed?

11       A.    Yes.

12       Q.    Okay.  And then the column that says, staff

13   assigned, that is the person who, on July 30th for the

14   a.m. shift, was assigned to that post, correct?

15       A.    That is correct.

16       Q.    Do you see the block of columns that says,

17   supervisor, RDO, and status?

18       A.    Yes, ma'am.

19       Q.    What are those columns showing?

20       A.    So those are the supervisors that are also

21   assigned to that particular shift.

22       Q.    Okay.  What does RDO mean?

23       A.    It's a regular day off.  So that regular day off

24   for Capadona is Wednesday, Thursday, Friday -- I can't see

25   that last bit.  I think it's Saturday.  So on a 12-hour

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

210

1    shift they have, of course, one week where they have three

2    days off and the next week where they have four days off.

3         Q.    Okay.  And then it says, status RDO for

4    Capadona.

5         A.    That means Capadona on that day, on Friday, is

6    on his day off.

7         Q.    Okay.  So the supervisors who are present on

8    this day are Brandon Hoyt, Maria Molina, Paul Munley, and

9    then a person who's in training, Kenneth Waldridge; is

10   that accurate?

11        A.    That's correct.

12        Q.    And all the other people on their regular day

13   off?

14        A.    Yes, ma'am.

15        Q.    The block of columns right below that where it

16   says, name and RDO, what is that column showing, that set

17   of columns?

18        A.    So that's showing the staff and their regular

19   day off on that shift.  So this is on a Friday, I believe.

20   And so if they have a Friday RDO then they would be off on

21   this particular day.

22        Q.    Okay.  So the people who are in the supervisor

23   as a status RDO, and then where it just says name and it

24   says that one of their RDOs is F, all together, those

25   people are the total staff on RDOs in the last block of

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

211

1   columns?

2          A.      Yes, ma'am.

3          Q.      Okay.  All right.  Thank you.  I'm going to the

4   last block of columns where it says, total staff, and

5   there's authorized FTEs, do you see that?

6          A.      Yes, ma'am.

7          Q.      And FTE means full-time equivalent, right?

8          A.      Full-time employee.

9          Q.      Full-time employee.  And it says there's 135

10  authorized for this shift, correct?

11         A.      Yes, ma'am.

12         Q.      And 78 vacancies?

13         A.      Yes, ma'am.

14         Q.      Which leaves a total of 57 assigned staff,

15  correct?

16         A.      That's correct.

17         Q.      Can you explain how the total available and

18  total on RDOs don't add up to the total assigned?

19         A.      I'd have to look at -- so there's normally four

20  sheets in that packet so that I could break that down, but

21  you could have staff out on military leave for extended

22  periods of time.  You could have staff out on extended sick

23  leave for extended periods of time, FMLA.  You could have

24  staff out on training.  But in those four sheets it will

25  delineate where they are.

1      Q.    Okay.  Those statuses that you just described,
2   FMLA leave, training, are those counted as available?
3      A.    Those are counted as total assigned.  So you
4   could have 57 people assigned, but if you've got somebody
5   out on military leave -- and for example, we've had staff
6   out on military leave for a couple of years -- they're
7   still counting towards your numbers, but you're never going
8   to see them.  You're never going to be able to post them.
9      Q.    Okay.  But the total available plus the total
10  on RDO add up to more than the total assigned.  That's
11  what's confusing me.
12     A.    I'd have to look at all four of these sheets,
13  ma'am, in order to determine those numbers.
14     Q.    On this one says page 1 of 3.  So this one has
15  three sheets.  Do you see where I'm pointing to?
16     A.    Yes, ma'am.
17     Q.    So we have more staff and positions listed, and
18  then we have some special assignments.  Do you see those?
19     A.    Yes, ma'am.
20     Q.    Are the people who are listed as ICS warden
21  approved, are they assigned to ICS at the beginning of a
22  shift?
23     A.    So a warden-approved position is a special
24  assignment.  So I would have to see exactly what that word
25  approved position is, but, for instance, if they have a

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

213

1    medical line going on that's not designated as one of those

2    posts, then they would be warden approved for that

3    particular position because we have to fill it because we

4    have to conduct that medical line.

5         Q.    Okay.

6         A.    And so any position that's not authorized on

7    that roster -- so, like, for instance, it's a medical line

8    that needs to be done and there's no medical line on that

9    roster to place a person in, then that would become a

10   warden-approved position.  We place that officer in that

11   position as warden approved because it's something that has

12   to get done.

13        Q.    Okay.  That helped me understand that very

14   well.  Thank you.

15             When are these daily post sheets filled

16   out?

17        A.    Those are filled out -- so we do projections.

18   So we do a two-week projection on all of our rosters.  And

19   then that roster is finalized that day that we are on

20   shift.

21        Q.    Okay.  Is it finalized at the beginning of the

22   shift or at the end of the shift?

23        A.    It's finalized throughout the shift.  And I say

24   that because things can change throughout the day.  You

25   could have an employee that gets sick at work and you have

1    to send them home.  You can have a medical transport that

2    goes out and now you have to provide two staff from that

3    unit to the hospital.  So it's a living document throughout

4    the day.  By the end of the day it's a completed document.

5         Q.    Okay.  All right.  So, for example, for George

6    control, Charlie control, John control, there's no one

7    listed.  Does that mean that no one was staffing that post

8    on that shift that day?

9         A.    That is correct.  That means that if you go up

10   just a little bit -- so you'll see where you have somebody

11   in Ida control.

12        Q.    Yes.

13        A.    And they would actually be responsible for that

14   Ida control in the control room adjacent or across the hall

15   from him.  So if you toured SMU on our Browning, they both

16   look exactly the same.  And you have four clusters down a

17   run and those clusters are across the hall from one

18   another.  That control room also sits across the hall from

19   one another upstairs.  So as officers enter the pods within

20   Ida run, then Officer Wallace would take care of the

21   control room in Ida while those officers are in those pods.

22   There wouldn't be any officers in the pod across the hall

23   until he goes over and he allows officers in there so that

24   he can keep a visual of those officers.

25        Q.    Okay.  All right.

1      A.    Unfortunately, it's the world we live in

2   currently with our staffing levels.  It's really difficult

3   to staff these large units, and COVID was extremely

4   difficult on us.

5      Q.    Yeah.  What are the main tasks for a housing

6   unit control?  So, like, Henry control, Easy control, Ida

7   control, one of those officers.

8      A.    First and foremost, as I mentioned, they're

9   watching the officers down in the pods.  So they're making

10  sure that they're safe.  They are opening doors for those

11  officers as needed.  They also maintain the Correctional

12  Service Journal in those areas.  So they're documenting

13  everything that happens within those areas.

14     Q.    Okay.  Anything else that they're doing?

15     A.    They're reviewing cameras, as well, that may be

16  in those areas.  And then, of course, you can hear a lot of

17  what's going on up in those control rooms in the pods.

18            So as we mentioned earlier, if we have an

19  inmate screaming for help or somebody needs an emergency

20  assistance or whatever, they normally can hear that and

21  they're getting on their radio and they're calling floor

22  officers saying:  Hey, I have somebody in pod 1 that needs

23  a response, and they'll open the door to pod 1 to allow

24  the staff in.

25     Q.    Okay.  So one of the things that a control

216

1    officer is responsible for is listening to what's going

2    on, as well as watching, to determine if there's an

3    emergency going on?

4         A.    Yes, ma'am, and to document everything that's

5    going on within those clusters.

6         Q.    Okay.  And what are the main tasks of housing

7    unit floor officers like Dog floor, Henry floor, Easy

8    floor, Ida floor?

9         A.    So they are responsible for the health and

10   welfare checks and the security within those pods.  So

11   they're the officers that we mentioned earlier that are

12   responsible to do those walks in no more than those

13   59-minute time frames.

14              They will go through -- they're also

15   responsible for taking care of any deliveries to inmates

16   that need to happen such as mail or store.  They do

17   counts.  They're the responsible parties for going through

18   and ensuring that face-to-ID counts are taking place at

19   our designated count times.  And they're assisting the

20   inmates with whatever needs to be taken care of during

21   their shift.

22        Q.    How many designated count times are there

23   during the day, during the 24-hour period?

24        A.    We have one that starts at 0400; we've got one

25   at 1100; we've got one at 1600; we've got one at 2030; and

217

1  then we've got another one at 2300 hours.  So we've got

2  five formal counts.  And then throughout the night they

3  will do an informal count after that 2300 count is

4  completed and they will do informal counts every hour or as

5  needed and designated by the shift run.

6      Q.    Okay.  What are the job duties of a recreation

7  officer?

8      A.    Recreation officer is -- and it depends on

9  whether they're doing escorts for recreation or they're

10 actually out at the recreation fields, but they are in

11 charge of security for recreation and, like I said, doing

12 escorts, if needed.  But they're providing security in

13 those areas and they're also the ones that are logging

14 those times for the out-of-cell tracking for those inmates

15 as they leave their cells for recreation.

16            They're also responsible for counts while

17 they're out there.  So if there's a count going on they'd

18 be responsible for completing the out count for the

19 inmates and making sure that it is correct and the count

20 of the inmates out on the field is correct, and answering

21 any questions that the inmates might have while they're

22 out at recreation.

23     Q.    Okay.  What is a mental health/medical/programs

24 officer?

25     A.    Those are escorts.  So if we have inmates that

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

218

1   need to be seen by mental health, mental health staff will

2   coordinate with that officer to get the inmates up that get

3   seen by mental health.  Likewise, with medical.  Or if

4   there's a program class going on, they would be responsible

5   for escorting the inmates to the programs class and back to

6   their cell.

7        Q.    So would the floor officer essentially get the

8   people out of their cells and then sort of hand them off

9   to the mental health medical programs officer like at the

10  door to the pod?

11       A.    If there's good coordination between those two

12  officers then they could certainly do it that way, but you

13  really have to stay in continuous motion throughout those

14  pods as a floor officer to maintain those health and

15  welfare checks in a timely manner.

16            So especially if we're so short that you

17  have an officer that's responsible for both those

18  clusters, they are extremely busy doing health and welfare

19  checks and taking care of the things that need to be taken

20  care of:  The counts, the feeding, the delivery stuff.

21  They are extremely busy during the day.  So a task like

22  that, getting them ready for that escort, might not

23  happen, and it would be the sole responsibility of that

24  escort officer to take care of that.

25       Q.    Okay.  What is a DI 326 recreation escort/SMI

219

1   officer?

2       A.    So DI 326 is what was started when we began the

3   Parsons lawsuit.   They are responsible for the recreation

4   turnout.   They would be responsible for taking care of

5   out-of-cell tracking forms, that kind of stuff.

6       Q.    So how are they different from recreation

7   officers?

8       A.    I'm not exactly sure how Browning has them

9   designated.   So a DI 326 recreation escort and a recreation

10  escort officer would be different because you might have --

11  so, for instance, part of our schedule of getting guys out,

12  for example, from BMU, so they're going to have more time

13  out of cell because they are designated mental health SNY

14  inmates.   They might be responsible for those escorts,

15  whereas the other officer is responsible for just getting

16  everybody out that's required for recreation that day in

17  their area.

18      Q.    Okay.   And what is a yard officer and how is it

19  different from recreation officer?

20      A.    A yard officer is an individual that's in charge

21  of pretty much taking care of everything.   You're usually

22  putting one of your best officers in that spot.   They're

23  assisting the supervisors in getting daily tasks done,

24  making sure that count will set up with the count movement

25  officer, the escorts are taking place.   They're kind of the

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

220

1    coordinator of everything to ensure that everything is

2    getting done, and they're the lending hand if, for

3    instance, the officer needs to go down and get inmates out

4    of a cell and it's a double-bunked cell, that a yard

5    officer might assist so that they could be that second

6    officer when that cell door is open.  They're kind of a

7    do-it-all officer of everything that needs to get done that

8    day.  It's a very busy post.

9          Q.    Okay.  And what is a rover?

10         A.    A rover is responsible for just doing health and

11   welfare checks.  That's what they do.  So they'll be in a

12   designated area and all they do is continuous motion all

13   day long doing nothing but health and welfare checks on

14   inmates.

15         Q.    Okay.  And a watch pod officer, what is that?

16         A.    That's that officer I mentioned earlier that's

17   assigned to the watch pods.  So if you have one watch pod,

18   that officer is assigned to that area.  He takes care of

19   all of the 10- and 30-minute watches and takes care of the

20   [indistinct] on those observation logs.

21               If you've got three pods like they would at

22   SMU 1 -- I believe they have three mental health pods over

23   there -- that officer would be responsible for those three

24   pods.  So, again, very busy posts.  They're moving in and

25   out of there.

1            Continuous watches are taken care of by an

2    officer sitting on that cell, but the other watches would

3    be taken care of by that watch officer, and they're also

4    in charge of documenting everything on the Correctional

5    Service Journal.

6        Q.    Okay.  Would an officer doing the continuous

7    watch be included down in the special assignments area?

8        A.    He could.  Yes, ma'am.  Also, depending on how

9    short-staffed one unit is and if another unit is doing

10   really well -- for instance, I'll stick with Eyman.  So if

11   Eyman/Cook unit had to send an inmate on a mental health

12   watch, and they send him to SMU 1 to be placed in the watch

13   pod and SMU 1 is running really short that day, they could

14   potentially take an officer from Cook unit just to sit on

15   that continuous watch because it's a Cook unit inmate.  And

16   that happens every once in a while, depending on staffing

17   needs.

18       Q.    Okay.  Can you explain to me what the term

19   cross-leveling is?

20       A.    I can.  So if as staff come in and we find out

21   that we are short at -- I'll go with Florence complex --

22   and we're short at Central unit, in South unit at Florence

23   complex comes in one or two staff over their required

24   critical staffing needs, we can take those one or two

25   officers and place them at Central unit and it's considered

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

222

1    a cross level.  We've taken those staff in order to level

2    out our staffing across the complex to make sure that we're

3    as safe as possible at those units.

4        Q.    You just said critical staffing requirements.

5    Is there a way to tell from the daily post sheets which

6    staff are considered critical staffing requirements?

7        A.    Ma'am, we're so short-staffed at Florence and

8    Eyman right now they're all considered critical.

9        Q.    Okay.  Are all of the positions listed in this

10   column of required posts, are they all considered critical

11   required posts?

12       A.    So those are all of the posts within the unit.

13   The deputy warden, in consultation with the warden of the

14   complex, will designate which posts have to be filled, must

15   be filled every day.  And as I spoke about earlier, if you

16   have a control room right across the hall from another

17   control room, then one of those control room posts would be

18   considered critical because you have to be able to run both

19   of them.  Does that make sense?

20       Q.    Yes.

21       A.    So it's a designation based on your staffing on

22   which posts are critical and must be filled.

23       Q.    Is that included in any document anywhere?

24       A.    That is more than likely kept at the unit level

25   and probably at the warden's level just so they know

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

223

1   exactly what posts have to be filled.

2       Q.    What does it mean if a post is collapsed?

3       A.    As you see, the posts on the left that do not

4   have a staff member assigned to them -- so, for instance,

5   the first one, the north wing officer, that means that that

6   post has been collapsed for the day because there's no

7   staff member assigned to it.

8       Q.    Does that mean that someone else is supposed to

9   take on the tasks of that post?

10      A.    Unfortunately, yes, ma'am.  That's exactly what

11  that means.

12              (Exhibit 19 identified for the record.)

13      Q.    BY MS. MORRIS:  I'm going to go to the Eyman

14  priority post sheet, which is Isolation Exhibit 19.  Can

15  you tell me what this document is?

16      A.    This is their priority posting chart.  I don't

17  see where it says that, but I'm looking at it.  I'm pretty

18  sure that's exactly what this is.  This is developed by the

19  complex.  And what they do is they go down through

20  everybody's posts and they figure out which posts are

21  critical and which posts can be collapsed first.

22              So as we come in and we're short-staffed,

23  they will look at what cross levels need to be done, and

24  they'll look at that by collapsing the posts that you see

25  on the left right in a row.  So they'll start with Cook 1

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

224

1    C/D control and they'll say that that's the first post

2    that needs to be collapsed.  If we're short, what they'll

3    do is they'll take that individual and they'll send them

4    elsewhere.  If there's already nobody posted there they

5    will move down to the next one and so forth and so on.

6        Q.    Okay.  So the posts become more critical as you

7    go farther down the chart; is that accurate?

8        A.    It's actually reversed.  It's from the bottom

9    up.

10       Q.    Okay.  So you look at the bottom line 220 on

11   page 6 of --

12       A.    I just gave you inaccurate information.

13       Q.    That's okay.

14       A.    It's going to be from the top down, ma'am.

15       Q.    So the very first post that would be collapsed

16   would be the complex communications number 1?

17       A.    No, the other way.  It's going to be that CD we

18   talked about.  And the reason I say that is because, if you

19   look at the bottom of that, you'll see main controls.  Main

20   controls in a facility, they're last.

21       Q.    They're last, okay.

22       A.    So it's the last post that's going to be

23   collapsed.

24       Q.    Okay.  All right.  And so in the process of

25   figuring out where staff go, this is used to decide staff

1   from -- Cook is going to go over to Browning or Rynning or

2   something like that, right?

3        A.    That is correct.

4              (Exhibit 21 identified for the record.)

5        Q.    BY MS. MORRIS:  Now I'm going to show to you

6   the Lewis one which I find much more challenging.  So

7   we're looking at Exhibit 21.  All right.  So Lewis puts

8   all the different shifts on one page, as far as I can

9   tell.  So we go to the bottom of -- actually, can you tell

10  me what document 21 is?

11       A.    I haven't worked at Lewis.  I am assuming this

12  is their priority posting chart.  They've got it broken

13  down by shift and it looks like it goes from top to bottom

14  like the other ones and -- well, maybe not.  This is the

15  first I've seen this document, ma'am.  I apologize.

16       Q.    That's okay.  Like I said, I find this one a

17  more challenging document to look at than the Eyman one.

18              If we scroll down can you tell if it's

19  the -- you know what?  We'll ask the warden from Lewis to

20  walk me through that one.

21       A.    I would be more comfortable with that, ma'am.

22       Q.    Fair enough.  Do detention units have similar

23  priority posts, post sheets?

24       A.    They could.  So, for instance, you could -- I

25  know years back we used to have a control room officer that

1    was required and a floor officer required in detention, but

2    you would also have an additional two or three officers in

3    there, and that was if we were fully staffed, which in the

4    Florence/Eyman area it hasn't been that way in a very, very

5    long time.

6                    But those individuals, that fourth officer

7    and that third officer, would be potentially cross-leveled

8    out, if needed, and you would remain with the two floor

9    officers and the control room officer in that detention

10   area if that example kind of explains it a little bit.

11       Q.    Do detention units have mental health and

12   medical programs officers?

13       A.    No.   They would actually be those escorts that

14   you see on that posting chart.   So if an inmate in

15   detention needed to be seen by mental health, then

16   Officer Bennett would still be responsible for going into

17   detention and getting that particular inmate and taking him

18   to mental health.

19       Q.    So it would be someone from the same -- I'm

20   confused.   If, say, the detention unit at Eyman/Rynning,

21   what would be the post that would take a person from that

22   detention unit to medical or mental health?

23       A.    If you had two officers in detention one of

24   those officers could take them.   If you've only got the one

25   officer in detention, the officer has to remain in

1   detention.  So you have to find somebody else to do that

2   escort.  If you have a designated escort officer, they

3   would take care of that escort.  If they are short-staffed

4   and do not have an escort officer, you could look at the

5   yard officer taking care of that or you could look at a

6   sergeant or a lieutenant doing that escort, depending on

7   how short-staffed you are.

8        Q.    Okay.  Are detention units supposed to have

9   escort officers?

10       A.    I've never seen escort officers in detention.

11  Normally, they're designated within the unit and the unit

12  just takes care of the detention area, unless, of course,

13  like I said, that you're well staffed and you have a couple

14  of staff in detention.  Because if you've only got one

15  staff on the floor in detention you can't take that officer

16  out of detention because they have to continually do the

17  health and welfare checks.  So it would have to be another

18  staff member that would do that escort.

19       Q.    And it would be the control officer that would

20  call the other staff person from somewhere else?

21       A.    Yes.

22       Q.    Assuming that there's someone available

23  somewhere else?

24       A.    Correct.  There's always going to be somebody

25  that can take care of it.  Like I said, you may have to get

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

228

1    a supervisor in there.  I know being short-staffed, if you

2    have to have a captain or an associate deputy warden do

3    that escort, then it gets taken care of because that's a

4    priority.  It's a medical need of that inmate.  So we're

5    going to get him escorted over to medical and get it taken

6    care of.

7         Q.    Okay.  For each mental health watch unit what

8    are the posts?

9         A.    Mental health watch -- like the mental health

10   areas, the pods?

11        Q.    Yeah.

12        A.    As I described earlier, you'd have an officer

13   assigned to the pod.  So they would be responsible for

14   taking care of those 10-minute, 30-minute watches, taking

15   care of the observation logs, taking care of the journal

16   within that pod or multiple pods.  That would be their

17   responsibility:  Doing the health and welfare checks,

18   making sure all the checks are done on the particular

19   watches, making sure the [indistinct] is completed, making

20   sure that the inmates are getting what they're supposed to

21   get according to the watch order.

22        Q.    If someone in a watch pod has an order that

23   says they can go to recreation, who would take them to

24   recreation?

25        A.    That recreation officer we just spoke about a

229

1    little bit ago.

2        Q.    Would there be a recreation officer assigned to

3    a watch pod?

4        A.    No, there wouldn't.  That would have to be

5    coordinated with the staff you have available.  Some pods

6    have a [indistinct] area at the end of the pod in SMU 1 in

7    Browning and at Rast, as well.  Some of them do not.  So

8    you may have to utilize a recreation area at the end of a

9    pod and another pod, if need be.  But if the order is for

10   recreation, then we find an escort to get the inmate to

11   recreation.

12       Q.    Okay.  I'm going to go to topic 15, which is

13   policies and procedures regarding the use of force or

14   restraints by ADCRR staff on incarcerated people on mental

15   health watch or incarcerated people classified as SMI MH-3

16   through MH-5 or any other mental health classification

17   employed by the ADCRR or Centurion while housed in

18   isolation.

19             Are there any policies regarding the use of

20   force on prisoners who are classified as SMI housed in

21   isolation?

22       A.    Yes, there are.

23       Q.    What policies are those?

24       A.    Our use of force policy.  And I don't remember

25   the number.  I apologize.

1     Q.    That's okay.  I am going to bring it up if I
2  can.  Too many policies.  Okay.  I'm sharing the screen.
3            Do you know -- so if we go to Section 4 on
4  the use of force in policy 804 there is Section 4.1.3.1
5  which talks about a cool-down period for people designated
6  as SMI, right?
7     A.    Yes, ma'am.
8     Q.    Okay.  This applies only to the use of force on
9  a person with SMI in max custody, correct?
10    A.    It does.  However, we've implemented department-
11  wide -- there's a directive that came down that we will
12  treat all maximum custody inmates the same so that there's
13  no foul-ups by staff as far as whether they're SMI or not,
14  and we'll provide a cool-down period if we're going to
15  utilize force -- planned use of force on a maximum custody
16  inmate.
17    Q.    Has that been turned into a policy?
18    A.    I don't believe it has.  That was a verbal
19  direction that came down.  I can't remember if it was from
20  the assistant director at the time.  It's been a while.
21    Q.    Can you estimate how long it's been?
22    A.    I want to say that that was when we had a
23  different assistant director at the time.  I believe it was
24  division director at the time, Carson McWilliams.
25    Q.    So how long ago are you talking about?

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

231

1      A.    It was probably about three years ago maybe,
2   three or four years ago.
3      Q.    Is that right?  It's about three years ago, you
4   think?
5      A.    Somewhere around there, yes, ma'am.
6      Q.    But that has not, in three years since then,
7   been reduced to any kind of written policy?
8      A.    Not that I'm aware of, ma'am.  The cool-down
9   period in the policy is the one right here in front of us,
10   number 804.
11      Q.    And this cool-down policy applies for the use
12   of chemical agents, right?
13      A.    Correct, on a planned use of force.  Yes, ma'am.
14      Q.    Okay.  It doesn't apply to other types of uses
15   of force, does it?
16      A.    So a spontaneous use of force it would not.  We
17   would not have the time to do that.
18      Q.    Okay.  Are there planned uses of force that are
19   not chemical agents?
20      A.    Yeah.  You could have a planned use of force
21   where there is a force cell team, yes.  A cool-down period
22   would be implemented for that, as well.
23      Q.    And do you know if that's in policy anywhere?
24      A.    In our use-of-force policy right here it talks
25   about our use-of-force continuum and how we could enter

232

1  that continuum at any point based on how we feel that

2  situation needs to be take care of.  So it is within that

3  policy in 804.

4      Q.    Okay.  But the cool-down period, is that

5  referenced in any other -- like, if you look at Section

6  4.1.3.1 where it talks about the cool-down period, it says

7  it's offering a cool-down prior to the use of force

8  involving the use of oleoresin capsicum.

9              So does the cool-down period policy apply

10  to other types of uses of force?

11      A.    It is not written in this policy, but I can tell

12  you from experience at cell block Kasson with the mental

13  health inmates, if we have an inmate that mental health has

14  deemed not appropriate to utilize chemical agents and we

15  have to use a force cell team to remove that inmate from

16  the cell, that inmate is going to be afforded a cool-down

17  period so that we can attempt to negotiate him out of that

18  cell without going in after him.

19      Q.    But that's not in the policy?

20      A.    No, ma'am, it's not.  That's just sound

21  correctional judgment.

22      Q.    Okay.  Are there any policies regarding the use

23  of force on people who are designated as MH-3 in

24  isolation?

25      A.    Yes, there is.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

233

1      Q.     Where, or what policy?

2      A.     I believe it's within this 804 policy.  And it

3   may be specific to Taser use taken on that mental health 3.

4   It might be mental health 4 that we're talking about.  I

5   apologize.

6      Q.     So 4.2.1.3.3, CEWs, which are Tasers, correct,

7   CEWs?

8      A.     Yes, ma'am.  It's a mental health 4.  I

9   apologize.

10     Q.     Just to be clear, a CEW is essentially a Taser,

11  correct?

12     A.     Yes, ma'am.  It's a conductive electrical

13  weapon, which would be a Taser.  Yes, ma'am.

14     Q.     Okay.  And they are not to be used on people

15  with a mental health score of 4 or above or on any female

16  inmate within the perimeter of a unit without

17  authorization from the deputy warden; is that correct?

18     A.     That's correct.  That's correct.

19     Q.     Are there any other policies that relate to use

20  of force on prisoners who are designated as MH-3?

21     A.     Not that I'm aware of, no, ma'am.

22     Q.     Are there any other policies relating to the

23  use of force on prisoners designated as MH-4, besides this

24  one that we just looked at?

25     A.     Not that I'm aware of, ma'am, no.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

234

1      Q.    Are there any policies, besides the one that we

2  just looked at, regarding the use of force on prisoners

3  who are designated as MH-5?

4      A.    Not that I'm aware of.  No, ma'am.

5      Q.    Are there any policies and procedures relating

6  to the use of force on prisoners who are on mental health

7  watch?

8      A.    Not that I'm aware of.  No, ma'am.

9      Q.    Are there any policies that allow for the use

10  of chemical agents on a person who's self-harming?

11      A.    I am not sure about that, ma'am.

12      Q.    Are there any policies on the use of restraints

13  on a person with an SMI in isolation?

14           MS. LOVE:  Form and foundation.

15           THE WITNESS:  I'm not sure about that one,

16  as well, ma'am.

17      Q.    BY MS. MORRIS:  Okay.  Are there any policies

18  regarding the use of restraints on persons designated as

19  MH-3 when they're in isolation?

20      A.    Not that I'm aware of, ma'am.

21           MS. LOVE:  Form and foundation on that one,

22  belated.

23      Q.    BY MS. MORRIS:  Are there any policies on the

24  use of restraints on persons designated as MH-4 when

25  they're in isolation?

235

1        MS. LOVE:  Same objection.

2        THE WITNESS:  Not that I'm aware of, ma'am.

3    Q.   BY MS. MORRIS:  Are there any policies on the

4 use of restraints on persons designated as MH-5 when

5 they're in isolation?

6        MS. LOVE:  Same objection.

7        THE WITNESS:  Not that I'm aware of, ma'am.

8    Q.   BY MS. MORRIS:  Are there any policies on the

9 use restraints on persons on mental health watch?

10        MS. LOVE:  Same objection.

11        THE WITNESS:  Not that I'm aware of, ma'am.

12        MS. MORRIS:  Okay.  I'm done.

13        MS. LOVE:  Okay.  I just have one quick

14 follow-up just to clarify.

15

16                  EXAMINATION

17 BY MS. LOVE:

18    Q.   When you were asked questions regarding whether

19 there were any policies dictating use of chemical agent,

20 use of force on inmates who are on mental health watch,

21 and just in reviewing DO 804, I wanted to direct your

22 attention to section 5 and see if that refreshes your

23 recollection as to whether or not there is a provision in

24 the policy as related to the use of chemical agents and a

25 cool-down period on inmates who are in designated mental

237

1                        SIGNATURE PAGE

2              I, WARDEN JEFFREY VAN WINKLE), a deponent
   exercising my right to read and sign my deposition taken
3  on September 24, 2021, place my signature hereon and make
   the following changes on this ____ day of _____,
4  2021.

5              (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

                   _____
7                  WARDEN JEFFREY VAN WINKLE

8  PAGE    LINE    READS              CHANGE TO         REASON

9  _____   _____   _____   _____   _____

10 _____   _____   _____   _____   _____

11 _____   _____   _____   _____   _____

12 _____   _____   _____   _____   _____

13 _____   _____   _____   _____   _____

14 _____   _____   _____   _____   _____

15 _____   _____   _____   _____   _____

16 _____   _____   _____   _____   _____

17 _____   _____   _____   _____   _____

18 _____   _____   _____   _____   _____

19 _____   _____   _____   _____   _____

20 _____   _____   _____   _____   _____

21 _____   _____   _____   _____   _____

22 _____   _____   _____   _____   _____

23 _____   _____   _____   _____   _____

24 _____   _____   _____   _____   _____

25 _____   _____   _____   _____   _____

238

1    STATE OF ARIZONA      )
                           )
2    COUNTY OF MARICOPA    )

3          BE IT KNOWN that I took the foregoing deposition
     pursuant to Notice; that the witness was duly sworn by
4    me; and that said transcript is a full, true, and
     accurate record of the proceedings; that the proceedings
5    were taken down by me in shorthand and thereafter reduced
     to print under my direction; that I have acted in
6    compliance with ACJA 7-206.

7          I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in the
8    outcome hereof.

9          Pursuant to request, notification was provided
     that the deposition is available for review and
10   signature.

11         Dated this 8th day of October, 2021.

12                          _Janet Hauck_

13

14                          _____
                            Janet Hauck, RPR
                            Certified Reporter
15                          Arizona CR No. 50522

16

17         I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
     has complied with the ethical obligations set forth in
18   ACJA 7-206.

19

20

21

22   _Lisa L. Glennie_

23   _____
     GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
24   Arizona RRF No. R1035

25

# EXHIBIT 16

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br> vs. <br><br> David Shinn, Director, Arizona Department of Corrections, Rehabilitation and Reentry; and Larry Gann, Assistant Director, Medical Services Contract Monitoring Bureau, Arizona Department of Corrections, Rehabilitation and Reentry, in their official capacities, <br><br> Defendants. | ) <br> ) No. <br> ) CV 12-00601-PHX-ROS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
(via videoconference)

October 28, 2021
9:00 a.m.
Houston, Texas

Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona 85020-5130

Prepared by:
602.266.6535                Jennifer Honn, RPR
www.glennie-reporting.com   Arizona CR No. 50885

2

1                              I N D E X

2    WITNESS                                              PAGE

3    JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ

4         Examination by Mr. Fathi                         4

5

6

7

8                         INDEX TO EXHIBITS

9    Description                                          Page

10   Exhibit 1    Expert Report of John S. Wilson, PhD,    18
                  CCHP-MH, CPHQ
11                (13 pages)

12   Exhibit 2    ADCRR Inmate Assault, Self-Harm, &       64
                  Mortality Data
13                FY 2022 as of 9/30/2021
                  (4 pages)
14
     Exhibit 3    E-mail from Tom Dolan                    135
15                1/14/2020
                  Subject: Contract FTE v Recommended FTE
16                ADCRR00111128 -111131
                  (14 pages)
17
     Exhibit 4    (Not marked.)
18   Exhibit 5    (Not marked.)
     Exhibit 6    (Not marked.)
19
     Exhibit 7    Excerpt: Deposition of Stefanie         137
20                Platt, PsyG
                  (7 pages)
21
     Exhibit 8    Defendants' Third Supplemental Pretrial  116
22                Disclosure Statement

23   Exhibit 9    Mortality Review Committee Final Report   90
                  ADCRRM0026203 -26206
24
     Exhibit 10   Mortality Review Committee Final Report   96
25                ADCRR00000106 -109

 1      DEPOSITION OF JOHN SEDDON WILSON, PhD, CCHP-MH, CPHQ
                      (via videoconference)
 2

 3            The deposition of JOHN SEDDON WILSON, PhD,

 4   CCHP-MH, CPHQ was taken on October 28, 2021, commencing

 5   at 9:00 a.m., via videoconference, the witness appearing

 6   in Houston, Texas, before JENNIFER HONN, a Certified

 7   Reporter, Certificate No. 50885, for the State of

 8   Arizona.

 9   APPEARANCES:

10   For Deponent:

11        BROENING OBERG WOODS & WILSON
          Sarah L. Barnes, Esq.
12        2800 North Central Avenue
          Suite 1600
13        Phoenix, Arizona 85004
          Slb@bowwlaw.com
14
     For Plaintiffs:
15
          ACLU NATIONAL PRISON PROJECT
16
          David C. Fathi, Esq.
17        915 15th Street N.W., 7th Floor
          Washington, D.C. 20005
18        Dfathi@aclu.org

19        Corene Kendrick, Esq.
          39 Drumm Street
20        San Francisco, California 94111
          Ckendrick@aclu.org
21
     For Defendant:
22
          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
23        Ashlee B. Hesman, Esq.
          3100 West Ray Road
24        Suite 300
          Chandler, Arizona 85226
25        Ahesman@strucklove.com

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

24

1    A.    I have an additional paper that's under review

2  with colleagues that continues the work on suicide

3  prevention.  And that has been submitted and it's under

4  review.

5         And then there is a final paper that's in

6  preparation on the same topic.

7    Q.    Any other publications that you currently have

8  in process?

9    A.    No, sir.

10    Q.    Of the seven publications listed on your C.V.,

11  how many were published in peer-reviewed journals?

12    A.    Four.

13    Q.    And which ones are those?

14    A.    They are Boren, Folk, et al.

15    Q.    Okay.

16    A.    Disabato, Folk, et al.; Folk, Disabato, et al.,

17  and Folk, Loya, et al.

18    Q.    Okay.  According to your resume you have been

19  vice president of behavioral health services for

20  Centurion since 2020.  Is that correct?

21    A.    Yes.

22    Q.    And what month did you start that position?

23    A.    April.

24    Q.    April of 2020?

25    A.    Yes.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

25

1      Q.   And before that you were vice president of

2  clinical development from 2014 to 2020.  Is that right?

3      A.   Yes.

4      Q.   In that position, did you have any involvement

5  with the Arizona contract?

6      A.   I helped develop Centurion's proposals for two

7  cycles of RFP.

8      Q.  I'm sorry.  Just a minute, Doctor.  I'm hearing

9  some extraneous noise.  Do we know what that is?

10     A.  I heard it, too.

11         MS. BARNES:  I'm not sure what you heard.

12  I didn't hear anything.  There's somebody that's a little

13  bit loud outside my office.  Do you hear talking?

14         THE WITNESS:  Yes.

15         MS. BARNES:  Hold on one second.

16         Yet another Zoom going on next door.

17  Sorry.  The world of Zoom.

18         MR. FATHI:  Thank you.

19      Q.   (By Mr. Fathi) Doctor, just so the record is

20  clear, I'm going to re-ask my question.  As VP of

21  clinical development, did you have any involvement with

22  the Arizona contract?

23      A.   Yes.

24      Q.   And what was that involvement?

25      A.   I helped develop the proposals that Centurion

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

26

1   submitted in response to two requests for proposals from

2   the Department of Corrections.

3        Q.   And when -- when were those proposals submitted?

4        A.   I would have to refresh my memory by looking at

5   documents.   But to the best of my -- sitting here today,

6   2016, 2018.

7        Q.   And was the 2018 proposal the one that led to

8   Centurion beginning the contract on July 1, 2019?

9        A.   Yes.

10       Q.   What was your role in developing that proposal?

11       A.   I assisted with technical language to address

12   the clinical requirements that were laid out in the

13   requests for proposals.

14            Is that a clear answer?

15       Q.   Yes.   Was there anything else?

16       A.   My recollection is that with the first proposal

17   that was not successful, I had involvement with staffing

18   proposal considerations.

19       Q.   Thank you.  Did you have any involvement with

20   staffing considerations in the 2018 or 2019 proposal?

21       A.   Again, I would have -- have to refresh my memory

22   by looking at documents, but my memory is that the 2018

23   or '19 RFP may have laid out for us what staffing needed

24   to be provided.

25            The DOC may have actually mandated that.  And if

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

27

1    that memory's correct, and I -- I can't be sure, then any

2    discussions that I had around Centurion staffing would

3    have been limited to the implications of that mandated

4    staffing for clinical care and considerations for a

5    regional office leadership staffing.

6         Q.   Do you have any recollection of those

7    discussions as you sit here today?

8         A.   I'm fairly confident they had discussions around

9    the regional office staffing.  There may have been a

10   number of positions that were considered or felt to be

11   needed and added.  But I don't have specific memories.

12        Q.   And who were those discussions with?

13        A.   They would have been with senior members of our

14   operations team and our business development team.

15        Q.   And what are the names of those people?

16        A.   Rebecca Leuthy.  Do you want me to spell?

17        Q.   I think the court reporter would appreciate it.

18        A.   L-e-u-t-h-y.  Robert May.  Rock Welch.  Julie

19   Buehler, spelled B-e-u-h-l-e-r.

20             And there may have been other participants in

21   those discussions, but those would have been the four key

22   folks.

23        Q.   Was Steve Wheeler involved?

24             MS. BARNES:  Form and foundation.

25             THE WITNESS:  Your question is was Steve

28

1    Wheeler involved in discussions around staffing the

2    regional office?

3         Q.    (By Mr. Fathi) Correct.

4              MS. BARNES:   Same objection.

5              THE WITNESS:   I apologize.   I don't have a

6    memory one way or the other.   It is possible.

7         Q.    (By Mr. Fathi) And tell me about the substance

8    of these discussions around staffing a regional office?

9         A.    I wish I could.   I apologize.   My -- my

10   challenge is that during that time period, I had multiple

11   discussions about multiple projects.   And it is very

12   difficult three years later to recall specifics about a

13   specific proposal.

14            I believe the gist in Arizona had to do with

15   ensuring that we had enough regional resources to manage

16   the complex requirements of the contract.

17            And specifically around the contract monitoring

18   that was required with the hundreds of performance

19   measures.   The -- I think there may have been questions

20   around information, there we go, information technology

21   and the need for interfaces that enabled automated

22   reporting to occur.

23            And just adequate oversight management of

24   service delivery in complexes.

25            So I am reconstructing all of that based on

1   probabilities.   I don't have specific memory of specific
2   content.
3        Q.    Other than what we've discussed, did you have
4   any role in discussions around staffing for the 2018
5   Arizona proposal?
6        A.    Not that I can recall.
7        Q.    Does your current position as VP of behavioral
8   health involve providing direct patient care to
9   incarcerated people?
10       A.    No.
11       Q.    Does your current position involve reviewing the
12  healthcare records of incarcerated people?
13       A.    To a limited degree.
14       Q.    Tell me about how your current position involves
15  reviewing the healthcare records of incarcerated people.
16       A.    There are two ways in which it may.
17             One is if I'm called upon to participate in a
18  quality review process potentially for examining our
19  readiness for NCCHC accreditation or adherence to
20  national standards.
21             And the other is if I'm called to assist in
22  providing patient-specific consultation for a difficult,
23  challenging patient where staff are scratching their
24  heads and don't -- don't know how to make further
25  progress with a patient.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

30

1      Q.    When was the last time you reviewed the medical
2   record of a person incarcerated in Arizona?
3      A.    May I consult my report?
4      Q.    Of course.
5      A.    After reviewing my report, I believe the last
6   time that I reviewed patient care records in Arizona was
7   earlier this year, as part of a team that was preparing
8   the Yuma complex for NCCHC accreditation.
9            I would have to review my calendar to give you a
10  month or a date.
11     Q.    Can you give me a season?  Winter, spring?
12     A.    The spring.
13     Q.    So perhaps March, April?
14     A.    Yeah.
15     Q.    So I take it you have not reviewed any Arizona
16  patient records in connection with this litigation?
17     A.    I have not.
18     Q.    Did your -- I'm sorry.  About how many hours in
19  an average week would you say you spend reviewing Arizona
20  patient records?
21     A.    I think the average would be zero.
22     Q.    Did your prior position at Centurion as VP of
23  clinical development involve providing direct patient
24  care to incarcerated people?
25     A.    It did not.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

31

1     Q.    Did it involve the review of medical records of
2  incarcerated people?
3     A.    Yes.
4     Q.    And please tell me about that.
5     A.    It was, again, occasional.  And either involved
6  quality improvement reviews, accreditation readiness.  Or
7  very rarely, but occasionally, once a year or so,
8  consultation of patient-specific treatment concerns.
9     Q.    Doctor, when was the last time you had a job
10  that involved providing correct -- excuse me -- direct
11  patient care?
12     A.    2006.
13     Q.    And was that when you were at Southwestern
14  Virginia Mental Health Institute?
15     A.    It was.
16     Q.    Have you ever had a job that involved on a
17  routine basis providing direct patient care to
18  incarcerated people?
19     A.    I have.
20     Q.    And when was that?
21     A.    That was at Central New York Psychiatric Center,
22  which is a state hospital operated by the Office of
23  Mental Health, but it only treats incarcerated patients.
24     Q.    And what time period was that?
25     A.    Approximately 2002, 2004.  I'll have to look at

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

1     that.

2          Q.   And since that position, have you had a job that

3     involved on a regular basis providing direct patient care

4     to incarcerated people?

5          A.   No.   Primarily I've been working

6     administratively.

7          Q.   Doctor, in what city and state do you reside?

8          A.   I reside in Houston, Texas.

9          Q.   And in what city and state is your office?

10         A.   Our corporate office is in Vienna, Virginia.   I

11    work from home.

12         Q.   I see.   As do many of us right now.   So you work

13    from your home in Houston?

14         A.   I do.

15         Q.   When was the last time you were inside an

16    Arizona prison?

17         A.   It was either March 2021 when I helped provide

18    consultation and training at Florence and Tucson, or a

19    little later at Yuma with the NCCHC survey prep review.

20         Q.   Okay.   So just so I understand, your testimony

21    is that you were at -- you were inside the Florence

22    and -- I'm sorry, which --

23         A.   Tucson.

24         Q.   And Tucson prisons in March of 2021.   And also

25    inside the Yuma prison possibly a little bit later than

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

33

1    that?

2         A.    Either earlier or later, but it was 2021.

3         Q.    Okay.

4         A.    First half.

5         Q.    About the same time?

6         A.    Yeah.

7         Q.    Okay.   When was the last time you were

8    physically in the state of Arizona?

9         A.    For work?

10        Q.    For -- yes, let's start with that.

11        A.    It would have been on one of those visits that I

12   just indicated.

13        Q.    Okay.   Are you the direct supervisor of any

14   Centurion employees who work in Arizona?

15        A.    No.

16        Q.    In an average week about how much of your time

17   do you spend on the Arizona contract?

18        A.    I'd like to answer that differently.

19        Q.    All right.

20        A.    Because asking for an average washes out the

21   variability, which can be very substantial.

22              Some weeks I spend no time at all with my

23   attention on Arizona.   And there have been other weeks

24   when most of my time, 90 percent has been focused on

25   Arizona.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

34

1      So most weeks in the last year I have not been

2  focused on Arizona.

3    Q.  Since let's say the middle of July of this year,

4  give me an average, or, if you prefer, give me a range of

5  how much time per week you spent on the Arizona contract.

6        MS. BARNES:  Form.

7        THE WITNESS:  Perhaps one.

8    Q.  (By Mr. Fathi) I'm sorry, say again, please.

9    A.  I'm sorry.  Perhaps one to two hours a week on

10  average.

11    Q.  And you say on page 1 of your report that -- I'm

12  sorry.  Why don't we bring it up so everyone can see.

13      So, Doctor, on page 1 of your report in the

14  penultimate paragraph you say that, "Centurion has

15  correctional healthcare programs in 13 state correction

16  systems and four county detention systems across the

17  United States."

18      Is that correct?

19    A.  It's 13 or 14, yeah.  It is correct.

20    Q.  And according to your report, you are

21  responsible for providing clinical consultation, guidance

22  and leadership across all of those programs; correct?

23    A.  Yes.

24    Q.  While we're here let's go up to the previous

25  paragraph.  And in the final sentence of that paragraph,

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

35

1  you say, "I have not been compensated for the preparation

2  of this report other than my regular salary."

3          Do you see that, Doctor?

4     A.   I do see that.

5     Q.   And that is correct?

6     A.   Absolutely correct.

7     Q.   Has Centurion been compensated in any way for

8  this report or for your work in connection with this

9  case?

10          MS. BARNES:  Form and foundation.

11          MS. HESMAN:  Form.  Foundation.

12          THE WITNESS:  Not to my knowledge.

13     Q.   (By Mr. Fathi) Okay.  Have you ever personally

14  spoken to an incarcerated person in Arizona?

15     A.   Yes.

16     Q.   When was the last time that happened?

17     A.   It would have either been at Tucson or Yuma.

18     Q.   So in March of 2021?

19     A.   Yes.

20     Q.   And when was the last time before that that you

21  personally spoke to a person incarcerated in Arizona?

22     A.   There was not a prior time.

23     Q.   So that was the only time?

24     A.   Yes.

25     Q.   Okay.  So as we've discussed, Doctor, Exhibit 1

40

1   discussions outside of counsel in preparing the report.

2   I may have alerted Dr. Wu on my progress on my report,

3   but --

4       Q.   (By Mr. Fathi) But what?

5       A.   That would have been in passing, and -- approach

6   wasn't discussed.

7       Q.   Would Janine's last name be Gahris, G-a-h-r-i-s?

8       A.   Yes.  It would.

9       Q.   Okay.  Doctor, let me go back to a topic we

10  discussed a moment ago.  You testified that you were in

11  Arizona prisons in approximately March and April of this

12  year; is that right?

13      A.   Yes.

14      Q.   Were those the only times you've ever been

15  inside an Arizona prison?

16      A.   No.

17      Q.   When was the last time before March or April of

18  this year that you were in an Arizona prison?

19      A.   As part of the -- I'm going to say 2016

20  procurement cycle, I toured all of them, all the corridor

21  complexes.

22      Q.   Any other time you've ever been inside an

23  Arizona prison?

24      A.   Not to my recollection.

25      Q.   Okay.  Let's look at page 2 of your report,

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

41

1    please.

2              Doctor, on page 2 of your report, in the

3    penultimate paragraph, four lines down you refer to,

4    "In-cell self-study programming for incarcerated

5    patients."

6              Do you see that language?  I'm sorry?

7         A.   I do.

8         Q.   All right.  Is it your testimony that this

9    constitutes mental health treatment?

10                  MS. HESMAN:  Form.  Foundation.

11                  THE WITNESS:  It is a component of mental

12   health treatment.  It certainly does not constitute the

13   entire spectrum of mental health treatment.

14        Q.   (By Mr. Fathi) All right.  And in the final

15   paragraph on -- starting on the first line, you refer to,

16   "Written patient" -- "Written patient education

17   handouts."

18              Do you see that language, Doctor?

19        A.   I do.

20        Q.   Is it your testimony that written patient

21   education handouts constitute mental health treatment?

22        A.   I would have the same answer in that it's a

23   component.  And I'd like to elaborate if I may.

24        Q.   Please.

25        A.   It's not a substitute for face-to-face

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

42

1    encounters.   There are many incarcerated individuals who
2    need education and pointers on managing stress.   They may
3    not have a psychiatric disorder.
4           So these patient education handouts are intended
5    to be appropriate for general population patients --
6    inmates as well as patients who are receiving ongoing
7    care and might need or want a little extra
8    psycho-education --
9        Q.    All right.
10       A.    -- supplement.   Not -- not core.
11       Q.    Okay.   At the top of page 3, in the paragraph
12   numbered 1, you write, "During 2020, our behavioral
13   health leadership in Arizona began to recognize
14   challenges in the use of clinical restraints, and in
15   particular the need for psychiatric providers to engage
16   in enhanced scrutiny and management of restraint
17   practices."
18           Do you see that language, Doctor?
19       A.    I do.
20       Q.    Who is the behavioral health leadership you're
21   referring to?
22       A.    Dr. Anthony Carr, who was -- is the statewide
23   psychiatric director.   And Dr. Stefanie Platt, who is the
24   former behavioral health director state-wide for
25   Centurion in Arizona.

43

1    Q.   And why was there a need for psychiatric
2  providers to engage in enhanced scrutiny and management
3  of restraint practices?
4    A.   In Arizona, unlike any other DOCs that I'm
5  familiar with, the department had promulgated a policy
6  that permitted psychologists to take -- order people in
7  and order people out of clinical restraints.
8         And Dr. Carr, Dr. Platt, and myself, were
9  concerned that because the -- because use of restraints
10  carries with it significant medical risks up to and
11  including mortality, inadvertent death, it was not
12  appropriate for professionals who are not medically
13  trained to be making those decisions about placing
14  patients in or taking them out of clinical restraints.
15         We all agreed that psychiatric providers needed
16  to be involved in these cases.
17    Q.   Under the policy or practice that you're
18  describing, was there anyone else besides psychologists
19  who could put people in or take people out of restraints?
20    A.   Yes.  And I need to clarify my language, and I
21  apologize for that.
22         So the placement of somebody in clinical
23  restraints, the physical placement, typically is done by
24  correctional officers.
25         And it is possible to place somebody in clinical

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

45

1      Q.   And what was the impetus for reviewing these

2   restraint policies and practices?

3      A.   It was -- it was twofold.

4           I was very surprised to learn of this because

5   it's -- it's unusual.  And once -- once I learned of it,

6   and it really was Dr. Platt and Carr reaching out and

7   consulting, they were concerned that restraints might be

8   overused, and that patients might be maintained in

9   clinical restraints not only too frequently, but too

10   long, for too long of a duration.  So that was one

11   concern.

12           We want to use clinical restraints as a last

13   resort, very rarely, only when necessary and all other

14   alternatives have been determined to be ineffective or

15   not feasible.

16           And then the other is that we really wanted our

17   restraint practice to meet the community standards, in

18   particular the Arizona Department of Health Services

19   standards and the Arizona code.

20           So we had to bring our practice in alignment

21   with community standards, and we also wanted to decrease

22   the use of restraints.

23      Q.   Were there any adverse patient outcomes as a

24   result of this practice and policy?

25               MS. HESMAN:   Form.   Foundation.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

46

1          THE WITNESS:  I don't know the answer to

2    that.  I asked that same question and was informed that

3    there were near misses.  To my knowledge there have been

4    no deaths or serious medical injuries while in

5    restraints, but my knowledge is limited.

6          That was our concern, however.  We wanted

7    to avoid adverse outcomes.  We wanted to avoid

8    unnecessary uses of force.  We wanted to avoid intrusive,

9    restrictive interventions if we could avoid them.  We

10   wanted to preserve patient dignity and autonomy.

11   Q.   (By Mr. Fathi) Tell me about the near misses.

12   A.   I can't.

13          MS. BARNES:  Form and foundation.

14          THE WITNESS:  I didn't get details.

15   Q.   (By Mr. Fathi) At any point was the length of

16   time that people spent in restraints tracked?

17          MS. HESMAN:  Form.  Foundation.

18          THE WITNESS:  I do not know the answer to

19   that.

20   Q.   (By Mr. Fathi) At any time, was there a review

21   of who was ordering restraints to see if certain

22   practitioners were overusing them?

23          MS. HESMAN:  Form.  Foundation.

24          THE WITNESS:  I can answer definitively not

25   by me.  Whether Dr. Carr and Dr. Platt reviewed

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

47

1      individual instances or patterns of instances and had

2      consultations with professionals, I can't answer.

3          Q.    (By Mr. Fathi) But you, yourself, didn't request

4      that information?

5          A.    Correct.

6          Q.    Now, a little bit further down in the same

7      paragraph you wrote --

8          A.    Oh, I'm sorry, that's not correct.  During the

9      course of preparing for -- preparing this report, I did

10     request that data.  And I was told that they don't have

11     it.

12         Q.    Okay.  But your preparation of this report in

13     October of this year was the first time you had requested

14     that data?

15         A.    That's correct.

16         Q.    And from whom did you request that data?

17         A.    From Janine.

18         Q.    So back to page 3 of your report, Doctor, the

19     paragraph numbered 1, about the middle of the page you

20     write that, "Clinical operations reviewed current

21     practices and policies within the state of Arizona,

22     compared these with Arizona State Code and Arizona

23     Department of Health Services requirements, federal

24     requirements, and national standards in the community."

25              Do you see that language, Doctor?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

48

1    A.    I do.

2    Q.    Was the use of restraints in the Arizona

3  Department of Corrections in the time period that you

4  were talking about, 2020, compliant with the Arizona

5  State Code?

6              MS. HESMAN:   Form.   Foundation.

7              THE WITNESS:   No.

8    Q.    (By Mr. Fathi) I'm sorry.   What was your answer?

9    A.    No.

10    Q.    In what way was it not compliant?

11    A.    My recollection is that the Arizona State Code

12  required reviews at a certain time interval or cadence

13  which I believe was two hours.   And the Department's

14  technical manual permitted a longer time period between

15  patient reviews.

16         And I also believe that -- I'm not certain of

17  this, but I also believe that the use of psychologists

18  for the authorization of the order and discontinuation of

19  the order was not consistent with Arizona State Code.

20  I'm not certain of that, but those are the two

21  independent memories I have right now.

22    Q.    Was the use of restraints in the Arizona

23  Department of Corrections consistent with Arizona

24  Department of Health Services requirements?

25              MS. HESMAN:   Form and foundation.

1          MS. BARNES:  Form and foundation.

2          THE WITNESS:  To my knowledge, yes.  Again,

3    as I've already indicated, I didn't specifically review

4    restraint episodes, patient health records, or the

5    duration of restraints for purposes of this project.

6      Q.   (By Mr. Fathi) Was the use of restraints in the

7    Arizona Department of Corrections in this time period

8    consistent with federal requirements?

9          MS. HESMAN:  Form.  Foundation.

10         THE WITNESS:  I would have to review to

11   answer that question.

12     Q.   (By Mr. Fathi) What would you need to review?

13     A.   I'd need to go back and review the federal CMS

14   requirements and compare them to the technical manual and

15   see how they line up.

16     Q.   And was the use of restraints in Arizona prisons

17   at this time consistent with national standards of the

18   community?

19         MS. HESMAN:  Form.  Foundation.

20         THE WITNESS:  Again, national standards

21   would not permit psychologists or nonmedically trained

22   mental health professionals to order release from or

23   placement in restraints.

24         MR. FATHI:  Okay.  We've been going for a

25   bit.  Why don't we take a break for the sake of everyone

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

50

1    but especially our court reporter.  Is five minutes

2    enough or do people need longer?

3              MS. BARNES:  Seven minutes, to 10:30.

4              (Recess from 10:23 a.m. to 10:34 a.m.)

5        Q.   (By Mr. Fathi) Doctor, page 3 of your report,

6    still in paragraph 1, you write that, "Three

7    Arizona-specific, webinar-based staff trainings were

8    developed and delivered to Centurion behavioral health

9    staff in December 2020."

10             Do you see that language?

11       A.   I do.

12       Q.   Doctor, you're a little faint.

13       A.   I apologize.  I do see that language.

14       Q.   You're still very faint.  Is there -- have you

15   done something different?

16             MS. BARNES:  I can hear him fine.

17             THE WITNESS:  I haven't done anything

18   different.

19       Q.   (By Mr. Fathi) Ah, tech failure on my end.  Very

20   sorry.

21             All right.

22             Who conducted those trainings?

23             MS. BARNES:  Form.  Foundation.

24             THE WITNESS:  Two members of the clinical

25   operations team, myself, and Brenda Fields, who is a

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

51

1    registered nurse with extensive expertise in nurse

2    monitoring of clinical restraints.

3                 And in addition, I partnered with Dr. Platt

4    in the deescalation role which I had developed, but she

5    was one of the presenters of those slides.

6        Q.   (By Mr. Fathi) All right.  So there were a total

7    of five presenters?

8        A.   Three.  Brenda Fields, John Wilson, and Stefanie

9    Platt.

10       Q.   All right.  And Ms. Fields is an RN; correct?

11       A.   Correct.

12       Q.   Were the three trainings identical, or was it a

13   series of three trainings?

14       A.   Series of three.

15       Q.   So were all Centurion behavioral health

16   employees in Arizona required to attend all three

17   trainings?

18       A.   No.  And I want to elaborate on why that was the

19   case.

20       Q.   Please.

21       A.   Those -- those trainings were developed and

22   recorded so that the Arizona leadership could then

23   provide the training to their psychiatric and psychology

24   staff and presumably others.

25                 But clinical ops developed the training,

1   presented it to the small group of Centurion of Arizona

2   behavioral health leaders who then took that training and

3   used it.

4       Q.   Okay.  So who if anyone was required to attend

5   this training?

6               MS. HESMAN:  Foundation.

7               THE WITNESS:  I don't know if there was a

8   requirement for the initial training sessions.  We had

9   several behavioral health leaders attend.

10      Q.   (By Mr. Fathi) How many Centurion of Arizona

11  employees have received this training?

12              MS. HESMAN:  Foundation.

13              THE WITNESS:  I'm sorry.  Did you hear me?

14  I don't know the answer to that question.

15      Q.   (By Mr. Fathi) How long did the trainings last?

16              MS. HESMAN:  Foundation.

17              THE WITNESS:  Roughly an hour and a half

18  each.

19      Q.   (By Mr. Fathi) So three sessions of an hour and

20  a half each?

21      A.   Yes.

22      Q.   Was there a test at the end of the training?

23      A.   I don't recall.

24      Q.   Were there written training materials?

25      A.   Yes.

53

1      Q.    Who prepared the written training materials?

2             MS. HESMAN:  Foundation.

3             THE WITNESS:  Brenda Fields and myself.

4      Q.    (By Mr. Fathi) If I wanted to know how many

5  Centurion of Arizona behavioral health employees have

6  taken this training, what documentation would I ask for?

7             MS. BARNES:  Form and foundation.

8             THE WITNESS:  There should be attendance

9  records maintained in the regional office in Arizona by

10  Centurion.

11     Q.    (By Mr. Fathi) Do you know that those records

12  exist?

13            MS. HESMAN:  Foundation.

14            THE WITNESS:  I do not know one way or the

15  other.

16     Q.    (By Mr. Fathi) Have you ever requested those

17  records?

18     A.    No.

19     Q.    All right.  Was the policy allowing

20  psychologists to authorize placement in restraints ever

21  formally changed?

22            MS. HESMAN:  Form.  Foundation.

23            THE WITNESS:  I did ask about that.  My

24  recollection is I had a conversation with Dr. Platt.  And

25  that policy was changed, the language was changed, but

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

54

1    that at the time of our conversation, the new language

2    had not yet been implemented or approved.

3                 And therefore that Centurion was going to

4    proceed as if the new language had been approved and

5    ensure that psychiatry was involved with each restraint

6    episode.

7                 And I do remember Dr. Carr telling me that

8    he's ensuring that that takes place.

9        Q.    (By Mr. Fathi) When was your conversation with

10   Dr. Platt?

11       A.    I don't recall.

12       Q.    Was it in 2021?

13       A.    Probably.

14       Q.    Was it in the first or second half of 2021?

15       A.    It would have been before July.

16       Q.    All right.  And when you say that the new

17   language had not yet been approved, do you mean approved

18   by the Arizona Department of Corrections?

19       A.    Yes.

20       Q.    As we sit here today, has that new language been

21   approved?

22             MS. HESMAN:   Foundation.

23       Q.    (By Mr. Fathi) I'm sorry?

24       A.    I don't know.

25       Q.    All right.  All right, Doctor, going back to

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

58

1      A.    I'm not able to tell you specifically what they

2   did, that's correct.

3      Q.    What were the requirements for these positions,

4   the qualifications required?

5      A.    So to my knowledge, my memory, we wanted

6   master's level, independently licensed with training or

7   certification in functional assessment, behavioral

8   functional assessment.

9      Q.    And what was the salary offered for these

10  positions?

11              MS. BARNES:   Form and foundation.

12              THE WITNESS:   I don't know.

13     Q.    (By Mr. Fathi) When initial efforts were

14  unsuccessful did you try raising the salary?

15              MS. BARNES:   Same objection.

16              THE WITNESS:   I don't know.

17     Q.    (By Mr. Fathi) Did you try offering a signing

18  bonus?

19              MS. BARNES:   Same objections.

20              THE WITNESS:   I don't know.

21     Q.    (By Mr. Fathi) Back to page 3 of your report.

22  In the final paragraph, you write, "In March 2021, our

23  Clinical Operations behavioral health team provided four

24  training sessions to our Arizona behavioral health staff

25  on," and then it lists a number of topics.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

59

1          Do you see that language?

2     A.    I do.

3     Q.    Was that training live or by video?

4     A.    That was live.

5     Q.    Who conducted the training?

6     A.    I did, Dr. Joel Andrade did, and our program

7  manager from our Pennsylvania DOC program, Jennifer

8  Sheptock, did.

9     Q.    And what are the qualifications of those other

10  two people?

11     A.    Dr. Joel Andrade is a doctoral psych -- not

12  psychologist -- social worker with 20 to 25 years of

13  experience in correctional behavioral health services and

14  a national expert in that area.

15          And Jennifer Sheptock has managed state-wide

16  behavioral health programs as well as juvenile

17  correctional settings where she trained in functional

18  assessment.

19     Q.    And were these four identical sessions or was it

20  a series of four different sessions?

21     A.    A series of four different sessions.

22     Q.    And were all Centurion behavioral health staff

23  in Arizona required to attend this training?

24          MS. HESMAN:   Foundation.

25          THE WITNESS:   No.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

1    Q.    (By Mr. Fathi) How many Centurion behavioral

2  health staff in Arizona attended this training?

3              MS. HESMAN:   Foundation.

4              THE WITNESS:   We provided the four sessions

5  twice.  Once at Florence, and once in Tucson.  And the

6  behavioral health staff who were on site in Florence

7  completed that training, and the behavioral health staff

8  in Tucson completed that series of trainings.

9              It was typically three to five

10 participants.  These were intimate, intensive roundtable

11 trainings.  There were written materials, slides.

12    Q.    (By Mr. Fathi) Are there behavioral health

13 staff -- were there behavioral health staff working at

14 Florence at that time who did not attend the training?

15             MS. BARNES:   Foundation.

16             THE WITNESS:   I don't know.  I suspect

17 health technicians we wouldn't have included.

18    Q.    (By Mr. Fathi) But was the training mandatory

19 for any category of behavioral health staff?

20             MS. HESMAN:   Foundation.

21             THE WITNESS:   No.

22    Q.    (By Mr. Fathi) And same question at Tucson, were

23 there mental health staff then working at Tucson who did

24 not participate in this training?

25             MS. HESMAN:   Foundation.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

61

1          THE WITNESS:  I don't know.  I don't

2  recall.

3      Q.   (By Mr. Fathi)  Was the training offered at any

4  prisons other than Florence and Tucson?

5          MS. BARNES:  You cut out there, Doctor.

6          THE WITNESS:  Okay.  Not by clinical

7  operations.

8      Q.   (By Mr. Fathi)  Was the training offered by

9  anyone at other prisons besides Florence and Tucson?

10     A.   I don't know, but I want to elaborate on why I

11  said it that way.

12          Clinical operations develops training to support

13  and empower our regional leadership to then take that

14  training and the initiatives and carry them forward.  So

15  it's possible that there was -- that the training was

16  carried out at other complexes.

17     Q.   Do you have any reason to believe that it was?

18     A.   I don't have any data to make an opinion one way

19  or the other.

20     Q.   In terms of the training that you personally

21  participated in, why was the decision made to offer it

22  only at Florence and Tucson?

23     A.   We focused on those two institutions because we

24  provided the training in the context of also providing

25  patient-specific consultation to bring the training and

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

62

1  the consultation together, and take the principles of the

2  training and apply them to a clinical case.

3        And there was a case at Florence and a case at

4  Tucson that Dr. Platt had identified as needing

5  behavioral interventions, behavioral change

6  interventions.  So that's why those two locations were

7  selected.

8     Q.   And what were the names of those patients?

9          MS. HESMAN:  Foundation.

10          THE WITNESS:  I don't recall.

11     Q.   (By Mr. Fathi) Let's look at page 4 of your

12  report, please.

13        And in the final paragraph of page 4, you use

14  the term "suicide spectrum behaviors."  Do you see that,

15  Doctor?

16     A.   Yes.

17     Q.   What's the definition of that term?

18     A.   That is a term that I'm using to encompass

19  everything from suicidal ideation and statements to

20  self-injury to suicide attempts to death by suicide.

21     Q.   So it includes -- it can include statements

22  without any self-harm or attempt at self-harm?

23     A.   I believe that's part of my -- yes.

24     Q.   And is that definition written down anywhere?

25     A.   No.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

64

1                    (Deposition Exhibit 2 was marked for

2     identification.)

3         Q.    (By Mr. Fathi) Doctor, Exhibit 2 is a document

4     created on a monthly basis by ADCRR titled "Inmate

5     Assault, Self-Harm, and Mortality Data."

6               Do you see that?

7         A.    I do.

8         Q.    Are you generally familiar with this document?

9         A.    I am.

10        Q.    Did you rely on this document in writing your

11    report?

12               MS. BARNES:   If you need to see more pages

13    in it, Dr. Wilson, just ask them to scroll down.

14               THE WITNESS:   Can you scroll to the final

15    page, please?

16               Yes, I did rely on this document.

17        Q.    (By Mr. Fathi) All right.   At the top of page 4,

18    it points out that, "ADCRR has adopted a new method of

19    counting acts of inmate self-harm as of July 28."

20               Do you see that, Doctor?

21        A.    I do.

22        Q.    Were you aware of that?

23        A.    Yes.

24        Q.    So ADC classifies self-harm behavior as either

25    self-injurious behavior or suicide attempt.   Do you see

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

65

1    that, Doctor?

2       A.   Yes.

3       Q.   And how does that taxonomy map onto your term

4    "suicide spectrum behavior"?

5       A.   My taxonomy, if you want to call it that,

6    includes both.

7       Q.   But as I understand your testimony a moment ago,

8    your term is broader because it can include suicidal

9    statements unaccompanied by any self-injurious behavior;

10   correct?

11      A.   It could be, yes, correct.

12      Q.   All right.  Let's look at -- back to your

13   report.  Let's look at the graph on page 5 that's titled

14   Graph 1.

15           So Graph 1 is titled "Total Suicidal Spectrum

16   Behaviors"; correct?

17      A.   It is.

18      Q.   And who created this graph, Doctor?

19      A.   I did.

20      Q.   Was anyone else involved?

21      A.   No.

22      Q.   What's the source of the data that is portrayed

23   in this graph?

24      A.   You just showed Exhibit 2 as one example of the

25   data I used.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

66

1  Q. So if I wanted to see your underlying data I

2 would look at Exhibit 2 and other monthly versions of

3 that report?

4  A. You would.

5  Q. Did you rely on any other data to create

6 Graph 1?

7  A. No.

8  Q. All right. Now, is it your testimony that the

9 Arizona Department of Corrections Rehabilitation and

10 Reentry also tracks suicidal statements?

11  A. No.

12  Q. Okay. Then how are you able to come up with

13 numbers for total suicide spectrum behaviors relying on

14 ADCRR sources that don't track suicidal statements?

15  A. Point taken. The graphs don't include suicidal

16 ideation that I generated.

17  Q. Okay.

18  A. And therefore they're inconsistent with the

19 definition I just gave you.

20  Q. Okay.

21  A. The graph --

22  Q. Go ahead.

23  A. The graphs include self-injurious behavior,

24 suicide attempts, and suicides, deaths by suicide listed

25 here on this table that we're looking at right now.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

67

1          And so, for instance, in July of 2021, the
2     Department listed 154 incidents total in that purple
3     column on the far right.  That's the number I used.
4          Q.   I see.  To your knowledge does anyone track
5     suicidal statements among ADCRR prisoners?
6                    MS. HESMAN:  Form.  Foundation.
7                    THE WITNESS:  Not to my knowledge.
8          Q.   (By Mr. Fathi) So Centurion doesn't track that?
9          A.   Correct.
10         Q.   All right.  Let's look at the graph on page 6
11    titled "Graph 2:  Rate of Suicide Spectrum Behaviors Per
12    100,000 Individuals."
13              Do you see that, Doctor?
14         A.   I do.
15         Q.   And, again, who created this graph?
16         A.   I did.
17         Q.   Was anyone else involved?
18         A.   No.
19         Q.   And what's the source of the data for this
20    graph?
21         A.   The source of this data are the -- what I
22    caption as suicide spectrum behaviors, minus suicidal
23    ideation from Exhibit 2, and other instances of -- other
24    monthly instances of that report.
25              As well as the month-to-month reports that the

68

1   DOC posts to their website showing average ADP, so

2   average population.

3       Q.   All right.  And what does the purple line mean

4   in this graph, Doctor?

5       A.   The purple line is an approximate trend line

6   that shows an overall decrease in the rate of suicide

7   spectrum.

8       Q.   And who drew -- who drew that trend line,

9   Doctor?

10      A.   That was generated by an Excel function.

11      Q.   What's the name of the Excel function?

12      A.   It's a polynomial trend line.

13      Q.   Is that the name of the function in Excel?

14      A.   Yep.

15      Q.   And is your answer the same for all of the

16  purple lines that appear in the graphs of your report?

17      A.   Yes.

18      Q.   Okay.  Let's look at page 7.  There are four

19  graphs on page 7.  Doctor, same question.  Who created

20  these graphs?

21      A.   I did.

22      Q.   And was anyone else involved?

23      A.   No.

24      Q.   And the source of the data is the same as for

25  the others?

69

1      A.    Yes.

2      Q.    All right.  And --

3      A.    I apologize.

4      Q.    Go ahead.

5      A.    No, that's not correct.  The source of the

6   graphs were -- Graph 3 and 4 is the same.

7      Q.    The same as you've previously described?

8      A.    That's correct.

9      Q.    What is the source of the information for

10  Graphs 5 and 6?

11     A.    This is the self-injurious behavior log that

12  Janine sent me.

13     Q.    Okay.  And let's look at page 8.  There are

14  three graphs on page 8.  Who created these graphs?

15     A.    I did.

16     Q.    And was anyone else involved?

17     A.    No.

18     Q.    And what's the source of the data in these

19  graphs?

20     A.    The self -- self-injurious log that I received

21  from Janine.

22     Q.    And that includes restraint episodes?

23     A.    It does.  For -- but only for patients who

24  engaged in self-injury.

25     Q.    Doctor, why did you not state the source of your

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

70

1    data for any of these graphs?

2        A.    Can we please scroll up?

3        Q.    Yes.

4              MS. BARNES:   What page do you want to be on

5    the screen, Dr. Wilson?

6              THE WITNESS:   Well, on page 4, you're

7    there, that final paragraph.

8              I do indicate that the self-injury suicide

9    attempts and deaths by suicide data are published to the

10   Department's website each month.

11             So I failed to indicate which specific

12   report holds those data, but I did indicate that it came

13   from the DOC.

14             I apologize for not being complete there.

15       Q.    (By Mr. Fathi) Okay.  And going to Graphs 5

16   and 6 --

17       A.    Yes.

18       Q.    -- why did you not state the sources -- the

19   source for your data there?

20       A.    Please give me a minute.

21             So, again, I apologize for the omission, but the

22   first paragraph that's shown on the screen right now, the

23   second -- third sentence, final sentence there,

24   "Centurion's Arizona program has tracked both metrics for

25   patients who engaged in self-injury since July 2020."

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

71

1      I did not identify it as a self-injurious

2   behavior log, but that was my attempt to identify the

3   source.

4      Q.   Okay.   And going to the three graphs on page 8.

5   Why did you not identify the source for these data?

6      A.   I have to reconstruct the omission, but I had

7   intended to indicate that this came from Centurion of

8   Arizona through the self-injurious log.

9      And the average number per month and the average

10  rate of restraints per 100,000 are recalculations of

11  essentially the same data.   But I apologize.   It did come

12  from the self-injurious behavior log.

13     Q.   Okay.   But it doesn't say that in your report;

14  correct?

15     A.   It doesn't.

16     Q.   Okay.

17          MS. BARNES:   David, can we take a break

18  here and now, or just in a minute or two when you have a

19  good moment to break?   We've been going now almost two

20  hours and I'm sorry, but I actually need another restroom

21  break.

22          MR. FATHI:   Okay.   I -- I just have a

23  couple more questions about this.

24          MS. BARNES:   That's fine.

25          MR. FATHI:   All right.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

73

```
 1              (Recess from 11:11 a.m. to 11:19 a.m.)
 2      Q.    (By Mr. Fathi) Doctor, are you familiar with the
 3   term "nonzero axis deception"?
 4      A.    Could you repeat that?
 5      Q.    Sure.  Are you familiar with the term "nonzero
 6   axis deception"?
 7      A.    No.
 8      Q.    Okay.  What that refers to, Doctor, is the
 9   practice of in a bar graph as, of the type that you have
10   in your report, starting the Y or the vertical axis at a
11   value higher than zero in order to make the difference
12   between the various bars appear larger than it actually
13   is.
14           So let's look at Graph 5 in your report on
15   page 7.  And there, Doctor, you started the vertical axis
16   at 9 rather than zero; correct?
17      A.    Correct.
18      Q.    And if you'd started it at zero the difference
19   between the two bars would appear much smaller than it
20   does in this graph; correct?
21                 MS. BARNES:  Form.
22                 MS. HESMAN:  Form.
23                 MS. BARNES:  Foundation.
24                 THE WITNESS:  The difference would still
25   be 2.
```

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

74

1      Q.    (By Mr. Fathi) Yes, but looking -- but the
2  relative size of the two bars would be much closer than
3  it is in this graph; correct?
4              MS. HESMAN:   Form.
5              THE WITNESS:   I guess, yes.
6      Q.    (By Mr. Fathi) Okay.   And similarly in Graph 6
7  you started the vertical axis at 25 rather than zero;
8  correct?
9      A.    Yes.
10     Q.    Okay.   And if you'd started the vertical axis at
11 zero, the two bars would look much more similar, wouldn't
12 they?
13             MS. HESMAN:   Form.
14             MS. BARNES:   Form.
15             THE WITNESS:   Their height would be closer
16 together, but the absolute numerical difference would
17 remain unchanged.
18     Q.    (By Mr. Fathi) But the size difference between
19 the two bars would be significantly smaller, wouldn't it?
20             MS. BARNES:   Form.
21             MS. HESMAN:   Form.
22             THE WITNESS:   The size difference would be
23 smaller.
24     Q.    (By Mr. Fathi) All right.   Let's look at
25 Graph 6 -- I'm sorry, that was Graph 6.   Let's look at

1  anyone other than your attorney tell you to do that?

2            MS. BARNES:  Form.  And, again, let me

3  clarify my instruction.  My instruction to you,

4  Dr. Wilson, is if someone -- if your answer is positive,

5  if someone told you that -- that you should set this at

6  zero and that someone is an attorney, do not answer.

7            If your answer is that no one told you

8  that, then you can say no one told me that.

9            THE WITNESS:  No one instructed me on how

10  to set the axes.  Never any discussion about the minimum

11  value for any of these axes.  I -- I took what Excel gave

12  me automatically and put it into the report.

13      Q.   (By Mr. Fathi) Okay.  All right.  Back to page 5

14  where you give some population statistics.  Do you see

15  those, Doctor?

16      A.   I do.

17      Q.   Are those statistics for the entire ADCRR

18  incarcerated population?

19      A.   They are.

20      Q.   And are you aware that Arizona has about seven

21  and a half thousand prisoners in private prisons?

22      A.   I am.

23      Q.   But Centurion doesn't provide care for those in

24  the private prisons; correct?

25      A.   That is correct.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

78

1      Q.   So what are the analogous figures for the ten
2   state-run prisons at which Centurion does provide care?
3      A.   I would have to check, but based on what you've
4   just said, they're 7,000 less than what I show here.
5      Q.   Still on page 5, Graph 1, obviously these --
6   this graph portrays certain figures, and each bar
7   represents a -- a total number of suicide spectrum
8   behaviors; correct?
9      A.   Correct.
10      Q.   Do those numbers include the private prisons or
11   only the state-run prisons where Centurion provides care?
12      A.   My understanding of the published statistics is
13   that they include the private prison beds, too.
14      Q.   Okay.  So that means that these figures that you
15   have put in your Graph 1 include the private prisons as
16   well; correct?
17      A.   Yes.
18      Q.   Okay.  Graph 2 on page 6.  Same question.  Do
19   these numbers also include the private prisons?
20      A.   Yes.
21      Q.   Is your answer the same for all of the graphs in
22   your report?
23      A.   No.
24      Q.   All right.  Let's go through them all, then.
25   Next page, please.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

1          Graphs 3 and 4, are these -- do these numbers
2    include the private prisons or only the state-run
3    prisons?
4        A.   All of them.  Both private and public, yeah,
5    state-run.
6        Q.   And Graphs 5 and 6, do these figures include the
7    private prisons?
8        A.   No.
9        Q.   And how can you tell that, Doctor?
10        A.   Because Graphs 5 and 6 come from the
11    self-injurious behavior log that Centurion tracks, that
12    Centurion maintains.  And because we don't provide
13    services in the private prisons, it would not include any
14    emergency room runs for self-injury or suicide attempts
15    from those private prisons.
16        Q.   Okay.  But when you were calculating the rate
17    per 100,000, what was the denominator you used?  Did you
18    use the number, the entire prisoner population including
19    the private prisons, or did you include only the people
20    incarcerated at the state-run prisons?
21        A.   I used the entire population.
22        Q.   I see.  Let's look at page 8, please.  Same
23    question for the three graphs on page 8.  Do these
24    include all of the prisons including the private prisons,
25    or just the state-run prison?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

80

1      A.    Just the state.

2      Q.    I see.  And, again, in the middle graph when

3  you're calculating a rate per 100,000, did you use as a

4  denominator the entire prison population including the

5  private prisons or just the state-run prisons?

6      A.    The entire population.

7      Q.    Okay.  And that would tend to understate the

8  rate of restraint, wouldn't it?

9              MS. HESMAN:  Form.  Foundation.

10             THE WITNESS:  Mathematically, yes.

11     Q.    (By Mr. Fathi) All right.  Back to page 6,

12  please.  Now, you say here about -- in about the middle

13  of page 6 that talking about average number of suicide

14  spectrum behaviors per month, there has been a 47 percent

15  reduction in incidents.  Do you see that?

16     A.    Yes.

17     Q.    Did you calculate that percentage, Doctor?

18     A.    I did.

19     Q.    Can you tell me how you did it?

20     A.    Yep, I can.  This statement goes with Graph 3,

21  and in Graph 3, I show that on average there were 212

22  incidents of self-injury and suicide or attempted suicide

23  in the second half of 2019, and 112 in the first nine

24  months of 2012 -- 2021.  Pardon me.

25     Q.    And that's how you came up with the 47 percent?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

81

1    A.    Yep.

2    Q.    And I think you testified that you're using

3    numbers from the entire system including the private

4    prisons; correct?

5    A.    I am.

6    Q.    What is the percentage change looking only at

7    the ten facilities where Centurion provides care?

8    A.    The DOC doesn't report that.  I don't know the

9    answer.

10   Q.    Okay.  All right.  Back to page 6, please.

11   A.    May I clarify?

12   Q.    Please.

13   A.    My understanding is that if an incarcerated

14   individual is engaged in self-injury or suicide attempt,

15   they're going to be moved to a state-run complex.

16         And my other clarification is that the way the

17   department reports self-injury suicide attempts and

18   completed suicide does include those private prisons.

19         So if there are episodes of suicide attempts,

20   completed suicides or self-injury at the private prisons,

21   they -- they should be wrapped up in these numbers and

22   included in them in order to have a complete picture.

23   Q.    Okay.  Back to page 6, please.

24         Now, Doctor, when you calculated this 47 percent

25   reduction in incidents you're counting different months

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

82

1    in 2019 and 2021; correct?

2         A.    Correct.

3         Q.    So you're comparing July through December 2019

4    to January through September 2021; correct?

5         A.    That's correct.

6         Q.    And you're making that same comparison in

7    Graphs 3 and 4; right?

8         A.    Right.

9         Q.    And in Graphs 5 and 6 and the three graphs on

10   page 8, you're again comparing different months.   This

11   time it's July through December of 2020 and January

12   through September of 2021.   Is that correct?

13        A.    That's right.

14        Q.    And that is a potential confounding variable,

15   isn't it?

16                  MS. HESMAN:   Form.   Foundation.

17                  THE WITNESS:   Yes.

18        Q.    (By Mr. Fathi) Back to page 6, please.   So at

19   the bottom of the first paragraph, you -- you describe a

20   38 percent reduction using the rate of suicide spectrum

21   behaviors per 100,000 population; correct?

22        A.    Correct.

23        Q.    And did you calculate that percentage?

24        A.    I did.

25        Q.    Sorry?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

83

1      A.    Yes.

2      Q.    Okay.  And could you tell me how you did that,

3   please?

4      A.    In the same way that I calculated the 47 percent

5   reduction in incidents.  This one goes to Graph 4, and it

6   compares the second half of 2019 with the first nine

7   months of 2021.

8      Q.    And I assume from your previous testimony that

9   these numbers were calculated using the entire ADC

10  population including the private prisons; correct?

11     A.    Correct.  Yes.

12     Q.    And what are the analogous numbers for just the

13  ten state-run prisons at which Centurion provides care?

14     A.    I don't know.

15     Q.    Okay.  Let's go back to Exhibit 2, please.

16         Okay.  Could you explain to me -- let me back

17  up.

18         I gather from your testimony that this document

19  or other monthly iterations of this document is the

20  primary source for the information in the graphs in your

21  report; correct?

22     A.    Yes.

23     Q.    Okay.  Walk me through how you get from this ADC

24  document, Exhibit 2, to the numbers in your report?

25     A.    I used this table to pull out the total number

1     Q.   Okay.   Let me ask a different question.   You --

2   your report discusses extensively numbers of suicide

3   spectrum behaviors and rates of suicide spectrum

4   behaviors and changes in those numbers of rates over

5   time.

6           But there is no analogous discussion of actual

7   completed suicides; is that correct?

8     A.   There's no analogous discussion, that's correct.

9     Q.   And why is that?

10          MS. HESMAN:   Form.   Foundation.

11          THE WITNESS:   My effort was to show overall

12   trends.   I had limited time to develop all of these data.

13   And suicide -- deaths by suicide unfortunately tend to

14   be -- well, fortunately tend to be small numbers, but

15   unfortunately tend to vary somewhat unpredictably over

16   time.

17          And therefore most of the experts who look

18   at completed suicides are now recommending using

19   five-year time blocks to calculate rate of suicide or

20   completed suicide.

21          Because Centurion has only been present

22   since 2019, I wasn't sure that I could use data for

23   completed suicides in the same way I could use for the

24   self-injurious behavior and suicide attempts to give a

25   clear picture of trends over time.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

87

1    correct?

2         A.    I see that.

3         Q.    And that ten suicides in fiscal year '21 was the

4    highest number since fiscal year '11.  Do you see that?

5         A.    I do.

6         Q.    And the overall prison population was

7    substantially higher in fiscal year '11; correct?

8         A.    Yes.

9         Q.    Do you have any hypothesis as to why last year

10   had the highest suicides since 2011?

11                   MS. HESMAN:   Form.  Foundation.

12                   THE WITNESS:  I do.

13        Q.    (By Mr. Fathi) And what's that?

14        A.    The rise in deaths by suicide has been

15   experienced in multiple correctional systems, and my

16   hypothesis is that the pandemic has interfered with

17   patient movement, with ability to get out of cell, with

18   staffing shortages, and with the delivery of -- the

19   ability to deliver care.

20              Everyone has been strained, from correctional

21   officers to healthcare staff to incarcerated inmates.

22   And this level of -- this increase in suicide, I think,

23   likely reflects all of that.

24        Q.    So you mentioned staffing shortages.  Do you

25   believe that shortages of mental health staff may be

1   contributing to this increase in -- in suicides?

2                   MS. HESMAN:   Form.   Foundation.

3                   THE WITNESS:   What you suggest of course is

4   theoretically possible.   But I don't know what the

5   staffing shortages are, if there are, for mental health

6   in -- in the department right now.

7       Q.   (By Mr. Fathi) I'm sorry, did you just say

8   you're not familiar with the state of mental health

9   staffing in the Arizona Department of Corrections?

10      A.   I don't specifically know what the vacancies

11  are, that is correct.

12      Q.   All right.   Do you believe that mental health

13  staff shortages in the Arizona Department of Corrections

14  may be a contributing factor to the increase in suicides

15  last year?

16                  MS. HESMAN:   Form.   Foundation.

17                  THE WITNESS:   Without knowing what those

18  shortages are and their impact on service delivery, I

19  really can't speculate.

20      Q.   (By Mr. Fathi) Are you familiar with what the

21  staffing shortages were at any point in fiscal year '21?

22  In other words, July 1, 2020, to June 30, 2021?

23      A.   I would have to review my records.   So I have no

24  specific recollection right now of what those shortages

25  may or may not have been.

90

1          MS. BARNES:  Form and foundation.

2          THE WITNESS:  Yes.

3      Q.   (By Mr. Fathi) Doctor, you mentioned mortality

4   reviews a moment ago.  Do you as a matter of course

5   review mortality reviews from the Arizona Department of

6   Corrections?

7      A.   I do not.

8      Q.   Do you as a matter of course review

9   psychological autopsies from the Arizona Department of

10  Corrections?

11     A.   I do not.

12     Q.   Okay.  Let's look at Exhibit 9, please.

13          (Deposition Exhibit 9 was marked for

14  identification.)

15     Q.   (By Mr. Fathi) Doctor, have you seen Exhibit 9

16  before?

17     A.   I do not believe so.

18     Q.   This is an Arizona Department of Corrections

19  Mortality Review Committee Final Report about a man who

20  died by suicide on January 28, 2021.  Do you have any

21  familiarity at all with this person or his suicide?

22     A.   No.

23     Q.   Now, January 28, 2021, was after the beginning

24  of the self-harm initiative that you described earlier;

25  correct?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

91

1      A.    January 28, 2021 -- yes, I think so.

2      Q.    Okay.  Let's look at page 2.  So at the top of

3   page 2, Doctor, the second item asks, "Was sufficient

4   care offered/provided regarding mental health issues?"

5          And the box is checked, "No."  Do you see that?

6      A.    I do see that.

7      Q.    And then a little bit further down under

8   "Contributing Cause Analysis," the box is checked for,

9   "Failure to recognize symptoms or signs, and delay in

10  access to care."

11          Do you see that?

12     A.    I do.

13     Q.    Page 3, please.  And at the bottom under

14  "General Critique," the boxes are checked for "Diagnosis

15  not timely," and "Treatment not timely."

16          Do you see that, Doctor?

17     A.    Yes.

18     Q.    And finally the reviewer concludes that his

19  death was, and the box is checked for, "Possibly

20  avoidable."  Do you see that?

21     A.    I do.

22     Q.    And I think your testimony is you haven't seen

23  this document before today; correct?

24     A.    Correct.

25     Q.    Now that you've seen this document, does this

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

92

1   have any effect on your opinion regarding the adequacy of

2   suicide and self-harm prevention in ADC?

3                    MS. BARNES:   Form.

4                    MS. HESMAN:   Form.   Foundation.

5                    THE WITNESS:   It's obviously a very

6   concerning conclusion.

7        Q.   (By Mr. Fathi) Does it have any effect on your

8   opinion regarding the adequacy of suicide and self-harm

9   prevention in the Arizona Department of Corrections?

10                   MS. HESMAN:   Same objection.

11                   MS. BARNES:   Form.

12                   THE WITNESS:   Give me a minute to think how

13  to answer that.

14       Q.   (By Mr. Fathi) Of course.

15       A.   Let me start by saying that I haven't evaluated

16  the adequacy of suicide prevention efforts in Arizona.

17            So for purposes of my report, I looked at broad

18  trends of outcomes that looked positive.   I think within

19  broad trends it will always be possible to find

20  exceptions.   And unfortunately when there are exceptions

21  as appears to have been concluded here, there are adverse

22  outcomes.

23       Q.   Is it your testimony that the broad trends of

24  completed suicides was positive?

25                   MS. HESMAN:   Form.

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

93

1              THE WITNESS:   Broad trends of self-injury

2      and suicide attempts going down is in the right

3      direction.

4              The elevation of number of suicides that

5      we've just talked about is obviously not positive.

6      Q.   (By Mr. Fathi) Does the information in this

7      document have any effect on your opinion regarding the

8      adequacy of suicide and self-harm provision in the

9      Arizona Department of Corrections?

10             MS. HESMAN:   Form.   Foundation.   Asked and

11     answered.

12             MS. BARNES:   Form.

13             THE WITNESS:   I want to spend a little bit

14     of time looking at the document if I may before I answer.

15     Q.   (By Mr. Fathi) Please take your time, Doctor.

16     If you need it scrolled, just please say so.

17     A.   Yes.   Please, may I see the prior page?   Thank

18     you.   Let me pause here for a moment.   And I know we

19     reviewed it before, but if you don't mind, just scroll

20     all the way up.   Okay.   Thank you.   I'd like to look at

21     the summary.

22             Okay.   Would you please repeat the question so

23     I --

24     Q.   Sure.   Does the information you have just

25     learned from reviewing this document have any effect on

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

94

1    your opinion regarding the adequacy of suicide and

2    self-harm prevention in the Arizona Department of

3    Corrections?

4                    MS. HESMAN:   Objection.

5                    MS. BARNES:   Foundation.

6                    THE WITNESS:   Because I haven't evaluated

7    the suicide prevention efforts in Arizona, I don't

8    actually have an opinion that this data can modify.

9                    It does look like a health needs request

10   was submitted and the patient was not seen and died

11   shortly thereafter.

12                   So in that regard, based on the limited

13   piece of information I've got in front of me, I -- I

14   agree that there -- I agree with the findings

15   that there -- if you can scroll down, let me not testify

16   to something that's not in there -- that there -- there

17   was a lack of timely diagnosis and treatment.

18       Q.   (By Mr. Fathi) Okay.  So just to be clear,

19   you're not going to testify at the trial of this case --

20   I'm sorry, you're not going to offer any opinion at the

21   trial of this case on the adequacy of suicide and

22   self-harm prevention in Arizona prisons; correct?

23                   MS. BARNES:   Form.

24                   MS. HESMAN:   Form.

25                   THE WITNESS:   I don't know what my

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

95

1   testimony at trial will be.  And based on this

2   deposition, I will -- I may find time to review suicide

3   prevention efforts in more detail.  So I may have an

4   opinion at trial.

5       Q.   (By Mr. Fathi) Well, Doctor, it doesn't work

6   that way.

7       A.   Oh.

8       Q.   The purpose of this proceeding is for us to find

9   out what your testimony is going to be at trial, and I

10  believe you just said you don't have an opinion on the

11  adequacy of suicide and self-harm prevention in the

12  Arizona Department of Corrections.

13          So if I heard that wrong, please let me know,

14  but I think that's what you just said.

15              MS. BARNES:  Form.

16              THE WITNESS:  So I did just say that, and

17  let me amend that and clarify it just a little bit.

18              Based on the data that I reviewed, it looks

19  like concerted efforts have been made to reduce

20  self-injury and suicide attempts.

21              It also looks like we had a spike in

22  completed suicides.  That's a mixed picture.  But the

23  spike in completed suicides does not eradicate the

24  reduction in other types of self-injury.

25              And I think it's a fair inference that

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

96

1    those trends that I mapped out based on Department data

2    reflect positive -- the effect of a positive -- a

3    positive effect -- a positive outcome on the efforts

4    being made in Arizona.

5                Is it adequate?  I'd need a definition for

6    adequate.  One suicide's too many.  It's a tragedy.

7                MS. HESMAN:  David, can you let us know

8    when a good time to break for lunch is?  I only need

9    about 30 minutes, but I don't know what other people's

10   thoughts are on that.

11               MR. FATHI:  All right.  Give me another

12   couple minutes to -- to finish up this line of

13   questioning.

14               MS. HESMAN:  Okay.

15               MS. BARNES:  Let me just ask one last

16   question before you do that.  Do you have an idea of how

17   long you're going to have if we take a 30-minute break,

18   how much more after that you're going to have.

19               MR. FATHI:  Probably, you know, always hard

20   to say because it depends on the answers, but probably

21   between an hour and an hour and a half.

22               MS. BARNES:  Okay.

23       Q.   (By Mr. Fathi) Okay.  Let's look at Exhibit 10,

24   please.

25               (Deposition Exhibit 10 was marked for

98

1      A.   I do.

2      Q.   And the reviewer concludes that this death was

3   possibly avoidable.  Do you see that?

4      A.   I do.

5      Q.   So does the information you just learned from

6   this document have any effect on your opinion regarding

7   the adequacy of suicide and self-harm prevention in the

8   Arizona Department of Corrections?

9           MS. HESMAN:  Form.  Foundation.

10          MS. BARNES:  Form and foundation.

11          THE WITNESS:  I'm -- I'm really struggling

12   with this line of questioning, and I apologize for that.

13          The reason I'm struggling is this is the

14   first time I've seen these cases.  It's the first time

15   I'm looking at the fact patterns.

16          And how these particular cases reflect on

17   overall suicide prevention efforts and the quality of

18   mental health care is -- it's difficult for me to assess

19   that in this context right now.

20          So I really need more time to look at these

21   data and find out more about the suicide prevention

22   program before I can answer adequately.

23      Q.   (By Mr. Fathi) Did you review any completed

24   suicides in order to prepare your report?

25      A.   No.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

100

1     Q.   (By Mr. Fathi) Let's look at page 3 of this

2  document again.  Doctor, do you see the heading "Mental

3  Health Concerns"?

4     A.   Yes.

5     Q.   And it says, "There was no suicide risk

6  assessment conducted upon placement or removal from

7  watch."

8         Do you see that?

9     A.   Yes.

10    Q.   Is that something that could be impacted by a

11  lack of mental health staff?

12            MS. HESMAN:  Form.  Foundation.

13            MS. BARNES:  Form.  Foundation.

14            THE WITNESS:  Yes.

15    Q.   (By Mr. Fathi) Item 2, "There was no crisis

16  treatment plan developed within one business day of

17  placement on watch (there was no plan developed for the

18  entirety of his watch)."

19         Doctor, is that something that could be affected

20  by a shortage of mental health staff?

21            MS. BARNES:  Form and foundation.

22            THE WITNESS:  My answer is yes.

23    Q.   (By Mr. Fathi) Item 3, "There is no indication

24  that safety was reliably reestablished prior to

25  discontinuing watch (in fact, the patient's mental status

1    was significantly worse at the time of discontinuing

2    watch than when it was started)."

3            Doctor, is that something that could be affected

4    by a shortage of mental health staff?

5                    MS. HESMAN:  Form.

6                    MS. BARNES:  Form and foundation.

7                    THE WITNESS:  Potentially, yes.

8        Q.    (By Mr. Fathi) And No. 4, "There is no

9    indication that multiple disciplinary consultation was

10   conducted prior to discontinuing the watch."

11           Is that something that could be affected by a

12   shortage of mental health staff?

13                   MS. HESMAN:  Form and foundation.

14                   MS. BARNES:  Same objections.

15                   THE WITNESS:  Yes.

16       Q.    (By Mr. Fathi) And if we scroll up to page 1, we

17   see that this -- this suicide occurred at the Eyman

18   complex.  Do you see that, Doctor?

19       A.    Yes.

20       Q.    And that was one of the complexes where the

21   suicide self-harm prevention training was -- was not

22   conducted; is that correct?

23       A.    That is correct.

24                   MR. FATHI:  Okay.  If people want to take a

25   lunch break this is good time.  How long do you need?

1    testify on.

2        Q.   All right.  And you're not going to offer any

3    opinions that are not set forth in your report; correct?

4                MS. BARNES:  Form.

5                THE WITNESS:  I don't know what I'll

6    testify to.

7        Q.   (By Mr. Fathi) Well, Doctor, as I said earlier

8    the whole purpose of providing an expert report, and this

9    proceeding today is to allow us to know what your

10   testimony is going to be at trial.

11            So if you're planning to testify about any other

12   of Dr. Stewart's opinions beyond the ones that you've

13   explicitly mentioned in your report, you need to tell me

14   that now.

15       A.   Okay.

16                MS. BARNES:  Again, with respect -- this

17   witness is in a unique situation, David, because he's

18   listed as an expert witness who's provided this report,

19   and a fact witness.

20                So if you are asking him for purposes of

21   his expert opinion in this report is he going to offer

22   any expert opinions outside of what is encompassed in his

23   report, then he can answer that.

24       Q.   (By Mr. Fathi) All right.  Doctor, are you going

25   to offer any expert opinions beyond what is in your

 1    report?

 2         A.    No.

 3         Q.    Okay.   Thank you.

 4               So just to be clear, you are -- you are not a

 5    medical doctor; correct?

 6         A.    Correct.

 7         Q.    You are not a psychiatrist?

 8         A.    Correct.

 9         Q.    You're not licensed to prescribe medication?

10         A.    Correct.

11         Q.    Have you ever clinically supervised a

12    psychiatrist?

13         A.    Clinically, no.

14         Q.    Have you ever clinically supervised a nurse

15    practitioner?

16         A.    No.

17         Q.    All right.   Let's talk about your opinion on

18    page 8 regarding nurse practitioners.

19               So I gather that you agree with Dr. Stewart that

20    the patients in ADCRR are extraordinarily complex;

21    correct?

22                    MS. HESMAN:   Form.

23                    THE WITNESS:   I do.

24         Q.    (By Mr. Fathi) I'm sorry, what was that?

25         A.    I do.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

105

1      Q.   All right.  Will you agree with me that

2   psychiatrists have more years of professional training

3   than psychiatric nurse practitioners?

4              MS. BARNES:  Form.

5              THE WITNESS:  Yes.

6              MS. BARNES:  Foundation.

7              THE WITNESS:  Yes.

8      Q.   (By Mr. Fathi) I'm sorry.  I didn't hear your

9   answer, Doctor.

10     A.   Yes.

11     Q.   Will you agree that there are some patients who

12  should be seen by a psychiatrist rather than or in

13  addition to a nurse practitioner?

14             MS. HESMAN:  Form.  Foundation.

15             THE WITNESS:  That's theoretically

16  possible.

17     Q.   (By Mr. Fathi) Okay.  Let's talk about your

18  opinions on dediagnosing.  Oh, I'm sorry, let me go back

19  to page 9, paragraph B, where you talk about

20  Dr. Stewart's report or opinions on mental health groups.

21  Do you see that?

22     A.   Yes.  I do.

23     Q.   So you, as I understand it, you agree with

24  Dr. Stewart that all behavioral health groups should be

25  coordinated by licensed behavioral health professionals;

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

106

1    correct?

2        A.    Correct.

3        Q.    And you also agree that behavioral health groups

4    that are psychotherapeutic in nature, including those

5    focused on behavioral skills building, need to be

6    delivered by licensed behavioral health professionals,

7    correct?

8        A.    Correct.

9        Q.    All right.   Now let's talk about dediagnosing.

10            So I gather you agree that erroneously removing

11   a diagnosis of a serious and persistent mental illness

12   like schizophrenia, like bipolar disorder, can put the

13   patient at risk?

14               MS. HESMAN:   Form.   Foundation.

15               THE WITNESS:   In -- in theory, I completely

16   agree that any erroneous diagnosis, addition or removal,

17   can put the patient at risk.

18       Q.    (By Mr. Fathi) Right.   Well, I'm -- I'm looking

19   at the last sentence of the penultimate paragraph on

20   page 9 where you say, "Removing that flag can present

21   risks if the patient's treatment needs are no longer

22   being met."

23             Do you stand by that statement?

24       A.    I do.

25       Q.    Okay.   Let's look at page 10.   At the end of the

1    diagnosis of serious mental illness, I believe the

2    patient is entitled to the care that is required to meet

3    the patient's needs.

4              I believe what you're asking is when -- and

5    let me just make sure I understand the question.  When a

6    SMI or serious mental diagnosis is removed, certain

7    requirements under the stipulation for treatment no

8    longer apply.  Is that what you were asking me?

9        Q.   Yes.  My question is, are you aware of that

10   fact?

11       A.   I am aware of that fact.

12       Q.   Okay.  Dr. Stewart identified 14 patients as

13   possible examples of dediagnosing.  Did you review any of

14   those patients' records?

15       A.   No.

16       Q.   So you have no opinion as to whether in those

17   particular cases dediagnosis had taken place?

18       A.   Correct.

19       Q.   Okay.  On page 10, you respond to the opinions

20   of Robert Joy.  Do you see that?

21       A.   I do.

22       Q.   And in the last sentence of the penultimate

23   paragraph you write, "From July 2019 when Centurion

24   assumed responsibility for healthcare with ADCRR and

25   September 2021, an average of 28 percent of the

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

110

1  population has been identified on any given month as

2  requiring ongoing mental health services."

3          Do you see that?

4      A.   Yes.

5      Q.   And then the next sentence you write, "There has

6  only been small variation in this proportion from month

7  to month during this time period (range 27 to

8  29 percent)."

9          Do you see that?

10     A.   Yes.

11     Q.   And what is the source -- what is your source

12  for those statistics?

13     A.   It is in the second-to-last paragraph and it's

14  the second sentence.  The Department publishes monthly

15  at-a-glance reports.

16     Q.   So that is your source for these statistics?

17     A.   That is correct.

18     Q.   And when you talk about patients requiring

19  ongoing mental health services, what -- what's the

20  definition of that term that you're using?

21     A.   I believe that is the language used in the

22  at-a-glance reports.

23     Q.   Okay.  But my question is what's the definition?

24     A.   My understanding of that definition is that this

25  is a -- a patient who's on the mental health caseload and

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

111

1    requires ongoing treatment, including a treatment plan.

2        Q.    And when those percentages that we're

3    discussing, were those calculated using the entire ADC

4    prisoner population including the private prisons or only

5    the ten state-run prison locations?

6        A.    I would have to review, but my recollection is

7    the entire.

8        Q.    Okay.  So what are the analogous percentages if

9    you look only at the state-run prisons?

10        A.    I don't know.

11        Q.    Doctor, are you aware that the private prisons

12    don't accept patients with ongoing mental health needs?

13                MS. HESMAN:   Form.

14                THE WITNESS:   Now that you've asked that

15    question, I believe that's correct.

16        Q.    (By Mr. Fathi) Okay.   So if you were looking

17    only at the population of the ten state-run prisons, the

18    percentage of patients with mental health needs would be

19    higher than the figures we've just discussed; correct?

20                MS. HESMAN:   Form.   Foundation.

21                THE WITNESS:   So in this case -- in this

22    case I took the percentages -- I took the data directly

23    from the Department as they report it.

24                And given the condition that you just

25    reminded me of, that the private prisons don't accept

1   patients who require ongoing mental healthcare, the

2   percentages may -- well, let me start over.

3             I'm -- I'm telling you what the Department

4   reports.  I don't -- I did not do calculations.  And if

5   there's a different or better way to present those

6   statistics, I think that that's outside of the scope of

7   my report.

8        Q.   (By Mr. Fathi) Well, this is your report, and

9   I'm asking you about the statistics you used.

10            So as I understand it, you believe that this

11  28 percent figure is calculated using the entire state

12  prison system including the private prisons; is that

13  right?

14       A.   That's my belief.

15       Q.   Okay.

16       A.   But I'd have to double check.

17       Q.   Okay.  So let's just assume that's true.  Then

18  if you calculated the analogous figure using only the ten

19  state-run prisons, the percentage would be higher, would

20  it not?

21            MS. HESMAN:  Form.  Foundation.

22            THE WITNESS:  Yes.

23       Q.   (By Mr. Fathi) And the percentage would be

24  higher because the numerator, the number of people with

25  mental health needs, would be the same.  And the

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

113

1   denominator would be smaller by about seven and a half

2   thousand; correct?

3                    MS. BARNES:   Form.

4                    THE WITNESS:   Correct.

5        Q.   (By Mr. Fathi) Okay.  So to recap, you don't

6   know what the percentage would be if we were looking just

7   at the ten state-run prisons?

8                    MS. BARNES:   Form.

9                    THE WITNESS:   Sitting here today, I would

10  need to review the at-a-glance reports to ensure I answer

11  that correctly.  If you want me to do so, I will be happy

12  to.

13       Q.   (By Mr. Fathi) Okay.  But my question is,

14  sitting here today, you don't know what the percentage of

15  patients with ongoing mental health needs is, looking

16  just at the ten state-run prisons?

17       A.   Sure.  I don't.

18       Q.   Okay.  Now, also on page 10 of your report, it

19  says -- this is the second line of the final paragraph --

20  "The overall proportion of incarcerated individuals who

21  are identified as requiring mental healthcare is

22  consistent with proportions found in other state

23  correctional settings."  Do you see that?

24       A.   I do.

25       Q.   What's your source for that statement?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

114

1      A.    My experience working for my company and
2   multiple reviews in other programs.
3      Q.    So what -- when you make this comparison here,
4   what states to what states are you comparing to Arizona?
5      A.    Florida, Georgia, Massachusetts, Tennessee.
6      Q.    Any others?
7      A.    Those are the ones that came immediately to
8   mind.  I may have looked at Maryland.
9      Q.    What's the overall proportion of incarcerated
10  individuals who are identified as requiring mental
11  healthcare in the Florida prison system?
12     A.    I don't recall.
13     Q.    What is it in Georgia?
14     A.    Somewhere around 20 or 21 percent, last time I
15  looked.
16     Q.    What is it in Massachusetts?
17     A.    My understanding is that it's about 25 percent.
18     Q.    And what's that understanding based on?
19     A.    Last -- last look at statistics, which was a
20  while ago.
21     Q.    How long ago was that?
22     A.    I reviewed a report earlier this year from --
23  I'm not sure the date exactly, but mid 2015, somewhere in
24  that range.
25     Q.    Okay.  So just so I'm clear, you're not --

115

1    you're not able to cite any published data for this

2    statement; is that correct?

3              MS. BARNES:   Form.

4              THE WITNESS:   I could go gather that and

5    present it to you.  Many correctional systems do -- do

6    present those.

7        Q.   (By Mr. Fathi) Okay.  But when you wrote this

8    statement that the overall proportion of incarcerated

9    individuals who are identified as requiring mental

10   healthcare is consistent with proportions found in other

11   state correctional settings, you were just basing that on

12   your own personal experience; correct?

13       A.   That is correct.

14       Q.   Okay.  And you also state on page 10, "In other

15   state correctional programs, patients receiving ongoing

16   mental healthcare typically represent between 20 and

17   25 percent of the entire incarcerated population, and

18   some 5 percent to 8 percent of the entire population are

19   classified as seriously mentally ill."

20            What's your source for those statistics?

21       A.   It's, again, my personal experience with other

22   programs.

23       Q.   Okay.  So, again, you weren't looking at any

24   published data when you wrote those figures?

25       A.   No.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

122

 1   that what you're saying you're going to do?

 2              MR. FATHI:  May or may not do it right now,

 3   but we may do it later.  We need a clear record.

 4              MS. BARNES:  I want to take a two-minute

 5   recess before I respond to you.

 6              MR. FATHI:  Okay.  Two minutes is fine.

 7              MS. BARNES:  We'll take a break.

 8              (Recess from 1:12 p.m. to 1:15 p.m.)

 9              MS. BARNES:  So coming back, my -- my

10   position is going to be that I object to the questions,

11   fact witness -- fact -- sorry, can't talk -- fact

12   discovery has come and gone.  Those deadlines have come

13   and gone.  You did not notice the deposition to talk to

14   him about any potential fact testimony he might give.

15              With that objection, and reserving the

16   right to pursue that further at trial if necessary, you

17   can ask the witness the question.  If he can answer it,

18   he'll answer it.

19              MR. FATHI:  Okay.  Thank you.

20       Q.   (By Mr. Fathi) All right.  Doctor, going back to

21   Exhibit 8 -- can we have it on the screen?

22              So, Doctor, Exhibit 8 says that you're expected

23   to testify regarding how Centurion determined the

24   staffing levels needed for the ADCRR contract.

25              Do you see that?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

123

1      A.    I do.

2      Q.    And what is your testimony going to be on that

3   subject?

4                MS. HESMAN:   Form.   Foundation.

5                MS. BARNES:   Same objection.

6                THE WITNESS:   I don't know.   I haven't

7   prepared for trial.   I have already mentioned in this

8   deposition that my recollection is that the staffing was

9   provided to us in the most recent RFP.

10      Q.    (By Mr. Fathi) Do you know how Centurion

11   determined the staffing levels needed for the ADCRR

12   contract?

13                MS. HESMAN:   Form.   Foundation.

14                THE WITNESS:   I'm not sure I do now.

15      Q.    (By Mr. Fathi) Okay.   So next it says that you

16   are going to testify about changes Centurion has made to

17   staffing during the contract.

18      Do you see that?

19      A.    I do.

20      Q.    And what is your testimony going to be on that

21   topic?

22                MS. HESMAN:   Form.   Foundation.

23                MS. BARNES:   Form and foundation.

24                THE WITNESS:    In fact, I'm not qualified to

25   testify on that topic.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

124

1    Q.    (By Mr. Fathi) Okay.  So next it says you will

2    testify about a comparison of Centurion staffing levels

3    in Arizona versus staffing levels in other states.  What

4    is your testimony going to be on that topic?

5                MS. HESMAN:  Form.  Foundation.

6                MS. BARNES:  Foundation.

7                THE WITNESS:  I don't know.

8    Q.    (By Mr. Fathi) Well, tell me what you know about

9    Centurion staffing levels in Arizona versus staff levels

10   in other states.

11               MS. HESMAN:  Same objection.

12               THE WITNESS:  I have not taken the time to

13   do a direct comparison.

14   Q.    (By Mr. Fathi) Next it says you're going to

15   testify regarding Centurion's recruiting, hiring,

16   credentialing, training, retention and compensation

17   policies and practices for mental health staff.  Do you

18   see that?

19   A.    I do.

20   Q.    Tell me what your testimony is going to be on

21   that subject.

22               MS. HESMAN:  Form.  Foundation.

23               MS. BARNES:  Form and foundation.

24               THE WITNESS:  To the extent that I'm

25   qualified to testify on credentialing and training, I

1  don't know what my testimony will be.  I'm not the best

2  witness for recruiting and hiring and compensation

3  policies.

4      Q.   (By Mr. Fathi) Next it says that you are also

5  expected to testify regarding contract monitoring and

6  compliance activities.  Do you see that?

7      A.   I do.

8      Q.   And what is going to be the substance of your

9  testimony on those topics?

10              MS. HESMAN:  Form.  Foundation.

11              MS. BARNES:  Same objections.

12              THE WITNESS:  The substance of any

13  testimony that I provide will be consistent with what

14  I've described today in my deposition.

15      Q.   (By Mr. Fathi) So on the subjects of contract

16  monitoring and compliance activities, are you going to

17  testify to any information beyond what you've already

18  testified to today?

19              MS. HESMAN:  Form.  Foundation.

20              MS. BARNES:  Form and foundation.

21              THE WITNESS:  I don't know.

22      Q.   (By Mr. Fathi) Well, again, Doctor, you need

23  to -- you need to tell me what your testimony is going to

24  be.  So if you're going to testify on these topics beyond

25  what you've already said today, I'm asking you what your

130

```
 1    much.
 2              MR. FATHI:  You're most welcome.
 3        Q.   (By Mr. Fathi) Doctor, what is your testimony
 4    going to be at trial regarding contract monitoring and
 5    compliance activities?
 6              MS. HESMAN:  Form.  Foundation.
 7              MS. BARNES:  Form and foundation.  Asked
 8    and answered.  You can go ahead and answer it one more
 9    time, Dr. Wilson.
10              THE WITNESS:  I don't know.
11        Q.   (By Mr. Fathi) What is your testimony at trial
12    going to be regarding supervision and peer reviews of
13    mental health staff?
14              MS. HESMAN:  Form.  Foundation.
15              MS. BARNES:  Same.
16              THE WITNESS:  I don't know.
17        Q.   (By Mr. Fathi) Okay.  Tell me about your
18    involvement in peer reviews of mental health staff in
19    Arizona.
20              MS. HESMAN:  Form.  Foundation.
21              THE WITNESS:  I've had no involvement in
22    peer reviews.
23        Q.   (By Mr. Fathi) And it says you're going to,
24    "Testify regarding statistical data relating to the
25    provision of the mental healthcare to ADCRR inmates."
```

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

131

1           Do you see that?

2      A.   I do.

3      Q.   What statistical data will you be discussing?

4           MS. HESMAN:  Form.  Foundation.

5           MS. BARNES:  Form.  Foundation.

6           THE WITNESS:  I don't know.

7           MS. HESMAN:  He responded, David.

8           THE WITNESS:  I'm sorry.  I don't know.

9      Q.   (By Mr. Fathi) Tell me what kinds of statistical

10     data regarding the Arizona contract you track as a

11     regular part of your job?

12          MS. HESMAN:  Form.  Foundation.

13          THE WITNESS:  I don't track statistical

14     data as part -- a routine part of my job.

15     Q.   (By Mr. Fathi) And it also says that you're

16     going to testify regarding, "continuous improvements in

17     the delivery of mental healthcare and programming to the

18     ADCRR inmate population."  Do you see that?

19     A.   Yes.  I do.

20     Q.   And what are the continuous improvements to

21     which you're going to be testifying?

22          MS. HESMAN:  Form.  Foundation.

23          MS. BARNES:  Same objections.

24          THE WITNESS:  I don't know, except I think

25     I showed some improvement in my report, discussed some

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

132

1   improvement in the delivery of mental healthcare at least

2   in terms of the broad trends in self-injury and suicide

3   attempts.

4        Q.    (By Mr. Fathi) Other than that are you aware of

5   any other continuous improvements in the delivery of

6   mental healthcare and programming to the ADCRR inmate

7   population?

8                    MS. HESMAN:   Form.   Foundation.

9                    MS. BARNES:   Same objection.

10                   THE WITNESS:   My -- go ahead.

11                   MS. BARNES:   Sorry.   I said "same

12   objection."   Go ahead.

13                   THE WITNESS:   My understanding is that

14   there have been improvements in the metrics used under

15   this stipulation agreement, but I would have to refresh

16   myself regarding those to be able to say anything

17   specifically.

18        Q.    (By Mr. Fathi) Well, tell me about those

19   improvements in the metrics under the stipulation.

20                   MS. HESMAN:   Same objection.

21                   THE WITNESS:   At this time, I can't.

22   Because I did not review those statistics to prepare for

23   this deposition or prepare my report.

24        Q.    (By Mr. Fathi) Do you review those statistics as

25   a regular part of your -- your work?

**John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021**

133

1                MS. HESMAN:  Same objection.

2                THE WITNESS:  No.

3     Q.   (By Mr. Fathi) And it also says that you're

4  going to testify regarding your opinion that the mental

5  healthcare and programming delivered to ADCRR inmates

6  meets or exceeds community standards of care.

7         Do you see that?

8     A.   I do see that.

9     Q.   Is that going to be your testimony?

10           MS. HESMAN:  Same objections.

11           MS. BARNES:  Form and foundation.

12           THE WITNESS:  I don't know, but I would say

13  I think my testimony today has been clear that I haven't

14  reviewed mental healthcare and programming as part of my

15  preparation for the deposition today or my report.

16     Q.   (By Mr. Fathi) As we sit here today, is it your

17  opinion that the mental healthcare and programming

18  delivered to ADCRR inmates meets or exceeds community

19  standards of care?

20           MS. HESMAN:  Same objection.

21           THE WITNESS:  As we sit here today, I don't

22  have an opinion.

23     Q.   (By Mr. Fathi) If you were trying to form an

24  opinion, what would be the community standard of care

25  that you would apply?

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

134

1            MS. HESMAN:  Form.  Foundation.

2            THE WITNESS:  The kinds of things that I

3    would look at would be adherence to NCCHC, backlogs if

4    they exist, and quality of mental healthcare and

5    documentation by record review.

6        Q.   (By Mr. Fathi) And which of those things have

7    you reviewed since, say, July of this year?

8        A.   None of those things.

9        Q.   All right.  It also says that you will testify

10   regarding your opinion that the mental healthcare and

11   programming delivered to ADCRR inmates meets or exceeds

12   constitutional requirements.

13            Is that going to be your testimony?

14            MS. HESMAN:  Form.  Foundation.

15            MS. BARNES:  Form and foundation.

16            THE WITNESS:  I don't know.

17       Q.   (By Mr. Fathi) As we sit here today, is it your

18   opinion that the mental healthcare and programming

19   delivered to ADCRR inmates meets or exceeds

20   constitutional requirements?

21            MS. HESMAN:  Form.  Foundation.

22            MS. BARNES:  Form and foundation.

23            THE WITNESS:  I didn't develop an opinion.

24       Q.   (By Mr. Fathi) So you have no opinion on that?

25            MS. BARNES:  Same objection.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

135

1           (Reporter clarification.)

2           THE WITNESS:  I believe I said I don't have

3   an opinion.

4       Q.   (By Mr. Fathi) Doctor, do you have any legal

5   training?

6       A.   I worked as a legal assistant before I went to

7   graduate school.

8       Q.   Anything beyond that?

9       A.   No.

10           MR. FATHI:  Let's take a five-minute break.

11           (Recess from 1:32 p.m. to 1:39 p.m.)

12           MR. FATHI:  Let's look at Exhibit 3,

13   please.

14           (Deposition Exhibit 3 was marked for

15   identification.)

16       Q.   (By Mr. Fathi) Doctor, Exhibit 3 is a

17   January 14, 2020, e-mail from Tom Dolan to a number of

18   people.  First, who is Tom Dolan?

19       A.   He is the vice president of operations for

20   Centurion of Arizona.

21       Q.   Doctor, have you seen this e-mail before?

22       A.   No.

23       Q.   So Mr. Dolan writes, "Prior to Parson v Shinn

24   mediation, Richard asked us to review the staffing matrix

25   and submit a staffing proposal without budget

1          And she answered, "Every individual on our
2    regional mental health team."
3          And she was asked, "Including Dr. Carr?"  And
4    she answered, "Yes."
5          Dr. Wilson were you aware that Dr. Platt had
6    given this testimony?
7      A.   No.
8      Q.   Were you aware of any of the underlying facts
9    about which she testified?
10              MS. BARNES:  Form.  Foundation.
11              MS. HESMAN:  Same objection.
12      Q.   (By Mr. Fathi) Let me ask a more specific
13    question.
14      A.   Yeah.
15      Q.   Were you aware that a study had been carried out
16    that determined there was not sufficient mental health
17    staff to meet the 10 and 30-minute requirements?
18              MS. HESMAN:  Form.  Foundation.
19              MS. BARNES:  Foundation.
20              THE WITNESS:  I apologize for speaking too
21    soon.  No, I was not.
22      Q.   (By Mr. Fathi) Were you aware that everyone on
23    the regional mental health team had expressed the view
24    that there was not enough mental health staff?
25              MS. HESMAN:  Form.  Foundation.

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

142

1                    MS. BARNES:  Form.  Foundation.

2                    THE WITNESS:  No.

3        Q.    (By Mr. Fathi) Were you aware that some mental

4    health staff would tell -- had said that their caseloads

5    were too large for them to manage?

6                    MS. HESMAN:  Form.  Foundation.

7                    MS. BARNES:  Form.  Foundation.

8                    THE WITNESS:  No.

9        Q.    (By Mr. Fathi) All right.  Let's go to page 45,

10   please.  Excuse me, starting on page 44.

11                   MS. BARNES:  So I'm going to -- I'm going

12   to interject here again, much to your dismay, I'm sure.

13                   But what I am trying to figure out is what

14   your line of questioning right now about this deposition

15   transcript has to do with Dr. Wilson's expert opinion and

16   his expert report.

17                   All you're doing is reading into the record

18   testimony from this witness, a fact witness, and then

19   you're asking him if he was aware of these things.

20   That's it.  There's no -- this line of questioning

21   doesn't have anything to do with his expert opinion.

22                   MR. FATHI:  I would first note that

23   speaking objections are disfavored and improper.

24                   Dr. Wilson is expected to testify regarding

25   his opinion that the mental healthcare -- that -- excuse

John Seddon Wilson, PhD, CCHP-MH, CPHQ - 10/28/2021

147

1              And she answers, "Yes."  Do you see that?

2        A.   Yes.  I do.

3        Q.   And continuing on to page 45, she's asked, "Were

4   you aware of clinical encounters being canceled due to

5   lack of psych associate staff?"

6              Do you see that?

7        A.   I do.

8        Q.   And she answered, "I was aware of routine

9   encounters, a few, by the very end that had been

10  canceled, yes."

11             Do you see that?

12       A.   I do.

13       Q.   Were you aware that Dr. Platt had given this

14  testimony?

15       A.   No.

16       Q.   Were you aware of the underlying facts discussed

17  in this testimony?

18             MS. HESMAN:  Form.  Foundation.

19             MS. BARNES:  Form and foundation.

20             THE WITNESS:  No.

21       Q.   (By Mr. Fathi) When you wrote your response to

22  Mr. Joy's report, did you take into account vacancies

23  that existed among mental health staff?

24             MS. HESMAN:  Form.

25             THE WITNESS:  No.

148

1        Q.    (By Mr. Fathi) Just give me a moment.

2              Dr. Wilson, does this sworn testimony by

3     Dr. Platt have any effect on your opinion about the

4     adequacy of mental healthcare and programming in the

5     Arizona Department of Corrections?

6                   MS. HESMAN:  Form.  Foundation.

7                   MS. BARNES:  Form.

8                   THE WITNESS:  At this time I was not asked

9     to develop an opinion about the adequacy.  So I can't

10    answer that.

11        Q.    (By Mr. Fathi) If you are asked to develop an

12    opinion about the adequacy of mental healthcare in the

13    Arizona Department of Corrections, will this sworn

14    testimony by Dr. Platt be relevant as you form that

15    opinion?

16                   MS. HESMAN:  Form.  Foundation.

17                   MS. BARNES:  Form.

18                   THE WITNESS:  That sworn testimony should

19    be taken into account, yes.

20        Q.    (By Mr. Fathi) Doctor, we spoke earlier about

21    the increase in suicides recently in the department.

22    Could vacancies in custody staff be a contributing factor

23    to that increase?

24                   MS. HESMAN:  Form.  Foundation.

25                   THE WITNESS:  Theoretically, absolutely,

150

1                          SIGNATURE PAGE

2          I, JOHN SEDDON WILSON, a deponent exercising my
   right to read and sign my deposition taken on October 28,
3  2021, place my signature hereon and make the following
   changes on this _____ day of _____,2021.

4       (IF THERE ARE NO CHANGES, WRITE "NONE.")

5

6                          _____

                           JOHN SEDDON WILSON
7

8  PAGE   LINE   READS          CHANGE TO           REASON

9  _____  _____  _____

10 _____  _____  _____

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24 _____  _____  _____

25 _____  _____  _____

151

1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA )

3           BE IT KNOWN that I took the foregoing
    deposition pursuant to Notice; that the witness was duly
4   sworn by me; and that said transcript is a full, true,
    and accurate record of the proceedings; that the
5   proceedings were taken down by me in shorthand and
    thereafter reduced to print under my direction; that I
6   have acted in compliance with ACJA 7-206.

7           I CERTIFY that I am in no way related to
    any of the parties hereto nor am I in any way interested
8   in the outcome hereof.

9           Pursuant to request, notification was
    provided that the deposition is available for review and
10  signature.

11          Dated this 29th day of October, 2021.

12

13

14  _____
    Jennifer Honn
    Certified Reporter
15  Arizona CR No. 50885

16

17          I CERTIFY that GLENNIE REPORTING SERVICES,
    LLC, has complied with the ethical obligations set forth
18  in ACJA 7-206.

19

20

21

22

23  _____

24  GLENNIE REPORTING SERVICES, LLC
    Registered Reporting Firm
25  Arizona RRF No. R1035