Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**EXPERT DECLARATION OF GRANT PHILLIPS, M.D.** |

I, Grant Phillips, M.D., make the following Declaration:

1. I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2. I am the Medical Director for the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") and am licensed to practice medicine in the State of Arizona.

3. I graduated from Colorado State University with a Bachelor's in Biological Sciences and received my medical degree from Creighton University School of Medicine.

4. I completed my residency at the Phoenix Baptist Hospital in June 2002.

1    5.   Before taking my current role as ADCRR's Medical Director in 2020, I was
2    the Medical Director of the Maricopa County Correctional Health Services ("CHS"), a
3    position I assumed in February 2018.
4    6.   Prior to that, I was the Assistant Medical Director of CHS from January 2016
5    to January 2018 and the Lead Provider at Estrella Jail from January 2011 to December 2015.
6    7.   I also practiced family medicine and urgent care at Parkway Medical from
7    July 2006 to December 2010 and served as a Major in the Medical Corps, USAF, at Luke
8    Air Force Base in Arizona from July 2002 to July 2006.
9    8.   I actively provided health care to inmates in jails and prisons from 2011 to
10   2020.
11   9.   I am also an Assistant Clinical Professor at Creighton University School of
12   Medicine and at the University of Arizona College of Medicine.
13   10.  Exhibit 1 is my current curriculum vitae, which more fully outlines my
14   qualifications, along with my recent presentations.

**Medication-Assisted Treatment for Substance Use Disorder**

16   11.  I have reviewed Dr. Todd Wilcox's claims regarding provision of Medication
17   Assisted Treatment ("MAT") for substance use disorder ("SUD"), as well as Robert Joy's
18   resulting assumptions that he included in his staffing analysis.
19   12.  It is not the standard of care to provide MAT for SUD on such a large scale
20   with a prison population, and notably, neither Dr. Wilcox nor Mr. Joy cites to any literature
21   or other sources that support such a claim.
22   13.  In my experience, MAT for SUD using methadone, buprenorphine, or
23   naltrexone can be an effective component of treatment under certain circumstances,
24   particularly immediately prior to release to the community, but its prolonged use in a
25   correctional setting has significant risks and limitations.
26   14.  There is also an important distinction to be drawn between jail and prison
27   populations.
28   15.  In a jail setting, on average individuals with substance use disorders will be

1 released from custody into the community much more quickly, where they are often at high
2 risk of relapse.

3     16. By contrast, individuals in a prison setting have sentences lasting at least a
4 year and often much longer, and the risk of relapse is more remote in time.

5     17. As a result, the need for MAT for the treatment of SUD is significantly lower
6 in a prison setting than in a jail setting.

7     18. When I was at Maricopa County, I was part of the team that developed a
8 treatment program using methadone and naltrexone, as well as supporting the initiation of
9 buprenorphine, for individuals in the Maricopa County jails who were about to be released
10 and were identified as being at high risk of relapse upon return to the community.

11     19. For these individuals, we offered medication induction in the 7 to 10-day
12 period immediately before their release and coordinated with community Opioid Treatment
13 Programs to develop treatment plans to ensure continuity of care upon release into the
14 community.

15     20. Dr. Wilcox sent a team about three years ago to visit Maricopa County to
16 observe the program and potentially implement best practices for use in the Salt Lake City
17 jail system.

18     21. In designing the program at Maricopa County, we focused on high-risk
19 individuals immediately prior to their release because we concluded that this approach
20 presented the best balance between reducing risk of relapse and limiting security risks posed
21 by the administration of the medications.

22     22. Ongoing MAT for inmates who are not about to be released poses significant
23 security concerns because there is a strong incentive for diversion.

24     23. Methadone and buprenorphine have a high value as contraband in a
25 correctional setting. Additionally, inmates who are known to be receiving MAT may be
26 threatened or targeted for abuse by other inmates.

27     24. As a result, methadone and buprenorphine cannot be administered during a
28 regular pill pass or pill call. They must be administered in a controlled setting, where

3

1  medical and corrections staff are available to supervise administration of the medication
2  and individually verify its consumption.

3      25.     For example, in Maricopa County, we required inmates to sit in the clinic
4  during administration of methadone and to remain for a period of observation to ensure that
5  no diversion would take place.

6      26.     Eliminating the chance of diversion protects not only the patients for safety
7  reasons already mentioned, but also other inmates who are "opioid-naïve" and may gain
8  access to a dose of opioids that could be potentially fatal.

9      27.     Administration of MAT in the clinic therefore requires a significant amount
10 of time, staffing resources, and valuable clinic space to conduct properly.

11     28.     Enrolling large numbers of inmates in an opioid treatment program for an
12 indefinite period of time has the strong potential of diverting resources that should be
13 devoted to conducting daily clinical operations, like nursing sick call and provider chronic
14 care visits.

15     29.     Contrary to Dr. Wilcox's claims, MAT is available to ADCRR inmates.

16     30.     Inmates in ADCRR are currently able to request naltrexone induction prior to
17 release from custody.  ADCRR has a partnership with a pharmaceutical company that will
18 supply the first dose of the medication to the prison, and the patient is provided with a
19 follow-up treatment plan to allow for continued treatment in the community after release.
20 There are several patients at Perryville and a patient at Lewis who have recently requested
21 naltrexone injections.

22     31.     ADCRR also has a pilot program at Tucson called the Therapeutic
23 Community, also referred to as the Men in Recovery Community, which is an on-site
24 residential substance use treatment program that is designed to provide group therapy,
25 discharge planning, and induction immediately prior to release.  The program began with
26 30 inmates, but that number has been increased to 78 and will continue to increase up to the
27 program's capacity of 135.  MAT inductions for qualified patients with opioid use disorder
28 will be implemented prior to their release from custody starting in May/June 2022.

32. MAT for substance use disorders can be an effective method for reducing relapse in incarcerated individuals following their release from custody.

33. In my experience, for patients entering the jail system where the length of incarceration tends to be short and individuals are likely to reenter the community within days to months, continuity of MAT from the community is highly beneficial. This continuity of treatment creates less discomfort for the patient, who does not need to experience opioid withdrawal symptoms and greatly decreases the likelihood of relapse and overdose.

34. In the prison system, however, where an inmate is serving a defined period of time in custody and is likely to be incarcerated for months to years, or even decades, the implementation of MAT for prolonged periods is of questionable benefit.

35. Within the ADCRR system, there is a large population of inmates with SUD. If MAT were to be started long-term on a large scale, the evaluation, treatment, and monitoring of this population would require not only an increase in healthcare staffing, but also additional security staff, and additional facility infrastructure. It would also pull essential resources away from daily healthcare operations like sick call and medication administration.

36. In addition, patients on MAT in a prison setting may be targeted for diversion, putting themselves in danger. Also, the mere fact that some patients would be on MAT while others are not can be a trigger in itself for opioid cravings.

37. A much more practical approach would be to include MAT as a potential component of release planning.

38. It is certainly not the standard of care to provide MAT for all inmates with SUD regardless of their release date as claimed by Dr. Wilcox and Mr. Joy.

39. In my view, the current approach at ADCRR to treatment of SUD is in accordance with the standard of care in a correctional setting.

**Hepatitis C Treatment at ADCRR**

40. As is common in many jails and prisons, ADCRR has a large population of

1   patients with chronic hepatitis C.

2       41.    Since assuming the contract in July 2019, Centurion has prioritized treatment
3   of chronic Hepatitis C for ADCRR inmates.

4       42.    The effort has largely been spearheaded by Dr. Orm, with active monitoring
5   of patients overseen by Nurse Practitioner Amy Phillips.

6       43.    At this time, there are currently approximately 1,800 in-custody ADCRR
7   inmate-patients who are candidates for hepatitis C treatment.

8       44.    ADCRR's policies and procedures for the evaluation and treatment of
9   hepatitis C have recently been updated to ensure consistency with evidence-based practices.

10      45.    Centurion's hepatitis C program is designed to provide treatment based on the
11  severity of illness and risk of complication, and patients with chronic hepatitis C are
12  classified into groups based on 'Priority Levels'.

13      46.    Patients in Priority Level 1 are in the highest priority group for evaluation and
14  treatment and include patients with Fibrosis Stage 4 (F4) disease (cirrhosis), as well as those
15  with HIV or hepatitis B virus co-infection.

16      47.    Priority Level 2 patients are in the intermediate priority group and include
17  patients with Fibrosis stage 3 (F3) disease (advanced fibrosis), as well as patients with
18  Fibrosis stage 2 disease, along with comorbid conditions (e.g., chronic kidney disease,
19  diabetes).

20      48.    Finally, Priority Level 3 patients are those with Fibrosis stages F2 through F0.

21      49.    This priority system allows for evaluation and treatment of patients with the
22  most advanced disease, while also monitoring the progression of patients with less advanced
23  liver disease.

24      50.    There are approximately 8,000 inmates in ADCRR with chronic hepatitis C.

25      51.    Prior to the implementation of the Centurion program, 160 inmates had been
26  treated. As of August 31, 2021, 827 inmates had completed treatment, 130 inmates were
27  undergoing treatment, and 664 were in the process of being worked up for inclusion in the
28  program.

52. The goal is to complete treatment for all F3 and F4 inmates by the end of the second year of the program. During that timeframe, some inmates with lower Priority Levels were also being treated, but after that first milestone is reached, the focus will shift to completing treatment for all inmates, which will continue to be based on the systemic approach outlined in the ADCRR policies and procedures.

53. Additionally, the program is not static, and Centurion is continually looking at ways of innovating and best utilizing available resources to treat as many patients in the shortest possible timeframe.

54. ADCRR has worked closely with Centurion throughout the implementation of the program and has recently revised the Medical Services Technical Manual ("MSTM") to remove a previous exclusion from hepatitis C treatment of inmates with an active substance abuse disorder diagnosis, as well as disciplinary action for a positive urinalysis.

55. The complete revision of the hepatitis C MSTM chapter to reflect current evidence-based practices is a reflection of the high priority that ADCRR has placed on positive health outcomes for the prison population.

56. I understand that Dr. Wilcox has identified several cases in his report of inmates whose treatment for hepatitis C he claims was delayed or who experienced poor outcomes. However, the delays in treatment he has identified largely pre-date the Centurion hepatitis C program.

57. Additionally, successful treatment of hepatitis C at late stages is not a guarantee of a good outcome, and it is to be expected in any system, but particularly in a correctional system, that some percentage of individuals with cirrhosis and/or advanced fibrosis will experience poor outcomes despite receiving appropriate care.

58. This is in no way an example of a systemic problem with the delivery of hepatitis C treatment.

59. Centurion's hepatitis C program is very proactive and is at the leading edge compared to many other states. In my opinion, Centurion's program represents best practices for the treatment of hepatitis C in a correctional setting.

I declare under penalty of perjury under the laws of the United States of America and the State of Arizona that the foregoing is true and correct.

Executed this  11  day of November, 2021.

_____
Grant Phillips, M.D.