# In The Matter Of:

*Parsons vs.*

*Shinn*

---

*30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle)*

*September 24, 2021*

---

*Glennie Reporting Services, LLC*

*1555 East Orangewood Avenue*

*Phoenix, Arizona  85020*

*602.266.6535 Office     877.266.6535 Toll Free*

*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 092421JV.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen;<br>Stephen Swartz; Dustin Brislan;<br>Sonia Rodriguez; Christina Verduzco;<br>Jackie Thomas; Jeremy Smith; Robert<br>Gamez; Maryanne Chisholm; Desiree<br>Licci; Joseph Hefner; Joshua Polson;<br>and Charlotte Wells, on behalf of<br>themselves and all others similarly<br>situated; and Arizona Center for<br>Disability Law,<br>               Plaintiffs,<br>   v.<br><br>David Shinn, Director, Arizona<br>Department of Corrections,<br>Rehabilitation and Reentry; and<br>Larry Gann, Assistant Director,<br>Medical Services Contract Monitoring<br>Bureau, Arizona Department of<br>Corrections, Rehabilitation and<br>Reentry, in their official<br>capacities,<br>               Defendants.<br>_____ | Case No.<br>CV12-00601-PHX-ROS |

RULE 30(b)(6) DEPOSITION OF ARIZONA DEPARTMENT OF
CORRECTIONS, REHABILITATION, AND REENTRY ("ADCRR")

(WARDEN JEFFREY VAN WINKLE)

Via Zoom Videoconference
Phoenix, Arizona
September 24, 2021; 9:08 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue
Phoenix, Arizona  85020

602.266.6535
www.glennie-reporting.com

Prepared by:
Janet Hauck, RPR
Arizona CR No. 50522

2

1                          I N D E X

2

3   Witness                                    Page

4   WARDEN JEFFREY VAN WINKLE

5        Examination by Ms. Morris:              4

6        Examination by Ms. Love:             235

7        Further Examination by Ms. Morris:   236

8

9                     INDEX TO EXHIBITS

10  Description                                Page

11  Exhibit 1      Notice of 30(b)(6) Deposition      8

12  Exhibit 2      Department Order Manual effective   18
                   7/21/17
13
    Exhibit 3      Department Order Manual effective   38
14                 7/24/19

15  Exhibit 4      Department Order Manual 4/15/21    111

16  Exhibit 5      Department Order Manual effective  116
                   5/6/21
17
    Exhibit 6      Department Order Manual effective  175
18                 9/20/18

19  Exhibit 7      Department Order Manual effective  125
                   5/5/20
20
    Exhibit 14     Daily Post Sheet - CONFIDENTIAL    208
21                 SUBJECT TO PROTECTIVE ORDER

22  Exhibit 19     Priority Posting Chart -           223
                   CONFIDENTIAL SUBJECT TO PROTECTIVE
23                 ORDER

24  Exhibit 21     Yard Staffing Levels - CONFIDENTIAL 225
                   SUBJECT TO PROTECTIVE ORDER
25

3

```
 1            RULE 30(b)(6) DEPOSITION OF ARIZONA

 2   DEPARTMENT OF CORRECTIONS, REHABILITATION, AND REENTRY

 3   ("ADCRR") (WARDEN JEFFREY VAN WINKLE), was taken on

 4   September 24, 2021, via Zoom videoconference, commencing

 5   at 9:08 a.m., before JANET HAUCK, RPR, a Certified

 6   Reporter, Certificate No. 50522, for the State of Arizona.

 7

 8   VIDEOCONFERENCE APPEARANCES:

 9   For Plaintiff Arizona Center for Disability Law:

10            ARIZONA CENTER FOR DISABILITY LAW
             Maya Abela, Esq.
11            177 North Church Avenue, Suite 800
             Tucson, Arizona  85701
12
     For Plaintiffs Shawn Jensen; Stephen Swartz;
13   Sonia Rodriguez; Christina Verduzco; Jackie Thomas;
     Jeremy Smith; Robert Gamez; Maryanne Chisholm;
14   Desiree Licci; Joseph Hefner; Joshua Polson; and
     Charlotte Wells, on behalf of themselves and all others
15   similarly situated:

16            ACLU NATIONAL PRISON PROJECT
             Maria V. Morris, Esq.
17            915 15th Street N.W., Seventh Floor
             Washington, D.C.  20005
18
             PERKINS COIE, LLP
19            Alisha Tarin-Herman, Esq. (not yet admitted)
             2901 North Central Avenue, Suite 2000
20            Phoenix, Arizona  85012

21

22   For Defendants:

23            STRUCK LOVE BOJANOWSKI & ACEDO, PLC
             Rachel Love, Esq.
24            3100 West Ray Road, Suite 300
             Chandler, Arizona  85226
25
```

4

1              COURT REPORTER:  Before we proceed, will

2       counsel agree on the record that there is no objection to

3       me administering an oath to a witness not appearing

4       personally before me.

5              MS. MORRIS:  Yes.

6              MS. LOVE:  Yes.

7

8              WARDEN JEFFREY VAN WINKLE,

9       called as a witness herein having been first duly sworn by

10      the Certified Reporter to tell the whole truth and nothing

11      but the truth, was examined and testified as follows:

12

13                    EXAMINATION

14      BY MS. MORRIS:

15         Q.    Hi.  Could you please state your name for the

16      record.

17         A.    Jeffrey Van Winkle.

18         Q.    Have you been deposed before?

19         A.    No.  I've done depositions in writing before but

20      not in this manner.

21         Q.    All right.  Can you tell me what cases you've

22      done depositions in writing before?

23         A.    I just recently did one where an inmate is suing

24      us over a diet and another one where we are having an

25      employee sue the department.

5

1     Q.    Do you remember the name of the one about the

2  suit over the diet?

3     A.    I don't remember the inmate's name.  I'm sorry.

4     Q.    Okay.  Is it in the District of Arizona?

5     A.    I just completed that written deposition.  I

6  don't believe that's been turned in as of yet.

7     Q.    Okay.  And those two that you just mentioned

8  are the only ones you've ever done?

9     A.    Yes, ma'am.

10     Q.    Okay, thanks.  All right.  I'm going to give

11  you sort of a set of rules then that apply to depositions.

12  One thing is that everything that we say is being recorded

13  by the court reporter, and that means a couple things.

14  One is that it's important we try not to speak over each

15  other.  So I'll try to wait until you finish your answer

16  before asking another question, and you need to try to

17  wait until I finish my question before answering.  Makes

18  sense?

19     A.    Understood.

20     Q.    Okay.  The other thing it means is that it's

21  important to use words rather than gestures or nods or

22  uh-huh, huh-uh, okay?

23     A.    Yes, ma'am.

24     Q.    All right.  Over the course of the day your

25  lawyer may be making objections.  The lawyer makes these

1    for the record, but unless you're instructed not to

2    answer, you should go ahead and answer, okay?

3        A.    Yes, ma'am.

4        Q.    If you don't understand a question can you let

5    me know?

6        A.    Yes, I will.

7        Q.    If you don't tell me that you don't understand,

8    I'm going to assume that you understand.  Does that seem

9    fair?

10        A.    Yes, ma'am.

11        Q.    All right.  We're entitled to get the

12    information that you have.  If, for example, you don't

13    know the exact answer but you know an estimate, you should

14    go ahead and provide the estimate.  I'm not asking you to

15    guess or speculate, but if you have an estimate then

16    that's an appropriate answer.

17              So an example that I give to distinguish

18    between those two things is:  If I said to you, how many

19    coins are in my pocket, you would have no knowledge so you

20    would be guessing, whereas if I said, how many keys are in

21    your pocket, you might not know exactly, but you know four

22    or five or nine or ten, in that sort of estimate range,

23    right?  Does that make sense?

24        A.    Yes, ma'am.

25        Q.    Okay.  We'll take a break, like a short break,

7

1   about every hour, and we'll also take a lunch break.   And

2   I'm in a different time zone.  So if I'm going on too long

3   and you guys need a lunch break, let me know if it's time

4   for lunch.  Also, if you need a break at some point, let

5   me know.  I will find a breaking point that works and

6   we'll take a break.  Does that make sense?

7        A.    Yes, it does.

8        Q.    Okay.  Please don't speak with your lawyer

9   while there's a question pending, okay?

10       A.    Yes.

11       Q.    Are you on any medications that limit your

12   ability to give your full and accurate testimony today?

13       A.    No, I am not.

14       Q.    And is there any other reason that you're

15   unable to give your full and accurate testimony today?

16       A.    No, there is not.

17       Q.    Okay.  And again, I really do apologize for my

18   not being on screen.  I wish my computer was working

19   because it's weird to speak to someone and have them not

20   able to see me.  So I'm sorry about that.

21             Okay.  Warden Van Winkle, can you tell me,

22   what is your job title?

23       A.    I am warden at the Arizona State Prison

24   Complex -- Florence.

25       Q.    At Florence?

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

8

1       A.      Yes, ma'am.

2       Q.      Okay.  How long have you worked for the Arizona

3   Department of Corrections?

4       A.      I've worked for the Arizona Department of

5   Corrections Rehabilitation and Reentry for 22 years.

6       Q.      If I refer to the Arizona Department of

7   Corrections, Rehabilitation, and Reentry as ADCRR, will

8   you understand that that's what I'm talking about?

9       A.      Yes, ma'am.

10       Q.      Okay.  All right.  So do you understand that

11   you've been designated as a deponent under Rule 30(b)(6)

12   and what that means?

13       A.      Yes, ma'am.

14       Q.      So do you understand that you are testifying as

15   ADCRR in this deposition?

16       A.      Yes, ma'am.

17               (Exhibit 1 identified for the record.)

18       Q.      BY MS. MORRIS:  I would like to introduce what

19   we've marked as Plaintiffs' Exhibit 1 and it is the

20   deposition notice.  Can you see the deposition notice?

21       A.      Yes, ma'am.

22       Q.      Have you seen this deposition notice before?

23       A.      Yes, I have.

24       Q.      When was the first time you saw it?

25       A.      Monday midday.

9

```
 1        Q.    Monday of this week?

 2        A.    Yes, ma'am.

 3        Q.    Okay.  When did you first learn that you would

 4    be the 30(b)(6) designee?

 5        A.    Last Friday.

 6        Q.    So one week ago?

 7        A.    Yes, ma'am.

 8        Q.    How much time have you spent preparing for this

 9    deposition?

10        A.    Since I was notified I would be doing it.

11        Q.    Okay.  But about how many hours have you spent

12    total preparing?

13        A.    Oh, roughly 40 to 50 hours.

14        Q.    So it was essentially your full-time job for

15    this week?

16        A.    Yes, ma'am.

17        Q.    Okay.  All right.  So we're just going to go

18    quickly through each topic and confirm what you are

19    prepared to testify on today, okay?

20        A.    Yes.

21        Q.    All right.  So topic 1 is policies and

22    procedures for placement in, retention in, and release

23    from isolation.  Are you prepared to testify regarding

24    that topic?

25        A.    Yes.
```

10

1      Q.    Conditions of confinement in isolation.  Are

2  you prepared to testify regarding this topic?

3      A.    Yes.

4      Q.    Programming available in isolation, including

5  but not limited to, employment, education, drug treatment,

6  and rehabilitative services.  Are you prepared to testify

7  regarding topic 3?

8      A.    Yes.

9      Q.    Topic 4 is lengths of stay in isolation,

10  including mean, median, and maximum time -- lengths of

11  confinement in each isolation unit.  Are you prepared to

12  testify regarding topic 4?

13      A.    Yes.

14      Q.    Topic 5 is policies and procedures related to

15  incarcerated person privileges while housed in isolation,

16  including increases and decreases in such privileges.  Are

17  you prepared to testify regarding topic 5?

18      A.    Yes.

19      Q.    Topic 6 is policies and procedures regarding

20  any out-of-cell time for incarcerated persons in

21  isolation, including, but not limited to, any congregate

22  activities allowed with other incarcerated persons.  Are

23  you prepared to testify regarding topic 6?

24      A.    Yes.

25      Q.    It is my understanding that you are not

1    testifying with regard to topics 7 through 10; is that

2    accurate?

3              MS. LOVE:  Maria, let me jump in here to

4    let you know that the communications between Ashlee Hesman

5    and David Fathi I believe set forth that Warden Van Winkle

6    is prepared to testify for topic 7, 8, and 9 to the extent

7    that it's operations related, but if there's a drill-down

8    into specifics as to the provision of mental health care

9    specifically in the parameters of that, Dr. Stallcup will

10   be testifying to that.  So he has some information that is

11   operations related to where he could testify to 7, 8, and

12   9, but topic 10 would be exclusive Dr. Stallcup.

13       Q.   BY MS. MORRIS:  Okay.  And then topic 11 is

14   training provided to health care staff to work with

15   incarcerated persons in isolation.  Are you prepared to

16   testify as to that topic?

17       A.   Yes.

18              MS. MORRIS:  And, Rachel, is he the only

19   designee for that topic?

20              MS. LOVE:  At this point I think it's going

21   to be dictated upon the breadth of the questions.  He is

22   prepared to testify on that topic, but just not knowing

23   exactly, you know, how drilled down into the details he

24   may have to punt, and we can, I think, deal with that, but

25   he is prepared to testify to the topic.

12

1      Q.    BY MS. MORRIS:  Okay.  And then topic 12 is

2    training provided to correctional staff who are regularly

3    assigned to work in isolation units.  Are you prepared to

4    testify regarding topic 12?

5      A.    Yes.

6            MS. MORRIS:  And, Rachel, is it the same

7    situation there, that if there is something that you

8    believe he's going to be able to testify, but it's

9    possible that it will need to be designated to someone

10   else, as well?

11           MS. LOVE:  Correct, yes.  We are prepared.

12   We've done a lot of preparation for these, but if there's

13   a tiny little detail that he might not be able to answer,

14   we might have to designate an additional person.

15     Q.    BY MS. MORRIS:  All right.  Topic 13 is

16   correctional staff posts at each isolation unit for each

17   shift, including knowledge of post orders and daily job

18   duties.  Are you prepared to testify regarding topic 13?

19     A.    Yes.

20     Q.    Topic 14 is required correctional staff levels

21   for each isolation unit for each shift, including current

22   staffing schedules.  Are you prepared to testify regarding

23   that topic?

24     A.    Yes.

25     Q.    Then finally, topic 15 is policies and

1  procedures regarding the use of force or restraints by

2  ADCRR staff on incarcerated persons on mental health watch

3  or on incarcerated persons classified as SMI, MH-3 through

4  MH-5, or any other mental health classifications employed

5  by the ADC or Centurion while housed in isolation.  Are

6  you prepared to testify regarding that subject?

7      A.    Yes.

8      Q.    Okay.  I'd like to agree on some terminology

9  before we get going.  Can we agree that the term max

10 custody means maximum custody?

11     A.    Yes.

12     Q.    And can we agree that, if I use the term

13 general population max custody, that means maximum custody

14 that doesn't have some other special designation such as

15 enhanced management, restrictive status housing program,

16 behavioral modification, or STG?

17     A.    Yes.

18     Q.    And can we agree that mental health watch means

19 continuous mental health watch, ten-minute mental health

20 watch, 30-minute mental health watch, and precautionary

21 security watch, unless one of us specifies that we're

22 talking about some specific level of watch?

23     A.    Yes.

24     Q.    Okay.  All right.  Let's start with topic 1,

25 policies and procedures for placement and retention in and

14

1   release from isolation.

2                    What are the policies that related to

3   people being classified as max custody?

4        A.    I don't have specific policy numbers, but I can

5   speak to the policies getting placement into or retention

6   in detention.

7        Q.    I'm sorry.  Did you just say you don't know the

8   specific policy numbers?

9        A.    I'm not familiar with the exact policy numbers

10   at this time.  No, ma'am.

11        Q.    Okay.  Are you familiar with what policy is

12   used to classify people as max custody?

13        A.    Classification policy is 801, I believe.

14        Q.    Okay.  Do you know if there are any other

15   policies that would relate to people being classified to

16   max custody?

17        A.    It mostly revolves around our classification

18   policy, placing people in max custody.

19        Q.    Okay.  So you're not aware of any other

20   policies that relate to the classification as max custody?

21        A.    No, ma'am.

22        Q.    Okay.  People are sometimes classified as max

23   custody at their initial classification, correct?

24        A.    Correct.

25        Q.    Could you sort of walk me through how that

15

1  process works?

2       A.     As they come into our initial receiving area

3  then they go through a series of classification questions

4  that they have to look at, such as a prior commitment,

5  previous commitment, escape history, institutional

6  violence, or disciplinary history.  And so they take all of

7  that and look at age, as well, STG affiliation.

8              By our classification system all of that

9  gives specific numbers to those criteria.  Those numbers

10 are added up.  And if it warrants a high enough

11 classification number, then at that point it would warrant

12 max custody.  If they are warranted as max custody by our

13 classification system, our max intake center is at

14 Browning unit at Eyman complex, and they're transferred to

15 Eyman complex and they're brought into the system through

16 Browning unit at Eyman complex.

17      Q.     So does that initial classification process

18 happen before they come into ADCRR?

19      A.     No.  It's as they are initially placed within

20 Arizona Department of Corrections.

21      Q.     About how long does it take to get that initial

22 classification accomplished?

23      A.     More times than not they're getting that

24 completed within a three-day period.

25      Q.     Okay.  During that first three-day period would

16

1    all the people -- all the men be going to Phoenix?

2         A.    Yes, ma'am.

3         Q.    Okay.  And then if the classification indicates

4    that the person should be max custody then they would be

5    transferred to the Eyman/Browning intake unit?

6         A.    That's correct.  Yes, ma'am.

7         Q.    Okay.  Thank you.  You just described several

8    things get looked at to make that classification decision.

9    Are there override options or override possibilities?

10        A.    Initially, when somebody is coming in, that

11   override criteria wouldn't be looked at until their 180-day

12   review.

13        Q.    Okay.  Can you explain what you just said?

14        A.    I'm sorry.  I didn't mean to speak over you.

15        Q.    That's okay.

16              So as they come in as a classified max

17   custody they go to Browning and it's designated where

18   they're supposed to go from there.  So, for instance, if

19   they are an STG, if they're a previous STG coming into the

20   system they'll remain at Browning unit.  A maximum custody

21   general population inmate will remain at Browning unit.

22   An inmate that was previously protective custody that

23   could come in as maximum custody would go to Lewis

24   complex.

25              So based on their designation when they

17

1    come in is where they would be placed.  As they come into

2    maximum custody, if they're designated max custody, the

3    override wouldn't be looked at until we have a knowledge

4    of what type of inmate that's going to be.  So they would

5    have to do time at a maximum custody before we would

6    consider them for an override.

7        Q.    Okay.  My understanding is that a person who is

8    sentenced to a life sentence that the policy requires

9    them, regardless of what other things there are in their

10   classification consideration, the first two years they are

11   generally assigned to max custody; is that correct?

12       A.    That is correct.  So an inmate that comes in

13   with a life sentence automatically has to do two years in

14   maximum custody before they could be looked at to go to a

15   lesser custody level.

16       Q.    And is that considered an override, the fact

17   that they must go to max custody, regardless of other

18   factors in their classification process?

19       A.    It wouldn't be considered an override.  No,

20   ma'am.

21       Q.    Okay.  All right.  People are also sometimes

22   classified as max custody during their incarceration,

23   correct?

24       A.    Yes, ma'am.

25       Q.    Are there differences in the process during

```
 1    that reclassification as max custody as opposed to the

 2    initial classification as max custody?

 3         A.    There is, because they're looking at factors

 4    involved with that inmate's current incarceration.

 5              So, for instance, if you have an inmate

 6    that comes in at medium custody or close custody and they

 7    receive disciplinary infractions, those disciplinary

 8    infractions are going to increase that score during the

 9    classification review, and that potentially could place

10    them in a maximum custody setting based on their points.

11              (Exhibit 2 identified for the record.)

12         Q.    BY MS. MORRIS:  I'm going to introduce

13    Plaintiffs' Isolation Exhibit No. 2.  Can you see my

14    screen and that I'm showing you the departmental order

15    801?

16         A.    Yes, ma'am.

17         Q.    And can you tell me what department order 801

18    is?

19         A.    Inmate classification.

20         Q.    And this is the policy that you mentioned

21    earlier as the policy that is relevant to classification

22    of incarcerated people as maximum custody, correct?

23         A.    Yes, ma'am.

24         Q.    Okay.  I'm going to go to what is marked as

25    page 1 of DO 801, Exhibit 2.  In the paragraph on Purpose,
```

19

1   in the middle of the paragraph it says:  This process, the

2   classification process, considers behavior and other

3   objective factors that are available.  Do you see that?

4        A.    Yes, ma'am.

5        Q.    Is behavior considered an objective factor?

6        A.    Yes.  It could be.  Yes, ma'am.

7        Q.    Could it be not?  Is it always an objective

8   factor?

9        A.    Well, it could be looked at both negatively and

10  positively.

11       Q.    Okay.  What does objective factor mean?

12       A.    This is a factor that's absolutely going to

13  affect the inmate's score.  Something that we could

14  potentially look at in order to correctly score the inmate

15  for his classification.

16       Q.    And that's what you understand objective factor

17  to mean?

18       A.    Yes, ma'am.

19       Q.    Okay.  I want to go back just a moment.

20             If a woman comes into the system, into

21  ADCRR, and her classification process indicates that --

22  well, how does the process of classifying her as maximum

23  custody work?

24       A.    So they have an intake center at Perryville with

25  the females.  It's very similar to the males.  She would

20

1    come in, be assessed by her scores, and they would

2    determine at that point what custody level she would go

3    into.

4        Q.    And if she was found to be classified as max

5    custody, where would she then be sent?

6        A.    She would remain at Perryville.

7        Q.    Would she go to any particular housing unit?

8        A.    I'm not real familiar with the Perryville

9    complex as far as maximum custody placement.  I do not

10   believe currently that they have any maximum custody

11   inmates at Perryville, but I know they have a designated

12   area if they have an inmate that requires maximum

13   placement.

14       Q.    But to your knowledge, there are no female max

15   custody incarcerated people right now?

16       A.    Not that I'm aware of.  No, ma'am.

17       Q.    Is there someone who would be aware of that?

18       A.    The warden at Perryville would be aware of that.

19       Q.    Okay.  Going back to the Isolation Exhibit

20   No. 2, DO 801, in that initial paragraph about the purpose

21   of the policy, the last sentence is:  The classification

22   system is a component of the inmate's corrections plan.

23   Do you see that?

24       A.    Yes, ma'am.

25       Q.    What is the corrections plan?

21

1       A.     When an inmate comes in, the correctional

2   officer 3 that the inmate is assigned to will do a

3   corrections plan with the inmate.   It's a face-to-face

4   interaction with the inmate where they sit down and go over

5   basically things that are going to help the inmate during

6   his incarceration, such as programming that would be

7   required.   They talk about his release date and the items

8   that would need to be completed before he gets released.

9       Q.     Okay.   Where is the corrections plan found?

10      A.     All that information is placed within our

11  system, on our ACIS system.

12      Q.     Is a copy of the corrections plan provided to

13  the incarcerated person?

14      A.     Yes, ma'am, it is, by the correctional officer

15  3.

16      Q.     And is the corrections plan updated

17  periodically?

18      A.     It is.   Every time that they come in for --

19  every time they're classified the corrections plan should

20  be updated.

21      Q.     And that's essentially annually, correct?

22      A.     That is correct.

23      Q.     Okay.   So you mentioned that a person cannot be

24  reduced from their initial classification as max custody

25  for at least six months, correct?

22

1          A.     Yes, ma'am.

2          Q.     So if a person came into maximum custody and

3    did exactly the things that they're required to do to move

4    through the steps, there's no possibility that they would

5    be removed from max custody in less than six months; is

6    that accurate?

7          A.     Yes, ma'am.  And if I could go back just real

8    quickly.

9          Q.     Yeah.

10         A.     There are elements within the classification

11   policy that would allow us to initiate that process if we

12   so wanted to do so, I believe, if I remember correctly, in

13   regards to the policy.

14         Q.     Okay.

15         A.     It could, in fact, be initiated by the CO 3 and

16   it could go up through the chain.  To my knowledge, though,

17   I don't believe the inmates can be brought down in custody

18   level from max within the first six months.

19         Q.     All right.  When you were talking a moment ago

20   about -- you think there's way to speed that up and start

21   the process of reducing someone's max custody

22   classification, is that about people who are sentenced to

23   life sentences in their first two years, is it possible

24   that's what you were thinking about?

25         A.     No, ma'am.  That's non-discretionary.

23

1       Q.      Okay.

2       A.      An inmate that comes in with a life sentence has

3   to be two years in maximum custody.

4       Q.      Okay.  Do you know if that can be overridden in

5   any way?

6       A.      I don't believe there's a possibility of that.

7   No, ma'am.

8       Q.      Can you explain what a discretionary override

9   is?

10      A.      A discretionary override would be basically, as

11  I explained, if the CO 3 has noticed that the inmates

12  aren't doing things that they're supposed to do according

13  to their corrections plan, they are programming, staying

14  out of trouble, not getting disciplinary, and basically

15  being a model inmate within the system, they can put in for

16  discretionary override to place that inmate in a lower

17  custody level.  And they can initiate the paperwork on that

18  that would go up through the CO 4, through the deputy

19  warden, through the warden, and then ultimately up to

20  central office for final approval.

21      Q.      How is that different than simply moving

22  through the steps and being reclassified?

23      A.      That could happen in between the cycles of the

24  classification.

25      Q.      Okay.  Do you have any knowledge about how

24

1    often that happens?

2         A.    It actually happens quite a bit.  I know at

3    Florence complex where I'm currently located we do

4    discretionary overrides for inmates from maximum custody

5    down to close custody so that they can remain -- actually,

6    that's usually part of their regular classification.  If

7    you're specifically talking about discretionary overrides

8    that happen in between a regular classification, I don't

9    believe those happen a lot, but I know that they happen.

10        Q.    Do you know if ADCRR tracks how often those

11   happen?

12        A.    Yes.  Everything would be tracked through ACIS.

13        Q.    And through ACIS you would be able to see both

14   the number of people being reclassified through the

15   classification process, but also being reclassified

16   through a discretionary override process?

17        A.    Yes, ma'am.  They should be able to pull that up

18   through our system.

19        Q.    All right.  One reason that people might have a

20   discretionary override to put them into max custody is

21   because they're high profile, correct?

22              MS. LOVE:  Object to the form; foundation.

23              Go ahead.

24              THE WITNESS:  Please explain high profile.

25        Q.    BY MS. MORRIS:  Well, that was going to be my

25

1    question to you.  One second.

2              So we're looking at the section about

3    custody override types.  Do you see that?

4        A.    Yes, ma'am.

5        Q.    Okay.  And if we scroll down to Section 5.4.3

6    it says, high profile.  Do you see that?

7        A.    Yes, ma'am.

8        Q.    What does high profile mean in terms of

9    classification?

10       A.    So in this particular instance, all she's

11   referring to, if it is, for instance, a case that is very

12   well known, whether it be nationally or here in Arizona, an

13   inmate coming in that everybody is going to know who they

14   are, that would be considered a high profile inmate.

15       Q.    And why is that a reason to place someone in

16   max custody?

17       A.    Because we're looking at risk involving them,

18   risk involving us, looking at their protection more than

19   anything.  Inmates coming into the system that are high

20   profile, obviously, all the other inmates within our

21   population know about it and know about the inmate.  We do

22   that for security conditions and for safety reasons for the

23   inmate.

24       Q.    There is protective custody that's not max

25   custody, correct?

26

1      A.    Yes, ma'am.

2      Q.    But a person who is high profile might be

3  placed into max custody solely because of being high

4  profile?

5      A.    They could.  Yes, ma'am.  And we could do that

6  so that we could look at whether it's in the inmate's best

7  interest to place them in protective custody.  So while

8  that process is going on we would place them in a maximum

9  custody setting.

10     Q.    Let me make sure that I understand what you

11  just said.

12           While determining whether a person who is

13  high profile needs to be in protective custody and at what

14  level of security, they would be housed in max custody

15  while you're making that determination; is that right?

16     A.    Yes, ma'am, for the inmate's safety.

17     Q.    All right.  One of the other reasons that a

18  person might be placed into max custody on an override is

19  in Section 5.4.4.1, if the current offense or a prior

20  offense are depicted as heinous.  Do you see that?

21     A.    Yes, ma'am.

22     Q.    What does this mean?

23     A.    It's based on the inmate's crime.  So if the

24  inmate -- and this could also go back to a high profile

25  inmate.  If you have an inmate that committed a very bad

27

1   act -- I'll try not to use the word heinous here, because a

2   terrible act out in the public that everybody has knowledge

3   of and we consider them a risk within our prison system,

4   then we would place them in maximum custody.

5        Q.   What does it mean that it's depicted as?

6        A.   I would say that it -- well, it would be the

7   case itself.  It would be the actual circumstances involved

8   with the case.  So I can give you a for instance, but of

9   course it would be my opinion on what heinous is.  But if

10  we're looking at a child murderer and this individual is

11  all over the news and everybody knows about it, that could

12  potentially be looked at as a heinous crime.  And we would

13  look at that as a safety for the inmate coming as well as

14  safety for public why we would place them in maximum

15  custody.

16       Q.   Is it because of that being all over the news,

17  or is it because of the nature of the crime?

18       A.   It could be both.  It could be both.

19       Q.   Could be either?

20       A.   It could be either.

21       Q.   And then can you explain what other major

22  reason, the next section, Section 5.4.5, what kinds of

23  things fall under that as a reason for a discretionary

24  override?

25       A.   So extensive and violent, obviously, if the

28

 1    inmate is committing --

 2        Q.    I'm sorry.  Not Section 5.4.4.2, but the one

 3    right below that where it says, other major reason.  Do

 4    you see that?

 5        A.    Yes.

 6        Q.    What kind of things fall within that reasoning

 7    for an override?

 8        A.    Well, you could look at, for instance, an inmate

 9    that has an escape history, which would obviously pose a

10    risk to the public.  You could look at inmates that have

11    utilized a weapon on another inmate or staff member.  So

12    that kind of stuff.

13        Q.    Are those kinds of things that you just

14    described already considered within the classification

15    process?

16        A.    Yes, ma'am.  That kind of stuff would be looked

17    at during the classification process.

18        Q.    So even if you looked at it in the

19    classification process but the classification process

20    doesn't result in a max custody classification, the same

21    facts that didn't result in a max custody classification

22    could be the basis for an override to put the person into

23    max custody; is that correct?

24        A.    If we feel that there was a significant risk to

25    public staff or other inmates, then yes, ma'am.

1      Q.    Okay.  All right.  Let's go to page 16 of

2   Isolation Exhibit 2, the criteria governing placement into

3   max custody, Section 9.

4              Do you see at Section 9.1 it says:  The

5   maximum custody due process is not applicable to inmates

6   in detention pending investigation, discipline, or

7   protective custody unless the inmate scores out as maximum

8   custody.  Do you see that?

9      A.    Yes, ma'am.

10     Q.    Can you explain that, what that means?

11     A.    So an inmate placed in detention, we're not

12   necessarily going to place him right into maximum custody

13   because of the circumstances involved in placing him in

14   detention.

15              So we have a process called a two-way

16   investigation.  It's a disciplinary, and what we're doing

17   is investigating that.  So in order to provide the inmate

18   due process during that investigation, we want to make

19   sure that what he did is investigated and we know that is,

20   in fact, what he did before we were to move him out of

21   detention and place him in a maximum custody setting, if

22   that's what's warranted.

23     Q.    Okay.  But he doesn't have the due process that

24   he would have for placement into maximum custody while

25   he's in detention -- for his placement in detention?

1          A.     That's correct.

2          Q.     And the due process is also not applicable to

3    inmates housed in maximum custody medical and/or mental

4    health care units, regardless of their custody level.  Do

5    you see that?

6          A.     Yes.

7          Q.     Can you explain that provision to me?

8          A.     That would be a decision made by mental health

9    staff, medical staff, or contracted medical staff.  And

10   that's the best explanation I can give you on that.  It's

11   their discretion to place them within those mental health

12   care units or those medical units based on their health or

13   their mental health needs at the time.

14         Q.     And so if I'm understanding correctly, there

15   are medical and mental health units that are max custody

16   units, and a person who needs the type of care that is

17   provided in those units could be moved into them,

18   regardless of custody level; is that accurate?

19         A.     That is accurate.  Yes, ma'am.

20         Q.     So we're going to look now at Section 10 of

21   DO 801, which is Isolation Exhibit 2, which is procedures

22   for maximum custody place assessment and removal.

23                Does the process that's described here, the

24   hearing process, does that apply to people who are first

25   coming into the system, and in their initial

1  classification they are classified as max custody?

2      A.    I don't believe that process is for the initial

3  intake of inmates into max custody.  The hearing process

4  would be for individuals that are currently within the

5  system going into max custody.

6      Q.    Is there anyone in ADCRR who would be able to

7  answer that question definitively?

8      A.    Yes, ma'am.  Our administrator for

9  classification, Stacey Crabtree, would be able to answer

10 that question.

11     Q.    So any of the people listed in 10.1 are able to

12 initiate a request for placement into max custody,

13 correct?

14     A.    Yes, ma'am.

15     Q.    So that's the warden, the deputy warden, or the

16 associate deputy warden, correct?

17     A.    Correct.

18     Q.    The CO 3 and CO 4 cannot initiate that,

19 correct?

20     A.    No.  They would actually be responsible for

21 taking care of the paperwork involved in that hearing

22 process, but the request would come from the warden, deputy

23 warden, or associate deputy warden, or central office.

24     Q.    Okay.  And all of the forms that were filled

25 out and are described in here, form 801-6, 801-2, 801-7,

 1   these would all be placed into a file on the inmate?

 2        A.    Yes, ma'am.

 3        Q.    What file would they go into?

 4        A.    All of this information is placed within ACIS,

 5   our system.

 6        Q.    Okay.  Is there a disciplinary file?

 7        A.    I'm sorry.  Disciplinary file?

 8        Q.    Yeah.

 9        A.    Within ACIS?  Yes, ma'am.  There is.

10        Q.    Would these forms go into the disciplinary file

11   in ACIS?

12        A.    No.  They would go within the classification

13   file.

14        Q.    In the classification file.  Okay.

15              Can you explain to me what the maximum

16   custody placement recommendations/approval form, form

17   801-7, is?

18        A.    I believe this is the form that actually goes

19   through the recommendations for maximum placement.  So this

20   form is signed by the inmate.  It goes through the deputy

21   warden and the deputy warden makes a recommendation.  That

22   form then comes up to the warden's office.  The warden goes

23   through the packet, makes their recommendation, whether

24   they approve the maximum custody or do not approve the

25   maximum custody.  That packet then gets sent up to central

33

1    office classification.  They go through the packet, and

2    they either agree with the recommendations made by the

3    warden or they disagree with it, and subsequently the

4    inmate is either placed in maximum custody or he is not.

5         Q.    Is the recommendation/approval form filled out

6    regardless of the outcome of the hearing?

7         A.    The hearing for the inmate during my hearing

8    process?  Is that what we're talking about?

9         Q.    Yeah, yes.  So let's say the inmate goes

10   through the hearing process and the hearing officer says:

11   I don't think you need to go to max custody.  Does form

12   801-7 get filled out?

13        A.    It does.

14        Q.    It does?

15        A.    Yes.  More than likely, if there's not a reason

16   for the maximum custody placement and there wasn't a

17   directive given to begin that process, then that more than

18   likely wouldn't happen that way.  So we wouldn't start this

19   hearing process unless there was a reason for it.

20        Q.    Do you have any knowledge as to what percent of

21   max custody placement hearings result in a recommendation

22   that the person be placed in max custody?

23        A.    I do not have that percentage, no, ma'am.

24        Q.    Do you know if ADCRR tracks that?

25        A.    Yes, ma'am.  Everybody placed in maximum custody

34

1    we would have knowledge of, yes.

2         Q.    I guess my question is:  Does ADCRR track both

3    the number of hearings that do result in placement in max

4    custody and the number of hearings that result in a

5    recommendation that the person not go into max custody?

6         A.    I'm positive we do because all of that

7    information is placed within our ACIS system.  Yes, ma'am.

8         Q.    But you personally don't know that information?

9         A.    No, ma'am.  I can offer the fact that our

10   maximum custody population has reduced significantly in the

11   last five or six years.  I think currently normally we have

12   about a little over 1,600 max custody inmates in the entire

13   system in the state.  So I don't know the exact

14   percentages, but I know they have gone down significantly.

15        Q.    Okay.  If a hearing officer finds that the

16   person should not be placed in max custody, would the

17   maximum custody placement recommendation/approval form

18   saying that be forwarded to the warden or the warden's

19   designee?

20        A.    It would be so that we can document that the

21   hearing process took place.  And it would then, again, be

22   reviewed by the deputy warden to find out reasons for the

23   hearing officer's recommendation and whether the deputy

24   warden agrees with that recommendation or not, and then it

25   goes to the warden and, again, reviewed by the warden

35

1    trying to figure out why that decision of a recommendation

2    for not placing in maximum custody goes through.  And then

3    the warden would make the decision, as I explained earlier,

4    and then it would go to central office for their final

5    decision.

6        Q.    If the hearing officer recommends that the

7    person not go to maximum custody, could the deputy warden

8    decide that the person should go to max custody?

9        A.    They could make that recommendation.  They're

10   not the final approving authority.

11       Q.    Okay.  But they could make a recommendation?

12       A.    Yes, ma'am.

13       Q.    And if the hearing officer has not found that

14   the person should go to maximum custody, can the warden

15   decide that the person should go to maximum custody?

16       A.    Yes, ma'am.  It would be the warden's

17   recommendation, if they so choose, to place them in maximum

18   custody or not.  And, again, the final approving authority

19   would be central office.

20       Q.    Okay.  Can central office decide to place

21   someone in max custody if the hearing officer has

22   recommended against it?

23       A.    Yes, ma'am.  Central office can make the

24   determination to place the inmate in maximum custody if the

25   hearing officer, the deputy warden, and the warden all

36

1    recommended placing him in max custody.  Central office

2    still makes the final approving authority as far as max

3    custody or not.

4         Q.    All right.  Going down to Section 10.7, it says

5    that a person who is being reclassified as max custody is

6    placed in administrative detention prior to the completion

7    of the classification process and approval from central

8    classification.

9              Is that detention in a detention unit or in

10   a max custody unit?

11        A.    That would be placement in a detention facility.

12        Q.    Okay.  And how long can that process take?

13        A.    That process should not take more than 30 days.

14        Q.    At what point in the process -- from the time

15   of the hearing or even before hearing through to the

16   central office, at what point in that process is the

17   person moved to administrative detention?

18        A.    As soon as central office makes that

19   determination and places that decision within ACIS and that

20   paperwork is sent back so that that paperwork can be served

21   to the inmate, at that point the inmate is placed in

22   maximum custody if beds are available in maximum custody.

23        Q.    Okay.  I was going to get to that question in a

24   little while, but that would be a little different than

25   what I was asking.

1          At what point does the person get put into

2     detention?

3          A.    So as soon as the packet is initiated for

4     maximum custody, if there are enough points to place the

5     inmate in maximum custody and the maximum custody hearing

6     is going to -- the process is going to start, at that point

7     the inmate can be placed in detention.

8          Q.    Okay.  And that's what should not last more

9     than 30 days?

10         A.    Yes, ma'am.

11         Q.    All right.  Thank you.  So section 10.8 is

12    about the timing of reviews after maximum custody

13    approval.  Do you see that?

14         A.    Yes, ma'am.

15         Q.    And it says the person will be reviewed 180

16    days from maximum custody approval and annually thereafter

17    unless the approval was a maximum custody override, and if

18    it was an override, the inmate will be reviewed every 180

19    days, correct?

20         A.    Yes.

21         Q.    Can a person be removed from max custody other

22    than through the process that's being described in Section

23    10.8?

24         A.    At this point I don't believe they could be, no.

25    They would have to do that a minimum of 180 days until

38

1    their next classification for them to go down in level.

2         Q.    Okay.  Are you certain of that?

3         A.    I'm not, only because -- and I don't think that

4    it happens, but I believe the policy allows for

5    discretionary override similar to what we spoke about

6    earlier, but I believe they have to do that 180 days.

7         Q.    Okay.  Is there anyone who would be able to

8    answer that question definitively?

9         A.    Again, our administrator of classification,

10   Stacey Crabtree.

11        Q.    You said Stacey --

12        A.    Crabtree.

13        Q.    Okay.  We'll spend a lot of today looking at

14   DO 812, but I'm just going to represent to you that inside

15   of DO 812 it says that a person can be considered for

16   removal from max custody once they've been at step 3 for

17   at least 30 days.  Does that sound familiar to you?

18        A.    No, it does not.

19                  (Exhibit 3 identified for the record.)

20        Q.    BY MS. MORRIS:  Are you familiar with what I've

21   designated as Isolation Exhibit 3, plaintiffs' department

22   order 812?

23        A.    Yes, ma'am.

24        Q.    Okay.  And can you tell me what department

25   order 812 is?

39

1      A.     Maximum custody management and incentive system.

2      Q.     Okay.  We're on page 6 of the PDF that is

3  document 812.  It says page 4 at the top.  Do you see

4  that?

5      A.     Yes, ma'am.

6      Q.     We're looking at Section 5.5, and it says:

7  Inmates who have maintained step 3 for a minimum of 30

8  consecutive days without incident are eligible for

9  consideration for placement in a close custody housing

10  location.  Do you see that?

11      A.     Yes, ma'am, I do.

12      Q.     Okay.  So I want to see if I can understand the

13  interaction between the 180-day or annually thereafter

14  review and this provision of DO 812 that says you're

15  eligible to be considered after 30 days.  I'll give you a

16  couple of examples and try to figure out how those two

17  things work together, okay?

18      A.     Yes, ma'am.

19      Q.     Okay.  So if a person is in max custody and

20  they've been in max custody for 180 days and so they come

21  up for review and there is step 2 at that point, they

22  cannot be removed from max custody through that review

23  process at that time, correct?

24      A.     Again, a discretionary override could be

25  initiated at that point.