**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

40

1      Q.    Can a discretionary override be used to remove

2   someone who has not gotten to step 3 from max custody?

3      A.    It could be, but more than likely, it would not

4   be.

5      Q.    Do you know if that has ever been done?

6      A.    I'm not aware if it has been done or not, ma'am,

7   no.

8      Q.    So with the exception of the discretionary

9   override that you're not aware of ever having occurred,

10  that person who was a step 2 at the time they came up for

11  that initial review after 180 days, they would not be

12  considered for removal from max custody for another year

13  after that, correct?

14     A.    You're saying if it did not involve a

15  discretionary override, correct?

16     Q.    If the person was in max custody because of

17  being classified as max custody, not because of any

18  override.  So the person goes through the classification

19  process and they get placed into max custody as a result

20  of the classification process, if they were at step 2 when

21  they come up for their first review at 180 days, they

22  would not be able to be reviewed for removal from max

23  custody for another year after that; is that correct?

24     A.    I believe max custody is reviewed every 180

25  days, ma'am.

41

1      Q.     Okay.  So looking at Section 10.8 it says:

2   Inmates shall be reviewed 180 days from max custody

3   approval and annually thereafter unless the approval for

4   max custody was an override.  Do you see that?

5      A.     Yes, ma'am.

6      Q.     Do you believe that the review for max custody,

7   for removal from max custody, happens every 180 days?

8      A.     According to that it's the initial 180 days and

9   annually after that, just as it's written.

10      Q.     And when we say "that," we're talking about

11   DO 801 Section 10.8, and we're talking about the policy on

12   inmate classification, correct?

13      A.     Correct.

14      Q.     So the policy on inmate classification is that

15   a person placed into maximum custody not based on an

16   override is reviewed at 180 days and then annually

17   thereafter, correct?

18      A.     Correct.

19      Q.     Do you have any knowledge of the percentage of

20   people who are in maximum custody who are in max custody

21   because of an override?

22      A.     I don't have that percentage.  No, ma'am.

23      Q.     Would ADC have that knowledge, ADCRR?

24      A.     Yes, ma'am.  We would have that knowledge.

25      Q.     Would Stacey Crabtree know that information?

42

1      A.    Yes, ma'am.  More than likely she would.

2      Q.    Okay.  It's my understanding from what you've

3  testified about so far that you don't know how frequently

4  overrides happen either for placing someone into maximum

5  custody or for changing the timing of the review for

6  removal from max custody; is that accurate?

7      A.    I do not have those percentages, correct.

8      Q.    Okay.  All right.  Then for the next examples

9  that I give, let's just go on the assumption that these

10  are not due to overrides.  So these are just sort of the

11  default process, okay?

12      A.    Yes, ma'am

13      Q.    Okay.  So if a person who is placed into

14  maximum custody and they have been at step 3 for more than

15  30 days at the time they come up for review at 180 days,

16  okay?  Does that make sense?

17      A.    Yes.

18      Q.    At that point they could be considered for

19  removal from max custody, correct?

20      A.    That is correct.

21      Q.    If they are not removed from max custody

22  through that review, they would have to wait for another

23  year to be reviewed for removal from max custody, correct?

24      A.    That is correct.

25      Q.    And to be removed from max custody at that

43

1    review a year later, they would need to have been at that

2    point at step 3 for at least 30 days, correct?

3       A.    Correct.

4       Q.    You sounded like there was a hesitation in what

5    you were saying.

6       A.    I want to say that we have classified inmates

7    that were a step 2 down to close custody at that next

8    review as long as they were doing the things they were

9    supposed to do and hadn't had any disciplinary and were

10   programmed.  And those kind of go hand in hand.  So if

11   they're doing the things they're supposed to do and the

12   programming, more than likely they're going to be -- at

13   that year's time they're going to be a step 3.

14       Q.    You don't know how many people have been

15   removed from max custody through a review process when

16   they were step 2s, correct?

17       A.    No, ma'am, I don't.

18       Q.    Next example, a person is in maximum custody,

19   it's their initial review at 180 days, and at that time

20   they have been a step 3 for 28 days.  Can they be removed

21   from max custody through that review process?

22       A.    I would say yes, they could.

23       Q.    Okay.  Where is that in the policy?

24       A.    It would actually be an override.  It would be

25   an override.

44

1      Q.    Okay.  And, again, you don't know if or how

2   often such overrides happen?

3      A.    No, ma'am, I don't.

4      Q.    If someone was in that kind of a situation

5   where they're almost eligible but not quite, who would be

6   the person that could start the override process?

7      A.    At that 180-day review it would be the CO 3 that

8   would initiate the hearing.

9      Q.    I'm sorry.  The hearing?  What hearing are you

10   talking about there?

11      A.    The removal from max custody.  I'm sorry.  It's

12   the packet and the paperwork.  Not exactly the hearing.

13   It's the packet.

14      Q.    Okay.  Could the CO 3 be making the decision to

15   start that process, or would the warden, deputy warden, or

16   associate deputy warden be making that decision and asking

17   the CO 3 to start the process?

18      A.    At that review, if it's for the regular review,

19   it would be the CO 3.  It would be an inmate on their

20   caseload, and that would trigger on their caseload as

21   needing that review to be completed.  So it would initiate

22   that.

23      Q.    All right.  Section 11 of Isolation Exhibit 2

24   DO 801 is maximum custody appeals.  That process can take

25   up to 45 days to complete, correct?

45

1      A.    Yes, ma'am, it can.

2      Q.    Where is the incarcerated person housed during

3  that appeal process?

4      A.    That's going to depend on where they currently

5  are at.  So you could have somebody in a close custody unit

6  that would remain in that close custody unit while that

7  takes place.

8      Q.    Okay.  What if a person was in a medium custody

9  unit?

10     A.    Medium custody unit, this would be where, if

11  they were designated to go into maximum custody and we

12  started that process, we would place them in detention.

13     Q.    And that would be the same for minimum?

14     A.    Yes, ma'am.

15     Q.    Okay.  Section 12 sets out the process for

16  administrative reviews, correct?

17     A.    Yes, ma'am.

18     Q.    Does this process apply to people classified to

19  maximum custody?

20     A.    It could.  Yes, ma'am.

21         MS. MORRIS:  Let's take a five-minute break

22  and then come back.

23         (Recess from 10:22 a.m. to 10:30 a.m.)

24         MS. MORRIS:  Going back on the record.

25     Q.    BY MS. MORRIS:  How is it decided where a

1   person is going to be housed if they're in max custody?

2       A.   So it would be depending on their

3   classification.  So, like I said earlier, whether they're

4   general population, whether they're a sex offender, whether

5   they are coming back as a validated security threat group

6   number.  So it would be based on the description of when

7   they come in.

8            Previously if they had incarceration we

9   would look at that.  So if they were in protective custody

10  we would send them to Lewis complex where we house our

11  protective custody population.  And all that is based on

12  what each complex has designated as far as the population

13  type.

14      Q.   Are there any reasons that a person, according

15  to policy, cannot be placed into maximum custody?

16      A.   Not to my knowledge, no, unless of course they

17  have, for instance, an ADA restriction and we don't have

18  any ADA beds in our specific facility.  We would have to

19  look at all placement until a bed becomes available, but

20  other than that, that's the only thing I could think of.

21      Q.   Does that include mental health related ADA

22  concerns?

23      A.   It could, yes.

24      Q.   But that's a question about bed space and

25  whether bed space is available, not an actual exclusion of

1   the person from maximum custody; is that correct?

2       A.    Well, you mentioned a mental health individual.

3   If we have an inmate that is reviewed by mental health as

4   they came in and mental health felt that that individual

5   couldn't be placed in a maximum custody setting, then we

6   would be placing them elsewhere in a mental health setting.

7       Q.    What policy says that?

8       A.    I am not sure of that policy number, ma'am.

9       Q.    But you're sure that there is such a policy?

10      A.    Whether it's within our policies or if it's

11  within the health services manual, I'm not exactly sure,

12  ma'am.

13      Q.    Okay.  Does mental health staff have the

14  ability to determine that a person cannot be sent to

15  maximum custody?

16      A.    So this is a difficult question to answer

17  because we have mental health areas that are a maximum

18  custody setting.  So if, for instance, an inmate came in

19  through the Browning unit and through an initial assessment

20  a mental health staff determines that they needed to be

21  placed in a mental health program, and we have a mental

22  health program that is designated maximum custody.  So they

23  would place that individual in that program.  They would

24  still be considered maximum custody but they would be

25  within the mental health program.

48

1      Q.    Could mental health say this person cannot go

2  into maximum custody, regardless?

3      A.    No, they would not be able to do that unless

4  they showed reason why that individual could not due to

5  mental health concerns.

6      Q.    Is there a policy that says that they can

7  prevent a person from being placed into maximum custody

8  due to mental health concerns?

9      A.    Again, ma'am, that's similar to what I responded

10  to earlier.  I'm not sure if that's within our policy

11  guidelines or if that's within the Centurion guidelines.

12  I'm not sure.

13      Q.    Do you know whether or not there is such a

14  policy either for ADCRR or for Centurion?

15      A.    Again, I'm not sure.

16      Q.    Are there any special procedures when

17  considering placing someone who is mentally ill into max

18  custody?

19                  MS. LOVE:  Object to form; foundation.

20                  THE WITNESS:  I'm not aware of the

21  specifics in regards to that, ma'am.

22      Q.    BY MS. MORRIS:  Is anyone in ADCRR aware of the

23  specifics in regard to that?

24      A.    Again, I would probably state Stacey Crabtree.

25      Q.    For people who are newly classified as maximum

49

1    custody, what are the intake procedures for maximum

2    custody?

3         A.    Well, when an inmate comes in, again, their

4    initial classification is completed.  If they are, in fact,

5    maximum custody they would go through the intake center and

6    be placed within whatever category they came in at, as I

7    said before, a sex offender, general population.  They're

8    assigned a cell.  They're placed within a cell with a

9    receiving bag that has clothing and it has hygiene stuff.

10   It has bedding.  And they are given an orientation for the

11   specific unit and for the department.

12        Q.    Can we back up a moment?

13        A.    Sure.

14        Q.    You mentioned an intake, Eyman max custody

15   intake.  Is there a period of time that people spend in

16   the intake unit, the max custody intake unit?

17        A.    There could be.  Yes, ma'am.

18        Q.    Is there?

19        A.    Well, so, as they come in they could be placed

20   within that intake unit.  Now, they're usually there until

21   their classification is complete and we know exactly where

22   they're going to go and there is a bed available for them.

23   So once that's completed they are out of that intake area.

24        Q.    Okay.  So once it's determined where they will

25   go and there is a bed available they go out of the intake?

50

1       A.    Yes, ma'am.  We have to keep that area clear

2   because we have inmates coming in and out of there.

3       Q.    Okay.  I'll make a note for myself to remember

4   something later for a question.

5             While they are in the intake area do they

6   have a mental health review?

7       A.    Yes, they do.  During that intake process mental

8   health screens the inmate within a specified time period.

9       Q.    I'm sorry?

10      A.    Within a specified time period mental health

11  will evaluate that inmate.  Yes, ma'am.

12      Q.    What's the specified time period?

13      A.    I believe it is three days.

14      Q.    What about a medical review?  Do they have a

15  medical review in the intake?

16      A.    Medical would also have to review.  Yes, ma'am.

17      Q.    Is that a same time period?

18      A.    I'm not sure about the time period for medical.

19      Q.    Does orientation for max custody happen in the

20  intake unit?

21      A.    Normally not.  That is scheduled as soon as

22  they're housed within the facility itself.

23      Q.    So sex offender unit, STG unit, that kind of

24  thing?

25      A.    Yes, ma'am.

51

1       Q.    Okay.  While they're in the intake unit do they

2   have access to any programs?

3       A.    No, they do not.

4       Q.    Do they have access to property beyond the max

5   custody receiving bag that you described?

6       A.    No, ma'am, they do not.

7       Q.    Do they have access to visitation while they

8   are in intake?

9       A.    No, ma'am, because we're still trying to

10  determine where they're going to go.

11      Q.    Do they have access to phone calls while they

12  are in intake?

13      A.    I don't believe so.  Again, that's a short

14  period of time that they're in there, and all that is

15  determined once they get to the unit that they are

16  assigned.

17      Q.    What is the restricted status housing program?

18      A.    Restricted status housing program is a program

19  within maximum custody where we potentially could place

20  inmates that have violated what we call our forbidden

21  three, which would be a serious assault on a staff member,

22  a serious assault on another inmate with a weapon, or

23  multiple inmates on one inmate that would result in serious

24  harm to that particular inmate.

25      Q.    Where is there a restricted status housing

52

```
 1  program?
 2      A.   We have restricted status housing at Browning
 3  unit at Eyman complex.  We have restricted status housing
 4  at Lewis complex Rast unit.  I'm not sure if there's a
 5  restricted status housing at the female facility.  I'm not
 6  sure if that's there or not.
 7      Q.   Okay.  And that's Perryville again?
 8      A.   Yes, ma'am.
 9      Q.   How is it decided whether a person would be
10  sent to restricted status housing program at Browning
11  versus at Lewis/Rast?
12      A.   The criteria for placing an inmate in restricted
13  status housing is the same for both areas at Browning unit
14  and at Rast.
15      Q.   Is it a classification decision to put somebody
16  into a restricted status housing program?
17      A.   It could end up that way.  So, for instance, if
18  you have a medium-custody inmate that seriously assaults
19  another inmate with a weapon that causes serious harm and
20  the decision is made by the wardens at both facilities and
21  the regional operations director to place them in
22  restricted status housing, then that could make them -- at
23  that point we'd have to do the classification action for
24  maximum custody.
25      Q.   So tell me if I got this right.  Basically, if
```

53

1   the event that results in a person being placed into

2   restricted status happens when the person is not in max

3   custody the person would be reclassified for max custody

4   as well as being placed into restricted status; is that

5   right?

6       A.    Yes, ma'am.

7       Q.    And if the person was already max custody and

8   something happened that resulted in the person being

9   placed in restricted status, that would not be a

10  classification decision, correct?

11      A.    It still would because that disciplinary that

12  they would receive for that act would trigger a

13  classification action.  Even though they're in maximum

14  custody, it would bring their points higher than what they

15  previously were.

16      Q.    Okay.  Who makes the decision to start the

17  process of putting somebody into a restricted status

18  housing program?

19      A.    The warden of the facility that the incident

20  took place at, they would make a phone call to the regional

21  operations director of that particular facility.  And the

22  decision would be made in consultation with the Eyman or

23  the Lewis warden to basically advise them that this

24  particular inmate is going to be placed in restricted

25  status housing.

54

1      Q.    Of those three people that you just described,

2   the warden of the facility where the event happened, the

3   regional operations director, and the warden --

4   essentially the receiving warden, I think we could call it

5   that.  Does that work?

6      A.    Yes, ma'am, the sending warden and receiving

7   warden.  Yes, ma'am.

8      Q.    Which of those people has the power to -- if

9   they don't all agree, who gets to make the decision?

10      A.    The regional operations director is the one that

11   makes that decision.  If there is any kind of issues

12   between whether we should or whether we should not, then

13   the assistant director would make that final decision --

14   assistant director of prison operations.

15      Q.    If there's a disagreement -- if all three don't

16   agree, or --

17      A.    Normally, the receiving warden doesn't really

18   have any vested interest in it.  It's usually a discussion

19   between the warden of the facility and the regional

20   operations director.  I would say 99 percent of the time

21   the regional operations director is making that call to

22   place them on restricted status housing.  But if there is

23   any kind of a questions on whether that should happen or

24   not, then the assistant director for prison operations

25   would become involved and they would make that decision.

1      Q.    So if the sending warden thinks the person

2  should go to restricted status and the regional operations

3  director thinks that the person should not go into

4  restricted status, could the sending warden ask the

5  associate director of operations?

6      A.    Assistant director.

7      Q.    Assistant director.

8      A.    Let me clarify.  They could, but that would not

9  be advised because at that point they would be jumping

10  their chain of command.

11      Q.    Okay.  How would it get to the associate

12  director?  The question of whether this person should go

13  to restricted housing, how would that get to the associate

14  director?

15      A.    It would go to the regional operations director.

16      Q.    In what situation would the regional operations

17  director bring that to the associate director?

18      A.    Again, if there were any questions on whether

19  they should be placed in that area or not.

20      Q.    So basically, when the regional operations

21  director can't decide?

22      A.    Well, again, 99 percent of the time that does

23  not happen, but if that were ever to come into play then

24  the final decision could be made by the assistant director

25  of prison operations.

1      Q.    Where is the decision about whether or not to

2   place a person into restricted housing, where is that

3   documented?

4      A.    Well, it would be documented in our movement

5   screens through ACIS, and it would be documented in the

6   disciplinary ticket that would be generated due to the act

7   of placing them in restricted status housing, and then

8   ultimately the ticket results in a trigger for the

9   classification.  So it would be within the classification

10  system, as well.

11     Q.    And if a person was considered for restricted

12  status housing and then was not sent to restricted status

13  housing would that be documented anywhere?

14     A.    No, it wouldn't.

15     Q.    Are there any particular intake procedures for

16  coming into a restricted status housing program beyond

17  what there would be for coming into maximum custody or

18  different from what there would be for maximum custody?

19     A.    No, it would be fairly similar.  The inmate

20  would be brought in, be placed within a cell, given the

21  items that would be needed in the cell as far as the

22  bedding and clothing.  They would be given an orientation

23  by the individuals over that particular area within the

24  unit.  So it would be very similar.

25     Q.    Okay.  Are there any categorical reasons that a

1  person cannot be placed into restricted status housing

2  program?

3        A.    The only thing that comes to mind would be, as

4  we spoke about earlier, if there was any particular mental

5  health concerns in regards to that, then that would be

6  brought up by mental health staff and then that would be

7  talked about.

8        Q.    So an individual's mental health issues might

9  result in not being placed into restricted status,

10  correct?

11        A.    It could, yes.  Each one of them has their

12  place, and restricted status housing would be reviewed by

13  mental health staff.

14        Q.    Okay.  Is there any policy like a person with

15  serious mental illness cannot be placed into restricted

16  status?  That's what I mean by a categorical thing.

17        A.    Very similar to the response earlier, ma'am.

18  I'm not exactly sure of that policy.

19        Q.    So you don't know whether or not there is such

20  a policy?

21        A.    I do not.

22        Q.    Are there any categorical reasons that require

23  additional review prior to placing someone into

24  restrictive status?

25        A.    Not that I'm aware of, no, ma'am.

58

1      Q.    Okay.  Do you know whether there are?

2      A.    Just off the top of my head I'm thinking of

3  medical reasons, mental health reasons.  Those are the only

4  two things I can think of that would potentially be looked

5  at as why someone could not go into restrictive status

6  housing.

7      Q.    But, again, what you sound like you're

8  describing is an individual consideration.  I could

9  imagine something like you can't put people who are on

10  dialysis into restricted status because you won't be able

11  to get them to dialysis, something like that.

12            Are there any categorical things that you

13  can just say:  There is this situation, and, therefore,

14  there is no chance that the person would go in?

15      A.    No, ma'am.  That's why I kept it broad.  Medical

16  and mental health issues -- you mentioned dialysis but we

17  could, in fact, place the dialysis inmate within there

18  because we knew the transportations for those dialysis

19  inmates.  We could make those accommodations within

20  restricted status housing.

21      Q.    It was definitely just meant as an example of a

22  kind of thing that might result in there being a

23  categorical exclusion.

24      A.    I understand.

25      Q.    Okay.  All right.  Can you explain what

1    enhanced management status is?

2         A.    Enhanced management status is a program within

3    Browning unit.  It is a program designed for inmates that

4    have done the worst of the worst within the department and

5    the decision was made to place them with enhanced security.

6         Q.    Is that a classification decision?

7         A.    It's just a program within max custody very

8    similar to restricted status housing.

9         Q.    Okay.  What do you mean when you say it's a

10   program?

11        A.    So it is a program where we manage inmates that

12   have done horrific violations within the department.  For

13   instance, an inmate that escapes the department would be

14   looked at for enhanced security.  An inmate that has

15   committed a homicide within the prison would be looked at

16   for enhanced security as specific examples.

17        Q.    And just so we're super clear for the record,

18   when you say enhanced security you're using that

19   interchangeably with enhanced management?

20        A.    Yes, ma'am, I am.  My apologies.

21        Q.    No problem.  I just wanted to be sure that

22   there wasn't another status that I was going to have to

23   ask about.

24              Who makes the decision about whether a

25   person should go into enhanced management?

1      A.     That's a decision very similar to restricted

2    status housing that we spoke about by the sending warden

3    through the regional operations director.  It could

4    potentially go through assistant director of prison

5    operations, and then, of course, the receiving warden at

6    Eyman would be notified, as well.

7      Q.     Okay.  And are there any intake procedures for

8    someone who is being transferred into enhanced management

9    beyond what we've talked about with regard to the max

10   custody, generally?

11     A.     Not beyond what we've talked about.  No, ma'am.

12     Q.     Okay.  Are there any categorical reasons a

13   person cannot be placed into enhanced management?

14     A.     Very similar to restricted status housing,

15   ma'am.  It could potentially be medical or mental health

16   issues with a particular inmate.

17     Q.     But there are no categories of people that

18   cannot, because they belong to a category, be placed into

19   enhanced management; is that right?

20     A.     That's correct.  We've had different categories

21   within there such as general population, sex offender,

22   protective custody.

23     Q.     Okay.  Can a person who has a serious mental

24   illness be placed in an enhanced management?

25     A.     That would be in consultation with mental health

61

1  staff and would be determined with a discussion between

2  mental health staff and security staff on whether that

3  would be something that we would want to do or if it would

4  negatively affect that particular inmate.  So those

5  considerations would be looked at before we place that

6  individual on enhanced security.

7      Q.    So that would be a consideration of the

8  individual's mental health, correct?

9      A.    Yes, ma'am.

10     Q.    Is there any categorical rule, any rule that

11 limits the placement of people with SMI into enhanced

12 management?

13     A.    No, ma'am, other than if they're already within

14 our mental health program, again, that would be assessed by

15 mental health staff and security staff.

16     Q.    What is the STG unit?

17     A.    Also an area within Browning unit where we house

18 security threat group members that have been validated.

19     Q.    And security threat groups are often commonly

20 referred to as gangs; is that correct?

21     A.    That's correct.  Yes, ma'am.  And these are

22 designated gangs within our Arizona Revised Statutes.

23     Q.    Okay.  All right.  Is it a classification

24 decision to put somebody into the STG unit?

25     A.    Yes, ma'am.  It could be.  So a validated STG,

62

1    if it has been decided that they need to be placed within

2    Browning unit, then if -- for instance, as I mentioned

3    earlier, if they're a medium-custody inmate, then that

4    information would go through classification and placing

5    them at maximum custody Browning unit at Eyman complex.

6         Q.    If a person is validated as an STG member do

7    they necessarily become max custody?

8         A.    They don't.  So as of recently that has changed.

9    Before they did, and that policy was revised within the

10   past year, and now it's taken on a case-by-case basis and

11   reviewed by a committee.

12        Q.    By what committee?

13        A.    There's an STG committee that's put together

14   that reviews the STG placements.

15        Q.    Are there any intake procedures that are

16   different for someone coming into the maximum custody STG

17   unit different than what there would be in max custody

18   general population?

19        A.    No, ma'am.

20        Q.    Are there any categorical reasons a person

21   cannot be placed into the STG unit?

22        A.    For the STG unit I don't believe there is,

23   ma'am.  Up to then, again, if there were mental health

24   concerns where the individual could potentially take a

25   downturn with their health, that would be discussed with

63

1  mental health staff or medical staff and security staff.

2      Q.    Okay.  What is the BMU at Eyman/Browning?

3      A.    Browning unit houses behavioral management unit.

4  These are SMI or mental health inmates that have a history

5  of assaultive behavior, self-harm behavior, and they're

6  difficult inmates to manage within our system.

7      Q.    And this is a new unit, correct?

8      A.    No, ma'am.  This has been around for quite some

9  time.

10      Q.    At Eyman/Browning?

11      A.    It started at Eyman/Browning unit, and this was

12  back in, I believe, the early 2000s.  It started at

13  Browning and moved to SMU 1.  It was at SMU 1 for a little

14  while and then it moved to cell block Kasson at Central

15  unit at Florence complex.  And as of last month it was

16  moved back to ASPC Eyman/Browning unit.

17      Q.    So Kasson had a larger capacity than the BMU at

18  Eyman/Browning, correct?

19      A.    No, ma'am, completely the opposite.  We had 24

20  beds for BMU at cell block Kasson -- or, I'm sorry,

21  browning unit has 30 beds allocated for BMU.

22      Q.    So the only people that would have moved from

23  Kasson to the BMU at Eyman/Browning are people who were in

24  the area of Kasson that was designated as the BMU; is that

25  correct?

1       A.      That's correct.  We basically picked the program

2  up and moved it over to Browning unit.

3       Q.      Are there people in the BMU at Browning who are

4  not maximum custody?

5       A.      Yes, ma'am, there could be.

6       Q.      Okay.  There could be.  Do you know if there

7  are?

8       A.      I know at one point there were.  I'm not exactly

9  sure what that population looks like currently.

10      Q.      Okay.  When the BMU was at Kasson, were there

11 people in the BMU who were not maximum custody?

12      A.      We did have some individuals that were not

13 maximum custody.  Yes, ma'am.

14      Q.      And was that also true in the Kasson unit more

15 generally?  So not just the BMU but the rest of the Kasson

16 unit?

17      A.      The residential mental health program at Kasson,

18 yes, ma'am.  We also had individuals that were not

19 considered maximum custody within that program.

20      Q.      Are there any particular intake procedures for

21 someone being transferred into the BMU, different than

22 what we talked about for max custody?

23      A.      It's a little more intensive in regards to the

24 evaluations given to them by mental health staff, but

25 ultimately, it's very similar.  Yes, ma'am.

1      Q.    Okay.  What is detention?

2      A.    Detention is a temporary holding area where we

3   place inmates that could potentially have disciplinary

4   issues, have protective custody, or what we call 805

5   issues, where they're in fear for their life, disciplinary

6   issues.  So it's a temporary holding area for us.

7      Q.    Okay.  Is that a classification decision?

8      A.    Detention, I believe it is a classification

9   action.  Yes, ma'am.

10     Q.    Okay.  Who makes the decision to put someone

11  into detention?

12     A.    More times than not, the deputy warden will

13  basically call the warden's office of whatever facility it

14  happens at and the decision would be made by the warden to

15  place an inmate within detention.

16     Q.    Are there intake procedures for someone who is

17  being placed into detention?

18     A.    There are.  And it's very similar to what we

19  spoke about previously, but the inmate's property is

20  removed from them and it's gone through.  And they're, of

21  course, given orientation as to why they're being placed in

22  detention.  So everything else is pretty much the same.

23  They're given the same kind of hygiene items, clothing

24  items, that kind of stuff.

25     Q.    Are there any categorical reasons a person

66

1    cannot be placed in detention?

2         A.    The only ones, again, that come to mind could

3    potentially be a medical reason or a mental health reason.

4    Other than that, I don't believe there is, no.

5         Q.    And that would be a case-by-case basis, not a

6    category, correct?

7         A.    That is correct.

8         Q.    Okay.  What is close management?

9         A.    Close management is also a program within

10   Browning unit, and there is also close management at Lewis

11   complex at Rast.  Close management is a program that they

12   place inmates that are not necessarily rising to the level

13   of maximum custody in regards to their behavior but are

14   inmates that we don't believe can possibly function

15   correctly within a close custody setting and we want to

16   monitor a little more closely.  And so it is a designated

17   program for those particular inmates.  They're usually

18   inmates that have been in some type of issue disciplinary-

19   wise.

20        Q.    Who makes the decision to put a person into

21   close management?

22        A.    The decision to place an inmate in close

23   management is similar to the other programs.  It would go

24   through the warden, through the regional operations

25   director, and potentially could involve the assistant

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

67

1   director of prison operations.

2       Q.    And where would that decision be documented?

3       A.    There is a packet that has to be done in order

4   to place an inmate within close management.  That

5   documentation is kept and that document is also placed

6   within ACIS.

7       Q.    What are the kinds of reasons that result in a

8   person being placed in close management?

9       A.    An inmate could potentially be placed in close

10  management for being associated with an inmate that has

11  committed one of the forbidden three acts.  So when they do

12  their investigation within that they will find out if there

13  are any associates involved with that particular inmate.

14  Those associates, if during the investigation it is found

15  that they are part of that act that was committed, they

16  could potentially end up in close management.

17      Q.    Okay.  Any other examples?

18      A.    I would say close management could also be

19  utilized for inmates that we are just not comfortable

20  placing on a close custody yard due to a disciplinary

21  infraction and we wanted to monitor a little more closely

22  before we placed them on that close custody yard and find

23  out whether or not they would be able to function on a

24  close custody yard.  There is a probationary period when

25  they come out of close custody management so that we can

68

1    review them to make sure that they will, in fact, function

2    correctly on a close custody yard.  That's about it.

3        Q.    And the situation that you just described where

4    you're thinking about placing someone in a close custody

5    yard but you're not sure they will be able to function

6    there, is that for people who are coming out of maximum

7    custody?

8        A.    More times than not, no, but it could.

9        Q.    Okay.  So what would be the situation where it

10   wasn't someone coming out of max custody but you weren't

11   sure that they could function in a close custody yard?

12       A.    From one program to another, if you're looking

13   at restrictive status housing, for example, and a

14   particular inmate committed one of these forbidden three

15   acts that I spoke about earlier, we could potentially move

16   them down through close custody management to ensure that

17   they can, in fact, go to a close custody yard without any

18   kind of issues.

19       Q.    But that would mean they -- if they were in

20   restricted status then they were max custody, weren't

21   they?

22       A.    Correct.  That was your question I understood it

23   as.

24       Q.    Okay.  So that person, it's been decided

25   they're in max custody in restricted status, okay.  And

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

69

1   it's been decided that they no longer need restricted

2   status, they no longer need max custody, they are going to

3   go to close custody, but you're not sure they're quite

4   ready for it yet and so you put them into close

5   management; is that what you're saying?

6       A.    Yes, ma'am.  They have to meet the parameters to

7   be removed from the restrict status housing program, and

8   from there we could place them into close custody

9   management, if we choose to do so.

10      Q.    When you say, close custody management, that's

11  close management, right?

12      A.    Yes, ma'am.  I'm sorry.  Yes.

13      Q.    That particular set of terms I find very

14  confusing.

15      A.    My apologies.

16      Q.    No problem.  Okay.

17      A.    Just as a side note in regards to close custody

18  management, we really don't use the program a whole heck of

19  a lot.  I think currently in the state we've only got 26

20  inmates within that program.

21      Q.    And, again, that's close management?

22      A.    Close management.  Yes, ma'am.

23      Q.    Are there any categorical reasons that a person

24  cannot be placed into close management?

25      A.    Not that I'm aware of.  No, ma'am.

30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

70

1      Q.    Okay.  What is mental health watch?

2      A.    Mental health watch is a watch where we would

3   place an inmate that shows self-harm behavior, whether

4   they've actually committed self-harm, whether they state

5   that they are going to commit self-harm.  They would be

6   placed by mental health staff on a mental health watch

7   within a cell.  It could vary from a continuous watch where

8   an officer is sitting on that particular individual with

9   eyes on him all the time, to a ten-minute watch where they

10  check on him every ten minutes, to a 30-minute watch and

11  check on him every 30 minutes.

12     Q.    There's also something called a precautionary

13  security watch?

14     A.    Yes, ma'am.

15     Q.    Can you explain what that is?

16     A.    And I can give you an example of this.  As a

17  warden of a facility, if I have an inmate that comes in

18  after hours and I don't have the ability to get mental

19  health to see them, medical had seen the particular inmate

20  and medical has stated that they have some concerns but

21  don't choose to place them on a mental health watch, I have

22  the ability to place them on a security watch.  I can place

23  them on a security watch until I can have mental health

24  staff see that particular individual.  And the security

25  watch is basically a 30-minute watch where we can keep

1    track of the inmate to make sure they don't self-harm.

2         Q.    Okay.  Can security staff place someone onto a

3    mental health watch that's not a precautionary security

4    watch?

5         A.    No, ma'am.  It has to be done by the mental

6    health staff.

7         Q.    Okay.  All right.  Are there any policies that

8    govern the practices in -- I'm sorry.  I'm going to give

9    you a little bit of a map where I'm going.  I'm going to

10   start now talking in more depth about enhanced management.

11        A.    Yes, ma'am.

12        Q.    Okay.  Are there any policies other than DO 812

13   that set out the enhanced management program policies?

14        A.    Not to my knowledge.  I believe that is the only

15   policy that contains information regarding enhanced

16   management.

17        Q.    Looking now at Isolation Exhibit 3, which is DO

18   812, and we're looking at Section 7 relating to the

19   enhanced management housing status.  Do you see that?

20        A.    No, ma'am.  It's not on my screen.

21        Q.    That's because I didn't actually successfully

22   share my screen.  Now do you see it?

23        A.    Yes, ma'am.  I do.

24        Q.    Excellent.  7.1.1 lays out actions that -- so

25   it says that the person is either a serious escape risk or

72

 1   physically assaultive behavior, and it lists four

 2   categories of reasons why a person might be placed on

 3   enhanced management.  Do you see that?

 4       A.    Yes, ma'am.

 5       Q.    If a person commits one of the actions listed

 6   here -- a serious physical injury, an assault with a

 7   dangerous weapon, an assault causing a serious physical

 8   injury, or an assault resulting in the death of any

 9   person -- is it automatic that the person will go into

10   enhanced management status?

11       A.    No, ma'am.  It's not automatic.  I mean, it's

12   upon actually what happened.  So it's all based on a

13   case-by-case basis.  The facts of the matter are relayed

14   from the warden to the regional operations director and the

15   determination is made whether they're placed in there or

16   not.

17       Q.    And who makes that?

18       A.    Regional operations director, or it potentially

19   could go to the assistant director of prison operations.

20       Q.    If a person is convicted of one of the crimes

21   listed in 7.1.1.4, is it automatic that they'll be placed

22   into enhanced management status?

23       A.    It is not automatic, no, ma'am.  Again, it's

24   taken on a case-by-case basis and the details of exactly

25   what happened.

73

1      Q.     Does consideration of the crime look only at

2   the current conviction or would it look at the full

3   criminal record?

4      A.     For enhanced management we're looking at the

5   current offense.

6      Q.     Okay.  All right.  Is it written into policy

7   anywhere how the criteria for placement into enhanced

8   management are considered so that there's guidance as to

9   whether or not the person should be placed into enhanced

10   management?

11                MS. LOVE:  Form.

12                THE WITNESS:  There's not, ma'am.  As we

13   spoke about, it's a case-by-case basis.

14      Q.     BY MS. MORRIS:  Okay.  But there's no policy

15   guiding that case-by-case decision-making process?

16      A.     No, ma'am.  The policy in front of me is the

17   only policy we have on enhanced management, to my

18   knowledge.

19      Q.     Okay.  Going down to Section 7.4, and

20   specifically 7.4.2, it says:  Inmates classified as SMI

21   shall not be placed in EMHS, enhanced management housing

22   status, without review by the health services contract

23   monitoring bureau mental health director and contract

24   mental health director.  Do you see that?

25      A.     Yes, ma'am.

1      Q.    Is that review documented somewhere?

2      A.    So that assessment that's done by mental health

3  staff, to my knowledge, that is placed within their eOMIS

4  system.  That would be the documentation in regards to that

5  assessment.

6      Q.    So that would be the only documentation of that

7  review?

8      A.    To my knowledge.  Yes, ma'am.

9      Q.    Okay.  Is that review done in person or is it a

10  review of records?

11      A.    That review would have to be done in person, to

12  my knowledge.  Yes, ma'am.

13      Q.    Okay.  When you say to your knowledge, does

14  that mean that's what you think, or do you know that?

15      A.    I am not in charge of Eyman complex nor Browning

16  unit, ma'am.  So I'm going by what the policy states.

17      Q.    Where in the policy are you getting that it has

18  to be in person?

19      A.    So when mental health assessments are done --

20  and I am not exactly sure where the policy is on this, but

21  when mental health assessments are done they're supposed to

22  be done in person by the mental health staff.

23      Q.    This review is done by the monitoring bureau

24  mental health director and contract mental health

25  director?

75

1      A.      So we might be talking about two different

2   things.   The assessment I'm talking about is the on-site

3   mental health staff, and that inmate is placed in enhanced

4   security.  7.4.2 is in regards to individuals that I

5   believe are over that individual taking that mental health

6   assessment at the unit.  So, of course, they would not be

7   at the unit.  And so they would, yes, of course, be looking

8   at it through notes, phone calls, whatever the case may be.

9      Q.      Okay.  When does the review that's described in

10  7.4.2 happen in relation to placement into enhanced

11  management?

12     A.      In regards to the directors on 7.4.2., I'm not

13  exactly sure when that takes place, ma'am.

14     Q.      Okay.

15     A.      Above that on 7.4, it says within the five

16  business days, and since that's a subcategory of 7.4, I

17  would assume it would be within those five business days.

18     Q.      But that's just an assumption?

19     A.      Yes, ma'am.

20     Q.      Okay.  All right.  Let's talk now about the

21  restricted status housing program.  That's also governed

22  by DO 812, correct?

23     A.      Yes, ma'am.

24     Q.      Are there any other policies that set out

25  provisions relating to the restrictive status housing

76

1    program?

2         A.    Not that I'm aware of.  No, ma'am.

3         Q.    Okay.  So in section 6.4, which is on the

4    screen right now, can you see it?

5         A.    Yes, ma'am.

6         Q.    Okay.  And in section 6.4.3 it says, again,

7    that inmates classified as SMI shall not be placed in RSHP

8    without review by the mental health services contract

9    monitoring bureau mental health director and the contract

10   mental health director.  Do you see that?

11        A.    I'm sorry.  Could you repeat that?  I'm sorry.

12        Q.    This one, also, for restricted housing, there's

13   also this provision that there has to be review for people

14   who have an SMI to be placed into restricted housing just

15   like there was for enhanced management, correct?

16        A.    Yes, ma'am.

17        Q.    Is that the same type of review that happens

18   for enhanced management?

19        A.    Yes, ma'am, it is.

20        Q.    And do you know when that review has to occur?

21        A.    Similarly, because it's a subsection of 6.4, I'm

22   assuming it's within five business days.

23        Q.    Okay.  And, again, that review would be

24   documented in eOMIS?

25        A.    Yes, ma'am.

77

1      Q.     And it wouldn't be documented anywhere else?

2      A.     Not to my knowledge.  No, ma'am.

3      Q.     How does ADCRR ensure that the provisions about

4   having a review for a person with an SMI who is going into

5   restricted status housing program or enhanced management

6   actually occurs?

7      A.     So an inmate that is designated SMI within our

8   system, we have a code that tells us that the particular

9   inmate is, in fact, SMI.  So as the inmate is received from

10  whatever sending unit is sending them to the receiving

11  unit, then, as soon as they come in, we know, based on a

12  designated code behind their ADC number, that they are an

13  SMI inmate.  Does that answer that question for you?

14     Q.     Yes.  That's an M, correct?

15     A.     That is correct.

16     Q.     Does ADCRR have a system for making sure that

17  the review of a person who is classified as an SMI

18  actually occurs when that person is placed into RSHP or

19  enhanced management?

20     A.     So a couple different ways we know this.  So,

21  like I said, as they come in they're already designated

22  SMI, and because of that, that information is relayed.  We

23  have individuals that are in charge of that restricted

24  status housing program.  They will know when that inmate

25  comes in that they are, in fact, SMI.  All the inmates that

1  come into that program are automatically reviewed by mental

2  health staff just to make sure they're not going to harm

3  themselves when we place them in the program.

4          Mental health staff, as that inmate enters,

5  is automatically going to know by that designator code

6  that the inmate is SMI.  SMI inmates, obviously, are given

7  a little bit more attention through mental health staff

8  than other inmates within the facility.  So whether that

9  inmate is in that program or just a regular inmate not in

10  the program and designated SMI, that shows up on our

11  mental health staff's -- I don't know if it's their eOMIS

12  or what their tracking system is, but they know that that

13  inmate has to be seen as an SMI inmate.

14     Q.    Okay.  But that explains who knows and how they

15  know that the person has an SMI, but how does anyone at

16  ADCRR know that the review that's required for an SMI

17  inmate has actually occurred?

18     A.    So that individual that's over that program --

19  and it could, in fact, also involve the deputy warden of

20  that particular unit.  There's going to be communication

21  between them and the mental health staff to ensure that

22  that was, in fact, completed, and that's found out by the

23  entries within eOMIS.

24     Q.    Do you know what the entry would be called in

25  eOMIS?

79

1        A.    I do not, ma'am.  I don't utilize that system.

2    That's a medical system.

3        Q.    Do correctional personnel have access to eOMIS?

4        A.    No, we do not.

5        Q.    Does ADCRR in any way audit to determine

6    whether or not the reviews that are required for placing a

7    person with an SMI into restricted housing or enhanced

8    management that those reviews, in fact, occur?

9        A.    We can ask for a screen printout from eOMIS that

10   mental health staff or nursing staff could provide to that

11   individual over that program if that's what they wanted to

12   do.  We also have a monitoring bureau that can look at that

13   for us, as well.

14       Q.    Do you know if the monitoring bureau does look

15   at it?

16       A.    I don't know that offhand, ma'am.

17       Q.    Okay.  Let's talk a little bit about the STG

18   units.  These are primarily governed by DO 806, correct?

19       A.    Yes, ma'am.

20       Q.    Okay.  And DO 806 was recently revised,

21   correct?

22       A.    Yes, ma'am, within this year.

23       Q.    Yeah.  What were the main changes to DO 806?

24       A.    As I spoke about earlier, there's a couple of

25   big changes within that, one of which is we used to utilize