80

1    a point system in order to validate inmates.  That has

2    changed to now we look at an inmate being validated if they

3    meet three of the criteria set forth for a validated STG.

4    And then the other one that we spoke about was the -- they

5    don't automatically go to Browning unit if they are

6    validated.  That's taken on a case-by-case basis and looked

7    at.

8         Q.    Was there also a revision into the way people

9    can be removed from the STG unit?

10        A.    I'm not familiar with what the old system was

11   compared to the new system, ma'am.

12        Q.    Okay.  Fair enough.  I will ask you about it

13   when I get to that part of my outline.

14              Is there a new max custody unit at Lumley?

15        A.    Not that I'm aware of, ma'am.

16        Q.    Do you know if there's one that is in the

17   process of being set up?

18        A.    Not that I'm aware of, ma'am.

19        Q.    Okay.  Are there any other statuses of people

20   in max custody other than the ones that we've discussed?

21        A.    No, ma'am.  Not that I'm aware of.

22        Q.    Okay.  All right.  Let's talk a little bit

23   about the step program matrix for people in max custody,

24   and that is laid out in DO 812, correct?

25        A.    Yes, ma'am.

81

1       Q.    Okay.  Before we get into the details of it,
2    can you tell me, what's the purpose for the step-level
3    matrix for max custody?
4       A.    It's an incentive program basically set up so
5    that inmates get more privileges as they're doing things
6    that they should be doing.  Stay out of trouble,
7    programming, that kind of stuff.
8       Q.    Does everybody in max custody have to start at
9    step one?
10      A.    Yes, ma'am, they do.
11      Q.    Okay.  In the intake unit at Eyman do people
12   have a step level at that point?
13      A.    I don't believe they start that step program
14   until they're actually assigned to a unit.
15      Q.    All right.  So looking at Exhibit 3, the
16   maximum custody management subsequent reviews, section
17   3.0.  Do you see that?
18      A.    Yes, ma'am.
19      Q.    Okay.  There are step-level reviews every
20   month, correct?
21      A.    Yes, ma'am.
22      Q.    Is there any procedure to ensure that every
23   incarcerated person in max custody actually has a review
24   every month?
25      A.    So when those reviews take place the individuals

1   that are looked at, that entry is made within ACIS.

2       Q.    Okay.  Is there anyone that goes through ACIS

3   and make sure that every single person in max custody had

4   a review?

5       A.    That's usually done by the assigned CO 3s of the

6   particular inmates.

7       Q.    Okay.  And does anyone over the CO 3s make sure

8   that each of the CO 3s within their chain of command did,

9   in fact, make sure that all of the people had their

10  reviews?

11      A.    That would be the job of the CO 4 who is in

12  charge of the CO 3s.

13      Q.    All right.  Is there any auditing process to

14  make sure that everybody gets a review every month?

15      A.    Not that I'm aware of, no, ma'am.

16      Q.    Okay.  Could you describe the review process

17  for me?

18      A.    So as they come up for review these program

19  teams sit down and they discuss the different areas that

20  the inmate is supposed to be meeting to get to that next

21  step or subsequently to be reduced.  So if they are, like I

22  said earlier, doing things they're supposed to do, if

23  they're up for a step review and they have met the

24  qualifications within the matrix to move to the next step,

25  and they're programming, and they're disciplinary-free, and

83

1    they're showering and taking care of their areas, then they

2    would then be moved up in step based on the matrix at the

3    end of this policy.

4         Q.   Okay.  So that review process is, in fact, a

5    meeting, correct?

6         A.   It is.  They go over all the information that

7    may come up on that particular inmate, whether it be

8    disciplinary reports, information reports that are done.

9    They can have mental health staff in those meetings,

10   medical staff in those meetings.  And it's basically

11   everybody putting their heads together to make sure that

12   inmate is placed in the correct step.  And, again, it's per

13   the matrix.

14        Q.   Is there documentation of the review process?

15        A.   Other than the entries that are made in ACIS,

16   the particular administrator of the unit that's having a

17   program team meeting can keep minutes, if they so choose,

18   but I don't think there's a requirement for that.

19        Q.   Okay.  And when you say what's entered into

20   ACIS, that's just what the outcome of the review was; is

21   that correct?

22        A.   That's correct.

23        Q.   So what's entered into ACIS is not the

24   reasoning for what the outcome was; is that correct?

25        A.   I haven't been in that system in a long time,

84

1   but I believe there's a notes section in there that notes

2   can be entered in.

3        Q.    Do you know if they are entered in?

4        A.    That, I don't know, ma'am.

5        Q.    Okay.  So DO 812, section 3.1.1, lists the

6   people who are on the program team.  Do you see that?

7        A.    Yes, ma'am.

8        Q.    What is a unit administrator?

9        A.    Unit administrator is usually the associate

10  deputy warden or the deputy warden.

11       Q.    Okay.  And how many people would a captain be

12  involved in reviewing each month?

13       A.    The captain is usually involved in all of these

14  reviews.  So the captain is responsible for reviewing all

15  the information reports in the unit.  They review the

16  disciplinary reports in the unit.  So they would have

17  knowledge of any reports that would come up on an

18  individual and they would be involved in those meetings.

19       Q.    Okay.  So I guess the question is:  How many

20  people in max custody could there be in the area that a

21  captain has responsibility for?

22       A.    The captain is the chief of security of the

23  entire unit.

24       Q.    Of the entire unit?

25       A.    Yes, ma'am.

85

1      Q.    So, for example, there's a captain at Browning

2   who would have responsibility for all people in max

3   custody at Browning?

4      A.    Yes, ma'am.

5      Q.    Okay.  All right.  And then the CO 4 is going

6   to have responsibility over roughly how many people?

7      A.    The CO 4 is the program manager for the entire

8   unit.

9      Q.    For the entire unit?

10     A.    Yes, ma'am.

11     Q.    Okay.  What about the correctional lieutenant?

12     A.    The correctional lieutenant is in charge of

13   particular shifts within the unit.

14     Q.    But the whole unit but for a shift?

15     A.    Correct.  Well, they're the lieutenant of an

16   entire shift within that unit.  So they are the shift

17   commander for the shifts that they're involved with.

18     Q.    Okay.  All right.  But so, for example, a

19   correctional lieutenant at Browning who is on days would

20   have responsibility for all of the people at Browning

21   during the shift that that correctional lieutenant is

22   working?

23     A.    On that day shift.  Yes, ma'am.

24     Q.    Okay.  For the program team would it include

25   the correctional lieutenants for all of the shifts or just

86

1  one shift?

2      A.    It would be one shift.  And they can vary those

3  meetings at different times and include different

4  individuals in those meetings, if they chose to do so.  You

5  can potentially have a day-shift lieutenant at a 10:00

6  meeting and you can have -- if they're on eight-hour shifts

7  you could have a meeting at 2:30 and have the swing shift

8  lieutenant on that particular meeting.

9      Q.    Okay.  All right.  And then the correctional

10  sergeant, is that for the whole unit, as well?

11      A.    For a particular shift.

12      Q.    For a particular shift, okay.

13      A.    I'm sorry, just to clarify, too.  We also have

14  operations lieutenants that would be in charge of the

15  operations of the unit, not particularly a shift, but they

16  could be in charge of operations at whatever unit they're

17  assigned to.  And the same for sergeants.  You could have

18  operations sergeants, as well.  Not particularly part of a

19  shift, but part of the operations of the unit.

20      Q.    Okay.  But those people would not be involved

21  in the maximum custody management reviews, correct?

22      A.    More than likely, not, because, of course, they

23  are not dealing with the inmates every day like a shift

24  lieutenant would or a shift sergeant would.

25      Q.    Okay.  Then the CO 3, are they assigned to the

1    entire unit, or do they have a more localized purview?

2         A.    CO 3s have assigned caseloads.  So it's however

3    the CO 4 and the unit administration breaks up the inmate

4    population, and the CO 3 is given that particular area

5    population.

6         Q.    Okay.  And what about a CO 2?

7         A.    So the CO 2 -- so, in the program team

8    meetings -- for instance, let's say Browning unit had their

9    program team meeting, and it was during this program team

10   meeting they're going to go over inmates that are in the

11   enhanced program.  The CO 2 that works in the enhanced

12   program and has knowledge of those particular inmates would

13   be invited to that meeting because they speak to the

14   inmates every single day.

15        Q.    How many people would be in the area where a CO

16   2 would work generally?

17        A.    It depends on the area and it depends on the

18   unit and the physical plant.  So you can have a CO 2 that's

19   just over the BMU program, which would be 30 inmates at

20   Browning unit, and they'd be responsible during that shift

21   for those 30 inmates.  The next day that same CO 2 would be

22   placed in the detention area at -- or I'm sorry Browning

23   doesn't have one -- but be placed in the close management

24   area and be in charge of those -- I think there's 46 beds

25   for close management at Browning.  So they would be in

1  charge of those inmates the next day.  So it just depends

2  on where they're posted that day.

3      Q.    So in terms of the program team how is it

4  determined who the CO 2 that's assigned to the unit or

5  housing area is?

6      A.    It's going to be dependent upon who they're

7  reviewing in the program team meeting.

8      Q.    So is it just -- like if we're having a program

9  team meeting on Friday the 24th, wherever the CO 2 happens

10  to be assigned on Friday the 24th, that's the CO 2 that is

11  going to be responding about those individuals?

12      A.    Correct.  If we have to bring up more than one

13  CO 2 we would bring up CO 2s that are knowledgeable of the

14  inmates in that area they've been working, send them back,

15  bring up another CO 2 in another area, and so on and so

16  forth, if that's what we need to do.

17      Q.    Is the incarcerated person present at the

18  review?

19      A.    No, they are not.

20      Q.    Okay.  Are there forms that are filled out

21  regarding the review?

22      A.    Not that I'm aware of.  No, ma'am.

23      Q.    Is there any information given to the

24  incarcerated person who is being reviewed beyond whether

25  or not their step changed?

89

1      A.    I believe the CO 3 provides them with that
2  change in level.  Yes, ma'am.
3      Q.    So the CO 3 tells them whether or not their
4  level changed?
5      A.    It tells them or may give them a inmate letter
6  response with that information on it.  I'm not exactly sure
7  of that, but the inmate is informed one way or another.
8      Q.    Okay.  But is the inmate informed of the
9  reasons for the decision?
10     A.    I'm not sure about that, ma'am.  The inmate can
11 however, if, for instance, the CO 3 said that your step has
12 been decreased, and the inmate says why, and the reason is
13 not given by the CO 3, the inmate can provide an inmate
14 letter asking for those reasons and a response has to be
15 provided to them.
16     Q.    Is that written in policy somewhere?
17     A.    It's written in policy that an inmate can fill
18 out an inmate letter if he has concerns about something,
19 and it must be responded to.  Yes, ma'am.
20     Q.    Is it written anywhere that an inmate who asks
21 for the reasons why a step was reduced or not changed must
22 be told what those reasons are?
23     A.    I'm not aware of that in writing, but that's
24 just good practice that we're doing that.
25     Q.    Okay.  Would those responses to inmate letters

90

1    be entered into the inmate's file anywhere?

2         A.    Probably not.  No, ma'am.  The inmate is given a

3    copy of all that, however.  So, if the inmate chooses to

4    file that, if the CO 3 is making copies and keeping a file

5    on that particular inmate, it could be kept in that

6    fashion.

7         Q.    But that would be up to the CO 3?

8         A.    Yes, ma'am.

9         Q.    How long does a meeting to review inmate's step

10   level last?

11        A.    It's going to depend on how many inmates are

12   being reviewed during that meeting.

13        Q.    How long does it take to review one inmate?

14        A.    It could be very similar or it could involve

15   several different documents.

16        Q.    I'm looking for a time range.

17        A.    It's a case-by-case basis, ma'am.

18        Q.    Okay.  Is it ever done in one minute?

19        A.    It could be, sure.

20        Q.    Okay.  Does it ever take an hour?

21        A.    I highly doubt it would ever take that long to

22   determine an inmate's step level.

23        Q.    Does it ever take half an hour?

24        A.    I don't believe it would ever take that long,

25   ma'am, no.

91

1      Q.    Does it ever take 15 minutes?

2      A.    I don't believe it would take that long either,

3  ma'am.

4      Q.    What is the longest that you think would be

5  within that sort of normal range for reviewing an

6  individual's step progress?

7      A.    I would say anywhere between one to three or

8  four minutes.  And that's based on how many documents are

9  involved and how many individuals are speaking on behalf or

10  getting information on that particular inmate.

11      Q.    I'm going to go to a matrix.  So this is

12  attachment B, which is the matrix for Browning unit,

13  general population, STG, and condemned row.  Do you see

14  that?

15      A.    Yes, ma'am.

16      Q.    And then going down to the row that says,

17  step-level advancement, do you see that row?

18      A.    Yes, ma'am.

19      Q.    And it says, recommended by program team.  Do

20  you see that?

21      A.    Yes, ma'am.

22      Q.    And then below that there's a row that says,

23  step-level reduction.  Do you see that?

24      A.    Yes.

25      Q.    And it says:  Decision by program team on a

92

1    case-by-case basis.  Do you see that?

2        A.    Yes, ma'am.

3        Q.    What is the difference between recommending and

4    deciding?

5        A.    Well, I can state the obvious.  The

6    recommendation is them recommending and the deputy warden

7    of the unit approving and the program team making the

8    decision that they're going to reduce it.

9        Q.    So is it the policy that the program team, when

10   they believe that someone should advance, they just make a

11   recommendation, but then that decision is made by someone

12   else?

13       A.    My historical knowledge of this is the program

14   team makes the decision on the step level.  Now, I know

15   there has been discussion regarding changing this and

16   recommendations being made by the program team and the

17   final decision for maximum custody step level be made by

18   the assistant director, but that has not been put out yet.

19       Q.    Okay.  So, to your knowledge, even though

20   there's different language for step-level advancement and

21   step-level reduction, the thing that the program team is

22   doing for both of those is, in fact, deciding; is that

23   right?

24       A.    That is correct.

25       Q.    Okay.  And is there any reason that step-level

93

1   reduction says on a case-by-case basis and step-level

2   advancement doesn't?

3       A.    No, ma'am.  Not to my knowledge.

4       Q.    Okay.  So each of the matrixes has some variety

5   in terms of what is listed here.  So starting with the one

6   that we're looking at right now, Browning unit, in the

7   policy it says that one of the criteria for moving up is:

8   Display behavior that is cooperative and respectful.  How

9   is that determined in the step-level review?

10       A.    So in the step-level reviews that I have been in

11   in the past, unless there is some information provided,

12   whether it be by a staff member or whether it be by

13   information report or a disciplinary report that shows that

14   they are not doing that, then it is assumed that they are

15   doing it, that they are behaving themselves and being

16   respectful.

17       Q.    Okay.  And I'm sorry.  Did you say information

18   or did you say document?

19       A.    It's one and the same.  So any documentation to

20   include an information report.

21       Q.    Okay.  All right.  So the person is understood

22   to be displaying behavior that's cooperative and

23   respectful unless there is documentation in their file

24   that says that they're not; is that correct?

25       A.    That is correct, or, for instance, as we're

94

1    having that meeting we have a mental health staff member at

2    the meeting that says:  Well, you know, I went and saw the

3    inmate at his cell front last week and he was disrespectful

4    and he was being vulgar and making inappropriate comments,

5    that would be taken into consideration during that meeting.

6         Q.    Okay.  Is that only about mental health staff

7    or is that --

8         A.    No, that would be anybody.

9         Q.    Okay.  All right.  I just wanted to be sure.

10        A.    Just an example.

11        Q.    Okay.  For moving from step 1 to step 2 there's

12   a minimum of 90 days in step 1.  Do you see that?

13        A.    Where is that, ma'am?  I'm sorry.

14        Q.    On the step-level advancement row.

15        A.    Okay.  Yes.  Minimum of 30 calendar days in step

16   1.

17        Q.    Okay.  And then for step 3 you need a minimum

18   of 30 calendar days in step 2.  Do you see that?

19        A.    Yes, ma'am.

20        Q.    And then for step 3 it just says N/A.  Do you

21   see that?

22        A.    Yes, ma'am.

23        Q.    Are there no -- why does it say N/A?  Do you

24   understand that?

25        A.    Because if you're in step 3 you're in step 3.

1  There's no minimum requirement of days to be in step 3.

2  You're already step 3.

3      Q.    Okay.  Going back to that provision on

4  step-level advancement to step 3, so you're in step 2.

5  You must complete or actively participate in all programs

6  as per program plan.  Do you see that?

7      A.    Yes, ma'am.

8      Q.    Who decides whether the person is actively

9  participating?

10      A.    Normally, it's the CO 3, because most of those

11  programs that the inmate is supposed to be participating in

12  is being put on by the CO 3s.  They're the ones

13  facilitating the classes that the inmate would have to

14  complete.

15      Q.    What happens if a program isn't available?

16      A.    That is not a factor that would keep them from

17  moving up to step 3 if that program is not available and

18  it's within their program plan.

19      Q.    Is that stated in policy anywhere?

20      A.    I'm not sure if it is or not, ma'am.

21      Q.    In the row at step-level reduction from step 2

22  to step 1 there are a couple criteria relating

23  disciplinaries and then refusal to program, and then

24  consistently demonstrate poor socialization skills and/or

25  noncooperative behavior.  Do you see that?

96

1      A.    Yes, ma'am.

2      Q.    How would that be evaluated?

3      A.    Very similar to what we spoke about earlier.  If

4   it's documented that they're not cooperating with staff,

5   whether it be security staff, medical staff, mental health

6   staff, if that's placed on any documentation such as an

7   information report or a disciplinary report, that would be

8   looked at.

9      Q.    What would an information report that is

10  reporting on poor socialization skills look like?  So an

11  information report that's not a disciplinary report.  I

12  mean, what kind of thing would be described there?

13     A.    That would vary based on the author of the

14  report, ma'am.  If it was me writing that report then I

15  could tell you my report would say:  On the above date and

16  approximate time inmate so-and-so was disrespectful to me,

17  failed to follow my directives, was uncooperative, so on

18  and so forth.  More times than not, if the information

19  report is being written by a staff member, a disciplinary

20  report has also been written on that particular violation.

21     Q.    Okay.  So would you expect that if there is no

22  documentation of poor socialization skills or a lack of

23  respect, that kind of thing, and there is no disciplinary,

24  then a person would move from step 1 to step 2 at the

25  first review after they've done 30 days?

## 30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

97

1       A.      Yes, ma'am.  If they meet the matrix, yes,

2   ma'am.

3       Q.      And if there is no indication of disrespectful

4   behavior or non-cooperativeness and there's no

5   disciplinaries and they are going to those programs that

6   are offered, would you expect that the person would go

7   from step 2 to step 3 at their first monthly review after

8   they become a step 2?

9       A.      Yes, ma'am.  If they meet the requirements of

10  the matrix they would move up a step.

11      Q.      Okay.  We saw earlier that at step 3, if you're

12  at step 3 for a minimum of 30 days with no disciplinary,

13  no incidents, that you're eligible for consideration to be

14  moved out of max custody.  Do you remember that?

15      A.      Yes, ma'am.

16      Q.      Would you expect that a person who has done at

17  least 30 days as a step 3, doesn't have any

18  disciplinaries, and doesn't have anything in the record

19  indicating disrespectful behavior, bad socialization,

20  refusal to program, would be removed from max custody at

21  the first review by the classification board?

22                  MS. LOVE:  Form and foundation.

23                  THE WITNESS:  It's very similar to what we

24  spoke about earlier.  I would expect that inmate probably

25  to not reduce until he's been evaluated in maximum custody

98

1   for that 180 days.

2       Q.   BY MS. MORRIS:  Is there any process by which

3   the step reviews are reviewed by ADCRR?

4       A.   Not to my knowledge, other than anybody can go

5   on and look at step levels, make sure that they are up to

6   date.  For instance, the CO 4 at particular units to go on

7   and make sure that those are, in fact, being completed by

8   their staff or CO 3s.

9             As far as an internal audit of the step

10   system, I'm not aware of that.  No, ma'am.

11       Q.   Okay.  Is there any policy regarding how long a

12   person can be kept in max custody?

13       A.   I am not aware of that, ma'am.

14       Q.   Is there any policy regarding how long a person

15   can be kept at any of the step levels in max custody?

16       A.   Not that I'm aware of.

17       Q.   Is there any policy regarding how quickly a

18   person must be moved once they're reclassified as close

19   custody?

20       A.   Not that I'm aware of, ma'am.  No, ma'am.

21       Q.   Is there any policy as to how a person who has

22   been reclassified as close custody but not yet moved is

23   treated?

24       A.   Define treated.

25           MS. LOVE:  Form.

99

1      Q.    BY MS. MORRIS:  Whether they are treated as if

2   they were in max custody or as if they were in close

3   custody.

4      A.    No, not that I'm aware of.  No, ma'am.

5            MS. MORRIS:  Okay.  I'm ready to take a

6   break.  Would it make sense to take a lunch break now?

7            MS. LOVE:  Sure.

8            (Recess from 12:03 p.m. to 12:53 p.m.)

9            MS. MORRIS:  Back on the record at 12:53.

10     Q.    BY MS. MORRIS:  I want to talk about DO 812 and

11  enhanced management a little bit more.  I'm going to share

12  my screen.  Now I'm going to talk a little bit about how

13  people get reviewed in enhanced management and out of

14  enhanced management.

15           Section 7.5 says, the ROD -- that's

16  regional operations director, correct?

17     A.    Yes, ma'am.

18     Q.    The ROD, complex warden, and unit deputy warden

19  shall review the inmates in the EMHS program for

20  participation in step progression a minimum of every 30

21  calendar days.  Do you see that?

22     A.    Yes, ma'am.

23     Q.    Are those the only people that are involved in

24  review of enhanced management inmates?

25     A.    Yes, ma'am.

100

1      Q.    So the program team does not participate in

2   that review?

3      A.    No, they do not.

4      Q.    Okay.  Is that review based on records in the

5   inmates' files?

6      A.    There are records kept on that meeting.  I'm not

7   sure where those records are kept, however.

8      Q.    Okay.  That's a slightly different question

9   than I was trying to get to.

10               What do the ROD, the complex warden, the

11   deputy warden, the unit deputy warden review or consider

12   in this review process?

13      A.    They're looking at the matrix for enhanced

14   management, whether or not they're programming in their

15   cell, whether or not they've gotten any disciplinary.

16   They're looking at that kind of stuff.

17      Q.    And do they have individual knowledge about the

18   person's behavior, or are they reviewing documents for

19   that information?

20      A.    Both.  So the deputy warden of the unit is aware

21   of that individual and why they're in there.  The complex

22   warden is because they're notified when they're placed in

23   there, and the ROD is usually the approving authority.  So

24   they're also aware of why they're in there.

25      Q.    But is why they're in there part of the review

1    for step progression and EMHS program participation?

2          A.    No.  So they're in there because of what they

3    did, but during the review they're just looking to make

4    sure that the inmate is doing the things they're supposed

5    to do while they're in there.

6          Q.    Right.  And that's my question.  Like, how do

7    these three individuals know what people are doing in the

8    enhanced management program once they're in there?

9          A.    Because the individual in charge of that program

10   is documenting what the inmates are doing.

11         Q.    Okay.  So it's from the documents?

12         A.    Yes, ma'am.

13         Q.    And the documents would be in the inmates'

14   files?

15         A.    The inmates' files are kept there at the unit.

16   So I want to make sure I clarify.  It wouldn't be

17   information in the inmates' institutional file.  It would

18   just be their enhanced management file that they have there

19   at Browning.

20         Q.    What's in the enhanced management file at

21   Browning?

22         A.    Just that information.  Anything that is kept on

23   the inmate in regards to keeping track of what he's

24   programming on, what he's doing, any disciplinary he's

25   getting.  That kind of stuff.

1      Q.    Is there any policy that talks about what's in

2  the enhanced management file?

3      A.    No, ma'am, not that I'm aware of.

4      Q.    And the review is for both deciding whether the

5  person is progressing from step 1 to step 2 to step 3 and

6  also whether they need to be maintained in the enhanced

7  management program, correct?

8      A.    I'm not sure if that review has anything to do

9  with the steps.  That review is to determine whether or not

10  they need to remain in enhanced management or not.

11      Q.    Okay.  So when it says that they are reviewing

12  them for program participation and step progression,

13  you're not certain whether that means that they're

14  reviewing them for whether they should go from one step to

15  another?

16      A.    I believe that's done by the program team as far

17  as the steps go just like any other inmate in the Browning

18  unit.  This review is being completed to make sure they're

19  doing the things within that program they're supposed to,

20  and if they are, are they doing enough to be removed from

21  that program or not.

22      Q.    Okay.  What are the things they're supposed to

23  be doing that are not relevant to the step progression?

24      A.    It's very similar.  Basically, if they're doing

25  the things they're supposed to be doing to progress in

1    step, then that's what they're reviewing.  They're making

2    sure that the inmates are doing what they're supposed to be

3    doing all in the program.

4         Q.    Okay.  Let's look at attachment F to DO 812,

5    which is, again, in Exhibit 3, and this is the matrix for

6    enhanced management.  Do you see that?

7         A.    Yes, ma'am.

8         Q.    On the row that says, step-level advancement,

9    do you see that?

10        A.    Yes, ma'am.

11        Q.    Says, recommended by ROD and complex warden?

12        A.    Yes.

13        Q.    And then below that in the step-level reduction

14   row it says:  Decision by ROD and complex warden on a

15   case-by-case basis.  Do you see that?

16        A.    Yes, ma'am.  If that answers the question that

17   they are, in fact, looking at step level as well during

18   that meeting.

19        Q.    Okay.  But you were unaware of that?

20        A.    I was not aware of that at the time until I just

21   read that, ma'am.

22        Q.    Okay.  Is there any policy regarding reporting

23   anything relating to the placement into enhanced

24   management?

25        A.    Other than the enhanced management program

104

1    information within that policy, I don't believe there's

2    anything written on enhanced management.

3        Q.    Okay.  Is there any policy requiring reporting

4    of anything relating to the reviews of step progression

5    and continued participation in enhanced management?

6        A.    Not necessarily in regards to enhanced

7    management, but there is a policy regarding information

8    reporting, meaning if there is anything going on in

9    enhanced management and an officer or another staff member

10   sees something going on, then they're required to report it

11   through an information report, yes.

12       Q.    Okay.  But I'm asking about the review process.

13   Is there any reporting of the review process, that monthly

14   review that they're supposed to be doing for every person

15   in enhanced management?

16       A.    I believe there is.  I'm not aware of that

17   paperwork, however, ma'am.

18       Q.    Who would be?

19       A.    The complex warden at Eyman, the regional

20   operations director over Eyman, or even the deputy warden

21   at Browning unit would be aware of that information.

22       Q.    Okay.  Is there any policy requiring reporting

23   of anything relating to decisions regarding removals from

24   enhanced management?

25       A.    Just what's within that policy that we're

105

1   currently looking at.

2        Q.    Is there any policy regarding how long a person

3   can be kept in enhanced management?

4        A.    Not that I'm aware of.

5        Q.    Is there any policy regarding how quickly a

6   person must be moved out of enhanced management once

7   they're deemed to not require enhanced management?

8        A.    Not that I'm aware of.

9        Q.    Is there any policy regarding whether a person

10  is treated as if they are still in enhanced management

11  when they have been deemed to no longer require enhanced

12  management but they haven't yet been moved?

13       A.    I'm not aware of that verbiage in the policy,

14  but if they're no longer in the enhanced management program

15  they would no longer be managed as enhanced management.

16       Q.    Okay.  So they could be in an enhanced

17  management unit waiting for transfer and they would not be

18  treated as though they were still in enhanced management,

19  you're saying?

20       A.    That transfer is a very quick transfer out of

21  that program.  Once the decision has been made to remove

22  them from enhanced management, that movement usually takes

23  place that same day.

24       Q.    Okay.  How do you know that?

25       A.    I'm one of the ones that wrote the policy on

106

1    enhanced management.

2        Q.    Is that in the policy anywhere --

3        A.    I used to manage it at Browning unit when I was

4    the assistant deputy warden many years ago.

5        Q.    Okay.  Is it in the policy anywhere that it

6    should take place that quickly?

7        A.    No, ma'am.

8        Q.    Okay.  All right.  So talking a little bit

9    about the reviews in restrictive housing status, and we're

10   looking at section 6.5 in DO 812, which is Isolation

11   Exhibit 3.  It says:  The assessment team shall review

12   inmates in RSHP for program participation and step

13   progression on a minimum of every 30 calendar days.  Do

14   you see that?

15       A.    Yes, ma'am.

16       Q.    Is that assessment team that's described in 6.5

17   the same as the RSHP committee that is described in 6.4.1?

18       A.    I would say no, ma'am, because if you read the

19   subsection below that it also states that the mental health

20   staff would participate in that, which is not part of that

21   RSHP independent review committee that we spoke about in

22   6.4.

23       Q.    Okay.  So who is on the assessment team, then?

24       A.    I don't have that information, ma'am.  I'm not

25   exactly sure.

107

1      Q.    Okay.  This review that's happening every 30

2    days, that's for both continued participation in RSHP --

3    or continued placement in RSHP and step progression,

4    correct?

5      A.    Yes, ma'am.

6      Q.    Okay.  Looking at attachment D, which is page

7    15 of DO 812, it says that the step-level advancement for

8    RSHP and step-level reduction for RSHP is done by the RSHP

9    committee.  Do you see that?

10     A.    I do.

11     Q.    So does that mean that the assessment team and

12   the RSHP committee are the same thing?

13     A.    It would appear that way in the policy.  Yes,

14   ma'am.

15     Q.    So you think it's not that way in practice?

16   I'm only asking because the way you said it would appear

17   that way in the policies made it sound like maybe in

18   practice it's different.

19     A.    So I know that the team that reviews RSHP, the

20   committee is not supposed to be personnel that's within

21   that unit that the RSHP program is within.  Now, the

22   assessment team could be staff that are within the unit.

23   So that's why I'm thinking that those are two different

24   entities.

25     Q.    So how would you square that with what it says

1  in the policy about the step-level advancement being done

2  by the RSHP committee?

3     A.    Could you rephrase your question, please.

4     Q.    The RSHP committee, according to policy, is

5  making recommendations or decisions about whether a person

6  advances or is reduced in step, correct?

7     A.    Yes, ma'am, according to the policy.

8     Q.    According to the policy.  And then if we go

9  back to section 6.4 and 6.5 we see that the step review

10 process is done by the assessment team.

11    A.    Correct.  I'd actually like to look at that

12 entire policy to see if there is anything in that policy

13 that basically talks about who is made up of the assessment

14 team.  I don't know if there's anything prior to that in

15 that policy that explains that.

16    Q.    You can see my screen?

17    A.    Yes, ma'am.

18    Q.    I'm going to search on --

19          MS. LOVE:  Maria, I also have a copy of the

20 policy.  Is it okay if I put the -- while you both look,

21 maybe?

22          MS. MORRIS:  Yeah, that would be great.

23          THE WITNESS:  So if you look at 2.3, ma'am,

24 it says:  The assessment team consisting of a deputy

25 warden, chief security, correctional officer 4,

109

 1    correctional sergeant, and a CO 3.  So that would be the

 2    assessment team.

 3        Q.    BY MS. MORRIS:  So that's the assessment team,

 4    and they do a review, but it's not their review that

 5    decides step progression, or is it just an error in the

 6    policy?

 7        A.    I would take a guess that that's an error in

 8    this policy, ma'am, because they would be the ones that

 9    would have to do with step progression.

10        Q.    Okay.  Who is making the decision about whether

11    a person needs to continue to be housed in the restricted

12    status housing program?

13        A.    That would be the other committee that is not

14    part of that unit.

15        Q.    Which is the RSHP committee?

16        A.    Yes, ma'am.

17        Q.    Is there any policy requiring any reporting

18    about the reviews of step progression in restrictive

19    housing status?

20        A.    Not that I'm aware of, ma'am, no.

21        Q.    Is there any policy requiring reporting of

22    reviews for continued placement in RSHP?

23        A.    Not that I'm aware of, ma'am, no.

24        Q.    Is there any policy requiring reporting

25    anything relating to decisions regarding removal from

110

1  RSHP?

2       A.    Not that I'm aware of, ma'am, no.

3       Q.    Is there any policy regarding how long a person

4  can be kept in RSHP?

5       A.    Not that I'm aware of, ma'am, no.

6       Q.    Is there any policy regarding the minimum

7  amount of time a person can be held in RSHP?

8       A.    Not that I'm aware of, ma'am, no.

9       Q.    Is there any policy regarding how quickly a

10  person must be moved once they're deemed not to require

11  RSHP?

12       A.    Not that I'm aware of, ma'am, no.

13       Q.    Do you think that this is another situation

14  where people are moved quickly within the day after the

15  decision to remove them is made?

16       A.    Historically, yes.  Anytime an inmate is removed

17  from these type of programs it's within that exact same

18  day.

19       Q.    When you say, "these type of programs," what do

20  you mean?

21       A.    RSHP, enhanced management, close management.

22       Q.    Okay.  The step-level matrix also applies to

23  people in STG units, correct?

24       A.    Yes, ma'am.

25       Q.    In that setting?

111

1          A.    Yes.

2          Q.    Is there any difference in the review process

3    for people in max custody who are validated members of an

4    STG?

5          A.    There are differences in that review, according

6    to the policy on STGs, ma'am.  Yes, ma'am.

7          Q.    For the step progression?

8          A.    No.  No differences with the step progression.

9    No, ma'am.

10         Q.    Okay.  But there are differences in terms of

11   whether they can be moved out of max custody, correct?

12         A.    Yes, ma'am.

13         Q.    Is that set out in DO 806?

14         A.    If that is the policy regarding security threat

15   groups, then yes, ma'am, it is.

16                    (Exhibit 4 identified for the record.)

17         Q.    BY MS. MORRIS:  Let's look at what we've

18   identified as Exhibit 4.  I'm showing you what I'm

19   identifying as Exhibit 4.  Can you tell me what this

20   document is?

21         A.    This is the department order 806 on security

22   threat groups.

23         Q.    Okay.  And is this the policy that discusses

24   how people who have been validated as a STG would be moved

25   out of an STG program?

1      A.     Yes, ma'am.

2      Q.     Okay.  Looking at Section 5.3, which is at the

3   bottom of page 11 and onto page 12 of the PDF that is

4   Exhibit 4, this sets out the ways that people can have a

5   custody reduction on housing status change once they've

6   been validated as an STG member, correct?

7      A.     Yes, ma'am.

8      Q.     And 5.3.1 is renouncing the STG, correct?

9      A.     Yes, ma'am.

10      Q.     And 5.3.2 is completing the step-down program?

11      A.     Yes, ma'am.

12      Q.     5.3.3 is:  Qualify for custody reductions as

13   outlined in department order 801, inmate classification,

14   after having successfully completed a 24-month period

15   where they have not participated in any documented

16   STG/gang or terrorist activity.  Do you see that?

17      A.     Yes, ma'am.

18      Q.     Is that a new provision?

19      A.     As I said earlier, I'm not sure what the

20   previous policy stated compared to this one.  So I'm not

21   sure if that's new or not.

22      Q.     Okay.  5.3.3 has a sub-point that says that:

23   While housed in maximum custody the inmate shall complete

24   all three steps of the inmate maximum custody management

25   incentive system.  Do you see that?

113

1     A.    Yes, ma'am.

2     Q.    Is that true regardless of what way out of STG

3  status the person has?

4     A.    Not that I'm aware of.  No, ma'am.

5     Q.    So it's only under 5.3.3?

6     A.    Yes, ma'am.

7     Q.    Can you tell me what the difference between

8  5.3.3 and 5.3.4 is?

9     A.    I can only assume that it is talking about

10  whether or not information has been gathered that a

11  particular inmate would no longer be part of a security

12  threat group, but, again, I'm assuming on that, ma'am.

13     Q.    Okay.  So you don't know what the basis for the

14  different provisions of 5.3.3 and 5.3.4 are?

15     A.    No, ma'am, I do not.

16     Q.    Okay.  So a person can get out of STG status if

17  they successfully complete a 24-month period where they

18  haven't participated in STG gang activity, correct?

19     A.    Correct.  It has to go through a committee

20  before that's approved, however.

21     Q.    What committee?

22     A.    The STG committee or the coordinator.

23     Q.    Where is that in the policy?

24     A.    I believe earlier on in the policy it talks

25  about that specific group that reviews the STGs.

1      Q.    So is this what you're talking about, Section
2   1.4.2?
3      A.    The threat assessment committee.  I believe
4   that's it, ma'am.  Yes, ma'am.
5      Q.    Okay.  So it would be an annual decision?
6      A.    According to the policy, it would be in that
7   24-month period.
8      Q.    Okay.  So if a person is in STG status, and
9   let's say they had an annual review by the committee in
10  January, and then starting from March they had no
11  documented STG activities for two years, would they be
12  reviewed for removal from STG status in March once they
13  hit the two-year mark, or would they have to wait until
14  the annual review in January?
15     A.    The contradiction in the policy, according to
16  the one below, it's at the 24-month mark.  According to
17  this, the committee looks at these annually.  So I would
18  have to get clarification on that, ma'am.
19     Q.    Is there any policy regarding how long a person
20  can be kept in STG?
21     A.    No, ma'am, but the policy describes in detail
22  how they can get out of being a validated STG.
23     Q.    Okay.  Is there any policy regarding how
24  quickly a person must be moved once they're deemed not to
25  require being housed in STG anymore?

115

1       A.    Not that I'm aware of, ma'am, no.

2       Q.    Would you expect that this is another one of

3  those programs where it would happen very quickly?

4       A.    I would.  And simply because, for instance, if

5  an inmate decided to debrief, at that point we're removing

6  him from that STG population for his own safety and

7  removing him so that no harm comes to him.

8       Q.    Okay.  Do you know anything about what

9  percentage of people that get removed from STG are removed

10  via debriefing, via the step-down program, or via this

11  process of just being without any documented activities

12  for 24 months?

13       A.    I do not have that information but I know we

14  keep that information.

15       Q.    I'm sorry?

16       A.    I said I do not have that information.  However,

17  I know that information is kept by the department.

18       Q.    Okay.  I'm going to switch now to talk about

19  close management.

20             What policies govern placement in detention

21  and release from close management?

22       A.    The only information on close management is

23  within that close management policy, to my knowledge.

24       Q.    That's DO 813?

25       A.    Yes, ma'am.

116

1      Q.    And as far as you know, that is the only policy

2   regarding close management?

3      A.    To my knowledge, yes, ma'am.

4      Q.    Okay.  Are there things that a person in close

5   management is supposed to do to progress out of close

6   management?

7      A.    There is a matrix in the back of that policy

8   that talks about programming that needs to be completed.

9           (Exhibit 5 identified for the record.)

10     Q.    BY MS. MORRIS:  I'm going to open up what I'm

11  identifying as Exhibit 5.  Can you tell me what Exhibit 5

12  is?

13     A.    That is department order 813, close management.

14     Q.    Okay.  And this is the policy that you were

15  saying contains the policies relating to close management?

16     A.    Yes, ma'am.

17     Q.    Okay.  And the matrix is attachment B, the last

18  page, the matrix we were just talking about?

19     A.    Yes, ma'am.

20     Q.    So a person needs to go through these programs

21  in the three different phases to get out of close

22  management?

23     A.    Yes, ma'am.

24     Q.    Do each of these phases have any kind of time

25  requirement?  Do you have to spend a certain amount of

1  time at each phase?

2      A.    Not that I'm aware of, ma'am.

3      Q.    So at the bottom it says, asterisk denotes live

4  class facilitated by CO 3 with no more than 15

5  participants.  Do you see that?

6      A.    Yes, ma'am.  I do.

7      Q.    And there are some classes that have an

8  asterisk, but not a lot, right?  I actually only see one,

9  money management -- oh.  Money management and

10  self-control, yeah?

11      A.    Yes, ma'am.  I see that.

12      Q.    Do you know how long those two classes run for?

13      A.    I do not.  Typically, the CO 3 taught classes

14  run around eight weeks long.

15      Q.    Okay.  Would there be more than one class being

16  offered at a time in a given unit?

17      A.    More times than not, no, ma'am.

18      Q.    Okay.  So in order to take both of the classes

19  listed in phase 3 it would probably take at least 16 weeks

20  just of the --

21      A.    Let me clarify.  So different correctional

22  officer 3s are responsible for teaching different classes.

23  So to clarify my answer on your last question, there could

24  be two different CO 3s that are teaching those two classes

25  at the same time.  So, yes, ma'am.

118

1      Q.    Okay.  Do you know how often that happens?

2      A.    Quite a bit, actually, in every unit.

3      Q.    So in a single unit would you expect to see two

4   different CO 3 classes proceeding at the same time?

5      A.    Yes, ma'am.

6      Q.    Over the same, like, eight-week period?

7      A.    Yes, ma'am.

8      Q.    All right.  Thank you.  Is there a minimum

9   amount of time that people have to spend in close

10   management once they've been placed into close management?

11      A.    Not that I'm aware of, ma'am.

12      Q.    Is there a maximum amount of time they can

13   spend in close management?

14      A.    Not that I'm aware of.

15      Q.    The only policy that governs placement into

16   detention is policy DO 804, correct?

17      A.    Yes, ma'am.

18      Q.    Are there any other policies that relate to the

19   placement of people into detention?

20      A.    I believe the classification policy 801 may

21   describe placement in detention, but I'm not exactly

22   positive about that.

23      Q.    Okay.  What is the process for removing someone

24   from detention?

25      A.    So it depends on what they're in detention for.

119

1    So, for instance, an inmate is placed in detention for a

2    disciplinary reason, and the inmate is served what we call

3    a 2A form for a disciplinary detention.  We have 30 days to

4    complete that investigation on that disciplinary to decide

5    what we're doing with that inmate.  And at that 30-day mark

6    that investigation has to be complete and we have to decide

7    where we're placing the inmate, whether he's going back to

8    the unit he came from or whether he's being reclassed to a

9    higher custody.  If the investigation lasts longer than

10   that 30 days we would have to reserve another 2A, and that

11   would have to be done in the next 30 days.  And then at

12   that point we need to know where we're placing that inmate.

13        Q.    How many --

14        A.    I'm sorry.  There's one other, and that's 805s,

15   which would be inmates in fear for their life.  We place

16   them in detention.  We're doing a review on that to decide

17   whether or not there is, in fact, a threat against the

18   inmate's life and whether we're going to proceed with

19   protective custody or not.  That process could be a little

20   longer.  There is no set time frame for getting them out.

21   At this point the investigation is completed.  The review

22   for protective custody goes up to central office.  A

23   decision is made on whether to move them out to another

24   unit or actually place them in protective custody, at which

25   point they would be sent over to Lewis complex.