1    Q.    Okay.  Going back to the 2As, you said you've

2  got 30 days to do the investigation, and if the

3  investigation isn't completed within the 30 days you serve

4  another 2A that gives you another 30 days, right?

5    A.    Yes, ma'am.

6    Q.    Is there a limit on the number of times that

7  can happen for an individual being investigated?

8    A.    I've never seen that go past the second 2A,

9  ma'am, unless the charges turn into criminal charges, then

10  it could potentially prolong that investigation.

11    Q.    And if that were the case what would happen?

12  Where would the person be housed?

13    A.    They would stay at detention unless, of course,

14  that investigation gets completed, we find out what the

15  charge is, and that particular charge could place them in

16  another custody level, and they'd be moved out at that

17  point.

18    Q.    Is there any limit on how long they could be in

19  detention in that situation?

20    A.    No, ma'am, because it would be based on the

21  criminal investigation.

22    Q.    Okay.  Going to the 805 status, when a person

23  says they're in fear for their life, is there any limit on

24  the amount of time that ADCRR can take to investigate and

25  make a decision on whether the person should be placed in

121

1    protective custody?

2         A.    We have stuck to a 30-day time frame.  However,

3    I know with 805s sometimes it takes a little longer than

4    that, especially if they're reviewing for protective

5    custody.  We don't want inmates in detention because,

6    obviously, if we fill up those beds and there's no place to

7    place an inmate, if we need to use a detention bed that

8    becomes problematic for us.  So we try and make that

9    process as quickly as we possibly can.  Normally, we're

10   sticking within 30 days.  There are times, especially with

11   805s, that they could go past that 30-day time frame.

12        Q.    Do you know how much past they can go?

13        A.    Actually, it depends on a couple of different

14   things.  So, obviously, it depends on how long it takes for

15   the decision to be made on protective custody.  It could

16   depend on bed space, as well.  So if I have a inmate that

17   has a sex offense those are premium beds for us in the

18   department.  So if there are no beds available and the

19   decision has been made and we need to place them in a

20   sex-offender unit, we have to wait for a bed to become

21   available before we can move them out.

22        Q.    If a person has said they're in fear for their

23   life and ADCRR does the investigation for protective

24   custody and decides that the situation does not warrant

25   protective custody, what happens to the person?

122

1      A.    The inmate is alternatively housed to another

2  unit of custody level that he's at.

3      Q.    Okay.

4      A.    And, of course, we take into consideration any

5  do-not-house-withs that the inmate may have.  So we have to

6  look at all those factors before we could place them in

7  another unit.

8      Q.    Okay.  Going back to the 2A investigation

9  status people, is there a limit on the number of times a

10 2A notice can be served?

11     A.    Not that I'm aware of.

12     Q.    Can you explain to me what the procedures are

13 for refusal to house?

14     A.    A refusal to house is an inmate that obviously

15 does not want to house in a unit we're attempting to place

16 him at.  At that point he is or she is placed in detention.

17 We have a process in place where we will go and try and

18 convince the inmate to house.  If the inmate refuses then

19 disciplinary is issued, and we will continue this process

20 to try and get the inmate to house.  We'll look at

21 different alternatives to try and get them to house.  But,

22 ultimately, if they continue to house [sic], we will issue

23 disciplinary when the offers are made.  And if they are

24 reclassed to a higher level -- which normally that's what

25 they're looking for as a refusal to house so they can have

1   either their own cell or a cell with another individual --

2   at that point we'll move them to maximum custody if that's

3   what is warranted.

4       Q.   If a person says that in the yard where they

5   are they are in fear for their life is that a refusal to

6   house?

7       A.   No.  That would be an 805.

8       Q.   If a person asks for an alternative housing

9   placement is that a refusal to house?

10      A.   If they refuse to house in that particular unit

11  and they're looking for another unit, then that would be

12  considered a refusal to house.

13          Inmates can put in inmate letters asking to

14  be moved to other facilities or other units, but that

15  doesn't take place unless, of course, we have a situation

16  where we need to do a one-for-one because of a

17  do-not-house order or something like that, and we would

18  consider moving them at that point, but they have to

19  continue housing at the unit that they're at.  They can't

20  just refuse to house and walk up to a shift commander and

21  say:  I'm not going back to my house.  You guys need to

22  move me off the yard.

23      Q.   Unless they say they're in fear for their life?

24      A.   If they say they're in fear for their life they

25  can come in 805.

1      Q.    Okay.  If a person is assaulted in a housing
2   unit can that be a reason for considering them to have
3   refused to house?
4      A.    No, it is not.  At that point we're
5   investigating it.  And it depends on the circumstances.
6   A lot of times the inmates will say that I'm no longer safe
7   here.  We will 805 them.  Sometimes we have inmates that
8   will come up and say that they are not going to identify
9   the aggressors that assaulted them, and we make them an 805
10  at that point just for their own safety.
11     Q.    So if a person is assaulted and will not
12  identify their attacker they become an 805?
13     A.    Yes, ma'am.  At that point for their safety
14  we'll make them an 805.
15     Q.    And if you make them an 805 that would appear
16  in their records somewhere, correct?
17     A.    Yes, ma'am, it will.
18     Q.    Where would it be in their records?
19     A.    That 805 packet would go into their
20  institutional file, I believe.
21     Q.    If something goes into the institutional file
22  does it eventually make it into the central record?
23     A.    The institutional file basically is their
24  record.  That's kind of a hard file, and then we also have
25  ACIS, which is our electronic file.  So that 805 would be

125

1   logged inside ACIS, as well.

2       Q.    All right.  If a person is placed in detention

3   for refusing to house, are they placed in detention for at

4   least six months?  Is that a policy?

5       A.    Not that I'm aware of, no.

6               (Exhibit 7 identified for the record.)

7       Q.    BY MS. MORRIS:  I'm going to show you what I'm

8   identifying as Exhibit 7, D0 704.  Are you familiar with

9   this policy?

10      A.    Yes, ma'am, I am.

11      Q.    And I'm going to have to figure out where it is

12  in the policy.

13              So I'm looking at Section 10, refusal to

14  house procedures.  Do you see that?

15      A.    Yes, ma'am, I do.

16      Q.    Okay.  And if you go down to 10.2, if a viable

17  housing option cannot be found within the complex the

18  inmate shall not be eligible for movement out of the

19  complex for a minimum of six months.  Do you see that?

20      A.    I do, ma'am.

21      Q.    Is the person in detention during that time

22  period?

23      A.    Yes, ma'am.  They would be.

24      Q.    Okay.  You sound like -- and I'm very familiar

25  with that policy, and maybe I was misunderstanding the

126

1   policy when I asked about it before about a refusal to
2   house requiring six months in detention.
3               Can you explain in what circumstance would
4   a refusal to house not result in a six-months detention
5   stint?
6        A.    Basically, if we can convince them to house
7   someplace else.  Quite truthfully, that's about it.
8   Refusal to houses have been a big problem for us in the
9   department, managing them, because, of course, they take up
10  detention beds.  So we're trying to come up with viable
11  options regarding our refuse-to-house inmates in the
12  department.
13       Q.    As long as a person is in detention for refusal
14  to house, they get a disciplinary every 30 days; is that
15  correct?
16       A.    I believe that's what the policy states, yes.
17  So every time they refuse to house when we're offering them
18  a housing option, they would receive a disciplinary for
19  that.
20       Q.    And that housing option could be the housing
21  location where they came from?
22       A.    Yes, ma'am.  If they're still eligible for that
23  particular yard, then, yes, ma'am, it could be.
24       Q.    Okay.  And if they're refusing to house and
25  getting a disciplinary every 30 days, that will increase

127

 1  their custody level and their inmate risk score level,

 2  correct?

 3       A.    Yes, ma'am, it will.

 4       Q.    What are holding enclosures?

 5       A.    Holding enclosures are areas, whether they're

 6  outside or inside, that inmates are placed in temporarily

 7  while we decide what we're going to do with them, whether

 8  it be a transport or taking them inside a health unit, that

 9  kind of thing.

10       Q.    Is there any policy regarding how long a person

11  can be held in a temporary enclosure?

12       A.    There is.  They're not supposed to be held any

13  more than an hour in a enclosure -- outside enclosure, I

14  believe, is what the policy states.

15       Q.    And do you know what policy that is?

16       A.    I don't off the top of my head, ma'am.

17       Q.    Okay.  Does ADCRR know what that policy is?

18       A.    Yes, ma'am, they do.

19       Q.    They do.  Okay.

20       A.    I've read that in the policy.  So I do know it

21  is within a policy.

22       Q.    Unfortunately, that is not terribly helpful to

23  me.

24       A.    I'm sorry.

25             MS. MORRIS:  Rachel, I'm just going to say

1   that I am going to be thinking about whether or not we

2   need to ask for an additional designee on topic 1.  I'm

3   not doing it right now, but we'll be thinking through that

4   based on the responses.

5            MS. LOVE:  Okay.  We can just discuss that

6   later, but I think this is just the function of Rule

7   30(b)(6) notices where it's termed broad and then there's

8   drill-down to minutia details, but you and I can discuss

9   that, obviously.

10           MS. MORRIS:  And I actually do just want to

11  follow up one more question.

12       Q.   BY MS. MORRIS:  You said that the one hour was

13  for an outside holding cell.  Is there any limit on the

14  amount of time for an inside holding cell?

15       A.   I don't remember if it just says for a holding

16  enclosure or whether it's an outside holding enclosure, but

17  I know the verbiage does specifically state an hour, and

18  anything over that hour time frame has to be approved by

19  the warden.

20       Q.   Okay.  Do you know how frequently it has to be

21  approved by the warden?  Let me give you an example.

22  Let's say --

23       A.   Once they hit that hour mark, and the

24  expectation given to the facilities from central office is

25  that no inmates will be held in a holding enclosure longer

129

1   than an hour.  So it would have to be exigent circumstances

2   to go over that hour.

3       Q.   Okay.  And then would it have to be every hour

4   thereafter that there was approval like if there was a

5   riot going on or something like that?

6       A.   Yes, ma'am.

7       Q.   Okay.  All right.  Now we're going to talk

8   about topic 2, conditions of confinement in isolation.

9   Are there any call buttons of any sort in the cells in max

10  custody?

11      A.   No, ma'am.

12      Q.   How does a person in max custody get staff

13  attention in an emergency?

14      A.   So historically -- of course, we do our security

15  checks.  At any time an inmate can stop an officer and say

16  that they need something in an emergency situation.  That

17  officer, of course, will either take care of the issue or

18  call a supervisor to take care of that issue.  If it's in

19  between security checks -- I know having worked at Browning

20  SMU 1 in Central -- banging on the cell front, yelling in

21  the pod usually gets the attention of staff.  Staff will

22  enter that area and take care of whatever issue is taking

23  place at the time.

24      Q.   And do you know if that's acknowledged in any

25  policy?

130

1      A.    I don't, other than the inmates are told if they
2   have any issues they can bring it to a staff member's
3   attention.
4      Q.    Okay.  Inmates are also told that they are not
5   supposed to engage in excessive banging and noise,
6   correct?
7      A.    Yes, ma'am, but that is overlooked if it's an
8   emergency situation.
9      Q.    Okay.  Was that in the policy anywhere?
10     A.    No, ma'am.
11     Q.    Okay.  What we just talked about regarding how
12  people get staff attention in an emergency, is that true
13  for the enhanced management units, the restricted status
14  housing program, the STG units, and the BMU units?
15     A.    Yes, ma'am.  It's all within the same facility.
16     Q.    Okay.  What about in detention units?  Is it
17  the same?
18     A.    Same concept.  Yes, ma'am.
19     Q.    And is it the same in close management units?
20     A.    Yes, ma'am.
21     Q.    Are there call buttons of any sort in mental
22  health watch units?
23     A.    Not that I'm aware of.
24     Q.    So for a person who's not on constant
25  observation how would they get staff attention in an

131

1   emergency?  Was it the same thing?

2       A.    Same concept.  Yes, ma'am.  They're out and

3   about and they're walking and they're using continuous

4   motion.  So you don't see very many instances, if any at

5   all, where inmates are not able to get the attention of an

6   officer.

7       Q.    How do you know that?

8       A.    Based on reviewing our significant incident

9   reports every morning.

10      Q.    When a significant incident report is created

11  it's created by staff members, correct?

12      A.    Correct.

13      Q.    So -- and this is purely a hypothetical.  Let's

14  say a person in a maximum custody unit is having serious

15  chest pains and his cellmate starts banging on the door

16  and yelling, other people start yelling, too, to get the

17  attention of the staff member, and this starts at

18  8:02 a.m., and the staff member hears this and comes in at

19  8:15.  Wouldn't the significant incident report reflect

20  the time that the incident started as 8:15 when the person

21  heard the noise and came in?

22      A.    Yes, ma'am, it would.

23      Q.    So it wouldn't capture how long it took to get

24  the person's attention, correct?

25      A.    Correct.

132

1     Q.    So is there any other way that ADCRR would have
2  to know how long it takes to get staff members' attention?
3     A.    Could you rephrase that question again?  I'm
4  sorry.
5     Q.    Is there any way, other than the significant
6  incident reports, that ADCRR would have to determine how
7  long it takes to respond to incarcerated people calling
8  out for help in an emergency?
9              MS. LOVE:  Foundation.
10             THE WITNESS:  No, ma'am.  Not that I'm
11 aware of.
12    Q.    BY MS. MORRIS:  Let talk about out-of-cell
13 time.  Is out-of-cell time important?
14    A.    Absolutely.
15    Q.    Why?
16    A.    It's actually really good for the inmates'
17 mental health state.  It's good for the inmate to get out
18 and about, talk with others.  It actually has done wonders
19 for us since we started the program in regards to
20 interaction with staff and inmates and interaction amongst
21 other inmates, teaching pro-social behavior, and it gives
22 them an out from just everyday cell life.
23             It, in my opinion, has helped reduce a lot
24 of the problems we've had with some of our problematic
25 inmates just getting them out sitting at a table, going

133

1    out to rec, conversing with staff while staff is walking

2    through doing security checks.  It's been very good for us

3    as a department.

4         Q.    Okay.  What are the things that people in max

5    custody get out of cell for?

6         A.    Inmates get out for recreation.  Inmates get out

7    for showers.  Inmates get out for visitation.  Inmates get

8    out for medical appointments.  They get out for table time,

9    which would be pod time.  They get out for, for instance,

10   community meetings.  They get to get out for that and

11   converse with the deputy warden or the ADW of the units.

12   That's all that comes to mind right now.

13        Q.    What about classes or programs there?

14        A.    There you go.  I'm sorry.  Classes and programs.

15   Thank you.

16        Q.    Sure thing.  What about jobs?

17        A.    And jobs.  Yes, ma'am.

18        Q.    What about religious services?

19        A.    In maximum custody -- we don't have religious

20   services in maximum custody.

21        Q.    Okay.  How often do community meetings happen?

22        A.    Once a month.

23        Q.    Once a month.  And would a whole cluster go to

24   a community meeting, or one run?  Or how many people would

25   go to -- like, what unit of people would go to a community

134

1  meeting?

2       A.    So it's up to the unit administration, and they

3  usually will break it up between -- so, for instance, at

4  Browning unit it has different areas within it.  So they

5  could have designated, validated STG members come.  The

6  next month they could have general population max custody

7  and so on and so forth so that they're hitting everybody.

8       Q.    Okay.  So it's not that every person who is in

9  max custody would have the opportunity to go to a

10  community meeting every month?

11      A.    No.

12      Q.    There would be a community meeting every month,

13  and over the course of several months every max custody

14  person would have the opportunity to go to one?

15      A.    Correct.

16      Q.    Okay.  All right.

17      A.    And those meeting minutes are taken and they're

18  distributed out to the population so that the population

19  knows what was talked about in that community meeting.

20      Q.    Okay.  All right.  Are they distributed by

21  tablet?

22      A.    You know, I believe we have started doing that.

23  We started doing that at Florence complex.  Previously, it

24  was just by paper, and it would be placed up on bulletin

25  boards within the pods and clusters in the areas.

1      Q.    Okay.  So the things you mentioned were the

2  community meetings, rec, showers, medical, classes or

3  programs, jobs, visitation, and table time or pod time as

4  things that people in max custody get out of cell for,

5  right?

6      A.    Yes, ma'am.

7      Q.    Is that the same for people in enhanced

8  management units, restricted status housing program, STG

9  units, and BMU units?

10      A.    BMU, yes.  So BMU takes place -- or I'm sorry.

11  They actually do all of that, as well.  They do pod time.

12  They go out for classes, that kind of stuff.  Enhanced

13  security, I don't believe that all of that is done with

14  them.

15      Q.    So what would they get for out-of-cell time?

16      A.    I would have to look at the policy, at the

17  matrix, to find out exactly what they're authorized to do

18  in enhanced security.

19      Q.    And the policy being the 812 matrix?

20      A.    Yes, ma'am.

21      Q.    So I see recreation, visitation, phone.  Which

22  of those are out of cell?

23      A.    Visitation and recreation.

24      Q.    Okay.  Phone is not out of cell, correct?

25      A.    No.  That would be in cell.  That's a cordless

136

1    phone that they're given.

2        Q.    And then resource center library access.  Is

3    that out of cell?

4        A.    Not for enhanced management.  No, ma'am.  They

5    would be making any requests through the library for the

6    resources that they need and that would be brought to them.

7        Q.    Okay.  And you might need -- I'm guessing that

8    Rachel has a copy of this policy.

9                MS. LOVE:  We do.

10       Q.    BY MS. MORRIS:  Would you want to look at it to

11   see if there's anything else on here that would talk about

12   what out-of-cell time they get and that would be helpful

13   for you?

14       A.    Yes, ma'am.  It looks like that's it, ma'am,

15   enhanced security.  They get out for recreation, showers,

16   visitation.

17       Q.    They typically also get out for medical if they

18   need it, correct?

19       A.    Yes, ma'am.  If they need to take any medical

20   they would also be removed and taken to medical.

21       Q.    And is that the same rec, shower, visits, and

22   medical for restricted status?

23       A.    Yes, ma'am.  It would be.

24       Q.    And is that the same for STG?

25       A.    No, it is not.

137

1        Q.    Okay.  What out-of-cell time do people get in

2  STG?

3        A.    STG population is going to get the same

4  out-of-cell time that our general population would get.

5        Q.    The general population max custody?

6        A.    Yes, ma'am.

7        Q.    Okay.  What about detention units?

8        A.    Detention units would get the recreation and

9  they would get the visitation and also the showers.

10       Q.    And medical if they need it?

11       A.    And medical if they need it.  Yes, ma'am.

12       Q.    How much recreation time do people in detention

13  units get?

14       A.    Inmates in detention get six hours a week of

15  recreation.

16       Q.    What kind of out-of-cell time do people in

17  close management units get?

18       A.    Close management units would get the same.

19  Recreation, showers, visitation.  I believe they also have

20  programming requirements if they're on a step 3 that they

21  would actually come out and do programming.  And that may

22  be it.

23       Q.    Okay.  How much recreation time do they get?

24       A.    Close management, I would have to look at that

25  matrix, as well.

138

1          MS. LOVE:  I've also handed the warden a
2     copy, just so you know, a clean copy of the policy.
3          MS. MORRIS:  Okay.
4      Q.   BY MS. MORRIS:  On the screen now I'm showing
5     you Exhibit 5, DO 813, the close management one.  Remember
6     how earlier we were talking about live classes?
7      A.   Yes.
8      Q.   I'm looking at some of these classes and they
9     say small class.  I mean, in phase 3, feelings, a small
10    class and self-study.  Additional options include social
11    values, small class.  And if releasing within six months,
12    merging two worlds, small class.  Are those live classes
13    even if they don't have an asterisk?
14     A.   I'm sorry.  What was the question?  They're what
15    kind of classes?
16     Q.   Are they live classes even though they don't
17    have an asterisk?
18     A.   Yes, they are.
19     Q.   Okay.  All right.  So whatever of those classes
20    are being offered in a unit at a particular time, people
21    in close management would be able to go out of cell for,
22    correct?
23     A.   For phase 3.  Yes, ma'am.
24     Q.   And then if we go up to the close management
25    privileges we see six hours per week for recreation; is

139

1    that right?

2         A.    Yes, ma'am.  All three phases.

3         Q.    Okay.  Can people in close management have

4    jobs?

5         A.    I believe they can, depending on the phase.

6         Q.    How would you find out?

7         A.    It should be in this policy.  I don't see it

8    within the policy.  So I'm going to say, no, they cannot.

9         Q.    Okay.  What out-of-cell time do people on

10   mental health watch get?

11        A.    Out-of-cell time for mental health watch would

12   be designated by the mental health staff.  So what they

13   place on the watch order for that particular inmate is what

14   they would get.  So if they deem the inmate is safe to go

15   out to recreation and they designate that on the watch

16   order, then security staff would accommodate that, take the

17   inmate out for that recreation.  So it would be based on

18   what mental health staff agrees to.

19        Q.    Okay.  At Florence how often did you see a

20   person who was on mental health watch having documents

21   that say they can go out for rec?

22        A.    I have seen it done.  It does not happen often,

23   however.

24        Q.    Okay.  When a person who's in max custody

25   leaves their cell where is that documented?

140

1       A.     On the out-of-cell tracking form.

2       Q.     And that's true in general population, max

3   custody, enhanced management, restricted status, STG, and

4   BMU?

5       A.     Yes, ma'am.

6       Q.     Okay.  When a person in a detention unit leaves

7   their cell is that documented?

8       A.     It is.  It's on their detention form.  It's very

9   similar to the out-of-cell tracking form, but it's for

10  detention inmates.

11      Q.     Is it called the inmate detention record?

12      A.     That is it.  Yes, ma'am.

13      Q.     Okay.  All right.  And what about for someone

14  in close management?  Is their out-of-cell time

15  documented?

16      A.     Not that I'm aware of.

17      Q.     And if someone is on mental health watch and

18  they have out-of-cell time, where is that documented?

19      A.     That's documented on the observation form.

20  That's kept by the watch officer.

21      Q.     Where are the out-of-cell time tracking forms

22  that are used in max custody, where are they kept once a

23  form is filled out?

24      A.     Once a form is filled out and completed they are

25  kept at the unit.

141

1     Q.    At the unit.  It's a weekly form, right?

2     A.    Yes, ma'am.

3     Q.    And so the whole week for the unit would be

4  kept together; is that what you're saying?

5     A.    Yes, yes.  All of the weekly forms for that

6  particular week would be kept together.

7     Q.    Okay.  Is there any record of the out-of-cell

8  time that goes into the inmate's record?

9     A.    Not that I'm aware of.  No, ma'am.  The only

10  out-of-cell tracking is the out-of-cell tracking form.

11     Q.    Okay.  And for a detention unit, the inmate

12  detention record, are those also kept at the unit once the

13  week is filled out?

14     A.    Yes, it is.

15     Q.    Okay.  Are the inmate detention records audited

16  by anyone to see whether people are getting the

17  out-of-cell time required by policy?

18     A.    They are.  They are audited by our audit team

19  when the audit comes around for our particular areas.

20     Q.    Where are the observation forms kept once an

21  observation form is filled out completely for a mental

22  health watch?

23     A.    They're also kept at the unit.

24     Q.    Okay.  Are they audited by anyone?

25     A.    Yes, they are.

142

1      Q.     Who are they audited by?

2      A.     Same audit team.

3      Q.     Okay.  Is that the same audit team that audits

4    the out-of-cell time tracking forms?

5      A.     Yes, it is.  It's our annual audit team that

6    comes around and audits operations within the complex.

7      Q.     Okay.  Do the observation forms get provided to

8    mental health at all?

9      A.     I'm not sure if they are provided to mental

10   health or not.  I know mental health has access to them,

11   but I'm not sure if we provide them for their keeping.

12     Q.     Okay.  Do you know if the observation forms get

13   entered into eOMIS?

14     A.     The observation forms themselves, I am not sure

15   if they are or not.  I know the actual order, and that

16   information is placed within eOMIS.

17     Q.     So the order which would say whether or not the

18   person got out-of-cell time would be in eOMIS?

19     A.     Yes, to include when the watch started and when

20   it ended and any notation by the medical staff.

21     Q.     Okay.  When people in -- this one I think I

22   have to specify.  General population max custody, when

23   they leave their cells, what are the procedures for them

24   leaving the cell?

25     A.     Max custody, general population, they would be

143

1    strip searched to make sure they don't have any dangerous

2    contraband on them, and depending on their step level will

3    be restrained coming out of the cell.  Step 3 inmates, they

4    can come out unrestrained.  And then at that point they're

5    escorted to wherever they're going.

6         Q.    Step 2, are they restrained?

7         A.    Yes, they are.

8         Q.    With cuffs?

9         A.    Just handcuffs.  Yes, ma'am.

10        Q.    In back?

11        A.    Yes, ma'am.

12        Q.    Okay.  That's the only restraint for step 2?

13        A.    Yes, ma'am.

14        Q.    And in step 1 are they cuffed?

15        A.    Yes, ma'am.

16        Q.    Are there any other restraints?

17        A.    No, ma'am.

18        Q.    Okay.  At max custody general population how

19   many people are required to escort someone?

20        A.    It depends on how many inmates are in the cell.

21   So if I have a double-cell environment, two inmates in the

22   cell, then two officers or two staff members are required

23   to be there when the door is opened.  If it is one inmate

24   in the cell then one officer can be that escort.

25        Q.    And that doesn't depend on step level?

144

1      A.    No, it does not.

2      Q.    Is all of what you just said in a policy?

3      A.    Yes, it is.

4      Q.    What policy?

5      A.    I believe that's actually in the post order for

6    our housing unit officers.

7      Q.    For the floor officers?

8      A.    Yes, ma'am.

9      Q.    Are there any differences in what we just

10   discussed for people who are in max custody intake?

11     A.    Not that I'm aware of, no, ma'am.

12     Q.    Are there any differences in what we just

13   discussed for people who are in enhanced management?

14     A.    There are differences with enhanced.  They are

15   fully restrained, to my knowledge.

16     Q.    And what does fully restrained mean?

17     A.    They would have both handcuffs and also leg

18   restraints.  And depending on the severity of the reason

19   the inmate is in there, they could potentially have an

20   order to be transported in a transport chair.

21     Q.    Do you have any knowledge of what percent or

22   how many people in enhanced management are transported in

23   transport chairs?

24     A.    I do not have that information, ma'am.

25     Q.    Do you think that ADCRR maintains that

1  information?

2      A.    A unit deputy warden would have that

3  information.  Yes, ma'am.

4      Q.    And they're also subject to strip searches

5  before leaving their cell?

6      A.    Yes, ma'am.

7      Q.    Are there any differences regarding escorting

8  for people in enhanced management?

9      A.    In enhanced I believe there has to be two

10  officers present.  And, again, depending on severity, there

11  could potentially be a supervisor required as well.

12      Q.    Do you know if that's all in the policy

13  somewhere?

14      A.    I am not sure if that is in the actual post

15  order for that particular area or not.

16      Q.    Okay.  Could you describe what a transport

17  chair is?

18      A.    A transport chair is a chair that has four

19  wheels on it.  It is set up to where the inmate sits down

20  in it and their arms and legs and a chest piece is placed

21  over them so that they cannot get out of the chair, and

22  they are wheeled to wherever they're being transported to.

23      Q.    And if a person has been deemed to require

24  transport in a transport chair, would that even be true

25  for something like coming out of the cell to go to the

1   shower, so you're not leaving the run but you are leaving

2   the cell?

3       A.    No.  Not for showers.  No, ma'am.

4       Q.    Okay.  What about for rec in the chute, in the

5   recreation enclosure in the run?

6       A.    No, ma'am.

7       Q.    That would be only used if you're leaving the

8   run where you are?

9       A.    Yes.  If they're removing them from the pod,

10  that would be used potentially, yes.

11      Q.    Okay.  What about for people in restricted

12  status housing program?  What are the procedures for them

13  leaving their cells?

14      A.    They're strip searched.  The upper cuffs are

15  placed, handcuffs are placed, and they're removed from the

16  cell and taken to the destination.

17      Q.    Okay.  How many people have to escort someone

18  in restricted status housing?

19      A.    That's a unit complex-wide, state-wide order

20  that, if there are two inmates in the cell, two staff

21  members will be present when the door is open.

22      Q.    All right.  But if there's only one person in

23  the cell it would just be one officer?

24      A.    Yes, ma'am.

25      Q.    What about for STG units?  Any differences from

147

1  what you just described?

2       A.    No, ma'am.

3       Q.    Any differences from what you just described

4  for the BMU?

5       A.    No, ma'am, other than, depending on the inmate

6  that is being escorted and where they're being escorted

7  from, they could potentially use a transport chair for that

8  individual based on their history or propensity for

9  violence.

10      Q.    So the only places that you've mentioned that

11 there might be a transport chair are the BMU and the

12 enhanced management; is that right?

13      A.    Yes, ma'am.

14      Q.    Okay.  Are there any differences from what

15 we've discussed excluding the transport chair for people

16 in detention?

17      A.    No, ma'am.  Detention inmates are brought out

18 just the same.  Stripped, placed in handcuffs, and escorted

19 to where they need to go.

20      Q.    What about close management?

21      A.    Same, to my knowledge.

22      Q.    And what about people in mental health watch?

23      A.    Same.  They are strip searched, they are removed

24 with upper cuffs.  Depending on, again, their propensity

25 for violence, they could potentially be placed in lower

148

1   restraints and a chair utilized for them, as well.

2       Q.    So the places the chair might be used are

3   enhanced management, BMU, and mental health watch, and

4   that's it?

5       A.    They can utilize the chair anytime they think

6   that they need to utilize it.  However, it's not utilized

7   unless there is a perceived threat from the inmate.

8       Q.    Would it be right to say that most of the time

9   that the chair is used it's used in one of those three

10  units?

11      A.    Yes, ma'am.

12      Q.    But it could be used in any of the units?

13      A.    Yes, ma'am.

14      Q.    Okay.  All right.  For general population max

15  custody how many people go to rec at the same time?

16      A.    You could look at potentially turning out a

17  couple of pods at a time if you're utilizing the big rec

18  area at the max custodies.  You could potentially have two

19  pods out at one time.

20      Q.    Okay.  Are people in general population max

21  custody transported one at a time to the rec enclosures?

22      A.    Well, if they're utilizing the large rec area

23  they're likely -- or they are a step 3, and they are

24  escorted by recreation escort staff to the areas they are

25  going, usually by pod.

149

1      Q.    So the whole pod would go at the same -- they

2   would all sort of walk out in a line?

3      A.    Yes.  So you would bring the four on the bottom

4   at SU 1 or the five on the bottom at Browning.  And then

5   you would bring the other five on the top tier from

6   Browning or four from SMU 1, and you would escort them out

7   to the recreation enclosure and then do the same thing for

8   the next pod you're going to place out there for step 3

9   inmates.

10      Q.    Okay.  About how long does it take to get all

11   the people who are going to rec at one time when you've

12   got multiple people going out to rec?

13              MS. LOVE:  Form.

14              THE WITNESS:  It has the potential to take

15   awhile because of the different step levels.  The step 3

16   inmates, obviously, are easier.  The step 2 inmates are

17   restrained and taken to the 20 by 40 or the 10 by 10s.

18   The step 1 inmates are taken to the 10 by 10s.  So it can

19   be very time consuming.

20      Q.    BY MS. MORRIS:  Okay.  And the step 3 sounds

21   like they're not being restrained.  They do have to be

22   strip searched, right?

23      A.    Yes, they do.

24      Q.    Okay.  Given that it takes a chunk of time,

25   some amount of time to get everybody out to rec, what time

1   is used as the start time for rec?  Is it when you start

2   that process, when the process of getting people into the

3   rec enclosures is finished?  What is used for the start

4   time for rec?

5       A.    The start time, as it is placed on the

6   out-of-cell tracking form, is when the inmate is removed

7   from the cell.  And you're looking at a three-hour time

8   frame for outside rec.  So three hours starts when they're

9   removed from the cell and ends when they're placed back in

10  the cell.  Let me clarify that a little bit.

11      Q.    Okay.

12      A.    It's on a revolving schedule.  So, for instance,

13  if I've got Able cluster pod 1 started, of course, they're

14  going to be the first ones out to the rec field.  So

15  they're going to have a little bit of a longer rec time

16  than guys in pod 6 in Able cluster.

17              The next rec schedule or next day that

18  they're doing rec -- so that could be on a Monday, on

19  Wednesday they're doing the same thing -- they'll start

20  with pod 6 and send pod 6 out first and pod 1 would go

21  last.  And that's a revolving schedule so that it is even

22  for everybody as far as how much rec time they're getting

23  out of the rec enclosure.

24      Q.    And in that example that you just gave, so you

25  take Able pod 1 out, pod 2, pod 3 -- well, all the pods

1   that are going out and the last pod that gets out.  So is

2   the start time when the people in pod 1 get out or when

3   the people in pod 6 get out?

4       A.    The start time for the three hours would be when

5   the individuals on pod 1 are going out.  And that depends

6   on step level.  You could have six guys in the first pod

7   and only two guys in the last pod.  So your time frame on

8   getting people out definitely varies by phase level -- or

9   step level.

10      Q.    Okay.  And then as you're bringing them back

11  you also presumably go by pod, right?

12      A.    Yes.

13      Q.    And is it when the first pod is back in their

14  cell or when the last pod is back in their cell that is

15  the end time for rec?

16      A.    So when recreation is over they will have them

17  come up to the port at the large recreational enclosure.

18  They will escort them back to their pod.  And once they're

19  placed back in the cell then they were placed on the form

20  as to when they go back inside their cell.

21      Q.    But, again, if you've got multiple people that

22  are going to be going back in their cell at different

23  times, is the end time when the first people get back or

24  when the last people get back?

25      A.    No.  Those out-of-cell tracking forms are taken

152

```
 1   out by the recreation team.  So those return times would be
 2   the same time.
 3        Q.    I'm sorry.  I didn't understand that answer.
 4        A.    It would be the same time that they are
 5   returned, yes.
 6        Q.    But different people would be returning at
 7   different times, right?  It's not a lot different but
 8   somewhat different?
 9        A.    Yes, that's correct.  It's similar to when
10   they're going in.
11        Q.    Right.  Is the time that's recorded the time
12   that the first pod gets back in their cell or the time
13   that the last pod gets back in their cell?
14        A.    It's the time that they are returned to their
15   cell.
16        Q.    That who's returned to their cell?
17        A.    The individuals that are being escorted.
18        Q.    Does every single person have a different time
19   written down on the out-of-cell time sheet or --
20        A.    We're looking at a time that they're removed and
21   that's logged and then a time that they're placed back in
22   their cell and that's logged.  Does that make more sense?
23        Q.    Not really.
24        A.    Yes, they could have different times.
25        Q.    Okay.  If you move people who are in pod 1 back
```

1    to their cells and then people who are in pod 2 back to

2    their cells and then people who are in pod 3 back to their

3    cells, are the out-of-cell time sheets going to say a

4    different time for the people on pod 1, people on pod 2,

5    and people on pod 3 for the end of rec?

6        A.    Yes, they should, because we are entering the

7    time that they exit the cell and the time that they enter

8    back into the cell.  That's on an individual basis.  So if

9    I've got two guys that came back from recreation in pod 1,

10   and then one guy -- after you've gone through 2, 3, 4, and

11   5, one guy coming back at 6, his time should be different

12   as he enters back into the cell than the time of the two

13   guys entered pod 1.  Does that clarify it a little bit

14   more?

15       Q.    Yes, it does.  Thank you very much.

16             In max custody how often do people get

17   showers?

18       A.    Three times a week.

19       Q.    And how long do people have for their showers?

20       A.    We usually allow them a 30-minute shower.  And,

21   of course, that's going to be dependent on, you know,

22   what's going on in the unit.  If an emergency situation

23   happens or whatever, they could spend a little bit more

24   time than the 30 minutes in the shower.

25       Q.    And the showers in max custody units are

154

1  single-person showers, correct?

2      A.    Yes, ma'am.

3      Q.    When someone is taking a shower is there a CO

4  just waiting for them, or is the CO doing other things?

5      A.    The CO is doing other things.

6      Q.    Okay.  Do you know whether people in max

7  custody ever get left in the shower for lengthy periods?

8                MS. LOVE:  Form.

9                THE WITNESS:  It's definitely a

10 possibility.  Like I said, if an emergency situation

11 happens, depending on staffing, if we're very

12 short-staffed and people have to respond to an emergency

13 situation, the possibility of an inmate staying in the

14 shower longer than they're supposed to can definitely

15 happen, yes.

16     Q.    BY MS. MORRIS:  And the time for showers both

17 leaving the cell and getting back into the cell is not

18 recorded on the out-of-cell time sheets, correct?

19     A.    That is correct.

20     Q.    Is there any way to know how often people get

21 left in the shower for a lengthy period?

22                MS. LOVE:  Form.

23                THE WITNESS:  Unless it is logged on a

24 Correctional Service Journal up in the control room when

25 showers take place, then no, there is not.

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

155

1       Q.    BY MS. MORRIS:  Okay.  Is there any difference

2   in what we just talked about regarding showers for people

3   in enhanced management?

4       A.    No.  They get three showers a week, as well.

5       Q.    Okay.  And it's the same situation where they

6   have roughly a half an hour, but it could be longer, and

7   the officers are doing other things during the shower?

8       A.    Yes, ma'am.  That would be the same throughout.

9       Q.    And that's also true in restricted status, STG

10  units, and the BMU?

11      A.    Yes, ma'am.

12      Q.    It's also true in detention?

13      A.    Yes, ma'am.

14      Q.    Also true in close management?

15      A.    Yes, ma'am.

16      Q.    What about in mental health watch?

17      A.    Actually, that doesn't happen in mental health

18  watch.  It's only because there's a designated officer in

19  those areas.  That particular officer, if an emergency

20  situation kicks off, is not authorized to leave that area

21  because they have to conduct the watches.  So there is a

22  designated officer in those areas that takes care of the

23  showers and recreation and that kind of thing.

24      Q.    But a person in mental health watch has three

25  showers a week, as well?

156

 1      A.    Yes, they do, if the watch order dictates that,

 2  which I haven't seen one yet that does not.

 3      Q.    Okay.  For max custody how often do people go

 4  out to classes -- or I'm sorry.  I think I have to do

 5  general population max custody on this one.  How often do

 6  people go out to classes or group programs?

 7      A.    That's going to depend on their step level.  So

 8  step-level 1s do self-study inside their cell.  Step 2 and

 9  step 3, if their program plan dictates that they take those

10  program classes and on the priority program chart it says

11  that they need to take that class and they're offered that

12  class and they go out to that class -- it just depends on

13  the classes that are offered at the time.

14      Q.    How many people go to a class or a program at

15  the same time in general population max custody?

16      A.    That is going to be dependent on the CO 4 and

17  the CO 3 with that particular class.  I've seen classes get

18  up to 20 inmates at a time.

19      Q.    Okay.  If people are all going to the same

20  class will they be transported together?

21      A.    That's going to depend on their step level, so

22  whether or not they need to be restrained or not.

23  Normally, what they try and do just to save time is they

24  will get everybody within a pod, escort them together, get

25  them situated in the class.  If it's more than one pod in

157

1    that class or if there's multiple pods going and if we can

2    get escort help, of course, we'll do multiple at a time.

3    We have to look at, you know, every factor involved making

4    sure that there is no do-not-house-with issues and that

5    kind of stuff.

6              COURT REPORTER:  Could we take a break,

7    please?

8              MS. MORRIS:  We can take a break right now.

9              (Recess from 2:30 p.m. to 2:44 p.m.)

10             THE WITNESS:  Ms. Morris, may I clarify

11   something?

12       Q.   BY MS. MORRIS:  You certainly can.

13       A.   So I was thinking about the time out of cell

14   when we were discussing the recreation.

15       Q.   Yes.

16       A.   Just to be sure, I contacted Deputy Warden

17   Stickley at Eyman complex just to verify that the

18   information I was giving you was correct.  It is not.

19       Q.   Okay.

20       A.   So the updated information on that is the last

21   inmate that enters the recreation enclosure is when the

22   time starts for recreation.  The last inmate that enters

23   his cell is when the recreation period ends.  And that's

24   for everyone.

25       Q.   Okay.  That is super helpful.  Thank you so

158

1    much.

2         A.    You're welcome.

3         Q.    All right.  The amounts and types of visitation

4    are set out for max custody units in 812, correct?

5         A.    Yes, ma'am.

6         Q.    And for close management in 813?

7         A.    Yes, ma'am.

8         Q.    During COVID, were there any in-person --

9    whether contact or noncontact, were there any in-person

10   visits?

11        A.    No.  Everything was done through Zoom.

12        Q.    What about now?

13        A.    Now we're doing both Zoom and in-person visits.

14   It is all currently noncontact still, but we do have family

15   members coming in.  And what we have done is place a bio

16   shield in the middle of the table, and they cannot embrace

17   or any of that kind of stuff.  So it's basically kind of

18   like noncontact visitation, but the family members get to

19   come in and have that visit with the inmates.

20        Q.    Okay.  When did that start back up?

21        A.    Oh, don't quote me exactly, but we started that

22   back up, I believe, in June or July.

23        Q.    Okay.  What are the visitation policies for

24   people in detention?

25        A.    I believe they're the same.  So, of course, step

159

1   level and phase level is not utilized when they're in

2   detention, but I believe that they still -- well, it's all

3   noncontact.  I'm sorry.  It's all noncontact visitation

4   with detention.

5        Q.    Okay.  Do you know how much they're allowed?

6        A.    I believe it's within the policy on detention,

7   if I'm not mistaken.

8        Q.    Okay.  So in 804, in DO 804?

9        A.    I believe so.  Yes, ma'am.  I do remember that

10  all the visitation for detention, however, is noncontact.

11        Q.    Okay.  Are people on mental health watch

12  allowed visitation?

13        A.    Yes, if the mental health staff is in agreement

14  with that, then absolutely they can have visitation, yes.

15        Q.    Would that have to be written on the order, or

16  would it be something that would be asked if someone was

17  going to visit?

18        A.    I believe that has to be written on the order,

19  but, of course, it's not going to have to be written on the

20  order if somebody asks for it and mental health decides to

21  do it, so --

22        Q.    All right.  A little while ago, I think it was

23  when we were talking about showers and I asked about where

24  it would be recorded, the time, and you said, if I recall

25  correctly, that it might be in the Correctional Service