1      Q.    And that process can take up to 30 days?

2      A.    Yes, ma'am.

3      Q.    What percent of people classified as max

4  custody actually appeal that classification?

5      A.    I don't have that information, ma'am.

6      Q.    Do you know what percent of appeals result in a

7  change to max custody classification?

8      A.    I do not know that, ma'am.

9      Q.    How long do people spend on mental health

10  watch, on average?

11      A.    I do not have that average, ma'am.

12      Q.    What is the longest time anyone in ADCRR has

13  spent in mental health watch?

14      A.    I do not have that information, ma'am.

15      Q.    Does ADCRR do anything to track the amount of

16  time people spend in mental health watch?

17      A.    Not that I'm aware of.

18            MS. MORRIS:   Okay.   Let's do a break.

19            (Recess from 3:54 p.m. to 4:11 p.m.)

20            MS. MORRIS:   And we are back on the record.

21      Q.    BY MS. MORRIS:   Are there any ADCRR policies

22  regarding monitoring the mental and physical health of

23  people in isolation?

24      A.    Not that I'm aware of, no.

25            MS. LOVE:   I'm just clarifying that,

201

1   because these are kind of the dual designations that he's

2   speaking, unless he says otherwise, from the operations

3   side.

4        Q.   BY MS. MORRIS:  Okay.  All right.  I'm going to

5   go quickly through these topics because they're the

6   dual-designations ones.

7             So for topic H, does ADCRR have any

8   policies and procedures regarding self-harm and suicide

9   prevention for people in isolation?

10       A.   I'm sorry.  One more time.

11       Q.   Does ADCRR have any policies and procedures

12   regarding suicide and self-harm prevention for people in

13   isolation?

14       A.   Yes, we do.

15       Q.   And is that policy DO 807?

16       A.   I believe it is.  I'm trying to do it right now.

17   I apologize.

18            MS. LOVE:  Can you give him the title of

19   it, of 807?

20       Q.   BY MS. MORRIS:  Inmate suicide --

21       A.   Yes, ma'am, that would be it.

22       Q.   Are there any other policies besides DO 807

23   that relate to suicide and self-harm prevention for people

24   in isolation?

25       A.   Not that I'm aware of, no.

1          Q.    Does ADCRR have any policies and procedures

2    regarding the provision of health care to people in

3    isolation?

4          A.    Yes, I believe we do.

5          Q.    What policies are those?

6          A.    I'm not aware of what the actual number is,

7    ma'am.

8          Q.    Okay.  What do the policies require?

9          A.    The policy would require that we are providing

10   health care to our inmate population, I mean, to put it

11   very vaguely.

12         Q.    Yeah.  Well, I mean, but you also don't know

13   what policy it is?

14         A.    No, ma'am, I don't.  And just to go a little

15   further, there is specifics within the policy about our

16   response time to provide health care to the inmate

17   population in cases of emergency, and that would also carry

18   over into detention areas, maximum custody.

19         Q.    Okay.  But, again, you don't know what policy

20   it is?

21         A.    I don't, ma'am.

22         Q.    Okay.  And if I can recall correctly, you are

23   not testifying at all regarding topic 10; is that correct?

24         A.    That is correct.

25         Q.    Okay.  Topic 11 is training provided to health

**30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021**

```
 1   care staff who work with incarcerated people in isolation.
 2               Does ADCRR provide any training to health
 3   care staff who work with people in max custody about
 4   working in max custody?
 5       A.   So we have general classes that would encompass
 6   maximum custody for all of our staff to include health care
 7   staff, yes.
 8       Q.   Okay.  Does anything in those classes address
 9   max custody or other isolation units specifically even if
10   the class as a whole is broader than that?
11       A.   Those elements are discussed in a couple of our
12   trainings.  Yes, ma'am.
13       Q.   Okay.  Who provides the training?
14       A.   We have a department or an area within the
15   department that is in charge of developing and
16   administering training to our employees and our contracted
17   employees.
18       Q.   Okay.  Is that called, like, the training
19   department or does it have a title?
20       A.   For lack of a better word, yes, ma'am.
21       Q.   How many hours of training do health care staff
22   receive from ADCRR regarding working with people in
23   isolation units?
24       A.   I believe they're at right around 40 hours.
25       Q.   40 hours about isolation units?
```

1        A.    No.   Training in total.

2        Q.    Okay.   About how many of those 40 hours relate

3   to working with people in isolation units?

4        A.    I don't have the specifics on the amount of time

5   for that specific of an area.

6        Q.    Okay.   What subjects relating to working with

7   people in isolation units are included in the training for

8   health care staff?

9        A.    So we do training on suicide prevention.   We do

10  training on maximum restraints.   We do care training, which

11  is our health care training.   And all three of those are

12  for all of our staff to include our contracted staff.

13  Those are the three that come to mind.

14              MS. LOVE:   Do you want to refer to your

15  notes?

16              THE WITNESS:   May I refer to notes on that,

17  ma'am?

18              MS. LOVE:   And for the record, Maria, he

19  has notes which I'm happy to, after this, excise out of

20  the attorney-client privileged communications, but he did

21  speak with the training bureau.   So he has notes and he

22  can give you specific designations of the titles, which, I

23  think, is what you're probably after.

24              MS. MORRIS:   Okay.   I would appreciate

25  that.   Thank you.

1              THE WITNESS:  So specific to maximum

2    custody, actually of all population types for Centurion

3    staff, we offer a consolidated mental health class, a

4    nonviolent crisis intervention class, preventing inmate

5    suicides that I mentioned already, progressive mental

6    health restraints, which I mentioned, recognizing and

7    managing inmate mental health needs.  And then we have

8    five specific classes that are offered to Centurion staff

9    that are not offered to our regular security staff or any

10   other contractors, and those five are nurses line

11   encounter and Cegar, C-E-G-A-R, provider line encounters,

12   nurses line to provider line referrals, medical NHR, and

13   Cegar, C-E-G-A-R, and pharmacy.

14        Q.    BY MS. MORRIS:  Okay.  Is there any training

15   besides what you've already talked about that is provided

16   to correctional staff who are regularly assigned to work

17   in isolation units about working in isolation units?

18        A.    Those classes that I mentioned are, like I said,

19   for everybody with the exception of those last five.  We do

20   a training on inmate discipline, which would have effects

21   within max custody.  We do have a class on chemical agents,

22   the utilization of, communicable disease prevention.  We

23   started a brand-new class on Coronavirus and COVID 19

24   prevention and management.  We do a defensive tactics

25   class.

1      Q.    These classes that you're listing, do they

2  specifically address anything about people in isolation,

3  or are they general trainings regarding working in the

4  prison system?

5      A.    These are general trainings that would affect

6  all custody levels.

7      Q.    Are there any trainings that are specifically

8  about working in isolation units?

9      A.    We do a class -- and this is actually a class

10  for everybody, as well, our contractor partners, as well.

11  We do a three-day mental health training class, and this is

12  in regards to -- it's more about mental health inmates,

13  dealing with mental health inmates, use of force on mental

14  health inmates, which would talk about maximum custody.

15      Q.    Okay.  Anything else?

16      A.    Let me go through this list really quick to make

17  sure I didn't miss anything.

18      Q.    Okay.

19      A.    I believe that's it, ma'am.

20      Q.    Okay.  And are people in ADCRR trained on the

21  importance of documentation?

22      A.    We do have a class in regards to documentation.

23      Q.    And would you say that people are trained on

24  the importance of documentation?

25      A.    Yes, ma'am.

### 30(b)(6) Deposition of ADCRR (Warden Jeffrey Van Winkle) - 09/24/2021

207

1      Q.    Are people in ADCRR trained on the importance

2   of legible documentation?

3      A.    We actually talk about that within the class.

4   The class was geared toward the out-of-cell tracking forms.

5      Q.    Okay.  We're going to talk about correctional

6   staff posts, topic 13, and we're going to combine topics

7   13 and 14 because they overlap.

8               The posts for a particular housing unit

9   will differ between a.m. and p.m. shifts, correct?

10     A.    They can.  Yes, ma'am.

11     Q.    Okay.  Do they differ between weekday and

12  weekend shifts?

13     A.    Well, they could, yes, ma'am, depending

14  on officers posted for medical lines.  So we usually do

15  most of our medical lines during the week and it's a

16  reduced number on the weekends.  So that could affect it,

17  yes.

18     Q.    Okay.  All right.  Do the posts in each

19  isolation unit differ between Saturday and Sunday shifts?

20     A.    Not that I'm aware of, no, ma'am.

21     Q.    Okay.  Do they differ from weekday to weekday?

22     A.    No, they do not.

23     Q.    Okay.

24     A.    Let me go back to that.  So we could have

25  transportation staff that have to go out because an inmate

1    goes out to the hospital.  So that could differ, but other

2    than that, I can't think of anything else that would

3    differ.

4        Q.    Okay.  All right.  In looking at daily post

5    sheets I've seen that they have the same -- do the daily

6    post sheets include essentially everyone that is on any

7    shift assigned to a particular housing unit?

8        A.    So we have a staffing roster that has everybody

9    assigned to a particular unit and it's broken down by what

10   shift those individuals are on.  And then the daily post

11   sheet shows where those particular staff on that shift are

12   posted into what post.

13       Q.    Okay.  I think I'm going to bring up a daily

14   post sheet because I think it will be easier to talk about

15   it while looking at it.

16              (Exhibit 14 identified for the record.)

17       Q.    BY MS. MORRIS:  So this is Isolation Exhibit

18   14.  So can you tell me what this document is?

19       A.    That is the daily post sheet off of our staffing

20   rosters, yes, ma'am.

21       Q.    And this particular one is for Eyman on Friday,

22   July 30, 2021, for Browning, a 12-hour shift, the a.m.

23   shift, correct?

24       A.    Yes, ma'am.

25       Q.    Okay.  So the column on the right where it

209

1  says, required posts -- I'm sorry, the left.

2      A.    Yes, ma'am.

3      Q.    What is that column showing?

4      A.    Those are the posts within the unit.

5      Q.    Okay.  Are all of the posts that are listed in

6  that going to be CO 2s?

7      A.    Yes, they will be.

8      Q.    Okay.  When you say that they're the posts in

9  the unit, are they posts that are supposed to be staffed

10  for the shift that's listed?

11      A.    Yes.

12      Q.    Okay.  And then the column that says, staff

13  assigned, that is the person who, on July 30th for the

14  a.m. shift, was assigned to that post, correct?

15      A.    That is correct.

16      Q.    Do you see the block of columns that says,

17  supervisor, RDO, and status?

18      A.    Yes, ma'am.

19      Q.    What are those columns showing?

20      A.    So those are the supervisors that are also

21  assigned to that particular shift.

22      Q.    Okay.  What does RDO mean?

23      A.    It's a regular day off.  So that regular day off

24  for Capadona is Wednesday, Thursday, Friday -- I can't see

25  that last bit.  I think it's Saturday.  So on a 12-hour

210

1    shift they have, of course, one week where they have three

2    days off and the next week where they have four days off.

3         Q.    Okay.  And then it says, status RDO for

4    Capadona.

5         A.    That means Capadona on that day, on Friday, is

6    on his day off.

7         Q.    Okay.  So the supervisors who are present on

8    this day are Brandon Hoyt, Maria Molina, Paul Munley, and

9    then a person who's in training, Kenneth Waldridge; is

10   that accurate?

11        A.    That's correct.

12        Q.    And all the other people on their regular day

13   off?

14        A.    Yes, ma'am.

15        Q.    The block of columns right below that where it

16   says, name and RDO, what is that column showing, that set

17   of columns?

18        A.    So that's showing the staff and their regular

19   day off on that shift.  So this is on a Friday, I believe.

20   And so if they have a Friday RDO then they would be off on

21   this particular day.

22        Q.    Okay.  So the people who are in the supervisor

23   as a status RDO, and then where it just says name and it

24   says that one of their RDOs is F, all together, those

25   people are the total staff on RDOs in the last block of

211

1    columns?

2         A.    Yes, ma'am.

3         Q.    Okay.  All right.  Thank you.  I'm going to the

4    last block of columns where it says, total staff, and

5    there's authorized FTEs, do you see that?

6         A.    Yes, ma'am.

7         Q.    And FTE means full-time equivalent, right?

8         A.    Full-time employee.

9         Q.    Full-time employee.  And it says there's 135

10   authorized for this shift, correct?

11        A.    Yes, ma'am.

12        Q.    And 78 vacancies?

13        A.    Yes, ma'am.

14        Q.    Which leaves a total of 57 assigned staff,

15   correct?

16        A.    That's correct.

17        Q.    Can you explain how the total available and

18   total on RDOs don't add up to the total assigned?

19        A.    I'd have to look at -- so there's normally four

20   sheets in that packet so that I could break that down, but

21   you could have staff out on military leave for extended

22   periods of time.  You could have staff out on extended sick

23   leave for extended periods of time, FMLA.  You could have

24   staff out on training.  But in those four sheets it will

25   delineate where they are.

212

1      Q.   Okay.  Those statuses that you just described,
2  FMLA leave, training, are those counted as available?
3      A.   Those are counted as total assigned.  So you
4  could have 57 people assigned, but if you've got somebody
5  out on military leave -- and for example, we've had staff
6  out on military leave for a couple of years -- they're
7  still counting towards your numbers, but you're never going
8  to see them.  You're never going to be able to post them.
9      Q.   Okay.  But the total available plus the total
10 on RDO add up to more than the total assigned.  That's
11 what's confusing me.
12     A.   I'd have to look at all four of these sheets,
13 ma'am, in order to determine those numbers.
14     Q.   On this one says page 1 of 3.  So this one has
15 three sheets.  Do you see where I'm pointing to?
16     A.   Yes, ma'am.
17     Q.   So we have more staff and positions listed, and
18 then we have some special assignments.  Do you see those?
19     A.   Yes, ma'am.
20     Q.   Are the people who are listed as ICS warden
21 approved, are they assigned to ICS at the beginning of a
22 shift?
23     A.   So a warden-approved position is a special
24 assignment.  So I would have to see exactly what that word
25 approved position is, but, for instance, if they have a

1    medical line going on that's not designated as one of those

2    posts, then they would be warden approved for that

3    particular position because we have to fill it because we

4    have to conduct that medical line.

5        Q.    Okay.

6        A.    And so any position that's not authorized on

7    that roster -- so, like, for instance, it's a medical line

8    that needs to be done and there's no medical line on that

9    roster to place a person in, then that would become a

10   warden-approved position.  We place that officer in that

11   position as warden approved because it's something that has

12   to get done.

13       Q.    Okay.  That helped me understand that very

14   well.  Thank you.

15              When are these daily post sheets filled

16   out?

17       A.    Those are filled out -- so we do projections.

18   So we do a two-week projection on all of our rosters.  And

19   then that roster is finalized that day that we are on

20   shift.

21       Q.    Okay.  Is it finalized at the beginning of the

22   shift or at the end of the shift?

23       A.    It's finalized throughout the shift.  And I say

24   that because things can change throughout the day.  You

25   could have an employee that gets sick at work and you have

214

1   to send them home.  You can have a medical transport that

2   goes out and now you have to provide two staff from that

3   unit to the hospital.  So it's a living document throughout

4   the day.  By the end of the day it's a completed document.

5        Q.    Okay.  All right.  So, for example, for George

6   control, Charlie control, John control, there's no one

7   listed.  Does that mean that no one was staffing that post

8   on that shift that day?

9        A.    That is correct.  That means that if you go up

10  just a little bit -- so you'll see where you have somebody

11  in Ida control.

12       Q.    Yes.

13       A.    And they would actually be responsible for that

14  Ida control in the control room adjacent or across the hall

15  from him.  So if you toured SMU on our Browning, they both

16  look exactly the same.  And you have four clusters down a

17  run and those clusters are across the hall from one

18  another.  That control room also sits across the hall from

19  one another upstairs.  So as officers enter the pods within

20  Ida run, then Officer Wallace would take care of the

21  control room in Ida while those officers are in those pods.

22  There wouldn't be any officers in the pod across the hall

23  until he goes over and he allows officers in there so that

24  he can keep a visual of those officers.

25       Q.    Okay.  All right.

1      A.    Unfortunately, it's the world we live in

2    currently with our staffing levels.  It's really difficult

3    to staff these large units, and COVID was extremely

4    difficult on us.

5      Q.    Yeah.  What are the main tasks for a housing

6    unit control?  So, like, Henry control, Easy control, Ida

7    control, one of those officers.

8      A.    First and foremost, as I mentioned, they're

9    watching the officers down in the pods.  So they're making

10   sure that they're safe.  They are opening doors for those

11   officers as needed.  They also maintain the Correctional

12   Service Journal in those areas.  So they're documenting

13   everything that happens within those areas.

14     Q.    Okay.  Anything else that they're doing?

15     A.    They're reviewing cameras, as well, that may be

16   in those areas.  And then, of course, you can hear a lot of

17   what's going on up in those control rooms in the pods.

18           So as we mentioned earlier, if we have an

19   inmate screaming for help or somebody needs an emergency

20   assistance or whatever, they normally can hear that and

21   they're getting on their radio and they're calling floor

22   officers saying:  Hey, I have somebody in pod 1 that needs

23   a response, and they'll open the door to pod 1 to allow

24   the staff in.

25     Q.    Okay.  So one of the things that a control

1    officer is responsible for is listening to what's going

2    on, as well as watching, to determine if there's an

3    emergency going on?

4        A.    Yes, ma'am, and to document everything that's

5    going on within those clusters.

6        Q.    Okay.  And what are the main tasks of housing

7    unit floor officers like Dog floor, Henry floor, Easy

8    floor, Ida floor?

9        A.    So they are responsible for the health and

10   welfare checks and the security within those pods.  So

11   they're the officers that we mentioned earlier that are

12   responsible to do those walks in no more than those

13   59-minute time frames.

14             They will go through -- they're also

15   responsible for taking care of any deliveries to inmates

16   that need to happen such as mail or store.  They do

17   counts.  They're the responsible parties for going through

18   and ensuring that face-to-ID counts are taking place at

19   our designated count times.  And they're assisting the

20   inmates with whatever needs to be taken care of during

21   their shift.

22       Q.    How many designated count times are there

23   during the day, during the 24-hour period?

24       A.    We have one that starts at 0400; we've got one

25   at 1100; we've got one at 1600; we've got one at 2030; and

217

1    then we've got another one at 2300 hours.  So we've got

2    five formal counts.  And then throughout the night they

3    will do an informal count after that 2300 count is

4    completed and they will do informal counts every hour or as

5    needed and designated by the shift run.

6        Q.    Okay.  What are the job duties of a recreation

7    officer?

8        A.    Recreation officer is -- and it depends on

9    whether they're doing escorts for recreation or they're

10   actually out at the recreation fields, but they are in

11   charge of security for recreation and, like I said, doing

12   escorts, if needed.  But they're providing security in

13   those areas and they're also the ones that are logging

14   those times for the out-of-cell tracking for those inmates

15   as they leave their cells for recreation.

16              They're also responsible for counts while

17   they're out there.  So if there's a count going on they'd

18   be responsible for completing the out count for the

19   inmates and making sure that it is correct and the count

20   of the inmates out on the field is correct, and answering

21   any questions that the inmates might have while they're

22   out at recreation.

23       Q.    Okay.  What is a mental health/medical/programs

24   officer?

25       A.    Those are escorts.  So if we have inmates that

218

1    need to be seen by mental health, mental health staff will

2    coordinate with that officer to get the inmates up that get

3    seen by mental health.  Likewise, with medical.  Or if

4    there's a program class going on, they would be responsible

5    for escorting the inmates to the programs class and back to

6    their cell.

7         Q.    So would the floor officer essentially get the

8    people out of their cells and then sort of hand them off

9    to the mental health medical programs officer like at the

10   door to the pod?

11        A.    If there's good coordination between those two

12   officers then they could certainly do it that way, but you

13   really have to stay in continuous motion throughout those

14   pods as a floor officer to maintain those health and

15   welfare checks in a timely manner.

16              So especially if we're so short that you

17   have an officer that's responsible for both those

18   clusters, they are extremely busy doing health and welfare

19   checks and taking care of the things that need to be taken

20   care of:  The counts, the feeding, the delivery stuff.

21   They are extremely busy during the day.  So a task like

22   that, getting them ready for that escort, might not

23   happen, and it would be the sole responsibility of that

24   escort officer to take care of that.

25        Q.    Okay.  What is a DI 326 recreation escort/SMI

219

1  officer?

2      A.    So DI 326 is what was started when we began the

3  Parsons lawsuit.  They are responsible for the recreation

4  turnout.  They would be responsible for taking care of

5  out-of-cell tracking forms, that kind of stuff.

6      Q.    So how are they different from recreation

7  officers?

8      A.    I'm not exactly sure how Browning has them

9  designated.  So a DI 326 recreation escort and a recreation

10  escort officer would be different because you might have --

11  so, for instance, part of our schedule of getting guys out,

12  for example, from BMU, so they're going to have more time

13  out of cell because they are designated mental health SNY

14  inmates.  They might be responsible for those escorts,

15  whereas the other officer is responsible for just getting

16  everybody out that's required for recreation that day in

17  their area.

18      Q.    Okay.  And what is a yard officer and how is it

19  different from recreation officer?

20      A.    A yard officer is an individual that's in charge

21  of pretty much taking care of everything.  You're usually

22  putting one of your best officers in that spot.  They're

23  assisting the supervisors in getting daily tasks done,

24  making sure that count will set up with the count movement

25  officer, the escorts are taking place.  They're kind of the

220

1    coordinator of everything to ensure that everything is

2    getting done, and they're the lending hand if, for

3    instance, the officer needs to go down and get inmates out

4    of a cell and it's a double-bunked cell, that a yard

5    officer might assist so that they could be that second

6    officer when that cell door is open.  They're kind of a

7    do-it-all officer of everything that needs to get done that

8    day.  It's a very busy post.

9         Q.    Okay.  And what is a rover?

10        A.    A rover is responsible for just doing health and

11   welfare checks.  That's what they do.  So they'll be in a

12   designated area and all they do is continuous motion all

13   day long doing nothing but health and welfare checks on

14   inmates.

15        Q.    Okay.  And a watch pod officer, what is that?

16        A.    That's that officer I mentioned earlier that's

17   assigned to the watch pods.  So if you have one watch pod,

18   that officer is assigned to that area.  He takes care of

19   all of the 10- and 30-minute watches and takes care of the

20   [indistinct] on those observation logs.

21             If you've got three pods like they would at

22   SMU 1 -- I believe they have three mental health pods over

23   there -- that officer would be responsible for those three

24   pods.  So, again, very busy posts.  They're moving in and

25   out of there.

221

1              Continuous watches are taken care of by an

2       officer sitting on that cell, but the other watches would

3       be taken care of by that watch officer, and they're also

4       in charge of documenting everything on the Correctional

5       Service Journal.

6           Q.    Okay.  Would an officer doing the continuous

7       watch be included down in the special assignments area?

8           A.    He could.  Yes, ma'am.  Also, depending on how

9       short-staffed one unit is and if another unit is doing

10      really well -- for instance, I'll stick with Eyman.  So if

11      Eyman/Cook unit had to send an inmate on a mental health

12      watch, and they send him to SMU 1 to be placed in the watch

13      pod and SMU 1 is running really short that day, they could

14      potentially take an officer from Cook unit just to sit on

15      that continuous watch because it's a Cook unit inmate.  And

16      that happens every once in a while, depending on staffing

17      needs.

18          Q.    Okay.  Can you explain to me what the term

19      cross-leveling is?

20          A.    I can.  So if as staff come in and we find out

21      that we are short at -- I'll go with Florence complex --

22      and we're short at Central unit, in South unit at Florence

23      complex comes in one or two staff over their required

24      critical staffing needs, we can take those one or two

25      officers and place them at Central unit and it's considered

222

1  a cross level.  We've taken those staff in order to level

2  out our staffing across the complex to make sure that we're

3  as safe as possible at those units.

4       Q.    You just said critical staffing requirements.

5  Is there a way to tell from the daily post sheets which

6  staff are considered critical staffing requirements?

7       A.    Ma'am, we're so short-staffed at Florence and

8  Eyman right now they're all considered critical.

9       Q.    Okay.  Are all of the positions listed in this

10 column of required posts, are they all considered critical

11 required posts?

12      A.    So those are all of the posts within the unit.

13 The deputy warden, in consultation with the warden of the

14 complex, will designate which posts have to be filled, must

15 be filled every day.  And as I spoke about earlier, if you

16 have a control room right across the hall from another

17 control room, then one of those control room posts would be

18 considered critical because you have to be able to run both

19 of them.  Does that make sense?

20      Q.    Yes.

21      A.    So it's a designation based on your staffing on

22 which posts are critical and must be filled.

23      Q.    Is that included in any document anywhere?

24      A.    That is more than likely kept at the unit level

25 and probably at the warden's level just so they know

223

1  exactly what posts have to be filled.

2      Q.    What does it mean if a post is collapsed?

3      A.    As you see, the posts on the left that do not

4  have a staff member assigned to them -- so, for instance,

5  the first one, the north wing officer, that means that that

6  post has been collapsed for the day because there's no

7  staff member assigned to it.

8      Q.    Does that mean that someone else is supposed to

9  take on the tasks of that post?

10      A.    Unfortunately, yes, ma'am.  That's exactly what

11  that means.

12           (Exhibit 19 identified for the record.)

13      Q.    BY MS. MORRIS:  I'm going to go to the Eyman

14  priority post sheet, which is Isolation Exhibit 19.  Can

15  you tell me what this document is?

16      A.    This is their priority posting chart.  I don't

17  see where it says that, but I'm looking at it.  I'm pretty

18  sure that's exactly what this is.  This is developed by the

19  complex.  And what they do is they go down through

20  everybody's posts and they figure out which posts are

21  critical and which posts can be collapsed first.

22           So as we come in and we're short-staffed,

23  they will look at what cross levels need to be done, and

24  they'll look at that by collapsing the posts that you see

25  on the left right in a row.  So they'll start with Cook 1

224

1   C/D control and they'll say that that's the first post

2   that needs to be collapsed.  If we're short, what they'll

3   do is they'll take that individual and they'll send them

4   elsewhere.  If there's already nobody posted there they

5   will move down to the next one and so forth and so on.

6        Q.    Okay.  So the posts become more critical as you

7   go farther down the chart; is that accurate?

8        A.    It's actually reversed.  It's from the bottom

9   up.

10       Q.    Okay.  So you look at the bottom line 220 on

11  page 6 of --

12       A.    I just gave you inaccurate information.

13       Q.    That's okay.

14       A.    It's going to be from the top down, ma'am.

15       Q.    So the very first post that would be collapsed

16  would be the complex communications number 1?

17       A.    No, the other way.  It's going to be that CD we

18  talked about.  And the reason I say that is because, if you

19  look at the bottom of that, you'll see main controls.  Main

20  controls in a facility, they're last.

21       Q.    They're last, okay.

22       A.    So it's the last post that's going to be

23  collapsed.

24       Q.    Okay.  All right.  And so in the process of

25  figuring out where staff go, this is used to decide staff

225

1  from -- Cook is going to go over to Browning or Rynning or

2  something like that, right?

3       A.    That is correct.

4             (Exhibit 21 identified for the record.)

5       Q.    BY MS. MORRIS:  Now I'm going to show to you

6  the Lewis one which I find much more challenging.  So

7  we're looking at Exhibit 21.  All right.  So Lewis puts

8  all the different shifts on one page, as far as I can

9  tell.  So we go to the bottom of -- actually, can you tell

10  me what document 21 is?

11      A.    I haven't worked at Lewis.  I am assuming this

12  is their priority posting chart.  They've got it broken

13  down by shift and it looks like it goes from top to bottom

14  like the other ones and -- well, maybe not.  This is the

15  first I've seen this document, ma'am.  I apologize.

16      Q.    That's okay.  Like I said, I find this one a

17  more challenging document to look at than the Eyman one.

18            If we scroll down can you tell if it's

19  the -- you know what?  We'll ask the warden from Lewis to

20  walk me through that one.

21      A.    I would be more comfortable with that, ma'am.

22      Q.    Fair enough.  Do detention units have similar

23  priority posts, post sheets?

24      A.    They could.  So, for instance, you could -- I

25  know years back we used to have a control room officer that

1   was required and a floor officer required in detention, but

2   you would also have an additional two or three officers in

3   there, and that was if we were fully staffed, which in the

4   Florence/Eyman area it hasn't been that way in a very, very

5   long time.

6              But those individuals, that fourth officer

7   and that third officer, would be potentially cross-leveled

8   out, if needed, and you would remain with the two floor

9   officers and the control room officer in that detention

10  area if that example kind of explains it a little bit.

11     Q.    Do detention units have mental health and

12  medical programs officers?

13     A.    No.  They would actually be those escorts that

14  you see on that posting chart.  So if an inmate in

15  detention needed to be seen by mental health, then

16  Officer Bennett would still be responsible for going into

17  detention and getting that particular inmate and taking him

18  to mental health.

19     Q.    So it would be someone from the same -- I'm

20  confused.  If, say, the detention unit at Eyman/Rynning,

21  what would be the post that would take a person from that

22  detention unit to medical or mental health?

23     A.    If you had two officers in detention one of

24  those officers could take them.  If you've only got the one

25  officer in detention, the officer has to remain in

227

1    detention.  So you have to find somebody else to do that

2    escort.  If you have a designated escort officer, they

3    would take care of that escort.  If they are short-staffed

4    and do not have an escort officer, you could look at the

5    yard officer taking care of that or you could look at a

6    sergeant or a lieutenant doing that escort, depending on

7    how short-staffed you are.

8         Q.    Okay.  Are detention units supposed to have

9    escort officers?

10        A.    I've never seen escort officers in detention.

11   Normally, they're designated within the unit and the unit

12   just takes care of the detention area, unless, of course,

13   like I said, that you're well staffed and you have a couple

14   of staff in detention.  Because if you've only got one

15   staff on the floor in detention you can't take that officer

16   out of detention because they have to continually do the

17   health and welfare checks.  So it would have to be another

18   staff member that would do that escort.

19        Q.    And it would be the control officer that would

20   call the other staff person from somewhere else?

21        A.    Yes.

22        Q.    Assuming that there's someone available

23   somewhere else?

24        A.    Correct.  There's always going to be somebody

25   that can take care of it.  Like I said, you may have to get

228

1   a supervisor in there.  I know being short-staffed, if you

2   have to have a captain or an associate deputy warden do

3   that escort, then it gets taken care of because that's a

4   priority.  It's a medical need of that inmate.  So we're

5   going to get him escorted over to medical and get it taken

6   care of.

7        Q.    Okay.  For each mental health watch unit what

8   are the posts?

9        A.    Mental health watch -- like the mental health

10   areas, the pods?

11        Q.    Yeah.

12        A.    As I described earlier, you'd have an officer

13   assigned to the pod.  So they would be responsible for

14   taking care of those 10-minute, 30-minute watches, taking

15   care of the observation logs, taking care of the journal

16   within that pod or multiple pods.  That would be their

17   responsibility:  Doing the health and welfare checks,

18   making sure all the checks are done on the particular

19   watches, making sure the [indistinct] is completed, making

20   sure that the inmates are getting what they're supposed to

21   get according to the watch order.

22        Q.    If someone in a watch pod has an order that

23   says they can go to recreation, who would take them to

24   recreation?

25        A.    That recreation officer we just spoke about a

1   little bit ago.

2        Q.    Would there be a recreation officer assigned to

3   a watch pod?

4        A.    No, there wouldn't.  That would have to be

5   coordinated with the staff you have available.  Some pods

6   have a [indistinct] area at the end of the pod in SMU 1 in

7   Browning and at Rast, as well.  Some of them do not.  So

8   you may have to utilize a recreation area at the end of a

9   pod and another pod, if need be.  But if the order is for

10  recreation, then we find an escort to get the inmate to

11  recreation.

12       Q.    Okay.  I'm going to go to topic 15, which is

13  policies and procedures regarding the use of force or

14  restraints by ADCRR staff on incarcerated people on mental

15  health watch or incarcerated people classified as SMI MH-3

16  through MH-5 or any other mental health classification

17  employed by the ADCRR or Centurion while housed in

18  isolation.

19             Are there any policies regarding the use of

20  force on prisoners who are classified as SMI housed in

21  isolation?

22       A.    Yes, there are.

23       Q.    What policies are those?

24       A.    Our use of force policy.  And I don't remember

25  the number.  I apologize.

230

1      Q.    That's okay.  I am going to bring it up if I
2  can.  Too many policies.  Okay.  I'm sharing the screen.
3            Do you know -- so if we go to Section 4 on
4  the use of force in policy 804 there is Section 4.1.3.1
5  which talks about a cool-down period for people designated
6  as SMI, right?
7      A.    Yes, ma'am.
8      Q.    Okay.  This applies only to the use of force on
9  a person with SMI in max custody, correct?
10      A.    It does.  However, we've implemented department-
11  wide -- there's a directive that came down that we will
12  treat all maximum custody inmates the same so that there's
13  no foul-ups by staff as far as whether they're SMI or not,
14  and we'll provide a cool-down period if we're going to
15  utilize force -- planned use of force on a maximum custody
16  inmate.
17      Q.    Has that been turned into a policy?
18      A.    I don't believe it has.  That was a verbal
19  direction that came down.  I can't remember if it was from
20  the assistant director at the time.  It's been a while.
21      Q.    Can you estimate how long it's been?
22      A.    I want to say that that was when we had a
23  different assistant director at the time.  I believe it was
24  division director at the time, Carson McWilliams.
25      Q.    So how long ago are you talking about?

231

1        A.    It was probably about three years ago maybe,

2    three or four years ago.

3        Q.    Is that right?  It's about three years ago, you

4    think?

5        A.    Somewhere around there, yes, ma'am.

6        Q.    But that has not, in three years since then,

7    been reduced to any kind of written policy?

8        A.    Not that I'm aware of, ma'am.  The cool-down

9    period in the policy is the one right here in front of us,

10   number 804.

11       Q.    And this cool-down policy applies for the use

12   of chemical agents, right?

13       A.    Correct, on a planned use of force.  Yes, ma'am.

14       Q.    Okay.  It doesn't apply to other types of uses

15   of force, does it?

16       A.    So a spontaneous use of force it would not.  We

17   would not have the time to do that.

18       Q.    Okay.  Are there planned uses of force that are

19   not chemical agents?

20       A.    Yeah.  You could have a planned use of force

21   where there is a force cell team, yes.  A cool-down period

22   would be implemented for that, as well.

23       Q.    And do you know if that's in policy anywhere?

24       A.    In our use-of-force policy right here it talks

25   about our use-of-force continuum and how we could enter

232

1    that continuum at any point based on how we feel that

2    situation needs to be take care of.  So it is within that

3    policy in 804.

4        Q.    Okay.  But the cool-down period, is that

5    referenced in any other -- like, if you look at Section

6    4.1.3.1 where it talks about the cool-down period, it says

7    it's offering a cool-down prior to the use of force

8    involving the use of oleoresin capsicum.

9              So does the cool-down period policy apply

10   to other types of uses of force?

11       A.    It is not written in this policy, but I can tell

12   you from experience at cell block Kasson with the mental

13   health inmates, if we have an inmate that mental health has

14   deemed not appropriate to utilize chemical agents and we

15   have to use a force cell team to remove that inmate from

16   the cell, that inmate is going to be afforded a cool-down

17   period so that we can attempt to negotiate him out of that

18   cell without going in after him.

19       Q.    But that's not in the policy?

20       A.    No, ma'am, it's not.  That's just sound

21   correctional judgment.

22       Q.    Okay.  Are there any policies regarding the use

23   of force on people who are designated as MH-3 in

24   isolation?

25       A.    Yes, there is.

233

1      Q.     Where, or what policy?

2      A.     I believe it's within this 804 policy.  And it

3   may be specific to Taser use taken on that mental health 3.

4   It might be mental health 4 that we're talking about.  I

5   apologize.

6      Q.     So 4.2.1.3.3, CEWs, which are Tasers, correct,

7   CEWs?

8      A.     Yes, ma'am.  It's a mental health 4.  I

9   apologize.

10     Q.     Just to be clear, a CEW is essentially a Taser,

11  correct?

12     A.     Yes, ma'am.  It's a conductive electrical

13  weapon, which would be a Taser.  Yes, ma'am.

14     Q.     Okay.  And they are not to be used on people

15  with a mental health score of 4 or above or on any female

16  inmate within the perimeter of a unit without

17  authorization from the deputy warden; is that correct?

18     A.     That's correct.  That's correct.

19     Q.     Are there any other policies that relate to use

20  of force on prisoners who are designated as MH-3?

21     A.     Not that I'm aware of, no, ma'am.

22     Q.     Are there any other policies relating to the

23  use of force on prisoners designated as MH-4, besides this

24  one that we just looked at?

25     A.     Not that I'm aware of, ma'am, no.

234

1    Q.    Are there any policies, besides the one that we

2    just looked at, regarding the use of force on prisoners

3    who are designated as MH-5?

4    A.    Not that I'm aware of.  No, ma'am.

5    Q.    Are there any policies and procedures relating

6    to the use of force on prisoners who are on mental health

7    watch?

8    A.    Not that I'm aware of.  No, ma'am.

9    Q.    Are there any policies that allow for the use

10   of chemical agents on a person who's self-harming?

11   A.    I am not sure about that, ma'am.

12   Q.    Are there any policies on the use of restraints

13   on a person with an SMI in isolation?

14              MS. LOVE:  Form and foundation.

15              THE WITNESS:  I'm not sure about that one,

16   as well, ma'am.

17   Q.    BY MS. MORRIS:  Okay.  Are there any policies

18   regarding the use of restraints on persons designated as

19   MH-3 when they're in isolation?

20   A.    Not that I'm aware of, ma'am.

21              MS. LOVE:  Form and foundation on that one,

22   belated.

23   Q.    BY MS. MORRIS:  Are there any policies on the

24   use of restraints on persons designated as MH-4 when

25   they're in isolation?

1            MS. LOVE:  Same objection.

2            THE WITNESS:  Not that I'm aware of, ma'am.

3     Q.   BY MS. MORRIS:  Are there any policies on the

4  use of restraints on persons designated as MH-5 when

5  they're in isolation?

6            MS. LOVE:  Same objection.

7            THE WITNESS:  Not that I'm aware of, ma'am.

8     Q.   BY MS. MORRIS:  Are there any policies on the

9  use restraints on persons on mental health watch?

10            MS. LOVE:  Same objection.

11            THE WITNESS:  Not that I'm aware of, ma'am.

12            MS. MORRIS:  Okay.  I'm done.

13            MS. LOVE:  Okay.  I just have one quick

14  follow-up just to clarify.

15

16                    EXAMINATION

17  BY MS. LOVE:

18     Q.   When you were asked questions regarding whether

19  there were any policies dictating use of chemical agent,

20  use of force on inmates who are on mental health watch,

21  and just in reviewing DO 804, I wanted to direct your

22  attention to section 5 and see if that refreshes your

23  recollection as to whether or not there is a provision in

24  the policy as related to the use of chemical agents and a

25  cool-down period on inmates who are in designated mental

236

1   health units.

2        A.    It does state that in 5.1.1.

3

4                    FURTHER EXAMINATION

5   BY MS. MORRIS:

6        Q.    So now that your lawyer has told you what to

7   testify, you're able to testify to that?

8        A.    It's in the policy, ma'am.

9        Q.    Are there any other things in the policies that

10  you have neglected to tell me about when I asked if there

11  are policies regarding different issues?

12       A.    I do not have all the policies memorized, ma'am.

13  So there is a possibility, yes.

14                 MS. MORRIS:  Okay.  I'm finished.  Do you

15  have any further --

16                 MS. LOVE:  No, nothing.

17                 We'll read and sign.

18                 (The deposition adjourned at 5:13 p.m.)

19

20

21

22

23

24

25

237

1                       SIGNATURE PAGE

2          I, WARDEN JEFFREY VAN WINKLE), a deponent
   exercising my right to read and sign my deposition taken
3  on September 24, 2021, place my signature hereon and make
   the following changes on this ___ day of _____,
4  2021.

5              (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

                   _____
7                  WARDEN JEFFREY VAN WINKLE

8  PAGE    LINE    READS              CHANGE TO          REASON

9  _____   _____   _____    _____    _____

10 _____   _____   _____    _____    _____

11 _____   _____   _____    _____    _____

12 _____   _____   _____    _____    _____

13 _____   _____   _____    _____    _____

14 _____   _____   _____    _____    _____

15 _____   _____   _____    _____    _____

16 _____   _____   _____    _____    _____

17 _____   _____   _____    _____    _____

18 _____   _____   _____    _____    _____

19 _____   _____   _____    _____    _____

20 _____   _____   _____    _____    _____

21 _____   _____   _____    _____    _____

22 _____   _____   _____    _____    _____

23 _____   _____   _____    _____    _____

24 _____   _____   _____    _____    _____

25 _____   _____   _____    _____    _____

238

1    STATE OF ARIZONA      )
                            )
2    COUNTY OF MARICOPA  )

3          BE IT KNOWN that I took the foregoing deposition
     pursuant to Notice; that the witness was duly sworn by
4    me; and that said transcript is a full, true, and
     accurate record of the proceedings; that the proceedings
5    were taken down by me in shorthand and thereafter reduced
     to print under my direction; that I have acted in
6    compliance with ACJA 7-206.

7          I CERTIFY that I am in no way related to any of
     the parties hereto nor am I in any way interested in the
8    outcome hereof.

9          Pursuant to request, notification was provided
     that the deposition is available for review and
10   signature.

11         Dated this 8th day of October, 2021.

12

13

14   _____
     Janet Hauck, RPR
15   Certified Reporter
     Arizona CR No. 50522

16

17         I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
     has complied with the ethical obligations set forth in
18   ACJA 7-206.

19

20

21

22

23   _____
     GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
24   Arizona RRF No. R1035

25