## Chart I - A

## Deposition Testimony of Warden Jeffrey Van Winkle, Rule 30(b)(6) Designee for Isolation, regarding lack of knowledge or limiting the scope of testimony to his personal knowledge, experience or awareness[1]

| |
|---|
| **TOPIC 1** <br> **POLICIES AND PROCEDURES for placement in, retention in, and release from ISOLATION.** <br><br> **TOPIC 5** <br> **POLICIES AND PROCEDURES related to INCARCERATED PERSON privileges while housed in ISOLATION, including increases and decreases in such privileges.** |
| Q. Okay. Are you familiar with what policy is used to classify people as max custody? <br> A. Classification policy is 801, **I believe.** <br> Q. Okay. Do you know if there are any other policies that would relate to people being classified to max custody? <br> A. It mostly revolves around our classification policy, placing people in max custody. <br> Q. Okay. So you're not aware of any other policies that relate to the classification as max custody? <br> A. No, ma'am. <br><br> 14: 11-21 |
| Q. …If a woman comes into the system, into ADCRR, and her classification process indicates that -- well, how does the process of classifying her as maximum custody work? <br> A. So they have an intake center at Perryville with the females. It's very similar to the males. She would come in, be assessed by her scores, and they would determine at that point what custody level she would go into. <br> Q. And if she was found to be classified as max custody, where would she then be sent? <br> A. She would remain at Perryville. <br> Q. Would she go to any particular housing unit? <br> A. **I'm not real familiar with the Perryville complex** as far as maximum custody placement. **I do not believe** currently that they have any maximum custody inmates at Perryville, but I know they have a designated area if they have an inmate that requires maximum placement. <br> Q. But to your knowledge, there are no female max custody incarcerated people right now? <br> A. **Not that I'm aware of. No, ma'am.** <br> Q. Is there someone who would be aware of that? <br> A. The warden at Perryville would be aware of that. <br><br> 19:20-20:18 |
| Q. So if a person came into maximum custody and did exactly the things that they're required to do to move through the steps, there's no possibility that they would be removed from max custody in less than six months; is that accurate? |

---

[1] All citations are to the Transcript of Deposition of Warden Jeffrey Van Winkle pursuant to Rule 30(b)(6), September 24, 2021.

A. Yes, ma'am. And if I could go back just real quickly.

Q. Yeah.

A. There are elements within the classification policy that would allow us to initiate that process if we so wanted to do so, **I believe, if I remember correctly,** in regards to the policy.

Q. Okay.

A. It could, in fact, be initiated by the CO 3 and it could go up through the chain. **To my knowledge,** though, **I don't believe** the inmates can be brought down in custody level from max within the first six months.

22:2-18

Q. Can you explain what a discretionary override is?

A. A discretionary override would be basically, as I explained, if the CO 3 has noticed that the inmates aren't doing things that they're supposed to do according to their corrections plan, they are programming, staying out of trouble, not getting disciplinary, and basically being a model inmate within the system, they can put in for discretionary override to place that inmate in a lower custody level. And they can initiate the paperwork on that that would go up through the CO 4, through the deputy warden, through the warden, and then ultimately up to central office for final approval.

Q. How is that different than simply moving through the steps and being reclassified?

A. That could happen in between the cycles of the classification.

Q. Okay. Do you have any knowledge about how often that happens?

A. It actually happens quite a bit. **I know at Florence complex where I'm currently located** we do discretionary overrides for inmates from maximum custody down to close custody so that they can remain -- actually, that's usually part of their regular classification. If you're specifically talking about discretionary overrides that happen in between a regular classification, **I don't believe those happen a lot, but I know that they happen**.

Q. **Do you know if ADCRR tracks how often those happen?**

A. **Yes. Everything would be tracked through ACIS.**

Q. And through ACIS you would be able to see both the number of people being reclassified through the classification process, but also being reclassified through a discretionary override process?

A. Yes, ma'am. They should be able to pull that up through our system.

23:8-24:18

Q. …One of the other reasons that a person might be placed into max custody on an override is in Section 5.4.4.1, if the current offense or a prior offense are depicted as heinous. Do you see that?

A. Yes, ma'am.

Q. What does this mean?

A. It's based on the inmate's crime. So if the inmate -- and this could also go back to a high profile inmate. If you have an inmate that committed a very bad act -- I'll try not to use the word heinous here, because a terrible act out in the public that everybody has knowledge of and we consider them a risk within our prison system, then we would place them in maximum custody.

Q. What does it mean that it's depicted as?

A. I would say that it -- well, it would be the case itself. It would be the actual circumstances involved with the case. **So I can give you a for instance, but of course it would be my opinion**

on what heinous is. But if we're looking at a child murderer and this individual is all over the news and everybody knows about it, that could potentially be looked at as a heinous crime. And we would look at that as a safety for the inmate coming as well as safety for public why we would place them in maximum custody.

26:17-27:15

Q. And the due process is also not applicable to inmates housed in maximum custody medical and/or mental health care units, regardless of their custody level. Do you see that?
A. Yes.
Q. Can you explain that provision to me?
A. **That would be a decision made by mental health staff, medical staff, or contracted medical staff. And that's the best explanation I can give you on that.** It's their discretion to place them within those mental health care units or those medical units based on their health or their mental health needs at the time.

30:2-13

Q. So we're going to look now at Section of DO 801, which is Isolation Exhibit, which is procedures for maximum custody place assessment and removal. Does the process that's described here, the hearing process, does that apply to people who are first coming into the system, and in their initial classification they are classified as max custody?
A. **I don't believe that process is for the initial intake of inmates into max custody.** The hearing process would be for individuals that are currently within the system going into max custody.
Q. **Is there anyone in ADCRR who would be able to answer that question definitively?**
A. **Yes, ma'am.** Our administrator for classification, Stacey Crabtree, would be able to answer that question.

30:20-31:10

Q. …Does ADCRR track both the number of hearings that do result in placement in max custody and the number of hearings that result in a recommendation that the person not go into max custody?
A. **I'm positive we do** because all of that information is placed within our ACIS system. Yes, ma'am.
Q. **But you personally don't know that information?**
A. **No, ma'am.**

34:2-9

Q. Can a person be removed from max custody other than through the process that's being described in Section 10.8?
A. **At this point I don't believe** they could be, no. They would have to do that a minimum of 180 days until their next classification for them to go down in level.
Q. Okay. **Are you certain of that?**
A. **I'm not, only because -- and I don't think that it happens,** but I believe the policy allows for discretionary override similar to what we spoke about earlier, but I believe they have to do that 180 days.
Q. Okay. **Is there anyone who would be able to answer that question definitively?**

3

**A. Again, our administrator of classification, Stacey Crabtree**.
Q. You said Stacey --
A. Crabtree.

37:21-38:12

Q. Okay. We'll spend a lot of today looking at DO 812, but I'm just going to represent to you that inside of DO 812 it says that a person can be considered for removal from max custody once they've been at step for at least 3 days. **Does that sound familiar to you?**
**A. No, it does not.**

38:13-18

Q. **Can a discretionary override be used to remove someone who has not gotten to step 3 from max custody?**
**A. It could be**, but more than likely, it would not be.
Q. **Do you know if that has ever been done?**
**A. I'm not aware if it has been done or not, ma'am, no**.

40:1-7

Q. If the person was in max custody because of being classified as max custody, not because of any override. So the person goes through the classification process and they get placed into max custody as a result of the classification process, if they were at step 2 when they come up for their first review at 180 days, they would not be able to be reviewed for removal from max custody for another year after that; is that correct?
A. **I believe max custody is reviewed every 180 days, ma'am.**
Q. Okay. So looking at Section 10.8 it says: Inmates shall be reviewed 180 days from max custody approval and annually thereafter unless the approval for max custody was an override. Do you see that?
A. Yes, ma'am.
Q. **Do you believe that the review for max custody, for removal from max custody, happens every 180 days?**
**A. According to that it's the initial 180 days and annually after that, just as it's written.**
Q. And when we say "that," we're talking about DO 801 Section 10.8, and we're talking about the policy on inmate classification, correct?
A. Correct.

40:16-41:13

Q. Do you have any knowledge of the percentage of people who are in maximum custody who are in max custody because of an override?
A. **I don't have that percentage. No, ma'am.**
Q. **Would ADC have that knowledge, ADCRR?**
**A. Yes, ma'am**. We would have that knowledge.
Q. Would Stacey Crabtree know that information?
A. Yes, ma'am. More than likely she would.
Q. Okay. It's my understanding from what you've testified about so far that you don't know how frequently overrides happen either for placing someone into maximum custody or for changing the timing of the review for removal from max custody; is that accurate?

4

A**. I do not have those percentages, correct**.

41:19-42:7

Q. And to be removed from max custody at that review a year later, they would need to have been at that point at step 3 for at least 30 days, correct?
A. Correct.
Q. You sounded like there was a hesitation in what you were saying.
A. **I want to say that we have classified inmates that were a step 2 down to close custody** at that next review as long as they were doing the things they were supposed to do and hadn't had any disciplinary and were programmed. And those kind of go hand in hand. So if they're doing the things they're supposed to do and the programming, more than likely they're going to be -- at that year's time they're going to be a step 3.
Q. **You don't know how many people have been removed from max custody through a review process when they were step 2s, correct?**
A. No, ma'am, I don't.

42:25-43:17

Q. Next example, a person is in maximum custody, it's their initial review at 18 days, and at that time they have been a step for days. **Can they be removed from max custody through that review process?**
A. **I would say yes, they could.**
Q. **Okay. Where is that in the policy?**
A. **It would actually be an override. It would be an override.**
Q. **Okay. And, again, you don't know if or how often such overrides happen?**
A. **No, ma'am, I don't.**

43:18-44:3

Q. Are there any reasons that a person, according to policy, cannot be placed into maximum custody?
A**. Not to my knowledge, no**, unless of course they have, for instance, an ADA restriction and we don't have any ADA beds in our specific facility. We would have to look at all placement until a bed becomes available, but other than that, that's the only thing I could think of.
Q. Does that include mental health related ADA concerns?
A. It could, yes.
Q. But that's a question about bed space and whether bed space is available, not an actual exclusion of the person from maximum custody; is that correct?
A. Well, you mentioned a mental health individual. If we have an inmate that is reviewed by mental health as they came in and mental health felt that that individual couldn't be placed in a maximum custody setting, then we would be placing them elsewhere in a mental health setting.
Q. **What policy says that?**
A. **I am not sure of that policy number, ma'am.**
Q. **But you're sure that there is such a policy?**
A. **Whether it's within our policies or if it's within the health services manual, I'm not exactly sure, ma'am.**

46:14-47:12

Q. Could mental health say this person cannot go into maximum custody, regardless?

A. No, they would not be able to do that unless they showed reason why that individual could not due to mental health concerns.

**Q. Is there a policy that says that they can prevent a person from being placed into maximum custody due to mental health concerns?**

**A. Again, ma'am, that's similar to what I responded to earlier. I'm not sure if that's within our policy guidelines or if that's within the Centurion guidelines. I'm not sure.**

**Q. Do you know whether or not there is such a policy either for ADCRR or for Centurion?**

**A. Again, I'm not sure.**

48:1-15

Q. Are there any special procedures when considering placing someone who is mentally ill into max custody?

MS. LOVE: Object to form; foundation.

THE WITNESS: **I'm not aware of the specifics in regards to that, ma'am**.

Q. BY MS. MORRIS: **Is anyone in ADCRR aware of the specifics in regard to that?**

**A. Again, I would probably state Stacey Crabtree.**

48:16-24

Q. …While they are in the intake area do they have a mental health review?

A. Yes, they do. During that intake process mental health screens the inmate within a specified time period.

Q. I'm sorry?

A. Within a specified time period mental health will evaluate that inmate. Yes, ma'am.

**Q. What's the specified time period?**

**A. I believe it is three days.**

Q. What about a medical review? Do they have a medical review in the intake?

A. Medical would also have to review. Yes, ma'am.

**Q. Is that a same time period?**

**A. I'm not sure about the time period for medical.**

50:5-18

Q. Where is there a restricted status housing program?

A. We have restricted status housing at Browning unit at Eyman complex. We have restricted status housing at Lewis complex Rast unit. **I'm not sure if there's a restricted status housing at the female facility. I'm not sure if that's there or not.**

51:25-52:6

Q. Okay. Is there any policy like a person with serious mental illness cannot be placed into restricted status? That's what I mean by a categorical thing.

A. Very similar to the response earlier, ma'am. **I'm not exactly sure of that policy**.

**Q. So you don't know whether or not there is such a policy?**

**A. I do not.**

Q. Are there any categorical reasons that require additional review prior to placing someone into restrictive status?

A. **Not that I'm aware of, no, ma'am**.

Q. Okay. **Do you know whether there are?**
**A. Just off the top of my head I'm thinking of medical reasons, mental health reasons. Those are the only two things I can think of that would potentially be looked at as why someone could not go into restrictive status housing.**

Van Winkle Dep. 57:14-58:6

Q. Are there any categorical reasons a person cannot be placed into the STG unit?
A. For the STG unit **I don't believe there is**, ma'am....

62:20-23

Q. Are there people in the BMU at Browning who are not maximum custody?
A. Yes, ma'am, there could be.
Q. Okay. There could be. **Do you know if there are?**
**A. I know at one point there were. I'm not exactly sure what that population looks like currently.**

64:3-9

Q. Are there any categorical reasons a person cannot be placed in detention?
A. **The only ones, again, that come to mind could potentially be a medical reason or a mental health reason. Other than that, I don't believe there is, no.**

65:25-66:4

Q. Are there any categorical reasons that a person cannot be placed into close management?
A. **Not that I'm aware of. No, ma'am**.

69:23-25

Q. Okay. Are there any policies other than DO 812 that set out the enhanced management program policies?
A. **Not to my knowledge**. I believe that is the only policy that contains information regarding enhanced management.

71:12-16

Q. ...But there's no policy guiding that case-by-case decision-making process?
A. No, ma'am. The policy in front of me is the only policy we have on enhanced management, **to my knowledge.**

73:14-18

Q. Okay. Going down to Section 7.4, and specifically 7.4.2, it says: Inmates classified as SMI shall not be placed in EMHS, enhanced management housing status, without review by the health services contract monitoring bureau mental health director and contract mental health director. Do you see that?
A. Yes, ma'am.
Q. Is that review documented somewhere?
A. So that assessment that's done by mental health staff, to my knowledge, that is placed within their eOMIS system. That would be the documentation in regards to that assessment.
Q. So that would be the only documentation of that review?

A. **To my knowledge.** Yes, ma'am.
Q. Okay. Is that review done in person or is it a review of records?
A. That review would have to be done in person, **to my knowledge**. Yes, ma'am.
Q. Okay. **When you say to your knowledge, does that mean that's what you think, or do you know that?**
A. **I am not in charge of Eyman complex nor Browning unit, ma'am. So I'm going by what the policy states.**
Q. Where in the policy are you getting that it has to be in person?
A. So when mental health assessments are done -- **and I am not exactly sure where the policy is on this**, but when mental health assessments are done they're supposed to be done in person by the mental health staff.

73:19-74:22

Q. Okay.  When does the review that's described in 7.4.2 happen in relation to placement into enhanced management?
A. In regards to the directors on 7.4.2., **I'm not exactly sure when that takes place,** ma'am.
Q. Okay.
A. Above that on 7.4, it says within the five business days, and since that's a subcategory of 7.4, **I would assume** it would be within those five business days.
Q. **But that's just an assumption?**
A. **Yes, ma'am.**

75:10-19

Q. Are there any other policies that set out provisions relating to the restrictive status housing program?
A. **Not that I'm aware of.** No, ma'am.

75:24-76:2

Q. Okay. And in section 6.4.3 it says, again, that inmates classified as SMI shall not be placed in RSHP without review by the mental health services contract monitoring bureau mental health director and the contract mental health director. Do you see that?
A. I'm sorry. Could you repeat that? I'm sorry.
Q. This one, also, for restricted housing, there's also this provision that there has to be review for people who have an SMI to be placed into restricted housing just like there was for enhanced management, correct?
A. Yes, ma'am.
Q. Is that the same type of review that happens for enhanced management?
A. Yes, ma'am, it is.
Q. And do you know when that review has to occur?
A. Similarly, because it's a subsection of 6.4, **I'm assuming** it's within five business days.
Q. Okay. And, again, that review would be documented in eOMIS?
A. Yes, ma'am.
Q. And it wouldn't be documented anywhere else?
A. **Not to my knowledge.** No, ma'am.

76:6-77:2

Q. Okay. But that explains who knows and how they know that the person has an SMI, but **how does anyone at ADCRR know that the review that's required for an SMI inmate has actually occurred?**

A. So that individual that's over that program -- and it could, in fact, also involve the deputy warden of that particular unit. There's going to be communication between them and the mental health staff to ensure that that was, in fact, completed, and **that's found out by the entries within eOMIS.**

**Q. Do you know what the entry would be called in eOMIS?**

**A. I do not, ma'am. I don't utilize that system. That's a medical system.**

**Q. Do correctional personnel have access to eOMIS?**

**A. No, we do not.**

78:14-79:4

Q. Does ADCRR in any way audit to determine whether or not the reviews that are required for placing a person with an SMI into restricted housing or enhanced management that those reviews, in fact, occur?

A. We can ask for a screen printout from eOMIS that mental health staff or nursing staff could provide to that individual over that program if that's what they wanted to do. We also have a monitoring bureau that can look at that for us, as well.

**Q. Do you know if the monitoring bureau does look at it?**

**A. I don't know that offhand, ma'am.**

79:5-16

Q. . . . Are there any other statuses of people in max custody other than the ones that we've discussed?

A. No, ma'am. **Not that I'm aware of.**

80:19-21

Q. Okay. In the intake unit at Eyman do people have a step level at that point?

A. **I don't believe** they start that step program until they're actually assigned to a unit.

81: 11-14

Q. All right. Is there any auditing process to make sure that everybody gets a review every month?

A. **Not that I'm aware of,** no, ma'am.

82:13-15

Q. Is there documentation of the review process?

A. Other than the entries that are made in ACIS, the particular administrator of the unit that's having a program team meeting can keep minutes, if they so choose, but **I don't think there's a requirement** for that.

Q. Okay. And when you say what's entered into ACIS, that's just what the outcome of the review was; is that correct?

A. That's correct.

Q. So what's entered into ACIS is not the reasoning for what the outcome was; is that correct?

A. **I haven't been in that system in a long time, but I believe there's a notes section in there that notes can be entered in.**
Q. Do you know if they are entered in?
A. That, I don't know, ma'am.

83:14-84:4

Q. Okay. Are there forms that are filled out regarding the review?
A. **Not that I'm aware of.** No, ma'am.
Q. Is there any information given to the incarcerated person who is being reviewed beyond whether or not their step changed?
A. **I believe** the CO 3 provides them with that change in level. Yes, ma'am.
Q. So the CO 3 tells them whether or not their level changed?
A. It tells them or may give them a inmate letter response with that information on it. **I'm not exactly sure of that,** but the inmate is informed one way or another.
Q. Okay. But is the inmate informed of the reasons for the decision?
A. **I'm not sure about that, ma'am**. The inmate can however, if, for instance, the CO 3 said that your step has been decreased, and the inmate says why, and the reason is not given by the CO 3, the inmate can provide an inmate letter asking for those reasons and a response has to be provided to them.
Q. Is that written in policy somewhere?
A. It's written in policy that an inmate can fill out an inmate letter if he has concerns about something, and it must be responded to. Yes, ma'am.
Q. Is it written anywhere that an inmate who asks for the reasons why a step was reduced or not changed must be told what those reasons are?
A. I'm not aware of that in writing, but that's just good practice that we're doing that.

88:20-89:24

Q. So is it the policy that the program team, when they believe that someone should advance, they just make a recommendation, but then that decision is made by someone else?
A. **My historical knowledge of this** is the program team makes the decision on the step level. Now, I know there has been discussion regarding changing this and recommendations being made by the program team and the final decision for maximum custody step level be made by the assistant director, but that has not been put out yet.

92: 9-18

Q. Okay. And is there any reason that step-level reduction says on a case-by-case basis and step-level advancement doesn't?
A. No, ma'am. **Not to my knowledge**.

92:25-93:3

Q. Okay. So each of the matrixes has some variety in terms of what is listed here. So starting with the one that we're looking at right now, Browning unit, in the policy it says that one of the criteria for moving up is: Display behavior that is cooperative and respectful. How is that determined in the step-level review?
A. **So in the step-level reviews that I have been in in the past,** unless there is some information provided, whether it be by a staff member or whether it be by information report or a

disciplinary report that shows that they are not doing that, then it is assumed that they are doing it, that they are behaving themselves and being respectful.

93:4-16

Q. Okay. Going back to that provision on step-level advancement to step 3, so you're in step. You must complete or actively participate in all programs as per program plan. Do you see that?
A. Yes, ma'am.
Q. Who decides whether the person is actively participating?
A. Normally, it's the CO 3, because most of those programs that the inmate is supposed to be participating in is being put on by the CO 3s. They're the ones facilitating the classes that the inmate would have to complete.
Q. What happens if a program isn't available?
A. That is not a factor that would keep them from moving up to step if that program is not available and it's within their program plan.
**Q. Is that stated in policy anywhere?**
**A. I'm not sure if it is or not, ma'am.**

95:3-20

Q. Is there any process by which the step reviews are reviewed by ADCRR?
A. **Not to my knowledge,** other than anybody can go on and look at step levels, make sure that they are up to date. For instance, the CO 4 at particular units to go on and make sure that those are, in fact, being completed by their staff or CO 3s. As far as an internal audit of the step system, I'm not aware of that. No, ma'am.

98:2-10

Q. Okay. Is there any policy regarding how long a person can be kept in max custody?
A. **I am not aware of that,** ma'am.

98:11-13

Q. Is there any policy regarding how long a person can be kept at any of the step levels in max custody?
A. **Not that I'm aware of.**

98:14-16

Q. Is there any policy regarding how quickly a person must be moved once they're reclassified as close custody?
A. **Not that I'm aware of, ma'am**. No, ma'am.

98:17-20

Q. Is there any policy as to how a person who has been reclassified as close custody but not yet moved is treated?
A. Define treated.
MS. LOVE: Form.
Q. BY MS. MORRIS: Whether they are treated as if they were in max custody or as if they were in close custody.
A. **No, not that I'm aware of.** No, ma'am.

98:21-99:4

Q. Is there any policy that talks about what's in the enhanced management file?

A. No, ma'am, **not that I'm aware of.**

Q. And the review is for both deciding whether the person is progressing from step 1 to step 2 to step 3 and also whether they need to be maintained in the enhanced management program, correct?

A. **I'm not sure** if that review has anything to do with the steps. That review is to determine whether or not they need to remain in enhanced management or not.

Q. Okay. So when it says that they are reviewing them for program participation and step progression, you're not certain whether that means that they're reviewing them for whether they should go from one step to another?

A. **I believe** that's done by the program team as far as the steps go just like any other inmate in the Browning unit. This review is being completed to make sure they're doing the things within that program they're supposed to, and if they are, are they doing enough to be removed from that program or not. …

Q. Okay. Let's look at attachment F to DO 812, which is, again, in Exhibit 3, and this is the matrix for enhanced management. Do you see that?

A. Yes, ma'am.

Q. On the row that says, step-level advancement, do you see that?

A. Yes, ma'am.

Q. Says, recommended by ROD and complex warden?

A. Yes.

Q. And then below that in the step-level reduction row it says: Decision by ROD and complex warden on a case-by-case basis. Do you see that?

A. **Yes, ma'am. If that answers the question that they are, in fact, looking at step level as well during that meeting.**

**Q. Okay. But you were unaware of that?**

**A. I was not aware of that at the time until I just read that, ma'am.**

102:1-103:21

Q. Okay. Is there any policy regarding reporting anything relating to the placement into enhanced management?

A. Other than the enhanced management program information within that policy**, I don't believe there's anything written** on enhanced management.

103:22-104:2

Q. Okay. But I'm asking about the review process. Is there any reporting of the review process, that monthly review that they're supposed to be doing for every person in enhanced management?

A. **I believe there is. I'm not aware of that paperwork**, however, ma'am.

Q. **Who would be?**

**A. The complex warden at Eyman, the** regional operations director over Eyman, or even the deputy warden at Browning unit would be aware of that information.

104:12-21

Q. Is there any policy regarding how long a person can be kept in enhanced management?
A. **Not that I'm aware of.**

105:2-4

Q. Is there any policy regarding how quickly a person must be moved out of enhanced management once they're deemed to not require enhanced management?
A. **Not that I'm aware of.**

105:5-8

Q. Is there any policy regarding whether a person is treated as if they are still in enhanced management when they have been deemed to no longer require enhanced management but they haven't yet been moved?
A. **I'm not aware of that verbiage in the policy,** but if they're no longer in the enhanced management program they would no longer be managed as enhanced management.
Q. Okay. So they could be in an enhanced management unit waiting for transfer and they would not be treated as though they were still in enhanced management, you're saying?
A. That transfer is a very quick transfer out of that program. Once the decision has been made to remove them from enhanced management, that movement usually takes place that same day.
Q. Okay. **How do you know that?**
**A. I'm one of the ones that wrote the policy on enhanced management.**
**Q. Is that in the policy anywhere --**
**A. I used to manage it at Browning unit when I was the assistant deputy warden many years ago.**
**Q. Okay. Is it in the policy anywhere that it should take place that quickly?**
**A. No, ma'am.**

105:9-106:7

Q. Okay. All right. So talking a little bit about the reviews in restrictive housing status, and we're looking at section 6.5 in DO 812, which is Isolation Exhibit 3. It says: The assessment team shall review inmates in RSHP for program participation and step progression on a minimum of every 3 calendar days. Do you see that?
A. Yes, ma'am.
Q. Is that assessment team that's described in 6.5 the same as the RSHP committee that is described in 6.4.1?
A. **I would say no,** ma'am, because if you read the subsection below that it also states that the mental health staff would participate in that, which is not part of that RSHP independent review committee that we spoke about in 6.4.
Q. Okay. So who is on the assessment team, then?
A. **I don't have that information, ma'am**. **I'm not exactly sure.**

106:8-25

Q. So does that mean that the assessment team and the RSHP committee are the same thing?
A**. It would appear that way in the policy.** Yes, ma'am.
Q. So you think it's not that way in practice? I'm only asking because the way you said it would appear that way in the policies made it sound like maybe in practice it's different.

13

A. So I know that the team that reviews RSHP, the committee is not supposed to be personnel that's within that unit that the RSHP program is within. Now, the assessment team could be staff that are within the unit. **So that's why I'm thinking that** those are two different entities.

107:11-24

Q. Is there any policy requiring any reporting about the reviews of step progression in restrictive housing status?
A. **Not that I'm aware of**, ma'am, no.

109:17-20

Q. Is there any policy requiring reporting of reviews for continued placement in RSHP?
A. **Not that I'm aware of, ma'am, no.**

Van Winkle Dep. 109:21-23

Q. Is there any policy requiring reporting anything relating to decisions regarding removal from RSHP?
**A. Not that I'm aware of, ma'am, no.**

109:24-110:2

Q. Is there any policy regarding how long a person can be kept in RSHP?
**A. Not that I'm aware of, ma'am, no.**

110:6-8

Q. Is there any policy regarding the minimum amount of time a person can be held in RSHP?
A.**Not that I'm aware of, ma'am, no.**

Van Winkle Dep. 110:9-12

Q. Okay. 5.3.3 has a sub-point that says that: While housed in maximum custody the inmate shall complete all three steps of the inmate maximum custody management incentive system. Do you see that?
A. Yes, ma'am.
Q. Is that true regardless of what way out of STG status the person has?
A. **Not that I'm aware of. No, ma'am**.
Q. So it's only under 5.3.3?
A. Yes, ma'am.
Q. Can you tell me what the difference between 5.3.3 and 5.3.4 is?
A. **I can only assume** that it is talking about whether or not information has been gathered that a particular inmate would no longer be part of a security threat group, **but, again, I'm assuming on that, ma'am.**

112:22-113:12

Q. Okay. So if a person is in STG status, and let's say they had an annual review by the committee in January, and then starting from March they had no documented STG activities for two years, would they be reviewed for removal from STG status in March once they hit the two-year mark, or would they have to wait until the annual review in January?

A. The contradiction in the policy, according to the one below, it's at the 24-month mark. According to this, the committee looks at these annually. **So I would have to get clarification on that, ma'am.**

114:8-18

Q. Okay. Is there any policy regarding how quickly a person must be moved once they're deemed not to require being housed in STG anymore?
A. **Not that I'm aware of, ma'am, no.**

114:23-115:1

Q. Okay. Do you know anything about what percentage of people that get removed from STG are removed via debriefing, via the step-down program, or via this process of just being without any documented activities for months?
A. **I do not have that information but I know we keep that information**.
Q. I'm sorry?
A. I said I do not have that information. However, I know that information is kept by the department.

115:8-17

Q. What policies govern placement in detention and release from close management?
A. The only information on close management is within that close management policy, to my knowledge.
Q. That's DO 813?
A. Yes, ma'am.
Q. And as far as you know, that is the only policy regarding close management?
A**. To my knowledge, yes,** ma'am.

115:20-116:3

Q. Do each of these phases have any kind of time requirement? Do you have to spend a certain amount of time at each phase?
A. **Not that I'm aware of, ma'am.**

116:24-117:2

Q. So at the bottom it says, asterisk denotes live class facilitated by CO 3 with no more than 15 participants. Do you see that?
A. Yes, ma'am. I do.
Q. And there are some classes that have an asterisk, but not a lot, right? I actually only see one, money management -- oh. Money management and self-control, yeah?
A. Yes, ma'am. I see that.
Q. **Do you know how long those two classes run for?**
A. **I do not.** Typically, the CO 3 taught classes run around eight weeks long.

117:3-14

Q. All right. Thank you. Is there a minimum amount of time that people have to spend in close management once they've been placed into close management?
A. **Not that I'm aware of,** ma'am.

118:8-11

Q. Is there a maximum amount of time they can spend in close management?
A. **Not that I'm aware of.**

118:12-14

Q. The only policy that governs placement into detention is policy DO 804, correct?
A. Yes, ma'am.
Q. Are there any other policies that relate to the placement of people into detention?
A. **I believe the classification policy 801 may describe placement in detention, but I'm not exactly positive about that.**

118:15-22

Q. Okay. Going back to the 2A investigation status people, is there a limit on the number of times a 2A notice can be served?
A. **Not that I'm aware of.**

122:8-11

Q. …If a person is placed in detention for refusing to house, are they placed in detention for at least six months? Is that a policy?
A. **Not that I'm aware of, no.**

125:2-5

Q. As long as a person is in detention for refusal to house, they get a disciplinary every 30 days; is that correct?
A. **I believe that's what the policy states, yes.** So every time they refuse to house when we're offering them a housing option, they would receive a disciplinary for that.

126:13-19

Q. Is there any policy regarding how long a person can be held in a temporary enclosure?
A. There is. They're not supposed to be held any more than an hour in a enclosure -- outside enclosure, I believe, is what the policy states.
Q. **And do you know what policy that is?**
A. **I don't off the top of my head, ma'am.**
Q. **Okay. Does ADCRR know what that policy is?**
A. **Yes, ma'am, they do.**
Q. They do. Okay.
A. **I've read that in the policy. So I do know it is within a policy.**

127:10-22

Q. BY MS. MORRIS: You said that the one hour was for an outside holding cell. Is there any limit on the amount of time for an inside holding cell?
A. I don't remember if it just says for a holding enclosure or whether it's an outside holding enclosure, but I know the verbiage does specifically state an hour, and anything over that hour time frame has to be approved by the warden.

128:12-19

### TOPIC 2
### CONDITIONS OF CONFINEMENT in ISOLATION

Q. How does a person in max custody get staff attention in an emergency?

A. So historically -- of course, we do our security checks. At any time an inmate can stop an officer and say that they need something in an emergency situation. That officer, of course, will either take care of the issue or call a supervisor to take care of that issue. If it's in between security checks -- I know having worked at Browning SMU in Central -- banging on the cell front, yelling in the pod usually gets the attention of staff. Staff will enter that area and take care of whatever issue is taking place at the time.

Q. **And do you know if that's acknowledged in any policy?**

A. **I don't,** other than the inmates are told if they have any issues they can bring it to a staff member's attention.

Q. Okay. Inmates are also told that they are not supposed to engage in excessive banging and noise, correct?

A. Yes, ma'am, but that is overlooked if it's an emergency situation.

Q. Okay. Was that in the policy anywhere?

A. No, ma'am

Q. Are there call buttons of any sort in mental health watch units?

A. **Not that I'm aware of.**

129:12-130:23

Q. Okay. So the things you mentioned were the community meetings, rec, showers, medical, classes or programs, jobs, visitation, and table time or pod time as things that people in max custody get out of cell for, right?

A. Yes, ma'am.

Q. Is that the same for people in enhanced management units, restricted status housing program, STG units, and BMU units?

A. BMU, yes. So BMU takes place -- or I'm sorry. They actually do all of that, as well. They do pod time. They go out for classes, that kind of stuff. Enhanced security, I don't believe that all of that is done with them.

Q. **So what would they get for out-of-cell time?**

A. **I would have to look at the policy, at the matrix, to find out exactly what they're authorized to do in enhanced security.**

Q. And the policy being the 812 matrix?

A. Yes, ma'am.

135:1-20

Q. What kind of out-of-cell time do people in close management units get?

A. Close management units would get the same. Recreation, showers, visitation. I believe they also have programming requirements if they're on a step that they would actually come out and do programming. **And that may be it.**

Q. Okay. How much recreation time do they get?

A. Close management, **I would have to look at that matrix, as well.**

137:16-25

Q. Okay. Can people in close management have jobs?
A. **I believe they can,** depending on the phase.
Q. How would you find out?
A. **It should be in this policy. I don't see it within the policy. So I'm going to say, no, they cannot**.

139:3-8

Q. Okay. All right. And what about for someone in close management? Is their out-of-cell time documented?
A**. Not that I'm aware of.**

140:13-16

Q. Are there any differences in what we just discussed for people who are in enhanced management?
A. There are differences with enhanced. They are fully restrained, to my knowledge.
Q. And what does fully restrained mean?
A. They would have both handcuffs and also leg restraints. And depending on the severity of the reason the inmate is in there, they could potentially have an order to be transported in a transport chair.
Q. Do you have any knowledge of what percent or how many people in enhanced management are transported in transport chairs?
A. **I do not have that information, ma'am.**
Q. **Do you think that ADCRR maintains that information?**
A. **A unit deputy warden would have that information. Yes, ma'am.**

144:12-145:3

Q. Are there any differences regarding escorting for people in enhanced management?
A. In enhanced **I believe** there has to be two officers present. And, again, depending on severity, there could potentially be a supervisor required as well.
Q. Do you know if that's all in the policy somewhere?
A. **I am not sure if that is in the actual post order for that particular area or not.**

145:7-15

Q. Okay. Are there any differences from what we've discussed excluding the transport chair for people in detention?
A. No, ma'am. Detention inmates are brought out just the same. Stripped, placed in handcuffs, and escorted to where they need to go.
Q. What about close management?
A. Same**, to my knowledge.**

147:14-21

Q. Does every single person have a different time written down on the out-of-cell time sheet or --
A. We're looking at a time that they're removed and that's logged and then a time that they're placed back in their cell and that's logged. Does that make more sense?
Q. Not really.
A. Yes, they could have different times.

Q. Okay. If you move people who are in pod back to their cells and then people who are in pod back to their cells and then people who are in pod back to their cells, are the out-of-cell time sheets going to say a different time for the people on pod 1, people on pod, and people on pod for the end of rec?

A. Yes, they should, because we are entering the time that they exit the cell and the time that they enter back into the cell. That's on an individual basis. So if I've got two guys that came back from recreation in pod 1, and then one guy -- after you've gone through 2, 3, 4, and 5, one guy coming back at 6, his time should be different as he enters back into the cell than the time of the two guys entered pod 1. Does that clarify it a little bit more?

152:18-153:14

A. So I was thinking about the time out of cell when we were discussing the recreation.
Q**. Yes.**
A**. Just to be sure, I contacted Deputy Warden Stickley at Eyman complex just to verify that the information I was giving you was correct. It is not.**
Q. Okay.
A. So the updated information on that is the last inmate that enters the recreation enclosure is when the time starts for recreation. The last inmate that enters his cell is when the recreation period ends. And that's for everyone.

157:13-24

Q. …You mentioned earlier table time. Can you explain what table time is?
A. So we have placed tables inside the pods. And what we have done is allowed inmates to come out of their cell and sit at the table, and whether it be doing their homework, or doing activities in their programming class, or sitting down and eating, or just doing any activity, maybe an activity that our CO 3 gave to him, we've allowed designated times for inmates to come out and sit at the tables. It depends on their step level on how they sit at the table. So a step 3 can come out and sit at the table without restraints. A step 2 could come out and sit at the table and be restrained to the table as well as a step 1.
Q. Okay. Is the step 2 restrained at their hands and their legs at the table?
A. No. So their hands are free.
Q. Their hands are free?
A. Their leg would be tethered to the table.
Q. Okay. And that's the same for step 1?
A. Yes, ma'am. Step 1 may also have one of their hands tethered to table, as well, **if I remember the policy correctly.**
Q. Does everyone in max custody get table time? I'm sorry. In general population max custody. Let's start there.
A**. I'm not exactly sure if they're giving general population inmates table time or not. I know for a fact that table time is given to inmates at BMU, inmates that are in the mental health program. I'm not sure if it's given to general population inmates currently. I know early on it was. I'm not sure if that's the current practice.**
Q. Okay. Do you know if people with an SMI in enhanced management get table time?
A. SMIs do get table time, yes.
Q. Okay. Regardless of the type of max custody?

A. **I have not seen an SMI placed in enhanced security. That's not to say it hasn't happened.** I have not seen that, but they would be allowed table time if they're in there. That's a requirement of this particular case.

Q. Okay. And is that true for all of the statuses of max custody?

A. For SMI inmates, yes, ma'am.

Q. Okay. Do people in enhanced management who are not SMI get table time?

A. **I know at one point they were allowing that. I don't know if that has continued.**

Q. Okay. Is that the same for restrictive status?

A. Yes, ma'am, it would be.

Q. Is that the same for STG units?

A. **I'm not sure about that.** STGs are treated exactly the same as general population. It's just a designated code that they're a validated STG, but they get all the same privileges that a general population inmate gets.

161:6-163:13

Q. All right. Do people in detention with an SMI get table time?

A. I don't believe they do, no.

Q. Okay. Do people in detention who don't have an SMI get table time?

A. No, ma'am.

Q. Do people in close management who have an SMI get table time?

A. I'm not aware of that.

Q. Do people who don't have an SMI in close management get table time?

A. I am also not aware of that.

Q. And when you say you're not aware of that, I'm understanding that you're saying that you don't think that happens; am I right?

A. I'm just not sure. I haven't been over at Eyman complex for a while. I've been a deputy warden of operations and the warden at Florence for the past little over five years now. So I haven't been over there in a little while.

Q. So you don't know one way or the other?

A. No, ma'am, I don't.

163:14-164:10

Q. Okay. In general population max custody what percent of people have jobs?

A. I do not know the exact percentage, but I can tell you that there are porter jobs that are given to maximum custody inmates.

Q. **Do you think as many as 20 percent of the people have jobs?**

A. **Again, ma'am, I don't know the percentage. I don't want to give you wrong information.**

165:19-166:2

Q. Okay. All right. And generally only one person per pod would be assigned to be a porter at a time?

A. You could potentially have up to three porters in that pod. You could have a pod porter, you could have a shower porter, you could have a recreation area porter.

Q. Okay. All right. Do you know whether, in fact, most units have three porters per pod?

A. **I don't know that for a fact**. However, I could tell you that Browning and SMU do it that way. **I'm not certain about Rast. We usually share the same model. So I would be pretty confident in saying that that's how they're doing it.**

166:20-167:6

Q. **Does ADCRR track how many people in max custody units have jobs?**
A. **The particular unit does.**
Q. The unit does, okay. Do the units also track how many hours they're working?
A. They do. They're all paid through our work incentive program, our WIP program. All of that is documented on pay sheets and those have to be signed by the supervisors to be turned in and the inmates are paid accordingly. The hours are logged on that pay sheet.

167:19-168:3

Q. Can people in close management go to religious services?
A. **Not that I'm aware of, no….**

168:9-11

Q. …**Is there any effort in ADCRR to know how many activities are being canceled to, like, compile that into any kind of database or report?**
A. **So at this point there is no system that I am aware of in place for that. However, gathering that information would be pretty easy because you would simply have to gather those information reports that are generated. So you could easily do it that way.** Have all of the units start gathering that information through the information report.
Q. But to your knowledge, ADCRR has not done that?
A. No, ma'am.
Q. Okay. **Similarly, does ADCRR do anything to track how many cancellations are actually made up?**
A. **No. But, again, that's information that they could gather simply by looking at the documentation I just mentioned that that stuff would be located on. People do it that way, but there's no formal system in place that shows that information currently.**

171:2-21

Q. **Does ADCRR track the refusal rate in max custody for recreation?**
A. **They don't track the refusal rate, but, again, it's very similar to what we just discussed. That information is placed on out-of-cell tracking forms. So it could be tracked through the out-of-cell tracking forms.**
Q. **Okay. And that would also be true for refusals for other types of out-of-cell time, correct?**
A. **That's correct.**

172:1-9

Q. Do you know the reasons that people have for refusing out-of-cell time are?
A. **Most of my experience is with the mental health inmates that were at Kasson.** I have personally gone over and talked to a few of them that habitually refuse to go out. And I've heard reasons range from, I just don't feel like it, it's too cold out, it's too hot out. And some of them won't respond at all. So there's a large list of reasons why they don't go out. We usually try and

encourage them to go out. Shift supervisors, when they see our usual inmates -- and it's usually around the same ones that are doing it. They will go and talk to them, and the responses are usually the same.

172:10-23

Q. Okay. Has ADCRR done anything to determine how much natural light is getting into the max custody cells in the different units?
A**. Not that I'm aware of.** I know that there was a lighting initiative that was started a couple years ago where we were trying to switch out all the lights to LED lights, but that's the only thing I'm aware of in regards to the lighting.

180:6-13

Q. Okay. So I'm going to come back to the loaner television program. For people in max custody can anyone in any status of max custody, if they can afford it, get a television?
A. **To my knowledge,** yes, as long as they meet the qualifications on their matrix. I'm not sure if TV is still on the matrix or not, but I'm not aware of anybody that's not authorized other than on a mental health watch.
Q. Okay. And on the loaner program you said people in the mental health program can get a loaner TV if there is one available and they're indigent?
A. Yes, ma'am.
Q. Is that people who are in specific mental health units, or is it people who are designated as having mental health needs? Who are the people who are eligible for that loaner program?
A. **So I can specifically speak to the BMU program and the residential mental health program that was at Kasson**. And that program basically was picked up and taken down to Tucson Rincon unit, and I believe they have adopted the same procedures and policies that we have at Kasson. So if we have inmates that are unable to afford televisions and they are indigent status and we have televisions in our loaner program that we can loan out, then we will loan them to those inmates.

181:10-182:9

**TOPIC 3**
**Programming available in ISOLATION, including but not limited to employment, education, drug treatment, and rehabilitative services.**

**TOPIC 5**
**POLICIES AND PROCEDURES related to INCARCERATED PERSON privileges while housed in ISOLATION, including increases and decreases in such privileges.**

**TOPIC 6**
**POLICIES AND PROCEDURES REGARDING any out-of-cell time for INCARCERATED PERSONS in ISOLATION, including but not limited to any congregate activities allowed with other INCARCERATED PERSONS.**

Q. Are there other classes that are taught by CO 3s in any of the statuses that we've been talking about?
A. **Not that I am aware of at this point**, no.

| |
|---|
| 191:4-7 |
| Q. Okay. So is there any programming available in isolation other than the classes listed in the matrix for the Browning mandatory programs in 8 and the close management program matrix in 813? |
| MS. LOVE: Form. |
| THE WITNESS: **Not that I'm aware of**, no. |
| |
| Van Winkle Dep. 192:13-18 |

| |
|---|
| **TOPIC 4** |
| **Lengths of stay in ISOLATION, including mean, median, and maximum lengths of confinement in each ISOLATION unit.** |

| |
|---|
| Q. The question was: How long do people spend, on average, in max custody? |
| A. **I don't have that information, ma'am.** |
| |
| 193:7-9 |

| |
|---|
| Q. Okay. What is the longest time anyone in ADCRR custody has spent in max custody? |
| A. **I don't have that information, ma'am.** |
| Q. Would it be possible to know that? |
| A. **I'm not exactly sure if that's information that we would have on hand.** |
| |
| Van Winkle Dep. 193:10-15 |

| |
|---|
| Q. Okay. **What is the longest time that anyone currently in max custody has spent in max custody**? |
| A. Now, we have a condemned row in max custody, and I can speak to that population. I know we have an inmate on condemned row that's been incarcerated since 1978. **Now, he, however, has, within the last three or four years, moved down to close custody, but at the time I would probably put him up against anybody else**. |
| |
| 193:16-23 |

| |
|---|
| Q. How long do people spend, on average, at step 1 of max custody? |
| A. **I don't have that information, ma'am.** |
| |
| 193:24-195:1 |

| |
|---|
| Q. How long do people spend, on average, at step 2 of max custody? |
| A**. I do not have that information, ma'am.** |
| |
| 194:2-4 |

| |
|---|
| Q. How long do people spend, on average, at step 3 of max custody? |
| A. **I also do not have that information, ma'am.** |
| |
| 194:5-7 |

| |
|---|
| Q. Does ADCRR do anything to track the amount of time people spend in max custody? |
| A. **Not that I'm aware of at this point.** |
| |
| 194: 8-10 |

Q. Does ADCRR do anything to track the amount of time people spend in any of the steps in max custody?
A. **Not that I'm aware of at this time, ma'am.**

194: 11-13

Q. Would there be a way to track how long people spend in max custody?
A. **I am not aware of that information.**

195:14-16

Q. Okay. What percent of men sentenced to life have their custody reduced to close custody in less than two years?
A. **I do not have that information either, ma'am.**

Van Winkle Dep. 194:17-20

Q. Once a person is reclassified to close custody from max custody, how long do people spend, on average, in max custody awaiting rehousing?
A. **I don't have those averages, ma'am.**

194:25-195:3

Q. What is the longest time anyone in ADCRR custody has spent in max custody after having been reclassified to close custody?
A. **Again, I do not have that information, ma'am.**

195:4-7

Q. How long, on average, do people spend in STG status in max custody?
A**. I do not have that average, ma'am.**

195:8-10

Q. Does ADCRR do anything to track the amount of time people spend in STG status in max custody?
A. **Not that I'm aware of.**

195:11-13

Q. What's the longest time anyone in ADCRR custody has spent in STG status max custody?
A**. I do not have that information, ma'am.**

195:14-16

Q. What's the longest time anyone currently in STG status in max custody has spent in STG status in max custody?
A. **Again, I do not have that information, ma'am**.

196:17-20

Q. Once a person is approved to be removed from an STG status, how long do people spend, on average, in STG status awaiting rehousing?
A. That would be dependent upon housing. And like I said earlier, it's usually a fairly quick process, but **I do not have an average on that.**

| |
|---|
| 195:21-196:1 |
| Q. Okay. What's the longest time anyone in ADCRR custody has spent in STG status after having been reclassified to max custody?<br>A**. I do not have that information, ma'am.** |
| 196:2-5 |
| Q. How many people have been reclassified out of STG since the new policy came into effect in April allowing people to be removed based on months of no documented STG activity?<br>A. **I also do not have that information, ma'am.** |
| 196:6-10 |
| Q. How long, on average, do people spend in enhanced management in max custody?<br>A**. I also do not have that information, ma'am.** |
| 196:11-13 |
| Q. Does ADCRR do anything to track the amount of time people spend in enhanced management in max custody?<br>A. **I am not aware of that.**<br>Q. You're not aware of them doing that, or that means you don't know one way or the other?<br>A. **I'm not aware of them tracking that, ma'am.**<br>Q. Okay. Does that mean you think they do not track it or you just don't know?<br>A. **I just don't know.** |
| 196:14-22 |
| Q. What's the longest time anyone in ADCRR custody has spent in enhanced management in max custody?<br>A. **I do not have that information, ma'am.** |
| 197:12-15 |
| Q. Once a person is approved to be removed from enhanced management, how long do people spend, on average, in enhanced management awaiting rehousing?<br>A. As I stated earlier, that's a pretty quick process, but **I do not have that average, ma'am.** |
| 197:16-20 |
| Q. How long, on average, do people spend in restrictive housing program status in max custody?<br>A. **I do not have that average, ma'am**. |
| 197:21-23 |
| Q. What's the longest time anyone in ADCRR custody has spent in restrictive housing program status in max custody?<br>A**. I also do not have that information, ma'am.** |
| 197:24-198:2 |
| Q. Once a person is approved to be removed from restricted status housing program, how long do people spend, on average, before being rehoused? |

| |
|---|
| A. **I don't have that information, ma'am.** |
| 198:3-6 |
| Q. How long, on average, do people spend in a behavioral management unit or in a mental health unit in max custody?<br>A. **I do not have that average, ma'am.** |
| 198:7-10 |
| Q. What's the longest amount of time anyone in ADCRR custody has spent in a behavioral management unit or mental health unit in max custody?<br>A. **I also do not have that information, ma'am.** |
| 198:11-14 |
| Q. Once a person is approved to be removed from the behavioral management unit, how long do people spend, on average, in the BMU awaiting rehousing?<br>A. As I stated before, it's a pretty quick process, **but I don't have that average, ma'am.**<br>Q. **You don't actually know how long it is?**<br>**A. No, ma'am.** |
| 198:15-21 |
| Q. Okay. How long, on average, do people spend in close management status?<br>A. **I do not have that information, ma'am.** |
| 198:22-24 |
| Q. What's the longest time anyone in ADCRR custody has spent in close management status?<br>A. **I also do not have that information, ma'am.** |
| 198:25-199:2 |
| Q. How long, on average, do people spend in detention status?<br>A. **I do not have that information, ma'am.** |
| 199:3-5 |
| Q. What's the longest time anyone in ADCRR custody has spent in detention status?<br>A. **I do not have that information, ma'am.** |
| 199:6-8 |
| Q. People classified as max custody can seek administrative review of that classification, right?<br>A. Yes, ma'am.<br>Q. And that process takes about 45 days or up to 45 days?<br>A. Yes, ma'am.<br>Q. What percentage of people classified as max custody seek an administrative review of that classification?<br>A. **I also do not have that information, ma'am.**<br>Q. Do you know what percent of administrative reviews result in a change to the max custody classification?<br>A. **I do not know that, ma'am.** |

| |
|---|
| Van Winkle Dep. 199:9-22 |
| Q. People classified as max custody can also appeal the classification, correct?<br>A. Yes, ma'am.<br>Q. And that process can take up to 30 days?<br>A. Yes, ma'am.<br>Q. What percent of people classified as max custody actually appeal that classification?<br>A. **I don't have that information, ma'am.**<br>Q. Do you know what percent of appeals result in a change to max custody classification?<br>A. **I do not know that, ma'am.**<br><br>199:23-200:8 |
| Q. How long do people spend on mental health watch, on average?<br>A. **I do not have that average, ma'am.**<br>Q. What is the longest time anyone in ADCRR has spent in mental health watch?<br>A. **I do not have that information, ma'am.**<br>Q. Does ADCRR do anything to track the amount of time people spend in mental health watch?<br>A. **Not that I'm aware of.**<br><br>200:9-17 |
| **TOPIC 7[2]**<br>**POLICIES AND PROCEDURES for monitoring the effects of CONDITIONS OF CONFINEMENT in ISOLATION on INCARCERATED PERSONS' mental and physical health.** |
| Q. Are there any ADCRR policies regarding monitoring the mental and physical health of people in isolation?<br>A. **Not that I'm aware of, no.**<br><br>200:21-24 |
| **TOPIC 8[3] POLICIES AND PROCEDURES for suicide and self-harm prevention for INCARCERATED PERSONS in ISOLATION.** |
| Q. Does ADCRR have any policies and procedures regarding suicide and self-harm prevention for people in isolation?<br>A. Yes, we do.<br>Q. And is that policy DO 807?<br>A. I believe it is. I'm trying to do it right now. I apologize.<br>MS. LOVE: Can you give him the title of it, of 807?<br>Q. BY MS. MORRIS: Inmate suicide --<br>A. Yes, ma'am, that would be it. |

---

[2] Warden Van Winkle's designation on Topics 7, 8, and was expressly limited to the aspects of the topics that were "operations related," and did not include the aspects of the topics that relate to mental health care, for which another person was designated. Van Winkle. Dep. 11:3-12. Warden Van Winkle was not designated to testify regarding Topic 10. *Id.*

[3] *Id.*

Q. Are there any other policies besides DO 807 that relate to suicide and self-harm prevention for people in isolation?
A. **Not that I'm aware of, no.**

201:11-25

| TOPIC 9[4] |
| :---: |
| **POLICIES AND PROCEDURES regarding the provision of HEALTH CARE to INCARCERATED PERSONS in ISOLATION.** |

Q. Does ADCRR have any policies and procedures regarding the provision of health care to people in isolation?
A. Yes, I believe we do.
Q. **What policies are those?**
**A. I'm not aware of what the actual number is, ma'am.**
**Q. Okay. What do the policies require?**
**A. The policy would require that we are providing health care to our inmate population, I mean, to put it very vaguely.**
**Q. Yeah. Well, I mean, but you also don't know what policy it is?**
**A. No, ma'am, I don't.** And just to go a little further, there is specifics within the policy about our response time to provide health care to the inmate population in cases of emergency, and that would also carry over into detention areas, maximum custody.
Q. Okay. **But, again, you don't know what policy it is?**
**A. I don't, ma'am.**

202:1-21

| TOPIC 11 |
| :---: |
| **Training provided to HEALTH CARE STAFF who work with INCARCERATED PERSONS housed in ISOLATION.** |
| |
| TOPIC 12[5] |
| **Training provided to CORRECTIONAL STAFF who are regularly assigned to work in ISOLATION units.** |

Q. How many hours of training do health care staff receive from ADCRR regarding working with people in isolation units?
A. I believe they're at right around 40 hours.
Q. 40 hours about isolation units?
A. No. Training in total.
Q. Okay. About how many of those 40 hours relate to working with people in isolation units?
A. **I don't have the specifics on the amount of time for that specific of an area.**

203:21-204:5

---

[4] *Id.*
[5] In the course of answering questions regarding the training provided to health care staff, Warden Van Winkle indicated that his responses related to both health care staff and correctional staff. Van Winkle Dep. 04: 6-13,05:14-19.

**TOPIC 13**

**CORRECTIONAL STAFF posts at each ISOLATION unit for each shift, including knowledge of post orders and daily job duties.**

**TOPIC 14**

**Required CORRECTIONAL STAFF levels for each ISOLATION unit for each shift, including current STAFFING SCHEDULES.**

(discussing the Priority Post Charts which set out "which posts are critical and which posts can be collapsed first"; *see* Van Winkle Dep.23:16-21)

Q. BY MS. MORRIS: Now I'm going to show to you the Lewis one which I find much more challenging. So we're looking at Exhibit1. All right. So Lewis puts all the different shifts on one page, as far as I can tell. So we go to the bottom of -- actually, can you tell me what document is?

A**. I haven't worked at Lewis. I am assuming this is their priority posting chart. They've got it broken down by shift and it looks like it goes from top to bottom like the other ones and -- well, maybe not. This is the first I've seen this document, ma'am. I apologize.**

225:5-15

**TOPIC 15**

**POLICIES AND PROCEDURES REGARDING the use of force or restraints by ADCRR staff on INCARCERATED PERSONS on MENTAL HEALTH WATCH, or on INCARCERATED PERSONS classified as SMI, MH- through MH-5, or any other mental health classification employed by the ADC or CENTURION while housed in ISOLATION.**

Q. …if we go to Section 4on the use of force in policy 804 there is Section 4.1.3.1 which talks about a cool-down period for people designated as SMI, right?

A. Yes, ma'am.

Q. Okay. This applies only to the use of force on a person with SMI in max custody, correct?

A. It does. However, we've implemented department- wide -- there's a directive that came down that we will treat all maximum custody inmates the same so that there's no foul-ups by staff as far as whether they're SMI or not, and we'll provide a cool-down period if we're going to utilize force -- planned use of force on a maximum custody inmate.

Q. **Has that been turned into a policy?**

A. **I don't believe it has.** That was a verbal direction that came down. I can't remember if it was from the assistant director at the time. It's been a while.

Q. Can you estimate how long it's been?

A. I want to say that that was when we had a different assistant director at the time. I believe it was division director at the time, Carson McWilliams.

Q. So how long ago are you talking about?

A. It was probably about three years ago maybe, three or four years ago.

Q. Is that right? It's about three years ago, you think?

A. Somewhere around there, yes, ma'am.

Q. But that has not, in three years since then, been reduced to any kind of written policy?

A. **Not that I'm aware of, ma'am.** The cool-down period in the policy is the one right here in front of us, number 804.

| |
|---|
| **230:3-231:10** |
| Q. … So does the cool-down period policy apply to other types of uses of force? |
| A. It is not written in this policy, but **I can tell you from experience at cell block Kasson** with the mental health inmates, if we have an inmate that mental health has deemed not appropriate to utilize chemical agents and we have to use a force cell team to remove that inmate from the cell, that inmate is going to be afforded a cool-down period so that we can attempt to negotiate him out of that cell without going in after him. |
| Q. But that's not in the policy? |
| A. No, ma'am, it's not. That's just sound correctional judgment. |
| |
| **232:4-21** |
| Q. Are there any other policies that relate to use of force on prisoners who are designated as MH-3? |
| A. **Not that I'm aware of,** no, ma'am. |
| |
| **233:19-21** |
| Q. Are there any other policies relating to the use of force on prisoners designated as MH-4, besides this one that we just looked at? |
| A. **Not that I'm aware of,** ma'am, no. |
| |
| **233:2-25** |
| Q. Are there any policies, besides the one that we just looked at, regarding the use of force on prisoners who are designated as MH-5? |
| A. **Not that I'm aware of.** No, ma'am. |
| |
| **234:1-4** |
| Q. Are there any policies and procedures relating to the use of force on prisoners who are on mental health watch? |
| A. **Not that I'm aware of.** No, ma'am. |
| |
| **234: 5-8** |
| Q. Are there any policies that allow for the use of chemical agents on a person who's self-harming? |
| A. **I am not sure about that, ma'am**. |
| |
| **234: 9-11** |
| Q. Are there any policies on the use of restraints on a person with an SMI in isolation? |
| MS. LOVE: Form and foundation. |
| THE WITNESS: **I'm not sure about that one, as well**, ma'am. |
| |
| **234: 12-16** |
| Q. Are there any policies regarding the use of restraints on persons designated as MH-3 when they're in isolation? |
| A. **Not that I'm aware of, ma'am**. |
| MS. LOVE: Form and foundation on that one, belated. |

234: 17-22

Q. BY MS. MORRIS: Are there any policies on the use of restraints on persons designated as MH-4 when they're in isolation?

MS. LOVE: Same objection.

THE WITNESS: **Not that I'm aware of,** ma'am.

234:23-235:2

Are there any policies on the use of restraints on persons designated as MH- when they're in isolation?

MS. LOVE: Same objection.

THE WITNESS: **Not that I'm aware of,** ma'am.

235:3-7

Q. BY MS. MORRIS: Are there any policies on the use restraints on persons on mental health watch?

MS. LOVE: Same objection.

THE WITNESS: **Not that I'm aware of,** ma'am.

235: 8-11

## Generally, Regarding Ability to Testify About Policies

BY MS. LOVE:

Q. When you were asked questions regarding whether there were any policies dictating use of chemical agent, use of force on inmates who are on mental health watch, and just in reviewing DO 804, I wanted to direct your attention to section 5 and see if that refreshes your recollection as to whether or not there is a provision in the policy as related to the use of chemical agents and a cool-down period on inmates who are in designated mental health units.

A. It does state that in 5.1.1.

BY MS. MORRIS

Q. So now that your lawyer has told you what to testify, you're able to testify to that?

A. It's in the policy, ma'am.

Q. **Are there any other things in the policies that you have neglected to tell me about when I asked if there are policies regarding different issues?**

A. **I do not have all the policies memorized, ma'am. So there is a possibility, yes.**

235:18-236:13

## Chart I-B

## Deposition Testimony of Warden Jeffrey Van Winkle, Rule 30(b)(6) Designee for Isolation, Directly Contradicted by Evidence[6]

| | |
|---|---|
| Q. …You just described several things get looked at to make that classification decision. Are there override options or override possibilities? <br> A. Initially, when somebody is coming in, that override criteria wouldn't be looked at until their 180-day review. <br> Q. Okay. Can you explain what you just said? <br> A. I'm sorry. I didn't mean to speak over you. <br> Q. That's okay. … based on their designation when they come in is where they would be placed. As they come into maximum custody, if they're designated max custody, the override wouldn't be looked at until we have a knowledge of what type of inmate that's going to be. So they would have to do time at a maximum custody before we would consider them for an override. <br> Q. Okay. My understanding is that a person who is sentenced to a life sentence that the policy requires them, regardless of what other things there are in their classification consideration, the first two years they are generally assigned to max custody; is that correct? <br> A. That is correct. So an inmate that comes in with a life sentence automatically has to do two years in maximum custody before they could be looked at to go to a lesser custody level. <br> Q. And is that considered an override, the fact that they must go to max custody, regardless of other factors in their classification process? <br> A. It wouldn't be considered an override. No, ma'am. <br><br> 16:7-17:20 | Pls. Ex. 1310, 61 of 82 (Appendix 3), Initial Custody Classification Scoresheet: setting out potential override reasons <br><br> Pls. Ex. 1309, p. 4, §3.3, 3.3.3: Including in the section on "Non-discretionary overrides" the requirement that a person must spend the first two years of a life sentence in maximum custody. |

---

[6] All citations are to the Transcript of Deposition of Warden Jeffrey Van Winkle pursuant to Rule 30(b)(6), September 24, 2021 unless otherwise noted.

| | |
|---|---|
| Q. Where is there a restricted status housing program?<br>A. We have restricted status housing at Browning unit at Eyman complex. We have restricted status housing at Lewis complex Rast unit. I'm not sure if there's a restricted status housing at the female facility. I'm not sure if that's there or not.<br><br>51:25-52:6 | Deposition of ASPC-Lewis Rast Dep. Warden Anthony Coleman, October 14, 2021, 16:21-23<br><br>Q. Okay. Do you have any restricted status housing programs at Rast?<br>A. No. |
| Q. . . . Are there any other statuses of people in max custody other than the ones that we've discussed?<br>A. No, ma'am. Not that I'm aware of.<br><br>80:19-21 | Testimony of Rahim Muhammad and Dustin Brislan regarding the mental health maximum custody unit at ASPC-Tucson Rincon.<br>Warden Van Winkle had not discussed mental health maximum custody units, other than the BMU at ASPC-Eyman Browning, which is a different type of maximum custody unit. |
| Q. Okay. In the intake unit at Eyman do people have a step level at that point?<br>A. I don't believe they start that step program until they're actually assigned to a unit.<br><br>81: 11-14 | Trial Testimony of ASPC-Eyman Browning Deputy Warden Travis Scott, Nov. 2, 2021 (Rough Transcript, 11/2/2021 pm, p. 87, 4:00:52)<br><br>Q. People are in step one in the intake unit, correct?<br>A. That's correct. |
| Q. How long does it take to review one inmate?<br>A. It could be very similar or it could involve several different documents.<br>Q. I'm looking for a time range.<br>A. It's a case-by-case basis, ma'am.<br>Q. Okay. Is it ever done in one minute?<br>A. It could be, sure.<br>Q. Okay. Does it ever take an hour?<br>A. I highly doubt it would ever take that long to determine an inmate's step level.<br>Q. Does it ever take half an hour?<br>A. I don't believe it would ever take that long, ma'am, no.<br>Q. Does it ever take minutes?<br>A. I don't believe it would take that long either, ma'am.<br>Q. What is the longest that you think would be within that sort of normal range for reviewing an individual's step progress? | Trial Testimony of ASPC-Eyman Browning Deputy Warden Travis Scott, Nov. 2, 2021 (Rough Transcript, 11/2/2021 pm, p. 108-109, 4:27:54-4:28:28)  (testifying that he performs 700 step level reviews over the course of approximately 360 minutes of meetings)<br><br>Deposition Testimony of ASPC-Eyman SMU I Deputy Warden Lori Stickley, October 12, 2021 (testifying that at Eyman SMU I, the the approximately 500 step reviews each month are done during the course of approximately 240 minutes of meetings)<br><br>Q. Can you tell me what the average max custody census, or roughly what the census for max custody at SMU is?<br>A. What do you mean by "census"?<br>Q. The number of people.<br>A. Oh, like the population?<br>Q. Yeah, yeah. |

| | |
|---|---|
| A. I would say anywhere between one to three or four minutes. And that's based on how many documents are involved and how many individuals are speaking on behalf or getting information on that particular inmate.<br><br>90:13-91:10 | A. So like in A08, I have, like, 300 -- I think like 354 right now. I'm trying to remember from Friday's numbers, because I don't work over the weekend. And then in A38, which is the max custody sex offenders, I want to say I have like 158-ish.<br><br>36:3-14<br><br>Q. Okay. You gave me the number of people that you think were in A08 and A38 and detention last Friday.  Are those fairly typical numbers?<br>A. Yes, it fluctuates, though. Really the only one that fluctuates a lot is statewide detention. The other numbers are pretty stagnant based off of sentence because there's really no other place. In the max custody facility, that's where they're at until they get out.<br><br>39:23-40:6<br><br>Q. When did those meetings happen?<br>A. Every Thursday.<br>Q. What time?<br>A. 12:00.<br>Q. And when do they go until?<br>A. Depending on how many inmates, it could go 30 minutes, it could go 45, it could go an hour, just depends on how many inmates, because we have to review 100 percent a month. So we break it up every week and so it just depends on -- and it depends on how lengthy the discussions go, and based off the inmates' discipline if -- or so -- or programming. So sometimes we have in-depth discussions and sometimes it goes very quick.<br><br>91:10-22 |
| Q. Okay. What out-of-cell time do people on mental health watch get?<br>A. Out-of-cell time for mental health watch would be designated by the mental health staff. So what they place on the watch order | Trial Testimony of ASPC-Eyman Browning Deputy Warden Travis Scott, Nov. 3, 2021 (Rough Transcript, 11/3/2021 pm) |

| | |
|---|---|
| for that particular inmate is what they would get. So if they deem the inmate is safe to go out to recreation and they designate that on the watch order, then security staff would accommodate that, take the inmate out for that recreation. So it would be based on what mental health staff agrees to.<br><br>139:9-18 | Q. This particular form that we're looking at indicates that the person on watch could have recreation, correct?<br>A. Correct.<br>Q. But at Browning you do not have the physical plant to allow most people on mental health watch to go to recreation, correct?<br>A. Correct.<br><br>101:9-15 |
| Q. …General population max custody, when they leave their cells, what are the procedures for them leaving the cell?<br>A. Max custody, general population, they would be strip searched to make sure they don't have any dangerous contraband on them, and depending on their step level will be restrained coming out of the cell. Step 3 inmates, they can come out unrestrained. And then at that point they're escorted to wherever they're going.<br><br>142:22-143:5 | Trial Testimony of ASPC-Eyman Browning Deputy Warden Travis Scott, Nov. 2, 2021 (Rough Transcript, 11/2/2021 pm, p. 90, 4:04:21-4:04:31)<br><br>Q. In all of those units, when people are removed from their<br>cells, they are handcuffed in back?<br>A. Yes. |
| Q. Are there any differences regarding escorting for people in enhanced management?<br>A. In enhanced I believe there has to be two officers present. And, again, depending on severity, there could potentially be a supervisor required as well.<br>Q. Do you know if that's all in the policy somewhere?<br>A. I am not sure if that is in the actual post order for that particular area or not.<br><br>145:7-15 | Trial Testimony of ASPC-Eyman Browning Deputy Warden Travis Scott, Nov. 2, 2021 (Rough Transcript, 11/2/2021 pm, p. 90, 4:04:31-4:04:44)<br><br>Q. In enhanced management, a person leaving their cell must be<br>escorted by two officers and a sergeant?<br>A. That's correct. |
| Q. Okay. What about for people in restricted status housing program? What are the procedures for them leaving their cells?<br>A. They're strip searched. The upper cuffs are placed, handcuffs are placed, and they're removed from the cell and taken to the destination.<br>Q. Okay. How many people have to escort someone in restricted status housing? | Trial Testimony of ASPC-Eyman Browning Deputy Warden Travis Scott, Nov. 2, 2021 (Rough Transcript, 11/2/2021 pm, p. 91, 4:05:14-4:05:36)<br><br>Q. Restrictive status housing program is another category of<br>maximum custody at Browning, correct?<br>A. Yes, ma'am. |

| | |
|---|---|
| A. That's a unit complex-wide, state-wide order that, if there are two inmates in the cell, two staff members will be present when the door is open.<br><br>Q. All right. But if there's only one person in the cell it would just be one officer?<br><br>A. Yes, ma'am.<br><br>146:11-24 | Q. Restrictive status housing program, a person leaving their cell must be escorted by two officers?<br><br>A. Yes, ma'am.<br><br>Q. In restrictive status housing program, each time a person leaves the cell, they are restrained with leg irons, handcuffs, and handcuffs in back, correct?<br><br>A. Yes, ma'am. |
| Q. If a person has got something like a towel hanging up in their cell to dry, and is, therefore, not in compliance, is that considered a refusal?<br><br>A. No. That would potentially lead to a disciplinary ticket for 7 compliance, but if the inmate says they want to go to rec, then I don't know why a towel hanging in their cell would constitute a refusal, no.<br><br>174:8-14 | Doc. 4130, Written Testimony of Martin Horn, ¶ 147, photograph of a sign posted at ASPC-Lewis Rast, reading:<br>"Beginning 06/01/2020, All Inmates and their Cells shall be in 704 Compliance before Inmates will be allowed to go to Recreation. Also, the Inmates will be awake and ready to exit the cell when the officers arrive.  Failure to be in compliance, or failure to be ready to submit to the strip search or any unreasonable delay once the officer arrives will be considered a refusal of Recreation and will be documented on the DO812 forms as such." |