# EXHIBIT 1

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-ROS <br><br> **DEFENDANTS' TWELFTH SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS** |

## GENERAL OBJECTIONS

The Stipulation has been rescinded and the Court's approval of it vacated. (Dkt. 3921 at 37.) The case will proceed to trial on "Plaintiffs' claims in the original complaint that the delivery of health care and housing in isolation amount to constitutional deprivations in violation of the Eighth Amendment." (*Id*. at 2.) Thus, while documentation regarding compliance with the Stipulation may be discoverable, because the Stipulation's Performance Measures exceed constitutional minimums, it is not the standard Defendants will be held to at trial. Instead, Plaintiffs must prove Defendants violated their Eighth Amendment rights.

OBJECTION:   None. *See* monthly reports showing all off-site emergency department visits or hospitalizations from January 1, 2020 to the present produced ~~herewith~~ at ADCRR00000352-355, ADCRR00000487-522, ADCRR00000639-640, ADCRR00000713-715, ADCRR00000773-775, ADCRR000910-21948, ADCRR00021977-42498 and ADCRR00056128-56129.

**REQUEST NUMBER 19:**  DOCUMENTS SUFFICIENT TO SHOW, for all class members who are not fluent in English, each class member's name and ADC number, primary language, ASPC and LOCATION UNIT, and whether and how language interpretation was provided for all HEALTH CARE encounters from April 1, 2021, through the date of the report.

OBJECTION:  Overbroad and unduly burdensome as responding to this request would require an individual review of each inmate's file who requested interpretation services for an over six-month period.

Without waiving objections, *see* Interpretative Services Utilization Report for January 2020 through August 2021 produced ~~herewith~~ at ADCRR00059616-60923.

**REQUEST NUMBER 20:**  MENTAL HEALTH WATCH logs for each ASPC's watch unit(s) and any other housing location used to observe patients on MENTAL HEALTH WATCH, from January 1, 2020, to the present.

OBJECTION:  None. *See* Mental Health Watch logs for each ASPC watch unit and other housing locations from January 1, 2020 to the present produced ~~herewith~~ at ADCRR00060924-61538.

**REQUEST NUMBER 21:**  For each ASPC, DOCUMENTS SUFFICIENT TO SHOW, for the period from January 1, 2020, to the present, the number of people placed on MENTAL HEALTH WATCH, the total number of days for each person was placed on MENTAL HEALTH WATCH, and the mean, median and maximum duration length of stay on MENTAL HEALTH WATCHES.

OBJECTION:  This request is overbroad, unduly burdensome, and not proportional to the needs of the case as it would require an individual review of every inmate's file (many

of whom may have been on watch multiple times during a month) who was placed on watch for a nearly two-year time period and would require Defendants to create a document which Rule 34 does not require.  Without waiving these objections, *see* Defendants' Response to Request for Production 21.

**REQUEST NUMBER 22:**  Monthly CGAR reports (*see* Request Number 2) in Microsoft Excel format, from January 2020, to the present.

OBJECTION:  Defendants object to re-producing these documents in Microsoft Excel as the documents are not natively maintained in that format.    Producing CGAR reports in Microsoft Excel would unduly burden Defendants as they would have to manually create a document for Plaintiffs, which Rule 34 does not require.  For these reasons, this request is not proportional to the needs of the case. The request is further unduly burdensome and not proportional because it is duplicative of Request No. 2.  Indeed, "a party need not produce the same electronically stored information in more than one form." Fed.R.Civ.P. 34(b)(2)(E)(iii).

Without waiving objections, *see* CGAR Reports for the period of January 2020 to the present produced natively ~~herewith~~ at ADCRR00069766-69935. *See also* CGARs for June 2021 produced in native format ~~herewith~~ at ADCRR00136030-136542.

**REQUEST NUMBER 23:** Monthly HEALTH CARE staffing variance reports (*see* Request Number 4) in Microsoft Excel format, from January 1, 2020, to the present.

OBJECTION:   To the extent Plaintiffs request that Defendants produce this document in a different format than Microsoft Excel in response to Request No. 4, Defendants object as they are not required to produce the same electronic document in more than one form.   Fed.R.Civ.P. 34(b)(2)(E)(iii).

Without waiving objections, *see* Variance Reports for May through July 2021 produced in native format ~~herewith~~ at ADCRR00069737-69739. *See also* Variance Report for August 2021 produced in native format ~~herewith~~ at ADCRR00137140.

whether chemical agent use of force was utilized on this inmate while designated as maximum custody classification. Without waiving objections, *see* documents and videos relating to the use of force on Rahim Muhammad produced at ADCRR00159227-00159982. *See also* additional use of force videos produced at ADCRR00172353-172369.

DATED this 22nd day of October, 2021.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/ Daniel P. Struck
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Defendants*

23

# EXHIBIT 2

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE UNCERTIFIED [1]

1    November 5 2021, resuming direct examination of Dr. Platt

2    1:06 PM

3    Q.   (BY MS. KENDRICK)  Hi, Dr. Platt.  I wanted to follow up on

4    I was asking you before lunch about some of the hiring

5    positions the positions you hired what are the qualifications

6    to be a men till health lead at the prison?

7    A.   You must be a licensed mental health clinician so holding a

8    master's degree or higher.

9    Q.   What are the reasons you left Centurion?

10   A.   Although I loved the role in and of itself, the job itself,

11   the role, and felt initially it afforded me the opportunity to

12   effect positive change on a grander level, I no longer felt I

13   could -- had the ability to continue creating and effecting

14   positive changes with the barriers and resource -- resources I

15   didn't have at that time.

16   Q.   And what are the barriers to resource that is you're

17   referencing specifically?

18   A.   Financial resources to help with staff retention, bonuses

19   for staff coverages for shifts of an amount that staff felt to

20   be incentive advising, office space, you know, various things

21   of that nature.

22   Q.   Any other reasons?

23   A.   Yes.  Just communication concerns, operating in silos,

24   various things.

25   Q.   And you're now working in private practice?

UNITED STATES DISTRICT COURT

CROSS-EXAMINATION

1      THE WITNESS:  From my recollection, from June of 2020

2  through June of 2021, there was a 75 percent reduction of

3  self-harm ER send-outs.

4  Q.  (BY MS. HESMAN)  And another initiative that you worked on

5  in conjunction with Dr. Stallcup was bettering the quality of

6  patient care, right?

7  A.  Correct.

8  Q.  And improving documentation?

9  A.  Correct.

10  Q.  Improving interventions utilized?

11  A.  Correct.

12  Q.  Improving knowledge of interventions?

13  A.  Correct.

14  Q.  Improving treatment planning?

15  A.  Correct.

16  Q.  And who is Dr. Stallcup?  What is her title?

17  A.  The Mental Health Director for the Department of

18  Corrections, I believe.

19  Q.  And you two would bounce ideas off each other to ensure you

20  were on the same page, right?

21  A.  Yes.

22  Q.  In addition to reduction of self-harm numbers by 75

23  percent, you testified in your deposition that suicide watches

24  and length of stay on watch also drastically decreased,

25  correct?

CROSS-EXAMINATION

1   A.  Correct.

2   Q.  Explain that a little bit please.

3   A.  We would monitor the suicide watch numbers for length of

4   stay.  We started collecting data on that to ensure that we

5   were highly attentive to people that were on watch for more of

6   a prolonged period of time.  We implemented plans to have

7   several stages of treatment plans, several tiers of individuals

8   that would oversee the treatment plans, review them, contribute

9   to them, and thus have something very individualized and more

10  complex that was developed to help with preventive care for

11  individuals that were feeling suicidal or possibly

12  self-injurious, things like that.

13  Q.  And the two of you also implemented a tracking for

14  individuals who stayed on suicide watch for more than 14 days,

15  right?

16  A.  The regional mental health team with Centurion implemented

17  that, but Dr. Stallcup from my recollection was in support.

18  Q.  And the purpose of that was to continuously review those

19  individuals who were on Sue suicide watch for 14 days or longer

20  so that you can create more robust treatment plans, right?

21  A.  Correct.  To just ensure that we were tracking and doing

22  whatever we could to be preventive of anyone staying on a

23  suicide watch for a prolonged period of time.

24  Q.  And in doing that in creating the more robust treatment

25  plans for individuals on suicide watch for 14 days or longer,

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE UNCERTIFIED [17]

REDIRECT EXAMINATION

1   A.  Yes.

2   Q.  And that you've had the privilege to work on meaningful

3   corporate projects with outstanding leaders?

4   A.  Correct.

5   Q.  And that it's your hope that this -- that the positivity

6   can be reaped within the Department for years to come, correct?

7   A.  The positivity from some of the changes I put into place,

8   yes.

9   Q.  Correct.

10          MS. HESMAN:  If I could have a moment, please, Your

11  Honor.

12          Nothing further.  Thank you.

13          THE COURT:  Redirect.

14                       REDIRECT EXAMINATION

15  BY MS. KENDRICK:

16  Q.  Dr. Platt, you stated that you started collecting the data

17  tracking the length of stay of persons on suicide watch.  What

18  was the average length of stay on suicide watch at the time you

19  left?

20  A.  I honestly do not recall the time -- what the length of

21  stay was at that time.

22  Q.  And in tracking this was it broken down by prison?

23  A.  Yes, it was.

24  Q.  And when did Centurion start check the length of stay?

25  A.  My best estimate would be fall, winter of 2020.

UNITED STATES DISTRICT COURT

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE UNCERTIFIED[18]

REDIRECT EXAMINATION

1  Q.  What exactly -- how was this tracked?  Was it an excel

2  spreadsheet?  How did you collect this data?

3  A.  A spreadsheet pulled from our suicide watch logs, the

4  suicide watch logs contain information of when someone has

5  started their suicide watch, so a spreadsheet that pulled those

6  pieces of data from all of the prisons that the regional

7  behavioral health technician managed.

8  Q.  And did it require going into each patient's individual

9  medical record and manually reviewing how long they had been

10  suicide watch?

11  A.  That did not as it was on an excel trackers for the suicide

12  watch logs and pulled from those.

13  Q.  And you stated when Ms. Hesman was questioning you that

14  your staffing concerns were partially rooted in the court order

15  regarding the length of encounters.  What are the other

16  concerns that caused or the other problems that caused staffing

17  concerns, because you said partially implying there are other

18  things.

19  A.  Sure.  In that we could not meet court standards by the

20  analysis I spoke of -- spoke to earlier, that's the part that

21  we didn't have enough staff to hit those measures.  However, in

22  a perfect world, we would have more staff available so that we

23  could provide longer sessions, better you know different levels

24  of care, have smaller case loads, those kind of things which

25  would give space and time to allow for more treatment team

# EXHIBIT 3

| | |
|---|---|
| **From:** | Ashlee Hesman |
| **To:** | David Fathi; StruckLoveParsonsTeam |
| **Cc:** | Parsons Trial |
| **Subject:** | RE: Plaintiffs" RFP 21 - length of stay on suicide watch |
| **Date:** | Wednesday, November 10, 2021 6:18:00 PM |

David,

Defendants have produced documents that are "sufficient to show" the information requested in RFP 21.  The additional documents Dr. Platt referenced in her deposition and trial testimony are not responsive to Plaintiffs' request.

Thanks,

Ashlee

**From:** Ashlee Hesman
**Sent:** Wednesday, November 10, 2021 6:52 AM
**To:** David Fathi <dfathi@aclu.org>; StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>
**Cc:** Parsons Trial <ParsonsTrial@aclu.org>
**Subject:** RE: Plaintiffs' RFP 21 - length of stay on suicide watch

Hi David,

We believe we have satisfied our obligations with respect to responding to Plaintiffs' RFP 21, but I will have a formal response to you later today.

Thanks,

Ashlee

**From:** David Fathi <dfathi@aclu.org>
**Sent:** Tuesday, November 9, 2021 2:38 PM
**To:** StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>
**Cc:** Parsons Trial <ParsonsTrial@aclu.org>
**Subject:** Re: Plaintiffs' RFP 21 - length of stay on suicide watch

Counsel:

May we please have a response to this request?

Thank you.

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor

Washington, DC  20005
(202) 548-6603
dfathi@aclu.org
@DavidCFathi
Pronouns: he, him, his

*Not admitted in DC; practice limited to federal courts

---

**From:** David Fathi <dfathi@aclu.org>
**Sent:** Monday, November 8, 2021 11:34 AM
**To:** StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>
**Cc:** Parsons Trial <ParsonsTrial@aclu.org>
**Subject:** Plaintiffs' RFP 21 - length of stay on suicide watch

Counsel:

In their Request for Production No. 21 (attached), Plaintiffs sought:

"For each ASPC, DOCUMENTS SUFFICIENT TO SHOW, for the period from January 1, 2020, to the present, the number of people placed on MENTAL HEALTH WATCH, the total number of days for each person was placed on MENTAL HEALTH WATCH, and the mean, median and maximum duration length of stay on MENTAL HEALTH WATCHES."

Defendants responded:

"OBJECTION: This request is overbroad, unduly burdensome, and not proportional to the needs of the case as it would require an individual review of every inmate's file (many of whom may have been on watch multiple times during a month) who was placed on watch for a nearly two-year time period and would require Defendants to create a document which Rule 34 does not require. Without waiving these objections, see Defendants' Response to Request for Production 21 [sic]."

The documents produced in response to RFP 20 were "Mental Health Watch logs for each ASPC watch unit and other housing locations from January 1, 2020 to the present."

However, on November 5, Dr. Platt testified that ADCRR and Centurion began tracking length of stay on suicide/mental health watch in November or December 2020.  Thus, it appears that documents responsive to Plaintiffs' RFP 21 existed at the time of Defendants' response.

Please produce all documents responsive to RFP 21 no later than Friday, November 12, so that they are available for cross-examination of Defendants' witnesses the week of November 15.

Thanks very much.

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@aclu.org
@DavidCFathi
Pronouns: he, him, his

*Not admitted in DC; practice limited to federal courts

This electronic mail transmission contains information from the law firm Struck Love Bojanowski & Acedo, PLC that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

# EXHIBIT 4

# (REDACTED)

Florence Watches 07-2021 Randomized

| Status | Date | ADC | Name | On | Off |
|---|---|---|---|---|---|
| | | | | 07/06/21 | 07/12/21 |
| | | | | 06/01/21 | 06/08/21 |
| BACK ON WATCH | 06/10/21 | | | 06/04/21 | 06/07/21 |
| BACK ON WATCH | 06/21/21 | | | 06/10/21 | 06/14/21 |
| BACK ON WATCH | 07/02/21 | | | 06/21/21 | 06/24/21 |
| BACK ON WATCH | 07/15/21 | | | 07/02/21 | 07/12/21 |
| | | | | 07/15/21 | |
| BACK ON WATCH | 07/14/21 | | | 07/08/21 | 07/12/21 |
| | | | | 07/14/21 | 07/19/21 |
| | | | | 06/18/21 | 06/24/21 |
| BACK ON WATCH | 06/20/21 | | | 06/04/21 | 06/08/21 |
| | | | | 06/20/21 | 07/08/21 |
| BACK ON WATCH | 07/13/21 | | | 06/28/21 | 07/07/21 |
| | | | | 07/13/21 | |
| BACK ON WATCH | 06/25/21 | | | 06/06/21 | 06/08/21 |
| | | | | 06/25/21 | 06/28/21 |
| | | | | 06/10/21 | 06/15/21 |
| | | | | 05/29/21 | 06/07/21 |
| | | | | 07/10/21 | 07/14/21 |
| BACK ON WATCH | 06/16/21 | | | 05/22/21 | 06/07/21 |
| TRANSFERRED OUT | 07/13/21 | | | 06/16/21 | 07/13/21 |
| BACK ON WATCH | 07/03/21 | | | 06/16/21 | 06/28/21 |
| BACK ON WATCH | 07/24/21 | | | 07/03/21 | 07/12/21 |
| | | | | 07/24/21 | |
| | | | | 07/10/21 | 07/14/21 |
| BACK ON WATCH | 07/19/21 | | | 07/09/21 | 07/15/21 |
| | | | | 07/19/21 | 07/21/21 |
| BACK ON WATCH | 06/18/21 | | | 06/06/21 | 06/14/21 |
| | | | | 06/18/21 | 06/22/21 |
| BACK ON WATCH | 06/19/21 | | | 06/14/21 | 06/16/21 |
| | | | | 06/19/21 | 06/29/21 |
| | | | | 06/01/21 | 06/07/21 |
| BACK ON WATCH | 07/29/21 | | | 07/14/21 | 07/21/21 |
| | | | | 07/29/21 | |
| | | | | 07/20/21 | 07/27/21 |
| | | | | 06/25/21 | 06/29/21 |
| | | | | 06/03/21 | 06/08/21 |
| | | | | 06/28/21 | 07/19/21 |
| TRANSFER OUT | 06/10/21 | | | 06/05/21 | 06/09/21 |
| TRANSFER IN | 06/14/21 | | | 06/11/21 | 06/14/21 |
| | 07/13/21 | | | 06/21/21 | 06/23/21 |
| BACK ON WATCH | 07/26/21 | | | 07/13/21 | 07/19/21 |
| | | | | 07/26/21 | |
| | | | | 07/20/21 | 07/22/21 |
| | | | | 06/05/21 | 06/11/21 |

| | | | | |
|---|---|---|---|---|
| BACK ON WATCH | 07/07/21 | ███ | 06/14/21 | 06/28/21 |
| BACK ON WATCH | 07/15/21 | | 07/07/21 | 07/14/21 |
| | | | 07/15/21 | 07/27/21 |
| | | | 06/19/21 | 06/23/21 |
| BACK ON WATCH | 06/09/21 | | 06/02/21 | 06/08/21 |
| BACK ON WATCH | 06/21/21 | | 06/09/21 | 06/15/21 |
| BACK ON WATCH | 07/08/21 | | 06/21/21 | 06/28/21 |
| | | | 07/08/21 | 07/14/21 |
| | | | 07/08/21 | 07/15/21 |
| | | | 06/04/21 | 06/07/21 |
| | | | 05/11/21 | |
| | | | 06/08/21 | 06/11/21 |
| BACK ON WATCH | 06/27/21 | | 06/19/21 | 06/24/21 |
| BACK ON WATCH | 07/02/21 | | 06/27/21 | 07/01/21 |
| BACK ON WATCH | 07/13/21 | | 07/02/21 | 07/08/21 |
| TRANSFERRED OUT | 07/22/21 | | 07/13/21 | 07/22/21 |
| | | | 05/25/21 | 06/22/21 |
| | | | 07/14/21 | 07/19/21 |
| TRANSFERRED OUT | 06/21/21 | | 06/14/21 | 06/16/21 |
| | | | 06/02/21 | 06/10/21 |
| | | | 07/19/21 | 07/26/21 |
| BACK ON WATCH | 07/14/21 | | 07/02/21 | 07/12/21 |
| BACK ON WATCH | 07/23/21 | | 07/14/21 | 07/21/21 |
| | | | 07/23/21 | 07/26/21 |
| | | | 06/14/21 | |
| | | | 06/16/21 | 07/28/21 |
| | | | 06/10/21 | 06/14/21 |
| | | | 07/25/21 | 07/27/21 |
| BACK ON WATCH | 06/26/21 | | 06/01/21 | 06/07/21 |
| | | | 06/26/21 | 06/30/21 |
| | | | 06/28/21 | 07/06/21 |
| BACK ON WATCH | 06/25/21 | | 06/18/21 | 06/21/21 |
| | | | 06/25/21 | 06/29/21 |
| BACK ON WATCH | 07/05/21 | | 06/22/21 | 06/29/21 |
| BACK ON WATCH | 07/21/21 | | 07/05/21 | 07/12/21 |
| | | | 07/21/21 | 07/28/21 |
| TRANSFERRED OUT | 06/08/21 | | 06/03/21 | 06/07/21 |
| | | | 06/02/21 | 06/09/21 |
| TRANSFERRED OUT | 07/22/21 | | 07/15/21 | 07/22/21 |
| BACK ON WATCH | 07/27/21 | | 07/13/21 | 07/26/21 |
| | | | 07/27/21 | |
| TRANSFER IN | 07/08/21 | | 07/08/21 | 07/07/21 |
| TRANSFERRED OUT | 06/10/21 | | 06/04/21 | 06/07/21 |

# EXHIBIT 5

# In The Matter Of:

*Parsons vs.*

*Shinn*

*Stefanie Platt, PsyG*

*October 15, 2021*

*Glennie Reporting Services, LLC*

*1555 East Orangewood Avenue*

*Phoenix, Arizona  85020*

*602.266.6535 Office     877.266.6535 Toll Free*

*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 101521 SP.txt

**Min-U-Script®**

109

1    at least one day that trial won't occur during that time

2    frame.  But are you, generally speaking, available during

3    that time frame if you are to be called?

4        A.   Generally I'm out of town for part of that.  But

5    generally I'm available earlier in November, mostly

6    Fridays.  My schedule's fairly stacked Monday through

7    Thursday.

8        Q.   Sure.  Earlier you testified that part of your

9    role as the regional mental health director involved

10   improving the quality of care for inmates.  What are some

11   of the things that you did in that role to improve the

12   quality of care for inmates?

13       A.   I created a -- well, regional mental health team

14   created a suicide prevention committee that was to meet

15   every week.

16            We created -- I promoted a culture whereby

17   creating comprehensive individualized treatment planning

18   was important, advised that individuals needed to conduct

19   creating treatment plans in every crisis, every mental

20   health encounter that was proposed as a crisis.

21   Anyone that is self-harming multiple times, things of

22   that nature.

23            Had staff complete multiple trainings to assist

24   them in their treatment of patient populations where I

25   saw needs in -- in our training.  And a variety of

1    things.

2         Created and started tracking the watches and

3    looking at anyone that's been on watch for an extended

4    period of time.  Looked at creating and devising plans on

5    how to reduce their acuity and their mental health needs.

6         Really took a direction to reduce self-harm and

7    to reduce the number of suicide watches, the length of

8    suicide watches by trying a more preventive model

9    approach.

10   Q.   And you mentioned some of the trainings that you

11   implemented for staff.  What were some of the topics that

12   those trainings covered?

13   A.   Deescalation as stated, borderline personality

14   disorder, suicide prevention, various topics on that.

15        Reviewing CQI studies and information from a

16   corporate level for self-harming behaviors.  Behavioral

17   treatment planning.  Diagnostic and assessment skills and

18   tools.

19        Gosh, there's lots.  Antisocial personality

20   disorder.  There were a plethora of them over a period of

21   time.

22   Q.   Yeah, it does seem like a lot.  What other

23   changes were you -- did you implement during your time?

24   A.   Those I think would be the prime -- we

25   restructured our regional mental health team to create a