Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-ROS<br><br>**EXPERT TRIAL DECLARATION OF JOSEPH V. PENN, MD CCHP FAPA** |

I, Joseph V. Penn, make the following Declaration:

1.      I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.      Since 2013 I have served as Defendants' mental health expert in this matter. This litigation involves the Arizona Department of Corrections Rehabilitation & Reentry ("ADCRR") and inmates who brought the following claims: Unconstitutional Conditions of Confinement, Access to and Provision of Clinically Appropriate and Individually Determined Mental Health Evaluation and Treatment Services, Mental Health Intake Health Screening and Procedures, Mental Health and Psychiatric Evaluation and Treatment Services, Other Mental Health Policies and Procedures, Mental Health and Psychiatric

Staffing, Suicide Prevention Policy and Procedures, Audits and Compliance Reports, Access to Mental Health and Psychiatric Care.

3. Beginning in 2013 I have toured numerous Arizona state prison "corridor" facilities (facilities with inmates on psychotropic medications, on the mental health caseload, or receiving mental health services). I have also focused several tours to examine unit watch cells (inmates placed on and undergoing suicide watch precautions), inmates housed in restrictive housing units, and various specialty programs for inmates with medical and mental health needs.

4. During my service as an expert in this matter, I have prepared numerous reports and declarations, which are incorporated here by reference.

5. The following comprehensive assessment of the mental health and psychiatric services provided within ADCRR under the current contracted health care provider, Centurion, was conducted at the request of Defendants for a more current independent forensic and correctional psychiatric review of the current mental health practices, intake health screening and procedures, mental health and psychiatric evaluation and treatment services, psychotropic medications, policies and procedures, staffing, suicide prevention policy and procedures, audits and compliance reports, medical records and other documents with an emphasis on state inmates' access to mental health and psychiatric care.

6. Although my attached Curriculum Vitae (Exhibit 1) includes additional details of my education and experience, as well as a list of all my publications, a summary of my most relevant qualifications follows.

7. I am a psychiatric physician based in Conroe, Texas. I am triple board-certified in forensic psychiatry, general psychiatry, and child and adolescent psychiatry. All of these boards are under the American Board of Psychiatry and Neurology (ABPN); this is a member board of the American Board of Medical Specialties (ABMS) that grants board certification for psychiatrists and neurologists in the United States. I am fully licensed as a health care professional, specifically as a medical doctor (M.D.), to practice medicine in Texas. I specialize in correctional medicine, specifically, correctional psychiatry. I have

2

1   devoted most of my professional time in the past 20-plus years in both the practice and in

2   the teaching of general adult, child and adolescent, and forensic and correctional psychiatry.

3       8.     I have served in a variety of capacities as a forensic psychiatrist expert witness,

4   in civil matters involving jails, prisons and other correctional and forensic psychiatry and

5   community settings. I have been retained in civil matters as a court appointed expert,

6   plaintiff's expert, and defense expert; and in criminal matters as a prosecution expert,

7   defense expert, and a court appointed expert. I am committed to honesty and to strive for

8   objectivity throughout my correctional and forensic psychiatric work.

9       9.     I attended medical school at the University of Texas Medical Branch (UTMB),

10  Galveston, Texas, graduating in 1992. I completed three residency and fellowship training

11  programs for a total of seven years of specialty/subspecialty residency training – four years

12  of general psychiatry in 1996 at Brown University, Providence, Rhode Island, two years of

13  child and adolescent psychiatry in 1998 at Brown University, Providence, Rhode Island,

14  and one year of forensic psychiatry, at Yale University, New Haven, Connecticut, in 1999.

15      10.    For more than two decades, I have dedicated my career to clinical and

16  administrative work    within correctional settings. Since 1999 I have focused my clinical,

17  administrative, and forensic work within correctional settings including detention facilities,

18  jails, and prisons. Additionally, I have achieved and maintained specialized certification as

19  a Certified Correctional Health Professional-Mental Health (CCHP-MH) since 2004,

20  approximately 17 years, by the National Commission on Correctional Health Care

21  (NCCHC). This requires passing of a written national examination, demonstration of

22  proficiency in national correctional health standards, annual attestation of continuing

23  medical education credits, full medical licensure without restrictions, and annual re-

24  certification.

25      11.    I remain current in the evaluation, diagnosis, and treatment of individuals

26  within both correctional, forensic and non-correctional non-forensic settings as

27  demonstrated by my national board re-certification and maintenance of certification within

28  general, child and adolescent, and forensic psychiatry. I remain knowledgeable in clinical

3

and administrative psychiatry and systems of care issues within non-correctional settings through my leadership work at the national and state level within the American Academy of Psychiatry and the Law (AAPL), American Psychiatric Association (APA), Texas Society of Psychiatric Physicians (TSPP) the state district branch of the APA, the American College of Psychiatrists, and through other medical and psychiatric organizations.

12.     Since 2008, I have served as the Director of Mental Health Services for UTMB Correctional Managed Care (CMC). This is the division within UTMB that provides health care across a variety of correctional settings. In this capacity, I oversee the provision of psychiatric, psychological, and mental health services to approximately 80% (approximately 110,000 adult offenders) of the entire Texas state jail and state adult prison population housed within the Texas Department of Criminal Justice (TDCJ) facilities statewide. I also oversee the delivery of psychiatric services to approximately 800 youths housed statewide within state juvenile correctional institutional facilities (referred to as state schools) and halfway houses within the Texas Juvenile Justice Department (TJJD). I also oversee the delivery of psychiatric services to several county jails and short-term detention facilities in Texas (this is described in more detail below).

13.     In my administrative role, I oversee approximately 315 mental health staff including psychiatrists, psychologists, mental health managers and clinicians, case managers, psychiatric nurse practitioners, psychiatric physician assistants, and other mental health professionals and student trainees across the state. I provide both clinical and administrative support, oversight, quality assurance, supervision, and leadership. I review and co-sign at least 10 percent of charts of psychiatric nurse practitioners and physician assistants that I directly supervise. Also, I conduct peer reviews of psychiatrists and mid-level psychiatric providers. Frequently, I provide clinical support, prescribe, order, reorder or adjust psychotropic medications and provide other behavioral treatment recommendations to treatment staff.

4

14.     Periodically, I evaluate TDCJ and TJJD patients in person or via telepsychiatry at a variety of locations. Also, I participate in systemwide on- call duties. Further, I assist with direct patient care as needed.

15.     As detailed in my CV, I previously served as the acting clinical director (lead psychiatrist) on different occasions, and oversaw the care of more than 500 crisis management, diagnostic and evaluation treatment track inmate patients admitted to two dedicated inpatient psychiatric prison units, further detailed in my CV. These inmates were housed at two of three TDCJ dedicated psychiatric inpatient/behavioral health units located in Texas. As opposed to inmates with serious mental illness, the crisis management inmates for whom I oversaw care had been determined by an outpatient unit based Qualified Mental Health Professional ("QMHP") to   be at imminent risk of significant self-injury or suicide, or their mental health needs could not be managed at their assigned outpatient unit.

16.     I am routinely involved in the referral, acceptance, and admission and transfers or discharges of inmate patients within the state's three dedicated TDCJ inpatient psychiatric prison units. When needed, I also consult and oversee the evaluation and management of particularly complicated patients across TDCJ outpatient units, TDCJ inpatient/behavioral health prison units, and medical/psychiatric inpatients housed in TDCJ medical infirmary prison units or within our specialty medical surgical hospital, a maximum security prison unit, Hospital Galveston (HG), on the grounds of the UTMB academic medical center, medical school and other UTMB complex hospitals in Galveston, Texas. (HG is the only one of its type in the United States.)

17.     I obtained hospital privileges at a local community hospital where we transferred nursing home level of care state prison patients. This facility lacked a consulting psychiatrist; accordingly, I stepped in and oversaw the patients' psychotropic medication treatment and provided onsite and telephonic consultation to the patients' treatment hospitalist and other medical teams when patients demonstrated agitation, confusion, or other changes in mental status.

18.     I have approximately 13 years of clinical and administrative experience in the provision of psychiatric services and psychotropic medication treatment within state jails and state prisons, county jails, short-term Substance Abuse Felony Punishment treatment programs (SAFPs) and short-term Intermediate Sanction Facilities (ISFs) across Texas. I also have expertise in the evaluation and treatment services that are provided to adult state inmates who are identified as requiring substance abuse treatment and may have comorbid mental disorders. I have additional recent experience in the provision of short-term mental health and psychiatric treatment and management for undocumented migrant detainees with pending state charges. Lastly, I had previous oversight of on-site psychiatric and mental health services that UTMB CMC previously provided at four Federal Bureau of Prison (FBOP) units in Beaumont, Texas, and two county jails, specifically the Galveston County Jail, Galveston, Texas and Brazoria County Jail in Angleton, Texas.

19.     I have extensive experience in examining access to care and continuity of care. I perform psychiatric evaluations and suggest treatment approaches to mitigate possible mental health sequelae for certain juveniles and adult inmates in restrictive housing settings. I am familiar with mental health and psychiatry best practices to include suicide prevention policies and practices within juvenile and adult correctional settings nationally. I presented at an American Correctional Association meeting regarding the development and implementation of three mental health diversion treatment programs for inmates previously in restrictive housing settings in the Texas state prison system. I also published and presented in the areas of correctional mental health care and suicide prevention at state, national, and international meetings (this is detailed in my CV).

20.     I have extensive experience in the evaluation and treatment of incarcerated juveniles and adults with ADHD, disruptive behavior disorders, impulse control disorders, severe self- harming and self-mutilating behaviors, intellectual developmental disorders and neurocognitive disorders (including head injuries, dementia, and other neurocognitive disorders). I oversee two state prison developmental disabilities sheltered housing programs, the Hodge DDP program which houses approximately 600 male and the Valley Crain

satellite DDP program which houses approximately 100 female state prisoners identified with possible intellectual developmental disorders and/or adaptive functioning impairments.

21.     I have served on several national task forces and committees and have published on the use of psychotropic medications within correctional settings. I am involved in the oversight of state prison, county jail, and juvenile correctional disease management guidelines (DMGs), clinical protocols, decision-making regarding psychotropic medications and treatment protocols, formulary and non-formulary approval of psychotropic medications and psychiatric evaluation and treatment of individuals with serious mental illness (such as schizophrenia and other psychotic disorders) and also depressive disorders, ADHD, disruptive behavior disorders, and PTSD and anxiety disorders. As a result, I maintain a current clinical knowledge of the unique mental health needs individuals with serious mental illness such as psychotic disorders (e.g., schizophrenia, schizoaffective disorder and other psychotic disorders), bipolar disorders, severe depressive disorders, and personality disorders, and those with co-occurring substance disorders across a variety of correctional settings. In my clinical role, I perform both on-site and telepsychiatric evaluations and treatment management of high profile and more complicated patient offenders within our juvenile and adult correctional systems statewide.

22.     I currently serve on the Executive Operations Council of UTMB CMC, the Pharmacy and Therapeutics Committee (I am a past Chair), other Joint UTMB CMC and TDCJ Health Services and other Joint UTMB CMC and TJJD committees, and various other local, state, and national committees that are detailed in my CV. I was recently re-appointed as the Chair of the Joint Mental Health Work Group, and Co-Chair of the Gender Dysphoria Work Group. This demonstrates my knowledge and direct interaction regarding the provision of psychiatric and mental health care to incarcerated state inmate patient and various special populations.

23.     I have been appointed to councils, committees, work groups, task forces, and made numerous national and international contributions for example the American

7

Psychiatric Association (APA), American Academy of Child and Adolescent Psychiatry (AACAP), American Academy of Psychiatry and the Law (AAPL), and even within two non-psychiatrist led organizations, for example, the International Association for Correctional and Forensic Psychology (IACFP), and the American College of Correctional Physicians (AACP) (formerly known   as the Society of Correctional Physicians (SCP)). I served as an appointed member of the APA Council on Psychiatry and Law, which reviews law and psychiatry issues pertaining to correctional and community settings, and as past chair of the APA Council on Children, Adolescents and Their Families.

24.     I have published extensively in scientific journals and other peer reviewed publications in the areas of correctional patient care, correctional psychiatry and mental health, incarcerated individuals with mental health and substance abuse issues, mental health needs of geriatric inmates and other special populations, recidivism and continuity of care of offenders, and suicide prevention. Some recent publications specifically in correctional psychiatry and mental health include Psychiatric Services in Correctional Facilities: A Work Group Report of the American Psychiatric Association, the chapter, "Standards and Accreditation for Jails, Prisons, and Juvenile Facilities," in the Oxford Textbook of Correctional Psychiatry, and the chapter, "Correctional Psychiatry" in the most current edition of the Kaplan and Sadock's Comprehensive Textbook on Psychiatry (now in its 50th anniversary edition). I was a lead author in the American Academy of Psychiatry and the Law (AAPL) "Resource Document for Prescribing in Corrections," and also a subsequent revision (which is in press), and a separate "Resource Document for Prescribing in Juvenile Justice/Correctional Settings."

25.     I have presented nationally and internationally and have consulted nationally on correctional and non-correctional mental health care delivery and standards of care. Some recent examples: the Office of the California Attorney General regarding the California Department of Corrections and Rehabilitations (CDCR); Office of the Nevada Attorney General regarding the Nevada Department of Corrections, Sacramento County Jail, Rio Consumnes Correctional Center (RCCC) and Yolo County Jail, and other surrounding

8

county jails; Technical Assistance Project Consultant, U.S. Department of Justice in several states regarding jails, prisons and tribal nation correctional facilities, National Institute of Corrections (NIC); Technical Assistance to New York County Jails, Valhalla, New York; Consultant to the State of Vermont Department of Corrections; and Consultant, National Institute of Mental Health (NIMH) regarding ICE detainees (other examples are listed in my CV).

26.     I have undergone specialized initial and ongoing training and served as a physician surveyor for the National Commission on Correctional Health Care (NCCHC), a national organization that provides health care accreditation of jails and short-term detention facilities, prisons, juvenile facilities, and opioid treatment programs in correctional facilities. I have surveyed several major metropolitan county jails, short term detention facilities (e.g., US Immigration and Customs Enforcement [ICE] facilities) nationally (these are listed in my CV). I am the past chair of the NCCHC accreditation committee and continue to serve as a committee member.[1] I have served on several NCCHC standards revision task force groups to revise the NCCHC health care standards: NCCHC Standards for Health Services in Jails and Prisons, NCCHC Standards for Mental Health Services in Correctional Facilities, and the NCCHC Juvenile Health Standards (I serve as the current chair of the juvenile standards revision work group). This demonstrates my current knowledge and direct involvement in the provision of psychiatric and mental health care to detained/incarcerated juvenile and adult offender populations.

27.     I am actively involved at a national level in a leadership role within several psychiatric organizations. I am on the Council of the American Academy of Psychiatry and the Law (AAPL) and am the AAPL representative to the NCCHC Board of Directors. I am a past chair of the AAPL Suicidology committee, a committee focused on suicide phenomenology and suicide assessment and prevention and remain an active committee

---

[1] To avoid any appearance of a conflict of interest arising from my retention in this matter, I have consistently recused myself from all accreditation committee reviews and decisions involving any correctional facility located in the State of Arizona.

member. I also serve on the AAPL Government Action Committee and the AAPL Media and Public Relations, and the AAPL Rappeport Fellowship Committee. I also serve on the American Academy of Child and Adolescent Psychiatry (Children and the Law committee, formerly known as the Rights and Legal Matters committee). I was previously the AACAP's representative to the NCCHC Board of Directors and am now the AAPL representative. I am the current Chair of the NCCHC Board of Directors.

28.     I have guided the development of correctional psychiatry resource documents, publications, policy, best practices, and position statements within the American Psychiatric Association, the American Academy of Psychiatry and the Law, the American Academy of Child and Adolescent Psychiatry, and the Texas Society of Psychiatric Physicians. I am a past president of the Texas Society of Psychiatric Physicians, the Texas statewide branch of the American Psychiatric Association. I am also involved at a state level and have testified at the Texas State Capital on a variety of psychiatric, correctional and forensic psychiatry and mental health issues.

29.     In addition to those leadership roles, I also serve on the behavioral health committee and the health care committee of the American Correctional Association (ACA), (the ACA also provides accreditation of correctional facilities nationally). I am a past board member of the American College of Correctional Physicians. I routinely observe and inspect jails and prisons not only across the United States but have also done so in Guatemala.

30.     I have extensive experience in examining access to care, continuity of care, mental health and psychiatric evaluation and treatment approaches to mitigate possible mental health sequelae for certain inmates in restrictive housing settings and other mental health and psychiatry best practices to include suicide prevention policies and practices within juvenile and adult correctional settings nationally. I have also published and presented in the areas of correctional mental health care and suicide prevention at state, national, and international meetings.

31.     I maintain ongoing communication with other correctional professionals who provide direct clinical, administrative, and/or consultative work within correctional settings across the United States (and several other countries). I frequently attend and present at correctional health and other correctional related conferences and serve on several committees, as described earlier, including those conferences organized by the National Commission on Correctional Health Care (NCCHC), and the American Correctional Association (ACA). I served on the two most recent NCCHC task forces/work groups that were responsible for revising the separate NCCHC standards for jails and prisons in 2014 and 2018. I have participated in various American Psychiatric Association (APA), American Academy of Psychiatry and the Law (AAPL), and American Academy of Child and Adolescent Psychiatry (AACAP) committees and task force/work groups with relevance to adult and juvenile correctional health, suicide prevention policies and best practices, and the development of correctional standards and position statements. I am frequently contacted/consulted regarding policies, procedures, best practices, challenging patient cases or clinical situations, regarding my professional recommendations re: how to provide access to care, continuity of care, and implement efficient psychiatric and mental health care to jails, prisons, and other correctional settings, and have been qualified and rendered testimony at depositions and trials as an expert witness in several state and federal courts.

32.     Through these various experiences and my ongoing continuing medical education, I remain current in best practices for correctional mental health care services. Further, I continually review emerging correctional health research and evidence-based practices and quality improvement initiatives. For example, in my role as a reviewer for several scientific journals and through my work on the editorial board of the Journal of Correctional Health Care, I have knowledge and experience in reviewing the scientific merit and methodology of correctional health manuscripts/reviews. I am also particularly knowledgeable and maintain daily direct clinical and administrative involvement in establishing access to mental health and psychiatric care and continuity of care in the Texas

state prison system regardless of the medical and/or mental health need and acuity, across a variety of custody levels. This includes restrictive housing settings, suicide prevention, psychiatry evaluation, and treatment practices and modalities within state prison correctional settings. Due to my direct work experience and career focus on correctional psychiatry, and my work within organized psychiatry, correctional and forensic psychiatry at a state and national level, I believe that I am uniquely qualified to render opinions regarding the provision of psychiatric services within correctional settings.

33.     In summary, I have dedicated my career to direct patient care, other clinical and administrative work, and consultative services within juvenile and adult correctional settings for approximately 22 years.

34.     With regard to my academic work and clinical teaching roles, I am a Clinical Professor, Department of Psychiatry and Behavioral Sciences, UTMB, Galveston, Texas. I was previously Clinical Associate Professor in the Department of Psychiatry and Human Behavior, at Brown University and the Warren Alpert Medical School, Providence, Rhode Island. I provide clinical supervision to several psychiatrists, psychiatric nurse practitioners, physician assistants, and student trainees. I provide grand rounds, lectures, and trainings on a variety of correctional psychiatry topics at several medical schools and residency/fellowship training programs, to clinical faculty, psychiatry residents, medical students, physician assistant students and other trainees, treatment program staff, other professional organizations and am frequently invited to lecture in state, nationally, and internationally.

35.     I attend state and national meetings and have completed continuing medical education (CME) and maintenance of certification requirements to become and maintain my status as a triple board-certified psychiatrist – board certified in forensic psychiatry, general adult psychiatry, and child and adolescent psychiatry. I previously served as a board examiner for the American Board of Psychiatry and Neurology (ABPN) in the areas of general adult psychiatry and child and adolescent psychiatry, on the general psychiatry recertification committee, and on the forensic psychiatry committee (for individuals who

1   had completed a forensic psychiatry fellowship training program and are now sitting for

2   their initial ABPN board certification exam in forensic psychiatry, or alternatively sitting

3   for their 10 year recertification exams. I currently serve on the ABPN Forensic Psychiatry

4   Maintenance of Certification (MOC) committee.

5       36.     I have been qualified as an Expert Witness in various State and Federal Courts,

6   in the field of Forensic, Child and Adolescent, and Correctional Psychiatry (1998-present),

7   and have given expert opinion in the several areas, for example, standards of care in jails,

8   prisons, juvenile correctional facilities and other settings. I have also provided expert

9   opinion regarding the use of psychotropic medications, psychic harm, PTSD, suicide,

10  suicide prevention, suicide risk assessment, seclusion and restraint and other mental health

11  and psychiatry content areas.

12      37.     From 2013-2014 I was a Correctional Psychiatric Consultant to the Special

13  Master, Coleman v. Brown, Governor of California, et al., United States Court of Appeals,

14  Ninth Circuit, Pasadena, California. From 2017–2019 I served as a consultant to the State

15  of California's Office of the Attorney General regarding psychiatrists, psychologists, and

16  other mental health professional staffing, use of telepsychiatry, and increasing level of

17  efficiencies within the health care service delivery within the California Department of

18  Corrections and Rehabilitation (CDCR) state prison units statewide. I have also toured

19  several CDCR prison facilities, interviewed CDCR health care staff, and in particular

20  focused site evaluations of restrictive housing units and specialty programs for inmates with

21  medical and mental health needs with respect to access to care and continuity of care

22  concerns.

23      38.     Since 1998, I have conducted numerous evaluations and site tours of various

24  state prisons in Rhode Island, Vermont, Texas, California, and Arizona. I have toured

25  numerous   high   security   restrictive   housing   settings   (formerly   known   as   ad

26  seg/administrative segregation) to include male and female Death Row units in Texas and

27  Arizona. Based upon my experience, I am familiar with different custody and housing levels,

28  inmate movement for various activities (custody escorts to medical clinics for medical,

mental health or specialty clinic appointments, inmate movement for recreation, dining, work assignments, commissary, showers, visitation) and other operational issues. While I do not suggest that I am an expert with regard to general correctional custody issues, I have a fundamental appreciation of the impact and interplay between correctional custody and mental health delivery in custodial situations.

39.     My state medical and federal Drug Enforcement Agency (DEA) licenses are on file with the proper authorities. I hold a full and unrestricted medical license to practice in the State of Texas. I previously held full and unrestricted medical licenses in Rhode Island, Massachusetts, and Connecticut. (They remain in lapsed and/or inactive status because I live and practice correctional and forensic psychiatry exclusively in Texas.)

40.     Although I have extensive state and national correctional health experience, aside from my retention in this case, I have no current or past affiliations with the ADCRR, defendants, or other facility correctional custody, contracted health care, or administrative staff.

41.     Based upon my many years of study and practice and ongoing requirements in order to achieve and maintain triple board certification in the areas of general adult psychiatry, child and adolescent psychiatry, and forensic psychiatry, combined with my 20 plus years of work providing direct patient care as well as administering mental health care delivery systems in a variety of correctional settings, I am amply qualified to render opinions on the standard of care as it relates to the psychiatric and mental health treatment services provided by ADCRR and Centurion, across the various Arizona prison complexes.

42.     In summary, I have "real world" experience in all aspects of mental health care within state prison and other correctional settings. I have over 15 years serving on three different pharmacy and therapeutics committees, and I am involved in formulary medication decisions. I review and approve, versus defer, non-formulary psychotropic medication requests. With regard to my work as a forensic psychiatrist, I am not solely a plaintiff or defense expert. When possible, I attempt to balance as a court appointed expert, plaintiff's expert, and defense expert.

14

1

**Qualifications and Methodology of Plaintiffs' Experts**

2      43.     I am unable to establish if Mr. Haney is a qualified correctional mental health

3    professional. He lists that he has a PhD; however, I am unable to confirm if he is currently

4    licensed as a doctoral level psychologist and authorized to opine on clinical issues.

5      44.     By Dr. Stewart's own admission, the 156 files he reviewed in preparation of

6    his report suffer from selection bias. This is because he chose only to interview inmates that

7    were either: (1) hand selected by Plaintiffs' counsel; (2) agreed to speak to him; or (3) died

8    by suicide. Moreover, Dr. Stewart's methodology is further flawed by his decision to "focus

9    [only] on persons with the most serious mental health concerns or diagnoses." Such

10   individuals represent such a small number of the inmates in ADCRR custody and on the

11   mental health case load. The non-random sample selected by Dr. Stewart is not employed

12   utilizing a true scientific analysis or methodology.  Indeed, to conduct a rigorous and

13   representative analysis of the ADCRR health care, it is critically important to select a

14   random and representative sample of all inmates who received mental health care over the

15   period of interest. Focusing exclusively on inmates who died while in custody would likely

16   yield a skewed and non-representative view of health care service availability and delivery

17   in the ADCRR system. As such, Dr. Stewart's opinions are not and cannot be reflective of

18   ADCRR's system as a whole. No healthcare system—correctional or otherwise—is perfect.

19   Even in the highest-staffed and best-managed hospitals and other health care systems,

20   adverse patient outcomes occur.  Focusing only on these outlier outcomes, as Dr. Stewart

21   does, misses the big picture.

22     45.     Dr. Stewart's opinions are further discredited by his reliance upon a general

23   psychiatry resident trainee, Dr. Greg Nikogosyan, to assist in his records review.  Dr.

24   Nikogosyan has not completed a general psychiatry residency training program and thus

25   does not maintain an ability to independently practice. Nor is Dr. Nikogosyan board certified

26   in general or forensic psychiatry. Given the numerous complexities of this case, I have

27   numerous questions and concerns regarding Dr. Stewart's utilization of a general adult

28

psychiatry resident to assist in reviewing the records which form the basis of the opinions in his Report.

46.     Finally, as I have described in previous reports, Dr. Stewart is not fellowship trained nor board certified in forensic psychiatry and lacks the direct clinical and administrative corrections experience necessary to offer opinions regarding the systemic provision of mental health care to a state prison system.

## **Methodology and Bases for My Opinions**

47.     Based upon my review of the documents outlined in **Exhibit 2**, the medical and correctional records outlined in **Exhibit 3**[2], and my interviews of various Centurion and ADCRR staff, I formed opinions regarding the allegations in Plaintiffs' Complaint and the opinions of their experts, Dr. Pablo Stewart and Craig Haney. Each of my opinions are detailed below and are based upon my review of the documents mentioned above and my years of training and experience.  All of my opinions are to a reasonable degree of medical and psychiatric certainty.

48.     To avoid the selection bias present in the files selected by Plaintiffs' counsel and Dr. Stewart, and to capture the overall quality of mental health and psychiatric services being provided to ADCRR inmates, I utilized a truly random and standardized process to select files for review. To ensure that this selection focused on ADCCRR inmates with mental health needs, I had ADCRR generate a list of all inmates housed at all six corridor facilities, with a MH-score of 3 or higher. The report I received (ADCRR00177016) contained the data aggregated and sorted by facility. For each row of each complex, a column was added with MS Excel's random number function (=RAND()). Because the value changes with every edit to an MS Excel workbook, those data columns were copied and pasted as "valued only" to preserve the number.  Those random values were then sorted from smallest to largest, with the rows for the 15 smallest random values selected for review

_____

[2] The documents outlined in Exhibit 2 include mortality reviews, psychological autopsies, and the mental health records of inmates whose in-custody deaths were determined to be suicides.

from ASPC-Eyman, Florence, Phoenix, Lewis, Tucson and Yuma. For ASPC- Perryville, the same process was used with 30 rows selected. **Exhibit 4** is a list of the files randomly selected.[3]

49. To assist in my review of the voluminous individual chart review, due to the accelerated time in which my report was to be conducted, I utilized four practicing correctional psychiatrists (Donald Reeves, M.D., Anthony Tamburello, M.D., Nubia Lluberes, M.D., and Gabrielle Hobday, M.D.), each of whom completed both a general and forensic psychiatry program and currently works within a state prison correctional systemas a psychiatrist.

50. With no prior knowledge of the current ADCRR litigation, I asked them to independently review the randomly selected medical charts or charts reviewed by Dr. Stewart. To ensure objectivity, these consultants were blinded. They did not know whether the medical record files they reviewed were part of the random selection or the hand-picked "persons with the most serious mental health concerns or diagnoses" files selected by Plaintiffs and Dr. Stewart. Moreover, files were assigned for review in a manner such that no one consultant would be responsible for the exclusive review of any ADCRR complex.

51. Rather, the access to mental health care via medical record review at each ADCRR corridor complex was reviewed by not only myself, but also by these multiple independent consults with correctional and forensic training and 46 years cumulative of correctional psychiatry experience.

52. As detailed in my prior reports, I have previously toured all corridor ADCRR facilities. In preparation of this report, however, due to travel and time restrictions, I limited my tours to the corridor facilities that incarcerate ADCRR inmates who areon the mental health case load:[4] Phoenix, Eyman, Lewis, Perryville, Yuma, and Tucson.[5] During my tours,

---

[3] Only one file identified through this random selection also appears on the list of filesreviewed by Dr. Stewart.

[4] Inmates are considered to be on the mental health case load if they have a mental healthscore of MH-3 or above.

[5] I did not tour Florence, as inmates on the mental health case load were transferred

I visited the state-licensed inpatient psychiatric units at Perryville and Phoenix; specialized female treatment programs at Perryville; specialized male treatment programs at Phoenix; and high-custody housing areas. Before each tour, I met with the respective complex's correctional and healthcare leadership in a group setting. Throughout the tour and upon its conclusion, I had the opportunity to ask additional, individualized questions of corrections and healthcare staff.

53.     My December 18, 2013 Report details the manner in which I conducted previous tours, and I utilized the same methodology during the September 2021 tours:

> I conducted a physical tour of intake and reception areas, housing areas, and individual cells.  Upon entering individual cells, I noted the following items: reading materials, writing materials, boxes containing legal files, personal items, food, keep on person (KOP) medications, music, walkmans, tablet computers, and televisions which were allowed and available. I also observed day areas, recreation areas (with an emphasis on higher custody recreation areas), medical, dental, and mental health clinic areas. Further, I toured educational facilities, unit medical records departments, and other administrative support office space. I focused my tours on areas of higher custody levels, where prisoners were housed in any type of additional or special observation, and where prisoners were being monitored in "watch cells" while on various suicide prevention observation levels.
>
> I performed additional observation of state prisoners engaging in recreational activities while in their housing area such as basketball, jogging, weightlifting, and exercising. I saw work detail assignments including: sweeping, cleaning, landscaping, gardening, and painting murals. Further, I noted groups of inmate movement going to and from the chow hall (dining area) and in line for store items (commissary area).  I observed inmates in waiting room and clinic areas, group education, group psychotherapy, and vocational education. . . .
>
> I observed medications being administered in pill lines by nursing staff at several facilities. I also observed mental health staff assessing offenders housed on suicide precautions or in other high security settings. Within certain units, the staff were mandated to wear protective stab-proof vests and protective eye wear or, alternatively, spit shield helmets. In several watch status and high custody housing settings, I watched mental health care staff wearing protective stab-proof vests and goggles as they interacted with inmates. They spoke in a calm, professional, and therapeutic manner. Similarly, nursing staff

from that facility prior to my tour.

18

(wearing the same protective gear) administered medications, organized medications and blister packs, and documented their clinical activities." (ADC203375-76.)

54.     Almost eight years later, I observed these same interactions during my September 2021 tours.  Additionally, I observed correctional officers conducting mental health watches and mental health staff's interactions with ADCRR inmates. I did not observe them reading books or engaging in other distracting activities, as Dr. Stewart claims. I also reviewed various watch logs and confirmed that they were completed timely and in accordance with policy. Additionally, I observed the Warden, Deputy Warden, and other correctional and healthcare staff interacting with individual inmates across different settings  such as: housing pods, restrictive housing units, and clinic areas.

55.     The custody staff that I interviewed were uniformly pleased with mental health access, availability, coverage, and services. Universally, custody leadership reported an ability to timely reach mental health staff—typically the mental-health lead—via phone to notify them of a concern with an inmate. If urgent, the mental health staff assesses the inmate that same day. If it is not urgent, staff sees the inmate the next day. Custody also described that mental health staff are available to provide timely consultation regarding the management of inmates who showed signs of clinical deterioration.

56.     Custody can refer inmates for a provider assessment for admission to inpatient units at Phoenix (males) and Perryville (females) complexes. Nevertheless, mental health staff ultimately determine whether transfer is clinically indicated. When it is clinically indicated, *and* emergent, transfers have and can be accomplished in less than 24-hours from referral to admission. In summary, custody unit leadership denied any concerns regarding mental health staff's responsiveness or accessibility.

57.     I also had the opportunity to interview a variety of facility employees, including: captains, majors, lieutenants, assistant deputy wardens, senior wardens, educational staff, unit psychiatric providers (nurse practitioners), unit mental health leads, lead psychologists, psychology associates, pharmacy staff, and mental health staff. Most notably, I spoke often with the following individuals:

19

- Bobbie Pennington Stallcup, PsyD (Doctor of Psychology), Mental Health Program Director, Health Services Contract Monitoring Bureau, Arizona Department of Corrections

- Mark Haldane, Program Evaluation Administrator for ADCRR Monitoring Bureau

- Micaela McLane, Program Evaluation Administrator for ADCRR Monitoring Bureau

- Antonio Carr, MD, Statewide Psychiatric Director – Centurion

- Dr. Ashley Pelton, Clinical Psychologist, Regional Mental Health Director – Centurion

58.     I was not permitted to interview any individual inmates, including those who are referenced in Dr. Stewart's Report. However, I did review their records in eOMIS.

**National Commission on Correctional Health Care (NCCHC) Accreditation**

59.     NCCHC has offered a voluntary health services accreditation program for correctional facilities since the 1970s, when an American Medical Association (AMA) study of jails found inadequate, disorganized health services and a lack of national standards. In collaboration with other organizations, the AMA established a program that in 1983 became NCCHC, an independent, not-for-profit 501(c)(3) organization whose early mission was to evaluate and develop policy and programs for a field clearly in need of assistance. Based on its Jail, Prison, Mental Health, and Opioid Treatment Programs in Correctional Facility Standards, the process uses external peer review, specifically impartial, unbiased, neutral and qualified and trained survey teams composed of experienced and knowledgeable correctional nurses, physicians, psychiatrists and/or other qualified mental health professionals, and/or correctional health care administrators who perform surveys to determine whether correctional institutions meet the standards in provision of health services.

60.     NCCHC's mission is to improve the quality of health care in jails, prisons and juvenile confinement facilities. NCCHC establishes standards for health services in correctional facilities, operates a voluntary accreditation program for institutions that meet those standards, produces resource publications, conducts educational conferences and

offers certification for correctional health professionals. NCCHC is supported by the major national organizations representing the fields of health, mental health, law and corrections. Less than 5% of jails, prisons, juvenile detention and correctional facilities, and opioid treatment programs within US correctional settings have achieved and maintain current NCCHC accreditation.

61.     The process for a jail, prison, or other correctional facility or system to apply for and receive an initial survey, begin a self-study to review their facility's compliance with the respective jail or prison NCCHC standards and be considered for initial accreditation is requires team approach and staff buy-in and is quite time consuming. The facility health care staff then complete a self-survey questionnaire (SSQ). Information provided on the SSQ is reviewed by NCCHC staff and is used to help the facility prepare for the on-site survey. An on-site survey is conducted by a team of experienced surveyors. The lead surveyor prepares a report that undergoes a blinded review by the accreditation committee (the committee has no knowledge of the facility, health care entity or any other potentially identifying information). Once accredited, each year the facility receives a written report (Annual Maintenance Report) with updates on relevant information. Additional on-site visits will occur about every three years. To ensure my objectivity and neutrality, I have declined to participate in any Arizona correctional facility surveys or re-surveys, and I have also recused myself during accreditation committee review, discussion, or voting regarding any ADCRR or any other Arizona correctional facility.

62.     To illustrate the significance of this achievement, within the state of Arizona, the only facilities that have achieved and maintain current NCCHC accreditation are ADCRR, Maricopa County Jail, and two ICE facilities.

63.     Details of the most recent accreditation cycle for each ADCRR complex are outlined below:

- ASPC-Douglas – Accreditation review conducted December 10-12, 2018. Initial Report issued February 8, 2019. Full accreditation was granted on February 9, 2019 (ADCRR00138360-417).

- ASPC-Eyman – Accreditation review conducted March 16-19, 2020. Initial Report issued May 29, 2020. Complex awarded Continuing Accreditation with Verification (CAV) on May 29, 2020 (ADCRR00138459-522). Update Report issued on November 9, 2020. CAV status continued on November 9, 2020 (ADCRR00138524-543). Update Report issued and full accreditation was granted on January 15, 2021 (ADCRR00138544-549).

- ASPC-Florence – Accreditation review conducted March 22-24, 2021. Initial Report issued April 30, 2021 (ADCRR00138594-652). Continuing Accreditation with Verification was awarded on April 30, 2021 (ADCRR00138594-652). Update Report issued and full accreditation was awarded on September 9, 2021 (ADCRR00210543-550).

- ASPC-Lewis – Accreditation review conducted April 10-14, 2018. NCCHC issued Initial Report and placed complex on probation on June 22, 2018 (ADCRR00138662-686). Update Report issued and probation status continued on February 8, 2019 (ADCRR00138687-703). Further Update Report issued and full accreditation status was awarded on July 19, 2019 (ADCRR00138705-714).

- ASPC-Perryville – Accreditation review conducted January 8-11, 2019. NCCHC issued Initial Report on February 8, 2019 and awarded Continuing Accreditation with Verification on February 9, 2019 (ADCRR00138722-777). Update Report issued and CAV status continued on July 25, 2019 (ADCRR00138778-784). Second Update Report issued and full accreditation status was awarded on December 4, 2019 (ADCRR00138785).

- ASPC-Phoenix – Accreditation review conducted October 8-9, 2018. Initial Report issued and Continuing Accreditation with Verification awarded November 16, 2018 (ADCRR00138794-811). Update Report issued and CAV status continued on May 23, 2019 (ADCRR00138812- 816). Second Update Report issued and full accreditation was awarded on October 15, 2019 (ADCRR00138817-818).

- ASPC-Safford – Accreditation review conducted November 7-9, 2018. Initial Report issued on February 8, 2019 and full accreditation granted on February 9, 2019 (ADCRR00138878-931). Safford – Ft. Grant Unit. Accreditation review conducted November 7-9, 2018.  Initial Report issued on February 8, 2019 and full accreditation was granted on February 9, 2019 (ADCRR00138827-877).

- ASPC-Tucson – Accreditation review conducted April 22-26, 2019. Initial Report issued and Continued Accreditation with Verification awarded on July 19, 2019 (ADCRR00138951-139011). Update Report issued and full accreditation was awarded on December 17, 2019 (ADCRR00139012-024).

- ASPC-Winslow – Accreditation review conducted on February 25-27, 2019. Initial Report issued and Continuing Accreditation with Verification awarded on May 3, 2019 (ADCRR00139100-149). Update Report issued and CAV status was continued on October 24, 2019 (ADCRR00139157-162). Full accreditation was awarded on February 20, 2020 (ADCRR00138358). Winslow – Apache Unit. Accreditation review conducted on February 25-27, 2019. Initial Report issued and Continuing Accreditation with Verification awarded on May 3, 2019 (ADCRR00139051-099). Update Report issued and CAV status continued

22

on October 24, 2019 (ADCRR00139150-156). Full accreditation was awarded on February 20, 2020 (ADCRR00138358).

• ASPC-Yuma – Accreditation review conducted June 7-10, 2021. Initial Report issued and Continuing Accreditation with Verification was awarded on August 5, 2021 (ADCRR00139173-232).

64.     While I highlight certain standards throughout my report, all standards and ADCRR facilities' compliance with same are indicative of the exceptional mental health care provided within its facilities.

## Mental Health Staffing

65.     It is important to begin with the fact that there is no national requirement or guideline for recommended staffing in jails or prisons. Staffing levels are virtually impossible to set with any objective formula or standard that has general applicability. Rather, staffing levels should be assessed for a particular system based upon a clinical determination that adequate mental health services may be, or are, provided by a particular number of various types of professional staff providing the required services. To put it another way, staffing rations in correctional settings must allow for the provision of care which meets the standard of care.

66.     It is my professional opinion that ADCRR's contracted mental health services vendor, Centurion, has adequate numbers and types of mental health staffing. NCCHC defines a staffing plan as a plan that "lays out the full-time equivalent staff coverage required, lists current incumbents and vacancies, and addresses how full coverage will be accomplished if all positions are not filled (e.g., use of agency, temporary, or part-time staff)." ADCRR's staffing matrix accomplishes these goals, particularly where existing staff occasionally work beyond their set schedules to cross cover in order to fill a vacancy.

67.     Indeed, NCCHC found that ADCRR's staffing plans were adequate during all accreditations.

• ASPC-Douglas (ADCRR00138382-82, February 8, 2019 Report)

• ASPC-Eyman (ADCRR00138484-85, May 29, 2020 Report)

• ASPC-Florence (ADCRR00138617-18, April 30, 2021 Report)

- ASPC-Lewis (ADCRR00138674-75, June 22, 2018 Report)
- ASPC-Perryville (ADCRR00138744-45, February 8, 2019 Report)
- ASPC-Phoenix (ADCRR00138801-02, November 16, 2018 Report)
- ASPC-Safford (ADCRR00138898-99, February 8, 2019 Report)
- ASPC-Safford Ft. Grant Unit (ADCRR00138844-45, February 8, 2019 Report)
- ASPC-Tucson (ADCRR00138974-76, July 19, 2019 Report)
- ASPC-Winslow (ADCRR00139120-21, May 3, 2019 Report)
- ASPC-Winslow Apache Unit (ADCRR00139071-72, May 3, 2019 Report)
- ASPC-Yuma (ADCRR00139197-98, August 5, 2021 Report)

68.     I disagree with Dr. Stewart's assertion that ADCRR healthcare staffing, specifically mental health professionals, is inadequate. Centurion directly employs an array of qualified mental health professionals including:

- psychiatric director
- mental health director (doctorate level psychologist)
- staff psychiatrists
- staff psychiatric mid-level practitioners
- nurse practitioners and physician assistants
- staff psychologists (both doctoral and masters level)
- masters level clinicians
- licensed clinical social workers
- case managers/case workers
- other masters and bachelors level mental health clinicians
- psychiatric nurses

69.     I further disagree with Mr. Robert Joy's opinion that voluminous numbers of substance abuse counselors should be employed within ADCRR facilities. This is unnecessary and would represent a waste of resources.

24

70.     As I noted in my September 11, 2020 Declaration (Dkt. 3739-4) in support of Defendants' Response to Plaintiffs' Motion to Enforce, there is a national shortage of psychiatrists in the U.S. In my administrative capacity and in my consulting, national presentations, involvement in state and national organizations, committee work, and communication with other correctional health care professionals nationally, I am extremely familiar with the challenges in the recruitment and retention of psychiatrists, psychologists, and other qualified mental health professionals to work within correctional settings.  Due to a variety of factors, including geographical challenges (many prisons are located in remote, rural areas), stigma and safety issues associated with working in a correctional setting, lack of awareness of uniquepatient population and career opportunities, and funding limitations, many psychiatrists avoid practicing in correctional settings.  It is also important to note that health care staffing recruitment and retention challenges and shortages have been magnified—for all agencies—due to the unexpected absences resulting from the unprecedented COVID-19 pandemic.

71.     Despite these challenges, however, mental health staffing at ADCRR has continuously increased since health care was privatized in 2012 as shown by the following tables:

/ / /

/ / /

/ / /

25

| MH STAFFING - 2012 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| POSITION | Douglas | Eyman | Florence | Lewis | Perryville | Phoenix | Safford | Tucson | Winslow | Yuma | Total |
| MH-Mid Level: | N/A | 0 | 0 | 0 | 0 | 0 | N/A | 0 | N/A | 0 | 0 |
| Psychiatrist Provider: | N/A | 0.5 | 1 | 1 | 1 | 1 | N/A | 2 | N/A | 0 | 6.5 |
| Psychologist: | N/A | 2 | 4 | 5 | 3 | 5 | N/A | 9 | N/A | 0 | 28 |
| Psychology Associate: | 1 | 5 | 4 | 5 | 4 | 7 | 1 | 5 | 0 | 1 | 33 |

| MH STAFFING - July 2016 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| POSITION | Douglas | Eyman | Florence | Lewis | Perryville | Phoenix | Safford | Tucson | Winslow | Yuma | Total |
| MH-Mid Level: | N/A | 0 | 0 | 0 | 0 | 0 | N/A | 0 | N/A | 0 | 0 |
| Psychiatrist Provider: | N/A | 1 | 1 | 1 | 1 | 1.5 | N/A | 2 | N/A | 0 | 7.5 |
| Psychologist: | N/A | 4 | 2 | 3 | 3 | 3 | N/A | 4 | N/A | 0 | 19 |
| Psychology Associate: | 1 | 9 | 6.5 | 7 | 6.5 | 6.4 | 1 | 10 | 1 | 4 | 52.4 |

| MH STAFFING - July 2021 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| POSITION | Douglas | Eyman | Florence | Lewis | Perryville | Phoenix | Safford | Tucson | Winslow | Yuma | Total |
| MH-Mid Level: | N/A | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | N/A | 3.5 | N/A | 3 | 24 |
| Psychiatrist Provider: | N/A | 1 | 1 | 1 | 1 | 1 | N/A | 1 | N/A | 1 | 7 |
| Psychologist: | N/A | 3 | 3 | 3 | 2 | 4 | N/A | 4 | N/A | 1 | 20 |
| Psychology Associate: | 1 | 13 | 8 | 12 | 10 | 11 | 1 | 14 | 1 | 9 | 80 |

SOURCES:   ADCRR00139234 (2012 and 2021 Staffing Levels and ADCRR00178886 (July 2016 Contract FTE).

72.     It is important to note that ADCRR's inmate population is also on a declining trend—and fewer inmates require fewer staff.  To illustrate, when Centurion came on board on July 1, 2019,there were 34,015 inmates in ADCRR custody at the facilities at issue. On October 18, 2021, that population was down to 27,174.  This represents a reduction of 6,841 inmates or 20.11% of ADCRR's population over 27 months. Importantly, while the inmate population has declined by more than 20%, the contractual staffing levels have not.

73.     Additionally, as Centurion's Vice President of Operations, Arizona, Tom Dolan, detailed in declarations previously filed in this case, Centurion has made a concerted effort to recruit, retain, and competitively compensate mental health staff.  *See* Dkt. 3565-03, ¶¶ 16-24; Dkt. 3881-03, ¶¶ 39-50; Dkt. 3565-03, ¶¶ 8-15.

74.     Dr. Stewart asserts a need for more reliance on psychiatric physicians within this state correctional system. As noted in my prior report, dated December 18, 2013:

> This is neither clinically indicated, justifiable, or in keeping with correctional health practices nationwide. It is my professional opinion that the rote expansion in numbers of psychiatric physicians (as is the case in the State of California) has not demonstrated any advantageous clinical outcomes and is instead a fiscal burden. Psychiatric physicians tend to be one of the smallest percentages of mental health work forces found within county, state, and federal correctional systems and public and county mental health systems nationally. Most correctional mental health systems nationally mirror private and public mental health systems (VAs, state hospitals, and mental health centers) and largely rely on and emphasize a behavioral team approach to patients with serious mental illness. In other words, case workers, case managers, social workers, bachelors and masters level licensed professional counselors and psychologists, and doctoral level psychology staff, psychiatric physicians, psychiatric nurse practitioners, physician assistants, and other staff work in a collaborative team approach to address treatment needs. (ADC203401)

75. The utilization and staffing of psychiatric nursing, as implemented by Centurion at ADCRR, is a best practice within a state prison correctional setting and conforms to the standard of care.

76. In many state correctional systems, psychotropic medications are routinely administered at pill windows by less qualified or experienced pharmacy techs or non-nursing staff. Psychiatric nursing staff have additional training regarding mental illness, psychotropic medications, and side effects. They provide psychotropic medication education and stress the need for medication compliance.  Psychiatric nurses have a greater comfort level and experience dealing with inmates with mental disorders and serious mental illness. Non-psychiatric nurses, "medical" nurses, typically do not have this background.

77. The unique role and skill set of psychiatric nurses are particularly valuable when administering PMRB/forced antipsychotic medications. They are often able to develop therapeutic working relationships with particularly distrustful inmates with serious mental illnesses, encourage them to comply with their medications, and accept medications voluntarily, which is more likely to prevent the inmate from decompensating in a manner which otherwise might result in a use of force.

78. As I also noted in my December 18, 2013 report:

27

A bulk of mental healthcare delivery is provided by nonpsychiatrists in the community. In a similar manner nationally, due to a shortage of psychiatrists and/or other payer issues, psychiatric care is typically provided in primary care settings by nonpsychiatrists, specifically family physicians, internists, and pediatricians for adults and youths, respectively. These primary care professionals typically treat outpatients with non-psychotic mental illness, such as anxiety and depression, and psychiatrists are viewed as specialty referrals and are only used for a minority of complicated cases. Although the State of California has increased its base pay for psychiatrists and has implemented sweeping increases in the number of psychiatrists on site at various facilities, there is no published data to date that has demonstrated any improvements in the caliber and quality of mental healthcare in that system based on increased psychiatry staffing.

Independent of the psychiatric staffing expectations that Dr. Stewart proposes, there is no established or empirically validated correctional staffing plan, staffing ratios or recommendations for mental health and psychiatric staff within correctional settings. Instead, this should be performed based on patient clinical needs on an individual facility, countyor state basis. The current psychiatric and mental health staffing, available and offered mental health services of the above (availability of licensed and qualified and non-licensed mental health staff, psychologists, and psychiatrists) and availability of individual and group therapy for clinically appropriate offender patients and psychotropic medication treatment are well within the generally accepted standards for psychiatric and mental healthcare in state prison settings. The above staffing availability allows for services to be provided when an offender requests medical or mental health services or is identified to be in need of services.It also allows for the required services for state prisoners who experience suicidal behavior or ideation. (ADC203403.)

79.     To illustrate the inaccuracy of Dr. Stewart's opinions, according to the California Correctional Health Care Services website, recently there were over 90 vacant psychiatry positions in the state despite an average annual salary of $273,156 to $381,696.[6] Thereis also a lack of psychiatrists nationwide. This is not an Arizona-specific problem or an issue that is related to salary.

80.     At ADCRR, Centurion takes a multidisciplinary treatment team approach to provision of inmate mental health care. Encouraging and supporting a collaborative

---

[6] See https://cchcs.hodesiq.com/joblist.asp (last accessed October 22, 2021); https://cchcs.ca.gov/careers/psychiatrist-opportunities/ (same).

relationship and good communication between mental health and custody staff maximizes the likelihood of delivering quality clinical services. At ADCRR, mental health clinicians, nursing, and other health care staff, and custody personnel are partners in providing safe and effective services to inmates. It is essential that they align their efforts to identify inmates with mental illness and coordinate an effective response. Such collaborative efforts are present in the ADCRR system.

81.     In my professional opinion, Centurion maintains more than adequate mental health staffing to meet the mental health needs of ADCRR inmates with mental disorders and serious mental illnesses. Mental health and psychiatric provider staff are readily available during regular work hours. On call emergency psychiatry and psychology is available 24-hours, 7 days/week. All corridor facilities have, at a minimum, 24-hour nursing/medical staff on-site.  This is important for a variety of reasons, including to address inmates with comorbid medical diseases or conditions and to readily assess inmates engaging in self-harm. This level of 24-hour medical staffing on-site at all facilities statewide exceeds that typically found in other states.

82.     Moreover, there are mental health staff on-site every weekday, and some additional staff on weekends when clinically indicated, who will cross cover or come in for special clinical needs or cases. Additionally, there is always an on-call psychiatrist/psychiatric provider 24-7/365 days per year. Notably, the staff I spoke to frequently mentioned that Dr. Carr and Dr. Pelton are readily available for field inquiries. This multidisciplinary and layered mental health work force is clinically appropriate to meet the mental health needs of an incarcerated population.

83.     It is my professional opinion that since Centurion assumed management, there has been a sustained improvement in mental healthcare staffing levels, to include the addition of mental health leads. Staffing levels at ADCRR are sufficient and comport with the correctional standard of care.

29

84.     Finally, I note that while Dr. Stewart criticizes staffing, he fails to tie any of the individual files highlighted in his report to understaffing or explain how staffing deficiencies caused the alleged risks of harm he cites.

### Telepsychology & Telepsychiatry Services

85.     It is my opinion that Centurion appropriately uses telepsychology and telepsychiatry services to provide mental health care and medication management to ADCRR inmates.

86.     The American Psychiatric Association ("APA") is the oldest medical organization in theUnited States, and the largest organization of psychiatrists. It describes telepsychiatry as:[7]

> Telepsychiatry, a subset of telemedicine, can involve providing a range ofservices including psychiatric evaluations, therapy (individual therapy, group therapy, family therapy), patient education and medication management. Telepsychiatry can involve direct interaction between a psychiatrist and the patient. It also encompasses psychiatrists supporting primary care providers with mental health care consultation and expertise. Mental health care can be delivered in a live, interactive communication. It can also involve recording medical information (images, videos, etc.) and sending this to a distant site for later review.

87.     According to the APA, telepsychiatry is a clearly accepted and evidence-based technology and health care delivery medium. In February 2018, the APA updated its Policy on Telepsychiatry as follows:[8]

> Telemedicine in psychiatry, using video conferencing, is a validated and effective practice of medicine that increases access to care. The American Psychiatric Association supports the use of telemedicine as a legitimate component of a mental health delivery system to the extent that its use is for the benefit of the patient, protects patient autonomy, confidentiality, and privacy; and when used consistent with APA policies on medical ethics and applicable governing law.

---

[7]  *See*  https://www.psychiatry.org/patients-families/what-is-telepsychiatry, last accessed October 21, 2021.

[8]*See* https://www.psychiatry.org/psychiatrists/practice/telepsychiatry, last accessed October 21, 2021.

88.     Video-based telepsychiatry helps meet patients' needs for convenient, affordable and readily accessible mental health services. It can benefit patients in a number of ways, suchas:

- Improve access to mental health specialty care that might not otherwise be available (e.g., in rural areas)

- Bring care to the patient's location

- Help integrate behavioral health care and primary care, leading to better outcomes

- Reduce the need for trips to the emergency room

- Reduce delays in care

- Improve continuity of care and follow-up

- Reduce the need for time off work (e.g., childcare services) to access appointments far away

- Reduce potential transportation barriers, such as lack of transportation or the need for long drives

- Reduce the barrier of stigma

89.     While some people may be reluctant or feel awkward talking to a person on a screen, in my experience, most people are able to get comfortable with it. This has also become less of an issue as people become more familiar and comfortable with video communication in everyday life.

90.     Telepsychiatry allows psychiatrists to treat more patients in distant locations. Psychiatrists and other clinicians need to be licensed in the state(s) where the patient they are working with is located. State licensing boards and legislatures view the location of the patient as the place where "the practice of medicine" occurs.

91.     Although telepsychiatry has the disadvantage of the patient and psychiatrist not being in the same room, it can create enhanced feelings of safety, security and privacy for many patients.

92.     Telepsychiatry is beneficial and an integral part of providing quality mental health care ina correctional setting. As I explained in my December 13, 2013 Report, the

Handbook of Correctional Mental Health, (Scott 2010) highlights the value that telepsychiatry has had in psychiatric assessment and treatment in a correctional setting:

> Over the past decade, the use of telepsychiatry has played a significant role in psychiatric assessments and treatment in correctional settings. By 2001, correctional services in 26 states used some form of telemedicine, with provision of mental health care being one of the most common applications.
>
> The results from the use of telepsychiatry in correctional settings have been encouraging. Evidence indicates that telepsychiatry can deliver treatment whose results do not differ significantly from the gold standard of in-person evaluation. Studies of incarcerated populations show no difference between telepsychiatry and face- to-face therapy in measures of perception of the therapeutic relationship, post-session mood, or general satisfaction with services. In addition, the use of telepsychiatry appears to improve the safety and security of the institution and staff due to decreased inmate movement and increase the availability of specialized providers familiar with the setting, and decrease wait times and improve follow-ups. (ADC203455)

93.     Telepsychiatry has been of immense value to ADCRR inmates. This evaluation and treatment modality improves access to care, particularly in areas where there is a physician and health care manpower shortage. Currently, ADCRR and its contract vendor, Centurion, utilize telepsychiatry to provide consistent and quality mental health care to inmates.

94.     Based on my observations and my own experience with providing effective treatment through telepsychiatry, ADCRR's use of telepsychiatry is within the standard of care and leads to positive mental health management among the inmate population. This remains true, even as ADCRR continues to utilize a multi-disciplinary treatment team approach and on-site availability. In fact, ADCRR employs on-site staff psychiatrists, psychiatric midlevel practitioners, psychologists, and other mental health staff at facilities that house state inmates with higher acuity mental health needs or those inmates requiring suicide observation.

95.     As I also discussed in my December 13, 2013 Report, there is the presence of an on-site mental health clinician or other healthcare professionals at facilities with less state inmate mental health acuity. Also, mental health and other healthcare staff are readily

1    able to identify inmates who might refuse a psychiatric evaluation via telepsychiatry, leave

2    or attempt to leave the clinic area, or make threats of self-harm or harm to others.  In any

3    case where the clinical acuity or mental health needs of a state inmate exceed those

4    immediately available via telepsychiatry, they ensure prompt transfer for the inmate to a

5    facility with additional mental health services.

6        96.    Texas and ADCRR are not the only state prison systems that have

7    implemented telepsychiatry with positive results. Turning to Telemedicine for Prisoners'

8    Mental Health Treatment (Arndt, 2018), describes the growing use of telepsychiatry by the

9    California Department of Corrections and Rehabilitation. Dr. Edward Kaftarian, who was

10   the statewide chief of telepsychiatry for California Correctional Health Care Services

11   through 2017 stated, "By providing services remotely, we've been able to alleviate the

12   staffing shortages and deliver care to patients who would otherwise not have been seen by

13   psychiatrists." Through telepsychiatry, doctors are able to see an average of 12 inmates per

14   day.

15       97.    I personally have used telepsychiatry in treating inmates and find it to be just

16   as effective as on-site treatment. Based on my own experience, and my interviews with

17   Centurion staff, I highly endorse its use in ADCRR facilities.

18                            **Mental Health Licensure**

19       98.    It is my professional opinion that Centurion recruits and employs qualified

20   Mental Health Professionals who practice within the scope of their licenses. Impressively,

21   88% of the counseling staff who provide counseling services at ADCRR are licensed.

22       99.    They follow ADCRR and Centurion policies and procedures, are practicing

23   within the standard of care, and do not place class members at substantial risk of serious

24   harm.

25       100.   Importantly, all ADCRR facilities were found 100% compliant with NCCHC

26   Standard P-C-01–Credentials, which determines whether the facilities' qualified health care

27   professionals are legally eligible to perform their clinical duties. The most recent report for

28   each ADCRR complex is detailed below:

33

1

- APSC-Douglas – ADCRR00138377 (February 8, 2019)

2

- ASPC-Eyman – ADCRR00138478 (May 29, 2020) Florence – ADCRR00138612-613 (April 30, 2021)

3

4

- ASPC-Lewis – ADCRR00138693-694 (February 8, 2019) – Accredited under 2014 standards. Met 2014 Standard P-C-01.

5

6

- ASPC-Phoenix – ADCRR00138800 (November 16, 2018) – Accredited under 2014 standards. Met 2014 Standard P-C-01.

7

- ASPC-Perryville – ADCRR00138739 (February 8, 2019)

8

- ASPC-Safford – ADCRR00138893-894 (February 8, 2019)

9

- ASPC-Safford – Ft. Grant Unit – ADCRR00138839-840 (February 8, 2019)

10

- ASPC-Tucson – ADCRR00138996-970 (July 19, 2019)

11

- ASPC-Winslow – ADCRR00139115-116 (May 3, 2019)

12

- ASPC-Winslow – Apache Unit – ADCRR00139066-067 (May 3, 2019)

13

- ASPC-Yuma – ADCRR00139192 (August 5, 2021)

14

### **Delivery of Mental Health Care**

15

101.    Based upon my review of the items outlined in Exhibits 2 and 3, my tours of

16

the corridor facilities, and interviews with the individuals described above, it is my

17

professional opinion that the mental health treatment provided to inmates incarcerated

18

within ADCRR facilities exceeds correctional and community mental health standards.

19

102.    It is also my opinion that the policies, procedures, standards, and practices

20

utilized by ADCRR and Centurion, exceed generally accepted standards for state prisons.

21

In particular, there are clinically appropriate referral processes and procedures in place, with

22

an opportunity for continuous quality improvement.  Further, there are adequate, qualified,

23

trained mental health professionals to provide clinically appropriate access to care and to

24

support the mental health needs of the prisoners.

25

103.    It is my belief that the Policies, Procedures, and Standards utilized by

26

ADCRR, to include Department Orders and the Mental Health Technical Manual, regardless

27

of the correctional housing setting – even those alleged to constitute isolation or segregation by

28

Plaintiffs – do not cause an undue risk of harm to state prisoners incarcerated at different facilities. I have considered the following areas in my assessment:

- mental healthcare
- mental healthcare staffing
- medical record organization
- medication system
- monitoring of prisoners taking psychotropic medication
- monitoring of psychotropic medication therapeutic levels and side effects
- access to medical and mental healthcare
- mental health programming
- inpatient care
- treatment plan
- heat precaution
- suicide prevention
- confinement of prisoners with mental illness
- use of chemical agents with prisoners with mental illness
- use of telepsychiatry
- monitoring and oversight
- overall access to mental health services

**Quality Assurance Monitoring**

104.     ADCRR's Monitoring Bureau, which is comprised of a team of qualified mental health professionals, serves as a quality assurance safeguard. Pursuant to ADCRR's contract with Centurion, the Bureau monitors a variety of indicators (which often exceed standard of care minimums) to determine compliance and assess the overall provision of mental health care within the system. The Bureau serves as a checks and balance, to ensure Centurion is providing access to care, continuity of care, and quality care.

105.   The mental health portion of the Bureau works diligently to ensure the contracted vendor provides appropriate, timely, and professional mental health care to inmates at assigned state and contracted private prisons. They work to ensure that the contracted vendor's services are in line with NCCHC standards, ACA standards, and Court orders. The work collaboratively with the contracted vendor, on a daily basis, providing information regarding areas that need improvement as well as instruction on how to improve differentprocesses and procedures. They assist with gathering data, conducting daily audits, and ensuring the appropriate forms are in the chart as required for different processes. Currently, they are conducting daily audits to ensure that all individuals placed on watch have a Crisis Treatment Plan completed within one day of placement on watch and an SRA completed prior to the patient discontinuing watch.

106.   In addition to submitting requests to health care and mental health staff through the Health Needs Requests (HNRs), should an inmate be dissatisfied with the response, they may avail themselves to the grievance process, which I understand is set out in Departmental Order 802. If an inmate is unable to resolve their concern informally with the contract Assistant Director of Nursing (ADON), they may file a formal grievance to the CO IV Grievance Coordinator (and ADCRR employee). The CO IV Grievance Coordinator will refer the grievance to the contract Director of Nursing (DON), ensure a timely response, and ensure that all grievance records are directed to the Bureau. Furthermore, if the inmate remains dissatisfied with the response, they may submit an appeal to the unit CO IV Grievance Coordinator, who will refer the appeal to the contract Facility Health Administrator (FHA), ensure a timely response, and will ensure that all grievance records are ultimately directed to the Bureau for review. While the Bureau reviews the grievance records, the decision of the FHA is final.

**Intake Screenings**

107.   When transferred or reincarcerated prisoners go through the intake process, all prior medical and mental health requests and services are accessible during screening. It is my professional opinion that ADCRR provides timely and adequate mental health

screening of prisoners upon admission to intake facilities. Subsequently, where necessary, there is adequate and appropriate mental health evaluation, re-evaluation, and clinically indicatedreferrals to psychiatric professionals.  Further, inmates may submit health services requests pertaining to any mental health concern, any psychotropic medication side effects, or perceived lack of effectiveness. Also, they can make requests for changes in medication type, dose, or scheduling.  ADCRR inmates undergo a clinically appropriate sick call triage process, and when indicated by policy or by clinical necessity, are referred to qualified mental health professionals in a timely manner.

**Access to Adequate Mental Health Care & Continuity of Care**

108.   Importantly, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-A-01–Access to Care, which requires that inmates have access to care for their serious medical, dental, and mental health needs. According to NCCHC, "access to care means that, in a timely manner, a patient is seen by a qualified health care professional, isrendered a clinical judgment and receives care that is ordered." The most relevant recent report for all ADCRR complexes is detailed below:

- ASPC-Douglas – ADCRR00138363 (February 8, 2019)
- ASPC-Eyman – ADCRR00138462 (May 29, 2020)
- APSC-Florence – ADCRR00138598 (April 30, 2021)
- ASPC-Lewis – ADCRR00138707-708 (July. 19, 2019) – Accredited with 2014 standards, met 2014 standard P-A-01.
- ASPC-Phoenix – ADCRR00138797 (November 16, 2018) – Accredited with 2014   standards, met 2014 standard P-A-01.
- ASPC-Perryville – ADCRR00138725 (February 8, 2019)
- ASPC-Safford – ADCRR00188880 (February 8, 2019)
- ASPC-Safford – Ft. Grant Unit – ADCRR0013826 (February 8, 2019)
- ASPC-Tucson – ADCRR00138954 (July 19, 2019)
- ASPC-Winslow – ADCRR00139103 (May 3, 2019)
- ASPC-Winslow – Apache Unit – ADCRR00139054 (May 3, 2019)
- ASPC-Yuma – ADCRR00139177 (August 5, 2021)

109.    Additionally, all ADCRR facilities met NCCHC Important Standard P-D-06–Patient Escort, which looks to whether facility staff ensure that patients can meet scheduled health care appointments. According to NCCHC, the first compliance indicator is that "Patients are transported safely and in a timely manner for medical, dental, and mental health clinic appointments both inside and outside the facility." The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138390-391 (February 8, 2019)
- ASPC-Eyman – ADCRR00138493 (May 29, 2020)
- ASPC-Florence – ADCRR00138625-626 (April 30, 2021)
- ASPC-Lewis – ADCRR00138679 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-E-10.
- ASPC-Phoenix – ADCRR00138805 (November 16, 2018) – Accredited with 2014 standards, met 2014 standard P-E-10.
- ASPC-Perryville – ADCRR00138752 (February 8, 2019)
- ASPC-Safford – ADCRR00138906 (February 8, 2019)
- ASPC-Safford – Ft. Grant Unit – ADCRR00138852 (February 8, 2019)
- ASPC-Tucson – ADCRR00138983 (July 19, 2019)
- ASPC-Winslow – ADCRR00139126-128 (May 3, 2019)
- ASPC-Winslow – Apache Unit – ADCRR00139077-078 (May 3, 2019)
- ASPC-Yuma – ADCRR00139205 (August 5, 2021)

110.    Further, all ADCRR facilities met NCCHC Essential Standard P-E-09–Continuity, Coordination, and Quality of Care During Incarceration, which determines whether patient, medical, dental, and mental health care is coordinated and monitored from admission to discharge. According to NCCHC, while "[o]ther standards address elements of the patient's total care, this standard focuses directly on the health staff's ability to integrate all of these individual compliance standards while ensuring a continuum of care from admission to discharge." The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138402-403 (February 8, 2019)

- ASPC-Eyman – ADCRR00138505-506 (May 29, 2020)

- ASPC-Florence – ADCRR00138637-638 (April 30, 2021)

- ASPC-Lewis – ADCRR00138712-713 (July 19, 2019) – accredited under 2014 Standards – met 2014 standard P-E-12.

- ASPC-Phoenix – ADCRR00138814-815 (May 23, 2019) – accredited under 2014 Standards – met 2014 standard P-E-12.

- ASPC-Perryville – ADCRR00138763 (February 8, 2019)

- ASPC-Safford – ADCRR00138916-917 (February 8, 2019)

- ASPC-Safford – Ft. Grant Unit – ADCRR00138862-863 (February 8, 2019)

- ASPC-Tucson – ADCRR00138996-997 (July 19, 2019)

- ASPC-Winslow – ADCRR00139137 (May 3, 2019)

- ASPC-Winslow – Apache Unit – ADCRR00139087 (May 3, 2019)

- ASPC-Yuma – ADCRR00139217 (August 5, 2021)

111.    ADCRR has a variety of mental health units and programming available to its inmate population.  It is my professional opinion that there is adequate access to care by qualified mental health professionals.

112.    As detailed in the Mental Health Technical Manual, inmates who are admitted to a Residential Treatment Plan are classified as MH-4 and are provided several residential services.  Specifically, they are seen by a mental health clinician a minimum of every thirty days. Inmates who receive psychotropic medications are seen by a P/PNP a minimum of every ninety (90) days. Further, inmates are provided structured program activities on a weekly basis by health services and operation staff assigned to the program. Upon discharge from the program, the inmate's mental health score is lowered to MH-3 including a clinically appropriate subcode. The change in score shall occur at the time that movement is required, and the inmate shall remain in a corridor facility for a minimum of six (6) months. An overview of where these inmates are located, and the current vacancies, are detailed below:

| Unit | Type | Eligibility/Purpose | Capacity | Count (as of 10/5/21) |
|------|------|---------------------|----------|------------------------|
| Eyman – Browning BMU (A79) | Residential | All custody levels.  All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG. | 30 | 9 |
| Perryville-Lumley MH (B58) | Residential | Close Custody only.  All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG. | 36 | 19 |
| Perryville – Bldg 45 Central MH (B69) | Residential | Minimum and Medium Custody only.  Sex offenders and protective custody inmates are eligible. | 12 | 10 |
| Phoenix – Aspen (B22) | Residential | Medium and Minimum Custody only.  Sex offenders and protective custody inmates are eligible.  Eligible inmates may be disqualified from placement based upon escape risk. | 150 | 129 |
| Tucson – Rincon MH (C34) | Residential | Minimum, Medium & Close Custody only.  Sex offenders and protective custody inmates are eligible. | 256 | 189 |
| Tucson – Rincon MH Program II (C53) | Residential | All custody levels.  All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG. | 152 | 83 |

113.    Inmates who are admitted to an Inpatient Treatment Program (which are programs licensed by the Department of Health Services) are classified as MH-5 and are provided several inpatient services. Specifically, they are seen by a mental health clinician a minimum of every seven (7) days, seen a minimum of every thirty (30) days by a P/PNP, they are provided structured program activities on a daily basis by health services and operation staff assigned to the program, and any patient identified as being actively psychotic or actively suicidal is placed on a Continuous Mental Health Watch and is seen daily (including weekends and holidays) by a licensed mental health clinician. Further, upon discharge from the program, every effort is made to transition the patient to a residential program prior to placement in an outpatient setting. The change in score occurs at the time

40

the movement is required, and the inmate remains in a corridor facility for a minimum of six (6) months. An overview of where these inmates are located, and the current vacancies, are detailed below:

| Unit | Type | Eligibility/Purpose | Capacity | Count (as of 10/5/21) |
|---|---|---|---|---|
| Perryville – Treatment MH Ward (B70) | Inpatient | Minimum, Medium & Close Custody only.  All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG members. | 16 | 10 |
| Phoenix – Ida Ward (B08) | Inpatient | Minimum, Medium & Close Custody only.  All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG members. | 25 | 10 |
| Phoenix- John (B43) | Inpatient | Minimum, Medium & Close Custody only. All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG | 30 | 7 |
| Phoenix – King (B44) | Inpatient | Minimum, Medium & Close Custody only. All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG. | 35 | 9 |
| Phoenix – George (B71) | Inpatient | All custody levels, including Maximum. All inmates are eligible for treatment, including sex offenders, protective custody, condemned row, and STG. | 20 | 5 |

114.    Additionally, as shown by the volume of encounters in the table below, ADCRR provides appropriate continuity of care and clinically ordered and appropriate mental health and psychiatric treatment services:

/ / /

/ / /

/ / /

| Month | Practitioner - MH | Professional - MH | Total Number of MH Encounters |
|---|---|---|---|
| July 2019 | 5,369 | 31,407 | 36,776 |
| August 2019 | 6,318 | 28,356 | 34,674 |
| September 2019 | 5,295 | 27,896 | 33,191 |
| October 2019 | 6,043 | 25,444 | 31,487 |
| November 2019 | 13,376 | 17,094 | 30,470 |
| December 2019 | 5,126 | 21,050 | 26,176 |
| January 2020 | 5,076 | 21,005 | 26,081 |
| February 2020 | 7,809 | 25,225 | 33,034 |
| March 2020 | 6,256 | 27,920 | 34,176 |
| April 2020 | 6,474 | 30,933 | 37,407 |
| May 2020 | 6,539 | 31,063 | 37,602 |
| June 2020 | 6,375 | 29,061 | 35,436 |
| July 2020 | 6,338 | 29,083 | 35,421 |
| August 2020 | 5,947 | 14,602 | 20,657 |
| September 2020 | 4,749 | 23,667 | 28,416 |
| October 2020 | 8,525 | 21,735 | 30,260 |
| November 2020 | 7,776 | 22,354 | 30,130 |
| December 2020 | 9,168 | 24,251 | 33,419 |
| January 2021 | 8,525 | 21,735 | 30,260 |
| February 2021 | 7,563 | 23,693 | 31,256 |
| March 2021 | 8,857 | 26,909 | 35,766 |
| April 2021 | 8,131 | 25,249 | 33,380 |
| May 2021 | 7,611 | 22,992 | 30,603 |
| June 2021 | 7,814 | 22,343 | 30,157 |
| July 2021 | 7,494 | 21,384 | 28,878 |
| August 2021 | 8,174 | 21,921 | 30,095 |
| **Total** | **186,728** | **638,372** | **825,208** |

Sources:  ADCRR00056772-00058260; ADCRR-00069938-00069956, ADCRR00137854-00137859; and, ADCRR00175186 (monthly data collected from Encounters worksheet of each month, and aggregated across all ADCRR complexes).

115.   I have reviewed the Mental Health Technical Manual's guidelines, timeframes, and content with respect to intake, evaluations, follow ups, and frequency of encounters for inmates on the mental health case load and those who are in restrictive housing, to include health and welfare checks. Such guidelines comport with the correctional standard of care.

116.    Additionally, ADCRR has established classification systems to help custody and mental health staff easily identify inmates with mental health needs. Further, they prioritize housing of inmates who are on the mental health caseload or take psychotropic medications. ADCRR houses these inmates in designated "corridor" units with medical and mental health capabilities as opposed to keeping these inmates in non-mental health caseload units.

117.    ADCRR continues to put its daily count out by unit. Those ADCRR state prison units designated as mental health caseload units have a separate locator number. Inmates with current mental health needs are clustered in those units to provide mental health and psychiatric services more efficiently. Mentally ill offenders are housed in a manner to facilitate and improve custody supervision and clinical staff access, treatment planning, and case coordination efforts. When an inmate is identified to have an acute or chronic mental disorder, there is a joint custody and healthcare process. The decision-making protocols are based on the particular mental health signs, symptoms, functioning, and overall clinical acuity of the inmate. Healthcare staff's clinical assessment and treatment recommendations are reviewed, while maintaining correctional awareness of security and physical safety risks to other offenders. Correctional and healthcare staff are all incorporated into unit and housing placement decisions.

118.    Inmates who demonstrate clinical deterioration, mental symptoms, problem behaviors, clinical impairments, decline in daily living activities, self-injurious behaviors, suicidal ideations, or suicide attempts are triaged by nursing or mental health care staff, and are referred to mental health professionals as per the correctional health standard of care.

119.    As a result of the implementation of electronic documentation in the eOMIS system, mental health staff have immediate access to patients' most relevant data such as: mental health records, laboratory results, medication lists, and medication allergies. This meets the standard of care. The statewide implementation of an electronic medical record is a significant improvement when compared to the previous paper records format. For example, previously when an inmate moved from one unit to another, there was a risk of

1  delay or mishandling of a paper medical chart. Facility staff who were on the receiving end

2  might not have had immediate access to data regarding a newly arrived inmate. With eOMIS,

3  this is no longer the case. All health care staff with eOMIS access are now able to obtain

4  patient health care information in real time and share this information as clinically indicated.

5      120.   Centurion health care staff utilize the eOMIS system in a consistent and

6  clinically appropriate manner. They generate specific mental health documents such as the

7  Intake Mental Health Screening, Medical Intake Screening, and progress notes. The use of

8  these documents is in keeping with the correctional mental health standard of care.  They

9  provideessential clinical history such as: suicide attempts, suicide ideation, mood, other

10  mental health symptoms, psychiatric treatment history, and psychotropic medication history.

11      121.   Importantly, all ADCRR facilities were found 100% compliant with Essential

12  Standard P- E-05–Mental Health Screening and Evaluation, which requires that a mental

13  health screening is performed to ensure that urgent mental health needs are met and that

14  such screening is performed within 14 days of admission. The most recent report for each

15  ADCRR complex is detailed below:

16      •    ASPC-Douglas – ADCRR00138397-399 (February 8, 2019)

17      •    ASPC-Eyman – ADCRR00138500-502 (May 29, 2020)

18      •    ASPC-Florence – ADCRR00138633-634 NOT APPLICABLE – Screening

19      conducted at intake center prior to transfer. (April 30, 2021)

20      •    ASPC-Lewis – ADCRR00138678 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-E-05.

21      •    ASPC-Phoenix – ADCRR00138804 (November 16, 2018) – Accredited with 2014 standards, met 2014 standard P-E-05.

22

23      •    ASPC-Perryville – ADCRR00138758-760 (February 8, 2019)

24      •    ASPC-Safford – ADCRR00138912-913 (February 8, 2019)

25      •    ASPC-Safford – Ft. Grant Unit – ADCRR00138858-859 (February 8, 2019)

26      •    ASPC-Tucson – ADCRR00138991-992 (July 19, 2019)

27      •    ASPC-Winslow – ADCRR00139133-134 (May 3, 2019)

28      •    ASPC-Winslow – Apache Unit – ADCRR00139083-084 (May 3, 2019)

• ASPC-Yuma – ADCRR00139212-214 (August 5, 2021)

122. Additional on-site mental health care services include crisis intervention services, psychotropic medication management, and psychiatric re-evaluation by psychiatrists and psychiatric mid-level professionals. There was ample evidence of teamwork, collaboration, and communication among correctional, nursing, medical, and mental healthcare staff. Great efforts are made to identify inmates with mental health problems and to provide timely referrals, evaluations, and follow-up evaluations as clinically indicated. It is my professional opinion that there is continuity of mental healthcare during incarceration, unit transfers, and eventual release.

123. Inmates' access to care is further demonstrated by the percentage of submitted mental health HNRs that result in scheduled appointments as shown in the table below. While there is still some variability (which appears that it would likely track community COVID-19 spikes), since December 2019, all scheduled appointments were either completed, resulted in a no show, or resulted in a refusal in the same month. Moreover, there are a few months where the rate to scheduled appointment is greater than 100%, which suggests that some HNRs were not scheduled to a subsequent month (due to receipt late in a reporting month) but were scheduled and completed in the next month. (January 2020, February 2020, October 2020, and November 2020). This suggests concerted effort to eliminate any temporary backlog.

/ / /

/ / /

/ / /

45

| Month | Mental Health HNR Received | Scheduled Appointments Resulting from HNR Submission (Mental Health) | Scheduled Mental Health Appointments Resulting in Inmate No Shows | Scheduled Appointments Resulting in Inmate Refusals (Mental Health) | Completed Appointments Resulting from HNR Submission (Mental Health) |
|---|---|---|---|---|---|
| July 2019 | 919 | 526 | 1 | 6 | 328 |
| August 2019 | 958 | 778 | 0 | 3 | 491 |
| September 2019 | 1,330 | 527 | 0 | 5 | 446 |
| October 2019 | 771 | 562 | 7 | 40 | 362 |
| November 2019 | 919 | 515 | 2 | 60 | 312 |
| December 2019 | 1,304 | 1,304 | 0 | 18 | 1,286 |
| January 2020 | 1,362 | 1,301 | 0 | 34 | 1,362 |
| February 2020 | 1,252 | 1,142 | 0 | 44 | 1,243 |
| March 2020 | 1,166 | 1,025 | 0 | 21 | 1,004 |
| April 2020 | 1,161 | 1,150 | 0 | 47 | 1,103 |
| May 2020 | 1,177 | 1,077 | 0 | 24 | 1,053 |
| June 2020 | 1,995 | 1,077 | 0 | 24 | 1,053 |
| July 2020 | 1,907 | 1,203 | 0 | 80 | 1,123 |
| August 2020 | 1,218 | 1,001 | 0 | 51 | 950 |
| September 2020 | 1,205 | 1,099 | 0 | 43 | 1,056 |
| October 2020 | 1,454 | 1,408 | 0 | 27 | 1,427 |
| November 2020 | 1,461 | 1,408 | 0 | 27 | 1,427 |
| December 2020 | 1,488 | 1,488 | 0 | 36 | 1,452 |
| January 2021 | 1,454 | 1,454 | 0 | 27 | 1,427 |
| February 2021 | 1,164 | 1,164 | 0 | 0 | 1,164 |
| March 2021 | 1,105 | 900 | 0 | 73 | 827 |
| April 2021 | 1,071 | 900 | 0 | 73 | 827 |
| May 2021 | 918 | 900 | 1 | 8 | 891 |
| June 2021 | 1,047 | 866 | 0 | 7 | 859 |
| July 2021 | 1,313 | 1,075 | 0 | 7 | 1,068 |
| August 2021 | 1,374 | 1,128 | 2 | 12 | 1,114 |
| **Total** | **32,493** | **26,978** | **13** | **797** | **25,655** |

Sources:  ADCRR00056772-00058260; ADCRR-00069938-00069956, ADCRR00137854-00137859; and, ADCRR00175186 (monthly data collected from HNR worksheet of each month, and aggregated across all ADCRR complexes).

### **Accessibility of Inpatient Mental Health Treatment**

124.   At ADCRR, there is a continuum of care that includes access to intensive inpatient mental health care.

125.   I disagree with Dr. Stewart's opinion that there is inadequate access to inpatient mental health care. To the contrary, when clinically indicated, inmates across the state are referred and transferred to the inpatient units at Phoenix and Perryville.

126.   In my professional opinion, the inpatient intensive mental health care and treatment services available onsite at these two specially designated, state department of health independently licensed facilities, as described above, meet or exceed the standard of care.

127.   Referrals to ADCRR's inpatient units are completed within 48 hours and are immediate if clinically indicated. Examples of recent transfers that have been completed in one day or less are detailed below:

| ADC # | Name | Date Tx Requested | Date Physically Transferred | Tx Time |
|---|---|---|---|---|
| ███ | ███ | 1/28/2021 | 1/28/2021 | Same Day |
| ███ | ███ | 3/5/2021 | 3/5/2021 | Same Day |
| ███ | ███ | 3/9/2021 | 3/10/2021 | 1 Day |
| ███ | ███ | 4/23/2021 | 4/23/2021 | Same Day |
| ███ | ███ | 4/26/2021 | 4/27/2021 | 1 Day |
| ███ | ███ | 4/28/2021 | 4/28/2021 | Same Day |
| ███ | ███ | 5/3/2021 | 5/4/2021 | 1 Day |
| ███ | ███ | 10/12/2021 | 10/12/21 | Same Day |
| ███ | ███ | 9/10/2021 | 9/11/2021 | 1 Day |
| ███ | ███ | 9/10/2021 | 9/11/2021 | 1 Day |

128.   Currently, the inpatient units at both Perryville and Phoenix have available beds.  There is no wait time. As detailed in Dr. Stallcup's depositions, both Centurion and ADCRR meet multiple times a week to discuss inpatient referrals.

129.   The following is a summary of my tours and a brief description of these two specialized psychiatric/behavioral health inpatient treatment facilities and their respective milieus and resources:

47

130.   **ASPC-Perryville:** Located in Goodyear, Arizona, ASPC-Perryville is unique in that it is the only ASPC complex in the State where female offenders are housed. (Previously females who required an inpatient level of care/transfer to an inpatient unit for specialized mental healthcare required a transfer off-site to ASPC-Phoenix, but now there is new and dedicated inpatient psychiatric care provided onsite at the Perryville facility.) I was particularly impressed with how this unit resembled a community residential treatment facility as opposed to a correctional unit or even a psychiatric inpatient unit or ward. The unit was bright and clean and decorated by artwork. The females housed there were very proud of their unit and the work and role that they take part such as ensuring their cells or cots are neat and the beds are made and that their photos, drawings, and other personal possessions were contained and kept neat and orderly. There was ample therapeutic programming. The day room had sunlight and there were concerted efforts by custody and health care staff to provide a therapeutic and supportive milieu. Females were allowed to have access to day room, television and washer and dryer in the day room, areas to sit or walk or engage in the dayroom and in the nearby outdoor recreational activities, where there was particularly beautiful landscaping, and personal possessions and individual and group therapy and other treatment programming opportunities.

131.   **ASPC – Phoenix:**[9] Located in Phoenix, Arizona, ASPC-Phoenix is a unique facility in the ADC system. ASPC-Phoenix has a 336-bed reception unit where all new male intakes are screened, classified, evaluated, and held until transport to their assigned permanent housing location (with the exception of male inmates with a death sentence who bypass ASPC-Phoenix and receive their intake at the ASPC-Eyman Browning Unit). Additionally, there is a 61-bed minimum custody general population inmate worker unit, which houses minimum custody general population male inmates who work at the ASPC-Phoenix Complex. The mental health programs conducted in the Flamenco Unit (also referred to as the Alhambra Behavioral Health Treatment Facility) are State of Arizona

---

[9] As of October 11, 2021, the Baker Ward no longer served as an inpatient mental healthfacility.

Department of Health Services licensed (Behavioral Health Services Agency) Level 1 Sub-Acute Agencies. They have also achieved NCCHC accreditation and remain accredited. The Flamenco Unit is a licensed 125-bed intermediate mental health unit, which is subdivided into the King Ward (capable of housing up to 35 inmates), John Ward (capable of housing up to 30 inmates), Ida Ward (capable of housing up to 40 inmates, including up to 15 on watch status), and George Ward (capable of housing up to 20 inmates). Finally, the Aspen Unit, also referred to as the Men's Treatment Unit, operates as a transitional care unit for mental health inmates and has capacity to house 150 medium custody male inmates.

132.    During the tour on September 24, 2021, I visited all units (except the inmate worker housing units) and met with Warden Twyford, Dr. Carr, and Dr. Pelton. Warden Twyford described his appreciation/understanding of the unique challenges of this unit due to its primarily mental health mission in the ADC system.

### Privacy & Confidentiality in Mental Health Encounters

133.    Importantly, all ADCRR facilities were found compliant with NCCHC Important Standard P-A-07–Privacy of Care, which requires that health care encounters and exchanges of information remain private. According to NCCHC, "Privacy is made more difficult when triaging health complaints at the inmate's cell, in segregated housing, or in supermax housing, or when conducting interviews during the intake process. When cellside triage is required, or when conducting interviews during intake, health staff take extra precautions to promote private communications." The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138367 (February 8, 2019)
- ASPC-Eyman – ADCRR00138466 (May 29, 2020)
- ASPC-Florence – ADCRR00138602 (April 30, 2021)
- ASPC-Lewis – ADCRR00138670 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-A-09.
- ASPC-Phoenix – ADCRR00138799 (November 16, 2018) – Accredited with 2014 standards, met 2014 standard P-A-09.
- ASPC-Perryville – ADCRR00138729 (February 8, 2019)

1      •      ASPC-Safford – ADCRR00138884 (February. 8, 2019)

2      •      ASPC-Safford – Ft. Grant Unit – ADCRR00138830 (February 8, 2019)

3      •      ASPC-Tucson – ADCRR00138958 (July 19, 2019)

4      •      ASPC-Winslow – ADCRR00139106 (May 3, 2019)

5      •      ASPC-Winslow – Apache Unit – ADCRR00139057 (May 3, 2019)

6      •      ASPC-Yuma – ADCRR00139181 (August 5, 2021)

134.    It is my professional opinion that ADCRR inmates are offered private meeting space to ensure confidentiality during mental health encounters. During my September 2021 tours, mental health staff at all sites confirmed this. If inmates refuse this setting, mental health staff attempt to clarify the etiology. If an inmate is exhibiting symptoms suggestive of a psychotic disorder, mental health staff increase their attempts to monitor this patient. They would refer the patient for a psychiatric evaluation, prescribe PMRB medication, if indicated, or transfer the patient to Phoenix or Perryville inpatient units. Such offerings are consistent with the correctional standard of care and with the ultimate goal— particularly with inmates on watch—of keeping the inmate safe.

**Cell-Front Encounters for Mental Health Assessment**

135.    Plaintiffs' expert, Dr. Stewart, asserts that the use of cell-front encounters is clinically inappropriate and that this practice places ADCRR inmates at serious risk. I respectfully disagree, and in my view, the use of cell-front encounters to provide focused mental health assessment of inmates on suicide watch or other watch status is clinically appropriate.

136.    From a mental health and psychiatric perspective, the practice of cell-front encounters does not cause a patient on a suicide watch or other watch status to be at increased serious risk of harm to self. The goal and focus of mental health treatment regarding a suicide watch or watch status is to keep the inmate safe, to safely monitor an inmate patient for possible acts or attempted acts of self-harm, self-injury, or any suicide attempts. The goal is not to engage the patient in extended diagnostic interviewing or

1   individual psychotherapy or other treatment services. The immediate goal is to maintain the

2   patient's safety and to re-assess the inmate's risk of harm, activities of daily living and

3   whether they should remain on the suicide watch, the frequency of monitoring by custody

4   staff should remain the same, be increased or be reduced.

5       137.   Should a patient demonstrate clinical deterioration or further self-harm or

6   suicide attempts even while on a suicide watch or watch status, then the nursing and/or

7   mental health staff would re-evaluate the inmate patient to identify further behavioral

8   management, treatment plans, programming, and further evaluation and treatment

9   interventions, to include the possibility of transfer to a higher level of care such as an

10   inpatient psychiatric unit, the medical clinic (in the event of self-harm), or other clinical

11   management. The ultimate goal is to afford an inmate patient the least restrictive

12   environment that is clinically appropriate and thus the goal is to assess the patient frequently

13   to better identify if the watch is clearly clinically warranted.

14       138.   Dr. Stewart appears to argue that inmates on watch status should never

15   undergo cell-front encounters and should always be seen in a private confidential setting.

16   This is ultimately an individual clinical decision but must be carefully considered due to a

17   variety of resulting custody, escort, and patient and staff safety issues and risks. For example,

18   even when undergoing careful supervision and monitoring and custody escort to and from

19   the private confidential setting, an inmate on a suicide watch who is seen out of their cell

20   may surreptitiously gain access to miscellaneous items (e.g., pens, pencils, paper clips,

21   various sharp items, ligature items) that could result in further serious self-harm (ingestion,

22   insertion, cutting, other severe self-injury) or suicide attempts.

23   **Minimum Duration of Encounters**

24       139.   In my view, setting minimum required durations for mental health care

25   encounters can hamper the clinician's ability to provide mental health care.

26       140.   In my September 11, 2020 Declaration (Dkt. 3739-4), I noted numerous

27   examples of situations when continuing a mental health encounter just to comply with a

28   minimum duration requirement would have been clinically inappropriate and could have

risked causing the patient to develop anger, agitation, or other manifestations of behavioral dyscontrol or dysregulation to include impulsive, agitated, threatening, assaultive, or self-injurious behaviors in a patient who wanted to be left alone.

141.    In my review of inmate charts, both in preparation of that Declaration and in preparation of this declaration, I noted that psychiatric staff and other mental health care staff appropriately terminated clinical encounters when it became apparent that the particular inmate patients were no longer interested in continuing the individual therapy, new or follow-up evaluation, or other therapeutic encounter.  This decision by qualified mental health professionals is clinically appropriate in my professional opinion. In addition, attempting to develop and further strengthen a therapeutic working relationship with an inmate patient results in trust and rapport between mental health staff and inmate patients. The availability of this shared and respectful treatment partnership will also have an added benefit in encouraging other inmates who may not be on the current mental health caseload to seek mental health treatment when needed. This permits future, longer (if and when clinically necessary) and more in-depth encounters to take place where appropriate. Establishing a voluntary right to treatment as opposed to an arbitrary time mandated clinical encounter is particularly essential. This will reduce patient's resistance, reluctance and frank refusal to comply with future clinical encounters or to seek future mental health treatment. It is important to meet the patients where they are. The encounters referenced above did just that. Forcing a patient to engage in conversation for the sake of meeting stop-watch timeframes jeopardizes the ability to establish and build upon this potentially fragile therapeutic treatment relationship.

142.    It is my opinion that the interactions of mental health clinicians and inmates evidenced in these chart reviews were "meaningful" and "appropriate" and met the standard of care. These contacts, although sometimes brief, still provided vital information (such as mental health inquiry and assessment of the inmate patients' ability to communicate any subjective complaints such as suicidal or self-injurious impulses, thoughts of harm to self or others, or other emotional or physical distress or other health care needs or other requests),

the inmate patient's activities of daily living (ADL's) and their recent adjustment and functioning as noted by their grooming, hygiene, evidence of recent acts of self-harm/injury, the status of their cell and contents, and objective measures such as the patient's ability to reality test, answers provided via mental status testing, and overall clinical stability) to the mental health clinician and were utilized in evaluating the condition of the patient and in guiding treatment decision-making for example, whether to increase or reduce the frequency of monitoring, or discontinue a watch status.  It is important to view these contacts as part of an overall treatment plan. Also, I noted during my facility tours that mental health staff routinely reviewed watch logs (documented by correctional staff) which provided additional data to assist the mental health professional in their clinical determinations.  I also learned during additional staff interviews that custody staff and leadership are readily available to discuss complicated inmate patients and to provide additional information to mental health staff when needed.

143.   As I stated in my February 28, 2020 Declaration and still maintain, there is no national correctional health standard of care that establishes or defines an expected duration, timeframe, or range of time for a mental health professional to conduct any type of mental health or psychiatric interaction or encounter with a patient inmate.

144.   There is no national definition, standard for health services in prisons, licensing board (e.g., medical board for psychiatrists, psychology board for psychologists, and the like) requirements, established correctional clinical practices or national position statements or clinical guidelines, or any other national promulgated expectations regarding any defined time frame or expected duration for any particular type of mental health screening, evaluation, contact, or any type of treatment services within correctional settings.

145.   Regardless of the location, setting, or type of mental health encounter (e.g., a segregation visit, watch and post-watch encounters, crisis intervention treatment services, suicide risk assessment, individual counseling session), there is no defined or expected duration of time for any mental health professional within a correctional setting.

146.    The duration of each mental health encounter should be based on the professional's clinical judgment, background, training, professional experience, and individualized determination of each inmate's current clinical status and evaluation/individual treatment needs. It is also critical for the clinician to have the latitude to utilize their own professional judgment regarding the clinically indicated duration of any mental health encounters to build rapport, and to further develop and maintain a working therapeutic treatment relationship.

147.    The length of time needed to conduct a meaningful encounter will also vary depending on the type of encounter and its intended purpose.

148.    As I noted in my September 11, 2020 Declaration, the purpose of a suicide watch follow-up by a mental health professional is to identify if the patient currently on suicide watch or recently removed from suicide watch presents with clinical impairment, poses imminent risks of harm to self or others, and to identify what level of supervision and follow-up is clinically indicated or recommended.

149.    There is no nationally defined time duration requirement to conduct any type of mental health interaction or evaluation of a prisoner prior to, while on, or subsequent to removal from a suicide or mental health watch.

150.    According to the most current NCCHC Standards for Health Services in Prisons, 2018 (and the similar standards for Jails and Juvenile Health Standards), the Standard for Suicide Prevention and Intervention is defined, "Suicides are prevented when possible by implementing prevention efforts and intervention." There is no language in the NCCHC standard's compliance indicators, definitions, or discussion section that mandates or promulgates a minimum or certain amount of time or time range to be utilized during any of these encounters.

151.    Ultimately, it was and still is my opinion that there should be no mandated minimum amount of time for mental health professionals to see a patient, but that any contact should be guided by the independent clinical judgment of the mental health

professional. Such mandated minimums shift the focus from clinical care and can be counterintuitive where the inmate does not desire to be seen for the arbitrary amount of time.

### Treatment Plans & Timely Communication

152.    In preparation of this report, I reviewed numerous ADCRR inmate medical records. In my view, ADCRR provides comprehensive treatment plans, timely communication, and multidisciplinary coordinated care between psychiatric and mental health staff, nursing staff, medical providers, and custody staff. Such records are kept in accordance with the correctional standard of care. This significantly reduces the risk of an inmate's risk of harm to self or others.

153.    This is further supported by the fact that all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-F-01–Patients with Chronic Disease and Other Special Needs, which determines whether patients with chronic disease, other significant health conditions, and disabilities received ongoing multidisciplinary care aligned with evidence- based standards. This includes individualized treatment plans for SMI inmates.

154.    To determine whether this standard is met, NCCHC looks to whether "Treatment plans for patients with mental health conditions should incorporate ways to address the patients' problems and enhance patients' strengths, involve patients in their development, and Include strategies to prevent relapse. The strategies should describe signs and symptoms associated with relapse or recurring difficulties (e.g., auditory hallucinations), how the patient thinks a relapse can be averted, and how best to help the patient manage crises. The treatment plan may use any format that contains all of the required elements. Individual treatment forms are preferable since they facilitate developing a comprehensive plan that is easily identifiable. SOAP (subjective, objective, assessment, plan) notation in the progress notes is another way to document a treatment plan." The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138403-405 (February 8, 2019)
- ASPC-Eyman – ADCRR00138546-547 (January 15, 2021)

- ASPC-Florence – ADCRR00138639-640 (April 30, 2021)

- ASPC-Lewis – ADCRR00138702-703 (February 8, 2019) – accredited under 2014    standards – met 2014 standard P-G-01.

- ASPC-Phoenix – ADCRR00138807 (November 16, 2018) – accredited under 2014    standards – met 2014 standard P-G-01.

- ASPC-Perryville – ADCRR00138764-766 (February 8, 2019)

- ASPC-Safford – ADCRR00138918-919 (February 8, 2019)

- ASPC-Safford – Ft. Grant Unit – ADCRR00138864-865 (February 8, 2019)

- ASPC-Tucson – ADCRR00139020-022 (December 17, 2019)

- ASPC-Winslow – ADCRR00139138-139 (May 3, 2019)

- ASPC-Winslow – Apache Unit – ADCRR00139088-089 (May 3, 2019)

- ASPC-Yuma – ADCRR00139218-220 (August 5, 2021)

155.    Importantly, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard Essential Standard P-A-08–Health Records. According to NCCHC, a confidential health record is created and maintained using a standardized format.  The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138367-386 (February 8, 2019)

- ASPC-Eyman – ADCRR00138467-468 (May 29, 2020)

- ASPC-Florence – ADCRR00138602-603 (April 30, 2021)

- ASPC-Lewis – ADCRR00138648 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-H-01.

- ASPC-Phoenix – ADCRR00138809 (November 16, 2018) – Accredited with 2014    standards, met 2014 standard P-H-01.

- ASPC-Perryville – ADCRR00138729-730 (February 8, 2019)

- ASPC-Safford – ADCRR00138884-885 (February 8, 2019)

- ASPC-Safford – Ft. Grant Unit – ADCRR00138830-831 (February 8, 2019)

- ASPC-Tucson – ADCRR00138959-960 (July 19, 2019)

- ASPC-Winslow – ADCRR00139107-108 (May 3, 2019)

- ASPC-Winslow – Apache Unit – ADCRR00139058-059 (May 3, 2019)

1      •      ASPC-Yuma – ADCRR00139181-182 (August 5, 2021)

2

3      156.    In my record review of ADCRR medical and mental health records, I found

them organized by section and category and were easily accessible, even by me, lacking

4      any formal eOMIS training. The records clearly demonstrated that when patients submitted

5      medical health needs requests, there was timely response, evaluation, and treatment. I found

6      a pattern of evidence of patient-centered treatment planning, including attempts at providing

7      informed consent, treatment plans, and documentation of all healthcare encounters.

8      157.    While I am aware that many users believe the eOMIS system could be made

9      more user-friendly, the fact that when used by a mental health practitioner it contains

10     accessible links to vital signs, medication orders, lab results, treatment plans, and prior

11     encounters means that there is no justifiable reason for any mental health clinician or

12     psychiatric provider or mid-level to spend time duplicating information in their entries in

13     the manner which may have been previously appropriate when paper charts were

14     maintained.

15     158.    Based on my record review and interviews with Centurion and ADCRR staff,

16     there was evidence of ongoing multidisciplinary individualized treatment planning based

17     on the acuity and complexity of a particular patient. There was also evidence of documented

18     treatment planning and psychoeducation in eOMIS records that I reviewed.

19     159.    Although Dr. Stewart opines that the current medical records documentation

20     of treatment planning is inadequate, I disagree. Treatment planning is a process rather than

21     spending an inordinate amount of time documenting treatment plans or treatment planning

22     in the medical record. There are no established correctional standards regarding duration,

23     amount, or length of treatment planning documentation or treatment team meetings. While

24     it is important to allow additional detail and individualization in particularly complex cases

25     with acute mental health needs, the structure of the ADCRR mental health classification,

26     particularly with respect to various MH-3 subgroups, as well as design of the residential

27     programs, serves the function of ensuring that comprehensive treatment is provided, and

28

1   may reduce the need to include detail, which would only be necessary in a system where
2   such policies are not directed system-wide.

3       160.   There was evidence of treatment planning, timely communication, and
4   multidisciplinary coordinated care between psychiatric and mental health staff, nursing staff,
5   and when indicated medical providers, and custody staff. This practice significantly reduces
6   the risk of an ADCRR inmate patient's risk of harm to self or others or clinical deterioration.

7                   **Educational & Therapeutic Programming**

8       161.   ADCRR has a multitude and wide variety of both educational and therapeutic
9   group programming available to its inmate population. Such programming includes topics
10  on anger management, anxiety, mindfulness, coping with incarceration, grief support, post-
11  release, medication education, parenting, journaling, self-care, and much more.

12      162.   I reviewed various schedules, outlines, and lists of the group activities (both
13  therapeutic and education) offered by ADCRR and find them to be appropriate and proper
14  for the treatment of inmates on the mental health caseload. Group programming is organized
15  and offered through three primary forms. Group psychotherapy is facilitated by qualified
16  mental health professionals, as is the standard of care. In the residential treatment settings,
17  those sessions are scheduled once/week. In addition, there are separate weekly psycho-
18  educational groups which are facilitated by Behavioral Health Technicians, as well as a
19  third weekly educational group facilitated by qualified security personnel. This is an
20  appropriate division of labor and comports with the standard of care. The groups are
21  properly facilitated by qualified mental health professionals and are offered and available
22  to ADCRR inmates. It is unnecessary for a qualified mental health provider to facilitate all
23  groups. The fact that one psychotherapy group may be cancelled on a day due to a facilitator
24  absence, is not indicative of falsification of medical records where it is noted that the inmate
25  participated in a psycho-educational group.

26      163.   All ADCRR facilities met NCCHC Essential Standard P-F-03–Mental Health
27  Services – which, among other things, analyzes whether "in the correctional setting, as in
28  most other environments, the immediate objective of mental health treatment is to alleviate

symptoms of mental disorders and prevent relapses in order to sustain patients' ability to function safely in their environment…. Ideally, individual counseling, group counseling, self-help groups, residential programs, and clinical management are coordinated. In any event, policy and procedures define the roles of the treatment team and the health care team, as well as the areas of mutual Interest and collaboration. Community self-help initiatives such as Alcoholics Anonymous and Narcotics Anonymous may be an appropriate supplement or alternative to counseling provided by staff." The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR0138406-407 (February 8, 2019)

- ASPC-Eyman – ADCRR00138510-511 (May 29, 2020)

- ASPC-Florence – ADCRR00138641-642 (April 30, 2021)

- ASPC-Lewis – ADCRR00138638 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-G-04.

- ASPC-Phoenix – ADCRR00138807-808 (November 16, 2018) – Accredited with 2014       standards, met 2014 standard P-G-04.

- ASPC-Perryville – ADCRR0138767-768 (February 8, 2019)

- ASPC-Safford – ADCRR00138920-921 (February 8, 2019)

- ASPC-Safford – Ft. Grant Unit – ADCRR00138866-867 (February 8, 2019)

- ASPC-Tucson – ADCRR00139000-001 (July 19, 2019)

- ASPC-Winslow – ADCRR00139140-141 (May 3, 2019)

- ASPC-Winslow – Apache Unit – ADCRR00139090-091 (May 3, 2019)

- ASPC-Yuma – ADCRR00139221 (August 5, 2021)

164.    Similar to other state prison systems, ADCRR implemented a reduction of group therapy and out-of-cell time for state prisoners due to the COVID-19 pandemic. This was due to a variety of public health and safety measures which have been promulgated as best practices by the Centers for Disease Control (CDC). These practices are aimed to minimize and reduce COVID-19 spread in correctional settings where many inmates have medical and mental health risk factors and comorbidities.

59

165.    Similar to ongoing free world efforts, there has been great attention to social distancing, avoiding crowds, and airborne spread of COVID-19. During the pandemic surge, ADCRR inmates exited their cells, had shower time and phone time in groups of 4-6 to minimize the potential for COVID-19 spread. Similar to other correctional systems nationwide, inmates who tested positive for COVID- 19, demonstrated symptoms, or had possible COVID-19 exposure were subjected to medical quarantining or cohorting to reduce the risk of transmission between housing areas. Similarly, new intakes to ADCRR from county jails also require further monitoring.

166.    To its credit, ADCRR has achieved 80% vaccination rates, a remarkable accomplishment and well above the free world average.

167.    I have direct knowledge of several similar interventions that the TDCJ state prison system has taken to minimize the spread and infection of COVID-19 from state prisoners, custody staff, and health care staff. TDCJ discontinued visitation and reduced inmate movement whenever possible.

168.    In my administrative capacity, I was directly involved in the development of a protocol aimed at reducing the number of prisoners gathering during out-of-cell time and ambulating to pill windows for medication administration. I was also involved in a shared strategy between nursing, pharmacy, psychiatry, and custody leadership to administer some psychotropic medications as KOP, again, to reduce inmate movement and COVID-19 infection risk.

169.    Significantly, however, when groups could not be held due to COVID-19 concerns, inmates were provided with in-cell workbooks and packets which were subsequently discussed with a mental health provider during their next encounter. Such self-guided packets ranged in topic area and instructed inmates on suggested approaches to dealing with a variety of situations.

170.    Moreover, I disagree with Dr. Stewart's assumptions regarding use of "movies and T.V." in group programming. First, at ADCRR, it is my understanding that such video programming is rarely utilized in psychotherapy. While it is sometimes used in

1   educational groups—just as in educational settings on the outside—such programming is

2   used to jumpstart group discussions where the programming's content is discussed. Second,

3   video programming is often utilized as a reward for appropriate community behavior or for

4   holiday or other celebratory events.

### Access to Language Interpretation Services

6   171.   Based on my review of individual inmate records, facts, and data, I developed

7   a basis and had sufficient information to establish my professional opinion, to a reasonable

8   degree of medical and psychiatric certainty, that the mandated use of certified translators

9   for all healthcare interactions and/or for group psychotherapy is not the requisite standard

10  of care within a correctional setting. The standard of care within a state prison healthcare

11  setting does not require the use of translators/interpreters for all encounters, but rather it

12  depends upon the nature and extent of the encounter.

13  172.   My July 27, 2020 Report provides extensive support for my professional

14  opinion. To summarize, there is nothing in the NCCHC 2018 Prison Health Care standards

15  that provide for an explicit standard relating to effective communication with Limited

16  English Proficient ("LEP") inmates. Only the notes in NCCHC standards and select

17  standards in the ACA Performance Based Expected Practices for Adults in Correctional

18  Institutions identify the specific circumstances in which language interpretation services

19  should be used. These circumstances are when effective communication is compromised

20  due to speech, hearing, or language deficits; receiving screening; when identifying

21  advanced directives; and for informed consent.

22  173.   To the extent language interpretation services are provided by corrections

23  departments in other jurisdictions, such as by CDCR and the Orleans Parish Prison (a New

24  Orleans Louisiana County jail, not a Louisiana state prison), such service is due to

25  settlement agreements, and exceeds the standard of care.

26  174.   For example, the standard of care in the community and in correctional

27  healthcare is for staff to assess their own level of comfort and proficiency before

28  determining whether a separate translator/interpreter or translator service is required—it

would be improper for a provider to order or to document that translation service would be required where staff is proficient.

175.   The standard of care further mandates that the use of an interpreter is dependent upon the nature and extent of the encounter. For instance, an inmate receiving a blood pressure measurement or a fingerstick blood sugar test most likely does not need an interpreter. An interpreter would be necessary, however, where there are discussions regarding advance directives, as discussed above.

176.   To require any different from the standard of care would be unreasonable and at times, can lead to medical malpractice. For example, in emergency situations, time is simply not available to have translators/interpreters and other services available—rather, the standard of care is to provide emergency care and any delay in care may be alleged or viewed as medical malpractice.

177.   There are also inmates who would not require language interpretation services, such as inmates with varying degrees of deafness, who may be able to utilize hearing aids or other assistive devices, including cochlear implants to communicate with medical and mental health staff. My July 27, 2020 report outlines numerous examples of inmates whose eOMIS records reflect their ability to communicate with the use of such devices. Other inmates may be comfortable with lip reading, provided the speaker slows his or her rate of speech and articulates clearly. Other deaf or hearing-impaired inmates may prefer written communications. Thus, there is no one-size fits all standard for interacting with deaf inmates.

178.   Additionally, it is my understanding, based on my extensive review of inmate medical records and interviews with medical, mental health, administrative, and custody staff over the almost decade of my involvement in this case, that many individuals providing medical, nursing, and mental health care in the ADCRR system are fluent in Spanish.

179.   In conducting my review of inmate charts for the July 27, 2020 report, where it was noted that an inmate speaks a language other than English (for example Spanish) but the healthcare staff did not indicate interpreter services were required, I concluded that the healthcare staff conducting the encounter was likely proficient in Spanish (and/or the inmate

patient could also speak sufficient English). This conclusion is based upon the detailed nature of the SOAPE (Subjective, Objective, Assessment, Plan, Education) notes, indicating the healthcare staff could understand the nature of the complaints made by the inmate as documented in the subjective portion of the SOAPE note, and the provision of care/treatment that was consistent with and in response to the complaint made by the inmate. Additionally, the HSRs (Health Service Requests) and grievances I reviewed were detailed in nature and responded to consistent with the conclusion that the recipient understood the inmate's communications.

180.   Accordingly, it is my opinion that the current standard of care relating to accommodations for LEP inmates, or other inmates who Plaintiffs assert require language interpretation services, should remain the status quo. This widely accepted standard is for community and correctional healthcare providers to use translation/interpretation services if the healthcare provider is not proficient. Translation and interpretation services may be sought through another proficient healthcare staff member who is proficient in the language at issue, including a nurse, medical assistant, or another healthcare administrative support staff member (all of whom receive training in health information privacy), or to use a commercially available voice language telephone line.

181.   With respect to American Sign Language (ASL) inmates, the current standard, if an ASL proficient health services member is not available, is to use visual interpretation through a remote videoconference service, just as ADCRR does through Language Line InSight Video Interpreting.

182.   My most recent series of facility tours is also illustrative of my opinion. During my September 2021 tours, mental health care staff uniformly and consistently explained that if they had an inmate patient who had difficulty communicating in English, that they could utilize another health care professional as an interpreter or the language line. They also clarified that unless this was an emergency situation, they would not rely on custody staff to serve as translators. This complies with NCCHC requirements and the standard of care.

183.    During the most recent random eOMIS record review, I did not identify any non-predominant English-speaking individuals or other ADCRR individuals with other disabilities who had delays in access to mental health care, lack of continuity of care, or delays in receiving clinically indicated mental health treatment services due to a lack of professional interpreters or sign language services. Similarly, I did not identify any adverse patient outcomes resulting in morbidity or mortality due to a lack of professional interpreters or sign language services.

184.    While Dr. Stewart opines that he interviewed monolingual Spanish speakers during his September 2021 tours, a review of these inmates' records evidences their ability to communicate in English.

185.    Mental health staff have access to professional interpreter and sign-language services. There is no failure to provide language interpretation during mental health treatment encounters for non-predominant English-speaking inmates and inmates with other disabilities.

**Treatment of Recurrent Behavioral Problems**

186.    Some ADCRR inmates have severe personality disorders and/or significant impulse control disorders and may engage in recurrent problem behaviors. Centurion mental health staff, however, properly provide access to care and continuity of care for these treatment-refusing or refractory inmates in compliance with the correctional standard of care.

187.    Based on my record review and interviews with Centurion mental health care staff, I have identified that there is a concerted and genuine effort to identify a particular inmate patient's strengths and weaknesses and to gain diagnostic clarification. Whether an inmate has a sole or primary Axis I psychiatric disorder such as a mood or depressive disorder, anxiety disorder, or a psychotic disorder, or situation distress or stressors resulting in an adjustment disorder. Centurion staff attempt to identify the inmate patient's treatment needs. The staff universally expressed an understanding of the complex interplay with ADCRR patients presenting with a standard Axis I disorder, with the possible comorbidity

of a co-occurring impulse control disorder or a mild, moderate or severe personality disorder (antisocial, borderline, narcissistic personality disorder) or maladaptive personality traits. There is no fiscal or financial incentive or goal for mental health staff to place (or remove) inmate patients on/from the mental health caseload or refrain from referring to the psychiatrist or psychiatric mid-level provider for further diagnostic evaluation and psychotropic medication consideration.

188.    As expected within any jail or prison setting, there is an over-representation of inmates with severe personality disorders and/or significant impulse control disorders within the ADCRR. Similarly, many of these individuals will have difficulties following rules, requests, and getting along in a pro-social manner within a congregate care setting such as a jail or prison setting. Many of these inmates may engage in assaultive, self-injurious, or other problem behaviors. Based on my record review and interviews and facility tours and review of available treatment programming, it was very clear that mental health treatment services are available to ADCRR inmates with severe personality disorders and/or impulse control disorders.

189.    Moreover, whether inmates choose to partake in offered individual and group psychotherapy treatment services targeting impulse control and better understanding their problem behaviors and the impact on others, take psychotropic medications as prescribed, refrain from illicit substance abuse, psychotropic medication diversion, trafficking and trading, and other severe problem behaviors, is not something that can be externally changed. It is my professional opinion that Centurion mental health care staff make reasonable attempts to provide access to care and continuity of care for these treatment-refusing or refractory inmate patients. This is further illustrated by the outreach efforts where refusing inmates are brought to medical to speak with a nurse or clinician, are advised of the consequences of refusing treatment, and must execute a written refusal. To the extent that inmates are not able to be transported to the medical area, mental health or nursing staff will round and go cell-side to see the inmates, counsel them, and obtain a signed-refusal. In my professional opinion, this actually exceeds the community standard of care. In private

1   or community mental health practices, should an individual not arrive for a scheduled
2   appointment with a therapist or a psychiatrist, the mental health professional would not, as
3   a common practice, travel to the patient's home and attempt to meet with them at the
4   patient's home, or have the patient brought to their office for counselling on the refusal.

5   **Changes to Mental Health Diagnoses**

6       190.   The practice of adding, discontinuing, or modifying psychiatric mental
7   disorders is a necessary and common component of the provision of mental health treatment.
8   This practice comports with accepted correctional and community standards of care and
9   does not put class members at risk of harm to self or others.

10       191.   The diagnosis and treatment of mental illness is a subjective process, which
11   sometimes involves making a preliminary diagnosis, attempting a treatment, and based
12   upon subsequent experience and behavior, may result in changing the diagnosis. This may
13   be further complicated as certain behaviors result from substance abuse issues. For example,
14   a person while using methamphetamines may appear to be manic, and exhibit symptoms of
15   depression while not using. While that could be diagnosed as bi-polar disorder, being in a
16   setting where the individual refrains from use of illicit substances may result in cessation
17   of the symptoms and demonstrate that the initial diagnosis was incorrect.

18       192.   It is my professional opinion that is within accepted medical and psychiatric
19   practice and the correctional and community standard of care to add, modify or remove
20   medical International Classification of Diseases (ICD) or psychiatric (DSM) diagnoses.
21   Contrary to medical and surgical specialties, there are no diagnostic blood, urine, or other
22   tests that would definitively rule in or rule out a psychiatric diagnosis. Psychiatric diagnoses
23   are best made longitudinally as opposed to cross sectionally.

24       193.   Within correctional settings, many inmates at the time of intake will self-
25   report past, recent or current psychiatric diagnoses and/or psychotropic medication due to a
26   variety of reasons. Many inmates may under-report or not clarify the extent of their
27   substance abuse versus dependence which can affect their mood, behavior, and functioning.

28

66

194.    It is within accepted community and correctional practice for psychiatrists, doctoral level psychologists, and other qualified mental health professionals to consider patient reported symptoms, diagnoses, and then based on the patient's clinical presentation, current signs and symptoms, and when indicated, additional record review of additional collateral information (past records, drug testing results, prior custody and legal information) and other historians to add, discontinue or modify provisional "working" or current psychiatric diagnoses. This practice is individualized to the particular patient, is a clinically reasoned and determined decision- making process, and does not put class members at risk of harm to self or others.

195.    The fact that ADCRR contracted mental health staff are willing to change course, when clinically appropriate, demonstrates that they comport with the standard of care. In my records review, I did not see the improper "de-diagnosing" practice claimed by Dr. Stewart. In fact, all inmates highlighted by Dr. Stewart as experiencing "de-diagnosing" still have major mental illnesses listed in their current mental health status.

**Prescription, Dispensing, Delivery, and Management of Psychotropic Medications**

196.    Importantly, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-D-01–Pharmaceutical Operations, which determines whether pharmaceutical operations meet the needs of the facility and conform to legal requirements. The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138386-386 (February 8, 2019)
- ASPC-Eyman – ADCRR00183487-488 (May 29, 2020)
- ASPC-Florence – ADCRR00138620-621 (April 30, 2021)
- ASPC-Lewis – ADCRR00138708-711 (July 19, 2019) – accredited under 2014 standards – met 2014 standard P-D-01.
- ASPC-Phoenix – ADCRR00138802 (November 16, 2018) – Accredited with 2014 standards, met 2014 standard P-D-01.
- ASPC-Perryville – ADCRR00138747-748 (February 8, 2019)
- ASPC-Safford – ADCRR00138901-902 (February 8, 2019)
- ASPC-Safford – Ft. Grant Unit – ADCRR00138847-848 (February 8, 2019)

- ASPC-Tucson – ADCRR00138977-978 (July 19, 2019)
- ASPC-Winslow – ADCRR00139122-123 (May 3, 2019)
- ASPC-Winslow – Apache Unit – ADCRR00139073-074 (May 3, 2019)
- ASPC-Yuma – ADCRR00139200-201 (August 5, 2021)

197. Additionally, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-D-02–Medication Services, which determines whether medications are provided in a timely, safe, and sufficient manner. The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138386-387 (February 8, 2019)
- ASPC-Eyman – ADCRR00138489 (May 29, 2020)
- ASPC-Florence – ADCRR00210548-549 (September 9, 2021)
- ASPC-Lewis – ADCRR00138676 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-D-02.
- ASPC-Phoenix – ADCRR00138802-803 (November 16, 2018) – Accredited with 2014 standards, met 2014 standard P-D-02.
- ASPC-Perryville – ADCRR00138780-781 (July 25, 2019)
- ASPC-Safford – ADCRR00902-903 (February 8, 2019)
- ASPC-Safford – Ft. Grant Unit – ADCRR00138848 (February 8, 2019)
- ASPC-Tucson – ADCRR00138978-979 (July 19, 2019)
- ASPC-Winslow – ADCRR00139123-124 (May 3, 2019)
- ASPC-Winslow – Apache Unit – ADCRR00139074-075 (May 3, 2019)
- ASPC-Yuma – ADCRR00139201-202 (August 5, 2021)

198. In my professional opinion, the following Policies, Procedures and Standards utilized by ADCRR are  within generally accepted practices:  (1) the review of recent mental health treatment and, in particular, county jail (prior to ADCRR admission) and community "free world" psychotropic and pharmacotherapy treatment; (2) past psychiatric diagnoses and treatment; (3) verification and corroboration of prior psychotropic pharmacotherapy; (4) initiation of psychotropic pharmacotherapy treatment when clinically indicated upon a

state inmate's admission to a ADCRR facility, transfer to another ADCRR facility, or while housed within the ADCRR system.

199.   Before switching to eOMIS, the prescribing system was based on a written/paper entry medical record that required individual physician or mid-level provider ordering of psychotropic and non-psychotropic medications, individual nursing transcription of these orders, and creation and documentation of delivery of medications in a written/paper Medication Administration Record (MAR) system. While such system is still within generally accepted practices, the ability to automate such a system upon entry of the medication order by a provider streamlines the process, reduces the time before medications can be provided, and reduces the risk of improper medication ordering.

200.   In August 2021, alone, reports from the contracted pharmacy, demonstrate that the medication ordering system is effective as shown in the graphic below.



Source:  ADCRR00177023 (Diamond Pharmacy Services, Psycho Donut Chart (Billed, by RXs), 8/1/2021 through 8/31/2021).

201.   Medication doses may, occasionally, be missed. A missing medication dose may occur due to the following factors: the sheer size and large volume of prescriptions; large prison facilities; physical plant issues; geographical challenges of the Arizona system; custodial movement of state prisoners within units; restrictions in offender movement in unit lockdowns; changes in unit assignments; other transportation and classification issues that are beyond the scope of healthcare staff; and especially during COVID-19, supply-chain disruptions which may render certain medications unavailable from pharmaceutical manufacturers. There is no perfect correctional or free world health system. Even with the above-mentioned factors, I did not find any evidence that an isolated event of a state prisoner missing his/her medications caused immediate or delayed clinical decompensation or further problems. I found no undue delay or that anyone was harmed as result of the delay.

202.   Centurion utilizes a mail order distributer, Diamond Pharmacy, for mail ordering, packaging, and dispensing of medications to unit staff. This model is common practice, used nationally, and I have immediate familiarity with this pharmacy practice in my prior roles in the State of Rhode Island and currently in the State of Texas. When nonclinical urgent medications are needed, it is important to note that there is a mechanism to request and obtain any urgent medications in a more expedited and immediate manner via designated local community pharmacies.

203.   In addition to the records of the named Plaintiffs, and the randomly pulled records referenced earlier, I also reviewed records of inmates who were diagnosed with mental illness and who were cited as examples of an alleged lack of an effective medication system in Dr. Stewart's Report. My review revealed there was no delay with respect to each of these patients' care in violation of generally accepted standards for a state prison facility. On-site outpatient and inpatient (when clinically indicated) mental health services included the identification and referral of state prisoners with mental health needs or past or current psychotropic medication treatment. Even inmates with no immediately identified clinical need or acuity, except for current/recent psychotropic medication treatment, were referred

for follow-up mental health and psychiatric evaluation and treatment in a timely and clinically appropriate manner.

204.   Dr. Stewart asserts there are delays in the prescribing and delivery of psychotropic medications and delays in mental health treatment within ADCRR. It is my professional opinion from record reviews, that the time frames for screening, referral, psychiatric evaluation, verbal/in-person medication orders after obtaining clarification and verification of the exact psychotropic medication, dose and schedule, informed consent from an inmate, medication ordering, filling, and dispensing, and medication administration are all within the standard of care of correctional psychiatry, are clinically justifiable practices within a state prison correctional setting, and are systemically implemented at ADCRR.

205.   According to NCCHC Accreditation Report of the Health Care Services at ADCRR, NCCHC standard P-A-08–Health Record Format and Contents, this essential standard was met at all complexes and separately accredited satellite units. (See above).

**Formulary and Non-Formulary Drugs**

206.   Centurion's formulary and non-formulary medication lists for psychotropic medications comply with generally accepted practices of a state prison facility. The practice and policy of using formulary medications and having a nonformulary medication approval process was within national correctional health standards and practices.

207.   In my professional opinion the Policies, Procedures and Standards utilized by ADCRR and Centurion with respect to the review of recent mental health treatment and, in particular, "free world" psychotropic and pharmacotherapy treatment, past psychiatric diagnoses and treatment, and verification and corroboration of prior psychotropic pharmacotherapy, initiation of psychotropic pharmacotherapy treatment when clinically indicated upon a state prisoner's admission to a facility, transfer to another facility, or while housed within the system, was within the generally accepted practices.

208.   My review of the medication lists clearly establishes that various psychotropic medication classes and agents are available. I disagree with Dr. Stewart's

71

1    opinions regarding prescriptions that should be added to or removed from Centurion's
2    formulary. Significantly, Dr. Stewart fails to appreciate that in any correctional environment
3    (jail, prison, juvenile correction setting, etc.), there is a need for health care and custody
4    staff to maintain a high index of suspicion for the abuse, diversion, and trafficking of
5    prescribed psychotropic and non-psychotropic medications. Psychiatrists and other health
6    care professionals providing direct and indirect (such as emergency departments, regional
7    hospitals, clinics, and consulting specialists) services to inmates may be naive to this risk,
8    especially for noncontrolled (e.g., non-narcotic and non-stimulant) medications.

9    209.   I disagree with Dr. Stewart's assertion that Wellbutrin should be included on
10   Centurion's formulary. Wellbutrin is a particularly problematic medication and is thus
11   typically a non-formulary agent in correctional settings. Moreover, while Wellbutrin is an
12   approved and supported option for the treatment of depression, it is not the only option for
13   the treatment of depression. There are numerous SSRIs and SNRIs which can be utilized to
14   treat depression. The efficacy of SSRIs/SNRIs is equal in comparison to Wellbutrin.
15   Including Wellbutrin on Centurion's formulary is not necessary, nor is it required by the
16   standard of care.

17   210.   I also disagree with Dr. Stewart's assertion that Trileptal is not sufficiently
18   utilized within ADCRR's system. Oxcarbazepine (generic name, brand name is Trileptal)
19   is an anticonvulsant which is only FDA-approved for the treatment of seizures. It does not
20   have a current FDA-approved indication for the treatment of bipolar or any mood disorders.
21   The use of this medication for the treatment of mood disorders and impulse control is
22   considered off-label use and is supported by limited literature. The APA guidelines
23   recommend lithium or valproate or an antipsychotic for the treatment of bipolar disorder.
24   Oxcarbazepine is to be used as an alternative option. I share these same concerns regarding
25   the use of Seroquel. Quetiapine (generic name for Seroquel) is a treatment option for the
26   management of schizophrenia. The efficacy of quetiapine is similar to other antipsychotics
27   within the class of Second-Generation Antipsychotics. Quetiapine, although a very good
28   therapeutic option, is associated with frequent misuse and abuse. Literature indicates that

Quetiapine may be the most abused and misused Second-Generation Antipsychotic. Due to its serious risk for abuse, misuse, diversion, trafficking and trading, Seroquel is a nonformulary medication in many jail and prison settings.

211.   And, for similar reasons, I disagree with Dr. Stewart's opinion that Clozapine "should definitely be on Centurion's formulary." Clozapine (generic name for Clozaril) is an antipsychotic medication option that is typically used only for patients with treatment-refractory or resistant schizophrenia (when numerous other antipsychotic medication trials have been ineffective). While Clozapine may be beneficial, it is important to determine if the patient is a candidate for clozapine treatment. There are a myriad of risks and side effects (lowering of seizure threshold, sialorrhea (drooling), sedation, etc.) associated with this medication. Clozapine is also associated with neutropenia (an abnormally low concentration of neutrophils, a type of white blood cell) making one prone to infections and neutropenic sepsis, a condition which may become life-threatening. Thus, regular blood monitoring is required. Additionally, all prescribers of clozapine products must certify in the Clozapine REMS Program. For these and other reasons, Clozapine is not a first line antipsychotic medication treatment. To ensure patient safety, the need for crucial blood monitoring, and other necessary safeguards, it is a non-formulary medication which requires special review within community and correctional settings.

212.   Centurion's pharmacy and therapeutic committee's decision-making and psychiatric leadership's decision to have Wellbutrin, Trileptal, Seroquel, and Clozapine as non- formulary agents are within accepted correctional psychiatry prescribing practices and meet the correctional standard of care.[10]

213.   I also disagree with Dr. Stewart's opinion that Tri-cyclic anti-depressants ("TCAs") are inappropriate and place ADCRR inmates at risk. While TCAs may have a higher risk of causing certain anticholinergic side effects (e.g., dry mouth, blurry vision,

---

[10] I was a primary author in the American Academy of Psychiatry and the Law's correctional psychiatry prescribing resource document (Tamburello, A., et al., The American Academy of Psychiatry and the Law Practice Resource for Prescribing in Corrections, J Am Acad Psychiatry Law, 46:242-43, 2018), which addresses these concerns.

constipation) these can be managed and monitored safely within community and correctional settings. I agree that TCAs may be associated with increased heat-related illness risks, however, the efficacy of this class of medication is undisputed and is comparable to other antidepressant medication classes such as SSRI/SNRIs. TCAs may be safely utilized for patients who are not responsive to first and second-line antidepressants. Further, TCAs are one of the only antidepressant agents that have an established therapeutic window that can be monitoring via blood monitoring to establish treatment compliance, medication metabolism, and efficacy.

214.   And Dr. Stewart fails to acknowledge that within a correctional setting TCAs may be used for a variety of other nonpsychiatric medical uses, medical indications such as enuresis (bedwetting), insomnia, diabetic neuropathy, low back pain, migraine headaches, and other chronic pain conditions. Medical staff and other correctional primary care providers often utilize TCAs as opposed to narcotic and opiate and other pain medication which are particular agents of abuse, diversion, addiction and dependence and put the patient at risk for extortion for these medications within correctional settings. Moreover, many county jails may have previously initiated TCAs for insomnia and sedative hypnotic agents. Thus, ADCRR may have inherited patients from the county jail or the community on these medications. Discontinuing past medications, even when the therapeutic benefit or risk to benefit ratio is problematic, is often a challenging issue for correctional psychiatric and medical providers.

215.   A "newer" medication does not always equate to better medication. Perphenazine, Prochlorperazine and Trifluoperazine are First Generation Antipsychotics ("FGAs"). Dr. Stewart opines that they are no longer used, nor should they ever be and are, generally, not utilized within the ADCRR as often due to the availability of Second Generation Antipsychotics ("SGAs"). Dr. Stewart fails to describe numerous common short- and long-term metabolic side effects to include significant weight gain, pre-diabetes and metabolic syndrome that place patients at risk for morbidity and mortality and are

commonly associated SGAs. Additionally certain SGAs require baseline and serial electrocardiogram (EKG) testing/monitoring due to serious pro-arrythmia inducing risks.

216.    My review of ADCRR pharmacy and medical records demonstrated that a majority of ADCRR inmates treated with antipsychotic medications were typically on second generation oral agents. Some were on long-acting injectable agents, but very few were on Perphenazine (brand name is Trilafon) or Trifluoperazine (brand name is Stelazine). FGAs may be associated with an increased risk of movement disorders, however, many of these agents are still utilized in community and correctional settings and have a role in the treatment of schizophrenia and other psychotic disorders. Indeed, APA guidelines continue to recommend utilization of both FGA and SGA based on patient specific factors. Further, in my clinical experience, many patients with psychotic disorders who are offered "newer" SGAs verbalize a preference to remain on older agents due to their familiarity with the medication, its short- and long-term side effects, and other beneficial effects. Sharing a respectful, empathic, and collaborative treatment approach with these patients, in order to develop and maintain treatment and medication compliance, is essential and should override a move towards the "newest" medication.

217.    Finally, I am puzzled by Dr. Stewart's insinuation that Prochlorperazine is being utilized within ADCRR primarily as an antipsychotic medication. This medication's brand name is Compazine and is commonly used for the acute treatment of nausea and vomiting. I did not find/review a single chart or medical document of an ADCRR patient with a psychotic disorder that was treated with prochlorperazine as a designated, sole or primary/specific antipsychotic agent or intent. It is possible a patient with a psychotic disorder may have developed a gastro-intestinal issue with nausea and vomiting and medical/health care staff ordered Compazine as a time-limited agent for symptom relief. Compazine may be used similar to other gastrointestinal relief agents within community emergency and urgent care settings and correctional settings.

/ / /

/ / /

**Administration & Distribution of Psychotropic Medications**

218.   It is my professional opinion that ADCRR has an adequate psychotropic medication administration and distribution system and meets correctional health and community standards of care.

219.   I find that the Policies, Procedures and Protocols for the administration of psychotropic medication(s) are within the generally accepted practices of a state prison facility. According to available documentation, the psychotropic medications that were administered were done so by trained medical staff qualified to dispense medications. The practice and policy of using formulary medications and having a nonformulary medication approval process is within national correctional standards.

**PMRB Process**

220.   During numerous interviews with nursing and mental health care staff across the state, and also as spelled out in Centurion and Arizona DOC policy, I learned that if and when there is a clinical question involving the clinical necessity, consideration of the clinical necessity and/or appropriateness of PMRB, or the need to begin to pursue this process with due process protections for inmate patients who may be subjected to involuntary administration of psychotropic mediations (when clinically indicated as a means of treating psychiatric illness or urgently reducing harm, dangerousness, or severe violence towards self or others), that Dr. Carr (or his designee) are readily available to discuss by phone, or alternatively, an on call psychiatrist is available 24 hours per day, 365 days per year, even afterhours and on weekends. I understand this same process to be in place for orders of seclusion or restraint.

221.   Of significance with respect to the emergency use of psychotropic medication, all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-G-03–Emergency Psychotropic Medication, which requires that health staff follow policies developed for the emergency use of force psychotropic medication as governed by the laws applicable in the jurisdiction. The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138414 (February 8, 2019)

- ASPC-Eyman – ADCRR00138518-519 (May 29, 2019)

- ASPC-Florence – ADCRR00138649 (April 30, 2021)

- ASPC-Lewis – ADCRR00138685 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-I-02.

- ASPC-Phoenix – ADCRR00138810 (November 16, 2018) – Accredited with 2014 standards, met 2014 standard P-I-02.

- ASPC-Perryville – ADCRR00138774-775 (February 8, 2019)

- ASPC-Safford – ADCRR00138928 (February 8, 2019)

- ASPC-Safford – Ft. Grant Unit – ADCRR00138873-874 (February 8, 2019)

- ASPC-Tucson – ADCRR00139008-009 (July 19, 2019)

- ASPC-Winslow – ADCRR00139147-148 (May 3, 2019)

- ASPC-Winslow – Apache Unit – ADCRR00139097-098 (May 3, 2019)

- ASPC-Yuma – ADCRR00139228-229 (August 5, 2021)

**Prevention of Heat-Related Illnesses**

222.   Pursuant to the ADCRR Mental Health Technical Manual, certain policies and procedures must be followed to manage heat intolerance during use of psychotropic medications. Specifically, Chapter 4, Section 11.0 provides that the medical provider must assess heat intolerance in combination with psychotropic medications and to duly act in accordance with the protocols outlined in the section. These protocols include, but are not limited to: medical staff must verify all cases of suspected heat intolerance, medical staff must document the clinical examination in the medical record, inmates prescribed psychotropic medication must be referred for additional psychiatric management, and all reasonably available steps must be taken to prevent heat injury or illness and if symptoms continue, the inmate must be transferred to a housing area where the temperature does not exceed 85 degrees. (See ADCRR Mental Health Technical Manual, dated December 24, 2019.)

77

223.   I have observed first-hand the mitigation efforts implemented by ADCRR in both past and recent tours. My observations, which I noted in my December 18, 2013 Report, remain consistent and are as follows. During my tours of outdoor recreational areas, enclosures, and open recreation yards, I observed several facilities have implemented outdoor heat precautions. Correctional staff demonstrated several preventative steps, including shaded areas, misters, misting units, opportunities for water/hydration, and the like. Correctional staff also shared that inmates had the opportunity to decline recreation time during temperature extremes.

224.   I also observed multiple postings that remind correctional and healthcare staff of the need to be aware of heat related issues and responses. In addition to postings, ADCRR has issued memorandums to its wardens concerning Standardized Temperature Checks. One memorandum, dated March 23, 2021, reminds wardens to direct the taking and logging of temperatures on April 1st of every year, and to ensure that temperature taking, and logging continues through October 31st. (See ADCRR Memorandum re Standardized Temperature Checks dated March 23, 2021, at Bates No. ADCR00172370.) It further explains that where there is a cell identified as having a temperature of above 95 degrees, the Shift Commander must notify the Deputy Warden or the On Call Duty Officer. Then, immediate steps shall be taken to bring the temperature down. As to inmates on psychotropic medications who are suffering a heat intolerance reaction, "all reasonable available steps [must] be taken to prevent heat illness or injury. If all other steps have failed to abate heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit." Based upon my inspection of ADCRR complexes, understanding of the temperature monitoring methods, and personal experience, I do not believe that temperature readings measured in this manner above 90 degrees pose an undue risk of harm.

225.   It is my professional opinion that temperatures are appropriately monitored by trained correctional staff, that staff receive training and training materials regarding heat extremes, basic first aid, and emergency response, and staff respond appropriately to higher

temperatures by implementing appropriate precautions to prevent heat related injury to all inmates, including those that might be on psychotropic medications.

226.   I have not identified any medical records or reports of inmates with psychotropic medications or heat related complications or death. It is my professional opinion that, as a matter of practice, heat related precautions are being addressed and meet the standard of care.

### **Treatment for Suicidal or Self-Harming Inmates**

227.   It is my professional opinion that ADCRR provides clinically appropriate mental health and psychiatric evaluation, crisis stabilization, supportive psychotherapy, and other treatment services to inmates who are potentially suicidal or at high risk for imminent self-harm. This mental health care meets the correctional and community standard of care. When rare suicides occur, psychological autopsies and administrative suicide reviews are conducted. Morbidity and mortality reviews are completed. An assessment is made regarding the various factors that potentially culminated in a particular inmate's suicide.

228.   This is supported by the fact all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-B-05–Suicide Prevention and Intervention, which determines whether suicides are prevented, when possible, by implementing prevention efforts and intervention. The most recent report for each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138374 (February 8, 2019)
- ASPC-Eyman– ADCRR00138474-475 (May 29, 2020)
- ASPC-Florence – ADCRR00210547-548 (September 9, 2021)
- ASPC-Lewis – ADCRR00138703 (February 8, 2019) – accredited under 2014 standards – met 2014 standard P-G-05.
- ASPC-Phoenix – ADCRR00138815 (May 23, 2019) – accredited under 2014 Standards – met 2014 standard P-G-05.
- ASPC-Perryville – ADCRR00138779-780 (July 25, 2019) All standards met December  4, 2019 (ADCRR00138785).
- ASPC-Safford – ADCRR00138890-891 (February 8, 2019)

1      •      ASPC-Safford – Ft. Grant Unit – ADCRR00138836-837 (February 8, 2019)

2      •      ASPC-Tucson – ADCRR00139016-017 (December 17, 2019)

3      •      ASPC-Winslow – ADCRR00139112-113 (May 3, 2019)

4      •      ASPC-Winslow – Apache Unit – ADCRR00139063-064 (May 3, 2019)

5      •      ASPC-Yuma – ADCRR00139188-189 (August 5, 2021)

6

7    229.    The ADCRR strives for and implements timely suicide prevention practices

and efforts.

8

9    230.    The United States Department of Justice, Bureau of Justice Statistics,

routinely collects, compiles, and reports on in-custody deaths including those by suicide.

10

The most recent report released in October 2021 reveals a nationwide long-term trend of

11

increasing suicides in all custodial environments.

12

13

14    

15

16

17

18

19

20

21

22

23

24

25

26    / / /

27    / / /

28    / / /

1
2
3
4
5
6
7
8
9
10
11
12



13  Source:  Carson, E. Ann (October 2021), Suicide in Local Jails, State and Federal Prisons,

14  2000-2019 – Statistical Tables, at 1-2  (Bureau of Justice Statistics (BJS) Report).

15      231.    Moreover, as detailed in Department Order 807, ADCRR properly trains and

16  refreshes staff regarding suicide prevention training. Additionally, I understand that

17  ADCRR conducts three-minute man-down drills at least once a month on each shift. Such

18  preventative training reduces risk of harm to the inmate population and ensures both custody

19  and healthcare staff are prepared for emergency scenarios. Importantly, all healthcare and

20  custody staff are required to maintain CPR certification.

21      232.    The success of these efforts is reflected in the decline of self-harm incidents

22  at ADCRR, as shown in the following graphs:[11]

23
24
25
26
27
28

---

[11] These graphs also include data from the private prisons housing ADCRR inmates, which is consistent with how other states with private prisons report their suicide and self-harm statistics, including Arizona.  For example, California's reported data includes La Palma Correctional Center (prior to the return of those inmates to state-operated facilities), which is located in Eloy, Arizona, and had no reported suicides among its 3,000 CDCR (California Department of Corrections and Rehabilitation) inmates.

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23



24
25
26
27
28

Source:   Prepared by John Wilson based upon data reported by ADCRR at https://corrections.az.gov/sites/default/files/REPORTS/Assualt/2021/assaultmortality-sept21.pdf (as well as prior reports for monthly data points)





<u>Source:</u>   Prepared by John Wilson based upon data reported by ADCRR at https://corrections.az.gov/sites/default/files/REPORTS/Assualt/2021/assaultmortality-sept21.pdf (as well as prior reports for monthly data points)

233.   As the below chart indicates, from July 2019 to August 2021, there is no concentration of completed suicides at any particular ADCRR Complex (or custody level).

/ / /

/ / /

| Month | Douglas | Eyman | Florence | Lewis | Perryville | Phoenix | Safford | Tucson | Winslow | Yuma | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July 2019 | - | - | - | - | 1 | - | - | 1 | - | - | 2 |
| August 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| September 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| October 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| November 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| December 2019 | - | - | - | - | - | - | - | - | - | - | 0 |
| January 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| February 2020 | - | 1 | - | - | - | - | - | - | - | - | 1 |
| March 2020 | - | 1 | - | - | 1 | - | - | - | - | - | 2 |
| April 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| May 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| June 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| July 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| August 2020 | - | 1 | - | - | - | - | - | - | 1 | - | 2 |
| September 2020 | - | - | - | - | 1 | - | - | 1 | - | - | 2 |
| October 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| November 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| December 2020 | - | - | - | - | - | - | - | - | - | - | 0 |
| January 2021 | - | - | - | 1 | - | - | - | 1 | - | - | 2 |
| February 2021 | - | - | - | - | - | - | - | 1 | - | - | 1 |
| March 2021 | - | - | - | - | - | - | - | - | - | - | 0 |
| April 2021 | - | 1 | - | - | - | - | - | - | - | - | 1 |
| May 2021 | - | - | - | - | - | - | - | - | - | 1 | 1 |
| June 2021 | - | - | - | - | - | - | - | 1 | - | - | 1 |
| July 2021 | - | - | - | - | - | - | - | - | - | - | 0 |
| August 2021 | - | 1 | - | - | - | - | - | - | - | - | 1 |
| **Total** | **0** | **5** | **0** | **1** | **3** | **0** | **0** | **5** | **1** | **1** | **16** |

Sources:                ADCRR00056772-00058260;           ADCRR-00069938-00069956,

ADCRR00137854-00137859; and, ADCRR00175186 (monthly data collected from IM

Suicides worksheet of each month)

/ / /

/ / /

**Reduction in Use of Force on SMI Inmates**

234.    Use of force on the mentally ill cannot be completely eliminated. When an inmate is self-harming, the immediate goal is to stop the harm for the safety and security of the inmate. Custody staff are paramount to achieving this goal as they are the first line of defense.  Use of OC spray, after verbal attempts to stop the behavior fail, represents a minimally restrictive solution that comports with the standard of care. Custody staff that work in restrictive units and inpatient units, are provided with a three-day mental health training regarding various de-escalation tactics.

235.    It is my professional opinion that from a psychiatric/mental health point of view that the various units of ADCRR have a sufficient procedure in place to protect against any alleged or claimed substantial risk of harm from the use of OC spray and chemical agents. Specifically, ADCRR correctional and Centurion health care staff training and education, documentation, attempt de-escalation approaches and other alternatives to OC spray, and the additional policy, procedure and practice, of ensuring that any inmate upon which OC spray is used is immediately taken to nursing and medical personnel for nursing assessment and medical evaluation. Should there be any emotional or psychic distress, additional mental health referral and evaluation provides an added level of protection more than sufficient to address the "risk of harm" raised by Dr. Stewart in his report. Further, the policy, procedure, and practice of ensuring that each inmate where chemical spray is utilized receives both the opportunity to wash and have a change of clothing, further reduces any "risk of harm" claimed by Dr. Stewart. Finally, the ready availability and access of CPR trained custody and health care staff, nearby emergency departments and other local hospitals also mitigate any additional "risk of harm."

236.    During my September 2021 ADCRR tours, I did not witness any uses of force.

**Segregated Confinement of Inmates with Mental Illness**

237.    There is tremendous disagreement regarding the definition of "solitary confinement."

238.    Mr. Haney implies in his expert report that there is ample empirical research that clearly established an immediate and direct cause and effect. He infers that all individuals with mental illness will demonstrate clinical deterioration and exacerbation of their mental illness, and also engage in self-injurious behaviors and suicide attempts. Several of the articles that he cites are books or book chapters or other thought pieces, many are in obscure journals, and many do not appear to have undergone any type of exhaustive/rigorous peer-reviewed review.

239.    The articles cited by Mr. Haney are problematic due to a variety of methodological, design (lack of control group and instruments), and ethical (lack of informed consent) issues.

240.    Further, the articles cited are presented as evidence-based, scientific studies, which they are not.  I take issue with the fact that none of the articles refers to a single controlled adult prison, juvenile detention, or juvenile correctional facility. None includes risk of psychic or emotional harm using baseline and outcome criteria and assessment instruments by clinicians.

241.    Instead, Mr. Haney cites articles pertaining to restrictive housing settings and risk of harm that are, in reality, position papers put out by organizations who cite literature from attorneys and advocacy groups. It is important to note that they are neither peer-reviewed nor published in medical journals.  This is significant because Plaintiffs argue that ADCRR purposefully places inmates with serious mental illness into isolated confinement with a resulting effect of emotional, psychic, or serious harm.

242.    In my opinion, scientific literature is currently lacking on this topic. The only statewide study on the effects of long-term segregation in Colorado that was conducted by medical professionals was conducted from 2007-2010. The Colorado study is the only one that provides established scientific methodology and rigorous research. Significantly, and contrary to the hypothesis of its researchers, the results contradict Mr. Haney's opinions. The Colorado study is the only current adult correctional system study that has been published in a medical journal, as opposed to those in non-peer reviewed literature. O'Keefe,

86

Maureen & Klebe, Kelli & Metzner, Jeffrey & Dvoskin, Joel & Fellner, Jamie &Stucker, Alysha. (2013). A Longitudinal Study of Administrative Segregation. The Journalof the American Academy of Psychiatry and the Law. 41. 49-*60. See also,* O'Keefe, Maureen (May 2017). Reflections on Colorado's Administrative Segregation Study. NIJ Journal (available at: https://www.ojp.gov/pdffiles1/nij/250346.pdf)

243.    Mr. Haney asserts that "isolated confinement" is analogous to "solitary confinement" such as that allegedly found in supermax confinement special housing units (SHU) in the U.S. federal prison system or other administrative segregation settings (referred to as "restrictive housing" settings) in state and federal prisons for adult inmates. He opines that "isolated confinement" is akin to an SHU setting and that there is sensory deprivation, no stimulation, and other social isolation. Professor Haney is curiously silent regarding the serious risks of harm that many of these individuals pose to other inmates, custody, and health care staff. These types of settings are used in correctional systems for adults who belong to security threat groups (STG). These prisoners are extremely aggressive and assaultive, often members of prison, national, or regional gangs. In these instances, isolated confinement is used only after less restrictive housing and supervision efforts havebeen unsuccessful.

244.    In my professional opinion, ADCRR custody staff and Centurion health care staff work collaboratively to identify and divert individuals at risk.  ADCRR inmates, with or without current mental disorders, who engage in serious disciplinary infractions and face restrictive housing still have full access to medical and mental health care. These individuals are routinely assessed by medical and mental health staff to identify any medical or psychiatric contraindications to this type of placement. They do periodic screening and monitoring toassess for signs of clinical deterioration. Reasonable efforts are made to identify individuals who are engaging in problem behaviors due to a mental disorder. In these cases, they provide additional mental health treatment and divert them from restrictive housing settings when possible.  Should there be evidence of deterioration when the inmate is housing in these disciplinary settings, health care staff intervene. They evaluate the

1  individual to determine their medical or mental health treatment needs. They provide

2  recommendations to custody staff regarding a possible move to a housing setting where

3  their health care needs could be better addressed.

4      245.   There is timely communication and interface between mental health and

5  custody. Custody staff readily consult mental health for their clinical input regarding cases,

6  bookings, disciplinary housing and other treatment efforts/planning for challenging/difficult

7  inmates. This demonstrates the good collegiality/partnership and collaboration and timely

8  communication between clinical and security staff on difficult to manage inmates. These

9  efforts, as further detailed in Department Orders 807, 812, & 813, comply with the

10  correctional standard of care and represent the various steps taken by ADCRR to screen

11  inmates in restrictive housing settings for mental disorders, serious mental illness, self-

12  injurious and suicidal behaviors, and clinical deterioration in the activities of daily living.

13  As further detailed in these policies and Dr. Stallcup's deposition, nursing and mental health

14  care staff conduct timely and appropriate rounding within restrictive housingsettings and

15  inmates are provided with therapeutic and educational programming inclassroom settings.

16  Further, inmates who are prescribed psychotropic medications, who demonstrate

17  medication non-compliance, are timely seen by mental health staff. These checks and

18  balances appropriately mitigate precipitation or worsening of mental illness.

19      246.   In summary it is my professional opinion that ADCRR avoids the prolonged

20  segregation of minor youth (youth waived to the adult state prison system) and adult inmates

21  with mental disorders. Custody and health care staff work proactively to place inmates with

22  mental disorders in restrictive housing settings if there is potential for harm to themselves

23  or others. If an inmate with serious mental illness is placed in a restrictive housing setting

24  or higher custody settings which the Plaintiffs may argue is "segregation," ADCRR

25  employs a variety of in-cell and out-of-cell structured therapeutic activities (i.e., mental

26  health/psychiatric treatment) in appropriate programming space, adequate unstructured out-

27  of-cell time is implemented, and other safeguards are permitted. Centurion mental health

28

staff work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals.

247.   Mr. Haney's opinions are further discredited by the fact that all ADCRR facilities were found 100% compliant with NCCHC Essential Standard P-G-02–Segregated Inmates, which states that any practice of segregation should not adversely affect and inmate's health. To determine whether this standard is met, NCCHC looks to whether for solitary confinement (defined as less than three encounters with staff or other inmates per day), daily monitoring by medical staff is needed, coupled with monitoring by a mental health clinician at least once per week. For other segregation with more routine contact, only three medical and/or mental health contacts are required per week. The most recent reportfor each ADCRR complex is detailed below:

- ASPC-Douglas – ADCRR00138412-413 (February 8, 2019)
- ASPC-Eyman – ADCRR00138541-542 (November 9, 2020)
- ASPC-Florence – ADCRR00138648 (April 30, 2021)
- ASPC-Lewis – ADCRR00138679 (June 22, 2018) – Accredited with 2014 standards, met 2014 standard P-E-09.
- ASPC-Phoenix – ADCRR00138805 (November 16, 2018) – Accredited with 2014 standards, met 2014 standard P-E-09.
- ASPC-Perryville – ADCRR00138773-774 (February 8, 2019)
- ASPC-Safford – ADCRR00138927-928 (February 8, 2019)
- ASPC-Safford – Ft. Grant Unit – ADCRR00138872-873 (February 8, 2019)
- ASPC-Tucson – ADCRR00139007-008 (July 19, 2019)
- ASPC-Winslow – ADCRR00139146-147 (May 3, 2019)
- ASPC-Winslow – Apache Unit – ADCRR00139096-097 (May 3, 2019)
- ASPC-Yuma – ADCRR00139227-228 (August 5, 2021)

/ / /

/ / /

/ / /

**Files Highlighted by Dr. Stewart**

▉▉▉▉▉▉▉▉▉▉▉**:**

248.   I disagree there was a delay and failure to provide adequate treatment to ▉▉▉▉▉▉▉▉ and counter that appropriate mental health care has been availed to Mr. ▉. Inmate ▉▉▉ submitted an HNR on 3/24/21 requesting to get back on psych medications. A nursing encounter was held that same morning and he underwent an Initial Psychiatric Evaluation that same day. His predominant complaint was anxiety and sleeping problems. He did not present with any psychotic symptoms, clinical deterioration, nor did he present with imminent risk of harm to self or others. He received a diagnosis of "anxiety disorder, unspecified" and was prescribed medication.

249.   On 4/9/21 he submitted an additional HNR wanting to change his psych medications. He received 3 mental health assessments on 4/13/21, 4/13/21, and 4/19/21 respectively.

250.   When he saw the RN on 8/29/21, he reported wanting to get his medication changed again. The RN noted that there was no acute distress, and a referral was made to mental health. He was seen the following day for a MH Health Wellness check and reported no mental health concerns. He participated in psych education groups on 8/31/21 and 9/7/21 and demonstrated good behavior in each class. Importantly, inmate Lopez has a history of amphetamine dependence (disorder), drug abuse (NEC) unspecified, abuse of other non-psychoactive substances, and psychotropic and pain medication seeking behaviors. During a 9/30/21 encounter with a mid-level provider he again requested another medication change.

251.   Mr. ▉▉▉ did not submit any HNRs the entire month of September. He submitted four HNRs related to dental complaints in October, but none regarding mental health (as of 10:27 PM CST 10/21/2021) in October to date. In October he has received MH - Group Counseling, MH - Treatment Plan Reviews, MH - Individual Counseling, release planning, and several MH - Health and Welfare Rounds by several qualified mental health professionals.  He was successfully released from the ADCRR on 10/30/21.

252.    My review of ████████'s ADCRR mental health records revealed that Mr. ████ received timely and frequent encounters with qualified mental health professionals. Additionally, the psychotropic medications which he was prescribed were in fact appropriate for his working diagnosis of schizoaffective disorder. AIMS (Abnormal Involuntary Movement Scale) examinations to assess for antipsychotic medication induced abnormal muscle movements were completed by psychiatric staff. Clinically appropriate laboratory studies were ordered and reviewed.

████████████████

253.    ████████' mortality review and psychological autopsy were reviewed and will not be repeated here. In summary, this was a 20-year-old single Caucasian male with no verifiable community psychiatry treatment history, a past medical history of mild intermittent asthma, and a substance use history significant for uncomplicated cannabis dependence, continuous (disorder), opioid dependence, uncomplicated, other psychoactive substance abuse, uncomplicated.  He underwent nursing intake at the ASPC-PHX ALHAMBRA on 1/14/2021.He arrived to ADCRR with no prescription bottles or list of psychotropic medications, no list of current or recent psychotropic medication, and specifically with no past psychiatricdiagnoses or current psychotropic medication treatment history for the past 6 months.

254.    Mr. ████████s specifically denied any psychiatric treatment history, and any psychotropic medication treatment even when specifically questioned by three different ADCRR health care staff at during three different evaluations – staff nurse at intake, medical staff who performed an intake history and physical examination, and the staff psychologist.

255.    There is no documentation that the county jail sent any lists of medications or other clinical information to ADCRR or that any family members contacted ADCRR staff regarding anysafety concerns. He underwent a mental health assessment on 1/14/21 and was seen in a private, confidential setting. The psychologist documented that she had reviewed his transfer summary from County (jail) and attempted to identify any recent

mental health treatment history in the county jail. She also noted that the eOMIS records indicated no SMI status. He denied any prior suicide attempt or any past psychiatric hospitalizations. He also denied any family history of suicide attempts or completed suicide. The psychologist noted the following: "Writer met with Pt in a confidential setting for MH intake for 5 minutes. Patient reports he has no further questions or concerns at this time and refused to continue the encounter. Future and goal oriented. Calm. Denied current DTS (danger to self)/SI (Suicidal ideations)/DTO (danger to others)/AVH (auditory or visual hallucinations). Good hygiene." She also wrote the following in her assessment notes: "No DTS/DTO. Stable mood/affect. Future oriented. Family support. No current psychotropic medications. Pt reported just D/Ced (Discontinued) medication for "anxiety and depression" two weeks ago." She noted the following in her disposition section: "No emergent Mental Health needs. Inmate informed of how to access Mental Health services (HNR)."

256.   On 1/26/2021, the patient reportedly requested to see mental health regarding "Voices he is hearing since stopped taking meds." This request was reviewed by Benjamin Tomanek. Mr. ▮▮▮▮▮ was scheduled to undergo a scheduled nursing sick call on 1/27/21 at 9:00 AM. He did not submit any additional sick call requests, nor is there any documentation of any oddities in his speech or behavior, nor any other sick call requests. For unclear reasons, he did not undergo this scheduled sick call on 1/27/21 nor was he referred to mental health. He was reportedly found hanging in his cell on 1/28/21 with a resulting ICS. I concede the concern that there was an unclear breakdown in the nursing triage and sick call and referral to mental health. Whether a nursing peer review was conduct and the outcome of this remains unclear at the time of this report. Even if Mr. ▮▮▮▮▮ had been referred to mental health staff in a more timely manner subsequent to the scheduled nursing sick call, and he had received a subsequent psychiatric evaluation, been treated with or without the use of psychotropic medication and/or other treatment services at this time, it is not possible to definitely establish to a reasonable degree of medical/psychiatric certainty that this would have prevented him from engaging in his apparent lethal act of self-harm via asphyxiation.

257.   I disagree with Dr. Stewart's opinion as to inmate ████████. There is no discrepancy in his medical record for 8/24/21.  The two entries regarding programming are for different types of classes and run by different mental health staff. The Psych Educational Group heattended is conducted by a Behavioral Health Tech and the Psych Therapy Group is run by a QMHP.

258.   Further, Mr. ████ has not submitted any mental health HNRs in 2021 to date. According to the eOMIS system, his last HNR was dated 5/8/21 for an allergy medication refill. This clearly demonstrates that Mr. ████ understands and can communicate his health care needs when indicated. His most recent/last mental health HNR regarding wanting to see a psych associate was on November 8, 2020, requesting to see a psych associate once a week. He was seen three days later by a psych associate (licensed). He was provided weekly group counseling, monthly individual counseling, and 90-day psychiatry.

259.   I disagree that Mr. ████ has received "highly inadequate and dangerously deficient care."In fact, Mr. ████ has received almost daily re-assessments by a team of qualified mental health professionals and nursing staff, often several staff meeting with him on the same day.

260.   The following treatment plan details the level of treatment efforts and familiarity with Mr.████ treatment needs, including his strengths, limitations, target problems/behaviors, description of problem, inmate's description of the problem, treatment goals, and interventions.

261.   I also disagree with Dr. Stewart's opinion that he "…should be urgently transferred to an inpatient hospital setting." Mr. ████ has received ongoing and repeated efforts to work with him and to help him remain free from self-injury and to be able to successfully transition off suicide watch status.

/ / /

1   ██████████████████

2   262.   Dr. Stewart appears to assert that this patient has a "very inadequate treatment

3   plan," "…represents extremely poor care…" and that the psych associate "failed to mention

4   anything about possible medication modification options." He also asserts that "the

5   complexity of this case clearly exceeds the skills of a psych associate" and that this patient

6   can and should only be properly treated and stabilized by a psychiatrist, not a psychiatric

7   nurse practitioner. He also appears to assert that only if Trileptal is re-started as a "mood

8   stabilizer," he will significantly reduce his incidence of cutting.

9   263.   Dr. Stewart also opines that Mr. ███████ "needs to be transferred to a higher

10  level of care" and be "thoroughly evaluated for psychotropic medications."

11  264.   Mr. ███████ underwent a MH - Segregation Visit on 10/21/21. He was seen

12  walking around his cell wearing his yellow smock appropriately.  He was medication

13  compliant and was not a danger to others or to himself currently.

14  265.   He has not requested an HNR for a mental health issue or concern since 8/1/20.

15  266.   On 10/19/2021, Dr. Kenneth Worthern, a psychiatrist, conducted a psychiatric

16  evaluation of Mr.███████. I reviewed the evaluation and am of the professional opinion

17  that the psychiatric evaluation comports with the standard of care. No psychotic symptoms

18  were identified. Dr. Worthern did not identify any imminent risks of harm to self or others.

19  Similarly, Dr. Worthern did not identify any current clinical need, indication or necessity

20  to transfer Mr. ███████ from his current mental health unit to any inpatient psychiatric

21  unit setting.

22  ██████████████████

23  267.   I disagree with Dr. Stewart. The decision to admit/transfer a patient to an

24  Inpatient setting for more Intensive Mental Health Care is a complex decision that requires

25  a weighing of numerous static and dynamic clinical variables, the establishment of past

26  failure of less restrictive treatment interventions and alternatives, is clinically determined,

27  and depends on a variety of factors and independent clinical judgment by a QMHP.

28

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **;  and/or,** ▮▮▮

3    ▮▮▮▮▮▮

4         268.   I did not find inadequate treatment plans or planning or a failure to coordinate

5    care between psychiatric and mental health staff, or with medical providers. I did not identify

6    any risk of harm or adverse outcomes.

7    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮ **; and/or,** ▮▮▮▮▮▮▮

9         269.   I disagree that ACDRR and Centurion failed to provide language

10   interpretation in mental health treatment places to Non-English Speaking Class Members.

11   Due to the availability of onsite staff who serve as interpreters and the availability of

12   professional interpreters via the language line, this does not place class members with

13   disabilities at risk of harm.

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **; and,** ▮▮▮▮▮▮▮

15        270.   I disagree with Dr. Stewart's assertion that these three patients (and other

16   unnamed examples) remain profoundly symptomatic or there are acts of omission or

17   commission by ADCRR or Centurion to afford appropriate mental health treatment services

18   to inmates who submit HNRs or are referred for evaluation and treatment. I remain unclear

19   regarding Dr. Stewart's use and definition of "profoundly symptomatic" as this is not

20   recognized diagnostic nomenclature in the DSM-5. Mental disorders including Axis I and

21   Axis II (From DSM-IV-TR) often require a period of time to establish and refine diagnostic

22   certainty. This may be even more challenging in correctional settings, and when patients

23   refuse to comply with evaluation and treatment that is offered. Additionally, psychotherapy

24   and psychotropic medications require treatment compliance, initiative, time, and effort

25   from the patient.  As Dr. Stewart is aware, most psychotropic medications take time to have

26   a sustained clinical effect, and the dose and schedule must be initiated gradually to avoid

27   side effects and to gain trust and treatment compliance from the patient.

28   / / /

1   ████████████████████████████████ ; and/or, ████████████████

2   271.   I found no evidence that any revisions, additions, or discontinuations of any

3   DSM-5 psychiatric diagnoses was clinically inappropriate or that it had any deleterious or

4   adverseoutcome on any of these inmates identified here.

5   ███████████████████████████████████████████████████████

6   █████████████████████████████████ ; and/or, ████████████████

7   ████████

8   272.   I disagree with Dr. Stewart. Per my chart reviews of the above inmates, I

9   found that ADCRR's mental health care vendor, Centurion, provided clinically appropriate

10  andadequate monitoring and management of medication therapeutic levels.   When side

11  effects were reported, patients were assessed in a timely manner, and these clinical

12  monitoring, sick call process through HSRs and access to psychiatric and mental health care

13  staff doesnot place class members with mental illness at any increased risk of serious harm.

14  ███████████████ and/or ████████████████████

15  273.   Based on my record review I disagree and did not find any "failure" to provide

16  basic mentalhealth care to inmates engaging in self harm and suicidal behaviors identified

17  here.

18  ████████████████████████

19  274.   Based on my record review, I acknowledge that Mr. ████████ is a

20  complicated and treatment resistant patient, with a complicated past medical history of

21  rheumatoid arthritis, obesity, hypertension, chronic pain, ambulation difficulties, and

22  Hepatitis C. He has numerous and conflicting psychiatric diagnoses including amphetamine

23  (or other stimulant)-induced psychotic disorder, schizophrenia versus schizoaffective

24  disorder, borderline personality disorder, unspecified mood [affective] disorder, and post-

25  traumaticstress disorder. It is my professional opinion that Mr. ████████ continues to

26  receive appropriate and timely correctional mental health and psychiatric services. He is

27  currently housed in the ASPC-Tucson Rincon MH Program. He underwent a follow-up

28  psychiatric evaluation on 10/21/21 and reported, "I'm good. I'm starting to stabilize a bit."

He made good eye contact, engaged in the assessment, denied anxiety, was eating well and attending recreation, and his mood was more hopeful, more positive.

██████████████████████████████████████████████**;and/or** ██████

██████████████

275.   I found no evidence that ADCRR or Centurion engaged in a planned or purposeful effort to effect inappropriate uses of force on any of the above individuals identified as having mental illness.

██████████████ **and/or** ██████████████████

276.   I found no evidence that ADCRR or Centurion engaged in a planned or purposeful effort to effect isolated confinement on any of the above individuals identified as having mental illness.

277.   It is also my professional opinion that clinically appropriate mental health evaluation and treatment services have been previously available and remain currently available to each of the named Plaintiffs. Finally, I do not find any alleged lack of appropriate correctional-based mental health evaluation, treatment services, or any resulting detrimental effect on their overall level of functioning.

## Conclusion

278.   After careful review of the above facts and data, and based on my training as a correctional and forensic psychiatrist, my additional qualifications as a certified correctional health professional (CCHP) in mental health, my direct clinical and administrative experiences, and my correctional and forensic consultation experiences nationally, work as a physician surveyor nationally within various US correctional and ICE facilities, NCCHC accreditation and standards committee work, presentations and attendance at national correctional meetings including NCCHC and ACA, discussion with practicing correctional professionals and leaders nationally, and my current active practice and full time work within correctional settings and approximately 22 years of direct experience in correctional settings, I have sufficient basis and information to form my professional opinion to a

reasonable degree of medical/psychiatric and scientific certainty. Each of my opinions are to a reasonable degree of medical and psychiatric certainty/probability.

279.   Per my review of the above, it is my professional opinion that the Policies, Procedures and Standards utilized by ADCRR meet generally accepted standards for state prisons and that clinically appropriate referral processes and procedures are in place, with an opportunity for continuous quality improvement, and there are adequate qualified and trained mental health staff to provide clinically appropriate access to care and to support the mental health needs of the incarcerated state prisoners.

280.   The Policies, Procedures and Standards utilized by ADCRR in connection with mental healthcare; mental healthcare staffing; medical record organization; medication system; monitoring of prisoners taking psychotropic medications; the monitoring and management of psychotropic medication therapeutic levels and side effects; access to medical and mental health care; mental health programming; inpatient care; treatment plans; heat precautions; suicide prevention; confinement of prisoners with mental illness; use of chemical agents with prisoners with mental illness; use of telepsychiatry; monitoring and oversight; and the overall access to mental health services, regardless of the correctional housing setting - those alleged to constitute isolation or segregation by Plaintiffs - do not cause an undue risk of harm to state prisoners incarcerated at different facilities. It is my professional opinion, based on the current mental health system, staffing, and policies and procedures, that the respective use of different custody-determined classification and housing assignment settings, as per established policies, procedures and standards, is in keeping with national correctional health standards of care.

281.   It is also my professional opinion that clinically appropriate mental health evaluation and treatment services have been previously available and remain currently available to each of the named Plaintiffs.

282.   Finally, I do not find any alleged lack of appropriate correctional-based mental health evaluation or treatment services or any resulting detrimental effect on their overall level of functioning.

283.    As to each of these areas, and those discussed in detail throughout my report, it is my opinion that the Policies, Procedures, and Standards by ADCRR meet the generally accepted practices for state prisons for incarcerated state prisoners with and without mental illness. The Policies, Procedures, and Standards, and the implementation of those Policies, Procedures, and Standards by both the correctional personnel at ADCRR state prison facilities and its current contracted medical and mental health vendor, Centurion Medical Services, are performed within generally accepted national, state, and county practices, including accepted practices for care, custody, and control, and without deliberate indifference to the psychiatric and/or mental health needs of these incarcerated state prisoners.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of November, 2021.

_____

JOSEPH V. PENN MD CCHP FAPA