**Index of Exhibits to the**
**Declaration of Corene T. Kendrick**

| Exhibit | Description |
|---------|-------------|
| 1 | A true and correct copy of an email from Corene Kendrick to Defendants' counsel, Dan Struck, dated August 5, 2021 |
| 2 | A true and correct copy of an excerpt of the deposition transcript of Dr. Joseph Penn, dated April 11, 2014 |
| 3 | A true and correct copy of an excerpt of the deposition transcript of Dr. Joseph Penn, dated November 17, 2021 |
| 4 | Documents produced by Defendants (purportedly all notes taken by Dr. Joseph Penn during his tours of various Arizona State Prison Complexes on September 20-24, 2021) |

# EXHIBIT 1

**Corene Kendrick**

| | |
|---|---|
| **From:** | Corene Kendrick |
| **Sent:** | Thursday, August 5, 2021 11:22 AM |
| **To:** | Dan Struck |
| **Cc:** | StruckLoveParsonsTeam; Lucy Rand; Michael E. Gottfried; mary.beke@azag.gov; David Fathi; Maria Morris; Jessica Carns; Samantha Weaver; PLO-Arizona Team; Maya Abela; Jared Keenan; Daniel  Barr |
| **Subject:** | RE: Parsons - availability for call re discovery |

Dear Dan,

I write to follow up on Judge Silver's order that the parties confer on how to best streamline discovery and to follow up on your email of July 26, 2021, and topics we'd like to discuss during our call on Friday.  Unless otherwise indicated, "day" refers to calendar day.

As a threshold matter, we need to establish if Defendants will agree to produce any/all information maintained by their agent Centurion pursuant to our accelerated timelines.  Pursuant to the contract between ADC and Centurion, the company is supposed to provide ADC any requested document or report upon request.

We also propose that the sides reserve the right to move the Court upon good cause to request more discovery beyond the limits agreed to here.
- All objections to discovery requests provided in writing within 7 days. (You agreed in 7/26/21 email).
- We proposed that the parties meet-and-confer within one business day of providing written objections; you proposed three business days.
  - We propose three calendar days for a meet and confer.
- We proposed production of documents within 14 days; we will agree to your counter-proposal (see 7/26/21 email) that all non-ESI documents be produced within 21 days.
- We propose that any objections to RFAs or interrogatories similarly be provided in writing within 7 days of the request, and responses be provided within 21 days.

**Document Requests**
- We note that the Federal Rules do not place a limit on document requests.
- On our July 26 phone call, you proposed a limit of 50 document requests. We propose a limit of 125 non-ESI document requests per side.  We anticipate that a significant number of the requests will be of documents and reports that defendants provided to us on a monthly basis and/or prior to our monitoring tours.
- We propose a limit of no more than two ESI-related requests to ADC (timeframes, custodians, and key words to be negotiated), and no more than two ESI-related requests to Centurion.  Timeframes, key words, and custodians to be negotiated.

**Interrogatories:**
- Rule 33 limits interrogatories to 25.
- We propose a limit of 20 interrogatories per side, except for interrogatories directed solely to the authenticity and/or admissibility of documents, with the timeframes noted above for written objections and responses.

**Requests for Admission:**
- We similarly propose a limit of 20 RFAs per side, except for RFAs directed solely to the authenticity and/or admissibility of documents, with the timeframes noted above.

**Depositions:**

- The anticipated trial witnesses need to be disclosed in sufficient time to allow them to be deposed within the window for fact discovery. The parties had agreed to make initial disclosures on September 10, we propose that Defendants specifically identify their anticipated trial witnesses that day. To the extent that we will call incarcerated people, we may need a little more time to communicate with them and get their agreement to be trial witnesses, so we propose that Plaintiffs specifically identify their anticipated trial witnesses by September 17.
- While Plaintiffs' expert disclosures and reports are not due until October 9, and Defendants' on October 22, we propose that the parties identify their experts and exchange the names and affiliations of their experts by September 17, 2021 so that each side can prepare for depositions.
- We agreed that depositions –including experts – could be done by video as necessary. (See 7/23 filing).
- We had proposed fact witness deponents be made available within 7 days of request and 30(b)(6) within 14 days of request.  You countered with 14 days for both, with "consideration for a longer period of time based upon witness schedules."
  - We can agree to your counterproposal of 14 days being the limit to make both fact witnesses and 30(b)(6) witnesses available, but we are concerned about the vagueness of your exception.  We propose that production of the witness needs to occur within 14 days unless the witness is unavailable due to illness and/or a previously planned vacation.  Furthermore, if a 30(b)(6) designee is unavailable for a significant period of time (i.e. due to extended FMLA / sick leave, paternity leave), that a different individual should be designated and prepared to testify on the topic.
- Deposition limits (non-experts)
  - You proposed non-expert limit of 15 fact and/or 30(b)(6) witnesses, up to 4 hours each. We note that this is less than that authorized by Rule 30 (10 witnesses, up to 7 hours each).
  - We propose that each deposition be up to the authorized 7 hours per witness.
  - We propose a limit of 70 hours of fact witness depositions per side.
  - We propose ten 30(b)(6) depositions. (If Defendants designate multiple witnesses for one 30(b)(6) topic, that still counts as one deposition.)

**Expert tours**

We agreed that Plaintiffs would provide at least seven days' notice of tours. You also asked us to try to have experts' tours of a particular facility occur on the same day whenever possible. We are attempting to coordinate schedules to do that to the extent possible.

We also agreed that we would provide you with the names of the class members whose medical records are reviewed by our experts in preparation of their reports. We propose that we provide you those names starting on August 11, and every two weeks thereafter until the October 10 date of the report (August 11, 25, September 8, 22, and October 6). Defendants would reciprocally provide the names of records reviewed by their experts on those dates.

With regard to any tours by Defendants' experts, we object to Defendants' experts speaking to any class members outside of the presence of class counsel.  *See Coleman v. Brown*, 938 F.Supp.2d 955, 962-63 968-69, n. 20 (E.D. Cal. 2013) (sanctioning counsel and striking defendant prison systems' expert reports after defendants' counsel and experts improperly communicated with represented class members outside the presence and without the consent of class counsel, and ordering that "it may be that the possible ethics violations here are best left to be dealt with by the California Bar. In addition, the Clerk is directed to deliver a copy of this order to the State Attorney General, to ensure that she is made aware of the conduct." (citation omitted)). <u>If Defendants' experts anticipate any possibility of speaking to any incarcerated person during a prison visit, then Defendants must notify us at least seven days prior to the scheduled tour so that counsel for Plaintiffs are present during the visit.</u>

We ask that you instruct your experts to preserve any and all notes they take in the course of their inspection tours or other work on this case, and we will do the same.  In 2014, Dr. Joseph Penn testified that he was not instructed to preserve his notes, and he destroyed some of them (Penn deposition, April 11, 2014, 49:18-53:18).  If Defendants' experts fail to preserve their notes, we will seek a spoliation order.

**Trial management / streamlining**
Judge Silver's scheduling order indicates that she plans for three weeks of trial (Nov. 1-19), with at least four days of hearings per week.

We reiterate our proposal that the Court permit submission of all experts' testimony by writing with one hour of direct and no more than three hours of cross (and whatever time the judge wants to ask questions herself).  You indicated in your July 26 email that Defendants will object to such a request. Given the very tight timeframe set out by the Court, we reiterate our request. Since Plaintiffs have the burden of proof, we propose that the Court allocate 60% of trial hours/minutes to Plaintiffs and 40% to Defendants. If Defendants do not stipulate, we will request the court allocate more time to Plaintiffs. If Defendants still object, we will separately move the Court to permit such submission.

We propose that the parties stipulate to the admissibility of all experts' reports.

We also would like to discuss the issue of the admissibility of the underlying medical records (or max custody logs and central files or any other voluminous documents) referenced in expert reports.  Since the reports often cover hundreds of class members, and the medical records are kept in the unwieldy electronic health record system that requires printing every entry and subentry separately, producing the class members' records to the Court electronically or in paper format would be incredibly burdensome if not impossible for both parties.  Given Judge Silver's response to Defendants' attempt last year to introduce reams of max custody documents to the record, we would like to discuss on our call Friday about asking her (or her JA) for guidance on this issue.

If you have any questions before our call tomorrow, let us know.

Thanks,
Corene

Corene Kendrick
Deputy Director
ACLU National Prison Project
39 Drumm St.
San Francisco, CA 94111
ckendrick@aclu.org

---

**From:** Dan Struck <DStruck@strucklove.com>
**Sent:** Wednesday, August 4, 2021 12:25 PM
**To:** Corene Kendrick <ckendrick@aclu.org>
**Cc:** StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>; Lucy Rand <Lucy.Rand@azag.gov>; Michael E. Gottfried <Michael.Gottfried@azag.gov>; mary.beke@azag.gov; David Fathi <dfathi@aclu.org>; Maria Morris <MMorris@aclu.org>; Jessica Carns <JCarns@aclu.org>; Samantha Weaver <SWeaver@aclu.org>; PLO-Arizona Team <plo-az@prisonlaw.com>; Maya Abela <mabela@azdisabilitylaw.org>; Jared Keenan <jkeenan@acluaz.org>; Daniel Barr <DBarr@perkinscoie.com>
**Subject:** Re: Parsons - availability for call re discovery

We will circulate a number.

Sent from my iPhone

> On Aug 4, 2021, at 9:19 AM, Corene Kendrick <ckendrick@aclu.org> wrote:
>
> That works for us. Should we use your firm's call-in number?
>
> Thanks,
> Corene
>
> Corene Kendrick
> Deputy Director
> ACLU National Prison Project
> 39 Drumm St.
> San Francisco, CA 94111
> ckendrick@aclu.org

**From:** Dan Struck <DStruck@strucklove.com>
**Sent:** Wednesday, August 4, 2021 11:49 AM
**To:** Corene Kendrick <ckendrick@aclu.org>
**Cc:** StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>; Lucy Rand <Lucy.Rand@azag.gov>; Michael E. Gottfried <Michael.Gottfried@azag.gov>; mary.beke@azag.gov; David Fathi <dfathi@aclu.org>; Maria Morris <MMorris@aclu.org>; Jessica Carns <JCarns@aclu.org>; Samantha Weaver <SWeaver@aclu.org>; PLO-Arizona Team <plo-az@prisonlaw.com>; Maya Abela <mabela@azdisabilitylaw.org>; Jared Keenan <jkeenan@acluaz.org>; Daniel Barr <DBarr@perkinscoie.com>
**Subject:** Re: Parsons - availability for call re discovery

11:30 AZ time on Friday.

Sent from my iPhone

> On Aug 4, 2021, at 8:42 AM, Dan Struck <DStruck@strucklove.com> wrote:
>
> Corene,
> How does 11:30 AZ time work for you?
>
> Sent from my iPhone

>> On Aug 4, 2021, at 5:05 AM, Corene Kendrick <ckendrick@aclu.org> wrote:
>>
>> Hi Dan,

Can you let us know some times Thursday and Friday that would work for your team for a meet and confer?

Thanks,
Corene

Corene Kendrick
Deputy Director
ACLU National Prison Project
39 Drumm St.
San Francisco, CA 94111
ckendrick@aclu.org

---

**From:** Corene Kendrick
**Sent:** Monday, August 2, 2021 12:05 PM
**To:** Dan Struck <DStruck@strucklove.com>
**Cc:** StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>; Lucy Rand <Lucy.Rand@azag.gov>; Michael E. Gottfried <Michael.Gottfried@azag.gov>; mary.beke@azag.gov>; David Fathi <dfathi@aclu.org>; Maria Morris <MMorris@aclu.org>; Jessica Carns <JCarns@aclu.org>; Samantha Weaver <SWeaver@aclu.org>; PLO-Arizona Team <plo-az@prisonlaw.com>; Maya Abela <mabela@azdisabilitylaw.org>; Jared Keenan <JKeenan@acluaz.org>; Daniel Barr <DBarr@perkinscoie.com>
**Subject:** RE: Parsons - availability for call re discovery

Yes, we will do that before the call.
Thanks.

Corene Kendrick
Deputy Director
ACLU National Prison Project
39 Drumm St.
San Francisco, CA 94111
ckendrick@aclu.org

---

**From:** Dan Struck <DStruck@strucklove.com>
**Sent:** Monday, August 2, 2021 11:28 AM
**To:** Corene Kendrick <ckendrick@aclu.org>
**Cc:** StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>; Lucy Rand <Lucy.Rand@azag.gov>; Michael E. Gottfried <Michael.Gottfried@azag.gov>; mary.beke@azag.gov>; David Fathi <dfathi@aclu.org>; Maria Morris <MMorris@aclu.org>; Jessica Carns <JCarns@aclu.org>; Samantha Weaver <SWeaver@aclu.org>; PLO-Arizona Team <plo-az@prisonlaw.com>; Maya Abela <mabela@azdisabilitylaw.org>; Jared Keenan <jkeenan@acluaz.org>; Daniel Barr <DBarr@perkinscoie.com>
**Subject:** Re: Parsons - availability for call re discovery

Thanks Corene.  I'll check with the team on availability for this call. It would make sense, though, for you folks to respond to our suggested limitations we have already submitted to the court.

Sent from my iPhone

> On Aug 2, 2021, at 6:00 AM, Corene Kendrick <ckendrick@aclu.org> wrote:
>
> Dear Dan,
>
> Judge Silver's July 30 order directs the parties to confer about discovery limitations and evidentiary stipulations, and to file a report with her on Monday August 9.
>
> In light of that, I'm writing to find out your availability for a call on Thursday and Friday (Aug. 5 and 6). If you can let me know some times that work for your team on those dates, we'll see what works for us.
>
> Thanks,
>
> Corene
>
>
> Corene Kendrick
> Deputy Director
> ACLU National Prison Project
> 39 Drumm St.
> San Francisco, CA 94111
> ckendrick@aclu.org

This electronic mail transmission contains information from the law firm Struck Love Bojanowski & Acedo, PLC that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any

attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

---

# EXHIBIT 2

**Confidential - Subject to Protective Order**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; ) | No. CV12 00601 |
| Stephen Swartz; Dustin Brislan; ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco;) | |
| Jackie Thomas; Jeremy Smith; Robert ) | |
| Gamez; Maryanne Chisholm; Desiree ) | |
| Licci; Joseph Hefner; Joshua Polson;) | |
| and Charlotte Wells, on behalf of ) | |
| themselves and all others similarly ) | |
| situated; and Arizona Center for ) | |
| Disability Law, ) | |

    Plaintiffs,   )
  vs.       )

Charles Ryan, Director, Arizona )
Department of Corrections; and  )
Richard Pratt, Interim Division  )
Director, Division of Health   )
Services, Arizona Department of  )
Corrections, in their official  )
capacities,         )

    Defendants.   )

VIDEOTAPE DEPOSITION OF

JOSEPH V. PENN, MD, CCHP, FAPA

April 11, 2014
9:32 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

        Prepared by:
602.266.6535       Carolyn T. Sullivan, RPR
www.glennie-reporting.com  Arizona CR No. 50528

**Confidential - Subject to Protective Order**

                                                                    2

 1                          I N D E X

 2   WITNESS                                              PAGE

 3   JOSEPH V. PENN, MD, CCHP, FAPA

 4        Examination by Mr. Fathi                          7

 5

 6

 7

 8

 9
         All exhibits are designated CONFIDENTIAL
10   INFORMATION - SUBJECT TO PROTECTIVE ORDER
     with the exception of Exhibit No. 550
11

12                      INDEX TO EXHIBITS

13   Description                                          Page

14   Exhibit 544 Confidential Expert Report of             37
                 Joseph V. Penn MD CCHP FAPA,
15               December 18, 2013
                 ADC203372-203515
16
     Exhibit 545 Confidential Supplemental Expert          37
17               Report of Joseph V. Penn MD CCHP FAPA,
                 March 26, 2014
18
     Exhibit 546 Handwritten Notes of Dr. Penn             48
19               PENN000001-118

20   Exhibit 547 Handwritten Notes of Dr. Penn             48
                 PENN000348-365
21
     Exhibit 548 Material from binders with Tabs 1-32      75
22               (Various Bates numbers)

23   Exhibit 549 Arizona Monthly Staffing Report           95
                 Roll-Up - May 2013
24               (Excludes Regional Office)
                 ADC117064

25

**Confidential - Subject to Protective Order**

3

1                     INDEX TO EXHIBITS (Cont.)

2   Description                                        Page

3   Exhibit 550 Psychiatric Services in Jails and       137
                Prisons
4               A Task Force of the American
                Psychiatric Association
5               Second Edition

6   Exhibit 551 Observation Record of Adrian            166
                Anderson, 3/24/14
7               ADC261951

8

9

10       QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER

11                       Page   Line

12                        20     14
                          59     14
13                        60      6
                         127     19
14                       127     29
                         128      3
15                       128     17
                         129     14
16                       129     22
                         129     25
17                       130      5
                         130     13
18

19

20

21

22

23

24

25

**Confidential - Subject to Protective Order**

4

```
 1                    VIDEOTAPE DEPOSITION OF

 2               JOSEPH V. PENN, MD, CCHP, FAPA

 3

 4               The videotape deposition of JOSEPH V. PENN,

 5    MD, CCHP, FAPA, was taken on April 11, 2014, commencing

 6    at 9:32 a.m., at the law office of PERKINS COIE LLP, 2901

 7    North Central Avenue, Suite 2000, Phoenix, Arizona,

 8    before CAROLYN T. SULLIVAN, a Certified Reporter,

 9    Certificate No. 50528, for the State of Arizona.

10
      APPEARANCES:
11

12    For all Plaintiffs except Arizona Center for Disability
      Law:
13
          AMERICAN CIVIL LIBERTIES UNION FOUNDATION
14        National Prison Project
          David C. Fathi, Esq.
15        Director
          Amy Fettig, Esq.
16        Senior Staff Counsel
          915 15th Street, NW
17        7th Floor
          Washington, DC 20005-2112
18

19    For Plaintiff Arizona Center for Disability Law:

20        ARIZONA CENTER FOR DISABILITY LAW
          Sarah E. Kader, Esq.
21        Asim Varma, Esq.
          Staff Attorneys
22        5025 East Washington Street
          Suite 202
23        Phoenix, Arizona 85034

24

25
```

**Confidential - Subject to Protective Order**

5

1   APPEARANCES:

2   For Defendants:

3        STRUCK WIENEKE & LOVE, P.L.C.
         Kathleen L. Wieneke, Esq.
4        3100 West Ray Road
         Suite 300
5        Chandler, Arizona 85226

6

7   Also Present:

8        Chris Eichler, CLVS
         Forensic Video Deposition Services
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Joseph V. Penn, MD, CCHP, FAPA - videotaped - 04/11/2014**
**Confidential - Subject to Protective Order**

49

1      Q.     Are they -- are these all the notes you made

2    during your inspections of ADC facilities?

3      A.     Well, I'm -- I'm not sure if I can answer that.

4    I -- these are -- look to be photocopies of the notes,

5    but I notice unfortunately on some of the bottoms of some

6    of these, it looks like some things have gotten cut off.

7    But to answer your question, I don't -- this is all the

8    copies of the notes, yes, that I made.  But -- but just

9    to make the point to the bottom, so there's certain

10   things at the bottoms of some of these that got cut off.

11     Q.     Okay.  Putting aside the fact that some

12   portions of pages might have been cut off in copying --

13     A.     Right.

14     Q.     -- this is the totality of the notes that you

15   made during your inspection tours of ADC facilities,

16   correct?

17     A.     That's fair, yes.

18     Q.     Okay.  Have you made any other notes at any

19   time during your work on this case?

20     A.     I've made notes to myself, for example, when I

21   reviewed a videotape or reviewed a record and wrote a

22   note to myself, something to the effect of include this

23   in the report or don't forget -- like -- kind of like

24   to-dos or -- but those have all been destroyed.  So this

25   is the -- these are the records that exist that I've

**Joseph V. Penn, MD, CCHP, FAPA - videotaped - 04/11/2014**
**Confidential - Subject to Protective Order**

50

1   written.

2      Q.    And about how many pages of those notes to

3   yourself were there?

4      A.    A handful.  I mean, like -- for the first

5   report, probably more, maybe four or five pages, and then

6   for the supplemental, maybe three or four -- two to three

7   pages, something like that.

8      Q.    And why did you destroy them?

9      A.    Well, it's scribble.  It's basically, you know,

10  a box, something like a particular named plaintiff to --

11  it's like a note -- I put the -- the named plaintiff and

12  put psychosis, and then that jogs me, okay, I need to

13  write something about the psychotic symptoms that I

14  noticed or -- or be aware of that.  So it's like a

15  reminder to myself.

16     Q.    My -- my question is, why did you destroy them?

17     A.    Well, because they were -- they were basically

18  notes to myself to help me remember what to put, like a

19  prompt -- like a sticky.  I think of it like a -- for me,

20  and my wife would attest to this, I'm very -- I'm kind of

21  a disorganized person.  So by putting a sticky note to

22  myself to remember to do something, I actually do it.  So

23  that's why -- so I don't keep sticky notes I guess is

24  what I am trying to say.

25     Q.    Did your counsel not instruct you that you

**Joseph V. Penn, MD, CCHP, FAPA - videotaped - 04/11/2014**
**Confidential - Subject to Protective Order**

51

1   needed to preserve all of your notes in this case?

2                    MS. WIENEKE:  Object to the form.

3                    Don't answer the question.  That invades

4   communications protected by 26(b)(4).

5                    MR. FATHI:  No.  It has to do with the

6   information that was conveyed to him regarding his work.

7                    MS. WIENEKE:  No.

8       Q.    BY MR. FATHI:  Doctor, did your counsel not

9   instruct you that you were to preserve all notes in this

10  case?

11                   MS. WIENEKE:  No.  You don't have to answer

12  that question.

13      Q.    BY MR. FATHI:  Doctor, was it your

14  understanding that you were to preserve all of your notes

15  in this case?

16                   MS. WIENEKE:  You don't have to answer that.

17                   MR. FATHI:  Yes.  That is not about

18  communications with counsel.

19                   WIENEKE:  Well, if the information came from

20  counsel, then it is about that.  So --

21                   MR. FATHI:  The communi- --

22                   MS. WIENEKE:  -- if -- if you --

23                   MR. FATHI:  -- the communications are not

24  protected --

25                   MS. WIENEKE.  If you would allow me to speak

**Joseph V. Penn, MD, CCHP, FAPA - videotaped - 04/11/2014**
**Confidential - Subject to Protective Order**

52

1    and not interrupt me.  It is rude and unprofessional.

2    He's not going to answer questions about what

3    communications he had with counsel except for those

4    allowed under 26(b)(4), which pertains to the facts upon

5    which he based his report.  He's already told you what

6    the content of the scribbles were.  You are now asking

7    him questions that invade the work product privilege that

8    are protected.

9              If you want to terminate the deposition and

10   we can get Judge Wake on the phone and you can raise this

11   issue, we can do that.  But he's not going to answer

12   those questions.  I've asserted the objection based on

13   privilege, and I've instructed him not to answer.  Move

14   on to something else.

15       Q.   BY MR. FATHI:  Doctor, I'm not asking about any

16   communications with your counsel.  Was it or was it not

17   your understanding that you were to preserve your notes

18   in this case?

19              MS. WIENEKE:  Do not answer it to the extent

20   that it invades information and communications with

21   counsel in this case.

22       Q.   BY MR. FATHI:  I'm not asking about your

23   communications with counsel, Doctor.

24              MS. WIENEKE:  I'm providing you instructions

25   as to how to answer the question based on the privilege.

**Joseph V. Penn, MD, CCHP, FAPA - videotaped - 04/11/2014**
**Confidential - Subject to Protective Order**

53

1           THE WITNESS:  I've -- I've produced or

2    turned over everything that I wrote with regard to this

3    case except for a scribbly note that said something like

4    Christina Verduzco, psychosis, or Joshua Polson,

5    antisocial, Arian Brotherhood, or, you know, just notes

6    to myself to -- for -- that way I could remember, and it

7    was a way for me to learn more about the case and --

8        Q.    BY MR. FATHI:  Excuse me, Doctor, but you need

9    to answer the question I asked.

10           MR. FATHI:  Would you read the question

11   back, please.

12           (The requested portion of the record was

13   read by the reporter.)

14           MS. WIENEKE:  Same instruction, Dr. Penn.

15           THE WITNESS:  I don't recall ever being told

16   specifically by anyone or in the retainer letter or by

17   anybody to -- to keep or retain everything.  I don't

18   recall that, no.

19       Q.    BY MR. FATHI:  Other than what we've already

20   discussed, did you take any other notes whatsoever in

21   connection with your work in this case?

22       A.    No.

23       Q.    Did you visit ASPC-Douglas, Doctor?

24       A.    No, I did not.

25       Q.    Did you visit ASPC-Winslow?

**Confidential - Subject to Protective Order**

301

```
1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA )

3

4           I, CAROLYN T. SULLIVAN, a Certified

5   Reporter, Certificate No. 50528, in the State of Arizona,

6   do hereby certify that the foregoing witness was duly

7   sworn to tell the whole truth; that the foregoing pages

8   constitute a full, true, and accurate transcript of all

9   proceedings had in the foregoing matter, all done to the

10  best of my skill and ability.  Pursuant to request,

11  notification was provided that the deposition is

12  available for review and signature.

13

14          I FURTHER CERTIFY that I am not related to

15  nor employed by any of the parties hereto, and have no

16  interest in the outcome.

17

18          WITNESS my hand this 13th day of April,

19  2014.

20

21

22

23          Carolyn T. Sullivan, RPR
            Arizona Certified
            Reporter No. 50528

24

25
```

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

VICTOR PARSONS; SHAWN JENSEN;        )
STEPHEN SWARTZ; DUSTIN BRISLAN;      )
SONIA RODRIGUEZ; CHRISTINA           )
VERDUZCO; JACKIE THOMAS; JEREMY      )
SMITH; ROBERT GAMEZ; MARYANNE        )
CHISHOLM; DESIREE LICCI; JOSEPH      )
HEFNER; JOSHUA POLSON; and           )
CHARLOTTE WELLS, on behalf of        )
themselves and all others           )
similarly situated; and ARIZONA     )
CENTER FOR DISABILITY LAW,           )
                                     )
                 Plaintiffs,         )
                                     )Case No:
v.                                   )CV 12-00601-PHX-ROS
                                     )
DAVID SHINN, DIRECTOR, ARIZONA       )
DEPARTMENT OF CORRECTIONS,           )
REHABILITATION AND REENTRY; and      )
LARRY GANN, ASSISTANT DIRECTOR,      )
MEDICAL SERVICES CONTRACT            )
MONITORING BUREAU, ARIZONA           )
DEPARTMENT OF CORRECTIONS,           )
REHABILITATION AND REENTRY, in       )
their official capacities,           )
                                     )
                 Defendants.         )

DEPOSITION OF JOSEPH VINCENT PENN, M.D., CCHP, FAPA
(Volume 2 - pages 262 - 339)
Via Zoom Videoconference
November 17, 2021
1:00 p.m.
Chandler, Arizona

Glennie Reporting Services, LLC
1555 East Orangewood Avenue        Prepared by:
Phoenix, Arizona 85020             Robin L. B. Osterode
602.266.6535                       CSR, RPR
www.glennie-reporting.com          CA CSR No. 7750
                                   AZ CR No. 50695

263

1                           I N D E X

2    WITNESS                                          PAGE

3    JOSEPH VINCENT PENN, M.D., CCHP, FAPA

4              Examination by Ms. Kendrick        265, 336

5              Examination by Ms. Orcutt             335

6

7

8

9

10                      INDEX TO EXHIBITS

11   Description                                      Page

12   Exhibit 41 Deposition of Joseph V. Penn, M.D.,     272
                dated October 26, 2021; 263 pages
13
     Exhibit 42 Bates stamped documents                269
14              ADCRR00232486 - ADCRR00232614

15

16

17

18

19

20

21

22

23

24

25

1       DEPOSITION OF JOSEPH VINCENT PENN, M.D., CCHP, FAPA

2               The deposition of JOSEPH VINCENT PENN, M.D.,

3   CCHP, FAPA, Volume 2, via Zoom Videoconference, was taken

4   on November 17, 2021, commencing at 1:00 p.m., at

5   Chandler, Arizona, before ROBIN L. B. OSTERODE, RPR, CSR,

6   California Shorthand Reporter No. 7750 and Arizona

7   Certified Reporter No. 50695.

8   APPEARANCES:

9   For Plaintiffs:

10          ACLU NATIONAL PRISON PROJECT
            By: Corene Kendrick
11          39 Drumm Street
            San Francisco, California 94111
12          (202) 393-4930
            ckendrick@aclu.org
13          (Videoconference appearance.)

14          ACLU NATIONAL PRISON PROJECT
            By: Maria Morris
15          915 15th Street N.W., 7th Floor
            Washington, D.C. 20005
16          (202) 548-6603
            mmorris@aclu.org
17          (Videoconference appearance.)

18   For Defendants:

19          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
            By: Anne M. Orcutt
20          3100 West Ray Road, Suite 300
            Chandler, Arizona 85226
21          (480) 420-1616
            aorcutt@strucklove.com
22          (Videoconference appearance.)

23   Also Present:

24          Samantha Weaver
            (Videoconference appearance.)
25

1      Q.    So how do you keep a record of what you've

2    reviewed?

3            MS. ORCUTT:  Form.

4            THE WITNESS:  Sorry, I don't keep a record.  I

5    mean, it's in my head.  I know certain of the patients in

6    particular, I recall their clinical case, and

7    I've -- yeah, so that's how I've been remembering.

8    BY MS. KENDRICK:

9      Q.    All right.  Now, I'd like to turn to the notes

10   from your tours.  And I'm going to go through them

11   chronologically, based on the dates of your tours as

12   listed in the notes.  Okay?

13     A.    Okay.

14     Q.    All right.

15           So, Samantha, could we please go to the Tucson

16   notes.  It's ADCRR00232512.  It's at page 28 of the PDF.

17           And, Dr. Penn, are these your notes that you

18   took during the Tucson tour?

19           MS. ORCUTT:  Do you need to look through them?

20           THE WITNESS:  Yes, could I see those?  Scroll

21   down, please.

22   BY MS. KENDRICK:

23     Q.    Sure.  Okay.  So it begins at ADCRR00232512 and

24   runs through page ADCRR00232520.

25           MS. ORCUTT:  Do you need to see those again?

1          THE WITNESS:  If I could see the last page

2    again.  The Tucson, I think, goes to Yuma.  I don't

3    remember the exact -- where it ends.

4          Yes, it ends at 232520; that's correct.

5          MS. KENDRICK:  Okay.  If we can go back to the

6    first page of those notes, please, Sam.

7      Q.    So you testified on October 26th that you had a

8    laptop with you when you were touring the facilities; is

9    that correct?

10     A.    Yes.

11     Q.    And that you took no handwritten notes, but all

12   the notes that you made were in a document on your

13   computer?

14     A.    That's correct.

15     Q.    All right.  As you can see, the first two

16   paragraphs are in black font and then the rest of the

17   page, I believe, if we can scroll down just a little,

18   about two-thirds of the way down is in red font.  And

19   then it goes back to black font.

20          What do the colors of the fonts mean?

21     A.    Yes, so I utilized a transcriptionist.  I have

22   a professional transcriptionist to help me with notes.

23   And so the reason why it's in red is because the

24   transcriptionist, I don't -- I think she struggled to

25   understand what I was writing because she's not a

1  corrections or healthcare professional.  So she put it in

2  red for me to then go back and address those.

3      Q.    So you dictated your notes while you were

4  walking or while you were --

5      A.    No.  No.

6      Q.    What was the transcriptionist transcribing

7  from?

8      A.    So when I -- when I went on the tours, I wrote

9  some rough notes.  And then I e-mailed them to my

10  transcriptionist for her to make them nicer to where they

11  would read as sentences, as opposed to just kind of

12  random, you know, observations or things to follow up on.

13          So I asked her to help with the grammatical

14  errors and spelling and punctuations, and that sort of

15  thing, because that's what she does for me.  So that's

16  how I employed -- and then she sent me back the revised,

17  you know, with edits.  And then I reviewed it again.  And

18  then that's what I turned over and submitted as my notes.

19      Q.    And is this transcriptionist somebody who works

20  for you in -- normally in the course of your work and

21  your business?

22      A.    If you could clarify when you say my work and

23  my business, I don't know what you mean by that.

24      Q.    Well, I believe you said you often use a

25  transcriptionist, and so I was just inquiring if this is

1   the person that you normally use for transcribing notes

2   for you?

3           MS. ORCUTT:   Form.

4           THE WITNESS:   When you say "notes," I'm not

5   sure what you're referring to.  If you could clarify,

6   like, what you're referring to, I can try to answer your

7   question.

8   BY MS. KENDRICK:

9       Q.   Sure.  What's the name of this

10  transcriptionist?

11      A.   Sure.  Her name is Kathleen, K-a-t-h-l-e-e-n,

12  El, E-l, dash, B, like boy, a-s-i-t.

13      Q.   Oh.  Her last name is El-Basit?

14      A.   Yes.

15      Q.   And is Ms. El-Basit somebody that you have used

16  before to transcribe notes?

17      A.   No, this is the first time I've employed her to

18  do this.

19      Q.   And where does Ms. El-Basit work?

20      A.   I don't know exactly where she works.  When you

21  say "where," do you mean the city or the state or do you

22  mean the entity?  Or -- I'm not understanding.

23      Q.   The entity and the -- the entity and the city

24  and state, yes.

25      A.   So I don't know what her -- I think she's a

296

1    school teacher by day job, but I believe she's in the

2    Chicago area.  Somewhere in the Chicago, Illinois area.

3        Q.    Okay.  And she was not with you when you

4    visited these prisons.  Correct?

5        A.    That's correct.

6              MS. KENDRICK:  And, Anne, we would like to be

7    provided the raw notes that Dr. Penn e-mailed to

8    Ms. El-Basit.  We had asked for all notes taken.  And it

9    appears that there was a previous draft that we were not

10   provided.

11             MS. ORCUTT:  We'll confer about that on the

12   next break and we'll let you know.

13             MS. KENDRICK:  Thank you.

14       Q.    All right.  If we go about halfway down this

15   first page it says, "Toured housing unit 8, Rincon, the

16   watches."

17             Do you see that?

18       A.    Yes.

19       Q.    And then five lines down where the font is

20   black again, it says, "I toured housing unit 5, which

21   accommodates recently transferred inmates from the Kasson

22   facility located in Florence, Arizona."

23             Is that correct?

24       A.    (No audible response.)

25       Q.    Did I read that correctly?

1   was prompting myself to go back and ask -- to find out

2   what the name of that housing area was.  And I guess I

3   never got around to completing that.

4        Q.    Okay.  And if we could go to the next page,

5   please.  At the top it says, "Interview: Jose Bucio,"

6   B-u-c-i-o, "LPC," and it goes, on this page and I believe

7   on to the next page with your notes with Mr. Bucio --

8   actually, it looks like it goes to a third page.  So,

9   yes, so your notes with Mr. Bucio go through page 232525.

10       A.    Right.  So four pages, correct.

11       Q.    Four pages, okay.

12             So if we can go back to page 232522, which was

13  the first page of the notes with Mr. Bucio.  The

14  next-to-last paragraph that begins with the phrase,

15  "According to Mr. Bucio," about midway through that

16  paragraph, you have a sentence that says, "Mr. Bucio

17  credited Dr. Stallcup for overseeing the successful

18  implementation of," and then there's a blank line in red

19  font.

20             Do you remember what the blank was for?

21       A.    No, I don't.

22       Q.    Okay.  And let's see, if we can go to

23  page 232526.  And this states at the top "Joint

24  Interview: Jamie Babb," B-a-b-b, "MSW, and Eric Felber,"

25  F-e-l-b-e-r, "LPC."  And then in all caps in red font it

1   states, "I wasn't sure to whom - Babb or Felber - I

2   should attribute quoted text."

3           Is that a note to you from the

4   transcriptionist, Ms. El-Basit?

5       A.    Yes, that's exactly what that is.

6       Q.    Okay.  All right.  And if we could go down to

7   the next page, 232527.  About halfway down there's some

8   text in red.  The second paragraph states, "Inmates in

9   detention, some delays in having access to interview

10  space.  They are housed two to three to cell, but some

11  are single-celled."

12          Is that correct?

13          MS. ORCUTT:  Form.

14          THE WITNESS:  That's how it reads there in my

15  notes; that's fair.

16  BY MS. KENDRICK:

17      Q.    Okay.  And did Mr. Babb or Mr. Felber give you

18  any explanation as to the reason for the delays in having

19  access to the interview space?

20          MS. ORCUTT:  Form.

21          THE WITNESS:  Yes.  I don't think I reflect it

22  in my note here, but as I recall from my memory, the

23  issue is there's interview space and there's actually

24  dedicated interview space.  But because of the custody

25  level, it takes time for custody to come down and escort

315

1      Q.    And, again, like we've discussed before, some
2  of your text is in black and some of it is in red.  And,
3  again, is the red -- the red font is your -- is the
4  transcriptionist, Ms. El-Basit, highlighting things for
5  you?
6      A.    No, I think what I testified to, that's
7  my -- those are my notes that I wrote, but I think she
8  had questions about the content, because she's not a
9  clinician or correctional person.  So she wanted me to
10 maybe explain like what is PMRB, what's Haldol, what's
11 Prolixin, what's a medical or dayroom.  Just kind of
12 giving me a heads up of maybe you need to do a little bit
13 more on that.
14     Q.    Okay.  All right.  Let's go to the next page.
15 And then the next page, sorry.
16           This is your Perryville notes.  It begins on
17 page ADCRR00232502, and goes for four and a half pages,
18 ending at 232506.
19           And do these appear to be your notes from
20 Perryville?
21     A.    Yes.
22     Q.    Okay.  So we'll just walk through these very
23 quickly.  And, again, you state at the beginning, "On
24 September 22nd, 2021, I participated in a tour of ASPC
25 Perryville."

1          Was she referring to senior administration of

2  Centurion or of ADCRR?

3      A.    Actually, I believe both.  I think she was

4  directly saying at Centurion, ever since -- and I think

5  she worked under Corizon -- but that whole paragraph, she

6  was explaining to me how Centurion has been successful

7  because they've raised their salaries, they've given

8  signing bonuses.  She implied -- or she told me that

9  under Corizon, they would request additional staff or be

10 able to move staff from point A to point B, and they kind

11 of never really got any timely responses.  But under

12 Centurion, her -- those are her direct quotes there --

13 that basically senior administration was much more

14 responsive to all the above.

15         And then also the ADCRR, which funds those

16 positions, was responsive to those requests from

17 Centurion.  That's my recollection.

18     Q.    Thank you.

19         If we could go to the next page, please.

20 ADCRR00232493.  One more page, sorry.

21         And then at the bottom of the page, in red font

22 it says, "Interview: ?"  And then it states, "You

23 interviewed two monitoring bureau north and south

24 regions, one (male) is an attorney, by training.  The

25 other (female) is a nurse by training."

Joseph V. Penn, M.D., CCHP, FAPA, Volume II - 11/17/2021

330

```
1              Who wrote this?
2       A.    I did.
3       Q.    Do you normally address yourself in the second
4   person?
5       A.    Yes.  Sometimes.
6       Q.    Great.
7              Let's go to Phoenix, which was the last prison
8   you visited.  And this begins at ADCRR00232507 through
9   511.  And, Dr. Penn, does this appear to be your notes
10  from when you toured the Phoenix facility?
11      A.    On that date, September --
12      Q.    On September 24th, 2021.
13      A.    Right.  Yes.  Because I've toured it before, so
14  yes.
15      Q.    Okay.  And if we can go to the second page of
16  your Phoenix notes, which is ADCRR00232508, the first
17  paragraph, you state, "Also I spoke with Dr. Stabinsky,"
18  S-t-a-b-i-n-s-k-y, "site medical director, who indicated
19  that they avoid off-site ED/hospitalizations.  Some staff
20  are able to perform suturing to avoid off-site
21  transfers."
22             Did I read that correctly?
23      A.    Yes.
24      Q.    The reference to performing suturing, is that
25  in response to patients who cut themselves?
```

1   individuals that self-harm or, you know, have behavioral

2   issues, triangulation would be where there's splitting

3   involved, where you -- a change of shift.  You may have

4   really good staff in the morning and in the afternoon,

5   but say the third shift person comes on, and he isn't on

6   board and doesn't know what the first and second shift --

7   I think that's what she's referring to as the triangle.

8          You could have a -- and she used a hypothetical

9   where one correctional officer might do something that

10  could antagonize or provoke an inmate, and it would be

11  back to square one with starting a behavioral plan all

12  over again.  So that was her concern, which she shared

13  with me.

14      Q.    And did her statement regarding CO, or

15  correctional officer, start banging on a patient's door

16  and set them off, did that concern you?

17          MS. ORCUTT:  Form.

18          THE WITNESS:  Yes, it did.

19          MS. KENDRICK:  Okay.  All right.

20          I have nothing further, Anne.  But I just want

21  to reiterate that we do request that we get the raw notes

22  from his tours that he provided to the transcriptionist.

23          MS. ORCUTT:  We talked about that over the

24  break and he does not have the raw notes.  All he has is

25  what he provided to us.

335

```
 1   BY MS. KENDRICK:

 2       Q.    Did you e-mail those raw notes to the

 3   transcriptionist, Dr. Penn?

 4       A.    When you say "raw notes," I guess I'm not sure

 5   what you mean by "raw notes."

 6       Q.    You previously said that you wrote rough notes

 7   and sent them to a transcriptionist, Ms. El-Basit, in

 8   Chicago.  And then she sent you back your notes typed up.

 9   And so that's what I'm referring to is what you sent to

10   Ms. El-Basit.

11       A.    Yes, that's correct.

12       Q.    And did you send those notes to her via e-mail?

13       A.    Yes.

14       Q.    And did you save the e-mail?

15       A.    No.

16       Q.    The e-mail has been deleted?

17       A.    Yes.

18             MS. KENDRICK:  Okay.  All right.

19             I'm done with my questions, Anne.  I don't know

20   if you had any questions you wanted to ask.

21             MS. ORCUTT:  Just very brief follow-up.

22

23                   E X A M I N A T I O N

24   BY MS. ORCUTT:

25       Q.    So, Dr. Penn, earlier you were asked by
```

339

```
 1   STATE OF ARIZONA     )
     COUNTY OF MARICOPA   )
 2
                BE IT KNOWN that the foregoing proceedings
 3   were taken before me; that the witness before testifying
     was duly sworn by me to testify to the whole truth; that
 4   the foregoing pages are a full, true, and accurate record
     of the proceedings all done to the best of my skill and
 5   ability; that the proceedings were taken down by me in
     shorthand and thereafter reduced to print under my
 6   direction.

 7          [X] Review and signature was requested.

 8          [ ] Review and signature was waived.

 9          [ ] Review and signature not required.

10          I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in the ACJA 7-206(F)(3)
11   and ACJA 7-206(J)(1)(g)(1) and (2).  Dated at Phoenix,
     Arizona, this 17th day of November, 2021.
12

13

14

15          _____
                 ROBIN I. B. OSTRODE, RPR
16               CA CSR
                 AZ CR
17
                 *    *
18          I CERTIFY that Glennie Reporting Services,
     LLC, has complied with the ethical obligations set forth
19   in ACJA 7-206(J)(1)(g)(1) through (6).

20

21

22

23          _____
24   GLENNIE REPORTING SERVICES, LLC
     Registered Reporting Firm
25   Arizona RRF No. R1035
```

# EXHIBIT 4

**ASPC -Eyman**

On September 23, 2021, I participated in tour of ASPC-Eyman.  After a tour of the physical plant,  I met with several prison staff members to gain further understanding of the access to mental health care within the prison.  I spoke with Ms. Katie Masters, LMSW;  Ms. Bianca Mocha, LPC, Regional Psychology Associate; Ms. Name Barker, Psychiatric NP; Mr. Jeremy Pata, Psychiatric RN; and Last 2 names.

ASPC-Eyman is comprised of five separate units; Browning, Cook, Meadows, Rynning, and the SMU I unit.  ASPC-Eyman has an inmate capacity of approximately _____. There are _____ chronic care patients and _____ mental health patients at this facility.  Each unit has different types of offenders and offers slightly different programs.  They offer basic adult education and a GDE course so an inmate can earn a high school equivalency diploma.

The Eyman prison complex has a variety of programs and work options for that inmates such as working in a license plate factory, laundry, or bakery.  This facility offers substance abuse treatment and mental health programs that are aimed to improve impulsiveness in inmates, as well as curbing aggression.  Vocational skills that inmates can learn at this facility include culinary arts, business management, construction, plumbing, and custodial skills.

I toured the Browning unit, watch cells, the behavioral management unit (BMU), educational room, programming space, enclosures in which mental health staff sees high custody inmates, and psychiatric associates in private medical space.

On my tour of the SMI unit observed watch cells, one constant and two 30 minute watches, the educational room, programming space, enclosures in which mental health staff sees high custody inmates, and psychiatric associates in private medical space. Additionally, I spoke with nursing staff who were conducting HNR checks and pill/medication administration.  I inquired about emergency psychiatric medications, injectables, and management of extrapyramidal side effects.

The warden explained that mental health staff is readily available and can be contacted within five minutes. There is a psychiatrist  on call 24 hours a day, 365 days a year.

**Interview:  Ms. Katie Masters, LMSW**

Ms. Masters is the mental health lead at the Eyman facility. Previous to her employment with ADC, she worked at an adolescent treatment center and a private psychiatric hospital for four years. Ms. Masters has worked in numerous ADC facilities since she started 2014. Her first stint was at the Perryville facility where she remained for one and a half years.  After that, she

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

**ADCRR00232487**

worked at the Phoenix facility for eight 8 months.  Then, she transferred to the Eyman facility for three year and returned to the Phoenix facility for 2 years.  At the time of our conversation, Ms. Masters had been back at the Eyman facility for several months.  In total, Ms. Masters has been with ADC for seven years.

According to Ms. Masters, there have been numerous significant improvements since Centurion assumed medical management of ADC facilities.

Ms. Masters indicated that Centurion's recruitment process is more aggressive than Corizon's. Within a matter of weeks of their takeover, Centurion offered larger recruitment bonuses and signing bonuses for psychologists and psychiatric  associates.  Under Corizon, the signing bonus for a psychiatric associate was $2500.  Centurion raised it to $20,000.  Further, Centurion offers some loan reimbursement.  Ms. Masters remarked that Centurion actively seeks applicants, while Corizon waited for people to apply online.

Ms. Masters explained that another area of improvement is in the area of staff education and lifelong learning.  Under Centurion, the CEU requitements  jumped from four hours to eight hours per year for home/computer based training. Further, in order to maintain their license, mental health staff must acquire 30 CEU hours every two years.  Staff are able to receive webinar-based CEU educational materials.   Centurion reimburses employees for all CEU expenses.

Further, Ms. Masters believes that, under Centurion, there has been increased suicide prevention training and more clinical training.   not just fire extinguisher do you use,

With the forthcoming closure of the Florence facility,  three behavioral health technicians, two psychiatric associates, and one psychiatric nurse have been transferred from Florence to the Eyman facility.

The psychiatric nurses serve a number of roles.  They clear pending medication orders, confirm that medications match the notes/orders, facilitate HNRs for mental health programs, watch follow-ups on weekends and holidays, and run mental health nurse lines.

There are 13 psychology associate positions at the Eyman facility. At the time of my visit, nine of those positions were filled.  All new staff are license-eligible, and they must attain licensure within 18 months of their start date.  According to Ms. Masters, staffing was very challenging in July 2021.  In order to ensure access to mental health care, the Eyman staff received supplemental assistance from the Phoenix facility, non-corridor facilities, and other mental health leads.  Mental health leads and mental health technicians occasionally helped out on weekends.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

According to Ms. Maters, telepsychology lines are utilized on the weekends.  With telepsychology, they are able to perform watch follows, HNR's, return to clinics, sick calls, and ICS events.  Except for psychology assessments and daily watches that must to be done in person, they can perform all routine weekday tasks through telepsychology.

MH techs n = 7 FTE's currently all filled, only budgeted SCUD'ed/slotted to have 6 FTE's

PsyfGhchologists doctoral level n = 3 scud'ed for 4.  3 working on site currently, one new hire starting in a few weeks

Psychiatric nurses: 2 FTE's, 1 vacancy

Psychiatric  1 psychiatric FTE scudded for 1,

All telepsychiatry works in state.  used to work onsite at Browning unit, but now working telepsychiatry.  Dr. Adiza Sulley, could get patient seen by one of the onsite midlevel psychiatric providers or Dr. Sulley the same day within 15 minutes to one hour, it depends on custody escort (Tucson, Florence, Phoenix, Eyman).

Ms. Masters explained the PMRB protocol at the Eyman facility.  A treating midlevel can recommend a PMRB, but a non-treating psychiatrist is the chair of the PMRB board.  A non-treating psychologist also participates on the PMRB board.  Additionally, a CO-3 or CO-4 attends as the patient's advocate.  An ADW or deputy ward (DW) also sits in on the board.  In all cases, the patient has the right to speak at the meeting.

Psychiatric midlevels: scudded for 5.5, , currently filled, 5 psychiatric NP's, could hire 0.5 psychiatric NP's

The biggest challenges are finding suitable office space in which to see patients, getting quick access to inmates in different housing units, and escorting inmates to appropriate spaces in a timely manner.

According to Ms. Masters, CGARs have become an increasing source of contention.  She shared her frustration regarding situations in which it is not clinically indicated that a patient be seen, yet the PM requires twice monthly encounters. Further, if one of the encounters is deemed not complaint because of a minor error in paperwork (i.e., incorrectly completed form), yet another session must be schedule.  Ms. Masters commented, "And the patient still doesn't want to see me.  And now they are really pissed.  I am putting myself in harm's way and taking valuable clinical time away from other patients."

Further, Ms. Masters opined that this has an overall negative effect on staff morale and productivity.  There are long lines of frustrated and disgruntled patients sitting in the waiting

room. This fosters an atmosphere of distrust; patients demand to be removed from the therapists' caseloads.  This toxic situation keeps clinicians from from seeing more inmates who need to be seen.  Previously, they saw 15-18 patients a day.  Now, they are only able to see 8-9.  Even if they have to stay overtime, clinicians continue to see crisis patients.

Ms. Masters explained that when the 10 minute/30 minute rule was instituted, many health care staff quit including four or five long term (greater than 5 years) psychologists as well as Dr. Tenreiro who left after 10 years with ADC.  Ms. Master's admitted, "Our notes are being scrutinized.  We're constantly being told that our notes aren't good enough.  I'm doing the work, but it doesn't count if paperwork is not filled out perfectly.  For example, you could write about their eating, grooming, and hygiene, but if you don't use the specific wording of 'ADL' then it doesn't count.  If you miss one of the eight components or it's not submitted in the correct time frame, it doesn't count.  People were getting written up.  The patient is doing fine, but we don't get credit."

Ms. Masters explained the mental health scoring system.  Mental health technicians have to see patients' seg walks.  If patient is at a mental health level 3, on antidepressants, and stable, clinicians must see them every 30 days and do a 30 minute, as opposed to a check in which would be more therapeutically appropriate. If a patient refuses care, a refusal form must be completed, the 8 points must be verified, and the sheet has to be scanned.  There is no clinical need to include bullet point details on the refusal form.  Many protocols that are not currently clinically indicated or necessary under the new system.

When asked about the mental health staff's relationship with the Monitoring Bureau, Ms. Masters indicated that is it satisfactory.  "We have good two way communication, in particular with high profile inmates.  There are some disagreements regarding where patients should be housed and what mental health programs should be in or not be in."  Sometimes, the Monitoring Bureau wants the patient moved.  Dr. Stallcup (previously Dr. Taylor) is instructed to move patients when the mental health staff feels that it is not necessary.  Ms. Masters remarked, "There are times we are all on the same page."


**Interview:  Ms. Bianca Mocha, LPC  (Did you speak with her in Tucson as well?)**

I spoke with Ms. Mocha at the Eyman facility. She is a Master's level Regional Psychology Associate who oversees the psychology associates at southern region units, Florence, Eyman, and Tucson, and non-corridor units, Douglas and Safford.  Ms. Mocha has been at the Tucson facility for three years.  She was employed by Corizon and is now with Centurion full-time.  Previous to her employment at ADC, she worked as a mental health professional to support

inmates who have been recently released into the community.  According to Ms. Mocha, the job was satisfying, but she wanted to work with a more challenging population.

Rare psychiatric DMS connectivity delays/issues.  20-30 minutes every 2-3 months.

75% of staff (Florence and Tucson) were on the verge of quitting, I'm really considering leaving.

Ms. Mocha feels that the mental health staff's focus should be on doing crisis intervention, stabilizing patients, keeping them physically safe, and giving them coping skills so they can be discharged off watch. Ms. Mocha opined that the mental health staff should not be doing therapy with actively psychotic patients. Instead staff should help them function and achieve their baseline so therapy can be provided in the future.  According to Ms. Mocha, it is not clinically indicated to be doing therapy while someone is on watch.  Someone on watch do 10 minute, if their return to clinic MH appointment (q monthly) is due while they are on watch, then the watch contact must be 30 minutes. 10, 10, 30, 10.  No clinically indicated reason for 30 minute

Bianca: "More staffing support.  More support to go out and get staff, if we need positions, positions changed, more flexibility, what can we do about it, get heard"  "Few weeks to a month"  Senior administration is more responsive to staffing requests or position adjustments.

Ms. Mocha remarked, "My biggest challenge is getting custody staff to bring up the patient.  If there is an ICS, there is already security present."  She described that if a patient is decompensating, needs stat medication, a restraint, or crisis intervention, mental health staff immediately contact the on call psychiatric provider, midlevel, psychiatrist, or Dr. Carr. If needed, they order stat PRN medication to the psychiatric nurse or an RN.  PRN medications and restraint medication can only be ordered by a psychiatrist.  NPs can give stat medications as needed.  According to Ms. Mocha, "There is always coverage.  There is always an option."

Further, Ms. Mocha remarked, "The 10minute/30minute intent is good, but I don't think it clinically helps anything.  It is a nitpicking type of rule rather than clinically driven and evidence based.  It gets in the way of effective treatment."


**Interview:  Name Barker, Psychiatric NP**

Ms. Barker has been a psychiatric NP with ADC since January 2020.  Presently, she covers the East Unit. Previously, she worked at Kasson, the SMI and BMU unit

Prior to joining ADC, she worked for 14 years in the free world.  In Tennessee, she was employed as a psychiatric RN in a variety of settings: county jail, community mental health,

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

female prison substance use/abuse detox withdrawal unit, a correctional facility, a crisis stabilization unit, and inpatient mental health.

According to Ms. Barker, mental health care at the Eyman facility is superior to the care in other places where she has worked.  She remarked, "There is access to care, regardless of the shift. Treatment is in compliance with Centurion practice disease management guidelines, FDA approvals, and APA treatment guidelines.  There are channels to approach when there are challenges. Providers will stay over to get things done or will take a telepsych visit.  If a patients are returning from hospitals, we continue the care to help them get better."

Ms. Barker explained that she is able to get medications approved, formulary versus non-formulary.  She has the ability to seek non-formulary approval;  turnaround time is prompt.  Ms. Barker described a situation that occurred the day before my visit in which she received an immediate response on medication approval.  While she was meeting with a patient, Ms. Barker was able to get Lexapro approved before the patient left your office.  Typically, approval takes a day or two.  She added that if an alternative treatment plans (ATP) is denied via email, she reaches out, advocates, and gets a second opinion.

She reports to Dr. Carr. She can consult with Dr. Carr

She described how she would meet with a patient and offer oral meds, or injectable meds, if the patient consents, and the patient is in the office with the psych NP, she will have the patient give consent, Mr. Pata (see below) will come and give injection.

**Interview: Mr. Jeremy Pata, Psychiatric RN**

Mr. Pata has worked full time with ADC since 2016 as a psychiatric nurse.  Initially, he was stationed in the North unit at Kasson before it closed.  Recently, he was transferred to the Browning unit at the Eyman facility.  Prior to joining ADC, Mr. Pata was a Firefighter in the military for eight years. He worked at the Pinal County jail as an intake nurse, spent time doing medical clearance, and was a corrections officer for five years.  Mr. Pata worked in _____ CCA with _____ PHS ICE detainees as a medical nurse for one and a half years.  He has also done free world nursing and health care.

Mr. Pata reports to Ms. Masters and Dr. Carr.  Since he is a psychiatric nurse, Mr. Pata's performance evaluations are completed by Ms. Masters or Ms. Mocha.  Mr. Pata cannot be pulled into triaging medical HNR's, medical nurse lines, or other medical nursing functions. Instead, his role is to work as a psychiatric nurse not as a medical nurse.  When there is an ICS,

he responds in the role as recorder. At the end of the ICS, he shares his report/record with medical nurse.

According to Mr. Pata, many of the patients are familiar with him.  "They know my name.  They know I am there to help them.  There is comfort in seeing familiar faces.  No one likes needles. It's all in the way you talk to them, your approach.  I say hello, reintroduce myself, even if they know who I am. I will ask, 'Would you like the medication?' I kneel down beside them and thank them for their compliance."

## Training videos re: PMRB

According to Mr. Pata, if mental health staff can get patients to take medications voluntarily, that is better than PMRB.  They utilize PMRB as a "last resort."  In his experience, Mr. Pata believes that patients who have been in PMRB improve, stabilize, and turn around.  He remarked, "They rec.  They shower. Not playing with excrement.  Not speaking in tongues. Not talking to the walk.  Tremendous transformation."

Mr. Pata gives PMRB versus voluntary injectable medications.  He keeps a master injection log on an Excel spread sheet.  He can check medications in eOMIS, run medication reports, run "Haldol decanoate," update the logs, and get notification from medical nurses.  Mr. Pata said, "Checks and balances avoid human error." Psychiatric nurses are responsible for maintaining and updating the log daily.  PMRB vs. voluntary, start and when meds will expire/new injection due/med and dose.

When asked about the change from Corizon to Centurion, Mr. Pata remarked, "There were no previous monitors under Corizon, no court orders, no checks and balances.  Now, there are more policies and procedures, Zoom meetings, standard of care is starting to come up.  It's night and day in my opinion. I like what I see.  We have a good group of people. We work as a team.  We work around the shortages.  I don't like to be short staffed.  We find ourselves staying late to get the work done. If we had all the staff, additional custody staff, we could do the job more efficiently."

**Interview: ?**

You interviewed two monitoring bureau north and south regions one (male) is an attorney by training, the other (female) is a nurse by training

Discussed the 10"30" issues

Risk management and documentation issues

Vivitrol upon discharge.  Get additional doses through Medicaid.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00232494

**ASPC -Lewis**

On September 22, 2021, I participated in tour of ASPC-Lewis.  After a tour of the physical space, I met with two prison staff members to gain further understanding of the access to mental health care within the prison.  I spoke with Dr. Micaela Reece-Williams, Psy.D, and Ms. Jamie Pemberton, MR RN.

ASPC-Lewis is divided into eight units; Bachman, Barchey, Buckley, Eagle Point, Morey, Rast, Stiner and Sunrise unit.  ASPC-Lewis has an inmate capacity of approximately _____.  There are _____ chronic care patients and _____ mental health patients at this facility.  Each of these units offers a variety of programs, some of which are not offered at other units.  These units have different custody levels as well.

At the Stiner unit, I entered a cell that was designated as a watch cell and spoke with the ADW on duty.  There were no patients on watch in this unit at the time of my visit.  Next, I toured the Hub and talked to psychiatric nursing staff.

Lastly, I toured the Rast Max unit where I observed several watch cells, watches, and housing units.  The general milieu of Rast Max was professional and calm.  I noted non-judgmental interactions between custody staff and inmates.  Several inmates were sleeping in their cells on various 10 minute/30 minute watches.  I observed no yelling, agitation, or disturbances that required tear gas or OC spray.  Warden Coleman noted that there has been a significant culture change since _____.  Presently, there are fewer incidences of custody-initiated seclusion and restraints.  The use of tear gas or OC spray has markedly reduced.  During a previous tour of Rast Max on _____, I had noted the recent use of OC spray.

While in Rast Max I witnessed the following interactions:

1. I observed a constant/continuous dry cell watch of an inmate who had allegedly ingested an item.   The officer seated outside the cell was professional in appearance.  His interactions with the  mental health staff and Warden Coleman were respectful.

2. I observed Dr. Reece-Williams, mental health lead, wearing a stab proof vest and protective eye wear.  She was walking down the run, reviewing watch orders posted outside each inmate's cell, speaking with inmates on watch, assessing their mental state, and clarifying their status and next steps.

3. I observed an interaction between Dr. Reece-Williams and an who inmate had a leg injury that had been treated with a large bandage wrap.  He had a piece of under-wrapping gauze approximately eight inches in length.  Dr. Reece-Williams immediately notified custody, specifically Warden Coleman, who requested that the inmate surrender the gauze.  The inmate turned over the item without any disturbance.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

4.  I observed an interaction between an inmate on second level run who had rubber tubing running from his bean slot to his neighbor's cell. Warden Coleman clarified that the inmate was using the rubber tubing to communicate with the neighboring inmate. Warden Coleman requested that the inmate immediately remove the tubing.
5.  I observed an incident in which Warden Coleman instructed two inmates on the second level run to remove items that had been taped to the bottom portion of the front door of their cell. The items blocked the lower glass pane, impeding the ability of staff to see inmates standing in their cells.

**Interview:  Dr. Micaela Reece-Williams, Psy.D**

I spoke with Dr. Micaela Reece-Williams, Psy.D, who has served as the mental health lead at ASPC-Lewis for one and a half years. Ms. Reece-Williams has over 15 year of experience in community behavioral health, working with SMI patients, underserved populations, juvenile sex offenders, and domestic violence survivors. Ms. Reece-Williams has administered psychological evaluations and autism testing with juveniles. She worked at a federal halfway house with _____ (BOP) prisoners after their release. She assisted inmates in finding employment and by coordinating details of their release with family members.

Dr. Reece-Williams discussed the difficulty in recruiting licensed applicants. Presently, they have two vacancies for doctoral-level psychologists and two vacancies for psychology associates. According to Dr. Reece-Williams, if staff are not licensed, they are prohibited from "taking individuals off watch or performing individual watch assessments." Psychologists new to the field prefer to work in private practice where they can amass clinical hours without the stress of safety and custody issues common to corrections. Further, ASPC-Lewis is not commutable from Phoenix. Most staff live closer to the facility in Buckeye or other cities but still face a 60-minute commute.

According to Dr. Reece-Williams, "Every Tuesday we have a treatment team meeting with mental health staff who are directly involved in placing and removing inmates on watch and completing daily watch assessment." They confer about individualized staffing, patients who are on watch, and those who have actual mental health conditions. Dr. Reece-Williams explains that everyone else is a housing concern for a host of reasons such as: running from debt on the yard (for substance abuse or contraband); escaping peers (who have provided incriminating testimony), or refusing to house because of the nature of criminal offenses or issues with a cellmate. Further, there may be secondary gain when an inmate is facing a disciplinary ticket for refusing to house.

When asked about the 10 minute/30 minute documentation requirements, Dr. Reece-Williams responded, "The 10 and 30-minute times are arbitrary." She described a common scenario in

which the mental health staff cannot immediately locate a required form or the form has not been scanned in properly.  In either case, the first several minutes of the session are spent completing the proper paperwork.  As a result, the mental health unit receives a red CGARS because they met with the patient only 27 of the required 30 minutes.  According to Dr. Reece-Williams, "You do great work and take pride in your work, but you get judged on a time frame and a piece of paper.  It doesn't take into consideration the time spent on chart review or clinical documentation or in discussion with the custody, health care, or other prison staff."

Dr. Reece-Williams explained that, at times, the mental health staff's relationship with security, "Puts parameters and constraints on therapy that might not be necessary."  According to Reece-Williams, the client guides treatment.  If a patient wants to refuse treatment, he can.  With new requirements, however, the inmate must sign a refusal.  The inmates fear that this might be perceived as a lack of cooperation on their part. It takes time to explain the extra layer of documentation, and that can overshadow the reason for the initial encounter.  Dr. Reece-Williams stated, "I can have a meaningful five minutes with someone.  If your encounter serves a purpose, it is quantity not quality."

Further, Dr. Reece-Williams described a domino effect that occurs which strains the relationship between mental health and security staff.  For instance, if there are six inmates in the enclosure in the Stiner yard waiting to be seen by mental health staff, they begin to lash out at security if there is a perceived delay in care.  At that point, custody calls mental health staff in an attempt to expedite matters.  However, therapists are in sessions and unavailable to respond to custody staff immediately.  Inmates in the waiting room grow agitated.  In this tumultuous atmosphere, patients decide to forgo their request for treatment, preferring to sign a refusal.  Security has to de-escalate these tense situations.  Inmates seeking treatment must sit through count and often get trapped.

According to Dr. Reece-Williams, the typical length of watch for mental health issues, the time needed for the patient to decompress, is anywhere from three days to one week.  However, if the patient has a history of cutting, SIB/SMB, or suicide attempt, or if they are waiting for medications to stabilize their condition, the length of watch could be two weeks or longer. Dr. Reece-Williams explained, "It is always individualized.  It is for assessment purposes and safety. Our hope is to be able to increase protective factors prior to releasing them back to the yard and prior to transitioning them off watch.  We want to assess their distress and provide them with coping tools."  Dr. Reece-Williams explains that mental health staff teach grounding or breathing techniques.  "Seven breaths in and seven breaths out.  It can change their body chemistry.  We want to help them develop coping tools."

Dr. Reece-Williams stated that patients are always offered the option of a private setting in which to speak to mental health staff.  Therapists use _____ (CBT) and _____ (DBT) skills.  Since

patients are not allowed to have writing instruments on continuous and 10 minute watches, therapist write for them.  When the watch numbers are low, weekend staff spends additional time looking for curriculum and printing that material.  If a patient has talked about trauma or disclosed trauma, there is continuity of care.  The inmate is able to follow through with the same therapist the following day.  Dr. Reece-Williams warned that mental health staff must exercise caution when unraveling a patient.  The therapist must ensure that the patient is able to continue to receive therapy and treatment.

In her experience, Dr. Reese-Williams finds that the majority of patients appreciate the support offered by therapists and that patients want to work on their treatment issues.  Inmates want to talk to their family and have access to tablets and writing instruments.  According to Dr. Williams-Reece, the mental health staff "follow the watch book to a T."  On continuous or 10 minute watches, the patient cannot have anything.  On 30 minute watches, they are allowed reading material.

Occasionally, patients use "suicide" or threats of suicide to _____.  Dr. Reece-Williams recounted one incident in which an inmate _____ for four months.  The mental health staff exhausted all of their options, and, eventually, the patient was able to house successfully. Every effort is made to transition patients off watch.  The mental health team takes a proactive approach by meeting to discuss the "true need" of each inmate.  Dr. Reece-Williams meets with security every Wednesday to discuss security and housing concerns that impact each inmate, and she receives a daily email regarding inmates on watch.

Dr. Reece-Williams admitted that ASPC-Lewis is experiencing custody shortages.  Inmates' access to a psychiatrist can be challenging. At the Lewis facility, there is no psychiatrist on site. The one full-time psychiatrist, Dr. Kahn, provides telepsychiatry 40 hours per week.  They face some custody escort issues which are further complicated by COVID protocols.

There are three psychiatric _____ (NP) on site who see all patients.  If there are clinical concerns regarding medical complaints, side effects, appropriateness or other issues, mental health staff notify one of the mental health RNs or a behavioral health technician such as administrative support staff or an unlicensed staff member. Some of behavioral health technicians run groups on stress and anxiety, coping tools with SMI, painting, and arts and crafts. There is an additional therapist who runs an additional therapy group with SMI patients.

There are two mental health RNs who perform a unique role on the mental health team. Their principal supervisor is DON, but Dr. Reece-Williams supervises them on a daily basis.

The mental health RNs ensure that inmates on watch get their medications.  They oversee and administer the PMRB (forced medications).  Further, the mental health RNs attend treatment team meetings and offer comprehensive and timely input regarding patients' psychiatric

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

ADCRR00232498

medications.   Dr. Reece-Williams described an incident in which an inmate appeared to have experienced weight loss.  The mental health RNs communicated this issue to Dr. Reece-Williams.  Then they provided some additional medication education to inmates and explained what to expect when on an injectable medication protocol.  Dr. Reece-Williams stated that the mental health RN sees the PMRB 45 minutes after injection.

Dr. Reece-Williams described the supportive relationship between mental health staff and security staff.  If a patient is decompensating, any rank of custody staff intervenes and contacts Dr. Reece-Williams immediately by phone or email.  The inmate is seen the same day or the next day.  She recalled an incident in which an inmate's father had died.  Although the chaplain and sister had already apprised the inmate of his father's passing, the psychiatric associate visited the inmate immediately and called Dr. Reece-William's with an assessment of the inmate's mental state.  After hours, weekends, or triaging, Dr. Reece-Williams may receive an email regarding a patient's status.  If so, she notifies mental health staff and directs them to follow up with the patient the next morning.

At ASPC-Lewis, any employee can staff a patient.  If the patient has a need beyond what ASPC-Lewis can render, mental health staff initiates a referral which is reviewed by Dr. Reece-Williams.  Then, she remits the referral to regional leadership and mental health leads at all complexes.  Dr. Reece-Williams attends weekly meetings with Dr. Carr, the regional psychiatrist; Dr. Pelton, the regional mental health director; and the regional release planner who has access to community information.  Case-by-case, they discuss information that is not available in eOMIS such as prior history, psychiatric hospitalizations, past psychiatric medication history, SMI evaluations, PMRB, and medication compliance. The team reaches out to staff from previous units for necessary, historical information regarding the efficacy of past treatments. Dr. Reece-Williams remarked, "Location is not going to change the person.  The patient might need a higher level of care at his current location or a referral to an alternate location for a higher level of care where he can function the best."

Currently, the Lewis facility employees two student interns and two doctoral-level Psy.D students. Interns can perform the same clinical functions as a non-licensed psychiatric associate.  The interns are supervised by an onsite licensed pschi9klogy from Midwestern University.  Dr. Reece-Williams credited this as an excellent teaching opportunity.

Dr. Reece-Williams discussed the challenges faced by the new, increased requirements for documentation. Previously, it took five minutes to hand write a note regarding a patient on 10minute/30minute watch.  Now with increased expectation for formalized documentation, it takes up to 30 minutes to write, submit, and scan a note.  According to Dr. Reece-Williams, "It adds time that we don't have.  Mental health is onsite from 8am to 5pm.  If someone comes at 4:50pm, they will be seen, but it will take an additional 30 minutes to one hour to complete.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

PDFs must be scanned in a certain way.   If mental health staff is at a certain yard, they may not have access to scanner."  Before the increased documentation requirements, there were 40-70 inmates on watch status on any given day.  On the day of my tour, the mental health unit at Lewis had twelve inmates on watch.

The Lewis facility is being audited by state monitors for eight key components. There is additional documentation required when placing a patient on a watch to include:  a crisis treatment plan, a risk assessment, a watch order, clinical notes, and a refusal.   Dr. Reece-Williams admits, "We have no additional staff. We are being asked to do more with less to prove the work that we do tirelessly each day."

**Interview:  Jamie Pemberton, Mental Health RN**

I spoke with Ms. Jamie Pemberton who has been employed at ASPC-Lewis for five years as a mental health RN.

According to Ms. Pemberton, "Corrections work is different, good, interesting.  I would get burnt out in hospital.  Here every day is different.  You can actually see the progress and patient improvement."  She finds it rewarding to work with patients whose mental health improves.  She observes inmates who go from being on watch to stabilization. With medication compliance, they are eventually released and employee new coping skills in the free world.  When they are in a better state of mind, they are disposed to staying on their medication.

According to Ms. Pemberton, if an inmate refuses his meds, often it is because he perceives it is "poison."  Ms. Pemberton hopes that the facility will make printed informational materials available to patients, especially for common drugs like Risperdal, Haldol, and Remeron.  She believes that it would be beneficial for patients to read about possible side effects and different options.  Ms. Pemberton remarked that Dr. Khan and the three mid-levels onsite do considerable education around medication protocols.

Ms. Pemberton stated that there is one PMRB or less per month and that Haldol and Prolixin are the most common medications prescribed.  Voluntary will do in medical room or day room.  Involuntary, custody will do a cell extraction

She explained that the provider tries to starts the patient on oral or short acting tablets.  Then three doses of short acting injectable on serial days are ordered.  Haldol HTL Nursing staff notify medical and custody staff.  The patient sees the ___ (PA) for watch contact after the injection and is seen for daily watch contact by mental health staff.  The patient returns for observation for the next three to four days.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

Psych RN medication compliance is in the MAR.  If refusing.  Administered, refused, administered, have to look at each medication individually.  No collective

Ms. Pemberton detailed her responsibilities on the unit as such:  participates in treatment team meetings, watch pod, and AM/PM pill pass; clears orders and interfaces with psychiatric providers, mental health, and custody; addresses HNRs submitted by inmates; participates in yard-specific treatment team meetings once per week per yard to discuss possible PMRB inmates; and attends suicide watch meetings.

Also voluntary versus PMRB injectables.

Ms. Pemberton stated that she is not involved with emergency medication, use of injectables emergency medication for combative inmates, or inmates being transferred to Phoenix.  She said that medical staff can order Ativan/PRN medications.

<u>ASPC - Perryville</u>

On September 22, 2021, I participated in a tour of ASPC-Perryville.  After a tour of the physical plant,  I met with two prison staff members to gain further understanding of the access to mental health care within the prison.  I spoke with <u>Dr. Micaela Reece-Williams, Psy.D, and Ms. Jamie Pemberton, MR RN.</u>

ASPC-Perryville is made up of eleven different units; Complex Detention, Complex Minors, Lumley, Piestewa, San Carlos, San Pedro, Santa Cruz, Santa Maria, Santa Rosa, Special Management, and Women's Treatment.  ASPC-Perryville has an inmate capacity of approximately _____. There are _____ chronic care patients and _____ mental health patients at this facility.  Like most correctional institutions, Perryville offers inmates an adult basic education program and a GED program.  Basic medical and dental care is offered to all inmates, as well as substance abuse treatments.  Inmates may also take advantage of many vocational studies such as working in a print shop, garment factory, kitchen, warehouse and laundry, as well as farming, an auto auction, wildfire and state fair crew.  Inmates can also work on road and maintenance crews that work at various cities in the area.

While at the Perryville facility, I toured the inpatient ward referred to as the "Complex Ward," a 2 step-down Lumley Mental Health Unit (LMHU), and _____CRTU Building 45.

**Interview:  Mr. Richard Cadogan, LPC**

After the tour, I spoke with Mr. Richard Cadogan who is the mental health lead at ASPC-Perryville.  He is a licensed associate counselor with a masters in _____.  Before coming to ADC, Mr. Cadogna served in the U.S. Air Force from 2000-2011. During his tenure with the Air Force, Mr. Cadogan counseled individuals who suffered from situational awareness, psychological issues, claustrophobia, psychological threats of flying.  Trained pilots. Mr. Cadogan also worked in Germany with military personnel returning from Iraq, who were affected by physical trauma, loss of limbs, and emotional trauma.  He graduated from _____in 2015.

After his graduation, Mr. Cadogan started his employment with ADC.  He spent four years in a male setting at Lewis Rast;  he has been working in the female unit at Perryville for two years. According to Mr. Cadogan, females have additional mental health needs.  At the same time, they are more emotionally involved and more willing to engage and disclose information.

We discussed staffing at APSC-Perryville.  There is a total of 10.0 FTE psychiatry associate clinicians.  At present, there is only one vacancy.  Behavioral health technicians (BHT) run

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

psychoeducation groups and assist with telepsychiatry lines; they are unlicensed. There is a total of 3.0 FTE BHTs. At this time, there are no BHT no vacancies. Further, there are two psychology/doctoral level psychologists on staff. There are five psychiatric RN slots with no vacancies at present. There is 1.0 FTE for telepsychiatry, 1.0 FTE psychiatrist, 3.0 FTE NPs, and 1.0 FTE Physician's Assistant (PA). There are two <span style="color:red">midlevels</span> are onsite. The staffing patterns was the same with Corizon. There is a need for additional mental health staff.

The inpatient ward is referred to as the "Complex Ward" which is state licensed and has 16 beds. This ward is geared at targeting acute behavior. Currently, there are nine patients in the unit. Typically, it houses 13 patients. According to Mr. Cadogan, it is important to prioritize and identify which patients are appropriate for placement in "Complex Ward" based on their behavior and temperament. They rely on a team approach with custody to make placement decisions. For example, if a patient is actively psychotic, DTS, or actively suicidal, there is 24 hour nursing service. The psychiatric nurse practitioner is on site full time and is supervised by Dr. Carr who comes onsite as needed for particularly complicated patients.

<span style="color:red">Level 5 actively psychotic, unable to manage their medications.</span>

<span style="color:red">Smoked or snorted Keppra and snorted Gabapentin are major drugs of abuse, can result in drug induced psychosis.</span>

Mr. Cadogan denied inpatient backlogs at the Perryville facility. He remarked, "I always make something work." He or a clinician meet with each patient to explain the process of where she will move in the next week or two; however, time frames change as needed. Mental health staff meet with patients to discuss which goals have been met, what additional needs they have, and if the patient would benefit from remaining in the unit. Those conversation address questions such as: "Do you feel you are able to self-regulate?" and "Will you be successful?" According to Mr. Cadogan, "The patient can try it out. If it doesn't work out, we can always have them come back." An average length of stay is four months. However, at present there is one patient who needs residential level of care and a single cell. She will be in the unit indefinitely.

The mental health staff at the Perryville facility spend a great deal of time helping patients identify their behaviors and habits. Individuals who are more knowledgeable and not vulnerable to the population can be placed in LMHU based on their temperament. Those who are more vulnerable and at risk for being extorted, bullied, or taken advantage of would benefit from CRTU. According to Mr. Cadogan, patients who take longer to stabilize and turnaround include those females with "inconsistent or lack of reciprocal family support and contact, who are attention seeking, <span style="color:red">and/or</span> have borderline personality disorder."

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

Mr. Cadogan indicated that since everything is onsite at ASPC-Perryville, there is more treatment flexibility. He said, "We have the luxury of 'fear of the unknown' compared to other complexes." He described a female who was getting institutionalized who was fearful of leaving prison. They use inpatient to stabilize the patient's psychosis. Then the patient is programmed, in CRTU or LMHU, whichever is the best fit for them.

There are two step-down units from inpatient to residential:

1) For level 4 inmates, 2 Step-down LMHU is a behavioral program for individuals who cut/self-harm. LMHU can house 28 patients, but the usual count is 18-19. Mr. Cadogan shared an example, Ms. Christina Verduzco who had improved at CRTU building 45 and is stable at LMHU. She has been in the program for last three and a half years. The treatment team is working with her proactively with techniques and coping skills to look at possible transition to the general population yard. With programming and groups, Ms. Verduzco feels supported and has gained confidence in her ability to gradually move back into general population. Ms. Verduzco is still receiving services as she transitions. Once she is back in general population, Ms. Verduzco will have additional contacts and treatment services with the mental health staff.

2) For level 4 inmates, CRTU building 45 is complex residential treatment unit. It houses 12 patients and is typically full. It is a highly sought unit because of the many amenities such as: washer and drier, karaoke, personal bathroom, and large screen televisions.

When asked about how patients are identified and referred to inpatient units, Mr. Cadogan explained that outpatient referrals are sent to Dr. Pelton, the statewide mental health director, who previously served as the clinical/mental health director at the Phoenix inpatient facility. Every Monday, cases are brought to the referral board. If a patient meets the established criteria and it is clinically indicated, the patient will be moved to inpatient care. If it is not clinically indicated, the patient is managed on the yard with an individually determined treatment plan which could include: coping skills, psychiatric medication, adjustment/treatment/interventions, self-help and grounding techniques, journaling, relational skills, distress tolerance skills, motivational interview, self-talk, solution focused, or DBT and CBT, especially for females who self-harm/mutilate or who are instrumental self-harmers. As an outlet, patients are allowed to draw on the walls in their cells with chalk.

Every patient's treatment plan and token system are individualized. For example, there are a number of items that patients can earn for healthy behavior: tablet use, phone calls, journal time, popcorn, movie Fridays, chocolate, or candy.

SMI 3 A's (means you are acute distress or you are SMI)

By policy, SMI are seen every 90 days.  However, if a psychotropic medication is adjusted/changed, the patient is seen every 30 days.  Further, even if the patient is not taking medication or their medication has not changed, the patient is seen by psychology every 30 days.  This best practice that was implemented by Dr. Carr.

General outpatient submit an HNR.  Or come in from county jail (transfer summary), would do a bridge med order for 42 days, but are seen sooner. Would be typically seen by mental health within 2 weeks.

According to Mr. Cadogan, "Staff do a really good job providing services.  It's hard to capture what the staff does on a day-to-day basis.  It's not cookie cutter.  Every case is situationally based."  As for the 10 minute/30 minute rule, Mr. Cadogan believes that it is the quality of the encounter, not the quantity, is key.  He remarked, "You can see a patient for an hour and a half.  Maybe the patient could achieve the same in 15 minutes?  Next month they may need an hour boost."  He feels that the arbitrary 10/30 minute rule diminishes the value of clinical judgment.  He remarked, "We are learning the patient and her needs."  According to Mr. Cadogan, "CGAR is not a true reflection of what the staff are doing.  They work very hard."  They may have met 8 criteria, but the refusal letter was not scanned in on time.  Will send out individually, serves no purpose.

**Joint Interview:  Name? and Name?  (Interviewed 2 psychiatric nurses)**

At the time of our conversation, they were preparing medication cards for medication administration.  There are no KOP medications in this unit.  The majority of patients are on psychotropic medications.  Further, patients have access to long acting injectable antipsychotic medications.  Of all current patients, only one does not receive psychotropic medications.  The "Complex Ward" has 24 hour nursing on site.  Medical staff will come on site to the unit if patients have any medical issues or concerns.  They also explained that emergency psychotropic medication use is rare.   Typically one patient will need it for a day or two and then will nothing for months. They explained PMRB is rare less than or approx. 5/year

**Interview: NAME, Psyciatric PA**

NAME is supervised by Dr. Carr.  NAME has Dr. Carr's cell phone number and calls him whenever needed.  There is on-call psychiatry available systemwide, and for the Complex Ward inpatient unit, 365 days per year.  NAME explained non-form review and the approval process

and feels that there are no issues or concerns regarding medication list and formulary approval process.


**Joint Interview: Custody staff CO-3 NAME and Captain NAME**

While on tour of the "Complex Ward," I noted lots of natural, ambient light.  The cells were neat and had opportunity for personal materials such as drawings to be hung on the walls.  The women seemed positive and engaged.  None appeared psychotic or disorganized.  There was no yelling, agitation, or disruption.  Both custody and mental health staff were engaged and attentive to the patients.

Most of the women were in the common day room area; only a few patients were in their cells.  In this form setting, I observed a large screen television, drawings, chalk, and colorings.  I toured the outside recreation area which had beautiful landscaping, a covered area with an awning, and ample area for recreation.  The additional outdoor recreation enclosures have a misting system, and the women have access to large jugs filled with ice cold water.  Inmates are allowed outdoors three times a day and can decline outdoor time if they choose.

I also toured the watch cells, the restraint chair area, and the patient transport chair area, and the seclusion/restraint bed area.  When in use, the door of the restraint bed area is kept open and the entire incident is recorded start to finish by custody staff.

The custody and mental health staffs described a creative problem solving approach for particularly challenging inmates.  It is token economy incentives with cash ins.

**ASPC- Phoenix**

On September 24, 2021, I toured two inpatient psychiatric housing units. After a tour of the physical space, I met with two prison staff members to gain further understanding of the access to mental health care within the prison. I spoke with Dr. Antonio Carr, _____, and Ashley Pelton, PhD.

ASPC-Phoenix is divided into six units; Alhambra Reception center, which is where inmates go through the intake and classification process, Aspen SPU, B-Ward, Flamenco Females, Flamenco Males, and the Inmate Worker Unit. ASPC-Phoenix has an inmate capacity of approximately _____. There are _____ chronic care patients and _____ mental health patients at this facility. There are programs at each of the units, but they are not all the same. At Alhambra and Flamenco inmates can be selected to preform different jobs and activities, such as yard maintenance and kitchen crew. All of the units give access to medical and dental care for the inmates and Alhambra and Flamenco have a mental health unit.

I toured the Baker unit which is in the process of transitioning from an IPC mental health to an IPC medical mission. I inquired about indications, monitoring, and patient safety measures when the maximum behavior chair or bed are utilized.

Additionally, I toured five different wards in the Flamenco unit: Ida ward which is used as a reception and intake center for mental health patients; George ward where higher security needs inmates are housed; John ward which houses mental health patients; King ward, a second ward for mental health housing; and Quiet ward which is used for watches. In all areas of the facility that I toured, officers were professional and observing patients to ensure safety. Documentation was legible, and watch logs demonstrated staggered, unpredictable watch checks. The inmate patients' activities were quiet. I did not hear yelling or disruption. I did not observe any uses of force or OC spray.

I also toured the dayrooms, library, psychiatry offices, medical treatment rooms, recreation areas, dining hall, and visitation areas. There is opportunity for outdoor recreation and natural sunlight. Inmates have access to therapeutic day rooms which include large screen televisions, videogames, and gaming chairs. Some inmates were single-celled; the largest cell housed six inmates. For mental health inmates, they are double-bunking in two-man cells which, according to Warden Norman Twyford, is working well.

While on the tour, Warden Twyford indicated that he communicates with mental health staff via radio. He believes that ASPC- Phoenix is providing humane treatment to all mental health inmates.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

Also, I spoke with Dr. Stabinsky, site medical director, who indicated that they avoid off site ED/hospitalizations. Some staff are able to perform suturing to avoid off-site transfers.

I observed an interaction with an older African American male patient who had some food items in his cell.  The correctional officer incentivized the inmate patient who had requested an additional bible.

I observed another interaction with a young, well-developed, and muscular Hispanic male patient who had injured his abdomen which required an ostomy/colostomy bag.  He was reported to have inserted an item into the stoma.  Correctional officers were appropriate in their interactions with the patient.


**Interview:  Dr. Antonio Carr, _____**

I spoke with Dr. Antonio Carr, who served as the interim Regional Psychiatric Director in 2018 until he was officially appointed to that role in July 2019.  Dr. Carr has 10 years of experience in a variety of community, emergency, inpatient, diversion, and substance abuse facilities.  Further, he was employed as a psychiatrist in an urgent psychiatric care facility and in the _____ UPC Emergency Department.  For ten years in Maricopa County, he worked at a stand-alone emergency crisis center META.  Value Options.

Dr. Carr served as the chief medical officer at Horizon Health and Wellness, a community, non-profit, mental health SMI and GMH facility in which a bulk of the clients are Medicaid SMI.  Also, he has worked at Maricopa County Jail, Lower Buckeye Jail, and Madison County Jail which is now the 4th Avenue Street Jail. On weekends, Dr. Carr has worked at private psychiatric and behavioral health hospitals.  He has experience with involuntary treatment, emergency pick-up orders for police, affidavits, first responders, and law enforcement.

In 2017, Dr. Carr started his tenure with the Arizona Department of Corrections.  He worked on site in every unit at Florence for two years.  Also, he worked onsite at the Lewis and Eyman facilities.

As Dr. Carr remarked on the tour, "I feel 100 percent supported in this position, in this role.  Tom Dolan, (_____), has never said 'We can't do that.'  Instead, he says, 'Let's figure this out.'"  To Dr. Johnny Wu, Dr. John Wilson, Dr. Joel Andrade, Dr. Diado Griffin, psychiatric director.

According to Dr. Carr, there has been a major cultural shift since Centurion assumed management of health care at ASPC-Phoenix.  Under Corizon management, less documentation was prefered.  Since Centurion came onboard and completed training in 2018 and 2019, there

has been increased expectation of documentation.  Previously, staff was encouraged not to put anything into the chart.  Now, they are required to document intense interdisciplinary meetings; however, it gets lost in non-clinical contact notes.  Clinical collaboration is placed in non-clinical contact notes especially with more complicated patients or less complicated patients.  Phoenix and Perryville watch meetings.

Pivot and reduce SIB  Dr. Carr (and Dr. Stalkup from mental health monitoring bureau also has data that demonstrates a reduction in SIB (Color graph)***

**Interview:  Ashley Pelton, PhD**

Dr. Pelton has worked in a variety of intensive inpatient and outpatient substance abuse treatment programs. In Indiana, she was employed at a community mental health center, working with children and adults around the issues of violence, shelter, and school.  Dr. Pelton was employed by Corizon as a psychology associate in Arizona DOC.  At that time, she was not licensed, but since then she has received licensure.  Dr. Pelton acted as the lead psychologist at Florence where she focused on Kasson, residential programs, and IPC units.  In July 2019, she transitioned to Clinical Director and has served as the Regional Mental Health Director since August 2021.

When asked about patient mental health care, Dr. Pelton opined, "The 30 minute contact piece is not clinically indicated for most situations.  It is not clinically indicated for a watch.  It's challenging.  We spend way too much time talking about how to document the eight components [that are being audited by state monitors].  Getting credit for 30 minute contacts is getting in the way of good patient care.  We need more case management for particular patients.  Is what we are doing clinically indicated versus filling time to get that 30 minute credit?  The goal would be to build trust, do good clinical care versus wasting time."

According to Dr. Carr, the biggest challenges "Culture change/shift, having care for patients with nursing/medical.  Convince, twist arms, prior correctional health.  Chronic care guidelines.  Dr. Carr is passionate, attempting to get patients seen by medical staff.  We need medical to be on the same board with the same level of care.  Cutting, frequent follow-up, monitoring, establish rapport.  Get patient out of the cycle.  You are malingering, we aren't giving you Gabapentin.  In a tug of war with each other.   Meeting with site medical director, improved communication and collaboration.

Dr. Pelton: agrees with above.  Other issue is triangulation, getting custody on board.  We can create the most wonderful treatment plans.  CO start banging on their door, set them off.

With regard to the physical plant, Dr. Pelton claims that there is a need for additional office space, clinic space, and treatment programming.  One of the most significant problems is that there is no computer access in the clinical room on the unit.  This is a particular challenge  for millennial staff who are accustomed to computers and having immediate access to information.  In order to deliver the highest standard of care, mental health staff must review a myriad of patient records such as:  MARS, allergies, medications, labs, charts, and treatment plans.  Without immediate access to a computer, Dr. Pelton stated that, "The staff is unable to utilize certain tools in our tool belt in real time."

According to Dr. Pelton, there are gaps in _____ (EMR) training.  There are no IT staff trainers.  New employees must take two weeks of New Employee Orientation (NEO) training, one week of mental health training, one week of custody training, and an additional one to two weeks of training depending on the individual complex and the employee's number of years of clinical and correctional experience.  Subsequent to the classroom training, new employees shadow patient encounters with more experienced staff who then reviews forms (PMRB, refusal forms) and formulary.  The new hire shadows another provider for a few days and connects back with that provider after one week to review charts and receive feedback.  The facility tailors training depending on the new hire's experience.

When asked about suicide prevention, planning, policy, and procedures, Dr. Pelton explained the protocol at ASPC-Phoenix.  If an inmate verbalizes or is identified to be at suicide risk during business hours, the psychologist, psychology associate, or psychiatric provider can place the inmate on suicide watch.  In the case of near-misses (overdose or significant events), mental health staff are notified by call, text, or email.  Patients with near-miss attempts are placed in an admissions unit at an offsite hospital in Phoenix.  Experienced staff with expertise in dealing with the most acutely ill patients thoroughly assess and evaluate the patient.  SIR reports when patient is transported offsite.

Psychological autopsies are conducted by a non-therapeutic/non-treating psychology PhD or PsyD staff member.  Autopsies are typically completed within two weeks of the suicide but may not exceed 30 days.  Dr. Carr and Dr. Pelton review charts within hours of notification of death.  According to Dr. Pelton, psychological autopsies are an excellent opportunity for collaboration and education.  In an effort to ascertain the facts surrounding each case, the mental health staff consider the following questions:  What were the warning/precipitating issues?;  What did we do right?; What could we have done better or more?; Did we follow our policy?; and What about the documentation?   In addition to the psychological autopsy, there is an automatic chart audit after a suicide.

<span style="color:red">May be notified by security or facility MH lead.</span>

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**                                    **ADCRR00232510**

Dr. Pelton explained that at ASPC-Phoenix, there is a doctoral-level psychologists and a psychiatric provider always on call.  Additionally, a psychiatrist is on call to prescribe emergency medications or medically-ordered seclusion and restraints.  Training on suicide prevention, restraints, and documentation occurs at mental health staff meetings, new staff orientation, and annually online.  Staff can receive ____ (CEU) credits from their respective boards.  Some funding is available through ADC for CEU training.  Psychologists 3 days.   Masters level 2-3 days.  Psychiatrists get 4 days for CME.

The 15 minute/30 minute protocol applies to psychiatry as well.  Mental health staff are required to see psychiatric patients for 30 minutes.  At any point, the patient can decide to stop the encounter.  If the patients terminates the session, the monitoring bureau requires that he complete a "refusal to encounter form."  The mental health score is based on_____ (CPT) codes.  Medicare, billing, spreadsheet based on complexity of care.  Time spent, reviewed, BMI, vitals,

Dr. Pelton explained that peer reviews of staff are conducted annually.  Monthly psychiatric provider  When conducting non-form reviews or bridge orders (new county jail intakes), Dr. Carr examines the charts.  Any concerns identified by custody staff, ____ (FHA), Dr. Stallcup, or the monitoring bureau will trigger a review by Dr. Pelton and/or Dr. Carr.  Morbidity and mortality can result in a chart review.  In Arizona, psychiatrists do not need to co-sign or establish delegative prescriptive authority agreement with  psych PA (only one) or with psych NPs.  MH Leads meeting.  They will provide the name and frequency of their meetings.  Incarcerated patients with highest number of HNR's and ICS's.  They track SIB/mental health watch greater than 14 days.  They will schedule staffings.  They will reach out to staff and speak   They will look at data/trends to see if any have SMI/psychiatric diagnoses.

According to Dr. Pelton, the Phoenix facility mental health staff has a positive and ongoing relationship with Dr. Stallcup and the monitoring bureau.  There is weekly communication regarding how they can work together to improve patient care.  Dr. Pelton remarked that the relationship between ASPC-Phoenix and the monitoring bureau is, "Collaborative in every sense of the word.  Rarely do they call us about a CGAR problem.  We are asked for our clinical opinion."

Dr. Pelton further opined that the 10 minute/30 minute rule offers nothing but negative value in providing patient care.  She said, "It's tedious and affects staff morale.  Month after month of seeing red.   We really try to protect staff from that."

According to Dr. Pelton, "We try to be on the ground, educate staff, avoid labeling patients as being 'behavioral' or 'malingering' or 'BMU'.  Previously, there was an undercurrent of "us (the vendor) versus "them" (the monitoring bureau).  There is value to improved documentation.  Improve documentation equals improved quality of care."

**ASPC -Tucson**

On September 20, 2021, I participated in tour of ASPC-Tucson.  After a tour of the physical space,  I met with various prison staff members to gain further understanding of the access to mental health care within the prison.  I spoke with D. Pierce, Corrections Officer (CO); Ms. Pugh, Psychology Associate; Bianca Mocha, LPC, Regional Psychology Associate; and Kaci Schwestach, Associate Deputy Warden (ADW).

ASPC-Tucson is divided into eleven units; Catalina, Cimarron, Complex Detention, Manzanita, Rincon Minors, Ricon Transitory, Rincon, Rincons Minors Detention, Santa Rita, Whetstone and Winchester unit.  Each of these units specializes in a certain type of offender and offers programs that meet the needs of those specific offenders.  General medical and dental care can be accessed by inmates located in any of the units.

If an inmate requires inpatient level of care, he is referred and transferred to Alhambra or Flamenco Unit in ADOC-Phoenix.  Will attempt PMRB in House 8.  Sgt. Dame: "We do this all the time."  We have a hearing, able to appeal it (due process), can appeal the hearing decision, 2 days later can receive injection.  2 nurses on the complex are authorized to do this.  PMRB policy/process

Recruiting and retention correctional officer and health care staff challenges

Federal prison/ICE/border patrol

City and county police department

Toured Housing unit 8 Rincon.  The watches

suicide watch,

1 constant watch, 10" and 30" minute

Staggered/unpredictable

Placed on and taken off only by QMHP/mental health orders/separate form for order

I toured Housing Unit 5 which accommodates recently transferred inmates from the Kasson facility located in Florence, Arizona.  Some of the inmates in Housing Unit 5 are maximum custody, but many are not.  Max mental health are availed.  Close custody unit/go down in custody.  All inmates are double-celled.  A few individuals are single-celled; however, single-cells are granted only after a mental health review.  The grounds are in the process of being completed by outside contractors and inmate workers.  There are plans for an outdoor recreation space, full basketball court, and a ramada picnic table area.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

The recreation space in Housing Unit 5 is ideal for treatment programming.  There are separate buildings for housing and treatment, with a short walk (five minutes or less) between the two structures.  The treatment building has more than adequate classroom space to accommodate educational classes, and individual and group therapy.  According to ADW Schwestach, inmates find group sessions most productive when there are fewer distractions in the room.  Therefore, they have limited therapeutic groups to eight inmates per classroom.  ADW Schwestach remarked, "We do not want to just do a program. We want the programs to be meaningful, beneficial."  Igloo containers of water and restrooms are available onsite.  When asked about the improvements to Housing Unit 5, ADW Schwestach remarked, "We truly care.  We want to keep everyone safe, including the inmates, public, and staff.  We don't want to see anyone get hurt."

10 by 10 for Step 1.  Will be same dimensions as current KASSON Rec areas.

Jobs:  house porters, shower porters, once rec enclosures, they can work in rec enclosures

**Interview: D. Pierce, CO-2**

I met with Mr. Pierce at the Tucson facility. He has served as a correctional officer at ASPC-Tucson for six years.  For approximately four and half years of his tenure at the Tucson facility, Mr. Pierce has worked with Serious Mentally Ill (SMI) inmates.

In our discussion regarding access to mental health care, Mr. Pierce explained that once an HNR is submitted, the patient must be seen within 24 hours. If an inmate has difficulty filling out the Health Needs Request (HNR), custody staff will notify medical staff.  During pill pass or HNR lines, the medical staff will explain Health Insurance Portability and Accountability Act (HIPAA) protections to the inmate. With regard to "private health care interaction," every inmate has the opportunity to speak individually with a mental health staff member.  In cases of English as a second language, fluent prison staff are brought in or a phone line translator is utilized. In the event of an emergency, medical or mental health staff are available immediately.  Regardless whether staff clears the inmate, the patient is put on continuous 10 or 30 minute watch.

According to Mr. Pierce, medical staff gets inundated with complaints of back pain, headache, and abdominal pain which delays care. However, inmates always have ready access to psychiatric care.  He pointed out that when inmates provide him with a clear explanation of their mental health needs, he is able to quickly communicate that information to the mental health staff.  As stated by Mr. Pierce, "I can get psychiatry in five minutes.  They get down here pretty fast."

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

If an inmate receives distressing news from family, psychiatric staff is available to see the inmate immediately. In other cases, the correctional officer speaks with the inmate and contacts the mental health staff.   In many cases, the psychiatric staff is already aware of the situation and has scheduled an appointment with the inmate.  In less serious cases, mental health staff will ask the inmate to complete an HNR.

In cases of acute concern, an Incident Command System (ICS) is initiated.  The ICS is the highest level of alert and overrides all other forms of communication.  The custody officer makes an ICS over the radio in situations of staff assaults, fighting, unsecure door or lock, self-harm, or inmate out of place or refusing directive. If it is a medication-related issue, the inmate submits an HNR directly to medical staff.  Custody staff is prohibited from handling the HRN.  It might be several days before medical staff addresses the issue.

Mr. Pierce discussed the recent transfer of inmates from the Kasson facility to the Tucson facility.  He indicated that the situation has been stressful.  ASPC-Tucson receives ten inmates at a time, and the timeline for their stay is unclear.  If Tucson staff requires pertinent information regarding a transferring inmate, they wait up to ten minutes for a response from a captain or lieutenant.

According to Mr. Pierce, the Kasson inmates prefer the Tucson facility.  Inmates claim that Florence is short-staffed.  The wait in the shower area is approximately 30 minutes. Unlike Kasson, ASPC-Tucson lets inmates choose whether they want a cellmate or not. The transferees like this option, and often prefer to have a cellmate.   Further, Tucson inmates have 24-hour access to tablets for games, emails, messaging, texting, movies, and music.  At Kasson, inmates are limited to tablet usage twice weekly.  Mr. Pierce remarked that when an inmate who self-harms is allowed access to a tablet, "past self-harming goes to nothing."  At Kasson, the staff delay giving the inmate a tablet, claiming that it is "too early to tell" if access to technology would mitigate the inmate's distress.

Since some inmates cannot order movies, they offer different incentives.  The inmate's family must put money on account, just like commissary or phones.  At the Tucson facility, inmates do not have to wait for phone lines.  Phones are available from 7am to 7 pm, and calls are time limited.  In cases of staff assault or unit lockdown, phone access is revoked.

Using a 5 point scale, Mr. Pierce rated custody staff a 4.  He indicated, "Except when short-staffed, everyone works together.  Everyone communicates."  He gave mental health a rating of 4, too.  He explained that inmates have few complaints with the psychiatry staff and feel that access to care is "good."  Mr. Pierce gave medical staff a rating of 2 out of 5, admitting that inmates have significantly more complaints about medical care.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

**Interview:  Ms. Pugh, Psychology Associate**

I spoke with Ms. Pugh at the Tucson facility. She is a licensed LMSW with ten years of experience and a full-time Centurion employee.  Dr. Shaar is the head mental psychologist at the Tucson facility and serves as Ms. Pugh's supervisor.  In the past, Ms. Pugh has worked weekends at the Eyman unit SMU and did Browning watches for one year.  For eight years, she worked inpatient, residential, and outpatient at Sonora.  Ms. Pugh moonlights on weekends.

During our conversation, Ms. Pugh indicated that she has a passion for corrections work: "I like crisis, and I like helping people.  Everyone has an opportunity to learn."  She enjoys the challenge of explaining complex clinical terms to inmates in language that they can understand and digest. According to Ms. Pugh, ninety percent of the inmate population will be returning to the community upon their release.  Supporting inmates as they gain new skills and change destructive behaviors makes her work in corrections personally rewarding.

In her role as Psychology Associate, Ms. Pugh performs suicide watches in House 8.  She provides counseling to mitigate inmates' concerns.  The most common issues faced by inmates are suicidal thoughts, a life crisis, or conflict with family or peers.  Ms. Pugh indicated that the most stressful situations for inmates are when family does not respond to phone calls, when they feel that the Department of Corrections (DOC) is "picking on them," or when they are "not getting along with their cellie."  If Ms. Pugh speaks with an inmate who prefers to remain in his cell, she notifies him that the content of their session will not be confidential.

Ms. Pugh states that much of her work revolves around helping inmates identify and clarify their true feeling state.  Inmates learn to recognize "trigger words" such as "anxious" or "depressed."  In a clinical setting, Ms. Pugh and the inmate tease out exactly how he is feeling and discuss activities like journal writing, exercising, reading, or talking to family that might help alleviate distressing feelings.  Ms. Pugh assists inmates in creating a "tool box" which contains a variety of methods to help them manage difficult feelings when they arise.

When asked about the role of technology, Ms. Pugh responded that, "Tablets are good and bad."  For those inmates who are being released, tablets can be a useful and powerful tool for gathering information and resources that the inmate will need upon his release. However, there can be serious detrimental effects to mental health when an inmate uses a tablet to send an email to which he does not receive a timely reply or any reply at all.

According to Ms. Pugh, the key component for successful outcomes is the inmate's willingness to talk and engage in the therapeutic process.  She feels that it is her job to communicate to the patient that they are being heard and supported.  If an inmate refuses to engage, staff will provide education, explain the watch process, and discuss the next steps in the process.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

**ADCRR00232515**

There are a number of resources available in the Tucson facility to support inmates who are in crisis including music, pod casts, and religious and church services.  Many in-cell activities are available to inmates such as Sudoku and word puzzles.  These activities provide an avenue for discussion between the mental health staff and the inmate, a way to break the ice for meaningful discussion.  Often, inmates equate "mental health issues" with "being crazy."  It is the role of Ms. Pugh and her colleagues to help inmates gain a better understanding of mental health and all that it entails.  Further, Ms. Pugh has experience running a lifers' group.

When seen every day, Ms. Pugh observes increased willingness in an inmate's inclination to engage in the therapeutic process. Per the new order, mental health staff must meet with patients 10 minutes per day.  Often, however, the mental health staff spends more than ten minutes with inmates.  Ms. Pugh described an instance in which she met with the same inmate for 40 minutes, two days in a row. Although he was not on her caseload, the inmate expressed an interest in goal-setting. Ms. Pugh felt that he was in need of increased support and counseling;  she had the time and opportunity to provide it.

Denies delays in custody escorts, only if there is a major . . . j

Computer in the house.  Will evaluate inmate first, then will go and look up in eOMIS to figure out discrepancies.   Spit on staff, instead of getting disciplinary, I'm SMI or suicidal you can't give me tickets."

If someone on the yard is suicidal, mental health staff is available Monday through Friday from 7AM to 6 PM.  On Saturdays and Sundays mental health staff is available from 8AM to 12PM.  If it is afterhours, nursing contacts the on-call doctoral-level psychologists who authorizes the patient to be put on watch.  will get called and evaluate them and options to place on MH watch suggest custody watch (aggressive but not mentally ill).  The mental health staff uses best practice by avoiding the removal of an inmate from watch on the weekend.  Instead, they lower watch time from 30 to 10 minutes or from continuous to 10 minute watch.  The only conflicts between custody staff and mental health staff arise when mental health requests permission to see inmates who are on watch during count.  Ms. Pugh said that these conflicts get resolved by approaching an individual sergeant regarding the special circumstances or by waiting until count clears.

In her experience, Ms. Pugh observes that, at times,  inmates use self-harm for secondary gain such as more personal attention, increased recreational time, a different cellmate, or increased bargaining power. ("I'm going to cut myself until the warden comes and talks to me.") Further, an inmate may be aggravated with another prisoner or guard and uses self-harm to demonstrate the depth of their anger.  In many cases, sergeants and ADWs will seek out struggling inmates and talk to them.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

**ADCRR00232516**

According to Ms. Pugh, ASPC-Tucson lacks resources such as:  therapy dogs, yoga, tactile boxes, sand, paint, and other different therapeutic modalities. Unfortunately, these are limited by custody and safety issues.  Further, she feels that weekly, instead of monthly, check-ins and contacts would increase engagement on the part of the inmate. Ms. Pugh believes that inmate-led groups and discussions have proved to be very successful.

Using a 5 point scale, Ms. Pugh gave custody staff a 4.  She feels that they "work well" and do not always get the opportunity to understand clinical issues and decision making.  In its current state, Ms. Pugh feels that mental health deserves a rating of 3.5, with the goal of achieving a 4 in the future.  She stated that the biggest challenge is staff turnover.  Further, she feels that the current model of meeting with inmates weekly to work on goal-setting is crisis-driven and is less effective than traditional outpatient counseling.  When adequately staffed, Ms. Pugh believes that medical deserves a 4 out of 5. However, medical is currently understaffed and is sitting at a rating of 3.

*****Administration PMRB medication, safety vs. therapeutic, talk to custody re: explaining true SMI/mental health issues, give them more time to respond, might take more time, might need more time coming out to shower, or if assaultive, male versus female staff appropriateness and goodness of fit, cognitively limited re: masturbating*****

Would like to see more mental health techs re: custody staff/CIT training

**Interview:  Bianca Mocha, LPC**

I spoke with Ms. Mocha at the Tucson facility. She is a Master's level Regional Psychology Associate who oversees the psychology associates at southern region units, Florence, Eyman, and Tucson, and non-corridor units, Douglas and Safford.  Ms. Mocha has been at the Tucson facility for three years.  She was employed by Corizon and is now with Centurion full-time. Previous to her employment at ADC, she worked as a mental health professional to support inmates who have been recently released into the community.  According to Ms. Mocha, the job was satisfying, but she wanted to work with a more challenging population.

When asked about the performance of staff at the Tucson facility, Ms. Mocha was optimistic. "I think we are doing an amazing job.  I look at the challenges at all the complexes . . . getting the inmate out of his cell, with the right officer, at the right time, to his appointment . . . there is more of a team mentality.   We ask ourselves, 'How can we make this better? Where do we need to pull more people in?'"  Ms. Mocha explained that medical and custody staff are using a more collaborative approach.  In the past, custody and medical staff "stayed in their own lanes."  She indicated that mental health staff has increased, so there are "more co-workers

and colleagues to help get the job done.  We can focus on patient care, rather than just having the patients seen."  More IT has helped in the long run.

At the same time, Ms. Mocha was forthcoming about the challenges they face.  She admits that staffing turnover and retention are problematic.  She feel that this issue is "site-specific rather than company-specific."

With respect to ratings for staff at the Tucson facility, Ms. Mocha gave custody a 4.5 out of 5: "We have a really good team here at Tucson.  Custody is so caring and kind, not like the war stories we used to hear."  She rated medical as 4.5 claiming, "There's always room for improvement and improving processes."  Mental health also received a 4.5 out of 5 rating from Ms. Mocha.  "If there is a problem, it is an outlier, not the norm.  I see people going above and beyond trying to do the best they can to do the best for their patients."

Wearing a stab proof vest, eye shields, to


**Interview:  Sgt. Dame, Title**

After the tour of the Tucson facility, I spoke with Sgt. Dame.  She has 11 years of correctional experience at the Tucson facility, working primarily in House 8 with SMI inmates.  MH Housing Watch 1.5

When asked about access to health care at the Tucson facility, Sgt. Dame explained that once an HNR is submitted, the patient must be seen within 24 hours. If the inmate is on continuous watch, he has no access to any writing utensils, so he cannot complete an HNR.  In order to protect the patient's confidentiality and to comply with HIPPA regulations, custody calls mental health. At that point, a mental health staff member might treat the inmate in his cell, or if the patient needs further treatment, mental health staff completes the HNR for the inmate, and he submits it upon arrival to the mental health unit. In cases of English as a second language, Centurion will not rely on custody staff to translate.  Instead, they must secure a professional translator.

At the start of the day, two mental health staff (a psychiatric associate or other mental health/psychiatric staff) see all patients in the mental health watch area.  Some inmates refuse. These morning encounters vary in length depending on how cooperative the inmate is and how much he wants to talk.  Inmates are given the choice to talk in front of their cell or to speak to a staff member privately in an office.  Sgt. Dame supposed that half of the inmates opt to talk outside their cells, and half choose to speak privately. Some inmates get impatient waiting to

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

be taken off watch.  Especially on Mondays, patients wants to get off watch and return back to sender/return to sender/their detention or general population.

Sgt. Dame offered a number of reasons why inmates might seek suicide housing.  An inmate might request suicide housing because he wants to hide from another inmate to whom he owes a debt.  Other inmates have SMI or legitimate histories of cutting and self-harm.  In some instances, inmates are manipulative.  They believe that if they speak to a certain mental health staff member, they are more likely to get what they want.

Sgt. Dame explained that some inmates have "little games they play."  She described an incident in which an inmate on continuous mental health watch covered his cell with feces.  When she confronted the patient, he explained that he was mad at a nearby inmate who had been provoking him and antagonizing him with derogatory terms and inflammatory language about his crime.  This was the first time the patient had acted out in this manner.  Later, he felt remorseful and apologized for smearing the feces.

Like Mr. Pierce, Sgt. Dame reflected on the recent transfer of Kasson inmates to the Tucson facility.  She thought that the transfers would occur in November 2021.  Since the transfer date was moved up, they are still in the process of reconfiguring the recreation yard and fencing.

Sgt. Dame explained that there are three mental health classes occurring at any given time. The classes are categorized by steps from 1 to 3.  Step 1 is the lowest level.  Step 3 is the highest level. A CO-3 class is always offered.  Twice weekly, CO-4 mental health staff, lieutenants, and the deputy warden meet to discuss step level and advancement, to review progress, and to find alternate housing.  Sgt. Dame applauds this multidisciplinary approach; she values the participation and input from all stakeholders.

When asked to rate the performance of prison staff, Sgt. Dame rated medical with 3 out of five points, indicating that nursing is "short-staffed."  She gave both custody and mental health 4 out of 5. She remarked that they are "quick to respond to ICS and to get someone evaluated.  In an emergency, they get there fast." Further, she added that inmates would give medical a low rating of 2.5 out of 5.  She says that inmates criticize medical and ICS's complaints.

**Interview:  Kaci Schwestach, Associate Deputy Warden (ADW)**

Ms. Kaci Schwestach has been employed at ADC for 14 years.  For the past two years, she has served as the Associate Deputy Warden (ADW).  Previously, she was a CO-4 in the Rincon unit.

According to ADW Schwestach, "I believe that medical cares.  From my interactions, I feel that they work well.  They are short-staffed, but it is not a lack of care." She indicated that there are more mental health staff at Rincon, and they are "usually there right away to help."

ADW Schwestach said that she walks the housing units and recreational areas at least once a day.  This provides opportunities for inmates to express concerns.  In order to avoid grievances, ADW Schwestach handles inmates' concerns immediately.  For instance, if an inmate requests Gabapentin, she contacts the Assistant Facility Health Administrator (AFHA) or the Director of Nursing (DON), and medical will respond as soon as possible.  She admits that the inmate might not be happy about any delay, but she feels confident that "medical is trying to work with the inmate."

When questioned about the medical grievance process, ADW Schwestach explained that if an inmate believes he is in an emergency situation, he can submit an emergency grievance.  If his condition is deemed an emergency by medical staff, they must respond to the patient within 24 hours.  If it is not considered to be a medical emergency, the medical staff has extended time to review the grievance and respond to the patient.  An informal grievance must be addressed within 15 days.  Medical staff have an additional 20 days to respond to a formal grievance.  This is a two-step process.  All PREA allegations are reviewed by medical and mental health staff.  Medical staff determines if off-site, outside medical evaluation is necessary for a rape kit.

With regard to seclusion and restraints, ADW Schwestach stated that a restraint chair is used only with approval from the psychiatrist on duty and that the warden must be notified.  The use of a restraint chair is never initiated by custody staff.  Before using a restraint chair, the patient is given a cool down period and is seen by medical and mental health staff.  If there is no improvement in the patient's condition, a restraint chair is ordered.  According to ADW Schwestach, "We try to get them out as quick as possible.  We don't want them to be in a restraint chair.  We avoid it as much as possible."  Nurses examine the straps to ensure that they are not too tight, and they check vital signs."  The Tucson facility has not used a restraint chair in over a year.

When asked about interactions between custody staff and the health care contractor, ADW Schwestach remarked that it is a "good relationship with timely communication."  She indicated that weekly interdisciplinary meetings convened to discuss House 8 (Kasson transferees) have fostered cooperation.  She believes that the various stakeholders are better able to "meet in the middle" and that they have created a "successful team."

<span style="color:red">Might be dissatisfaction re: what specific</span>

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

**ADCRR00232520**

**ASPC -Yuma**

On September 21, 2021, I participated in a tour of ASPC-Yuma.  After a tour of the physical space,  I met with various prison staff members to gain further understanding of the access to mental health care within the prison.  I spoke with Mr. Jose Bucio, LPC, Mental Health Lead Psychology Associate; Mr. Jamie Babb, MSW, Psychology Associate; Mr. Eric Felber, LPC, Psychology Associate; and Mr. John McAdorey, Senior Warden.

ASPC-Yuma is a correctional complex made up of five units; Cheyenne, Cibola, Cocopah, Dakota, and La Paz unit.  ASPC-Yuma has an inmate capacity of approximately _____. There are _____ chronic care patients and _____ mental health patients at this facility.  Inmates can participate in a variety of education, treatment, and work programs.  One of the most coveted work programs at this facility is the wild land and fire crew which teaches inmates to fight forest fires.  Inmates can also earn their GED and learn a variety of vocational skills.

When I visited the medical and suicide watch cells, I noted that many patients were lying calmly in their beds, exhibiting no signs of agitation.  They had good eye contact.  There was no yelling.  There was a fixed camera in cell supplements.  The correctional officer was seated within a few feet and had immediate visual contact with all cells.

Custody officers may initiate a request for an inmate to be put on watch, but a Qualified Mental Health Associate (QMHP) must order the patient to be placed on 10 minute/30 minute watches, or to advance from continuous to 10 minute watch.  The patient will move from 10 minute to 30 minute watches and then to be removed for watch in entirety.  All watches are documented as staggered and unpredictable.

After observing the watch cells, I toured the pre-hearing detention custody area and housing unit NAME.  This area accommodates inmates who are pending disciplinary review for contraband and other disciplinary issues. Mental health staff is available to patients Monday through Friday and on some weekends.  The nursing staff evaluate SMIs, ____(DTS), ____ (DTO), and other mental health patients placed in detention.  The nursing staff sees these patients within one hour.  Mental health staff can be consulted at any time.  If an 805 (protective custody order) is filed and denied, then mental health staff need to evaluate the patient to assess for suicide and safety risk.

I found custody staff and custody leadership attentive, professional, and respectful when dealing with patients.  They answered all questions posed to them by inmates.  They did not use force.  I observed no use of OC/pepper spray, seclusion, or restraints.

**Interview:  Jose Bucio, LPC**

I spoke with Mr. Bucio at the Yuma facility.  Mr. Bucio serves as the Mental Health Lead Psychology Associate.  He has a Masters in Community Counselling.  He oversees both and administrative and clinical matters.

Prior to his work in corrections, Mr. Bucio spent eight years working as a community counselor and then as a clinical supervisor at Community Health Associates Center (previously Community Intervention Associates).  This behavioral health center deals with adults and juveniles who are in crisis and have SMI as well as general outpatient mental health.   Mr. Bucio has approximately 15 years of clinical experience.

Mr. Bucio was employed by Corizon at ASPC-Yuma for four and a half years.  He remained at Yuma when Centurion took over and has been at the facility full time for the past two years.

According to Mr. Bucio, since Centurion assumed management of health care at ASPC-Yuma, the situation is, "Better as far as I see.  I notice more emphasis on providing more clinical support.  There is better equipment, computers, and technology."  Previously, Corizon was slow to respond to IT requests.  When Corizon did respond after much delay, they issued outdated equipment that was prone to malfunction.  Under Centurion management, however, IT is more responsive and user-friendly.  Centurion has provided new equipment which allows them to run uninterrupted Zoom meetings with clinical and statewide staff.  Further, when admissions contacts staffing regarding patients who are high profile or high acuity, mental health staff determine if the inmate meets the criteria for a higher or lower level of care.  With new computers and prompt IT support from Centurion, the transitioning of inmates from one level of care to another is more easily accomplished.

According to Mr. Bucio, Yuma performs well as a system.  They comply with _____ (CGAR) scores.  Clinically, Yuma's notes are of high standard.  As stated by Mr. Bucio, "With good clinical documentation comes improved quality of care."  Mr. Bucio credited Dr. Stallcup for overseeing the successful implementation of _____. He believes that the institution of the 10 minute/30minute rule has contributed to the overall improvement in quality of care and attention to patients.

Refusals the inmate ends the session, not us.

Mr. Bucio explained that multidisciplinary meetings are convened every Tuesday.  Wardens, AWD, DON, and Assistant Facility Health Administrators (AFHA) discuss patients on mental health watches, clinical planning, and other administrative issues such as: custody barriers, escort issues, and communication between custody and psychiatry.  If a patient has recently started on medications, the team will confer with mental health regarding whether or not the

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

patient warrants a higher level of care.  According to Mr. Bucio, the Yuca mental health staff is proactive.  Their goal is to remove inmates on watches as quickly as possible. <span style="color:red">responding to custody concerns if perception of delays in nursing and mental health seeing inmates) explanation of why it takes more time (used example of 10" and 30" rules.</span>

On Mondays, mental health leads and regionals from across the state discuss patients who may need a higher or lower level of care.  Mr. Bucio explained, however, that the mental health staff reach out proactively at any point during the week for more frequent follow-ups and diagnostic clarification with an onsite psychiatrist and psychologist.

<span style="color:red">Will send out multidisciplinary treatment meetings to discuss/staff a patient on Thursdays. Custody, medical and nursing, and FAH and AFAH.  Typically only mental health will attend/participate.</span>

According to Mr. Bucio, for inmates on watches and in therapeutic programing, "We give more supportive therapy to help patients identify and better address a lot of their issues – additional tools to help them cope."  Inmates' concerns are often housing-related. Some inmates seek housing in the mental health unit because they want to avoid debt repayment to another inmate, owe money to the store or for drugs, or refuse to house.  Mr. Bucio has observed that it takes several days to build rapport with an inmate before he will open up and further explore an issue.

Mr. Bucio stated that mental health staff encourage patients to meet in a private setting; however, they cannot force the patient to engage. The goal is for patients to commit to the therapeutic process by following, practicing, and implementing new behaviors discussed in session. Once a patient is off watch, mental health staff continue to reinforce the importance of these new behaviors.  If the patient is dealing with depression, <span style="color:red">extra therapeutic factors might be introduced</span>.  If the patient is psychotic, mental health staff reinforce the importance of treatment and medication compliance, <span style="color:red">reality testing, and exploration.</span>

Laptops and tablets can be used effectively for proctoring telepsychiatry in detention and private settings.  The use of technology avoids custody staff having to escort inmates to the medical clinic.  As long as Centurion continues to provide continuous, reliable WIFI access,  this model affords more flexibility for delivery of mental health care.

ASPC-Yuma faces staffing challenges.  Presently, they employ one onsite psychiatrist. Most care is provided via telepsychiatry.  On Thursdays and Fridays, there is one onsite 1.0 FTE nurse practitioner.  She does telepsychiatry for the Yuma facility on the weekends. <span style="color:red"> and on site psychologist.</span>   When onsite, she observes patients in detention units and watches.  If a patient is psychotic, he can be referred to the Phoenix/Alhambra/inpatient psychiatric unit for stabilization or go before the Psychotropic Medication Review Board (PMRB).

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

When asked about suicide watches, Mr. Bucio stated that they employ best practice.  Patients are identified on a case-by-case basis.  According to Mr. Bucio:  "When a patient is not responding to the psychiatric provider, and I know that they are responding well to the mental health clinician, we have the two work together."  Mental health staff encourage inmates to solicit counseling and support. Mr. Bucio noted that, except for certain psychotic patients, the mental health staff have been more successful in getting inmates the help that they need.  They make every effort to meet patients in a private setting as opposed to cell front.  Instead of limiting a session to 10 or 30 minutes, they take whatever time is needed.  However, Mr. Bucio cautioned that, "More is not always better."

Further, Mr. Bucio stated that since Centurion has managed the Yuma facility, proactivity is the goal.  Mr. Bucio remarked, "We try to get patients the help they need, as opposed to waiting and watching them deteriorate."  Previously under Corizon, Mr. Bucio explained, "Someone could be psychiatrically unstable for up to one week."  At that point, when the patient's mental state had declined to where acute care was necessary, the facility had to exhaust all resources, use psychiatry, and wait for psychotropic medications to take effect.  Only when a patient was cutting or self-harming did Corizon advocate for immediate intervention.  Under Centurion, the objective is to stabilize patients more expeditiously.  Mr. Bucio explains that if he wants to staff a patient in order to discuss and identify further steps, he is encouraged to contact Dr. Pelton, regional mental health director, or Dr. Carr, psychiatric director, who are readily available for consultation.

 When on watches, when a patient with psychotic symptoms, refuses medications, but doesn't meet criteria

"More preventative and proactive."   PMRB  should be in eOMIS statewide.  Forced medication encounter.

Mr. Bucio asserts that there are fewer PMRBs under Centurion compared to Corizon.  After a training and educational meeting with a Centurion attorney, there is more attention to criteria and to individualized treatment plans and planning in place.  They are attempting to move to voluntary as opposed to renewals/repetitions of PMRB.  Mental health staff look at ADLs, compliance with directives, rules and expectations of custody/institution (refraining from loud or disruptive behavior, and current functioning as opposed to being overly preventative and pursuing repeated PMRBs.

Looks at and monitors staff productivity.  At least/at a minimum 7 patients per day.

Seclusion and restraints, try to avoid and try to get them moved the same day.  Try to avoid.

Corizon: Previous 4 MH psych associates and 1 Mental Health Lead

Doubling in MH staff.

Mr. Bucio described challenges that the Yuma facility faces in the recruitment and retention of licensed candidates.  If an employee is not licensed, they must be supervised.  According to  Mr. Bucio, applicants are often young and new to corrections work.  Whenever possible, Mr. Bucio offers flexibility to staff, amenable to reducing full time hours from 40 to 32 hours in order to meet the needs of the employee.  Further, he is willing to assume the responsibility of clinical supervision for PRN staff who wish to pursue licensure. Due to concerns about meeting CGARs and liability issues, ASPC-Yuma is not engaging master's-level students completing internships.

Centurion Currently 8 MH psych associates (2 vacant, and 1 mental health lead

If 10" or 30" minute not met due to patient appears to be mandated treatment, clinician will document

"Security is pivotal and is not a barrier here," asserts Mr. Bucio.  He feels that security staff at the Yuma facility is sensitive and takes into account the needs of mentally ill inmates.   "We require their assistance," Mr. Bucio said of security staff.  "They have rapport and trust with the inmates. They are accessible and helpful."  According to Mr. Bucio, the warden is supportive and takes mental health seriously.  He has mandated that mental health training on first aid and resiliency be provided to custody staff.

Although the Yuma mental health unit has been challenged by staffing and COVID-related issues , Mr. Bucio discussed future goals for the department.  They have plans to launch a ==suicide warning signs and referral program (QPR)== for officers, medical staff, nursing staff, and inmates acting as peer supports.  Further, they are exploring ways to generate a referral that would not result in a disciplinary or punitive response.   Also, they want to provide ==crisis incident system management support== (==CISM==) training.  Mr. Bucio has met with the warden about rolling out a program that would train inmates to identify peers who might need mental health intervention.

==Group therapy doesn't count toward 10" and 30".  Previously no caps on group size.  Group therapy could provide more therapeutic value than individual therapy.==

Presently, the Yuma facility offers a social skills group for SMI.  They plan to add group meetings for anger management, mood, and anxiety.  At present, group size has been decreased due to lack of staffing.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

ADCRR00232525

**Joint Interview:  Jamie Babb, MSW, and Eric Felber, LPC**

I WASN'T SURE TO WHOM – BABB OR FELBER - I SHOULD ATTRIBUTE QUOTED TEXT.

I met with Mr. Jamie Babb, a psychology associate working towards clinical licensure under the supervision of Mr. Bucio.  Mr. Babb has been employed at the Yuma facility for three and a half years: one and a half years under Corizon the last two years with Centurion. Previously, Mr. Babb worked as an advocate at a crisis response center in Yuma county, a non-profit for victims of abuse and homicide.  Prior to that, he supervised social workers for Home Hospice care.

Along with Mr. Babb, I spoke with Mr. Eric Felber, LPC, a psychology associate who has worked at ASPC-Yuma for six years under Corizon and Centurion.  Previously, he was member of the La Frontera Impact mobile crisis team in Phoenix for nine years.  He was employed for three years as an online counselor for Better Health.  Mr. Felber also has a private practice.

All of our work is done.  CGAR's and audits changing, went 2 years without deficiencies

It is the opinion of Mr. Babb and Mr. Felber that, although the 10 minute/30 minute watch rule "looks good on paper, it is not good in actuality."  They believe that the rule has not been communicated well or effectively.  Also, the rule changes periodically without any notice or explanation. They feel pressured to "check the box and document that it was done."  Although the patient knows what he needs,  they must force the patient to sign documentation.  You could die if you don't go 30 minutes.  10 or 30 minutes is not attainable in a crisis situation. Patient is refusing to talk to us.  Additionally, Mr. Felber reported concerns about the logistics of signing forms inside cells.  He fears possible COVID exposure and spread to himself, inmates, and prison staff.

Further, Mr. Felber explained that the 10 minute/30 minute watch is not practical with SMI. With regard to the refusal to continue encounter form, Mr. Felber remarked that, "It is compliance with a complete lack of cooperation."  Inmates must leave their cell to sign the refusal.  Many are reluctant to sign.  They worry about losing benefits or appearing difficult.  He feels that there is no feedback on effectiveness or efficacy of _____.

According to Mr. Babb, patients have many questions about the 10 minute/30 minute rule. They ask: "What does it mean?  Is it going to be used against me?  Will it take away my benefits/SSI?  Does it mean I'm refusing medical care?"  Mr. Babb claims, "I give everyone at least a 5-minute orientation.  It takes a while to explain.  This takes away from the rapport.  I become more of an enforcer."

Mr. Felber stated, "Rapport takes a long time, especially with SMIs.  They have social phobia and can't handle it.  It's much easier for them to refuse.  They will slowly start to demonstrate

rapport.  I try to work with them and get them in and out as soon as possible.  My job is to assist, not to decompensate."

Mr. Babb and Mr. Felber have a combined caseload of 380 patients.  They spend considerable time scanning and uploading forms.  They evaluate SMI, DTS, DTO, and other mental health patients placed in detention.  The nursing staff sees the patient within one hour;  however, it can take up to one hour to get an inmate brought up to the mental health unit.

Mental health staff can be consulted at any time regarding issues of clearance.  If a protective custody is filed and denied, the mental health staff evaluate the patient to assess for suicide and safety risk.

"I worked insanely hard to break the culture, only assess for pure, simple symptoms.  There was some not eating, sleeping, getting along with cellie, blanket documentation DTO (danger to others)/DTS (danger to self)

Inmates in detention some delays in having access to interview space

They are housed 2-3/cell, but some are single celled.

Mr. Babb stated, "I stay here because I see my patients are vulnerable and they aren't always heard.  Because they're in orange they might be disrespected or devalued.  I stay here, because I'm an advocate for my patients.  I am a change agent.  I can't change the system, how things are done.  I can be present with the individual in front of me, be there with them.  To validate them, in their experience.  I acknowledge their experience."  Further, Mr. Babb said, "My number one complaint is how undervalued mental health is seen.  Not a necessity.  Just doing enough.  Check the box.  They saw mental health."

Mr. Babb and Mr. Felber concur that employee recognition from Centurion is lacking. They feel that the _____ (DOC) gives them more recognition than Centurion.  The mental health team supports each other and feel appreciated by DOC.  After responding to an ICS or cell extraction, the mental health staff is very involved.  They make every attempt to deescalate the situation so use of force is not necessary.  DOC expresses their thanks and gratitude for the mental health staff's intervention.  AOC get calls from an ADW, CO-3 or Lt. or Captain or other rank/appreciation.

At the onset on the COVID pandemic, mental health staff worked alongside custody staff.   At that time, the Yuma facility was faced with a myriad of challenges such as:  sick leave, fatigue, burn out, clearance /time clock nursing station, and child care issues.  Notwithstanding these difficulties, the mental health team visited COVID units and checked LaPaz Yuma. Custody staff

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
PARSONS V. SHINN, USDC CV12-00601

showed much appreciation;  however, the mental health team received no recognition from Centurion for their exceptional care of patients during the uncertainty of COVID.

Mr. Babb and Mr. Felber would like patients to have access to more psychoeducational materials, music, and training for inmates.

Group sessions don't count as an encounter.   No credit given.


**Interview:  John McAdorey, Senior Warden**

I spoke with Mr. John McAdorey who has served as the Senior Warden at ASPC –Yuma since December 2019 when Warden _____ died of a COVID-related illness and five months after Centurion had assumed health care management at the facility. Previously, Mr. McAdorey was the _____ (DWOP) at ASPC - Eyman.

According to Warden McAdorey, "These (Centurion) people have been nothing but a blessing. Nothing but a team effort. Fluid communications, cooperative problem solving.  Whatever problem comes across, we are going to work together.  Custody and mental health and medical - we are peas in a pod."

He stated that this strong partnership served them especially well during the COVID pandemic when they faced additional challenges.  There was increased communication during that time to discuss:  COVID exposures, possible exposures, positive results, everyday effects on inmates, vaccinated versus unvaccinated, and personal protective equipment (PPE) supplies.

Deputy McAdorey explained that the team meets daily for review of hospitalized inmates.  He remarked that inmates have access to mental health care as needed.  According to Warden McAdorey, an inmate in need of mental health care can be seen in his cell or escorted to the mental health unit within three minutes. An inmate placed on watch status must be seen by the nursing staff.  In cases of possible use of force, the mental health staff is available to help deescalate and assist custody should the inmate have mental health issues.

Higher custody unit Dakota unit.   Same issue.

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**PARSONS V. SHINN, USDC CV12-00601**

**ADCRR00232528**