**Index of Exhibits – Defendants' Motion to Preclude Plaintiffs' Rebuttal Witness**

| Exhibit | Description |
|---------|-------------|
| 1 | December 1, 2021 Email correspondence between A. Hardy and D. Struck |
| 2 | Excerpt of Defendants' First Supplemental Disclosure Statement, September 14, 2012 |
| 3 | Excerpt of J. Penn Expert Report, December 18, 2013 |
| 4 | Excerpt of J. Penn Supplemental Expert Report, March 26, 2014 |
| 5 | Excerpt of J. Penn Second Supplemental Expert Report, September 19, 2014 [Redacted] |
| 6 | Excerpt of Deposition of J. Penn, April 11, 2014 |
| 7 | Excerpt of Deposition of J. Penn, September 30, 2014 |
| 8 | Excerpt of L. Mendel Expert Report, December 18, 2013 |
| 9 | Excerpt of L. Mendel Second Supplemental Expert Report, March 26, 2014 [Redacted] |
| 10 | Excerpt of J. Dovgan Supplemental Expert Report, March 26, 2014 |
| 11 | Excerpt of Defendants' First Supplemental Pretrial Disclosure Statement, October 1, 2021 [Redacted] |

# EXHIBIT 1

| **From:** | Alison Hardy |
| **To:** | Dan Struck; StruckLoveParsonsTeam |
| **Cc:** | Parsons Trial; Parsons Case |
| **Subject:** | RE: witnesses |
| **Date:** | Wednesday, December 1, 2021 5:32:39 PM |

Hi Dan,

Let me know if defendants are willing to enhance the specificity of your disclosures re Mr. Dolan's testimony, and we can discuss more details re Ms. Knox's disclosure.

Alison

**From:** Dan Struck <DStruck@strucklove.com>
**Sent:** Wednesday, December 1, 2021 10:12 AM
**To:** Alison Hardy <ahardy@prisonlaw.com>; StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>
**Cc:** Parsons Trial <ParsonsTrial@aclu.org>; Parsons Case <PLO-AZ@prisonlaw.com>
**Subject:** RE: witnesses

Alison,

We would not be having him testify as to P&P and likely not NCCHC compliance, but his testimony could touch on the other areas mentioned below.

As for Ms. Knox, can you provide some substance as to what she is going to testify beyond "She will testify regarding the NCCHC survey and accreditation process"?

Dan

**From:** Alison Hardy <ahardy@prisonlaw.com>
**Sent:** Tuesday, November 30, 2021 3:05 PM
**To:** Dan Struck <DStruck@strucklove.com>; StruckLoveParsonsTeam <StruckLoveParsonsTeam@strucklove.com>
**Cc:** Parsons Trial <ParsonsTrial@aclu.org>; Parsons Case <PLO-AZ@prisonlaw.com>
**Subject:** witnesses

Hi Dan,
Regarding Mr. Dolan, defendants have disclosed that he will testify on a wide array of topics, including P&Ps for the provision of medical, mental health and dental care; Centurion's obligations under the contract with ADCRR and review of monthly and quarterly reports; implementation of telehealth programs; staffing levels, recruiting, hiring, retention and incentives; improvements to Stipulation compliance levels; and Centurion's compliance w/ NCCHC standards.  You have told us that you anticipate his testimony will be short, however, and will likely not include all of the subjects listed in the initial disclosure.  We ask that you provide us with an updated disclosure by this Thursday.  Thanks.

As discussed, I've attached Ms. Knox's CV.  Below is our witness disclosure:

Ms. Knox, MN, RN, CCHP-RN has been a consultant regarding delivery of health care in the correctional setting for 20 years.  During her extensive career as a correctional health care professional, Ms. Knox was the Health Services Administrator for the Oregon Department of Corrections from 1984-2001, and the Director for Nursing for the Washington Department of Corrections from 2004-2008.  Ms. Knox was a surveyor for the NCCHC from 1998-2017, during which time she surveyed approximately a dozen correctional facilities and trained others to become certified surveyors.  She also trained to be a lead surveyor.  She will testify regarding the NCCHC survey and accreditation process.

We anticipate her direct will take about one hour.

I will send you a list of exhibits we would like to move into evidence later today.  Do defendants have additional exhibits you hope to admit?  It would be very helpful if you could provide us with a list as well.

Alison

Alison Hardy
Sr. Staff Attorney
**Prison Law Office**
1917 Fifth Street
Berkeley, CA 94710
Office:  (510) 280-2621
Cell:  (510) 292-0549
Pronouns: She/her

This electronic mail transmission contains information from the law firm Struck Love Bojanowski & Acedo, PLC that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

# EXHIBIT 2

1  Arizona Attorney General Thomas C. Horne
   Office of the Attorney General
2  Michael E. Gottfried, Bar No. 010623
   Assistant Attorney General
3  1275 W. Washington Street
   Phoenix, Arizona 85007-2926
4  Telephone: (602) 542-4951
   Fax: (602) 542-7670
5  Michael.Gottfried@azag.gov

6  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
7  Timothy J. Bojanowski, Bar No. 22126
   Nicholas D. Acedo, Bar No. 021644
8  Courtney R. Cloman, Bar No. 023155
   Ashlee B. Fletcher, Bar No. 028874
9  Anne M. Orcutt, Bar No. 029387
   STRUCK WIENEKE & LOVE, P.L.C.
10 3100 West Ray Road, Suite 300
   Chandler, Arizona  85226
11 Telephone:  (480) 420-1600
   Fax:  (480) 420-1696
12 dstruck@swlfirm.com
   kwieneke@swlfirm.com
13 tbojanowski@swlfirm.com
   nacedo@swlfirm.com
14 ccloman@swlfirm.com
   afletcher@swlfirm.com
15 aorcutt@swlfirm.com
   *Attorneys for Defendants*
16

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-NVW  **DEFENDANTS' FIRST SUPPLEMENTAL RULE 26(a)(1) DISCLOSURE STATEMENT** |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

2658987.1

1   Victor Parsons' Request for Production.

2        35.   **ADC's Report of Operating Cost for 2010, Bates Numbers**

3   **ADC014054-ADC014102, produced with Defendants' Joint First Supplemental**

4   **Response to Victor Parsons' Request for Production.**

5        36.   **ADC's Contract with Wexford Health Sources, Inc., Bates**

6   **Numbers ADC014103-ADC016042, produced at the deposition of Karen Ingram on**

7   **September 13, 2012.**

8        37.   **The National Commission on Correctional Health Care's**

9   **Accreditation Report of the Health Care Services at Arizona State Prison Complex**

10  **Douglas, Arizona dated June 26, 2009, Bates Numbers ADC016043-ADC016060,**

11  **produced herewith on the attached CD.**

12        38.   **The National Commission on Correctional Health Care's**

13  **Accreditation Update Report of the Health Care Services at Arizona State Prison**

14  **Complex Florence, Arizona dated November 18, 2011, Bates Numbers ADC016061-**

15  **ADC016066, produced herewith on the attached CD.**

16        39.   **The National Commission on Correctional Health Care's**

17  **Accreditation Report of the Health Care Services at Arizona State Prison Complex**

18  **Lewis, Buckeye, Arizona dated November 12, 2010, Bates Numbers ADC016067-**

19  **ADC016070, produced herewith on the attached CD.**

20

21        40.   **The National Commission on Correctional Health Care's**

22  **Continuing Accreditation of the Health Care Services at Arizona State Prison**

23  **Complex Lewis, Buckeye, Arizona dated November 17, 2010, Bates Numbers**

24  **ADC016071-ADC016080, produced herewith on the attached CD.**

25        41.   **The National Commission on Correctional Health Care's**

26  **Certificate of Accreditation of the Health Care Services at Arizona State Prison**

27  **Complex Yuma, San Luis, Arizona dated November 2010, Bates Numbers**

28  **ADC016081-ADC016081, produced herewith on the attached CD.**

42.     The National Commission on Correctional Health Care's Continuing Accreditation of the Health Care Services at Arizona State Prison Complex Perryville, Goodyear, Arizona dated July 2, 2009, Bates Numbers ADC016082-ADC016089, produced herewith on the attached CD.

43.     The National Commission on Correctional Health Care's Continuing Accreditation of the Health Care Services at Arizona State Prison Complex Phoenix, Arizona dated July 2, 2009, Bates Numbers ADC016090-ADC016096, produced herewith on the attached CD.

44.     The National Commission on Correctional Health Care's Accreditation Report of the Health Care Services at Arizona State Prison Complex Tucson, Arizona dated June 26, 2009, Bates Numbers ADC016097-ADC016106, produced herewith on the attached CD.

45.     The National Commission on Correctional Health Care's Accreditation Report of the Health Care Services at Arizona State Prison Complex Winslow, Arizona dated February 27, 2009, Bates Numbers ADC016107-ADC016135, produced herewith on the attached CD.

46.     The National Commission on Correctional Health Care's Continuing Accreditation of the Health Care Services at Arizona State Prison Complex Winslow, Arizona dated July 2, 2009, Bates Numbers ADC016136-ADC016138, produced herewith on the attached CD.

47.     The National Commission on Correctional Health Care's Accreditation Report of the Health Care Services at Arizona State Prison Complex Yuma, San Luis, Arizona dated November 12, 2010, Bates Numbers ADC016139-ADC016147, produced herewith on the attached CD.

48.     Plaintiffs' institutional files, including grievance files, as maintained by any and all correctional institutions in which Plaintiff has been detained.

108

DATED this 14th day of September, 2012

STRUCK WIENEKE, & LOVE, P.L.C.


By _____
    Daniel P. Struck
    Kathleen L. Wieneke
    Timothy J. Bojanowski
    Nicholas D. Acedo
    Courtney R. Cloman
    Ashlee B. Fletcher
    STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
    Chandler, Arizona  85226

    Arizona Attorney General Thomas C. Horne
    Office of the Attorney General
    Michael E. Gottfried
    Assistant Attorney General
    1275 W. Washington Street
    Phoenix, Arizona 85007-2926

    *Attorneys for Defendants*

2658987.1

COPIES of the foregoing e-mailed to
all counsel of record per the attached list
this 14th day of September, 2012.


By: _____

110

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                      Plaintiffs,<br><br>                    v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                      Defendants. | NO. 2:12-cv-00601-NVW |

## CONFIDENTIAL EXPERT REPORT OF:

Joseph V. Penn MD CCHP FAPA
UTMB Correctional Managed Care
200 River Pointe Drive, Suite 200
Conroe, Texas 77304
Office: (936) 494-4170

## REGARDING MENTAL HEALTHCARE
## AT THE ARIZONA DEPARTMENT OF CORRECTIONS

DECEMBER 18, 2013

*Joseph V Penn MD*

Joseph V. Penn MD CCHP FAPA
Director, Mental Health Services
UTMB Correctional Managed Care (CMC)
Clinical Associate Professor
UTMB Dept. of Psychiatry and Behavioral Sciences

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER      ADC203372

Screening and Medical Intake Screening forms utilized are appropriate in connection with correctional offenders' history, including, but not limited to, suicide attempts, suicide ideation, mood, and other mental health symptoms, psychiatric treatment history, and psychotropic medication history.

Per the information received, the intake process and any subsequent emergency services or nonemergency medical or mental health requests and services described in the Policies and Procedures referenced above is consistently and uniformly utilized for the screening of newly admitted prisoners or during the subsequent incarceration of state prisoners. Additional on-site mental health services include crisis intervention services, psychotropic medication management, and psychiatric re-evaluation by psychiatrists and psychiatric midlevel professionals. There was ample evidence of teamwork and collaboration and communication between correctional and nursing and medical and mental healthcare staff in efforts to identify offenders with mental health problems, and timely referrals, evaluations, and follow-up evaluations conducted by mental health staff and psychiatry staff as clinically indicated. It is my professional opinion that there is continuity of mental healthcare during incarceration, unit transfers, and up to eventual release.

According to the National Commission on Correctional Health Care (NCCHC), Accreditation Report of the Health Care Services at the following facilities, the NCCHC standard, P-E-05 Mental Health Screening and Evaluation, essential standard was met:

**<u>ASPC-Douglas</u>:**

AGA_Review_00023021 ("The nurse completes the mental health screening at the intake facility. A new mental health review is completed for all new arrivals and the mental health clinician reviews them. The staff at this facility is aware of pending arrivals. Inmates with

10

serious mental health diagnoses would not be transferred to this facility.") - June 28, 2013 Report.

**ASPC-Perryville:**

ADC_P000910 ("A mental health staff member completes the mental health screening on the second day of an inmate's arrival; the screening addresses all inquiries as described in the standard. Inmates who screen positive on the mental health screening are referred to qualified mental health professionals for further evaluation.") – June 28, 2013 Report.

**ASPC-Phoenix:**

ADC_P000929 ("The receiving screening nurse also completes the mental health screening and has been trained to do so. A member of the mental health team promptly sees any inmate referred to them. The mental health screening addresses all inquiries as described in the standard.") – June 13, 2013 Report.

**ASPC-Tucson:**

ADC_P000944 ("The nurse at the intake facility completes the mental health screening; the intake nurse completes it for juveniles. A member of the mental health team reviews the mental health screenings.") – June 28, 2013 Report

**ASPC-Winslow:**

ADC140127 ("A nurse at the intake facility completes the mental health screening. Inmates who are seriously mentally ill or who are receiving psychotropic medication are not admitted to this facility. The nurse reviews the medical chart and makes mental health referrals as needed".) – June 28, 2013 Report

The standard was also met at ASPC-Safford (ADC140103 July 30, 2013, Accreditation letter), ASPC-Florence (ADC055480, December 1, 2011, Accreditation Letter), ASPC-Lewis

11

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER      ADC203383

(ADC055486, November 17, 2010, Accreditation Letter), and ASPC-Yuma (ADC_P000965, March 15, 2011, Accreditation Letter).

### 2. **Healthcare Staffing**

I reviewed the Arizona State Prison Complex (ASPC) location, mission, population, and size for each unit.  The below describes the following:

1) Identification of units, locations visited, and who I met with at each location;

2) Summary of data relating to potential mental health caseload (including breakout for Maximum Custody-type locations); and

3) Summary of Corizon-ADC contractual mental health staffing requirements at each complex, as well as staffing, as reported by Corizon at the end of October 2013.

### ASPC – Phoenix:

Located in Phoenix, Arizona, ASPC-Phoenix is a unique facility in the ADC system. ASPC-Phoenix as a 336-bed reception unit where all new male intakes are screened, classified, evaluated, and held until transport to their assigned permanent housing location (with the exception of male inmates with a death sentence who bypass ASPC-Phoenix and receive their intake at the ASPC-Eyman Browning Unit).  Additionally, there is a 55-bed minimum custody general population inmate worker unit, which houses minimum custody general population male inmates who work at the ASPC-Phoenix Complex.

The Baker Ward (also referred to as the Baker Unit) and the Flamenco Ward (Also referred to as the Flamenco Unit) are both State of Arizona Department of Health Services licensed (Behavioral Health Services Agency) Level 1 Sub-Acute Agencies.  They have also achieved NCCHC accreditation and remain accredited through March 2014 (pending an additional NCCHC focus study).  The Baker Ward is an acute care mental health unit with 40

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER      ADC203384

According to the National Commission on Correctional Health Care (NCCHC), Accreditation Report of the Health Care Services, NCCHC standard P-C-07 Staffing, important standard was met at the following facilities:

ASPC-Douglas (ADC_P000894, June 28, 2013 Report)
ASPC-Florence (ADC055480, December 1, 2011, Accreditation Letter)
ASPC-Perryville (ADC_P000907, June 28, 2013 Report)
ASPC-Phoenix (ADC_P000926, June 28, 2013 Report)
ASPC-Safford (ADC140103, Accreditation Letter)
ASPC-Lewis (ADC055486, Accreditation Letter)
ASPC-Tucson (ADC_P000941 June 28, 2013 Report)
ASPC-Winslow (ADC140125 June 28, 2013 Report)
ASPC-Yuma (ADC_P000965, Accreditation Letter).

### 3.    Medical Records:

I reviewed several Arizona Department of Corrections state prisoner medical records. The records are currently in a paper (in a non-electronic medical record, EMR format), but there are plans to implement a statewide EMR in the near future.  It is my understanding that Corizon is working collaboratively with Arizona Department of Corrections leadership for a planned roll-out March 2014, adding additional units sequentially.   Medical records were organized by section and category and well-maintained.  I did not identify any of Dr. Stewart's concerns regarding the medical records.  It is important to note that the Arizona Department of Corrections inpatient medical records are kept separately from outpatient medical records.  The records I reviewed clearly demonstrated written documentation that when offender patients submitted medical health needs requests, there were timely clinical responses and that clinically appropriate evaluation and treatment services were offered.  I found a pattern of evidence of patient centered treatment planning, including attempts at providing informed consent, treatment plans, and documentation of medical, nursing, dental, and mental healthcare encounters.

32

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER      ADC203404

Dr. Stewart asserts there are delays in the prescribing and delivery of psychotropic medications and delays in mental health treatment in the Arizona Department of Corrections. It is my professional opinion from record reviews that the time frames for screening, referral, psychiatric evaluation, verbal/in-person medication orders after obtaining clarification and verification of the exact medication, dose and schedule, and informed consent from a state prisoner, medication ordering, filling, and dispensing, and medication administration are all within the standard of care of correctional psychiatry and are clinically justifiable practices within a state prison correctional setting.

According to the National Commission on Correctional Health Care (NCCHC), Accreditation Report of the Health Care Services at the Arizona Department of Corrections Facilities, NCCHC standard P-H-01, Health Record Format and Contents, an essential standard was met:

**ASPC-Douglas:**

AGA_Review_00023024 ("Inmate medical and mental health records are integrated in hard copy format; it is clear that health information is shared on an ongoing basis among providers. The health record includes a problem list, as well as all other critical elements. We found the records to be well organized and all filing was kept up to date.") – June 28, 2013 Report

**ASPC-Perryville:**

ADC_P000914 ("Inmate medical and mental health records are integrated in hard copy format. Critical health information is shared on an ongoing basis among providers. The health record includes a problem list, as well as all other critical elements. We found the health records to be extremely well organized and maintained.") – June 28, 2013 Report

36

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER        ADC203408

process and sick call request process described in the Policies and Procedures reference above is consistently and uniformly utilized for the screening of all newly admitted state prisoners of varying lengths of incarceration and is in keeping with national correctional healthcare standards and the standard of care within state prison settings.

According to the National Commission on Correctional Health Care (NCCHC), Accreditation Report of the Health Care Services at the following facilities, the NCCHC standard P-G-04 Basic Mental Health Services essential standard was met:

**ASPC-Douglas:**

AGA_Review_00023023 ("There is one mental health professional on site. He is responsible to assess inmates who are placed in CDU, and address any mental health-related sick call requests. He evaluates any inmates on a suicide watch and then sends them on to a complex with a mental health unit, and assists the psychiatrist to see any inmates via telemedicine. Inmates with serious mental health issues do not remain at this facility. Program staff offer a variety of support groups.") – June 28, 2013 Report

**ASPC-Perryville:**

ADC_P000919 ("In September 2013, the RHA submitted copies of supplemental worksheets/training materials for the following topics for the minors' unit: anger management, boundaries, peers relationships and conflicts, sexuality and STDs, drugs education, underage drinking, communication skills/problem solving, career interests and parenting skills. The RHA also provided evidence of health needs request monitoring to determine if additional resources were required. The standard is now met.") – October 11, 2013 Update Report.

42

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER       ADC203414

**ASPC-Phoenix:**

ADC_P000931 ("Mental health services are comprehensive; there is an inpatient unit for the sub-acute Level 1 mentally ill inmate [s]. This unit houses approximately 200 residents. The building is divided into three floors and inmates are usually in a cell either by themselves or with one other inmate, depending upon their level of illness. On-site services include the identification and referral of inmates with mental health needs, crisis intervention services, psychotropic medication management when indicated, individual counseling, group counseling, psychosocial/psychoeducational programs, and treatment documentation and follow-up.") – June 13, 2013 Report

**ASPC-Tucson:**

ADC_P000947 ("Mental health services are available on site. There is an inpatient unit for seriously mentally ill patients. The Men's Behavioral Health Treatment center is where the mental health watches are done and it also includes a transitory unit for offsite medical appointments. On-site services include the identification and referral of inmates with mental health needs, crisis intervention services, psychotropic medication management when indicated, individual counseling, group counseling, psychosocial/psychoeducational programs, and treatment documentation and follow-up. A variety of mental health groups are offered.") – June 28, 2013 Report

**ASPC-Winslow:**

ADC140129 ("Mental health services are available on site. Inmates who require psychotropic medication would not be housed at this facility. The staffing includes a mental health clinician to provide on-site services, including the identification and referral of inmates with mental health needs, crisis intervention services, individual counseling, group counseling,

43

psychosocial/psychoeducational programs, and treatment documentation and follow-up.") – June 28, 2013 Report

The standard was also met at ASPC-Safford (ADC140103 July 30, 2013, Accreditation letter), ASPC-Florence (ADC055480, December 1, 2011, Accreditation Letter), ASPC-Lewis (ADC055486, November 17, 2010, Accreditation Letter), and ASPC-Yuma (ADC_P000965, March 15, 2011, Accreditation Letter).

**8.    Mental Health Programming:**

The Policies and Procedures for mental health programming implemented at the Arizona Department of Corrections facilities were within generally accepted practices.  Specifically, the different types and level of services provided depending on the acuity and severity of each individual state prisoner's mental healthcare symptoms, functioning and diagnoses, as determined by qualified mental health professionals working individually or making team decisions, was within generally accepted practices.

My tours of different units and review of available records supported that there are multiple correctional and healthcare staff onsite that are present and readily available.  Via my direct observation on-site, my review of various policies and procedures, and as evidenced by national accreditation by NCCHC, there is clearly a system in place at each unit to identify, refer, and treat adult offenders who submit sick call requests seeking assistance with insomnia, depression, disruptive behaviors, mental symptoms, such as hallucinations (auditory or visual), paranoia, delusions (fixed false beliefs), problem behaviors or any other distress.  Similarly, there is a system in place for referring offenders who do not self-identify or submit sick call requests, but instead present with behaviors, symptoms or functional impairments more suggestive of current mental illness.  Available documentation suggested timely intake mental

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER        ADC203416

I had the opportunity to observe several offenders who were being monitored on suicide precautions. I approached and asked direct questions regarding policies and procedures and the specific documentation correctional officers were filling out while carrying out these watches. These officers demonstrated tremendous professionalism and appeared to be very serious and dedicated in their efforts to keep offenders free from self-harm or suicide attempts. I was impressed that potentially suicidal offenders placed on suicide precautions are maintained on a 10-minute watch (this is a higher rate of frequency of observation than NCCHC standards which has a recommended 15-minute level of checks). I also asked questions regarding the Post Orders which exist for mental health watches and the specific Watch Orders which are posted at each watch cell. Officers identified that, as soon as they come on shift, they read the Post Orders, and they comply with the expectations of reading the post and carrying out suicide precaution and monitoring orders, and this procedure was consistent across all the complexes I visited. I also reviewed the Watch individual logs, and these were completed in keeping with departmental policies and procedures, and are within the standard of care.

I was particularly impressed by a correctional officer who was directly monitoring an offender at Browning who had allegedly swallowed a foreign object and was being watched on a direct and continuous 1:1 watch. The correctional officer explained to me that one of his post duties was to collect any/all feces from the offender and individually manually inspect the feces with gloved hands to locate the foreign object (which may have been a sharp item, with the risk of cutting the officer). The officer clearly had an unpleasant job assignment, but he took great pride and demonstrated professionalism with this safety issue.

Not only did I observe the suicide watch within designated observation areas, I also observed suicide watch being carried out in a clinically appropriate manner at the IPC Florence

72

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER        ADC203444

Central Unit where an offender with medical issues, who had recently engaged in self-mutilation, was being watched and kept safe from self-harm or suicide.

Based on my review of materials, tours, and interviews, it is my professional opinion that Arizona Department of Corrections offenders designated as potentially suicidal or self-harming are provided with adequate mental health evaluation, treatment, and suicide prevention practices.

According to the National Commission on Correctional Health Care (NCCHC), Accreditation Report of the Health Care Services at Arizona Department of Corrections Facilities, NCCHC standard P-G-05 Suicide Prevention Program, an essential standard, was met:

**ASPC-Douglas:**

AGA_Review_00023024 ("The suicide prevention program addresses each of the 11 key components as described by the standard. The RHA has approved the training curriculum for staff. Treatment plans addressing suicidal ideation and its reoccurrence are developed and patient follow up occurs as clinically indicated. Actively suicidal inmates are placed on constant observation in the CDU and are then moved to another facility. Potentially suicidal inmates are monitored on an irregular schedule not exceeding 15 minutes between checks. There have been no suicides since the last survey.") – June 28, 2013 Report

**ASPC-Perryville:**

ADC_P000913 ("The suicide prevention program addresses each of the 11 key components as described by the standard. The RHA has approved the training curriculum for staff. Security staff carries suicide training/recognition reference cards as part of their daily uniform. Treatment plans address suicidal ideation and its reoccurrence and patient follow-up occurs as clinically indicated. Actively suicidal inmates are placed on constant observation. Potentially suicidal inmates are monitored on an irregular schedule not exceeding 15 minutes

73

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER       ADC203445

setting.  The use of "isolation" or "short- or long-term segregation" does not occur within Arizona Department of Corrections, as there are opportunities for outside recreation, showers, and the like.  With regard to the Plaintiffs' assertion (Dr. Haney's) of possible mental health impact from the use of higher custody levels, there is no empirical data to suggest any cause and effect psychiatric and/or mental health impact from the limited use of higher custody levels.  Specifically, there is no definitive empirical evidence for a cause and effect that the use of higher custody levels will cause post-traumatic stress disorder (PTSD) or psychic harm or injury.  State prisoners placed in higher custody levels have the ability to request a mental health assessment to the extent they are experiencing sequellae from isolation.  This ability to request mental health evaluation and periodic monitoring by nursing and mental health staff provides sufficient protection from the confines of a state prison facility to protect any and all offenders from harm.  The facility policy and procedure provided for mental healthcare staff to be informed when offenders were placed in higher custody settings and to evaluate offenders with mental illness.  According to ADC Departmental Order 1101, Section .05, detention referrals by policy, are to be seen by mental health within 24 hours.  This type of policy and procedure is consistent with the generally accepted standards for state prison facilities.  This referral practice helps mitigate any potential risk of harm.

According to the National Commission on Correctional Health Care (NCCHC), Accreditation Report of the Health Care Services at Arizona Department of Corrections Facilities, the NCCHC standard P-E-09 Segregated Inmates, an important standard, was met:

**ASPC-Douglas:**

AGA_Review_00023022 ("Conditions of segregation at this facility (NCCHC's 2b category) require health rounds at least three times a week, which is the practice at this facility.

77

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER        ADC203449

mental health staff.  Healthcare staff were sensitive to offender patient's right to refuse treatment and clearly documented informed consent, psycho-education, illness education, how they responded and psychotropic medication treatments, barring a need to pursue compelled/forced psychotropic medications in rare circumstances.  There was a pattern of documentation where they sought permission from each individual state prisoner for healthcare treatment and releases of information, demonstrating attempts to seek informed consent on the part of correctional healthcare staff.

According to the National Commission on Correctional Health Care (NCCHC), Accreditation Report of the Health Care Services at the Arizona Department of Corrections Facilities, the NCCHC standard P-A-01 Access to Care, an essential standard, was met:

**ASPC-Douglas:**

AGA_Review_00023016 ("Inmates have access to health care.  Patients are seen by a qualified clinician and receive care for their serious medical, mental health, and dental needs. Inmates are assessed $4.00 for self-initiated services, although mental health care and medications are exempt from the policy. All inmates receive care regardless of ability to pay.") – June 28, 2013 Report

**ASPC-Perryville:**

ADC_P000905 ("Inmates have access to health care. Patients are seen by a qualified clinician and receive care for their serious medical, mental health, and dental needs.

Inmates pay $4.00 for self-initiated care. There is no charge for mandated assessments or testing, mental health care, or medication. All inmates receive care regardless of ability to pay.") – June 28, 2013 Report

**ASPC-Phoenix:**

85

ADC_P000923 ("Inmates have access to health care. Patients are seen by a qualified clinician and receive care for their serious medical, mental health, and dental needs. Inmates are assessed $4.00 for self-initiated services; chronic care, mental health care, and medications are exempt from the policy. All inmates receive care regardless of ability to pay.") – June 13, 2013 Report

**ASPC-Tucson:**

ADC_P000937 ("Inmates have access to health care. Patients are seen by a qualified clinician and receive care in a timely manner as ordered for their serious medical, mental health, and dental needs. Inmates are assessed $4.00 for self-initiated services; mental health care and medications are exempt from the co-pay program. Developmentally disabled inmates, those in the special housing unit, and minors are exempt. All inmates receive care regardless of ability to pay.") – June 28, 2013 Report

**ASPC-Winslow:**

ADC140122 ("Inmates have access to health care. Patients are seen by a qualified clinician and receive care for their serious medical, mental health, and dental needs. Inmates are assessed $4.00 for self-initiated services, physical assessments, chronic and mental health care, and medications are exempt from the policy. although mental health care and medications are exempt from the policy. All inmates receive care regardless of ability to pay.") – June 28, 2013 Report

The standard was also met at ASPC-Safford (ADC140103 July 30, 2013, Accreditation letter), ASPC-Florence (ADC055480, December 1, 2011, Accreditation Letter), ASPC-Lewis (ADC055486, November 17, 2010, Accreditation Letter), and ASPC-Yuma (ADC_P000965, March 15, 2011, Accreditation Letter).

86

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER      ADC203458

# EXHIBIT 4

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br>Plaintiffs,<br><br>    v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br>Defendants. | NO. 2:12-cv-00601-NVW |

## CONFIDENTIAL SUPPLEMENTAL EXPERT REPORT OF:

Joseph V. Penn, MD CCHP FAPA
UTMB Correctional Managed Care
200 River Pointe Drive, Suite 200
Conroe, Texas 77304
Office: (936) 494-4170

## REGARDING MENTAL HEALTHCARE
## AT THE ARIZONA DEPARTMENT OF CORRECTIONS

March 26, 2014

*[signature: Joseph V. Penn]*

Joseph V. Penn, MD CCHP FAPA
Director, Mental Health Services
UTMB Correctional Managed Care (CMC)
Clinical Associate Professor
UTMB Dept. of Psychiatry and Behavioral Sciences

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER   ADC261843

videos with follow-up sessions with a psychologist," and "customized programming to meet individual inmates' needs, such as individual and group treatment, anger management, pro-social behavior, substance abuse treatment, emotional awareness, and transitional mental health services.

(ADC140142).

Operations additions to support integrated approach to mental health and suicide prevention include:

- establishing routine staff checks - DO 805,
- enhancement of intervention strategies and response times for medical emergencies and suicide attempts - DO 807,
- implementation of DI 294 regarding Inmate Housing Assignments,
- review of involuntary medications – Pharmacy and Therapeutics Committee.

(ADC140143).

ADC also enhanced existing training courses regarding response to suicide and self-harm attempts to include:

- CARE Training for ADC staff,
- Crisis Intervention and Suicide Prevention (CRISP) Training for ADC staff,
- expanded mental health intervention for inmates who refuse to house,
- staff specialty training to provide specialty training to line staff working in mental health areas,
- inmate mental health training to increase inmate awareness of suicide prevention strategies and inmate sensitivity to risk factors

(ADC140144).

With regard to security staffing, in FY 2013, 193 security staff FTE positions were restored to ensure more staff contact and supervision of the inmate population. (ADC140145). Regarding mental health professionals, Corizon continues to hire full-time and locum tenens employees to provide constitutionally adequate mental health services to the inmate population. (ADC140146).

It is my professional opinion that these strategies related to the provision of mental health care to the inmate population are in keeping with established national "best practices" in correctional suicide prevention and also are as recommended by national medication associations such as the American Psychiatric Association, and national correctional accreditation entities such as the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA).

4

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER         ADC261846

APA.[3]   I was particularly impressed with ADC's process for critical incident debriefing following a completed suicide, which was explained to me by Dr. Nicole Taylor, ADC's Mental Health Monitor.  After a suicide, the ADC Critical Incident Response Team (CIRT) meets with offenders and staff who witnessed or were involved in the suicide and/or medical intervention efforts.  In addition to CIRT, ADC mental health staff debriefs offenders housed in the same pod or housing area near the decedent.  The mental health staff also offer assistance to other inmates on the pod, other inmates who are immediate family members or close friends of the decedent, and inmates who were crime partners (involved in the initial offense that resulted in the current incarceration). CIRT can refer offenders to mental health for follow-up.  Offenders are also able to seek mental health and psychiatric services via an HNR.  CIRT can also refer correctional and health care staff to an employee assistance program (EAP) counseling services.

### 3.    NCCHC Standards for Suicide Prevention

All of the ADC facilities accredited by the NCCHC met its standards for suicide prevention.

The following is a general description of the National Commission on Correctional Health Care (NCCHC) [J Penn in press]:

> NCCHC originated as the AMA jail project and was incorporated as an independent nonprofit organization in 1983. Its mission is to improve the quality of health care provided in jails, prisons, and juvenile confinement facilities. The NCCHC board of directors comprises liaisons from 37 national organizations, including the American Academy of Child and Adolescent Psychiatry (AACAP), the American Academy of Psychiatry and the Law (AAPL), and the American Psychiatric Association (APA), and other organizations from the fields of medicine, public health, law, and corrections, as well as state and county associations.
>
> The NCCHC standards represent NCCHC's requirements for health services (e.g., nursing, medical, dental, and mental health and psychiatric) in state and federal prisons, jails, short-term detention, juvenile detention and other confinement settings, and U.S. Immigration and Customs Enforcement facilities. They are intended for use in evaluating the health services in correctional facilities, including those that are part of larger systems. Once

---

[3]  The APA, founded in 1844, is the world's largest psychiatric organization.  It is a medical specialty society representing a growing membership of more than 35,000 psychiatrists.

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC261848

implemented, the NCCHC standards can lead to increased efficiency of health services delivery, greater organizational effectiveness, better overall health protection for incarcerated adults and juveniles, reduced risk of liability related to health services, and NCCHC accreditation.

Mental health care has been integral to the NCCHC standards and accreditation program from the start.

The following is a general description of the NCCHC Accreditation Process (J Penn in press):

Approximately 500 correctional facilities participate in NCCHC's accreditation program. These facilities are diverse in terms of jurisdiction, management structure, size, and inmate population, ranging from a juvenile facility with an average daily population of 10 to a large metropolitan jail complex housing 9,000 inmates. The average size of an accredited prison is more than 1,300 inmates. NCCHC is not a membership organization and there are no requirements to becoming accredited other than meeting the standards and adhering to NCCHC accreditation policies.

A correctional facility seeking accreditation first reviews the standards manual relevant to the setting to assess current compliance with the standards. The next step is to complete an application, followed by a self-survey questionnaire. NCCHC staff review the information on the questionnaire and work closely with the facility to help it prepare for an on-site survey. Once the facility feels ready, a survey is scheduled. Survey duration depends on the facility's size and the complexity of health services provided but is usually two or three days.

Survey teams are made up of highly qualified, rigorously trained physicians, nurses, health administrators, and other credentialed health professionals who understand corrections and combine that knowledge with their professional expertise. They conduct a review of health records as well as policies and procedures; interview health staff, correctional officers and inmates; and tour the facility to gather information. Surveyors use the same compliance indicators listed in each NCCHC standard to measure compliance. At the end of the survey, an exit conference is conducted to discuss their preliminary findings. These reviews are collegial and educational, with the survey team offering suggestions for improvement.

The NCCHC accreditation committee then reviews the survey team's report to evaluate compliance with the standards and make

7

an accreditation decision. The facility receives a comprehensive written report that includes recommendations to assist with standards compliance. Once accredited, the facility will submit an annual report with updates on key information. Subsequent on-site visits occur about every three years.

As stated in my previous report, ADC has achieved and demonstrated compliance with NCCHC Suicide Prevention Standard Prison Standard P-G-05, an essential standard, at ASPC-Douglas, Safford, Florence, Lewis, Yuma, Phoenix, Perryville, Tucson, and Winslow.  I note that ASPC-Eyman is not accredited by the NCCHC.  It is my opinion that Eyman would meet NCCHC standard P-G-05 for suicide prevention if assessed by the NCCHC because the policies and practices relating to suicide prevention and assessment at Eyman are the same as those at other ADC facilities that are accredited by the NCCHC.

### 4.      ADC Suicides and Suicide Rates

My prior report discusses suicide rates in more detail.  As I previously stated, having zero suicides in a correctional setting is a desirable yet completely unattainable goal.  The reality is that no matter how good a prison's suicide prevention policies and practices are, it is simply impossible to prevent all suicides in a correctional setting – just as it is in the community or any institutional setting.

Dr. Stewart also takes issue with the number of suicides at ADC this year.  Second Supplemental Report at 2.  While there has been a modest increase in the number of suicides at ADC this year to date, which will no doubt affect ADC's annual suicide rate, I do not find this increase to be cause for concern.  When the number of suicides involved is low in proportion to the population, a single suicide results in a nearly threefold increase in the suicide rate per 100,000 inmates.  An increase by one or even a few suicides in a given year does not signal a system-wide deficiency.  It remains my professional opinion that the current suicide rate at ADC is not indicative of any systemic deficiencies in ADC's suicide prevention policies or practices.

### 5.      ADC Mortality Reviews and Psychological Autopsies

The ADC Mental Health Technical Manual Chapter 4, Section 5.0 requires that a psychological autopsy be completed on all deaths of inmates with a MH score of 3 or above and all inmates who complete suicide regardless of mental health score.  This policy comports with national standards, including the NCCHC.

8

NCCHC Standard P-A-10, Procedure in the Event of an Inmate Death (an important standard), compliance indicator #1 requires that "All deaths are reviewed within 30 days." According to P-A-10, compliance indicator #2, "A death review consists of a. an *administrative review*, b. a *clinical mortality review*, and c. a *psychological autopsy*, if the death is by suicide." According to P-A-10, compliance indicator #4, "Corrective actions identified through the mortality review process are implemented and monitored through the facility's CQI program for systemic issues and through the patient safety program for staff-related issues."  My review of available materials, including NCCHC Accreditation reports, indicates that all of the ADC facilities accredited by the NCCHC met these standards.  (ADC_P000888-000901, ADC055480, ADC055486, ADC_P000902-000915, ADC_P000920-000933, ADC140103, ADC_P000934-000950, ADC_P000960-000964).

Dr. Stewart faults ADC for not performing psychological autopsies for each of the eight suicides listed in his report.  I have learned that psychological autopsies have been performed for each of the eight suicides in his report.  Dr. Stewart also claims that the ADC mortality reviews are insufficient. Second Supplemental Report at 1-2.  I disagree.  Mortality reviews should be short and are intended to capture systemic issues for use in continuous quality improvement.  In my professional opinion, the ADC mortality reviews I have reviewed are sufficient.  Moreover, as part of ADC's mortality review process, medical, mental health and security personnel meet on days 3 and 14 following any in-custody death to review the circumstance of the death and to determine any lessons learned, changes or improvements recommended as a result.  This process provides appropriate self-critical analysis and opportunity for implementation of or adjustment of existing procedures in order to increase the quality of care and custody provided to the inmate population.  The timing and nature of such processes, in my professional opinion, complies with the national standard of care in corrections.

Dr. Stewart also finds fault with ADC's psychological autopsies. There is no nationally standardized definition of psychological autopsy, nor am I aware of any requirement that the psychological autopsy take any particular form.  In my professional opinion, the format of a psychological autopsy is far less important than its content.  What matters is the ability to generate discussion regarding any factors that may have contributed to the death or any suggestions for future improvements.  In speaking with ADC and Corizon staff regarding these psychological autopsies, it is my understanding that they engaged in such a dialogue with respect

9

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC261851

ratios or any mandate or affirmative duty that psychiatrists should be identified to serve as the primary type of correctional or non-correctional health care role.   In particular, the NCCHC is comprised of 28 member organizations, and to date, none of these organizations, and the three organizations that specifically represent psychiatric physicians on a national basis, the American Psychiatric Association (APA), the American Academy of Psychiatry and the Law (AAPL), the American Academy of Child and Adolescent Psychiatry (AACAP), or larger member organizations such as the American Medical Association (AMA), have proposed position statements, disease management guidelines, or other written materials asserting specifically that psychiatrists may have unique training, skills, or abilities to lower the risk of suicide attempts or completed suicides within correctional and non-correctional settings, or that increased numbers of psychiatrists within correctional settings will reduce suicide attempts and suicide.

From an administrative perspective, it is exceedingly difficult to recruit and retain permanent (non-locums or temp work) quality/competent early and midcareer psychiatrists in geographically remote areas when there are higher paying non-correctional office based, and growing telepsychiatry opportunities in major metropolitan areas, typically with higher salaries, in office based settings and with non-hazardous duty work conditions.

None of the above listed national psychiatric organizations nor the NCCHC, ACA or the Joint Commission have promulgated psychiatric staffing ratios or recommendations to date. According to the American Psychiatric Association Psychiatric Services in Jails and Prisons: A Task Force Report of the American Psychiatric Association,

> Staffing levels are a particularly thorny and complex subject, because systems vary widely in their organization, physical plants, resource availability, and population characteristics."
>
> Staffing ratios are often sought by courts and regulatory agencies that wish to assert and impose minimally acceptable numbers of staff for each mental health profession. The authors of the first edition of these guidelines were reluctant to specify staffing ratios. They noted that:
>
> We have not sought to specify in detail such matters as specific programs or level of staffing because of the wide variety of correctional facilities with their differences in administrative and political imperatives. Issues such as what level of care or range of treatment modalities are required in which particular setting for

12

health examination that is appropriate to the particular, suspected level of services needed and is focused on the suspected mental illness.  The psychiatrist has both a direct and an indirect role in the provision of this service:

> a.   The psychiatrist helps develop policies and procedures.
> b.   The psychiatrist performs the mental health evaluation or consultation when appropriate and/or necessary. In some small jails, where a consulting psychiatrist may be the sole mental health practitioner, he or she will be a direct provider of this service.
> c.   The psychiatrist may take responsibility for supervision of the mental health staff, administration of the mental health services, and liaison with other medical and administrative personnel in the facility.

According to the APA Services in Prisons and Jails, the comprehensive mental health evaluation should be conducted by a psychiatrist or by another appropriately licensed or credentialed mental health professional.   In most jail and prison settings, mental health evaluations are typically conducted by non-psychiatric qualified mental health professionals. The psychiatrist has both a direct and an indirect role in the provision of this service:

> a. The psychiatrist may perform all or part of the comprehensive mental health assessment when appropriate and/or necessary (e.g., when a detainee is already taking psychotropic medications).
> b. The psychiatrist may take responsibility for supervision of the mental health staff, administration of the mental health services, and liaison with other medical and administrative personnel in the facility.

Dr. Stewart's assertion that psychiatrists should be the identified staff to assess and monitor offenders at risk for clinical deterioration, and in particular to perform suicide risk screenings and assessments within administrative segregation and other restrictive housing settings, is not consistent with accepted national standards and recommendations.  It is certainly not in keeping with the above described accreditation organizations (NCCHC, ACA, and Joint Commission) and their national standards and accreditation processes.

None of the three entities (American Correctional Association, the National Commission on Correctional Health Care, or the Joint Commission) that routinely review and accredit correctional health care services provided within correctional settings have established any mandate or affirmative duty that psychiatrists should be identified to serve as the primary type of

15

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC261857

correctional or non-correctional health care role.  None of the 28 NCCHC member organizations, nor the APA, the AAPL, AACAP, or AMA, have proposed position statements, disease management guidelines, or other written materials asserting specifically that psychiatrists may have unique training, skills, or abilities to lower the risk of suicide attempts or completed suicides within correctional and non-correctional settings, or that increased numbers of psychiatrists within correctional settings will reduce suicide attempts and suicide.

As an example, according to the American Psychiatric Association Psychiatric Services in Jails and Prisons: A Task Force Report of the American Psychiatric Association,

> "Institutions should provide for regular rounds by a qualified mental health clinician in all segregation housing areas. During these rounds, each inmate should be visited briefly so that any emerging problem can be assessed. The clinician should also communicate with segregation security staff in order to identify any inmate who appears to be showing signs of mental deterioration or psychological problems."

The APA references a "qualified mental health clinician," but does not require that the clinician be a psychiatrist.  In my opinion, the standard of care does not require that psychiatrists must or even should be the specified professional to engage in regular rounds in segregated housing areas.  Each type of clinician that is a member of the mental health treatment team serves an important role in a correctional setting.

It is my professional opinion that the Arizona Department of Corrections and its contracted health care vendor/provider, Corizon, currently utilize psychiatrists and psychiatric midlevel professionals (such as nurse practitioners and physician assistants) and other mental health staff of various clinical backgrounds and training levels, in a clinically appropriate manner and in keeping with national correctional standards of care.  It is also my opinion that they utilize a multidisciplinary approach to mental health delivery in keeping with the standard of care within correctional settings nationally, and similarly within community "free world" settings.  It is further my opinion that ADC's vendor, Corizon, maintains sufficient psychiatric and mental health staff both on-site and via standardly used telemedicine and telepsychiatry and other distance technologies (telephone consultation and psychiatric and psychology emergency services/on call) that are all in keeping with correctional and community "free world" standard psychiatric and mental health practices and the standard of care.  Finally, ADC maintains a

16

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC261858

that inmates receive not only medical but mental health and psychiatric care to be within the generally accepted standards for a state prison facility.  The procedures and protocols for accessing medical care and/or mental health care were published through several means.

Correctional health care differs significantly from outpatient and other community based systems of care.  It is well within generally accepted practices for state offenders to access mental health care and/or mental care directly through either medical staff, nursing staff or correctional officers, and through the use of verbal requests and a written sick call process.  In my review of the named Plaintiffs' records, death records and random chart reviews, I found no first hand documentation of an ADC correctional officer, or any other ADC staff member, or any Corizon staff purposefully or unintentionally impeding the delay of mental health care.

I have reviewed the documents produced regarding suicides at ADC and Dr. Stewart's opinions in his Second Supplemental Report regarding the care eight ADC inmates received prior to their deaths.[4]  Dr. Stewart makes numerous assertions and inferences regarding the identification and prevention of the inmates who successfully completed suicide within ADC system based on isolated information.  He also asserts that ADC staff and Corizon staff failed to properly identify and prevent inmate suicides.  I respectfully disagree with his hypotheses and assertions.

Suicide risk assessment and management within the community and even more so within correctional settings are complicated processes unlike any other in medicine.  There are no laboratory values or imaging studies to support the decision-making process in the event of a bad

---

[4] I am a correctional psychiatrist with additional forensic psychiatry fellowship specialty training and board certification and additional certification as a correctional health professional by the National Commission on Correctional Health Care (NCCHC).  I have over 20 years of correctional experience (and also consulting, NCCHC surveying and technical assistance, and administrative experience within correctional and forensic systems/settings).  I have published and presented in the areas of correctional suicide prevention and risk management strategies.  I actively practice correctional psychiatry and also maintain an administrative role within a large state prison system.  I take on call afterhours and weekends and must make split second decisions regarding suicide risk determination and management often with limited information and often based on second hand information.  I attend local, state, and national correctional, forensic psychiatry and general psychiatry meetings, and remain current via other CME activities.  I am also integrally involved in state prison morbidity and mortality reviews, quality improvement, mental health committees and the like.  It is my professional opinion that the identification of suicide risk and suicide prevention within correctional settings is one of the most difficult challenges for correctional and health care staff alike.

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC261860

not find systemic deficiencies in medication delivery or management.  For example, I reviewed the mental health records, medication administration records, and videotaped depositions of the named Plaintiffs with mental health claims.  In addition, I reviewed the documents produced regarding suicides at ADC and Dr. Stewart's opinions in his supplemental reports regarding the psychotropic medications eight ADC inmates received prior to their deaths.  It is my professional opinion that the individually and clinically-based decisions by psychiatrists at ADC regarding psychotropic medication initiation, discontinuation, or other changes to psychotropic medications dosage and/or schedule did not have any contributory, cause and effect, or other causal relationship to any of the eight suicides referenced in Dr. Stewart's Second Supplemental Report.

It is my professional opinion that the prescribing practices to initiate, continue, discontinue, adjust, or change psychotropic medications, dosage, and schedules in the charts I have reviewed were all within accepted national correctional practices and within the accepted standard of psychiatric care.  I specifically did not find any psychotropic medication prescribing practices that fell below the national correctional standard of care.  Similarly, it is my professional opinion that the individually and clinically-based decision by an ADC - contracted Corizon psychiatrist regarding psychotropic medication initiation, discontinuation, or other

---

board certification.  My experience includes work as a direct treating clinical psychiatrist within both community and correctional settings.  I hold additional certification by the NCCHC as a certified correctional health professional (CCHP).   I have experience as a correctional administrator, forensic psychiatric consultant, and member of the forensic psychiatric certification and re-certification committee (this committee oversees national board examination content material related to correctional psychiatry, correctional settings, and practices within correctional settings).  I have also served as a past board examiner for the American Board of Psychiatry and Neurology (ABPN).   I have conducted NCCHC accreditation surveys and technical consultation of/to correctional facilities and systems nationally.  I have served as a member of various committees at a state and national level, both correctional and private psychiatric hospital pharmacy and therapeutics committees in Texas and Rhode Island, respectively.  I am a member and current chair of the Texas Department of Criminal Justice (TDCJ) Joint Mental Health Working Group.  I remain current on accepted psychotropic medication prescribing practices within correctional settings through reviews of state and nationally promulgated disease management guidelines, clinical guidelines, position statements for correctional settings, presentations at state and national  correctional conferences (ACA, NCCHC, NIC and the like), and through ongoing dialogue with academic-based and community-based providers, forensic and state hospitals, mental health centers, Veteran Administration settings, and via discussion with correctional psychiatry colleagues nationally and via continuing medical education (CME) programs.

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC261871

review of available documents, tours of ADC facilities, and review of the literature, Plaintiffs' experts misuse the term "extreme isolation."

According the NCCHC Mental Health Standard, MH-E-07 Segregated Inmates (an essential standard), extreme isolation is defined as "situations in which inmates are seen by staff or other inmates fewer than three times a day."

During my tours of Eyman, Florence, Perryville, Tucson,[6] Lewis and Yuma, I specifically targeted segregated housing areas.  My goal was to identify and observe segregated inmates that were separated from the general population and who received services and activities separate from other inmates.  I observed inmates on administrative segregation, protective custody, maximum custody, close custody, detention, and watch status.  I did not observe any units or housing areas that would meet the criteria for "extreme isolation."  My previous report provides additional detail regarding my observations of individual housing cells and areas, in cell and out of cell time, recreational activities, work programs, and mental health and other programming and will not be repeated here.

In short, offenders in segregated housing areas were seen by correctional staff numerous times daily, health care staff daily, and had recreational opportunities at least three times a week for a total of approximately six hour total recreation time a week.  Inmates also had regular contacts with staff for food delivery, showers, medical appointments, medication delivery, mail delivery, legal visits, personal visits, Chaplain services, commissary delivery, and library services, thus greatly exceeding the fewer than three times a day definition of "extreme isolation."

As to specific daily contacts, all inmates, including offenders in segregated housing areas, must stand for five formal (face to ID card counts) per 24 hour period.  (DO 701.04, ADC012644-56).  ADC General Housing Unit Post Orders (PO-35, Section 1.5, ADC107518-24), also require constant motion of floor officers in housing units of all custody levels, and checks not more than one hour apart in the assigned area.  Correctional officers assigned as rovers (PO-37, ADC_S00557-61) are in constant, random motion, and thus are observing offenders with great frequency.

For those offenders in detention units, medical personnel make rounds a minimum of three days per week on non-consecutive days.  (HSTM at 307, ADC010954).  Additionally,

---

[6] At Tucson, Lewis, and Yuma, I viewed detention and watch cells in which inmates were segregated.

31

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER        ADC261873

# EXHIBIT 5

# (REDACTED)

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br>Plaintiffs,<br><br>      v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br>Defendants. | NO. 2:12-cv-00601-NVW |

## CONFIDENTIAL SECOND SUPPLEMENTAL EXPERT REPORT OF:

Joseph V. Penn, MD CCHP FAPA
UTMB Correctional Managed Care
200 River Pointe Drive, Suite 200
Conroe, Texas 77304
Office: (936) 494-4170

## REGARDING MENTAL HEALTHCARE
## AT THE ARIZONA DEPARTMENT OF CORRECTIONS

September 19, 2014

*[signature]*

Joseph V. Penn, MD CCHP FAPA
Director, Mental Health Services
UTMB Correctional Managed Care (CMC)
Clinical Associate Professor
UTMB Dept. of Psychiatry and Behavioral Sciences

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

## I.    INTRODUCTION

I have reviewed additional materials as well as the rebuttal and supplemental reports of Plaintiffs' experts Dr. Pablo Stewart, Eldon Vail, and Dr. Craig Haney.   I also conducted additional tours of the Arizona Department of Corrections (ADC) maximum custody units on June 19 and 20, 2014.   I also interviewed Dr. Nicole Taylor, the Mental Health Monitor for ADC, Kathy Campbell, the Health Services Monitoring Bureau Program Evaluation Administrator for ADC, and Dr. Michael Dolny, the ADC Deputy Research Unit Manager.   I also spoke with Dr. Mark Fleming, the Vice President for Behavioral Health for Corizon Health, and Mark Jansen, the Vice President of Operations for Corizon Health, and Jennifer Finger, Vice President and Assistant General Counsel for Corizon, Central Office.

The following observations and opinions are based upon my review of this additional information.   This report further supplements my prior reports, dated December 18, 2013 and March 26, 2014.

## II.    RECORDS REVIEWED

In addition to the materials listed in my prior two reports, I have also reviewed the following materials and performed the following facility tours:

1.   American Psychiatric Association Psychiatric Services in Jails and Prisons: A Task Force Report of the American Psychiatric Association, (2000) Second Edition, American Psychiatric Publishing, Washington, DC.[1]

2.   Standards for Mental Health Services in Correctional Facilities, National Commission on Correctional Health Care, 2008[2].

---

[1]   This document is under current review and revision.   I am on the American Psychiatric Association (APA) Council of Psychiatry and Law, Workgroup on Persons with Mental Illness in the Criminal Justice System that is reviewing and revising this document.

[2] I am on a task force that is currently revising and drafting the 2015 NCCHC Mental Health Standards.

2

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER                    ADC448455

3. Standards for Health Services in Prisons, National Commission on Correctional Health Care, 2008 and 2014[3].

4. Briefing to Arizona Governor Jan Brewer: ADC Mental Health Initiatives and Suicide Prevention Strategies, May 2013, produced at ADC140132-48.

5. Penn, JV. Standards and Accreditation for Jails, Prisons, and Juvenile Facilities, In Oxford Textbook of Correctional Psychiatry. Edited by Trestman R, Appelbaum K, and Metzner J. Oxford University Press, New York, NY (in press).

6. Follow-up tours of ADC Eyman and ADC Florence on 6/19/14 and ADC Perryville on 6/20/14 (I had previously toured all three facilities as per my previous report).

7. Defendant Ryan's First Supplemental Response to Plaintiff ▇▇▇▇'s Request for Admission (Request Nos. 33-43; pgs. 1, 22-25 and 39)

8. Declaration of ▇▇▇▇▇▇▇ in support of Motion for Class Certification.

9. Defendants' Third Supplemental Response to ACDL's First Request for Production (Request No. 8; pgs. 1, 13-14 and 20).

10. Defendants' Fifth Supplemental Response to Plaintiff ▇▇▇'s First Request for Production (Request No. 9; pgs. 1, 12-13 and 38).

11. Defendants' Response to Plaintiff ▇▇▇' First Set of Interrogatories (Interrogatory Nos. 10-12 ; pgs. 1, 7-18 and 30).

12. Attachments A-G to Defendant's Seventeenth Supplemental Response to Plaintiff ▇▇▇' First Request for Production (47 pgs.).

---

[3] I was on the NCCHC Prison Standards task force that revised the 2008 NCCHC Prison standards and completed the 2014 NCCHC Prison standards.

3

ADC448456

It is still my professional opinion, based on the current mental health system, staffing, and policies, procedures and practices, that the respective use of different custody-determined classification and housing assignment settings, as per established policies, procedures, practices, and standards, that the Arizona Department of Corrections' mental health system is in keeping with national correctional health standards of care and meets or exceeds the standards established by the National Commission on Correctional Health Care (NCCHC).

It is also still my professional opinion that clinically appropriate mental health evaluation and treatment services have been previously available and remain currently available to each of the named Plaintiffs: ███████████████████████████████████████ ██████████████████████████████████████████████████████████, ███████████████████████, and ████████████.[5]  Finally, I do not find any alleged lack of appropriate correctional-based mental health evaluation or treatment services or any resulting detrimental effect on their overall level of functioning.

Based upon my review of ADC policies, procedures, practices, mortality reviews and psychological autopsies, interviews with ADC and Corizon staff, tours of ADC facilities and review of the materials cited above as well as all materials reviewed in this case, I disagree with Dr. Stewart's and the other Plaintiffs' experts conclusions.  My opinions with respect to each issue are addressed in more detail below.

---

[5] It is my understanding that Plaintiffs ████████████ and ████████████ were removed as named Plaintiffs in this action after they were released from prison.

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER                    ADC448461

1. **Psychiatric and Mental Health Staffing**

Plaintiffs and Plaintiffs' experts, in particular, Dr. Stewart, have asserted that there is inadequate psychiatric and mental health staffing in the Arizona Department of Corrections.  I agree that in some areas correctional facilities, due to a variety of factors, struggle to maintain adequate psychiatric and mental health staff.  This is because it is not viewed as a prominent position and working with inmates is often a dangerous, difficult, and thankless job.  ADC has overcome these challenges through establishing numerous recruitment and hiring strategies, staffing requirements in its contract with Corizon, who is contracted to provide mental health staff, the use of technology such as telepsychiatry, and other innovative strategies described below.

Based on my knowledge and experience from my current mental health leadership role (this will be seven years in February 2015) in the largest state prison population in the United States and my prior background, training, and current clinical, administrative, operational, experience in the delivery of correctional mental health care in state systems (previously in Rhode Island, now in Texas), and moreover, in my consultative role and other active involvement in the creation, review, and revision of/to national correctional mental health standards, my work in correctional accreditation, technical assistance, correctional facility survey visits nationally, and consultation to jail, prison, and juvenile correctional systems across the United States, and my other current committee, work group, and task force activities within the National Commission on Correctional Health Care (NCCHC), American Correctional Association (ACA), Society of Correctional Physicians (SCP), the American Board of Psychiatry and Neurology (ABPN), and the American Psychiatric Association (APA), I believe that I have

9

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

ADC448462

the requisite background, training and qualifications and current clinical, administrative practice and real world experience to render opinions regarding correctional psychiatric and mental health care staffing within a state prison system.   Based on my review of current staffing reports, additional available records, my discussions with Dr. Nicole Taylor, other ADC leaders, Dr. Fleming and other Corizon mental health staff, and my review of the contracts re: Arizona Department of Corrections current contracted vendor, Corizon, recent and current Corizon health care staffing data, and staffing patterns, I disagree with the assertion that there is inadequate psychiatric and mental health staffing in the Arizona Department of Corrections.

According to the American Psychiatric Association Psychiatric Services in Jails and Prisons: A Task Force Report of the American Psychiatric Association, (2000) Second Edition:

> There are no accepted national standards of care regarding appropriate and safe numbers of psychiatrists and other mental health professionals in any setting, correctional or otherwise. Nevertheless, courts and regulatory agencies, court monitors, psychiatrists serving as expert witnesses and other correctional health consultants, frequently seek to establish these staffing ratios in correctional settings.  Concrete statements about such ratios are also often sought by governmental agencies attempting to assess specific budgetary needs of the correctional settings over which they have oversight.

ADC's mental health staffing plan is established in its contract with Corizon and is subject to monthly monitoring and periodic revision.   The contract establishes the minimum number of mental health professionals and staff at each facility.  *See* Contract No. 130051DC, Section 2.17, and Amendment No. 6, ADC334042-60.  In addition, Corizon has a staffing policy, which is consistent with several national correctional accreditation standards, specifically, the NCCHC 2008 Standards for Health Services in Prison, P-C-07, NCCHC 2008 Standards for Mental Health Services in Correctional Facilities, MC-C-07, ACA 2003 Standards for Adult Correctional Institutions 4-4050, 4-4392, 4-4050, 4-4412 and ACA 2012 Standards Supplement

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER                ADC448463

effects, and the like would not have occurred if an ADC psychiatrist had evaluated the ADC inmate in a timely manner.  He disregards the treatment team approach in corrections that includes correctional nursing, medical, dental, health care administration and support staff and other health care staff who can identify and refer inmates for mental health evaluation and treatment.

Dr. Stewart also disregards the fact that in ADC (and nationally in other correctional settings) mental health staff work together with correctional staff to monitor and assist inmates with mental health needs.  Correctional staff is needed to help monitor inmates and inform mental health staff.  For example, correctional staff is used to monitor inmates on constant watches, 10-minute watches, or 30-minute watches.  Correctional staff is also necessary to help transport inmates to their various programs, activities, and medical or mental health appointments.  The mental health staff have weekly meetings with correctional staff to discuss the inmates' advancement in the Step Program.  Dr. Stewart fails to account for the vital custody and health care partnership where trained correctional staff who are on site 24 hours a day can identify and communicate concerns regarding inmates who might be having mental health concerns or problems.  Dr. Stewart also disregards the established/accepted national correctional definitions of *mental health services* and *mental health staff, and qualified mental health professionals* in prior standards as defined in the NCCHC Standards for Health Services in Prisons (2014) page 173:

> *Mental health services:* include the use of a variety of psychosocial and pharmacological therapies, either individual or group, including biological, psychological, and social, to alleviate symptoms, attain appropriate functioning, and prevent relapse.
>
> *Mental health staff:* include qualified mental health care professionals who have received instruction and supervision in

20

ADC448473

identifying and interacting with individuals in need of mental health services.

*Qualified mental health professionals:* include psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for the mental health of patients.

None of the NCCHC, ACA, or the Joint Commission national standards, position statements, clinical guidelines or other publications assert or imply that psychiatrists should serve the main or exclusive role or function within correctional mental health. Clearly, not all mental health evaluation and treatment functions that are performed within a correctional setting fall immediately to the psychiatrist. Dr. Stewart's assertion that psychiatrists are the most essential health care professional in a correctional setting runs counter to the well established multidisciplinary treatment team approach across community and correctional settings alike.

Dr. Stewart similarly fails to identify the vital role of psychiatric nurse practitioners and physician assistants. There is a well reported current national shortage of psychiatrists, and as a result, correctional, community, public sector, Veteran's Administration, and other health care systems struggle to recruit and retain psychiatrists. As noted in the NCCHC Standards for Mental Health Services in Correctional Facilities, "[w]hile it is not possible to specify exact *prescribing provider*-to-patient ratios, the amount of prescriber time must be sufficient to ensure that there is no unreasonable delay in patients receiving necessary care, and that care ordered is received in a timely fashion." MH-C-07, Mental Health Staffing. In addition, "psychiatric nurse practitioners or physician assistants under the supervision of a psychiatrist can substitute for a portion of the psychiatrist's or prescribing psychologist's time seeing patients" when state law permits. *Id*. Many jails and prisons across the US routinely utilize psychiatric nurse

21

practitioners and physician assistants, sometimes referred to as midlevel practitioners or professionals or as mid-levels, to ensure psychiatric access to care and continuity of care.

In order to evaluate the adequacy of the staffing plan, it is necessary to review multiple factors, not just the number or type of mental health providers, and certainly not a sole emphasis on psychiatrists alone. The factors that impact psychiatric and other mental health care staffing in correctional settings are facility specific and not static or fixed. As explained in the NCCHC Standards, the "sufficiency of the staffing plan can be affected by a number of factors, including adequacy of support staff; efficiency of the mental health clinic design; extent of waiting lists for mental health groups, individual or medication therapies; case-mix acuity of patients; timeliness and thoroughness of mental health professional encounters; and timeliness of responses to crisis referrals." MH-C-07, Mental Health Staffing.

As described above, there are no empirically based/determined national standards for psychiatric and mental health care staffing in correctional settings because there is too much variability across the nation in terms of different physical plants, varying clinical acuity (adjustment disorders, suicidal ideation, self-injurious, suicidal behavior, etc.), chronic mental health needs, inmate/patient turnover with varying lengths of incarceration, different types of detainees/offenders in various lock-ups, jails, prisons, juvenile, and other community corrections settings, especially when looking across metropolitan and rural settings.

Many inmates who present with histories of various diagnoses and remote/past psychiatric treatment may do very well within the structure and regimented correctional setting with minimal or less intensive psychiatric/mental health involvement. We see many long term offenders that just want to do their time and don't want to be bothered to have to come up to the mental health clinic, stand in med lines, or who request discontinuation of psychotropic

22

medications.   Many of these offenders do very well under these circumstances.   Obviously correctional health care systems should strengthen their efforts and focus on the true seriously mentally ill patient population.   Many inmates may report or carry more serious past diagnoses (e.g, have been diagnosed as being "bipolar" and the like) who turn out to be more substance abuse/dependence, Axis II, and less suggestive of a true chronic mental illness.   Psychiatric and other mental health staffing decisions should be made on an individual unit or regional basis by the medical and mental health leadership in partnership with custody leadership.

The following is an example from the NCCHC standards, where NCCHC has consistently not made staffing recommendations.

> "The intent is that the health care delivery system has sufficient numbers and types of health staff to care for the inmate population."

> "The number and types of qualified health care professionals required depend on the size of the facility, the types (e.g., medical, nursing, dental, mental health) and scope (e.g., outpatient, specialty care, inpatient care) of health services delivered, the needs of the inmate population, and the organizational structure (e.g., hours of service, use of assistants, scheduling). Consideration is given to labor-intensive activities when developing a staffing plan. Such activities include medication distribution, sick call, or cell checks in segregated housing."

> "While it is not possible to specify exact clinician-to-patient ratios, the amount of prescribing clinician time must be sufficient to ensure that there is no unreasonable delay in patients receiving necessary care."

> "The sufficiency of the staffing plan can be assessed by a number of factors. These include having an adequate number of physicians, midlevel practitioners, and support staff to provide necessary care, having timely and thorough physician encounters, and the length of the list of those waiting to be seen by the physician or other health care professionals."

> "Physician time must be sufficient to fulfill both clinical and administrative responsibilities."

23

that the majority of ADC units have achieved national accreditation by the NCCHC (only a minority of correctional systems nationally are able to achieve this national correctional accreditation, and typically the number of jails receiving NCCHC accreditation significantly outnumbers prisons) further supports the fact that Corizon and ADC's mental health records comport with free world and correction health care standards.

As a current surveyor, member, and chair of the accreditation committee of NCCHC, I am aware of the process by which it takes for a correctional system to seek accreditation, the accreditation process, and the specific review of prison health care records.  It is my professional opinion that in spite of the current challenges and limitations of a paper medical record (which is currently being transitioned and implemented into a statewide Electronic Medical Record or EHR) it would be impossible for the ADC to achieve and maintain NCCHC accreditation with inadequate mental health and other health care records as asserted by Dr. Stewart.  Dr. Stewart fails to give specific examples of problems or inadequate mental health care records and how this specifically had a direct or indirect cause and effect impact on patient health care or access to care or continuity of care.  If there are any current problems with regard to the legibility, filing of loose notes, other administrative issues pertaining to the medical records, it is my professional opinion that once the EHR is fully implemented statewide and once health care staff become familiar with the EHR, that any minor problems or issues will self-correct.  Finally it is my opinion that the current records system is adequate and fulfilling the needs of the inmate population.

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER                    ADC448484

the Flamenco Unit) are both State of Arizona Department of Health Services licensed (Behavioral Health Services Agency) Level 1 Sub-Acute Agencies.

ADC has also achieved and maintained NCCHC accreditation.  It is important to note that similar to Joint Commission accreditation, only a minority of correctional systems in the United States have achieved NCCHC accreditation.  As NCCHC's website indicates, when a "correctional facility achieves NCCHC accreditation, the message is clear:  Its leaders are committed to providing a nationally accepted standard of care in health services delivery." NCCHC survey teams monitor accredited facilities to ensure continued compliance with NCCHC standards.   "Importantly, accreditation also signals a constitutionally acceptable level of care for a facility's inmates, which translates into improved health status, fewer grievances and lawsuits, and reduced health risk to the community when inmates are released."  *See* http://www.ncchc.org/accreditation-programs.  Accreditation assures the public, staff and inmates that the inmates receive mental health care according to nationally accepted standards and helps recruit qualified mental health staff and professionals and maintain the morale of current staff and professionals.  *See* http://www.ncchc.org/mental-health-accreditation-overview.

Warden Fizer who oversees the Central Unit described his belief that there are sufficient mental health staff available for high acuity inmates at the Central Unit.  If an offender's mental health needs become too acute, the offender can be transferred to the Phoenix/Baker Ward.  If a bed is not immediately available, then the offender will be placed on pod watch on constant watch by correctional officers.

During my tour of the Eyman unit, I observed a separate group of staff members who were undergoing a tour of the unit.  I met the clinical director from the Phoenix, Baker Ward unit, Dr. Hauke, a doctoral level psychologist.  She explained that they were conducting cross

36

All of the ADC facilities accredited by the NCCHC met its standards for suicide prevention.

The following is a general description of the National Commission on Correctional Health Care (NCCHC):

> NCCHC originated as the AMA jail project and was incorporated as an independent nonprofit organization in 1983. Its mission is to improve the quality of health care provided in jails, prisons, and juvenile confinement facilities. The NCCHC board of directors comprises liaisons from 37 national organizations, including the American Academy of Child and Adolescent Psychiatry (AACAP), the American Academy of Psychiatry and the Law (AAPL), and the American Psychiatric Association (APA), and other organizations from the fields of medicine, public health, law, and corrections, as well as state and county associations.
>
> The NCCHC standards represent NCCHC's requirements for health services (e.g., nursing, medical, dental, and mental health and psychiatric) in state and federal prisons, jails, short-term detention, juvenile detention and other confinement settings, and U.S. Immigration and Customs Enforcement facilities. They are intended for use in evaluating the health services in correctional facilities, including those that are part of larger systems. Once implemented, the NCCHC standards can lead to increased efficiency of health services delivery, greater organizational effectiveness, better overall health protection for incarcerated adults and juveniles, reduced risk of liability related to health services, and NCCHC accreditation.
>
> Mental health care has been integral to the NCCHC standards and accreditation program from the start.

The following is a general description of the NCCHC Accreditation Process:

> Approximately 500 correctional facilities participate in NCCHC's accreditation program. These facilities are diverse in terms of jurisdiction, management structure, size, and inmate population, ranging from a juvenile facility with an average daily population of 10 to a large metropolitan jail complex housing 9,000 inmates. The average size of an accredited prison is more than 1,300 inmates. NCCHC is not a membership organization and there are no requirements to becoming accredited other than meeting the standards and adhering to NCCHC accreditation policies.

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

ADC448504

A correctional facility seeking accreditation first reviews the standards manual relevant to the setting to assess current compliance with the standards. The next step is to complete an application, followed by a self-survey questionnaire. NCCHC staff review the information on the questionnaire and work closely with the facility to help it prepare for an on-site survey. Once the facility feels ready, a survey is scheduled. Survey duration depends on the facility's size and the complexity of health services provided but is usually two or three days.

Survey teams are made up of highly qualified, rigorously trained physicians, nurses, health administrators, and other credentialed health professionals who understand corrections and combine that knowledge with their professional expertise. They conduct a review of health records as well as policies and procedures; interview health staff, correctional officers and inmates; and tour the facility to gather information. Surveyors use the same compliance indicators listed in each NCCHC standard to measure compliance. At the end of the survey, an exit conference is conducted to discuss their preliminary findings. These reviews are collegial and educational, with the survey team offering suggestions for improvement.

The NCCHC accreditation committee then reviews the survey team's report to evaluate compliance with the standards and make an accreditation decision. The facility receives a comprehensive written report that includes recommendations to assist with standards compliance. Once accredited, the facility will submit an annual report with updates on key information. Subsequent on-site visits occur about every three years.

I disagree with Drs. Stewart and Haney's assertion that ADC has inadequate suicide prevention policies and practices.  According to the Corizon CAG FAQ PBMS Report FY 14-March 2014 the statewide reported suicides from July 2013 to March 2014 was 7.  According to Dr. Taylor, ADC's "current completed suicide rate of 16-17 per 100,000 inmates is near the national average."   Will Barnow, ADC legislative liaison, sent the following data to Charles Ryan, ADC Director, in an email, dated 12/17/03:

"Suicide Rate:

- ADC had the 4th lowest suicide inmate rate of the 13 western states from 2001-2011.
-
- ADC suicide rate for this period was 18 per 100,000 inmates.
-
- New Mexico had a rate of 24 per 100,000 inmates and Utah had a

52

In summary, it is my professional opinion that these strategies related to the provision of mental health care to the inmate population are in keeping with established national "best practices" in correctional suicide prevention and also as recommended by national medication associations such as the American Psychiatric Association, and national correctional accreditation entities such as the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA).

**9.      Alleged Isolated Confinement.**

I disagree with Dr. Craig Haney's characterization of all of ADC's maximum custody units as "isolated confinement units."  As noted above, I have toured and inspected these facilities and observed the programs, activities and treatments available in the maximum custody units and do not believe they are "isolation units."

Segregation, based on my training and experience refers to isolation of an inmate in a cell for an average of 23 hours per day with limited direct human interaction. The term prolonged as used here refers to stays in such settings exceeding thirty days.

Alleged degrees of social isolation, sensory deprivation, and confinement can vary significantly, as will the responses by different inmates to the segregation experience. In general, decreased and altered social interactions appear to cause more mental health problems than does sensory deprivation. In fact, many segregation units impose sensory overstimulation (e.g., inmates yelling for communication purposes or for other reasons). Radios and television sets, which may be available in these housing units, can decrease or eliminate sensory deprivation, although the severe disruption in normal social interactions remains a problem (Metzner 2002). When sanctions exclude access to even these minimal diversions, however, inmates in segregation can experience adverse psychological effects from unrelenting inactivity and

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

ADC448525

8)      Correctional systems need to develop alternatives to prolonged segregation for inmates. Further studies are needed to examine the efficacy of different behavioral programs and activities to help identify which inmates respond best to which interventions.

It is my professional opinion that ADC makes multiple system wide, regional, and unit efforts to avoid restrictive housing settings except when clearly indicated and necessitated by an offender's disciplinary status, involvement in a security threat groups, or other violence risk factors.  It is also my opinion that they only utilize restrictive housing when indicated and in keeping with correctional practices nationally and in keeping with their policies and procedures, which are being continually revised, updated and there is an ongoing effort for continuous quality improvement and staff and offender education and staff training in particular.   It is my opinion that ADC has implemented multiple initiatives to avoid isolation, and they provide numerous opportunities for therapeutic programming, out of cell work assignments with rewards, and spontaneous non-correctional or health care staff prompted individual and group interaction and group physical exercise activities by ADC inmates in cell and in the outside recreational enclosures

It is my professional opinion that ADC staff and Corizon staff follow routine medical, nursing, and mental health "segregation" clearance and rounds and other nationally promulgated policies and procedures as per NCCHC and ACA.  "Segregation" is a high risk housing area with a disproportionate number of suicides compared to general housing units. Inmates may be placed in segregation for protective custody, disciplinary infractions, or administrative reasons (e.g., affiliation with a gang, assault history). Within 72 hours of placement in segregation, ADC and Corizon provide mental health screening to assess suicide risk and determine whether an inmate's serious mental illness may worsen in this environment. Smaller non-corridor ADC

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER                  ADC448531

# EXHIBIT 6

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, )))))))))))) | No. CV12-00601-PHX-NVW (MEA) |
| Plaintiffs, )) | |
| vs. )) | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, )))))))))) | |
| Defendants. )) | |

VIDEOTAPE DEPOSITION OF

JOSEPH V. PENN, MD, CCHP, FAPA

April 11, 2014
9:32 a.m.
Phoenix, Arizona

*Glennie Reporting Services, LLC*
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

602.266.6535
www.glennie-reporting.com

Prepared by:
Carolyn T. Sullivan, RPR
Arizona CR No. 50528

JOSEPH V. PENN, MD, CCHP, FAPA - 4/11/14

```
 1              MS. WIENEKE:  Form.
 2              THE WITNESS:  I have reviewed NCCHC
 3   accreditation reports of all three of those facilities --
 4         Q.   BY MR. FATHI:  Doctor, you need to answer my
10:56:00  5   question.
 6         A.   Okay.
 7              MR. FATHI:  Would you read the question
 8   back, please.
 9              (The requested portion of the record was
10:56:03 10   read by the reporter.)
11              MS. WIENEKE:  The question was to records.
12   You can answer the question.
13              THE WITNESS:  That's correct.  I -- I am
14   prepared to an -- to give an opinion about -- medical and
10:56:33 15   mental health care at those facilities even -- even
16   though not having gone there or reviewed specific
17   individual records, yes.
18         Q.   BY MR. FATHI:  I'm sorry, you just said medical
19   care.  Are -- are you going to be providing opinions on
10:56:46 20   medical care also?
21         A.   If I were to be asked.  As a physician, as a
22   psychiatrist, as a medical doctor, I -- I believe that I
23   could answer questions about medical conditions.  I think
24   many psychiatric conditions have an overlap or overlay
10:57:05 25   with medical conditions, and I actually just presented a
```

JOSEPH V. PENN, MD, CCHP, FAPA - 4/11/14

1      Q.    Describe the process by which these 17 charts
2   were selected.
3      A.    I asked the health information services
4   director or staff, I don't know if they were the director
11:08:07  5   or the staff member, basically, this is how I would like
6   charts pulled because I want to get a random sampling
7   of -- of charts, specifically offenders identified as
8   having a serious mental illness.  And so that's what I
9   asked them to do.  I asked them to pull a random sample
11:08:36  10  of offenders, ADC offenders with serious mental illness.
11     Q.    And how did they do that?
12     A.    I don't work in health information systems, so
13  I don't know how they would have done that.
14     Q.    And is your answer the same for the Tucson
11:08:53  15  charts and the Lewis charts?
16     A.    What I did was -- I basically said the same
17  thing.  I'd like the same methodology of, you know, run a
18  caseload of all the mentally ill -- offenders with mental
19  illness and then do a random -- and I forget specifically
11:09:20  20  if they were doing it like every third or every fourth
21  person or every other person.  I -- I don't know how they
22  did that.  But I -- I did ask them for it to be a random
23  sample.  And I -- I certainly could speak more to a
24  random sampling with regard to NCCHC accreditations and
11:09:36  25  how that's an important process rather than hand

JOSEPH V. PENN, MD, CCHP, FAPA - 4/11/14

1   didn't do that in this case.

2        Q.    Well, when you reviewed a medical record and

3   you didn't take notes on your review --

4        A.    Uh-huh.

11:18:36  5        Q.    -- how did you record what you learned from

6   that record?

7        A.    Well, this gets to the whole NCCHC

8   accreditation survey training that I have.  I -- I'm

9   certified as a correctional health professional and also

11:18:56 10  have gone through and received training and ongoing

11  training as a -- as a surveyor for the NCCHC, National

12  Commission on Correctional Health Care.  So when we go

13  and survey facilities, our -- our standard process is not

14  to take handwritten notes on every single chart we review

11:19:15 15  but to look at the totality of the records and the health

16  care that's being delivered, access to care, looking at

17  all the records.

18              So that -- I -- I think the real reason is

19  just the shear volume of records in this case and my

11:19:33 20  time, which I have a full-time daytime job, and so I'm

21  doing this after hours and on weekends, and I try to

22  squeeze this kind of work in when I can.  And so the

23  short answer is, I learn from things that I do.  And --

24  and I applied more of an NCCHC accreditor/surveyor

11:19:57 25  methodology to this process rather than detailed notes on

1   mental illness who's been seen -- if I'm not mistaken,

2   seen recently or in the last month.  And I asked that

3   those charts be randomly pulled.

4       Q.   So the -- the population from which you were

11:27:29  5   sampling was limited to people who had been seen in the

6   last month?

7       A.   No.  I mean, I -- I think -- I don't recall

8   specifically if it was just people on the mental health

9   caseload, people with serious mental illness, or people

11:27:45 10   that had been seen recently or people in the last month.

11   That, I don't recall.

12       Q.   And how concretely was this sample of ten

13   generated?

14       A.   Sorry, I'm not sure I understand your question.

11:27:57 15   How concretely?

16       Q.   How did they come up with these ten names?

17       A.   I have no idea.

18       Q.   Okay.  Now, let's move on to some of your

19   opinions.

11:28:20 20            What is your overall opinion as to ADC's

21   mental health care as it existed on September 27th, 2013?

22       A.   Well, I've -- I've listed all my opinions in

23   the report.  I -- it's my opinion that based on my review

24   of records, touring, speaking to people, and reviewing

11:28:52 25   NCCHC accreditation reports, looking at policies and

 1    don't say anything out of turn here, that attorney Lopes

 2    let me know that there had been some concerns because of

 3    my work in the Arizona litigation that the California --

 4    I believe it's the PLO, the -- and I don't know what

12:10:21  5    that -- Prison -- I forget what that acronym stands for.

 6    But that they were objecting that they -- they didn't

 7    want me involved in that because of my defense work in

 8    this case.

 9                So if I could just -- what I understand is

12:10:37 10    I've kind of recused myself.  I'm not currently active on

11    that group or team of people that are involved.  So

12    that's my understanding of where my -- my role or my

13    agency at the present time is with that -- with that

14    work.

12:11:04 15                But I'd be happy -- I mean, if -- if that

16    can all get worked out, I -- I have no bias.  I have

17    no -- I have no skin in the game, and I'm happy to help

18    consult and help systems get better wherever they are.

19         Q.    Okay.  Would you turn to page 11 of your

12:11:37 20    report, please.

21         A.    Sure.

22         Q.    And on page 11, going onto page 12, you cite

23    various NCCHC accreditation letters pertaining to ADC

24    facilities.  Do you see that?

12:12:05 25         A.    Yes.

JOSEPH V. PENN, MD, CCHP, FAPA - 4/11/14

1      Q.    Now, as of the time of your December 18th

2  report, Lewis had last been accredited in 2010, correct?

3  This is at the top of page 12.

4      A.    That's according to this, but I don't know if

12:12:37  5  there's been any subsequent documentation or additional

6  reviews by NCCHC, but --

7      Q.    Doctor, my -- my question --

8      A.    Yeah.

9      Q.    -- specifically asked at the time of this

12:12:51 10  report.

11      A.    That's the -- November 17, 2010, is the last

12  accreditation letter that I cited in this report, yes.

13      Q.    Okay.  And as of the time of -- of your report,

14  the Yuma and Florence facilities had last been accredited

12:13:06 15  in 2011, correct?

16      A.    Yes.

17      Q.    Okay.  Did you rely on these reports from 2010

18  and 2011 in assessing ADC's mental health care as of

19  December 2013?

12:13:25 20      A.    Yes.

21      Q.    Okay.  Is the Eyman facility accredited by

22  NCCHC?

23      A.    It's my understanding that they are not.

24      Q.    Has the Eyman facility ever been accredited by

12:13:39 25  NCCHC?

JOSEPH V. PENN, MD, CCHP, FAPA - 4/11/14

1      A.    You would probably have to ask NCCHC.  I don't

2  know, you know, the 20- or 30-year history or however

3  long that facility has been there.  But I -- I don't

4  believe they're currently accredited, no.

12:13:53  5      Q.    And you don't know if they've ever been

6  accredited?

7      A.    Correct.

8      Q.    Would you turn to Tab 10, please.  And would

9  you turn to page Wexford 064, please.  The heading at the

12:14:26 10  top of the page is Dysfunctional Culture.  And the last

11  bullet point on page Wexford 064 is, quote:  Staff

12  shortages have existed for so long that site level

13  employees have become complacent with operating below

14  industry standards.  End of quote.

12:14:48 15           Doctor, did you take the statement by

16  Wexford Health Sources into account in forming your

17  opinions?

18           MS. WIENEKE:  Object to the form,

19  foundation.

12:15:00 20           THE WITNESS:  No.  Because this is the first

21  time that I've seen this document.  I mean, I can try to

22  explain the interface of private -- private vendors and

23  correctional systems --

24      Q.    BY MR. FATHI:  Doctor, you've -- you've

12:15:14 25  answered the question.

```
         1        A.    I have no reason to disagree with Dr. Shaw.
         2   What I'm saying is you have to take this into perspective
         3   of the totality of they're trying to make changes and
         4   improvements to their system.  They still are remaining
12:22:02 5   NCCHC accredited.  If -- if things were as bad or as dire
         6   as it appears in this memo, I think NCCHC could have
         7   easily put them on probation or -- or taken away their
         8   accreditation.  So, again, I -- I -- I have no reason to
         9   dispute what Dr. Shaw wrote here in this memorandum.
12:22:26 10       Q.    Okay.  And further down the page, the same
        11   page, Dr. Shaw writes, quote:  Wexford's psychiatry
        12   staffing is insufficient to provide a safe level of
        13   services.  End quote.  Do you disagree with that
        14   statement by Dr. Shaw?
12:22:41 15            MS. WIENEKE:  Form.
        16            THE WITNESS:  I don't disagree with
        17   Dr. Shaw's statement.  That was his -- in his role as the
        18   contract monitor, that's what he's saying, so I have no
        19   reason to -- to dispute that because I don't have any
12:22:59 20   firsthand knowledge.  But the point is, and I really want
        21   to be able to answer this, that when you're short on
        22   psychiatrists, often your medical staff will help out and
        23   help renew medications.  Nurses will identify which
        24   offenders -- which medications are about to run out.  So
12:23:21 25   there's the capability within a correctional system,
```

 1   say "you shall" or "you must" or "you" -- all it says is

 2   "it has been suggested."  So that's -- "it is suggested"

 3   is not a definitive standard of care.  And this is just a

 4   task force report.  And, you know, we're in the process

02:05:57  5   of rewriting it or revising it.  So hopefully we'll get

 6   more clarity on this issue.

 7       Q.   So it's your testimony that that is not a

 8   psychiatric staffing ratio?

 9               MS. WIENEKE:  Object to the form.

02:06:08 10               THE WITNESS:  It's my opinion that that is a

11   recommendation, but it is not widely agreed upon within

12   the correctional community.

13       Q.   BY MR. FATHI:  Is it your opinion that that is

14   not a psychiatric staffing ratio?

02:06:29 15               MS. WIENEKE:  Form.

16               THE WITNESS:  It is a suggestion about

17   psychiatric staffing ratios.  And just to be very clear,

18   NCCHC, ACA, and Joint Commission do not have that.  This

19   is one document, the APA, that you're citing.  But

02:06:50 20   there's nothing in the NCCHC, which accredits

21   correctional facilities, or the ACA --

22       Q.   BY MR. FATHI:  Doctor, there is no question

23   pending.  I'm going to ask you again to please not answer

24   non-existence questions.

02:07:03 25               Does ADC have one FTE psychiatrist for every

JOSEPH V. PENN, MD, CCHP, FAPA - 4/11/14

1          MR. FATHI:  Would you read the question
2     back.
3          (The requested portion of the record was
4     read by the reporter.)
03:21:52 5          THE WITNESS:  It's my professional opinion
6     that it could hypothetically cause a risk of harm, but
7     facilities are trained to and staff are trained to take
8     measures to avoid that risk or to reduce the risk.  So it
9     doesn't pose an excessive risk of harm.
03:22:12 10     Q.    BY MR. FATHI:  How are cell temperatures
11     monitored at the Florence Complex?
12     A.    I don't know.
13     Q.    But you're confident that they are
14     appropriately monitored by trained correctional staff,
03:22:24 15     correct?
16          MS. WIENEKE:  Form.
17          THE WITNESS:  Well, the facilities are NCCHC
18     accredited, and typically NCCHC looks at all those
19     different issues.  The accreditation team that would come
03:22:36 20     out and survey them would look at all of those different
21     variables.  I'm not a corrections or custody expert.  If
22     you had documentation showing that there have been
23     multiple fatalities due to hyperthermia heat-related
24     death, I would be happy to review that, but I'm not aware
03:23:00 25     of any cases to date where there's a clear cause and

# EXHIBIT 7

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn Jensen; | ) | No. CV12 00601 |
| Stephen Swartz; Dustin Brislan; | ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco; | ) | |
| Jackie Thomas; Jeremy Smith; Robert | ) | |
| Gamez; Maryanne Chisholm; Desiree | ) | |
| Licci; Joseph Hefner; Joshua Polson; | ) | |
| and Charlotte Wells, on behalf of | ) | |
| themselves and all others similarly | ) | |
| situated; and Arizona Center for | ) | |
| Disability Law, | ) | |
| | ) | |
|          Plaintiffs, | ) | |
|      vs. | ) | |
| | ) | |
| Charles Ryan, Director, Arizona | ) | |
| Department of Corrections; and | ) | |
| Richard Pratt, Interim Division | ) | |
| Director, Division of Health | ) | |
| Services, Arizona Department of | ) | |
| Corrections, in their official | ) | |
| capacities, | ) | |
| | ) | |
|          Defendants. | ) | |
| | ) | |

DEPOSITION OF JOSEPH V. PENN, MD, CCHP, FAPA

September 30, 2014
10:03 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

602.266.6535
www.glennie-reporting.com

Prepared by:
Carolyn T. Sullivan, RPR
Arizona CR No. 50528

1   put the reference, the article reference.  And I don't

2   have a bibliography, so typically I just write the

3   citation with the article or source, but I don't

4   typically write the page numbers.

5        Q.    Would you turn to page 23 of your report,

6   please.  Now, the second half of page 23 consists of a

7   number of indented paragraphs, and you say that the

8   following is an example from the NCCHC standards.  Do you

9   see that, Doctor?

10       A.    Yes.

11       Q.    What is the source of the language quoted in

12  these indented paragraphs?

13       A.    I believe that's either the NCCHC prison

14  standards or the NCCHC mental health standards where

15  that's cited from.

16       Q.    Why did you not provide the title of the work

17  that you were citing?

18       A.    Well, a couple of things.  I mean, I could have

19  been a little more precise in that.  It's my

20  understanding that all -- all three different sets of

21  standards -- actually, there's four different standards.

22  There's the jail, the prison, the mental health, and then

23  there's the opioid treatment standard.  So there's four

24  different standards.  If I'm not mistaken, I believe that

25  all four of the standards would include that language

20

1    verbatim.  But, sure, I probably could have put prison

2    standards or mental health standards, if I'm not

3    mistaken.

4        Q.    Well, whatever the source turns out to be, is

5    the language on page 23 of your report a verbatim

6    quotation from that source?

7        A.    Unless if I made a mistake in typing it or got

8    a typo or misspelled a word, yes, it's very much

9    verbatim.

10       Q.    Did you omit any language from this quotation?

11       A.    Not intentionally, no.

12       Q.    Now, immediately before that indented quotation

13   begins, you write, quote:  NCCHC has consistently not

14   made staffing recommendations.  End of quote.

15            Do you see that, Doctor?

16       A.    Yes, I see that.

17       Q.    Is it your testimony that NCCHC has

18   consistently not made staffing recommendations?

19       A.    I think that's fair, yes.

20       Q.    And is that your testimony just with regard to

21   mental health care or with regard to any kind of health

22   care staffing?

23       A.    I would say that NCCHC has taken that position

24   and made that recommendation across correctional health

25   care, be it medical, dental, nursing, or mental health

21

1    care, yes.

2        Q.    So it's your testimony that NCCHC has

3    consistently not made staffing recommendations for any

4    kind of correction health care, correct?

5        A.    Well, I wanted to be clear that they -- they

6    basically clarify -- they provide guidance or language

7    about that you have to provide services, you know,

8    sufficient numbers and types of staff to care.  But as

9    far as giving a number or percentage or ratios, they

10   don't go that far.

11       Q.    For any kind of correctional health care?

12       A.    Not to the best of my knowledge, no.

13       Q.    Doctor, in preparing this report, did you

14   review the MGAR reports?

15       A.    Yes, I did.

16       Q.    For which facilities?

17       A.    Well, and I'd need to refer to my -- the

18   Appendix A that has all the documents that I reviewed.  I

19   can't really answer that question because, as I

20   understand it, ADC prisoners typically move from facility

21   to facility.  So I reviewed -- I reviewed MGAR reports.

22   I'm not sure if I can answer specifically by facility.

23   But the short answer is yes, I reviewed MGAR reports.

24       Q.    But you're not able to tell me for which

25   facilities?

53

1   clarified for me, and it's in my report, is that if a bed

2   is not available, that person could be watched or kept on

3   a constant observation until a bed became available.

4           So the best practice or the intent is to get

5   them transferred to Baker as soon as possible.  And they

6   do whatever they can to -- they'll do an independent van

7   transfer and they'll make that happen.  But if there's

8   not a bed available that they will keep that person safe

9   until a bed is available, which would be a day or two at

10  the most.

11      Q.    So the transfers to Baker Ward do not in fact

12  always occur on the same day, correct?

13              MS. LOVE:  Form and foundation.

14              THE WITNESS:  Well, in medicine, like we --

15      Q.    BY MR. FATHI:  Yes or no, Doctor?

16              MS. LOVE:  Same objections.

17              THE WITNESS:  There's never an "always."  So

18  I would say that it's likely that there may have been

19  cases where a transfer did not occur within the same day,

20  yes, that's fair.

21      Q.    BY MR. FATHI:  Okay, thank you.

22              Would you turn to page 36, please.  The

23  first full paragraph on page 36, you write, quote:  ADC

24  has also achieved and maintained NCCHC accreditation.

25  End of quote.

54

```
 1              Do you see that, Doctor?
 2      A.    Yes.
 3      Q.    Is it your testimony that ADC as a system is
 4  accredited by NCCHC?
 5      A.    I can try to answer that, but I think the
 6  people that would be able to answer that question better
 7  would be the ADC leadership or NCCHC leadership.  I can
 8  tell you my understanding --
 9      Q.    Well, let me just clarify.  You wrote in your
10  report:  ADC has also achieved and maintained NCCHC
11  accreditation.
12      A.    Yes.
13      Q.    Is it your testimony that ADC, as a system, is
14  accredited by the NCCHC?
15      A.    It's my understanding that all of the units
16  except for Eyman have NCCHC accreditation.  So as I sit
17  here today, I can't say the entire system, but I can say
18  the majority or all but one unit have achieved and
19  maintained NCCHC accreditation.
20      Q.    Further down the page, you -- second full
21  paragraph, you are writing about Warden Fizer.  And you
22  write that he, quote:  described his belief that there
23  are sufficient mental health staff available for high
24  acuity inmates available at the Central Unit.  End of
25  quote.
```

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

NO. 2:12-cv-00601-NVW

## CONFIDENTIAL EXPERT REPORT OF:

Lawrence H. Mendel, D.O., FSCP, CCHP
1255 N. Hamilton Road, #71
Columbus, OH  43230
TELEPHONE: (614) 471-8151

## REGARDING
## MEDICAL HEALTHCARE AT THE ARIZONA DEPARTMENT OF CORRECTIONS

DECEMBER 18, 2013

Lawrence H. Mendel, D.O., FSCP, CCHP

also a Certified Correctional Healthcare Professional and a member of three national correctional healthcare organizations.  Additionally, I regularly attend correctional medical conferences and have participated in more than thirty during my time in correctional care.

In my capacity as a consultant and an NCCHC accreditation surveyor, I have worked with prison systems in ten states and have audited medical care in prisons in twelve states and jails in five.  In addition to my work in correctional consulting, I have had a special interest in facilities designed for correctional medical care and have toured eleven correctional medical facilities in nine states.  My Curriculum Vitae is attached as Exhibit A.  A list of my recent trial and deposition testimony is attached as Exhibit B.

In addition to my work in the correctional medicine field, I also worked as an emergency physician at several hospitals in Ohio from 1983 through 1988.  I am Board Certified in Family Practice and a fellow of the Society of Correctional Physicians.  I also hold a faculty appointment with The Ohio State University as an Assistant Clinical Professor of Family Medicine.

My compensation for this work is $175 per hour for document review and site visits, $250 per hour for report preparation, and $350 per hour for trial or deposition testimony.

**B.**     **Methodology**

The Plaintiffs' experts use an impressionistic methodology based on isolated incidents culled from conversations with inmates and review of certain charts selected by the Plaintiffs' lawyers.  In so much as Plaintiffs' experts identify and discuss less than 0.35% of the inmates housed in the ten Complexes at issue in this litigation, I do not believe that any valid conclusions about gross systemic deficiencies can be drawn.  Rather, any evaluation of alleged systemic faults needs to be considered based upon system-wide information or, at minimum, a properly selected statistically significant sample size.  Alternatively, system-wide data as to health care

CONFIDENTIAL INFORMATION - PROTECTIVE ORDER                    ADC203765

consults had been approved and scheduled and the Neuro-ophthalmology consult had been submitted according to the grievance response. A grievance from Yuma filed in September complained of not being seen in follow-up for a hand injury that occurred in February. He was scheduled and had been seen by a provider according to the response. Yuma equipment and supply requests included a request for contact lens solution and another for CPAP repair. The contact lens solution was ordered according to the response. The facility reported they were trying to find the necessary CPAP parts. At Lewis, there were requests for a wedge pillow, medical shoe order, a catheter clamp for urinary incontinence, and hearing aids. The wedge pillow, shoes, and catheter clamp were approved. The hearing aid request was pending.

As a group, the grievances do not reflect a persistent pattern of poor access to care, inadequate emergency care, lack of availability of ordered medication or lack of availability of specialty care. Nor is there a pervasive pattern that demonstrates inadequate staffing or a failure to adequately chronic diseases.

## III.   STANDARDS

As a result of my training and experience, I am familiar with the applicable standards of correctional healthcare.

### A.   NCCHC Standards

The National Commission on Correctional Healthcare (NCCHC) is the leading national organization in the development of healthcare standards for correctional facilities. The mission of the NCCHC is to improve the quality of health care in jails, prisons, and juvenile confinement facilities. With support from the major national organizations representing the fields of health, law, and corrections; NCCHC's leadership has established standards for health services for correctional facilities. These standards serve as a framework to ensure that systems, policies, and procedures are keeping with nationally recognized best practices.

CONFIDENTIAL INFORMATION - PROTECTIVE ORDER          ADC203768

NCCHC's leadership in setting standards for correctional health care is unsurpassed, rooted in long experience, deep knowledge, and invaluable contributions from the leading experts in the fields of health, law, and corrections. As health care evolves, so do the accreditation standards and responses to contemporary concerns and practices.

As one method of achieving that mission, NCCHC accredits both facilities and provides individual certification for providers and administrators. A facility seeking accreditation must apply with NCCHC and submit to an on-site survey by NCCHC's accreditation team. The accreditation team includes a number of individuals with a range of background and typically many years of correctional experience. The survey process includes chart audits, review of facility policies and procedures, inspection of the facilities, and interviews with healthcare staff, custody staff and inmates with questions that address access to care, emergency procedures, and is designed to assure that policy and procedures are implemented in a manner consistent with the stated policy. The survey process inspects virtually every aspect of a prison operation and physical plant. NCCHC accreditation is valid for three years, after which a facility must undergo another on-site survey to maintain its accreditation. To be accredited under the 2008 Prison Health Standards, a facility must be 100% compliant with the applicable Essential NCCHC Standards, and 85% compliant with the applicable Important NCCHC Standards.

**B.**     **ADC Accreditation**

ADC facilities were already accredited by the NCCHC prior to the time of the current litigation. NCCHC accreditation teams inspected ADC facilities on the following dates:

1. Douglas        March 26-28 of 2012

2. Florence       September 7-10 of 2010

3. Lewis          January 11-14 of 2010

4. Perryville     April 10-13 of 2012

6

found them to be well managed and organized.  I also spoke with several schedulers and reviewed off-site care logs.  Both of these areas appear to function properly.

### D. Quality Assurance Programs

Quality Assurance programs were found to be deficient at several sites by the NCCHC accreditation survey teams, but these deficiencies have been corrected to the satisfaction of the NCCHC accreditation committee.  The CQI process has been fundamentally changed by Corizon and new processes are in place.

### E. Specialized Care

Dr. Cohen claims that more inmates require specialized placement than Arizona can accommodate and that Arizona has not provided adequate medical beds for disabled prisoners, aged inmates, and prisoners who need some form of sheltered living due to their medical or mental health conditions.  During my site visits, I inquired into how ADC accommodates transfer requests if bed space is insufficient and was advised that in some cases patients have to remain in the hospital longer if infirmary space is unavailable.  This is the same process that occurs in the community when hospital discharge can be delayed pending nursing home placement.

Moreover, none of the infirmary units were full when I visited in September, and Florence was in the process of opening a new IPC unit that is now operational.  They have increased the IPC beds by 44% to 156 in the past year.  Tucson also opened and staffed a disabled housing unit during the summer of 2013.  Additionally, there is also a contract with Select Specialty hospital – a long-term care hospital that can house more complex patients or serve as a resource if infirmary demand increases.  During the month of September, seven ADC inmates were hospitalized at Select.  It is clear that sufficient capacity exists to respond to these needs and ADC has demonstrated the capacity to respond and adapt as necessary.

CONFIDENTIAL INFORMATION - PROTECTIVE ORDER          ADC203809

# EXHIBIT 9

# (REDACTED)

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

Victor Parsons, *et al.*, on behalf of themselves
and all others similarly situated; and Arizona
Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department
of Corrections; and Richard Pratt, Interim
Division Director, Division of Health Services,
Arizona Department of Corrections, in their
official capacities,

Defendants.

NO. 2:12-cv-00601-NVW


## CONFIDENTIAL SECOND SUPPLEMENTAL EXPERT REPORT OF:

Lawrence H. Mendel, D.O., FSCP, CCHP
1255 N. Hamilton Road, #71
Columbus, OH 43230
TELEPHONE: (614) 471-8151


## REGARDING
## MEDICAL HEALTHCARE AT THE ARIZONA DEPARTMENT OF CORRECTIONS

MARCH 26, 2014

Lawrence H. Mendel, D.O., FSCP, CCHP

Wilcox's reports.  Of the 17 pregnancy charts reviewed, Dr. Wilcox found that the care was appropriate in 16 of the charts.  A finding that almost 73% of the care was within the standard of care, and that 94% of all pregnancy charts reviewed were within the standard of care confirms my opinion that the alleged systemic deficiencies simply do not exist.

Similarly, Dr. Cohen produced notes pertaining to his interviews and/or records review of only 92 inmates.  Yet, less than half of them (41 inmates) are mentioned in his reports.

Finally, Dr. Williams produced notes pertaining to her interviews and/or record review of 60 inmates.  Similarly, she only discusses 20 of those inmates in her reports.  Notably, she does not mention inmates such as ██████████████████ where she noted "no concerns" (WILLIAMS000007); or ████████████████ where she noted "no concerns except getting out in September." (WILLIAMS000006).

While I have not yet learned of the specific methodology used by Plaintiffs' three medical experts to determine which medical records would be reviewed and which inmates would be interviewed during the various site visits, it is apparent to me that Drs. Wilcox, Cohen, and Williams have cherry-picked what they believe to be the "most egregious" examples of care to cite to in their reports.   By doing so, they have created the misimpression that medical care in Arizona Department of Corrections facilities is grossly inadequate and that all inmates are at "significant risk" of harm.  It would have been far more appropriate to have reviewed a random sample of records in order to make a determination as to whether or not systemic deficiencies exist.   Furthermore, in their reports, Drs. Wilcox, Cohen and Williams frequently omit other essential information, including NCCHC accreditations or gross statistical data necessary to form an opinion as to whether or not any systemic deficiencies exist in the ADC medical system.

**<u>Conclusion:</u>**

The death records reflect that the ADC mortality rate is lower than the national average for all mortality rates maintained by the Bureau of Justice cited in my initial report.  The death records reviewed   do not indicate a systemic deficiency in the delivery of or access to medical care in the Arizona Department of Corrections.

# EXHIBIT 10

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-NVW |

## CONFIDENTIAL SUPPLEMENTAL EXPERT REPORT OF:

John W. Dovgan, DDS
3841 E. Thunderbird Road, Ste. 101
Phoenix, AZ  85032
TELEPHONE: (602) 867-1899

## REGARDING
## DENTAL CARE AT THE ARIZONA DEPARTMENT OF CORRECTIONS

March 26, 2014

John W. Dovgan, DDS

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC203111

> standard of care within the correctional clinical arena, rather than the fact that the treatment is rendered in a secured surrounding. Similarly, oral surgery and endodontic services are delivered comparably within a correctional environment.

Dr. Shulman is also critical in his reports of the National Commission on Correctional Health Care (NCCHC) standards for oral care, claiming that these standards are themselves below the standard of care.  Yet in prior cases in which he has served as a dental monitor and been responsible for writing and/or approving dental policies, he has embraced the NCCHC as defining the community standard.  *See, e.g.,* JDS002050.  Additionally, the ADA recognizes the NCCHC as being at the forefront of correctional dentistry and has included articles regarding the NCCHC in the Journal of the American Dental Association (JADA)[1] as recently as January of 2014 of this year.

Dr. Shulman is also critical of NCCHC accreditation, complaining that "the NCCHC reviewers found no adverse findings related to the dental program. The reviewers failed to note problems with the substance of ADC policies."  I agree with the NCCHC reviewers, as I found no adverse findings related to the dental policies or the dental program. When I found extended treatment times for routine or urgent care, it was because ADC policies as set out in the Dental Services Technical Manual (DSTM) and the contract were not being followed.

## IV.   **ADC POLICIES**

Dr. Shulman asserts that ADC policies and procedures regarding (1) dental assistant triage, (2) prioritization of HNRs regarding pain and lost or fractured restorations, and (3) removal of inmates from the routine care list when they submit an HNR for pain place all ADC inmates at risk of dental injury.  Shulman Supplemental Report at 4-5.  I disagree both with Dr. Shulman's assessment that ADC policies place inmates at risk of dental injury and with his position that he does not need to show that any particular inmates, including the named plaintiffs, suffered any dental injury as a result of ADC's policies.  It is my opinion, as stated in my prior report and below, that ADC policies and procedures regarding dental assistant triage are within the standard of care.  I disagree with Dr. Shulman that lost or fractured restorations and complaints of tooth sensitivity should be prioritized as urgent care and that ADC's decision not to do so places inmates at risk of dental injury.  Similarly, I disagree that requiring inmates to

---

[1]  JADA is recognized as being the most respected source for dentists in America.

2

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC203113

# EXHIBIT 11

# (REDACTED)

1   Daniel P. Struck, Bar No. 012377
    Rachel Love, Bar No. 019881
2   Timothy J. Bojanowski, Bar No. 022126
    Nicholas D. Acedo, Bar No. 021644
3   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    3100 West Ray Road, Suite 300
4   Chandler, Arizona  85226
    Telephone:  (480) 420-1600
5   Fax:  (480) 420-1695
    dstruck@strucklove.com
6   rlove@strucklove.com
    tbojanowski@strucklove.com
7   nacedo@strucklove.com

8   *Attorneys for Defendants*

9                    **UNITED STATES DISTRICT COURT**

10                        **DISTRICT OF ARIZONA**

11

12  Victor Parsons, *et al.*, on behalf of themselves        NO. 2:12-cv-00601-ROS
    and all others similarly situated; and Arizona
    Center for Disability Law,

13                                                            **DEFENDANTS' FIRST**
                                                Plaintiffs,   **SUPPLEMENTAL PRETRIAL**
14                                                            **DISCLOSURE STATEMENT**
                v.

15  David Shinn, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim
16  Division Director, Division of Health Services,
    Arizona Department of Corrections, in their
17  official capacities,

18                                              Defendants.

19          Defendants, through counsel and pursuant to Federal Rule of Civil Procedure

20  26(a)(1) and the Court's Orders (Doc. 3931, 3940), submit their **First Supplemental**

21  Pretrial Disclosure Statement. **This is a cumulative disclosure. Supplemental**

22  **information appears in bold typeface. Any information which is withdrawn is deleted.**

23  Defendants will supplement and/or amend these disclosures as trial preparation progresses.[1]

24

25

26

27          _____
            [1] Defendants will provide 26(a)(2)(c) disclosures by the expert witness disclosure
28  deadline.

477. **August 9, 2019 letter to David Fathi regarding Suicide of ███████ ███████ – ASPC-Tucson (ADCRR00138319).**

478. **June 19, 2021 letter from Allison Hardy regarding Inadequate Emergency Response to Class Member Suicide (PM 25) (ADCRR00138320-00138321).**

479. **July 1, 2021 letter to Allison Hardy regarding Inadequate response to Class Member suicide (PM 25) (ADCRR00138322).**

480. **May 17, 2019 letter from David Fathi regarding Class Member Suicide (ADCRR00138323-00138337).**

481. **May 28, 2019 letter to David Fathi regarding Class Member Suicide, ███████████████████████ ADCRR00138228-00138340).**

482. **Centurion Mental Health Roster, with licensure types, June 2021 (ADCRR00138341-00138344).**

483. **ADCRR NCCHC Accreditation Listing and certificates of accreditation, as of August 2, 2021 (ADCRR00138345-00138357).**

484. **ADCRR NCCHC Accreditation Listing, updated August 18, 2021 (ADCRR00138358).**

485. **Exhibit 14, to Solicitation No. ADOC18-0008264, NCCHC Information (ADCRR00138359).**

486. **February 8, 2019 NCCHC Accreditation Report for ASPC-Douglas (ADCRR00138360-00138417).**

487. **October 2016 NCCHC Certificate of Accreditation for ASPC-Eyman (ADCRR00138418).**

488. **October 23, 2016 NCCHC Accreditation Report for ASPC-Eyman (ADCRR00138419-00138440).**

489. **July 18, 2017 NCCHC Accreditation Update Report for ASPC-Eyman (ADCRR00138441-00138451).**

490. **October 20, 2017 NCCHC Accreditation Update Report for ASPC-Eyman (ADCRR00138452-00138458).**

491. **May 29, 2020 NCCHC Accreditation Report for ASPC-Eyman (ADCRR00138459-00138522).**

492. **November 9, 2020 NCCHC Accreditation Update Report for ASPC-Eyman (ADCRR00138523-00138543).**

493. **January 15, 2021 NCCHC Accreditation Update Report for ASPC-Eyman (ADCRR00138544-00138549).**

494. **June 2017 NCCHC Certificate of Accreditation for ASPC-Florence (ADCRR00138550).**

495. **June 30, 2017 NCCHC Accreditation Report for ASPC-Florence (ADCRR00138551-00138572).**

496. **January 16, 2018 NCCHC Accreditation Update Report for ASPC-Florence (ADCRR00138551-00138588).**

497. **March 29, 2018 NCCHC Update Accreditation Report for ASPC-Florence (ADCRR00138589-00138593).**

498. **April 30, 2021 NCCHC Accreditation Report for ASPC-Florence (ADCRR00138594-00183652).**

499. **January 16, 2016 NCCHC Focused Survey Report for ASPC-Lewis (ADCRR00138653-00138661).**

500. **June 22, 2018 NCCHC Accreditation Report for ASPC-Lewis (ADCRR00138662-00138686).**

501. **February 8, 2019 NCCHC Accreditation Update Report for ASPC-Lewis (ADCRR00138687-00138703).**

502. **July 19, 2019 NCCHC Accreditation Update Report for ASPC-Lewis (ADCRR00138704-00138714).**

503. **November 2, 2016 NCCHC Accreditation Update Report for ASPC-Perryville (ADCRR00138715-00138721).**

504. **February 8, 2019 NCCHC Accreditation Report for ASPC-Perryville (ADCRR00138722-00138777).**

505. **July 25, 2019 NCCHC Accreditation Update Report for ASPC-Perryville (ADCRR00138778-00138784).**

506. **December 4, 2019 NCCHC Accreditation Update Report for ASPC-Perryville (ADCRR00138785).**

507. **December 15, 2016 NCCHC Accreditation Update Report for ASPC-Phoenix (ADCRR00138786-00138793).**

508.  **November 16, 2018 NCCHC Accreditation Report for ASPC-Phoenix (ADCRR00138794-00138811).**

509.  **May 23, 2019 NCCHC Accreditation Update Report for ASPC-Phoenix (ADCRR00138812-00138816).**

510.  **October 15, 2019 NCCHC Accreditation Update Report for ASPC-Phoenix (ADCRR00138817-00138818).**

511.  **August 18, 2016 NCCHC Accreditation Update Report for ASPC-Safford – Fort Grant Unit (ADCRR00138819-00138823).**

512.  **February 8, 2019 NCCHC Accreditation Report for ASPC-Safford – Fort Grant Unit (ADCRR00138824-00138877).**

513.  **February 8, 2019 NCCHC Accreditation Report for ASPC-Safford (ADCRR00138878-00138931).**

514.  **February 24, 2017 NCCHC Accreditation Update Report for ASPC-Tucson (ADCRR00138932-00138945).**

515.  **August 29, 2017 NCCHC Accreditation Update Report for ASPC-Tucson (ADCRR00138946-00138950).**

516.  **July 19, 2019 NCCHC Accreditation Report for ASPC-Tucson (ADCRR00138951-00139011).**

517.  **December 17, 2019 NCCHC Accreditation Update Report for ASPC-Tucson (ADCRR0139012-00139024).**

518.  **May 11, 2017 NCCHC Accreditation Update Report for ASPC-Winslow (ADCRR00139024-00139034).**

519.  **July 18, 2017 NCCHC Accreditation Update Report for ASPC-Winslow (ADCRR00139035-00139050).**

520.  **May 3, 2019 NCCHC Accreditation Report for ASPC-Winslow – Apache Unit (ADCRR00139051-00139099).**

521.  **May 3, 2019 NCCHC Accreditation Report for ASPC-Winslow (ADCRR00139100-00139149).**

522.  **October 24, 2019 NCCHC Accreditation Update Report for ASPC-Winslow – Apache Unit (ADCRR00139150-00139156).**

523.  **October 24, 2019 NCCHC Accreditation Update Report for ASPC-Winslow (ADCRR00139157-00139162).**

524. **November 25, 2014 NCCHC Accreditation Update Report for ASPC-Yuma (ADCRR00139163-00139167).**

525. **March 1, 2018 NCCHC Accreditation Update Report for ASPC-Yuma (ADCRR00139168-00139172).**

526. **August 5, 2021 NCCHC Accreditation Report for ASPC-Yuma (ADCRR00139173-00139232).**

527. **ADCRR summaries comparing mental health staffing by complex in 2012 and 2021 (ADCRR00139233-00139234).**

528. **Distribution of ADCRR population by Mental Health Score, for the week beginning September 15, 2021 (ADCRR00139235-00139236).**

529. ADCRR documents relating to conditions of confinement in maximum custody units, as defined by the Class Certification Order, during the period from July 1, 2018 until the time of trial.

530. ADCRR and Centurion documents relating to the provision of medical, mental health, and dental care to inmates detained at the ten Arizona State Prison Complexes identified in the Class Certification Order, during the period from January 1, 2019 until the time of trial.

531. eOMIS medical records for any and all inmates identified on the lists exchanges by the parties of records viewed by experts through the time of trial.

532. Any and all information posted on social media accounts (including but not limited to Facebook, Instagram, Twitter, LinkedIn, TikTok, YouTube, SnapChat, Pinterest, Reddit, OnlyFans, etc.) created, used, and/or maintained by any current or former inmate, Corizon employee, or ADCRR employee, who may be called during Plaintiffs' case-in-chief.

533. Documentation relied upon and/or produced by any expert retained to offer testimony at trial.

534. All deposition transcripts and exhibits from testimony provided in this matter unless otherwise objected to.

535. Any reports prepared by an expert in this case.

536. Curricula vitae of all Defendants' expert witnesses.

537. Demonstrative exhibits for use at trial.

538. Without waiving any objections, any and all exhibits identified by any other parties, even if later withdrawn.

539. Without waiving any objections, any and all documents listed or identified by any party in response to interrogatories, requests for production, or requests for admissions, including but not limited to those documents produced by Defendants in response to Plaintiffs' First and Second Requests for Production, and any supplemental productions thereto.

540. All discovery responses by Plaintiffs and responses to the same in interrogatories, requests for production, or requests for admissions submitted by any party, including supplemental responses.

541. Any and all documents disclosed by Plaintiffs.

By disclosing the above documents, Defendants do not stipulate to the ultimate admissibility of these documents at trial and hereby preserves all available objections to admissibility provided by the Federal Rules of Evidence, Federal Rules of Civil Procedure, and orders issued by the Court in this matter. Defendants anticipate that additional documents/tangible evidence will be identified as discovery continues and will supplement at that time.

DATED this 1st day of October, 2021.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC

By /s/ Daniel P. Struck
Daniel P. Struck
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

*Attorneys for Defendants*