Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Shawn Jensen, *et al.*,<br><br>                          Plaintiffs,<br><br>          v.<br><br>David Shinn, *et al.*,<br><br>                          Defendants. | NO. CV-12-00601-PHX-ROS<br><br>**EXPERT TRIAL DECLARATION OF OWEN J. MURRAY, D.O., MBA** |

I, Owen J. Murray, make the following Declaration:

1.     I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.     I am a physician board certified in the field of Family Practice.

3.     I have considerable expertise in correctional healthcare, with more than 30 years of experience in correctional medicine. Specifically, for the past 26 years, I have worked for the University of Texas Medical Branch (UTMB) Offender Health Services Program.

4.     I currently serve as the Vice President of Offender Health Services, in which capacity I am responsible for ensuring the provision of all medical, mental health, and dental services for approximately 98,000 adult offenders in the Texas Department of Criminal Justice state jails and prisons (i.e., approximately 80% of the state's correctional facility

population), as well the delivery of such services to juvenile offenders in the Texas Juvenile Justice Department facilities.

5.    I oversee a staff of approximately 3,500 healthcare and clinical support employees located at more than 100 correctional facilities throughout the state of Texas as well as the prison hospital on the Galveston campus.

6.    Before joining UTMB in 1995, I served as a Divisional Medical Director of Chicago's Cook County Jail and several correctional facilities operated by the Illinois Department of Corrections.

7.    In addition, I have served as a healthcare consultant for a number of correctional systems, including the California and Arizona Departments of Corrections.

8.    My curriculum vitae is attached as Exhibit 1.

9.    A list of the documents and materials I reviewed in preparation of my expert report and this Declaration is attached as Exhibit 2.

### Scope and Method of Assessment

10.    I was asked to evaluate whether the overall health care system for inmates in the custody of the Arizona Department of Corrections Rehabilitation & Reentry ("ADCRR") contains systemic deficiencies which render the delivery of health care services below the standard of care.

11.    To do so, I conducted site visits, interviewed staff, and reviewed documents. Staff interviews were conducted without the presence of senior Centurion leadership to promote free discussion.

12.    I requested a random selection of inmates being treated for chronic medical conditions to allow for review of chronic and episodic care and documentation.  I discuss the medical care provided to each inmate from the random sample below.

13.    I undertook an analysis of the performance measures (PMs) that were employed to monitor the provision of healthcare to ADCRR inmates under the Parsons Stipulation and that are currently being employed to monitor the performance of the contracted healthcare vendor.

14.    I also sought data from ADCRR and Centurion regarding the systemic delivery of healthcare, including certain outcome measures that I have found useful for comparing across populations.

### Facility and Healthcare Delivery System

15.    Between September 20, 2021 and October 19, 2021, I reviewed the medical facilities and programs at all 10 of the state-run ADCRR facilities through in-person tours and interviews with medical staff and program managers.

16.    The objective of the review was to determine if these facilities are providing an acceptable level of healthcare.

17.    The facility review focused on evaluating 6 components of medical care that have been identified by correctional healthcare experts as essential for an adequate healthcare delivery system.[1]

- Staffing
- Access to care
- Diagnostic services
- Records and facilities
- Pharmacy services
- Quality monitoring

18.    For each of these 6 components, I evaluated the adequacy of specific elements of medical care at each of the ADCRR facilities I toured.

19.    **Staffing:** Healthcare delivery is dependent upon having adequate and qualified medical professionals. My evaluation of this component included a review of the institutions' medical organizational structure, current staffing plans, healthcare staffing levels, recruitment and retention, staff development opportunities, and credentialing requirements. I spoke with available members of the facility leadership teams, typically to

---

[1] Anno BJ. Correctional Health Care: Guidelines for the Management of an Adequate Delivery System. Washington, DC: US Dept of Justice, National Institute of Corrections, 2001.

3

include the Site Medical Director (SMD), Facility Health Administrator (FHA), and the Director of Nursing (DON).

20.     **Access to Care:** The cornerstone of any correctional medical delivery system is its ability to provide all levels of medical care in a timely manner. I reviewed the sick call process, chronic disease management, dietary services, emergency care, hospital care, specialty services, and patient education being provided.

21.     **Diagnostic Services:** The two major areas of this component are medical imaging and laboratory services.

22.     **Records and Facilities:** Two specific components were evaluated. The first was an assessment of the adequacy of the physical space for providing medical care (e.g., clinics, emergency room, special medical programs, etc.) as well as availability of medical supplies and equipment. The second component was an assessment of the eOMIS medical record currently in use throughout the ADCRR system.

23.     **Pharmacy Services:** My inspection of the facility's pharmacy services included an evaluation of the pharmacy program to include prescription ordering, turnaround times, local procurement, and the medication administration process.

24.     **Quality Monitoring:** Quality assurance monitoring is an essential process in any healthcare system. My assessment of quality monitoring at ADCRR facilities focused on the use of objective metrics, current performance measures, mortality review, and process improvement.

25.     Certain of the components I reviewed are either consistent across all complexes (e.g., pharmacy services, dietary services, patient education resources, eOMIS, etc.) or are handled on a regional level (e.g., credentialing).

26.     My interviews with the management teams from the complexes revealed the following regarding these components:

27.     **Pharmacy Services:** All ADCRR complexes utilize Diamond Pharmacy Services. Diamond is the largest provider of correctional pharmacy services in the world. They help manage over 700,000 correctional patients in 47 states in 1,700 correctional

facilities and 120 juvenile detention centers. Diamond provides next day delivery on routine medications provided the order is placed before 2 PM. STAT medications are obtained at the local Walgreens or CVS on an as-needed basis. None of the providers I spoke with noted any problems with Diamond or their pharmacy program. Additionally, the providers I spoke with indicated that it is not an onerous process to get approval for non-formulary medications.

28.    **Dietary Services:** The ADCRR provides a registered dietician for the entire system. Necessary dietary counseling is done by a nurse or provider. None of the healthcare teams I spoke with had any concerns regarding dietary services.

29.    **Patient Education:** All ADCRR complexes have access to the patient education provider KRAMES. The service was brought on by Centurion and is markedly improved over what Corizon has offered previously. KRAMES is a patient education and health literacy solutions company. It provides both print and digital patient education for all levels of health literacy. All of the healthcare teams were complimentary of the service and noted that it was used routinely by both nursing and providers.

30.    **Specialty Care Resources:** Centurion has introduced additional specialty services and resources that are available across the system. Centurion provides access to My Wound Care Doctor to facilitate better coordination and timely provision of advanced wound care management. Centurion also provides access to RubiconMD eConsults. Rubicon is a health delivery service that enables the primary care clinicians to discuss their consults with over 120 different specialists. Although its use is not mandated by Centurion, it is encouraged. There is no utilization review approval process for using the service which expedites care provision. All of the management teams I spoke with found value in the RubiconMD service and used it regularly.

31.    **Staff Credentialing:** The credentialling process is handled centrally by Centurion. The process works incredibly well and is major improvement over Corizon. Centurion handles credentialing for all licensed staff.

32.    **Health Information – eOMIS:** The ADCRR currently provides medical

record support to the facility healthcare teams through the eOMIS electronic health record. eOMIS is an electronic health record platform that was designed by Marquis Software and implemented in the Department in 2014. I consistently heard frustration across the complexes regarding the functionality of eOMIS and am glad to see that the current Request for Proposal (RFP) put out by ADCRR provides for the vendor to implement a new EHR.

33.     The following is a summary of my interviews with the management teams from each complex, followed by a section on my overall findings.

**ASPC-Tucson**

34.     I visited ASPC-Tucson on September 20, 2021. On the day of the review, the inmate population was 4,423 inmates.

35.     ASPC-Tucson is divided into the following units: Catalina, Cimarron, Complex Detention, Manzanita, Rincon Transitory, Rincon, Santa Rita, Whetstone, and Winchester. Each of these units specializes in a certain type of offender and offers programs that meet the needs of those specific offenders. General medical and dental care can be accessed by inmates located in any of the units.

36.     I interviewed the following staff:

- Dr. Abel Salazar, MD, a Family Practice trained, Board-Certified physician who attended Baylor Medical School. He is the SMD and has been at ASPC-Tucson for 4 years. He has been in community practice since 1993, and prior to joining ASPC-Tucson, he practiced in the Tucson community.

- Dr. Armando Guzman, MD, who was a Board-Certified general surgeon until he closed his practice in 2005. He has been practicing correctional medicine since 2011. He has been at ASPC-Tucson for 4 years and provides approximately 30 hours of coverage per week.

- Ms. Laura Elliot, FNP RN, who has been an RN for the last 20 years and an FNP for the last 13 years. She is specialized in geriatric care.

- Ms. Alice Warren, FNP RN, who has been an FNP for 6 years. She has

worked at ASPC-Tucson for 3 years.

- Ms. Danielle Dennis, who has been an RN for 9 years. She has been at ASPC-Tucson for 4 years and currently serves in the ADON role.

- Ms. Amanda Thrush, who is an LPN by training and has been at ASPC-Tucson for 2 years. She currently serves in the role of AFHA.

37.    At the time of my visit, on-site provider staffing was 1 SMD, 1 MD (30 hours/week), and 7 full time FNPs.

38.    Mid-level provider staffing has improved "significantly" since Centurion assumed responsibility in July 2019; however, recruiting physicians has historically been a challenge. The facility recently recruited Dr. Winfred Williams who was expected to start full time in October.

39.    The most significant issue the facility is confronting is a 50% nurse vacancy rate. As of the date of my visit, the facility had 39 RN budgeted positions, of which 23 were filled with a full-time employee. Regarding LPNs, they had 48.75 budgeted positions with 29 currently filled. Agency RNs (9.9 FTEs) and LPNs (7.2 FTEs), as well as the use of overtime, cover about 30% of the vacant shifts. Additionally, there were 9 ADON positions, with 5 currently being vacant.

40.    The facility has taken steps to provide additional nurse call lines by FNPs on Saturdays. Centurion has provided additional bonus pay ($250-$500 per shift) to encourage staff to pick up these extra shifts. Additionally, the facility utilizes nurse telehealth triage to assist with nurse lines. The backlog of HNRs went from 184 to 24 in a week given this additional effort.

41.    HNRs have risen dramatically with up to 200-300 per day, and many of the requests are duplicates (if the patient had not been seen the previous day). Units that would pre-pandemic have 3-4 HNRs/day now have upwards of 25. The primary reason cited by the healthcare team for the increase in HNRs was that the copay program[2] had been

---

[2] With some exceptions, ADCRR inmates typically pay a small copay to access medical care. However, copays have been suspended throughout the pandemic to encourage

1 │ suspended during the COVID-19 pandemic.

2 │      42.    ASPC-Tucson has a 66-bed inpatient clinic (IPC) and a 48 bed special needs

3 │ unit (SNU). ASPC-Tucson also provides dialysis services on-site for twenty patients and

4 │ manages the only Methadone program in the department.  The facility also has a 50-bed

5 │ residential housing unit for patients who primarily require assistance with their activities of

6 │ daily living (ADLs).

7 │      43.    Banner University Medical Center-South is the closest hospital, and all 911

8 │ emergencies are referred there. If patients require higher levels of care, they are typically

9 │ transferred to University Medical Center Main. Lifeflight is available through the hospital

10 │ if a higher level of care is required.

11 │      44.    Dr. Salazar and the healthcare team noted that access to subspecialty care had

12 │ dramatically improved with the change from Corizon to Centurion. Centurion implemented

13 │ a no Utilization Review (UR) approval for the first 6 months of the contract. Apparently,

14 │ once Corizon knew that they would not have their contract renewed, they provided minimal

15 │ subspecialty clinic support. Centurion encountered a substantial backlog of requests for

16 │ subspecialty care which led to the generation of the no approval necessary program.

17 │      45.    The COVID-19 pandemic reduced subspecialty capacities statewide which

18 │ did affect ASPC-Tucson. Scheduling of appointments has improved significantly, however

19 │ neurology, orthopedics, and urology clinics are still intermittently challenged to find an

20 │ available appointment. The facility recently added a new contract with a urology group in

21 │ Phoenix that provides in-person and telehealth services. Arizona law mandating payment

22 │ of AHCCCS reimbursement rates for subspecialty care for inmates does create an additional

23 │ hurdle at times for accessing services.

24 │      46.    Centurion has established more on-site subspecialty services such as

25 │ ultrasound, audiology, physical therapy, and optometry. Dr. Salazar indicated that he and

26 │ his team find value in the Rubicon MD eConsults and use the service regularly. Ms. Warren

27 │ 

28 │ any potentially symptomatic inmates to seek medical care.

8

was highly complementary of the service and uses it routinely. She has found the service to be a great learning resource, and it has improved the care she provides.

47.     Tucson Fire Department provides EMS services, and they are directly across the street from the facility. There were no concerns noted regarding accessing EMS transportation.

48.     ASPC-Tucson utilizes urology, infectious disease, and primary care telehealth services on an as-needed basis. The facility is currently fully staffed for providers, so they are not utilizing any primary care telehealth. Centurion has added access to a telehealth RN which has been used to assist with nurse line encounters.

49.     On-site radiology is provided at all complexes by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately 2 hours. Radiology units are located at the HUB and Manzanita. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally.

50.     Garcia Laboratory provides the lab services for all 10 ADCRR complexes. The turnaround time for routine lab is typically 48 hours from the time they are drawn. STAT lab goes to Phoenix with a four-hour return on results. Occasionally STAT lab may be taken to Banner. Dr. Salazar and his provide team voiced no concerns regarding lab services.

51.     The SMD, DON, FHA, Mental Health Lead (MHL), and dental director (DD) comprise the facility management team. The SMD, DON, and FHA meet daily, and the entire team meets weekly. The health team is part of the daily security meeting scheduled at 9 AM.

52.     The members of the CQI team are the FHA, Assistant Facility Health Administrator (AFHA), SMD, MHL, DON, Healthcare Delivery Facilitator (HDF), infection control, clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

53.    Dr. Salazar feels that the healthcare provided at ASPC-Tucson is better than what is found in the community.

**ASPC-Yuma**

54.    I visited ASPC-Yuma on September 21, 2021. On the day of the review, the inmate population was 3,346 inmates.

55.    ASPC-Yuma is a correctional complex made up of five units: Cheyenne, Cibola, Cocopah, Dakota, and La Paz.  Inmates can participate in a variety of education, treatment, and work programs.  One of the most coveted work programs at this facility is the wild land and fire crew, which teaches inmates to fight forest fires.  Inmates can also earn their GED and learn a variety of vocational skills.

56.    I interviewed the following staff:

- Ms. Carli Meyers, who is an RN and the Complex DON. She has been an RN for 8 years and has been employed at the Yuma complex for the same amount of time.  She became the DON of the facility in 2015.
- Ms. Brin Hofer, who has been the FHA at Yuma since 2019 and began working at the Yuma complex in 2012. She is a radiology technologist by training.
- Ms. Anna Wilson, who is the AFHA. Ms. Wilson has a BS in healthcare administration. She has been at the Yuma complex for 2 years. Prior to joining the team at Yuma, she was working in an assisted living facility.
- Dr. Elijah Jordan, Jr., MD, who attended Wright State Medical School and graduated in 2008. He did an Internal Residency and has been at the Yuma complex since 2014. He was named SMD in 2018.

57.    As of the date of my visit, on-site provider staffing is 1 SMD, 1 MD (30 hours/week), and 4 mid-level providers. There are 2 full time telehealth FNPs and a 0.25 physician. The telehealth providers are Centurion employees and are assigned to the complex. The additional telehealth coverage is used to assist with CGAR compliance. Dr.

Jordan recognizes both to be competent providers.

58.    Provider staffing has improved "significantly" since Centurion assumed responsibility in July 2019. From March 2018 through October 2019, the only provider staff had been Dr. Jordan and one physician's assistant. Dr. Jordan noted that the salary flexibility and benefits with Centurion are much improved over that with Corizon. He provided the example that Centurion pays for provider travel and housing which has allowed for a greater recruiting radius. The complex has not had any provider vacancies since January 2020.

59.    Nurse staffing currently is excellent. The complex has an allotted capacity for 14 RNs of which they currently have 17 filled. Allotted LPNs is 10 and the complex currently has 14 filled. There are 4 ADONs positions and 1 DON position, all of which are filled. Ms. Meyers noted that most of the staff have been here for an extended period and her nursing turnover is low. The remainder of the healthcare staffing is excellent with no critical vacancies.

60.    ASPC-Yuma has no special medical programs.

61.    Yuma Regional Medical Center is approximately 20 minutes away from ASPC-Yuma and provides emergency and inpatient services. Lifeflight is available if Yuma Regional is unable to provide the necessary level of care. Dr. Jordan did not have any issue with the care provided by Yuma Regional.

62.    The availability and scheduling of outpatient subspecialty consultations prior to the pandemic was not a problem. However, during the pandemic scheduling became much more of a challenge. The primary reason was that many subspecialists stopped seeing all patients. The Yuma GI clinic currently has a 6-month wait for new patient referrals, and the facility has had to relocate those consults to an available consultant in Phoenix.

63.    Dr. Jordan was clear that access to subspecialty care had dramatically improved with the change from Corizon to Centurion. Centurion has established more on-site subspecialty services such as audiology, ultrasound, physical therapy, and optometry. Dr. Jordan indicated that he and his team find value in the RubiconMD eConsults service provided by Centurion and use the service regularly.

64.     San Luis Fire Department provides EMS and typically responds to a facility emergency call within 10 minutes. The healthcare team indicated that they are extremely reliable.

65.     ASPC-Yuma utilizes two full-time telehealth FNPs, as well as an as-needed physician. Centurion has added access to a telehealth RN which the facility uses to assist with nurse line encounters.   Telehealth orthopedics, urology, and GI are subspecialty services available to the facility; however, the facility typically does not require their use.

66.     On-site radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately 2 hours. Ultrasound is available 8 hours per week. MRI and CT studies go off-site locally.

67.     Garcia Laboratory provides the lab services for all ADCRR facilities. The turnaround time is typically 48 hours from the time they are drawn. STAT lab studies go to Yuma Regional hospital.

68.     The SMD, DON, FHA, MHL, and DD comprise the facility management team. The SMD, DON, and FHA meet daily, and the entire team meets weekly. The health team is part of the daily security meeting scheduled at 9 AM.

69.     The members of the CQI team are the FHA, SMD, MHL, DON, HDF, infection control clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

**ASPC-Douglas**

70.     I visited ASPC-Douglas on October 18, 2021. On the day of the review, the inmate population was approximately 1500 inmates.  ASPC-Douglas contains the Eggers, Gila, Maricopa, Mohave, and Papago Units and is a non-corridor facility.[3]

71.     I interviewed the following staff:

---

[3] Patients with higher Medical scores are not housed at non-corridor facilities.

- Ms. Jennifer Anderson, who is an RN and Complex DON. She has been an RN for six years and has been employed at the Douglas complex for 2 years. She became the DON of the facility in March of 2021; prior to that she was the ADON. She additionally does ER work at Banner UMC and was a Combat Medic prior to being a nurse.

- Ms. Kimberly Esquer, who has been the FHA since 2019 and has been at the complex since March 1994. She is a dental technician by training and has promoted up over time.

- Dr. Dorothy Heines, MD, who attended Medical School at Midwestern University and graduated in 2000. She did an Internal Medicine Residency and is Board Certified. She has been Site Medical Director at ASPC-Douglas since January 2021. She originally began in April 2020 at ASPC-Tucson.

72.     On-site provider staffing is 1 SMD and 2 mid-level providers. The facility has no vacancies.

73.     Nurse staffing currently is excellent. The complex has an allotted capacity for eight RNs, of which they currently have 8.2 filled. Allotted LPNs is four, and the complex currently has 4 filled. There is one Assistant Director of Nursing (ADON) and one complex Director of Nursing (DON), both of which are filled. Ms. Anderson noted that most of the staff have been here for an extended period, and her nursing turnover is low. The remainder of the healthcare staffing is excellent with no critical vacancies. The facility has been able to transition LPNs to RNs and provide career continuity for them. Currently, Centurion pays $6-8/hr. more than the community, making ASPC-Douglas a preferred choice.

74.     ASPC-Douglas has no special medical programs.

75.     Douglas ER is approximately 15 minutes away from ASPC-Douglas and provides emergency services. Lifeflight is available out of Douglas ER. Dr. Heines did not have any issue with the care provided by Douglas ER.

76.     The availability and scheduling of outpatient sub-specialty consultations prior

to the pandemic was not a problem. However, during the pandemic, scheduling became much more of a challenge. The primary reason was that many sub-specialists stopped seeing all patients. Specialty Cardiology is provided in Douglas, but the bulk of the clinics the facility uses are located in Phoenix. Scheduling has returned to pre-pandemic levels.

77.     Dr. Heines and Ms. Esquer were clear that access to sub-specialty care had dramatically improved with the change from Corizon to Centurion. Centurion has established more on-site subspecialty services such as audiology, ultrasound, and optometry.

78.     Douglas Fire Department provides EMS and typically respond to a facility emergency call within 20-30 minutes. The healthcare team indicated that they were reliable.

79.     ASPC-Douglas utilizes two full-time telehealth FNPs as well as an as-needed physician. Centurion has added access to a telehealth RN, which the facility uses to assist with nurse line encounters.  Telehealth Orthopedics, Urology, and GI are sub-specialty services available to the facility, however they typically do not require their use.

80.     Onsite radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately two hours or less. Ultrasound is available as needed. MRI and CT studies go off-site to Canyon Vista Hospital in Sierra Vista.

81.     Garcia Laboratory provides the lab services for all ADCRR facilities. The turnaround time is typically 48 hours from the time they are drawn. STAT lab studies go to Douglas ER.

82.     The SMD, DON, FHA, MHL, DD, HCF, and the medical records lead comprise the facility management team. The entire team meets 4 days a week. The FHA is part of the daily security meeting scheduled at 4 PM and a weekly Executive Staff meeting.

83.     The members of the CQI team are the FHA, SMD, MH lead, DON, Healthcare Delivery Facilitator (HDF), DD, pharmacy (inventory control), medical records administrator, and clinical coordinator. They meet monthly by policy and have a standard

1    routine agenda from which minutes are produced.

2    **ASPC-Lewis**

3        84.    I visited ASPC-Lewis on September 22, 2021. On the day of the review the

4    inmate population was 4,401 inmates.

5        85.    ASPC-Lewis is divided into eight units: Bachman, Barchey, Buckley, Eagle

6    Point, Morey, Rast, Stiner, and Sunrise.  Each of these units offers a variety of programs,

7    some of which are not offered at other units. Lewis houses all custody levels (minimum

8    through maximum), and now also houses Minors (both male and female) at Sunrise.

9        86.    I interviewed the following staff:

10       •    Ms. Brin Hofer, who has been at ASPC-Lewis since April 22, where

11           she has been filling in for the FHA/AFHA vacancy. She works with

12           Spencer Sego, LPN, to assist with the administrative responsibilities

13           of the facility.

14       •    Ms. Donna Mendoza, who is the DON and has been at ASPC-Lewis

15           since October 2019. She started at ASPC-Perryville in 2008 and was

16           weekend nurse supervisor. In 2010, she assisted full-time in the

17           development of the monitoring plan for the PMs. Upon completion of

18           that task, she assumed a position at ASPC-Perryville with Corizon.

19       •    Mr. Michael Delgado, who is currently the AFHA and has been in that

20           position for the last 2 months. He has a bachelor's degree in emergency

21           management. Prior to his arrival at ASPC-Lewis, he was the AFHA at

22           Florence for 3 years. He started in ADCRR initially with Wexford and

23           then moved to Corizon.

24       •    Mr. Spencer Sego, who is the Centurion Director of Operations for the

25           Northern Region. He is an LPN by training. He began working in the

26           ADCRR in June 2014 and has worked for Corizon and Centurion.

27       87.    Nurse staffing has been challenging during the pandemic. Currently, the

28   facility has 6 ADON positions with 5 being vacant. Five ADONs have recently stepped

down, with 4 remaining on in RN positions.  There are 30 RNs budgeted with 9 unfilled at this time. Agency nursing has been able to fill 6 FTEs and the remainder of the coverage comes from additional staff overtime. The facility has 40 budgeted LPN positions with 12 currently vacant. The facility has been able to cover half the LPN vacancies with agency staffing. However, they have been only able to fill 1 RN position through agency. Agency nursing as a whole is incredibly limited due to the dramatic premiums being paid in the community.

88.     Centurion has increased their sign-on bonus to $10K for RNs and LPNs and has offered RNs an additional $1200 plus overtime per shift and LPNs $900 plus overtime to improve facility staffing. This is in addition to the bonus pay ($250-$500 per shift) that Centurion is offering to all staff to encourage them to pick up these extra shifts. Additionally, the facility utilizes nurse telehealth triage to assist with nurse lines.

89.     Dr. Theodora Paul has been the SMD since June 2018. The staffing requires 2 MDs and 6 MLPs of which the facility has 2 physician vacancies. They use primary care telehealth services as needed.

90.     ASPC-Lewis has a 13-bed IPC.

91.     Abrazo West is the closest hospital, and all 911 emergencies are referred to that facility. It is approximately 40 miles from ASPC-Lewis. LifeFlight is available out of the facility if it is required. Abrazo Central in Phoenix or University Medical Center in Phoenix are additional facilities that are utilized for emergent patient referral.

92.     I met with Ms. Erica Johnson, the clinical coordinator, who is responsible for scheduling specialty care services. She has been at ASPC-Lewis for 10 years and has worked for ADCRR, Wexford, Corizon, and Centurion. She indicated that in the early part of the pandemic, finding available off-site specialty clinic appointments was challenging due to significantly reduced capacities. However, at this time, clinic capacities are returning to pre-pandemic levels, and scheduling is getting back to normal. She noted that Centurion is providing more on-site subspecialty care than Corizon had in the past.

93.     Ms. Johnson attempts to utilize the same specialty physicians and specialty

groups because they understand the nuances of correctional care. She also noted that it improves continuity and consistency of specialty services. She will reach out for additional clinics if scheduling times exceed the current metrics. She noted that AHCCCS reimbursement rates do limit the number of specialists interested in seeing ASPC-Lewis patients.

94.   EMS services are available and arrive at the facility typically within 40 minutes.

95.   ASPC-Lewis utilizes telehealth for cardiology, infectious disease, urology, endocrinology, rheumatology, ENT, ortho-spine, and nephrology. The facility has access to all specialties as required. They use CareClix to access the subspecialty telehealth system.

96.   On-site radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately four hours. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally.

97.   I met with Ms. Traci Lessanau who is the Statewide Radiology Coordinator for Trident Care. She was previously employed by Corizon. She indicated that since Centurion's arrival, the number of radiology studies has increased by 20%. Centurion added new views for various studies, such as flexion-extension for the evaluation of back pain. Additionally, Trident offers multiple radiology specialists to evaluate films, which is a significant improvement over Corizon who employed only a single radiologist to read all films.

98.   Garcia Laboratory provides the lab services for all ADCRR facilities. The turnaround time for routine lab is typically 48 hours from the time they are drawn. STAT lab goes to Tempe-St. Luke's.

99.   The SMD, DON, Facility FHA) MHL, and DD comprise the facility management team. The SMD, DON, and FHA meet daily at 8:15 AM. They meet with the warden daily at 3:15 PM.

100.   The members of the CQI team are the FHA, SMD, MH lead, DON, HDF

infection control clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

**ASPC-Winslow**

101.   I visited ASPC-Winslow on October 19, 2021. On the day of the review, the inmate population was approximately 1400 inmates.   ASPC-Winslow includes the Coronado, Kaibab, and Apache units and is a non-corridor facility.

102.   I interviewed the following staff:

- Ms. Corie Rackley, who is an RN and Complex DON. She has been an RN for 6 years and has been employed at the Winslow complex for 5 years.  She became the DON of the facility in 2017, and prior to that she was the ADON.

- Mr. Dennis Randels, who has been the FHA since December 2015. Mr. Randel has a Master's in Nursing and Business Management. He previously worked with Indian Health Services from 1989-2013 and started at as a staff nurse.

- Dr. Elijah Jordan, who is the acting SMD at Winslow and is also the SMD at Yuma. I spoke with Dr. Jordan while I was touring at Yuma.

- Ms. Myra Nkule, who is a Family Nurse Practitioner and has been at Winslow since April 2020. Prior to being at Winslow she was a telemetry RN in Lubbock, TX.

- Mr. Mark Lopez, who is an RN who has been at Winslow since June of 2020. He previously was a Captain in the Department and worked at Winslow. He also was a paramedic in the community.

- Mr. Sergio Rivera, who is the Medical Records supervisor.  He has been at the facility since 2017. He started in Radiology and has worked his way up through the system.

- Ms. Robin Hendricks, who is the ADON and clinical coordinator. She

has been at Winslow since 2017 and started as a floor RN. She has been an RN for 17 years.

103.    As of the date of my visit, on-site provider staffing is 1 SMD, 2 mid-level providers, and 2 prn MLPs. The SMD was vacant as of the prior week, and the facility is now recruiting. Dr. Jordan is now acting as the SMD, which is working out well. Telehealth primary care is available but at the time of my visit, there was no need for its use.

104.    Nurse staffing currently is excellent. The complex has an allotted capacity for 10 RNs of which they currently have 14 filled. Allotted LPNs is 5 and the complex currently has 2 filled and 3 prn[4] appointments. The facility can use RNs to cover LPN vacancies if necessary. There are 2 ADONs and one complex DON, all of which are filled.

105.    Ms. Rackley noted that most of the staff stay for an extended period, and nursing turnover is low. Many of the nurses have been there since the prison was built. The remainder of the healthcare staffing is excellent with no critical vacancies. The facility has a small Centurion float pool to fill vacant shifts.

106.    There is a nursing school in Winslow which assists with nurse hiring.

107.    ASPC-Winslow has no special medical programs.

108.    Little Colorado Medical Center (LCMC) is approximately 4 minutes away from ASPC-Winslow and provides emergency services. Lifeflight is available out of LCMC. Patients requiring more advanced services are sent to Flagstaff Medical Center, which is 45 minutes away.

109.    The availability and scheduling of outpatient sub-specialty consultations prior to the pandemic was not a problem. However, during the pandemic scheduling became much more of a challenge. The primary reason was that many sub-specialists stopped seeing all patients.

110.    The majority of the clinics the facility uses are located in Flagstaff. Scheduling has returned to pre-pandemic levels.

---

[4] PRN positions are typically on-call and utilized as needed.

111.   Mr. Randels and Ms. Hendricks were adamant that access to sub-specialty care had dramatically improved with the change from Corizon to Centurion. Mr. Randels noted that under Corizon it was a painstaking process to get a patient off-site, even at times to the ER.

112.   Centurion has established more on-site sub-specialty services such as audiology, ultrasound, and optometry.

113.   Action Medical provides EMS and typically respond to a facility emergency call within 4-7 minutes. The healthcare team indicated that they were very reliable.

114.   ASPC-Winslow does not utilize telehealth for specialty care at this time, however all services are available.

115.   Onsite radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings are done at LCMC. Ultrasound, MRI and CT studies go off-site to Northern Arizona Radiology in Flagstaff.

116.   Garcia Laboratory provides the lab services for all ADCRR facilities. The turnaround time is typically 48 hours from the time they are drawn. STAT lab studies go to LCMC.

117.   ASPC-Winslow utilizes Diamond Pharmacy Services. Diamond provides next day delivery on routine medications provided the order is placed before 2 PM. Stat medications are obtained at the local Walmart on an as needed basis. The management team had no issues with Diamond.

**ASPC-Perryville**

118.   I visited ASPC-Perryville on September 22, 2021. On the day of the review the inmate population was 3,318 female inmates.

119.   ASPC-Perryville is made up of the following units: Complex (or Central, which includes IPC, SNU, watch cells, Reception, Mental Health Unit, and MH Ward), Lumley (including MH, Medium), Piestewa, San Carlos, San Pedro, Santa Cruz, Santa Maria (including Detention), Santa Rosa (including Second Chance Center), Special

Management, and Women's Treatment.  Like most correctional institutions, Perryville offers inmates an adult basic education (ABE) program and a GED program.  Basic medical and dental care is offered to all inmates, as well as substance abuse treatments.  Inmates may also take advantage of many vocational programs, such as working in a print shop, garment factory, kitchen, warehouse, laundry, farming, auto auction, wildfire crew, and state fair crew.  Inmates can also work on road and maintenance crews that work at various cities in the area.

120.    I interviewed the following staff:

- Dr. Steve Ibrahim, DO, who is an Internal Medicine trained, Board-Certified physician practicing since 2007. He is currently the acting SMD and has been at ASPC-Perryville for 4 years.

- Mr. Charles Falkena, who is currently the AFHA and has a background as a behavioral health technician. He has been at the facility since December 2019.

- Ms. Rachelle Moore, BSN, who has been at the facility since 2015. She began her career as an RN and was promoted to the DON position in 2018. She has also been the FHA since 2016.

121.    On-site provider staffing is currently 2.5 FTEs of physician and 6 FTEs of mid-level provider. The facility has not had challenges with provider staffing.  Additionally, ASPC-Perryville has 2 full time OB-Gyn physicians on-site who manage all the prenatal and gynecologic care.

122.    Nurse staffing has been challenging during the pandemic. Prior to that time, nurse staffing was never a problem. Currently, the facility has 6 ADON positions with 3 being vacant. There are 30 RNs budgeted with 14 unfilled at this time. Nursing agency has been able to fill 6 FTEs, and the remainder of the coverage comes from additional staff overtime. The facility has 24 budgeted LPN positions with only 3 currently vacant.

123.    Centurion has increased their sign-on bonus to $10K for RNs and LPNs and has offered RNs an additional $1200 plus overtime per shift and LPNs $900 plus overtime

to improve facility staffing. This is in addition to the bonus pay ($250-$500 per shift) that Centurion is offering to all staff to encourage them to pick up these extra shifts. Additionally, the facility utilizes nurse telehealth triage to assist with nurse lines.

124.    ASPC-Perryville has a 15-bed IPC and a 12-bed SNU.

125.    Abrazo West and Banner Estrella are the closest hospitals, and all 911 emergencies are referred there.

126.    Dr. Ibrahim and the healthcare team noted that access to subspecialty care dramatically improved with the change from Corizon to Centurion. Centurion implemented a no UM approval for the first six months of the contract to address the substantial backlog of requests for subspecialty care that it inherited from Corizon, which led to the generation of the no approval necessary program.

127.    The COVID-19 pandemic reduced subspecialty capacities statewide, which did affect ASPC-Perryville. The team noted that the state-mandated AHCCCS reimbursement rates for subspecialty care does create an additional hurdle at times for accessing subspecialty services.

128.    Centurion has established more on-site subspecialty services such as ultrasound, audiology, physical therapy, optometry, as well as OB-Gyn services.

129.    Dr. Ibrahim feels that the healthcare provided at ASPC-Perryville is comparable to what is found in the community.

130.    EMS services are available and arrive at the facility typically within 15 minutes. Dr. Ibrahim had no concerns regarding emergency transportation.

131.    ASPC-Perryville utilizes telehealth for cardiology, infectious disease, rheumatology, neurology, and nephrology.

132.    On-site radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately 2 hours. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally.

133.    Garcia Laboratory provides the lab services for all ADCRR facilities. The

turnaround time for routine lab is typically 48 hours from the time they are drawn. STAT lab goes to Tempe-St. Luke's.  Dr. Ibrahim and his provider team voiced no concerns regarding lab services.

134.    The SMD, DON, FHA, MHL, and DD comprise the facility management team. The SMD, DON, and FHA meet daily, and the entire team meets weekly. The health team is part of the daily security meeting scheduled at 9 AM.

135.    The members of the CQI team are the FHA, AHFA, SMD, MH lead, DON, HDF, infection control clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

**ASPC-Safford**

136.    I visited ASPC-Safford on October 18, 2021. On the day of the review the inmate population was approximately 1500 inmates.  ASPC-Safford includes the Graham, Tonto, and Fort Grant satellite units and is a non-corridor facility.

137.    I interviewed the following staff:

- Mr. Ray Jared, who has been the FHA since August 2020 and is an RN by training. He has been at Safford since January 2016 and has been a floor RN, then moved into an ADON position, and then DON.
- Ms. Crystal Pelto, who has been at ASPC-Safford for 9.5 years and is currently the DON.
- Mr. Joseph Panelli, who is a Physician Assistant by training and has been at ASPC-Safford for 2 years. He began at the facility directly out of PA school.

138.    ASPC-Safford has 1 DON position which is filled and 2 ADON positions with 0 vacancies. There are 16 RN positions with 0 vacancies and 6 LPN positions with 3 currently vacant. LPN vacancies are easily covered with overtime. The facility can fill LPN vacancies with RN staff. The facility has 1 SMD (Dr. Edmund Mitchell) and two additional mid-level provider positions with no vacancies.

139.    ASPC-Safford has no special medical programs.

140.    Mt. Graham Regional Medical Center (MGRMC) hospital is the nearest hospital and receives all the 911 and emergency transfers. The facility is approximately 20 minutes away.

141.    The pandemic did create challenges with sub-specialty clinic scheduling; however, that has improved significantly. AHCCCS reimbursement rates do create some challenges finding specialists willing to see Safford patients.

142.    The facility has optometry and audiology services on-site.

143.    Southwest EMS provides EMS services. They typically arrive at the facility within 20-30 minutes. Mr. Panelli had no concerns regarding emergency transportation.

144.    ASPC-Safford utilizes telehealth for only for Urology and that is occasionally. Typically, they have no issue finding available specialty clinic appointments. Most subspecialty referrals are sent to Tucson or Phoenix.

145.    Onsite radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately two hours. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally.

146.    Garcia Laboratory provides the lab services for all ADCRR facilities. The turnaround time for routine lab is typically 48 hours from the time they are drawn. STAT lab goes to MGRMC. Mr. Panelli and his provide team voiced no concerns regarding lab services.

147.    The Site Medical Director (SMD), Director of Nursing (DON), ADONs, Facility Health Administrator (FHA), Mental Health (MHL) and Dental Director (DD) comprise the facility management team. The SMD, DON, FHA, AFHA, and HDF meet informally daily and a formal meeting twice a week. The health services team meets with the Warden every daily 9:30 AM.

148.    The members of the CQI team are the FHA, SMD, MH lead, DON, ADONs, Healthcare Delivery Facilitator (HDF) infection control clinical coordinator, DD, pharmacy

(inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

**ASPC-Eyman**

149.    I visited ASPC-Eyman on September 23, 2021. On the day of the review the inmate population was 5,180 inmates.

150.    ASPC-Eyman is comprised of five separate units: Browning, Cook, Meadows, Rynning, and SMU I.  Custody levels include medium through maximum, and different units have slightly different programming.  The two programs they all seem to have are basic adult education and GRE courses. ASPC-Eyman has a variety of programs and work that inmates can participate in.  A license plate factory run by inmates really does exist and is part of the Eyman complex.  Other jobs inmates can do are work in the laundry or bakery.  This facility offers substance abuse treatments and mental health programs that are aimed to improve impulsiveness in inmates, as well as curbing aggression.  Vocational skills that inmates can learn at this facility include culinary arts, business management, construction, plumbing, and custodial skills.

151.    I interviewed the following staff:

- Ms. Artie Cordova, who is the facility clinical coordinator. She has been at Eyman for 9 months. She has been in corrections for over 25 years, 14 of which were in ADCRR. She began providing clinical coordinating services in January 2019 with Corizon.

- Ms. Terri Espinoza, who has been with the Florence-Eyman facilities for 25 years. She is currently the clinical coordinator at Eyman and has been in that role since 2017.

- Ms. Ashley Bardwell, who is the HDF and provides supervision and oversight to the clinical coordinators. She started in that role in 2018. She has a master's degree in hospital administration.

- Ms. Matilde Smith, who is an LPN by training. She is currently the FHA and has been in that role for the last 2.5 years. She started at

Eyman in 2017 as a CNA working for Corizon.

- Ms. Veronica Renna, who is the DON and has been at the facility for 2 years. She holds a BSN degree and has been a nurse for 8 years. Before arriving at Eyman, she worked at Banner Hospital in the ER.

- Dr. Rodney Stewart, MD, who has been at Eyman for approximately 6 years. He is an internist by training. Prior to his arrival at Eyman, he had been the Florence IPC physician for 2 years.

152.   Ms. Renna has 6 ADON positions with 2 vacancies. There are 20 RN positions with 9 vacancies and 30 LPN positions with 7 currently vacant. She can cover both the RN and LPN vacancies through the use of agency and overtime.

153.   Dr. Stewart is currently the SMD, and there is 1 additional physician position which is vacant. He has 5 mid-level provider positions, all of which are filled. He additionally has the service of 1 full time NP through the telehealth program. Centurion has added 2 additional MLP positions due to the increasing acuity at the facility.

154.   ASPC-Eyman has no special programs.

155.   Florence Anthem hospital is the nearest hospital and receives all the 911 and emergency transfers. The facility is approximately 20 minutes away. However, EMS may divert the patient's care to Mountain Vista Medical Center in Mesa if clinically indicated.

156.   The pandemic did create challenges with subspecialty clinic scheduling; however, that has improved significantly. AHCCCS reimbursement rates do create challenges in finding specialists willing to see Florence/Eyman patients. It was also noted that free world facilities must make special accommodations to inmate patients. Audiology and physical therapy are available on-site.

157.   EMS services are available and arrive at the facility typically within 10-15 minutes. Dr. Stewart had no concerns regarding emergency transportation.

158.   ASPC-Eyman utilizes telehealth for pulmonology, infections disease, urology, and rheumatology.  They have access to all specialties. They use CareClix and Amwell to see patients through telemedicine. The facility uses primary care telehealth

typically for chronic care services. They do not use the nurse telehealth services.

159.    ASPC-Eyman provides Basic Life Support services. They provide minor emergency care at the facility. The treatment room has 1 bed and can provide intravenous fluids. The limit on patient time spent in the ER is 8 hours.

160.    On-site radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately 2 hours. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally.

161.    Garcia Laboratory provides the lab services for all ADCRR facilities. The turnaround time for routine lab is typically 48 hours from the time they are drawn. STAT lab goes to Tempe-St. Luke's.   The provider team voiced no concerns regarding lab services.

162.    The SMD, DON, FHA, MHL, and DD comprise the facility management team. The SMD, DON, FHA, AFHA, and HDF meet at 9:00 AM daily. The health services team meets with the warden every Tuesday at 10:30 AM.

163.    The members of the CQI team are the FHA, AHFA, SMD, MH lead, DON, HDF infection control clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

**ASPC-Florence**

164.    I visited ASPC-Florence on September 23, 2021. On the day of the review the inmate population was 2,522 inmates.

165.    ASPC-Florence now includes the following units: Central, East, South and Globe. ASPC-Florence is in the process of being closed, with staff to be reassigned to ASPC-Eyman. All of the units with the exception of East offer basic adult education and have a GED program. East unit has a focus on reducing domestic violence and centers around shaping the way offenders think to try and lower aggression and impulsive behavior. East also offers a parenting class, poetry workshop, and re-entry for inmates preparing for

release. Globe and South unit have the most vocational programs. Globe has a forestry work program as well as wastewater, fire crew, landfill crew, barber, tailor, and kitchen vocational classes. South unit offers construction and fabrication in metal and wood classes.

166.   I interviewed the following staff:

- Ms. Trina Randall, who is currently the FHA at the facility. She has been at ASPC-Florence for 3.5 years and has been involved in correctional healthcare for over twenty-one years. She worked the previous 17 years for the Indiana Department of Corrections in healthcare administration.

- Ms. Julie Jones, who is currently the DON and has been at ASPC-Florence since 2016. Prior to assuming the role as DON, she was an ADON and a sick call nurse. She is a BSN.

- Dr. Johnathon Mahn, who is a Board-Certified Internist who graduated from Midwestern University in Arizona. He has been at ASPC-Florence since January 2021. Prior to arriving at ASPC-Florence, Dr. Mahn was a residency program director.

167.   On-site provider staffing is 1 SMD, 2 MD (filled with part-time providers), and 6 mid-level providers with 2 vacancies. ASPC-Florence is closing, and the staffing allocations are being reduced in line with the facility depopulation. Nurse staffing currently is 1 DON which is filled, and 6 ADONs with 2 vacancies which are not going to be filled due to the facility transition. There are 36 RN positions with 15 vacancies which are currently being filled through overtime and agency coverage. The facility has 30 LPN positions with 7 vacancies, and overtime and agency are used to fill shifts as necessary.

168.   ASPC-Florence has a 57-bed IPC and 5 dialysis chairs.

169.   Florence Anthem Hospital is approximately 20 minutes from ASPC-Florence and provides emergency medical services. Mountain Vista Medical Center in Mesa is also utilized based upon the patient's condition.

170.   The availability and scheduling of outpatient sub-specialty consultations prior

28

to the pandemic was not a problem. However, during the pandemic, scheduling became much more of a challenge. The primary reason was that many sub-specialists stopped seeing all patients. The Florence Gastroenterology (GI) clinic currently has a six-month wait for new patient referrals. The facility has had to relocate those consults to an available consultant in Phoenix. Centurion has established on-site sub-specialty services, such as audiology, ultrasound, physical therapy, and optometry.

171.    The Florence Fire Department provides EMS and typically respond to a facility emergency call within 10-15 minutes. The healthcare team indicated that they were extremely reliable. There are two sub-stations close to the facility.

172.    ASPC-Florence utilizes Pulmonary, ID, Urology, and Rheumatology services primarily. They have access to all specialties if needed. They occasionally have used primary care telemedicine services, typically for management of chronic care patients.

173.    Onsite radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately two hours. Ultrasound is available 8 hrs./week. MRI and CT studies go off-site locally.

174.    Garcia Laboratory provides the lab services for all AZDOC facilities. The turnaround time is typically 48 hours from the time they are drawn. STAT lab studies go to Florence Regional hospital.

175.    The SMD, DON, FHA, MHL, and DD comprise the facility management team. The SMD, DON, FHA, HDF, and AFHA meet daily at 9:00 A.M. There is a weekly Warden's meeting held every Tuesday at 10:30 A.M. that health services attends.

176.    The members of the CQI team are the FHA, SMD, MHL, DON, HDF, infection control, clinical coordinator, DD, pharmacy (inventory control), chronic care nurse, and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

**ASPC-Phoenix**

177.    I visited ASPC-Phoenix on September 24, 2021. On the day of the review the

1    inmate population was 2,522 inmates. Phoenix has a reception unit, inmate worker unit,
2    Aspen unit, and Alhambra unit.

3         178.   I interviewed the following staff:

4              •    Mr. Phillip Sclotter, MPA, who has been at Phoenix since May 17,
5                   2021. Prior to his starting at ASPC-Phoenix, he had been the
6                   administrator at several Long-Term Care Facilities.

7              •    Dr. Seth Stabinsky, MD, who is Board Certified in Obstetrics and
8                   Gynecology. He did a fellowship at Stanford University in endoscopic
9                   gynecologic surgery. Prior to coming to ASPC-Phoenix in January
10                  2019, he spent five years at ASPC-Perryville providing primary care
11                  services.

12             •    Ms. Nicole Mitchell, who is the HDF and has held that position for the
13                  last three years. Prior to arriving at ASPC-Phoenix, she was the
14                  practice manager in a family practice clinic.

15        179.   On-site provider staffing allows for one SMD which is filled and one MD
16   which is recently vacant and for which they are recruiting. Additionally, the facility has four
17   full-time mid-level providers, all of which are filled, and two half-time mid-levels as
18   additional staffing.

19        180.   Nurse staffing calls for one DON position which is filled and three ADON
20   positions, which are currently not filled. There are 39 RN positions with 20 being filled and
21   3 LPN positions with zero vacant.

22        181.   Centurion has increased their sign on bonus to $10K for RNs and LPNs and
23   offered RNs an additional $1200 plus overtime per shift and LPNs $900 plus overtime to
24   improve facility staffing. Centurion has provided additional bonus pay ($250-500 per shift)
25   to encourage staff to pick up these extra shifts. Additionally, the facility utilizes nurse
26   telehealth triage to assist with nurse lines.

27        182.   ASPC-Phoenix is the primary Intake Facility for the Department of
28   Corrections and currently has no special medical programs. The facility is scheduled to have

IPC capabilities later this year.

183.    Emergency referrals are sent to Valleywise Hospital, the hospital serving Maricopa County. The facility is within close proximity to ASPC-Phoenix.

184.    Given the facility's Intake mission, off-site subspecialty services are generally required only on an emergent basis. On those occasions when subspecialty care is emergently required, ASPC-Phoenix has not had difficulty finding available capacity.

185.    Rubicon MD is also available to the provider staff and is used as necessary.

186.    Optometry is available on-site.

187.    EMS services are available and arrive at the facility typically within 5-10 minutes. Dr. Stabinsky had no concerns regarding the timely availability of emergency transportation.

188.    They have access to all specialties. The facility uses CareClix and Amwell to see patients through telemedicine.

189.    On-site radiology is provided by a state contract with Trident Care. Trident Care reads all plain films with a normal turnaround time between 24-48 hours. STAT readings can be requested and are returned in approximately two hours. Ultrasound is available on-site weekly. MRI and CT studies go off-site locally.

190.    Garcia Laboratory provides the lab services for all ADCRR facilities. The turnaround time for routine lab is typically 48 hours from the time they are drawn. STAT lab goes to Tempe-St. Luke's.  Dr. Stabinsky and his team voiced no concerns regarding lab services.

191.    The SMD, DON, FHA, AFHA, MHL, and DD comprise the facility management team. The SMD, DON, and FHA meet daily, and entire team meets weekly. The health team is part of daily security meeting scheduled at 9 AM.

192.    The members of the CQI team are the FHA, AHFA, SMD, MH lead, DON, HDF, infection control, clinical coordinator, DD, pharmacy (inventory control), and medical records administrator. They meet monthly by policy and have a standard routine agenda from which minutes are produced.

**Summary of Tour/Interview Findings:**

193.    In my opinion, ADCRR has the necessary physical plant and infrastructure to deliver appropriate care. The facility management teams I spoke with were entirely professional and dedicated to providing the best care possible for the patients in their charge.

194.    Vacancies, specifically nursing, at several facilities were a key concern for the individuals I interviewed. However, Centurion and ADCRR have recently initiated aggressive actions regarding the use of contemporary pay practices (sign-on bonuses, shift differentials, retention bonuses, and incentive pay) to help facilitate the filling of vacant positions and retention of current staff. The use of overtime, nursing agency staff, and telehealth has also been able to provide some relief.

195.    Two other recurring concerns that I heard consistently across my tours related to monitoring of the PMs and eOMIS. There was unequivocal agreement that a significant amount of healthcare staff's time could be freed up for direct patient care if the oversight of the PMs was less burdensome. A number of the individuals I interviewed expressed frustration that they spend more time charting to meet the requirements of a PM than is necessary for best care, and there was also some frustration around instances of failing PMs based on a technicality not included in the actual PM.

196.    Additionally, it was noted that eOMIS is not efficient in its management of many of the clinical workflow processes, and the management teams were unanimous in their agreement that a substantial amount of additional direct patient care time could be created if this functionality was improved. Specifically, I heard that the learning curve for eOMIS is steep, there is a great deal of redundancy, and it requires too many clicks to get to what you need. Interviewees did indicate that there had been some positive changes with eOMIS over the years but would like to see additional changes made to the system, including alerts and additional safeguards, better trending of data over time, especially for lab results, and better report generating capabilities.  The fact that ADCRR is requiring a new EHR system in the upcoming RFP is a welcome development and will likely result in overall improved care.

197.    When asked whether they needed additional staffing beyond the current allocated positions, none of the facility leadership teams felt that was necessary. They stated that if their vacancies were filled, the current workload would be manageable with the current number of healthcare positions. They also reiterated that some relief from PM monitoring and improved functionality of the electronic health record would allow significantly more time for direct patient care. My experience working with facility leadership teams is that they are not reticent about requesting additional staff if needed. The interviews I conducted with the facility leadership teams were done without attorneys or Centurion management present so that open communication could ensue.

198.    Subspecialty care availability was challenged during the pandemic but has mostly returned to normal availability. Centurion has substantially improved access and availability of specialty care both on and off-site. Specialty care through telemedicine is readily available to all facilities, and Centurion has made Rubicon available to assist all providers with access to specialty expertise.

199.    The management teams were consistent with their recommendations on how to make the healthcare delivery system more efficient. Those recommendations included:

- Replace or enhance the current eOMIS medical record system
- Eliminate the state mandate of AHCCCS reimbursement rates for subspecialty care
- Reduce the current number of PMs
- Standardize the monitoring bureau's auditing practices and take a more collaborative approach to monitoring
- Use objective measures rather than subjective interpretation to evaluate quality
- Reinstate the inmate copay program
- Maintain consistency in contracted healthcare providers

**Medical Record Review**

200.    Reviewing chronic and episodic care utilizing a statistically reasonable

method is a critical component of the evaluation of any healthcare system. A random selection of medical records provides a vehicle to confirm what is being reported by healthcare staff and to validate in practice the objective quality metrics used in the system. The random selection of records, rather than a purposive selection, is essential in drawing generalizable conclusions about the population.

**Methodology:**

201.    A random review of (10) medical records of patients with at least two chronic care diagnoses was performed at all ADCRR facilities except ASPC-Phoenix and ASPC-Florence.[5] To conduct the random sample, we received a list of patients that are enrolled in Chronic Care Clinics (CCC) in ADCRR.  The number of chronic care diagnoses and the patients' units of assignment was also provided on the list.  The patient list was initially sorted by unit of assignment. Next, each facility list was sorted by the number of chronic care diagnoses for each patient. Patients were pooled by the number of chronic care diagnoses (8, 7, 6, etc.) and then 2 records were randomly selected from each pool until a count of 10 was reached. This methodology allowed for a patient with varying degrees of chronic issues to be reviewed, but also ensured that patients with more complex medical needs were included in the sample.

202.    I consulted with Dr. Jacques Baillargeon, the Director of Epidemiology and Outcomes Research in the Division of Correctional Managed Care and a Senior Epidemiologist in the Office of Biostatistics at the University of Texas Medical Branch, regarding the adequacy of my sampling method. He concluded that "[a]lthough the overall sample size was small (n=80), the sampling approach is likely to have yielded a reasonable representative sample." Dr. Baillargeon's report, including his CV, is attached as Exhibit 3. Consultation with an epidemiologist regarding sampling methodology is something reasonably relied upon by experts in my field.

---

[5] I did not review chronic care records at ASPC-Florence in light of the closure of the facility and determined the sample size of inmates receiving chronic care treatment at ASPC-Phoenix, which is almost exclusively an intake facility with only a very small permanent population, would be too small.

203.   The goal of this review was to assess the quality of care being provided at each facility. The review of the patient care was based on information available in eOMIS and was focused most specifically on the provider care. The medical records reviewed contained hundreds of unique healthcare transactions and demonstrated most of the essential health delivery processes.

204.   I acquired the services of three experienced correctional providers to assist me in the medical record review in light of the time constraints to prepare my expert report. Moreover, utilization of a team approach in analyzing or auditing systemic care in prisons or prison systems is commonly used by experts in my field. The participating providers (CVs attached as Exhibits 4-6) were:

- Dr. Jane Leonardson, MD, is board certified in Internal Medicine and Medical Informatics. She serves as the chief medical information officer for the UTMB-CMC program. She has more than 25 years of correctional medicine experience and has performed work on similar cases in California and Illinois.

- Mr. John Pulvino is a physician assistant and has been practicing correctional medicine for the last 30 years. He is currently the Director of Quality and Outcomes for UTMB CMC.

- Ms. Erin Freeman is a physician assistant and has been practicing correctional medicine for the last 10 years. She is currently a Clinical Outcomes Specialist for UTMB CMC.

205.   Dr. Leonardson performed the majority of the chart reviews. She also reviewed all the chart reviews by Mr. Pulvino and Ms. Freeman for consistency and quality of analysis and to improve inter-rater reliability. Dr. Leonardson and I then reviewed the group's findings for each patient.

206.   Since I submitted my expert report on October 22, 2021, I have been able to review the charts of all 80 inmates in the random sample, and nothing in that review changes my findings or opinions as stated in my report.

**Explanation of Ratings:**

207. The medical records were reviewed and scored in three areas: quality of chronic care documentation, quality of chronic care, and quality of episodic care.

208. Each area was scored based upon a traditional Likert system, with 1 being poor and 5 being excellent. Each record then received a composite score for the total care provided to allow for ease of comparison.

209. A rating of **5-Excellent** was assigned to care that was timely and reflected good decision-making. The care may not have been perfect in all instances, but the imperfections found did not affect the outcomes. This rating may allow for a lack of preventive healthcare. Regarding documentation, this rating was used if the notes were clear and comprehensive (usually free-typed instead of utilizing the template).

210. A rating of **4—Very Good** may represent care that was mostly solid, but there may be some important care that was delayed slightly or a decision that should have been made a bit earlier eventually got made and there was no harm to the patient by the delay.

211. A rating of **3—Good** may represent a mix of care that was sometimes poor and sometimes great. However, if there was a problem with care that markedly increased risk to a patient, a lower score was assigned, since it does not help to provide excellent care for some problems and to not address a problem that had a significant risk of causing an adverse outcome.

212. A rating of **2—Fair** would be assigned if the decision-making represented a lack of basic practice rules or put the patient at some risk. It may represent good decision-making regarding referrals, with delay in the referral. Often this rating reflected that there was some good care, but it was overshadowed by the presence of care that put the patient at risk and could not be overlooked. Using this rating for documentation would represent incomplete notes where the reader cannot follow the care very easily at all.

213. A rating of **1-Poor** represents care that cannot be excused or overlooked. It represents risk to patients, lack of basic knowledge or follow through, or a timeline that does not realistically apply to the patient's problem. In documentation, this rating might be

used when the patient's care was fragmented, to a point where one cannot follow what should happen. This may be due to the shortcomings of eOMIS or may be due to a lack of comprehensive documentation by the provider.

**Patient Chart Reviews for ASPC-Tucson**

***Patient 1:*** █████████████     ***ADCRR*** ██████

214.   Mr. ██████ is an 81-year-old male who has been incarcerated with ADCRR since June 1990.  He is listed as having 12 chronic clinic problems.  Mr. ██████ has the following chronic care conditions: 1) HTN, 2) type 2 DB; 3) HDL; 4) CAD, s/p coronary artery bypass grafting and percutaneous coronary intervention, 5) severe peripheral arterial disease with revascularization procedures and resulting gangrene of a toe, requiring amputation; 6) atrial fibrillation/Sick Sinus Syndrome, requiring pacemaker placement and chronic anticoagulation, 7) chronic kidney disease (CKD); 8) hypothyroidism; and 9) cognitive decline requiring assistance in self-care.

215.   The earliest provider note that I find in this chart is from January 2015 at the Eyman facility.  He remained at the Eyman facility (with intermittent housing at Florence infirmary after two hospitalizations until he was transferred to the Tucson infirmary in October 2020.  He remains at the Tucson Infirmary.

216.   Mr. ██████ was also seen for and hospitalized with cellulitis of the lower extremities, acute kidney failure, pneumonia, difficulty with ambulation, and a toe ulcer.

217.   Mr. ██████ chronic care problems are complex and challenging.  The difficulty with following the list of chronic problems and the assessment and plan for each, is apparent in this patient's chart.  It seems that chronic clinic visits sometimes addressed all of the patient's problems and sometimes did not.

218.   The patient's diabetes was under fair control for much of the course of the chart, but there is evidence that providers did not always feel they had recent lab work upon which to base care, despite lab work being done very frequently.  It seems that lab work was done immediately after the chronic clinic visit.  It was reviewed, but sometimes changes in therapy were not ordered outside of the chronic clinic visit, and then another chronic

clinic visit occurred several months later, where it is unclear if the labs done months ago reflected any change in therapy. The display of labs both in the lab section and in the chart is an obstacle to providing good care.

219. Later on in the patient's course, and while he was at the Tucson facility, it was apparent that tight control for this patient's diabetes was not going to be an option since he was non-compliant to diet and because he had hypoglycemia when his sugars ran closer to the desirable range.

220. Mr. ▬▬▬ blood pressure (BP) was ultimately controlled, as were his lipids and cardiac problems. He received specialty care for his peripheral vascular disease, which was severe and for his cardiac problems. He is on state-of-the-art treatment for Sick Sinus Syndrome.

221. Mr. ▬▬▬ has been seen often for his medical problems and his care. While somewhat fragmented, it was comprehensive except for the notable lack of detailed foot exams in this patient with (later) documented severe peripheral arterial disease. There are notations, even within a few months of the patient having gangrene, that he has pedal pulses, which is interesting, but there is not a detailed exam of the patient's feet seen. In light of this patient's ultimate diagnosis of severe peripheral arterial disease, one could wonder if earlier foot exams would have identified an issue before he had a negative clinical outcome.

222. **Documentation of Chronic Care: 2-Fair:** This patient's chronic care notes early in this EHR do not do an adequate job of outlining all of the patient's problems, the assessment of those problems, and the plan for each. I noticed more in this chart than in previous charts that providers are not seeing labs that were ordered at the last visit, or are unaware of whether that lab reading reflects any treatment change in the interim that might be affecting what they are seeing on the day of clinic.

223. It is difficult to follow the providers' thought processes in the EHR without having the lab values that they are seeing in the chart. I can understand the confusion of the providers about lab values, since they default to an order in the chart that is the date they

1   were ordered, rather than the date of the collection of the specimen.  As I review notes, I

2   am able to see the future results of labs that were ordered on the day of the clinic (which

3   would not have been available to the ordering provider), but not all of the labs that the

4   provider would be basing their decisions on.

5       224.   **Quality of Chronic Care: 3-Good:** While there was a lag in treatment of

6   some problems and a lapse in treatment of various issues in this chart, his chronic care

7   treatment was good.  Specifically, it seemed like treatment of the patient's diabetes and his

8   hypothyroidism lagged.  Also, there is no documented, detailed foot exam.  There are orders

9   for vaccines, but it is unclear if the patient needs them.

10      225.   **Quality of Episodic Care: 4-Very Good:** Mr. ████████ has been seen by

11  specialists and hospitalized for episodic complaints and has recovered.  He has been referred

12  to physical therapy and is being cared for in an infirmary, where he is seen very frequently

13  and has had his complaints, or lack of them, noted.

14  ***Patient 2:*** ██████████████   ***ADCRR*** ████████

15      226.   Mr. ██████ is a 54-year-old male who has been incarcerated with ADCRR

16  since July 2014.  He is listed as having 10 chronic clinic problems.  Mr. ██████ has the

17  following chronic clinic problems: 1) HTN; 2) type 2 DB; 3) HDL; 4) peripheral

18  neuropathy; and 5) asthma.  He is listed in the problem list as having seizures, Hepatitis C,

19  COPD, and vitamin B12 deficiency anemia, none of which are active problems.  It does

20  appear to me that this patient had a deficiency of B12 that may have been contributing to

21  his peripheral neuropathy, but he has never had anemia and his B12 treatments have been

22  suspended.

23      227.   Mr. ██████ has also been treated for toe pain and sores on his feet.

24      228.   The earliest provider note that I find in the EHR is from February 2016 at the

25  Florence facility.  He appears to have moved to the Tucson facility in early 2017 and then

26  was moved for much of his stay to the Eyman facility in summer 2017.  It appears that he

27  was released in July 2018.  He reappears at the Phoenix facility for an intake assessment in

28  August 2018.  Shortly after that, he is transferred to the Lewis facility and to the Yuma

facility in early 2019.  He remained at the Yuma facility until September 2021, when he was transferred back to the Tucson facility.  The majority of his care appears to have been at Yuma.

229.    It appears that Mr. ████████ chronic care problems were well-treated.  He has had controlled BP for his entire incarceration.

230.    Mr. ████████ diabetes has been very well-controlled until very recently.  He had an increase in his HbA1c in May 2021 and the provider who saw him at chronic clinic in August implicated that the patient was not compliant to his medication.  This was at the Yuma facility.

231.    I have seen reference to comprehensive foot exams in the chronic clinic notes, which document that the patient has decreased sensation in his feet.  It seems that he had documented low serum B12 levels that improved with treatment, but that the B12 lapsed in June 2021.  The next provider review, the patient was started on an oral renal vitamin.

232.    Mr. ████████ lipids are well-managed, and his asthma is also well-managed.

233.    There was delay in recognizing that Mr. ████████ Hepatitis C was not active, and even after this was noted, it was followed for a period of time after that in chronic clinic.

234.    It appears that Mr. ████████ had good treatment for his foot pain and wound on his foot.  He received an injection for toe pain that mentions that he had a metatarsal spur, when the x-ray shows a calcaneal spur.  Mr. ████████ also had a COVID infection and recovered without incident.

235.    **Documentation of Chronic Care:  3—GOOD:** For most of the more recent chronic care documents, the template is ignored, and the notes are free-typed.  There are ongoing chronic clinic problems that are not mentioned and carried forward.  The problem list is not very helpful for tracking chronic clinic problems, since there are diagnoses on the problem list that are not active and even which never existed.

236.    I continue to see an issue where labs are ordered on the day of chronic clinic, are drawn shortly thereafter, the results are reviewed and found to be abnormal, and the comment is that it will be followed at the next chronic clinic, which might be months later.

At the next chronic clinic, a review of the labs which allows the provider to understand what has happened between the last clinic and the present is difficult, with labs being dated by the ordering date and defaulting to an order that does not reflect the date of collection. It is also difficult to follow what is happening with the inability to import lab data into a note and to only be able to see future data from the labs ordered the day of the visit.

237.    **Quality of Chronic Care: 4—VERY GOOD:** This patient's diabetes, HTN, asthma and lipids were well-attended and controlled, for the most part. I believe his B12 deficiency should be paid attention to in light of the known neuropathic problems. The patient's Hepatitis C was not active. It should be removed from the problem list. I commend the staff at Yuma for discontinuing following it on the chronic clinic visits.

238.    **Quality of Episodic Care: 4—VERY GOOD:** This patient received care for several problems and did well. The injection in the foot for a metatarsal spur instead of a calcaneal spur is an outlying finding.

***Patient 3:***            ***ADCRR***

239.    Mr.          is a 52-year-old male who has been incarcerated with ADCRR since July 1993. He is listed as having 9 chronic clinic problems. Mr.          chronic clinic problems are as follows: 1) Sick Sinus Syndrome with intermittent atrial fibrillation, s/p pacemaker placement and with chronic anticoagulation, 2) HTN; 3) HDL; 4) hyperthyroidism; 5) OSA with CPAP treatment; 6) and 6) latent TB infection.

240.    The earliest provider note I find in the EHR is from December 2014 at the Lewis facility. It appears he was housed there until he was admitted to a Lewis infirmary in early 2015. He was maintained in the Lewis infirmary until transfer to a Tucson infirmary in June 2015. Mr.          stayed in the Tucson infirmary until he was transferred to a skilled nursing unit in the Tucson complex in the summer of 2019 where he remains.

241.    Over the time period reviewed, I also saw mention of problems of CAD and Hepatitis C. I see no evidence that this patient has either one of these. I am not convinced that this patient has thyroid disease, based on the labs available in this EHR. His TSH was repeatedly normal, and he once had an elevated T3RU. He had a negative HCV antibody

41

when it was checked.  He is on anticoagulation for paroxysmal atrial fibrillation, not for CAD.

242.    Mr. ███████ is a complex patient. It is difficult to follow the course of his care due to the issues inherent with the EHR.  His chronic clinic notes do not list all of his chronic clinic problems so that they may be carried along.  His OSA is not treated as a chronic clinic problem and probably should be.  This patient's chronic pain may be classified as a chronic clinic problem, using the definition of being a problem in which the patient may have a poor outcome if his medications were to lapse, or he would be lost to follow-up.  This patient is on chronic opioids for back pain and has had extensive workup for his pain, including steroid injections and specialty care with a pain specialist.

243.    The problems of paroxysmal atrial fibrillation, HTN, HDL, and thyroid disorder (it is unclear what the thyroid disorder is) are all controlled.  Mr. ███████ arrhythmia and pacemaker therapy are very well-managed with frequent involvement of a cardiologist and evaluations that have included echocardiograms, Holter monitoring, and stress-testing.

244.    Mr. ███████ has, as mentioned, had chronic back pain and foot pain.  He has had a great deal of specialty care for this as well, with a special orthotic crafted for his foot, multiple imaging studies of his spine, and the administration of epidural steroid injections.

245.    Mr. ███████ has had evaluation for peripheral vascular disease, multiple surgeries for dental problems (with the oral surgeon), evaluation for hypoglycemia, which was negative, and several esophago-gastroduodenoscopies and colonoscopies for GI complaints.

246.    **Documentation of Chronic Care:  3—GOOD:** Although the documentation within the chart is good, the issues relating to the EHR is an impediment to the continuity of care.

247.    **Quality of Chronic Care:  4—VERY GOOD:** This patient has received a plethora of care for his problems (arrhythmia with pacemaker and anticoagulation, HTN, HLD, chronic pain, and OSA).  They have all been controlled.  The OSA has not been

1    addressed with any regularity in CCC. Mr. ███ also has been seen for problems that

2    should not have been addressed in chronic clinic or by a provider at all—namely latent TB

3    infection.  Care is fragmented because of how data is displayed in the EHR.  Care has been

4    aggressive, including using a pain service and multiple specialists.  I think consideration

5    should be given as to the most appropriate and effective use of chronic clinic. This should

6    be communicated to all facilities since chronic clinic documentation is unique to

7    corrections.

8         248.   **Quality of Episodic Care: 4—VERY GOOD:** This patient had every

9    complaint extensively worked up.

10   ***Patient 4:***  ███   ***ADCRR*** ███

11        249.   Mr. ██ is a 74-year-old male who has been incarcerated with ADCRR since

12   March 1999.  He is listed as having 9 chronic clinic problems.

13        250.   Mr. ██ has the following chronic care problems: 1) COPD; 2) type 2 DB; 3)

14   HDL; 4) OSA; and 5) HTN.  His OSA was mentioned on his intake assessment, and he has

15   a CPAP machine, but it is not mentioned in chronic clinic notes.  Mr. ██ reported at intake

16   that he had a history of Hepatitis C that had been successfully treated prior to arrival.  His

17   labs supported that he has had a sustained viral response and does not have Hepatitis C, but

18   he continues to be followed for Hepatitis C in chronic clinic, regardless.

19        251.   The earliest provider note that I find in the EHR is from August 2017 at the

20   Phoenix facility.  He had an intake assessment and then was transferred to the Tucson skilled

21   nursing unit due to hearing loss and inability to communicate.  He was housed in a Tucson

22   until the present, but for a short stay in the Tucson IPC, where he was placed "for housing

23   only."

24        252.   He has also been seen for: 1) cataracts; 2) enlarged prostate with lower urinary

25   tract symptoms; 3) severe hearing deficit; 4) COVID infection; and 5) lower extremity

26   edema and "ruber" (sic), which the provider associated with possible peripheral vascular

27   disease.

28        253.   Mr. ██ care is less complex than some, but diagnoses are missed from one

chronic clinic note to the next and sometimes new diagnoses are added. "COPD" becomes "asthma" at one point, despite being oxygen-dependent for part of his incarceration. (He is now refusing oxygen.)

254.   Mr. ███ COPD was well-controlled for much of his stay, but it appears that in the last 6 months, 2 of his inhalers have lapsed and need to be reordered.

255.   Mr. ███ diabetes has also been well-controlled until very recently. The most recent A1c was done shortly after the last chronic clinic was completed. The A1c was higher than desirable. The provider commented on the lab that it would be discussed at the next clinic visit. If one goes back into the encounters, there is a medicine renewal for glargine insulin that is 15u a day; however, it was listed as 10u a day in a previous note.

256.   It appears that Mr. ███ had monofilament testing in August and October 2019. He has had regular visits with optometry for retinopathy screening. He has had a pneumovax and a Shingrix vaccine, per his medicine list.

257.   Mr. ███ HTN and lipids are well-controlled. He does not have an active Hepatitis C infection and it should not continue to be followed in chronic clinic.

258.   Mr. ███ had cataract removal and has had investigation of his leg complaints (he does not have peripheral vascular disease). He had a COVID infection and recovered without incident.

259.   **Documentation of Chronic Care: 2—FAIR:** It is difficult to follow the plan for a patient due to the EHR. Medication doses change and there is no indication why. It is unclear where medication discontinuation is documented. It is not possible to tell which labs the providers are basing their decisions upon unless they free type them in. Chronic clinic documentation is haphazard, with some diagnoses listed, but not all. Diagnoses that have not been active for years remain on the list of problems that are followed.

260.   **Quality of Chronic Care:  3—GOOD:** This patient's HTN and lipids have been under good control for his entire incarceration. His diabetes has recently become less controlled. His COPD has been controlled.

261.   **Quality of Episodic Care: 5—EXCELLENT:** This patient has had several

problems that have been fully addressed or worked up and ruled out.

***Patient 5:*** ▓▓▓▓▓▓▓▓ ***ADCRR*** ▓▓▓▓

262.   Mr. ▓▓▓ is a 72-year-old male who has been incarcerated with ADCRR since August 2012.  Mr. ▓▓▓ is listed as having 8 chronic clinic problems.

263.   The earliest, substantive provider note I find is from September 2014 at the Florence infirmary.  He was transferred from the infirmary to Florence facility after about 3 weeks of treatment.  He remained housed at the Florence facility until late 2020, when he was transferred to the Tucson skilled nursing unit.  He remains there.

264.   Mr. ▓▓▓ has the following chronic clinic problems: 1) type 2 DB; 2) HTN; 3) COPD; 4) HDL; 5) proteinuria; 6) CAD; 7) peripheral arterial disease; 8) necrosis of toes requiring amputation; 9) diabetic foot ulcers with osteomyelitis; 10) Parkinsonism; 11) systolic heart failure due to ischemia; and 12) diabetic retinopathy.

265.   Mr. ▓▓▓ also has the following in his problem list that I find unsupported by the chart notes: iron-deficiency anemia, hypothyroidism, and asthma.  Mr. ▓▓▓ has also had COVID infection and has had cataract extraction.

266.   Mr. ▓▓▓ medical care is extremely complex.  His diabetes was never at goal, his BP control was not at goal, his lipids were acceptable, and his COPD was stable. I noticed that the chronic clinic notes did not include all of the chronic clinic diagnoses and did not reference the last A1c.  There were times when the provider actually documented an A1c that was above goal and did not advance diabetes treatment.

267.   Mr. ▓▓▓ had a positive microproteinuria in 2017 and is not put on an ARB until years later.   There are numerous checks for microproteinuria His ACEI/ARB protection is no longer present for a few years in the middle of the timespan reviewed.  It is written in a note that he has nephropathy, yet his creatinine remains normal.

268.   Mr. ▓▓▓ had an extreme amount of specialty care during 2014-2017 (cardiac catheterization, stents, peripheral vascular disease treatment) and this was very difficult to follow.

269.   **Documentation Overall/Documentation of Chronic Care: 1—POOR:**

The care for Mr. ███ is very poorly documented.  This is due to the EHR.  I did not find why or when medications were stopped or lapsed.  Chronic clinic notes did not list all chronic clinic problems.  This means that at every chronic clinic visit (especially if it is a provider that does not know this patient), a full review of the chart would need to be done to understand the patient's problems.

270.    The list of problems is difficult to follow.  Diagnoses are added that never existed (this patient had a mildly decreased iron level on one lab panel, which triggered an anemia workup even though he did not have a low H/H.  He had a high FTI on one panel that triggered adding "hypothyroidism" (high FTI would indicate hyperthyroidism), despite the patient having a normal TSH.

271.    There is a great deal of information in this EHR - perhaps all the information needed to care for this patient - but it is time-consuming.  All the major modules are displayed in a way that makes it difficult for providers to locate what they need.

272.    **Quality of Chronic Care:  2—POOR:** I think the care of this patient overwhelmed the providers.  Likely the information needed was not available.  His diabetes was never very well-controlled, and for a very long time, his BP was not either.  It is difficult to separate the quality of the care from the documentation of the care.  In 2017, a lab was performed showing that he had microproteinuria.  ACEI/ARB was not started for some time.  For years it was not found on his medication list and then it reappeared on the medication list relatively recently. This patient has a great many problems that have been somewhat urgent and distracted from the maintenance and control of his underlying disease states.

273.    **Quality of Episodic Care:  4—VERY GOOD:** Mr. ███ has lived through a COVID infection and has had his cataracts extracted.  I find both of these somewhat remarkable.  He has also had intermittent cellulitis and infections and infestations that have received episodic treatment that was very good.

***Patient 6:*** ███        ***ADCRR*** ███

274.    Mr. ███ is a 55-year-old male who has been incarcerated with ADCRR

46

since September 2008.  He is listed as having 8 chronic clinic problems.

275.    Mr. ▓▓▓ chronic care problems (by my assessment) are: 1) type 2 DB; 2) HTN; 3) HDL; 4) CKF; 5) adenocarcinoma of the gastric cardia; 6) osteomyelitis on the foot; 7) OSA; 8) hypothyroidism; 9) peripheral neuropathy; 10) CAD and presence of cardiac pacemaker; 11) atrial fibrillation; 12) chronic anticoagulation; and 13) history of unprovoked DVT.

276.    The earliest provider note that I find in the EHR is from July 2014 at the Florence facility.  He was transferred to the Tucson facility in August 2015 and was housed between the skilled nursing unit and the IPC since then. He has also had several hospitalizations in the period of time reviewed.

277.    Mr. ▓▓▓ was also seen for rashes and skin breakdown, COVID infection and for BPH and LUTS during this period of time.

278.    Mr. ▓▓▓ is an extremely complex patient.  His chronic care is difficult to follow.  His diabetes, in general, was addressed and controlled, as was his HDL and HTN. He has had a great deal of specialty care for his foot care and needs surgery for a toe lesion (amputation). He has had multiple cardiology visits for pacemaker assessment and has seen the optometrist regularly for retinopathy screening.  His creatinine has dropped into the normal range over the past 2 years, and he is receiving ACEI treatment for prophylaxis of renal injury. Mr. ▓▓▓ anticoagulation has also been well-managed and followed closely.

279.    Mr. ▓▓▓ was diagnosed with cancer of the gastric cardia in July 2021. My concern with this is that he was documented as having lost 100 pounds in 5 months on a May chronic clinic visit.  He had a low hemoglobin on the chart from January 2021.  The provider who saw the patient in May ordered lab studies for anemia, a different provider reviewed the results (hemoglobin 11.5), signed off on them, and said the results would be reviewed with the patient at the next visit.  The next visit for chronic clinic was not scheduled to happen for months.  The patient was being seen daily by nursing and every few days by a provider and these results were not mentioned.  It was not until July 19, 2021, that the patient had a coffee-ground emesis, was sent to the hospital and scoped, and found

to have a gastric tumor.  He is now scheduled for surgery, chemotherapy, and radiation.

280.  **Documentation of Chronic Care: 2—FAIR:** The EHR makes taking care of complicated patients difficult to do well.  The templates provided do not promote comprehensive, easy-to-follow documentation that can be referred to at the next visit, so problems are not followed continuously.  Additionally, if there is no comprehensive chronic clinic note for a provider to refer to, the provider will need to review the chart as I have done, which is time-prohibitive.  I continue to see inaccuracies in the problem list, difficulty with following labs, reviewing consults, and following preventive care efforts.

281.  **Quality of Chronic Care:  2—FAIR:** This patient had most of his chronic clinic problems managed.  I am, however, extremely concerned about the profound weight loss and a drop in his hemoglobin, which should have prompted a referral for a workup.

282.  **Quality of Episodic Care: 5—EXCELLENT:** I have no criticism of the episodic care that I saw documented.

***Patient 7:***  ███████████████        ***ADCRR*** ██████

283.  Mr. ████████ is a 58-year-old male.  He has been incarcerated with ADCRR (this time) since January 2020.

284.  Mr. ████████  has the following chronic clinic problems: 1) hepatocellular carcinoma; 2) Hepatitis C infection; 3) cirrhosis of the liver; 4) legal blindness due to trauma to right eye and endophthalmitis of the left eye; 5) HTN; and 6) type 2 DB.

285.  The earliest provider note that I find in the EHR is from January 2020 at the Phoenix facility.  He was transferred shortly thereafter to the Tucson skilled nursing facility and has recently been housed in Tucson residential medical housing.

286.  Mr. ████████  also has diagnoses of idiopathic thrombocytopenia and diabetic retinopathy, and I do not believe he has either one.

287.  There was no episodic care to review for Mr. ████████

288.  Mr. ████████  arrived with urgent medical needs, namely, he was in the middle of treatment for hepatocellular carcinoma.  He received a referral to hematology-oncology, which occurred rapidly.  Hematology-oncology referred him for interventional

48

radiology evaluation which took 3 months.  The patient has now received Y-90 treatment for his tumor with incomplete cure.

289.  Mr. ██████ is currently being treated for Hepatitis C.

290.  Mr. ██████ has had adequate control of his diabetes and HTN.  Extreme control of either is not a priority, in light of his tumor and prognosis.

291.  Mr. ██████ has also had a thorough evaluation of his eye problems with optometry and with ophthalmology.  His vision prognosis is guarded.

292.  **Documentation of Chronic Care:  3—GOOD:** The documentation issues with the EHR have been mentioned in my summary, and they exist here as well.  The providers are doing a variable job at documenting this patient's chronic clinic needs, but some of the notes have only one diagnosis listed ("DM") and most are missing some diagnoses.

293.  **Quality of Chronic Care:  3—GOOD:** This patient has received care for his hepatocellular carcinoma and is now receiving care for his Hepatitis C.  His BP and diabetes should not be run tightly, and they are acceptable.

294.  **Quality of Episodic Care:  NOT APPLICABLE**

***Patient 8:*** ██████████ ***ADCRR*** ██████

295.  Mr. ████ is a 49-year-old male.  He has been incarcerated with ADCRR since September 2019.  He is listed as having 7 chronic clinic problems.  Mr. ████ has the following chronic care problems: 1) CAD s/p PCI; 2) history of CHF with indication of systolic dysfunction and diastolic dysfunction; 3) HTN; 4) type 2 DB; 5) s/p pacemaker/implanted defibrillator placement; 6) proteinuria; 7) CKD; and 8) diabetic neuropathy.

296.  The earliest provider note that I find in the EHR is from September 2019 at the Phoenix facility.  Several days later, he was transferred to the Tucson facility, and he remains housed there.

297.  Mr. ████ is listed as having had bypass grafts for which I see no documentation.  Also, he has a diagnosis of enlarged prostate which is based on the patient

reporting that he was told that in the past.  There has been no rectal exam or PSA done, nor any workup of this at all.  It has not been treated or symptomatic during this incarceration, yet he has it listed on his problem list, and it is added with regularity to the chronic clinic notes.

298.  It appears to me that he may have kidney disease and is spilling protein in his urine, yet this diagnosis has not been added to his chronic clinics.  He has also recently been seen by optometry and is noted to have "ocular HTN" but has not had this added to his problem list.

299.  Mr. ███ has received very good care for his chronic clinic problems, despite frequently refusing lab work, clinic visits, and refusing to answer questions during clinic visits. His diabetes is well controlled, and it appears that his BP is adequately controlled on his current regimen.  He has been hospitalized once for chest pain and has seen the cardiologist several times for evaluation of his cardiac status and for interrogation of his pacemaker.  Mr. ███ has had an EKG during this incarceration, and another is ordered, along with a SPECT-stress test to evaluate his status after his recent hospitalization.  Mr. ███ had 4 monofilament tests documented over a 6-month period in 2020.

300.  There was no episodic care to review for this patient.

301.  **Documentation of Chronic Care:  3—GOOD:** In general, the notes for chronic clinic included most of the patient's chronic clinic problems, although some diagnoses should not have been included and some should have been mentioned and included in the listing of issues.

302.  **Quality of Chronic Care:  5—EXCELLENT:** Mr. ███ problems are under good control.  There is investigation into whether there are new problems after being hospitalized.

303.  **Quality of Episodic Care:  NOT APPLICABLE**

***Patient 10:*** ███ ***ADCRR*** ███

304.  Mr. ███ is a 65-year-old male who has been incarcerated with ADCRR since November 2013.  He is listed as having 6 chronic clinic problems. Mr. ███ chronic

clinic problems are as follows: 1) type 2 DB; 2) peripheral neuropathy due to DB; 3) HDL; 4) microproteinuria; 5) asthma; and 6) HTN.  He is consistently seen in chronic clinic for Hepatitis C, which is not active.  At one point a provider referred to the patient having a seizure diagnosis in chronic clinic.  It is unclear where that diagnosis came from.  It was not present on the next chronic clinic note.  Microproteinuria is not on his problem list, nor is liver disease, yet he has a score of F3 on a Fibrosure test.

305.   The earliest provider note that I find in the EHR for this patient is from March 2015 at the Tucson complex.  He remains housed at the Tucson complex.

306.   Mr. ██████ was also seen for a thyroid disorder and was evaluated for varicose veins.  He had a COVID infection in December 2020 and was evaluated for joint pain over the years.

307.   Mr. ██████ has had good control of his lipids and BP.  His diabetes has never really been well-controlled, but providers have continuously attempted to improve his diabetes regimen.  Mr. ██████ has had eye exams with regularity.  I found one ophthalmology note, hand-written, that states that the patient has diabetic retinopathy, and then another from shortly thereafter, which was typed, that stated that he did not have diabetic retinopathy.  Mr. ██████ has had 1 monofilament test that I found scanned into the chart from September 2021.

308.   In 2016, there were labs in the chart showing that Mr. ██████ Hepatitis C was not active.  Yet, his chronic clinic notes continued to address Hepatitis C.  Mr. ██████ has also had labs looking at whether he was immune to Hepatitis A (he is) and B (it appears he has had an infection and it may have resolved, but he does not have surface antibody).  Regardless, he has had Hepatitis B vaccine ordered twice.

309.   Mr. ██████ has had a documented positive microalbumin test since 2016 and he is on an ACE inhibitor, but he has continued to have microalbumin checks every 3 months.  This is non-value-added.

310.   It appears that Mr. ██████ got quite a lot of attention for his joint complaints, often during chronic clinic.  He was screened for inflammatory arthritis despite having a

clinical picture and x-rays that were not consistent with inflammatory arthritis.  He has had steroid injections in his joints and has had specialty care visits with orthopedics.

311.    He also has had a thyroid nodule worked up by an ENT and had an aspiration showing a benign cyst.  His TSH and FT4 are consistently normal.  Mr. ███ has also had an extensive workup and specialty care for superficial varicose veins.  Support hose were recommended.

312.    **Documentation of Chronic Care:  2—FAIR:** It is difficult for providers to use the Chronic Care template effectively.  I am seeing a gastroenterology visit that has the designator "colposcopy" instead of "colonoscopy," and I see duplicate documentation scanned in of the same specialty visit.

313.    **Quality of Chronic Care: 3—GOOD:** Mr. ███ had good care for his HDL and HTN, and there was a great deal of attention paid to controlling his diabetes, without success.  I disagree with the practice of splitting chronic clinic diagnoses into separate visits. I noticed that on Mr. ███ last chronic clinic visit, it was said that his asthma was well-controlled and then the inhaler was discontinued.  I do not understand why this was done. I also disagree with the repeated testing for thyroid disease and microalbuminuria.  None of this testing would lead to a change in treatment.

314.    Hepatitis C that is inactive should not continue to be addressed in chronic clinic.  It may have been desirable to workup his positive Hepatitis B core antibody, and if it represents resolved infection, and to document that.  It does not make clinical sense to give this patient 2 Hepatitis B vaccine series.

315.    **Quality of Episodic Care:  4—VERY GOOD:** Mr. ███ joint pains clearly did not represent inflammatory arthritis and the workup for that was extraneous, as was his workup for varicosities in his legs.  However, no harm was done, and his episodic complaints were addressed.  He also received a thorough workup for his thyroid nodule.

**Summary of Findings for ASPC-Tucson:**

316.    The staff at the Tucson complex are highly motivated to provide excellent care.  There is no sign of indifference in the care delivered by providers. The Tucson

providers seem extremely competent and up-to-date on their medical knowledge.  I would mention that I have seen the use of calcium channels as the drug of choice for HTN in a diabetic and the use of a fibrate instead of a statin in a diabetic to be an issue.  I saw less use of NSAIDS in this patient set than I have at other units, which is positive.

317.   The Tucson patients and the Eyman patients, in comparison to the Safford, Yuma and Winslow patients are much more complex.  Review of these charts is arduous with the EHR in its current state, and the care these patients have received is really quite remarkable, in view of how difficult the review of care is in the EHR.

318.   It is encouraging that the EHR is being replaced to provide an experience that is centered on the flow of patient care, on allowing providers to document care clearly, to determine what a patient needs and to guide medical staff to provide excellent care.

319.   It appears that the care is much improved and much better documented over the past 2-3 years.  Much of that seems to be related to the providers free-typing chronic clinic notes instead of attempting to use the chronic clinic template.

320.   I also notice that referrals seem to happen very readily when needed.

321.   There appears to be more attention to documenting a detailed foot exam and to screening for colon cancer and HIV over the past couple of years under Centurion.

322.   The excessive burden of non-value-added care in chronic clinic should be eliminated.  A large part of this is resulting from excessive lab testing using panels that are not required, per national guidelines.

323.   Vaccination history and administration of recommended vaccines should also be routinely offered.

324.   Screening for cancer that is recommended under national guidelines should be offered.  Specifically, there does not appear to be organized screening for colon cancer.  I saw less repetitive screening with PSA in this set of charts.

325.   The care for the Hepatitis C patients' needs to be better demonstrated in the charts.  Patients with Hepatitis C antibody should be screened early for active disease and taken out of chronic clinic.

**Patient Chart Reviews for ASPC Yuma**

***Patient 1:*** ███████████     ***ADCRR*** ██████

326.    Mr. ████ is a 51-year-old male who has been incarcerated with ADCRR since April of 2009.  He is listed as having 3 chronic clinic problems.  By my assessment, he has mild persistent asthma and elevated lipids with a low ASCVD score and no indication for treatment.  He has been receiving diet counseling in CCC for this problem.

327.    The first note I found that had been completed by a provider was in October 2018 at the Phoenix facility.  It appears that Mr. ████ was moved to the Yuma facility shortly after that.  He is due for his next CCC visit in October.

328.    Most of Mr. ████ visits have been about a left shoulder injury that he suffered in a bike accident prior to incarceration.  He has been receiving NSAIDs for this, and he also has seen an orthopedic surgeon and has been diagnosed with an AC separation.

329.    Mr. ████ has also had an abnormal CXR that was investigated and cleared, and a mild increase in his glucose.  Diabetes was ruled out.

330.    Mr. ████ has had asthma that has been followed every 6 months in chronic clinic.  The provider at Yuma has been documenting that he is using his rescue inhaler 2-4 times per week, but she has not started a steroid inhaler.  Regardless, the patient does well.

331.    This same provider also noted the slight increase in lipids and documented an ASCVD score.  She properly did not start medications and only recommended that he watch his diet.  He should have a check of his lipids annually but has been getting labs much more frequently.  The panels that are ordered include many non-indicated lab studies.

332.    **Documentation of Chronic Care: 5—EXCELLENT:** Despite the limitations of this EHR, the documentation of the chronic care of this patient is excellent.  The provider consistently asks about frequency of using a rescue inhaler and has included an ASCVD score.

333.    **Quality of Chronic Care: 3—GOOD:** This patient is doing very well, but, by guidelines, should be on a steroid inhaler.  I also believe that HDL that is not likely to ever require pharmacologic treatment should be treated as an annual screening task, not as

54

an ongoing chronic care item.

334.   I also think that the panels that are being used are extremely unhelpful and are difficult to keep up with.  Most of the tests that are being done are not indicated.  An annual lipid check would be adequate for this patient, and he should be having colon cancer screening.

335.   **Quality of Episodic Care: 5—EXCELLENT:** This patient has had attention for his AC separation.  However, repair has been delayed due to COVID shutdowns.

***Patient 2:*** ▮▮▮▮▮▮▮▮▮▮ ***ADCRR*** ▮▮▮▮▮

336.   Mr. ▮▮▮ is a 58-year-old male who has been incarcerated with the ADCRR since May 2012.  He is listed as having 2 chronic clinic problems.  He is on the Winslow list, and I originally reviewed his chart for the Winslow facility, but there is only one very recent provider note from the Winslow facility.  The vast majority of the care was delivered at the Yuma facility.

337.   Mr. ▮▮▮ has the following chronic clinic diagnoses on his problem list: HTN and HDL.  Not listed, but addressed in chronic clinic, are tachycardia and BPH.

338.   The first EHR note containing substantive documentation from a provider is from June 2016 at the Phoenix facility.  This patient had an intake assessment at the Phoenix facility in 2016 and in 2018.  He was transferred to the Yuma facility in June 2018.  The documented provider care is from the Yuma facility, until the very last note (from 9/22/2021, the day before my review), which was from the Winslow facility.

339.   Mr. ▮▮▮ did not have significant episodic healthcare addressed in provider notes, nor did his HNRs reflect much need for episodic care.

340.   The chronic clinic care that Mr. ▮▮▮ received was much more than he should have received.  Much of it was due to over-reliance on lab testing.

341.   Mr. ▮▮▮ had unexplained sinus tachycardia when he was first seen.  His BP was not elevated, but he was started on propranolol.  He was then seen for years for HTN which had not been diagnosed.

342.   In 2019, his propranolol was discontinued because the patient insisted he did

not have HTN.  His BP then went up (as did his pulse) and he was found to have normal vital signs for a very long time (until June 2021).  In June 2021, he had one elevated BP reading and was started back on a beta-blocker.

343.    The finding of rare and unexplained tachycardia also led to checking thyroid function (as it should).  The TSH was found to be slightly depressed, but the T4 was normal.  This prompted immediate starting of methimazole, despite the normal thyroid function.  It also prompted an extensive workup including thyroid peroxidase antibodies, not once, but twice, and, in the end, repeat TSH was normal, the methimazole was stopped (properly) and all was deemed normal.

344.    The patient is followed for his elevated lipids which are really borderline.  There is no indication why treatment was started.  I cannot say that the patient needs it or not, but there should be an explanation in the chart as to why it was treated.  This should include an ASCVD risk assessment and an explanation of what the goal is for the treatment.

345.    Another ongoing workup for something that never existed is the persistence of 6-month, continuously normal checks of HbA1c.  The patient repeatedly tells the providers that he has never had diabetes, but because it was mentioned in the intake physical (without source), it persists in the chronic clinic care.

346.    Lastly, the patient reported he had a remote history of Hepatitis C and that he had been treated.  This is noted in the first note in the chart from June 2016.  He is followed repeatedly for Hepatitis C until finally, in 2019, an HCV RNA is ordered and is found to be normal.  He appears to have a sustained viral response to his treatment with interferon.

347.    There is no episodic care found for me to comment on.  I see no evidence that the patient has been vaccinated or had any screening for colon cancer.

348.    **Documentation of Chronic Care: 4—VERY GOOD:** The EHR has the aforementioned challenges, but despite those, the documentation of chronic care is relatively easy to follow.  There continue to be issues with including problems in chronic clinic and on the problem list that do not exist.  It seems to be difficult to designate problems as inactive or resolved.

349.   **Quality of Chronic Care: 3—GOOD:** This patient had some real problems (Hepatitis C, tachycardia and, later, HPN), but also was seen and sometimes treated for problems that didn't really exist.  He does not, for his circumstances, have significant HDL.  He never had thyroid disease and did not need an antithyroid drug.  He should not have been getting HbA1c levels done every 6 months.

350.   His Hepatitis C was treated, and he had an excellent outcome.

351.   **Quality of Episodic Care:  NOT APPLICABLE**: I do not have any content on which to comment.

***Patient 3:*** ▮▮▮▮▮▮▮▮▮▮▮     ***ADCRR*** ▮▮▮▮

352.   Mr. ▮▮▮▮▮ is a 56-year-old male.  He has been incarcerated with ADCRR since January 2009.  He is listed as having 2 chronic clinic problems: HTN and HDL. He is currently housed at the Winslow facility, but his healthcare has largely been at the Yuma facility.

353.   The initial chart containing provider notes is in November 2018 at the Phoenix facility.  It appears that this patient had an intake assessment at this time and then was transferred to Yuma.  He remained at Yuma until mid-August 2021.

354.   There is little evidence of episodic care in the EHR (performed by providers), but he was diagnosed with COVID in January 2021 and was seen by providers for that.

355.   It appears that Mr. ▮▮▮▮▮ chronic care was quite good.  His HPN was treated effectively and quickly, despite Mr. ▮▮▮▮▮ refusing several chronic care visits.

356.   Dr. Smalley, at the Yuma facility, documents an ASCVD risk score in the chronic clinic notes and starts a statin.  The patient does not tolerate the statin, and it is discontinued.  Ezetimibe was begun and there was some improvement seen in the LDL.

357.   There is mention of abnormal glucose in the chronic clinic notes.  I do not know where this has come from.  There are no abnormal glucose readings in the lab section of the chart.  I see no less than 4 HbA1c readings (all normal) in the past 1.5 years.  There seems to be a great deal of over-testing.

358.   I find no evidence of the patient receiving screening for hepatitis, HIV, or

colon cancer.  I see no evidence of vaccines being delivered (source is the medicines tab).

359.   **Documentation of Chronic Care:  3—GOOD:** I see no documentation of an abnormal glucose, and this has led to at least 4 lab tests.  Other than this, I am able to follow the care decisions for this patient.

360.   **Quality of Chronic Care: 4—VERY GOOD:** This patient's HPN was well-treated and responded rapidly.  The lipids were treated properly by calculating an ASCVD risk score and starting a statin, even though the patient eventually did not tolerate it.

361.   I see no evidence that routine screening for colon cancer happened until Mr. ▮▮▮ arrived at Winslow.  I see no evidence of screening for HCV or HIV.

362.   **Quality of Episodic Care:  5—EXCELLENT:** Mr. ▮▮▮ had COVID with few symptoms but appears to have been seen for it.  I question the utility of a provider seeing a patient with few symptoms, but that would be policy-driven.

***Patient 4:*** ▮▮▮▮▮▮ ***ADCRR*** ▮▮▮

363.   Mr. ▮▮▮ is a 78-year-old male.  He has been incarcerated with ADCRR since May 2015.  He is listed as having 8 chronic care problems: 1) HTN; 2) type 2 DM; 3) HDL; 4) CKD; 5) LUTS; 6) COPD; 7) Hepatitis C; 8) and history of seizures, stable off of medication.  The patient also has cirrhosis of the liver, but this is not listed.

364.   The first note with an entry from a provider is in June 2017 from the Yuma facility, where the patient remains.

365.   Mr. ▮▮▮ was seen in CCC starting in 2015 and there are some truly outstanding notes entered in this chart.  Provider Ling and Dr. Smalley, in particular, wrote coherent notes with pertinent history and physical exams.

366.   Provider Ling recorded in a chronic clinic note in 2015 that the patient had been experiencing chest pains approximately monthly. Provider Ling ordered an EKG, which was abnormal (LBBB), and there is no evidence that this patient, with a very great pre-test probability of having heart disease, ever had this followed up.

367.   In 2015, Provider Ling also noted in the records that the patient needed colon cancer screening.  A fecal occult blood test was positive.  There is no evidence that this

result was reviewed and there is no follow-up.  I see no more mention of colon cancer screening for this patient, and there was no referral that I find for colonoscopy.  He has also had some low hemoglobin readings.

368.    Dr. Smalley has consistently been seeing this patient in chronic care and has done an excellent job.  She is tracking vaccine status and has this patient's BP and diabetes under great control.  This patient was seen approximately every 3 months for his chronic care issues.  He also had a HbA1c checked pretty much every 3 months and had screening for microalbumin and for sensation in his feet using a microfilament.

369.    Mr. ███████ Hepatitis C was treated in January 2021, and he appears to have had a sustained viral response so far.

370.    This patient had a positive HCV antibody in 2015 and did not have an FNA done until 2018.  He did not have screening for HIV until April 2020.

371.    Regarding episodic care, there is mention in the provider notes of foot, hip, and knee pain.  X-rays were ordered to evaluate this.  Osteoarthritis was seen.

372.    **Documentation of Chronic Care: 5—EXCELLENT:** In the past few years, the notes for CCC have become much more helpful.  There is evidence that providers are tracking the requirements for a chronic clinic disease (diabetes and HCV are the most prominent in this patient), and they are able to see from note to note what needs to be done.  I am seeing that one provider, Dr. Smalley, consistently is seeing this patient, which I believe is also a very positive approach to chronic care.

373.    **Quality of Chronic Care:  3—GOOD:** There are issues with the care received in the 2015 timeframe.  More recently, I would rate his care as excellent, especially with the care delivered by Dr. Smalley. Regarding the care in 2015, however, I am troubled by screening for blood in the stool, finding it to be present, and seeing some low hemoglobin. These levels in a patient who should be getting screened for colon cancer, even without risk factors or heme in his stool, is important.

374.    I am also troubled by getting a history of chest pain (which was not well-described) in a patient with many risk factors for CAD and an abnormal EKG and then not

acting on it.  Both of these happened in 2015.  There seems to definitely be improvement in this recently, but I still do not see colon cancer screening. If the colon cancer screening would be addressed as a systemic issue, my rating would be higher.   It is difficult to overlook the lack of routine colon cancer screening.

375.   **Quality of Episodic Care:  4—VERY GOOD:** This patient complained of pain in multiple joints and automatically had x-rays done.  This was probably unnecessary.

*Patient 5:* ▮▮▮▮▮▮▮▮        *ADCRR* ▮▮▮▮▮

376.   Mr. ▮▮▮▮ is a 58-year-old male.  He has been incarcerated with ADCRR since August 2017.  He is listed as having 8 Chronic care problems.  By my assessment, Mr. ▮▮▮▮ chronic clinic problems are: 1) type 2 DM; 2) HTN; 3) HDL; and 4) mild, intermittent asthma.

377.   The earliest substantive note that I find in the EHR is from August 2017 at the Phoenix facility.  Mr. ▮▮▮▮ was transferred shortly after that to the Yuma facility where he remains.

378.   He has had issues over the course of the chart with microhematuria, which is referred to as a known problem, with kidney stones and with knee pain.

379.   Mr. ▮▮▮▮ was seen regularly in chronic clinic and his diabetes, HDL, and HTN were controlled. There is reference to monofilament testing, but I cannot find the documentation of that.  There are consults to optometry for diabetic retinopathy screening.

380.   Mr. ▮▮▮▮ was started on albuterol for cough-variant asthma and PFTs were ordered.

381.   There is a set of negative hemoccult cards documented in 2019 and none since.  I see no documentation of vaccine administration in the medication history.

382.   Mr. ▮▮▮▮ episodic care was also very well attended.  He was referred to urology for his hematuria and refused workup.  Mr. ▮▮▮▮ had x-rays for his respiratory complaints and his musculoskeletal complaints.

383.   **Documentation of Chronic Care:  3—GOOD:** It is much easier to follow the course of care in this chart than it has been in some of the older charts.  I cannot find the

documentation of vaccines in the medication tab, and I cannot find the results of the monofilament testing.

384. **Quality of Chronic Care:  5—EXCELLENT:** I found nothing missed in this patient's chronic care.  Vaccinations for certain chronic care problems and the monofilament testing results should be well-documented and easier to find.

385. **Quality of Episodic Care:  5—EXCELLENT:** All problems appear to have been addressed well.

***Patient 6:*** ███████████ ***ADCRR*** ██████

386. Mr. ████ is a 68-year-old male who has been housed with ADCRR since April 2018.  He is listed as having 7 chronic care problems.  By my assessment, Mr. ████ chronic clinic problems are: 1) HTN; 2) HDL, 3) tricuspid valve replacement; 4) pacemaker; 5) benign prostatic hypertrophy; and 6) COPD.

387. The earliest note with provider entry in the EHR is in April 2018 at the Phoenix facility.  It appears he went to the Yuma facility shortly after that.  He remains at the Yuma facility.

388. Mr. ████ has the following non-chronic clinic problems: venous insufficiency, UTI, and renal calculus.

389. Mr. ████ received excellent care in chronic clinic for his problems.  He had close monitoring and his HTN, COPD, and HDL were very well-controlled.  His BPH was frequently symptomatic, but there was great effort to control his LUTS.  He saw a urologist, who recommended an alternate alpha-blocker (from the one he was already taking).  It appears that the alternate medication was ordered.  It was non-formulary, and it is unclear what happened with the order.

390. Mr. ████ had an episode of syncope, thought related to the use of an alpha-blocker, a calcium channel blocker and an ACE inhibitor, along with dehydration.  His medications were adjusted for this.

391. Mr. ████ was seen by a cardiologist in June 2019 and had a check of his pacemaker and an EKG.  The results of the echocardiogram are in the chart, but the

1    interpretation is not.  It is unclear if the patient returned to the cardiologist.

2        392.   Mr. ███  was seen over the time reviewed for back pain, leg swelling,

3    hematuria, passing a kidney stone, constipation, and for COVID infection.   All were

4    managed capably.

5        393.   Labs panels over the reviewed period of time showed elevated transaminases.

6    I see no screening for hepatitis.  I see no screening for HIV and no screening for colon

7    cancer.  It appears the patient received a pneumovax in 2018, but I do not see any evidence

8    that the patient has been receiving flu vaccines.

9        394.   **Documentation of Chronic Care:  3—GOOD:** It is fairly easy to follow the

10   providers' thought processes in this chart.  If this patient did receive vaccines, it needs to

11   be easier to find that information.  I suspect there are records from the cardiologist that are

12   missing (an interpretation of the cardiac echogram).  Care should be made to scan in all

13   outside records.  It is difficult to follow what happened to the order for the alternate alpha-

14   blocker which was ordered as a non-formulary drug.

15       395.   **Quality of Chronic Care:  4—VERY GOOD:** This patient's chronic care

16   problems were seen on a very regular schedule and were as well-controlled as possible.

17   Consults were completed when needed.

18       396.   **Quality of Episodic Care:  5—EXCELLENT:** This patient received very

19   timely and appropriate episodic care.

20   ***Patient 7:*** ███████      ***ADCRR*** ████

21       397.   Mr. ████ is a 51-year-old male.  He has been incarcerated with ADCRR

22   since August 2013.  Mr. ████ is listed as having 7 Chronic clinic problems. By my

23   assessment, Mr. ████ chronic care problems are: 1) Hepatitis C, chronic; 2) asthma; 3)

24   LTBI (although he later had a negative QuantiFERON); and 4) Lower urinary tract

25   symptoms.

26       398.   He also has the following problems: 1) hx of an inguinal hernia repair; 2)

27   osteoarthritis; 3) scabies; 4) COVID infection; and 5) history of anemia.

28       399.   The earliest provider note in the EHR is from October 2014 at the Tucson

facility.  He appears to have been housed at the Tucson facility until in 2017.  An intake evaluation appears at the Phoenix facility.  Shortly thereafter, he is transferred to the Yuma facility.  In early 2018, he appears to have transferred to the Lewis 2nd Chance Center and then in April 2019, he has an intake evaluation once again at the Phoenix facility.  In May 2019, he was back at the Yuma facility receiving his care.

400.   Mr. ███ had establishment of his chronic Hepatitis C infection early in his documented healthcare course.  He had lab testing which showed that he had immunity to HAV and HBV and also that he had a positive viral load.  He had all of these labs repeated more than once.  I am unclear as to why any of these would need to be repeated when the patient has not been treated for his Hepatitis C (in which case, the provider would repeat the VL to assess response to treatment).  Mr. ███ had a Fibrosure test that shows F0. He has had APRI scores on some of his chronic clinic notes but not on all of them.

401.   Mr. ███ carried a diagnosis of benign prostatic hypertrophy based on LUTS, despite a normal prostate exam and a normal PSA.  He was on an alpha-blocker for treatment for a period of time but is no longer on it.  It is unclear what the cause is for his LUTS.

402.   Mr. ███ was seen for a period of time in chronic clinic for a positive TB skin test, and this was discontinued after his QuantiFERON test came back negative.

403.   Mr. ███ asthma was mild and intermittent, and he uses only a rarely administered rescue inhaler.

404.   Mr. ███ other problems, inguinal hernia, skin problem, OA, and COVID, were all well-attended to.

405.   Mr. ███ has a history of anemia on his problem list.  There is one CBC that showed a decreased HB/HCT.  There is no workup for this in the chart.  There is a negative set of hemoccult cards and a repeat CBC that is normal.  There is no referral for colonoscopy with the decrease in hemoglobin and hematocrit.

406.   **Documentation of Chronic Care:   3—GOOD:** I can easily follow the chronic care notes and the provider care across this patient's course.  I am seeing repeat of

labs that do not need to be repeated, which leads me to believe that the past labs might not be easy to visualize.  I also see that the history and physical is free-typed (it is easy to read this) and that the radio-button templates, which are very difficult to read and probably to populate, are often left empty.

407.  **Quality of Chronic Care:  4—VERY GOOD:** This patient, like other patients I have reviewed, has received very good chronic care, but has had extra lab work and has had labs done that were not indicated. This patient's HCV has not reached the threshold of treatment, and he has had regular laboratory evaluations of the activity of his Hepatitis C.  There is no reason to repeat the HCV RNA over and over when the patient has not been treated.  There is also no reason to repeat chronic antibody status for Hepatitis B and A.  It has been completed, and he is immune.

408.  **Quality of Episodic Care:  5—EXCELLENT:** This patient had multiple problems addressed well, including having surgical repair of a right inguinal hernia.

***Patient 8:***  █████████  ***ADCRR***  ████

409.  Mr. ███ is a 56-year-old male.  He has been incarcerated with ADCRR since April 2017.  He is listed as having 6 Chronic care problems.  By my assessment, Mr. ███ chronic clinic problems are: 1) HTN; 2) asthma; and 3) hx seizures.

410.  Mr. ███ also was seen for 1) various foot complaints, especially plantar warts; 2) upper GI bleeding; 3) vision complaints; 4) low back pain; and 5) COVID infection.

411.  The earliest provider note in the EHR is from February 2015 at the Yuma facility.  It appears he then went the Phoenix facility later in 2015 (there are notes from July 2015) and then later in 2015, he went to the Eyman facility.  He returned to the Phoenix facility for an intake physical in June 2018, and then was transferred to Yuma.  He remains at the Yuma facility.

412.  Mr. ███ HTN was very well-managed.  He had good BP control early on with 2 drugs, and when his pressure started to rise, a third drug was added, which controlled his BP.  He was screened for diabetes and HDL.  He was counselled to discontinue smoking.

413.  Mr. ███ asthma was also well-controlled.  He was on a steroid inhaler for

maintenance and a rescue inhaler.  Most notes mention the frequency of use of the rescue inhaler.

414.   Mr. ███ seizure disorder has not been treated or active over the period of time covered in the EHR.  He was given a low bunk and refused medication.  It would have been reasonable to dismiss him from follow-up in chronic care clinic.

415.   Mr. ███ had many visits for foot pain and for plantar warts.  He saw a podiatrist several times and had x-rays done of his feet.  At one point, he was put on naproxen.  Several weeks later, he had an upper GI bleed and gastric and duodenal ulcers were diagnosed by EGD.  His NSAID was discontinued after this episode.

416.   Mr. ███ COVID seems to have been asymptomatic, but he was quarantined and screened for symptoms.

417.   **Documentation of Chronic Care:   5—EXCELLENT:** The providers' documentation on the EHR are very good.  I can follow the thought process in their notes and care does not appear to have been dropped due to poor communication on transfer.

418.   **Quality of Chronic Care:   4—VERY GOOD:** This patient's HTN and asthma were very well cared for.  I think the seizure clinic should have been dropped from the CCC list.  I see no screening for hepatitis, HIV, or colon cancer in this chart.

419.   **Quality of Episodic Care: 5—EXCELLENT:** This patient received a great deal of attention for his foot problems, including podiatric specialty attention.  He also received excellent care with his upper GI bleeding and with his COVID infection.

*Patient 9:* ███████        *ADCRR* ███

420.   Mr. ███ is a 45-year-old male.  He has been incarcerated with ADCRR since September 2008.  Mr. ███ is listed as having 6 chronic clinic problems. By my assessment, his chronic clinic problems are: 1) type 2 DM; 2) HTN; 3) CKD 21; 4) HDL; 5) diastolic heart failure; 6) diabetic neuropathy; and 7) Hepatitis C.

421.   The earliest provider note in the EHR is in June 2016 at the Phoenix facility.  He was transferred to the Yuma facility shortly after that and remains at Yuma.

422.   Mr. ███ also had an inguinal hernia that he received care for.

423.   Mr. ■■■ chronic care is very complicated.  He was a known diabetic with neuropathy upon arrival to the system.  His diabetes was well-controlled for a few years, early on.  He had his vaccines and was referred to optometry for screening for retinopathy. He had labs to follow his blood sugar control and to screen for proteinuria, which he had.

424.   Mr. ■■■ HTN was also well-controlled for a time in the system.  He was seen in chronic clinic very frequently.  His blood pressure accelerated in 2020 and became very difficult to control.  Effort was put into controlling it with medication changes.  ACEI required discontinuation due to angioedema.   The patient was put on 5 different antihypertensives at one point.  His pressure remained high.

425.   Mr. ■■■ went on to have lower extremity edema.  He was found to have an elevated BNP and was diagnosed with CHF.  He was referred to cardiology, who then ordered an EKG and stress test with Lexiscan.  The Lexiscan showed multiple areas of ischemia.  Medications were adjusted.  The patient recently had a hospitalization for CHF.

426.   In the spring of 2021, the patient was referred to nephrology with inability to control the BP and for rising creatinine levels, triglycerides, and proteinuria.  He was diagnosed with CKD stage 2I B and has been under the care of the nephrologist.

427.   Mr. ■■■ was also aware of having Hepatitis C upon arrival into the system. His labs were followed and upon the worsening of his kidney function, treatment was started.  He is currently on a course of Zepatier.

428.   As for episodic care, Mr. ■■■ developed an inguinal hernia while incarcerated and has been treated with a truss.  He also repeatedly submitted requests to medical staff wanting gabapentin for his neuropathy, but he was found trafficking the medication or cheeking the medication several times over the years.

429.   **Documentation of Chronic Care:  4—GOOD:** The providers' notes are excellent.  Most are free-typing their chronic clinic notes instead of using the radio-button template.  It is much easier to read.  It is difficult to follow BP readings on a patient with finger stick readings twice a day.  One must scroll through hundreds of FSBS readings to see BP readings.  For a patient like this, it would be very difficult to assess a trend in the

BP.

430.   **Quality of Chronic Care:  5—EXCELLENT:** This is a very complicated patient who has received really great care.  He has been seen very frequently.

431.   **Quality of Episodic Care: 5—EXCELLENT:** Again, this patient was seen promptly and cared for extremely competently.

***Patient 10:***　█████████　***ADCRR***　███████

432.   Mr. ███ is a 62-year-old male.  He has been incarcerated with ADCRR since September 2015.   He is listed as having 5 chronic clinic problems: 1) HPN; 2) hypertriglyceridemia/dyslipidemia; 3) type 2 DM; 4) iron-deficiency anemia; and 5) asthma.

433.   The earliest provider note identified in the EHR is in August 2015 at the Phoenix facility.  He was transferred from Phoenix to Yuma shortly thereafter and remains at Yuma.

434.   Mr. ███ has been seen for GI bleeding, chronic low back pain, hemorrhoids, constipation, and recently had pneumonia.

435.   Mr. ███ arrived to the ADCRR with diagnoses of seizure, HTN, and asthma. He was diagnosed with hypertriglyceridemia/HDL and type 2 diabetes after his incarceration.  Mr. ███ chronic clinic problems have been extremely well-managed.  He has been seizure-free (at least not visualized seizures) since arrival.  His HTN is very well-managed.  His diabetes has been very well-controlled.  Lately, he has controlled his diabetes with diet alone.  In 2017 and 2018, he was on medication for diabetes.  His asthma has become more active over the years but is also well-managed.  His chronic clinic problems have been frequently and aggressively addressed.  It appears that Mr. ███ had routine screening with optometry, as well.

436.   Mr. ███ has also had significant anemia during this incarceration.  He has had colonoscopy and EGD and was found to have hemorrhoids and a duodenal ulcer.  He underwent a hemorrhoidectomy during this incarceration.

437.   Mr. ███ has repeatedly tested negative for COVID, but he had pneumonia in

spring 2020 and was effectively treated for that.

438.   Mr. ████ episodic care around dry skin and back pain have also been well-attended to.

439.   **Documentation of Chronic Care:   5—EXCELLENT:** Despite the problems with following and documenting care in the EHR, the provider notes are easy to follow.  Most of the notes have been free-typed.  There is entry in the radio-button template, but the majority is in the body of the text.  It is difficult to see trends in lab values the way that the labs are displayed.  I also cannot find Metformin in the medication tab.

440.   **Quality of Chronic Care:  5—EXCELLENT:** This patient has received excellent care for all of his chronic care problems, and all are very well-controlled.

441.   **Quality of Episodic Care:  5—EXCELLENT:** This patient had excellent care for his GI bleeding, hemorrhoids, and pneumonia, including specialty care and surgery.

**Summary of Findings for ASPC-Yuma:**

442.   I conclude that the staff at the Yuma complex are highly motivated to provider excellent care.  There is no sign of indifference in the care delivered by providers. The Yuma providers seem extremely competent and up-to-date on their medical knowledge.

443.   The EHR should be replaced to provide an experience that is centered on the flow of patient care, on allowing providers to document care clearly and to guide medical staff to provide excellent care.

444.   I am very encouraged to see intake assessments being completed (at the Phoenix facility) where vaccinations are mentioned.  I do not, however, see that there is an assessment of what vaccines were needed or given (in the medication tab).

445.   It appears that the care is much improved and much better documented over the past 2-3 years.  There is more evidence of continuity of care and much less duplication of care.  The Yuma facility, especially, seems to have the same provider doing a patient's care over time.  The care seems more coherent in the past couple of years.

446.   There is increased emphasis on preventive care in the past several years, which some screening for HIV and hepatitis (although the screening should be for chronic

hepatitis, not acute hepatitis).  There needs to be more emphasis on screening for colon cancer, as I've mentioned previously.

447.   The excessive burden of non-value-added care in chronic clinic should be eliminated.  A large part of this is resulting from excessive lab testing using panels that are not required, per national guidelines.

448.   Vaccination history and administration of recommended vaccines should also be routinely offered.

449.   Screening for cancer that is recommended under national guidelines should be offered.  Specifically, there does not appear to be any organized screening for colon cancer.  On the flip side, routine ordering of PSA is done, and this is actually controversial.  Once again, the right tests need to be ordered.

**Patient Chart Reviews for ASPC-Douglas**

***Patient 1:*** ███████████ ***ADCRR*** ███████

450.   Mr. ██████ is a 30-year-old male who was first incarcerated with ADCRR on 1/10/17.  Since that date, he has been released and reincarcerated twice.  Since 2/5/21, he has been housed at the ASPC-Douglas Eggers unit. At his intake in January 2017, Mr. ██████ was listed as having 6 chronic care diagnoses.  Upon further review, however, only 2 of the diagnoses meet the traditional correctional definition of chronic care, those being asthma and Hepatitis C.

451.   Mr. ██████ was seen in the CCC for his asthma within 30 days of intake and then 3 months later before his release. An albuterol inhaler was ordered at intake but was not reordered at his chronic care visit on 1/31/17, even though it would expire before his next chronic care visit. The inhaler was reordered outside of a clinical encounter on 3/17/17 but was listed as non-KOP, which, in essence, nullified its use as a rescue inhaler. When Mr. ██████ was seen at the CCC on 4/26/17, the order was changed to KOP.

452.   Mr. ██████ was released in June 2017 and reincarcerated in March 2018. Upon intake a "Men's Intake Panel" which consists of a complete blood count (CBC) with differential and rapid plasma RPR was ordered. The use of lab panels with arbitrary names

such as "Men's Intake Panel," designations which are not universally recognized in the medical community, is perplexing.  While I agree that obtaining an RPR at all intakes is appropriate, a routine CBC is not necessary on every patient. Rather, an HIV test would be a more useful test for every inmate at intake.

453.   Mr. ███ was released again but returned to ADCRR in October 2019. He was seen in chronic care for his asthma within 30 days of intake and every 6 months thereafter. "Diagnostic Panel 2," another example of the use of non-customary medical terms, was ordered at several chronic care visits although the patient refused. In my opinion, this is an inappropriate use of this panel because lab date in this panel does not have anything to do with asthma care and was not indicated in any screening recommendations for this patient.

454.   HIV and HCV Ab tests were ordered during a chronic care visit 4/15/21. The HIV test was negative, but the HCV Ab test was positive. Mr. ███ HCV RNA was also positive, confirming chronic Hepatitis C. This new diagnosis was addressed in a chronic care visit a few weeks later when the NP ordered a Fibrosure test and a repeat HCV RNA to be completed prior to next visit. Of note, once a diagnosis of chronic Hepatitis C is confirmed and the patient is not currently receiving direct-acting antivirals, it is not necessary to order a routine HCV RNA as it does not give any information on the severity of liver damage. Hepatitis A and B vaccine series were ordered even though no testing was done to determine if patient already had immunity. While it is not harmful to administer these vaccines even if immunity already exists, it is unnecessary.

455.   Mr. ███ care with ADCRR highlights the need for better classification of diagnoses which are considered chronic illnesses. For example, "history of intubation" was labeled as a chronic condition in Mr. ███ initial problem list. This was traced back to when he answered "yes" to the question, "Have you ever had a tube put down your throat so that a machine breathes for you?" on the nurse intake questionnaire.  During the provider's intake physical, Mr. ███ denied any history of intubation; however, the diagnosis was not removed from the problem list where it remains today.

456.   **Documentation of Chronic Care: 4—VERY GOOD:** At each chronic care visit for asthma, the provider documented the frequency of rescue inhaler use, if there were any exacerbations, and peak flows. Diagnostic lab panels were ordered even before the patient was diagnosed with Hepatitis C without a clear medical necessity documented.

457.   **Quality of Chronic Care: 4—VERY GOOD:** Prior to 2020 when patient's rescue inhaler was changed to levalbuterol, the patient's albuterol inhaler was ordered non-KOP then was not renewed during his chronic care visit. These inconsistencies have been resolved since 2020.

458.   **Quality of Episodic Care: 5—EXCELLENT:** The patient's HNRs are mainly for dental issues which are being addressed.

***Patient 2:*** ▬▬▬▬▬▬ ***ADCRR*** ▬▬▬

459.   Mr. ▬▬▬ is a 44-year-old male who has been incarcerated with ADCRR since December 2016.  He has been housed at the ASPC-Douglas Mohave unit since 2/11/20.  Mr. ▬▬▬ has 2 chronic care illnesses, HTN and a remote history of lymphoma.

460.   At intake, Mr. ▬▬▬ reported a history of Hodgkin lymphoma which was "treated" with a vegan diet. However, there is no documentation to support this self-reported diagnosis. Mr. ▬▬▬ reported occasional night sweats and flu-like symptoms, so an oncology referral was placed. An oncologist saw the patient a few weeks later and ordered a PET-CT which was negative for lymphoma recurrence. Again on 4/3/17, Mr. ▬▬▬ saw the oncologist who requested records to confirm his diagnosis. In June 2017, Mr. ▬▬▬ returned to the oncologist, and the oncologist documented uncertainty if the patient really had Hodgkin lymphoma. Given the night sweats, the oncologist recommended cocci serologies which were negative. Mr. ▬▬▬ has received no further oncology care.

461.   On 9/11/20, Mr. ▬▬▬ was seen by a NP via telemed for headaches. Four months prior to Mr. ▬▬▬ incarceration, he was hit by a baseball and sustained a head injury. The NP ordered imaging at that time.  Further, the NP noted that Mr. ▬▬▬ BP was 135/95.  In the notes, the NP wrote: "Will put on low dose CCB to see if this will improve BP and help his HAs. I don't want to use Beta Blockers as his HR is already pretty

low." The patient was started on verapamil, a calcium channel antagonist known to decrease heart rate, a medication that should be avoided if there is already concern about worsening bradycardia. In fact, Mr. ███ was not truly bradycardic, which is less than 60 beats per minute. However, the EHR flags heart rates in the 60s as abnormal. Mr. ███ was seen in the CCC a few weeks later when HTN was added to his problem list. An EKG was not ordered until his chronic care visit a year later.

462. Mr. ███ headaches persist and continue to be addressed. They are thought to be a musculoskeletal cause which is supported with documentation. He was diagnosed with COVID during a routine unit screening but has remained asymptomatic. Mr. ███ chronic care visits every 6 months have shifted to HTN concentration, and his history of lymphoma is no longer addressed.

463. **Documentation of Chronic Care: 3—GOOD: If** Mr. ███ reported remote history of lymphoma remains on the problem list as a chronic condition, then it should be addressed at least annually in the CCC. It has not been mentioned in either of his 2 chronic care visits in 2021. There is no documentation of an atherosclerotic cardiovascular disease risk assessment despite the patient being over 40 years of age and having HTN.

464. **Quality of Chronic Care: 3—GOOD:** An EKG was not ordered on initial diagnosis of HTN. Also, the use of verapamil as an initial choice for BP control despite documented concern about Mr. ███ heart rate was inappropriate.

465. **Quality of Episodic Care: 5—EXCELLENT:** The patient's HNRs were addressed appropriately.

***Patient 3:*** ███ ***ADCRR*** ███

466. Mr. ███ is a 53-year-old male who was housed at the D-Mohave unit from June 2019 to February 2021. He was transferred to the ASPC-Douglas Gila unit in March 2021 where he has remained. Mr. ███ admission date is listed as 8/5/14, but he was inactive, possibly released, from 2016-2019. He is listed as having 5 chronic care diagnoses, but one diagnosis is listed twice.

467.   Mr. ███ entered the system in 2014 with an existing diagnosis of HTN and taking hydrochlorothiazide 25mg daily, metoprolol 50mg BID, and amlodipine 10mg daily. In June 2019, Mr. ███ went through intake again and reported a diagnosis of COPD, using ciclesonide and albuterol inhalers, and taking amlodipine and metoprolol for his HTN. He was seen in the CCC at least every 6 months; however, there are no annual physical visits documented. If ASPC-Douglas is combining his annual physical with his chronic care visit, then age-appropriate cancer screenings, such as a colon cancer screening, should have been discussed and documented on the chronic care note.  Mr. ███ refused his annual physical in 2021, but there is no documentation of visit or refusal in previous years.

468.   Mr. ███ was recently diagnosed with type 2 diabetes, currently controlled without medications and was started on atorvastatin after his ASCVD risk was calculated to be 15%. He had a diabetic eye exam by an optometrist.

469.   **Documentation of Chronic Care: 4—VERY GOOD:** Documentation reveals that the patient is receiving chronic care at regular intervals, and each diagnosis is appropriately addressed. However, there is no documentation that screenings for colon cancer, Hepatitis C, and HIV have ever been discussed with Mr. ███

470.   **Quality of Chronic Care: 5—EXCELLENT:** The patient's BP has remained well-controlled throughout his incarceration.  He was started on atorvastatin to lower his risk of cardiovascular disease, and his COPD has been treated adequately.

471.   **Quality of Episodic Care: 4—VERY GOOD:** In May 2021, Mr. ███ requested a visit to discuss nocturia. This prompted the provider to order a hemoglobin A1C and, subsequently, a diagnosis of diabetes was given. However, the provider also ordered oxybutynin at this encounter. This medication is known to be abused in correctional facilities due to its anticholinergic effects.  It should not have been a first-line therapy before the workup of the nocturia was even completed.

***Patient 4:*** ███████ ***ADCRR*** ███

472.   Mr. ███ is a 34-year-old male who has been housed at the ASPC-

73

Douglas Mohave unit since his intake in December 2019. His 3 chronic care conditions are type 1 diabetes, HDL, and HTN. Currently, Mr. ██████ is undergoing a workup for lymphocytosis.

473.    At intake, the patient was taking Lantus 40u AM and 15u PM, sliding scale regular insulin, and lisinopril 10mg. His initial HgbA1C was 8.6%. Over the next 8 months, Mr. ██████ dose of Lantus was regularly increased; however, pre-meal rapid acting insulin, a medicine that should be taken with Lantus, was not ordered.  Mr. ██████ A1C rose to 9.1%, and he experienced a few hypoglycemic episodes that required medical attention.

474.    The patient was not referred to endocrinology, but on 8/17/20, he saw endocrinologist, Joel Ehrenkranz, on-site who decreased the patient's Lantus and prescribed pre-meal rapid acting insulin.  With a few minor adjustments by the unit providers at subsequent visits, his blood sugar improved, and his A1C is now 6.7%.

475.    At his initial chronic care visit, Mr. ██████ BP was 114/68. The provider documented that the patient had some lower extremity edema and started him on HCTZ 12.5mg daily. In my opinion, this low dose of HCTZ would not have mitigated his edema. During his chronic care visit in March 2020, Mr. ██████ admitted that he was not taking the HCTZ. His BP at that time was 97/56. Despite his diastolic pressure being in the hypotensive range and admitting to non-compliance with HCTZ, the patient's medication was not discontinued. The medication was later stopped after the patient submitted an HNR requesting its discontinuation.

476.    At his next chronic care appointment in May 2020, when Mr. ██████ BP was 98/57, the NP stated in the note: "It appears his BP may be over controlled." The patient was on lisinopril 10mg, but the provider discontinued it and ordered lisinopril 20mg-HCTZ 12.5mg daily. Fortunately, the provider himself or someone else noticed this error.  The new medicine was discontinued the following day and replaced with lisinopril 5mg. Certainly, this was a near miss. If Mr. ██████ had taken this medication, I have no doubt that it would have decreased his BP to a level where he would have experienced hypotensive

symptoms.

477. **Documentation of Chronic Care: 4—VERY GOOD:** Mr. ███ was seen at least every 3 months for his diabetes. He had comprehensive foot exams and annual referrals to optometry for diabetic eye exams. The EHR's inability to track lab trends makes it difficult for the user to quickly review this patient's A1C over time.

478. **Quality of Chronic Care: 2—FAIR:** For the first 8 months of Mr. ███ incarceration, there was a lack of proper insulin regimen and mismanagement of his BP. In addition, he was prescribed nortriptyline for his diabetic neuropathy and was increased to 75mg despite an increasing heart rate. (His pulse was 115 on the day it was increased to 75mg.)

479. **Quality of Episodic Care: 2—FAIR:** Mr. ███ has had lymphocytosis since his intake in December 2019. At the very least, a problem-focused visit should have occurred to determine if the patient has anorexia, night sweats, or any other B symptoms. A peripheral blood smear should have been ordered to further evaluate his lymphocytosis. If abnormal, then possibly a flow cytometry should have been ordered. Instead, the provider referred the patient for a CT chest scan which is unnecessary. If someone has clinical evidence of lymphoma, then the patient would need CT scans of soft tissue neck, chest, ab, and pelvis, not just CT chest.  Also, there are multiple HNRs for ibuprofen refills, but it is not clear why this patient is taking it regularly.  The care Mr. ███ received when he developed a diabetic foot ulcer was superb.

***Patient 5:*** ███            ***ADCRR*** ███

480. Mr. ███ is a 40-year-old male who has been housed at the ASPC-Douglas Mohave and Gila units since intake in 2018. Currently, he has a diagnosis of asthma and Hepatitis C. He entered the system with a self-reported diagnosis of seizure disorder on no meds; diagnosis was later inactivated when it was determined Mr. ███ was never formally diagnosed and had not had a seizure in 2 years.

481. **Documentation of Chronic Care: 4—VERY GOOD:** The EHR template for chronic care visits includes redundant information which impedes the provider's

productivity. As previously mentioned, the panels include labs that are unnecessary for this patient.  Further, results are difficult to review since they are grouped in alphabetical, not by type, as they appear in the actual lab text report.

482.   **Quality of Chronic Care: 4—VERY GOOD:** Although the quality of chronic care was very good, the provider did fail to reorder Mr. ███ albuterol inhaler at chronic care visits on 3/13/20 and 5/26/20, despite an expired prescription. However, this did not result in any harm to the patient as he reported using his inhaler infrequently. The patient's HCV RNA, which is needed to confirm the diagnosis of chronic Hepatitis C after a positive antibody result, was checked in March 2020.

483.   **Quality of Episodic Care: 5—EXCELLENT:** Mr. ███ HNRs for glasses and dental work were addressed promptly and appropriately.

***Patient 6:*** ███ ***ADCRR*** ███

484.   Mr. ███ is a 42-year-old male who was housed at the ASPC-Douglas Gila unit but discharged immediately after the review. He had insulin-dependent diabetes (unclear if it was type 1 or type 2 because both are in the problem list), HTN, and HDL. His chronic care visits took place at least every 12 weeks. He had regular hemoglobin A1C tests, but urine microalbumin was ordered with the A1C every 3 months which is not necessary. This test is only needed annually. Mr. ███ had comprehensive feet exams and annual diabetic eye exams. He was not screened for HIV or Hepatitis C at intake despite admitting to injectable drug use.

485.   **Documentation of Chronic Care: 4—VERY GOOD:** Providers ordered urine microalbumin and entire diagnostic panels frequently without documentation of medical necessity.

486.   **Quality of Chronic Care: 4—VERY GOOD:** All the required tests and exams for a diabetic were completed, albeit some too often. A chest x-ray was ordered during the most recent chronic care visit in August 2021 with indication of HTN. This is not necessary in a routine evaluation of HTN with absence of cardiopulmonary signs or symptoms.

487. **Quality of Episodic Care: 5—EXCELLENT:** Mr. ▮ had a reducible umbilical hernia which was conservatively treated with restrictions and treated with NSAIDs as needed.

***Patient 7:*** ▮▮▮▮ ***ADCRR*** ▮▮▮

488. Mr. ▮ is a 47-year-old male who is housed at the ASPC-Douglas Gila unit with HTN, HDL, and chronic heart failure (CHF). The CHF was reported at intake, but records were never requested to confirm the diagnosis and to find out his ejection fraction. Despite being on no cholesterol-lowering medication at intake, he was given a diagnosis of HDL before labs were completed. Mr. ▮ was seen regularly in chronic care, although his lipids were not addressed until his most recent chronic care visit on 7/2/21. It was at this visit that his 10-year cardiovascular risk was calculated to be 30%, and he was started on atorvastatin 40mg. The provider ordered a diagnostic panel of labs that revealed a mild elevation in Mr. ▮ TSH.  At the time of my review, this has not been addressed.

489. **Documentation of Chronic Care: 3—GOOD:** A 10-year cardiovascular risk score was not calculated until a year and a half after his intake. His CHF has not been documented in any recent chronic care notes.

490. **Quality of Chronic Care: 3—GOOD:** If the patient does, in fact, have CHF, he is on the appropriate medications for this. However, Mr. ▮ HDL should have been addressed sooner given his history of heart disease.

491. **Quality of Episodic Care: 5—EXCELLENT:** Mr. ▮ tested positive for COVID in December 2020 when unit-wide testing was conducted. He was seen by the provider a few days later and was asymptomatic.

***Patient 8:*** ▮▮▮▮ ***ADCRR*** ▮▮

492. Mr. ▮▮ is a 62-year-old male with HTN housed at the ASPC-Douglas Eggers unit. At intake, he reported a history of Hepatitis C treated with interferon in 2012; however, an HCV RNA ordered at intake was positive.

493. This is another example of providers ordering unnecessary tests. Mr. ▮▮ already had a baseline EKG in his chart, yet a repeat EKG and chest x-ray were

ordered during his May 2019 chronic care visit for HTN without documentation of cardiopulmonary symptoms or clinical suspicion for intrathoracic pathology. His medications, despite expiring the day of this chronic care visit, were not renewed. It was not realized until a few weeks later when the patient submitted a request for refills.

494.    In 2020, Mr. ██████████ was transferred to a private facility where he was treated for Hepatitis C with Mavyret and achieved sustained virologic response. He returned to ASPC-Douglas in August 2021. A Fibrosure and ultrasound were ordered at this time, both confirming cirrhosis. The provider placed Mr. ██████████ on a tickler file for an abdominal ultrasound every 6 months. Cirrhosis should have been added to the problem list, and the patient should continue to be followed in chronic care to address the cirrhosis.

495.    Mr. ██████████ was seen frequently, per his requests, for suspicious skin lesions. He was eventually referred to dermatology at which time he was diagnosed with SSC in situ (Bowen's disease). He was treated with wide local excision and Mohs surgery in 2019. It would be prudent for Mr. ██████████ to see a dermatologist annually, especially after the physician, in his last dermatology note, documented that some of the lesions needed to be reevaluated.

496.    **Documentation of Chronic Care: 3-GOOD:** As mentioned, Mr. ██████████ cirrhosis needs to be addressed even though he no longer has Hepatitis C. The cirrhosis is not listed in the comments of his next chronic care visit and is not on the problem list. Due to the inefficiency of the EHR, it is difficult to determine which immunizations Mr. ██████ has received.

497.    **Quality of Chronic Care: 4-VERY GOOD:** The patient's HTN has remained controlled on his current regimen. Mr. ██████████ has received treatment for his Hepatitis C but should continue to be followed for his cirrhosis. His medications should be renewed at the chronic care visit if their expiration precedes the next chronic care visit.

498.    **Quality of Episodic Care: 3-GOOD:** The patient's HNRs were addressed promptly. However, there has been no recent follow-up for his Bowen's disease.

***Patient 9:*** ████████████ ***ADCRR*** ████████

499.   Mr. ████ is a 42-year-old male housed at the ASPC-Douglas Gila unit. His intake date is listed as 1/15/2010; however, his sentence began on 4/23/18. He is being followed for Hepatitis C. His liver synthetic function is well-preserved based on his labs. His Fibrosure test predicts his fibrosis score as F1-2.

500.   Mr. ████ case is another in which excessive labs were ordered. An acute hepatitis panel was ordered during one of Mr. ████ chronic care visits; however, this panel does not include the Hepatitis B surface antibody to confirm immunity. One provider ordered a Hepatitis B DNA, even though this patient has a negative HBsAg. It is unclear whether Mr. ████ carries immunity to Hepatitis B because there is no documentation of immunization or HBsAb.

501.   **Documentation of Chronic Care: 3—GOOD:** Mr. ████ immunity to Hepatitis B has not been documented because the correct lab test (HBsAb) has not been ordered. Due to the inefficiency of the EHR, it is difficult to determine which immunizations Mr. Balino has received.

502.   **Quality of Chronic Care: 5—EXCELLENT:** Besides the issue with the Hepatitis B immunity, there are no issues with his chronic care.

503.   **Quality of Episodic Care: 5—EXCELLENT:**   The majority of Mr. ████ HNRs were dental-related; he has been followed by the dentist regularly throughout his incarceration. He tested positive for COVID in December 2020 and was evaluated by the provider; he did not require medical care for this.

***Patient 10:*** ████████     ***ADCRR*** ████

504.   Mr. ████ is a 43-year-old male housed at the ASPC-Douglas Gila unit. His sentence began in October 2019. He is currently being followed for Hepatitis B.

505.   At intake Mr. ████ reported a recent hospitalization for spinal meningitis for which he was taking Augmentin and doxycycline. Records were obtained which revealed that the patient had osteomyelitis of the lumbar spine with epidural abscess. At his first chronic care visit, he reported that he had both Hepatitis B and C. Subsequently, Mr. ████ had 2 HCV RNAs <12 indicating spontaneous clearance. The detectable Hepatitis

B DNA level confirmed the diagnosis of Hepatitis B, but it was not added to the problem list until a year later.

506.   Presently, Mr. ███████ receives the correct workup for Hepatitis B based on recommendations given by an outside "treatment committee."  His Fibrosure predicts a fibrosis stage of F3-F4, and his ultrasound is suspicious for cirrhosis. There is no INR on file to calculate his MELD-Na score. The last chronic care note states that his data was submitted to the "treatment committee" for review.

507.   **Documentation of Chronic Care: 4—VERY GOOD:** Hepatitis B is included on Mr. ███████ problem list, but not until almost a year after confirmation.  Other than this, the documentation is very good.

508.   **Quality of Chronic Care: 4—VERY GOOD:** Mr. ███████ may have cirrhosis, although he does not have all the clear findings of cirrhosis.  Mr. ███████ liver synthetic function appears to be preserved per his labs.  The ultrasound did reveal coarse echotexture, but his spleen was not enlarged. If Mr. ███████ is diagnosed with cirrhosis, his Hepatitis B should be treated despite his low-level viremia, and he should be closely followed in chronic care with surveillance imaging for HCC.

509.   **Quality of Episodic Care: 2—FAIR:** The patient has an ongoing prescription for Ibuprofen 600mg prn for back pain. Given his liver disease and possible cirrhosis, this medication may be unsafe due to the risk of GI bleeding. If the patient's lumbar pain is increasing, then he may need further workup given his history of osteomyelitis of the lumbar spine. The issue has not been addressed, however, because Mr. ███████ ibuprofen is reordered with refills outside of a clinical encounter.

**Summary of Findings for ASPC-Douglas:**

510.   Patients were seen nearly equally by mid-level providers and physicians in chronic care and follow-up visits.

511.   There was never a delay in chronic care as they methodically schedule patients at regular intervals, and the providers always ordered labs in preparation for the next chronic care visit.

512.   Age-appropriate cancer screening is lacking.

513.   Immunizations were offered to every patient reviewed, but the EHR lacked an immunization tab/section to view these without having to click through each nurse immunization note.

514.   The current lab panels should be removed as they contain some unnecessary tests that are not routinely ordered on all patients, such as T3 uptake.

515.   The EHR is a barrier to sound medical care for a variety of reasons, but the best example of this is in the lab section where eOMIS displays lab results in an ineffective way and prevents the user from seeing trends in lab results. Clicking through each ordered test felt identical to flipping through lab results in a paper chart.

**Patient Chart Reviews for ASPC-Lewis**

***Patient 1:*** ████████   ***ADCRR*** ████████

516.   Mr. ████ is a 65-year-old male who has been incarcerated with ADCRR since March 2015.  He is listed as having 10 chronic clinic problems; however, I find only 5.  The earliest provider note I can find in the EHR is from April 2015 at the Lewis facility. He later transferred to Phoenix and arrived at the Lewis complex on 2/22/18 where he is still housed.

517.   I believe the confusion with the number of chronic conditions is caused by the process of documentation on the EHR problem list or other processes that feed this list. The same diagnoses are found multiple times and are either identical or with slight variations.  This is seen throughout the entire EHR document history leading to an additive effect resulting in erroneous condition counts.

518.   Mr. ████ has the following chronic clinic problems: 1) HTN; 2) Hepatitis C, stage F4 via FibroTest-ActiTest; 3) hyperlipidemia; 4) heart failure (not graded) and pace/defibrillator placement; and 5) COPD vs. Asthma. Mr. ████ other problems include reflux and anemia (although his hemoglobin is usually within normal range).

519.   Mr. ████ is seen very frequently in chronic care, usually every 3 months but at least every 6 months. His CHF, HTN, lipids, and COPD are very well-managed.  Mr.

1   ████ is managed in cardiology clinic for his CHF and resistant HTN.  He has had multiple

2   ultrasounds to evaluate his HCV status, all returning minimal pathology and many repeat

3   liver function studies showing minimal elevation of enzymes. He was successfully treated

4   for HCV with labs showing undetected virus on 5/21/21.

5       520.   The Lewis providers' notes were very detailed and complete using the

6   traditional SOAPE documentation method.  Despite the difficulties inherent to this EHR,

7   providers were very conscientious in managing appointments, lab results, and follow-up

8   needs.  The providers showed real effort in monitoring and treating this patient's chronic

9   conditions.

10      521.   Overall, this patient's chronic disease care was excellent. Lower

11  documentation scores reflect the earlier years of care.

12      522.   **Documentation of Chronic Care: 4—VERY GOOD:** The EHR makes the

13  documentation, in general, extremely difficult.  The navigation through chart sections is

14  cumbersome and time-consuming.  Providers finally abandoned the radio-buttons and

15  inserted free text-making clinic notes legible and easy to follow.

16      523.   **Quality of Chronic Care: 5—EXCELLENT:** This patient requires

17  continual attention for his cardiovascular problems and this provider team definitely

18  manages all aspects of his care.  The providers never allowed Mr. ████ HCV status to

19  be ignored and managed this all the way to treatment success.

20      524.   **Quality of Episodic Care: 5—EXCELLENT:** This patient had several

21  acute problems that were well-managed.

22  ***Patient 2:*** ████████ ***ADCRR*** ████

23      525.   Mr. ████ is a 36-year-old male who has had multiple departures and

24  receptions into ADCRR with his most recent reception being November 2019 at ASPC-

25  Lewis. Mr. ████ is listed as having 11 chronic clinic problems; however, in reality, he has

26  4 chronic conditions.

27      526.   The confusion with the number of chronic conditions is caused by the process

28  of documentation on the EHR problem list or other processes that feed this list.  The same

diagnoses are found multiple times and are either identical or with slight variations.  This is seen throughout the entire EHR document history leading to an additive effect resulting in erroneous condition counts.

527.   Mr. ▊ has the following chronic clinic problems: 1) asthma; 2) post-traumatic seizure disorder; 3) hyperlipidemia; and 4) chronic Hepatitis C.

528.   Mr. ▊ is seen routinely in CCC and additional follow-up appointments between these chronic clinics. He is seen at least every 6 months but usually at 3-month intervals.  His care has been relatively straightforward with the primary emphasis on his post-traumatic seizure disorder.  In the clinic notes Mr. ▊ claims to have seizures monthly; however, I can find no evidence of witnessed events or recent emergency interventions.  There does seem to be an issue with seizure medication compliance as noted by frequent anti-seizure medication laboratory levels.  There are numerous patient counseling notes concerning medication compliance.  In 2016 he was evaluated by a neurologist for his seizures and an EEG and head CT scan were both normal.  The conclusion was a trial of gabapentin.

529.   Following his most recent return into ADCRR and the Lewis complex in November of 2019, his Hepatitis C status was reevaluated with serial liver function studies and Fibrosure lab.  He has chronically elevated liver enzymes and a fibrosis stage F1.  The chronic clinic notes state that he does not meet the "Hepatitis Committee" treatment criteria.

530.   **Documentation of Chronic Care: 4—VERY GOOD:** The recent chronic care for this patient was routine and complete.  The notes over the last 3 years bypass the radio-buttons and have free text SOAPE notes.  The content of these more recent notes provides a very good picture of the care plan.

531.   **Quality of Chronic Care: 5—EXCELLENT:** Over the last 3 years each of his chronic conditions are identified and addressed with each chronic care visit.  There is a concerted effort to maximize treatment outcome.

532.   **Quality of Episodic Care: 5—EXCELLENT:** When he was seen, the encounters were excellent.

1   _**Patient 3:**_ ████████████    _**ADCRR**_ ██████

2   533.   Mr. █████ is a 64-year-old male who has been in and out of ADCRR since

3   2001 and has been consistently on the Lewis complex since 2016.  Mr. █████ is listed as

4   having 8 chronic clinic problems.  Mr. █████ has a relatively complicated medical history

5   including 1) HTN; 2) asthma; 3) seizure disorder; 4) Hepatitis C; 5) self-reported history of

6   colon cancer; 6) inguinal hernia s/p repair 6) atherosclerotic cardiovascular disease, s/p

7   angioplasty; 7) cerebral infarction; and 8) s/p eye injury with muscle repair.

8   534.   Mr. █████ is seen routinely in CCC and for additional follow-up

9   appointments between these chronic clinics for medication reviews and acute problems.  He

10  is seen at least every 6 months for his chronic problems. His HTN and asthma are well-

11  controlled as is his cardiovascular disease.   He is followed by cardiology and

12  gastroenterology and had a normal stress echo and a normal colonoscopy in the past.  His

13  last cardiology visit was in 2016 and the last GI appointment was in 2017.  A recent provider

14  note requested referrals to both specialists recognizing the extended interval between

15  evaluations.  His Hepatitis C status for treatment is currently being worked up with labs and

16  a liver ultrasound which was negative for malignancy.

17  535.   Mr. █████ had an altercation in which he sustained a severe eye injury in

18  2016 with a subsequent amniotic membrane transplant and muscle repair.  The facility

19  closely monitored this problem and arranged 14 ophthalmology visits during the course of

20  treatment.

21  536.   The Lewis providers are using SOAPE note format instead of the radio-

22  buttons embedded in the EHR, and the content and quality of these notes are excellent.

23  537.   The only issues I can see with his care are the intervals between specialty

24  follow-up for his CV disease and follow-up colonoscopy and medication management of

25  his Plavix.  The specialty referrals were both recognized and resolved.  The Plavix fell off

26  of the active medication list within the last few months and, as far as I can see, this has not

27  been resolved.

28  538.   **Documentation of Chronic Care: 4—VERY GOOD:** The recent chronic

care documentation for this patient was clear and complete. This is a remarkable improvement from previous years. The notes over the last 3 years bypass the radio-buttons and have free text SOAPE notes. The content of these more recent notes provides a very good picture of the care plan. The earliest documentation was rather inconsistent and without much value as far as content.

539. **Quality of Chronic Care: 4—VERY GOOD:** The routine quality of chronic care is excellent. The score was reduced to very good due to omissions noted above.

540. **Quality of Episodic Care: 5—EXCELLENT:** Numerous episodic care incidents were handled efficiently through either resolution or reassignment to chronic care.

***Patient 4:*** ▮▮▮▮▮▮▮▮      ***ADCRR*** ▮▮▮▮

541. Mr. ▮▮▮ is a 64-year-old male who has been in ADCRR since 1998 and has been consistently on the Lewis complex since November 2018. Mr. ▮▮▮ is being followed for 6 chronic clinic problems.

542. Mr. ▮▮▮ has an extensive cardiovascular medical history and is also being followed in chronic clinic for the following: 1) HTN; 2) asthma; 3) atrial fibrillation s/p ablation; 4) Hepatitis C; 5) self-reported history of type 2 diabetes; and 6) hyperlipidemia.

543. Mr. ▮▮▮ is seen routinely in CCC and additional follow-up appointments between these chronic clinics for medication reviews and acute problems. As with previous reviews, the quality of documentation improved dramatically in 2018 and has steadily improved since that time. He is seen at least every 6 months for his chronic problems. His HTN and asthma are well-controlled. He is not on active medication for diabetes and his fasting blood glucose and HgA1c values are all normal. Either he does not have diabetes, or he is controlling it well with diet. He has an extensive history of atrial fibrillation with ablation in the past. He is seen frequently in cardiology clinic and had a normal doppler echo and heart catheterization in March 2018. The facility manages his symptoms in a timely manner and refers him for specialty evaluation when appropriate. He is maintained on Xarelto for clot prevention.

544. Facility providers use the SOAPE format and provide clear, accurate clinic

notes with well-defined plans of care.

545. **Documentation of Chronic Care: 5—EXCELLENT:** The recent chronic care for this patient was routine and complete. The notes over the last 3 years bypass the radio-buttons and have free text SOAPE notes. The content of these more recent notes provides a very good picture of the care plan. The earliest documentation was rather inconsistent and without much value as far as content.

546. **Quality of Chronic Care: 5—EXCELLENT:** The routine quality of chronic care is excellent.

547. **Quality of Episodic Care: 5—EXCELLENT:** Numerous episodic care incidents were handled timely and efficiently.

***Patient 5:*** ▮▮▮▮▮▮ ***ADCRR*** ▮▮▮▮

548. Mr. ▮▮▮ is a 39-year-old male who has been in ADCRR on and off since 2005 and has been consistently on the Lewis complex since July 2019. Mr. ▮▮▮ is being followed for 5 chronic clinic problems.

549. Mr. ▮▮▮ most difficult chronic condition is diabetes. He is also followed in chronic clinic for the following: 1) HTN; 2) asthma; 3) Hepatitis C; and 4) proliferative diabetic retinopathy. He also self-reports a history of a MI at age 23 and renal cell carcinoma. There are no records in the EHR to substantiate these diagnoses and because of the rather scarce charting in 2015, I cannot find any notes supporting the addition of these conditions.

550. During his most recent time at the Lewis complex, Mr. ▮▮▮ has been seen every 3 months in CCC and additional follow-up appointments between these chronic clinics for medication reviews and acute problems. There was a brief initial period after he arrived at the Lewis complex where the EHR documentation was scant. However, it dramatically improved beyond the first month. His HTN and asthma are well-controlled. He is followed very closely for his diabetes with regular fasting blood glucose checks and HgbA1c lab every 3 months. He is currently on an ACE inhibitor, and he has annual urinary microalbumin checks. He is also followed frequently by a retinal specialist for diabetic

retinopathy and has had retinal repair and laser coag therapy.  His HgbA1c values fluctuate from 6 to 8, and he is counseled frequently about medication compliance.  He is using insulin treatment for his diabetes.  His Hepatitis C evaluation is ongoing and his latest Fibroscan showed A0.

551.    Facility providers use the SOAPE format and provide clear, accurate clinic notes with well-defined plans of care.  As noted above, this was not the practice in prior incarcerations in 2015.

552.    **Documentation of Chronic Care: 4—VERY GOOD:** The chronic care for this patient during his stay at the Lewis complex was routine and complete.  The notes bypass the radio-buttons and have free text SOAPE notes.  The content of these more recent notes provides a very good picture of the care plan.  The earliest documentation in ADCRR was rather inconsistent and without much value as far as content. However, the documentation demonstrated a marked improvement since his recent time at the Lewis complex.  This chart would have been excellent but for the earlier charting practices and the brief period of insufficient charting with his initial arrival at Lewis.

553.    **Quality of Chronic Care: 5—EXCELLENT:** The routine quality of chronic care is excellent.

554.    **Quality of Episodic Care: 5—EXCELLENT:** Numerous episodic care incidents were handled timely and efficiently.

***Patient 6:*** ▮▮▮▮▮▮▮▮     ***ADCRR*** ▮▮▮▮▮▮▮

555.    Mr. ▮▮▮▮▮ is a 39-year-old male who has been in ADCRR on and off since 2011 and has been consistently on the Lewis complex since January 2018.  Mr. ▮▮▮▮▮ is being followed for 6 chronic clinic problems.

556.    Mr. ▮▮▮▮▮ primary chronic condition is CHF. He is also followed in chronic clinic for the following: 1) HTN; 2) asthma; 3) Hepatitis C; 4) seizure disorder; and 5) s/p skin graft lower extremity.

557.    Mr. ▮▮▮▮▮ care, although complicated, has been relatively straight-forward.  His CHF has been a primary focus of care and has been extensively evaluated by

cardiology. He has been seen numerous times and his recent echo and heart catheterization show no CAD and minimal decline in ejection fraction.  He has also been seen several times in the recent past to evaluate a post-traumatic skin graft done in 2017 in the free world.  He is seen in chronic clinic every 3 months and his HTN, seizure disorder, and asthma are well-controlled.  His Hepatitis C evaluation is ongoing and his latest Fibroscan showed A0 with an HCV RNA quant <12.

558.    Facility providers use the SOAPE format and provide clear, accurate clinic notes with well-defined plans of care.  As noted above, this was not the practice in prior incarcerations in 2018.

559.    **Documentation of Chronic Care: 5—EXCELLENT:** The chronic care for this patient during his stay at the Lewis complex was routine and complete.  The notes bypass the radio-buttons and have free text SOAPE notes.  The content of these more recent notes provides a very good picture of the care plan.  The earliest documentation in ADCRR was rather inconsistent and without much value as far as content.  The documentation has demonstrated a marked improvement since his recent time at the Lewis complex.

560.    **Quality of Chronic Care: 5—EXCELLENT**: The routine quality of chronic care is excellent.

561.    **Quality of Episodic Care: 5—EXCELLENT:** Numerous episodic care incidents were handled timely and efficiently.

***Patient 7:*** ███████        ***ADCRR*** ███████

562.    Mr. ████ is a 45-year-old male who has been in ADCRR on and off since 2000 and has been consistently on the Lewis complex since June of 2018. Mr. ████ is being followed for 5 chronic clinic problems.

563.    Mr. ████ is currently followed in CCC for the following: 1) HTN; 2) diabetes; 3) Hepatitis C; 4) glaucoma; and 5) osteomyelitis of left great toe.

564.    Mr. █████ care has been primarily centered around complications of diabetes.  He is seen in chronic clinic every 3 months.  He has non proliferative bilateral retinal disease and is seen frequently by a retinal specialist for treatment.  He had chronic

osteomyelitis of his left great toe for several years which eventually led to amputation this year.  His HTN is not controlled at times and the provider responds quickly with counseling and/or medication adjustments.  He was treated successfully for his Hepatitis C in 2018 and his APRI scores are followed post treatment.  He has frequent HgbA1c and urinary microalbumin labs and a filament test documented on every chronic care visit. The quality of charting has been exceptional while on the Lewis complex from June 2018 to the present.

565.    Facility providers use the SOAPE format and provide clear, accurate clinic notes with well-defined plans of care.  Notes prior to 2018 are very limited in content.

566.    **Documentation of Chronic Care: 5—EXCELLENT:** The chronic care for this patient during his stay at the Lewis complex was frequent and complete.  Providers do not use the radio-buttons and use free text SOAPE notes.  The content of these more recent notes provides a very good picture of the care plan.  As noted above charting prior to 2018 was not informative and very incomplete. There has been a marked improvement in documentation since his recent time at the Lewis complex.

567.    **Quality of Chronic Care: 5—EXCELLENT:** The routine quality of chronic care is excellent.  It appears that the providers are following chronic disease protocols very closely.

568.    **Quality of Episodic Care: 4—VERY GOOD:** Numerous episodic care incidents were handled timely and efficiently.

***Patient 8:***          ***APCRR***

569.    Mr.        is a 52-year-old male who has been in ADCRR on and off since 2003 and has been consistently on the Lewis complex since April 2020.

570.    Mr.        is being followed for 5 chronic clinic problems.  Mr.        is currently followed in CCC for the following: 1) HTN; 2) aortic valve replacement; 3) Hepatitis C; and 4) s/p coronary angioplasty.

571.    Mr.        care has been very straightforward.  He is seen in chronic clinic monthly.  This frequency is due to his anticoagulation for which he is monitored with a PT/INR every 3 months.  His HTN is fairly well-controlled, and he was treated in 2006 for

his HCV with Pegasus. The quality of charting is very good.

572.   Facility providers use the SOAPE format and provide clear, accurate clinic notes with well-defined plans of care.

573.   **Documentation of Chronic Care: 5—EXCELLENT:** The chronic care for this patient during his stay at the Lewis complex was very frequent (monthly) and complete. Providers do not use the radio-buttons and use free text SOAPE notes.  The content of the notes while at the Lewis complex provides a very good picture of the care plan.  There has been a marked improvement in documentation since his recent time at the Lewis complex.

574.   **Quality of Chronic Care: 5—EXCELLENT:** The routine quality of chronic care is excellent.

575.   **Quality of Episodic Care: 4—VERY GOOD:** Numerous episodic care incidents were handled timely and efficiently.

***Patient 9:*** ▮▮▮▮▮▮▮▮▮ ***ADCRR*** ▮▮▮▮▮

576.   Mr. ▮▮▮▮ is a 40-year-old male who has been in ADCRR on and off since 1999 and has been consistently on the Lewis complex since January 2020. Mr. ▮▮▮▮ is being followed for 4 chronic clinic problems.

577.   Mr. ▮▮▮▮ is currently followed in CCC for the following: 1) HTN; 2) asthma; 3) seizure disorder; and 4) OSA.

578.   Mr. ▮▮▮▮ is seen in chronic care every 3-6 months.  His asthma is well-controlled and his HTN is generally controlled. Any elevated BPs are recognized, and the patient is either counseled about compliance or medications are adjusted.  There were no documented seizure episodes.  He was evaluated for his OSA with a sleep study in 2018. The quality of charting has been very good while on the Lewis complex.

579.   Facility providers use the SOAPE format and provide clear, accurate clinic notes with well-defined plans of care.  Notes prior to 2020 are very limited in content.

580.   **Documentation of Chronic Care: 5—EXCELLENT:** This is not a very complicated patient; however, the quality of the chronic clinic notes is excellent.  Providers do not use the radio-buttons and use free text SOAPE notes.  The content of the notes while

at the Lewis complex provides a very good picture of the care plan.  Prior to 2020 the quality of the notes was not informative and very incomplete.  There has been a marked improvement in the quality of charting since his recent time at the Lewis complex.

581.   **Quality of Chronic Care: 5—EXCELLENT:** The routine quality of chronic care is excellent.

582.   **Quality of Episodic Care: NOT APPLICABLE:** There were very few acute care episodes.  The few that could be reviewed were handled primarily by nursing staff.

***Patient 10:***  ███████████  ***ADCRR*** ████████

583.   Mr. ████ is a 58-year-old male who has been in ADCRR on and off since 1996 and has been consistently on the Lewis complex since June 2019.  Mr. ████ is being followed for 4 chronic clinic problems.

584.   Mr. ████ is currently followed in CCC for the following: 1) HTN; 2) asthma; 3) seizure disorder; and 4) atherosclerotic heat disease.

585.   Mr. ████ is seen in chronic care every 3-6 months.  His asthma is well-controlled, and his peak flows are checked with each visit. His HTN is well-controlled.  Mr. ████ has not had a seizure in over 2 years and is not on antiseizure medication. He has a LexiScan stress test in 2015 which was negative for ischemia.  He has been ordered a hemoccult screening, a PSA, and annual metabolic screening panels. The quality of charting has been very good while on the Lewis complex.

586.   Facility providers use the SOAPE format and provide clear, accurate clinic notes with well-defined plans of care.  Notes prior to 2015 are very limited in content.

587.   **Documentation of Chronic Care:  5—EXCELLENT:** This is not a very complicated patient; however, the quality of the chronic clinic notes is excellent.  Providers do not use the radio-buttons and use free text SOAPE notes.  The content of the notes while at the Lewis complex provides a very good picture of the care plan.  Prior to 2015 the quality of the notes was not informative and very incomplete.

588.   **Quality of Chronic Care: 5—EXCELLENT:** The routine quality of chronic care is excellent.

589.   **Quality of Episodic Care: NOT APPLICABLE:** There were very few acute care episodes.  The few that could be reviewed were handled primarily by nursing staff.

**Summary of Findings for ASPC-Lewis:**

590.   The staff at the Lewis complex are very detail-oriented and provide excellent clinical care.  They appear to use current chronic disease treatment recommendations from national guidelines and apply standard protocols for common chronic processes.  It is unclear whether these protocols formally exist; however, there is a definite pattern of care for certain chronic conditions. The Lewis providers seem extremely competent and motivated to provide excellent care.

591.   The current EHR is an impediment for provider documentation and information sharing.  The look, feel, and flow of information is fragmented, forcing providers to improvise with documentation workarounds.  Although there were no significant errors in care found on the Lewis complex in this review, the potential for errors in patient care is high.

592.   There is a very obvious difference in the patient care documentation over the last 2-3 years.  The content quality of the chronic care notes has improved dramatically as the providers have abandoned the radio-button templates and have inserted a standard SOAPE note format.  The notes are very comprehensive and appear to follow a disease management guideline for common problems.

593.   Preventive notes for infectious diseases especially Hepatitis C are consistent and include monitoring labs.

594.   The frequency of standard lab panels for chronic care patients seems to be excessive.  Labs are repeated at an illogical frequency especially following previous normal values.  This is overly burdensome for providers and ancillary staff and a nuisance for the patients.

595.   Cancer screening that is recommended under national guidelines should be offered.

**Patient Chart Reviews for ASPC-Winslow**

1   ***Patient 1:*** ▮▮▮▮▮▮▮▮▮▮  ***ADCRR*** ▮▮▮

2   596.   Mr. ▮▮▮▮ is currently 49 years old.  He has been incarcerated with

3   ADCRR since February of 2017. He is listed as having 7 Chronic Clinic Diagnoses.

4   597.   Mr. ▮▮▮▮ arrived to the Phoenix Complex and had a thorough intake

5   physical. He reported having DM, HLD, and HTN.  He did not report until later that he had

6   a hx of HCV.

7   598.   He was transferred to the Yuma facility shortly after arrival and was seen very

8   regularly in CCC for his diabetes, HTN, and HDL.  He was on insulin, ACE, statin, and

9   aspirin upon arrival.  His insulin was adjusted, and Metformin was added over the next

10   couple of years.  All in all, the patient's diabetes, BP, and lipids were under excellent

11   control.

12   599.   Mr. ▮▮▮▮ was given a pneumovax and flu vaccine.  His feet were

13   examined, and he was referred to optometry.  He was diagnosed with mild diabetic

14   retinopathy and followed for this annually.  He was also diagnosed with peripheral

15   neuropathy and was found to have microalbuminuria while at the Yuma facility.

16   600.   The patient's creatinine remained stable and normal.

17   601.   The patient ultimately reported to a Yuma physician that he had a history of

18   HCV and, when tested, was found to have HCV ab and to be immune to Hep A.  He was

19   not immune to Hepatitis B and a Hepatitis B vaccine was ordered.  A viral load was ordered

20   on the next CCC visit.

21   602.   The patient transferred to Winslow in early 2020.

22   603.   Mr. ▮▮▮▮ had a Fibrosure test that showed he had cirrhosis.  The "Hepatitis

23   Committee" proceeded to get him treated for Hepatitis C in the spring of 2020.  He had a

24   negative viral load at the conclusion of treatment.  The viral loads that were ordered after

25   completion of treatment were cancelled, so it is difficult to tell if he had a sustained viral

26   response.

27   604.   Mr. ▮▮▮▮ had very little episodic care.  He was once seen for a cough and

28   had a negative CXR.

93

605. **Documentation of Chronic care: 4—VERY GOOD:** This chart is easy to follow.  The documents are all present.  It is unclear why some labs are canceled.

606. **Quality of Chronic Care: 5—EXCELLENT:** The quality of diabetes care was excellent at both Yuma and Winslow.  The patient was seen frequently, and labs were followed closely.  Once the patient was diagnosed with HCV, the patient had appropriate follow-up. Mr. ███ was treated for HCV, and it probably was successful, but SVR has not been documented.

607. **Quality of Episodic Care: 4—VERY GOOD:** I don't have enough information available due to infrequent complaints.  What was seen was fine.

***Patient 2:*** ███           ***ADCRR*** ███

608. Mr. ███ is currently a 37-year-old male who has been incarcerated with ADCRR since November 2014.  He is listed as having 7 Chronic Clinic Diagnoses.

609. There are many years between Mr. ███ intake date and the first note in the EHR that has substantive content.  The first note I find is on June 17, 2015 at the ASPC-Lewis Stiner Unit.  Mr. ███ appears to have been receiving care at the Stiner unit until he had an intake physical at the Phoenix facility in March 2018 and was transferred to the Safford facility.  He then went to the Tucson facility and then the Eyman facility and arrived at the Winslow facility in spring/summer 2021.  The first note I see from the Winslow facility is on June 2, 2021.  There is a significant gap in the medical record between 2015 and 2018.

610. Mr. ███ appears to have arrived at prison with diagnoses of HTN and asthma.  His HTN was difficult to control, and he had been tried on an ACEI, which did not control his pressure and was stopped.  He was placed on a calcium channel blocker, which helped to control his pressure.

611. Mr. ███ was diagnosed with diabetes, classified as type I, and there is evidence of an ICU stay at the time of diagnosis in 2016.  He originally was on Glargine, which was then switched to NPH/regular.  His diabetes control varied.  His A1c was down to 6.5 in March 2020, which is also the time that his creatinine began to rise.  It was not

until December of 2019 that CKD was diagnosed.  There was a lag in restarting an ACEI for the CKD.  After many notes without mention, a note stated that it was offered for BP control and that the patient did not want to take another BP medication. Lisinopril was started at the Winslow facility this month.

612.  Mr. ███████ appears to have had close to annual retinal screening (negative for retinopathy), and there are occasional mentions of the providers doing an assessment of his feet and his peripheral sensation.

613.  Mr. ███████ was diagnosed with HDL, and it was appropriately and successfully treated.

614.  Mr. ███████ asthma was not very active, although he reported using his albuterol inhaler about once a day and there was no discussion about adding a controller medication.

615.  Mr. ███████ episodic care consisted of some minor skin problems, needing his toenails cut and constipation.  These problems were addressed.

616.  **Documentation of Chronic care: 3—GOOD:** I found at least 1 instance where a provider had copy-pasted content from one note to another, which should not be done.  The documentation of the actual chronic clinic problems continues to be hampered by the template used for CCC.

617.  **Quality of Chronic Care: 3—GOOD:** There were instances where the insulin regimen should be adjusted, and nothing was done.  As the creatinine climbed, there should have been an immediate response to start an ACEI and to explain to the patient that this drug was not just for BP control.  It is interesting to note that as soon as the patient was seen at the Winslow facility for CCC, the patient was switched from NPH to Glargine and had Lisinopril added to his regimen.

618.  **Quality of Episodic Care: 5—EXCELLENT:** There is not much episodic care demonstrated in the provider notes, but what is there was well taken care of.

***Patient 3:*** ████████████████ ***ADCRR*** ███████

619.  Mr. ███████ is a 55-year-old male who has been incarcerated with

ADCRR since May 1988.  He is listed as having 6 chronic care diagnoses.  Mr. ▮▮▮▮▮▮▮ carries the following chronic clinic diagnoses: 1) CKD; 2) thrombocytopenia; 3) Hepatitis C (s/p treatment in 2018); 4) gout; 5) HDL; and 6) HTN.  He was originally seen in chronic clinic for HTN and HDL and both were relatively well-managed.  Mr. ▮▮▮▮▮▮ later reported to medical staff that he had been diagnosed with Hepatitis C in the 1990s.  This would be during this patient's incarceration, so this information had not followed the patient, somehow.

620.    Despite having many notes in the EHR prior to this date, the first substantive note in the EHR is a provider review completed on January 29, 2015 at the Eyman facility. It appears that Mr. ▮▮▮▮▮▮ went from the Eyman facility to the Tucson facility in December 2015, then back to the Eyman facility in 2017.  He remained at the Eyman facility until 2019, when he was transferred to the Winslow facility.  The first note I find at the Winslow facility is from December 27, 2019.

621.    Mr. ▮▮▮▮▮▮ had good management of his Hepatitis C.  He was screened for immunity to other hepatidites and, when the decision to treat came down from the "Hepatitis Committee," an HIV test was done.  He had Fibrosure tests that showed severe fibrosis and yet cirrhosis was not added to his problem list.  He did have an APRI on his chronic clinic notes consistently (prior to treatment) starting on June 21, 2016.

622.    Mr. ▮▮▮▮▮▮ was treated successfully for Hepatitis C in 2018-2019 and appears to have had a sustained viral response.

623.    Mr. ▮▮▮▮▮▮ was seen frequently for various aches and pains and was actually referred to a rheumatologist at one point, who opined that the mild elevation in the patient's rheumatoid factor was likely related to HCV infection.  It was recommended to get a cyclic citrullinated peptide antibody, but it does not appear that one was ordered.

624.    After 2017, while Mr. ▮▮▮▮▮▮ was housed at Eyman, the staff consistently refrained from ordering NSAIDs in this patient with cirrhosis and thrombocytopenia.  As soon as he was transferred to Winslow in 2019, he complained of musculoskeletal pain and was put on NSAIDs.  This is despite a notation of needing to add

CKD as a diagnosis and of having low platelets and known cirrhosis.

625.   Not long after adding NSAIDs, the patient presented with GI bleeding, was given hemoccult cards, and was found to be heme positive on all.  No rectal exam was done at the time that the GI bleeding was reported.  The patient underwent colonoscopy and EGD, which showed gastritis.

626.   The remainder of the patient's chronic care history is unremarkable.

627.   Mr. ████████ episodic care consists mostly of musculoskeletal pains, and, at one point, he had a pain in a toe that was later thought to be gout and he was started on allopurinol.

628.   **Documentation of Chronic Care: 2—FAIR:** Aside from the previously mentioned difficulties with eOMIS, I noticed some copy and pasted reviews of systems and of histories of current problems on the notes

629.   **Quality of Chronic Care: 3—GOOD:** This category would be very good if it were not for the use of NSAIDs in a patient with CKD, thrombocytopenia, and cirrhosis. This patient then went on to a GI bleed.  NSAIDs should not be used in the presence of any of these conditions.

630.   **Quality of Episodic Care: 4—VERY GOOD:** This patient received a great deal of attention and care for his various complaints.  I have no issue with any of this except for the use of NSAIDs as mentioned previously.

***Patient 4:*** ████████████ ***ADCRR*** ██████

631.   Mr. ████ is a 60-year-old male who has been incarcerated with ADCRR since November 2013.  He is listed as having 6 chronic clinic problems.  Mr. ████ has the following chronic clinic diagnoses: 1) type 2 DM, and 2) HDL.  He is listed as having had Hepatitis C and also chronic fatigue, enlarged prostate and vitamin D deficiency.  He was seen for episodic complaints of fatigue, hernia, foot pain, and weight loss during the period of time reviewed.

632.   The first substantive note from a provider, which is found in the EHR is from October 2014 from the ASPC-Lewis Stiner Unit.  The patient was at Lewis until transfer to

Yuma in 2015 and then to Phoenix in 2019.  There seems to be a gap in the records between 2016 and 2019.  Mr. ███ starts to be seen by medical staff at Winslow in November 2019.

633.   Mr. ███ diabetes has been well-controlled over the period of time reviewed.  He was properly screened for diabetes due to being obese and was found to have an elevated A1c.  He was started on Metformin and has done well.  He has had screening for retinopathy.

634.   Upon arrival to Winslow, I find a very thorough note from Dr. Jordan, who orders those studies needed for HCV.  It had not been ascertained to this point whether Mr. ███ had active Hepatitis C.  He did not.  Furthermore, he was found to be immune to Hepatitis A and B.  I did not see HIV screening for Mr. ███.

635.   The patient has been properly placed on statin, ACEI, and aspirin.  In February 2020, the patient was seen for foot pain and was started on naproxen.  He had GI bleeding several months later and was found to have gastritis by EGD.

636.   The patient's hernia was repaired during this incarceration as well.

637.   **Documentation of Chronic Care: 3—GOOD:** Despite the limitations of eOMIS, most of the documentation is present and can be followed.  Consult notes are present and are easy to discern.

638.   **Quality of Chronic Care: 3—GOOD:** I have assigned this grade despite good diabetes and HDL care because there was a delay in checking whether the patient had an ominous underlying cause for weight loss back in 2015, and there was a delay in checking whether the patient had active Hepatitis C.

639.   **Quality of Episodic Care: 2—FAIR:** On the one hand, Mr. ███ had his hernia repaired expeditiously.  On the other hand, he was placed on an NSAID in January 2020 and bled from his stomach a couple of months later.  NSAIDs should be avoided whenever possible, especially in the elderly and especially when Tylenol has not been tried.

***Patient 5:*** ███████  ***ADCRR*** ███

640.   Mr. ███ is a 65-year-old male who has been incarcerated with ADCRR since August 2010.  He is listed as having 5 chronic clinic problems.  Mr. ███ has the

following chronic clinic diagnoses: 1) HTN; 2) Hepatitis C; 3) cirrhosis; 4) asthma; and 5) chronic eye pain with optic neuritis.  Mr. ▮▮▮▮ also has had a workup for heme positive stool and has been treated by ophthalmology for dry eye and for ptosis of the right lid.

641.   The first note I find with content written by a provider is from July 2014 at the Tucson facility.  Mr. ▮▮▮▮ was at the Tucson facility until transfer to Florence in 2017 and then to Winslow in spring 2020.

642.   The care for Mr. ▮▮▮▮ chronic problems early on included HTN and asthma.  There were many notes discussing pain management, since the patient had been started on morphine and wanted increased doses.  He resisted stopping morphine.  The patient was caught cheeking his medications over the years, as well.

643.   Mr. ▮▮▮▮ care in 2014-2016 is a bit disjointed.  The CCC notes often included 1 diagnosis and not another.  The Hepatitis C was identified in a lab test done in 2015, which is in the chart and the first HCV RNA I find is from 2016, yet HCV was not added to the CCC list.  HCV is not added to CCC until 2018, while he was at the Florence facility.  It appears that the patient started to have APRI calculations at this time.  He began having u/s screening and Fibrosure in 2020 when at the Winslow facility.

644.   Another finding that was unaddressed early in this patient's record is the fact that he consistently has an elevated hemoglobin, hematocrit, and iron level.  This was not worked up until the patient arrived at the Winslow facility in 2020 and had a ferritin to look for hemochromatosis and a JAK mutation test to look for polycythemia vera.

645.   The patient's asthma was not mentioned often, and it does not appear that he had many complaints about it.  The patient's BP is now controlled.

646.   From the standpoint of episodic care, there is the questionable use of turmeric, vitamin C, vitamin D, and n-acetyl cysteine for post-COVID syndrome.

647.   Mr. ▮▮▮▮ had a great deal of episodic care around pain control.  Opioids should not be used for chronic pain in general, and this case demonstrates this well.  Mr. ▮▮▮▮ also complained about skin rashes, dental pain, and wanting glasses.  These were all seen to.

648.    **Documentation of Chronic Care: 3—GOOD:** Aside from the previously mentioned challenges with the EHR, documentation was good.  There are issues with older notes from 2014-2015 with not being able to easily track the patient's problems and labs.  There are also issues with the chronic clinic template not displaying the information that is important to collect at a chronic clinic appointment.

649.    **Quality of Chronic Care: 4—VERY GOOD:** The chronic care improved greatly when the patient arrived at Winslow.  The Hepatitis C was worked up.  The high hemoglobin was recognized as being a potential problem.  Cirrhosis was added to the problem list.  The patient's HTN and asthma were controlled.  The patient's pain seems to have been managed and the patient actually had a blepharoplasty for a drooping eyelid during this incarceration.

650.    **Quality of Episodic Care: 5—EXCELLENT:** The patient was seen for all of his complaints, and they were addressed.

***Patient 6:***　██████████　***ADCRR***

651.    Mr. ████ is a 47-year-old male who has been incarcerated with ADCRR since September 2014.  He is listed as having 4 chronic clinic problems.

652.    The EHR has multiple visits listed early in this patient's incarceration that are devoid of meaningful information.  The first actual medical note that I found was from November 2014 at the Florence facility.  Mr. ████ was housed at the Florence facility until sometime in 2016, when he was sent to Winslow.  He was then sent in 2017 to Tucson and in 2018 to Phoenix and in 2019 to Lewis.  In spring of 2019, he was transferred back to the Winslow facility.

653.    Mr. ████ arrived to ADCRR with a diagnosis of type 2 DM.  He stated that he had been taking Glipizide in the free-world and had been put on metformin when he arrived.  His A1c was less than 7 in the earliest that is available (September 2014), and he then gained 40 pounds.  His A1c rose precipitously in 2017.

654.    While in Florence, Mr. ████ was found to have microalbuminuria, and lisinopril was started promptly.  Mr. ████ did not like the metformin (he felt it did not

work as well as glipizide) and asked for the glipizide to be restarted. Metformin was increased. The patient was started on gemfibrozil for elevated triglycerides. Over the following year, the patient was started on insulin and had an improvement in his sugars and his symptoms. Glipizide was also added to the regimen.

655. Upon arrival to Winslow in 2016, the patient was seen, the fibrate was discontinued, and he was (properly) begun on a statin. The NPH insulin was adjusted and pushed during the short time he was there.

656. When the patient was transferred to Tucson, he was not on metformin. He believed that he would be released in 28 days. During the time he was here, he had a hypoglycemic episode, and he had an infection on his scalp.

657. The patient was then transferred to Phoenix and was only on insulin for his diabetes at the intake physical. He was diagnosed and treated for latent syphilis at this facility.

658. The patient was then transferred to Lewis and was seen in CCC. The fibrate was added back. He was on insulin, but no oral medications for DM. The initial note in CCC did not mention that the A1c a month or so prior had been 10.3.

659. Upon transfer to Winslow for the second time, Mr. ███ was seen in CCC, had a microfilament test for peripheral sensation, was referred to optometry, and was started on Glargine shortly thereafter. He was started on statin again and the fibrate was discontinued. Mr. ███ has had elevated blood sugars and A1c despite persistent counseling and medication adjustments on the part of the medical staff.

660. Most recently, the patient has reported having chest pain and has been referred to and seen by a cardiologist. An evaluation is pending.

661. While incarcerated, Mr. ███ reported foot problems, skin infections, urine that is malodorous, a bump on his hip, and a pain in his ribs. All of these issues were addressed capably.

662. **Documentation of Chronic Care: 3-GOOD:** The same issues exist with early notes in eOMIS and with the templates available for CCC, but documentation is

present.

663.    **Quality of Chronic Care: 4-VERY GOOD:** This patient's diabetes was aggressively treated.  The fact that his diabetes is still not well-controlled is not reflective of effort on the part of the unit medical staff.  Winslow's handling of the patient's chronic problems is especially good with a quick switch back to a statin from a fibrate, which was the wrong choice for this patient.

664.    It seems that the patient's complaint of chest pain was rapidly addressed and a referral to cardiology occurred quickly.

665.    **Quality of Episodic Care: 5—EXCELLENT:** There is episodic care of note, but all that I saw was acceptable.

***Patient 7:***  ██████    ***ADCRR*** ███

666.    Mr. ███ is a 59-year-old male who has been incarcerated with ADCRR since October 2014.  He is listed as having 3 chronic clinic problems.  By my assessment, Mr. ███ only chronic care problems are HDL and HTN.

667.    The initial note containing any clinical information written by a provider, which exists in this patient's chart is in July 2014 at the Yuma facility.  It appears the patient was in Yuma until he was briefly transferred to Safford in 2019 and then to the Winslow facility sometime in June 2019.  He remains housed at the Winslow facility.

668.    Mr. ███ has had the following episodic problems: dental pain and joint pain.

669.    It appears that Mr. ███ HTN was very well attended to at all facilities; however, he refused treatment completely in the middle of his incarceration.  Once he became willing to take medication, his BP rapidly became controlled.  The care at Winslow was quite good, and they tried a medication or dose, watched the BP readings, and then increased treatment over several weeks.

670.    It has not been established that this patient needs to have his lipids treated.  He may need it, but the reasoning has not been documented.  He is not diabetic and does not have an LDL>190, so he should have an ASCVD risk established to determine if he

1    needs medication.

2    671.   There is also a diagnosis of anemia while in Safford that is unsupported.  He

3    was never anemic.  He had one reading of a low iron level on one of the panels that was

4    ordered, and he never should have had an iron level done.

5    672.   **Documentation of Chronic Care: 4—VERY GOOD:** Other than a lack of

6    the thought process on why this patient's lipids should be treated, the documentation of the

7    care was excellent.

8    673.   **Quality of Chronic Care: 4—VERY GOOD:** This is especially true at the

9    Winslow facility, but in defense of the other facilities, this patient did refuse medication for

10   quite a while. I think it is important to document whether this patient requires treatment of

11   his lipids and the level of intensity that is recommended. I think excessive testing for

12   concerns that are unlikely to contribute to the patient's healthcare should be discontinued.

13   674.   **Quality of Episodic Care: NOT APPLICABLE**

14   ***Patient 8:***                    ***ADCRR***

15   675.   Mr.        is a 43-year-old male who has been incarcerated with ADCRR

16   since March 2005.  He is listed as having 3 chronic care problems.

17   676.   The initial note containing any clinical information written by a provider,

18   which exists in this patient's chart, is in April 2019, at the Phoenix facility. It appears he

19   had an intake assessment at Phoenix and then was moved to Winslow and then was moved

20   back to the Phoenix facility for another intake assessment in March 2020, and was again

21   transferred to the Winslow facility, where he remains.

22   677.   By my assessment, Mr.        is noted to have the following chronic clinic

23   problems: 1) HTN; 2) Hepatitis C; 3) HDL; and 4) history of asthma.

24   678.   I have no provider notes for episodic care.

25   679.   In general, Mr.        HTN was well treated.  He was seen every few months,

26   started on an ACEI, had it increased, and then had a calcium-channel blocker added when

27   the desired BP goal had not been met.  His HTN is well-controlled.

28   680.   Mr.        HCV seems to have been treated with a sustained viral response

in 2011 (with Ribavirin, per notes), but this information is not in the EHR.  It does appear that the patient was reinfected with HCV while incarcerated.  It is noted that the patient was shooting heroin as recently as 2019.

681.    His Hepatitis C was again evaluated with a Fibrosure test and with serial viral load tests and appears to be active.  His fibrosis score is F0, however.  It is stated in the chart that the patient has received Hepatitis B and A vaccines, but I see no evidence of this in the chart.  There is also no evidence that the patient has ever had an HIV test.

682.    Mr. ███ is seen consistently in his stay (but not in the last CCC note, when he returned to Winslow) for HDL.  There is no treatment begun for this (as there probably should not be), but there is no comment on an ASCVD risk score, nor the plan for the HDL.  A slightly out of range lab result that is not elevated enough to treat for this patient should not be included in chronic clinic, in my opinion.  It detracts from taking care of the issues that require more attention from a provider.

683.    **Documentation of Chronic Care: 4—VERY GOOD:** This patient's HTN care and HCV care are well-documented.  There is a lack of some supporting labs and possibly evidence of vaccination status that is missing in the EHR, but perhaps this is present in an old chart, since it is mentioned in the CCC notes.

684.    There is poor documentation around HDL and what the treatment plan is.  The plan of treatment for the Hepatitis C is difficult to follow as it is managed by a committee that does not document in the EHR.

685.    **Quality of Chronic Care: 4—VERY GOOD:** This patient's HTN was treated well and is controlled.  His Hepatitis C is being followed.  The HDL should not be included in chronic care unless treatment is planned.  As the patient is seen for his HTN in chronic clinic, an annual lipid screen can be performed and need for treatment evaluated.

686.    **Quality of Episodic Care:  NOT APPLICABLE**

**_Patient 9:_** ███████ **_ADCRR_** ███

687.    Mr. ███ is a 37-year-old male who has been incarcerated with ADCRR since November 2010.  He is listed as having 2 Chronic Clinic problems.  By my evaluation,

1  Mr. ████ chronic clinic problem is Hepatitis C.

2      688.  The initial note containing significant clinical information is on January 10,

3  2018, at the Phoenix facility.  He appears to have had an intake assessment at the Phoenix

4  facility and then transferred to the Yuma facility, where he remained until sometime in 2018

5  (prior to September 20).  He remains at the Winslow facility.

6      689.  Mr. ████ chronic clinic problem is Hepatitis C.  He was originally seen

7  for latent TB infection (prior to the diagnosis of Hepatitis C) and then it was determined

8  that Mr. ████ did not have a latent TB infection at all.  After that, he was followed only

9  for Hepatitis C in his chronic care visits.

10      690.  Mr. ████ was discovered to have elevated transaminases in February 2018,

11  when he was at the Yuma facility.  He was tested for hepatitis and was found to have

12  Hepatitis C.  HIV testing was also done at this time.  HCV RNA testing was not done until

13  October 2020.

14      691.  When the patient arrived at Winslow, he had a CCC note for his Hepatitis C,

15  and it was noted that he was immune to Hepatitis A and B.  His APRI was documented, and

16  he had continued CCCs up to the present.  He has had his APRI documented and has had a

17  liver ultrasound in July 2020 that showed a prominent liver.

18      692.  Mr. ████ was seen for a skin rash and onychomycosis and received

19  excellent episodic care for these problems.

20      693.  **Documentation of Chronic Care: 4—VERY GOOD:** This patient's course

21  of care is easy to follow, and he has had the recommended labs and studies.  This patient

22  had repeat hepatitis antibody testing (chronic and acute, A, B and C), despite having a test

23  on his chart in 2018.

24      694.  **Quality of Chronic Care: 4—VERY GOOD:** This patient's diagnosis of

25  Hepatitis C occurred rapidly after the recognition that he had elevated transaminases.  The

26  early workup included screening for immunity to other hepatidites and that the patient was

27  screened for HIV.  Mr. ████ doesn't have much end organ damage and will continue to

28  be followed without treatment.

695. **Quality of Episodic Care: 5—EXCELLENT:** This patient's episodic care was taken care of and documented very competently.

***Patient 10:*** ████████████████ ***ADRRC*** ████

696.    Mr. ██████ is a 50-year-old male who has been incarcerated with ADCRR since March 2007.  Mr. ██████ is listed as having 1 chronic care problem.

697.    The first note with meaningful provider entry in the EHR is from March 2017 (and intake Px at the Phoenix facility).  After that, there is no provider entry until August of 2020 at the Winslow facility.  Mr. ██████ is currently housed at the Winslow facility.

698.    Mr. ██████ medical problems are latent TB infection, Bell's Palsy, restless leg syndrome, GU chlamydia infection, and COVID infection.

699.    Mr. ██████ had no notes that were identified as chronic clinic notes in the EHR.  The one chronic clinic problem that is cited for Mr. ██████ is the LTBI.  Mr. ██████ did have some episodic care that was well-managed around his chlamydia infection (which seems to have been found in the middle of his incarceration) and his Bell's Palsy.  It appears he had one episode of dehydration during his incarceration, and he also was seen when he became positive for COVID for which he was isolated.

700.    **Documentation of Chronic Care:   NOT APPLICABLE:** I see no documentation of chronic care.  Mr. ██████ does not have any diagnoses that should be managed in CCC, since LTBI should not be managed by a provider in CCC, but rather by an infectious disease nurse.

701.    **Quality of Chronic Care:  NOT APPLICABLE**

702.    **Quality of Episodic Care: 5—EXCELLENT:** This patient had a chlamydia infection, which was treated properly and also had Bell's Palsy, which was treated.  He had COVID and was isolated.

**Summary of Findings for ASPC-Winslow:**

703.    I am very encouraged to see Intake physicals being completed (at the Phoenix facility) where vaccinations are mentioned.  I do not, however, see that there is an assessment of what vaccines were needed or given (in the medication tab).

704.    It appears that the care is much improved and much better documented over the past 2-3 years.  There is more evidence of continuity of care and much less duplication of care.  The care seems more coherent in the past couple of years, although there still seems to be some difficulty upon transfer in completely understanding the patient's issues.

705.    There is increased emphasis on preventive care in the past several years. There needs to be more emphasis on screening for colon cancer.

**Patient Chart Reviews for ASPC-Perryville**

***Patient 1:***        ███████████        ***ADCRR***  ████████

706.    Ms. ██████████ is a 64-year-old female incarcerated since 12/14/07 currently housed at the PV-Lumley unit since 2018. She is a clinically complex patient with numerous chronic care illnesses and medications. Her chronic conditions include: 1) seizure disorder; 2) Hepatitis C; 3) type 2 diabetes; 4) asthma; 5) CHF; 6) hypothyroidism; 7) ulcerative colitis; 8) HTN; and 9) HDL. Provider clinic notes begin in the EHR in the year 2014.

707.    Ms. ██████████ seizure disorder is controlled with divalproex. This was a self-reported diagnosis at intake, and the patient has not had a documented seizure during her entire incarceration. She is taking dicyclomine for ulcerative colitis diagnosed by barium enema 2009; however, colonoscopy in 2013 was normal (this is per documentation found in an older chronic care note).

708.    Her BP fluctuates, which may be a compliance issue. Over half of the BP readings recorded in the past 3 months are over target goal. This could be due to the discontinuation of her amlodipine during her last chronic care visit on 5/4/21, but it is unclear why it was discontinued. It may have been intentional since the patient reported edema in her legs, which is a side effect of amlodipine.

709.    Regarding her diabetes, this has been well-controlled. Her last hemoglobin A1C was 6.5%. Her metformin was discontinued on 7/27/21; therefore, she has not received treatment for her diabetes for the past 2 months. There is no documentation as to why this was done. She is receiving annual eye exams, but she has not had a urine microalbumin or a urine albumin to creatinine ratio since 2015. She also has a diagnosis of HDL for which

1  she is taking gemfibrozil. She was previously on a statin, but it was discontinued in 2016
2  when she had a prolonged QT interval on a routine EKG. Her LDL is only 53 mg/dL.

3  710.  This patient has smoked throughout her incarceration. She was diagnosed
4  with asthma and is currently on a levalbuterol inhaler. She did have a chest CT in 2018,
5  which was unremarkable, to evaluate a nodule on a routine chest x-ray, but she may need a
6  repeat low dose chest CT given her age and smoking history.

7  711.  She was given a diagnosis of CHF in 2018. She presented with dyspnea and
8  orthopnea prompting the provider to order a beta natriuretic peptide. It was mildly elevated.
9  She subsequently had an echocardiogram revealing only mild left ventricular hypertrophy
10  and ejection fraction 60-65%.

11  712.  She has a long history of Hepatitis C which has not been mentioned in a
12  chronic care note since October 2019. Although her AST to Platelet Ratio Index (APRI)
13  score is < 0.5, her fibrosis-4 score of 1.92 indicates possible advanced fibrosis. She has no
14  ultrasound or alpha fetoprotein level on record. She should be evaluated for conditions such
15  as HIV, which can accelerate liver fibrosis. There is no record that an HIV test has been
16  ordered although this could have been checked prior to the adoption of this EHR.

17  713.  Her hypothyroidism has been monitored and treated with levothyroxine. Over
18  the years, the dose has been slowly increased from 88 mcg to 137 mcg. She had a normal
19  thyroid ultrasound in June 2020 after the provider noted an enlarged thyroid gland.

20  714.  **Documentation of Chronic Care: 3—GOOD**

21  715.  As pointed out above, Hepatitis C was last addressed in October 2019. There
22  is also no documentation of an annual physical in the EHR. If this type of visit is conducted
23  with the chronic care encounter, then age-appropriate cancer screening needs to be
24  addressed in the chronic care clinic notes. She is up to date on colon cancer screening
25  (normal colonoscopy 2013), but past due for a mammogram. She also has not had a pap
26  smear since 2014 and the only refusal for one is from 2018.

27  716.  The subjective and objective sections of the chronic care visit are difficult to
28  review given the use of radio-buttons that are not aligned. It was much easier to follow what

was happening with the patient when the provider free typed in these sections.

717.   **Quality of Chronic Care: 4—VERY GOOD:** Despite the issues outlined above, the quality of chronic care this patient has received is very good. She is clinically complex patient with polypharmacy; yet, throughout her years in the ADCRR, she has remained stable. She has not had any exacerbations of her chronic illnesses and has not been hospitalized.

718.   **Quality of Episodic Care: 5—EXCELLENT**: Patient has submitted over 150 HNRs since 2014. The majority of these are regarding various musculoskeletal complaints. These were all addressed by both nursing and providers.

***Patient 2:*** ████████████ ***ADCRR*** ██████

719.   Ms. ██████ is a 49-year-old female incarcerated since 5/1/19 and currently housed at the PV-San Carlos since May 2019. Her chronic care conditions include: 1) asthma; 2) COPD; 3) HDL; 4) HTN; 5) type 2 diabetes: 6) hypothyroidism; 7) atherosclerotic heart disease; and 8) CHF. History of intubation is also listed on her problem list in the chronic condition category. While this is an important part of her medical history, it should not be classified as a chronic illness.

720.   Prior to incarceration, Ms. ██████ had 6 coronary artery stents placed. In October 2020 she reported occasional chest tightness. She was referred to a cardiologist and underwent a nuclear stress test which was abnormal. She subsequently underwent a heart catherization where blockage was found in her left anterior descending artery. She is on antiplatelet and statin therapy for secondary prevention of cardiovascular events. However, her dose of atorvastatin is only 20mg, but given her history and the need for high intensity statin therapy, this dose should be increased.

721.   She takes oral medication for her diabetes with a hemoglobin A1C of 7.2%, decreased from 7.9%. She is receiving annual optometry exams. She is on appropriate medication for her asthma and COPD (confirmed with spirometry), and frequency of inhaler use is documented in her chronic care clinic notes.

722.   Regarding screening and preventative care, she is up to date on her pap smear,

but she should be tested for HIV and Hepatitis C given her reported history of IV drug abuse.

723.   **Documentation of Chronic Care: 5—EXCELLENT:** While the problem list could use some revisions as mentioned above, the documentation of her chronic care visits was excellent.

724.   **Quality of Chronic Care: 4—VERY GOOD:** Given her extensive cardiovascular history, this patient should be on a higher dose of her statin. Her last LDL cholesterol reading was 93 which is not at goal for this high-risk patient. Her other chronic conditions are currently managed adequately.

725.   **Quality of Episodic Care: 3—GOOD:** In September 2019, this patient submitted an HNR for wrist pain and chest pain. The nurse saw the patient for these complaints, but the documentation in the note is more centered around the wrist pain. She then submitted another request to be seen for the same issues. It was then that a provider visit was arranged, but the provider's assessment was "chronic pain," when the provider should have addressed the chest pain. All other HNRs were handled appropriately.

***Patient 3:*** ███████████ ***ADCRR*** ███

726.   Ms. ███ is a 51-year-old female incarcerated since 2018 and currently housed at the PV-San Carlos unit. Her chronic conditions include: 1) HIV; 2) HTN; 3) asthma; 4) HDL; 5) type 2 diabetes; and 6) CKD.

727.   She was started on ART in county jail after being off treatment before her arrest. Prior to the end of 2020, providers were ordering an entire immune deficiency panel to obtain the patient's CD4 count. This is not recommended as it is not useful and is expensive. Her viral load is <40 copies and her CD4 count responded to therapy increasing from 469 at intake to 829 as of October 2021. Her CD4 count only needs to be monitored annually.

728.   The patient has been seen by both the medical doctor and mid-level providers for chronic issues. Her HTN, HDL, and CKD are stable. She was diagnosed this year with type 2 diabetes and started on metformin without delay. Her hemoglobin A1C is now 6.1%,

and her eye exam is scheduled.

729.   Spirometry testing in January 2021 confirmed she had mild intermittent asthma. At her chronic care visit in May 2021, the provider documented that she was using her inhaler 3-4 times per day, yet in the assessment, her asthma is classified as mild intermittent and documented as stable. Her asthma is clearly not stable if she is using her rescue inhaler that often and signals that she needs a step up in treatment. Just a few weeks prior to that she had an on-unit emergency visit for difficulty breathing, and a nebulizer treatment had to be given.

730.   In September 2019, she began complaining of a cough. She saw the unit nurses and providers for this, but a chest x-ray was not ordered until April 2020 which was unremarkable. She has continued to complain of a cough this year. She may have chronic bronchitis, but given her age, current tobacco use, and 30+ year smoking history, a low dose chest CT should be ordered. This is based on a recommendation from the United States Preventative Services Task Force.

731.   **Documentation of Chronic Care: 4—VERY GOOD:** There are no periodic physicals on record. If these are being combined with chronic care visits, then a discussion of breast cancer screening should be documented.

732.   **Quality of Chronic Care: 3—GOOD:** As detailed above, her asthma is not controlled but was not addressed in the plan of her May 2021 chronic care visit. Her HIV is controlled to the point that she does not require as frequent monitoring of her CD4 count.

733.   **Quality of Episodic Care: 4—VERY GOOD:** The patient has had a cough for the past few years for which she has seen both nurses and providers. This could be due to her asthma, but she may need further workup given her smoking history.

***Patient 4:***          ***ADCRR***

734.   Ms.          is a 55-year-old female incarcerated since 2004 and currently housed at the PV-Santa Cruz I unit. She is listed as having seven chronic care conditions due to duplicates on the problem list, but I could only identify the following: 1) seizure disorder; 2) asthma and/or COPD (both are listed); and 3) HDL.

735.    This is a challenging patient. She has a long problem list including multiple drug allergies. She has been sent emergently to the hospital twice for stroke-like symptoms, received an extensive workup, and was concluded by neurology to have conversion disorder. Her seizures were found to be psychogenic in nature. She is on levetiracetam (Keppra) for this. In the earlier years of EHR documentation, the patient's Keppra level was checked every two to three months which is generally unnecessary with this medication. This practice has stopped since early 2020.

736.    Patient has also had a cardiac workup with a negative nuclear stress test and a normal echocardiogram. She has undergone urologic workup for recurrent UTIs including a normal CT abdomen/pelvis, urine cytology, and cystoscopy. The patient may have both asthma and COPD (asthma-COPD overlap syndrome). Her spirometry testing revealed a mild restriction. She is currently receiving montelukast (Singulair), levalbuterol inhaler, and umeclidinium inhaler (anticholinergic to relax the airways in patients with COPD). Unfortunately, she is a current smoker.

737.    She has been provided with hearing aids, a wrist splint, and orthotic shoes. She has received regular screening mammograms and pap smears (although I could not locate the result of the one done in November 2020). She has been screened for Hepatitis C (negative) and for colon cancer (negative hemoccult in 2020).

738.    **Documentation of Chronic Care: 5—EXCELLENT:** Despite the inability of the EHR to incorporate current lab results within a clinic note, the providers are typing pertinent lab results within the note. She has documentation of preventative care and cancer screenings.

739.    **Quality of Chronic Care: 5—EXCELLENT:** While therapeutic drug monitoring of Keppra is appropriate in some patients, there was no documentation to support that it was needed in this patient, and these tests appeared to be blindly ordered every few months in the past. As mentioned above, this is no longer occurring. Her chronic conditions are currently controlled.

740.    **Quality of Episodic Care: 5—EXCELLENT:** The episodic care

documentation was excellent. She has received thorough workup of her complaints and has been provided with new splints and shoes at her requests.

***Patient 5:*** ███████████ ***ADCRR*** ████████

741.    Ms. █████ is a 36-year-old female incarcerated since 2017 who is currently housed at the PV-San Carlos unit. She is being followed for type 2 diabetes, asthma, and HDL.

742.    She did not have a diagnosis of diabetes at intake; rather, she was diagnosed about a year later when her hemoglobin A1C was 5.9% with a normal fasting glucose. This is consistent with pre-diabetes which is usually treated with lifestyle changes first. She is receiving annual eye exams, but there is no nephropathy screening. She is also not on an ACE inhibitor or ARB (medications with renal protective effects).

743.    She is taking ezetimibe and gemfibrozil for her HDL. A statin was ordered in December 2018 but discontinued just a few minutes later then reordered in March 2019 but discontinued three months later. Her asthma is controlled on a ciclesonide inhaler, levalbuterol inhaler, and montelukast.

744.    **Documentation of Chronic Care: 5—EXCELLENT:** In regard to her asthma, the providers are documenting inhaler use frequency and peak flows. There is documentation that lifestyle changes are also discussed for her diabetes and HDL.

745.    **Quality of Chronic Care: 3—GOOD:** Patient was diagnosed with diabetes even though she did not meet criteria for diagnosis. While she is receiving regular eye exams, she has not been screened for nephropathy which is the standard of care for diabetes.

746.    **Quality of Episodic Care: 5—EXCELLENT:** Patient's gynecology related complaints were addressed by a gynecologist with regular follow-up visits.

***Patient 6:*** ███████████ ***ADCRR*** ████████

747.    Ms. █████ is a 48-year-old female incarcerated since 2015 who is currently housed at the ASPC-Perryville Lumley unit. Her chronic conditions include HTN, HDL, and asthma.

748.    She entered the system with a pre-existing diagnosis of HTN, originally on

113

1  propranolol 20mg BID and amlodipine 5mg. Her BP was well controlled in the beginning,
2  slowly started to increase, then in 2019 nearly every BP was elevated.

3      749.   Sometime in the summer of 2019, she developed acute chronic back pain
4  while moving a table. She was seen almost daily in the clinic at this time, and her BP
5  elevations were thought to be due to her pain. She initially refused an x-ray but agreed a
6  few weeks later revealing mild osteoarthritis of the lumbar spine. Her pain intensified, and
7  she was placed in an infirmary for pain control. An urgent MRI was completed in August
8  2019 revealing spinal stenosis L3-L4 through L5-S1 with compression of the right S1 nerve
9  root. She saw a pain management physician the following month and received an epidural
10  steroid injection, but she refused her follow-up pain management appointment.

11      750.   Her BP was elevated the entire time she was in the infirmary. She was also
12  on NSAIDs for the pain which could have further increased her BP. The MD increased her
13  metoprolol from 50mg twice a day to 75mg twice a day then finally to 100mg twice a day.
14  At her chronic care visit in January 2020, her heart rate was noted to be 49, so her metoprolol
15  was discontinued. The provider added clonidine 0.1mg twice daily which was later also
16  discontinued. In September 2020, Cardizem 120mg was added to her regimen which also
17  included losartan 100mg and amlodipine 10mg at the time. This prescription later expired,
18  and patient is currently not taking this medication.

19      751.   She continued to complain of radiating back pain, so she was referred to the
20  pain clinic but again signed a refusal. She was seen again in chronic care clinic on 12/24/20
21  at which time her BP was 190/101, but no adjustments were made to her antihypertensive
22  medication. The mid-level provider did, however, add naproxen despite the patient already
23  taking ibuprofen.

24      752.   At her most recent chronic care appointment in June 2021, her BP was 150/85
25  and her sodium was noted to be 129. In September 2021, the NP added hydrochlorothiazide
26  12.5mg. There were no follow-up BPs ordered, but her BP at her recent gynecologist visit
27  was 132/75.

28      753.   Her asthma is controlled with a steroid (ciclesonide) inhaler and levalbuterol

inhaler. The prescription for the levalbuterol inhaler expired a few months ago. She is up to date on her pap smear and screening mammogram.

754.   **Documentation of Chronic Care: 4—VERY GOOD:** The EHR makes it difficult to view the patient's current lab results within the chronic care clinic note. The providers type the pertinent results into their notes.

755.   **Quality of Chronic Care: 2—FAIR:** It is not unusual for a patient's BP to increase with acute pain, and this occurred in her case when she first presented with back pain in the summer of 2019 making the management of her BP challenging. It is even more difficult when the medications that alleviate some of her pain (NSAIDs) can cause an increase in her BP. She may not have been on a diuretic, a first-line treatment for HTN, from the beginning to avoid worsening her chronic urinary incontinence. She was recently started on a low dose (12.5mg) of hydrochlorothiazide which could potentially worsen her hyponatremia. Repeat labs are not scheduled until the end of December. As discussed above, her metoprolol 100mg twice a day was discontinued when she was bradycardic. It is not clear why the provider did not simply decrease the dose.

756.   **Quality of Episodic Care: 5—EXCELLENT:** Her episodic care was largely centered around her back pain. It was clear the providers were making an effort to alleviate her pain which included referring her to pain management, trying a variety of medications for musculoskeletal and neuropathic pain, and initially placing her in an infirmary for increased medical needs.

*Patient 7:* █████████████ *ADCRR* ███████

757.   Ms. ████████ is a 59-year-old female incarcerated since 2020 and is currently housed at the ASPC-Perryville San Carlos unit. Her chronic conditions are type 2 diabetes, HTN, and alcoholic cirrhosis.

758.   She was aware she had diabetes at intake but was on no medication at the time. She is now on metformin with A1C of 4.8% and has received an eye exam. Her BP is controlled with medications including an ACE inhibitor.

759.   The cirrhosis was discovered after routine labs were abnormal. Her Hepatitis

C antibody was negative, but she admitted to heavy alcohol abuse. The diagnosis was discussed with the patient and added to the problem list on 6/9/2020 at which time the provider ordered prednisone 5mg pack without the reason documented. Her platelets were only 47,000. An ultrasound in July 2020 revealed coarse echotexture of liver, splenomegaly, and a slightly dilated inferior vena cava. A repeat ultrasound for hepatocellular carcinoma surveillance in April 2021 also revealed findings consistent with cirrhosis including splenomegaly and low portal vein velocity. She had multiple requests and emergency nurse visits for abdominal pain in 2020. Her alpha-fetoprotein is 7.6, and I calculated her MELD-Na score to be 12. Her total bilirubin is 2.8 as of September 2021 which is an increase from her baseline of <2.

760.    During routine evaluation, the provider noted a heart murmur. She saw a cardiologist who recommended an echocardiogram and treadmill stress test. There is no documentation that these recommendations have been acted upon. She is up to date on her pap smear, but there is no documentation that a screening mammogram has been discussed, offered, or refused by the patient.

761.    **Documentation of Chronic Care: 3—GOOD:** There is no documentation that the cardiology recommendations were addressed and no documentation that she was offered a screening mammogram. Other than that, the documentation was very good.

762.    **Quality of Chronic Care: 3—GOOD:** This patient has compensated cirrhosis and has an elevated risk of esophageal variceal bleeding. She will need to undergo an EGD to screen for esophageal varices, but she has not been referred to a gastroenterologist.

763.    **Quality of Episodic Care: 4—VERY GOOD:** Both the providers and nursing should recognize that this patient could be at risk for spontaneous bacterial peritonitis and should be in the differential any time she complains of abdominal pain. Her urinary complaints were addressed, and she is now followed by a urologist.

***Patient 8:*** █████████        ***ADCRR*** █████

764.    Ms. ████ is a 41-year-old female incarcerated since 2016 who is currently

116

housed at the Lumley unit. Her chronic conditions include hypothyroidism, Hepatitis C, and HTN. She is receiving cervical cancer screening annually given her history of a cervical cone biopsy prior to incarceration.

765.   Her hypothyroidism is due to chronic autoimmune thyroiditis. She had extensive workup of a nodular goiter including thyroid ultrasounds, fine needle aspirations, and CT scans of her neck. This workup began in 2019, but she was not referred to endocrinology until the end of 2020. The endocrinologist has requested at each visit that the unit check her TSH and free T4 levels, but the thyroid panel that is being ordered by the unit provider only contains total T4, not free T4.

766.   Given her history of IV drug abuse, a Hepatitis C antibody test was ordered at intake with a positive result. She has had a Fibrosure test indicating no fibrosis of the liver. She was diagnosed with HTN this year and appropriately started on hydrochlorothiazide 12.5mg, but then a few weeks later, spironolactone 25mg was added. It is unclear why an additional diuretic was ordered.

767.   **Documentation of Chronic Care: 4—VERY GOOD:**  The limitations of the EHR chronic care clinic note are evident in this patient's chart. The use of the radio buttons does not allow the provider to elaborate on an abnormal finding. In addition, the lab results guiding the patient's plan of care must be typed into the note.

768.   **Quality of Chronic Care: 3—GOOD:** The reason for prescribing this patient two different diuretics for BP management is not understood. She was only on 12.5 mg of hydrochlorothiazide at the time of this addition and the dose of this medication could have easily been increased to 25 mg, the usual dose used in hypertensive patients. Her hypothyroidism is monitored with routine lab work, but a free T4 is not a part of the thyroid panel that is being ordered.

769.   **Quality of Episodic Care: 5—EXCELLENT:** Documentation suggests that her HNRs are being addressed. She had workup of her enlarged thyroid when she reported symptoms and was sent to an optometrist when she complained of pressure behind her eyes where she was diagnosed with ocular HTN.

***Patient 9:*** ▮▮▮▮▮▮▮   ***ADCRR*** ▮▮▮▮

770.   Ms. ▮▮▮ is a 59-year-old female incarcerated since January 2019 and is currently housed at the ASPC-Perryville San Pedro unit. Her chronic conditions include seizure disorder and HTN.

771.   On the day of her intake, she had an acute GI bleed. At the hospital, she was found to have a large peptic ulcer on EGD. This was thought to be due to NSAID use. She was also diagnosed with a non-ST elevation myocardial infarction due to an elevated troponin which the hospital providers felt was secondary to the demand from the acute GI bleed. Her echocardiogram in the hospital was normal. She did follow-up with a gastroenterologist as an outpatient, and a repeat EGD confirmed the ulcer had healed. She remains on both pantoprazole and sucralfate for GI protection but was also recently prescribed ibuprofen 600mg three times daily as needed while on celecoxib. Co-administration of these medications can increase the risk of a GI bleed.

772.   Her seizure disorder is controlled on phenytoin, and her BP was at goal during her most recent chronic care appointment. Screening for cervical cancer and breast cancer are up to date. In February 2021, she reported rectal bleeding, documented in provider note as mostly bright red blood but some dark red blood as well. There is no documentation of a rectal examination, but she was issued guaiac cards. Only one card result was located which was negative. She returned 4 months later again reporting rectal bleeding. No rectal examination was done, but the patient was issued hemorrhoid treatment. Her hemoglobin and hematocrit have remained stable, but she has a documented 8lb weight loss in August (last weight recorded was 9/7/21). Given her age, her rectal bleeding requires further workup, starting with a rectal examination at the unit.

773.   **Documentation of Chronic Care: 4—VERY GOOD:** The documentation was excellent, except for a failure to address the diagnosis of HTN (controlled).

774.   **Quality of Chronic Care: 5—EXCELLENT:**

775.   She is on appropriate medications for her chronic care illnesses. She is receiving pap smears and mammograms for screening.

776.   **Quality of Episodic Care: 2—FAIR:** Even though her guaiac card was negative, she should have a rectal exam to further evaluate her complaints of rectal bleeding. Her various musculoskeletal complaints have been addressed, and she has been seen in the orthopedic surgery clinic 7 times in the past year. However, she was prescribed ibuprofen 600 mg 3 times daily as needed while on celecoxib despite her history of an acute GI bleed due to NSAIDs.

***Patient 10:*** ███████████ ***ADCRR*** ██████

777.   Ms. ██████ is a 50-year-old female incarcerated since 2019 who is currently housed at the ASPC-Perryville Santa Rosa unit. Her problem list lists two active chronic conditions: asthma and hypothyroidism.

778.   Hypothyroidism was added to the list based on outside medical documentation and is currently controlled on medication. HTN was added to her problem list at intake but noted as resolved a year later during a chronic care visit because her BP readings were at goal without medication. She does have some mild elevations in her BP this past year, so I am confident this will be addressed at her upcoming chronic care visit.

779.   In January 2020, she reported a history of asthma diagnosed in her 20s with the last attack in 2013. The NP ordered an albuterol inhaler, a steroid inhaler (ciclesonide), and a leukotriene inhibitor (montelukast). Later that year, the patient reported that she had not taken her asthma medications in 4 years, so the MD discontinued her inhalers and noted her asthma to be resolved in his assessment. The diagnosis remained on the problem list. The same doctor reordered her inhalers in April 2021 when she presented with allergic conjunctivitis.

780.   This patient is also closely followed by gynecology after her intake pap smear revealed Low Grade Squamous Intraepithelial Lesion (LSIL) with positive HPV requiring a colposcopy. Her cervical biopsy was positive for high grade cervical disease, so the patient underwent a Loop Electrosurgical Excision Procedure (LEEP) revealing high grade dysplasia with margins involved. A follow-up colposcopy 4 months later was negative. She required another LEEP procedure this year, now only showing low grade cervical disease.

781.   **Documentation of Chronic Care: 5—EXCELLENT:** There are CCC notes documented every 6 months; most of these visits have been conducted by the medical doctor. The gynecologist notes were also well-documented with a clear indication that her diagnosis and treatment options were explained to her.

782.   **Quality of Chronic Care: 4—VERY GOOD:** This score is based on the management of her asthma as outlined above.

783.   **Quality of Episodic Care: 5—EXCELLENT:** The patient's cervical dysplasia treatment was excellent. From her abnormal pap smear at intake to now, her cervical dysplasia has been managed in accordance with the American Society of Colposcopy and Cervical Pathology guidelines.

**Summary of Findings for ASPC-Perryville:**

784.   The gynecology care provided at this complex was outstanding. It was clear there are regular gynecology clinics at each of the units.

785.   Patients were seen by both mid-level providers and physicians.

786.   There was never a delay in chronic care as they methodically schedule patients at regular intervals, and the providers always ordered labs in preparation for the next chronic care visit.

787.   Overall, diabetics are managed effectively with medication, regular labs, and routine eye exams.

788.   There are shortcomings within the EHR, especially with the chronic care template, that is impeding documentation.

**Patient Chart Reviews for ASPC-Safford**

***Patient 1:***                   ***ADCRR***

789.   Mr.       is a 52-year-old male who has been incarcerated with ADCRR since April 2007.  He is listed as having 7 chronic care diagnoses. I find the patient's active chronic problems to be HCV, HTN, and hypertriglyceridemia.  He has an existing first-degree AV block and gave a history of an MI in the remote past, but there is no evidence of this.

790.   Mr. ███ arrived at ADCRR in April 2007.  There is no evidence in the lab section of the chart that Hepatitis C infection had been documented until 2020. It appears that the patient had his transaminases followed regularly, but the APRI was not routinely calculated.  There was an APRI of .82 in March 2017 and an APRI of 1.3 in September of 2020.  It appears that in 2021, there is some oversight, and the provider requested work-up for the Hepatitis C from a "Hepatitis Committee."  The documentation completed by this committee is not available in eOMIS.

791.   It appears that the patient was not screened for immunity to Hepatitis A and B or for HIV or for level of activity of Hepatitis C until many years after his incarceration with ADCRR.  He had Fibroscan, ultrasounds, and APRI that indicate that he has cirrhosis, yet this diagnosis is not on the problem list, nor is it addressed in the CCC notes.

792.   The patient had hypoglycemia and hypothyroidism added to his problem list. The hypothyroidism was improperly diagnosed and treated based on a NORMAL TSH. The hypoglycemia was unsupported by labs.

793.   The patient was seen for a latent TB infection in CCC and had no evidence on the chart of a positive PPD.  When a PPD was placed in 2021, it was negative.

794.   Regarding the patient's episodic care, he complained of numbness in his hand and abdomen at one point but refused workup.  He had dizziness and an EKG was done for the first time (despite a history of HTN) showing a first-degree AV block.  He was sent to cardiology and had an MRI of the brain.

795.   The patient had knee pain and was started on NSAIDs, despite having cirrhosis.

796.   **Documentation of Chronic Care: 1-POOR:** I base this on the fact that for many years, there is no documentation of the thought processes behind decisions. Credit must be given to Dr. Mitchell, MD, who seemed to attempt to write a cogent note about the patient's problems. This low score, however, is based upon lack of documentation from many years ago.

797.   **Quality of Chronic Care: 2—FAIR:** I base this on the early, inappropriate

addition of hypothyroidism that did not exist, the addition of Latent TB (which should not be followed in CCC), the lack of any kind of early screening for the need for vaccination against Hepatitis A and B, or screening for coinfection with HIV. The care for the patient's HTN was adequate, but no EKG was done at the time of diagnosis.

798.   In the summer of 2020, Dr. Mitchell attempted to make sense of the erroneous diagnoses on the patient's problem list. He did, however, fail to recognize that the patient had cirrhosis and to document and treat that. He did a good job at treating the patient's HTN but did not consider using a beta-blocker to both improve BP control and to prophylax for variceal bleeding in this cirrhotic patient. Despite having a first-degree AV block, this patient likely could have tolerated a low dose of beta-blocker. The low score here is also due to treatment which occurred many years ago.

799.   **Quality of Episodic Care: 2—FAIR:** This cirrhotic patient was placed on NSAIDs for pain and should not have been.

***Patient 2:*** ▮▮▮▮▮▮   ***ADCRR*** ▮▮▮▮

800.   Mr. ▮▮▮▮ is a 54-year-old male who has been incarcerated with ADCRR since April 1990. He is listed as having 6 Chronic care diagnoses. Documentation is lacking in eOMIS early on (notes start in 2001). The first vital signs in the chart are from 2015. There are lab tests performed without explanation. It is possible that there is another chart that precedes this chart, but I did not have it for my review. Most of the early chart is from Bachman; Mr. ▮▮▮▮ was transferred to Safford in 2018.

801.   Much of the early chronic care visits are for asthma and LTBI. It appears that Mr. ▮▮▮▮ asthma was well-controlled, for the most part. The standard template used for history in the CCC template is not helpful for documenting the important elements of asthma control. It is difficult to tell if the patient is non-compliant to his asthma treatment or if he is not using his rescue inhaler when the template asks about how often inhalers are used. Also, it is unnecessary, to re-ask past medical history at every visit.

802.   In late 2016, the patient began to lose significant weight. His transaminases were elevated, and screening showed the patient had chronic Hepatitis B. He also had

antibody for Hepatitis C, but follow-up viral load testing for HCV was negative.  He was started by unit staff on tenofovir to treat HBV.  He was not referred for specialty care and laboratory follow-up was infrequent.  His Hepatitis A IgG was not assessed, and an HIV test was not done.

803.    Regarding the weight loss, Mr. ███ had an extensive lab workup for autoimmune disease and had a borderline elevated ANA and dsDNA.  Screening for colon cancer was not, and still has not, been performed.  Upon receipt of the results from the ANA, the provider sent the patient to a nephrologist (not a rheumatologist) for a workup, despite normal renal function.  The nephrologist concluded that the ANA results were likely related to the HBV infection.

804.    When Mr. ███ was transferred to Safford in 2018, the Safford staff was challenged to make sense of Mr. ███ medical history.  Chronic clinics after the transfer included HCV, which was not an active disease.  A review of the chart to see a negative viral load was, apparently, not done.  A repeat of the HCV viral load was not done.  Fibroscan was done in 2020.

805.    In 2019, a provider saw the patient at Safford and stated that an HIV and hemoccult would be ordered.  I do not see orders for either.  There is mention that the "Hepatitis Committee" had requested an HBV viral load, but they are not listed in the chart.

806.    The medication for HBV lapsed after the June 2019 visit, along with all the asthma medication.  Fortunately, follow-up labs for HBV showed a sustained viral response, despite the lapse of the medication.

807.    Mr. ███ was seen for several episodic complaints which were adequately treated.

808.    **Documentation of Chronic Care: 3—GOOD:** It is difficult to document well in eOMIS.  The templates are not set up for easy documentation (radio-buttons, small font, extraneous fields that are distracting, and display data that is unnecessary for medical decision-making) and the communication at the time of transfer seems to be unsupported by eOMIS.  There does appear to be more complete documentation in the last two years

since his arrival at Safford.

809.   **Quality of Chronic Care: 1—POOR:** Asthma care seems to be acceptable (except for the lapsing of all meds in the summer of 2019).  That is balanced by the fact that a significant weight loss in a man in his 50's does not trigger screening for both HIV and colon cancer.  These still have not been performed.

810.   Also, working the patient up for autoimmune disease in response to the extreme weight loss does not make sense.  Then, finding a borderline abnormal reading on the workup and referring the patient to a nephrologist (the patient had normal kidney function) instead of a rheumatologist, is difficult to explain.  This, however, occurred over five years ago at a different facility.

811.   **Quality of Episodic Care: 4—VERY GOOD:** There were only a few episodic complaints listed (an abrasion, cough, warts) which were handled appropriately.

**_Patient 3:_**              **_ADCRR_**

812.   Mr.          is a 68-year-old male who has been incarcerated with ADCRR since September 2008.  He is listed as having 6 chronic care diagnoses.  Notes with content start around 2015.  Providers seemed to find it difficult to determine the patient's history and previous healthcare plan.

813.   Mr.          was treated in chronic clinic for HTN, HDL, and for LUTS.  He had repeated renal calculi and a partial nephrectomy for renal cell carcinoma in the left kidney.  These problems seem very well handled at Safford.  He was seen frequently and on time.  His medication was reliably reordered.

814.   I did see reference to screening for cancer in this chart and for reviewing the chart for preventive healthcare needs (vaccines).

815.   Mr.          required a bit of episodic care also.  This all seemed to be in order.

816.   **Documentation of Chronic Care: 1—POOR:** Even though documentation in eOMIS is difficult, there were a number of meaningful and substantive notes.  There does not seem to be an effective way to document the flow of care with review of tests and follow-up.  Plans for care are not clearly explained.  These problems, however, preexist his

124

incarceration at Safford.

817.   **Quality of Chronic Care: 2—FAIR:** Mr. ████ had well-controlled HTN and his LUTS was treated effectively.  He was treated for HDL for a time, but it is not apparent why this was done.  He did not have an EKG on the chart, despite having HTN and occasional complaints of chest pain.  His abdominal pain workup led to an early diagnosis and potentially curative partial nephrectomy for renal cell carcinoma.  He has been receiving frequent specialty care for recurrent kidney stones, including lithotripsy.  His chronic care at Safford has been much improved.

818.   **Quality of Episodic Care: 5—EXCELLENT:** The episodic care received by Mr. ████ included nasal complaints, joint pain, eye complaints, and heartburn.  All were treated appropriately and in a timely manner.

***Patient 4:*** ████████████      ***ADCRR*** ████

819.   Mr. ████ is a 42-year-old male who has been incarcerated with ADCRR since March 2008.  He is listed as having 5 chronic care diagnoses.

820.   The early notes found in eOMIS lack substantial medical information.  The EHR begins to have more substantive documentation in March 2019. The care in 2019 was at Phoenix, then at Lewis.  He was transferred to Safford late in 2019, with the first provider entry being 12/11/2019.

821.   Mr. ████ arrived at ADCRR with a history of HCV, diabetes, and HTN.  It appears that he was followed for these problems relatively closely in chronic clinic.  His chronic clinics were scheduled appropriately.  He had anemia added to his problem list, despite the fact that anemia was not an actual problem upon recheck.

822.   He had lab work done to evaluate diabetes control.  In the last 2 years, he also had eye exams annually and foot exams in chronic clinic.  I do not see that these items were completed prior to the past 2 years.  Mr. ████ diabetes control was managed well.  Mr. ████ lipids were also evaluated.

823.   Mr. ████ BP control was well-done.  His elevated BP readings were noted, and medications for HTN were increased and supplemented with new medications.

125

He was on an ACEI for HTN, which is desirable in a diabetic.  There is no baseline EKG.

824.    Mr. ███████ HCV status was confirmed by ordering a viral load, but there is no sign that he had screening for immunity to other hepatidites or for HIV.  It is unclear what the management plan is for HCV from reading the chart.  He is classified as F3 by Fibroscan and should be considered to have significant, active liver disease with fibrosis, if not cirrhosis.  There is no addition of significant liver disease to the problem list and the patient was started on NSAIDs at one point, which are contraindicated with active liver disease.

825.    The diagnosis of anemia was based on a hemoglobin of 13.3 which was not reproducible.  I found it interesting that there was no consideration of doing a rectal exam in a 40+ year old man with possible anemia.

826.    The episodic care I saw included a positive COVID test, leg pain, and flank pain which were all addressed adequately.

827.    **Documentation of Chronic Care: 3—GOOD:** eOMIS makes documentation and continuity of care a challenge.  It is obvious that the Safford providers are trying to take care of the patient and to document a plan going forward.  The exception to this is in HCV care, where it is unclear what the treatment plan is.

828.    **Quality of Chronic Care: 3—GOOD:** Mr. ███████ diabetes and HTN were well attended.  However, I cannot tell what the plan is for the Hepatitis C, as there is no consideration of the bridging fibrosis (cirrhosis) that was found on the Fibroscan.  The anemia probably never existed, yet it still shows on the problem list.  Also, anemia in this patient should have prompted a rectal exam. There is no EKG on the chart, as there should be.  Despite that, Mr. ███████ is currently doing well.

829.    **Quality of Episodic Care: 5—EXCELLENT:** Mr. ███████ episodic problems seem to have been cared for well.

***Patient 5:*** ███████████ ***ADCRR*** █████

830.    Mr. ██████ is a 63-year-old male who has been incarcerated with ADCRR since April 1980.  He is listed as having 5 chronic clinic diagnoses.  Mr. ████ carries

126

chronic clinic diagnoses of Hepatitis C, COPD, HTN, and HDL.  It should be pointed out that Mr. ███ has never had the lab work done to verify that his HCV is active.  His HTN was followed for years in chronic clinic with absolutely normal readings without medication.  His BP became elevated after starting NSAIDs for a wrist fracture.  His HDL has never been treated.  His COPD has been officially diagnosed by spirometry.

831.    The early notes found in eOMIS lack substantial medical information.  There are multiple notes labeled as "periodic physical" which contain either no information or minimal information.  The first substantive medical note found in Mr. ███ chart is in 2018.  The patient was moved to Safford in 2019, it appears, with the first provider entry at Safford occurring on 6/12/19.

832.    Mr. ███ had to ask for hepatitis screening.  He has not had screening for immunity to Hepatitis A or B and has not had a viral load done to see if the HCV is active.  His LFTs are normal.  He has had a Fibroscan, which may not have been indicated if his viral load is negative.  He has never had screening for HIV, despite a similar mode of transmission and general acceptance that HIV should be screened for upon admission to prison.

833.    Mr. ███ has had issues with chronic sinusitis and with a radius fracture which did not heal and required ORIF.  These issues have been well-addressed.

834.    There does not seem to be much attention to preventive healthcare needs.  There is no mention in CCC notes of screening for colon cancer, yet there seems to be very regular screening for prostate cancer by PSA.  There is no mention of vaccines.

835.    **Documentation of Chronic Care: 2—FAIR:** eOMIS is a difficult EHR that makes it challenging for providers to follow the course of care.  It appears that there are issues with ordering tests that then are cancelled or do not get run, for whatever reason.  These issues predate his incarceration at Safford.

836.    **Quality of Chronic Care: 2—FAIR:** This rating is warranted because there is care for problems that do not exist (or are inactive) and should not take up time in CCC.  I also see diagnoses for which baselines labs and studies are not done.  An EKG should be

ordered for a patient with HTN.  An ASCVD risk is not calculated to determine when lipids should be treated, and the diagnosis of HCV is not verified.  There are no vaccinations given for other types of hepatitis.  There are no HIV screenings for patients with HCV or in general.

837.    This patient's COPD was diagnosed by spirometry, but the patient had been started on beta-agonist and inhaled steroid instead of on an inhaled anticholinergic which would be recommended.  The patient feels better than he did previously, but probably should be taken off the steroid and tried on an anticholinergic.

838.    **Quality of Episodic Care: 5—VERY GOOD:** There are no issues with Mr. ▮▮▮▮ episodic care.

***Patient 6:*** ▮▮▮▮▮▮▮▮▮ ***ADCRR*** ▮▮▮▮

839.    Mr. ▮▮▮▮ is a 54-year-old male who has been incarcerated with ADCRR since April 2014.  He is listed as having 4 chronic clinic diagnoses.  The first note with a provider entry was from 12/1/2014.  The notes in this chart range from having very little entered by the provider to an absolutely exemplary note on 12/20/2017 written by Dr. Boryczka.  Mr. ▮▮▮▮ has a complicated medical history with 1) extensive CAD; 2) s/p MI; 3) CHF with low ejection fraction; 4) an implanted defibrillator/pacer; and 5) Hepatitis C and Sick Sinus Syndrome.

840.    This patient was referred to cardiology for the care of his AICD/pacer and his CHF.  The unit staff seem to do a good job at following the cardiology recommendations.

841.    Many of the chronic clinic notes fail to mention the Hepatitis C and, while this patient had his HCV verified with a viral load, he did not have antibody titers to look for immunity to Hepatitis A or B until very recently.  He also did not have an HIV test until very recently.

842.    It appears that this patient was recently started on treatment for HCV.  There is no way to follow any of this decision-making in the chart.

843.    Mr. ▮▮▮▮ also had quite a few episodic visits for URIs, for which he often had antibiotics ordered, bronchitis (again, antibiotics ordered), and elbow pain.

844.   Mr. ██████ complained about elbow pain and was, at one time, started on systemic steroids which are not indicated and may cause fluid retention in the face of very poor cardiac output.

845.   Mr.██████ complained about elbow pain and was put on NSAIDs (2 different kinds) despite him being on ASA for his heart condition and despite having CHF and HCV. NSAIDs should be avoided in this patient.

846.   **Documentation of Chronic Care: 3—GOOD:** The documentation is more complete than in other charts, and it also seemed that there were actual notes present earlier in the course of his incarceration.  eOMIS is a large hurdle in patient care.  Chronic clinic diagnoses should not be seen in separate chronic clinic visits as it causes fragmentation of care.

847.   **Quality of Chronic Care: 4—VERY GOOD:** This complicated patient received excellent care for his cardiac condition and now is going to have his HCV treated. He did not have screening for HIV and immunity to Hepatitis B, as he should have.

848.   **Quality of Episodic Care: 2—FAIR:** I do not understand the use of antibiotics for URI in this patient, who actually needed a CXR and probably a BNP to determine whether the symptoms he was experiencing were associated with CHF.  The use of systemic steroids for a musculoskeletal problem is ill-advised in any patient, but especially in a patient with CHF.  After consult, the patient got a local steroid injection which would have been a great treatment option instead of oral steroids or NSAIDs. Episodic care since his arrival in Safford has been much improved.

***Patient 7:*** ██████████  ***ADCRR*** █████

849.   Mr. ████ is a 62-year-old male who has been incarcerated with ADCRR since January 1997.  He is listed as having 4 Chronic Clinic problems. Mr. ████ has: 1) Hepatitis C; 2) GI bleeding; 3) gastritis; 4) HTN (at one time); 5) HDL; 6) iron-deficiency anemia; and 7) latent TB infection.  He has had various complaints that prompted episodic care, including pain in parts of his body and an inability to move his arm and leg.

850.   The first note I found with an entry from a provider was from August 2015 at

ASPC-Phoenix.

851.   Mr. ███ was found to have Hepatitis C when a routine blood screen showed elevated transaminases.  He then had a screening for antibodies to Hepatitis A and B and received a Hepatitis B vaccine. He was not initially screened for HIV, but was later, and was found to be negative.  Mr. ███ was treated for Hepatitis C in September 2018 and has had a sustained viral response.

852.   At one point, Mr. ███ had positive hemocult cards and was to have a colonoscopy, which he refused.  He was also to have an EGD prior to treatment for HCV, but it appears it occurred after the HCV treatment.  He had significant gastritis and a positive test for H. Pylori.  He was treated for H. Pylori, but it appears he was continued on NSAIDs as well.

853.   There was a brief time when Mr. ███ was treated for HTN but then was taken off of his medications, and his BP remained normal.  Mr. ███ had mildly elevated lipids that were not treated.

854.   **Documentation of Chronic Care: 3—GOOD:** Although the format of eOMIS is not conducive to finding information in the chart, everything was present.  In the last two years, the providers are consistently writing better notes.

855.   **Quality of Chronic Care: 4—VERY GOOD:** Mr. ███ was treated for Hepatitis C and screened for his needs for vaccination and HIV.  He has had an excellent outcome from his treatment.  This patient's anemia would have been completely evaluated if he had not refused colonoscopy. ASCVD risk scores should be included in the notes where lipid treatment is being considered.

856.   **Quality of Episodic Care: 2—FAIR:** This patient received treatment for all of his issues.  He refused his evaluation of his c/o weakness and had a complete recovery, regardless.  I disagree with the use of NSAIDs in patients with liver disease and gastritis.

***Patient 8:*** ████████████     ***ADCRR*** ████

857.   Mr. ██████ is a 50-year-old male who has been incarcerated with ADCRR, this time, since March 2020. He has been incarcerated in the past.  This patient is

1  listed as having 3 chronic clinic problems.  Mr. ▮▮▮▮ has HTN, HDL, and asthma.

2      858.    This chart has an intake assessment and physical.  This is the first chart that I

3  have found with this information.  It may be because this patient was re-incarcerated in the

4  past 2 years.

5      859.    He is overweight and is not tolerant of statins.  Two statins were tried, and

6  both were discontinued due to perceived intolerance (diarrhea).  Mr. ▮▮▮▮ BP was

7  not controlled upon arrival, and he was switched from ACE/HCTZ to a calcium channel

8  blocker, with excellent results.

9      860.    Mr. ▮▮▮▮ has had an inconsistent experience with asthma control, and

10  the provider has worked with him to improve inhaler technique and has adjusted his

11  controller medication.

12      861.    There has been some attention to vaccinating Mr. ▮▮▮▮ against

13  Hepatitis A and B; however, there is no screening for HIV, nor is there attention to other

14  vaccines that are recommended for adults.

15      862.    Mr. ▮▮▮▮ had COVID in December 2020 with few symptoms and has

16  also complained of various pains and of reflux.  All were treated appropriately.

17      863.    **Documentation of Chronic Care: 4—VERY GOOD:** There are consistent

18  notes with pertinent content; however, the formatting of the EHR is ineffective.

19      864.    **Quality of Chronic Care: 5—EXCELLENT:** The patient's HTN was

20  addressed, and the patient's asthma is controlled.  The provider took the time to ask about

21  rescue inhaler use at all CCC visits and reviewed inhaler technique.  The patient's HDL is

22  still not completely under control due to the patient-perceived intolerance to statin.

23      865.    **Quality of Episodic Care:  5—EXCELLENT:** This patient had little

24  episodic care.  He complained of heartburn and rhinitis and was treated.  He was monitored

25  when he had COVID.  He also was seen repeatedly for diet non-compliance.  This is another

26  task that should not be put on the provider's schedule.

27  ***Patient 9:*** ▮▮▮▮▮▮ ***ADCRR*** ▮▮▮

28      866.    Mr. ▮▮▮▮ is a 56-year-old male who has been incarcerated with ADCRR

since July 2013.  He is listed as having 3 Chronic Clinic problems.

867.    Much of Mr. ██████ care was done in the Phoenix and Florence facilities. He was moved to Safford in 2019.  The early notes in eOMIS are without substance.  The first note with any information was written in 2015.

868.    Mr. ██████ was noted to have HCV in the first CCC note with information. He was released, it seems, a few months after that and returned to the system in 2017.  There is a complete intake assessment completed by a physician at Phoenix.  The patient was then transferred to Florence and then Safford.

869.    Mr. ██████ was seen for several years for HCV without an HCV ab in eOMIS until February 2018.  He also had no HCV RNA ordered until very recently.  He did have routine labs to follow transaminases and several orders for prothrombin times.  In 2018, a Hepatitis B vaccine series was ordered, as the patient did not have immunity to HBV.

870.    Mr. ██████ also has had a systolic murmur identified in January 2020 and has undergone a complete cardiology work up.  It does appear that the consultation process is smooth.  An EKG should be performed on the unit level because of complaints of dyspnea on exertion.

871.    Mr. ██████ also reported a history of heme positive stools, although I see no evidence in the chart that this was ever checked.  Mr. ██████ was sent to gastroenterology and had a normal colonoscopy.

872.    Mr. ██████ had several diagnoses that should have been managed in episodic care and were instead managed in chronic care. The patient was seen for nasal allergies, GERD, and bowel gas as part of CCC.  This is ill-advised and detracts from the care of actual chronic clinic problems.

873.    Mr. ██████ also received care for a cut hand and had c/o of pain that prompted a neurology consult.

874.    **Documentation of Chronic Care: 2—FAIR:** In general, the notes have improved over the past several years.  However, the templates that are being used do not

promote good documentation.  The murmur was only described as "systolic" and there is no mention of how loud the murmur was or in what area it was auscultated.

875.   **Quality of Chronic Care: 3—GOOD:** This patient did receive specialty care for his murmur, his possible hematochezia, and for questionable neurologic complaints. This patient's HCV infection was recognized early on.  It is only in the past few years that an APRI has been noted in CCC notes.  The decision-making process of the "Hepatitis Committee" should be able to be followed. The provider should not be addressing allergies, GERD, and other GI complaints such as flatus, in CCC.  It detracts from the actual problems that require close monitoring in CCC.

876.   **Quality of Episodic Care: 2—FAIR:** Ordering blood tests for runny nose has a low yield and opens up other issues with the results.

***Patient 10:***      ***ADCRR***

877.   Mr. ██████ is a 62-year-old male who has been incarcerated with ADCRR since July 2008.  He is listed as having 2 Chronic Clinic problems.

878.   The early notes in the EHR are largely unpopulated with medical information. The first note with significant information is an intake physical from Phoenix dated 12/15/16.  It appears in these charts that the Phoenix facility reliably performs and documents an intake assessment, at least since 2015 or 2016.

879.   Mr. ██████ was known to have HCV during the entire time covered in the EHR.  He had HCV antibody verified early on in the medical documentation but did not have a viral load done for years.  Nor did he have a documented APRI.  He still has not had a liver u/s. It was requested but canceled.  He had a Fibrosure in August 2021.  He recently had a lab test to check for immunity to HAV and HBV.

880.   Mr. ██████ has been followed in CCC for HDL that does not require treatment.  He has also had LUTS and a normal PSA and was treated with Flomax with improvement in symptoms.

881.   Mr. ██████ has had a few episodic complaints that have been adequately handled, such as constipation, musculoskeletal pain, vision complaints, bug bites, and

calluses.

882.   **Documentation of Chronic Care: 3—GOOD:** This chart continues to demonstrate the challenges of an EHR with a dysfunctional user interface, but the documentation is consistently present in the past few years.

883.   **Quality of Chronic Care: 2—FAIR:** Diagnoses that are not active for a patient are continued to be followed in CCC.  This patient had a borderline increase in cholesterol which probably should have prompted calculation of an ASCVD score.  His cholesterol level is acceptable.  After that, lipids should be repeated per national guidelines.  Lab tests are ordered repeatedly in this system that will never be, nor should they be, utilized. The real CCC diagnosis is HCV.  It is difficult to see what management decisions are being made since it is not in the chart.

884.   **Quality of Episodic Care: 4—VERY GOOD:** Care for this patient's episodic issues was very good.

**Summary of Findings for ASPC-Safford:**

885.   Intake assessments being completed at the Phoenix facility where vaccinations are mentioned is a positive development.

886.   It appears that the care is much improved and much better documented over the past 2-3 years.  There is more evidence of continuity of care and much less duplication of care.  The care is more coherent in the past couple of years.

887.   The excessive burden of non-value-added care in chronic clinic should be eliminated.  A large part of this is resulting from excessive lab testing using panels that should not be done per national guidelines.

888.   Vaccination history and administration of recommended vaccines should also be routinely offered.

**Patient Chart Reviews for ASPC-Eyman**

***Patient 1:*** ████████ ***ADCRR*** ████

889.   Mr. ████ is a 30-year-old male who was first incarcerated with ADCRR in September 2010.  He is listed as having 13 chronic care diagnoses; however, the total

number is unclear.  The earliest provider note in the EHR is from January 2014 at the Eyman facility.  At the end of 2014, he was transferred to the Florence infirmary for a short period and then returned to Eyman where he is still housed.

890.    Mr. ▆▆▆▆ has the following chronic care problems by my assessment:  1) HTN; 2) type 2 DM; 3) HDL; 4) CAD, s/p CABG x 4 and stent placement, complicated by dehiscence of sternotomy; 5) COPD vs. asthma; 6) non-Hodgkin lymphoma; 7) Hepatitis C; 8) diabetic neuropathy; 9) possible seizures; 10) latent TB Infection; 11) cirrhosis; 12) SCC of the skin.

891.    Of these, seizures and lymphoma are not clearly listed on the problem list, cirrhosis is not on the problem list, and SCC of the skin is not listed. Mr. ▆▆▆▆ other medical problems include chronic diarrhea, gallstones, COVID, chronic renal calculi, and abdominal hernia.

892.    Mr. ▆▆▆▆ received outstanding care to address his chronic problems.  His diabetes, HTN, lipids, and CAD are very well-managed.  When levels were out of range, medicines were adjusted.  Mr. ▆▆▆▆ Hepatitis C was treated in the spring of 2019, and he has had a sustained viral response.  Mr. ▆▆▆▆ has had CABG x 4, PCI with bare metal stent, cholecystectomy, sternum repair, abdominal hernia repair, oncology care, optometric screening, and Mohs surgery for the skin cancer on his nose.

893.    The chronic care visits for this patient have been very involved.  Any ambiguous documentation demonstrates difficulty with the EHR rather than any shortcomings on the part of providers who have gone to great efforts to accurately track and gather information.  The majority of Mr. ▆▆▆▆ contacts have been with the same provider which is extremely important for a patient such as this.

894.    The chronic clinic notes did not contain all of the diagnoses that should have been included.  The lymphoma, skin cancer, and HDL were not noted clearly.  CAD was not included, and cirrhosis was not acknowledged.  It is important to recognize and document cirrhosis in as NSAIDs are contraindicated.  Notwithstanding, this patient's care, while fragmented, was excellent.  This is especially true considering the complexity of the

1    care.

2    895.    **Documentation of Chronic Care: 3—GOOD:** The problem list does not

3    prioritize the patient's important diagnoses which makes follow-up on consults, labs, and

4    medications fragmented.  The providers' use of free-typing the history and physical made

5    following the care much easier.  The problem tracking in chronic care needs attention.  All

6    chronic clinic problems (those for which a lapse in medication or a loss to follow-up could

7    result in a bad outcome for the patient) should be followed and carried from one chronic

8    clinic to the next.  Resolved or inactive chronic clinic problems should be removed from

9    chronic care list.

10    896.    **Quality of Chronic Care: 5—EXCELLENT:** This was an extremely

11    complex patient who received outstanding care. His specialty care occurred promptly,

12    especially oncology and imaging.

13    897.    **Quality of Episodic Care: 5—EXCELLENT:** This patient has many

14    medical issues that have been well-addressed, treated, resolved, or managed.

15    ***Patient 2:*** ▇▇▇▇▇▇▇    ***ADCRR*** ▇▇▇▇

16    898.    Mr. ▇▇▇▇ is a 67-year-old male who has been incarcerated in ADCRR

17    since September 1993.  Mr. ▇▇▇▇ is listed as having 12 chronic clinic problems.  The

18    earliest provider note in the EHR is from November 2014 at the Eyman facility.  He remains

19    at the Eyman facility.

20    899.    Mr. ▇▇▇▇ has the following chronic clinic problems: 1) HTN; 2) type 2

21    DM; 3) HDL; 4) aortic stenosis with right-sided heart failure; 5) latent TB infection; 6)

22    COPD; 7) glaucoma; and 8) diabetic neuropathy.  The aortic stenosis is not listed in the

23    problem list.

24    900.    Mr. ▇▇▇▇ has also had a zoster infection.

25    901.    Mr. ▇▇▇▇ chronic clinic issues are complex, and he has received a great

26    deal of attention for them.  His BP and diabetes have never been consistently at goal despite

27    much effort from staff and the use of multiple medications. Mr. ▇▇▇▇ has also had a

28    great deal of specialty care.  He has seen cardiology to evaluate an abnormal EKG and lower

extremity edema and chest pain.  He had studies that showed moderate to severe aortic stenosis with concentric LVH. He also was shown by adenosine stress to have no evidence of ischemia.

902.   Mr. ███████ has been seen regularly by optometry and ophthalmology for retinopathy screening and for cataracts and glaucoma.  In one note, the ophthalmologist wrote that the eye drops that the patient was supposed to be using "weren't ordered"; this was not the case. Mr. ██████ refused care and was non-compliant to medications and diet periodically.

903.   **Documentation of Chronic Care: 2—FAIR:** The chronic care for this patient is very complex, and the templates in the EHR make it difficult to get an accurate understanding of Mr. ████████ health profile. Documentation for chronic care is fragmented, and some chronic care problems are never mentioned or are mischaracterized (i.e., CAD vs aortic stenosis).

904.   **Quality of Chronic Care: 3—GOOD:** It is difficult to tell if preventive care is being given (besides optometry for diabetes).  Patient compliance is not easy to quantify. There was much repetition of labs, including repeated ordering of microalbumin in urine, despite the known presence of it and the patient being on an ACEI.

905.   **Quality of Episodic Care: 5—EXCELLENT:** The episodic care was well-done.

***Patient 3:*** ████████     ***ADCRR*** ██████

906.   Mr. ████ is a 68-year-old male who has been incarcerated with ADCRR since August 2011.  He is listed as having 11 chronic clinic problems.  The earliest provider note I found in the EHR is in November 2014 at the Eyman facility. It appears that the patient was housed at the ASPC-Eyman during the entire documented time span, except for some stays in the infirmary at Florence after he was hospitalized.

907.   Mr. ████ is an extremely complex patient.  He has the following chronic clinic problems: 1) HTN; 2) type 2 DM; 3) CHF; 4) chronic warfarin anticoagulation, 5) BPH with LUTS, 6) HDL, 7) automatic implantable defibrillator/pacemaker insertion; and

8) asthma. He also has received care for skin lesions, arthritis, incontinence, GERD, dysphagia, low back pain, bronchitis, pharyngitis, lipoma in the axilla, constipation, and a pressure ulcer.

908. Mr. ███ is currently on 26 medications. He has received copious care which is documented in the EHR. He has severe CAD and had 2 cardiac catheterizations during the past 6 years. He had several stents placed during the first catheterization and an attempt at a stent was made in the second that resulted in a perforation of the LAD and cardiac tamponade. He had an MI at that time, which resulted in a low EF and required an AICD. Mr. ███ has been closely followed by cardiology.

909. Mr. ███ has also had timely urology care for complications related to his urologic problems. He has cystoscopy and has intermittently needed to have a catheter. He had urosepsis at one point, which required hospitalization. He was found to have non-obstructive renal calculi as well. Mr. ███ had countless visits for his diabetes, lipids, and HTP. His HTP is reasonably well-controlled, but despite maximal therapy, his diabetes has never been at goal. His lipids are well-controlled.

910. It is unclear whether all of Mr. ███ preventive care and age-based screenings have been done. He received a pneumovax in 2016.

911. Mr. ███ has also received a great deal of episodic care. He has had 2 different skin biopsies, and an ultrasound and a CT scan to evaluate an axillary mass. He has had ankle-brachial indices done to evaluate PVD which were normal.

912. **Documentation of Chronic Care: 2—FAIR:** The cumbersome nature of the EHR makes is difficult to follow the course of very complicated patients. This is not a reflection of the providers' documentation. The notes typed free-hand by providers in the chronic care template are much easier to follow than if they use the template. This EHR system impeded the delivery of good care for very complicated patients.

913. **Quality of Chronic Care: 5—EXCELLENT:** These providers have gone above and beyond for this patient; Mr. ███ has had copious visits with providers. He has had world-class care despite having had some bad outcomes and the inability to get his

diabetes to goal.  In my opinion, Mr. ▮▮▮ would have succumbed to his diseases long ago if he were not receiving the outstanding care that he has been afforded in ASPC-Eyman.

914.  **Quality of Episodic Care: 5—EXCELLENT:** This patient received an extraordinary amount of episodic care.  When the problem appeared to be potentially threatening, Mr. ▮▮▮ received expedient workup.

***Patient 4:*** ▮▮▮▮▮▮▮▮▮ ***ADCRR*** ▮▮▮▮

915.  Mr. ▮▮▮ is an 81-year-old male.  He has been incarcerated with ADCRR since August 2011.  He is listed as having 11 chronic care problems.  The earliest provider note found in the EHR is from December 2014 at the Eyman facility.  It appears that Mr. ▮▮▮ has been housed at the Eyman facility since then, except for a brief period in 2017, when he was hospitalized and then recovered in the infirmary at the Florence facility.

916.  Mr. ▮▮▮ chronic clinic problems are: 1) s/p aortic valve replacement; 2) chronic anticoagulation for aortic valve replacement, 3) COPD; 4) HDL; 5) s/p CVA; 6) dry macular degeneration; 7) RA; 8) skin cancer (basal cell); and 9) anemia.  Mr. ▮▮▮ has also been seen for lower urinary tract symptoms, cataract and cataract extraction, blindness in left eye, and carpal tunnel syndrome.

917.  Mr. ▮▮▮ has received a great deal of care.  He had his aortic valve replaced prior to this incarceration.  There was no description of the type of valve he received, but he has been on warfarin for his entire incarceration.  He is not entirely compliant to his warfarin and his INR is very seldom at goal (2.5-3.5).  It is difficult to follow the provider's reasoning in the chronic clinic notes around the INR.  It is unclear as to what Mr. ▮▮▮ INR is and whether he has been taking his coumadin.  The difficulty with the EHR in documenting labs and trends in labs lends to this issue.

918.  Also, Mr. ▮▮▮ was diagnosed with RA during this incarceration.  He was mildly symptomatic when he presented and the provider ran some labs; however, not all the recommended labs were ordered.  Further, he was started on steroids which was unnecessary.  Mr. ▮▮▮ should be referred to a rheumatologist for initial management.  It became obvious over time that the providers thought that the rheumatoid factor level needed

to be followed; it does not.  RA treatment is guided by resolution of joint inflammation. Mr. ████ carpal tunnel likely represents a manifestation of his RA.  It is being managed by splinting.

919.    Further, Mr. ████ COPD, HTN, and lipids have been well-tended.  He had a cerebrovascular accident with unilateral weakness in November 2017.    He was hospitalized, returned to an infirmary and received physical therapy.  Mr. ████ lost the vision in one eye prior to incarceration and, when it was recognized that he had a significant cataract in the other eye, that cataract was extracted.  Later, he developed dry macular degeneration in the good eye and has received antioxidants and counseling to discontinue smoking.

920.    In 2020, one provider mentioned that Mr. ████ had anemia and ordered an anemia panel.  The anemia panel was not done, but the components of it were eventually completed separately.  Despite there being a serum iron level and a TIBC level (ferritin was normal), no iron-binding saturation level was mentioned in the chart.  No MCV was mentioned (it was nl) and no hemoccult was ordered upon initially recognizing that this elderly man had anemia.  A year later, a hemoccult was ordered.  The MCV does not appear to have returned.

921.    It was recognized that the patient had open wounds that likely represented skin cancer; it was basal cell carcinoma.  Mr. ████ was referred to a dermatologist and these were removed.  Regarding episodic care, he reported some urinary complaints and back pain which were addressed.

922.    **Documentation of Chronic Care: 2—FAIR:** The history and physical notes that are easiest to follow for chronic clinic are those that skip the radio- button templates in the EHR and are free-typed. Each chronic clinic problem and the plan for care needs should be easily retrievable at the next visit.  The thinking around the anticoagulation (lack of adequate anticoagulation) is not well-documented.  To their credit, the providers have developed workaround systems for managing the EHR.

923.    **Quality of Chronic Care: 3—GOOD:** Overall, the care was more than

adequate.  Mr. ████ COPD, HDL, and HTN have been very well-controlled.  There was obvious effort at anticoagulation; however, it is unclear as to whether providers understood the INR goal.  The RA has not been well-managed because providers seem unclear about the best course of action.  An autoimmune disease warrants at least some guidance from a subspecialist.

924.  Mr. ████ has had very good care for his CVA.  It is unfortunate that the CVA could not be prevented.

925.  **Quality of Episodic Care: 5—EXCELLENT:** It appears that this patient had extremely good care for his vision, pain, and skin problems.  It is unfortunate that continued smoking is an option for this patient.

***Patient 5:*** ████████  ***ADCRR*** ████

926.  Mr. ████ is a 43-year-old male who has been incarcerated with ADCRR since June 2005.  He is listed as having 10 Chronic Clinic problems.  The earliest provider note I found in the EHR is from November 2014 at ASPC-Eyman. He remains at the Eyman facility.

927.  Mr. ████ chronic clinic problems are: 1) asthma; 2) Hepatitis C; 3) seizures; 4) HDL (which has never required treatment); and HTN.  Mr. ████ has received extensive care for back and neck pain,

928.  HTN, asthma, and seizures.  All of these are well-controlled.  There is question about whether the patient even has seizures.  At one point, the patient described his "seizures" as being muscular jerking as he falls asleep. He also had a normal EEG, which does not necessarily rule out seizures.

929.  Mr. ████ has had Hepatitis C for a very long time.  He has had an evaluation at ASPC-Eyman that indicated that he was F0 on a Fibrosure test.  He has received Hepatitis B vaccine when it was learned that he was not immune to Hepatitis B.  He is known to be immune to Hepatitis A.  I noted that Mr. ████ did not have routine testing for HIV and did not have screening for immunity to Hepatitis A or B until relatively recently.  He has had repeated HCV RNA tests despite the fact that he has not been treated for Hepatitis C

and is known to have active disease.

930.   This patient has a diagnosis of HDL based on a minimally elevated total cholesterol.   This patient is not a treatment candidate at this time.   In my opinion, this diagnosis should be dropped from the chronic care list and should not exist on his problem list.   Mr. ███ has received episodic care for his back and neck pain.   He has had imaging studies of both his lumbar and cervical spines and has had physical therapy for his pain.

931.   **Documentation of Chronic Care: 2—FAIR:** Mr. ███ chronic clinic problems together with assessment and plans for care have not been well-organized which makes it difficult to address his needs at the next visit.   In some cases, there is inclusion of a problem that does not exist.   The EHR templates for chronic care hamper documentation.

932.   **Quality of Chronic Clinic: 3—GOOD:** Mr. ███ BP is controlled, and his seizures are treated.   It has not been determined if he is having seizures or if he is having myoclonic jerking at the time of sleep onset. There has been delay in screening for HIV and concurrent Hepatitis C in this patient.  Mr. ███ should have received Hepatitis B vaccine

933.   **Quality of Episodic Care: 5—EXCELLENT:** This patient received more than adequate attention and treatment for his back and neck pain.

***Patient 6:*** ███████        ***ADCRR*** ███

934.   Mr. ███ is an 81-year-old male who has been incarcerated with ADCRR since April 2015.  He is listed as having 10 chronic clinic problems.  The earliest provider note I find in the EHR is from April 2015 at the Eyman facility where he has remained.

935.   Mr. ███ has the following chronic clinic problems: 1) HTN; 2) HDL; 3) CAD, s/p CABG and PCI, 4) CAD, with history of TIA, CVA and syncope; 5) colon polyps; 6) COPD; 7) RA, and 8) diastolic dysfunction.  Mr. ███ has also received care for cataracts (laser treatment), epiretinal membrane threatening macula detachment (followed by ophthalmology, and erosive gastritis.

936.   Mr. ███ is an extremely complex patient, who has received copious amounts of care.  He may not be alive if he were not incarcerated, where he has extremely regular and frequent access to medical care.  His HTN, HDL, and COPD have all been

1  extremely well-controlled.

2      937.   Mr. ▮▮▮ has had active problems with atherosclerotic arterial disease.  He

3  had coronary artery bypass grafts in the past and has required stent placement since then.

4  He has frequent chest pain, and visits to the hospital or ER approximately every few months

5  since 2018.

6      938.   Mr. ▮▮▮ has received specialty care from radiology, rheumatology,

7  pulmonary, neurology, and gastroenterology.  He has had several stress-imaging tests and

8  has had arteriography of his carotids and great vessels.  He has had a full neurologic workup

9  with brain imaging and EEG.  His eye complaints have been addressed and treated by both

10  optometry and ophthalmology.

11      939.   Mr. ▮▮▮ has received an incredible amount of excellent care.

12      940.   **Documentation of Chronic Care: 4—VERY GOOD:** The provider notes

13  from ASPC-Eyman for this patient's chronic care are very good.  The chronic clinic notes

14  are free-typed, and the radio-button template is largely ignored, which allows tracking all

15  of this patient's problems from one visit to another.  However, the problem list is unclear,

16  and that makes it difficult to discern the patient's chronic problems.

17      941.   **Quality of Chronic Care: 5—EXCELLENT:** This patient has received

18  amazing care.  Each of his complicated chronic clinic problems has been addressed.  He has

19  had countless visits with facility providers and has a complex array of subspecialists

20  involved in his care.  His atherosclerotic arterial disease is his most active problem at this

21  time, but his underlying HTN and HDL are controlled.  His COPD is well-controlled.

22      942.   **Quality of Episodic Care: 5—EXCELLENT:** Mr. ▮▮▮ episodic care is

23  also complex, and one could argue that the problems that are being classified as episodic

24  could be chronic clinic problems which have been resolved.  He is receiving close care for

25  ophthalmologic problems for an issue that, if it progresses, could cause detachment of the

26  macula.  He has had YAG laser treatment for cataracts.

27  ***Patient 7:*** ▮▮▮▮▮▮▮ ***ADCRR*** ▮▮▮▮▮

28      943.   Mr. ▮▮▮ is a 70-year-old male who has been incarcerated with ADCRR

since March 1998.  He is listed as having 9 chronic care problems.  The earliest provider note in the EHR is from December 2014 at the Eyman complex.  At the time of my expert report, Mr. ███ was out to the hospital for a Coronary Artery Bypass.  I understand that he is currently housed at the IPC at ASPC-Florence.  The following assessment is based upon the review of his records completed immediately prior to his hospitalization.

944.  Mr. ███ chronic clinic problems are: 1) HTN; 2) type 2 diabetes, 3) HDL; 4) BPH, 5) thrombocytopenia vs. pseudo thrombocytopenia; 5) atrial fibrillation; and 6) chronic kidney disease, stage 3.  Mr. ███ has also been seen for the following persistent lower extremity edema with skin breakdown, joint pains, and COVID infection.

945.  Mr. ███ is a complicated patient and has received frequent care.  He has been seen at least every 3 months and has had labs done on this schedule also.  It seems that his diabetes has never been really well-controlled.  Mr. ███ is morbidly obese, with a BMI>40 and is not compliant to diet nor exercise.  Mr. ███ has had continued adjustment of his medication for his diabetes, with discontinuation of metformin as his renal function deteriorated.

946.  Mr. ███ BP has been intermittently controlled.  He has been on alpha-blockers, it appears, for his LUTS (sometimes 2 of them); amlodipine, which was discontinued as it worsened his lower extremity edema; lisinopril, which was discontinued or lapsed; and is now on metoprolol, which is for BP control, but also for rate control with his atrial fibrillation.  Mr. ███ HDL is well-controlled.

947.  Mr. ███ has had atrial fibrillation for the past several years and has been followed by a cardiologist.  He has had 2 echocardiograms and 2 chemical stress tests.  His medications have been adjusted as recommended by the cardiologist.  Mr. ███ has been on Eliquis for stroke prevention with his atrial fibrillation, and digoxin has been added for rate control.

948.  Mr. ███ has also been evaluated for thrombocytopenia, which appears likely to be pseudo thrombocytopenia.  He has seen a hematologist for this condition.  Further, Mr. ███ has multiple joint pains and has had his left shoulder evaluated by MRI.

He has been on and off of NSAIDS for the past years despite having CKD.

949.   **Documentation of Chronic Care: 3—GOOD:** Due to the cumbersome nature of the EHR templates, documentation of this complex patient has been adversely affected.  Not all diagnoses are listed in some of the chronic clinic notes, nor are they in the problem list.  It is difficult to follow labs without being able to look at trends, and it is hard to discern when annual care such as a monofilament test or an extensive foot exam is required.

950.   **Quality of Chronic Care: 4—VERY GOOD:** Unfortunately, Mr. ██ diabetes and HTN are not well-controlled; however, that it is not due to inattention or inaction by his providers who have followed him closely and attempted to adjust medication to address his medical problems.

951.   **Quality of Episodic Care: 3—GOOD:** Mr. ██ had his complaints addressed.  The only concern is the use of NSAIDs for pain in this patient.

***Patient 8:*** ██          ***ADCRR*** ██

952.   Mr. ██ is a 72-year-old male who has been incarcerated with ADCRR since November 2013.  He is listed as having 9 chronic clinic problems.  The earliest provider note found in the EHR is from July 2015 at the ASPC-Eyman facility.  He has remained at the Eyman facility, except for trips to the hospital for acute care problems.

953.   Mr. ██ has the following chronic clinic problems: 1) HTN; 2) type 2 DM; 3) HDL; 4) CAD, s/p stent placement and past inferior wall myocardial infarction; 5) asthma (not listed on problem list); 6) CKD (not listed on problem list); and 7) iron-deficiency anemia.  Mr. ██ has received episodic care for extremity pain, lower extremity edema, pneumonia with COVID, and syncope.

954.   Mr. ██ is another very complex patient.  Mr. ██ diabetes has been under marginal control for a patient who has known CAD.  Unfortunately, the patient resisted starting insulin.  The EHR makes it difficult to see a trend for the HbA1c.

955.   It appears that Mr. ██ HTN has been largely uncontrolled.  The cardiologist who saw Mr. ██ in October 2020 noted that his BP was controlled.  It is

1   rare to see a desirable BP in the notes for CCC.  It appears that the patient was on 1 drug

2   for HTN for a prolonged period of time, despite having BP readings that were higher than

3   goal.

4       956.   Further, Mr. ██████ has had gradually increasing creatinine levels and has

5   not had CKD added to his problem list nor to his chronic clinic list.  Again, there is the use

6   of NSAIDs in this very high-risk patient.

7       957.   Mr. ██████ lipid management was excellent.  He had asthma diagnosed

8   several years ago, but it is not on the problem list, and it is not clear how this diagnosis was

9   established.

10      958.   Mr. ██████ experienced a syncopal episode and several episodes of chest

11  pain for which he was hospitalized.  He likely should have had a cardiology visit earlier

12  than he did, since he had established CAD and had been experiencing chest pains and lower

13  extremity edema.  Now, Mr. ██████ has iron-deficiency anemia.  There is mention of

14  bloody stools, but there is no documentation of the blood in the stool, and there is no referral

15  to have his GI tract visualized.

16      959.   **Documentation of Chronic Care: 2—FAIR:** The EHR chronic care

17  templates make documentation challenging.  There is little documentation about preventive

18  care for diabetes in eOMIS. It is difficult to track control of diabetes in this system with the

19  inability to see trends in the HbA1c.

20      960.   **Quality of Chronic Care: 2—FAIR:** Mr. ██████ has gradually increasing

21  creatinine without recognition in chronic clinic.  He has had elevated BP readings without

22  much response.  He has not had a workup for iron-deficiency anemia and did not have early

23  investigation of the lower extremity edema and chest pains (called "stable angina" in notes)

24  prior to being in distress.

25      961.   **Quality of Episodic Care: 3—GOOD:** This patient was well-cared for with

26  his COVID infection and ensuing pneumonia.  His joint pain has been managed by

27  prescribing treatment that does not include NSAIDs which are contraindicated in this

28  patient.  NSAIDs were ordered about 4-5 years ago for this patient during a chronic clinic

visit for diabetes and HTN, when the patient complained of knee pain and had an exam consistent with osteoarthritis.

***Patient 9:*** ███████████████ ***ADCRR*** █████

962. Mr. ████████ is a 71-year-old male who has been incarcerated with ADCRR since February 2008. He is listed as having 8 chronic care problems. The earliest provider note I find in the EHR is from December 2015 at the Eyman facility. It appears he remained at the Eyman facility until the present except for 1 hospitalization.

963. Mr. ██████████ chronic clinic problems are: 1) type 2 DM; 2) HTN; 3) Hepatitis C; 4) severe hepatic fibrosis (not on problem list); 5) anemia; 6) HDL; 7) CKD; and 8) asthma. Mr. █████████ was also seen over the period of time reviewed for an inguinal hernia, urosepsis, tinnitus, and for COVID infection.

964. The management of Mr. ███████ diabetes and HTN seems to be quite good. He has medications added when his labs or vitals indicate that he is not under control. It appears that he had routine eye exams to look for the development of retinopathy. I do not see evidence of a detailed foot exam or of annual flu vaccines.

965. Mr. ██████████ Hepatitis C was successfully treated in the beginning of 2019. He was found to be an F4 on a Fibrotest and has had some thrombocytopenia that may be secondary to hypersplenism but may also be platelet clumping. It is unclear.

966. Mr. █████████ lipids are at target, but it is unclear if they were ever out of control. Early in the treatment, a fibrate was used instead of a statin. There were no marked elevations in triglyceride levels, so it was unclear why a fibrate was used. He is now on a statin, and his lipids are at goal.

967. Mr. █████████ asthma has been well-managed, and he has not had any issues with it.

968. Mr. ████████ was markedly anemic at the end of March 2019. However, there are no notes to explain this finding, other than to order repeat labs and a hemoccult, which was negative. Several months later, his hemoglobin was normal. It is unclear what was done, if anything.

969.   Mr. ████ episodic care also seems to be good.  He had urosepsis, was hospitalized, and treated successfully.  He had a right inguinal hernia repair.  Mr. ████ tinnitus was treated with herbal remedies that probably should not have been used if there is no FDA approval for them.

970.   **Documentation of Chronic Care: 2—FAIR:** Due to the ineffectiveness of the EHR, chronic clinic notes (mostly in 2015-2017) lack useful history, physical exam, and practical assessment and plan.  Further, Hepatitis C care is largely not reflected in the chart.

971.   **Quality of Chronic Care: 4—VERY GOOD:** This patient, like others, has had successful treatment of his Hepatitis C infection with a sustained viral response.  His diabetes, HTN, and lipids are controlled for the most part.  He had anemia that was unexplained but passed.  Mr. ████ has CKD that is being followed.  It seems he should be on an ACEI.  By my review, he was on one until April 2019, when it no longer appears in the medication list and has not been renewed.

972.   **Quality of Episodic Care: 4—VERY GOOD:** This patient had a hernia repaired and his urosepsis treated.  He had tinnitus with an audiology evaluation.

***Patient 10:*** ████████ ***ADCRR*** ████

973.   Mr. ██ is a 37-year-old male who has been incarcerated with ADCRR since March 2016.  Mr. ██ is listed as having 8 chronic clinic problems.  The earliest provider note that I find in the EHR is from March 2016 at the Phoenix facility.  It appears that he was then transferred to the Florence facility and then to the Eyman facility, where he remains.

974.   Mr. ██ has the following chronic clinic problems: 1) Hepatitis C; 2) HTN; 3) HDL; 4) asthma; and 5) neuropathic pain.  Mr. ██ has also been seen for reflux episodically and had COVID infection.

975.   Mr. ██ arrived at prison with a diagnosis of asthma and neuropathic pain in his leg.  He denied a history of hepatitis.  He later admitted to providers that he had known about having Hepatitis C.

976.   Mr. ███ asthma has been well-controlled.  He was started on a rescue inhaler only at the beginning of his incarceration and had a steroid, controller inhaler added after it was learned that he was requiring his rescue inhaler daily.  Unfortunately, despite providers' documentation on many notes that he was on both inhalers, it appears that the controller inhaler was not active in the medication list for quite some time.  Instead, it appears he was on 2 rescue inhalers (albuterol and levalbuterol) until one of them expired. At that time, it was noticed that the steroid inhaler had not been ordered.

977.   Mr. ███ HTN has always been well-controlled on Lisinopril only.  Mr. ███ has active Hepatitis C which was evaluated by Fibrosure test, and he was found to have F1 disease.  He had multiple tests for immunity Hepatitis A and B.  The first one showed that he was immune to Hepatitis B, but not A.  He received a Hepatitis A vaccine.  He has not been treated for his Hepatitis C at this point and is being followed with lab screening.

978.   Mr. ███ HDL is primarily hypertriglyceridemia.  It has been treated on and off with a statin.  It does not appear that there has been an ASCVD risk score completed. The statin was restarted because it was deemed that the triglyceride level was higher than desirable.  It would have been helpful for the provider to state the reason for starting the statin (i.e., "the patient's triglycerides are greater than 175, so I will start statin").  Much of Mr. ███ concern was pain control, and that was addressed frequently and to the patient's satisfaction.

979.   Mr. ███ had COVID and recovered without incident.

980.   **Documentation of Chronic Care: 3—GOOD:** It is difficult with this EHR to know when medications are expiring, so occasionally medications like this patient's steroid inhaler expire.  It is possible that he still had his inhaler on his person and was using it even though it had expired.  Further, there is no section of the chronic clinic template in the EHR where the labs which a provider is using for decisions are displayed.

981.   **Quality of Chronic Care: 4—VERY GOOD:** Mr. ███ had stable chronic clinic problems despite the issue with his inhaler expiring.  His BP and asthma were well-controlled, and his Hepatitis C was being monitored.  He was vaccinated for pneumococcal

149

1  pneumonia.  However, he does not fall into a high-risk group and does not meet CDC

2  criteria for being vaccinated.  He was appropriately vaccinated for Hepatitis A.  It appears

3  he received a Tdap in 2018 and in 2020.

4      982.   Performing an ASCVD risk score or stating the reason for starting lipid-

5  lowering therapy should be encouraged and documented before committing a patient to

6  statin therapy and that the recommendation for treating hypertriglyceridemia should be

7  reviewed.

8      983.   **Quality of Episodic Care: 5—EXCELLENT:** It appears that Mr. ▮ was

9  closely monitored and was quarantined with his COVID infection.

10 **Summary of Findings for ASPC-Eyman:**

11     984.   The staff at ASPC-Eyman are highly motivated to provide excellent care.  The

12 Eyman providers, for the most part, seem extremely competent and up-to-date on their

13 medical knowledge.

14     985.   The ASPC-Eyman patients are very complex. The care these patients have

15 received is quite remarkable in light of how difficult the review of care is in the EHR.

16     986.   It appears that the care is much improved and much better documented over

17 the past 2-3 years.  Much of that seems to be related to the providers free-typing chronic

18 clinic notes instead of attempting to use the chronic clinic templates.

19     987.   The excessive burden of non-value-added care in chronic clinic should be

20 eliminated.  A large part of this is resulting from excessive lab testing using panels that are

21 not required per national guidelines.

22 **Summary of Chart Review Findings:**

23

24

25

26

27

28

988.   As shown in the below chart, overall scores across the three areas reviewed averaged from good (documentation) to very good (quality of chronic care, quality of episodic care).

**Quality of Care Review for Chronic Disease Patients**
Average for All Complexes

| Facility | Documentation | Chronic Care | Episodic Care |
|---|---|---|---|
| Safford | 2.5 | 2.8 | 3.6 |
| Winslow | 3.3 | 3.8 | 4.4 |
| Yuma | 4.0 | 4.0 | 4.9 |
| Douglas | 3.6 | 3.8 | 4.1 |
| Eyman | 2.5 | 3.8 | 4.5 |
| Lewis | 4.6 | 4.9 | 4.7 |
| Perryville | 4.2 | 3.6 | 4.3 |
| Tucson | 2.4 | 3.3 | 4.3 |
| | | | |
| Average | 3.4 | 3.8 | 4.4 |

1- POOR
2- FAIR
3- GOOD
4- VERY GOOD
5- EXCELLENT

989.   There was evidence of real motivation and effort to provide excellent care. It was also evident that the care that is being delivered over the past 2 years is more comprehensive than it was previously. There was more effort at good documentation, provision of preventive care by disease state, and timelier referral to specialty than previously seen. There were obvious efforts to treat patients for Hepatitis C and to achieve goals in HTN and diabetic patients.

990.   Care for the patients with fewer chronic clinic problems was less splintered and easier to follow than the care for the very complex patients.  Especially complex were those patients from the Eyman and the Tucson complexes, which correlates with their missions.  However, the more complex the patient, the more fragmented the documentation in eOMIS and the more challenging to follow their care plan.  At times, it was difficult to discern what happened in that patient's care, and what was supposed to have happened.  This fragmentation issue is due to using an EHR that does not support the flow of patient

1   care, does not push desired behavior and care, does not contribute to ideal decision-making,

2   and does not allow a rapid review of a patient's history and healthcare needs.  In short, this

3   EHR does not allow for the care of complex patients in a comprehensive way and has

4   become an impediment to the timely and efficient care of these patients.

5       991.   There were instances where there was disagreement with the care of the

6   patient.  Often, when omissions were found, it was difficult to tell if the problem was the

7   provider's decision-making or a problem with documentation in the EHR, but there were

8   also some errors of commission. For example, there were instances where the correct

9   medications were not being ordered.  There appears to be a regular practice of ordering

10  fibrates for diabetics with elevated triglycerides instead of a statin. There were several

11  patients who had NSAIDs ordered for them, despite a contraindication to NSAIDs, and who

12  then experienced upper GI bleeding or worsening kidney function.  There appeared to be

13  an under-recognition of active liver disease being a contraindication to NSAIDs.

14      992.   There is a substantial amount of laboratory testing being ordered in ADCRR.

15  It was recognized that, on occasion, laboratory studies ordered were not clinically indicated.

16  The concern with this practice is that it demands explanation of any abnormal finding (PM

17  46).  Review of these findings is laborious, which detracts from the providers' ability to

18  zero in on the most critical medical issues.  Unnecessary lab testing can create confusion

19  for future providers in determining what the patient's acute problems are. There were

20  examples where lab studies were returned with significant findings but appeared not to be

21  acted upon in a timely fashion.

22      993.   It appeared that referrals for oncology, cardiology, and GI are happening

23  expeditiously, especially over the past 2 years. Diabetics are receiving timely referrals for

24  retinopathy evaluations reliably over the past several years as well.

25      994.   Providers who are reviewing lab data which warrants a change in therapy

26  should make those changes at the time of lab review or should request an appointment with

27  the patient to discuss the changes, if that is necessary.  There were examples of labs that

28  were reviewed with a comment that the necessary changes would be "discussed at the next

chronic clinic" which was scheduled for months later.  When that clinic occurred, the provider seeing the patient often noted that there were "no recent labs" or they made no changes in therapy because they could not tell if changes had already been made. Another issue in decision-making that could be improved is in the ordering of follow-up evaluations.

995.    Overall, the quality of care being provided in ADCRR is good and meets the standard of care.  The care seems to have steadily improved over the most recent 2 years. The healthcare teams are working very hard to give excellent care and there is passion evident in their work.

996.    The record reviews revealed some instances where the care that was delivered was not consistent with the standard of care; however, that is found in every healthcare system and is not unusual to be expected. Most of these were errors of omission based on the challenges created by eOMIS.  I find that the health care being provided within the ADCRR system meets or exceeds the standard of care.

## Quality and Benchmarks:

997.    Improving the quality of healthcare is important to both patients and the healthcare system. Quality in healthcare means providing the care the patient needs when the patient needs it, in a safe, effective manner. It also represents the degree to which these provided health services increase the likelihood of a desired health outcome.

998.    I reviewed the current metrics and tools being used within the ADCRR to evaluate the quality of care being provided to patients. I have also included an assessment of available Healthcare Effectiveness Data and Information Set (HEDIS) benchmarks that can be used to evaluate the quality of healthcare across the ADCRR system and make comparisons to other systems, and extant clinical outcome data.

## ADCRR PMs

999.    Currently the ADCRR is using a set of PMs as the focal point for its assessment of patient care quality. It is my understanding that these PMs were initially created as part of the settlement agreement entered into by the parties in this litigation. These PMs primarily assess healthcare process end points which may or may not improve

the quality of care. I reviewed the PMs and attempted to determine the degree to which their successful completion would positively impact the likelihood of a desired health outcome. I have divided them into three categories as follows:

1000. <u>High Potential for Impacting Quality of Care:</u> Measures which have the highest potential to maximize desired outcomes if performed as stated in the measure description.

1001. <u>Medium Potential for Impacting Quality of Care:</u> Measures which may have a medium level impact on quality if performed as stated in the measure description.  This is not an indication of importance to the overall quality of care; it is based on its weight relative to other measures.

1002. <u>Low Potential for Impacting Quality of Care:</u> Measures which may have the least potential impact on quality if performed as stated in the measure description.  Again, this level is based on its relative position compared to other measures.

1003. <u>High Potential Measures include the following:</u>

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 11 | Medical | Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT. |
| 13 | Medical | Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication. |
| 14 | Medical | Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication. |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 33 | Nursing | All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility. |
| 34 | Medical | A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility. |
| 35 | Nursing | All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption. |
| 37 | Nursing | Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need). |
| 38 | Nursing | Vital signs, to include weight, will be checked and documented in the medical record each time an inmate is seen during sick call. |
| 40 | Medical | Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral. |
| 41 | Medical | Emergent provider referrals are seen immediately by a Medical Provider. |
| 43 | Nursing | Inmates returning from an inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there. |
| 44 | Medical | Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours. |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 50 | Medical | Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider. |
| 51 | Medical | Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider. |
| 52 | Medical | Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report. |
| 53 | Medical | Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease. |
| 54 | Medical | Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place. |
| 55 | Medical | Disease management guidelines will be implemented for chronic diseases. |
| 57 | Medical | A Medical Provider will order prenatal vitamins and diet for a pregnant inmate at the inmate's initial intake physical examination. |
| 63 | Nursing | In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission. |
| 64 | Medical | In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission. |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 65 | Medical | In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission. |
| 67 | Nursing | In an IPC, registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks. |
| 103 | Dental | Urgent care wait times, as determined by the contracted vendor, shall be no more than 72 hours from the date the HNR was received. |

1004.  Medium Potential Measures include the following:

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 1 | Nursing | Each ASPC will maintain, at a minimum, one RN onsite 24/7, 7 days/week. |
| 2 | Medical | Each ASPC will maintain, at a minimum, one Medical Provider (not to include a dentist) onsite during regular business hour and on-call at all other times. |
| 3 | Dental | Dental staffing will be maintained at current contract levels–30 dentists. |
| 4 | Nursing | Infirmary staffing will be maintained with a minimum staffing level of 2 RNs on duty in the infirmary at all times at Tucson & Florence infirmaries and a minimum of one RN on duty in the infirmary at all times at Perryville and Lewis infirmaries |
| 5 | Medical | Medical Records will be accurate, chronologically maintained, and scanned or filed in the patient's chart within two business days, with all documents filed in their designated location. |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 6 | Medical | Provider orders will be noted daily with time, date, and name of person taking the orders off. |
| 7 | Medical | Medical record entries will be legible, and complete with time, name stamp and signature present. |
| 8 | Nursing | Nursing protocols/NETS will be utilized by nurses for sick call. |
| 10 | Medical | Each patient's medical record will include an up-to-date Master Problem list. |
| 22 | Medical | Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order. |
| 23 | Nursing | Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff. |
| 24 | Nursing | Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items. |
| 25 | Medical | A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency. |
| 28 | Medical | Every medical provider will undergo peer reviews annually with reviews and recommended actions documented. |
| 30 | Medical | The initial mortality review of an inmate's death will be completed within 10 working days of death. |
| 31 | Medical | Mortality reviews will identify and refer deficiencies to appropriate managers and supervisors, including CQI committee, and corrective action will be taken. |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 32 | Medical | A final independent clinical mortality review will be completed by the Health Services Contract Monitoring Bureau for all mortalities within 10 business days of receipt of the medical examiner's findings. |
| 36 | Nursing | An LPN or RN will screen HNRs within 24 hours of receipt. |
| 39 | Medical | Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral. |
| 42 | Medical | A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider. |
| 46 | Medical | A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison. |
| 48 | Medical | Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record. |
| 56 | Medical | Inmates with a chronic disease will be provided education about their condition/disease which will be documented in the medical record. |
| 58 | Medical | Results of an inmate's prenatal screening tests will be documented in the medical record. |
| 59 | Medical | Inmates will be screened for TB on an annual basis. |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 60 | Medical | All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended. |
| 61 | Medical | All female inmates ages 21 to 65 will be offered a Pap smear every 36 months after initial intake, unless more frequent screening is clinically recommended. |
| 62 | Medical | All prisoners are screened for tuberculosis upon intake. |
| 66 | Medical | In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours. |
| 68 | Medical | In an IPC, Inmate health records will include admission orders and documentation of care and treatment given. |
| 69 | Nursing | In an IPC, nursing care plans will be reviewed weekly documented with a date and signature. |
| 70 | Nursing | All IPC patients have properly working call buttons, and if not, health care staff perform and document 30-minute patient welfare checks. |
| 71 | Medical | Inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided the diet, if clinically indicated. When prescribing the special diet, the provider will include the type of diet, duration for which it is to be provided, and any special instructions. |

1005.  Low Potential Measures include the following:

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 9 | Medical | SOAPE format will be utilized in the medical record for |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| | | encounters. |
| 12 | Medical | Medical record will contain documentation of refusals or "no shows." |
| 15 | Medical | Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals. |
| 16 | Medical | Perpetual inventory medication logs will be maintained on each yard. |
| 17 | Nursing | The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature. |
| 18 | Nursing | Daily delivery manifests will be kept in binders located in medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN. |
| 19 | Nursing | Perpetual inventory medications will be signed off on the Inmate's individual MAR. |
| 20 | Nursing | Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record. |
| 21 | Nursing | Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor. |
| 26 | Nursing | Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance. |
| 29 | Nursing | Each ASPC facility Director of Nursing or designee will conduct, and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02. |

| Measure Number | Discipline | Measure Description |
|---|---|---|
| 47 | Medical | A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request. |
| 49 | Medical | Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial. |
| 72 | Medical | Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a QHCP. |
| 100 | Dental | Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs. |
| 101 | Dental | Dental assistants will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist. |
| 102 | Dental | Routine dental care wait times will be no more than 90 days from the date the HNR was received. |

1006.  The analysis of the PMs reveals that most have a very limited role in directly impacting quality of care for patients. Even those PMs designated as High Potential for Influencing Quality of Care require healthcare staff to perform certain specific actions to ensure that quality is improved. For example:

1007. PM 38 requires that "Vital signs, to include weight, will be checked and documented in the medical record each time an inmate is seen during sick call." This measure was scored as "High Potential" quality; however, it is dependent on the vitals being

162

taken correctly and then ultimately used in appropriate manner based upon the results.

1008.  PM 52 requires that "Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report." This was scored as "High Potential" quality; however, the improvement in quality comes from the Provider taking the appropriate action.

1009.  PM 53 requires that "Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease." This was scored as "High Potential" quality; however, the incremental increase in quality comes not from meeting the 30-day timeframe but rather that the treatment plan developed is clinically appropriate and complete.

1010.  The use of PMs is common in correctional healthcare.  However, they are typically used as contractual metrics rather than quality indicators. The continued use of these PMs by ADCRR should be reevaluated to ensure that each measure, if completed appropriately, adds objective improvement to the care being delivered.

**National Committee for Quality Assurance (NCQA) Metrics**

1011.  The NCQA is dedicated to improving healthcare quality by evaluating and reporting on the quality of managed care and other healthcare organizations in the United States. NCQA has developed the HEDIS measures, which is a tool to measure the performance of health plans on the quality of care and services provided to their patients.

1012.  The HEDIS measures are a tool used by more than 90 percent of U.S. health plans to measure performance on critical aspects of care and service delivery. Over 190 million people are enrolled in health plans that report quality results using HEDIS. Due to its broad utilization with so many health plans and because the measures are so specifically defined, HEDIS can be used to make comparisons among healthcare organizations.  It allows for health plans (commercial, Medicare, and Medicaid) across the country to publicly report on HEDIS measures, enabling fair and reasonable comparison.

1013.  HEDIS quality measures evaluate:

- Effectiveness of Care

- Access/Availability of Care
- Utilization
- Risk Adjusted Utilization
- Measures Reported Using Electronic Clinical Data Systems

1014.  The use of HEDIS guidelines in the correctional setting is highly appropriate and becoming more prevalent. We use HEDIS metrics in the Texas Department of Criminal Justice correctional health care system to evaluate and compare clinical outcomes against free-world healthcare systems.

1015.  While randomly selected chart reviews can certainly be valuable in evaluating the quality of care provided across a system, there will always be some element of subjectivity in the reviews, as two different doctors may evaluate the same care differently.

1016.  By contrast, the HEDIS metrics are truly an objective measure of clinical outcomes. And because the HEDIS metrics include the entire population of patients who meet the standardized parameters, they eliminate any concerns around sampling bias or error.

1017.  The use of these objective measures also standardizes for imperfect care, allows for targeting of patients with known chronic disease, and serves as the quality evaluation tool used in the community. It also evaluates the specific care provided to a large population rather than a single individual.

1018.  My team's review of the direct chronic care found in the medical records of the 80 ADCRR inmates from our random sample of chronic care patients validates these HEDIS scores. As I conducted my own review of the 80 charts, I reviewed the blood pressure and A1C results for each applicable patient for consistency with the HEDIS results, and I found them to be consistent with the system-wide ADCRR scores.

1019.  Achieving or surpassing a HEDIS benchmark does not occur by chance; rather, it is reflective of a well-run, patient-centered healthcare organization.

1020.  There are two HEDIS measures (Controlling High Blood Pressure and Comprehensive Diabetic Care) that are applicable to any correctional healthcare population

and can be used to measure essential care for two of the larger chronic care populations found in the prison setting.

1021. The HEDIS metric for Controlling High Blood Pressure assesses the percentage of adults 18–85 years of age who had at least one outpatient visit with a hypertension diagnosis during the first 6 months of the measurement year whose blood pressure was adequately controlled based on blood pressure <140/90 mm Hg.

1022. The HEDIS metric for Comprehensive Diabetic Care assesses the percentage of adults 18–75 years of age with diabetes (type 1 and type 2) who had each of the following:

- Hemoglobin A1c (HbA1c) testing
- HbA1c poor control (>9.0%)
- HbA1c control (<8.0%)
- HbA1c control (<7.0%) for a selected population
- Eye exam (retinal) performed
- Medical attention for nephropathy
- BP control (<140/90 mm Hg)

1023. I asked Centurion to provide data for these measures for all ADCRR inmates systemwide who met the criteria for that particular measure. The data for these metrics were compiled by Chris Bourque, in consultation with Dr. Johnny Wu, using data pulled from eOMIS.

1024. I provided the parameters to Mr. Bourque using the same parameters published by HEDIS, with one exception. HEDIS only measures individuals who have been undergoing treatment for at least 12 months. I wanted to be more inclusive and conservative in my review of the care provided by Centurion to ADCRR inmates and accordingly included all patients who have been in treatment for at least six months.[6] This had the effect of setting the bar higher for Centurion. If we had used the 12-month threshold, the ADCRR

---

[6] Additionally, HEDIS allows for the optional exclusion from the sample of individuals with certain conditions, including patients with end-stage renal disease, patients on dialysis, and pregnant females, but we elected not to exclude anyone from the ADCRR sample based on these conditions.

results for these measures would likely have improved the HEDIS scores for ADCRR compared to the HEDIS populations.

1025. When the data sets were completed, I asked Dr. Wu, who is familiar with HEDIS, to review them with Mr. Bourque for accuracy.

1026. The population total used for the HEDIS metrics was 27,181 ADCRR inmates. The HTN sample totaled 4,806 inmates, and the diabetes sample totaled 787 inmates.

1027. Consistent with the HEDIS parameters, for the HTN sample, we used the latest blood pressure recorded for that inmate in eOMIS. For the diabetes sample, we used the most recent A1C result for that inmate from Garcia Labs.

1028. The percentages for ADCRR were then compared to nationwide commercial HMO, commercial PPO, and Medicaid populations.

1029. As evident in the charts below, the HTN and diabetic HEDIS scores for the care provided by ADCRR are above the national average for HMO, PPO, and Medicaid populations, reflecting excellent care delivery and outcomes. Additionally, these results are indicative that ADCRR is exceeding the community standard of care. The results are consistent among the various ADCRR facilities.

1030. Importantly, these HEDIS measures evaluate the quality of care provided to thousands of ADCRR patients across the ADCRR system. As previously mentioned, surpassing the HEDIS benchmark does not occur by chance. Rather, it requires the critical, system-wide health delivery processes as a whole to function efficiently and effectively. These healthcare processes include intake screening, nursing evaluation, intake physical examination, chronic care clinic enrollment, laboratory ordering, laboratory results review, medication ordering, medication administration, compliance monitoring, patient education, dietary counseling and management, nursing appointments for blood pressure and blood sugar checks, insulin administration process, chronic care clinic, clinical documentation, and data collection and management. ADCRR could not have exceeded the HEDIS benchmark on both the HTN and diabetic metrics if these critical processes were broken or

1  otherwise not functioning effectively across the ADCRR system.

2  **<u>Controlling Blood Pressure</u>**









1  **Controlling Hemoglobin A1c**

2



Comparison of HgbA1c as an Indicator of Diabetes Control



Comparison of HgbA1c <7 as an Indicator of Diabetes Control by Facility



1031. Given the condensed timeline for production of my expert report, additional HEDIS comparisons could not be accomplished. However, there are many other applicable HEDIS measures which ADCRR should review and consider for incorporation into their quality monitoring plans going forward.

**<u>Other Outcome Metrics</u>**

1032. Other metrics for evaluating the systemic delivery of healthcare in a correctional setting include Hepatitis C treatment rates and COVID-19 vaccination rates. The Hepatitis C treatment outcomes and inmate COVID-19 vaccination rates shown are additional quality outcomes that demonstrate a health system that is working to deliver quality care.

1033.  In my conversations with Dr. Phillips and Dr. Orm, it is clear that ADCRR and Centurion have prioritized the treatment of Hepatitis C. This focus is also reflected in the below chart, which shows the increase in numbers of inmates receiving treatment for Hepatitis C.



1034. In reviewing ADCRR and Centurion's Hepatitis C testing and treatment protocol, including staging, it is my opinion that it reflects current best practices in a correctional setting and is in line with what other state correctional systems are currently doing.

1035.   COVID-19 vaccination rates are a good indicator of the efficacy of a prison healthcare system's patient educational processes and coordination of efforts between medical staff, custody staff, and outside agencies. As shown in the chart below, ADCRR's inmate vaccination rates are significantly higher than community rates for both Arizona and the U.S., reflecting a high-functioning system.



**System-Wide Encounter Statistics**

1036.   Another important measure is the number of encounters for critical processes (e.g., intakes, chronic care visits, medication administration, etc.) on a monthly and/or annual basis across the system. No healthcare delivery system is perfect, and human error will occasionally occur in any system, no matter how high quality the system is or how caring the individual providers are.  For this reason, it is critical to view mistakes and poor outcomes in the context of the overall volume of care being delivered, recognizing that 50 such outcomes in a very small system could potentially be indicative of a systemic problem, whereas even ten times the number of outcomes in a much larger system would likely not be reflective of any systemic issues with the delivery of care.

1037.   I was provided with data from ADCRR and Centurion on treatment volumes

across the ten state-run prisons.  In preparing this Declaration, I re-reviewed the Centurion Monthly Clinical Data reports, which show that between July 2019 and August 2021, ADCRR received a total of 571,708 HNRs, or an average of 21,989 HNRs per month. These HNRs resulted in 328,509 scheduled nursing appointments (or an average of 12,635 scheduled nursing appointments per month) and 39,832 scheduled provider appointments (or an average of 1,532 provider appointments per month).[7]

1038.  Given this sheer volume of medical care, and associated diagnostic testing, specialty consults, and medications being provided to ADCRR inmates each month, it is to be expected that some appointments would be untimely, some diagnoses would be delayed or not interpreted correctly, and some medication doses would be missed. However, the occurrences of these issues identified by Plaintiff's medical expert, Dr. Wilcox, across his hand-picked, non-representative samples are in no way a reflection of systemic deficiencies in the delivery of care to ADCRR inmates, particularly when compared to the totality of care provided.

**Mortality Reviews**

1039.  Mortality reviews from 254 patients spanning from May 2019 through July 2021 were provided for my review and analysis. Thirty-two mortality reviews from the set were excluded because they involved self-harm, overdose, or murder, leaving 222 for review with respect to the medical treatment provided. At the outset, I will note that there were a number of mortality reviews in which the reviewer(s) concluded that the death was preventable. In each of those instances, I concur with that conclusion. However, preventable deaths and sub-optimal patient care are certainly not unique to ADCRR and are found in the community, the rates of which are uncertain due to under reporting. In fact, the third leading cause of death in the United States is medical error.[8] In conducting my review,

---

[7] Not all HNRs require appointments (e.g., requests for medication refills, medical record copies, etc.), and some inmates submit multiple HNRs that result in a single appointment. The above appointment figures are only for HNR-generated visits and do not include other types of visits, including chronic care, IPC rounding, follow-up visits, etc.

[8] Study Suggests Medical Errors Now Third Leading Cause of Death in the U.S., available                                                                                                     at

however, I was not only concerned with the details of the individual cases documented but also with the process itself and the outcomes generated from it – i.e., the findings associated with the reviews and how those findings are used to drive improvements. This is because the purpose of the mortality review process is to uncover areas for improvement and to funnel that information to those who can act upon it.

1040.  My review of the 222 mortality reviews revealed some variability in both the quality and specificity of the findings over time. It appears that the more recent mortality reviews, as a whole, contain more actionable findings than earlier reviews. However, I believe there remains some room for improvement in terms of consistently identifying and articulating actionable findings. The other area for improvement I would point out relates to the timing of these reviews in relationship to the actual date of death. In my conversation with Dr. Phillips, he indicated that he was aware of both of these issues and is currently in the process of revamping the entire mortality review process. The goal is to make the process more expeditious and provide more timely feedback to the facility staff, as well as to increase the usefulness of the findings. Some of these changes are apparent in the more recent reviews, but I would encourage them to continue their efforts to more fully realize the benefits of the process.

---

https://www.hopkinsmedicine.org/news/media/releases/study_suggests_medical_errors_now_third_leading_cause_of_death_in_the_us (retrieved October 22, 2021).

1041.  Related to mortality reviews, another important measure of the functioning of a prison system's healthcare delivery system is its mortality rate, which also provides for comparisons across systems. The below charts utilizing the most recent available statistics from the U.S. Bureau of Justice show that Arizona's prison mortality rate compares favorably to the other states with the largest prison populations.





1

**Expert Opinions of Dr. Wilcox**

2     1042.  I have reviewed the expert report submitted by Dr. Wilcox on October 9,

3     2021, along with the supplement he issued on October 18, 2021, and I find it troubling that

4     he attempts to make sweeping conclusions about the systemic delivery of healthcare in

5     ADCRR on the basis of anecdotal instances of care that he finds deficient. I consulted with

6     epidemiology expert Dr. Baillargeon[9] on Dr. Wilcox's methodology as set forth in his

7     October 9, 2021 report and his decision not to review a random sample of patients "because

8     when evaluating a healthcare delivery system, it is generally not as helpful to examine care

9     for healthy people as it is to look at the treatment of sick people, particularly those with

10    complex or chronic conditions that require coordination, communication, and judgment."

11    Wilcox at 10.

12    1043.  Dr. Baillargeon responded as follows:

13    To conduct a rigorous and representative analysis of the
      ADCRR health care system, it is critically important to select a
14    random and representative sample of all inmates who received
      health care over the period of interest. At a minimum, I would
15    recommend examining a representative sample of a subset of
      inmates with known health conditions, such as chronic
16    conditions. Focusing exclusively on inmates who died or who
      voiced complaints about their care while in custody would
17    likely result in a biased assessment and would substantially
      limit one's ability to make any generalizable inferences about
18    the healthcare received by the entire ADCRR population.

19    1044.  Reviewing a randomly drawn sample of chronic care patients would have

20    permitted Dr. Wilcox to examine the delivery of healthcare for these conditions and make

21    inferences about the population as a whole – indeed, that is exactly what I did in my review

22    for this report. Instead, Dr. Wilcox chose to focus on a non-randomly drawn subset of

23    inmates who either died in custody or submitted complaints about their medical care to

24    Plaintiffs' counsel. It is not surprising, then, that he was able to identify instances of

25    allegedly deficient care.

26    1045.  Unfortunately, the highly compressed timeframe of expert discovery in this

27    _____

28    [9] For Dr. Baillargeon's qualifications and full opinions, see Exhibit 3.

case did not permit me to review the individual files of the inmates cited in Dr. Wilcox's report. I feel compelled, however, to comment on the case of ████████ which Dr. Wilcox used as an example of providers providing inadequate care.  I am quite familiar with Mr. ████████ care, having previously prepared a declaration in this case dated September 25, 2020 in which I outlined my review of his records in response to an August 2020 letter from the Prison Law Office.

1046.  In preparation of that declaration, I reviewed the care of Mr. ████████ available in eOMIS from July 15, 2013 through September 25, 2020. I also spoke with Centurion leadership and administrative staff, including Dr. John May, Dr. Johnny Wu, the Florence Facility Health Administrator, and Centurion's Regional Director for CQI, and Mr. ████████ treating providers, including Dr. Gilbreath and NP Stockton, regarding his care.

1047.  While Dr. Wilcox insinuates in his report that Mr. ████████ penis had to be amputated because he did not receive accommodations for his disability, his medical records tell a very different story.

1048.  Mr. ████████ is a 43-year-old male with hypertension and a history of a gunshot wound to the thoracic spine (T-11) in 2011 with subsequent lower extremity paralysis and bladder dysfunction. Over the period of my review, Mr. ████████ was evaluated over 300 times by medical and mental health providers and had thousands of nursing encounters.

1049.  He has intermittently refused evaluations from nursing, physician and mid-level practitioners, specialist physicians, hospital care, medications, and treatments. The medical record is replete with numerous examples of Mr. ████████ insistence that care be provided to his specifications dating back to 2014.

1050.  The following excerpts taken from eOMIS accurately reflect Mr. ████████ attitude and behavior towards the clinical recommendations and requests from ADCRR's healthcare vendor:

**8/26/2014**
- Discussed with patient importance of following treatment protocols outlined.

- Specifically:
  1) need for offloading sacrum and turning frequently. Pt indicated understanding
  2) need for antibiotics for infected wound. Pt indicated understanding
  3) pain management. Pt notified that he would be required to take his antibiotic prior to receiving any narcotics. He was told that he can no longer pick and choose which medications he would take. He has the right to refuse treatment, but it would mean he cannot choose only to receive pain medications for a wound he is refusing to take antibiotics for or leave a wound vac for. Pt indicated understanding.

- Discussion was observed by the on-duty nursing staff. - Dr. Johnson

**9/16/2014**
- follow-up note

- Pt has been extremely manipulative and refuses all care. He is demanding the return of his Clinitron bed. The recommendation from Dr. Lipan is for a Clinitron bed as well. I do not believe that the patient's wounds will adequately heal until he follows the recommendations of a wound vac and antibiotic therapy along with frequent turning to off-load his wounds no matter what type of bed he is in. This patient has a history of refusing to be turned when in the Clinitron bed due to personal preference and comfort and he refuses to leave the wound vac in place. We have tried 3 different types of wound vacs in order to obtain Mr. ▬▬▬▬▬ compliance, but he has removed all of them repeatedly.

- Please re-order a Clinitron bed for this patient and attempt to initiate a 2 hour turning except at night. - Dr. Johnson

**4/10/2015**
- the foley catheter has come out.

- Time Stamp: 10 April 2015 13:16:07 --- User: Jeffrey Sharp (SHAJE01)
  added hx: "this happened to me before. I don't want a suprapubic cath. Just give me a condom cath and it will heal by itself I can pee now as it is."

- IM refusing to go to the hospital. Dr. Ripsin says he can't refuse - send him.

- Now the pt has a penis that is splayed open ventrally and the foley cath has come out.

- IM refuses hosp care and suprapubic cath. told pt he has to go to the hospital, listen to urologist tell him what is appropriate care (he can tell the urologist his story) and go from there.

- direct admit to MV hosp for suprapubic cath and urology management.
  IM refuses to go. discussed w Dr. Johnson and Dr. Ripsin again. IM cannot refuse to go to the hospital. sending via DOC transport for hosp admit and urology eval. - Dr. Sharp

**4/14/2015**
- Return from hospital

- as a post script, it should be noted that this pt hid this condition from us for some weeks because he did not want to go back to IPC.  even when the penile issue was discovered by me, he wanted no tx except a condom catheter. he refused to go to the hospital, go in an ambulance, or go to IPC....until...he was told he could not refuse housing and was being sent to the hospital anyway. He was told he could refuse care there. He said he had had this condition previously and that it resolved spontaneously with a condom catheter. Doubting that was true I sent him to the hospital. - Dr. Sharp

**1/17/2017**
- Inmate presents to discuss his pain medications.  Referencing last note, because at that time he refused to have both his tramadol and gabapentin levels checked, I DC'd the medications.  I'm now offering to have him try other pain medications, yet he does not want to; he wants to go back on the tramadol and gabapentin.  I tried to convince him to at least try other pain medications, but he refused.  The meeting then ended.  - PA Denehy

**8/24/2017**
- Pt reports wound to his buttocks healed around April or May of this year and no longer needs duoderm or wound care. Pt is asking about new chair and noted he got his last wheelchair in April or May of this year. He states that he wants one that reclines more. Pt also states that he would like a rojo cushion to prevent further skin issues. States this was not a concern previously as he was changing positions frequently but now that he works, he sits more and does not want another wound. Pt also wants to talk about his medications. He states Pamelor does not help and would like T4's or baclofen started. Noted pt has not been on these medications in quite a while and reviewed purpose of TCS's, SSRI's in chronic pain management. Pt is agreeable to trying alternate pain medication. - Burns, NP

**12/22/2017**
- Pt presents to "POST D/C FROM IPC - F/U WOUND CARE ON BUTTOX" Initially, pt wanted to refuse today's PL visit. Reports he does not want to be seen by medical stating medical does not provide medication for his pain. Pt requesting T3. States his wound is healed and does not need anything from

medical at this time. Pt eventually agrees to be seen and examined by provider. Pt reports R. leg spasm. - PA Igwe

**7/2/2018**
- "C/O ABDOMINAL PAIN" Pt states "you guys don't do anything for me. You took me off my gabapentin and tramadol 2 yrs ago; you are giving me psych meds but I do not want to take psych medications. I requested Xrays to see if the bullets in my body are now on the surface. My doctor had told me to do Xrays to see if the bullets can be removed by surgery. I do not want any medications. You guys have other people on gabapentin, but you will not give me gabapentin. I am already in a lawsuit against Corizon and my lawyer said there is no reason why I should not be given gabapentin. You guys do not do anything for me".

- Pt reports ongoing L. sided abdominal pain radiating to his R. abdomen. Pain at 9/10 worse at night at 10/10. Constant associated with sharp back upper pain. Reports H/O gunshot wound approx. 7 yrs ago, with 5 retained bullets on back abdomen and chest areas. Pt requesting back and chest Xray - states he was told by a doctor in 2011 to find out if the bullets have surfaced to a site where they could be removed. - NP Igwe

**7/2/2019**
- PATIENT SEE TODAY 7/02/19 AT 12:10 ROUND.

- Sheltered housing visit/round. Patient was seen but not fully evaluated. Patient awake alert and to his own ability. Patient refused to be evaluated. Per nursing staff patient is refusing wound care. Patient not in any acute distress at this time. - NP Eze

1051. These examples accurately reflect Mr. ▇▇▇▇ consistent efforts to undermine his own healthcare outcomes by refusing to participate in his care plan. He holds himself and the healthcare team hostage to his particular care preferences.

1052. While it is stating the obvious, it is difficult to provide care when an individual repeatedly refuses the care. Mr. ▇▇▇▇ health care team has recruited mental health services on numerous occasions to assist with Mr. ▇▇▇▇ participation in his care plan, to no avail.

1053. Mr. ▇▇▇▇ has been a challenging patient for many years, and the medical record repeatedly documents Mr. ▇▇▇▇ refusals of evaluations, medications, wound care, and other treatments from on-site nursing staff and providers, offsite specialists, and hospital-based providers. In fact, there are 113 refusals for wound care and nursing

assessments between July 2019 and the end of December 2019 alone.

1054. Mr. ████ is an extremely challenging patient who puts his own life at risk in efforts to ensure treatment as he believes it should be administered.

1055. Mr. ████ unquestionably experienced an unfortunate outcome, but it cannot be blamed on medical or custody staff, particularly when he himself refused care on so many occasions.

1056. I have not seen anything in the recent records to change my earlier opinions as to his treatment, and I stand by my conclusion in my declaration that the care provided to him met the standard of care.

1057. More recently, during an expert tour on September 8th of this year, Dr. Wilcox requested that nursing staff perform a urinalysis of Mr. ████ who has a chronic indwelling suprapubic catheter, based on the appearance of the urine in his collection bag. In his report, Dr. Wilcox claims that Mr. ████ urinalysis showed infection but that he was not provided an antibiotic to treat the infection until September 21. Beyond the troubling concern that Dr. Wilcox was attempting to direct patient care during a site visit, I also question his conclusions.

1058. Asymptomatic bacteriuria exists in all chronically catheterized patients. A diagnosis of a UTI in a catheterized patient is made when the patient has signs and symptoms that are consistent with a UTI or a systemic infection that is otherwise unexplained. Mr. ████ had no signs or symptoms of a UTI at the time that Dr. Wilcox declared he had one based solely on the appearance of the urine in the collection bag. The appearance or smell of the urine should not be used to diagnose a UTI when found in isolation. Pyuria (elevated white blood cell count, which leads to cloudy urine or pus in the urine) is frequently found in catheterized patients with bacteriuria, whether they have symptoms or not, and odorous or cloudy urine has not been demonstrated to be indicative of either bacteriuria or UTI. If Dr. Wilcox is going to direct care for a patient, he should, at the very least, brush up on the literature. The concept of "asymptomatic bacteriuria" or "colonization" in a catheterized patient is not new.

1059.  When this patient was seen on September 21, 2021 by the unit provider, it is documented that he reported chills and "kidney pain".  However, he had no fever or other objective signs of an infection and likely should not have been treated for a urinary tract infection.  Dr. Wilcox, himself, may have been the cause of the decision to treat this patient, who likely should not have had a urinalysis done in the first place, since he was not symptomatic.

1060.  When a patient with a chronic indwelling catheter actually does have a symptomatic UTI, it is important to get a urine culture to guide therapy.  In this case, the most recent culture that had been done grew a bacteria that is sensitive to ceftriaxone, which was the antibiotic given to Mr. ████████  However, it does not appear that Mr. ████████ should have been given antibiotics at all.

1061.  I also feel compelled to comment on the substance of Dr. Wilcox's other claims that can be addressed without requiring review of specific medical records.

1062.  Dr. Wilcox categorically asserts, based only on a handful of instances cited in his report, that nurses are acting outside the scope of their licenses. I have not found that to be the case in my review of the records or interviews with facility leadership or regional leadership for this contract. The nurses and providers I interviewed felt comfortable with the supervision available, and I believe the ratio of providers to nurses in the ADCRR system allows for adequate supervision.

1063.  Dr. Wilcox also makes the blanket claim that mid-level providers do not have the training or experience to handle complicated cases. This statement is not true across the board. Mid-level providers, and even doctors, have varying levels of training and experience in any system. The question that should be asked is, does the mid-level provider have the understanding of where their skillsets end, and do they have the resources to ask for help when needed? The first part of this question will necessarily depend on the individual mid-level provider involved, but the second part can be answered in the affirmative based on my review of this system.

1064.  Each complex has an assigned physician-level SMD who can be consulted,

and Centurion's regional leadership, including Dr. Orm is also available. The RubiconMD service made available by Centurion allows for consultations with specialists without the need for UM approval, giving a mid-level provider the ability to seek out advice from an experienced provider whose training exceeds that of a primary care provider. In my decades of experience working in a correctional setting, chronic care patients are routinely, and effectively, managed by mid-levels providers, who are also capable of diagnosing new problems.

1065.  Dr. Wilcox asserts that nurses do not have adequate clinic space to treat patients, but I did not hear that as a complaint from anyone on my tours, and I met with facility management teams and staff at each of the 10 ADCRR complexes. I was told on one of my tours that Dr. Wilcox had asked to have pictures taken of two clinic rooms that are primarily used for storage and only used for patient care on rare occasions. Dr. Wilcox was informed of this, yet apparently included the photographs in his report.

1066.  Dr. Wilcox finds fault with x-ray films not being available for viewing in eOMIS. I believe this is likely a personal preference of his based on years of reviewing paper medical charts, where the films are typically included. With the advent of EHRs, films are now typically stored separately from the medical record, and viewing them is a process. In my experience, most doctors prefer to see the radiology report, not the films. Given that x-ray films can typically be read within two hours on a STAT basis within the Centurion system, I don't see this is an issue.

1067.  Dr. Wilcox claims that the Centurion formulary lacks appropriate options for pain medication because it includes only Tylenol #3 and morphine but not Norco[10] or an equivalent medication. I disagree, and in fact, our formulary in the UTMB system includes the same two options as Centurion's. We limit both the number of opioids on our formulary and the duration of use. This is consistent with the nationwide effort to implement opioid stewardship programs to help providers to safely initiate opioid prescribing, set patient

---

[10] Norco combines an opioid pain reliever with a non-opioid pain reliever.

1   expectations around pain management, and balance the risks and harms associated with

2   opioid use and abuse. In my opinion, Centurion's formulary offers reasonable options for

3   pain relief. As noted above in my interviews with providers during my site tours, the process

4   for obtaining non-formulary approval is not burdensome and can be used in those instances

5   where in the provider's medical judgment, another option is clinically indicated.

6          1068.  Dr. Wilcox highlights several examples of providers failing to offer health

7   screenings for cervical cancer, colorectal cancer, and prostate cancer. I also encountered

8   some examples of that in my random sample of chronic care patients. In talking to Dr.

9   Phillips and Dr. Orm, they are revising guidelines for age-appropriate screenings and are

10  prioritizing provider education on the importance of preventive screenings. Implementing

11  a new EHR as is required in the new RFP will help tremendously in this regard, as it will

12  have appropriate safeguards to alert providers when such screenings are due.

13         1069.  Dr. Wilcox also points to some examples where providers did not timely

14  review and act upon recommendations from outside specialists or hospitals. Pointing out

15  anecdotes is not a valid conclusion on an entire process. In my interviews, the providers and

16  nurses all recognized the importance of reviewing hospital and specialty consult records,

17  but the timeliness of this review is highly dependent on when the records are available. The

18  records have to be scanned into the file after they come in, and eOMIS does not have the

19  same notification capabilities as many other EHRs that would alert providers or nursing

20  staff that the records have been received. Again, this is an issue that I would expect to be

21  markedly improved with the implementation of the new EHR called for under the current

22  RFP.

23                          **Expert Opinions of Robert Joy**

24         1070.  I have also reviewed the October 9, 2021 expert report of Robert Joy. First

25  and foremost, I question Mr. Joy's methodology in that he relies almost exclusively on

26  interviews with Plaintiffs' other experts and non-corrections sources (e.g., nursing homes

27  and the Veteran's Administration) to develop his staffing model. He also explicitly states

28  that while he was provided data regarding the numbers of encounters performed by various

disciplines within the ADCRR system, he chose to entirely disregard that information in developing his model. Instead, he claims, without any support or data to validate his claims, that there are unmet needs for healthcare of various types. Remarkably, he then proceeds to create his own estimates of the amounts and types of care needed in the system, all without conducting any tours of the facilities or any interviews with staff.

1071. Second, I question many of the assumptions underlying his analysis. For example, Mr. Joy assumes that a provider can see only 10 to 12 patients a day. In my lengthy experience in corrections, I can tell you that a provider who maintained such a low output would likely experience remedial action. The norm in corrections is for a provider to see between 18 and 20 patients per shift. Based on that level of output, Centurion has the appropriate staffing levels to meet the needs of the ADCRR population. This was confirmed in my interviews with staff, who did not feel that additional staff was needed beyond contract levels. Mr. Joy also incorrectly claims that the ratio of mid-level providers to physicians at ADCRR is 6:1. In speaking with Tom Dolan, I understand that the ratio as set out in the new RFP is actually 2:1, which is better than the community standard he cites for Arizona.

1072. Mr. Joy also assumes that there are unmet needs for certain services. For example, he claims that 100% of the ADCRR inmate population is in need of substance abuse disorder education, 62% of the population is in need of treatment for substance abuse disorder, and 21% of the population is specifically in need of medication-assisted treatment for substance abuse disorder. It is my understanding that substance abuse disorder treatment has never been raised as an issue in this case until now, and I am unaware of any other prison systems that provide medication-assisted treatment for substance abuse on nearly that scale.

1073. Finally, Mr. Joy compares ADCRR staffing levels to 2011 data from the CDC's National Center for Health Statistics and the Bureau of Justice Statistics to establish what he claims is an appropriate "benchmark." Besides the problem of using "comparative" data from a decade ago, Mr. Joy also sets the "benchmark" at the 75th percentile to justify

1  the outputs of his staffing model. I am unaware of any reason to set the benchmark at that

2  level, and he does not offer any support for doing so.

3  **Conclusion**

4  1074.  The ADCRR has the necessary staff and facilities to deliver healthcare that

5  meets or exceeds the community standard of care. Currently nurse staffing is a challenge at

6  several of the facilities; however, it is not significantly different than what exists in the

7  healthcare community at large. Centurion is applying appropriate recruiting measures such

8  as sign-on bonuses and shift differentials, to ameliorate these local staffing challenges.

9  1075. Healthcare starts with the people who are responsible for providing the

10  services. In corrections, the best barometer for how a facility medical department operates

11  is to observe the facility management team.   My facility interviews revealed that the

12  healthcare management teams were comprised of exceptionally dedicated people who were

13  committed to doing the absolute best for their patients. Each member was passionate about

14  ensuring that every patient received quality care. They were articulate on both the strengths

15  and weaknesses of their programs. They had a deep appreciation for what changes could be

16  made in the delivery system that would allow them the opportunity to provide their best

17  care.

18  1076.  Centurion is providing industry standard services in radiology, pharmacy, and

19  laboratory to support each facility. Centurion has added additional value-added programs

20  such as KRAMES for patient education, Rubicon for specialty care, and CareClix for

21  telemedicine access which further enhances ADCRR's ability to provide quality care.

22  Community subspecialty care availability, which had been challenged during the early

23  stages of the pandemic, has returned to more historic levels. The legislature's mandated

24  AHCCCS reimbursement rates do create an encumbrance for finding access to certain

25  specialists. Despite these impediments, Centurion has been providing substantially more

26  subspecialty care and Hepatitis C treatment than its predecessor.

27  1077. ADCRR, through its health provider, Centurion, is providing a level of

28  healthcare consistent with the community standard of care. Their current performance on

the objective HEDIS measures for HTN and diabetes surpass that provided by the major U.S. health plans. This is a remarkable achievement and is reflective of a health system operating efficiently and focused on best care for the patients. The random medical record review validated the HEDIS scores and the quality of care that was being provided. Additionally, the COVID-19 vaccination rates achieved within the ADRCC are admirable and reflect a health system that is working well, collaborating with security to achieve superior outcomes. Finally, the ADCRR's Hepatitis C treatment program has significantly increased the number of patients being treated.

1078. The current set of PMs and associated monitoring by the monitoring bureau appears to be an encumbrance to ADCRR's ability to provide best care. The oversight process has had the unintended consequence of creating two health systems: one delivering care to patients and the other measuring adherence to the PMs. The volume of healthcare staff's time spent on ensuring PM compliance was significant.

1079. Going forward, ADCRR should review all the PMs to ensure that each measure actually adds value and quality. The measuring of all PMs needs to be clearly defined and objective, preferentially through the use of data available in the EHR. Additionally, ADCRR needs to incorporate the use of HEDIS performance measures in its review of quality.

1080. The eOMIS medical record is not an innovative, contemporary EHR. The platform does not have the work flow efficiencies, logistical safeguards, and data reporting capabilities necessary to produce ADCRR's best care. Without exception, the facility management teams at every complex indicated that a new EHR or modernized eOMIS would drastically increase their ability to see more patients. I am pleased to see that the current RFP released by ADCRR for future healthcare services contains provisions for the selected healthcare provider to deploy a new medical record platform.

1081. The general sense of the medical record review was that care has been improving since the arrival of Centurion. I am confident that Centurion and ADCRR are working on revising the mortality review process to ensure timelier assessment and more

immediate action as necessary. This change in practice will have a significant positive impact going forward.

1082.  Overall, it is my opinion that ADCRR is delivering care that meets or exceeds the community standard. While I have identified some areas for improvement, most notably with eOMIS, PM reporting, and the mortality review process, I did not find any systemic deficiencies with the provision of health care to ADCRR inmates. Even in the areas where I have noted opportunities for improvement, it is clear that ADCRR recognizes the issues and has been working towards improving them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of December, 2021.


_____

Owen J. Murray