Exhibits to Declaration of Rita K. Lomio
in Support of Motion to Strike Portions of Dr. Owen Murray's Written Direct Testimony
(Doc. 4201)

| Exhibit | Description | Type of Record |
|---------|-------------|----------------|
| Ex. A | Expert Report of Dr. Owen Murray dated October 22, 2021 | **Under seal** |
| Ex. B | Excerpts from the Deposition of Dr. Owen Murray dated October 26, 2021 | **Public** |

# Exhibit A

## Filed Under Seal

# Exhibit B

# In The Matter Of:

*Parsons vs.*
*Shinn*

---

*Owen Joseph Murray, D.O., MBA*
*October 26, 2021*

---

*Glennie Reporting Services, LLC*
*1555 East Orangewood Avenue*
*Phoenix, Arizona  85020*
*602.266.6535 Office     877.266.6535 Toll Free*
*www.glennie-reporting.com   office@glennie-reporting.com*

Original File 102621 OM.txt

**Min-U-Script®**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; | ) Case No. |
| Stephen Swartz; Dustin Brislan; | ) CV12-00601-PHX-ROS |
| Sonia Rodriguez; Christina | ) |
| Verduzco; Jackie Thomas; Jeremy | ) |
| Smith; Robert Gamez; Maryanne | ) |
| Chisholm; Desiree Licci; Joseph | ) |
| Hefner; Joshua Polson; and | ) |
| Charlotte Wells, on behalf of | ) |
| themselves and all others | ) |
| similarly situated; and Arizona | ) |
| Center for Disability Law, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| David Shinn, Director, Arizona | ) |
| Department of Corrections, | ) |
| Rehabilitation and Reentry; and | ) |
| Larry Gann, Assistant Director, | ) |
| Medical Services Contract | ) |
| Monitoring Bureau, Arizona | ) |
| Department of Corrections, | ) |
| Rehabilitation and Reentry, in | ) |
| their official capacities, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

VIDEOCONFERENCE DEPOSITION OF
OWEN JOSEPH MURRAY, D.O., MBA

October 26, 2021
8:00 a.m.
Chandler, Arizona

Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

Prepared by:
602.266.6535                    Carolyn T. Sullivan, RPR
www.glennie-reporting.com       Arizona CR No. 50528

2

1                          **I N D E X**

2   WITNESS                                    PAGE

3   OWEN JOSEPH MURRAY, D.O., MBA

4          Examination by Mr. Specter                4

5

6

7

8

9

10

11                    INDEX TO EXHIBITS

12   No.          Description                    Page

13               (No exhibits were marked.)

14

15

16

17

18

19

20

21

22

23

24

25

3

1          DEPOSITION OF OWEN JOSEPH MURRAY, D.O., MBA,

2   was taken on October 26, 2021, commencing at 8:00 a.m.,

3   at STRUCK LOVE BOJANOWSKI & ACEDO, PLC, 3100 West Ray

4   Road, Suite 300, Chandler, Arizona, before CAROLYN T.

5   SULLIVAN, a Certified Reporter, Certificate No. 50528,

6   for the State of Arizona, attending via videoconference.

7   The witness was present via videoconference, and all

8   counsel appeared via videoconference.

9

10   APPEARANCES:

11   For Plaintiffs:

12          PRISON LAW OFFICE
            Donald Specter, Esq.
13          Executive Director
            1917 Fifth Street
14          Berkeley, California 94710
            510-280-2704
15          dspecter@prisonlaw.com

16

17   For Defendants:

18          STRUCK LOVE BOJANOWSKI & ACEDO, PLC
            Timothy Bojanowski, Esq.
19          3100 West Ray Road
            Suite 300
20          Chandler, Arizona 85226
            480-420-1600
21          tbojanowski@strucklove.com

22

23

24

25

4

1               OWEN JOSEPH MURRAY, D.O., MBA,

2    called as a witness herein, having been first duly sworn

3    by the Certified Reporter to speak the whole truth and

4    nothing but the truth, was examined and testified as

5    follows:

6

7                          EXAMINATION

8    BY MR. SPECTER:

9        Q.    Good morning, Dr. Murray.  My name's Don

10   Specter.  I'm one of the lawyers for the plaintiffs in

11   this case.

12             Would you please state your name and spell

13   your last name for the record, please.

14       A.    Sure.  Owen is the first.  Joseph is the

15   middle.  Murray, M-u-r-r-a-y.

16       Q.    Thank you.

17             Okay.  So, Mr. -- Dr. Murray, you've been

18   deposed, many times before, correct?

19       A.    Yes, sir.

20       Q.    So you're familiar with the rules of

21   depositions?

22       A.    Correct.

23       Q.    So besides Tim, is there anybody else in the

24   room with you?

25       A.    No, sir.

7

1    A.    Correct.

2    Q.    Is there anything else besides the ones listed

3 in that -- in an appendix to your report that you have

4 relied on?

5    A.    I believe that that list is correct.

6    Q.    The report itself, did you write the entire

7 report?

8    A.    I wrote the majority of the report.  A lot of

9 the medical record review was written by my three

10 colleagues.

11    Q.    Okay.  So can you describe how that medical

12 record review occurred, please.

13    A.    Sure.  We were provided a list of chronic care

14 patients by facility, and we went through and --

15 accompanying the list was a number of chronic care

16 diagnoses we had.  So we stratified those by the number

17 of diagnoses and then went through and picked two

18 patients out of each category, starting with the patients

19 who had the most chronic care diagnoses, and did a random

20 selection of those two and continued down the list until

21 we had ten medical records to review.

22    Q.    I see.  And who reviewed the medical records?

23    A.    Primarily, Dr. Leonardson, but Erin Freeman

24 and John Pulvino also assisted on a couple of facilities.

25    Q.    And when they reviewed a record, did they

8

1    write a summary of your findings?

2         A.    Correct.

3         Q.    And did you review any medical records?

4         A.    I reviewed several medical records that

5    Dr. Leonardson pulled out, but I did not review any

6    medical records specifically related to the chart review

7    piece.

8         Q.    Okay.  So all of the descriptions in that

9    medical review section of your report were written by

10   Dr. Leonardson or one of the other reviewers; is that

11   right?

12        A.    Correct.

13        Q.    And did you do any spot-checking of their

14   review?  Did you look at the medical records yourself?

15        A.    I reviewed all of the reviews with

16   Dr. Leonardson, and she reviewed all of the reviews with

17   the other reviewers.

18        Q.    My question is, did you go into the medical

19   record itself to determine whether the summary of the

20   review was accurate?

21        A.    As I said, I went through a couple that

22   Dr. Leonardson pulled out for me to look at several

23   issues that she wanted to make sure I understood, but I

24   did not go back and re-review the medical records they

25   reviewed.

Owen Joseph Murray, D.O., MBA - 10/26/2021

9

1      Q.    Okay.  So when you said "several," how many is

2  "several"?

3      A.    Four or five.

4      Q.    Okay.  And you also, in order to prepare your

5  report, you toured the ten facilities; is that correct?

6      A.    That is correct.

7      Q.    And how many days did you spend touring?

8      A.    Seven.

9      Q.    Okay.  And how long would you spend at each

10  institution, approximately?

11      A.    I'd say on average, about three hours.

12      Q.    Okay.  And what did you do there?

13      A.    I met with the facility management teams,

14  toured the medical facility, and then sat down and went

15  through an interview process with the management teams.

16      Q.    And were you accompanied by any attorneys on

17  these trips?

18      A.    Mr. Bojanowski was present for the first five

19  days, and then Mr. Ray was present for the last two days.

20      Q.    So when you met with the management team, was

21  Mr. Bojanowski present?

22      A.    No.  No one was present, not an attorney nor

23  someone from Centurion, other than on the last few days,

24  the Centurion attorney -- I don't know the name -- was --

25  listened by phone.

Owen Joseph Murray, D.O., MBA - 10/26/2021

92

```
 1              (A recess was taken from 10:48 a.m. to
 2     10:59 a.m.)
 3        Q.    BY MR. SPECTER:  Dr. Murray, now we're going
 4     to talk a little bit -- or maybe a lot -- about the
 5     medical record review, which takes up the majority of
 6     your report.
 7        A.    Okay.
 8        Q.    So, as I understand it, 80 charts were
 9     reviewed in this process, correct?
10        A.    Correct.
11        Q.    And the majority were reviewed by
12     Dr. Leonardson, right?
13        A.    Correct.
14        Q.    And then you had a couple other people,
15     Pulvino and Freeman.  Do you know how many charts they
16     reviewed, respectively?
17        A.    Mr. Pulvino did ten, and I think Erin might
18     have done ten and possibly a few more.
19        Q.    And then did Dr. Leonardson review their
20     findings or --
21        A.    Correct.
22        Q.    Do you know if she actually went into the
23     record to check what they did or she just talked to them
24     about what they found or reviewed their write-up?
25        A.    She reviewed their write-up and was available
```

Owen Joseph Murray, D.O., MBA - 10/26/2021

93

1   to them if they had questions and had discussions with

2   them early on before about the scale that they were going

3   to use in reviewing the care.

4        Q.    Okay.  And if I understand you correctly, you

5   didn't review any of the findings in this part of the

6   report; is that correct?

7        A.    That's correct.

8        Q.    And except for a couple cases which you

9   reviewed for other reasons, you didn't review the records

10  yourself, correct?

11       A.    That is correct.

12       Q.    And your review analyzed chronic and episodic

13  care and documentation of that care, correct?

14       A.    Those three aspects, correct.

15       Q.    And the review focused, quote, more

16  specifically on the provider care, correct?

17       A.    That is correct.

18       Q.    Okay.  So that means that the focus wasn't on

19  other aspects of the care, such as sick calls,

20  hospitalizations, all those other things that go into

21  making up a health care system?

22       A.    Well, it wasn't the focus, but it was

23  reviewed.

24       Q.    But you didn't specifically analyze those

25  subjects, right?

1    Q.    BY MR. SPECTER:  Okay.  And what about the

2  rating for episodic -- yes.  The rating for episodic

3  care, that was "excellent," yet they didn't provide for

4  his inhalers, reorder his inhalers.  That was rated as

5  "excellent."  Do you agree with that?

6    A.    Well, the episodic care isn't the chronic

7  care.

8    Q.    So do you agree with the rating based on what

9  you've read today?

10   A.    As I said, it doesn't sound like the patient

11  had a great number of episodic care requests, as noted in

12  the review, so it was rated "excellent."

13   Q.    Okay.  Let's turn to page 80 to 81.

14         Okay.  This is Patient No. 3 for Winslow.  Do

15  you see it, Doctor?

16   A.    Yes, sir.

17   Q.    Okay.  Thank you.

18         Okay.  This is a 55-year-old patient who was

19  prescribed NSAIDs.  He had chronic kidney disease,

20  correct?

21   A.    Correct.

22   Q.    And a GI bleed, correct?

23   A.    Correct.  You're on page 82?

24   Q.    Pardon me?

25   A.    You're on page 82 now?

Owen Joseph Murray, D.O., MBA - 10/26/2021

127

1     Q.    Yes.

2           And it says no rectal exam was done at the

3     time the GI bleeding was reported.  Do you see that?

4     A.    I see that.

5     Q.    And is this one of the records that you

6     reviewed?

7     A.    No.

8     Q.    What's the purpose of a rectal exam after a GI

9     bleed?

10    A.    Well, it's important to establish the source

11    of the GI bleed, upper or lower.

12    Q.    I see.  Okay.

13          And you rated the care -- quality of chronic

14    care as "good," even though they prescribed NSAIDs even

15    when the patient had chronic kidney disease.  Do you see

16    that?

17    A.    Yes.

18    Q.    Do you agree with that review?

19    A.    I think that particular thing was an oversight

20    on the part of the provider.  And, again, it's a

21    subjective review.  They took that into consideration.

22    And, again, given his other chronic diseases that they

23    felt were managed appropriately, they felt "good" was

24    reflective of that care.

25    Q.    I'm asking if you felt "good" was reflective

Owen Joseph Murray, D.O., MBA - 10/26/2021

128

1  of that care.

2      A.    I didn't review this chart, so I don't have an

3  opinion.

4      Q.    And here again, it's the situation where they

5  might have taken care of some of his problems.  But I

6  think you said earlier in the definition that if you take

7  care of some of the problems but you don't take care of

8  all the problems, a patient could be at risk of harm.

9  And that seems to be the case in this case as well,

10  doesn't it?

11          MR. BOJANOWSKI:  Note an objection.

12          Go ahead.

13          THE WITNESS:  I don't know.  To the extent

14  that the NSAIDs created the GI bleeding -- in looking at

15  and reading the review, that seems like the issue at

16  heart, was the NSAIDs and the relationship to the

17  cirrhosis and CKD.

18      Q.    Right.  So the answer to my question is yes,

19  that's true?

20          MR. BOJANOWSKI:  Same objection.

21          Go ahead.

22          THE WITNESS:  Can you repeat the question

23  again.  I'm sorry.

24          THE COURT REPORTER:  Would you like it read

25  back?

Owen Joseph Murray, D.O., MBA - 10/26/2021

143

1    Q.    Not for ADCRR, though.

2    A.    Oh, no, no, no.

3    Q.    That's what I'm talking about.  Do you know

4  sample size?

5    A.    It's about 4,000 patients, hypertensive

6  patients.

7    Q.    Okay.  And what about for the chart -- or

8  table, chart, whatever it is, on page 143 where it's the

9  A1C comparison?

10    A.    I think that's just under 1,000 patients,

11  diabetic patients.

12    Q.    And do you know what percentage of diabetic

13  patients that is who are in custody in Arizona?

14    A.    Well, it would have been all of them that fit

15  the descriptor that we gave him.  So they had to be in

16  the system, and they had to have that diagnosis for at

17  least six months before they would be counted.  So it's a

18  smaller number than the total number of diabetics there.

19  But the way the HEDIS metric works -- in fact, actually,

20  the way the HEDIS metric works is, actually, you're

21  allowed -- you have to be under treatment for a year.  I

22  moved that back to six months just to be more

23  conservative.

24    Q.    Okay.  Let's just go to page 94.  This is

25  Patient No. 1 for Perryville.  Are you with me?

144

1      A.      I am.

2      Q.      This is a 64-year-old woman with diabetes and

3  eight other chronic illnesses, right?

4      A.      Yes.

5      Q.      And what is metformin?

6      A.      It's an oral medication to help lower your

7  blood glucose level.

8      Q.      It's for diabetics, right?

9      A.      Correct.

10     Q.      The metformin was -- if you see on the fourth

11  paragraph down, her metformin was discontinued on July

12  27th, 2021, by an LPN.  Therefore, she has not received

13  treatment for her diabetes in the past two months.  There

14  was no documentation of why this was done.

15             Do you see those?

16     A.      I do see it, yes.

17     Q.      Okay.  First question:  Should metformin or

18  any other diabetes medication be discontinued by an LPN?

19     A.      Not by an LPN, no.

20     Q.      So you would -- okay.  And it's a concern,

21  isn't it, that she didn't receive that medication

22  treatment for two months?

23             MR. BOJANOWSKI:  Note an objection.

24             Go ahead.

25             THE WITNESS:  Again, it gets back to the

145

1   problem with many illnesses, that it's difficult to find

2   the rationale for what's going on.  I would find it hard

3   to believe that an LPN can write an order and stop a

4   medication, but that's what the reviewer put in here.  To

5   the extent that the metformin -- given her A1C was 6 1/2,

6   I don't know whether they thought that, given her other

7   problems, that metformin should not be continued.

8           One of the things that Dr. Wilcox and I

9   definitely agree about is the note quality for some of

10  these patients really makes it difficult to figure out

11  what the thought process was for some of their clinical

12  decisions.

13      Q.   BY MR. SPECTER:  So you don't have an opinion

14  about the adequacy of care in this case because haven't

15  reviewed the medical record; is that right?

16          MR. BOJANOWSKI:  Same objection.

17          Go ahead.

18          THE WITNESS:  That's correct, right.

19      Q.   BY MR. SPECTER:  And it also says she's

20  receiving annual eye exams but has not had a urine

21  microalbumin or a urine albumin to creatine ratio since

22  2015.  What are those things?

23      A.   Those tests?  They're there to test the kidney

24  function.

25      Q.   And is it a concern that she hasn't had those

146

1    tests for six years?

2              MR. BOJANOWSKI:  Same objection.

3              Go ahead.

4              THE WITNESS:  As I said, I would be curious if

5    it has been done, and I would find it to be something

6    that should be done in this particular patient if it's

7    not.

8         Q.    BY MR. SPECTER:  If you turn the page, please.

9              So it says that -- if you look under

10   Documentation of Chronic Care --

11        A.    Yes.

12        Q.    -- it says hepatitis C was last addressed in

13   2019.

14             Well, before you go to that, did can you go up

15   a couple paragraphs.  Do you see it says she has a long

16   history of hepatitis C?  And then it says that hepatitis

17   C was last addressed in October of 2019.  There is also

18   no documentation of an annual physical in the EHR.

19             And the reviewer gave this documentation of

20   chronic care a rating of "good."  Do you agree with that?

21        A.    Well, I mean, I agree with the reviewer, what

22   they --

23        Q.    Okay.

24             And the quality of chronic care is listed as

25   "very good" even though it says she's past due for a

147

1  mammogram and has also not had a Pap smear since 2014.

2  Do you see that?

3        A.    I do see that, yes.

4        Q.    And you agree also with the reviewer's

5  description or rating that the quality of chronic care

6  was "very good"?

7        A.    I would agree.

8        Q.    Do you agree that the hepatitis C should have

9  been addressed between October 2019 and the present or

10 the time that your reviewer reviewed the medical record?

11            MR. BOJANOWSKI:  Note an objection.

12            Go ahead.

13            THE WITNESS:  As I said, without reviewing the

14 record myself, I don't have an opinion on that.

15       Q.    BY MR. SPECTER:  Okay.  Do you have an opinion

16 about whether there should have been documentation of an

17 annual physical in the EHR?

18            MR. BOJANOWSKI:  Same objection.

19            Go ahead.

20            THE WITNESS:  I mean, that is an issue that

21 we've noted.  It's hard to find if it's there.  We

22 struggle oftentimes to find it.

23       Q.    BY MR. SPECTER:  So when you can't find

24 something like that, is it your opinion that it was done,

25 but it was just not documented?

Owen Joseph Murray, D.O., MBA - 10/26/2021

148

1          MR. BOJANOWSKI:  Same objection.

2          Go ahead.

3          THE WITNESS:  My opinion is it's hard to tell

4   if it was done or done and filed in another part of the

5   record.  So --

6      Q.   BY MR. SPECTER:  But you didn't find it in

7   another part of the record.

8      A.   Yeah.  That's what I said.

9      Q.   So what makes you believe it was there?

10     A.    The fact that in talking with the medical

11  teams at the facility, they talked about the fact that

12  they were doing annual exams.  But as I said, we

13  struggled to find -- or not annual.  Physical exams.

14     Q.   So you basically took their word for it even

15  though you couldn't find any documentation in the record;

16  is that right?

17          MR. BOJANOWSKI:  Same objection.

18          Go ahead.

19          THE WITNESS:  All I'm saying is we couldn't

20  find them in the medical record.  So is it possible they

21  were done?  Yes, and we couldn't find them.  Is it

22  possible they weren't done?  Yes, that's possible too.

23     Q.   BY MR. SPECTER:  Is that how you -- in your

24  system, is that how you analyze patient care, when

25  something isn't in the record, that you kind of assume

149

1  that it might have been done?  Is that how you check on

2  the care of your providers and other clinicians?

3      A.    No.  I mean, our electronic health record is

4  much more sophisticated than eOMIS.  So it's much easier

5  for me to go and track in various sections of the chart

6  where those documents would and should be.  And if

7  they're not there, then I do have an issue with whether

8  or not it was done.

9          In eOMIS, I don't necessarily -- as I said, if

10 I can't find it, it wasn't done, but that doesn't mean it

11 wasn't done.  There are so many documents in three that

12 are so difficult to track and find that it could be in

13 there.

14     Q.    So what I'm hearing is eOMIS is so difficult

15 to use that you can't really review the adequacy of care

16 because you don't know whether something has been done or

17 not?

18         MR. BOJANOWSKI:  Same objection.

19         Go ahead.

20         THE WITNESS:  It is.  It creates that

21 challenge, yes.

22     Q.    BY MR. SPECTER:  Okay.  Do you even know, as

23 far as the mammogram, whether she received -- whether

24 Arizona's policy was followed about when a mammogram

25 should be conducted?

Owen Joseph Murray, D.O., MBA - 10/26/2021

150

```
 1              MR. BOJANOWSKI:  Same objection.
 2              Go ahead.
 3              THE WITNESS:  As I said, I don't have an
 4    opinion on that.
 5         Q.    BY MR. SPECTER:  Okay.  Let's go to page 98.
 6    We're talking about Patient No. 7.
 7         A.    Uh-huh.
 8         Q.    She's a 59-year-old woman, obviously, with
 9    chronic conditions, including type 2 diabetes,
10    hypertension, and alcoholic cirrhosis.
11              And you'll see that during -- on the fourth
12    paragraph, it says:  During routine evaluation, the
13    provider noted a heart murmur.  Do you see that too?
14         A.    I do.
15         Q.    And she saw a cardiologist, who recommended an
16    echocardiogram and a treadmill stress test.  Do you see
17    that?
18         A.    Yes.
19         Q.    And there's no documentation that these
20    recommendations have been acted upon.  Do you see that?
21         A.    I do.
22         Q.    And why is it necessary -- why should somebody
23    who has a heart murmur have an echocardiogram and a
24    treadmill stress test?
25         A.    To assess what actually is causing that murmur
```

151

1   and to see if that murmur is impacting their heart

2   function and exercise tolerance.

3      Q.   So the risk of harm here is relatively high,

4   isn't it?

5          MR. BOJANOWSKI:  Same objection.

6          Go ahead.

7          THE WITNESS:  I mean, it's possible.

8      Q.   BY MR. SPECTER:  Well, you don't want to spend

9   money doing things that are just possible, right?  This

10  costs money to do these things just because it's possible

11  or because it's indicated because there's a serious risk

12  of potential harm to the patient if they don't diagnose

13  the condition properly.

14         MR. BOJANOWSKI:  Same objection.

15         Go ahead.

16         THE WITNESS:  As I said -- well, again, the

17  cardiologist recommended echocardiogram and a treadmill

18  stress test.  So those are two tests to continue the

19  workup for her heart murmur.  To the extent, as I said,

20  not knowing this patient specifically, to know what her

21  ultimate cardiovascular risk is and risk of death, as I

22  said, I don't know that from this review.

23      Q.   BY MR. SPECTER:  So you didn't review her file

24  either, correct?

25      A.   Correct.

152

1    Q.    So you have no opinion about the adequacy of

2    the care she received, correct?

3    A.    Well, regarding her chronic care, as I said,

4    that's in there.

5    Q.    Okay.  So the quality of chronic care, you

6    agree with the reviewer's rating of "good" for this

7    patient?

8    A.    Yeah.  In relation to her diabetes and

9    hypertension, yes.

10   Q.    What about her heart murmur?

11   A.    From the standpoint of what happened to those

12   recommendations and if they were acted upon, again, that

13   would take further review and discussion with the

14   provider about what happened.

15   Q.    Well, did the reviewer have a discussion with

16   the provider about what rating they should give them?

17          MR. BOJANOWSKI:  Same objection.

18          Go ahead.

19          THE WITNESS:  No.

20   Q.    BY MR. SPECTER:  So how could they give it a

21   rating if they didn't know all the facts?

22          MR. BOJANOWSKI:  Same objection.

23          Go ahead.

24          THE WITNESS:  Again, as I said, these reviews

25   were to validate the HEDIS results.  So that's really

1    what we're looking for.  We were comprehensive in what we

2    looked at and pointed out other care issues that we came

3    across for the sake of completeness and fairness.

4               So, as I said, the documentation of the

5    chronic care and the quality of the chronic care do

6    relate to the things that -- the diseases that we

7    identified as true chronic care.  The heart murmur and

8    other things we pointed out, these were deficiencies.

9    And as we said, we noted them and put them in our review.

10        Q.    BY MR. SPECTER:  So I didn't see in your

11   report, maybe you could point me to it, that this review

12   was done to validate the HEDIS values.  Where in your

13   report do you say that?

14        A.    Honestly, I don't remember if I did say that.

15        Q.    You just said it a second ago.

16        A.    No.  You asked me if it was in the report.  I

17   don't know if I actually put it in the report, but that

18   was the intent.

19        Q.    So all this other stuff is just a byproduct of

20   the HEDIS review; is that right?

21        A.    Correct.  It is -- no.  It was an attempt, not

22   a byproduct.  It was a review of the records and to look

23   at and validate what we were seeing in the HEDIS results

24   but also to review the care that's going on and to see if

25   we found issues or concerns with the care that we needed

154

1    to bring forward, and that's what we did.

2         Q.    Okay.  And so the HEDIS results for, like,

3    blood pressure and A1C, for example, those are numerical

4    values, right?

5         A.    Yes.

6         Q.    Well, I didn't see in all of these cases that

7    hardly any of them had numerical values for both of those

8    conditions.

9         A.    I'm not sure I understand your question.

10        Q.    Well, if you're trying to validate whether

11   somebody's A1C is controlled, you would need to look at

12   all the different cases and see what their A1C is.  And

13   for your purposes of validating these charts, then you

14   would put a notation or some information on each chart

15   about what their A1C is, and then you would be able to

16   determine whether the HEDIS measurement and comparison

17   was valid, right?

18        A.    Well --

19              MR. BOJANOWSKI:  Note an objection.

20              Go ahead.

21              THE WITNESS:  Well, we look at No. -- Case 7.

22   Actually, it is there, so, yes, they did look at some.

23              But the HEDIS measurements are what they are.

24   They're looking at objective metrics.  We were looking to

25   make sure that what was seen in the medical record was

155

1   consistent with that.  We weren't going out and pulling

2   out blood pressures.  That was already done through the

3   HEDIS measurements and both for blood pressure and for

4   hemoglobin A1C.  We were just looking to see if the care

5   provided was consistent with that, which meant what

6   medications were being used.  You know, just in general,

7   was the chronic care consistent with what those results

8   were.

9       Q.    BY MR. SPECTER:  Okay.  In how many cases of

10  the 80 was the A1C consistent with the HEDIS figures?

11  How many cases?

12      A.    I don't have that specific stat.

13      Q.    And you don't have it for blood pressure

14  either, correct?

15      A.    I have the general ones that we got through

16  the HEDIS analysis.

17      Q.    No.  I'm talking about in your record review.

18  How many of the 80 cases?

19      A.    We didn't do that review that way.

20      Q.    Okay.  Let's go to page 91.  98, I'm sorry.

21      A.    Okay.

22      Q.    Oh, wait a minute.  We just did that already,

23  98.

24            Oh, here's another question on that same

25  patient.  So do you know what the medication called

167

1                    SIGNATURE PAGE

2          I, OWEN JOSEPH MURRAY, D.O., MBA, a deponent
   exercising my right to read and sign my deposition taken
3  on October 26, 2021, place my signature hereon and make
   the following changes on this _____8th___ day of
4  __November_____, 2021.

5          (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

7                              OWEN JOSEPH MURRAY, D.O., MBA

8  PAGE   LINE   READS        CHANGE TO        REASON

9   149    11   three         there

10  ____   ____  _____

11  ____   ____  _____

12  ____   ____  _____

13  ____   ____  _____

14  ____   ____  _____

15  ____   ____  _____

16  ____   ____  _____

17  ____   ____  _____

18  ____   ____  _____

19  ____   ____  _____

20  ____   ____  _____

21  ____   ____  _____

22  ____   ____  _____

23  ____   ____  _____   NOV 10 2021

24  ____   ____  _____

25  ____   ____  _____

168

1  STATE OF ARIZONA    )
   COUNTY OF MARICOPA )
2
            BE IT KNOWN that the foregoing proceedings were
3  taken before me; that the witness was duly sworn by me;
   and that said transcript is a full, true, and accurate
4  record of the proceedings all done to the best of my
   skill and ability; that the proceedings were taken down
5  by me in shorthand and thereafter reduced to print under
   my direction.
6

7       [X] Review and signature was requested.

8       [ ] Review and signature was waived.

9       [ ] Review and signature was not required.

10

11          I FURTHER CERTIFY that I have complied with the
   ethical obligations set forth in ACJA 7-206(F)(3) and
12 ACJA 7-206(J)(1)(g)(1) and (2).

13          Dated this 31st day of October, 2021.

14

15                              _____

16                              Carolyn T. Sullivan, RPR
                                Certified Reporter
17                              Arizona CR No. 50528

18          I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
   has complied with the ethical obligations set forth in
19 ACJA 7-206.

20

21

22

23 _____

24 GLENNIE REPORTING SERVICES, LLC
   Registered Reporting Firm
25 Arizona RRF No. R1035