Exhibits to Declaration of Daniel C. Barr
in Support of Response to Defendants' Motion to Preclude Plaintiffs' Rebuttal Witness

| Exhibit | Description | Type of Record |
|---|---|---|
| Ex. A | Rough transcript from the trial on the morning of November 16, 2021 | **Public** |
| Ex. B | Defendants' revised witness schedule, dated November 17, 2021 | **Public** |
| Ex. C | Rough transcript from the trial on the afternoon of November 16, 2021 | **Public** |
| Ex. D | Rough transcript from the trial on the afternoon of November 17, 2021 | **Public** |
| Ex. E | Rough transcript from the trial on the afternoon of November 18, 2021 | **Public** |
| Ex. F | Expert Report of Grant C. Phillips, M.D., dated October 22, 2021 | **Under Seal** |
| Ex. G | Rough transcript from the trial on the morning of November 3, 2021 | **Public** |
| Ex. H | Excerpt from Defendants' Second Supplemental Pretrial Disclosure Statement, dated October 15, 2021 | **Public** |
| Ex. I | Final transcript from the trial on the morning of November 19, 2021 | **Public** |
| Ex. J | Curriculum Vitae of Catherine M. Knox MN, RN, CCHP-RN | **Public** |
| Ex K | December 1, 2021 email from Dan Struck, attorney for Defendants | **Public** |

# Exhibit A

REALTIME UNEDITED TRANSCRIPT - ROUGH DRAFT ONLY!                1

1                              PLEASE NOTE:

2

3            This uncertified rough draft is an unread, unedited,
   rough draft copy of the following proceedings.  It is NOT a
   certified transcript and CANNOT be quoted from in a pleading or
4  in any other document.  The final, certified transcript to
   follow can be quoted from.

5

6            Please be aware that the unedited, uncertified rough

7  draft transcript may contain untranslated steno, reporters'

8  notes to themselves, misspelled proper names, nonsensical

9  English word combinations, and/or mistranslated English words.

10 These are not mistakes made by the reporter but are caused by

11 the computer interpretation of the steno strokes and by the

12 limitations imposed by writing the English language

13 phonetically.  All such entries will be corrected on the final,

14 certified transcript.

15           The page and line numbers may change slightly in
   production of the final transcript; however, the time codes
16 will remain the same.

17 CV-12-00601 JENSEN V. SHINN 11-16-21 MORNING SESSION

18 WITNESS DAVID SHINN

19 WITNESS LARRY GANN

20

21

22

23

24

25

DIRECT EXAMINATION

8:46:42AM    Q.  Does the Bureau of Prisons when you were there, did they seek accreditation from the National Commision on Correctional Health Care?

A.  Yes, they did.  When I left the Bureau of Prisons, they
8:46:53AM    were 100 percent accredited through the NCCHC and considered that the gold standard of accreditation for health care accreditation.

Q.  What did you do once you left that position?

A.  From my first tour in D.C., I moved on to a facility in
8:47:17AM    central valley in California up by Merced.  I was an associate warden, which was second in command of that facility and had one of the most challenging assignments I had in my career.

I walked into an institution that struggled with staff, based on its location, and walked into a health care
8:47:42AM    department, at that time, in an area which I had no background whatsoever.  I have no medical training, anything on that side, however, as I described from my previous experience, I do have an analytical ability and the ability to lead people through processes.

8:48:01AM    They were struggling both from a staffing perspective and a leadership perspective at that location.  I spent a lot of time working with the leader of that unit.  The staff were not getting what they needed to follow that leader.

We spent a lot of time correcting those behaviors and
8:48:19AM    also working directly with the staff to improve the care at

DIRECT EXAMINATION

9:30:13AM   discussions on people's beliefs that staffing should be added,

and I believe we need the appropriate number of staff to

provide quality health care.  I think we have that, and we can

have that at 100 percent through some of the techniques that I

9:30:31AM   mentioned, we can certainly provide that, and we are providing

that in a lot of ways today.

The other challenges, some of the court ordered

stipulation measures.  I have asked from the very beginning to

be 100 percent in every one of these at every location.

9:30:50AM   Often we are at 90 percent or better of those, and at

many locations, as Dr. Stern reported prior to my arrival, we

were at 100 percent of those.

And some of those could have -- some of those measures

were fully met, but it is my desire and my ask of our partner

9:31:13AM   to be 100 percent at every location every day.

Q.  Are your facilities accredited by the NCCHC?

A.  Yes, they are.  All of our facilities throughout the state

are accredited through NCCHC.  And as I mentioned, this is a

standard also that the Bureau of Prisons uses throughout the

9:31:41AM   entire nation.

Q.  Is that important to you?

A.  It is very important.  We need folks who are in this

business, who are professionals, who have that professional

depth of experience, to come in and look and let us know where

9:31:58AM   we stand in this, and that's exactly what we've gotten through

9:32:03AM   NCCHC.

We are also in the process of beginning accreditation through the American Correctional Association, who will come in and look at health care throughout the state as well.

9:32:14AM   We have literally begun the preparations at the Safford complex, and I think Sunday of this week, the American Correctional Association sent their staff to that location to provide some hands-on training, and we hope to complete that accreditation this coming calendar year.

9:32:36AM   Q.  One of the things with respect to the closing of the Florence facility that occurred was the closing down of the Kasson unit.  Can you tell us about that?

A.  Sure.  I think there have been many benefits to the deactivation of Florence.  I think one of the greatest

9:33:01AM   opportunities we had was to take the offenders at Kasson and put them in a much more conducive environment at the prison complex at Tucson in the Rincon unit.

We have a tremendous staff at Tucson and some great mental health professionals there as well.  The space is very

9:33:27AM   different that than that of Kasson.

We have exponentially more classroom space there.  The classrooms themselves are a little bit more user friendly.  And you literally go from one area to an entirely separate area for program.

9:33:44AM   So it is not one enclosed module.  You literally go

# Exhibit B

Daniel P. Struck, Bar No. 012377
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1695
dstruck@strucklove.com
rlove@strucklove.com
tbojanowski@strucklove.com
nacedo@strucklove.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Shawn Jensen, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. CV-12-00601-PHX-ROS<br><br><br>**DEFENDANTS' REVISED WITNESS SCHEDULE** |

Defendants hereby file a revised witness schedule listing the amount of time Defendants expect to spend on direct and redirect examination, and the amount of time Plaintiffs expect to spend on cross-examination of Defendants' witnesses. (*See* Dkt. 4112.)

**DEFENDANTS' WITNESSES**

| | Direct | Cross | Redirect |
|---|---|---|---|
| Monday, November 15, 2021 | | | |
| Warden Jeffrey Van Winkle | 1.5 hours | 1 hour | 15 minutes |
| Tuesday, November 16, 2021 | | | |
| Director  David Shinn | 40 minutes | 45 minutes | 15 minutes |

| Larry Gann | 1.5 hours | 1 hour | 30 minutes |
|---|---|---|---|
| **Wednesday, November 17, 2021** | | | |
| Larry Gann *(continued)* | | | |
| Dr. Bobbie Pennington-Stallcup | | | |
| Dr. Elijah Jordan | 45 minutes | 30 minutes | 15 minutes |
| **Thursday, November 18, 2021** | | | |
| Warden James Kimble | 1 hour | 30 minutes | 15 minutes |
| Jeffrey Van Winkle *(continued)* | | | |
| Dr. Grant Phillips | 45 minutes | 30 minutes | 15 minutes |
| **Friday, November 19, 2021** | | | |
| Dr. Joseph Penn | 1 hour | 1.5 hours | 45 minutes |
| Dr. Antonio Carr | 1 hour | 45 minutes | 15 minutes |
| Tom Dolan *(by video)* | 45 minutes | 30 minutes | 15 minutes |
| **Tuesday, December 7, 2021** | | | |
| Dr. Wendy Orm | 45 minutes | 30 minutes | 30 minutes |
| Katie Masters | 30 minutes | 15 minutes | 10 minutes |
| Bianca Mocha | 30 minutes | 15 minutes | 10 minutes |
| Dr. Owen Murray | 45 minutes | 2 hours | 1 hour |

DATED this 17th day of November, 2021.

STRUCK LOVE BOJANOWSKI & ACEDO, PLC


By /s/ Daniel P. Struck
    Daniel P. Struck
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alisha Tarin-Herman   atarinherman@perkinscoie.com

Alison Hardy   ahardy@prisonlaw.com

Asim Dietrich:   adietrich@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Austin C. Yost:   ayost@perkinscoie.com; docketPHX@perkinscoie.com

Corene T. Kendrick:   ckendrick@aclu.org

Daniel Clayton Barr:   DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:   dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:   dspecter@prisonlaw.com

Eunice Cho   ECho@aclu.org

Jared G. Keenan   jkeenan@acluaz.org

John Howard Gray:   jhgray@perkinscoie.com; slawson@perkinscoie.com

Karl J. Worsham:   kworsham@perkinscoie.com; docketphx@perkinscoie.com

Kathryn E. Boughton:   kboughton@perkinscoie.com; docketphx@perkinscoie.com

Kelly Soldati   ksoldati@perkinscoie.com; docketphx@perkinscoie.com

Maria V. Morris   mmorris@aclu.org

Maya Abela   mabela@azdisabilitylaw.org

Mikaela N. Colby:   mcolby@perkinscoie.com; docketphx@perkinscoie.com

Rita K. Lomio:   rlomio@prisonlaw.com

Rose Daly-Rooney:   rdalyrooney@azdisabilitylaw.org

Sara Norman:   snorman@prisonlaw.com

Sophie Jedeikin Hart   sophieh@prisonlaw.com

Victoria Lopez:   vlopez@acluaz.org

1        I hereby certify that on this same date, I served the attached document by U.S. Mail,
2    postage prepaid, on the following, who is not a registered participant of the CM/ECF
     System:

3        N/A

4                        /s/     Daniel P. Struck

# Exhibit C

DIRECT EXAMINATION (CONT'D) - LARRY GANN - ROUGH DRAFT

-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-

**\*\* ROUGH DRAFT DISCLAIMER \*\* ROUGH DRAFT DISCLAIMER \*\***

**PLEASE NOTE:**

This is an UNCERTIFIED ROUGH DRAFT transcript.

IT IS NOT a certified transcript and CANNOT be

quoted from in a pleading or in any other document.  If you

would like to quote from or copy/paste text from this

hearing, please order a complete or partial certified

transcript.  The certified transcript can be quoted from in

any pleading or other document.

-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-

CV12-00601 JENSEN V SHINN - TRIAL DAY 10 P.M. SESSION

13:09 13:09 13:09

13:09:44

**LARRY GANN,**

recalled as a witness herein, after having been previously

sworn or affirmed, was examined and testified as follows:

D I R E C T   E X A M I N A T I O N   CONTINUED

13:09:47      THE COURT:  All right, let's proceed.

MR. BOJANOWSKI:  Thank you, Your Honor.

BY MR. BOJANOWSKI:

Q   Mr. Gann, we had left off before the break we were

talking about PM 44 and how it was that the department found

13:10:03   out that there were some issues with that and then the

\*\* UNCERTIFIED ROUGH DRAFT \*\* UNCERTIFIED ROUGH DRAFT \*\*

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:40:49   is concerned?

A   Absolutely.  I'll get --

Q   You follow up on that.

A   Every one of them.  Yes.

13:40:54   Q   And how do you do that?

A   Personally through my staff.  We also have things that

will come from different avenues, through directors,

projects.  Like I said constituent services is a resource for

families and patients as well as friends and family line but

13:41:11   it is not been rare at all for my phone to ring and it be a

family member on the other end.

Q   Mr. Gann are you familiar with NCCHC.

A   I am.

Q   I was once an auditor.  I was trained as a auditor for

13:41:57   them twice although I never actually audited a facility based

on the amount of travel I had to do with NaphCarephCare but

I've been to many of their conventions and many of their

lectures.  It's the one place a correctional healthcare

professional can go to to learn best practices that are going

13:42:12   on throughout the correctional industry in our nation.

Q   Have you been trained by the NCCHC?

A   I was trained as an auditor by them, yes, two different

occasions.

Q   Do you utilize any of their auditing techniques in your

13:42:25   current position?

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:42:26   A   I do.  And to be honest with you their standards are best practices throughout the industry.  I was a little disheartened from some of the testimony I heard from plaintiffs expert to hear NCCHC was nothing more than policy
13:42:41   driven policy organization that was checking off on policies. The foremost fundamental mission of the NCCHC is to ensure the quality of the healthcare provide.  It is not simply a quantitative practice.

Q   What do you mean by that?

13:42:56   A   They go through, look at each standard that's actually in place and they're not just looking for the policy and procedures.  As a matter of fact part of the prep for NCCHC is to provide organizations policy and procedure with the facilities policies and procedure because they're often not
13:43:13   the same entities we have Centurion and ADC R.  The policies have to match.  You have to so examples of those policies. And then once they see how those policies are being followed in written form they actually go out and tour the facilities to ensure there's a consistent manner of this approach going
13:43:32   on day to day.

Q   So it's more than just a policy review.

A   Absolutely.

Q   Have you been a part of an investigation by the NCCHC or audit I should say?

13:43:45   A   Have I been through auditing process for a survey, that's

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:43:48    what it is typically called, going through the survey

process.  I have honestly been through more than I can

remember.

Q    Okay.  Can you name, like, facilities where it's occurred

13:43:58    that you've participated in the process?

A    Every facility that I ran at NaphCare was accredited.

All of our facilities are accredited and have been for over

20 years except for Florence that was just accredited in

2015.

13:44:15    Q    Do the surveyors interview inmates as part of their

review?

A    Absolutely.  Inmates, staff.  They want to be walked

through very intricate details from every one of your process

from intake to discharge planning yes.

13:44:34    Q    Do they review medical charts?

A    They do.  Current care, continuity of care purposes,

absolutely.

Q    What happens if they find something wrong?

A    Well, they're looking for failures and if it seems like

13:44:47    the spirit of the standard is not being met and followed

accordingly, as a part of your day to day practice, they'll

fail you on the starred adder.  If it's an essential standard

you can't fail anything.  It must be 100 percent.  If it's on

important standard you have to score at least 85 percent on 0

13:45:07    the important standards.

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:45:08   Q    Is it 85 percent overall or 85 percent on each standard?

A    100 percent on every essential standard and overall of the important standards you can only fail 15 percent of those standards.

13:45:34   Q    Can you describe for the courts categories of standards involved?

A    The categories often will include of course access to care, making sure access to care is there.  You're also going to be looking at offsite referrals chronic cares medication

13:45:49   administration.  It's going to be really the basics.  It's common sense approach but at the same time it's ensuring that a constitutional level of care is met at these facilities.

Q    Is there a staffing component that is looked at?

A    There is.  You get asked that question a lot.  How come

13:46:07   NCCHC doesn't tell me how many staff to have in my infirmary I was asking that question when was young director of nursing.  I had 65 patients in my infirmary at Clark county and I called the NCCHC I asked how what should the staffing ratio be I came from the hospital and I'm about one to eight

13:46:26   and given times on med surge or one to four if I'm in the ER with the triage services as well.  They won't particularly give you a staffing ratio and that's because every facility is laid out differently, logistics are different.

Just because I had 65 patients in that infirmary

13:46:45   doesn't mean that they were having acute care.  A lot had

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:46:49 mobility issues, had inmate workers that could help with

mobile tee issues, peer partner led groups.  Some had issues

where they had respiratory issues and had to be oxygen

concentrating device.  So it's very important to look at

13:47:05 workload.

So the best way to determine if an infirmary is

properly staffed is if the nursing care that is in there can

actually properly document and round on the patients on a

daily basis.

13:47:27 MR. BOJANOWSKI:  One moment, Your Honor.

Pull up defendants 3305.

Q   Mr. Gann would you have a look at defendants Exhibit 3305

and let me know if you recognize that.

THE COURT:  And this has been admitted?

13:48:05 MR. BOJANOWSKI:  I don't believe it has.

THE COURTROOM DEPUTY:  I'll check.

MR. BOJANOWSKI:  It has not.

THE COURT:  Thank you.

BY MR. BOJANOWSKI:

13:48:14 Q   Do you recognize this document Mr. Gann?

A   Looks like summary page for NCCHC survey for Arizona

State prison complex Douglas from February 2019.

Q   All right.  And is this summary page then a part of a

larger report?

13:48:32 A   It is.  They'll actually break out every standards.  Some

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:48:35    standards may come back with verification being required.

That means you have to do corrective action plan if a

standard's not met and you have to put that corrective action

plan into place show that your corrective action plan has

13:48:49    been successful to get full accreditation.

Q    Go ahead and keep looking at the different pages of this

particular document?

THE COURT:  How many pages do we have here?

MR. BOJANOWSKI:  To be honest with you, I don't

13:49:05    know, Your Honor.

THE COURT:  I see page 3.

MR. BOJANOWSKI:  58 pages.

THE COURT:  You want him to look at it all?

MR. BOJANOWSKI:  No, Your Honor.  I want to lay

13:49:15    enough foundation.  We have the NCCHC certifications and

backup documentation that we would seek to admit into

evidence.

THE COURT:  Let me ask, counsel, do you have any

objection?

13:49:31    MS. KENDRICK:  Yes, we do, on hearsay grounds.

THE COURT:  Okay.  I'm going to sustain it so far.

BY MR. BOJANOWSKI:

Q    All right.  So do you receive these documents and reports

from the NCCHC after they do their survey?

13:49:47    A    Yes.  Absolutely.  Copy is often sent to the vendor and a

** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:49:51  copy is always sent to the warden of the facility.

Q   Is this part of your monitoring of the contract between Centurion and ADCRR?

A   It's required all our facilities maintain NCCHC
13:50:05  accreditation, yes.

Q   So any time there's a survey done and accreditation is issued, the results are sent to the monitoring bureau?

A   We have a binder that keeps track of all of them yes.

Q   And you specifically monitor that compliance as part of
13:50:20  monitoring the contract obligations of Centurion?

A   If there are opportunities we're going to follow up with contracted vendor to ensure those opportunities are remedied deed and full accreditation can be maintained.

Q   Is this a true and accurate copy of the results of the
13:50:36  NCCHC survey at this facility?

A   Yes.

Q   Is this record regularly kept in the business of the monitoring department?

A   It is.

13:50:44  Q   Is it part of your job duties to ensure that that record is maintained as business record of ADCRR?

A   It is.  It's part of the contract with Centurion or any other vendor that comes forward.

          MR. BOJANOWSKI:  Your Honor, we move admission of
13:50:57  the document.

     ** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:50:58        MS. KENDRICK:  We still object under hearsay.  This
is nod a ADCRR business record and it does not meet the
definition under Rule 8037.

                THE COURT:  Sustained.

13:51:19        MR. BOJANOWSKI:  May I have one moment, Your Honor?
                THE COURT:  Yes.

BY MR. BOJANOWSKI:

Q   Mr. Gann, have a look at measure P-C-07 staffing do you
see that?

13:52:38  A   I do.

Q   Are you familiar with this particular measure?

A   Yes.

Q   And what is this measure looking to establish?

A   It's basically establishing staffing is correct in order
13:52:49  to basically provide the quality of care throughout the
rigorous standards of the national correctional healthcare.

                THE COURT:  I'm sorry to interrupt, but what
document are we looking at?

                MR. BOJANOWSKI:  We're looking at the same document.
13:53:01  It's just, I don't know the page number but it's --

                THE COURT:  Same document where I sustained the
objection for admissibility?

                MR. BOJANOWSKI:  Right.

                THE COURT:  So okay well you can ask him questions
13:53:15  about it, I suppose but the document is not admitted.

        ** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

DIRECT EXAMINATION (CONT'D) – LARRY GANN – ROUGH DRAFT

13:54:16  components in correctional healthcare facility that is being

surveyed by the NCCHC meets accreditation process from the

constitutionality of the correctional healthcare provided in

that facility.

13:54:31          MS. KENDRICK:  Objection, move to strike.

               THE COURT:  Sustained.

BY MR. BOJANOWSKI:

Q    And?

               THE COURT:  Ask another question.

13:54:37  BY MR. BOJANOWSKI:

Q    You're familiar with the certification of the 10

facilities in the ADCRR system.

A    I am.

Q    They all meet this particular P-C-07 measure.

13:54:49          MS. KENDRICK:  Objection.

               THE WITNESS:  They do.

               MS. KENDRICK:  Hearsay again.

               THE COURT:  Sustained.

Q    ADCRR facilities are certified by the NCCHC.  Is that an

13:55:13  accurate statement?

A    That is correct.  Every one of our facilities.

Q    In order to be certified, do they have to pass the

measures that are set forth in the auditing tool?

A    They do.

13:55:27  Q    And has that occurred?

          ** UNCERTIFIED ROUGH DRAFT ** UNCERTIFIED ROUGH DRAFT **

# Exhibit D

REALTIME UNEDITED TRANSCRIPT - ROUGH DRAFT ONLY!

1                               PLEASE NOTE:

2

3          This uncertified rough draft is an unread, unedited,
     rough draft copy of the following proceedings.  It is NOT a
     certified transcript and CANNOT be quoted from in a pleading or
4    in any other document.  The final, certified transcript to
     follow can be quoted from.

5

6          Please be aware that the unedited, uncertified rough

7    draft transcript may contain untranslated steno, reporters'

8    notes to themselves, misspelled proper names, nonsensical

9    English word combinations, and/or mistranslated English words.

10   These are not mistakes made by the reporter but are caused by

11   the computer interpretation of the steno strokes and by the

12   limitations imposed by writing the English language

13   phonetically.  All such entries will be corrected on the final,

14   certified transcript.

15          The page and line numbers may change slightly in
     production of the final transcript; however, the time codes
16   will remain the same.

17   CV-12-00601 JENSEN V. SHINN 11-17-21 AFTERNOON SESSION

18   WITNESS BOBBIE PENNINGTON-STALLCUP

19   WITNESS ELIJAH JORDAN

20   WITNESS JEFFREY VAN WINKLE

21

22

23

24

25

REDIRECT EXAMINATION                          40

2:07:42PM    BY MS. HESMAN:

             Q.  Dr. Stallcup, are you familiar with the special needs tab

             in eOMIS?

             A.  Yes.

2:07:47PM    Q.  And for this particular inmate, it's true that under

             special needs, this individual has a hearing aid, correct?

             A.  Yes.

                    MR. FATHI:  Objection, leading, Your Honor.

                    THE COURT:  Sustained.  She already answered it, but

2:08:01PM    try not to lead.

                    MS. HESMAN:  Understood, Your Honor.

             BY MS. HESMAN:

             Q.  Dr. Stallcup -- you can take this down now, thank you --

             there were questions, a variety of questions regarding

2:08:15PM    interpretation services.  What's your understanding pursuant to

             NCCHC of when it is permissible to have an officer provide

             interpreter services?

             A.  So an officer can provide interpreter services in an

             emergency.

2:08:36PM    Q.  You were also asked questions regarding evaluations before

             being admitted to max custody, do you recall that?

             A.  Yes.

             Q.  And I believe you testified that before admission, there's

             not an evaluation but can you explain when there is an

2:08:52PM    evaluation?

UNITED STATES DISTRICT COURT

# Exhibit E

1    November 18, 2021 at 1:03 p.m.

2        (Resuming with cross-examination of Warden Van Winkle)

3            THE COURT:  Ms. Morris, you may proceed.

4    Q.  (BY MS. MORRIS)  Mr. Campbell, could we please bring up

5    Plaintiffs' Exhibit 1687.

6            Could we actually start at the first page, Page 1.

7            Plaintiffs' Exhibit 1687 is the Florence-Kasson unit

8    maximum custody notebook for July of 2021, correct?

9    A.  Yes, ma'am.

10   Q.  And that's after the post COVID reopening, correct?

11   A.  Yes, ma'am.

12   Q.  Could we go to Page ADCRR00213475.  Okay.  Here we are

13   looking at the monitoring week was actually July 24th through

14   30th, correct?

15   A.  Yes, ma'am.

16   Q.  And this is an individual who was at Kasson?

17   A.  Correct.

18   Q.  In step 3?

19   A.  Correct.

20   Q.  And this out-of-cell tracking form indicates that he was

21   offered recreation in the 10-by-10s, correct?

22   A.  Correct.

23   Q.  Which is not compliant with DO812?

24   A.  I'd actually have to look at the entire month, so I believe

25   in the entire month they can be offered the large rec

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

DIRECT EXAMINATION

1    Q.   And do you do that on a continuous basis systemwide?

2    A.   Yes.  So we -- we have a meeting called the JMRC mortality

3    report meeting, JMRC stands for joint mortality review

4    committee and it's a monthly meeting that will be convening and

5    it includes members of my team as well as Centurion's team,

6    Dr. Orm and their regional head of CQI to ensure that any

7    corrective action plan we put into place with the mortality

8    review is getting addressed.

9    Q.   Is there a peer review process in place as part of CQI?

10   A.   Yes.

11   Q.   Could you explain to the Court what that is and how it

12   works.

13   A.   A peer review process is the -- it's chart reviews.  And

14   one-on-one conversations by the supervisor to the employee.  So

15   in the example of a medical provider, it would be the site

16   medical director reviewing the nurse practitioner's notes and

17   doing this on a regular basis.  It's typically done annually

18   and as part of the annual review then there's a face to face

19   meeting to go over the results.

20   Q.   And is this another one of those teaching moments

21   so-to-speak, the peer review process?

22   A.   It's a teaching moment.  It's a built in process.  It's

23   mandated by the NCCHC as part of their -- you know, their

24   accreditation process.  But it's not a be all end all as far as

25   supervision, because it kind of forms of bare minimum of

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

DIRECT EXAMINATION

1   supervision.

2          Within the MSTM there's also the peer review, the

3   chart reviews that are done monthly by site medical directors

4   to assure quality and that's done on a regular basis with the

5   intention of giving immediate feedback to people rather than

6   waiting for their annual review.

7   Q.  Are you familiar with the chronic conditions that exist in

8   the ADCRR system?

9   A.  Yes.

10  Q.  And chronic conditions are again dealt with as part of the

11  MSTM?

12  A.  Yes.

13  Q.  And what does the MSTM in a general sense set out with

14  regard to chronic conditions?

15  A.  There's a chapter in the MSTM that talks about the approach

16  to chronic conditions.  Chronic conditions being conditions

17  that generally need to be managed long term and don't have a

18  defined cure.  So within that chronic condition framework we'd

19  be looking at diabetes, hypertension, some mental health

20  disorders, seizure disorders, cardiac conditions.  The list

21  goes on.  It's not really a limited defined list.  But what the

22  MSTM states is that these conditions need to be followed by a

23  provider and that there need to be regular visits with labwork,

24  renewal of medications which applies in most of these cases,

25  and then appropriate specialty referrals.

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

### DIRECT EXAMINATION

1    A.  Yes.

2    Q.  How does Arizona compare with other states?

3    A.  Arizona's at the leading age of hepatitis C treatment for

4    inmates.

5         MS. HART:  Objection.  That opinion was not included

6    in this expert declaration.

7         THE COURT:  I can't hear you.

8         MS. HART:  Sorry that opinion was not included in his

9    expert declaration regarding Hep C there was no comparison to

10   other states disclosed.

11        THE COURT:  If that's the case, it's excluded.

12   Q.  (BY MR. BOJANOWSKI)  Do you have an opinion with regard to

13   Centurion's program for treatment of Hep C?

14   A.  It's an excellent program.  It's proactive.  It's going to

15   have tangible benefits on the current health of inmates as well

16   as the inmates health for the next couple of decades.

17   Q.  Does it represent the best practices of medical care in the

18   industry?

19   A.  Yes.

20   Q.  You're familiar with the NCCHC?

21   A.  Yes.

22   Q.  How are you familiar with the NCCHC?

23   A.  I'm an NCCHC surveyor.  I also do consulting work through

24   their off shoot organization called NCCHC resources

25   incorporated and I've also been the participant in or the

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

DIRECT EXAMINATION

1   recipient of multiple NCCHC surveys.

2   Q.   Can you describe what the NCCHC does.

3   A.   Yes.   The NCCHC is the preeminent accrediting body for

4   correctional institutions in the United States.   They do

5   surveys.   Their accreditation process involves doing an initial

6   survey if a facility has never had a survey before, if a -- if

7   it's a reaccreditation, it's a survey that takes place every

8   three years.   They send an on site team of experts in their

9   fields, and that team been consist of nurses, a physician,

10   possibly mental health if it's a large enough facility, and

11   possibly an administrator.   And under the leadership of a lead

12   surveyor, analysis of policies and procedures is done, review

13   of meeting minutes, and then importantly on site tours of the

14   facilities, discussions with custody leadership and custody

15   staff, and interviews with the inmate population; in advance

16   after NCCHC survey and as part of the preparation, postings are

17   put throughout the facility at the housing units so that the

18   inmate population knows what to expect and can request a face

19   to face interview with an NCCHC surveyor.

20   Q.   Have you in your experience participated in a number of

21   these surveys?

22   A.   Yes.

23   Q.   Have you spoken to inmates about their concerns?

24   A.   I have.

25   Q.   And how is that information utilized in the analysis?

UNITED STATES DISTRICT COURT

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

DIRECT EXAMINATION

1  A.  All of the information is put together into a report and

2  there's an exit conference that takes place.  And some

3  facilities fill the whole room with multiple members of the

4  team.  Other facilities may just have a couple of members

5  present.  But this is a time then to go piece by piece through

6  each -- each of the standards in the NCCHC book and to talk

7  with the facility candidly about what they're doing well and

8  what they may need improvement on.  And then in addition to

9  that, then the written results of the survey go to an NCCHC

10  accreditation committee and that committee meets every two

11  months.  I'm a member of that committee P committee meets every

12  two months and decides on based on the number of standards that

13  passed versus didn't pass will decide on whether a facility

14  gets accredited or reaccredited or possibly different action.

15  Q.  As part of the process, is there a chart review that

16  happens?

17  A.  Yes.  The physician conducts chart reviews.

18  Q.  And what's the purpose of doing that?

19  A.  It's to assess the quality of care that's given overall.

20  You can tell a lot from a chart review.  One, how readable or

21  accessible is the chart?  How user friendly is the chart for

22  the person who needed to input data and order things and get a

23  snapshot of this patient's condition?  And then it gives an

24  idea of the quality of care that's being given.  Is the quality

25  of the documentation good?  Can someone else pick up that chart

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

DIRECT EXAMINATION

1  and understand what's going on with the patient or do you have

2  to sift through it?

3  Q.  So there's a quality of care component of the analysis that

4  goes on with the surveyors?

5  A.  Ultimately the main gist as I go in to do surveys is

6  quality of care for the patients through all those different --

7  all the different items in the NCCHC standards book comes down

8  to how is the care for the patient?

9  Q.  How about determining staffing adequacy?  What is done to

10  make that determination?

11  A.  NCCHC has written the standards to not dictate specific

12  staffing ratios.  That's by design.  Because NCCHC

13  accreditation applies to facilities in small remote place that

14  is have ten beds and it also applies to large complexes with

15  multiple thousands of inmates.  So to dictate a staffing plan

16  in their standards book is -- it's not a one size fit all.  But

17  in order to meet these standards and to practice high quality

18  care, a facility has to have appropriate staffing.

19  Q.  How did you evaluate whether that's true or not?

20  A.  It sometimes comes down to the granular level.  Some

21  facilities that we survey have -- there was a survey that I did

22  in which it was a prison in which all of the dialysis for the

23  patients were housed in this one facility.  The staffing for

24  that facility is going to be much different than a complex that

25  doesn't even have an I PC.  So it does come down to are the --

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

DIRECT EXAMINATION

1   are the quality measures met, and it comes down to passing each

2   of those items.

3   Q.  Do the -- do the surveyors talk to staff and ask them if

4   staffing is adequate?

5   A.  Yes.

6   Q.  Do they look at staffing plans?

7   A.  They do look at staffing plans.  That's part of the final

8   report that's submitted.  And ultimately these one-on-one

9   conversations -- and as a physician surveyor I have one-on-one

10  conversations with physicians, PAs, and nurse practitioners,

11  and sometimes psychiatric providers.  I ask them about the

12  good -- the high quality aspects of the facility that they're

13  working in, and I also ask them about what -- where is there

14  room for improvement?  And so if there are staffing concerns,

15  that comes up in these conversations.

16  Q.  Are all ten facilities within ADCRR certified by the NCCHC?

17  A.  Yes.

18  Q.  How many facilities across the country are certified with

19  the NCCHC?

20  A.  Approximately 500.

21  Q.  Is that the majority of facilities in the country?

22  A.  It's the minority of the facilities.  But I ask this

23  question multiple sometimes how many -- what's in the

24  denominator?  How many facilities are there?  It's an undefined

25  number.  I can say that the number that stands out that's been

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE
## DIRECT EXAMINATION

1    quoted to me but not officially is about 4,500.  So 500

2    facilities out of 4,500 are NCCHC accredited.

3    Q.  Is the NCCHC certification, is that some evidence that the

4    facility is meeting the community standard of care with regard

5    to the provision of healthcare?

6    A.  Yes.

7              MS. HART:  Objection.  This calls for expert

8    testimony.

9              THE COURT:  Sustained.

10   Q.  (BY MR. BOJANOWSKI)  Dr. Phillips, are you familiar with

11   nursing nets?

12   A.  Yes.

13   Q.  What are they?

14   A.  They're nursing encounter tools?

15   Q.  And is that something that's in eOMIS.

16   A.  Yes.

17   Q.  Is it embedded in eOMIS?

18   A.  Yes, it is.

19   Q.  And I mean what generally is it to a layperson?  I mean I'm

20   sure you see it all the time, but for somebody like me, what is

21   this nursing net thing look like and what does it do?

22   A.  A net is a standardized form that nurses use based on a

23   patient's complaint for a face-to-face visit.  So it includes

24   the at the top of the visit and there are a number of different

25   kind of net that is are used.  There might be one for sore

UNCERTIFIED UNQUOTABLE UNCERTIFIED UNQUOTABLE

DIRECT EXAMINATION

1    to face within 24 hours of submitting a health needs request,

2    and that's an NCCHC standard and it's also -- it's clearly

3    access to care issue.

4    Q.  All right.  In the ADCRR system, what level of licensure is

5    required to be seen within the 24-hour time frame?

6    A.  Specific to the ADCRR system, it's an RN level or above

7    that must see the patient.

8    Q.  And what is the NCCHC standard for the licensure level that

9    would be appropriate to be seen?

10   A.  They don't -- they don't dictate that it's an RN so it

11   could be an LPN.

12   Q.  As a result of the discussions with Dr. Salazar, is there a

13   plan that had been developed back a few months ago to address

14   this situation?

15   A.  Sure.  And just to be clear, I've had discussions with

16   Dr. Salazar as well as other site leadership at Tucson

17   including members of my team.  But some of the solutions that

18   were put forth included doing telehealth visits with RNs from

19   other complexes as well as working on hiring because ultimately

20   this is a staffing issue, and of course it's I guess it's

21   probably no news flash that nursing staffing is difficult

22   anywhere, wet in custody or outside of custody.  So getting

23   nurses to staff the Tucson complex has been especially

24   challenging.  So we've -- we've talked with Centurion

25   leadership, regional leadership, and found out about some of

# Exhibit F
## Filed Under Seal